UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

LEROY "BUD" BENSEL, et al.,

         Plaintiffs,

     v.

ALLIED PILOTS ASSOCIATION et
al.,

         Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 02-2917 (JEI)

**OPINION**

**APPEARANCES:**

Lisa J. Rodriguez, Esq.
Nicole M. Acchione, Esq.
TRUJILLO, RODRIGUEZ & RICHARDS, LLC
258 Kings Highway East
Haddonfield, NJ 08033
         Counsel for Plaintiffs

Martin M. Green, Esq.
Allen P. Press, Esq.
Jonathan Andres, Esq.
GREEN JACOBSON, P.C.
Suite 700 Pierre Laclede Center
773 Forsyth Boulevard
St. Louis, MO 63105
         Counsel for Plaintiffs

John C. Connell, Esq.
Alexander Nemiroff, Esq.
ARCHER & GREINER
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033-0968
         Counsel for Defendants

Daniel M. Katz, Esq.
Jason M. Whiteman, Esq.
KATZ & RANZMAN, P.C.
4530 Wisconsin Ave., N.W. Suite 250
Washington D.C. 20016
         Counsel for Defendants

**IRENAS**, Senior District Judge:

This Second Amended Complaint arises under the provisions of the Railway Labor Act, 45 U.S.C. §§ 151-188.  Plaintiffs, a class of former TWA pilots, allege the Air Line Pilots Association ("ALPA") breached its duty of fair representation owed to them during the TWA, Inc.-American Airlines assets acquisition.  The gravamen of Plaintiffs' complaint is that ALPA's underlying conflict of interest in trying to merge unions with the American pilots, infected the entire process of the assets acquisition so much so that ALPA breached its duty of fair representation.  Presently before the Court is Defendant's Motion for Summary Judgment.  For the reasons set forth below, this Motion will be denied.[1]

## I.

## A.

In early 2001, TWA, Inc. ("TWA") and American Airlines negotiated an asset purchase transaction.[2]  TWA was in dire financial straits and American Airlines appeared to be its only and last financial hope before it succumbed to liquidation.  Def

---

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

[2] Plaintiffs' claims arise from the events leading to and following the sale of TWA's assets to American Airlines.  Second Amended Complaint ¶ 27.

2

Statement of Material Facts (SMF) ¶ 14.  ALPA was the certified exclusive collective bargaining agent for the Plaintiffs and all TWA pilots until April 3, 2002.  About six months before TWA and American began negotiating the deal, in October, 2000, ALPA adopted a national policy to recruit independent pilot unions to come into its fold, including, but not limited to the American Airlines pilots represented by the Allied Pilots Association ("APA").[3]  ALPA claims this organizing effort, specifically with regards to APA, was aborted in late January, 2001, because of the impending merger of TWA and American Airlines.  Defendant's Motion for Summary Judgment (Def. Motion for SJ), 27.

The TWA Master Executive Council ("TWA-MEC") was the executive body of the local division of the ALPA.  Second Amended Complaint ¶ 31.[4]  For each airline at which it represents employees, ALPA sets up a MEC to serve as "the coordinating council for ALPA members at that airline."  *Ford v. Air Line Pilots Ass'n Intern.*, 268 F. Supp. 2d 271, 277 (E.D.N.Y. 2003).

Under the terms of the Asset Purchase Agreement, TWA was required to and did file for bankruptcy.  SMF ¶ 8.  The

---

[3]In 1963, the American pilots broke away from ALPA (an organization they helped to found) and created their own union, APA. Plaintiffs' Statement of Additional Material Facts (SOAMF) ¶ 6.

[4]The TWA-MEC was composed of three non-voting officers, six voting representatives elected by the TWA pilots and three non-voting representatives.  Second Amended Complaint ¶ 31.

negotiating process of the Purchasing Agreement was therefore
monitored by the Bankruptcy Court in Wilmington, Delaware, with
the TWA-MEC representing the TWA pilots' interests.  Second
Amended Complaint ¶ 30.  The TWA-MEC and ALPA both had their own
independent advisors, including labor counsel, bankruptcy
counsel, an investment banking firm, and an aviation consulting
firm.  SMF ¶ 30-31.

