**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

LEROY "BUD" BENSEL, et al.,     )     Civil Action No. 02-2917 (JEI)
                           )
          Plaintiffs,      )
                           )
     v.                   )
                           )
ALLIED PILOTS ASSOCIATION, et al., )     Motion Date:  March 1, 2010
                           )
          Defendants.    )

---

**MEMORANDUM OF
DEFENDANT AIR LINE PILOTS ASSOCIATION, INT'L,
IN OPPOSITION TO
PLAINTIFFS' MOTION FOR RECONSIDERATION OF
THE DECEMBER 17, 2009 ORDER
DENYING PLAINTIFFS' MOTION FOR SANCTIONS**

---

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121

By:    John C. Connell, Esquire
       Alexander Nemiroff, Esquire

*Pro Hac Vice*:

Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Ave., N.W., Suite 250
Washington, DC  20016
(202) 659-4656

Counsel for Defendant Air Line Pilots Association, International

## I.  Plaintiffs' Motion for Reconsideration Should Be Denied

Plaintiffs have moved for reconsideration of the Court's denial of their motion for sanctions on the basis of supplemental production of documents by Cohen, Weiss and Simon LLP ("CWS"), a third party law firm, discovered long after CWS responded to a subpoena duces tecum.  Plaintiffs offer no cognizable basis for this motion, and it should be denied.

Requests for reconsideration are governed by Local Civil Rule 7.1(i), which "is 'an extremely limited procedural vehicle,' *Tehan v. Disab. Mgmt. Servs.*, 111 F. Supp. 2d 542, 549 (D.N.J. 2000) that is granted 'very sparingly,' *Cataldo v. Moses*, 361 F. Supp. 2d 420, 433 (D.N.J. 2004)."  *D & D Assocs. v. Bd. of Educ.*, No. 03-1026 (MLC), 2009 WL 904054, at *1 (D.N.J. Mar. 31, 2009); *accord Stansbury v. Brother Int'l Corp.*, No. 06-4907 (FLW), 2009 WL 3425681, at *6 (D.N.J. Oct. 23, 2009) ("Reconsideration is an extraordinary remedy." (citation omitted)).  There are only three possible grounds for such a motion, and those grounds are narrowly construed.  *Id*; *Merritt v. Klem*, No. 1:CV-06-01289, 2007 WL 906282, at *2 (M.D. Pa. Mar. 22, 2007).  Plaintiffs contend that the recent production included new material, and that this material constitutes one such ground, "the availability of new evidence that was previously unavailable," thereby justifying reconsideration.  Pl. Br. 3, 13; *see D & D Assocs.*, 2009 WL 904054, at *1; *Stansbury*, 2009 WL 3425681, at *6.  Their contention fails, however, because the materials that were recently produced do not provide "new evidence" that would support a spoliation claim.

### A.  The CWS Documents Do Not Support Reconsideration of Spoliation

### 1.  The CWS Internal Memorandum Dated November 6, 2000

Plaintiffs claim that one piece of "new evidence" that warrants renewal of the spoliation motion is an internal CWS memorandum dated November 6, 2000 ("the CWS Memo"),

analyzing hypothetical scenarios concerning successor liability for court judgments against the

Allied Pilots Association ("APA") in the event that ALPA were to become the bargaining agent

for the American Airlines pilots. Pl. Br. 4-11; Pl. Ex. B. But Plaintiffs' analysis is flawed.

