## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| LEROY "BUD" BENSEL, ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 02-2917 (JEI) |
| ) | |
| ALLIED PILOTS ASSOCIATION, ) | |
| ET AL., ) | |
| ) | |
| Defendants. ) | |

## JOINT FINAL PRETRIAL ORDER

A pretrial conference having been held before the Honorable Joseph E. Irenas, United States District Court Judge, on February 8, 2011, with Lisa J. Rodriguez and Nicole M. Acchione, of Trujillo Rodriguez & Richards, LLC, and Martin M. Green, Allen P. Press, and Joe D. Jacobson of Green Jacobson, P.C., appearing on behalf of the Plaintiffs and Daniel M. Katz of Katz & Ranzman, P.C., and John C. Connell and Steven J. Fram of Archer & Greiner, P.C., appearing on behalf of Defendant Airline Pilots Association ("ALPA"), the following Final Pretrial Order is hereby entered:

## I.   JURISDICTION and BRIEF SUMMARY OF THE CASE

### A.   Jurisdiction:

The Parties agree this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 and 28 U.S.C. § 1367. The Parties also agree this Court has personal jurisdiction over the Defendant.

B.    Plaintiffs' Brief Summary of the Case:

Plaintiffs are the Court-appointed representatives of a certified class of former TWA

pilots who allege that their former union, the Air Line Pilots Association ("ALPA"), breached its

duty of fair representation to the Class following the announcement of the airline merger

between TWA, Inc. and American Airlines in January of 2001. Plaintiffs allege that ALPA

acted arbitrarily, discriminatorily and in bad faith by failing to protect the seniority rights of the

TWA pilots. ALPA had several options designed to have preserved and/or created substantial

leverage for the TWA pilots in their fight to protect their seniority during their negotiations with

the American Airline pilots, including but not limited to supporting the TWA pilots' refusal to

waive the Labor Protective Provisions ("LPP's") contained in the TWA/ALPA collective

bargaining agreement; pursuing various litigation strategies that were designed to thwart and/or

stall the disadvantageous seniority integration devised by the American pilots, and supporting

legislative efforts to mandate a seniority integration arbitration.

ALPA not only refrained from pursuing these and other options, but actually worked to

undermine them. ALPA's actions in this regard were arbitrary and in bad faith and caused

damage to the TWA pilots. The evidence adduced at trial will also show that ALPA's conduct in

this regard was motivated by its desire to obtain representation of the American pilot group.

Defendant denies these allegations.

Defendant's Brief Summary of the Case:

This case concerns the claim by Plaintiffs, former TWA pilots, that during negotiations

leading to a merged seniority list with the Allied Pilots Association ("APA"), the American

Airlines pilots' union, Defendant Air Line Pilots Association ("ALPA") sacrificed the TWA

pilots' interests, in violation of its duty of fair representation, in order to curry favor with the

2

American Airlines pilot group. Specifically, Plaintiffs contend that ALPA misled the TWA Master Executive Council ("MEC") into approving a package of agreements on April 2, 2001, refused to authorize the filing of three lawsuits proposed by the TWA MEC's seniority integration attorney, failed to lobby effectively for the enactment of legislation by the United States Congress, and failed to take certain other actions to support the TWA pilots' seniority negotiations in a bad faith attempt to re-unify with the American pilots' union at the expense of the TWA pilots. ALPA contends that it fulfilled its duty of fair representation to the former TWA pilots and provided them with appropriate support and resources to preserve as many of their jobs as possible and to enhance their wages and working conditions in connection with the American Airlines acquisition of TWA's assets. ALPA expressly denies the allegations of bad faith and misrepresentations, asserts that the proposed lawsuits were not undertaken because of sound reasons and contends that the legislation was not enacted because of circumstances beyond its control. ALPA further contends that its conduct did not cause any harm to the former TWA pilots' seniority interests.

ALPA notes that this case was originally certified as a class action at a time when American Airlines and its union, the Allied Pilots Association (the "APA"), were parties and the relief sought by Plaintiffs was equitable in the nature. <u>See</u> Order of February 12, 2003 [Docket 48]. After the dismissal of American Airlines and the APA was affirmed by the Third Circuit and this case was remanded for further proceedings against ALPA, the nature of the class claims were modified into damage claims against ALPA. <u>See</u> Order filed on March 19, 2007 [Docket 205]. As discussed more fully below, in Section IX(B)(1), ALPA believes, after a more thorough analysis of the claims being asserted by Plaintiffs and in light of recent law concerning class actions, including the Third Circuit's decision in <u>In re Hydrogen Peroxide Antitrust Litig.</u>,

3

Case 1:02-cv-02917-    Document 348   Filed 02/02/11   F  _e 4 of 77 PageID: 9540

552 F.3d 305 (3d Cir. 2008), that it is inappropriate for this action to proceed to trial as a class action.[1]

## II.   STIPULATED FACTS

The parties stipulate to the following facts:

### The Defendant

1.     Defendant Air Line Pilots Association ("ALPA") is the world's largest airline pilot union, representing over 50,000 pilots employed by numerous airlines.

2.     For more than half a century, ALPA served as the labor union representing pilots at Trans World Airlines, Inc. ("TWA").

3.     The coordinating council for ALPA at TWA was the TWA Master Executive Council ("TWA MEC" or "MEC"). The TWA MEC consisted of TWA pilots elected by the ALPA members employed at TWA.

### The Plaintiffs

4.     Plaintiffs are a class of pilots who were employed by TWA.

### TWA

5.     TWA had agreed to allow ALPA to appoint one member of its corporate board of directors, and Robert Pastore served as ALPA's appointed member of the TWA board beginning in August 2000. As a member of TWA's board of directors, Pastore had access to confidential financial information about TWA, and as the Chairman of the TWA MEC, he shared that information with the TWA MEC, doing so with the permission of TWA.

6.     In November 2000, the TWA MEC unanimously passed a resolution recognizing that "TWA is once again in a serious financial crisis," and authorizing negotiations with TWA to respond to the crisis.

### The Asset Purchase Agreement

7.     On January 9, 2001, TWA entered into an agreement (the "Asset Purchase Agreement") with American Airlines, Inc. ("American"), through which American agreed to purchase most of TWA's assets.

8.     American also agreed in the Asset Purchase Agreement to provide employment for most of TWA's union-represented employees and to pay TWA's union employees the wages

---

[1] The Third Circuit's Opinion in <u>Hydrogen Peroxide</u> was filed on December 30, 2008, and was amended on January 16, 2009. The date shown in the published versions of the opinion is 2008.

and benefits equivalent to the wages and benefits paid to employees in similar positions at American.

9.    Pilots at American received higher hourly pay rates than pilots at TWA.

10.   In accordance with the Asset Purchase Agreement, TWA filed for bankruptcy on January 10, 2001.

### The "Scope and Successorship" Condition to the Asset Purchase Agreement

11.   The pilots working for American were represented by a different union, the Allied Pilots Association ("APA").  American was a significantly larger airline than TWA: American had approximately 11,500 pilots, while TWA had approximately 2300.

12.   Most pilot collective bargaining agreements in effect in 2001 – including the TWA-ALPA collective bargaining agreement and the collective bargaining agreement between APA and American – used seniority bidding to allocate work opportunities.

13.   A pilot's income is based largely on aircraft and position assignments, and seniority is an important issue for pilots employed under these collective bargaining agreements.

14.   The collective bargaining agreement between ALPA and TWA in 2001 contained "scope and successorship" provisions.  Those provisions required any purchaser of substantially all of TWA's assets to integrate the TWA pilots' seniority list with the seniority list for the purchaser's pilots under one of two processes: (1) a process maintained internally by ALPA for integrating the pilot seniority lists of airlines where both groups are represented by ALPA, or (2) a similar process established by the Civil Aeronautics Board.  Both processes involved negotiation followed by arbitration before a neutral arbitrator.

15.   The collective bargaining agreement between American and APA did not permit seniority integration and so it conflicted with the TWA-ALPA agreement.  Instead, it stated that the seniority placement of any pilot would be based on his or her length of service with American. Without amendment, under that agreement TWA pilots would have been placed at the end of the American pilot seniority list, effective as of the date they became American employees.

16.   The Asset Purchase Agreement addressed the conflict between these provisions of the TWA-ALPA and American-APA collective bargaining agreement by requiring TWA to amend its agreement with ALPA to eliminate the scope and successorship provisions of that agreement as a condition of the acquisition.

### Bankruptcy Court Approval of the Asset Purchase Agreement

17. On March 12, 2001, the bankruptcy court approved the sale of TWA's assets to American under the Asset Purchase Agreement.

*Negotiations with TWA*

18.     ALPA's structure requires each Master Executive Council to appoint a negotiating committee consisting of pilots from that airline to negotiate with management. The results of those negotiations must then be approved by the Master Executive Council or the entire membership at the airline, and then submitted to the ALPA President for final approval.

19.     The TWA MEC Negotiating Committee negotiated with TWA management over the changes to the TWA-ALPA collective bargaining agreement required by the Asset Purchase Agreement, and other matters related to the transaction.

20.     The TWA MEC Negotiating Committee tentatively agreed (subject to MEC approval) to all of the changes to the collective bargaining agreement required by the Asset Purchase Agreement, with the exception of modifying the scope and successorship provisions. The TWA MEC Negotiating Committee obtained TWA's agreement to pay raises, recognition of the TWA pilots' longevity for pay purposes and additional funding for the TWA pilots' retirement plan. The tentative agreement was in the form of a collective bargaining agreement for a new entity—TWA LLC—that American would establish to operate TWA's assets until those assets and employees could be merged into American's operations.

21.     The TWA MEC Negotiating Committee refused to modify the scope and successorship provisions in the TWA-ALPA collective bargaining agreement unless TWA provided a separate agreement that offered the same protections: a process for seniority list integration that was similar to the process described in the scope and successorship provisions in that the process culminated in the final and binding determination of unresolved disputes through arbitration by a neutral third party.

22.     On March 2, 2001, the TWA MEC filed a "grievance"—which is a mechanism for protesting violations of the collective bargaining agreement—to challenge the portion of the Asset Purchase Agreement that required modification of the scope and successorship provisions.

23.     TWA rejected ALPA's proposal for a separate agreement establishing a process for seniority list integration. However, on March 9, 2001, TWA representatives informed the TWA MEC Negotiating Committee that, in response to the TWA MEC's proposal for a seniority list integration process agreement, American would agree to use its "reasonable best efforts" with APA "to secure a fair and equitable process for the integration of seniority," and to engage a facilitator.

*Negotiations with APA*

24.     After the American purchase of TWA assets transaction was announced on January 9, 2001, the TWA MEC appointed a committee known as a "Merger Committee" to negotiate with the Mergers and Acquisitions Committee of the APA, the union which represented the American pilots. The goal of those negotiations was to reach agreement regarding the integration of the American and TWA pilot seniority lists.

6

25.    The TWA MEC Merger Committee met with the APA Mergers and Acquisitions Committee during February and March 2001, and both sides exchanged seniority list integration proposals.

### The Section 1113 Motion

26.    On March 15, 2001, TWA filed a Section 1113 motion in the Bankruptcy Court.

27.    On March 30, 2001, ALPA filed an objection to TWA's Section 1113 motion.

28.    The Section 1113 motion was scheduled for a hearing on April 6, 2001.

### The Decision to Modify the CBA

29.    On March 21 and 22, 2001, and then again on April 1 and 2, 2001, the members of the TWA MEC met in St. Louis to determine whether to accept the package of agreements offered by TWA and American, including the agreement to waive the scope and successorship provisions in the TWA CBA.

### The ALPA / TWA-LLC Transition Agreement

30.    On March 12, 2001, the Bankruptcy Court approved the sale of TWA's assets to a wholly-owned subsidiary of American called TWA LLC.

31.    The transaction between TWA and American closed on April 10, 2001, and on that day the TWA pilots became employees of TWA LLC.

### Continued Negotiations with APA and the "Reasonable Best Efforts" Grievance

32.    During the period after April 2, 2001, the TWA MEC Merger Committee and the APA Mergers and Acquisitions Committee continued to meet to negotiate over seniority list integration.

33.    On April 18 and June 14, 2001, the TWA MEC Merger Committee submitted proposals for seniority list integration to the APA Mergers and Acquisitions Committee.

34.    On July 23, 2001, the APA and TWA MEC merger committees agreed to use a facilitator in their seniority integration negotiations, as provided in American's "reasonable best efforts" agreement, and began facilitated negotiations.

35.    In an agreement dated August 31, 2001, the TWA MEC and APA merger committees extended the facilitator's authority from September 1, 2001, to September 15, 2001.

36.    The facilitated seniority integration negotiations between the APA and TWA MEC merger committees ended on September 17, 2001, without reaching an agreement.

37.    On September 24, 2001, the TWA MEC filed a grievance against TWA LLC and American asserting a violation of American's "reasonable best efforts" agreement ("Reasonable Best Efforts grievance").

38.     On November 1, 2001, the structure of the TWA MEC changed as a result of TWA LLC's closure of two pilot domiciles.

39.     On December 12 and 13, 2001, the ALPA-TWA LLC System Board of Adjustment ("SBA") conducted a hearing on the Reasonable Best Efforts grievance.

40.     The SBA issued a tentative decision in the Reasonable Best Efforts grievance on March 20, 2002, and a final decision on April 18, 2002. The SBA found that American had complied with its promise to use its reasonable best efforts and denied the grievance.

### *Supplement CC*

41.     On November 8, 2001, APA and American reached an independent agreement on the seniority integration of the former TWA pilots, known as "Supplement CC."

42.     Supplement CC was to become effective at the same time the ALPA-TWA LLC collective bargaining agreement expired—i.e., when the National Mediation Board determined that the operations of American and TWA LLC were sufficiently integrated to constitute a single transportation system for the purposes of collective bargaining.

### *NMB Proceedings*

43.     On November 9, 2001, APA filed a petition with the NMB asserting that the merger of American and TWA was sufficiently complete so that the two entities were a single transportation system for the purposes of collective bargaining.

44.     ALPA filed an opposition to APA's petition on January 10, 2002.

45.     At this same time, a group called the Aviation Workers Rights Foundation made its filing with the National Mediation Board charging ALPA with a conflict of interest for helping to organize the American pilots.

46.     On March 5, 2002, the NMB declared that TWA LLC and American were a single employer for the purposes of collective bargaining, and on April 3, 2002, the NMB certified APA as the bargaining representative for the pilots of both American and TWA LLC.

47.     As a result, the pilots of TWA LLC became covered by the APA agreement with American, the April 9, 2001 TWA LLC-ALPA transition agreement expired (by its own terms), ALPA's status as the collective bargaining agent for the TWA LLC pilots terminated, and Supplement CC became effective.

### *ALPA's Pilot Unity Resolution*

48.     On October 16, 2000, ALPA's Board of Directors adopted a Pilot Unity resolution reaffirming its objective to represent all airline pilots in the United States and Canada, including those represented by the independent pilot associations, such as Air Canada Pilots Association, Allied Pilots Association, FedEx Pilots Association, and Independent Association of Continental Pilots.

49.   ALPA's President, Duane Woerth, was invited to address APA's Board of Directors in October 2000.

50.   President Woerth addressed the APA Board in late October 2000.

51.   In President Woerth's address to the American pilots, Woerth urged them to join ALPA, declaring: "We want you right now."

52.   President Woerth assured the American pilots that their political independence would be preserved at ALPA.

53.   APA also staffed an "ALPA Exploratory Committee."

54.   The Chairman of the APA's ALPA Exploratory Committee and three APA officers met with ALPA representatives at ALPA headquarters on November 30, 2000.

55.   In accordance with a resolution of APA's Board of Directors from the fall of 2000, APA mailed to its members its thirty-nine (39) page ALPA Exploratory Committee report dated April 11, 2001.

## III.   PLAINTIFFS' CONTESTED FACTS

Plaintiffs intend to prove the following contested facts with regard to liability:

### *The Asset Purchase Agreement*

1.   Under the terms of the Asset Purchase Agreement governing the transaction between TWA and American, the purchase was to occur through a process that involved TWA filing for bankruptcy.

2.   ALPA filed a limited objection with the bankruptcy court, supporting the sale but seeking an order stating that the sale would not alter ALPA's rights under the 1998 ALPA-TWA collective bargaining agreement.

3.   American provided debtor-in-possession financing to TWA during the pendency of the bankruptcy.

4.   As a condition to the transaction, American promised to hire nearly all of TWA's union-represented employees.

### *The "Scope and Successorship" Condition to the Asset Purchase Agreement*

5.   The Asset Purchase Agreement required TWA to eliminate from its collective bargaining agreement with ALPA certain provisions known as "labor protective provisions" ("LPPs"), which established a process culminating in arbitration to integrate seniority lists in the events of a merger or acquisition.

