A&G | ARCHER & GREINER, P.C.
ATTORNEYS AT LAW

**STEVEN J. FRAM**
*Also Member of Pennsylvania Bar*

ONE CENTENNIAL SQUARE
HADDONFIELD, NJ 08033-0968
856-795-2121
FAX 856-795-0574

www.archerlaw.com

Email Address:
sfram@archerlaw.com

Direct Dial:
(856) 354-3051

Direct Fax:
(856) 673-7051

June 10, 2011

**HAND DELIVERY**
The Honorable Joseph E. Irenas, U.S.D.J.
United States District Judge
Mitchell H. Cohen Federal Building & U.S. Courthouse
1 John F. Gerry Plaza, Room 310
Camden, NJ 08101

RE:   **Brady, et al. v. Air Line Pilots Association, et al.**
      **No. 2917-JEI (D.N.J. Camden)**

Dear Judge Irenas:

I am writing to advise Your Honor of two sets of disputes over the admissibility of witness testimony that will arise next week.

First, I believe that on Monday Plaintiffs intend to show excerpts from the videotaped depositions of Roland Wilder. Counsel provided to Your Honor on Thursday a copy of the transcript of what Plaintiffs intend to show from Mr. Wilder's original deposition on August 8, 2008, with one section marked to indicate objections raised by ALPA.

A dispute also exists concerning a handful of questions that I asked Mr. Wilder during his supplemental deposition on March 21, 2011. As Your Honor may recall, at the Final Pretrial Conference, ALPA was granted leave to take a brief supplemental deposition of Mr. Wilder because an issue arose during discovery about whether Mr. Wilder attended the meeting of the TWA MEC on April 2, 2001. In that supplemental deposition, Mr. Wilder confirmed, after reviewing his billing records and other documents, that he was 100% certain that he was <u>not</u> present at the MEC meeting on April 2, 2001, but instead that he left St. Louis on the afternoon of April 1 to fly to Louisville on another client matter.

At the conclusion of my brief examination of Mr. Wilder on March 21, 2001, I advised him of certain testimony given by class representatives Young and Hollander in their depositions – to the effect that Mr. Wilder was present during the meeting on April 2, 2001 – and asked whether that testimony was accurate or inaccurate. Mr. Press objected to the form of these

| PRINCETON OFFICE | FLEMINGTON OFFICE | PHILADELPHIA OFFICE | WILMINGTON OFFICE | GEORGETOWN OFFICE | NEW YORK OFFICE |
|---|---|---|---|---|---|
| 700 Alexander Park | Plaza One | One Liberty Place - 32nd Floor | 300 Delaware Avenue | 9 East Market Street | 2 Penn Plaza |
| Suite 102 | 1 State Route 12, Suite 201 | 1650 Market Street | Suite 1370 | P.O. Box 977 | Suite 1500 |
| Princeton, NJ 08540 | Flemington, NJ 08822-1722 | Philadelphia, PA 19103-7393 | Wilmington, DE 19801 | Georgetown, DE 19947 | New York, NY 10121 |
| P 609-580-3700 | P 908-788-9700 | P 215-963-3300 | P 302-777-4350 | P-302-858-5151 | P 212-292-4988 |
| F 609-580-0051 | F 908-788-7854 | F 215-963-9999 | F 302-777-4352 | F-302-858-5161 | F 212-629-4568 |

Hon. Joseph E. Irenas, U.S.D.J.
June 10, 2011
Page 2

questions.  Mr. Press and Ms. Rodriguez advised me yesterday, when counsel were discussing
Mr. Wilder's supplemental deposition, that they objected to showing the jury these questions and
Mr. Wilder's responses.  Although I was not initially inclined to press this issue, after Mr.
Altman repeatedly asserted, during his testimony yesterday, not only that Mr. Wilder <u>was</u> present
on April 2, 2001, but that Mr. Wilder was intimidated into silence by the other advisors on that
date, I have now concluded that it is very important for the jury to see these portions of Mr.
Wilder's testimony.

