JAMES BAEHLER (December 18, 2006)
*Bensel, et al. v. Allied Pilots Association, et al.*
PLAINTIFFS' DEPOSITION DESIGNATIONS

| Plaintiffs' Designation | Defendant's Objections | Defendant's Counter Designation | Defendant's Counter Designation for Completeness | Plaintiffs' Objections |
|---|---|---|---|---|
| 6:18-8:10 | | | 8:11-22 | |
| 8:23-10:20 | | | | |
| 11:6-20:3 | 12:21-13:2 13:21-14:1 14:15-21 15:4-19 Hearsay, FRE 802 16:13-23 18:4-19:20 Lack of Personal Knowledge, Relevance, FRE 401, 403, 602 | | 20:4-26:10 | |
| 26:11-31:18 | 26:21-27:3 Hearsay, FRE 802 27:13-24 28:15-29:4 29:14-30:8 Hearsay, Relevance, Lack of Personal Knowledge, FRE 401, 403, 602, 802 30:23-31:10 Hearsay, FRE 802 31:19-21 Lack of Personal Knowledge, FRE 602 | | 31:19-32:2 | Improper completeness designation; Irrelevant; Lack of Personal Knowledge, FRE 602 |

| | | | | |
|---|---|---|---|---|
| 32:3-40:18 | 32:3-11<br>Lack of Personal Knowledge, FRE 602<br>32:12-20<br>Hearsay, FRE 802<br>33:24-34:7<br>Relevance, FRE 401, 403<br>38:8-40:18<br>Lack of Personal Knowledge, Improper Expert Testimony, FRE 602, 702, 704 | | | |
| 40:24-41:6 | 41:5-6<br>Relevance, Lack of Personal Knowledge, FRE 401, 403, 602 | | 41:7-9 | Improper completeness designation |
| 41:10-43:20 | 41:10-43:20<br>Relevance, Lack of Personal Knowledge, Improper Expert Testimony, FRE 401, 403, 602, 702, 704 | | 43:21-22 | Improper completeness designation |
| 43:23-44:5 | 43:23-44:5<br>Relevance, Lack of Personal Knowledge, Improper Expert Testimony, FRE 401, 403, 602, 702, 704 | | 44:17-49:24 | Improper completeness designation. |

| | | | | |
|---|---|---|---|---|
| | | 49:25-75:18<br>75:24-78:23<br>79:12-82:11<br>82:20-87:10<br>87:16-90:2<br>90:5-17<br>90:21-94:2<br>94:6-98:13<br>98:16<br>98:20-22<br>98:24-100:8<br>100:10-13 | | 51:2 – 54:11<br>Relevance<br>FRE 401, 402, 403<br>Lack of Foundation<br>56:23-57:11<br>Relevance;<br>Mischaracterizes<br>testimony;<br>58:12-59:12<br>Relevance<br>FRE 401, 402, 403;<br>Hearsay; Lack of<br>Personal Knowledge;<br>Improper Summary,<br>FRE 1006;<br>59:13 – 60:25<br>Lack of Personal<br>Knowledge; Lack of<br>Foundation;<br>61:1 – 62:1<br>Relevance<br>FRE 401-403<br>Lack of Foundation;<br>Lack of Personal<br>Knowledge<br>62:17- 63:8<br>Lack of Foundation;<br>Lack of Personal<br>Knowledge,<br>Relevance<br>87:6-25<br>90:10-91:6<br>91:18-25<br>93:1-11<br>Lack of Foundation;<br>Lack of personal<br>knowledge;<br>Speculation;<br>98:12-100:13<br>Argumentative; Lack<br>of Personal<br>Knowledge;<br>Relevance |
| 101:16-103:5 | 102:24-103:3<br>Hearsay, FRE 802 | | 100:17-101:3<br>101:10-15 | |

| 104:13-24 | 104:13-24 Relevance, Lack of Personal Knowledge; FRE 401, 403, 602 | 105:4-106:2 106:10-112:9 112:11-15 112:19-113:24 114:1-2 | | Relevance, Lack of Personal Knowledge, Lack of Foundation |



## In The Matter Of:

*Leroy "Bud" Bensel, et al*
*v.*
*Air Line Pilots Association, et al*

---

*JAMES BAEHLER*
*December 18, 2006*

---

## REPORTING ASSOCIATES, LLC

*Certified & Registered Professional Reporters*

*Cherry Hill  --   Philadelphia  --   Trenton*

*(888) 795-2323*



*www.ReportingAssociates.com*

JAMES BAEHLER

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------x
LEROY "BUD" BENSEL, et al,
    Plaintiffs,
                Cause No.
    -against-      02-2917-JEI-AMD
AIRLINE PILOTS ASSOCIATION,
    Defendant.
-----------------------------------x
DEPOSITION OF JAMES BAEHLER
    New York, New York
    Monday, December 18, 2006

Reported by:
Judith A. Frost
Job No.: 163435

December 18, 2006 11:07 a.m.

Deposition of JAMES BAEHLER, held at the offices of Whelan & Tusa, 90 Park Avenue, New York, New York, pursuant to notice, before Judith A. Frost, a Shorthand Reporter and Notary Public of the State of New York.

**Page 2**

APPEARANCES:

    TRUJILLO RODRIGUEZ & RICHARDS, LLC
    Attorneys for Plaintiffs
        8 Kings Highway West
        Haddonfield, New Jersey 08033
        856-795-9002
    BY:  LISA RODRIGUEZ, ESQ.
        and
    GREEN JACOBSON & BUTSCH, P.C.
        Suite 700, Pierre Laclede Center
        7733 Forsyth Boulevard
        St. Louis, Missouri 63105
        314-862-6800
    BY:  ALLEN P. PRESS, ESQ.

    KATZ & RANZMAN, P.C.
    Attorneys for Defendants
        5028 Wisconsin Avenue, N.W.
        Washington, DC 20016
        202-659-1799
    BY:  DANIEL M. KATZ, ESQ.

**Page 3**

I N D E X

WITNESS                       PAGE
JAMES BAEHLER
Ms. Rodriguez          5, 100
Mr. Katz            44, 105

E X H I B I T S

NUMBER      DESCRIPTION        PAGE
ALPA 97     Jim Baehler's fees     51
ALPA 98     Handwritten note      62
ALPA 99     Newsletter           66
ALPA 100    Letter dated 10/26/01  69

**Page 4**

    IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be the same and are hereby waived.

    IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form are reserved until the time of the trial.

    IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer as oath, with the same force and effect as it signed and sworn to before the Court.

J A M E S   B A E H L E R,    called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

    THE VIDEOGRAPHER:  This is the videotape deposition of James R. Baehler in the matter of Leroy "Bud" Bensel, et al, versus Airline Pilots Association.

    This is in the U.S. District Court of New Jersey. Cause number 02-2917.  This deposition is being held at the law offices of Whelan & Tusa in New York City on the

JAMES BAEHLER

5

1 18th of December 2006.
2 My name is Barry Forman from the firm
3 of Reporting Associates with offices in
4 Philadelphia, Pennsylvania and Cherry Hill,
5 New Jersey. I am the videographer. The
6 court reporter is Judy Frost also from
7 Reporting Associates.
8 We are going on the record at seven
9 minutes past 12 o'clock, and will counsel
10 please state your appearances for the
11 record.
12 MR. KATZ: Good morning. My name is
13 Lisa Rodriguez from the firm of Trujillo
14 Rodriguez & Richards for plaintiffs and the
15 class.
16 MR. KATZ: I'm Daniel Katz of the law
17 firm of Katz & Ranzman from Washington, DC,
18 and I represent defendant Air Line Pilots
19 Association, International.
20 THE VIDEOGRAPHER: You may proceed.
21 MR. KATZ: We note for the record the
22 presence of Allen Press. Thank you.
23 EXAMINATION BY
24 MS. RODRIGUEZ:
25 Q Good morning, Mr. Baehler.

6

1 A Good morning.
2 Q My name is Lisa Rodriguez, and as I
3 have said I'm from the law firm of Trujillo
4 Rodriguez & Richards and with me today here is Allen
5 Press from the firm of Green and others in St.
6 Louis.
7 We represent the plaintiffs in a class
8 action that is pending in Federal Court in New
9 Jersey, and the class action is titled Bensel versus
10 Airline Pilots Association. I am going to be asking
11 you a series of questions. The court reporter is
12 taking down everything you say and you are under
13 oath.
14 If you don't understand a question,
15 please ask me to repeat it. If at any time you need
16 to take a break, just let me know, and we can take a
17 break and accommodate you.
18 Mr. Baehler, I understand that there
19 came a time that you served as a negotiator for TWA
20 pilots; is that correct?
21 A I wouldn't say a negotiator, I was a
22 member of the negotiating committee in which the TWA
23 pilots were negotiating with the American Airline
24 pilots over the integration of their two pilot
25 groups after the acquisition of TWA by American.

7

1 Q Was that the first time you worked
2 with the TWA pilots as a negotiator?
3 A No, I never worked with them as a
4 negotiator doing the negotiations for them. What I
5 did starting in 1988 was to conduct seminars on
6 negotiating tactics and principles for the MEC and
7 for the merger committees over that period of time.
8 I also served briefly as a moderator
9 in negotiations between the pilots and the company
10 over the new contract prior to 2001.
11 Q You gave a date of 1988. Was that the
12 first time, can you tell me how you came to have a
13 relationship with the TWA pilots in 1988?
14 A I was sitting on an airplane returning
15 to New York and in the seat next to me was a
16 gentleman and we began a long flight, I think it was
17 cross country. We began talking, and it turned out
18 that he was a pilot and was with TWA and this was
19 shortly after Carl Icahn had acquired the company.
20 He informed me that the pilots were negotiating with
21 Icahn over a new contract.
22 When he discovered I was a
23 negotiations consultant he arranged for me to meet
24 when we got back to New York, to meet with the head
25 of the MEC and from that they began to retain me to

8

1 conduct these seminars for the MEC and the
2 negotiating committee.
3 Q Who was it that you met on the
4 airplane?
5 A Tom Brown.
6 Q You referred to a meeting with the
7 MEC. What is the MEC?
8 A It's a governing body for the TWA
9 pilots. It stands for master executive committee I
10 think.
11 MR. KATZ: Council.
12 THE WITNESS: Council. Thank you.
13 Q Again in the time frame of 1988 when
14 you first met with the TWA MEC who comprised the MEC
15 at that point if you recall?
16 A I can give you a few names. Tom
17 Ashwood. No, he was a gentlemen I met with first
18 but he was gone by the time I was hired.
19 As I recall at the time that I first
20 came on board Kent Scott was the head of the MEC and
21 Bill Compton was the head of the negotiating
22 committee. The other members I'm not sure.
23 Q After you met with the TWA MEC what
24 did you do next back in the 1988 time frame?
25 A They would call me in on a

Pages 5 to 8

JAMES BAEHLER

9

1  semi-regular basis to either conduct a seminar of
2  one or two days for the MEC or to do the same for
3  the negotiating committee.
4      As the individuals would change on the
5  MEC and the negotiating committees they would call
6  me in periodically to bring everybody up to speed.
7      Q    When you say conduct seminars, what
8  sort of seminars did you conduct?
9      A    Basic negotiating principles and
10  techniques.
11     Q    Can you tell me what some of those
12  basic negotiating principles and techniques that you
13  instructed them on were?
14     A    Well, the most basic principle is that
15  you need to know what kind of leverage you have in a
16  negotiation, and the leverage is a function of what
17  does the other side want from you.
18      So one of your principal tasks in a
19  negotiation is to identify, I should rephrase that,
20  what the other side needs from you because in a
21  negotiation what you are trying to discern is not
22  what the other side says they want but rather what
23  they need because usually what they want is more
24  than they are willing to accept.
25      What they are willing to accept is

10

1  what they really need.  So you are trying to find
2  out what does this other side really need to get out
3  of this negotiation, and the way you do that is by
4  asking questions and, more importantly, listening.
5  In fact, a good negotiator spends more time
6  listening than talking.
7      There's some misconception that
8  negotiations consist of sweeping the other side off
9  their feet with eloquence and charts and all of
10  that.  That isn't it.
11      You need to find out what the other
12  person really needs to get out of the negotiations
13  in order to fashion a proposal that makes sense to
14  the other side.
15     Q    How often between the time period of
16  1988 through 2001 were you asked to conduct seminars
17  or otherwise consult with the TWA MEC?
18     A    My guess is it would be on an average of
19  twice a year.  Maybe three times each year.  Maybe
20  not.  More like once or twice a year I would think.
21     Q    How would you come to be when you
22  retained individually for each individual?
23     A    Yes, I would get a call from whoever
24  was on the committee or whoever was involved and do another
25  they would say we need you to come in and do another

11

1  one of your workshops and I would say okay.
2      When I finished I would send them a
3  invoice for my fees and expenses and that would be
4  it.  There was never any written contract or
5  retainer.
6      Q    You indicated earlier this afternoon
7  that you assisted or were called in by the TWA MEC
8  in connection with negotiations with American
9  Airlines.
10      Can you tell me how that came about?
11     A    I got a phone call in April of 2001
12  from Keith O'Leary, who at that time was the vice
13  chairman of the MEC, and he told me that they were
14  involved in some difficult negotiations with the
15  American Airline pilots and they would like me to
16  work with the negotiating committee.
17      So I said I would be glad to and I
18  flew to St. Louis and spent three or four days with
19  the MEC and then simultaneously with the negotiating
20  committee and Mike Day, the chairman, and the other
21  members.
22     Q    The TWA negotiating committee?
23     A    Correct.
24     Q    Were you given any information prior
25  to flying to St. Louis concerning the negotiations?

