**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

PATRICK BRADY, et al.,

Plaintiffs,

v.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,

Defendant.

Civil Action No. 02-2917 (JEI)

**BRIEF IN SUPPORT OF**
**DEFENDANT'S MOTION FOR JUDGMENT**
**AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(a)**

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By: Steven J. Fram, Esquire
Kerri E. Chewning, Esquire

*Pro Hac Vice*:

Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Ave., N.W., Suite 250
Washington, DC 20016
(202) 659-4656

Attorneys for Defendant
Air Line Pilots Association, International

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

ARGUMENT ..... 4

I. STANDARD GOVERNING ALPA'S MOTION FOR JUDGMENT PURSUANT TO RULE 50(A) ..... 4

II. PLAINTIFFS HAVE FAILED TO PRESENT SUFFICIENT EVIDENCE THAT ALPA BREACHED ITS DUTY OF FAIR REPRESENTATION ..... 4

A. Plaintiffs Failed to Present Sufficient Evidence that ALPA Acted in Bad Faith or Arbitrarily ..... 5

1. The Merger Committee Meeting on March 28 and 29, 2001 ..... 6

2. The MEC Vote on April 2, 2001 ..... 8

3. The Alleged "Get Real" Comment ..... 14

4. The Bond Amendment ..... 17

5. Seniority Integration and Supplement CC ..... 19

B. Plaintiffs Have Not Produced Evidence That They Suffered Any Injury In Fact Because of ALPA's Actions ..... 23

CONCLUSION ..... 27

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Addington v. US Airline Pilots Ass'n*,
2009 WL 2169164 (D. Az. July 17, 2009) ....................6

*Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists v. United Techs. Corp., Pratt & Whitney*,
87 F. Supp. 2d 116 (D. Conn. 2000)....................21

*Airline Pilots Ass'n Int'l v. O'Neill*,
499 U.S. 65 (1991)....................6

*Amalgamated Ass'n of St. Elec. Ry. Employees v. Lockridge*,
403 U.S. 274 (1971)....................5

*AmeriSteel Corp. v. Int'l Bhd. of Teamsters*,
267 F.3d 264 (3d Cir. 2001)....................13

*Barr v. United Parcel Serv.*,
868 F.2d 36 (2d Cir.1989)....................13

*Bensel v. Allied Pilots Ass'n*,
675 F. Supp. 2d 493 (D.N.J. 2009)....................23

*Bensel v. Allied Pilots Ass'n*,
387 F.3d 298 (3d Cir. 2004)....................20

*Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R.R. Co.*,
363 U.S. 528 (1960)....................21

*Cont'l Airlines, Inc. v. Eastern Pilots Merger Comm. (In re Cont'l Airlines, Inc.)*,
484 F.3d 173 (3d Cir. 2007)....................13

*Deboles v. Trans World Airlines, Inc.*,
552 F.2d 1005 (3d Cir. 1977)....................5, 7, 23, 24

*Findley v. Jones Motor Freight*,
639 F.2d 953 (3d Cir. 1981)....................5

*Ford Motor Co. v. Huffman*,
345 U.S. 330 (1953)....................6

*Humphrey v. Moore*,
375 U.S. 335 (1964)....................5, 23, 24

*Kavowras v. New York Times, Co.*,
132 Fed. Appx. 381 (2d Cir. 2005) ........ 13

*Lightning Lube Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1992) ........ 4

*Marquez v. Screen Actors Guild, Inc.*,
525 U.S. 33 (1998) ........ 6

*McDermott Int'l, Inc. v. Wilander*,
498 U.S. 337 (1991) ........ 4

*McHale v. Alvarez (In re The 1031 Tax Group, LLC)*,
397 B.R. 670 (Bankr. S.D.N.Y. 2008) ........ 11, 12

*Moore v. Essex County Div. of Welfare*,
2009 WL 2581511 (D.N.J. Aug. 20, 2009) ........ 5

*NLRB v. American Postal Workers Union*,
618 F.2d 1249 (8th Cir. 1980) ........ 6

*Northview Motors, Inc. v. Chrysler Motors Corp.*,
227 F.3d 78 (3d Cir.2000) ........ 4

*Petersen v. United Steel Workers of Am.*,
2009 WL 3269311 (D.V.I. Oct. 8, 2009) ........ 5, 24

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) ........ 4

*Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*,
922 F.2d 984 (2d Cir. 1990) ........ 11, 12

*Spellacy v. Air Line Pilots Ass'n, Int'l*,
156 F.3d 120 (2d Cir. 1998) ........ 23

**FEDERAL STATUTES**

11 U.S.C. § 105(a) ........ 11

11 U.S.C. § 362(a) ........ 11

11 U.S.C. § 1113 ........ passim

28 U.S.C. § 157(a) ........ 12

**RULES**

Fed. R. Civ. P. 50(a) ........ 4

**INTRODUCTION**

During the course of their case, Plaintiffs have presented live testimony from three voting members of the TWA Master Executive Council ("MEC") (Alan Altman, Sally Young and Howard Hollander), from two members of the Merger Committee (Sean Clarke and Michael Day) and from two other pilots who participated in certain of the meetings and lobbying efforts with respect to the Bond Bill (Theodore Case and Matthew Comlish). Plaintiffs have also presented videotaped deposition testimony from a number of other witnesses as well as a number of exhibits.

At this point, it appears that Plaintiffs are claiming that ALPA acted arbitrarily or in bad faith with respect to five separate issues. First, Plaintiffs claim that representatives of ALPA improperly pressured the members of the Merger Committee, in connection with meetings with the American pilots on March 28 and 29, 2001, to agree to staple 825 pilots to the bottom of the American seniority list. As discussed below, however, the members of the Merger Committee declined to follow that alleged recommendation – they only proposed that 425 pilots be stapled; the American pilots did not accept the proposal and the recommendation was more favorable than the seniority integration ultimately imposed in the form of Supplement CC. As a consequence, there is no evidence that the ALPA representatives acted arbitrarily or in bad faith in making this recommendation.

