## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, et al.,     ) <br>     ) <br>     Plaintiffs,     ) <br>     ) <br>     v.     ) <br>     ) <br> AIR LINE PILOTS ASSOCIATION,     ) <br> INTERNATIONAL,     ) <br>     ) <br>     Defendant.     ) <br>     ) | Civil Action No. 02-2917 (JEI) |

---

## DECLARATION OF STEVEN J. FRAM, ESQUIRE, IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(a)

---

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121

By:    Steven J. Fram, Esquire
        Kerri E. Chewning, Esquire

*Pro Hac Vice*:

    Daniel M. Katz, Esquire
    Katz & Ranzman, P.C.
    4530 Wisconsin Ave., N.W., Suite 250
    Washington, DC  20016
    (202) 659-4656

Attorneys for Defendant
    Air Line Pilots Association, International

STEVEN J. FRAM hereby declares as follows:

1.     I am a member of the Bar of this Court and am a shareholder in the law firm of Archer & Greiner, P.C., attorneys for Defendant, Air Line Pilots Association, International.

2.     I am submitting this Declaration in order to provide copies of certain trial transcripts that are referred to in the brief being filed by Defendant on June 27, 2011, in support of the Defendant's Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(a).

3.     True and correct copies of the following trial or other transcripts are attached as follows to this Declaration:

| **EXHIBIT** | **DESCRIPTION** |
| --- | --- |
| A | Relevant pages from Trial Transcript, Volume 2, of June 8, 2011 |
| B | Relevant pages from Trial Transcript, Volume 6, of June 15, 2011 |
| C | Relevant pages from Trial Transcript, Volume 7, of June 16, 2011 |
| D | Relevant pages from the deposition transcript of Roland Wilder, dated August 8, 2008 |
| E | Relevant pages from the deposition transcript of Seth Rosen, dated August 26, 2008 |

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 27, 2011.

_/s/ Steven J. Fram_____
Steven J. Fram, Esquire

6878119v1

2

# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3         THEODORE A. CASE, SALLY YOUNG,
           HOWARD HOLLANDER, PATRICK BRADY
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                          Plaintiffs,
 6                                              VOLUME 2
                    V.                     TRIAL TRANSCRIPT
 7
           AIR LINE PILOTS ASSOCIATION,
 8
                          Defendant.
 9
                          CAMDEN, NEW JERSEY
10                        JUNE 8, 2011

11         B E F O R E:   HONORABLE JOSEPH E. IRENAS
                          UNITED STATES DISTRICT JUDGE
12
                     A P P E A R A N C E S:
13
              TRUJILLO, RODRIGUEZ & RICHARD
14            BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                     AND
              GREEN JACOBSON, P.C.
16            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
              AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17            For the Plaintiffs.

18            ARCHER GREINER
              BY:   STEVEN FRAM, ESQ.
19                    AND
              KATZ & RANZMAN
20            BY:   DANIEL M. KATZ, ESQ.
              FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
              ELIZABETH GINSBERG, ESQ.
22            IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1        Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3                          S/   LYNNE JOHNSON

4                          Lynne Johnson, CSR, CM, CRR
5                          Official Court Reporter

6

7

8

9

10             LYNNE JOHNSON, CSR, CM, CRR
           OFFICIAL COURT REPORTER
11         UNITED STATES DISTRICT COURT
           P.O. BOX 6822
12         LAWRENCEVILLE, NJ  08648
           PHONE:   609 896 1836

13

14

15

16

17

18

19

20

21

22

23

24

25

1    have been in authority telling me it couldn't get passed.

2    Q.    Do you recall being remained D that the new president,

3    President Bush, was from Texas and that American was based

4    there, and that American was very powerful in Texas?

5    A.    Yes.

6    Q.    And given all of those explanations, did you still think

7    in early December, 2001, that this bill had any chance

8    whatsoever of getting passed?

9    A.    Any chance?  Yes, there was some chance it could be

10   passed.  It already passed unanimous consent if the Senate.

11   Q.    Passed the Senate and got out in the joint house Senate

12   conference.  Did you have any prior experience in trying to

13   get legislation passed by Congress?

14   A.    Floss.

15   Q.    This was the first time?

16   A.    Yes.

17   Q.    So you were a rooky when it came to try trying to get

18   legislation passed?

19   A.    Yes, sir.

20   Q.    You testified this morning about some aspects of the

21   American Airlines contract.  Do you recall that?

22   A.    Yes, I do, I believe so.

23   Q.    And I think you testified that the contract did not

24   require the stapling of the TWA pilots, in the context of the

25   American TWA transaction that was announced in January?

# EXHIBIT B

1

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3      PATRICK BRADY, SALLY YOUNG,
        HOWARD HOLLANDER, THEODORE CASE,
 4      AND MICHAEL FINUCAN, individually
        and on behalf of all others
 5      similarly situated,
                     Plaintiffs,
 6                                         VOLUME 6
             V.                            TRIAL TRANSCRIPT
 7

        AIR LINE PILOTS ASSOCIATION,
 8
                     Defendant.
 9
                          CAMDEN, NEW JERSEY
10                        JUNE 15, 2011

11      B E F O R E:   HONORABLE JOSEPH E. IRENAS
                       UNITED STATES DISTRICT JUDGE
12
                     A P P E A R A N C E S:
13
            TRUJILLO, RODRIGUEZ & RICHARD
14          BY:  NICOLE M. ACCHIONE, ESQ.
                 AND: LISA J. RODRIGUEZ, ESQ.
15                    AND
            GREEN JACOBSON, P.C.
16          BY:  ALLEN PRESS, ESQ.   (MO. BAR)
            AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17          For the Plaintiffs.

18          ARCHER GREINER
            BY:   STEVEN FRAM, ESQ.
19                AND
            KATZ & RANZMAN
20          BY:  DANIEL M. KATZ, ESQ.
            FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
            ELIZABETH GINSBERG, ESQ.
22          IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2     accurate record as taken stenographically in the
above-entitled proceedings.
3
                    S/   LYNNE JOHNSON
4
                    Lynne Johnson, CSR, CM, CRR
5                    Official Court Reporter
6
7
8
9
10              LYNNE JOHNSON, CSR, CM, CRR
              OFFICIAL COURT REPORTER
11              UNITED STATES DISTRICT COURT
              P.O. BOX 6822
12              LAWRENCEVILLE, NJ  08648
13
14
15
16
17
18
19
20
21
22
23
24
25

Hollander-voir dire/Fram                                    66

1     the MEC.

2               THE COURT:  Let's do this.  Let's have the jury

3     take a break and we will discuss it.  Okay.

4               Do not discuss the case among yourselves.  Keep an

5     open mind until you have heard all the evidence.  We will be

6     back in a few minutes.

7               (The jury leaves the courtroom.)

8               THE COURT:  Do you want a voir dire on this?

9               MR. FRAM:  Yes, I think that would be helpful, your

10    Honor.

11              THE COURT:  Go ahead.

12              MR. FRAM:  Thank you.

13              VOIR DIRE EXAMINATION.

14              BY MR. FRAM:

15    Q.   Do you have the exhibit in front of you, sir?

16    A.   I do.

17    Q.   What you wanted to testify is about the fact that Mr.

18    Woerth allegedly said at at a meeting of the APA board on

19    April 5 that the TWA pilots had to get real.  Right?

20    A.    If that is the question to be asked.  Yes.

21    Q.   You knew that was the question that was going to be

22    brought out, right?

23    A.   I suspected so, yes.

24    Q.   Okay.  And were you present at the meeting of the APA

25    board on April 5, 2001, when Mr. Woerth allegedly made that

1   remark?

2   A.   I was not present.

3   Q.   Do you have any personal knowledge whatsoever of what he

4   said at that meeting?

5   A.   Personal knowledge, no.

6   Q.   Isn't it a fact that Mr. Woerth appeared before the TWA

7   MEC on April 23 and 24 of 2001, and told the MEC that he had

8   been misquoted, that one of the American pilots had misquoted

9   what he said to the APA board?

10  A.   I know Mr. Woerth was at that meeting.  I couldn't swear

11  under a Bible what his quote was that day.

12           THE COURT:  Who is Cathy O'Leary?

13  A.   It is  Keith O'Leary.

14           THE COURT:  I know Cathy O'Leary.  I know a Cathy

15  O'Leary.  Who is Keith O'Leary.

16  A.   Keith O'Leary to my recollection, your Honor, was at the

17  time of TWA MEC's communication officer.  He would deal with

18  emails and publications.

19           THE COURT:  Okay.  How many people were present, if

20  you know, at the APA special board of directors meetings.

21  A.   I would have no idea of their attendance, your Honor.

22           THE COURT:  Okay.  So your knowledge about what

23  went on in that meeting comes from this email.

24           THE WITNESS:  That is correct.

25  Q.   And you don't even know if the material that Mr. O'Leary

1   forwarded was genuine, right?

2   A.   I do not, no.

3   Q.   You have no idea who prepared this alleged report, yes?

4   A.   I just received it as an email.

5          MR. FRAM:  Thank you.

6          MR. JACOBSON:  May I cross on the voir dire?

7          THE COURT:  Yes.  You can.

8          VOIR DIRE EXAMINATION.

9          BY MR. JACOBSON:

10  Q.   Mr. Hollander, as a result of receiving this email, did

11  the MEC take any action?

12  A.   The MEC had concern and took action, yes.

13  Q.   The action you took was what?

14  A.   I can't remember specifically, but one thing we did was

15  request that Mr. Woerth address these issues.

16  Q.   Did Mr. Woerth come to your meeting?

17  A.   He did.

18  Q.   Was that the only MEC meeting that Mr. Woerth attended

19  throughout the entire American Airlines merger process?

