UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PATRICK BRADY, *et al.*,

    Plaintiffs,

v.

AIR LINE PILOTS ASSOCIATION,

    Defendant.

Civil Action No. 02-2917 (JEI)

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER LAW PURSUANT TO FED. R. CIV. P. 50(a)**

---

Lisa J. Rodriguez
Nicole M. Acchione
**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
258 Kings Highway East
Haddonfield, NJ 08033
(856) 795-9002

Allen P. Press
Joe Jacobson
**GREEN JACOBSON, P.C**
7733 Forsyth Boulevard
Pierre Laclede Center, Suite 700
St. Louis, Missouri 63105
(314) 862-6800

Dated: July 6, 2011

# TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTION | 1 |
| DEFENDANT HAS NOT SATISFIED THE STANDARD FOR DIRECTED VERDICT | 2 |
| ARGUMENT | 3 |
|     I. THE STANDARD FOR PROVING A BREACH OF THE DUTY OF FAIR REPRESENTATION | 3 |
|     II. DEFENDANT'S ARGUMENTS ARE WITHOUT MERIT | 7 |
|     III. PLAINTIFFS NEED NOT ESTABLISH CAUSATION OR DAMAGES DURING THE LIABIILTY PHASE | 9 |
|     III. PLAINTIFFS PRESENTED SUFFICIENT EVIDENCE TO SUPPORT A VERDICT IN THEIR FAVOR | 10 |
| CONCLUSION | 13 |

## TABLE OF AUTHORITIES

### FEDERAL CASES

Page

*ALPA v. O'Neill*,
499 U.S. 65 (1991)..................................................................................................4,5

*Aguinaga v. United Food & Committee Workers International Union*,
993 F.2d1463 (10th Cir. 1993) ...............................................................................4

*Alier v. Tuscan*,
979 F.2d 946 (2d Cir. 1992)....................................................................................5

*Anderson v. Liberty Lobby*,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).....................................2, 11

*Baxter v. United Paperworks International Union, Local 7370*,
140 F.3d 745 (8th Cir. 1998) ..................................................................................4

*Bellesfield v. RCA Communications, Inc.*,
675 F. Supp. 952 (D.N.J. 1987) .............................................................................3

*Bensel v. Air Line Pilots Association*,
387 F.3d 298 (3d Cir. 2004)................................................................................1, 7

*Fineman v. Armstrong World Industrial*,
980 F.2d 171 (3d Cir. 1992)....................................................................................2

*Galena v. Leone*,
638 F.3d 186 (3d Cir. 2011)....................................................................................2

*Jeffreys v. Communs. Workers of America*,
354 F.3d 270 (4th Cir. 2003) ..................................................................................4

*Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*,
162 F.3d 1290 (11th Cir. 1998) ..............................................................................3

*Lewis v. Tuscan*,
829 F. Supp. 665 (S.D. N.Y. 1993) ........................................................................5

*Lewis v. Tuscan Dairy Farms, Inc.*,
25 F.3d 1138 (2d Cir. 1994).............................................................................4,5,6

*Lightning Lube, Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993)......................................................................................2

*MacLeary v. Hines,*
   817 F.2d 1081 (3d Cir. 1987)............................................................................................2

*Mody v. Hoboken,*
   959 F.2d 461 (3d Cir. 1992)..............................................................................................2

*Reeves v. Sanderson Plumbing Products,*
   530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).............................................3

*Tait v. Armor Elevator Co.,*
   958 F.2d 563 (3d Cir. 1992)..............................................................................................2

*Teneyck v. Omni Shoreham Hotel,*
   365 F.3d 1139 (D.C. Cir. 2004) .......................................................................................3

*Vaca v. Sipes,*
   386 U.S. 171 (1967)..........................................................................................................3

## INTRODUCTION

Defendant breached its duty of fair representation to the TWA Pilots. This breach comes not from an isolated event but rather from the aggregate of Defendant's misconduct from January of 2001, when the TWA/American acquisition was announced, though April 2002 when ALPA lost the representational rights of the TWA Pilots. Defendant, however, contends it is entitled to a directed verdict by parsing each separate incident or event into minute sections and then asking the Court to consider each section in isolation. That is not the standard on a motion for directed verdict and is certainly not the Plaintiffs' case. Rather, the Defendant's conduct during the 15-month period of time must be viewed in its totality and against the backdrop of Defendant's ongoing attempts to court the American pilots.

