

**ARCHER & GREINER, P.C.**
ATTORNEYS AT LAW

**STEVEN J. FRAM**
*Also Member of Pennsylvania Bar*

ONE CENTENNIAL SQUARE
HADDONFIELD, NJ 08033-0968
856-795-2121
FAX 856-795-0574

www.archerlaw.com

Email Address:
sfram@archerlaw.com

Direct Dial:
(856) 354-3051

July 11, 2011

**VIA EMAIL and CM/ECF**
The Honorable Joseph E. Irenas, Sr. U.S.D.J.
United States District Judge
Mitchell H. Cohen Federal Building & U.S. Courthouse
1 John F. Gerry Plaza, Room 310
Camden, NJ 08101

RE: **Brady, et al. v. Air Line Pilots Association**
    **Civil No. 02-2917 (JEI)**

Dear Judge Irenas:

    I am writing on behalf of Defendant with respect to three concerns about the closing argument that Mr. Press began today. I would like the opportunity tomorrow, before he continues his closing, to place a statement on the record with respect to these issues.

    First, Mr. Press asserted, in response to the questions that I had raised about the credibility of the pilots who testified on behalf of the plaintiffs, that those pilots were "serious, credible people." He did not present this as an argument based upon any evidence, including any refutation of my points, but instead simply asserted it. I believe that his comments in that regard are inconsistent with RPC 3.4(e), which provides that, in trial, a lawyer shall not state a personal opinion as to the credibility of a witness. I request that Mr. Press be instructed to refrain from any further attempting to "vouching" for his witnesses.

    Second, Mr. Press asserted, during his argument, that "ALPA" could have arranged for a postponement of the Section 1113 hearing. This statement contradicts the record evidence. Richard Seltzer, who handling the Section 1113 motion, testified that Section 1113 requires the court to schedule a hearing no later than two weeks after the motion is filed and that only a one-week extension of a hearing date is available. He further testified that TWA's Section 1113 motion, which was filed on March 15, 2001, was originally scheduled for a hearing on a date to be determined but that around March 21, 2001, he was advised that TWA had filed an amended motion which scheduled the hearing for April 6, which would have been 20 or 21 days after the original filing date and therefore the last date under the statute for a hearing. I attach, for Your

| PRINCETON OFFICE | FLEMINGTON OFFICE | PHILADELPHIA OFFICE | WILMINGTON OFFICE | GEORGETOWN OFFICE | NEW YORK OFFICE |
|---|---|---|---|---|---|
| 700 Alexander Park | Plaza One | One Liberty Place - 32nd Floor | 300 Delaware Avenue | 9 East Market Street | 2 Penn Plaza |
| Suite 102 | 1 State Route 12, Suite 201 | 1650 Market Street | Suite 1370 | P.O. Box 977 | Suite 1500 |
| Princeton, NJ 08540 | Flemington, NJ 08822-1722 | Philadelphia, PA 19103-7393 | Wilmington, DE 19801 | Georgetown, DE 19947 | New York, NY 10121 |
| P 609-580-3700 | P 908-788-9700 | P 215-963-3300 | P 302-777-4350 | P-302-858-5151 | P 212-292-4988 |
| F 609-580-0051 | F 908-788-7854 | F 215-963-9999 | F 302-777-4352 | F-302-858-5161 | F 212-629-4568 |

Honor's convenience, pages 119 to 121 of the transcript of Mr. Seltzer's testimony on July 6, 2011.

Mr. Seltzer's testimony was based upon Section 1113(d)(1), which provides as follows:

> (d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than <u>fourteen days</u> after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. <u>The court may extend the time for the commencement of such hearing for a period not exceeding seven days</u> where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

11 U.S.C.A. § 1113 (West) (emphasis added).

I request that Mr. Press be directed to correct his misstatement when he continues his closing argument.

Third, Mr. Press argued at some length today that ALPA acted arbitrarily because it made certain promises to the TWA pilots and allegedly failed to fulfill those promises. I believe that this argument is inconsistent with the standard that applies to the conduct of a union in a duty of fair representation case and that his attempt to impose a higher standard of conduct on ALPA, by suggesting that it was required to keep any promises it made or fulfill any assurances it allegedly provided, is contrary to the law. Our research indicates that statements of opinions and alleged failures to fulfill promises, including general promises of support, can only be a DFR violation if the opinions or promises were made in bad faith. See, e.g., O'Neill v. ALPA, 939 F.2d 1199, 1201-05 (5th Cir 1991) (post-remand) (promises that pilots could ratify agreement were not "sufficiently egregious" or "intentionally misleading" to be bad faith DFR breach; promise that retired and resigned pilots would be included in settlement with carrier do not rise to level of intentional misrepresentations designed to harm these pilots); Swatts v. United Steelworkers, 808 F.2d 1221, 1225 (7th Cir 1986) (assurance by union that no job loss was possible in strike was not DFR violation in the absence of evidence of intentional affirmative misstatements; "as the district court noted, the statements complained of were merely opinions which had 'reasonable support in the experience of union leaders.'"); Bautista v. Pan Am World Airlines, 828 F.2d 546, 550-51 (9th Cir 1987) (granting summary judgment where union official gave an opinion concerning his interpretation of a "No Layoff Guarantee" provision; "The statements at issue here are nothing more than 'partisan exhortation delivered under conditions of conflict,' and thus cannot form the basis of a DFR claim."); Nellis v. ALPA, 815 F. Supp. 1522, 1530-32 (E.D. Va. 1993) (rejecting allegation that union undertook certain negotiation obligations under fragmentation policy and then failed to fulfill them; "the mere fact that a union has made certain promises, but not fulfilled them, does not mean that the promises were made in bad faith");

