Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By: Steven J. Fram, Esquire

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PATRICK BRADY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,<br><br>Defendant. | Civil Action No. 02-2917 (JEI) |

**DECLARATION OF STEVEN J. FRAM, ESQUIRE, IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b)**

STEVEN J. FRAM hereby declares as follows:

1. I am a member of the Bar of this Court and am a shareholder in the law firm of Archer & Greiner, P.C., attorneys for Defendant, Air Line Pilots Association, International.

2. I am submitting this Declaration in order to provide copies of certain deposition and trial transcripts and other materials that are referred to in the brief being filed by Defendant

on August 10, 2011, in support of the Defendant's Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b).

3. True and correct copies of excerpts of deposition transcripts and trial transcripts and trial exhibits are attached as follows to this Declaration:

| **EXHIBIT** | **DESCRIPTION** |
|---|---|
| **Deposition Transcripts** | |
| A | Deposition of Mark Hunnibell dated October 24, 2006 |
| B | Deposition of John Clark dated December 1, 2006 |
| C | Deposition of Roland Wilder dated August 8, 2008 |
| D | Deposition of Seth Rosen dated August 26, 2008 |
| E | Deposition of Jeffrey Brundage dated September 12, 2008 |
| **Trial Transcripts** | |
| F | Trial Transcript, Volume 2, of June 8, 2011 |
| G | Trial Transcript, Volume 7, of June 16, 2011 |
| H | Trial Transcript, Volume 10, of June 23, 2011 |
| I | Trial Transcript, Volume 11, of June 27, 2011 |
| J | Trial Transcript, Volume 12, of June 28, 2011 |
| K | Trial Transcript, Volume 13, of June 29, 2011 |
| L | Trial Transcript, Volume 14, of June 30, 2011 |
| M | Trial Transcript, Volume 15, of July 5, 2011 |
| N | Trial Transcript, Volume 16, of July 6, 2011 |
| O | Trial Transcript, Volume 17, of July 7, 2011 |
| P | Trial Transcript, Volume 18, of July 11, 2011 |
| Q | Trial Transcript, Volume 19, of July 12, 2011 |
| **Trial Exhibits** | |
| R | J-135, Letter from Roland Wilder to Robert Pastore, dated October 31, 2001 |
| S | J-301, APA's Understanding of TWA's Verbal Proposal, dated March 29, 2001 |
| T | P-3, Letter from Mark Hunnibell to Ronald Rindfleisch attaching receipts for Primadata and Travel, dated December 18, 2001 |
| U | P-131, Memorandum from Roland Wilder to ALPA Legal Department, dated August 16, 2001 |
| V | P-133, Drafts of August Litigation, dated August 17, 2001 |
| W | P-356, Letter from Robert Pastore to Duane Woerth with Resolutions from TWA |

| | |
|---|---|
| | MEC Special Meeting, dated December 6, 2001 |
| X | P-406, Fax from David Singer to Suzie Menoni attaching article by Wesley Kennedy, dated March 29, 2001 |
| Y | D-16, Letter from Steve Rautenberg and Sally Young to Council 3 Pilots, dated April 3, 2001 |
| Z | D-25, STL Council 3 Information Update, dated May 8, 2001 |
| AA | D-35, Letter from Howard Hollander, Ted Case, and David Singer to Council 2 Pilots, dated April 10, 2001 |
| BB | D-42, Memo from Roland Wilder to TWA MEC, dated May 7, 2001 |
| CC | D-74, Minutes of TWA MEC Special Meeting on April 2, 2001 |
| DD | D-88, Minutes of TWA MEC Special Meeting on October 20-23, 2001 |
| EE | D-181, TWA MEC Summary of Duane Woerth's Comment to the TWA MEC/Members on April 23, 2001, dated April 25, 2001 |
| FF | D-207, Letter from Robert Pastore and Keith O'Leary to Arnold Kellen, dated September 24, 2001 |
| GG | D-257, Minutes of TWA MEC Meeting on October 31, 2001 |
| HH | D-411, ALPA's Jumpseat Policy |

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on August 10, 2011.

Steven J. Fram, Esquire

7017473v1

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

Cause No. 02-2917-JEI-AMD

-----------------------------------------x

LEROY "BUD" BENSEL, et al.,

Plaintiffs,

Vs.

AIRLINE PILOTS ASSOCIATION,

Defendant.

-----------------------------------------x

D E P O S I T I O N

The deposition of CAPTAIN MARK HUNNIBELL, taken on behalf of the Plaintiffs in the hereinbefore entitled action, before Francine Garb, a Certified Shorthand Reporter and Notary Public within and for the State of Connecticut, commencing at 10:00 a.m., on October 24, 2006, at the offices of Brandon Smith Reporting, Six Landmark Square, Stamford, Connecticut 06901.

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Page 50

MARK HUNNIBELL
about this deposition?
A No.
Q Earlier in the deposition you mentioned that you had met with Mr. Rindfleisch?
A Yes.
Q And he's one of the organizers at ALPA, right?
A I believe so.
Q When was the first time you met with him in connection with trying to organize the American Airline pilots to join ALPA?
A That is a question I felt confident that you would ask, and I can't say for sure. I think it's possible we may have met sometime late in 2001 or 2002. I don't know.
Q It's possible, certainly sitting here today, your best memory, you are saying it's possible you met him in the year 2001 in connection with trying to organize the American Airline pilots to join ALPA?
A I would say it's possible. I would be more confident in saying it's the year 2002.
Q And that would be the winter of 2002?
A I think if I met with him, it was

Page 51

MARK HUNNIBELL
probably after we had run out of time on the cards.
Q What does that mean?
A Well, the card campaign that we were running timed out. There is -- they are only good for a year, and then you have got to go back and resolicit signatures, and we didn't do that. So, we let the cards expire, and then we transitioned to an effort to generate political support for a merge.
Q You said a whole bunch there.
A I'm sorry.
Q Don't apologize to me.
The 12-month limitation you are talking about, what you are saying is that once these campaign cards go out to the membership, you have 12 months to --
A Twelve months from the date the individual signed, it times out. That is my understanding. My understanding is that the National Mediation Board will not accept as valid a card that was executed more than 12 months earlier.
Q For those of us in the room that aren't

Page 52

MARK HUNNIBELL
labor lawyers, explain what you mean by these cards. What's the purpose of the cards?
A The cards were cards that I sent out in conjunction with my campaign for Vice President, actually, and they are cards that say -- we sent them to every APA member, or that was the idea anyway. And the intent was that pilots would sign and return these cards, and we would get enough of them, which in this case, my understanding is we would need 51 percent, because the pilots were already represented. And once we got enough of them, that we would request an election.
What the cards themselves said was I want to have a representation election on the property at American, and I want ALPA to be my representative, something like that. And then the people would fill it out and mail it back.
Q And they are, physically, like little postcards?
A They are postcards, yes.
Q When were they mailed out?
A I think I mailed them at the end of my campaign. I think it was probably either the beginning of May or middle of May, 2001. It's

Page 53

MARK HUNNIBELL
possible that it was in June, but I don't think it was. I'm trying to remember the time line on that election, and I don't think I went to run off in that election, which would have meant it was probably a May campaign.
Q You said these cards, once signed, they are good for 12 months, right? That is your understanding?
A Yes.
Q During what period were you receiving signed cards back from American pilots?
A Well, I never received them.
Q Where did they go?
A They went to the post office in California.
Q That would be John Clark's post office?
A John got them, yes.
Q How long was he receiving signed cards; do you know?
A I don't know. It was over the course of the year. They came and trickled -- you get an initial bunch, and then they kind of trickled out.
Q I'm trying to understand. I'm asking these questions because you prefaced your

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

MARK HUNNIBELL

conversation occurred, it was well prior to this. This was not a conversation that occurred in December 18th, you know, December 18th or anything like that. It was months earlier that there was any kind of notion.

And so I tried to keep track of my expenses, and then at the end of year it was like, okay, look, let's figure out where we're at with the finances and send them a bill, so to speak, and see what happens.

Q And you were saying that this was probably a while prior --

A I wouldn't say a while prior, but there was not a conversation that took place, that I believe, in December that says, hey, send us your expenses. I don't think that ever occurred between John Clark and anybody at ALPA. I think what happened, we got to the end of the year, we started looking at where we were going and stuff, and thought if we're even thinking about getting reimbursed, we got to submit something.

Q Let me show you a document. I think you have created a nexus in my brain that maybe will make some sense to you now.

MARK HUNNIBELL

THE VIDEOGRAPHER: It's 12:20, we're going off the record.

(Time noted: 12:15 p.m.)

(Luncheon recess taken)

MARK HUNNIBELL

A F T E R N O O N S E S S I O N

(Time Noted: 12:58 p.m.)

(10/14/01 e-mail marked Plaintiffs' Exhibit 5 for identification.)

THE VIDEOGRAPHER: 1:16, we're on the record.

BY MR. PRESS:

Q Mr. Hunnibell, when we broke I was searching for an exhibit, and I found it and I have marked it Exhibit 5.

A Okay.

MR. KATZ: Do you have copies of that for me?

MR. PRESS: Oh, I'm sorry, yes.

Q This, again, as you will note, is an ALPA document, and at the bottom you will see it's marked ALPA. It's an e-mail, it says, from John Clark to Jerry Mugerditchian, dated October 14, 2001.

A Okay.

Q Have you ever seen this before?

A Well, I was a recipient of it, so I probably saw it.

Q That was going to be my next question.

MARK HUNNIBELL

A I see that I'm a CC on it.

Q So you remember receiving this document?

A I can't say that I remember receiving it. Like I think I previously testified, that I remember that this was something that we had been talking about for a while prior to the December letter. So I think -- I think it's possible that the December letter that you -- that was in Exhibit 3 talked about a spreadsheet, and I think that that is probably the spreadsheet that was attached to this.

Q And specifically, you are referring to the next several pages that are attached to Exhibit 5?

A Right. That is probably a printout of my work product.

Q That is a spreadsheet you created, you think?

A Probably, yes.

Q And just for the record, it's a spreadsheet of the expenses that you had incurred trying to organize this campaign, right?

A That's correct.

Q And you sent that spreadsheet, or

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Page 226

SIGNATURE SHEET

I, MARK HUNNIBELL, have read the foregoing transcript of the testimony taken at the deposition on the 24th day of October, 2006, and it is true and accurate to the best of my knowledge.

MARK HUNNIBELL

Subscribed and sworn to before me this day of , 2006.

Notary Public

Page 227

STATE OF CONNECTICUT:
COUNTY OF FAIRFIELD:

I, Francine Garb, a Notary Public within and for the State of Connecticut, do hereby certify that the deposition of MARK HUNNIBELL was held before me on the 24th day of October, 2006, at the offices of Brandon Smith Reporting, Six Landmark Square, Stamford, Connecticut 06901.

I further certify that the witness was first sworn by me to tell the truth, the whole truth and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as hereinbefore appears.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the event of said cause.

Dated at Stamford, Connecticut this 2nd day of November, 2006.

ss/Francine Garb

Page 228

OCTOBER 24, 2006

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| MARK HUNNIBELL | Mr. Press | 5 |
| | Mr. Katz | 199 |
| | Mr. Press | 214 |
| | Mr. Katz | 223 |

EXHIBITS

| FOR IDENTIFICATION | | PAGE |
|---|---|---|
| Plaintiffs' 1 | Group of invoices | 34 |
| Plaintiffs' 2 | Letter | 49 |
| Plaintiffs' 3 | Group of documents | 63 |
| Plaintiffs' 4 | Document bearing Bates No. ALPA 018562 | 82 |
| Plaintiffs' 5 | 10/14/01 e-mail | 103 |
| Plaintiffs' 6 | Document dated 4/3/02 | 128 |
| Plaintiffs' 7 | 2/11/02 receipt | 134 |
| Plaintiffs' 8 | Document bearing Bates Nos. ALPA 24561 through 587 | 142 |
| Plaintiffs' 9 | Document headed "Presentation by Captain Duane Woerth for President" | 154 |
| Plaintiffs' 10 | String of e-mails | 159 |
| Plaintiffs' 11 | Document headed "ALPA Exploratory Committee Report to the APA Board of Directors Winter 2001 Board Meeting" | 166 |

Page 229

EXHIBITS
(Continued)

| | | |
|---|---|---|
| Plaintiffs' 12 | Document dated 1/31/01 | 174 |
| Plaintiffs' 13 | Document dated 4/5/01 | 180 |
| Plaintiffs' 14 | 4/14/01 memorandum | 187 |
| Plaintiffs' 15 | Document dated 6/1/01 | 190 |
| Plaintiffs' 16 | Excerpt from ALPA's website | 217 |

* * *

# Exhibit B

Cause No. 02-2917-JEI-AMD

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW JERSEY

-oOo-

LEROY "BUD" BENSEL, et al.,

Plaintiffs,

vs.

AIR LINE PILOTS ASSOCIATION,

Defendants.

=======================================================

VIDEOTAPED DEPOSITION OF
MAJ. JOHN B. CLARK, JR.

FRIDAY, DECEMBER 1, 2006

INCLINE VILLAGE, NEVADA

Reported by: KIMBERLY J. WALDIE, NV CCR #720, RPR
CALIFORNIA CSR #8696

b5c99f65-a54b-4571-8b2b-2bfed7b52128

Major John B. Clark, JR. - December 1, 2006
Leroy "Bud" Bensel, et al. vs. Air Line Pilots Association

Page 94

document, it's got -- it says ALPA, and there's a number. Do you see that?
A Uh-huh.
Q And that would signify that Mr. Katz's law firm produced this. All right?
A Okay.
Q And this is the way the document came to me.
A Okay.
Q Did you forward this e-mail on to somebody at ALPA? Did you do that?
A I can't tell you that. I have no idea.
Q Right. Okay.
A I mean it -- since, you know, it looks to me like whoever forwarded that information was redacted from the top of this, I don't know.
Q Fair enough.
A My guess is if Dennis Petretti was running for president, that this was sent to as many pilots at American Airlines as possible. Probably above 90 percent of them. So I could have been a recipient of this, but I don't know that I was, and I couldn't tell you if I forwarded it.
Q Fair enough. Now, if you look at the first paragraph of his e-mail --
A Okay.

Page 95

Q -- Captain Petretti says, (Reading): I would like to preface my comments with the understanding that what I have -- should be "to say" -- what I have to say has to do with the recent and ongoing activity by APA leadership in rejoining ALPA.
And my question is, as far as you know, what activity was ongoing by APA leadership to rejoin ALPA in April of 2001?
A The ALPA Exploratory Committee was probably showing up in their mailboxes as he was sending this. That's it.
Q That -- that was the only thing that the leadership was undertaking at that point?
A That's it.
Q All right. Other than you and Captain Hunnibell's effort, your grass roots campaign, if you will, was there anybody else at the APA that was working to organize the American pilots to join ALPA?
A There may have been.
Q And I know that you got some support along the way. But was there another, you know, significant effort underway that you know of?
A There may have been.
Q Can you tell me anything about it?
A No. I'm saying there is -- the possibility

Page 96

exists that there may have been.
Q But sitting here today you are not aware of any?
A No.
Q All right.
A Nor was I back then.
Q Now, you recall that there were two mailings that you and/or Mr. Hunnibell were involved in of campaign cards. Right?
A Uh-huh.
Q All right. And the first one was -- well, the first one, did it go to all the pilots, all the American Airline pilots?
A It went to whatever distribution list Prima Data had.
Q Prima Data, what -- what's that?
A That's the firm that APA uses to send campaign mailers to. They provide the addresses of the pilots.
Q That was your intention, to --
A APA provides the list -- the distribution list to Prima Data, and Prima Data sends it to that list. You, as the candidate, don't get to see the list.
Q Can anybody call Prima Data and get a copy of that list?
A Absolutely not.

Page 97

Q That's proprietary to the union. Right?
A Of course.
Q Okay. And then there was a second mailing then. Was it your intention to mail to the same group of people at that time?
A Yes.
Q All right. Do you recall generally what the time frame was between the two mailings?
A No.
Q Was it more than six months?
A No, because the election cycle is not that long.
Q So it was less than six months?
A I would say it was probably four to six weeks at the most.
Q Okay.
A If I recall that the cards were sent in late May or June, and you are showing me this saying that it was sent in mid-April, there's your four to six weeks.
Q So sitting here and looking at the record that we have before us, you would -- you would draw the inference or -- let me start over and ask a real question.
From everything that you know and you've seen today, you would believe that the first mailer went out

25 (Pages 94 to 97)

Laurie Webb & Associates 517 S. 9th Street Las Vegas, Nv. 89101 1-800-982-3299

b5c99f65-a54b-4571-8b2b-2bfed7b52128

Major John B. Clark, JR. - December 1, 2006
Leroy "Bud" Bensel, et al. vs. Air Line Pilots Association

Page 186

and sign the deposition and make any corrections.
THE WITNESS: I'll make corrections if they're -- if those are -- any need to be made and then I will sign the corrected copy.
MR. PRESS: Right on. That's it.
THE WITNESS: Okay.
THE VIDEOGRAPHER: This concludes the deposition of John Clark on December 1st, 2006. The time going off record is 5:57 p.m.
(The proceedings concluded at 5:57 P.M.)

______________________
MAJ. JOHN B. CLARK, JR.

Page 187

I, KIMBERLY J. WALDIE, a Certified Shorthand Reporter licensed in the State of California and the State of Nevada, do hereby certify:

That on FRIDAY, DECEMBER 1, 2006, at the Hyatt Regency Lake Tahoe, 111 Country Club Drive, Incline Village, Nevada, personally appeared MAJ. JOHN B. CLARK, JR., who was duly sworn to testify and deposed in the matter entitled herein;

That said deposition was taken in verbatim stenotype notes by me, a Certified Shorthand Reporter, and thereafter transcribed into typewriting as herein appears;

That the foregoing transcript, consisting of pages 1 through 186, is a full, true and correct transcription of my stenotype notes of said deposition to the best of my knowledge, skill and ability.

I further certify that I am not a relative or employee of counsel of any of the parties, nor a relative or employee of any party involved in said action, nor financially interested in the action.

At the conclusion of the proceedings the witness requested the transcript be e-mailed to him.

Dated at Reno, Nevada, this 11th day of December, 2006.

______________________
KIMBERLY J. WALDIE, CSR No. 8696
NV CCR #720, RPR

Page 188

STATE OF _______________)
) ss.
COUNTY OF ______________)

I, ________________________, a notary public in and for the County of __________________,

State of ____________________, do hereby certify:

That on the ______ day of ______________, 2006 before me personally appeared MAJ. JOHN B. CLARK, JR., whose deposition appears herein;

That any changes in form or substance desired by the witness were entered upon the deposition by the witness;

That the witness thereupon signed the deposition under penalty of perjury.

Dated: At __________________________,
This _____ day of ____________________, 2006.

______________________________

Page 189

OFFICER'S ACTIONS RE SIGNING OF DEPOSITION
PURSUANT TO NEVADA RULES OF CIVIL PROCEDURE

DATE
12-11-06 AT DIRECTION OF COUNSEL THE WITNESS WAS SENT AN E-MAIL OF THE TRANSCRIPT

WITNESS SIGNED DEPO

ORIGINAL SENT TO

OTHER ACTIONS

48 (Pages 186 to 189)

Laurie Webb & Associates 517 S. 9th Street Las Vegas, Nv. 89101 1-800-982-3299

b5c99f65-a54b-4571-8b2b-2bfed7b52128

# Exhibit C

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

LEROY "BUD" BENSEL, et al.,
Plaintiffs Civil Action No.
vs. 02-2917 (JEI)
AIR LINE PILOTS ASSOCIATION,
Defendant
_______________________________/

The videotaped deposition of ROLAND P. WILDER, JR., was held on Friday, August 8, 2008, commencing at 9:36 a.m., at the Law Offices of Baptiste & Wilder, P.C., 1150 Connecticut Avenue, N.W., Suite 500, Washington, D.C. 20036, before Steven Poulakos, Notary Public in and for the District of Columbia.

REPORTED BY: Steven Poulakos

REPORTING ASSOCIATES, LLC
112 Haddontowne Court, Suite 202
Cherry Hill, NJ 08034
(888) 795-2323

A P P E A R A N C E S:

ON BEHALF OF THE CLASS REPRESENTATIVES:
ALLEN P. PRESS, ESQUIRE
Green, Jacobson & Butsch, P.C.
7733 Forsyth Boulevard, Suite 700
St. Louis, Missouri 63105
Telephone: 314-862-6800
Email: Press@stlouislaw.com

ON BEHALF OF THE PLAINTIFFS:
NICOLE M. ACCHIONE, ESQUIRE
Trujillo, Rodriguez & Richards, LLC
258 Kings Highway East
Haddonfield, N.J. 08033
Telephone: 856-795-9002
Email: Nacchione@trrlaw.com

(APPEARANCES continued on next page.)

(A P P E A R A N C E S continued.)

ON BEHALF OF THE DEFENDANT:
DANIEL M. KATZ, ESQUIRE
Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W, Suite 250
Washington, D.C. 20016
Telephone: 202-659-4656
Email: Danielmkatz@comcast.net

ALSO PRESENT: Leroy Bensel
Bill Foster, Videographer

INDEX
Deposition of ROLAND P. WILDER, JR.
August 8, 2008

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Press | 7 |
| Mr. Katz | 188 |
| Mr. Press | 220 |
| Mr. Katz | 227 |

| EXHIBIT NUMBER: | | MARKED |
|---|---|---|
| 117 | A Grievance | 42 |
| 118 | A Document from ALPA's Files | 49 |
| 119 | The March 13th Memo | 58 |
| 120 | A Copy of an Invoice | 70 |
| 121 | An E-mail | 72 |
| 122 | A Memo dated March 12th, 2001 | 73 |
| 123 | An E-mail dated March 10th | 82 |
| 124 | A Letter dated March 26th, 2001 | 86 |
| 125 | A Collection of Legal Papers | 95 |
| 126 | A Grievance dated March 22, 2001 | 107 |
| 127 | A Memo dated July 2nd, 2001 | 129 |
| 128 | A Draft Letter dated 7/2/01 | 140 |

(INDEX continued on next page.)

the MEC would pass on this at the meeting. So I don't think that he was attempting -- attempting to foreclose MEC action by telling me to speak to Mr. Woerth on that.
Q I think I understood you, but actually can you -- go ahead, Mr. Wilder.
A Yes. I think what I'm trying to say is that Mr. Pastore was reserving, to the voting members of the MEC, the decision of the MEC to proceed or not, but he wanted to be ready, as I did, in the event the MEC chose to go forward.
Q Very good.
I mean the point of that was to preserve the litigation option as an option?
A That's correct.
Q Okay.
A And as --
Q And in fact you spoke -- well, do you remember speaking to the local counsel in New York before the April 2nd meeting concerning your strategy? Captain Hollander and First Officer Singer would have been the -- the elected members?
A I may have spoken to David Singer and Captain Hollander, but I don't have a clear memory of

doing so.
Q That's okay.
A I mean I certainly spoke to those -- to those individuals later on. In fact I went to a meeting of the New York MEC. And I know I spoke to them there, but that was after, well after this situation. So what I'm saying is that I don't have a clear memory of speaking to them before the April 2nd meeting, but I certainly am not discounting --
Q Okay.
A -- the fact that it happened if they have a better memory than I do.
Q The -- this 1113 motion --
A Yes.
Q -- that -- you recall that was filed on March 15 by TWA, right around mid-March?
A Yes.
Q Now, was that a big surprise to you when that motion got filed?
A No.
Q Wasn't that something that everybody anticipated would happen if, you know, negotiations broke down?

A I didn't -- don't think that anyone was surprised by it.
Q Okay. Can I have this grievance here?
Do you remember after it got filed that ALPA filed a grievance saying filing the 1113 motion violated our contract? Do you remember that grievance?
A I do not remember that, but it's very possible.
Q Oh, okay.
(Whereupon, a document was marked as Deposition Exhibit Number 126.)
BY MR. PRESS:
Q Well, I'll hand you this if you've never seen it then, Exhibit 126.
A (Witness reviewing document.)
Q This is a grievance dated March 22, 2001, grieving the filing of the 1113 motion, right?
A (Witness reviewing document.)
Yes, I have the exhibit.
Q Yes.
Were you aware that that grievance was filed?
A I'm sure I was at the time.
Q So we saw ALPA filing a grievance on

March 2 grieving the deal itself and then three weeks later they're filing a grievance on the 1113 motion, right?
A Correct.
Q They -- they are fighting at that point?
A Yes.
Q And I think you've said it as well as anybody could. What -- what happens to employee groups that fight?
MR. KATZ: Objection to form. It's vague.
THE WITNESS: I -- I had said to -- in the Court proceeding and in my earlier deposition -- that in my experience that good things happen to employee groups that fight.
BY MR. PRESS:
Q Right.
Okay. Getting now to the April 2nd meeting in particular. Was that the first time that you learned that ALPA was indeed opposed to your litigation strategy at that meeting?
A In so many words, yes.
Q And -- well, I mean it became clear to you that day that they were not going to support the litigation?

Page 145

fundamentally flawed?
MR. KATZ: I'm going to object as to form. He's already testified that he didn't ever see the -- didn't read the memo before. And I don't think it's proper examination even in a deposition to ask him whether he agrees with a memo written by somebody else about which he never even read before.
MR. PRESS: The judge may agree with you, but as you know that was just for the record.
BY MR. PRESS:
Q You can answer.
A I think the -- my answer to that is Mr. Warner and Marta had a disagreement with Bill, Josh McInerney, and myself over the theoretical basis for the litigation that we were outlining. That's quite clear.
Do I think it was -- do I think our work was fundamentally flawed?
Q That's my question.
A I think not.
Q Okay. If you look at the fourth page of the memorandum, section 3, entitled, Wilder Memorandum.
A Yes.
Q I'd like you to read -- read into the

Page 146

record, if you would, the first sentence of that paragraph.
A TWA merger consult, Roland Wilder, has been openly frustrated by the lack of leverage held by the TWA-LLC pilots in the seniority integration process and he has consistently attempted to find anything that will increase that leverage. The Wilder memorandum outlines the most recent theory.
Q There you go.
A Yes.
Q You would agree with that statement, you were frustrated?
A I'm sorry.
Q You were frustrated?
A Yes.
Q And you were consistently attempting to find anything to help increase the pilot's leverage, weren't you?
A I was.
Q And by ALPA rejecting this strategy that you were outlining, in your opinion that was not helpful --
MR. KATZ: I object.
THE WITNESS: It -- it didn't minimize my

Page 147

frustration, no.
BY MR. PRESS:
Q Okay. There was one more time that I'm aware of where you came up with a litigation strategy.
A Yes.
Q Okay.
A Yes.
Q Let's look at that one.
(Whereupon, a document was marked as Deposition Exhibit Number 131.)
BY MR. PRESS:
Q I've handed you now Exhibit 131 --
A Yes.
Q -- which is an August 16th, 2001 memo from you to ALPA legal department.
A Correct.
Q And this was a memo that was prepared by your firm and reviewed and approved by you, right?
A Oh, yes.
Q And, again, with as little legalese and as much common parlance as you can give us, tell us what's going on in this memorandum, what you are proposing to do and why.
A In mid-August of 2001 the TWA merger

Page 148

committee and the MEC feared that the American pilots were in the process of developing an agreement with the American Airlines that would be foisted on the TWA pilots over their objection.
Q The so-called cramdown?
A Yes.
Q All right. Now, describe more particularly what you are referring to with this cramdown. What does that mean?
A Well, the -- at the time in mid-August the merger committees for the American pilots and the TWA pilots were engaged in seniority integration negotiations. The American pilots had before it a very comprehensive, econometrically based seniority integration plan that the TWA merger committee, with the guidance of Professor Cannon, had developed.
And the purpose of that was to set forth an integrated seniority list composed of both American and TWA pilots in a way that would be fair to both groups. That was what -- one of the things that we were discussing.
The fear was that the American pilots would abandon that process, make an independent deal with American Airlines pursuant to the American collective

bargaining agreement and then foist that seniority integration plan, developed only by the company and the American pilots, on the TWA pilots.
Q Some sort of --
A The purpose of the strategy outlined on August 16th, 2001 was to prevent that.
Q Okay. And in what manner were you going to prevent this unilateral action from taking place?
A This -- well, that requires a bit of background.
Q Yes. The whole -- right.
A We spoke earlier about the best efforts obligation that American undertook in March of 2001. The idea in Exhibit 131, the August 16 memo, was that we would seek an injunction against American and TWA to enforce that obligation, pending arbitration, of American's commitment to use its best efforts.
Q All right. Let me stop you right there.
It was your belief that American Airlines had -- had broken its promise to use its best efforts?
A That's correct.
Q Okay. And -- and the idea was that there would be, I guess, a grievance filed --
A Correct.

Q -- to complain about that --
A Yes.
Q -- and to seek some appropriate remedy?
And the fear was that you are going to have this seniority list crammed down your throats before you could have that best efforts grievance heard and decided? That was the fear?
A That's correct.
Q And so to prevent that from happening you wanted to go to Court and get an injunction?
A Correct.
Q All right. And the injunction specifically would have asked the federal judge to do what?
A To prevent the implementation of a seniority list pending the determination of the best efforts grievance by the arbitrator --
Q Okay.
A -- which would have taken some time.
Q And did you believe that this was another way to help generate some leverage for the TWA MEC in its merger claim?
A More than that. It was a way of preventing what was feared by the TWA MEC as an imminent disaster.
Q And, again, this was your best opinion at

the time as to how to deal with the issue presented to you?
A Yes.
Q Okay. And you would -- you have the same opinion today?
A I would.
Q Now, this was an idea that you gained some acceptance from ALPA initially, right?
A That's correct.
Q You presented this idea to the ALPA legal department on August 16th, right?
A Correct.
Q And do you remember that you then, later in the month of August, you had a meeting at ALPA headquarters with Mr. Cohen and President Woerth?
A That's correct.
Q Can you explain who accompanied you to that meeting and what was discussed?
A My recollection is that Master Chairman Pastore was present and I believe Captain Day, the then chairman of the TWA merger committee, was present, but I am not absolutely certain of that.
Q Okay.
A I believe so.

On the ALPA National side was Mr. Woerth, Jonathan Cohen and I believe Mr. Woerth's then executive assistant whose name escapes my mind.
Q Howard Attarian?
A Thank you.
Q He was there too?
A He was.
Q And for the record, Jonathan Cohen, he was head of the whole ALPA legal department?
A Correct.
Q Right.
And what did Mr. Cohen say to you about the strategy you proposed in your August 16th memo?
A It was my impression that Mr. Cohen as well as Captain Woerth were content that the approach that I had suggested had merit --
Q Okay.
A -- and could -- and could prevent a cramdown.
Q Okay. We saw you writing a letter to Captain Woerth in March seeking authority to file this suit.
Was the point of this meeting to seek that authority right then without having to write a letter

and wait for a response?
A No. I think the point of the meeting was to discuss the concern with Captain Woerth and acquaint him with the idea that we had to deal with it. And certainly it was my impression that if a cramdown came in mid-August or shortly -- shortly thereafter, that permission would have been forthcoming.
Q Okay. You understood as a result of that meeting that you were going to be allowed to file this injunction suit?
A Somebody -- somebody would.
Q Right.
You understood that ALPA was going to authorize this one?
A I thought so.
Q Okay. And in reliance on that you went back to your office and had more papers filed to carry out the lawsuit?
A No, not at that point. We -- whether we would move on this would be dependent upon whether the American pilots and American Airlines sought to come up with a deal that would render meaningless the rest of the negotiations.
Q Okay.

A Now, I can't say that we did not work on something shortly after that meeting, but the -- certainly the papers were not prepared in any -- anything close to final form as we had in March of 2001.
(Whereupon, a document was marked as Deposition Exhibit Number 132.)
BY MR. PRESS:
Q Here's Exhibit 132. This came from your file, I believe, Mr. Wilder. Exhibit 132 is a draft letter dated August 16, 2001 to Mr. Carty.
Do you recognize this is a draft letter that you had prepared for Mr. Woerth's signature?
A I prepared it for somebody's signature.
Q You think it would have been for his signature?
A I would assume so, but I certainly don't know.
Q Okay. Do you know if a letter like this was signed by Mr. Woerth?
A No, it wasn't. But this was a response to the seniority integration plan recently imposed by your company on TWA LLC's agents. And that imposition did not come in August or September.

Q Correct. All right.
A So --
Q There's no need for the letter?
A There was no need for the letter.
Q I understand.
A That's correct.
Q So you prepared this memorandum in August 16th, mid-August, and then got authority to -- or at least talked to the ALPA people about it and got their authority. You were doing it at that time -- the timing of this was because the facilitated negotiations you understood were supposed to end at the end of August?
A That's right.
Q Right.
But as a matter of fact they continued thereafter; the parties continued to talk some?
A The parties continued to talk I believe without the facilitator moving into September and October.
Q All right. And so this idea of a lawsuit, it got shelved basically until the negotiations were kaput?
A Yes.

Q And when was that? Do you remember?
A The negotiations failed finally, I believe, on October 26, 2001.
Q Okay. Some time around there.
A Yes.
Q And they were -- the collapse of the negotiations actually occurred here in Washington, D.C.?
A It did.
Q All right. Can you tell us the circumstances of how you learned of -- well, I guess the end dates for you, the -- what you were doing and how you learned that the negotiations were over?
A Well, I was present.
Q Go ahead.
All right. You were present for the negotiations themselves?
A Yes.
Q All right. And at one point were you directed to go to your office and complete the necessary work to get the lawsuit ready to go?
A At -- at the point where it appears the American pilots would not move any further off the proposal that they brought with them to Washington.

something else in response to that last question. Was there something else you wanted to say about whether you had ever been in a situation like that before?
A Only to point out that this situation was unique.
Q So you really hadn't been in a situation like the one you were in, in 2001, in representing other clients prior to that? Is that what you are saying?
MR. PRESS: Object to the form of the question.
THE WITNESS: I think what I was trying to describe was the fact that the overall situation was unique, that there was no 1113 interplay with the Delta/Western or the PSA/U.S. Airways cases that I have described. And that, therefore, there was no interplay with the national union quite like there was in this case. It was a unique situation.
BY MR. KATZ:
Q Western Airlines wasn't in bankruptcy when Delta acquired it?
A That's correct.
Q And PSA wasn't in bankruptcy --
A It was not.

Q -- when U.S. Air acquired it?
A Correct.
Q So the interplay of the bankruptcy laws with the Railway Labor Act wasn't involved in those situations either?
A That's correct.
Q And I think that you stated in answer to Mr. Press's questions, didn't you, that the litigation was -- that you were proposing in each of these instances -- was novel? Is that true?
A Yes.
Q All right. And in view of the complications presented by section 1113 of the bankruptcy code, it's also true that the proposed litigation was complex.
MR. PRESS: Object to the form of the question --
BY MR. KATZ:
Q Is that question fair?
MR. PRESS: -- as to which litigation you are referring to.
BY MR. KATZ:
Q As to each of those three pieces of litigation.

A The legal situation as a whole was complex, yes. The litigation that I was proposing was also complex.
Q And just as an example we have the last exhibit, and Mr. Press showed you, was Exhibit 135, your October 31 letter --
A Yes.
Q -- memorializing the advice you had previously given orally on October 22.
A Correct.
Q At the bottom of the first page and the top of the second page you describe the steps in the plan, in general, as including litigation grievance, court enforcement of the arbitration award if successful and the single carrier proceeding. Plus in the next sentence you mention legislation mandating arbitration of seniority integration issues.
Can you give us any more detail on what these separate elements involved?
A I can try.
Q Please.
A I was trying to describe to the MEC the -- just how steep the task was in order to be successful, that all of the legs of these various strategies would

have to fall into place in order to, overall, get the MEC where it wanted to go. And we discussed the litigation. The grievance, of course, was filed and that was heard before Richard Block I understand and Arbitrator Block ruled against ALPA.
The Court enforcement would presuppose success in the litigation we had recommended in August. The single carrier proceeding was relevant because, as I indicated, the carriers came together. There was a chance that under the Delta/Western situation the case would be mooted and wouldn't be able to enforce these obligations. And then, of course, the legislation had to pass and...
Q To back up to the NMB single carrier proceeding --
A Yes.
Q -- what -- what was necessary there, in order to be successful, is that the government agency would need to delay its approval of the single carrier status?
A That certainly would have been helpful. If the NMB had wanted to move forward with the single carrier determination, and of course it did, we would have to rely upon the injunction to hold the carriers

Page 193

apart.
Q To keep the carriers from merging the operations --
A Yes.
Q -- of American and TWA?
A Correct. That would have even put more strain on the litigation.
Q And this was at a time in the fall of 2001 when the airline industry was essentially devastated?
A It was after 9/11 and the revenue traffic of the various airlines, not just TWA, American, but the rest of the industry was very, very seriously affected, adversely affected.
Q Were the versions of the bill, the Bond bill that you saw, to have a retroactive effect or to be prospective only?
A We prepared it so it would have a retroactive effect.
Q And what were the -- any -- did you have any indications from anyone on the Hill about that?
A No. There were no positive indications as of late October and 2001 that it would pass in retroactive form.
Q And the bill did pass in the Senate and it

Page 194

was attached as a rider to a defense appropriations bill, wasn't it?
A That's correct.
Q Did it ever pass in the House?
A I -- I think that is correct.
Q It did not pass in the House?
A Right.
Q And it was -- the conference committee pulled that item from the defense appropriations bill when it reported it out. Is that true?
A I think that is correct, yes.
Q Were there any indications from the White House that -- I guess it was President Bush at that point -- that President Bush would have signed it if it hadn't --
A Not that I know of. But Senator Bond, of course, was an influential Republican and that gave us hope on that score.
Q Let me read because I've only one got one copy of this. This is the complaint in this case, the second amended restated complaint. Let me just read paragraphs 98 and 99. And then I'll pass them to you --
A Of course.

Page 195

Q -- so that you can see them.
98 says: During this time and at all times after October 2000, ALPA and its attorneys and advisors had an undisclosed and concealed conflict of interest in representing the TWA pilots and class in that ALPA with, upon information and belief, the blessing and assistance of APA was seeking to convert and organize the incumbent American pilots under ALPA.
And paragraph 99 says: Upon information and belief ALPA's overriding objective and goal was not to achieve a fair and equitable integration of the classes' seniority, but to appease APA and the incumbent American pilots and foster its organizational efforts.
Let me give you these because I know that was a lot of words, 98 and 99, and ask you, after you've had a chance to review them, whether you have any comment on the accuracy of those allegations.
A (Witness reviewing document.)
I had been asked --
MR. PRESS: I am sorry, before you answer, show my objection to the form of the question.
THE WITNESS: I -- I had been asked about this subject during my earlier deposition. And I think

Page 196

what we established at that point when my memory was fresher that I didn't know about this organizational effort during the time that I was the TWA MEC merger counsel.
BY MR. KATZ:
Q Are you aware of any evidence that would support those allegations, Mr. Wilder?
A No. As I said it came up in my deposition and I think at that point I said that I was not aware of these allegations and would not have been aware of them unless my clients brought them to my attention. And I first thought that they must have and then I -- I simply could not remember anybody saying this.
Q So you are not aware of any evidence that was --
A Yes. I'm not sure I can -- my knowledge is such that -- I can help with this question.
Q Let me ask you about one other thing with regard to legislation.
A Yes.
Q Isn't it true that you wouldn't really be in a position to know what actions ALPA took to support the Bond bill, if any?
MR. PRESS: Object to the form of the

Q And in September of 1983 Continental rejected its collective bargaining agreements, didn't they?
A That's correct under the old provisions of the code.
Q And the rejection doctrine was well established in bankruptcy law in commercial contracts?
A Yes.
Q And when you reject a commercial contract, the contract -- the debtor in possession nullifies that contract, doesn't it?
A Which did rise to a bankruptcy claim --
Q Right.
A -- in favor of the creditor, yes.
Q In the Continental bankruptcy, isn't it true that the company treated the Continental employees very differently after the rejection of their collective bargaining contracts?
A Of course.
Q It cut their pay in half?
A (Inaudible response.)
Q It abrogated their -- their -- their grievance arbitration provision?
A Yes.

Q And it discontinued recognizing the unions that had been the collective bargaining representatives for those employees?
A That's correct.
MR. KATZ: Thank you, Mr. Wilder.
MR. PRESS: Nothing further.
THE VIDEOGRAPHER: The deposition concludes at 3:35:52.
(Reading and signature not waived.)
(Whereupon, at 3:35 p.m., deposition was adjourned.)

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

____________________________
ROLAND P. WILDER, JR.

District of Columbia,
To wit:

I, Steven Poulakos, a Notary Public of the State of Maryland, do hereby certify that the within-named witness, personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 25th day of August, 2008.

____________________________
Steven Poulakos
Notary Public

My commission expires:
June 17, 2009

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

LEROY "BUD" BENSEL, et al.
Plaintiffs
vs. Civil Action No.
AIR LINE PILOTS ASSOCIATION 02-2917 (JEI)
Defendant
_______________________/

The Videotaped deposition of SETH ROSEN was held on Tuesday, August 26, 2008, commencing at 9:00 a.m., at the Law Offices of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., 1100 New York Avenue, N.W., Suite 500, West Tower, Washington, D.C. 20005, before Steven Poulakos, Notary Public in and for the District of Columbia.

REPORTED BY: Steven Poulakos

A P P E A R A N C E S:

ON BEHALF OF THE CLASS REPRESENTATIVES:
ALLEN P. PRESS, ESQUIRE
Green, Jacobson & Butsch, P.C.
7733 Forsyth Boulevard
Suite 700, Pierre Laclede Center
St. Louis, Missouri 63105
Telephone: 314-862-6800
E-mail: press@stlouislaw.com

ON BEHALF OF THE PLAINTIFFS:
NICOLE M. ACCHIONE, ESQUIRE
Trujillo, Rodriguez & Richards, LLC
258 Kings Highway East
Haddonfield, New Jersey 08033
Telephone: 856-795-9002
E-mail: nacchione@trrlaw.com

(APPEARANCES CONTINUED ON THE NEXT PAGE)

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
DANIEL M. KATZ, ESQUIRE
Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W., Suite 250
Washington, D.C. 20016
Telephone: 202-659-4656
E-mail: danielmkatz@comcast.net

ALSO PRESENT: Mike Huff, the Videographer

I N D E X
Deposition of SETH ROSEN
August 26, 2008

| Examination by: | Page |
|---|---|
| Mr. Press | 6,166 |
| Mr. Katz | 166 |

| Exhibit No. | | Marked |
|---|---|---|
| 136 | A Copy of the Objection Filed by ALPA | 43 |
| 137 | A Letter from Cohen, Weiss & Simon | 48 |
| 138 | A Memo Prepared by David Holtzman | 60 |
| 139 | A Copy of the Transition Agreement Between TWA-LLC and ALPA | 67 |
| 140 | An E-mail | 70 |
| 141 | An E-mail | 72 |
| 142 | A Letter | 106 |
| 143 | A September 28th, 2001, Memo | 114 |
| 144 | A Series of E-mails | 130 |
| 145 | A List | 160 |

ways you do it. Sometimes it's alone. Sometimes it's with the pilots going to a Congressman's office and sitting down and talking through the issue. That's usually the way they work.

Q Okay. And -- and I really wanted to exclude the TWA pilots and focus only on ALPA National's efforts.

A Well, this department is very limited. There's only a few people in the department that do lobbying. There's either two or three people depending on the time. I'm not sure whether it was two or three people at that point. I think there were three. I think John Baker.

MR. KATZ: Jerry Baker.

THE WITNESS: Jerry Baker I think was in the department also. So there may have been three people who are kind of the active lobbyists. That's -- that's the setup. So those are the people who do it. And then it would be TWA people.

BY MR. PRESS:

Q Okay.

A It would be those professionals, also, plus the pilots.

Q I want to talk to you about Roland Wilder's

third litigation strategy in his August 16th, 2001, memorandum. If you could get that in front of you.

MR. KATZ: Give him a chance to read it.

MR. PRESS: I've got to find my copy first.

MR. KATZ: I may have a copy of it.

THE WITNESS: (Witness reviewing document.)

BY MR. PRESS:

Q You've reviewed a document, a memo, dated August 16th, 2001, from Roland Wilder to the ALPA legal department? Is that what you've just done?

A Yes, I did.

Q And just for the record, Mr. Rosen, I should have handed this to you before.

A Yes. That's all right.

Q We marked it as Exhibit 131 in Roland's deposition.

A Okay.

Q All right?

A Uh-huh.

Q And you've reviewed the same memorandum?

A Yes.

Q True? Okay.

And now my question is -- well, first of all, it's a fact that ALPA did not authorize the filing

of the lawsuit that Mr. Wilder wanted to file as part of this memo, correct?

A Correct.

Q And can you tell -- can you tell us why ALPA would not give that authority?

A This case he was -- the underlying basis for the memo was to protest or to grieve or to seek some kind of injunctive relief based on the American's failure to comply with the best efforts letter.

And as you know that process was still going on at that point in time. And he was anticipating the fact that it would probably break down and not be successful. And he wanted to be in a position to move if, in fact, that facilitation agreement broke down. And essentially go in to compel -- if I understood him, I understand it correctly -- to compel arbitration of a minor dispute and to somehow enjoin implementation of a joint list that may or may not come out which was obviously speculative at that point.

In the end the legal action was going to be based on the theory that we had to have this minor dispute. We had to go there to compel arbitration over a minor dispute. In the end there was a grievance

filed over that particular dispute and the company agreed to go to a system board.

So they participated which pretty much obviated the necessity of this litigation. And so we proceeded on and exhausted, you know, the process. And ultimately, as you know, the following February Richard Bloch came down with the decision that found that the company had not violated the best efforts letter.

Q So it was ALPA's position that there was no need for the injunction that Mr. Wilder wanted to obtain because the reasonable best efforts grievance had been filed and American participated in that?

A Well, I think the grievance was filed subsequently. I'm not sure it was filed then.

Q That's true.

A It was filed after the whole process broke down. I am not -- I don't remember exactly when the grievance was filed. I think it was -- it might have been January, but I'm not sure. I don't want to just reach for a date. I'm just not sure of the date.

Q It's my understanding of the facts that the reasonable best efforts grievance was filed after the decision -- after the supposed cramdown came.

A After the October series of letters and --

Q All right. And you didn't talk to -- well, strike that.

MR. PRESS: That's all.

THE WITNESS: All right.

MR. KATZ: Thank you.

THE VIDEOGRAPHER: This concludes the video deposition at 12:49 p.m.

\- - -

(Whereupon, at 12:49 p.m., deposition was adjourned.)

\- - -

(Exhibits were retained by counsel.)

JURAT

I, SETH ROSEN, do hereby certify that I have read the foregoing transcript of my testimony taken on August, 26, 2008, and have signed it subject to the following changes:

PAGE LINE CORRECTION

________________________
SETH ROSEN

DATE ______________

Sworn and subscribed to before me this __________ day of _______________, 2008.

___________________________
NOTARY PUBLIC

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Steven Poulakos, registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 4th day of September, 2008.

________________________
Steven Poulakos
Notary Public

My commission expires:
June 17, 2009

# Exhibit E

**In The Matter Of:**

*Bensel v.*
*Air Line Pilots Association*

---

*JEFFREY BRUNDAGE*
*Vol. 1*
*September 12, 2008*

---

*REPORTING ASSOCIATES, LLC*
*Certified & Registered Professional Reporters*
*Cherry Hill -- Philadelphia -- Trenton*
*(888) 795-2323*
*www.ReportingAssociates.com*

Original File 0912brun.txt
Min-U-Script® with Word Index

issues?

A Yeah. I mean, we were, I would say, not only specific but we need absolutely clear to the folks at TWA that we were unwilling to proceed with the transaction in any way, shape or form if the scope provisions remained in the TWA agreements.

Q What was your authority, what did you base your authority on that the transaction wouldn't close if there was a scope provision?

MR. HAVERMANN: Object to form. Go ahead. You can answer.

A Um, I don't understand the question.

Q OKAY.

A If you can explain to me what you mean by authority.

Q Sure. I mean, you made the statement to Terry and -- or, I'm sorry, to Terry Hayes that the transaction wouldn't close if there wasn't a resolution of the collective bargaining agreement issue, correct?

A Yes.

Q What did you base that statement on?

A Conversations with Don Carty, conversations with the folks in our corporate development area, and just our internal discussions that we had at American

about the acquisition and what shape the acquisition would need to take. And, in those discussions there was never a time when we contemplated moving forward with the acquisition unless the scope issues were resolved.

Q Do you know what, do you have an opinion of whether or not you would have had to have shareholder approval to back out of the asset purchase agreement?

A No, I don't.

MR. HAVERMANN: Object to form. You can answer.

A No idea.

Q Did you talk to anybody about what would have to happen to walk away from the deal with TWA?

A Um --

Q What would have to happen internally at American to allow you to walk away from the deal with TWA?

A No.

Q At some point there was an agreement from American to use its reasonable best efforts to facilitate the resolution of the collective bargaining agreement issue, is that correct?

A The agreement was to work towards an

agreement on seniority integration. So I'm, I'm not sure what you mean when you say the collective bargaining agreement issue.

(Plaintiffs' Deposition Exhibit Number 194 was marked for purposes of identification.)

MR. HAVERMANN: Is that 194?

MS. RODRIGUEZ: 194.

BY MS. RODRIGUEZ:

Q Mr. Brundage, do you recognize this document?

A I do.

Q Can you tell me what it is?

A It's a representation by American to the chairman of the TWA MEC, the ALPA MEC, where we agreed to use our reasonable best efforts with our labor organizations, specifically the pilots, to secure a fair and equitable process for the integration of seniority.

Q Do you know, do you recognize the signature on that?

A It's been a long time. I believe it may be Ann McNamara's signature but I'm -- Ann left the company a number of years ago but this, this signature is familiar to me and I think it's Ann's. It's very

difficult to tell from the signature.

Q It is very difficult to tell. And again who is Ann McNamara?

A She was general counsel at the time.

Q Do you know who came up with the reasonable best efforts language?

A I believe the language was developed by Harry Rissetto from Morgan Lewis who was outside counsel, Dick Malahowski, who is labor counsel at American, and, and myself and folks that work for me in the labor relations department.

Q So you were involved in the process of coming up with the reasonable best efforts language?

A Yeah. I was involved in the discussions about what representations that we could actually make. Because of the limitations in our collective bargaining agreements, that was, that was on its face but also the practical labor, labor relations considerations in light of the circumstances we found ourselves in from the Reno transaction.

Q And you gave us -- do you know how this letter got to Mr. Pastore?

A I'm going to speculate but if I remember correctly there were meetings that occurred just

Page 57

BY MR. KATZ:
Q I have a few questions on behalf of ALPA. I take it from what you've been saying this morning, Mr. Brundage, that American was not bluffing about walking away from this transaction unless the scope provisions of the union contracts at TWA were waived or eliminated by the bankruptcy court?
A Yeah. Not only was it not a bluff, it wasn't even open for negotiation.
Q And, did you do everything within your pours of articulation to make that clear to Terry Hayes?
A Absolutely.
Q And, to the best of your knowledge, did he attempt to communicate American's position as effectively as he could to the representatives of the Air Line Pilots Association?
A I assume he did, especially based, that we now know the outcome, that they elected to eliminate those provisions voluntarily.
Q On August the 28th the Plaintiffs conducted a deposition of Randy Babbitt concerning his role in advising the TWA MEC. As you may be aware, he was, he had then established Eclat Consulting Firm in January,

Page 58

February, March of 2001. He testified to some conversations that he had on the phone with you. Do you recall any conversations with Randy Babbitt during that period of time?
A I do.
Q Would you describe what you remember of them?
A Well, Randy had been asked to help the, in his role as Eclat had been asked to help the TWA MEC. And I, you know, I don't know what that role was but I assume he was just an external adviser to the MEC. And, Randy had contacted me. And we had talked on a number of occasions. And I think what Randy was trying to figure out was to see if I could provide any insight as to what the APA may do from my position as the management guy who dealt with them. And, so, you know, I, I essentially made it very clear to Randy that the base case was probably that they would put the TWA pilots on the bottom of the list.
Q Did you in any of these conversations with Captain Babbitt give him any indication that American was negotiable about the elimination of the TWA union's merger protections?
A Quite to the contrary, was absolutely clear

Page 59

with Randy that those pilots in all likelihood would be unemployed if those conditions weren't removed from the agreement because we fully expected that TWA would liquidate and there would be no jobs. And my conversations with Randy were, you know, if you're going to try to help these guys, you better get them to understand that the only way they're going to be flying as pilots is if they figure out how to get rid of these provisions.
Q I represented the AirCal pilots in 1987 in their seniority negotiations with the Allied Pilots Association and we ended up with an agreement that had terms like hard fence and porous fence in it. Are you familiar with those terms, hard fence and porous fence?
A I am.
Q Would you describe generally what they would mean with respect to the TWA-American transaction?
A Well, if the, while the airlines were being combined and prior to a final integration and operating process, and even beyond the integration if a fence was, in fact, established, it would define what jobs and what opportunities in the American system that the TWA pilots would have access to.

Page 60

So, if it was a hard fence, I, you can think about it as an area in which the TWA pilots would have opportunity but beyond that area, meaning captains jobs, flying opportunities, holidays, all kind of conditions, they wouldn't have any access to that. And then a porous fence would be a situation where the same kind of conditions would apply but on some negotiated terms certain pilots who were identified would be able to move through the fence and go over and begin to take advantage of the larger American Airlines system in this case.
Q All right. The Plaintiffs' lawyer gave you a document which was marked as Exhibit 190 -- let me make sure I got the right one -- 195, which was a memo that you wrote to the American pilots on March 27th, 2001.
A Yep.
Q And on the second page, the bottom two paragraphs talk about what might happen if this transaction is consummated and there's some kind of opportunity for integration of TWA pilots into the American system. I'm going to give you a minute just to read that over.
A Okay.

ALPA at that time.

Q How about during the summer of 2001, did you have any discussions Duane Woerth?

A Yeah. Well, obviously --

Q In connection with the facilitation?

A The letter I wrote and I'm sure I had numerous conversations because it was the typical labor relations environment where we had an interest in getting the parties to the table and getting an agreement and we were trying to talk to anybody we could talk to, to get them to convince their side that was, whether it be Ed James at APA or whether it be someone at, at, Captain Woerth or someone in the representation department at ALPA. So, I would have been making plenty of phone calls to say, look, you got to talk some sense into your guys and we got to get this resolved. We need a deal here.

Q Do you recall Mr. Woerth ever saying, yeah, I'll talk some sense into my guys?

A In every case they were very professional about their representation. Everybody, I think, professed to want to get an agreement. The challenge was the subject, you know, the details of the agreement. And, the ALPA hierarchy and the ALPA MEC,

you know, were anxious to get the very best deal they could get for their folks.

MS. RODRIGUEZ: I have no further questions.

MR. KATZ: Nothing further. Thank you, Mr. Brundage.

MR. HAVERMANN: Okay. Off the record.

VIDEOGRAPHER: The deposition is concluded. We're off the record at 11:10.

(Deposition concluded at 11:12 a.m.)

JURAT

I, JEFF BRUNDAGE, do hereby certify that I have read the foregoing transcript of my testimony taken on September, 12, 2008, and have signed it subject to the following changes:

PAGE LINE CORRECTION

________________________
JEFF BRUNDAGE

DATE ______________

Sworn and subscribed to before me this __________ day of _______________, 2008.

________________________
NOTARY PUBLIC

State of Maryland
Baltimore County, to wit:

I, ROBERT A. SHOCKET, a Notary Public of the State of Maryland, County of Baltimore, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 22nd day of September, 2008.

________________________
Robert A. Shocket
Notary Public

My Commission Expires:
November 1, 2010

# Exhibit F

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

THEODORE A. CASE, SALLY YOUNG, HOWARD HOLLANDER, PATRICK BRADY AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,

Plaintiffs,

V.

VOLUME 2
TRIAL TRANSCRIPT

AIR LINE PILOTS ASSOCIATION,

Defendant.

CAMDEN, NEW JERSEY
JUNE 8, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBERG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648
PHONE: 609 896 1836

have been in authority telling me it couldn't get passed.

Q. Do you recall being remained D that the new president, President Bush, was from Texas and that American was based there, and that American was very powerful in Texas?

A. Yes.

Q. And given all of those explanations, did you still think in early December, 2001, that this bill had any chance whatsoever of getting passed?

A. Any chance? Yes, there was some chance it could be passed. It already passed unanimous consent if the Senate.

Q. Passed the Senate and got out in the joint house Senate conference. Did you have any prior experience in trying to get legislation passed by Congress?

A. Floss.

Q. This was the first time?

A. Yes.

Q. So you were a rooky when it came to try trying to get legislation passed?

A. Yes, sir.

Q. You testified this morning about some aspects of the American Airlines contract. Do you recall that?

A. Yes, I do, I believe so.

Q. And I think you testified that the contract did not require the stapling of the TWA pilots, in the context of the American TWA transaction that was announced in January?

# Exhibit G

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,
Plaintiffs,

V.

AIR LINE PILOTS ASSOCIATION,

Defendant.

VOLUME 7
TRIAL TRANSCRIPT

CAMDEN, NEW JERSEY
JUNE 16, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBERG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648

committee for I think a year then. I was eventually elected to be the grievance chairman.

Q. Anything else?

A. That is it.

Q. Mr. Clarke, we are going to talk about your merger committee work primarily. That committee was formed in January, 2001, to negotiate seniority with the American pilots?

A. That's correct.

Q. And you were, were you involved in that?

A. Yes.

Q. When you went in to the process, when the process started, what was your expectation, Mr. Clarke, as to what sort of seniority integration you could achieve?

A. Well, we did a lot of research and a lot of studying before we even came up with that, but the basic premise was always starts with date of hire. Because that is, in an airline career of the pie pilot, that is your ticket.

THE COURT: Is that what you wanted or what you expected.

THE WITNESS: Both.

A. We fully expected date of hire, with conditions and restrictions.

Q. Can you explain what that means? First of all, can you explain what date of hire means, just so it is clear?

THE COURT: Where were you, by the way, when this meeting was taking place?

THE WITNESS: After dinner, then we went --

THE COURT: Dinner, what city were you in?

THE WITNESS: Dallas.

THE COURT: Advisors came into Dallas.

THE WITNESS: Correct.

THE COURT: They in fact came to Dallas.

THE WITNESS: Yes.

Q. And you in fact had a dinner with the ALPA advisors?

A. Yes, we did.

Q. After dinner what happened?

A. After dinner we went to a conference room and --

Q. At the hotel?

A. At the hotel.

Q. Okay.

A. And basically Bob Christy, the ALPA adviser, came in and said he had he had information that would lead us to get a negotiated seniority agreement but we had to staple 80025 of our own pilots.

Q. Did he say, provide any basis for what he was saying?

A. No. Through the process they talked a lot about back channel negotiations, not negotiations, but back channel communications where they might have somebody that would be able to kind of let them know what the other side is

functionally they didn't really --

A. For a short time thereafter, the members that remained still, they were still working on another portion of it, that we maybe are going to get to.

Q. Remind the jury when the cram-down came. You resigned October 26. When did the cram-down come?

A. Shortly thereafter is when --

THE COURT: Was it November 8, when they executed the CC?

THE WITNESS: Yes.

Q. Okay.

THE COURT: Was it November 8?

Q. Tell the jury what additional support you wanted from ALPA in your negotiations with American pilots?

A. We wanted, we wanted them to give us leverage. We needed them to give us leverage. We had to have it. We were in a position --

THE COURT: What does that mean?

THE WITNESS: We wanted Duane Woerth to attend, why couldn't he attend more meetings. Why didn't Duane Woerth go into that room after he told us, you are not going to do they are not going to do this to our pilots. We wanted him to go in and say that to them.

We wanted him to not visit the APA, and in some way, make a statement that somehow could even remotely be

construed that we need to get real. We wanted him to threaten something, we are the largest airline pilot union in the world. Threaten a strike. Say that, hey, you know what?

You are not going to do this to our pilots and if you do, United may not start their airplanes up tomorrow, Delta may not start their airplanes up tomorrow. We needed that. We needed them to give us something.

We needed them to support us more in the legislative effort. We needed them at the eleventh hour, when it was time to file for the injunction, not to just pull the rug out from under us and leave us standing there in a room with nothing left because he refuses to sue another union, who he said in their letters, which was just now it appears was lip service, saying, hey, you have the full support.

Well, we didn't. We didn't have the full support. And some of the things that were coming out were actually detrimental to us, and that is what we needed. We needed them on our side more than what they were.

When you go into a crowded place sometime and you are by yourself and you are the only guy standing there, and there is a group of three or four other guys standing down at the end of the bar and they are talking, whatever --

THE COURT: All right, all right.

A. You want your buddy to --

Q. So the ALPA recommendation, if accepted by your committee, and accepted by American, would have been better in the long run for the TWA pilots? Yes?

A. There is a lot of if's in there.

THE COURT: But you know what the proposal was, the 825, you know what CC was.

A. We are also assuming that American would have accepted it, and the APA would have accepted it.

THE COURT: It is a theoretical question. If the question is, which would have been better for the pilots?

A. The 825 would have been better.

Q. Yeah, but you explained that it wasn't just 825. It was a whole package. The March package recommended by ALPA, if accepted, would have been better than Supplement CC, yes?

A. Yes.

Q. Did you testify before that you expected when this whole process began to get date of hire, in terms of seniority integration?

A. Yes.

Q. Did you know at the time you were appointed to the committee what the ALPA contract, the TWA pilots contract with TWA said about seniority integration?

A. Say that again.

Q. Were you familiar with the seniority, the scope and successorship provisions of the TWA pilots contract, the one

# Exhibit H

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,

Plaintiffs,

VOLUME 10
TRIAL TRANSCRIPT

V.

AIR LINE PILOTS ASSOCIATION,

Defendant.

CAMDEN, NEW JERSEY
JUNE 23, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648

isn't it? It is a new concept, it hadn't been --

A. I thought he asked a bit, did you say change or improve significantly?

Q. My question was, I asked a bad question. Up in here, you know, the three prior proposals they had made, did any of them include as a feature the notion of a protective cell in St. Louis?

A. No.

Q. What do you attribute that movement to?

MR. FRAM: I object. Calls for speculation.

THE COURT: I will sustain that objection.

Q. What had changed between September 18 and last offer or mid October when they made this new proposal?

MR. FRAM: Your Honor, it is the same question, I object.

THE COURT: I am going to allow it. What had changed was the Bond bill?

THE WITNESS: That's right.

Q. Had ALPA National given you any new leverage?

A. No.

Q. As presented to you by the American committee, was it presented as take it or leave it, or was there a negotiation?

A. There was a couple of extra little tiny tidbits that were thrown on it, that I felt were window dressing, that if we took it and there was a very tight timeframe, almost 24

# Exhibit I

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,
Plaintiffs,

VOLUME 11
TRIAL TRANSCRIPT

V.

AIR LINE PILOTS ASSOCIATION,

Defendant.

CAMDEN, NEW JERSEY
JUNE 27, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648

would be better off having a fair integration through negotiation and that I would do everything I can to help that process.

I suggested we get facilitation, if you won't have an arbitrator, at least get some outside help to try to get the parties to get to a deal, but they could not approach this like they did with Reno Air or Trans Caribbean or Air California. This was a big transaction, the TWA pilots deserved a better integration that their contract was providing.

Q. Did you tell the Allied Pilots board of direct directors that you told the TWA pilots that they needed to get real?

A. No. I told American pilots that they needed to get real. It was all in reference to this idea that they could staple absolutely to the bottom of single pilot. That was completely unreasonable. And I reminded them of their hippocracy, quite frankly. If you are acquiring somebody, you want to be stapled. If you are being acquired by somebody else, you want to be integrated, I told them that. I called them on that. They didn't seem to blink, but I think they got my message.

Q. Did you compare this transaction to the Reno deal?

A. Yes.

Q. What did you say about that?

MEC on these items that are mentioned here?

A. Yes, I do.

Q. And then it says that you briefed them on your presence at an APA board meeting in Dallas. Was that part of your address?

A. Yes, it was.

Q. And did the question arise as to what you had said to the Allied Pilots Association board?

A. Most certainly it did.

Q. What did you tell the members of the TWA MEC at that time?

A. I recounted accurately what I told the members of the Allied board, American pilots, how to treat, you ought to treat the TWA pilots fairly and give them a much better integration than stapled to the bottom, and basically repeated what I just gave in testimony, that you ought to think long term, the TWA pilots were senior. There is a lot of reasons to, for Allied to stretch way beyond what they were currently offering, prepared to offer the TWA pilots. That is what I told them.

Q. Did they have questions about your participation in this board meeting?

A. Well, they did because it had been erroneously reported by an American pilot that I had told them that TWA should get real, when in fact I had told Allied that they needed to get

real, and of course, that should be cleared up and it was.

Q. How was it cleared up?

A. I told them what actually happened, and they were satisfied.

Q. All right. You see below the questions and answers, there is a reference to Ted Case. And a statement he made.

A. Yes.

Q. And it says he asked you, the TWA pilots, had your commitment as the president of ALPA to use the full resources of the association, including litigation, if possible or necessary. Do you remember him raising that point?

A. Yes.

Q. What did you tell him at that time?

A. I believe I told him he would have our full support and we would use litigation, if it was warranted. In other words, if there was a legal basis or American or Allied had violated laws, we would proceed. But it had to be a plausible lawsuit.

Q. The minutes say that you told Mr. Case and the MEC that ALPA would not leave any stone unturned to protect the TWA pilots. Do you remember saying that?

A. Yes.

Q. And do you feel that you fulfilled that commitment?

A. Yes, I do.

Q. In terms of the actions of the association you were

# Exhibit J

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,
Plaintiffs,

V.

VOLUME 12
TRIAL TRANSCRIPT

AIR LINE PILOTS ASSOCIATION,

Defendant.

CAMDEN, NEW JERSEY
JUNE 28, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648

school in Edmonds.
Q. Are you a college grad?
A. I am.
Q. Where did you go and what degree did you receive, please?
A. Excuse me. I went to the University of Washington. I have a bachelor of science in electrical engineering, and I attended California Lutheran College, where I received a MBA.
Q. What year did you get your undergrad degree, please?
A. 1973.
Q. How about your MBA?
A. I believe it was 1985.
Q. There was a little bit of a gap between those years. Can you tell us what you were doing between when you graduated college and when you got the MBA, please?
A. After college graduation I went to active duty in the navy, served as a naval aviator and officer from 1973 to '79. And in the spring of 1979 I was hired by TWA.
Q. Did you continue your military service after your activity duty?
A. I continued in the Reserves from 1979 through 1993, I retired from the Reserves in 1993.
Q. What were the highest ranks that you attained while on active duty in the reserves?
A. On active duty, the highest rank I attained was

lieutenant, 03, and the REserves I retired as a commander, 05.

Q. When you began at TWA in 1979 what position did you have?

A. My first position was 727 flight engineer.

Q. Okay. Did you work continuously for TWA from 1979 up until early 2001?

A. No. I did not. I was furloughed in, I believe the first of October of 1979. I was furloughed almost immediately after being hired at TWA.

Q. For how long were you out on furlough at that point?

A. I was out on furlough approximately five and a half years.

Q. What did do you during that timeframe?

A. I went to work for an aerospace firm by the name of Teledyne Electronics. I served as a staff engineer and a program manager.

Q. Nor how long did you do that?

A. The entirety of the furlough, five and a half years.

Q. So you were recalled to TWA in approximately when, 85?

A. I was recalled in April of 1985.

Q. Okay. Did you have other furloughs during the remainder of your career with TWA?

A. No, I did not.

Q. And as of early 2001 what was your position with TWA?

A. I was a 767 captain.

Q. Okay. And I am not sure I asked you about of this, how old are you today?

A. 59.

Q. About ten years ago you would have been 49?

A. Correct.

Q. Did you at some point become involved in the Air Line Pilots Association, which we are referring to as ALPA?

A. That's correct.

Q. When did that start, please?

A. I started in, unofficial capacity more as a activist probably in about 1993. I became interested in issues and began contacting representatives and so on and so forth. I didn't attain an official position in ALPA until about September of 2000.

Q. What about 1993, or the events of 1993 led you to become involved in an unofficial capacity?

A. Principally, I think it was the risk to my career caused by TWA's financial struggles.

Q. Can you give us a little detail about what those financial struggles were and how, why they raised the concern?

A. The financial struggles I think began when Carl Icahn bought in to TWA in the 1986 timeframe. But the company entered bankruptcy, I believe the first time was in 1992, and

A. Yes, it is.

Q. You referred to a "we" and I asked you who was involved. At the top of those minutes, the top of those minutes, does that list the people or at least the elected local council members and officers that were present at the meeting?

A. Yes, it does.

Q. I think you mentioned a minute ago that you received a copy of the asset purchase agreement between American and TWA at this meeting?

A. Yes. Early on we received a copy of the asset purchase agreement. I don't recall the exact date but early on we did.

Q. You think it would have been as of the date of this meeting?

A. I believe so.

Q. Did you take the time to review the asset purchase agreement?

A. I did.

Q. And did you notice any provisions that were of particular interest to you?

A. Well, I immediately turned to what we already understood to be the section detailing the employee provisions which my recollection is was section 10, and I immediately read through section 10, and on reading it, my happiness, elation, about the announcement of the deal started to wane pretty

drastically. My heart sank.

Q. What did you see in that section of the agreement that led your heart to start to sink?

A. Well, the document detailed the condition that the employee groups would have to waive their scope provisions, and other provisions of their existing contracts.

Q. Just so we are all on the same page, can you describe what the scope provisions meant to you?

A. The scope provisions meant to me that we had available to us the eventuality of an arbitrator taking a look at the seniority integration that would ensue.

Q. And did you come to understand why American made the waiver of scope a condition of the deal with TWA?

A. I am not sure at what point I became, you know, completely familiar with that. But early on I did become quite familiar with that. There was a, relative to the pilots, there was a provision in the American pilots contract that was going to be in conflict with the scope provisions in our contract.

Q. And what understanding, if you recall, did you have of the provision in the American pilots contract that would have affected the TWA pilots?

A. I am sorry. I didn't hear the question.

Q. What understanding did you have of the contract provision, the American pilots contract, that was of concern

to you?
A. Well, the American pilots contract, it appeared to indicate that pilots who came to work at American would go in order of the date they began line flying, and it really made no exception for acquisition or mergers or otherwise. So that is what it looked like to me, the American pilots contract required.
Q. You just mentioned the term line flying. Can you describe for the jury what that is?
A. When you are hired at an airline, you initially go through a process of training, and not until you complete that training, be it ground school or simulated training, and actually reach the line, reach the cockpit, that is the point at which the American pilots contract stipulated that pilots would be added to the seniority list, in that order.
Q. So line flying is actually a day after the date of official hire?
A. That's correct.
Q. Do you recall at this first meeting of the MEC after the announcement on January 11 that some outside professional were there to advise the members of the MEC?
A. I believe there were, yes.
Q. Sir, would you please turn to the second page of the minutes. Do you see about 40 percent down, Judge Mabey, LeBoeuf, Lamb, Green and MacRae?

# Exhibit K

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,

Plaintiffs,

VOLUME 13
TRIAL TRANSCRIPT

V.

AIR LINE PILOTS ASSOCIATION,

Defendant.

CAMDEN, NEW JERSEY
JUNE 29, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

precluded us from having to go in and waive portions of our contract.

Q. How about the merger committee? What degree of confidence did you have in the people on the merger committee?

A. I had high confidence in the membership of the merger committee at that time.

Q. Okay. All right. So let's turn to the actual meeting on March 21 and 22. Do you recall attending that meeting of the MEC?

A. Yes, I was at this meeting.

Q. I am going to refer you to defendant's exhibit 223 in evidence. Which I think you should have in front of you. The minutes of those meetings. You attended both days of that meeting?

A. Yes.

Q. And what discussion, if any, do you recall about Section 1113?

A. Well, I remember briefing by our bankruptcy counsel and I remember --

THE COURT: Who was?

THE WITNESS: Richard Seltzer was one of them. Steve Tumblin was another one of them. I don't remember, I mean, my recollection of this meeting is that they walked us through the process of the 1113 and how it would proceed, how

we could expect it to proceed.

Q. Let me ask you something. Based upon your review of the actual statutes and you review of the motion, did you reach any conclusions in your mind before this meeting about how likely it was that the Section 1113 motion would be granted?

MR. PRESS: Judge, I object to that, calling for a legal conclusion.

THE COURT: It is not being offered for the accuracy of the conclusion because this is a case about perception. I am going to allow it.

MR. FRAM: Thank you.

Q. My question, Mr. Rautenberg, was before this meeting on the 21 and 22, did you, based upon your own independent investigation and analysis, did you reach any conclusions in your mind about how likely it was that the Section 1113 motion would be granted?

A. Yes, I wouldn't necessarily call it a conclusion. I had, I was pessimistic. I would say I was very pessimistic about the probability of our success on 1113.

Q. And when you met with advisors and the other MEC members on March 21 and 22, were you given any assessments by advisors about how they felt the Section 1113 was likely to come out?

A. Yes. In a nonquantitative way we were. That meeting served to enhance my prior assessment, I guess. At best I

would say I became more pessimistic as time went on about the prospects of prevailing, should we choose to try to prevail, against a 1113 motion.

Q. All right. You say that, advisors talked in a nonquantitative way. Can you give us some more detail?

A. Yes. It was talking us through the 1113 motion, and basically, what would, you know, what the situation entailed, notice requirements, the negotiation requirements, the hearing, and so on. It was that kind of a situation, and yeah, there was -- you know, there was indication of what the probabilities of success were, but it was not, I think the probability was this or I think the probability was that. It was -- later on there was numbers that were mentioned by counsel.

Q. Let's come to that in a minute. All right. So the bottom line in terms of what advisors were saying about the likelihood that the motion would be granted, that TWA would be able to reject the contract, was what?

A. Not likely.

Q. Would you repeat the question. I think I heard the question. I may have? The bottom line in terms of what advisors were saying about the likelihood that TWA would win the motion and be able to reject the contract?

A. That was very likely. Our probability of over coming the motion was not likely.

Q. The other members of the MEC, do you recall which of them were present during the discussion you just referred to?
A. I really don't recall specifically who was there.
Q. If I were to refer you back to the minutes, defendant's exhibit 223. Would the second line, March 21, it says secretary Treasurer Bob Stow called the roll. Members present and accounted for. Do you see that?
A. Yes.
Q. Would that have indicated that all of the voting members and the officers were present?
A. It would.
Q. Do you recall the other members of the MEC, including the other voting members, asking questions about Section 1113?
A. There was a discussion, but 1113 was not a secret. You know, it was not something that just came up out of the blue. It had been an ongoing issue. An ongoing expectation, I guess.
Q. Okay. Do you recall any of the other members of the MEC on March 21 or 22 appearing to be confused or not understanding what advisors were saying about Section 1113?
A. No, I have no recollection of that.
Q. What was your understanding as a result of the meetings on March 21 and 22 about what would happen if the 1113 motion was granted, meaning that TWA was able to have the collective

bargaining agreement rejected?

A. My understanding was that we would have no contract, that employees would be basically, you know, if they were, as if they were hired, would be an engineer, like I was at one time, that we wouldn't have a working agreement. We wouldn't have a grievance process. We wouldn't -- we would be basically without a contract. Starting over.

Q. Did you view that as a good prospect?

A. No, certainly not, certainly not.

Q. Do you recall any discussion at these meetings on March 21 and 22 about what might happen in the Section 1113 motion was denied meaning that TWA was unsuccessful in getting the bankruptcy court to reject the contract.

A. I don't recall a whole lot of discussion about that at the time, but we all knew that American had placed waiver of certain provisions of our contract as a condition. It was not a secret. It was absolutely an important issue through that period of time. So the prospect that American would back away from a transaction or the possibility that they would back away from a transaction as a result of that or threaten us or, it was always present.

Q. Was that possibility something you recall being discussed at these meetings on March 21?

A. Discussed at that particular meeting, you know, I don't recall it being discussed right at that particular time but

there was a lot of discussions about those topics.
Q. And did you view that as a good thing or a bad thing, if American were to walk away from the transaction?
A. I view Americans departure from the transaction to be disastrous.
Q. Explain to us why you felt that would be disastrous?
A. I was confident that Americans departure from the transaction would cause the liquidation of TWA and the loss of jobs.
Q. All right. Let's move ahead to the meetings of the MEC on April 1 and April 2. Do you recall those meetings?
A. I do.
Q. Just to put in context, I refer you to defendant's exhibit 210 in evidence. It should be the next document there. Do you recall that as an email of Thursday, March 29, scheduling a work session on Sunday, April 1, and a formal meeting on Monday, April 2?
A. Yes.
Q. We projected that. And then the next document, so you have it in context, is defendant's exhibit 179 in evidence, and that is the agenda for the April 2 meeting. Pull that up real quick.
A. Yes.
Q. All right. Let's focus on the April 2 meeting, and I am going to ask you to start by telling us who was present at

seeking to block the transaction. And seeking to get American to cough up whatever American would cough up to move the transaction forward.

Q. And when you said the company a minute ago, you are referring to TWA? You said the company had a collective bargaining agreement that required scope protections?

A. Yes. Our collective bargaining agreement with TWA.

Q. What was your reaction to Wilder's idea of maybe filing a lawsuit to prevent the American transaction from going forward?

A. I was not -- I was very much opposed to Wilder's idea of trying to block the transaction.

Q. You were very much?

A. I was very much opposed to the concept of blocking the transaction.

Q. Did any of the members of the MEC speak up in favor of Roland Wilder's idea?

A. I don't recall that they did, know.

Q. Did any of the other advisors speak up in favor of Wilder's idea?

A. No.

Q. How about Mr. Hollander, do you recall Mr. Hollander saying anything to suggest that he supported the /OEUTD of a lawsuit to prevent the transaction?

A. No, I don't.

A. Yes.

Q. It looks like the MEC is in executive session for what, about, almost two and a half hours?

A. Yes.

Q. Okay. Describe for us, please, what happens in terms of who is present or not present when the MEC goes into executive session?

A. The people who are not present would include any guests, pilots who have come to the meeting to observe, staff members are zip reply not present aside from typically our counsel. The officers would be present, if they were on the scene. The MEC members would be present, the Secretary Treasurers would be present. It was for situations where, what was discussed or what came out, might be, if it were disclosed, harmful to our group.

Q. Okay. On this particular occasion when the MEC went into executive session did advisors remain or not, do you recall?

A. I don't recall specifically whether they were. I suspect they were.

Q. Okay. And do you see that there was an agenda item on the top, we have that there, agenda item, 01-475 was moved and failed in executive session and not for distribution. Do you recall what that agenda item was?

A. I do. I found a copy of it, in the materials that I had

MEC.

Q. Okay. Do you recall any discussion about the idea of a jumpseat war?

A. I do.

Q. Tell us what you recall, please.

A. The general issue during this period of time was leverage and the lack thereof, the lack of leverage. Everybody, well, I shouldn't say everybody. Seeking traction or seeking leverage was a common theme throughout the MEC, throughout the committees, and people began to grouse about the fact that we didn't seem to be get go a lot of support from ALPA Washington or ALPA international, and so because of this grousing there was a meeting scheduled in Duane Worth's office, and the specific purpose of the meeting was for members of the MEC to grouse about ALPA's international action or inaction relative to the seniority integration.

Q. I am sorry to interrupt. Just give us your best recollection of when the meeting took place?

A. My best recollection was in the summer.

Q. Okay.

A. Of 2000.

Q. Who do you recall, this meeting was in Duane Worth's office in Washington?

A. Yes.

Q. Who do you recall being present?

A. I was present. I recall Jim Arthur being present. I recall Sally Young being present and I recall Bob Pastore being present. Beyond that, there may have been others. Those are people I remember being there.

Q. Okay. And what do you recall being discussed during this meeting at Duane Worth's office in Washington?

A. Well, the initial, beyond kind of, "Can I get you guys a cup of coffee?" The social aspects, Duane started the meeting with I am not going to start a jumpseat war. We have done it before. It has not been proved effective. Words to that effect. And then it was beyond that, what can I do for you?

So that was the discussion of the jumpseat war that I heard. I thought a jumpseat war would have been a really bad idea and I was really glad that it was off the table.

Q. Do you recall anybody from the MEC who was present at this meeting pushing Captain Woerth and saying, well, no, we really need to do this, jumpseat war?

A. No, no.

Q. Why did you think it was really a bad idea?

A. Well, as I said earlier, we were in a position where we needed to talk our way into the best possible seniority integration that we could get and the prospect of a jumpseat war, it just held, you know, you are going to wind up aggravating the very people with whom you are trying to

negotiate your way into something better. And aggravating them is in my mind not the way to go. I don't think it would be helpful.

I think it would be unhelpful I think that people who got bumped off a jumpseat by TWA or by other ALPA carriers because of the TWA integration would communicate with their leadership that, you know, just staple them all. Whatever.

It would result in retaliation, in my opinion.

Q. The people who were grousing at this meeting in Duane Woerth's office in the summer of 2001, did they have any other suggestions, did they make any demands of Duane Woerth in terms of what ALPA National could or should do to help the TWA pilots?

A. There were no specific requests made that ALPA National should do X or Y. I was at the meeting because, A, the meeting was scheduled, I was a member of the MEC and I considered it my job to be there, but B, I wanted to hear what knuckle-headed ideas some of my fellow MEC members might come up with and ask Duane Woerth in a meeting I wasn't in attendance at, but I was frankly embarrassed to be there because there just wasn't anything constructive asked for.

And part of the conversation was brought by me and I wasn't the one that asked for the meeting. But it was basically, "Can you bluff? Can you posture?" Can you, you

know, that was the gist of what I heard.

Q. Setting aside the issue of a possible jumpseat war, were there any specific requests made by people there that Duane Woerth turned down?

A. No. No. Not to my recollection. Like I said, beings it was embarrassing to be there.

Q. The next document in the pile in front of you is P-165. Question is not which is not yet in evidence?

THE COURT: Is that P or D?

MR. FRAM: Plaintiff's, your Honor. P.

Q. Do you recognize P-165 as an email that you and others received on or about May 7, 2001, attaching a confidential memo?

A. Yes.

Q. Do you recall this?

A. I recall the letter it is attached to more than I recall the email. But I got the letter from Roland Wilder. And the email, not so much.

Q. All right. Well.

MR. FRAM: Your Honor, I move plaintiff's 165 into evidence.

MR. PRESS: No objection. I thought it was already.

THE COURT: I am sorry.

MR. PRESS: I thought it was already.

you know, make, continue to make good-faith efforts or at least what they considered to be good0faith efforts to reach a deal, it was no longer possible.

I think it was a culminating point, vis a vis the APA, if you will.

Q. So let's go back now to the meeting that began on October 20.

Let's go back if we could to D 88 in evidence. And part with the first page, and try to walk through this a little bit. I think you mentioned before that you and a couple other members of the MEC decide not to attend this meeting because you were concerned about some agenda items?

A. Yes.

Q. Is that first page, Saturday, October 20, it says not in attendance, Rautenberg, Lewin and Altman. Does that reflect what you just discussed?

A. Yes.

Q. It looks like the meeting continues if we turn to the second page on Sunday, October 21, 2001. Called to order at 10:30. Tell us, please, what efforts, if any, were made over the next several days to get the seniority integration process back on track. Tell us the efforts that were made, who was involved -- let me break it down for you.

Were efforts made beginning on October 21, 2001, to get the seniority integration process back on track?

A. Yes, I think so. Our merger committee was in extensive meetings with leadership of the APA. It was no longer really the APA's merger and acquisitions committee they were meeting with, but with their chairman, and their union president, and so they were meeting with them. They reported to us that these meetings were not, you know, negotiations, you know, even as a stretch any more, but merely the APA explaining to them the way it was going to be. And explaining to them what the integration was going to look like.

Q. Just logistically these minutes refer to the meeting being in Washington, D.C.?

A. Yes.

Q. Are you saying the merger committee was also meeting at the same time, were they also meeting in Washington?

A. Yes.

Q. How far apart were the two meetings taking place?

A. Well.

Q. Do you recall?

THE COURT: You mean physically?

MR. FRAM: Physically, your Honor, yeah.

A. My recollection is that that we were in the same hotel, they were meeting in the same hotel. I never saw where they were meeting so I couldn't be sure of that.

Q. In addition to the people who were at the meeting, the MEC meeting, and participating in the negotiations, were

other people calling in from time to time?

A. Oh, there was a lot of calls.

Q. Tell us, give us a sense, who was calling in as this discussion continued?

A. We had calls from Duane Woerth, we had calls from Howard Atterian, we had calls from Senator Bond's office, a gentleman by the name of Trevor LeCann. We had a conference calls with Jeff Brundage, from American. There was a lot of stuff going on, a lot of interactions going on.

Q. The different people who were calling in, what position were they taking with respect to seniority integration?

A. Jeff Brundage was taking the position that, you know, he realized that this offer was, I won't use the terms he used, but it was a tough pill to swallow. It wasn't exactly what he said.

But that is the essence of it, in more crude language. But we should swallow it. And that it was the best we were going to do. And that if we did not, that American would not follow through on the commitments that it had made as part of the offer.

THE COURT: You mean the best efforts?

THE WITNESS: No. I mean American had made a commitment to provide a minimum floor to the domicile in St. Louis which was to be restricted to former TWA pilots. And that they would not comply with that. They also made a

commitment --

THE COURT: You mean they were going to put a fence around it?

A. Yes, there was going to be a fence around St. Louis and the APA agreed there would be a fence around St. Louis but American had indicated a willingness to ensure that there actually was a St. Louis domicile with St. Louis flying. That is the commitment that he indicated they would withdraw, that they would not comply with. It was part of the offer --

THE COURT: In simple terms, they were going to eliminate St. Louis as a hub for the combined airline?

A. No, the situation wasn't there yet. But there was planned a restriction that the flying in St. Louis would be reserved for TWA pilots.

THE COURT: That is the so-called fence.

THE WITNESS: Right. Our view was a fence in St. Louis was not of value to us unless there was flying that was based in St. Louis.

THE COURT: In other words, unless St. Louis was still a hub.

A. Yes. Well, there is a connection between the hub and whether there is flying or not. There isn't necessarily flying that is conducted out of St. Louis by pilots based in St. Louis, and the commitment American was making was to pilots being based in St. Louis. That was the flying that

was to be researched for us.

THE COURT: Okay.

Q. So as of the meeting we have been talking about there was a proposal on the table from American and the APA?

A. Yes.

Q. Did the members, are we still at the point where there are six voting members of the MEC, two from Council 2, two from Council 3, and two from Council 4?

A. Yes.

Q. Were the members of the MEC able to agree on whether to accept or not accept the proposal that American had put on the table, American and the APA?

THE COURT: That proposal provided for stapling some of the TWA pilots.

THE WITNESS: Yes, sir.

THE COURT: What number?

THE WITNESS: About 1,200, is my recollection.

THE COURT: The total you are talking about including stapling its 1,200 junior pilots to the bottom of the American list.

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

Q. The six vote were the six voting members able to agree on how to respond to this proposal?

A. Not with unanimity. We made a decision. The proposal

was not approved.

Q. Okay.

A. Actually, I don't think it was a proposal at that time. I believe it was a proposal to us that we were accepting with conditions, or considering accepting with conditions.

Q. There were some actual votes did taken by the members of the MEC during these meetings?

A. Yes, there were several.

Q. Let's walk through them quickly if we can. I want to refer, please, to the bottom of page 13.

You see there is a discussion that continues, actually at the top, case was directed after much sole searching and deliberation I speak against the motion for conditional acceptance of the seniority integration proposed by the APA representatives yesterday, October 22, 2001.

At the bottom it lies like there is an actual roll call vote, and 803 for, 1123 against. If I am reading it correctly, it looks like you and Lewin were the ones who voted most of your votes in favor, and you got out-voted by the other members.

A. That's correct.

Q. And what, if you can tell us, if you recall, what proposal were you voting to accept which the group could not agree on?

A. We had as a result of the merger committees, the

meetings with the APA, we had a two-page set of notes that explained what the seniority list would look like, it explained what the fence around St. Louis would look like.

We had an understanding of commitments that American was prepared to make relative to furloughs, they were willing to restrict furloughs in the fourth quarter of 2001, and in the first quarter of 2002 to certain numbers.

There was language about the prospect for future furloughs, and there was Americans guarantee that they would limit the reduction in flying available to TWA pilots in St. Louis.

Q. Was there then some further discussion after that resolution failed?

A. Yes, after that resolution failed, one of the calls we got, will, after that resolution failed, the discussion centered on pursuing the litigation strategy that had been outlined by Roland Wilder, and so the MEC sought that, you know, that outcome to go pursue this litigation strategy.

We then got a call I believe directly from Duane Woerth and he indicated that the executive council had decided that ALPA was not going to pursue this injunction. And after some nashing of teeth and so on, the members of the MEC who were engaging in a caucus amongst themselves, there was essentially four of the voting members of the MEC who would routinely caucus amongst themselves in one of the hotel

rooms, they left the room. And they went to caucus Americans themselves.

Q. Right.

A. When they came out of that room, I was having Diet Coke in the lobby of this meeting room, just waiting to find out what the majority of the MEC who had disappeared was going to do, what are we doing next. We are not going to have this litigation.

And it was passed to me that Sally Young and Alan Altman were going to abstain. And I was kind of perplexed. What does that mean, Sally Young and Alan Altman are going to abstain? But okay.

We went back in to the meeting room, and when it became apparent to all of the parties present, in the meeting room, what was going to happen, and that because Sally Young and Alan Altman were planning on abstaining, that Lewin and myself had sufficient roll call votes to pass a resolution, and that since we had already favored the passage of this resolution that we would probably pass it with roll call.

I mean, that I think became the general consensus, and one of the members of the merger committee had what I would term a sustained emotional outburst. I believe, the minutes reflect that the staff was invited out of the room, and I am, I believe that that was the point where Bob Pastore asked the staff to leave the room because it was -- you know,

it was better for the situation while this, while this situation was going on.

Q. Let's come back to that in a minute. I want to list the votes that happened. The first one you talked about was 803 for, 1128 against. And it was you and Lewin. Then the four others were against. It would have been Hollander, it would have been case Case. It would have been Young. And Altman.

We will come back to the emotional outburst in a minute.

There was a second vote taken with respect to the proposal that was on the table where some people abstained?

A. Yes.

Q. That is reflected in the minutes at page 15. Is that correct?

A. Yes.

Q. Let's list that up here so we can see how things were shifting around. So vote number 2, I am I correct it was 797 for?

A. Yes.

Q. It was --

A. That is what the minutes reflect.

Q. 412 against. And it was 722 abstain. And the 797 for is still you, and Lewin, two people voted against, Hollander and Case.

A. Well, Hollander, Hollander was not present. I don't

believe that Hollander was present for any of these meetings but he had left his proxy with Ted Case.

Q. And is that reflected in the vote there where it says Hollander, proxy to case.

A. Yes.

Q. We will put a P next to that. The two who voted to abstain were Young and Altman?

A. Right. And you are referring to the majority of the vote with the names because some people split their votes but the majority of the votes were as you indicated.

Q. There were minor splits. Looks like you voted 710 in favor and two against?

A. Yes.

Q. All right. So did that mean that the resolution passed because there were 797 in favor and 412 against?

A. That resolution did bass. It was not an identical offer, and I don't believe it was even an offer at that point.

THE COURT: It refers to a counter proposal. What are you referring to. It says vote to send counter proposal. What does that mean?

A. As a result of this emotional outburst, the letter that had been prepared that was being considered at the time of the first vote had been revised.

THE COURT: In what way?

THE WITNESS: In a number of ways. The letter had been revised to increase the support that American would have to provide to the St. Louis flying. It revised the furlough provisions substantially. Those were the essential changes. So it wasn't an offer made to us any longer, it had been revised.

THE COURT: The first time you were voting on accepting an offer that was made to you?

THE WITNESS: Yes, sir.

THE COURT: Now you are voting on a counter proposal.

THE WITNESS: Yes, your Honor.

THE COURT: Go ahead.

Q. Do you have in front of you P-343 in evidence it is October 23, 2001 letter?

A. 343, yes.

Q. Is that the letter with the counter proposal that was prepared and sent as a result of the vote you have just been talking about?

A. As a result of the second vote, yes, that's correct.

Q. As a result of the vote that had people abstaining?

A. Yes.

Q. Okay. And how was that letter sent to American and the APA?

A. I am not sure. The staff, Bob Pastore and the staff

took care of sending it. I am sure it was sent promptly.

Q. Was there a reaction from Mr. Brundage to the sending of that letter during the meeting that we have been discussing on October 23?

A. There was. Mr. Brundage was extremely unhappy. The minutes reflect I think that Mr. Brundage said it wasn't acceptable. That is a gross under-statement of his response.

Q. Let's go back to the minutes if we could, D 88. Page 16 at the top, let's go back to that.

A. Yes.

Q. Can you blow up 812, MEC discussion of Brundage. Brundage said the counter proposal was not acceptable. Was he referring, as you understood it, to the October 23 mention we just talked about?

A. Yes. As I understand it, he was referring to this P 343 letter.

Q. So you made a counter proposal. Brundage says it is unacceptable. What happens next at the meeting?

A. The group of MEC members who had been routinely caucusing in another room left to caucus in another room. And they were gone for some time, and they came back, and I don't know -- I don't know.

Q. Let's go back to the minutes. Staying on that same page below that. It says that at 1818, you are back in regular

session. Holtzman outlined Holtzman outline terms of third proposal to send to APA. Then you and Mr. Lewin made a motion.

A. Yes.

Q. Can you describe what the motion was?

A. Well, this was the original motion. This was the same terms that had been rejected in the first vote. Was considered again in the third vote.

Q. All right. So we are back --

THE COURT: This time you were going to send it to them?

THE WITNESS: Yes, sir.

THE COURT: First time they sent it to you.

THE WITNESS: Yes, your Honor.

Q. The third vote is back pretty much to the same issue as vote number 1. We are back to 807. You actually have a couple more. Then all the people who had abstained on the second vote, they are back in the opposition camp. They vote against it.

A. Yes.

Q. So the upshot of all of this is no agreement on seniority integration?

A. That's correct.

Q. Did the members of this opposition group, the four who voted against the proposal on the table twice, did they

articulate what they saw as the next step in terms of how to resolve the issue of seniority integration?

A. I don't recall them articulating that at that time. The subject had been discussed extensively over the course of this meeting, this long meeting.

Q. Okay. Can you tell us if you recall what was their theory or their idea for how to resolve the issue, if it wasn't by reaching some kind of an agreement?

A. Well, my belief was that they were intending to pursue litigation.

Q. Okay. Now, when you walked away from this meeting with no agreement on seniority integration, were you happy or unhappy?

A. Well, some of us were very dissatisfied, and unhappy, but the crowd who had voted against it and carried the day engaged in what I thought was a kind of a silly celebration. You know, they began to celebrate.

Q. Describe what you mean when you say they began to celebrate?

A. High five'ing, congratulating each other, it was as if they had accomplished something. You know. And I don't know how they -- I mean literally it was as if they had accomplished something and how they got to the conclusion that they had accomplished something was beyond me.

Q. Do you think that it was a, let me come at it this way.

DIRECT EXAMINATION.

BY MR. FRAM:

MR. FRAM: If I may, your Honor?

THE COURT: You may proceed.

Q. Thank you.

THE COURT: Get as close to the microphone, sir, as you can. You can pull it down.

A. Sure.

Q. Mr. Singer, good afternoon, sir. You are a former TWA pilot?

A. Yes, I am.

Q. And you were a first officer rep out of Council 3 back in 2001?

A. For part of 2001, yes.

Q. Let me get a little background if I could. How old are you, please?

A. I am 64. I will be 65 next Wednesday.

Q. Tell us where did you grow up?

A. I was born in Amsterdam, New York. Upstate New York.

Q. You graduate from college?

A. Yes, I did.

Q. Where did you graduate from and what year, please?

A. Cornell University in 1968.

Q. And any form further formal education?

A. Yes.

Q. What was that, please?
A. I went to law school for three years, and got a JD degree from Washington College of Law at American University in Washington, D.C.
Q. In what year, please?
A. 1971.
Q. What did you do for work after getting your law degree, please?
A. I was admitted to the bar in 1972, and I worked for two years as an attorney in a small firm in upstate New York.
Q. At some point did you decide you wanted to pursue a career as a pilot?
A. Yes.
Q. When was that, please?
A. I took my first lessons in 1974.
Q. And did there come a point where you got a job as a commercial pilot?
A. Yes.
Q. When was that, please?
A. In 1990 was my first airline.
Q. Which airline was that?
A. That was Jet Stream airlines, working for U.S. Air Express.
Q. What type of job were you able to get as a pilot?
A. I was a first officer on a Jet Stream.

Q. Can you walk us through your career as a commercial pilot from that point up until early 2001, please?

A. Okay. Later in 1990 I got a job for Pan Am Express. And I was with Pan Am Express as a pilot until I believe August of 1991 when I received a furlough notice, just as I was about to relocate to the Philadelphia area. Two days later they hired me as a crew scheduler and I stayed as a crew scheduler for that airline through the Pan Am bankruptcy and liquidation and the takeover by TWA.

At that point it was Trans World Express, and I was recalled as a pilot in March of 1992.

Q. Recalled as a pilot by what company?

A. Trans World Express, the same company I was working for at that point as a crew scheduler.

Q. What was your next job as a commercial pilot?

A. I started with TWA in February of 1996, a few months after Trans World Express went out of business.

Q. And for what period of time did you continue as a pilot for TWA?

A. I was with TWA from 1996, and I was furloughed in 2003. At that point it was TWA LLC.

Q. Did you work as a pilot after you were furloughed in 2003?

A. Yes. 2004 I was hired by Trans Meridian airlines. I worked with them until they shut down in 2005. And a month

later went to work for maximum jet, a start up airline and worked for them until two days before my 60th birthday when I was required to retire.

Q. And is that because at that point in time the mandatory retirement age for pilots was 60 years old?

A. That's correct.

THE COURT: For commercial pilots.

Q. Commercial pilots, yeah. What have you done since in terms of work?

A. I have done some sales jobs with a manufactures representative for Sony. Off and on. And last year I worked as an interviewer and then a crew leader for the U.S. Census.

Q. Are you currently working today, sir?

A. No, I am not.

Q. Are you taking some classes, I understand?

A. I am taking classes and I just started a business as an energy consultant.

Q. Do you live locally, is that correct?

A. I live in Mount Laurel, New Jersey.

Q. Tell us about when you first became involved in union work after you started a TWA in February of 1996?

A. Almost immediately I went on the safety committee as I had been at Trans World Express and Pan Am Express.

Q. And did you have other union involvement that led up to your becoming a Council 2 rep?

A. Yes.

Q. Tell us briefly about that.

A. Shortly after the TWA contract was approved, I believe that was 1998, I went on the grievance committee. And I was subsequently elected to the system board of adjustment. I couldn't give you the exact date of that.

Q. All right. Let's jump ahead. When were you elected out of Council 2 to be the first officer representative on the TWA MEC?

A. I am trying to figure out exactly when that was. I know I went through two election cycles. So it had to be, and the last one was in the fall of -- it may have been a special election. I think it was a special election. The first time. Because it must have been around 1999, I would guess.

Q. And were you a Council 2 rep on the MEC when you learned about the TWA bankruptcy and the proposed transaction with American Airlines?

A. Yes, I was.

Q. What is your recollection of when that happened?

A. I believe January 8, 2001.

Q. And for how long did you serve as a Council 2 rep on the TWA MEC?

A. Until August of 2001.

Q. And during that period did you attend meetings of the MEC?

 mentioned here, was the merger attorney for the Allied Pilots Association. And reading into it I saw there was a lot of discussion of different mergers at the airlines since they were deregulated, in 1978, and even some discussion about the deregulation.

Q. And what did the article tell you about the way seniority integrations in the absence of labor protective provisions, in the absence of Allegheny Mohawk had gone down?

A. The conclusions I took from this was that in any case, the stronger airline, or in some cases, the larger airline, or the airline that had more political clout, or the airline that was stronger financially, was in much stronger position than the airline, the airline that was being acquired.

Q. Do you recall the article Mr. Kennedy and Mr. Nichols referring to the process that prevailed as one akin to the law of the jungle? Do you recall that phrase?

A. I recall very well, because I do a lot of value and deregulation from the other airlines I was with and also from the fact that the Professor Alfred Khan, who was the father of airline deregulation was my Economics 101 Professor at Cornell, in 1974 -- 1964.

Q. All right. So in the context of the American acquisition of TWA, and the integration of the pilot groups, what did the article lead you to believe or expect in terms

# Exhibit L

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,

Plaintiffs,

VOLUME 14
TRIAL TRANSCRIPT

V.

AIR LINE PILOTS ASSOCIATION,

Defendant.

CAMDEN, NEW JERSEY
JUNE 30, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648.

and it was very informative. It was very informative to me, and I think to everybody there.

Q. And did any of the members of the MEC appear to be confused?

A. No.

Q. Just in terms of your personal observation?

A. No.

Q. What was the next step in term of moving this whole process forward?

A. The next step was, you know, in light of the pendency of the 1113 motion, a group of advisors had talked about the importance of the next scheduled meeting between the two merger committees. I am not sure when it had been, when the date had been fixed, but there was a meeting scheduled for the next week in the Dallas Fort Worth area. And Michael Glanzer --

THE COURT: That was April 2.

THE WITNESS: No. I think it was March 28, 29.

Q. Okay. Did that meeting -- was there a discussion on March 21 or 22 about this next meeting of the merger committee?

A. Yes. On March 22 Michael Glanzer came to me and he said he had been talking with the other advisors, and they were stressing the importance of this next meeting and of the possibility of the two committees reaching an agreement, and

of the urgency of at least making the attempt to reach an agreement, and Michael Glanzer thought it would be beneficial for some of advisors to meet with the merger committee prior to meeting with the APA merger committee.

So I went to Scott Shwartz and I explained this to him and asked if he could put such a meeting together. He said he would --

MR. JACOBSON: Objection. I think he is getting into hearsay.

THE COURT: I will allow it. Go ahead.

A. He then spoke to Mike Day who was chairman of the merger committee, and arranged, and we agreed that we would meet at a restaurant near the Dallas Fort Worth airport, and we did.

MR. FRAM: Your Honor, is this a good time for a break?

THE COURT: I think the jury wants that. We have been at it about an hour 40 minutes. We will take a 15-minute break until about 20 after ten.

(Jury leaves the courtroom)

THE COURT: I am holding my finger up. I am not saying anything. You know what it means.

(The jury leaves the courtroom.)

(Recess)

(Jury even enters the courtroom)

DAVID HOLTZMAN, resumes.

CONTINUED DIRECT EXAMINATION

By MR. FRAM:

THE COURT: Mr. Fram.

Q. Mr. Holtzman, we were talking before the break about discussions you had I think you said with Scott Shwartz who would have been the MEC vice chairman on March 22 about scheduling a meeting of the merger committees for the following week. Do you recall that?

A. Yes.

Q. At what point in time was that meeting scheduled? When was the meeting scheduled for, do you recall?

A. The meeting of the advice advisors with the MEC merger committee was put together in the two days after the end of the MEC meeting, that would have been March 23, March 24, arrangements were made to meet with the committee whose meeting had already been scheduled for the next week.

Q. Okay. I want to show you J 299 and J 301 which are both in evidence.

MR. JACOBSON: 299, and?

MR. FRAM: 301.

Q. Do you recognize those as documents that were generated during the course of the merger committee meetings on March 29, 2001, and -- March 28 and March 29, 2001?

A. Yes, I do.

Q. Okay. And did you and some of the other advisors have a meeting with the members of the merger committee on the evening of March 28?
A. Yes, we did.
Q. Okay. And that meeting was where?
A. Well, we first had a dinner meeting, and then we met that evening at the Hilton Arlington in Arlington, Texas.
Q. Who were advisors present for the dinner and the meeting?
A. I was. Clay Warner. Steve Tumblin. And Bob Christy.
Q. All right. So Clay Warner you told us before was an in-house labor attorney at ALPA, correct?
A. Yes.
Q. Steve Tumblin was one of the bankruptcy attorneys from the LeBoeuf Lamb firm?
A. Yes.
Q. Tell us, please, who was Bob Christy?
A. Bob Christy is a, excuse me, at that time, was a staff member of ALPA in the economic and financial analysis department.
Q. And who were the members of the merger committee whom you had dinner with and then met with later on the evening of March 28 of 2001?
A. The chairman, Mike Day, John Swanson, Gary Flor, John Hefley, and Sean Clarke.

Q. Now, did the members of the merger committee you have just described, were they aware before advisors met with them that you all were coming?

MR. JACOBSON: Object to the form of the question. It is asking for his knowledge of someone else's state of mind.

THE COURT: Well, he has a basis for knowing it?

A. They knew we were coming to meet them.

Q. Did any of them act surprised when you met them for dinner?

A. No.

Q. What was discussed during dinner and thereafter between advisors and the members of the merger committee.

A. What was discussed was the, in the part of the room where I was, was just the importance to the overall process of reaching an agreement with the APA, if that was at all possible.

Q. And why was that important as of late March to the overall process?

A. Because the Section 1113 motion to reject the collective bargaining agreement was scheduled. I don't know, eight or ten days after.

Q. And what impact would an agreement between the pilot groups on seniority integration have on the Section 1113 motion?

A. Well, the whole object of the process was to reach an acceptable agreement. So if a waiver was still necessary, it would be a painless waiver, at least in terms of seniority integration.

Q. Do you recall the specifics of what was discussed between advisors and the members of the merger committee during dinner and later that evening about the kinds of proposals, or the type of proposals that were going back and forth?

A. It was, there was a discussion of whether a proposal could be made to bring the parties closer together. There may have been numbers discussed, but that was not something that I was involved in. But the chairman, Mike Day, was interested in making some movement, making an attempt at some movement between the two committees.

Q. Do you recall some discussion about whether some TWA pilots should be stapled as part of these discussions?

A. That was an issue, yes.

Q. Let's talk about kind of the tone of the meeting. Were any of the ALPA advisors putting pressure on the members of the merger committee to make any particular kinds of proposal?

A. Not for any particular proposal. And as I said before, you can't, you can't really cause a pilot to do something in a leadership position that they don't want to do. You know,

they talked about different ideas for proposals, but you know, I don't think anything would be characterized as other than a suggestion.

Q. Do you recall any disagreements among the members of the merger committee, among the pilots, about how they should proceed?

A. No, I don't.

Q. And how late into the evening did the meeting go, do you recall?

A. Well, the meeting went very late. But Bob Christy and I and I think Clay Warner got on an elevator at about the same time, eleven or 11:30 and we were headed to our rooms to get some sleep, and the committee continued, I think Steve Tumblin, stayed and worked with the committee rather late.

Q. Was an agreement on seniority integration reached the next day between the pilot groups?

A. No.

Q. What happened next in terms of preparing the deal with the Section 1113 motion that had been filed and was set for a hearing on April 6?

A. Well, it was Thursday, the 29, I think, when I returned to St. Louis, and we were then in the process of finally collecting a proposal from TWA, and through TWA from TWA Airlines, LLC, and in a couple of particulars from American Airlines. So.

Q. I am sorry. Proposal for what?

A. A proposal for a collective bargaining -- both for the waivers between TWA and ALPA, and also for a collective bargaining agreement between ALPA and the new airline, TWA airlines, LLC, which would go into effect if approved by the MEC when the transaction closed.

Q. TWA LLC was the entity that was set up by American as its wholly owned subsidiary?

A. Yes.

Q. Do you have in front of you D 210 which is in evidence. It is a Thursday March 29, 2001, email, from Robert Stow scheduling the meetings on April 1 and April 2? You should have it there.

A. It may take me a moment to find it.

Q. I will give it to you.

A. Thank you.

Q. Whose suggestion was it, if you recall, to send this email and schedule a work session on April 1 and a meeting to begin on April 2 of 2001?

A. I suggested to Scott Shwartz that a meeting be scheduled, as you say, with a work session on Sunday, April 1, and a meeting starting April 2 and Bob Stow initiated that.

Q. As of -- by the way, why did you suggest a work session on a Sunday on April 1, 2001?

A. Well, there were two factors. One is we wanted to schedule it as soon as possible so that there was sufficient time in advance of the April 6 hearing.

But more importantly on a Sunday, in a work session would be less pressure filled and intense for the MEC. There was the MEC is not in session, they can't reach a decision, thus, there should be less -- they should feel less pressure afternoon it should be more informal and hopefully useful for the MEC members.

Q. When this email went out on March 29 scheduling the work session and the start of and to start a meeting, had you received the proposal from TWA LLC that you referred to before?

A. I had not received it yet.

Q. Okay. At what point in time did you receive it, do you recall?

A. I received it on Saturday, March 31.

Q. I want to show you what has been marked as D 115, which is in evidence. Otherwise that the email which forwarded the proposal from TWA LLC?

A. Yes.

Q. And it looks like it came in at 8:40 p.m. on Saturday, March 31, of 2001?

A. That's right.

Q. What did you do afternoon receiving this to advise the

# Exhibit M

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,

Plaintiffs,

VOLUME 15
TRIAL TRANSCRIPT

V.

AIR LINE PILOTS ASSOCIATION,

Defendant.

CAMDEN, NEW JERSEY
JULY 5, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

2

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648.

A. Roland alone thought that the risk of litigation was worth it, to give leverage on the seniority integration.

Q. All right. Let's talk about what happened after the end of these meetings on March 21 and 22. At the end of the meetings was any direction given by the MEC to the merger committee merger committee?

A. Yes.

Q. What direction was given to the merger committee when this meeting broke up?

A. Randy Babbitt had suggested that in addition in advance of the 1113 hearing, and in advance of making a decision on whether or not to accept the agreement with LLC, the merger committee should meet again with the merger committee at APA. And present essentially the worst possible offer that they could stomach, to see if there was any possible way of getting a deal, in advance of making in decision of agreement versus no agreement.

Q. You mentioned that the merger committee was given direction to try this in advance of the hearing. Had a hearing be scheduled at that point on the 1113 motion?

A. I believe so. But actually it was really less the hearing than the decision point for the MEC. I know the decision point for the MEC was actually going to be triggered off of that hearing but I don't recall exactly whether it was scheduled at that point.

Q. I think you said the merger committee was directed to make the worst possible offer they could stomach. Can you explain that more?

A. Instead of negotiating, making little increment mal movements from side to side to see if you could eventually get to an agreement, they were told go make the best thing you can. Jump to where you think you can get an agreement and you can still stomach it. Put it on the table and see if you can get a response and an agreement.

Q. And what was explained at the MEC level about why they wanted the merger committee to do that, to try and resolve this issue of seniority integration?

A. If to see if there is any possible way to resolve that issue before the decisions had to be made by the MEC.

Everything hinged on those merger discussions. If we could reach an agreement with the Allied Pilots Association on seniority integration, the rest was really, really easy.

Q. Now, this direction you have been describing, did that direction come from advisors?

A. No.

Q. Who did it come from?

A. It was a suggestion by adviser, Randy Babbitt, but the direction came from the MEC.

Q. And at the end of the meetings on March 22 was any

direction given to the negotiating committee in terms of what it should do or not do?

A. Yes. It was an a continuation of the direction they had had all along which was to get an agreement with, at least since early March, to get an agreement with TWA, LLC, nail down every possible issue, but avoid the successorship clause issues in section 1.

Q. Okay. And how about the lawyers who were dealing with the 1113 motion, what direction, if any, was given to them at the end of the meeting on March 22, 2001?

A. They understood, because Richard was going to be working on it at that point, that we were to prepare, Richard was to prepare and file an objection to the 1113.

Q. Well, if you had told the attendees at the meeting, the MEC members, that, and if Glanzer had told them all that the Section 1113 motion was going to be granted, this was a lost cause, why did the MEC direct the lawyers to prepare opposition?

A. Well, it is sort of a literal answer. I will work up from there.

The literal answer was if we didn't file an opposition, then it was going to be conceded and we were definitely going to lose, by giving up. So if we were going to keep a toe in that at all, we had to file an objection.

And the MEC hadn't made a decision yet on whether

# Exhibit N

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,

Plaintiffs,

V.

AIR LINE PILOTS ASSOCIATION,

Defendant.

VOLUME 16
TRIAL TRANSCRIPT

CAMDEN, NEW JERSEY
JULY 6, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648.

approved or agreed with the American transaction or not?

A. I believe I attended part of the MEC meeting in Wilmington the week of the fifth.

THE COURT: Fifth of what month?

THE WITNESS: Fifth of March. I am sorry, your Honor.

A. I also was on a conference call with the MEC officers and advisors I think March 1st, February 28, and at a meeting on March 2. At every meeting that I attended members of the MEC made clear that their goal, the seniority integration goal, was to have the American transaction go through. And to oppose the only other transaction, if you call it that, that was deposed, which was the transaction by Carl Icahn, and it was -- at every meeting, you know, MEC would say, let's not forget our goal, that we want the American transaction to go through.

Q. Did they explain why they wanted the American transaction to go through?

A. The company was -- yes, they did.

Q. What did they say?

A. The company was on the verge of liquidation. American was offering to hire all employees to assume all retiree medical benefits, both for retired employees, and that included retired pilots, and for active pilots, and it was considered a much stronger, viable airline. The American,

was discussed. I know it was at least one of them. I believe it was at both meetings.

Q. We are still focusing on March 21 and 22?

A. Right.

Q. Do you recall it being discussed at that meeting?

A. I believe it was discussed because we were discussing -- the meeting was really called to discuss the 1113. The filing, the response, the implications of a 1113.

Q. Do you recall what was said about the potential right to strike with the 11th, if the 1113 were granted?

A. Yes.

Q. Tell us, please.

A. I was very careful, the other advisors were very careful to sort of divide up this issue. And Mr. Holtzman's memo had divided up the issue for us. The first issue was could, if the 1113 were granted, could the pilots strike against the company in bankruptcy. TWA, Inc., the debtor, I think of it as the debtor. And the answer to that was yes. We could strike against this company that was on the verge of liquidation, they could strike against that company. And there --

THE COURT: It was a company that was still flying the aircraft.

A. I it was the company still flying the aircraft, although one could wonder if the 1113 were granted whether, how much

longer they would be flying the aircraft.

THE COURT: I know.

A. The second question that was posed to us at this meeting and the March 12 memos, March 14 meeting, was under various circumstances, if the pilots went -- if the pilots ended up despite the 1113 being hired by the new company, I think of it as the new company, TWA LLC, could they strike against TWA LLC.

THE COURT: You are assuming the closing took place.

A. Yes. That is how the question was usually posed to us. The closing took place, there was no contract. But the employees got hired any way. The pilots got hired any way. And that answer was very different. That answer was we could give no assurance that they would be able to strike. That it was sort of a -- we received a number of questions about it, because the pilots were looking to see, was there some assurance that if the contract were rejected and they were hired any way, it sort of wanted to know, well, what would take place with the new airline, would we be protected? Could we strike? Would we have a contract? They asked all these questions together. What would happen?

And on the strike we explained, and I had had some research done before this meeting on the 21st, and I had, and I had research done twice because my, I had it done.

Q. Research done by whom?

A. Research done by other people in my office, and in fact I held a meeting with several, I do some Railway Labor Act work but I primarily do bankruptcy work involving ALPA.

I held a meeting with other individuals in my office who do more Railway Labor Act work, and Clay or somebody may have brought it to my attention.

Q. Clay Warner?

A. After those meetings it was brought to my attention.

Q. Clay Warner?

A. Yes, I am sorry. Clay Warner. That there was a Second Circuit case, that, from the point of view of the union, a terrible case, but sometimes there are terrible cases, that said, if a company was a new company, and a new employer, and there was no contract, between the company and the union, under the Railway Labor Act which is what governed the airlines, the union couldn't strike because it was contrary to an obligation of the Railway Labor Act, but the company, after it set terms and conditions of employment, could change it.

It is the worst of all possible words. The union couldn't strike and the company could lower salaries, change working conditions. And at the end of the decision, the Second Circuit said, you know, the union says this sounds very unfair. It is very unfair. It sounds very unfair but

that is the law, and that is the law for a new company.

We had tremendous concern that that is the law that would be applied to TWA LLC, the new company, if there was no contract, and it was just a transfer of employees. And that a court would say that is a new company, there is no contract in effect and there were other theories that somehow it was a successor under labor law although I am not sure that would have done anything other than a bargaining obligation. What we said is we can give you no assurance that you can strike and there is a good possibility, or a larger probability, that you will not be able to strike. There is this awful decision out there.

Q. Could not strike against?

A. TWA LLC. So again, we said you can strike against your company, your current company. But then the next question is can we strike against the new company. And we said, we think there is an excellent chance you cannot strike against the new company.

Q. All right.

A. And I will say that in response to the first point, members of the MEC sort of said, at various meetings, why would we want to strike against TWA, which is in bankruptcy and to the err go on the verge of collapse. That was their question.

THE COURT: By the way, assuming they struck TWA

they went to LLC and they didn't have a contract and things didn't work out well there, would they have the strike as a weapon. And we told them there is an excellent chance you do not have the right to strike.

Q. Did any of advisors say the idea of a strike would be a good idea against either company, TWA Inc., or TWA LLC?

A. I don't think anybody offered an opinion about LLC, the new company. I think advisors sort of slugged our shoulders and said, as the MEC was, you know, it is an interesting question why you would want to strike against a company that is maybe on the verge of liquidation.

Q. Let's move on head, unless, does your Honor want a break. I think we have been going an hour and a half. I want to ask about the April 1 meeting now?

THE COURT: Let's take a break until a few minutes after twelve, 12: 02 or 12:03

MR. FRAM: Thank you, your Honor.

THE COURT: Do not discuss the case amongst yourselves. Keep an open mind until you have heard all the evidence. All rise.

(Recess.)

THE COURT: You noticed I added a few lines about the attorneys generally. Anybody have any objection did that?

MR. PRESS: No.

# Exhibit O

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,
Plaintiffs,

V.

VOLUME 17
TRIAL TRANSCRIPT

AIR LINE PILOTS ASSOCIATION,

Defendant.

CAMDEN, NEW JERSEY
JULY 7, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648.

and all reasonable inferences from that evidence is to be viewed in a light most favorable to our clients, and when you do that you will find --

THE COURT: You even said that in a brief.

MR. PRESS: You will find there is substantial evidence in this record to support findings of yes on both of the questions that you had proposed to send to the jury. And you should deny this motion, Judge.

THE COURT: Okay. Anything else by anybody?

MR. FRAM: No, thank you, your Honor.

MR. PRESS: No, your Honor.

THE COURT: I am going to deny the motion for directed verdict, the Rule 50 directed verdict at this time. I think there are, admittedly there are fragments, but there are fragments of evidence flowing through this record, and I guess I am most troubled by, but I think that it is not a very subtle point that ALPA had a potential for conflict of interest, a serious conflict of interest here. I mean there was only two months before the American acquisition was announced that they, that there was a unity resolution, I think I have that right, the unity resolution was passed and Woerth I think went down to speak to APA, and clearly, by the way I find nothing wrong in any of that. It was done in November, 2000, or earlier, to try and bring in American, you know, and Fed Ex and UPS, and Continental, and anybody else

into the ALPA fold.

It was perfectly lawful, proper conduct. And American would I think at that time may have been one of the most prosperous American passenger carriers. And certainly try to bring them into the ALPA fold. Perfectly proper. We need to decide how one goes about doing that as a goal, under the circumstances. It is perfectly legitimate.

But ones American announced its acquisition, and required the waiver of the scope provisions in the ALPA contract as a condition for the acquisition of a clearly a failing airline, ALPA was very much in a conflict of interest situation. And I simply don't believe, I mean I think a jury could conclude they were certainly well aware there was a conflict of interest inherent in that situation and the question is how did they deal with it. I agree it is not like a lawyer, you kick the lawyer off the case, and hire two new lawyers.

You can't do that, you can't say I am going to fire this union and say, well, bring the Teamsters in to negotiate for us. You can't do that. I mean, the pilots, the TWA pilots couldn't do that.

So I think it behooved ALPA, you know, to be like Calpernia, Caesar's wife, and you know, be above and beyond all reproach.

Again we have all the snippets of evidence relating

to the card campaign that was going on. We have representations that it was going to be paid for. I mean the expenses, whether it was going to be paid. That appears not just once. But a couple of times. And I, as I recall, I think it was when Clay Warner was on the stand and he had proofread a letter where it said submitted. And he changed the word to incurred. Which the net effect would be accurate to expand the possible scope of reimbursement. He tried to get around that by saying I was worried about fraudulent -- but nowhere was there -- Clay Warner is a pretty smart guy, looks to me to be a pretty smart buy, nowhere does he say we can't reimburse you for anything. While the integration negotiations were still going on.

I think there are other bits of evidence throughout, you know, even the, although here you talked about it, the fee petition for fees in bankruptcy. What was our contribution? Our contribution was keeping the union out. Our contribution was seeing that they didn't make any trouble. That is a contribution of some kind, but the question is to whom.

I think I may have to revisit this issue. I think the rule says when I deny a motion and submit it to a jury I can reconsider this when the jury verdict comes back, depending on what the verdict is.

But I am going to let it to go to the jury. I

think there is enough here, giving all inferences favorable to the plaintiff. And the plaintiff ought to be thanked for his very short argument. Not too many lawyers have the guts to get up and do that. After hearing as talented an argument as Mr. Fram made. When the juices start flowing and they go argument for argument, case for case, evidence for evidence, but Mr. Press had the courage just to say basically I get, I got all the evidence I need, that is enough for me and I think it is enough in this case. Again, the reaction of ALPA, their dealings with Hunnibell and Clark, I found very troubling.

I found the conflict would be readily apparent. Warner seemed to me like a very bright, cautious, fellow. We didn't hear from the top dog, the top lawyer, Jonathan Cohen, we didn't hear from him. We heard from Holtzman who wasn't technically in the legal department. He was in the representation department. But he was a lawyer for all intents and purposes, looks like a good lawyer. I just, it is inconceivable that a jury could conclude that they were well aware of the potential for conflict here. And instead of taking the relatively simple steps they could have taken to make it clear to the APA, it, they have nothing to do with any organizational effort, that was cut off, and whatever the reason they chose not to do that. And so I am going to deny the motion.

I am going to submit the case to the jury and see what happens after that.

MR. FRAM: Your Honor, will you permit the jury to make decisions about whether Roland Wilder's theories had merit?

THE COURT: I am not going to instruct them that the theory had merit or doesn't have merit. We don't have enough in this record, I am not even going to ask the jury to consider that.

If it is suddenly an opinion -- the jury shouldn't be deciding, you know, whether the theory, I am not so sure that I have enough. I mean, you know, we have Roland Wilder saying one thing, other people saying other things. You said they have no merit. But if I had a dollar for every meritless suit that is filed in this Court, I guess I would be a wealthy man. I mean litigation has a time component. Let's take even the issue, for instance, as to whether APA had a duty of fair representation to the TWA pilots after they became the bargaining agent for the combined group April 3rd.

When the National Board certified the results of this, the 30 days had passed and they certified the result of the single carrier determination.

The question is do they have a duty of fair representation at an earlier time, maybe back in November.

# Exhibit P

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,

Plaintiffs,

VOLUME 18
TRIAL TRANSCRIPT

V.

AIR LINE PILOTS ASSOCIATION,

Defendant.

CAMDEN, NEW JERSEY
JULY 11, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648.

of Wilder's lawsuits were filed in the beginning, for example.

There was a concern that the whole deal would blow up. It is not enough to prove that if that lawsuit had been filed they would have different, that they would have been worse. They have to prove to you that the overall integration would have are better, more favorable. I want you to keep those standards in mind, those two requirements, either arbitrary or bad faith in an impact, that it made a difference, as you listen to the arguments to consider the evidence in the case.

And a point I want you to keep in mind as well is that when you Judge the conduct of ALPA and listen to the plaintiff's arguments, you don't do so from this vantage point. You don't do so with the benefit of hindsight, or gee, we found out something later that if we had known about in April of 2001 we might have decided differently. No Monday morning quarterbacking. No second-guessing. You need to put yourself in the mind frame of the people who are making decisions at the time, and decide did they do things that were unreasonable, given what they knew and given what the circumstances were.

I want to break up the factual information you have heard in the case roughly into three sets of issues. You heard a lot. You heard about things that led up April 2, you

heard about complaints over the summer. You heard about things that happen in the fall of 2001. And just for the purposes of talking about the issues, I want to talk about the events leading up April 2 of 2001, when the decision is made to accept the collective bargaining agreement with TWA LLC, and talking about the facts and the evidence there. I then want to talk a little bit about what happened over the summer in terms of the negotiations back and forth. And then I want to talk finally about the events after 9-11, and the events leading up to the imposition of Supplement CC, all the back and forth there.

And I am doing that in part because when you think about the evidence in each of those periods, Mr. Wilder stepped up and said I think we should file a lawsuit. And I think you are going to hear from the plaintiffs' side that they are going to argue that each of those points, that the lawsuit should have been pursued.

The decision on April 2, I think the claim you are going to hear from the plaintiffs is that the members of the MEC who voted on April 2 to accept a new collective bargaining agreement, to waive their labor protected rights, to move forward, they were somehow coerced, they were bamboozled, they were either misled or bullied by ALPA into taking action. We will address that.

The events over the summer of 2001, I think the

claim there is that ALPA didn't properly support them. It didn't provide resources. And I will talk about that. I won't spend as much time on that.

And finally the decision that is made, or really the nondecision, that is made in the October and November timeframe, by the MEC. I think the claim there is that ALPA did not provide sufficient support. It didn't push for the Bond Amendment, it didn't threaten to do things that some people wanted. But again, the common theme in all of these is we need to be more aggressive, we should go and file a lawsuit.

The theory I think the plaintiffs have as to why ALPA allegedly didn't do the things it was supposed to do is a conspiracy theory. And their theory I think is that ALPA announced as an organization in October of 2000 its so-called unity campaign. And we have unity resolution, it is in evidence. It is adopted by ALPA with the concurrence of all the different MEC's, everybody knows about it. And as you have heard, the resolution says that we want ALPA to represent as many airline pilots in the United States, and Canada, as it can. We think that benefits everybody. All the pilots, to have a bigger group. It benefits everybody in terms of ALPA's ability to negotiate better contracts with individual airlines, it benefits everybody in terms of having that kind of base line.

And there were specific pilot groups, as you heard, that ALPA was focused on in late 2000, the one at the top of the list, as you heard from Captain Woerth, and also Seth Rosen who was the Continental pilots. There have been discussions ongoing already, and ALPA did in fact proceed with its organizing campaign, the campaign to merge with the union, the independent union representing Continental, Federal Express was another independent union that represented those pilots and was there as well.

But certainly the American pilots represented by the Allied Pilots Association, they were one of the groups that ALPA was interested in, and Captain Woerth went and talked, as you have heard, to the leadership of the APA, in October of 2000 and said, hey, we would like to have you guys come back. We know you split off back in the early sixties. We think it makes sense. We think it makes sense for us. We think it makes sense for you to come back.

No question about that. No question everybody knew about that. And of course one of the things that the American pilots union is dealing with at that point is this $45 million fine you heard about. They had the sick-out in February of 1999, American had to cancel hundreds of flights, lost all kinds of money. They went to court and a federal judge down in Texas imposed this fine. That was unresolved, as of late 2000. It was a concern to some degree to the

American pilots. That became an issue of discussion.

So the conspiracy theory, as we understand it, is that because ALPA was interested in attracting the American pilots, bringing them back in to ALPA, during 2001, when ALPA was assisting the TWA pilots, it tried to undercut them. It tried to undercut them in a way so that they got less favorable seniority integration and the American pilots did better.

And I think you heard throughout trial this some of the plaintiffs' witnesses complain about the fact that ALPA didn't do certain things. Obviously there were other witnesses and I will come to that, who we call and said, no, that is not the case and of course you will recall Steve Rautenberg who was there from day one, had a very different perspective than some of the plaintiffs' witnesses, you heard David Singer, the fellow who got pushed out of Council 2 because he did not agree with Ted Case, and Howard Hollander.

But that is the theme. That is the theory that, A, ALPA did things that it shouldn't have done, or failed to do things it should have done; and B, it did that because it was really more interested in the American pilots. And what I think the evidence proves and what I am going to argue to you is that ALPA did everything it should have done. It acted reasonably and certainly not unreasonably or irrationally,

and that this long term interest of bringing the American pilots back had nothing to do with anything.

So let me walk ahead and give you some very important background, you probably heard it but I want to summarize a couple points about how ALPA works so that you understand how far-fetched this theory is and why it makes no cents.

The first thing I ask you to recall is that the way ALPA is structured is that the pilots at an individual airline, such as TWA, they make all the major decisions. What happens is you have the three councils which you have heard about, Council 2 in New York, Council 3 in St. Louis and Council 4 in California, Los Angeles, they represent elect representatives.

At least early in 2001, up until November 1, you have six representatives, one captain rep and one first officer rep from each of the so-called domiciles. Those elected representatives get together and they elect officers to help them organize things and run things, and they make the decisions. This is a Democratic system where the pilots, through elections, in effect, are having their representatives make decisions, including the decisions about what gets put out to the membership for ratification, so that the six people who are voting on a particular issue think, gee, we want to make sure the members are really comfortable

what with what they are doing, they have the option of sending that issue out and in effect getting a referendum on it, not taking responsibility for making the decision and saying we are going to leave it up to you.

Are there limits on what an MEC can do? Yes. They are supposed to operate and conduct themselves in accordance with the Constitution and the bylaws, and the policies of ALPA. Otherwise, there would be no point in having them be part of the bigger organization.

And ALPA gets to approve litigation. ALPA does not permit individual unions to go off and file lawsuits. And indeed, it couldn't, because the unions are part of ALPA. If a law lawsuit is going to get filed on behalf of the authorized collective bargaining representative of the employee, it has got to be ALPA that files the lawsuit.

As you can imagine over the years and given the number of unions that number of airline groups, rather, pilots that ALPA represents, you would want to have some degree of consistency, some institutional knowledge about what kinds of lawsuits work or don't work, and that is why ALPA reserves the right to make that decision.

And then within ALPA you have these MEC's, they together form the ALPA board of directors, the MEC chairman, the master chairman form an executive board, and then officers and executive vice presidents from the MECs form an

executive council. So you have all this coordination within ALPA, and all of this discussion and interaction back and forth with the MEC members, not only of TWA, but all of the other airlines whose pilots are represented by ALPA.

And one of the things I want you to keep in mind as we talk through the issues in the case, and you hear about some of the complaints you heard from the plaintiffs, like the litigation complaint. We didn't go off, ALPA didn't authorize to go off and file a lawsuit to enjoin or conduct a transaction.

Again, the TWA pilots act through the MEC. How does the MEC act? They have votes, they make decisions. If a resolution does not come out or a directive does not come out of the MEC there is nothing for ALPA to do or not do. Again, that is the process. The process is referred to, you may have heard as Independence Plus. The pilots are independently entitled to make their own decisions. The plus is ALPA has these resources, and this guidance and the institutional knowledge and the like to back them up.

All right. So let's focus on this first set of issues that I mentioned to you before, the one leading up April 2, and I will give you a little background just so we have it all in mind, and you have heard this for weeks and weeks.

I am sorry if I am repeating stuff you know well.

I will try to move through this quickly. January of 2001 is TWA's third bankruptcy filing. It had filed back in 1992 and again in 1995. There had been concessions, millions and millions of dollars of concessions by the pilots, lots of concessions from the flight attendants and the other workers as well.

The good news about the American deal is that American is promising jobs to all of the TWA employees, all 20,000 of them, obviously including the pilots. American is at that point the largest airline in the country. It is financially secure. It is stable. It has a bright future. The hitch, of course, as you heard, is that the asset purchase agreement between American and TWA requires that the TWA pilots waive their labor protective provisions, the one that is most important, as you have heard, is the right to go to arbitration if the pilot groups do not agree on seniority. I will come back to that.

Why does American require that as a condition of the deal? Because American has a labor agreement, a collective bargaining agreement with its own union, the APA, that entitles the APA to have any new pilots who come in be stapled, meaning being put at the bottom of the seniority list. American has no leverage over the APA to speak of. I will come back and talk about how incidental that becomes but the fact of the matter is American is legally required to

respect the contract that it signed with the APA and with its own pilots, and there is no reason in the world why American is going to disrupt that or try to attack that or try to change that.

You have heard a lot in the case from some of the TWA pilots. I think really all of them to be fair about how important seniority is in the pilot industry. We don't disagree with that. But think about the American pilots. Seniority is just as important to the American pilots as it is to the TWA pilots.

So when the deal gets announced their position very much is, hey, we have a contract that entitles us to seniority over the TWA pilots, and it is important. We are not going to give that up unless something significant happens.

ALPA, of course, has no leverage over American or the APA. It doesn't have contracts with them. It really doesn't have leverage. And we will talk, despite the absence of that leverage, about things that ALPA tried to do to persuade the American pilots, and to persuade American to treat the TWA pilots with some compassion.

But American makes clear, as you have heard during the entire process, and certainly after April 2, that it is not fooling around here, when it says that the TWA pilots have to waive scope, it is serious. And you have heard the

testimony about its threats to walk away from the deal if that aspect, that condition is not met.

And of course, the Section 1113 motion which you have heard about again and again and again is the device, the vehicle that American acting really behind the scenes, or not even really behind the scenes, with TWA, that is the vehicle that they use to bring this issue ahead. Because as you have heard, in early 2001, TWA is in terrible condition. The bankruptcy is public. People aren't buying as many tickets. American is putting in this so-called DIP, debtor in possession financing, and this is costing American a lot of money. They want to move this deal along and not have it be out there, and the way they do that is by filing a motion under Section 1113.

Pardon me one second.

All right. So what does the MEC supported by ALPA do to get ready for what everything else is coming? Everybody knows this decision is coming in terms of do we waive scope, do we not?

And again, you heard about the different committees that the MEC had, the committees of course, they are all persons, I don't want to say man, because you have some women involved, but they are all persons, pilots.

You have the negotiation committee out there, chaired by Ron Kiel. You have a merger committee that is

appointed. You have Bud Bensel, he does it for a while, early March, he steps down, and then Mike Day comes in as chair of that committee. He has a group of pilots. You heard Mr. Day testify. You heard about a merger oversight committee. You heard about a bankruptcy committee. So there are many, many pilots beyond the ones who are elected and beyond the ones who are directly part of the MEC who are part of the process.

During this period, the MEC and the different committees also engaged in different advisors. I will talk about that in a little bit, and you also heard that a public relations firm is engaged. That firm is engaged to get out to the public, and to get out to Congress the position of the TWA pilots, with respect to the deal. And the position of the pilots, unambiguously, without any question, is we support the deal. We want the American deal to go ahead. We want Carl Icahn to disappear. We don't want TWA to liquidate and loose our jobs, and that is a sensible position.

It is really the only position that you could take that makes sense under the circumstances. What are some of the key events you heard about during the period leading up April 2? Well, you have got to figure out do you want to accept this collective bargaining agreement, you have got to determine to waive seniority. This is the decision, I project I had for you what the decision ultimately is. I am

going to walk back a little bit and talk to you about some of the events leading up to it.

But if you recall, all the different back and forth that went into this, if you recall the resolution that is adopted on April 2, it is not a resolution as a couple of plaintiffs' witnesses said to waive scope, it is a resolution to accept the new collective bargaining agreement, subject to some tweaks and loose ends, to waive scope and resolve the 1113 motion and move ahead.

Obviously, the resolution of that motion means that you avoid a lot of downside that you heard about. And you certainly avoid the risk of American walking away from the deal. I will talk about that in a little more detail.

What is the new collective bargaining with TWA LLC? Well, it secures jobs with the largest, most financially secure airline in the industry. You got higher hourly rates. You heard some of those numbers. The 767 captains from American are making $66 per hour more than the TWA captains. So that is obviously a positive.

I think you also heard that the hour limitations are a little bit different in American, but the fact of the matter is very significant benefit. You heard about the contributions to $12 million plus interest in contributions that are made as part of this deal by TWA LLC to the fund, that is a big benefit. And you heard as well about the

flight pay loss that ALPA picks up. I want to just dwell on that for a second, because I think it says a lot about the case that the plaintiffs have presented.

If you recall under the collective bargaining agreement with TWA, Inc., the company goes into bankruptcy, there is this bank that set-aside for flight pay loss. And that is money that is available for people involved in union activities. Members of the TWA MEC, they go to meetings, they are involved in grievances, if they miss a flight and can't make money as a result of that, well, the bank is out there and TWA pays.

Well, what happens when this deal is negotiated is that that disappears, and you may have heard some testimony, you may recall testimony about the joint petition, remember the fee petition that is put into bankruptcy? I think with Mr. Jacobson, who was talking to Mr. Holtzman, well, Mr. Holtzman, isn't it a fact that one of the things that the TWA pilots gave up when this agreement was struck is they gave up their right to flight pay loss payment?

Well, Yeah, they did. They give it up in terms of TWA, Inc., a company in bankruptcy and about to disappear, so they didn't really give anything up P. Who stepped in and paid the flight pay loss? ALPA did. And you heard the testimony about the millions of dollars that ALPA paid through 2001 and 2002 to the pilots who were doing the union

work.

You heard about the $180,000, for example, in flight pay loss that was paid to Robert Pastore, who was the master chairman of the MEC. What happens here, I want to highlight this for you with respect to the collective bargaining agreement, is that ALPA steps in. ALPA could have said listen, we don't want to be responsible for flight pay loss. Let's have TWA LLC pay $2 million less for the outstanding pension contributions. We will set that aside.

Did it do that? No. It made a direct contribution, a direct benefit to the union members by stepping up and saying we will take care of the flight pay loss. We will support you going forward in your union activities and your efforts to protect the rights of the TWA pilots.

Now, let's focus for a minute on what the TWA pilots gave up when they agreed to this new collective bargaining agreement on April 2, because this becomes a big issue going forward. We are going to focus on that, you are going to hear a lot about. They gave up the right to seniority arbitration, and of course I think you heard that there was essentially no choice. The section 1113 motion was there. They were advised by the advisors that it would likely be granted. I will show you in a couple of minutes the statements that the plaintiffs themselves made, where

they acknowledged that, yeah, this particular bankruptcy judge was going to run this through. The motion was going to be granted. We really didn't have much of a choice. Of course, you will recall Mr. Warner's testimony, he is the lawyer from ALPA who did this analysis. Recall his notes, he has agreement, no agreement, pros, cons, he walks through and analyzes the pilots and they come to appreciate and understand it is really a no-win situation. I think the phrase Mr. Warner used was lose/lose. You don't have much of a choice? But to give it up and to take the jobs and be happy that you now have positions with the largest, most financially secure airline in the country.

But I just want you to keep in mind as we talk about the later negotiations, seniority negotiations, is that the plaintiffs' mantra, what they keep saying is we gave up scope, we gave up the right to seniority arbitration. What does that mean? What does it mean to give up the right to go to arbitration?

It doesn't mean giving up a particular position on the seniority list. It doesn't mean you would get date of hire. You heard what date of hire is. Date of hire means you look at the dates when the two groups were hired at the respective airlines and you put them together. That would be the most equal way. It doesn't mean ratioing, where if you have 11,000 pilots here and 2,300 here. It doesn't mean you

take five pilots from American and one pilot from TWA. It doesn't mean anything.

It means I have the right to go to an independent third party, and you have no idea who that person is. And make your case. Make your argument for why you think you are entitled to something in particular. So the right that is given up is something that is very indefinite and very unclear. That is all the TWA pilots ever claimed that they were entitled to, the right to go to arbitration, with no idea of how an arbitrator might view this, with no idea whether an arbitrator would look at this and look at the arguments made by American pilots and say yeah, you guys were right.

So when you think, as you will be asked to, about this issue of causation, remember I said to you before, that the plaintiffs have to prove that there was a breach of the duty, and they have to prove it mattered, they have to prove that the outcome would have been more favorable. I don't know how they could possibly do it because if you got what you claim you didn't get, if you had gotten the seniority arbitration, who knows what the arbitrator's perspective would have been? And I will come back to that point in just a little bit. But keep that in mind.

Now, you are probably wondering, well, Mr. Fram, if this is all so clear, if the decision on April 2 was so

clear, really there is no choice, the 1113 was going to be granted, this was the right thing, the pilots on the MEC did the responsible thing, they protected jobs, they avoided risk, they didn't assume, as I think you heard one of the plaintiffs' witnesses testify, they didn't think Don Carty was bluffing. Think about that.

Here is a guy who is the CEO of one of the largest companies in the country, and he publicly states at different points that if certain things don't happen, if scope is not waived, that the deal is off, we are not going to go through. And you have individual pilots saying, oh, the guy is bluffing. I don't believe him.

Here is a guy who took on his own union and got a $45 million fine, and you are prepared to call his bluff? You are a smaller pilot group. He owes no obligation to you whatsoever and you are going to call his bluff.

Anyway, what is the plaintiff's version? What do they say about why ALPA either acted arbitrarily, it acted irrationally or that it acted in bad faith with respect to this decision we have been talking about on April 2 of 2001.

Well, here is the story. We are going back a weeks and weeks now. You may not recall this that clearly because you have heard other testimony but I want to remind you of what Ted Case and Alan Altman and Sally Young and Howard Hollander told you when they testified about what happened

and why they felt that they were mistreated. The story they told that was a consistent story, and I will show you that in a couple minutes, is that April 2 was the first time that we were told that we had to waive scope.

They claim that Roland Wilder was there at the meeting on April 2, and that he was shouted down. He tried to speak up and articulate his litigation theory, but the other advisors shouted him down, principally Michael Glanzer. They claimed that they had received advice about the Section 1113 motion prior April 2, to the effect you don't need to worry about it.

Remember Hollander testified, Oh, I had a conversation with Clay Warner, a 45-minute conversation, at some point in late March, where he told me don't worry about the 1113 motion, it is likely to be denied. I will come back to Mr. Hollander in a couple of minutes.

And what they say as a result of all of this is that we were pressured and coerced. Voices were raised. The phrase they use is the train is leaving the station.

And what I want to do is I want to show you some of the testimony, obviously it wasn't videotaped, but we have transcripts. I think you understand that Ms. Johnson has been sitting here through this whole trial typing away and the result of her efforts, is that we get a transcript every day what the testimony was, and I want to show you some

excerpts from those transcripts, we are going to put them up on the big screen, and what I would like to do is start with Altman, Young.

All right. So this is Alan Altman talking on April 2. I don't know if people can see that. The other screen is not going to light up. We will work with this one. What he says is, on April 2, instead of what we had been told, don't waive scope, there is no reason to. We were told you have to waive scope, you have to do it now. If you don't waive scope, and it was, there were emotions involved.

Comments were made that the train had left the station. Kind of apropos, we are dealing with Railway Labor Act issues. What he is trying to suggest is not an allusion to the Railway Labor Act. He is trying to suggest we were railroaded. The train has left the session. We heard that a number of times. There was a sense of urgency. There had been no urgency, it had been fairly relax the you don't have to do it. It is not going to succeed.

Let's go to the bottom. He says, well, did all advisors on April 2 ultimately agree that the Section 1113 motion was likely to be granted?

That is what they told us. I don't know why they changed their mind. Roland Wilder did not agree.

We will come back to Roland Wilder. It says, he is referred there, remember that April 3, there are a couple

communications that went out on April 3, explaining what happened. He says, it says, not one of our advisors believed that we would be successful against 1113. The Court has sided with TWA and American on virtually every important issue.

Does that refresh your memory that all the advisors, including Mr. Wilder, agreed a the 1113 was likely to be granted? No, Roland did not. Like I said, Roland walked out of the room. He was upset and he just turned around and I don't consider this agreeing. As he is walking out the door, he says, I guess some contract is better than no contract. I can tell you, I remember Roland being abused, actually quite heavily, by the other advisors. It was not a pleasant sight. He describes Roland as a defeated person as he walks out of the room oh April 2. This is the meeting on April 2. He says, voices were raised. Actually, we were all being yelled at. This was not professional.

Very dramatic.

Let's talk for a minute about what Hollander said. Mr. Hollander. Right.

Can you recall what the individual advisors said to you, and if you can't recall, can you recall what any of them said? Then he says, you know, it is an interesting statement. I can tell you what was said that day as if it were yesterday. He recalls it vividly. The little bit vague

as to who said what. Clay Warner was an active speaker. Michael Glanzer did speak. Bob Christie did speak. Roland Wilder attempted to speak. April 2, Roland Wilder attempted to speak. Let me phrase it as this. I am from New York. To me, it almost looked like a Broadway play. That is how I look at it today. Everybody was singing the same song and dancing to the same step, with one exception, which was Roland Wilder. Singing the same song. I will come back to that. He says, I highlighted this.

At least once or twice he tried to offer suggestions he was interrupted in his speaking. He was not like, I am not saying like allowed, but he was cut off. Mr. Wilder, we will get to that. Mr. Wilder, we don't share your opinion on that.

Then, in the final sentence, he says the quote of the day that is engrained in my head is the train is leaving the station.

We were railroaded. The train is leaving the station.

All right. Let's turn and look for a minute at Ms. Young, what does she have to say about this. Sally Young. We are talking about at the meeting on April 2. You have seen evidence about a litigation strategy that Mr. Wilder had come up with to try to hold the deal hostage basically. Was that discussed at the meeting on April 2? She says she never

saw it. She didn't even know about the litigation strategy. The first time she saw it was part of the litigation. Skipping down where it says, "Roland had made his presentation."

This is her version of what happened on April 2, 2001. "Roland had made his presentation and had argued somewhat differently than the rest of the advisors, and at that point in time after his presentation he sat down and Michael Glanzer, the investment banker, who had been advising about potential mergers got very angry and in fact stood up and went over to Roland and again was screaming, American is not going to do the deal if you don't waive scope. They are going to walk." This is Mr. Press questioning.

"Again, screaming?

"ANSWER: Screaming."

They are trying to paint a picture. Or trying to. What does she say about how Mr. Wilder reacted? Again, we are on April 2, 2001. He capitulated, he looked defeated. His body language was, he ended his presentation by saying, you know, a contract is better than no contract. A phrase that we saw before.

So this is the story, it is dramatic. It was orchestrated, advisors were all singing the same song, they had all gotten together with the exception of our champion, Mr. Wilder, to take a common position. They beat this guy

up. They shouted him down, they physically intimidated him. You get the image of Mr. Glanzer walking up and standing over him. This is the allegation the plaintiffs have made.

All right. Well, let's talk for a couple minutes about what Mr. Wilder says about the meeting on April 2, 2001. You may recall this. Let's start with the first Wilder video, please.

What we are talking about --

MR. PRESS: Your Honor, I don't know if it is proper to replay testimony.

THE COURT: I am going to allow it.

MR. PRESS: All right.

MR. FRAM: What we are talking about is Mr. Wilder had a bill like all lawyers, who bill by the hour, he kept time records. You recall his day timer he wrote in the book, where he was on what days. So we are showing him his bill, the one that he sent to Mr. Pastore and that the MEC paid as, to see what it says about what he was doing on April 1 and April 2. You just heard or saw or remembered testimony from the plaintiffs about Mr. Wilder being there on April 2 and all this drama. What does Mr. Wilder say about what is happening on April 2 of 2001.

(Videotape deposition of March 21, 2011, at 15:09 commences)

MR. FRAM: All right. Then, there is a second

clip.

(Clip March 21, 2011, commencing at 14:15 commences)

MR. FRAM: 100 percent certain he was in Louisville on April 2, 2001, and obviously could not have been at the meeting with the MEC. Well, how can Young and Hollander and Case, who said the same thing, and Altman come in and say he was there and he got beat up on April 2? It never happened. They are making it up. And in terms of trying to dramatize the decision on April 2.

I will show you something else. Let's move, jump to clip three of the video, which Is where in the same deposition, Mr. Press was there, asked Mr. Wilder about some prior testimony given about different events. Let's skip to three, please.

(Videotape of Roland Wilder commences, videotape of March 21, 2011 commencing at 14:21:40 played)

MR. FRAM: Whatever I said before happened on April 1, not on April 2. Let's show the final Wilder clip where he talks about things that he thought happened on April 2.

Go ahead.

(Videotape of Roland Wilder dated August 8, 2008, commencing at 2:55:25, commences).

MR. FRAM: I was asked that by Captain young. Sally Young. And he has now clarified this is April 1.

Well, what did the plaintiffs say about what happened on April 1? Do you recall this?

They all told the same story. They said that they didn't understand that the members of the MEC were invited April 1. You may recall me showing them that email, the March 29 email, where it refers to the scheduling the meeting. Let's pull that up real quick. Brian, that is D 210. If you blow the top part, this is the announcement sent to all the pilots who testified. It is announcing that the master chairman is holding a special meeting on April 2. There will be a work session beginning on Monday -- I am sorry, work session beginning Sunday, April 1. There is no indication that they are not invited and yet all of them, Case, and Altman, and Young and Hollander, they all testified on the stand in the courtroom that they were there on April 1. They didn't think they were invited. They were busy with other stuff. They didn't attend. They insinuated, they suggested this was a meeting for the organizers to get organized.

This goes back to the conspiracy theory. The advisors are sitting down, trying to coordinate. Well, wait a minute. You just heard Mr. Wilder testify everything he thought happened on April 2, including the dialogue with Sally Young, happened on the first. So Mr. Wilder is now confident that he recalls here being there on April 1 and

that Sally Young came in and testified as did the other pilot plaintiffs, they weren't even there.

Mr. Rautenberg and Mr. Singer were here and testified. They were other pilots on the MEC. They said everybody was there. We were there. Everybody was there. Mr. Holtzman was there and testified about it. Mr. Warner was there and testified about it. Mr. Seltzer was there, and testified about it.

By the way, Mr. Rautenberg and Mr. Singer, you think they are popular among the former TWA pilots for coming in here and testifying and contradicting what Altman and Young and Hollander and Case said. Did you notice how they got glared at by some of the pilots when they left the stand? I don't know if you noticed that or not. They are not popular for not agreeing with the plaintiffs' position in this case.

I want you to think when you judge credibility, that is a big issues in the case, I want you to think about what incentive does Steve Rautenberg have to come from St. Louis and get on the stand and talk about these issues. Is he going because he is going to benefit in some fashion? No, he is doing it because it is the truth. Same with David Singer.

So the story that the plaintiffs are trying to tell you about being bullied, and coerced on April 2, never

happened. If you look at the minutes of April 2, and I encourage you did do that, D 74 in evidence, you will see that they begin the meeting with the discussions by Randy Babbitt. They go through all routine business and then the issues gets called late in the afternoon. There is no indication of presentations. There is no suggestion of bullying.

Look at the documents that were prepared and sent out on April 3rd. You recall Captain Pastore sends out an announcement to all TWA pilots on April 3rd. Let's pull a couple up quickly. There are a handful of document by the way that I really encourage you to sit and review carefully. You are going to get a mountain of documents. You may not be able to see it. It is a lot of material. If every one of you took the time to go through every document, you would be here for weeks trying to figure this out. You can certainly do that. That is up to you. But there are a handful of documents I want to encourage you to review. One is D 15. This is the report of Captain Pastore. Pull that up real quick.

This is where if we go to the next page he talks about what happened at the meeting. Summarizes what the issue was on April 3rd. The alternative facing our MEC was to fight the 1113 motion in court. Not one of our advisors believed that we would be successful against the 1113. The

Court, referring to the bankruptcy Judge you heard about, Judge Peter Walsh in Wilmington, thus far has sided with TWA and American on virtually every important issue. If we did not agree to the new CBA with TWA Airlines LLC and the Court granted TWA's 1113 motion, as expected, we would lose all of our contractual rights, including our scope. Pretty succinct summary of what happened.

When you read this document, see if there is any indication in there of last-minute coercion, of people not being prepared, he says by the way, contrary to what Young and Altman and Case and Hollander said that Wilder agreed. I showed you some testimony a couple minutes ago from Altman where he said, Wilder didn't agree. He didn't say he, the 1113 would be granted. That is one example, and I ask you to review that.

D 16, pull that up. That is the letter that goes out from the two Council 3 representatives, Mr. Rautenberg and Ms. Young.

At this point in time, the day after the decision on April 3, they are on the same page literally. They both signed the letter. When they got up on the stand they were miles apart in terms their recollection. But look what they said collectively in a letter sent the day after the meeting. "The MEC has consulted extensively with a large group of professional advisors on the CBA negotiations, the merger

negotiations, and the bankruptcy process."

And then it identifies all advisors that you heard mentioned, a few of whom testified in court. The unanimous opinion of our advisors, including Richard Seltzer, the motion experienced Section 1113 attorney available, the likelihood of ALPA's prevailing in an attempt to defeat TWA's CBA rejection application was virtually nil. Next page.

Attorneys advised the Bankruptcy Code does not provide the Court the authority to modify the contract. In effect, the contract would have to be rejected or retained in its entirety. This aspect of the situation created a high probability that the representational status of ALPA would also be affected.

Any suggestion of coercion or railroading in that letter? No. There is none.

The third document I am going to mention it, you recall it, I won't bother projecting it, the April 10 letter, D 35, that goes out from Council 2, that is the letter signed by case and by Hollander and Singer. There is no suggestion of coercion or last minute rush or anything to that effect. What the letters do is they explain the very thorough, deliberate process that the elected members of the MEC went through in making the difficult but clear decision that they should accept the new collective bargaining agreement as part of that process, or scope.

Let me just, let me dwell for a minute on one other aspect of this. The plaintiffs also have a version of what happened at the meeting on March 21 and 22. Okay. You may recall that very important meeting. What has happened leading up to March 21 and 22 is on March 15, the bankruptcy Judge approves the American transaction, March 12, a Monday, couple days later, March 15, American again on behalf, really TWA, on behalf of American, goes ahead and files a Section 1113 motion. That brings this whole issue ahead.

The motion, as you heard many times, is scheduled for a hearing in the bankruptcy court on April 6. A day or so after they file the motion they put this proposed collective bargaining agreement out there. Remember it has a time line that says this is going to be withdrawn. On the date of the 1113 hearing so it is this carrot and stick approach. The carrot is here is a new collective bargaining agreement but you have to accept it before April 6. The stick is the 1113 motion. If you don't accept that, then you have no contractual rights.

So these are pretty important events, pretty significant events. And what does the MEC, the leadership of the MEC, okay, remember the leadership of the MEC, Robert Pastore, here is a guy who was a former board member of TWA, Inc., went to the board meetings, understood the financial condition, was there when the board voted to approve the deal

with American, the deal that provides for waiving scope.  He
knew from having been through the wars, as did many TWA
pilots like Steve Rautenberg and Dave Singer, they have been
through the prior bankruptcies.  They knew what could happen.

He was willing very sensibly to move ahead with the
whole process.

So what happens is they schedule a meeting on March
21 and 22.  What is the purpose of the meeting?  The purpose
of the meeting is to have advisors come in.  Than indeed
advisors come in, and they analyzed the 1113 motions,
remember those memos we talked about?  We got the agenda for
March, 14.  We got the memos Mr. Holtzman sends out to Mr.
Warner and to Richard Seltzer, what about the 1113 motion?
What about the contract rights?  What about the right to
strike?  You remember those.  You  heard those just within
the last week or so.  Advisors go out and research the issues
and figure out as best they can what is going to happen and
everybody gets together on March 21 and 22 to try to figure
out what do we do in response to the carrot that is being
dangled in front of us and the stick that American is ready
to bring down on their heads.  What is the plaintiffs'
version?  What is the version of Altman and Young and
Hollander and Ted Case, we admit we were there and we admit,
you may recall me doing this, we admit that there were two
executive sessions.  One on the 21st, for over three hours

Who is the faction? I mean, come on. Steve Rautenberg is the faction. He is the one that got run right out of his office because of the things he did there at the end trying to get Supplement CC passed, after the full MEC had just rejected it two weeks earlier. Remember all of that. Steve Rautenberg is the faction. He is entitled to his opinion. And no one could quarrel with somebody wanting to have their own opinion. But don't come in here, Mr. Fram, and recreate facts.

Mr. Rautenberg was the faction. And his decision was so unpopular, remember what happened? There was that recall vote in St. Louis, it was the most attended two-day pilot meeting ever in the history of TWA, it was about 600 people showed up for this. So no. Again, Mr. Rautenberg is entitled to his opinion, but it wasn't very popular.

So that was part of who we brought in. Who else did we bring in here? We brought in Roland Wilder, by video, remember Roland? Will, can you put his picture up there real quick? Roland Wilder.

This was not the way I would have wanted to present this testimony to you. You got to believe me on that. Playing a video, I would never want to do that in any case of, especially in this one, not of this man in particular.

He lives in Washington, D.C.. It is outside the subpoena power of the Court. I can't put a subpoena on him

and get him here. Couldn't do it. This was the only way I could present his testimony to you.

And I know they are throwing Roland right under the bus here all morning and afternoon. But do you believe that? This is an experienced, serious, highly qualified man. He is a guru in this industry. He testified that he is one of a handful of lawyers in the country that practice in this area of the law, and that is seniority disputes.

He is the expert. And we are supposed to believe Clay Warner over Roland Wilder as to what is a good legal strategy. Come on. Come on.

So we brought you Roland Wilder. And here is what is important. There is a lot of things important. But Roland testified, he testified that good things happen to employees that fight. Good things happen to employees that fight in a labor struggle. And he said, if you are going to get in a fight it is better to fight than to lie down. That was, that is his advice to every group that he represents.

And that is sound advice. But what happened here? What did ALPA do?

They insisted that the TWA pilots surrender their best leverage, the scope. That is the first thing they did. You got to surrender that. And then we go into the negotiations and everything that the TWA pilots asked to do, to garner some leverage, what did ALPA say. No. No. No.

No.  No.  No.  That is all they ever said to the TWA pilots.
And they never had an idea of their own, no, that is not a
good idea, but let's try this.  No, they didn't do anything
to supply the TWA pilots with any leverage after they
stripped them or advised them to surrender their best
leverage.  That is what happened here.

         And we brought you the people that wanted to fight.
Who did they bring in?  They brought you four lawyers, not
that there is anything wrong with that.  They brought you
four lawyers, none of whom told you anything that they did to
help in the seniority debate.  None of them.  Not one of
them.  And they brought you two disgruntled former TWA
pilots, Rautenberg and Singer, and they brought you a
completely discredited former president, Duane Woerth.  And
why do I say that he is discredited?

         Mr. Fram called my clients liars.  I am not going
to do that to Ambassador Woerth, but what he said on the
witness stand wasn't entirely truthful about some of the
important things.  You remember the testimony, my partner,
Joe, was cross examining him about the scab list.  Remember
the testimony, there was this business about the TWA pilots
wanted to have a jumpseat war against the American pilots.
And there was, there was some evidence, Duane Woerth was
asked the question, isn't it true that ALPA has a list of
scabs, and that scab list is distributed to members?  And the

# Exhibit Q

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG, HOWARD HOLLANDER, THEODORE CASE, AND MICHAEL FINUCAN, individually and on behalf of all others similarly situated,

Plaintiffs,

V.

AIR LINE PILOTS ASSOCIATION,

Defendant.

VOLUME 19
TRIAL TRANSCRIPT

CAMDEN, NEW JERSEY
JULY 12, 2011

B E F O R E: HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY: NICOLE M. ACCHIONE, ESQ.
AND: LISA J. RODRIGUEZ, ESQ.
AND
GREEN JACOBSON, P.C.
BY: ALLEN PRESS, ESQ. (MO. BAR)
AND: JOE D. JACOBSON, ESQ. (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY: STEVEN FRAM, ESQ.
AND
KATZ & RANZMAN
BY: DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

2

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

S/ LYNNE JOHNSON

Lynne Johnson, CSR, CM, CRR
Official Court Reporter

LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
P.O. BOX 6822
LAWRENCEVILLE, NJ 08648.

There is one other issue I need to talk to you about and that is the issue of injury. The Judge will instruct you that you should find that ALPA caused injury to TWA pilots if you believe that but for ALPA's breach, the overall outcome of the seniority integration would have been more favorable to the TWA pilots. But for ALPA's breach, the integration would have been more favorable.

Now, before I get into the evidence on that, I want to talk to you about the burden of proof just a bit. You will be instructed that should you find a fact that -- that you should -- you will be instructed that you should find a fact as true if you believe it is more likely true than not. No matter how slightly the scale tips in favor on that fact. No matter how slightly, if you believe it is more likely true you need to find it a fact. That is that instruction.

You will also be instructed to use your common sense. You don't believe that out here. You take it in with you.

So on this injury question, after applying your common sense, you need to determine whether or not plaintiffs proved some injuries. Well, we proved that the 1,200 TWA pilots got furloughed. Everyone that got stapled got furloughed.

We have to show that ALPA, TWA pilots would have gotten a more favorable integration had ALPA not breached its

duty of fair representation.

Now, what is the evidence of that? What is the evidence that there could have been a more favorable integration? There was direct testimony from Mr. Day about that. He said I would have expected, I think his testimony, his answer was it would have been reasonable to believe that we would have got a better deal closer to the Tannen proposal had ALPA done the things we asked for and gave us the leverage we needed.

Mike Day told you that. He was the only one in the room with the American side. ALPA produced nobody in that position. They give you four witnesses, four lawyers that were completely uninvolved. Mike Day told you we could have got a better deal.

And what is the evidence to support that conclusion? What is the evidence of it? It is in the, the proof is in the pudding. It really is. The first offer made by the APA was on March 1st and they offered up staple 1,500. About. Two thirds.

They didn't come off that until April 18. They lowered the staple by 50. But at least that is movement in the right direction. They do that every month, we will, after a year we will have a fair deal. So this is curious, this is after the scope waiver, pilots give up their best leverage and they come back with a better proposal. It is

Louis, which not only kept them all in St. Louis corralled there but it kept American pilots out of St. Louis, which meant they couldn't bid there which was some sort of benefit for the TWA guys.

So on the strength of the TWA pilots doing nothing other than get Senator Bond to introduce some legislation, the American pilots lower the staple by 250, and offer this notion of a fence in St. Louis. That was done with just the leverage of maybe the senator's bill might get passed some day. That was the only leverage. That was all that had changed. What if ALPA had gotten involved and done any of the things, or all of the things, that were requested of it? Litigate, boycott. All of it. Would there have been a better deal? A more favorable deal? Again, that is up to you to decide. But again, you must use your common sense and look at what happened.

If you lower that staple by one pilot, that is injury.

Folks, I am finished. Okay. I am sure you have heard enough. And I am going to sit down now, and the Judge is going to read some instructions to you and we will see you when you get back.

THE COURT: Thank you, Mr. Press. We will take a short break now. About 15 minutes. It is 25 of 11. About ten of 11. Then I will read my charge of the law to you.

# Exhibit R

EXHIBIT
J-135
PENGAD 800-631-6989

85

BAPTISTE & WILDER, P.C.
ATTORNEYS AT LAW
1150 CONNECTICUT AVENUE, N.W., SUITE 500
WASHINGTON, D.C. 20036
(202) 223-6723

ROLAND P. WILDER, JR.

FACSIMILE (202) 223-9677
E-MAIL BapWild@aol.com

**CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGED COMMUNICATION**

October 31, 2001

Captain Robert A. Pastore
Master Chairman, TWA MEC
500 Northwest Plaza, Suite 1200
St. Ann, MO 63074

Dear Captain Pastore:

This is in response to your request for a written version of the advice concerning APA's proposal for a seniority integration I provided to the TWA Master Executive Council during the period October 21-23, 2001.

On Monday, October 22, 2001, in response to Captain Young's question, I told the MEC that its decision whether to accept APA's proposal should be heavily influenced by the likelihood of success or failure of the ongoing legislative effort. I emphasized that the prospective litigation described in my memorandum of August 16, 2001, due to its inherent limitations, had less than a 50 percent chance of leading to an acceptable seniority solution.

Typically, in seniority integration cases, the recommendation of Merger Counsel is subsumed in the Merger Committee's recommendation. By Tuesday, October 23, 2001, however, it had become clear that the Merger Committee was deadlocked and could not make a recommendation with respect to the APA proposal. Individual members of the Committee communicated their personal views to the MEC.

At the MEC's request, I pointed out the difficulty of the MEC's task if the APA's disappointing offer was rejected. Each element of that task – including the litigation, grievance, court enforcement of the arbitration award, if successful, and

the single carrier proceeding – was considered in some detail with the MEC. I also reiterated the necessity of obtaining legislation mandating arbitration of seniority integration issues. All of these elements had to succeed in order for us to obtain an arbitrated resolution to the seniority dispute. I likened at our task to climbing a mountain. If we surmounted all of the obstacles and reached the top of the mountain, I was convinced that we would attain a better seniority integration than what APA has offered. But if we made a single misstep, we would fall from the mountain and fail to achieve our goal. The task I outlined was a formidable one.

After it became apparent that ALPA National would not authorize the pursuit of injunctive relief, I said that the plan I had outlined would not succeed and that no other viable alternatives were available to the MEC. For this reason, I said, "our choices were to accept the proposal or dance naked in the streets." I have not changed my mind. Pursuing elements of the plan I outlined without embracing the whole plan is a losing strategy. A fight to the death without a realistic hope of winning rarely makes sense. This is not one of those rare occasions. My recommendation was not based on the desirability of APA's proposal, which was inferior to what I had expected, but on the unavailability of viable alternatives for the TWA MEC.

Very truly yours,

BAPTISTE & WILDER, P.C.

By: [signature]
Roland P. Wilder, Jr.

RPW,JR/kcb

# Exhibit S

EXHIBIT
J-301

## APA'S UNDERSTANDING OF TWA'S VERBAL PROPOSAL ON 29 MAR 01

1. This was a verbal proposal presented by Gary Flor, TWA Merger Committee member, on 29 Mar 2001 in Arlington, TX.

2. TWA Merger committee proposes looking at AA seniority data points and feather specific groups of TWA pilots into those groups in a "feather-to-fit" methodology. These data points and TWA pilots groups are as follows:

| AA Seniority #'s | TWA Seniority #'s | |
|---|---|---|
| 1551 | 1 | (95% OF B-777/MD-11 Captains feather at 1 : 4.85 to TWA #869) |
| 5768 | 869 | (Junior AA B-767 Captain feather at 1 : 3.65 to TWA #1282) |
| 7276 | 1282 | (Junior AA Captain feather at 1 : 6.85 to TWA #1915) |
| 11389 | 1915 | (Last TWA pilot on AA seniority list) |
| | 434 | (Bottom 434 TWA pilots placed at bottom of AA seniority list |

3. TWA Merger committee proposes the following fences:

   a. B-777 Captain – 10 year fence then 17% max until AANG (AA New Guy) can hold B-777 Captain status
   b. A-300 Captain – 3 years fence then 17% max until AANG can hold A-300 Captain status
   c. B-777 First Officer – First Officer fenced until AANG can hold B-777 First Officer status.

ALPA 023652

J-301

# Exhibit T



FIRST CLASS
FIRST CLASS

ALPA 024593

P-3

Mark L. Hunnibell
2611 Long Hill Road
Guilford, CT 06437
Tel: 203-457-9872
Fax: 801-383-5030

December 18, 2001

Mr. Ron Rindfleisch
Air Line Pilots Association
535 Herndon Parkway
Herndon, VA 20170

Ron:

I have attached documents supporting the reimbursement request that I understand John Clark has filed. I cannot presently locate receipts for some of the smaller items that are reflected as incurred by me in the spreadsheet. Still, I have documentation for the "big ticket" items as attached:

1. Copies from microfiche of my three payments to Primadata, Inc. (the printer/mailer who produced and mailed the cover letter and authorization cards). I do not get actual copies of cancelled checks and, if I was provided with a complete "PAID IN FULL" receipt, I cannot find it. These checks, and the accompanying invoice, are the best I have.

2. 5/15/2001 invoice from Primadata, Inc. for the handling and postage for the card mailing. Note that this does not include the amount for the actual printing the letters, envelopes, and authorization cards. That was billed separately for $1,276.94 and I cannot find that invoice, but I do have the cancelled check in that amount, (#6120, 5/22/2001) that includes my memo of the purpose of the check. The balance due on the 5/15/2001 Primadata invoice ($1,462.14) was also paid on 5/22/2001 with my check #6119. The $2,000 reflected on the invoice as "Deposit" was paid on 5/9/2001 with my check #6107.

3. 5/14/2001 USPS certificate of mailing. This was not paid directly by me. The amount was included in the invoice from Primadata, Inc.

4. Copy of the room charges ($114.25) applied to my credit card on 7/23/2001. The total charge was actually split between John Clark and myself (which is why is still shows a balance due identical to what I had charged on my card). John will no doubt be submitting the other half of this expense.

5. Ten (10) e-mail notices of setup and billing for the aa-alpa.org web site. These costs continue to be billed monthly to my personal credit card. The invoices may be a little hard to follow, but the charges I incurred were $84.44 for initial setup and the first 6 months, plus $10 per month after that ($50), plus $25 on 12/4/2001 to re-register the domain (Total: $159.44).

I believe the total expenses reflected above ($5,012.77) substantially exceed the amount for which I am seeking reimbursement. Please let me know if you need more information.

Sincerely,

Mark Hunnibell

MARK L. HUNNIBELL AND
LAURA S. HUNNIBELL
203-457-9872
2611 LONG HILL RD.
GUILFORD, CT 06437

ALLIED PILOTS ASSOCIATION
FEDERAL CREDIT UNION
387 SHUMAN BLVD., SUITE 380E
NAPERVILLE, IL 60563-8453

6119
70-9321/719

5/22/2001

PAY TO THE ORDER OF Primadata $**1,462.14

One Thousand Four Hundred Sixty-Two and 14/100********************** DOLLARS

Primadata
1228 West Scyene Road
Suite 130
Mesquite, TX 75149-3127

MEMO Mail Services & Postage /151,44

⑈006119⑈ ⑆071993214⑆ 847202⑈ ⑈0000146214⑈

Acct: 847202 Check #: 6119
Amt: $1,462.14 Date: 05-31-2001

0710-0002388630
050335739 05-31-01
050335739-1532

071000013
05/31/01
07301294

Sequence #: 2388630

MARK L. HUNNIBELL AND
LAURA S. HUNNIBELL
203-457-9872
2611 LONG HILL RD.
GUILFORD, CT 06437

ALLIED PILOTS ASSOCIATION
FEDERAL CREDIT UNION
387 SHUMAN BLVD., SUITE 3E
NAPERVILLE, IL 60563-8453

6120
70-9321/719

5/22/2001

PAY TO THE ORDER OF Primadata $ **1,276.94

One Thousand Two Hundred Seventy-Six and 94/100********************** DOLLARS

Primadata
1228 West Scyene Road
Suite 130
Mesquite, TX 75149-3127

MEMO Postcard/Env/Letter 15142

⑈006120⑈ ⑆071993214⑆ 847202⑈ ⑈0000127694⑈

Acct: 847202 Check #: 6120
Amt: $1,276.94 Date: 05-31-2001

0710-0
0503357
050335738 05-31-01
050335738 1532

071000013
BANK ONE
05/31/01
07301293

Sequence #: 2388628

MARK L. HUNNIBELL AND
LAURA S. HUNNIBELL
203-457-9872
2611 LONG HILL RD.
GUILFORD, CT 06437

ALLIED PILOTS ASSOCIATION
FEDERAL CREDIT UNION
587 SHUMAN BLVD., SUITE 383E
NAPERVILLE, IL 60563-8453

6107
70-9321/719

5/9/2001

PAY TO THE ORDER OF Primadata $ **2,000.00

Two Thousand and 00/100********************************************** DOLLARS

Primadata
1228 West Scyene Road
Suite 130
Mesquite, TX 75149-3127

MEMO Mark Hunnibell for Vice Presiden

⑈006107⑈ ⑆071993214⑆ 847202⑈ ⑈0000200000⑈

Acct: 847202 Check #: 6107
Amt: $2,000.00 Date: 05-14-2001

0002357512
05/14/2001
0710-0030-1
060641632 0710-0030-1
060641632 05-14-01
060641632 1753 1293 04 06 110

071000013
BANK ONE
05/13/01
07866382

FOR DEPOSIT ONLY
PRIMADATA, INC.
9500006912

Sequence #: 2357512

# Primadata, Inc.

Invoice

1228 Scyene Road, Suite 134
Mesquite, Texas 75149-3128
(972) 216-9910

Invoice Number: 15144
Invoice Date: 05/15/01

Sold To:

Hunnibel For Vice President
2611 Long Hill Road
Guilford, CT 06437-3616

Attn: Mark

Ship To:

Mesquite PO

Delivered Via: Mesquite PO
Delivery Date: 05/14/01
Terms: Net 10

P.O. Number: Mark
P.O. Date:
Salesperson: PDI

| Quantity | Description | Price |
|---|---|---|
| 11091 | MAIL SERVICES<br>HUNNIBELL FOR VICE PRESIDENT<br>(Data Conversion-E Mail, Data Hygiene, Address Corrections, De Dupe, Ink Jet Envelope, Fold Letter, Insert 2 Pieces, Seal, Zip Sort, Sleeve & Strap Trays, Deliver To Mesquite PO, UPS Overs To Mark) | 1332.56 |
| 11091 | POSTAGE . POSTAGE SAVINGS $643.98<br>(Presorted STD--Automated) | 2129.58 |

| | | |
|---|---|---|
| Subtotal: | | 3462.14 |
| Tax: | | |
| Deposit: | | 2000.00 |
| Total: | $ | 1462.14 |

Past 30 days subject to 1.50% Interest (18% A.P.R.)

*Thank You for your business!*

ALPA 024598

05/24/2001 04:12 9722169904 PRIMADATA, INC. PAGE 01

POSTAL SERVICE PERMIT SYSTEM TRANS# 200113415200/00M1

3602 STATEMENT OF MAILING/3607 WEIGHING AND DISPATCH CERTIFICATE

STATION OR UNIT: MESQUITE MAIN POST OFFICE COMPANY PERMIT USED: Y
FINANCE NUMBER : 48-5860 PERMIT NO: 00072

PRIMADATA INC
1228 W SCYENE RD STE 134
MESQUITE TX 75149-3128

DUPLICATE

| DATE OF MAILING | CLASS | PROC CAT | TYPE |
|---|---|---|---|
| 05/14/01 | STANDARD | LETTERS | BULK REGULAR |

| WEIGHT OF SINGLE PIECE (LBS) | TOTAL PIECES | TOTAL POUNDS |
|---|---|---|
| 0.0300 | 11,082 | 332.4600 |

MAILED: FOR
PERMIT NO. 80646
NAME: MARK HUNNIBEL

CONTAINERS
64

NBRVP:
ERRORS: 0.00%

RECEIVED [illegible] 5 2001

AFFIXED POSTAGE:
AMOUNT FROM TRUST: $2,126.52

I CERTIFY that this mailing has been inspected concerning: 1)eligibility for the rate of postage claimed; 2)proper preparation (and presort where required); 3)proper completion of the statement of mailing; and 4)payment of the required annual fee.

MESQUITE TX 75149 MAY 14 2001 USPS

ROUND STAMP REQUIRED
TIME____ AM / PM

ROUND STAMP REQUIRED
TIME____ AM / PM

SIGNATURE OF WEIGHER

RECEIVED FOR PROCESSING BY

COMMENTS: REMAINING ON DEPOSIT: $7.39
CLK INIT: DJE

**mark@hunnibell.net**

---

**From:** Minerva Technical Support [support@minerva.net]
**Sent:** Saturday, January 27, 2001 12:19 PM
**To:** mark@hunnibell.net
**Subject:** New Domain Information

Hello Mark,

Thank you for choosing Minerva Network Systems as your Internet Solutions Provider. We are pleased to inform you that your order has been processed. The following information will grant access to your account:

Company Name: Alpa Now
Contact Name: Mark Hunnibell
Contact Phone Number: 203-457-9872

Domain Name: aa-alpa.org
IP Address: 206.239.54.14

FTP Username: alpanow
FTP Password: #######

Home Page or Start file: index.html

Please review the technical information above and let us know if any changes are necessary.

If you require an email(s) account for your website (example: yourname@yourdomain.com) or if you have any additional technical questions or concerns, please contact support@minerva.net or reply to this email.

For all other inquiries or account changes, please contact the following:

Technical Support:
support@minerva.net
1.888.667.7231 ext. 1
703.263.3300

Sales Issues:
sales@minerva.net
1.888.667.7231 ext. 2
703.263.2200

Billing Issues:
billing@minerva.net
1.888.667.7231 ext. 3
703.263.0796 ext. 3

You may also visit our website for additional information at www.minerva.net. Thank you for choosing Minerva.

Geoffrey Watson
Minerva Technical Support

**mark@hunnibell.net**

**From:** billing@minerva.net
**Sent:** Tuesday, January 30, 2001 7:49 PM
**Subject:** Periodic Billing Order 1163-1 Submitted

```
Periodic Billing Order
Order # 1163-1 Submitted

Amount: 10.00
Tax: 0.00
Shipping: 0.00
Customer: mark hunnibell
Company: Minerva Network Systems
Address: 2611 Long hill Rd

City:  Guilford
State: CT
Country: US
Zip: 06437
 ------------------------------
  Periodic Billing Information
Startdate: 2001/07/03
Periodicity: m1
Installments: 99
Threshold: 3
Comments:
```

**mark@hunnibell.net**

| | |
|---|---|
| **From:** | MNS Accounts & Billing [billing@minerva.net] |
| **Sent:** | Wednesday, February 07, 2001 4:41 PM |
| **To:** | mark@hunnibell.net |
| **Subject:** | Bill 2/6/01 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT 06437

| | |
|---|---|
| CUSTOMER ID | MNS-394 |
| ACCOUNT STATUS | |
| Previous Balance | $0.00 |
| Payments | $84.44 CR |
| Adjustments | $0.00 |
| Current Charges | $84.44 |
| CURRENT BALANCE | $0.00 |
| BILL NUMBER | 932 |
| BILL DATE | Feb 6, 2001 |
| DUE DATE | Mar 8, 2001 |

Your account is current. Do not send payment.

---

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231.

---

PAYMENTS

| Date | Description | Amount |
|---|---|---|
| Jan 30 | Credit Card Payment MC | $84.44 CR |
| | TOTAL PAYMENTS | $84.44 CR |

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Jan 25 | Set up fee | $35.00 |
| | Set-Up Fees | $10.00 |
| | Additional Services Domain Registration | $25.00 |
| Jan 30 | Basic Account 6 month pre-pay: MNS-394-1 (Jan 25 - Jun 3 | $49.44 |
| | 6 Month Fee with 5% discount: (86.74% of $57.00) | $49.44 |
| | TOTAL CURRENT CHARGES | $84.44 |

**mark@hunnibell.net**

| | |
|---|---|
| **From:** | billing@minerva.net |
| **Sent:** | Monday, July 02, 2001 10:32 AM |
| **To:** | mark@hunnibell.net |
| **Subject:** | Bill 07/02/2001 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT 06437

CUSTOMER ID MNS-394

ACCOUNT STATUS

| | |
|---|---|
| Previous Balance | $0.00 |
| Payments | $0.00 |
| Adjustments | $0.00 |
| Current Charges | $44.13 |
| TOTAL AMOUNT DUE | $44.13 |
| BILL NUMBER | 2691 |
| BILL DATE | Jul 2, 2001 |
| DUE DATE | Aug 1, 2001 |

The total amount due will be automatically charged to your credit card. Do not send payment.

---

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or 1-703-263-0796.

Late fees: $15.00 on all over due balances of $20.00 or more.

---

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Jul 2 | Basic account 6 month pre pay: MNS-394-1 (Jul 1 - Jul 24 | $44.13 |
| | Monthly Fee: (77.42% of 57) | $44.13 |
| | TOTAL CURRENT CHARGES | $44.13 |

ALPA 024604

mark@hunnibell.net

| | |
|---|---|
| **From:** | billing@minerva.net |
| **Sent:** | Wednesday, August 01, 2001 3:27 PM |
| **To:** | mark@hunnibell.net |
| **Subject:** | Bill 08/01/2001 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT 06437

| | |
|---|---|
| CUSTOMER ID | MNS-394 |
| ACCOUNT STATUS | |
| Previous Balance | $10.00 |
| Payments | $0.00 |
| Adjustments | $0.00 |
| Current Charges | $0.00 |
| TOTAL AMOUNT DUE | $10.00 |
| BILL NUMBER | 3032 |
| BILL DATE | Aug 1, 2001 |
| DUE DATE | Aug 31, 2001 |

The total amount due will be automatically charged to your credit card. Do not send payment.

-------------------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or 1-703-263-0796.

Late fees: $15.00 on all over due balances of $20.00 or more.

-------------------------------------------------------------------------------

**mark@hunnibell.net**

| | |
|---|---|
| **From:** | billing@minerva.net |
| **Sent:** | Friday, August 31, 2001 1:38 PM |
| **To:** | mark@hunnibell.net |
| **Subject:** | Bill 8/31/01 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT 06437

| | |
|---|---|
| CUSTOMER ID | MNS-394 |
| ACCOUNT STATUS | |
| Previous Balance | $10.00 |
| Payments | $10.00 CR |
| Adjustments | $0.00 |
| Current Charges | $10.00 |
| TOTAL AMOUNT DUE | $10.00 |
| BILL NUMBER | 3351 |
| BILL DATE | Aug 31, 2001 |
| DUE DATE | Sep 30, 2001 |

The total amount due will be automatically charged to your credit card. Do not send payment.

---

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or 1-703-263-0796.

Late fees: $15.00 on all over due balances of $20.00 or more.

---

PAYMENTS

| Date | Description | Amount |
|---|---|---|
| Aug 3 | Credit Card Payment M | $10.00 CR |
| | TOTAL PAYMENTS | $10.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Aug 31 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 |
| | Monthly Fee | $10.00 |
| | TOTAL CURRENT CHARGES | $10.00 |

ALPA 024606

**mark@hunnibell.net**

**From:** billing@minerva.net
**Sent:** Monday, October 01, 2001 1:01 PM
**To:** mark@hunnibell.net
**Subject:** Bill 10/1/01

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT 06437

CUSTOMER ID MNS-394

ACCOUNT STATUS

| | |
|---|---|
| Previous Balance | $10.00 |
| Payments | $10.00 CR |
| Adjustments | $0.00 |
| Current Charges | $10.00 |
| TOTAL AMOUNT DUE | $10.00 |
| BILL NUMBER | 3673 |
| BILL DATE | Oct 1, 2001 |
| DUE DATE | Oct 31, 2001 |

The total amount due will be automatically charged to your credit card. Do not send payment.

---

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or 1-703-263-0796.

Late fees: $15.00 on all over due balances of $20.00 or more.

---

PAYMENTS

| Date | Description | Amount |
|---|---|---|
| Sep 4 | Credit Card Payment | $10.00 CR |
| | TOTAL PAYMENTS | $10.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Oct 1 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 |
| | Monthly Fee | $10.00 |
| | TOTAL CURRENT CHARGES | $10.00 |

ALPA 024607

**mark@hunnibell.net**

**From:** billing@minerva.net
**Sent:** Thursday, November 01, 2001 3:13 PM
**To:** mark@hunnibell.net
**Subject:** Bill 11/1/01

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT 06437

CUSTOMER ID MNS-394

ACCOUNT STATUS

| | |
|---|---|
| Previous Balance | $10.00 |
| Payments | $35.00 CR |
| Adjustments | $0.00 |
| Current Charges | $35.00 |
| TOTAL AMOUNT DUE | $10.00 |
| BILL NUMBER | 4005 |
| BILL DATE | Nov 1, 2001 |
| DUE DATE | Dec 1, 2001 |

The total amount due will be automatically charged to your credit card. Do not send payment.

---

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or 1-703-263-0796.

Late fees: $15.00 on all over due balances of $20.00 or more.

---

PAYMENTS

| Date | Description | Amount |
|---|---|---|
| Oct 3 | Credit Card Payment m | $10.00 CR |
| Oct 3 | Credit Card Payment M | $25.00 CR |
| | TOTAL PAYMENTS | $35.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Oct 3 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $0.00 |
| | Monthly Fee: (93.55% of $10.00) | $9.35 |
| | Discount: 100% | $9.35 CR |
| Oct 3 | Set up Domain and Registration for 1 year: MNS-394-4 | $25.00 |
| | Set up Domain and Registration for 1 year | $25.00 |
| Oct 31 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 |
| | Monthly Fee | $10.00 |
| | TOTAL CURRENT CHARGES | $35.00 |



# THE WASHINGTON COURT HOTEL

◆ ON CAPITOL HILL ◆

A Harbaugh Hotel

525 NEW JERSEY AVE., N.W., WASHINGTON, D.C. 20001 202-628-2100 FAX: 202-879-7918

CLARK, JOHN
AIR LINE PILOTS ASSN

| | |
|---|---|
| ARRIVAL | 7/22/01 |
| DEPARTURE | 7/23/01 |
| NO. IN PARTY | 2 |
| RATE | 169.00 |

CC#: [redacted]7029 Exp: 06/03

ACCOUNT NO. 403115 ROOM NO. 1008

| NO. | DATE | DESCRIPTION | | | | | AMOUNT |
|---|---|---|---|---|---|---|---|
| A-STANDARD | | | | | | | |
| | 7/22/01 | LOCAL PHONE | 1008 | 7220072001 | 23:55 | 5470421 KINKOS | $1.00 |
| | 7/22/01 | ROOM CHARGE | 1008 | 12 | | | $169.00 |
| | 7/22/01 | ROOM TAX | 1008 | 13 | | | $24.51 |
| | 7/23/01 | LONG DISTANCE PHONE | 1008 | 7230139002 | 10:06 | 8003231470 ALPA | $1.00 |
| | 7/23/01 | CAFE & GRILL | 1008 | 1538 | 10:48 | | $32.99 |
| | 7/23/01 | MASTERCARD | 1008 | 5602824 | | [redacted]7029 | $114.25CR |
| | | * BALANCE DUE * | | | | | $114.25 |

[redacted] 7029

1008

06/03
MARK L HUNNIBELL

072201 5602824

DATE C723C

TOTAL 114.25

PURCHASER SIGNATURE

TYPE OF CREDIT CARD: MC AX DSCVR VISA DC OTHER

CUSTOMER COPY
IMPORTANT:
RETAIN THIS COPY FOR YOUR RECORDS.

STREET

CITY STATE ZIP CODE

Regardless of charge instructions, I acknowledge the above as personal indebtedness.

GUEST SIGNATURE ______________________

**mark@hunnibell.net**

| | |
|---|---|
| **From:** | billing@minerva.net |
| **Sent:** | Friday, November 30, 2001 12:42 PM |
| **To:** | mark@hunnibell.net |
| **Subject:** | Bill 11/30/01 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT 06437

CUSTOMER ID MNS-394

ACCOUNT STATUS

| | |
|---|---|
| Previous Balance | $10.00 |
| Payments | $10.00 CR |
| Adjustments | $0.00 |
| Current Charges | $10.00 |
| TOTAL AMOUNT DUE | $10.00 |
| BILL NUMBER | 4344 |
| BILL DATE | Nov 30, 2001 |
| DUE DATE | Dec 30, 2001 |

The total amount due will be automatically charged to your credit card. Do not send payment.

---

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or 1-703-263-0796.

Late fees: $15.00 on all over due balances of $20.00 or more.

---

PAYMENTS

| Date | Description | Amount |
|---|---|---|
| Nov 29 | Credit Card Payment MC | $10.00 CR |
| | TOTAL PAYMENTS | $10.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Nov 30 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 |
| | Monthly Fee | $10.00 |
| | TOTAL CURRENT CHARGES | $10.00 |

**mark@hunnibell.net**

**From:** billing@minerva.net
**Sent:** Tuesday, December 04, 2001 4:50 PM
**To:** mark@hunnibell.net
**Subject:** Bill 12/4/01

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT 06437

| | |
|---|---|
| CUSTOMER ID | MNS-394 |
| ACCOUNT STATUS | |
| Previous Balance | $10.00 |
| Payments | $35.00 CR |
| Adjustments | $0.00 |
| Current Charges | $25.00 |
| CURRENT BALANCE | $0.00 |
| BILL NUMBER | 4475 |
| BILL DATE | Dec 4, 2001 |
| DUE DATE | Jan 3, 2002 |

Your account is current. Do not send payment.

---

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or 1-703-263-0796.

Late fees: $15.00 on all over due balances of $20.00 or more.

---

PAYMENTS

| Date | Description | Amount |
|---|---|---|
| Dec 4 | Credit Card Payment mc | $10.00 CR |
| Dec 4 | Credit Card Payment mc | $25.00 CR |
| | TOTAL PAYMENTS | $35.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Dec 4 | Set up Domain and Registration for 1 year: MNS-394-5 | $25.00 |
| | Set up Domain and Registration for 1 year | $25.00 |
| | TOTAL CURRENT CHARGES | $25.00 |

to Paris Hotel

LS TRANSPORTATION
CALL AHEAD
HRS. FOR RESERVATION
702-740-4050

KET #
@7.50
-TRP STRP 7.50
AL 7.50
(PD 7.50
H 7.50
T RESPONSIBLE FOR
MISSED FLIGHTS
RK3 NO.606316
.05.WED 13:14 #01-1

YELLOW-CHECKER-STAR
"THE" CAB COMPANIES
Las Vegas, Nevada
873-2227
COMPUTER RADIO DISPATCHED

DRIVER# ________ DATE 12/05/01
(CHARGE THE ACCT. OF)
(RECEIVED OF) ________
FOR TAXI FARE FROM Paris Hotel
TO LAS Airport
(X) DRIVER NAME ________
(X) PASSENGER SIGNATURE ________
AMOUNT $ 15.00

Trip to LAS on 12/05/01

LAX-CPCS
ENTRY 13 12-03-01 10:21
EXIT 16 12-05-01 17:22
ID NO 118 FEE $ 15.00
LP# NU 0184 SEQ 2919

While at LAS
parking at LAX

ALPA 024611

Corresponds to spread sheet

OFFICE DEPOT
1700 ROSECRANS AVE.
MANHATTAN BEACH, CA 90266
310-536-9969

Employee 210160 06/07/01 17:01
Store #0967 Reg #002 Tran #8889
SALE POS Version 4.07

| | | |
|---|---|---|
| 7878704625 | GUIDE,CARD,A | 3.49 |
| MFG. LIST $ 5.80 | | |
| 7169138977 | BX,SHOE,1.5G | 5.56 |
| 4 @ | 1.39 | |
| MFG. LIST $ 2.49 | | |
| | SUBTOTAL | 9.05 |
| CA 8% SALES TAX | | .72 |
| | TOTAL | 9.77 |
| CASH | | 10.77 |
| | CHANGE | 1.00 |

Try our COPY CENTER for
Printing and Copying Services

***************** SALE *****************
Mail Boxes Etc.
Making Business Easier.. Worldwide.
****************************************
Shift:0168 Drw:01 ID:1228 Clerk:Amy
6/14/01 17:10:58
Center #3268
2110 ARTESIA BLVD #B
REDONDO BEACH, CA 90278
Phone 310 318 3000

| Qty Description | Unit | Ext |
|---|---|---|
| 2 Stamps | 6.80 | 13.60 |
| Sub Total: | | 13.60 |
| Tax: | | 0.00 |
| Total Sale: | | 13.60 |
| Cash: | | 20.00 |
| Change: | | 6.40 |

Postal transactions may have received a handling fee.

Visit our Web Site at: WWW.MBE.COM

EL SEGUNDO MAIN PO
EL SEGUNDO, California
902459998
(310)322-7238
07/16/2001 01:40:08 PM

Sales Receipt

| Product Description | Sale Qty | Unit Price | Final Price |
|---|---|---|---|
| $6.80 Statue of Liberty PSA Bk | 1 | $6.80 | $6.80 |
| $6.80 Apple & Orange PSA Bk | 1 | $6.80 | $6.80 |
| Total: | | | $13.60 |
| Paid by: Cash | | | $13.60 |

For information on current postage rates, visit our web site at www.usps.com.
Bill#: 1000400300173
Clerk: 10

—— Thank you for your business ——

**Taxi Cab Receipts**

DATE: 7/20/01 TIME: 11:00 PM
TRIP ORIGIN: Washington Court Hotel
DESTINATION: Kinko's
FARE: $ 10.00 SIGNATURE

RECEIPT

DATE 5/4/01 No. 241668
FROM John B Clark Jr. $66.00
DOLLARS
FOR RENT Box 215
FOR
ACCT. 66 —
PAYMENT [illegible]
DUE
CASH
CHECK
MONEY ORDER
FROM 5/4/01 TO 9/4/01
BY Mel

ALPA 024612

Corresponds to spread sheet

Kinko's (202) 547-8421
317 PENNSYLVANIA AVESOUTHEAST
WASHINGTON, DC 20003

| QTY/LIST | DISC | PRICE | AMOUNT |
|---|---|---|---|
| 3 Office SUPPLIES | | | |
| 0.67 | 0.00 | 0.69 | 2.07 |
| 38 PC SS WRK STATION TIME/MIN | | | |
| 0.20 | 0.00 | 0.20 | 7.60 |
| 19 COMP RENT LTR.LGL. B&W PRNT | | | |
| 0.49 | 0.00 | 0.49 | 9.31 |
| 13 ES COLOR S/S LTR, LGL | | | |
| 1.00 | 0.00 | 1.00 | 13.00 |

SUB 31.98 TX 1.84 TOT 33.82
MasterCard 33.82
CHG 0.00
XXXXXXXXXXXX4654 08/02 AP005645
I agree to pay the above amount
cording to the card issuer agreement.
Sign Here: X

CW4718 7K 640118 RG 3A 07/23/01 01:20
Visit us @ http://www.kinkos.com

************** SALE ****************
Mail Boxes Etc.
Making Business Easier. Worldwide.
*****************************
Shift:0141 Drw:01 ID:1401 Clerk:Amy
5/16/01 17:03:57
Center #3269
2110 ARTESIA BLVD #B
REDONDO BEACH, CA 90278
Phone 310 318 3000

| Qty | Description | Unit | Ext |
|---|---|---|---|
| 1 | Mailbox Service | 5.00 | 5.00 |

Sub Total: 5.00
Tax: 0.00
Total Sale: 5.00
Cash: 5.00
Change: 0.00

Postal transactions may have received a handling fee.

Visit our Web Site at: WWW.MBE.COM

USPS, REDONDO BEACH MAIN
REDONDO BEACH, California
902779998
05/04/2001 (310)376-3252 05:35:16 PM

Sales Receipt

| Product Description | Sale Qty | Unit Price | Final Price |
|---|---|---|---|

Business Reply Mail
Account Number: 1000300000010
Customer Name: ALPA REPRESENATION CAMPA IGN
Address: JOHN CLARK 3616 A THE STRAND
Amount of Deposit: $0.00
Annual Fee: $125.00
Accounting Fee: $375.00
Total: $500.00
Paid by:
Check 4146205 $500.00
Bill#: 1000300228904
Clerk: 14
Thank

Susan At Window

USPS, REDONDO BEACH MAIN
REDONDO BEACH, California
902779998
05/15/2001 (310)376-3252 04:31:35 PM

Sales Receipt

| Product Description | Sale Qty | Unit Price | Final Price |
|---|---|---|---|

Business Reply Mail
Account Number: 25
Customer Name: ALPA REPRESENTATION CAMP AIGN
Address: JOHN
Amount of Deposit: $500.00
Total: $500.00
Paid by:
Check 4146205 $500.00

ALPA 024613

RECE
FOR RENT
Box 215
DOLLARS

Corresponds to spread sheet

MAIN OFFICE USPS
MANHATTAN BEACH, California
902669998
06/02/2001 (310)937-9569 01:57:31 PM

Sales Receipt

| Product Description | Sale Qty | Unit Price | Final Price |
|---|---|---|---|
| INCLINE VILLAGE NV 89451 First-Class | | | $0.76 |
| | Issue PVI: | | $0.76 |
| INCLINE VILLAGE NV 89451 First-Class | | | $0.76 |
| | Issue PVI: | | $0.76 |
| INCLINE VILLAGE NV 89451 First-Class | | | $0.76 |
| | Issue PVI: | | $0.76 |
| TUSTIN CA 92780 First-Class | | | $0.76 |
| Return Receipt | | | $1.50 |
| Certified | | | $1.90 |
| Label Serial #: 70001530000283528118 | | | |
| | Issue PVI: | | $4.16 |
| $6.80 Flowers PSA Bk | 1 | $6.80 | $6.80 |
| Total: | | | $13.24 |
| Paid by: | | | |
| Cash | | | $15.00 |
| Change Due: | | | -$1.76 |

NetPost Mailing Online lets you send your mailings right from your computer! It's quick, easy and online at www.usps.com.
Bill#: 1000600743131
Clerk: 16

Thank you for your business

 

# THE WASHINGTON COURT HOTEL

◆ ON CAPITOL HILL ◆

A Harbaugh Hotel

525 NEW JERSEY AVE., N.W., WASHINGTON, D.C. 20001 202-628-2100 FAX: 202-879-7918

CLARK, JOHN
AIR LINE PILOTS ASSN

1/2 hotel stay in DCA.

ARRIVAL
DEPARTURE
NO. IN PARTY
RATE

7/22/01
7/23/01
2
169.00

CC#: 5471211540017029 Exp: 06/03

ACCOUNT NO. 403115 ROOM NO. 1008

| NO. | DATE | DESCRIPTION | | | AMOUNT |
|---|---|---|---|---|---|
| A-STANDARD | | | | | |
| 7/22/01 | LOCAL PHONE | 1008 | 7220972001 [illegible] | [illegible]470[illegible] | $1.00 |
| 7/22/01 | ROOM CHARGE | 1008 | 13 | | $169.00 |
| 7/22/01 | ROOM TAX | 1008 | 13 | | $24.83 |
| 7/23/01 | LONG DISTANCE PHONE | 1008 | 7230139002 [illegible] | 800[illegible]231470 | $1.00 |
| 7/23/01 | CAFE & GRILL | 1008 | [illegible] | [illegible]0-48 | $32.89 |
| 7/23/01 | MASTERCARD | 1008 | 56028[illegible] | 547121154001[illegible]029 | $114.25CR |
| 7/23/01 | MASTERCARD | 1008 | 560[illegible] | 547121154[illegible]654 | $114.25CR |
| | | * BALANCE DUE | | | $.00 |

COMPANY STREET

CITY STATE ZIP CODE

Regardless of charge instructions, I acknowledge the above as personal indebtedness.

GUEST SIGNATURE ______

ALPA 024615

# Exhibit U

# BAPTISTE & WILDER, P.C.

MEMORANDUM

TO: ALPA Legal Department

FROM: Roland P. Wilder, Jr.

DATE: August 16, 2001

ATTORNEY/CLIENT
ATTORNEY WORK PRODUCT
PRIVILEGED COMMUNICATION

RE: Legal Action to Enforce AA Letter of Agreement

---

This memorandum is to request enforcement by ALPA of American Airlines, Inc.'s duty under the March 29, 2001 agreement between TWA-LLC and the Association, to use its "reasonable, best efforts" with the Allied Pilots Association to obtain a fair and equitable process for the integration of seniority lists. That enforcement action would include a request for interim injunctive relief to prevent AA and the APA from entering into an agreement imposing APA's seniority solution pending action by the adjustment board on our contract claim. Alternatively, the TWA-MEC is requesting permission to undertake the foregoing action to prevent a "cram-down" after facilitation ends on August 31, 2001.

1. Factual Background

AA's obligation to ALPA arises from the March 30, 2001 letter sent by AA to TWA-MEC Chairman Capt. Robert Pastore. The letter provided that

> I understand you wish to have confirmation of American's commitment on its part with respect to process for resolving integration of seniority. For its part, American Airlines, Inc. ("American") agrees to use its reasonable best efforts with its labor organization representing the airline pilots craft or class to secure a fair and equitable process for the integration of seniority. In that regard, American will engage a facilitator to organize meetings with the labor organizations representing the airline pilots and American and TWA-LLC. American agrees to adopt the procedures that result from this process for seniority integration.

ALPA 044385

The circumstances surrounding the execution of the AA letter to Capt. Pastore support a conclusion that it is integrated into the ALPA/TWA, LLC collective bargaining agreement. The language used by AA was first proposed by ALPA to TWA. TWA's labor counsel, Bernard Plum, drafted language that provided AA would use its "reasonable, best efforts" with APA to obtain a fair and equitable process for seniority integration. In fact, this proposal was submitted by TWA as an exhibit to its § 1113 motion before the Delaware Bankruptcy Court. It was at ALPA's insistence that the representation contained in this proposal come from AA directly rather than from LLC purporting to act on behalf of AA. The LOA, therefore, was clearly undertaken by AA to induce ALPA's waiver of scope protections in the TWA Basic Agreement.

The origin of the language, which came from an LLC proposal, and the purpose of the language, to induce ALPA's agreement to the CBA scope waiver, both demonstrate that the LOA was an integral part of the CBA negotiations. AA's position as the parent of LLC also supports a conclusion that its representation to ALPA is integrated into the LLC CBA. As parent, AA has the ability to bind LLC. Further, the direct representation to ALPA creates "privity" or a contractual relationship with ALPA. Finally, ALPA gave valuable consideration in exchange for AA's promise, namely the waiver of CBA scope provisions that permitted the AA/TWA transaction to close. We believe, therefore, that the Letter of Agreement is integrated into the LLC/ALPA CBA and that AA can be compelled to participate in the minor dispute resolution procedures of the LLC CBA as they pertain to a dispute over AA's obligations under the Letter of Agreement.

We believe several facts indicate AA has failed to utilize its "reasonable, best efforts" to obtain the APA's agreement to an equitable integration process. First, on March 27, 2001, during the time the AA/TWA contract was before the bankruptcy court and just days prior to AA's letter to Captain Pastore, AA Chief Pilot Bob Kudwa sent a letter to Capt. John Darrah, President of APA, assuring him that AA would permit APA to integrate the TWA pilots in the manner it wished. Second, AA entered the "draw-down" agreement with the APA without any negotiation with ALPA, even though the agreement clearly provides for transfer of TWA aircraft from TWA's service into AA's service. This agreement was not a work protection agreement, but a work acquisition agreement whereby the APA obtained work belonging to the TWA pilots. AA's exclusion of ALPA as the TWA pilots' recognized representative from such negotiations demonstrates its intention to allow the group most hostile to the TWA pilots, the APA, to determine the terms of service for the TWA

pilots. Third, AA recently demonstrated its intentions toward former TWA employees by implementing an integration in the passenger/reservation agent craft or class that staples the most senior TWA agents below the most junior AA agents in all locations outside St. Louis. Finally, AA Vice-President and TWA-LLC Chairman Bob Baker asserted to the TWA-MEC that AA's only obligation under the March 30, 2001 LOA was to obtain a facilitator to referee discussions between the parties. This statement clearly indicates that AA has taken no action other than the hiring of Mr. Valtin as facilitator. As we will present below, American's obligation to hire a facilitator is only one example of the steps it must take to fulfill its "best efforts" obligation. That language from the LOA does not define AA's obligation to utilize its "best efforts." Its failure to make efforts beyond hiring a facilitator, therefore, constitute a violation of its contractual obligation.

2. Analysis

Compelling AA's participation in the minor dispute process can be obtained through suit in federal district court. *See, e.g.,* Machinists v. Central Airlines, 372 U.S. 682, 695-96 (1963). More significant, however, is the danger presented by an agreement between AA and APA prior to a decision by the adjustment board on an ALPA grievance. If AA and APA were to enter a seniority integration agreement prior to the adjustment board's decision, then the board process would be rendered moot. APA could insist that AA fulfill its contractual obligations to APA under the integration agreement, irrespective of any other contractual obligations the carrier owes to ALPA. In a line of cases arising from W.R. Grace & Co. v. Rubber Workers Local 759, 461 U.S. 757 (1983) courts have consistently held that a union may enforce the obligations under its collective bargaining agreement, notwithstanding other conflicting obligations by the employer, so long as the CBA obligation does not violate public policy. A seniority integration agreement clearly would not contravene any public policy, particularly in light of the DOT's stated policy that seniority protections are matters for collective bargaining, not regulatory enforcement. *See,* ALPA v. U.S. Department of Transportation, 791 F.2d 172 (D.C. Cir. 1986); ALPA v. U.S. Department of Transportation, 838 F.2d 563 (D.C. Cir. 1988).

In order to prevent APA from mooting the "best efforts" arbitration through an integration agreement with AA, we would need to obtain an injunction from a district court barring AA from entering a seniority integration agreement with APA until the adjustment board has fully adjudicated the grievance. In Brotherhood of Locomotive Engineers v. Missouri-Kansas-

Texas Ry., 363 U.S. 528 (1960), the Supreme Court held that injunctive relief is appropriate to preserve the jurisdiction of the adjustment board. 363 U.S. at 534. The Norris-LaGuardia Act, 29 U.S. § 108, does not prohibit such injunctive relief. *See, e.g.*, Machinists v. Northwest Airlines, 304 F.2d 206, 211 (8th Cir. 1962). Prior to issuing an injunction a district court must examine the nature of the dispute in order to ensure that it will threaten irreparable injury to the Board's jurisdiction. 363 U.S. at 534. *See also* Machinists v. Eastern Air Lines, 847 F.2d 1014 (2d Cir. 1988). Absent circumstances in which the adjustment board will be deprived of its primary jurisdiction over the minor dispute, an injunction is not appropriate.

We believe that an M-K-T injunction would be appropriate to preserve the jurisdiction of the adjustment board to hear the LOA grievance in light of the fact that the board would be deprived of its jurisdiction over the dispute by an AA/APA seniority integration agreement. If APA could bind AA to order the seniority list in accordance with its separate agreement, then the adjustment board would be unable to direct AA to obtain a different integration process from APA. As mentioned above, the APA could insist on performance under its agreement and seek to enforce it in court if AA refused to perform. The adjustment board would be stripped of its ability to order AA to fulfill its duty under the LOA.

The adjustment board would also be unable to provide a monetary remedy in place of specific performance because monetary relief is too speculative. The adjustment board would not know what procedures and/or standards would have been used in a process that was never developed. Absent such established standards and procedures, there is no objective basis for establishing where on the AA seniority list the TWA pilots would have been placed by a fair and equitable seniority process. Without knowing what seniority positions were lost by the TWA pilots, it is not possible to provide a back pay or front pay remedy. For example, the adjustment board would not know what type of equipment or status bids were lost by the TWA pilots. Absent an equitable remedy and monetary remedy, the adjustment board is wholly stripped of its power to fully adjudicate the minor dispute. An injunction preventing AA from entering an integration agreement with the APA, therefore, is necessary to preserve the adjustment board's jurisdiction over the minor dispute arising from AA's violation of the LOA.

Illustrating the principles underlying a minor dispute injunction action is IAM v. Pratt-Whitney, 87 F. Supp. 2d 116 (D. Conn. 2000). In this case, the IAM filed suit to stop a transfer of production by P-W from its Connecticut

facilities to plants based outside the state. The IAM predicated its request for an injunction on P-W's violation of Article 22 in its collective bargaining agreement under which the company agreed to make "every effort" to keep work within the bargaining unit. The company further agreed that "it is not the intent of Pratt to use subcontractors for the purpose of reducing or transferring work that is presently and normally manufactured by employees in the bargaining unit nor to place such work in Maine or Georgia . . ." The company's management admitted that its decision making was based solely on cost control and other financial considerations. It did not consider plans that would have permitted it to maintain the work within the bargaining unit.

In opposition to the IAM's motion, the Company argued that under the language of the LOA the specific language prohibiting transfer of work to Maine or Georgia defined the requirement for best efforts. It asserted that to satisfy its best efforts obligation all it needed to do was refrain from transferring work to those locations. The court rejected that argument, holding that the later appearing specific language was only illustrative of actions that Pratt had to refrain from in order to satisfy the best efforts requirement. 87 F. Supp. 2d at 129. The specific examples, however, did not completely define the every effort language. The court also rejected this argument on the grounds that allowing this specific language to fully define the general language would render the "every effort" language superfluous. It determined that the only way to give effect to all language in the agreement was to read the every effort statement as having real meaning and that the specific language provided examples of things Pratt would not do or does not intend to do, in consequence of its "every efforts" promise

The district court further found the language of the Letter of Agreement to be clear and unambiguous. Id. at 130. It, therefore, refused to consider bargaining history in interpreting the meaning of the language.

Significantly, the district court rejected Pratt's argument that the "every effort" language was too vague to be enforceable. Id. at 131. Pratt relied on precedent such as Nellis v. ALPA, 815 F. Supp. 1522 (E.D. Va. 1993), in support of its contention. The court distinguished Nellis and other precedent on the ground that in those cases the "every effort" language did not appear in a contractual context. Rather, the plaintiffs were attempting to enforce extra-contractual promises that the company would use best efforts or every effort. By contrast, the "every effort" language binding Pratt appeared in the CBA with the IAM. The district court noted that courts have routinely found addressed "every effort" language in the contractual context and found it to be

enforceable. Id. at 131. The court concluded that Pratt's obligation to use "every effort" was not too vague and could be enforced. Id.

In crafting a remedy, the district court found that specific performance was appropriate because the drastic reduction in the workforce severely undermined the IAM's bargaining position. Id. at 125, 132. It further found that this injury was a recognized harm and could not be quantified. Id. at 133. The court found that it could determine Pratt's compliance with an injunction to utilize its best efforts, but could not determine monetary damages to the union. It noted "injunctive relief is appropriate where, as here, monetary damages would be extremely difficult, if not impossible to ascertain." Id. at 134, *quoting* Danielson v. Laborer's Local 275, 479 F.2d 1033 (2d Cir. 1973).

The court rejected Pratt's arguments that the balance of hardships tilted in its favor. It noted that, to the extent Pratt was unable to achieve cost savings, the harm resulted from its own actions in undertaking bidding system changes prior to a final adjudication of its dispute with the IAM. The court also held that its injunction requiring "best efforts" was not too vague to be enforceable under the federal rules. Id. at 136. The court observed that since the "every effort" language was specific and subject to definition, an injunction enforcing that obligation was also not too vague to be enforceable. Id.

This decision was affirmed on appeal by the United States Court of Appeals for the Second Circuit. 230 F.3d 569 (2000). The court of appeals agreed with the district court that the "every effort" language was specific and enforceable by the court. Id. at 577-78. It also agreed with the district court that the specific language contained in the section was only illustrative of the company obligation to make every effort and did not wholly define that obligation. Id. at 577.

AA has asserted that its only requirement under the LOA is to provide a facilitator for discussions between the pilot groups. The Pratt-Whitney decision rejects such an interpretation of the LOA and shows that a proper reading of the language would hold that the facilitator requirement is illustrative of AA's obligation to use "every reasonable effort" but does not fully define its obligation under that language. Further, because the language requiring AA to use its reasonable best efforts appears in the contract, it is not vague and can be enforced by the court or adjustment board.

It also clear that the TWA pilots and ALPA will suffer irreparable injury it AA does not fulfill its obligations under the LOA. The TWA pilots will

suffer a permanent loss of seniority if AA and APA implement the current APA proposal. Further, ALPA suffers a loss of bargaining strength because, without a fair and equitable process, it has no leverage to exercise in negotiations with APA.

By contrast, neither APA nor AA can make out an imminent injury arising from the contemplated injunction. The final integration is not intended to occur for approximately three years. AA will not suffer any operational delay from an injunction. The APA cannot assert an injury from being required to engage in a fair and equitable process. It also cannot claim an injury flowing from enforcement of AA's other contractual obligations, even if these obligations restrict its negotiations with APA. AA has many contractual obligations to third parties, such vendors, that could affect its negotiations with its pilots. APA will have suffered nothing merely because AA has additional constraints placed on its bargaining position. Finally, there can be no question but that the jurisdiction of the System Board would be rendered hollow if it was deprived of the power to issue a remedy for a contractual violation.

We believe that an action to compel AA's participation in the minor dispute process would have a substantial likelihood of success. The court clearly has power to preserve the jurisdiction of the adjustment board. The LOA is, at least arguably, within the scope of the CBA and so the dispute qualifies as a minor dispute. An irreparable injury to both the adjustment board's jurisdiction and to the TWA pilots would occur if AA and APA enter an integration agreement prior to a full adjudication of the dispute. For these reasons, we believe that the Association must act promptly to preserve the minor dispute for full adjudication by the adjustment board.

# Exhibit V

8/17/01

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

1362

| | | |
|---|---|---|
| AIR LINE PILOTS ASSOCIATION INTERNATIONAL, AFL-CIO, Plaintiff, v. AMERICAN AIRLINES, INC. Defendant. | ) | Case No.__________________ |

**COMPLAINT TO COMPEL ARBITRATION AND FOR OTHER EQUITABLE RELIEF**

The Air Line Pilots Association International, AFL-CIO, ("ALPA") hereby files its Complaint to compel the Defendant American Airlines ("AA" or "the Company") to participate in arbitration in accordance with the ALPA/Trans World Airlines, L.L.C. collective bargaining agreement between the parties, and in support states as follows:

**STATEMENT OF JURISDICTION**

1. This action arises under the Railway Labor Act ("RLA" or "the Act"), 45 U.S.C. §§ 151, *et seq.*, and the Court therefore has federal question jurisdiction pursuant to 28 U.S.C. § 1331. This Court possesses jurisdiction to enforce the parties' obligations under the Railway Labor Act and to grant an order compelling the Defendant, American Airlines, to arbitrate the grievance in dispute between the parties. This matter also arises under the All Writs Act, 28 U.S.C. § 1651. This Court possesses

P-133

ALPA 051893

authority under the All Writs Act to issue any order necessary to preserve its jurisdiction.

**VENUE**

2. Venue is proper in this court pursuant to 28 U.S.C. § 1391(c) as the Defendant American regularly conducts business within this judicial district and possesses substantial contacts therein.

**PARTIES**

3. Plaintiff Air Line Pilots Association International, AFL-CIO, ("ALPA") is an unincorporated labor organization with its headquarters at 1625 Massachusetts Ave., N.W., Washington, D.C. ALPA is the bargaining representative of the flight deck crewmember employees of Trans World Airlines, L.L.C. ("TWA, LLC")

4. Defendant American Airlines, Inc. ("AA") is an "air carrier" subject to the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 40101 *et seq.* AA is also a "carrier" as that term is defined in Sections 201 and 202 of the RLA, 45 U.S.C. §§ 181, 182. AA is a Delaware Corporation with its principal place of business in Fort Worth, Texas. AA is also the parent of its wholly-owned subsidiary TWA, LLC.

**FACTS**

***The TWA, LLC/ALPA Collective Bargaining Agreement***

5. AA completed its purchase of TWA, LLC as a transaction arising in the bankruptcy proceeding of Trans World Airlines, Inc. ("Old TWA"). AA set as a condition of its acquisition of Old TWA that a new collective bargaining agreement be negotiated

between ALPA and TWA, LLC, which AA established in order to hold the Old TWA assets it was acquiring in the acquisition.

6. Specifically, AA required that ALPA waive certain protections contained in Sections 1(C) and (D) of its collective bargaining agreement with Old TWA that addressed the parties' obligations regarding scope, successorship and merger. *See* Exhibit 1 attached.

7. Sections 1(C) provided:

> **(C) Successorship and Parent Companies**
> (C)(1) The Company and its Affiliates shall require any successor, assign, assignee, transferee, administrator, executor and/or trustee of the Company or of a Parent (a "Successor") resulting from the transfer (in a single transaction or in multi-step transactions) to the Successor of the ownership and/or Control of all or substantially all of the equity securities and/or assets of the Company (a "Successorship Transaction") to employ the pilots on the TWA Pilots System Seniority List in accordance with the provisions of the Agreement and to assume and be bound by the Agreement.
> (C)(2) The Company and its Affiliates shall not conclude any agreement for a Successorship Transaction unless the Successor agrees in writing, as an irrevocable condition of the Successorship Transaction, to assume and be bound by the Agreement, to recognize the Association as the representative of the Successor's pilots, and to guarantee that the pilots on the TWA Pilots System Seniority List will be employed by the Successor in accordance with the provisions of the Agreement.
> . . .

8. Section 1(D)(1) provides:

> **(D) Labor Protective Provisions**
> (D)(1) Successorship and Merger. In the event of a Successorship Transaction in which the Successor is an air carrier or any person or entity that controls or is under the Control of an air carrier (the "Merger Partner"), the Company shall require the Merger Partner to agree, and the Merger Partner shall agree, to employ the Company's pilots and to integrate the pre-merger pilots seniority lists of the Company and the Merger Partner pursuant to Association merger policy if the Merger Partner's pilots are represented by the Association and otherwise pursuant

to Section 3 and 13 of the Allegheny-Mohawk Labor Protective Provisions ("LPPs").

9. These contract provisions guaranteed the TWA pilots a fair and equitable process for integrating the seniority list of merged pilot groups.

10. AA demanded that Old TWA obtain a waiver of these provisions in order to complete the acquisition. In order to obtain that waiver, Old TWA engaged in negotiations with ALPA pursuant to § 1113(b) of the Bankruptcy Code.

11. During the course of negotiations, ALPA proposed that AA agree to use its best efforts to obtain a fair and equitable process for negotiations on seniority list integration of the AA pilots and TWA pilots.

12. In response to ALPA's demand TWA's labor attorney drafted proposed language for inclusion in the revised CBA. That language provided:

> 5. Process. AA will use reasonable best efforts with its labor organization representing pilots to secure a fair and equitable process for the integration of seniority. In that regard AA will engage a facilitator to organize meetings with the labor organizations representing the pilots of AA and TWA, LLC. AA agrees to adopt the procedures that result from this process for seniority integration of pilots.

*See* Exhibit 2 attached.

13. ALPA and TWA did not come to agreement as to waiver of the scope provisions prior to the deadline that AA considered necessary to complete the transaction. For this reason, TWA filed a motion pursuant to § 1113(b) of the Bankruptcy Code. As part of its motion, TWA filed the TWA process proposal (Exhibit 2) as an exhibit.

14. After the filing of TWA's § 1113 motion TWA and ALPA continued to negotiate in an effort to reach agreement as to modification of the collective bargaining agreement. During those further negotiations, ALPA insisted that AA directly represent to ALPA that it would make its best efforts to obtain a fair and equitable seniority integration process as provided in TWA's process proposal.

15. On March 30, 20001 AA sent to Captain Robert Pastore, Chairman of the TWA ALPA Master Executive Council, a letter stating that

> I understand that you wish to have confirmation of American's commitment on its part with respect to process for resolving integration of seniority. For its part, American Airlines, Inc. ("American") agrees to use it reasonable best efforts with it labor organization representing the airline pilots craft or class to secure a fair and equitable process for the integration of seniority. In that regard, American will engage a facilitator to organize meetings with the labor organizations representing the airline pilots and American and TWA-LLC. American agrees to adopt the procedures that result from this process for seniority integration.

*See* Exhibit 3.

16. In reliance upon AA's agreement reflected in its March 30, 2001 letter to Captain Pastore, ALPA agreed to TWA's and AA's request for waiver of the scope provisions contained in its CBA.

17. With ALPA's agreement to waive the scope provisions of the TWA CBA secured, TWA concluded a collective bargaining agreement with ALPA.

18. The modification of the TWA CBA, specifically the waiver of the scope provisions of the contract, satisfied AA's express conditions for completion of the AA/TWA acquisition and permitted the transaction to close. AA had stated that it would complete the acquisition absent waiver of these scope provisions.

19. AA's proposed acquisition of the substantially all of TWA's assets was presented to the United States Bankruptcy Court for the District of Delaware.

20. The Bankruptcy Court approved AA's proposed acquisition agreement on April 1, 2001.

21. The transaction providing for AA's acquisition of the substantially all of the assets of Old TWA was completed and closed on April 10, 2001.

22. The AA/TWA transaction would not have completed absent ALPA's agreement to waiver the scope provisions of the TWA/ALPA collective bargaining agreement.

**<u>American's Failure to Use Its "Best Efforts"</u>**

23. American has failed to use its "reasonable, best efforts" to obtain the APA's agreement for a fair and equitable seniority integration.

24. On March 27, 2001, AA Chief Pilot Bob Kudwa wrote to Captain John Darrah, President of the APA, and informed him that AA was permitting the APA to determine how the TWA pilots would be integrated into AA's operation. He did not state that the TWA pilots would have any input regarding the integration. In fact, Kudwa referred to the proposed United/USAirways integration and that the USAirways pilots would be integrated into United's operation on the basis of Sections 3 and 13 of the Allegheny-Mohawk Labor Protective Provisions. In contrast, Kudwa wrote "Our deal leaves APA to determine the basis for seniority integration."

25. American further demonstrated is intention to allow the APA full discretion over the treatment of TWA pilots' rates of pay, rules and working conditions when it

negotiated a "draw down" agreement for the TWA, LLC operation with the APA. Included, within the provisions of that agreement were terms for a scheduled transfer of aircraft from the TWA, LLC operation to the AA operation. This agreement constitutes a transfer of work from TWA pilots to AA pilots. AA excluded ALPA from these negotiations and the APA refused ALPA's request to participate in these negotiations. AA, therefore, allowed the APA to negotiate for acquiring the work of TWA pilots. AA excluded the recognized representative of the TWA pilots and, instead, negotiated with the group, APA, most adverse to the interests of the TWA pilots.

26. AA also demonstrated its intention toward the integration of former TWA employees when it integrated the employees in the reservations/passenger agent craft or class. AA issued a seniority integration in which the senior most TWA agents, some possessing thirty years service, were stapled underneath the junior-most AA agents, some with only a few months service, in all stations except St. Louis.

27. Finally, AA Vice-Chair and Chair of TWA, LLC, Bob Baker, informed the TWA-MEC that AA did not believe it was required to do any more to ensure a fair seniority integration process than to retain a facilitator for the TWA MEC/APA discussions. Baker also stated that AA would not review any integrated seniority list proposed by APA for fairness and equity. It would only review the proposed list for purposes of administration, including training costs.

28. Upon information and belief, AA has not taken any action to negotiate APA's agreement for a fair and equitable seniority integration process other than to retain facilitator Rolf Valtin.

**The Minor Dispute Resolution Procedures**

29. The System Board of Adjustment has exclusive jurisdiction over disputes arising from the interpretation or application of the collective bargaining agreement.

30. Section 22 (G & H) of the CBA permits the Union to submit a grievance to the Company alleging a violation of the CBA.

31. On ______________, 2001, the TWA MEC submitted to the Company on behalf of all TWA seniority list pilots a grievance pursuant to Sections 21(B) of the CBA asserting violations by AA of the LOA between AA and ALPA. *See* Attached Exhibit 3.

32. The grievance asserted that the Company was in violation of the LOA by failing to exercise it reasonable, best efforts to secure the APA's agreement for a fair and equitable seniority integration process.

33. The Union invoked the expedited arbitration provisions of Section 1(F) of the CBA for resolution of the grievance.

34. The Company has communicated its intention not to honor the relevant sections of the CBA and to deny the grievance.

**COUNT ONE**
**(ORDER COMPELLING ARBITRATION)**

35. The Union incorporates by reference the allegations of paragraphs 1 to 20 pursuant to Fed. R. Civ. P. 10(c).

36. The March 30, 2001 letter from AA to ALPA was sent in order to secure ALPA's agreement to the new collective bargaining agreement, including waiver of scope protections, with its wholly-owned subsidiary, TWA, LLC.

37. AA sent the letter intending that ALPA would rely on the representations made therein.

38. ALPA relied upon the representations contained in the March 30, 2001 AA letter in agreeing to waiver the scope protections provided in the TWA/ALPA collective bargaining agreement.

39. Because AA's made its representations to ALPA as part of the collective bargaining process and for the purpose of inducing ALPA to enter a modified collective bargaining agreement with its wholly-owned subsidiary and to agree to the specific conditions established by AA for that CBA, the March 30, 2001 letter is properly considered part of the TWA, LLC/ALPA collective bargaining agreement.

40. As the obligations undertaken by AA in the March 30, 2001 letter are part of the TWA, LLC/ALPA collective bargaining agreement, AA is bound to follow the minor dispute resolution procedures established in the agreement.

41. As a carrier subject to the Act, AA is required to exert every reasonable effort to settle all disputes, whether arising out of the application of a collective bargaining agreement or otherwise. 45 U.S.C. § 152, First.

42. TWA is required to consider and decide all disputes between it and its employees "with all expedition" in conference with the designated representative of its employees. 45 U.S.C. § 152, Second.

43. TWA is required to confer with the representative of its employees within ten days of receipt of a notice requesting a conference on a dispute arising out of

grievances or out of the interpretation or application of a collective bargaining agreement. 45 U.S.C. § 152, Sixth.

44. TWA is also required to establish a system board of adjustment for the purpose of resolving disputes between the Carrier and an employee or group of employees over the interpretation or application of collective bargaining agreements. 45 U.S.C. § 184.

45. The System Board of Adjustment established pursuant to 45 U.S.C. § 184 possesses exclusive jurisdiction over all disputes arising out of grievances or out of the interpretation or application of the collective bargaining agreement concerning rates of pay, rules and working conditions.

46. Under the collective bargaining agreement between TWA and the pilots in the service of TWA as represented by ALPA, a dispute resolution procedure, including a system board of adjustment with a neutral arbitrator was established. Exhibit 1.

47. AA was bound by the terms of its representations in the March 30, 2001 letter to utilize its "reasonable, best efforts" to obtain the APA's agreement to enact a fair and equitable process for seniority integration.

48. AA has failed to make its "reasonable, best efforts" to obtain the APA's agreement to a fair and equitable seniority integration process. AA's retention of a facilitator is not sufficient to satisfy its obligations under the March 30, 2001 letter.

49. ALPA and TWA's pilots will suffer irreparable injury by AA's violations of its obligations under the March 30, 2001 letter if the APA is permitted to integrate the TWA pilots in a manner without following a fair and equitable process for seniority

integration. The TWA pilots will be placed in inferior positions relative to the AA pilots than would have occurred in a fair and equitable seniority process.

50. The injury suffered by the Union and the pilots outweighs any injury suffered by the Defendants.

51. The grievance procedures of the TWA collective bargaining agreement were invoked in a timely manner by the Union.

52. The Union has sought an expedited grievance process for resolution of the minor dispute in place between the parties.

53. The Company has refused to convene a System Board of Adjustment to hear the March 2nd grievance.

54. The Carriers' refusal to comply with the dispute resolution procedures set forth in the TWA collective bargaining agreement is without justification and constitutes a violation of 45 U.S.C. §§ 152, First, Second, Sixth and § 184.

55. This court has authority to enforce a Carrier's obligations under §§ 2, First, Second, Sixth and 204 of the Act.

**COUNT TWO**
**(ORDER PURSUANT TO ALL WRITS ACT PRESERVING THE JURISDICTION OF THE ADJUSTMENT BOARD AND THIS COURT OVER THE MINOR DISPUTE)**

56. The allegations of paragraphs 1 through 36 are incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

57. This court has authority under the Railway Labor Act, 45 U.S.C. § 151, et seq., to issue injunctions in order to preserve the primary jurisdiction of the adjustment board over minor disputes.

58. If the APA and American enter a separate agreement providing for the integration of the AA and TWA seniority lists, the APA would be entitled under law to demand AA's performance under that separate agreement. The effect of this contrary obligation by AA would be restrict the adjustment board from awarding equitable relief if it found that AA had violated its obligations under the March 30, 2001 letter.

59. In addition, the adjustment board would not be able to grant a monetary remedy to the TWA pilots because any monetary relief would be too speculative to calculate. The only remedy the adjustment could provide is an equitable remedy.

60. Because a separate seniority integration agreement between AA and APA would deprive the adjustment board of power to impose an equitable remedy, the adjustment would be deprived of all power to issue a remedy and its ruling on the grievance would be moot. The adjustment board would be, for all practical purposes, deprived of its jurisdiction over the minor dispute.

61. This court has power to issue injunctive relief to preserve the primary jurisdiction of the adjustment board. It also possesses jurisdiction under the All Writs Act, 28 U.S.C. § 1651 to enter any order necessary for the preservation and aid of its jurisdiction.

62. This court also possesses jurisdiction under the Railway Labor Act, 45 U.S.C. §§ 151, *et seq.*, to enter orders enforcing the awards issued by system boards of adjustment.

63. This court's authority to enter orders enforcing adjustment board awards is central to the Act's dispute resolution mechanism.

64. This court has exclusive authority to enter an order enforcing any award issued by an adjustment board in the minor dispute alleged in the instant matter.

65. If a separate seniority integration agreement is completed by AA and APA both the adjustment board and this court will be deprived of their jurisdiction under the Act to enforce the resolution of minor disputes, thus frustrating one of the central purposes of the Act.

66. To preserve the primary jurisdiction of the adjustment board award over the minor dispute, and this court's jurisdiction to enforce an award by the adjustment board, this court should enter an order enjoining completion of any seniority integration agreement between AA and the APA until such time as the Adjustment Board has fully adjudicated the minor dispute and this court has entertained an action for enforcement any adjustment board award.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays for judgment in its favor and for the following relief:

1. Entry of an order compelling Defendant AA to comply with the dispute resolution procedures of the TWA, LLC/ALPA collective bargaining agreement and to convene on an expedited basis a system board of adjustment to hear the grievance arising from the Company's obligations under the March 30, 2001 letter and to comply fully with its obligations under §§ 152, First, Second, Sixth and 204 of the Railway Labor Act. 45 U.S.C. §§ 152, First, Second, Sixth and 184.

2. For entry of an order, pursuant to this court's authority under the Railway Labor Act and the All Writs Act, enjoining completion of any seniority integration agreement between AA and APA in order to preserve the primary jurisdiction of the adjustment board over the minor dispute and of this court to enforce any award issued by the system board of arbitration in favor of the Association.

3. For its attorneys fees and costs.

4. For such other and further relief as the court may deem appropriate.

Dated: March 4, 2005.

Respectfully submitted,

Roland P. Wilder, Jr.
William R. Wilder
BAPTISTE & WILDER, P.C.
1150 Connecticut Ave., NW
Suite 500
Washington, D.C. 20036
(202) 223-0723
Attorneys for Plaintiff

8/17/01

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

1361

AIR LINE PILOTS ASSOCIATION INTERNATIONAL, AFL-CIO,

Plaintiff,

v.

TRANS WORLD AIRLINES, INC.; AMERICAN AIRLINES, INC.

Defendants.

Case No.__________

**MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Air Line Pilots Association International, AFL-CIO, ("ALPA") moves for entry of a temporary restraining order and preliminary injunction against the Defendants Trans World Airlines, LLC ("LLC") and American Airlines, Inc. ("AA") and in support states as follows:

1. ALPA has filed suit against the Defendants seeking to compel AA's compliance with its obligations under the Railway Labor Act, 45 U.S.C. §§ 151, *et seq.* to arbitrate a "minor dispute" between the parties arising from its violation of a March 30, 2001 letter agreement contained in the LLC/ALPA collective bargaining agreement.

2. Adjudication of the minor dispute between AA and ALPA lies within the exclusive jurisdiction of the TWA/ALPA Pilot System Board of Adjustment ("System Board"). *In re Continental Airlines*, 125 F.3d 120 (3d Cir. 1997).

3. This court's role is to preserve the jurisdiction of the arbitration board to decide finally minor disputes submitted to it. *Id.* at 130. Further, this court has jurisdiction to enforce an award by the system board.

4. To obtain injunctive relief a movant must establish (1) the movant has a substantial likelihood of success on the merits; (2) the movant will suffer irreparable injury if the preliminary injunction is not granted; (3) that the harm suffered by the movant outweighs the harm to the opposing party if the preliminary injunction is granted; and (4) the preliminary injunction is in the public interest.

5. ALPA has a substantial likelihood of success on the merits. AA is clearly obligated by the RLA §§ 2, First, Second, Sixth and 204, "to exert every effort" to resolve minor disputes. 45 U.S.C. §§ 152, First, Second, Sixth and 184. Further, TWA is required to establish a system board for the exclusive resolution of minor disputes. Section 362 of the Bankruptcy Code does not apply to relieve TWA of its obligation to arbitrate this minor dispute before the system board. *In re Continental Airlines*, 125 F.3d at 137. A dispute qualifies as "minor" if the proponents position is "arguably permitted" by the language of the CBA. *Consolidated Rail Corp. v. RLEA*, 491 U.S. 299 (1989). ALPA's position, that AA's obligation under the March 30, 2001 letter is encompassed in the LLC/ALPA CBA and that AA has violated that obligation, are both arguably supported by the language of the CBA. Accordingly, the dispute should be considered minor and AA is bound to arbitrate it before the adjustment board.

6. The pilots in the service of TWA will suffer irreparable injury if AA and the Allied Pilots Association conclude a seniority integration agreement without AA

undertaking its best efforts to obtain a fair and equitable process for seniority integration. The defendants' representations indicate that it will not utilize its best efforts to obtain a fair and equitable seniority integration process and, instead, intends to allow the APA to determine the basis for seniority integration. If AA and the APA conclude a separate seniority integration agreement, then the APA will be legally entitled to enforce that agreement, notwithstanding AA's obligations to the TWA pilots. The pilots represented by the plaintiff will then be unable to enforce their rights under their Agreement and will forever lose the protections obtained through collective bargaining.

7. The defendants will not suffer irreparable injury by entry of the injunction to preserve the jurisdiction of the arbitration board and to preserve the jurisdiction of this Court to enter an order enforcing an award of the system board. Even if the defendants suffer some injury by a delay to conduct an expedited arbitration, that injury is outweighed by the injury that will be suffered by the TWA pilots who will forever lose their ability to enforce their rights under the collective bargaining agreement if a seniority integration is concluded without AA's exercise of it reasonable best efforts to obtain a fair and equitable integration process.

8. The public interest in the peaceful resolution of labor disputes without interruption of interstate commerce that underlies the RLA will be served by requiring AA to arbitrate the minor dispute before the system board. *See Brotherhood of Railway and Steamship Clerks v. Assoc. for the Benefit of Non-Contract Employees*, 380 U.S. 650, 658 (1965)("The major objective of the Railway Labor Act [] was 'the avoidance of

industrial strife, by conference between the authorized representatives of employer and employee.")(citations omitted).

9. Injunctive relief, including a temporary restraining order and a preliminary injunction, is necessary in order to preserve the jurisdiction of the system board to adjudicate the minor dispute and of this Court to enforce the system board's award. *In re Continental Airlines*, 125 F.3d at 130. ALPA, therefore, satisfies the requisites for issuance of a temporary restraining order and preliminary injunction.

WHEREFORE, ALPA respectfully requests that the court grant its motion and enter an order,

(i) Directing AA to arbitrate immediately before the system board of adjustment the minor dispute between the parties arising out of the March 30, 2001 letter of agreement;

(ii) Enjoining AA from entering any agreement with the APA providing for the integration of the TWA/AA pilot seniority lists until the system board of adjustment has an opportunity to fully adjudicate the minor dispute and this court has an opportunity to enter an order pursuant to any award of the system board;

(iii) Such other and further relief as the court deems appropriate.

Dated: March 4, 2005.

Respectfully submitted,

Roland P. Wilder, Jr.
William R. Wilder
Baptiste & Wilder, P.C.
1150 Connecticut Ave., NW, Suite 500
Washington, D.C. 20036
(202) 223-0723
Attorneys for Plaintiff

# Exhibit W

TWA MEC
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
500 NORTHWEST PLAZA, SUITE 1200 □ ST. ANN, MISSOURI 63074 □ 314-770-8500

December 6, 2001

Duane Woerth, President
Air Line Pilots Association
1625 Massachusetts Avenue, NW
Washington, D.C. 20036

Dear Duane,

Attached are several resolutions generated at the Special MEC meeting and are forwarded to you pursuant to the direction to me by the MEC.

MEC Resolution #01-117
MEC Resolution #01-118
MEC Resolution #01-119
MEC Resolution #01-123

Respectfully,

Bob Pastore

Robert A. Pastore
TWA MEC Master Chairman

cc: TWA MEC

ALPA 001544

**TWA MEC SPECIAL. MEETING**
**DECEMBER 4, 2001**
**ST. LOUIS, MO**

## COMPILATION OF ACTIONS

**Resolution #01-117 by H. Hollander/S. Young**

WHEREAS ALPA's surrender of the labor protective provisions in the ALPA-TWA Collective Bargaining Agreement was approved in the context of contractual promises of "fair and equitable" treatment of the TWA pilots in the American Airlines acquisition of Trans World Airlines, and

WHEREAS the absence of an orderly dispute settlement process following the surrender of those labor protective provisions has allowed "jungle rules" to prevail, failing to provide the promised "fair and equitable" pilot seniority integration and settlement of other pilot working condition issues falling out of the American Airlines' acquisition, and

WHEREAS the National Mediation Board has received an application for Single Carrier status, and

WHEREAS a determination by the National Mediation Board granting Single Carrier status will inflict on the TWA LLC pilots the unacceptable "cram down" of a unilaterally imposed seniority integration scheme already agreed to by the Allied Pilots Association and American Airlines, and

WHEREAS the unacceptable, unfair and inequitable conditions of that "cram down" by the Allied Pilots Association and American Airlines will permanently injure the airline careers of a majority of the ALPA represented pilots of TWA LLC, and

WHEREAS the ALPA legal staff claims to be waiting to "analyze" the Single Carrier filing, and ALPA national leadership declines to respond to the TWA MEC's request to file an official ALPA objection to the Single Carrier status application, such objection considered necessary to prevent the APA-AMR "cram-down" of the TWA pilots, and

WHEREAS the national leadership of ALPA has already stated that they contemplate taking no other legal action to achieve the ALPA promised "fair and equitable" settlement of issues falling out of the American Airlines acquisition of TWA, and

WHEREAS the TWA MEC considers timely action by ALPA in filing an objection with the National Mediation Board and other relevant actions to be absolutely critical, such action currently understood to be not freely forthcoming from national ALPA,

**THEREFORE BE IT RESOLVED that ALPA shall, after thorough preparation, file an official objection to the National Mediation Board, protesting the Single Carrier application and taking all appropriate legal and political actions to fulfill the ALPA promise of "fair and equitable" treatment of the TWA pilots in the American Airlines' acquisition of Trans World Airlines, or delegate to the TWA MEC the authority to make such a filing on behalf of ALPA, and**

**BE IT FURTHER RESOLVED that the TWA Master Chairman immediately transmit this MEC Resolution to ALPA President Duane Woerth, the ALPA Executive Committee and ALPA Executive Board for their action.**

PASSED voice vote

ALPA 001545

**TWA MEC SPECIAL MEETING**
**DECEMBER 4, 2001**
**ST. LOUIS, MO**

**COMPILATION OF ACTIONS**

**Resolution #01-118 by H. Hollander/S. Clarke**

WHEREAS a determination by the National Mediation Board granting Single Carrier status to American Airlines and the Allied Pilots Association would forever extinguish one of the oldest airline pilot airline memberships of the Air Line Pilots Association in less than a proud manner, and

WHEREAS there are specific legal and political actions that will serve to preserve the reputation of ALPA and restore the pride of the ALPA members at TWA, providing the "fair and equitable" treatment promised by ALPA when the labor protective provisions of the TWA-ALPA Collective Bargaining Agreement were surrendered under the threat of Section 1113 of Chapter 11 of the Bankruptcy Code, and

WHEREAS those legal and political actions will require financial resources that exceed the current ability of the TWA MEC operating under the MEC's allotted ALPA budget (as was reduced by nearly $1.5 million dollars, also under the threat of Section 1113 proceedings), and

WHEREAS the TWA pilots have faithfully paid ALPA dues since the early founding of the Association and enjoy the rare ALPA distinction of having repaid ALPA from previous draws on the Major Contingency Fund, and

WHEREAS the career-threatening situation faced by the TWA pilots in the American acquisition of TWA clearly qualifies for financial support from the ALPA Major Contingency Fund,

**THEREFORE BE IT RESOLVED that the TWA MEC requests from ALPA additional MEC funding in the initial amount of three million dollars ($3,000,000.00) to be drawn from ALPA national budgets or the Major Contingency Fund, as may be decided by the appropriate ALPA authority, and**

**BE IT FURTHER RESOLVED that this resolution be immediately transmitted by the Master Chairman to ALPA President Duane Woerth, ALPA Executive Committee and ALPA Executive Board, and**

**BE IT FURTHER RESOLVED that the funds requested shall be allocated to reimbursing the TWA MEC budge for extraordinary bankruptcy legal fees and continuing seniority integration issues.**

PASSED voice vote

ALPA 001546

**TWA MEC SPECIAL. MEETING**
**DECEMBER 4, 2001**
**ST. LOUIS, MO**

**COMPILATION OF ACTIONS**

**Resolution #01-119 by H. Hollander/S. Clarke**

WHEREAS ALPA surrendered the labor protective provisions in the TWA-ALPA Collective Bargaining Agreement under advice of ALPA expert advisors and ALPA legal counsel and with the promise of ALPA support in achieving a "fair and equitable" integration of the TWA pilots into the American Airlines system, and

WHEREAS the APA-AMR announcement of the "cram down" of the TWA pilots must be interpreted as a failure of the current mix of ALPA advisors and legal counsel to help the TWA MEC achieve a "fair and equitable" solution, or even create a fair process to achieve that goal of a "fair and equitable" solution to the many pilot labor issues related to the AMR acquisition of TWA, and

WHEREAS ALPA National legal staff has stated that they have no interest in taking any further actions to enforce the ALPA promises of "fair and equitable" treatment of the TWA pilots by APA and AMR, and

WHEREAS it has been recently discovered that ALPA National has been receiving representation "pledge cards" from pilots at American Airlines at the same time the TWA MEC has been attempting to negotiate with APA and AMR on behalf of the TWA pilots, and

WHEREAS the interests of the pilots represented by the TWA MEC deserve the undivided loyalty and highest priority of advisors and legal counsel assisting the TWA MEC on issues relating to the AMR acquisition of Trans World Airlines, and

WHEREAS the pending application to the National Mediation Board for Single Carrier status at American Airlines may be one of the TWA MEC's last opportunities to protect the interests of the TWA pilots from the permanent career damage that the APA-AMR "cram-down" scheme poses, and

WHEREAS additional legal counsel is needed immediately by the TWA MEC to address issues related to the NMB "Single Carrier" issue and other issues related to the AMR acquisition, said legal counsel able to operate with undivided loyalties to the TWA pilots and under priorities established by the TWA MEC,

**THEREFORE BE IT RESOLVED that the TWA MEC gain from ALPA National the immediate authority to engage outside legal counsel, with that outside legal counsel to be financed by MEC funds, pilot assessments, the Major Contingency Fund, other ALPA national funds, or a combination of any or all the above as mutually agreed to by the TWA MEC and higher ALPA authorities, and**

**BE IT FURTHER RESOLVED that this resolution to immediately transmitted by the Master Chairman to ALPA President Duane Woerth, ALPA Executive Committee and ALPA Executive Board.**

PASSED voice vote

ALPA 001547

**TWA MEC SPECIAL. MEETING**
**DECEMBER 4, 2001**
**ST. LOUIS, MO**

**COMPILATION OF ACTIONS**

**Resolution #01-123 by H. Hollander/S. Young**

WHEREAS the Air Line Pilots Association International has been conducting an active recruitment effort of the pilots employed by American Airlines, and

WHEREAS "ALPA pledge cards" are currently being collected by at the address of ALPA Representation Campaign, 2110 Artesia Blv. #B215, Redondo Beach, CA 90278-9955, and

WHEREAS the stated purpose of collecting those pledge cards is to make a valid claim of the representational interest of a labor group, sufficient to cause the initiation of a National Mediation Board conducted representational election among the pilots of American Airlines, and

WHEREAS such election may cause the American Airlines pilot class and craft to claim ALPA as their collective bargaining agent and abandon the Allied Pilots Association, and

WHEREAS while the TWA pilots fully endorse ALPA's short term goal of recruiting the pilots of American Airlines back into our international pilot union, and the larger goal of extending the benefits and responsibilities of ALPA membership with fairness and equity to all professional airline pilots, and

WHEREAS on a simultaneous track with recruiting efforts at American Airlines, ALPA remains legally obligated under the Association's duty of fair representation to the pilots of TWA LLC, to protect the rights of the TWA LLC pilots in direct and indirect negotiations with the Allied Pilots Association and American Airlines, and

WHEREAS the ALPA promise of "fair and equitable" treatment of the TWA LLC pilots in the Allied Pilots Association-American Airlines seniority integration process has not been realized, with the "cram-down" seniority integration announced by APA and AMR a clear signal of that fact, and

WHEREAS that unilaterally imposed "cram down" seniority integration scheme would permanently injure the careers of the TWA LLC pilots, well beyond the already immediate negative impact (inflicted without effective ALPA objection) of American Airlines closing TWA LLC pilots domiciles and transferring TWA LLC flying to flying conducted by American pilots represented by the Allied Pilots Association, and

WHEREAS the balance of ALPA words and deeds, must reflect a dedicated exercise of ALPA's duty of fair representation in protecting the rights and interests of the 2300 ALPA represented TWA pilots, and

WHEREAS ALPA's recommendation to amend certain TWA pilot contractual Labor Protective Provisions during the initial phase of the American Airlines acquisition of TWA may be perceived as a deliberate sacrifice of the TWA pilots as part of the ALPA effort to attract into the ALPA union fold over 10,000 pilots currently employed by American Airlines, and

WHEREAS ALPA must conduct itself in a manner so as to totally preclude the appearance of any conflict of ALPA's interests or accusations of ALPA's abandoning the TWA pilots, now

ALPA 001548

**TWA MEC SPECIAL. MEETING**
**DECEMBER 4, 2001**
**ST. LOUIS, MO**

**COMPILATION OF ACTIONS**

**THEREFORE BE IT RESOLVED that as a clearly and publicly stated pre-condition of any ALPA assumption as bargaining agent of the pilots of American Airlines, and as a pre-condition to any further ALPA representation and/or recruiting efforts at American Airlines, that ALPA Merger Policy shall be applied, pro-actively or retroactively as the timing of events may dictate, to the American Airlines acquisition of TWA and the integration of the TWA LLC pilots into the American Airlines pilot seniority list, and**

**BE IT FURTHER RESOLVED that official acceptance by the Allied Pilots Association and American Airlines of this application of ALPA Merger Policy be a publicly stated pre-condition for ALPA's refrain from filing an objection to the Allied Pilots Association's *single-carrier* application with the National Mediation Board, and**

**BE IT FURTHER RESOLVED that, absent the official acceptance by the Allied Pilots Association and American Airlines of ALPA Merger Policy as applying to the acquisition of TWA, ALPA will pledge and utilize the full resources of the Association to vigorously and immediately oppose the application for the Allied Pilots Association's single-carrier representational designation to the National Mediation Board, and**

**BE IT FURTHER RESOLVED that this resolution be transmitted immediately by the TWA Master Chairman to ALPA President Duane Woerth, ALPA Executive Committee and ALPA Executive Board for action.**

**PASSED** voice vote

ALPA 001549

# Exhibit X

FILE COPY

**David B. Singer**
35 Forest Hill Dr. • Cherry Hill, NJ 08003-1728

## COVER PAGE

_11__pages, including cover page

From: David Singer

To: Suzi Menoni

Suzi,
Please copy this article by APA's merger attorney, Wesley Kennedy, and distribute to the MEC, the officers and the MOC, ASAP. Thanks....DBS

Re:

# eniority Integration in he Absence of andatory Labor rotective Provisions

obert H. Nichols
esley Kennedy

ew people would argue that stable, amicable labor relations are in he public interest and that labor disputes have adverse consequences or employees, employers, and the public. This goal clearly underlies ederal labor policy in the airline industry.[1] Stable labor relations re in the interest of employees, who wish to pursue livelihoods ithout the hardship of disputes with their employers; employers, ho wish to sell their services without the uncertainty and costs of isputes with their employees; and airline passengers, who wish to ravel without the delays and disruptions that can be caused by labor isputes.

The issue of seniority is particularly important to the achievement of these public policies in the airline industry, for no employment issue is dearer to airline employees. Seniority has even more signif- icance to airline employees than to employees in other industries in which seniority is measured predominantly by an employee's tenure in one location. In the airline industry, seniority is predominantly

1. Among the declared purposes of the RLA are "[t]o avoid any inter- ruption to commerce or to the operation of any carrier engaged therein"; "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules or working conditions"; and "to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." RLA § 2, 45 U.S.C. § 152 (1926). *See* NLRA § 1, 29 U.S.C. § 151 (1935).

3- 9-00;12:13PM;Nestle Hotel Library ;6072541298 # 4/ 13

ALPA 001312

"system seniority," measured across the carrier's entire system. Seniority dictates not only individuals' wages and compensatory benefits, but also their jobs, residences, shifts, hours, and virtually every other important aspect of their employment. This is particularly true of in-flight employees—pilots and flight attendants—who work in multimillion dollar "plants" traveling thousands of miles each day. Accordingly, disputes concerning seniority endanger stable labor relations.

No situation creates a greater risk of acrimonious seniority disputes than does the merger of two carriers. The harsh consequences that can befall employees as a result of the integration of two seniority lists are readily apparent: integration creates direct clashes between separate groups of employees who must frequently work side by side. Although such conflicts can be particularly acrimonious when the premerger groups were represented by separate bargaining representatives and seniority issues become entangled with representational issues,[2] passions can run high and disputes can become intense even when the employee groups share the same union.[3] These conflicts can provoke direct employee actions against travelers[4] and, in extreme cases, make air travel dangerous.[5]

Given the highly charged nature of this issue, disputes should not be resolved by sheer political or economic power at the expense of the legitimate seniority expectations of the employee groups at the merging airlines. For many years before deregulation, a fair process, culminating in arbitration, was provided by sections 3 and 13 of the standard labor protective provisions routinely imposed by the Civil Aeronautics Board as a condition of its approval of mergers, acquisitions, and similar transactions. Section 3 of the standard LPPs provides for the "fair and equitable" integration of seniority lists in each craft or class of employees when a merger affects seniority interests and for the resolution of those issues through arbitration under section 13 of the LPPs if the issues cannot be resolved through collective bargaining or an alternative procedure. Some airline unions have also developed their own internal policies to augment the provisions of sections 3 and 13.[6] Following deregulation, however, the Department of Transportation has effectively taken the position that LPPs will *never* be imposed as a condition of its approval of mergers or similar transactions and that carriers and their employees are left to their own devices to resolve seniority issues arising in mergers.[7]

The laissez-faire posture adopted by the DOT, under which the process of collective bargaining has been depended on for the solution to all merger-related labor issues, has significantly altered the environment in which seniority integration disputes are resolved. In fact, this approach has proven wholly inadequate for resolving the conflicts that arise in the integration of seniority lists. Instead, the process that now prevails in the industry and that has replaced the orderly procedures of sections 3 and 13 is the "law of the jungle," under which the stronger premerger employee group—particularly when it is supported by management at the merged carrier—is able to impose its will on the smaller premerger group.

To redress this imbalance of power, some process, such as sections 3 and 13 of the standard LPPs, should be imposed by statute for the resolution of seniority issues arising out of airline mergers and acquisitions.

## *Development of CAB and DOT Rules Regarding LPPs*

### The Imposition of LPPs before Deregulation

The standards governing the imposition of LPPs as a condition of regulatory approval of airline mergers or similar transactions have

2. Such representational questions are beyond the scope of this chapter. These issues do, however, have a good deal of currency. *See* Western Airlines v. IBT, 107 S. Ct. 1515 (1987) (O'Connor, Circuit Justice); TWA-Ozark Airlines, 14 NMB at 218 (1987).

3. These representational questions are discussed in Wilder and Lurye, *Successorship Clauses: A Union Perspective, infra* p. 189.

4. *See, e.g., Sabotage at Northwest Air*, Crain's Detroit Bus., Feb. 2, 1987.

5. Thus, for example, there have been reports in the news media, in connection with the Northwest-Republic merger, of isolated instances of aircraft sabotage. Given the level of employee hostility generated in such situations as the Texas Air-Eastern merger (*see, e.g.*, Wall St. J., Jan 22, 1987, at 6), one can reasonably anticipate that such occurrences may continue.

6. *See infra* pp. 146–48.
7. *See infra* pp. 148–51.

their roots in the treatment of similar issues in the railroad industry. Since 1950 the CAB has routinely imposed LPPs as a condition for the approval of airline transactions adversely affecting employees,[8] and the validity of this policy has consistently been upheld by the courts.[9] The CAB standardized its LPPs in 1961 in the *United-Capital Merger* case[10] and thereafter imposed those LPPs in numerous cases. In 1972, in the *Allegheny-Mohawk Merger* case,[11] the CAB reviewed its policy and, with minor modifications, reaffirmed its commitment to the formula adopted in *United-Capital*. The standard LPPs have since been known colloquially as "*Allegheny-Mohawk* LPPs."

Beginning no later than *United-Capital*, the standard LPPs expressly covered seniority issues. Section 3 of the *United-Capital* LPPs, which remained unchanged after *Allegheny-Mohawk*, provided that

> [i]nsofar as the acquisition or merger affects the seniority rights of the carriers' employees, provisions shall be made for the integration of seniority lists in a fair and equitable manner, including, where applicable, agreement through collective bargaining between the carriers and the representatives of the employees affected. In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with Section 13.[12]

Section 13 of the standard LPPs, both under *United-Capital* and *Allegheny-Mohawk*, established a procedure for the resolution of disputes, culminating in final and binding arbitration.

The CAB made no determination in section 3 of *how* seniority lists were to be integrated, beyond the general standard that the integration be "fair and equitable." Instead, the Board left this decision to the parties in each case. Over time, internal union procedures—supported by the obligation to arbitrate under section 13 of the

8. United-Western Acquisition of Air Carrier Property, 11 CAB 701, 708 (1950), *aff'd sub nom.* Western Airlines v. CAB, 194 F.2d 211 (9th Cir. 1952).

9. *See, e.g.*, ALPA v. CAB, 477 F.2d 900 (D.C. Cir. 1973); American Airlines v. CAB, 445 F.2d 891 (2d Cir. 1971); Cling v. ALPA, 346 F.2d 270 (7th Cir. 1965); Kent v. CAB, 204 F.2d 263 (2d Cir. 1953), *cert. denied*, 346 U.S. 826; Hyland v. United Air Lines, 254 F. Supp. 367 (N.D. Ill. 1966).

10. 33 CAB 307, 342–47 (1961), *aff'd sub nom.* Northwest Airlines v. CAB, 303 F.2d 395 (D.C. Cir. 1962).

11. 59 CAB 22 (1972).

12. United-Capital Merger, 33 CAB 307 (1961) (App. A).

LPPs—were developed for those cases in which both premerger employee groups in a particular craft or class were represented by the same labor organization. The most prominent of these internal union procedures has been, of course, the ALPA Merger Policy, which was developed beginning in the late 1940s. That policy, which has since been amended on numerous occasions and is a continual source of debate within ALPA,[13] provides for a three-stage process for integrating seniority lists, with each stage to be completed within a specified time period: (1) data collection and verification; (2) negotiation and, if necessary, mediation; and (3) in the event no resolution has been achieved through negotiation or mediation, arbitration before a board of ALPA members, chaired by a neutral person from outside the association.[14] The outcome of this process is binding upon ALPA[15] and becomes the position of the association in negotiations and, if necessary, in arbitration with the merged carrier under sections 3 and 13. ALPA Merger Policy has governed the integration of pilot seniority lists in virtually every airline merger since the early 1960s in which both premerger pilot groups were represented by ALPA.

The process established under sections 3 and 13 has served the interests of all concerned. It guarantees that an impartial resolution will be achieved, through arbitration if necessary, and thus protects the interests of all airline employees in resolving seniority integration conflicts. Moreover, from the perspective of the affected carriers, seniority integration under sections 3 and 13 has been essentially a "no-cost" item. Aside from marginal cost increases, such as potentially increased training costs,[16] protection of seniority rights between

13. *See, e.g.*, Report of the Merger Policy Study Committee to the ALPA Board of Directors (Nov. 1986) (available from authors).

14. ALPA Merger Policy Booklet 3–8 (Dec. 1, 1986) (available from authors).

15. *Id.* at 8

16. The legitimate interest of a merging carrier to minimize transition costs, such as training, resulting from seniority integration actually *coincides* with the interest of employees in preserving their jurisdiction over their premerger work. To the extent that the carrier's interests are not sufficiently protected through internal union procedures or other processes adopted by the affected employees, these interests are protected by the merged carrier's right to participate in bargaining and arbitration under sections 3 and 13.

3- 9-99;12:13PM;Nestie Hotel Library ;8072541299 # 8/ 9

two premerger employee groups through this process is on the whole greatly beneficial to the carriers because an impartial process tends to minimize the inevitable antagonisms that arise from the clash of conflicting seniority interests.

## *Deregulation and the Emergence of Current LPP Doctrine*

Congress turned the airline industry upside down when it enacted the Airline Deregulation Act in 1978.[17] Events since then have demonstrated that airline employees have been profoundly affected by the statute. Although the "Employee Protection Program" (EPP) included in section 43 of the Act[18] demonstrated a recognition by Congress that deregulation could have an undue impact on employees, it seems reasonably clear that Congress gave no substantive consideration to whether the CAB should continue to impose standard LPPs, particularly those in sections 3 and 13, as a condition for approval of airline transactions.[19] The driving force behind deregulation was not labor protection but, rather, a desire by Congress that the CAB's treatment of airline transactions be governed more closely by traditional antitrust law.[20]

In 1979, the CAB, while acknowledging in *Texas International–Pan Am–National Acquisition*[21] that the "public interest" standard remained unchanged by the deregulation act,[22] determined that the act required a reevaluation of its previous LPP doctrine. The Board

> put all labor parties on notice that labor protection in the future will be provided *only* if and when the Board determines that it is required by special circumstances. LPP's will no longer be imposed as a matter of course, or because tradition dictates their use. We therefore advise labor to negotiate its own merger protections through the collective bargaining process at the first opportunity.[23]

Nevertheless, the Board continued to make standard LPPs a condition for approval of airline transactions and indeed has not denied such employee protections in any two-carrier transaction since deregulation.

Following the "sunset" of the CAB's authority,[24] the DOT at the first opportunity made clear—in cases such as the *Midway–Air Florida Acquisition*,[25] *Southwest-Muse Acquisition*,[26] *Pacific Division Transfer*,[27] and *Piedmont-Empire Acquisition*[28]—that it would carry to its logical extreme the CAB's admonition in *Texas International–Pan Am–National* that employees should rely on collective bargaining for protection from the adverse consequences of mergers. The DOT adopted a standard under which LPPs would not be imposed unless necessary to prevent disruption of the air transportation system as

17. Pub. L. No. 95–504, 92 Stat. 1705 (1978).

18. 92 Stat. 1752, 49 U.S.C. § 1552. The EPP has been upheld by the Supreme Court. Alaska Airlines v. Brock, 107 S. Ct. 1476 (1987).

19. Indeed, there are indications that Congress assumed, in enacting the ADA, that preexisting CAB doctrine on the subject would continue unchanged. Thus, although Congress liberalized the CAB's authority to approve airline mergers, the statutory provision empowering the Board to condition approval "upon such terms and conditions as it shall find to be just and reasonable" under the public interest was left unchanged. Federal Aviation Act, § 408(b), 49 U.S.C. § 1378(b). Moreover, Congress added to the definition of the "public interest" under the FAA a provision that the Board "shall consider . . . as being in the public interest, and in accordance with the public convenience and necessity . . . the need to encourage fair wages and equitable working conditions for air carriers." Federal Aviation Act, § 102(a)(3), 49 U.S.C. § 1302(a)(3). This is precisely the language the Supreme Court found in 1939 to authorize the ICC to impose LPPs in the railroad industry. United States v. Lowden, 308 U.S. 225 (1939). S. Rep. No. 631, 95th Cong., 2d Sess., issued in 1978, noted with approval that airline employees had relied on the CAB's LPP doctrine and that deregulation would likely make such protections even more necessary to those employees. Subsequent statements by members of Congress have indicated that Congress assumed that LPPs would be imposed under the same standards following deregulation as had been applied previously. *See, e.g.*, H.R. Rep. No. 882, 99th Cong., 2d Sess. 3 (1986); 128 Cong. Rec. 57,236 (daily ed. June 21, 1982); H.R. Rep. No. 793, 98th Cong., 2d Sess. 11 (1984).

20. *See, e.g.*, S. Rep. No. 631, 95th Cong., 2d Sess. 78–79 (1978); H.R. Rep. No. 1211, 95th Cong., 2d Sess. 5–17 (1978); 134 Cong. Rec. H13,446–47, S18,798–800 (daily ed. Oct. 14, 1978).

21. CAB Orders 79–12–163/164/165.

22. *Id.* at 59–60.

23. *Id.* at 67.

24. CAB Sunset Act of 1984, § 3, Pub. L. 98–443, 98 Stat. 1703; ADA, § 40(a), Pub. L. 95–540, 92 Stat. 1744, 49 U.S.C. § 1551.

25. Order 85–6–33.

26. Order 85–6–79.

27. Order 85–11–67.

28. Order 86–1–45.

5- 8-89; 12:13PM;Nestle Hotel Library
1607254;1206

a whole or under "special circumstances" to ensure fair wages and equitable working conditions. In so doing, the department made clear that in its view the impact of airline mergers on employees was entirely a matter for collective bargaining, not regulatory action: "[C]arriers and unions should decide through private negotiations what benefits should be paid airline employees in the event of a merger or acquisition."[29] The DOT consistently reaffirmed this "laissez-faire" policy during a spate of airline merger proceedings during 1986 and 1987.[30] Its refusal to impose LPPs as a condition of approval essentially left carriers and their employees on their own in resolving employee issues in mergers. The DOT also rejected alternative requests by labor parties to impose only sections 3 and 13.[31]

The DOT's standard has been upheld by two courts of appeal, one in a case containing virtually no record of the impact of a transaction on employees,[32] and the other in a case in which the terms of the carriers' transaction took account of the impact on employees.[33] In a recent decision, however, arising from the Northwest-Republic, TWA-Ozark, and Texas Air–Eastern acquisitions, the District of Columbia Circuit overturned the department's application of its LPP standard in the *Texas Air–Eastern* case and remanded the proceeding to the DOT for consideration of the impact of the acquisition on employees. The court indicated that, if collective bargaining proves to be inadequate in a particular case for the protection of employees' interests, LPPs should be imposed.[34] Moreover, as discussed below, events in these cases and others in recent years have

29. Midway–Air Florida Acquisition Show Cause Proceeding, Order 85–6–33, at 5.

30. Joint Application of USAir Group, Inc., PS Group, Inc., & Pacific Southwest Airlines, Order 87–3–11; American–Air Cal Show-Cause Proceeding, Order 87–2–33; Delta-Western Acquisition Case, Order 86–12–30; Texas Air–Eastern Acquisition Case, Order 86–10–2; TWA-Ozark Acquisition Case, Order 86–9–29; Texas Air–Eastern Acquisition Case, Order 86–8–77; Northwest-Republic Acquisition Case, Order 86–7–81.

31. *See, e.g.*, TWA-Ozark Acquisition, Order 86–9–29; Northwest-Republic Acquisition, Order 86–7–81; Pacific Division Transfer, Order 85–11–67.

32. ALPA v. DOT, 791 F.2d 172 (D.C. Cir. 1986).

33. Independent Union of Flight Attendants [IUFA] v. DOT, 803 F.2d 1029 (9th Cir. 1986).

34. ALPA v. DOT, 838 F.2d 563 (D.C. Cir. 1988).

underscored the costs to all concerned of not having an orderly mechanism for accomplishing seniority integration. Finally, there are continuing efforts in Congress to compel the DOT to alter its LPP standard.[35] It therefore remains possible that in the future the DOT may be forced to look more favorably on requests to impose LPPs.

INADEQUACY OF THE PRESENT APPROACH

It is the DOT's philosophy that employment issues, including seniority integration, arising from airline mergers or acquisitions should be subject to the same "market" forces that govern entry into the airline market. The absence of a mandatory process for seniority integration puts a premium on economic and political power, both in relations between the merged carrier and its employees and in relations between respective premerger employee groups. Some merged carriers have shown favoritism to one premerger employee group and have pitted employee groups against one another. Similarly, a politically stronger premerger employee group may be given an incentive to impose its will on its weaker counterpart. Under deregulation, the traditional bilateral process of collective bargaining, on which the DOT relies to resolve all merger-related employee issues, is wholly inadequate in preventing such outcomes. Indeed, even when the parties have recognized that establishing an orderly integration process is in their mutual interest, formulating such a process has frequently proved both costly and difficult.

## DOT's Laissez-Faire Approach

RECENT HISTORY

Since 1984, when the DOT was first called upon to approve the merits of such transactions, approximately twenty airline mergers and acquisitions have been approved. A partial list of the mergers with significant labor relations implications would include the following: Southwest-Muse (1985), Midway–Air Florida (1985), United–Pan Am (Pacific Division) (1985), Northwest-Republic

35. *E.g.*, Aviation Daily, May 14, 1987, at 241–42.

03/29/2001 02:42 8564246488 DAVID SINGER PAGE 06
3- 8-99;12:13PM;Nestle Hotel Library ;6072541288 # 8/ 15

(1986), Texas Air–Eastern (1986), TWA-Ozark (1986), Delta-Western (1986), Alaska-Jet America (1986), Texas Air–People/Frontier (1986), American–Air California (1986), USAir-PSA (1986), and USAir-Piedmont (1987). Rumors suggesting future mergers sweep the industry almost daily. A brief review of how seniority integration was or is being accomplished in each of these cases may be helpful in appreciating some emerging issues confronting the parties in such cases.[36]

In several of these cases, and particularly when by reason of earlier concessionary agreements labor had achieved significant ownership interests and board representation, the acquiring carrier has agreed to accept LPPs "as a matter of contract." What this phrase means in a practical sense is far from clear. Such agreements were reached in *Delta-Western* and *USAir-PSA*.

In *Delta-Western*, Delta stated to the DOT that it would offer provisions no less favorable than the traditional *Allegheny-Mohawk* LPPs to its employees as a matter of contract.[37] This commitment was exacted by Western in the discussions leading up to the agreement between the carriers and reflected the degree to which labor concerns were matters of agenda at that carrier, on whose board of directors labor was represented. Following the merger, this promise was translated into a letter sent by Delta to all its employees, both Western and premerger Delta, purporting to afford to each employee a series of provisions essentially identical to *Allegheny-Mohawk* LPPs, including sections 3 and 13. Delta was unwilling to make such provisions a matter of contract with AFA, however, which represented Western's flight attendants. Delta's reluctance was not altogether illogical, since the airline's flight attendants were unrepresented. Delta also declined, however, to enter into such an agreement with ALPA, which represented the pilots of both carriers. Discussions between the pilots about seniority integration commenced under the auspices of ALPA, and Delta initially refrained from active participation in the process. As time wore on, however, Delta became impatient and sought to impose deadlines on the groups; it also indicated that it would be unwilling to wait for the full procedure provided by ALPA Merger Policy. Finally, Delta intruded itself more directly into the process and in effect acted to "mediate" the seniority dispute between the pilot groups. For all practical purposes, ALPA was not a player in the resolution of the dispute.[38] The integrated pilot seniority list that resulted from this process is now the subject of litigation.[39]

Delta has systematically refused to deal with AFA on any seniority issues and has even rejected those merger representatives designated by AFA as the appropriate representatives of the former Western flight attendants.[40] Thereafter, no agreed solution having been achieved, Delta imposed what it deemed to be a "fair and equitable" solution. That list was unacceptable to the Western flight attendants, and arbitration under the contractual LPPs is ongoing.

*Northwest-Republic* represents a slight variant on this theme. Republic's unions had negotiated an obligation from Republic to obtain a commitment from an acquiring carrier that it would agree to contractual LPPs no less favorable than *Allegheny-Mohawk*. At the commencement of the Northwest-Republic DOT proceeding, Northwest claimed to the administrative law judge that it would honor Republic's commitment only "until the procedures for resolving major disputes have been exhausted."[41] For reasons made abundantly clear in the chapter in this volume by Roland P. Wilder, Jr., and William

36. In both *Southwest-Muse* and *Alaska–Jet America*, the merged carrier has opted to keep the operations separate and distinct. At Muse, which operated under the Transtar name before its recent cessation of operations, the pilots designated ALPA as their representative. Aviation Daily, May 26, 1987, at 306. The Southwest pilots have their own union, and it reportedly was instrumental in Southwest's determination to keep the two operations separate. Alaska openly announced at the time of the acquisition of Jet America, which it proposed to operate as a nonunion subsidiary, that the deal was undertaken to "keep pressure on the unions [at Alaska] for further cost containment." Aviation Daily, Oct. 31, 1986, at 170. By the latter part of 1987, the carrier reversed course and determined to combine the operations. In negotiations with ALPA, the parties reached an agreement in October 1987 by which the Jet America pilots, without their participation, were placed on the ALPA list. That agreement has been challenged by a group of former Jet America pilots in ongoing litigation. Bernard v. Alpa, No. C87-5400 CAL (N.D. Cal.).

37. Agreement & Plan of Merger among Delta Airlines, Inc., DL Acquisition Corp., & Western Airlines, Inc. § 5.11 (available from authors).

38. As made clear below, TWA—which steadfastly opposed LPPs in any form—had taken an even stronger approach in the earlier TWA-Ozark merger.

39. Herring v. Delta Air Lines, No. 87–5725-RJK (C.D. Cal.).

40. A subsequent ballot conducted by the carrier confirmed these individuals as the desired spokespersons for the Western group.

41. Joint Applicants' Answers to Labor Parties' Information Requests, Mar. 17, 1988, at 4–5 (available from authors).

3- 9-88; 12:13PM; Nestle Hotel Library ;8072564129 # 9/ 13

Lurye, this formulation was unacceptable to the union parties Finally, Northwest, after considerable prodding by the administrative law judge, agreed to honor Republic's commitment to its employees.[42] Thereafter, recognizing the impossibility of offering sections 3 and 13 only to Republic employees, the carrier made those two provisions available to Northwest's pilots and flight attendants as well.[43]

As far as the pilots are concerned, Northwest has continued to operate the airlines as separate entities and has maintained separate ALPA contracts with each pilot group. Northwest has been content to let the ALPA process run its course, reserving the right to reject the result and trigger its own "section 13" arbitration if it finds the outcome unpalatable. The situation for flight attendants has been confused by the representational issues presented by the contest between the Teamsters and AFA. There too the carrier appears content to let the victorious union, the Teamsters, resolve the dispute without management input. Thus, in many ways, Northwest's response to these issues has been the most traditional.[44]

42. Stipulation Regarding Labor Protective Provisions, May 1, 1986 (available from authors).

43. The logic of this arrangement escaped the Republic pilots, who subsequently filed a suit against Northwest in an attempt to arbitrate the integration of the list with Northwest alone (under § 13) without the participation of the Northwest pilots. Northwest resisted this proposition, as did ALPA, which intervened in the case. The Republic pilots ultimately abandoned the litigation. Lawhus v. Northwest Airlines, No. 86–1032-A (E.D. Va.).

44. To complete the picture, however, it is worth noting that this approach extended only to the in-flight employees. When faced with a representational dispute among the office, clerical, passenger, and fleet service employees in 1986, Northwest negotiated an agreement establishing the seniority for portions of this group of employees with the Brotherhood of Railway and Airline Clerks (BRAC), which represented some of these employees. This was accomplished without participation by the ALEA-represented Republic employees, save for a committee of BRAC-selected employees. The result survived court challenge. ALEA v. Republic Airlines, 798 F.2d 967 (7th Cir.), *cert. denied*, 107 S. Ct. 458 (1986). Thereafter, the NMB determined that the appropriate unit was inconsistent with that reflected in these agreements and directed an election. BRAC now has lost the right to represent these employees. What the IAM, the successful union in the NMB election, will ultimately do with this resolution remains to be seen.

United's acquisition of Pan Am's Pacific operations, which included some 430 pilots and 1,200 flight attendants, illustrates yet another approach. At the DOT hearing, United fought vigorously against imposition of any LPPs and prevailed.[45] United then turned in good faith to its own unions to address the issues presented by the transaction, one of which was, of course, seniority.[46] The flight deck crews (United's pilots and Pan Am's pilots and flight engineers), through very sophisticated representatives, quickly established a procedural agreement among themselves and the carrier. The agreement was patterned after the ALPA Merger Policy, although ALPA procedure was not applicable because of the presence of Pan Am flight engineers represented by the Flight Engineers International Association (FEIA). The agreement provided for arbitration among the employee groups if agreement could not be reached in negotiations. United agreed either to accept the result or to arbitrate. The position of the pilot groups, however, was to be established in the initial proceeding. In fact, the issues between the pilot groups were resolved in direct negotiations and accepted by United within a very short time.

The flight attendants presented quite another story. United spent months in negotiations with the union that represented its flight attendants, AFA, in an effort to reach substantive agreement on the integration of seniority lists. When that attempt collapsed, considerable effort was expended in designing an elaborate procedural agreement to resolve the dispute. This was accomplished in direct negotiations, which also dealt with the wages, hours, and working conditions that would be part of the new long-haul routes being acquired by United. The ultimate agreement, which required membership ratification, provided for two-step arbitration between the flight attendant groups, wholly funded by United (including the cost of counsel for the employee groups), and committed United absolutely to accepting the result. The matter was arbitrated under a standard which the neutral found indistinguishable from the LPP standard. In September 1987, approximately a year and a half after

45. Pacific Division Transfer, Order 85–11–67 (1985).

46. United declined to involve the Pan Am unions in this process, prompting a challenge to the DOT's determination not to impose LPPs by the independent Pan Am flight attendants' union. The Ninth Circuit rejected this appeal. IUFA v. DOT, *supra*.

03/29/2001 02:42 8564246498 DAVID SINGER PAGE 05

the effective date of the transaction, an award was issued by which the flight attendants' lists were integrated.

Midway's acquisition in bankruptcy proceedings of many of the assets of Air Florida presented different problems. In that situation, Midway determined, shortly after reactivating some of Air Florida's operations, that it wanted its pilot groups to be integrated. The groups were represented by different unions, however: by an independent union at Air Florida and by ALPA (which had just been certified) at Midway. The carrier's desires were made clear to both pilot groups through a carefully orchestrated series of actions designed to keep each group uncertain about the carrier's intent in the event they did not reach the desired result. Nevertheless, the pilots were able through intensive direct negotiations, the costs of which were borne by the carrier, to integrate their lists and to designate ALPA as the representative of the combined group.[47]

Texas Air, of course, was unencumbered by significant union constraints. It therefore determined upon its acquisition of Eastern that its New York Air employee groups would be folded into its Continental structure.[48] An arbitral process was imposed by the carrier, which entailed truncated proceedings between the employee groups, including legal counsel for each group paid by the carrier. Many Continental pilots objected strongly to the result. In response, when Texas Air later folded the People Express pilot group into the Continental group, the carrier declined to afford the People Express pilots a comparable arbitration procedure, but instead simply assigned positions to the People Express pilots by status. Senior status was assigned to the Continental and New York Air pilots, People Express captains were placed at the bottom of the captain ranks, and so on.

When Continental acquired the assets of Frontier Airlines, the Frontier employees had slightly more leverage by reason of their substantial bankruptcy claims. In exchange for the waiver of these claims, the Frontier employee groups were able to negotiate with Continental a relatively neutral seniority integration process, again at the expense of the carrier, between themselves and their counterparts at Continental. In the case of the pilots, the arbitration award that emerged from this process gave rise to considerable dissatisfaction among the former Frontier pilots. This outcome resulted, at least in part, from restrictions on the arbitrator by the agreement authorizing the arbitration; those restrictions had been insisted on by Continental in order to protect pilots who had flown during the Continental pilot strike, which had commenced in September 1983. The integrations affecting the former Frontier flight attendants and ground employees were conducted under less restrictive provisions; each of those groups was, accordingly, able to reach a settlement more favorable than the arbitration award issued in the pilots' case. Meanwhile, at least pending the outcome of "single-carrier" issues before the NMB, or the imposition of LPPs by the DOT on remand from the court of appeals, the Eastern pilots remain on the outside and have no available mechanism to compel an integration with the Continental pilots.

A final approach is best exemplified by the TWA-Ozark merger. In that case, as will be discussed in considerably more detail below, the carrier openly favored its own pilots. After a series of unprecedented actions, including the assignment of all of Ozark's MD-80s (its premium aircraft) to TWA crews, the furlough of approximately eighty Ozark pilots, and threats of more dire actions to come, a solution was "negotiated" between the two pilot groups.[49] ALPA,

47. For whatever reason, to date Midway has not seen any reason to do the same with its flight attendants' units, which remained separate until very recently. The Miami-based former Air Florida group was represented by AFA, which displaced an independent union in 1987. Before the election at Air Florida, AFA had narrowly lost an election among the separate unit of the Chicago-based Midway flight attendants. In June 1987, AFA sought a second election and ultimately was certified in November 1987. Before that certification, however, on September 1, 1987, AFA lost its representational rights in the Southern operation, because as of that date the two operations were formally combined. During the period when no group was represented, the carrier unilaterally combined the groups' seniority lists, based upon length of service with Midway or its affiliated operations.

48. The irony is obvious to anyone who participated in the battles waged over New York Air's separate nonunion status. *See* ALPA v. Texas Int'l Airlines, 656 F.2d 16 (2d Cir. 1981); ALPA v. Texas Int'l Airlines, 567 F. Supp. 66 (S.D. Tex. 1983).

49. The issues for flight attendants at TWA are enormously complicated by the unsuccessful strike by the TWA flight attendants' union in 1987 and the aftermath of litigation. Suffice it to say, there is ample evidence that the seniority issues between the Ozark flight attendants, formerly represented by AFA, and the various TWA flight attendants' groups are being used effectively by the carrier for its own purposes.

3- 9-98 ;12:13PM;Nestle Hotel Library ;8072541280 # 11/ 13

03/29/2001 02:42 8564246480 DAVID SINGER PAGE 10

faced with an explicit threat by the TWA pilots that they would leave ALPA if efforts were made to enforce the arbitration provisions of ALPA Merger Policy, found itself unable to do more than exercise moral suasion on the TWA group to act responsibly, to little or no avail. Needless to say, litigation commenced.[50]

### Incentives for Carriers

As noted above, seniority integration is an issue on which the merged carrier should have little or no legitimate interest beyond questions of training costs and the like. Accordingly, if the carrier is bound to a mandatory process for seniority integration, its involvement in the process is likely to be minimal. If the merged carrier is free not to agree to a process for seniority integration, however, the carrier is able to side with one or the other premerger employee groups by granting or withholding its consent to a particular process or outcome and to play employee groups against one another in order to secure economic or other concessions from the unfavored employees. The incentives to engage in such conduct are particularly strong in the present intense competitive atmosphere in the industry.[51]

### Incentives for Employee Groups

Criticism of the current approach to seniority integration cannot be confined only to the conduct of employers. Internal union policies such as ALPA Merger Policy theoretically remain binding on employee groups regardless of the presence or absence of sections 3 and 13. In the absence of an ultimately enforceable process, however, politically powerful employee groups are presented with an opportunity to work their will on weaker groups in the seniority integration process. Even when the two groups share the same collective bargaining representative, the political pressures on the representative are such that it may have little choice but to accede to the wishes of the stronger group.[52]

50. Hammond v. ALPA, No. 87-2792 (N.D. Ill.).

51. *See Winners in the Air Wars*, Fortune, May 11, 1987, at 68–79; P. Cappelli, *Competitive Pressures and Labor Relations in the Airline Industry*, 24 Indus. Rel. 316 (1985).

52. In theory, the duty of fair representation bars a union from discriminating between employee groups on the basis of political power. *See, e.g.*, Branch 6000, Nat'l Ass'n of Letter Carriers v. NLRB, 595 F.2d 808, 812, & n.15 (D.C. Cir. 1979); Barton Brands v. NLRB, 529 F.2d 793, 798–99 (7th Cir. 1976); Truck Drivers & Helpers Local Union 568 v. NLRB, 379 F.2d 137, 142–43 (D.C. Cir. 1967); Ferro v. Railway Express Agency, 296 F.2d 847, 851 (2d Cir. 1961). It is plain, however, that in the real world, political pressures regarding an issue as central as airline seniority integration might overwhelm the will of a union to adhere to its policies.

Again, the TWA-Ozark merger may be seen as the paradigmatic case. When TWA was acquired by Carl Icahn in early 1987, the TWA pilots obtained an agreement with the company[53] that provided, among other things, that in the event of a subsequent merger the pilot seniority lists of TWA and the acquired carrier could be integrated only with the consent of "ALPA."[54] The TWA pilots' master executive council (MEC) interpreted that agreement as giving it veto power over any seniority integration in the TWA-Ozark merger and made clear that it would consent to such an integration only if the terms were substantially favorable to the TWA pilots and detrimental to the Ozark pilots. The MEC indicated its intention, in the event its demands were not met, to withdraw the TWA pilots from membership in ALPA.[55] ALPA, despite its ultimate agreement with the Ozark pilots that ALPA Merger Policy was binding in the TWA-Ozark merger[56]—an agreement extracted months after the integration process should have begun and with intense political infighting—had little political alternative but to accommodate the demands of the TWA pilots. The outcome was an "agreement" between the two pilot groups, in reality reached outside the confines of ALPA Merger Policy, substantially favorable to the TWA pilots and adverse to the Ozark pilots, entered into by the Ozark pilots under substantial political and economic pressure.[57]

53. The "wraparound agreement" is discussed in greater detail below, in connection with the inadequacy of collective bargaining.

54. Letter of Understanding among ALPA, TWA, and Carl Icahn, Jan. 3, 1986 (cited herein as the "wraparound agreement"), § 10 (available from the authors).

55. *See, e.g.*, St. Louis Post-Dispatch, Dec. 5, 1986.

56. Resolution of the ALPA Executive Committee, Nov. 19, 1986 (available from the authors); Letter from Henry A. Duffy, President of ALPA, to Captain M.G. Burkhart, Oct. 14, 1986 (available from the authors).

57. Letter of Agreement between TWA and the Air Line Pilots in the

3- 8-88; 12:13PM; Nestle Hotel Library ;6072841286 # 12/ 13

## The Inadequacy of Collective Bargaining

In the view of the DOT, these seniority integration problems can be resolved adequately through the traditional processes of collective bargaining. Traditional collective bargaining is a bilateral process, in which a single employer and a single collective bargaining representative negotiate agreements. By contrast, seniority integration in any craft or class, even in the paradigmatic two-carrier merger, involves as many as four parties—the two employee groups and the two carriers. Moreover, these parties cannot even be identified before the merger, when merger protections and seniority integration procedures are ideally negotiated.[58] Merger protections and LPPs negotiated before a merger by the separate employee groups may thus result in different levels of contractual protection for the two groups[59] and may prove difficult to enforce against a merged carrier, which is necessarily bound by the contracts of its premerger corporations.

The extreme case, once again, is TWA-Ozark. The wraparound agreement was not a collective bargaining agreement; on the contrary, it was negotiated with a third party—Carl Icahn—who was seeking to acquire control of the carrier during the takeover battle with Texas Air. Unfortunately for the Ozark pilots, who at the time of the acquisition were seeking to negotiate LPPs, the TWA-Ozark merger agreement prohibited Ozark from modifying its position in any subsequent collective bargaining negotiations.[60] In short, following the merger, the TWA and Ozark pilots were subject to radically different degrees of merger protection solely because the Ozark pilots did not have the good fortune to find themselves in the midst of a corporate raid and had the bad fortune not to have secured contractual LPPs before the merger. Thus the fortuities of timing play a critical role in employees' abilities to negotiate fair and equitable procedures for seniority integration.

Even when employee groups have successfully negotiated full *Allegheny-Mohawk* LPPs with their employers, however, as Wilder and Lurye discuss fully in the next chapter, prevailing labor law successorship doctrine makes their enforcement problematical.

## Need for a Mandatory Process

The public interest is ill served by the existing DOT doctrine, which leaves the affected parties to resolve for themselves the nettlesome seniority integration issues that arise in all airline mergers. The passions engendered by these issues, the incentives the current doctrine gives parties to take unfair advantage of their political and economic leverage, and the inadequacy of the system of collective bargaining for resolving these issues all support the conclusion that sections 3 and 13 of the standard LPPs should be made statutory in every merger or similar transaction. Sections 3 and 13 serve legitimate ends: the need for an orderly, expeditious, and impartial system to protect the seniority rights of employees and the legitimate desire of a merged carrier to avoid unnecessary training or other costs resulting from the integration of the premerger work forces. Sections 3 and 13 provide these protections at surprisingly little cost to employees or carriers. These time-honored procedures, which served the industry well for nearly four decades, are perhaps the only available mechanisms by which to carry out the indisputable, basic public policies supporting fair wages, equitable working conditions, and stable labor relations.

---

Service of Trans World Airlines, Inc., as Represented by ALPA, Feb. 20, 1987 (available from the authors).

58. Negotiating such protections and procedures after a merger has occurred or been announced is obviously inadequate. At that juncture, the merged carrier has little immediate incentive to negotiate a fair and equitable seniority integration, in that, as discussed above, it then has an incentive to side with one or the other employee group and to play the two groups against each other.

59. To say that the respective groups simply have to live with the consequences of the agreements they chose to negotiate does not take into account that, at the time each group negotiated its protection, it had no way of predicting the merger partner its employer would select. At any rate, such a cliché will hardly prevent resentment on the part of the adversely affected group, which must work closely with other employees who have superior terms and conditions of employment.

60. TWA-Ozark Agreement and Plan of Merger, at 20 (available from the authors).

# Exhibit Y

EXHIBIT
D016

#16

TWA COUNCIL 3
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
P.O. BOX 10277 □ ST. LOUIS, MISSOURI 63145-0277 □ 314-426-1789

April 3, 2001

Fellow Council 3 Pilots:

Yesterday, the MEC took action that will define the circumstances and the contractual provisions under which the TWA pilots will be transitioned into TWA-LLC. As you may know, American's proposed asset purchase of TWA's assets and its employment of TWA employees is contingent upon the renegotiation of scope, successorship, and benefits provisions of our Collective Bargaining Agreement (CBA). The asset purchase agreement required that those provisions not be applicable to or assumed by American. In addition, the transaction was conditioned on our acceptance of American's work rules.

The Negotiating Committee, under the guidance of the MEC, has been negotiating with the company over the last several weeks to resolve these issues and to seek contract language that would provide an acceptable alternative to our existing CBA. The condition that the scope provision of our contract be waived has been of utmost concern to the MEC since it is that language that provides for Allegheny-Mohawk Labor Protective Provisions (LPPs) that require a process to a fair and equitable seniority integration with the Allied Pilots Association (APA).

The provision for Sections 3 and 13 of the Allegheny–Mohawk LPPs in our contract conflicts with the contract between American and the APA. Consequently, retention of those provisions would require an agreement between American and the APA to conduct the AA–TWA pilot seniority integration in accordance with those provisions. One fundamental aspect of the LPPs is the inclusion of binding arbitration. Unfortunately, even with our best efforts, American has been unable to offer retention of those requirements to the TWA pilots.

As a debtor-in-possession of a bankrupt entity, TWA management's fiduciary responsibility is now directed to the creditors of the company. Accordingly, to ensure that labor disagreements over the contractual issues do not jeopardize the transaction that the company has put forward, TWA filed an application for rejection of our CBA with the bankruptcy court. That application was made under §1113 of the bankruptcy code. The MEC has consulted extensively with a large group of professional advisors on the CBA negotiations, the merger negotiations, and the bankruptcy process. Those advisors include David Holtzman, our own contract administrator; Clay Warner, labor law specialist from ALPA International; Richard Seltzer, bankruptcy counsel from Cohen, Weiss and Simon; Bill Roberts, labor law specialist from ALPA International; Steven Tumblin, bankruptcy counsel from Lebouf Lamb; Roland Wilder, merger counsel; Michael Glanser, investment banker; Robert Christy from ALPA Economic and Financial Analysis; and former ALPA President Randy Babbitt.

The unanimous opinion of our advisors, including that of Richard Seltzer, the most experienced §1113 attorney available, was that the likelihood of ALPA's prevailing in an attempt to defeat TWA's CBA rejection application was virtually nil. In addition, our attorneys advised that the

bankruptcy code does not provide the court the authority to modify the contract. In effect, the contract would have to be rejected or retained in its entirety. This aspect of the situation created the high probability that the representational status of ALPA would also be affected by a §1113 action.

Because successorship provisions would also be lost in a §1113, there would be no contractual argument that CBA recognition of ALPA could be transferred from the current TWA to the new corporate entity. Representational status can be obtained either through National Mediation Board certification or through voluntary recognition by the carrier. In TWA ALPA's case, our representational status is in effect through voluntary recognition and has been so since at least 1946. On day one at the new TWA-LLC, we would have neither voluntary recognition (absent agreement as to the waiver) nor NMB certification. Consequently, the loss of the CBA would also require action on the part of ALPA and the pilots to reestablish recognition. Absent voluntary recognition by TWA-LLC, the process of NMB certification would take approximately two to four months.

We must acknowledge genuine concerns about the impact of a voluntary vs. court-imposed waiver of our scope language on our seniority integration negotiations. The concept that requiring the court to impose the rejection of our contract might preserve more future legal recourse has been widely discussed amongst the membership. The unequivocal opinion of all of our legal advisors is that future legal options provide zero basis for the selection of one course of action over the other. A view that a voluntary waiver might be perceived by the APA as a signal of our weakness has also been put forth. Unfortunately, the APA's conduct of negotiations to date gives every indication that they already expect the seniority integration negotiations to be conducted absent the provisions of our scope language. There is a significant amount of evidence to suggest that the seniority integration negotiations will be protracted and difficult. If so, unity and cohesiveness amongst the TWA pilots will be required to demonstrate that a fair and equitable agreement is in the long-term best interests of the APA and the American pilot group. We have plans in place to maximize our ability to achieve a fair and equitable agreement.

In the face of the stark reality that our scope language and other portions of our contract would have to be waived or we would face virtually certain loss of the entire contract and probable loss of ALPA recognition by TWA-LLC, the MEC voted to accept a negotiated settlement. That negotiated settlement provides for a contract covering the employment of TWA-LLC pilots and it provides for voluntary recognition of ALPA by TWA-LLC. It also includes job protections, pay and other valuable provisions. Unfortunately, we must acknowledge that the provisions negotiated to replace the Mohawk-Mohawk language of our CBA do not measure up to our desires. Some of the key provisions of the agreement are summarized below:

- **Pay** – Transition of TWA-LLC pilots to AA pay rates will occur no later than January 1, 2002. In the intervening period, rates of pay and changes called for in our existing CBA will continue in effect, including the 9-1-01 pay increase.
- **DAP Contributions** – At closing, over $12M plus interest in back due DAP contributions will be paid. Subsequently 14.31 percent of pilot monthly compensation will be contributed to the American Airlines 401(k) $uper $aver plan.
- **Job Protection** – AA will use its reasonable best efforts to assist TWA-LLC to successfully maintain TWA-LLC airline operations and pilot employment opportunities during the transition

period. If, however, on the date of integration of AA and TWA-LLC operations, there are TWA-LLC pilots on furlough, they will not lose employment opportunities at AA by virtue of their furlough status at TWA-LLC. Such employment will be consistent with the AA CBA and the final TWA-LLC/AA Seniority Integration Agreement.

- **Benefits** – TWA-LLC can implement changes to benefit plans and benefits during either the initial 15 days of operation of the LLC or subsequently with 21 days' notice. Such changes must either mirror the benefits provided by current TWA plans or be no less favorable than those applicable to similarly situated AA employees.
- **Work Rules** – TWA-LLC can implement changes to work rules with 21 days' notice. Such changes will transition the work rules to those in effect at AA. Until AA wage rates become effective, TWA-LLC cannot modify the provisions of CBA paragraph 9(F) in a manner that reduces the opportunity for Additional Flying (TAS, VFL).
- **Seniority Integration** – AA will use its reasonable best efforts with the APA to secure a fair and equitable process for the integration of seniority. AA will engage a facilitator to organize meetings with the APA and ALPA. AA will adopt the procedures that result from the process.
- **Grievance Procedures** – TWA-LLC will implement procedures that mirror the procedures used currently at TWA. Those procedures will evolve to procedures like those contained in the AA-APA CBA.
- **Contract Language** – Contract language will be provided on the TWA crew website within 60 days of the closing. Changes to benefits and work rules as they are transitioned to those in effect at AA will be posted to the website within 20 days of the change.

Obviously, the transition to TWA-LLC and ultimately to American is going to involve substantial changes. Work rules and benefits at American are different to a significant degree, and they are not in all cases superior to those in effect at TWA. TWA pilots have had to adapt through many years of challenging circumstances. We will continue to adapt as we make this transition to American Airlines. Your ALPA leadership will now focus even more of our combined resources and energy into achieving a fair and equitable seniority integration. We will continue to promote and protect the interests of the TWA pilots as well as enforce the provisions of our new CBA. Our success in these efforts will necessarily rely on the unity and resolve of the TWA pilot group.

Steven Rautenberg
Council 3 Chairman
Captain Representative

Sally Young
Council 3 Vice Chairman
First Officer Representative

P02269
D-016
Page 3 of 3

# Exhibit Z

alpa

# STL COUNCIL 003

## INFORMATION UPDATE

## BRIEFING #: 2001-09,

May 8, 2001

EXHIBIT
D025

**HELLO, THIS IS RON TAMACCIO, COUNCIL 003 COMMUNICATIONS CHAIRMAN WITH AN ALPA INFORMATION UPDATE.**

**TODAY IS TUESDAY, MAY 08, 2001.**

**IT'S 15:04 HOURS IN ST. LOUIS.**

**THERE ARE TEN ITEMS IN THIS BRIEFING.**

### 1. AS ALWAYS, SAFETY FIRST!

In our last Update, we cited a few examples of how some of our captains declare themselves experts in airworthiness requirements by not entering malfunctioning components or known deficiencies in the aircraft's logbook.

AS a follow on, we'd like to remind you that whenever you encounter any non-normal situation; be prudent and use all the resources available to you.

Don't proclaim yourself the on-site "expert," and start making decisions before you've had a chance to consult with the real experts.

Worse yet, don't ignore a bad situation hoping it will just go away.

The former is foolish, and the latter is just plain stupid!

Unfortunately, last week we had another in-flight engine failure.

The crew landed without incident, but, once again, failed to call anyone from ALPA's Safety Department.

We found out about it the next day.

Please remember, anytime you declare a flight segment *"non-routine"* per Chapter 6, Section VII, P., s., of the FOP; whatever happened to cause you to make that declaration is probably something ALPA needs to know about.

In some respects, our simulator training for these kinds of abnormal procedures sets us up for not following through with the necessary notifications.

In the sim, once we touch down, the event ends and we go on to the next one.

However, in the real world, when we experience one of these kinds of situations, the crew is put on Chief Pilot Hold (CHP) and the 21(A) inquiries begin immediately thereafter.

The first things you do or say are the very things that will have the greatest impact on the eventual outcome.

Don't start talking or writing until you talk to us!

Call 1-800-USE-ALPA.

## 2. INTEGRATION UPDATE.

Things aren't going well in our discussions with APA about how to integrate the TWA pilots into the American Airlines' Pilot Seniority List.

To date, both proposals from APA included a methodology whereby the most senior TWA pilot ends up somewhere below the middle of the current AA list, and more than half of the rest of the TWA group is stapled to the bottom.

Unlike Mr. Carty, the rest of AA's top managers, and many airline industry analysts, the APA's leadership still refuses to attribute any value to TWA's contributions to the transaction between the two airlines.

It's apparent to us that APA feels AA "saved" TWA from extinction, and absent that, we'd all be out of work.

So, from their perspective, we should be quite happy with APA's current offer.

Until their mindset changes, and APA's leadership recognizes how this transaction _enhances the career expectations of its members,_ it's unlikely their negotiating position will change.

Nevertheless, our team is preparing a very detailed counter-proposal; based on a concept that does reflect the substantial positive contribution the TWA assets bring to AA's system, the company's "bottom line," and the career expectations of all its pilots.

Also, there's another *sub-rosa* aspect to this whole negotiation.

Since the pilots from Continental recently voted to rejoin ALPA, APA is now the only large, stand-alone pilots union in the US.

Its leadership just agreed to pay a $49.5 million claim to AA management resulting from APA's illegal sick out in February 1999.

The former Reno Air pilots are suing them and there's a group of AA pilots in a shadow union on their property.

All things considered, perhaps APA's leadership feels they must appear "strong" to their members in order to maintain their independent status and their position as bargaining agent for the AA pilots. It's no secret that ALPA would like to have AA back in the Association. We'll keep you posted as events unfold.

Because of scheduling conflicts, the next meeting between the parties will not occur until sometime later this month.

## 3. STAFFING REPORT.

What follows is from Gary Tritt, Acting Chairman of the System Schedule Committee.

*The following information is for distribution to the pilot group.*

*First item concerns the future wide body displacement message.* ***_At this time there are no plans by_***

***the company to post another wide body displacement bid message.***

*The current staffing of the wide body fleet is such that there is minimal overstaffing through the fall, 2001.*

*Second item concerns the 717 fleet. The company has created an aggressive June schedule for the 717 fleet that has resulted in excessive penalty time creating a situation whereby the crews available were not sufficient to fly the schedule. In an effort to reduce the crew requirements for June the result was a decrease in actual flying hours and very few 1 and 2 day trips for the fleet.*

*Third item again concerns the 717 fleet. Expect a bid message within the next month effective probably in August for 717 vacancies. We are requesting that all pilots, especially the DC9 pilots review their standing bids. If the company is unable to fill the 717 vacancies and there is an overstaffing of the DC9 fleet (a real probability due to DC9 aircraft being retired), then we can probably expect a displacement message for the DC9.*

*Fourth item. The company is in the process of completing their semi-annual review of the financial plan and will adjust the financial plan as required.*

*It is unknown at this time the specifics, however, considering the changes that have occurred in ownership and fleet size we expect to see changes, to what extent, we don't know. It is imperative that all pilots continue to review their standing bids.*

*Last item. When pilots have questions concerning their schedule, they should first contact crew scheduling. If your answer is not satisfactorily answered then you next step should be to contact your domicile for resolution.*

*If your problem is not answered satisfactorily, or you feel that this could be a problem to other pilots, please notify your Scheduling Committee representative, a Grievance Committee representative or your elected LEC representatives.*

*These representatives are listed on the MEC website. And again, have a question, just ask, we'll try our best to get an answer for you.*

*Gary Tritt*

ALPA 000212

*SSC Chmn, Acting*

## 4. RETIREMENT PLAN OPTIONS.

Sometime last week, everyone should have gotten a letter confirming the amount of past-due company contributions, plus interest, made to your DAP account. The payments were made on April 19th.

These monies were the last contributions from any source, excluding rollovers, to the TWA DAP and 401(k) accounts.

All future TWA LLC retirement contributions and your personal 401(k) contributions will go to your new AA $uper $aver Account.

Also in the letter was important information about the future of the DAP and 401(k) Plan.

It appears that the DAP will continue, as is, with a new sponsor. However the 401(k) Plan will eventually be terminated.

Please pay close attention to the directions for requesting a distribution or rollover from either your DAP or 401(k) account.

Errors could have substantial tax consequences.

## 5. NEW MEC OFFICER.

The MEC elected Keith O'Leary to replace Scott Schwartz as its Vice Chairman.

Keith is a STL MD-8 Captain. He lives in STL.

## 6. MORE CHANGES ON THE MERGER COMMITTEE.

The MEC chose Captain D.J. Glasby to replace Captain Gary Flor on the Merger Committee.

Captain Flor left the committee for personal reasons.

The Merger Committee member are:

Captain Mike Day
Captain D. J. Glasby
Captain John Swanson
F/O John Hefley
F/O Sean Clark

## 7. ALPA PRESIDENT SPEAKS TO APA ABOUT TWA PILOTS.

What follows is an excerpt from ALPA's President, Captain Duane Woerth's comments to the TWA MEC and ALPA members present at a Special MEC meeting on April 23, 2001.

*Addressing the current issues facing TWA pilots specifically, Captain Woerth said that as an ex-Braniff pilot he was happy that TWA pilots had hung on to get to the point we are. The Association's focus now is on obtaining a fair seniority integration for the TWA pilots, he said.*

*Captain Woerth reported that earlier this month he traveled to Dallas with the intention of speaking to the Allied Pilots Association Board of Directors about the TWA pilots' seniority integration. Although the APA did not guarantee that Captain Woerth would be allowed to speak to the APA BOD, he went with the hope of receiving an official invitation. That morning, APA President John Darrah contacted Captain Woerth with that invitation. This would be only the second time since APA was formed that a sitting ALPA President had been able to officially address the APA BOD, according to Woerth.*

*During his discussion with the APA, Captain Woerth said that this transaction would mark the first time in the American pilots' careers that they would have to deal with integrating a large airline with a long history. He said this transaction is different than Reno or Air Cal and the APA must realize that and be fair in their negotiations.*

*He went on to tell the APA that the TWA MEC had recently made one of the hardest decisions he has ever seen any MEC make in reaching the transition agreement with TWA Airlines LLC. Captain Woerth said that the TWA MEC had made a realistic assessment of their situation and made the hard decision, and now the APA needs to get realistic and make a hard decision.*

*He told the APA that they have an even greater responsibility to be fair and realistic since they would not allow a third party to facilitate the negotiations. (NOTE: Subsequent to Captain Woerth's meeting with the APA, they agreed to the use of a facilitator if needed.)*

ALPA 000214

*Captain Woerth told the MEC then that he would send a letter to the TWA pilots and others to be sure they all know what his position is. Captain Woerth pledged the financial support of the entire Association for the TWA pilots. In light of losing the 9,000-hour flight pay loss bank previously negotiated with TWA, Inc., Captain Woerth assured the MEC and other members present that the TWA MEC will be provided the funds and other support necessary from ALPA to process MEC activities.*

*Capt. Woerth stated that they would look at the TWA MEC's financial needs quarter by quarter without micromanaging the MEC.*

*This is a unique situation - we are going to take care of business, he added.*

*Question and Answers (paraphrased and condensed):*

*Q: What is APA's status with regard to the AFL-CIO?*

*A: The APA has been trying to get into the AFL-CIO for a long time, and they have not been successful. They need to be true members of the labor movement if they want the political support and clout that goes along with a national union.*

*Q: What did you think of the APA's latest proposal?*

*A: I saw their first proposal, and when they said they had a better one I certainly thought it would be better than that. I found it highly unsatisfactory.*

*Q: Do we have your commitment to use the resources of ALPA, including litigation, to ensure TWA pilots are integrated fairly?*

*A: If we have any basis for litigation, we will do what is necessary, including litigation. We hold the bargaining rights-we don't need MCF for litigation.*

*Q: What is your assessment of the APA Board of Directors? How did they receive you?*

*A: When I was in front of them, it was a very controlled group. There are less than 20 members on the BOD, out of which maybe two are approaching 50 years old. Frankly, in that way they don't look all that different than any MEC. Their Vice President is an ex-Eastern pilot; however, since American growth has been mostly through internal expansion and*

*the APA has never been through a large merger like the rest of ALPA's MECs, they are struggling with how to do this.*

*Q: Are you of the opinion that an integration that is not fair to the TWA pilots will have long-range consequences for the industry and American Airlines going forward?*

*A: I think that's obvious. This transaction results in the largest airline with the largest pilot group. What the rest of the world's pilots will be counting on is for this combined group to have the unification and strength to do their job in negotiating their next contract. We need leading edge companies with leading edge contracts. The biggest airlines can raise the bar for everyone. If one big airline does not, then it negatively impacts the rest of the pilots in the industry.*

*The consequences of not doing the right thing are serious. The APA can use the addition of the TWA pilots to strengthen their position. If not, with a hostile political environment and an aggressive management, they might stay a notch below where they need to be. They need to be aware of the long-term consequences of what they do.*

*Q: Is there anything that you can do to assist the five pilots who have not been offered employment by American Airlines in the TWA LLC?*

*A: Bob Pastore and I will talk to Don Carty before any decision is made to be sure he understands all the issues involved.*

*Q: What influence do you think Don Carty has with the APA? Is there any assistance we can get from him?*

*A: We have an open dialogue with him. How effective he will be, I'm not certain. He has a hard time reaching a deal with his own pilots. If he doesn't want to look like the dumbest CEO in the industry he's got to do this right.*

*Q: Why did ALPA not choose to sponsor the pilots' DAP?*

*A: If we agree to sponsor one, we would have to be prepared to take on more. We simply don't have the resources to take on that kind of liability.*

*Q: What's the status of the fine levied against the APA as a result of their sickout in 1998?*

*A: I don't think Don Carty is going to make them write a check for something when they don't have*

*it. I don't know what he will tell the judge.*

*The members applauded Capt. Woerth at the conclusion of his remarks.*

## 8. AA EXECS MEET WITH TWA LINE PILOTS IN STL.

Captain Rick Crocker provided this summary of the "Meet & Greet" session with AA managers in STL on May 3d.

*The representative in attendance for AA were:*

*Capt. Bob Kudwa: VP Flight Operations*

*Jeff Brundage: VP employee relations*

*Capt. Eric Lewis: Managing Director (I believe of Flt Ops)*

*Capt Kudwa opened up the session with a few comments:*

*The TWA/AA combination places AA ahead of UAL strategically and puts UAL in a position of trying to find a way to counter what AA has done.*

*TWA runs an outstanding airline.*

*He wants everybody's motto for this merger to be "treat everybody like you want to be treated."*

*They do most of their company communication over their website.*

*They have access to Sabre from the website (you will no longer have to maintain a CompuServe account).*

*There were a few more comments but they are the same things we have already heard a 100 times. The rest of the statements were from the question and answer portion.*

*Someone asked about the potential loss of 60 A/C. He said they plan to move A/C out of LLC only to match the retirements of LLC pilots. Most of the A/C transfers would happen to A/C whose leases run out.*

*The future of the B717 depends on Boeing. They were offered a deal to replace every F100 with a B717. The returned F100's would not be used in the states. The deal got a little cloudy when they were going to have to include the extra F100's coming from USAir.*

ALPA 000217

*The drop dead last possible date to be LLC is 12/31/04, but the LLC could disappear sooner.*

*Part of the delay in figuring out fleet plans and training issues was that they couldn't look at everything until the bankruptcy judgment was final (antitrust laws prohibited it).*

*If at any point there is an excess of pilots in the LLC they will be able to move across the fence (instead of being furloughed) based on whatever is agreed upon for our seniority integration.*

*The first noticeable change to our A/C is going to be the seats -- were going back to comfort class.*

*There will not be disposal of TWA a/c. They do not plan to replace 180 a/c unlike the Reno acquisition were they are replacing all of the a/c.*

*His comment on seniority integration is that it's "like everyone showing up to the dance with two dates but you are still worried about losing your girlfriend."*

*AA will not accept a proposal from APA that creates large costs.*

*Management is neutral on the position of seniority integration.*

*They would like an integration process sooner rather than later.*

*NO ONE WILL BE DISPLACED. He said that they do not have a displacement program and that as long as no one bids out of their seat they should not be forced out.*

*On their upgrade or out policy he said it is not their intention to eliminate people, in fact he thought we had a stricter policy.*

*When do we train to AA procedures? It will be slow integration followed by some sort of FAA requirement. They have no idea at this time what is exactly going to be required.*

*Are we a pawn in the upcoming Section 6 negotiations? We don't plan to use LLC as a pawn either way in negotiations.*

*They want the integration done quickly. "This has got to be done right from the people side, people issues are very important."*

*Any plans to change our domiciles? No changes currently, they plan to keep things status quo at the co-located domiciles.*

*They do NOT want another integration like Reno. They were not happy with the way the labor portion of the Reno integration worked out.*

*They thought the Air Cal integration went smoothly and like the easy way that integration of work forces took place.*

*Based on current staffing if we went to AA work rules there would be a significant shortage of LLC pilots.*

*We will be on AA pay and benefits NO LATER than 1/1/02.*

*Pref bid will be dead 12/31/01.*

*The type of flights using STL will be focused on connecting traffic so they can utilize ORD for more O&D traffic. They do not see an immediate increase in our international flying out of STL, they are still trying to get landing slots in NRT for the route authorities they have so don't look for a STL-NRT route anytime soon.*

*LLC new hires will be hired by A/A and then allotted to LLC, as LLC needs new pilots. They are currently looking into the status of the pilots in our pilot pool.*

*When will we get new uniforms? They have not set a date yet but would like it sooner rather than later.*

*They are currently working on who is going to be our feeder in STL.*

*When will we be eligible for profit sharing? LLC pilots will not be eligible for a profit sharing check for the year 2001 but should be eligible after that.*

*What is the status of the LLC5? They are currently still reviewing their legal issues and hope to have it resolved soon. It is now the LLC4 because one pilot has already been returned to the list.*

*These above comments are only my perception from my notes of the meeting.*

*Hope this helps those that want more info.*

*Rick*

## 9. A MESSAGE FROM OUR COUNCIL'S NEW SECRETARY/TREASURER

*Fellow Council 3 Pilots*

*I have just recently been able to obtain the email addresses of those pilots in Council 3, that have them on file with TWA ALPA. This was not an easy task with all the red tape involved.*

*As I have committed to a better line of communication with you, I will begin to give you EMAIL updates as to our progress with APA in the coming days, weeks and months.*

*You can also store my email address; so in the event you have any questions, feel free to email me. I will do my best to respond appropriately to those questions. In that, I will say that there may be times that I will not be able to be specific about sensitive issues that have to do with Strategic Planning Issues with the APA*

*This will be in your best interest in the long term. You may ask why? The answer is simple and to the point. Information that is often in the planning stage is not complete nor is it appropriate to communicate it if it may jeopardize the plan before it even gets started.*

*Often EMAILS and general postings have found themselves in the hands of the APA and being counteracted to our Merger Committee, at their surprise. This is a tremendous problem that hurts the TWA pilots and your MEC's fight to seek a fair and equitable integration of the seniority list.*

*It is incumbent upon each one of us to understand this process. I ask that each of you take it upon yourself to limit your Internet and ALPA Board communication of items that may not already be released by ALPA.*

*I will also state, if ever in the future I feel that this process has a flaw or seems to be going down the wrong path, I will immediately communicate this to ALL C3 Pilots.*

*Those that represent you in ALPA are to be held accountable for their actions, this includes me. If you ever doubt their actions or their intent, it is perfectly within your right, to question their motives and their actions or lack thereof.*

*I am still committed to seeking (DOH) or it's equivalent for the TWA pilot's.*

*I will be putting a briefing together in the next 24 hours to bring as*

*much of you up to date as possible.*

*Again, please feel free to email me at anytime.*
*Fraternally,*
*Jim Arthur*
*C3 Secretary/Treasurer*
*STL MD80 Captain*
TWAC3JIMARTHUR@CS.COM

## 10. A SPECIAL FRIEND APPROACHES RETIREMENT.

Our Chief Pilot will retire on May 24th. Captain Magnuson has served us well during his tenure as our "boss."

He's an outstanding example of the true spirit of enlightened, customer-oriented management.

Lee's unique style and genuinely caring approach to his responsibilities has, on more than one occasion, resulted in preserving a fledgling pilot's flying career that was in serious jeopardy.

His successor will have a difficult time following such a fine manager.

Before he retires, please try to stop by or send him a note to wish him well.

**THAT'S ALL FOR NOW. LOOK FOR OUR NEXT UPDATE SOMETIME LATER THIS MONTH.**

**THANKS FOR CALLING WATSON.**

**GOOD BYE.**

**The preceding information is a verbatim transcript of a TWA ALPA Council 003 Code-A-Phone message. The messages are updated frequently. Each message is prepared by Captain Ron Tamaccio and is sequentially numbered to provide continuity. The recording is available around-the-clock by calling WATSON at 314-426-1011.**

**ALPA maintains an office in the STL airport terminal. It's located in room MTS-2267, on the lower level in the corridor behind the rental car counters between exits MT-14 and MT-15.**

**The office is open weekdays from 0800 to 1600. The telephone number is (314)-426-1789. The FAX number is (314)-426-7295.**

**The mailing address is:**
**Air Line Pilots Association,**
**P.O. Box 10277,**
**SAINT LOUIS, MISSOURI 63145**

ALPA 000221

## HERE ARE SOME IMPORTANT TELEPHONE NUMBERS.

YOUR Captain Rep:
Steve Rautenberg,
(636) 561-4884

YOUR F/O Rep:
Sally Young,
(636) 561-1621

YOUR Secretary/Treasurer:
Jim Arthur
(314) 422-9518

MEC Safety Reporting Voice-Mail System:
(800) USE ALPA
(314) 770-8556

ALPA Worldwide Safety & Accident Investigation Hotline:
(202) 797-4180
CALL COLLECT!

MEC Code-a-Phone:
(800) 253-7919
MEC Office:
(314) 770-8500
MEC FAX:
(314) 770-8510/8597
MEC Benefits Specialist
Mary Ulett (314) 770-8500
DAP Office:
(314) 739-7373
DAP NAV Update:
http://resources.hewitt.com/4twadap.
DAP Information:
(877) 4TWADAP
CCS Hotline:
(800) 388-7665
TWA Info Line:
(800) TWA-1976
Council 002 CDP:
(800) 253-7928
Council 004 CDP:
LAX & SFO: (800) 887-1821
TWA Flight Information:
(800) 893-5436
TWA Non-Rev VRU System:
(800) 449-3833

American Airlines Info Line:
(800) 222-2789

STL Chief Pilot:
Captain Lee Magnuson,
Office: (314) 429-9452
Beeper: (800) 673-5288
Weekly Recorded Update:
(800) 892-5723
Box 78527#

STL Asst Chief Pilot:
Captain Roger Mason,
Office: (314) 429-9453
Beeper: (800) 573-5244

Domicile Week End Duty Mgr:
Beeper: see FIP/106

ALPA 000222

# EXHIBIT AA



TWA COUNCIL 002
AIR LINE PILOTS ASSOCIATION INTERNATIONAL
P.O. BOX 406 □ HERNDON, VIRGINIA 20170 □ 703-689-4294

April 10, 2001

Fellow Council 2 Pilots,

On April 2, 2001, the TWA MEC chose a course of action that will steer us through one more phase of our sometimes arduous journey. That choice was somewhat necessitated by a specific clause in the American Airlines asset purchase agreement. As the agreement states:

> **"ARTICLE X - EMPLOYEE MATTERS - Union matters . . . TWA shall amend all existing Collective Bargaining Agreements relating to any present or former employee of TWA to provide that (i) scope, successorship, and benefits provisions of the Collective Bargaining Agreement are not applicable to or being assumed by Purchaser. . . ."**

The Negotiating Committee diligently worked through the process of melding our existing contract into language facilitating the final implementation of the transaction. With the exception of Scope and Recognition, several minor and a few major changes in your contract were negotiated to a successful conclusion. While the resulting product is not everything that we desired, still and all it may be considered acceptable.

The MEC has recognized since the first iteration of the initial offer that the requirement to amend or waive our Scope protections would turn out to be the most critical and difficult issue to deal with successfully. The primary source of concern was Section 1 (D), Labor Protective Provisions of our contract. The section calls for seniority list integration to be governed by Sections 3 and 13 of the Allegheny Mohawk Labor Protective Provisions, in the event of an ALPA/non-ALPA merger or successorship transaction. The guiding principle embodied by these labor protective provisions is binding arbitration in the event of a failure to mutually resolve an integrated seniority list. The APA's Scope and Recognition section treats the LPPs somewhat differently. Their language provides Allegheny Mohawk protections for their pilots in the event American is acquired (not the successor company) in a transaction and states that they do not apply if American is the acquirer (successor company) in a transaction. Because of this conflict, retention of these provisions for TWA pilots requires an agreement between American and the APA. Unfortunately, AMR failed to reach an agreement with the APA to resolve this issue.

TWA management's role during this time has been focused upon consummating the transaction. In order to ensure a timely conclusion of the transaction, TWA filed a motion under Section 1113 of the bankruptcy code to reject our Collective Bargaining

Hollander Ex
35

P02270
D-035

Agreement. If successful, the hearing and judge's ruling would effectively eliminate the Scope problem. Any one who attended the previous bankruptcy proceedings is aware of Judge Walsh's predisposition to press forward with this transaction. After consultation with many professional advisors (see attached list), it was their unanimous opinion that TWA would very likely prevail in its quest before the bankruptcy judge.

The only disagreement among the advisors came from Roland Wilder, our independent merger counsel. The dissenting opinion was singularly focused over the legal strategy, court filings, and course of action leading up to the 1113 deadline.

Another difficult issue raised by the 1113 filing was basic union representation. Who would represent the TWA LLC pilots if TWA succeeded with its 1113 motion? There are two tracks under legal guidelines for labor unions to be recognized. One is voluntary recognition by both employer and employees, the second is certification by the National Mediation Board (NMB). All the ALPA legal advisors argued that, because Section 1 of our contract included TWA Inc.'s voluntary recognition of ALPA as the collective bargaining agent of the TWA pilots since 1946, we would be without union representation at TWA LLC in the event TWA was successful at the 1113 hearing. TWA LLC's willingness to voluntarily recognize ALPA was conditioned upon the Scope waiver. Absent voluntary recognition, the NMB certification process would most likely take 60 to 180 days (as speculated by some ofour advisors).

Given this one scenario, only TWA LLC's voluntary recognition or NMB certification would allow ALPA to remain as our collective bargaining agent.

Addressing the legitimate concerns over the effect of a voluntary versus court-imposed loss of Scope is certainly difficult. While one course of action may enhance and another may diminish our strength in the political, public, or legal arena, in the end the "unequivocal opinion" of our ALPA legal advisors was that maintaining prospective options in those venues provided little or no basis for selecting a specific course of action today.

With the 1113 event looming near and with the full confidence of our ALPA Legal staff, the MEC voted to accept a negotiated settlement, voluntarily waiving our Scope provisions. It was a difficult decision and it was not a unanimous vote. Another letter will follow highlighting some of the dissenting opinion issues.

Entering into the TWA LLC with a known quantity and a contract does provide comfort level. A promise of American pay rates no later than January 1, 2002, while not perfect, is somewhat of a comfort as well. Unfortunately, the provisions negotiated to replace the Allegheny-Mohawk language in our contract fall short of our wishes.

Here is the short list of what we have:

**Pay**—Transition of TWA-LLC pilots to AA pay rates will occur no later than January 1, 2002. In the intervening period, rates of pay and changes called for in our existing CBA will continue in effect, including the 9-1-01 pay increase.

**DAP Contributions**—At closing, over $12M plus interest in back due DAP contributions will be paid. Subsequently 14.31% of pilot monthly compensation will be contributed to the American Airlines 401(K) $uper $aver plan.

**Job Protection**—AA will use its reasonable best efforts to assist TWA-LLC to successfully maintain TWA-LLC airline operations and pilot employment opportunities during the transition period. If, however, on the date of integration of AA and TWA-LLC operations there are TWA-LLC pilots on furlough, they will not lose employment opportunities at AA by virtue of their furlough status at TWA-LLC. Such employment will be consistent with the AA CBA and the final TWA-LLC/AA Seniority Integration Agreement.

**Benefits**—TWA-LLC can implement changes to benefit plans and benefits during either the initial 15 days of operation of the LLC or subsequently with 21 days of notice. Such changes must either mirror the benefits provided by current TWA plans or be no less favorable than those applicable to similarly situated AA employees.

**Work Rules**—TWA-LLC can implement changes to work rules with 21 days of notice. Such changes will transition the work rules to those in effect at AA. Until AA wage rates become effective, TWA-LLC cannot modify the provisions of CBA paragraph 9(F) in a manner that reduces the opportunity for Additional Flying (TAS, VFL).

**Seniority Integration**—AA will use its reasonable best efforts with the APA to secure a fair and equitable process for the integration of seniority. AA will engage a facilitator to organize meetings with the APA and ALPA. AA will adopt the procedures that result from the process. **(However APA has so far absolutely refused the facilitator idea or process.)**

**Grievance Procedures**—TWA-LLC will implement procedures which mirror the procedures used currently at TWA. Those procedures will evolve to procedures like those contained in the AA-APA CBA.

**Contract Language** - Contract language will be provided on the TWA crew website within 60 days of the closing. Changes to benefits and work rules as they are transitioned to those in effect at AA will be posted to the website within 20 days of the change.

The transition to TWA LLC and ultimately to American is going to involve substantial changes. The contractual changes agreed to with TWA LLC should provide a stepping-off point into the final transition to American Airlines. The work rules and benefits provided by American for their employees are significantly different than ours, and the ones contained in the TWA LLC. They are not in every case superior to what we currently enjoy. However, as Mr. Carty has already pointed out, they do have a rather generous pay and benefit package over there.

The TWA MEC will now focus every ounce of energy on providing the Merger Committee with the necessary tools to achieve a fair integration of our seniority list. Our success will depend to a great extent on unity among the TWA pilots.

| Howard Hollander | David Singer | Ted Case |
| --- | --- | --- |
| Chairman, Council 2 | Vice Chairman, Council 2 | Secretary-Treasurer |
| Captain Representative | First Officer Representative | Council 2 |

**Advisor list:**

David Holtzman, TWA ALPA Contract Administrator
Richard Seltzer, Cohen, Weiss and Simon, ALPA
Bill Roberts, ALPA Legal
Clay Warner, ALPA Legal
Steven Tumblin, bankruptcy counsel from Lebouf Lamb
Roland Wilder, TWA pilots merger counsel, from Baptist and Wilder
Michael Glanser, Glanzer LLC, financial advisor
Robert Christy from ALPA Economic and Financial Analysis
Randy Babbitt, consultant and former president of ALPA

# EXHIBIT BB



EXHIBIT
D042

# BAPTISTE & WILDER, P.C.

## MEMORANDUM

**CONFIDENTIAL ATTORNEY/ CLIENT COMMUNICATION WORK PRODUCT PRIVILEGE**

**TO:** TWA Master Executive Council

**FROM:** Roland P. Wilder, Jr.

**DATE:** May 7, 2001

**RE:** Fair Representation Actions

Individual pilots have expressed interest in retaining counsel who would be asked to represent the TWA pilot groups in litigation against APA, AA and perhaps ALPA if ongoing seniority integration efforts are unsuccessful in obtaining a fair and equitable seniority list to become effective after the operational integration.

Pilot dissatisfaction with seniority integration often leads to fair representation litigation. The right to initiate such litigation is personal to affected pilots; thus the MEC cannot prevent pilots from filing and financing litigation of this type. I also recognize that the threat of such litigation is considered by many to provide leverage that could strengthen our position in merger negotiations with APA. Nonetheless, I believe that concerted pilot efforts to organize and finance fair representation actions are contrary to the pilot group's interests and should not be encouraged by MEC officials or Committee members.

Litigation against APA and/or AA is certain to fail if it is poorly conceived, inadequately financed, or initiated too soon. Also, efforts to prepare for such litigation could divert needed resources from the MEC and discourage ALPA from providing additional support. These considerations weigh heavily in favor of your maintaining control over the litigation initiative.

In cooperation with ALPA Legal, but independently if necessary, this firm will evaluate the availability of a litigation option and present it for your consideration. Please understand that any litigation contemplated against APA and AA will be novel and complex. Necessarily, then, our evaluation will remain a "work in progress" until the Merger Committee's seniority plan has been launched and the facilitated negotiations are underway. Since the TWA pilots have not yet suffered a

Hollander Ex
42

P03526

"legally cognizable injury," without which litigation is impossible, there is no harm in taking the time to investigate this matter properly.

I will be pleased to expand on these points, by telephone or in person, as long as appropriate confidentiality is preserved.

cc: Captain M. Day

**facsimile**
TRANSMITTAL

to: ALAN VICKERY
fax #: 212-446-2350
re:
date: 5/21/01
pages: 19, including this cover sheet.

ALAN:

REFERENCE OUR TELEPHONE CONVERSATION THIS DATE:

1st 11 PAGES ARE TWA/ALPA CBA (CHK SEC 10)

NEXT 8 PAGES ARE LPP'S

LAST 2 PAGES AA/TWA ASSET PURCHASE

WES KENNEDY ON LPP'S IS USEFUL.

VOL'S OF ADDITION DOCUMENTATION AVAILABLE

- Bud Bensel

From the desk of
BUD BENSEL

14 Larsen Park Drive
Medford NJ 08055

856-596-9463
Fax 856-985-5247

P03329

American Airlines

Jeff Brundage
Vice President
Employee Relations

October 12, 2001

2001 OCT 15 '01

VIA FACSIMILE AND FEDERAL EXPRESS

Captain Duane Woerth, President
Air Line Pilots Association
1625 Massachusetts Avenue, NW
Washington, DC 20036

Dear Captain Woerth:

The events of the last week surrounding American Airlines continuing efforts to facilitate a seniority integration agreement between the Allied Pilots Association ("APA") and the Air Line Pilots Association TWA Master Executive Council ("ALPA TWA MEC") leave me, to say the least, perplexed and aggravated. In addition to the efforts expended previously by American in an effort to facilitate a seniority integration list agreement between the APA and the ALPA TWA MEC, I personally have dedicated the majority of my time since Friday, October 5, 2001, attempting to convince, cajole or quite frankly twist the arm of the ALPA TWA MEC to attend a meeting or meetings, arranged by AA, so that the APA President, Vice-President and Merger Committee Chairman would have an opportunity to present to ALPA new concepts designed to enhance protections for TWA pilots when merged into the American seniority list.

The ALPA TWA MEC's representatives attended a meeting at my office on October 8th to receive a briefing on the state of emergency at American and TWA and on our financial condition. During that meeting Mr. Roland Wilder updated me on the status of the seniority discussions between ALPA and the APA for which American had provided the services of Mr. Rolf Valton as a facilitator. The ALPA TWA MEC asked me to review a number of additional processes that included arbitration, facilitation and negotiation. I explained that, from my perspective, there simply is not time for another lengthy "process". I stated that American believed that it was time for the APA and ALPA to make decisions and conclude an integration agreement.

I invited the ALPA TWA MEC representatives to attend a meeting the next day to discuss seniority integration, which I planned to facilitate, between the APA and ALPA. The ALPA TWA MEC representatives indicated that they would need to consult with the members of the MEC to determine their willingness to meet and used one of our conference rooms for that purpose. Later they indicated that they would need more time and would contact me the next morning. On Tuesday I received a call confirming the meeting. I was asked to provide special travel accommodations for the ALPA TWA MEC Merger Committee Chairman so that he would be able to attend the meeting on Wednesday. We accommodated that request.

P. O. Box 619616, MD 5235, Dallas/Fort Worth Airport, Texas 75261-9616
Phone (817) 967-2266, Fax (817) 967-1843, Email Jeff.Brundage@aa.com

P01556

Late in the day on Tuesday I received a proposed confidentiality agreement from Mr. Holtzman as a precondition to the next day's three party meeting. It was immediately apparent that the proposed confidentiality agreement was unacceptable to me because it required that even the fact that the meeting was scheduled would remain confidential and that nothing discussed or proposed at the meeting could be referred to in any other forum. First, I had already discussed the proposed meeting with numerous parties prior to receiving the confidentiality document. Secondly, the APA committee had briefed me earlier in the day as to the provisions of the new proposal that they intended to present to the ALPA committee and I had had numerous conversations regarding that proposal with a number of people.

On Wednesday, just prior to the scheduled start of the meeting, I received a call from Mr. Holtzman and Mr. Wilder indicating that the ALPA TWA MEC had decided not to participate in the meeting and to inquire as to the disposition of the confidentiality agreement. They informed me that Captain Pastore would be arriving but that no one from the ALPA TWA MEC would be meeting with the APA representatives who had already arrived at my office and were waiting to begin discussions.

Captain Pastore arrived and confirmed that the ALPA TWA MEC representatives would not be attending the meeting and that without the confidentiality agreement proposed by ALPA in place, no discussion between ALPA and APA could take place. I challenged Captain Pastore on the proposed confidentiality agreement in that I fully understand the reasons to keep alternative proposals exchanged during the meeting confidential but questioned the motivation for needing to keep the very fact that meetings took place confidential.

To make matters worse, I was informed that representatives of the ALPA TWA MEC met with Senator Bond on Thursday, October 11th and represented to the Senator that no attempt had been made to schedule the meetings I have described. When those representatives were informed that Mr. Carty had visited with the Senator earlier in the day and described ALPA's unwillingness to meet they indicated, as it was related to me, that Mr. Carty was at best misinformed. This conduct is inappropriate and entirely unacceptable.

I hope that we can get past this week's disjointed events. We are committed to facilitating a seniority integration agreement between ALPA and APA. I would appreciate any assistance you can provide toward this end.

Sincerely,

Jeff Brundage
Vice President – Employee Policy & Relations

cc: Donald J. Carty

P01557

# EXHIBIT CC

# TWA MEC Minutes

Written, edited and published by your TWA Master Executive Council, these minutes provide a record of the business conducted during the representative body's last meeting. This document is not a verbatim transcript of the meeting's reports, discussions and actions. Rather, it is a comprehensive summary of those events. For more information on the issues influencing TWA pilots' careers, consult the TWA MEC's other various communications.

SPECIAL MEETING DATE: April 2, 2001 St. Louis, Missouri

EXHIBIT
D074
PENGAD 800-631-6989

**MASTER EXECUTIVE OFFICERS**
**Robert A. Pastore, Master Chairman**
**Scott A. Schwartz, Vice Chairman**
**Robert C. Stow, Sr., Secretary/Treasurer**

**COUNCIL 2 - NY**
**Howard B. Hollander, Captain Rep.**
**David B Singer, First Officer Rep.**
**Ted Case, Secretary/Treasurer**

**COUNCIL 3 - STL**
**Steven P. Rautenberg, Captain Rep.**
**Sally D. Young, First Officer Rep.**

**COUNCIL 4 - LAX/SFO**
**Pablo Lewin, Captain Rep.**
**Alan Altman, First Officer Rep.**
**Glenn Stieneke, Secretary/Treasurer**

---

**Monday, April 02, 2001**

0904 Master Chairman Bob Pastore called the meeting to order.

Vice Chairman Scott Schwartz called the roll, members present or accounted for. Members not present were Sally Young and Glenn Stieneke.

Committee Members: Ron Kiel, Bud Bensel, John Hefley, Jeff Darnall, Keith O'Leary, Cary Bouchard

Guests: List on file MEC Office

Sergeant At Arms: John Hefley

Steering Committee: Singer, Young, Altman

Announcements

Pastore reviewed the agenda for the meeting.

**Bankruptcy/Transaction Update: Randy Babbitt, Eclat Consulting**
Babbitt addressed the decision making process regarding the 1113 bankruptcy hearing and discussed different scenarios that could result from the bankruptcy.

Questions and Answers

0940 Report concluded.

Case Ex 74

**Vice Chairman Report: Scott Schwartz**
Schwartz addressed the upcoming 1113 bankruptcy hearing. Stated that the MEC needed to look closely
at the LLC agreement and make it the best possibly scenario. Discussed spooling up special committee
to deal with issues that would arise during the LLC. Also discussed creating a special web site for the
TWA pilots. Discussed some leverage the Merger Committee could use. Schwartz stated this MEC
could not give up the fight, just because Friday will come and go. Reminded the MEC they were a union,
and must continue to function one.

Question and Answers

Hollander stated for the record that he was disappointed that Captain Woerth was not present at the
bankruptcy hearing in Delaware, and had not come to any of the MEC's special meetings. Hollander said
he appreciated Captain Woerth's busy schedule, but would like to see him face to face at least once.
Hollander with the MEC hope could engage more support from Woerth and ALPA National.

0950 AI#0104-71 by Hollander/Lewin
**SUBJECT:** Election of System Board Member Position "E"

0951 Officer Caucus

0952 Back on main motion

**Resolution #01-62 by H. Hollander/P. Lewin**

WHEREAS Council 2 Vice Chairman David Singer has resigned from his position on the Pilots System
Board of Adjustment, effective with the election of his successor, due to his assignment as First Alternate
ALPA Representative to the Bankruptcy Court's of Unsecured Creditors, in addition to his commitment
to LEC and MEC duties, and

WHEREAS the TWA MEC Master Chairman has caused notice to be given to the TWA pilots of a
pending vacancy on the System Board of Adjustment,

**THEREFORE BE IT RESOLVED that nominations for the pending position on the System Board
be immediately opened and**

**BE IT FURTHER RESOLVED the TWA MEC immediately elects a member to fill the unexpired
term for the ALPA "E" position on the TWA Pilots System Board of Adjustment.**

**PASSED** unanimous voice vote

**Nominations for System Board Position "E"**

Singer/Lewin moved to open the floor for nominations.
VOTE: **PASSED** unanimous voice vote.

Singer nominated Russ Okrent.

Singer spoke on behalf of Okrent. Stated he had sufficient experience to fulfill the position.

0953 Rautenberg/Altman moved to close the floor for nominations.
VOTE: **PASSED** unanimous voice vote.

Okrent was elected.

Lewin, for the record, agreed with Hollander's earlier statement and he was also disappointed that the President of ALPA had not become more involved with TWA's plight and hope this would change in the near future.

Case, Singer and Altman, for the record, added their disappointment as well.

Pastore stated that although he was not making any excuses for Duane Woerth, Woerth does have a lot on his plate right now and this was one of the reasons Randy Babbitt was engaged.

0958 Recess
1030 Reconvened

**Retirement and Insurance Issues: Joe Montanaro, DAP/401K, Catherine Powers, ALPA R&I, Mary Ulett, Benefits Specialist**

Powers updated the MEC regarding obtaining a plan sponsor and the past due Plan contributions. Discussed which Plan contributions could be rolled over if the plan was terminated. Powers announced that ALPA, legally, could not be the Plan sponsor. This was a ruling that came down from the Department of Labor.

Montanaro stated that there could be other solutions since AMR did not want to be the Plan sponsor. Montanaro expressed strongly to continue to fight for this Plan and that it shouldn't be terminated.

Questions and Answers

1054 Young arrived at the meeting.

1135 Recess
1150 Reconvened

Senior Contract Administrator David Holtzman briefed the MEC regarding the DAP/401K termination and made recommendations on how to proceed.

1203 AI#0101-72 by Singer/Hollander
**SUBJECT:** Amendment of DAP/401K Plan

Discussion

1206 Lewin/Rautenberg moved to POSTPONE until end of the meeting.
Discussion
VOTE on POSTPONEMENT: **FAILED** voice vote.

1222 Back on main motion.

Discussion

**Resolution #01-63 by D. Singer/H. Hollander**

WHEREAS the closing of the TWA/AA asset purchase sale may be imminent, and

WHEREAS TWA and/or ALPA's ability to amend the DAP may be in questions upon closing, now

**THEREFORE BE IT RESOLVED that the TWA MEC amend the first paragraph of Article XIII, Section 13.01 of the TWA Pilots Directed Account Plan to read as follows:**

> **The Board of Directors of the TWA Pilots DAP have the right to amend in whole or in part, any or all of the provisions of the Plan. No amendment shall make it possible for the Trust assets to be used for or diverted to purposes other than the exclusive benefit of participants and their beneficiaries or defraying reasonable administrative expenses.**

**BE IT FURTHER RESOLVED that the TWA MEC amend Article XIII Section 13.02 of the TWA DAP to read as follows:**

> **The Board of Directors of the TWA Pilots Directed Account Plan may terminate this Plan at any time.**

**PASSED** voice vote

1230 Recess
1335 Reconvened

Stow called the roll, all members present or accounted for.

**Membership and Guest Hour**

Ron Burnett, Council #3: Addressed the MEC regarding lack of information he was receiving about the current AMR acquisition. Concerned with the possibility the unions could have a negative impact on the deal. Also addressed concerns with the continuation of PMA and requested the MEC encourage their pilots to remain in the plan.

Questions and Answers

John Roman, Council #3: Addressed the MEC regarding recent events and expressed concerns about waiving scope clause. Recommended leaving this decision up to the Courts.

Questions and Answers

Keith O'Leary Council #3: Addressed the MEC regarding the MEC not looking at other options in reference to the outcome of the bankruptcy and the lack of time spent on a strategic plan.

Questions and Answers

Sean Clarke, Council #3: Addressed the MEC regarding the Company's decision to displace 767 pilots. Company said this was for May only and was not canceling May bid.

Questions and Answers

1430 Membership and Guest hour concluded.

1431 Recess
1506 Reconvened

**Merger Committee Update: Gary Flor, John Hefley, Sean Clarke, John Swanson**

Rautenberg/Singer moved to enter into Executive Session.
VOTE: **PASSED** voice vote.

***AGENDA ITEM #0104-75 WAS MOVED AND FAILED IN EXECUTIVE SESSION AND NOT FOR DISTRIBUTION***

1728 Lewin/Young moved to come out of Executive Session.
VOTE: **PASSED** unanimous voice vote.

AI#0104-74 Rautenberg/Lewin
**SUBJECT:** CBA for TWA LLC.

Discussion

1730 MEC Caucus

1736 Back on Main motion.

Discussion

1750 Hollander/Young moved to POSTPONE AI#0104-74 until the next MEC meeting.

1751 MEC caucus

1752 Hollander WITHDREW motion to postpone AI#0104-74.

Back on Main motion, discussion continued.

Case (for the record): Spoke against resolution. Not convinced that scope would not survive. Stated that the possibilities and potential outcomes post 1113 bankruptcy hearing had not been answered to his complete satisfaction. Case said he saw absolutely no improvement of ALPA's leverage for a fair seniority integration moving into the TWA LLC by waiving scope. To the contrary, he saw the opposite, no incentive for APA or AMR to ever treat the TWA pilots fairly. If the goal was fair seniority list integration, using every piece of potential leverage was the key. Waiving scope voluntarily wasn't the answer.

**Resolution #01-64 by S. Rautenberg/P. Lewin**

WHEREAS the Negotiating Committee reports that it has negotiated to the best offer available from TWA and American for a collective bargaining agreement applicable to TWA LLC on all issues except scope, subject to minor clarifications on a handful of matters; and

WHEREAS TWA has filed a motion under § 1113 of the Bankruptcy Code to reject the current ALPA collective bargaining agreement, which will be considered April 6, 2001; and

WHEREAS the MEC has considered extensive advice from its bankruptcy counsel (Steve Tumblin and Richard Seltzer), merger counsel (Roland Wilder), investment advisor (Michael Glanzer) and former ALPA President Randy Babbitt, as well from ALPA staff in the Representation Department (Bill Roberts

and David Holtzman), Legal Department (Clay Warner), and Economic and Financial Analysis Department (Bob Christy), now

**THEREFORE BE IT RESOLVED that the Negotiating Committee is directed to seek clarification immediately on all outstanding issues arising from the proposed agreement covering the operations of TWA LLC (the "LLC CBA") and to finalize the LLC CBA, and**

**BE IT FURTHER RESOLVED that bankruptcy counsel is directed to take steps that would insure that the LLC CBA is incorporated in court documents resolving the § 1113 motion, and**

**BE IT FURTHER RESOLVED that no later than April 5, 2001, the Master Chairman, or his designee, is directed to execute the LLC CBA and forward the LLC CBA immediately to ALPA President Duane Woerth for his signature, and to waive those provisions of the current ALPA-TWA collective bargaining agreement that must be waived as a condition to the closing of the Asset Purchase Agreement, and**

**BE IT FURTHER RESOLVED that the Merger Committee, with the assistance of the MEC Officers and advisors, is directed to take all appropriate actions, including efforts to negotiate with the Allied Pilots Association concerning seniority integration, and**

**BE IT FURTHER RESOLVED that the Master Chairman does not release this motion until advised by the Communications Chairman.**

**PASSED** roll call vote
(Hollander requested roll call vote)
**FOR**: 1501 **AGAINST**: 450 **ABSTAIN:** 0

| **FOR:** | |
|---|---|
| Hollander, Council #2: | 55 |
| Singer, Council #2: | 142 |
| Rautenberg, Council #3: | 724 |
| Young, Council #3: | 400 |
| Lewin, Council #4: | 90 |
| Altman, Council #4: | 90 |
| **AGAINST:** | |
| Hollander, Council #2: | 180 |
| Singer, Council #2: | 65 |
| Young, Council #3: | 205 |

1823 <u>AI#0104-76 Young/Altman</u>
**SUBJECT:** Increase in Master Chairman stipend.

**<u>Resolution #01-65 by S. Young/A. Altman</u>**

WHEREAS the ALPA Board of Directors recognized that full time union officers incur "significant unreimbursed expenses" at its October 2000 meeting by passing a resolution to allow these individuals to receive up to $2000 per month, and,

WHEREAS the events that have occurred since September 2000 has caused the MEC Chairman unusually long term absences from his residence which has required significant personal expenditures, and

WHEREAS the present MEC policy of allowing $1000 monthly for unreimbursed expenses is insufficient,

**THEREFORE BE IT RESOLVED that the MEC authorizes the Master Chairman $2000 per month to cover unreimbursed expenses for the foreseeable future.**

**PASSED** voice vote

1826 Singer/Hollander moved to adjourn the meeting.
VOTE: **PASSED** unanimous voice vote.

1827 All business concluded; the meeting was adjourned.

Robert C. Stow, Sr.
TWA MEC Secretary/Treasurer

# EXHIBIT DD

# TWA MEC Minutes

Written, edited and published by your TWA Master Executive Council, these minutes provide a record of the business conducted during the representative body's last meeting. This document is not a verbatim transcript of the meeting's reports, discussions and actions. Rather, it is a comprehensive summary of those events. For more information on the issues influencing TWA pilots' careers, consult the TWA MEC's other various communications.

SPECIAL MEETING DATE: October 20-22, 2001 Washington, D.C.

EXHIBIT
D088

**MASTER EXECUTIVE OFFICERS**
**Robert A. Pastore, Master Chairman**
**Keith J. O'Leary, Vice Chairman**

**COUNCIL 2 - NY**
**Howard B. Hollander, Captain Rep.**
**Theodore A. Case, First Officer Rep**

**COUNCIL 3 - STL**
**Steven P. Rautenberg, Captain Rep.**
**Sally D. Young, First Officer Rep.**
**Jim Arthur, Secretary/Treasurer**

**COUNCIL 4 - LAX/SFO**
**Pablo Lewin, Captain Rep.**
**Alan Altman, First Officer Rep.**
**Glenn Stieneke, Secretary/Treasurer**

---

**Saturday, October 20, 2001**

1000 Captain Bob Pastore called the meeting to order.

Vice Chairman Keith O'Leary called the roll.

In attendance: Hollander, Case, Young, Arthur, Stieneke

Not In attendance: Rautenberg, Lewin, Altman

Proxies: None

Committee members: Ron Kiel, Keith Holcomb, Bud Bensel, Matt Comlish

Announcements

1001 Recess

Case for the read Article 1 Section 14 from ALPA's Constitution and By-Laws:

*Representation of all members of the Association at any duly called meeting of the Board of Directors, Executive Board and Master Executive Council is mandatory. Elected representatives may be considered as acting against the best interest of the Association if they fail to represent, or arrange for representation of their constituents.*

Case also requested that Pastore notify Woerth regarding members attempt to deny quorum.

Pastore stated he thought this was a postponed regular meeting. Holtzman stated that it would be a stretched to say this was a regular meeting. Additionally a 24-hour notice was given that this was a special meeting.

Pastore Ex
88

1014 Pastore adjourned meeting for lack of quorum.

Pastore called for Special MEC meeting for 10:30, Sunday, October 20.

---

**Sunday, October 21, 2001**

1030 Master Chairman Bob Pastore called the meeting to order.

Vice Chairman Keith O'Leary called the roll.

In attendance: Hollander, Case, Rautenberg, Young, Arthur, Altman, Lewin and Stieneke

Committee Members: Bud Bensel, Matt Comlish, Ron Kiel, Keith Holcomb

Announcements

Pastore reviewed the agenda for the meeting. Also discussed Jeff Brundage's letter to Duane Woerth. Pastore said he spoke directly with Brundage to clear up some of the discrepancies in the letter.

Holtzman briefed the MEC regarding Dispute Resolution Committee grievances. These are handled by the DRC committee, the MEC is not involved.

Case for the record: "I have been made aware of at least two letters written by Duane Woerth, President of ALPA. One, intimating that this TWA MEC intends to depart from the TWA MEC Policy Manual with regard to the seniority integration discussions with the APA which began on October 20, 2001. For the record, this MEC member has no intention of taking any such action.
The other, concerns Special MEC meetings and a reiteration of intimations about the TWA MEC's conduct with respect to the seniority integration discussions with the APA. I am very concerned about the intimidating language of both letters. Because of the failure of this MEC to meet prior to the seniority integration engagement, this MEC has allowed non-Merger Committee members into the room for direct negotiations, which may be in violation of the TWA ALPA MEC Policy Manual. For the record, I object to this action. I am not quite sure how I am to continue representing my constituents with these letters in effect."

1045 **Briefing from Captain Howard Attarian. ALPA Executive Administrator (*via phone*)**
Captain Howard Attarian addressed the MEC regarding the recent seniority integration meetings between ALPA and APA. Also discussed several communication strategies.

Questions and Answers

1058 Briefing concluded.

1059 **Protocol Discussion for the Merger Committee**

Case/Altman moved to enter into Committee of the Whole
VOTE: **PASSED** unanimous voice vote.

1108 Recess
1125 Reconvened

---

Hollander requested that the record reflect that Rautenberg, Lewin and O'Leary were not present.

1130 O'Leary and Lewin returned to the meeting.
1131 Rautenberg returned to the meeting.

**Legislative Committee Report: Matt Comlish**
Comlish briefed the MEC regarding the legislative efforts during the past few weeks. Grass roots campaign has been very successful, receiving a lot support on Capital Hill. Suggested that the MEC plan for the upcoming weeks. Comlish said that tomorrow would be the most critical juncture. Recommended developing public relations campaign and get something released with press today. He said he would like to see more of the rank and file getting involved. Comlish suggested that keeping the pressure on and asked the MEC to stay in DC to help with the campaign. Also need to educate the pilots so they participate and work together as a team. Expressed concerns that ALPA has not been supportive in either the political or public campaigns. If this fails, it is because of lack of support from ALPA National.

Questions and Answers

1206 Recess
1214 Reconvened.

Questions and Answers continued.

1222 Report concluded.

1223 Case/Hollander moved to come out of Committee of Whole.
VOTE: **PASSED** unanimous voice vote.

AI# 0110-118 Case/Hollander
**SUBJECT:** TWA ALPA legislative initiative.

WHEREAS the TWA ALPA Governmental Affairs Committee has experienced an extraordinary level of success, and been instrumental in placing a Bill on the floor of both the U.S. House of Representatives and U.S. Senate, and

WHEREAS those Bills, Senate (S.1479) and companion House (H.R.2989), are specifically designed to allow for 3rd party neutral arbitration, for a resolution to the TWA / ALPA, American / APATWA LLC's seniority integration, and

WHEREAS those Bills are a direct result of the work of the Governmental Affairs Committee as augmented by certain members of the MEC, now

THEREFORE BE IT RESOLVED that the TWA MEC augments the TWA ALPA Governmental Affairs Committee by placing the following members on the Governmental Affairs Committee to include the entire MEC: Howard Hollander, Ted Case, Sally Young and Jim Arthur.

Discussion

1228 Lewin/Case moved to POSTPONE until after the Merger Committee report and the conclusion of the legislative report.
VOTE: **PASSED** voice vote.

**Merger Committee Update: Mike Day**
Briefed the MEC regarding ongoing meetings with APA.

1246 Report concluded.

MEC discussed whether to called a Special Meeting or move a late agenda item to deal with any merger proposals.

Arthur suggested that the MEC stay the course that we assured Senator Bond, the MEC would follow.

1255 Recess
1316 Reconvened

**Representational Structure Report: Bill Kientz**
Kientz updated the MEC regarding representational structure. Most likely TWA would fall under the American West concept. The MEC would need to make a request to the Executive Council. Kientz suggested that the MEC make two requests, first dealing with the next four months, then to deal with the next election cycle. The MEC could request to keep the current officers until the next election cycle. Recommend whatever the MEC decides, it be unanimous. Some MEC members have suggested seniority-based representation. Under this structure there would seven status reps, with 300 pilots per rep. Kientz said the he talked to the American West Master Chairman and they were not happy with their setup. It works, but doesn't work well.

Questions and Answers

1345 Report concluded.

1346 Recess
1408 Reconvened

Rautenberg/Young moved to consider any seniority integration proposal or tentative agreement submitted to the MEC by the TWA MEC Merger Committee.

Discussion

VOTE to consider any seniority integration proposal: **PASSED** voice vote.

**Representational Structure Discussion**

Young/Hollander moved to into Committee of the Whole.
VOTE: **PASSED** unanimous voice vote.

Per Pastore, no minutes were recorded during the Committee of the Whole.

1456 Recess
1516 Reconvened

Hollander moved to come out of Committee of Whole.
VOTE: **PASSED** unanimous voice vote.

Representation Structure discussion continued.

MEC agreed that representation would be status quo but agreed to wait until the body heard from Salverson to see if the Executive Council would pass status quo.

**Communications Update: Keith Holcomb**
Briefed the MEC regarding press conference and his discussions with Don Skiados, ALPA, Director Communications.

1647 Recess
1700 Reconvened

1701 Recess until 20:00pm

20:00 Reconvened
20:01 Recess

2020 **Communications Committee Report: Keith Holcomb**
Briefed the MEC regarding press conference and rally. Rally has been delayed but press conference will go on as scheduled. Skiados was ready to assist us.

**Negotiating Report: Ron Kiel**
Kiel updated the MEC regarding meeting with Brundage. Briefed the MEC on preliminary negotiations.

2039 Recess
2044 Reconvened

**Representation Structure: Bill Kientz**
Updated the MEC with regarding conversation with Captain Jerry Mugerditchian, ALPA, Vice President Administration. Mugerditchian said that anything was possible. Kientz said that there was a possibility that TWA could keep the current reps with seniority block. Recommend that the decision stay within the confines of the Constitution and By-Laws.

2055 Recess
2109 Reconvened

**Merger Committee Update: Sean Clarke**
Updated the MEC on the latest proposal from APA.

Questions and Answers

2127 Updated concluded.

2128 AI# 0110-119 Case/Altman
**SUBJECT**: TWA ALPA Representational Structure

WHEREAS the tragic events in early September have caused unprecedented issues to be dealt with by the Air Line Pilots Association, and

WHEREAS the TWA ALPA representational structure has the proven ability to remain adaptable and innovative concerning union representational duties, and

WHEREAS TWA LLC is caught in middle of the largest airline merger in history, and

WHEREAS the TWA MEC and ALPA is faced with the largest air carrier seniority integration in history, and

WHEREAS it is vitally important to maintain basic governing principles and stability for the purpose of adequately representing the interests of the TWA ALPA pilots, including representation for pay and working conditions, and

WHEREAS TWA LLC will collapse into a single Council airline with more than two thousand (2000) active members, which will tax the MEC beyond it's representational capacity, now

THEREFORE BE IT RESOLVED that to provide a organization structure for the continued governance and representation of TWA pilots the TWA MEC requests the Vice President – Administration/Secretary to coordinate with the ALPA Executive Council to adopt and administer the following requests:

1. Provide a temporary vehicle to maintain the current duly elected TWA MEC status representatives as the "status quo" for the purpose of adequately representing the TWA pilots. This vehicle shall expire upon the normal election cycle beginning March 01, 2002.

2. The MEC requests that the ALPA Vice President-Administration/Secretary coordinate with the ALPA Executive Council to provide a vehicle to maintain the TWA ALPA MEC Officers who are in place on October 31, 2001 until the normal election cycle.

Discussion

2237 Case/Altman moved to POSTPONE until after Kientz's briefing tomorrow.
VOTE: **PASSED** voice vote.

**Captain Duane Woerth and Captain Howard Attarian (via phone)**
Discussion regarding APA's latest proposal.

2253 Recess.

---

**Monday, October 22, 2001**

0900 Master Chairman Bob Pastore called the meeting to order.

Vice Chairman Keith O'Leary called the roll.

In attendance: Hollander, Case, Rautenberg, Arthur, Lewin, and Altman

Not In attendance: Young and Stieneke

Proxies: None

Committee members: Ron Kiel, Keith Holcomb, Bud Bensel, Matt Comlish

Announcements

0909 Recess

0918 Stieneke arrived at the meeting.

0920 Young arrived at the meeting

1015 Recess
1030 Reconvened

Lewin/Hollander moved to accept AI#0110-120 as a late agenda item.
VOTE: **PASSED** voice vote.

AI#0110-120 Young/Rautenberg
SUBJECT: Parker Dues Deferral

Discussion

**Resolution #01-97 by S. Young/S. Rautenberg**

**BE IT RESOLVED that the TWA MEC approves a two-month period for repayment of 1999 dues/service charge reconciliation for Charles Parker.**

**PASSED** voice vote

Case for the record: Abstained from voting because he did not have enough information to make a decision.

1040 Recess
1100 Reconvened

1103 Altman/Case moved to go into Committee of the Whole.
VOTE: **PASSED** unanimous voice vote.

Pastore requested no minutes be recorded.

1132 Recess
1148 Reconvened

MEC discussed the agenda and representation structure.

1153 Working lunch that included briefing from the Merger Committee. No minutes recorded per Pastore's direction.

1315 MEC discussed the briefing from the Merger Committee and asked numerous questions of Roland Wilder.

1347 Recess
1349 Reconvened

MEC discussion continued.

Tanner shared his opinion regarding the recent proposal; felt it was a step south. The restrictions were not as favorable as the APA had offered earlier.

Lewin requested that the full details of the deal be given to the body for review before he could make a decision.

Rautenberg also requested the deal be reviewed in its entirety before he could reach a decision. Felt he did not have enough information to even consider voting. Rautenberg said he felt that the MEC was in no position to even contemplate this issue, need all the experts to advise us.

1420 **Government Affairs Update: Matt Comlish**

Comlish updated the MEC regarding efforts on Capitol Hill. Trevor Blackaan from Senator Kit Bond's office informed Comlish the reason no one from their office would be present during the negotiations was to avoid the appearance of interfering. Comlish said he found it odd that Norma Kaehler, AMR Vice President, Government Affairs, was on site today. He said that she had met with him and Bud Bensel and asked a few questions regarding how negotiations were going and how ALPA was being treated. Comlish emphasized the tremendous importance of keeping the legislation effort going.

Questions and Answers

1435 Caucus

1438 Update concluded.

1439 **Merger Committee Update**
Day briefed the MEC regarding the meetings with APA. Discussion focused on furloughs.

Day's briefing was set aside in order that the MEC receive a briefing from Paul Hallisay, ALPA Director, Government Affairs.

1443 **Briefing from Paul Hallisay, ALPA Director, Government Affairs** (via phone)
Hallisay discussed the MEC's recent legislative efforts. Stated that he felt that even if the Bill passed in the Senate, it would not pass in the House. Although efforts to this point have been somewhat successful the Bill would never come to the floor, this issue was very controversial.

Questions and Answers

1449 Briefing concluded.

1500 **Merger Committee Update: Mike Day** (continued)
Day suggested that the MEC hear from Jeff Brundage, AMR, Vice President Employee Relation regarding the recent proposal.

MEC agreed to hear from Brundage.

Kientz briefed the MEC on Brundage's background while he was at ALPA.

1504 **Discussion with Jeff Brundage, Vice President Employee Relations, American Airlines (via phone)**
Brundage stated that there were some options. If there wasn't an agreement, things would remain status quo. AMR has tentative language with APA and will file for single carrier status. AMR has said from day one they want to be a single carrier. The other option was arbitration. Brundage stated Don Carty told Senator Bond if the Bill passed, he would shut down TWA LLC. AMR made a commitment to its employees, right or wrong. AMR employees cannot fathom an arbitrated seniority list. AMR committed to its employees that AMR would not support arbitration for seniority. If the Bill passed, AMR would shut down the TWA LCC, cannot afford to upset the apple cart. Brundage said that Delta was going to be very aggressive, that was why we want to be in position to compete. The other piece was litigation; certainly an option. AMR doesn't share the same opinion with ALPA of what we signed up with back in Delaware. We have done what was reasonable to facilitate the process and feel it will stand up in court. Final option was to make a deal. Brundage said he would not answer whether or not this was a fair deal. There has been little success of fair integration among major carriers. He has not seen and integration where all parties were happy in the end, understood that this was an emotional issue. AMR will do everything it takes to become the number one airline. This was a lousy place to be, but that is where we are.

Questions and Answers

1620 Discussion concluded.

1621 Recess.
1639 Reconvened

Pastore announced that Day made a commitment to Ed White that nothing would be released to the press until close of business tomorrow. Day said that he had no problem calling White and telling him the deal was off.

Day reviewed in detail the proposal.

Questions and Answers

1725 Recess.
1729 Reconvened.

Questions and Answers

1740 Hollander left the meeting, Hollander proxy to Case.

1744 Lewin left the meeting, Lewin proxy to Altman.

1757 Lewin arrived at the meeting.

1830 Recess
1842 Reconvened

**TWA ALPA Representational Structure Discussion**
Pastore announced that he gave his proxy to Kientz to attend the Executive Board. He recommended that he would like to see the most Reps possible.

Kientz briefed the MEC regarding prospect of status quo. ALPA has stated that they are going to be flexible on this because of the current circumstances. He read from the ALPA Constitution and By-Laws regarding organizational structure. There were several options, but recommended block seniority representation for the interim. The MEC needs to be unanimous on this decision.

Questions and Answers

Rautenberg for the record requested the following be read to the Executive Council: *I understand that the Executive Council will be considering the request of the TWA MEC on representational structure at its meeting this week. I have abstained from voting on that recommendation in order to facilitate cooperation among the members of the MEC at this critical juncture. However, I do believe that the Executive Council should be aware of the most serious reservation that prevents me from outright support of our request.*

*I am writing to communicate my concern and ask that you share it with the Executive Council members as they consider our representational situation. A vacancy was created in the Council 2 First Officer Representative position on August 10, 2001. That vacancy was created by recall. The vacancy was filled on an interim basis soon after. However, to my knowledge, the election process for the secret ballot of the membership to elect the representative to serve the remainder of the term has not begun. I cannot endorse the failure of Council 2 to begin that process by scheduling and holding the nominating meeting. Subsequent to about September 28, when TWA announced its intentions to close the JFK domicile, the failure to hold nominations is understandable. However, the expiration of seven weeks between the recall on August 10 and the announcement of domicile closing at the end of September with no nominations being scheduled or conducted is in my opinion highly inappropriate. That is aggravated by the fact that Council 2 did in fact find it possible to conduct a meeting for the purpose of electing an interim representative. Nominations could have been held at that time.*

*The potential addition of four months to an interim representative's term that should already have ended is a circumstance that I cannot support.*

*Thank you in advance for communicating this to the Executive Council.*

Rautenberg for the record said that if the Council #2 election been conducted, he would have supported the status quo motion.

1924 Caucus

MEC reviewed press release.

Kientz recommended that MEC do a straw poll regard representation. He would take their decision to Bob Salverson and Jerry Mugerditchian to write the resolution.

1942 Recess.

---

**Tuesday, October 23, 2001**

0900 Master Chairman Bob Pastore called the meeting to order.

0901 Recess

0945 Reconvened

Vice Chairman Keith O'Leary called the roll.

In attendance: Case, Rautenberg, Young, Arthur, Lewin, Altman and Stieneke

Not In attendance: Hollander

Proxies: Hollander proxy to Case

Committee members: Sean Clarke, John Swanson, Matt Comlish, DJ Glasby, Bud Bensel, Mike Day

Guests: On file MEC office

Announcements

**Merger Committee Report: Mike Day**

Day stated that if there were better furlough protections, the Merger Committee would agree to the deal unanimously. Pilots that were now furloughed were definitely at risk. Day didn't believe there was a chance for litigation or the Bill passing, only leverage was to continue to delay. He said he was not trying to sell this, the Committee tried to get unanimous consensus. The Committee can only recommend this with certain conditions.

Swanson stated if that the captain upgrades were based on retirements rather than the economy. With the deal, recall rights would maintain April 10 seniority number, but if the pilot stayed in STL would maintain current seniority and would be able to move up to captain sooner than anywhere in the system. Recall could be anywhere there was an opening, but as soon as there was an opening in STL, the TWA pilot would get it before any AMR pilot.

Day reminded the body that quality of life is not an issue for APA pilots; they only care about the money.

Swanson stated that the MEC agrees not to take the deal; the TWA pilots would loose about 400 numbers in their seniority number. Doesn't' seem a lot right now, but later in their career it will. Also, TWA pilots would be recalled to the bottom of APA seniority list.

Questions and Answers

1022 Recess
1040 Reconvened

Glasby stated that the MEC must do what was the best for all the TWA pilots. He was opposed to the deal; this was not integration but isolation. This was the best deal the Committee could get; APA was not going to give anymore. The upside of voting this down was very small. The litigation was not going get us better seniority; the legislative option was dead. Glasby also felt that the airline was going to be shrunk considerably. If the MEC agreed to the deal, it would protect some 1000 pilots. If don't accept, all pilots would be at risk.

Clarke said if there was furlough protection, he would not be for the proposal but he would be neutral. He thought there was a miss conception that if we don't accept the deal that we will loose 400 numbers on seniority, there was a shot that this won't happen. Briefed the MEC on the mitigation package. The APA already believes that anyone hired by the April 10 date has furlough protection. Clarke said that the

TWA pilots were the mitigation package whether we take the deal or not. Clarke hoped that this group would not sell out 1200 pilots to save their own butt. We don't have to come to a deal, there would be some risks. He couldn't believe anyone on the Merger Committee could sign a deal that was going to furlough 1200 pilots. We are here to prevent furloughs, not to voluntarily sign up for furloughs, and that would be what you will be doing if you accept this deal.

Wilder stated he was here to advise the MEC on the law and to help them get were they decided to go. Injunctions were being prepared against the single carrier filing. In order to get to arbitration all the pieces have to fall in line. First, the MEC must stop AMR from reaching an agreement with APA and then file injunction on the single carrier filing. This would only be a short delay, but cannot stop them from doing this eventually. ALPA needs to win the grievance with Richard Block, on fair and equitable process for integration. If ALPA wins the grievance, need to get a specific remedy. The next step if ALPA prevails would be to file suit to make sure the award was enforced. Next ALPA would need to work on improving the deal. During this period, ALPA would need to continue the legislative front with Senator Bond. During this period, there was nothing to prevent furloughs. Depending on the economy, if the traffic doesn't return, AMR would take it out of our hides. Wilder didn't see any legal protection to prevent AMR from furloughing heavier on the TWA side. He saw the fight going on through the first of the year. If ALPA obtained arbitration, it would be about 120 days for the arbitration. This would be a period of vulnerability. As in any war, there would be causalities. If ALPA doesn't take the deal, APA and AMR positions are that furloughed TWA Pilots would be recalled after all APA pilots.

1122 Recess
1142 Reconvened

MEC reviewed letter to APA to accept the proposal.

Rautenberg/Lewin moved that the letter to APA be issued as written.
Discussion

Case/Young moved to POSTPONE motion by Rautenberg/Lewin until 1230.
Discussion
VOTE: **PASSED** voice vote.
Lewin requested recorded vote.
FOR: Case, Hollander (*Proxy to Case*), Altman, Young
AGAINST: Rautenberg, Lewin

MEC continued discussion on the APA proposal.

Tannen briefed the MEC with numbers of captain projections and potentials for TWA first officers to become captain.

1209 Case/Lewin moved to enter into Committee of Whole.
VOTE: **PASSED** voice vote.
Rautenberg requested recorded vote.
FOR: Case, Hollander (*Proxy to Case*), Lewin, Altman, Young
AGAINST: Rautenberg

MEC continued discussion on APA's proposal.

Altman/Young moved to extend motion to POSTPONE until 1245.
VOTE: **FAILED** recorded vote.

Lewin requested recorded vote.
FOR: Young, Altman
AGAINST: Rautenberg, Lewin
ABSTAIN: Hollander (*Proxy to Case*), Case
Pastore voted against the motion to break to the tie vote.

Discussion continued.

Case for the record: "After much sole searching and deliberation, I speak against the motion for conditional acceptance of the seniority integration proposed by the APA representatives yesterday October 22, 2001.

Having been a principle in the effort to encourage the APA to return to the table, I find this offer an affront to those efforts. This offer cannot be considered fair and equitable by any reasonable standard. I represent a range of New York, First Officer constituents. This offer does not meet their needs or desires or the nearly 60% of pilots most directly affected by this offer. This offer places the whole of my constituents at risk of imminent furlough, and would devastate their careers. No reasonable standard would allow for 1241 TWA pilots, with years of service ranging from one year to twelve and a half years of service, to be placed below an American pilot who was hired on April 10, 2001. To rob those 1241 TWA pilots of their dedicated years of service and experience, and consider them newly hired at American Airlines as of April 10, 2001, is totally unacceptable.

Placing nearly 60% of the TWA pilots in immediate risk is deplorable. The only reasonable standard for furlough protection is a reasonable seniority number.

No reasonable standard of fair and equitable has been met with this offer.

After listening to American Airlines labor relations representative, Jeff Brundage, and quoting him: "American and the APA have a Tentative Agreement for an imposed seniority integration, which is essentially identical to the current offer on the floor," with two exceptions. I don't see the advantage of agreeing to this offer and thus denying the Association and TWA pilots due process.

I don't believe that American Airlines has exhausted their "reasonable best efforts" in this effort, and until that effort, and our grievance compelling that effort, has seen the light of day, we do not have the best deal available."

Young called the question that the letter to APA be issued as written.
VOTE: **FAILED** roll call vote.
Lewin requested roll call vote.
**FOR**: 803 **AGAINST**: 1128

| | | |
|---|---|---|
| FOR: | Hollander (*Proxy to Case*) Council#2- | 3 |
| | Case, Council #2- | 3 |
| | Rautenberg, Council #3- | 710 |
| | Young, Council #3- | 7 |
| | Lewin, Council #4- | 80 |
| AGAINST: | Hollander (*Proxy to Case*) Council#2- | 208 |
| | Case, Council #2- | 200 |
| | Rautenberg, Council #3- | 2 |
| | Young, Council #3- | 631 |
| | Lewin, Council #4- | 4 |
| | Altman, Council #4- | 83 |

Holtzman updated the MEC regarding conversation with Brundage regarding mitigation. Brundage suggested that ALPA condition its acceptance on APA's mitigation efforts. If APA does this there would be seniority integration as we now it, if don't do mitigation, there would be no deal. For first quarter, the next furloughs would be between 0-250. Brundage suggested that there be in three-way conference call this afternoon to get this done.

Pastore briefed the MEC regarding his conversation with Don Carty. Pastore asked for full furlough protection. Carty said he could not guarantee furlough protection. Covered the furloughs for this year. There would be up to 200 furloughs the fourth quarter. However AMR was only anticipating 133. For the first quarter of next year, furloughs could be 0-250. Although AMR could not guarantee that there would be no furloughs, Pastore recommended asking for AMR to at least guarantee the numbers.

MEC Discussion

Lewin/Young moved to go into Committee of the Whole.
VOTE: **PASSED** voice vote.

MEC in the Committee of the Whole

1355 MEC Caucus

1400 **Update from Trevor Blackaan of Senator Kit Bond's Office**
Updated the MEC about the legislation. Senator Bond was committed, but had some concerns that the Bill could be filibustered.

Questions and Answers

1430 Update concluded.

1431 **Discussion with Captain Duane Woerth** (via phone)
Woerth and the MEC discussed the recent proposal and other options available to the MEC if they decide not to accept the deal.

1435 Discussion concluded.

1453 Case/Altman moved to recess until Merger Counsel arrived.
VOTE: **PASSED** recorded vote.
Lewin requested recorded vote.
**FOR**: Case, Young, Altman, Hollander proxy to Case
**AGAINST**: Rautenberg, Lewin

1454 Recess
1514 Reconvened

Pastore updated Hollander via phone with the recent comments from Woerth.

1617 Staff was excused from the room.

MEC discussion with Roland Wilder and the Merger Committee.

1635 Staff returned.

Lewin/Rautenberg moved to accept APA proposal with conditions as recommended by the Merger Committee (Counter proposal to APA).

Discussion

1624 Caucus

1630 MEC back in regular session.

1631 VOTE to send Counter proposal: **PASSED** roll call vote.
Lewin requested roll call vote.

**FOR:** 797 **AGAINST:** 412 **ABSTAIN:** 722

| | | |
|---|---|---|
| FOR: | Hollander (*Proxy to Case*) Council#2- | 3 |
| | Case, Council #2- | 3 |
| | Rautenberg, Council #3- | 710 |
| | Lewin, Council #4- | 81 |
| AGAINST: | Hollander (*Proxy to Case*) Council#2- | 208 |
| | Case, Council #2- | 200 |
| | Rautenberg, Council #3- | 2 |
| | Lewin, Council #4- | 2 |
| ABSTAIN: | Young, Council, Council #3 | 638 |
| | Lewin, Council #4 | 1 |
| | Altman, Council #4- | 83 |

1635 Recess
1740 Reconvened

Pastore briefed the MEC regarding his phone conversation with Brundage. Brundage stated TWA, LLC pilots would not get Greenbook pay prior to January 1, and no guarantees on furloughs. Pastore said the Brundage did agree to provide in writing that furloughs would be no more than 200 in the 4th quarter of 2001 and and no more than 250 pilots in the first quarter of 2002.

**MEC Discussion with Captain Howard Attarian (*via phone*)**

1758 Discussion concluded.

1759 Young called for the orders of the day.

Pastore asked for indulgence until Brundage responded to the Counter proposal. MEC agreed.

**MEC Discussion with Captain Howard Attarian and Bob Christy.**

Attarian stated that the counter proposal were not acceptable. MEC questioned how they were getting this information. Attarian stated that they just got off the phone with Brundage and he said the conditions were not acceptable. Pastore said that was not his understanding with his phone conversation with Brundage.

1804 Discussion concluded.
1805 MEC Caucus

1812 <u>**MEC Discussion with Jeff Brundage.**</u>
Brundage said that the counter proposal was not acceptable.

1818 Back in regular session

Holtzman outline terms of third proposal to send to APA.

1822 Rautenberg/Lewin moved to accept terms as described by David Holtzman.
VOTE: **FAILED** roll call vote.
Lewin requested roll call vote.
**FOR**: 807 **AGAINST**: 1123 **ABSTAIN**: 1

| | | |
|---|---|---|
| FOR: | Hollander (Proxy to Case), Council #2 - | 3 |
| | Case, Council #2 - | 3 |
| | Rautenberg, Council #3 - | 710 |
| | Young, Council #3 - | 7 |
| | Lewin, Council #4 | 81 |
| | Altman, Council #4 | 3 |
| AGAINST: | Hollander (Proxy to Case), Council #2 - | 208 |
| | Case, Council #2 - | 200 |
| | Rautenberg, Council #3 - | 2 |
| | Young, Council #3 - | 631 |
| | Lewin, Council #4 | 2 |
| | Altman, Council #4 | 80 |
| ABSTAIN: | Lewin, Council #4 | 1 |

Case stated that the MEC had sent a conditional acceptance to the APA proposal. The MEC is requesting a formal response.

Young asked if the MEC was requesting that Brundage state that he rejected the package? Holtzman said Brundage made it clear that it was not acceptable.

1829 Young/Altman moved to adjourned meeting.
VOTE: **PASSED** voice vote.

1830 Meeting adjourned.

# EXHIBIT EE

EXHIBIT
D181

Duane Woerths Comments 4-25-01.txt

To: [unknown], twamec
From: INTERNET:twamec@alpa.org, INTERNET:twamec@alpa.org
Date: 4/25/01, 1:29 PM
Re: TWA MEC Summary of Duane Woerth's Comments 4-23-2001

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

AIR LINE PILOTS ASSOCIATION
TWA-MEC COMMUNICATIONS COMMITTEE
500 Northwest Plaza, Suite 1200
St. Ann, MO 63074
314-770-8500/Code-A-Phone: 800-253-7919
www.alpa.org

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

Copyright c 2001 by Air Line Pilots Association TWA MEC
Any unauthorized copying, distribution or dissemination of this information is strictly prohibited without the written consent of the Air Line Pilots Association, International.

This e-mail is intended for the recipient.

Summary of Duane Woerth's comments to TWA MEC/Members, April 23, 2001

ALPA President Duane Woerth spoke before the MEC and approximately 70 TWA ALPA members for nearly an hour and a half. Captain Woerth began his discussion by providing an update on the tentative agreement reached in the Delta pilots' contract negotiations and an update on the Comair strike. He said that members should be receiving their Comair strike assessment notices very soon. Captain Woerth also updated the MEC and members on the status of legislation to change the Age 60 mandatory retirement age for pilots.

Addressing the current issues facing TWA pilots specifically, Captain Woerth said that as an ex-Braniff pilot he was happy that TWA pilots had hung on to get to the point we are. The Association's focus now is on obtaining a fair seniority integration for the TWA pilots, he said.

Captain Woerth reported that earlier this month he traveled to Dallas with the intention of speaking to the Allied Pilots Association Board of Directors about the TWA pilots' seniority integration. Although the APA did not guarantee that Captain Woerth would be allowed to speak to the APA BOD, he went with the hope of receiving an official invitation. That morning, APA President John Darrah contacted Captain Woerth with that invitation. This would be only the second time since APA was formed that a sitting ALPA President had been able to officially address the APA BOD, according to Woerth.

During his discussion with the APA, Captain Woerth said that this transaction would mark the first time in the American pilots' careers that they would have to deal with integrating a large airline with a long history. He said this transaction is different than Reno or Air Cal and the APA must to realize that and be fair in their negotiations.

He went on to tell the APA that the TWA MEC had recently made one of the hardest decisions he has ever seen any MEC make in reaching the transition agreement with TWA Airlines LLC. Captain

Woerth said that the TWA MEC had made a realistic assessment of their situation and made the hard decision, and now the APA needs to get realistic and make a hard decision. He told the APA that they have an even greater responsibility to be fair and realistic since they would not allow a third party to facilitate the negotiations. (NOTE: Subsequent to Captain Woerth's meeting with the APA, they agreed to the use of a facilitator if needed.)

Captain Woerth told the MEC then that he would send a letter to the TWA pilots and others to be sure they all know what his position is. Captain Woerth pledged the financial support of the entire Association for the TWA pilots. In light of losing the 9,000-hour flight pay loss bank previously negotiated with TWA, Inc., Captain Woerth assured the MEC and other members present that the TWA MEC will be provided the funds and other support necessary from ALPA to process MEC activities.

Capt. Woerth stated that they would look at the TWA MEC's financial needs quarter by quarter without micromanaging the MEC. This is a unique situation - we are going to take care of business, he added.

Question and Answers (paraphrased and condensed):

Q: What is APA's status with regard to the AFL-CIO?

A: The APA has been trying to get into the AFL-CIO for a long time, and they have not been successful. They need to be true members of the labor movement if they want the political support and clout that goes along with a national union.

Q: What did you think of the APA's latest proposal?

A: I saw their first proposal, and when they said they had a better one I certainly thought it would be better than that. I found it highly unsatisfactory.

Q: Do we have your commitment to use the resources of ALPA, including litigation, to ensure TWA pilots are integrated fairly?
A: If we have any basis for litigation, we will do what is necessary, including litigation. We hold the bargaining rights- we don't need MCF for litigation.

Q: What is your assessment of the APA Board of Directors? How did they receive you?

A: When I was in front of them, it was a very controlled group. There are less than 20 members on the BOD, out of which maybe two are approaching 50 years old. Frankly, in that way they don't look all that different than any MEC. Their Vice President is an ex-Eastern pilot; however, since American growth has been mostly through internal expansion and the APA has never been through a large merger like the rest of ALPA's MECs, they are struggling with how to do this.

Q: Are you of the opinion that an integration that is not fair to the TWA pilots will have long-range consequences for the industry and American Airlines going forward?

A: I think that's obvious. This transaction results in the largest airline with the largest pilot group. What the rest of the world's pilots will be counting on is for this combined group to have the unification and strength to do their job in

negotiating their next contract. We need leading edge companies with leading edge contracts. The biggest airlines can raise the bar for everyone. If one big airline does not, then it negatively impacts the rest of the pilots in the industry.

The consequences of not doing the right thing are serious. The APA can use the addition of the TWA pilots to strengthen their position. If not, with a hostile political environment and an aggressive management, they might stay a notch below where they need to be. They need to be aware of the long-term consequences of what they do.

Q: Is there anything that you can do to assist the five pilots who have not been offered employment by American Airlines in the TWA LLC?

A: Bob Pastore and I will talk to Don Carty before any decision is made to be sure he understands all the issues involved.

Q: What influence do you think Don Carty has with the APA? Is there any assistance we can get from him?

A: We have an open dialogue with him. How effective he will be, I'm not certain. He has a hard time reaching a deal with his own pilots. If he doesn't want to look like the dumbest CEO in the industry he's got to do this right.

Q: Why did ALPA not choose to sponsor the pilots' DAP?

A: If we agree to sponsor one, we would have to be prepared to take on more. We simply don't have the resources to take on that kind of liability.

Q: What's the status of the fine levied against the APA as a result of their sickout in 1998?

A: I don't think Don Carty is going to make them write a check for something when they don't have it. I don't know what he will tell the judge.

The members applauded Capt. Woerth at the conclusion of his remarks.

# # #

---------------------- Internet Header --------------------------------
Sender: twamec@alpa.org
Received: from twaexchange.alpa.org ([12.4.64.202])
        by spdmgaaf.compuserve.com (8.9.3/8.9.3/SUN-1.9) with ESMTP id OAA01697
        for <twamec@compuserve.com>; Wed, 25 Apr 2001 14:29:40 -0400 (EDT)
Date: Wed, 25 Apr 2001 14:29:40 -0400 (EDT)
Received: from %LOGID% (DT00038848 [192.168.213.229]) by twaexchange.alpa.org with SMTP (Microsoft Exchange Internet Mail Service Version 5.5.2653.13)
        id JJ7K1SQS; Wed, 25 Apr 2001 13:19:33 -0500
From: TWA MEC <twamec@alpa.org>
To: <twamec@compuserve.com>
Subject: TWA MEC Summary of Duane Woerth's Comments 4-23-2001
Mime-Version: 1.0
Content-Type: text/plain; charset="us-ascii"

Duane Woerths Comments 4-25-01.txt

Reply-To: twamec@alpa.org
X-Mailer: MailList Express 3.60, Internet-Soft.Com
Message-Id: <200104251315.23w9r9A@>

Page 4

D-181
Page 4 of 4

ALPA 003430

# EXHIBIT FF



EXHIBIT
D207

TWA MEC
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
500 NORTHWEST PLAZA, SUITE 1200 ☐ ST. ANN, MISSOURI 63074 ☐ 314-770-8500

**CERTIFIED MAIL RETURN RECEIPT REQUESTED**
Mail Receipt # P-7099 3400 0015 0956 1009

September 24, 2001

Captain Arnold L. Kellen
Chief Pilot - Western Region
TWA-LLC Flight Operations
Lambert Field, P.O. Box 10236
St. Louis, MO 63145

Mr. Jeff Brundage
Vice-President – Employee Relations
American Airlines, Inc.
P.O. Box 619616, MD 5235
Dallas/Ft. Worth, TX 75261-9616

RE: ALPA Case No. 061-01

GRIEVANT'S EXHIBIT # 1-a

Dear Captain Kellen and Mr. Brundage:

Pursuant to Section 21(B) of the Transition Agreement between TWA Airlines, LLC ("TWA-LLC"), and the air line pilots in its service, as represented by the Air Line Pilots Association, International ("ALPA"), the undersigned on behalf of all TWA-LLC pilots, hereby request a discussion based upon the violation of Section 29 of the Transition Agreement and related provisions including, but not limited to, the Letter dated March 17, 2001 signed by Anne McNamara for American Airlines, Inc. ("American") and Chuck Marlett for TWA-LLC and the Letter dated March 30, 2001 signed by Anne McNamara for American.

The subject of the discussion is the failure of TWA-LLC/American to use its reasonable best efforts with the Allied Pilots Association to secure a fair and equitable process for integration of seniority. ALPA has not entered into an agreement for seniority integration, and there is no fair and equitable process for seniority integration at this time.

ALPA requests that this grievance be expedited and considered by the System Board of Adjustment pursuant to Section 22(J) of the Transition Agreement.

It is requested that TWA-LLC/American send a copy of all hearing notices and decisions rendered in this case in a timely manner to the undersigned and to MEC Representation Department, Air Line Pilots Association, 500 Northwest Plaza, Suite 1200, St. Ann, MO 63074.

Yours truly,

Robert A. Pastore, Chairman
TWA MEC

Keith O'Leary, Vice Chairman
TWA MEC

cc: TWA MEC
S. W. Clarke, Grievance Chairman
ALPA Representation Department
T. C. Irwin, Vice President Flight Operations
D. S. Annett, Director Labor Relations
File



**TWA MEC**
**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL**

500 NORTHWEST PLAZA, SUITE 1200 ◻ ST. ANN, MISSOURI 63074 ◻ 314-770-8500

**CERTIFIED MAIL RETURN RECEIPT REQUESTED**
Mail Receipt # P-7099 3400 0015 0956 1016

September 24, 2001

Captain Arnold L. Kellen
Chief Pilot - Western Region
TWA-LLC Flight Operations
Lambert Field, P.O. Box 10236
St. Louis, MO 63145

Mr. Jeff Brundage
Vice-Président – Employee Relations
American Airlines, Inc.
P.O. Box 619616, MD 5235
Dallas/Ft. Worth, TX 75261-9616

RE: ALPA Case No. 061-01

1-6

Dear Captain Kellen and Mr. Brundage:

Pursuant to Section 21(B) of the Transition Agreement between TWA Airlines, LLC ("TWA-LLC"), and the air line pilots in its service, as represented by the Air Line Pilots Association, International ("ALPA"), the undersigned on behalf of all TWA-LLC pilots, hereby request a discussion based upon the violation of Section 29 of the Transition Agreement and related provisions including, but not limited to, the Letter dated March 17, 2001 signed by Anne McNamara for American Airlines. Inc. ("American") and Chuck Marlett for TWA-LLC and the Letter dated March 30, 2001 signed by Anne McNamara for American.

The subject of the discussion is the failure of TWA-LLC/American to use its reasonable best efforts with the Allied Pilots Association to secure a fair and equitable process for integration of seniority. ALPA has not entered into an agreement for seniority integration, and there is no fair and equitable process for seniority integration at this time.

ALPA requests that this grievance be expedited and considered by the System Board of Adjustment pursuant to Section 22(J) of the Transition Agreement.

It is requested that TWA-LLC/American send a copy of all hearing notices and decisions rendered in this case in a timely manner to the undersigned and to MEC Representation Department, Air Line Pilots Association, 500 Northwest Plaza, Suite 1200, St. Ann, MO 63074.

Yours truly,

Robert A. Pastore, Chairman
TWA MEC

Keith O'Leary, Vice Chairman
TWA MEC

cc: TWA MEC
S. W. Clarke, Grievance Chairman
ALPA Representation Department

T. C. Irwin, Vice President Flight Operations
D. S. Annett, Director Labor Relations
File

# EXHIBIT GG

# TWA MEC Minutes

Written, edited and published by your TWA Master Executive Council, these minutes provide a record of the business conducted during the representative body's last meeting. This document is not a verbatim transcript of the meeting's reports, discussions and actions. Rather, it is a comprehensive summary of those events. For more information on the issues influencing TWA pilots' careers, consult the TWA MEC's other various communications.

SPECIAL MEETING DATE: October 31, 2001 St. Louis, Missouri.

EXHIBIT D257

**MASTER EXECUTIVE OFFICERS**
**Robert A. Pastore, Master Chairman**
**Keith J. O'Leary, Vice Chairman**

**COUNCIL 2 - NY**
**Howard B. Hollander, Captain Rep.**
**Theodore A. Case, First Officer Rep**

**COUNCIL 3 - STL**
**Steven P. Rautenberg, Captain Rep.**
**Sally D. Young, First Officer Rep.**
**Jim Arthur, Secretary/Treasurer**

**COUNCIL 4 - LAX/SFO**
**Pablo Lewin, Captain Rep.**
**Alan Altman, First Officer Rep.**
**Glenn Stieneke, Secretary/Treasurer**

---

**Wednesday October 31, 2001**

1205 Master Chairman Bob Pastore called the meeting to order.

Vice Chairman Keith O'Leary called the roll.

Members in attendance: Hollander, Rautenberg, Young, Arthur, Lewin, Altman

Members not in attendance: Case, Stieneke

Proxies: Case proxy to Hollander

Committee Members: Mike Day, John Swanson, Stan Bellows, Ron Kiel, Jim Callaway

Guests: On file MEC office

Steering Committee: Hollander Rautenberg, Lewin

Sergeant at Arms: Jim Callaway

Announcements

1210 Rautenberg moved to accept two late agenda items. One agenda item dealt with re-opening the ALPA message boards and the other dealt with recording minutes during Executive Session.

Hollander requested that Rautenberg withdraw his motion until after the scheduled Membership and Guest hour.

Rautenberg withdrew his motion.

1211 **Membership and Guest Hour**

John Swanson, Council #2: Addressed the MEC regarding seniority integration. ALPA and the APA were far apart and would never reach a list based on date of hire. He felt that APA's offer last week was their bottom line because he had been around them long enough to believe it to be. Swanson outlined APA's proposal and explained why he was for the proposal. Discussed the protections for the STL cell.

Questions and Answers

Mike Day, Council #2: Addressed the MEC regarding seniority integration. He echoed what Swanson just stated. He voted in favor of the APA proposal. He also believed that this was the best deal ALPA was going to get. After nine months working with this, he believed there were no other alternatives. Equity is in the eyes of the beholder. APA pilots feel that their union sold them out for the sake of the senior pilots. Also, September 11 changed everything; the process failed us. Even though we waived scope in the asset purchase agreement, the Judge would have waived it for us. If ALPA has the opportunity to re-engage, should be more prepared. Felt there were too many members on the Merger Committee and the MEC tried to micro-manage the committee. St. Louis cell was not better than date of hire, but it was the best we could get.

Questions and Answers

Jim Martin, Council #2: Addressed his concerns regarding the behavior of the current MEC. More afraid what ALPA was doing to us than this MEC. Believed we received the best offer and there will not be any more offers. Life wasn't fair, but should try to make it as fair as possible. Addressed his concerns to Hollander about his position. Hollander stated that the legislation was an illusion for the APA, it was to put pressure on the APA. Hollander also stated that Case was the extreme, and would not be in position to vote on anything. However, Hollander gave his proxy to Case, this was irresponsible. Martin asked that Hollander, Case, Arthur and Altman do not come back in power.

Questions and Answers

1331 Bob Ritchie, Council #3: Thanked the MEC and Negotiating Committee for the work done on behalf of the TWA Pilots. He said that he hasn't always agreed them, but thought they had done what was in best interest of the TWA pilots. As a 30-year ALPA member, ALPA National had lost its moral authority over him, and most people in this room. Current MEC has 91/2 hours to exist, that if would make any changes; those changes would be illegitimate acts. If the MEC decides to make changes, do it in open forum so the pilots can see what the MEC was doing and hear what the MEC was saying, so there were no rumors and gossip. If the pilots are going to have eat this sausage, it was time that they saw how it was made.

1335 Recess

Clarke gave his dissenting opinion regarding the proposal. In his opinion, the Committee was not deadlocked; the vote to accept APA's proposal was 4 against and 2 for. The Committee had a bottom line; there were four deal killers that were never addressed. Clarke said this was the best deal we were going to get.

1354 Rautenberg/Altman moved to accept AI#0110-124 as a late agenda item.
VOTE: **PASSED** unanimous voice vote.

1355 Rautenberg/Lewin moved to accept disclosing Executive Session minutes during seniority integration discussion as late agenda item.

Discussion

VOTE: **FAILED** recorded vote.
Rautenberg requested recorded vote
FOR: Rautenberg, Lewin
AGAINST: Hollander, Case, Young, Altman

1403 AI#0110-122 Lewin/Rautenberg
**SUBJECT:** PMA Plan Amendment

Discussion

**Resolution #01-98 by P. Lewin/S. Rautenberg**

WHEREAS the current provisions of the PMA plan document pertaining to termination of the plan do not address when PMA benefit payments would cease or when a final PMA assessment would be made in the event of a plan termination, now

**THEREFORE BE IT RESOLVED that Section VII.4 of the TWA Pilots Mutual Aid (PMA) Plan shall be amended, effective November 1, 2001, to read:**

**"4. This Plan may be amended or terminated at any time by the Master Executive Council. In the event of a plan termination, PMA benefits will be payable through the end of the month prior to the plan termination date. The PMA assessment for such final benefit payments will be taken from Member Share Accounts at the end of the month in which the Plan terminates. "**

**PASSED** unanimous voice vote

1409 AI# 0110-123 Altman/Hollander
**SUBJECT:** PMA Plan Termination

**Resolution #01-99 by A. Altman/H. Hollander**

WHEREAS the Air Line Pilots Association - Trans World Airlines Master Executive Council is the Plan Sponsor and Plan Administrator of the TWA Pilots Mutual Aid Plan, and

WHEREAS the TWA pilots will no longer be represented by the Air Line Pilots Association as of such date the National Mediation Board finds that a single transportation system exists at American Airlines, and

WHEREAS the MEC believes that it is in the best interest of the PMA Plan members to terminate the PMA Plan on or before such date the Air Line Pilots Association no longer represents the TWA pilots, now

**THEREFORE BE IT RESOLVED that the TWA Pilots Mutual Aid Plan shall be terminated effective December 31, 2001, and**

**BE IT FURTHER RESOLVED that PMA claims shall be payable through the end of November, 2001, and**

**BE IT FURTHER RESOLVED that PMA claims for October and/or November 2001 will be payable only if postmarked on or before December 15, 2001, and**

**BE IT FURTHER RESOLVED that the PMA Committee shall provide written notification to all PMA Plan members of the plan termination.**

**PASSED** unanimous voice vote

1412 Secretary/Treasurer Election

Pastore opened the floor for nominations.

Rautenberg nominated Bob Stow.
Arthur nominated Ted Case.
Hollander nominated Steve Parrella.

Lewin recommended that this be put out to the membership; the MEC has been three months without a Secretary/Treasurer, didn't see any urgency.

1415 Recess
1428 Reconvened

Lewin nominated Mark Killpack.
Arthur WITHDREW his nomination.
Hollander nominated Ted Case.

Pastore briefed the body on election procedure as outlined in the TWA MEC Policy Manual.

Rautenberg spoke on behalf of Stow. He said that Stow was the best candidate for the job. His only fall back was that he wouldn't tell people what they wanted to hear.

Killpack addressed the MEC regarding his nomination for Secretary/Treasurer. He said he had not come to the meeting to seek a position but was approached and asked if he would not object to the nomination.

Case addressed the MEC regarding his nomination for Secretary/Treasurer. He said he had a fair amount experience in this area.

1442 Pastore closed the floor for nominations.

Ballot Certification Committee appointed.

1445 Case was elected Secretary/Treasurer.

1446 Recess
1458 Reconvened

1500 AI# 0110-124 Rautenberg/Altman
**SUBJECT:** ALPA Message Boards

Discussion

**Resolution #01-100 by S. Rautenberg/A. Altman**

WHEREAS the TWA ALPA website message boards have been closed to membership participation during the ongoing seniority integration negotiations, and

WHEREAS the APA and American have reached a Tentative Agreement on a seniority integration implementation, and

WHEREAS further negotiations are highly unlikely, and

WHEREAS the membership has a right to the unfettered exchange of information and ideas, now,

**BE IT RESOLVED THAT THE TWA ALPA website message boards be reopened immediately.**

**PASSED** unanimous voice vote

1503 AI# 0110-125 Altman/Hollander
**SUBJECT**: TWA ALPA MEC request for ALPA President, Duane Woerth's authorization or approval for pursuing Federal Court, Injunctive Relief, to prevent an AMR/APA imposed seniority list integration.

WHEREAS the American Airlines acquisition agreement and subsequent transaction requires fully integrating the TWA ALPA pilot seniority list with the AMR APA pilot seniority list, and

WHEREAS all seniority integration discussions between the parties have terminated without agreement on a seniority list integration methodology, and

WHEREAS the TWA MEC, coordinating with ALPA National Legal and independent Merger Counsel, Roland Wilder planned for the prospect of such an occurrence, and

WHEREAS the plan called for a Federal Court, Injunctive Relief request to prevent an AMR/APA imposed seniority integration, now

THEREFORE BE IT RESOLVED the ALPA TWA MEC formally requests a written authorization or approval, from ALPA, to file such a request in Federal Court, and

BE IT FURTHER RESOLVED that the TWA MEC requests the President of the Air Line Pilots Assocation International, Duane Woerth to grant such authorization, and

BE IT FURTHER RESOLVED that the MEC Officers are directed to immediately forward a copy of this resolution to Duane Woerth, President, Air Line Pilots Association, International.

Discussion

1515 Altman with the will of the second WITHDREW AI# 0110-125

1517 AI# 0110-126 Hollander/Altman
**SUBJECT**: TWA ALPA general membership ratification of any seniority integration process or proposal agreed to by ALPA and or AMR and or APA.

Discussion

**Resolution #01-101 by H. Hollander/A. Altman**

WHEREAS the American Airlines acquisition agreement and subsequent transaction requires fully integrating the TWA ALPA pilot seniority list with the AMR APA pilot seniority list, and

WHEREAS the approval of a final seniority list integration is the single most important decision concerning the pay, working conditions and futures of all TWA ALPA pilots, and

WHEREAS the TWA MEC representatives and the TWA MEC Chairman have been duly elected and charged with the duty to represent the best interests and desires of the TWA ALPA pilots, and

WHEREAS that charge is individually and collectively carried out by each MEC member and MEC Officer, now

**THEREFORE BE IT RESOLVED that any proposed integrated seniority list agreed to between the TWA ALPA elected Representatives and AMR APA representatives shall be unanimously agreed to by each and every individual TWA MEC member and the TWA MEC Chairman, and**

**BE IT FURTHER RESOLVED that absent unanimous agreement of each TWA MEC member and TWA MEC Chairman, the acceptance of an integrated seniority list is a decision best made by the TWA ALPA pilots themselves, and**

**BE IT FURTHER RESOLVED the ALPA TWA MEC shall submit the proposed integrated seniority list, should the TWA ALPA and AMR APA representatives agree to one, to the TWA ALPA membership for membership ratification.**

**PASSED** voice vote

1555 Recess
1615 Reconvened

1616 AI# 0110-125 Hollander/Altman
**SUBJECT**: TWA ALPA MEC request for ALPA President, Duane Woerth's authorization or approval for pursuing Federal Court, Injunctive Relief, to prevent an AMR/APA imposed seniority list integration.

**Resolution #01-102 by H. Hollander/A. Altman**

WHEREAS the American Airlines acquisition agreement and subsequent transaction requires fully integrating the TWA ALPA pilot seniority list with the AMR APA pilot seniority list, and

WHEREAS all seniority integration discussions between the parties have terminated without agreement on a seniority list integration methodology, and

WHEREAS the TWA MEC, coordinating with ALPA National Legal and independent Merger Counsel, Roland Wilder planned for the prospect of such an occurrence, and

WHEREAS the plan called for a Federal Court, Injunctive Relief request to prevent an AMR/APA imposed seniority integration, now

**THEREFORE BE IT RESOLVED the ALPA TWA MEC formally requests a written authorization or approval, from ALPA, to file such a request in Federal Court, and**

**BE IT FURTHER RESOLVED that the TWA MEC requests the President of the Air Line Pilots Assocation International, Duane Woerth to grant such authorization, and**

**BE IT FURTHER RESOLVED that the MEC Officers are directed to immediately forward a copy of this resolution to Duane Woerth, President, Air Line Pilots Association, International.**

**PASSED** voice vote

AI# 0110-127 Hollander/Altman
**SUBJECT**: TWA ALPA MEC request for ALPA President, Duane Woerth's authorization or approval for pursuing Federal Court, Injunctive Relief, to prevent an AMR/APA imposed seniority list integration.

Discussion

Resolution #01-103 by H. Hollander/A. Altman

WHEREAS the American Airlines acquisition agreement and subsequent transaction requires fully integrating the TWA ALPA pilot seniority list with the AMR APA pilot seniority list, and

WHEREAS all seniority integration discussions between the parties have terminated without agreement on a seniority list integration methodology, and

WHEREAS American Airlines management has indicated that they expect the Allied Pilots Association to file a Single Carrier filing before the National Mediation Board, in the immediate future, and

WHEREAS the Air Line Pilots Association, International has a legal right to file an objection to such a filing, and

WHEREAS such an objection would be considered an action to protect the TWA ALPA pilots from an AMR/APA imposed seniority list integration, now

**THEREFORE BE IT RESOLVED that the ALPA TWA MEC formally requests ALPA to file an objection to APA's single carrier filing to the National Mediation Board, or alternatively authorize independent TWA Merger Counsel Baptiste and Wilder, in coordination with ALPA Legal, to take such action, and**

**BE IT FURTHER RESOLVED that the TWA MEC requests the President of the Air Line Pilots Association International, Duane Woerth to issue such direction or grant such authorization, and**

**BE IT FURTHER RESOLVED that the MEC Officers are directed to immediately forward a copy of this resolution to Duane Woerth, President, Air Line Pilots Association International.**

**PASSED** unanimous voice vote

1421 Young moved to discuss informational picketing campaign.

Pastore requested that before MEC discussed this issue that it wait until Friday after ramp office.

Young agreed, but stated that the pilots want to know where we were going from here.

Pastore said he understood her request.

O'Leary recommended that this could be discussed during scheduled conference call the following day.

Pastore announced that effective November 1, the East and West domiciles would be closed. Pastore thanked the members of Council #2 and #4 for all their work.

1626 Rautenberg/Altman moved to adjourn.
VOTE: **PASSED** unanimous voice vote.

1627 Meeting was adjourned.

# EXHIBIT HH

## TABLE OF CONTENTS

**PART 1 - JUMPSEAT POLICY** ........ 115-2

A. MEC Jumpseat Coordinator/Committee Chairperson ........ 115-2
B. Duties and Responsibilities of Jumpseat Coordinators/Committee Chairpersons ........ 115-2
C. Admission to Flight Deck ........ 115-3
D. Cabin Seating ........ 115-3
E. Security/Identification ........ 115-3
F. Jumpseat Fraud and Abuse ........ 115-4
G. Boarding Priority ........ 115-4
H. Other Jumpseat Requests ........ 115-4
I. National Jumpseat Registry ........ 115-4

**INDEX** ........ 115-5

ALPA 034147

## SECTION 115 - JUMPSEAT POLICY

### PART 1 - JUMPSEAT POLICY

SOURCE - Executive Board October 1997; AMENDED - Board 2000

The following policy provides guidelines that may be used by Master Executive Councils in establishing jumpseat policies and procedures with their respective airlines.

ALPA encourages participation by other pilot unions and officials of non-represented airlines in the industry-wide Jumpseat Task Force.

ALPA encourages all pilots to extend the use of their jumpseats to eligible cockpit crewmembers as a professional courtesy and as a resource to enhance the safety of flight. The Captain is, and shall always be, the final authority as to admission to the flight deck.

Denial of jumpseat privileges as a means of punishing, coercing or retaliating against other pilot groups or individuals is not supported by ALPA. The Jumpseat and/or Professional Standards Representative appointed by the respective Master Executive Council or governing body should resolve disputes that arise between pilots, airlines or other unions.

Master Executive Councils should appoint a Jumpseat Coordinator/Committee Chairperson and authorize him/her to work with their Company in establishing and administering jumpseat policy and procedures.

#### A. MEC JUMPSEAT COORDINATOR/COMMITTEE CHAIRPERSON

1. Guidelines for selection of Jumpseat Coordinator/Committee Chairperson
    a. Experience - must be knowledgeable of the applicable Federal Aviation Regulations, associated legal interpretations and specific company policies that affect jumpseat usage at their respective airline.
    b. Appointment/Term of Office - per MEC policy.
2. Funding for MEC Jumpseat Coordinators/Committee Chairpersons
    a. Necessary funding for the MEC Jumpseat Coordinator/Committee Chairperson should be arranged by the respective MEC. Funding considerations should include flight pay loss, as well as other related expenses, to adequately represent pilot issues.

#### B. DUTIES AND RESPONSIBILITIES OF JUMPSEAT COORDINATORS/COMMITTEE CHAIRPERSONS

1. Establish appropriate communication with the MEC to insure proper administration and compliance with the respective airline's jumpseat program.
    a. The Jumpseat Coordinator/Committee Chairperson should report directly to the MEC Chairperson or designated appointee. The Coordinator or Chairperson should be authorized to represent the MEC in dealings with Company Officers on jumpseat matters. Issues of a critical nature should immediately be addressed to the MEC Chairperson.

2. Maintain an accurate file of company and industry-wide jumpseat policy and procedures.
   a. When changes occur, the MEC Jumpseat Coordinator or Committee Chairperson should communicate them to the ALPA National Jumpseat Committee Chairperson for appropriate dissemination. ALPA resources will be used to keep all members of the Jumpseat Task Force informed on specific airline policies and procedures.
   b. Communicate company and industry-wide changes of jumpseat procedures and protocol to the pilot group and other affected company employees. Appropriate union and/or company media sources should be incorporated to accomplish this.
3. Address and resolve issues that may arise over jumpseat authority and usage in a timely manner. Reciprocal airline and other off-line matters should be discussed with the associated Jumpseat Coordinator. Discussions beyond ALPA represented carriers should include the ALPA National Jumpseat Chairperson.
4. Submit a Jumpseat Coordinator/Committee report at all regularly scheduled meetings of the MEC, or as otherwise directed.

**C. ADMISSION TO FLIGHT DECK**

1. Captains should be familiar with applicable Federal Air Regulations and their own Company policies concerning jumpseat use.
2. ALPA supports the Captain's authority to manage the flight deck environment and resources in a manner that enhances safety. Accordingly, ALPA supports the Captain's authority to exclude any person other than required crew from the flight deck if, in his opinion, that person's presence will compromise safety.
3. If a jumpseat rider is to remain on the flight deck, the Captain will ensure that he/she is properly briefed on safety, communication and evacuation procedures. This may be done verbally or by means of a printed aircraft specific briefing card.
4. ALPA and most airlines consider a pilot jumpseat rider as an additional crewmember. Pilot jumpseat riders must be prepared to exercise flight related tasks that the Captain may assign.

**D. CABIN SEATING**

1. In accordance with company policy, if a cabin seat(s) is available, the Captain may offer it to a jumpseat rider(s) to accommodate additional jumpseat requests. Appropriate procedures for such accommodations should be adopted and developed as Company policy.
2. As representatives of their airline and profession, jumpseat riders must conduct themselves in a manner that is above reproach at all times.
3. Although seated in the cabin, jumpseat riders may be asked to assist the cockpit or cabin crew in certain situations.

**E. SECURITY/IDENTIFICATION**

1. Without exception, security is paramount in all aspects of aviation safety. The Captain is responsible for ensuring that all jumpseat riders admitted to the flight deck have in their possession the proper documentation. For pilots, this shall include airmen's certification and valid company ID. Jumpseat riders should have this identification readily available for inspection.
2. Host Captains should recognize that a union membership card is another means of identity verification, although not all pilots of represented airlines are union members.
3. Under the Captain's authority, entry to the flight deck will not be permitted for individuals with whom the Captain or his flight deck crew is not entirely comfortable.

 ## F. JUMPSEAT FRAUD AND ABUSE

1. A fraudulent jumpseat rider is an individual attempting to gain access to a flight deck by knowingly being deceptive. Counterfeit IDs, failure of medical certificate standards or dismissal by the presented employer constitute fraudulent representation.

2. An abuse of the jumpseat privilege includes, but is not limited to, individuals revenue positioning at company request for reasons other than commuting to or from work or on personal business.

## G. BOARDING PRIORITY

1. It is understood that certain individuals, such as government or company officials in the performance of their duties, must be given free and unlimited access to the cockpit by FAR. Seniority, first-come, first-served or a reservation system may be used for company and off-line pilots.

2. Extending preferential boarding to specific carriers shall be reviewed and amended when determined appropriate by the Coordinator/Chairperson, the MEC and the Company.

3. Within boarding priority, most airlines accommodate off-line jumpseat riders on a first-come, first-served basis. Due consideration should be given to union affiliation. Any problems that arise should be quickly referred to the Captain for resolution.

4. Company boarding priority for other individuals shall be mutually developed by the Jumpseat Coordinator/Committee Chairperson, the airline management and the MEC.

## H. OTHER JUMPSEAT REQUESTS

1. The FAA has an established procedure whereby air traffic controllers are allowed access to the cockpit for familiarization flights. ALPA supports these familiarization flights and encourages pilots to welcome controllers into their cockpits for this purpose. ATC personnel must have in their possession FAA Form 3120-28 Parts A&B, FAA Form 3120-31 and their FAA identification card/badge.

2. Foreign air carrier pilots, FAA licensed dispatchers and other individuals may be accommodated with authorization by the FAA and company flight management authorities.

## I. NATIONAL JUMPSEAT REGISTRY

SOURCE - Board 2000; AMENDED - Executive Board May 2001

The ALPA Jumpseat Committee shall produce and maintain a National Jumpseat Registry. The airlines listed will abide by ALPA Jumpseat Policy and shall have appointed Jumpseat Coordinators to work with the ALPA sponsored Industry Jumpseat Task Force. The Registry will be disseminated within ALPA to Master Executive Councils and their appointed Jumpseat Coordinators to use as they see fit.

INDEX

Admission to Flight Deck ........ 115-3
Boarding Priority ........ 115-4
Cabin Seating ........ 115-3
Duties and Responsibilities of Jumpseat Coordinators/Committee Chairpersons ........ 115-2
Jumpseat Fraud and Abuse ........ 115-4
Jumpseat Requests, Other ........ 115-4
MEC Jumpseat Coordinator/Committee Chairperson ........ 115-2
National Jumpseat Registry ........ 115-4
Security/Identification ........ 115-3