# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| _____ | ) | |
| PATRICK BRADY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2917 (JEI) |
| | ) | |
| AIR LINE PILOTS ASSOCIATION, | ) | |
| INTERNATIONAL, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

---

## BRIEF IN SUPPORT OF
## DEFENDANT'S COMPANION MOTION FOR NEW TRIAL
## PURSUANT TO FED. R. CIV. P. 59 OR FOR DISMISSAL

---

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By:    Steven J. Fram, Esquire

*Pro Hac Vice*:

      Daniel M. Katz, Esquire
      Katz & Ranzman, P.C.
      4530 Wisconsin Ave., N.W., Suite 250
      Washington, DC 20016
      (202) 659-4656

Attorneys for Defendant
      Air Line Pilots Association, International

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ...................................................................................................... 1

PROCEDURAL AND FACTUAL STATEMENT ....................................................... 1

ARGUMENT .............................................................................................................. 2

I.     A New Trial Should Be Granted Because of the Erroneous Jury
Instructions. ................................................................................................... 2

     A.    The Court's Charge Concerning Arbitrariness Was Legally
Deficient. .............................................................................................. 2

         1.    The DFR Arbitrary Charge Failed to Inform the Jury that a
Union's Conduct Is Not Arbitrary If Any Rational Basis
Exists to Support It. ...................................................... 3

         2.    Perfunctory Conduct By Itself Cannot be the Basis for
Finding Arbitrary Conduct. ........................................... 6

     B.    The Court's Charge Concerning Bad Faith Was Legally Deficient. .......... 8

         1.    The Unexplained "Examples" of Bad Faith that the Jury
Was Instructed to Consider Permitted the Jury to Reach A
Verdict Based on Legally Impermissible Grounds ...................... 9

         2.    "Acting with Hostility." ................................................ 9

         3.    "Making Misleading Statements." ................................. 10

         4.    "Ignoring Union Policies." .......................................... 11

         5.    Not Disclosing "Conflicts of Interest." ........................ 12

         6.    The Court's Instructions Failed to Provide Required
Guidance on "Bad Faith Motive." ............................... 14

     C.    The Court's Causation Instruction Permitted Improper Speculation. ...... 15

         1.    The Causation Instructions Were Also Deficient. ........................ 16

         2.    The Evidence Could Not Have Supported a Finding for
Plaintiffs Under an Appropriate Jury Instruction. ....................... 17

         3.    The Controlling Case Law Demonstrates the Problem with
the Causation Charges in this Case and Why a Verdict in
Plaintiffs' Favor on Causation Cannot Be Permitted to
Stand. ........................................................................ 19

II.    A New Trial Should Be Granted Due to the Erroneous Exclusion of the
Testimony of Jeffrey Brundage of American Airlines. ........................ 23

III.    A New Trial Should Be Granted Because Plaintiffs' Counsel Knowingly Presented False Testimony and Engaged in Other Misconduct. ..........................27

    A.    Plaintiffs' Counsel Knowingly Offered False Testimony. .......................27

    B.    Misstatements Made in Plaintiffs' Closing Argument. ...........................29

        1.    Misstatements About Section 1113 of the Bankruptcy Code........................................................................................30

        2.    Misstatements About Funding Provided By ALPA. ...................31

        3.    Misstatements About Negotiating Assistance Provided By ALPA.........................................................................................32

IV.    A New Trial Should Be Granted Because the Court Erred When It Allowed Plaintiffs' Counsel to Cross-Examine Seth Rosen About the Irrelevant "Scab List." .........................................................................34

V.    A New Trial Should Be Granted Because of the Court's Prejudicial Comments and Prejudicial Interrogation of Seth Rosen. .....................................35

    A.    The Court Improperly Intervened During the Testimony of Seth Rosen. ....................................................................................36

    B.    The Court's Conduct Was Extraordinarily Prejudicial.............................42

VI.    A New Trial Should Be Granted Due to the Violation Of Defendant's Seventh Amendment Right.............................................................................46

CONCLUSION ............................................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

Ackley v. Western Conference of Teamsters,
    958 F.2d 1463 (9th Cir. 1992) ........................................................................................12, 19

Acri v. Int'l Ass'n of Machinists,
    781 F.2d 1393 (9th Cir. 1986) ..............................................................................................19

Addington v. USAPA,
    No. Civ. 08-1633, 2009 WL 2169164 (D. Ariz. July 17, 2009), rev'd on other
    grounds, 606 F.3d 1174 (9th Cir. 2010) ....................................................................14, 15, 22

Air Wis. Pilots Protection Comm. v. Sanderson,
    909 F.2d 213 (7th Cir.1990) ..................................................................................................22

ALPA v. O'Neill,
    499 U.S. 65 (1991) .........................................................................................................passim

Amalgamated Ass'n of Motor Coach Employees v. Lockridge,
    403 U.S. 274 (1971) ................................................................................................................8

Anderson v. United Paperworkers Int'l Union,
    641 F.2d 574 (8th Cir. 1981) ................................................................................19, 20, 21, 22

Aoude v. Mobil Oil Corporation,
    892 F.2d 1115 (1st Cir.1989)................................................................................................29

Baker v. Newspaper and Graphic Communications Union, Local 6,
    628 F.2d 156 (D.C. Cir.1980)................................................................................................7

Barr v. United Parcel Service, Inc.,
    868 F.2d 36 (2d Cir. 1989) ....................................................................................................6

Barrett v. Thorofare Markets, Inc.,
    452 F. Supp. 880 (W.D. Pa. 1978) .......................................................................................22

Barthelemy v. ALPA,
    897 F.2d 999 (9th Cir. 1990) ............................................................................................5, 13

Bates v. Locomotive Fireman,
    56 L.R.R.M. 2271 (M.D. Fla. 1964)......................................................................................7

Bazarte v. United Transp. Union,
    429 F.2d 868 (3rd Cir. 1970)................................................................................................6

Bensel v. Allied Pilots Ass'n,
    675 F. Supp. 2d 493 (D.N.J. 2009) ........................................................................ 14

Bhaya v. Westinghouse Elec. Corp.,
    922 F.2d 184 (3d Cir. 1990), cert. denied, 501 U.S. 1217 (1991) ..................... 26, 46

Blancha v. Raymark Industries,
    972 F.2d 507 (3d Cir. 1992) ................................................................................... 24

Carter v. Kentucky,
    450 U.S. 288 (1981) ............................................................................................... 36

Deboles v. Trans World Airlines,
    552 F.2d 1005 (3d Cir. 1977) ........................................................................... passim

Dixon v. Federal Express Corp.,
    33 Fed. App'x 157 (6th Cir. 2002) .................................................................... 36, 45

Douglas v. Owens,
    50 F.3d 1226 (3d Cir. 1995) ..................................................................................... 2

Draper v. Airco, Inc.,
    580 F.2d 91 (3d Cir. 1978) ...................................................................................... 27

Executive Bd. of Transport Workers Union of Philadelphia, Local 234 v. Transport
    Workers Union,
    338 F.3d 166 (3d Cir. 2003) .................................................................................... 11

Fineman v. Armstrong World Indus., Inc.,
    980 F.2d 171 (3d Cir. 1992) .................................................................................... 27

Ford Motor Co. v. Huffman,
    345 U.S. 330 (1953) ............................................................................................ 3, 13

Forrest v. Beliot Corp.,
    424 F.3d 344 (3d Cir. 2005) .................................................................................... 34

Gasperini v. Ctr. for Humanities, Inc.,
    518 U.S. 415 (1996) ................................................................................................. 2

Gaynor v. Atlantic Greyhound Corp.,
    183 F.2d 482 (3d Cir. 1950) .................................................................................... 26

Gvozdenonic v. United Airlines,
    933 F.2d 1100 (2d Cir. 1991) .................................................................................. 22

Hayes v. National Contractors Ass'n,
    781 F.2d 1321 (9th Cir. 1985) ................................................................................... 4

Hazel-Atlas Glass Co. v. Hartford-Empire Co.,
   322 U.S. 238 (1944) ...................................................................................29

Humphrey v. Moore,
   375 U.S. 335 (1964) ..................................................................................4, 8

In re Paoli R.R. Yard PCB Litigation,
   113 F.3d 444 (3d Cir. 1997) ........................................................................47

Lauria v. National Railroad Passenger Corp.,
   145 F.3d 593 (3d Cir. 1998) ........................................................................26

Lewis v. Tuscan Dairy Farms, Inc.,
   25 F.3d 11381142-43 (2d Cir. 1994) ...........................................................10

Marquez v. Screen Actors Guild, Inc.,
   525 U.S. 33 (1998) ....................................................................................3, 4

Matter of Rhone-Poulenc Rorer, Inc.,
   51 F.3d 1293 (7th Cir. 1995) .......................................................................47

Matthews v. Milwaukee Area Local Postal Workers Union,
   495 F.3d 438 (7th Cir. 2007) .........................................................................4

McDaniel v. Anheuser-Busch, Inc.,
   987 F.2d 298 (5th Cir. 1993) .......................................................................47

Merritt v. International Ass'n of Machinists and Aerospace Workers,
   613 F.3d 609 (6th Cir. 2010) .......................................................................10

Morales v. P.F. Labs, Inc.,
   No. Civ. A. 00-150, 2000 WL 33678049 (D.N.J. Aug. 3, 2000) .............................3

Morgan v. Communication Workers,
   2009 WL 749546 (D.N.J. 2009) .....................................................................6

Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.,
   174 F.3d 801 (6th Cir. 1999) ..................................................................36, 45

Nellis v. ALPA,
   815 F. Supp. 1522 (E.D. Va. 1993) .................................................................7

O'Neill v. Air Line Pilots Ass'n,
   939 F.2d 1199 (5th Cir. 1991) ...........................................................5, 8, 10, 13

Panrell v. United Mine Workers,
   872 F. Supp. 1502 (N.D. W. Va. 1995)............................................................7

Perna v. Elec. Data Sys., Corp.,
    916 F. Supp. 388 (D.N.J. 1995) .................................................................29

Peterson v. Lehigh Valley Dist. Council,
    676 F.2d 81 (3d Cir. 1981) .....................................................................10

Rakestraw v. United Airlines,
    981 F.2d 1524 (7th Cir. 1992) ..........................................................passim

Ramirez v. DeCoster,
    194 F.R.D. 348 (D. Me. 2000) ...............................................................47

Riley v. Letter Carriers Local 380,
    668 F.2d 224 (3d Cir. 1981) ......................................................................6

Rivas v. Brattesani,
    94 F.3d 802 (2d Cir. 1996) ...............................................................36, 45

Santa Maria v. Metro-North Commuter Railroad,
    81 F.3d 265 (2d Cir. 1996) ......................................................................36

Spellacy v. Air Line Pilots Ass'n, Int'l,
    156 F.3d 120 (2d Cir.1998) ..........................................................4, 11, 19

Starr v. United States,
    153 U.S. 614 (1894) .................................................................................36

Story Parchment Co. v. Paterson Parchment Paper Co.,
    282 U.S. 555 (1931) .................................................................................22

Swatts v. United Steelworkers,
    808 F.2d 1221 (7th Cir 1986) ..............................................................7, 10

U. S. Gypsum Co. v. Schiavo Bros., Inc.,
    668 F.2d 172 (3d Cir. 1981), cert. denied, 456 U.S. 961 (1982) .............2

U.S. v. Quattrone,
    441 F.3d 153 (2d Cir. 2006) .....................................................................2

United States v. Freeman,
    Civ. No. 09-4043, 2011 WL 2417091 (7th Cir. June 17, 2011)..............28

United States v. LaPage,
    231 F.3d 488 (9th Cir. 2000) ............................................................27, 28

United Steelworkers v. Rawson,
    495 U.S. 362 (1990) ..................................................................................3

W.V. Realty, Inc. v. N. Ins. Co.,
    334 F.3d 306 (3d Cir. 2003) ................................................................46

**FEDERAL STATUTES**

§ 1113 of the Bankruptcy Code ...........................................................30

**RULES**

Fed. R. Civ. P. 50 (a) .........................................................................12

Fed. R. Civ. P. 50(b)....................................................................passim

Fed. R. Civ. P. 59..............................................................................2

Fed. R. Civ. P. 59(a) ..........................................................................1

Fed. R. Evid. 401 .............................................................................23

**CONSTITUTIONAL PROVISIONS**

Seventh Amendment, U.S. Const. ............................................1, 46, 47, 48

**OTHER AUTHORITIES**

Black's Law Dictionary 800 (5th ed. 1981) ............................................41

## INTRODUCTION

Defendant, Air Line Pilots Association, International ("ALPA"), submits this Brief in support of its motion for a new trial or dismissal pursuant to Fed. R. Civ. P. 59(a). This Motion is submitted in the alternative to ALPA's Renewed Motion for Judgment as a Matter of Law pursuant to Fed. R. Civ. P. 50(b), which is being filed concurrently.

