Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By:      Steven J. Fram, Esquire

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>AIR LINE PILOTS ASSOCIATION,<br>INTERNATIONAL, )<br><br>Defendant. ) | Civil Action No. 02-2917 (JEI) |

---

**DECLARATION OF STEVEN J. FRAM, ESQUIRE, IN SUPPORT OF DEFENDANT'S COMPANION MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59 OR FOR DISMISSAL**

---

STEVEN J. FRAM hereby declares as follows:

1.      I am a member of the Bar of this Court and am a shareholder in the law firm of

Archer & Greiner, P.C., attorneys for Defendant, Air Line Pilots Association, International.

2.      I am submitting this Declaration in order to provide copies of certain deposition

and trial transcripts and other materials that are referred to in the brief being filed by Defendant

1

on August 10, 2011, in support of the Defendant's Companion Motion for New Trial Pursuant to

Fed. R. Civ. P. 59 for Dismissal.

     3.    True and correct copies of excerpts of deposition transcripts and trial transcripts

and trial exhibits are attached as follows to this Declaration:

## EXHIBIT    DESCRIPTION

### Deposition Transcripts

| | |
|---|---|
| A | Deposition of Mark Hunnibell dated October 24, 2006 |
| B | Deposition of John Clark dated December 1, 2006 |
| C | Deposition of Jeff Brundage dated September 12, 2008 |

### Trial Transcripts

| | |
|---|---|
| D | Trial Transcript, Volume 2, of June 8, 2011 |
| E | Trial Transcript, Volume 3, of June 9, 2011 |
| F | Trial Transcript, Volume 4, of June 13, 2011 |
| G | Trial Transcript, Volume 7, of June 16, 2011 |
| H | Trial Transcript, Volume 9, of June 22, 2011 |
| I | Trial Transcript, Volume 10, of June 23, 2011 |
| J | Trial Transcript, Volume 11, of June 27, 2011 |
| K | Trial Transcript, Volume 12, of June 28, 2011 |
| L | Trial Transcript, Volume 13, of June 29, 2011 |
| M | Trial Transcript, Volume 14, of June 30, 2011 |
| N | Trial Transcript, Volume 15, of July 5, 2011 |
| O | Trial Transcript, Volume 16, of July 6, 2011 |
| P | Trial Transcript, Volume 17, of July 7, 2011 |
| Q | Trial Transcript, Volume 18, of July 11, 2011 |
| R | Trial Transcript, Volume 19, of July 12, 2011 |

### Trial Exhibits

| | |
|---|---|
| S | P-3, Letter from Mark Hunnibell to Ronald Rindfleisch attaching receipts for Primadata and travel, dated December 18, 2001 |
| T | P-357, Flight Pay Loss Denials by Jalmer Johnson, dated December 12, 2001 |
| U | D-13, TWA-MEC Resolution #01-64, dated April 2, 2001 |
| V | D-50, Letter from Jalmer Johnson to Kevin Dillion, dated August 29, 2001 |
| W | D-94, Letter from Duane Woerth to Senator Christopher Bond, dated October 4, 2001 |

| | |
|---|---|
| X | D-136, Memorandum from Ana McAhron-Schulz to Duane Woerth re: TWA MEC Merger Committee Request, dated August 3, 2001 |
| Y | D-158, ALPA Executive Council Resolution AI #25, dated May 21, 2001 |
| Z | D-159, ALPA Executive Board Resolution AI #23, dated May 22-24, 2001 |
| AA | D-160, ALPA Executive Council Resolution AI #36, dated September 24-28, 2001 |
| BB | D-165, Letter from Duane Woerth to Representative Jerry Lewis, dated December 10, 2001 |
| CC | D-172, TWA-MEC Information Update, dated December 19, 2001 |
| DD | D-200, Letter from Jeff Brundage to Duane Woerth, dated December 12, 2001 |
| EE | D-233, Letter from Robert Pastore to Duane Woerth, dated July 10, 2001 |

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 10, 2011.

_____
Steven J. Fram, Esquire

7016338v1

3

# Exhibit A

Bensel v. Air Line Pilots

10/24/2006                                          Mark Hunnibell

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

Cause No. 02-2917-JEI-AMD

-----------------------------------------x

LEROY "BUD" BENSEL, et al.,

      Plaintiffs,

   Vs.

AIRLINE PILOTS ASSOCIATION,

      Defendant.

-----------------------------------------x


D E P O S I T I O N


    The deposition of CAPTAIN MARK HUNNIBELL,

taken on behalf of the Plaintiffs in the

hereinbefore entitled action, before Francine

Garb, a Certified Shorthand Reporter and Notary

Public within and for the State of Connecticut,

commencing at 10:00 a.m., on October 24, 2006,

at the offices of Brandon Smith Reporting,

Six Landmark Square, Stamford, Connecticut 06901.


Brandon Smith Reporting

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Bensel v. Air Line Pilots

10/24/2006                                            Mark Hunnibell

Page 2

APPEARANCES:
FOR THE PLAINTIFFS:
GREEN, JACOBSON & BUTSCH, P.C.
Suite 700, Pierre Laclede Center
7733 Forsyth Boulevard
St. Louis, Missouri 63105
BY: ALLEN P. PRESS, ESQ.
    - and -
TRUJILLO, RODRIGUEZ & RICHARDS, LLC
8 Kings Highway West
Haddonfield, New Jersey 08033
BY: NICOLE M. ACCHIONE, ESQ.

FOR THE DEFENDANT:
KATZ & RANZMAN, P.C.
5028 Wisconsin Avenue, N.W.
Washington, D.C. 20016
BY: DANIEL M. KATZ, ESQ.

ALSO PRESENT:
ROBIN KORMOS, VIDEOGRAPHER

HAMILTON COMMUNICATIONS

Page 3

                    * * *

        IT IS HEREBY STIPULATED AND AGREED, by and
between the attorneys for the respective parties
hereto, that the sealing and filing of the within
deposition be, and the same hereby are waived; and
that the transcript may be signed before any
Notary Public with the same force and effect as if
signed before the Court.

        IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to the form of the
question, shall be reserved to the time of trial.

                    * * *

Page 4

        THE VIDEOGRAPEHER:  We are now on the
record.  This is the deposition of Mark
Hunnibell, taken on behalf of the Plaintiff
in the case of Leroy "Bud" Bensel, et al.,
versus Airline Pilots Association, Case No.
02-2917-JEI-AMD, filed in the United States
District Court for the District of New
Jersey.
        Today's date is October 24, 2006.  The
time on the videotape record is 10:04 a.m.
This deposition is being held at 6 Landmark
Square, Stamford, Connecticut.  My name is
Robin Kormos, representing Hamilton
Communications of 1442 Essex Road, Westport,
Connecticut.
        Would counsel please introduce
yourselves for the record.
        MR. PRESS:  Allen Press is here for the
Plaintiff class of former TWA pilots.
        MR. KATZ:  I'm Daniel Katz of the
Washington, D.C. law firm of Katz & Ranzman.

I represent Defendant, Airline Pilots

Association.

Page 5

1           MARK HUNNIBELL
2       THE VIDEOGRAPHER:  Will the court
3   reporter please swear in the witness.
4   M A R K   H U N N I B E L L,
5   the witness herein, giving his address as 376
6   Black Rock Turnpike, Redding, Connecticut 06896,
7   was duly sworn and testified as follows:
8   DIRECT EXAMINATION
9   BY MR. PRESS:
10      Q   Mr. Hunnibell, can you start by stating
11  your name for the record.
12      A   It's Mark Hunnibell.
13      Q   Where do you live, sir?
14      A   376 Black Rock Turnpike in Redding,
15  Connecticut.
16      Q   That is where you live?
17      A   Yes.
18      Q   Are you currently employed?
19      A   Yes.
20      Q   Where is that?
21      A   American Airlines.
22          Before I start, I want to make sure that
23  you did receive a letter that I sent yesterday.
24      Q   No, I did not.
25      A   Well, I sent it actually Friday, and

2 (Pages 2 to 5)

Brandon Smith Reporting

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Bensel v. Air Line Pilots

10/24/2006                                      Mark Hunnibell

Page 50

1          MARK HUNNIBELL
2    about this deposition?
3        A   No.
4        Q   Earlier in the deposition you mentioned
5    that you had met with Mr. Rindfleisch?
6        A   Yes.
7        Q   And he's one of the organizers at ALPA,
8    right?
9        A   I believe so.
10       Q   When was the first time you met with him
11   in connection with trying to organize the American
12   Airline pilots to join ALPA?
13       A   That is a question I felt confident that
14   you would ask, and I can't say for sure.  I think
15   it's possible we may have met sometime late in
16   2001 or 2002.  I don't know.
17       Q   It's possible, certainly sitting here
18   today, your best memory, you are saying it's
19   possible you met him in the year 2001 in
20   connection with trying to organize the American
21   Airline pilots to join ALPA?
22       A   I would say it's possible.  I would be
23   more confident in saying it's the year 2002.
24       Q   And that would be the winter of 2002?
25       A   I think if I met with him, it was

Page 51

1          MARK HUNNIBELL
2    probably after we had run out of time on the
3    cards.
4        Q   What does that mean?
5        A   Well, the card campaign that we were
6    running timed out.  There is -- they are only good
7    for a year, and then you have got to go back and
8    resolicit signatures, and we didn't do that.  So,
9    we let the cards expire, and then we transitioned
10   to an effort to generate political support for a
11   merge.
12       Q   You said a whole bunch there.
13       A   I'm sorry.
14       Q   Don't apologize to me.
15           The 12-month limitation you are talking
16   about, what you are saying is that once these
17   campaign cards go out to the membership, you have
18   12 months to --
19       A   Twelve months from the date the
20   individual signed, it times out.  That is my
21   understanding.  My understanding is that the
22   National Mediation Board will not accept as valid
23   a card that was executed more than 12 months
24   earlier.
25       Q   For those of us in the room that aren't

Page 52

1          MARK HUNNIBELL
2    labor lawyers, explain what you mean by these
3    cards.  What's the purpose of the cards?
4        A   The cards were cards that I sent out in
5    conjunction with my campaign for Vice President,
6    actually, and they are cards that say -- we sent
7    them to every APA member, or that was the idea
8    anyway.  And the intent was that pilots would sign
9    and return these cards, and we would get enough of
10   them, which in this case, my understanding is we
11   would need 51 percent, because the pilots were
12   already represented.  And once we got enough of
13   them, that we would request an election.
14           What the cards themselves said was I
15   want to have a representation election on the
16   property at American, and I want ALPA to be my
17   representative, something like that.  And then the
18   people would fill it out and mail it back.
19       Q   And they are, physically, like little
20   postcards?
21       A   They are postcards, yes.
22       Q   When were they mailed out?
23       A   I mailed them at the end of my
24   campaign.  I think it was probably either the
25   beginning of May or middle of May, 2001.  It's

Page 53

1          MARK HUNNIBELL
2    possible that it was in June, but I don't think it
3    was.  I'm trying to remember the time line on that
4    election, and I don't think I went to run off in
5    that election, which would have meant it was
6    probably a May campaign.
7        Q   You said these cards, once signed, they
8    are good for 12 months, right?  That is your
9    understanding?
10       A   Yes.
11       Q   During what period were you receiving
12   signed cards back from American pilots?
13       A   Well, I never received them.
14       Q   Where did they go?
15       A   They went to the post office in
16   California.
17       Q   That would be John Clark's post office?
18       A   John got them, yes.
19       Q   How long was he receiving signed cards;
20   do you know?
21       A   I don't know.  It was over the course of
22   the year.  They came and trickled -- you get an
23   initial bunch, and then they kind of trickled out.
24       Q   I'm trying to understand.  I'm asking
25   these questions because you prefaced your

                                14  (Pages 50 to 53)

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Bensel v. Air Line Pilots

10/24/2006                                                 Mark Hunnibell

---

Page 54

MARK HUNNIBELL
1   testimony about meeting with Mr. Rindfleisch with
2   some notion about this 12-month time period, and
3   I'm getting the flavor that you are getting cards
4   in over a long time period. So how does that help
5   you answer when you met with Mr. Rindfleisch?
6       A   What I mean is that I believe that it
7   was not until after we realized that we weren't
8   going to get enough cards, and we were going to
9   have to pursue a different strategy if we were
10  going to do this.
11      Q   Is it your testimony, sir, that the
12  first time you met Mr. Rindfleisch was after your
13  card campaign had failed?
14      A   Well, I don't know that I would
15  characterize it as a failure. We just stopped the
16  effort.
17      Q   You didn't get the 51 percent threshold?
18      A   I would say that that is accurate, yes.
19      Q   The first time you met with this
20  gentleman was after --
21      A   That is the question. I don't know.
22  That, I don't know. My sense is that is the case.
23      Q   And do you keep a daytimer or anything
24  that reflects your meetings with people?
25

Page 55

MARK HUNNIBELL
1       A   Not -- no, not that.
2       Q   When meeting with Mr. Rindfleisch, you
3   would have e-mailed him to set up the meeting or
4   confirm the meeting, where you are going to meet,
5   what time, right?
6       A   Yes. And I think that -- you know, to
7   be honest, I don't even know. I'm not trying to
8   be evasive or anything, I don't really know when I
9   met him. I know that I did at one point, but I
10  can't remember the context. But that meeting, I
11  think, was probably something that John set up. I
12  don't remember exactly. I know that I didn't have
13  a lot to do with it.
14      Q   Let me see if I can help.
15          Was that the meeting in Las Vegas? Is
16  that where you met Mr. Rindfleisch?
17      A   I have never been to Vegas to meet
18  Mr. Rindfleisch, no.
19      Q   Who did you meet in Las Vegas in
20  connection with the ALPA organization effort?
21      A   I didn't meet anybody in Las Vegas.
22      Q   You didn't meet anybody in Las Vegas?
23      A   No.
24      Q   Maybe it was Mr. Clark, and I got it
25

Page 56

MARK HUNNIBELL
1   wrong.
2       But, anyway, how many times have you met
3   with Mr. Rindfleisch?
4       A   I would say it's possible, I think,
5   three times at most. At most.
6       Q   Over what period of time, stating it in
7   months?
8       A   Well, assuming that I'm correct in my
9   recollection, that it was in mid 2002 when I met
10  him the first time, 15 months.
11      Q   So three times over a 15-month period?
12      A   Right.
13      Q   And it's your best recollection that the
14  time period began in mid 2002 now?
15      A   Yes. After the time-out on the cards,
16  yes.
17      Q   Are you backing away from your testimony
18  that it could have been possible you met him in
19  '01?
20      A   Yes. And it is possible that I could
21  have. It's possible. I cannot -- if you just
22  said yes, you were there, yes, you are right, I
23  was there. I can't say that I wasn't. It's just
24  my recollection was that -- is that it was later.
25

Page 57

MARK HUNNIBELL
1   It -- but if it was, then I would say, like, we
2   met them later, too, so it would be a longer
3   period than 15 months.
4       Q   Your first meeting with the gentleman,
5   where was it?
6       A   That is the problem I'm having. I don't
7   know that I met him that day, but my -- John and I
8   traveled to Washington, D.C. at some point, and I
9   can't say for sure when that was, but we traveled
10  to Washington, D.C., and we met -- I believe we
11  met him at that time.
12      Q   You and Mr. Clark went to Washington,
13  D.C. to meet with some ALPA folks?
14      A   That was the intent, yes.
15      Q   Did you carry out that intent? Did you
16  meet with them?
17      A   Very briefly, yes. And -- and like I
18  said, I don't know -- I'm trying to sort of
19  connect these things, I'm trying to put these
20  pieces together. Not that there were so many
21  things, but it was kind of a blur to me. I
22  traveled down the night before, and John had done
23  all of this legwork on this thing, and I was going
24  along for the ride. But that would have been, at
25

15 (Pages 54 to 57)

Brandon Smith Reporting

Bensel v. Air Line Pilots

10/24/2006                                                    Mark Hunnibell

Page 94

1          MARK HUNNIBELL
2      A   I don't think so.  No, I don't think I
3  did.
4      Q   What about any of the lawyers over
5  there?  Jonathan Cohen, did you ever talk to or
6  e-mail him?
7      A   Cohen?
8      Q   Yes.
9      A   I don't think so.
10     Q   How about a fellow named Clay Warner,
11  did you ever correspond with him in writing or
12  e-mail?
13     A   What department does he work?
14     Q   He's a lawyer, Legal.
15     A   I don't recall.  I don't recall doing
16  that.  I had some unrelated correspondence, and I
17  don't know when it was, regarding some analysis
18  that I had done on retirement plans for pilots.
19  And I remember sending my analysis to somebody at
20  ALPA saying, hey, do I understand the features of
21  these plans correctly?  And I think I got a reply
22  back from them, but that had nothing to do with
23  this campaign.
24     Q   Let me go through a list of names and
25  entities, and I'm going to ask you the same

Page 95

1          MARK HUNNIBELL
2  question:  Did you ever exchange e-mails with this
3  person or company?
4      A   And this is all prior to this date?
5      Q   Right.  And I'm limiting my question
6  regarding your campaign.
7      A   Okay.
8      Q   And the first one I'm going to give you
9  is Jalmer Johnson; did you ever exchange e-mails
10  with him regarding your ALPA campaign?
11     A   I don't believe I did, no.
12     Q   Howard Attarian?
13     A   It is possible.
14     Q   A fellow named Randy Babbitt?
15     A   I am almost positive I had nothing to do
16  with Randy Babbitt.
17     Q   A lawyer in New York named Seltzer or
18  anybody at his firm named Cohen, Weiss & Simon?
19     A   I don't believe so, no.
20     Q   A lawyer in Washington, D.C. named
21  Wilder, Roland Wilder?
22     A   The name sounds familiar, but I don't
23  know why.
24     Q   And Howard Attarian, how about him?
25     A   I think I already answered that.

Page 96

1          MARK HUNNIBELL
2      Q   I think you did.  I'm sorry.
3          Bob Christy?
4      A   I don't know who that is.  I don't think
5  so.  So I don't know who that is.
6      Q   Let's move on to something else -- oh,
7  Bill Roberts, how about him, did you e-mail him?
8      A   I don't know.  I mean, you are asking me
9  these questions, and if you got an e-mail, it
10  would be helpful because I can't -- I don't know
11  what they do or what -- like I said, my e-mails
12  really focused on this, and that one exchange with
13  benefits, or pension department or something like
14  that.
15     Q   Very good.  I think we have closed the
16  loop on that, then.
17     A   The -- I will tell you that I am a
18  member of ALPA, I'm an inactive participant.  And
19  so to some extent I may have had communications
20  with membership and things like that.
21     Q   Do you remember talking with Ron
22  Rindfleisch or Jerry Mugerditchian concerning
23  getting your expenses reimbursed for your
24  ALPA-related expenses?
25     A   I think -- I don't remember discussing

Page 97

1          MARK HUNNIBELL
2  it directly.  Obviously, we have a letter here
3  that talks about it.  I think most of my
4  expectations in that regard came from discussions
5  with John Clark, and John Clark was adamant that
6  we keep records of our expenses, and that we would
7  seek reimbursement for them.
8      Q   You are referring to what?
9      A   It looks like Exhibit 3, and there's
10  this letter of December 18th from me.
11     Q   Obviously, that letter relates to a
12  request for reimbursement, right?
13     A   So it would be rather obvious that I had
14  the expectation of being reimbursed.
15     Q   And that expectation came from a
16  conversation from somebody at ALPA?
17     A   I think it probably came indirectly to
18  me that John felt that the only way that we were
19  going to get reimbursed would be if we could
20  substantiate our expenses, so this was an attempt
21  to substantiate our expenses.  And I think we had
22  the idea that we were going to get reimbursed, but
23  it never happened.
24     Q   Let me ask you this:  You sent a letter
25  to Mr. Rindfleisch, and his response to your

25 (Pages 94 to 97)

Brandon Smith Reporting

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Bensel v. Air Line Pilots

10/24/2006                                          Mark Hunnibell

---

Page 102

MARK HUNNIBELL

1  conversation occurred, it was well prior to this.
2  This was not a conversation that occurred in
3  December 18th, you know, December 18th or
4  anything like that. It was months earlier that
5  there was any kind of notion.
6       And so I tried to keep track of my
7  expenses, and then at the end of year it was like,
8  okay, look, let's figure out where we're at with
9  the finances and send them a bill, so to speak,
10 and see what happens.
11     Q   And you were saying that this was
12 probably a while prior --
13     A   I wouldn't say a while prior, but there
14 was not a conversation that took place, that I
15 believe, in December that says, hey, send us your
16 expenses. I don't think that ever occurred
17 between John Clark and anybody at ALPA. I think
18 what happened, we got to the end of the year, we
19 started looking at where we were going and stuff,
20 and thought if we're even thinking about getting
21 reimbursed, we got to submit something.
22     Q   Let me show you a document. I think you
23 have created a nexus in my brain that maybe will
24 make some sense to you now.

---

Page 103

MARK HUNNIBELL

1       THE VIDEOGRAPHER: It's 12:20, we're
2  going off the record.
3       (Time noted: 12:15 p.m.)
4       (Luncheon recess taken)

---

Page 104

MARK HUNNIBELL

1       A F T E R N O O N   S E S S I O N
2       (Time Noted: 12:58 p.m.)
3       (10/14/01 e-mail marked Plaintiffs'
4  Exhibit 5 for identification.)
5       THE VIDEOGRAPHER: 1:16, we're on the
6  record.
7  BY MR. PRESS:
8       Q   Mr. Hunnibell, when we broke I was
9  searching for an exhibit, and I found it and I
10 have marked it Exhibit 5.
11     A   Okay.
12     MR. KATZ:  Do you have copies of that
13 for me?
14     MR. PRESS:  Oh, I'm sorry, yes.
15     Q   This, again, as you will note, is an
16 ALPA document, and at the bottom you will see it's
17 marked ALPA. It's an e-mail, it says, from John
18 Clark to Jerry Mugerditchian, dated October 14,
19 2001.
20     A   Okay.
21     Q   Have you ever seen this before?
22     A   Well, I was a recipient of it, so I
23 probably saw it.
24     Q   That was going to be my next question.

---

Page 105

MARK HUNNIBELL

1       A   I see that I'm a CC on it.
2       Q   So you remember receiving this document?
3       A   I can't say that I remember receiving
4  it. Like I think I previously testified, that I
5  remember that this was something that we had been
6  talking about for a while prior to the December
7  letter. So I think -- I think it's possible that
8  the December letter that you -- that was in
9  Exhibit 3 talked about a spreadsheet, and I think
10 that that is probably the spreadsheet that was
11 attached to this.
12     Q   And specifically, you are referring to
13 the next several pages that are attached to
14 Exhibit 5?
15     A   Right. That is probably a printout of
16 my work product.
17     Q   That is a spreadsheet you created, you
18 think?
19     A   Probably, yes.
20     Q   And just for the record, it's a
21 spreadsheet of the expenses that you had incurred
22 trying to organize this campaign, right?
23     A   That's correct.
24     Q   And you sent that spreadsheet, or

---

27 (Pages 102 to 105)

Brandon Smith Reporting

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Bensel v. Air Line Pilots

10/24/2006                                                    Mark Hunnibell

---

Page 158

MARK HUNNIBELL
1      MARK HUNNIBELL
2   occurred in September of 2000.  As I mentioned
3   earlier in my testimony, that was following the
4   failure of a tentative agreement that I had voted
5   in favor of, the President had adamantly
6   supported, that would be President Richard Lavoy.
7   And subsequent to the failure of that tentative
8   agreement, and I would say subsequent to this, not
9   in any relation to this, but subsequent to this,
10  President Woerth was invited there, I believe, by
11  President Lavoy.  I believe that to be the case.
12  Nobody at APA, I don't think, pursued it, having
13  him come.
14          Other than that, as far as I know, I
15  don't know anything about it.  I was surprised he
16  came, and I was surprised at what he said, but --
17      Q   What surprised you as to what he said?
18      A   The open overture of it.  It was an open
19  session overture -- open session overture to the
20  American Airlines pilot group, and I was pleased.
21  It was a pleasant surprise, but I was surprised
22  nonetheless.
23          But I also had to say that to the extent
24  that you want to infer that my campaign in 2004,
25  as some people would, was about going back to

---

Page 159

1       MARK HUNNIBELL
2   ALPA, there was certainly that many number of
3   people who believed that that was Rich Lavoy's
4   hidden agenda, if you will.  For all of these
5   years, he just wanted to go back to ALPA.  I don't
6   think that was his purpose.  I think his purpose
7   was to get the issue out in debate in front of the
8   membership to talk about it.
9       Q   Was one of the purposes to somehow get
10  out of the $45 million judgment that had been
11  leveled against --
12      A   No.  That was --
13          MR. KATZ:  I am going to object to the
14  question.  This witness has no way of knowing
15  what was in Captain Levoy's head.
16          MR. PRESS:  You can know what comes out
17  of his mouth, though.
18      A   It was an issue -- not personal motive.
19  His motive?  No, I have no expectation that his
20  intent was to get ALPA to pay for that fine.  That
21  was preposterous.  But it was a factor, and it's
22  indicated in here, I think, somewhere about the
23  fine.  There is some discussion about that fine.
24      Q   It is.
25      A   So it was an issue of debate what would

---

Page 160

1       MARK HUNNIBELL
2   happen to it and things like that.
3       Q   But the fine wasn't the driver for
4   inviting Captain Woerth to the board meeting?
5       A   No.  I think that -- I'm trying to
6   remember.  There were a number of resolutions at
7   different domiciles over the summer or in January
8   that year saying, hey, listen, we got to look at
9   this, let's look at forming up a merger committee,
10  let's go to ALPA.
11          So I think that his appearance there
12  might have been triggered by President Levoy
13  looking at these resolutions being on the agenda
14  for the meeting and say, listen, we're going to
15  discuss this, let's have the guy come and talk to
16  us about it before we can make this a resolution.
17  I think that is the context of this problem.
18      Q   Tell me if this is true or not:  Was it
19  true that American Airlines wanted the APA off the
20  property because of the way the Reno merger was
21  handled?
22      A   No, I don't think so.  I don't think so.
23      Q   You answered my question.
24          I'm going to hand you Exhibit 10.
25          (String of e-mails marked Plaintiffs'

---

Page 161

1       MARK HUNNIBELL
2       Exhibit 10 for identification.)
3   BY MR. PRESS:
4       Q   Exhibit 10 is an e-mail -- well, the
5   first e-mail is dated November 21st of 2000 from
6   Sue Pyle.  Who is she?
7       A   She is the Executive Secretary.
8       Q   And basically the next pages, it's a
9   long document, is this a transcript of Captain
10  Woerth's speech to the APA board on
11  October 27th, 2000?
12      A   Well, presuming that this e-mail is
13  authentic, and I have no reason to believe it
14  isn't, it appears to be saying that this is the
15  transcript, and if there is anything you want to
16  correct, let us know.  And a little bit of fluff
17  in there, but basically that is what he's saying.
18          There's a number of pages of the
19  transcript, and I think -- this transcript here
20  has the actual comments of the board in it, and I
21  think I made some comments at the meeting.
22      Q   There is a comment attributed to you.
23      A   Right, yes.
24      Q   Have you seen this before?
25      A   No.

---

41 (Pages 158 to 161)

Brandon Smith Reporting

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Bensel v. Air Line Pilots

10/24/2006                                                    Mark Hunnibell

Page 230

E R R A T A S H E E T
NAME OF CASE: BENSEL, ET AL., VS AIR LINE PILOTS
          ASSOCIATION
DATE OF DEPOSITION: OCTOBER 24, 2006
WITNESS: MARK HUNNIBELL

If there are any corrections to your deposition,
indicate them on this sheet of paper, give the
change, page number, line number, and reason for
the change.
PAGE     LINE          REASON FOR CHANGE
CHANGE TO:
PAGE     LINE          REASON FOR CHANGE
CHANGE TO:
PAGE     LINE          REASON FOR CHANGE
CHANGE TO:
PAGE     LINE          REASON FOR CHANGE
CHANGE TO:
PAGE     LINE          REASON FOR CHANGE
CHANGE TO:
PAGE     LINE          REASON FOR CHANGE
CHANGE TO:
PAGE     LINE          REASON FOR CHANGE

Subscribed and sworn to before me
this   day of       , 2006.

(Notary Public        My Commission Expires

          Brandon Smith Reporting Service
              44 Capitol Avenue
            Hartford, Connecticut 06106
                (860) 549-1850

Date: November 5, 2006
To: Allen P. Press, Esq.
    Green Jacobson & Butsch, P.C.
    Suite 700 Pierre Laclede Center
    7733 Forsyth Boulevard
    St. Louis (Clayton) Mo. 63105
In re Leroy Bensel Vs. Air Line Pilots Association
Deposition of: Captain Mark Hunnibell
Date taken: October 24, 2006
Dear Mr. Press:
Enclosed please find the original and your copy of
the deposition of Capt. Mark Hunnibell that was
taken on October 24, 2006. The witness wishes to
read and sign the deposition.

If you have any questions, please call me.
Sincerely,

Francine Garb
Court Reporter

cc: Daniel M. Katz, Esq.

59 (Pages 230 to 232)

Brandon Smith Reporting

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

# Exhibit B

Page 1

Cause No. 02-2917-JEI-AMD

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW JERSEY

-oOo-

LEROY "BUD" BENSEL, et al.,

           Plaintiffs,

vs.

AIR LINE PILOTS ASSOCIATION,

           Defendants.

=========================================================

VIDEOTAPED DEPOSITION OF
MAJ. JOHN B. CLARK, JR.

FRIDAY, DECEMBER 1, 2006

INCLINE VILLAGE, NEVADA

Reported by:  KIMBERLY J. WALDIE, NV CCR #720, RPR
              CALIFORNIA CSR #8696

b5c99f65-a54b-4571-8b2b-2bfed7b52128

Major John B. Clark, JR. - December 1, 2006
Leroy "Bud" Bensel, et al. vs. Air Line Pilots Association

---

Page 2

1
2
APPEARANCES OF COUNSEL:
3
4
   For the Plaintiffs:
5  GREEN JACOBSON & BUTSCH, P.C.
   BY:  ALLEN P. PRESS, ESQ.
6  7733 Forsyth Boulevard, Suite 700
   Clayton, Missouri 63105
7
8    For the Defendants:
   (Appearing telephonically and via video conference
9  for a portion of the proceedings.)
   KATZ & RANZMAN, P.C.
10 BY:  DANIEL M. KATZ, ESQ.
   5028 Wisconsin Ave., N.W., Suite 250
11 Washington, D.C. 20016
12
   VIDEOGRAPHER:
13 BILL STEPHENS
14
   ALSO PRESENT:
15 LEROY "BUD" BENSEL
16
17
18
19
20
21
22
23
24
25

---

Page 3

1          I N D E X
2
3 WITNESS        EXAMINED BY      PAGE
4 MAJ. JOHN B. CLARK, JR.  MR. PRESS      10
5
6
7
8      EXHIBITS FOR IDENTIFICATION
9
10 Plaintiff's
11   34  Document entitled "ALPA Exploratory      20
        Committee Election at Fall Board
12       Meeting"
13   35  Document entitled "AEC Continuing      26
        Operations"
14
15   36  Subpoena in a Civil Case          29
16   37  Handwritten note on the letterhead of    33
        Allied Pilots Association and related
        document
17
18   38  Application for Delivery of Mail      99
        Through Agent dated 5-4-01
19   39  Document entitled "Allied Pilots      113
        Association Boston Domicile"
20
     40  Document dated Sat., 29 Sep 2001,      141
21       Subject:  Suggested examples for your
         reps
22
     41  Document dated Sat., 29 Sep 2001,      143
23       Subject:  Urgent - Immediate Action
         Required
24
     42  Document entitled "APA Information      144
25       Hotline"

---

Page 4

1      EXHIBITS FOR IDENTIFICATION
2               PAGE
3   43  Document entitled "Ron, Heads Up!"      151
4
5 Witness's
6   A  Letter dated November 14, 2006, to      182
       Mr. Press, Re:  Subpoena for Bensel,
7      et al., v. Air Line Pilots Association
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 5

1       CORRECTION LIST
2  PAGE/LINE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24            -oOo-
25

---

2 (Pages 2 to 5)

b5c99f65-a54b-4571-8b2b-2bfed7b52128

Major John B. Clark, JR. - December 1, 2006
Leroy "Bud" Bensel, et al. vs. Air Line Pilots Association

Page 94

1  document, it's got -- it says ALPA, and there's a
2  number.  Do you see that?
3      A  Uh-huh.
4      Q  And that would signify that Mr. Katz's law firm
5  produced this.  All right?
6      A  Okay.
7      Q  And this is the way the document came to me.
8      A  Okay.
9      Q  Did you forward this e-mail on to somebody at
10  ALPA?  Did you do that?
11      A  I can't tell you that.  I have no idea.
12      Q  Right.  Okay.
13      A  I mean it -- since, you know, it looks to me
14  like whoever forwarded that information was redacted
15  from the top of this, I don't know.
16      Q  Fair enough.
17      A  My guess is if Dennis Petretti was running for
18  president, that this was sent to as many pilots at
19  American Airlines as possible.  Probably above
20  90 percent of them.  So I could have been a recipient of
21  this, but I don't know that I was, and I couldn't tell
22  you if I forwarded it.
23      Q  Fair enough.  Now, if you look at the first
24  paragraph of his e-mail --
25      A  Okay.

Page 95

1      Q  -- Captain Petretti says, (Reading):  I would
2  like to preface my comments with the understanding that
3  what I have -- should be "to say" -- what I have to say
4  has to do with the recent and ongoing activity by APA
5  leadership in rejoining ALPA.
6          And my question is, as far as you know, what
7  activity was ongoing by APA leadership to rejoin ALPA in
8  April of 2001?
9      A  The ALPA Exploratory Committee was probably
10  showing up in their mailboxes as he was sending this.
11  That's it.
12      Q  That -- that was the only thing that the
13  leadership was undertaking at that point?
14      A  That's it.
15      Q  All right.  Other than you and Captain
16  Hunnibell's effort, your grass roots campaign, if you
17  will, was there anybody else at the APA that was working
18  to organize the American pilots to join ALPA?
19      A  There may have been.
20      Q  And I know that you got some support along the
21  way.  But was there another, you know, significant
22  effort underway that you know of?
23      A  There may have been.
24      Q  Can you tell me anything about it?
25      A  No.  I'm saying there is -- the possibility

Page 96

1  exists that there may have been.
2      Q  But sitting here today you are not aware of
3  any?
4      A  No.
5      Q  All right.
6      A  Nor was I back then.
7      Q  Now, you recall that there were two mailings
8  that you and/or Mr. Hunnibell were involved in of
9  campaign cards.  Right?
10      A  Uh-huh.
11      Q  All right.  And the first one was -- well, the
12  first one, did it go to all the pilots, all the American
13  Airline pilots?
14      A  It went to whatever distribution list Prima
15  Data had.
16      Q  Prima Data, what -- what's that?
17      A  That's the firm that APA uses to send campaign
18  mailers to.  They provide the addresses of the pilots.
19      Q  That was your intention, to --
20      A  APA provides the list -- the distribution list
21  to Prima Data, and Prima Data sends it to that list.
22  You, as the candidate, don't get to see the list.
23      Q  Can anybody call Prima Data and get a copy of
24  that list?
25      A  Absolutely not.

Page 97

1      Q  That's proprietary to the union.  Right?
2      A  Of course.
3      Q  Okay.  And then there was a second mailing
4  then.  Was it your intention to mail to the same group
5  of people at that time?
6      A  Yes.
7      Q  All right.  Do you recall generally what the
8  time frame was between the two mailings?
9      A  No.
10      Q  Was it more than six months?
11      A  No, because the election cycle is not that
12  long.
13      Q  So it was less than six months?
14      A  I would say it was probably four to six weeks
15  at the most.
16      Q  Okay.
17      A  If I recall that the cards were sent in late
18  May or June, and you are showing me this saying that it
19  was sent in mid-April, there's your four to six weeks.
20      Q  So sitting here and looking at the record that
21  we have before us, you would -- you would draw the
22  inference or -- let me start over and ask a real
23  question.
24          From everything that you know and you've seen
25  today, you would believe that the first mailer went out

25  (Pages 94 to 97)

b5c99f65-a54b-4571-8b2b-2bfed7b52128

Major John B. Clark, JR. - December 1, 2006
Leroy "Bud" Bensel, et al. vs. Air Line Pilots Association

Page 98

1  somewhere in -- in April and the second mailer went out
2  somewhere in May or June?
3      A  Yes.
4      Q  Okay.  Now, the first mailer, the cards got --
5  you explained got chewed up in the post office equipment
6  somehow?
7      A  Yeah.  The cards were too small, so the second
8  ones we -- we sent out were a little bit larger.  They
9  had to be small enough to fit in an -- in an envelope.
10     Q  So you guys -- maybe not you personally, but --
11 or maybe you did do this.  Who stuffed the envelopes
12 with the cards?
13     A  Prima Data.
14     Q  Prima Data did all that.  The card hadn't been
15 chewed up yet when it was shoved in the envelope.
16 Right?
17     A  We didn't find that out until we started
18 receiving them.
19     Q  When they got returned to you, they would get
20 chewed up.  That was the problem?
21     A  Yes.
22     Q  So people were responding to your first mailer.
23 Right?
24     A  Yes.
25     Q  In a favorable way as far as you thought?

Page 99

1      A  Well, if they sent a card in, that was
2  favorable, yes.
3      Q  Okay.
4      A  But not all of them were favorable responses.
5  But yes.
6      MR. PRESS:  I've got a document -- Mr. Katz,
7  I'm going to mark -- it's a one-page document.  It's got
8  the date May 4th, 2001, on top.  It's a post office
9  document.  This was faxed to your office today.
10     MR. KATZ:  Okay.  Yeah.  I have that.
11     MR. PRESS:  Good.  I'm going to mark it
12 Exhibit 38, and I'm going to hand it to Mr. Clark.
13         (Exhibit 38 marked for
14          Identification.)
15     Q  MR. PRESS:  I've handed you Exhibit 38.  Is --
16 well, you see the date up there in the top right, May
17 4th, '01?
18     A  Yep.
19     Q  And is that your signature on the bottom
20 right-hand corner?
21     A  Yes.
22     Q  And this was some form that you filled out with
23 the United States Post Office.  Right?
24     A  Yeah, in Redondo Beach, California.
25     Q  And the purpose of this was to set up a post

Page 100

1  office box for your campaign cards that get delivered to
2  you?  Would that be fair?
3      A  No, that's incorrect.
4      Q  Tell me what it's for then.
5      A  This is to establish the Business Reply Mail
6  account and tell them where the delivery -- or where --
7  what the address of the campaign is, and where those
8  cards would be going.  So no.  The post office box we
9  had was not at the U.S. Post Office in Redondo Beach,
10 California.  It was at a Mailboxes Et Cetera --
11     Q  Okay.
12     A  -- on Artesia Boulevard.  But this is a post
13 office document, and this is for a Business Reply Mail
14 account --
15     Q  Okay.  And --
16     A  -- otherwise known as BRM.
17     Q  And -- and by setting up this business reply
18 account -- what? -- do you get some favorable postage
19 rates or something like that?  What's the -- what's the
20 point?
21     A  No.  When you get something in the mail that
22 says "no postage required" on it, and it has a permit
23 number on it, that's a BRM account.  Okay?  So anybody
24 who wants to establish a BRM account through the United
25 States Post Office has to go through a plethora of

Page 101

1  paperwork to establish that account.
2      Q  All right.
3      A  Which is what I did.  And this is one of many
4  of the pieces paper that I filled out with the Redondo
5  Beach post office to establish the BRM account, and then
6  tell them what address was going to be printed on those
7  cards, which is the address you see here.  Okay?  And
8  that's where the cards were going to be going.
9          But when you establish a BRM account, you put
10 money into the -- into escrow with the United States
11 Post Office, and then as the cards came in, they would
12 deduct off -- off of that escrow account, they would
13 take the money.
14     Q  Who holds the escrow?  The post office?
15     A  Post office.
16     Q  How do you -- how do you figure out how much
17 money to put in escrow?  Is that based upon how many
18 mailers you make?
19     A  I think they set a minimum, especially for
20 someone who had never had a BRM account before.
21     Q  Now, the money that funded that escrow account,
22 that came from you personally?
23     A  Yes, yeah.  It was my funds.  And I can't
24 remember how much it was.
25     Q  Okay.  So this was all work you did as part of

26  (Pages 98 to 101)

b5c99f65-a54b-4571-8b2b-2bfed7b52128

Major John B. Clark, JR. - December 1, 2006
Leroy "Bud" Bensel, et al. vs. Air Line Pilots Association

Page 186

1  and sign the deposition and make any corrections.
2       THE WITNESS:  I'll make corrections if
3  they're -- if those are -- any need to be made and then
4  I will sign the corrected copy.
5       MR. PRESS:  Right on.  That's it.
6       THE WITNESS:  Okay.
7       THE VIDEOGRAPHER:  This concludes the
8  deposition of John Clark on December 1st, 2006.  The
9  time going off record is 5:57 p.m.
10      (The proceedings concluded at 5:57 P.M.)
11
12
13      _____
        MAJ. JOHN B. CLARK, JR.
14
15
16
17
18
19
20
21
22
23
24
25

Page 187

1       I, KIMBERLY J. WALDIE, a Certified Shorthand
2  Reporter licensed in the State of California and the
3  State of Nevada, do hereby certify:
4       That on FRIDAY, DECEMBER 1, 2006, at the Hyatt
5  Regency Lake Tahoe, 111 Country Club Drive, Incline
6  Village, Nevada, personally appeared MAJ. JOHN B. CLARK,
7  JR., who was duly sworn to testify and deposed in the
8  matter entitled herein;
9       That said deposition was taken in verbatim
10 stenotype notes by me, a Certified Shorthand Reporter,
11 and thereafter transcribed into typewriting as herein
12 appears;
13      That the foregoing transcript, consisting of
14 pages 1 through 186, is a full, true and correct
15 transcription of my stenotype notes of said deposition
16 to the best of my knowledge, skill and ability.
17      I further certify that I am not a relative or
18 employee of counsel of any of the parties, nor
19 a relative or employee of any party involved in said
20 action, nor financially interested in the action.
21      At the conclusion of the proceedings the
22 witness requested the transcript be e-mailed to him.
23      Dated at Reno, Nevada, this 11th day of
24 December, 2006.
25      _____
        KIMBERLY J. WALDIE, CSR No. 8696
        NV CCR #720, RPR

Page 188

1
2
3  STATE OF_____)
                  ) ss.
4  COUNTY OF _____)
5
6       I, _____, a notary
7  public in and for the County of
        _____,
8
9       State of_____, do hereby certify:
10      That on the _____ day of
11 2006 before me personally appeared MAJ. JOHN B. CLARK,
12 JR., whose deposition appears herein;
13      That any changes in form or substance desired
14 by the witness were entered upon the deposition by the
15 witness;
16      That the witness thereupon signed the
17 deposition under penalty of perjury.
18
19      Dated:  At _____,
20 This _____ day of _____, 2006.
21
22      _____
23
24
25

Page 189

1
2       OFFICER'S ACTIONS RE SIGNING OF DEPOSITION
3       PURSUANT TO NEVADA RULES OF CIVIL PROCEDURE
4
5  DATE
6  12-11-06      AT DIRECTION OF COUNSEL THE WITNESS WAS
                 SENT AN E-MAIL OF THE TRANSCRIPT
7
8
9
10
11
12      WITNESS SIGNED DEPO
13
14      ORIGINAL SENT TO
15
16      OTHER ACTIONS
17 _____      _____
18 _____      _____
19 _____      _____
20 _____      _____
21 _____      _____
22 _____      _____
23 _____      _____
24 _____      _____
25 _____      _____

b5c99f65-a54b-4571-8b2b-2bfed7b52128

# Exhibit C

# In The Matter Of:

*Bensel v.*
*Air Line Pilots Association*

---

*JEFFREY BRUNDAGE*
*Vol. 1*
*September 12, 2008*

---

*REPORTING ASSOCIATES, LLC*
*Certified & Registered Professional Reporters*
*Cherry Hill  --  Philadelphia  --  Trenton*
*(888) 795-2323*
*www.ReportingAssociates.com*



Original File 0912brun.txt
**Min-U-Script® with Word Index**

Bensel v.
Air Line Pilots Association

JEFFREY BRUNDAGE - Vol. 1
September 12, 2008

---

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF NEW JERSEY
 3
 4   LEROY "BUD" BENSEL, et al.
 5             Plaintiffs
 6    vs.                        Civil Action No.
 7   AIR LINE PILOTS ASSOCIATION      02-2917 (JEI)
 8             Defendant
 9   _____/
10
11
12            The Videotaped deposition of JEFF BRUNDAGE
13   was held on Friday, September 12, 2008, commencing at
14   9:02 a.m., at the Law Offices of Morgan, Lewis &
15   Bockius, 1111 Pennsylvania Avenue, N.W., Washington,
16   D.C. 20004, before Robert A. Shocket, a Notary Public.
17
18
19
20
21
22
23
24   REPORTED BY: Robert A. Shocket
```

---

Page 2

```
 1   A P P E A R A N C E S:
 2
 3         ON BEHALF OF THE PLAINTIFFS:
 4         LISA J. RODRIGUEZ, ESQUIRE
 5         NICOLE M. ACCHIONE, ESQUIRE
 6           Trujillo, Rodriguez & Richards, LLC
 7           258 Kings Highway East
 8           Haddonfield, New Jersey 08033
 9           Telephone: 856-795-9002
10           E-mail: nacchione@trrlaw.com
11
12
13         ON BEHALF OF THE DEFENDANT:
14         DANIEL M. KATZ, ESQUIRE
15           Katz & Ranzman, P.C.
16           4530 Wisconsin Avenue, N.W.
17           Suite 250
18           Washington, D.C. 20016
19           Telephone: 202-659-4656
20           E-mail: danielmkatz@comcast.net
21
22
23
24         (APPEARANCES CONTINUED ON THE NEXT PAGE)
```

---

Page 3

```
 1   APPEARANCES CONTINUED:
 2
 3
 4           ON BEHALF OF AMERICAN AIRLINES AND
 5           DEPONENT, JEFF BRUNDAGE:
 6           DONALD L. HAVERMANN, ESQUIRE
 7             Morgan, Lewis & Bockius
 8             1111 Pennsylvania Avenue, N.W.
 9             Washington, D.C. 20004
10             Telephone: 202-739-5072
11             Facsimile: 202-739-3001
12             E-mail: dhavermann@morganlewis.com
13
14
15   ALSO PRESENT: FRANCIS C. HEIL, ESQUIRE
16                 Senior Attorney American Airlines
17
18
19   ALSO PRESENT: DAVID VOIGTSBERGER, Videographer
20
21
22
23
24
```

---

Page 4

```
 1                   I N D E X
 2             Deposition of Jeff Brundage
 3                 September 12, 2008
 4
 5   Examination by:                           Page
 6   Ms. Rodriguez                            6,77
 7   Mr. Katz                                   56
 8
 9
10   Exhibit No.                              Marked
11   Plaintiffs':
12   193    Analyst Presentation               15
13   194    Letter, 3/30/01                    23
14   195    Memo, 3/27/01                      26
15   196    Bates ALPA 035088-92               36
16   197    Bates ALPA 036716-28               51
17
18   Defendants':
19   200    Letter, 10/12/01                   68
20   201    Letter 10/24/01                    72
21
22
23
24
```

Bensel v.
Air Line Pilots Association

JEFFREY BRUNDAGE - Vol. 1
September 12, 2008

Page 25

1 immediately prior to the agreement, the acquisition
2 agreement being signed. And I believe that Ann and
3 Chuck Marlette, who was, worked in the legal department
4 at American, were in meetings and that's how this
5 letter was exchanged.
6      Q   When, do you know if this is the first time
7 that the TWA MEC heard about the reasonable best
8 efforts language?
9      A   I don't know. I have no way to know that.
10     Q   Did you talk to anybody at the TWA MEC or
11 ALPA about what exactly you meant by the reasonable
12 best efforts?
13     A   Well, there was, there was plenty of
14 discussion. And I'm going to jump forward a little bit
15 but there was also then an arbitration.
16     Q   And I know about the arbitration but again
17 I'm trying to focus on this timeframe, the March, April
18 timeframe prior to the waiver of scope. Were there any
19 discussions with anybody at ALPA or the TWA MEC about
20 what exactly was entailed, what you meant by the
21 reasonable best efforts?
22     A   Prior to this letter being provided we were
23 still in the period where the TWA labor relations folks
24 were handling the discussions. So, I have no knowledge

Page 26

1 of any discussions prior to this letter.
2          MS. RODRIGUEZ: Oh, shoot.
3          MR. HAVERMANN: Is that it?
4          MS. RODRIGUEZ: Yeah.
5          (Plaintiffs' Deposition Exhibit Number 195
6 was marked for purposes of identification.)
7          MR. HAVERMANN: You gave me two.
8          BY MS. RODRIGUEZ:
9      Q   Do you recognize this document, Mr.
10 Brundage?
11     A   If you would give me a second to read
12 through it.
13     Q   Sure.
14     A   It's not something that's obvious. Well,
15 it appears to be a memo that I wrote.
16     Q   Do you --
17     A   And considering that it was written in
18 March of 2001, and I have written a few memos since
19 then, it's, on its face I'll just assume that it's
20 correct.
21     Q   Do you know why you, do you have any
22 recollection as to why you wrote this other than this
23 status update; who were you writing it to?
24     A   It appears as though it would have been to

Page 27

1 our pilot group. And, I imagine that it was to update
2 them on our interest in reaching an agreement that made
3 sense for the company but that would not in any way
4 create friction as a result of offering employees jobs
5 from TWA.
6      Q   Do you know how this memo was transmitted
7 to the American Airline pilots?
8      A   No idea.
9      Q   Is there typically a way that -- do you
10 typically correspond with pilots?
11     A   Yeah. We, we use, we use telephone, we use
12 e-mail, we, you know, normal, regular interaction with
13 the pilots was a, just a normal thing.
14     Q   On the last page of this memo -- one, two,
15 three -- the third paragraph from the bottom, it talks
16 about the merged pilot seniority as part of APA's
17 responsibility, you don't have a say in seniority
18 integration.
19     A   Uh-huh.
20     Q   Do you see that?
21     A   Uh-huh.
22     Q   Was that a concept that had been conveyed
23 to ALPA?
24     A   The, Terry Hayes would have been very clear

Page 28

1 with ALPA in his discussions as to why we wanted to
2 have certain provisions removed, American desired to
3 have certain provisions removed from the ALPA scope
4 agreement, to go forward with the transaction. So, I
5 mean, knowing what a, almost religious issue scope is
6 with pilot groups, I can't fathom for a moment that
7 from the time Terry made the first request to the TWA
8 MEC that they didn't absolutely understand with
9 complete certainty the reasoning for a request to
10 remove the scope language on Allegheny-Mohawk. I mean,
11 that, that's, that is the pillar and key concept in the
12 scope language of those agreements so the pilots at
13 each of those airlines spent a lot of time getting that
14 information into the agreements.
15     Q   Were you involved at all in the, the
16 American Airlines decision to acquire parts of USAir.
17     A   I was.
18     Q   And was there the same issue with regard to
19 Allegheny-Mohawk rights in that decision?
20     A   There was.
21     Q   And was there a decision to, if that
22 transaction was consummated, to allow USAir pilots to
23 regain their Allegheny-Mohawk rights?
24     A   Well, I'll do my best. The USAir

Bensel v.
Air Line Pilots Association

JEFFREY BRUNDAGE - Vol. 1
September 12, 2008

Page 29

1 transaction, if I remember, had two or three
2 alternatives as to how we would move forward and United
3 was considering acquiring USAir and wanted to divest a
4 portion of the USAir assets.  We recognized that the
5 USAir, our ability to take both aircraft and people
6 from USAir had the exact same problems associated with
7 it that the TWA transaction did.
8         And if I remember the transaction
9 correctly, there were a certain number of airplanes
10 that we would take without any people but then there
11 was, I think it was 757s; there were a number of 757s
12 that United and USAir insisted that if we were to
13 acquire those aircraft we would have to take the people
14 with them.
15         And the USAir contract had the same type of
16 Allegheny-Mohawk language in it.  And we went to our
17 pilot group and said, look, we recognize that your
18 agreement doesn't provide for this, we recognize that
19 this is not something that, you know, we asked them if
20 they would waive it and they immediately said
21 absolutely not and so we said, well, what we'll do is
22 we'll try to convince you and your pilots that it makes
23 sense to take these aircraft and if you agree, then
24 what you will agree to do is take these pilots and use

Page 30

1 Allegheny-Mohawk provisions to integrate them.  That
2 never happened.
3         Let me say it differently.  We explicitly
4 told the pilots that it was really their decision
5 whether we were going to take those 757s because the
6 decision hinged on their willingness to integrate any
7 USAir pilots that came with those aircraft using an
8 Allegheny-Mohawk type process.  And they told us,
9 first, the transaction didn't close but they also told
10 us they weren't willing to do that.
11         Q    Are you familiar with the 1113 process at
12 all?
13         A    Yes.
14         Q    And what's your familiarity based on?
15         A    Well, I worked for an airline -- I was a
16 line pilot -- that went bankrupt so I got a little
17 taste of 1113 and that process and obviously the events
18 of the industry over the past four or five years, it's
19 been debated pretty heavily.
20         Q    Did you talk to Terry Hayes prior to TWA
21 filing their 1113 motion?
22         A    I, today I have no idea what the date of
23 their filing was versus when I began to talk to Terry
24 Hayes, but so, I can't, I can't put that timing in

Page 31

1 place for you.
2         Q    Well, prior to April 10th did you have any
3 discussions with Terry Hayes about the filing of the
4 1113 motion?
5         A    Sure.
6         Q    What did you, what do you recall discussing
7 with him?
8         A    Well, American was very interested in
9 acquiring the assets and if we -- if we were unable to
10 negotiate a resolution with the TWA management, meaning
11 that they were able to change their agreements to make
12 them compliant with our request, one of the options
13 would have been for TWA to have gone into the
14 bankruptcy court and attempted to reject the TWA
15 collective bargaining agreements.  And, had that
16 occurred, it had the possibility of clearing the way
17 for us to acquire the assets without these onerous
18 provisions that would have prevented the transaction.
19         Q    Did you ever talk to Terry Hayes about the
20 willingness of American to wait out the 1113 process?
21         A    My recollection is that we were very
22 anxious to conclude the transaction.  And if you ask me
23 what caused us to be anxious, I'm not sure I could tell
24 you but I can tell you that having worked through that

Page 32

1 period of time we were very anxious to conclude the
2 transaction and we were not interested in a long,
3 drawn-out process.  I don't know if that's responsive
4 but that's the best of my memory.
5         Q    Did you ever give them a drop-dead date?
6 And let me start, did you ever give Terry Hayes a
7 drop-dead date for resolving the collective bargaining
8 agreement issues?
9         A    Well, your word's drop-dead date.  I think
10 we said to Terry on numerous occasions that this can't
11 drag out and the commercial side had contemplated a
12 date for closing and that would have been the date by
13 which he needed to achieve either through collective
14 bargaining or through an 1113 process the changes to
15 the agreements.  So, it was critical and there were
16 dates but the dates were around the transaction.
17         Q    And you don't recall the dates?
18         A    No.
19         Q    Was there a concern or did you have a
20 concern that the TWA pilots could strike if the 1113
21 motion was granted in its totality?
22         A    That was a highly debated point of law that
23 I think people felt was unanswered in the courts and I
24 think that the majority of folks who counsel management

Bensel v.
Air Line Pilots Association

JEFFREY BRUNDAGE - Vol. 1
September 12, 2008

---

Page 41

1  --
2      Q    And I'm not referring to wages.  I'm
3  talking about --
4      A    But from a training perspective, yes, it
5  would, it would be, the most economically advantageous
6  way would be to not have to retrain anybody, to allow
7  everyone to just remain in their piece of equipment and
8  fly.  And, and because seniority governs which piece of
9  equipment you fly and those kind of things, it would
10 cost more to retrain everybody as a result of putting
11 all of the TWA pilots on the bottom of the list, if
12 that's --
13     Q    So you would never, even, even in the face
14 of APA opposition you would never engage in a
15 transaction where all the pilots in an acquired airline
16 were stapled to the bottom of list?  Let me be
17 specific.  Even in the face of APA opposition it just
18 didn't make economic sense for American to staple all
19 the TWA pilots to the bottom of the list?
20     A    We, we understood when we undertook the TWA
21 acquisition that, in fact, that might be the result.
22 And, that was in fact the result for the flight
23 attendants from TWA, different work group, different
24 issues but --

---

Page 42

1      Q    Different training issues?
2      A    Different training issues but, but going in
3  --
4      Q    Different economic issues?
5      A    Different economic issues but going into
6  the transaction, we fully understood that that was
7  probably the likely outcome.  So, and the reason I say
8  that is by requiring TWA to remove the Allegheny-Mohawk
9  integration scope language, we recognize that when we
10 employed people as part of that asset acquisition, that
11 it would be the American Airlines, we call it the Green
12 Book -- that's our, our short-term, shorthand for the
13 pilot contract -- that the seniority section of that
14 agreement would govern and that unless the pilots
15 themselves chose to provide us with a seniority list
16 that provided integration, some dovetailing
17 integration, we were going to end up with all of the
18 TWA pilots as the last pilots on the list.  So, we knew
19 that going in.  In fact, that, I would call it, that
20 was the stake in the ground.
21     Q    And you would do that even if it was more
22 costly for American to do it that way?
23     A    Well, you know, there are all kinds of
24 costs associated with integrating carriers.  And, yes,

---

Page 43

1  the training issue is one of the costs but the
2  commercial folks look at all of those costs in the
3  aggregate and they look at what they think the revenue
4  synergies are going to be and it's just part of doing
5  business to have those costs.
6          I mean, you calculate them, you estimate
7  them, you bake it into the overall economics of the
8  deal and you make a determination whether the deal
9  makes sense or not.  So, no one would look, look at
10 that issue in isolation.  That, that issue is one of
11 the economic factors of making your decision to either
12 acquire the assets or not, in this case.
13     Q    So when you came up with the reasonable
14 best efforts language in that framework, what did you
15 intend to do; what did you intend that language to
16 mean?
17     A    Well, I mean, maybe a moment's review of
18 how we got to the, that language.  It was clear that
19 the TWA pilots were very concerned about how they would
20 be treated once they were acquired.  And I'm going to
21 give you my opinion.  My opinion was that they had a
22 choice between unemployment and potentially no piloting
23 careers and the opportunity to come to work for
24 American.

---

Page 44

1          And, so, that was the overriding
2  consideration for them but once, once they made the
3  decision that recognizing there was the real
4  possibility that they would end up losing their
5  captains jobs and end up on the bottom of the American
6  list, they worked very hard to try to create the best
7  possible opportunity for themselves when they came
8  over.  And they wanted, they, we had said to our
9  employees we will not conclude a transaction that
10 requires a seniority integration or arbitration or the
11 use of Allegheny-Mohawk, the transaction will not take
12 place if that ends up being a condition.
13          And, you know, I personally went on road
14 shows across the country and literally made those
15 assurances in person to, to our folks so that it was
16 very clear what our position was.  And I think that TWA
17 pilots were very anxious to say to us, okay, we'll
18 accept the terms that you require for us to be able to
19 continue to be employed as pilots but we'd like you to
20 help us.  Do the best that you can, use whatever effort
21 you can to help us get a better seniority deal from the
22 APA.
23          And, you know, we, they, they initially
24 tried to get us to include Allegheny-Mohawk.  I mean,

---

Page 57

1  BY MR. KATZ:

2      Q   I have a few questions on behalf of ALPA.

3  I take it from what you've been saying this morning,

4  Mr. Brundage, that American was not bluffing about

5  walking away from this transaction unless the scope

6  provisions of the union contracts at TWA were waived or

7  eliminated by the bankruptcy court?

8      A   Yeah. Not only was it not a bluff, it

9  wasn't even open for negotiation.

10     Q   And, did you do everything within your

11 pours of articulation to make that clear to Terry

12 Hayes?

13     A   Absolutely.

14     Q   And, to the best of your knowledge, did he

15 attempt to communicate American's position as

16 effectively as he could to the representatives of the

17 Air Line Pilots Association?

18     A   I assume he did, especially based, that we

19 now know the outcome, that they elected to eliminate

20 those provisions voluntarily.

21     Q   On August the 28th the Plaintiffs conducted

22 a deposition of Randy Babbitt concerning his role in

23 advising the TWA MEC. As you may be aware, he was, he

24 had then established Eclat Consulting Firm in January,

Page 58

1  February, March of 2001. He testified to some

2  conversations that he had on the phone with you. Do

3  you recall any conversations with Randy Babbitt during

4  that period of time?

5      A   I do.

6      Q   Would you describe what you remember of

7  them?

8      A   Well, Randy had been asked to help the, in

9  his role as Eclat had been asked to help the TWA MEC.

10 And I, you know, I don't know what that role was but I

11 assume he was just an external adviser to the MEC.

12 And, Randy had contacted me. And we had talked on a

13 number of occasions. And I think what Randy was trying

14 to figure out was to see if I could provide any insight

15 as to what the APA may do from my position as the

16 management guy who dealt with them. And, so, you know,

17 I, I essentially made it very clear to Randy that the

18 base case was probably that they would put the TWA

19 pilots on the bottom of the list.

20     Q   Did you in any of these conversations with

21 Captain Babbitt give him any indication that American

22 was negotiable about the elimination of the TWA union's

23 merger protections?

24     A   Quite to the contrary, was absolutely clear

Page 59

1  with Randy that those pilots in all likelihood would be

2  unemployed if those conditions weren't removed from the

3  agreement because we fully expected that TWA would

4  liquidate and there would be no jobs. And my

5  conversations with Randy were, you know, if you're

6  going to try to help these guys, you better get them to

7  understand that the only way they're going to be flying

8  as pilots is if they figure out how to get rid of these

9  provisions.

10     Q   I represented the AirCal pilots in 1987 in

11 their seniority negotiations with the Allied Pilots

12 Association and we ended up with an agreement that had

13 terms like hard fence and porous fence in it. Are you

14 familiar with those terms, hard fence and porous fence?

15     A   I am.

16     Q   Would you describe generally what they

17 would mean with respect to the TWA-American

18 transaction?

19     A   Well, if the, while the airlines were being

20 combined and prior to a final integration and operating

21 process, and even beyond the integration if a fence

22 was, in fact, established, it would define what jobs

23 and what opportunities in the American system that the

24 TWA pilots would have access to.

Page 60

1      So, if it was a hard fence, I, you can

2  think about it as an area in which the TWA pilots would

3  have opportunity but beyond that area, meaning captains

4  jobs, flying opportunities, holidays, all kind of

5  conditions, they wouldn't have any access to that. And

6  then a porous fence would be a situation where the same

7  kind of conditions would apply but on some negotiated

8  terms certain pilots who were identified would be able

9  to move through the fence and go over and begin to take

10 advantage of the larger American Airlines system in

11 this case.

12     Q   All right. The Plaintiffs' lawyer gave you

13 a document which was marked as Exhibit 190 -- let me

14 make sure I got the right one -- 195, which was a memo

15 that you wrote to the American pilots on March 27th,

16 2001.

17     A   Yep.

18     Q   And on the second page, the bottom two

19 paragraphs talk about what might happen if this

20 transaction is consummated and there's some kind of

21 opportunity for integration of TWA pilots into the

22 American system. I'm going to give you a minute just

23 to read that over.

24     A   Okay.

Page 69

1    A    That's correct.

2    Q    And, it says Roland Wilder briefed you on

3  the seniority discussions, is that correct?

4    A    Yes, that's correct.

5    Q    And then the ALPA TWA MEC representatives

6  asked you to review a number, additional processes that

7  included arbitration, facilitation and negotiation; do

8  you recall that?

9    A    I do.

10    Q    And do you recall what your response was?

11    A    This, this letter is representative of my

12  frustration at this point because we had worked very

13  hard to try to get the APA folks to engage in a

14  discussion and the TWA folks just seemed to be

15  stalling, posturing and making it impossible to get a

16  meeting together.  So, you know, they came in and

17  essentially proposed Allegheny-Mohawk, if I remember

18  correctly, in some form, and, I mean, I was pretty

19  short with them and said, you know, that's been off the

20  table since the beginning of the year, get off it.  If

21  you want to do something, get busy and get something

22  done but this is nonsense.

23    Q    So the idea of an arbitration was gone at

24  that point?

Page 70

1    A    Long gone.

2    Q    And you made that clear to the TWA MEC

3  representatives?

4    A    Crystal clear.

5    Q    The bottom paragraph on the first page says

6  that you invited the ALPA representatives to a meeting

7  the next day, in which you planned to facilitate talks

8  between the two pilot groups' representatives?

9    A    Yes.

10    Q    That meeting never occurred, did it?

11    A    No.

12    Q    Would you explain why?

13    A    The, I read this pretty quickly but I think

14  I referred to the fact that they were, the people that

15  came to the meeting were unable to commit.  They said

16  they would have to go back and talk to the MEC.  And

17  then the next thing I received was a confidentiality

18  agreement that, being refreshed by the letter, you

19  know, was very frustrating because this had, we had

20  broad discussions about having this meeting and getting

21  the meeting set up and who was going to attend and then

22  they produced this confidentiality agreement which was

23  impossible for me to sign.

24         I mean, I discussed this with members of

Page 71

1  management and this was the effort and all of a sudden

2  they proposed that the fact that a meeting is even

3  going to take place is going to be confidential and

4  that horse had left the barn as well.

5    Q    In terms of the company's reasonable best

6  efforts to encourage an agreement between the

7  representatives of the two pilot groups, would this

8  meeting that you were proposing to facilitate have

9  constituted an element in the company's reasonable best

10  efforts?

11    A    Well, we had met our obligation with, under

12  the letter that we provided to the TWA MEC folks that I

13  believe it was Ann McNamara provided very early in the,

14  in the, in the process.  We had moved at this point

15  into the practical realm of meeting to expeditiously

16  get the, this integration concluded.  The economy was

17  starting to move away from us.  There were numerous

18  challenges.  You know, we, we had gotten to the point

19  where nine eleven had occurred.  I mean, the world had

20  changed dramatically.

21         So, this was now the practical effort to

22  work towards getting this, these two airlines put

23  together.  So I, I would not describe it as part of our

24  reasonable best efforts.  This was a practical labor

Page 72

1  relations effort to do what was necessary because we

2  had two airlines and we had to get them together.

3    Q    And, Mr., Captain Pastore showing up

4  without the ability to talk about these issues, was

5  that helpful to the process of resolving these

6  practical issues?

7    A    It just looked like a dodge.  It looks like

8  they were just delaying for some reason.

9         MR. KATZ:  I would like to show you one

10  other document.  This one is, let's call this ALPA

11  exhibit 201.

12         (Defendant ALPA Deposition Exhibit Number

13  201 was marked for purposes of identification.)

14         BY MR. KATZ:

15    Q    Do you remember writing this letter dated

16  October 24, 2001, to Captain Pastore?

17    A    I do.

18    Q    And can you tell us anything about the

19  letter?

20    A    We had spent the previous, I think probably

21  Saturday, Sunday, Monday over at the Mayflower here in

22  town, in Washington, attempting to reach an agreement

23  on seniority.  The, we, that didn't happen.  When we

24  broke, I went back to, with my team back to Texas.  The

Bensel v.
Air Line Pilots Association

JEFFREY BRUNDAGE - Vol. 1
September 12, 2008

---

Page 73

1 TWA MEC remained here in Washington and committed to
2 continue to work because it's my understanding that
3 they had some real differences of opinion within the
4 MEC as to what they should or how they should proceed.
5 Captain Pastore had agreed that he would keep us posted
6 as to their progress.
7        And I received, I believe, a fax prior to
8 this where the TWA MEC said that they would accept the
9 proposed seniority integration that APA had proposed
10 but they then added a bunch of conditions which had
11 never been negotiated that would have significantly
12 increased's Americans costs. And, so, this is my
13 response to Bob because first I was, you know, very
14 surprised that they had simply just added conditions
15 and sent them to us without discussion. They were
16 aware that those conditions weren't acceptable and this
17 was explaining to him that we, we couldn't agree to
18 that.
19    Q   During October 2001, when, the month when
20 these two letters we've just gone over were written, do
21 you recall any discussions with Bill Compton that
22 related to the possibility of providing TWA pilots with
23 additional protections in a seniority integration?
24    A   I had a number of calls, and, but I don't

---

Page 74

1 specifically remember the content. I did, I did talk
2 to Bill, participated in a couple of calls with Bill
3 and Don Carty, Bill Compton and Don Carty, but I don't
4 have any recollection of a specific -- the
5 conversations were generally about what was happening.
6 So, that's, that's the best I can do to recall what the
7 content of the conversations were. Bill and Don were
8 both very, working very hard to try to get the
9 integration on track.
10    Q   And was it essentially your instructions
11 from the people higher in the executive structure at
12 American to try to work out an agreement between the
13 two pilot groups' representatives and the company if
14 possible?
15    A   Absolutely. We were, you know, we
16 recognized especially after having seen some of the
17 challenges we faced in Reno, we knew this was going to
18 be a very significant task to integrate these two
19 carriers. And, you know, from a labor relations
20 perspective, the more that you can get agreed to and
21 behind you, the easier the job is. So, it was very
22 much in our interest to get these two pilot groups to
23 agree and get something on paper that we could define
24 and agree to and understand and get plans in place to

---

Page 75

1 get the carriers integrated.
2    Q   So that was your goal during October 2001?
3    A   Absolutely.
4    Q   Do you recall whether there would have been
5 greater protections for the TWA pilots in a three-way
6 agreement between ALPA, APA and the company than there
7 was in the two-way agreement between American and the
8 Allied Pilots Association only?
9    A   Well, Duane, the letter that I had written
10 to Captain Woerth, you know, that was part of the
11 frustration because it was my understanding and the
12 facilitation, what occurred during the facilitation, I
13 really was never party to and was never fully briefed
14 on because the pilot groups insisted on a high degree
15 of confidentiality around those discussions.
16        But, you know, the APA, and again, as I
17 testified to earlier, I think that the APA was feeling
18 some pressure because of the potential Bond legislation
19 in the Senate and as a result of that I think it
20 motivated them to potentially put a little more on the
21 table to try to get this resolved. And it was my
22 understanding that the TWA pilots were not aware of
23 some of the things that they were willing to do. And,
24 you know, I made it very clear that the company was

---

Page 76

1 very interested in this and there may be some things
2 that the company could add to an agreement if it became
3 a three-way negotiation instead of just a negotiation
4 between the pilot groups.
5        So, as we talked about earlier, if the two
6 pilot groups had agreed to something they would have
7 then had to have come and negotiated with the company
8 to get it implemented. What I was proposing is time is
9 short, we need to get an agreement, let's just put what
10 the company has to offer, what the APA has to offer
11 that the TWA pilots had not seen before on the table
12 and see if we can't figure out how to get had this
13 thing resolved and moved forward.
14        So, there were specific things that we
15 offered to do in terms of some protections from
16 furlough and other things. And I don't remember
17 specifically what the terms were but the TWA pilots
18 were very concerned that, that on some date specific,
19 1st of January, I believe it was, that we were going to
20 furlough just hordes of TWA pilots because of 9/11, the
21 economy, everything else, it was clear that the airline
22 was going to have to be smaller. And what we said to
23 them was we won't do that. We'll put some limitations
24 around that and hopefully there will be a little bit of

---

Bensel v.
Air Line Pilots Association

JEFFREY BRUNDAGE - Vol. 1
September 12, 2008

Page 77

1 time and the economy will improve and it won't be
2 necessary. So, there were a number of things that we
3 said we'd add and we also created some additional
4 protections around the St. Louis domicile that would
5 have guaranteed more flying opportunities, more job
6 opportunities and more captains job opportunities for
7 the TWA pilots.
8     Q    St. Louis protected cell?
9     A    Yes, St. Louis.
10     Q    And those enhancements by APA and American
11 were blocked by Captain Pastore and TWA MEC?
12     A    Yeah. They, they just unilaterally decided
13 to add things. I mean, from a classic negotiations,
14 you know, tenacious grab of the obvious but they just
15 overreached beyond comprehension and it was just very
16 frustrating because they didn't seem to have a good
17 sense of reality.
18     Q    And those were the things that you wanted
19 to discuss at the meetings you outlined in your October
20 12th letter, ALPA Exhibit 200?
21     A    That's correct.
22         MR. KATZ: Thank you very much. That's all
23 the questions I have.
24 FURTHER EXAMINATION

Page 78

1 BY MS. RODRIGUEZ:
2     Q    I just have a couple more questions. I
3 want to follow-up. You never talked to Terry Hayes
4 about what he was telling the TWA pilots, did you?
5     A    I'm, I'm hesitating because I, I've
6 testified that I had regular conversations with Terry
7 about what our expectations were for the modifications
8 to the contract. So, to the extent that we discussed
9 those, I assume that's what he told the TWA pilots. I
10 mean, he indicated to me that he was attempting to get
11 his labor agreements amended in a fashion that would be
12 acceptable to American.
13     Q    Did you ever ask him what exactly he told
14 the pilots?
15     A    No recollection of that conversation.
16     Q    Did you have any discussions with
17 anybody -- going back just a little bit to the 1113.
18 Did you have any discussions with anybody at American
19 about what a strike would mean if the TWA pilots, if
20 all the contract provisions were abrogated and the
21 pilots went on strike?
22     A    Well, as I mentioned earlier, we presumed
23 that an 1113 motion that was successful in court and
24 having provisions of the contract abrogated did not

Page 79

1 result in the right to strike.
2     Q    So you didn't have a discussion about what
3 would happen if you were wrong in your analysis of the
4 status of the law and they could strike?
5     A    I, I have -- that's not a, something that I
6 remember.
7     Q    Do you, do you know how much American
8 committed to the asset purchase agreement, how much
9 money American --
10     A    Offhand I do not.
11     Q    Do you know how much they had committed to
12 the DIP financing?
13     A    I, offhand I do not.
14     Q    Do you know whether it was in the vicinity
15 of about a quarter of a billion dollars; does that
16 refresh your recollection at all?
17     A    It doesn't.
18     Q    Okay. You testified earlier that you
19 didn't talk to Dan in connection with your testimony
20 here today or about your potential trial testimony.
21 Have you spoken to anybody else at ALPA?
22     A    I have not.
23     Q    Have you spoken to Duane Woerth?
24     A    On this subject, no. Duane, I spoke to

Page 80

1 Duane probably six months ago, four months ago,
2 something like that. But there was, first I didn't
3 know this was going to occur and it never came up in
4 the conversation.
5     Q    Did you talk to Duane Woerth at all during
6 the time period from January 2001 to April 2001?
7     A    No specific recollection.
8     Q    Do you have any general recollection?
9     A    Well, look, the challenge for me is that,
10 you know, I had a relationship with many of the folks
11 at ALPA. I had worked there. I worked in the
12 representation department. And we attend industry
13 meetings. I mean, one of the greatest assets in labor
14 relations is to have contacts to be able to discuss
15 things with people to get the work done. And, so, I
16 had regular contact with people from ALPA, at industry
17 meetings and other places but it was just part of doing
18 business.
19     Q    How about specific conversations with
20 regard to the waiver of the scope provision during this
21 January to April timeframe?
22     A    No. And again I, Randy Babbitt was working
23 in Eclat at the time and I had specific conversations
24 with Randy but I didn't, I don't consider him to be at

Bensel v.
Air Line Pilots Association

JEFFREY BRUNDAGE - Vol. 1
September 12, 2008

Page 81

1 ALPA at that time.
2    Q   How about during the summer of 2001, did
3 you have any discussions Duane Woerth?
4    A   Yeah.  Well, obviously --
5    Q   In connection with the facilitation?
6    A   The letter I wrote and I'm sure I had
7 numerous conversations because it was the typical labor
8 relations environment where we had an interest in
9 getting the parties to the table and getting an
10 agreement and we were trying to talk to anybody we
11 could talk to, to get them to convince their side that
12 was, whether it be Ed James at APA or whether it be
13 someone at, at, Captain Woerth or someone in the
14 representation department at ALPA.  So, I would have
15 been making plenty of phone calls to say, look, you got
16 to talk some sense into your guys and we got to get
17 this resolved.  We need a deal here.
18    Q   Do you recall Mr. Woerth ever saying, yeah,
19 I'll talk some sense into my guys?
20    A   In every case they were very professional
21 about their representation.  Everybody, I think,
22 professed to want to get an agreement.  The challenge
23 was the subject, you know, the details of the
24 agreement.  And, the ALPA hierarchy and the ALPA MEC,

Page 82

1 you know, were anxious to get the very best deal they
2 could get for their folks.
3         MS. RODRIGUEZ: I have no further
4 questions.
5         MR. KATZ: Nothing further.  Thank you, Mr.
6 Brundage.
7         MR. HAVERMANN: Okay.  Off the record.
8         VIDEOGRAPHER: The deposition is concluded.
9 We're off the record at 11:10.
10        (Deposition concluded at 11:12 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 83

1         JURAT
2         I, JEFF BRUNDAGE, do hereby certify that I
3 have read the foregoing transcript of my testimony
4 taken on September, 12, 2008, and have signed it subject
5 to the following changes:
6  PAGE   LINE         CORRECTION
7
8
9
10
11
12
13
14
15
16
17
18     _____
19        JEFF BRUNDAGE
20 DATE _____
21 Sworn and subscribed to before me this
22 _____ day of _____, 2008.
23 _____
24 NOTARY PUBLIC

Page 84

1 State of Maryland
2 Baltimore County, to wit:
3         I, ROBERT A. SHOCKET, a Notary Public of
4 the State of Maryland, County of Baltimore, do hereby
5 certify that the within-named witness personally
6 appeared before me at the time and place herein set
7 out, and after having been duly sworn by me, according
8 to law, was examined by counsel.
9         I further certify that the examination was
10 recorded stenographically by me and this transcript is
11 a true record of the proceedings.
12        I further certify that I am not of counsel
13 to any of the parties, nor in any way interested in the
14 outcome of this action.
15        As witness my hand and notarial seal this
16 22nd day of September, 2008.
17
18     _____
19        Robert A. Shocket
20        Notary Public
21
22
23 My Commission Expires:
24 November 1, 2010

# Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3        THEODORE A. CASE, SALLY YOUNG,
          HOWARD HOLLANDER, PATRICK BRADY
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                          Plaintiffs,
 6                                              VOLUME 2
               V.                          TRIAL TRANSCRIPT
 7

 8        AIR LINE PILOTS ASSOCIATION,

 9                        Defendant.

10                              CAMDEN, NEW JERSEY
                                JUNE 8, 2011
11

12        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
13
                    A P P E A R A N C E S:
14
              TRUJILLO, RODRIGUEZ & RICHARD
15            BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
16                 AND
          GREEN JACOBSON, P.C.
17            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
              AND: JOE D.  JACOBSON, ESQ.  (MO. BAR)
18            For the Plaintiffs.

19            ARCHER GREINER
              BY:   STEVEN FRAM, ESQ.
20                  AND
          KATZ & RANZMAN
21            BY:  DANIEL M. KATZ, ESQ.
              FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
22
              ELIZABETH GINSBERG, ESQ.
23            IN-HOUSE COUNSEL FOR ALPA.

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.

3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter

6

7

8

9

10              LYNNE JOHNSON, CSR, CM, CRR
              OFFICIAL COURT REPORTER
11            UNITED STATES DISTRICT COURT
              P.O. BOX 6822
12            LAWRENCEVILLE, NJ  08648
              PHONE:   609 896 1836
13

14

15

16

17

18

19

20

21

22

23

24

25

1    machine.

2    Q.    Did you call anybody at ALPA seeking help?

3    A.    I don't recall.

4          THE COURT:  Did you write to ALPA seeking help?

5    A.    I am pretty sure there was correspondence that went back

6    and forth.  I was extremely busy coordinating the lobbying

7    effort.

8          THE COURT:  Did you ever write a letter to ALPA

9    asking for support?

10   A.    I believe Captain Pastore did.

11         THE COURT:  Okay.  The answer is you didn't.

12         THE WITNESS:  No.

13   Q.    Did you see any evidence of any support from ALPA in any

14   of the offices, Senate offices, you went to?

15   A.    No, sir, not that I could see.

16   Q.    What happened to the bell as to the bill as far as

17   getting through the Congress?

18   A.    Getting through the Congress.

19   A.    It was just passed on the Senate floor by unanimous

20   consent and eventually stripped out of the defense

21   appropriations bill that we had attached it to in the House

22   Senate conference committee.

23   Q.    I handed you exhibit P 418.  What is that?

24   A.    This is a press release from Senator Kit Bond.

25   Q.    What is the date of it?

Case-direct                                                                85

1   A.    It is dated December 8, 2001.

2            MR. PRESS:  Move for the admission of P-418, Judge.

3            MR. FRAM:   I have the same objection as before,

4   your Honor.  Did it is admitted for the truth I object.  If

5   for nonhearsay purposes.  I understand the Court's ruling.

6            THE COURT:  Well, to the extent it has facts, do

7   you have any dispute with what it says in here?

8            MR. FRAM:  Not with respect to the facts.  But

9   there are some opinions and understandings.

10           THE COURT:  To the extent it is Bond's opinion, we

11  are not offering it for the truth.  We are not saying whether

12  his opinions are accurate or inaccurate.  I am going to allow

13  it.  P-418.

14           MR. PRESS:  Yes, your Honor.

15  Q.    This is a press release dated December 8, '01, from the

16  Senator?

17  A.    Yes, sir.

18  Q.    Just read the tag line at the top?

19  A.    Senate adopts Bond airline workers fairness act.

20  Requires third-party arbitration for seniority talk.

21  Q.    It got through the Senate, your bill, that you drafted?

22  A.    Yes, sir.  I didn't draft it completely.

23  Q.    What happened to the bill after that?

24  A.    As I stated before, in the House Senate reconciliation

25  conference it was stripped.

1   different than what had been proposed in Washington, D.C. a

2   few weeks earlier?

3   A.   No, it wasn't.  And I did ask Mr. Brundage who also

4   attended those meetings.

5   Q.   In who is Mr. Brundage?

6   A.   He was the vice president of the labor relations at

7   American in charge of Americans negotiations with this deal.

8   If there was on the 22nd, I believe the 22nd or 23rd, I asked

9   him directly, is there any difference between what you have

10   already agreed to do and what you are offering us today and

11   he said virtually none.  Aside from a couple of conditions.

12   Q.   Now, this supplement CC, it was?

13           THE COURT:  It didn't become immediately effective,

14   though.

15           THE WITNESS:  No, sir, it did not.

16           THE COURT:  Some things had to happen.

17   A.   Yes.

18   Q.   That was my next question, what were those things?

19           THE COURT:  I turn it back to you.

20   Q.   What were those things that had to happen for this

21   seniority plan to be effective?

22   A.   For this seniority plan to become effective a single

23   carrier transportation certification had to be made by the

24   National Mediation Board.

25   Q.   And again, I think you described that a little bit

# Exhibit E

1     IN THE UNITED STATES DISTRICT COURT.
      FOR THE DISTRICT  OF NEW JERSEY
2     CIVIL 02-2917  (JEI)

3  THEODORE A. CASE, SALLY YOUNG,
  HOWARD HOLLANDER, PATRICK BRADY
4  AND MICHAEL FINUCAN, individually
  and on behalf of all others
5  similarly situated,
      Plaintiffs,
6            VOLUME 3
    V.       TRIAL TRANSCRIPT
7

8  AIR LINE PILOTS ASSOCIATION,

9      Defendant.

10       CAMDEN, NEW JERSEY
       JUNE 9, 2011

11  B E F O R E:   HONORABLE JOSEPH E. IRENAS
        UNITED STATES DISTRICT JUDGE
12

      A P P E A R A N C E S:
13

14   TRUJILLO, RODRIGUEZ & RICHARD
   BY:  NICOLE M. ACCHIONE, ESQ.
    AND: LISA J. RODRIGUEZ, ESQ.
15     AND
   GREEN JACOBSON, P.C.
16   BY:  ALLEN PRESS, ESQ.   (MO. BAR)
   AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17   For the Plaintiffs.

18   ARCHER GREINER
   BY:   STEVEN FRAM, ESQ.
19     AND
   KATZ & RANZMAN
20   BY:  DANIEL M. KATZ, ESQ.
   FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21

   ELIZABETH GINSBERG, ESQ.
22   IN-HOUSE COUNSEL FOR ALPA.

23

24

25

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON

4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10              LYNNE JOHNSON, CSR, CM, CRR
                OFFICIAL COURT REPORTER
11              UNITED STATES DISTRICT COURT
                P.O. BOX 6822
12              LAWRENCEVILLE, NJ  08648
                PHONE:   609 896 1836

13

14

15

16

17

18

19

20

21

22

23

24

25

1   A.   The comments came from Terry Hayes.  They never came

2   from American Airlines people to us.  So I don't know where

3   the comment or why he said it.  I can't speculate on that.

4   Q.   Didn't you --

5        THE COURT:  Terry Hayes who I had.

6   A.   Terry Hayes said it.  He is what?

7        THE COURT:  He was the labor director of TWA, Inc..

8   A.   That's correct.  Labor director, correct.

9   Q.   Didn't you tell us this morning that Mr. Hayes and the

10  other TWA people at that point were basically working for

11  American?

12  A.   No, they were working, they were working for American.

13  I don't know what they were saying to him.  I am not going to

14  speculate.  Terry Hayes is a TWA person.  He said something.

15  I didn't hear it from an American person so I didn't take it

16  for much.

17  Q.   Did Terry Hayes communicate that Jeff Brundage, who was

18  the vice president for labor affairs for American, was saying

19  that American would walk away from the deal?

20  A.   Actually, I think he did say that.  But again, I don't

21  know if he is making that up.  It is coming through a third

22  party.  I am not going to speculate on that.

23  Q.   All right.  But regardless of whether it came directly

24  or not, when you hear that American were you hearing that

25  American might walk away from the deal?

# Exhibit F

```
 1            IN THE UNITED STATES DISTRICT COURT.
              FOR THE DISTRICT  OF NEW JERSEY
 2            CIVIL 02-2917  (JEI)

 3     THEODORE A. CASE, SALLY YOUNG,
       HOWARD HOLLANDER, PATRICK BRADY
 4     AND MICHAEL FINUCAN, individually
       and on behalf of all others
 5     similarly situated,
                    Plaintiffs,
 6                                        VOLUME 4
          V.                              TRIAL TRANSCRIPT
 7
       AIR LINE PILOTS ASSOCIATION,
 8
                    Defendant.
 9
                              CAMDEN, NEW JERSEY
10                            JUNE 13, 2011

11     B E F O R E:   HONORABLE JOSEPH E. IRENAS
                      UNITED STATES DISTRICT JUDGE
12
                  A P P E A R A N C E S:
13
          TRUJILLO, RODRIGUEZ & RICHARD
14        BY:  NICOLE M. ACCHIONE, ESQ.
              AND: LISA J. RODRIGUEZ, ESQ.
15               AND
          GREEN JACOBSON, P.C.
16        BY:  ALLEN PRESS, ESQ.   (MO. BAR)
          AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17        For the Plaintiffs.

18        ARCHER GREINER
          BY:   STEVEN FRAM, ESQ.
19               AND
          KATZ & RANZMAN
20        BY:  DANIEL M. KATZ, ESQ.
          FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
          ELIZABETH GINSBERG, ESQ.
22        IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10            LYNNE JOHNSON, CSR, CM, CRR
              OFFICIAL COURT REPORTER
11            UNITED STATES DISTRICT COURT
              P.O. BOX 6822
12            LAWRENCEVILLE, NJ  08648
              PHONE:   609 896 1836
13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. FRAM:  Yes, your Honor.

2           MR. PRESS:  The question is does this refresh her

3   recollection of Mr. Brundage being upset.

4           MR. FRAM:  Yes.

5           MR. PRESS:  I object to that question.

6           THE COURT:  She said she hasn't recollected it.

7   Let's start with that.  Let's start by asking her if she is

8   familiar with this letter.  If she knows anything about it.

9   Then if you want to try to refresh her recollection, that is

10  up to you.  But you, she has to have a failure of

11  recollection before you can refresh somebody's recollection.

12          Do you have a copy for me of that?

13          MR. FRAM:  That was the one that was mis-marked

14  before.  That was the October 12 letter that I thought was --

15          THE COURT:  D 200?

16          MR. FRAM:  D 200.

17          THE COURT:  You give me --

18          MR. FRAM:  Sorry about that.

19  Q.   So do you recall this letter?

20  A.   I don't recall it.  It does refresh my memory a bit.

21  Q.   Does it refresh your memory about Mr. Brundage being

22  very upset that he felt snubbed by TWA MEC.

23  A.   No, you know, I read the letter.  I see what Mr.

24  Brundage wrote.  I am not sure that he is correct in his

25  description of what happened.  It is possible he is but I

1    don't -- I don't ever remember the TWA MEC wanting to go to

2    Dallas.  We never sent the MEC, we always sent the merger

3    committee.  That was the appropriate system.

4    Q.    Do you recall the letter, having read it, do you now

5    recall seeing a copy of it back in October?

6    A.    I don't.

7    Q.    Great.  I am handing you now what, a new exhibit, which

8    is D 21.

9              THE COURT:  So this isn't being offered in

10   evidence?

11             MR. FRAM:  Right.

12   Q.    D 21, do you recognize that that as a letter that Mr.

13   Rautenberg, the other pilot rep, from Council 3 sent to all

14   of the Council 3 pilots dated October 25 of 2001?

15   A.    It is a gated October 25, and it is signed by Steve

16   Rautenberg.

17   Q.    Do you recall seeing this letter back in October, 2001?

18   If you don't, please just say --

19   A.    I am sure I saw the letter by I haven't read it

20   recently.  I haven't refreshed my memory of this letter

21   recently.

22   Q.    Were you in regular communication with Mr. Rautenberg

23   back in October, 2001?

24   A.    I think it is safe to say the communications between

25   Captain Rautenberg and myself broke down.

1   A.   Not specifically Randy.  I knew he was new, he knew all

2   of the high level people at ALPA.  I will say it that way.

3   Q.   You knew that because he had worked at ALPA with whoever

4   was there?

5   A.   That's correct.

6   Q.   So you were surprised that Mr. Woerth in the fall of

7   2001 was talking to Jeff Brundage?

8   A.   I was surprised that Duane Woerth called Jeff after the

9   MEC voted not to sign the integration agreement.  I was

10  surprised without direction from the MEC that Duane Woerth

11  would reach out and have conversations with Jeff Brundage at

12  that point.

13  Q.   Why were you surprised that Mr. Woerth was trying to

14  keep an open line of communication and see what the best

15  possible deal was for the TWA pilots?

16  A.   I guess I wasn't aware of anything, any conversation

17  that would change, that he would could have with Jeff

18  Brundage that could change the context of the cram-down.

19  Q.   So you are saying that when this vote took place on

20  October 31 to reject the American proposal, you thought that

21  should be the end of it, that there should be no further

22  discussions with American or the APA.  Yes?

23  A.   The vote took place in the third week of October, not on

24  October 31.  It was on October 22, I believe --

25            THE COURT:  During that three-day meeting.

1   A.    I during the three-day meeting.  October 31 meeting was

2   a separate one day meeting, a special meeting back in St.

3   Louis, MEC meeting.

4               THE COURT:  Are you offering 88 in evidence?

5               MR. FRAM:  Yes, I move 88 in evidence.

6               MR. PRESS:  No objection.

7               THE COURT:  D 88 will be in evidence.

8   Q.    Your position after this vote on October 22 was that

9   there should be no further discussions between the TWA MEC

10  and the American or the APA?

11  A.    That is incorrect.

12  Q.    What further discussions did you think should take place

13  after the vote you just described?

14  A.    I was in favor of any interaction that would provide us

15  a better integration.  Duane Woerth did that, made that

16  /TPAOEP call, without any discussion about what his strategy

17  was in trying to obtain us a better integration.  Now, that

18  is why I asked him when he called me on the phone, I said

19  what precipitated this meeting, this special meeting that you

20  are calling 24 hours ahead and he said we are, you know, we

21  are talking to I think he said he talked to Jeff Brundage.

22  And he said I think we are going to get, maybe going to get a

23  look at a better deal.  I was all for that.

24  Q.    Just because Mr. Woerth wasn't talking to you doesn't

25  mean he wasn't talking to Captain Pastore, correct?

# Exhibit G

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT  OF NEW JERSEY
CIVIL 02-2917  (JEI)

PATRICK BRADY, SALLY YOUNG,
HOWARD HOLLANDER, THEODORE CASE,
AND MICHAEL FINUCAN, individually
and on behalf of all others
similarly situated,
                              Plaintiffs,
                                              VOLUME 7
          V.                          TRIAL TRANSCRIPT

AIR LINE PILOTS ASSOCIATION,

                              Defendant.

                              CAMDEN, NEW JERSEY
                              JUNE  16, 2011

B E F O R E:   HONORABLE JOSEPH E. IRENAS
                      UNITED STATES DISTRICT JUDGE

          A P P E A R A N C E S:

          TRUJILLO, RODRIGUEZ & RICHARD
          BY:  NICOLE M. ACCHIONE, ESQ.
               AND: LISA J. RODRIGUEZ, ESQ.
                    AND
          GREEN JACOBSON, P.C.
          BY:  ALLEN PRESS, ESQ.   (MO. BAR)
          AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
          For the Plaintiffs.

          ARCHER GREINER
          BY:  STEVEN FRAM, ESQ.
               AND
          KATZ & RANZMAN
          BY:  DANIEL M. KATZ, ESQ.
          FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

          ELIZABETH GINSBERG, ESQ.
          IN-HOUSE COUNSEL FOR ALPA.

1

2          Pursuant to Section 753 Title 28 United States
    Code,  the following transcript is certified to be an
3   accurate record as taken stenographically in the
    above-entitled proceedings.

4                         S/  LYNNE JOHNSON

5
                          Lynne Johnson, CSR, CM, CRR
6                         Official Court Reporter

7

8

9

10

11          LYNNE JOHNSON, CSR, CM, CRR
            OFFICIAL COURT REPORTER
12          UNITED STATES DISTRICT COURT
            P.O. BOX 6822
13          LAWRENCEVILLE, NJ  08648

14

15

16

17

18

19

20

21

22

23

24

25

Baehler-direct/Rodriguez                                    143

1    find additional sources of leverage and you talked about a

2    public relations campaign.  Did that ever happen, that you

3    know of?

4    A.   Not that I know of.

5    Q.   How about the lobbying effort you talked about, did that

6    happen?

7    A.   I think Matt Camlish, one of the pilots stationed in

8    Washington --

9             THE COURT:  Comlish?  C O M L I S H?

10   A.   Comlish, was working to get some kind of legislation

11   through Congress that would have benefited the TWA pilots in

12   this situation.

13   Q.   But as far as you know, ALPA National never provided any

14   additional --

15   A.   Not that I am aware of.

16   Q.   We were talking about meetings.  Were you there?  The

17   merger committee was there.  Did you ever see ALPA National

18   at any meeting?

19   A.   Yes.

20   Q.   When was that?

21   A.   That date I think I remember.  I think it was August 27.

22   Duane Woerth and Kevin Dillon.

23   Q.   Let me stop you there.  Who is Kevin Dillon?

24   A.   I am not sure.

25   Q.   What is, what has his role?

1    A.   What his position is at ALPA I don't know.  I assumed he

2    was one of Duane Worth's higher-ups.

3    Q.   Go ahead.

4    A.   Came to the meeting, joint meeting between the two

5    merger committees.  And when I heard about it, that Duane

6    Woerth was coming down, I thought hey, great.  Our big

7    brother is getting involved in this tussle and he is not

8    going to let these rough guys push us around any more, so I

9    was very glad to hear this.

10             Unfortunately, when Duane Woerth came down, he

11   began with a very arms length dispassionate or disinterested

12   approach, asking both sides to find some compromise that the

13   industry needs this compromise, and so does ALPA, and that we

14   need to work together, and it was all very vague, and there

15   wasn't any substance that I could see.

16             THE COURT:  Mr. Baehler, you keep talking about

17   leverage for the TWA pilots.  Did the American pilots have

18   leverage?  And if so, what was their leverage?

19   A.   My understanding is that if it came down to the end, and

20   no agreement was reached, that the American pilots would be

21   able to impose any kind of a settlement, any kind of a plan,

22   that they chose.  And that the TWA pilots  --

23             THE COURT:  How would they do that?

24             THE WITNESS:  Just by  -- well, the term that was

25   used in our discussion was at any point, if they really want

1    to, they can staple the entire TWA seniority list to the

2    bottom of their list.  That was the phrase that was used.

3              THE COURT:  And they had the legal right to do

4    that?  .

5    A.   That was our understanding.

6              THE COURT:  The legal right to do that.

7              THE WITNESS:  I assume so.

8              THE COURT:  That was their leverage?

9              THE WITNESS:  Yes.  That was our understanding.

10             THE COURT:  That is a lot of leverage.

11             THE WITNESS:  Of course.

12             THE COURT:  And there is no appeal from that?

13   A.   I don't know if there is an appeal.

14             THE COURT:   Okay.

15   Q.   So you are referring to a meeting in August of 2001,

16   and --

17   A.   Yes.

18   Q.   Where you saw Duane Woerth and Kevin Dillon?

19   A.   Afterwards, see, I could, I couldn't believe what I was

20   hearing, because I thought that there was going to be a lot

21   of support, a lot of muscle in Duane Worth's appearance and

22   there wasn't.

23             So afterwards, when we finally broke, I turned to

24   the TWA guys and I said what is going on here?  I thought

25   ALPA is your big brother.  And the pilots said you don't

Baehler-direct/Rodriguez                                    146

```
 1    understand --
 2            MR. FRAM:  Your Honor, I object.
 3            THE COURT:  Yeah, your conversation, these
 4    conversations are not evidence.
 5            MS. RODRIGUEZ:  Okay.
 6            THE COURT:  Your observation was that the report,
 7    that Duane Woerth wasn't giving you support, giving you union
 8    support?
 9    A.   Right.  Correct.
10            THE COURT:  I don't think his conversation is for
11    this --
12    Q.   We will just stop there.  What happened after the
13    August, what was your role in the negotiations following this
14    August 27 meeting with Duane Woerth?
15    A.   It continued to be the same.  In our private meetings we
16    would discuss -- caucuses, we would discuss what the
17    situation was and how we would deal with each of the problems
18    as they came up, and I would give my observations of the
19    other side.
20            And it seemed to me that the basic problem was
21    that, and if it was expressed by Mickey Malersky.
22            THE COURT:  Who is Mickey Malersky?
23    A.   One of the other American pilots.
24            THE COURT:  Was he on the merger committee?
25    A.   Yes.
```

Comlish-direct/Rodriguez                                    168

1    Q.    Also at ALPA?

2    A.    At ALPA National, yes.  And there was no answer there so

3    we left a message and waited and waited so finally, we took

4    the draft of what  we put together and we put it on the fax

5    and sent it to ALPA National headquarters.

6         Within minutes of us sending that fax we got a call from

7    Paul Hallisay.

8    Q.    What did Mr. Hallisay say?

9    A.    He said "Interesting.  This bill will never hit the

10   floor of the United States Senate."

11              And he said it with such a tone, I will never

12   forget it.

13   Q.    Did you ask him what he meant when he said this bill

14   will never hit the floor of the United States Senate?

15   A.    He said it would get tied up in committee.

16   Q.    Did he say anything else?

17   A.    He says, "Well, let me take a look at it.  I will see

18   what we can do."  And the conversation ended and we waited

19   for him to get back to us.

20   Q.    Did he ever get back to you?

21   A.    Yes, he did.

22   Q.    And again, what is the timeframe that we are talking

23   about?

24   A.    That is still the week of, I want to say the 21st, in

25   that timeframe, that week.

1           THE COURT:  21st of what?

2           THE WITNESS:  We are going into September, yes.  So

3    we are going towards the end of September.

4    Q.    How long did it take him to get back to you?

5    A.    It, let me back up for a second.  This was the last week

6    of September, the Monday of the last week of September is

7    when it started.  Okay.

8           It took several hours, I believe, it may have been

9    the next day.  It has been a while.  I am trying to remember.

10   But he did get back to us.  And his response was that there

11   were some problems with the language.

12   Q.    Did he tell you what the problems were?

13   A.    He said it was too broad.  We needed to restrict the

14   language, confine the language further, and he explained to

15   us what that meant was that the language covered the pilots,

16   the flight attendants and the mechanics.  He felt that the

17   IAM who represented the mechanics were going to object to

18   this legislation.  And they were going to object to this

19   legislation because the mechanics already had a deal on

20   seniority.

21          THE COURT:  With whom?

22          THE WITNESS:  With the American mechanics.

23          THE COURT:  They already had a deal.

24   A.    They already had a deal because they were both AFL-CIO

25   represented unions and because of that, they agreed to some

Comlish-direct/Rodriguez                                    170

1    process that gave them seniority.

2         THE COURT:  Did that include the flight attendants

3    as well?

4    A.   No.

5         THE COURT:  It was just the mechanics?

6    A.   Just the mechanics.

7    Q.   So what did you do in response to his comments, Mr.

8    Comlish?

9    A.   We rewrote the legislation, and we put in the

10   legislation that any previous agreements that were made would

11   not be undone by this transaction.  By this legislation.

12   Excuse me.

13   Q.   Than did you send that back to, did you send that back

14   to Mr. Hallisay?

15   A.   We sent it back to Mr. Hallisay.

16   Q.   Did that address his concerns?

17   A.   Yes.

18   Q.   So what was the next thing that happened?

19   A.   The next thing that happened was that we, Senator Bond

20   said that is ALPA National in approval of this language, and

21   we said yes, they are.  And he said, well, we want to put out

22   a press release with regard to this legislation being

23   introduced.

24        So Senator Bond created and had a press release put

25   out to the press.

1   Q.   Now, during this whole process had you ever reached out

2   to anybody at American or APA and told them about this

3   proposed legislation?

4   A.   No, I didn't.

5   Q.   Do you know when the first press release went out from

6   Mr. Bond's office, Senator Bond's office?

7   A.    I can't recall any specifics.  I believe he had it on

8   his website on Monday, it must have been, it was on a Monday.

9   If I had a calendar in front of me it would help.

10   Q.   Did you at this point ask ALPA National for help, help

11   or support in getting the bill passed?

12   A.    Oh, yes.  We felt that ALPA National was going to play a

13   major role in helping this legislation.  As I said before,

14   this is the reason why I took the position as the chairman of

15   the government affairs committee, so I could get, be part of

16   ALPA National's lobbying department, and to get their support

17   and help.

18   Q.   Did you ask specifically for any, did you ask for any

19   specific help from ALPA National?

20   A.    Well, the first step at this point was to have the

21   legislation introduced, and then it was time to begin the

22   work.

23   Q.    I just want to hand up to you, sir, and it is already in

24   evidence, P-419, and ask you --

25                THE COURT:  P?

Comlish-direct/Rodriguez                                    172

1              MS. RODRIGUEZ:   P.

2    Q.    That is the press release.  And ask if that is the press

3    release you are referring to?

4    A.    This is the press release.

5    Q.    That was drafted by Senator Bond's office?

6    A.    Yes, it was.

7    Q.    Thank you.  So Senator Bond issued his press release

8    announcing the legislation.  What was the next thing to

9    happen?

10   A.    Well, the press release got out, and I would say that

11   all hell broke lose.

12   Q.    Can you tell us what you mean by that?

13   A.    The APA immediately picked it up, and began to contact

14   their pilots, that, uh-oh, Senator Bond has got this bill and

15   it is going to require binding arbitration.

16   Q.    What did you do in response?

17   A.    Well, at that point, it was obvious that there was going

18   to be a big fight, we were going to have to get our troops

19   together and get as much support from ALPA National as

20   possible to beat them to the punch on Capitol Hill.

21   Q.    Did you talk to anybody at ALPA National about this?

22   A.    There were ongoing discussions with Paul Hallisay and

23   the MEC members, and I was talking to them through the chain

24   of command.

25   Q.    Through the chain of command?

1          And I said, "What about our opponents here?  We

2    have got to do something."

3          "I don't want to talk about it any further."  And

4    he leaves, walks off.

5    Q.   Did you ever ask him what he meant when he said we are

6    going to handle this in-house?

7    A.   I had no contact with him after that.

8    Q.   Had you talked to anybody else from ALPA National prior

9    to this time about your efforts on the hill?

10   A.   Well, you know, through the chain of commands there was

11   discussions with Paul Hallisay and the government affairs

12   department.

13   Q.   And other than that did you have any other conversations

14   with anyone else at ALPA?

15   A.   No.

16   Q.   Did you ever receive any phone calls from anybody

17   conveying --

18   A.   I am sorry.  I take that back.  There was the Mayflower

19   Hotel meetings which took place.  And just prior to that

20   there was a phone call that came in from Paul Hallisay, while

21   I was in a meeting with Senator Bond.  And that was October.

22          THE COURT:  It came into Senator Bond's office?

23   A.   That's correct, the phone call came into Senator Bond's

24   office for us, and we were discussing at the time the

25   possibility of setting up some meetings to reengage the

# Exhibit H

```
 1                   IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3         PATRICK BRADY, SALLY YOUNG,
           HOWARD HOLLANDER, THEODORE CASE,
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                       Plaintiffs,
 6                                              VOLUME 9
                V.                              TRIAL TRANSCRIPT
 7
           AIR LINE PILOTS ASSOCIATION,
 8
                       Defendant.
 9
                                    CAMDEN, NEW JERSEY
10                                  JUNE  22, 2011

11         B E F O R E:   HONORABLE JOSEPH E. IRENAS
                          UNITED STATES DISTRICT JUDGE
12
                       A P P E A R A N C E S:
13
              TRUJILLO, RODRIGUEZ & RICHARD
14            BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                 AND
              GREEN JACOBSON, P.C.
16            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
              AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17            For the Plaintiffs.

18            ARCHER GREINER
              BY:   STEVEN FRAM, ESQ.
19                  AND
              KATZ & RANZMAN
20            BY:  DANIEL M. KATZ, ESQ.
              FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
              ELIZABETH  GINSBURG, ESQ.
22            IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
above-entitled proceedings.

3

                 S/   LYNNE JOHNSON
4

               Lynne Johnson, CSR, CM, CRR
5               Official Court Reporter

6

7

8

9

10          LYNNE JOHNSON, CSR, CM, CRR
           OFFICIAL COURT REPORTER
11         UNITED STATES DISTRICT COURT
           P.O. BOX 6822
12         LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

1    But I tended not to add, I tended to, in this case, I thought

2    I was going to leave it to you to call him and have him

3    testify as to whatever you want him to testify to, and then

4    the plaintiffs could cross examine him.

5              MR. KATZ:   Just one page.

6              THE COURT:   I am going to look at it right this

7    second.

8              THE COURT:   I did review this section.   It falls

9    rather squarely within the comments I just made.   The line of

10   questioning here, and I guess it was Mr. Press who was doing

11   the questioning, the, apparently, ALPA has hard goods,

12   stickers, pens, buttons, things like that, that they will

13   give out for use in an organizing campaign.   If they want to

14   put various things on their cars, bumper stickers and pens

15   and key chains, and goodies like that, and the question was

16   asked of Rindfleisch as to whether he had supplied those, and

17   his series of answers to the questions seem to have been he

18   was making some distinction between a card campaign where he

19   wouldn't supply those things, and possibly a merger campaign.

20   I don't know.

21              I am not sure, he was making some kind of thing.

22   The bottom line is he denied having supplied any of that

23   stuff.   Or at least he didn't recall doing it.   Let me put it

24   that way.   He didn't recall it.   That may be.   That may be

25   something you want to bring out if he is here on the stand is

1    that he didn't supply those kind of things, and whatever the

2    reason was that he didn't supply them.

3         But I am not going to, for the very reasons I just

4    articulated it, and why, you know, I don't think that makes

5    any prior answer of his misleading.  Those I would put, even

6    if I thought there there were things that made a prior answer

7    misleading and you left out something that was needed to

8    understand the entire answer, so the jury wouldn't be misled,

9    that would be one thing.

10        But I don't think the sections being offered by the

11   plaintiff -- it is part of their case but I don't think the

12   answers are particularly misleading.

13        MR. KATZ:  That was our intent, to clarify earlier

14   answers.

15        THE COURT:  I understand.  And I mean in one sense,

16   the various things, marked, at least my initial draft here,

17   you know, they weren't misleading, they were just, they gave

18   a fuller and completer picture but I don't think it is the

19   plaintiff's obligation in an adverse deposition, in deposing

20   an adverse party, to put every aspect of that person's

21   testimony into the record.  You can't mislead, but if line

22   ten or eleven changes the answer, that is different from

23   wanting to put the whole case in, the whole story in.  This

24   is your witness, he is welcome here in court and he can

25   testify, and whatever he says he says, the jury will hear it.

# Exhibit I

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3         PATRICK BRADY, SALLY YOUNG,
           HOWARD HOLLANDER, THEODORE CASE,
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                        Plaintiffs,
 6                                          VOLUME 10
                V.                          TRIAL TRANSCRIPT
 7
           AIR LINE PILOTS ASSOCIATION,
 8
                        Defendant.
 9
                                   CAMDEN, NEW JERSEY
10                                 JUNE  23, 2011

11         B E F O R E:   HONORABLE JOSEPH E. IRENAS
                          UNITED STATES DISTRICT JUDGE
12
                    A P P E A R A N C E S:
13
              TRUJILLO, RODRIGUEZ & RICHARD
14            BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
              GREEN JACOBSON, P.C.
16            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
              AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17            For the Plaintiffs.

18            ARCHER GREINER
              BY:   STEVEN FRAM, ESQ.
19                  AND
              KATZ & RANZMAN
20            BY:  DANIEL M. KATZ, ESQ.
              FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
              ELIZABETH  GINSBURG, ESQ.
22            IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1    Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2 accurate record as taken stenographically in the
above-entitled proceedings.

3
       S/ LYNNE JOHNSON

4
       Lynne Johnson, CSR, CM, CRR
5       Official Court Reporter

6

7

8

9

10     LYNNE JOHNSON, CSR, CM, CRR
      OFFICIAL COURT REPORTER
11     UNITED STATES DISTRICT COURT
      P.O. BOX 6822
12     LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  I just want to put on the record a

2    couple of things.  I had a conversation with counsel this

3    morning concerning the deposition of Jeffrey Brundage that

4    was proposed to be read into the record.  I was very unhappy

5    with this deposition.  Mr. Brundage was pretty much -- this

6    is not to question his sincerity or his honesty, but he was

7    very much an out of control witness, in the sense that you

8    ask a question, he would launch into a three- page answer.

9              He rarely gave an answer that was less than a full

10   paragraph and in many cases he gave answers that took up two

11   pages of transcript, that often, usually, launched into areas

12   that had nothing to do with the question that was being

13   asked.  And of course, this was a discovery dep but, it

14   wasn't a de bene esse dep, and so when Ms. Rodriguez would

15   ask leading questions, which is not an improper technique in

16   a discovery dep because you sometimes want the witness to

17   sort of go on and on.

18             Mr. Katz started questioning him, in in many cases

19   with leading questions but even when there was a leading

20   question the answer was, he wouldn't even respond to the

21   leading question, even when he was being led he would go off.

22   So we have, we talked about this, we did that, we did this.

23   You know, their position with this.  But you have no idea,

24   you know, who was talking to whom, where it was, who was

25   present, what was said.  And I would, as I say, at some point

4

1   the objections of plaintiff are just, toward the end it is

2   like 28 pages, just, of objections I added up the pages, I

3   think it was 28 pages.  But you know, that are objected to.

4           But in many cases, it is not, if not most cases, of

5   value.  I just feel like I could not let any of this in

6   unless it was cleaned up some way or Mr. Brundage came to

7   court and that I could control the questioning, you know,

8   have it done the right way.

9           Now, Mr. Katz said he was going to go back and look

10  at this and, you know, see if he can work something up,

11  narrow what is being offered, et cetera.  But right now I am

12  not going to let this be played in this form.

13          And the second point is on the issue of the

14  testimony of the TWA CEO, what was his name again?

15          MR. KATZ:  Bill Compton.

16          THE COURT:  Compton before the Senate when they

17  were investigating the acquisition of American -- not

18  investigating -- well, maybe investigating is the right word.

19  I don't know.  Looking into the American acquisition, there

20  is a tape that defendant wants to play of Compton's

21  testimony.  And there clearly was some kind of agreement

22  between the parties related to Compton, because his

23  deposition wasn't taken and the exchange keeps talking about

24  stipulations.

25          But for the life of me I couldn't figure out what

1   isn't it?  It is a new concept, it hadn't been --

2   A.   I thought he asked a bit, did you say change or improve

3   significantly?

4   Q.   My question was, I asked a bad question.  Up in here,

5   you know, the three prior proposals they had made, did any of

6   them include as a feature the notion of a protective cell in

7   St. Louis?

8   A.   No.

9   Q.   What do you attribute that movement to?

10           MR. FRAM:  I object.  Calls for speculation.

11           THE COURT:  I will sustain that objection.

12  Q.   What had changed between September 18 and last offer or

13  mid October when they made this new proposal?

14           MR. FRAM:  Your Honor, it is the same question, I

15  object.

16           THE COURT:  I am going to allow it.  What had

17  changed was the Bond bill?

18           THE WITNESS:  That's right.

19  Q.   Had ALPA National given you any new leverage?

20  A.   No.

21  Q.   As presented to you by the American committee, was it

22  presented as take it or leave it, or was there a negotiation?

23  A.   There was a couple of extra little tiny tidbits that

24  were thrown on it, that I felt were window dressing, that if

25  we took it and there was a very tight timeframe, almost 24

1    Q.    And he directly addressed that and said at the meeting

2    that he had been misquoted, right?

3    A.    I don't recall.

4    Q.    All right.  So let's just move to the top of the next

5    page and refresh your memory about some of the things that

6    Captain Woerth talked about.  The second paragraph, Captain

7    Woerth told the MEC that he would send a letter to the TWA

8    pilots and others to be sure they all know what his position

9    is.

10           "Captain Woerth pledged the financial support of

11   the entire association for the TWA pilots.  In light of

12   losing the 9,000 hour flight pay loss bank previously

13   negotiated with TWA, Captain Woerth assured the MEC and the

14   other members present that the TWA MEC will be provided with

15   funds and other support necessary from ALPA to process MEC

16   activities."  Do you see this?

17   A.    Yes, I do.

18   Q.    Tell us about the 9,000 hour flight pay loss, what was

19   that?  Do you recall?

20   A.    I recall that we had an agreement with the company that

21   would allow us --

22           THE COURT:  The company being TWA.

23           THE WITNESS:  TWA.

24   A.    That allowed us so many hours of flight pay loss to do

25   union business and we had just lost that.

Day-cross/Fram                                            168

```
 1   Q.   And Captain Woerth told the MEC that ALPA would step up

 2   and would provide substitute financing so that the MEC

 3   members and the committee members could continue to work on

 4   behalf of the TWA pilots, right?

 5   A.   That's correct.

 6   Q.   That was significant in terms of financial support, yes,

 7   that turned out to be hundreds of thousands of dollars,

 8   didn't it?

 9   A.   I don't know how much it was, but I would say that is

10   probably correct.

11   Q.   And that enabled you and the other pilots to attend I

12   think you said over ten days of merger committee

13   negotiations, that enabled TWA pilots dozens, dozens of them,

14   to walk on Capitol Hill and lobby in favor of the Bond

15   Amendment.  Isn't that so?

16   A.   I can only speak on my merger committee.  I don't know

17   how the money was spent on the political committee.

18   Q.   ALPA supported your --

19          THE COURT:  Did you get payments from them, you

20   were doing a lot of work.

21   A.   Yes.

22          THE COURT:  Did you get paid?

23   A.   We got flight pay loss.

24          THE COURT:  In their case from the union rather

25   than from TWA.  From ALPA, rather than TWA.
```

Day-cross/Fram                                                169

1    Q.    Yes?

2    A.    I never questioned where it was coming from.  But if the

3    company wasn't providing it, then I guess the union was

4    providing it.  Yes, sir.

5    Q.    Did you ever put in for flight pay loss and not have it

6    paid by ALPA?

7    A.    No, no, never did.

8    Q.    Any members of your committee ever complain that ALPA

9    wasn't supporting them financially?

10   A.    No.

11   Q.    Do you see under questions and answers, question:  What

12   is APA status with regard to the AFL-CIO?  Can we blow that

13   question and answer up.

14         The answer was the APA has been trying to get into

15   the AFL-CIO for a long time and they have not been

16   successful.  They need to be true members of the labor

17   movement if they want the political support and clout that

18   goes along with a national union.

19         That was something, wasn't it, in terms of ALPA

20   trying to put pressure on the APA.  Yes?

21   A.    Pretty weak.

22   Q.    Skip down, we are not going to do then them all.

23         Question.  Do we have your commitment, the

24   resources of ALPA, including litigation, to ensure that TWA

25   pilots are integrated fairly?

# Exhibit J

```
            IN THE UNITED STATES DISTRICT COURT.
1                   FOR THE DISTRICT  OF NEW JERSEY
                    CIVIL 02-2917  (JEI)
2

3        PATRICK BRADY, SALLY YOUNG,
         HOWARD HOLLANDER, THEODORE CASE,
4        AND MICHAEL FINUCAN, individually
         and on behalf of all others
5        similarly situated,
                         Plaintiffs,
6                                           VOLUME 11
             V.                             TRIAL TRANSCRIPT
7

8        AIR LINE PILOTS ASSOCIATION,

9                     Defendant.

                              CAMDEN, NEW JERSEY
10                            JUNE  27, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12

                    A P P E A R A N C E S:
13

14           TRUJILLO, RODRIGUEZ & RICHARD
             BY:  NICOLE M. ACCHIONE, ESQ.
                     AND: LISA J. RODRIGUEZ, ESQ.
15                        AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:   STEVEN FRAM, ESQ.
19                   AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21

             ELIZABETH  GINSBURG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                    LYNNE JOHNSON, CSR, CM, CRR
18                  OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
19                  P.O. BOX 6822
                    LAWRENCEVILLE, NJ  08648
20

21

22

23

24

25

1    A.    Oh, yeah.  But I assumed that was going to happen.  He

2    didn't have to warn me.  I knew it was going to happen.

3    Q.    And in addition to the arrangements for the request for

4    consultants to the executive council and arranging for

5    special bankruptcy counsel, what else did you do?

6    A.    I reached out to then President Darrah, I wanted to have

7    a conversation with him.  I wanted at some point to be able

8    to address the American pilots and ask, do my -- that they

9    would do much better, that they would not staple the American

10   -- the TWA pilots to their list, that we would have a process

11   that would be fair, and, but mostly just preparing the

12   council, my duties at ALPA and reaching out to Mr. Carty and

13   told him he wanted to make sure the transaction flows.

14   Q.    Did you talk to Mr. Carty at this time?

15   A.    I talked to himself times in the month of January of

16   that year.

17   Q.    Tell us what Mr. Carty said to you in those telephone

18   conversations and what you said back to him, please?

19   A.    He was emphasizing that he was, that he hoped it was

20   going to close, that he knew my opinion on stapling pilots to

21   the bottom.  I opposed that.  It was not ALPA's merger

22   policy.

23           He just reiterated that I needed to know that if

24   the pilots' joy at being acquired went away and was being

25   replaced by a feeling that they could somehow have the

1   transaction, that American would buy them and still permit an

2   arbitration, that I should disabuse myself them of the notion

3   that that was absolutely not going to happen.

4   Q.   That is what Mr. Carty told you?

5   A.   Mr. Carty told me that, and this was again, he learned

6   his lesson, a bloody lesson, in the Reno debacle, that even

7   if American pilots are unreasonable in this regard, that is

8   what they were, and he was not prepared to destroy further

9   his relationship with APA, and so this was the demand he was

10  willing to countenance, either the scope was waived or no

11  transaction.  He was very emphatic.

12  Q.   And you said you had several conversations with, was

13  this repeated in the other conversations you had as well?

14  A.   Probably only mentioned.  It was mostly the first

15  conversation, to make sure there was no doubt in my mind that

16  the transaction could only close under one set of

17  circumstances.

18  Q.   Can you tell us anything about your conversation with

19  Mr. Darrah, the president of the Allied Pilots Association?

20  A.   They were also briefed.  He was fairly new to his

21  position.  I think he had just gotten the job in November,

22  and  he said he worked for the board of directors and they

23  had a policy, and his duty was to the board,  but he would

24  try to work with me, but he was fairly noncommittal at that

25  time.

1    Q.   This is the resolution of April 2, 2001, adopted by the

2    TWA MEC to accept the package of agreements that American and

3    TWA put on the table.  You are familiar with that?

4               THE COURT:  Don't have D 13 in evidence.

5               MR. KATZ:  Let me if ask if there is an objection

6    to it.  I believe it is in the minutes which are in evidence.

7               THE COURT:  Maybe.

8               MR. KATZ:  As a separate exhibit, you don't have a

9    problem.

10              MR. JACOBSON: No objection to the separate exhibit.

11              THE COURT:  Okay.  Then I am going to mark D 13 in

12   evidence.

13   Q.   Now we can put that up.  And the third whereas, can you

14   blow that up, please?

15              We have already talked about the assistance you

16   provided to the TWA pilots in retaining expert bankruptcy

17   counsel for the 1113 motion.  Mr. Seltzer.  This whereas

18   clause remind you of any other things that you and ALPA did

19   to  assist the TWA pilots in connection with this

20   transaction?

21              MR. JACOBSON: Objection, your Honor, to the leading

22   form of the question.

23              THE COURT:  Rephrase it.

24   Q.   Can you tell us, Mr. Woerth, whether in addition to Mr.

25   Seltzer there are other things, if any, that you and the

1   association did to assist the TWA pilots?

2   A.    Well, this is, this list of counsel, we hired

3   additional, we had bankruptcy counsel, but we also wanted

4   investment bankers, Glanzer is there, I think there is a

5   communications specialist firm.  I forgot the name of the

6   firm.  There is at least two more consulting firms that I

7   think they wanted hired and I think we hired, everyone they

8   asked for I think we allowed them to be hired.  I don't think

9   we turned them down for anything.

10  Q.    So you mentioned Mr. Glanzer?

11  A.    Yes.

12  Q.    He is an investment banker?

13  A.    Investment banker.

14  Q.    Communications firm.  That was retained at the request

15  of the TWA MEC?

16  A.    Yes.

17  Q.    You mentioned, who else did you mention?

18  A.    Besides, well, the investment bankers, we had our own

19  in-house counsel, and there is an additional person that came

20  on later that they wanted to hire, I don't even remember his

21  name.

22  Q.    All right.  And Mr. Babbitt is mentioned.

23  A.    Yes.

24  Q.    Would you remind the jury who Mr. Babbitt is or was at

25  the time?

Woerth/direct                                                    41

1   A.   Mr., Captain Babbitt was the former president of the Air

2   Line Pilots Association.  After he retired he set up his own

3   consulting firm called Eclat and he was also on some boards

4   in Washington Metropolitan airport board.  He was an

5   influntial player in Washington.

6   Q.   E C L A T is Eclat?

7   A.   Yes, sir.

8   Q.   And do you know what he is doing now?

9   A.   He is the FAA administrator of the United States.

10  Q.   So he is the top aviation safety official in the

11  country?

12  A.   That's correct.

13  Q.   And how did it come about that Mr. Babbitt was advising

14  the TWA pilot in this connection, do you know?

15  A.   I do not know.  I know they requested his, I think Bob

16  Pastore reached out to him, there may have been somebody

17  else.  But I was happy Randy was willing to agree to help

18  them.

19  Q.   So the MEC asked you for permission to retain his

20  services as adviser?

21  A.   Well, the request comes to me, but all outside counsel,

22  every time any outside consultants are hired, it requires

23  executive council to approve them.  Sometimes they don't, but

24  in TWA's case, they approved every one that they asked for.

25  Q.   All right.  Merger  counsel, was there a special lawyer

Woerth/direct                                              48

1    Q.   How would you compare this appearance at the Allied

2    Pilots Association board of directors on October 27, 2000, to

3    the organizing efforts that were ongoing at Continental

4    airlines amongst the pilots there?

5    A.   At this point with Continental, the reason I chose

6    Continental and Fed Ex is we had a large group including

7    their board of directors who was already on board and willing

8    to sign an agreement.  We had already, it was going to cost

9    about a million and a half dollars for each campaign.  We had

10   almost 100 volunteers of ALPA volunteers who would need to go

11   out on the road and be willing to work for about 120 days, be

12   in the crew rooms, talk to the pilot, be present on videos,

13   make campaign literature.  It is a like a political campaign

14   that lasts intensely the last 120 days are very intense but

15   it takes about a year.

16   Q.   These are pilots from other airlines like Northwest and

17   United?

18   A.   Yes.

19   Q.   Who go to talk to Continental in the Continental crew

20   rooms?

21   A.   Right.  Plus we had Continental pilots, most important

22   in the effort because their board of directors, the ICE

23   board, wanted to merge with ALPA and so it is going to be a

24   joint campaign.  And we were going to get, I had enough

25   contact with Fed Ex that we were going to have a similar

Woerth/direct                                                    49

1    experience with Fed Ex because we had a large majority of the

2    board and their leadership actually wanted to merge.  I

3    wasn't having to convince them.

4              THE COURT:  By the way, there is two ways you can

5    take a nonALPA union, one, can you merge the two unions.

6              THE WITNESS:  Yes, sir

7              THE COURT:  You don't get cards, you don't do a

8    campaign there?

9    A.   That's correct.

10             THE COURT:  Or you can use a card campaign which is

11   in effect you certify the existing union and then certify

12   ALPA as the bargaining agent, or have an election which then

13   certified ALPA.

14             THE WITNESS:  Those are the two methodologies, sir.

15             I rejected the card campaign.  I was, I thought it

16   was a terrible strategy, and I was the principal advocate of

17   this strategy only by merger.  If it couldn't co-opt the

18   leadership, if they didn't agree with you, I didn't want a

19   hostile takeover.

20             It is either a friendly takeover where both

21   leadership teams wanted it, or it wasn't worth pursuing it.

22   It was going to be a costly failed endeavor.  So I was

23   committed to one strategy, a strategy by merger, not by card

24   count.

25   Q.   If we go to the third page of this document, be it

Woerth/direct                                                      50

1    further resolved, and numbered paragraphs.  I would like to

2    get to the number 3 item.  Proposed merger agreements with

3    independent pilots associations will be subject to approval

4    by the executive council and ratification by the executive

5    board.

6              So did this resolution reflect the preferred method

7    that you just stated?

8    A.   Yes, it did.

9    Q.   Is this the method that you employed with the a, that

10   the association employed, with the Continental pilots?

11   A.   Yes.

12   Q.   So how did it start, was their action taken by the

13   governing body of the Continental pilots?

14   A.   Eventually it started with my approaching their

15   leadership, probably in 1999.  And it took a lot of months to

16   develop a bond and a trust that this is something we should

17   do together, so it is probably six months of spade work, if

18   you will, trying to nurture a relationship and then got them

19   very interested to the point I wanted to make sure that the

20   Airlines Pilot Association would approve the merger, and they

21   needed the confidence that the entire board of directors

22   would welcome Continental back.  That is really what the

23   principle focus of the whole reason to have this pilot unity

24   resolution, it was about Continental, it wasn't about Fed Ex

25   and it wasn't about American.

Woerth/direct                                                    65

```
 1   A.   No.

 2   Q.   Did you appear at the April 2 MEC meeting?

 3   A.   No.

 4   Q.   Why not?

 5   A.   I wasn't invited.

 6   Q.   And how does that work under ALPA's practice?

 7   A.   ALPA's practice is, I am like the president.  We have 41

 8   airlines.  And I work in Washington, and I don't impose

 9   myself on the govenors, I don't just show up at their

10   meetings.  I am the president.  I want to talk to you, if

11   they want my advice they can invite me to meetings which I am

12   happy to attend.  They can see me in Washington.  But I had

13   60,000 pilots, of which -- to represent.  I am not ensure

14   where I was April 2, but I wasn't with them, I know that.

15   Q.   Were you invited to that meeting?

16   A.   No, I was not.

17   Q.   And do you have other responsibilities as the president

18   of the union?

19   A.   Many additional responsibilities.  Yes.  60,000 pilots,

20   40 airlines.

21   Q.   Is there a staff of the Air Line Pilots Association

22   responsible for directing the activities?

23   A.   Yes, we have nearly 500 employees and lots of directors

24   and lawyers who do the work.

25   Q.   And are there areas that you focus on aside from local
```

1    that road now.

2    Q.    And did you agree with that decision?

3    A.    Yes, I did.

4    Q.    Could you think of anything that you could have done or

5    that ALPA could have done to persuade the Allied Pilots

6    Association to go along with the seniority integration

7    process that ended up with arbitration?

8    A.    I do not.

9    Q.    All right.  After the MEC made this decision on April 2,

10   you made an appearance, did you not, at the Allied Pilots

11   Association board of directors meeting in April, 2001?

12   A.    Yes, I did.

13   Q.    Would you tell us how that came about, please?

14   A.    I requested a meeting and asked that president of APA,

15   John Darrah at the time, it was going to be in Texas, in

16   Dallas, to meet with American Eagle pilots and I wanted this

17   opportunity to talk to the board to advocate the position of

18   the TWA pilots in in this integration.

19   Q.    Did Mr. Darrah extend an invitation to you to appear

20   beer before the Allied Pilots Association board on April 5?

21   A.    Yes, he did.

22   Q.    You accepted that invitation and addressed the board?

23   A.    Yes, I did.

24   Q.    Tell us, what did you tell the board?

25   A.    I told the board that the TWA pilots had made a very

1   difficult decision, it is hard to give up scope protection,

2   and a right you believe you have, and, but they had done that

3   now.

4            I was really trying to get them convinced that most

5   importantly, that the provision in the contract about just

6   stapling to the bottom 100 percent of the TWA pilots was

7   totally unacceptable, it was morally reprehensible.  They

8   would live to regret the day in this regard.  They wanted,

9   they were very jealous of the Northwest contract, the United

10  contract, the Delta contract, the ability to have pilot

11  unity, and as a reminder to them they had done small things

12  before, the great American Airlines had a couple of small,

13  they bought Trans Caribbean in the sixties, they bought Air

14  California.  They bought Reno, those were tiny small

15  transactions.  11,000 pilots absorbing two or three hundred.

16           And this was very different.  TWA was almost 2,500

17  pilots with an established carrier, very seasoned, and if

18  they wanted unity they were going to have for their combined

19  future at American, they are going to have to have a fair

20  process, even if it didn't include arbitration, their

21  negotiation was going to have to really stretch beyond what

22  they purportedly had right in their contract.  So I was

23  encouraging them to use all their efforts to go way beyond to

24  what they thought they were going to do to think of the long

25  term future of American, which included TWA, that they would

Woerth/direct                                                    74

1  would be better off having a fair integration through

2  negotiation and that I would do everything I can to help that

3  process.

4      I suggested we get facilitation, if you won't have an

5  arbitrator, at least get some outside help to try to get the

6  parties to get to a deal, but they could not approach this

7  like they did with Reno Air or Trans Caribbean or Air

8  California.  This was a big transaction, the TWA pilots

9  deserved a better integration that their contract was

10 providing.

11 Q.   Did you  tell the Allied Pilots board of direct

12 directors that you told the TWA pilots that they needed to

13 get real?

14 A.   No. I told American pilots that they needed to get real.

15 It was all in reference to this idea that they could staple

16 absolutely to the bottom of single pilot.  That was

17 completely unreasonable.  And I reminded them of their

18 hippocracy, quite frankly.  If you are acquiring somebody,

19 you want to be stapled.  If you are being acquired by

20 somebody else, you want to be integrated, I told them that.

21 I called them on that.  They didn't seem to blink, but I

22 think they got my message.

23 Q.   Did you compare this transaction to the Reno deal?

24 A.   Yes.

25 Q.   What did you say about that?

1   A.   There was nothing to compare.  Reno was a brand new

2   airline with junior pilots.  There was only a couple hundred

3   of them.  And TWA had been around for 70 years, and some of

4   these pilots had been flying for 30 years.  And they had an

5   important international network and domestic network, their

6   company thought it was important enough to buy them, for

7   their future they ought to do a fair integration.

8   Q.   Did you say anything to the Allied Pilots Association

9   board of directors with regard to the age and experience of

10  the TWA pilots in terms of how that might impact the American

11  pilots?

12  A.   Well, I tried to remind them that TWA was also a very

13  senior pilot group.  They had a lot of senior pilots and

14  within five to ten years, I thought a large, I didn't have

15  precise numbers, but 30 to 40 percent of the TWA pilots would

16  retire, in other words, the benefit of that American pilots

17  were all going to to get promoted inside to those jobs, so

18  that again, my focus was trying to think of the long term.

19          This is a merger that is going to happen now.

20  American will benefit and you will inherent a lot of good

21  jobs from TWA because their senior pilot force will retire,

22  so bottom line, think long term.  Don't think about tomorrow.

23  Think ten years from now.

24  Q.   Mr. Woerth, do you think that your appearance before the

25  APA board of directors was a help or a hindrance to the TWA

1   pilots in their seniority integration?

2          MR. JACOBSON:  I  am going to object, your Honor.

3   I think that is total speculation.

4          THE COURT: Ask that a different way.  I am

5   sustaining the objection to that question.

6   Q.   Mr. Woerth, what if any impact do you feel your

7   appearance had?

8   A.   I do know that unlike in previous acquisitions by

9   American, that APA ultimately did agree to enter in

10  facilitated negotiations, negotiations that ultimately took

11  place from, well, the deal was in April.  They continued to

12  negotiate all the way through mid September which was very

13  uncharacteristic of American, and that they did come off

14  their staple everybody to the bottom of the lies, it was

15  still in my view a harsh integration but 46 percent of TWA

16  got integrated.  Not as well as I would have liked.  And so I

17  hope there was some impact.  I can't take credit for this.  I

18  tried my best.

19  Q.   All right.  Returning to exhibit P-244.  Which has been

20  now I think received in evidence?

21          THE COURT:  Which one?

22          MR. KATZ:  P-244.  I distributed that before.

23          THE COURT:  That is in evidence.

24          MR. KATZ:  Before the break.

25          THE COURT:  That was already in evidence.

1    listing things before April 2 and after April 2, you attended

2    the APA board of directors.   That was on April 5, right?

3    A.   Yes.

4    Q.   Then on April 23 you attended the TWA MEC meeting.   And

5    and met with the TWA pilots?

6    A.   Yes.

7    Q.   And do you remember taking part in any of the seniority

8    integration discussions after this point in time?

9    A.   It was later in the summer when the facilitation

10   started.  2, I took the opportunity twice to attend the

11   facilitation.

12   Q.   What city were those talks being held in?

13   A.   In Washington, D.C.

14   Q.   Who were the participants in those talks?

15   A.   There was merger committees of both of American pilots

16   and the TWA pilots.

17   Q.   Anyone else present?

18   A.   I think the facilitator was also present.

19   Q.   That was Rolf Dalton?

20   A.   That's correct.

21   Q.   And he is a nationally recognized arbitrator and

22   mediator?

23   A.   That's correct.

24   Q.   With experience in airline industry disputes?

25   A.   Yes.

Woerth/direct                                                          84

```
 1   Q.   Were there also lawyers for the two sides there?

 2   A.   On at least one occasion I believe both Roland Wilder

 3   and Wes Kennedy were both present, I believe.

 4              THE COURT:   What is the second name?

 5   A.   Wes Kennedy I believe is the attorney that the American

 6   pilots were using.   Wes Kennedy.

 7   Q.   He was their seniority lawyer?

 8   A.   Yes.

 9   Q.   Like Mr. Wilder was for the TWA pilots?

10   A.   That's correct.

11   Q.   And what was the subject being discussed at these

12   meetings?

13   A.   Well, they were having facilitated discussions to get to

14   a negotiated settlement of integration.   I came to support

15   the TWA pilots and also to encourage the importance of a

16   negotiated settlement, and the sooner they got one, the

17   better.

18              So I was trying to encourage both parties, both

19   parties honestly to stretch and try to reach an agreement.

20   Q.   And how did it come about that you attended this

21   session?

22   A.   I asked the party, I think Bob Pastore asked if I could

23   show the support for the TWA pilots, my physical presence at

24   the meeting, so I complied with that.

25   Q.   What did you say when you were there?
```

Woerth/direct                                               85

1  A.   I encouraged to the Allied Pilots that they, of course

2  were going to have to get off that stapling proposal.   They

3  are going to have to stretch, I reminded them what I told

4  them in Dallas, you shall going to have to get way past where

5  you think you can have a comfortable, fair settlement that

6  you can be proud of, and American employees as well as

7  Allied.

8          Everybody needs to get off their current positions

9  because it was like trench warfare.   You weren't going to get

10 a deal with both sides staying exactly where  they were and

11 just staring at each other.   There hadn't been a lot of

12 movement.   That is what I told them.

13 Q.   Mr. Woerth, it has been suggested in these proceedings

14 earlier before today, that the TWA pilots might have

15 benefited if you had threatened litigation at the meeting you

16 are referring to.   Did you consider that?

17 A.   I didn't think litigation would be helpful.   In fact, it

18 would  be a total distraction, and might end the

19 negotiations.

20 Q.   Why did you think that?

21 A.   There was no legal foundation to compel American

22 Airlines pilots to even negotiate.   They had a contract that

23 said they could do what they were going to do.   Nobody

24 appreciated that.   I certainly didn't.   But I didn't see a

25 legal argument.   There was a morally persuasive argument to

1              THE COURT:  Okay.  You are correct.

2   Q.   Can you identify this document?

3   A.   Yes.

4   Q.   What is it, please?

5   A.   It is a request to hire James Baehler to provide

6   negotiating training, consultant services to the merger

7   committee of the TWA MEC.

8   Q.   Is this an executive council, ALPA executive council

9   resolution dated May 21, 2001?

10  A.   Yes, it is.

11             MR. KATZ:   Can this be admitted into evidence,

12  your Honor?

13             THE COURT:  Any objection.

14             MR. JACOBSON: No objection,  your Honor.

15             THE COURT:  D 158 in evidence.

16  Q.   And can you tell us how did did this issue arise of

17  hiring Baehler?

18  A.   It was a request of the TWA MEC.

19  Q.   Was it, do you know who Baehler was?

20  A.   Yes, I do now.  I don't think I knew him at the time.

21  Q.   And how would -- who was he?

22  A.   He was a consultant to provide training for negotiations

23  to lots of different types of companies.

24  Q.   All right.  And did the ALPA Executive Council grant or

25  deny the request of the MEC?

1    A.    They granted it.

2    Q.    This was May 21?

3    A.    Yes, sir.

4    Q.    159, please, for identification.

5              THE COURT:  D 159.

6              MR. KATZ:  Yes, sir.

7    Q.    This is just a day or two later the ALPA executive board

8    is meeting.  That is a different body from the executive

9    council, right?

10   A.    That's correct.

11   Q.    We went over that before.  This is the master chairman

12   of each airline comprised the executive board.  Did it not?

13   A.    That's correct.

14   Q.    And do you recognize exhibit D 159 as a resolution

15   adopted by the executive board at its May 22 to 24, 2001,

16   regular meeting?

17   A.    Yes, I did I do.  Can can I ask that it be admit

18   understood evidence, your Honor.

19              THE COURT:  Any objection.

20              MR. JACOBSON: No objection.

21              THE COURT:  D 159 in evidence.

22   Q.    All right.  Tell us, Mr. Woerth, what what the TWA

23   pilots were seeking here?

24   A.    It is a long resolution.  I am going to need a moment.

25

1          Additional funding to enable  -- to properly

2    represent the TWA pilots through their crisis and properly

3    complete the task before them.  They wanted another one

4    million dollars, I think.  They they already had a million

5    dollars.

6    Q.   So were they looking for additional support from the

7    union?

8    A.   Yes.

9    Q.   And under the "Therefore, be it resolved," would you

10   read what the executive board did?

11   A.    It says the executive board pledges the full moral

12   support of the association along with the necessary funding

13   in accordance with current ALPA policies and ALPA

14   constitutional bylaws to enable the TWA MEC to properly

15   represent the TWA pilots through this crisis and to properly

16   complete the tasks before them.

17   Q.   So they asked for support and they got it?

18   A.   Yes.

19   Q.   Let me put that up on the board here, too.

20          With regard to the funding, are you aware of any

21   project that was denied to the TWA pilots because of a

22   shortage of funds?

23   A.    I am not aware of a single project that was denied TWA.

24   Q.   All right.  Exhibit P 316 is in evidence.   It is an

25   ALPA  --

Woerth/direct                                             105

```
 1              THE COURT:  P-2.

 2              MR. KATZ:  D 233.

 3              THE COURT:  Okay.

 4   Q.   Can you identify this document, Mr. Woerth?

 5   A.   Yes.

 6   Q.   What is it?

 7   A.   It is a letter from Captain Pastore to me.

 8   Q.   And can you even capsule encapsulate what he was seeking

 9   here.  Well, what is significant about the  aletter, in your

10   view?

11   A.   It appears with him thanking me for our support of the

12   pilot group of the executive board.

13   Q.   Let me ask you to slow down for a second.  I?

14              MR. KATZ:  I would ask that this be received in

15   evidence, your Honor.

16              THE COURT:  Any objection?

17              MR. JACOBSON: No objection on this one.

18              THE COURT:  Okay.  D 233 in evidence.

19   Q.   Blow up the first paragraph, please.   You were saying,

20   Mr. Woerth, before I asked you to identify the document, what

21   was Mr. Pastore saying in the letter?

22   A.   He was thanking me for my support and getting the

23   support of the executive board and opening and closing

24   paragraphs.  He also enclosed a copy of a video presentation

25   along with this letter.
```

Woerth/direct                                              106

1   Q.   He says, in the next-to-last paragraph, where he says

2   enclosed is a copy of a video presentation that was produced

3   with your assistance and the assistance of the ALPA

4   Communications Department.

5            What is he talking about there?

6   A.   I believe he is probably talking about the video

7   presentation on seniority integration, that I kind of gave

8   the introduction to a presentation for fair integration,

9   Rightful Place, I believe it was called.

10  Q.   Correct.  The plaintiffs actually showed the jury part

11  of your video in that document.  So June 14 was the video.

12  Did you participate in making the video?

13  A.   Yes, I did.

14  Q.   And do you know what was, what resources were used to

15  make the video?

16  A.   I know our ALPA communications facility, I believe as

17  well as a communications specialist, helped in producing that

18  video.

19  Q.   Was it unusual for the president of the association to

20  take part in the seniority integration materials like in?

21  A.   Yes, it was.

22  Q.   Why is that?

23  A.   Most pilot seniority integrations want to keep the

24  president and executive council and everybody else out of, in

25  other words, go to your neutral corners, we don't support

1   either side, and don't make any statements that will look

2   like it is contrary or, to ALPA policy.  So there was, to

3   speak on a specific seniority integration proposal was a

4   little unusual.

5   Q.   Are you aware of any instance of the president of ALPA

6   participating in the seniority integration talks in this

7   manner?

8   A.   I am not aware of any.

9   Q.   And was this video widely disseminated?

10  A.   I believe it was.

11  Q.   Exhibit 299 for identification, please.  This is a July

12  18 letter from Captain Pastore to you, Mr. Woerth.  Did you

13  receive this on or about that date?

14  A.   Yes.

15          MR. KATZ:  I would ask it be received in evidence,

16  your Honor.

17          THE COURT:  Any objection to D 299?

18          MR. JACOBSON: No, your Honor.

19          THE COURT:  Okay.  D 299 is in evidence.

20          MR. KATZ:  Thank you.

21  Q.   The first paragraph, Captain Pastore refers to his vice

22  chairman appearing in front of the executive council.  Do you

23  recall that event?

24  A.   Yes, I do.

25  Q.   And what do you remember about it?

1   A.   Yes.

2   Q.   Do you know whether the TWA pilots floated an assessment

3   at that time, in January, 2001, to pay for Mr. Wilder's fees?

4   A.   I don't know how soon they formed, I believe they had

5   $600,000, I am not sure when they raised the money.

6   Q.   But what was the position of the Air Line Pilots

7   Association in connection with the request in July 18, 2001

8   letter that is received as exhibit D 299?

9   A.   Up until that time with U.S. Airways involvement we

10  didn't believe we could assist, but we are willing to

11  reconsider now that U.S. Airways in which Captain Pastore is

12  now that they are gone, we could consider additional help.

13  Q.   Thank you.  I would like to show the witness exhibit D

14  136 for identification.

15            THE COURT:  Okay.

16  Q.   Can you identify this document?

17  A.   Yes.

18  Q.   What is it, please?

19  A.   It is a request for economic financial analysis of a

20  great many things, the differences between TWA and American

21  contract.

22  Q.   Let me start --

23  A.   Almost a dozen.

24            THE COURT:  P-136, is this that a memo from Ana

25  McAlhren Schulz.

1    A.    Yes.

2    Q.    Ms. McAlren-Schwarts was at the time, what position did

3    she told?

4    A.    She was the director of our economic and financial

5    analysis department.

6    Q.    And the memo is dated August 3, 2001?

7    A.    Yes.

8    Q.    And is she reporting on a meeting she had with a

9    representative or representative of the TWA pilots?

10   A.    Yes.

11   Q.    And did you receive this memo and talk to Mc. McAhlren

12   Schultz at or about that time?

13   A.    I  received the memo and I believe I also talked to her.

14          MR. KATZ:  Your Honor, I would ask that D 136 be

15   received in evidence.

16          THE COURT:  Any objection?

17          MR. JACOBSON: I don't believe so, your Honor.

18          THE COURT:  You want time to check?

19          MR. JACOBSON: I don't believe so.

20          THE COURT:  Okay.  There is no objection.

21          MR. JACOBSON: No, your Honor.

22          THE COURT:  All right.

23          THE COURT:  D 136 is in evidence.

24   Q.    There are a great many items on this list, Mr. Woerth.

25   Is that what you were saying?

1    A.    That was American, of course.

2          THE COURT:  My question was specifically as to the

3    seniority provisions, the scope provisions of the two

4    contracts.  It was understood that Allegheny Mohawk rights

5    that TWA had in its ALPA contract were not in the American

6    APA contract, at least when American was the acquirer.

7    A.    That's correct.

8          THE COURT:  That was understood.

9    Q.    So I have written up there the contract comparison that

10   was compared by the economic and financial analysis

11   department.  Could we turn to exhibit D 160 for

12   identification, please:  Do you have that document?

13   A.    Yes, I do.

14   Q.    Can you identify what the document is?

15   A.    It is another outside counsel request by the TWA MEC

16   Q.    This is an ALPA executive council resolution dated

17   September 24, 2001?

18   A.    Yes.

19         MR. KATZ:  I would ask for its receipt in evidence,

20   Judge Irenas.

21         MR. JACOBSON: No objection, your Honor.

22         THE COURT:  D 160 in evidence.  Go ahead.

23   Q.    Let's just flip down to the bottom paragraph where it

24   says the final resolution?

25   A.    Yes.

1    Q.   The MEC has requested that the association retain Roland

2    Wilder to provide legal services related to an alleged

3    violation by TWA and American of the contractual obligations

4    in connection with seniority integration.  Do you know what

5    that refers to?

6    A.   Yes, I do.

7    Q.   Would you tell the jury, please?

8    A.   I think we were preparing a grievance as to the best

9    efforts clause of an American agreement with, to use their

10   best efforts in seniority integration, we were filing a

11   grievance and this was a request to have -- to pay Roland

12   Wilder for those services.

13   Q.   Turning to the therefore, therefore be it resolved and

14   further resolved clauses on the second page.

15   A.   Yes.

16   A.   We, the executive council authorized, we gave them what

17   they asked for.

18   Q.   Okay.  This is different from the seniority integration

19   fees, this is work on something else?

20   A.   Yes.

21   Q.   Kind of grievance litigation?

22   A.   Correct.

23   Q.   Let me continue my list here.  I have run out of room on

24   this page.  Let me start a new page.  There was September 24.

25   Wilder fees.

1            Do you know whether action was taken on this issue

2      to pursue this legal concept.

3      A.    Yes, we did pursue the grievance.

4      Q.    All right.  Except D 305 for identification.  Do you

5      have that, Mr. Woerth?

6      A.    Yes, I do.

7      Q.    Is this the submission made under your name of the

8      grievance to the system board of adjustment?

9      A.    Yes, it is.

10            MR. KATZ:  Your Honor, I would ask that 305, D 305,

11      been received in evidence.

12            MR. JACOBSON: No objection.

13            THE COURT:  D 305 in evidence.

14      Q.    The document has several parts, the first page is dated

15      October 26, 2001.  Is that signature on your behalf on page

16      3, Mr. Woerth?

17      A.    Yes, it is.

18      Q.    And is that the submission by the Air Line Pilots

19      Association of this grievance to this system board of

20      adjustment?

21      A.    Yes, it is.

22      Q.    And is that an arbitration panel?

23      A.    Yes, it is.

24      Q.    What is the question that was presented, looking back to

25      the bottom of page 1?

1   Compton who was the CEO, and asked if he was aware what was

2   going on.

3           He said he was, that he had assisted Brundage in

4   some regard trying to save, in his words, save this deal so

5   we could get a negotiated settlement rather than a contract

6   of seniority imposition by American, and APA which they

7   reported to me that it was imminent, that sometime within the

8   next ten or 20 days APA and American were just going to

9   impose their will and that would be the end of it.  They are

10  hoping to get a three-party agreement that they could reach

11  an agreement that the TWA MEC would agree to, that we could

12  have, be a part of the agreement, to provide extra protection

13  for the TWA pilots.

14  Q.   What was your view of the best course of action to

15  protection the TWA pilots?

16  A.   My view was to try to entice the best possible offer you

17  could from American and to re-engage in negotiations, and to,

18  in this letter they also talk about efforts to have

19  legislation that Mr. Carty had found out about and was very

20  angry about and actually threatened to walk away from the

21  transaction.

22          That had been confirmed to me, Norm Mineta, the

23  Secretary of Transportation, this is all happening at the

24  same time, Mr. Carty was very angry about an attempt for

25  legislation and that I wanted the TWA MEC to re-engage and I

Woerth/direct                                                    134

1   talked to Brundage and through our attorney to sweeten their

2   offer, to put more on the table, give some extra protection

3   for seniority for TWA pilots, protect the St. Louis domicile

4   specifically.  This was kind of a last-ditch effort to try to

5   get a negotiated settlement.

6   Q.   Did you say that you improved, you asked the other side

7   to improve their offer?

8   A.   Yes, I did.

9   Q.   Did you say you talked to the secretary of

10  transportation, Norman Mineta?

11  A.   Yes, I did.

12  Q.   When was that conversation?

13  A.   Well, there were several conversations.  I was in

14  constant contact with the Secretary of Transportation because

15  of the events of 9-11 but on this specifically, the last one

16  was really, near the end of October, the 21st or 22nd of

17  October, but I talked to him probably every two or three

18  times a week in the weeks leading up to this.

19  Q.   What did you say to him about the TWA pilots?

20  A.   I told him, he was mostly a one-way conversation, that

21  he was totally aware, he is the Secretary of Transportation,

22  I was completely interested.  His son was a TWA pilot.  He

23  was not unaware of what was going on.  The Secretary of

24  Transportation had a son at TWA.  Rob Brantner I think was

25  his name.

Woerth/direct                                                    135

1          And, but he was afraid that American was about to

2   just do what they wanted to do with APA and just move on to

3   other subjects, that the events of 9-11, it was time to just

4   end the negotiation, not walk away from the transaction, but

5   impose their seniority list and just be done.

6          THE COURT:  They couldn't walk away from the

7   transaction, it was already closed.

8   A.    No, he wasn't talking about walking away from the

9   transportation.  He is you talking about just giving an

10  imposed seniority list, reaching an agreement with APA and

11  American and just be done.  That was the advice I got from

12  the Secretary of Transportation.  And that the government was

13  not going to intervene or stop the transaction, or put

14  pressure on Mr. Carty.  We were done now.

15  Q.    That is what Mr., Secretary Mineta told you?

16  A.    Secretary Mineta.

17  Q.    Why did you view the imposition of an agreement between

18  APA and American as less desirable for the TWA pilots?

19  A.    The way American, this is a common par gaining practice,

20  they had suite end the offer, but only with agreement, in

21  other words, they added additional things, additional

22  seniority protection, they created a special, what they call

23  it the St. Louis cell, that the St. Louis, where the TWA

24  pilots were domiciled would be given extra protection,

25  special seniority about that.

Woerth/direct                                              149

1    recollection that the --

2    A.   I always knew that, the ultimate outcome that it was

3    removed.  I didn't know the timeframe.  Now you are

4    refreshing my memory of what time that actually happened, in

5    December.

6              THE COURT:  That happened in the joint conference

7    meeting between the House and the Senate, didn't happen in

8    the, in the Senate it passed --

9              THE WITNESS:  That's correct.

10   Q.   The next paragraph in the middle  of the paragraph,

11   Captain Stieneke says, blow up the middle paragraph, Brian.

12   We wish to thank Senator Bond, Carnahan and others for their

13   efforts to date.  Furthermore, we would like to express our

14   gratitude to our own Legislative Affairs Committee, and ALPA

15   Government Affairs for their support and guidance in pushing

16   this proposed legislation forward.

17             Did you see that at the time?

18   A.   Yes.

19   Q.   And you agree with this appreciative comment of Captain

20   Stieneke?

21   A.   I appreciate it, we tried, and it didn't work.

22   Q.   Was there, despite the proposed legislation, was there

23   nevertheless another opportunity for consideration of

24   agreement?

25   A.   After the October MEC meeting?

1    Q.   Right, right.

2    A.   Yes.  I had implored through Jeff Brundage, American and

3    APA pilots, not to reach an agreement, and try at least one

4    more time to give us another chance to vote on a superior

5    agreement, the one that was rejected previously in October by

6    the TWA MEC.

7    Q.   And can you tell us what happened with regard to that

8    effort?

9    A.   A meeting was called for December 7.  By that time there

10   was only two representatives left --

11   Q.   You said December 7.

12   A.   I said November 7, I meant to say November 7.

13   Q.   Thank you.

14   A.   I apologize.  November 7 of 2001.  And by that time, the

15   MEC, which used to have six members, was down to two.  The

16   West Coast base and the East Coast base were closed, so now

17   all the votes were consolidated into two people.

18   Q.   All the pilots were placed in St. Louis?

19   A.   All the pilots were based in St. Louis.  Capital Steve

20   Rautenberg and First Officer Young were the only two

21   representatives who represented all the pilots.  So now if

22   there is another vote, two people would make the decision.

23   So the meeting was called, and for November 7, by Captain

24   Pastore.

25

1   with the APA caused them to not staple all of the TWA pilots

2   to the bottom of the list.  Is that correct, sir?

3   A.   That wasn't the only consideration, but I think I helped

4   that.

5   Q.   All right.  When do you think did you that, sir?

6   A.   The first time I talked to John Darrah which was right

7   after the transaction was announced and then again in April.

8   Q.   When did you think that you persuaded them that they

9   shouldn't staple everyone?

10  A.   I am not sure if that was the only persuading person but

11  I made that argument.  I am not sure when they made their

12  decision.  I think it might might have been before that.

13  Q.   You don't know when that was?

14  A.   No, I don't know when it was.

15  Q.   He we talked about the major contingency fund.  That is

16  a pool of money roughly 70 million in cash, 20 million in

17  property, that ALPA tries to maintain for major contingencies

18  like strikes and the like, correct?

19  A.   Yes.

20  Q.   All right.  And you viewed that this proposed merger

21  between TWA and a nonALPA carrier, the acquisition of assets,

22  however you want to characterize it, that would be something

23  that would come within the major contingency, correct?

24  A.   I know TWA had been given multiple grants of the major

25  contingency fund dating back to 1988.

1           MR. JACOBSON:  I am waiting to see if he read it.

2    A.   I read it.

3    Q.   Now, you mentioned earlier that you recalled that the

4    advice you got was that if there was a merger, that would

5    likely lead to ALPA being liable for 45 million dollars.   Do

6    you remember saying that?

7    A.   Yes.

8    Q.   And do you now recall whether you were told that the

9    combination was not by merger, but through, but through the

10   issuance of authorization cards?

11          THE COURT:  Followed by an election.

12   Q.   Following by an MB election that would dramatically

13   reduce the possibility of any liability?

14   A.   It does not refresh my memory.  It may be my fault.  I

15   only really wanted the answer to one question.  I asked the

16   lawyer a question.  He gave me the answer to a question I

17   didn't ask.  I only cared about the merger.  I was never

18   going to do a card campaign.  So whatever they advised me on

19   a card campaign, I don't remember it because I was completely

20   disinterested.   I would never do a card campaign on

21   American.  I wanted to know what about a merger, and I

22   stopped reading or listening after that.  That is probably

23   why I don't remember.  I didn't care about it.

24          THE COURT:  Even if it would get you 11,000

25   American pilots?  I mean that is the jewel, at that time,

1    supposed to be the jewel of the domestic airline industry.

2            THE WITNESS:  Your Honor, I would respectfully

3    disagree.

4            I never, the point of the union is to have a strong

5    union.  You can win an election by one tenth of one percent

6    and you have won, and now you have got a boat load of

7    trouble.

8            We did that with Federal Express, and we won.  And

9    two years later they decertified it.  We lost millions of

10   dollars, big fight, took us six years to get them back.  I

11   was committed to only one way, not a card campaign which

12   would be viewed as hostile.

13           My judgment was the only way to have a long-term

14   success, not even an election success, was by a merger.  That

15   is what I was committed to.

16           THE COURT:  Does the card campaign have to be

17   hostile?

18   A.   I viewed it -- with independence -- when you are not

19   organized, you are not fighting another union.  When you are

20   already organized, I believe they were viewed as hostile.  If

21   they hadn't agreed to it, if the board wasn't on board like

22   we did with Continental and Fed Ex, it would be competing

23   campaigns.   I just saw that as failure.  That was my

24   judgment, long-term failure.  Even if you won the election

25   you wouldn't win much.

Woerth-cross/Jacobson                                      173

1   Q.   Right.  But if the APA board, if the people who were in

2   charge of APA, really wanted to merge with you, and they

3   wanted to accommodate your interest in avoiding picking up

4   this 45 million dollars fine, sir, wouldn't it be appropriate

5   then to say you have our blessings, go forward with the card

6   campaign, we don't consider it hostile?  We understand we

7   need to cooperate with you this way in order to avoid this

8   fine flowing through to ALPA?

9   A.   That question never occurred to me or anybody else that

10  I was aware of.

11  Q.   And you don't recall receiving advice that as long as

12  you minimized ALPA's, APA's official involvement in the card

13  campaign and did it with ALPA money, that that would further

14  immunize ALPA from any liability for the 45 million dollars?

15  A.   I think I already testified I wasn't listening to

16  anything about a card campaign.  I was determined to only do

17  a merger.

18  Q.   Let me give you a document, keep that one up there.  Let

19  me give you a document marked as P 10.

20          THE COURT:  P 10.

21          MR. JACOBSON:  Yes.

22          THE COURT:  All right.

23  Q.   Do you have that document, sir?

24  A.   Yes.

25  Q.   And that document is a transcript of sorts, a rough

1  Q.    That is part of what you do?

2  A.    Part of the whole profession, absolutely.

3  Q.    That is part of your strength, to get the special

4  interest litigation that your constituents need?

5  A.    Yes.

6          MR. JACOBSON: I am trying to skip over things.

7          THE COURT:  I am not bothering you.

8          MR. JACOBSON: I know.  We all have places to go

9  here, your Honor.

10  Q.    Do you know a man named John Clark?

11  A.    Yes.

12  Q.    How do you know Mr. Clark?

13  A.    Mr. Clark used to be on the board of APA board, and he

14  was an extremely interested person in APA joining the Air

15  Line Pilots Association.

16  Q.    All right.  In fact, he was the person who filed the

17  motion for the -- for APA's ALPA Exploratory Committee?

18  A.    Probably so.

19  Q.    All right.  And he was the person who took the lead in

20  collecting the vote authorization cards?

21  A.    He did it on his own volition for his own campaign.

22  ALPA had nothing to do with what he was doing, but he did do

23  that, as I understand.

24  Q.    Okay.  So the answer is yes, he is the person who helped

25  lead the authorization card campaign to bring ALPA on to the

1    property at American Airlines?

2    A.    Within American.  American campaign.

3    Q.    I understand.  The answer is yes, that is the person,

4    John Clark?

5    A.    That is the person.

6    Q.    And in fact you met Mr. Clark in Las Vegas, Nevada, at

7    the AFL-CIO convention?

8    A.    I did.

9    Q.    At that point he delivered a large quantity of

10   authorization cards to you and Mr. Mugerditchian?

11   A.    Delivered a package.  I have no idea how many cards were

12   in there busy didn't care but he give us some cards.  He gave

13   them to Mugerditchian, yes.

14   Q.    Over a thousand cards, right?

15   A.    I haven't a clue how many cards were there.

16   Q.    And a disk with the index of all the cards, database of

17   the cards, correct?

18   A.    I don't know anything about that.

19            THE COURT:  Nobody opened the envelope, you just

20   burned it.

21   A.    I, we had lunch, your Honor.  At that luncheon meeting.

22   He had it in a suitcase.  I had to leave.  I said leave

23   whatever you have with Mr. Mugerditchian, but I was also

24   clear, thank you for your interest but I was not going to do

25   a card campaign.  He left the meeting highly disappointed

1  moved the motion for the ALPA Exploratory Committee, correct?

2  A.   Yes.

3  Q.   All right.  And you understood that he left his seat on

4  the APA board, and  began on his own collecting authorization

5  cards to have the American property join ALPA?

6  A.   Absolutely, that is what I understood he did.

7  Q.   And he brought these cards to you and Mr. Mugerditchian

8  in Las Vegas, Nevada?

9  A.   Yes.

10       THE COURT:  Do you know where he got the blank

11  cards, before anybody signed them, do you know where he got

12  them?

13  A.   I don't, I have no idea.

14       THE COURT:  You don't know.  Okay.

15  Q.   You don't know whether or not they came from ALPA?

16  A.   I never looked at the cards.  I wasn't interested in the

17  cards.

18       THE COURT:  But that is not the question.  The

19  question is, that I asked is do you know where they came

20  from.  That is a lot of cards.

21       MR. JACOBSON: That is a lot of cards.

22  A.   No, I do not, your Honor.

23       THE COURT: All right.  That is all.

24  Q.   And had you had any conversations with anyone within

25  ALPA about the fact that Mr. Clark had left the ALPA, excuse

# Exhibit K

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT  OF NEW JERSEY
CIVIL 02-2917  (JEI)

PATRICK BRADY, SALLY YOUNG,
HOWARD HOLLANDER, THEODORE CASE,
AND MICHAEL FINUCAN, individually
and on behalf of all others
similarly situated,

Plaintiffs,

VOLUME 12

V.                          TRIAL TRANSCRIPT

AIR LINE PILOTS ASSOCIATION,

Defendant.

CAMDEN, NEW JERSEY
JUNE  28, 2011

B E F O R E:   HONORABLE JOSEPH E. IRENAS
               UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARD
BY:  NICOLE M. ACCHIONE, ESQ.
     AND: LISA J. RODRIGUEZ, ESQ.
         AND
GREEN JACOBSON, P.C.
BY:  ALLEN PRESS, ESQ.   (MO. BAR)
AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
For the Plaintiffs.

ARCHER GREINER
BY:   STEVEN FRAM, ESQ.
      AND
KATZ & RANZMAN
BY:  DANIEL M. KATZ, ESQ.
FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

ELIZABETH  GINSBURG, ESQ.
IN-HOUSE COUNSEL FOR ALPA.

1           Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.

3
                        S/   LYNNE JOHNSON
4
                     Lynne Johnson, CSR, CM, CRR
5                    Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                    LYNNE JOHNSON, CSR, CM, CRR
18                  OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
19                  P.O. BOX 6822
                    LAWRENCEVILLE, NJ  08648
20

21

22

23

24

25

1    says that executive council approved subject to the approval

2    of the executive board  $251,94040 in supplemental funding

3    from the operating contingency fund to bring your MEC's

4    account up to the required 90 level as of June 1, 2001.

5            Do you see that, sir?

6    A.    Yes.

7    Q.    Isn't it a fact that this roughly quarter of a million

8    dollars was the only additional funds provided to the TWA MEC

9    by ALPA throughout the entire TWA American merger

10   negotiations, and transition?

11   A.    I think that's correct.  Everything we requested they

12   had enough funds to pay for it in their budget.

13   Q.    You agree this is the only supplemental funds that ALPA

14   provided?

15   A.    I think that's right.

16   Q.    These are the funds that are supposed to be repaid?

17   A.    I believe so.

18   Q.    All right.

19   Q.    In fact, all the things that ALPA approved to TWA MEC to

20   do, to the extent that you approve things, if there were

21   costs involved the TWA MEC paid those costs?

22   A.    Yes.

23           MR. KATZ:  I am going to object to that

24   characterization, your Honor.

25           MR. JACOBSON: It is already answered.

Woerth-redirect/Katz                                    165

1          THE WITNESS:  That's correct.

2    Q.   Now, what I am getting to, Mr. Woerth, are there

3    limitations when you are talking about outside consultants

4    like Mr. Baehler, that affect any MEC's ability to access its

5    budgeted funds to spend in that fashion?

6    A.   The requirement for any outside consultant is to get

7    permission, and the point is we are trying to control

8    expenses.

9          They have, you have your own in-house counsel and

10   we hope our own resources are good enough, so to help control

11   the cost of MECs and not just hire everybody's uncle and

12   cousin, there is some control of outside consultants.  If

13   they feel they are needed, they are approved but they are

14   charged, accounted for --

15         THE COURT:  They pay for it out of their own

16   budget.

17   A.   Yes.  They need permission to hire an outside

18   consultant.

19         THE COURT:  I think he has testified to this

20   before.  Go ahead.

21   Q.   Mr. Woerth, do you know whether on April 10, 2001, when

22   TWA and its assets became TWA LLC, a subsidiary of American

23   Airlines, whether Mr. Compton and some of the other TWA

24   executives were asked by American Airlines to leave or stay

25   on or something else?

# Exhibit L

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT  OF NEW JERSEY
CIVIL 02-2917  (JEI)

PATRICK BRADY, SALLY YOUNG,
HOWARD HOLLANDER, THEODORE CASE,
AND MICHAEL FINUCAN, individually
and on behalf of all others
similarly situated,
                    Plaintiffs,

                                        VOLUME 13
        V.                              TRIAL TRANSCRIPT

AIR LINE PILOTS ASSOCIATION,

                    Defendant.

                            CAMDEN, NEW JERSEY
                            JUNE 29, 2011

B E F O R E:   HONORABLE JOSEPH E. IRENAS
               UNITED STATES DISTRICT JUDGE

              A P P E A R A N C E S:

        TRUJILLO, RODRIGUEZ & RICHARD
        BY:  NICOLE M. ACCHIONE, ESQ.
             AND: LISA J. RODRIGUEZ, ESQ.
                  AND
        GREEN JACOBSON, P.C.
        BY:  ALLEN PRESS, ESQ.   (MO. BAR)
        AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
        For the Plaintiffs.

        ARCHER GREINER
        BY:  STEVEN FRAM, ESQ.
             AND
        KATZ & RANZMAN
        BY:  DANIEL M. KATZ, ESQ.
        FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

        ELIZABETH  GINSBURG, ESQ.
        IN-HOUSE COUNSEL FOR ALPA.

2

1

2          Pursuant to Section 753 Title 28 United States
Code,   the following transcript is certified to be an
3     accurate record as taken stenographically in the
above-entitled proceedings.

4
                        S/   LYNNE JOHNSON
5
                        Lynne Johnson, CSR, CM, CRR
6                       Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18
                   LYNNE JOHNSON, CSR, CM, CRR
19                 OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
20                 P.O. BOX 6822
                   LAWRENCEVILLE, NJ  08648.
21

22

23

24

25

1    you know, make, continue to make good-faith efforts or at

2    least what they considered to be good0faith efforts to reach

3    a deal, it was no longer possible.

4            I think it was a culminating point, vis a vis the

5    APA, if you will.

6    Q.   So let's go back now to the meeting that began on

7    October 20.

8            Let's go back if we could to D 88 in evidence.  And

9    part with the first page, and try to walk through this a

10   little bit.  I think you mentioned before that you and a

11   couple other members of the MEC decide not to attend this

12   meeting because you were concerned about some agenda items?

13   A.   Yes.

14   Q.   Is that first page, Saturday, October 20, it says not in

15   attendance, Rautenberg, Lewin and Altman.  Does that reflect

16   what you just discussed?

17   A.   Yes.

18   Q.   It looks like the meeting continues if we turn to the

19   second page on Sunday, October 21, 2001.  Called to order at

20   10:30.  Tell us, please, what efforts, if any, were made over

21   the next several days to get the seniority integration

22   process back on track.  Tell us the efforts that were made,

23   who was involved -- let me break it down for you.

24           Were efforts made beginning on October 21, 2001, to

25   get the seniority integration process back on track?

1    A.    Yes, I think so.  Our merger committee was in extensive

2    meetings with leadership of the APA.  It was no longer really

3    the APA's merger and acquisitions committee they were meeting

4    with, but with their chairman, and their union president, and

5    so they were meeting with them.  They reported to us that

6    these meetings were not, you know, negotiations, you know,

7    even as a stretch any more, but merely the APA explaining to

8    them the way it was going to be.  And explaining to them what

9    the integration was going to look like.

10   Q.    Just logistically these minutes refer to the meeting

11   being in Washington, D.C.?

12   A.    Yes.

13   Q.    Are you saying the merger committee was also meeting at

14   the same time, were they also meeting in Washington?

15   A.    Yes.

16   Q.    How far apart were the two meetings taking place?

17   A.    Well.

18   Q.    Do you recall?

19          THE COURT:  You mean physically?

20          MR. FRAM:  Physically, your Honor, yeah.

21   A.    My recollection is that that we were in the same hotel,

22   they were meeting in the same hotel.  I never saw where they

23   were meeting so I couldn't be sure of that.

24   Q.    In addition to the people who were at the meeting, the

25   MEC meeting, and participating in the negotiations, were

1    other people calling in from time to time?

2    A.    Oh, there was a lot of calls.

3    Q.    Tell us, give us a sense, who was calling in as this

4    discussion continued?

5    A.    We had calls from Duane Woerth, we had calls from Howard

6    Atterian, we had calls from Senator Bond's office, a

7    gentleman by the name of Trevor LeCann.  We had a conference

8    calls with Jeff Brundage, from American.  There was a lot of

9    stuff going on, a lot of interactions going on.

10   Q.    The different people who were calling in, what position

11   were they taking with respect to seniority integration?

12   A.    Jeff Brundage was taking the position that, you know, he

13   realized that this offer was, I won't use the terms he used,

14   but it was a tough pill to swallow.  It wasn't exactly what

15   he said.

16         But that is the essence of it, in more crude

17   language.  But we should swallow it.  And that it was the

18   best we were going to do.  And that if we did not, that

19   American would not follow through on the commitments that it

20   had made as part of the offer.

21         THE COURT:  You mean the best efforts?

22         THE WITNESS:  No.  I mean American had made a

23   commitment to provide a minimum floor to the domicile in St.

24   Louis which was to be restricted to former TWA pilots.  And

25   that they would not comply with that.  They also made a

1    that you had talked with, which of advisors that were there

2    that day had you talked with the most before then?

3    A.   I don't recall.  I know we had a long meeting with Randy

4    Babbitt.

5    Q.   Wasn't Roland Wilder the one that had advised you the

6    most up to that point in time?

7    A.   Roland Wilder was the advisor to the merger committee,

8    of which I was not a member, but did have meetings, we did

9    have meetings, updates from them and Roland Wilder.

10   Q.   Okay.  And you know that Roland Wilder had always

11   advised the MEC not to waive scope up April 2, any way?

12   A.   I don't recall.

13   Q.   Do you recall that on April 2 Mr. Wilder initially took

14   the position that you all should not waive scope?

15   A.   I do not recall that.

16   Q.   So do you recall that he was confronted verbally by Bob

17   Christy regarding his opinion, you remember that?

18   A.   No, if that happened, I wasn't aware of it.

19   Q.   Do you remember that Roland Wilder left the meeting in

20   disgust?  Do you remember that?

21   A.   No, I don't.   It seems to me I saw some documents that

22   showed that he wasn't there at all.  But I didn't have any

23   recollection.

24   Q.   I mean --

25            THE COURT:  He said he doesn't have any independent

1    recollection.

2    Q.    You independently recall Mr. Wilder was there, however,

3    don't you?

4    A.    I do not.

5    Q.    Do you still have your deposition transcript in front of

6    you or was that removed from you?

7    A.    I still have it.

8    Q.    If you go to page 99.  Are you at page 99?

9    A.    Yes.

10   Q.    Well, actually there is a question better on 102.  At

11   the beginning there.

12              MR. FRAM:  What line, please?

13   Q.    Line 5.  You are with asked a question regarding Mr.

14   Wilder's presence at the meeting on April 2, right?  You are

15   shown a document.  Does that refresh your memory that he was

16   not there on April 2 and your answer was there?

17   A.    "I still think he came.  He came in late, I believe."

18   Q.    So he was there on April 2, that is your best memory

19   sitting here today?

20   A.    Yes.  If he was there he came in late.

21   Q.    At the same meeting, the April 2 meeting, that is, Mr.

22   Singer, there was a request made to put up the matter for

23   membership ratification vote.  Do you remember that?

24   A.    Yes.

25   Q.    And do you remember that, I don't know which adviser it

# Exhibit M

1

```
 1                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3          PATRICK BRADY, SALLY YOUNG,
            HOWARD HOLLANDER, THEODORE CASE,
 4          AND MICHAEL FINUCAN, individually
            and on behalf of all others
 5          similarly situated,
                          Plaintiffs,
 6                                              VOLUME 14
               V.                               TRIAL TRANSCRIPT
 7
            AIR LINE PILOTS ASSOCIATION,
 8
                          Defendant.
 9
                               CAMDEN, NEW JERSEY
10                             JUNE  30, 2011

11          B E F O R E:   HONORABLE JOSEPH E. IRENAS
                           UNITED STATES DISTRICT JUDGE
12
                       A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                    AND: LISA J. RODRIGUEZ, ESQ.
15                      AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.  (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:   STEVEN FRAM, ESQ.
19                     AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH  GINSBURG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                   LYNNE JOHNSON, CSR, CM, CRR
18                 OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
19                 P.O. BOX 6822
                   LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

1    of it being a professional position.

2    Q.    You had the corner office in the suite, correct?

3    A.    That's right.

4    Q.    And you supervised and organized the packing up of all

5    the things that had been the TWA MEC?

6    A.    I did not supervise, no.

7    Q.    You directed the office manager under your direction to

8    pack up boxes of all the documents, all the notes, everything

9    else, right?

10   A.    No, she did not work under my direction.

11   Q.    All right.  Do you know that hundreds of boxes of

12   documents were packed up in that location, correct?

13   A.    Many boxes were boxed up.

14   Q.    Were hundreds of boxes of documents packed up?

15   A.    If I said hundreds before, I am not sure if I was

16   correct.  But it was many, many boxes.

17   Q.    All right.  And they are all shipped to a place called

18   Iron Mountain, right?

19              MR. FRAM:  Your Honor, I object.

20              THE COURT:  Yes.

21              MR. FRAM:  May we see your Honor at sidebar.  Or

22   that is fine.

23              THE COURT:  Where is this going?

24              MR. JACOBSON: I am going to explain why there is an

25   absence of certain documents here.  I am not casting blame

1    for it.

2              THE COURT:  No.  Go to another area.  Go to another

3    area.  Jack.

4              MR. JACOBSON: All right.  Your Honor.  I

5    understand.

6    Q.   Let's move now to the beginning of this situation, a

7    little before the American Airlines proposal was mentioned.

8    And there was something called a stand-alone plan, correct?

9    That was being worked on?

10   A.   The company had --

11   Q.   That could be a yes or no, sir?

12   A.   Yes, the company had a stand-alone.

13   Q.   You were involved with the negotiating committee on

14   working out the terms of that stand-alone?

15   A.   No.

16   Q.   You were not involved with the negotiating committee in

17   negotiating with TWA, Inc., regarding how ALPA would

18   participate in the stand-alone plan?

19   A.   Amy problem is with the stand-alone plan, we did

20   negotiate with the company.

21   Q.   Say that again.  I didn't understand what you said.

22   A.   We were not involved in what was called the stand-alone

23   plan.  However, we did negotiate with the company during that

24   period.

25   Q.   All right.  Let me give you what has been marked --

# Exhibit N

1

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3       PATRICK BRADY, SALLY YOUNG,
         HOWARD HOLLANDER, THEODORE CASE,
 4       AND MICHAEL FINUCAN, individually
         and on behalf of all others
 5       similarly situated,
                         Plaintiffs,
 6                                          VOLUME 15
              V.                            TRIAL TRANSCRIPT
 7
         AIR LINE PILOTS ASSOCIATION,
 8
                         Defendant.
 9
                                    CAMDEN, NEW JERSEY
10                                  JULY 5, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                     A P P E A R A N C E S:
13

14          TRUJILLO, RODRIGUEZ & RICHARD
            BY:  NICOLE M. ACCHIONE, ESQ.
15               AND: LISA J. RODRIGUEZ, ESQ.
                     AND
16          GREEN JACOBSON, P.C.
            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
17          AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
            For the Plaintiffs.

18          ARCHER GREINER
            BY:   STEVEN FRAM, ESQ.
19                AND
            KATZ & RANZMAN
20          BY:  DANIEL M. KATZ, ESQ.
            FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
            ELIZABETH  GINSBURG, ESQ.
22          IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                    S/   LYNNE JOHNSON
4
                    Lynne Johnson, CSR, CM, CRR
5                   Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
            LYNNE JOHNSON, CSR, CM, CRR
18          OFFICIAL COURT REPORTER
            UNITED STATES DISTRICT COURT
19          P.O. BOX 6822
            LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

Warner-direct/Fram                                          125

1    filed with the bankruptcy court?

2    A.    I review drafts, yes.

3    Q.    And do you recall that, I will refer you to page 10, I

4    am sorry, page 4, paragraph 10.  That paragraph is noting

5    that in addition to some waivers and modifications required

6    by the asset purchase agreement, that TWA and American they

7    requested other changes to the ALPA CBA  in order to provide

8    TWA and American with additional flexibility in integrating

9    the two carriers operations, and then it says these include

10   among other changes a relinquishment by TWA pilots of, talks

11   about pay increases in A.

12           Let's focus on that by the way.  What impact on the

13   TWA pilots was there of them giving up pay increases from

14   TWA, Inc., of $20 million in 2001?

15   A.    None, because they got higher pay increases through TWA

16   LLC.

17   Q.    B refers to more than $1,500,000 actually in flight pay

18   reimbursement for pilots working on ALPA committees and

19   performing overwork for ALPA.  Do you see that?

20   A.    Yes.

21   Q.    Did the TWA pilots involved in the MEC continue to get

22   flight pay reimbursement after they gave up their right to

23   flight pay reimbursement under the TWA, Inc., collective

24   bargaining agreement?

25   A.    Absolutely.

Warner-direct/Fram                                         126

1   Q.   Who paid?  Who reimbursed them for the flight pay losses

2   and expenses?

3   A.   Came through the ALPA budget.

4          THE COURT:  They were still ALPA representatives at

5   the time..

6   A.   Correct, correct.

7          THE COURT:  Even though it was owned by American.

8          THE WITNESS:  Correct.

9   Q.   All right.  So did you --

10         THE COURT:  Didn't they have a bank of certain

11  amount of money that they, for flight pay loss, like $9

12  million or something?

13  A.   What this is talking about is in the TWA, Inc.,

14  collective bargaining agreement, there was a 9,000 hour

15  flight pay loss bank.

16         THE COURT:  That was not included in the LLC

17  transition agreement, let's call it.

18         THE WITNESS:  That's correct.  And what ended up

19  happening then was that ALPA funds paid for the flight pay

20  loss rather than it being paid for by TWA.

21  Q.   Do you know for the year 2001 how much ALPA paid to TWA

22  MEC members and those assisting them in flight pay losses and

23  expenses?

24  A.   Actually, I have a number that it would also include the

25  amount paid for their advisors and to run the MEC office and

Warner-direct/Fram                                              127

```
 1   all of that.  But the total, oddly, it doesn't include my
 2   time or the --
 3           THE COURT:  Just the flight pay loss, not the other
 4   expenses, just the flight pay loss was the question.
 5   A.   I don't have a number, a total flight pay loss number
 6   for all of the individuals.  No.
 7   Q.   Do you have flight pay loss numbers for individual
 8   members of the MEC who are doing this?
 9   A.   I do.
10   Q.   What was the number for the MEC master chairman, Robert
11   Pastore?
12   A.   Absolute flight pay loss, or flight pay loss and
13   expenses?
14   Q.   Let's distinguish what they are.  What kind of expenses
15   are we talking about?
16   A.   Hotels, meals.
17           THE COURT:  Travel.
18           THE WITNESS:  Travel.  But travel for pilots,
19   normally they travel on their travel passes, mostly.  So that
20   is not there.  But it is hotels and meals and things like
21   that.
22   Q.   Put it all together, flight pay loss and expenses, what
23   was the number paid to Captain Pastore by ALPA in 2001, do
24   you have that?
25   A.   I have the number for 2001 was $129,000.
```

1   Q.   Okay.  Was he paid additional flight pay loss and

2   expenses in '02?

3   A.   Yes.  Another $54,000 in 2002.

4   Q.   Okay.  How about the voting members of the MEC, how

5   about Sally Young?

6   A.   Sally Young received 28,000 in 2001, and 14,000 in 2002,

7   for a total of almost 43,000.

8   Q.   Alan Altman?

9   A.   His total for the two years is 58,000, 38,700, in 2001

10  and almost 20,000 in 2002.

11  Q.   Howard Hollander?

12  A.   Howard Hollander's total for the two years was 68,600

13  For 2001, and 30,000 for 2002.

14          THE COURT:  Sean Clarke.

15          THE WITNESS:  Sean Clarke was 38,000 in 2001, 8,000

16  in 2002 for a total of about 46,000500.

17  Q.   Mike Day, do you have his numbers?

18  A.   64,000 in 2001, and just 855 in 2002.  He wasn't

19  involved any more.

20  Q.   To round it out, Steve Rautenberg, do you have his

21  number?

22  A.   I do.  31,000 in 2001 and nothing in 2002.

23  Q.   So to the best of your knowledge did any of these pilots

24  who were volunteering to advance the interest of the pilots

25  at large, did any of them suffer any out of pocket losses

1   based upon the efforts they were making on behalf of the TWA

2   pilots?

3   A.   Not at all.

4           MR. JACOBSON: I object to that.

5           THE COURT:  I am going to sustain that objection.

6   First of all, was anybody ever turned down for flight pay

7   loss in 2001, of that group that you just went through one by

8   one by one.  Any of them turned down?

9   A.   I am not aware that anybody on this group would have

10  been turned down.  There was a period at the end of 2001 when

11  the MEC was drawing substantial amounts from one of the

12  contingency funds and there was a review process.

13          THE COURT:  Were they ever told that, any of these

14  people told that lobbying for the Bond bill, time they spent

15  doing that would be not reimbursed for flight pay loss?

16  A.   The MEC members and officers I think the answer is no.

17  I think by December when the Bond bill was effectively dead

18  and some other none representatives were told that those

19  couldn't be reimbursed.  That was at a point when the MEC --

20          THE COURT:  So there were people who were told no

21  in 2001.

22          THE WITNESS:   Not the representatives.

23          THE COURT:  Who are you talking about there?

24  A.   .  Pilots who didn't have a representative position, is

25  my recollection, who were seeking to, instead of showing up

Exhibit O

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                      Plaintiffs,
 6                                          VOLUME 16
              V.                            TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                      Defendant.
 9
                                  CAMDEN, NEW JERSEY
10                                JULY 6, 2011

11        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                    A P P E A R A N C E S:
13
             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                     AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:   STEVEN FRAM, ESQ.
19                 AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH  GINSBURG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                   LYNNE JOHNSON, CSR, CM, CRR
18                 OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
19                 P.O. BOX 6822
                   LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

Rosen-direct/Fram                                          25

1   we bring to the table in terms of representing pilots and

2   their interests plus they saw the advantage of being under

3   the ALPA merger policy so that in the event they would be

4   merged in the future with another ALPA carrier they would be

5   covered by the ALPA merger policy.

6   Q.   You mentioned that a joint committee of some type was

7   formed between Continental's union and ALPA to pursue merger

8   discussions?

9   A.   Yes.

10  Q.   What happened next in terms of the effort to bring the

11  Continental pilots into ALPA?

12  A.   The next thing that happened was we agreed upon a merger

13  agreement to merge the two in terms of all the business

14  points you would deal with, staff, money, things like that.

15  And an orderly transition.  That was the next step.  After

16  that we then had to start going out and holding a vote within

17  Continental pilot group.

18  Q.   What did that involve?

19  A.   Well, that involved a huge undertaking, a lot of pilots,

20  we had office's at all their domiciles.  We would go to crew

21  rooms.  We had as I said other 50 pilot volunteers who would

22  go around and talk to pilots.  We had a huge amount of staff

23  support to handle this undertaking because it was very

24  complicated and we had lawyers assigned because there were

25  legal issues.  Communications people assigned.  It was a full

1    undertaking.

2    Q.   The leadership of the Continental pilots union had

3    agreed to merge, why was there any need to go and talk to the

4    individual pilots?

5              MR. PRESS:  Judge, I object to the relevance of

6    this.  You don't know why we are talking about the

7    Continental pilots.

8              THE COURT:  Yeah, I am beginning to --

9              MR. FRAM:  If you want me to explain, your Honor, I

10   am happy to.  We are talking about what you do to organize

11   pilots and we are going to compare it to what never happened

12   at American.  None of this  happened at American.

13             THE COURT:  You are wrong.  That is a misstatement

14   of facts.  There were cards out there.  Those cards didn't

15   come from the Tooth Fairy.  Those cards were being collected.

16   They were handed over to ALPA.  Your statement that none of

17   this happened in American is not a true statement.

18             MR. FRAM:  Sorry, your Honor.  None of this was

19   done by ALPA.  ALPA did not organize other unions as

20   explained by the witness.

21             THE COURT:  That is unclear.  That is your take.  I

22   am not sure the evidence doesn't support another inference on

23   that.

24             MR. FRAM:  Your Honor, I respectfully disagree with

25   that.

Rosen-direct/Fram                                    27

1          THE COURT:  The jury will decide that.  That is

2     what we have them here for.

3          MR. PRESS:  Your Honor, I believe Mr. Fram's

4     statement to this jury but heard by this jury opened the door

5     to what happened after April 3rd, 2002.

6          THE  COURT:  Let's leave that for another day.

7          I think the jury has the drift of what you are

8     saying.  I don't think we need an explanation for why there

9     has to be a big campaign to generate votes among the pilot

10    groups itself in a merger.

11    Q.   Did ALPA in any way shape or form initiate a card

12    campaign at American Airlines?

13    A.   No, they did not.

14         THE COURT:  In the card campaign, where do the

15    cards come from?

16    A.   In a card campaign we generate the cards.

17         THE COURT:  That's right.

18    A.   We print cards.  When we do our own card campaign we

19    print the cards and distribute the cards.

20         THE COURT:  You are aware there was a card campaign

21    going on in a limited sense with American.

22    A.   I am aware.

23         THE COURT:  You are aware those cards were

24    delivered, in fact, to ALPA.

25    A.   Yes.

Rosen-direct/Fram                                                      28

 1              THE COURT:  Those cards then disappeared later on,

 2     the physical cards.  You know that as well.

 3              THE WITNESS:  Yes, that was in my deposition.

 4              THE COURT:  You don't know what happened.

 5              THE COURT:  That's correct.

 6              THE COURT:  Do you know who printed the cards?

 7     A.   No, I don't know.

 8              THE COURT:  You don't know whether it was American

 9     that printed the cards and provided them to Hunnibell and

10     Clark, the American pilots or they somehow or other got out

11     and got cards of their hone.

12     A.   They could have done that.

13              THE COURT:   They could have done that but you

14     don't know.

15     A.   I am not aware of providing any cards to them.

16              THE COURT:  You can't say, you don't simply know.

17     You are not even aware of where the cards are, that might

18     tell us, if we had the cards we might know who prepared them,

19     wouldn't we?  If we physically had the cards.

20     A.   I am not sure.

21              THE COURT:  Maybe.  It might give us a clue who the

22     printer was, was a printer used by --

23     A.   I understand what you are saying, but I am am not sure.

24              THE COURT:  There is a lot of things we could do if

25     we had the cards.

Rosen-direct/Fram                                           29

1   A.   I understand what you are saying.

2          THE COURT:   Go ahead.

3   Q.   Mr. Rosen, did ALPA printed cards that were used to

4   distribute to the American pilots?

5   A.   No, I am not aware --

6          THE COURT:   No, no.  Don't say no.  You don't know,

7   do you, where the cards came from?  You don't know where the

8   cards came from.

9   A.   I don't know where they came from.

10         THE COURT:   And you don't know where they are so we

11  can't do any forensics on them to figure it out, right?  Is

12  that correct?

13         THE WITNESS:   Yes.

14         THE COURT:   Don't try to get him to say that he

15  knows American didn't distribute them.  He is not aware that

16  they did, but he doesn't know where they got the cards.  I

17  you don't know where Clark and Hunnibell got the cards.

18  A.   All I know.

19         MR. FRAM:   We have testimony that --

20         THE COURT:   He doesn't know.  What other witnesses

21  say is one thing.  He doesn't know.

22  Q.   Mr. Rosen, did you direct anybody to print cards?

23  A.   No.

24  Q.   To send to the American Airline pilots?

25  A.   No.

1   Q.   Has anybody at ALPA ever told that you they printed

2   cards to send to American?

3   A.   No. No one of told me that.

4   Q.   Was any money ever budgeted by ALPA in 2001 to try to

5   organize the American pilots?

6            MR. PRESS:  He is leading the witness.

7            THE COURT:  Yeah, you are leading him.  By the way,

8   did ALPA ever indicate to Hunnibell and Clark that they would

9   reimburse them for expenses they incurred in their card

10  campaign.

11           THE WITNESS:  Did ALPA?

12           THE COURT:  Did ALPA ever indicate on ALPA

13  letterhead or ALPA, from ALPA official to say Clark and

14  Hunnibell that they would reimburse them for their expenses.

15  A.   I am not aware of any --

16           THE COURT:  You are not aware?

17           THE WITNESS:  No.

18           THE COURT:  So if somebody showed you a memo or a,

19  or something that said otherwise, you would be surprised.

20  A.   Yes, because I know --

21           THE COURT:  No, no, you didn't know.  You would be

22  surprised if such a document were shown.

23  A.   Why surprised?

24           THE COURT:  Well, because you are not aware of it.

25  So you would be surprised if somebody showed you an ALPA memo

1   and an ALPA documents that promised to reimburse.  You

2   indicator indicated there would are reimbursement.

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  Okay.  Next.

5   Q.   To your knowledge did ALPA ever actually reimburse any

6   expenses to Clark or Hunnibell?

7   A.   No, they did not.

8   Q.   Let's wrap up with the Continental campaign.  I think

9   you told us about some of the, have you told us about the

10  resources that ALPA devoted to trying to pursue the merger

11  with Continental?

12  A.   I think I did.  I explained that we had two assistant

13  directors, we had a whole bunch of people from

14  communications, legal department, a lot of pilot volunteers,

15  a lot of interim political officers who were assisting in the

16  campaign.  Very widespread support.

17  Q.   And what cost, can you tell us how much money ALPA

18  incurred during the course of trying to organize or merge

19  with the Continental pilots?

20             MR. PRESS:  Again, Judge, relevance.

21             THE COURT:  Are you objecting?

22             MR. PRESS:  Yes.

23             THE COURT:  Say I object.

24             MR. PRESS:  I object.

25             THE COURT:  Sustained.

1    crossed the picket line, they were referred to as scabs,

2    right?

3    A.    That's correct.

4    Q.    You are aware that these scabs in fact were precluded

5    from ALPA jumpseats?

6    A.    I am aware of that.

7    Q.    Right.  And you are aware that in fact there was a list

8    of all these scabs that ALPA produced and distributed to all

9    of its members, right?

10   A.    No, I am not aware of that.

11   Q.    You are not aware of that?

12   A.    No.

13   Q.    Aren't you aware there was a lawsuit over that and you

14   provided testimony, I think?

15   A.    Yeah, that we didn't have a list.

16   Q.    You didn't have a list?

17   A.    We did not have the list.  That was the testimony.

18   Q.    Isn't it true, Mr. Rosen, that in 1991 ALPA produced and

19   distributed 50,000 copies of the scabs list, the final

20   publication was entitled the scabs of Eastern, of the strike

21   of 89.  Aren't you aware of that?

22   A.    I don't remember.

23   Q.    Can I show you?

24   A.    Sorry.

25   Q.    I want to show you.

Rosen-cross/Press                                                        52

1            MR. FRAM:  Your Honor, I object under 403.

2            THE COURT:  No, I will allow it.

3            MR. FRAM:  Can I see you at sidebar?

4            THE COURT:  I am going to allow it.  The jumpseat

5    issue is clearly in the case.  I will allow it.  Go ahead.

6    Q.   I am going to hand you something that I want you to look

7    at, first of all, what is it, are you familiar with this?

8            MR. FRAM:  May I have a copy?

9            MR. PRESS:  I am sorry.

10           THE COURT:  What is it marked?

11           MR. PRESS:  It is not marked, Judge.  It is just, I

12   am just using it to refresh memory for now.

13   A.   I what are you pointing me to?  I apologize --

14   Q.   Have you ever seen this case I have landed you?

15   A.   Yes.

16   Q.   Oh.  This is a published opinion of --

17   A.   I said yes.

18   Q.   Dun versus ALPA?

19   A.   Yes.

20   Q.   You are familiar with in lawsuit, right?

21   A.   Goes back a long time.  I don't recalling it.  I would

22   have to read it, your Honor.

23           THE COURT:  Well, if you want to read it, I am

24   certainly going to ask him to ask questions on it.

25           MR. PRESS:  I don't want to sit and have you read

1   in front of the jury.

2          THE COURT:   If you want to know about the list,

3   forget -- just stick with what he knows about the list.

4   Q.   You are denying that ALPA produced and distributed a

5   scab list?

6   A.   No, you have refreshed my recollection.  I would like an

7   opportunity to review it, and I appreciate your refreshing

8   it.  I apologize if I gave incorrect information on that.

9          THE COURT:   Okay.  Your recollection is refreshed.

10  Q.   In this is refresh refreshing your memory in fact ALPA

11  did produce and distribute a scab list?

12  A.   If that is what it says, that is what it says.  That is

13  why I wanted to review it.

14         THE COURT:   Let him look at it.

15  Q.   Please --

16         THE COURT:   Go ahead and a look at it.

17  Q.   I show you --

18         THE COURT:   Let him look at it.

19         MR. PRESS:   I am sorry, Judge.

20         (Pause)

21  A.   I see the paragraph you highlighted which clearly states

22  in 1991 ALPA produced and distributed 50,000 copies of the

23  scab list.  This final publication was entitled the scabs of

24  Eastern, of the strike of '89.

25         THE COURT:   The question is do you recall  that

Rosen-cross/Press                                           54

1   now?

2   A.    I do recall it now.

3           THE COURT:  Okay.

4   Q.    So as a matter of fact, ALPA did produce and distribute

5   a scabs list of these Eastern pilots, right?

6   A.    I think you asked me that.  Yes.

7   Q.    And part of the intention of doing that was for that

8   list to be taken into cock pits by ALPA pilots so they on on

9   would know who the scabs were that might want to sit in the

10  jumpseat.  That was part of the reason?

11  A.    I can't speak to the intent.

12  Q.    That is fair enough.

13  Q.    Following up on some of the judge's questions about Mr.

14  Rindfleisch.  You were aware at the time, this is 2001, on

15  '02, that he was communicating directly with American pilots

16  about rejoining ALPA?

17  A.    He was communicating with American pilots.   Who were

18  expressing an interest in ALPA.

19  Q.    And two in particular had undertaken this card campaign,

20  Mr. Hunnibell and Mr. Clark, right?

21  A.    Yes.

22  Q.    You know for a fact Mr. Rindfleisch had regular

23  communication with those two men.

24  A.    There was frequent emails exchanged between the three of

25  them.

Seltzer-direct/Fram                                          88

1   serious and prejudicial and if your Honor is concerned about

2   anything I say, that might suggest that, I request that you

3   call counsel to sidebar.  I really do.

4           THE COURT:  Okay.

5           MR. FRAM:  I am very upset about the Court's

6   comments on the record in front of the jury so.

7           THE COURT:  All right.

8           MR. FRAM:  I request that you not do that again,

9   please.

10          THE COURT:  All right.  I am going to give this

11  charge, this instruction.  When the jury comes in.

12          MR. FRAM:  Thank you, your Honor.

13          (Jury enters the courtroom (.

14          THE COURT:  Everyone please be seated.

15          Ladies and gentlemen, I want to give you an

16  instruction that relates to an interchange that took place

17  earlier in the day.

18          During the examination of Mr. Rosen I made a

19  comment to the effect that Mr. Fram had made an inaccurate

20  factual statement.

21          I instruct you to disregard that comment.  Certain

22  of the facts in this case are disputed by the parties, and my

23  comment referred to those disputed facts.  It is your role as

24  the jury to decide disputed facts.  Your role and your role

25  alone.

1          I also want to make it clear that I have been very

2     proud of all the lawyers in this case.  I believe all the

3     lawyers in this case, every one of them, have acted in the

4     highest traditions of the profession, and honorably in every

5     respect.

6          And I don't want anything I ever say to make you

7     think that I disrespect or am critical of anything, given the

8     difficulty of this case and the emotions involved.  All the

9     lawyers on both sides have performed admirably.

10         Okay.

11         MR. FRAM:  Thank you, your Honor.  ALPA calls

12    Richard Seltzer to testify, please.

13         THE COURT:  Richard Seltzer?

14         MR. FRAM:  Yes, your Honor.

15         RICHARD SELTZER, sworn.

16         DIRECT EXAMINATION

17         BY MR. FRAM:

18         THE COURT:  You may proceed.

19    Q.   Good morning, Mr. Seltzer.  You are a lawyer at the

20    Cohen, Weiss law firm in New York?

21    A.   Yes.

22    Q.   Is that correct?

23    A.   Yes.

24    Q.   That law firm has represented ALPA in certain legal

25    matters over the years?

1    a pilot representative or two, and so I do remember talking

2    to people at ALPA about that, did they have a recommendation

3    on who might be a good retiree to serve on the committee.

4    But other than that, and sort of reporting that the motion

5    had been made, ALPA didn't -- none of the unions I think

6    represented there, retirees for those purposes, so it wasn't

7    that.

8    Q.    Did you give some kind of presentation at the meeting on

9    March 21 and 22 of 2001 about Section 1113, the likelihood of

10   it being granted and related issues?

11   A.    Yes.

12   Q.    As of March 21 and 22, did you have an understanding

13   about when the motion would be heard by the Judge, by Judge

14   Walsh and when ALPA would be required to file any responsive

15   papers?

16   A.    Yes.

17   Q.    What was your understanding of when the motion was going

18   to be heard by Judge Walsh are?

19   A.    I believe when the motion was filed, in fact, if I can

20   look at it for a second, it had down, hearing on the first

21   page, it had hearing date to be determined.  Objection date,

22   March 26.

23          So when it was filed we actually didn't know what

24   day it was going to be heard.

25          I believe right around the 21st, it may have been

Setlzer-direct/Fram                                    120

1   the 21st, TWA filed an amended motion stating that the

2   hearing would be held on April 6, and that objections would

3   be due March 30 instead of March 26.

4   Q.   Okay.

5   A.   And I believe I reported at that meeting that at some

6   point during that meeting.

7   Q.   When you reported to the MEC -- by the way, just tell us

8   generally who was present at the meetings on March 21 and 22,

9   2001?

10  A.   It was an MEC meeting.  There were a series of these

11  meetings.  Members of the MEC would be there and the officers

12  and the chairs at least of the negotiating and merger

13  committees, and the creditors committee representatives, and

14  David Holtzman and me and Steve Tumblin and Michael Glanzer,

15  and I think at most of these meetings, if not all of them,

16  Clay Warner.

17  Q.   Did you talk at the meeting on March 21 and 22 about

18  whether the hearing date could be postponed, whether there is

19  a way to get the motion to be considered to be put off?

20  A.   I believe I did.

21  Q.   What did he say?

22  A.   The statute, this is a very unusual statute.  The

23  statute says that when the motion is filed, the hearing, the

24  Court will schedule the hearing no later than two weeks after

25  the motion is filed.  And the Court, for, it says something

1    like special circumstances or the circumstances of the case,

2    can extend it one week, and that is all.  The hearing has to

3    start 21 days after the motion is filed.  No later than that.

4    Unless the company agrees.

5            As I remember, April 6 was 21 days, maybe it was 20

6    days, but it was 21 days after March 15.  So that unless the

7    company agreed, the hearing was going on start on April 6.

8    The statute instructed the Judge not to extend the start of

9    the hearing unless the company agreed.

10   Q.   Did you have a sense on March 21 or 22 of how long the

11   hearing would take?

12   A.   Yes.  I had a general sense.

13   Q.   Did you talk to the people at the meeting about how long

14   you thought the hearing would take?

15   A.   At both this meeting and the meeting on, the last

16   meeting which was April 1, 2, my -- and we were focusing at

17   this point more on getting the objection done and filed.

18   That was the first thing we needed to do.  But that -- from

19   everything I knew in the negotiations, everything was

20   focusing now on scope and successorship.  And seniority

21   integration.   I sort of mean that too.

22            And so my view, I think I expressed at this point,

23   I know I expressed at the next meeting, was that we would

24   need a witness, the negotiating history was going to be

25   agreed to, I thought, what is in the contract is going to be

# Exhibit P

```
1              IN THE UNITED STATES DISTRICT COURT.
               FOR THE DISTRICT  OF NEW JERSEY
2              CIVIL 02-2917  (JEI)

3         PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
4         AND MICHAEL FINUCAN, individually
          and on behalf of all others
5         similarly situated,
                    Plaintiffs,
6                                          VOLUME 17
             V.                            TRIAL TRANSCRIPT
7
          AIR LINE PILOTS ASSOCIATION,
8
                    Defendant.
9
                              CAMDEN, NEW JERSEY
10                            JULY 7, 2011

11        B E F O R E:  HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                    A P P E A R A N C E S:
13
             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:   STEVEN FRAM, ESQ.
19                  AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH  GINSBURG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON

4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                 LYNNE JOHNSON, CSR, CM, CRR
18               OFFICIAL COURT REPORTER
                 UNITED STATES DISTRICT COURT
19               P.O. BOX 6822
                 LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25          .

1   and all reasonable inferences from that evidence is to be

2   viewed in a light most favorable to our clients, and when you

3   do that you will find --

4             THE COURT:  You even said that in a brief.

5             MR. PRESS:  You will find there is substantial

6   evidence in this record to support findings of yes on both of

7   the questions that you had proposed to send to the jury.  And

8   you should deny this motion, Judge.

9             THE COURT:  Okay.  Anything else by anybody?

10            MR. FRAM:  No, thank you, your Honor.

11            MR. PRESS:  No, your Honor.

12            THE COURT:  I am going to deny the motion for

13  directed verdict, the Rule 50 directed verdict at this time.

14  I think there are, admittedly there are fragments, but there

15  are fragments of evidence flowing through this record, and I

16  guess I am most troubled by, but I think that it is not a

17  very subtle point that ALPA had a potential for conflict of

18  interest, a serious conflict of interest here.  I mean there

19  was only two months before the American acquisition was

20  announced that they, that there was a unity resolution, I

21  think I have that right, the unity resolution was passed and

22  Woerth I think went down to speak to APA, and clearly, by the

23  way I find nothing wrong in any of that.  It was done in

24  November, 2000, or earlier, to try and bring in American, you

25  know, and Fed Ex and UPS, and Continental, and anybody else

1   into the ALPA fold.

2           It was perfectly lawful, proper conduct.  And

3   American would I think at that time may have been one of the

4   most prosperous American passenger carriers.  And certainly

5   try to bring them into the ALPA fold.  Perfectly proper.  We

6   need to decide how one goes about doing that as a goal, under

7   the circumstances.  It is perfectly legitimate.

8           But ones American announced its acquisition, and

9   required the waiver of the scope provisions in the ALPA

10  contract as a condition for the acquisition of a clearly a

11  failing airline, ALPA was very much in a conflict of interest

12  situation.  And I simply don't believe, I mean I think a jury

13  could conclude they were certainly well aware there was a

14  conflict of interest inherent in that situation and the

15  question is how did they deal with it.  I agree it is not

16  like a lawyer, you kick the lawyer off the case, and hire two

17  new lawyers.

18          You can't do that, you can't say I am going to fire

19  this union and say, well, bring the Teamsters in to negotiate

20  for us.  You can't do that.  I mean, the pilots, the TWA

21  pilots couldn't do that.

22          So I think it behooved ALPA, you know, to be like

23  Calpernia, Caesar's wife, and you know, be above and beyond

24  all reproach.

25          Again we have all the snippets of evidence relating

1   dispute about what a reasonable lawyer would have done, the

2   plaintiffs are required to present expert testimony.  They

3   didn't present any that was admissible.  We understand the

4   Court's ruling.

5         THE COURT:  Again, I recognize that that is, that

6   the question of bringing litigation really creates a very,

7   very difficult issue.  But I don't think that just based on

8   the evidence before me there is really enough in the position

9   to say this suit was meritless.  Somebody, I think the issues

10  are far more complicated.

11        We have -- I won't say this has never happened.  I

12  think there are one or two cases around where duty of fir

13  representation was related to seniority integration.  But it

14  is a very unusual case.  Very, very unusual.  This is not

15  just a case of where -- this is an issue of two unions in the

16  same field, and one, possibly wanting to take over the other

17  one, and a union in a position of lose-lose, I think it is a

18  very unusual situation.  I think courts, had they been

19  facing, you know, Roland Wilder's suit, you might have gotten

20  some unusual results.

21        All the law is against it.  Every bit of it.  I

22  couldn't find anything favorable, but I was 100 percent sure

23  I was going to win the case.  Guess what?  I won it.  There

24  was something about the case that told me, you can read all

25  the cases you want.  Usually it is the other way around.  And

1  distinction between, you know, that the union is the union

2  and the MEC is something totally different.  Not going to do

3  that.

4        MR. FRAM:  Okay, thank you.

5        THE COURT:  But you can, you know, the fact that

6  you can argue that they were selected by the MEC, you know,

7  and reported to the MEC, or paid for by the union.  I am not

8  going to allow it.  Next.  Finished with 14 out of 15.

9        MR. FRAM:  Yes.  15, I think, on 15, your Honor,

10  you didn't like "highly."  But I will note any way that at

11  the very top of the next page, it refers to reasonableness

12  that is irrational.

13        THE COURT:  Sorry.

14        MR. FRAM:  The first sentence of 15, union's

15  conduct is arbitrary if looking at all the evidence

16  presented, it is so far outside the range of reasonableness

17  that it is irrational.

18        I just note O'Neill uses the phrase "wholly

19  irrational."  So we would ask the Court to consider that.

20        THE COURT:  I personally think the word "wholly"

21  confuses rather than, if the plaintiff accepts it, I will put

22  it in.

23        MR. PRESS:  No.  I like your instruction, Judge.

24        MR. FRAM:  I have nothing else on 15, your Honor.

25        THE COURT:  16.

1   bad faith when it acts or fails to act out of ill will

2   towards the employees it represents."

3           MR. FRAM:  Yes.

4           THE COURT:  There is no objection to that change.

5   I will make it.

6           THE COURT:  What else?

7           MR. FRAM:  Next paragraph, examples of bad faith.

8   Deliberately making misleading statements to employees, not

9   disclosing conflicts of interest, acting with hostility

10  towards union members and ignoring union policies in labor

11  negotiation.  We are a little concerned about that language,

12  your Honor.

13          One, not disclosing conflicts of interest.  I am

14  not sure, we don't believe the law supports that.  Acting

15  with hostility towards union members.

16          Again, I alluded to this testimony, which I think

17  you know my view of it, by Comlish, that when Duane Woerth

18  scowled at him, I am concerned that the jury might think

19  someone might not, that someone allegedly raising their

20  voice,  that someone raising their voice is a violation.  It

21  doesn't.  It has to be meaningful.  Or ignoring the policy of

22  the labor negotiation.  I don't know that the law supports

23  that.

24          We think the jury is going to be confused, and I

25  don't believe there is any evidence, your Honor, in the case

1    the verdict sheet?

2              THE COURT:  Yes.

3              MR. FRAM:  I have one request.  I think I know how

4    you are going to rule.  We submitted a verdict sheet.

5              THE COURT:  Let me find it.

6              MR. FRAM:  Your Honor, we think it is important to

7    separate issues out to avoid confusion.  We request separate

8    questions relating to the vote on April 2 and events

9    thereafter, both with respect to each breach of the duty and

10   causation.

11             THE COURT:  No.  No.  I don't think, I know you

12   wanted from day one to separate the case that way.  If you

13   want to argue that there was no card campaign, the evidence

14   doesn't show there was any conflict up April 2.  Fine, you

15   can argue that to the jury.  But I am not going to split the

16   case.

17             MR. FRAM:  Thank you, your Honor.

18             THE COURT:  What is your comment?

19             MR. PRESS:  Interrogatory two, the causation

20   question.  Did ALPA's violation of its DFR directly cause

21   injury to the TWA pilots?

22             I would suggest removing the word "the" and leaving

23   it, because that would suggest all.  And the jury has heard

24   from Mike Day that he wasn't hurt by Supplement CC.  And that

25   fact alone would preclude us from a yes answer to that

# Exhibit Q

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3       PATRICK BRADY, SALLY YOUNG,
         HOWARD HOLLANDER, THEODORE CASE,
 4       AND MICHAEL FINUCAN, individually
         and on behalf of all others
 5       similarly situated,
                       Plaintiffs,
 6                                          VOLUME 18
              V.                          TRIAL TRANSCRIPT
 7
         AIR LINE PILOTS ASSOCIATION,
 8
                       Defendant.
 9
                            CAMDEN, NEW JERSEY
10                          JULY 11, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                    A P P E A R A N C E S:
13
            TRUJILLO, RODRIGUEZ & RICHARD
14          BY:  NICOLE M. ACCHIONE, ESQ.
                 AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
            GREEN JACOBSON, P.C.
16          BY:  ALLEN PRESS, ESQ.   (MO. BAR)
            AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17          For the Plaintiffs.

18          ARCHER GREINER
            BY:   STEVEN FRAM, ESQ.
19                AND
            KATZ & RANZMAN
20          BY:  DANIEL M. KATZ, ESQ.
            FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
            ELIZABETH  GINSBURG, ESQ.
22          IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
               LYNNE JOHNSON, CSR, CM, CRR
18             OFFICIAL COURT REPORTER
               UNITED STATES DISTRICT COURT
19             P.O. BOX 6822
               LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

```
 1    concerned a little bit about causation in two respects.  One,

 2    we think the jury needs to understand that causation has to

 3    be proven by the plaintiffs, you say that in the charge.

 4              THE COURT:  I say it in the charge, now I will be

 5    saying it twice, with that paragraph.

 6              MR. FRAM:  But we also request, consistent with the

 7    charge we submitted yesterday, that they be instructed that

 8    they should not speculate about whether things might have

 9    been different.  We also request, given the instruction on

10    the verdict sheet that a separate section be included here

11    that focuses just on the issue of causation.

12              THE COURT:  I am satisfied that the charge covers

13    that point.  I mean more than happy.

14              MR. FRAM:  We stand on the objections we made last

15    week as well.

16              THE COURT:  Of course.  Okay.

17              MR. FRAM:  Thank you.

18              THE COURT:  I am going to mark what is now draft

19    number 4 of the charge, and draft number 3 of the jury

20    verdict, as C 3 and C 4.  And before we close I will mark the

21    exhibit, the final char charge.

22              MS. RODRIGUEZ:  The jury instructions are C 3  and

23    the charge is C 4.

24              THE COURT:  The other way around -- no, you are

25    right.  C 3 will be the charge, and C 4 will be the verdict
```

No.  No.  No.  That is all they ever said to the TWA pilots.

And they never had an idea of their own, no, that is not a

good idea, but let's try this.  No, they didn't do anything

to supply the TWA pilots with any leverage after they

stripped them or advised them to surrender their best

leverage.  That is what happened here.

And we brought you the people that wanted to fight.

Who did they bring in?  They brought you four lawyers, not

that there is anything wrong with that.  They brought you

four lawyers, none of whom told you anything that they did to

help in the seniority debate.  None of them.  Not one of

them.  And they brought you two disgruntled former TWA

pilots, Rautenberg and Singer, and they brought you a

completely discredited former president, Duane Woerth.  And

why do I say that he is discredited?

Mr. Fram called my clients liars.  I am not going

to do that to Ambassador Woerth, but what he said on the

witness stand wasn't entirely truthful about some of the

important things.  You remember the testimony, my partner,

Joe, was cross examining him about the scab list.  Remember

the testimony, there was this business about the TWA pilots

wanted to have a jumpseat war against the American pilots.

And there was, there was some evidence, Duane Woerth was

asked the question, isn't it true that ALPA has a list of

scabs, and that scab list is distributed to members?  And the

1   idea is that ALPA members are not to allow scabs to use the

2   jumpseat.  Do you remember that?  And I should give you some

3   more framework before I go on.

4           ALPA has told you that we don't do jumpseat wars

5   because we don't use the jumpseat to punish another pilot.

6   We don't use it for political reasons.  Well, that is

7   hogwash.  They do it.  With this scab list.

8           Duane Woerth denied it.  Oh, we have never had a

9   scab list.  Remember how, he was very calm in his testimony.

10  But when it came to that scab list he perked right up.  And

11  he said very defiantly, no, we have never had a scab list.

12  Remember what he said next?  That would be illegal.  Okay.

13  Joe sat down.

14          Then what happened a week later?  Seth Rosen is on

15  the witness stand, and he tells you the truth.  They did have

16  a scab list.  It took them a while to get there to remember

17  that.  Remember I had to show him a copy of a court opinion

18  that he actually participated in and once he read that, he

19  said, he had to admit then, yes, Mr. Press, we did have a

20  scab list and we did distribute it to all of our members.

21          So Duane Woerth was not exactly truthful with you.

22  And as Mr. Fram told you, I mean, come on, that is black and

23  white.

24          Did you have a scab list, Captain Woerth?

25          No, that would be illegal.

1          We know it is not true.  They did have one.  But he

2     just didn't want to tell you that.  And what did Mr. Fram say

3     about somebody that doesn't tell you the truth in the witness

4     stand?  You can believe what you want to believe and what you

5     don't want to believe.  And I suggest that everything he said

6     should be clouded, you should judge very seriously whether or

7     not you believe that from this man.  All right.

8          So that is what they brought you.  We brought you

9     all the people who wanted to fight and they brought you a

10    bunch of people that told you nothing about any fight that

11    they put up.  All they brought to you was excuses.

12         And I am sitting here listening to Mr. Fram, and

13    excuses, everyone has got an excuse, excuses are like noses,

14    my mother told me.  Everybody has got one.  That is not what

15    the TWA pilots wanted.  They wanted a fight.  They wanted

16    real support.  They needed leverage against the American

17    pilots.  Yes.

18         What Mr. Fram said is true, the American pilots did

19    have the leverage.  But they didn't have the most powerful

20    pilot union in the world backing them up.

21         And that is what our clients expected.  They

22    expected real support.

23         Now, let's get to the instructions you are going to

24    get.  The Judge is going to instruct you that ALPA violated

25    its duty of fair representation to the TWA pilots if it did

1   one of two things.  If it acted arbitrarily, or it acted in

2   bad faith.

3          Now, let's begin with arbitrary, okay.  You will be

4   instructed that examples of arbitrary conduct include acting

5   in a perfunctory or superficial manner.  Perfunctory or

6   superficial manner.  If a union does that, a union has acted

7   arbitrarily and has violated its duty to its members.

8          So did ALPA act perfunctorily, superficially?  You

9   bet.  I mean, my goodness, they did nothing but give lip

10  service.

11         I am going to break things down into things that

12  made sense in my mind any way.  Let's talk about the broken

13  promises first.  I think it is completely legitimate and fair

14  to conclude that a union act arbitrarily when it doesn't do

15  what it promises to do.

16         It seems fair.  If you promise one thing and you

17  don't deliver, you do just the opposite, then that is

18  arbitrary conduct.  And so let's look at what ALPA promised

19  my clients, while all of this was going on.   They are real

20  words.  D 243.

21         Now I need to be able  to see it.

22         D 243.  What did they promise here?  Can you go to

23  the highlighted section?

24         What is the date on this?  I need to go over here

25  so I can see.  This is an MEC meeting from January, 2001,

1   right.  And Captain Shwartz, where is he at?  He is the vice

2   chairman there, the second line.  He reports on some

3   conversation he had with Duane Woerth.  What does he report?

4   If you go to the next clip.  Shwartz briefed the MEC on his

5   conversation with ALPA president Duane Woerth.  He said

6   President Woerth indicated he would be extremely supportive

7   of the MEC's efforts in the coming months.

8          So that was promise one.  Woerth is going to be

9   extremely supportive.

10          What is promise two?  March 2, D 245.  This is

11   again an MEC meeting, March 2, in St. Louis.  And there is

12   another report on what Duane Woerth says he is going to do,

13   if we can go to that.  Vice chairman Scott Shwartz stated

14   that Captain Woerth was committed in assisting this pilot

15   group to facilitate fair seniority integration.  Good.  That

16   is what we want.  Assured the body that all resources would

17   be utilized to obtain fair seniority integration.

18          All resources would be used.

19          That is what was promised that date.

20          What is the next one?  March 21, D 223.  Another

21   MEC meeting.  March 21.  What is the promise and commitment

22   delivered that day?  Again from Scott Shwartz.  He again

23   briefed the MEC regarding teleconference with Duane Woerth

24   who promised to ramp up ALPA support and utilize other legal

25   venues for support. Other legal venues.    That would be

1    what?  A lawsuit.

2          And by the way, the timing of that, March 21, the

3    first time TWA pilots asked to bring a lawsuit was five days

4    later when Roland Wilder that letter to Duane Woerth

5    suggesting he should try to hold up this deal to buy times

6    for my guys.  That was written five days after Woerth

7    promised other legal venues of support.  And of course, we

8    know what happened to that litigation strategy.  It was

9    rejected.  Woerth didn't even bother to respond to Roland

10   Wilder on that one.

11         Okay.  So the next promise, this one  we don't have

12   a document of, but we have Mike Day's testimony.  Remember

13   Captain Day, the distinguished man who was head of the merger

14   committee, in charge of negotiating the seniority?  Do you

15   remember him?  And Mike Day told you that after he got done

16   with his first round of, if you want to call them

17   negotiations, at the end of March with the American

18   negotiators, he was very distraught, and he said he had a

19   conversation with Randy Babbitt, and Babbitt told him, said,

20   Mike, don't worry about it.  Duane Woerth has told me that as

21   soon as we get all the bankruptcy issues put aside, the

22   gloves are coming off.  That was promised at the end of

23   March.  As soon as we get the bankruptcy issues resolved, the

24   gloves are coming off.  Okay.  That sounds good.

25         So that was the promise that day.

1          Then let's go to the next one, which is April 23, D

2     78.  This is April 23, another MEC meeting in St. Louis.

3     This is the one where Duane Woerth attended, and what did he

4     report to the MEC?  What did he report?  First we have Ted

5     Case over here.  He is making a statement for the record, and

6     he wants Captain Woerth on the record this time.  He says,

7     Captain Woerth, if the TWA pilots -- Oh, he asked Captain

8     Woerth if the TWA pilots had his commitment as the president

9     of ALPA to use the full resources of the association,

10    including litigation, if possible or necessary, against the

11    APA, American, and TWA.

12          What does Captain Woerth, how does he respond?

13    Captain Woerth responded what?  If there was any basis for

14    litigation, it will be pursued.

15          That no stone will be unturned to protect the TWA

16    pilots.

17          Now, maybe there is no legal duty to turn over any

18    stone on behalf of the guys you represent, but if you

19    promise it to them, shouldn't you deliver it?  Of course you

20    should.

21          So that was April 23.  What is the next one?  It is

22    May 31, P 316.  P 316.  This is the May 31 letter that Duane

23    Woerth sent to every TWA pilot.  All 2,300 of them got this

24    letter.  And what does he say here?  How does he conclude?

25          As president, I will continue to coordinate with

1    your MEC and your merger committee to ensure TWA pilots are

2    fairly and equitably integrated into the American pilots

3    seniority list.

4           Okay.  And we had every MEC member testify and

5    every merger committee member testify, up to that point, sir,

6    and Ms. Young, was there any coordination between MEC and

7    Duane Woerth?  And the answer was no.  Was there any

8    coordination thereafter?  No.  And the same question was

9    asked of Sean Clarke and Mike Day and they both testified no.

10          So, but this is what the ALPA president is

11   promising.  This is what they were promising.  And that is

12   what my  clients expected.  That is what they expected.  The

13   full resources of their union applied against the American

14   pilots.  So that they could in fact get the best seniority

15   integration possible.  That is what they expected.  That is

16   clearly not what they got.  What they got was a whole gaggle

17   of advisors  that show up on April 2 to persuade them to

18   waive scope.  We know that happened.  Then they all

19   disappear, all these advisors, meeting after meeting in

20   March, and early April.  And then poof, they are gone.  Never

21   to come back.

22          It is all the pilots ever got from ALPA was lip

23   service and the word no.  That is all they ever got.  They

24   even said no to writing a letter, remember, this one?  It is

25   D, no, P-161.  P-161.  This is, I mean this is really

1    amazing.

2           This is Randy Babbitt, he was the last witness to

3    testify by that video deposition that they played.  And he

4    wants to write a letter to the secretary, or the -- yeah, the

5    head of the Department of Transportation, Norm Mineta and he

6    wants to write this letter saying Secretary Mineta, you

7    should hold up this American deal until the seniority issues

8    are played out and worked out and there is going to be some

9    assurance of fairness.  That is what the attached letter

10   says.

11          And what happened?  He sends this up to Clay Warner

12   on March 28.  Warner testified that he spoke with Paul

13   Hallisay, this ALPA lobbyist about it.  And Paul said, Duane

14   says no.  Okay.  You can't even send a letter.

15          Go to the next page, or the last page, there is

16   another no in here.  Remember Clay Warner wouldn't even agree

17   when the Judge was trying to get him to agree that that is

18   his handwriting?  The suggested proposed letter says that I

19   would suggest that the final DOT approval should include

20   language requiring American to take appropriate steps to meet

21   the minimum fairness standards on seniority integration.

22   Okay.  And Warner -- that is proposing DOT assure fairness in

23   the transaction.  And Warner writes, no.

24          You are going to be instructed on this

25   arbitrariness element, that a union acts arbitrarily if it

1    acts irrationally.

2            Irrational behavior from a union is arbitrary

3    conduct.

4            Now, like broken promises, shouldn't we conclude

5    that it is irrational for a union to persistently violate its

6    own practices and policies?  If a union persistently does

7    that in representing its members, wouldn't you consider that

8    to be irrational?  Well, there was plenty of that here.

9    Plenty of it.  We saw that ALPA has many, many tools

10   available to itself to help its members.

11           Many tools.  And I am going to list them one by

12   one.  And the fact is, and why we are here is that none of

13   those tools were given to the TWA pilots.  The first one I

14   want to talk about is contract negotiation assistance.

15           These TWA pilots as part of the scope surrender,

16   they get this new collective bargaining agreement, right?

17   Mr. Fram wants you to believe this is some great thing.  I

18   will get into that.  But let's just talk about how it was

19   negotiating and compare that to ALPA policy.

20           ALPA first of all has a written policy on how to

21   negotiate a contract with your employer.  And that was

22   exhibit 249.  P-249.  Or J, I am being told there is the

23   first page of it.  We had Mr. Rosen talk about some of this

24   stuff.  And on the first highlighted clip, what is the policy

25   there?  D.  Ratification.  That means you have to have all

the members vote on it.  Ratification.  The conclusion of an
agreement shall, at the discretion of the MEC, be subject to
MEC or membership ratification.

So if the MEC wants, it can put out a contract for
membership ratification.

What happened here?  On April 2 when the advisors
are all there telling them the train is leaving the station,
they may say that comment wasn't made, but you know it was,
they all say it.  But when that conversation was taking place
the MEC said they were reluctant to do this.  They didn't
want to.  They said can't we put this out for vote?  Can't we
have membership ratification?  And what was the response?
No.  There is not enough time.  There is not enough time to
do that.

Well, what was driving that issue?  The bankruptcy
hearing which was set to be heard four days later.  Okay.
The meeting was on Monday and then the bankruptcy hearing was
on a Friday, and they are saying, well, there is not enough
time to put it up for ratification.  But there was.  Mr.
Seltzer supplied the proof.  He told you that there is an
automatic right to an extension of the 1113 hearing.  All
they had to do is go into court and say Judge, we would like
an extension of this hearing so that we can put this issue
out to vote to the members, the union local representatives
have asked for it, and that is what we want to do.

```
 1              And that would have been done.  Then ALPA has

 2    procedures for telephonic balloting.  In can be done very

 3    quickly.  So when they told the MEC there is not enough time,

 4    that wasn't true.  There was time.  They just wanted a

 5    decision that day.  And I will explain to you why that was

 6    important to them.  But not now.

 7              The next highlighted page, again, how to negotiate

 8    a contract policy.  This one is "Crisis and concessionary

 9    Negotiations."

10              The TWA pilots were clearly involved in a

11    concessionary negotiation.  They were being asked to give up

12    their scope.  Nothing could be more important to them.

13              So this policy applies.  And what does it say on

14    the next page?  If you are involved in that kind of

15    negotiation, ALPA shall provide to the MEC, can you highlight

16    that?  Shall provide three things.  First one is probably the

17    most important one:  Coordination directly through the

18    president's office.  So under ALPA's written policy, if an

19    MEC is involved in a concessionary negotiation, that

20    negotiation has to be coordinated through the president's

21    office.

22              That didn't happen here.  Woerth didn't tell you

23    one thing that he did coordinating any of this negotiation of

24    this new contract.  He wasn't involved.  They violated the

25    policy.
```

1          Now, there are remarks in the record that Captain

2     Woerth made when he is speaking to the American pilots.  A

3     copy of his speech is in evidence, it is exhibit 10, P 10.

4     And in his speech he makes some remarks about, additional

5     remarks on what ALPA does when negotiating a contract, and if

6     you go to page 26 of this document, it is number 26, now,

7     this is what is going on here.

8          You got this fellow, Captain Dan Hall, that is an

9     American pilot, he is asking a question.  And his question to

10    Captain Woerth is about how they structure negotiations.

11    Then Captain Woerth responds.  Here is his response.

12         "We have employees, we have three directors, a

13    director and three assistant directors that are in

14    Washington.  We farm them out kind of on what I call the

15    crisis patrol.  Like Seth" --  presumably referring to Seth

16    Rosen.  "Seth is the director of that entire department.  But

17    since the Delta contract is so important now on top of

18    Northwest, we have three negotiators down at Delta, plus Seth

19    Rosen on the team."

20         Our number one guy is assigned to the number one

21    project.  And that is how we use our top four or five most

22    senior guys.  The bigger the stakes, the more experienced

23    person we have, the more seasoned veteran on the team.  That

24    is what ALPA represents to the world what it does when its

25    members are involved in an important negotiation.

1          Weren't my clients involved in an important

2     negotiation?  David.  David Holtzman, the same lawyer Dave

3     Singer said wasn't so good, wasn't very thorough.  That is

4     all the TWA pilots got.  We didn't get Seth Rosen.  We didn't

5     get these directors, or any assistance.

6          So they violate their written policy, and they

7     violate their, what they tell the representations to the

8     world on what they do.  And that is just on contract

9     negotiation.

10         Then, let's talk about seniority, seniority

11    negotiations.

12         What is the policy there?  Again, this one is in

13    writing.  It is P 20.  P 20.  This is ALPA's merger and

14    fragmentation policy.  This is the how-to manual on when you

15    are trying to negotiate two seniority lists together, this is

16    the manual on how to do it and achieve a fair result.

17         Most of it deals with the context of two carriers,

18    two pilot groups both represented by ALPA, and that is the

19    typical situation of what we had here is atypical, because

20    ALPA didn't represent the other side.  What I said is because

21    ALPA represents so many pilots that usually it is two ALPA

22    represented groups going at one another and in those cases

23    ALPA just backs off.  They say go hire your own lawyer.  Go

24    raise as much money as you want and have it out.  And ALPA,

25    you know, steps aside.

1          That wasn't our case.  ALPA didn't represent the

2     other side.  This is a case that they get to take the gloves

3     off, as it were.  And about but what is the policy, what does

4     it say on page 15?  NonALPA or unorganized airlines.  Right

5     there.  When the circumstances surrounding a merger preclude

6     adherence to this policy, i.e., where a nonALPA or

7     unorganized group is involved, reasonable steps shall be

8     taken by the president to seek acceptance of a procedure that

9     will enable the parties to proceed to a fair and equitable

10    resolution.

11          The president is required to take reasonable steps

12    to seek acceptance of a procedure that will enable a fair

13    result.

14          Duane Woerth worth didn't tell you any step he took

15    to comply with this policy, and that is because he didn't

16    take any.  This is another example of ALPA violating its own

17    policy.

18          Duane Woerth was supposed to get involved here.  He

19    was supposed to direct these concessionary negotiations and

20    he was supposed to beat on the American pilots to agree to a

21    procedure for a fair integration.  And he did neither one of

22    those.

23          Now, what is another tool that ALPA has.  Funding.

24          Staying with exhibit 20, if you go back four pages

25    to page this is a whole thing on funding an MEC faced with

1    merging with a nonALPA carrier.

2              See, beginning on the sentence.  Statement of

3    intent.  This is ALPA's intent.  Written policy.  It is of

4    particular concern that there is the potential that one of

5    our smaller or less financially able MECs could face a merger

6    with a nonALPA carrier without sufficient means to provide

7    adequate representation for their membership.  As provided by

8    ALPA policy, nothing in this policy restricts the MEC

9    chairman of such a group from petitioning the president for

10   supplemental funding to allow proper representation.

11             ALPA policy anticipates that in the situation my

12   clients were faced with, that they get a request for more

13   money.  That is the statement of intent.  And every time my

14   guys asked ALPA for money.  What was the answer?  No.

15             In fact, if you remember there was a meeting in

16   July of '01 at the executive council, this is ALPA's board --

17   or not the board, but another layer below the board, the

18   executive council.  And the TWA pilot had a group there Bob

19   Pastore, Mike Day and Bud Bensel and they presented to the

20   executive council and they asked for permission to hire a

21   lawyer.  They weren't even asking for money.  All they wanted

22   was money to hire an independent lawyer because Roland wasn't

23   working for ALPA.  Every time Roland asked for something they

24   said no, so they said let's hire a new lawyer.  What was the

25   response?  Remember, we had Tom Rachsford, he was a member of

152

1    something going on that day.

2          Now, on this funding issue, you have also got this

3    thing called a major contingency fund, which we heard some

4    testimony about.  This was ALPA's war chest that it doles out

5    to pilot groups that need supplemental funding and they had

6    75 million dollars in it at this time.  But of course the TWA

7    pilots restricted completely from any major contingency

8    funding.  Any time they asked for it, answer, no.

9          But let's compare that to other pilot groups.  And

10   my partner, Joe Jacobson, he was questioning Duane Woerth

11   about this, he showed one press release after another where

12   pilot groups are getting big sums of money, the Delta pilots,

13   ten million I think it was, everybody seemingly who asked for

14   money out of the major contingency fund gets it except the

15   TWA pilots.  And even while this was going on, there was a

16   small, tiny group of pilots, from Ryan Airlines, and they are

17   involved with some sort of seniority issue, and they asked

18   for a million dollars and they got a million dollars.  This

19   was in May of 2001.  Same time, Duane Woerth is promising all

20   the support for the TWA pilots.  Ryan Airlines pilots get a

21   million.

22          This is a good time to break.

23          THE COURT:  Okay.  Ladies and gentlemen, first of

24   all, of course, job one, have a safe trip home and a safe

25   trip in tomorrow.

# Exhibit R

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                        Plaintiffs,
 6                                          VOLUME  19
                V.                          TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                        Defendant.
 9
                              CAMDEN, NEW JERSEY
10                            JULY 12, 2011

11        B E F O R E:  HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                  A P P E A R A N C E S:
13
          TRUJILLO, RODRIGUEZ & RICHARD
14        BY:  NICOLE M. ACCHIONE, ESQ.
                AND: LISA J. RODRIGUEZ, ESQ.
15                  AND
          GREEN JACOBSON, P.C.
16        BY:  ALLEN PRESS, ESQ.   (MO. BAR)
          AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17        For the Plaintiffs.

18        ARCHER GREINER
          BY:   STEVEN FRAM, ESQ.
19                AND
          KATZ & RANZMAN
20        BY:  DANIEL M. KATZ, ESQ.
          FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
          ELIZABETH  GINSBURG, ESQ.
22        IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2     accurate record as taken stenographically in the
above-entitled proceedings.

3
                    S/   LYNNE JOHNSON

4
                    Lynne Johnson, CSR, CM, CRR
5                   Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                    LYNNE JOHNSON, CSR, CM, CRR
18                  OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
19                  P.O. BOX 6822
                    LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

1          THE COURT:  No, no, no.  He had to stand up in the

2     courtroom, they are serious people.  There wasn't one single

3     reference to the record.  All of Mr. Fram's comments about

4     the credibility were tied to the record, tied to things that

5     were said and that were in the record.  Not one comment about

6     that.

7          You can't express a personal opinion about the

8     credibility of your clients.  Don't do it again.

9          MR. PRESS:  I won't.

10          THE COURT:  And if you do it again -- I don't know

11     what I am going to do, but I am going to do something.  And

12     you can, part of you record, you know they are telling the

13     truth because, and you can make whatever references to the

14     record you want.  But having to stand up in the courtroom and

15     saying they are serious people, is not proper closing

16     argument.

17          All right.  Let's go to the second point.

18          MR. FRAM:  Thank you.

19          THE COURT:  1113.

20          MR. FRAM:  Your Honor, 1113, you cited the

21     testimony, we provided the statute.  The argument that they

22     could have gone and gotten an extension is just wrong, and

23     there is nothing in the --

24          THE COURT:  It is not complete, it is a little more

25     murky than that.  They filed the, some time early in March

1   irks don't know, they filed, TWA filed its 1113 motion.

2           MR. FRAM:  March 15, your Honor.

3           THE COURT:  Well, on the 21st, but on the 21st, and

4   there is no return date set on that motion.

5           MR. FRAM:  Yes, your Honor.

6           THE COURT:  On the 21st an amended motion was

7   filed, which may start the clock all over again.  If you

8   don't even consider that possibility, that the amended motion

9   would start the clock all over again.  And in that case, they

10  set the 6th as the date, and I don't know whether the Court

11  set that date, or it was in TWA's papers.

12          MR. JACOBSON: The testimony of Mr. Seltzer was that

13  that date had already been set by the court for other motions

14  so the motion war set for a date that was already set for

15  that case.

16          THE COURT:  I don't understand what you said.

17          MR. JACOBSON: Seltzer said that April 6 had been

18  set as a date for a hearing in bankruptcy before the 1113

19  motion was filed, and when they filed the amended motion they

20  set it for that already scheduled date.

21          THE COURT:  Yeah, but was it, TWA said in the

22  papers that is going to be the return date or was the it the

23  Court said it.

24          MR. JACOBSON:  That was the date they said, TWA set

25  in the papers.

1          THE COURT:  That is what they thought.  It wasn't

2     a date the Court said I am going to hear it.  There was a

3     date scheduled for other matters.

4          MR. JACOBSON: Correct.

5          THE COURT:  But now, the 6th happened to be 16 days

6     from March 21st.  I don't know with the weekend, how that

7     falls or anything.

8          So there may well be an additional period where you

9     could get an extension, if you start the clock running from

10    the date the amended motion is filed.

11         MR. FRAM:  The testimony of Mr. Seltzer was that

12    that was the final date.

13         THE COURT:  Well, first of all, nobody made any

14    effort to extend it.

15         Mr. Press, your statement that they had an

16    automatic right to extension, even the statute doesn't say

17    that.  The Court has a right to grant the motion.  It is not

18    like our motion practice here where the clerk can give a two-

19    week extension are or something.

20         MR. FRAM:  For an answer, and a dispositive motion.

21         THE COURT:  The Judge doesn't have to get involved,

22    the Clerk's office will do it.  But in this statute, the

23    Court has to approve it.  In other words, it is not

24    automatic.

25         So quite candidly, it is a little bit murky.  What

1   do you propose I do about it?  I am not going to instruct the

2   jury on it.

3           You want me to put my thumb in, I am not.

4           But what do you suggest other than that?  Because

5   your argument is quite candidly less than rock solid.

6           MR. FRAM:  Well, if your Honor's view is that the

7   argument was fairly based upon the evidence, then I am

8   probably not be entitled to a remedy.  What I would like is

9   to be able to get up and give a rebuttal closing, that would

10  be very nice.  I don't know that your Honor is going to allow

11  that.

12          THE COURT:  Let me, I have been thinking about that

13  all night, about the question of rebuttal closing.  But let

14  me -- on that point.  But because what I see right now is

15  exactly what Mr. Jacobson said.  You had a date set.  The

16  date was used when the amended was filed, and that happened

17  in 16 days, not 14 days after afterward.  Right, March 21,

18  April 6?

19          MR. FRAM:  But you raise an important point, your

20  Honor.  The statute says --

21          THE COURT:  It is not automatic.

22          MR. FRAM:  The statute says it has got to be 14

23  days after it is filed.  So if it gets refiled on the 21st,

24  April 6 could not have been the correct date.  It would have

25  been more than 14 days later.  It is right in the statute.

1          THE COURT:  Bankruptcy judges, all judges, district
2     judges, we set our calendars, we change dates all the time.
3          MR. FRAM:  In contradiction of the statute, your
4     Honor?
5          THE COURT:  What are you going to do, appeal to the
6     Circuit?
7          You know, but the statement there was an automatic
8     right to an extension is not an accurate statement.  It is an
9     inaccurate statement.
10          I am going to see what Mr. Press does with that
11     when he gets his closing.
12          I think the more relevant point from Mr. Press's
13     point of view is that nobody made any effort to get the Judge
14     to extend it.  That is supported by the record.  That nobody
15     made a motion, nobody asked the Judge, nobody said Judge, we
16     need a week or two to analyze this.
17          Nobody tried, or nobody even tried to use the
18     statute to get an extra number of days.
19          That is relevant.  And that is supported by the
20     record.  It is not supported by the record that it is an
21     automatic right.
22          But on the other hand, I think there is a very
23     credible argument that the filing started the clock going.
24          All right.  Third point.
25          MR. FRAM:  Your Honor, the third point is a little

1    That is what they want you to believe.  Because Roland Wilder

2    testified he wasn't there on April 2.

3            Well, what is missing from that argument is the

4    fact that Roland Wilder flip-flopped three times on whether

5    he was there on April 1 or April 2.  And that was played to

6    you.  And what Mr. Fram played to you was his last testimony

7    where he flip-flopped back saying no, I wasn't there.  I was

8    there on the first, but not on the second.

9            So instead of coming in and trying to convince you

10   that all my clients lied, isn't it more reasonable to think

11   that Mr. Wilder was just confused on the date?  Isn't that

12   more reasonable?

13           You know what I think about it.  But you also have

14   something that was missing.  David Singer, their own witness,

15   testified that Roland Wilder was there on April 2.  Their

16   other pilot witnesses, Rautenberg, he conveniently couldn't

17   recall.  That was his testimony.  So every pilot witness that

18   hit that stand told you that Roland Wilder was there that

19   day.

20           And Roland Wilder, again he went back and forth

21   several times and then finally, the last time he testified it

22   was, no, Roland wasn't there.

23           So let's get back to this list of tools.  Where I

24   left off was funding.

25           The next one I want to talk about is lobbying.  The

on their behalf when it came to this Bond bill.  Remember how
that started, it wasn't ALPA's idea.  It was Matt Comlish's
idea and Ted Case's idea.  By the way, I got a picture of
Ted, in case you forgot him.  He was the first witness to
testify.  He is on a trip and can't testify.  Ted and Matt
came up with that idea on their own.  They went to Senator
Bond and they drafted the legislation themselves, and Senator
Bond introduced this thing.

And they asked for ALPA support over and over
again.  They went to Duane Woerth's office and asked for
support.  Nothing happened.  Except one letter to Senator
Bond.

Writing a letter to the Senator that sponsored the
bill and saying we support this bill, that is silly.  Unless
you think the Senator is going to withdraw the bill.  I mean,
why would you write, it is the other 99 senators that you
should have been writing to, not the guy that sponsored the
bill.  But that is what Duane Woerth did and that is all he
did.

Remember, it went further than that.  Remember Matt
Comlish.  He testified that they had these daily meetings
when they were organizing all these big  groups of pilots to
go out on the Hill and knock on doors and talk to senators
and staffers.

Remember, they had these morning meetings, and Ted

```
 1   people.  And the answer he got was, we haven't heard from

 2   your union.  Mr. Hallisay wasn't doing any work.  That is the

 3   evidence.

 4           Mr. Fram told you yesterday that the bill was going

 5   nowhere.  I guess it is some sort of excuse not to support

 6   it.  It wasn't going anywhere?  What happened to it?  The

 7   Senate unanimously approved that bill.  That was on December

 8   8.

 9           On their own, the TWA pilots got that bill through

10   the Senate.  Then it has to go to Congress -- yeah, it has to

11   go then to the House of Representatives.  What did ALPA do

12   then?  This is P 357.

13           Remember the timing of this.  December 8.  It gets

14   unanimously approved by the Senate.  Four days later,

15   December 12, we have this going on.  Go to the next page,

16   please, will.  This is this business about flight pay loss,

17   where pilots make claims, if they drop a trip, they are not

18   getting paid by their employer, doing union business, the

19   union will pay them for their lost pay.  This is flight pay

20   loss, that is what this is.

21           This is -- this is the flight pay loss claim form

22   submitted by Howard Hollander for legislative work in DC.

23   And that claim got denied.  This is Jalmer Johnson was the

24   testimony.  That is the general manager of ALPA.  Four days

25   after this bill passes the Senate, they start denying flight
```

1    pay loss claims for pilots that want to lobby.

2            Now we got to get through the House of

3    Representatives.  There is five times more representatives

4    than senators.  And they start denying flight pay loss.  Go

5    to the next page.  You can see another example.  Jim Arthur.

6    He is another MEC representative, legislative work in DC.

7    Denied.  Lisa Mauro, legislative work in DC.  Denied.  This

8    is four days after the thing gets passed by the Senate.  I

9    don't think it is a coincidence.

10           And what happened?  The bill died in the House.

11   That is what happened.  So lobbying.

12           What is another tool that ALPA has?  Litigation.

13   Litigation is another thing this union does.

14           They have a whole legal department.  It is headed

15   by a man named Jonathan Cohen.  I want to show you Mr.

16   Cohen's words in a previous example prior to the TWA's pilot

17   problems, this is exhibit 405.

18           Mike Day showed this to you.  This was a memo,

19   March 22, '01 that he sent to the MEC and the negotiating

20   committee and he attached a whole bunch of documents that he

21   had collected from ALPA, that related to past seniority

22   integration.  If you go to the next page, he is talking, here

23   at the bottom, Jonathan Cohen, director of legal.  This is

24   his memo, about the TWA Ozark transaction which was a merger

25   that occurred in mid eighties.  Ozark was a regional carrier

1    president, going to the other group and trying to secure a

2    fair process.  That is their policy, but no, not for the TWA

3    pilots.  To provide funding in several ways through this

4    major contingency fund, and others.  But no, not for the TWA

5    pilots.

6              We have this great lobbying department at your

7    service.  But no, not for the TWA pilots.

8              We have this legal department and we litigate even

9    when the chances are slim.  But no, not for the TWA pilots.

10             We have this affiliation with the 14 million member

11   AFL-CIO which provides much power.  That is at your disposal,

12   but no, not for the TWA pilots.

13             We have a practice in the past and currently as to

14   scabs to keep people we don't like off our jumpseats.  But

15   no, you can't do that, you TWA pilots can't.  And we have

16   this policy of Independence Plus that you are going to make

17   your own decisions.  But no, not for the TWA pilots.

18             That is what we had.  Did ALPA act arbitrarily?  At

19   the end, what we have here is we know that ALPA is very good

20   at supporting a scope waiver.  They are very good at

21   supporting surrender, but they are not so good at -- I

22   shouldn't say that.  But they provided no support for the TWA

23   pilots in the struggle that really mattered.  The struggle

24   for their seniority.  There was no support there.  And that

25   is why we are here.

1   representation when it acts in bad faith.  The Judge will

2   instruct you that you can find that faith in several ways and

3   one of them is when a union acts with hostility towards its

4   members.  Hostility.  If you find that ALPA acted with

5   hostility to the TWA pilots, that can support a finding it

6   breached its duty.

7          Now, was there any evidence of hostility presented

8   to you of ALPA officials acting in a hostile manner towards

9   the TWA pilots?  Well, let's look what happened on March 28.

10  This was a meeting in Dallas, Mike Day's first meeting with

11  the American pilots.  And negotiating seniority.  The

12  negotiations had just begun.  And remember what happened on

13  March 28.  The TWA side made a proposal.  It was basically a

14  modified, I call it modified date of hire.  That was the

15  proposal made on 3/28.  And this was scheduled series of

16  meetings, there was going to be a follow-up meeting the next

17  day, remember?  And what happened?  The TWA pilots went back

18  to their hotel in Dallas after they make their proposal, and

19  they are met with, by Clay Warner, and Bob Christy.  David

20  Holtzman said he was there as well.

21          These guys were not invited.  That was the

22  testimony, of Mike Day.  They were not invited.  They show

23  up.  What did Mike say?  He said I was kind of happy to see

24  them.

25          I knew I would get a good meal, he said.  They did.

1  They went out to eat.  But what happened after the dinner?

2  After the dinner they met back at the hotel and what did Clay

3  Warner and Bob Christie say?  They said you have to make an

4  offer, you got to make an offer that is going to get a deal

5  done and you need to did it now and you need to offer up 825

6  TWA pilots to be stapled.  Remember that?  That is some

7  Independence Plus there.  They are telling them how to

8  negotiate.

9        And they are asking that the TWA pilots make a

10  huge, huge, compromise, right off the bat.  I mean, they made

11  a proposal the other day that had -- -that day, that had not

12  been responded to.  There was already an offer on the table,

13  and these guys come in and say you need to offer up 825.

14        Do you remember what the testimony was from Mike

15  Day and Sean Clarke?  They were outraged.  And this resulted

16  in quite an argument.  They all, Sean and Mike both testified

17  that it was heated.  Very heated.  And lots of yelling.  From

18  Mr. Warner and Mr. Christy.  So is that hostility?  That is

19  again for you to decide.

20        But it didn't end there, the yelling, any way.  By

21  the way, what happened the next day?  The merger committee

22  went in and made an offer, not to staple 825, but 434.

23  Remember that?  And Mike Day testified that that was a

24  horrible, horrible decision that he made, and something that

25  he has regretted ten years later.  That is what he told you.

```
 1   ALPA got it.  It was printed up.  Ms. Toone's computer.  This
 2   talks about quite a few things.  Hello.  This is first
 3   officer Randy Leruth with the hotline message for the LA
 4   domicile on Friday, June 1.   He starts off with "This
 5   message will cover the following topics."  Number 2 is TWA
 6   seniority integration status.
 7           If you go, next page, there is a rather lengthy
 8   email.  But the update does talk about the TWA seniority
 9   integration.  In here it says what?  We want to avoid having
10   an arbitrator or judge decide the seniority integration by
11   date of hire.
12           You can stop right there.
13           Remember Mr. Fram telling you arbitration, you
14   don't know who, we don't know what an arbitrator would do,
15   and of course that is true.  But we do know this, that we
16   know what the American pilots, or at least this American
17   pilot, thought.  We got to avoid that because then there will
18   be date of hire.  We also need to avoid a Judge, a
19   litigation, because we can end up with the same thing.  Mr.
20   Case's litigation that got rejected.  Maybe.  But that is
21   their fear.  Litigation is something that they fear.  At
22   least this pilot did.
23           Go to 147 BB.
24           Okay.  This is Mark Hunnibell writing to Ron
25   Rindfleisch, June 13.  It is a rather, I do want you to read
```

1    the response was, but we do know this, the cards, however

2    many there were, they are not here any more.  Remember Mr.

3    Rosen testified, we asked him what happened to the cards?  I

4    don't know.  Looked everywhere, can't find them.  That was

5    his answer.  Can't find them.  Rindfleisch denied he ever had

6    it in his deposition.  And here is an email that says, hey,

7    those cards I give you last year, I got some more.  Do you

8    want them?

9              Okay.  And then going to 148, I think it is 4 E's,

10   or is it five, 5 E's, 148, 5 E's.  This is the last on this

11   subject here.  This is April 30 of '02.  John:  Thanks, John.

12   John Clark.  To Ron.  Add this to the reimbursement request,

13   please.  He has another receipt.  So he updated ALPA on his

14   receipts and the cards, they are not here.

15             The evidence, there is evidence in this case that

16   ALPA had its hands all over this campaign.

17             And promises go to pay for it.  They are updating

18   on it daily, the American pilots are emailing with John Clark

19   and Mark Hunnibell and others.  ALPA had its hands all over

20   it.

21             Was there a bad faith motive for what ALPA did and

22   didn't do to protect the TWA pilots seniority?  That is again

23   for you to decide.

24             So we talk about arbitrariness, we talked about bad

25   faith.

1          There is one other issue I need to talk to you

2      about and that is the issue of injury.  The Judge will

3      instruct you that you should find that ALPA caused injury to

4      TWA pilots if you believe that but for ALPA's breach, the

5      overall outcome of the seniority integration would have been

6      more favorable to the TWA pilots.  But for ALPA's breach, the

7      integration would have been more favorable.

8          Now, before I get into the evidence on that, I want

9      to talk to you about the burden of proof just a bit.  You

10     will be instructed that should you find a fact that -- that

11     you should -- you will be instructed that you should find a

12     fact as true if you believe it is more likely true than not.

13     No matter how slightly the scale tips in favor on that fact.

14     No matter how slightly, if you believe it is more likely true

15     you need to find it a fact.  That is that instruction.

16         You will also be instructed to use your common

17     sense.  You don't believe that out here.  You take it in with

18     you.

19         So on this injury question, after applying your

20     common sense, you need to determine whether or not plaintiffs

21     proved some injuries.  Well, we proved that the 1,200 TWA

22     pilots got furloughed.  Everyone that got stapled got

23     furloughed.

24         We have to show that ALPA, TWA pilots would have

25     gotten a more favorable integration had ALPA not breached its

1    duty of fair representation.

2             Now, what is the evidence of that?  What is the

3    evidence that there could have been a more favorable

4    integration?  There was direct testimony from Mr. Day about

5    that.  He said I would have expected, I think his testimony,

6    his answer was it would have been reasonable to believe that

7    we would have got a better deal closer to the Tannen proposal

8    had ALPA done the things we asked for and gave us the

9    leverage we needed.

10            Mike Day told you that.  He was the only one in the

11   room with the American side.  ALPA produced nobody in that

12   position.  They give you four witnesses, four lawyers that

13   were completely uninvolved.  Mike Day told you we could have

14   got a better deal.

15            And what is the evidence to support that

16   conclusion?  What is the evidence of it?  It is in the, the

17   proof is in the pudding.  It really is.  The first offer made

18   by the APA was on March 1st and they offered up staple 1,500.

19   About.  Two thirds.

20            They didn't come off that until April 18.  They

21   lowered the staple by 50.  But at least that is movement in

22   the right direction.  They do that every month, we will,

23   after a year we will have a fair deal.  So this is curious,

24   this is after the scope waiver, pilots give up their best

25   leverage and they come back with a better proposal.  It is

1    still obnoxious from the TWA pilots' side, but that is what

2    they did.

3           Now, what happened after that?  They go into this

4    facilitated negotiation process, all throughout the summer,

5    meeting after meeting after meeting.  I don't know how many

6    meetings.  I know it was more than ten, Mike Day testified

7    to.  And throughout that the APA does nothing.  They don't

8    come off this position one iota to out that whole process in

9    the summer.

10          And then after 9-11, a week after 9-11, they write

11   a letter to Mike Day saying we are done.  We are done talking

12   to you, we are going to go to our board, and we are going to

13   do what we want.  At that point, 14, 15, was still the offer.

14   What happened next?  The TWA pilots got involved.  They went

15   to Senator Bond, got him involved.  And Bond announces this

16   bill that would give arbitration to the TWA pilots, had it

17   passed.  That was on October first that that announcement was

18   made.

19          This is just some Senator saying hey, I got this

20   bill, I put on the floor.

21          What happened next?  American pilots come back to

22   the table on their own and say hey, we got a better deal, you

23   are going to love it.  And that better deal, it was better,

24   was Supplement CC.   The staple lowered to 1,200.  And it

25   included in this notion of fencing all the TWA pilots in St.

Louis, which not only kept them all in St. Louis corralled there but it kept American pilots out of St. Louis, which meant they couldn't bid there which was some sort of benefit for the TWA guys.

So on the strength of the TWA pilots doing nothing other than get Senator Bond to introduce some legislation, the American pilots lower the staple by 250, and offer this notion of a fence in St. Louis. That was done with just the leverage of maybe the senator's bill might get passed some day. That was the only leverage. That was all that had changed. What if ALPA had gotten involved and done any of the things, or all of the things, that were requested of it? Litigate, boycott. All of it. Would there have been a better deal? A more favorable deal? Again, that is up to you to decide. But again, you must use your common sense and look at what happened.

If you lower that staple by one pilot, that is injury.

Folks, I am finished. Okay. I am sure you have heard enough. And I am going to sit down now, and the Judge is going to read some instructions to you and we will see you when you get back.

THE COURT: Thank you, Mr. Press. We will take a short break now. About 15 minutes. It is 25 of 11. About ten of 11. Then I will read my charge of the law to you.

# Exhibit S





ALPA 024593

P-3

Mark L. Hunnibell
2611 Long Hill Road
Guilford, CT 06437
Tel: 203-457-9872
Fax: 801-383-5030

December 18, 2001

Mr. Ron Rindfleisch
Air Line Pilots Association
535 Herndon Parkway
Herndon, VA 20170

Ron:

I have attached documents supporting the reimbursement request that I understand John Clark has filed. I cannot presently locate receipts for some of the smaller items that are reflected as incurred by me in the spreadsheet. Still, I have documentation for the "big ticket" items as attached.

1. Copies from microfiche of my three payments to Primadata, Inc. (the printer/mailer who produced and mailed the cover letter and authorization cards). I do not get actual copies of cancelled checks and, if I was provided with a complete "PAID IN FULL" receipt, I cannot find it. These checks, and the accompanying invoice, are the best I have.

2. 5/15/2001 invoice from Primadata, Inc. for the handling and postage for the card mailing. Note that this does not include the amount for the actual printing the letters, envelopes, and authorization cards. That was billed separately for $1,276.94 and I cannot find that invoice, but I do have the cancelled check in that amount, (#6120, 5/22/2001) that includes my memo of the purpose of the check. The balance due on the 5/15/2001 Primadata invoice ($1,462.14) was also paid on 5/22/2001 with my check #6119. The $2,000 reflected on the invoice as "Deposit" was paid on 5/9/2001 with my check #6107.

3. 5/14/2001 USPS certificate of mailing. This was not paid directly by me. The amount was included in the invoice from Primadata, Inc.

4. Copy of the room charges ($114.25) applied to my credit card on 7/23/2001. The total charge was actually split between John Clark and myself (which is why is still shows a balance due identical to what I had charged on my card). John will no doubt be submitting the other half of this expense.

5. Ten (10) e-mail notices of setup and billing for the aa-alpa.org web site. These costs continue to be billed monthly to my personal credit card. The invoices may be a little hard to follow, but the charges I incurred were $84.44 for initial setup and the first 6 months, plus $10 per month after that ($50), plus $25 on 12/4/2001 to re-register the domain (Total: $159.44).

I believe the total expenses reflected above ($5,012.77) substantially exceed the amount for which I am seeking reimbursement. Please let me know if you need more information.

Sincerely,

Mark Hunnibell

MARK L. HUNNIBELL AND
LAURA S. HUNNIBELL
203-457-9872
2611 LONG HILL RD.
GUILFORD, CT 06437

ALLIED PILOTS ASSOCIATION
FEDERAL CREDIT UNION
387 SHUMAN BLVD., SUITE 380E
NAPERVILLE, IL 60563-8453

6119

70-3321/719

5/22/2001

PAY TO THE
ORDER OF   Primadata                                             $ **1,462.14

One Thousand Four Hundred Sixty-Two and 14/100************************   DOLLARS

Primadata
1228 West Scyene Road
Suite 130
Mesquite, TX 75149-3127

MEMO   Mail Services & Postage 151 44

⑈006119⑈ ⑈071993214⑈        847202⑈    ⑈0000146214⑈

Acct: 847202    Check #: 6119
Amt: $1,462.14    Date: 05-31-2001

0710-0002388630
050335739 C200 0090007205E
050335739 05-31-01
050335739-1532-1409

071000013
BANK ONE
05/31/01
07301294

Sequence #: 2388630

ALPA 024595

MARK L. HUNNIBELL AND
LAURA S. HUNNIBELL
203-457-9872
2611 LONG HILL RD.
GUILFORD, CT 06437

ALLIED PILOTS ASSOCIATION
FEDERAL CREDIT UNION
387 SHUMAN BLVD., SUITE 350E
NAPERVILLE, IL 60563-8453

6120

70-9321/719

5/22/2001

PAY TO THE
ORDER OF   Primadata                                          $ **1,276.94

One Thousand Two Hundred Seventy-Six and 94/100********************  DOLLARS

Primadata
1228 West Scyene Road
Suite 130
Mesquite, TX 75149-3127

Postcard/Env/Letter   15142
MEMO

⑈006120⑈ ⑆071993214⑆ 847202⑈ ⑈000012694⑈

Acct: 847202    Check #: 6120
Amt: $1,276.94    Date: 05-31-2001

Sequence #: 2388628

ALPA 024596

MARK L. HUNNIBELL AND
LAURA S. HUNNIBELL
203-457-9872
2611 LONG HILL RD.
GUILFORD, CT · 06437

ALLIED PILOTS ASSOCIATION
FEDERAL CREDIT UNION
367 SHUMAN BLVD., SUITE 3836
NAPERVILLE, IL · 62563-8453

6107

70-5321/719

5/9/2001

PAY TO THE ORDER OF ___ Primadata ___ $ **2,000.00

Two Thousand and 00/100************************************************ DOLLARS

Primadata
1228 West Scyene Road
Suite 130
Mesquite, TX 75149-3127

MEMO ___ Mark Hunnibell for Vice Presiden ___

⑈006107⑈ ⑆071993214⑆ 847202⑈ ⑆0000200000⑈

Acct: 847202    Check #: 6107
Amt: $2,000.00    Date: 05-14-2001

FOR DEPOSIT ONLY
PRIMADATA, INC.
9500006912

0002357512
05/14/2001

0710-0030-1
060641632  0710-0030-1
060641632  05-14-01
060641632  1753 1293 04 06 110

071000013
05/13/01

07866382

Sequence #: 2357512

ALPA 024597

# Primadata, Inc.

1228 Scyene Road, Suite 134
Mesquite, Texas 75149-3128
(972) 216-9910

**Invoice**

| | |
|---|---|
| Invoice Number: | 15144 |
| Invoice Date: | 05/15/01 |

Sold To:

Hunnibel For Vice President
2611 Long Hill Road
Guilford, CT 06437-3616

Attn:   Mark

Ship To:

Mesquite PO

| | | | |
|---|---|---|---|
| Delivered Via: | Mesquite PO | P.O. Number: | Mark |
| Delivery Date: | 05/14/01 | P.O. Date: | |
| Terms: | Net 10 | Salesperson: | PDI |

| Quantity | Description | Price |
|---|---|---|
| 11091 | **MAIL SERVICES** **HUNNIBELL FOR VICE PRESIDENT** (Data Conversion-E Mail, Data Hygiene, Address Corrections, De Dupe, Ink Jet Envelope, Fold Letter, Insert 2 Pieces, Seal, Zip Sort, Sleeve & Strap Trays, Deliver To Mesquite PO, UPS Overs To Mark) | 1332.56 |
| 11091 | POSTAGE .   POSTAGE SAVINGS $643.98 (Presorted STD--Automated) | 2129.58 |

| | | |
|---|---|---|
| | Subtotal: | 3462.14 |
| | Tax: | |
| Past 30 days subject to 1.50% interest (18% A.P.R.) | Deposit: | 2000.00 |

*Thank You for your business!*

| | | |
|---|---|---|
| Total: | $ | 1462.14 |

ALPA 024598

```
05/24/2001  04:12    9722169904              PRIMADATA, INC.                    PAGE 01
                          POSTAL SERVICE PERMIT SYSTEM   TRANS# 200113415200/00M1
  3602          STATEMENT OF MAILING/3607 WEIGHING AND DISPATCH CERTIFICATE
```

| | |
|---|---|
| STATION OR UNIT: MESQUITE MAIN POST OFFICE | COMPANY PERMIT USED: Y |
| FINANCE NUMBER : 48-5860 | PERMIT NO: 00072 |

```
            PRIMADATA INC
            1228 W SCYENE RD STE 134
            MESQUITE  TX 75149-3128              DUPLICATE
```

| DATE OF MAILING | CLASS | PROC CAT | TYPE |
|---|---|---|---|
| 05/14/01 | STANDARD | LETTERS | BULK REGULAR |

| WEIGHT OF SINGLE PIECE (LBS) | TOTAL PIECES | TOTAL POUNDS |
|---|---|---|
| 0.0300 | 11,082 | 332.4600 |

```
MAILED: FOR
PERMIT NO. 80646
NAME: MARK HUNNIBEL

CONTAINERS
    64                                    RECEIVED MAY 16 2001

NBRVP:
    ERRORS:   0.00%
                              AFFIXED POSTAGE:
                              AMOUNT FROM TRUST:        $2,126.52
```

```
    I CERTIFY that this mailing has been inspected concerning:
    1)eligibility for the rate of postage claimed; 2)proper preparation
    (and presort where required); 3)proper completion of the statement of
    mailing; and 4)payment of the required annual fee.
```

```
  ROUND STAMP REQUIRED                    ROUND STAMP REQUIRED
  TIME____ AM / PM                        TIME____ AM / PM


  SIGNATURE OF WEIGHER                    RECEIVED FOR PROCESSING BY

COMMENTS:                          REMAINING ON DEPOSIT:       $7.39
                                              CLK INIT: DJE
```

ALPA 024599

**mark@hunnibell.net**

| | |
|---|---|
| **From:** | Minerva Technical Support [support@minerva.net] |
| **Sent:** | Saturday, January 27, 2001 12:19 PM |
| **To:** | mark@hunnibell.net |
| **Subject:** | New Domain Information |

Hello Mark,

Thank you for choosing Minerva Network Systems as your Internet Solutions Provider. We are pleased to inform you that your order has been processed. The following information will grant access to your account:

Company Name: Alpa Now
Contact Name: Mark Hunnibell
Contact Phone Number: 203-457-9872

Domain Name: aa-alpa.org
IP Address: 206.239.54.14

FTP Username: alpanow
FTP Password: #######

Home Page or Start file: index.html

Please review the technical information above and let us know if any changes are necessary.

If you require an email(s) account for your website (example: yourname@yourdomain.com) or if you have any additional technical questions or concerns, please contact support@minerva.net or reply to this email.

For all other inquiries or account changes, please contact the following:

Technical Support:
support@minerva.net
1.888.667.7231 ext. 1
703.263.3300

Sales Issues:
sales@minerva.net
1.888.667.7231 ext. 2
703.263.2200

Billing Issues:
billing@minerva.net
1.888.667.7231 ext. 3
703.263.0796 ext. 3


You may also visit our website for additional information at www.minerva.net. Thank you for choosing Minerva.

Geoffrey Watson
Minerva Technical Support

1

ALPA 024601

**mark@hunnibell.net**

| | |
|---|---|
| **From:** | billing@minerva.net |
| **Sent:** | Tuesday, January 30, 2001 7:49 PM |
| **Subject:** | Periodic Billing Order 1163-1 Submitted |

```
Periodic Billing Order
Order # 1163-1 Submitted

Amount: 10.00
Tax: 0.00
Shipping: 0.00
Customer: mark hunnibell
Company: Minerva Network Systems
Address: 2611 Long hill Rd

City:  Guilford
State: CT
Country: US
Zip: 06437
-------------------------------
   Periodic Billing Information
Startdate: 2001/07/03
Periodicity: m1
Installments: 99
Threshold: 3
Comments:
```

1

ALPA 024602

**mark@hunnibell.net**

| | |
|---|---|
| From: | MNS Accounts & Billing [billing@minerva.net] |
| Sent: | Wednesday, February 07, 2001 4:41 PM |
| To: | mark@hunnibell.net |
| Subject: | Bill 2/6/01 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT 06437

CUSTOMER ID                MNS-394

ACCOUNT STATUS

Previous Balance           $0.00
Payments                   $84.44 CR
Adjustments                $0.00
Current Charges            $84.44

CURRENT BALANCE            $0.00

BILL NUMBER                932
BILL DATE             Feb 6, 2001
DUE DATE             Mar 8, 2001

Your account is current. Do not send payment.

------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231.

------------------------------------------------------------

PAYMENTS

| Date | Description | Amount |
|---|---|---|
| Jan 30 | Credit Card Payment MC | $84.44 CR |
| | TOTAL PAYMENTS | $84.44 CR |

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Jan 25 | Set up fee | $35.00 |
| | Set-Up Fees | $10.00 |
| | Additional Services  Domain Registration | $25.00 |
| Jan 30 | Basic Account 6 month pre-pay: MNS-394-1  (Jan 25 - Jun 3 | $49.44 |
| | 6 Month Fee with 5% discount: (86.74% of $57.00) | $49.44 |
| | TOTAL CURRENT CHARGES | $84.44 |

1

ALPA 024603

**mark@hunnibell.net**

| | |
|---|---|
| From: | billing@minerva.net |
| Sent: | Monday, July 02, 2001 10:32 AM |
| To: | mark@hunnibell.net |
| Subject: | Bill 07/02/2001 |

```
MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437


CUSTOMER ID              MNS-394

ACCOUNT STATUS

Previous Balance              $0.00
Payments                      $0.00
Adjustments                   $0.00
Current Charges              $44.13

TOTAL AMOUNT DUE             $44.13

BILL NUMBER                    2691
BILL DATE              Jul 2, 2001
DUE DATE               Aug 1, 2001

The total amount due will be automatically charged
to your credit card.  Do not send payment.

------------------------------------------------------------

Thank you for your business!

For Customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

------------------------------------------------------------

CURRENT CHARGES

Date   Description                                         Amount
------------------------------------------------------------
Jul 2  Basic account 6 month pre pay: MNS-394-1  (Jul 1 - Jul 24  $44.13
       ------------------------------------------------------------
       Monthly Fee: (77.42% of 57)                          $44.13
       ------------------------------------------------------------
              TOTAL CURRENT CHARGES                          $44.13
```

ALPA 024604

mark@hunnibell.net

From:           billing@minerva.net
Sent:           Wednesday, August 01, 2001 3:27 PM
To:             mark@hunnibell.net
Subject:        Bill 08/01/2001


MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell.
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437


CUSTOMER ID                MNS-394

ACCOUNT STATUS

Previous Balance           $10.00
Payments                    $0.00
Adjustments                 $0.00
Current Charges             $0.00

TOTAL AMOUNT DUE           $10.00

BILL NUMBER                  3032
BILL DATE               Aug 1, 2001
DUE DATE               Aug 31, 2001

The total amount due will be automatically charged
to your credit card.  Do not send payment.

------------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

------------------------------------------------------------------------

1

ALPA 024605

**mark@hunnibell.net**

From:           billing@minerva.net
Sent:           Friday, August 31, 2001 1:38 PM
To:             mark@hunnibell.net
Subject:        Bill 8/31/01


MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437


CUSTOMER ID              MNS-394

ACCOUNT STATUS

Previous Balance         $10.00
Payments                 $10.00 CR
Adjustments              $0.00
Current Charges          $10.00

TOTAL AMOUNT DUE         $10.00

BILL NUMBER                  3351
BILL DATE                Aug 31, 2001
DUE DATE                 Sep 30, 2001

The total amount due will be automatically charged
to your credit card.  Do not send payment.

--------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

--------------------------------------------------------------


PAYMENTS

| Date  | Description            | Amount     |
|-------|------------------------|------------|
| Aug 3 | Credit Card Payment M  | $10.00 CR  |
|       | TOTAL PAYMENTS         | $10.00 CR  |

CURRENT CHARGES

| Date   | Description                                        | Amount  |
|--------|----------------------------------------------------|---------|
| Aug 31 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00  |
|        | Monthly Fee                                        | $10.00  |
|        | TOTAL CURRENT CHARGES                              | $10.00  |

1

ALPA 024606

**mark@hunnibell.net**

From:           billing@minerva.net
Sent:           Monday, October 01, 2001 1:01 PM
To:             mark@hunnibell.net
Subject:        Bill 10/1/01


MINERVA NETWORK SYSTEMS, INC.


Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437


CUSTOMER ID              MNS-394

ACCOUNT STATUS

Previous Balance         $10.00
Payments                 $10.00 CR
Adjustments               $0.00
Current Charges          $10.00

TOTAL AMOUNT DUE         $10.00

BILL NUMBER                3673
BILL DATE           Oct 1, 2001
DUE DATE           Oct 31, 2001

The total amount due will be automatically charged
to your credit card.  Do not send payment.

-------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

-------------------------------------------------------------

PAYMENTS

| Date | Description | Amount |
|------|-------------|--------|
| Sep 4 | Credit Card Payment | $10.00 CR |
| | TOTAL PAYMENTS | $10.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|------|-------------|--------|
| Oct 1 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 |
| | Monthly Fee | $10.00 |
| | TOTAL CURRENT CHARGES | $10.00 |

1

ALPA 024607

**mark@hunnibell.net**

| | |
|---|---|
| From: | billing@minerva.net |
| Sent: | Thursday, November 01, 2001 3:13 PM |
| To: | mark@hunnibell.net |
| Subject: | Bill 11/1/01 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437

CUSTOMER ID                 MNS-394

ACCOUNT STATUS

Previous Balance            $10.00
Payments                    $35.00 CR
Adjustments                 $0.00
Current Charges             $35.00

TOTAL AMOUNT DUE            $10.00

BILL NUMBER                 4005
BILL DATE                   Nov 1, 2001
DUE DATE                    Dec 1, 2001

The total amount due will be automatically charged
to your credit card.  Do not send payment.

------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

------------------------------------------------------------

PAYMENTS

| Date | Description | Amount |
|---|---|---|
| Oct 3 | Credit Card Payment m | $10.00 CR |
| Oct 3 | Credit Card Payment M | $25.00 CR |
| | TOTAL PAYMENTS | $35.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Oct 3 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $0.00 |
| | Monthly Fees (93.55% of $10.00) | $9.35 |
| | Discount: 100% | $9.35 CR |
| Oct 3 | Set up Domain and Registration for 1 year: MNS-394-4 | $25.00 |
| | Set up Domain and Registration for 1 year | $25.00 |
| Oct 31 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 |
| | Monthly Fee | $10.00 |
| | TOTAL CURRENT CHARGES | $35.00 |

1

ALPA 024608



# THE
# WASHINGTON COURT
# HOTEL
◆ ON CAPITOL HILL ◆

A Harbaugh Hotel

525 NEW JERSEY AVE., N.W., WASHINGTON, D.C. 20001   202-628-2100   FAX: 202-879-7918

CLARK, JOHN
AIR LINE PILOTS ASSN

| | |
|---|---|
| ARRIVAL | 7/22/01 |
| DEPARTURE | 7/23/01 |
| NO. IN PARTY | 2 |
| RATE | 169.00 |

CC#: _____7029   Exp: 06/03

ACCOUNT NO.   403115    ROOM NO.   1008

| NO. | DATE | DESCRIPTION | | | | | AMOUNT |
|---|---|---|---|---|---|---|---|
| | A-STANDARD | | | | | | |
| | 7/22/01 | LOCAL PHONE | 1008 | 7220072001 | 23:55 | 5470421 | $1.00 |
| | 7/22/01 | ROOM CHARGE | 1008 | 12 | | KINKOS | $169.00 |
| | 7/22/01 | ROOM TAX | 1008 | 13 | | | $24.51 |
| | 7/23/01 | LONG DISTANCE PHONE | 1008 | 7230139002 | 10:06 | 8003231470 | $1.00 |
| | 7/23/01 | CAFE & GRILL | 1008 | 1538 | 10:48 | APA | $32.99 |
| | 7/23/01 | MASTERCARD | 1008 | 5602824 | | 7029 | $114.25CR |

* BALANCE DUE *   $114.25

7029

1008

MARK L HUNNIBELL

06/03

072201   5602824

PURCHASER'S SIGNATURE

TYPE OF CREDIT CARD
MC   AX   DISCVR
VISA   DC   OTHER

CUSTOMER COPY
IMPORTANT:
RETAIN THIS COPY FOR YOUR RECORDS.

STREET

CITY                STATE          ZIP CODE

Regardless of charge instructions, I acknowledge the
above as personal indebtedness.

GUEST SIGNATURE _____

ALPA 024600

**mark@hunnibell.net**

From:         billing@minerva.net
Sent:         Friday, November 30, 2001 12:42 PM
To:           mark@hunnibell.net
Subject:      Bill 11/30/01

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437

CUSTOMER ID                MNS-394

ACCOUNT STATUS

Previous Balance           $10.00
Payments                   $10.00 CR
Adjustments                 $0.00
Current Charges            $10.00

TOTAL AMOUNT DUE           $10.00

BILL NUMBER                  4344
BILL DATE             Nov 30, 2001
DUE DATE              Dec 30, 2001

The total amount due will be automatically charged
to your credit card.  Do not send payment.

-----------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

-----------------------------------------------------------------------

PAYMENTS

| Date | Description | Amount |
|------|-------------|--------|
| Nov 29 | Credit Card Payment mc | $10.00 CR |
| | TOTAL PAYMENTS | $10.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|------|-------------|--------|
| Nov 30 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 |
| | Monthly Fee | $10.00 |
| | TOTAL CURRENT CHARGES | $10.00 |

1

ALPA 024609

**mark@hunnibell.net**

| | |
|---|---|
| **From:** | billing@minerva.net |
| **Sent:** | Tuesday, December 04, 2001 4:50 PM |
| **To:** | mark@hunnibell.net |
| **Subject:** | Bill 12/4/01 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437

| CUSTOMER ID | MNS-394 |
|---|---|

ACCOUNT STATUS

| | |
|---|---|
| Previous Balance | $10.00 |
| Payments | $35.00 CR |
| Adjustments | $0.00 |
| Current Charges | $25.00 |
| CURRENT BALANCE | $0.00 |

| | |
|---|---|
| BILL NUMBER | 4475 |
| BILL DATE | Dec 4, 2001 |
| DUE DATE | Jan 3, 2002 |

Your account is current.  Do not send payment.

------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

------------------------------------------------------------------

PAYMENTS

| Date | Description | Amount |
|---|---|---|
| Dec 4 | Credit Card Payment mc | $10.00 CR |
| Dec 4 | Credit Card Payment mc | $25.00 CR |
| | TOTAL PAYMENTS | $35.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Dec 4 | Set up Domain and Registration for 1 year: MNS-394-S | $25.00 |
| | Set up Domain and Registration for 1 year | $25.00 |
| | TOTAL CURRENT CHARGES | $25.00 |

1

ALPA 024610

to Paris Hotel

Trip to LAS on 12/05/01

LS TRANSPORTATION
CALL AHEAD
#RS.FOR RESERVATION
702-740-4050

KET # #7.50
-TRP STRP        7.50
AL               7.50
CPD          7.50
H            7.50
T RESPONSIBLE FOR
MISSED FLIGHTS
RK3         NO.605316
.05.WED 13:14    #01-1

YELLOW-CHECKER-STAR
"THE" CAB COMPANIES
Las Vegas, Nevada
873-2227
COMPUTER RADIO DISPATCHED

DRIVER#_____ DATE 12/05/01
(CHARGE THE ACCT. OF)
(RECEIVED OF)_____
FOR TAXI FARE FROM  Paris Hotel
TO  LAS Airport
(X) DRIVER NAME_____
(X) PASSENGER SIGNATURE_____
AMOUNT $ 15.00

LAX-CPCS
ENTRY 13  12-05-01 17:22
EXIT 16  12-05-01 17:22
ID NO 118   FEE $ 15.00
LP# NV 8184   SEQ 2919

ALPA 024611

Corresponds to spread sheet

ALPA 024612

---

**OFFICE DEPOT**
1700 ROSECRANS AVE.
MANHATTAN BEACH, CA 90266
310-536-9969

Employee 210160    06/07/01 17:01
Store #0967  Reg #002 Tran #8889
SALE          POS Version 4.07
78787044625  GUIDE,CARD,A        3.49
            MFG.LGHT $ 5.80
71691J8977   BX,SHOE,1.50        5.56
            4 @      1.39
            MFG.LIST $ 2.49
                   SUBTOTAL      9.05
CA 8% SALES TAX                   .72
                   TOTAL         9.77

CASH                            10.77
CHANGE                           1.00

Try our COPY CENTER for
Printing and Copying Services

---

Visit our Web Site at: www.MBE.COM
Postal transactions may have received a handling fee.

Change:        6.40
Cash:         20.00
Total Sale:   13.60
Tax:           0.00
Sub Total:    13.60

| Qty | Description | Unit | Ext |
|-----|-------------|------|-----|
| 2 | Stamps | 6.80 | 13.60 |

Center #3289
2110 ARTESIA BLVD #B
REDONDO BEACH, CA 90278
Phone 310 318 3000
Shift:0168 Drv:01 ID:1220 Clerk:Amy
7/14/01                     17:10:58
****************************************
Mail Boxes Etc. SALE
Making Business Easier... Worldwide.
****************************************

---

EL SEGUNDO MAIN PO
EL SEGUNDO California
(310)322-7238
07/15/2001          01:40:08 PM

| Product Description | Sales Receipt Qty | Sale Unit Price | Final Price |
|----|----|----|----|
| $6.80 Status of Liberty PSA Bk | 1 | $6.80 | $6.80 |
| $6.80 Apple & Orange PSA Bk | 1 | $6.80 | $6.80 |

Total:                      $13.60

Paid by:
Cash                        $13.60

For information on current postage
rates, visit our web site at
www.usps.com
Bill#: 1000400300173
Clerk: 10

Thank you for your business

---

**Taxi Cab Receipts**

DATE: 7/23/01   TIME: 11:00 PM
TRIP ORIGIN: Washington Court Hotel
DESTINATION: Dulles
FARE $ 10.00
SIGNATURE

---

**RECEIPT**                 No. 241668
DATE 5/4/01
FROM John B Clark Jr
                              DOLLARS
FOR RENT  Box 215
ACCT 66    CASH
           CHECK    FROM 5/4/01 TO 9/4/01
DUE                 BY  Mel

ALPA 024612

*Corresponds to spreadsheet*

Kinko's                 (202) 547-0421
317 PENNSYLVANIA AVE SOUTHEAST
WASHINGTON,      DC 20003

| QTY/LIST | DISC | PRICE | AMOUNT |
|----------|------|-------|--------|
| 3        | Office SUPPLIES |  |  |
| 0.69     | 0.00 | 0.69  | 2.07 |
| 38       | PC SS WRK STATION TIME/MIN |  |  |
| 0.20     | 0.00 | 0.20  | 7.60 |
| 19       | COMP RENT LTR.LGL. B&W PRNT |  |  |
| 0.49     | 0.00 | 0.49  | 9.31 |
| 13       | ES COLOR S/S LTR, LGL. |  |  |
| 1.00     | 0.00 | 1.00  | 13.00 |

| SUB | 31.98 | TX | 1.84 | TOT | 33.82 |
|-----|-------|----|------|-----|-------|
|     |       |    | MasterCard |  | 33.82 |
|     |       |    | CHG |  | 0.00 |

XXXXXXXXXXXXX465A 06/02 AP00S9445
I agree to pay the above amount
cording to the card issuer agreement.
Sign Here: X _____

CW4910 TK   A40118 RG 3A 97/23/01 01:20
Visit us @ http://www.kinkos.com

———  Thank  ———

Postal transactions may have received a
handling fee.

Visit our Web Site at: WWW.HBE.COM

*********** SALE ***********
Mail Boxes Etc.
Making Business Easier.. Worldwide
Center #3289
2110 ARTESIA BLVD #B
REDONDO BEACH, CA 90278
Phone 310 318 3000
Shift:0141 Drw:01 ID:1401 Clerk:Amy
5/16/01                          17:03:57

| Qty | Description | Unit | Ext |
|-----|-------------|------|-----|
| 1 Mailbox Service | | 5.00 | 5.00 |

Sub Total:         5.00
Total Sale:        5.00
Cash:              5.00
Change:            0.00

05/04/2001                    08:05:16 PM

USPS, REDONDO BEACH MAIN
REDONDO BEACH, California
902779998
(310)376-3252

Sales Receipt

| Product | Sale | Unit | Final |
|---------|------|------|-------|
| Description | Qty | Price | Price |

Business Reply Mail
Account Number:    100000000000019
Customer Name:     ALPA REPRESENTATION CAMPA
IGN                JOHN CLARK
                   3616 A THE STRAND
Address:
Amount of Deposit:              $60.00
Annual Fee:                    $125.00
Accounting Fee:                $375.00

Total:                         $500.00

Paid by:
Check            4146205
                               $500.00

Bill#: 1000300029904
Clerk: 14

SUSAN M WILSON

---

USPS, REDONDO BEACH MAIN
REDONDO BEACH, California
902779998
05/15/2001   (310)376-3252   04:31:35 PM

Sales Receipt

| Product | Sale | Unit | Final |
|---------|------|------|-------|
| Description | Qty | Price | Price |

Business Reply Mail
Account Number:    25
Customer Name:     ALPA REPRESENTATION CAMP
AIGN               JOHN

Address:
Amount of Deposit:              $500.00

Total:                          $500.00

Paid by:
Check            4146205
                                $500.00

ALPA 024613

RECE...
FOR RENT...
DOLLARS
PO Box 215

Corresponds to spread sheet



```
        MAIN OFFICE  USPS
      MANHATTAN BEACH, California
             902669998
06/02/2001    (310)937-9569      01:57:31 PM

----------- Sales Receipt -----------
Product        Sale   Unit        Final
Description     Qty   Price        Price

INCLINE VILLAGE NV 89451          $0.76
First-Class
                                ---------
              Issue PVI:          $0.76

INCLINE VILLAGE NV 89451          $0.76
First-Class
                                ---------
              Issue PVI:          $0.76

INCLINE VILLAGE NV 89451          $0.76
First-Class
                                ---------
              Issue PVI:          $0.76

TUSTIN CA 92780                   $0.76
First-Class
   Return Receipt                 $1.50
   Certified                      $1.90
   Label Serial #: 70001530000283528118
                                ---------
              Issue PVI:          $4.16

$6.80 Flowers   1   $6.80         $6.80
PSA Bk
                                ---------
Total:                          $13.24

Paid by:
Cash                            $15.00
Change Due:                     -$1.76

NetPost Mailing Online lets you send
your mailings right from your computer!
It's quick, easy and online at
www.usps.com.
Bill#: 1000600743131
Clerk: 16

----- Thank you for your business -----
```

ALPA 024614



# THE
# WASHINGTON COURT
# HOTEL
◆ ON CAPITOL HILL ◆
A Harbaugh Hotel

525 NEW JERSEY AVE., N.W., WASHINGTON, D.C. 20001   202-628-2100   FAX: 202-879-7918

CLARK, JOHN
AIR LINE PILOTS ASSN

½ hotel stay in DCA



ARRIVAL      7/22/01
DEPARTURE    7/23/01
NO IN PARTY  2
RATE         169.00
CC#:  5471211540017029    Exp: 06/03

ACCOUNT NO.  403115    ROOM NO.  1008



| NO. | DATE | | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| | 7/22/01 | 1008 | | |
| | 7/22/01 | 1008 | ROOM CHARGE | 169.00 |
| | 7/22/01 | 1008 | ROOM TAX | $24.53 |
| | 7/23/01 | 1008 | LONG DISTANCE PHONE | $1.00 |
| | 7/23/01 | 1008 | CAFE & GRILLE | $31.95 |
| | 7/23/01 | 1008 | MASTERCARD | $114.25CR |
| | 7/23/01 | 1008 | MASTERCARD | $114.25CR |
| | | | BALANCE DUE | $.00 |

ALPA 024615

# Exhibit T

# AIR LINE PILOTS ASSOCIATION
## FAX COVER PAGE

DATE: _12/12/01_

TO: _Bob Pastore, Ted Case, Kevin Dillon (@ Va #)_

PHONE: _____ FAX: _____

FROM: _Talmer Johnson_

PHONE: _____ FAX: _(703) 689-4356_

SUBJECT: _____

TRANSMITTAL FORM PLUS _3_ PAGE(S)

MESSAGE:

P-357

P00534

## TRANS WORLD AIRLINES PILOTS MASTER EXECUTVE COUNCIL

**MEC OFFICERS**
*Robert A. Pastore*
  Chairman
*John S. Hafley*
  Vice Chairman
*Theodore A. Case*
  Secretary/Treasurer



**Air Line Pilots Association**
*FACSIMILE*

---

**DATE:**                December 12, 2001

**TO:**                  Jaimer Johnson
**LOCATION**             703-689-4356

**FROM**                 Ted Case
**LOCATION**             314/770-8510 (Fax)
                         314/770-8500 (Phone)

**PAGE(s)**              1

---

Please review the following flight pay loss/union business for approval:

| Name | Date | Project | Hours | Purpose |
|------|------|---------|-------|---------|
| Hollander, Howard LEC Rep | 12/13/01-12/14/01 | 70083 | 5:00 | Ongoing seniority integration issues and legislative work in DC |

*Denied*  12/12/01

*This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone. Thank you.*

## TRANS WORLD AIRLINES PILOTS MASTER EXECUTVE COUNCIL

**MEC OFFICERS**
*Robert A. Pastore*
Chairman
*Keith O'Leary*
Vice Chairman

Secretary/Treasurer

**Air Line Pilots Association**
*FACSIMILE*

| | |
|---|---|
| **DATE:** | December 10, 2001 |
| **TO:** **LOCATION** | Jalmer Johnson 703-689-4356 |
| **FROM** **LOCATION** | Bob Pastore 314/770-8510 (Fax) 314/770-8500 (Phone) |
| **PAGE(s)** | 1 |

Please review the following flight pay loss/union business for approval:

| Name | Date | Project | Hours | Purpose |
|---|---|---|---|---|
| Arthur, Jim LEC Rep | 12/12/01-12/14/01 | 70024 | 7:30 | Legislative work in DC Per Pastore & Woerth |
| Mauro, Lisa Legislative Committee | 12/12/01-12/14/01 | 70024 | 18:42 | Legislative work in DC Per Pastore & Woerth |

12/12/01

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone. Thank you.

P00532

# TRANS WORLD AIRLINES PILOTS MASTER EXECUTVE COUNCIL

**MEC OFFICERS**
**Robert A. Pastore**
*Chairman*
**John S. Hefley**
*Vice Chairman*
**Theodore A. Case**
*Secretary/Treasurer*



**Air Line Pilots Association**
*FACSIMILE*

---

**DATE:**       December 12, 2001

**TO:**         Jaimer Johnson
**LOCATION**    703-689-4356

**FROM**        Ted Case
**LOCATION**    314/770-8510 (Fax)
                314/770-8500 (Phone)

**PAGE(s)**     1

---

**Please review the following flight pay loss/union business for approval:**

| Name | Date | Project | Hours | Purpose |
|---|---|---|---|---|
| ① Cutler, Larry<br>Gov't Affairs Comm | 12/13/01-<br>12/15/01 | 70024 | 7:30 | Ongoing legislative work<br>MEC office |
| ② Darnall, Jeff<br>Vice Chairman<br>Communications Comm | 12/16/01-<br>12/19/01 | 70018 | 10:00 | Ongoing communication<br>projects, Contract<br>Education |
| ③ Vasser, Ron<br>Gov't Affairs Comm | 12/13/01-<br>12/15/01 | 70024 | 15:00 | Ongoing legislative work in<br>DC |

① Denied
② OK
③ Denied            12/12/01

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone. Thank you.

P00533

# Exhibit U



**TWA MEC SPECIAL MEETING**
**APRIL 2, 2001**
**ST. LOUIS, MO**

**COMPILATION OF ACTIONS**

**Resolution #01-64 by S. Rautenberg/P. Lewin**

WHEREAS the Negotiating Committee reports that it has negotiated to the best offer available from TWA and American for a collective bargaining agreement applicable to TWA LLC on all issues except Scope, subject to minor clarifications on a handful of matters; and

WHEREAS TWA has filed a motion under § 1113 of the Bankruptcy Code to reject the current ALPA collective bargaining agreement, which will be considered April 6, 2001; and

WHEREAS the MEC has considered extensive advice from its bankruptcy counsel (Steve Tumblin and Richard Seltzer), merger counsel (Roland Wilder), investment advisor (Michael Glanzer) and former ALPA President Randy Babbitt, as well from ALPA staff in the Representation Department (Bill Roberts and David Holtzman),  Legal Department (Clay Warner), and Economic and Financial Analysis Department (Bob Christy), now

**THEREFORE BE IT RESOLVED that the Negotiating Committee is directed to seek clarification immediately on all outstanding issues arising from the proposed agreement covering the operations of TWA LLC (the "LLC CBA") and to finalize the LLC CBA, and**

**BE IT FURTHER RESOLVED that bankruptcy counsel is directed to take steps that would insure that the LLC CBA is incorporated in court documents resolving the § 1113 motion, and**

**BE IT FURTHER RESOLVED that no later than April 5, 2001, the Master Chairman, or his designee, is directed to execute the LLC CBA and forward the LLC CBA immediately to ALPA President Duane Woerth for his signature, and to waive those provisions of the current ALPA-TWA collective bargaining agreement that must be waived as a condition to the closing of the Asset Purchase Agreement, and**

**BE IT FURTHER RESOLVED that the Merger Committee, with the assistance of the MEC Officers and advisors, is directed to take all appropriate actions, including efforts to negotiate with the Allied Pilots Association concerning seniority integration, and**

**BE IT FURTHER RESOLVED that the Master Chairman does not release this motion until advised by the Communications Committee Chairman.**

PASSED roll call vote
(Hollander requested roll call vote)
FOR:  1501  AGAINST: 450  ABSTAIN: 0
FOR:
Hollander, Council #2:          55
Singer, Council #2:            142
Rautenberg, Council #3:        724
Young, Council #3:             400          **ALPA 006209**

**TWA MEC SPECIAL MEETING**
**APRIL 2, 2001**
**ST. LOUIS, MO**

**COMPILATION OF ACTIONS**

| | |
|---|---|
| Lewin, Council #4: | 90 |
| Altman, Council #4: | 90 |
| **AGAINST:** | |
| Hollander, Council #2: | 180 |
| Singer, Council #2: | 65 |
| Young, Council #3: | 205 |

ALPA 006210

# Exhibit V

EXHIBIT
**D050**

**Air Line Pilots Association**
**General Manager's Office**
**535 Herndon Parkway**
**Herndon, VA  20170**
**703-689-4306**
**703-689-4356 (FAX)**



# Fax

| To: | Suzi Menoni | | From: | Jaimer Johnson |
|-----|-------------|---|-------|----------------|
| **Fax:** | 314-770-8510 | | **Pages:** | 3 |
| **Phone:** | | | **Date:** | 8/29/2001 |
| **Re:** | | | **CC:** | |

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

**Suzi,**

**Please make sure the attached letter gets to Bob Pastore.  I'm  sending the original overnight mail tonight.  Thanks.**

**Jaimer**

*Bensel Ex 50*

P02318

D-050
Page 1 of 3

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL**

535 HERNDON PARKWAY □ P.O. BOX 1169 □ HERNDON, VIRGINIA 20172-1169 □ 703-689-2270
FAX 703-689-4370

August 29, 2001

Capt. Robert Pastore
TWA MEC Chairman
Air Line Pilots Association
500 Northwest Plaza, Suite 1200
St. Ann, MO  63074

Dear Bob,

As you are aware, the Executive Board and Executive Council have both passed
resolutions in support of the TWA pilots.  Specifically, the Executive Board, at its May
2001 meeting, pledged "the full moral support of the Association, along with necessary
funding in accordance with current ALPA Policies and the ALPA Constitution and By-
Laws, to enable the TWA MEC to properly represent the TWA pilots through this crisis
and to properly complete the tasks before them."

The Executive Council in July 2001 reaffirmed the Executive Board's resolution, and
stated that "the support of the Association includes appropriate financial resources
and full access to ALPA's professional staff, including in-house financial analysts and
attorneys, the latter to be utilized to help evaluate all effective and appropriate legal
strategies that could be pursued by the Association and the TWA MEC."  The
Executive Council went further by directing the President "to establish a TWA
Coordination and Oversight Committee to ensure that the TWA MEC receives the
appropriate financial and professional resources to effectively represent the TWA pilots
in a cost effective manner."

I think you would agree that the Association has followed through on the pledges of its
governing bodies.  ALPA has actively advocated the need for a fair and equitable
seniority integration to American Airlines and APA.  Duane Woerth has personally
attended the ongoing facilitation process with APA to show the Association's support
for the TWA pilots.  Your MEC has had full access to ALPA's staff, including the
ongoing evaluation of appropriate legal strategies.  The Executive Council approved,
subject to the approval of the Executive Board, $251,940 in supplemental funding
from the Operating Contingency Fund to bring your MEC's account up to the required
90% level as of June 1, 2001.  And we – Kevin Dillon and Jalmer Johnson – have been
selected to be on the TWA Coordination and Oversight Committee to ensure effective
access to, and utilization of, ALPA resources.

P02319

D-050
Page 2 of 3

Capt. Robert Pastore
August 29, 2001
Page 2


One aspect of the function of our Committee is to work with you to ensure the appropriate flight pay loss expenditures. As you are aware, flight pay loss is permitted only for MEC and national Association activities; ALPA financial policies do not provide for flight pay loss for LEC activities. Further, ALPA financial policies give flight pay loss approval authority for MEC activities to the MEC Chairman. In practice – often within MEC policy manuals (which cannot be in conflict with ALPA administrative policies or the Constitution and By-Laws) – this authority has also been assigned to the MEC Secretary-Treasurer.

A further layer of approval exists within policy for MECs where their Account Balances are less than 90% of Current Quarter Income. Such MECs shall be subject to flight pay loss pre-approval by the Vice President-Finance/Treasurer. Since the TWA MEC's Account Balance dropped below 90% as of June 1, 2001, such provisions currently apply to your MEC, and the authority to pre-approve flight pay loss has been assigned to our committee. Until we establish a more refined system to approve flight pay loss, FPL for the months of August, September and October 2001 for representatives other than the following will require advance pre-approval by either of us: (1) the TWA merger committee; (2) the TWA MEC officers; (3) TWA MEC members attending TWA MEC meetings.

Of course, we both recognize the many challenges your group has faced and will continue to face. We look forward to continuing to work with you and your MEC to maximize your ability to achieve a fair and equitable seniority merger with the APA.

Please call either of us if you have any questions.

Sincerely,


Kevin Dillon
ALPA Executive Vice President
United Airlines

Jalmer D. Johnson
ALPA General Manager


cc:   Duane Woerth
      John Feldvary
      Kevin O'Leary
      Bob Stow
      TWA MEC

P02320

D-050
Page 3 of 3

# Exhibit W





**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL**
1625 MASSACHUSETTS AVENUE, N.W. ☐ WASHINGTON, D.C. 20036 ☐ 703-689-2270
FAX 202-797-4052

October 3, 2001

Honorable Christopher "Kit" Bond
United States Senate
Washington, DC  20510

Dear Senator Bond:

On behalf of the Air Line Pilots Association, I want to advise you of our strong support for your bill, S. 1479, "the Airline Workers Fairness Act," to ensure fair treatment for the employees of TWA in the acquisition of that airline by American Airlines.  ALPA has long favored the seniority integration procedures similar to those provided in your bill to facilitate the combining of employee workforces in airline mergers.  These procedures worked well for decades under the Civil Aeronautics Board's oversight of airline mergers, providing an orderly and fair mechanism to settle the difficult issues involved in seniority list integration.

The airline industry is experiencing unprecedented trauma as a result of the tragedies that occurred on September 11.  Despite the swift and substantial assistance provided by the Congress, the airlines still face serious financial problems and tens of thousands of airline workers will be furloughed.  In the case of the American Airlines acquisition of the equity and assets of TWA, the integration of the employee seniority lists has not been completed.  Therefore, the furloughs at American, that are expected to reach 20,000, will have a disproportionate impact on the TWA workforce.  S. 1479 will help to mitigate this result by imposing a process that is fair and expeditious in resolving the seniority list integration issues.

The TWA pilots and other dedicated employees are willing to bear their fair share of the sacrifice that is required of all Americans during these difficult times for our nation.  However, they should not be expected to shoulder a disproportionate burden due to the circumstances surrounding this merger.  Your bill will go a long way toward ensuring that fairness is done in this particular transaction, and ALPA has committed its full resources to working with you to that end.

Thank you for your initiative to address this important issue, and for your strong commitment to the employees of TWA.

Sincerely,

Duane E. Woerth, President

DEW/jw

SCHEDULE WITH SAFETY     ◆━●━◆     AFFILIATED WITH AFL-CIO

Arthur Ex
94

# Exhibit X



EXHIBIT

D136

## AIR LINE PILOTS ASSOCIATION

**TO:**       Captain Duane Woerth, President
**FROM:**   Ana McAhron-Schulz, Economic & Financial Analysis
**DATE:**    August 3, 2001
**SUBJECT**: TWA Merger Committee Request

As I mentioned in our telephone conversation, yesterday I met with D.J. Glasby, member of the TWA Merger Committee, Michael Tanner, their economist, and Mark Seward, member of TWA's System Schedule Committee. The TWA Merger Committee is requesting assistance from E&FA in the form of various analyses. These analyses are to be completed prior to their next round of facilitation meetings which begin on August 20th. In addition, we have assigned Steve Gillespie to be their full-time "numbers cruncher" for the facilitation period.

Below is a list of the projects assigned to us:

✈  Quantify the operational and financial value that TWA brings to American Airlines.

✈  Analyze the difference between the AMR acquisition of TWA and the AMR acquisition of Air California and Reno. Explain that TWA is not a regional airline and that American will not park TWA's aircraft.

✈  Quantify/analyze the growth potential of the "new American" such that 1+1 is equal to more than two -- including increased traffic and increased ASM growth.

✈  Analyze the APA Seniority Integration Proposal vis-à-vis the TWA Seniority Integration Proposal.

✈  Develop a contract comparison between the TWA and American contracts. Quantify the number of jobs differential between APA's work rules and TWA's and explain that the APA work rules are inferior to those of TWA, therefore the difference in compensation between the two carriers is less.

✈  With the transition to Sabre in December, TWA pilots will now be divided into international and domestic categories. The APA pilots claim that this will reduce the number of needed Captain positions. Prove that this won't happen.

✈  Analyze the Transition Agreement between APA and its management and explain how this will affect the TWA pilots.

ALPA 039411

✈ Provide a logical argument that it is more likely that American will retire its Fokker fleet over the B717 fleet.

✈ Analyze TWA's Rightful Place Proposal on a year by year basis through 2025 assuming that all pilots bid to the highest paying equipment at all times.

✈ Analyze the Rightful Place Proposal with no conditions or restrictions.

✈ Is there a way E&FA can show that TWA would not have shut down in January? Review Price Waterhouse Stand Alone Plan and see if it can be supported.

✈ Provide a quantitative person for their facilitation period.

✈ Various Form 41 information back to 1982.

Please call if you have any questions.

ALPA 039412

# Exhibit Y



AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
57TH REGULAR EXECUTIVE COUNCIL MEETING
May 21, 2001

SUBJECT
Outside Consultant – TWA MEC

SOURCE
President Duane E. Woerth

BACKGROUND INFORMATION
The TWA MEC has requested authorization to engage the services of an
outside consultant, James R. Baehler, to provide negotiations training and
consulting services to the Merger Committee of the TWA MEC.  The cost of
such agreement would be charged to the TWA MEC.

PROPOSED RESOLUTION
WHEREAS the Trans World Airlines (TWA) MEC requested authorization to
engage the services of an outside consultant to provide negotiations training
and consulting services to the Merger Committee of the TWA MEC,

THEREFORE BE IT RESOLVED that the Executive Council authorize the
President to enter into an agreement with James R. Baehler to provide
support to the TWA MEC, and

BE IT FURTHER RESOLVED that the cost of such agreement be charged to
the TWA MEC budget.

FINAL RESOLUTION
WHEREAS the Trans World Airlines (TWA) MEC requested authorization to
engage the services of an outside consultant to provide negotiations training
and consulting services to the Merger Committee of the TWA MEC,

THEREFORE BE IT RESOLVED that the Executive Council authorize the
President to enter into an agreement with James R. Baehler to provide
support to the TWA MEC, and

BE IT FURTHER RESOLVED that the cost of such agreement be charged to
the TWA MEC budget.

**ALPA 019807**

AI #25
Page 1 of 1

# Exhibit Z

EXHIBIT

D159

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
87TH REGULAR EXECUTIVE BOARD MEETING
May 22-24, 2001

AI#23

SUBJECT
Support for TWA MEC

SOURCE
TWA MEC

BACKGROUND INFORMATION
See Proposed Resolution.

PROPOSED RESOLUTION
WHEREAS the TWA pilots have faced incredible challenges for more than a
decade and a half, living through three changes in corporate ownership, a
corporate raider and three bankruptcies, and

WHEREAS the TWA pilots have been loyal members of ALPA from ALPA's
inception, currently representing Councils #2, #3 and #4, and

WHEREAS the TWA pilots have contributed millions of dollars into the MCF
to support their brothers and sisters and to protect the piloting profession,
and

WHEREAS the TWA pilots are now facing extraordinary expenses in their
current merger with American Airlines, which occurred, without precedent,
during a Chapter 11 proceeding, and

WHEREAS the TWA pilots have also been forced to abandon the primary
protection of the Scope Clause section of their Collective Bargaining
Agreement in order to avoid Chapter 7 liquidation of their carrier and affect
the transition to TWA LLC, and

WHEREAS the TWA MEC has enormous obstacles remaining before them in
order to protect their loyal ALPA members and affect a successful transition
to American Airlines, obstacles including ongoing negotiations, the
continuing need for bankruptcy counsel, extraordinary communications needs
both internally and externally, a yet to be defined merger integration process,
the need for merger counsel and pension plan termination litigation, and

WHEREAS the long-term goal of ALPA of "one Union for all pilots" could be realized with the return of the pilots of American Airlines and the best ambassadors to lead that charge would be the post-merger TWA pilots who truly appreciated the value of having proper support both morally and financially of a National Union, and

WHEREAS the plethora of problems before the TWA MEC are only compounded by a dramatic reduction in available funding, coupled with enormous expenses to properly represent their constituents, including the loss of previously contractually provided Flight Pay Loss of over $1 million annually, and

WHEREAS the future of U.S. airline consolidation will be clearly affected by the outcome of the current acquisition of TWA by American Airlines and thus the very future of our profession and our careers would be impacted by a negative outcome,

THEREFORE BE IT RESOLVED that the Executive Board pledges the full moral and financial support of the Association to enable the TWA MEC to properly represent the TWA pilots through this crisis and to properly complete the tasks before them.

FINAL RESOLUTION
WHEREAS the TWA pilots have faced incredible challenges for more than a decade and a half, living through three changes in corporate ownership, a corporate raider and three bankruptcies, and

WHEREAS the TWA pilots have been loyal members of ALPA from ALPA's inception, currently representing Councils #2, #3 and #4, and

WHEREAS the TWA pilots are now facing extraordinary expenses in their current merger with American Airlines, which occurred, without precedent, during a Chapter 11 proceeding, and

WHEREAS the TWA pilots have also been forced to abandon the primary protection of the Scope Clause section of their Collective Bargaining Agreement in order to avoid Chapter 7 liquidation of their carrier and affect the transition to TWA LLC, and

**ALPA 018340**

WHEREAS the TWA MEC has enormous obstacles remaining before them in order to protect their loyal ALPA members and affect a successful transition to American Airlines, and

WHEREAS these obstacles include ongoing negotiations with TWA LLC, the need for merger counsel for a yet to be defined seniority integration process, extraordinary communications needs both internally and externally, and a continuing need for bankruptcy and pension plan termination litigation counsel, and

WHEREAS ALPA's long-term goal of "one Union for all pilots" will be enhanced by the post-merger TWA pilots working to return the pilots of American Airlines to ALPA, and

WHEREAS the plethora of problems before the TWA MEC are compounded by a dramatic reduction in available funding due to the loss of TWA-provided Flight Pay Loss of over $1 million annually, coupled with the above stated expenses, and

WHEREAS the future of U.S. airline consolidation will be clearly affected by the outcome of the current acquisition of TWA by American Airlines and thus the very future of our profession and our careers would be impacted by a negative outcome,

THEREFORE BE IT RESOLVED that the Executive Board pledges the full moral support of the Association, along with necessary funding in accordance with current ALPA Policies and the ALPA Constitution and By-Laws, to enable the TWA MEC to properly represent the TWA pilots through this crisis and to properly complete the tasks before them.

**ALPA 018341**

# EXHIBIT AA



AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
59TH REGULAR EXECUTIVE COUNCIL MEETING
September 24-28, 2001

SUBJECT
Approval of Outside Counsel Requested by the TWA MEC

SOURCE
President Duane E. Woerth

BACKGROUND INFORMATION
The TWA MEC has requested that the Association utilize the services of
Roland P. Wilder, Jr. (Baptiste & Wilder, PC) to provide legal services with
respect to matters arising from alleged violation by TWA and American of
contractual obligations in connection with seniority integration arising from
the acquisition of TWA by American Airlines.

PROPOSED RESOLUTION
WHEREAS the TWA MEC has requested that the Association retain the
services of Roland P. Wilder, Jr. (Baptiste & Wilder, PC) to provide legal
services related to alleged violation by TWA and American Airlines of
contractual obligations in connection with seniority integration arising from
the acquisition of TWA by American, and

WHEREAS the law firm will work with the ALPA Legal Department on this
matter,

THEREFORE BE IT RESOLVED that the Executive Council authorizes the
President to enter into an agreement with Baptiste & Wilder, PC to provide
such legal services, working with the ALPA Legal Department, and

BE IT FURTHER RESOLVED that the costs associated with this matter be
charged to the TWA MEC account.

**ALPA 019820**

FINAL RESOLUTION
WHEREAS the TWA MEC has requested that the Association retain the
services of Roland P. Wilder, Jr. (Baptiste & Wilder, PC) to provide legal
services related to alleged violation by TWA and American Airlines of
contractual obligations in connection with seniority integration arising from
the acquisition of TWA by American, and

AI #36
Page 1 of 2

WHEREAS the law firm will work with the ALPA Legal Department on this matter,

THEREFORE BE IT RESOLVED that the Executive Council authorizes the President to enter into an agreement with Baptiste & Wilder, PC to provide such legal services, working with the ALPA Legal Department, and

BE IT FURTHER RESOLVED that the costs associated with this matter be charged to the TWA MEC account.

**ALPA 019821**

AI #36
Page 2 of 2

# EXHIBIT BB

Wednesday, December 12, 2001  1:33 PM    To: Capt. Jeff Darnall    From: David Berkley, 437-5776    Page: 2 of 2

12/11/2001  05:32    2027974030    ALPA    PAGE  02/02

225-6498



**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL**
1625 MASSACHUSETTS AVENUE, N.W. □ WASHINGTON, D.C. 20036 □ 703-689-2270
FAX 202-797-4052

December 10, 2001

**EXHIBIT**
**D165**

The Honorable Jerry Lewis
U.S. House of Representatives
Washington, DC  20515

Dear Representative Lewis:

On behalf of the Air Line Pilots Association and the pilots of TWA, I am writing to urge you and your fellow House conferees to support the Bond amendment that is contained in the FY 2002 Defense Appropriations Bill. This provision that was adopted by the Senate on a voice vote would address an inequitable situation facing the employees of TWA now that the assets and equity of that carrier have been acquired by American Airlines.

Since the agreement to merge these two carriers, the pilots of each airline have attempted to negotiate a seniority list integration. Unfortunately, to date, they have not been able to reach an agreement that treats the TWA pilots in a fair and equitable manner. Ultimately, as American Airlines downsizes its workforce in response to the tragic events of September 11th, the furloughs will have a disproportionate impact on the TWA pilots as well as the other employees. The Bond amendment will help to mitigate the hardship on the TWA employees by putting in place a process whereby the dispute over seniority list integration will be submitted to binding arbitration and settled in a fair and expeditious manner.

The TWA pilots and other dedicated employees are willing to bear their fair share of the sacrifice that is required of all Americans during these difficult times for our nation. However, they should not be expected to shoulder a disproportionate burden due to the circumstances surrounding this merger. This amendment will help to ensure that fairness is done in this particular transaction, and ALPA urges you, as a conferee on the DOD Appropriations Bill, to agree to the Senate position in the conference.

Thank you for considering our views on this important matter.

Sincerely,

Duane E. Woerth, President

DEW:jb

SCHEDULE WITH SAFETY    ◆    AFFILIATED WITH AFL-CIO

**ALPA 001561**

# EXHIBIT CC

EXHIBIT

**D172**

PENGAD 800-631-6980

Subj:   **Special MEC Information System Update 12/19/01**
Date:   12/19/01 10:46:43 PM Eastern Standard Time
From:  gstieneke@compuserve.com (P. Glenn Stieneke)
Sender:   twamec@alpa.org
Reply-to:   twamec@alpa.org
To:       twapilots@twapilots.org

Here is an Email message from the TWA MEC Communications Committee!
= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

AIR LINE PILOTS ASSOCIATION
TWA-MEC COMMUNICATIONS COMMITTEE
500 Northwest Plaza, Suite 1200
St. Ann, MO 63074
314-770-8500/Code-A-Phone: 800-253-7919
www.alpa.org
= = = = = = = = = = = = = = = = = = = = = = = = = = = = =

Copyright © 2001 by Air Line Pilots Association TWA MEC. Any unauthorized
copying, distribution or dissemination of this information is strictly
prohibited without the written consent of the Air Line Pilots Association,
International.

This e-mail is intended for the recipient.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = =

This is TWA MEC Communications Chairman Captain Glenn Stieneke with a
Special TWA MEC Information System Update on December 19, 2001

On Tuesday December 18th the joint Conference Committee tasked with
finalizing the language for the House and Senate versions of the Defense
Appropriations Bill HR3338, met for a very short session.  While we are
still awaiting the official conference report, we believe that S.A. 2354,
along with multiple other amendments, was removed from HR3338.

With the help of some fine individuals (Senator Kit Bond and others), the
TWA pilots came very close to enacting arbitration legislation during this
session of Congress.  The TWA Legislative Affairs Committee raised awareness
of the seniority integration to a new high with the amendment's initial
passage in the U.S. Senate.  We wish to thank Senator Bond, Carnahan and
others for their efforts to date.  Furthermore, we would like to express our
gratitude to our own Legislative Affairs Committee and ALPA Government
Affairs for their support and guidance in pushing this proposed legislation
forward.  Finally, we would also be remiss if we did not acknowledge all of
you, the TWA line pilots, friends and family, for demonstrating steadfast
poise and determination with your calls, letters and faxes.

While this is a minor setback, it was not completely unexpected.  We knew
all along that it is very difficult to procure legislative language on an
appropriations bill.  This is also not the end of our fight on Capital Hill.
Congress intends to break for the Holidays shortly and plans to return on
January 23rd. Senator Bond has assured us he will attempt another avenue to
have our case heard.  Since neither, Senate Bill S.1479 or Senate Amendment
S.A. 2354 were actually voted on, they may be re-visited in the next session
of Congress. The TWA pilot lobbyists and ALPA Government Affairs have made a
definite impression on both Houses of Congress and will continue to strive
for legislation requiring fair and equitable treatment during this seniority
integration.

There are several issues before the next session of Congress that will be

P01156
D-172
Page 1 of 2

germane to our issue.  To name just a few:  Economic Stimulus, Enron (employee issues), AA – BA, if the DOT and DOJ continue hearings past January 15th.  We also believe that the subject of industry consolidation and employee integration concerns will be a topic of interest when Congress returns on January 23.  Congressman and Senators have just begun raising questions about the behavior of parties involved in this integration.

On another note, ALPA has requested and been granted an extension for filing our objection to the APA's single carrier petition before the NMB.  The MEC Officers are coordinating with ALPA legal counsel on this issue and there will be more to come on this front shortly.  The NMB has wide ranging powers considering these issues and we expect to request as much assistance from them as they are legally empowered to grant.

In the meantime, let us focus on our most important priorities – our families and friends, including our brethren who were adversely affected by the Sept. 11 tragedies.

On behalf of the TWA MEC, I would like wish everyone a happy holiday season, and wish for justice and fairness to prevail in the year ahead.


============================================================================
To unsubscribe from this list at anytime, send email to Majordomo@twapilots.org
with the following 1 line in the BODY of the message (Subject is ignored).

unsubscribe twapilots

You may also email the TWAMEC Office at <twamec@alpa.org> if you have any
problems removing your email address.


---------------------- Headers --------------------------------
Return-Path: <twamec@alpa.org>
Received: from  rly-yh05.mx.aol.com (rly-yh05.mail.aol.com [172.18.147.37]) by air-yh04.mail.aol.com (v82.22) with ESMTP id MAILINYH41-1219224643; Wed, 19 Dec 2001 22:46:43 1900
Received: from  wrench.thebook.com ([63.110.6.249]) by rly-yh05.mx.aol.com (v83.18) with ESMTP id MAILRELAYINYH510-1219224630; Wed, 19 Dec 2001 22:46:30 -0500
Received: (from majordomo@localhost)
    by wrench.thebook.com (8.9.3/8.9.1) id WAA09089
    for twapilots-twapilots-outgoing; Wed, 19 Dec 2001 22:44:05 -0500
X-Authentication-Warning: wrench.thebook.com: majordom set sender to twamec@alpa.org using -f
From: "P. Glenn Stieneke" <gstieneke@compuserve.com>
To: <twapilots@twapilots.org>
Subject: Special MEC Information System Update 12/19/01
Date: Wed, 19 Dec 2001 19:43:12 -0800
Message-ID: <LLEPLDBLDOEPGNMLPNLJCECICAAA.gstieneke@compuserve.com>
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook IMO, Build 9.0.2416 (9.0.2911.0)
Importance: Normal
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2600.0000
Sender: twamec@alpa.org
Reply-To: twamec@alpa.org
Content-Transfer-Encoding: quoted-printable
X-MIME-Autoconverted: from 8bit to quoted-printable by wrench.thebook.com id WAA09089

P01157
D-172
Page 2 of 2

# EXHIBIT DD

10/16/2001  10:07   3147708597              REPRESENTATION

EXHIBIT

D200

## American Airlines

Jeff Brundage                                          October 12, 2001
Vice President
Employee Relations

### VIA FACSIMILE AND FEDERAL EXPRESS

Captain Duane Woerth, President
Air Line Pilots Association
1625 Massachusetts Avenue, NW
Washington, DC  20036

Dear Captain Woerth:

The events of the last week surrounding American Airlines continuing efforts to facilitate a seniority integration agreement between the Allied Pilots Association ("APA") and the Air Line Pilots Association TWA Master Executive Council ("ALPA TWA MEC") leave me, to say the least, perplexed and aggravated.  In addition to the efforts expended previously by American in an effort to facilitate a seniority integration list agreement between the APA and the ALPA TWA MEC, I personally have dedicated the majority of my time since Friday, October 5, 2001, attempting to convince, cajole or quite frankly twist the arm of the ALPA TWA MEC to attend a meeting or meetings, arranged by AA, so that the APA President, Vice-President and Merger Committee Chairman would have an opportunity to present to ALPA new concepts designed to enhance protections for TWA pilots when merged into the American seniority list.

The ALPA TWA MEC's representatives attended a meeting at my office on October 8th to receive a briefing on the state of emergency at American and TWA and on our financial condition. During that meeting Mr. Roland Wilder updated me on the status of the seniority discussions between ALPA and the APA for which American had provided the services of Mr. Rolf Valton as a facilitator.  The ALPA TWA MEC asked me to review a number of additional processes that included arbitration, facilitation and negotiation. I explained that, from my perspective, there simply is not time for another lengthy "process". I stated that American believed that it was time for the APA and ALPA to make decisions and conclude an integration agreement.

I invited the ALPA TWA MEC representatives to attend a meeting the next day to discuss seniority integration, which I planned to facilitate, between the APA and ALPA. The ALPA TWA MEC representatives indicated that they would need to consult with the members of the MEC to determine their willingness to meet and used one of our conference rooms for that purpose. Later they indicated that they would need more time and would contact me the next morning. On Tuesday I received a call confirming the meeting. I was asked to provide special travel accommodations for the ALPA TWA MEC Merger Committee Chairman so that he would be able to attend the meeting on Wednesday. We accommodated that request.

P01556

. 10/16/2001  10:07   3147708597                  REPRESENTATION                      PAGE  03

Captain Duane Woerth, President
Page 2


Late in the day on Tuesday I received a proposed confidentiality agreement from Mr. Holtzman as a precondition to the next day's three party meeting. It was immediately apparent that the proposed confidentiality agreement was unacceptable to me because it required that even the fact that the meeting was scheduled would remain confidential and that nothing discussed or proposed at the meeting could be referred to in any other forum. First, I had already discussed the proposed meeting with numerous parties prior to receiving the confidentiality document. Secondly, the APA committee had briefed me earlier in the day as to the provisions of the new proposal that they intended to present to the ALPA committee and I had had numerous conversations regarding that proposal with a number of people.

On Wednesday, just prior to the scheduled start of the meeting, I received a call from Mr. Holtzman and Mr. Wilder indicating that the ALPA TWA MEC had decided not to participate in the meeting and to inquire as to the disposition of the confidentiality agreement. They informed me that Captain Pastore would be arriving but that no one from the ALPA TWA MEC would be meeting with the APA representatives who had already arrived at my office and were waiting to begin discussions.

Captain Pastore arrived and confirmed that the ALPA TWA MEC representatives would not be attending the meeting and that without the confidentiality agreement proposed by ALPA in place, no discussion between ALPA and APA could take place. I challenged Captain Pastore on the proposed confidentiality agreement in that I fully understand the reasons to keep alternative proposals exchanged during the meeting confidential but questioned the motivation for needing to keep the very fact that meetings took place confidential.

To make matters worse, I was informed that representatives of the ALPA TWA MEC met with Senator Bond on Thursday, October 11th and represented to the Senator that no attempt had been made to schedule the meetings I have described. When those representatives were informed that Mr. Carty had visited with the Senator earlier in the day and described ALPA's unwillingness to meet they indicated, as it was related to me, that Mr. Carty was at best misinformed. This conduct is inappropriate and entirely unacceptable.

I hope that we can get past this week's disjointed events. We are committed to facilitating a seniority integration agreement between ALPA and APA. I would appreciate any assistance you can provide toward this end.

                              Sincerely,


                              Jeff Brundage
                              Vice President – Employee Policy & Relations


cc:    Donald J. Carty



                                                                      P01557

                              D-200
                              Page 2 of 2

# EXHIBIT EE



**TWA MEC**
**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL**
500 NORTHWEST PLAZA, SUITE 1200 □ ST. ANN, MISSOURI 63074 □ 314-770-8500

00001 JUL 16 '01 13:00001

July 10, 2001

Captain Duane Woerth, President
Air Line Pilots Association, International
1625 Massachusetts Avenue, N.W.
Washington, DC  20036

Dear Duane:

I am writing to thank you for your support of our pilot group at the last Executive Board meeting.  With your support, the Agenda Item pledging the full moral support and the necessary funding to enable our MEC to properly represent our pilots passed by acclamation.

As you know, the TWA pilots are fighting for fair treatment by both American Airlines and the Allied Pilots Association.  The issues involved in this integration, however, reach beyond TWA pilots.  The loss of our Scope due to the TWA acquisition by American has far reaching consequences for many ALPA pilots.  The APA's concept of stapling two thirds of our pilots flies in the face of fairness and professionalism.  The very foundation of our profession, including seniority, relies on mutual respect between pilots and an appreciation for the rights of all pilots.

Our MEC is facing many significant obstacles and challenges, including extraordinary expenses for our Merger Committee and Merger Counsel.  Another challenge facing our pilots is the public nature of the seniority integration negotiations.  The APA unilaterally decided early on in the negotiations to release proposals into the public domain. In order to keep our membership equally informed we have also released information about the proposals.

Not surprisingly, the public nature of the negotiations has fueled miscommunication and misperceptions by both pilot groups, increasing tensions between our respective pilot groups.  A major initiative of our MEC, therefore, has been a communications campaign to ensure that our pilots and other ALPA pilots have accurate information in order to counter this misinformation.

Enclosed is a copy of a video presentation that was produced with your assistance and the assistance of the ALPA communications department.  In addition to the video, I am enclosing recent print communications that provide additional information on our seniority integration.

Once again, I would like to thank you for your support of our pilot group.  The ongoing support of our Association is crucial to our future success.

Sincerely,

Captain Robert A. Pastore
Master Chairman

cc: TWA MEC

SCHEDULE WITH SAFETY   ⚙   AFFILIATED WITH AFL-CIO

**ALPA 020210**
D-233
Page 1 of 1

EXHIBIT
D233