**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

PATRICK BRADY, et. al.,

                        Plaintiffs,

       v.                              Civil Action No. 02-2917 (JEI)

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,

                        Defendant.

---

**BRIEF OF DEFENDANT IN SUPPORT**
**OF MOTION TO REVOKE *PRO HAC VICE* ADMISSIONS**

---

                                      Archer & Greiner
                                      A Professional Corporation
                                      One Centennial Square
                                      P.O. Box 3000
                                      Haddonfield, New Jersey 08033-0968
                                      (856) 795-2121
                                      By: Steven J. Fram, Esquire

*Pro Hac Vice:*
       Daniel M. Katz, Esquire
       Katz & Ranzman, P.C.
       4530 Wisconsin Ave., N.W., Suite 250
       Washington, DC 20016
       (202) 659-4656

Counsel for Defendant, Air Line Pilots Association, International

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

RELEVANT FACTUAL AND PROCEDURAL HISTORY ........................................... 2

I.      Events Leading up to the Vote on April 2, 2001 .................................................... 2

II.     Roland Wilder Was Not Present at the April 2, 2001 TWA-MEC Meeting in St. Louis ....................................................................................................................... 3

        A.     The Depositions of the Plaintiffs in this Litigation ................................. 4

        B.     The Missouri State Court Litigation ....................................................... 5

        C.     Wilder's Deposition on August 8, 2008 .................................................. 6

        D.     The Wilder Affidavit of February 20, 2009 ............................................ 7

        E.     Plaintiffs' Opposition to ALPA's Motion for Summary Judgment ........ 9

        F.     Wilder's Video Testimony at Trial ........................................................ 10

        G.     Alan Altman's Deposition ..................................................................... 12

        H.     Plaintiffs' False Testimony at Trial ...................................................... 12

III.    The Alleged "Get Real" Comment ...................................................................... 17

IV.    Press's Closing Argument .................................................................................... 20

ARGUMENT ..................................................................................................................... 22

I.      Plaintiffs' *Pro Hac* Counsel Committed Numerous Violations of the RPCs ................... 22

II.     The *Pro Hac Vice* Admissions of Press and Jacobson Should Be Revoked ................... 27

CONCLUSION .................................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Avery v. Georgia,
    345 U.S. 559 (1953) (Frankfurter, J., concurring)...................................................26

Belote v. Maritrans Operating Partners, L.P.,
    CIV. A. 97-3993, 1998 WL 136523 (E.D. Pa. Mar. 20, 1998) ...............................29

Chamber v. Heidelberg,
    2007 U.S. Dist. LEXIS 38819 (D.N.J. May 25, 2007) ...........................................28

Chambers v. NASCO, Inc.,
    501 U.S. 32 (1990) ....................................................................................................27

Data Systems Analysts, Inc. v. Netplex Group,
    187 F.R.D. 181 (D.N.J.1999) .....................................................................................28

Eagan v. Jackson,
    855 F.Supp. 765 (E.D.Pa. 1994)................................................................................28

In re Complaint of PMD Enterprises Inc.,
    215 F. Supp. 2d 519 (D.N.J. 2002)............................................................................28

In re Corn Derivatives Antitrust Litig.,
    748 F.2d 157 (3d Cir.1984) .......................................................................................28

In re Tutu Wells Contamination Litig.,
    120 F.3d 368 (3d Cir.1997) .......................................................................................28

Inorganic Coatings, Inc. v. Falberg,
    926 F.Supp. 517 (E.D.Pa.1995)................................................................................28

Johnson v. Trueblood,
    629 F.2d 302 (3d Cir.1980) .......................................................................................28

Lennen v. John Eppler Machine Works, Inc.,
    1997 WL 566078 (E.D. Pa. Sept. 5, 1997)...............................................................29

Maldonado v. New Jersey ex rel. Admin. Office of Courts-Prob. Div.,
    225 F.R.D. 120 (D.N.J. 2004) .............................................................................23, 27

United States v. Gordon–Nikkar,
    518 F.2d 972 (5th Cir.1975) ......................................................................................25

United States v. Kross,
    14 F.3d 751 (2d Cir. 1994) ..................................................................................24

United States v. Townsley,
    843 F.2d 1070 ......................................................................................25, 26

**STATE CASES**

Florida Bar v. Rightmyer,
    616 So. 2d 953 (Fla. 1993) ...............................................................................23

In re Cardwell,
    50 P.3d 897 (Colo. 2002)..................................................................................23

**RULES**

ABA Formal Ethics Op. 87-353 (1987) ........................................................................24

ABA Formal Ethics Op. 93-376 (1993) ........................................................................25

L. Civ. R. 101.1(c)(4) & 103.1 cmt. 2 ........................................................................28

L. Civ. R. 103.1(a)..........................................................................................23

L. Civ. R. 104.1(h)..........................................................................................28

RPC 1.0(f)..................................................................................................23

RPC 1.16(a)(1)..............................................................................................25

RPC 3.3..............................................................................................23, 24, 26, 27

RPC 3.4(e) .................................................................................................27

RPC 4.2....................................................................................................28

**OTHER AUTHORITIES**

John S. Applegate, "Witness Preparation," 68 Tex. L.Rev. 277, 310 (Dec. 1989)......................25

Lisa Renee Salmi, "Don't Walk the Line: Ethical Considerations in Preparing Witnesses
    for Deposition and Trial," 18........................................................................25

Restatement (Third) of the Law Governing Lawyers (2000), §120 cmt. ....................................24

Richard. C. Wydick, "The Ethics of Witness Coaching," 1 Cardozo L.Rev. 1 (1995)................25

Wolfram, "Client Perjury," 50 S. Cal.L.Rev. 809, 860 (1977) ....................................25

Defendant, Air Line Pilots Association, International ("ALPA"), submits this Brief in support of its Motion for the Revocation of the *Pro Hac Vice* Admissions of two of the attorneys who represented the Plaintiffs at the liability trial, namely Allen Press and Joseph Jacobson.

## INTRODUCTION

During the liability trial, these attorneys failed to comply with the most basic ethical obligation of a lawyer: to refrain from presenting false evidence. Instead, Press and Jacobson knowingly proffered false testimony with respect to two key issues in this case: (1) certain events leading up to the vote by the TWA-MEC on April 2, 2001, including whether Roland Wilder, Esquire, merger counsel for the TWA-MEC, was present at that meeting; and (2) what Duane Woerth said to the TWA-MEC at its meeting on April 23, 2001, in response to a claim by an American pilot that Woerth had on April 5, 2001, told the Board of Directors of the Allied Pilots Association (the "APA") that the TWA pilots had to "get real."

With respect to the first of these issues, the evidence establishes that the pilot witnesses presented by Plaintiffs fabricated a consistent, coordinated story that Wilder was present at the TWA-MEC offices in St. Louis on April 2, 2001.  They knew that story was false because it was contradicted by undisputed documents, by the testimony of Wilder himself, and by the testimony of other pilots and by the other advisors who testified at trial on behalf of ALPA. Despite this, Press presented false testimony from five witnesses and then not only improperly relied upon that and other false testimony in his closing argument but compounded his misconduct by impermissibly "vouching" for the credibility of these witnesses by asserting that they were "serious, credible people." Jacobson presented false testimony by Howard Hollander both about what happened leading up to and at the meeting on April 2, 2001, and that Hollander was present at a meeting of the TWA-MEC on April 23, 2001, when Captain Duane Woerth, then the President of ALPA, met with the TWA-MEC. Jacobson knew this testimony was false because

1

the official minutes of the TWA-MEC meeting on that date, which Jacobson used during his direct examination of Mr. Hollander, included a statement that Hollander was <u>not</u> present at the meeting. Indeed, on cross-examination Hollander admitted that he was <u>not</u> present when Woerth met with the MEC on April 23 and that his prior testimony was false.

