# Exhibit A

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
CIRCUIT JUDGE DIVISION
STATE OF MISSOURI

BAPTISTE & WILDER, P.C., )
A professional corporation )
)
Plaintiff, )
)                              Cause No. 04CC-004764
)
vs. )
)
)                              Division  19
TRANS WORLD AIRLINES, LLC )
MASTER EXECUTIVE COUNCIL )
500 Northwest Plaza, Suite 1200 )
St. Ann, Missouri 63074 )
A labor organization )
        And )
ROBERT A. PASTORE )
5294 Grapeview Road )
Grapeview, Washington  98546 )
Individually and in his capacity as TWA, )
LLC MEC Chairman )
        And )
JOHN HEFLEY )
96 Ledge Hill Drive )
St. Alban, Vermont  95748 )
Individually and in his capacity as TWA, )
LLC MEC Vice Chairman )
        And )
TED CASE )
2463 Waterscape Trail )
Snellville, Georgia  30078 )
Individually and in his capacity as TWA, )
LLC MEC Secretary-Treasurer )
        And )
HOWARD HOLLANDER )
14 Adelphi Avenue )
Harrison, New York  10528 )
Individually and in his capacity as TWA, )
LLC MEC Captain Representative )
        And )
JIM ARTHUR )
7502 Fieldstone Court )
Indianapolis, Indiana  46254 )
Individually and in his capacity as TWA, )
LLC MEC First Officer Representative )

And                                              )
SALLY YOUNG                                       )
667 Lakewood Drive                               )
Lake St. Louis, Missouri 63367                   )
Individually and in her capacity as TWA,         )
LLC MEC First Officer Representative             )
        And                                      )
SEAN CLARKE                                      )
3705 Bluff springs Drive                         )
St. Charles, Missouri                            )
Individually and in his capacity as TWA,         )
LLC MEC First Officer Representative             )
        And                                      )
AIR LINE PILOTS ASSOCIATION,                     )
INTERNATIONAL                                    )
Attn: Clay Warner                                )                    :
535 Herndon Parkway                              )
Herndon, Virginia  20170                         )
                                                 )
        Defendants.                              )

## PLAINTIFF'S FIRST AMENDED PETITION FOR BREACH OF CONTRACT FOR

## LEGAL FEES AND EXPENSES

Comes now Plaintiff, Baptiste & Wilder, P.C., and for its cause of action herein states as follows:

1.     Plaintiff is a professional legal corporation organized under and existing by virtue of law and having its physical place of business in Washington, D.C.  Plaintiff further states that the debt sued upon arose in and Plaintiff's cause of action accrued in the State of Missouri;

2.     Defendant TWA, LLC Master Executive Council  (hereinafter referred to as MEC) has its principal place of business in St. Louis County, Missouri;

3.     The remaining Defendants, with the exception of Defendant Air Line Pilots Association, International, were officers of TWA, LLC MEC and at the time the cause of action accrued were based in St. Louis, Missouri.  Consequently, sufficient contacts exist for jurisdiction to be proper under Missouri's long-arm statute;

4.     On January 19, 2001 Plaintiff and Defendant TWA, LLC Master Executive Council, then known as TWA MEC entered into a written retainer agreement for legal services, wherein Plaintiff agreed to provide legal services to defendant TWA MEC in exchange for specified hourly rates and reimbursement for out-of-pocket expenses incurred during the course of Plaintiff's representation.  A true copy of this retainer agreement is attached hereto and incorporated herein as Exhibit A.  Defendant Airline Pilots Association, International is the successor in interest to TWA MEC;

5.     Defendant Robert Pastore singed this fee agreement on behalf of Defendant TWA, LLC Master Executive Council;

6.     The hourly rates provided for in the retainer agreement between Plaintiff and Defendant TWA, LLC Master Executive Council are fair and reasonable and represent the customary rates of Plaintiff in similar cases;

7.     Plaintiff performed fully under the contract, providing competent legal representation on various matters as requested by TWA, LLC MEC;

8.     The Retainer Agreement provides for billing on a monthly basis, and the bills are payable on receipt;

9.     Despite demand for payment, there remains due and owing to Plaintiff the sum of $95,545.81 for legal services rendered and expenses incurred in the representation of Defendant TWA, LLC MEC during the months of August, September, October, November, and December, 2001;

10.     Defendant, TWA, LLC MEC has bank accounts with Union Planters Bank totaling approximately $156,000.00 from which Plaintiff's legal fees and expenses can be paid, and Defendants Pastore, Hefley Case, Hollander, Arthur,

3

Young, and Clark exert authority and control over said bank accounts as does Defendant Air Line Pilots Association, International as the successor in interest to TWA LLC, MEC;

     11.    Defendants have breached their obligations to Plaintiff under the contract for legal services between Plaintiff and Defendants by failing to pay billings as they were received.

     WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants in the principal sum of $95,545.81, together with interest at the rate of nine per cent per year form January 1, 2002, and for costs herein expended.

RICHARD A. ABRAMS, MBEN # 26128
8000 Maryland Avenue, Suite 1000
St. Louis, Missouri 63105
Telephone:  (314) 721-5156
Facsimile:   (314) 725-7435
Attorney for Plaintiff

# BAPTISTE & WILDER, P.C.

ATTORNEYS AT LAW

1150 CONNECTICUT AVENUE, N.W., SUITE 500

WASHINGTON, D.C. 20036

(202) 223-0723

ROLAND P. WILDER, JR.

January 17, 2001

FACSIMILE (202) 223-9677
E-MAIL BapWild@aol.com

<u>VIA UPS NEXT DAY DELIVERY</u>

Captain Robert A. Pastore
Chairman
TWA Master Executive Council
500 Northwest Plaza
Suite 1200
St. Ann, MO 63074

Dear Captain Pastore:

This letter is to confirm that Baptiste & Wilder, P.C. ("Firm") agrees to represent the Trans World Airlines Master Executive Council ("TWA MEC") upon the terms set forth below.

1.    <u>SERVICES</u>

The Firm agrees to provide legal services to the TWA MEC and its Merger Representatives, including advice and consultation; document preparation; legal research; representation in court, arbitration and administrative proceedings; and participation in negotiations and conferences, all with respect to matters arising from or related to collective bargaining negotiations and seniority integration in connection with the acquisition of TWA by American Airlines and related transactions.

2.    <u>FEES</u>

The Firm's current fee structure is $250 per hour for senior principals, $225 per hour for other principals, and $175-195 per hour for associates depending upon their experience.   The paralegal rate is $60 per hour.  We are prepared to guarantee those hourly rates for one (1) year.

Exhibit A

BAPTISTE & WILDE, P.C.
Captain Robert A. Pastore
Chairman
TWA Master Executive Council
January 17, 2001
Page 2

3.   EXPENSES

The Firm will bill you for all out-of-pocket expenses incurred in our representation, including actual costs for photocopying, postage, transportation, messenger, overnight or facsimile transmission service, long distance telephone calls, service and filing fees, computer research fees, witness fees of all types, and the fees and expenses of consultants, if required.

4.   BILLING

The Firm will bill you monthly for services rendered and for all out-of-pocket expenses. The bill will indicate the amount of time spent on your case, the nature of the services rendered, and the particular expenses incurred. These bills are payable upon receipt.

Since we are not always promptly billed for certain out-of-pocket expenses, such as telephone calls and electronic search expenses, we may not have received the bills for all such expenses when you receive our final statement. Consequently, we may bill you for some expenses after you have received our final statement for services rendered.

5.   WRITTEN MODIFICATION

This retainer agreement may be modified only by mutual consent in writing.

6.   TERMINATION

This retainer agreement may be terminated by the Firm for, among other things, the late payment or non-payment of monthly statements, failure to cooperate in the representation, insisting upon unethical conduct by the Firm or persistently failing to accept the Firm's advice. This agreement may be terminated by the client any time it becomes dissatisfied with the Firm's services. Written notice of termination must be given. In the event of termination, you will remain responsible for fees earned and expenses incurred by the Firm prior to the time the notice of termination is received, as well as for work performed and for expenses incurred incidental to termination.

BAPTISTE & WILDER, P.C.
Captain Robert A. Pastore
Chairman
TWA Master Executive Council
January 17, 2001
Page 3


       Please read this letter carefully.  If you find its terms acceptable, you may indicate your agreement by signing and dating this letter and the enclosed duplicate original, and by returning one original to me.  Do not hesitate to contact me if you have any questions concerning the provisions of this agreement.

       Very truly yours,

       BAPTISTE & WILDER, P.C.


    By: _____
       Roland P. Wilder, Jr.

RPWJr:beu


APPROVED:


_____
CAPTAIN ROBERT A. PASTORE

01-19-01
DATE

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
DOCKET NO.  02CV2917 (JEI)

LEROY "BUD" BENSEL, JAMES ARTHUR, PATRICK
BRADY, THEODORE A. CASE, MATTHEW J. COMLISH,
DARSHANPRIT S. DHILLON, LEMUEL A. DOUGHERTY,
MICHAEL V. FINUCAN, JOHN S. HEFLEY, HOWARD B.
HOLLANDER, ROBERT A. PASTORE and SALLY YOUNG,

             Plaintiffs,

     -vs-

ALLIED PILOTS ASSOCIATION, AIR LINE PILOTS
ASSOCIATION, AMERICAN AIRLINES, INC., and TWA AIRLINES,
LLC,

             Defendants.


                - - -
          September 15, 2006
                - - -


          Oral sworn deposition of SALLY RENETTE

YOUNG, 2725 Fairway Oaks Drive, Lake St. Louis,

Missouri, taken in the law offices of Archer & Greiner,

P.C., Esquires, One Centennial Square, Haddonfield, New

Jersey, before Cindy Pineiro, C.M., CSR #XI01815, and

Notary Public of the State of New Jersey, on the above

date, commencing at 9:00 A.M., there being present:

8572b3b6-d960-4576-a138-31a62985ca49

Page 62

1  was doing was asking the bankruptcy court to,
2  essentially, nullify the TWA pilots' collective
3  bargaining agreement?
4      A    Right.
5      Q    And, ultimately, the Court did not act on
6  the motion vis-a-vis the pilots, did it?
7      A    No.
8      Q    And why was that?
9      A    We withdrew it, I believe.
10     Q    The company withdrew its motion
11 because --
12     A    Yeah.  That's what I meant.
13     Q    Because an agreement was worked out with
14 the company?
15     A    Uh-huh.
16     Q    Let me just show you this, which was also
17 an exhibit submitted to the Court earlier.
18         (TWA MEC Special Meeting April 2, 2001,
19         was marked as Young-13 for identification by the
20         court reporter.)
21 BY MR. KATZ:
22     Q    This is a resolution adopted by the TWA
23 MEC on April 2, 2001, correct?
24     A    Uh-huh.
25     Q    And this was the action taken by the MEC

Page 63

1  to give the companies, American and TWA, what they had
2  stipulated was necessary in the asset purchase
3  agreement, which is Exhibit 4 that we looked at
4  earlier?
5      A    Yes.
6      Q    And the way I read this resolution, in
7  terms of your votes, it shows 400 votes for Council 003
8  by you as the co-pilot representative in favor, and 205
9  votes against.
10     A    Uh-huh.
11     Q    Would you explain why you split your
12 votes in that fashion, please?
13     A    Well, after extensive advice from the
14 ALPA advisors who came in town that day, the -- in
15 particular Roberts made it sound like if we didn't
16 voluntarily waive those provisions, that we would be
17 putting our pilots at risk of not being represented by
18 a union.  That American had no obligation to recognize
19 ALPA as the collective bargaining agent.  That pilots
20 would be put at risk.
21         And those -- that is the approximate
22 number of junior pilots that I represented.  Prior to
23 that day my position was that we shouldn't voluntarily
24 waive -- voluntarily waive these provisions.  That they
25 should be stripped in bankruptcy court if that was

Page 64

1  going to happen.
2      Q    Well, I have a number of follow-up
3  questions.  First of all, why did you split the votes
4  400 and 205?  How did you come up with those particular
5  numbers, and why did you vote -- cast 400 of your
6  members votes in favor and 205 against?
7      A    That was my assessment of the proportion
8  of pilots junior -- more junior first officers that
9  would be put at the most risk.
10     Q    205 or 400?
11     A    The 400.
12     Q    And so the 400 corresponds to the most
13 junior of the first officers in St. Louis, who you felt
14 were at the greatest risk of being harmed by the
15 granting of the Section 1113 motion?
16     A    That's correct.
17     Q    And the 205 corresponds to some first
18 officers based in St. Louis who are more senior and
19 were less at risk?
20     A    That's correct.
21     Q    Okay.  And did you do an examination of
22 the TWA pilots' seniority list to -- or of your own
23 membership in St. Louis to make that judgment?
24     A    I don't know that I did an examination,
25 but I was aware of the general --

Page 65

1      Q    Seniority?
2      A    -- seniority of the people I represented.
3      Q    Okay.  And you mentioned Bill Roberts as
4  the advisor who you mentioned.  Bill Roberts -- let me
5  just ask:  Was he to you the most important of the
6  advisors in terms of influencing you to vote in this
7  manner?
8      A    Every advisor said something that I
9  remembered that day.  I really -- I went to this
10 meeting with the intention of voting no, because that
11 was what I thought my constituents wanted in general.
12         There was -- you know, there was some
13 people that thought one thing and some people that
14 thought another.  Each of the advisors -- I asked
15 questions of each of the advisors, and each of the
16 advisors were -- they were in concert.  They were all
17 of the same opinion, with the exception of Roland
18 Wilder, and they all advised us to waive scope that
19 day.
20         And Bill Roberts made it sound like,
21 because TWA had recognized -- voluntarily recognized
22 ALPA as its collective bargaining agent some 70 years
23 prior, that there was no certification of that.  That
24 American had no obligation to do that, and that we
25 would be put at risk as a pilot group.  We would not be

17  (Pages 62 to 65)

8572b3b6-d960-4576-a138-31a62985ca49

Page 82

1    doesn't grant the waiver that the company's insisting
2    on, the Court will grant the 1113 motion and reject
3    ALPA's collective bargaining contract; isn't that
4    correct?
5        A       That was what the advisors said, and I
6    had no reason to not believe anything that they said,
7    actually, that day.
8            But, you know, whether or not the
9    provisions would have been stripped is -- we'll never
10   know, because we voluntarily waived them. Had we
11   allowed them to be stripped, there may have been -- my
12   position now is there may have been things that we
13   could have done and actions we could have taken had we
14   not voluntarily waived.
15           And, actually, that day we were talking
16   about voluntarily waiving early, because that was one
17   of the discussions that we had. Roland Wilder
18   disagreed that we waive that day. He said wait until
19   the steps of the -- the steps of the courthouse.
20       Q       So that's April 6th instead of April 2nd?
21       A       Correct.
22       Q       But he didn't --
23       A       So that day we were deciding, do you
24   waive and do you waive today? And I thought we were
25   told by the advisors there was value to waiving, and

Page 83

1    value to waiving early. That if need be, you could
2    litigate the language in the asset purchase agreement,
3    which never happened.
4            I've come to understand since then that
5    the likelihood of us being stripped of our union
6    representation in that situation is pretty slim.
7    Although American did not -- although there was not a
8    certification vote some 70 years ago, that -- in fact,
9    you know, us being lay -- you know, laid bare without
10   union representation probably would not have happened.
11   But that was what they intimated would have happened.
12       Q       You said Bill Roberts said that?
13       A       Yes.
14       Q       Do you have any reason to think that Bill
15   Roberts knew those statements about union
16   representation to be false when he made them?
17           MR. PRESS: Wait. Let me object to the
18   form of the question. I don't know which
19   representation you're talking about now.
20           Subject to that, go ahead and answer.
21   BY MR. KATZ:
22       Q       What information do you have to suggest
23   that Bill Roberts knew any of these representations to
24   the MEC, regarding what would happen if there was an
25   1113 motion granted, that he knew them to be false when

Page 84

1    he made those statements? Do you have any information
2    like that, Captain Young?
3        A       I don't have information about what he
4    was thinking in his head, no.
5        Q       All right. And with regard to Exhibit
6    15, the e-mail from Captain Pastore, he talks about --
7    the part on page two he says, "The strategic decision,
8    then, was made to get as many contractual protections
9    available going into the LLC," and he lists things that
10   he says were gained.
11           Do you disagree with Captain Pastore's
12   recitation here on page two of the many things that
13   were gained by entering into this waiver and the new
14   collective bargaining contract with TWA, LLC?
15       A       No.
16       Q       You agree that it was an advantage to
17   have a retention of the September 1, 2001 pay raise,
18   correct?
19       A       Yes.
20       Q       And you agree that that would have been a
21   risk if the collective bargaining contract between ALPA
22   and TWA were rejected, correct?
23       A       That that provision would be at risk?
24       Q       That pay raise.
25       A       Yes.

Page 85

1        Q       And you agree that it was an advantage to
2    have $12 million in late and outstanding DAP payments
3    plus interest?
4        A       Yes.
5        Q       Would you explain for the record what a
6    DAP payment is?
7        A       It's a form of a 401-K. It's a Directed
8    Account Plan, and it was an airline -- specific to TWA,
9    and it was the pilots' -- basically, their 401-K.
10       Q       And TWA had failed to make those payments
11   on time?
12       A       That's correct.
13       Q       And as a result of entering into this
14   waiver in the new collective bargaining agreement,
15   those sums were paid, correct?
16           Now, there's more. It's a long list. But
17   then on the next page, the next paragraph, Captain
18   Pastore recites that, "The 1113 option may not have
19   resulted in a total loss of our current pay, working
20   conditions, and union representation."
21           He recognizes that there were legal
22   arguments that would support the status quo, doesn't
23   he?
24       A       Which paragraph are you talking about?
25       Q       The first full paragraph on page three.

