## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 02-2917 (JEI) |
| ) | |
| AIR LINE PILOTS ASSOCIATION, ) | |
| INTERNATIONAL, ) | |
| ) | |
| Defendant. ) | |

---

## [CORRECTED] BRIEF IN SUPPORT OF DEFENDANT'S
## MOTION FOR JUDGMENT AS A MATTER OF LAW
## PURSUANT TO FED. R. CIV. P. 50(b)

---

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By:     Steven J. Fram, Esquire

*Pro Hac Vice*:

Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Ave., N.W., Suite 250
Washington, DC  20016
(202) 659-4656

Attorneys for Defendant
Air Line Pilots Association, International

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 1

I.     THE STANDARDS FOR ARBITRARY AND BAD FAITH CONDUCT ..................... 2

II.    THE CAUSATION REQUIREMENT ........................................................................... 4

     A.    Plaintiffs Were Required To Prove That The Outcome Of Seniority
           Integration Negotiations Would Have Been More Favorable For The
           TWA Pilots ...................................................................................................... 5

     B.    The Only Admissible Evidence on Causation Was Testimony From
           Representatives of American and the APA ...................................................... 7

     C.    Plaintiffs Relied Upon Improper Speculation In Arguing Causation .................. 11

     D.    Plaintiffs Improperly Relied Upon the Logical Fallacy of False Cause .............. 14

     E.    The Contention That More Support Would Have Meant More Concessions
           Was Also Speculative ...................................................................................... 15

III.    PLAINTIFFS FAILED TO PRESENT SUFFICIENT EVIDENCE THAT ALPA
      BREACHED ITS DUTY OF FAIR REPRESENTATION ........................................... 17

     A.    The Alleged Conflict ...................................................................................... 22

     B.    The Merger Committee Meetings on March 28 and 29, 2001 ........................... 24

     C.    The MEC Vote on April 2, 2001 ..................................................................... 26

     D.    ALPA Acted Reasonably And Responsibly In Deciding Not To Pursue
           Wilder's Litigation Theories ........................................................................... 29

     E.    The Alleged "Get Real" Comment ................................................................. 32

     F.    The Jump Seat War ........................................................................................ 34

     G.    The Bond Bill ................................................................................................. 36

     H.    ALPA's Recommendations Regarding Other Lawsuits Were Not
           Unreasonable Or In Bad Faith ......................................................................... 38

     I.    Other Promises and Assurances ...................................................................... 40

CONCLUSION ................................................................................................................ 44

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

FEDERAL CASES

Ackley v. Western Conference of Teamsters,
    958 F.2d 1463 (9th Cir. 1992) ..................................................................................6

Air Turbine Tech., Inc. v. Atlas Copco AB,
    295 F.Supp.2d 1334 (S.D.Fla.2003) .......................................................................10

Air Turbine Tech., Inc. v. Atlas Copco AB,
    410 F.3d 701 (Fed. Cir. 2005) ..................................................................9, 10, 11

Amalgamated Ass'n of St. Elec. Ry. Employees v. Lockridge,
    403 U.S. 274 (1971) .................................................................................................3

Anderson v. United Paperworkers Int'l Union,
    641 F.2d 574 (8th Cir. 1981) .............................................................................5, 6

Barr v. United Parcel Serv.,
    868 F.2d 36 (2d Cir.1989) .....................................................................................31

Bautista v. Pan Am World Airlines,
    828 F.2d 546 (9th Cir 1987) ..................................................................................41

Bensel v. Allied Pilots Ass'n,
    675 F. Supp. 2d 493 (D.N.J. 2009)..........................................................................2

Bensel v. Allied Pilots Ass'n,
    387 F.3d 298 (3d Cir. 2004) ..................................................................................38

Camacho v. Ritz-Carlton Water Tower,786
    F.2d 242 (7th Cir. 1986) ........................................................................................30

Deboles v. Trans World Airlines, Inc.,
    552 F.2d 1005 (3d Cir. 1977) .................................................................3, 4, 5, 26

Ford Motor Co. v. Huffman,
    345 U.S. 330 (1953) .................................................................................................3

Humphrey v. Moore,
    375 U.S. 335 (1964) ...........................................................................................3, 4, 5

In re Trans World Airlines, Inc.,
    322 F.3d 283 (3rd Cir. 2003)..................................................................................30

Irwin v. Odyssey Contracting Corp.,
    61 F. App'x. 150 (6th Cir. 2003) ......................................................................16

Kavowras v. New York Times, Co.,
    132 Fed. Appx. 381 (2d Cir. 2005)...................................................................31

Kraft Foods, Inc. v. BC-USA, Inc.,
    840 F.Supp. 344 (E.D.Pa.1993)........................................................................9

Marquez v. Screen Actors Guild, Inc.,
    525 U.S. 33 (1998) ............................................................................................3

McDermott Int'l, Inc. v. Wilander,
    498 U.S. 337 (1991) ..........................................................................................2

Moore v. Essex County Div. of Welfare,
    2009 WL 2581511 (D.N.J. Aug. 20, 2009) .......................................................3

Nellis v. ALPA,
    815 F. Supp. 1522 (E.D. Va. 1993) .................................................................41

NLRB v. American Postal Workers Union,
    618 F.2d 1249 (8th Cir. 1980) ...........................................................................3

Northview Motors, Inc. v. Chrysler Motors Corp.,
    227 F.3d 78 (3d Cir.2000) .................................................................................2

O'Neill v. ALPA,
    939 F.2d 1199 (5th Cir. 1991) ............................................................2, 3, 30, 40

Panrell v. United Mine Workers of Am., Int'l Union,
    872 F. Supp. 1502 (N.D.W. Va. 1995)............................................................41

Petersen v. United Steel Workers of Am.,
    2009 WL 3269311 (D.V.I. Oct. 8, 2009) ..........................................................3

Powell v. J.T. Posey Co.,
    766 F.2d 131 (3d Cir.1985) ...............................................................................2

PXRE Corp. v. Terra Nova Ins. Co. Ltd.,
    76 Fed. Appx. 485 (3d Cir. 2003).....................................................................2

Spellacy v. Air Line Pilots Ass'n, Int'l,
    156 F.3d 120 (2d Cir. 1998) ..............................................................................4

Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.,
    63 F.3d 1267 (3d Cir. 1995) ...............................................................7, 8, 9, 10

Swatts v. United Steelworkers,
    808 F.2d 1221 (7th Cir 1986) .................................................................................. 41

United States v. Dunmire,
    403 F.3d 722 (10th Cir. 2005)) ................................................................................ 16

United States v. Lovern,
    590 F.3d 1095 (10th Cir. 2009) ................................................................................ 16

Vaca v. Sipes,
    386 U.S. 171 (1967) ................................................................................................... 2

**RULES**

Fed. R. Civ. P. 50 .............................................................................................. passim

Fed.R.Evid. 803(3) ......................................................................................... 8, 9, 10

**OTHER AUTHORITIES**

Ruggeri J. Aldisert, Logic for Lawyers: A Clear Guide to Legal Thinking (NITA 3d ed.
    1997), at 199 ............................................................................................................ 15

Defendant, Air Line Pilots Association, International ("ALPA"), submits this Brief in support of its Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b).

## INTRODUCTION

On June 27, 2011, ALPA filed a Motion for Judgment as a Matter of Law pursuant to Rule 50(a) based upon the evidence produced by Plaintiffs during their case. The Court denied that motion from the bench on July 7, 2011. See Tr. of July 7, 2011 at 86:12 to 90:2. ALPA incorporates herein and relies upon the facts and legal authority contained in ALPA's Rule 50(a) motion.

Based upon the additional facts presented during ALPA's case and the additional legal discussion below, ALPA respectfully submits that it is entitled to judgment as a matter of law pursuant to Rule 50(b).[1] As discussed below, no reasonable jury could have concluded that ALPA breached its duty of fair representation. Furthermore, there is no evidence in the record to support Plaintiffs' contention that any DFR violation by ALPA caused injury to any member of the class. As a consequence, judgment should be entered in favor of ALPA and this action should be dismissed.

## ARGUMENT

Rule 50 of the Federal Rules of Civil Procedure provides that, after the entry of judgment where the court has not granted an earlier Rule 50(a) motion for judgment, "the movant may file a renewed motion for judgment as a matter of law...." Fed. R. Civ. P. 50(b). A judgment notwithstanding the verdict is appropriate if the record is "deficient of that minimum quantity of

---

[1] The deposition and trial transcripts and trial exhibits referred to in this brief are attached to the accompanying Declaration of ALPA's counsel. In this brief, ALPA's trial exhibits are referred to as "D-__," Plaintiffs' trial exhibits are denoted as "P-__," and Joint exhibits are referred to as "J-__."

evidence from which a jury might reasonably afford relief." Powell v. J.T. Posey Co., 766 F.2d

131, 133-34 (3d Cir.1985) (citations and internal quotations omitted).  Although the evidence

must be viewed in the light most favorable to the non-moving party, PXRE Corp. v. Terra Nova

Ins. Co. Ltd., 76 Fed. Appx. 485, 489 (3d Cir. 2003), a dismissal is "mandated where the facts

and the law will reasonably support only one conclusion."  Northview Motors, Inc. v. Chrysler

Motors Corp., 227 F.3d 78, 88 (3d Cir.2000) (quoting McDermott Int'l, Inc. v. Wilander, 498

U.S. 337, 356 (1991)).

## I.      The Standards for Arbitrary and Bad Faith Conduct.

A union violates its duty of fair representation if it acts arbitrarily, discriminatorily or in

bad faith.  Vaca v. Sipes, 386 U.S. 171, 190 (1967); O'Neill, 499 U.S. at 67.  These are three

distinct branches of DFR law.  See Vaca, 386 U.S. at 190; O'Neill, 499 U.S. at 67.  Although

both ALPA and the Court understood, as this case was being prepared for trial, that Plaintiffs

were only relying on the "bad faith" branch to support their claim that ALPA violated its duty of

fair representation,[2] shortly before at the Final Pretrial Conference and during trial they relied

upon a claim that ALPA acted arbitrarily.  As a consequence, this brief will assess the evidence

presented in light of both the arbitrary and bad faith standards.