ALPA, the TWA pilots and TWA were all bound by a 1998
collective bargaining agreement ("CBA") which among other
provisions required "the fair and equitable seniority integration
of employees in the event of a merger or acquisition of TWA."
Second Amended Complaint ¶ 36.  This provision is known as a
Labor Protective Provision ("LPP").  Part of American's offer to
TWA was "the promise to hire nearly all of TWA's union-
represented employees."  *Id.* ¶ 12.  But, American Airlines' offer
was contingent upon the TWA-MEC waiving their LPPs contained in
the 1998 CBA.  American Airlines had its own binding CBA with
APA, its pilots' union, which required any newly hired pilots be
"stapled" to the bottom of the American pilots' seniority list.
*Id.* ¶ 24. In other words, American Airlines seemed unwilling to
break its own CBA with its pilots and would not hire the TWA
pilots if they did not relinquish their seniority integration
rights so as to comply with APA's stated contractual position.
The APA, and its own CBA were the TWA pilots' biggest obstacle to

4

retaining their LPPs for the future.

The TWA-MEC was willing to exchange their LPPs for another seniority integration process.  However, if the LPPs were waived and no other agreement could be negotiated, then the TWA pilots' seniority would be governed by the APA-American CBA.  Under this arrangement, TWA pilots with 7 or 8 years of experience might have less seniority than American pilots who had just been hired.

When, in early 2001, ALPA, with the TWA-MEC's approval, refused to agree to American Airline's request to remove the LPPs from the TWA pilots' CBA, TWA moved to reject the ALPA-TWA's CBA in its entirety under § 1113(c) of the Bankruptcy Code, 11 U.S.C. § 1113(c).[5]  Fifteen days later, ALPA filed an objection to TWA's

---

[5] The text of the statute reads:

"... (c) The Court shall approve of an application for rejection of a collective bargaining agreement only if the court finds that— (1) the trustee has, prior to this hearing, made a proposal that fulfills the requirements of subsection (b)(1); (2) the authorized representative of the employees has refused to accept such proposal without good cause; and (3) the balance of the equities clearly favors the rejection of such agreement."

11 U.S.C. § 1113

There is some confusion regarding the possible effect of the § 1113(c) motion.  Plaintiffs contend that TWA, Inc. was only seeking rejection of a single contractual clause--the LLP--not rejection of the entire CBA.  They further contend that ALPA knew this but still misinformed the TWA-MEC that if the Bankruptcy Court granted the § 1113(c) motion, the TWA pilots would lose their contractual and representative rights.  Allegedly, ALPA

motion.

In spite of this objection, on April 2, 2001, the TWA-MEC (with the ALPA's approval and alleged coercion) adopted a resolution agreeing to eliminate the LPPs.  As a result of this resolution, TWA withdrew its § 1113 motion, and the transaction between TWA and American Airlines closed on April 10, 2001.  At this point, nearly all of the TWA pilots became employees of TWA LLC, a subsidiary entirely owned by American Airlines.  American Airlines, concurrently with the TWA-MEC's agreement to waive the LPP, submitted a new CBA which was signed by TWA LLC and ALPA, representing the TWA pilots.  In addition, American Airlines agreed in a letter to ALPA and the TWA-MEC that it would use its "reasonable best efforts" to come to an agreement with regard to seniority integration of the American and TWA pilots.  SMF ¶ 40.

However, after months of attempting to find a middle ground in negotiations between APA and TWA-MEC, on November 8, 2001, APA and American Airlines executed an agreement ("Supplement CC") that imposed the default seniority integration formula on the TWA

---

misinformed the Plaintiffs in an effort to mislead and coerce them into waiving their LPPs.  Plaintiffs' Statement of Additional Material Facts (SOAMF) ¶¶ 95-98.  Plaintiffs point to no case law supporting the proposition that § 1113(c) can ever only apply to one element of a CBA, but instead rely upon the vague statements of former ALPA President Randy Babbit to assert TWA, Inc.'s alleged intention and ALPA's knowledge of it. Plaintiffs also claim that ALPA's objection filed with the Bankruptcy Court, supports their alleged understanding of the minimal possible collateral damage which would befall the CBA if the § 1113(c) motion was granted.  There is little evidence of this either.

LLC pilots (as they were known after the purchase of TWA by American Airlines).[6]  Second Amended Complaint ¶ 16.  In essence, most of the TWA LLC pilots (with a few exceptions) were to be placed junior to the American pilots hired prior to April 10, 2001.  *Id.*

In November, the National Mediation Board (NMB), at the behest of the APA, determined the operations of American Airlines and TWA LLC were sufficiently integrated so as to be a single employer for collective bargaining purposes.[7]  With this determination, Supplement CC became binding upon the TWA LLC pilots.  ALPA filed an opposition to the APA's petition on January 10, 2002.