First, Plaintiffs contend that they should have had this memo for the deposition of CWS

attorney Richard Seltzer on September 19, 2008, but this claim rests on the incorrect assertion

that the CWS Memo's reference to "RSS" is to Seltzer. Pl. Br. 3-4, 3 n.2. In fact, however, as

Seltzer explained at his deposition, the "RSS" reference is not to him—his initials are "RMS"—

but to Robert S. Savelson, another attorney at CWS, whom Plaintiffs did not seek to depose after

they uncovered this information. ALPA Ex. 1: Seltzer Dep. 33.[1]

Second, this memo was never in ALPA's possession, and accordingly cannot constitute a

ground for a claim of ALPA spoliation. As Plaintiffs recognize, the CWS Memo was an

"Internal CWS Memorandum." Pl. Br. 4. This was not the only internal memorandum CWS

produced but ALPA did not possess; in the summer of 2008, CWS produced similar internal

memoranda discussing the successor liability issue—some pre-dating and some post-dating the

CWS Memo. This particular memo was overlooked until Seltzer found it in a general file that

had no apparent relation to the TWA pilots, the TWA Chapter 11 case or the subject matter of

the instant litigation. ALPA Ex. 2: Richard Seltzer Declaration. As Seltzer explained in his

transmittal letter to Plaintiffs' counsel accompanying the CWS supplemental production, CWS

discovered the document "in a year end clean-up of unrelated files." Pl. Ex. A. ALPA did not

produce the CWS Memo in discovery because ALPA never had it.[2]

---

[1] Seltzer also explained that he did not communicate with anyone at ALPA on the subject of the American pilots
rejoining ALPA, and that his only involvement in the successor liability issue was to discuss union bankruptcies at
one or two internal CWS meetings. *Id.* at 34-39.

[2] Plaintiffs' motion for reconsideration is also defective because the CWS Memo does not qualify as "previously
unavailable" evidence. To the extent that Plaintiffs rely on it to prove the contents of Savelson's conversation with
Jonathan Cohen and Marcus Migliore on November 3, 2000, Plaintiffs never sought to depose any of these three and
their recollections of the meeting were "readily available." *See Stansbury*, 2009 WL 3425681, at * 7. Furthermore,

Finally, Plaintiffs inexplicably assert that the CWS Memo "would have resulted in the Court's granting Plaintiffs' motion for sanctions with respect to the destroyed authorization cards." Pl. Br. 7. No aspect of the CWS Memo changes the bases for the Court's decision rejecting the spoliation claims. As noted in ALPA's opposition to Plaintiffs' sanctions motion (Doc. 301) at 19-22, Plaintiffs have all of the pertinent information from the cards—the wording of the cards, the number of cards and the dates they were signed—and they suffered no prejudice from the loss of the cards themselves.[3] Here, as in *In re DaimlerChrysler AG Securities Litigation*, No. 00-993-JJF, 2003 WL 22951696, at *2, (D. Del. Nov. 25, 2003), Plaintiffs cannot demonstrate "a reasonable possibility, based on concrete evidence rather than a fertile imagination," that the lost documents would have contained favorable information.

## 2. The Duane Woerth Email of November 13, 2001

Plaintiffs are wrong in arguing that the CWS supplemental production included a newly discovered email sent by Duane Woerth. ALPA previously produced this same email as part of another document that expressly shows that Woerth's executive assistant, Renata Mack, forwarded the email to a CWS attorney and others "On Behalf Of Woerth, Duane." ALPA Ex. 3: ALPA 52605-06. While the email in the CWS supplemental production did not display the portion of the transmission denoting that Woerth's assistant was the one who actually sent it, the substance of the CWS email is identical and the same recipients are listed in the same order.

Moreover, the email is without significance to any issue in this case. The email itself simply forwarded a letter Bob Pastore proposed on November 13, 2001, to be sent to the Chief

---

although Plaintiffs argue that the CWS Memo detracts from the testimony of ALPA deponents that ALPA does not normally undertake card campaigns when the incoming pilot group is already organized, that issue has no bearing on Plaintiffs' sanctions motion.
[3] Prior to Plaintiffs' sanctions motion, they raised the issue of the authorization cards with Magistrate Judge Donio, Special Master Hedges and this Court and were rejected on all three occasions. April 26, 2007, Order ¶ 15 (Doc. 214); November 30, 2007, Order ¶ 2 (Doc. 241); August 26, 2008, Order ¶ 5 (Doc. 264).