6.     To comply with this condition, representatives of TWA presented ALPA with lists of provisions to be removed from the ALPA-TWA collective bargaining agreement.

7.     The lists included demands from American with respect to removing the LLPs from the ALPA-TWA collective bargaining agreement.

8.     Since American was willing to guarantee wage and benefit levels for pilots hired in accordance with the Asset Purchase Agreement, the most significant demand was for the elimination of provisions in the ALPA-TWA collective bargaining agreement addressing seniority integration.

9.     Most pilots' collective bargaining agreements—including the 1998 collective bargaining agreement between ALPA and TWA and the one between American and APA, which represents American's pilots—use seniority bidding to allocate work opportunities.

10.     A pilot's assignments to specific types of aircraft, to positions within each aircraft (captain or first officer), and to bases or domiciles are awarded through seniority bidding, as are individual work and vacation assignments.

11.     A pilot's income is based largely on aircraft and position assignments, and seniority is an important issue for pilots employed under these collective bargaining agreements.

12.     The 1998 collective bargaining agreement between ALPA and TWA contained specific protections regarding seniority integration in the event TWA was purchased or merged with another airline.

13.     The 1998 collective bargaining agreement between ALPA and TWA required TWA to ensure that any purchaser agreed to a set of procedures, including arbitration, to achieve a fair and equitable seniority integration for the pilots of the merging airlines.

14.     The APA-American collective bargaining agreement required American to treat the pilots of any acquired carrier like new hires by placing them at the bottom of the American seniority list.

### *ALPA's Attempts to Organize the American Pilots*

15.     On October 16, 2000, ALPA's Board of Directors adopted a Pilot Unity resolution setting forth its objective to represent all airline pilots in the United States and Canada, including those represented by the independent pilots associations, such as Air Canada Pilots Association, Allied Pilots Association, FedEx Pilots Association, and Independent Association of Continental Pilots.

Case 1:02-cv-02917-JL   Document 348   Filed 02/02/11   Pa_ _ 11 of 77 PageID: 9547

16.   Recruiting the American pilots was "one of the biggest goals" of ALPA.

17.   ALPA's President, Duane Woerth, viewed the addition of the American pilots as his personal "legacy."

18.   President Woerth was invited to address APA's Board of Directors in October 2000.

19.   President Woerth addressed the APA Board in late October 2000.  Woerth was the first ALPA president to have received such an invitation after the American pilots broke away from ALPA in 1963.

20.   In President Woerth's address to the American pilots, Woerth urged them to join ALPA, declaring: "We want you right now."

21.   President Woerth assured the American pilots that their political independence would be preserved at ALPA.

22.   President Woerth also assured the American pilots that ALPA would deal with the $45 million judgment that had recently been entered against APA as a result of an illegal sick out it had engaged against American.

23.   Following President Woerth's presentation to the APA Board, the APA mailed an executive summary of Woerth's speech to all of its members.

24.   APA also staffed an "ALPA Exploratory Committee."

25.   The Chairman of the APA's ALPA Exploratory Committee and three APA officers met with ALPA representatives at ALPA headquarters on November 30, 2000.

26.   Throughout December 2000 and early January 2001, ALPA shared information with APA.

27.   For a fee, ALPA also assisted APA as it prepared for contract negotiations with American.

28.   On January 23, 2001, Woerth told the ALPA Executive Council that the campaign for the American pilots was continuing and he updated the Council on those efforts.

29.   This information was not disclosed to the TWA MEC.

30.   Ron Rindfleisch, ALPA's chief organizer, corresponded with the American pilots in the Winter of 2000.

31.  Soon after the American/TWA merger was announced, the TWA MEC appointed a Merger Committee to negotiate the seniority integration with the American pilots.

32.  The Merger Committee met with ALPA representatives in late January 2001.

33.  The ALPA representatives in attendance were asked if ALPA was still pursuing its organizing efforts at American. The manager of ALPA's Economic & Financial Analysis Department, Bob Christy, assured the TWA pilots those efforts had ceased. Likewise, Bill Roberts, an attorney and member of ALPA's Representation Department, told the TWA pilots that there was nothing going on between ALPA and APA.

34.  On January 25, 2001, ALPA's General Manager wrote to APA's President, John Darrah, to confirm that APA was still looking to join ALPA. ALPA offered assistance in financing the communications and member polling in support of the campaign.

35.  While APA's report concerning ALPA had been finalized in January, its distribution to the American pilots was delayed to April (after the "scope waiver") to allay any fears among the American pilots about ALPA's representation of the TWA pilots.

36.  The APA Board passed a resolution directing its ALPA Exploratory Committee to find answers to a list of "40 Questions" it had concerning a merger with ALPA.

37.  In early 2001, the TWA and American pilot groups began their seniority negotiations. Two negotiating sessions took place in early 2001. No agreement was reached. The American pilots openly expressed hostility toward the TWA pilots.

38.  The TWA pilots reported to ALPA the lack of progress with their negotiations and the American pilots' hostility toward them. ALPA made no response or rebuke of the American pilots.

39.  In April, 2001, Woerth reported to ALPA's Executive Council that ALPA had "expanded" its organizing efforts at American.

40.  On April 5, 2001, three days after the TWA MEC waived scope, and one day before the now mooted Section 1113 hearing in the bankruptcy court, ALPA President Woerth presented to the APA Board at a special meeting.

41.  At the April 5, 2001 meeting, Woerth told the American pilots that the TWA pilots would have to "get real" with respect to their seniority integration proposals and that they had "unrealistic goals."

42.     Woerth's attendance at the APA BOD was not disclosed to the TWA pilots.

43.     A TWA pilot wrote to the ALPA Legal Department to inquire if Woerth had actually made the "get real" comment, but ALPA attorney Clay Warner did not investigate and advised ALPA that no response was "necessary or appropriate."

44.     On April 11, 2001, APA mailed to its members the thirty-nine (39) page report of its ALPA Exploratory Committee.

45.     Beginning in April 2001, officer election campaigns were beginning at APA. ALPA learned from an American pilot that two of APA's presidential candidates and one vice-presidential candidate were running on pro-ALPA tickets.

46.     The pro-ALPA vice-presidential candidate, Mark Hunnibell, wrote to ALPA to request help regarding his campaign website.

47.     ALPA also received campaign material from the other APA presidential candidate.

48.     Hunnibell sent the American pilots authorization cards to request an election to make ALPA their union.

49.     ALPA was informed that Hunnibell planned to have ALPA control the authorization cards.

50.     The pro-ALPA candidates were not elected but continued their ALPA card campaign.

51.     ALPA's Vice-President told one of the American pilot organizers, John Clark, to use Rindfleisch as their "point of contact" at ALPA concerning the campaign.

52.     As that point of contact, Rindfleisch talked and emailed with American pilots on an almost daily basis.

53.     Rindfleisch's correspondence with American pilots covered many topics, including:

        a.      The identity of American pilots supporting the campaign;

        b.      The proper handling of the authorization cards;

        c.      Access to the American pilots' private campaign website;

        d.      Access to APA's private bulletin board;

        e.      Messages from American pilots regarding ALPA;

13

      f.     The provision of ALPA promotional materials to American pilots;

      g.    American pilots' hostility for and mockery of TWA pilots;

      h.    The seniority negotiations between the TWA pilots and American pilots;

      i.     American's contract negotiations with its pilots;

      j.     ALPA's response to the APA's single carrier filing with the National Mediation Board;

      k.    ALPA's response to the AWRF's allegation of a conflict of interest;

      l.     The lawsuit filed against the TWA pilots by APA;

      m.   APA's response to the TWA pilots' legislative efforts; and

      n.    Purely personal matters.

54. Most if not all of ALPA's high level executives, including Woerth, were aware of the ongoing communications between Rindfleisch and the American pilots, as Rindfleisch forwarded to them much of his correspondence with the American pilots.

55. Although these communications between ALPA and the American pilots took place at the same time the TWA pilots were negotiating with APA for their seniority, ALPA never disclosed these facts to the TWA pilots.

56. This would have been important to the TWA MEC.

57. In late July 2001, Hunnibell and Clark were invited to ALPA headquarters to meet with various ALPA officials and were treated to dinner by ALPA's vice-president.

58. Those meetings took place just one day before the TWA pilot leaders went before ALPA's Executive Council to request additional funding for their efforts. ALPA denied that request and did not disclose their meetings with the American pilots.

59. The TWA pilots' negotiations with APA for their seniority ended in October 2001 without agreement.

60. American pilots Clark and Hunnibell requested that ALPA reimburse them for the expenses they had incurred in running the ALPA campaign.

61.   Clark followed-up on his reimbursement request two weeks later by email dated
      October 30, 2001, and Rindfleisch forwarded their reimbursement request to
      Woerth and fifteen other ALPA executives and officials.

62.   Clark followed-up again by email dated November 6, 2001, and Rindfleisch
      responded, promising a "response and check very soon."

63.   Clark delivered to ALPA the authorization cards they had collected from
      American pilots.

64.   The delivery of the authorized cards was made in Las Vegas, where Woerth and
      other ALPA executives were attending AFL-CIO meetings.

65.   ALPA is no longer is possession of the authorization cards.

66.   On December 5, 2001, Rindfleisch asked Clark and Hunnibell to submit the back-
      up for the expenses they sought to be reimbursed and promised the expenses
      would be paid as soon as ALPA received their receipts.

67.   In an email approved by ALPA's director of Finance and an ALPA staff attorney,
      Rindfleisch promised the American pilots their expenses would be paid as soon as
      ALPA received their receipts.

68.   The American pilots then mailed their receipts to ALPA.

69.   At this same time, a group called the Aviation Workers Rights Foundation made
      its filing with the National Mediation Board charging ALPA with a conflict of
      interest for helping to organize the American pilots.

70.   The proceedings before the National Mediation Board concluded on April 3,
      2002.

71.   On April 3, 2002, ALPA received via email a resolution passed at APA's
      Dallas/Ft. Worth base to merge with ALPA.

72.   Between August 2002 and July 2003, Woerth spoke at the APA domicile in
      Dallas, New York, Chicago, Los Angeles and Miami.

### TWA's Section 1113 Motion / April 2nd TWA MEC Meeting

73.   In violation of its contract with its pilots, TWA agreed as part of the Asset
      Purchase Agreement with American that it would amend all existing collective
      bargaining agreements to provide that their scope provisions would not be
      applicable to American, including the right to a seniority integration process that
      culminates in final and binding arbitration.

74. ALPA initially refused to waive their right to arbitrate any seniority dispute.

75. In response, TWA filed its Section 1113 motion in the bankruptcy court.

76. The motion was set for a first day of evidentiary hearing on Friday April 6, 2001.

77. On Friday March 30, 2001, ALPA filed its opposition to the 1113 motion, and simultaneously called for a meeting with the TWA MEC the following business day, April 2, 2001.

78. David Holtzman, an ALPA attorney designated to exclusively serve the TWA pilot group, arranged for a group of eight other ALPA "advisors" to attend the meeting.

79. On April 2, 2001, advisors Richard Seltzer and Steve Tumblin told the MEC that their chances of prevailing on the Section 1113 motion were slim to none. The other union advisors went a step further telling the MEC it had no choice but to waive their scope protections, accept TWA's last "offer" and surrender their opposition to the 1113 motion.

80. The MEC complied with ALPA's instruction and voted to waive the TWA pilots' scope protections.

81. The right to arbitrate any seniority dispute is the "pillar" of a pilot collective bargaining agreement and giving it up is a "gigantic concession."

82. ALPA considered the TWA MEC's scope waiver concessionary.

83. ALPA's president had no involvement in any of the negotiations leading up to the TWA pilots' scope waiver.

84. The ALPA advisors who attended the meeting told the TWA MEC that the decision to waive scope had to be made that day.

85. One of the ALPA advisors warned the MEC "the train is leaving the station."

86. ALPA, however, did not believe there was any specific deadline at the time other than a general presumption that the commencement of the 1113 hearings on April 6 might trigger a deadline.

87. ALPA also knew that Section 1113 hearings at major airlines can stretch on for weeks or even months, and the Section 1113 litigation process itself often involves the bankruptcy judge in a mediatory role.

Case 1:02-cv-02917-J.   Document 348   Filed 02/02/11   P. ... 17 of 77 PageID: 9553

88.    Advisor and former ALPA President Randy Babbitt's advice to the TWA MEC
       would have been different had he understood that a decision was not required on
       April 2, 2001 and there was more time to negotiate.

89.    None of the ALPA advisors told the MEC members that the Section 1113 process
       would afford them additional time to make their decision.

90.    The time pressure on April 2 was driven by Woerth's desire to have the TWA
       MEC waive scope protections prior to a special APA Board meeting he was
       scheduled to attend on April 5. Woerth's scheduled attendance at the April 5,
       2001 APA meeting was not disclosed to the TWA MEC.

91.    All of these facts would have been important to the MEC in making its decision.

92.    In March 2001, ALPA attorney Clay Warner told at least one TWA MEC
       representative they would defeat TWA's 1113 motion.

93.    Three days before the April 2 meeting, ALPA filed an extensive opposition to the
       1113 motion in which it made compelling arguments why the motion should be
       denied.

94.    On April 2, however, the lawyer who drafted that opposition told the TWA MEC
       there was a 100% chance of failure on the 1113 motion.

95.    One of the ALPA advisors, attorney Bill Roberts, told the TWA MEC the
       consequence of contract rejection would be that all TWA pilots would lose their
       contractual and representation rights and, therefore, be subject to termination at
       will.

96.    Roberts also said that with the loss of the contract would come the loss of the
       entire grievance process so that pilots could be terminated simply for calling in
       sick.

97.    These predictions were "greatly exaggerated."

98.    One of the ALPA advisors even knew that TWA was only seeking rejection of a
       single contractual clause—the scope provisions—not rejection of the entire
       collective bargaining agreement.

99.    These facts would have been important to the MEC in its decision-making.

100.   The ALPA advisors insisted that, in the absence of a waiver, American would
       abandon the transaction resulting in the immediate liquidation of TWA.

101.   ALPA, however, was not aware of any such threat by American.

102. Even in the face of a threat, ALPA's standard practice was not to concede without putting management's threats to the test.

103. American's contemporaneous statements regarding the transaction called into question the truth of any real or imagined threat by it to abandon the deal because the TWA pilots insisted on a fair seniority integration process.

104. American had already demonstrated that it was willing to breach its collective bargaining agreement with APA by arranging for the creation of a TWA LLC, staffed by TWA pilots.

105. American was also willing to pressure the APA to accede to seniority integration procedures for other ALPA-represented pilot groups, as evidenced by its plan to go forward with the United/US Airways portion of the deal with the expectation that APA would "consent" to the integration of 500 US Airway Captains based on Allegheny-Mohawk principles (arbitration if no agreement).

106. ALPA also believed at the time that American CEO Don Carty was "staking his reputation on the consummation of the deal."

107. The ALPA advisors believed the TWA pilots, absent some other intervening factor(s), could expect "little other than placement on the bottom of the [American] seniority list."

108. Prior to the April 2 MEC meeting, American made the following offer in exchange for the TWA MEC's agreement to waive scope "to use its reasonable best efforts with its labor organization representing the airline pilots craft or class [APA] to secure a fair and equitable process for the integration of seniority. In that regard, American will engage a facilitator to organize meetings with the labor organizations representing the Airline Pilots and American and TWA-L.L.C. American agrees to adopt the procedures that result from this process for seniority integration."

109. Prior to the April 2, 2001, TWA MEC meeting, ALPA agreed with Roland Wilder that this promise was inadequate to protect the TWA pilots.

110. During the April 2, 2001 meeting, however, ALPA told the TWA pilots' representatives that the "reasonable best efforts" promise had "meat and guts to it;" that it was "something that we could enforce in court some day" and would support litigation in the event the TWA pilots' seniority was not properly respected.

111. The representations made by ALPA at the April 2, 2001 meeting were material to the MEC's decision to waive scope.

18

112.   ALPA knew the Reasonable Best Efforts process was doomed from the start because the facilitator had virtually no powers.

113.   At a break during the April 2, 2001 meeting, the ALPA advisors held a closed door meeting with Wilder in which the advisors bullied Wilder into acquiescence.

114.   Prior to the April 2, 2001 meeting, ALPA attorney Warner was optimistic concerning the TWA pilots' chances of prevailing in the pending Section 1113 litigation and advised the TWA MEC not to be deterred by the threat of an 1113 filing.

115.   At the April 2, 2001 meeting, Warner told the MEC his initial advice had been "premature" and that he had to "defer" to the other ALPA attorneys present.