    I therefore request that Your Honor rule that Mr. Wilder's supplemental deposition
testimony, as displayed to the jury, should include questions and answers from the supplemental
transcript beginning at page 17, line 6 and continuing to page 20, line 13, but excluding
Plaintiffs' objections.  A copy of the March 21, 2011 transcript is enclosed with this letter.

    In <u>United States v. Harris</u>, 471 F.3d 507 (3d Cir. 2006), the Third Circuit confirmed that
it is inappropriate to ask one witness whether another witness is lying.  Such questions, the court
noted, "invade the province of a jury and force a witness to testify as to something he cannot
know, i.e., whether another is intentionally seeking to mislead the tribunal." <u>Id.</u> at 511.  At the
same time, the Third Circuit held that it is appropriate and "often necessary on cross-examination
to focus a witness on the differences and similarities between his testimony and that of another
witness":

> This is permissible provided he is not asked to testify as to the
> veracity of the other witness.  <u>See, e.g.</u>, <u>United States v. Gaines</u>,
> 170 F.3d 72, 81-82 (1st Cir 1999) (explaining that questions that
> avoid the "'L' word" and call upon a witness to say whether
> another was "mistaken" or "wrong" may be acceptable); <u>United
> States v. Gaind</u>, 31 F.3d 73, 77 (2d Cir. 1994) (explaining that
> "[a]sking a witness whether a previous witness who gave
> conflicting testimony is 'mistaken' highlights the objective conflict
> without requiring the witness to condemn the prior witness as a
> purveyor of deliberate falsehood, i.e., a liar.'").  We do not
> foreclose the possibility that other circumstances may make a
> question about another witness' veracity appropriate.

<u>Id.</u> at 512.

    The second issue that will arise next week relates to Plaintiffs' intention to call James
Baehler as a witness.  Mr. Baehler is a non-pilot negotiations consultant who was engaged by the
TWA MEC in late April of 2001 to assist the Merger Committee in negotiations with the
American pilots.  During his deposition, Mr. Baehler gave a number of opinions about how
ALPA should have represented the TWA pilots, including opinions that ALPA should have
undertaken a public relations campaign, should have conveyed that it was willing to use

Hon. Joseph E. Irenas, U.S.D.J.
June 10, 2011
Page 3

litigation against the APA and should have supported a lobbying campaign in Washington on behalf of the TWA pilots. His testimony also includes much hearsay and speculation.

I enclose, with this letter, a copy of the transcript of Mr. Baehler's deposition that is highlighted to show the portions originally designated by Plaintiffs. (The cover sheet to the transcript also lists ALPA's objections, ALPA's counter-designations for completeness and Plaintiffs' objections to those counter-designations.)

In the Joint Final Pretrial Order, ALPA objected to any testimony by Mr. Baehler as follows:

> Defendant objects to Plaintiffs' attempt to call James Baehler as a witness at trial on the grounds that his testimony is opinion testimony but that (a) he was never identified as an expert and never provided an expert report; (b) he is not qualified to give lay opinion testimony because the facts upon which his testimony relies are not within his personal knowledge; (c) certain of the information he relies upon for his opinions is hearsay or speculation; and (d) his proposed opinions will not be helpful to the trier of fact.

JFPO at page 45.

We understand, from speaking with Plaintiffs' counsel yesterday, that they intend to call Mr. Baehler as a live witness at trial this coming week. ALPA now renews its objections to any testimony by Mr. Baehler on the grounds noted above.

We appreciate Your Honor's consideration of these issues.

Respectfully yours,

STEVEN J. FRAM

SJF:gam
Enclosure
cc:     Allen Press, Esquire (via email – w/enclosures)
        Lisa Rodriguez, Esquire (via email – w/enclosures)
        Nicole M. Acchione, Esquire (via email – w/enclosures)
        Daniel M. Katz, Esquire (via email – w/enclosures)

6828812v1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

------------------------------x
LEROY "BUD" BENSEL, ET AL., :
                       :
     Plaintiffs,       :
                       :
     v.                   :   Civil Action
                       :   No. 02-2917 (JEI)
ALLIED PILOTS ASSOCIATION, :
ET AL.,                :
                       :
     Defendants.      :
------------------------------x

Washington, D.C.