12

1      A    Not that I recall.
2      Q    Did you have a prior knowledge of the
3  negotiations going on between TWA and American?
4      A    No, I knew that American had acquired
5  TWA from news reports but the situation with the
6  pilots I was ignorant of.
7      Q    What happened when you flew to St.
8  Louis in April of 2001?
9      A    I sat down with the negotiating
10  committee and I asked them to bring me up to speed,
11  and they told me that the negotiations were very
12  difficult because sometime prior to that April
13  meeting, somewhere in January or February and just
14  prior to the acquisition, they had agreed to give up
15  their contract, to invalidate it, and the reason
16  they did that was because from what they told me
17  that Don Carty, the president of American Airlines
18  had said, that we would call off the merger unless
19  the TWA pilots agreed to give up their scope as they
20  called it.
21      That as they were dealing with this
22  matter, there were advisors from the airline pilots
23  headquarters who were telling them if they didn't
24  agree that the merger would be called off that all
25  the pilots from TWA would be out of a job because

JAMES BAEHLER

13

1  the company would go into a bankruptcy and broken up
2  and its assets sold off.
3      Q    Who were you meeting with on the
4  negotiating committee at that time in April of 2001?
5      A    Mike Day, John Swanson, John Hefley,
6  D.J. Glasby and Sean Clark. I think that was it. I
7  am pretty sure that's it.
8      Q    Did you talk to them about why -- let
9  me back up a minute.
10         When you say given up their contract
11  or scope, did you have an understanding that
12  included the seniority of the integration for the
13  TWA pilots?
14     A    Yes.
15     Q    Did you talk to them why they thought
16  it was appropriate to give up that contract right?
17     A    I didn't think they thought it was
18  appropriate. I think they did it because they were
19  under considerable pressure from American Airlines
20  who had said they were going to call off the merger
21  and from the representatives from ALPA,
22  International who were strongly urging them to do
23  this under the threat of everyone losing their jobs.
24         With the pressure from American and
25  from ALPA headquarters they didn't feel they could

14

1  refuse and so they gave up their scope.
2      Q    Did you talk to anybody from ALPA
3  about the pressure that they put on the negotiating
4  committee to give up scope?
5      A    No.
6      Q    How did you learn about the pressure
7  put on the negotiating committee?
8      A    From what the members of the committee
9  told me when they were helping me understand the
10  background.
11         I said before if I can be of any help
12  to you I need to know where you stand and what the
13  situation is and how you got here and work out an
14  action plan of where we want to go next.
15     Q    Did they give you any specifics about
16  what ALPA did in order to facilitate them giving up
17  scope?
18     A    What they said was there were lawyers
19  from ALPA who met with them and told them that just
20  had to give up their scope under this threat that
21  they were all going to be out of a job. With the
22  statements of Don Carty that American would not
23  effect the merger unless this happened, they
24  eventually gave in and gave up their scope.
25     Q    Did that strike you as unusual?

15

1      A    Well, I never heard of a negotiation
2  where one side gives up all the leverage that they
3  would have afterwards. I told them that.
4          I said this doesn't make any sense. I
5  said you now have no leverage in this negotiation.
6  The American pilots can do whatever they want and
7  you have nothing to say about it. You gave up your
8  scope and what did you get in return.
9          I was told that Don Carty promised
10  them he would use his best efforts to see to it that
11  the American pilots were fair and equitable in the
12  deal they worked out to integrate the two join
13  seniority systems.
14         I said, well, that doesn't sound to me
15  like much of substance. You gave up every bit of
16  leverage you have in this negotiation or would have
17  and now what do you have left. This promise that
18  later turned out not to be of much value. At least
19  not that I saw.
20     Q    After you met with the negotiating
21  committee and the MEC in April of 2001, what
22  happened next?
23     A    Well, the first thing that we did was
24  sit down and try to assess what leverage we did have
25  and to see what kind of plan we could produce that

16

1  would have some effect in the negotiations. The
2  conclusion that we came to was that since we didn't
3  have the scope contract on our side, then there
4  needed to be some kind of other pressure put on
5  American and the APA to give us some leverage.
6          One of the things that I suggested was
7  that airline pilots headquarters mount a public
8  relations and a lobbying campaign because when you
9  are dealing with a labor dispute that affects the
10  public's right to travel public opinion has a
11  tremendous effect on the outcome of the
12  negotiations.
13         I suggested that ALPA be enlisted to
14  develop a public relations campaign and a lobbying
15  campaign which it is designed to do. They are in
16  Washington and it's their function. It's that kind
17  of an organization.
18         I also thought at the same time ALPA
19  would be able to provide the threat of litigation
20  and that ALPA should make it clear to APA that if
21  this were not done on some equitable basis that APA
22  would be faced with a lawsuit and have to defend it
23  in court.
24     Q    Did you convey that information to,
25  did you have any communications with anybody from

## JAMES BAEHLER

**17**

1  ALPA during this time period?
2      A    The only communication I had was that
3  Bob Pastor thought that perhaps ALPA could pay part
4  or some of my fees and I'm not sure how it was
5  arranged but I know I talked with Clay Werner and
6  ALPA eventually agreed to pay for eight days of my
7  time.  I signed a contract to that effect, but that
8  was the only contract that I had with ALPA.  I think
9  Clay is the only person at ALPA that I had ever
10  spoken to.
11      Q    During the time that you met with MEC
12  and the negotiating committee was anybody from ALPA
13  at those meetings?
14          I am again talking about April 2001.
15      A    No.
16      Q    After the April meeting did you again
17  meet with representatives from TWA MEC or the
18  negotiating committee?
19      A    We met on a semi-regular basis
20  throughout the spring and summer and into the early
21  fall of 2001.  I can't give you the dates of every
22  one of those meetings.
23      Q    Again after the April meeting, is that
24  when you talked about the possibility of a public
25  relations campaign?

**18**

1      A    That was my recommendation.  Where it
2  went after that I don't know.  After that I got
3  involved in the negotiations themselves.
4      Q    Going back again to the pilot's
5  decision to waive scope what, if anything, would you
6  have done differently leading up to the waiver of
7  that scope provision?
8      MR. KATZ:  I'm going to object to that
9      question.  It is speculative and the form of
10      the question is improper.
11      Q    In the face of the threat from
12  American Airlines to walk away from the transaction?
13      A    I don't believe, I think it was a
14  bluff.  I said so at this time.  I did not believe
15  that Don Carty was ready to call off up to the time
16  would have been the largest merger I think in
17  airline history simply because the TWA pilots
18  wouldn't give up their scope.  I just didn't believe
19  that.
20          Carty's position as was explained to
21  me was that had there been a pilots in Reno Air when
22  they acquired the Reno Air Company and Carty said he
23  wasn't going to go through that one again, and if
24  the scope wasn't waived then he would call off the
25  merger and I didn't believe it.

**19**

1          First of all, the problems that were
2  caused after the Reno acquisition from the American
3  pilots who staged a sick-out of some kind and
4  disrupted the schedule at American for some period
5  of time, and eventually some court ruled that this
6  is was illegal, a court in Texas I think.  They
7  fined the APA $50 billion after
8  paying $50 billion fine American Airlines was not
9  going to cause any serious disruption because the
10  TWA pilots had not given up their scope.
11          Second, it just seemed to me to be a
12  bluff.  I think when someone in the negotiation
13  offers what appears to be a bluff you have to call
14  them on it.  If it turns out -- in other words, they
15  should have refused to give up their scope.  If it
16  turned out later that it was not a bluff and that
17  Carty was really going to call off the merger, they
18  could go back and say, okay, we thought you were
19  bluffing and you are not so let's talk.  That's the
20  least they should have done was call the bluff.
21      Q    Now, it's April 2001 and the pilots
22  have waived their contract rights, they are still in
23  negotiations and what happened next as far as your
24  involvement?
25      A    We began a series of meetings with the

**20**

1  APA that were very difficult, very tedious and time
2  consuming and they lasted through the summer and
3  into the fall.
4          American, I am sorry, the TWA pilots
5  hired Professor Tannen who was an economics
6  professor and an expert in the airline industry who
7  prepared a very detailed proposal which he called
8  the rightful place on how the American and TWA pilot
9  groups could be integrated in terms of their
10  seniority list.
11          The basis of the proposal, as I
12  recall, American had provided both sides, or at
13  least APA who had given it to us was the list of new
14  aircraft that American anticipated bringing online
15  in the next five years I think.  Also there was the
16  addition of TWA aircraft and routes, all of which
17  meant that American was going to expand considerably
18  in terms of aircraft and crews over the next five
19  years.
20          What Professor Tannen tried to
21  demonstrate was a method whereby based on those
22  increased crew staffing was that the TWA pilots
23  could be integrated into the American pilots
24  seniority list without causing any loss of promotion
25  expectation.

## JAMES BAEHLER

**21**

1    The problem was that, as I recall it,
2  at one point Mickey Malerski, one of the APA pilots,
3  said no matter how you slice it, talking about
4  Tannen's proposal, I will end up with some 800 TWA
5  pilots ahead of me which meant everybody below
6  Mickey on the list would have some 800 pilots below
7  them.
8    But I said you will still progress to
9  captain, wide body and so on at the same time rate.
10  It doesn't change that I still have 800 guys ahead
11  of me and I think that was the crux of the whole
12  thing.
13    Both sides had a problem in that they,
14  whatever deal was agreed upon was going to have to
15  be approved by all the pilots on either side.  I
16  know in our negotiations we spent quite a bit of
17  time trying to make sure that whatever deal we were
18  proposing would be acceptable to the pilots as a
19  group, and I am sure the same thing was happening on
20  the APA side.
21    Professor Tannen's proposal could have
22  served as a justification that would have been used
23  to sell the deal to both sides because it was
24  authoritative, it was impartial, it was analytical
25  and it was quantitative, and it was a deal that

**22**

1  could be supported in that it wasn't produced by one
2  side or the other.  It was impartial and it was
3  analytical and quantitative so that everyone could
4  look at it and say yes that makes sense.
5    The problem is that again going back
6  to Mickey's statement, no matter how you sliced it
7  there was going to be a TWA pilot put ahead of some
8  of the American pilots and they couldn't accept
9  that.
10    Q    How was Professor Tannen's report
11  presented to APA?
12    A    It was a PowerPoint presentation that
13  he had prepared and that was thrown on the screen
14  and analyzed in great detail at a number of
15  meetings.
16    In fact, afterwards there was a hiatus
17  while American aviators looked at it, analyzed it
18  and produced a very detailed dissection of it and
19  the conclusion was that it wouldn't work and they
20  rejected it.
21    Q    Who was present when the Tannen report
22  was presented?
23    A    Both negotiating committees.
24    Q    By both committees, you mean TWA and
25  the American negotiating committees?

**23**

1    A    Yes.
2    Q    Were there representatives from ALPA
3  there when the proposal was presented?
4    A    No.
5    Q    Representatives from APA?
6    A    Yes, the whole negotiating team was
7  there.
8    Q    What was the response to the Tannen
9  proposal?
10    A    Well, they asked a lot of questions
11  and they went through almost line-by-line and tried
12  to understand exactly what it was.  I'll give them
13  credit for that.  They didn't just slough it off.
14  They looked at it very, very carefully.
15    The sense I have is that APA was
16  trying to find a solution that would be acceptable
17  to both sides.  They were really to find that.  I
18  don't think they came in thinking about trying to
19  just cram down some kind of a proposal that wasn't
20  acceptable.  I don't think it was that at all.  They
21  were trying to find something acceptable.
22    It came up against that stumbling
23  block that there were going to be TWA pilots put the
24  senior list ahead of those from American even though
25  Professor Tannen showed it would not effect their

**24**

1  promotion expectations.
2    Q    When was the Tannen report presented?
3    A    Sometime in the summer of 2001.
4    Q    What was the next thing that happened
5  during the negotiations?
6    A    I'm not sure about the sequence, but
7  there was a facilitator brought in, a fellow named
8  Rolf Valtin, who was paid by American.
9    As I understand it, I think the
10  suggestion was made by TWA that we share the cost,
11  APA pay half and I think ALPA refused.  That's my
12  recollection.  That's my understanding, ALPA
13  refused, and American paid for the facilitator and
14  they hired him and found him.  TWA people had
15  nothing to say about him.
16    His contribution was not to me very
17  effective, and one of the -- there was an
18  interesting slip, I don't know if you would call it
19  a slip, that at one point he referred to the Tannen
20  report, are you going to talk about the Tannen
21  mythology, and we were whoa.  Well, then there was
22  some joking was this a Freudian slip and so on.  I
23  think he meant to say methodology, I am not sure but
24  it came out mythology, and I think that was his
25  attitude, his real attitude toward the Tannen report

JAMES BAEHLER

25

1   that it wasn't something that was useful as a basis
2   for a deal.
3        Q    Did he come in after the Tannen report
4   was presented or was he there during the initial
5   presentation?
6        A    I am not sure.
7        Q    What was his stated purpose, what was
8   the objective of having him as a facilitator?
9        A    The negotiations had not been going
10  very well and it was thought that perhaps some
11  outside third party might be able to find a way to
12  bring the two sides together, and in this case that
13  didn't happen.
14       Q    What time period was he brought in?
15       A    Sometime in the summer.  That's my
16  recollection.
17       Q    Did he attend negotiating sessions
18  between TWA and American?
19       A    Yes.
20       Q    How many sessions approximately did he
21  attend?
22       A    I don't know.
23            I should say this also.  Occasionally
24  Mike Day, Ed White and Rolf Valtin would meet
25  separately and maybe one or two others, I don't

26

1   know.
2            I was never a part of those meetings
3   but I thought it was a good idea.  My experience in
4   negotiations more often than not progress is made
5   offline.  Proposals can be made that are not in
6   public and don't necessarily commit you to a course
7   of action.  So I thought those sessions could have
8   been very productive.  I don't know if they were or
9   not.  I don't know because I was never a party to
10  any of them.
11       Q    Again during this time period was
12  ALPA, representatives from ALPA ever present at any
13  of the meetings?
14       A    Somewhere in that time period of the
15  summer, maybe, I don't think, it was somewhere in
16  the summer, yes, in August, Duane Worth, the head of
17  ALPA and Kevin Dillon, one of his aides, sat in on
18  the session and they were there for pretty much the
19  whole day as I recall.
20            Kevin, I don't recall if he said
21  anything, but Duane started out by telling us how
22  important it is that the negotiations be completed
23  successfully and urging us to find a solution and to
24  work together to find a deal that both sides can
25  live with and in general took a very hands-off,

27

1   almost disinterested approach.  Not uninterested but
2   disinterested in the sense that he wasn't taking
3   sides.
4            As I was listening to him I thought it
5   was very odd that the head of the union, in effect,
6   be so at arm's length when one of the locals of the
7   union was engaged in a very difficult negotiation
8   with another group that had no affiliation with
9   ALPA.  APA had deliberately chosen not to become
10  members of ALPA and, in fact, from what pilots told
11  me they often were coldly indifferent to ALPA and
12  its objectives.
13            So at the end of the day when Duane
14  and Kevin left we sat around talking and I said what
15  is going on here.  Why isn't ALPA threatening a
16  lawsuit or why aren't they bringing some muscle into
17  this negotiation.  You guys don't have any clout
18  here and they can provide some and what is going on.
19            Somebody, I don't know if it was Mike
20  Day or it might have been somebody else, you don't
21  understand, ALPA is trying to enroll the APA pilots,
22  bring them into ALPA.  I said okay, all right.  So
23  ALPA had its agenda which apparently was not
24  consistent with the expectations of the TWA pilots.
25       Q    Do you know who Bob Christie is?