Second, Plaintiffs continue to assert that the ALPA advisors gave bad advice and "pressured" the TWA MEC in connection with the MEC vote on April 2, 2001, to avoid the risks associated with a court ruling on TWA's motion under Section 1113 of the Bankruptcy Code by accepting the new Collective Bargaining Agreement being offered by TWA LLC and by waiving the scope and successorship provisions in the CBA that existed between ALPA and TWA. It is undisputed that all of the pilots knew, from the moment when the transaction with American

Airlines was first announced in early January, that a waiver of the labor protective provisions in the TWA CBA was a condition of the transaction. It was also recognized by all of the advisors, including Roland Wilder, the attorney who was engaged directly by the MEC as its merger counsel, that Bankruptcy Judge Peter Walsh, who was presiding over the TWA bankruptcy, would very likely grant TWA's motion under Section 1113 of the Bankruptcy Code to reject the TWA CBA. No evidence was presented to suggest that the advice given -- to accept the CBA with TWA LLC and avoid the risks and uncertainties with the Section 1113 motion and the possibility that American would walk away from the deal -- was in any way deficient or motivated by bad faith. With respect to the issue of bad faith, there is no evidence that any of the advisors who were working with the MEC during the period leading up to April 2, 2001, were in any way influenced by ALPA's on-going interest in representing all pilots including the American pilots. Indeed, a number of the key advisors, including Michael Glanzer, an investment banker, and Steven Tumblin, a bankruptcy attorney, had been engaged directly by the MEC; no facts were presented to suggested that they were controlled by or beholden to ALPA.

Third, Plaintiffs assert that Duane Woerth acted improperly, and undercut the Merger Committee's negotiating position when he allegedly made a remark to the Board of Directors of the APA on April 5, 2001, that the TWA pilots had to "get real." The evidence presented during Plaintiffs' case confirms that it was entirely proper for Woerth to communicate with the leadership of the APA as part of his efforts to persuade the American pilots to treat the TWA pilots fairly and that Woerth was misquoted. The admissible evidence established that Woerth denied telling the APA that the TWA pilots had to "get real" and instead told the American pilots that they should be realistic in their approach to seniority integration.

Fourth, Plaintiffs have complained that ALPA acted improperly in pressuring the members of the MEC to agree, at a meeting on November 7, 2001, to accept a seniority integration offer that had been made by American and the APA and in not pursuing litigation. Because that advice was rejected by the MEC, there is no basis for claiming that the TWA pilots relied upon ALPA's alleged advice. And because the litigation strategy depended on American and TWA's refusal to process the "reasonable best efforts" case, the fact that they agreed to process the case ended the legal basis for the strategy.

Fifth, and finally, Plaintiffs have complained that ALPA did not adequately support their efforts with respect to the Bond Amendment. The Court previously ruled, when it discussed the issues raised by ALPA's trial brief with counsel on June 2, 2011, that Plaintiffs could not pursue a claim that ALPA's alleged failure to support the Bond Amendment was the reason that the Amendment was not enacted, because any such claim was purely speculative. The Court ruled, instead, that evidence of ALPA's alleged failure to support the Bond bill was admissible only as evidence of ALPA's "bad faith." The only possible evidence of bad faith presented, that Duane Woerth allegedly "scowled" at Matt Comlish and told him that the TWA pilots had to get off Capitol Hill, and that ALPA declined to approve a handful of flight pay loss requests in early December of 2001, a full month after Supplement CC had been imposed, does not establish bad faith.

Because Plaintiffs have failed to present sufficient evidence from which a reasonable jury could return a verdict that ALPA breached its duty of fair representation, judgment should be entered in favor of ALPA and this action should be dismissed at this time.

## ARGUMENT

### I. Standard Governing ALPA's Motion for Judgment Pursuant to Rule 50(a).

Rule 50 of the Federal Rules of Civil Procedure permits a directed verdict when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). "[A] directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 88 (3d Cir.2000) (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991)).

Accordingly, the Court must make a legal determination about the sufficiency of the evidence introduced by the plaintiffs. *See Lightning Lube Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir. 1992). In so doing, the court is required to "review all the evidence in the record ... [and in] doing so, draw all reasonable inferences in favor of the nonmoving party ... [without] mak[ing] credibility determinations or weigh[ing] the evidence." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 149-50 (2000). The Court must review the record as a whole and it must "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached…" *Id.* at 151.

Plaintiffs here have had ample opportunity to present sufficient evidence to support their claim that ALPA breached its duty of fair representation. They have failed, however, to meet that burden. Accordingly, judgment should be entered at this time in favor of ALPA.

### II. Plaintiffs Have Failed to Present Sufficient Evidence that ALPA Breached Its Duty of Fair Representation.

The former TWA pilots claim that ALPA breached its duty of fair representation by acting in bad faith and in an arbitrary manner during the TWA bankruptcy. Plaintiffs further contend that but for these actions allegedly motivated by bad faith, they would have achieved

some undefined "better deal" regarding their employment benefits than what they received through Supplement CC. Plaintiffs also argue that ALPA's purported bad faith continued even after the MEC vote to waive the seniority provisions.

**A. Plaintiffs Failed to Present Sufficient Evidence that ALPA Acted in Bad Faith or Arbitrarily.**

To establish bad faith, plaintiffs have the burden of presenting affirmative "substantial evidence" of "fraud, deceitful action or dishonest conduct." *See Amalgamated Ass'n of St. Elec. Ry. Employees v. Lockridge,* 403 U.S. 274, 299 (1971); *Humphrey v. Moore,* 375 U.S. 335, 348 (1964); *Moore v. Essex County Div. of Welfare*, Civ. No. 07-2504, 2009 WL 2581511, at *8 (D.N.J. Aug. 20, 2009). A showing of fraud, deceitful action or dishonest conduct requires proof of (1) a false or misleading statement or material omission, (2) reliance by union members on the misleading statement or material omission; (3) injury caused by the wrongdoing; and (4) wrongful intent on the part of the defendant against the plaintiffs. *See, e.g., Deboles v. Trans World Airlines, Inc.*, 552 F.2d 1005, 1017-18 (3d Cir. 1977); *Petersen v. United Steel Workers of Am.*, No. Civ. 2004-0062, 2009 WL 3269311, at *10 (D.V.I. Oct. 8, 2009). In *Petersen*, the court expressly held that in order to prevail, the plaintiffs were required to "establish that (1) the Union communicated inaccurate information in bad faith, (2) they relied on such information when they voted to strike or when they decided not to cross the picket line, (3) they would not have voted to strike or would have crossed the picket line if not for the misrepresentation, and (4) they sustained injuries from striking." 2009 WL 3269311, at *10.