20  A.   That's correct.

21         THE COURT:  That is not voir dire.  That has

22  nothing do with this.  You can question about Woerth's

23  appearance and what he said he heard.  But that has nothing

24  to do.

25         MR. JACOBSON:  I am sorry.

Hollander-voir dire/Jacobson                                    69

1    Q.   And did Mr. Woerth, Captain Woerth, deny this statement

2    that is in here?

3    A.   He did not deny the statement.  I believe he said that

4    he was misquoted.  But he did not deny the statement.

5             THE COURT:  Look, you can question what worth said,

6    if somebody asked him that question, can you say that.  I

7    don't know what happened at another meeting.  But this is,

8    you are offering this to have Woerth say,  having said

9    something --

10            MR. JACOBSON:  To the Allied pilots.

11            THE COURT:  At a meeting that this witness wasn't

12   present for.

13            MR. JACOBSON:  That's correct, your Honor.

14            THE COURT:  And this is yet by another person who

15   we have, who apparently is not going to testify, as to what

16   Woerth said, and at that meeting.  I mean, that is hearsay.

17            MR. JACOBSON:  Your Honor, I think the fact that

18   they have the statement  that Captain Woerth met with them

19   and told them to get real on associated senior merger

20   settlement --

21            THE COURT:  The circumstances of what he said, the

22   context, he doesn't know.

23            MR. JACOBSON:  The importance of this to me is with

24   this witness, is that the MEC then invited Captain Woerth to

25   come to the meeting, they queried him about this.  He danced

1    around it, he didn't admit or deny.  He said he was quoted

2    out of context.

3            THE COURT:  He can say that.  He can testify as to

4    what Woerth said, what questions were asked of Woerth, what

5    was the response of  --

6            MR. JACOBSON:  Without offering the document.  What

7    about the fact.  All I really want is that --

8            THE COURT:  I know what you want out of that.  That

9    is clear.  You want to get something that will go in the jury

10   room and it says that Captain Woerth said the TWA pilots have

11   to get real.  That doesn't make this admissible.

12           MR. JACOBSON:  What about just the two lines that I

13   want to read, have him read, not the document itself?

14           THE COURT:  No, you are trying to put in evidence

15   something that you can't, he testifies, I will have to hear

16   it, but he can testify about Woerth's appearance, what

17   questions he was asked.  So you will really get into evidence

18   to the extent, if it was happening, that somebody asked him

19   did you tell the board of directors of ALPA that I, I am

20   sorry, the APA, did you tell the APA board of directors that

21   the TWA pilots have to get real and what his response was.

22           MR. JACOBSON:  I understand. I can ask that

23   question.

24           THE COURT:  That is direct testimony.  If he heard

25   that, you know, whatever that, when that meeting, that he

1    attended, I mean, we have been listening for, there has been

2    no objection and I wouldn't sustain an objection where he is

3    present and hears this and can say what he hears.

4          MR. JACOBSON:  I understand your ruling, your

5    Honor.

6          THE COURT:  And it may well be that you will get

7    before the jury that somebody asked him, did you tell the APA

8    directors that the TWA pilots have to get real.  And then he

9    said X.  Y, I don't want to something suggest something, but

10   whatever he says the answer is to that.  That is direct

11   testimony.  That is his observation with his eyes, his ears,

12   his senses.

13         MR. JACOBSON:  I understand, your Honor.

14         THE COURT:  And Woerth is the president of the

15   defendant.  So that is a party admission in effect.  So I

16   allow all that.

17         But putting before them a detailed report before

18   the jury of what went on in a meeting, that it is not a

19   business record of ALPA, it is, it is like ALPA minutes, you

20   know, or the MEC minutes or even the board of ALPA minutes

21   probably are admissible as business records of a party in

22   this case, ALPA.

23         But I don't know what this is.  He doesn't know.  I

24   think you can get actually pretty close to what you want to

25   do, but you but you can't do it through this.

# EXHIBIT C

1

```
 1

 2                   IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 3                   CIVIL 02-2917  (JEI)

 4         PATRICK BRADY, SALLY YOUNG,
           HOWARD HOLLANDER, THEODORE CASE,
 5         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 6         similarly situated,
                          Plaintiffs,
 7                                           VOLUME 7
                V.                           TRIAL TRANSCRIPT
 8
           AIR LINE PILOTS ASSOCIATION,
 9
                          Defendant.
10
                                   CAMDEN, NEW JERSEY
11                                 JUNE  16, 2011

12         B E F O R E:   HONORABLE JOSEPH E. IRENAS
                          UNITED STATES DISTRICT JUDGE
13
                         A P P E A R A N C E S:
14
                 TRUJILLO, RODRIGUEZ & RICHARD
15               BY:  NICOLE M. ACCHIONE, ESQ.
                      AND: LISA J. RODRIGUEZ, ESQ.
16                         AND
                 GREEN JACOBSON, P.C.
17               BY:  ALLEN PRESS, ESQ.   (MO. BAR)
                 AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
18               For the Plaintiffs.

19               ARCHER GREINER
                 BY:  STEVEN FRAM, ESQ.
20                    AND
                 KATZ & RANZMAN
21               BY:  DANIEL M. KATZ, ESQ.
                 FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
22
                 ELIZABETH GINSBERG, ESQ.
23               IN-HOUSE COUNSEL FOR ALPA.

24

25
```

2

1

2          Pursuant to Section 753 Title 28 United States
   Code,  the following transcript is certified to be an
3  accurate record as taken stenographically in the
   above-entitled proceedings.

4
                        S/   LYNNE JOHNSON
5
                        Lynne Johnson, CSR, CM, CRR
6                       Official Court Reporter

7

8

9

10

11          LYNNE JOHNSON, CSR, CM, CRR
            OFFICIAL COURT REPORTER
12          UNITED STATES DISTRICT COURT
            P.O. BOX 6822
13          LAWRENCEVILLE, NJ  08648

14

15

16

17

18

19

20

21

22

23

24

25

Clarke-direct/Press                                         29

1              THE COURT:  Where were you, by the way, when this

2    meeting was taking place?

3              THE WITNESS:  After dinner, then we went --

4              THE COURT:  Dinner, what city were you in?

5              THE WITNESS:  Dallas.

6              THE COURT:  Advisors came into Dallas.

7              THE WITNESS:  Correct.

8              THE COURT:  They in fact came to Dallas.

9              THE WITNESS:  Yes.

10   Q.   And you in fact had a dinner with the ALPA advisors?

11   A.   Yes, we did.

12   Q.   After dinner what happened?

13   A.   After dinner we went to a conference room and --

14   Q.   At the hotel?

15   A.   At the hotel.

16   Q.   Okay.

17   A.   And basically Bob Christy, the ALPA adviser, came in and

18   said he had he had information that would lead us to get a

19   negotiated seniority agreement but we had to staple 80025 of

20   our own pilots.

21   Q.   Did he say, provide any basis for what he was saying?

22   A.   No.  Through the process they talked a lot about back

23   channel negotiations, not negotiations, but back channel

24   communications where they might have somebody that would be

25   able to kind of let them know what the other side is

1              THE WITNESS:  That's correct.

2              THE COURT:  -- they would be stapled, they would be

3    behind somebody just hired two days ago from American

4    Airlines.

5              THE WITNESS:  That's correct.

6    Q.   Did you advise Mr. Christy of the proposal that the

7    American negotiators had suggested, offering --

8    A.   After I went crazy.

9    Q.   Well, okay.

10             THE COURT:  I am sorry.  Your question is?

11   Q.   Was Mr. Christy aware that the American negotiators were

12   wanting to staple two thirds of your pilot group to the

13   bottom of their list?

14   A.   Yeah.

15   Q.   And he comes in at 825, that's roughly a third, right?

16   A.   Right.

17             THE COURT:  No, it is more than that.  40 percent.

18   A.   So, I mean, I was --

19   Q.   Go ahead.

20   A.   I was mad.  I mean, here we just presented an offer to

21   the APA that was based on a date of hire, that was stapling

22   nobody without a response from the APA.

23   Q.   You had an offer on the table?

24   A.   Which had an offer on the table.  Here comes ALPA and

25   they want us staple 825 of our own guys.  I said you guys are

1    out of your mind.  There is no way.  How can we as pilot

2    representatives, somebody that is supposed to be watching our

3    backs of the guys that we have flown with for these years and

4    just come in and say yeah, let's throw 825 of them on the

5    bottom of the list.  It is crazy.

6    Q.   How did Mr. Christie explain himself, what did he say?

7    A.   Basically he was, we were coming to the April 2nd, its

8    April 4 when we were going to be forced to make a decision on

9    the scope waiver.

10   Q.   Right.

11   A.   So everybody, in everybody's best interest, a deal would

12   be better than having to make that decision, if we could get

13   a deal that we could swallow.  That deal you can't swallow.

14          That is what I told them, I said we cannot go from

15   a date-of-hire proposal and the next day show up, and offer

16   to staple 825 of our own guys.

17          First of all, that is not very good negotiating to

18   come in and negotiate against yourself.

19          And second of all, how can you really do that?  How

20   can you do that to somebody?  How can I do that to my friends

21   and my co-workers.

22   Q.   So what happened?  How did the meeting end?

23   A.   Well, we stayed until probably about one or two in the

24   morning.  And eventually Bob Christy and the ALPA advisors

25   were able to convince the more senior members of our

1    committee that that obviously weren't going to be stapled

2    that there had to be some sort of a staple for the American

3    pilots to go with this.  And they wanted to get a deal.  So I

4    kept arguing and arguing and arguing, and trying to convince

5    them that this was not good, and eventually we ended up where

6    our proposal would be to staple 400 something pilots.  So I

7    got it down to half.