Defendant's motion omits consideration of the material evidence that Plaintiffs established during the trial about the lack of meaningful support ALPA provided to the TWA pilots during this critical time, in their fight to achieve a fair seniority integration. It also ignores the evidence of the ongoing, clandestine support ALPA provided to the American pilots campaigning to join ALPA. As the Third Circuit in this case has already held, "[If] ALPA failed to take specific actions on behalf of [the TWA pilots] for an improper purpose or in bad faith, they may obtain relief for ALPA's breach of its fair representation duty." *Bensel v. Air Line Pilots Association*, 387 F.3d 298, 311 (3d Cir. 2004).

ALPA's desire to acquire the American pilots, a desire testified to by Duane Woerth, created a conflict of interest that invaded the entire seniority integration process. Its effect so compromised the process that a fair seniority integration for the TWA Pilots was simply not possible.

## DEFENDANT HAS NOT SATISFIED THE STANDARD
## FOR DIRECTED VERDICT

In ruling on a motion for directed verdict under Rule 50, the Court must deny the motion "if there is evidence reasonably tending to support the recovery by the plaintiffs as to any of its theories of liability." *Tait v. Armor Elevator Co.*, 958 F.2d 563, 569 (3d Cir. 1992) (internal quotations omitted). All evidence must be viewed in a light most favorable to the non-moving party and plaintiff must be given "the advantage of every fair and reasonable inference." *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). Under this standard, defendant's motion may only be granted if "viewing the evidence in the light most favorable to the non-moving party, there is no question of material fact for the jury, and any verdict other than the one directed would be erroneous under the governing law." *Tait*, 958 F.2d at 569 (citing *MacLeary v. Hines*, 817 F.2d 1081, 1083 (3d Cir. 1987)).

Courts ruling on a motion for directed verdict may not weigh the evidence or make credibility determinations. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202, 216 (1986); *see also Mody v. Hoboken*, 959 F.2d 461, 465 (3d Cir. 1992). Therefore, where plaintiff has presented affirmative evidence in support of its claims, the court cannot direct a verdict based on the credibility of plaintiff's witnesses, but rather must reserve that determination for the jury. See *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 213 n.30 (3d Cir. 1992) ("we may not tread on the jury's credibility determination function" but instead "we must presume in reviewing [a] directed verdict that the jury would believe [plaintiff's] factual contentions.")

Moreover, the Court is not limited in its review of the evidence to only that evidence that was presented in Plaintiff's direct case. Rather, "in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105, 122 (2000). In other words, the record is not frozen at the moment defendant moves for a directed verdict:

> Rule 50(a) does not authorize a trial judge, after the defense has presented its case (in whole or in part), to revisit, and grant, a defense motion for judgment as a matter of law made at the close of the plaintiff's case without considering, in addition to the evidence presented in the plaintiff's case, the evidence presented by the defense.
>
> *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1154 (D.C. Cir. 2004) (*quoting Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1305 n.31 (11th Cir. 1998)).

In reviewing the entire record, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. Thus, the court may only consider defendants' evidence that is "uncontradicted and unimpeached" and "comes from disinterested witnesses." *Id.*

## ARGUMENT

### I. THE STANDARD FOR PROVING A BREACH OF THE DUTY OF FAIR REPRESENTATION.

ALPA's duty of fair representation required it to serve the interests of all TWA pilots without hostility or discrimination towards any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. *Vaca v. Sipes,* 386 U.S. 171, 177 (1967); *Bellesfield v. RCA Communications, Inc.,* 675 F. Supp. 952, 955 (D.N.J. 1987). Here, Plaintiffs have established that ALPA's conduct was arbitrary and motivated by bad faith.

A union acts in bad faith when it acts with an improper intent, purpose or motive. *Spellacy,* 156 F.3d at 126. It encompasses fraud, dishonesty, or other intentional misleading

3

conduct. *Baxter v. United Paperworks Int'l Union, Local 7370*, 140 F.3d 745, 747 (8th Cir. 1998). Whether or not union officials act in bad faith depends on the subjective motivation of the union officials. *Jeffreys v. Communs. Workers of Am.*, 354 F.3d 270, 275-76 (4th Cir. 2003).