Hon. Joseph E. Irenas, U.S.D.J.
June 10, 2011
Page 3

<u>Panrell v. United Mine Workers of Am., Int'l Union</u>, 872 F. Supp. 1502, 1508 (N.D.W. Va. 1995) (granting summary judgment; "the Court is of the opinion that the International Union, neither acted arbitrarily, nor with discrimination, nor in bad faith when through its agent, Ms. Scott, it allegedly represented to the plaintiffs that the proceeds [of a settlement] would be distributed to just the 207 [union members], and then, after gathering further information and giving careful consideration to the most equitable method and scope of distribution, the International Union determined that the proceeds should be distributed to all of the approximately 525 members of Local 2095 who had lost their recall/employment rights at the Kitt Energy mine when it was illegally transferred").

ALPA therefore requests that Your Honor instruct the jury, as part of the charge, that any opinions provided by ALPA and alleged failures to fulfill a promise cannot qualify as arbitrary conduct and that opinions and alleged promises can only be DFR violations if proof of bad faith is established.

I appreciate the Court's consideration of these issues.

Respectfully submitted,

STEVEN J. FRAM

cc: Lisa Rodriguez, Esquire (w/encl.)(via email and ECF)
Allen Press, Esquire (w/encl.)(via email and ECF)

6919997v1

1   the 21st, TWA filed an amended motion stating that the
2   hearing would be held on April 6, and that objections would
3   be due March 30 instead of March 26.
4   Q.   Okay.
5   A.   And I believe I reported at that meeting that at some
6   point during that meeting.
7   Q.   When you reported to the MEC -- by the way, just tell us
8   generally who was present at the meetings on March 21 and 22,
9   2001?
10  A.   It was an MEC meeting.  There were a series of these
11  meetings.  Members of the MEC would be there and the officers
12  and the chairs at least of the negotiating and merger
13  committees, and the creditors committee representatives, and
14  David Holtzman and me and Steve Tumblin and Michael Glanzer,
15  and I think at most of these meetings, if not all of them,
16  Clay Warner.
17  Q.   Did you talk at the meeting on March 21 and 22 about
18  whether the hearing date could be postponed, whether there is
19  a way to get the motion to be considered to be put off?
20  A.   I believe I did.
21  Q.   What did he say?
22  A.   The statute, this is a very unusual statute.  The
23  statute says that when the motion is filed, the hearing, the
24  Court will schedule the hearing no later than two weeks after
25  the motion is filed.  And the Court, for, it says something

1  like special circumstances or the circumstances of the case,
2  can extend it one week, and that is all.  The hearing has to
3  start 21 days after the motion is filed.  No later than that.
4  Unless the company agrees.
5           As I remember, April 6 was 21 days, maybe it was 20
6  days, but it was 21 days after March 15.  So that unless the
7  company agreed, the hearing was going on start on April 6.
8  The statute instructed the Judge not to extend the start of
9  the hearing unless the company agreed.
10 Q.  Did you have a sense on March 21 or 22 of how long the
11 hearing would take?
12 A.  Yes.  I had a general sense.
13 Q.  Did you talk to the people at the meeting about how long
14 you thought the hearing would take?
15 A.  At both this meeting and the meeting on, the last
16 meeting which was April 1, 2, my -- and we were focusing at
17 this point more on getting the objection done and filed.
18 That was the first thing we needed to do.  But that -- from
19 everything I knew in the negotiations, everything was
20 focusing now on scope and successorship.  And seniority
21 integration.  I sort of mean that too.
22          And so my view, I think I expressed at this point,
23 I know I expressed at the next meeting, was that we would
24 need a witness, the negotiating history was going to be
25 agreed to, I thought, what is in the contract is going to be

```
 1   a pilot representative or two, and so I do remember talking
 2   to people at ALPA about that, did they have a recommendation
 3   on who might be a good retiree to serve on the committee.
 4   But other than that, and sort of reporting that the motion
 5   had been made, ALPA didn't -- none of the unions I think
 6   represented there, retirees for those purposes, so it wasn't
 7   that.
 8   Q.   Did you give some kind of presentation at the meeting on
 9   March 21 and 22 of 2001 about Section 1113, the likelihood of
10   it being granted and related issues?
11   A.   Yes.
12   Q.   As of March 21 and 22, did you have an understanding
13   about when the motion would be heard by the Judge, by Judge
14   Walsh and when ALPA would be required to file any responsive
15   papers?
16   A.   Yes.
17   Q.   What was your understanding of when the motion was going
18   to be heard by Judge Walsh are?
19   A.   I believe when the motion was filed, in fact, if I can
20   look at it for a second, it had down, hearing on the first
21   page, it had hearing date to be determined.  Objection date,
22   March 26.
23          So when it was filed we actually didn't know what
24   day it was going to be heard.
25          I believe right around the 21st, it may have been
```