## PROCEDURAL AND FACTUAL STATEMENT[1]

The trial of the liability phase of this bifurcated class action commenced on June 6, 2011, and concluded on July 13, 2011, when the jury returned a verdict of liability against ALPA. For the reasons set forth below, in the event the Court does not grant judgment in favor of ALPA on liability as a matter of law as separately requested in ALPA's companion motion under Rule 50, ALPA respectfully requests that the Court grant a new trial or dismiss the case based upon the following grounds: (1) the Court's charge to the jury was erroneous in critical respects; (2) the Court's exclusion of the testimony of Jeffrey Brundage of American Airlines was legal error and prejudicial; (3) misconduct by counsel for Plaintiffs during trial resulted in significant prejudice to ALPA; (4) the Court erroneously allowed Plaintiffs to cross-examine Seth Rosen on an irrelevant issue that unfairly prejudiced ALPA; (5) the Court's unwarranted intervention and criticism of ALPA and ALPA's counsel during the examination of Seth Rosen at a crucial point in the trial resulted in enormous prejudice; and (6) the use of the two-part verdict form violated ALPA's Seventh Amendment rights.

---

[1] The deposition and trial transcripts and trial exhibits referred to in this brief are attached to the accompanying Declaration of ALPA's counsel. In this brief, ALPA's trial exhibits are referred to as "D-__," Plaintiffs' trial exhibits are denoted as "P-__," and Joint exhibits are referred to as "J-__."

## ARGUMENT

Fed. R. Civ. P. 59 provides that a court may grant a new trial on all or some of the issues after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." The power of trial courts to grant new trials is broad. <u>Gasperini v. Ctr. for Humanities, Inc.</u>, 518 U.S. 415, 433 (1996) (citing <u>Blunt v. Little</u>, 3 F. Cas. 760, 761-762 (No. 1,578) (C.C. Mass. 1822) (Story, J.) ("[I]f it should clearly appear that the jury have committed a gross error, or have acted from improper motives, or have given damages excessive in relation to the person or the injury, it is as much the duty of the court to interfere, to prevent the wrong, as in any other case.")). "A new trial is sometimes the only effective way to cure the prejudice resulting from errors or oversight, and if that is the case a new trial must be ordered." <u>U. S. Gypsum Co. v. Schiavo Bros., Inc.</u>, 668 F.2d 172, 180 (3d Cir. 1981), <u>cert. denied</u>, 456 U.S. 961 (1982).

## I.   A New Trial Should Be Granted Because of the Erroneous Jury Instructions.

It is well settled that "[a] party is entitled to a jury instruction that accurately and fairly sets forth the current status of the law." <u>Douglas v. Owens</u>, 50 F.3d 1226, (3d Cir. 1995). Erroneous jury charges are grounds for granting a new trial. <u>U.S. v. Quattrone</u>, 441 F.3d 153, 177 (2d Cir. 2006) (<u>citing</u> <u>United States v. Doyle</u>, 130 F.3d 523, 535 (2d Cir.1997)).

ALPA submits that the Court's charge did not accurately and adequately guide the jury with respect to key aspects of the duty of fair representation, including the nature of conduct that qualifies as arbitrary, the elements necessary to establish bad faith and the standards governing the issue of causation.

### A.   The Court's Charge Concerning Arbitrariness Was Legally Deficient.

As we explain in our companion Motion for Judgment After Trial as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b), the Court erred by submitting the issue of arbitrariness to the

jury and ALPA is thus entitled to a judgment notwithstanding the verdict or, in the alternative, a new trial. In addition, in submitting the issue to the jury the Court provided a charge on arbitrariness that was legally deficient. With regard to whether ALPA breached its DFR by engaging in arbitrary conduct, the Court instructed the jury in Jury Charge §15 that:

> A union's conduct is arbitrary if, looking at all the evidence presented, it is so far outside a wide range of reasonableness that it is irrational. A union acts arbitrarily when it makes decisions based on considerations that are not legitimate union objectives. Examples of arbitrary conduct include things like acting in a perfunctory or superficial manner.

As demonstrated below, this instruction fails to inform the jury of the proper degree of deference due to union decision-making. Specifically, Instruction §15 (1) fails to tell the jury that a union determination is arbitrary only if it is devoid of *any* rational basis, and (2) it erroneously informs the jury that "perfunctory or superficial" union conduct alone can constitute an arbitrary action even if a rational basis existed for such conduct.

### 1.       The DFR Arbitrary Charge Failed to Inform the Jury that a Union's Conduct Is Not Arbitrary If Any Rational Basis Exists to Support It.

A union must be given "room to make discretionary decisions and choices, <u>even if those judgments are ultimately wrong</u>." <u>Marquez v. Screen Actors Guild, Inc.</u>, 525 U.S. 33, 45-46 (1998) (emphasis added); <u>accord</u> <u>United Steelworkers v. Rawson</u>, 495 U.S. 362, 374, 376 (1990) (doctrine of fair representation is a <u>purposefully limited check</u> on the exercise of union power). Moreover, "'mere disagreements over tactics and strategy' will not support a claim for breach of the duty of fair representation." <u>Morales v. P.F. Labs, Inc.</u>, No. Civ. A. 00-150, 2000 WL 33678049, at *2 (D.N.J. Aug. 3, 2000) (quoting <u>DeFillippes v. Star Ledger</u>, 872 F. Supp. 138, 141 (D.N.J. 1994)). Thus,

> the final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a "wide range of reasonableness," <u>Ford Motor Co. v. Huffman</u>, 345 U.S., at 338, 73 S. Ct., at 686, that it is <u>wholly "irrational" or "arbitrary."</u>

ALPA v. O'Neill, 499 U.S. 65, 78 (1991) (emphasis added) (in reversing judgment against union, Court ruled that holding below, that jury finding that the settlement was worse than surrender could alone support a judgment that the union had acted arbitrarily and irrationally, "unduly constrains the 'wide range of reasonableness,' . . . within which unions may act without breaching their fair representation duty").  In addition, a jury is not permitted to second-guess the union by "substitut[ing] its own view [of proper conduct] for that reached by the union."  Id.; accord Spellacy v. Air Line Pilots Ass'n, Int'l, 156 F.3d 120, 127 (2d Cir.1998). In order to meet the "wholly" irrational or arbitrary standard, a plaintiff must show that the union's challenged representational decisions or acts were "without a rational basis or explanation." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 46 (1998).[2]

The "wholly" modifier that the Supreme Court included in O'Neill was not an extraneous throwaway; it underscored the fact that a union cannot be found to have engaged in an arbitrary DFR breach unless there is NO legitimate objective justification for its actions.  When used in the context of the DFR standard, as the Supreme Court explicitly did in O'Neill, it places the burden on plaintiffs to show that the union's decisions are "completely" or "totally" irrational or

---

[2]  See, e.g., Deboles v. Trans World Airlines, 552 F.2d 1005, 1016 (3d Cir. 1977) (union actions are "non-arbitrary" if the union had "some objective justification for its conduct"); Rakestraw v. United Airlines, 981 F.2d 1524, 1530-31 (7th Cir. 1992) (union may, without breaching DFR arbitrary prong, "surrender" to management demands, seek to "bridge the gap" between employee groups and favor one group of employees over another as long as it does not act solely for an illegitimate reason); Matthews v. Milwaukee Area Local Postal Workers Union, 495 F.3d 438, 441 (7th Cir. 2007) (to show arbitrary conduct, plaintiff must establish that there was no even "colorable" reason for the union's conduct); Hayes v. Nat'l Contractors Ass'n, 781 F.2d 1321, 1324 (9th Cir. 1985) (to show DFR arbitrary breach, plaintiff must show that union's conduct is without "rational basis" or is "unrelated to legitimate union interests"); see also Humphrey v. Moore, 375 U.S. 335, 350 (1964) (no arbitrary conduct where union acted upon relevant consideration); O'Neill, 499 U.S. at 79 (even assuming that union "made a bad settlement" for plaintiffs, union did not act arbitrarily because its determinations were "not illogical").

arbitrary. O'Neill, 499 U.S. at 78. The expansive leeway of this standard is needed if the fact finder is to accord the requisite broad deference to the union's determinations and actions.

If any legitimate basis exists for a union's determinations, a plaintiff's "arbitrary" DFR claim fails. This is so even if there were other arguably suspect reasons for the union's conduct. See Barthelemy v. ALPA, 897 F.2d 999, 1004-06 (9th Cir. 1990) (union's rational collective bargaining position is not subject to review under the duty of fair representation even where it was motivated in part by officials' desires to maintain their jobs and prerequisites); Rakestraw, 981 F.2d at 1527, 1533-34 (in seniority integration situation, claim by pilots of the smaller carrier, Ozark, that ALPA's president was "toadying to the more numerous TWA pilots" could not establish a DFR breach where ALPA's reasonable efforts were aimed at "bridg[ing] the gap" between the two pilot groups); see also O'Neill v. Air Line Pilots Ass'n ("O'Neill II"), 939 F.2d 1199, 1205 n.13 (5th Cir. 1991) (on remand) (where the union acted rationally in settling a strike, that foreclosed DFR liability even if it could be shown that the union's president "had some political motivation in ending strike"). Jury Charge §15 failed to adequately inform the jury of this law, and permitted the jury to find actionable conduct based merely on decisions with which the jury disagreed.

During the charging conference, ALPA counsel requested that the Court include the word "wholly" before the word "irrational" in the first sentence of Jury Charge §15. Tr. 7/7/11 at 121. Despite the fact that this word is explicitly included in the test articulated by the Supreme Court in O'Neill, 499 U.S. at 78, the Court denied that request, Tr. 7/7/11 at 121, and the word was not included in the final jury instructions. Similarly, to meet the O'Neill DFR arbitrary standard (discussed above), the word "solely" had to be inserted in the second sentence of this jury charge so that it would have read: "A union acts arbitrarily when it makes decisions solely based on

considerations that are not legitimate union objectives." By excluding the word "wholly" from the jury charge and not including "solely" in the second sentence of this instruction, the Court permitted the jury to determine that ALPA breached the DFR arbitrary prong even if the union had a legitimate basis for its determinations. By so doing, the jury was able to reach a verdict that did not accord ALPA the deference and wide range of reasonableness to which it was entitled under federal labor law. O'Neill, 499 U.S. at 74, 78.

### 2.    Perfunctory Conduct By Itself Cannot be the Basis for Finding Arbitrary Conduct.

The Court's jury charge additionally undermined the legitimacy of the jury's verdict by its inclusion of two undefined, irrelevant "[e]xamples" of what could constitute "arbitrary" misconduct: "things like acting in a perfunctory or superficial manner." Jury Instruction §15. [3] The "perfunctory" charge failed in several respects. The Court gave the jury no guidance on what could be considered "perfunctory" conduct in the context of the present case, and thus improperly left the jury to figure out the meaning of the term for itself. See Riley, 668 F.2d at 228 (noting that perfunctory is a term that has "proven difficult over time to apply").

---

[3] This concept has been applied only in the context of consideration of a union's actions in handling a grievance or arbitration on behalf of an employee, and thus has no applicability in the case at bar. In the grievance-arbitration context, the term "perfunctory" has been used to refer to situations where the union, by its failure to timely act, eliminated the opportunity for the grievance to be considered or arbitrated or was extremely deficient in its preparation for an arbitration hearing, see, e.g., Riley v. Letter Carriers Local 380, 668 F.2d 224, 227-28 (3d Cir. 1981) (affirming grant of summary judgment for union where union had reasonable basis for its determination not to pursue grievance on behalf of employee); Barr v. United Parcel Service, Inc., 868 F.2d 36, 43 (2d Cir. 1989). But even in that limited context, a union's conduct can only give rise to a DFR breach if there is no reasoned basis for the union's actions or if the union's failures are attributable to bad faith (a separate prong discussed below). Bazarte v. United Transp. Union, 429 F.2d 868, 872 (3rd Cir. 1970) ("It is therefore essential to plaintiff's claim that there should have been proof of 'arbitrary or bad faith conduct on the part of the Union.'"); Barr, 868 F.2d at 43 (jury finding of DFR breach reversed because union's tactical decisions in handling member's grievance were "[a]t most ...errors in judgment" and "do not rise to the level of bad faith or arbitrariness"); Morgan v. Communication Workers, 2009 WL 749546 at *7 (D.N.J. 2009) (same as Bazarte).