As a consequence of this and the related misconduct outlined below, the Court should revoke the *pro hac vice* admissions of Press and Jacobson.

<u>**RELEVANT FACTUAL AND PROCEDURAL HISTORY**</u>[1]

As discussed below, and as the Court is aware from the liability trial, plaintiffs and ALPA presented wildly divergent evidence concerning the events preceding and including the meeting of the TWA-MEC on April 2, 2001.

**I.      <u>Events Leading up to the Vote on April 2, 2001</u>**

The events that led to the vote of the TWA-MEC on April 2, 2001, were set in motion when Robert Pastore, the Master Chairman of the TWA-MEC, scheduled a special meeting of the MEC in St. Louis to take place on March 21 and 22, 2001. The scheduling of the meeting was announced via email on March 19, 2001, to all of the members of the MEC, including Altman, Case, Hollander and Young. <u>See</u> D-382. It is undisputed that three of these members of the MEC, along with the other voting members of the MEC, its officers and certain committee members, attended the meetings on March 21 and 22. <u>See</u> D-223. The email scheduling this meeting indicated that the agenda would include a report on the bankruptcy proceedings, including TWA's filing of the §1113 motion, as well as reports from the Merger and Negotiating Committees.

---

[1] The deposition and trial transcripts and trial exhibits referred to in this brief are attached to the accompanying Declaration of ALPA's counsel.  In this brief, ALPA's trial exhibits are referred to as "D-__," Plaintiffs' trial exhibits are denoted as "P-__," and Joint exhibits are referred to as "J-__."

This special meeting of the MEC was obviously critical, given recent developments in the bankruptcy. On March 12, 2001, the Bankruptcy Court had approved the purchase by American Airlines of TWA's assets. On March 15, 2001, TWA had followed up with a motion under §1113 of the Bankruptcy Code to reject its Collective Bargaining Agreement with the TWA pilots. Two days later, on March 17, 2001, the TWA Negotiating Committee had proposed a new Collective Bargaining Agreement between TWA, LLC and ALPA with the proviso that its offer of a new agreement would be withdrawn if not accepted by April 6, 2001, the scheduled date for the commencement of the hearing on the §1113 motion.

In accordance with TWA MEC policy, the formal agenda prepared for the special meeting on March 21 and 22, 2001 listed the outside advisors who were expected to attend. With respect to the Merger Committee update that was scheduled for the first day of the meeting, the agenda reflected the anticipated participation not only of the members of the Merger Committee but also of Roland Wilder:

> Transaction Updated Continued
> Merger Committee: Mike Day, Sean Clarke, Gary Flor, John Hefley, John Swanson, Bud Bensel
>
> Roland Wilder, Baptiste & Wilder
>
> Robert Christy, ALPA E&FA

D-382.

## II.    Roland Wilder Was Not Present at the April 2, 2001 TWA-MEC Meeting in St. Louis

On March 29, 2001, after the Merger Committee had attempted without success to reach agreement with the American pilots, Pastore scheduled another special MEC meeting for April 2. The email scheduling that meeting indicated that there would be a work session beginning at 1:00 p.m. on Sunday, April 1, and that the agenda items for the work session would include

3

"contractual review of proposed TWA Airlines, LLC/ALPA Agreement, update on merger talks and other negotiations which are taking place." See D-210. The email further indicated that the following advisors had been "requested to be at the [April 1] work session…: Michael Glanzer, Steve Tumblin, Rolland [sic] Wilder, Randy Babbitt, Bob Christy, Clay Warner." Id. The agenda for the April 2 meeting – which was prepared on March 30, 2001 – made clear that Wilder was not expected to attend the formal meeting of the MEC. Instead, consistent with a prior commitment, which required that Wilder be in Louisville on April 2, he was not listed as among the attendees on the agenda. See D-179.

That Wilder attended the work session on April 1 but not the MEC meeting on April 2 is confirmed by the invoice that his firm forwarded to Pastore on May 9, 2001. That invoice shows the following as Wilder's time entries for April 1 and April 2, 2001:

|  |  |  | Hours |
|---|---|---|---|
| 4/1/01 | RPW | Meeting with D. Holtzman, M. Glanzer; review documents; outline presentation; attend MEC meeting | 7.50 |
| 4/2/01 | RPW | Phone conference with J. Hefley; C. Warner, WRW; respond to messages | 1.60 |

D-176 at 2 (emphasis added).

### A.        The Depositions of the Plaintiffs in this Litigation

Despite the incontestable nature of these documents, when the first of the Plaintiffs' witnesses were deposed in this case in September of 2006, two of them testified that Wilder was present at the meeting on April 2, 2001:

> Young.  During her deposition, Sally Young claimed that her recollection of the April 2 MEC meeting was clear. She testified that she "asked questions of each of the advisors" at the meeting on April 2 and "each advisor said something that [she] remembered that day." See Young Dep. of Sept. 15, 2006 at 65:8-15. Young testified that the advisors "were all of the same opinion, with the exception of Roland Wilder, and they all advised us to waive scope that day." Id. at 65:16-19.

Ms. Young claimed that Wilder gave very specific advice on April 2: "Roland Wilder disagreed that we waive that day. He said wait until the steps of the courthouse." Id. at 82:15-19.

Hollander. When Howard Hollander was deposed several days later, his testimony contradicted that of Young. Hollander testified that he "remember[ed] no specific person engaging in any specific statement" on April 2, 2001. See Hollander Dep. of Sept. 19, 2006 at 76:16-17. Although Hollander claimed that Wilder was at the meeting on April 2, he testified that throughout the meeting, "Wilder stood 100 percent silent" and "rendered no opinion whatsoever." Id. at 70:12-15. Hollander went on to testify: "I believe Roland Wilder was not in favor or in agreement with his fellow advisors that day. My position is --- my opinion that Wilder really wished to say something else, but for some reason chose to stay silent." Id. at 77:24 to 78:5.

**B.      The Missouri State Court Litigation**

Shortly thereafter, the issue of whether Wilder was present in St. Louis on April 2 came up again as the result of litigation that Wilder filed against the TWA-MEC and certain of its members, including Robert Pastore, the Master Chairman of the TWA-MEC, as well as Hollander and Young, to collect unpaid bills for his services to the TWA-MEC during 2001. In that action, Baptiste & Wilder, P.C. v. TWA MEC, et al., No. 04cc004764 (Cir. Ct., St. Louis County, MO) ("Missouri Litigation"), Wilder's law firm sought to recover $69,012.49 in unpaid legal bills, along with interest. See Missouri Litigation Complaint dated Feb. 14, 2005. After various pre-trial motions were granted, the only defendant who remained in the action, Pastore, was represented during pre-trial proceedings and at trial by Allen Press.