22   (Pages 82 to 85)

DEGNAN & BATEMAN
(856)   547-2565

8572b3b6-d960-4576-a138-31a62985ca49

Page 162

1        MR. PRESS: I object to the form of the
2   question.
3        THE WITNESS: What grounds?
4   BY MR. KATZ:
5        Q     Yeah.
6        A     I think what this -- some of these points
7   are trying to delineate is -- is the inaction of ALPA
8   to utilize whatever avenues it could to provide
9   protection to the TWA pilots.
10       Q     Well, let's just talk about 107(d) for a
11  minute, Captain Young.  It complains about the failure
12  of ALPA to challenge the certification of APA as the
13  certified collective bargaining agent of the former TWA
14  pilots.  Now, that challenge would, presumably, be a
15  lawsuit to invalidate the NMB's extension of APA's
16  certification to cover the TWA, LLC pilot group, right?
17       A     Right.
18       Q     So, I mean, if you file a lawsuit, a
19  lawyer has to rely on grounds to file a lawsuit.  What
20  would the grounds be?  Do you have any suggestions?
21       A     No.
22       MR. PRESS: Wait.  Wait.  I object to the
23  form of the question.
24  BY MR. KATZ:
25       Q     And 107(e) talks about failure to

Page 163

1   challenge supplement CC.  That, presumably, as well is
2   a lawsuit to challenge supplement CC.  And what grounds
3   would the association use to pursue that kind of
4   litigation?
5        .  MR. PRESS: I object to the form of the
6   question.
7   BY MR. KATZ:
8        Q     Do you have any suggestions?
9        A     No.
10       Q     Number 107(f).  That's out of the case.
11       107(g) is kind of a catchall.  Is there
12  anything else that you wanted to add for G that we
13  haven't covered already in this deposition?
14       A     No.
15       Q     All right.  I'd like to take a short
16  break, confer with Ms. Wagner.  Maybe we're all done.
17            - - -
18
19
20
21
22
23
24
25

Page 164

1            C E R T I F I C A T I O N
2   STATE OF NEW JERSEY
3   COUNTY OF BURLINGTON
4        I, Cindy Pineiro, a Certified Shorthand
5   Reporter and Notary Public of the State of New
6   Jersey, do hereby certify that I reported the
7   deposition in the above-captioned matter; that
8   the said witness was duly sworn by me; that the
9   reading and signing of the deposition were
10  waived by said witness and by counsel for the
11  respective parties; that the foregoing is a true
12  and correct transcript of the stenographic notes
13  of testimony taken by me in the above-captioned
14  matter.
15       I further certify that I am not an
16  attorney or counsel for any of the parties, nor
17  a relative or employee of any attorney or
18  counsel connected with the action, nor
19  financially interested in the action.
20
21
22       Cindy Pineiro, CSR #X1001815
23       Notary Public # 2327620  Expires 4/14/10
24  Dated:  September 15, 2006
25

DEGNAN  &  BATEMAN
(856)   547-2565

8572b3b6-d960-4576-a138-31a62985ca49

# Exhibit C

CondenseIt™

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2              DOCKET NO.  02CV2917 (JEI)

 3   LEROY "BUD" BENSEL, JAMES ARTHUR, PATRICK
     BRADY, THEODORE A. CASE, MATTHEW J. COMLICH,
 4   DARSHANPRIT S. DHILLON, LEMUEL A. DOUGHERTY,
     MICHAEL V. FINUCAN, JOHN S. HEFLEY, HOWARD B.
 5   HOLLANDER, ROBERT A. PASTORE and SALLY YOUNG,

 6              Plaintiffs,

 7      -vs-

 8   ALLIED PILOTS ASSOCIATION, AIR LINE PILOTS
     ASSOCIATION, AMERICAN AIRLINES, INC., and TWA AIRLINES,
 9   LLC,

10              Defendants.

11              - - -
12              September 19, 2006
                - - -
13

14              Oral sworn deposition of HOWARD BARRY

15   HOLLANDER, 14 Adelphi Avenue, Harrison, New York, taken

16   in the law offices of Archer & Greiner, P.C., Esquires,

17   One Centennial Square, Haddonfield, New Jersey, before

18   Cindy Pineiro, C.M., CSR #XI01815, and Notary Public of

19   the State of New Jersey, on the above date, commencing

20   at 9:40 A.M., there being present:

21

22

23

24

25
```

**Page 2**

```
 1

 2      GREEN, JACOBSON & BUTSCH, P.C., ESQUIRES,
 3      BY:  ALLEN P. PRESS, ESQUIRE,
        Attorneys for the Plaintiffs.

 4

 5      TRUJILLO, RODRIGUEZ & RICHARDS, LLC,
        ESQUIRES,
 6      BY:  NICOLE M. ACCHIONE, ESQUIRE,
        Attorneys for the Plaintiffs.

 7

 8      KATZ & RANZMAN, P.C., ESQUIRES,
 9      BY:  DANIEL M. KATZ, ESQUIRE,
        Attorneys for the Defendants.

10

11

12      ALSO PRESENT:
13      Marta Wagner, Esq.
        LeRoy W. Bensel.

14

15

16

17

18                   COPY

19

20

21

22

23

24

25
```

**Page 3**

```
        (By agreement of counsel, the signing,
 1      sealing and certification of the deposition were
        waived, and all objections, except as to the
 2      form of the questions, were reserved to the time

 3      of trial.)

 4              I N D E X

 5
```

```
 6   Witness                      Page

 7   Howard Barry Hollander

 8     By Mr. Katz                   7

 9     By Mr Press                  178

10

11

12              E X H I B I T S

13

14   Marked for I.D.              Page

15

16   Hollander-34 - TWA MEC special Meeting, January 11,

17   2001                          39

18   Hollander-35 - Letter dated April 10, 2001    59

19   Hollander-36 - Council Minutes dated August 29,

20   2001                          96

21   Hollander-37 - Council Minutes dated October 30,

22   2001                         102

23   Hollander-38 - Fax dated December 3, 2001   103

24   Hollander-39 - E-mail dated October 31, 2001 107

25
```

**Page 4**

```
 1              E X H I B I T S (Continued)

 2

 3   Marked for I.D.              Page

 4

 5   Hollander-40 - TWA MEC special Regular Meeting, January

 6   22-24, 2002                  114

 7   Hollander-41 - Letter dated March 26, 2001   119

 8   Hollander-42 - Memorandum dated May 7, 2001   126

 9   Hollander-43 - Letter dated October 31, 2001  134

10   Hollander-44 - Confidential Draft 7/31/01    142

11   Hollander-45 - Untitled document dated June 1,

12   2001                         149

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 69

1  this Court deems it equitable and just;" does it not?
2    A   It says that.
3    Q   All right.  Getting back to Roland
4  Wilder, did he tell you in a conversation that you had
5  with him in April of 2001 that he thought that Judge
6  Walsh would deny the Section 1113 motion?
7    A   In more than one conversation with Roland
8  Wilder it was his legal opinion that he believed the
9  TWA pilots would prevail, be successful.  That TWA's
10  motion would be denied, not happen.  He believed, and
11  stated over some period of time, that he did not think
12  that TWA would be the prevailing -- that we would be
13  the prevailing entity.
14    Q   And were those conversations you had with
15  him one-on-one, or were they remarks he made in front
16  of the entire MEC?
17        MR. PRESS: Object to the form of the
18  question.  Or both?
19        THE WITNESS: They were multiple.  They
20  were one-on-one, they were via phone.  There was one, I
21  remember, specific time in a room with at least two
22  other individuals, I believe Ms. Young and Mr. Hefley,
23  where he had discussed his view of the outcome of the
24  1113.
25  BY MR. KATZ:

Page 70

1    Q   And when did those conversations occur?
2    A   Prior to the April '01 date.
3    Q   Prior to the MEC resolution on April 2,
4  2001, that's reflected in Exhibit 13?
5    A   Prior to that date, yes.
6    Q   And were they also repeated in front of
7  the entire MEC?
8    A   To the best of my knowledge they were
9  not.
10    Q   Did he say something different in front
11  of the entire MEC?
12    A   On April -- excuse my reach -- 2nd of
13  2001, the best of my recollection, Mr. Wilder stood 100
14  percent silent on that day and rendered no opinion
15  whatsoever.
16    Q   We'll come back to Mr. Wilder in a
17  minute.  But you also mentioned Clay Warner and David
18  Holtzman.
19    A   Correct.
20    Q   Did you have private opinions -- private
21  discussions -- I'm sorry -- with them in which they
22  expressed their opinion that the 1113 motion might be
23  denied?
24        MR. PRESS: Object to the form of the
25  question.  I don't know if you're asking him, did he

Page 71

1  have separate conversations with each gentleman, or
2  separate conversations with both at the same time?  I
3  object to the form of the question.
4        Go ahead.
5  BY MR. KATZ:
6    Q   Go ahead.
7    A   I had individual conversations with Mr.
8  Warner, could not tell you a date, to try to better get
9  an education on the 1113 and its substance.  I reached
10  him.  I believe he was at his office in Herndon.
11        Mr. Holtzman; I had more than one
12  conversation with him that was based on my frequent
13  visits to the MEC office, and simply walking in and
14  having a discussion with him.  Where are we on this?
15  What's happening on this, and his venturing an opinion.
16    Q   Well, this motion in Exhibit 12 was filed
17  on March 15, 2001?
18    A   Correct.
19    Q   And so were these conversations with Mr.
20  Warner between March 15th and April 2nd?
21    A   To the best of my recollection that would
22  have to be correct.
23    Q   And the conversations with Mr. Holtzman
24  were, likewise, between March 15th and April 2nd?
25    A   That would also have to be correct.

Page 72

1    Q   And the conversations with Roland Wilder,
2  they were also within that time frame?
3    A   I would have to say correct.
4    Q   All right.  And what did Clay Warner say
5  about the likelihood of the 1113 motion being denied?
6        MR. PRESS: Object to the form of the
7  question.  At which time?
8  BY MR. KATZ:
9    Q   What did he tell you?
10        MR. PRESS: Object to the form of the
11  question.  At which time?
12  BY MR. KATZ:
13    Q   You can answer the question if you can.
14        MR. PRESS: To the best you can answer it.
15        THE WITNESS: During my conversation with
16  Mr. Warner his -- I'm paraphrasing -- his initial gut
17  reaction was that we were not to worry.  That between
18  him and the help that the MEC would be receiving,
19  leading up to the bankruptcy, that we would -- he
20  believed we would prevail and be able to protect the
21  rights of the TWA pilots.
22  BY MR. KATZ:
23    Q   When was that conversation?
24    A   Again, I couldn't tell you a date.  It
25  was some time prior to going to the bankruptcy hearing,

CondenseIt™

Page 73

1 I could tell you, in April of '01.
2 Q   Was it prior to the March 12th hearing
3 that we read the transcript of Judge Walsh from?
4      MR. PRESS: Object to the form of the
5 question. I thought we already established -- well,
6 object to the form of the question.
7      THE WITNESS: I -- again, it's six years
8 ago, but my recollection is it might -- it probably --
9 the probability of it being between that time and
10 between April would be likely. But was -- is there a
11 chance it was before that? It is possible.
12 BY MR. KATZ:
13 Q   Did Mr. Warner modify that opinion as
14 time went on?
15 A   I believe he did.
16 Q   And what did he tell you subsequent to
17 that?
18 A   I never had a personal one-on-one
19 conversation with Mr. Warner. His next advice was at
20 the meeting where himself and, I believe, everybody on
21 this list on page four was in attendance at an MEC
22 meeting where he gave, I'll use the word, contradictory
23 advice.
24 Q   That was April 2nd or thereabouts?
25 A   Or thereabouts, yes.

Page 74

1 Q   Because April 2nd was when the resolution
2 was adopted, right?
3 A   That is correct.
4 Q   Was that a one-day meeting?
5 A   I can't recall if that was day two of a
6 two-day meeting or if that was a one-day meeting; I
7 cannot recall. I cannot recall if it was a one-day or
8 two-day meeting.
9 Q   And what did Mr. Warner say on April 2nd
10 or April 1st in front of the entire MEC?
11 A   Again, I could not give you his exact
12 words. His opinion was -- the opinion from the
13 advisors -- I'm going to use it in a general sense,
14 'cause I can't remember exactly who spoke and said what
15 words. But the opinion at that time given to the MEC
16 that -- that this was the way -- this was the best
17 advice. This was the way to proceed.
18 Q   Did Mr. Warner say that the likelihood
19 was that the 1113 motion would be denied on April 1st
20 or 2nd when you were at the MEC meeting?
21 A   I can't say if it was Mr. Warner who
22 spoke, 'cause I can only say I have a picture of this.
23 There was a room full of ALPA advisors. I can't say
24 who was doing the talking.
25 Q   You don't remember whether Mr. Warner

Page 75

1 said anything at all at that meeting?
2 A   I can't remember he -- if he spoke or
3 not, no.
4 Q   Do you know whether David Holtzman spoke
5 at that meeting?
6 A   I do not remember David Holtzman speaking
7 at that meeting.
8 Q   Did David Holtzman tell you that he
9 thought the 1113 motion was going to be denied?
10 A   Personally?
11 Q   Yes.
12 A   No.
13      David -- well, again, I want to make sure
14 I got it correct. David Holtzman never came to me and
15 never offered a different opinion than what we had
16 spoken about: That he had always believed we would
17 prevail.
18      At the meeting I don't recall David
19 Holtzman ever saying anything, but I just don't recall
20 him speaking at that meeting, as I don't recall Roland
21 Wilder speaking at that meeting.
22 Q   And you don't remember Clay Warner
23 speaking at that meeting?
24 A   I cannot recall which gentleman spoke,
25 except I can say that when he was present, I believe

Page 76

1 the person who did speak most was Bob Christy.
2 Q   Do you remember Richard Seltzer speaking
3 at that meeting?
4 A   I remember him being present. I do not
5 remember conversations from Richard Seltzer or any
6 individual.
7 Q   Do you remember Mr. Seltzer saying that
8 it was highly likely that the 1113 motion would be
9 denied?
10 A   I do not.
11 Q   Remember Mr. Tumblin saying that?
12 A   No, I do not.
13 Q   Do you specifically remember the
14 statements of any of the people who were talking on
15 April 1st and 2nd, the advisors?
16 A   I remember no specific person engaging in
17 any specific statement. I just remember that the ALPA
18 advisors, surprisingly, were there, and it was their
19 general advice to the MEC, or -- they gave general
20 advice to the MEC which precipitated eventually, before
21 that meeting ended, of a vote.
22 Q   And the advice was in favor of the
23 resolution?
24 A   That is correct.
25 Q   And the resolution was adopted?

Page 77

1    A   And the -- yes, that is correct.
2    Q   And you cast some of your votes in favor
3  of the resolution?
4    A   I did.
5    Q   All right.  Exhibit 35; do you still have
6  that?
7    A   35?
8    Q   That's the April 10th letter, yeah.
9    A   Yes.
10   Q   It says right below the sentence I was
11 asking about before, "The only disagreement among the
12 advisors came from Roland Wilder."
13       Isn't it the case that Mr. Wilder's
14 disagreement was with the timing of the adoption of the
15 resolution rather than whether the resolution should be
16 passed at all?
17   A   I am not -- I believe that was one of his
18 disagreements.
19   Q   That you could wait a couple days more;
20 is that right?
21   A   I believe that's correct.  I believe that
22 was one of his disagreements.
23   Q   And what else did he disagree about?
24   A   As previously stated, I -- it's difficult
25 to say, because of the time frame.  I believe Roland

Page 78

1  Wilder was not in favor or in agreement with his fellow
2  advisors that day.
3        My position is -- my opinion that Mr.
4  Wilder really wished to say something else, but for
5  some reason chose to stay silent.
6    Q   Did he tell you that he was instructed to
7  remain silent?
8    A   He did not tell me he was instructed to
9  stay silent.
10   Q   Did you have any evidence that would
11 suggest that he was instructed to remain silent?
12   A   I have no evidence per se.
13   Q   Do you have any evidence to indicate that
14 he was -- well, let me strike that.
15       The next paragraph of your letter talks
16 about the question of whether there would be an
17 interruption of ALPA's ability to continue representing
18 the TWA, LLC pilots if the 1113 motion were granted.
19       Have you read that paragraph?
20   A   The one that starts, "Given this one
21 scenario"?  Is that where you're at?
22   Q   I was at the one -- well, both that and
23 the one before it go together.
24   A   Okay.
25   Q   So was there a discussion that you recall

Page 79

1  at this MEC meeting by the advisors of the difficult
2  issue of union representation, whether that would be
3  retained or lost?
4    A   There was a discussion about that.
5    Q   And do you remember what was said?
6    A   To the best of my recollection, there was
7  a discussion about who would be representing the TWA
8  pilots.  There was also further -- that was the -- that
9  was their -- was that discussion, yes.
10   Q   Didn't some legal expert or lawyer who
11 was there say that if the motion were granted, the TWA
12 pilots' collective bargaining agreement would be
13 invalidated, rejected, or words to that effect?
14   A   Or words to that effect, correct.
15   Q   And did another person there also say
16 that it was possible that in that process TWA, LLC
17 would refuse to continue recognizing ALPA as the
18 bargaining representative of the former TWA pilots?
19   A   I'm not sure of the exact verbiage, but
20 there was a statement close to that effect that was
21 made.
22   Q   And didn't the same person say that this
23 was an open issue?
24   A   I can't recall his exact words, Mr. Katz.
25   Q   On page three of the April 10th letter,

Page 80

1  Exhibit 35, there's a list of the implications of
2  making an agreement, right?
3    A   I see highlighted "Pay, Job Protection;"
4  is that what you're referring to?
5    Q   Yeah.  What are those?
6    A   These are different parts of the
7  collective bargaining agreement.
8    Q   When the resolution was adopted, didn't
9  ALPA, on behalf of the TWA pilots, enter into a
10 modified collective bargaining agreement that was going
11 to govern the pilots under the TWA, LLC regime?
12   A   That would be a correct statement.
13   Q   And didn't that involve a pay increase?
14      MR. PRESS:  I object to the form of the
15 question.
16 BY MR. KATZ:
17   Q   You can answer it.  Look at the top item
18 on page three.
19   A   I'm reading the top item.  The reason
20 I'm -- there's a hesitation, because there was -- that
21 is written here, it says that there was a pay increase.
22 But I remember there was also even a grievance filed
23 about that.  There was some issue about that that came
24 about, but that's what this document says.  It
25 references a pay increase on 9/1/01.  To my