The Arbitrary Standard.  It is well settled that a union's conduct is "arbitrary only if, in

light of the factual and legal landscape at the time of the union's actions, the union's behavior is

_____

[2] Indeed, in opposing ALPA's motion for summary judgment, Plaintiffs contended only that
ALPA acted in bad faith, and allegations that ALPA's actions were arbitrary or discriminatory
were conspicuously absent.  See Docket 302 (Plaintiffs' Opposition to ALPA's Motion for
Summary Judgment) at 4-6.  The Court's opinion denying ALPA's motion for summary
judgment also found that Plaintiffs' only basis for proceeding was their bad faith theory.  Bensel
v. Allied Pilots Ass'n, 675 F. Supp. 2d 493, 500 n. 13 (D.N.J. 2009) ("The Plaintiffs do not
allege ALPA was arbitrary or discriminatory.").  By not asserting an arbitrary claim, but
apparently holding it for trial, plaintiffs deprived ALPA of the opportunity to secure summary
judgment on such a claim.

so far outside a 'wide range of reasonableness,' as to be irrational.'" O'Neill, 499 U.S. at 67 (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953)). To meet this standard, Plaintiffs were required to produce "substantial evidence" that ALPA's decisions and conduct were without any "rational basis or explanation." Humphrey, 375 U.S. at 348; Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 46 (1998). This standard means that a court or jury cannot invalidate the union's decision even if either determines that the decision was bad, mistaken or even unreasonable. See Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 45–46 (1998). Thus, "[m]ere negligence, poor judgment or ineptitude are insufficient to establish a breach of the duty of fair representation." NLRB v. American Postal Workers Union, 618 F.2d 1249, 1255 (8th Cir. 1980).

     The Bad Faith Standard. To establish bad faith, plaintiffs had the burden of presenting affirmative "substantial evidence" of "fraud, deceitful action or dishonest conduct." See Amalgamated Ass'n of St. Elec. Ry. Employees v. Lockridge, 403 U.S. 274, 299 (1971); Humphrey v. Moore, 375 U.S. 335, 348 (1964); Moore v. Essex County Div. of Welfare, Civ. No. 07-2504, 2009 WL 2581511, at *8 (D.N.J. Aug. 20, 2009). Such a showing, standing alone, however, is not enough. In addition to proof of a false or misleading statement or material omission, bad faith requires a showing of reliance by union members on the misleading statement or material omission; injury caused by the wrongdoing; *and* wrongful intent on the part of the defendant against the plaintiffs. See, e.g., Deboles v. Trans World Airlines, Inc., 552 F.2d 1005, 1017-18 (3d Cir. 1977); Petersen v. United Steel Workers of Am., No. Civ. 2004-0062, 2009 WL 3269311, at *10 (D.V.I. Oct. 8, 2009).

     During trial, Plaintiffs presented a long list of things that ALPA allegedly did or failed to do and that allegedly constituted violations of its duties of fair representations to the TWA pilots.

3

Because the jury rendered a general verdict, it is impossible to know what violations the jurors had in mind when they returned their verdict after deliberating for less than a day or even if the jurors agreed on the same violations. This brief will discuss the specific DFR violations that Plaintiffs pressed at trial and will demonstrate that no reasonable jury could have found in favor of Plaintiffs on any of them.

Before turning to the specific DFR violations claimed by Plaintiffs, this brief will first discuss in detail the fundamental flaw in Plaintiffs' case that pervades every alleged DFR violation: Plaintiffs' failure to prove that any of the alleged DFR violations caused injury to any of the pilots.

## II.   <u>The Causation Requirement.</u>

In addition to establishing arbitrary or bad faith conduct, Plaintiffs were required to prove that DFR violations by ALPA "directly caused" injury to the TWA pilots. <u>Deboles</u>, 552 F.2d at 1019; <u>see also</u> <u>Spellacy v. Air Line Pilots Ass'n, Int'l</u>, 156 F.3d 120, 130 (2d Cir. 1998) (requiring plaintiffs to prove that the union's bad faith conduct "caused their injury"). The U.S. Supreme Court addressed this issue in <u>Humphrey</u>, 375 U.S. at 350-51, holding that the plaintiff did not prove his bad faith DFR case because he presented no actual evidence of causation: "The trial court found it 'idle speculation to assume that the result would have been different had the matter been differently presented.' We agree. Moore has not, therefore, proved his case."

In <u>Deboles</u>, the Third Circuit held that the district court erred by holding that the union breached its duty of fair representation without requiring proof that the contract at issue would not have been ratified absent the union's misrepresentations. <u>Id.</u> at 1017-19. In reversing the district court, the Third Circuit held that "false statements may not create liability under the federal labor laws absent a showing of <u>tangible injury proximately resulting from the falsehood.</u>" <u>Id.</u> at 1017 (emphasis added). The court further clarified that the traditional elements of a claim

for fraud, including detrimental reliance, are necessary to provide liability for a bad faith breach of the duty of fair representation.  Id.  The court reasoned that none of the alleged misrepresentations actually caused the contract to be ratified or any other injury: "Such speculative, *post hoc* reasoning does not suffice to demonstrate concrete injury caused by the misstatements absent supporting evidence in the record below."  Id. at 1017-18 & 1018 n.26.  Thus, the Third Circuit unequivocally held that no DFR violation could be established because the union's breach of the duty "must be found to have contributed to the erroneous outcome of the contractual proceedings" and the evidence failed to support such a finding.  Id. at 1018 (internal citations omitted).

### A.  **Plaintiffs Were Required To Prove That The Outcome Of Seniority Integration Negotiations Would Have Been More Favorable For The TWA Pilots.**

In the context of contract negotiations, the courts have consistently held, following Deboles, that DFR liability requires a plaintiff to prove both that the union members would have proceeded differently (detrimental reliance) and that the outcome of the negotiations with the company would have been different.  For example, in Anderson v. United Paperworkers Int'l Union, 641 F.2d 574, 578-79 (8th Cir. 1981), during a meeting to discuss and vote on a company proposal, a union representative assured members that a special security fund had been created, which guaranteed severance pay for the union members, when in fact no such fund existed.  Id. at 576.  After the union members ratified the agreement, the company went bankrupt and the members only received a portion of their expected severance pay.  Id.  The members brought a DFR action against their union for its representatives' misrepresentation regarding the severance pay package.  Id.

The Eighth Circuit reversed the trial court's denial of the union's motion for judgment notwithstanding the verdict, holding that plaintiffs had failed to establish both that the

misrepresentations led the union members to alter their "position in regard to acceptance or rejection of the collective bargaining agreements" and that a different vote would have led the company to agree to the new contract provisions and contribute to the tax fund:

> This conclusion assumes that, if [the union representative] had told the truth, the employees would not have ratified the collective bargaining agreement, . . . the employees would have used their leverage to obtain and would have won from the Company a severance pay security fund . . . [and] the Company could afford to and would have contributed to the fund.  The trial record does not support these assumptions.

Id. at 579.  In short, the Eighth Circuit held, the plaintiffs' claims were speculative, as "the Union cannot be liable absent a showing that but for [the Union's] misrepresentations the severance pay would have been paid."  Id. at 580-81.

Likewise, in Ackley v. Western Conference of Teamsters, 958 F.2d 1463, 1472 (9th Cir. 1992), during the union's process for ratifying a CBA, union members claimed that union representatives failed to disclose material changes in the CBA, prior to the ratification vote, in violation of the union's duty of fair representation.  Id. at 1468.  The Ninth Circuit affirmed the dismissal of the plaintiffs' DFR claim, holding that the plaintiffs had to prove both that the outcome of the vote would have been different and that the company would have agreed to the union's position:

> [P]laintiffs must demonstrate "a causal relationship between the alleged misrepresentations and their injury."  They must show that (1) absent the misrepresentations, the outcome of the ratification vote would have been different; and that (2) had it been different, the company would have acceded to the union's demands.

Id. (citation omitted).  Because the plaintiffs in Ackley could not establish that the company would have acceded to the union's demands, they could not prove causation and dismissal was proper.  Id. at 1473.

6

What these decisions mean, in the context of this case, is that Plaintiffs were required to demonstrate, with respect to their claims that ALPA acted in bad faith, that alleged dishonest conduct by ALPA (1) led the MEC to proceed differently than it would have (detrimental reliance) and; (2) that American Airlines and the APA would have behaved in a way that would have resulted in a different seniority integration outcome.  Thus, with respect to the vote that took place on April 2, 2001, Plaintiff were required to prove not only that the members of the MEC would have voted differently but that American would not have walked away from the deal and that negotiations with the American pilots would have resulted in an overall jobs situation that was more favorable than what the TWA pilots received under Supplement CC.  With respect to Plaintiffs' other claims that ALPA acted arbitrarily or in bad faith by failing to support the TWA pilots, including during seniority integration negotiations in the Fall of 2001, Plaintiffs were required to prove that greater support or more aggressive positions by ALPA actually would have led the APA to agree to a more favorable seniority integration.

**B.    The Only Admissible Evidence on Causation Was Testimony From Representatives of American and the APA.**

The need for Plaintiffs to prove that American Airlines and the APA would have behaved differently has important evidentiary implications that Plaintiffs disregarded throughout trial. Specifically, in order to prove that American and the APA would have proceeded differently if the TWA MEC or ALPA had taken different positions or done different things, Plaintiffs were required to present direct testimony from representatives of American and the APA about what they would have done.  Anything less was inadmissible speculation.

The Third Circuit's decision in Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1273 (3d Cir. 1995), an antitrust case, illustrates this point.  The plaintiffs in Stelwagon alleged that the defendant had engaged in price discrimination in violation of the

Robinson-Patman Act.  The case proceeded to trial and the jury found in favor of the plaintiff. The trial court denied the defendant's post-trial motion for judgment as a matter of law based upon the alleged failure of the plaintiff to present admissible evidence that it lost sales because its prices were higher than those of the sellers.  The Third Circuit reversed and directed judgment in favor of the defendant, ruling that the only admissible evidence that the plaintiff had lost sales because of different prices was direct testimony from the customers themselves and that the plaintiff had failed to present such evidence.

The Third Circuit began its analysis in <u>Stelwagon</u> by noting that an antitrust plaintiff, in order to recover damages, "must establish cognizable injury attributable to [the] antitrust violation and some approximation of damage." 63 F.3d at 1273 (citing <u>J. Truett Payne Co. v. Chrysler Motor Co.</u>, 451 U.S. 557, 561 (1981)).  In other words, the court noted, a plaintiff must prove a causal connection between the price discrimination and actual damage suffered. <u>Id</u>.