The Aviation Workers' Rights Foundation, Inc. (AWRF), representing approximately 600 TWA pilots with the full support of the TWA-MEC, also filed an opposition with the NMB against APA's petition.  They also submitted documents and a statement contending ALPA's conflict of interest (with regards to APA) so infected the TWA pilots' decision making process that "any seniority integration put in place by APA without agreement of the TWA pilots or neutral binding arbitration cannot be

---

[6]ALPA was conspicuously absent from these negotiations, even though ALPA was still the TWA LLC pilots' union at this time.

[7]The APA petitioned for this determination on November 9, 2001, one day after they agreed with American Airlines on Supplement C.

legitimate."  SMF ¶ 75; Def. Att. 23, Exhibit 7, 4.[8]  Regardless
of these oppositions, the NMB determined the two companies were
sufficiently integrated so as to be a single employer for
collective bargaining purposes and Supplement CC became the new
binding agreement for the former TWA pilots.

While this drama was unfolding, two American pilots, Mark
Hunnibell and John Clark, organized a campaign to reunite APA and
ALPA.  They sent authorization cards to American pilots to
request a vote on re-unification with ALPA in mid-May of 2001.
They also were in contact with Ronald Rindfleisch, New Members
Liaison for ALPA, on a regular basis throughout the winter of
2001, and well into the next year of 2002.[9]  Ronald Rindfleisch,
according at least to John Clark, was to be their "point of
contact" at ALPA with regards to this campaign.  Acchione Decl.,

---

[8]In response to these allegations, Woerth wrote a letter to
the head of the TWA-MEC and member of AWRF, Captain Robert
Pastore (also a named Plaintiff), denying any conflict of
interest on ALPA's part.

[9]ALPA denies Rindfleisch corresponded with the American
pilots regularly, stating that he simply received a lot of emails
from them.  As Rindfleisch's emails were unable to be retrieved
by the time ALPA acknowledged its duty to preserve his electronic
correspondence, Plaintiffs are unable to confirm directly that he
actively corresponded with the two pilots.  But there is
circumstantial evidence which indicated that he did.  Acchione
Decl., Exs. 42, 44, 45.  As of now, Plaintiffs can identify over
150 known emails between American pilots and executives at ALPA
(including Rindfleisch) between January 1, 2001 and April of
2002.  SOAMF ¶ 36. From these facts, the Court draws an inference
favorable to the Plaintiffs and for the purposes of this Motion
accepts as true that Rindfleisch corresponded frequently with the
American pilots.

Ex. 53.  The correspondence between the two American pilots and those at ALPA covered a wide range of topics: the TWA-American Airlines merger, the authorization cards sent to APA members, and reimbursement for the two American pilots' costs.[10]  However, ALPA insists it "did not bankroll, encourage or assist" the American pilots in any way.  Plaintiffs, of course, disagree with this statement and allege ALPA misrepresented its position to them and misled them by concealing these relationships with APA members.  Def. Motion for SJ, 3.

**B.**

This claim of breach of the duty of fair representation, under 45 U.S.C. §§ 151-188, is before this Court for the second time.[11]  The first time Plaintiffs' claims were dismissed as failing for "statute of limitations reasons."  *Bensel v. Allied Pilots Association*, 271 F. Supp. 2d 616, 624 (D.N.J. 2003) (hereinafter *Bensel I*).  The Third Circuit reversed this decision and held that under the ray of hope doctrine, the statute of limitations did not preclude Plaintiffs' suit against ALPA:

---

[10] While the reimbursement by ALPA was discussed, and from the email correspondence, seemingly encouraged by Rindfleisch, it is fact that the American pilots were never reimbursed for their expenses by ALPA. SOAMF ¶ 41.

[11] Although duty of fair representation is not expressly included in federal labor laws, it is an implicit obligation of exclusive bargaining representatives under the Railway Labor Act. *Chauffeurs, Teamsters and Helpers, Local 391 v. Terry*, 494 U.S. 558, 563 (1990).

"[A]t this stage of the proceedings Plaintiffs
should be given a fuller opportunity for discovery
. . . It may be that ALPA properly carried out its
duty of fair representation and there was nothing
ALPA could realistically accomplish under
difficult circumstances.  But it is too early to
decide this issue at this point."