Executive Officer of American Airlines, asking him not to approve the seniority integration agreement that American and the APA had executed a few days earlier. Pastore's proposal was distributed within ALPA, and Ms. Mack sent it on Woerth's behalf to a CWS attorney, among others, shortly after it arrived. ALPA produced many other versions of the same email transmission, including the one attached hereto as ALPA Exhibit 3. The CWS production of a slightly different version of the same email does not constitute evidence of spoliation and does not provide any basis for sanctions against ALPA.[4]

## B. Plaintiffs Have Identified No Basis for Undermining the Extensive Discovery Analysis Already Undertaken in This Case

Plaintiffs ignore the extensive discovery history underlying this Court's ruling on spoliation, but that history bears on the current motion. ALPA's discovery practices over the course of this case were subjected to intense scrutiny in response to Plaintiffs' continuing claims that the only possible explanation for their inability to find any evidence of bad acts is that ALPA must have destroyed such evidence. The spoliation ruling Plaintiffs now ask this Court to reconsider came at the conclusion of many months of examination and re-examination of ALPA's retention, collection and production of electronic and other documents. As detailed in ALPA's opposition to Plaintiffs' sanctions motion (Doc. 301) at 11-12, 30-39, Special Master Hedges oversaw extensive electronic discovery utilizing the analytical services of Capitol Legal Services ("CLS"), an independent forensic computer specialist. ALPA supported its opposition to the sanctions motion with a declaration from CLS attesting to the fact that CLS uncovered no indication of the destruction of evidence. The Court found that Plaintiffs' "vague statements" did "not rise to the specificity level required by the Third Circuit to impose sanctions or even make a finding of spoliation." Op. 7-8 (Doc. 310).

---

[4] Plaintiffs also misplace their reliance on Pl. Ex. E, an email *sent to Woerth*. They have not shown that Woerth opened it, saw it or responded to it; the document fails to prove anything of relevance to Plaintiffs' sanctions motion.

Plaintiffs attempt to leverage the CWS documents into a basis for renewing their claim of spoliation, but neither the documents nor their production alters the legal or factual terrain confronting the Court. Plaintiffs focus, for example, on a letter from the ALPA Legal Department to CWS in May 2005, and mischaracterize it as setting improper "limits" on Plaintiffs' document requests. Pl. Br. 8. The letter fails to support this characterization because it explicitly requested that CWS forward to the Legal Department *any responsive documents* that the firm had:

> We are requesting that you review your files and those of your colleagues and forward to us any material that appears to be responsive to plaintiffs' requests. A copy of the discovery requests that the plaintiffs have served on us is enclosed.

Pl. Ex. F. Any doubt about the breadth of the responsive documents ALPA sought was resolved by ALPA's simultaneous transmittal to CWS of Plaintiffs' document requests themselves. The May 2005 letter provides no basis for inferring any deficiency in ALPA's effort to gather responsive documents from CWS.

Plaintiffs' motion is also defective because it relies upon a supplemental *production* of documents to allege the *spoliation* of evidence. CWS provided documents to Plaintiffs that it had not discovered in its original search in the summer of 2008, but no documents were *destroyed*. Indeed, CWS, ALPA's outside legal counsel and a firm which is not a party to this case, acted responsibly and promptly despite having no obligation under the Federal Rules of Civil Procedure to produce later-discovered documents to Plaintiffs. Rule 26(e) requires a "*party*" to supplement its production of documents, but Rule 45 imposes no comparable duty on CWS, which is not a "party" to the litigation.[5]

---

[5] The Federal Civil Rules Handbook describes the "core concept" of Rule 26(e) as follows: "Parties have a duty to supplement automatic disclosures and discovery responses under certain limited conditions set forth in Rule 26(e). Otherwise, *there is no general duty to supplement*." Steven Baicker-McKee et al., *Federal Civil Rules Handbook 2010* 757 (2009) (emphasis supplied) (footnotes omitted).