116.   Before the April 2, 2001 meeting, ALPA attorney David Holtzman said he "always believed we would prevail."

117.   On April 2, 2001, David Holtzman was silent.

118.   ALPA's goal for the April 2 meeting was to "step in and close deal."

119.   As of that day, ALPA had made no preparations for the Section 1113 hearing scheduled to begin on April 6, 2001.

120.   The ALPA advisors "coerced and intimidated" the TWA MEC into waiving scope at the April 2, 2001 meeting.

121.   After the MEC voted to waive scope, the ALPA advisors gathered in a conference room alone and were overheard saying: "we got 'em;" "we are off the hook;" "we got Sally Young;" the "MEC caved;" and called Howard Hollander a "real son of a bitch" and a "prick."

122.   ALPA believed the TWA pilots would have been entitled to strike if the bankruptcy court rejected their collective bargaining agreement.

123.   At the April 2 meeting, none of the ALPA advisors informed the MEC of their right to strike if the 1113 motion was granted.

124.   ALPA then took credit for avoiding a potential strike as a basis for TWA's reimbursement of ALPA's attorneys' fees incurred in the bankruptcy.

125.   The threat of a strike presented potential leverage for the TWA pilots, as American had determined that it needed the TWA pilots or otherwise face expensive training costs to replace the TWA pilots.

Case 1:02-cv-02917-JL   Document 348   Filed 02/02/11   Pa_   20 of 77 PageID: 9556

126. These facts would have been important to the MEC in making its decision on April 2, 2001.

127. The TWA pilots would have possessed statutory rejection claims had the bankruptcy court rejected their collective bargaining agreement, *11 U.S.C. § 365,* which were of such financial significance that the Committee of Unsecured Creditors actually opposed TWA's motion to reject the unions' collective bargaining agreements.

128. The leverage presented by these rejection claims was never explained to the TWA MEC and would have been important to the MEC in making its decision.

129. The MEC's waiver decision resulted from ALPA's "overwhelming advice" that they had no choice but to waive scope.

130. ALPA then took credit for the decision in applying for its attorneys' fees in the bankruptcy court.

### *ALPA Rejected Roland Wilder's Litigation Strategies*

131. Roland Wilder was retained by ALPA to be the TWA MEC's independent Merger Counsel.

132. ALPA filed a grievance against TWA for having entered into the Asset Purchase Agreement in breach of their collective bargaining agreement. ALPA filed a second grievance against TWA for having filed the Section 1113 motion.

133. Wilder developed a legal strategy to enjoin the closing of the TWA asset sale until resolution of the grievances in order to force American to pressure the APA into a fair and equitable seniority integration.

134. Only ALPA's president could authorize the suit proposed by Wilder.

135. ALPA's own opposition to the 1113 motion recognized that TWA was not seeking rejection of ALPA as the pilots' bargaining agent.

136. Wilder rejected the possibility that American would abandon the transaction and deemed the loss of TWA pilot seniority to be the more serious risk.

137. Prior to April 2, Wilder maintained that without a process agreement or some other legitimate guarantee of a fair and equitable seniority integration process, the MEC should not agree to waive the pilots' scope protections.

138. Prior to the April 2, 2001 meeting, attorneys Holtzman and Wilder agreed to aggressively defend the TWA pilots' scope protections - even in the face of an

1113 motion - and only to surrender in exchange for an appropriate seniority integration process agreement culminating in arbitration absent an agreement.

139.   The MEC directed Wilder to seek authority from President Woerth to implement this strategy. In doing so, Wilder described it as "necessary both to preserve the TWA pilots' rights and to enhance ALPA's ability to defend" against TWA's 1113 motion.

140.   The creation of even a short delay in consummating the deal could have created substantial pressure on both TWA and American.

141.   Woerth did not authorize the lawsuit.

142.   On April 9, 2001, the day the bankruptcy settlement was concluded, American and APA reached an "Agreement in Principle" on the terms of a new collective bargaining agreement (the "Transition Agreement") to cover the transitional period in which TWA LLC would be operated as a subsidiary of American. This Agreement included a "seniority integration plan."

143.   Thereafter, American and APA continued to negotiate to a final Transition Agreement. These negotiations directly impacted the terms and conditions of employment of the TWA pilots, a group that APA was not authorized to represent.

144.   The TWA MEC protested to APA that it and American were unlawfully negotiating the TWA pilots' terms and conditions of employment.

145.   Wilder submitted a detailed memo to ALPA describing how the negotiations between American and APA caught them in the "horns of a dilemma" and subjected them to potential liability for their failure to include ALPA in the negotiations.

146.   Wilder reported to ALPA that this potential for litigation created leverage that was "quite desperately needed" for the TWA pilots and he requested authority to file suit.

147.   In labor litigation, the leverage created in ongoing negotiations can be more important than whether the litigant ultimately prevails.

148.   ALPA refused to authorize Wilder's proposed suit.

149.   The TWA MEC's inability to secure an agreement with APA subjected the TWA pilots to the likelihood that APA and American would simply impose their own agreed-upon seniority list (the "cram down"). As this result became imminent, Wilder submitted a memorandum to ALPA which outlined yet another strategy to

enjoin American and APA from entering into an agreement imposing an APA-dictated seniority integration.

150. Wilder met with Woerth and the head of the ALPA Legal Department to discuss the litigation strategy, at which time ALPA approved it.

151. Due to ALPA's approval, Wilder drafted the pleadings and papers necessary to file the injunction action.

152. A subsequent session of negotiations took place in Washington, D.C., in October 2001 at the request of Senator Christopher Bond. When those negotiations failed and the time for action to prevent the "cram down" was at hand, Wilder made the final preparations to file suit. Wilder then told the TWA pilot representatives: "God damn it, I can't file the lawsuit. Duane [Woerth] won't let me."

153. In a telephone conversation that day, Woerth told the TWA MEC representatives, "I am not taking any legal action and I am not going to let you take any legal action. ... I don't sue unions and I don't sue companies I don't have a contract with."

154. The Chairman of the TWA MEC stated this was not a cogent reason to deny the litigation to which Woerth replied: "You're going to have to sign the deal, that's it."

155. Wilder was given no rationale for ALPA's denial, other than ALPA's own political or "strategic" agenda.

156. Wilder stated that ALPA's constant rejection of his efforts to defend the TWA pilots was a singular experience.

## *ALPA Advisors' Undisclosed Conflicts of Interest*

157. Richard Seltzer, one of the advisors who attended the April 2, 2001 TWA MEC meeting, was a partner at Cohen, Weiss & Simon.

158. Cohen, Weiss & Simon was general counsel to the Association of Professional Flight Attendants ("APFA"), the union which represented the American flight attendants.

159. The APFA shared the APA's goal of denying date of hire seniority integration to TWA employees.

160. ALPA did not inform the TWA MEC of Cohen, Weiss & Simon's conflict of interest until March of 2002.

22

161.  Advisor Randolph Babbitt's retainer provided for him to be directed by both the TWA MEC and ALPA's President, Duane Woerth.

162.  Duane Woerth refused to send the letter proposed by Babbitt to Norm Mineta, then Secretary of the United States Department of Transportation ("DOT"). The letter predicted total seniority loss for the TWA pilots and requested that final DOT approval of the TWA asset purchase be conditioned on "the fair and equitable integration of employees from TWA into the combined work force of American."

163.  Prior to the April 2, 2001 meeting, Babbitt had also recommended to ALPA that the MEC develop a bottom line seniority proposal accompanied with the threat of litigation for the purpose of creating some leverage.

164.  Babbitt did not mention either of his strategies to the MEC during the April 2, 2001 meeting. Instead, Babbitt said "there are no problems here. You're going to get jobs with a well-heeled major airline. These guys aren't going to kill you."

165.  ALPA advisor Michael Glanzer expected to receive a fee in the amount of approximately $2.8 million if the American/TWA transaction was successful.

## *The Transition Agreement*

166.  The agreement to waive scope and settle the Section 1113 motion included a new collective bargaining agreement between ALPA and TWA LLC, a newly formed subsidiary of American ("Transition Agreement").

167.  ALPA hailed this agreement as a major accomplishment, principally because TWA LLC agreed to employ all the pilots of former TWA.

168.  The Asset Purchase Agreement itself ensured employment of all of TWA's pilots.

169.  Under the terms of the Transition Agreement, ALPA agreed to waive any future collective bargaining by providing that TWA LLC's "sole obligation shall be to confer with ALPA on all changes during the notice period and to provide ALPA with all changes or amendments in writing."

170.  ALPA's waiver of its duty to bargain was not required by the Asset Purchase Agreement and ALPA knew it gave "TWA and American unprecedented flexibility in integrating the two carriers."

171.  This waiver and its benefit to American was not explained to the MEC.

172.  Pursuant to the Transition Agreement, ALPA also waived other protections secured in its previous agreement that were not required by the Asset Purchase Agreement, including but not limited to: flight pay loss; longevity and seniority

23

credit during furlough; a contract amendable date; the forfeit of pay increase; the loss of a seat on the Board of Directors and furlough protections for pilots hired on or before March 15, 1985.

173. None of this was disclosed to the TWA MEC.

174. All these facts would have been important to the MEC in making its decision on April 2, 2001.

175. ALPA's Constitution and By-Laws require that any first contract be ratified by the affected pilot membership.

176. The Transition Agreement with newly formed TWA LLC was a first contract.

177. At the April 2, 2001, meeting pursuant to ALPA's Constitution and By-Laws, the TWA MEC requested that the whole matter of waiving scope and entering into a contract with TWA LLC be subject to membership ratification.

178. ALPA denied that request.

### Major Contingency Fund Requests

179. The facilitated seniority negotiations required by the bankruptcy settlement were scheduled to begin in June 2001.

180. At a special TWA MEC meeting held in advance of those negotiations, Woerth pledged the "full support of ALPA" for the TWA pilots to preserve their seniority.

181. Part of ALPA membership dues are set aside in what is known as the "Major Contingency Fund."

182. From September 1998 to April 2003, at least 24 requests were made by various ALPA pilot groups for money from the Major Contingency Fund.

183. In January 2002, the TWA MEC requested money from the Major Contingency Fund, this time to challenge the legality of the seniority agreement reached between American and APA that was to be "crammed down" upon the TWA pilots.

184. This request was denied.

### ALPA Denied Other Requests for Assistance Made by the TWA Pilots

185. ALPA touts as another of its strengths the fact that it is the trade union for pilots, with more than 60,000 pilot members at its disposal.

24

186.  The TWA pilots specifically requested that ALPA enlist the support of its members by denying jump seat privileges to any American pilot flying on an ALPA carrier.

187.  ALPA touts as another of its strengths its public relations and communications abilities.

188.  ALPA touts as another of its strengths its affiliation with the AFL-CIO.

189.  The TWA MEC's inability to secure an agreement with APA subjected the TWA pilots to the likelihood that APA and American would simply impose their own agreed-upon seniority list (the "cram down").

190.  A subsequent session of negotiations took place in Washington D.C. in October 2001 at the request of Senator Christopher Bond. When those negotiations failed, and the time for action to prevent the "cram down" was at hand, Wilder made the final preparations to file suit.

191.  After the negotiations failed, the TWA MEC voted 5 to 1 to reject the proposed seniority integration agreed to by APA and American, later to be referred to as "Supplement CC." Steve Rautenberg cast the only vote in favor of Supplement CC.

192.  Sally Young refused to second Rautenberg's motion for reconsideration and Chairman Pastore affirmed that a second was required in order to vote on any motion.

193.  Commencing on or about September 28, 2001, the TWA MEC, in cooperation with Missouri Senator Christopher Bond, launched an effort to obtain legislation that would mandate an Allegheny-Mohawk seniority integration process for the American and TWA employee groups.

194.  The United States Senate adopted the legislation.

195.  In February 2002, APA sued TWA pilot Bud Bensel in Texas seeking a declaration that Supplement CC was enforceable. The APA amended its complaint to seek a defendant class consisting of all the TWA pilots.

196.  The TWA MEC requested that ALPA defend the case and challenge Supplement CC. ALPA denied that request.

197.  In late July 2001, after ALPA rejected Wilder's litigation strategy, TWA pilot representatives presented to ALPA's Executive Council and formally requested money from the Major Contingency Fund in order to retain a new independent lawyer.

198. Their request was denied in whole, without basis and one council member openly expressed anger towards the TWA pilots.

199. Woerth's response to the request was to say "no" and "hell no."

200. In January 2002, the TWA MEC again requested money from the Major Contingency Fund, this time to challenge the legality of the seniority agreement reached between American and APA that was to be "crammed down" upon the TWA pilots.

201. Woerth attended only one negotiating session with APA. In meeting with the Merger Committee prior to the session, he spoke in tough terms that he would not allow the APA to treat the TWA pilots unfairly, but in the actual negotiating session, Woerth spoke in meek conciliatory terms and assumed a disinterested attitude.

202. Woerth had no direct other role in the negotiations with APA.

203. ALPA took no action to organize any of its members to picket or otherwise assist the TWA pilots in the fight to protect their seniority.

204. ALPA took no action to undertake a public relations campaign in support of the TWA pilots.

205. ALPA took no action to enlist the support of the AFL-CIO as a means of assisting the TWA pilots.

206. In the Fall of 2001, ALPA unilaterally collapsed all TWA representation into a single domicile with only two representatives, Young and Rautenberg, despite the fact that the TWA MEC had previously voted unanimously to maintain all TWA domiciles until final absorption into American.

207. Woerth then gave 24-hours notice of a TWA MEC meeting on November 7, 2001, to reconsider the Supplement CC proposal.

208. Woerth had never before called a TWA MEC meeting.

209. Because Rautenberg was a Captain and Young was a First Officer, the meeting called by Woerth presented Rautenberg with the power to single-handedly "reconsider" and approve what the full MEC had previously rejected just days before.

210. ALPA knew it would be insulated from any potential fair representation liability if the MEC had agreed to Supplement CC.

211.   Sally Young refused to second Rautenberg's motion for reconsideration and Chairman Pastore affirmed that a second was required in order to vote on any motion. In response, ALPA attorney Warner screamed at Young. He threatened that she would get sued by her fellow pilots if she did not allow the motion to be ruled upon and warned that ALPA would provide her with no assistance.

212.   Warner's conduct led to a written complaint from Young in which she requested that attorney Holtzman investigate Warner's use of "coercive threats," an investigation which never occurred.

213.   The United States Senate adopted legislation that would mandate an Allegheny-Mohawk seniority integration process for the American and TWA employee groups. The American pilots were threatened by the legislation.

214.   Woerth reacted angrily to the ALPA Executive Council when hearing of the legislative effort.

215.   ALPA Director of Government Affairs, Paul Hallisay, did nothing to support the lobbying effort.

216.   Legislators and their staffers advised the TWA pilot representatives who lobbied on Capitol Hill that ALPA did not support the legislation and it wanted the legislators to "ignore" the TWA pilots.

217.   In December 2001, ALPA cut off all flight pay loss to TWA pilots who lost time at work due to their lobbying efforts.

218.   Calls from American pilots outnumbered calls from TWA pilots by 10 to 1, yet ALPA made no effort to rally its significantly larger membership base to the cause.

219.   Warner ordered Holtzman to "avoid the issue if possible, and avoid at all costs discussing timing of representation and sources of funding."

220.   At the same time, Holtzman spied on the MEC to learn of their strategy.

221.   ALPA denied the MEC's request to defend the TWA pilots and challenge Supplement CC.

## IV.   DEFENDANT'S CONTESTED FACTS

Defendant, ALPA, intends to prove the following contested facts with regard to liability:

### *The Plaintiffs*

1.     The Plaintiffs named on the Complaint, the class representatives, include pilots who served as members and officers of the TWA MEC, including Robert Pastore, who was Chairman of the TWA MEC from August 2000 through April 2002.

### *TWA*

2.     TWA declared bankruptcy in 1992.

3.     TWA declared bankruptcy again in 1995.

4.     TWA incurred operating losses of $29.26 million in 1997, $65.16 million in 1998, and $347.64 million in 1999. Its operating loss for the first nine months of 2000 was $99.6 million, compared to an operating loss of $78.2 million for the same period of 1999. Its operating activities generated only $7.7 million in cash for the first nine months of 2000, compared with $69.9 million for the same period in 1999.

5.     By the end of 2000, TWA Inc. was on the brink of bankruptcy and probable liquidation.

6.     In pleadings filed in bankruptcy court on January 10, 2001, TWA asserted that it faced "an immediate cash shortage" and an "acute liquidity crisis," and that "without immediate access to" additional financing, its "ability to maintain operations for even the short term would be in doubt."