Monday, March 21, 2011

Videotape Deposition of:

ROLAND WILDER

called for examination by counsel for Defendant Air
Line Pilots Association, International, pursuant to
notice, commencing at 2:00 p.m., at Baptiste & Wilder,
P.C., 1150 Connecticut Avenue, N.W., Suite 500,
Washington, D.C., before Delores M. Green, a Court
Reporter and Notary Public in and for the District of
Columbia, when were present on behalf of the
respective parties:

2

1    APPEARANCES:

2         On behalf of the Plaintiff:

3              ALLEN P. PRESS, ESQUIRE
               Green Jacobson, P.C.
4              Suite 700, Pierre Laclede Center
               7733 Forsyth Boulevard
5              St. Louis, Missouri 63105
               (314) 862-6800
6              press@stlouislaw.com

7
          On behalf of the Defendant Air Line Pilots
8         Association, International:

9              STEVEN J. FRAM, ESQUIRE
               Archer & Greiner, P.C.
10             One Centennial Square
               P.O. Box 3000
11             Haddonfield, New Jersey 08033-0968
               (856) 795-2121
12             sfram@archerlaw.com

13
          ALSO PRESENT:   MARTA WAGNER, ESQUIRE
14

15

16

17

18

19

20

21

22

3

1                         I-N-D-E-X

2    WITNESS:                                    PAGE:

3    ROLAND WILDER

4         Examination by Mr. Fram                 5

5         Examination by Mr. Press                20

6

7                         - oOo -

8

9                   E-X-H-I-B-I-T-S

10   Wilder Exhibit

11       A    Subpoena                            22

12       B    Notice of Deposition - Roland Wilder   22

13       C    Order - U.S. District Court          22

14

15

16

17

18

19

20

21

22

4

                    P R O C E E D I N G S

1                    THE VIDEOGRAPHER:   Here begins videotape

2     number 1 in the videotape deposition of Roland Wilder

3     taken in the matter of LeRoy "Bud" Bensel, et al. vs.

4     Allied Pilots Association, et al., in the United

5     States District Court for the District of New Jersey,

6     Camden Vicinage; Case Number 02-2917-JEI.

7                    Today's date is March 21, 2011.   The time is

8     2:01 p.m.   This deposition is being held at Baptiste &

9     Wilder, P.C., Washington, D.C.

10                   The court reporter is Delores Green.   The

11    videographer is Jasmin Rice, both here on behalf of

12    Inabnet Reporting Services.

13                   Will counsel please introduce themselves and

14    state whom you represent.

15                   MR. PRESS:   Yes, Jasmin.   Allen Press is

16    here for the plaintiffs.

17                   MR. FRAM:   Steven Fram for the defendant,

18    Airline Pilots Association, International.   And with

19    me is Marta Wagner, in-house counsel at Airline Pilots

20    Association.

21                   THE VIDEOGRAPHER:   Will the court reporter

5

1   please swear in the witness.

2   Whereupon,

3                    ROLAND WILDER

4   was called as a witness, and having been first duly

5   sworn by the Notary Public, was examined and testified

6   as follows:

7     EXAMINATION BY COUNSEL FOR DEFENDANT AIRLINE PILOTS

8                 ASSOCIATION, INTERNATIONAL

9                 BY MR. FRAM:

10     Q.    Mr. Wilder, good afternoon.  My name is

11   Steve Fram.  We met a couple minutes ago.  You're here

12   today pursuant to a subpoena and a court order that

13   enable us to supplement your prior deposition

14   testimony in this case.

15          Are you aware of that?

16     A.    I am.

17     Q.    And you have in front of you, sir, a copy of

18   the subpoena and the court order that requires your

19   appearance.