28

1       A    I think he's a lawyer from ALPA, but I
2   am not sure, and I'm not sure I ever met him.  I
3   might have but I am not sure.
4       Q    We are in the summer of 2001, and the
5   facilitator has been brought in and what happened
6   next?
7       A    It was more of the same.  There was a
8   great deal of talk and analysis of the Tannen
9   proposal and then KPMG -- I'm sorry, I forgot that.
10  American, ALPA decided, APA decided to have their
11  own outside analysis so they hired KPMG to do a
12  study and to produce a report that would be a
13  proposal on how to do this and that was introduced
14  at one of the meetings.
15            We looked, dissected it as best you
16  could, and afterwards we went back and sat down with
17  it and it didn't sense.  Assumptions didn't seem to
18  be valid.  The conclusions certainly weren't.  The
19  methodology was very suspect.  Even the arithmetic
20  had some problems with it.
21            We just didn't see it as a positive
22  step, that it just seemed to muddy the waters, and I
23  think I said at this time I think this was just
24  obtained to create a paper trail so that however
25  this turns out the APA guys can say we brought this

JAMES BAEHLER

29

1  outside agency and this was their proposal and we
2  did the best we could.  It wasn't anything that was
3  either -- it wasn't useful at least from our point
4  of view.
5       Q    What happened next as far as your
6  involvement with the TWA MEC negotiations?
7       A    We kept meeting through August, and
8  then on September, the 10th, we had a meeting in St.
9  Louis and the next morning of course was
10 September 11 and we were at breakfast or in the
11 lobby, rather, and saw the planes hit the World
12 Trade Center and we were just stunned like everyone
13 else.
14          When it became known there were they
15 were two American planes, Mike Day called in White
16 and said I don't suppose you want to meet today and
17 he said no, we will meet.  Mike said you just lost
18 two planes and two crews.  We can't do anything
19 about that.  Let's get this done.
20          So we sat down with him that day, and
21 I have to tell you what was said and done that day I
22 don't know.  It's a blur.  Then I don't know,
23 sometime later, I guess maybe before lunch, I don't
24 know, we heard that the towers had come down and
25 then I learned that there were 200 firemen who had

30

1  died.
2          I live on Roosevelt Island here in New
3  York and the special op headquarters for the fire
4  department is on Roosevelt Island and I knew the
5  captain and a number of those firemen and I knew
6  they were dead.  So when everyone went out to dinner
7  that evening I didn't join them.  I couldn't do it.
8  I went back to my room and had a hamburger sent up.
9       Q    You talked earlier about the creation
10 of a public relations campaign and ALPA's ability to
11 put that together.
12          Did that ever happen?
13       A    Not as far as I know.  I know that
14 Senator Bond and Congressman Gephardt were trying to
15 generate some kind of congressional action that
16 would have been a help to the TWA pilots, and I know
17 that an appeal was made to ALPA by the MEC to assist
18 in that and as far as I know they chose not to.
19       Q    Was it important during this time
20 period, and again I am talking about early 2001
21 through the end of the negotiations, that the pilots
22 remain unified?
23       A    In my very first session with the
24 pilots I told them it's absolutely essential that
25 any dissent, whatever it is, be contained within the

31

1  pilot group.  That it is -- unless the other side
2  perceives you as being totally unified and totally
3  focused on the same objectives you are never going
4  to succeed in these negotiations.
5          So that was one of the things that we
6  tried to communicate as much as we could with the
7  pilots to let them know what was happening and how
8  it was happening and where we were going or not
9  going so that there would be as much unity as
10 possible.
11          That doesn't mean there was any
12 disagreement or dissent.  Of course there was even
13 on the negotiating committee, we didn't agree on
14 everything all the time, but it was essential that
15 the pilots remain solidly behind the negotiating
16 committee and the MEC.  Otherwise, there would have
17 been no leverage whatsoever.  Anything like that,
18 any division would be exploited by the other side.
19       Q    Was that need for unity, was that
20 something that APA had conveyed to the pilots prior
21 to your entering the negotiations?
22          MR. KATZ:  I'm going to object.
23          How would the witness know what was
24       being communicated before he was involved in
25       the picture?

32

1       Q    Can you answer that?
2       A    I would have no idea.
3       Q    When you got involved with the pilots
4  did they understand the need for unity?
5          MR. KATZ:  Same objection.
6       A    I think they did and it wasn't just
7  this one time.  Everytime that I was in St. Louis
8  with the negotiating committee and we would report
9  to the MEC I would say the same thing.  I would say
10 you guys have got to stay together, have got to
11 stick together.
12       Q    When you had discussions with the
13 pilots when you became involved in April of 2001
14 when they talked about the decision to waive scope,
15 did they talk about some of the tactics that had
16 been employed to get them to waive scope?
17       A    No, all they said was that the lawyers
18 from ALPA had put enormous pressure on them to give
19 up their scope.  How that pressure was evidenced I
20 don't know.
21       Q    Do you know whether or not they talked
22 to them about the impact of the deal not going
23 through and their fellow pilots?
24       A    That was the threat.  That was the
25 threat from Don Carty, the threat from Don Carty and

JAMES BAEHLER

33

1  the conclusion from the ALPA lawyers that if the
2  pilots don't give up their scope the company would
3  go bankrupt and parts would be sold off and they all
4  would be out of a job.
5       Q    During your involvement with the
6  negotiating committees, what, if anything, did you
7  see American or Don Carty do which would reflect the
8  best efforts that they agreed to employ in exchange
9  for giving up scope?
10      A    My understanding is that he wrote a
11 letter to Ed White at APA recommending that a fair
12 and equitable integration be achieved and urging Ed
13 and the APA to find that kind of a solution.  I
14 don't know of anything else that was done by Carty.
15      Q    Do you know whether he ever put any
16 meat on the bones of a fair and equitable
17 integration or he just used those words, he had a
18 proposal?
19      A    If he did it never appeared in the
20 negotiating room.  It wasn't there.
21      Q    After September 11 what happened next
22 in the negotiations?
23      A    Well, things just kind of wound
24 downhill after that.  I am going to confess after
25 that I really wasn't as focused as I might have

34

1  been.  It took me -- I know we met in St. Louis for
2  the next couple of days and then it took me a while
3  to get back to New York and, in fact, you couldn't
4  get a flight.
5       I rented a car, drove to Indianapolis
6  and stayed with my daughter-in-law and then flew
7  back from Indianapolis a few days later.  What we
8  got done after that, it just seemed to me that the
9  whole atmosphere had changed, that there was no
10 longer any talk about expanding American flight
11 schedules or crews or aircraft, that it was now talk
12 about contractions and at that point APA was in no
13 mood to put any American pilot ahead of them on the
14 seniority list.
15      As it turned out, the final deal that
16 was imposed I think it put some of the more senior
17 pilots of TWA on the list but virtually everybody
18 else was stapled to the bottom of the American
19 seniority list.
20      Q    I want to just go briefly over some of
21 your background and how you became a negotiating
22 trainer and consultant.
23      How did you, what was your educational
24 background that provided that course?
25      A    I am afraid my educational background

35

1  didn't provide much help in negotiation.  I have a
2  degree in the teaching of social studies from the
3  University of Illinois and a master's in educational
4  psychology from Hobart College.
5       I was, I spent four years in the Air
6  Force as an instructor in military law, and then for
7  four or five years I was an insurance investigator
8  and there I learned to negotiate with the personal
9  injury lawyers which was an education in itself.
10      Then I took a job as a sales rep with
11 a company called Science Research Associates and
12 three years later my territory was out in Long
13 Island where I was made district manager, and then
14 when SRA was bought by IBM I was sent to IBM to act
15 as liaison between the two companies in a computer
16 instruction program project which was too far ahead
17 of its time, the technology was not adequate at that
18 point.
19      The project was shut down, and I took
20 a job then as national sales manager in the
21 education division for Xerox Corporation, and then I
22 was, I took a job as president of Cambosco
23 Scientific Company, a small scientific company in
24 Boston, and when it was merged with General
25 Biological in Chicago I left there and I became

36

1  manager of training and development for the
2  education division at CBS.  Then manager for the
3  publishing group at CBS in training and development.
4       In that role -- well, let me go back a
5  bit.  When I had been a salesman I had found that
6  there was a deficiency in my selling profile.  When
7  I started selling I thought that there was one part
8  to the sales process where you get the other side to
9  want what you have, and I was pretty good at that.
10 What I didn't understand is that there is a second
11 part to the sales process which involves getting
12 them to want to pay what you want them to pay for
13 what they want.  That's the negotiation part.
14      So I began to look into this
15 negotiations thing and found that there are certain
16 basic principles and techniques that are applicable
17 in almost any negotiating situation, and I started
18 reading books and talking to people and gradually
19 acquiring what I thought was some adequate basis, a
20 base of knowledge in both parts of sales.  The
21 selling and the negotiating.
22      So then when I was the manager of
23 training and development I wanted to make sure that
24 the other salespeople in the company had both parts.
25 Most of the sales training is done on product

JAMES BAEHLER

37

1  knowledge and selling skills and it's not on how you
2  negotiate.  So I organized a seminar on negotiation
3  skills for salespeople and I hired a fellow named
4  Dr. Alan Schoonmaker who does those kinds of
5  seminars and I sat in on it.
6          As I was going through the seminar
7  observing it I thought to myself I can do this, and
8  I had been for sometime unhappy with working for
9  somebody else.  I thought I would like to work for
10  myself, and I talked to Alan about this and he told
11  me what was involved in becoming a negotiations
12  consultant and how you did it.
13          Fortunately, you didn't have to go to
14  law school or be certified by a state agency or pass
15  a bar exam or anything like that.  You can just say
16  I am one and there are a lot of guys that have done
17  that and some are good and some are not so good.  He
18  encouraged me, and I told my wife this is something
19  I can do well and I want to do it and I want to go
20  or my own.  She was a little apprehensive but I did
21  it.
22          I culled my customer base from people
23  I knew in the business contacts that I had made over
24  the years and that produced some references.  And
25  also I began teaching the negotiations course at the

38

1  American Management Association in which people from
2  various companies from all over the country would
3  come to a seminar and I would teach it, and in each
4  seminar at least two people would go back to their
5  company and say this guy is pretty damn good and
6  let's bring him in and that's the principal manner
7  in which I built up my client base.
8      Q    In this case when you got involved did
9  ALPA follow the principles of negotiations that you
10  believed had universal applicability?
11      A    Well, certainly not in recommending
12  that the pilots give up their scope because that is
13  your leverage.  Just, you can't do that.  You just
14  cannot do that.
15          If you go into a negotiation and you
16  have given up the only leverage you have what kind
17  of a result are you going to get out of that
18  negotiation?  You are going to end up with whatever
19  the other side decides to impose upon you because
20  you don't have any leverage.
21          That is the basis for all negotiations
22  is leverage.  A negotiation is an exercise in
23  perceived power, not power itself, but perceived
24  power because people's behavior is not determined by
25  what is real but what they perceive it to be.

39

1          So then the question is what is power.
2  Well, power is a very simple thing.  If you have
3  power you can either help someone or you can hurt
4  them.  That's all.  It's not complicated, it's
5  simple.
6          So if you are in a negotiation in this
7  particular case and you have given up your scope you
8  don't have the power to hurt the other side.  There
9  is nothing you can use that will impel them to do
10  what you want them to do.  All you are left with is
11  the help side.  That isn't enough.  It isn't enough.
12          In a negotiation you have to have
13  both.  You have to have the ability to help and to
14  hurt and if you don't have that then the
15  negotiation- you might as well, in fact, if you are
16  in that situation you don't negotiate, you say I'm
17  out of here.  I won't do it because if I try to
18  negotiate without any leverage I am going to end up
19  on the short end of the stick and I am going to
20  regret it later.
21          So when ALPA insisted that the TWA
22  pilots give up their scope what they were really
23  saying was when you give up your scope and you get
24  into negotiations you are not going to have any
25  leverage and you are going to have whatever APA

40

1  gives you.
2          The rationale is but yes you were
3  saving your jobs.  Well, I would have tested that.
4  You call their bluff.  You say okay, in that case we
5  are out of here.  You walk away.  I have never seen
6  a negotiation of any consequence in which at one
7  point or another one side or both hasn't walked
8  away.  It's a routine part of negotiations.
9          How do you know when you are getting
10  the best deal you can from an automobile dealer?
11  Unless you walk and he lets you go and and doesn't
12  call you, okay, I guess that was his best offer and
13  you call him back and say, okay, let's talk
14  business.
15          But you will never know.  If you don't
16  go out the door you will never know.  That's what
17  you do in negotiations, you test the other side.  In
18  this case there was no testing.
19          THE VIDEOGRAPHER:  Off the record.
20      The time is two minutes past one o'clock.
21          (Recess taken.)
22          THE VIDEOGRAPHER:  We are back on the
23      record at ten minutes past one o'clock.
24      Q    Mr. Baehler, right before the break
25  you were talking about leverage and the need to