Additionally, a finding of bad faith required Plaintiffs to demonstrate that ALPA had a "bad faith motive" in the manner in which it handled the integration of the TWA pilots into American Airlines. *See Findley v. Jones Motor Freight*, 639 F.2d 953, 959 (3d Cir. 1981). Moreover, in order for the bad faith motive to constitute a breach of the duty of fair

representation, Plaintiffs were required to prove that the "bad" motive was the sole motivating factor for ALPA's actions. *See Addington v. US Airline Pilots Ass'n*, No. Civ. 08-1633, 2009 WL 2169164, at *14-15 (D. Az. July 17, 2009), *rev'd on other grounds*, 606 F.3d 1174 (9th Cir. 2010).

In addition, any judicial review of the union's decisions and conduct "must be highly deferential." *Airline Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 76, 78 (1991). A union's actions cannot be considered arbitrary unless the actions complained of are "so far outside a 'wide range of reasonableness' that it is wholly 'irrational' or 'arbitrary.'" *Id.* at 78 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). This standard means that a court or jury cannot invalidate the union's decision simply because it determines that the decision was bad, mistaken or even unreasonable. *See Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45–46 (1998) Thus, "[m]ere negligence, poor judgment or ineptitude are insufficient to establish a breach of the duty of fair representation." *NLRB v. American Postal Workers Union*, 618 F.2d 1249, 1255 (8th Cir. 1980).

As explained below, Plaintiffs failed during their case in chief to demonstrate that the actions or decisions undertaken by ALPA were motivated solely (or even partly) by bad faith with respect to any of the Plaintiffs' theories. Plaintiffs have also failed to demonstrate that ALPA's actions were in any way "irrational." Accordingly, judgment should be entered in favor of ALPA.

**1. The Merger Committee Meeting on March 28 and 29, 2001.**

Sean Clarke, the most junior member of the Merger Committee by far in March of 2001,[1] testified that on the evening of March 28, 2001, a number of ALPA advisors, including Bob

[1] Clarke was thirty years old and had been a TWA pilot for less than five years. The other members of the Merger Committee included pilots who were in their forties and fifties.

Christy, met with the Merger Committee and represented that they had information that would lead to a negotiated seniority agreement with the American pilots but that the TWA pilots had to agree to staple 825 pilots in order to get that deal. *See* Tr. of 6/16/11 at 29. Clarke testified that he strongly opposed this proposal and that, after negotiations within the Merger Committee, the Committee agreed to propose that 434 TWA pilots be stapled. This verbal proposal, which was presented to the American pilots on March 29, 2001, was memorialized in J-301. It is undisputed that the American pilots did not accept this proposal and that the issue of seniority integration was negotiated further into the fall of 2001. Clarke testified under cross-examination that the number of TWA pilots who ultimately were stapled in Supplement CC was approximately 1,250 and that the stapling of 825 pilots, if agreed to in March of 2001, would have been a better deal. Under further questioning, Clarke also admitted that the entire "package" recommended by the ALPA advisors in late March, if accepted, would have been a better deal than Supplement CC. *Id.* at 79.

Given the position of the American pilots that a substantial number of the TWA pilots would have to be stapled, and given that the ultimate seniority imposed under Supplement CC was worse for the TWA pilots, there is no basis for claiming that the ALPA advisors acted in bad faith in making their recommendations in late March. Moreover, there is no basis for any claim by Plaintiffs that the ALPA advisors were motivated to undercut the position of the TWA pilots because there is no evidence that Mr. Christy or any of the other advisors present knew about or were influenced by Jalmer Johnson's letter of January 25, 2001 or any other alleged efforts by ALPA to curry favor with the American pilots. Moreover, because the Merger Committee rejected the recommendations of the ALPA advisors, there is no basis for claiming that they relied upon or were misled by the ALPA advisors, as required by *Deboles*. Any claim relating to

advice given by the ALPA advisors in late March with respect to seniority integration must therefore be dismissed.

**2. The MEC Vote on April 2, 2001.**

The primary claim Plaintiffs have advanced in this litigation is that ALPA acted in bad faith by urging the members of the TWA MEC to vote to waive scope on April 2, 2001 and to accept employment and a package of other benefits from American rather than contest the Section 1113 motion that had been filed by TWA in the Bankruptcy Court seeking to vacate the Collective Bargaining Agreement between TWA and its pilots. Plaintiffs contend that the MEC's decision to do so was informed by misrepresentations made by the advisors who were present in April 2, 2001, apparently, including the independent advisors selected by the MEC.

The undisputed facts refute any claim that the advisors made any misrepresentations during the course of providing advice before and at the meeting of the MEC on April 2, 2001. The claims of bad faith made by Plaintiffs with respect to the vote on April 2, 2001, appear be as follows: (1) that certain of the ALPA advisors predicted before April 2, 2001, that TWA would likely lose the 1113 motion, but then changed their advice and "pressured" the members of the MEC into voting to waive scope and accept the CBA with TWA, LLC; (2) that the advisors falsely advised the MEC on April 2 that there was probably no right to strike if the Section 1113 motion were granted, contrary to a statement made in a footnote to the brief filed with the Bankruptcy Court on March 30, 2001 in opposition to the Section 1113 motion; (3) that the advisors predicted that if the Section 1113 motion were denied, American Airlines might walk away from the proposed asset purchase and that the pilots would lose everything including their jobs; and (4) that American Airlines would use its reasonable best efforts to assist the two unions (ALPA, representing TWA pilots, and APA, representing the American Airlines pilots) to arrive at a fair and equitable process for resolving the seniority and integration issues.