8    Q.   And that proposal was that made the next day, the next

9    morning?

10   A.   Yeah.

11        THE COURT:  Which is what, the end of March?

12   A.   March 29, the next day.

13        MR. PRESS:  This is J 301, Mr. Fram.

14   Q.   Mr. Clarke, I handed you exhibit J 301, right?

15   A.   Yes.

16   Q.   What is this?

17   A.   This is the proposal that we presented to the APA.

18   Q.   On?

19   A.   March 29.

20        MR. PRESS:  We move for the admission of exhibit J

21   301.

22        MR. FRAM:  No objection.

23        THE COURT:  Well, before, this was, was this

24   prepared by APA, this document?

25        MR. PRESS:  It says APA's understanding of TWA's

1    functionally they didn't really --

2    A.    For a short time thereafter, the members that remained

3    still, they were still working on another portion of it, that

4    we maybe are going to get to.

5    Q.    Remind the jury when the cram-down came.  You resigned

6    October 26.  When did the cram-down come?

7    A.    Shortly thereafter is when --

8              THE COURT:  Was it November 8, when they executed

9    the CC?

10             THE WITNESS:  Yes.

11   Q.    Okay.

12             THE COURT:  Was it November 8?

13   Q.    Tell the jury what additional support you wanted from

14   ALPA in your negotiations with American pilots?

15   A.    We wanted, we wanted them to give us leverage.  We

16   needed them to give us leverage.  We had to have it.  We were

17   in a position --

18             THE COURT:  What does that mean?

19             THE WITNESS:  We wanted Duane Woerth to attend, why

20   couldn't he attend more meetings.  Why didn't Duane Woerth go

21   into that room after he told us, you are not going to do they

22   are not going to do this to our pilots.  We wanted him to go

23   in and say that to them.

24             We wanted him to not visit the APA, and in some

25   way, make a statement that somehow could even remotely be

1  construed that we need to get real.  We wanted him to

2  threaten something, we are the largest airline pilot union in

3  the world.  Threaten a strike.  Say that, hey, you know what?

4           You are not going to do this to our pilots and if

5  you do, United may not start their airplanes up tomorrow,

6  Delta may not start their airplanes up tomorrow.  We needed

7  that.  We needed them to give us something.

8           We needed them to support us more in the

9  legislative effort.  We needed them at the eleventh hour,

10  when  it was time to file for the injunction, not to just

11  pull the rug out from under us and leave us standing there in

12  a room with nothing left because he refuses to sue another

13  union, who he said in their letters, which was just now it

14  appears was lip service, saying, hey, you have the full

15  support.

16           Well, we didn't.  We didn't have the full support.

17  And some of the things that were coming out were actually

18  detrimental to us, and that is what we needed.  We needed

19  them on our side more than what they were.

20           When you go into a crowded place sometime and you

21  are by yourself and you are the only guy standing there, and

22  there is a group of three or four other guys standing down at

23  the end of the bar and they are talking, whatever --

24           THE COURT:  All right, all right.

25  A.   You want your buddy to --

Clarke-direct/Press                                          73

1    Q.    Let's put day below.  So you think mid to late fifties,

2    maybe?

3    A.    Yeah.

4    Q.    But mid fifties, certainly?

5    A.    Yup.

6    Q.    All right.  We will say the time.  All right.  So you

7    are having a discussion with the other people on the

8    committee, day, Flor, Swanson and Hefley?

9    A.    Correct.

10   Q.    Some of them were in favor of going with the proposal

11   being, being advised by the ALPA advisors?

12   A.    I don't think anybody really wanted to do it.  But they

13   were being put into a position where they felt that if that

14   is what was going to get a deal, that they would at least

15   look at it, but no one started to say, I don't think any

16   pilot would admit they wanted to staple 825 other pilots.

17   Q.    Setting aside your interpretation, what did they say?

18   Did they say we are willing to recommend this if that will

19   resolve this issue quickly so we can move on with other

20   matters?

21   A.    At some point they may have considered that, but

22   obviously we didn't go with that.  That was not -- they did

23   not agree to on do that.

24   Q.    My question is a little different.  Do you recall, do

25   you fully recall the specifics of who said what at this

Clarke-direct/Press                                    74

1    meeting?

2    A.    You mean as far as of single word, no, but I remember

3    the general atmosphere of the meeting.

4    Q.    Well, do you recall any of these people, Day, Flor,

5    Swanson, Hefley, saying yeah, let's propose 825 to the

6    American pilots tomorrow?

7    A.    Mike Day did not, because he is ultimately the one that

8    decided that, you know, where we would come up, he was the

9    chairman.  So he said that, myself and Hefley were against

10   it.  Flor and Swanson, I wouldn't say were for it but once

11   we, as a committee we negotiated between each other and

12   talked amongst other each other, we agreed with the 400

13   number.

14   Q.    What was that specific number, 400 --

15            THE COURT:  36 or something.

16   Q.    Do you recall it or do you have to make reference to the

17   notes.  You are referring I assume to J 301?

18   A.    Yeah.  434.

19   Q.    Okay.  I think you said before that you were the one who

20   fought hardest against the 825 number?

21   A.    Myself and Hefley.

22   Q.    Did you get the sense that the other guys were willing

23   to go with a number that was a little bit higher?

24   A.    I got the sense that if they thought, without certainty,

25   that they would arrive at a deal with this proposal, that

Clarke-direct/Press                                          76

1    Q.    Right.  But just answer my questions, please.  You were

2    upset at the prospect of getting stapled, right?

3    A.    I wasn't upset I was getting stapled.  I was upset 825

4    people were getting stapled.

5    Q.    The number of pilots who ultimately got stapled under

6    Supplement CC was how many?

7    A.    1,250, I believe.

8    Q.    And that was in November, November 8 of 2001?

9    A.    Correct.

10   Q.    If the American pilots had agreed to staple only 825 in

11   March of  2001, that would have been a better deal for the

12   TWA pilots  than the deal that ultimately was achieved,

13   right?

14   A.    No.

15   Q.    So 825 is not a lower number than 1,250?

16   A.    You have to look at the deal as a whole.

17   Q.    So you think?

18   A.    If they stapled 1,250 pilots but they have protections

19   and they have furlough protection and they have a lot of

20   other  things that can come with that, that is not

21   necessarily -- I mean everybody wants to look at the staple

22   and say how many people were on the bottom of the list and

23   that, while that hurts, you got to also look at the deal as a

24   whole.

25   Q.    Right.  But just taking it one issue at a time.  The

Clarke-direct/Press                                                    77

1    staple deal that was recommended by ALPA in March, late

2    March, of 2001, was better than the staple aspect of

3    Supplement CC.  Just by virtue of the numbers, right?

4    A.    825 on the bottom of the list, probably would have been

5    better than 1,250.  Depending on the rest of the deal.

6    Q.    Right.  Any discussion in March about protective cells?

7    A.    Yes.

8    Q.    And protective cell ended up getting to be part of

9    Supplement CC, right?

10   A.    Well, I don't know if it was protective cells, I have to

11   take that back.  It was fences.  We were fenced off of

12   certain airplanes.  There were no cells.

13   Q.    Can you explain to us how a fence is different from a

14   cell, a protective cell?

15   A.    A protective cell is when they basically take all the

16   TWA pilots and push them into Saint Louis, and that is where

17   we have to work out of.  A fence, or, I should say a

18   condition or restriction would be you can't fly a triple

19   seven for a certain period of time and you can't fly an MD 11

20   or whatever airplanes they had that we wouldn't have, so when

21   we proposed that, we set a ten-year fence from flying the

22   triple seven captain.

23   Q.    Just so --

24   A.    The cell, there was never any discussion about us just

25   being in St. Louis at that point.

Clarke-direct/Press                                    78

1    Q.    So just so we are clear.  In terms of how you define the

2    fence versus a protective cell, was a protective cell on the

3    table in March during these discussions with the American

4    pilots?

5    A.    It is kind of a mixed word.  A fence off of the triple

6    seven and the A 300 was in the discussions.  That was at

7    least in our proposal.

8    Q.    Just to cut to the chase, in your view, is a deal that

9    was ultimately imposed in Supplement CC in November, was that

10   a better overall deal for the TWA pilots than the proposal

11   that your committee made on March 29 of 2001?  If it is not a

12   yes or no question, you should feel free to say so.

13   A.    I don't think so.  That is a pretty broad statement to

14   just say yes or no to.

15          What we ultimate had done to us was not good.

16   Stapling 825 --

17          THE COURT:  No, no, the question is, he has asked

18   you to compare two things, CC, and then the earlier proposal

19   with how many staples, eight hundred --

20          MR. FRAM:  825.

21          THE COURT:  He is asking which would have been a

22   better deal.

23   A.    Oh, yeah, looking back, you know, looking back on it and

24   knowing now what I guess I should have known then, 825 would

25   have been a better deal.

1   Q.   So the ALPA recommendation, if accepted by your

2   committee, and accepted by American, would have been better

3   in the long run for the TWA pilots?  Yes?

4   A.   There is a lot of if's in there.

5        THE COURT:  But you know what the proposal was, the

6   825, you know what CC was.

7   A.   We are also assuming that American would have accepted

8   it, and the APA would have accepted it.

9        THE COURT:  It is a theoretical question.  If the

10  question is, which would have been better for the pilots?

11  A.   The 825 would have been better.

12  Q.   Yeah, but you explained that it wasn't just 825.  It was

13  a whole package.  The March package recommended by ALPA, if

14  accepted, would have been better than Supplement CC, yes?

15  A.   Yes.

16  Q.   Did you testify before that you expected when this whole

17  process began to get date of hire, in terms of seniority

18  integration?