A union's actions are arbitrary if in the limit of the legal and factual landscape, its behavior is outside a wide range of reasonableness, so as to be viewed as irrational. *ALPA v. O'Neill*, 499 U.S. 65, 67 (1991).

Here, as detailed below, ALPA's actions were arbitrary, in that actions were taken and decisions were made that were unprecedented in the history of airline seniority negotiations. ALPA's actions were also done in bad faith, as ALPA maintained a second agenda of acquiring the American pilots, without disclosing its interest and the conflict of interest it created to the TWA pilots. As a result of ALPA's actions the TWA pilots were deprived of all effective means of protecting their seniority in the negotiations with the American pilots.

This is not a collective bargaining case and does not fit squarely within established cases. The breach of the duty of fair representation in this case does not follow from employee dissatisfaction with the end product of contract negotiations with the employer, as in *ALPA v. O'Neill*, although there is no dispute that the pilots were unhappy with the seniority integration imposed upon them. Instead, this case involves the primary concern that a duty of fair representation was designed to address. That is, the concern that individual employees not be deprived of all effective means of protecting their interests. *See Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1142 (2d Cir. 1994)(distinguishing *O'Neill*); *Aguinaga v. United Food & Comm. Workers Int'l Union*, 993 F. 2d.1463, 1471 (10${}^{th}$ Cir. 1993)).

*Lewis v. Tuscan Farms* is factually analogous to this case. 25 F.3d 1138. In *Lewis*, one milk processing company, Tuscan Dairy Farms, sought to acquire another, smaller milk

processing company, Liberty Farms. The President of the union representing Liberty Farms' employees began having discussions with Tuscan about its possible purchase of Liberty Farms, believing that Liberty Farms did not have the resources to compete in the changing competitive market. The Liberty Farms employees had a provision in their contract that required an employer to "dovetail" seniority lists when there was a merger or a consolidation of facilities. While recognizing the importance of dovetailing the seniority lists to the Liberty Farms employees, the Union President, however, assured Tuscan that it would not seek a merger of the seniority lists. The Union President did not disclose this fact to the employees. He did stress, however, to Liberty Farms that Tuscan would pay Liberty's unfunded ERISA liability.

While negotiations were proceeding, the Union President told some Liberty employees that he was running for re-election and was hesitant to merge the Liberty seniority list with the Tuscan list because to do so would risk alienating over 200 Tuscan workers to please 100 Liberty workers. *Lewis*, 25 F.3d at 1140.

The merger ultimately took place, Tuscan indemnified Liberty Farmers for its ERISA liability and stapled the Liberty workers to the bottom of its seniority list.

The district court found that the actions of the Union, through its President, breached its duty of fair representation. Before this was heard on appeal, the Supreme Court decided *ALPA v. O'Neill*, 499 U. S. 65 (1991). As a result, the case was remanded to give the district court the opportunity to apply the *O'Neill* standard. *Alier v. Tuscan*, 979 F.2d 946, 948 (2d Cir. 1992). On remand, the district court held that the Union's actions were arbitrary and in bad faith under *O'Neill*. *Lewis*, 25 F.3d at 1142 (citing *Lewis v. Tuscan*, 829 F. Supp. 665, 666, 669 (S.D. N.Y. 1993)).

On appeal from the second decision, the Union claimed that its decision to agree to not merge the seniority lists was justified by Tuscan's agreement to pay $2.5 million to cover the unfunded pension liability, that it was a rational decision, and one that was in the best interests of the Union membership as a whole. 25 F.3d at 1142.[1] The Second Circuit rejected these arguments and affirmed the district court's decision holding that the Union, through the actions of its President, breached its duty of fair representation.

Similarly, in *Aguinaga*, the union's motive was not in protecting the plaintiffs, but instead a desire to obtain status as bargaining representative for a different group of employees. *Id.* The court rejected the union's argument that it be afforded the deference granted in *O'Neill*, stating "such deference would only be appropriate insofar as the Union's motive had been proper." *Id.*