Furthermore, the Court did not instruct that, in any event, such conduct could only give rise to a DFR breach case if no rational basis existed that would warrant the union's actions.

An additional problem with the Court's failure to provide guidance on its use of "perfunctory" in this charge is that it permitted Plaintiffs' counsel to fill this void by supplying the jury with his own incorrect standard.  Mr. Press, in his closing argument, told the jury: "You will be instructed that examples of arbitrary conduct include acting in a perfunctory or superficial manner."  See Tr. 7/11/11 at 138:3-5.   Mr. Press then erroneously told the jury that this meant that if a union "do[es]n't deliver" on a promise or does not adhere to its policies, it engages in perfunctory conduct in violation of the DFR arbitrary component.  Id. at 138-50.  But not fulfilling promises does not equate to "perfunctory" conduct as that term is used in DFR case law.  And, by so stating, Plaintiffs' counsel misrepresented the applicable law.  Even if a union does not fulfill a promise or deviates from its policies, it does not thereby breach the DFR if it had a rational basis for its conduct.[4]

Mr. Press's remarks improperly encouraged the jury to cast a wide net to find actionable conduct, well beyond the narrow limits established by federal labor policy and precedent.  Had the Court provided the necessary instruction ALPA requested (see July 11, 2011, Letter from S. Fram to the Court at 2-3), Plaintiffs' counsel's comments would not have been permitted, and the jury thus would not have been told that it could base a finding of arbitrary conduct on an incorrect standard.  Because the Court's jury instructions, however, left it to the jurors to

---

[4]  Regarding promises: see, e.g., Swatts v. United Steelworkers, 808 F.2d 1221, 1225 (7th Cir 1986); Cleveland, 38 F.3d at 295; Nellis v. ALPA, 815 F. Supp. 1522, 1530-32 (E.D. Va. 1993); Panrell v. United Mine Workers, 872 F. Supp. 1502, 1508 (N.D. W. Va. 1995). With regard to deviating from union policy: see, e.g., Rakestraw, 981 F.2d at 1533; Baker v. Newspaper and Graphic Communications Union, Local 6, 628 F.2d 156, 166-67 (D.C. Cir.1980); Bates v. Locomotive Fireman, 56 L.R.R.M. 2271, 2274 (M.D. Fla. 1964). See also S. Fram July 11, 2011, Letter to Court.

determine for themselves whether ALPA's actions were perfunctory and if so, whether that could establish a DFR breach, the jury was able to evaluate ALPA's conduct based on an incorrect standard.

For these reasons, it was error for the Court to instruct the jury that (1) plaintiffs could succeed on less than a showing that the union's actions were based <u>solely</u> on arbitrary grounds that served no legitimate purpose, and (2) "perfunctory or superficial" performance by ALPA alone would suffice to establish a DFR breach.  As a result, ALPA is entitled to a new trial. These charging deficiencies deprived the jury's verdict of its legitimacy.  Further, had the Court properly charged that ALPA could be held liable under the arbitrary prong analysis only if its representatives acted with *no* legitimate or rational purpose, the jury could not have determined that ALPA's conduct violated its DFR.  As a result, ALPA is entitled to a new trial if the Court does not grant ALPA's motion under Rule 50 (b) for judgment as a matter of law.

**B.**       **The Court's Charge Concerning Bad Faith Was Legally Deficient.**

To establish that a union has engaged in a "bad faith" DFR violation,  a plaintiff must adduce "substantial evidence of fraud, deceitful action or dishonest conduct." <u>Amalgamated Ass'n of Motor Coach Employees v. Lockridge</u>, 403 U.S. 274, 299 (1971) (quoting <u>Humphrey v. Moore</u>, 375 U.S. 335, 348 (1964)).  Such bad faith conduct must be "sufficiently egregious" and so "intentionally misleading" as to be "invidious" in order to breach the duty. <u>O'Neill v. ALPA</u>, 939 F.2d 1199, 1203 (5th Cir. 1991) (on remand) ("<u>O'Neill II</u>").  The Court's instruction to the jury on bad faith, Jury Charge §16, was critically deficient in a number of ways.

1.   **The Unexplained "Examples" of Bad Faith that the Jury Was Instructed to Consider Permitted the Jury to Reach A Verdict Based on Legally Impermissible Grounds.**

In overruling ALPA's objection, see Tr. 7/7/11 at 136; July 10, 2011, Letter from S. Fram to the Court at 1, the Court submitted to the jury an instruction that identified four specific examples of "bad faith":

> Examples of bad faith include things like deliberately making misleading statements to employees, not disclosing conflicts of interest, acting with hostility towards union members, and ignoring union policies in labor negotiations, if such actions are the result of a bad-faith motive described [earlier in the charge] . . . .

But the charge provided no guidance for the jury as to what any of these examples mean in the unique context of a DFR action. Without such guidance, the jury was free to draw its own conclusions as to what would satisfy the bad faith standard without regard to the applicable legal standards. Given this deficiency, the jury could well have determined on legally impermissible grounds that ALPA violated the DFR.

2.   **"Acting with Hostility."**

Without instructions to the contrary, a jury understandably could conclude that Plaintiffs could establish that ALPA "act[ed] with hostility towards union members" merely by evidence that ALPA National representatives used a raised voice in talking to them. Indeed, Plaintiffs' counsel encouraged the jury to do just that. After telling the jurors that "[i]f you find that ALPA acted with hostility to the TWA pilots, that can support a finding it breached its duty," see Tr. 7/12/11 at 42:4-6, he cited as an example of such hostility, a heated argument between TWA MEC Merger Committee members and ALPA advisors over the content of a seniority integration proposal. Id. at 43:14-19.

The problem this presents is fundamental. Equating the use of raised voices with hostility that would establish a DFR bad faith breach cannot be squared with the Supreme

Court's "substantial evidence" standard. "Hostility" has a defined meaning in DFR law and it does not include using an elevated tone of voice. See Merritt v. International Ass'n of Machinists and Aerospace Workers, 613 F.3d 609, 625 (6th Cir. 2010) (union representative's calling union members "whiners" who were "a lot of trouble" was insufficient to establish hostility under the DFR). Rather, "hostility" has a specific meaning in DFR law, and involves severe misconduct such as racial animus, see, e.g., Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 85 (3d Cir. 1981), or secretly waiving contractual protections and leaving employees with no way to protect themselves, Lewis v. Tuscan Dairy Farms, Inc., 25 F.3d 1138 1142-43 (2d Cir. 1994). There is nothing remotely similar in the trial record established in the current proceeding.

Because the jury received no instruction on what was required to establish hostility for DFR bad faith purposes, the jury was left free to base its verdict on an impermissible standard. As a consequence, the verdict cannot stand.

### 3.    "Making Misleading Statements."

Similarly erroneous was the Court's unexplained instruction that the jury could find bad faith based on allegedly misleading statements by ALPA. A misrepresentation can only serve to ground a bad faith DFR breach if it (1) is "'intentionally misleading and . . . of a nature to be reasonably relied upon by the membership,'" O'Neill II, 939 F.2d at 1202 (quoting Swatts v. United Steelworkers, 808 F.2d 1221, 1225 (7th Cir. 1986)), and (2) actually caused the alleged harm. Deboles v. Trans World Airlines, Inc., 552 F.2d 1005, 1017-18 (3d Cir. 1977).

In Deboles, plaintiffs alleged that the union negotiated lesser seniority rights for them because they were opposed by other bargaining unit employees who would be disadvantaged thereby and then, as the trial court found, made a series of misrepresentations over several years concerning the efforts it allegedly was making to resolve the seniority issue as plaintiffs desired.

-10-

Id. at 1010-11.  The Third Circuit rejected the district court's finding that the union's misrepresentations constituted bad faith sufficient to establish a DFR breach because there was an objectively reasonable basis for including different seniority provisions in the collective bargaining agreement and there was no "direct nexus" shown between the misrepresentations and the harm alleged, i.e., the substandard seniority protections the union negotiated for plaintiffs. Id. at 1018.

Here, the Court denied ALPA's request to instruct the jury, consistently with Deboles, that a misrepresentation could support a DFR breach only if there was a direct causal nexus between the misrepresentation and the harm Plaintiffs claim to have suffered.  By failing to so charge the jury, the jury could have concluded that "deliberately making misleading statements" was sufficient under Jury Charge §16 to establish a bad faith DFR breach.  Such a conclusion would have, in effect, impermissibly punished ALPA for misstatements that caused no injury. Id. at 1019.  For this additional reason, the jury verdict cannot be permitted to stand.

### 4.  **"Ignoring Union Policies."**

Contrary to Plaintiffs' argument, a union does not automatically breach its duty of fair representation because it departs from its stated policies.  While strictly adhering to its internal policy may "insulate" a union from a DFR claim, "it does not follow that deviation exposes the union to liability." Rakestraw, 981 F.2d at 1533.  Moreover, there was no evidence to support a finding that ALPA "ignore[ed]" its "policies" in representing the TWA pilots.

Using this example of bad faith was error because the Court did not further instruct the jury that ALPA's interpretation of its own policies and procedures is entitled to deference and cannot be second-guessed unless "patently unreasonable." Executive Bd. of Transport Workers Union of Philadelphia, Local 234 v. Transport Workers Union, 338 F.3d 166, 170 (3d Cir. 2003); see, e.g., Spellacy v. Airline Pilots Ass'n, 156 F.3d 120, 128 (2d Cir.1998).  Further, a union

-11-

retains the discretion to adapt its policies to changed or different circumstances. <u>Rakestraw</u>, 981

F.2d at 1533; <u>Ackley</u>, 910 F.2d at 1304. These basic principles provide necessary context for any

evaluation of whether a union can be said to have "ignore[d]" its governing policies.

Plaintiffs' counsel took full advantage of this open-ended instruction.  For example, he

argued that ALPA somehow violated its Merger Policy because the union allegedly failed to take

"reasonable steps" to achieve a fair and equitable integration under the circumstances presented

here, where the TWA pilots would be integrated with a non-ALPA carrier.  Tr. 7/11/11 at 149:1-

22.  The reasonableness of the steps to be taken under Merger Policy was for ALPA to determine

in the exercise of ALPA's discretion under settled law.  Because the jury was provided no

guidance with respect to the deference to be afforded ALPA's interpretation of its governing

documents, it was free to substitute its view of what were "reasonable steps" to take and free to

condemn as bad faith anything short of the standard it adopted, whatever that may have been.

### 5.    Not Disclosing "Conflicts of Interest."

The central theory of Plaintiffs' case was that ALPA acted in bad faith because it was

actively pursuing representation of the American pilot group while at the same time negotiating

the seniority integration of the TWA pilots into that larger group.  In the Court's view, because

of this "inherent" "serious" "conflict," <u>see</u> Tr. 7/7/11 at 86-87 (Court's comments in denying

ALPA's Rule 50 (a) motion), ALPA was required to be "like Calp[u]rnia," "above and beyond

all reproach."  <u>Id</u>. at 87:22-24.  This view of the case carried over into the Court's jury

instruction that ALPA could be found to have engaged in bad faith if it failed to disclose this

"conflict of interest".  The "conflict of interest" instruction, particularly unaccompanied by

adequate explanation, afforded the jury the opportunity to find a DFR breach on legally

impermissible grounds.

As a threshold matter, the "beyond all reproach" standard that the Court imposed on ALPA, which justified the Court's inclusion of the "conflict of interest" example in the bad faith jury charge, conflicts with the DFR standard established in <u>Air Line Pilots Ass'n v. O'Neill</u>, 499 U.S. 65 (1991), and its progeny. While the Court viewed this to be a "[v]ery, very unusual" case, <u>see</u> Tr. 7/7/11 at 93:14, in fact the claims raised here are more similar to than different from the vast majority of DFR claims. In any DFR claim the fundamental issue is whether the union acted fairly in its representation of the bargaining unit, and only one "highly deferential" standard applies "to all union activity." <u>O'Neill</u>, 499 U.S. at 67. The claims in this case provided no basis for subjecting ALPA to a more exacting DFR obligation.

The suggestion that different rules apply when a union is faced with a supposed conflict also is inconsistent with the fundamental premise of the established DFR standards that unions routinely are confronted with competing and indeed, irreconcilable interests, which are "a recurring fact" in collective bargaining. <u>Ford Motor Co. v. Huffman</u>, 345 U.S. 330, 337-38 (1953). Such conflicts are found in a broad variety of contexts, such as where different employee groups have irreconcilable demands,[5] or where union officials' self-interest is alleged to have tainted decision-making.[6] In fact, it is precisely because unions must confront and

---

[5] <u>E.g.</u>, <u>Huffman</u>, 345 U.S. at 334-35, 338 (no DFR breach where union agreed that returning veterans would obtain seniority credit for time served in the military, even those newly hired, and this seniority rule would adversely affect incumbent employees).