In a November 7, 2006 deposition in the Missouri Litigation, Wilder contradicted the deposition testimony that Young and Hollander had given less than two months earlier in this case by testifying that he attended a meeting of the members of the TWA-MEC, the Merger Committee, and the ALPA advisors on April 1, 2001, and that he left that afternoon because he "had a commitment for another client in another city." See Dep. Wilder Dep. of Nov. 7, 2006 at

100:18-21. Wilder added that he "did not learn about the vote on April 2, until [he] called up the MEC the following day." Id.

At the trial of the Missouri Litigation on November 21, 2006, just two weeks later, Wilder gave different testimony about April 2. When asked by his attorney, James Cole, Esquire, about whether he was present at the meeting on April 2, Wilder responded: "I was present for the first part of the public part of that meeting. I had an engagement with another client in another city, and so I left St. Louis where the meeting was held prior to that decision being made." See Tr. of November 21-22, 2006 at 36:9-13.

As noted above, the invoice that Wilder had sent to the TWA-MEC for April 2001 was an exhibit during the Missouri Litigation. Id. at 82:21-24. That document would have refreshed Wilder's memory and established conclusively that he was not present on April 2. The invoice, along with the plane ticket attached to it, would have further confirmed that Wilder travelled to Louisville on the afternoon of April 1, 2001.

Despite what this invoice would have established, Press – who obviously knew that a discrepancy existed between what certain of the plaintiffs had said in their depositions in September 2006 in this case and what Wilder had said in his deposition in the November 2006 Missouri Litigation – did not show that invoice to Wilder at any point during his cross-examination at the trial of the Missouri Litigation.

**C.**  **Wilder's Deposition on August 8, 2008**

When Wilder was deposed by Press in this case on August 8, 2008, Press again did not show him the April 2001 Baptiste & Wilder invoice – which would have established that Wilder was not present on April 2, 2001 -- and instead had Wilder testify that he was present on April 2, 2001. At the beginning of that examination, under questioning by Press, Wilder testified that he had been incorrect in his deposition in the Missouri Litigation and correct in his trial testimony

6

and that he had been present on April 2 rather than April 1. Wilder Dep. of dated August 8, 2008
at 8:17 to 9:23.

It is difficult to understand why Wilder chose to confirm his trial testimony in the
Missouri Litigation that he was in St. Louis with the TWA-MEC on April 2 over his deposition
testimony in that case that he was in Louisville on another matter on April 2. All Wilder had to
do was to review his invoice to the TWA-MEC for April 2001, which he obviously still had in
his possession. He could also have reviewed his bill to the client he met with in Louisville late on
April 1 and on April 2. Or, as discussed below, he could simply have referred to his "Day-
Timer," which he also obviously still had in his possession. All three of these basic documents
would have readily confirmed that Wilder was not physically in St. Louis on April 2, 2001.

What is equally puzzling is that Press made no effort to resolve the discrepancy between
Wilder's deposition and trial testimony in the Missouri Litigation by refreshing Wilder's
recollection with Wilder's invoice. Press obviously had a copy of that invoice in his possession
and was fully familiar with it from the Missouri Litigation. Given the importance of what
allegedly happened at the meeting on April 2, Press could easily have corrected Wilder's
testimony simply by handing him the invoice. In short, one can only wonder how two
experienced attorneys, both familiar with the fact that Wilder had filed litigation based upon his
unpaid bills, could have failed to discuss the Wilder invoice and what it clearly reflected about
his work for the TWA-MEC on April 1 and 2.

**D.    The Wilder Affidavit of February 20, 2009**

After the deposition of Plaintiffs' proposed expert witness, Lee Seham,[2] during which the
question of the date of Roland Wilder's appearance at the April 1 meeting became pronounced,

---

[2] In an Order filed on March 11, 2009 [Docket #294], the Court ruled that Mr. Seham's
testimony was inadmissible at trial.

counsel for ALPA made an effort to lay to rest the issue of whether Wilder was present on April 2. In response to a demand by ALPA's counsel, Wilder checked his records and corrected his testimony by providing ALPA's counsel with an Affidavit dated February 20, 2009. In that Affidavit, which ALPA filed in support of its motion for summary judgment in this case, Wilder confirmed that he was in St. Louis at the MEC's offices for the work session on April 1, 2001, but that he left at approximately 4:30 p.m. to travel to Louisville, Kentucky, on another client matter and remained in Louisville on April 2, 2001. See D-236 at 2. Wilder submitted, with his Affidavit, a portion of his deposition testimony from the Missouri Litigation along with pages from his "Day-Timer" for April 2001, which confirmed that he met with a different client in Louisville on the evening of April 1 and on April 2. Id. at 10 to 11.

After Wilder's Affidavit definitively corrected the record and demonstrated that he was physically in Louisville on April 2, ALPA expected Plaintiffs' counsel, who were now confronted not only with Wilder's invoice and plane ticket, but also his Day-Timer and his sworn Affidavit – as well as the agendas for the meeting on April 2, 2001, and the deposition testimony of David Holtzman – to back away from the fiction that Wilder was in St. Louis at the MEC meeting on April 2, 2001.

To do so, however, would undermine the entire foundation of the Plaintiffs' case, which was their claim that Wilder and the members of the TWA-MEC were ambushed by the other advisors at the meeting on April 2 and were bullied and coerced into waiving scope. If the members of the TWA-MEC had to admit that they were present on April 1 with Wilder and the other advisors, they could not imply that the other advisors met by themselves on April 1 in order to coordinate their assault on the TWA-MEC on April 2. Plaintiffs could not claim, as Hollander did at trial, that the events of April 2 seemed choreographed "like a Broadway play." See Tr. of

8

June 15, 2011 at 42:14-15. Moreover, if the other advisors had rejected Wilder's litigation theory on April 1, the members of the TWA-MEC would have had an entire day to decide what to do. They could not have claimed, as they had attempted to, that they got the "bum's rush" the following day.

Finally, a concession by the Plaintiffs that certain of their key witnesses, including Young and Hollander, had been mistaken in thinking at their depositions that Wilder was present on April 2, would have undermined their credibility. If Young and Hollander had to admit that they had been mistaken about the events of April 1 and 2, the jury might conclude that their recollections were also faulty about other key events.

Faced with these consequences, counsel for Plaintiffs made the wrong choice ethically and determined to go "all in" by allowing the pilots not only to stick to their story of oppression at the hands of ALPA, but to embellish and coordinate their false testimony in an effort to make it appear credible. This unfortunate decision resulted in numerous violations of the rules of ethics and, ultimately, a trial that was tainted by false and misleading testimony with respect to the events leading up to April 2 and other matters.

### E.    Plaintiffs' Opposition to ALPA's Motion for Summary Judgment

On March 12, 2009, ALPA filed a second motion for summary judgment in this case. Plaintiffs opposed ALPA's motion for summary judgment, in part, by continuing to assert that Wilder was in St. Louis at the TWA-MEC meeting on April 2, 2001. Plaintiffs took this position despite all of the contravening probative evidence. In a Declaration executed on May 15, 2009, and submitted as part of Plaintiffs' opposition to ALPA's motion [Docket #302], Hollander asserted:

> 5. I attended a meeting of the MEC on April 2, 2001, also attended by eight advisors and the MEC's attorney, Roland Wilder. During this meeting, Richard Seltzer and Steve Tumblin told the MEC their chances of prevailing on the

> Section 1113 motion were poor. ALPA national advisors such as Clay Warner
> and Bill Roberts, took it a step further and threatened the MEC that it had no
> choice but to waive scope and surrender its opposition to the Section 1113
> motion, or risk losing their entire collective bargaining agreement, their union,
> and the right to grieve.