Page 177

1  integration Supplement CC was not in effect?
2    A   That would be a true statement.
3    Q   Okay.  Let me just take a two-minute
4  break to consult with my co-counsel.
5        (Short recess was held.)
6  BY MR. KATZ:
7    Q   We're done.  No more questions.
8        MR. PRESS:  I've got a few things I'd like
9  to follow-up on, because I don't think the record is
10  correct.
11        MR. KATZ:  Well, I'm not going to continue
12  the deposition.  The deposition is over.
13        MR. PRESS:  Well, I have a right to ask
14  questions.  I'm a party here.
15        MR. KATZ:  I'm not going to pay for a
16  transcript for you to ask your own client questions on
17  the record.  If you want to put something in the
18  record, you can submit a declaration.
19        MR. PRESS:  We're going to make a record
20  now while we're all here.  Take five minutes.
21        MR. KATZ:  I'm not interested in it.
22        MR. PRESS:  Dan, I don't think you have a
23  choice in the matter.  Any party that appears at a
24  deposition has a right to ask questions.  We're here,
25  and I want the record to be clear and not be misleading

Page 178

1  in any way.  If you want a misleading transcript,
2  that's your problem.  But this will take two minutes,
3  really.
4        MR. KATZ:  I'll give you two minutes.  Go
5  ahead.
6  BY MR. PRESS:
7    Q   Okay.  You were asked some questions
8  about a conversation with Bob Pastore concerning the
9  announcement of the deal with American.  You timed that
10  conversation around the Christmas break.
11        Having reflected on your answer, do you
12  know for a fact, sitting here, that that conversation
13  was with Bob Pastore?
14    A   I do not know for a fact it was with Bob
15  Pastore.  It could very well have been another entity.
16    Q   Sitting here today do you know who the
17  conversation was with?
18    A   No, I do not.
19    Q   All right.  You were asked some questions
20  as to the competency of Steve Tumblin's legal advice to
21  the MEC.
22        Sitting here today, do you have any
23  criticisms of his work?
24    A   My criticisms would stem from the
25  resulting -- I know he billed the association and the

Page 179

1  MEC a substantial amount, and we were dissatisfied with
2  the outcome, you know.  So his advice to me was not
3  satisfactory.
4    Q   Okay.  Same question as to Mr. Glanzer,
5  Michael Glanzer.  You were asked as to the competency
6  of his work on behalf of MEC.  Do you have any
7  criticisms of his work?
8    A   Have a similar answer.  We were not
9  satisfied in whole with -- at the end in how the
10  results turned out; therefore, we were not satisfied --
11  or at least the body was not satisfied conclusively
12  with the advice that he was giving.  Or, again, in a
13  finality in the advice that he ended up giving to the
14  MEC.
15    Q   Okay.  That's it.
16        MR. KATZ:  The deposition is over now.
17                  - - -

Page 180

1            C E R T I F I C A T I O N
2  STATE OF NEW JERSEY
3  COUNTY OF BURLINGTON
4        I, Cindy Pineiro, a Certified Shorthand
5    Reporter and Notary Public of the State of New
6    Jersey, do hereby certify that I reported the
7    deposition in the above-captioned matter; that
8    the said witness was duly sworn by me; that the
9    reading and signing of the deposition were
10    waived by said witness and by counsel for the
11    respective parties; that the foregoing is a true
12    and correct transcript of the stenographic notes
13    of testimony taken by me in the above-captioned
14    matter.
15        I further certify that I am not an
16    attorney or counsel for any of the parties, nor
17    a relative or employee of any attorney or
18    counsel connected with the action, nor
19    financially interested in the action.
20
21
22    Cindy Pineiro, CSR #XI001815
23    Notary Public # 2327620  Expires 4/14/10
24  Dated:  September 19, 2006
25

# Exhibit D



IN THE MATTER OF:

# Baptiste & Wilder, P.C.
## vs.
# Trans World Airlines, LLC, et al.

Cause No. 04CC-004764

Deposition of Roland P. Wilder, Jr.
11/7/2006

**Gore Perry Gateway Lipa Baker Dunn & Butz
Certified Court Reporters & Legal Videographers
1-800-878-6750**

,

DepoScript3

2

In the Circuit Court of the County of St. Louis

State of Missouri


BAPTISTE & WILDER, P.C.,

      Plaintiff,

  vs.              Cause No. 04CC-004764

                 Division 19

TRANS WORLD AIRLINES, LLC, et al.,

      Defendants.


DEPOSITION OF ROLAND P. WILDER, JR., produced, sworn and

examined on behalf of the Defendants, on the 7th day of

November 2006, at the Law Offices of Murphy Wasinger, LC,

1401 South Brentwood Boulevard, in the County of St.

Louis, State of Missouri, before Vanessa L. Hertich, a

Certified Court Reporter and Notary Public within and for

the State of Missouri.

DepoScript3

3

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4          James S. Cole

5          Murphy Wasinger, LC

6          Attorneys at Law

7          1401 South Brentwood Boulevard - Suite 550

8          St. Louis, Missouri 63144

9

10    FOR THE DEFENDANTS:

11          Allen P. Press

12          Green, Jacobson & Butsch, P.C.

13          Attorneys at Law

14          7733 Forsyth Boulevard - Suite 700

15          Clayton, Missouri 63376

16

17    THE VIDEOGRAPHER:  John Gore

18

19

20

21

22

23

24

25

DepoScript3

1    going to get behind this?

2        MR. COLE:  Object to the question as calling for

3    speculation.  Go ahead and answer if you can.

4        A:  Get behind what?

5        Q:  (By Mr. Press)  The filing of the lawsuit.  Did

6    you have a feeling that it would ever be authorized?

7        MR. COLE:  Object on the same ground.

8        A:  My -- My feeling was at the meeting on April 1st

9    that I was the one person who was recommending this

10   course of action.  I received no encouragement from

11   anyone on the MEC, on the Merger Committee, ALPA's

12   advisors, or anybody in the room.

13       Q:  Did you speak with any of the MEC members, you

14   know, privately before they voted, at which they told you

15   anything about their thought process?

16       A:  No.

17       Q:  All right.

18       A:  The reason for that is that I had a commitment

19   for another client in another city and I, therefore, left

20   after the meeting.  I did not learn about the vote on

21   April 2 until I called up the MEC the following day.

22       Q:  Did anybody at ALPA ever tell you they would

23   authorize the filing of the lawsuit if the MEC directs

24   such action?

25       A:  No.

196

```
 1                    C E R T I F I C A T E

 2

 3        STATE OF MISSOURI

 4                           SS

 5        COUNTY OF ST. CHARLES

 6

 7             I, Vanessa L. Hertich, Certified Court Reporter

 8        and Notary Public within and for the State of Missouri,

 9        do hereby certify that pursuant to Notice at the Offices

10        of Murphy Washinger, LC, 1401 South Brentwood Boulevard,

11        St. Louis, Missouri,

12                  ROLAND P. WILDER, JR.

13        came before me, was by me duly sworn to testify the whole

14        truth of his knowledge of the matters in controversy

15        aforesaid, was examined and his examination then written

16        in stenotype by me and afterwards typed, under my

17        supervision, signature of the witness being expressly not

18        waived by consent of counsel and the witness, as

19        hereinbefore set out, in the day and in that behalf

20        aforesaid, and said deposition is herewith returned.

21             I further certify that I am not counsel,

22        attorney or relative of either party, or clerk or

23        stenographer of either party, or of the attorney of

24        either party, or otherwise interested in the event of

25        this suit.
```

197

1          GIVEN under my hand and notarial seal at St.

2    Louis, Missouri, on this 9th day of November 2006.

3          My Notary Commission expires July 22, 2008.

4

5

6

7          Vanessa L. Hertich

8          Notary Public in and for the

9          State of Missouri.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit E

# In The Matter Of:

*Bensel v.*
*Air Line Pilots Association*

---

*ROLAND P. WILDER, JR.*
*Vol. 1*
*August 8, 2008*

---

*REPORTING ASSOCIATES, LLC*
*Certified & Registered Professional Reporters*
*Cherry Hill  --  Philadelphia  --  Trenton*
*(888) 795-2323*
*www.ReportingAssociates.com*

Bensel v.
Air Line Pilots Association

ROLAND P. WILDER, JR. - Vol. 1
August 8, 2008

Page 5

1   (INDEX continued.)

2                              INDEX

3             Deposition of ROLAND P. WILDER, JR.

4                     August 8, 2008

5

6   EXHIBIT NUMBER:                         MARKED

7   129  An E-mail                              142

8   130  A Memo                                 143

9   131  A Memo dated  August 16th, 2001        147

10  132  A Draft Letter dated August 16, 2001   154

11  133  A Draft of a Complaint                 165

12  134  A Draft of a Lawsuit                   167

13  135  A Letter dated October 31, 2001        179

14

15

16

17

18

19

20

21

22

23

24

Page 6

1      THE VIDEOGRAPHER: This is the beginning of
2  the videotaped deposition of Roland Wilder.  The time
3  is now 9:36:15 on August 8th, 2008.
4      This deposition is being conducted at the
5  offices of Baptiste & Wilder located at 1150
6  Connecticut Avenue, N.W., Suite 500, Washington, D.C.
7  20036.
8      This deposition is being taken pursuant to
9  notice by the Plaintiff in civil action number 02-2917,
10 entitled, Leroy "Bud Bensel", et al., versus Air Line
11 Pilots Association, in the United States District Court
12 for the District of New Jersey.
13     I will now ask counsel to please identify
14 themselves and indicate which party they represent.
15     MR. PRESS: Allen Press is here for the
16 Plaintiffs.
17     MS. ACCHIONE: Nicole Acchione is also here
18 for the Plaintiffs.
19     MR. KATZ: For Defendant, Air Line Pilots
20 Association, Daniel Katz of the Washington, D.C. law
21 firm Katz & Ranzman.
22     THE VIDEOGRAPHER: The video technician
23 today is Bill Foster.  The court reporter today is
24 Steven Poulakos of Reporting Associates.

Page 7

1      Will the court reporter, please, swear in
2  the Witness.
3      P R O C E E D I N G S
4  Whereupon,
5      ROLAND P. WILDER, JR.,
6  called as a witness, having been first duly sworn to
7  tell the truth, the whole truth and nothing but the
8  truth, was examined and testified as follows:
9  EXAMINATION
10     BY MR. PRESS:
11 Q   Mr. Wilder, can you state your name for the
12 record?
13 A   Yes.  It's Roland P. Wilder, Jr.
14 Q   And you, sir, are a lawyer?
15 A   Correct.
16 Q   And you specialize in the area of labor
17 law?
18 A   Correct.
19 Q   And, of course, we're here today to take
20 your deposition in the TWA pilots case against ALPA.
21 You understand that, correct?
22 A   I do.
23 Q   And we appreciate you being here and your
24 cooperation in sitting for this deposition.  We'll do

Page 8

1  as best as we can to move this along as quickly and
2  orderly as possible.  If you need a break, let us know.
3  If you need to attend to a phone call, let us know that
4  too.
5      If I ask you answer a question, sir, that
6  you don't understand, please, say so and I will ask a
7  better question.  Okay?
8  A   I will.
9  Q   Mr. Wilder, you mentioned you are a labor
10 lawyer.  Your connection to this lawsuit, of course, is
11 that you were the merger counsel for the TWA master
12 executive counsel and merger committee.
13 A   That's correct.
14 Q   All right.  And you understand you are
15 testifying under oath today?
16 A   I do.
17 Q   And do you recall back in November '06 you
18 gave a deposition in a related matter and you testified
19 under oath then too, correct?
20 A   I did.
21 Q   And -- and then shortly thereafter you
22 testified in a hearing in front of a judge under oath
23 again, correct?
24 A   Correct.

Page 9

1  Q  All right.  Have you had an opportunity in
2  preparing -- I shouldn't say that.
3     In preparation for today did you review any
4  of your prior testimony?
5  A  Yes.  I reviewed my deposition and I went
6  over briefly the Court testimony that I gave.
7  Q  Okay.  And in reviewing that did you find
8  anything that was glaringly incorrect or something that
9  you read and said, boy, that was wrong, I need to
10  change that?
11  A  There was an inconsistency between the
12  Court testimony and the deposition in terms of when
13  certain meetings took place on or about April 1st and
14  2nd.  The correct dates were set forth in the Court
15  testimony.
16  Q  I know precisely what you are referring to.
17  When you testified in your deposition, you testified
18  you attended an MEC meeting with the ALPA advisors on
19  April 1 and at Court you testified it was April 2.
20  A  That's correct.
21  Q  And the accurate testimony was that
22  provided in Court?
23  A  Correct.
24  Q  But in making that misstatement of one day

Page 10

1  you weren't trying to mislead anybody; you just missed
2  the date?
3  A  That's correct.
4  Q  And, Mr. Wilder, other than that slight
5  inconsistency, did you find anything else in your
6  testimony that was wrong?
7  A  Certainly not dramatically wrong.  There
8  were some typographical errors by the court reporter in
9  the deposition that I believe I corrected, but my
10  version did not contain a formal correction.  It
11  contained handwritten notes of the correction.
12  Q  And other than that, you are satisfied that
13  the substance of your testimony was accurate then?
14  A  I am.
15  Q  Okay.  I want to go into some depth about
16  your background --
17  A  Yes.
18  Q  -- because I think it's important.
19     You are a lawyer.  When did you graduate
20  from law school, Mr. Wilder?
21  A  1966.
22  Q  And what law school was that?
23  A  Vanderbilt Law School.
24  Q  Did you -- and that's in Nashville,

Page 11

1  Tennessee?
2  A  Correct.
3  Q  Okay.  And, sir, did you graduate with any
4  honors from law school?
5  A  I was a managing editor of the law review.
6  Q  Okay.  And with respect to people that
7  didn't go to law school can you tell them what that
8  means as far as your class rank to have achieved that
9  status?
10  A  Positions in the law review are based on
11  class rank.  And, therefore, I was the second ranking
12  position on the law review and my rank was quite high
13  within the class.
14  Q  Very good.
15     Then after law school did you go to work
16  immediately in the field of law in some capacity?
17  A  Yes.  I was recruited for an honors program
18  at the U.S. Department of Labor to join the Division of
19  Labor Relations and Civil Rights, United States
20  Department of Labor in the office of the solicitor.
21  Q  So this is in 1966 in the heart of the
22  civil rights movement.
23  A  Just after the 1964 statute had passed,
24  yes.

Page 12

1  Q  Okay.  And what did you do for the U.S.
2  Department of Labor?
3  A  I advised a program known as the Office of
4  Federal Contract Compliance.  This was an executive
5  order program that imposed equal opportunity standards
6  on government contractors and subcontractors.
7  Q  Okay.  And how long did you have that job,
8  sir?
9  A  There were several jobs.  I progressed to a
10  management capacity, counsel of civil rights.  And I
11  left that position in November or December rather of
12  1971.
13  Q  All right.  Then what was your job?  Where
14  did you go to work then?
15  A  But during that period I was also assigned
16  to the civil division of the U.S. Department of Justice
17  to represent the United States in the contempt phase of
18  United States versus Florida East Coast Railway.
19  Q  Okay.  Was that your first I guess
20  introduction to labor and employment related issues
21  outside the civil rights arena?
22  A  I did a dissertation on labor and
23  employment for my JD.
24  Q  Okay.

Page 201

1    MR. PRESS: Object to the form of the
2  question.
3    THE WITNESS: There was -- there is no
4  question that there was a disagreement among
5  professionals concerning what should be done at this
6  point. And it was based on the legal merits of the
7  situation and the perception of those involved on what
8  would do the trick.
9    BY MR. KATZ:
10  Q   Did you think it was an honest disagreement
11  on April 2nd?
12    MR. PRESS: Object to the form of the
13  question.
14    THE WITNESS: I -- I have no reason to
15  believe it was anything other than that. But it was --
16  as you know in this field we get behind our theoretical
17  discussions and they get insistent on occasion.
18    BY MR. KATZ:
19  Q   Mr. Press has referred to these people, the
20  other professionals who were there that day, I think
21  there were eight of them, as ALPA advisors.
22    Are you aware of the fact that Steve
23  Tumblin had in fact been advising the TWA MEC for many
24  years before that?

Page 202

1  A   I think -- yes. I think that he had
2  appeared in TWA matters before that. Whether he was
3  retained by the MEC or whether he was retained by ALPA
4  I'm not entire sure.
5  Q   And Michael Glanzer, he had been advising
6  the MEC on financial matters and investment banking
7  matters prior to the time you were retained as merger
8  counsel in January of 2001; isn't that true?
9  A   I'm not sure again who Mr. Glanzer was
10  representing directly. For investment advisors that is
11  not too important. They're advising on the
12  transaction. But it could have been. I just don't
13  know.
14  Q   Did you advise the TWA MEC on April 2nd,
15  2001 that American management had told the American
16  pilots that APA would control the seniority integration
17  if the TWA MEC waived its scope provisions?
18  A   I advised the TWA MEC that the chief pilot
19  of American had made a representation to that effect to
20  the president of the American pilots that the American
21  pilots would control the seniority integration.
22  Q   And did you -- well, let me just ask you
23  since we have a document that relates to that.
24  Exhibit 134, this is the October 22 version of that

Page 203

1  draft complaint?
2  A   Yes. This is the draft complaint?
3  Q   Right. Take a look at page 7, Mr. Wilder,
4  paragraph 26.
5  A   Yes.
6  Q   And it says there: On March 27, 2001
7  American Airlines' chief pilot Bob Kudwa, K-U-D-W-A,
8  wrote to Captain John Darrah, D-A-R-R-A-H, president of
9  the APA, and informed him that American was preventing
10  the APA to determine how the TWA pilots would be
11  integrated into American's operation --
12  A   Yes.
13  Q   -- et cetera.
14    That's -- the allegations in that paragraph
15  are what you are referring to in your most recent
16  answers?
17  A   Yes. I told the MEC about this
18  communication.
19  Q   And so they were aware of that on April 2nd
20  when they entered into their deliberations if they were
21  listening to you?
22  A   I -- I believe they understood what I was
23  saying.
24  Q   And the quote at the bottom of the

Page 204

1  paragraph is that Mr. Kudwa wrote to Captain Darrah our
2  deal leaves APA to determine the basis for seniority
3  integration.
4  A   I don't know that I quoted that in so many
5  words. I do know that I referred to the March 27, 2001
6  communication from Kudwa to Darrah.
7  Q   Okay. And in your discussions with the TWA
8  MEC on April 2 did you give them any advice about what
9  their litigation options would be if they determined
10  that they should waive their LPPs, their labor
11  protective provisions?
12  A   Yes.
13  Q   What was it that you said, Mr. Wilder?
14  A   I indicated that once the scope provision
15  was gone that the -- were very limited litigation
16  opportunities for the TWA pilots after that point. I
17  was asked that by Captain Young.
18  Q   Sally Young?
19  A   Yes.
20  Q   And do you remember exactly what you said?
21  A   I do not remember the exact words, but I
22  tried to make it -- make it as clearly as I could that
23  the best litigation alternative for the TWA pilots was
24  the one that I was recommending at that point.