The Third Circuit held that the District Court had committed legal error by relying upon testimony of employees of Stelwagon about out-of-court conversations with Stelwagon's customers.  The testimony had been offered by the plaintiff under the "state of mind" exception to the hearsay rule contained in FRE 803(3), but was relied upon by the plaintiff during the trial for the truth of what the customers allegedly said.  The Third Circuit held that this was improper:

> Essentially, the testimony was that the customers could and did purchase Tarmac MAPs from Standard at prices lower than Stelwagon's prices.  Statements that are considered under the exception to the hearsay rule found at Fed.R.Evid. 803(3), commonly referred to as the "state of mind" exception, cannot be offered to prove the truth of the underlying facts asserted. . . . The district court, in explaining its decision to allow the anecdotal testimony, acknowledged the limited use of evidence admitted under Rule 803(3) . . . .  Notwithstanding this express acknowledgement, it is clear from the district court's opinion disposing of Tarmac's motion for judgment as a matter of law, that the court considered the customer statements for a purpose beyond which they were originally, and properly, admitted:

> Stelwagon [ ] introduced . . . the anecdotal evidence of its customer statements,
> admitted under the state of mind exception, *see* Fed.R.Evid. 803(3); J.F. Feeser,
> 909 F.2d at 1535 n. 11; Kraft Foods, Inc. v. BC-USA, Inc., 840 F.Supp. 344, 348
> (E.D.Pa.1993), *to establish that it actually lost sales to Celotex and Standard.*

63 F.3d 1267, 1274-76 (emphasis in Third Circuit opinion).

The Third Circuit held that this testimony was not admissible to prove causation:

"Because the statements properly could not have been admitted in the first instance as proof of

the fact of the matter asserted, we believe the district court's reliance on them as proof of actual

antitrust damages, in the form of lost sales, was in error." Id. at 76. After holding that expert

testimony offered by the plaintiff was also not admissible to prove causation, the Third Circuit

directed the entry of judgment in favor of the defendant.

The court relied on similar reasoning in Air Turbine Tech., Inc. v. Atlas Copco AB, 410

F.3d 701 (Fed. Cir. 2005). There the plaintiff, Air Turbine Technology, Inc. ("ATT"), the

manufacturer of a specialized pneumatic industrial tools known as a "governed turbine pencil

grinder," asserted a claim for false advertising under the Lanham Act. Its claim was that the

defendant, Atlas Copco AB ("Atlas"), made a similar tool, the TSF07, to look like the ATT's

tool, the TSF06, and that Atlas advertised the TSF07 as having the same governed turbine

characteristics as the TSF06, when in fact the TSF07 did not have such capabilities. ATT alleged

that this false advertising caused consumer confusion as to product origination and, moreover,

caused consumers to stop buying the TSF06 because they believed it had the same inferiorities as

the TSF07. "In other words," the court noted, "ATT alleged that consumers were not satisfied

with the TSF07 because it lacked the advertised 'governed turbine' feature and that, because of

the falsely advertised similarities to the TSF06, they stopped buying the TSF06." Id. at 701.

In pressing its contention that it lost business because of the defendant's misconduct, the

court summarized "ATT's evidence of causation" as "sworn testimony from its employees and

distributors that customers told them at trade shows that they will not buy ATT's tool because they have an Atlas Copco tool just like it and it does not operate as they would like." Id. at 1344. The trial court found that, with the exception of one affidavit, the employee and distributor testimony did not go to the ultimate issue of causation. That was because, although the testimony indicated that customers stopped buying the ATT tool as a result of dissatisfaction with the Atlas tool, it did not suggest that customers stopped buying the ATT tool as a result of Atlas's false advertisements. The trial court also concluded that although one employee affidavit did suggest a causal link to Atlas's advertisements, that affidavit was based on inadmissible hearsay. Id. at 705-06 (citing the trial court's opinion at Air Turbine Tech., Inc. v. Atlas Copco AB, 295 F.Supp.2d 1334, 1349 (S.D.Fla.2003)).

 In granting summary judgment against ATT, the trial court held, and the Federal Circuit agreed, that the failure of ATT to submit statements directly from its customers was a "fatal flaw with the evidence" because "the consumers' statements to [plaintiff's witness] are hearsay and not admissible under the state-of-mind exception found in Rule 803(3) of the Federal Rules of Evidence." Id. at 705-06.

 In this case, all of Plaintiffs' claims were premised on the assertion that American Airlines and the APA might have acted differently if the TWA MEC or if ALPA had been more aggressive. But Plaintiffs never presented any testimony from any representatives of American or the APA to support the necessary showing that they would have acted differently. Indeed, Plaintiffs did not even attempt to do what the plaintiffs did in Stelwagon and Air Turbine, which would have been Plaintiffs' pilot witnesses testify about statements made to them by representatives of American and the APA and attempt to rely upon an exception to the hearsay rule. For example, Mike Day, who met with representatives of the APA dozens of times, never

once attempted to suggest that the American pilots made any statements to indicate that the APA would have agreed to a more favorable seniority integration if ALPA had been more aggressive.

In fact, Plaintiffs successfully argued against the admission into evidence of the *only* proper first-hand testimony on the issue of causation, the deposition testimony of Jeffrey Brundage, who was American's Vice President of Employee Relations in 2001. Plaintiffs objected to this testimony because it would have definitively resolved the issue of causation by refuting any suggestion that American was bluffing in threatening to abandon the TWA acquisition and by confirming that American was unwilling to put more pressure on the APA. For example, Brundage testified that American would have walked away from the transaction with TWA if the TWA pilots had refused to waive scope:

> [W]e were, I would say, not only specific but we need [sic] absolutely clear to the folks at TWA that we were unwilling to proceed with the transaction in any way, shape or form if the scope provision remained in the TWA Agreements.

Brundage Dep. of 9/12/09 at 21. When asked later during his testimony to confirm that American was serious about not proceeding with the transaction unless the scope provisions were waived, Mr. Brundage testified unequivocally: "Not only was it not bluffing, it wasn't even open for negotiation." Id. at 57. But Plaintiffs not only kept this out, their lawyer then took advantage of this outcome by arguing in closing that ALPA had not produced anyone from "the American side." Tr. of July 12, 2001, at 73.

### C.  Plaintiffs Relied Upon Improper Speculation In Arguing Causation.

Instead of presenting testimony from representatives of American and the APA on the issue of causation, Plaintiffs relied upon improper speculation in arguing that they had established injury. In their brief filed on July 6, 2011, in opposition to ALPA's Motion for Judgment as a Matter of Law Pursuant to Rule 50(a), Plaintiffs' entire argument on the issue of

causation was contained in a single sentence.  After asserting that many of the TWA pilots suffered "injury-in-fact" because they were furloughed or demoted, Plaintiffs asserted:  "[B]oth Captain Day and Roland Wilder testified that a better deal could have been achieved if ALPA had provided the support it was required to under the law."  Pls' Br. filed on July 6, 2011 at 10 (emphasis added).

      In his closing argument, Plaintiffs' counsel conceded that Plaintiffs were required to demonstrate that the "TWA pilots would have gotten a more favorable integration had ALPA not breached its duty of fair representation."  Tr. of July 12, 2001, at 72:24 to 73:21 (emphasis added).  Mr. Press then disregarded the requirement that Plaintiffs had to prove that there would have been a more favorable integration by claiming that there was "direct testimony" from Mike Day "that there could have been a more favorable integration":

> He [Day] said I would have expected, I think his testimony, his answer was it would have been reasonable to believe that we would have gotten a better deal closer to the Tannen proposal had ALPA done the things we asked for and gave us the leverage we needed.

> Mike Day told you that.  He was the only one in the room with the American side. ALPA produced nobody in that position.  They gave you four witnesses, four lawyers that were completely uninvolved.  Mike Day told you we could have gotten a better deal.

Id. at 73:2 to 73:14 (emphasis added).  He also argued that events after the introduction of the Bond Bill were further evidence that more support from ALPA, if provided, might have resulted in a better deal.  He argued:

> So on the strength of the TWA pilots doing nothing other than get Senator Bond to introduce some legislation, the American pilots lower the staple by 250, and offer this notion of a fence in St. Louis.  That was done with just the leverage of maybe the senator's bill might get passed some day.  That was the only leverage. That was all that had changed.  What if ALPA had gotten involved and done any of the things, or all of the things, that were requested of it?  Litigate, boycott.  All of it.  Would there have been a better deal?  A more favorable deal?  Again, that is up to you to decide.  But again, you must use your common sense and look at what happened.

Id. at 75.

There are multiple problems with these assertions. First, counsel misstated the evidence when he argued that Day had testified that the seniority integration could have been more favorable if ALPA had thrown its weight behind the Bond Bill. Press had attempted to have Day give an opinion to that effect but counsel for ALPA objected and the Court sustained the objection. After Day described the proposal made by the APA after 9/11, which for the first time included a protective cell in St. Louis for the TWA pilots, the testimony was as follows:

> Q. . . . [T]he three prior proposals they [the APA] had made, did any of them include as a feature the notion of a protective cell in St. Louis?
>
> A. No.
>
> Q. What do you attribute that movement to?
>
> MR. FRAM: I object. Calls for speculation.
>
> THE COURT: I will sustain that objection.

Tr. of June 23, 2011 at 95:5-11.

Although the Court permitted Day to testify about the order of events, Day never expressed the opinions, which he would not have been qualified to offer in any event, that the Bond Bill caused the APA to modify its position and that more vigorous support from ALPA would have resulted in even more movement on the part of the APA:

> Q. What had changed between September 18 and last offer or mid October when they made this new proposal?
>
> MR. FRAM: Your Honor, it is the same question, I object.
>
> THE COURT: I am going to allow it. What had changed was the Bond bill?
>
> THE WITNESS: That's right.
>
> Q. Had ALPA National given you any new leverage?
>
> A. No.

See Tr. of June 23, 2011 at 95:12-20.

Second, even if Day had testified, as claimed by Press in his closing, that the TWA pilots "could have gotten a more favorable seniority integration" and that it was "reasonable to believe that we would have gotten a better deal closer to the Tannen proposal had ALPA done the things we asked for and gave us the leverage we needed," such testimony would have been insufficient to prove, as required by the law, that the result "would" have been more favorable. Instead, as discussed above, the only admissible evidence of how American or the APA would have behaved was their testimony.