*Bensel v. Allied Pilots Association*, 387 F.3d 298, 312 (3d Cir.
2004)(hereinafter *Bensel II*).[12]

Plaintiffs now allege ALPA made a number of material
misrepresentations to induce the TWA-MEC to concede its LPPs and
remove them from its contract.  ALPA also, allegedly, did not
inform the TWA-MEC of material facts including its involvement
in an organizing campaign to bring American pilots into ALPA's
representation.  Specifically Plaintiffs allege ALPA made or
permitted to be made the following false misrepresentations:

"a. that there was a 100 percent chance that TWA
would win the section 1113 motion resulting in the
TWA pilots losing everything including their
bargaining agent, grievance procedures, and all
other provisions of their CBA;

b. that if they [Plaintiffs] did not agree to
concede their LPPs, American would walk from the
deal and that they would again lose everything
including their jobs;

c. that if they [Plaintiffs] did agree, American
would use its reasonable best efforts to assist
the two unions [ALPA and APA] to arrive at a fair
and equitable resolution of the seniority and
integration issues; and

d. that APA intended to negotiate a fair

_____

[12] Plaintiffs originally brought three other claims against
APA, American Airlines and TWA.  This Court dismissed all four
claims and the Third Circuit affirmed these dismissals.  *Bensel
II*, 387 F.3d at 323.

resolution with the TWA pilots."

Second Amended Complaint ¶ 101.

The Plaintiffs also contend ALPA failed to disclose a number of material facts to the TWA pilots, specifically:

> "a. that ALPA and APA were engaged in an active organizing campaign to bring the American pilots into ALPA with the knowledge and approval of APA;
>
> b. that American and APA, with ALPA's knowledge, had already secretly negotiated and agreed upon the substance and framework of a final seniority integration in several agreements including a transition agreement and an agreement which would ultimately become known as Supplement CC."

*Id.* ¶ 102.

Finally, Plaintiffs contend ALPA "intentionally sabotaged the efforts of the TWA pilots to protect and preserve their seniority integration rights in order for ALPA to obtain representations rights to American's over 11, 000 pilots and the $30,000,000 in dues they paid." *Id.* ¶ 103.   As a result of these omissions and misrepresentations, ALPA, Plaintiffs contend, breached its duty of fair representation by:

> "a. Failing to require American and TWA-LLC to negotiate the terms of seniority integration and the terms and conditions of the TWA Pilots employment with ALPA while ALPA remained the certified collective bargaining agent for the Class as required by the RLA;
>
> b. Permitting American and TWA-LLC to require the TWA-MEC to negotiate seniority integration with APA;
>
> c. Failing to seek representational rights of the combined pilots before the NMB;

d. Failing to challenge the certification of APA
as the certified collective bargaining agent of
the former TWA pilots as requested of them by the
TWA-MEC;

e. Failing to take action to challenge Supplement
CC, though the agreement was entered into to
control matters relating to rates of pay, rules
and working conditions of the Class and was
entered into with the ALPA as the Class'
collective bargaining agent, in violation of the
RLA;

f. Failing to take any action to enforce the
arbitration award issued on May 26, 2002; and

g. Otherwise failing to take action to protect the
seniority and jobs of the Class and otherwise
acting in a manner adverse to the Class' interest.

*Id.* ¶ 107.

ALPA believes Plaintiffs' complaint is merely a case of

"buyer's remorse." Def. Motion for SJ, 1.  The record, ALPA

contends,

"leaves no room for doubt that, absent the TWA-
MEC's consent to these agreements, one of two
events would have occurred. . . . Either American
would have exercised its right to walk away from
the transaction, leaving TWA without any prospect
but liquidation . . . Or the bankruptcy court
would have granted TWA's Section 1113 motion and
authorized TWA to reject the pilots' CBA which
would have left them in a legal no-man's land."

*Id.* at 1-2.

The question before the Court is whether Plaintiffs have adduced

sufficient facts demonstrating a genuine issue of material fact

requiring resolution by a jury.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  "A fact is material if under the governing substantive law, a dispute about it might affect the outcome of the suit." *Waste Mgmt. of P.A., Inc. v. Shinn*, 938 F. Supp. 1243, 1251 (D.N.J. 1996) (internal citation omitted).  In the specific case of an alleged breach of the duty of fair representation, the Third Circuit explicitly determined that "liability for a labor union's deceptive conduct in breach of the fiduciary duty of fair representation arises only if the breach directly causes damages to an individual or group to whom the duty is owed." *Deboles v. Trans World Airlines*, 552 F.2d 1005, 1019 (3d Cir. 1977).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the

district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).  The nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).  "Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominate roles."  *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 538 F.2d 180, 185 (8th Cir. 1976). Furthermore, when "much depends upon the credibility of the witnesses testifying as to their own states of mind . . . assessing credibility is a delicate matter best left to the fact finder." *Metzger v. Osbeck*, 841 F.2d 518, 521 (3d Cir. 1988).