Plaintiffs have failed to establish any nexus between their sanctions motion and the materials that CWS recently produced.  The law firm's supplemental production accordingly provides no support for reconsidering Plaintiffs' motion for sanctions against ALPA.

## II.   Plaintiffs' Alternative Requests Also Lack Merit

Plaintiffs refer the Court to the decision in *Pension Committee of the University of Montreal Pension Plan v. Banc of Am. Securities*, No. 05 Civ. 9016 (SAS) (S.D.N.Y. Jan. 15, 2010), as "additional support" for their motion for reconsideration, or, alternatively, for their conditional motion to certify an interlocutory appeal if the Court grants ALPA's motion to certify an interlocutory appeal. Pl. Br. 11, 13.  The decision does not provide support for either of Plaintiffs' requests.

Recognizing that the *Pension Committee* decision is "not governing law in this District," Pl. Br. 11, Plaintiffs eschew any reliance on it as an independent ground for their motion for reconsideration.  It is appropriate that they do so because this Court has specifically held:

> [A]n opinion from the Southern District of New York is not controlling law for the purposes of a motion for reconsideration. *See Owens v. City of Atlantic City*, No. 05-3132 (NLH), 2008 WL 4205797, at *4 (D.N.J. 2008) ("A court's failure to consider another district court's decision on a similar issue is not a sufficient basis for reconsideration, as the other court's opinion is not a 'controlling decision.'").

*Pine Belt Auto., Inc. v. Royal Indem. Co.*, No. 06-5995 (JAP), 2009 WL 424384, at *2 (D.N.J. Feb. 19 2009); *accord D & D Assocs.*, 2009 WL 904054, at *2 ("[A] decision that is not controlling precedent is not an intervening change in the controlling law for purposes of a motion for reconsideration." (citing *United States v. Manzo*, No. 97-289, 2006 WL 2845763, at *7 (D.N.J. Sept. 29, 2006)))."  Since the *Pension Committee* decision cannot constitute a ground for reconsideration, it provides no basis for reconsideration when the Court's jurisdiction is invoked

using the "extremely limited procedural vehicle," *D & D Assocs.*, 2009 WL 904054, at *2, which brings this matter before the Court at this time.

In any event, this Court's ruling on sanctions is consistent with the Southern District of New York decision upon which Plaintiffs rely. This Court reviewed Plaintiffs' allegations of spoliation and concluded that "without specific evidence of fraud or bad faith, these allegations do not rise to the standard required for a finding of spoliation." Op. 2 (Doc. 310). In addition to the absence of evidence of bad faith, the Court explained that Plaintiffs "have failed to identify even one document or email favorable to their case that was lost or destroyed, and they have failed to specify any prejudice to their case 'arising from the alleged oversights of which they accuse ALPA.'" *Id.* at 3. Plaintiffs cite as the controlling standard in this Circuit *Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). Pl. Br. 12. This Court applied the three-part test in that decision, the first part of which is "the degree of fault of the party who altered or destroyed the evidence." Op. 4-5. Accordingly, Plaintiffs themselves err when they assert that "this Court relied upon the wrong standard" in taking into consideration the fact that they "failed to establish any evidence of bad faith." Pl. Br. 12. Moreover, even if a party is negligent in conducting discovery—and we dispute that ALPA was—sanctions are still inappropriate under the *Pension Committee* decision unless the complaining party establishes both relevance and prejudice; that is, it "must present extrinsic evidence tending to show that the destroyed [documents] would have been favorable to [its] case." *Pension Comm.*, slip op. at 16-17. The *Pension Committee* decision thus does not conflict with this Court's approach.

Plaintiffs have still not even attempted to demonstrate that their contingent request to certify an interlocutory appeal meets the standards set out in 28 U.S.C. § 1292(b). Rather than

reiterating our reasons for opposing Plaintiffs' request, we incorporate by reference our

submission on this point on January 25, 2010 (Doc. 316) at 8-9, where we outlined those reasons.