### *The Asset Purchase Agreement*

7.     On January 9, 2001, TWA and American announced that American would purchase substantially all of the assets of TWA (although it would not purchase the corporation itself).

8.     The Asset Purchase Agreement provided for TWA to file for bankruptcy again, and stated that American was to provide immediate financing, called "debtor-in-possession financing," to keep TWA operating until the purchase could be completed.

9.     As part of its offer to purchase certain assets of TWA, American promised to hire nearly all of TWA's union-represented employees.

10.    Robert Pastore, TWA MEC Master Chairman and a TWA pilot, told the ALPA Executive Council in mid-January 2001 that the American transaction must happen or TWA would go out of business. Pastore held a seat on the TWA Board of Directors and had the latest information on liquidity, access to capital markets, financial viability, etc. The Executive

Council included all of ALPA's national officers (including President Duane Woerth) and several executive vice presidents (including one elected by and reporting to the group of MECs that included the TWA MEC among others).

11.     After the proposed acquisition was announced, William Compton, CEO of TWA, told Woerth in February or March 2001 that there was no "Plan B" for TWA, and that either the deal worked or TWA was out of cash and out of business.

## The "Scope and Successorship" Condition to the Asset Purchase Agreement

12.     American was committed to avoiding a repetition of the mistake it made in the American-Reno transaction—purchasing another carrier when the acquisition led to a dispute with APA, which contended that the purchase violated its collective bargaining agreement.

13.     The Asset Purchase Agreement addressed the conflict between these provisions of the TWA-ALPA and American-APA collective bargaining agreement by requiring TWA to amend its agreement with ALPA to eliminate the scope and successorship provisions of that agreement as a condition of the acquisition.

> Prior to Closing, TWA shall amend all existing Collective Bargaining Agreements relating to any present or former employee of TWA to provide that . . . scope, successorship, and benefits provisions of the Collective Bargaining Agreements are not applicable to or being assumed by [American] . . . .

14.     Woerth spoke on the phone with Jeff Brundage, head of American Airlines labor relations, in March or April 2001 and urged him to ensure that American and APA made a maximum effort to provide the best seniority integration possible.

15.     On March 27, 2001, Scott Schwartz, Matt Comlish and Clay Warner met on behalf of ALPA with the Department of Transportation, which had the authority to approve airline mergers, to request that the agency require that American ensure that pilot seniority lists were integrated through a fair and equitable seniority process. The DOT representatives expressed disinterest and never responded to the request.

## TWA MEC Support for the Asset Purchase Agreement

16.     All fifteen members of the TWA Board of Directors—including TWA MEC Chairman and ALPA representative Robert Pastore — voted unanimously to approve the Asset Purchase Agreement between TWA and American, including the provision for amending the CBAs as described above.

17.     The TWA MEC strongly supported the Asset Purchase Agreement.

18.     In a press release dated January 10, 2001, TWA MEC Chairman Pastore stated with respect to the Asset Purchase Agreement that "we believe this is a positive move for American, TWA and our pilots, especially because it proposes to protect the jobs of all pilots and most other TWA employees."

19.    In a recorded message to TWA pilots, TWA MEC Vice Chairman Scott Schwartz stated:

> [W]e believe the American acquisition represents the best opportunity for our pilots and for all TWA employees. If for some reason this deal does not close, because of [former TWA investor Carl] Icahn or some other reason, then we face the probability that all 20,000 jobs at TWA will be lost and the traveling public will suffer from less competition.

20.    In a written statement submitted to the United States Senate Commerce Committee, the TWA MEC stated:

> TWA's future has been in doubt for many years, but its pilots have come through again and again to keep the airline flying. In the last 15 years, pilots alone have agreed to more than $600 million in tangible concessions in reduced salaries and work rule changes. As a result, TWA pilots today make significantly less, on average, than pilots at other airlines who have equivalent seniority, expertise and training.
>
> ... ALPA-represented TWA pilots support a complete, fair and sound resolution to this latest and, we believe, final chapter in our airline's history. This resolution will allow TWA and its many constituencies, including its 20,000 employees, to:
>
> • Secure the long-term stability of 20,000 jobs that remain as good as or better than they are now.
>
> • Protect the medical and retirement benefits of past TWA employees. Even though ALPA does not represent its retired members in collective bargaining, no one would argue that fulfilling promises to retirees is the right thing to do.
>
> • Avoid ongoing fatal damage from Carl Icahn, who is in no small part responsible for the situation [in] which TWA now finds itself, and who has claimed that he is willing to provide economic support to other interested parties.
>
> • Advance a complete, fair and sound resolution, sparing those markets largely served by TWA from economic damage.
>
> For these reasons, we submit that the offer from American Airlines to buy TWA's assets satisfactorily crosses the threshold and meets the criteria outlined above. It is an example of the complete, fair and sound solution we seek.

21.    The TWA MEC also opposed attempts made to derail American's purchase of TWA's assets.

30

22.     In February 2001, the TWA MEC issued a press release announcing that TWA pilots would attend a bankruptcy court hearing to oppose an attempt by Continental Airlines to delay the sale to American, which, according to the press release, would "put[] American Airlines' proposed transaction with TWA and 20,000 TWA employee jobs in jeopardy." TWA MEC Chairman Pastore stated: "If Continental's motion is granted, the future of TWA employee jobs could be in jeopardy. The TWA pilots and several members of Congress have concluded that the proposed American transaction is the only complete, fair and sound solution."

23.     In March 2001, MEC Vice Chairman Scott Schwartz testified in bankruptcy court in favor of American's purchase of TWA assets, and in opposition to a competing reorganization plan for TWA that was proposed by former TWA investor Carl Icahn.

### *Bankruptcy Court Approval of the Asset Purchase Agreement*

24.     Although American's acquisition of TWA's assets was initially challenged by some of TWA's creditors, the bankruptcy court rejected those challenges. On March 12, 2001, the bankruptcy court approved the sale of TWA's assets to American under the Asset Purchase Agreement. The court found that, without the sale to American, TWA would cease operations almost immediately. The Court stated:

> A denial of the motion [to sell TWA's assets to American] would put this Chapter 11 case in a free-fall context. And I agree with the uncontested testimony of [TWA President] Compton that it would result in a collapse of TWA . . . .

> I am convinced that, given [TWA's] history, if this Court were to reject or deny the motion, that there would be an immediate and precipitous decline in the financial affairs of the debtor with a very, very high probability, if not certainty, of liquidation. . . .

> And my conclusion is that if this debtor does not proceed with a transaction with American, there isn't going to be a strategic transaction with anyone else and the inevitable result will be a liquidation of the debtor in this chapter [11] proceeding. . . .

### *Negotiations with APA*

25.     The TWA MEC retained an attorney named Roland Wilder to be the TWA MEC's counsel with respect to seniority list integration with the American pilots.

26.     The initial proposal from the APA committee was more advantageous to TWA pilots than the APA-American collective bargaining agreement required. Rather than placing all TWA pilots at the end of the combined seniority list, as the APA collective bargaining agreement provided, APA proposed that the most senior 824 TWA pilots would have been placed at higher points in the combined list, with the remaining 1500 TWA pilots placed at the bottom of the list.

31

27.     In a counterproposal at the end of March, the TWA MEC Merger Committee proposed placing 434 TWA pilots at the bottom of the list, and integrating 1915 TWA pilots at higher points on the list.

### *The Section 1113 Motion*

28.     Section 1113 of the U.S. Bankruptcy Code is a provision that governs the process by which a bankrupt entity may "reject" – or eliminate – collective bargaining agreements with the unions representing its employees. The process requires the bankrupt company to propose changes that are "necessary" to permit the bankrupt entity to reorganize, to provide information that the union needs to evaluate those proposals, and to negotiate in good faith.

29.     On March 15, 2001, TWA filed a Section 1113 motion in the Bankruptcy Court to reject its collective bargaining agreement with ALPA. The basis for the motion was the TWA MEC's refusal to agree to change the scope and successorship provisions of the TWA-ALPA collective bargaining agreement. TWA's motion stated:

> The requested modifications to TWA's collective bargaining agreement with ALPA . . . could not be more essential to the goal of preventing TWA's liquidation. Indeed, American has conditioned the closing of the transaction on acceptance of the proposed waivers by TWA's unions. The waivers are necessary because the ALPA . . . collective bargaining agreement could be construed to preclude the sale, and because they directly conflict with American's terms and conditions of employment – including seniority integration – for similarly situated American employees. . . . Failure to obtain the waivers will allow American to walk away from the transaction – making TWA's liquidation a virtual certainty. As the Court recognized in its March 12, 2001 ruling approving the sale, the American transaction is vital to the interests of TWA and its creditors: "if the court were to reject or deny this motion, there would be an immediate and precipitous decline in the financial affairs of the debtor and with a very, very high probability, if not certainty, of liquidation."

### *The Decision to Modify the CBA*

30.     ALPA retained several advisors for the TWA MEC, all of whom were selected by the MEC, some of whom had worked with the TWA MEC long before this transaction.

31.     On March 21 and 22, 2001, and then again on April 1 and 2, 2001, the members of the TWA MEC met in St. Louis to determine whether to accept the package of agreements offered by TWA and American, including the agreement to waive the scope and successorship provisions in the TWA CBA, as American had insisted in the Asset Purchase Agreement.

32.     The terms of the proposal for the collective bargaining agreement between ALPA and TWA LLC, which ALPA received on March 31, 2001, specified that it would "be deemed withdrawn" if ALPA did not accept it prior "to the commencement of the hearing on TWA [Inc.]'s motion to reject the ALPA collective bargaining pursuant to Section 1113 of the Bankruptcy Code."

33.     When Terry Hayes emailed management's proposed package of agreements to David Holtzman on March 31, 2001, Holtzman promptly forwarded it to the MEC officers, who in turn arranged an MEC meeting to consider it on April 1-2. Holtzman, at the request of MEC officers, asked the key MEC advisors to come to St. Louis to attend the MEC meeting in order for the MEC to have available to it the best advice possible in considering how to respond to management's proposal.

34.     The TWA MEC's counsel for seniority list integration, Roland Wilder, proposed filing a lawsuit in an attempt to stop the sale of TWA's assets to American. The TWA MEC did not accept Wilder's proposal.

35.     The TWA MEC listened to Roland Wilder's presentation for nearly an hour during the April 1 portion of the MEC meeting. However, it did not ask Wilder to file the litigation he proposed. His proposed lawsuit would have sought a federal district court injunction to compel TWA to arbitrate a grievance filed on March 2, 2001 (asserting that TWA's entry into the Asset Purchase Agreement violated the scope and successorship provisions in the ALPA-TWA collective bargaining agreement) and to prevent the closing of the American transaction pending completion of the arbitration proceedings. The MEC instead passed the resolution to accept the package of agreements offered by TWA and American.

36.     The TWA MEC determined that April 2 was the time for the MEC to make the decision on the proposed package of agreements received from TWA and American on March 31 in order to facilitate the consummation of the American acquisition of TWA's assets and thereby preserve the TWA pilots' jobs. Pastore called the April 2, 2001, TWA MEC meeting.

37.     On April 2, the TWA MEC passed a resolution stating as follows:

> WHEREAS the Negotiating Committee reports that it has negotiated to the best offer available from TWA and American for a collective bargaining agreement applicable to TWA LLC on all issues except Scope, subject to minor clarifications on a handful of matters; and

> WHEREAS TWA has filed a motion under § 1113 of the Bankruptcy Code to reject the current ALPA collective bargaining agreement, which will be considered April 6, 2001; and

> WHEREAS the MEC has considered extensive advice from its bankruptcy counsel (Steve Tumblin and Richard Seltzer), merger counsel (Roland Wilder), investment advisor (Michael Glanzer) ad former ALPA President Randy Babbitt, as well as from ALPA staff in the Representation Department (Bill Roberts and David Holtzman), Legal Department (Clay Warner), and Economic and Financial Analysis Department (Bob Christy), now

> THEREFORE BE IT RESOLVED . . . that no later than April 5, 2001, the Master Chairman . . . is directed to . . . waive those provisions of the current ALPA-TWA collective bargaining agreement that must be waived as a condition to the closing of the Asset Purchase Agreement . . . .

38.     Under ALPA's procedures, MECs vote using "roll call" voting if any MEC member requests that voting form. Under "roll call" voting, each MEC member casts votes equal to the number of members he or she represents.

39.     The TWA MEC used roll call voting to address the resolution to approve the agreements negotiated by the pilots' Negotiating Committee, including the changes to the scope and successorship provisions of the collective bargaining agreement. All six voting members of the TWA MEC voted at least some of their roll call votes in favor of the resolution to accept the package of agreements offered by TWA and American, and the resolution passed by a roll call majority of 1501 to 450. Plaintiff Sally Young cast 400 of her 605 votes in favor; Plaintiff Howard Hollander cast 55 of his 235 votes in favor.

40.     On April 3, 2001, MEC Chairman Pastore sent a communication to all TWA pilots explaining the TWA MEC's vote:

> The bankruptcy of our airline has put our pilot group at a major disadvantage, especially with regard to our Scope protections. This was made even more difficult by the unwillingness, up to this point, of the APA to agree to a fair and equitable seniority integration. We have met with representatives of the ALPA numerous times with little progress. We intend to continue to meet with the APA as long as necessary to reach a fair seniority agreement.
>
> The alternative facing our MEC was to fight the 1113 motion in court. Not one of our advisors believed that we would be successful against the 1113. The court thus far has sided with TWA and American on virtually every important issue. If we did not agree to the new CBA with TWA Airlines LLC, and the court granted TWA's 1113 motion as expected, we would lose all of our contractual rights, including our Scope. Thus, we were faced with losing our Scope one way or another. The strategic decision, then, was made to get as many contractual protections available going into LLC.

41.     On April 3, 2001, MEC members Steve Rautenberg and Sally Young sent a letter to Council 3 pilots explaining the MEC's April 2 decision.

42.     On April 10, 2001, MEC members Howard Hollander and David Singer, along with their local council secretary-treasurer, Theodore Case, sent a letter to Council 2 pilots explaining the MEC's April 2 decision.

On April 6, 2001, the Bankruptcy Court approved a stipulation and order withdrawing the Section 1113 motion and formalizing the agreement regarding modification of the scope and successorship provisions of the TWA pilots' collective bargaining agreement.

34

Case 1:02-cv-02917-JL   Document 348   Filed 02/02/11   Pa_   35 of 77 PageID: 9571

*The ALPA / TWA-LLC Transition Agreement*

43.    On that same date, ALPA and TWA LLC entered into a "Transition Agreement" that included the pay raises and other benefits negotiated by the TWA MEC Negotiating Committee.

44.    The Transition Agreement also included the promised commitment from American to use its "reasonable best efforts" with APA to obtain a "fair and equitable" process for the integration of seniority:

> For its part, American Airlines, Inc. ("American") agrees to use its reasonable best efforts with its labor organization representing the airline pilots craft or class to secure a fair and equitable process for the integration of seniority. In that regard, American will engage a facilitator to organize meetings with the labor organizations representing the airline pilots and American and TWA-LLC.

45.    The Transition Agreement was to govern the pay and work rules for the TWA LLC pilots during the "transition" period in which the former TWA assets and employees were merged into American's operations. When that merger was sufficiently advanced, the National Mediation Board would determine that American and TWA LLC were a "single transportation system" for the purposes of collective bargaining, and the American-APA agreement would then begin to cover the former TWA pilots.

*Continued Negotiations with APA and the "Reasonable Best Efforts" Grievance*

46.    At a special TWA MEC meeting on April 23, 2001, ALPA President Duane Woerth pledged the full support of ALPA for the TWA MEC's seniority integration negotiations. SOMF ¶ 165.

47.    Following the TWA MEC's decision to reach new agreements with TWA and American, Wilder, the TWA MEC seniority integration attorney, proposed two additional theories on which he wished to file lawsuits, claiming that they would enhance the leverage of the TWA MEC Merger Committee. One theory was outlined in a memo dated July 2, 2001, and the other in a memo dated August 16, 2001. Other ALPA attorneys evaluated both of Wilder's proposed lawsuits. They determined that the theory suggested in the July 2 memo was "fundamentally flawed" as a matter of law, as described in the following paragraph, and recommended against filing suit on it. The later Wilder memo was determined to have some merit, if and when the facilitated negotiations did not produce a seniority integration agreement, and ALPA adopted a portion of the second proposal by filing a grievance asserting a violation of the TWA collective bargaining agreement as a result of American's alleged failure to satisfy its "reasonable best efforts" process agreement. However, it became unnecessary to file a lawsuit to compel TWA and American to arbitrate the grievance when TWA and American promptly did so.