20     A.    I do.

21     Q.    And the subpoena and the court order are the

22   reason that you're appearing here today; is that

6

1    correct?

2         A.    That's correct.

3         Q.    Did you have an opportunity to review any of

4    the testimony that you earlier gave in this case on

5    August the 8th of 2008?

6         A.    I did not.

7         Q.    Okay.  Do you understand that we're here to

8    try to clarify one specific aspect of that testimony,

9    which is whether you appeared at a meeting of the TWA

10   Master Executive Council on April the 2nd of 2001 and

11   also to clarify some aspects of where you were on

12   April 1 of 2001?

13        A.    I understand that.

14        Q.    Okay.  What I'd like to do, sir, is start by

15   showing you a document that has been premarked as

16   Exhibit D-236.  This is an affidavit that you took

17   dated September 20, 2009.

18             I'd just like you to take a moment to

19   confirm that it is an affidavit you read and signed,

20   and then I'm going to ask you to look -- refer

21   specifically to Exhibit B, which is the first page of

22   your daytimer.

7

1      A.    Certainly.

2      Q.    Okay.   Take a minute with the document and

3   tell me when you're ready to answer --

4      A.    Sure.

5      Q.    -- some questions about it.

6      A.    That is my affidavit.

7      Q.    All right.   And focusing on the daytimer, we

8   have three pages; the cover page and two pages from

9   the daytimer.

10         Can you please confirm that that is, in

11   fact, your copies of your daytimer?

12      A.    Yes.   Both -- all three pages represent

13   copies from my daytimer for April of 2001.

14      Q.    And let's turn to the page that relates to

15   April 1 of 2002 -- I'm sorry.   2001, rather.

16         Is that your handwriting, sir?

17      A.    It is.

18      Q.    And I see that you have a number there,

19   01-513?   Yes?

20      A.    That's correct.

21      Q.    Can you tell me what that represents,

22   please?

8

1        A.    Yes.   That represents the client number for

2   the TWA-MEC.

3        Q.    And would you read for us what you handwrote

4   next to that client number?

5        A.    Yes.   "Meet with David Holtzman, M. Glanzer;

6   review documents; outline presentation; attend MEC

7   meeting."

8        Q.    And below that, you have a different number,

9   89-6; is that correct?

10       A.    That's correct.

11       Q.    And that refers to a different client?

12       A.    It refers to a different client.

13       Q.    Can you read the narrative that you put

14   there, please?

15       A.    Yes.   "Review Section 6 notice and revise

16   scope proposal; meet with negotiating committee."

17       Q.    And then on the next page of the daytimer,

18   the entries for April 2, you have a reference to that

19   other client 89-6.

20       A.    Yes.

21       Q.    Can you read that reference for us, please?

22       A.    Yes.   "Attend collective bargaining

9

1   negotiations; meet with negotiating committee; review

2   and revise proposals."

3        Q.   And then below that, do you have another

4   reference there to the TWA-MEC representation?

5        A.   That's correct.

6        Q.   Can you read the narrative for us there,

7   please?

8        A.   Yes.   "Phone conference with John Hefley,

9   Clay Warner, WRW" -- that's William Wilder, a partner

10  in this firm -- "and respond to messages."

11       Q.   When did you make the entries that you've

12  just read for us in your daytimer?

13       A.   When?

14       Q.   Yeah.   About when?

15       A.   On November 2nd.   I'm sorry.   On April 2nd.

16       Q.   And what was your purpose in making those

17  entries, please?

18       A.   This is the foundation for the time records

19  that the firm maintains for me, and also we use this

20  for the billing.

21       Q.   Okay.   What I'm showing you now is D-176.

22            Can you please confirm that D-176 is a copy

10

1   of the billing statement that your firm sent to

2   Captain Robert Pestor (phonetic) of the TWA-MEC for

3   the month of April of 2001?

4        A.    It appears to consist of the firm's billing

5   to the TWA-MEC for the month of April, the bill being

6   dated May 9, 2001, and attached to the billing are the

7   various expense records evidencing the expenses I

8   incurred representing the TWA-MEC in April.