Pages 37 to 40

JAMES BAEHLER

41

1  maintain your leverage in order to have an effective
2  negotiating position, and you also talked about in
3  the absence of any particular leverage ALPA had
4  available to it a public relations campaign.
5         What would you have had ALPA do in
6  connection with a public relations campaign?
7         MR. KATZ: I'm going to object as to
8  form.
9     Q   You can answer.
10        What do you think would have been an
11 appropriate public relations campaign?
12    A   I can't describe a campaign as it
13 would be mounted because I'm not a public relations
14 expert, but that is certainly what ALPA is
15 experienced at.  I think it was incumbent upon them
16 to provide whatever public relations assistance the
17 TWA pilots would feel would help them in the
18 negotiations.
19        They have got the resources and they
20 have got the experience and they have got the people
21 and they have got the contracts and they know how to
22 do those sorts of things.
23    Q   How could a public relations campaign
24 have helped in the negotiations?
25    A   Because as I said earlier anytime your

42

1  union is involved to negotiate it affects the
2  public's right to travel.  Public opinion has a
3  great deal to say about the outcome.  It's just a
4  fact of life.
5         Now, how effective a public relations
6  campaign it would have been I don't know.  I don't
7  know.  It might have been considerably effective or
8  there might have been none.
9         I think it should have been tried.  I
10 think it was the responsibility of ALPA to provide
11 any of kind of assistance TWA needed or required or
12 asked for in these negotiations because they were
13 dealing with an entity that was not part of ALPA and
14 that, in fact, had been somewhat hostile to ALPA
15 over the years.  I couldn't understand why APA was
16 being treated with in effect with kid gloves.
17    Q   Was there anything else other than the
18 public relations campaign that ALPA could have been
19 done to obtain leverage?
20    A   Absolutely.  You can always,
21 litigation is not something that anyone wants to
22 entertain with any equanimity, and early on ALPA
23 should have been made known if an equitable
24 agreement was not reached and that ALPA was willing
25 to use litigation and use all of its resources in

43

1  that suit against APA, that would have provided some
2  real pressure.
3     Q   Do you know whether --
4     A   I am sorry, and in addition there
5  could have been a lobbying campaign on behalf of the
6  TWA pilots.  Why couldn't ALPA, for instance, have
7  called upon other pilots who were in the area or
8  passing through Washington or willing to do so to
9  join with them in lobbying the members of Congress.
10 Airplane pilots are respected and they are heroes to
11 a lot of us.
12        When we have pilots in United or Delta
13 and Continental walking the hall of Congress and
14 talking about how unfair things are to the TWA
15 pilots that is going to have some effect.  I think
16 Kit Bond and Dick Gephardt would have been gotten a
17 much positive response if that lobbying effort had
18 been organized.
19    Q   Do you feel ALPA did its job in
20 connection with this merger?
21        MR. KATZ: Objection.
22    Q   You can answer that.
23    A   No, as I understand, it is to support
24 its members, and TWA was a charter member of ALPA as
25 I understand over the years, from what I have been

44

1  told, hundreds of millions of dollars in TWA dues
2  were paid into ALPA.  I think it was time for ALPA
3  to pay some of that back.
4         MS. RODRIGUEZ: I have no further
5  questions.
6         MR. KATZ:  I have some clarifying
7  questions for you.
8  EXAMINATION
9  BY MR. KATZ:
10    Q   Do you want to take a break?
11    A   No, like the dentist you want to get
12 it over with.
13    Q   I will make a stab at it.  If sometime
14 when I am asking these questions you want a break,
15 please let me know, and we will take one.
16    A   Okay.
17    Q   Ms. Rodriguez asked you about your
18 background and I took some notes on what you said
19 and I guess I would like to, if I could, pin down
20 some of the time frames in what you were describing.
21    A   Okay.
22    Q   For instance, when did you get your
23 degree from the University of Illinois?
24    A   1951.
25    Q   You said what it was in?

Pages 41 to 44

JAMES BAEHLER

45

1    A    Teaching in social studies.
2    Q    What years were you in the Air Force?
3    A    1951 to 1955.
4    Q    During the Korean War?
5    A    Correct.
6    Q    Did you serve in Korea?
7    A    No, no, I never left the Air Force
8    base which was a basic training base in upstate New
9    York.
10   Q    Were you a pilot?
11   A    No, no.
12   Q    Then what period of time did you work
13   as an insurance investigator dealing with these PI
14   lawyers?
15   A    From 1955 to 1961 I think.
16   Q    After you got out of the Air Force?
17   A    Yes.
18   Q    Then you had these various sales
19   positions with the company that was absorbed by IBM
20   and then with Xerox, and when were you the president
21   of Cambosco?
22   A    1968 to 1972. Somewhere in there.
23   Q    The general dates you referred to, I
24   wanted to get a feel for it generally.
25   A    Sure.

46

1    Q    At some point you basically went into
2    business for yourself?
3    A    1981.
4    Q    That was in 1981?
5    A    Yes.
6    Q    The business was related to what you
7    had done before in the sense that you had been
8    involved in training and development?
9    A    Yes.
10   Q    You were doing training for
11   negotiations?
12   A    And sales training.
13   Q    Sales training?
14   A    Yes.
15   Q    Both.
16        You did that from 1981, and did you
17   retire at some point or are you still doing this?
18   A    I'm still doing it.
19   Q    So that's the last 25 years or so.
20        During that period of time you talked
21   about the work that you did with the TWA MEC.
22        Were there any other master executive
23   councils of the Airline Pilots Association for which
24   you did similar work or any work?
25   A    Yes, U.S. Air when Pete Gauthier was

47

1    the chairman or maybe he was the head of the
2    negotiating committee, I'm not sure.
3    Q    Do you know what years that was?
4    A    No, no.
5    Q    He was both the negotiating committee
6    chairman and later he was the MEC chairman back in
7    the late nineties I think.
8        Is that around when it was?
9    A    You got me.
10   Q    Did you run negotiating seminars for
11   the U.S. Air negotiating committee?
12   A    I think I did one and then I think
13   that -- no, I did it twice. I was there twice. I
14   was there twice.
15        I don't recall any other MEC's I
16   worked for, although I did do sales negotiations for
17   American Airlines cargo people. For Pam AM. Pan AM
18   was, I know I did a couple of sessions at Pam AM,
19   but I can't remember.
20        Air France with their cargo people.
21   That was a nice one. They gave me two free tickets
22   on Air France first class. I liked that.
23   Q    Did you teach these cargo people at
24   American, Pan Am and Air France how to negotiate and
25   sell?

48

1    A    Not sell.
2    A    Based on cargo?
3    A    Just the basic principles. It wasn't,
4    I am not going to teach you how to negotiate cargo
5    rates, but it was basic principals of negotiations
6    and now let's see how they apply to your situation.
7    Q    Their situation was selling cargo
8    space on airlines to transport cargo?
9    A    Yes, and negotiating with
10   consolidators and shippers and whoever else uses
11   their airline.
12   Q    Let's go back to the pilots.
13        Aside from these two seminars for the
14   U.S. Air pilots and the various seminars you
15   conducted for the TWA pilots, did you work with any
16   other pilot groups in connection with negotiations?
17   A    No.
18   Q    Did you work with any other labor
19   organizations in connection with their activities?
20   A    One.
21   Q    What was that?
22   A    It wasn't, it wasn't for a union. It
23   was for the Puget Sound Power and Light Company. It
24   was to go into negotiations with their unionized
25   workers. I worked with the negotiating committee

Pages 45 to 48

JAMES BAEHLER

49

1  for the company.
2      Q    That happened to be the company that
3  my friend from West Point was the CEO of.  Richard
4  Sonstelie was his name.
5      A    No.
6      Q    He was the CEO until about five years
7  ago.
8          So how many seminars did you work with
9  the management people at Puget Sound Power and
10  Light?
11      A    I don't know.  Four or five.
12      Q    No other unions then?
13      A    No.
14      Q    That was labor negotiations between
15  the company and the union?
16      A    Right.
17      Q    To get a new collective bargaining
18  contract?
19      A    Yes.
20      Q    In your experiences, other than these
21  seminars you did for the cargo people at American,
22  Pan Am and Air France, did you have any particular
23  work experience in the airline industry?
24      A    No.
25      Q    You described your activities with

50

1  regard to the TWA pilots, and I guess just to circle
2  back on that I think you said prior to the
3  negotiations in the year 2001 you met Tom Brown on
4  the airplane in 1988 and did one or two seminars a
5  year from 1988 to 2001.
6          Did I get that right?
7      A    Yes.
8      Q    So that would have been 13 years, 13
9  to 26 seminars you did?
10      A    It could be.  When you are multiplying
11  it by another number get a bigger number guess but
12  approximately.
13      Q    Again what was the total number of
14  days you worked with the TWA pilots on this project
15  in 2001 starting in April?
16      A    Oh, God.  A guess.  30 to 40.
17      Q    Did you review any documents before
18  you came over here like your invoices to refresh
19  your recollection to what the project entailed?
20      A    Well, the invoices didn't indicate
21  what the project was but yes I checked, I reviewed
22  the invoices, yes.
23      Q    I made up a little chart.  I looked at
24  the invoices too and just made up a chart just to
25  get a feel for the amount of activity that you were

51

1  involved in.
2          MR. KATZ:  Let's mark this as ALPA
3  Exhibit -- gosh, I don't remember the
4  numbering system before but I think I
5  exhausted that.
6          Let's just call this ALPA 97.  The
7  court reporter will put a little stamp on
8  that.
9          (ALPA Exhibit 97, Jim Baehler's fees,
10  marked for identification, as of this date.)
11      Q    I just sat down with the invoices and
12  wrote down the invoice number on the left and the
13  date in the second column, the dates and place you
14  had done the work, the number of days and the amount
15  you billed.
16          What you take a look at this and tell
17  me if it looks correct?
18      A    As far as I can tell.
19      Q    I haven't added this up but let's do
20  it now.  About 30 days is what I came up with here.
21          That's exactly what you just said 30
22  days?
23      A    I guessed right.
24      Q    So you worked on this project
25  approximately 30 days?

52

1      A    Yes.  Wait.  All the work that I did
2  is not necessarily billed.  There's a lot of phone
3  calls and a lot of back and forth.  When I would be
4  home there was a lot of communication and back and
5  forth.
6          So the work, there was a lot of input
7  that I had or discussions that I had with Mike Day
8  and the other members of the committee or Bob Pastor
9  and the other members of the MEC that I never billed
10  them for.
11      Q    Let's clarify the record on one point.
12          I think in your direct examination,
13  you said that you worked with the negotiating
14  committee.  In fact, Mike Day was the chairman of
15  the merger committee, wasn't he?
16      A    I'm sorry, to me that's the same.
17      Q    The merger committee was trying to
18  negotiate a seniority integration agreement with
19  representatives of American pilots?
20      A    Right, all this work was for the
21  merger committee.
22      Q    I just wanted to clear that up.
23      A    Yes.
24      Q    In fact, while you indicated you said
25  you were a member of the committee, you were really

JAMES BAEHLER

53

1  a consultant to that committee?
2      A    That was a mistake.
3      Q    The only people that were members were
4  the pilots?
5      A    Of course.  That was a mistake.
6      Q    They were elected by their colleagues
7  on the MEC to serve on the merger committee?
8      A    Correct.
9      Q    Your role was to advise the merger
10  committee and the MEC about the principles of
11  negotiations.  Is that fair?
12      A    And to apply those principles to the
13  situation that they were in, sure.
14      Q    Did you sit in on the negotiations
15  with the representatives of the American pilots?
16      A    Yes.
17      Q    Did you speak at those meetings on
18  behalf of the TWA pilots?
19      A    Very seldom.
20      Q    Who was the principal spokesperson for
21  the TWA pilots?
22      A    Mike Day.
23      Q    He was the chairman of the committee
24  and he did most of the talking in the merger
25  negotiations?

54

1      A    But that doesn't mean the others
2  didn't speak up a lot also but Mike, he did most of
3  the talking.
4      Q    Then you would work with the TWA
5  merged committee before the actual meetings with the
6  other side and afterwards to develop strategy and so
7  forth?
8      A    Sure.
9      Q    You began this process it appears
10  around the middle of April 2001; is that correct?
11      A    Correct.
12      Q    So if I tell you that the TWA MEC
13  adopted a resolution waiving their scope clause
14  rights on April 2, 2001, was that a point in time
15  prior to the time you became involved in this
16  project?
17      A    Yes.
18      Q    So when you got involved that had
19  already happened?
20      A    Correct.
21      Q    It was your judgment that was an
22  error?
23      A    Correct.
24      Q    But you were basing your judgment on
25  what you know about negotiations in general; isn't

55

1  that true?
2      A    Correct.
3      Q    Because it happened before you were
4  there, you didn't hear the threat, for instance,
5  from Don Carty that American would back out of the
6  acquisition of TWA assets unless the TWA pilots
7  complied with this demand, did you?
8      A    I did not personally hear that threat.
9      Q    So when you say he was bluffing, it's
10  not based on seeing the man's face when he was
11  talking to them?
12      A    Correct.
13      Q    It's based on your general experience
14  in negotiations; is that fair?
15      A    And applying that experience to the
16  particular situation in which this merger of two
17  major airlines was about to happen, and I didn't
18  believe it would not happen simply because the TWA
19  pilots refused to give up their scope.
20      Q    Had you ever been involved in an
21  airline merger before?
22      A    No.
23      Q    Did you have any special knowledge
24  about airline mergers?
25      A    No.