Plaintiffs have failed to adduce any evidence that any of the representations made in the context of the April 2, 2001 vote were false or misleading in any way. With respect to the likelihood that the Section 1113 motion would be granted, regardless of what individual advisors allegedly said to individual members of the MEC in private phone conversations before April 2, 2001, by the time the MEC met on April 2, 2001, all of the advisors, including Roland Wilder, agreed that it was highly likely that the motion would be granted. Thus, an April 3, 2001 letter signed by class representative Sally Young, and sent to all of the Council 3 pilots, reported that the "unanimous opinion" of the nine advisors, including Wilder, "was that the likelihood of ALPA's prevailing in an attempt to defeat TWA's CBA rejection application [under Section 1113] was virtually nil." *See* Exh. D-16.[2] An April 10 letter signed by the three elected officers of Council 2, including class representatives Ted Case and Howard Hollander, made clear that their assessment of the likely outcome of the Section 1113 motion was based not only the legal analysis of Section 1113 provided by the advisors but also by their personal observations of Judge Walsh. *See* Exh. D-35 ("If successful, the hearing and the judge's ruling [on the Section 1113 motion] would effectively eliminate the Scope problem. Any one [sic] who attended the previous bankruptcy proceedings is aware of Judge Walsh's predisposition to press forward with this transaction. After consultation with many professional advisors (see attached list) it was their unanimous opinion that TWA would very likely prevail in its quest before the bankruptcy judge.").

With respect to the claim that the TWA pilots were falsely advised that they probably did not have a right to strike if the Section 1113 motion was granted, Plaintiffs have failed to articulate how this alleged advice was in any way relevant or material to the decision made by

---

[2] ALPA's trial exhibits are denoted as D-[number], Plaintiffs' trial exhibits as P-[number], and Joint trial exhibits as J-[number].

the MEC on April 2, 2001. If the members of the MEC had been advised that the TWA pilots had a right to strike if the Section 1113 motion was granted, what would they have done? None of the three voting members who testified at trial – Altman, Young and Hollander – ever suggested that they might have voted differently and never explained how the right to strike would have in any way helped the TWA pilots. It is undisputed that the TWA pilots wanted the American transaction to go forward because they wanted jobs, not the right to strike and be out of work. For example, the resolution passed on March 30, 2001, by the Council 4 pilots, who Altman represented, directed him and Pablo Lewin, the other Council 4 representative, to vote in favor of the collective bargaining agreement that had been proposed by TWA LLC: "Be it further resolved that Council 4 pilots instruct the Council 4 LEC officers to vigorously pursue the protections that at all times the current and future TWA LLC pilots and the retired pilots of TWA, Inc., shall be covered by a Collective Bargaining Agreement." *See* Exh. D- 365. The Council 4 pilots wanted a new contract, not the right to strike. That the right to strike was not material to the decision made on April 2 is also confirmed by the report sent immediately after the meeting on April 2, 2001 by Robert Pastore, the Chairman of the MEC, and by the letters sent on April 3 and April 10 by the Council 3 and Council 2 representatives. *See* Exh. D-015; D-016; D-035. Those letters make no mention of the question of right to strike as a factor in the deliberations of the MEC.

Plaintiffs have also failed to present any evidence that American was bluffing when it threatened to abandon the transaction or that the ALPA advisors could have known that American was bluffing. Plaintiffs have claimed that the MEC could have pursued Roland Wilder's idea of filing an action in District Court to enjoin the American/TWA transaction in order to preserve the right of ALPA to arbitrate the grievances that had been filed by ALPA

based on the company's violation of Section 1 of the TWA-ALPA CBA. *See* Exh. P-117; J-119. The alleged violation occurred when TWA and American entered into the Asset Purchase Agreement without requiring that American assume a seniority integration process consistent with Allegheny-Mohawk LPPs, sections 3 and 13. *See* Exh. P-117; J-119. Wilder proposed to argue that the bankruptcy court did not have jurisdiction over this grievance since it constituted a "minor dispute" under the CBA, which should be referred to the System Board of Adjustment. *See* Exh. J-119; J-124.

But Wilder's theory was fundamentally flawed, given not only that TWA was in bankruptcy, but also that it had filed a Section 1113 motion to reject the CBA that was the subject of the claim. "Section 362 of the Bankruptcy Code provides that the filing of a petition in bankruptcy automatically stays certain actions directed against the debtor or against the debtor's property." *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 989 (2d Cir. 1990) (citing 11 U.S.C. § 362(a)). Section 105 further authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," even if the dispute falls "outside the bounds of the automatic stay." *McHale v. Alvarez (In re The 1031 Tax Group, LLC)*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008) (quoting 11 U.S.C. § 105(a)); *see also In re Ionosphere*, 922 F.2d at 994. Read in concert, Sections 362 and 105 provide for "centralized jurisdiction and administration of the debtor, its estate and its reorganization in the Bankruptcy Court." *In re Ionosphere*, 922 F.2d at 989. These provisions allow the bankruptcy court to "protect its jurisdiction" over the debtor's estate so it can "proceed efficiently with reorganization." *Id.* at 991, 993. Thus, if an action concerning a debtor in bankruptcy is filed outside of the bankruptcy

court, the bankruptcy court "has the power to take the necessary steps to enforce its resolution." *Id.* at 993-94.

Here, Wilder proposed to file his injunction suit in the U.S. District Court in Delaware but did not propose a motion to lift the automatic stay or a motion to withdraw the reference. This was a fundamental flaw in Wilder's first litigation strategy since bankruptcy courts retain jurisdiction over bankruptcy and related matters unless the district court withdraws the jurisdictional reference. *See In re Ionosphere,* 922 F.2d at 989; 28 U.S.C. § 157(a). Wilder's proposed lawsuit would have posed a substantial threat to the bankruptcy court's jurisdiction and the bankruptcy court would have had broad jurisdiction over the matter since the proposed action was either a core matter or sufficiently "related to" the bankruptcy. *See In re Ionosphere,* 922 F.2d at 989-94. Wilder argued that the litigation created a minor dispute, not "core jurisdiction" for the bankruptcy court. J-124; Wilder Dep. Tr. 58-63. However, the *In re Ionosphere* court soundly rejected this argument. *See In re Ionosphere,* 922 F.2d at 989-94.