19  A.   Yes.

20  Q.   Did you know at the time you were appointed to the

21  committee what the ALPA contract, the TWA pilots contract

22  with TWA said about seniority integration?

23  A.   Say that again.

24  Q.   Were you familiar with the seniority, the scope and

25  successorship provisions of the TWA pilots contract, the one

Clarke-direct/Press                                                91

1   information.

2   Q.   So was it clear to you in early March that

3   misinformation was potentially getting out there?

4   A.   From their side?

5   Q.   Yes, sir.

6   A.   Yes.

7   Q.   And that was the same kind of misinformation that an

8   American pilot circulated when he reported that Duane Woerth

9   said at a meeting that the TWA pilots had to get real.

10  Right?

11  A.   I don't think that was misinformation.

12  Q.   Didn't you tell us when you attended the meeting on

13  April 23 that Captain Woerth denied making that statement,

14  that was your testimony this morning, right?

15  A.   When I first said that he kind of politically danced

16  around it, yes.

17  Q.   You said he denied it, right?

18  A.   Okay, yes.

19  Q.   So you understood when he said I never said that, that

20  this was misinformation that was being circulated by the

21  American pilots to try to embarrass Captain Woerth and try to

22  cause unrest or disquiet within the TWA pilot ranks, right?

23  A.   Or he wasn't telling the truth when he said he didn't

24  say it.

25  Q.   Oh, so did it occur to you that the American pilots --

Comlish-direct/Rodriguez                                    168

1   Q.    Also at ALPA?

2   A.    At ALPA National, yes.  And there was no answer there so

3   we left a message and waited and waited so finally, we took

4   the draft of what  we put together and we put it on the fax

5   and sent it to ALPA National headquarters.

6        Within minutes of us sending that fax we got a call from

7   Paul Hallisay.

8   Q.    What did Mr. Hallisay say?

9   A.    He said "Interesting.  This bill will never hit the

10  floor of the United States Senate."

11              And he said it with such a tone, I will never

12  forget it.

13  Q.    Did you ask him what he meant when he said this bill

14  will never hit the floor of the United States Senate?

15  A.    He said it would get tied up in committee.

16  Q.    Did he say anything else?

17  A.    He says, "Well, let me take a look at it.  I will see

18  what we can do."  And the conversation ended and we waited

19  for him to get back to us.

20  Q.    Did he ever get back to you?

21  A.    Yes, he did.

22  Q.    And again, what is the timeframe that we are talking

23  about?

24  A.    That is still the week of, I want to say the 21st, in

25  that timeframe, that week.

Comlish-direct/Rodriguez                                    170

1    process that gave them seniority.

2            THE COURT:  Did that include the flight attendants

3    as well?

4    A.    No.

5            THE COURT:  It was just the mechanics?

6    A.    Just the mechanics.

7    Q.    So what did you do in response to his comments, Mr.

8    Comlish?

9    A.    We rewrote the legislation, and we put in the

10   legislation that any previous agreements that were made would

11   not be undone by this transaction.  By this legislation.

12   Excuse me.

13   Q.    Than did you send that back to, did you send that back

14   to Mr. Hallisay?

15   A.    We sent it back to Mr. Hallisay.

16   Q.    Did that address his concerns?

17   A.    Yes.

18   Q.    So what was the next thing that happened?

19   A.    The next thing that happened was that we, Senator Bond

20   said that is ALPA National in approval of this language, and

21   we said yes, they are.  And he said, well, we want to put out

22   a press release with regard to this legislation being

23   introduced.

24            So Senator Bond created and had a press release put

25   out to the press.

1              MR. FRAM:  They do now, your Honor.

2              THE COURT:  Okay.

3     Q.   So page 100, sir.  Let's talk about what you said in

4     your sworn testimony in January of this year.  Page 100, line

5     3.

6              Do you see where Mr. Katz asked you:

7              "QUESTION:  Did Woerth ever say anything to you

8     directly about being opposed to your lobbying efforts?

9              "ANSWER:  How do you define directly?

10             "QUESTION:  I mean, you are face-to-face with him,

11    or you are in a telephone conversation with him.  Says

12    Comlish, I am opposed to your legislative efforts.  Something

13    like that.

14             "ANSWER:  Counsel, we had a chain of command and I

15    wanted to honor that chain of command, so many of these

16    communications went through the chain of command back and

17    forth to Duane Woerth.

18             "QUESTION:  Well, I am just asking you a simple

19    question.  Did you have a conversation directly with Duane

20    Woerth on the phone or in person in which he told you that he

21    was opposed to what you were doing?"

22             And what was your answer, sir?

23    A.   My answer was no.

24    Q.   Thank you.

25             MR. FRAM:  I have nothing further, your Honor.

| | |
|---|---|
| 1 | THE COURT:  Any redirect? |
| 2 | MS. RODRIGUEZ:  No, your Honor. |
| 3 | THE COURT:  Okay.  Mr. Comlish, you can step down. |
| 4 | THE WITNESS:  Thank you. |
| 5 | THE COURT:  Thank you. |
| 6 | (Witness excused.) |
| 7 | THE COURT:  Ms. Rodriguez, Mr. Press. |
| 8 | MR. PRESS:  Our next witness is Captain Tom |
| 9 | Rachford, again, via video. |
| 10 | THE COURT:  Okay. |
| 11 | MR. PRESS:  I don't know if we will get through the |
| 12 | whole clip in the half hour we have remaining. |
| 13 | THE COURT:  We will get through a half hour of it. |
| 14 | MR. PRESS:  Again, ladies and gentlemen, we took |
| 15 | the deposition of Tom Rachford. |
| 16 | THE COURT:  Do you have for me a copy of that?  Or |
| 17 | do I have it inside? |
| 18 | MR. PRESS:  I do.  This is the one you gave me. |
| 19 | MR. PRESS:  We took Captain Rachford'S deposition |
| 20 | in Phoenix, Arizona (September 25, 2008. |
| 21 | (Videotape commences.) |
| 22 | MS. RODRIGUEZ:  Your Honor, this is a natural line |
| 23 | for the break. |
| 24 | THE COURT:  The last line was Page 26, line 1. |
| 25 | MS. ACCHIONE:  Yes. |

# EXHIBIT D

# In The Matter Of:

*Bensel v.*
*Air Line Pilots Association*

---

*ROLAND P. WILDER, JR.*
*Vol. 1*
*August 8, 2008*

---

*REPORTING ASSOCIATES, LLC*
*Certified & Registered Professional Reporters*
*Cherry Hill -- Philadelphia -- Trenton*
*(888) 795-2323*
*www.ReportingAssociates.com*

Bensel v.
Air Line Pilots Association

ROLAND P. WILDER, JR. - Vol. 1
August 8, 2008

---

**Page 1**

1              THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW JERSEY

3

4    LEROY "BUD" BENSEL, et al.,

5              Plaintiffs        Civil Action No.

6    vs.                        02-2917 (JEI)

7    AIR LINE PILOTS ASSOCIATION,

8              Defendant

9    _____/

10

11             The videotaped deposition of ROLAND P.

12   WILDER, JR., was held on Friday, August 8, 2008,

13   commencing at 9:36 a.m., at the Law Offices of Baptiste

14   & Wilder, P.C., 1150 Connecticut Avenue, N.W., Suite

15   500, Washington, D.C. 20036, before Steven Poulakos,

16   Notary Public in and for the District of Columbia.

17

18   REPORTED BY:  Steven Poulakos

19

20

21             REPORTING ASSOCIATES, LLC

22             112 Haddontowne Court, Suite 202

23             Cherry Hill, NJ  08034

24             (888) 795-2323

---

**Page 2**

1   A P P E A R A N C E S:

2

3       ON BEHALF OF THE CLASS REPRESENTATIVES:

4           ALLEN P. PRESS, ESQUIRE

5           Green, Jacobson & Butsch, P.C.

6           7733 Forsyth Boulevard, Suite 700

7           St. Louis, Missouri 63105

8           Telephone: 314-862-6800

9           Email: Press@stlouislaw.com

10

11      ON BEHALF OF THE PLAINTIFFS:

12          NICOLE M. ACCHIONE, ESQUIRE

13          Trujillo, Rodriguez & Richards, LLC

14          258 Kings Highway East

15          Haddonfield, N.J. 08033

16          Telephone: 856-795-9002

17          Email: Nacchione@trrlaw.com

18

19

20

21

22

23

24   (APPEARANCES continued on next page.)

---

**Page 3**

1   (A P P E A R A N C E S continued.)

2

3       ON BEHALF OF THE DEFENDANT:

4           DANIEL M. KATZ, ESQUIRE

5           Katz & Ranzman, P.C.

6           4530 Wisconsin Avenue, N.W, Suite 250

7           Washington, D.C. 20016

8           Telephone: 202-659-4656

9           Email: Danielmkatz@comcast.net

10

11   ALSO PRESENT:  Leroy Bensel

12              Bill Foster, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

---

**Page 4**

1                  INDEX

2        Deposition of ROLAND P. WILDER, JR.

3              August 8, 2008

4

5   EXAMINATION BY:                     PAGE

6   Mr. Press                             7

7   Mr. Katz                            188

8   Mr. Press                           220

9   Mr. Katz                            227

10

11  EXHIBIT NUMBER:                     MARKED

12  117  A Grievance                     42

13  118  A Document from ALPA's Files    49

14  119  The March 13th Memo             58

15  120  A Copy of an Invoice            70

16  121  An E-mail                       72

17  122  A Memo dated March 12th, 2001   73

18  123  An E-mail dated March 10th      82

19  124  A Letter dated March 26th, 2001 86

20  125  A Collection of Legal Papers    95

21  126  A Grievance dated March 22, 2001 107

22  127  A Memo dated July 2nd, 2001     129

23  128  A Draft Letter dated 7/2/01     140

24  (INDEX continued on next page.)