Here, the TWA Pilots have introduced evidence concerning the misdeeds and lost opportunities committed by ALPA. Plaintiffs have also introduced evidence of ALPA's conflict of interest, including but not limited to its knowledge and involvement with the card campaign, seeking to become the union for the American pilots. Reviewing this evidence in the light most favorable to Plaintiffs, supports a finding by the jury that ALPA's conduct during 2001 and part of 2002 was arbitrary and that the conduct was motivated by bad faith. Further, the jury could rationally conclude that, based upon the evidence, the TWA Pilots were harmed by the ultimate seniority integration and that a better deal could have been achieved if ALPA had not breached its duty of fair representation. Plaintiffs have established that ALPA's actions deprived the pilots of all effective means of protecting their seniority interests in their negotiations with the American pilots. And, as stated by the Third Circuit, "[If] ALPA failed to take specific actions on behalf of [the TWA pilots] for an improper purpose or in bad faith, they may obtain relief for

---

[1] The Union also claimed that Tuscan would have walked from the deal, if the Union did not agree to waive the dovetail provision. *Id.* at 1142.

ALPA's breach of its fair representation duty." *Bensel v. Air Line Pilots Association*, 387 F.3d 298, 311 (3d Cir. 2004).

Plaintiffs have made such a showing.

## II.  THE DEFENDANT'S ARGUMENTS ARE WITHOUT MERIT.

Defendant's brief starts with the inaccurate premise that Plaintiffs' claim is based on a handful of separate events. This, however, is not the basis of Plaintiffs' claim.

Defendant first argues there can be no DFR liability since the ALPA advisors' March 2001 demand that the Merger Committee offer up 825 pilots for stapling was a better offer than what was ultimately imposed by the APA in Supplement CC. Defendant's argument is nonsensical. It also finds no support in the record. There is nothing to suggest the offer ALPA National wanted the merger committee to make would have been accepted by the American pilots. It is also reasonable to assume by starting with an initial staple of 825, without leverage, the staple point would have been worse.

Next, Defendant claims that the advice provided by the ALPA advisors to the TWA MEC on April 2nd was not motivated by bad faith, and that there is no evidence that the advice was rendered in bad faith. Plaintiffs, however, have unequivocally established that there were ongoing communications between ALPA and the American Pilots prior to April 2, 2001. *See* Exhibit P147. Plaintiffs have also presented evidence that President Woerth appeared before the APA Board of Directors on April 5, 2001, just three days after the members of the TWA MEC were told they must waive scope and provided with no other options. Based upon these facts, it is reasonable to conclude that the advice provided on April 2nd was provided in an effort to further ALPA's goal of appeasing and ultimately acquiring the American Pilots. More importantly, however, is the fact that the events that transpired on April 2nd are just a piece of

7

this puzzle and cannot be considered in isolation. Moreover there is question as to the accuracy and honesty of advice rendered at the April 2 meeting. The advisors gave the TWA MEC false advice concerning the right to strike or, at a minimum, advice in direct contrast to claims by ALPA to the Bankruptcy Court when ALPA touted the fact that it averted a strike. Similarly, the Plaintiffs' presented evidence that the advisors' refusal to permit membership ratification of the Transition Agreement violated ALPA's Administrative Manual. *See* J249. And, finally, while perhaps some of the advice provided that day may have been legally accurate, it was the urgency of that advice, the demeanor of the advisors, and the lack of any suggestion that even a brief delay might have yielded leverage as the TWA Pilots have attempted to obtain a fair seniority integration that is at issue. Simply stated, the events of April 2nd are yet another example of ALPA failing to provide the TWA Pilots with any real support or leverage. Instead, ALPA provided one-sided advice. Based upon this evidence, a jury reasonably could conclude that the advice was arbitrary and motivated by bad faith.

Defendant then argues that Plaintiffs have not presented admissible evidence for the jury to conclude that Woerth visited the APA Board of Directors, just three days after the TWA Pilots waived scope, and told the American Pilots that the TWA Pilots needed to "Get Real." Defendant's argument, however, ignores the testimony of Robert Reifsnyder, an American Pilot, who testified that he was present and wrote to his fellow pilots that he heard Woerth say that the TWA Pilots had to "Get Real." *See* Volume 5, 41:21–23. It also ignores the testimony of Clay Warner who testified that he received, and dismissed, an email from an angered TWA Pilot who similarly heard that Woerth had made such comments. *See* Volume 11, 81:23-82:1. And, finally, it ignores the fact that Woerth himself testified that he attended a late April MEC

8

meeting where he discussed his comments to the APA, in an attempt to cover up his "Get Real" statement.