[6] <u>E.g.</u>, <u>O'Neill II</u>, 939 F.2d at 1205 n.13 (holding that union president's interest in reelection did not create disputed issue of fact tainting otherwise rational decision to settle strike); <u>Barthelemy v. ALPA</u>, 897 F.2d 999, 1006 (9th Cir. 1990) (self-interest of union officers in reelection alleged to have motivated challenges decisions were insufficient evidence of bad faith to warrant denial of summary judgment); <u>Rakestraw v. United Airlines</u>, 981 F.2d 1524, 1527, 1533 (7th Cir. 1992) (in seniority integration situation, claim that ALPA's president was "toadying to the more numerous TWA pilots" did not give rise to DFR claim where ALPA's reasonable efforts were aimed at "bridg[ing] the gap" between the two pilot groups).

respond to competing demands and concerns that unions are to be given broad leeway in making decisions, forbidding second-guessing by courts and juries. See O'Neill, 499 U.S. at 76.[7]

Even though, as the Court noted, it was "perfectly lawful, proper conduct" for ALPA to seek to organize under its banner all pilot groups, American's included, Tr. 7/7/11 at 87:2, the unexplained "conflict of interest" instruction left the jury free to conclude that ALPA's pursuit of this concededly legitimate objective was nevertheless sufficient to establish DFR liability – without *any* evidence that ALPA's desire to represent all pilots in any way negatively affected its actions in connection with representing the TWA pilots.

Because the Court's conflict of interest instruction conflicts with DFR case law, and thus permitted the jury to find liability on impermissible grounds, the verdict must be set aside.

### 6.    The Court's Instructions Failed to Provide Required Guidance on "Bad Faith Motive."

The Court also erred when it failed to instruct that Plaintiffs had to show that bad faith was the sole motive for ALPA's challenged actions. The Court instead gave Jury Charge §16, which allowed the jury to find that if there was "a" bad faith motive for its actions, that would be sufficient for finding a DFR breach; it incorrectly said that "to find that ALPA acted in bad faith, you must find that ALPA had a bad faith motive," and that the union's conduct was "the result of a bad faith motive . . . ."

This instruction allowed the jury to render a verdict that employed a legally erroneous standard on "bad faith motive." Under DFR case law, Plaintiffs were required to show that bad faith was the "sole motivating factor for ALPA's actions." See Addington v. USAPA, No. Civ. 08-1633, 2009 WL 2169164, at *14-15 (D. Ariz. July 17, 2009), rev'd on other grounds, 606 F.3d 1174 (9th Cir. 2010). There, the plaintiffs argued that a "bad motive combined with a good

---

[7] In this respect unions are not like lawyers, contra Bensel v. Allied Pilots Ass'n, 675 F. Supp. 2d 493, 502 (D.N.J. 2009); they can and indeed must represent conflicting interests.

motive could still produce liability where the bad motive predominates." Id. at *15.  The Court

rejected the suggestion because the case law does not support a mixed-motive DFR theory, but

instead permits a finding of DFR liability only if the union acted "for no reason other" than a bad

motive. Id. at *11, 15.  Thus, plaintiffs were required to (and in that case did) show that the

"union's sole motivation is improper." Id. at *14.  See also Rakestraw v. United Airlines, Inc.,

981 F.2d 1524, 1534-35 (7th Cir. 1992) (holding that DFR liability could not be established

based on a bad faith motive where a legitimate union reason also informed the union's action

because that would undercut the considerable deference due union decision making).  Thus, the

jury should have been instructed that if ALPA had both legitimate and "bad" motives for its

actions, the jury must find that ALPA did not breach the DFR.

The Court's failure to so instruct the jury permitted it to render a verdict predicated on

legally impermissible grounds.  As a consequence, the verdict must be vacated and the Court

must grant ALPA a new trial.

## C.     The Court's Causation Instruction Permitted Improper Speculation.

The Court included in its description of the "Nature of the Claim" the following charge

on causation:

> If plaintiffs prove that ALPA's conduct was arbitrary or motivated by bad faith,
> they must then prove a tangible injury resulting from the conduct in order to
> prevail.  A labor union can only be held liable for breach of its duty of fair
> representation if its breach directly causes injury to an individual or group to
> whom the duty is owed.  In this case, proving injury means that Plaintiffs are
> required to demonstrate that, but for ALPA's breach of its duty of fair
> representation, the overall outcome of the integration of the TWA Pilots into
> American would have been more favorable.

Jury Charge §13.  The only other instruction dealing with causation was in the "verdict" charge:

"If you find by a preponderance of the evidence, looking at all the evidence presented, that

ALPA breached its duty of fair representation by acting arbitrarily or in bad faith and that

-15-

ALPA's conduct caused injury to some or all of the TWA Pilots, you must find for the Plaintiffs." Jury Charge §18.

### 1.     The Causation Instructions Were Also Deficient.

The Court's limited instructions on causation provided no guidance to the jurors as to what they could or could not properly consider in determining if Plaintiffs had carried their burden of proving that ALPA's DFR breaches directly caused injury to the Plaintiff class and that but for those breaches, Plaintiffs would have received a more favorable jobs situation than they ultimately received.  Left without appropriate instruction, the jurors were free to formulate their own criteria and to determine whether those unknown criteria were satisfied.

ALPA's counsel sought to cure this deficiency in the draft charges by, among other things, seeking the inclusion of the following language which, if included, would have alerted the jury that it could not base its causation verdict on any speculative injury to Plaintiffs:

> In determining the question of causation, you may not guess or speculate about whether any claimed breach of duty resulted in a direct, tangible injury to the Plaintiffs.  Rather, Plaintiffs must prove that actual harm was caused by conduct that constituted a breach of the duty of fair representation and must do so by a preponderance of the evidence.

See July 10, 2011, Letter from S. Fram to the Court, proposing supplemental charges, at 2-3 (with supporting case authorities); Tr. 7/11/11 at 7:6-9.

The Court, however, rejected this essential modification.  Id. at 7:12-13.  In fact, the final charges did not address ALPA's stated concerns.  The Court did not instruct the jurors on how they were to assess causation, and more specifically, that that they could not base a causation determination on speculation—whether their own or that of trial witnesses.  Unconstrained by such necessary clarifying jury instructions, Plaintiffs' counsel was able to supply the jury with his own watered-down causation standard, which invited juror speculation (as further reviewed

below), and which in turn contributed to a jury verdict that could not have been reached had the

jury adhered to proper instructions on causation.

>    **2.    The Evidence Could Not Have Supported a Finding for Plaintiffs Under an Appropriate Jury Instruction.**

In describing the test for satisfying causation, Plaintiffs' counsel told the jury that all they

needed to do was to "believe that but for ALPA's [DFR] breach, the overall outcome of the

seniority integration would have been more favorable to the TWA pilots." See Tr. 7/12/11 at

72:4-6 (emphasis added).  Moreover, according to Plaintiffs' counsel, the jury could arrive at this

"belief" simply by applying their own "common sense." Id. at 72:6-18.

When Plaintiffs' counsel then turned to the "evidence" on "this injury question," the

significant problem posed by the lack of proper guidance to the jury became all the more clear.

As he explained it:

> We have to show that ALPA TWA pilots would have gotten a more favorable
> integration had ALPA not breached its duty of fair representation. Now, what is
> the evidence of that? There was the direct testimony from Mr. Day about that. He
> said I would have expected, I think his testimony, his answer was that it would
> have been reasonable to believe that we would have got a better deal closer to the
> Tannen proposal[8] had ALPA done the things we asked for and gave us the
> leverage we needed. Mike Day told you that.

Id. at 72:24-73:14.

It is important to focus on the supposed "evidence" Plaintiffs' counsel cited "to support

that conclusion," id. at 73:15-16, because it demonstrates the fundamental problems set in

motion by the faulty charge.  He noted that the American pilots' merger committee had moved

off its original March 1, 2001, proposal on April 18, 2001, by "lower[ing] the staple by 50," id.

at 73:20-21, and he then encouraged the jury to speculate as to the implications it could draw

from that: "They do that every month, we will, after a year we will have a fair deal."  Id. at

---

[8]  This was reference to the so-called "Rightful Place" proposal conceived by an economist
retained by the TWA pilots.

73:21-23.  Obviously, counsel's suggestion of possible further changes to the integrated seniority list is not "evidence," and neither would similar conjecture offered by a trial witness, such as Day, be evidence.  Moreover, counsel's hypothesis ran counter to the evidence he next cited that the American Airlines pilots' merger committee agreed to *no* changes during the ensuing six months.  Id. at 74:3-9.  Yet, because the jury was not provided any instructive contrary guidance, it was given liberty to accept the invitation of Plaintiffs' counsel to engage in speculation.

But Plaintiffs' counsel went even further in his effort to encourage jury speculation concerning whether Plaintiffs were injured by ALPA's conduct.  As an "evidentiary" basis for a causation finding for Plaintiffs, Mr. Press cited the "better deal" that the American Airlines pilots' merger committee offered in October 2001 after the proposed Bond Bill had surfaced, id. at 74:22, and then asked the jury to imagine the following:

> [W]hat if ALPA had gotten involved and done any of the things, or all of the things, that were requested of it? … litigate, boycott … all of it. Would there have been a better deal? A more favorable deal? <u>Again, that is for you to decide.</u>

Id. at 75:11-15 (emphasis added).  Counsel again reminded the jury that, rather than searching for evidence to supply the answers to these questions, they instead could rely on their "common sense."  Id. at 75:15-16.  Finally, Mr. Press advised the jurors that even if they only found the "staple" would have been "lower[ed]" by one pilot, that is injury" that would suffice to satisfy Plaintiffs' causation burden and support a verdict for Plaintiffs on causation.  Id. at 75:17-18.

Whatever else might be said of counsel's conjectures and Day's beliefs as to what might happen, they could not serve to establish what <u>would have occurred</u> had things transpired differently.  Had the jury been properly charged, it would have understood that it could not have based a conclusion that the integration <u>would have been better</u> on such speculative testimony.

-18-

Similarly, neither Day nor any other witness provided evidence that the other "injury"

cited by Plaintiffs—the post 9/11 furlough of TWA pilots, id. at 72:19-23—would not have

occurred but for ALPA's alleged misconduct.[9]

### 3.   The Controlling Case Law Demonstrates the Problem with the Causation Charges in this Case and Why a Verdict in Plaintiffs' Favor on Causation Cannot Be Permitted to Stand.

The jury could only find for Plaintiffs if the evidence demonstrated that ALPA's arbitrary

or bad faith DFR misconduct directly caused Plaintiffs' injury—that ALPA's conduct was the

"but for" cause of the injuries they allegedly suffered.  Deboles v. Trans World Airlines, Inc.,

552 F.2d 1005, 1019 (3d Cir. 1977); Spellacy v. Air Line Pilots Ass'n, 156 F.3d 120, 130 (2d

Cir. 1998); Anderson v. United Paperworkers Int'l Union, 641 F.2d 574, 578-79 (8th Cir. 1981);

Ackley v. Western Conference of Teamsters, 958 F.2d 1463, 1472 (9th Cir. 1992); Acri v. Int'l

Ass'n of Machinists, 781 F.2d 1393, 1397 (9th Cir. 1986); Rakestraw v. United Airlines, 981

F.2d 1524, 1534 (7th Cir. 1992).  In the context of contract negotiations, the courts have

consistently held, following Deboles, 552 F.2d at 1017-19, that DFR liability requires a plaintiff

to prove both that the union members would have proceeded differently (detrimental reliance)[10]

and that the outcome of the negotiations with the company would have been different.  See, e.g.,

Ackley, 958 F.2d 1468-73; Anderson, 641 F.2d at 578-81.  Plaintiffs were therefore required to

demonstrate, with respect to their bad faith claim, that any allegedly dishonest conduct by ALPA

(1) led the MEC to proceed differently than it would have (detrimental reliance) and; (2) that

---

[9]  While the Court refused to let Day respond when asked by Plaintiffs' counsel to what he attributed the movement reflected in what became the American-APA Supplement CC Agreement because that "calls for speculation," see Tr. 6/23/11 at 95:4-11, the jury was not instructed that it was forbidden to speculate as to what might have occurred but did not in determining whether Plaintiffs had carried their heavy burden on causation.
[10]  For a fuller discussion of the "detrimental reliance" element, see ALPA's Rule 50(b) Brief.

American Airlines and the APA would have responded in a way that improved the TWA pilots' jobs situation.