Hollander also asserted, in this Declaration, that the ALPA advisors "successfully coerced the

MEC to vote in favor of a waiver…" Id.

Counsel for Plaintiffs also submitted to the Court and relied upon, as part of their

opposition to ALPA's summary judgment motion, the portions of the depositions of Young and

Hollander described above, in which they claimed that Wilder was at the April 2 meeting. They

likewise relied upon portions of the deposition of LeRoy Bensel, in which he had also claimed

that Wilder was at the April 2 meeting. Plaintiffs' brief in opposition to summary judgment cited

this false testimony in asserting that, during a break in the meeting on April 2, 2001, "the ALPA

advisors held a closed door meeting with Wilder in which the advisors bullied him into

acquiescing to their position." Pls' Brief filed on May 8, 2009 [Docket #302] at 30.

### F.    Roland Wilder's Video Testimony at Trial

After the Court relied upon these papers in denying summary judgment, during the period

leading up to trial, counsel for Plaintiffs continued to press the contention that Wilder was in St.

Louis at the MEC meeting on April 2, 2001, and to adhere to their version of what happened at

that meeting. Thus, in preparing the Joint Final Pre-Trial Order ("JFPO"), counsel for Plaintiffs

designated significant portions of Wilder's deposition testimony, including those portions in

which he had testified that he was in St. Louis on April 2, as among the videotaped deposition

testimony to be played at trial. Astonished that Plaintiffs' counsel would rely upon testimony that

was clearly false and that Wilder had corrected in his subsequent Affidavit, counsel for ALPA

requested that plaintiffs' counsel agree to a supplemental deposition of Wilder so that Wilder

could correct his testimony in a manner that would be admissible at trial.  Counsel for Plaintiffs refused this request.

As a consequence, ALPA was forced, in its portions of the JFPO, to raise this issue with the Court and to request that it be permitted to take a supplemental deposition of Wilder. See JFPO at 70-71 [Docket #353]. The Court granted this request. At the subsequent supplemental videotaped deposition of Wilder at his office in Washington, D.C., Wilder reviewed his firm's invoice for April 2001, and the plane tickets and other disbursement materials which confirmed that he had flown to Louisville on the afternoon of April 1 and could not possibly have been in St. Louis at the MEC meeting on April 2. After reviewing these materials, Wilder testified that he was "100 percent certain" that he was that he was in Louisville rather than St. Louis on April 2:

> Q:    How confident are you that you were not present at a meeting of the TWA-MEC on Monday April the 2nd of 2001?
>
> A:    Now I am confident that I was not there on April 2, because I learned of the vote on April 2 by telephone. And I learned as a result of this proceeding that the vote was taken on April 2, not in [sic] April 1.
>
> Q:    If you had to give a percentage in terms of how certain you are that you were not present for the meeting of the MEC on April 2, with 100 percent being the most certain, what percentage would you give for how certain you are that you were not present at any meeting of the TWA-MEC on April 2 of 2001?
>
> A:    I would say that I am 100 percent certain because that is confirmed by the written record and the – my handwritten notes which were   taken at the time on April 2. That is what I have the most confidence in, frankly."

Wilder Dep. of Apr. 21, 2011 at 16:9 to 17:5 (emphasis added). Under cross-examination by Press, Wilder testified that the events he described in his August 8, 2008 deposition as having taken place on April 2 had actually taken place on April 1. Those events included discussions with members of the MEC, including Sally Young. See Aug. 8, 2008 Dep. of Wilder at 204:7-24.

11

Needless to say, this testimony rendered false the trial testimony of the Plaintiffs' pilots, who claimed that they were not present on April 1, 2001.

### G.   Alan Altman's Deposition

After the Court denied Plaintiffs' motion to bar the trial testimony of Steven Rautenberg, Plaintiffs were permitted to identify Alan Altman and David Singer as trial witnesses, and ALPA was given leave to take their depositions. See Order filed on Apr. 14, 2011 Order [Docket #374]. At the deposition of Altman, his recollection was unclear with respect to the meeting on April 2. See Apr. 28, 2011 Dep. of Altman at 167:17-18. He initially testified that he thought Wilder was present on April 2 and that Wilder did not want the TWA-MEC to waive scope. Id. at 171:12-13. When later questioned about what exactly Wilder said on April 2, Altman responded: "I don't remember what he said. I know he was against it." Id. at 171:15-16. Upon further examination, Altman conceded that he was not even certain if Wilder attended the MEC meeting on April 2 but that he recalled Wilder being present "with us" on April 1. Id. at 171:17-21.

### H.   Plaintiffs' False Testimony at Trial

Wilder's "100% certain testimony" and the supporting documents did not deter six of the Plaintiffs' pilot witnesses – Case, Altman, Hollander, Clarke, Day and Young – from testifying at trial that Wilder was present with them in St. Louis on April 2, 2001. Five of these pilots claimed that

> (1) they appeared at a meeting of the TWA-MEC in St. Louis on April 2, 2001;
>
> (2) Roland Wilder was present and proposed a litigation strategy that was designed to obtain more "leverage" in negotiating with TWA, LLC and the American pilots;
>
> (3) Wilder attempted to explain the basis for his theory but was essentially shouted into silence by the other advisors;
>
> (4) they and the other members of the MEC were not aware, before April 2, 2001, that they would be called to "waive scope" on that day; and

(5) they and the other members of the MEC were "coerced" into agreeing to
waive scope.

These same witnesses claimed that they did <u>not</u> attend the "work session" that had been

scheduled for the prior day, Sunday, April 1, and implied that the "advisors" used that session to

coordinate their assault on the pilots during the meeting on April 2. These pilot witnesses and

their counsel, who presented their testimony, were obviously aware of Wilder's corrected

testimony and the documentation that supported it. Indeed, several of these pilots testified <u>after</u>

Wilder's supplemental deposition was shown by video in court. Despite this, they stuck to their

story.

At trial, the inconsistencies among the deposition testimony of the Plaintiffs' pilot

witnesses miraculously disappeared. During his deposition, Hollander had testified that during

the meeting on April 2, 2001, Wilder "stood 100 percent silent" and "rendered no opinion

whatsoever." <u>See</u> Hollander Dep. of Sept. 19, 2006 at 70:12-15. At trial, under questioning by

Jacobson, Hollander changed his testimony and claimed that Wilder spoke on multiple occasions

but was shouted down by the other advisors:

> Everybody was singing the same song and d[anc]ing to the same step, with one
> exception which was Roland Wilder... [Wilder] often tried to get his points
> across. At least once or twice tried to offer other suggestions and he was
> interrupted in his speaking. He was not like, I am not saying like allowed, but he
> was cut off. Mr. Wilder, we will get to that. Mr. Wilder, we don't share your
> opinion on that. It was that type of a conversation.

Tr. of June 15, 2011 at 42:17 to 43:1. During his trial testimony, Hollander also claimed to recall

for the first time the same words other pilots claimed Wilder used in his allegedly dramatic exit

from the meeting:

> At some point I think Roland Wilder, our merger attorney, and this is an opinion,
> was frustrated. We all saw a video here yesterday. Roland Wilder is a fairly frail
> man, well spoken, soft spoken. He literally grabbed his briefcase, and he headed
> for the door, and he had this look on his face, you know, with bloodshot eyes,
> almost, and his departing comments were this: He said look, maybe some deal is

better than no deal, but I can tell you if you are going to do this, you don't have to
do it today.