Page 229

1 Q   And in September of 1983 Continental
2 rejected its collective bargaining agreements, didn't
3 they?
4 A   That's correct under the old provisions of
5 the code.
6 Q   And the rejection doctrine was well
7 established in bankruptcy law in commercial contracts?
8 A   Yes.
9 Q   And when you reject a commercial contract,
10 the contract -- the debtor in possession nullifies that
11 contract, doesn't it?
12 A   Which did rise to a bankruptcy claim --
13 Q   Right.
14 A   -- in favor of the creditor, yes.
15 Q   In the Continental bankruptcy, isn't it
16 true that the company treated the Continental employees
17 very differently after the rejection of their
18 collective bargaining contracts?
19 A   Of course.
20 Q   It cut their pay in half?
21 A   (Inaudible response.)
22 Q   It abrogated their -- their -- their
23 grievance arbitration provision?
24 A   Yes.

Page 230

1 Q   And it discontinued recognizing the unions
2 that had been the collective bargaining representatives
3 for those employees?
4 A   That's correct.
5     MR. KATZ: Thank you, Mr. Wilder.
6     MR. PRESS: Nothing further.
7     THE VIDEOGRAPHER: The deposition concludes
8 at 3:35:52.
9     (Reading and signature not waived.)
10     (Whereupon, at 3:35 p.m., deposition was
11 adjourned.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 231

1     CERTIFICATE OF DEPONENT
2
3     I hereby certify that I have read and
4 examined the foregoing transcript, and the same is a
5 true and accurate record of the testimony given by me.
6
7     Any additions or corrections that I feel
8 are necessary, I will attach on a separate sheet of
9 paper to the original transcript.
10
11
12
13
14
15
16
17
18
19
20
21
22
23 _____
24     ROLAND P. WILDER, JR.

Page 232

1 District of Columbia,
2 To wit:
3
4     I, Steven Poulakos, a Notary Public of
5 the State of Maryland, do hereby certify that the
6 within-named witness, personally appeared before me
7 at the time and place herein set out, and after having
8 been duly sworn by me, according to law, was examined
9 by counsel.
10     I further certify that the examination was
11 recorded stenographically by me and this transcript
12 is a true record of the proceedings.
13     I further certify that I am not of counsel
14 to any of the parties, nor in any way interested in
15 the outcome of this action.
16     As witness my hand and notarial seal this
17 25th day of August, 2008.
18
19 _____
20     Steven Poulakos
21 Notary Public
22
23 My commission expires:
24 June 17, 2009

# Exhibit F

 COPY

## In The Matter Of:

*LEROY BENSEL, ET AL. v.*

*ALLIED PILOTS ASSOCIATION, ET AL.*

*ROLAND WILDER*

*April 21, 2011*



8959 CENTER STREET
MANASSAS, VIRGINIA 20110
(703) 331-0212
INFO@INABNETREPORTING.COM
WWW.INABNETREPORTING.COM

*Original File 0321111AK&RV114.txt*

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

```
---------------------------x
LEROY "BUD" BENSEL, ET AL., :
                            :
      Plaintiffs,           :
                            :
   v.                       :  Civil Action
                            :  No. 02-2917 (JEI)
ALLIED PILOTS ASSOCIATION,  :
ET AL.,                     :
                            :
      Defendants.           :
---------------------------x
```

Washington, D.C.

Monday, March 21, 2011

Videotape Deposition of:

ROLAND WILDER

called for examination by counsel for Defendant Air

Line Pilots Association, International, pursuant to

notice, commencing at 2:00 p.m., at Baptiste & Wilder,

P.C., 1150 Connecticut Avenue, N.W., Suite 500,

Washington, D.C., before Delores M. Green, a Court

Reporter and Notary Public in and for the District of

Columbia, when were present on behalf of the

respective parties:

16

1    not attend any meeting on April 2?

2        A.    That's correct.   I was in Louisville.

3        Q.    All right.   So when you testified in your

4    deposition in this case on August the 8th of 2008 that

5    you had attended a meeting on April the 2nd, you were

6    mistaking in that testimony?

7        A.    I was referring to the meeting that actually

8    took place on April 1.   Yes.

9        Q.    How confident are you that you were not

10   present at a meeting of the TWA-MEC on Monday, April

11   the 2nd of 2001?

12       A.    Now I am confident that I was not there on

13   April 2, because I learned of the vote on April 2 by

14   telephone.   And I learned as a result of this

15   proceeding that the vote was taken on April 2, not in

16   April 1.

17       Q.    If you had to give a percentage in terms of

18   how certain you are that you were not present for a

19   meeting of the MEC on April 2, with 100 percent being

20   the most certain, what percentage would you give for

21   how certain you are that you were not present at any

22   meeting of the TWA-MEC on April 2 of 2001?

17

1      A.   I would say that I am 100 percent certain

2   because that is confirmed by the written record and

3   the -- my handwritten notes which were taken at the

4   time on April 2.  That is what I have the most

5   confidence in, frankly.

6      Q.   Are you aware that Captain Sally Young has

7   testified in a deposition in this proceeding that you

8   were present at the meeting of the MEC on April 2 of

9   2001 and that you got into a screaming match with

10  Michael Glanzer at that time?

11     A.   I'm not aware of that, no.

12     Q.   Okay.  Is that testimony by Captain Young,

13  as I represented it, is that testimony accurate or

14  inaccurate?

15          MR. PRESS:  I object to the form of the

16  question.

17          THE WITNESS:  The -- Mr. -- as I recall,

18  Mr. Glanzer spoke on April 1 forcefully and I spoke on

19  April 1 for merely an hour.  I spoke longer, I

20  believe, than anybody else at that meeting.  And we

21  had different views of what should be done, yes.  Was

22  I screaming at Mr. Glanzer, I don't believe so.

25

CERTIFICATE OF NOTARY PUBLIC

1

2

3        I, DELORES M. GREEN, a Notary Public in and

4   for the District of Columbia, before whom the

5   foregoing deposition was taken, do hereby certify that

6   the witness whose testimony appears in the foregoing

7   pages was duly sworn by me; that the testimony of said

8   witness was taken by me in shorthand at the time and

9   place mentioned in the caption hereof and thereafter

10  reduced to typewriting under my supervision; that said

11  deposition is a true record of the testimony given by

12  said witness; that I am neither counsel for, related

13  to, nor employed by any of the parties to the action

14  in which this deposition is taken; and, further, that

15  I am not a relative or employee of any attorney or

16  counsel employed by the parties thereto, nor

17  financially or otherwise interested in the outcome of

18  this action.

19

20                      _____
                        Delores M. Green
                        Notary Public in and for
21                      THE DISTRICT OF COLUMBIA

22  My commission expires:

Exhibit G

**Bensel, et al., v. Allied Pilots Association, et al.**                    **ALAN ALTMAN, 4/28/11**

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
- - -
LEROY "BUD" BENSEL, et al.   :
                             :
        Plaintiffs,   :
                      :
                      : Civil Action No.
    v.                : 02-2917-JEI
                      :
ALLIED PILOTS ASSOCIATES,   :
AIRLINE PILOTS ASSOCIATIONS,   :
INT'L, AMERICAN AIRLINES, INC.:
and TWA, LLC,                 :
                      :
        Defendants.   :
                      :
- - -

Oral videotaped deposition of ALAN ALTMAN, held
at the Offices of Sousa Court Reporters, 1013 Garces
Avenue, Las Vegas, Nevada, on Thursday, April 28, 2011,
commencing at 8:26 a.m., taken by and before
Lisa C. Puettmann-Hawton, Certified Court Reporter.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

---

**Page 2**

1  APPEARANCES:
2  GREEN JACOBSON & BUTSCH, P.C.
   BY:  ALLEN P. PRESS, ESQUIRE
3  Pierre LaClede Center
   7733 Forsyth Boulevard
4  Suite 700
   Clayton, Missouri 63105
5  (314) 862-6800
   REPRESENTING THE PLAINTIFF
6
7  KATZ & RANZMAN, P.C.
   BY:  DANIEL M. KATZ, ESQUIRE
8  (Pro Hac Vice)
   4530 Wisconsin Avenue, N.W.
9  Suite 250
   Washington, DC  20016
10 (202) 659-4656
   REPRESENTING THE DEFENDANTS
11
12 GEOFFREY KLIMAS, SR.
   LEGAL VIDEOGRAPHER
13
14 Also Present Telephonically:
15 Steve Fram
   Marta Wagner
16
   - - -
17
18
19
20
21
22
23
24
25

---

**Page 3**

1              I N D E X
2
3  WITNESS                    PAGE
4  ALAN ALTMAN
5    Mr. Katz                  5
6
7          - - -
8          E X H I B I T S
9  Number                  Marked/Ref
10 ALTMAN 345   Resume of Alan Altman     11
11 ALTMAN 346   Certification by the ALPA  15
                Election and Ballot
12              Certification Board
   ALTMAN 347   TWA Bankruptcy/AA Buyout   67
13              Benefit Issues to be Addressed
                Updated as of 2/28/01
14
   ALTMAN 348   Handwritten notes dated 2/28/01  68
15
   ALTMAN 349   Handwritten notes         72
16
   ALTMAN 350   Meeting with Company March 2,  86
17              2001 TWA Training Center (Joan
                Baker notes)
18
   ALTMAN 351   Letter dated March 5, 2001 from  89
19              TWA to Mr. Terry Hayes regarding
                ALPA Waiver Proposal
20
   ALTMAN 352   Meeting with Company March 5,  100
21              2001 (Joan Baker notes)
22 ALTMAN 353   American Airlines letter dated  103
                March 6, 2001 to Mr. William
23              Compton
24 ALTMAN 354   Meeting with Company March 6,  108
                2001 - B. Lance's Notes
25

---

**Page 4**

1          E X H I B I T S
              (Continued)
2
   Number                  Marked/Ref
3
   ALTMAN 355   TWA's Revised Proposal for  118
4              Changes to the TWA-ALPA
                Collective Bargaining
5              Agreement dated March 8, 2001
   ALTMAN 356   ALPA's Counter Proposal to  120
6              TWA's Revised Proposal dated
                March 8, 2001
7
   ALTMAN 357   Handwritten notes         127
8
   ALTMAN 358   Agenda dated March 14, 2001 -  137
9              Confidential
10
   ALTMAN 359   ALPA Comprehensive Proposal  139
11              dated March 15, 2001
   ALTMAN 360   Meeting with Company dated  141
12              March 15, 2001 (Joan Baker
                notes)
13
   ALTMAN 361   Letter dated March 17, 2001  145
14              from TWA to Mr. Robert Pastore
15
   ALTMAN 362   Letter dated March 26, 2001  150
16              from TWA to Captain Robert
                Pastore
17
   ALTMAN 363   Letter dated March 27, 2001  152
18              to John from Bob Kudwa
   ALTMAN 364   Proposed Talking Points dated  154
19              March 28, 2001
20
   ALTMAN 365   TWA Council 4 Meeting Notice  157
21              and Council Minutes dated
                March 30, 2001
22
   ALTMAN 366   Memorandum of Understanding for  184
23              Changes to the TWA-ALPA
                Collective Bargaining Agreement
24              dated March 31, 2001
25              - - -

---

1  (Pages 1 to 4)

**Bensel, et al., v. Allied Pilots Association, et al.**                    **ALAN ALTMAN, 4/28/11**

Page 165

1    Q.    It doesn't say that in the Resolution.
2    A.    It doesn't say otherwise either.  All it says is
3    that do your best efforts and vigorously pursue the
4    protections.
5          In other words, if you go out there and get what
6    you can, go out there and do your best for us and we
7    always bring it back.  It always goes back to the pilots
8    or used to -- would go back to the pilots.
9          So all they're saying is, hey, guys we're
10   supporting you, go forward.  This is what we want to see
11   and that's what we did.  We went forward and we're going
12   to try to get the best deal according to what the pilots
13   wanted.
14   Q.    Aren't the pilots saying don't take this to the
15   Bankruptcy Judge and let him invalidate your contract?
16   A.    It doesn't say that anywhere in there.
17   Q.    You wouldn't have a contract if the Judge --
18   A.    How do we know?  How do we know the Jude is going
19   to do that?
20         See, everyone is making these assumptions that
21   this is what this says and this is what the Judge was
22   going to do.  And that's where I believe we started to
23   get bad advice, because we don't know what was going to
24   happen.
25         All it says here is vigorously pursue the

Page 166

1    protections, that is at all times current and future TWA
2    pilots and retired pilots protected by Collective
3    Bargaining.  It doesn't say anything else.  It just says
4    vigorously pursue which we did and then we did exactly
5    what the pilots told us to do, go out there and fight
6    for us.
7    Q.    In fact, you did what the pilots asked by voting
8    in favor of the Agreement proposed March 31, the very
9    next day, didn't you?
10   A.    I don't remember.  Show it to me.
11   Q.    This is Exhibit D13, which is the April 2nd
12   Resolution -- April 2nd compilation of actions from the
13   MEC meeting.
14         It shows that you cast all 90 of your Council 4
15   votes in favor of accepting the package of Agreements
16   that had been proposed by management on March 31.
17         Isn't that correct?
18   A.    That was a Resolution so I just took what the
19   Resolution -- it wasn't very particular but that's what
20   the pilots said on the Resolution, so you vote that way.
21   We didn't stop fighting.
22         I mean, this doesn't mean anything.  This is a
23   Resolution.
24   Q.    This Resolution was in accordance with the
25   Resolution adopted by the Council 4 pilots on March 30,

Page 167

1    wasn't it?
2    A.    Council 4, my guys, passed that Resolution.  In
3    fact, I don't know what the other bases did.  I would
4    like to know what the other bases did when they went on
5    the road shows and see what the votes were or the
6    Resolutions were.
7    Q.    Do you know whether there were discussions about a
8    Resolution at Council 2, for instance?
9    A.    I don't remember.  I'm sure there had to be.  If
10   we were holding a Resolution or meeting in LA, there had
11   to be something going on at the other bases too.
12   Q.    Do you remember whether there was a discussion
13   like that and a Resolution from the St. Louis --
14   A.    I don't know.  I would have to see some notes.
15   Q.    But you do remember this meeting on April 2, I
16   take it.
17   A.    April 2nd, I remember the meeting.  That's when I
18   lost my trust and my faith in our union.
19   Q.    Well, you cast -- you and Pablo Lewin cast all 90
20   of the votes that each of you have in favor of accepting
21   the Agreement that was on the table; correct?
22   A.    Uh-huh.
23   Q.    And why don't you explain why you did that.
24   A.    We went into this meeting on April 2nd, none of us
25   were going to waive scope.

Page 168

1          Throughout the previous two months, we were going
2    back and forth with these negotiations both on the
3    Merger Committee level and on the negotiating level for
4    Transition Agreement that there was a scope waiver.
5          And this meeting on April 2nd, all a sudden ALPA
6    comes in saying you have to waive your scope now.
7    That's it.  You have to do it now immediately.  You're
8    going to be -- if you don't waive -- and literally, it
9    was a panic mode.
10   Q.    Let me cut you off there and take it in smaller
11   bite size pieces.
12         What did Richard Seltzer say at the April 2nd
13   meeting?
14   A.    I don't recall who said what to us on an
15   individual basis.
16   Q.    Do you recall anything that Richard Seltzer said
17   at the meeting.
18   A.    No.  I remember what was told to us.
19   Q.    What did Richard Seltzer say to you in particular?
20   A.    I don't remember.  I know what was told to us by
21   our advisors.
22   Q.    I want to hear one by one.  Do you remember
23   anything that Richard Seltzer said on April 2nd?
24   A.    You know what, they probably all said the same
25   thing because they were all saying the same thing.

42  (Pages 165 to 168)

Bensel, et al., v. Allied Pilots Association, et al.                    ALAN ALTMAN, 4/28/11

Page 169

1    Q.   Do you remember anything Richard Seltzer said on
2    April 2nd at the MEC meeting?
3    A.   No.  Does he remember what I said at the meeting,
4    probably not.
5         I remember what was told to us.
6    Q.   Do you remember anything that Randy Babbitt said
7    at the April 2 meeting?
8    A.   Yeah.  I don't know why -- well, this is something
9    that upset me.  Why was Babbitt there?  Why wasn't Duane
10   Woerth there?
11        This is a pretty important meeting and Duane was
12   too busy to attend so he sent Randy Babbitt.  I do
13   remember that at that point, that was the explanation
14   for why he was there.
15   Q.   Who gave you that explanation?
16   A.   It was Randy that said it.  He said Duane is too
17   busy to be here.  He's got something else going on so he
18   sent me because I'm the special advisor to the
19   President.
20   Q.   What did Randy Babbitt say to the MEC about the
21   Agreement that was proposed by management?
22   A.   It wasn't about the Agreement.  It was talking
23   about why we had to waive our scope and successorship
24   that day.
25   Q.   What did Babbitt say?