### D.  **Plaintiffs Improperly Relied Upon the Logical Fallacy of False Cause.**

Plaintiffs' causation argument based upon the timing of the APA's concessions in relation to the Bond Bill was speculative and insufficient to support a verdict on the issue of causation. Throughout trial, Plaintiffs argued the following syllogism:  (1) the APA gave ground because the threat of the Bond Bill; and (2) because some support for the Bond Bill led the APA to make some concessions, more support for the Bond Bill by ALPA would have resulted in more concessions. This logic is deeply flawed in two respects.

To begin with, that the APA gave some ground in negotiations after the Bond Bill was introduced does not mean that it gave ground because of the Bond Bill. There are numerous other, equally if not more plausible explanations for why the APA might have modified its position. For example, it is equally if not more plausible that the APA gave ground because the impact of 9/11 on the airline industry meant that all of the stapled TWA pilots were going to be furloughed in any event. Or it might have given ground because Duane Woerth used his personal relationships with Jeffrey Brundage and Don Carty of American and John Darrah of the APA to persuade them to be more flexible. Tr. of June 29, 2011 at 29:6-31 and 155:25 to 156:7. Or the APA may have offered a better deal because American wanted to resolve the seniority

14

integration issue in the aftermath of 9/11 and requested that the APA relent.  We simply do not

know why the APA changed its position because none of the decision-makers from the APA

testified at trial.

Plaintiffs' argument about the timing of the APA's concession in relationship to the Bond

Bill represents a clear example of what Judge Aldisert has referred to as the "fallacy of false

cause."  He describes the *post hoc* version of this fallacy as follows: "The *post hoc* fallacy

consists of reasoning from sequence to consequence.  It is reasoning from what happened in

sequence to the assumption of actual connection.  We commit this fallacy wherever we argue that

because a certain event was proceeded by another event, the preceding event was the cause of the

latter."  Ruggeri J. Aldisert, Logic for Lawyers:  A Clear Guide to Legal Thinking (NITA 3d ed.

1997), at 199.  To illustrate this fallacy, Judge Aldisert recounts the story of a woman passenger

on board the Italian liner *Andrea Doria*:

> On the fatal night of the *Andrea Doria's* collision with the Swedish ship
> *Stockholm* off Nantucket in 1956, she retired to her cabin and flicked a light
> switch.  Suddenly there was a great crash, and the sound of grinding metal, and
> passengers and crew ran screaming through the passageway.  The lady burst from
> her cabin and explained to the first person in sight that she must have set the
> ship's emergency brake.

Id. at 199-200.

In this case, the only way to prove why the APA changed its position in the Fall of 2001

was to present testimony from representatives of the APA.  Plaintiffs never presented any proof

that the APA modified its position because of the Bond Bill.  They impermissibly asked the jury

to speculate.

E.    **The Contention That More Support Would Have Meant More Concessions**
      **Was Also Speculative.**

Equally flawed and unsupported was the second part of Plaintiffs' syllogism:  that more

support for the Bond Bill would have led to more concessions on the part of the APA even if it

15

had led to any concessions in the first place.  Simply because something bends under some pressure does not mean that it will bend more under more pressure.  It might break.  Or it might bounce back.  Indeed, the evidence in the record indicates that American and the APA were upset about the Bond Bill and that continued lobbying on the part of the TWA pilots threatened to result in a negative reaction in the form of a less favorable seniority integration.  It is noteworthy that Wilder himself cautioned the TWA pilots, at the MEC meeting on October 23, 2001, that American and the APA might retaliate if the TWA pilots were too aggressive and cautioned that "as in any war there would be casualties."  D-88 at 12.  So more support by ALPA and more pressure on American and the APA might have backfired and harmed the TWA pilots.

As a consequence, it was pure speculation for Plaintiffs to argue that more support from ALPA would have resulted in more concessions from the APA.  "Although the law permits reasonable inferences, where two or more equally plausible explanations exist from the evidence, a jury's selection of one is not a reasonable inference, but pure conjecture."  Irwin v. Odyssey Contracting Corp., 61 F. App'x. 150, 153-54 (6th Cir. 2003) (citing Michigan law).  "While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable." United States v. Lovern, 590 F.3d 1095, 1107 (10th Cir. 2009) (quoting United States v. Dunmire, 403 F.3d 722, 724 (10th Cir. 2005)).

Put simply, there was only one way to prove that American and the APA would have agreed to a more favorable seniority integration if ALPA had supported the Bond Bill more vigorously or done *any* of the other things Plaintiffs now say ALPA should have done: direct testimony to that effect from representatives of American and the APA.  Anything else was speculation.

Instead of proof, however, the record in this case is devoid of evidence to suggest either that the TWA MEC would have voted differently on any issues (detrimental reliance) or that if it had, American and the APA would have proceeded differently (causation).  On the issue of the vote on April 2, 2001, no member of the MEC called by Plaintiffs testified that he or she would have voted differently if advisors engaged by ALPA or the MEC had advised differently.  More importantly, Plaintiffs also failed even to offer, at the time of trial, the only admissible evidence on the issue of causation:  testimony from representatives of American and the APA.  Instead, counsel for Plaintiffs encouraged the jury to speculate about how American and the APA might have reacted, and the jury did so.  The jury's verdict must therefore be set aside and judgment entered in favor of ALPA.

### III.   Plaintiffs Failed to Present Sufficient Evidence that ALPA Breached Its Duty of Fair Representation.

For the above reasons, even if Plaintiffs had proven every DFR violation they alleged, judgment in favor of ALPA would still be required because Plaintiffs failed to prove that ALPA's actions or inactions had any impact on American or the APA.  ALPA submits, however, that Plaintiffs also failed at trial to prove any arbitrary or bad faith conduct in the first place.  For those reasons as well, judgment should be entered in favor of ALPA notwithstanding the jury verdict.

During the course of their case, Plaintiffs presented live testimony from three voting members of the TWA Master Executive Council ("MEC"), namely Alan Altman, Sally Young and Howard Hollander; from two members of the Merger Committee, Sean Clarke and Michael Day; and from two other pilots who participated in certain of the meetings and lobbying efforts with respect to the Bond Bill, Ted Case and Matthew Comlish.  Plaintiffs also presented the

17

testimony of James Baehler and videotaped deposition testimony from a number of other witnesses, as well as a numerous exhibits.

ALPA presented live testimony from two pilots who were voting members of the TWA MEC, namely Steven Rautenberg and David Singer; from Duane Woerth, the former President of ALPA; and from five of the advisors who provided support to the TWA MEC, namely David Holtzman, Clay Warner, Richard Seltzer, Steve Tumblin (by deposition) and Randy Babbitt (by deposition).

The undisputed evidence presented at trial established that the TWA MEC was empowered to make decisions that bound the pilots as a group. ALPA could not agree to a new CBA, waive scope, agree to a seniority integration, select a committee, or even initiate a lawsuit without a decision of the MEC. With respect to the events leading up to and on April 2, 2001, the MEC made decisions with the assistance of four independent advisors who were retained by the MEC (Steven Tumblin, Michael Glanzer, Roland Wilder and Randy Babbitt), four full-time employees of ALPA (David Holtzman, Clay Warner, Bill Roberts and Bob Christy) and an outside attorney who represented ALPA and the MEC in the TWA bankruptcy (Richard Seltzer). With respect to the events after April 2, 2001, the MEC relied heavily on its own advisors that it retained and who reported to it directly, including Roland Wilder, Michael Tannen and James Baehler. During the period after April 2, 2001, the members of the TWA MEC did not even claim to rely upon advice or representations of ALPA. Instead, the Plaintiffs complained that ALPA either refused to authorize certain actions requested by members of the MEC, such as the lawsuits proposed by Roland Wilder or a "jump seat" war, or failed to provide adequate support for the Bond Bill.

As discussed below, to some degree the witnesses presented by Plaintiffs and by ALPA disagreed about the specifics about what was said to whom and when. For example, several of the pilots presented by Plaintiffs claimed – incredibly and falsely – that they were not aware before April 2, 2001 of the need to decide whether to accept a new collective bargaining agreement with TWA, LLC and to waive scope. Undisputed documents and the witnesses presented by ALPA established that the waiver of the right to arbitrate the issue of seniority integration was a condition of the agreement with American Airlines and which all the pilots were well aware of this almost immediately thereafter.

Separate and apart from the fact and credibility disputes that Plaintiffs attempted to create at trial, it is clear that different pilots had different expectations and perspectives concerning numerous issues based upon their seniority, education and experience. This was a classic intra-union dispute. The existence and resolution of such disputes is fundamental to the operation of a labor organization, and it is for this reason that a union's decisions are not subject to second-guessing. Within the TWA MEC and its committees, some pilots advocated a more aggressive approach and were prepared to risk significant adverse consequences; other pilots recognized that the TWA pilots had very little "leverage" and concluded that a conciliatory approach was more likely to be more effective. For example, Sean Clarke, the most junior member of the Merger Committee, was 30 years old in 2001 and had only been a TWA pilot since 1996. Despite the undisputed terms of the CBA between American Airlines and the APA, which entitled the American pilots to staple all of the TWA pilots to the bottom of the American seniority list, Clarke testified that he initially expected a seniority integration based upon date of hire. Tr. of June 16, 2011 at 16:12-23. Clarke became frustrated when it became clear to him that a substantial number of TWA pilots would be stapled and that he was likely to be among

19

them.  After the events of 9/11, Clark had little to lose if American walked away from the deal –
he would be furloughed no matter what – and he behaved accordingly by insisting on highly
aggressive positions that endangered the ability of more senior pilots to continue flying.

Steve Rautenberg, in contrast, was 49 years old in 2001.  He was hired by TWA in 1979
but was then furloughed for 5 ½ years, from 1980 to 1985.  Tr. of June 28, 2011 at 183-85.  He
had then lived through the first and second TWA bankruptcies in 1992 and 1995.  Rautenberg,
who had received his MBA while on furlough, understood from his experience at TWA and his
knowledge of the industry that any seniority integration with the American pilots, in light of the
CBA between American and the APA and terms of the Asset Purchase Agreement between
American and TWA, would inevitably be highly unfavorable to the TWA pilots.  Id. at 190-92.
Rautenberg realized early on, and certainly after 9/11, that many TWA pilots were likely to be
stapled and would be furloughed. He was not willing to agree to desperate, high-risk strategies
that were unlikely to help more junior pilots but that would threaten the jobs of the more senior
pilots.