## III.

### A.

There is a special legal relationship between a union and its members.  A "union which is the exclusive bargaining agent [for its member-employees] has a federally-created statutory duty to fairly represent all members of the bargaining unit in negotiation, administration and enforcement of the collective bargaining agreement."  *Deboles,* 552 F.2d at 1014.  A union violates its duty of fair representation (DFR) if its conduct towards any of its

members is "arbitrary, discriminatory, or in bad faith." *Vaca v.*

*Sipes*, 386 U.S. 171, 190 (1944).

> " A union must conform its behavior to each of these three
> separate standards.  First, it must treat all factions and
> segments of its membership without hostility or discrimination.
> Next, the broad discretion of the union in asserting the rights
> of its individual members must be exercised in complete good
> faith and honesty.  Finally, the union must avoid arbitrary
> conduct. Each of these requirements represents a distinct and
> separate obligation, the breach of which may constitute the
> basis for civil action."

*Warehouse Union, Local 86 v. Nat'l Labor Relations Bd.*, 652 F.2d

1022, 1024 (D.C. Cir. 1981).

In the Second Amended Complaint, Plaintiffs allege that ALPA

is guilty of having acted in bad faith.  However, it is not

entirely clear, as a legal matter, what conduct constitutes a bad

faith breach of a union's duty of fair representation.[13]

Different circuits point to different behavior as possible

evidence of bad faith.  For example, the Third Circuit does not

require a showing of fraud to successfully claim bad faith

failure of DFR, but has held that "a union has a duty not to

deliberately misrepresent its bargaining efforts and positions in

order to induce ratification of a collective bargaining agreement

---

[13]For alleged arbitrary or discriminatory breaches, it is
easy to imagine what proof a party might bring: conduct is
arbitrary if it is "so far outside a wide range of
reasonableness, that it [is] wholly irrational." *Air Line Pilots
Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991).  With regard to
discrimination, the DFR prohibits a union from only "invidious"
discrimination based upon constitutionally protected categories,
like race or gender.  *Id.*  The Plaintiffs do not allege ALPA was
arbitrary or discriminatory.

and the breach of that duty gives rise to an unfair representation claim." *Felice v. Sever*, 985 F.3d 1221, 1227 (3d Cir. 1993). However "[t]o show a [bad faith] breach of the Union's duty of fair representation [in the Ninth Circuit], appellant must demonstrate substantial evidence of fraud, deceitful action or dishonest conduct." *Crusos v. United Transp. Union, Local 1201*, 786 F.2d 970, 973 (9th Cir. 1986).[14] There is no single standard by which to evaluate claims of bad breaches of DFRs. All of the Circuits, however, do consider the union's intent as critical to determining if there was in fact a bad faith breach. As with most determinations of intent, this makes the inquiry fact-intensive.

In *United Steelworkers of America v. Rawson*, the Supreme Court narrowed the field of what could constitute evidence of a breach of DFR, declaring that "mere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation." 495 U.S.

---

[14]The Ninth Circuit has also held that "[i]ntentionally misleading statements by union officials designed to persuade members to join in collective action, such as a strike or ratification of a newly negotiated agreement, can supply the bad faith necessary for a DFR violation." *Bautista v. Pan American World Airlines, Inc.*, 828 F.2d 546, 550 (9th Cir. 1987). And the Fourth Circuit has stated that: "proof of a union's bad faith requires a showing that the union never intended to keep its promises," *Nellis v. Air Line Pilots Assoc.*, 815 F. Supp. 1522 (E.D.Va. 1993), *aff'd*, 15 F.3d 50 (4th Cir. 1994), and that whether a union acted in bad faith depends on the subjective motivation of the union's officials. *Jeffreys v. Communication Workers of America*, 354 F.3d 270, 275 (4th Cir. 2003).

362, 372-73 (1990).  Plaintiffs must be able to produce evidence
that ALPA did more than simply act negligent or without proper
care in dealing with the TWA-American Airlines merger.

Courts should use deference when questioning the
machinations of unions in negotiations.  As the Supreme Court
explained, "the relationships between courts and labor unions
[i]s similar to that between the courts and the legislature."
*O'Neill*, 499 U.S. at 78.  The court must be "highly deferential
[of the union's decisions], recognizing the wide latitude that
negotiators need for the effective performance of their
bargaining responsibilities."  *Id.*  Parties cannot simply be
saddened by a choice they made when the scenario seemed un-
winnable, only to allege bad faith when, in hindsight, it emerges
that a different and better choice could have been made.