## CONCLUSION

For the foregoing reasons, ALPA respectfully submits that Plaintiffs' motion for

reconsideration should be denied.

Dated: February 3, 2010                  Archer & Greiner
                                         A Professional Corporation
                                         One Centennial Square
                                         P.O. Box 3000
                                         Haddonfield, New Jersey 08033-0968
                                         (856) 795-2121


                                  By:____/s/ John C. Connell_____
                                         John C. Connell, Esquire
                                         Alexander Nemiroff, Esquire

*Pro Hac Vice*:

          Daniel M. Katz, Esquire
          Katz & Ranzman, P.C.
          4530 Wisconsin Ave., N.W., Suite 250
          Washington, DC  20016
          (202) 659-4656

          Counsel for Defendant Air Line Pilots Association, International

5283990v1

# EXHIBIT 1

# In The Matter Of:

*Bensel v.*
*Air Line Pilots Association*

---

*RICHARD J. SELTZER*

*Vol. 1*

*September 19, 2008*

---

*REPORTING ASSOCIATES, LLC*

*Certified & Registered Professional Reporters*

*Cherry Hill  --  Philadelphia  --  Trenton*

*(888) 795-2323*

*www.ReportingAssociates.com*



Original File 0919selt.txt

**Min-U-Script® with Word Index**

Bensel v.
Air Line Pilots Association

RICHARD J. SELTZER - Vol. 1
September 19, 2008

Page 33

1    Q.    Okay.  The billing partner, is that Mr.
2  Abram?
3    A.    I think, actually, Mr. Salveson produced
4  the bills or reviews them.
5    Q.    The initials, that's for the billing
6  lawyer.  Right.  Are you R.S.S.?
7    A.    I'm sorry.  What -- oh --
8    Q.    There's initials next to the time
9  entries.
10    A.    Right.
11    Q.    So that's to reflect what lawyer is
12  doing the work.  Right?
13    A.    That's correct.
14    Q.    Are you R.S.S.?
15    A.    No, I'm not.
16    Q.    What initials are yours?
17    A.    R.M.S.
18    Q.    Who is R.S.S.?
19    A.    Mr. Savelson.  If you look on the first
20  page of the bill, on the letterhead, you'll see the
21  names of the attorneys, generally, with their middle
22  initial.
23    Q.    I was going to direct you -- the last
24  page of the bill actually lists the lawyers?
25    A.    Right.

Page 34

1    Q.    Okay.
2    A.    Right, with their initials.
3    Q.    I just wanted to make sure I was reading
4  it correctly.
5          If you look at page ending 50, document
6  number 50 --
7    A.    Yes.
8    Q.    -- there's an entry there -- there's
9  only one entry that hasn't been whited out.  It says,
10  "Preparation for and conference call with officers
11  and staff on IACP and APA issues."
12          Do you understand what -- do you have an
13  understanding of what your partner was working on
14  that's reflected here?
15    A.    I don't.  I mean, I know APA is a -- I
16  think that's the American union.  I think IACP may
17  have been the independent Continental pilots' union,
18  but that's a guess.  I don't know that that's what
19  their initials were, at least the Continental pilots'
20  initials were.
21    Q.    Did you do any work associated with
22  ALPA's effort, before the year 2001, to authorize the
23  APA to join ALPA?
24    A.    I have no idea whether ALPA was doing
25  any work to organize the APA.