48.    The other ALPA attorneys determined that Wilder's proposal that ALPA sue American and APA based upon the theory that APA owed a duty of fair representation to the TWA pilots during the period after April 2, 2001, and before April 3, 2002, was "fundamentally

flawed" because it ignored the elementary "and (indisputable) rule that no such duty exists with respect to employees outside the bargaining unit." These attorneys recommended to ALPA that it not pursue this strategy.

49.    Wilder's August 16, 2001 lawsuit proposal was based on what would happen if TWA LLC would refuse to process the Reasonable Best Efforts grievance; when TWA LLC promptly processed the grievance to arbitration, the basis for the proposed motion to compel arbitration was eliminated.

50.    President Woerth declined to authorize ALPA to sue American and APA to enjoin them from implementing a seniority integration between the American and TWA LLC pilots pending arbitration of the Reasonable Best Efforts grievance.

51.    TWA LLC heard the Reasonable Best Efforts grievance on October 2, 2001, and on October 18, 2001, issued a written denial, which ALPA appealed to the ALPA-TWA LLC System Board of Adjustment on October 26, 2001.

52.    On October 10, 2001, American Vice President – Employee Policy & Relations Jeff Brundage scheduled a meeting between representatives of APA and the TWA MEC to discuss seniority integration. The TWA MEC voted not to participate.

53.    With the Reasonable Best Efforts grievance pending, American increased its efforts to provide a process for the APA and the TWA MEC to reach a seniority integration agreement, but when Jeff Brundage, American's Vice-President – Employee Relations, attempted to facilitate a meeting on October 12, 2001, between APA and TWA MEC representatives, TWA MEC officials declined to take advantage of the opportunities he offered.

54.    APA tendered a revised proposal to the TWA MEC on October 20 and 21, 2001. The TWA MEC accepted the seniority integration concepts in the APA revised proposal on October 23, but added conditions to its counterproposal that were unacceptable to American. Accordingly, APA's revised proposal did not result in an agreement with ALPA.

55.    On November 7, 2001, Pastore called a meeting of the restructured TWA MEC to reconsider APA's most recent seniority integration proposal, approved by American, the terms of which ALPA attorneys confirmed prior to the meeting. The meeting adjourned without a vote on the proposal.

56.    On October 1, 2001, Senator Christopher Bond of Missouri introduced the Airline Workers Fairness Act, S. 1479, 107th Cong. (2001), which ALPA supported and which was designed to apply to the seniority process between APA and the TWA MEC the protections that the TWA MEC had agreed to eliminate from its collective bargaining agreement on April 2, 2001.

57.    Woerth sent a letter to Senator Bond on October 3, 2001, expressing ALPA's support for the Bond bill, and he and other ALPA officers and the ALPA Government Affairs Department staff supported the bill through letters, phone calls and meetings.

58. In December 2001, the TWA MEC requested $3 million from the MCF, mainly for legal defense. The request was outside the scope of the MCF, did not advance the interests of ALPA's membership as a whole and the ALPA Executive Council appropriately denied it.

### *Supplement CC*

59. On November 8, 2001—the day after the TWA MEC adjourned its meeting without considering APA's seniority proposal—APA and American reached an independent agreement on the seniority integration of the former TWA pilots, known as "Supplement CC." The existing APA-American collective bargaining agreement provided that the seniority of all pilots would be determined as of their date of employment with American, so under that provision, all TWA pilots would be placed on the seniority list as if they had been hired on April 10, 2010, when American's acquisition of TWA's assets became final or at such later date as the former TWA pilots became direct employees of American. But American and APA agreed to modify that provision to the benefit of TWA pilots, so that 1,067 of the 2301 TWA pilots whose names appeared on the TWA LLC seniority list dated July 1, 2001, would be placed at higher points in the combined list. In addition, certain positions in St. Louis were reserved for former TWA pilots.

### *NMB Proceedings*

60. ALPA opposed APA's petition.

### *ALPA's Pilot Unity Resolution*

61. On December 7, 2000, Jalmer Johnson, Howard Attarian and Ken Cooper of ALPA traveled to Dallas to meet with APA officers and the APA negotiating committee. APA leadership showed no interest in merging with ALPA.

62. When the proposed American acquisition of TWA assets was announced on January 9, 2001, Duane Woerth, ALPA President, told key ALPA staff and officers to cease all organizing activities at American. These ALPA staff and officers recognized immediately that the proposed transaction made it impossible to consider a merger of the unions because the American pilots wanted to control the seniority integration.

63. After January 10, 2001, when TWA filed for bankruptcy, no negotiations or discussions about having ALPA represent the pilots of American or about merging APA into ALPA took place between officials at APA and officials at ALPA.

### *The Hunnibell/Clark Organizing Effort*

64. In May of 2001, shortly after the TWA MEC agreed to modify the CBA and TWA withdrew its Section 1113 motion, two American pilots, Mark Hunnibell and John Clark, began a campaign to persuade the American pilots to join ALPA.

65. The organizing activities of Hunnibell and Clark were not initiated in any way by ALPA. The approach Hunnibell and Clark took – to obtain employee signatures on authorization cards designating ALPA as the preferred representative—was inconsistent with

37

ALPA's practice where pilots were already represented by a union. ALPA's practice was to negotiate consensual merger terms directly with the leadership of the other union, not to engage in a card campaign.

66.     Rindfleisch did not learn about the Hunnibell/Clark card campaign until Hunnibell called him after he and Clark had already mailed out the cards to American pilots. Rindfleisch told Hunnibell that ALPA did not approve of the card campaign when he first learned of it.

67.     Mugerditchian met Hunnibell and Clark for the first time on July 22, 2001, at the Washington Court Hotel. He took them to dinner at the Dubliner, which cost $65 plus tip for the three of them.

68.     Hunnibell and Clark incurred certain expenses during the course of their efforts to generate support among American pilots for representation by ALPA. While the reimbursement of those expenses was requested by Hunnibell and Clark and was discussed with Ron Rindfleisch, ALPA's New Member Liaison, none of their expenses was ever reimbursed.

69.     The Aviation Workers Rights Foundation, Inc. ("AWRF"), an organization of TWA LLC pilots that included several of the named plaintiffs, filed submissions opposing APA's single carrier petition with the NMB. In a February 27, 2002 letter addressed to Pastore—and sent to all TWA LLC pilots—President Woerth responded to the AWRF allegations by summarizing events pertinent to the allegations. As explained in President Woerth's letter, the Pilot Unity resolution and the Hunnibell/Clark card campaign had no connection with the events leading up to the TWA MEC's adoption of the April 2, 2001 resolution eliminating the scope and successorship provisions of the 1998 ALPA-TWA collective bargaining agreement.

## V.   WITNESSES and SUMMARY OF TESTIMONY

A.     Plaintiffs' Witnesses and Summary of Their Testimony:

Plaintiffs intend to call some or all of the witnesses listed below with regard to liability

and anticipate they will testify as indicated.

1.     Sally Young
       14 667 Lakewood Drive
       Lake St. Louis, Missouri

Ms. Young will testify to her background as a TWA pilot, and an ALPA volunteer. She

will testify to her membership on the TWA MEC. She will also testify to her position on the

ALPA Board of Directors, ALPA governance, ALPA policy and ALPA practice. She will testify

to the efforts taken by her and the other MEC members and officers to protect the TWA pilots'

seniority, and the reasoning behind the decisions they made in that regard. This would include, but not be limited to, her work with the TWA Negotiating and Merger Committees, and the TWA MEC Merger Counsel, Roland Wilder, and her interactions and communications with officials at TWA, American and APA in that regard. She will also testify to her interactions and communications with ALPA officials, representatives, advisors and lawyers in that regard, and her union's lack of support for and interference with the TWA pilots' efforts to protect their seniority. Ms. Young will also testify to the seniority she and other TWA pilots lost, and the resulting financial and personal effects on her and other TWA pilots.

    2.    <u>Howard Hollander</u>
           14 Adelphi Avenue
           Harrison, NY 10528

Mr. Hollander will testify to his background as a TWA pilot, and an ALPA volunteer. He will testify to his membership on the TWA MEC. He will also testify to his position on the ALPA Board of Directors, ALPA governance, ALPA policy and ALPA practice. He will testify to the efforts taken by him and the other MEC members and officers to protect the TWA pilots' seniority, and the reasoning behind the decisions they made in that regard. This would include, but not be limited to, his work with the TWA Negotiating and Merger Committees, and the TWA MEC Merger Counsel, Roland Wilder, and his interactions and communications with officials at TWA, American and APA in that regard. He will also testify to his interactions and communications with ALPA officials, representatives, advisors and lawyers in that regard, and his union's lack of support for and interference with the TWA pilots' efforts to protect their seniority. Mr. Hollander will also testify to the seniority he and other TWA pilots lost, and the resulting financial and personal effects on him and other TWA pilots.

3.   Ted Case
      2463 Waterscape Trail
      Snellville, GA 30078

Mr. Case will testify to his background as a TWA pilot, and an ALPA volunteer.  He

will testify to his position as an officer of the TWA MEC, and ALPA policy and practice. .He

will testify to the efforts taken by him and the other MEC members and officers to protect the

TWA pilots' seniority, and the reasoning behind the decisions they made in that regard.  This

would include, but not be limited to, his work with the TWA Negotiating and Merger

Committees, and the TWA MEC Merger Counsel, Roland Wilder, and his interactions and

communications with officials at TWA, American and APA in that regard.  He will also testify to

his interactions and communications with ALPA officials, representatives, advisors and lawyers

in that regard, and his union's lack of support for and interference with the TWA pilots' efforts

to protect their seniority.  Mr. Case will also testify to the seniority he and other TWA pilots lost,

and the resulting financial and personal effects on him and other TWA pilots.

4.   Robert Pastore
      4727 Surrey Drive
      Corona Del Mar, CA 92625

Mr. Pastore will testify to his background as a TWA pilot, an ALPA volunteer, and a

member of the TWA Board of Directors.  He will testify to the history of TWA, its value and

assets, its significance to the St. Louis region, and the efforts to keep TWA a stand alone carrier.

He will testify to his position as Chairman of the TWA MEC, and ALPA governance, policy and

practice.  He will testify to the efforts taken by him and the other MEC members and officers to

protect the TWA pilots' seniority, and the reasoning behind the decisions they made in that

regard.  This would include, but not be limited to, his work with the TWA Negotiating and

40

Merger Committees, and the TWA MEC Merger Counsel, Roland Wilder, and his interactions

and communications with officials at TWA, American and APA in that regard. He will also

testify to his interactions and communications with ALPA officials, representatives, advisors and

lawyers, and his union's lack of support for and interference with the TWA pilots' efforts to

protect their seniority. Mr. Pastore will also testify to the seniority he and other TWA pilots lost,

and the resulting financial and personal effects on him and other TWA pilots.

          5.    <u>Sean Clarke</u>
                 St. Louis, Missouri

Mr. Clarke will testify to his background as a TWA pilot, and an ALPA volunteer. He

will testify to his membership on the TWA MEC Merger Committee, and ALPA policy and

practice. He will testify to the efforts taken by him and the other Merger Committee members to

protect the TWA pilots' seniority, and the reasoning behind the decisions they made in that

regard. This would include, but not be limited to, his interactions and communications with

APA officials, the TWA MEC, the other Merger Committee members and consultants, the TWA

MEC Merger Counsel, and officials at TWA and American. He will also testify to his

interactions and communications with ALPA officials, representatives, advisors and lawyers in

that regard, and his union's lack of support for and interference with the TWA pilots' efforts to

protect their seniority. Mr. Clarke will also testify to the seniority he and other TWA pilots lost,

and the resulting financial and personal effects on him and other TWA pilots.

          6.    <u>Matt Comlish</u>
                 320 South Talbot Court
                 Roswell, GA 30076

Mr. Comlish will testify to his background as a TWA pilot, and an ALPA volunteer. He

will testify to his position as Chairman of the TWA MEC Legislative Affairs Committee, and

ALPA policy and practice. He will testify to the efforts taken by him and other TWA pilots to

have legislation enacted that would have required binding arbitration in the absence of an agreement between the TWA pilots and American pilots relative to their seniority. He will also testify to his interactions and communications with ALPA officials and representatives in that regard, and his union's lack of support for and interference with the TWA pilots' efforts to enact the legislation. Mr. Comlish will also testify to the seniority he and other TWA pilots lost, and the resulting financial and personal effects on him and other TWA pilots.

> 7.   Michael Day
>      Cedar Key, Florida

Mr. Day will testify to his background as a TWA pilot, and an ALPA volunteer. He will testify to his position as Chairman of the TWA MEC Merger Committee, and ALPA policy and practice. He will testify to the efforts taken by him and the other Merger Committee members to protect the TWA pilots' seniority, and the reasoning behind the decisions they made in that regard. This would include, but not be limited to, his interactions and communications with APA officials, the TWA MEC, the other Merger Committee members and consultants, the TWA MEC Merger Counsel, and officials at TWA and American. He will also testify to his interactions and communications with ALPA officials, representatives, advisors and lawyers in that regard, and his union's lack of support for and interference with the TWA pilots' efforts to protect their seniority. Mr. Day will also testify to the seniority he and other TWA pilots lost, and the resulting financial and personal effects on him and other TWA pilots.

> 8.   Howard Caldwell
>      Belleville, Illinois

Mr. Caldwell will testify to his background as a TWA pilot, and ALPA volunteer and ALPA policy and practice. He will testify to his membership on the TWA MEC Membership Committee and his interaction and communications with Duane Woerth in March 2001 while

working on that Committee. Mr. Caldwell will also testify to the seniority he and other TWA pilots lost, and the resulting financial and personal effects on him and other TWA pilots.

> 9.   Dee J. Glasby
>      12166 Conifer Ridge Drive
>      Conifer, Colorado

Mr. Glasby will testify to his background as a TWA pilot, an ALPA volunteer, and a member of the TWA MEC Restructuring Committee. He will testify to the history of TWA, its value and assets, its significance to the St. Louis region, and the efforts to keep TWA a stand alone carrier. He will also testify to his membership on the TWA MEC Merger Committee, and ALPA policy and practice. He will testify to the efforts taken by him and the other Merger Committee members to protect the TWA pilots' seniority, and the reasoning behind the decisions they made in that regard. This would include, but not be limited to, his interactions and communications with APA officials, the TWA MEC, the other Merger Committee members and consultants, the TWA MEC Merger Counsel, and officials at TWA and American. He will also testify to his interactions and communications with ALPA officials, representatives, advisors and lawyers in that regard, and his union's lack of support for and interference with the TWA pilots' efforts to secure proper union support and to protect their seniority. Mr. Glasby will also testify to the seniority he and other TWA pilots lost, and the resulting financial and personal effects on him and other TWA pilots.

> 10.   James Baehler
>       531 Main Street, Suite 627
>       New York, NY 10044

Mr. Baehler will testify to his background as a negotiation consultant and his work with the TWA MEC Merger Committee relative to its negations with APA. He will testify to the efforts taken by him and the Merger Committee to protect the TWA pilots' seniority, and the

reasoning behind the decisions they made in that regard. This would include, but not be limited to, his interactions and communications with APA officials, the TWA MEC, the other Merger Committee members, the TWA MEC Merger Counsel, and officials at TWA and American. He will also testify to his interactions and communications with ALPA officials, representatives, advisors and lawyers in that regard, and the union's lack of support for and interference with the TWA pilots' efforts to protect their seniority. He will also testify regarding standard negotiating practices and ALPA's substantial departure from those practices.

          11.    Patrick Brady
                309 Manzanita Avenue
                Ventura, CA  93001-2224

Mr. Brady will testify to his background as a TWA pilot and ALPA volunteer. Mr. Brady will also testify to the seniority he and other TWA pilots lost, and the resulting financial and personal effects on him and other TWA pilots.

          12.    Thomas Rachford
                Chandler, Arizona

Mr. Rachford will testify about his experience with ALPA in his role as a pilot for Emery, including his role of organizing the campaign to bring ALPA onto the Emery property. Mr. Rachford will also testify as to his roles as chairman of the Emery pilots and as the Chairman of the Emery Pilot's Master Executive Council. He will testify about his experiences as an executive vice-president of ALPA. This testimony will include, but not be limited to, ALPA governance under Duane Woerth, ALPA's pilot unity campaign, Duane Woerth's hostility toward the TWA pilots and other events surrounding the negotiations of the TWA/American seniority list.

13.   An ALPA Representative

Plaintiffs reserve the right to call any ALPA representative in attendance at trial to testify to any relevant fact.