9        Q.    And the first page of D-176 is your

10  transmittal letter --

11       A.    That's correct.

12       Q.    -- the letter that forward the bill.  And

13  then the first page of the bill has an entry on 4-1-01

14  which shows 7.5 hours.  Do you see that?

15       A.    I see that.

16       Q.    And the description there is precisely the

17  same description as you read from April 1 on the

18  daytimer, correct?

19       A.    Correct.

20       Q.    So your practice in having your firm prepare

21  bills was to take the narrative you wrote in the

22  daytimer, around the time you performed the services,

11

1    and then have that narrative put into your billing

2    system so that the client got billed for the time?

3        A.    That is correct.

4        Q.    Now, can you tell us after you spent the

5    time shown on April 1 of 2001 representing the MEC,

6    did you leave town later that day?

7        A.    Yes.  I had a meeting with another client in

8    Louisville, Kentucky.  I left the MEC offices in St.

9    Louis somewhere between 4:30 and 5:00 on the afternoon

10   of April 1 and went to the airport, flew to

11   Louisville; and I believe I met with the client in

12   Louisville on April 1, yes.

13       Q.    Okay.  You just refreshed your memory about

14   meeting with the client in Louisville by referring to

15   the daytimer?

16       A.    I just did, yes.

17       Q.    Okay.  And if you turn back to the bill, it

18   looks like you have an attachment, and this is page 6

19   of 20 if you look in the center in the bottom.  It

20   says D-176, 6 of 20.

21       A.    I have it.

22       Q.    Is that a copy, at the top, of the plane

12

1   ticket and then a copy at the bottom of a -- I guess a

2   cab receipt?

3        A.   The form at the bottom is a cab receipt,

4   yes, presumably from my home to National Airport.  And

5   the top document is a passenger receipt on the --

6   well, it's my trip to -- actually the passenger

7   receipt is from St. Louis to Louisville to Washington.

8        Q.   Okay.  And the cab receipt on the bottom,

9   was that cab fare from your home to National, or would

10  that have been cab fare from St. Louis to the St.

11  Louis Airport?

12       A.   I think it would be from my home to National

13  Airport.

14       Q.   Is that because you flew from National

15  Airport to St. Louis on the morning of April 1?

16       A.   That's correct.

17       Q.   Do you recall when the meeting on April 1

18  with representatives of the TWA-MEC began?

19       A.   My recollection is that I flew in early.  I

20  met with David Holtzman, and then there was a meeting

21  with various people from ALPA, ALPA legal department,

22  that's representation department and certain other

13

1    outside advisors of ALPA before the MEC meeting.

2         Q.    I'd like to show you an e-mail that has been

3    marked as D-210 and ask you if you have seen that

4    before.

5         A.    I don't believe I've seen this document

6    before.

7         Q.    All right.  The e-mail appears to be an

8    e-mail from Robert Snow --

9         A.    Stow.

10             MS. WAGNER:  Stow.

11             BY MR. FRAM:

12        Q.    I'm sorry.  Stow.  Thank you -- to a number

13   of members of the MEC.  And he indicates in the second

14   sentence that there would be a session at 1300 on

15   Sunday, April 1 at the MEC office.

16             Do you see that second sentence?

17        A.    Yes, I do.

18        Q.    Does that refresh your memory that a work

19   session involving members of the MEC and yourself and

20   others was scheduled to begin at about one o'clock

21   p.m. on April 1?

22        A.    That would be the meeting that occurred

14

1    after the meeting that you asked about earlier, yes.

2        Q.   And do you recall that back on April 1 that

3    the MEC had also scheduled a formal meeting on Monday,

4    April the 2nd to vote on certain matters?

5        A.   I was uncertain when the vote would take

6    place.  I thought the vote would take place in the

7    late afternoon or evening of April 1.  But I later

8    understood that the voting took place on April 2.