56

1      Q    About the airline industry at all?
2      A    No.
3      Q    When you said this was one of the
4  biggest mergers in history, weren't you in fact
5  mistaken?  Wasn't U.S. Air's acquisition of Piedmont
6  for over a billion dollars bigger in terms of the
7  number of pilots in the acquired company and the
8  amount of the value of the transaction?
9      A    I was thinking in terms of passenger
10  miles flown.
11      Q    Didn't the combined U.S. Air, didn't
12  Piedmont fly more revenue passenger miles than TWA?
13      A    It could have.
14      Q    You don't really know the answer to
15  that, do you?
16      A    No.
17      Q    Didn't it claim more passengers that
18  TWA?
19      A    It could have.
20      Q    You don't know the answer one way or
21  the other?
22      A    Not at this point.
23      Q    In terms of the FedEx's acquisition of
24  Flying Tiger, there was were no passenger miles
25  flown by Flying Tiger, it was bigger in terms of the

JAMES BAEHLER

57

1  value of the transaction?
2      A    It could have been.  I was thinking of
3  the passenger airlines.  I said it was one of the
4  biggest.  I didn't say it was the biggest.
5      Q    Do you know if it was bigger than
6  Delta and Western?
7      A    I don't know.
8      Q    Northwestern Republic?
9      A    No, I don't know.
10     Q    Texas Air's acquisition of Eastern, do
11 you know whether that was larger than this?
12     A    At this point, no.
13     Q    So at this point, as we sit here
14 today, your comments about TWA's acquisition being
15 one of the largest mergers in airline history could
16 be subject to revision; is that fair?
17     A    I still think it was one of the
18 biggest mergers in airline history.
19     Q    Do you know whether the executives
20 from TWA also told representatives of TWA MEC that
21 American was likely to walk if the TWA MEC didn't
22 surrender the scope?
23     A    I don't know.
24     Q    You did work with Bill Compton when he
25 was chairman of the negotiating committee, didn't

58

1  you?
2      A    Yes, I did.
3      Q    You worked with him when he was the
4  MEC chairman?
5      A    Yes.
6      Q    Did you find him to be a reliable and
7  trustworthy person?
8      A    As far as I know.
9      Q    Did you have substantial dealings with
10 him when he was an ALPA official?
11     A    Sure, yes.
12     Q    If Bill Compton said this deal was the
13 last hope for keeping TWA alive, would you be
14 prepared to accept that as an accurate statement?
15     A    I don't know at what point he made
16 that statement and what were the circumstances at
17 the time.  I don't know.
18          Was that made prior to the pilots
19 giving up their scope that he made that statement?
20     Q    Yes.
21     A    Was it prior to the pilots giving up
22 their scope?
23     Q    Yes.
24     A    I don't know then.
25     Q    If you found out that was the case,

59

1  would that make a difference to your opinions?
2      A    No, no, no.  I still maintain the
3  position that if you are going to give up every bit
4  of leverage that you have in the negotiation and get
5  nothing in return, that you ought to at least call
6  the others side's bluff if it's a bluff and find
7  out.
8          If it's a bluff you will find that out
9  and if it's not you can then come back and make any
10 of concessions that are necessary, but I don't think
11 you should give in without testing the bluff,
12 regardless of who said it.
13     Q    Have you ever been in a situation
14 where you called somebody's bluff and they didn't
15 come back and make a deal when you ran to them and
16 asked to have the last deal that was on the table?
17     A    Have I ever personally been in that
18 situation?
19     Q    Yes.
20     A    Not that I can recall.
21     Q    Is it inconceivable to you that if the
22 TWA pilots refused to waive their scope clauses as
23 they did on April 2nd that Carty would have simply
24 walked and the transaction would have fallen apart?
25     A    If the TWA pilots then had not tried

60

1  to reopen the negotiations, yes, but if a week or
2  two later Don Carty was in the process of
3  dissolving, undoing of the merger, and the pilots
4  realized that it was not a bluff and that he was
5  serious then they could call him, and at that point
6  if he's a businessman who is looking at things
7  logically and analytically then he would say, all
8  right, let's get back and do this.
9          I don't think at that point he would
10 call off this very advantageous merger to American
11 simply because the pilots chose not to accept his
12 first edict.  That's not good negotiations on his
13 part.
14     Q    You really don't know what was going
15 on in Mr. Carty's mind, do you?
16     A    Of course not.  That's how you find
17 out what is in the other person's mind, you test it.
18     Q    You don't really know what the
19 discussions were between Carty and representatives
20 of the TWA pilots during those negotiations, do you,
21 you weren't involved in any of those?
22     A    No.
23     Q    That all happened prior to your
24 becoming involved?
25     A    Correct.

Pages 57 to 60

JAMES BAEHLER

61

1    Q    Are you aware that the bargaining
2 agent for the ground employees and the mechanics at
3 TWA also waived their Allegheny and Mohawk labor
4 protective protections in their collective
5 bargaining contracts?
6    A    I think I learned that later.
7    Q    The IAM?
8    A    Yes, I think I learned that later.
9    Q    And the bargaining representative to
10 the flight attendants likewise waived their scope
11 protections; isn't that true?
12    A    That's my understanding.
13    Q    They weren't people who talked to the
14 lawyers that had been retained by ALPA to advise the
15 TWA MEC?
16    A    I don't know whether they did or not.
17    Q    But they made their own judgment about
18 Carty and whether he was bluffing?
19    A    I don't know what their judgment was.
20 I know they did waive their scope.  What was the
21 basis for that, I don't know.
22    Q    You think they made a mistake too?
23    A    I don't know.  I don't know their
24 situation.  I don't know how it came about.
25         All I can talk about is the pilots and

62

1 what I learned in working with them.
2    Q    What was the source of your
3 information, the TWA MEC?
4    A    The members of the merger committee.
5    Q    You didn't talk to Clay Warner on this
6 subject, did you?
7    A    No.
8    Q    You talked about your bills and the
9 method of getting paid?
10    A    Correct.
11    Q    Is that approximately the right amount
12 that you received in fees?
13    A    As far as I know.
14    Q    I took out the expenses because they
15 were just passed through, the expenses.
16    A    Yes, yes.
17    Q    I have this note and let's mark this
18 is as Exhibit 98.
19         (ALPA Exhibit 98, handwritten note,
20 marked for identification, as of this date.)
21    Q    Do you recognize this handwriting?
22    A    No, it's not mine.
23    Q    It's not yours?
24    A    No.
25    Q    The note at the top talks about work

63

1 done from April 1 to June 30, two invoices, one in
2 May and two in June, and then down below it says
3 paid by ALPA and it says the same three figures in a
4 different order?
5    A    Okay.
6    Q    Is this what was paid from ALPA
7 National to you for the eight days?
8    A    I have no idea.  All I know is the
9 eight days, and how much the total of my fees
10 amounted to in eight days I don't know.
11    Q    Then the remainder of your fees were
12 paid by the TWA MEC merger fund?
13    A    Out of the merger fund, correct.
14    Q    That was money that was raised by the
15 assessments of the TWA pilots to pay for merger
16 related expenses?
17    A    That is my understanding.
18    Q    Did it make any difference to you
19 whether you were paid from one source or the other?
20    A    No.
21    Q    I don't know if I need to make this an
22 exhibit or not.  I'm holding up a two page document
23 dated July 2001 with what looks like your photograph
24 and it has got a headline that says "An Interview
25 with Negotiating Consultant Jim Baehler".

64

1         Do you remember seeing this?
2    A    Yes, I do.
3    Q    Do you remember writing it?
4    A    Yes, I do.
5    Q    There are some people that did some
6 editing on it, but basically it's Q and A by
7 yourself, isn't it?
8    A    Yes, it was.
9    Q    This was a device to educate the TWA
10 pilots about what was going in the negotiations,
11 wasn't it?
12    A    It was two purposes.  One, to let them
13 know what was happening in the negotiation and two,
14 to assist in the process of maintaining unity.
15    Q    So this was a way to tell them about
16 what was going on and to let them know about your
17 work on behalf of the TWA pilots?
18    A    There was another.  Third.  To let
19 them know there was professional help for the
20 committee and the pilots were not going it alone.
21    Q    You weren't the only professional
22 involved on behalf of the TWA merger committee, were
23 you?
24    A    No.
25    Q    Who were some of others?

Reporting Associates, LLC   1-888-795-2323

## JAMES BAEHLER

### 65

1    A   Professor Tannen and Roland Wilder.

2    Q   How about David Holtzman?

3    A   He was never, I used to see him around

4 the MEC headquarters in St. Louis, but he was never

5 involved in any of the face-to-face negotiations

6 with APA.

7    Q   Any other professionals that you can

8 think of right now?

9    A   Not offhand.  There might have been,

10 but I don't remember them now.

11    Q   Was this part of a, called The Beacon

12 newsletter TWA MEC to TWA pilots?

13    A   Inhouse newsletter but in magazine

14 form though.  Pamphlet.

15    Q   Let me just ask you about one or two

16 of the entries in here and if we need to I'll make

17 it an exhibit.  I don't have copies of it now and

18 it's kind of a funny size.

19    You gave some background for your own

20 work, right?

21    A   Yes.

22    Q   You asked the question are there other

23 problems facing the merger committee, and let me

24 just read part of the answer and tell me if I have

25 read it correctly.

### 66

1    A   I am sure you will read it correctly.

2    Q   "I think the other major stumbling

3 block to progress in the negotiations is the fact

4 that they are being conducted in the open," and you

5 go on the explain.

6    Do you recall explaining about that?

7    A   Sure.

8    Q   I think that Ms. Rodriguez asked about

9 that subject and you talked a little about it on

10 direct examination, and could you expand a little

11 more?

12    MS. RODRIGUEZ:  I'm going to ask it be

13 marked as an exhibit.

14    MR. KATZ:  That's fine.  I don't have

15 copies available now.  We can mark it as

16 Exhibit 99.

17    I wasn't asking the witness to read me

18 anything.  I was asking for his comments.

19    (ALPA Exhibit 99, newsletter, marked

20 for identification, as of this date.)

21    A   The issue of open negotiations, the

22 problem with open negotiations is that when others

23 are observing, whether it is people who are one side

24 on the other, there's a tendency to avoid making

25 concessions because you don't want to be caught

### 67

1 giving up something that somebody else might object

2 to.

3    So open negotiations are usually a

4 series of innocuous proposals, and there is very

5 little actual negotiations that go on.  Real work on

6 the negotiation is conducted either in private

7 sessions in which there was not other people who can

8 comment or criticize what is being proposed or

9 suggested or in offline negotiations in which

10 private trial balloons can be floated to see whether

11 or not they have any validity.

12    Q   You did say that there were some

13 private meetings that you mentioned on direct

14 examination between Mike Day, Ed White and Rolf

15 Valtin?

16    A   Correct.

17    Q   Other than those, was this problem

18 about the open negotiations ever satisfactorily

19 resolved to your knowledge?

20    A   Not really.  Not really because both

21 sides felt it incumbent upon them to inform their

22 pilot constituents on a regular basis what was

23 happening.

24    It wasn't as bad as if there were

25 pilots sitting in and going back to spread stories

### 68

1 but it would have been better if there had been a

2 blackout of news or stories.

3    You are familiar -- this is a routine

4 in union relations.  When it gets serious what do

5 they do?  They cause a blackout, and they can get

6 down to some serious work.  They never got to that

7 point in this.  It probably wouldn't have been

8 useful because people would have been wondering what

9 was going on.

10    We did the best with the situation to

11 keep the pilots somewhat informed about what was

12 happening.

13    Q   Did there come a time when you advised

14 the TWA merger committee to have, I don't know how

15 to put it, more closed negotiations and less open

16 negotiations?

17    A   There might have been.

18    Q   Do you recall telling that?

19    A   I don't but I might have.

20    Q   There is a question and answer after

21 the one we were just talking about where you said

22 how can these problems be overcome and the answer

23 is, "I am not sure that they can be," and then you

24 went on to give a more detailed response.

25    So my next question is in view of that

JAMES BAEHLER

**69**

1 question and answer, Mr. Baehler, isn't it true that
2 when you got involved there was by no means any
3 assurance that the negotiations were going to
4 successfully result in an agreement?
5      A      There was no assurance of that,
6 correct.
7      Q      That was ultimately how it turned out?
8      A      That's correct.
9      MR. KATZ: Let's mark this Exhibit 100.
10      (ALPA Exhibit 100, letter dated
11      10/26/01, marked for identification, as of
12      this date.)
13      Q      Take a look at ALPA Exhibit number
14 100, Mr. Baehler, and tell me if you could please
15 whether you recognize this document?
16      A      It's a letter that I wrote, sure, to
17 Keith O'Leary.
18      Q      On/or about October 26, 2001?
19      A      That's the date, yes.
20      Q      That's your signature Jim down at the
21 bottom?
22      A      Yes.
23      Q      Keith O'Leary, was he the secretary
24 treasurer?
25      A      I think he was at that point.

**70**

1      Q      In the second paragraph you say "After
2 September 11 there really wasn't much that APA could
3 do."
4      Then at the end of that paragraph --
5      A      I am sorry, that's a misprint. Wait a
6 minute.
7      Q      Look at the whole paragraph before you
8 answer.
9      You also say "It was impossible for
10 APA or its board to agree to any substantive
11 concessions beyond their last offer in Chicago."
12      That was your opinion on October 27,
13 2001, wasn't it?
14      A      Correct.
15      Q      Is it still your opinion now?
16      MS. RODRIGUEZ: Take a minute to read
17      the letter.
18      A      I think that is what I have been
19 saying pretty much during this deposition.
20      Q      That's what I thought you would be
21 saying.
22      A      Yes.
23      Q      Why is it that you felt that way?
24 Would you care to add any comments to what you have
25 got here and what you said before?