In order to protect its broad jurisdiction over both core and non-core proceedings, the bankruptcy court would have had the power to enjoin the parties from proceeding in the district court action so that the bankruptcy court could proceed with the efficient reorganization of TWA. *See id.* at 989-94; *In re The 1031 Tax Group,* 397 B.R. at 684. In light of the threat of liquidation of TWA and the pending Section 1113 motion, it is inconceivable that Judge Walsh would have postponed the proceedings until the TWA-ALPA System Board of Adjustment resolved the grievance. Nor is it conceivable that the federal district court in Delaware would have withdrawn the reference and granted an injunction to prevent American from acquiring TWA's assets.

Without the injunction from the district court to delay the corporate transaction—the second prong of Wilder's two-part strategy—it would have been futile to seek an injunction to compel arbitration of the grievance. *See Cont'l Airlines, Inc. v. Eastern Pilots Merger Comm. (In re Cont'l Airlines, Inc.)*, 484 F.3d 173, 181 (3d Cir. 2007); *AmeriSteel Corp. v. Int'l Bhd. of Teamsters*, 267 F.3d 264, 276 (3d Cir. 2001). When there is no dispute left to arbitrate, there is "no basis for compelling a futile proceeding, 'the very antithesis' of what an arbitration should be." *In re Cont'l Airlines, Inc.*, 484 F.3d at 181. Without the injunction, the grievance process would have been futile because there was not enough time to complete the process. Either TWA would have liquidated, the corporate transaction would have closed or the bankruptcy court would have granted the Section 1113 motion. Neither of Wilder's proposed injunctions on its own would have been sufficient to create any leverage for the TWA pilots, and arbitrating the grievance would have been futile. And there was a most definite downside in filing the lawsuit suggested by Wilder: the Section 1113 motion might have been granted (without a new TWA LLC CBA) or American might have walked away from the deal.

In short, no reasonable jury could find that ALPA breached its duty of fair representation to the TWA pilots based on ALPA's failure to pursue such a lawsuit, especially since the TWA MEC itself expressed no interest in pursuing the litigation. Indeed, a union's "failure to take an action that is unlikely to be advantageous does not subject it to liability for breach of its duty of fair representation." *Kavowras v. New York Times, Co.*, 132 Fed. Appx. 381, 383 (2d Cir. 2005) (quoting *Barr v. United Parcel Serv.*, 868 F.2d 36, 44 (2d Cir.1989)).

Finally, there are no facts to support any claims that any of the ALPA advisors acted in bad faith or were motivated by a desire to sacrifice the interests of the TWA pilots in order to further ALPA's goal of merging with the APA and attaching the American pilots. The primary

evidence upon which Plaintiffs have relied has always been the card campaign of the two American pilots, John Clark and Mark Hunnibell. But they did not begin their card campaign until May of 2001, over a month after the vote on April 2, 2001.

As a consequence, the only evidence in Plaintiffs' case of on-going interest on the part of ALPA in the American pilots is the January 25, 2001 letter of Jalmer Johnson to the APA. But there is no evidence that any of the advisors who worked with the TWA MEC during the period leading up to April 2, 2001 were even aware of that letter and there is no basis for suggesting that any of the advice provided was in any way affected by ALPA's previously announced interest in the American pilots. With respect to the 1113 issue, it is important to note that the MEC received the same advice from its independent advisors, such as Glanzer, Tumblin and Wilder, as it did from the advisors who were employed by or engaged by ALPA, such as Holtzman, Warner, Roberts and Seltzer. Plaintiffs have never alleged, and they certainly presented no evidence at trial to suggest, that Glanzer, Tumblin and Wilder were influenced by ALPA's interest in representing the American pilots.

The advice given by the advisors to the MEC on April 2, 2001, was consistent for a simple reason: the advice was far from irrational; it was sound and prudent. There is no evidence to suggest otherwise.

**3. <u>The Alleged "Get Real" Comment.</u>**

Plaintiffs attempted to suggest during trial that Duane Woerth, the President of ALPA, undercut their negotiating position with the American pilots by telling the APA Board, during a meeting on April 5, 2001, that the TWA pilots had to "get real." It should be noted, by way of background, that it was very much in the interest of the TWA pilots for Woerth to be communicating with the leadership of the American pilots for the purposes of pleading the case of the TWA pilots. The witnesses who testified for the Plaintiffs confirmed that they wanted

Woerth to be advocating on their behalf, although several of them complained that Woerth was not forceful enough and were disappointed that Woerth did not threaten the American pilots. *See* Tr. of 6/16/11 at 63-64.

Woerth appeared before the APA Board on April 5, 2001, just after the TWA pilots had voted to accept the CBA with TWA LLC and at a time when it was clear that seniority integration negotiations between the TWA and American pilots, which had already been contentious, would have to continue. During the examination of Howard Hollander, Plaintiffs attempted to move into evidence P-174, an email which included a report from an American pilot who claimed that Woerth had made the "get real" comment. Although the Court denied the admission of P-174 as obvious hearsay, *see* Tr. of 6/15/11 at 66-71, the Court did permit Hollander to testify about statements allegedly made by Woerth at a meeting of the MEC on April 23, 2001, when Woerth was questioned about his comments to the APA Board on April 5. After the Court made clear that Hollander could only testify about what Woerth had said if he was present on April 23, Hollander testified that he was present and claimed that Woerth did not deny the comment that had been attributed to him by one of the American pilots:

> Q. Were you present at that April 23 meeting?
>
> A. I was.
>
> Q. Was Captain Woerth asked about his visit to the allied pilots, that is the American airline union, board of directors?
>
> A. He was. He was questioned about not only going there but his comment.
>
> . . .
>
> Q. Did Captain Woerth deny having made that statement?
>
> A. He did not deny making the statement.
>
> Q. Okay.
>
> A. He did not.

THE COURT: Let him finish his answer. Go ahead.

A. He did not deny making his this statement but his complete answer was he believed he was misquoted.

Tr. of 6/16/11 at 73-74 (emphasis added).