---

Page 57

1 that you drafted that we looked at in Exhibit 118?
2 A  That's correct.
3 Q  And why -- why was that your opinion?
4 A  Because without either American's
5 acceptance of Article 1 or the parties' acceptance of a
6 process agreement, there would be no orderly procedure
7 for the resolution of the dispute over the integration
8 of those two.
9 Q  And without -- and what risk or downside
10 did that present your clients if that were to occur?
11 A  My clients --
12 Q  What were you trying to avoid?
13 A  -- represented the weaker and smaller pilot
14 group.  And there was danger that if the American
15 pilots exercised sole control over the seniority
16 integration process, that the TWA pilots would be
17 treated less fairly than if the dispute was resolved by
18 agreement or by neutral arbitration.
19 Q  Okay.  So you viewed that the TWA pilots
20 would get a better shake with an independent arbitrator
21 deciding the thing than just subjecting themselves to
22 the will of the American pilots?
23 A  I think that's true.  But perhaps even more
24 broadly, TWA pilots would have faired better had there

Page 58

1 been an orderly process culminating with the threat of
2 someone deciding what was fair and equitable.
3 Q  Okay.
4 A  The -- I think all parties behaved more
5 reasonably if they believed that at some point the
6 decision would be taken out of their hands.
7 Q  Now, when you presented your process
8 agreement to the other side, what was the response you
9 got?
10 A  The American pilots declined to enter into
11 it and the two carriers declined to enter into it.
12 Q  Okay.  And did you then devise some -- a
13 strategy that involved litigation to try to exert some
14 pressure on those groups to sign the process agreement?
15 A  Yes.
16 Q  Okay.  And I brought some documents with me
17 that relate to that.  Of course I am referring to your
18 March 13th memo.
19    (Whereupon, a document was marked as
20 Deposition Exhibit Number 119.)
21    BY MR. PRESS:
22 Q  Mr. Wilder, I've handed you Exhibit 119.
23 Can you tell us what this is?
24 A  Yes.  This is a memorandum that was

Page 59

1 prepared by my firm and it was communicated to the TWA
2 MEC on March 13.  Its purpose was to cause the TWA MEC
3 and its various committees to focus on the impending
4 seniority integration.
5 Q  Okay.  This was -- this was a legal
6 memorandum that you prepared or -- well, you
7 certainly -- maybe you didn't prepare every word, but
8 you had a hand in preparing this?
9 A  Certainly.
10 Q  And you reviewed it before it was sent to
11 your clients?
12 A  Of course.
13 Q  Of course.
14    Okay.  And, now, Mr. Wilder, tell us -- you
15 know, with as little legalese as you can, tell us what
16 your strategy was that's reflected in this memorandum
17 as to how you were going to get the other side to sign
18 this process agreement.
19 A  The --
20 Q  Did I say as much legalese or as little?
21 That is what I meant.
22 A  I think you said as little legalese.
23 That's what caused me to hesitate.  This is a very
24 complicated area.  I'll try to make it as easy as

Page 60

1 possible.
2    As we noted earlier the TWA pilots had an
3 agreement with TWA that in the event of the transaction
4 of the type that was before us, that is American's
5 acquisition of TWA and its assets and its employees,
6 that TWA, as a condition of that transaction, would
7 cause American Airlines to agree to a seniority
8 integration process and other scope protections.
9    TWA did not comply with its agreement.
10 There was pending, as of March 2, a grievance
11 challenging TWA's violation of the agreement.  If the
12 transaction had gone forward, that is -- that is that
13 TWA disappeared and American was the sole employer of
14 the TWA pilots, the grievance would be moot.  There
15 would be no more way to challenge TWA's violation of
16 the agreement.
17 Q  Let me stop you right there.
18 A  Yes.
19 Q  This grievance that we saw on March 2nd,
20 that got filed?
21 A  Yes, Exhibit 1.
22 Q  Your Exhibit 117.  I am sorry.  It was the
23 first one today, but this is just a continuation.
24 A  Fine.

Bensel v.
Air Line Pilots Association

ROLAND P. WILDER, JR. - Vol. I
August 8, 2008

---

Page 61

1  Q   What you are saying is if the deal goes
2  through and American ends up buying all of these assets
3  and TWA doesn't exist anymore, the TWA pilots have
4  nothing -- nothing to grieve against, that your -- the
5  grievance, as you say, would be moot?
6  A   That's correct.
7  Q   Okay.  And they would have no remedy for
8  what they were trying to seek in the grievance itself?
9  A   Yes.
10  Q   So continue.
11  A   So the purpose of the litigation that our
12  firm began to develop for consideration by the TWA MEC
13  and ALPA National was designed to protect the
14  jurisdiction of the adjustment board.  In other words,
15  to ensure that the decision would not be moot, that the
16  TWA pilots would continue to have a forum within which
17  their contractual dispute could be finally adjudicated.
18      The form of that litigation would be a
19  so-called All Writs injunction by the Federal Court,
20  not the Bankruptcy Court, but by the District Court, to
21  cause American and TWA not to conclude the transaction
22  until there was a way for the TWA pilots' grievance to
23  be finally adjudicated.
24  Q   Okay.  Right.  So you envisioned going to

---

Page 62

1  court and asking a judge, a federal judge to enter an
2  order telling American Airlines and TWA that they can't
3  proceed with this deal until the TWA pilots have their
4  grievance heard?
5  A   Have their grievance heard.  Or the parties
6  entered into the process agreement that was the subject
7  of our earlier discussion.
8  Q   I was going to ask you.  The -- one of the
9  goals of filing that case would be not so much just to
10  win and get the order from the court you wanted but to
11  create some leverage in your negotiation with the other
12  side to get them to sign the process agreement?
13  A   Yes.
14  Q   Is that fair?
15  A   Yes.
16  Q   And you thought -- you saw that lawsuit
17  that you wanted to file as a viable and reasonable way
18  to create that kind of leverage for you and your
19  clients?
20  A   In my view it was the only way to create
21  the kind of leverage that was needed on the seniority
22  front.  My focus of course was confined to the
23  seniority issue that was before the merger committee
24  and I did not have responsibility for the entire

---

Page 63

1  dispute between American and TWA and the pilot groups.
2  Q   Would it be fair to say that that was your
3  best advice at the time to the TWA MEC?
4  A   Yes.
5  Q   Okay.  Sitting here today, seven years
6  later, Mr. Wilder, wouldn't you agree you would give
7  the same advice today?
8  A   As of April 2 in 2001 I would.
9  Q   Well, what you are referring to is the fact
10  that there was a surrender of scope?
11  A   What I am referring to is that the position
12  and the economics of the industry has changed
13  dramatically in late 2001 and subsequently.  That's
14  what I'm referring to.
15  Q   Okay.  Okay.  You are talking about the
16  effect of post 9/11 has had on the industry?
17  A   Yes.
18  Q   Okay.  But all things being the same, if
19  you were representing a different group of pilots at
20  the exact same time you would give the same advice if
21  they were faced with the same struggle?
22  A   I have given the same advice to other
23  groups as well, yes.
24  Q   Now, this Court order that you were going

---

Page 64

1  try to get from this federal judge it's called an
2  injunction?
3  A   That is correct.
4  Q   Okay.  And you thought the injunction would
5  help give you leverage to get the other side to sign
6  this process agreement, right?
7  A   Yes.
8  Q   Did you -- did you think that that was
9  something that would happen in a relatively short
10  period of time?
11  A   Given the pressures of any air carrier
12  transaction of this type it would have to happen in a
13  short period of time.  Very short.
14  Q   Was it your thought at the time that if the
15  transaction was held up for a short period of time that
16  that would have been enough to get the process
17  agreement entered into?
18  A   That was -- that was the belief, that the
19  parties were in a sufficient hurry that an interruption
20  in what was happening would bring very substantial
21  pressure to bear upon the air carrier parties and they
22  might be more willing to discuss a process resolution
23  than they were at the present time, at the then present
24  time.

---

Bensel v.
Air Line Pilots Association

ROLAND P. WILDER, JR. - Vol. I
August 8, 2008

---

Page 145

1 fundamentally flawed?
2    MR. KATZ: I'm going to object as to form.
3 He's already testified that he didn't ever see the --
4 didn't read the memo before. And I don't think it's
5 proper examination even in a deposition to ask him
6 whether he agrees with a memo written by somebody else
7 about which he never even read before.
8    MR. PRESS: The judge may agree with you,
9 but as you know that was just for the record.
10    BY MR. PRESS:
11 Q   You can answer.
12 A   I think the -- my answer to that is
13 Mr. Warner and Marta had a disagreement with Bill, Josh
14 McInerney, and myself over the theoretical basis for
15 the litigation that we were outlining. That's quite
16 clear.
17    Do I think it was -- do I think our work
18 was fundamentally flawed?
19 Q   That's my question.
20 A   I think not.
21 Q   Okay. If you look at the fourth page of
22 the memorandum, section 3, entitled, Wilder Memorandum.
23 A   Yes.
24 Q   I'd like you to read -- read into the

---

Page 146

1 record, if you would, the first sentence of that
2 paragraph.
3 A   TWA merger consult, Roland Wilder, has been
4 openly frustrated by the lack of leverage held by the
5 TWA-LLC pilots in the seniority integration process and
6 he has consistently attempted to find anything that
7 will increase that leverage. The Wilder memorandum
8 outlines the most recent theory.
9 Q   There you go.
10 A   Yes.
11 Q   You would agree with that statement, you
12 were frustrated?
13 A   I'm sorry.
14 Q   You were frustrated?
15 A   Yes.
16 Q   And you were consistently attempting to
17 find anything to help increase the pilot's leverage,
18 weren't you?
19 A   I was.
20 Q   And by ALPA rejecting this strategy that
21 you were outlining, in your opinion that was not
22 helpful --
23    MR. KATZ: I object.
24    THE WITNESS: It -- it didn't minimize my