Finally, Defendant mischaracterizes the evidence Plaintiffs presented concerning ALPA's lack of involvement with the Bond Amendment. In so doing, Defendant attempts to evade the province of the jury by asserting as a fact that Matt Comlish had been impeached. Such an argument is disingenuous at best. Woerth never told Mr. Comlish, or any other TWA Pilot, that he was opposed to the Legislation. *See* Volume 11, 144:1-12; 146:11-12. In fact, Mr. Woerth's testimony was that he supported the Legislation, but he was concerned about inexperienced pilots lobbying on the Hill, fearing that Mr. Comlish's inexperience might negatively impact the Legislation. Defendant does not even attempt to explain why it interprets Woerth's "get off the Hill" statement is a suggestion that he did not support the Legislation. It is stated as an *ipse dixit* conclusion of impeachment. Mr. Comlish's testimony is consistent both with his prior deposition testimony and totally consistent with the testimony of Mr. Woerth

Further, the testimony surrounding the Bond Amendment is evidence that providing leverage in fact yielded results. The evidence introduced shows that rather than producing the doomsday results predicted by ALPA's advisors, a little leverage yielded a positive result. American's response to the Bond Amendment was to return to the bargaining table it had previously walked away from.

### III. PLAINTIFFS NEED NOT ESTABLISH CAUSATION OR DAMAGES DURING THE LIABILITY PHASE OF THE CASE.

The parties have argued on multiple occasions the line that divides the liability phase of this case with the damages phase. As a direct result of Defendant's Motion for Bifurcation, Plaintiffs continue to maintain that the liability phase is limited to the very discrete issue of whether ALPA breached its duty of fair representation. Even assuming, however, that Plaintiffs

9

were required to make a showing of causation and injury in fact, Plaintiffs have satisfied their burden.

There is no dispute that Supplement CC resulted in the stapling of over 1200 TWA Pilots. Those pilots were then furloughed. There was also undisputed testimony by TWA Pilots who were demoted from a Captain to a First Officer and/or from a larger plane to a smaller plane as a result of the seniority integration. This undisputed testimony surely that satisfies the "injury in fact" prong that Defendant claims Plaintiffs are required to establish during this phase of the trial. Those pilots suffered monetary damages stemming from their demotion, whether it be from Captain to First Officer or from First Officer to having no job at all.

Similarly, both Captain Day and Roland Wilder testified that a better deal could have been achieved if ALPA had provided the support it was required to under the law. Certainly Plaintiffs are required to establish no more than a better deal could have been achieved, and are not required to recreate what a fair and reasonable seniority integration would have looked like. The complexities of such a seniority integration is precisely the reason Defendant moved for bifurcation in the first place.

### IV. PLAINTIFFS' PRESENTED SUFFICIENT EVIDENCE TO SUPPORT A VERDICT IN THEIR FAVOR.

Defendant conveniently ignores the bulk of the evidence presented to date that support a finding that ALPA breached its duty of fair representation. Plaintiffs established the following facts which, when considered in their totality and against the backdrop of ALPA's desire to acquire the American pilots, are arbitrary and/or motivated by bad faith.[2]

---

[2] The evidence described herein is by no means exhaustive of the overwhelming evidence presented during the trial that supports Plaintiffs' claim that ALPA breached its duty of fair representation to the TWA Pilots.

- After the acquisition was announced, ALPA promised to provide the TWA Pilot with its full support, and to permit litigation if necessary. *See* Exhibit D223, Trial Transcript Volume 11, 82:14-18; *See also* Exhibit 78; Volume 10, 33:20 – 34:10. As the evidence shows, ALPA's promise was an empty one. *See* Volume 12, 18: 11-14.

- At the same time the TWA MEC merger committee began meeting with its counterpart at the APA to negotiate seniority, ALPA maintained its relationship with the APA by performing work under the Service Agreements. *See* Exhibit 113; Volume 12, 47:20- 48:8; 53:12-54:21. This fact was not disclosed to the TWA Pilots. Volume 3, 66:20-21.

- Instead of fighting to retain seniority, ALPA officials recommended offering to the APA the stapling of 825 TWA Pilots. *See* Volume 7, 29:17-30:4; 30:8-21. Volume 10, 26:10-27:10.