This governing case law indicates how exacting this causation standard is and that it cannot be satisfied through conjecture. Nothing about this case warrants a different standard, one that permits speculation and shifts to ALPA the burden of proving that there was no causation (a burden that ALPA could not meet in any event because the Court erroneously excluded the testimony of Jeff Brundage, as discussed in Point II below).

For example, in Deboles, union leaders made false representations to the union membership in conjunction with their consideration and ratification of a proposed collective bargaining agreement. Based on these misrepresentations, the District Court found that the union had breached its DFR. The Third Circuit reversed because plaintiffs provided "no proof that the contract would not have been ratified had those members been told the truth," and thus they could not demonstrate "a showing of tangible injury proximately resulting from the falsehood." Deboles, 552 F.2d at 1017, 1019-20. The court rejected plaintiffs' effort to satisfy that showing by offering their opinions as to what might have happened had the union not lied:

> Had they known the truth, they now say, they might have challenged the union's original recognition as bargaining representative, or they have sought separate representation. Such speculative, post hoc reasoning does not suffice to demonstrate concrete injury caused by the misstatements absent supporting evidence in the record below.

Id. at 1018 n.26. Yet it is precisely such speculation as to what might have occurred that the Court here declined to foreclose, and in which Plaintiffs' counsel, unconstrained by an appropriate limiting charge, asked the jury to engage to reach its causation verdict.

Anderson, like Deboles, presented a situation in which the union leadership made false statements to the membership when it was considering whether to ratify a proposed contract.

The union assured its members that a special security fund had been created which guaranteed severance pay for the employees; in fact, no such fund existed. Anderson, 641 F.2d at 576. After the union members ratified the agreement, the company went bankrupt and the members received only a portion of the severance pay that they had expected. Id. The jury found that the union had breached its DFR and awarded damages to plaintiffs. The district court denied a motion for judgment notwithstanding the verdict, id. at 581, and found that "it was for the jury to determine . . . whether the . . . Union representative . . . misrepresented the Company's intentions, and whether those representations, if any, altered the Union member employees' position in regard to acceptance or rejection of the collective bargaining agreements," id. at 579, 581. The Eighth Circuit reversed, ruling that "the evidence fails to demonstrate any causal link between [the union representative's] misrepresentations and the plaintiffs' injuries." Id. at 579. To establish causation, plaintiffs were required to demonstrate both that, had the union representative "told the truth, the employees would not have ratified the" collective bargaining agreement (CBA), *and* that the Company could have and would have contributed to the severance pay fund. Id. While some employees testified that they would have gone out on strike or taken other jobs had they known the truth, this evidence could not establish the requisite causal link:

> Even crediting this self-serving testimony, it is mere speculation that an employer which had continually resisted the severance pay provision as written, had refused to establish a security fund, and was only a few months from filing from bankruptcy, would have been willing and able to establish a security fund and contribute the necessary funds to it. Even assuming that but for [the union representative's] misrepresentations the employees would have struck ... to obtain a security fund, there is no proof that they have accomplished their objective. The plaintiffs have not proved that but for [the union representative's] misrepresentations ... they would have obtained their severance pay.

<u>Id.</u> at 580.  The causation claims in <u>Anderson</u> failed because the plaintiffs could not prove "that holding out longer would necessarily have gotten them more money.  The fact of injury as well as the amount of damages on this theory must remain purely conjectural." <u>Id.</u> at 581.[11]

The situation here is no different.  Plaintiffs (or even "some" of them) would only have secured an improved seniority integration if, <u>inter alia</u>, the APA agreed to it.  There simply is no evidence in the record, only speculation, to support such a finding.  To the contrary, the evidence is undisputed that the American pilots held fast to the seniority integration provided under the Supplement CC Agreement between them and American.

Plaintiffs' many theories as to what ALPA could have done on their behalf necessitate that, to prove causation, Plaintiffs should have, but failed to, present probative evidence that their seniority would have been improved through any of the following:

> (1) the bankruptcy court would have denied TWA's §1113 motion and thus the LPPs in the TWA-ALPA CBA would have survived intact;

> (2) American would have proceeded to close the acquisition of TWA without the scope clause waiver even though that acquisition had been explicitly conditioned on such waiver;

> (3) an arbitrator determining seniority integration would have produced an integration more favorable to the TWA pilots – something even Plaintiffs' counsel conceded was entirely speculative, <u>see</u> Tr. 7/12/11 at 60:13-15;[12]

---

[11] <u>See also</u> <u>Story Parchment Co. v. Paterson Parchment Paper Co.</u>, 282 U.S. 555, 562 (1931) ("[T]here is a clear distinction between the measure of proof necessary to establish the fact that petitioner has sustained some damage and the measure of proof necessary to enable the jury to fix the amount.  The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of the amount."); <u>Barrett v. Thorofare Markets, Inc.</u>, 452 F. Supp. 880, 883 (W.D. Pa. 1978) (granting summary judgment because "[t]he fact of injury as well as the amount of damages in this theory must remain purely conjectural").

[12] Just as with integrations determined by other means, employee groups have contended that arbitrators gave them unfair integrations.  <u>See, e.g.</u>, <u>Gvozdenonic v. United Airlines</u>, 933 F.2d 1100 (2d Cir. 1991); <u>Air Wis. Pilots Protection Comm. v. Sanderson</u>, 909 F.2d 213 (7th Cir.1990); <u>Addington v. USAPA</u>, No. Civ. 08-1633, 2009 WL 2169164 (D. Ariz. July 17, 2009)

(4) if the lawsuits proposed by Roland Wilder had been filed, they would have resulted in a more favorable integration for the TWA pilots through an integration arbitration or otherwise;

(5) pursuing the Bond legislation after American and Allied had awakened to it and mobilized opposition to it would have pushed Allied to move on seniority;

(6) the Bond legislation would have been enacted into law and that, if it were, the TWA pilots would have received an improved seniority integration;

(7) contrary to what occurred, the System Board in the "reasonable best efforts" case would have ruled for ALPA, (establishing that American had failed to fulfill its obligation with respect to helping to arrange for a fair and equitable seniority integration), and would have vacated Supplement CC, which in turn would have provided the TWA pilots with a more favorable seniority integration;

(8) the AFL-CIO would have agreed to include American Airlines (a highly-unionized carrier) on its "do not patronize list," and, if it had, that this would have caused a seniority integration more favorable to the TWA pilots; and

(9) had ALPA agreed to initiate a "jumpseat war", despite all the attending negative consequences that could generate, that this, too, would have caused a modification in the seniority integration favorable to the Plaintiffs.

Plaintiffs presented no evidence, only the speculation of Day and the argument of their counsel, to meet this evidentiary burden. Had the jury been properly charged on causation, it could not have found for the Plaintiffs without ignoring the charge. The failure of causation is, under the governing case law reviewed above, outcome determinative and the verdict on causation cannot stand, entitling ALPA to a new trial if the Court does not grant judgment for ALPA as a matter of law.

## II.   A New Trial Should Be Granted Due to the Erroneous Exclusion of the Testimony of Jeffrey Brundage of American Airlines.

Under Fed. R. Evid. 401, relevant evidence is defined as having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The rules of evidence, "while giving

---

(pilot group switched unions because of dissatisfaction with arbitrated integration), rev'd on other grounds, 606 F.3d 1174 (9th Cir. 2010).

judges great freedom to admit evidence, diminishes substantially their authority to exclude evidence as irrelevant." Blancha v. Raymark Industries, 972 F.2d 507, 514 (3d Cir. 1992) (citing 22 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence §5166 at 74 (1978)).   Once evidence has been deemed relevant—and there can be no question that the testimony of Brundage addressed issues at the heart of this case—a court must articulate a reason under the rules of evidence for its exclusion.  This the Court failed to do, to the significant prejudice of ALPA.

Here, given the absence of any admissible evidence from Plaintiffs on the issue of causation, the Court's determination to exclude the deposition testimony of Jeff Brundage was particularly prejudicial.  To the extent Plaintiffs did present any admissible evidence on the issue of causation—ALPA contends that they did not—testimony by Brundage on behalf of American that additional threats or other conduct by ALPA would not have changed American's position was highly relevant to the issue of causation.

Brundage testified that American wanted to reach an agreement on the issue of seniority integration, but that it would not agree to anything that would "create friction" with the APA and would not put pressure on the American pilots.  Brundage Dep. Tr. at 27.  He also testified about going on "road shows" across the country to reassure the American pilots that the APA would control the seniority integration and that arbitration would not be a part of the seniority integration process.  Brundage Dep. Tr. at 44.

Brundage further testified unequivocally that American was not bluffing about walking away from the deal, absent elimination of the scope provisions: "Not only was it not a bluff, it wasn't even open for negotiation."  Brundage Dep. Tr. at 57.  He also testified that American was "very anxious to conclude the transaction and we were not interested in a long drawn-out

process." Brundage Dep. Tr. at 31-32.  This testimony would have effectively refuted Plaintiffs'

claim that Roland Wilder's first litigation theory, if implemented, might have resulted in a better

jobs outcome for the TWA pilots.

Also clearly relevant was Brundage's testimony about his letter to Woerth on October 12,

2001, a letter which memorialized Brundage's frustrations in dealing with the TWA MEC and its

representatives.  Brundage Dep. Tr. at 69-70.  Although the TWA pilots were still pushing for a

process that included arbitration late into the fall of 2001, Brundage testified that any hope of

arbitration was "long gone" by that time.  Brundage Dep. Tr. at 70.  Brundage also testified

about his frustration based on a meeting that he scheduled in Dallas, but which never took place

because of Plaintiffs' refusal to participate.  He further testified about the seniority deal that the

TWA MEC voted down on October 23, 2001, which would have contained enhanced protections

for the TWA pilots, but which were not ultimately included in Supplement CC as a result of

Plaintiffs' opposition, and the TWA-MEC's asserted "acceptance" of a seniority integration on

October 23, 2001, "with conditions" that the MEC knew were unacceptable to American.

Brundage Dep. Tr. at 71-73, 75-77.

Moreover, given the fact and credibility disputes Plaintiffs and their counsel attempted to

create concerning the reasonableness of ALPA's concern about what American would or would

not do, testimony by Brundage on American's plans would have been critically important to the

jury.  The inability of ALPA to present Brundage's testimony enabled counsel for Plaintiffs, in

his closing, to disparage the testimony of the ALPA and MEC advisors as unworthy of belief.

Thus, Brundage's testimony about conversations he had with Babbitt and Woerth would have

corroborated ALPA's trial testimony regarding the reasonableness of their concerns about taking

positions that were overly aggressive.  Brundage Dep. Tr. at 57-59, 74-75.

Brundage's deposition testimony would have refuted Plaintiffs' testimony on a variety of other issues as well.  It would have contradicted Ted Case's testimony, for example, that there was virtually no difference between the seniority deal offered by American and APA in October 2001 and Supplement CC.  Tr. 6/8/11 at 102.  It would have also countered Alan Altman's testimony that TWA Labor Relations executive Terry Hayes was lying when he relayed Brundage's message that American would walk away from the deal if the scope waiver issue remained unresolved.  Tr. 6/9/11 at 163.  Brundage's testimony would have also refuted Sally Young's testimony in which she questioned the accuracy of Brundage's letter to Woerth on October 12, 2001.  Tr. 6/13/11 at 92-93; D-200.  Finally, Brundage's testimony was particularly important because it would have been the only testimony before the jury from a person not associated with either Plaintiffs or ALPA.

The Court's stated reason for barring Brundage's deposition testimony—that certain of his answers were too long, see Tr. 6/23/11 at 3-4—finds no support in the rules of evidence.  The length of Brundage's answers during his deposition is not a proper ground for the exclusion of such critical testimony, and the Court's exclusion of that testimony was highly unfair and prejudicial to ALPA.

ALPA should accordingly be granted a new trial based on the Court's improper exclusion of Brundage's testimony.  It is well settled that the improper exclusion of testimony is grounds for a new trial.  See, e.g., Lauria v. National Railroad Passenger Corp., 145 F.3d 593, 597-602 (3d Cir. 1998) (exclusion of expert witness and lay opinion expert witness warranted new trial); Gaynor v. Atlantic Greyhound Corp., 183 F.2d 482, 485 (3d Cir. 1950) (exclusion of corroborating fact witness with actual knowledge was error).  See also Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 187 (3d Cir. 1990) (reversal warranted where exclusion is "arbitrary

-26-

and irrational"), cert. denied, 501 U.S. 1217 (1991).  The unique position of this witness made the exclusion of his testimony especially prejudicial to ALPA.