Id. at 44:6-14.

Altman also changed his deposition testimony at the time of trial to conform to the

Plaintiffs' story. At his deposition, Altman had testified that he was not even certain that Wilder

was present on April 2 but that he recalled Wilder being "there with us on April 1," with "us"

referring to the members of the MEC. See Altman Dep. of Apr. 28, 2011 at 171:12-13. During

examination by Press at trial, however, Altman testified that he was "confident" that Wilder was

present on April 2, 2001, see Tr. of June 9, 2011 at 154:12-13, and for the first time offered vivid

details – which he said he did not recall at his deposition -- that were strikingly consistent with

the trial testimony of Hollander and Young about Wilder's dramatic departure:

> Roland was the one advisor who always stood firm and told us not to waive
> scope. When Roland left the meeting – Roland was a dissenting view among
> advisors. Roland was being treated poorly by the others in that room, the other
> advisors. Roland left. I remember this because his bag, garment bag, was behind
> me. He grabbed his garment bag, he is walking out the door. He stopped. My
> characterization of Roland's face was he looked defeated. He looked very upset.
> And he turned around and he said, "I guess some contract is better than no
> contract. And as he turned, he said, if you are going to waive scope, you don't
> have to do it now. You can do it on the courthouse steps."

Id. at 154:20 to 155:7 (emphasis added).

Case and Young gave almost identical trial testimony about the alleged mistreatment of

Wilder and his dramatic departure. Case, under questioning by Press, testified that Wilder

"expressed a positive position … for his litigation strategy for a period of time," but "eventually

capitulated, and said 'I guess a contract is better than no contract.'" See Tr. of June 8, 2011 at

185:6-11 (emphasis added). Case went on to characterize Wilder's demeanor on April 2 as

"distraught." Id. at 185:18-19.

During her examination by Press, Young's testimony mirrored that of Case, particularly with respect to the language she chose to describe Wilder's appearance. She claimed that Glanzer screamed at Wilder, and afterwards, Wilder "capitulated and he looked defeated." See Tr. of June 13, 2011 at 34:24 (emphasis added). In addition, Young recalled the exact same piece of advice from Wilder as Case and Hollander had testified to earlier in the trial: "He ended his presentation by saying … a contract is better than no contract, and I suppose if you have to waive, I would just advise you wait until the courthouse steps." Id. at 34:25 to 35:3.

It strains credulity to suggest that the pilots who testified for Plaintiffs, and who had difficulty remembering the most basic details about events and discussions at other MEC meetings around the same timeframe, recalled the exact same particulars about the April 2 meeting over ten years later and then chose the exact same words ("capitulated" and "defeated") to describe Wilder's demeanor without consciously synthesizing their stories at some point prior to trial. Furthermore, it is equally implausible that they remembered the same advice from Wilder and were able to recite it almost *verbatim* but were unable to remember other statements made by the other advisors on April 2.

A sixth pilot presented by Plaintiffs, Michael Day -- who was never deposed in this case – testified that he did not attend the meeting on April 2, 2001.  But Day also supported Plaintiffs' fictionalized version of events by insisting that he was in St. Louis on April 2 at a separate Merger Committee meeting in the MEC office and physically observed Wilder there. See Tr. of June 23, 2011 at 35:7 to 37:25.

While Plaintiffs' pilot witnesses had vivid recall of events on April 2, their memories failed them with respect to the Special TWA-MEC meetings on March 21-22. While Case, Altman, Hollander and Young all conceded that they were present at the meetings on March 21

15

and 22, not one of them recalled which of the advisors were present at the meetings, the substance of the discussions, or the nature of the professional advice given. See Tr. of June 8, 2011 at 145:9-14 and 174:7-19; Tr. of June 9, 2011 at 133:4-11 and 135:9-14; Tr. of June 13, 2011 at 135:9-14 and 136:14-21; Tr. of June 15, 2011 at 156:22 to 157:10 and 168:17-25. This case of collective amnesia is highly suspect because the official minutes of these meeting show that the meetings involved relevant, substantive discussions about the important merger issues, such as the bankruptcy proceedings. In fact, seven advisors to the MEC were present at these meetings, and updates on the bankruptcy court proceedings and American transaction were held in executive sessions with the Negotiating Committee and Merger Committee, which together were over six hours in length. See D-233.

Similarly, with respect the work session scheduled for April 1, the Plaintiffs' pilot witnesses claimed that they did not attend because of short notice (Case and Altman), see Tr. of June 8, 2011 at 183:24-25; Tr. of June 9, 2011 at 151:6-21, or did not know MEC members were invited to participate in the meeting (Young and Hollander). See Tr. of June 13, 2011 at 143:16-25; Tr. of June 15, 2011 at 35:15-25. Needless to say, this testimony contradicted not only the corrected testimony of Wilder but also that of pilot Rautenberg, who testified that they were both present on April 1 and that the entire MEC and all of the advisors, including Wilder, attended the meeting. See Tr. of June 29, 2011 at 16:24 to 17:15 and 170:20-23. Rautenberg described the meeting as "an open dialogue" in which the advisors "offered their thoughts about the 1113" and "the probabilities of prevailing." Id. at 20:3-11.

It is significant that a number of other TWA pilots who were involved in the events on March 21-22 and April 1 and 2, 2001, and who were listed as witnesses for the Plaintiffs in the JFPO, did not appear and testify at trial. Robert Pastore was the Master Chairman of the TWA-

MEC and was a class representative when this case was initially filed. Pastore had received

Wilder's invoice for April 2001 and had approved it for payment. Although counsel for Plaintiffs

repeatedly represented during trial that Pastore would appear and testify, at the last minute

counsel announced, without explanation, that Pastore would not testify, and he never appeared.

See Tr. of June 9, 2011 at 22:15 to 23:6; Tr. of June 16, 2011 at 219:20-25; Tr. of June 20, 2011

at 44:1-3, 9-11; Tr. of June 22, 2011 at 13:8-17.

### III.    The Alleged "Get Real" Comment

Another critical issue about which counsel for Plaintiffs knowingly presented false

testimony related to Duane Woerth's alleged comment at a meeting of the APA Board on April

5, 2001, that the TWA pilots had to "get real" in terms of their expectations for the seniority

integration process with American Airlines pilots. During his direct examination of Hollander,

Jacobson offered exhibit P-174, an e-mail from Keith O'Leary to the TWA MEC, forwarding a

posting on the APA's website about the alleged comment by Woerth. ALPA's counsel objected

to the e-mail as hearsay, and the Court permitted ALPA's counsel to conduct *voir dire* in

connection with the exhibit. During *voir dire* examination by Jacobson, Hollander admitted that

he was not present at the APA Board meeting on April 5, 2001 but implied that he was in

attendance at the April 23, 2001 MEC meeting during which Woerth addressed the MEC about

his comments to the APA.  Tr. of June 15, 2011 at 68:10 to 69:4. Thereafter, the Court cautioned

that Hollander was only to testify about what questions were asked of Woerth and Woerth's

responses at the April 23 meeting that Hollander had personally heard and observed. Id. at 69:23

to 71:12.