Page 170

1    A.   You had to waive your scope and successorship.
2    Q.   Was that his exact words?
3    A.   All of them said that.  In fact, what was said --
4    Q.   I just asked you about Randy Babbitt.  What did
5    Randy Babbitt say?
6    A.   They all said the same thing.  Every advisor --
7    and I'm not going to quote them exactly because I don't
8    remember the exact quote.
9    Q.   What did Steve Tumblin say?
10   A.   You have to waive your scope.
11   Q.   What did Michael Glanzer say?
12   A.   You have to waive your scope.
13   Q.   What did Clay Warner say?
14   A.   You have to waive your scope.
15   Q.   What did David Holtzman say?
16   A.   You have to waive your scope.
17   Q.   What did Bob Christy say?
18   A.   You have to waive your scope.
19   Q.   Are you quoting them?
20   A.   I'll tell you what was said.  You have to waive
21   your scope -- I will paraphrase.  If you don't, that --
22   the threats came real hard and heavy that you're going
23   to --
24   Q.   Who are you quoting now?
25   A.   The ALPA advisors.  Our advisors were in there

Page 171

1    telling us that we had to waive scope.
2    Q.   You're saying that there was a script that each of
3    these people said the same thing?
4    A.   They were all on the same page because they
5    obviously discussed this before.
6    Q.   Are you saying they each said the same thing?
7    A.   Yes, exactly the same thing.
8    Q.   So Tumblin, Glanzer, Babbitt, Holtzman, Christy,
9    Roberts, Warner, Seltzer, every one of them said word
10   for word the same thing?
11   A.   Yes, it was very frustrating.
12   Q.   What did Roland Wilder say on April 2nd?
13   A.   Roland did not want us to waive our scope.
14   Q.   What did he say?
15   A.   I don't remember what he said.  I know he was
16   against it.
17   Q.   Are you sure he was there on April 2nd?
18   A.   I don't remember exactly who was there on
19   April 2nd.
20        Actually, no, Roland I don't know if he was there
21   or not.  He was there with us on April 1st.
22   Q.   Would he have said on April 1st don't waive your
23   scope?
24   A.   He did not want to waive scope.  Roland had a plan
25   of action.

Page 172

1         Roland had an entire plan of action.
2    Q.   Tell me what he said.
3    A.   He said don't waive scope, not hard to understand,
4    don't waive your scope.
5         That was the gist of our merger attorney telling
6    us what his recommendation was.  Roland also had a plan
7    of taking this to a District Court in New York to fight
8    this.
9    Q.   Did he explain about his plan?
10   A.   Yes, he did and Duane Woerth said I'm not funding
11   it but that came after the fact, I'm not authorizing it
12   because Duane had to do that.
13   Q.   You talked to Duane Woerth about --
14   A.   No, it was on the phone.
15   Q.   Duane Woerth called into the April 2nd meeting?
16   Is that your testimony?
17   A.   I don't remember if it was the April 2nd meeting,
18   but it was a meeting just after we had done this and
19   Roland had a plan of action and Duane says as the ALPA
20   President, I'm not authorizing that.
21        And I remember just looking over at Roland and he
22   had this look of kind of like huh?  Kind of shocked.
23        Roland's idea was that he had a plan and what that
24   plan would do would just delay.  And the idea was as
25   everyone knows, the longer you can wait in a situation

43  (Pages 169 to 172)

**Bensel, et al., v. Allied Pilots Association, et al.**                    **ALAN ALTMAN, 4/28/11**

---

**Page 221**

1  and I'm being told by experts that this deal is going to
2  fall apart, done, walk away.  They're done.  The airline
3  is going out of business, everyone is losing their job
4  or you're going to go into that 1113 Hearing and you're
5  going to take your contract -- you're going to go into
6  this thing as non-union, non-contract, at-will
7  employees.  Either way, neither scenario is all that
8  pleasant.
9        This is what you are told.  They said the way you
10  stop that is you waive your scope and you accept this
11  Agreement.
12  Q.    And that was the decision that you made when you
13  cast your 90 ballots in favor of this Resolution.
14  A.    I don't have the ability to tell everyone they are
15  going to lose their jobs.
16  Q.    And you didn't want to risk your co-worker's jobs,
17  did you?
18  A.    It's not my place to do that.
19  Q.    I don't have anything further.  That completes my
20  questioning.
21        THE VIDEOGRAPHER:  Mr. Press, do you have any
22  questions?
23        MR. PRESS:  No, I don't, Geoffrey.
24        THE VIDEOGRAPHER:  This concludes the videotape
25  deposition of Alan Altman consisting of five tapes on

---

**Page 222**

1  Thursday, April 28th, 2011.
2        The original tapes of this testimony will remain
3  in the custody of Summit Court Reporting, Incorporated,
4  1500 Walnut Street, Suite 1610, Philadelphia,
5  Pennsylvania, 19102.
6        The time is approximately 2:34 p.m. Pacific
7  daylight time.  We are now off the record.
8        MS. REPORTER:  Mr. Press, did you want a copy?
9        MR. PRESS:  Sure.
10
11        (The deposition concluded at 2:34 p.m.)
12                  * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 223**

1              REPORTER'S DECLARATION
2
3  STATE OF NEVADA    )
                      ) SS.
4  COUNTY OF CLARK    )
5
6        I, Lisa C. Puettmann-Hawton, Certified Court
   Reporter No. 521, declare as follows:
7        That I reported the taking of the deposition of the
   witness, ALAN ALTMAN, commencing on Thursday, April 28,
8  2011 at the hour of 8:26 a.m.
        That prior to being examined, the witness was by me
9  duly sworn to testify to the truth, the whole truth, and
   nothing but the truth.
10        During the deposition, the deponent was advised of
   the opportunity to read and sign the deposition
11  transcript under Rule 30, the original signature page is
   being forwarded to Allen Press, Esq. to obtain the
12  deponent's signature.
        That I thereafter transcribed said shorthand notes
13  into typewriting and that the typewritten transcript of
   said deposition is a complete, true and accurate
14  transcription of said shorthand notes taken down at said
   time.
15        I further declare that I am not a relative or
   employee of counsel or any party involved in said
16  action, nor a relative or employee of the parties
   involved in said action, nor a person financially
17  interested in the action.
        Dated at Las Vegas, Nevada this 11th day of May,
18  2011.
19
20                  _____
21
22                  Lisa C. Puettmann-Hawton, CCR 521
23
24
25

---

**Page 224**

1        INSTRUCTIONS TO WITNESS FOR READING & SIGNING
2        Read your deposition over carefully.
3  It is your right to read your deposition and make
4  changes in form or substance.  You should assign a
5  reason in the appropriate column on the errata
6  sheet for any change made.
7        After making any changes in form or
8  substance which have been noted on the following
9  errata sheet along with the reason for any change,
10  sign your name on the errata sheet and date it.
11        Then sign your deposition at the
12  end of your testimony in the space provided.
13  You are signing it subject to the changes you have
14  made in the errata sheet, which will be attached
15  to the deposition before filing.  You must sign it
16  in front of a notary.  Have the witness sign in
17  the space provided.  The witness need not be a
18  notary public.  Any competent adult may witness
19  your signature.
20        Return the original errata sheet to your
21  counsel promptly.  Court rules require filing
22  within 30 days after you receive the deposition.
23
24

---

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

# Exhibit H

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS

STATE OF MISSOURI


BAPTISTE & WILDER, P.C.,  )
          )
          )
    Plaintiff,  ) Cause No. 04CC-4764
VS.          )
          ) Division 19
ROBERT A. PASTORE,   )
          )
    Defendant.  )


## TRANSCRIPT OF PROCEEDINGS

On Monday and Tuesday, November 20-21, 2006, the
above-entitled cause came on for hearing before THE
HONORABLE MELVYN W. WIESMAN, Judge of Division No. 19 of
the St. Louis County Circuit Court.

## A P P E A R A N C E S

The Plaintiff was represented by James S. Cole, Esq.

The Defendant was represented by Allen P. Press, Esq.


Jill R. Longworth, CCR, RPR, RMR
Official Reporter, Division 19
21st Judicial Circuit

33

1 about March 1.  On March 15th, TWA filed for
2 so-called 1113 relief in the bankruptcy courts,
3 which if granted would have allowed TWA to do away
4 with the scope protections that I'm speaking of.
5     Q    Let me go into that just a little bit for
6 explanation.  1113 is a section of the bankruptcy
7 code?
8     A    It is.
9     Q    And what was the motion designed to do when
10 it was filed in the bankruptcy courts?
11    A    TWA wanted to cause the court to give it --
12 to give TWA permission to change the provisions of
13 the TWA pilots' Collective Bargaining Agreement, in
14 particular those provisions dealing with scope and
15 seniority protection.
16    Q    Was it a motion to reject the agreement
17 entirely?
18    A    The motion was framed in terms of a total
19 rejection.  The court under 1113 gives permission to
20 allow rejection, but normally the contract is
21 changed with respect to the provisions that the
22 company wants to change, and that emerges in
23 negotiations between the union and the company that
24 are mandated by 1113.
25    Q    Was that motion set for a hearing sometime

34

1 early in April in bankruptcy court?
2     A    It was indeed, and that caused the
3 emergency that my memorandum of March 13 was
4 addressed to.
5     Q    Now, what was the alternative to fighting
6 the 1113 motion?
7     A    In my judgment, there was only one
8 alternative that the TWA pilots had in the face of
9 the emergency that was thus created, and that was to
10 sue in the United States District Court for the
11 District of Delaware in an effort to enforce the TWA
12 pilot scope provision.  That threatened to hold up
13 the transaction.  What that would have achieved,
14 according to the strategy outlined in the
15 memorandum, is to force American to sign a process
16 agreement under which American, when the transaction
17 was completed, would adopt and agree to a process
18 for the integration of the American pilots and the
19 TWA pilots' seniority list.  That was critical
20 because there was no other way to cause American, in
21 my judgment, to adopt the process by which a fair
22 seniority integration could be achieved.
23          This was a bold action, but it was action
24 that I had undertaken for the mechanics of Western
25 Airlines in connection with the Delta/Western

35

1 transaction, and it was action that I had undertaken
2 for the Pacific Southwest Airlines mechanics when
3 that organization, when that company was acquired by
4 US Airways.  It was bold, but it had been effective
5 in improving the lot of employees at least twice
6 before.
7     Q    In connection with your recommendation, did
8 you also communicate that recommendation to another
9 level of the Air Line Pilots Association?
10    A    I did.  I drafted a letter to Captain Duane
11 Woerth, who was then the President of ALPA National,
12 and I requested the permission of ALPA National to
13 initiate legal action in the name of ALPA against
14 TWA to enforce the TWA employees' contract.
15    Q    If you would, sir, turn to Exhibit 16 in
16 the exhibit notebook.
17          Is Exhibit 16 a copy of the letter you just
18 mentioned that you wrote to Captain Woerth?
19    A    It is.  That letter deals with the
20 extraordinarily complex jurisdictional interplay
21 between the United States Bankruptcy Court and the
22 United States District Court for purposes of the
23 Railway Labor Act and the bankruptcy code.
24          MR. COLE:  Your Honor, I offer Exhibit 16.
25          MR. PRESS:  No objection.

36

1          THE COURT:  It will be admitted.
2     Q    (By Mr. Cole)  At some point, was there a
3 decision by the Master Executive Council on whether
4 to waive the scope protections or not?
5     A    Yes.  That occurred on or about April 2,
6 2001.
7     Q    Were you present for that meeting when the
8 decision was made?
9     A    I was present for the first part or the
10 public part of that meeting.  I had an engagement
11 with another client in another city, and so I left
12 St. Louis where the meeting was held prior to that
13 decision being made.
14    Q    Was the decision of the Master Executive
15 Council then communicated to you in some way?
16    A    The decision of the MEC was communicated to
17 me by John Hefley the next day.
18    Q    What was Hefley's position at that time in
19 the ALPA?
20    A    Mr. Hefley was a member of the Merger
21 Committee, and I think he may have held another
22 position as well, but I don't recall that position.
23    Q    What was the decision of the MEC?
24    A    The MEC's decision was to waive the scope
25 protection in the TWA pilots' Collective Bargaining

81

1  agreements stipulate that billing for our clients
2  will be accomplished monthly, and they are.  And so
3  bills were rendered to the TWA-LLC, pursuant to the
4  retainer agreement of January 17, 2001, every month
5      Q    And to prepare those bills, how do you keep
6  time of your own efforts?
7      A    Time is kept contemporaneously.
8      Q    In what kind of record?
9      A    Well, it varies.  Some of our lawyers, the
10 younger lawyers, do it electronically.  Some of our
11 lawyers, the older lawyers, use time sheets.  And
12 because I travel so frequently, I use daily journals
13 on which to record my time.
14         MR. COLE:  If I may approach the witness,
15 Your Honor?
16         THE COURT:  You may.
17     Q    (By Mr. Cole)  Mr. Wilder, I've handed you
18 a substantial exhibit that we've marked as Exhibit
19 30.  Can you advise the Court what Exhibit 30 is.
20     A    Yes, of course.
21         Mr. Cole, I have not gone over every page
22 in this very lengthy document, but it appears to be
23 the contemporaneous time records that were kept by
24 the lawyers in our firm who worked on the Trans
25 World Airways representation.

82

1      Q    And in connection with preparing this
2  exhibit, would you redact and not photocopy
3  information that applied to other clients?
4      A    Yes, our time records are sufficiently
5  comprehensive for all clients that there would be a
6  danger in disclosing confidential information in
7  this proceeding of contacts we had with other
8  clients, and those records are, therefore, redacted.
9      Q    To your knowledge, does Exhibit 30 show all
10 the time records that you and your firm kept in
11 connection with your representation of the TWA MEC?
12     A    I believe so, yes.
13         MR. COLE:  I offer Exhibit 30, Your Honor.
14         MR. PRESS:  No objection.
15         THE COURT:  Exhibit 30 will be admitted.
16         MR. COLE:  If I may approach, Your Honor,
17 and hand the exhibit to you.
18     Q    (By Mr. Cole)  Mr. Wilder, I would like to
19 show you what we've had marked as Exhibit 4.  Also a
20 bulky exhibit.
21         Do you recognize Exhibit 4 as a collection
22 of the invoices that were sent to the TWA Master
23 Executive Council during your engagement?
24     A    I do.
25     Q    Were each of these invoices prepared from

83

1  the time records that you kept and we've had
2  admitted into evidence?
3         Were the invoices based on the time records
4  that you kept?
5      A    Yes.  The invoices in P-4 were based on the
6  time records that appeared in the previous exhibit,
7  Exhibit 30.
8      Q    How were they -- mechanically speaking
9  within your office, how were the time records
10 converted to entries on invoices?
11     A    At least once a month and usually twice a
12 month, time is submitted by the lawyers in our firm
13 to the billing department, and the billing
14 department inputs the records into a billing program
15 that enables the detailed bills that I depicted in
16 Exhibit 4 to be created and sent to clients on a
17 thirty-day interval basis.
18     Q    Was your practice to review invoices before
19 they were sent to the client?
20     A    The responsible principal for each
21 litigation or other matter does review the bills
22 prior to their going out to the client and applies
23 the suitable judgments in terms of corrections or
24 whatever changes should be made.
25     Q    In connection with the representation of

84

1  the TWA MEC, were you the responsible partner in our
2  firm?
3      A    Yes, I was.
4      Q    And did you have the task of reviewing
5  these invoices then before they were sent out?
6      A    Yes, I did.
7      Q    Did the firm keep records on out-of-pocket
8  expenses that were incurred in the course of its
9  representation of the TWA MEC?
10     A    Yes, in the course of representing labor
11 organizations, our firm is required to keep rather
12 careful track of expenses.  All of our clients
13 require that expenses to the firm, whether it be a
14 taxicab ride or a hotel bill or an airline fair, be
15 reflected in the bill itself.
16     Q    And did you list those expenses item by
17 item in connection with each of the invoices that
18 appear in Exhibit 4?
19     A    We did.  That's our usual practice.
20     Q    Did you also send the client photocopies of
21 receipts in connection with these invoices?
22     A    Yes.
23     Q    And finally, when the total amount shown on
24 the last page of the invoice itself for each
25 invoice, did it also include credits of previous

## REPORTER'S CERTIFICATE

I, Jill R. Longworth, Certified Court Reporter, hereby certify that I am the Official Court Reporter for Division 19 of the Circuit Court of the County of St. Louis, State of Missouri, and that I was present and reported all the proceedings had in the above-styled cause, and I further certify that the foregoing pages contain a true and accurate transcription of the proceedings transcribed.