Other pilots involved in the MEC agreed with Rautenberg and disagreed with the
aggressive positions advanced by Howard Hollander and other pilots who, later in the year, took
the position that the TWA pilots should reject the seniority proposal made by American and the
APA before the imposition of Supplement CC.  David Singer, who was 54 in early 2001, had
obtained a law degree and practiced as a lawyer for several years before becoming a pilot.
Although significant older than many of the TWA pilots, Singer had only joined TWA in 1996
and had relatively little seniority.  Tr. of June 29, 2011 at 156-59.  Despite this, Singer
understood, based upon his review of the Section 1113 motion and his own independent
research, including a chapter from a book that he obtained and circulated to the other members of

the MEC shortly before the vote on April 2, see P-406, that the TWA pilots had little leverage in seniority negotiations. He recognized that the principle likely to govern those negotiations with the American pilots was the "law of the jungle," meaning that a significant group of the TWA pilots were likely to be stapled. Tr. of June 29, 2011 at 169:15-22.

Rautenberg and Singer were just as entitled as the more aggressive wing to press their position through the MEC's voting procedures, and they were successful on April 2, prevailing by a large majority. No jury or Court has the right under the law to question their decision because other members of the MEC, such as Young, *later* adopted the view that the April 2 MEC had not been aggressive enough.

Even after Singer was recalled by Council 2 and certain of the pilots who had voted to waive scope and preserve jobs on April 2 adopted more radical positions, other pilots continued to share the same perspective as Rautenberg. For example, Pablo Lewin, one of the representatives from Council 4, not only voted all of his votes in favor of the TWA, LLC proposal on April 2, see D-74, but supported Rautenberg's position in the Fall of 2001 that the MEC should accept the last offer made by American and the APA. See D-88. As a consequence, counsel for Plaintiffs plainly mischaracterized the evidence, when he argued in his closing, that Rautenberg was the "faction." Tr. of July 11, 2011 at 133. Rautenberg's conservative approach to the crisis presented by the TWA bankruptcy and the seniority integration issues was both shared by and respected by many pilots. That Rautenberg – and others – agreed with the manner in which ALPA approached matters is conclusive proof that ALPA acted reasonably and responsibly and did not breach its duties to the TWA pilots. The only way around that conclusion is to adopt the view that these intelligent and responsible individuals like Rautenberg and Singer, elected by their fellow pilots, were "duped" by their own

advisors, but ten years into this controversy they certainly do not think they were.  The jury had no basis for substituting its view for theirs.

### A.    **The Alleged Conflict.**

Plaintiffs pressed their claim of an alleged secret conflict at trial.  The facts are otherwise. To begin with, there is no basis upon which Plaintiffs can claim that ALPA had an undisclosed conflict as a result of its openly expressed long-term interest in representing the American pilots. It is undisputed that ALPA's Unity Resolution was passed in October of 2000, see D-2, and that Duane Woerth met with the Board of the APA shortly thereafter, on October 27, 2000, to encourage the leadership of the APA to consider merging with ALPA.  See P-10.  These events, which were widely publicized within ALPA, and were certainly known to the TWA pilots, took place months before the announcement of the American/TWA transaction.  The Court itself noted, in ruling on ALPA's Rule 50 Motion, that this conduct was "perfectly lawful, proper conduct," and that it was "perfectly legitimate."  Tr. of July 7, 2011 at 86-87.

That the TWA pilots were aware of ALPA's long-term interest in representing the APA and that some pilots saw that as a positive in the seniority integration negotiations between the unions, well after the scope waiver, is reflected in the Council 3 Information Update dated May 8, 2001.  See D-25.  That Update noted that "things aren't going well in our discussion with APA about how to integrate the TWA pilots into the American Airlines' Pilot Seniority List" and reported that the APA's proposals had included a "methodology whereby the most senior TWA pilot ends up somewhere below the middle of the current AA list, and more than half of the rest of the TWA group is stapled to the bottom."  The Update further noted that the APA's leadership, unlike the management of American, "still refuses to attribute any value to TWA's contributions to the transaction between the two airlines."  The Update summarized the American pilots' attitude succinctly:  "it is apparent to us that APA feels AA 'saved' TWA from

22

extinction, and absent that, we'd all be out of work.  So, from their perspective, we should be quite happy with APA's current offer."  Id. at 2.

The Update then noted that there was "another *sub rosa* aspect to this whole negotiation," specifically that with the Continental pilots having voted to rejoin ALPA, the APA would then be "the only large, stand-alone pilots union in the U.S." The Update surmised that the APA, having been fined $45 million as a result of the American pilots' sickout in February of 1999, was perhaps attempting to justify its continued existence by taking a hard-line against the TWA pilots:

> All things considered, perhaps APA's leadership feels they must appear "strong" to the members in order to maintain their independent status and their position as bargaining agent for the AA pilots.  It's no secret that ALPA would like to have AA back in the association.

D-25 at 2-3 (emphasis added).  Given that the TWA pilots themselves said that it was "no secret" that ALPA wanted to represent the American pilots, there was simply no "undisclosed conflict."

Moreover, it is undisputed that ALPA did not take any concrete steps to pursue the American pilots during the seniority integration dispute.  And it cannot fairly be argued that ALPA's offer to reimburse Clarke and Hunnibell for several thousand dollars of expenses well after the fact of their card campaign had ended qualifies as support  The record is clear that these expenses were not paid.  The record establishes as well that Clark and Hunnibell printed the cards, circulated the cards and received the cards back without any encouragement from ALPA and without any expectation of reimbursement at the time.

Moreover, the record establishes that the TWA pilots themselves wanted ALPA to pursue representation of the American pilots in late 2001, after the American pilots filed for single carrier status and it became clear that ALPA would no longer be able to represent the TWA pilots.  This of course was at the very time when ALPA representatives were discussing the cards

23

that Clark and Hunnibell had obtained and would have needed those cards to consider whether to pursue representation of the merged pilot group after a single carrier determination. Thus, in a resolution sponsored by Hollander and Young at a Special Meeting of the TWA MEC on December 4, 2001, the TWA MEC passed a resolution which noted, among other things, that the "TWA pilots fully endorse ALPA's short term goal of recruiting the pilots of American Airlines back into our international pilot union, and the larger goal of extending the benefits and responsibility of ALPA membership with fairness and equity to all professional airline pilots" and encouraged ALPA to use the desire of some American pilots to rejoin ALPA as leverage to persuade the APA to revise the terms of Supplement CC. See P-356 at ALPA 0001548. In other words, even after Supplement CC was adopted, the TWA pilots – including the pilots who have pressed this litigation -- themselves wanted ALPA to obtain and rely upon the very cards that they now claim ALPA should never have received in the first place. So they obviously did not disapprove, at the time, that ALPA had obtained information from Clark and Hunnibell.

**B.      The Merger Committee Meetings on March 28 and 29, 2001.**

One of Plaintiffs' claims at trial was that ALPA improperly pressured the Merger Committee to "bid against itself" in negotiations with the APA on March 29, 2001, and that the ALPA Merger Committee members succumbed to this pressure – these being the same supposedly tough Merger Committee members who claim that being more aggressive with APA could have produced better results. Clarke testified that the Merger Committees met on March 28, 2001, that later that day a number of ALPA advisors, including Bob Christy, met with the Merger Committee and represented that they had information that would lead to a negotiated seniority agreement with the American pilots but that the TWA pilots had to agree to staple 825 pilots in order to get that deal. See Tr. of June 16, 2011 at 29. Clarke testified that he strongly opposed this proposal and that, after negotiations within the Merger Committee, the Committee

24

agreed to propose that 434 TWA pilots be stapled. This verbal proposal, which was presented to the American pilots on March 29, 2001, went only part way toward what ALPA advisors recommended, and was rejected without any counter-offer at that time. See J-301.

David Holtzman and Clay Warner both testified about the meeting on March 28 and both denied that the Merger Committee was pressured. They explained that the Merger Committee moved off its prior position substantially at the direction of the MEC on its Special Meeting on March 21-22, 2001. Tr. of June 30, 2011 at 58-66; Tr. of July 5, 2001 at 66-68.

It is undisputed that the American pilots did not accept this proposal and that the issue of seniority integration was negotiated further into the fall of 2001. Clarke testified under cross-examination that the number of TWA pilots who ultimately were stapled in Supplement CC was approximately 1,250 and that the stapling of 825 pilots, if agreed to in March of 2001, would have been a better deal. Clarke also admitted that the entire "package" recommended by the ALPA advisors in late March, if accepted, would have been a better deal than Supplement CC. Tr. of June 16, 2011 at 79.

Given the position of the American pilots that a substantial number of the TWA pilots would have to be stapled, and given that the seniority imposed under Supplement CC was worse for the TWA pilots, there is no basis for claiming that the ALPA advisors acted in bad faith in making their recommendations in late March. It is also the case that the Merger Committee admittedly never accepted the recommendation. Steve Rautenberg's undisputed testimony was that American's position was intractable and well known:

> [W]e all knew that American had placed waiver of certain provisions of our contract as a condition. It was not a secret. It was absolutely an important issue through that period of time. So the prospect that American would back away from a transaction or the possibility that they would back away from a transaction as a result of that or threaten us or, it was always present.

See Tr. of June 29, 2011 at 11:8 to 16:1.

Moreover, there is no basis for any claim by Plaintiffs that the ALPA advisors were motivated to undercut the position of the TWA pilots because there is no evidence that Mr. Christy or any of the other advisors present knew about or were influenced by Jalmer Johnson's letter of January 25, 2001 or were aware of *any* alleged efforts by ALPA to curry favor with the American pilots.  Correspondingly, a desire to represent the American pilots – even actions taken in support of that goal taken after January 2001 – did not constitute a "conflict of interest" or "bad faith"; to the contrary, it is what a union does, and there is not a shred of authority in DFR jurisprudence to suggest otherwise.  Indeed, only if it were a fact that ALPA made decisions intended to help the American pilots at the expense of the TWA pilots would there be potential grounds for such an argument. But there is no such evidence. Moreover, because the Merger Committee rejected the recommendations of the ALPA advisors, there is no basis for claiming that they detrimentally relied upon or were misled by any statements, promises, or assurances of the ALPA advisors, as required by Deboles.