Actual judicial determinations that a union acted in bad
faith are few and far between.[15]  The typical allegations of bad

---

[15]The Seventh Circuit was extremely deferential when it
decided a case involving an earlier TWA merger that ALPA urges
this Court to adopt as dispositive.  In *Rakestraw v. United
Airlines, Inc.*, 981 F.2d 1524, 1534 (7th Cir. 1992), two similar
cases were disposed of in one opinion which held that neither
union had breached its DFR.  *Rakestraw* stands for the proposition
that if there was a rational reason for the union's actions, then
there can be no breach of the duty of fair representation. The
Seventh Circuit stated that "a voluntary choice may not be
withdrawn because the choice was an effort to make the best of a
bad situation.  Adult pilots, of sound mind and well aware of the
consequences of their acts, must expect to keep their contracts,
even when they wish they could have made better deals."
*Rakestraw,* 981 F.2d at 1534.  Defendant claims this is "the
controlling legal principle as to the TWA-MEC's decision to
accept the package of agreements proposed by TWA and American . .

faith are between two groups of pilots, represented by the same union.  Usually these suits occur when one airline buys another one and two different MECs are opposed to one another under the umbrella of the same union.  *Nellis v. Air Line Pilots Assoc.,* 815 F. Supp. 1522 (E.D.Va. 1993), *aff'd,* 15 F.3d 50 (4th Cir. 1994).  In those cases, there will inevitably be winners and losers as to integration, seniority rights and salary.  Within a union, "[m]ajority rule is the norm," *Rakestraw v. United States*, 981 F.2d 1524, 1533 (7th Cir. 1992), and the union is usually not legally held responsible for actions which favor the larger number of pilots over the smaller number as long as its actions are rational and non-discriminatory.

---

. . A deal is a deal."  Def. Motion for SJ, 3.

Yet, as the Second Circuit accurately noted in *Ramey v. District 141, International Association of Machinists*, 378 F.3d 269 (2d Cir. 2004), the Seventh Circuit's *Rakestraw* decision is questionable.  If bad faith can only be a breach of the DFR when there is no alternative rational reasoning for the decisions made, then bad faith just becomes a synonym of arbitrary. *Rakestraw*'s conclusion therefore ignores the tripartite standard announced by the United States Supreme Court in *Vaca*.  Simply because the action might be objectively rational, does not mean it was not a bad faith breach of the Union's duty of fair representation.  *Ramey*, 378 F.3d at 277.  *Rakestraw*'s interpretation renders a bad faith violation indistinct from an arbitrary violation and therefore cannot be the correct interpretation of a bad faith breach of the duty of fair representation.

However, the Seventh Circuit does get one thing right.  It held that ALPA had mixed motives for choosing the actions it took.  *Rakestraw,* 981 F.2d at 1534.  From the discovery in the case at bar , it would seem ALPA may also have had mixed motives. This is all the more reason for a fact finder to weigh the evidence supporting or contradicting the Plaintiffs' claims to accurately assess the underlying intent of ALPA.

The factual scenario before this Court is unique in that here, there is only one set of constituents to whom the union owes a DFR: the TWA pilots.  ALPA is accused of favoring an outside group of pilots, represented by a rival union--not one set of its own members over another.  Analogies to other DFR cases are therefore not especially useful because of the distinct factual situation presented at bar.  It is helpful, however to look to two other areas of the law, legal professional conduct and honest services wire and mail fraud. Both of these areas of the law require duties of loyalty, which when breached, can result in litigation.

Lawyers have an ethical duty to inform their clients of any possible or actual conflicts of interest.[16]  A lawyer breaches his ethical duty to his client by failing to disclose conflicts of interest regardless of the legal matter:

> "a possible effect on the quality of the attorney's services on behalf of the client . . .  may be a diminution in the vigor of his representation . . . .  The fact that a deleterious result cannot be identified subsequently as having actually occurred does not refute the existence of the likelihood of its occurrence, depending upon the facts and circumstances, at the time the decision was made to represent the client without having obtained his consent."

*International Business Machines Corp. v. Levin*, 570 F.2d 271, 280 (3d Cir. 1978).

In other words, the outcome of the legal work is not

---

[16] In New Jersey, a lawyer shall not represent a client if there is a concurrent conflict of interest.  N.J. RPC 1.7

determinative as to the breach of duty.  Instead, "the duty of undivided loyalty which an attorney owes to each of his clients," is paramount to the client's injury, and provides the right of action.  *Id.* (quoting *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976).

Similarly, honest services mail and wire fraud, 18 U.S.C. § 1346, occurs when a public official, who owes a duty of honest, faithful and disinterested service to the public, breaches this duty by taking a bribe or failing to disclose a conflict of interest resulting in personal gain and deprives the public of its right to disinterested decision making when.  *United States v. Antico*, 275 F.3d 245, 262-63 (3d Cir. 2001).  "Thus, undisclosed, biased decision making for personal gain, whether or not tangible loss to the public is shown, constitutes a deprivation of honest services." *Id.* at 263. The harm resulting from honest services fraud is similar to the harm in lawyer-client conflict of interest cases and the harm alleged by the Plaintiffs here: the harm caused by a breach of the duty of undivided loyalty.