Page 35

1    Q.    That's something you just know nothing
2  about?
3    A.    You're asking about whether they were
4  organizing?
5    Q.    Or trying to merge.
6    A.    I -- I, at one point, was asked some
7  questions about what the legal impact of the damages
8  judgment against the APA would be if there were an
9  affiliation, merger, whatever, with APA, and I
10  focused on that particular issue.
11    Q.    What you're referring to is the fact
12  that American Airlines held a $45 million judgment
13  against the APA or thereabouts, $45 million?
14    A.    It was a large number.
15    Q.    Right.
16    A.    That's all I remember.
17    Q.    And the issue there was if the APA
18  merged with ALPA, whether or not ALPA would be
19  shouldered with that liability.  Was that the issue?
20    A.    If there was some sort of -- yes --
21  affiliation.
22    Q.    All right.  And did you come to sort of
23  conclusion in your research?
24    A.    I think several of us at the firm had --
25  you know, had one or two meetings where we talked

Page 36

1  about it.
2          I wasn't tasked with reaching a
3  conclusion.  I was part of a discussion, partly, I
4  think, because of my bankruptcy work, I had been
5  involved in the past with some cases where -- or
6  looking at cases where unions had filed for
7  bankruptcy, and whether that impacted -- how that
8  affected claims that there might be against the
9  union.
10          I think -- my best recollection is that
11  the discussion produced that there would be serious
12  problems -- there would be serious difficulty in
13  anyone evading -- there would be serious issues with
14  any entity like ALPA evading the liability for
15  that -- for that -- for those damages, if there were
16  to be any affiliation or merger or some sort of
17  transaction.
18    Q.    Okay.  Serious issues in what regard?
19  That ALPA might be liable?
20    A.    Yes.
21    Q.    For the liability?
22    A.    Yes.
23    Q.    Okay.  And when that was -- was that the
24  recent opinion of this law firm, that that liability
25  would be transferred to ALPA if there was a merger?

Bensel v.
Air Line Pilots Association

RICHARD J. SELTZER - Vol. 1
September 19, 2008

Page 37

1    A.    I don't know.  I did not communicate
2  with the client about it.  I was not generally -- I
3  was asked -- I participated in one or two meetings
4  within the firm where we discussed the issue.
5        Mr. Savelson and Mr. Abram are the ones
6  who generally act as, I would say, general counsel to
7  ALPA and consult with them.
8        I have more discrete projects.  I was
9  not involved -- you know, this was not my project.
10  This was not my case.
11        I was asked, I think, more from my
12  experience in the bankruptcy angle, what I could
13  contribute on this particular issue, and we had a
14  discussion, and I don't know what, if anything, was
15  reported to ALPA by other people in the firm.
16    Q.    Okay.  From the bankruptcy angle, what
17  were you analyzing, whether or not the liability
18  could be shared somehow in bankruptcy?
19    A.    Yeah, there are cases -- there have been
20  cases where there were major judgments against,
21  generally, local unions, either NLRB judgments or I
22  think, mainly, NLR -- National Labor Relations Board
23  judgments against unions, and they were in
24  bankruptcy, and there was a question about whether,
25  by merging the local, or assigning the members of

Page 38

1  that local to another local, whether liabilities
2  against the local in bankruptcy, you know, could be
3  shed, and I think my conclusion was, as I best
4  remember now, that there was -- there was tremendous
5  difficulty in shedding any liable --
6    Q.    Okay.
7    A.    -- in the bankruptcy context.
8    Q.    And that was something that you
9  communicated to one of the partners here that you
10  understand was communicated to ALPA?
11    A.    I don't know if it was communicated to
12  ALPA.
13    Q.    Very good.
14    A.    I can only testify about what I know.
15    Q.    And that's right.  Now, Mr. Seltzer, was
16  it your understanding that ALPA -- because of this
17  $45 million liability that might be transferred to it
18  in a merger, was it your understanding that ALPA,
19  basically -- I don't know what the word is, but
20  stopped exploring the idea of a merger?
21        MR. KATZ: I'm going to object.  Lack of
22  foundation.
23    A.    I don't know what ALPA was doing or not
24  doing.
25        I was asked a discrete question about