B.   Defendant's Objections to Plaintiffs' Witnesses:

1.   Defendant objects to Plaintiffs' attempt to call James Baehler as a witness at trial on the grounds that his testimony is opinion testimony but that (a) he was never identified as an expert and never provided an expert report; (b) he is not qualified to give lay opinion testimony because the facts upon which his testimony relies are not within his personal knowledge; (c) certain of the information he relies upon for his opinions is hearsay or speculation; and (d) his proposed opinions will not be helpful to the trier of fact.

2.   Defendant objects to Plaintiffs' attempt to present testimony related to the issue of damages on the grounds that damages are not part of this trial based upon the Court's Order of Bifurcation.

3.   Defendant objects to any attempt by Plaintiffs to have multiple witnesses testify concerning the same events on the grounds that such testimony will be repetitive and duplicative. Defendant notes that it appears from Plaintiffs' summary of their witnesses that many of their witnesses are prepared to testify about many of the same facts.

C.   Defendant's Witnesses and Summary of Their Testimony:

ALPA intends to call some or all of the witnesses listed below with regard to liability and anticipates they will testify as indicated. If any of the witnesses listed below are not available to testify at trial, ALPA reserves the right either to designate their deposition testimony or to request that it be permitted to take *de bene esse* depositions for the purposes of presenting their testimony at trial. Plaintiffs object to this reservation.

1.  **Howard Attarian**
    Vice President-Flight Operations
    United Air Lines, Inc.
    77 W. Wacker Drive
    Chicago, IL 60601

Howard Attarian was the ALPA Executive Administrator during the events at issue in

this litigation. He will testify about his participation in meetings and phone conferences with

representatives of American, of APA, of the TWA MEC and other TWA pilots, including class

representatives, about his communications with other ALPA employees, officers and outside

advisors for ALPA, and about the basis of his actions as Executive Administrator. It is

anticipated that his testimony will include, but not be limited to, the following specific areas: his

present and past employment; his meeting with APA officers in Dallas on December 7-8, 2000,

including the APA officers' lack of interest in a merger with ALPA; the purpose and content of

Duane Woerth's remarks at APA Board meetings; his conversations with Jeffrey Brundage

concerning the American Airlines acquisition of TWA assets; and Captain Woerth's statements

to the TWA MEC on October 23, 2001, concerning a proposed lawsuit against APA and

American.

2.  **J. Randolph Babbitt**
    Administrator
    Federal Aviation Administration
    800 Independence Avenue, SW
    Washington, DC 20591

J. Randolph Babbitt is a former President of ALPA and was an outside advisor for the

TWA MEC and ALPA during the events at issue in this litigation. He will testify about his

participation in meetings and on phone conferences with representatives of American,

representatives of APA, representatives of the TWA MEC and other TWA pilots, including class

representatives, about his communications with ALPA employees, officers and outside advisors

Case 1:02-cv-02917-JEI   Document 348   Filed 02/02/11   Page 47 of 77 PageID: 9583

for ALPA, and about his recommendations as an advisor. It is anticipated that his testimony will include, but not be limited to, the following specific areas: his current and past employment and business activities; the roles of ALPA's governing bodies and the Home Office in representing pilots; the goals of the TWA MEC in connection with the American acquisition of TWA's assets; the content and basis for his advice to ALPA and the TWA MEC concerning revisions to the collective bargaining agreement and ALPA's previous representation of pilot groups whose airlines were acquired by other non-ALPA air carriers.

**3.    Leroy "Bud" Bensel**
5 Carter Lane
Marlton, NJ 08053

Leroy "Bud" Bensel was the former Chairman of the TWA MEC Merger Committee and was founder and President of AWRF during the events at issue in this litigation. ALPA will call him as an adverse witness. It is anticipated that his testimony will include, but not be limited to, the following specific areas: his background as a TWA pilot, an ALPA volunteer, Chairman of the TWA MEC Merger Committee and founder and President of AWRF; his activities as TWA MEC Merger Committee Chairman; his understanding of TWA's financial condition and prospects for survival in the winter and spring of 2001; the purposes and activities of AWRF, including his work with Boies, Schiller & Flexner LLP and that firm's guidance concerning a proposed lawsuit against ALPA.

**4.    Jeffrey Brundage**
American Airlines, Inc.
4333 Amon Carter Boulevard
Fort Worth, TX 76155

Jeffrey Brundage was Vice President of Employee Relations at American during the events at issue in this litigation. He will testify about his participation in meetings and on phone

conferences with representatives of American, APA, TWA, the TWA MEC and other TWA

pilots, his communication with ALPA employees, officers, and outside advisors for ALPA, and

his actions as Vice President of Employee Relations at American.  It is anticipated that his

testimony will include, but not be limited to, the following specific areas: his aviation and labor

relations background and responsibilities at American in 2001; and his discussions with other

American executives, TWA executives, and with APA and ALPA officers concerning the

American asset acquisition, negotiations to modify the TWA CBA and to integrate the seniority

lists of American and TWA.

> 5.   **William Compton**
>       c/o Morgan, Lewis & Bockius LLP
>       1111 Pennsylvania Avenue, NW
>       Washington, DC 20004

William Compton was the President and CEO of TWA during the events at issue in this

litigation.  ALPA anticipates presenting his testimony through his congressional and Bankruptcy

Court testimony with respect to TWA's poor financial condition, lack of prospects for

acquisition by others, and the low career prospects of the TWA pilots.

> 6.   **John Feldvary**
>       Air Line Pilots Association
>       535 Herndon Parkway
>       Herndon, VA 20170[not his current address]

John Feldvary was Vice President of Finance for ALPA during the events at issue in this

litigation.  He will testify concerning his expense report for December 8, 2001, regarding the

attendees at a dinner.

> 7.   **Michael Glanzer**
>       793 Carroll Street
>       Brooklyn, NY 11215

Michael Glanzer was a financial advisor for the TWA MEC and ALPA during the events at issue in this litigation. He will testify about his participation in various meetings and on phone conferences with representatives of American, representatives of the TWA MEC and other TWA pilots, including class representatives, about his communication with ALPA employees, officers, and outside advisors, and about his advice and recommendations in his capacity as a TWA MEC advisor. It is anticipated that his testimony will include, but not be limited to, the following matters: his background as a commercial lawyer and investment banker and his retention by TWA MEC as financial advisor in mid-2000; his knowledge that TWA was going out of business in 2000 unless someone purchased it; his belief that American could have acquired most of the TWA assets it sought through Chapter 11 bankruptcy if the TWA asset purchase deal had fallen through; his understanding that TWA would have been liquidated absent the American debtor-in-possession ("DIP") financing, which was increased due to larger-than-anticipated losses at TWA; and the substance of his advice at the meetings on April 1-2, 2001.

8.   **David Holtzman**
      Air Line Pilots Association
      150 Westpark Way
      Suite 150
      Euless, TX 76040

David Holtzman was a Senior Contract Administrator for the TWA MEC during the events at issue in this litigation. He will testify about his participation in various meetings and on phone conferences with representatives of American, APA, TWA, the TWA MEC and other TWA pilots, including class representatives, about his communication with other ALPA employees, officers and outside advisors, and about his advice and recommendations in his capacity as a TWA MEC advisor. It is anticipated that his testimony will include, but not be limited to, the following specific areas: his educational and employment background and his

49

position and duties as the ALPA Senior Contract Administrator for the TWA MEC in 2001-02;
his efforts in 2000 to secure a transaction that would keep TWA in operation; his attempts to
negotiate the best deal he could for the TWA pilots in connection with the American acquisition
of TWA's assets; the steps he took to arrange for the TWA MEC's consideration of the
American proposal; the compensation received by the TWA pilots before, during, and after their
employment at TWA LLC; his discussions with Richard Seltzer concerning the role of one of his
partners at Cohen, Weiss and Simon as General Counsel to the American flight attendants'
union; his discussions with the TWA MEC leadership concerning this conversation and the
absence of any conflict of interest or other problems as a result of that representation; his
participation in discussions at the TWA MEC meetings on April 1-2, 2001; the negotiation of the
ALPA-TWA LLC Transition Agreement; and the services he and other ALPA staff provided
after the acquisition to achieve the objectives that the TWA MEC established.

> 9.     **Mark Hunnibell**
>        376 Black Rock Turnpike
>        Redding, CT 06896

Mark Hunnibell was an American pilot and a member of APA during the events at issue
in this litigation. He will testify about his communication with members of APA and ALPA
employees and officers. It is anticipated that his testimony will include, but not be limited to, the
following specific areas: a card campaign to secure support for a merger with ALPA, done
without any assistance or encouragement from ALPA, and without his making a request for such
support; his informing ALPA of the card campaign after he had already sent out the cards to
11,000 American pilots; his discussions with Ronald Rindfleisch about his card campaign,
making known to him that ALPA did not approve of the effort; that APA officials had no interest
in merging their union with ALPA; the absence of any follow-up to the work of APA's ALPA

Exploratory Committee; the absence of any active campaign by ALPA or APA with regard to a

merger of the unions after announcement of the proposed American acquisition of TWA assets;

and the number of card-signers and the dates on which they signed cards. If Plaintiffs are

permitted to raise the issue of documents that were allegedly not retained, Mr. Hunnibell is also

expected to testify that the emails produced from ALPA disaster-recovery tapes are the only

emails he remembers sending to or receiving from people at ALPA.

> **10.    Jalmer Johnson**
> Air Line Pilots Association
> 535 Herndon Parkway
> Herndon, VA 20170

Jalmer Johnson was the General Manager of ALPA during the events at issue in this

litigation. He will testify about his participation in various meetings and on phone conferences

with representatives of APA, the TWA MEC and other TWA pilots, other ALPA employees,

officers, and outside advisors, and his actions as General Manager of ALPA. It is anticipated

that his testimony will include, but not be limited to, the following specific areas: his

employment at ALPA and his duties as ALPA's General Manager; the roles of ALPA's Home

Office and MECs in representing pilots; the procedures for applying for and monitoring MCF

advances, and how the MCF fits into ALPA's financial and legal structure; the prior access of

the TWA MEC to MCF funds; failure of the TWA MEC MCF requests during 2001-02 to meet

ALPA policy requirements for accessing MCF funds or to serve the interests of the ALPA

membership as a whole; his role as the point of contact for ALPA's dealings with APA in late-

2000 and his meeting with APA officers and the APA Negotiating Committee in Dallas on

December 7, 2000, as well as his work with APA's ALPA Exploratory Committee; the pro

forma nature of the January 25, 2001, letter to APA, including that he neither expected nor

received any response from APA; the terms and background of the ALPA-APA services

agreement dated December 12, 2000; the expenses charged to ALPA Project Code 50221; the absence of authority on the part of Ronald Rindfleisch regarding reimbursing Mark Hunnibell and John Clark for their expenses; and the absence of payment to Hunnibell or Clark or any other American pilot to reimburse them for any expenses they incurred in attempting to organize for ALPA. He will also provide an analysis of TWA's financial condition in late-2000 and early-2001.

> 11.   **Ana McAhron-Schulz**
>         Air Line Pilots Association
>         535 Herndon Parkway
>         Herndon, VA 20170

Ana McAhron-Schulz was Director of the Economic and Financial Analysis Department at ALPA during the events at issue in this litigation. It is anticipated that her testimony will include, but not be limited to, the following specific areas: her background and experience, including her job responsibilities as Director of ALPA's Economic and Financial Analysis Department; TWA's financial condition in late-2000 and early 2001, as reported by her and her Department to Duane Woerth, other ALPA Departments and the TWA MEC and its various committees; and a comparison of the compensation received by TWA pilots and American pilots. She will also respond to Dee J. Glasby's contentions as to an alleged meeting between them in July 2001.

> 12.   **Christopher McCarthy**
>         Air Line Pilots Association
>         535 Herndon Parkway
>         Herndon, VA 20170

Christopher McCarthy is Manager of Information Technology and Operation Services at ALPA. He will testify concerning his analysis of the computer disk and spreadsheet prepared by

Mark Hunnibell and John Clark if Plaintiffs dispute the fact that there were exactly 1549

authorization cards, including the fact that the same people appear on both lists.

**13.     Steven Rautenberg**
          7 Rue Grand Court
          Lake St. Louis, MO 63367

Steven Rautenberg was a member of the TWA MEC during the events at issue in this

litigation. He will testify about his communications with members of the TWA MEC, the TWA

pilots, and ALPA staff, advisors and officers. He will testify about his background as a TWA

pilot, an ALPA volunteer, and Captain Representative for Council 3 of the TWA MEC. It is

anticipated that his testimony will include, but not be limited to, the following specific areas: the

TWA MEC's role in dealing with the TWA MEC Negotiating, Merger and Government Affairs

Committees; the TWA MEC's role in dealing with ALPA National staff, officers, and advisors;

the TWA MEC's support of the transaction with American; his role in and recollection of TWA

MEC meetings on April 1-2, 2001, October 20-23, 2001, and November 7, 2001, among others;

the TWA MEC's awareness of the ALPA Pilot Unity Resolution and the organizing activities

that implemented it; and the TWA MEC's awareness of the Hunnibell/Clark card campaign. He

will also testify about his reasons for opting out of the Plaintiff Class.

**14.     Ronald Rindfleisch**
          Air Line Pilots Association
          535 Herndon Parkway
          Herndon, VA 20170

Ronald Rindfleisch was the New Member Liaison/Organizer at ALPA during the events

at issue in this litigation. He will testify about his communications with members of APA, other

ALPA employees and officers, and his actions as New Member Liaison/Organizer. It is

anticipated that his testimony will include, but not be limited to, the following specific areas: his

employment history and job duties with ALPA; his email exchanges with Mark Hunnibell, John Clark and other American pilots as compiled in P-147 and P-148; if Plaintiffs are permitted to raise the issue of documents that were not retained, his not having deleted any emails to destroy potential evidence; his telephone conversations with Hunnibell, Clark and other American pilots, in which he emphasized that ALPA did not organize a pilot group that is already represented through a card campaign, but sought to work out a merger agreement with the independent union as was done with the Independent Association of Continental Pilots and the FedEx Pilots Association; the percentage of eligible pilots who must sign a card where there is a card campaign before ALPA will file a petition with the National Mediation Board ("NMB") seeking a representation election; how he learned of the Hunnibell/Clark card campaign when Hunnibell called him after Hunnibell had already mailed out the cards to the American pilots and his expression of disapproval of the card campaign when he first learned of it; his not having advised American pilots as to the language for cards or any other aspect of their effort to solicit cards from other American pilots; his communications with Hunnibell and Clark concerning their request for reimbursement of their expenses in connection with their card campaign and his mistake in offering reimbursement because ALPA did not approve any aspect of their card campaign and he had no authority to approve anyone's expenses; his communications with Jalmer Johnson in December 2001 concerning providing the reimbursement request to Kevin Barnhurst, ALPA's Director of Finance; and Johnson's directive that Barnhurst not pay them but hold them in a file.

> **15.**   **Seth Rosen**
> Air Line Pilots Association
> 535 Herndon Parkway
> Herndon, VA 20170

Seth Rosen was the Director of the Representation Department at ALPA during the events at issue in this litigation. He will testify about his participation in meetings and on phone conferences with representatives of American, APA, the TWA MEC and other TWA pilots, his communication with other ALPA employees, officers and outside advisors for ALPA, and his actions as Director of the Representation Department. It is anticipated that his testimony will include, but not be limited to, the following specific areas: his present and past employment and his experience dealing with airline labor issues; functions of the ALPA Representation Department in 2001-02; the support ALPA provided to the TWA MEC and its Negotiating and Merger Committees in dealing with the acquisition and the seniority integration; the roles of ALPA's Home Office and MECs in representing pilots; his not having considered the interests of the American pilots or any ALPA interest in a representing the American pilots in formulating his advice and that he saw no indication that anyone else at ALPA did so; ALPA's representation of smaller pilot groups in mergers in which the larger group was not represented by ALPA, as in the Air Cal-American merger; ALPA's response to Roland Wilder's various proposals to initiate litigation on behalf of ALPA; the purpose, achievements and limitations of the ALPA-TWA LLC Transition Agreement; efforts of the ALPA Government Affairs Department and ALPA National Officers to secure the enactment of the Bond bill (if the issue of the Bond bill is not excluded from the case); the implications of a three-way seniority integration agreement among ALPA, American and APA in contrast to Supplement CC, to which ALPA was not a party; the reasons for ALPA's decision in March 2002 not to ask the NMB to conduct the representation election among the combined American-TWA pilot group; the job duties of his subordinate, Ronald Rindfleisch, and his role in the events in this case; his not having met with Dee J. Glasby and Ana McAhron-Schulz in July 2001; his not calling the TWA MEC or Merger Committee in

55

October 2001 to express disapproval of their failure to reach an agreement on seniority integration; and the agreements reached by other crafts and classes of former TWA employees, including flight attendants, mechanics and passenger service representatives and other ground employees, concerning modification of agreements regarding seniority issues.