9        Q.   All right.  So you attended the meeting on

10   April 1.  And the part of the meeting that involved

11   the members of the TWA-MEC to your recollection began

12   at about one o'clock p.m.?

13       A.   Yes.

14       Q.   And when you left at 4:30 or 5:00, no vote

15   had been taken by the MEC; is that --

16       A.   No --

17       Q.   -- correct?

18       A.   -- the MEC had gone into executive session

19   at that point.

20       Q.   And what does executive session mean?

21       A.   Means that the MEC members were meeting

22   privately.

15

1       Q.     They were meeting without you and the other

2   advisors being present; is that correct?

3       A.     That's correct.

4       Q.     So at the point in time when you left on

5   April 1, no vote had been taken to waive scope; is

6   that correct?

7       A.     That's correct.

8       Q.     Did you later learn that a formal meeting of

9   the MEC took place on April 2 and that at that meeting

10   the MEC voted to waive scope?

11       A.     Yes.

12       Q.     And do these materials refresh your memory

13   that you were not present at a meeting of the MEC on

14   April 2 of 2001?

15       A.     No.   I testified in the first deposition in

16   the state court at the state trial and in my

17   deposition in this proceeding that I learned of the

18   vote in a telephone call with Mr. Hefley and Clay

19   Warner on April 2.   That call was made from

20   Louisville.

21       Q.     But in terms of whatever meeting took place

22   of the TWA-MEC on April 2, is it correct that you did

16

1    not attend any meeting on April 2?

2         A.    That's correct.  I was in Louisville.

3         Q.    All right.  So when you testified in your

4    deposition in this case on August the 8th of 2008 that

5    you had attended a meeting on April the 2nd, you were

6    mistaking in that testimony?

7         A.    I was referring to the meeting that actually

8    took place on April 1.  Yes.

9         Q.    How confident are you that you were not

10   present at a meeting of the TWA-MEC on Monday, April

11   the 2nd of 2001?

12        A.    Now I am confident that I was not there on

13   April 2, because I learned of the vote on April 2 by

14   telephone.  And I learned as a result of this

15   proceeding that the vote was taken on April 2, not in

16   April 1.

17        Q.    If you had to give a percentage in terms of

18   how certain you are that you were not present for a

19   meeting of the MEC on April 2, with 100 percent being

20   the most certain, what percentage would you give for

21   how certain you are that you were not present at any

22   meeting of the TWA-MEC on April 2 of 2001?

17

1      A.   I would say that I am 100 percent certain

2   because that is confirmed by the written record and

3   the -- my handwritten notes which were taken at the

4   time on April 2.  That is what I have the most

5   confidence in, frankly.

6      Q.   Are you aware that Captain Sally Young has

7   testified in a deposition in this proceeding that you

8   were present at the meeting of the MEC on April 2 of

9   2001 and that you got into a screaming match with

10  Michael Glanzer at that time?

11     A.   I'm not aware of that, no.

12     Q.   Okay.  Is that testimony by Captain Young,

13  as I represented it, is that testimony accurate or

14  inaccurate?

15          MR. PRESS:  I object to the form of the

16  question.

17          THE WITNESS:  The -- Mr. -- as I recall,

18  Mr. Glanzer spoke on April 1 forcefully and I spoke on

19  April 1 for merely an hour.  I spoke longer, I

20  believe, than anybody else at that meeting.  And we

21  had different views of what should be done, yes.  Was

22  I screaming at Mr. Glanzer, I don't believe so.

18

1          BY MR. FRAM:

2          Q.    Okay.   But in terms of testimony that

3    Captain Young is giving that a screaming match took

4    place on April the 2nd, do you agree that that never

5    happened, because you weren't there on April the 2nd?

6          MR. PRESS:   I object to the form of the

7    question.

8          THE WITNESS:   Certainly, if I was not there,

9    no screaming match took place.

10         BY MR. FRAM:

11         Q.    Are you aware that Howard Hollander, another

12   member of the TWA-MEC, has testified in his deposition

13   in this case that you attended the meeting on April

14   the 2nd of 2001 of the MEC and that you sat there

15   silently and looked disgusted and uncomfortable?