**71**

1      A      After September 11 there wasn't much
2 that APA could do.  After September 11 there wasn't
3 talk about expanding the airline and more routes and
4 crews.  Now it's contraction.
5      In that situation APA's obvious
6 primary responsibility was to maintain the jobs of
7 their members, and if they had to staple the TWA
8 pilots at the bottom of their seniority list to do
9 that then they were prepared to do it.
10      Q      That's what you would have expected
11 them to do at that point in time, isn't it?
12      A      I don't know what I expected them to
13 do but it certainly is something that is not
14 surprising.  That's their job to protect the jobs of
15 their people.
16      Q      So you were not surprised there wasn't
17 that much progress made after September 11?
18      A      No, no.
19      Q      You didn't fault APA for it, that was
20 their job at that point in time; is that right?
21      A      What I objected to, which is in the
22 third paragraph, is that we were led to believe that
23 APA was ready to put an offer on the table that we
24 would like.
25      I'll keep reading. "How that came

**72**

1 about is a mystery to me and I have no idea where
2 the blame lies but it was apparent by Monday that
3 the APA had nothing to offer and we had been misled,
4 and I am also upset that Ed White and John Darrah
5 didn't tell us up-front on Saturday they were not
6 authorized to alter their Chicago offer by one
7 iota."  Instead they spent Saturday and Sunday
8 asking for an offer from us and then analyzing it in
9 detail.  Only until Monday did they reveal the
10 Chicago offer was not going to be altered, which
11 left MEC very little time to give it consideration
12 before APA's 2:00 p.m. deadline."
13      Q      You said in the letter that how that
14 came about was a mystery?
15      A      How we were led to believe that they
16 APA was ready to put an offer on the table we would
17 like is a mystery, that's correct.  We were given
18 the impression that APA was going to put an offer or
19 on the table that, quote, we would like.
20      Q      You don't know how that came about?
21      A      Correct.
22      Q      In the last full paragraph before the
23 in any event piece you mentioned that "Mike Day and
24 his committee did the most that any negotiating team
25 can accomplish, which to drive the other side to

## JAMES BAEHLER

**73**

1  place their bottom line on the table."
2       Do you still feel that way?
3     A    Yes.
4     Q    The final conclusion was that it was
5  not the fault of APA that it came in so late for
6  proper analysis?
7     A    No, it's says "The fault that it came
8  too late for proper analysis is the fault of APA."
9     Q    "The fact that it came too late for
10  analysis is the fault of the APA and reveals their
11  ignorance for collective bargaining techniques."
12     A    Yes.
13     Q    That's refers to the American pilots'
14  union?
15     A    Correct.
16     Q    Did the events discussed in this
17  letter to your view have something to do with the
18  negotiations not progressing at that point?
19     A    I don't understand the question.
20     Q    You mentioned the fact that this
21  proposal came too late for the MEC to give it
22  adequate consideration?
23     A    Correct.
24     Q    Did that have something to do with the
25  fact that there was no progress made on the

**74**

1  negotiations at that point in time?
2     A    No, because there was no further
3  negotiations. It's just that the MEC didn't have
4  time to adequately consider and analyze the APA
5  proposal. Instead of giving it to us on Friday or
6  Saturday, they kept us believing over the weekend
7  that they were going to get a different offer that
8  was going to be better, and it turned out on Monday
9  after sitting around Saturday and Sunday trying to
10  analyze what this new offer was going to be, it
11  turned out to be the same offer that was offered on
12  Friday, and told us that we had a 2:00 p.m. deadline
13  to say yes or no to it. Why couldn't they have told
14  that to us on Friday.
15     Q    You don't blame that on ALPA, do you?
16     A    No. Everything in the world is not
17  ALPA's fault.
18     Q    That wasn't true for a while.
19        It doesn't sound like you really had
20  any conversations with people working at the ALPA
21  national headquarters?
22     A    Correct.
23     Q    You had this one conversation with
24  Clay Warner that really wasn't substantive, was it?
25     A    Correct, it was about my invoices, who

**75**

1  was paying me, that's all.
2     Q    It wasn't about the substance of the
3  negotiations or the PR campaign or anything?
4     A    No.
5     Q    I think it's clear from what you
6  testified about earlier today that you did not make
7  recommendations to anyone at ALPA national in
8  Washington, D.C. or Herndon with regard to a PR
9  campaign or a lobbying campaign or any of those
10  subjects, did you?
11     A    That would not have been my role or my
12  responsibility or my function.
13        In fact, part of the recommendation it
14  would have to come from somebody on the MEC.
15     Q    You nevertheless felt comfortable
16  talking about what you felt ALPA's responsibility
17  was?
18        I have it in my notes that --
19     A    Let me put it another way.
20        MS. RODRIGUEZ: Wait until he asks a
21  question, Mr. Baehler. He's reviewing his
22  notes.
23     A    All right.
24     Q    I have in my notes you said it was the
25  responsibility of ALPA to provide whatever

**76**

1  assistance that TWA pilots wanted in these
2  negotiations or something like that.
3        On what do you form the basis for
4  determining what ALPA's responsibility was in these
5  negotiations, Mr. Baehler?
6     A    It's my understanding that ALPA is the
7  umbrella organization of which the TWA pilots MEC is
8  a member. TWA pilots pay dues to ALPA.
9        Is that correct?
10     Q    You don't have any real experience in
11  how labor unions function, do you? Have you ever
12  been a union member?
13     A    No.
14     Q    What is the source of your
15  understanding of how unions function then?
16     A    Just from what I read in the
17  newspapers, books and magazines.
18     Q    Have you ever read the constitution
19  and bylaws of the American Airlines organization?
20     A    No.
21     Q    You are not really familiar with the
22  responsibility of how the different parts of that
23  organization are determined?
24     A    Correct. I am assuming, and if I am
25  incorrect can tell me, I am assuming that the

JAMES BAEHLER

**77**

1 international headquarters has some responsibility
2 to protect the interests of the locals from whom
3 they received dues.
4    Q    Do you know whether there are locals
5 in the Airline Pilots Organization?
6    A    I'm using local in the sense of a
7 traditional union.
8    Q    In fact, ALPA is not a traditional
9 union and they don't have locals; isn't that true?
10    A    Whatever they are called.  The MEC is
11 a unit of ALPA, is that not correct, and this unit
12 pays dues to ALPA.
13    Q    Are you a lawyer?
14    A    No.
15    Q    Have you done any legal research or
16 other research about the responsibilities of labor
17 organizations under the Federal labor laws?
18    A    No.
19    Q    So when you talk about the
20 responsibility of ALPA, you are making that
21 statement not as a legal conclusion but as some kind
22 of a moral judgment about the way unions ought to
23 operate?
24    A    No, no.
25    Q    In what sense then?

**78**

1    A    I assume when you pay dues to some
2 organization that has some supervisory
3 responsibility for you, that they have some
4 additional responsibility to make sure that your
5 interests are being protected.
6    Q    Do you think they have to do
7 everything you ask them to?
8    A    Of course not.
9    Q    Do you think they have to make some
10 judgments about what is in the best interest of the
11 group?
12    A    I would assume so.
13    Q    Do you think the bargaining
14 representative has to make a judgment about what is
15 achievable in the circumstances?
16    A    Sure, of course.
17    Q    Do you know what steps ALPA took to
18 evaluate that?
19    A    No.
20    Q    So your comments about ALPA's
21 responsibility and what it was incumbent upon ALPA
22 to do, those are not legal conclusions, are they?
23    A    Correct.
24    MR. KATZ:  The videographer has held
25 up a note indicating that he's about to run

**79**

1 out of tape, and while we may finish within
2 the few minutes remaining I think it would
3 probably be better to take a short break and
4 let him change the tape.
5    THE VIDEOGRAPHER:  Off the record.
6 The time is two o'clock and this is the end
7 of tape number one.
8    (Recess taken.)
9    THE VIDEOGRAPHER:  This will be the
10 start of tape number two and we are back on
11 the record at 11 minutes past two o'clock.
12    Q    Mr. Baehler, I do have a few more
13 questions.  You mentioned in your testimony earlier
14 this afternoon that TWA pilots have no say in the
15 choice of a facilitator and that ALPA refused to pay
16 for the costs of the facilitator.
17    Is it possible that you are wrong
18 about those things?
19    A    It's possible.  That's my
20 understanding.
21    Q    What is your understanding based on?
22    A    Information that was given to me by
23 members of the merger committee.
24    Q    Did you see any document that
25 confirmed either of those points?

**80**

1    A    No.
2    Q    Which member of the merger committee
3 told you that?
4    A    I don't remember.
5    Q    So you are not really sure about those
6 things, are you?
7    You may answer the question.
8    A    I am sure that I was told that ALPA
9 chose not to participate in the fee for the
10 facilitator and that APA therefore chose the
11 facilitator and paid the facilitator entirely out of
12 American money.
13    Q    Was it American or APA?
14    A    APA.
15    Q    You are saying it was APA who paid for
16 the facilitator?
17    A    I am sorry, I don't know whether it
18 was American Airlines or APA.  I don't know.
19    Q    Do you know who it was that selected
20 the facilitator when that was done?
21    A    It's my understanding it was either
22 APA or American.
23    Q    But you are not really sure how it was
24 done?
25    A    How it was done, no.

Pages 77 to 80

JAMES BAEHLER

81

1    Q    Do you have any reason to question the
2  credentials involved as a mediator?
3    A    No.
4    Q    You have mediated a number of
5  contracts in the airlines over a number of years?
6    A    I suppose I was told that at the time
7  but at this time the information has not stuck with
8  me.
9    Q    The period of time when they failed to
10 achieve an agreement included the period of time
11 after September 11 when it got much more difficult,
12 if not impossible, to do that?
13   A    Correct.
14   Q    I think the mediation went on through
15 October, didn't it, do you recall?
16   A    I don't recall.
17   Q    You list four days of consulting on
18 Exhibit 97, October 19 through 22, in Washington,
19 D.C.
20       Does that tell us whether you were
21 still involved in the facilitated discussions at
22 that point in time?
23   A    I don't remember if Mr. Valtin was
24 there then.  You asked if he was there and I don't
25 know.

82

1    Q    I was basically asking whether the
2  facilitated discussions were continuing in
3  mid-October.
4    A    There were discussions in mid-October,
5  and whether they were being facilitated by Mr.
6  Valtin I don't remember.
7    Q    Because you weren't there, you don't
8  have any first-hand knowledge of what was said on
9  the 2nd of April by advisors to the TWA MEC; is that
10 true?
11   A    True.
12       THE VIDEOGRAPHER: I am receiving
13 BlackBerry interference.
14       MS. RODRIGUEZ: It is off.
15   Q    Mr. Baehler, with regard to the people
16 who were there giving advice to the TWA MEC, have
17 you ever met Rich Seltzer?
18       MS. RODRIGUEZ: I'm sorry, can you
19 repeat the question?
20   Q    Richard Seltzer was one of the people
21 who was advising the TWA MEC on April 2nd, 2001.
22       Have you ever met him?
23   A    I don't recall meeting him.  I might
24 have and, if so, I don't remember.  I don't recall
25 meeting him.

83

1    Q    He's a lawyer with the law firm of
2  Cohen Weiss & Simon in New York City who specializes
3  in bankruptcy law.
4        Does that refresh your recollection
5  about whether you met him or not?
6    A    No.
7    Q    Have you ever met Randy Babbitt?  He
8  was another advisor who was there on the 2nd of
9  April 2001.
10   A    No.
11   Q    Do you know who he is?
12   A    He was head of ALPA when I first
13 started working with TWA pilots in 1988.  Beyond
14 that, I don't know anything else about him.
15   Q    But he was the president of ALPA?
16   A    In 1988.  That I know.
17   Q    Ms. Rodriguez asked you about Bob
18 Christie.  Let's just stick with those two people,
19 Mr. Seltzer and Captain Babbitt.
20       Do you think they were unaware of the
21 possibility of walking out on American Airlines as a
22 negotiating tactic?
23   A    I would have no idea at all about
24 whether they knew anything.  I don't know.  I wasn't
25 there and I never have spoken with them about it as

84

1  far as I know.  How would I know what is in their
2  minds?
3    Q    Do you know whether they are
4  experienced negotiators?
5    A    I have no idea.
6    Q    So when you say that you think that
7  these advisors made a mistake, you really don't know
8  what kind of considerations they were weighing in
9  giving advise to the TWA MEC, do you?
10   A    You are asking if I know what was in
11 their minds, what considerations they were weighing
12 in their minds, no, I don't know that.
13   Q    If they are aware of some facts that
14 you are not aware of it's possible that you are the
15 one that made a mistake and not them, isn't it?
16   A    Well, I don't know what possible
17 information someone would have that would justify
18 going into a negotiation and saying to one party I
19 want you to give up every single leverage you will
20 have.  I don't know what kind of information would
21 produce that conclusion.
22   Q    Suppose if you didn't give it up the
23 Bankruptcy Court was going to take it away from you
24 anyhow.  Would that be a factor one would consider?
25   A    Well, of course, but is that an

Reporting Associates, LLC   1-888-795-2323

JAMES BAEHLER

**85**

1 absolute certainty that the Bankruptcy Court said to
2 the pilots that if you don't give up your scope we
3 are going do take it away from you?
4     Q    Suppose you were advising your client
5 as a negotiating consultant and while nothing in
6 life is an absolute certainty you had as close to a
7 certainty as you could visualize in your mind about
8 what was going to happen if you didn't agree to it.
9          Wouldn't that be something that would
10 be a factor that you would weigh heavily in giving
11 advice to that client?
12    A    Of course you weigh it heavily.  Of
13 course.
14    Q    In addition, by agreeing to waive your
15 scope provisions you got something in return and you
16 were going to lose it for nothing anyhow, wouldn't
17 that make the analysis a little simpler?
18    A    I don't know if would make it simpler.
19 It would certainly make the decision more difficult.
20 Anytime you call someone's bluff you are taking a
21 chance.  Negotiations is not a mathematical exercise
22 in which you say, okay, this is two and two equals
23 four.  It doesn't work like that.
24          In negotiations you are trying to
25 determine what is really behind the other person's

**86**

1 proposal, and you are also trying to determine when
2 they tell you that this is their bottom line,
3 whether or not that is really their bottom line.
4          In this case Carty was saying this is
5 my bottom line.  I'm not going to go ahead with this
6 merger unless the TWA pilots give up their scope.  I
7 am going to test that.  I can't imagine any
8 situation in a negotiation where you don't test that
9 statement.
10    Q    What was the risk involved in testing
11 it?
12    A    The risk was that Dr. Carty was not
13 bluffing and would then say, okay, the merger is
14 off, in which case you call him back and say, wait,
15 wait.  We are negotiating here.  What is the big
16 rush.  If you are going to do this then let's stop
17 and think about it.  Let's talk some more.  Let's
18 talk some more, but you don't just walk away and
19 stay away.  That's not a walk-away, that's a
20 goodbye.  You walk away to test the other person's
21 bottom line, that's all.
22          It is like buying a, I don't want to
23 make analogies here, but you just don't do that in
24 any negotiation because, in effect, you then say,
25 okay, I am giving up all my leverage so I am now

**87**

1 throwing myself on your mercy to give me whatever is
2 in your good heart to give me.
3     Q    That's the situation you found the TWA
4 MEC was in when you started advising them, isn't it?
5     A    Correct.
6     Q    Getting back to this question of
7 Bankruptcy Court and the advice to waive the scope
8 because TWA pilots were getting something out of
9 that and the Bankruptcy Court was going to take it
10 away and not give anything in return?
11        MS. RODRIGUEZ:  I object to the
12 question.
13        MR. KATZ:  I haven't posed the
14 question yet but let me phrase the question
15 this way.
16    Q    Wasn't there also a risk in the
17 negotiations in early April before you got involved
18 that Carty would say, instead of saying I'm going to
19 walk away from the transaction, he would simply say
20 I'm tired of negotiating with you, you are a pain
21 and I'm not going to negotiate anymore and I'm going
22 to let the Bankruptcy Court decide what to do.
23        Wasn't that also a risk?
24    A    Well, that would certainly be an
25 alternative that he would consider.