Under cross-examination, Hollander changed his testimony and admitted that he had <u>not</u> been present at the meeting on April 23, 2001:

Q. You were there when Mr. Woerth addressed the MEC on April 23 and 24, correct?

A. No, I was not.

Q. You weren't even at the meeting where he was asked about whether he had made the statement?

A. Duane Woerth's appearance was the first day of the meeting. My recollection is I was not there on the first day of the meeting.

Q. So how do you know that he did not deny making the statement but believed it had been taken out of context?

A. I was getting phone calls from almost everybody in that room, every break they had.

THE COURT: I am sorry. I thought when, I asked some questions about that and one of the reasons he explored it, I understood that you were there. That is why I made the distinction between what I would consider hearsay as to what he said, as to what came out of his own mouth. That is what you heard.

A. I thought you were referencing the APA message with the attorney about what was said down there. What was said in the meeting on --

THE COURT: When he appeared, and when he was questioned, clearly he was questioned, we know from the minutes that he was questioned about what he had said, when he had visited and spoke for a brief period of time at the APA, I guess board of directors meeting, the board of directors meeting. Maybe I am confused. I thought you were present. I think I even said that. I made the point that I would give you full range to say anything you heard him say.

MR. FRAM: I heard it the same way, your Honor.

A. Then I will yield and say I was mistaken. I was not there for Duane Woerth's personal appearance on the first day of that meeting.

*Id*. at 195-96 (emphasis added).

Plaintiffs also played a portion of videotaped testimony from Clay Warner, an in-house attorney at ALPA, concerning an email that was forwarded to him and in which a TWA pilot indicated that he was "upset" about Woerth's alleged "get real" statement. Warner testified that he did not respond to that email.

Sean Clarke testified on June 16, 2011, that he was present at the MEC meeting on April 23, 2001, that he heard Mr. Woerth discuss his remarks to the APA Board and that Mr. Woerth denied saying that the TWA pilots would have to "get real" and made clear that he had been misquoted. *See* Tr. of 6/16/11 at 91. Clarke also authenticated D-181, which was a TWA MEC summary of Woerth's comments on April 23, 2001. That summary, which was circulated to all of the TWA pilots on April 25, 2001, two days after Woerth's appearance, includes the following statement:

> He [Woerth] went on to tell the APA that the TWA/MEC had recently made one of the hardest decisions he has ever seen any MEC make in reaching the Transition Agreement with TWA Airlines, LLC. Captain Woerth said that the TWA/MEC had made a realistic assessment of their situation and had made the hard decision, and now the <u>APA needs to get realistic and make a hard decision</u>. He told the APA that they have an even greater responsibility to be fair and realistic since they would not allow a third party to facilitate the negotiations.

D-181 at pages 1 and 2 (emphasis added).

Because the record is devoid of any admissible evidence that Woerth made the alleged "get real" comment to the American pilots and instead establishes that Woerth denied making the remark and said he was misquoted, any claim based upon the alleged "get real" comment must be dismissed.

**4. <u>The Bond Amendment</u>.**

Nor is there any evidence to suggest that ALPA acted in bad faith with respect to the Bond Amendment. Plaintiffs' witnesses attempted to claim that ALPA National acted in bad

faith with respect to the Bond bill based upon an alleged incident on October 16, 2001, where Duane Woerth allegedly "scowled" at Matt Comlish and told him that the TWA pilots "need to get off the Hill right now." *See* Tr. of 6/16/11 at 78. Comlish was impeached with his deposition testimony in which he was directly asked by Mr. Katz whether Woerth had ever told him that Woerth was opposed to what the pilots were doing and Comlish denied that any such conversation ever took place. *Id.* at 195. Comlish conceded that Paul Hallisay, the chief ALPA Legislative Liaison, made a number of helpful suggestions about how to revise the bill to avoid objections by the flight attendants, *id.* at 170, but also cautioned Comlish that the bill would get tied up in committee and would never be enacted. *Id.* at 168.

It is undisputed that the Bond Amendment would only have benefited the TWA pilots and that the TWA pilots were pressing for the bill during a legislative session that was focused in the aftermath of the terrorist attacks on September 11, 2001, including compelling issues of national security, the survival of the airline industry, the President's Declaration of War on terror and Al-Qaeda and the mobilization of Untied States troops to the Middle East. Moreover, the evidence presented at trial established that Bond Amendment had angered American and the American pilots and threatened to undermine negotiation efforts. Indeed, Jeff Brundage told the MEC directly, during its meeting on October 31, 2001, that Don Carty, the President and CEO of American, had advised Senator Bond that American would close TWA LLC – and all of the TWA pilots would lose their jobs – if the Bond Amendment was enacted into law. *See* D-257. Despite this, Comlish, Hollander and others continued to lobby for the Bond Bill, and ALPA continued to support those efforts by paying them for their flight pay losses until early December of 2001, almost a full month after Supplement CC was enacted, when it finally declined to approve further payments.

Plaintiffs have failed to produce any evidence that ALPA was under an obligation to devote all of its resources to campaigning in support of the Bond bill in order to get the TWA pilots out from under the agreement to waive scope they had reached by agreeing to the CBA with TWA LLC on April 2, 2001. There is no evidence that it was bad faith to recognize the realities of the legislative process under which there was strong and decisive opposition to this bill. It is also beyond dispute that ALPA, or any other union, did not violate its DFR because it could not ensure that such legislation would pass.

Moreover, given the circumstances, including Carty's threat, it was eminently reasonably for ALPA to conclude, in early December of 2001, that further efforts to push the Bond Amendment might harm the TWA pilots and to discourage further lobbying efforts by lobbying "rookies" such as Case. *See* Tr. of 6/8/11 at 133. No reasonable jury could conclude otherwise. As a consequence, the Court should rule, as a matter of law, that ALPA did not act in bad faith with respect to the Bond Amendment.

**5. <u>Seniority Integration and Supplement CC.</u>**

Plaintiffs have also failed to produce evidence that ALPA acted in bad faith by recommending, in the Fall of 2001, that the MEC enter into a three-party agreement with American and the APA rather than have those parties impose Supplement CC on the TWA pilots and then file litigation. The evidence has demonstrated that there were significant benefits to agreeing to a deal, including protection against unilateral changes by American and the APA to Supplement CC and that others involved in the MEC, including Steven Rautenberg and Mike Day, the Chairman of the Merger Committee, recommended that the TWA pilots agree to a three-party deal, and that Roland Wilder also recommended that course of action.