---

Page 147

1 frustration, no.
2    BY MR. PRESS:
3 Q   Okay. There was one more time that I'm
4 aware of where you came up with a litigation strategy.
5 A   Yes.
6 Q   Okay.
7 A   Yes.
8 Q   Let's look at that one.
9    (Whereupon, a document was marked as
10 Deposition Exhibit Number 131.)
11    BY MR. PRESS:
12 Q   I've handed you now Exhibit 131 --
13 A   Yes.
14 Q   -- which is an August 16th, 2001 memo from
15 you to ALPA legal department.
16 A   Correct.
17 Q   And this was a memo that was prepared by
18 your firm and reviewed and approved by you, right?
19 A   Oh, yes.
20 Q   And, again, with as little legalese and as
21 much common parlance as you can give us, tell us what's
22 going on in this memorandum, what you are proposing to
23 do and why.
24 A   In mid-August of 2001 the TWA merger

---

Page 148

1 committee and the MEC feared that the American pilots
2 were in the process of developing an agreement with the
3 American Airlines that would be foisted on the TWA
4 pilots over their objection.
5 Q   The so-called cramdown?
6 A   Yes.
7 Q   All right. Now, describe more particularly
8 what you are referring to with this cramdown. What
9 does that mean?
10 A   Well, the -- at the time in mid-August the
11 merger committees for the American pilots and the TWA
12 pilots were engaged in seniority integration
13 negotiations. The American pilots had before it a very
14 comprehensive, econometrically based seniority
15 integration plan that the TWA merger committee, with
16 the guidance of Professor Cannon, had developed.
17    And the purpose of that was to set forth an
18 integrated seniority list composed of both American and
19 TWA pilots in a way that would be fair to both groups.
20 That was what -- one of the things that we were
21 discussing.
22    The fear was that the American pilots would
23 abandon that process, make an independent deal with
24 American Airlines pursuant to the American collective

---

Bensel v.
Air Line Pilots Association

ROLAND P. WILDER, JR. - Vol. I
August 8, 2008

Page 149

1  bargaining agreement and then foist that seniority
2  integration plan, developed only by the company and the
3  American pilots, on the TWA pilots.
4  Q  Some sort of --
5  A  The purpose of the strategy outlined on
6  August 16th, 2001 was to prevent that.
7  Q  Okay. And in what manner were you going to
8  prevent this unilateral action from taking place?
9  A  This -- well, that requires a bit of
10  background.
11  Q  Yes. The whole -- right.
12  A  We spoke earlier about the best efforts
13  obligation that American undertook in March of 2001.
14  The idea in Exhibit 131, the August 16 memo, was that
15  we would seek an injunction against American and TWA to
16  enforce that obligation, pending arbitration, of
17  American's commitment to use its best efforts.
18  Q  All right. Let me stop you right there.
19     It was your belief that American Airlines
20  had -- had broken its promise to use its best efforts?
21  A  That's correct.
22  Q  Okay. And -- and the idea was that there
23  would be, I guess, a grievance filed --
24  A  Correct.

Page 150

1  Q  -- to complain about that --
2  A  Yes.
3  Q  -- and to seek some appropriate remedy?
4     And the fear was that you are going to
5  have this seniority list crammed down your throats
6  before you could have that best efforts grievance heard
7  and decided? That was the fear?
8  A  That's correct.
9  Q  And so to prevent that from happening you
10  wanted to go to Court and get an injunction?
11  A  Correct.
12  Q  All right. And the injunction specifically
13  would have asked the federal judge to do what?
14  A  To prevent the implementation of a
15  seniority list pending the determination of the best
16  efforts grievance by the arbitrator --
17  Q  Okay.
18  A  -- which would have taken some time.
19  Q  And did you believe that this was another
20  way to help generate some leverage for the TWA MEC in
21  its merger claim?
22  A  More than that. It was a way of preventing
23  what was feared by the TWA MEC as an imminent disaster.
24  Q  And, again, this was your best opinion at

Page 151

1  the time as to how to deal with the issue presented to
2  you?
3  A  Yes.
4  Q  Okay. And you would -- you have the same
5  opinion today?
6  A  I would.
7  Q  Now, this was an idea that you gained some
8  acceptance from ALPA initially, right?
9  A  That's correct.
10  Q  You presented this idea to the ALPA legal
11  department on August 16th, right?
12  A  Correct.
13  Q  And do you remember that you then, later in
14  the month of August, you had a meeting at ALPA
15  headquarters with Mr. Cohen and President Woerth?
16  A  That's correct.
17  Q  Can you explain who accompanied you to that
18  meeting and what was discussed?
19  A  My recollection is that Master Chairman
20  Pastore was present and I believe Captain Day, the then
21  chairman of the TWA merger committee, was present, but
22  I am not absolutely certain of that.
23  Q  Okay.
24  A  I believe so.

Page 152

1     On the ALPA National side was Mr. Woerth,
2  Jonathan Cohen and I believe Mr. Woerth's then
3  executive assistant whose name escapes my mind.
4  Q  Howard Attarian?
5  A  Thank you.
6  Q  He was there too?
7  A  He was.
8  Q  And for the record, Jonathan Cohen, he was
9  head of the whole ALPA legal department?
10  A  Correct.
11  Q  Right.
12     And what did Mr. Cohen say to you about the
13  strategy you proposed in your August 16th memo?
14  A  It was my impression that Mr. Cohen as well
15  as Captain Woerth were content that the approach that I
16  had suggested had merit --
17  Q  Okay.
18  A  -- and could -- and could prevent a
19  cramdown.
20  Q  Okay. We saw you writing a letter to
21  Captain Woerth in March seeking authority to file this
22  suit.
23     Was the point of this meeting to seek that
24  authority right then without having to write a letter

Page 153

1 and wait for a response?

2 A   No.  I think the point of the meeting was

3 to discuss the concern with Captain Woerth and acquaint

4 him with the idea that we had to deal with it.  And

5 certainly it was my impression that if a cramdown came

6 in mid-August or shortly -- shortly thereafter, that

7 permission would have been forthcoming.

8 Q   Okay.  You understood as a result of that

9 meeting that you were going to be allowed to file this

10 injunction suit?

11 A   Somebody -- somebody would.

12 Q   Right.

13    You understood that ALPA was going to

14 authorize this one?

15 A   I thought so.

16 Q   Okay.  And in reliance on that you went

17 back to your office and had more papers filed to carry

18 out the lawsuit?

19 A   No, not at that point.  We -- whether we

20 would move on this would be dependent upon whether the

21 American pilots and American Airlines sought to come up

22 with a deal that would render meaningless the rest of

23 the negotiations.

24 Q   Okay.

Page 154

1 A   Now, I can't say that we did not work on

2 something shortly after that meeting, but the --

3 certainly the papers were not prepared in any --

4 anything close to final form as we had in March of

5 2001.

6    (Whereupon, a document was marked as

7 Deposition Exhibit Number 132.)

8    BY MR. PRESS:

9 Q   Here's Exhibit 132.  This came from your

10 file, I believe, Mr. Wilder.  Exhibit 132 is a draft

11 letter dated August 16, 2001 to Mr. Carty.

12    Do you recognize this is a draft letter

13 that you had prepared for Mr. Woerth's signature?

14 A   I prepared it for somebody's signature.

15 Q   You think it would have been for his

16 signature?

17 A   I would assume so, but I certainly don't

18 know.

19 Q   Okay.  Do you know if a letter like this

20 was signed by Mr. Woerth?

21 A   No, it wasn't.  But this was a response to

22 the seniority integration plan recently imposed by your

23 company on TWA LLC's agents.  And that imposition did

24 not come in August or September.

Page 155

1 Q   Correct.  All right.

2 A   So --

3 Q   There's no need for the letter?

4 A   There was no need for the letter.

5 Q   I understand.

6 A   That's correct.

7 Q   So you prepared this memorandum in

8 August 16th, mid-August, and then got authority to --

9 or at least talked to the ALPA people about it and got

10 their authority.  You were doing it at that time -- the

11 timing of this was because the facilitated negotiations

12 you understood were supposed to end at the end of

13 August?

14 A   That's right.

15 Q   Right.

16    But as a matter of fact they continued

17 thereafter; the parties continued to talk some?

18 A   The parties continued to talk I believe

19 without the facilitator moving into September and

20 October.

21 Q   All right.  And so this idea of a lawsuit,

22 it got shelved basically until the negotiations were

23 kaput?

24 A   Yes.

Page 156

1 Q   And when was that?  Do you remember?

2 A   The negotiations failed finally, I believe,

3 on October 26, 2001.

4 Q   Okay.  Some time around there.

5 A   Yes.

6 Q   And they were -- the collapse of the

7 negotiations actually occurred here in Washington,

8 D.C.?

9 A   It did.

10 Q   All right.  Can you tell us the

11 circumstances of how you learned of -- well, I guess

12 the end dates for you, the -- what you were doing and

13 how you learned that the negotiations were over?

14 A   Well, I was present.

15 Q   Go ahead.

16    All right.  You were present for the

17 negotiations themselves?

18 A   Yes.

19 Q   All right.  And at one point were you

20 directed to go to your office and complete the

21 necessary work to get the lawsuit ready to go?

22 A   At -- at the point where it appears the

23 American pilots would not move any further off the

24 proposal that they brought with them to Washington.