- At the April 2, 2001, meeting ALPA provided one-sided advice to the TWA MEC that ultimately led to the waiver of the scope provision. *See* Volume, 36:14 to 38:8.

- ALPA did not permit Roland Wilder to pursue his first litigation strategy to delay the Section 1113 motion.[3] *See* Volume 2, 30:2-18.

- ALPA did not advise the TWA Pilots of their right to strike, although ALPA then touted that it had averted a strike in support of its application for fees in the bankruptcy court.

- ALPA denied the TWA Pilots' request for membership ratification of the Transition Agreement, in violation of ALPA's Administrative Manual. J249.

- Following the TWA MEC's decision to waive scope, a new Transition Agreement was entered into that waived additional items not required by the Asset Purchase Agreement, items that inured to the benefit of the American. Volume 2, 46:16-19; 50:14–54:25.

- On April 5, 2001, three days following scope waiver, President Woerth appeared before the APA BOD and assured the American Pilots that he told the TWA Pilots

---

[3] The leverage that Wilder's three litigation strategies would have provided is for the jury to decide. And, although Defendant has characterized Wilder's strategies as frivolous, there is no evidence of this. Quite the contrary, Wilder himself testified that, at least with regard to his July 2001 strategy, that it was not "fundamentally flawed" as ALPA characterized it. Moreover, ALPA witnesses testified at trial that Wilder's first strategy became moot after the TWA MEC waived scope – not that it was frivolous. Weighing of the evidence, including making credibility determinations, are a function of the jury and not those of the judge on a motion for directed verdict. *Anderson*, 477 U.S. 242. Accordingly, Defendant's arguments in this regard should be rejected.

11

they had to "Get Real." *See* Volume 5, 41:21 – 42:23.   Woerth did not disclose this fact to the TWA Pilots.

- The only MEC meeting during 2001 that Woerth attended was in April 2001 (at which time he acknowledged that the TWA Pilots were told by American that he made the "Get Real" comment).  *See* Volume 11, 81:12-20.

- ALPA denied every MCF request made by the TWA Pilots.

- ALPA denied the TWA Pilots' request for a jump seat war in an effort to gain leverage.

- ALPA denied the other two litigation strategies recommended by Mr. Wilder. *See* Volume 10, 59:1 – 65:13.

- ALPA failed to provide support for the Bond Amendment.

- The American Pilots were concerned about the Bond Amendment.  P148pp.

- Throughout 2001, ALPA maintained almost daily contact with the American pilots concerning the card campaign, among other things. *See* e.g. Deposition of Ronald Rindfleisch (August 27, 2008) 39:8-39:11, 70:18-71:1,82:2-82:14, 82:22-83:6; Exhibits P147 and P148.

- ALPA's contact with the American Pilots culminated in a meeting in Las Vegas at which time American Pilot John Clark gave ALPA a package containing the campaign cards, a fact never disclosed to the TWA Pilots. *See* Volume 10, 193:7-12.

- While in Las Vegas, Clark was treated to a lavish meal at Smith & Wolensky's steakhouse with Woerth and other ALPA representatives.   *See* Exhibit P362.

- ALPA cannot account for the whereabouts of the campaign cards that it collected from Clark in Las Vegas.

- On the same day Woerth met with Clark in Las Vegas, ALPA sent an email promising to reimburse the American Pilots for expenses incurred in connection with the card campaign.  P148kk.

- It is undisputed that over 1200 TWA Pilots were stapled to the bottom of American's seniority list.

- Had ALPA provided its full support, as promised, TWA Pilots could have achieved a better seniority integration.

These facts, and others, support a jury finding that ALPA's conduct was arbitrary and/or motivated by bad faith in violation of the duty of fair representation.

## CONCLUSION

Defendant's motion must be denied. Not only does it fail to account for much, if not most, of the admissible evidence adduced at trial, but it applies the wrong standard and evades the province of the jury by making credibility determinations.

Dated: July 6, 2011

Respectfully submitted,

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**

By:     s/ Lisa J. Rodriguez
Lisa J. Rodriguez
Nicole M. Acchione
258 Kings Highway East
Haddonfield, NJ 08033
(856) 795-9002

**GREEN JACOBSON, P.C**
Allen P. Press
Joe Jacobson
Pierre Laclede Center, Suite 700
7733 Forsyth Boulevard
St. Louis, Missouri 63105
(314) 862-6800