**III.   A New Trial Should Be Granted Because Plaintiffs' Counsel Knowingly Presented False Testimony and Engaged in Other Misconduct.**

It is firmly established that a new trial is necessary where counsel for a party presents testimony that is false, deliberately adduces inadmissible evidence or misstates the evidence in closing argument.  See, e.g., Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 206-07 (3d Cir. 1992); Draper v. Airco, Inc., 580 F.2d 91, 95 (3d Cir. 1978).  See generally 11 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d §2809 ("If a verdict has been unfairly influenced by the misconduct of counsel a new trial should be granted.").  A new trial is required in this case because Plaintiffs' counsel knowingly presented false testimony which improperly prejudiced the jury against ALPA, and because Plaintiffs' counsel misstated numerous key facts in closing argument.

**A.   Plaintiffs' Counsel Knowingly Offered False Testimony.**

As set forth in ALPA's accompanying motion to revoke the pro hac vice admission of two of the attorneys who represented Plaintiffs at the liability trial, the facts of which ALPA incorporates herein for the purposes of this motion, these attorneys knowingly presented false testimony by a number of pilots during trial and then improperly relied upon that testimony in closing argument.

Courts have not hesitated to order new trials where false testimony is offered, even where the proponent of the false testimony concedes its falsity before the trial is concluded.  In United States v. LaPage, 231 F.3d 488 (9th Cir. 2000), a criminal case, the Ninth Circuit reversed a conviction where the prosecution offered false testimony and then failed immediately to call it to the attention of the trial court.  It rejected the government's argument that the false testimony did

not affect the outcome of the trial because the defense knew that the testimony was false at the

time it was given and had the opportunity to impeach the witness with a transcript of earlier

testimony and because the government conceded that the witness had lied in its rebuttal closing

argument. Id. at 491. The Ninth Circuit explained:

> The government correctly argues that there was other evidence from which the
> jury could have figured out that Manes had lied about Pinkston and other matters,
> and that the defense knew as plainly as the prosecutor that Manes had lied. But
> the government's duty to correct perjury by its witnesses is not discharged merely
> because defense counsel knows, and the jury may figure out, that the testimony is
> false. Where the prosecutor knows that his witness has lied, he has a
> constitutional duty to correct the false impression of the facts.... [I]n this case, the
> prosecutor sat silently as his witness lied, and sat silently as his witness evaded
> defense counsel's ineffectual cross-examination. In closing argument, the
> prosecutor continued to do nothing to remedy the falsehood. Only after the
> defense has used up its last chance to address the jury in closing argument did the
> prosecutor concede on rebuttal that Manes had lied about Pinkston. Though
> making the concession, the prosecutor argued that Manes's lie about Pinkston was
> not about anything important so it should not affect the verdict. Because the
> prosecutor delayed the correction until rebuttal argument, the defense could no
> longer explain why the lie about Pinkston was important.

Id. at 491-92. The problem with perjured testimony, the court added, is that it is impossible to

know its full impact:

> All perjury pollutes a trial, making it hard for jurors to see the truth. No lawyer,
> whether prosecutor or defense counsel, civil or criminal, may knowingly present
> lies to a jury and then sit idly by while opposing counsel struggles to contain this
> pollution of the trial.

Id.; see also United States v. Freeman, Civ. No. 09-4043, 2011 WL 2417091 (7th Cir. June 17,

2011) (granting a new trial and harshly criticizing government attorneys who presented false

testimony and delayed calling it to the attention of the court).

Indeed, where, as here, false testimony has been boldly proffered in open court, the

sanction of dismissal may well be appropriate. "Fraud on the court occurs where it can be

demonstrated, clearly and convincingly, that a party has sentiently set in motion some

unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir.1989). In Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944), the Supreme Court stated that "courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system." As Justice Black wrote:

> [t]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society ... The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

Id.; see also Aoude, 892 F.2d at 1119.  "Accordingly, a court's inherent power to dismiss a case and protect the sanctity of the judicial process is never more compelling than in a situation of individuals who engage in fraud upon the court." Perna v. Elec. Data Sys., Corp., 916 F. Supp. 388, 404 (D.N.J. 1995).  Applying the Perna six-factor test in this case, id. at 398, the Court would be fully warranted in dismissing this action based upon the misconduct of the named Plaintiffs and class counsel in knowingly presenting false testimony during trial.  At a minimum, based upon the presentation of false testimony and counsel's misconduct in his closing argument, the Court should order a new liability trial and should prohibit, as part of that trial, any testimony or evidence by the pilots who testified falsely at the first trial.

B.  **Misstatements Made in Plaintiffs' Closing Argument.**

During closing arguments, Plaintiffs' counsel, Allen Press, misrepresented the facts related to several key issues, including those described in ALPA's brief in support its motion to

revoke *pro hac vice* admissions.  The number and magnitude of misstatements made during his closing argument require the Court to grant ALPA a new trial.

<b>1.   <u>Misstatements About Section 1113 of the Bankruptcy Code.</u></b>

Mr. Press claimed that Richard Seltzer testified that there was "an automatic right to an extension of the 1113 hearing." Tr. 7/11/11 at 145.  Not only was this factually incorrect, but it was inconsistent with bankruptcy law.  Mr. Seltzer testified that the statute governing the timing of the Section 1113 hearing provides that the bankruptcy court may extend the hearing one week for "something like special circumstances or the circumstances of the case." Tr. 7/6/11 at 119-21.  But even then, Mr. Seltzer testified, "the statute instructed the Judge not to extend the start of the hearing unless the company agreed," which is completely opposite from an automatic extension.  <u>Id.</u> at 121.

ALPA raised this issue in Mr. Fram's letter to Judge Irenas on July 11, 2011, which the Court addressed the next morning before continuing with Plaintiffs' closing argument.  Tr. 7/12/11 at 4-8.  During that discussion about Mr. Press's mischaracterization of Mr. Seltzer's testimony, the Court opined that this issue was "a little more murky" than ALPA had said, based on the fact that TWA, Inc. had filed an amended 1113 motion.  <u>Id.</u>  However, the Court repeated no less than four times that the statute did not provide for an automatic right to an extension and that Mr. Press's previous statement was inaccurate: "[T]he statement that there was an automatic right to an extension is not an accurate statement.  It is an inaccurate statement." <u>Id.</u> at 6-8.  Nevertheless, the Court refused to instruct the jury on the issue.  <u>Id.</u> at 7-8.  It was improper therefore for Mr. Press to argue to the jury that ALPA could have obtained an automatic extension for the Section 1113 hearing.

-30-

2.      **Misstatements About Funding Provided By ALPA.**

Mr. Press claimed that ALPA denied the TWA pilots' requests for funding "every time my guys asked ALPA for money." Tr. 7/11/11 at 150, 152.   However, Mike Day admitted on cross that ALPA absorbed the financial consequences of the loss during the bankruptcy proceedings of the TWA MEC's 9,000-hour flight pay loss bank. Tr. 6/23/11 at 167-69.  Day even admitted that it was "significant in terms of financial support." Id. at 168.  Day further admitted that none of the members of the merger committee ever complained that ALPA was not supporting them financially.  Id. at 169.  Woerth testified on direct that: "I don't think we turned them down for anything." Tr. 6/27/11 at 40-41; D-13.

Clay Warner also testified that the TWA pilots received $1.5 million in flight pay loss reimbursements during 2001 for pilots working on ALPA committees or performing work for ALPA. Tr. 7/5/11 at 125.  Specifically, Bob Pastore received $183,000 in flight pay loss; Sally Young received $43,000; Alan Altman received $58,000; Howard Hollander received $98,000; Sean Clarke received $46,000; Mike Day received $64,000; and Steve Rautenberg received $31,000. Id. at 127-28.  Warner testified that MEC officers and representatives were not turned down for flight pay loss in 2001.  Plaintiffs identified only three instances in which ALPA denied flight pay loss to individual TWA pilots who did not hold representative positions with the MEC for lobbying activities related to the Bond Bill, and that was in mid-December 2001. Tr. 7/5/11 at 129; see also P-357.

Woerth testified on cross that the TWA pilots had "enough funds to pay for [everything that they requested] in their budget," so ALPA did not need to provide additional funds every time the MEC requested such funding. Tr. 6/28/11 at 21.  The TWA pilots received all necessary funding, and Woerth was not aware of "a single project that was denied" because of a shortage of MEC funds. Tr. 6/27/11 at 103; D-159.  Nor did Plaintiffs identify any such projects.  To the

contrary, while the TWA MEC did not receive MCF funding in 2001 or 2002, the MEC did receive over $250,000 in funding from the operational contingency fund. Id. 119-20; D-50. Based on the record in this case, it was improper for Mr. Press to argue to the jury that ALPA denied the TWA pilots funding every time they requested additional funding.

### 3.   Misstatements About Negotiating Assistance Provided By ALPA.

Mr. Press claimed that ALPA never gave the TWA pilots "contract negotiation assistance." Tr. 7/11/11 at 144. He argued that the TWA pilots were involved in "Crisis and Concessionary Negotiations," but that Woerth did not do anything to help the TWA pilots as required by ALPA policy: "He wasn't involved. They violated the policy." Mr. Press later claimed "We didn't get Seth Rosen. . . . or any assistance." Id. at 146-49. Mr. Press further claimed that ALPA "provided no support for the TWA pilots in the struggle that really mattered. The struggle for their seniority. There was no support there." Tr. 7/12/11 at 32.

However, Sally Young admitted on cross that Duane Woerth contacted Jeff Brundage at American in October 2001, to try and obtain a "better integration." Tr. 6/13/11 at 106-07. Young admitted that just because Woerth was not talking to her, that did not mean he was not talking to Bob Pastore. Id. at 107. Woerth testified that he "implored through Jeff Brundage, American and APA pilots, not to reach an agreement, and try at least one more time to give [the TWA pilots] another chance to vote on a superior agreement." Tr. 6/27/11 at 149-50. Steve Rautenberg also testified that the MEC also received calls from Woerth and Howard Attarian in October 2001, while the merger committee was meeting with the APA. Tr. 6/29/11 at 68-70.

Woerth also maintained contact with the President of the APA, John Darrah, the CEO of American Airlines, Donald Carty, and the Secretary of Transportation, Norman Mineta, in an attempt to improve the TWA pilots' seniority integration. Tr. 6/27/11 at 29-30, 72, 133-35, 156. Woerth testified that he persuaded Darrah not to have the APA staple all of the TWA pilots and

to "improve their offer." Id. at 29, 72, 134, 156.  Woerth testified that he also tried to persuade Carty of the same thing, but that Carty was "emphatic" about allowing the APA to control the seniority integration and would not "destroy his relationship with APA," after going through the "Reno debacle." Id. at 30.  Woerth testified that he reached out to Secretary Mineta for assistance from the Department of Transportation, but that Mineta said that "the government would not intervene or stop the transaction, or put pressure on Mr. Carty," if American and the APA decided to simply impose a seniority list. Id. at 134-35.

In addition, Woerth testified that ALPA's Executive Council allowed the TWA pilots to hire all of the outside consultants that they asked for: "I don't think we turned them down for anything." Tr. 6/27/11 at 40-41; D-13.  The Executive Council approved the retention of former ALPA President and airline consultant Randy Babbitt and negotiations consultant James Baehler, and it approved the use of Roland Wilder to research the reasonable best efforts grievance against TWA LLC and American. Id. at 41, 101-02, 114-116; see also D-158, D-160.  ALPA approved the use of other outside advisors including bankruptcy law experts and a financial advisor, and ALPA made available in-house legal counsel and specialists in economic and financial analysis. See id. at 39-41; see also Tr. 6/28/11 at 165.

Woerth was involved in the seniority negotiations to the extent that the MEC requested his involvement, even though it is not customary for the ALPA President to participate in seniority negotiations. Tr. 6/27/11 at 65.  Nor is it customary for the ALPA President to attend MEC meetings unless specifically requested to do so by the MEC, and Woerth therefore did not attend the meeting on April 2, 2001, as the MEC did not invite him. Id.  However, he did attend the April 23 MEC meeting, to which he was invited, and later attended the facilitated

negotiations in August 2001 at the TWA MEC's request.  Id. at 65, 83-85.  Woerth also attended

the APA Board meeting in Dallas on April 5, 2001, to advocate for the TWA pilots.  Id. at 72-76.

Woerth also participated in the "Rightful Place" video presentation, which was funded by

ALPA and produced using ALPA's communications facilities.  Id. at 105-06; D-233.  Woerth's

participation in this video, which was made to help the TWA pilots in their seniority

negotiations, was highly unusual and unprecedented.  Id. at 106-07.  ALPA also provided

economic and financial analysis for the TWA pilots, including a contract comparison between

the American and TWA contacts.  Id. at 110-11; D-136.