Plaintiffs' counsel knew that Hollander was not present at the MEC meeting on April 23,

2001 because the official minutes of the April 23 to 24, 2001 TWA MEC meeting – a document

that Jacobson showed to Hollander during his direct examination, id. at 75:24 to 76:1 – included

a statement on the first very page by Case that Hollander was unable to attend the meeting due to

personal obligations:

> Case read for the record the following statement written by Hollander to the
> Master Chairman:
>
> "Due to personal reason, which we have spoken about last week, I am
> unfortunately unable to attend the TWA MEC Special Meeting on April 23-24. It
> is however my intent to attend the second day of the Special Meeting if at all
> possible. So that there is no confusion or misunderstanding, I have sent F/O Ted
> Case a valid proxy to vote on all issues in my place. We have spoken at length on
> all the published agenda items and he has a clear understanding on how the
> Council 002 pilots wish to be represented. I have asked F/O Ted Case to read this
> into the record at the start of the meeting and hand you this for your record."

D-078 (emphasis added).

Despite this undisputed document, Hollander then proceeded to testify before the jury

that he was present at the April 23, 2001 meeting of the MEC and that Woerth, when asked about

his meeting with the Board of the APA on April 5, 2001 "did not deny" making the get real

comment:

> Q. [By Mr. Jacobson] Were you present at that April 23 meeting?
>
> A. I was.
>
> . . .
>
> Q. What was he told that he was alleged to have said to the Allied board?
>
> A. The TWA MEC had concern because it was relayed to us that Captain Woerth
> told the Allied Pilots Association, our opposite union, that the TWA pilots need
> to, quote, "get real."
>
> Q. Get real on what?
>
> A. It just said get "get real." We obviously took an assumption that he was
> referencing the seniority integration, and the proposal of such.
>
> Q. Can you recall one way or the other whether seniority integration itself is
> specifically mentioned in connection in connection with the get real excellent
> [sic]?
>
> A. It was.

Q. Did Captain Woerth deny having made that statement?

A. He did not deny making the statement.

Tr. of June 15, 2011 at 73:5 to 75:23 (emphasis added). During cross-examination by counsel for

ALPA, however, Hollander admitted that he was not present at the MEC meeting on April 23

and that he only knew about Woerth's alleged statements from what was allegedly relayed to

him by other MEC members during telephone calls:

Q. [By Mr. Fram]… You were there when Mr. Woerth addressed the MEC on April 23 and 24, correct?

A. No, I was not.

Q. You weren't even at the meeting where he was asked about whether he had made the statement?

A. Duane Woerth's appearance was the first day of the meeting. My recollection is I was not there on the first day of the meeting.

Q. So how do you know that he did not deny making the statement but believed it had been taken out of context?

A. I was getting phone calls from almost everybody in that room, every break they had.

THE COURT: I am sorry. I thought when, I asked some questions about that [during the Rule 104 hearing] and one of the reasons he explored it, I understood that you were there. That is why I made the distinction between what I would consider hearsay as to what he said, as to what came out of his own mouth. That is what you heard.

A. I thought you were referencing the APA message with the attorney about what was said down there. What was said in the meeting on –

THE COURT: When he appeared, and when he was questioned, clearly he was questioned, we know from the minutes that he was questioned about what he had said, when he had visited and spoke for a brief period of time at the APA, I guess board of directors meeting, the board of directors meeting. Maybe I am confused. I thought you were present. I think I even said that. I made the point that I would give you full range to say anything you heard him say.

MR. FRAM: I heard it the same way, your Honor.

19

A. Then I will yield and say I was mistaken. <u>I was not there for Duane Woerth's personal appearance on the first day of that meeting.</u>

<u>Id</u>. at 194:14 to 196:19 (emphasis added). Hollander was therefore able to present plainly inadmissible hearsay about what other pilots who were at the meeting allegedly heard from Woerth. He offered no explanation of why he initially testified that he personally observed the interaction between Woerth and the MEC on April 23, <u>id</u>. at 196:17-19, and the Court took no corrective action. The obvious point of Hollander's improper testimony was to put the thought in the jury's head that because Woerth did not fully deny making the "get real" comment, perhaps he had really made such a comment to the APA.

Jacobson and Press knew that ALPA's counsel had the April 23 and 24 MEC meeting minutes available to them and could use the statement about Hollander's absence to confront Hollander about his false testimony. Knowing Plaintiffs might otherwise be unable to present evidence about the alleged "get real" comment during their case in chief, Plaintiffs' counsel took a chance and misled the Court in an attempt to raise questions in the jury's mind about ALPA's alleged conflict of interest.

## IV.   <u>Press's Closing Argument</u>

Despite being confronted with conclusive evidence that Wilder did not attend the April 2 MEC meeting, Press chose in his closing to rely on the false testimony of the six pilots who had asserted that Wilder was present with them on April 2 in St. Louis. Apparently taking the view that if enough people claim something is so it becomes true, Press argued that the testimony of the Plaintiffs' pilot witnesses should be credited because "their story was completely consistent." <u>See</u> Tr. of July 11, 2011 at 132:10-11. Press went on to improperly vouch for his clients as "serious, credible people," basing this statement solely on the fact that the Plaintiffs' witnesses

had agreed to disregard Wilder's bills and other evidence that he was not present on April 2 and had told a uniform, coordinated story. Id. at 132:23.

On the second day of his closing argument, Press continued to disregard the evidence that Wilder was not in St. Louis on April 2. Instead, he asserted that Wilder had "flip-flopped three times on whether he was there on April 1 or April 2." Press misleadingly characterized Wilder's testimony from his 2011 supplemental deposition as just another turnabout resulting from his confusion about the dates. See Tr. of July 12, 2011 at 13:3-8. Press also falsely claimed that the logical explanation for these conflicting accounts was that Wilder never clarified his confusion about the dates. He disregarded Wilder's Affidavit, which had been admitted into evidence. This argument was a blatant mischaracterization of Wilder's testimony on April 21, 2011, during which Wilder had dissipated the confusion that Press himself had helped to create and had testified that he was 100% certain, based upon irrefutable documents, that he was not in St. Louis on April 2.

Press also misled the jury with respect to his discussion of Duane Woerth's alleged "get real" comment. Early in his closing, Press expressed indignation that Hollander – who had unquestionably given blatantly false testimony about the April 23 MEC meeting – had been portrayed as "a liar" in the closing argument of ALPA's counsel. See Tr. of July 11, 2011 at 132:14-15. Press, however, made no effort to resolve the discrepancy between Hollander's hearsay testimony about Woerth's statements to the MEC on April 23, 2001, and the testimony of Sean Clarke, another of Plaintiffs' witnesses. Clarke, who, unlike Hollander, was physically present at the April 23 meeting and had personally heard Woerth discuss his April 5 remarks to the APA Board, testified that Woerth denied stating that the TWA pilots had to "get real." See Tr. of June 16, 2011 at 91. Press simply ignored Clarke's testimony in stating that "there is not

21

one substantiating piece of evidence in the record" to support Woerth's testimony about what he really said to the APA Board of Directors on April 5, 2001. See Tr. of July 12, 2011 at 34:16-17.

Another misrepresentation of the evidence, and the law, made by Press during his closing was his contention that ALPA could have arranged for a postponement of the §1113 hearing. Thus:

> Mr. Seltzer supplied the proof. He told you that there is <u>an automatic right to an extension</u> of the 1113 hearing. All they had to do is go into court and say Judge, we would like an extension of this hearing so that we can put this issue out to vote to the members, the union local representatives have asked for it, and that is what we want to do. And that would have been done.