Jill R. Longworth, CCR #0366
Official Court Reporter


Transcript Completed:  November 29, 2006

368

# Exhibit I

```
 1              IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917   (JEI)

 3         THEODORE A. CASE, SALLY YOUNG,
           HOWARD HOLLANDER, PATRICK BRADY
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                          Plaintiffs,
 6                                            VOLUME 2
                V.                         TRIAL TRANSCRIPT
 7
           AIR LINE PILOTS ASSOCIATION,
 8
                          Defendant.
 9
                                  CAMDEN, NEW JERSEY
10                                JUNE 8, 2011

11         B E F O R E:   HONORABLE JOSEPH E. IRENAS
                          UNITED STATES DISTRICT JUDGE
12
                        A P P E A R A N C E S:
13
              TRUJILLO, RODRIGUEZ & RICHARD
14            BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                 AND
              GREEN JACOBSON, P.C.
16            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
              AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17            For the Plaintiffs.

18            ARCHER GREINER
              BY:   STEVEN FRAM, ESQ.
19                  AND
              KATZ & RANZMAN
20            BY:  DANIEL M. KATZ, ESQ.
              FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
              ELIZABETH GINSBERG, ESQ.
22            IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1          Pursuant to Section 753 Title 28 United States
   Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
   above-entitled proceedings.

3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter

6

7

8

9

10              LYNNE JOHNSON, CSR, CM, CRR
            OFFICIAL COURT REPORTER
11          UNITED STATES DISTRICT COURT
            P.O. BOX 6822
12          LAWRENCEVILLE, NJ  08648
            PHONE:   609 896 1836
13

14

15

16

17

18

19

20

21

22

23

24

25

1    that another ALPA carrier, U.S. Air, was involved, they were

2    part of the discussions, correct?

3    A.    Correct.

4    Q.    Just to finish up the thought on these dates.  I am not

5    going to go through all the minutes.  Do you recall receiving

6    the TWA LLC proposal on or about March 17, becoming aware of

7    that?

8    A.    No, I did not.

9    Q.    Do you recall being present at the TWA MEC special

10   meeting on March 21 and 22?

11   A.    Again, I would have to see the minutes.

12   Q.    You don't have any present recollection of what

13   happened?

14   A.    March 21, 22.  I have to see the minutes.

15   Q.    You do recall being present at the meeting on April 2 of

16   2001, correct?

17   A.    Yes, I do.

18   Q.    When did you first recall people talking about the

19   Section 1113 issue?

20   A.    Much probably in passing, being brought up in the

21   February, March, early March timeframe.

22   Q.    Did you at that timing and look at Section 1113 of the

23   Bankruptcy Code?

24   A.    No, sir, I did not at that time look at it.

25   Q.    Did you ever and and look at Section 1113 of the

1    Q.    All right.   Mr. Case, do you agree that in addition to

2    the six advisors I mentioned before that Randy Babbitt was

3    also there?

4    A.    Y es.

5    Q.    So there were seven, yes?   There were seven?

6    A.    I said lawyers.   Six lawyers and one adviser.

7    Q.    Mr. Babbitt LAD be the former president of the Air Line

8    Pilots Association?

9    A.    Yes, he had.

10   Q.    New the industry pretty well?

11   A.    Yes, he did.

12   Q.    His advice with respect to the decision we have been

13   discussing was what?

14   A.    Was to waive scope.

15   Q.    His advice was to accept the collective bargaining

16   agreement that had been offered by TWA LLC?

17   A.    As it was expressed to me his advice was to waive scope.

18   Q.    All right.   And can you show me on the agenda where it

19   lists Mr. Wilder as an attendee?

20   A.    It does not list Mr. Wilder on the list as an attendee.

21   Q.    In fact, Mr. Wilder wasn't there on April 2, correct?

22   A.    I believe that is incorrect.   I believe he was there and

23   there is some dispute over that.

24   Q.    So he do you recall a meeting the day before, April 1?

25   A.    That's correct.   I did not attend that meeting.

Case-cross/Fram                                           185

```
 1   A.    That's correct, work session.

 2   Q.    The April 1 meeting is the one you did not attend?

 3   A.    I was unable to attend that meeting.

 4   Q.    What do you say you recall Mr. Wilder telling people on

 5   April 1, I am sorry April 2, with respect to his ideas?

 6   A.    Mr. Wilder expressed a positive position for possible

 7   position for his litigation strategy for a period of time,

 8   after he listened to the ALPA advisors long enough he

 9   eventually capitulated and said I I guess a contract is

10   better than no contract.  And Mr. Wilder eventually changed

11   his opinion to mirror that of advisers.

12   Q.    Do you recall Mr. Wilder appearing to be distraught as

13   the discussion went on?

14   A.    Mr. Wilder is a little hard of hearing, and it did

15   appear at time that he was a little behind on some of it, and

16   in my opinion, he looked a little distraught about being --

17             THE COURT:  I am sorry, your opinion what --

18   A.    He looked distraught about being overwhelmed by

19   advisers' advice.

20   Q.    But what he ultimately said at the end of the day at the

21   end of the discussion is that he agreed with the other

22   advisors about what the MEC should do?

23   A.    Yes, he eventually said almost verbatim, "I guess a

24   contract is better than no contract."

25   Q.    So based upon the fact that Mr. Wilder ultimately
```

# Exhibit J

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3       THEODORE A. CASE, SALLY YOUNG,
         HOWARD HOLLANDER, PATRICK BRADY
 4       AND MICHAEL FINUCAN, individually
         and on behalf of all others
 5       similarly situated,
                    Plaintiffs,
 6                                      VOLUME 3
              V.                        TRIAL TRANSCRIPT
 7

         AIR LINE PILOTS ASSOCIATION,
 8
                    Defendant.
 9
                         CAMDEN, NEW JERSEY
10                       JUNE 9, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                    A P P E A R A N C E S:
13

             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:   STEVEN FRAM, ESQ.
19                 AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH GINSBERG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.

3
                    S/   LYNNE JOHNSON

4
                    Lynne Johnson, CSR, CM, CRR
5                   Official Court Reporter

6

7

8

9

10            LYNNE JOHNSON, CSR, CM, CRR
              OFFICIAL COURT REPORTER
11            UNITED STATES DISTRICT COURT
              P.O. BOX 6822
12            LAWRENCEVILLE, NJ  08648
              PHONE:   609 896 1836

13

14

15

16

17

18

19

20

21

22

23

24

25

1   15.

2         MR. JACOBSON:  First of all this objection was not

3   made in the pretrial.  This is a new objection.

4         MR. KATZ:  It was a new exhibit they are trying to

5   offer.  MR. JACOBSON:  Same testimony that was in the

6   pretrial and wasn't objected to.

7         MR. KATZ:  The plaintiffs tried to add a new

8   exhibit and testimony, your Honor.

9         MR. JACOBSON:  That is not a factual statement.

10         MR. KATZ:  They are asking about a document with an

11   unknown author.

12         THE COURT:  What is 232?

13         MR. KATZ:  232 is a draft by an unknown person at

14   Loboef.

15         MR. JACOBSON:  It was a document from the man's law

16   firm of an outside line for the chairman, Bob Pastore to be

17   given at the bankruptcy hearing.  Mr. Pastore will testify he

18   he wasn't shown it and part of the proposed testimony is you

19   are aware that if the Court rejects your -- accepts the 1113,

20   then you have a right to strike.

21         And there is going to be plenty of evidence that

22   Mr. Pastore and the others weren't aware of that and we think

23   that is part of the problem here is that the lawyers and

24   advisors are telling the Court and they are aware that that

25   there is at least a credible right to strike but they are not

1    sharing that with the MEC members.  In fact, when asked that

2    at that April second meeting they say you most probably don't

3    have any right to strike.  That is I think evidence of the

4    misinformation that is being given that helped corrupt this

5    hole process persuading the MEC members to vote to waive

6    scope.

7              MR. KATZ:  Judge Irenas, this portion of the

8    deposition and this document and exhibit, the witness says he

9    doesn't know who drafted it.  He does talk about the

10   discussion of the right to strike in other portions of his

11   deposition.  And recites what he remembers of the discussion

12   about the right to strike at the April 2 meeting.

13             MR. JACOBSON:  He does describe the document as one

14   produced by his law office.  He recognizes the coding on the

15   left, that it comes from their file.  He says he doesn't know

16   which lawyer prepared it but this was an outline intended for

17   Bob Pastore.

18             THE COURT:  Who prepared it?  What was it prepared

19   for?

20             MR. JACOBSON:  It was prepared for the bankruptcy

21   hearing.

22             THE COURT:  Yeah, but I mean, some law clerk could

23   have prepared, to start with, maybe it was something that was

24   going to be reconsidered.  Just an undated, untimed, no

25   testimony backing it up.

Altman-cross/Fram                                                133

1   recall that?

2   A.    On the second page, vice chairman gave a brief on it,

3   that's correct.

4   Q.    Do you recall any comments that were made by advisors

5   during that meeting?

6   A.    And tell us, sir, without looking at the document, do

7   you recall without looking at the document anything that any

8   of advisors said at the meeting.

9   A.    Not, I can't speak to that because it was ten years ago.

10  Without looking at the document, I don't know who was present

11  and who wasn't.

12  Q.    Do you recall that there was a period of time when the

13  meeting went into executive session?

14  A.    I don't remember, but if it says it did, it did.   Ten

15  years ago.

16  Q.    Page 3 of the document document, please.   Thursday,

17  March 22, 2001.   Just blow up where it says transaction

18  update on the very bottom, merger committee.

19  A.    Okay.

20  Q.    You see it says 9:15 RAUTENBERG/YOUNG move to enter into

21  executive session.   Vote passed?

22  A.    I see that.

23  Q.    Do you agree on the next page that the MEC remained in

24  executive session until 12:30.   Which would have been over

25  three years.

Altman-cross/Fram                                            135

1   achieve through the 1113 motion?

2   A.    They wanted to, or what they told us, was that if we

3   didn't voluntary waive our scope and successorship that they

4   would go to the Court and ask for it that way.

5   Q.    Do you recall that the Section 1113 motion sought to

6   reject the entire collective bargaining agreement?  Do you

7   recall that?

8   A.    Yes, I do.

9   Q.    Let's go back to this meeting.  Do you recall what any

10  of advisors said with respect to Section 1113 or anything

11  else during that meeting?

12  A.    No.

13  Q.    No?

14  A.    No.  Not in the executive session, I sure don't.

15  Q.    Do you recall what Mr. Seltzer said about the chances

16  that the Section 1113 motion would be granted?

17  A.    Not in this meeting, I don't.

18  Q.    But you do recall that the, that he told you and others

19  on April 2 that there was a 99 percent chance it would be

20  granted?

21  A.    That's correct.

22  Q.    You testified that you were surprised because that was

23  contrary to the prior advice, yes?

24  A.    That's correct.

25  Q.    Does that help you remember that the advice Mr. Seltzer

Altman-cross/Fram                                              151

1   A.    Yes.

2   Q.    Okay.  Can you find it for me real quick?

3   Q.    Take this copy.  Move it along.  You testified about

4   attending the meeting on April 2, yes?

5   A.    That's correct.

6   Q.    Did you also attend a meeting on April 1 of 2001 in St.

7   Louis?

8   A.    I flew in and I had dinner.

9   Q.    Are you aware that there was a meeting on April 1, that

10  afternoon of the members of the MEC and of advisors?

11  A.    I don't know any of the MEC members that showed at the

12  meeting.  I came in from Los Angeles.  I knew that there had

13  been an email sent out that they would like to have a

14  gathering on April 1, prior to the April 2nd MEC meeting.  I

15  didn't get in town in time.

16  Q.    All right.  So you knew that a meeting was scheduled on

17  Sunda ay, April 1, at one o'clock p.m. to talk about issues

18  and prepare for the formal MEC meeting the next day?

19  A.    That's correct.

20  Q.    You are saying that you didn't attend that meeting?

21  A.    No. I couldn't make it in in time.

22  Q.    What time did you arrive in town on the first?

23  A.    It was late in the afternoon, maybe early evening.  I

24  came in and had dinner with a couple members of the MEC.

25  Q.    Who do you recall having dinner with?

1   that there were three people present?

2   A.    No, I am not saying that.  I am saying there if there

3   was a meeting on the first that would have been a dinner

4   meeting and if Roland was there, he was there.  There

5   probably were more than three people there.  I don't

6   remember.

7   Q.    All right.  Do you have a recollection of being told

8   before the meeting on April 2 that Mr. Wilder couldn't be

9   there on  second because he had a conflicting business

10  engagement?

11  A.    Roland was there on the second.

12  Q.    You are confident that Roland was there on the second?

13  A.    Yes, I am.

14  Q.    Okay.  Do you recall Roland saying at the end of the

15  debate on the 2nd, that after hearing what everybody else had

16  to say, that he agreed that the MEC should vote to accept the

17  collective bargaining agreement that was on the table?

18  A.    No.

19  Q.    And as part of that you would agree to waive scope?

20  A.    No.  Roland was the one adviser who always stood firm

21  and told us not to waive scope.  When Roland left the meeting

22  -- Roland was a dissenting view among advisors.  Roland was

23  being treated poorly by the others in that room, the other

24  advisors.  Roland left.  I remember this because his bag,

25  garment bag, was behind me.  He grabbed his garment bag, he

1    is walking out the door.  He stopped.   My characterization of

2    Roland's face was he looked defeated.   He looked very upset.

3    And he turned around and he said, "I guess some contract is

4    better than no contract."

5            And as he turned, he said, if you are going to

6    waive scope, you don't have to do it now.  You can do it on

7    the courthouse steps.

8    Q.   This was on April 2, a Sunday -- I am sorry.  This was

9    on April 2, a Monday, of 2001, correct?

10   A.   That's correct.

11   Q.   Now, the March 31 transition agreement, P-131, this

12   thick document that we talked about before, the one signed by

13   Mr. Kiel and Mr. Pastore, that document was discussed on

14   April 2, do you recall that?

15   A.   It was in a resolution that was passed by the MEC for

16   the negotiating committee to go out, tie up loose ends, with

17   the transition agreement, and have it became for Mr. Pastore

18   ato sign, Bob Pastore, on April 5.

19   Q.   So the direction of the MEC was for people to spend more

20   time on the transition agreement, and to negotiate the best

21   possible wrap ups they could and then sign it?

22   A.   That was the direction of the MEC.

23   Q.   That was the resolution that passed, yes?

24   A.   That's correct.

25   Q.   And when you cast the 90 votes that you were entitled to

# Exhibit K

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3       THEODORE A. CASE, SALLY YOUNG,
         HOWARD HOLLANDER, PATRICK BRADY
 4       AND MICHAEL FINUCAN, individually
         and on behalf of all others
 5       similarly situated,
                          Plaintiffs,
 6                                            VOLUME 4
              V.                          TRIAL TRANSCRIPT
 7

         AIR LINE PILOTS ASSOCIATION,
 8
                          Defendant.
 9
                                  CAMDEN, NEW JERSEY
10                                JUNE 13, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                    A P P E A R A N C E S:
13

             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                 AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:   STEVEN FRAM, ESQ.
19                 AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH GINSBERG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON

4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10                 LYNNE JOHNSON, CSR, CM, CRR
                   OFFICIAL COURT REPORTER
11                 UNITED STATES DISTRICT COURT
                   P.O. BOX 6822
12                 LAWRENCEVILLE, NJ  08648
                   PHONE:   609 896 1836

13

14

15

16

17

18

19

20

21

22

23

24

25

1    scope.  They are going to walk.

2    Q.    And again, screaming?

3    A.    Screaming.

4    Q.    Now you have got Mr. Christy screaming at Ted Case, you

5    got Michael Glanzer screaming at Roland Wilder?

6    A.    Correct.

7    Q.    What did you think when you have one adviser yelling at

8    another one?

9    A.    Well, I was trying to listen to the advice of the

10   experts.  I didn't think it was, I mean I thought it was that

11   important.  To me they were trying to make a point that it

12   was that crucial, that they waive scope.  And unfortunately

13   at the end --

14   Q.    Ms. Young, before you answer that.  Was this the first

15   time you had ever been at a MEC meeting where you were, where

16   you had lawyers make presentations to you?

17   A.    We had probably heard from, you know, like I said,

18   Roland Wilder a little bit.  We have our own in-house

19   attorney, David Holtzman.  Yes, this was at first time there

20   was any real presentation or advice given to us about the

21   situation with we were in with the purchase.

22   Q.    After Mr. Glanzer is screaming at Mr. Wilder did he

23   change his position, Mr. Wilder, that is?

24   A.    He did.  He capitulated and he looked defeated.  You

25   know, his body language was, and he said, he ended his

1   presentation by saying, you know, a contract is better than

2   no contract, and I suppose if you have to waive, I would just

3   advise you to wait until the courthouse steps.

4   Q.   Meaning wait until Friday?

5   A.   Yes.

6   Q.   At the hearing?

7   A.   Yes.

8   Q.   Correct.

9   A.   Yes, correct.

10  Q.   Ms. Young, before the vote was made did you take a straw

11  pole for an opinion?

12  A.   I did.  Again I was looking for all the information that

13  I could gather that day and I spoke to everybody in the room

14  who I knew, I spoke to Bud Bensel, the merger committee

15  chairman.  I spoke to two of the merger committee members who

16  were there.  I spoke to a couple of the negotiating committee

17  members who were there.  I knew where the MEC members stood.

18  And everybody in that room, after listening to advisors, had

19  the opinion that we had to waive scope.  Except for three

20  people.

21  Q.   Who?

22  A.   Howard Hollander, Ted Case and John Hefley.  John Hefley

23  was a member of the merger committee.

24  Q.   And how did you vote then?

25  A.   No.

1    advisors said during the meeting on March 21 or March 22?

2    A.   I don't.

3    Q.   Do you see as well that 16 20, it shows transaction

4    update continued.  Then it has the merger committee now.  And

5    it is showing Roland Wilder and Robert Christy?

6    A.   Yes.

7    Q.   Two more lawyers.  Yes?

8    A.   Yes.

9    Q.   So we have a total of seven lawyers present advising the

10   MEC at the special meeting on March 21.  Yes?

11   A.   I don't know that they were advising.  I don't remember

12   any specific advise they gave us.  If you note, they

13   presented for one hour.  Five attorneys presented for one

14   hour.

15            So I  don't know how much stuff, you know,

16   extensive information we could have gone over in that short

17   period.

18   Q.   This is the agenda?

19   A.   Correct.

20   Q.   The actual presentations, as we discussed from the

21   minutes, the actual presentations took longer.

22   A.   Okay.

23   Q.   Do you agree that?

24   A.   Yes.

25   Q.   The agenda looks like it is setting aside one hour for

Young-cross/Fram                                              136

1    the negotiating committee  but we talked about how the

2    minutes reflect executive session for more than three hours,

3    right?

4    A.   Yes.

5    Q.   In same with the merger committee.  The agenda has one

6    hour, but the executive session on the merger committee

7    issues were actually more than three hour, yes?

8    A.   Yes.

9    Q.   Then you see on March 22 the final page of the document,

10   it says transaction update continued, if required?

11   A.   Yes.

12   Q.   And then eleven o'clock, MEC discussion, and direction?

13   A.   Yes.

14   Q.   Does all of that refresh your memory that April 2 was

15   not the first time that advisors sat down and talked to the

16   members of the MEC in detail about waiver of scope, Section

17   1113, and the importance the of getting a new collective

18   bargaining agreement?

19   A.   I am sure that they were there.  I am sure that this is

20   correct.  I just don't remember the substance of what they

21   told us.

22   Q.   Do you recall that after this meeting that the

23   negotiating committee went back and continued to negotiate

24   with the counterparts, the people at TWA about a new

25   collective bargaining agreement?

1   Friday or Saturday before the Monday meeting?

2          THE COURT:  Are you talking about the April 2

3   meeting.

4   Q.   April 2, yes.  In fact an email went out scheduling the

5   meeting on Thursday, March 29.

6   A.   Okay.

7   Q.   Does this refresh your recollection?

8   A.   As I said I was not somebody who spent a lot of time on

9   email.  If the email went out and I didn't collect the email

10  that day, it might have been called that day, but I wasn't

11  informed until a day or two days --

12         THE COURT:  But that wasn't the fault of the people

13  calling the meeting.

14  A.   I didn't say it was.  I didn't find out about it until a

15  couple days before was the point I was trying to make.

16  Q.   The email told you there with would be a work session

17  beginning Sunday, April 1, at 1300 hours, is that one o'clock

18  p.m.?

19  A.   Yes.

20  Q.   Did you attend that work session or not?

21  A.   No.

22  Q.   Why not?

23  A.   I don't think we were invited.  As far as I know, no MEC

24  member was invited.  I believe it was a work session with

25  advisors and the officers.

# Exhibit L

```
                    IN THE UNITED STATES DISTRICT COURT.
                    FOR THE DISTRICT  OF NEW JERSEY
                    CIVIL 02-2917  (JEI)

          PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
          AND MICHAEL FINUCAN, individually
          and on behalf of all others
          similarly situated,
                         Plaintiffs,
                                              VOLUME 6
               V.                             TRIAL TRANSCRIPT

          AIR LINE PILOTS ASSOCIATION,

                         Defendant.