Finally, plaintiffs failed at trial to present any evidence that the negotiations on March 28 undercut the negotiating position of the TWA pilots and resulted in a less favorable seniority integration.  As discussed above, the only admissible evidence to that effect would have been testimony from members of the APA Merger Committee.

**C.      The MEC Vote on April 2, 2001.**

Plaintiffs claim that ALPA acted in bad faith by urging the members of the TWA MEC to vote to waive scope on April 2, 2001, and to accept employment and a package of other benefits from American rather than contest the Section 1113 motion that had been filed by TWA in the Bankruptcy Court seeking to vacate the Collective Bargaining Agreement between TWA and its pilots.  Plaintiffs contend that the MEC's decision to do so was informed by misrepresentations

made by the advisors who were present on April 2, 2001, apparently including the independent advisors selected by the MEC.

The undisputed facts refute any contention that any of the advisors, including any representatives of ALPA, made any misrepresentations or concealed material information during the course of providing advice before and at the meeting of the MEC on April 2, 2001. The claims of bad faith made by Plaintiffs with respect to the vote on April 2, 2001, appear to be as follows: (1) that certain of the ALPA advisors predicted before April 2, 2001, that TWA would likely lose the 1113 motion, but then changed their advice and "pressured" the members of the MEC into voting to waive scope and accept the CBA with TWA LLC; (2) that the advisors falsely advised the MEC on April 2 that there was probably no right to strike if the Section 1113 motion were granted, contrary to a statement made in a footnote to the brief filed with the Bankruptcy Court on March 30, 2001, in opposition to the Section 1113 motion; (3) that the advisors predicted that if the Section 1113 motion were denied, American Airlines might walk away from the proposed asset purchase and that the pilots would lose everything including their jobs; and (4) that American Airlines would use its reasonable best efforts to assist the two unions (ALPA, representing TWA pilots, and APA, representing the American Airlines pilots) to arrive at a fair and equitable process for resolving the seniority and integration issues.

Plaintiffs have failed to adduce any evidence that any of the representations made in the context of the April 2, 2001 vote were false or misleading in any way. With respect to the likelihood that the Section 1113 motion would be granted, regardless of what individual advisors allegedly said to individual members of the MEC in private phone conversations before April 2, 2001, by the time the MEC met on April 2, 2001, all of the advisors, including Roland Wilder, agreed that it was highly likely that the motion would be granted. Thus, an April 3, 2001 letter

signed by class representative Sally Young, and sent to all of the Council 3 pilots, reported that

the "unanimous opinion" of the nine advisors, including Wilder, "was that the likelihood of

ALPA's prevailing in an attempt to defeat TWA's CBA rejection application [under Section

1113] was virtually nil." See D-16.  An April 10 letter signed by the three elected officers of

Council 2, including class representatives Ted Case and Howard Hollander, made clear that their

assessment of the likely outcome of the Section 1113 motion was based not only the legal

analysis of Section 1113 provided by the advisors but also by their personal observations of

Judge Walsh. See D-35. ("If successful, the hearing and the judge's ruling [on the Section 1113

motion] would effectively eliminate the Scope problem. Any one [sic] who attended the previous

bankruptcy proceedings is aware of Judge Walsh's predisposition to press forward with this

transaction. After consultation with many professional advisors (see attached list) it was their

unanimous opinion that TWA would very likely prevail in its quest before the bankruptcy

judge").

  With respect to the claim that the TWA pilots were falsely advised that they probably did

not have a right to strike if the Section 1113 motion was granted, Richard Seltzer explained in his

testimony that he advised the MEC that it did have the right to strike against TWA, Inc., which

was in bankruptcy, but that it was less clear that the pilots had the right to strike against TWA,

LLC.  Tr. of July 6, 2011 at 130:13 to 133:18.  But Seltzer also explained that whether there was

a legal right to strike did not matter.  The goal of the MEC was to preserve jobs, not risk losing

them.  Id. at 101:7-16 and 135:7-11.  For this reason, Plaintiffs have failed to articulate how this

alleged advice was in any way relevant or material to the decision made by the MEC on April 2,

2001.  If the members of the MEC had been advised that the TWA pilots had a right to strike if

the Section 1113 motion was granted, what would they have done?  None of the three voting

members who testified at trial – Altman, Young and Hollander – ever suggested that they might have voted differently and none explained how the right to strike would have in any way helped the TWA pilots.  It is undisputed that the TWA pilots wanted the American transaction to go forward because they wanted jobs, not the right to strike and be out of work.  So any advice that there was no right to strike against TWA, LLC – rather than TWA, Inc. – was not only consistent with the bankruptcy brief, it was completely and undisputedly accurate.

With respect to the vote on April 2, 2001, there can be no claim that the advice given by the advisors other than Wilder – including independent advisors who did not answer to ALPA – was irrational or given in bad faith in order to help ALPA win over the AA pilots.  Those advisors counseled the MEC to avoid the substantial risks associated with having the Bankruptcy Court rule on the Section 1113 motion and the possibility that American would abandon the entire transaction.  Rautenberg and Singer, who themselves reviewed the Section 1113 motion papers, independently reached the same conclusion.

**D.    ALPA Acted Reasonably And Responsibly In Deciding Not To Pursue Wilder's Litigation Theories.**

Nor is there any basis for arguing that a reasonable jury could have found that it was irrational or in bad faith for ALPA to have recommended against and refused to approve Wilder's proposal to file litigation to enjoin the American transaction.  ALPA previously argued in its Trial Brief and Rule 50(a) motion that Wilder's theories lacked legal merit and maintains its position that the Court should have dismissed any claim based upon those theories as a matter of law.  ALPA incorporates herein and relies upon those prior arguments, including its arguments that Wilder's theory was fundamentally flawed from a legal perspective because it violated the bankruptcy automatic stay and that pursuing litigation would have risked disaster for the TWA pilots.

But even if it were not error for the Court to permit the jury to consider whether ALPA should have pursued those theories, no reasonable jury could have found that ALPA acted irrationally in declining to pursue litigation at any point in time. With respect to the events leading up to April 2, 2001, it is undisputed that American was the only bidder for TWA and that the waiver was a pre-condition for American's acquisition of TWA; the acquisition provided positions at American for all TWA pilots and with increased pay rates; and the acquisition prevented the "strong likelihood of a [TWA] liquidation" given that TWA was "in financial distress." In re Trans World Airlines, Inc., 322 F.3d 283, 286-87 & n.3, 292-93 (3rd Cir. 2003). None of this was irrational. That prudence dictated acceptance of the proposal and the waiver of scope is established not only by the testimony of Holtzman, Warner, Seltzer, Tumblin and Babbitt, but also by that of Rautenberg and Singer.

Moreover, the advisors acted responsibly in rejecting Wilder's litigation proposal and cautioning the TWA MEC about the downside in filing the lawsuit suggested by Wilder: the Section 1113 motion might have been granted (without a new TWA LLC CBA) or American might have walked away from the deal. See O'Neill, 499 U.S. at 78-81 (reasonable for union to decide to settle rather than go to war, even if it meant agreement to a presumably "bad" contract); Camacho v. Ritz-Carlton Water Tower, 786 F.2d 242, 245 (7th Cir. 1986) ("a union sensibly may conclude -- without violating the [DFR] that runs to all employees -- that the employees as a group are better off displaying a cooperative and conciliatory spirit than showing arms in every encounter over a discharge"). The fact that Wilder, as an aggressive lawyer, was willing to role the dice with the job security of 2400 pilots, is not relevant to the responsibilities of a union (including its MEC) when deciding the fate of those pilots.

In short, no reasonable jury could find that ALPA breached its duty of fair representation to the TWA pilots by declining to pursue the injunction action recommended by Wilder, especially since the TWA MEC itself expressed no interest in that litigation and no lawsuit could be filed without its decision to do so (and not simply a letter from the lawyer preparing the lawsuit before the MEC has voted to authorize it). Indeed, it is basic that a union's "failure to take an action that is unlikely to be advantageous does not subject it to liability for breach of its duty of fair representation." Kavowras v. New York Times, Co., 132 Fed. Appx. 381, 383 (2d Cir. 2005) (quoting Barr v. United Parcel Serv., 868 F.2d 36, 44 (2d Cir. 1989)).

Finally, there are no facts to support any claim that any of the ALPA advisors acted in bad faith or were motivated by a desire to sacrifice the interests of the TWA pilots in order to further ALPA's goal of merging with the APA and attaching the American pilots. The primary evidence upon which Plaintiffs have relied has always been the card campaign of the two American pilots, John Clark and Mark Hunnibell. But there is no evidence from this campaign, or from *any* other part of the case, that any ALPA advisor or ALPA official was motivated to act or not to act because of the desire to represent the AA pilots. Concerning the card campaign, the videotaped deposition testimony of Clark and Hunnibell, presented during Plaintiffs' case, established that their card campaign did not begin until May of 2001, over a month after the vote on April 2, 2001. Both Clark and Hunnibell explained that the card campaign was linked with Hunnibell's campaign to be elected as Vice President of the Allied Pilots Association and that ALPA was in no way involved in their decision to distribute the cards. There is *no* contrary evidence. Hunnibell and Clark utilized a company called Primadata to print and mail the cards. See P-3. Primadata was selected by the APA and was not recommended by or in any way affiliated with ALPA. See Clark Dep. of December 1, 2006 at 96:11 to 97:2. The first mailing

31

occurred sometime in late April or early May 2001, and the card campaign effectively ended on May 23, 2001, when Hunnibell lost the election. See Hunnibell Dep. of October 24, 2006 at 52:22; Clark Dep. of December 1, 2006 at 97:17 to 98:3. Moreover, Ronald Rindfleisch, who was responsible for communicating with and organizing pilot groups who expressed interested in joining ALPA, was not even made aware of the campaign until after the cards had been mailed. See Hunnibell Dep. of October 24, 2006 at 102:3 to 102:16.

As a consequence, the only evidence in Plaintiffs' case of on-going active interest on the part of ALPA in the American pilots is the January 25, 2001 letter of Jalmer Johnson to the APA. But there is no evidence that any of the advisors who worked with the TWA MEC during the period leading up to April 2, 2001, were even aware of that letter and there is no evidence for any claim that any of the advice provided was in any way affected by ALPA's previously announced interest in the American pilots.