The focus of the case at bar is not therefore the wrongfulness of the decisions made by ALPA, but rather ALPA's state of mind when making those decisions.  The Court looks to ALPA's process of negotiation, not its result  If the matter was simply evaluating whether the decisions made by the union were

right, then the Court would be extremely deferential to the
union, as case law dictates.  But the real question is whether
ALPA made its decisions, right or wrong, in good faith; whether,
when looking at all of evidence presented, there is a question as
to ALPA's good faith in negotiating with American and APA on
behalf of the TWA pilots.

To sustain their summary judgment burden, Plaintiffs must
point to sufficient record evidence upon which a reasonable fact
finder could infer that ALPA acted in bad faith when it purported
to negotiate a deal providing for seniority integration between
the TWA and American pilots.  Material facts may be disputed; and
the Court views those disputed facts in the light most favorable
to Plaintiffs.  *Pollock*, 794 F.2d at 864.  But the Court also
draws all reasonable inferences from the undisputed material
facts.  If the undisputed facts support more than one set of
reasonable inferences, the Court draws the inferences most
favorable to the Plaintiff.  *Coleman v. Blockbuster, Inc.* ____
F.3d _____, No. 08-4056, 2009 WL 3824754 at *3 (3d Cir. 2009).

B.

APA is no longer a party to this case.[17]  However, because

---

[17] This Court held that APA owed no duty to the TWA pilots
prior to April 3, 2002 and accordingly dismissed the Plaintiffs'
claims against the APA. The Third Circuit affirmed the dismissal
of APA as a party to this matter.  *Bensel II*, 387 F.3d at 312.

TWA's success in the seniority dispute might well injure the
rights of the American pilots, a reasonable factfinder might find
unusual ALPA's admitted interest in merging with American's
union.  A reasonable juror might conclude that ALPA could not
completely fulfill its duty to fairly represent Plaintiffs while
also attempting to ingratiate itself with a union whose members
had interests adverse to Plaintiffs.  On the record evidence, a
reasonable factfinder could conclude that ALPA's advice, tactics,
and strategy were not based on its desire to fulfill its DFR but
rather on its desire, at least in part, to curry favor with the
American pilots.

Plaintiffs contend ALPA did not negotiate in good faith on
its behalf.  One of their primary examples is the rejection, on
three separate occasions, by ALPA, of the litigation strategies
suggested by Roland Wilder, TWA-MEC's independent merger counsel.
Wilder first proposed a litigation strategy before the assets
acquisition was confirmed, to delay the consummation of the deal
and hopefully increase the pressure on American Airlines to deal
with the seniority issues.  Acchione Decl. Ex. 14 (Wilder Dep.
Tr.).  The TWA-MEC approved this strategy and requested Wilder to
ask Woerth, ALPA's president, to grant authority to file the suit
on March 26, 2001.[18]  Pl. Statements of Additional Material Facts
(SOAMF) ¶ 78.  Woerth refused to authorize the lawsuit and

---

[18] Only ALPA's president can authorize the filing of
litigation on behalf of the union.  SOAMF ¶ 80.

instead arranged for ALPA advisors to attend the next TWA-MEC meeting scheduled two days later.

This same scenario replayed itself in July, 2001, with Wilder proposing a new litigation strategy, the "horns of dilemma," which was designed to shake "the complacency of the American pilots to create a dilemma for APA whereby it could either accept ALPA participation at the bargaining table which Captain Pastore [head of the TWA-MEC] had requested or assume a fair representation duty to the TWA pilots."  Acchione Decl. Ex. 14 (Wilder Dep. Tr. 130-32).  ALPA again refused to authorize the suit.

Finally, in mid-September 2001, when the facilitated negotiations between TWA LLC and American pilots ended without an agreement, Wilder suggested and prepared to file a suit seeking to enjoin American Airlines and APA from entering into a seniority integration agreement, without the TWA pilots. However, ALPA, at the last minute, again denied Wilder the authority to file for the injunction.

Wilder testified that:

"the decision [not to pursue the litigation strategy] had to do with the [] overall strategy of ALPA rather than . . . the legal technicalities of the suit. . . . This had more strategic implications than tactical or technical implications . . . It was not my impression that there was any disagreement over the merits of the proposed litigation itself.  It had to do with the overall strategy being pursued by ALPA in connection with the dispute. "

*Id.* at 160:15-17.