Page 39

1  just whether this liability, what -- what was the
2  potential impact of this liability if there were a
3  transaction, if there were an affiliation or a merger
4  or whatever.
5        I don't know whether -- who, if anyone,
6  was thinking about it.
7        I don't know why the question was asked.
8  I didn't inquire.  I have a pretty busy schedule, so
9  I tend to deal with what I have to deal with.
10        I was asked -- I participated in one or
11  two meetings where we talked about this issue.  I
12  offered, you know, my view from a bankruptcy
13  perspective.
14        I have no -- I don't really know why the
15  question was asked or what happened to the
16  conversation -- you know, the conversation in terms
17  of what was related to ALPA.
18    Q.    And that was really my question, if you
19  knew what ALPA's reaction was to the likelihood of
20  being shouldered with this liability.
21    A.    I don't know why the question was even
22  asked.  I just dealt with trying to deal with the
23  question.
24    Q.    As far as any notion of ALPA merging
25  with the APA in the year 2000, was your involvement

Page 40

1  with any negotiation or discussions about that or
2  analysis of that limited to what you've already told
3  me today?
4    A.    Yes.
5    Q.    All right.
6        Now, were you aware that in the year
7  2001, there was a grass root campaign in American
8  Airlines by several of its pilots to join ALPA?
9        Were you aware of that at the time?
10    A.    No.
11    Q.    All right.  So you -- obviously, you
12  couldn't have been -- been involved in any analysis
13  or work in that regard?
14    A.    That's correct.
15    Q.    Now, in 2002, were you aware that ALPA,
16  after the TWA business was put to side, that ALPA
17  resumed its at least discussions with the APA about a
18  potential merger?
19    A.    I don't know that there were
20  discussions.  So I didn't know anything about any
21  renewal either.
22    Q.    My question is, were you aware of it?
23    A.    No.
24    Q.    All right.  So, obviously, you didn't do
25  any work in that regard?

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| LEROY "BUD" BENSEL, ET AL.       )<br><br>                                 )<br>                Plaintiffs,       )<br>                                 )<br>        v.                       )<br>                                 )<br>ALLIED PILOTS ASSOCIATION,       )<br>                ET AL.           )<br>                                 )<br>                Defendants.       ) | Civil Action No. 02-2917 (JEI) |

## DECLARATION OF RICHARD M. SELTZER

I, Richard M. Seltzer, do hereby state and affirm as follows:

1.      I am a member of the Bar of the State of New York and a partner in the law firm Cohen, Weiss and Simon LLP ("CWS"). I am providing this declaration in order to clarify and amplify my letter of January 12, 2010, explaining to counsel for plaintiffs in the above-captioned case the circumstances surrounding my firm's supplemental production of documents.

2.      When plaintiffs served CWS with a subpoena duces tecum in June 2008, I coordinated the firm's production of responsive documents. I reviewed the materials requested in the subpoena with CWS attorneys who regularly provided legal services to ALPA in relation to TWA and asked them to provide files with responsive documents and obtained those files. I also reviewed the electronic records that I believed would contain responsive documents. CWS focused its search on the subjects designated in the subpoena: "ALPA's potential merger with the Allied Pilots Association (hereinafter 'APA') and/or ALPA's acquisition of the representational rights of the pilots of American Airlines;" "the bankruptcy of TWA, Inc.;" and "the seniority

integration of the TWA pilots and American Airline pilots." CWS produced several thousand pages of documents to plaintiffs in July 2008.

3.      In December 2009, I discovered a document that CWS would have produced if we had found it during our search in the summer of 2008. I was sorting through some unrelated files in a year-end clean-up of my office shortly before Christmas and discovered the document in a folder that contained research regarding potential bankruptcy filings by unions. This folder had no apparent connection to TWA, American or any of the events or transactions involved in the above-captioned case. Because this was a separate research folder and this research folder was unrelated to any particular case, there was no reason for me to have searched this folder for responsive documents in the summer of 2008. When I found this document, I reported the discovery to the ALPA Legal Department and counsel for ALPA in this case. I also discussed the matter with other CWS attorneys and we undertook another thorough search of CWS paper and electronic records to determine whether we had also inadvertently omitted other responsive documents from the original CWS production. We ultimately discovered 454 pages of documents that CWS had not produced in our initial production.