16. **Richard Seltzer**
Cohen, Weiss & Simon LLP
330 West 42nd Street
25th Floor
New York, NY 10036

Richard Seltzer was an attorney in private practice, specializing in bankruptcy issues, and represented the TWA MEC and ALPA during some of the events at issue in this litigation. He will testify about his participation in various meetings and on phone conferences with representatives of the TWA MEC and other TWA pilots, his communications with ALPA employees, officers and outside advisors, and his advice and recommendations in his capacity as an attorney for the TWA MEC and ALPA. It is anticipated that his testimony will include, but not be limited to, the following specific areas: his work as a lawyer and his experience and that of his law firm in representing labor unions in bankruptcy cases; the legal work he performed and the advice he gave to ALPA, including the TWA MEC, the TWA MEC Merger and Negotiating Committees and ALPA staff, during the first four months of 2001; his not having considered the interests of the American pilot group or ALPA's alleged desire to acquire the bargaining rights for the American pilots in formulating or presenting his advice to the TWA MEC; that no one from the ALPA Home Office told him what advice to give; and that his advice was his best professional judgment of what was in the interests of the TWA pilots.

17. **Stephen Tumblin**
Chapman and Cutler LLP
201 South Main Street

56

Suite 2000
Salt Lake City, UT 84111

Steve Tumblin was an attorney in private practice, retained in connection with TWA's

bankruptcy, for the TWA MEC and ALPA during the events at issue in this litigation.  It is

anticipated that his testimony will include, but not be limited to, the following specific areas: his

work as a lawyer; ALPA's retention of his law firm in 1991 at the request of the TWA MEC,

and, subsequently, as one of its financial advisers; the manner in which he reported to the TWA

MEC regularly on TWA's financial condition throughout the years 1991-2001; the work his law

firm performed for the TWA MEC in connection with TWA's second and third bankruptcies;

that he never communicated with Duane Woerth with respect to the TWA bankruptcy; his view

that TWA's only chance for survival in 2000 was an acquisition or merger and that the TWA

MEC knew this and took steps to facilitate it; the necessity for the TWA pilots of completing the

American acquisition as the alternative to liquidation of the company; the role of American in

providing TWA substantial amounts of funding in DIP loans to allow it to continue operating

until the April 10, 2001 closing; his recollection of advice given by Richard Seltzer and others to

the TWA MEC concerning the lack of clarity regarding the TWA pilots' right to strike in the

event that their CBA was rejected under Section 1113 and the potential consequences of

exercising the right to strike; and his not having considered the interests of the American pilot

group or ALPA's alleged desire to represent the American pilots in formulating or presenting his

advice to the TWA MEC, and his having seen no indication that anyone else did so.

18.    **Marta Wagner**
       Air Line Pilots Association
       535 Herndon Parkway
       Herndon, VA 20170

Marta Wagner was a staff attorney in the ALPA Legal Department during the events at issue in this litigation. She will testify about her participation in meetings and on phone conferences with representatives of the TWA MEC and other TWA pilots, her communication with other ALPA employees, officers and advisors for ALPA, including the TWA MEC, and her advice as an attorney. It is anticipated that her testimony will include, but not be limited to, the following specific areas: She will explain her notes of meetings and conference calls she attended and will corroborate Clay Warner's testimony concerning statements made to Sally Young at the November 7, 2001, TWA MEC meeting.

**19.    Clay Warner**
        Air Line Pilots Association
        535 Herndon Parkway
        Herndon, VA 20170

Clay Warner was an attorney in the ALPA Legal Department during the events at issue in this litigation. He will testify about his participation in various meetings and on phone conferences with representatives of the TWA MEC and other TWA pilots, his communication with ALPA employees, officers, and advisors, and his advice and recommendations as an attorney for the TWA MEC and ALPA. It is anticipated that his testimony will include, but not be limited to, the following specific areas: his past and present work as a lawyer; the role of the ALPA Legal Department during the period January 2, 2001, to April 3, 2002, in supporting the TWA MEC and its Negotiating and Merger Committees; his meeting at the DOT on March 27, 2001, to request LPPs and the DOT representatives' reaction to that request; his discussion of the pros and cons of available options for the TWA MEC at meetings on March 21, 22, April 1 and 2, 2001; his role in preparing the August 6, 2001, memo to Seth Rosen and Jonathan Cohen, with the assistance of others, analyzing Wilder's July 2, 2001, memo suggesting litigation against APA and American; his role in analyzing Wilder's third litigation proposal; his not having

58

participated in October 2001 MEC meetings at Mayflower Hotel nor telephoning the TWA MEC

or Merger Committee to express disapproval of their failure to reach an agreement on seniority

integration; his attending the November 7, 2001, TWA MEC meeting in St. Louis, and his

discussions with Sally Young regarding her stated plan to absent herself from the meeting in

order to deprive the meeting of a quorum; the preparation by the ALPA Legal Department and

others of ALPA's opposition to APA's NMB single-carrier petition; the work done by the Legal

Department and others on the case presented for the TWA pilots before the System Board of

Adjustment challenging American's asserted compliance with its reasonable best efforts

obligation; his assistance in drafting Duane Woerth's February 27, 2002, letter to TWA pilots

and its accuracy in setting forth the facts and correctly analyzing the situation confronting the

TWA pilots in 2001; his editing for clarity only of Ronald Rindfleisch's December 20, 2001,

letter to Mark Hunnibell and John Clark regarding reimbursement; and his not having considered

the interests of the American pilots or any ALPA interest in representing the American pilots in

formulating and presenting his advice with respect to the TWA MEC and his having seen no

indication that anyone else did so.

> **20.     Roland Wilder**
> Baptiste & Wilder, P.C.
> 1150 Connecticut Avenue, NW
> Washington, DC 20036

Roland Wilder was an attorney in private practice retained to work on seniority

integration and related matters for the TWA MEC and ALPA during the events at issue in this

litigation. He will testify about his participation in various meetings and on phone conferences

with representatives of the TWA MEC and other TWA pilots, his communication with ALPA

employees, officers, and advisors, and his advice and recommendations as an attorney for the

TWA MEC and ALPA. It is anticipated that his testimony will include, but not be limited to, the

following specific areas: his unsuccessful effort on April 1, 2001, to persuade the TWA MEC to support a lawsuit against TWA and American; the different professional judgment of other advisors on the question and his view that they were giving their honest advice on what course of action best served the interests of the TWA pilot group; his not being present at the TWA MEC meeting on April 2, 2001; that no one from ALPA's Home Office told him the reasons for declining to authorize his proposed lawsuit on October 23, 2001; that his comments to the TWA MEC on that date are accurately summarized in his October 31, 2001, letter to Robert Pastore; and that, in view of the absence of viable alternative courses of action, his advice was to accept the seniority arrangements proposed by APA at that time.

21.   **Duane Woerth**
International Civil Aviation Organization
999 University Street
Montréal, Quebec H3C 5H7, Canada

Duane Woerth was the President of ALPA during the events at issue in this litigation. He will testify about his participation in various meetings and on phone conferences with representatives of American, APA, representatives of the TWA MEC and other TWA pilots, his communication with other ALPA employees, officers and advisors, and his various decisions in his capacity as President of ALPA. It is anticipated that his testimony will include, but not be limited to, the following specific areas: his current and prior employment and business activities; the roles of the ALPA Home Office and MECs in representing pilots; the duties and daily activities of the President of ALPA; the adoption by acclamation by ALPA's Board of Directors of the Pilot Unity Resolution on October 16, 2000; the ALPA organizing efforts undertaken pursuant to that Resolution and otherwise; his reports to ALPA governing bodies in 2001; his timing and rationale for telling ALPA staff to cease all organizing activities at American; the circumstances leading to his appearances at the APA Board of Directors meetings on October 22,

Case 1:02-cv-02917-JE   Document 348   Filed 02/02/11   Pag__ 61 of 77 PageID: 9597

2000, and April 5, 2001, and the purpose and content of his remarks at those meetings; his brief meeting with John Clark in Las Vegas in December 2001 and the extent of his knowledge of the communications of Ronald Rindfleisch with American pilots; his contacts with American and TWA executives and APA and TWA MEC officers during the September 2000-April 2001 timeframe; that he did not tell any of the ALPA advisors what advice to offer at the TWA MEC meeting on April 1-2, 2001; that he did not consider the interests of the American pilot group or any ALPA interest in representing the American pilots, in formulating or presenting his advice to the TWA MEC or in any actions he took or decisions he made with respect to the representation of the TWA pilots; his having seen no indication that any other person involved in the provision of services to the TWA pilots did so; ALPA's responses to the litigation proposed by Roland Wilder and the basis for those assessments; ALPA's actions to secure the enactment of the Bond bill; the functioning of ALPA's MCF and the TWA MEC receipt of funds from the MCF every year from 1988-2000; the TWA MEC requests for MCF funds in 2001-02; and ALPA's fulfillment of the TWA pilots' needs for financial and other support from ALPA's staff and third-party advisors during their transition from employment at TWA to AMERICAN.

In the event that the Court does not bar testimony about the issue of spoliation based on its prior ruling, ALPA reserves the right to call the following witnesses to rebut Plaintiffs' claim of spoliation:

> **22.**   **Andrew Bonner**
> Iron Mountain, Inc.
> 745 Atlantic Avenue
> Boston, MA 02111

Andrew Bonner will testify about his employment background and his duties as Iron Mountain's General Manager for Operations in the Maryland area, his investigation into his firm's inadvertent destruction of 269 boxes of ALPA documents and his conclusion that Iron

Mountain was solely responsible for the errors leading to the accidental destruction of those documents.

**23.    Elizabeth Ginsburg**
        Air Line Pilots Association
        535 Herndon Parkway
        Herndon, VA 20170

Elizabeth Ginsburg will testify about her background and experience as an ALPA attorney and her duties as a Managing Attorney in the ALPA Legal Department, ALPA's experience with Iron Mountain as reflected in her Declaration filed in this Court on May 6, 2009, and ALPA's efforts to collect, compile and retain paper and electronic documents pertinent to the present litigation, including but not limited to her investigation into the loss, destruction or return of the Hunnibell/Clark authorization cards and the search for emails to and from ALPA key players.

**24.    Ronald Hedges**
        Ronald J. Hedges LLC
        484 Washington Avenue
        Hackensack, NJ 07601

Ronald Hedges will testify about his role as Special Master in supervising electronic discovery, ALPA's cooperation with that project and the results of that project.

**25.    Chris McCarthy**
        Air Line Pilots Association
        535 Herndon Parkway
        Herndon, VA 20170

Christopher McCarthy will describe his experience and job duties with the ALPA Information Technology Department and ALPA's efforts to collect, compile and retain electronic documents pertinent to the present litigation, including but not limited to ALPA's cooperation with the electronic discovery supervised by Special Master Ronald Hedges. If the Court does not

strike the expert witness report of Joshua Restivo, McCarthy will also testify about the upgrading

of ALPA's email server in July 2002 and the steps taken by the ALPA IT Department to ensure

that no data was lost during that process.

> **26.   David Mota**
> Capital Legal Solutions
> 10521 Rosehaven Street
> Suite 300
> Fairfax, VA 22030

David Mota will describe his employment background and job duties with Capital Legal

Solutions, the independent computer forensics firm that conducted the forensic examination and

analysis of ALPA's computers and electronic files under the supervision of Special Master

Hedges. Mota will testify to the work he and his firm conducted in this regard and their

conclusions regarding Plaintiffs' allegations, as outlined in his Declaration dated April 6, 2009,

which ALPA submitted in opposition to Plaintiffs' Motion for Sanctions.

> **27.   Jonathan Wood**
> Air Line Pilots Association
> 535 Herndon Parkway
> Herndon, VA 20170

Jonathan Wood will testify as to his employment background, his duties as ALPA's Real

Estate Manager, his arrangements with Iron Mountain to pick up and store 269 boxes of ALPA

documents in August 2004 and his subsequent dealings with Iron Mountain as to these

documents.

> D.   Plaintiffs' Objections to Defendant's Witnesses:

> 1.   ALPA's witness list includes the following people who were not identified

in ALPA's *Rule 26* disclosure, and never deposed:

> Howard Attarian;
> John Feldvary;
> Ana McAhron-Schulz;
> Elizabeth Ginsburg;
> Ronald Hedges;
> David Mota; and
> Jonathan Wood.

Plaintiffs believe these undeposed and undisclosed witnesses should be barred from testifying and, if necessary, Plaintiffs will move *in limine* to preclude their testimony.

2.    ALPA's witness list includes the following people who were not identified in ALPA's *Rule 26* disclosure but were deposed (some in their individual capacity, and some in a representative capacity as a *Rule 30(b)(6)* witness):

> Mark Hunnibell;
> Jalmer Johnson;
> Christopher McCarthy;
> Ronald Rindfleisch;
> Seth Rosen; and
> Marta Wagner.

Plaintiffs believe the testimony of these undisclosed but deposed witnesses should be limited to that given at their depositions and, if necessary, Plaintiffs will move *in limine* to limit their testimony to that give at their depositions.

3.    On September 4, 2008, ALPA agreed not to call a number of people which it had identified in its *Rule 26* disclosures. That agreement included Steve Rautenberg. Despite its agreement, ALPA now proposes to call Mr. Rautenberg as a witness at trial.  In light of ALPA's agreement not to call Mr. Rautenberg as a witness,  ALPA should be precluded from calling him as a witness at trial and, if necessary, Plaintiffs will move *in limine* for that relief.

## VI.    **EXPERT WITNESSES**

A.    Plaintiffs' Expert Witnesses:

1.    <u>Lee Seham</u> – Plaintiffs expect to call Lee Seham as an expert witness. Although he was previously stricken, Plaintiffs will move *in limine* to permit the testimony of Lee Seham to rebut the testimony of Defendant's witnesses who will testify as to the merits of ALPA's directions to the TWA Pilots' leadership, and the merits of the strategies proposed by the TWA Pilots' leadership and counsel.

2.    <u>Joshua Restivo</u> – Plaintiffs expect to call Joshua Restivo to testify as to issues relating to spoliation, as set forth in his report dated November 12, 2008.

B.    <u>Defendant's Objections to Plaintiffs' Expert Witnesses</u>:  Defendant objects to Plaintiffs' attempt to call Lee Seham and Joshua Restivo as expert witnesses at trial on the ground that the Court previously ruled that no expert testimony would be permitted by Mr. Seham and that the Court denied Plaintiffs' motion for a spoliation sanctions.  If necessary, the specific bases for these objections will be set forth more in an *in limine* motion.

C.    <u>Defendant's Expert Witnesses</u>:  Defendant has not designated any expert witnesses for trial.

D.    <u>Plaintiffs' Response to Defendant's Expert Witnesses</u>:  Although Defendant has not designated any retained expert witnesses, many of its trial witness have been disclosed to offer legal opinions, negotiating strategy opinions and other expert opinions.  Plaintiffs object to any such testimony and the bases for such objections will be set forth by way of *in limine* motions.

## VII.   **EXHIBITS**

A.    <u>Plaintiffs' Exhibits</u>:

1.    Plaintiffs' Trial Exhibit List is attached as Exhibit A.

2.     Defendant objects to numerous exhibits listed by Plaintiffs on relevancy grounds including, but not limited to, documents related to Plaintiffs' spoliation claim. Defendant's remaining objections are noted on the attached Exhibit A.

B.     Defendant's Exhibits:

1.     Defendant's Trial Exhibit List is attached as Exhibit B.

2.     Plaintiffs object to numerous exhibits listed by Defendants. Those objections are noted on the attached Exhibit B.

C.     Joint Exhibits:

1.     The parties Joint Trial Exhibit List is attached as Exhibit C.

## VIII.   LAW

A.     Plaintiffs

Plaintiffs' statement of legal issues:

1.     In light of the Court's Order bifurcating liability and damages, what proof of causation and damages, if any, are Plaintiffs required to make to establish liability on their duty of fair representation claims?

B.     Defendant

Defendant's statement of legal issues:

1.     Should this action be permitted to proceed to trial as a class action, given that the issue of injury in fact is an individual issue for the members of the class, and in light of the Third Circuit's recent decision in In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008). This issue is discussed more fully below, in Section IX(B)(1) ("Decertification").

2.     Must Plaintiffs prove that ALPA's alleged conflict (by virtue of its alleged interest in merging with the APA, the union representing the pilots of American) resulted in advice—or other conduct—that differed from the advice ALPA would otherwise have given or the actions it otherwise would have taken?