16         MR. PRESS:   Yeah.   And Steve, these are

17   outside the scope of what this deposition is supposed

18   to be about.   It's not just for Mr. Wilder to comment

19   on people's testimony, but to establish a fact which

20   you've done.   And I object to these questions.   It's

21   improper.

22         MR. FRAM:   Okay.   Your objection is noted

19

1    for the record.

2            And if appropriate, the questions and the

3    answers will be edited out of the tape, but I think

4    it's important to make the record here.

5            So let's continue.  And let me ask the whole

6    question.  The objection has been noted.

7            BY MR. FRAM:

8    Q.   My first question, sir, is are you aware

9    that Mr. Hollander testified in his deposition in this

10   case, which was taken on September 19 of 2006, that

11   you were present at a meeting of the TWA-MEC on

12   April 2nd of 2001 and that you sat there silently and

13   looked disgusted and uncomfortable?

14   A.   I'm not --

15           MR. PRESS:  I object to that --

16           THE WITNESS:  -- aware of that testimony.

17           MR. PRESS:  Hold on.  I'm sorry, Mr. Wilder.

18           I object to the form of the question on

19   several grounds.  It's compound.  It violates the

20   terms of the court's order and it's an improper

21   question in that it ask for a witness to comment on

22   another witness's testimony.

20

1        Subject to all that, you can answer.

2        THE WITNESS:  I was not aware of Captain

3   Hollander's testimony.  I was also not there on

4   April 2, so how I looked is not possible for him to

5   determine.

6        BY MR. FRAM:

7    Q.   So do you agree that his testimony that you

8   were present at a meeting of the TWA-MEC on April 2 of

9   2001 is inaccurate?

10       MR. PRESS:  I object to the form of the

11  question on all the same grounds, as stated

12  previously.

13       THE WITNESS:  Necessarily.

14       MR. FRAM:  Okay.  Thank you.

15       Thank you, sir.  I have no further

16  questions.

17       MR. PRESS:  Mr. Wilder, can I speak with you

18  from here?  Is that okay?

19       THE WITNESS:  Sure.  That's fine.

20     EXAMINATION BY COUNSEL FOR THE PLAINTIFF

21       BY MR. PRESS:

22   Q.   Okay.  You remember when I took your

21

1  deposition a couple years ago in this case, we were

2  here in this room and I asked you questions about the

3  meetings.

4          Do you remember that we noted that there was

5  some confusion in the prior record and you

6  straightened me out on that day?  And you remember

7  what your testimony was?

8      A.   I think what I said was inaccurately that

9  the events that I testified to occurred on Monday,

10  which turned out to be April 2, not April 1.  And I

11  was wrong.

12     Q.   Okay.  And I'm really more interested in the

13  events.

14     A.   Uh-huh.

15     Q.   You testified for half of a day about the

16  events.  Well, maybe not a half day.  But we spent a

17  lot of time talking about what happened at that

18  meeting, be it April 1st or April 2nd.

19          And Mr. Wilder, all the things that you told

20  me occurred on April 2nd, they occurred on April 1st;

21  is that right?

22     A.   That's correct.

22

1    Q.    Okay.

2    A.    I was only there one day.

3    Q.    And, but -- oh, that's right.  And in that

4    day, the things you told me happened that day, you

5    weren't making any of that up, right?

6    A.    Of course, not.

7    Q.    No.  All that stuff happened.  You were just

8    wrong about the date?

9    A.    I was wrong about the date.

10    MR. PRESS:  Okay.  Thank you, sir.

11    MR. FRAM:  Thank you very much.

12    THE VIDEOGRAPHER:  Off the record at

13    2:23 p.m.

14              (Wilder Exhibits A, B, and C were

15              marked for identification.)

16         (At 2:23 p.m., the instant deposition was

17    concluded.  Reading and signature were not waived.)

18

19

20

21

22