**88**

1     Q    Wouldn't you view that from the
2 standpoint of the representatives of the pilots as a
3 risk?
4     A    No, I don't think so.
5     Q    Why not?
6     A    Because I have to ask myself why would
7 Don Carty want to acquire TWA, there's only one
8 reason, because he thinks it will enhance the growth
9 and the profitability of the expansion of American
10 Airlines.  It's an advantageous move for American
11 Airlines.
12        For a CEO of a company to say to
13 another group I'm not going to follow through on
14 something that would benefit my company because I'm
15 tired of negotiating with you, that does not sound
16 to me like a sensible approach.
17    Q    Listen to my question, I'm not sure
18 you heard my question.
19        Suppose Don Carty said I'm tired of
20 negotiating with you and I'm going to let the
21 Bankruptcy Court decide on the motion to invalidate
22 your collective bargaining contract under Section
23 11113 of the Bankruptcy Code, and instead of walking
24 away from the transaction he just said, okay, I am
25 not going to negotiate anymore, it's the point in

## JAMES BAEHLER

**89**

1  time where the court is about to rule on the motion
2  to invalidate the TWA collective bargaining
3  contract, isn't that a risk from that standpoint?
4      A  Why wouldn't he just do that?
5      Q  If the TWA pilots agreed, MEC agreed
6  to waive the scope, wasn't that also an alternative
7  that would have been a risk to the TWA pilots?
8      A  Well, if I had been in Don Carty's
9  position I would have waited for the Bankruptcy
10  Court to as you say invalidate the scope and then
11  there wouldn't have been any problem and the merger
12  would have gone through and the American pilots
13  would have gotten, TWA pilots would have gotten
14  whatever American decided to give them.
15      Why wouldn't he do that?
16      Q  My question to you, isn't that
17  possibility a risk also to the TWA pilots?
18      A  I don't know how big a possibility it
19  is. Is it something about to happen and that
20  nothing can stop it and it's inevitable and it's
21  going to happen soon then yes it is risk.
22      If it is something that may or may not
23  happen or may be countered by a legal action on the
24  part of the TWA pilots, I don't know. I don't know
25  what the circumstances were so I can't assess the

**90**

1  level of risk.
2      Q  There was some risk that would happen?
3      MS. RODRIGUEZ: Is that a question?
4      MR. KATZ: Yes.
5      A  If you say there is then I am not in a
6  position to dispute that.
7      The only question that I have is what
8  is the possibility of that happening and what is the
9  level of risk involved.
10      Q  So we have got a negotiating situation
11  where the representatives of TWA pilots have a risk
12  that Carty is not bluffing and he is going to walk
13  away from the transaction, and there is also a risk
14  that Carty is not bluffing and he will simply turn
15  the issues over to the Bankruptcy Court who will
16  then likely invalidate their collective bargaining
17  contract?
18      MS. RODRIGUEZ: Objection to the
19      premise that they would invalidate the
20      collective bargaining contract.
21      Q  The third possibility is he's bluffing
22  and he will come to terms with the TWA pilots if
23  they threaten to walk out or if they don't walk out.
24      Given that you have indicated you are
25  not really in a position to talk about the economic

**91**

1  analysis that American Airlines was going through at
2  the time and you are not in a position to evaluate
3  the legal issues and the likelihood that the
4  Bankruptcy Court would make certain rulings, how can
5  you be so sure that Carty was bluffing and that the
6  third course of action was the best course?
7      A  First of all, I'm not sure that Carty
8  was bluffing and he very well might have been
9  sincere. That's not the point. We don't know that.
10  To this day we don't know it. Only Don Carty knows
11  that.
12      All I'm saying is that there's no way
13  of knowing and since there isn't there is one way to
14  find out. That is the test the bluff. That would
15  have told us whether he was really bluffing or
16  sincere in calling off the merger because the pilots
17  wouldn't give up their scope.
18      Q  Do you have any reason to think that
19  the lawyers and others who were advising TWA MEC on
20  April 2nd, 2001, were giving anything other than
21  their best advice, their honest advice about how to
22  handle the situation?
23      A  I have no idea whether their advice,
24  it could have been sincere or they could have some
25  hidden agenda, I don't know. I have no idea.

**92**

1      Q  You mentioned Dr. Tannen's rightful
2  place proposal in your testimony earlier this
3  afternoon.
4      Are you saying that you thought that
5  American pilots should have given Professor Tannen's
6  proposal more consideration than they did?
7      A  No.
8      Q  What are you saying about American
9  pilots' response to the proposal?
10      A  What I said before is that I believe
11  they were sincerely trying to find a way to make
12  this proposal work given the restrictions that they
13  had to work under but they couldn't do it because no
14  matter how, as Mickey Malerski said, no matter how
15  you slice it 800 TWA pilots are now going to head
16  the senior list.
17      I think the APA looked at that
18  proposal and I think they sincerely tried to make it
19  work, but given the constraints under which they
20  were operating they were not able to do so.
21      Q  By the constraints they were operating
22  under, what are you referring to?
23      A  The fact that their pilots were not
24  going to accept TWA pilots ahead of them on the
25  seniority list.

JAMES BAEHLER

93

1    Q    In fact, some 45 percent of the TWA
2  pilots ended up ahead of American pilots on the
3  list?
4    A    Yes, I am not sure that is the exact
5  number but I do know that some of the TWA pilots
6  were placed ahead of some of the American pilots,
7  yes.
8    Q    You don't know how many?
9    A    That's correct.
10   Q    Or exactly where they were?
11   A    That's correct.
12   Q    Why did APA bring in KPMG?  Wasn't it
13 to do a similar analysis as to what Professor Tannen
14 did?
15   A    Why they did it I don't know, but the
16 end result was a proposal or analysis that was a
17 counterbalance to the Tannen proposal.  An
18 alternative.
19   Q    Professor Tannen was retained and paid
20 by either the TWA pilot merger fund or the American
21 pilots- airline organization, wasn't it?
22   A    I have no idea who paid.  I have no
23 idea.
24   Q    If he was going to be paid by some
25 representatives of the TWA pilots, do you think that

94

1  might have influenced the American pilots'
2  receptivity to his proposal?
3    MS. RODRIGUEZ:  Objection.
4    Q    You may answer the question if you
5  can.
6    A    I have no idea.  They seemed to treat
7  it with respect and certainly they gave it serious
8  consideration.
9    As I recall they sent a long, detailed
10 letter analyzing it almost line-for-line so it's not
11 as if they just sloughed it off.
12   Q    You used words like impartial when
13 referring to his report.
14   If he was paid by representatives of
15 the TWA pilots, would that affect your view of
16 whether it was impartial or not?
17   A    My dealings with Professor Tannen
18 tells me that he would not do something, he would
19 not slant or distort a proposal simply to favor the
20 person who was paying him, that his intellectual
21 pride would prevent him from doing that.
22   Q    As a matter of negotiation, do you
23 think it's likely that the American pilots perceived
24 Professor Tannen was impartial if they felt he was
25 going paid by the other side?

95

1    A    They gave no indication otherwise.
2  They seemed to treat him with respect and
3  consideration.
4    Q    So what were you saying about
5  Professor Tennen's report, you are surprised it
6  didn't lead to an agreement?
7    A    You often ask me if I'm surprised by
8  something and if you are asking me to go back five
9  years and ascertain my emotional state at the time,
10 it's very difficult.
11   All I can tell you is that I think the
12 American pilots tried to find a way to use Tannen's
13 proposal for a deal that would be satisfactory to
14 both sides.  They couldn't do it because it required
15 the placement of considerable numbers more of TWA
16 pilots ahead of APA pilots then they could accept.
17   I think it was a political issue
18 because they just didn't believe their pilot group
19 would approve that sort of proposal.
20   Q    That wasn't ALPA's fault, was it?
21   A    No, I guess it wasn't ALPA's fault,
22 except that the way the negotiations began without
23 any leverage I think ALPA has to bear some
24 responsibility.  So when they got into that
25 situation there was nothing, there was no leverage

96

1  to apply.
2    Q    But that was all before you got into
3  the picture, wasn't it?
4    A    Correct.
5    Q    Did you ever go to Capitol Hill and
6  lobby for the Bond bill?
7    A    No.
8    Q    Were you involved in any way in the
9  lobbying effort?
10   A    No.
11   Q    Do you have any particular background
12 in legislative matters?
13   A    No.
14   Q    So when you talk about what ALPA did
15 or didn't do in the lobbying fund you are not really
16 talking about an issue that you have any particular
17 expertise in, are you?
18   A    As a citizen of the United States and
19 as one who was a history major and who reads the
20 newspapers and the magazines very carefully and has
21 kept up his studies of history, I'm aware of the
22 function of lobbying and the function it serves and
23 how it can often prove effective.
24   It's my understanding one of the
25 functions of ALPA is to lobby Congress and whatever

Pages 93 to 96

JAMES BAEHLER

97

1  legislative body is involved on behalf of the
2  pilots. So I am operating on the premise that ALPA
3  could put its experience in lobbying to help the TWA
4  pilots in this situation.
5       Q    Aren't you aware that under the
6  Railway Labor Act, ALPA's responsibility is to
7  negotiate collective bargaining agreements and
8  administer collective bargaining agreements?
9       A    No, I'm not aware of it.
10      Q    Are you aware that when pilots, like
11 former TWA pilots, resigned their membership and pay
12 only a service charge, that the costs of lobbying
13 are excluded from what they pay?
14      A    No, I'm not aware of that either.
15      Q    From that standpoint any money spent
16 by ALPA on lobbying or public relations are
17 considered outside of the scope of the union's
18 responsibility?
19      A    I'm not aware of it.
20      Q    In fact, are you aware that ALPA's
21 duty in their representation of the pilots it
22 represents goes to the matters in which it is acting
23 as an exclusive bargaining representative mainly in
24 the negotiation of contracts and the administration
25 of collective bargaining contracts?

98

1       A    No, there is a lot about ALPA that I
2  don't know.
3       Q    How labor law, you don't know that
4  either; isn't that true?
5       A    That's true, but in this case we are
6  not talking about labor law, we are talking about
7  basic negotiating principles.
8       Q    That may be what you are talking about
9  but this lawsuit is about labor law.
10      A    All I can talk about is what I am
11 familiar with.
12      Q    You don't mean to express any opinions
13 about labor law in anything you said today, do you?
14           MS. RODRIGUEZ: Objection.
15      Q    You may answer if you can.
16      A    What was that question again?
17           MS. RODRIGUEZ: The question is
18      argumentative. His testimony is his
19      testimony.
20      Q    In your testimony today you are not
21 meaning to express an opinion about labor law, are
22 you?
23           MS. RODRIGUEZ: Objection.
24      A    Well, if there's a law, a labor law
25 that I disagree with I would have an opinion about

99

1  it.
2       Q    Have you testified about some labor
3  laws you disagree with today?
4       A    I don't know. It's possible because
5  as you say I'm unfamiliar with the scope of labor
6  laws, and maybe you were alluding to some aspect of
7  labor law that I wasn't familiar with.
8       Q    Let me ask you this. You mentioned in
9  your testimony earlier that you felt that ALPA
10 should have threatened to sue APA?
11      A    Yes.
12      Q    Did I understand you correctly?
13      A    You are correct.
14      Q    You are not aware of any legal theory
15 that ALPA could have used after April 2, 2001 to sue
16 APA, are you?
17      A    No, all I know is that anybody can sue
18 anybody at anytime, and it just seems to me that a
19 threatened lawsuit would have provided some modicum
20 of leverage.
21      Q    Even if the lawsuit was a frivolous
22 one; is that right?
23      A    Well, I think, as far as I know you
24 are not allowed to bring a frivolous suit, that the
25 courts will dismiss those out-of-hand, don't they?

100

1       Q    Are you aware of any law about
2  threatening to file a lawsuit?
3       A    No, not at all.
4       Q    That's really where you were heading,
5  threatening a lawsuit?
6       A    Of course.
7       Q    You didn't intend it should actually
8  be filed?
9           MS. RODRIGUEZ: Objection.
10      A    I don't know. If there's a basis for
11 filing such a suit why not.
12           MR. KATZ: That's all I have, Mr.
13      Baehler.
14           MS. RODRIGUEZ: I have a few questions
15      on redirect, Mr. Baehler.
16 FURTHER EXAMINATION
17 MS. RODRIGUEZ:
18      Q    I want to direct your attention, first
19 of all, to Exhibit 98 that Mr. Katz showed you.
20      A    Yes.
21      Q    The second part of the second
22 paragraph, it's not a paragraph but the second set
23 of writing on that document says paid by ALPA.
24           Do you see that?
25      A    Yes.