The evidence also fails to support any claims by Plaintiffs that ALPA acted improperly in failing to pursue any of the litigation theories recommended by Wilder. Wilder himself

conceded, in his various memos, that any litigation against American and the APA would be "novel and complex." *See* Wilder Dep. Tr. at 190-191. This Court subsequently held that there was no basis for ALPA to pursue litigation against American or the APA because the APA did not owe a duty of fair representation to the TWA pilots. *See Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 311-15 (3d Cir. 2004) ("As the NMB did not certify APA as the representative for the TWA pilots until April 3, 2002, APA did not owe any duty of fair representation to the Plaintiffs until that date.") The Third Circuit agreed. *See Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 311-15 (3d Cir. 2004). ("The scope of the duty of fair representation is commensurate with the scope of the union's statutory authority as the exclusive bargaining agent. . . . [Therefore], the union's statutory duty of fair representation does not extend to those persons who are not members of the pertinent bargaining unit. In other words, exclusive representation is a necessary prerequisite to the statutory duty to represent fairly.")

Also lacking in legal merit was final litigation theory, which suggested a lawsuit to enforce American's reasonable best efforts promise. *See* Exh. D-131. At the time, however, the litigation was unnecessary. A seniority integration plan had not been finalized, the parties were still negotiating, and the final seniority integration did not occur until October 23, 2001, at the earliest, after the facilitated negotiations broke down. *See* Wilder Dep. Tr. at 152-56.

Wilder's third theory was multifaceted and, by his own admission, required success in *all* areas in order to improve the seniority integration process for the TWA pilots. The theory had at least four parts: (1) a lawsuit to compel TWA LLC's participation in the "reasonable best efforts" grievance; (2) a status quo injunction to prevent American and APA from entering into and implementing a seniority integration agreement until the System Board of Adjustment could adjudicate the grievance; (3) court enforcement of an arbitration award, if successful in pursuing

the grievance; and (4) passage of the Bond bill, mandating an arbitration process for seniority integration issues. *See* Exh. P-131; P-133; J-135; Wilder Dep. Tr. at 148-150, 191-192. Even if successful, Wilder's theory also required that the Bond bill have "retroactive effect" so that it would apply to American's purchase of TWA's assets. *See* Exh. J-135; Wilder Dep. Tr. at 191-194.

Wilder argued that the reasonable best efforts letter was, "at least arguably, within the scope of the CBA, and so the dispute qualifie[d] as a minor dispute." *See* Exh. P-131 at 7. Wilder's "minor dispute injunction" would have attempted to "preserve the jurisdiction of the adjustment board to hear the . . . grievance in light of the fact that the board would be deprived of its jurisdiction over the dispute by an [American-APA] seniority integration agreement." *Id.*; *see also Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R.R. Co.*, 363 U.S. 528 (1960); *Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists v. United Techs. Corp., Pratt & Whitney*, 87 F. Supp. 2d 116, 129-30 (D. Conn. 2000).

The fatal flaws in Wilder's third theory were apparent from the outset. This theory depended upon the success of all four actions, none of which was likely to succeed. Wilder admitted as much in a letter to TWA MEC Chairman Robert Pastore on October 31, 2001. *See* Exh. J-135. In that letter, Wilder stated:

> All of these elements had to succeed in order for us to obtain an arbitrated resolution to the seniority dispute. I likened . . . our task to climbing a mountain. If we surmounted all of the obstacles and reached the top of the mountain, I was convinced that we would attain a better seniority integration than what APA has offered. But if we made a single misstep, we would fall from the mountain and fail to achieve our goal. The task I outlined was a formidable one.

*Id.* at 2 (emphasis added).

ALPA filed a grievance on September 24, 2001. *See* Exh. D-207. However, rather than refusing to process the grievance, as Wilder anticipated, TWA LLC agreed to process the

grievance on an expedited schedule and denied the grievance on October 18, 2001. *See* Exh. D-305. The grievance was then referred to the System Board of Adjustment on October 26, 2001, and TWA LLC agreed to participate in the arbitration, scheduled for November 6-8, 2001. *Id.* There was thus never a need for ALPA to authorize the lawsuit seeking an injunction to compel TWA LLC's participation since the company agreed to participate. *Id.;* Rosen Dep. Tr. at 111-112.

At that point, it was also unnecessary to seek a status quo injunction to prevent American and APA from entering into and implementing a seniority integration agreement, since TWA LLC processed the grievance on an expedited schedule. The implementation of a seniority agreement would not have affected the TWA pilots until the NMB issued a single-carrier determination and Supplement CC therefore became effective. Thus, there was no immediate argument for irreparable harm to the TWA pilots in October 2001, obviating any need or basis for the injunction lawsuit.

In short, the evidence demonstrates that none of Roland Wilder's legal theories were viable and pursuing them would have constituted a breach of Wilder's professional responsibility. But, in any case, there was no evidence that a decision not to pursue them was motivated by anything other than ALPA's disagreement with the effectiveness of those strategies and the negative effects they would have. ALPA's decision in that regard was therefore prudent and the class suffered no harm as a result of that decision.

**B. <u>Plaintiffs Have Not Produced Evidence That They Suffered Any Injury In Fact Because of ALPA's Actions.</u>**

This Court has previously held that liability for a DFR violation "arises only if the breach directly causes damages to an individual or group to whom the duty is owed." *Bensel v. Allied Pilots Ass'n*, 675 F. Supp. 2d 493, 499 (D.N.J. 2009) (emphasis added) (quoting *Deboles v. Trans World Airlines, Inc.*, 552 F.2d 1005, 1019 (3d Cir. 1977)).