Page 189

1 something else in response to that last question.  Was
2 there something else you wanted to say about whether
3 you had ever been in a situation like that before?
4 A   Only to point out that this situation was
5 unique.
6 Q   So you really hadn't been in a situation
7 like the one you were in, in 2001, in representing
8 other clients prior to that?  Is that what you are
9 saying?
10      MR. PRESS: Object to the form of the
11 question.
12      THE WITNESS: I think what I was trying to
13 describe was the fact that the overall situation was
14 unique, that there was no 1113 interplay with the
15 Delta/Western or the PSA/U.S. Airways cases that I have
16 described.  And that, therefore, there was no interplay
17 with the national union quite like there was in this
18 case.  It was a unique situation.
19      BY MR. KATZ:
20 Q   Western Airlines wasn't in bankruptcy when
21 Delta acquired it?
22 A   That's correct.
23 Q   And PSA wasn't in bankruptcy --
24 A   It was not.

Page 190

1 Q   -- when U.S. Air acquired it?
2 A   Correct.
3 Q   So the interplay of the bankruptcy laws
4 with the Railway Labor Act wasn't involved in those
5 situations either?
6 A   That's correct.
7 Q   And I think that you stated in answer to
8 Mr. Press's questions, didn't you, that the litigation
9 was -- that you were proposing in each of these
10 instances -- was novel?  Is that true?
11 A   Yes.
12 Q   All right.  And in view of the
13 complications presented by section 1113 of the
14 bankruptcy code, it's also true that the proposed
15 litigation was complex.
16      MR. PRESS: Object to the form of the
17 question --
18      BY MR. KATZ:
19 Q   Is that question fair?
20      MR. PRESS: -- as to which litigation you
21 are referring to.
22      BY MR. KATZ:
23 Q   As to each of those three pieces of
24 litigation.

Page 191

1 A   The legal situation as a whole was complex,
2 yes.  The litigation that I was proposing was also
3 complex.
4 Q   And just as an example we have the last
5 exhibit, and Mr. Press showed you, was Exhibit 135,
6 your October 31 letter --
7 A   Yes.
8 Q   -- memorializing the advice you had
9 previously given orally on October 22.
10 A   Correct.
11 Q   At the bottom of the first page and the top
12 of the second page you describe the steps in the plan,
13 in general, as including litigation grievance, court
14 enforcement of the arbitration award if successful and
15 the single carrier proceeding.  Plus in the next
16 sentence you mention legislation mandating arbitration
17 of seniority integration issues.
18      Can you give us any more detail on what
19 these separate elements involved?
20 A   I can try.
21 Q   Please.
22 A   I was trying to describe to the MEC the --
23 just how steep the task was in order to be successful,
24 that all of the legs of these various strategies would

Page 192

1 have to fall into place in order to, overall, get the
2 MEC where it wanted to go.  And we discussed the
3 litigation.  The grievance, of course, was filed and
4 that was heard before Richard Block I understand and
5 Arbitrator Block ruled against ALPA.
6      The Court enforcement would presuppose
7 success in the litigation we had recommended in August.
8 The single carrier proceeding was relevant because, as
9 I indicated, the carriers came together.  There was a
10 chance that under the Delta/Western situation the case
11 would be mooted and wouldn't be able to enforce these
12 obligations.  And then, of course, the legislation had
13 to pass and...
14 Q   To back up to the NMB single carrier
15 proceeding --
16 A   Yes.
17 Q   -- what -- what was necessary there, in
18 order to be successful, is that the government agency
19 would need to delay its approval of the single carrier
20 status?
21 A   That certainly would have been helpful.  If
22 the NMB had wanted to move forward with the single
23 carrier determination, and of course it did, we would
24 have to rely upon the injunction to hold the carriers

Bensel v.
Air Line Pilots Association

ROLAND P. WILDER, JR. - Vol. I
August 8, 2008

---

Page 193

1  apart.
2  Q   To keep the carriers from merging the
3  operations --
4  A   Yes.
5  Q   -- of American and TWA?
6  A   Correct.  That would have even put more
7  strain on the litigation.
8  Q   And this was at a time in the fall of 2001
9  when the airline industry was essentially devastated?
10  A   It was after 9/11 and the revenue traffic
11  of the various airlines, not just TWA, American, but
12  the rest of the industry was very, very seriously
13  affected, adversely affected.
14  Q   Were the versions of the bill, the Bond
15  bill that you saw, to have a retroactive effect or to
16  be prospective only?
17  A   We prepared it so it would have a
18  retroactive effect.
19  Q   And what were the -- any -- did you have
20  any indications from anyone on the Hill about that?
21  A   No.  There were no positive indications as
22  of late October and 2001 that it would pass in
23  retroactive form.
24  Q   And the bill did pass in the Senate and it

---

Page 194

1  was attached as a rider to a defense appropriations
2  bill, wasn't it?
3  A   That's correct.
4  Q   Did it ever pass in the House?
5  A   I -- I think that is correct.
6  Q   It did not pass in the House?
7  A   Right.
8  Q   And it was -- the conference committee
9  pulled that item from the defense appropriations bill
10  when it reported it out.  Is that true?
11  A   I think that is correct, yes.
12  Q   Were there any indications from the White
13  House that -- I guess it was President Bush at that
14  point -- that President Bush would have signed it if it
15  hadn't --
16  A   Not that I know of.  But Senator Bond, of
17  course, was an influential Republican and that gave us
18  hope on that score.
19  Q   Let me read because I've only one got one
20  copy of this.  This is the complaint in this case, the
21  second amended restated complaint.  Let me just read
22  paragraphs 98 and 99.  And then I'll pass them to
23  you --
24  A   Of course.

---

Page 195

1  Q   -- so that you can see them.
2     98 says:  During this time and at all times
3  after October 2000, ALPA and its attorneys and advisors
4  had an undisclosed and concealed conflict of interest
5  in representing the TWA pilots and class in that ALPA
6  with, upon information and belief, the blessing and
7  assistance of APA was seeking to convert and organize
8  the incumbent American pilots under ALPA.
9     And paragraph 99 says:  Upon information
10  and belief ALPA's overriding objective and goal was not
11  to achieve a fair and equitable integration of the
12  classes' seniority, but to appease APA and the
13  incumbent American pilots and foster its organizational
14  efforts.
15     Let me give you these because I know that
16  was a lot of words, 98 and 99, and ask you, after
17  you've had a chance to review them, whether you have
18  any comment on the accuracy of those allegations.
19  A   (Witness reviewing document.)
20     I had been asked --
21     MR. PRESS:  I am sorry, before you answer,
22  show my objection to the form of the question.
23     THE WITNESS:  I -- I had been asked about
24  this subject during my earlier deposition.  And I think

---

Page 196

1  what we established at that point when my memory was
2  fresher that I didn't know about this organizational
3  effort during the time that I was the TWA MEC merger
4  counsel.
5     BY MR. KATZ:
6  Q   Are you aware of any evidence that would
7  support those allegations, Mr. Wilder?
8  A   No.  As I said it came up in my deposition
9  and I think at that point I said that I was not aware
10  of these allegations and would not have been aware of
11  them unless my clients brought them to my attention.
12  And I first thought that they must have and then I -- I
13  simply could not remember anybody saying this.
14  Q   So you are not aware of any evidence that
15  was --
16  A   Yes.  I'm not sure I can -- my knowledge is
17  such that -- I can help with this question.
18  Q   Let me ask you about one other thing with
19  regard to legislation.
20  A   Yes.
21  Q   Isn't it true that you wouldn't really be
22  in a position to know what actions ALPA took to support
23  the Bond bill, if any?
24     MR. PRESS:  Object to the form of the

---

Page 229

1 Q   And in September of 1983 Continental
2 rejected its collective bargaining agreements, didn't
3 they?
4 A   That's correct under the old provisions of
5 the code.
6 Q   And the rejection doctrine was well
7 established in bankruptcy law in commercial contracts?
8 A   Yes.
9 Q   And when you reject a commercial contract,
10 the contract -- the debtor in possession nullifies that
11 contract, doesn't it?
12 A   Which did rise to a bankruptcy claim --
13 Q   Right.
14 A   -- in favor of the creditor, yes.
15 Q   In the Continental bankruptcy, isn't it
16 true that the company treated the Continental employees
17 very differently after the rejection of their
18 collective bargaining contracts?
19 A   Of course.
20 Q   It cut their pay in half?
21 A   (Inaudible response.)
22 Q   It abrogated their -- their -- their
23 grievance arbitration provision?
24 A   Yes.

Page 230

1 Q   And it discontinued recognizing the unions
2 that had been the collective bargaining representatives
3 for those employees?
4 A   That's correct.
5   MR. KATZ: Thank you, Mr. Wilder.
6   MR. PRESS: Nothing further.
7   THE VIDEOGRAPHER: The deposition concludes
8 at 3:35:52.
9   (Reading and signature not waived.)
10   (Whereupon, at 3:35 p.m., deposition was
11 adjourned.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 231

1   CERTIFICATE OF DEPONENT
2
3   I hereby certify that I have read and
4 examined the foregoing transcript, and the same is a
5 true and accurate record of the testimony given by me.
6
7   Any additions or corrections that I feel
8 are necessary, I will attach on a separate sheet of
9 paper to the original transcript.
10
11
12
13
14
15
16
17
18
19
20
21
22
23   _____
24   ROLAND P. WILDER, JR.