Plaintiffs were wrong in contending that Woerth failed to support and even to participate

in the negotiations, as the evidence demonstrates.  Their argument instead relied on what

amounts to stylistic criticism--in essence, that Woerth failed to provide assistance because he

was insufficiently vigorous or adversarial in his dealings with the APA.  This disagreement as to

what is an appropriate approach for the ALPA President cannot form the basis for a breach of the

highly-deferential DFR standards.  And based on the record in this case, it was improper for Mr.

Press to argue to the jury that ALPA provided no negotiation assistance for the TWA pilots.

**IV.**   **A New Trial Should Be Granted Because the Court Erred When It Allowed
Plaintiffs' Counsel to Cross-Examine Seth Rosen About the Irrelevant "Scab List."**

In the Third Circuit, an error by the trial court will be harmless "only if it is 'highly

probable' that the error did not affect the outcome of the case."  Forrest v. Beliot Corp., 424 F.3d

344, 349 (3d Cir. 2005).  In this case, the Court erred when it allowed Plaintiffs to question Seth

Rosen about whether ALPA produced a "scab list" in relation to the Eastern Airlines strike of

1989.  Tr. 7/6/11 at 51-54.  This issue arose when Plaintiffs' counsel was cross-examining Rosen

about whether ALPA had ever encouraged its members to deny jumpseats to scabs.  Rosen

answered that question affirmatively, but Plaintiffs' counsel continued to question Rosen about

whether ALPA had produced a scab list in 1991.  While the fact that ALPA may have encouraged members to preclude scabs from jumpseats at one point in time could arguably have been relevant to Plaintiffs' case, whether ALPA actually produced a scab list in 1991 had nothing to do with whether ALPA violated its DFR in the case at bar.

The Court's error in allowing Plaintiffs to question Rosen about the existence of a scab list was not just a harmless error.   During closing argument, Plaintiffs' counsel used Rosen's testimony on this irrelevant matter to attack Duane Woerth's credibility.  Tr. 7/11/11 at 135-37. Woerth's testimony was an important part of ALPA's defense, and if the jury did not believe his testimony because of a discrepancy on this irrelevant matter between his testimony and Rosen's, that most certainly prejudiced ALPA's defense.

## V.   A New Trial Should Be Granted Because of the Court's Prejudicial Comments and Prejudicial Interrogation of Seth Rosen.

ALPA was severely prejudiced when the Court improperly expressed the view—which was both inaccurate and unfounded—in the presence of the jury that ALPA initiated the card campaign of American pilots John Clark and Mark Hunnibell. A new trial should be granted as a result of this prejudicial action.

It has long been recognized that trial judges exert great influence over juries and that their words and actions, during the conduct of a trial, can have enormous impact.  See Manual on Complex Litigation (Fourth) (2008), at §12.35, p. 198 ("The Judge should ordinarily refrain from interfering with counsel's mode of questioning, except when ruling on objections.").  As the United States Supreme Court noted over a century ago:

> It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily . . . of great weight, and that his lightest word or intimation is received with deference, and may prove controlling.

Starr v. United States, 153 U.S. 614 (1894) (quoted in Carter v. Kentucky, 450 U.S. 288, 302 n.20 (1981)).

Appellate courts have not hesitated to reverse where trial judges engage in unfair criticism of a party or its counsel.  As the Sixth Circuit has noted:

> "[A] trial judge's position before a jury is overpowering.... His position makes his slightest action of great weight with the jury." . . . As a result, it is incumbent upon the trial judge to make certain that any corrective action taken during the trial is carefully measured to avoid the appearance of hostility or partiality before the jury. In [United States v.] Hickman, [592 F.2d 931 (6th Cir. 1979)], we stated that "[a]ssuming that a trial judge has good reason to interject himself into the trial, the manner in which he does so is crucial . . . . [A]n objective demeanor is important. Outright bias or belittling of counsel is ordinarily reversible error."

Dixon v. Federal Express Corp., 33 Fed. App'x 157 (6th Cir. 2002) (granting new trial before a different judge).  See also Nationwide Mut. Fire Ins. Co. v. Ford Motor Co., 174 F.3d 801, 808 (6th Cir. 1999) (holding that the trial court's "constant interruption of . . . direct examination . . . and the intemperate tone and content of the court's often argumentative questions" denied the plaintiffs a fair trial); Santa Maria v. Metro-North Commuter R.R. 81 F.3d 265, 273 (2d Cir. 1996) ("Although we have repeatedly observed that due process requires a fair trial rather than a perfect trial, . . . a court must strive for 'that atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding.' . . . Indeed, '[a] trial judge must be especially cautious and circumspect in language and conduct during a jury trial.'"); Rivas v. Brattesani, 94 F.3d 802, 807-08 (2d Cir. 1996) (granting new trial before a different judge where cumulative impact of trial court's comments in presence of jury were prejudicial to defendants).

### A.    The Court Improperly Intervened During the Testimony of Seth Rosen.

The Court's prejudicial conduct took place while counsel for ALPA was examining Seth Rosen about the manner in which ALPA organizes pilots who are already organized by other unions.  Rosen explained that ALPA does not use card campaigns to organize pilots who are

represented by independent unions, and began to testify about how ALPA went about organizing

the Continental pilots.  After counsel for Plaintiffs interposed an objection based upon relevance

and counsel for ALPA made an offer of proof, the Court interrupted with a series of assertions

and accusations.  We begin with Rosen's testimony:

> A.  Well, that [the organizing campaign at Continental] involved a huge undertaking, a lot of pilots; we had offices at all their domiciles. We would go to crew rooms. We had as I said other 50 pilot volunteers who would go around and talk to pilots. We had a huge amount of staff support to handle this undertaking because it was very complicated and we had lawyers assigned because there were legal issues. Communications people assigned. It was a full undertaking.
>
> Q.  The leadership of the Continental pilots union had agreed to merge, why was there any need to go and talk to the individual pilots?
>
> MR. PRESS: Judge, I object to the relevance of this. You don't know why we are talking about the Continental pilots.
>
> THE COURT: Yeah, I am beginning to --
>
> MR. FRAM: If you want me to explain, your Honor, I am happy to. We are talking about what you do to organize pilots and we are going to compare it to what never happened at American. None of this happened at American.
>
> THE COURT: <u>You are wrong. That is a misstatement of facts. There were cards out there. Those cards didn't come from the Tooth Fairy. Those cards were being collected.  They were handed over to ALPA. Your statement that none of this happened in American is not a true statement.</u>

Tr. 7/6/11 at 25:18-26:17 (emphasis added).

The Court's comments about the cards were both unrelated to the nature of the organizing

campaign at Continental and were misleading in suggesting that questions existed about where

the cards came from.  Indeed, by sarcastically commenting that the cards did not come "from the

Tooth Fairy," the Court both attacked counsel in front of the jury and all but asserted to the jury

that ALPA was involved in the creation of the cards.

As discussed below, the undisputed evidence presented at trial was that Hunnibell

arranged for the cards to be printed and mailed by Primadata, the printing and mailing service

used by the APA, and that ALPA was not even aware that he had done so until after the fact. In this single comment, therefore, the Court erroneously and improperly suggested to the jury that: (a) ALPA was involved in printing the cards; (b) Rosen and other ALPA witnesses had concealed information and were not telling the truth; and (c) ALPA counsel was attempting to misrepresent the facts.

This unwarranted and injudicious outburst was only the beginning.  After counsel for ALPA attempted to remind the Court that Rosen's testimony on the organizing campaign at Continental did not involve cards, the Court again essentially advised the jury of the erroneous conclusion ALPA had drawn—that ALPA was involved in organizing the American pilots and that ALPA's witnesses, and its counsel were lying in suggesting otherwise:

> MR. FRAM: Sorry, your Honor. None of this was done by ALPA. ALPA did not organize other unions as explained by the witness.
>
> THE COURT: That is unclear. That is your take. I am not sure the evidence doesn't support another inference on that.
>
> MR. FRAM: Your Honor, I respectfully disagree with that.
>
> THE COURT: The jury will decide that. That is what we have them here for.
>
> MR. PRESS: Your Honor, I believe Mr. Fram's statement to this jury but heard by this jury opened the door to what happened after April 3rd, 2002.
>
> THE COURT: Let's leave that for another day. I think the jury has the drift of what you are saying. I don't think we need an explanation for why there has to be a big campaign to generate votes among the pilot groups itself in a merger.
>
> Q. Did ALPA in any way shape or form initiate a card campaign at American Airlines?
>
> A. No, they did not.

Id. at 26:18-27:13.  At this point the Court again interrupted and began to interrogate Rosen directly, again suggesting that his testimony was not truthful but now also suggesting that ALPA made the cards "disappear" in order to conceal evidence of its involvement in the card campaign:

THE COURT: In the card campaign, where do the cards come from?

A. In a card campaign we generate the cards.

THE COURT: That's right.

A. We print cards. When we do our own card campaign we print the cards and distribute the cards.

THE COURT: You are aware there was a card campaign going on in a limited sense with American.

A. I am aware.

THE COURT: You are aware those cards were delivered, in fact, to ALPA.

A. Yes.

THE COURT: Those cards then disappeared later on, the physical cards. You know that as well.

THE WITNESS: Yes, that was in my deposition.

THE COURT: You don't know what happened.

THE COURT: That's correct.

THE COURT: Do you know who printed the cards?

A. No, I don't know.

THE COURT: You don't know whether it was American that printed the cards and provided them to Hunnibell and Clark, the American pilots or they somehow or other got out and got cards of their [own].

A. They could have done that.

THE COURT: They could have done that but you don't know.

A. I am not aware of providing any cards to them.

THE COURT: You can't say, you don't simply know. You are not even aware of where the cards are, that might tell us, if we had the cards we might know who prepared them, wouldn't we? If we physically had the cards.

A. I am not sure.

THE COURT: Maybe. It might give us a clue who the printer was, was a printer used by –

A. I understand what you are saying, but I am not sure.

Id. at 27:14-28:23 (emphasis added). After highlighting twice that the cards had "disappeared," the Court then made clear its view that it was ALPA's fault that the cards could not be located and examined, thereby suggested that ALPA had destroyed the cards in an effort to conceal its wrongful involvement in the card campaign:

> THE COURT: There is a lot of things we could do if we had the cards.
>
> A. I understand what you are saying.
>
> THE COURT: Go ahead.

Id. at 28:24-29:2.  When counsel for ALPA once again attempted to continue his examination, the Court insisted on again emphasizing the conclusion it has apparently reached, which was that ALPA was involved in the card campaign and that it had destroyed the cards to cover-up its wrongful conduct:

> Q. Mr. Rosen, did ALPA printed [sic] cards that were used to distribute to the American pilots?
>
> A. No, I am not aware --
>
> THE COURT: No, no. Don't say no. You don't know, do you, where the cards came from? You don't know where the cards came from.
>
> A. I don't know where they came from.
>
> THE COURT: And you don't know where they are so we can't do any forensics on them to figure it out, right? Is that correct?
>
> THE WITNESS: Yes.

Id. at 29:3-13.  After once again attempting to embarrass Rosen, the Court went out of its way to suggest to the jury that counsel for ALPA was attempting to mislead the jury:

> THE COURT: Don't try to get him to say that he knows American didn't distribute them. He is not aware that they did, but he doesn't know where they got the cards. . . . [Y]ou don't know where Clark and Hunnibell got the cards.
>
> A. All I know.

MR. FRAM: We have testimony that --

THE COURT: He doesn't know. What other witnesses say is one thing. He doesn't know.

Q. Mr. Rosen, did you direct anybody to print cards?

A. No.

Q. To send to the American Airline pilots?

A. No.

Q. Has anybody at ALPA ever told that you they printed cards to send to American?

A. No. No one of told me that.

Q. Was any money ever budgeted by ALPA in 2001 to try to organize the American pilots?

MR. PRESS: He is leading the witness.

THE COURT: Yeah, you are leading him.

Id. at 29:14-30:7.  Although counsel's question was plainly not a leading question,[13] the Court

used this comment as an opportunity to cross-examine Rosen about a completely different topic

in an obvious effort to embarrass him:

> [THE COURT:] By the way, did ALPA ever indicate to Hunnibell and Clark that they would reimburse them for expenses they incurred in their card campaign.
>
> THE WITNESS: Did ALPA?
>
> THE COURT: Did ALPA ever indicate on ALPA letterhead or ALPA, from ALPA official to say Clark and Hunnibell that they would reimburse them for their expenses.
>
> A. I am not aware of any --
>
> THE COURT: You are not aware?