See Tr. of July 11, 2011 at 145:20 to 146:1 (emphasis added). Richard Seltzer, who was handling the §1113 motion, provided no such testimony. Rather, he testified that §1113 requires the court to schedule a hearing no later than two weeks after the motion is filed and that only a one-week extension of a hearing date is available. See Tr. of July 6, 2011 at 120:22-25. He further testified that TWA's §1113 motion, which was filed on March 15, 2001, was originally scheduled for a hearing on a date to be determined but that around March 21, 2001, he was advised that TWA had filed an amended motion which scheduled the hearing for April 6, which would have been 20 or 21 days after the original filing date and therefore the last date under the statute for a hearing. Id. at 120:25 to 121:9.

## **ARGUMENT**

### I.    **Plaintiffs' *Pro Hac* Counsel Committed Numerous Violations of the RPCs .**

An attorney may not knowingly offer false testimony during a judicial proceeding, either in submissions to the Court or through testimony at trial. Indeed, it has been said that no ethical violation is more damaging to the "administration of justice or more hurtful to the public

appraisal of the legal profession than the knowledgeable use by a lawyer of false testimony in the judicial process." Florida Bar v. Rightmyer, 616 So. 2d 953, 955 (Fla. 1993).

Rule 3.3(a) of the New Jersey Rules of Professional Conduct,[3] relating to Candor Toward the Tribunal, prohibits a lawyer from knowingly offering false evidence to a tribunal and related conduct:

> A lawyer shall not knowingly:
>
> (1) make a false statement of material fact or law to a tribunal;
>
> (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting an illegal, criminal or fraudulent act by the client;
>
> . . .
>
> (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures....

Under RPC 3.3, a lawyer must refuse to offer evidence that the lawyer knows to be false, regardless of the client's wishes. "Zeal" is not an excuse for deceiving a court. In re Cardwell, 50 P.3d 897, 900-01 (Colo. 2002).

The ethical prohibition against offering false testimony reaches more broadly than the criminal prohibition against suborning perjury and bars an attorney from offering testimony that a witness mistakenly believes but which the attorney has reason to know is inaccurate. Thus, RPC 1.0(f) explains that the terms "knowingly" and "knows" denote "actual knowledge of the facts in question." The Rule further adds, however, that "knowledge may be inferred from the circumstances." As a consequence, although actual knowledge does not include unknown

---

[3] Pursuant to L. Civ. R. 103.1(a), the American Bar Association's Model Rules of Professional Conduct ("RPC"), as modified and adopted by the New Jersey Supreme Court, govern the conduct of attorneys who appear before this Court. See Maldonado v. New Jersey ex rel. Admin. Office of Courts-Prob. Div., 225 F.R.D. 120, 142 (D.N.J. 2004).

information, a lawyer may not go out of his or her way to avoid knowledge, such as by refusing to read a document. See Restatement (Third) of the Law Governing Lawyers (2000), §120 cmt. b ("Restatement").

Section 120(1)(c) of the Restatement, which is based upon RPC 3.3(a)(4), provides that a lawyer may not "offer testimony or other evidence as to an issue of fact known by the lawyer to be false."  Comment d to §120 explains the breadth of this responsibility:

> False testimony includes testimony that a lawyer knows to be false and testimony from a witness who the lawyer knows is only guessing or reciting what the witness has been instructed to say. This section employs the term "false testimony" and "false evidence" rather than "perjury" because the latter terms defines a crime, which may require elements not relevant to the application of the requirement of the Section in other contexts. For example, although a witness who testified in good faith but contrary to fact lacks the mental state necessary for the crime of perjury, the rule of the Section nevertheless applies to a lawyer who knows that such testimony is false. When a lawyer is charged with the criminal offense of suborning perjury, the more limited definition appropriate to the criminal offense applies."

Restatement, §120 cmt. d.

The duties to avoid offering false evidence and to take reasonable remedial measures with respect to false evidence that is material[4] apply during the course of civil discovery, such as at depositions, in connection with documents submitted to the court and testimony adduced at trial. See, e.g., United States v. Kross, 14 F.3d 751, 754 (2d Cir. 1994) (false statements made in civil deposition can form basis for charge of perjury even if not found to have been critical to outcome of underlying civil suit). An attorney must attempt to discourage a client from giving false testimony at trial. If the client nevertheless insists upon testifying falsely, the lawyer should not call the client as a witness. See ABA Formal Ethics Op. 87-353 (1987). If the client cannot

---

[4] The responsibility to avoid offering evidence that the lawyer knows to be false is mandated even as to statements that are not "material" or do not go to the substance or merits of the case. This is made clear by the 2002 amendments to Model Rule 3.3(a), which removed the qualifier "material" from the prohibition against making false factual statements. Materiality is only important if the lawyer has offered evidence and comes to know of its falsity.

24

be dissuaded from giving false testimony, a lawyer in a civil case should seek to withdrawal. See, e.g., Wolfram, "Client Perjury," 50 S. Cal.L.Rev. 809, 860 (1977); see RPC 1.16(a)(1). If the attorney is not permitted to withdraw and the client nevertheless gives testimony that the lawyer knows to be false, "the advocate must make such disclosure to the tribunal as is reasonably necessary to remedy the situation." ABA Formal Ethics Op. 93-376 (1993).

Although the preparation of witnesses to testify at trial is certainly proper, there is a clear line between proper witness preparation and improper witness "coaching." See Lisa Renee Salmi, "Don't Walk the Line: Ethical Considerations in Preparing Witnesses for Deposition and Trial," 18 Rev. of Litigation 135 (1999); Richard. C. Wydick, "The Ethics of Witness Coaching," 1 Cardozo L.Rev. 1 (1995). Although it is proper for an attorney to assist a witness to refresh her recollection, is it plainly improper to encourage a group of witnesses to tell a consistent story. Indeed, it is widely recognized that while inconsistencies between witness testimony can suggest uncertainty or even fabrication, "[p]erfect consistency, however, is also a sign of perjury." John S. Applegate, "Witness Preparation," 68 Tex. L.Rev. 277, 310 (Dec. 1989). In United States v. Townsley, 843 F.2d 1070, 1086, on reh'g, 856 F.2d 1189 (8th Cir. 1988), a criminal case, the Eighth Circuit rejected a claim of attorney-client privilege with respect to recorded conversations between an attorney and witnesses who were being called to testify before a grand jury on the grounds that the attorney was attempting to assist the witnesses to present a uniform but untruthful "story":

> It is abundantly clear from our review of the conversations played for the jury that Webbe, Sr. was vigorously participating in the obstruction of the grand jury's investigation. The conversations show that Webbe, Sr. was interested in presenting a uniform, knowingly untruthful, story from the various witnesses and actively coached them to that end. We emphatically reject any attempt to shield these conversations as privileged communications. See United States v. Gordon–Nikkar, 518 F.2d 972, 975 (5th Cir.1975) (plans to commit perjury and hide criminal activity are beyond the scope of the privilege).

Id. at 1086.