                                     CAMDEN, NEW JERSEY
                                     JUNE 15, 2011

          B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE

                    A P P E A R A N C E S:

               TRUJILLO, RODRIGUEZ & RICHARD
               BY:  NICOLE M. ACCHIONE, ESQ.
                    AND: LISA J. RODRIGUEZ, ESQ.
                         AND
               GREEN JACOBSON, P.C.
               BY:  ALLEN PRESS, ESQ.   (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
               For the Plaintiffs.

               ARCHER GREINER
               BY:   STEVEN FRAM, ESQ.
                         AND
               KATZ & RANZMAN
               BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

               ELIZABETH GINSBERG, ESQ.
               IN-HOUSE COUNSEL FOR ALPA.
```

2

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.
3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter
6
7
8
9
10                 LYNNE JOHNSON, CSR, CM, CRR
                   OFFICIAL COURT REPORTER
11                 UNITED STATES DISTRICT COURT
                   P.O. BOX 6822
12                 LAWRENCEVILLE, NJ  08648
13
14
15
16
17
18
19
20
21
22
23
24
25

1    overwhelming view was not to waive scope, please don't waive

2    our scope rights.

3    Q.    Was it your intention at that time not to waive scope?

4    A.    That's correct.

5    Q.    What was your view about the negotiations, about how one

6    might put leverage or pressure on the American pilots to

7    improve the negotiations, and this is as of the end of March,

8    2001?

9    A.    I only knew of, I think I knew of one that was proposed,

10   most certainly my information I think or the MEC's

11   information was coming either through Roland Wilder or

12   through the merger committee that there were strategies being

13   looked at.  I can't remember specifics about those

14   strategies.

15   Q.    All right.  Now, let's move to the special meeting of

16   April 1 and April 2.  All right.  Was this a regularly

17   scheduled meeting or a special meeting, to your recollection?

18   A.    This was a special meeting.

19   Q.    How much against notice did you have on of the special

20   meeting?

21   A.    I probably had about 24 hours notice.

22   Q.    Did you attend the meetings on April 1 of 2001?

23   A.    I was not, I was not at any meeting on April 1, and I

24   don't recall being called to a meeting from the message that

25   went out, it was specified to be a work session.

Hollander-direct/Jacobson                              42

1    Q.   What about the negotiations with committee members and

2    merge committee members.  Were they invited?

3    A.   I cannot recall if those committee members were invited

4    in or not.

5    Q.   Can you recall what the individual advisors said to you,

6    and if you can't recall, can you recall what any of them

7    said?

8    A.   You know, it is an interesting statement.  I can tell

9    you what was said that day as if I was there yesterday.

10   Sometimes it is a little vague as to who said what.  Clay

11   Warner was an active speaker.

12           Michael Glanzer did speak.  Bob Christie did speak.

13   Roland Wilder attempted to speak.  So I can remember that.

14   But let me phrase it as this:  I am from New York.  To me it

15   almost looked like a Broadway play.  That is how I look at it

16   today.

17           Everybody was singing the same song and distancing

18   to the same step, with one exception which was Roland Wilder.

19   Q.   Now, you said Roland Wilder attempted to speak.  What

20   did you mean by that?

21   A.   I often tried to get his points across.  At least once

22   or twice tried to offer other suggestions and he was

23   interrupted in his speaking.  He was not like, I am not

24   saying like allowed, but he was cut off.  Mr. Wilder, we will

25   get to that.  Mr. Wilder, we don't share your opinion on

1   that.  It was that type of a conversation.

2   Q.   All right.  You said Clay Warner was an active

3   participant in that conversation?

4   A.   He was active, yes.

5   Q.   What did Mr. Warner say as best as you can recall?

6   A.   Again, it was singing the same tune.  His recollection

7   -- the best of my recollection, Mr. Warner's advice was that

8   this deal had to go forward at all costs.  It was in the best

9   interest of the pilots.  His quote that day, and again I told

10  you how you remember specific things.  At least a half a

11  dozen times, the quote of the day that I, that is ingrained

12  in my head is the train is leaving the station.  You are

13  either going to get on board or you are going to be left

14  behind.

15          That is what was repeated over and over again.

16  Even at a certain point, I think it was, I used today's

17  phrase, sugar coated.  If you folks will vote to waive your

18  scope as the first union in front of the flight attendants

19  and in front of the mechanics, there may be some extra to

20  get.  You will be perceived as the good people.  American

21  Airlines may owe you one, in some phrase they thought that

22  there was some benefit to have by being the first union to

23  get on board.

24  Q.   Do you recall when that particular statement was made

25  relative to Mr. Wilder's departure from the meeting?

Hollander-direct/Jacobson                              44

1   A.    No.

2   Q.    Was it before or after you departed?

3   A.    I couldn't tell you if it was before or after.  Mr.

4   Wilder's departure was has actually done.

5   Q.    Can you describe Mr. Wilder's departure?

6   A.    At some point I think Roland Wilder, our merger

7   attorney, and this is an opinion, was frustrated.  We all saw

8   a video here yesterday.  Roland Wilder is a fairly frail man,

9   well spoken, soft spoken.  He literally grabbed his

10  briefcase, and he headed for the door, and he had this look

11  on his face, you know, with bloodshot eyes, almost, and his

12  departing comments were this:  He said look, maybe some deal

13  is better than no deal, but I can tell you if you are going

14  to do this, you don't have to do it today.

15        And then to the best point just walked out the door

16  and we hadn't seen him for the rest of that meeting.

17        THE COURT:  Do you know what time of day that was,

18  morning, afternoon, when he stormed out, not stormed out,

19  when he left the room.

20  A.    Midday, your Honor.  It was definitely not in the

21  morning and definitely not late in the afternoon.  It was

22  lunch hour, around that time.

23        THE COURT:  Your testimony.

24  A.    I will say midday.

25        THE COURT:  All right.

1   forwarded was genuine, right?

2   A.    I do not, no.

3   Q.    You have no idea who prepared this alleged report, yes?

4   A.    I just received it as an email.

5         MR. FRAM:  Thank you.

6         MR. JACOBSON:  May I cross on the voir dire?

7         THE COURT:  Yes.  You can.

8         VOIR DIRE EXAMINATION.

9         BY MR. JACOBSON:

10  Q.    Mr. Hollander, as a result of receiving this email, did

11  the MEC take any action?

12  A.    The MEC had concern and took action, yes.

13  Q.    The action you took was what?

14  A.    I can't remember specifically, but one thing we did was

15  request that Mr. Woerth address these issues.

16  Q.    Did Mr. Woerth come to your meeting?

17  A.    He did.

18  Q.    Was that the only MEC meeting that Mr. Woerth attended

19  throughout the entire American Airlines merger process?

20  A.    That's correct.

21        THE COURT:  That is not voir dire.  That has

22  nothing do with this.  You can question about Woerth's

23  appearance and what he said he heard.  But that has nothing

24  to do.

25        MR. JACOBSON:  I am sorry.

1   Q.   And did Mr. Woerth, Captain Woerth, deny this statement

2   that is in here?

3   A.   He did not deny the statement.  I believe he said that

4   he was misquoted.  But he did not deny the statement.

5           THE COURT:  Look, you can question what worth said,

6   if somebody asked him that question, can you say that.  I

7   don't know what happened at another meeting.  But this is,

8   you are offering this to have Woerth say,  having said

9   something --

10          MR. JACOBSON:  To the Allied pilots.

11          THE COURT:  At a meeting that this witness wasn't

12  present for.

13          MR. JACOBSON:  That's correct, your Honor.

14          THE COURT:  And this is yet by another person who

15  we have, who apparently is not going to testify, as to what

16  Woerth said, and at that meeting.  I mean, that is hearsay.

17          MR. JACOBSON:  Your Honor, I think the fact that

18  they have the statement  that Captain Woerth met with them

19  and told them to get real on associated senior merger

20  settlement --

21          THE COURT:  The circumstances of what he said, the

22  context, he doesn't know.

23          MR. JACOBSON:  The importance of this to me is with

24  this witness, is that the MEC then invited Captain Woerth to

25  come to the meeting, they queried him about this.  He danced

Hollander-voir dire/Jacobson                                    70

1    around it, he didn't admit or deny.  He said he was quoted

2    out of context.

3              THE COURT:  He can say that.  He can testify as to

4    what Woerth said, what questions were asked of Woerth, what

5    was the response of  --

6              MR. JACOBSON:  Without offering the document.  What

7    about the fact.  All I really want is that --

8              THE COURT:  I know what you want out of that.  That

9    is clear.  You want to get something that will go in the jury

10   room and it says that Captain Woerth said the TWA pilots have

11   to get real.  That doesn't make this admissible.

12             MR. JACOBSON:  What about just the two lines that I

13   want to read, have him read, not the document itself?

14             THE COURT:  No, you are trying to put in evidence

15   something that you can't, he testifies, I will have to hear

16   it, but he can testify about Woerth's appearance, what

17   questions he was asked.  So you will really get into evidence

18   to the extent, if it was happening, that somebody asked him

19   did you tell the board of directors of ALPA that I, I am

20   sorry, the APA, did you tell the APA board of directors that

21   the TWA pilots have to get real and what his response was.

22             MR. JACOBSON:  I understand. I can ask that

23   question.

24             THE COURT:  That is direct testimony.  If he heard

25   that, you know, whatever that, when that meeting, that he

1  attended, I mean, we have been listening for, there has been

2  no objection and I wouldn't sustain an objection where he is

3  present and hears this and can say what he hears.

4          MR. JACOBSON:  I understand your ruling, your

5  Honor.

6          THE COURT:  And it may well be that you will get

7  before the jury that somebody asked him, did you tell the APA

8  directors that the TWA pilots have to get real.  And then he

9  said X.  Y, I don't want to something suggest something, but

10 whatever he says the answer is to that.  That is direct

11 testimony.  That is his observation with his eyes, his ears,

12 his senses.

13         MR. JACOBSON:  I understand, your Honor.

14         THE COURT:  And Woerth is the president of the

15 defendant.  So that is a party admission in effect.  So I

16 allow all that.

17         But putting before them a detailed report before

18 the jury of what went on in a meeting, that it is not a

19 business record of ALPA, it is, it is like ALPA minutes, you

20 know, or the MEC minutes or even the board of ALPA minutes

21 probably are admissible as business records of a party in

22 this case, ALPA.

23         But I don't know what this is.  He doesn't know.  I

24 think you can get actually pretty close to what you want to

25 do, but you but you can't do it through this.

Hollander-direct/Jacobson                                    73

1    A.    This is his sole time.

2          THE COURT:  When was this meeting?

3    A.    This was April 23, your Honor.

4          THE COURT:  April 23.

5    Q.    Were you present at that April 23 meeting?

6    A.    I was.

7    Q.    Was Captain Woerth asked about his visit to the allied

8    pilots, that is the American airline union, board of

9    directors?

10   A.    He was.  He was questioned about not only going there

11   but his comment.

12   Q.    All right.  And did he tell you when he had gone to the

13   Allied Pilots board of directors meeting?

14   A.    He did.

15   Q.    What day had Captain Woerth attended a meeting of the

16   board of directors of Allied Pilots?

17   A.    April 5.

18   Q.    So that is three days after you voted to waive scope?

19   A.    That would be correct.

20   Q.    One day before the date that the 1113 motion had been

21   scheduled to be heard in bankruptcy court?

22   A.    That is a correct sequence of event.

23   Q.    All right.  Did you or one of the MEC members ask

24   Captain Woerth at that meeting whether he told the American

25   pilots union's board of directors that the TWA pilots had to

1    get real?

2    A.    He was questioned about that comment.

3    Q.    What specifically, as best you can recall, was Captain

4    Woerth asked about the comment that he had allegedly made to

5    the APA?

6    A.    He was asked specifically if he made the comment and

7    what he meant by it.

8    Q.    Was he told what the comment was that he was alleged to

9    have made?

10   A.    He was.

11   Q.    What was he told that he was alleged to have said to the

12   Allied board?

13   A.    The TWA MEC had concern because it was relayed to us

14   that Captain Woerth told the Allied Pilots Association, our

15   opposite union, that the TWA pilots need to, quote, "get

16   real."

17   Q.    Get real on what?

18   A.    It just said get "get real."  We obviously took an

19   assumption that he was referencing the seniority integration,

20   and the proposal of such.

21   Q.    Can you recall one way or the other whether seniority

22   integration itself is specifically mentioned in connection in

23   connection with the get real excellent?

24   A.    It was.

25   Q.    Did Captain Woerth deny having made that statement?

Hollander-direct/Jacobson                                    75

1   A.    He did not deny making the statement.

2   Q.    Okay.

3   A.    He did not.

4        THE COURT:  Let him finish his answer.  Go ahead.

5   A.    He did not deny making his this statement but his

6   complete answer was he believed he was misquoted.

7   Q.    All right.  He doesn't deny that he made the statement

8   that you had to get real, but somehow he was misquoted.

9        MR. FRAM:  Your Honor, I object to the leading

10  questions.  We should hear the testimony from the witness.

11       THE COURT:  Yeah.  Ask him what was said.  He does

12  have recollection on this subject.

13  Q.    What else did he say in context with that?

14  A.    Mr. Woerth said that his entire comment was -- he spoke

15  extremely briefly at the meeting, and that when asked about

16  the seniority integration, we queried him on the question of

17  get real.  And his reply was, is that he didn't deny the

18  statement of get real.  He just said it wasn't a complete

19  answer, and it was taken out of context.

20  Q.    Did he tell you what the complete answer was?

21  A.    He did not.

22  Q.    This was you you said April 22, April 23 --

23  A.    This was at the April 23 meeting, yes.

24  Q.    I would like you to look at defendant's exhibit 78.

25  Those are the minutes of the special meeting of April 23 and

Hollander-direct/Jacobson                                    76

1    24.

2    A.    Correct.

3    Q.    There is a discussion there on the second page relating

4    to Captain Woerth's visit.  Is that correct?

5    A.    I am sorry.  What page?

6    Q.    On the second page of this.

7          THE COURT:  What is this?

8          MR. JACOBSON:  This is exhibit D 78, the minutes

9    from the April 23, 24, 2001, MEC meeting.

10         THE COURT:  Is that already in evidence?

11         MR. JACOBSON:  Yes, your Honor.

12         THE COURT:  Go ahead.

13   A.    Hang on for a second.

14   Q.    Yes.  What is it you wanted?

15   Q.    I asked if the second page discussed Captain Woerth's

16   comments to the MEC?

17   A.    Duane Woerth, president.

18   Q.    You want me to read from there?

19   Q.    Just read the first paragraph of that?

20   A.    Captain Duane Woerth briefed the MEC regarding the

21   Delta's tentative agreement, the Conair strike, legislative

22   progress on the age 60 rule, and his presence at an APA board

23   meeting in Dallas.  Captain Woerth discussed the current

24   situation of the TWA pilots and stated the TWA MEC made one

25   of the most difficult decisions any MEC could be faced with,

Hollander-cross/Fram                                        156

1    committee, as to one of these March meetings, would have come

2    back to the MEC and said we have agreed to do a date of hire

3    seniority integration, that waiving scope would not have been

4    an issue.

5              THE COURT:  So the answer is waiving scope, or was

6    it persistent, a consistent issue throughout, really from

7    February at least April 2.

8    A.    That would be an accurate statement, your Honor.

9    Q.    And you recall the merger committee making an effort to

10   work with the American pilots to agree upon seniority

11   integration so that this issue of waiving scope could be

12   avoided, yes?

13   A.    I do remember that meeting, yes, I do.

14   Q.    Okay.  But just on this March 14 meeting, do you recall

15   where that was?

16   A.    I do not.

17   Q.    Do you recall who was present?

18   A.    Was March 14 when we were in Delaware?

19   Q.    I am not permitted to answer questions.  Either you

20   recall or you don't?

21   A.    I don't.

22   Q.    Do you recall a special meeting of the MEC, TWA MEC on

23   March 21 and 22?

24   A.    I recall.

25   Q.    Where was that?

1   A.   In Saint Louis.

2   Q.   Who was present?

3   A.   I really can't tell you who was present.  I would

4   imagine, best guess would be most of the MEC.

5   Q.   Were any advisors there, let's take take it a step at a

6   time.  Were any advisors at that meeting?

7   A.   Without looking at the notes I couldn't say.

8   Q.   Do you recall if there was any professional advice,

9   legal advice, bankruptcy advice, given at the meeting?

10  A.   I couldn't say without looking at the minutes.

11  Q.   You talked this morning about a meeting in Council 2.

12  Do you recall that?

13  A.   In March of in March of '02? ?  I mean March for Council

14  2.

15  Q.   You said you attended a meeting of Council 2 in March

16  where the issue of whether to waive scope was discussed.

17  Yes?

18  A.   Correct.

19  Q.   And you said that --

20          THE COURT:  That was New York.

21  A.   That was held at the Ramada Inn in New York, yes, by JFK

22  airport.

23  Q.   You said 50 to 60 people who attended that, they were

24  unanimous in wanting the MEC not to waive scope.  Right?

25  A.   That is correct.

1   A.   I recall being invited to to that meeting, yes.

2   Q.   And do you recall being told that the agenda for the

3   meeting would include, can we pull that up?

4            THE COURT:  What is the number?

5   Q.   382, your Honor?

6            THE COURT:  Defendant or plaintiff?

7            MR. FRAM:  Defendant, your Honor.  It is in

8   evidence.

9            THE COURT:  D 382.

10            MR. FRAM:  Yes, it is in evidence, your Honor.

11            THE COURT:  Okay.

12   Q.   Do you recall this email setting the meeting on March 21

13   and 22 and advising the members of the MEC that there would

14   be reports from the negotiating committee, and the merger

15   committee?

16   A.   I recall the email, yes.

17   Q.   Do you recall the reports that were given on March 21

18   and 22?

19   A.   I know reports were given.  You can't recall the

20   substance of what was translated that day.

21   Q.   Do you recall any of the professional advisors who were

22   present?

23   A.   I do not recall any specific advice.  I know there were

24   advisors present but I can't recall their direct advice on

25   that day.

Hollander-cross/Fram                                          194

1   information or guidance you got?

2   A.    What I am saying is back then my decision was based on

3   the fact that I didn't get anything.   Today I can't recall

4   the exact words what was said.

5   Q.    All right.  Mr. Case, do you recall Mr. Case making a

6   statement for the record at the April 2 meeting, that he

7   opposed the resolution, that was voted on by way of roll

8   call?

9   A.    I read those minutes and I recall Mr. Case making an

10  opposition to that, yes.

11  Q.    Did you know before he made the statement that he was

12  going to do it?

13  A.    I did not.

14  Q.    Now, after the April 2 meeting Duane Woerth came and

15  talked?

16          THE COURT:  Who?

17  Q.    Duane Woerth, the president of ALPA?

18          THE COURT:  I know.

19  Q.    He came and talked to, at the meeting on April 23 or 24,

20  do you recall that?

21  A.    He did.  I mean I know he came.

22  Q.    And you said this morning that he was quizzed about some

23  remarks that were attributed to him?

24  A.    That is what I understood, yes.

25  Q.    And you are one of the people quizzing him?

Hollander-cross/Fram                                          195

1    A.    No.

2    Q.    The remark attributed to him is that he had told the APA

3    board of directors on April 5 that the TWA pilots had to

4    quote get real.   Correct?

5    A.    That was what was relayed to us, yes.

6    Q.    You said this morning that when he was asked about that,

7    he did not deny making the statement, but believed that it

8    had been taken out of context?

9    A.    That is what was relayed to me, yes.

10   Q.    Well, no.   You were there when Mr. Woerth addressed the

11   MEC on April 23 and 24, correct?

12   A.    No, I was not.

13   Q.    You weren't even at the meeting where he was asked about

14   whether he had made the statement?

15   A.    Duane Woerth's appearance was the first day of the

16   meeting.   My recollection is I was not there on the first day

17   of the meeting.

18   Q.    So how do you know that he did not deny making the

19   statement but believed it had been taken out of context?

20   A.    I was getting phone calls from almost everybody in that

21   room, every break they had.

22         THE COURT:   I am sorry.   I thought when, I asked

23   some questions about that and one of the reasons he explored

24   it, I understood that you were there.   That is why I made the

25   distinction between what I would consider hearsay as to what

Hollander-cross/Fram                                            196

1  he said, as to what came out of his own mouth.  That is what

2  you heard.

3  A.   I thought you were referencing the APA message with the

4  attorney about what was said down there.  What was said in

5  the meeting on --

6          THE COURT:  When he appeared, and when he was

7  questioned, clearly he was questioned, we know from the

8  minutes that he was questioned about what he had said, when

9  he had visited and spoke for a brief period of time at the

10 APA, I guess board of directors meeting, the board of

11 directors meeting.  Maybe I am confused.  I thought you were

12 present.

13          I think I even said that.

14          I made the point that I would give you full range

15 to say anything you heard him say.

16          MR. FRAM:  I heard it the same way, your Honor.

17 A.   Then I will yield and say I was mistaken.  I was not

18 there for Duane Woerth's personal appearance on the first day

19 of that meeting.

20 Q.   D 181.  Do you recognize this, sir, as an email?  It is

21 a summary of Duane Woerth's comments to the TWA MEC members,

22 April 23, that was prepared and circulated as an official

23 document of the MEC.

24 A.   I recognize it as that.

25 Q.   Okay.  Can you just read for the jury?

Exhibit M