With respect to the 1113 issue, it is important to note that the MEC received the same advice from its independent advisors, namely Glanzer, Tumblin and Wilder, as it did from the advisors who were employed by or engaged by ALPA, namely Holtzman, Warner, Roberts and Seltzer. Plaintiffs have never alleged, and they certainly presented no evidence at trial to suggest, that Glanzer, Tumblin and Wilder were influenced by ALPA's interest in representing the American pilots.

The advice given by the advisors to the MEC on April 2, 2001, was consistent for a simple reason: the advice was far from irrational; it was sound and prudent, and it was not made in bad faith. There is no evidence to suggest otherwise.

E.    **The Alleged "Get Real" Comment.**

Plaintiffs attempted to suggest during trial that Duane Woerth, the President of ALPA, undercut their negotiating position with the American pilots by telling the APA Board, during a

32

meeting on April 5, 2001, that the TWA pilots had to "get real."  It should be noted, by way of

background, that it was very much in the interest of the TWA pilots for Woerth to be

communicating with the leadership of the American pilots for the purposes of pleading the case

of the TWA pilots. The witnesses who testified for the Plaintiffs confirmed that they wanted

Woerth to be advocating on their behalf, although several of them complained that Woerth was

not forceful enough and were disappointed that Woerth did not threaten the American pilots. See

Tr. of June 16, 2011 at 63:19 to 64:7.

Woerth appeared before the APA Board on April 5, 2001, just after the TWA pilots had

voted to accept the CBA with TWA LLC and at a time when it was clear that seniority

integration negotiations between the TWA and American pilots, which had already been

contentious, would have to continue.  Woerth testified that he never told the APA Board that the

TWA pilots had to "get real" and also testified that he explained to the TWA MEC on April 23,

2001, that he had been misquoted by an American pilot. See Tr. of June 27, 2011 at 74:14-22

and 81:21 to 82:4.

Sean Clarke testified at trial that he was present at the MEC meeting on April 23, 2001,

that he heard Woerth discuss his remarks to the APA Board and that Mr. Woerth denied saying

that the TWA pilots would have to "get real" and made clear that he had been misquoted. See

Tr. of June 16, 2011 at 91:17-24.  Clarke also authenticated D-181, which was a TWA-MEC

summary of Woerth's comments on April 23, 2001.  That summary, which was circulated to all

of the TWA pilots on April 25, 2001, two days after Woerth's appearance, includes the following

statement:

> He [Woerth] went on to tell the APA that the TWA/MEC had recently made one
> of the hardest decisions he has ever seen any MEC make in reaching the
> Transition Agreement with TWA Airlines, LLC. Captain Woerth said that the
> TWA/MEC had made a realistic assessment of their situation and had made the

33

> hard decision, and now the <u>APA needs to get realistic and make a hard decision</u>.
> He told the APA that they have an even greater responsibility to be fair and
> realistic since they would not allow a third party to facilitate the negotiations.

D-181 at pages 1 and 2 (emphasis added).

Because the record is devoid of any credible evidence that Woerth made the alleged "get real" comment to the American pilots and instead establishes that Woerth denied making the remark and explained that he had been misquoted, there was no basis for the jury to conclude that his alleged "get real" comment was a DFR violation.

More importantly, with respect to the issue of causation, the only evidence that mattered was what the American pilots present on April 5 heard and how they reacted. To prove that the "get real" comment, even if made, had any causation impact, Plaintiffs were required to present testimony from American pilots who were present on April 5 that (1) Woerth made the "get real" comment directed to the TWA pilots; *and* (2) that the APA took a different position as a result. This Plaintiffs failed to do.

**F.      The Jump Seat War.**

Nor can it be argued that a reasonable jury could have found that ALPA acted irrationally or in bad faith in failing to begin a "jump seat war" as suggested by Mike Day out of desperation because the American pilots were failing to give ground during seniority integration negotiations. There is no evidence that the TWA MEC (Mike Day not even being an elected member of the MEC) ever requested ALPA to initiate such activity, and that is sufficient to end the matter. But if it had done so, it is undisputed that ALPA had a policy, enacted in 1997, which prevented the use of jump seat privileges for economic and political purposes. <u>See</u> D-411. Even beyond that policy, Duane Woerth determined, based upon his experience, that a jump seat war would not assist the TWA pilots. That ALPA's judgment in that regard was both rational and reasonable is established by Rautenberg's testimony. Rautenberg testified that he attended a

meeting during the summer of 2001 at Woerth's office in Washington and that he was relieved

when Woerth rejected the idea of a jump seat war. Rautenberg noted that he "thought a jumpseat

war would have been a really bad idea and I was really glad that it was off the table." After

explaining that nobody from the MEC disagreed when Woerth said that a jump seat war would

not work, Rautenberg explained why he believed that a jump seat war was a bad idea:

> A. Well, as I said earlier, we were in a position where we needed to talk our way
> into the best possible seniority integration that we could get and the prospect of a
> jumpseat war, it just held, you know, you are going to wind up aggravating the
> very people with whom you are trying to negotiate your way into something
> better. And aggravating them is in my mind not the way to go. I don't think it
> would be helpful. I think it would be unhelpful I think that people who got
> bumped off a jumpseat by TWA or by other ALPA carriers because of the TWA
> integration would communicate with their leadership that, you know, just staple
> them all. Whatever. It would result in retaliation, in my opinion.

Tr. of June 29, 2011 at 42:2 to 45:6.  Rautenberg further explained that none of the members of

the MEC who were present suggested any constructive ideas for putting pressure on the

American pilots. He added that he had attended the meeting in part to "hear what knuckle-headed

ideas some of my fellow MEC members might come up with and ask Duane Woerth in a

meeting I wasn't in attendance at." He added:

> I was embarrassed to be there because there just wasn't anything constructive
> asked for. And part of the conversation was brought by me and I wasn't the one
> that asked for the meeting. But it was basically, "Can you bluff? Can you
> posture?" Can you, you know, that was the gist of what I heard.

Tr. of June 29, 2011 at 42:2 to 45.

Even if it could be argued that it was irrational for ALPA to not have commenced a jump

seat war, there is, once again, a complete absence of any proof that commencing such a war

would have influenced the American pilots to agree to a seniority integration that was more

favorable to the TWA pilots than Supplement CC.

### G.     The Bond Bill.

With respect to the Bond Bill, there is no evidence to suggest that ALPA acted arbitrarily

or in bad faith with respect to the Bond Bill.  It is undisputed that the Bond Bill would only have

benefited the TWA pilots and that the TWA pilots were pressing for its enactment during a

legislative session that was focused in the aftermath of the terrorist attacks on September 11,

2001, including compelling issues of national security, the survival of the airline industry, the

President's Declaration of War on terror and Al-Qaeda and the mobilization of United States

troops to the Middle East. Moreover, the evidence presented at trial established that Bond Bill

had angered American and the American pilots and threatened to undermine negotiation efforts.

With respect to the October 21-23, 2001 TWA-MEC meeting, Rautenberg testified that:

> We had calls from Duane Woerth, we had calls from Howard Attarian, we had
> calls from Senator Bond's office, a gentleman by the name of Trevor LeCann. We
> had a conference calls with Jeff Brundage, from American. There was a lot of
> stuff going on, a lot of interactions going on.
>
> Q. The different people who were calling in, what positionwere they taking with
> respect to seniority integration?
>
> A. Jeff Brundage was taking the position that, you know, he realized that this
> offer was, I won't use the terms he used, but it was a tough pill to swallow. It
> wasn't exactly what he said. But that is the essence of it, in more crude language.
> But we should swallow it. And that it was the best we were going to do. And that
> if we did not, that American would not follow through on the commitments that it
> had made as part of the offer.

Tr. of June 29, 2011 at 70:5-20 (emphasis added).[3] Indeed, Jeff Brundage told the MEC directly,

during its meeting on October 31, 2001, that Don Carty, the President and CEO of American,

had advised Senator Bond that American would close TWA LLC – and all of the TWA pilots

---

[3] Shortly thereafter, Hollander, Case, Young and Altman all voted against seniority integration
without any alternate proposal in place, and then celebrated, "[h]igh five'ing, congratulating each
other, it was as if they had accomplished something." Tr. of June 29, 2011 at 68:18 to 81:24.

would lose their jobs – if the Bond Bill was enacted into law. See D-257. While some want to say now that this was an empty threat, it was hardly irrational to believe it.

Despite this threat, Comlish, Hollander and others continued to lobby for the Bond Bill, and ALPA continued to support those efforts by paying them for their flight pay losses until early December of 2001, almost a full month after Supplement CC was adopted. Only then did ALPA finally decline to approve further flight pay loss payments for pilots who were not representatives. See P-357; see Tr. of June 8, 2011 at 133:17-19.

There is no evidence that it was unreasonable to recognize the realities of the legislative process under which there was strong and decisive opposition to the Bond Bill. Moreover, it was prudent, and certainly reasonable for ALPA to discourage further lobbying for the Bond Bill in light of American's threat to close TWA LLC. In the context of the crisis that existed in the airline industry after 9/11, including massive layoffs of pilots, it would have been unreasonable to assume that Don Carty was bluffing and take a chance of losing all of the jobs.

Given these circumstances, it was eminently reasonable for ALPA to conclude, in early December of 2001, that further efforts to push the Bond Bill might harm the TWA pilots and to discourage further lobbying efforts. No reasonable jury could conclude otherwise, and none could conclude that ALPA's actions were irrational.

With respect to the issue of causation, as already discussed in detail above, Plaintiffs failed to present any evidence that American and the APA would have given more ground if ALPA had pressed more vigorously for the Bond Bill. The only admissible evidence on this point would have been the affirmative testimony of representatives of American and the APA, which plaintiffs never produced.

**H.**   **ALPA's Recommendations Regarding Other Lawsuits Were Not**
     **Unreasonable Or In Bad Faith.**

The evidence also fails to support any claims by Plaintiffs that ALPA acted improperly in

failing to pursue any of the litigation theories recommended by Wilder after April 2, 2001.

Wilder himself conceded, in his various memos, that any litigation against American and the

APA would be "novel and complex." See D-42; Wilder Dep. of August 8, 2008 at 190-191.  This

Court subsequently held that there was no basis for ALPA to pursue litigation against American

or the APA because the APA did not owe a duty of fair representation to the TWA pilots.  See

Bensel v. Allied Pilots Ass'n, 387 F.3d 298, 311-15 (3d Cir. 2004) ("As the NMB did not certify

APA as the representative for the TWA pilots until April 3, 2002, APA did not owe any duty of

fair representation to the Plaintiffs until that date"). The Third Circuit agreed.  See Bensel v.