ALPA's undisputed rejection of the litigation strategies three separate times, could lead a reasonable factfinder to two distinct, reasonable inferences.  The three rejections could support the reasonable inference, as the Plaintiffs contend, that ALPA's overall strategy was to curry favor with APA by not faithfully executing their DFR to the TWA pilots.  Or, the three rejections could support the reasonable inference, as ALPA contends, that it just did not think the litigation strategies would work, and therefore rejected them.  These two contrary inferences are both possible from the evidence presented to the Court.  However, in a motion for summary judgment, the Court is required to draw the inferences most favorable to the Plaintiff. *Coleman,* 2009 WL 3824754 at *3.  As such, the Court views ALPA's three rejections as evidence that its actions were not taken in good faith and complete honesty.

ALPA's refusal to pursue Wilder's litigation strategies would not be surprising in light of ALPA's alleged motivation: its attempts to ingratiate itself with APA.  Some of the evidence Plaintiffs point to as indication of collusion between ALPA and APA occurred before the TWA-American Airlines deal was announced. ALPA freely admits that before the merger, it was actively organizing to recruit the independent pilot unions into the ALPA fold.  However, there is some evidence, such as emails and Minutes of Executive Council Meetings at ALPA which show that as late as April, 2002, ALPA seemed to still be pursuing a merger

with APA.  This evidence and its corresponding inferences also leads this Court to deny Defendant's Motion for Summary Judgment.

In late January, 2001, the TWA Merger Committee, a body separate from the TWA-MEC, was concerned with ALPA's conflict of interest with regard to actively recruiting the American pilots. ALPA officials assured the TWA Merger Committee that its' efforts had ceased.  SOAMF ¶18 (admitted by the Def. Response to Pl. Statements of Additional Material Facts, ¶8.)  However, this assurance is belied by the undisputed evidence that ALPA's general manager wrote to APA's president, on January 25, to offer ALPA's assistance in financing a push in support of the campaign to re-unify the two unions.  SOAMF, ¶20.  There is also documented evidence that as of the end of January, 2001, Woerth, the president of ALPA, gave updates as to recruitment efforts in ALPA Executive Council meetings.  SOAMF ¶ 19.

There are other, more harmful allegations.  Woerth, ALPA's President, gave a speech to the APA board literally three days after TWA-MEC waived its scope provisions (without informing the TWA-MEC of this appearance).  Woerth allegedly stated that the TWA pilots needed to "get real" on negotiating seniority merger settlement.  Acchione Decl. Ex. 98, 99.  This comment, if made, occurred at the beginning of an uphill battle for the TWA pilots to negotiate some sort of seniority agreement in good faith with the APA and American.  To have the head of the TWA's union tell their opponents that the TWA pilots need to "get real" while

stating otherwise to the pilots would be a direct negation of the Union's DFR.

ALPA and Woerth both deny this was ever said to the APA board. However, there is substantial conflicting evidence on this point.[19]  And these allegations, of continued attempts to recruit, taken together with ALPA's refusal to entertain Wilder's litigation strategy--regardless of why--prevent the Court from granting summary judgment.  The Court will deny Defendant's summary judgment motion with respect to allegations of bad faith in an attempt to re-unify with APA at the expense of the TWA pilots.

## IV.

For the above-stated reasons, Defendant's Motion for Summary

---

[19] On an American pilots' web board, pilot Robert Reifsnyder stated that "Duane Woerth stood in front of the APA board of directors and told us that he had told the TWA pilots to 'get real' on their aspirations of the seniority merge." Acchione Decl. Ex. 98.  Reifsnyder was deposed, seven years later, and stated that he did not recall specifically writing the post, but did remember Woerth speaking at the meeting. Acchione Decl. Ex. 22 (Reifsnyder Dep. Tr.).  Reifsnyder then stated that though he does not specifically recall Woerth making the statement, he has "no reason to believe . . . that he didn't from what I wrote here." *Id.* at 9-11.  This comment is also mentioned in the Notes from the APA special Board of Directors Meeting, Acchione Decl. Ex. 99, 5.  Woerth is quoted as saying that he felt the TWA pilots had "unrealistic goals." *Id.*  Furthermore, when a TWA pilot wrote the ALPA legal department to inquire as to Woerth really made this statement, no response or investigation was made.  SOAMF ¶ 163; Def. Response to Pl. SOAMF ¶ 163.

Judgment will be denied.   An appropriate order will be issued.


December 17, 2009                          s/ Joseph E. Irenas
                                      **JOSEPH E. IRENAS, S.U.S.D.J.**