4.      We also researched CWS's obligations under Rule 45 of the Federal Rules of Civil Procedure. Although we determined that the Federal Rules did not clearly impose a duty to supplement our original production, we decided that the appropriate course of action was nevertheless to immediately produce the documents that we had not previously produced. I promptly arranged for CWS technical staff to place these documents on a CD, which I sent by overnight delivery to counsel for plaintiffs on January 12, 2010.

I declare under penalty of perjury that the foregoing is true and accurate.

February 3, 2010

Richard M. Seltzer

3

# EXHIBIT 3

**Legal Temp, Legal**                                                1576

| | |
|---|---|
| From: | Warner, Clay, Herndon |
| Sent: | Tuesday, November 13, 2001 1:35 PM |
| To: | Wagner, Marta, Herndon; Holtzman, David, TWAMEC; Cohen, Jonathan, Herndon |
| Subject: | FW: Carty Letter |

Should someone mention to Bob that APA and AA have already signed an agreement?  This looks particularly silly in light of the existence of the agreement.

I know he won't listen to me (or any of us), but should we encourage Keith to send that message?

Clay
-----Original Message-----
From: Mack, Renata, Herndon On Behalf Of Woerth, Duane, Herndon
Sent: Tuesday, November 13, 2001 9:25 AM
To: Mugerditchian, Jerome, Herndon; Cohen, Jonathan, Herndon; Warner, Clay, Herndon; Migliore, Marcus, Herndon; 'mabram@cwsny.com'
Subject: FW: Carty Letter

FYI

-----Original Message-----
From: Keith O'Leary [mailto:keitholeary@compuserve.com]
Sent: Tuesday, November 13, 2001 9:03 AM
To: Woerth, Duane, Herndon; Holtzman, David, TWAMEC
Subject: Carty Letter


------------Forwarded Message----------------
From:   Robert A. Pastore, BobPastore
To:     Keith O'Leary, keitholeary
        Sally Young, [72153,2324]
        Steve Rautenberg, INTERNET:srautenberg@sprintmail.com
        Ted Case, [73644,3250]
        Jim Arthur, INTERNET:AVIATOR4TWA@CS.COM
        Howard Hollander, INTERNET:upfrontguy@aol.com
        Sean Clarke, INTERNET:pilotsc@home.com

Date:   11/13/01  2:58 AM

RE:     Carty Letter

Folks,

I am intending to send this letter out today.  Comments please:


Dear Mr. Carty:

The pilots of TWA represented by the Air Line Pilots Association have failed to reach agreement with the Allied Pilots Association on a satisfactory seniority integration.

In our view the failure to reach agreement stemmed solely from the fact that the APA is, and has been from the onset, determined to impose a seniority integration that is extremely detrimental, arbitrary and capricious, and in fact, punitive to the TWA pilots. This point is clear to anyone who gives even a cursory examination of the proposals

ALPA 052605

advanced by the APA.

The APA has made it clear that they intend to force upon the TWA pilots an integration that places over 1200 pilots, some of them current TWA Captains, below newly hired American pilots hired as late as April, 2001. This integration strips as much as twelve and a half years of longevity from many of the "stapled" TWA pilots, and places those very same pilots in the unenviable position of being furlough fodder for any future down sizing.

This patently unfair treatment of the TWA pilots will never be met with agreement by the TWA MEC or the TWA pilots.

Further, in light of the fact that this integration is subject to the approval of American management, it is clear to me that American would be better served by bringing on a pilot group that is motivated to help its new employer return to profitability.

I strongly encourage you to reject the APA's proposed seniority integration, and lead the way by joining with ALPA and the APA in finding a mutually agreeable and mutually beneficial solution to this dilemma.

I look forward to your reply.

Yours Truly,

Bob

ALPA 052606