3.     Must Plaintiffs prove that the positions or actions taken by American would have resulted in a significantly better jobs outcome for the TWA pilots if ALPA had taken

Case 1:02-cv-02917-JE   Document 348   Filed 02/02/11   Pag   67 of 77 PageID: 9603

some or all of the actions that the Plaintiffs allege it should have taken, or had not taken the actions they allege it should not have taken?

4.     Must Plaintiffs prove that the positions or actions of the APA would have resulted in a significantly better jobs outcome for the TWA pilots if ALPA had taken some or all of the actions that the Plaintiffs allege it should have taken, or had not taken the actions they allege it should not have taken?

5.     What showings of causation are Plaintiffs required to make to establish liability on their duty of fair representation claims?

6.     Can Plaintiffs establish the fact of injury with the reasonable certainty required by the law?

7.     Can a breach of the duty of fair representation be based upon an allegation that a union failed to adequately lobby for a change in the law?

8.     Were Roland Wilder's litigation strategies fundamentally flawed or, in any event, was there a reasonable basis for concluding that they would not achieve the proposed results?

9.     Must Plaintiffs prove their allegations of fraud by the clear and convincing standard that applies to common law fraud claims?

10.     If the Bankruptcy Court presiding over the TWA bankruptcy had ruled against ALPA on the Section 1113 motion, would that ruling have resulted in the rejection of the TWA CBA in its entirety?

## IX.   **MISCELLANEOUS**

A.     Plaintiffs intend to make some or all of the following motions prior to trial:

1.     Plaintiffs will move *in limine* to preclude ALPA from presenting evidence of any purported statement made by any American Airlines representative to the effect that American Airlines would abandon its acquisition of TWA's assets if the TWA pilots did not agree to the contract concessions set forth in the Asset Purchase Agreement.

2.     Plaintiffs will move *in limine* to preclude ALPA from presenting evidence of any purported statement made by any TWA representative to the effect that American Airlines would abandon its acquisition of TWA's assets if the TWA pilots did not agree to the contract concessions set forth in the Asset Purchase Agreement.

Case 1:02-cv-02917-JE   Document 348   Filed 02/02/11   Pag   68 of 77 PageID: 9604

      3.    Plaintiffs will move *in limine* to preclude ALPA from presenting evidence of any purported statement made by any American Airlines representative to the effect that American Airlines was prepared in October/November 2001 to make a seniority integration proposal more favorable to the TWA pilots than what it eventually adopted as Supplement CC.

      4.    Plaintiffs will move *in limine* to preclude ALPA from presenting evidence that it provided any support to the TWA MEC Merger Committee beyond that testified to by its Rule 30 (b) (6) rep on the topic, i.e. unidentified communications with American Airlines, and the prosecution of the "Reasonable Best Efforts" grievance.

      5.    Plaintiffs will move *in limine* to preclude ALPA from presenting evidence that any pursuit of the "horns of a dilemma" litigation strategy proposed by Roland Wilder in June/July 2001 would have impaired the TWA pilots' negotiations with APA.

      6.    Plaintiffs will move *in limine* to preclude ALPA from presenting evidence that it rejected filing of the "cram down injunction" suit proposed by Roland Wilder to be filed in October 2001 for any reason other than its stated position that the relief sought by that suit was then moot.

      7.    Plaintiffs will move *in limine* to preclude ALPA from presenting any evidence that any of Roland Wilder's litigation strategies were fundamentally flawed or, in the alternative, to permit the testimony of Lee Seham as to this issue.

      8.    Plaintiffs will move *in limine* to preclude ALPA from presenting evidence that if the TWA bankruptcy court ruled on TWA's Section 1113 motion, it would have resulted in the rejection of the TWA CBA in its entirety or, alternatively, to permit the testimony of Lee Seham as to this issue.

9. Plaintiffs will move *in limine* to preclude ALPA from presenting any evidence of TWA's earlier bankruptcies.

10. Plaintiffs will move *in limine* to limit the testimony of LeRoy "Bud" Bensel and preclude any testimony regarding privileged matters or his removal as a class representative.

11. Plaintiffs will move *in limine* to permit the testimony of Lee Seham.

12. Plaintiffs will move *in limine* to permit evidence of ALPA's spoliation, consistent with this Court's December 17, 2009 Order and Opinion which states, "the Court declines to issue a spoliation inference or to impose any other sanction *at this time.*" (emphasis added).

13. Plaintiffs will move *in limine* to preclude any reference to the fact that any TWA Pilot opted out of the Class.

14. Plaintiffs will move *in limine* to preclude the testimony of any ALPA witness who was not disclosed on ALPA's Rule 26 witness disclosure.

15. Plaintiffs will move *in limine* to limit the testimony of any ALPA witness who was not disclosed on ALPA's Rule 26 witness disclosure, but who was deposed, to the testimony given at their deposition.

16. Plaintiffs will move *in limine* to preclude ALPA from presenting evidence that the ALPA authorization cards it received from American Airline pilot John Clark were returned to him.

17. Plaintiffs will move *in limine* to preclude ALPA from presenting evidence that someone at ALPA told American Airline pilots Mark Hunnibell and John Clark that ALPA would not reimburse them for their expenses they incurred in running their ALPA campaign.

B.    Defendant intends to make some or all of the following motions prior to trial:

1.    <u>Decertification.</u>    ALPA believes that the Court should re-consider whether this case can properly proceed as a class action and will move to decertify this action pursuant to Fed. R. Civ. P. 23(c)(1)(C), which provides that an order that grants or denies class certification "may be altered or amended before final judgment."  In its recent decision in <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305 (3d Cir. 2008), which was decided well after this Court granted class certification, the Third Circuit tightened the requirements for the certification of class actions and held, among other things, that class certification is inappropriate unless all of the members of the class can demonstrate injury in fact and that trial courts must conduct a "rigorous analysis" of the requirements of Rule 23 before certifying an action as a class action.  ALPA submits that the fact of injury is not a common issue for the members of the class and that the requirement of predominance under Rule 23 cannot be established with respect to the claims in this case.  ALPA submits that the type of analysis required since <u>Hydrogen Peroxide</u> was not undertaken in this case at the time of certification and that further consideration of plaintiffs' claims makes clear that the fact of injury is an individual issue as to the members of the class. As a consequence, this case should not proceed to trial as a class action but should instead be decertified.

2.    <u>Supplemental Deposition.</u>  ALPA requests leave to conduct a brief supplemental deposition of Roland Wilder, whose videotaped testimony Plaintiffs intend to present at the time of trial.  Under questioning by Plaintiffs' counsel during his videotaped deposition on August 8, 2008, Mr. Wilder testified that he was present at and participated in perhaps the most important event in this case, the meeting of the TWA-MEC in St. Louis on April 2, 2001, where Wilder

was bullied by other ALPA advisors. However, after the close of discovery, Mr. Wilder

reviewed his billing and other records and his daily calendar and provided counsel for ALPA

with an affidavit in which he corrected his testimony and confirmed that he was <u>not</u> present

during the TWA-MEC meeting on April 2, 2001. Given the importance of what occurred at the

meeting on April 2, 2001, ALPA submits that it is essential for the jury to have accurate

testimony from Mr. Wilder on this issue so that the jury can make fully-informed credibility

determinations (1) about what did or did not happen during that meeting, and (2) about the

credibility of the class representatives who have claimed that Mr. Wilder participated at the

meeting on April 2, 2001, and was bullied into silence by the other ALPA advisors.

      3.    <u>Expert Testimony</u>. ALPA will move *in limine* to bar any expert testimony by Lee

Seham or Kevin McCormick on the ground that the Court has ruled that such testimony was not

admissible in its Order filed on March 11, 2009 [Docket 294].

      4.    <u>Opinion Testimony by James Baehler</u>. ALPA will move *in limine* to bar any

opinion testimony by James Baehler concerning "standard negotiating practices and ALPA's

substantial departure from those practices" on the grounds that Mr. Baehler was never identified

as an expert in accordance with the Court's pre-trial scheduling orders and that opinion

testimony by Mr. Baehler is not otherwise admissible under Rule 701.

      5.    <u>Spoliation</u>. ALPA will move *in limine* to bar any testimony, questions or

argument related to Plaintiffs' claim of spoliation, including any expert testimony by Joshua

Restivo (who provided an Expert Report), any deposition testimony of ALPA or Iron Mountain

witnesses concerning the discarding of documents, and any questioning of ALPA or other

witnesses at trial concerning the discarding of documents, on the grounds that the Court rejected

Plaintiffs' claim of spoliation in its Opinion and Order filed on December 17, 2009 [Docket 310

and 311]. As a consequence, any testimony concerning this issue is not relevant under Rule 401 and will be prejudicial under Rule 403.

6.   _Damages_.  ALPA will move *in limine* to bar any evidence concerning the alleged monetary damages suffered by any of the members of the class on the grounds that the issue of damages was bifurcated and is not part of this trial by virtue of the Court's Order filed on May 5, 2005.  As a consequence, testimony about the alleged damages resulting from ALPA's alleged breach of its duties is both not relevant under Rule 401 and prejudicial and will consume time unnecessarily under Rule 403.

7.   _Events After April 18, 2002_.  ALPA will move *in limine* to bar any evidence concerning events after April 18, 2002 on the grounds that such evidence is not relevant to any of the claims asserted by Plaintiffs and that such evidence might implicate the issue of alleged damages and therefore confuse the jury and prejudice ALPA.

8.   _Section 1113 Motion_.  ALPA will move *in limine* to bar any testimony or argument by Plaintiffs to the effect that a ruling by the Bankruptcy Court on TWA's Section 1113 motion adverse to ALPA might have resulted in something other than a rejection of the entire ALPA CBA.

9.   _Roland Wilder's Litigation Theories_.  ALPA will move *in limine* to bar any testimony or argument by Plaintiffs that ALPA violated its duty of fair representation as a result of its failure to approve Roland Wilder's litigation strategies, which were fundamentally flawed, or as to which there was a reasonable basis for concluding that they would not achieve the proposed results.

10.   _Lobbying Efforts_.  ALPA will move *in limine* to bar any evidence concerning lobbying efforts concerning the so-called Bond bill on the grounds that it had no duty, as a matter

72

of law, to lobby to change the law and that any claim that the Bond bill would have become law – and would have been applied retroactively – is speculative.

11.   _Asset Purchase, Not Merger._  ALPA will move _in limine_ to bar any testimony or argument by Plaintiffs that the transaction between American Airlines and TWA was a merger. Such testimony or argument would be misleading and potentially prejudicial on the grounds that the transaction was an asset purchase.

12.   _American Airlines and the APA – Change in CBA._  ALPA will move _in limine_ to bar any testimony or argument by Plaintiffs about how American Airlines or the APA would have acted, or what the outcome of seniority negotiations would have been, if ALPA had declined to modify the TWA CBA on April 2, 2001, on the grounds that such evidence would be hearsay (if based upon alleged out-of-court statements of representatives of American Airlines or APA) and/or speculation.

13.   _American Airlines and the APA – Other Actions._  ALPA will move _in limine_ to bar any testimony or argument by Plaintiffs about how American Airlines or the APA would have acted or what the outcome of seniority negotiations would have been if ALPA had filed any of the lawsuits that Roland Wilder proposed or had taken any of the other actions requested by the TWA-MEC on the grounds that such evidence would be hearsay (if based upon alleged out-of-court statements of representatives of American or APA) and/or speculation.

14.   _Tape Recordings._  ALPA will move to exclude from evidence any of the audio-recordings that have been marked as exhibits by Plaintiffs on the grounds that those recordings are of very poor quality and are difficult hear; that some of them appear to be incomplete or to have been edited; and that the conversations allegedly recorded will be duplicative of other

testimony and documents. Any use of the tapes should be restricted to discrete segments used either to refresh recollection or to impeach witness testimony.

15.   _Richard Seltzer's Alleged Conflict of Interest_.  ALPA will move *in limine* to bar any evidence concerning Richard Seltzer's alleged conflict of interest based on Cohen, Weiss & Simon's representation of American's flight attendants' union on the ground that there was no conflict under the Rules of Professional Conduct and that any argument or assertions to the contrary would not be relevant and would be unduly prejudicial under Fed. R. Evid. 401 and 403.

16.   _Insurance_.  ALPA had intended to move *in limine* to bar any evidence that refers to its liability insurance pursuant to Rule 411.  Plaintiffs have stipulated that information concerning insurance will not be offered or admitted at trial.

C.   Plaintiffs intend to present the deposition testimony of the witnesses identified below as designated in Exhibit D.  Plaintiffs reserve the right to introduce any portion of the deposition testimony designated by the Defendant.  Defendant has designated counter-designations and counter-designations for completeness.  See Ex. D.  Plaintiffs reserve the right to object to the testimony so designated by the Defendant, although Plaintiffs have attempted to include their objections in Exhibit D, attached hereto.

1.   Roland Wilder (August 8, 2008)

2.   James Baehler (December 18, 2006)

3.   Sherry Cooper (November 10, 2006)

4.   Thomas Rachford (November 25, 2008)

5.   Robert Reifsnyder (September 17, 2008)

6.   Steve Tumblin (September 22, 2008)

7.   Mark Hunnibell (October 24, 2006)

    8.     John Clark (December 1, 2006)

    9.     Randy Babbitt (August 28, 2008)

    10.    Seth Rosen (August 26, 2008)

    11.    David Holtzman (November 9, 2008)

    12.    Andrew Bonner (November 19, 2007)

    13.    Christopher McCarthy (May 29, 2007)

    14.    Jalmer Johnson (July 24, 2008)

    15.    Duane Woerth (October 29, 2008)

    16.    Ronald Rindfleisch (November 13, 2006)

    17.    Ronald Rindfleisch (August 27, 2008)

    18.    Clay Warner (September 16, 2008)

    19.    Jerome Mugerditchian (November 9, 2006)

    D.    Defendant, subject to the limitations of Rule 32 of the Federal Rules of Civil Procedure, reserves the right to use the deposition testimony of the witnesses listed below as designated in Exhibit E.  Defendant further reserves the right to introduce any portion of the deposition testimony designated by the Plaintiffs.  Defendant reserves the right to object to any of Plaintiffs' counter designations identified in Exhibit E.

    1.     J. Randolph Babbitt (August 28, 2008)

    2.     Jeffrey Brundage (September 12, 2008)

    3.     Theodore Case (September 26, 2006)

    4.     Matthew Comlish (January 14, 2011)

    5.     Michael Glanzer (September 18, 2008)

    6.     Dee J. Glasby (January 11, 2011)

    7.     Howard Hollander (September 19, 2006)

8.    Robert Pastore (September 27, 2006)

9.    Duane Woerth (October 29, 2008)

10.    Sally Young (September 15, 2006)

## X.    <u>NON-JURY TRIALS</u>

Not applicable.

## XI.    <u>JURY TRIALS</u>

No later than _____.

## XII.    <u>BIFURCATION</u>

Pursuant to the Court's Order, the issues of liability and damages shall be tried separately.

## XIII.    <u>ESTIMATED LENGTH OF TRIAL</u>

A.    <u>Plaintiffs' Estimation</u>:  Plaintiffs estimate that length of the trial will be 13 trial days.

B.    <u>Defendant's Estimation</u>:  Defendant estimates the length of the entire trial will be between six and eight weeks.

## CONCLUDING CERTIFICATION

We hereby certify that by affixing our signatures to this Final Pretrial Order that it reflects the efforts of all counsel and that we have carefully and completely reviewed all parts of this Order prior to its submission to the Court. Further, it is acknowledged that amendments to this Joint Final Pretrial Order will not be permitted except where the Court determines that manifest injustice would result if the amendment is not allowed.

**TRUJILLO RODRIGUEZ**
**& RICHARDS, LLC**

By: _s/ Lisa J. Rodriguez_____
Lisa J. Rodriguez
Nicole M. Acchione
258 Kings Highway East
Haddonfield, NJ 08033

**GREEN JACOBSON, P.C.**

By: _s/ Martin M. Green_____
Martin M. Green
Joe D. Jacobson
Allen P. Press
Jonathan Andres
7733 Forsyth Boulevard
Suite 700 Pierre Laclede Center
St. Louis, Missouri 63105

*Attorneys for Plaintiff*

**ARCHER & GREINER, P.C.**

BY: _s/ John C. Connell_____
Steven Fram
John C. Connell
One Centennial Square
Haddonfield, NJ 08033

**KATZ & RANZMAN, P.C.**

By: _s/ Daniel M. Katz_____
Daniel M. Katz
4530 Wisconsin Avenue, N.W.
Suite 250
Washington, DC 20016

*Attorneys for Defendant*

IT IS SO ORDERED:

Dated: _2/8/11_____

_____
Hon. Joseph E. Irenas
United States District Judge