JAMES BAEHLER

101

1    Q    Were you paid by ALPA because they
2 viewed you as somebody helpful in the negotiations
3 sort of an expert if you would like?
4        MR. KATZ: Objection.
5        How would this witness know what ALPA
6    had in its mind?  They paid him because they
7    had a contract.
8    Q    You can go ahead.  You can answer the
9 question.
10   A    I would assume that ALPA agreed to
11 retain me for eight days on the basis that I would
12 be of some assistance to the merger.
13   Q    Assistance in what way?
14   A    In helping them achieve a negotiated
15 result that everyone could live with.
16   Q    Mr. Katz asked you a bunch of
17 questions about whether or not you are a lawyer or a
18 labor law expert or whether or not you are an ALPA
19 expert, a whole series, but you worked with TWA MEC
20 over a period of 13 years; is that correct?
21   A    Correct.
22   Q    Over that 13 years did you develop an
23 understanding at least on a common-sense kind of
24 basis on the role of ALPA in negotiations?
25   A    I am not sure I understood their role

102

1 in terms of negotiations but the understanding that
2 I developed was that ALPA was almost like the parent
3 and the MEC was the child.  But in this case the
4 child was paying money to the parent and the parent
5 was exercising some supervision over the child.
6        Now exactly what that supervision was
7 and what the legal requirements were or weren't, I
8 don't know, but there was a clear understanding on
9 my part anyway, that the TWA pilots had to act in
10 ways that were consistent with the rules and
11 regulations that were established by ALPA.
12       At the same time, ALPA had a
13 responsibility to look out for the interests of the
14 TWA pilots and that when it came time to negotiate
15 with another pilot group who was not part of ALPA,
16 that ALPA should have been behind TWA in every way
17 that one could imagine professionally and with
18 whatever resources they had, with whatever skills
19 and ability they had to function on behalf of the
20 TWA pilots.
21       If it involved threatening a lawsuit
22 why not.  There is nothing wrong with that.  It just
23 gives -- what I didn't see from ALPA was even an
24 attitude that TWA should receive assistance.  When
25 Duane Worth and Kevin Dillon sat in on that date

103

1 there was nothing they said that indicated they were
2 backing TWA against ALPA or against APA.  It just
3 wasn't there.  I don't think that TWA should have
4 had to go to ALPA and ask for assistance.  I think
5 they should have been volunteering assistance.
6    Q    Mr. Katz also talked to you quite a
7 bit about the pending bankruptcy petition and
8 whether or not the bankruptcy court would sell the
9 contract in its entirety.  The questions he asked
10 you alluded to the fact that it was better to get
11 something than nothing.
12       Did the TWA pilots actually get
13 anything concrete for waiving their scope rights?
14       MR. KATZ:  Objection.
15       The witness doesn't have any basis to
16 know.
17   A    From what I could see, no, no.
18   Q    The representations by Mr. Carty that
19 he would use his best efforts, they didn't bear
20 fruit, did they?
21   A    Not that I saw.
22   Q    I want to show you or direct your
23 attention to Exhibit 100 that Mr. Katz showed you,
24 and to paragraph, the second full paragraph.
25       "Under those circumstances it was

104

1 impossible for APA or its board to agree to any
2 substantive concessions beyond their last offer in
3 Chicago."
4        Do you see that last sentence?
5    A    Yes.
6    Q    ALPA didn't do anything to help that
7 situation, did they?
8    A    Not that I saw.
9    Q    Because by this point in October 2001
10 they had already given up those leverages, isn't
11 that correct?
12   A    Yes.
13   Q    So during the whole time of the
14 negotiation the TWA MEC negotiating merger committee
15 was negotiating from a position of weakness; isn't
16 that correct?
17   A    Extreme weakness.  I only saw, the
18 only contact that I saw with ALPA headquarters was
19 when Duane Worth and Kevin Dillon came down on that
20 day, and on that day all I saw was this distant,
21 arm's length approach that ALPA had.  I didn't see
22 any indication that they were actively involved or
23 cared to be involved in assisting TWA in this
24 situation.
25       MS. RODRIGUEZ:  I have no further

JAMES BAEHLER

105

1      questions.
2  FURTHER EXAMINATION
3  MR. KATZ:
4      Q    How would you compare that to merger
5  negotiations you participated in?
6      A    I wouldn't.
7      Q    Why not?
8      A    Because there weren't any others.
9      Q    So you weren't involved when the APA
10 pilots agreed to, were trying to integrate their
11 seniority with American Airlines?
12     A    No, there were none previous and we
13 don't have to go through a bunch of others.
14     Q    You have no basis to compare what you
15 saw to anything that was happening?
16     A    Not to compare to any other airlines
17 mergers, correct.
18     Q    You have no idea what the people from
19 the national office did or didn't do in connection
20 with other seniority integration negotiations?
21     A    Correct.
22     Q    Ms. Rodriguez asked you about what
23 good came out of the waiving of the scope, and I'm
24 going to show you an Exhibit marked 15, ALPA Exhibit
25 15, at the Sally Young deposition.

106

1          This is an e-mail that was sent by Bob
2  Pastor the day after the scope waiver.
3          MS. RODRIGUEZ: Do you have a copy of
4  that?
5          MR. KATZ: I have just one copy of
6  that.
7          MS. RODRIGUEZ: Could I see that before
8  you show it to the witness?
9          MR. KATZ: Sure.
10     Q    So Bob Pastor sent this to all TWA
11 pilots on April 3rd, 2001, the day after the scope
12 waiver, and in here he says that he's going to talk
13 about the provisions that were agreed to. On the
14 second page he summarizes the agreement with TWA
15 Airlines, LLC.
16         Do you see that?
17     A    You show me what I'm supposed to look
18 at it here.
19     Q    Agreement with TWA Airlines, LLC.
20     A    Right.
21     Q    He says "MEC voted to enter into a new
22 transition agreement with TWA Airlines, LLC rather
23 than allow the courts to strip away all of your
24 contractual rights".
25         Did I read that correctly?

107

1      A    Yes, you did.
2      Q    He listed the advisors to the MEC,
3  bankruptcy counsel, merger counsel and investment
4  advisor, former ALPA president and ALPA staff; is
5  that correct?
6      A    Correct.
7      Q    He says the alternative -- go ahead
8  and read. All set? I'll try to read slowly because
9  I know it's hard to keep up when I'm reading
10 something from a written page.
11         In the paragraph immediately before
12 Captain Pastor lists what we gained and he talks
13 about the other alternative of an 1113 fight in
14 court, right?
15     A    Yes.
16     Q    He says that the court has thus far
17 sided with TWA and American on virtually every
18 important issue.
19         You are not aware of anything that
20 would contradict Captain Pastor on that point, are
21 you?
22     A    No.
23     Q    He says that if that "If we did not
24 agree to the new collective bargaining agreement
25 with TWA Airlines, LLC, and the court granted the

108

1  TWA's 1113 motion as expected, we would lose all of
2  our contractual rights including our scope."
3          That's what Captain Pastor says, isn't
4  it?
5      A    Yes.
6      Q    Below he lists the things that were
7  gained, and contrary to what you said a minute ago
8  there were quite a few things that he listed?
9      A    He listed some things, yes.
10     Q    He says there was a guarantee of
11 hiring of all eligible TWA pilots was something that
12 was gained.
13         That's correct, isn't it, as far as
14 you know?
15     A    Well, the key phrase is all eligible.
16 Who is eligible? What does that mean.
17     Q    Do you know of any TWA pilots who
18 didn't get hired at American?
19     A    What they are saying is that the jobs,
20 he said you are still going to have your job.
21     Q    Isn't that something?
22     A    If you assume that all jobs will be
23 lost unless this is done then yes this is a gain,
24 but what I am saying is I don't know that giving up
25 scope meant the only way to save all those jobs.

JAMES BAEHLER

109

1    Q    Captain Pastor also says, Mr. Baehler,
2  that the agreement allowed the TWA pilots to retain
3  their September 1, 2001 pay raises?
4    A    So they kept their jobs with the same
5  pay.
6    Q    Are we are talking about a pay raise?
7    A    A pay raise is what they got. As of
8  September 1st they will have their jobs as of the
9  September 1st pay scale, yes.
10        That is what they had. They didn't
11  get anything extra. What this said is American is
12  hiring the TWA pilots on the same basis on which
13  they were presently operating.
14    Q    Doesn't it also say they will get
15  $12 million paid in late and outstanding debt
16  payments?
17        Those are pensions that were not paid
18  by TWA?
19    A    Okay.
20    Q    That's something they didn't have,
21  isn't it?
22    A    Apparently, okay.
23    Q    It also says that they were to get a
24  guarantee of going to the American pay rates by
25  January 2002, and they didn't have that without the

110

1  agreement?
2    A    That's correct.
3    Q    That was a pay raise, wasn't it?
4    A    That's correct. That's correct.
5    Q    They got this promise from American to
6  use American's best efforts and that's the one you
7  were dismissive about earlier?
8    A    Correct.
9    Q    But you are aware that the board of
10  adjustment is shared by Richard Bloch?
11    A    Now.
12    Q    You are aware that the assistant board
13  of adjustment chaired by Rich Bloch, the LLCH found
14  that American did use its reasonable best efforts?
15    A    I'm not aware of, no.
16    Q    So there were some gains as a result
17  of this agreement, weren't there?
18    A    Mr. Katz, in short, this is a letter
19  from the chairman of the MEC to the entire pilot
20  group at TWA to inform them about a very bad deal,
21  and he put the best possible face on that deal.
22        And if I were in his position I would
23  have done exactly that. I would have listed all the
24  things, real or imaginary, that were gained and I
25  would have made it look acceptable because if it's

111

1  not acceptable then the pilots have got some real
2  problems.
3        This is an attempt to get the pilots
4  to accept this deal and live with it. It doesn't
5  mean it reflects exactly what was happening.
6    Q    On this part this is marked with a
7  bracket on the right of the letter on page three,
8  Pastor said "I don't want to minimize what we have
9  lost, through no fault of our own we were forced to
10  give our scope at the same time we were faced with
11  negotiating a fair and equitable senior integration
12  with the APA." This is the point you have been
13  talking about all through the day.
14        He then says "The alternative was to
15  have everything taken away as a result of the
16  American acquisition and still be faced with the
17  need to negotiate with the APA."
18        Don you agree with Captain Pastor
19  there?
20    A    No, because what he is saying is that
21  we have no choice and that the reason we are in the
22  situation we are because we have no choice, that we
23  had to give up our scope, and as I said if I were in
24  his position once it was done I would put the best
25  upon face on it also and that's what he's doing.

112

1        That doesn't change the fact that when
2  the scope was given all leverage in the negotiations
3  was lost.
4    Q    Captain Pastor understood that, didn't
5  he?
6    A    I don't know what he understood.
7    Q    You read excerpts from his letter of
8  April 3rd, and doesn't it seem to recognize he has
9  given up the leverage?
10    MR. KATZ: Objection.
11    A    He recognizes it in a letter that is
12  designed to win the support of the pilots for a very
13  bad deal.
14    Q    You can't show me anything in that
15  letter that you disagree with you, can you?
16    MR. KATZ: Objection.
17    He doesn't have the letter and he
18  hasn't studied it.
19    A    If you say anything in the letter, I
20  would have to go through the letter and study it and
21  see if there isn't something I disagreed with.
22    Q    As to the points we just covered?
23    A    Well, how can you disagree with
24  something that is designed to make other people
25  accept something that maybe shouldn't have happened.

JAMES BAEHLER

113

```
 1    I don't know.  I don't know.
 2         All I can tell you is that in his
 3  situation if I had been party to a deal as bad as
 4  that I would have written exactly that same sort of
 5  thing, and I would have tried to find things that
 6  would look good, and I would also admit that there
 7  were things that were given up because everyone
 8  knows that.  That's no concession, that is obvious.
 9         So the question is what can we say to
10  these pilots so they will get them to accept the
11  deal that was done and that is what the letter was
12  designed to do and it was done very well.
13    Q    Let me conclude with some conclusions
14  about what we are talking about.
15         Did you ever advise people who are in
16  negotiating situations where they have to pick
17  between the least bad of bad choices?
18         Did that ever come up?
19    A    Sure.
20    Q    When someone makes a choice like that,
21  picking the lesser of two evils, don't you think if
22  they are adults and they are mentally competent they
23  have to live with the consequences of their
24  decision?
25         MS. RODRIGUEZ: Objection.
```

114

```
 1    A    I will tell you that's so theoretical
 2  I'm not sure I know how to answer that.
 3         MR. KATZ:  I have nothing further for
 4  Mr. Baehler at this time.
 5         MS. RODRIGUEZ: I have no further
 6  questions.
 7         THE VIDEOGRAPHER:  This concludes our
 8  deposition.  We are going off the record.
 9         It's five minutes after two o'clock.
10         (2:05 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

115

```
 1              J U R A T
 2
 3         I, _____, the witness herein, do hereby
 4  certify that the foregoing testimony of the pages of
 5  this deposition to be a true and correct transcript,
 6  subject to the corrections, if any, shown on the attached
 7  page.
 8
 9         _____
10
11              JAMES BAEHLER
12
13  Subscribed and sworn to before me
14
15  this _____day of_____, 200_
16
17  _____
18
19  NOTARY PUBLIC
20
21  _____
22
23  NOTARY PUBLIC OF THE State of: _____
24
25  My commission expires:_____, 20__.
```

116

```
 1    ERRATA SHEET FOR THE TRANSCRIPT OF:
 2  Case Name:  Bensel v Airline Pilots
 3  Dep. Date:  12/18/06
 4  Deponent:  James Baehler
 5  Pg. Ln.  Now Reads  Should Read  Reason
 6  __ __  _____  _____  _____
 7  __ __  _____  _____  _____
 8  __ __  _____  _____  _____
 9  __ __  _____  _____  _____
10  __ __  _____  _____  _____
11  __ __  _____  _____  _____
12  __ __  _____  _____  _____
13  __ __  _____  _____  _____
14  __ __  _____  _____  _____
15  __ __  _____  _____  _____
16  __ __  _____  _____  _____
17  __ __  _____  _____  _____
18  __ __  _____  _____  _____
19
20            _____  _____
21
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS_____DAY OF_____, 2006
24
25  (Notary Public)   MY COMMISSION EXPIRES: _____
```

Pages 113 to 116

## JAMES BAEHLER

117

C E R T I F I C A T E

STATE OF NEW YORK )

) ss.:

COUNTY OF NEW YORK )

I, JUDITH A. FROST, a Shorthand Reporter
and Notary Public within and for the State of New
York, do hereby certify:

That JAMES BAEHLER, the witness whose
deposition is hereinbefore set forth, was duly sworn
by me, and that this transcript of such deposition
is a true record of the testimony given by the
witness.

I further certify that I am not related to
any of the parties to this action by blood or
marriage, and that I am in no way interested in the
outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my
hand this 3rd day of January, 2007.

_____

JUDITH A. FROST

Reporting Associates, LLC   1-888-795-2323