It is well-settled, in line with this Court's statements, that a bad faith breach of the duty of fair representation must "directly cause" some injury in fact. *Deboles*, 552 F.2d at 1019; *see also Spellacy v. Air Line Pilots Ass'n, Int'l*, 156 F.3d 120, 130 (2d Cir. 1998) (requiring plaintiffs to prove that the union's bad faith conduct "caused their injury"). The U.S. Supreme Court addressed this issue in *Humphrey v. Moore*, 375 U.S. at 350-51, holding that the plaintiff did not prove his bad faith DFR case as evidence of causation was lacking: "The trial court found it 'idle speculation to assume that the result would have been different had the matter been differently presented.' We agree. Moore has not, therefore, proved his case."

The Third Circuit's decision in *Deboles* is the leading case on this issue. In that case, the plaintiff union members alleged that union officials misrepresented certain facts for the purposes of inducing the members to ratify a contract. *Id.* at 1007, 1011. The Third Circuit, in an opinion by Judge Gerry, who was sitting by designation, held that the district court erred by holding that the union breached its duty of fair representation without requiring proof that the contract at issue would not have been ratified absent the union's misrepresentations. *Id.* at 1017-19.

In reversing, the Third Circuit held that "false statements may not create liability under the federal labor laws absent a showing of tangible injury proximately resulting from the falsehood." *Id.* at 1017 (emphasis added). The court further clarified that the traditional elements of a claim for fraud, including detrimental reliance, are necessary to provide liability

for a bad faith breach of the duty of fair representation. *Id.* The court reasoned that none of the alleged misrepresentations actually caused the contract to be ratified or any other injury: "[s]uch speculative, post hoc reasoning does not suffice to demonstrate concrete injury caused by the misstatements absent supporting evidence in the record below." *Id.* at 1017-18 & 1018 n.26. Thus, the Third Circuit unequivocally held that no DFR violation could be established because the union's breach of the duty "must be found to have contributed to the erroneous outcome of the contractual proceedings." *Id.* at 1018 (internal citations omitted).

As discussed in ALPA's trial brief, every court to address the issue has held that in order to prove DFR liability, plaintiffs must prove both detrimental reliance and that, but for the union's conduct, the outcome would have been different. *See* ALPA Trial Brief filed on May 20, 2011 at 11-16.

Recently, in *Petersen v. United Steel Workers of Am.,* Civ. No. 2004-0062, 2009 WL 3269311, at *7 (D.V.I. Oct. 8, 2009), plaintiffs argued that they relied on misinformation from their union before voting to strike and that they suffered harm when, after striking, they lost their jobs. The district court, following *Deboles*, held that "[i]n order to prove causation based upon misrepresentations that resulted in a strike vote or decision to remain on strike, a plaintiff must demonstrate that the vote to go on strike or decision to continue striking would have been different had the alleged misrepresentations not been made." *Id.* at *9-10 & *10 n.12.

Accordingly, as outlined above, the "no harm, no foul" principle applies with full force in both arbitrary and bad faith DFR cases. Plaintiffs here were required to show not only that the alleged misrepresentations prevented the TWA MEC from voting differently on April 2, 2001, but also that the Bankruptcy Court would have denied the Section 1113 motion, that American would not have walked away from the deal and that negotiations with the American pilots would

have resulted in an overall jobs situation that was more favorable than what they received under Supplement CC. Plaintiffs, however, have not been able to produce any such evidence.

Specifically, Plaintiffs have failed to demonstrate that a sufficient number of MEC members would have voted differently to change the outcome of the April 2, 2001 vote. Nor did Plaintiffs produce evidence that if the vote on April 2, 2001 had been different, Plaintiffs would have done better than Supplement CC in respect to their seniority terms and overall terms of integration into American. Thus, Plaintiffs have not carried their burden of producing evidence to prove that the ultimate outcome on their integration into American would have been more favorable to them.[3]

Additionally, Plaintiffs failed to produce evidence to demonstrate that ALPA's interest in ultimately recruiting the American pilots altered ALPA's evaluations of or responses to Wilder's litigation strategies or any other aspect of ALPA's conduct, in other words, that ALPA and the professional advisors would have taken different actions that would have produced a better outcome for Plaintiffs if ALPA had no interest in the American pilots. Nor did Plaintiffs produce evidence to establish that attempting Wilder's litigation strategies would have preserved the LPPs in the TWA-ALPA CBA, improved their terms of integration beyond what they received pursuant to Supplement CC, or enhanced their overall jobs situation.

Plaintiffs similarly failed to prove that ALPA's actions with respect to the post-Supplement CC situation would have been different but for ALPA's claimed motivation to gain favor with the American pilots, or that such actions would have produced better integration terms. Plaintiffs' evidence also failed to demonstrate that ALPA had any duty to take a more

[3] Indeed, it remains unclear, even after Plaintiffs' presentation of evidence, what seniority placements Plaintiffs contend were attributable to Supplement CC.

active role in the pursuit of the Bond bill or, that it if did indeed take a more active role, that the legislation would have passed to the TWA pilots' benefit (a matter not even in the case).

Plaintiffs simply failed to prove how seniority and other terms of integration would have been different from or better than Supplement CC. Supplement CC is a lengthy and enormously complex document that provides, among other things for a protective "cell" that reserved all of the positions in the St. Louis' domicile for pre-merger TWA pilots and 'fenced' the American pilots out of St. Louis' assignments. The result of this protective cell was preferential treatment for former TWA pilots beyond their numbers on the merged seniority list. Plaintiffs have failed to demonstrate whether seniority would have been more favorable for all of the pilots? Or more favorable for some but not for others? Or better for some but worse for others?

Absent evidence that the TWA pilots would have been in a better position than they achieved through the outcome of the merger transaction (or could have achieved if they had accepted ALPA's advice both in March 2001 and in October-November 2001), Plaintiffs' claims clearly fail as a matter of law.

**CONCLUSION**

For all the reasons expressed herein, ALPA respectfully requests that the Court grant its Motion for Judgment as a Matter of Law and dismiss the action with prejudice.

Respectfully submitted,

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121

By: *_/s/ Steven J. Fram_*
STEVEN J. FRAM, ESQUIRE
KERRI E. CHEWNING, ESQUIRE

*Pro Hac Vice*:
Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Ave., N.W., Suite 250
Washington, DC 20016
(202) 659-4656

Counsel for Defendant Air Line Pilots Association, International

Dated: June 27, 2011

6874766v1