Page 232

1 District of Columbia,
2 To wit:
3
4   I, Steven Poulakos, a Notary Public of
5 the State of Maryland, do hereby certify that the
6 within-named witness, personally appeared before me
7 at the time and place herein set out, and after having
8 been duly sworn by me, according to law, was examined
9 by counsel.
10   I further certify that the examination was
11 recorded stenographically by me and this transcript
12 is a true record of the proceedings.
13   I further certify that I am not of counsel
14 to any of the parties, nor in any way interested in
15 the outcome of this action.
16   As witness my hand and notarial seal this
17 25th day of August, 2008.
18
19   _____
20   Steven Poulakos
21 Notary Public
22
23 My commission expires:
24 June 17, 2009

# EXHIBIT E

# In The Matter Of:

*Bensel v.*
*Air Line Pilots Association*

---

*SETH ROSEN*
*Vol. 1*
*August 26, 2008*

---

*REPORTING ASSOCIATES, LLC*
*Certified & Registered Professional Reporters*
*Cherry Hill  --  Philadelphia  --  Trenton*
*(888) 795-2323*
*www.ReportingAssociates.com*



Original File 0826rose.txt

Min-U-Script® with Word Index

Bensel v.
Air Line Pilots Association

SETH ROSEN - Vol. 1
August 26, 2008

---

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW JERSEY

3

4   LEROY "BUD" BENSEL, et al.

5            Plaintiffs

6      vs.                    Civil Action No.

7   AIR LINE PILOTS ASSOCIATION    02-2917 (JEI)

8            Defendant

9   _____/

10

11

12          The Videotaped deposition of SETH ROSEN was

13   held on Tuesday, August 26, 2008, commencing at 9:00

14   a.m., at the Law Offices of Cohen, Milstein, Hausfeld &

15   Toll, P.L.L.C., 1100 New York Avenue, N.W., Suite 500,

16   West Tower, Washington, D.C. 20005, before Steven

17   Poulakos, Notary Public in and for the District of

18   Columbia.

19

20

21

22

23

24   REPORTED BY: Steven Poulakos

---

Page 2

1   A P P E A R A N C E S:

2

3        ON BEHALF OF THE CLASS REPRESENTATIVES:

4          ALLEN P. PRESS, ESQUIRE

5            Green, Jacobson & Butsch, P.C.

6            7733 Forsyth Boulevard

7            Suite 700, Pierre Laclede Center

8            St. Louis, Missouri 63105

9            Telephone: 314-862-6800

10           E-mail: press@stlouislaw.com

11

12

13        ON BEHALF OF THE PLAINTIFFS:

14          NICOLE M. ACCHIONE, ESQUIRE

15           Trujillo, Rodriguez & Richards, LLC

16           258 Kings Highway East

17           Haddonfield, New Jersey 08033

18           Telephone: 856-795-9002

19           E-mail: nacchione@trrlaw.com

20

21

22

23

24      (APPEARANCES CONTINUED ON THE NEXT PAGE)

---

Page 3

1   APPEARANCES CONTINUED:

2

3            ON BEHALF OF THE DEFENDANT:

4          DANIEL M. KATZ, ESQUIRE

5            Katz & Ranzman, P.C.

6            4530 Wisconsin Avenue, N.W., Suite 250

7            Washington, D.C. 20016

8            Telephone: 202-659-4656

9            E-mail: danielmkatz@comcast.net

10

11

12   ALSO PRESENT:  Mike Huff, the Videographer

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 4

1                  I N D E X

2            Deposition of SETH ROSEN

3                August 26, 2008

4

5   Examination by:                      Page

6   Mr. Press                          6,166

7   Mr. Katz                             166

8

9

10  Exhibit No.                        Marked

11  136   A Copy of the Objection Filed by ALPA    43

12  137   A Letter from Cohen, Weiss & Simon        48

13  138   A Memo Prepared by David Holtzman         60

14  139   A Copy of the Transition Agreement        67

15        Between TWA-LLC and ALPA

16  140   An E-mail                                 70

17  141   An E-mail                                 72

18  142   A Letter                                 106

19  143   A September 28th, 2001, Memo             114

20  144   A Series of E-mails                      130

21  145   A List                                   160

22

23

24

---

Bensel v.
Air Line Pilots Association

SETH ROSEN - Vol. 1
August 26, 2008

---

Page 109

1  ways you do it.  Sometimes it's alone.  Sometimes it's
2  with the pilots going to a Congressman's office and
3  sitting down and talking through the issue.  That's
4  usually the way they work.
5      Q    Okay.  And -- and I really wanted to
6  exclude the TWA pilots and focus only on ALPA
7  National's efforts.
8      A    Well, this department is very limited.
9  There's only a few people in the department that do
10  lobbying.  There's either two or three people depending
11  on the time.  I'm not sure whether it was two or three
12  people at that point.  I think there were three.  I
13  think John Baker.
14      MR. KATZ: Jerry Baker.
15      THE WITNESS: Jerry Baker I think was in
16  the department also.  So there may have been three
17  people who are kind of the active lobbyists.  That's --
18  that's the setup.  So those are the people who do it.
19  And then it would be TWA people.
20      BY MR. PRESS:
21      Q    Okay.
22      A    It would be those professionals, also, plus
23  the pilots.
24      Q    I want to talk to you about Roland Wilder's

---

Page 110

1  third litigation strategy in his August 16th, 2001,
2  memorandum.  If you could get that in front of you.
3      MR. KATZ: Give him a chance to read it.
4      MR. PRESS: I've got to find my copy first.
5      MR. KATZ: I may have a copy of it.
6      THE WITNESS: (Witness reviewing document.)
7      BY MR. PRESS:
8      Q    You've reviewed a document, a memo, dated
9  August 16th, 2001, from Roland Wilder to the ALPA legal
10  department?  Is that what you've just done?
11      A    Yes, I did.
12      Q    And just for the record, Mr. Rosen, I
13  should have handed this to you before.
14      A    Yes.  That's all right.
15      Q    We marked it as Exhibit 131 in Roland's
16  deposition.
17      A    Okay.
18      Q    All right?
19      A    Uh-huh.
20      Q    And you've reviewed the same memorandum?
21      A    Yes.
22      Q    True?  Okay.
23      And now my question is -- well, first of
24  all, it's a fact that ALPA did not authorize the filing

---

Page 111

1  of the lawsuit that Mr. Wilder wanted to file as part
2  of this memo, correct?
3      A    Correct.
4      Q    And can you tell -- can you tell us why
5  ALPA would not give that authority?
6      A    This was the -- the underlying basis
7  for the memo was to protest or to grieve or to seek
8  some kind of injunctive relief based on the American's
9  failure to comply with the best efforts letter.
10      And as you know that process was still
11  going on at that point in time.  And he was
12  anticipating the fact that it would probably break down
13  and not be successful.  And he wanted to be in a
14  position to move if, in fact, that facilitation
15  agreement broke down.  And essentially go in to
16  compel -- if I understand him, I understand it
17  correctly -- to compel arbitration of a minor dispute
18  and to somehow enjoin implementation of a joint list
19  that may or may not come out which was obviously
20  speculative at that point.
21      In the end the legal action was going to be
22  based on the theory that we had to have this minor
23  dispute.  We had to go there to compel arbitration over
24  a minor dispute.  In the end there was a grievance

---

Page 112

1  filed over that particular dispute and the company
2  agreed to go to a system board.
3      So they participated which pretty much
4  obviated the necessity of this litigation.  So we
5  proceeded on and exhausted, you know, the process.  And
6  ultimately, as you know, the following February Richard
7  Bloch came down with the decision that found that the
8  company had not violated the best efforts letter.
9      Q    So it was ALPA's position that there was no
10  need for the injunction that Mr. Wilder wanted to
11  obtain because the reasonable best efforts grievance
12  had been filed and American participated in that?
13      A    Well, I think the grievance was filed
14  subsequently.  I'm not sure it was filed then.
15      Q    That's true.
16      A    It was filed after the whole process broke
17  down.  I am not -- I don't remember exactly when the
18  grievance was filed.  I think it was -- it might have
19  been January, but I'm not sure.  I don't want to just
20  reach for a date.  I'm just not sure of the date.
21      Q    It's my understanding of the facts that the
22  reasonable best efforts grievance was filed after the
23  decision -- after the supposed cramdown came.
24      A    After the October series of letters and --

---

Page 169

1    Q    All right.  And you didn't talk to -- well,
2 strike that.
3         MR. PRESS: That's all.
4         THE WITNESS: All right.
5         MR. KATZ: Thank you.
6         THE VIDEOGRAPHER: This concludes the video
7 deposition at 12:49 p.m.
8                    - - -
9 (Whereupon, at 12:49 p.m., deposition is adjourned.)
10                   - - -
11
12 (Exhibits were retained by counsel.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 170

1    J U R A T
2    I, SETH ROSEN, do hereby certify that I
3 have read the foregoing transcript of my testimony
4 taken on August, 26, 2008, and have signed it subject
5 to the following changes:
6 PAGE    LINE           CORRECTION
7
8
9
10
11
12
13
14
15
16    _____
17         SETH ROSEN
18 DATE _____
19 Sworn and subscribed to before me this
20 _____ day of _____, 2008.
21
22
23 _____
24 NOTARY PUBLIC

Page 171

1 CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2
3         I, Steven Poulakos, registered Professional
4 Reporter, the officer before whom the foregoing
5 proceedings were taken, do hereby certify that the
6 foregoing transcript is a true and correct record of
7 the proceedings; that said proceedings were taken by me
8 stenographically and thereafter reduced to typewriting
9 under my supervision; and that I am neither counsel
10 for, related to, nor employed by any of the parties
11 this case and have no interest, financial or otherwise,
12 in its outcome.
13
14         IN WITNESS WHEREOF, I have hereunto set my
15 hand and affixed my notarial seal this 4th day of
16 September, 2008.
17
18         _____
19         Steven Poulakos
20         Notary Public
21
22
23 My commission expires:
24 June 17, 2009