---

[13] A leading question is defined as "[o]ne which instructs [the] witness how to answer or puts into his mouth words to be echoed back, . . . one which suggests to [the] witness [the] answer desired . . . ."  Black's Law Dictionary 800 (5th ed. 1981).

-41-

THE WITNESS: No.

THE COURT: So if somebody showed you a memo or a, or something that said otherwise, you would be surprised.

A. Yes, because I know --

THE COURT: No, no, you didn't know. You would be surprised if such a document were shown.

A. Why surprised?

THE COURT: Well, because you are not aware of it. So you would be surprised if somebody showed you an ALPA memo and an ALPA documents that promised to reimburse. You indicator indicated there would are [sic] reimbursement.

THE WITNESS: Yes, your Honor.

THE COURT: Okay. Next.

Id. at 30:7-31:4.

### B.      The Court's Conduct Was Extraordinarily Prejudicial.

The Court later gave a curative instruction at the insistence of ALPA's counsel, Tr.

7/6/11 at 88:14-89:9, but there can be no question that the Court's extended verbal assault on

Rosen and ALPA's counsel was both completely unwarranted and extraordinarily prejudicial.

First, the Court was factually incorrect in suggesting that ALPA was in any way involved

in the printing or distribution of the cards to the American pilots. During their depositions, which

were played at trial during Plaintiffs' case in chief, Hunnibell and Clark explained that the card

campaign was linked with Hunnibell's election campaign for APA Vice President and that

ALPA was in no way involved in their decision to distribute the cards. Hunnibell and Clark

utilized a company called Primadata to print and mail the cards. See Ex. P-3. Primadata was the

company that the APA used to send its campaign mailers. Clark Dep. Tr. at 96:11-97:2. The

APA supplied Primadata with the distribution list of American pilots. Id. Primadata was not

recommended by or in any way affiliated with ALPA. Id. The first mailing of cards occurred

sometime in late April or early May 2001, and the card campaign effectively ended on May 23, 2001, when Hunnibell lost the APA election. See Hunnibell Dep. Tr. at 52:22; Clark Dep. Tr. at 97:17-98:3. Ronald Rindfleisch, who was responsible for communicating with and organizing pilot groups who expressed interested in joining ALPA, was not even alerted about the campaign until after the cards had been mailed. See Hunnibell Dep. Tr. at 102:3-102:16.

Second, on at least four separate occasions this Court, Magistrate Judge Donio and Special Master Hedges each ruled that ALPA's inability to produce the signed cards did not prejudice Plaintiffs because they had all of the pertinent information that the cards themselves provided. Each time Plaintiffs raised this issue, the presiding judicial official ruled that Plaintiffs acquired all the relevant data related to the cards, which requested an NMB election, when ALPA produced spreadsheets created by Hunnibell and Clark: the number of cards signed and the dates on which they were signed. See Apr. 26, 2007, Order ¶ 15 (U.S.M.J. Donio) (Docket No. 214); Nov. 30, 2007, Order ¶ 2 (S.M. Hedges) (Docket No. 241); Aug. 26, 2008, Order ¶ 5 (Irenas, J.) (Docket No. 264); Dec. 17, 2009, Opinion Denying Plaintiffs' Motion for Sanctions (Irenas, J.) (Docket No. 310).[14]

As a consequence, the Court's comment that the cards did not come from the "Tooth Fairy" and its suggestion that the cards, if available, might have been subjected to a "forensic examination" that would have proven that ALPA was (or was not) involved in their printing and distribution were both misleading and extraordinarily prejudicial. There was no basis for injecting the issue of spoliation into this case and doing so was not only surprise, it was unfairly

---

[14] The Court also denied Plaintiffs' motions for reconsideration on the issue of spoliation. See, e.g., Feb. 8, 2011, Pretrial Order (Docket No. 353); Apr. 27, 2011, Order Denying Plaintiffs' Motion in Limine to Permit Evidence at Trial of Defendant's Spoliation (Docket No. 377).

prejudicial to ALPA.  See, e.g., Dec. 17, 2009, Opinion Denying Plaintiffs' Motion for Sanctions (Docket No. 310).

These clear statements to the jury that ALPA had engaged in the destruction of documents were particularly prejudicial because they were made late in the case, after ALPA no longer had the ability to present testimony or introduce evidence contrary to that assertion.  In the Joint Final Pretrial Order, ALPA designated both documents and witnesses to testify concerning the loss of documents and was prepared to prove, if Plaintiffs injected the issue of missing documents into the trial, that the alleged loss of various documents was not the fault of ALPA.  The Court's verbal assault on Rosen and ALPA's counsel occurred on the final day of planned testimony, after it was too late for ALPA to marshal witnesses and present documents that would have demonstrated that it had not engaged in the misconduct suggested by the Court.

Third, the Court's examination of Rosen clearly conveyed the Court's view that this witness was not being forthcoming and unquestionably undermined the credibility of all of his testimony, and, by extension, the testimony of other ALPA witnesses.

Fourth, the Court's repeated accusations that counsel for ALPA had misrepresented facts to the jury destroyed the credibility of ALPA's counsel and made it virtually impossible for him to argue effectively to the jury from that point forward.  Given the length and complexity of the trial, summations in this case necessarily involved reminding the jury of evidence and documents that they had heard about weeks earlier.  By accusing counsel for ALPA of attempting to mislead the jury, the Court essentially told the jury that they should be skeptical of all of the arguments offered by counsel for ALPA in summations.  That the Court's attack on Rosen, ALPA and ALPA's counsel took place toward the conclusion of a lengthy trial was particularly prejudicial.  Indeed, in his closing, counsel for Plaintiffs echoed the very ideas that the Court had improperly

-44-

put in the minds of the jurors through its interjections during the examination of Rosen.  Tr. 7/12/11 at 71-72.

The Court showed its hostility toward ALPA's alleged conduct with respect to the card campaign and its personal belief—which was completely erroneous—that ALPA had been involved in helping to distribute the cards and then made the cards "disappear" to cover up its misconduct.  By throwing the weight of judicial authority behind these positions and essentially making arguments that Plaintiffs themselves could not make, the Court advocated the position of Plaintiffs far more effectively than counsel for Plaintiffs could have. This was improper. See Nationwide, 174 F.3d at 805 ("a judge must sedulously avoid all appearances of advocacy").

The Court also made unwarranted and prejudicial comments both toward Rosen and toward ALPA's counsel in the presence of the jury, essentially accusing them of attempting to mislead the jury.  This too was unfairly prejudicial and requires a new trial.  See Dixon, 33 Fed. App'x at 165 ("Outright bias or belittling of counsel is ordinarily reversible error."); Rivas, 94 F.3d at 808 (reversing where the judge's use of the word "fraud" in questioning a defense witness was "potentially fatal to defendants' case"); Lawson, 2008 WL 2520811, at *11 ("The judge's repeated insertion into the trial process, consistently and openly criticizing counsel in the presence of the jury, irreparably prejudiced plaintiff's right to a fair trial.").

Finally, and perhaps most damaging, through its examination of Rosen about the disappearance of the cards, the Court itself introduced the issue of spoliation, an issue that the Court had itself ruled on several prior occasions was not established by Plaintiffs, was highly prejudicial, and could not be injected into the trial.  Heightening the extraordinary prejudice to ALPA arising from the Court's interjection of the spoliation issue into the case at this point was Mr. Jacobson's earlier improper cross-examination of David Holtzman about "hundreds of boxes

of documents" that were packed up at the TWA MEC office after APA became the TWA pilots' bargaining agent in April 2002, and were "all shipped to a place called Iron Mountain." Tr. 6/30/11 at 121-22.  The Court sustained ALPA's objection to this line of questioning, id., but the topic of missing documents was nevertheless inappropriately injected into the trial through these episodes despite the Court's repeated pre-trial rulings to the contrary.

The Third Circuit has held that a new trial is appropriate where, as here, prejudicial information is improperly brought before the jury.  See, e.g., W.V. Realty, Inc. v. N. Ins. Co., 334 F.3d 306, 314-15 (3d Cir. 2003) (ordering new trial where jury was permitted to hear testimony concerning a discovery violation by defendant that was not probative of bad faith and thus was irrelevant); Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 186 (3d Cir. 1990) (out-of-court statements supposedly made at a meeting that the employer was willing to engage in conduct that might be "illegal" created a danger of undue prejudice and required a new trial). Similarly, here, the Court's actions unfairly prejudiced ALPA by introducing and highlighting the issue of spoliation, which the Court had previously ordered was not an issue in the case.

## VI.   A New Trial Should Be Granted Due to the Violation Of Defendant's Seventh Amendment Right.

At the conclusion of this liability phase of the trial, the verdict form required the jury to answer two questions:

> (1) Did Defendants Air Line Pilots Association violate its duty of fair representation to the TWA pilots?
>
> (2) Did Defendants Air Line Pilots Association's violation of its duty of fair representation directly cause injury to **some** of the TWA pilots?

July 13, 2011, Jury Verdict Form (emphasis added).  The jury answered both question in the affirmative.  Effectively, having found a breach as to the class, the jury then found injury only as to "some" members of that same class.  Once this verdict was returned, the jury was released.

Thus, a new and different jury will sit for the damages phase of this trial. The instant verdict is incompetent to determine liability and as such violates ALPA's right to trial by jury in this bifurcated matter.

The United States Constitution guarantees that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const., amend. VII. In a bifurcated trial, this right requires that

> the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries. The problem is not inherent in bifurcation. It does not arise when the same jury is to try the successive phases of the litigation. .... The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact. This would be obvious if the second finder of fact were a judge. ... But it is equally true if it is another jury.

Matter of Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1303 (7th Cir. 1995) (citing cases), cert. denied, 516 U.S. 867 (1995). "This rule has an additional, pragmatic basis - if two juries were allowed to pass on an issue involving the same factual and legal elements, the verdicts rendered by those juries could be inconsistent, producing intolerably anomalous results." McDaniel v. Anheuser-Busch, Inc., 987 F.2d 298, 305 (5th Cir. 1993) ("[T]he Seventh Amendment guarantee of a trial by the jury is the general right of a litigant to have only one jury pass on a common issue of fact."). Accord In re Paoli R.R. Yard PCB Litig., 113 F.3d 444, 452 n.5 (3d Cir. 1997). See, e.g., Ramirez v. DeCoster, 194 F.R.D. 348, 354 & n.4 (D. Me. 2000).

Here, the jury found a breach as to the entire class but injury as to only some class members. On the one hand, the verdict offers no insight as to which Plaintiffs were harmed or how they were harmed. On the other hand, there is no finding that the class, as a whole, was injured by ALPA's actions; similarly, there are no findings that even the Class Representatives

were injured as a result of ALPA's actions.  Therefore, any assessment of damages for the class, as a whole, would be premature because liability for the class has not been determined.

As discussed in greater detail in Point II of ALPA's companion Rule 50(b) brief, the fact of injury is an essential element of DFR liability.  The Third Circuit explained in Deboles, 552 F.2d at 1018, that "the federal courts have consistently required a direct nexus between breach of this duty and resultant damages to the individual or minority segment as an element of liability." Thus, there could not be liability to the class if there were not injury to the class, as opposed to some of the class members.  ALPA's proposed verdict requiring finding of injury to the TWA pilots addressed this requirement, but the verdict sheet that the Court adopted, referring to injury to "some of the pilots," did not.

Under these circumstances, in the damages phase of trial, the second jury will need to answer some of the same questions as the first jury—whether the class or just some members of it were injured; if the latter, which pilots were injured as a result of the DFR violation; only adding as a new issue, if there are such DFR-caused injuries, what are the quantities of damages. The question of liability including causation will thus need to be examined and determined for a second time.  This necessarily entails the second jury passing judgment on issues of fact common to the verdict of the first jury, with the potential for inconsistent outcomes.  Indeed, the phase-two jury may find there was no liability to the class and there are no damages to the pilots.  The error has compromised ALPA's Seventh Amendment rights and warrants a new trial.

## **CONCLUSION**

For all of the foregoing reasons, defendant ALPA respectfully requests that, as an alternative to ALPA's renewed motion for judgment, the Court grant this motion for a new trial on the issue of liability.

Respectfully submitted,

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121

By:   ___/s/ Steven J. Fram_____
        STEVEN J. FRAM, ESQUIRE

*Pro Hac Vice*:
      Daniel M. Katz, Esquire
      Katz & Ranzman, P.C.
      4530 Wisconsin Ave., N.W., Suite 250
      Washington, DC 20016
      (202) 659-4656

      Counsel for Defendant Air Line Pilots Association, International

Dated: August 10, 2011

7016925v1