What happened in this case is obvious. The pilot witnesses called by Plaintiffs concocted a story of last-minute coercion on April 2. That was only plausible if Wilder was present then as opposed to the day before. In the face of Wilder's own testimony that he was 100% certain he was not present on April 2 and documents which proved that conclusively – to say nothing of the testimony of other witnesses – the pilot witnesses who testified for Plaintiffs not only persisted in giving false testimony but took affirmative steps to conform their testimony in an effort to make it appear more credible. The only logical conclusion is that during the trial preparation sessions that counsel for Plaintiffs conducted with Hollander and Altman, they were counseled to change their deposition testimony so that it conformed to that of Case and Young with respect to the events of late March and April 1 and 2, 2001.

Moreover, it is obvious that Plaintiffs' witnesses were improperly coached to claim that they were not present on April 1, despite the deposition testimony of Altman and of Wilder himself, and to claim that they could not recall anything about what was discussed at the MEC meetings on March 21 and 22, 2001. What Justice Frankfurter said in Avery v. Georgia, 345 U.S. 559, 564 (1953) (Frankfurter, J., concurring) surely applies in this case: "The mind of justice, not merely its eyes, would have to be blind to attribute such an occurrence to mere fortuity."

This misconduct resulted in numerous violations of RPC 3.3, including the following:

(1) Press violated RPC 3.3 by knowingly inducing Wilder during his deposition on August 8, 2008, to testify that he was present in St. Louis on April 2, 2001, when counsel were fully aware, from Wilder's bill for April 2001 that he was not present;

(2) Plaintiffs' counsel violated RPC 3.3 by submitting to the Court and relying upon, in opposition to ALPA's motion for summary judgment, deposition testimony and Declarations from various plaintiffs that falsely claimed that Wilder was in St. Louis on April 2, 2001;

(3) Plaintiffs' counsel violated PRC 3.3's requirement that they refrain from offering false testimony by designating, as part of the JFPO, portions of Wilder's deposition testimony that counsel knew was inaccurate and by attempting to prevent ALPA's counsel from correcting the record through a supplemental deposition;

(4) Plaintiffs' counsel violated RPC 3.3 by playing to the jury, during trial, false testimony from Wilder's deposition;

(5) Press violated PRC 3.3 by having five pilot witnesses falsely testify that Wilder was present in St. Louis on April 2, 2001, and to events involving Wilder on that date that could not possibly have occurred;

(6) Jacobson violated PRC 3.3 by having Hollander testify falsely concerning the events of April 1 and 2, as well as by having Hollander testify falsely that that he was present at the TWA-MEC meeting on April 23, 2001;

(7) Press violated PRC 3.3 in his closing argument by relying upon false testimony and disparaging as mistaken or inaccurate Wilder's corrected testimony and the testimony of witnesses presented by ALPA that accurately stated that Wilder was not present on April 2, 2001.

(8) Press violated RPC 3.4(e) in his closing by improperly vouching for the pilot witnesses by asserting that they were "serious, credible people." His assertion that his witnesses should be deemed credible because they all told the same story was not evidence that they were credible. It was proof that they made up a story and conspired to testify falsely.

This misconduct unquestionably tainted the trial of this case and the Court should revoke the admission of Press and Jacobson as counsel in this case.

## II.    The *Pro Hac Vice* Admissions of Press and Jacobson Should Be Revoked.

It is well settled that District Courts have the "inherent authority to impose sanctions upon those who would abuse the judicial process." Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1990). "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." Id. See also Maldonado v. New Jersey ex rel. Admin. Office of Courts-Prob. Div., 225 F.R.D. 120, 133 (D.N.J. 2004). The inherent authority of the court includes "the power to control admission to its bar and to discipline attorneys who appear before it." Chambers v.

NASCO, Inc., 501 U.S. at 43-44; accord In re Tutu Wells Contamination Litig., 120 F.3d 368,

383 (3d Cir.1997); In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3d Cir.1984)

 This disciplinary power extends to the conduct of counsel admitted *pro hac vice*. L. Civ.

R. 104.1(h) provides that "[w]henever an attorney applies to be admitted or is admitted to

practice before this Court for purposes of a particular proceeding (*pro hac vice*), the attorney

shall be deemed thereby to have conferred disciplinary jurisdiction upon this Court for any

alleged misconduct of that attorney arising in the course of or in preparation for such

proceeding." Accord L. Civ. R. 101.1(c)(4) & 103.1 cmt. 2.

 Admission *pro hac vice* is a privilege, and as such, the privilege may be revoked as a

sanction for unethical behavior. E.g., Johnson v. Trueblood, 629 F.2d 302, 304 (3d Cir.1980);

Chamber v. Heidelberg, 2007 U.S. Dist. LEXIS 38819, *9-10 (D.N.J. May 25, 2007) (Kugler, J.)

(revoking *pro hac vice* status of counsel who signed a motion and used /s/ indicator for local

counsel, where local counsel never authorized the filing and phone records did not support *pro

hac vice* counsel's statement that she tried to reach local counsel by phone).[5] In cases where an

attorney has engaged in improper *ex parte* communications with a represented party the

sanctions employed have varied from the severe sanction of disqualification to the more lenient

sanction of precluding counsel from using any information obtained through the *ex parte*

contacts. In re Complaint of PMD Enterprises Inc., 215 F. Supp. 2d at 530-32 (revoking *pro hac

vice* admission); Inorganic Coatings, Inc. v. Falberg, 926 F.Supp. 517 (E.D.Pa.1995)

---

[5] See also In re Complaint of PMD Enterprises Inc., 215 F. Supp. 2d 519, 530-32 (D.N.J. 2002)
(revoking *pro hac vice* admission of attorney who violated RPC 4.2 by having investigator
interview individual who was part of opposing party's litigation control group); Data Systems
Analysts, Inc. v. Netplex Group, 187 F.R.D. 181 (D.N.J.1999); Eagan v. Jackson, 855 F.Supp.
765 (E.D.Pa. 1994). As for what behavior may warrant the revocation of *pro hac vice* admission,
the Third Circuit held that, "[a]t a minimum, a violation of any disciplinary standard applicable
to members of the bar of the court would justify revocation of *pro hac vice* status." Johnson, 629
F.2d at 304.

(disqualifying counsel); <u>see also</u> <u>Belote v. Maritrans Operating Partners, L.P.</u>, CIV. A. 97-3993, 1998 WL 136523 (E.D. Pa. Mar. 20, 1998) (precluding counsel from using information obtained *ex parte*); <u>Lennen v. John Eppler Machine Works, Inc.</u>, 1997 WL 566078 (E.D. Pa. Sept. 5, 1997) (same).

The course of conduct engaged in by *pro hac vice* counsel in this case is far more serious than the conduct relied upon by other courts in revoking *pro hac vice* admissions or disqualifying counsel. Further proceedings in this case will be too complex and too burdensome, both to the parties and to the Court, to permit counsel who have lost their ethical compass to be involved. The Court should therefore revoke the *pro hac vice* admissions of Press and Jacobson and, for the reasons set forth in the separate motions being filed by ALPA, grant other appropriate relief.

## CONCLUSION

For all of the foregoing reasons, Defendant ALPA respectfully requests that the Court revoke the *pro hac vice* admission of Allen Press and Joseph Jacobson and grant the other relief sought by ALPA in its other motions.

Respectfully submitted,

Archer & Greiner
A Professional Corporation

By:   */s/ Steven J. Fram*
      Steven J. Fram, Esquire

*Pro Hac Vice:*
Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Ave., N.W., Suite 250
Washington, DC 20016
(202) 659-4656

Counsel for Defendant Air Line Pilots Association, International

Dated: August 10, 2011

7010587v1

30