```
 1

 2                        IN THE UNITED STATES DISTRICT COURT.
                         FOR THE DISTRICT  OF NEW JERSEY
 3                       CIVIL 02-2917  (JEI)

 4          PATRICK BRADY, SALLY YOUNG,
            HOWARD HOLLANDER, THEODORE CASE,
 5          AND MICHAEL FINUCAN, individually
            and on behalf of all others
 6          similarly situated,
                                Plaintiffs,
 7                                                VOLUME 7
                    V.                            TRIAL TRANSCRIPT
 8
            AIR LINE PILOTS ASSOCIATION,
 9
                                Defendant.
10
                                       CAMDEN, NEW JERSEY
11                                     JUNE  16, 2011

12          B E F O R E:   HONORABLE JOSEPH E. IRENAS
                            UNITED STATES DISTRICT JUDGE
13
                            A P P E A R A N C E S:
14
                    TRUJILLO, RODRIGUEZ & RICHARD
15                  BY:  NICOLE M. ACCHIONE, ESQ.
                         AND: LISA J. RODRIGUEZ, ESQ.
16                            AND
                    GREEN JACOBSON, P.C.
17                  BY:  ALLEN PRESS, ESQ.   (MO. BAR)
                    AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
18                  For the Plaintiffs.

19                  ARCHER GREINER
                    BY:  STEVEN FRAM, ESQ.
20                       AND
                    KATZ & RANZMAN
21                  BY:  DANIEL M. KATZ, ESQ.
                    FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
22
                    ELIZABETH GINSBERG, ESQ.
23                  IN-HOUSE COUNSEL FOR ALPA.

24

25
```

1

2          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
3     accurate record as taken stenographically in the
above-entitled proceedings.

4
                           S/   LYNNE JOHNSON
5
                           Lynne Johnson, CSR, CM, CRR
6                          Official Court Reporter

7

8

9

10

11          LYNNE JOHNSON, CSR, CM, CRR
            OFFICIAL COURT REPORTER
12          UNITED STATES DISTRICT COURT
            P.O. BOX 6822
13          LAWRENCEVILLE, NJ  08648

14

15

16

17

18

19

20

21

22

23

24

25

Clarke-direct/Press                                                91

1   information.

2   Q.   So was it clear to you in early March that

3   misinformation was potentially getting out there?

4   A.   From their side?

5   Q.   Yes, sir.

6   A.   Yes.

7   Q.   And that was the same kind of misinformation that an

8   American pilot circulated when he reported that Duane Woerth

9   said at a meeting that the TWA pilots had to get real.

10  Right?

11  A.   I don't think that was misinformation.

12  Q.   Didn't you tell us when you attended the meeting on

13  April 23 that Captain Woerth denied making that statement,

14  that was your testimony this morning, right?

15  A.   When I first said that he kind of politically danced

16  around it, yes.

17  Q.   You said he denied it, right?

18  A.   Okay, yes.

19  Q.   So you understood when he said I never said that, that

20  this was misinformation that was being circulated by the

21  American pilots to try to embarrass Captain Woerth and try to

22  cause unrest or disquiet within the TWA pilot ranks, right?

23  A.   Or he wasn't telling the truth when he said he didn't

24  say it.

25  Q.   Oh, so did it occur to you that the American pilots --

1    Wednesday.  But the next day.

2              MR. PRESS:  Is there a way for us to have that

3    information, whether it is going to be Tuesday or Wednesday

4    before we leave?

5              THE COURT:  Yes.  I will look at it.  I have it

6    home.  I forgot to look at it this morning.

7              MR. FRAM:  You are going to today the day off

8    Tuesday or Wednesday.

9              THE COURT:  One day I have to go to North Jersey

10   for some ticker tests.  Heart.  Up to Saint Barnabus.  I got

11   two kinds of test, two kind of heart tests, stress test, and

12   something else that has to do with the heart.

13             MR. FRAM:  One of the live witnesses, I would like

14   to know, they mentioned day.  I would like to know who is

15   after day.  The bigger issue is should we expect to have to

16   bring our witnesses in next week.  Sounds like we are only

17   going three days.

18             THE COURT:  Only three days next week.

19             MR. FRAM:  That helps.

20             MR. PRESS:  Day, and/or Pastore.  I don't know the

21   order.

22             THE COURT:  You are going to call Pastore.

23             MR. PRESS:  It could be both, could be just one.

24   Those are the positions we are going to collaborate on over

25   the weekend, see where we are.

# Exhibit N

```
                    IN THE UNITED STATES DISTRICT COURT.
                    FOR THE DISTRICT  OF NEW JERSEY
                    CIVIL 02-2917  (JEI)

          PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
          AND MICHAEL FINUCAN, individually
          and on behalf of all others
          similarly situated,
                         Plaintiffs,
                                             VOLUME 8
                V.                           TRIAL TRANSCRIPT

          AIR LINE PILOTS ASSOCIATION,

                         Defendant.

                                     CAMDEN, NEW JERSEY
                                     JUNE  20, 2011

          B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE

                    A P P E A R A N C E S :

             TRUJILLO, RODRIGUEZ & RICHARD
             BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
                  AND
             GREEN JACOBSON, P.C.
             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND: JOE D.  JACOBSON, ESQ.  (MO. BAR)
             For the Plaintiffs.

             ARCHER GREINER
             BY:  STEVEN FRAM, ESQ.
                    AND
             KATZ & RANZMAN
             BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

             ELIZABETH GINSBERG, ESQ.
             IN-HOUSE COUNSEL FOR ALPA.
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter

6

7

8

9

10             LYNNE JOHNSON, CSR, CM, CRR
               OFFICIAL COURT REPORTER
11             UNITED STATES DISTRICT COURT
               P.O. BOX 6822
12             LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. PRESS:  Bob Pastore.

2          THE COURT:  In person.

3          MR. PRESS:  Yes.

4          THE COURT:  After Mr. Pastor.

5          MR. PRESS:  Nothing.

6          THE COURT:  So basically we have to finish

7    Rindfleisch's, his two volumes of deposition, and then

8    Captain Day and Captain Pastore for their --

9          MR. PRESS:  That is still.  I don't want to mislead

10   anybody.  There is a possibility that pastor won't be here.

11   So, but the plan is to have him.

12         THE COURT:  But if he is not here, are you going to

13   use another witness?

14         MR. PRESS:  No, no.

15         THE COURT:  It just means the trial will be a day

16   or two shorter.

17         MR. PRESS:  That is exactly what it will mean.

18         THE COURT:  So it looks like you could finish early

19   this week.

20         MR. PRESS:  We could finish Thursday.

21         THE COURT:  Depending on, if Pastore and day come,

22   you think we could finish?

23         MR. PRESS:  Not in light of the cross examinations

24   that I would expect.

25         THE COURT:  Yeah.  It doesn't seem likely to me

# Exhibit O

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF NEW JERSEY
CIVIL 02-2917 (JEI)

PATRICK BRADY, SALLY YOUNG,
HOWARD HOLLANDER, THEODORE CASE,
AND MICHAEL FINUCAN, individually
and on behalf of all others
similarly situated,
                    Plaintiffs,

                                        VOLUME 9
        V.                              TRIAL TRANSCRIPT

AIR LINE PILOTS ASSOCIATION,

                    Defendant.

                              CAMDEN, NEW JERSEY
                              JUNE  22, 2011

B E F O R E:   HONORABLE JOSEPH E. IRENAS
               UNITED STATES DISTRICT JUDGE

             A P P E A R A N C E S:

        TRUJILLO, RODRIGUEZ & RICHARD
        BY:  NICOLE M. ACCHIONE, ESQ.
             AND: LISA J. RODRIGUEZ, ESQ.
             AND
        GREEN JACOBSON, P.C.
        BY:  ALLEN PRESS, ESQ.   (MO. BAR)
        AND: JOE D.  JACOBSON, ESQ.   (MO. BAR)
        For the Plaintiffs.

        ARCHER GREINER
        BY:  STEVEN FRAM, ESQ.
             AND
        KATZ & RANZMAN
        BY:  DANIEL M. KATZ, ESQ.
        FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

        ELIZABETH  GINSBURG, ESQ.
        IN-HOUSE COUNSEL FOR ALPA.

1          Pursuant to Section 753 Title 28 United States
    Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
    above-entitled proceedings.
3
                         S/  LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10             LYNNE JOHNSON, CSR, CM, CRR
            OFFICIAL COURT REPORTER
11          UNITED STATES DISTRICT COURT
            P.O. BOX 6822
12          LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            MS. RODRIGUEZ:  Just Day, yes.

 2            THE COURT:  Captain Day.  O'Day sounds nice, I like

 3   it.

 4            THE COURT:  Captain Day, and Captain Pastore.  What

 5   is the story?

 6            MR. FRAM:  I was hoping for an update so we know

 7   who would be here.

 8            THE COURT:  Is Pastore going to testify?

 9            MR. PRESS:  Not today.  And Judge, most, almost all

10   the evidence that we would have presented through Captain

11   Pastore has already been admitted with one --

12            THE COURT:  I am taking no position.

13            MR. PRESS:  There is an open issue.  The financial

14   condition of TWA is something that he was going to testify

15   to.  But you have ruled that that is irrelevant and out of

16   the case.

17            So we would be inclined not to present him at all.

18            THE COURT:  Well, when I said irrelevant, the

19   perception of the union as to what that condition was might

20   be relevant, as distinct from the fact of it.  I mean, it is

21   not like you would call a witness who would then go through

22   all the public records of TWA and then express an opinion, it

23   is viable for six months, viable for nine months, viable

24   forever.  That I considered irrelevant.

25            But I think I made it clear that I did consider it
```

# Exhibit P

1

```
 1                IN THE UNITED STATES DISTRICT COURT.
                  FOR THE DISTRICT OF NEW JERSEY
 2                CIVIL 02-2917  (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                      Plaintiffs,
 6                                        VOLUME 10
             V.                           TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                      Defendant.
 9
                                     CAMDEN, NEW JERSEY
10                                   JUNE  23, 2011

11        B E F O R E:  HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                        A P P E A R A N C E S:
13
             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D. JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:  STEVEN FRAM, ESQ.
19                AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH  GINSBURG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1           Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.

3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter

6

7

8

9

10                  LYNNE JOHNSON, CSR, CM, CRR
                    OFFICIAL COURT REPORTER
11                  UNITED STATES DISTRICT COURT
                    P.O. BOX 6822
12                  LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   So why were you there?

2    A.   I was there meeting with my committee, formulating

3    strategy and with Roland Wilder.

4    Q.   Now --

5           THE COURT:  Was Roland Wilder going back and forth

6    between where you were and where the MEC was?

7    A.   I didn't know it at the time, but Roland did leave, and

8    I went in search of him.  And I looked, and I thought maybe

9    that is where he would have been.  He wasn't at that time but

10   I am sure he was being asked questions by the MEC.

11   Q.   Now, you mentioned you went to go look for Roland.  Why

12   was that?

13   A.   Well, we had questions for him.  He had been gone for a

14   little bit.

15   Q.   Where did you find him?

16   A.   I found him in the library.

17   Q.   Okay.  Who did you find with him?

18   A.   About four or five ALPA advisors.

19   Q.   What did you observe?

20   A.   I observed Roland on one side of the table, and the five

21   advisors on the other side of the table.

22   Q.   And what was being discussed?

23          MR. FRAM:  Your Honor, could we know who advisors

24   allegedly were?

25          THE COURT:  Yes.  Who were these advisors?

1  Q.   Can you describe who, or tell us who they were?

2  A.   It would have been Bob Christy, it would have been Clay

3  Warner, I think Steve Tumblin might have been there.  And I

4  don't recall the names of the other two.

5  Q.   All right.  But you recall specifically Mr. Christy and

6  Mr. Warner?

7  A.   Yes.

8  Q.   All right.  And what did you hear those gentlemen

9  discussion discussing with Mr. Wilder?

10          THE COURT:  First of all, did you hear them

11 discussing with Mr. Wilder?

12 A.   Yes, Judge, I did.

13          THE COURT:  Okay.

14 A.   I walked in to the room.  I saw Roland in the corner and

15 I decided I was going to to make myself at home.

16          I got glares, but I sat down and what was happening

17 was I felt they were beating up on Roland.  What they were

18 doing was they were, they were attempting to say --.

19          MR. FRAM:  I object to his characterization.  Can

20 we please have the facts and not his impressions or

21 interpretations?

22          MR. PRESS:  He was just getting ready to say what

23 they were doing.

24          THE COURT:  Yeah, to some extent I will sustain the

25 objection.  I want to know what was being said, not your

Day-direct/Press                                                37

1    impression of what they were doing.

2    A.   The discussion was focused on the MEC's discussion of

3    the waiver of scope.  Roland was the only one of advisors who

4    was advising it not be done.

5              THE COURT:  That scope not be waived?

6              THE WITNESS:  That scope not be waived.

7    A.   The other advisors were attempting to persuade Roland to

8    change his position.

9              THE COURT:  What ammunition were they attempting to

10   use to do that persuasion?  If you know.

11   A.   The 1113 argument.  That was the primary one.

12             If the 1113 motion was granted, that the collective

13   bargaining agreement was going to be taken apart and we

14   didn't want to be in that position.

15   Q.   How was Mr. Wilder responding to all of this?

16   A.   Well, he was arguing against it.  Roland was our

17   attorney.  He was representing the merger committee.

18             THE COURT:  And the MEC, too.

19             THE WITNESS:  To some extent, Judge.  I always

20   looked at him as the merger committees attorney but obviously

21   the MEC and the merger committee were normally on the same

22   wavelength.

23   Q.   And these ALPA advisors persuasion over Roland Wilder,

24   what tone and volume were they using to persuade?

25   A.   They were loud.