Allied Pilots Ass'n, 387 F.3d 298, 311-15 (3d Cir. 2004).  ("The scope of the duty of fair

representation is commensurate with the scope of the union's statutory authority as the exclusive

bargaining agent.... [Therefore], the union's statutory duty of fair representation does not extend

to those persons who are not members of the pertinent bargaining unit.  In other words, exclusive

representation is a necessary prerequisite to the statutory duty to represent fairly").

Also lacking in legal merit was Wilder's final litigation theory, which suggested a lawsuit

to enforce American's reasonable best efforts promise.  See P-131.  Wilder's third theory was

multifaceted and, by his own admission, required success in all areas in order to improve the

seniority integration process for the TWA pilots. The theory had at least four parts: (1) a lawsuit

to compel TWA LLC's participation in the "reasonable best efforts" grievance; (2) a status quo

injunction to prevent American and APA from entering into and implementing a seniority

integration agreement until the System Board of Adjustment could adjudicate the grievance; (3)

court enforcement of an arbitration award, if successful in pursuing the grievance; and (4)

38

passage of the Bond bill, mandating an arbitration process for seniority integration issues. See P-131; P-133; J-135; Wilder Dep. of August 8, 2008 at 148-150 and 191-192.  Even if successful, Wilder's theory also required that the Bond Bill have "retroactive effect" so that it would apply to American's purchase of TWA's assets. See J-135; Wilder Dep. of August 8, 2008 at 191-194.

At the time Wilder first proposed this lawsuit, however, the litigation was unnecessary. A seniority integration plan had not been finalized, the parties were still negotiating, and the final seniority integration did not occur until October 23, 2001, at the earliest, after the facilitated negotiations broke down. See Wilder Dep. of 8, 2008 at 152-56.  Then, when the lawsuit was being considered, ALPA filed a grievance on September 24, 2001. See D-207.  However, rather than refusing to process the grievance, as Wilder anticipated, TWA LLC agreed to process the grievance on an expedited schedule. See D-305.  The grievance was then referred to the System Board of Adjustment on October 26, 2001, and TWA, LLC agreed to participate in the arbitration, scheduled for November 6-8, 2001.  Id.  There was thus never a need for ALPA to authorize the lawsuit seeking an injunction to compel TWA LLC's participation since the company agreed to participate.  Rosen Dep. of August 26, 2008 at 111-112.

At that point, it was also unnecessary to seek a status quo injunction to prevent American and APA from entering into and implementing a seniority integration agreement, since TWA LLC processed the grievance on an expedited schedule. The implementation of a seniority agreement would not have affected the TWA pilots until the NMB issued a single-carrier determination and Supplement CC therefore became effective. Thus, there was no immediate argument for irreparable harm to the TWA pilots in October 2001, obviating any need or basis for the injunction lawsuit.  Despite all the talk and all the emotion about that lawsuit, it was moot and *filing* it would have been an act of bad faith.

Rautenberg considered Wilder's litigation theory and agreed with the assessment of Woerth, Warner and others that the lawsuit proposed by Wilder was not worth pursuing. Tr. of June 29, 2011 at 24. No reasonable jury could have concluded that he and ALPA were irrational or unreasonable in that regard. In short, the evidence demonstrates that none of Wilder's legal theories was viable. But, in any case, there was no evidence that a decision not to pursue them was motivated by anything other than ALPA's disagreement with the effectiveness of those strategies and the negative effects they would have. ALPA's decision in that regard was therefore not arbitrary or in bad faith.

Moreover, and once again, Plaintiffs presented no evidence that pursuing litigation would have resulted in a more favorable seniority integration. If the lawsuits had been filed they would have failed, as noted above. There is also no evidence that the mere filing of the lawsuits would have induced American and the APA to propose a better than Supplement CC. Only sworn testimony from representatives of American and APA – which Plaintiffs made no effort to present – would have supported such a contention.

## I.    **Other Promises and Assurances.**

Finally, plaintiffs claimed for the first time, during their counsel's closing statement, that ALPA breached its duty fair representation by making a number of general promises and assurances to the TWA pilots and, in the view of some pilots, failing to fulfill those promises. These assurances included promises by Duane Woerth that he would "fully support the TWA pilots" by filing litigation if necessary and that ALPA would "leave no stone unturned" in its efforts to protect the rights of the TWA pilots. Tr. of July 11, 2011 at 13-44.

Statements of opinions and alleged failures to fulfill promises, including general promises of support, can only be a DFR violation if the opinions or promises were made in bad faith and there is proof of detrimental reliance. See, e.g., O'Neill v. ALPA, 939 F.2d 1199, 1201-05 (5th

40

Cir. 1991) (post-remand) (promises that pilots could ratify agreement were not "sufficiently

egregious" or "intentionally misleading" to be bad faith DFR breach; promise that retired and

resigned pilots would be included in settlement with carrier do not rise to level of intentional

misrepresentations designed to harm these pilots); Swatts v. United Steelworkers, 808 F.2d 1221,

1225 (7th Cir 1986) (assurance by union that no job loss was possible in strike was not DFR

violation in the absence of evidence of intentional affirmative misstatements; "as the district

court noted, the statements complained of were merely opinions which had 'reasonable support

in the experience of union leaders.'"); Bautista v. Pan Am World Airlines, 828 F.2d 546, 550-51

(9th Cir 1987) (granting summary judgment where union official gave an opinion concerning his

interpretation of a "No Layoff Guarantee" provision; "The statements at issue here are nothing

more than 'partisan exhortation delivered under conditions of conflict,' and thus cannot form the

basis of a DFR claim."); Nellis v. ALPA, 815 F. Supp. 1522, 1530-32 (E.D. Va. 1993) (rejecting

allegation that union undertook certain negotiation obligations under fragmentation policy and

then failed to fulfill them; "the mere fact that a union has made certain promises, but not fulfilled

them, does not mean that the promises were made in bad faith"); Panrell v. United Mine Workers

of Am., Int'l Union, 872 F. Supp. 1502, 1508 (N.D.W. Va. 1995) (granting summary judgment;

"the Court is of the opinion that the International Union, neither acted arbitrarily, nor with

discrimination, nor in bad faith when through its agent, Ms. Scott, it allegedly represented to the

plaintiffs that the proceeds [of a settlement] would be distributed to just the 207 [union

members], and then, after gathering further information and giving careful consideration to the

most equitable method and scope of distribution, the International Union determined that the

proceeds should be distributed to all of the approximately 525 members of Local 2095 who had

lost their recall/employment rights at the Kitt Energy mine when it was illegally transferred").

There are three problems with any suggestion that these promises were made in bad faith. First, there is no basis for arguing that ALPA acted dishonestly or made misrepresentations when it advised TWA pilots that it would support their efforts. And there is no question that ALPA provided substantial support to the TWA pilots, including numerous advisors, millions of dollars in flight pay losses and the direct involvement of Duane Woerth in encouraging representatives of American and the APA, including the APA's President and its Negotiating Committee, to treat the TWA pilots fairly and to do the right thing. Simply because ALPA did not take specific steps that certain pilots wanted it to take does not establish either lack of support or wrongful intent. Second, even if it could be argued that ALPA made general promises without intending to follow through – and there is no evidence of this -- there is no basis for claiming that any of the TWA pilots detrimentally relied upon ALPA's assurances or in any way changed their behavior. Third, once again, there are no facts to suggest that more vigorous action by ALPA would have resulted in a different outcome because Plaintiffs failed to present any testimony from representatives of either American or the APA.

The general assertion by Plaintiffs that a better seniority integration could have been achieved if ALPA had shown more "fighting spirit" was nothing more than improper speculation. The basis for this contention was Wilder's philosophy, which he used to attempt to justify his proposed lawsuits, that "good things happen to employee groups that fight." Wilder Dep. of August 8, 2008 at 108:12-14. Counsel for Plaintiffs relied heavily on this slogan in his closing argument in criticizing ALPA. Tr. of July 11, 2011 at 134-35.

Needless to say, there are other maxims that were equally if not more applicable to the high stakes, high risk circumstances that confronted the TWA pilots and ALPA throughout 2001. One is "discretion is the better part of valor." Another is that "fools rush in where angels fear to

tread." Setting aside the issue of whether it was foolish and irresponsible for Wilder to recommend litigation, the fact remains:  Wilder's general approach to union disputes and even his experience in other cases was irrelevant to the specifics of this case.  It was for the MEC, with respect to most issues, and for ALPA in limited respects, to choose among these maxims, and to decide whether there was a more sensible way to proceed than through jumpseat wars, empty lawsuits, and tough slogan-driven posturing.  The law does require a union to fight for the sake of fighting and many unions, like ALPA, have represented their members efficiently and effectively by picking their battles and their tactics.  It was not for the jury to decide whether the tactics ALPA chose, in the face of APA's hard-line, were the best options and to speculate about whether the meritless lawsuits and guerilla tactics advocated by some TWA pilots might possibly have achieved a better outcome.  Although ALPA believes that no responsible union would have rolled the dice with the jobs and future of 2300 pilots, the issue was whether ALPA acted irresponsibly by declining that gamble.  No jury applying the applicable legal standard could have found that ALPA violated its duties to the TWA pilots.

Moreover, and as noted above, it was Plaintiffs' responsibility to establish, through admissible evidence, that American and the APA would have reacted positively if ALPA had agreed to engage in the brinksmanship suggested by Wilder.  This they failed to do.

## CONCLUSION

For all of the foregoing reasons, defendant ALPA respectfully requests that the Court grant its renewed Motion for Judgment as a Matter of Law, and dismiss this action in its entirety with prejudice.

Respectfully submitted,

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121

By:   ___*/s/ Steven J. Fram*_____
         STEVEN J. FRAM, ESQUIRE

*Pro Hac Vice*:
        Daniel M. Katz, Esquire
        Katz & Ranzman, P.C.
        4530 Wisconsin Ave., N.W., Suite 250
        Washington, DC 20016
        (202) 659-4656

Counsel for Defendant Air Line Pilots Association, International

Dated: August 10, 2011

7014775v1

44