```
 1                    IN THE UNITED STATES DISTRICT COURT.
                   FOR THE DISTRICT  OF NEW JERSEY
 2                 CIVIL 02-2917  (JEI)

 3         THEODORE A. CASE, SALLY YOUNG,
           HOWARD HOLLANDER, PATRICK BRADY
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                            Plaintiffs,
 6
                   V.                      TRIAL TRANSCRIPT
 7                                         VOL. 1
           AIR LINE PILOTS ASSOCIATION,
 8
                           Defendant.
 9
                                    CAMDEN, NEW JERSEY
10                                  JUNE 7, 2011

11         B E F O R E:   HONORABLE JOSEPH E. IRENAS
                          UNITED STATES DISTRICT JUDGE
12
                      A P P E A R A N C E S:
13
              TRUJILLO, RODRIGUEZ & RICHARD
14            BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                 AND
              GREEN JACOBSON, P.C.
16            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
              AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17            For the Plaintiffs.

18            ARCHER GREINER
              BY:  STEVEN FRAM, ESQ.
19                 AND
              KATZ & RANZMAN
20            BY:  DANIEL M. KATZ, ESQ.
              FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
              ELIZABETH GINSBERG, ESQ.
22            IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                    S/   LYNNE JOHNSON

4
                    Lynne Johnson, CSR, CM, CRR
5                   Official Court Reporter

6

7

8

9

10           LYNNE JOHNSON, CSR, CM, CRR
           OFFICIAL COURT REPORTER
11         UNITED STATES DISTRICT COURT
           P.O. BOX 6822
12         LAWRENCEVILLE, NJ  08648
           PHONE:   609 896 1836

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury enters the courtroom.)

 2           THE COURT:  Good morning, everybody.  Please be

 3   seated.  Okay.  Ladies and gentlemen, the first thing we are

 4   going to do is swear in the jury.

 5                (Jury previously empanelled is sworn.

 6           THE COURT:  Ladies and gentlemen, now into now that

 7   you have been sworn I have the following preliminary

 8   instructions for you to guide you as jurors in this case.

 9   You will hear the evidence, decide what the facts are, and

10   then apply to those facts the law that I will give to you.

11   You, and only you, will be the judges of the facts.  You will

12   have to decide what happened.  I play no part in judging the

13   facts.  You should not take anything I may say or do during

14   the trial as indicating what I think of the evidence or what

15   your verdict should be.

16           My role is to be the Judge of the law.  I make

17   whatever legal decisions have to be made during the course of

18   the trial, and I will explain to you the legal principles

19   that must guide you in your decisions.  You must follow that

20   law whether you agree with it or not.

21           During the trial you will hear me use a few terms

22   that you may not have heard before.  Let me briefly explain

23   some of the most common to you.  The parties who are suing

24   are called the plaintiffs.  This is a class action lawsuit.

25   A class action lawsuit is one where the plaintiffs or in this
```

1   case several plaintiffs are allowed to bring a claim on

2   behalf of a large group who share a common interest in the

3   same issue.   In this case the plaintiffs are suing on behalf

4   of former TWA pilots.   This Court made a legal determination

5   that this matter could proceed as a certified class action

6   and provided class members with an opportunity to opt out.

7   And by that I mean they could choose not to be part of the

8   class if they wanted to.

9          As to the claims made in this case, your verdict

10  will govern for the entire certified class.   Your verdict

11  will not govern those individuals who opted out of the

12  litigation.

13         You should not allow the certification of this case

14  as a class action to influence your decision on the merits,

15  and you should not ascribe any more or less weight to the

16  plaintiff's claims because of the class certification.

17         Howard Hollendar, Sally Young, Patrick Brady, Ted

18  Case, and Michael Finucan can are the representatives of the

19  certified class of former TWA pilots who are suing on the

20  same claim.   They are called the named plaintiffs or class

21  representatives.   Named plaintiffs Hollander, Young, Brady

22  Case and Finucan, together with the certified class that they

23  represent, are the plaintiffs.   The party being sued is

24  called the defendant.

25         In their action the defendant is the Air Line

1  Pilots Association international, or ALPA.  ALPA was the

2  collective bargaining agent or union representing all of the

3  TWA pilots during the course of their employment at TWA.  You

4  will sometimes hear me refer to counsel, counsel is another

5  way of saying lawyer or attorney.  I will sometimes refer to

6  myself as the Court.  That is when I am feeling particularly

7  pompous, calling myself the Court.

8       At times during the trial a lawyer may make an

9  objection to a question asked by another lawyer, or to an

10  answer by a witness.  This simply means that the lawyer is

11  requesting that I make a decision on a particular rule of

12  law.

13       It is the duty of a lawyer to object to evidence

14  which he believes may not properly been offered, and you

15  should not be prejudiced in any way against the lawyer who

16  makes an objection to the parties he or she represents.  Do

17  not draw any conclusion from such objection or from my

18  rulings on the objections these only relate to the legal

19  questions that I must determine and should not influence your

20  thinking.  If I sustain an objection to a question the

21  witness may not answer it.  Do not attempt to guess what

22  answer might have been given had I allowed the question to be

23  answered.

24       Similarly, if I tell you not to consider a

25  particular statement, you should put that statement out of

1    your mind and you may not refer to that statement in your

2    later deliberations.  When I say admitted into evidence or

3    received into evidence, I mean that this particular

4    statement, this particular statement or the particular

5    exhibit may be considered by you in making the decisions you

6    must make at the end of the case.

7         In this case the plaintiffs claim that ALPA, their

8    former union, breached its duty of fair representation.  ALPA

9    denies these claims.  I will give you detailed instructions

10   of the law at the end of the case, and those instructions

11   will control your deliberations and decisions.  But in order

12   to help you follow the evidence during the trial I will now

13   give you a brief summary of the plaintiff's claims and the

14   elements that the plaintiffs must prove to make their case.

15        ALPA as the union and exclusive bargaining

16   representative for the TWA pilots was required under the law

17   to fairly represent the plaintiffs.  This duty is known as

18   the duty of fair representation.  I will now summarize the

19   positions asserted by the plaintiffs and the defendant.

20   These summaries have been prepared by the parties and you

21   should not view these comments as imparting my thoughts on

22   the strength or weakness of either party's position.  Again,

23   we are giving it to you now just to help you follow the

24   evidence as it goes in.

25        The plaintiffs claim that ALPA breached its duty of

1  fair representation by failing to protect the plaintiffs

2  seniority as part of TWA's merger with American Airlines, and

3  its subsequent and the subsequent merger of the two pile

4  pilot groups.  Instead of fairly representing the plaintiffs

5  to ensure a fair integration between the TWA and American

6  pilot's seniority list, plaintiffs allege that ALPA

7  sacrificed the interests of the approximately 2,300 TWA

8  pilots in an attempt to curry favor with the over 11,000

9  American pilots who ALPA was attempting to acquire into its

10 union.

11      Plaintiffs allege that ALPA proceeded with its

12 efforts to court the American pilots while falsely assuring

13 the TWA pilots that these efforts had ceased.  Plaintiffs

14 further claim that this created a conflict of interest that

15 affected the entire seniority negotiation and ultimately

16 resulted in a loss of seniority for the TWA pilots.

17      ALPA denies these allegations.  ALPA contends that

18 the TWA's severe financial difficulties and the resulting

19 bankruptcy proceeding created a situation where the seniority

20 provisions of the TWA pilots union contract conflicted with

21 the seniority provisions of the union contract between

22 American Airlines and its pilots.

23      ALPA further contends that the TWA pilots were

24 faced with the loss of their jobs unless they complied with

25 certain demands of American Airlines, and that the

1    representatives of the TWA pilots made a reasonable and

2    prudent decision in agreeing to a new labor contract that did

3    not include certain seniority protections that had been

4    included in their labor contract with TWA.

5            Finally, ALPA denies that continued with any

6    efforts to become the bargaining representative for the

7    American pilots after TWA filed for bankruptcy.  ALPA

8    contends that the TWA pilots did not experience any injury in

9    fact as a result of any of the actions which plaintiffs

10   contend were done in bad faith.

11           In this trial you are not going to be asked to

12   determine the amount of money damages owed to the plaintiffs,

13   if any.  Rather, you are only being asked to determine

14   whether ALPA breached its duty to the plaintiffs.

15           Now, a few words about your conduct as jurors.

16   First, I instruct you that during trial until you have heard

17   all of the evidence and retire to the jury room to

18   deliberate, you are not to discuss the case with anyone, not

19   even among yourselves.  If anyone should try to talk to you

20   about the case, including a fellow juror, bring it to my

21   attention promptly.  There are good reasons for this ban on

22   discussion, the most important being the need for you to keep

23   an open mind throughout the presentation of evidence.  I know

24   that many of you use cell phones, smart phones, Blackberries,

25   I-phones and other portable electronic devices to access the

1    internet and to communicate with others.  You must not talk

2    to anyone about this case, or use these electronic tools to

3    communicate electronically with anyone about the case.  This

4    includes your family and friends, do not communicate orally

5    with anyone about the case, either cell phone, smart phone,

6    computer or device of any kind, or use these devices to

7    communicate electronically by messages or a postings of any

8    kind, including email, instant messages, text messages, text

9    or instant messages, service such as Twitter, or through any

10   blog, website, internet chat room, or by way of any other

11   social network, including websites or services, including

12   Face Book, My Space, Linked-in, and YouTube.  Did I forget

13   anything?

14          If any lawyer, party or witness does not speak to

15   you in passing in the hall, ride the elevator, remember it is

16   because they are not supposed to talk or visit with you,

17   either.  That is why you are asked to wear your juror tag.

18   It shows that you are someone who is not to be approached in

19   any way.

20          Next, do not read or listen to anything related to

21   this case, that is not admitted into evidence.  By that I

22   mean if there is newspaper article or rate yo or television

23   report related to this case, do not read the article or watch

24   or listen to the report.

25          In addition, do not try to do any independent

1  research or investigation on your own on matters relating to

2  the case, or in this type of case.  Do not do any research on

3  the internet, for instance, or forget Google.  And Bing.  Or

4  anybody else's search engine.

5       You are to decide the case upon the evidence

6  presented at trial.  In other words, you should not consult

7  dictionaries or reference materials, search the internet,

8  websites, blogs or use other electronic tools to obtain

9  information about this case, or to help you decide the case.

10       You should not talk about the trial with anyone

11  else, not your family, not your friend's, not the people you

12  work with.  Please do not try to find out information from

13  any source outside the confines of this courtroom.  Also, as

14  I told you, you should not discuss the case among yourselves.

15  It is important that you wait until all the evidence is

16  received, and you have heard my instructions on the law

17  before you deliberate among yourselves.

18       Let me add that during the course of this trial you

19  will receive all the evidence you properly may consider to

20  decide the case.  Again, do not reach any conclusions on the

21  claim until all of the evidence is in.  Keep an open mind

22  until you start your deliberations at the end of the case.

23  No statement, ruling, remark or comment which I make during

24  the course of the trial is intended to indicate to you my

25  opinion as to how you should decide this case or to influence

```
 1    you in any way in your determination of the facts.  At times,

 2    I may ask questions of witnesses.  If I do so it is for the

 3    purpose of bringing out matters which I feel should be

 4    brought out, and not in any way to indicate my opinion about

 5    the facts or to indicate the weight I feel you should give to

 6    the testimony or the witness.  I don't think it will happen

 7    often, but in the heat of battle I may find it necessary to

 8    admonish the lawyers, and if I do so, you should not be

 9    prejudiced against either side because I found it necessary

10    to admonish one side or the other.

11           Let me tell you, that is called the well of the

12    Court.  That is a tough place to work.  That is a tough place

13    to work.  Take it from me, I worked there for 26 years.

14    Sometimes things can get a little heated.  I don't think it

15    will happen here much, but please be sympathetic to the

16    lawyers and realize that all of them are doing the best that

17    they can.  They really are.  During the trial it may be

18    necessary for me to talk with the lawyers out of your hearing

19    by having a bench conference or what we call a sidebar over

20    there.  If that happens, please be patient.  We are not

21    trying to keep important information from you.  These

22    conferences are are necessary nor me to fulfill my

23    responsibilities which is to be sure that the evidence is

24    presented to you correctly under the law.  We will of course

25    do what we can to keep the number and length of these
```

conferences to a minimum.  While we meet I will invite you to

stand up and stretch or take a short break or perhaps even

call a recess if it is a lengthy issue and permit you to go

for a break.  I may not always grant a attorneys request for

a conference.  Do not consider my granting or denying a

request for a conference as any indication of my opinion of

the case or what your verdict should be.

The evidence from which you are to find the facts

consists of the following:  The testimony of witnesses,

documents, or other things received as exhibits, any facts

that are stipulated, that is formally agreed to by the

parties, and any facts that are judicially noted, that is

facts I say you must accept as true, even without other

evidence.

The following things are not evidence:  Statements,

arguments, and questions of the lawyers for the parties in

this case; objections by lawyers; any testimony I tell you to

disregard; anything you may hear or see about this case

outside the courtroom.  You must make your decision based

only on the evidence that you see and hear in court.

Are you getting the message?

Do not let rumors, suspicions or anything else you

may see or hear outside of the Court influence your decision

in any way.  Use your common sense in weighing the evidence.

Consider it in light of your everyday experience with people

1    and events and give it whatever weight you believe it

2    deserves.  If your experience tells you that certain evidence

3    reasonably leads to a conclusion you are free to reach that

4    conclusion.

5            These are the rules that control when, what can be

6    received into evidence.  Now, a lawyer asks a question or

7    offers an exhibit into evidence, and the lawyer on the other

8    side thinks it is not permitted by the rules of evidence,

9    that lawyer may object.  This simply means as I told you

10   before that the lawyer is requesting that I make a decision

11   on a particular rule of evidence.  You should not be

12   influenced by the fact that an objection is made.  Objections

13   to questions are not evidence.  Lawyers have an obligation to

14   their client to make objections when they believe that

15   evidence being offered is improper under the rules of

16   evidence.  You should not be influenced by the objection or

17   by the court's ruling on it.

18           Do not speculate what the witness might have said,

19   or what an exhibit might have been.

20           There are two types of evidence that you may use in

21   reaching your verdict.  One type of evidence is called direct

22   evidence.  An example of direct evidence is when a witness

23   testifies about something that the witness knows through his

24   own senses, something the witness has seen, felt, touched or

25   heard or did.  If a witness testified that he saw it raining

```
 1    outside and you believed him, that would be direct evidence

 2    that it was raining.  Another form of evidence -- another

 3    form of evidence is circumstantial evidence.  Circumstantial

 4    evidence is proof of one or more facts from which you could

 5    find another fact.  If someone walked into the courtroom

 6    wearing a raincoat covered with drops of water and carrying a

 7    wet umbrella, that would be circumstantial evidence from

 8    which you could conclude that it was raining.  You should

 9    consider both both kinds of evidence that are presented to

10    you.  The law makes no distinction in the weight to be given

11    to either to either direct or circumstantial evidence.  You

12    are to decide how much weight to give any evidence.

13              In deciding what facts are you may have to decide

14    what testimony you believe, and what testimony you do not

15    believe.  You are the sole judges of the credibility of the

16    witnesses.  Credibility means whether a witness is worthy of

17    belief.  You may believe everything a witness says or only

18    part of it, or none of it, in deciding what to believe you

19    may consider a number of factors including the following:

20    The opportunity and ability of the witness to see or hear or

21    know things the witness testified to.  The quality of the

22    witness's understanding and memory.  The witness's manner

23    while testifying.  Whether the witness has an interest in the

24    outcome of the case or any motive, bias or prejudice, whether

25    the witness is contradicted by anything the witness said or
```

1    wrote before trial, or by other evidence, how reasonable the

2    witness's testimony is when considered in the light of other

3    evidence that you believe, and any other factors that bear on

4    believability.

5            The weight of the evidence to prove a fact does not

6    necessarily depend on the number of witnesses who may

7    testify.

8            What is more important is how believable the

9    witnesses were and how much weight you think their testimony

10   deserves.  Only the lawyers and I are allowed to ask

11   questions of witnesses.  You are not permitted to ask

12   questions of the witnesses.  If you wish, you may take notes

13   during the presentation of evidence.  The summations of

14   attorneys at the conclusion of the evidence and during my

15   instructions to you on the law.  My courtroom deputy will

16   arrange for it, for you to have pens, pencils and paper.

17   Remember that your notes are for your personal use, and may,

18   and they are not to be given or read to anyone else.  As you

19   see we have a court reporter here who will be transcribing

20   the testimony during the course of the trial.  But you should

21   not assume that the transcripts will be available for your

22   review during your deliberations.  Nor should you consider

23   notes that you or your fellow jurors may take as a kind of

24   written transcript.  Instead, as you listen to the testimony,

25   keep in mind you will be relying on your recollection of that

1    testimony during your deliberations.

2           Here are some other specific points to keep in mind

3    about note taking.  Note taking is permitted, not required.

4    Each you each of you may take notes.  No one is required to

5    take notes.  Do not try to summarize all of the testimony.

6    Notes are for the purpose of refreshing memory.  They are

7    particularly helpful when dealing with measurements, times,

8    distances, identities and relationships.  Over use of note

9    taking may be distracting.  You must determine the

10   credibility of witnesses so you must observe the demeanor and

11   the appearance of each person on the witness stand.  Note

12   taking may not distract you from that task.  If you wish to

13   take notes, you need not sacrifice the opportunity to make

14   important observations.  You may make your notes after having

15   made an observation.

16           Do not use your notes or other jurors notes as

17   authority to persuade fellow jurors.  In your deliberations

18   give no more nor less weight of a fellow juror just because

19   that juror did not take notes.  As I mentioned earlier, your

20   notes are not official transcripts.  They are not evidence,

21   and they are by no means a complete outline of the

22   proceedings or a list of the highlights of the trial.

23           They are valuable, if at all, only as a way to

24   refresh your memory.  Your memory is what you should be

25   relying on when it comes time to deliberate and render your

1  verdict in this case.

2         You therefore are not to use your notes as

3  authority to persuade fellow jurors of what the evidence was

4  during the trial.  Notes are not to be used in place of

5  evidence.

6         Do not take your notes away from the Court.  I

7  repeat, at the end of the day, please leave your notes in the

8  jury room.  This is a civil case.

9         The plaintiffs are the parties who brought the

10  lawsuit.  ALPA or the Air Line Pilots Association is the

11  party against which the lawsuit was filed.  The plaintiffs

12  have the burden of proving their case by what is called the

13  preponderance of the evidence.  That means the plaintiffs

14  have to prove to you, in light of all the evidence, that what

15  they claim is more likely so than not.  To say it

16  differently, if you were to put the evidence favorable to the

17  plaintiffs and the evidence favorable to ALPA on opposite

18  sides of the scale, the plaintiffs would have to make the

19  scales tip somewhat on their side.  If the plaintiffs fail to

20  meet this burden the verdict must be for ALPA.  If you find

21  after considering all the evidence that a claim or fact is

22  more likely so than not so, then the evidence or fact has

23  been proved by a preponderance of the evidence.  In

24  determining whether any fact has been proved by a

25  preponderance of the evidence in the case you may, unless

1    otherwise instructed, consider the testimony of all

2    witnesses, regardless of who may have called them, and all

3    the exhibits received in evidence, regardless of who may have

4    produced them.

5            You may have heard the term proof beyond a

6    reasonable doubt.  That is a stricter standard of proof that

7    is a lied only to criminal cases.  It does not apply to a

8    civil case such as this so you should put it out of your

9    mind.  Now the trial will proceed in the following manner.

10   First, one of the attorneys for the plaintiff will make an

11   opening statement to you.  Next, one of the attorneys for

12   ALPA will make an opening statement.  What is said in the

13   opening statement is not evidence.  It is simply an outline

14   to help you understand what each party expects the evidence

15   to show.  Plaintiffs go first because they have the burden of

16   proof.  The plaintiffs will then, after the opening

17   statements, the plaintiffs will then present witnesses who

18   counsel for ALPA will cross examine.  The plaintiffs may also

19   present evidence in the form of documents such as emails,

20   letters, or the like.

21           Following the plaintiff's case ALPA will then

22   present witnesses who counsel for plaintiffs may cross

23   examine.  ALPA may also present evidence in the form of

24   documents.  After the parties main case is presented, they

25   may be permitted, if they ask, to present what is called

```
1    rebuttal evidence.  After all the evidence has been presented

2    the attorneys will then present the closing arguments to

3    summarize and interpret the evidence in the way that is

4    helpful to their client's position.

5              As with opening statements, closing arguments are

6    not evidence.

7              I will then instruct you on the law.  After that

8    you will retire to the jury room to deliberate on your

9    verdict.

10             Now, normally we would begin right this minute with

11   the opening statements.  I am going to give the plaintiff

12   about ten minutes to sort of get set up and get organized.

13   Would you like that.

14             MR. PRESS:  That is fine.  Thank you, Judge.

15             THE COURT:  Okay.  So I will send you to the jury

16   room for just ten minutes.  Do not discuss the case among

17   yourselves.  Keep an open mind until you have heard all the

18   evidence.  Pretty soon I will just hold up my finger number 1

19   and you will know what I mean.  Okay.  All rise when the jury

20   leaves.

21             (The jury leaves the courtroom.)

22             (Recess)

23

24

25
```

```
 1              (Jury enters the courtroom.)

 2              THE COURT:  I now recognize Mr. Press to give the

 3    opening statement on behalf of the plaintiffs.

 4              MR. PRESS:  Thank you, your Honor.  Good morning,

 5    ladies.  Good morning, gentlemen.

 6              My name is Allen Press.  I represent five former

 7    TWA pilots.  One of them is sitting go here.  This is Ted

 8    Case.  Maybe, you remember TWA.  It was a large airline, had

 9    a big base in Newark, big base at JFK and LaGuardia, flew

10    international, flew all over the world, all over the United

11    States.  TWA had a proud 75-year history flying, but it all

12    ended in 2001 when America bought TWA and this lawsuit arises

13    out of that sale.  Okay.

14              Our clients, the five plaintiffs, the five pilots

15    we represent, have brought this case on behalf of a class as

16    you heard Judge Irenas tell you, a class of nearly 2,300 TWA

17    pilots.  And that is who we are here speaking on behalf of

18    for the next couple of weeks.

19              When they brought this case, as you heard, against

20    the labor union, their own labor union.  And that union is

21    called the Air Line Pilots Association.  And you are going to

22    hear a lot of acronyms, and here is the first one.  The Air

23    Line Pilots Association is referred to by our clients and the

24    union as ALPA.  Air Line Pilots Association.  ALPA.  You are

25    going to hear that.  That is the name you will hear.  And
```

1    that is the union we are suing here.

2          Now, what is ALPA?  What was ALPA?  It was a

3    uniformed in 1931.  And the TWA pilots were one of the

4    charter members 80 years ago.  They helped form this union.

5    Okay.  They there was a they were the second pilot group to

6    join and they helped grow the union.  They grew it to more

7    than 60,000 members at one time.  It is the largest pilot

8    union in the world and has been for a long time.  That is

9    what ALPA is.

10          Now, so that is who the parties are.  And this case

11   as you heard the Judge tell you, it is brought under a

12   federal labor law.  A union as the Judge told you, has a duty

13   to fairly represent its members.  And that is what this case,

14   this duty is called appropriately the duty of fair

15   representation.

16          Here comes another acronym.  DFR.  Duty of fair

17   representation.  You are going to hear probably witnesses

18   refer to this DFR.  So any way, that is what that means.

19   That is what this case is brought under.  We have alleged

20   that ALPA breached its duty of fair representation to the TWA

21   pilots.  And they did it, the evidence is going to show, they

22   did it in one of the most important challenges unionized

23   employee can phase, and what was that challenge?  It was a

24   fight to protect the TWA pilots seniority when American

25   purchased TWA.  We allege and hope to prove that this union

1  violated its duty to fairly represent the TWA pilots, and the

2  scene in its seniority struggle with the American pilots.

3  That is what the case is all about.

4         At the time that American bought TWA, there are

5  going to be a lot of dates.  Here is the first one, 2001 was

6  when the purchase was made.  At that time there was more than

7  2,300 TWA pilots flying for the airline.  Okay.  Now, what

8  happened to them?  Why are we here?  Within two years more

9  than 1,400 of those pilots had been laid off by American

10  because they lost their seniority.  More than 1,400 of the

11  original 2,300 had been laid off.  Of the 900 that weren't

12  laid off, more than half of them suffered drastic cuts in

13  their pay because they lost their seniority, many of them

14  lost their rank from captain to first officer.  We refer to

15  co-pilots as co-pilots but you are going to learn a lot about

16  of piloting profession.  They are called first officers.

17  What we had was TWA captains, be demoted to first officers.

18  Huge pay cuts as a result of that.

19         Pilots, because of their loss of seniority, they

20  were displaced from their home bases, forced to fly out of

21  other bases.  They lost the ability to bid on the planes that

22  they could have bid on before.  Everybody, the more senior

23  they are, you get to fly the bigger, better planes.  Pilots

24  want to fly the biggest planes, but when you lose seniority

25  and get demoted you get to fly the smaller planes.  That

1    happened here.  You will hear this.  All of this affects a

2    pilots career.

3         Now, why did all of this happen?  Why did the TWA

4    pilots, 1400 of them, get laid off.  The short answer is

5    this.  They lost their seniority.  Now, that might not be a

6    big deal to most of us but to a pilot, seniority is

7    everything.  It controls every important thing in their

8    career, their rank, their pay, the routes they fly, the

9    equipment they fly, the base they fly out of.  It controls

10   everything.

11        Like I said, in  American's purchase of TWA, more

12   than half the TWA pilots lost all their seniority.  Let me

13   explain how that happened.  Okay?  At every airline there is

14   a seniority list.  It is basically just a roster of the

15   pilots from the most senior pilot do you know to the most Jr.

16   and they are plugged in on when they were hired.  That is the

17   seniority list.  When an airline acquires another airline, in

18   this case it was American, they had a seniority list.  They

19   had 11,000 pilots at America, American Airlines.  11,000

20   pilots.  They had a list from one to 11,000.  Over here you

21   had TWA, right.  2,400 pilots.  And they had a list.  When

22   there is an airline merger somehow you got to combine these

23   two lists, somehow you got to do that.

24        Well, what happened here is that 1,200, more than

25   half, actually, of the TWA pilots got put right to the bottom

1   of the list.  Ted Case, for example.  15,000 flying hours.  I

2   for got how long you have been there, Ted.  But, 13 years.

3   13 year captain, at TWA.  15,000 flying hours.  He got put on

4   the bottom of this list behind people, pilots at America who

5   hadn't even flown yet, that were in probationary status and

6   training.  Ted Case was put behind them.  And 1,200 of his

7   brother's.  Okay.  So that is more than half.

8          And the other 1100, about, they got slotted on the

9   American seniority list.  They got slotted, the beginning,

10  being at the bottom, here, here, here, and that slotting was

11  done on a formula, eight to one.  So they are put, TWA pilot

12  here, eight American pilots, another TWA pilot, American

13  pilot, and on and on, at the end of the days there is Captain

14  Upp, you will hear about.  He was the most senior TWA pilot

15  at the time, it was a 1962 hire.  He was placed on this list

16  with 86 hires of American.  The most senior TWA pilot is

17  placed here.  23 year loss of seniority he suffered, and it

18  was like that all the way down to the bottom and of course

19  you had 1,200 stuck to the bottom lost all their seniority

20  completely.

21          The evidence will show this was grossly unfair to

22  TWA pilots.  I don't suspect you will hear ALPA say otherwise

23  in this courtroom.  Nobody disagrees that this was a grossly

24  unfair treatment of the TWA pilots.  So I guess the question

25  that maybe was in your mind is why were the TWA pilots

1   treated that way?  And the answer to that question, ladies

2   and gentlemen, is why we are here.  That is why we are here.

3   It was Al pass job, it was the TWA pilots unions job to

4   protected their seniority.  That was their job.  We think the

5   evidence in this courtroom will show that they failed on that

6   job.  Indeed, the evidence is going to show that ALPA did

7   almost nothing to protect the TWA pilots seniority.

8           The largest and most powerful airline in the world

9   with more than 60,000 members was faced off in its seniority

10  fight with a 11,000 member pilot member group and did

11  nothing.  Our clients expected a fight but they didn't get

12  one.  They got no fight.

13          And what resulted was the unfair seniority

14  integration that I put up here and told you about.

15          Now, this didn't happen all in one day.  It was a

16  long process.  I should back up.  These seniority issues and

17  airline mergers, there is a process that almost always

18  involves a negotiation between the two pilot groups.  In this

19  case you are going to hear that the TWA pilots appointed a

20  committee to negotiate, the American pilots had their own and

21  these two groups, the committees get together and talk about

22  how we are going to do this but it is always contentious.  We

23  are talking about job loss, these are things pilots hold dear

24  and they don't want to give it up.  There is a fight.  It is

25  a contentious issue always.  Our pilots, the TWA pilots,

1    expected a fight.  Like I said this didn't happen in one day,

2    it is not like American bought TWA and the next day made this

3    seniority integration.  This was a process that drug out more

4    than 13 months.  And in that 14, 13-month process, ALPA had

5    one opportunity after another to put up a fight, to flex its

6    might and protect its TWA pilots.  But it failed at every

7    opportunity.  You are going to hear about those

8    opportunities.

9            Now, it is not just me, as a lawyer standing up

10   here telling you these things.  You will hear this from

11   witnesses, from TWA pilots who will come here and sit in that

12   chair and tell you what happened.  They will tell you what

13   they did, what they asked their union to do and what the

14   union failed to do to protect them.

15           What happened was the TWA pilots, this committee

16   that was formed to negotiate, they were unable on their own

17   to convince the American pilots to treat them fairly.  All

18   right.  The negotiation was not successful.  So what did the

19   TWA pilots, what did any dues paying union member do?  They

20   went to their union and asked for help.  We need help.  We

21   are getting beat up here.  These American pilots are being

22   completely unreasonable and we need help.  Well, they got

23   none.  What they got was lip service and broken promises.

24   That is what you are going to hear.  There were no strikes.

25   None of the aggressive union action that we come to expect,

no strikes, no picketing, no boycotting, no litigating, no
anything.  None of the aggressive tactics from the union that
you would expect.

What you would hear instead is that ALPA simply
allowed the American pilots to impose their will on the TWA
pilots.  And carry out, what everybody will agree was a
grossly unfair integration.  So maybe now you are asking,
okay, Mr. Press, why would a union do that?  It doesn't make
any sense.

And it doesn't.  But there is a reason.  And the
reason is a lust for power.  See, ALPA didn't represent the
11,000 American pilots.  They did at one time.  The American
pilots were founding members of ALPA with TWA and  Northwest,
back in 1931.  But in 1963 the American pilots left ALPA and
formed their own company union.  In 1963 they left ALPA.
Now, in that time ALPA had always wanted those pilots to come
back, and in the year 2000 it looked like that might happen.

In the year 2000 there was an action at American
for those pilots to rejoin ALPA.  In November, 2000, ALPA's
president, Duane Woerth was invited to speak to the American
boards of directors.  This was the first time since the
American pilots broke away from ALPA that this happened.  He
was invited to speak, November, 2000.  He took advantage of
that, went to Dallas Fort Worth where they are headquartered
and spoke to the board of directors about rejoining ALPA.

1   His speech motivated the American pilots to form a committee

2   to rejoin ALPA.  They called it the ALPA Exploratory

3   Committee.

4           This committee traveled to Washington, D.C. where

5   ALPA is headquartered.  They had meetings, got their

6   information, were doing due diligence.  They flew to Fort

7   Worth, met with American pilots, and this committee was

8   generating some support at American to rejoin ALPA.  Then

9   what happened?  January, 2001, January 9 to be precise, so

10  this has got the meeting with pilots, meeting at Dallas, on

11  this day, three months, two and a half months later, American

12  announced it was buying TWA.

13          So the transaction is here, on that day everybody

14  knew there was going to be a fight between the TWA pilots and

15  the American pilots over seniority.  So the pilot group that

16  American was, that ALPA was courting to join its union in

17  November and December, all of a sudden now they are the bad

18  guy.  They are the adversary.  Well, ALPA, we believe the

19  evidence will show, they didn't want a fight.  They don't

20  want to fight the American pilots.  They wanted them to join

21  them, and this created a conflict of interest in them.  A

22  conflict of interest.  They were conflicted.  On the one hand

23  they know they got to represent the TWA pilots in this fight

24  that is going to be coming up, and on the other hand, they we

25  have these American pilots that we want to join us and we had

1    developed some traction in that regard.

2            And that conflict of interest, ladies and

3    gentlemen, we believe infected the affected the entire 13

4    month process that followed that ultimately resulted in the

5    stapling of 1300 pilots, pilots and the seniority loss I

6    talked about.  This conflict of interest, ALPA had no will to

7    fight.  That is what we think the evidence will show, there

8    was no will there to fight.  They want the American pilots.

9    They don't want to upset them.  They wanted this process over

10   as soon and as, as soon as possible and with as little blood

11   letting as possible.

12           I doubt you will hear an ALPA witness admit we had

13   a conflict of interest, we didn't put up a fight because we

14   wanted the American pilots, we didn't want to upset them.

15   Doesn't think you will hear that.  But we think the evidence

16   will support that conclusion by the time this process is over

17   with you.

18           Now, I want to get into some details as to as to

19   exactly what happened.  Before I do that I need to get into

20   some very complex issues.  This case is going to involve a

21   lot of complexity, and that is why it is going to take as

22   long as we think it might.  And we need to go to labor law

23   school, union school, and there will be some bankruptcy

24   issues to talk about.

25           The first thing, unions have what is called a

1    contract, a contract with the employee group they represent.

2    I mean, with the employer.  It is called a collective

3    bargaining agreement.  And what is that?  That is, it is like

4    an employment contract but it is for all the people in this

5    group.  The TWA pilots had a collective bargaining agreement

6    with TWA.  It was actually because ALPA is the bargaining

7    representative, it is their contract.

8              Wait.  I didn't want to talk about this so soon.

9              As part of this acquisition, I told you that

10   American bought TWA.  One of the conditions of the sale was

11   that TWA go into bankruptcy.  All right.  American required

12   TWA to go into bankruptcy.  That seemed weird.  Why would

13   they do that.  There was a very good strategic reason for it.

14   That was this.  When you go into bankruptcy court you can ask

15   the bankruptcy judge to eliminate the contracts that aren't

16   so profitable for you or they are losers.  You can ask the

17   bankruptcy court to eliminate them.  They are gone.  TWA had

18   one very bad contract.

19             You may have heard of Carl Icahn.  He was a

20   corporate raider.  At one point he owned TWA, and in, as part

21   of getting him out, because he just ruined the airline, or

22   almost did, he had  ticketing arrangement where he could buy

23   a ticket from TWA basically half price and sell them for

24   whatever he wanted, or he could get.  It was called, Karabu

25   ticket practice.  Well, this ticket practice was a burden on

1    TWA.    Mr. Icahn was able to under cut them in the market.

2    So when American bought TWA, one of the principle drivers for

3    going into bankruptcy was to get rid of this terrible Karabu

4    ticket program.   The sale contract between American and TWA

5    required TWA to go into bankruptcy.   TWA was not a bankruptcy

6    a airline.   This was a condition of the asset purchase.

7    Okay.   I expect you are going to hear ALPA witnesses and ALPA

8    lawyers try to exploit this bankruptcy and try to convince

9    you that Mr. Case and all my clients and all the TWA pilots

10   had no options, that they were all going to lose their jobs

11   if it wasn't for him.   Don't believe it.   Remember what the

12   evidence is going to show you.   Bankruptcy was a condition of

13   the sale.   And it was done for American's own strategic

14   reasons, not because TWA was going out of business.   Okay.

15   And your going to hear from two members of TWA's, board of

16   directors, the board of directors who will testify one live

17   and one by video, that TWA was viable.   They were not going

18   out of business

19          So remember when you hear the argument from the

20   other side.

21          Get goes back to the collective bargaining

22   agreement, there was another condition that American imposed

23   on TWA in order to conduct the sale or to carry out the sale

24   rather.   That condition was that TWA had to remove from its

25   collective bargaining agreements certain provisions.   All

1    right.   TWA had collective bargaining agreements with its

2    pilots, with its flight attendance, with its mechanics, with

3    all the unionized employees, and there were certain

4    provisions in those contracts  that American did not want to

5    accept.

6              And this gets really complex, okay.  But I will try

7    to explain as best I can.  The witnesses will do a much

8    better job I am sure.  I want to give you a little flavor for

9    what some of these concepts are.  The collective bargaining

10   agreement had this, what is called scope language in it.

11   Scope.  You are going to hear that over and over again.  What

12   that's what does that mean, scope?  Well, it means a couple

13   of things.

14             In this context it means protections for the

15   employees, protection for the employees in the event there is

16   an airline merger.  Historically, when two airlines merge,

17   had merged in the past, there was a process for the seniority

18   negotiations to occur.  There was an agreed process, that

19   almost every merger that followed that process and here was

20   that process.  First the two sides get together and

21   negotiate.  Negotiate first, try to work out a deal, right?

22             If you can't do that, that is one.  Then we go to

23   what is called mediation.  What is mediation?  Mediation is

24   basically facilitated settlement talks, negotiations, with

25   the mediator doesn't have any real power but he or she is

1    there kind of a referee, gets the sides to soften up and try

2    to help the parties settle.  That is mediation.

3          And if there couldn't be a seniority settlement

4    through mediation, the third step was arbitration.  And what

5    is that?  Arbitration is a binding proceeding where the

6    arbitrator sits as the Judge and the jury, and makes the

7    decision, on how the two pilot groups were being  merged, the

8    seniority lists were being merged.  So the scope in the

9    pilots collective bargaining agreement, it had all this in

10   there.  It said TWA, if you merge with another airline, this

11   is what is going to happen when we go to work out the

12   seniority dispute with the other side.  We are going to go to

13   negotiation, if that fails we will mediate.  If that fails,

14   we will arbitrate, this was the gold standard for many, many

15   years, on how the process to merge the seniority lists would

16   occur.

17         This was ALPA's policy for many, many years.  And

18   this was part of the TWA pilots collective bargaining

19   agreement.

20         American said TWA, you got to get rid of that.  We

21   are not going to buy TWA unless you remove these provisions

22   from your collective bargaining agreement with your

23   employees, including the pilots.

24         Now, that was something that the TWA pilots were

25   not real fond to do.  When they were asked to remove this

stuff from their contract they said no.  We are not doing

that.  That was the first time that they really needed a

fight.  But they refused.  And so what did TWA do?  They

filed a motion in the bankruptcy court.  Remember, they went

into bankruptcy because American wanted to, and while they

were there, first TWA asked the pilots to waive scope, that

is what they want to do.  Waive scope.  You got to waive

these provisions of the contract.  You got to waive your

scope.

        TWA pilots said no, so TWA responded with a motion

in the bankruptcy court.  Under a special bankruptcy law that

is referred to as Section 1113, which is just a section in

the Bankruptcy Code.  Section 1113.

        I am telling you, this stuff is complex but you are

going to hear this over and over again.  Section 1113 is the

law in the Bankruptcy Code that allows a bankruptcy Judge to

eliminate a contract.  That is the section under, if certain

conditions are met, certain standards are met, the Judge can

eliminate a contract.  So TWA, when the pilots wouldn't waive

their scope, they filed a motion, just get rid of the

collective bargaining agreement.  They filed a motion to

eliminate the collective bargaining agreement in its

entirety, which was again, a very unsettling thing.  That

motion was set to be heard, it was filed March 15, remember,

the contract, the contract for the purchase contract was

```
 1   January 9, just a little two months later we have got this

 2   motion filed, this thing is moving at warp speed, you are

 3   going to hear that airline mergers, this stuff takes forever,

 4   not in this case, though, it is moving very quickly.

 5          March 15, the motion is filed.  The bankruptcy

 6   court set it for what was going to be a hearing where the

 7   parties go to the bankruptcy Judge and argue their positions,

 8   that was going to be on April 6.  All right.

 9          Now, in the week leading up to this hearing, this

10   hearing, you know, TWA will get up and argue why the

11   collective bargaining agreement should be eliminated at and

12   the pilots, there are lawyers will stand up and say why it

13   shouldn't be.  That is what would happen here.  There are

14   briefs filed before this, and, any way, in the week leading

15   up to this, the two weeks leading up to this, three very

16   important things happened that basically almost completely

17   cut the legs out of the TWA pilots and their chances at

18   having anything good happen for them H three separate things

19   that you are going to hear lots of evidence about.

20          The first was in March.  The end of March.  March

21   28, to be precise.  There were meetings down in Dallas

22   between the two pilot commit teas that were negotiating the

23   seniority, remember, I told you the TWA pilots set up an

24   committee to do that and the American pilots did as well.

25   Those committees have met.  They had initial meetings in
```

1   February where all they did was exchange their seniority

2   lists and then in March, March first a real proposal had been

3   made by each group.  March 1, I should tell you what that

4   was.  The TWA pilots, their proposal was, all right.  Slot us

5   in to your seniority list based upon when we got hired.

6          So Ted Case, 1989 hire, put him on the American

7   seniority list with 89 hires, at American.  All right.  And

8   that would be done for everybody.  There was some other kind

9   of  twists, caveats to the proposal, but that is what it was.

10  Give everybody their date of hire.  Which you are going to

11  hear, that is the gold standard on how to merge a seniority

12  list.

13         The American pilots didn't think so much about

14  that.  They proposed at that time to staple two thirds of the

15  TWA pilot list to the bottom.  When I say staple, that means

16  you got the American list here, the you take the TWA pilot

17  list and put it right on the bottom.  They wanted to do two

18  thirds of the list, not the whole list.  That was the

19  American proposal, which the TWA pilots didn't think too much

20  of and there was no agreement reached on March first but

21  there were follow-up meetings arranged forth end of the

22  month, March 28.  At that meeting.

23         The American pilots did not submit a counter offer,

24  and the TWA pilot negotiating committee went back to their

25  hotel at night and they were confronted there by several

1   officials from the national union.  Several officials from

2   ALPA had flown in uninvited and met with the TWA pilots at

3   their hotel that evening.  At this meeting, these ALPA

4   officials say you got to get the deal done.  You have got to

5   get a deal done and you got to do it now and to get a deal

6   done, you offer to staple more than 800 TWA pilots.  This is

7   the union telling the TWA pilots you have got to surrender

8   800 of your guys.

9           Now, this was alarming to the TWA pilots

10  negotiator.  You are going to hear from at at least two of

11  them.  This was very troubling.  First of all it looked like

12  ALPA had inside information they didn't have on what would

13  get a deal done, but more alarming is the notion that you

14  would sacrifice so many of your brethren without even

15  fighting  for it.  We just started, March first, and here

16  they they are coming in saying you got to give up a third of

17  your pilots.  So this was troubling.  But it was said with

18  enough force that these TWA pilots, they did bend a little

19  bit to this coercion and the next morning they offered up,

20  March 29, came back for follow-up meetings with the American

21  guys and they offered to staple 40034 pilots.  There will be

22  some testimony how that number was arrived at, but the TWA

23  pilots didn't want to do that, and they will testify they

24  only did it because ALPA told them to.

25           Now, the American pilots, remember, you got to get

a deal done, they didn't encounter this.  So right off the
bat you have TWA pilots making huge concessions to the other
side.  Unnecessarily.  And you will hear from the negotiate
tours who made this, that this was a terrible mistake.  We
should have never done this.  It put us behind the eight
ball.  We were already back peddling before they even made a
move and it was a mistake.

          The other thing, remember I told you there was,
leading up to this 1113 here there was three really big
things that happened.  This was the first.  ALPA coming down
telling TWA pilots you got to staple 800.  Second one, right
on the heels of that, involves a lawyer that, his name is
Roland Wilder.  Roland Wilder is a labor lawyer.  And he was
hired by the TWA pilots to help them get through this
process.  Okay.  He has got over forty years experience in
dealing with these issues, and he took his video deposition.
He lives in Washington so we couldn't make him come up here
and testimony but we took his deposition and you will see it.
One of the the things he will tell you is that he came up a
with a plan in late March to create some leverage for the TWA
pilots.

          What he wanted to do is slow this process down.  He
wanted to slow it down.  How did he want to do that?  He
wanted to go to court and get an injunction holding up
American's purchase of TWA.  He thought that would create

1   pressure on American to put its foot on the American pilots,

2   on their pilots to soften up.

3          I will tell you in labor negotiation, slowing down

4   the process is almost always a good thing, just creating more

5   time creates leverage.  So he wanted to go to court, and he

6   will describe his strategy for you, but he wanted to get this

7   injunction.  And what good he do what did he do?  On March

8   26, I should back up.  The TWA pilots can't rush into court

9   and litigate their collective bargaining agreement.  It is

10  ALPA's contract.  They are the only ones that can enforce it.

11  ALPA, the union, has to bring the litigation.  So Mr. Wilder

12  knows this.

13         So what does he do?  He writes a letter to the

14  president of the union, Duane Woerth, on March 26, and he

15  says, President Woerth, here is the strategy I have, he cited

16  case law and everything in this letter, you will see it, he

17  said this is the strategy I want to employ.  I want to get

18  this injunction.  Please authorize me to do that.  He asked

19  for authority to file the lawsuit.  What does he get?  He

20  gets no response at all.  The president just completely

21  ignores him.  So his plea for help goes unanswered.  March

22  28, you got to staple 800.  March 26, that letter goes

23  unresponded to, not going to file that lawsuit.

24         Then just a few days later on April 2, is the third

25  event that you are going to hear a lot of evidence about.  On

1    April 2 there was a meeting of the two pilot leaders to talk

2    about the hearing.  Remember April 6 I told you there is go

3    fog be a hearing on the bankruptcy motion to get rid of the

4    contract.  On April 2 there was a meeting to talk about that.

5    I called them pilot leaders.  Let me tell you what they were

6    called.  Another acronym.  MEC.

7         ALPA has a structure.  Here is ALPA.  Then you got,

8    all these different airlines united.  Delta.  Northwest.

9    TWA, U.S. Air.  They were all represented by ALPA.  All these

10   different pilot groups nominate leaders to make decisions for

11   them, some decisions.  They can't make every decision, but

12   some they can.  And these pilot leaders that, that are

13   elected by the pilot group, it is called the master executive

14   counsel master executive council.  MEC.  Another acronym for

15   you.  Every pilot group for you, MEC.  MEC to help them out.

16   The TWA pilots had a MEC.

17        Mr. Case was part of that for a while.  You are

18   going to hear from other members of the MEC who will come in

19   and testify.  The names that the Judge read off to you, Sally

20   Young, Howard Hollander, these are two MEC members.  Anyway,

21   get go back April 2.  There is a meeting of the MEC on that

22   date.  To vote on how we are going to confront this

23   bankruptcy motion.  MEC meeting.

24        At this meeting a parade of ALPA officials and

25   lawyers confronted the MEC members.  There were six voting

1    members, by the way.  And the meeting was in St. Louis where,

2    by the way, that is where TWA was headquartered.  And if you

3    remember I told you I was from St. Louis and my partner, Joe,

4    is from St. Louis.  That is our connection to this lawsuit so

5    you understand.

6         The meeting is in St. Louis on April 2 with the MEC

7    and in come a group of seven ALPA lawyers and officials who

8    come down and say, ladies and gentlemen, you have to give up,

9    there is nothing for you -- there is no fight here.  If you

10   fight, you will all lose your jobs.  If you fight, American

11   is going to abandon this transaction.  TWA will liquidate and

12   you will cause job loss of 20,000 plus TWA employees.  That

13   is what will happen if you fight.  Now, leading up to this

14   meeting the MEC, I mean their strategy was we are going to

15   fight.  We are going to resist this motion.  We are not going

16   to give in.  We will do whatever it takes.

17        But on April 2 it all changed.  ALPA comes down and

18   says you are not fighting.  You are giving up.  It is time to

19   quit.  Well, we barely started.  Hey, come on, we are only

20   three months into this.  But that is what they said.  And

21   their sales pitch worked.  The MEC voted to give up the scope

22   that I talked about.  Give up the senior, the seniority

23   protections that they had in their contract, they voted to

24   give it up.  And in response TWA withdrew their motion to get

25   rid of the contract.  And here we go.  But that stripped the

 1    TWA pilots of probably their best leverage, you will hear.

 2    Giving up their scope protections was a huge decision.  And

 3    doing it was not done lightly.  But it was done, and you are

 4    going to hear from at least one MEC member who is going to

 5    testify it was a mistake.  Shouldn't have done it.  We should

 6    not have done it.  Why did we do it, because we were told to

 7    buy our union.  And they were told to again under this threat

 8    of, if you don't, you are going to cause job loss, the whole

 9    airline is going to shut down if you don't do this.

10          Now, at this MEC meeting there is going to be quite

11    a bit of testimony about it.  There is going to be testimony

12    about what was said, what wasn't said.  ALPA advisors --

13    well, the MEC members will testify that they came to learn

14    after the meeting that some of the things that were told them

15    that day weren't quite true.  Everything wasn't said just

16    right.  We don't need to call them liars or anything, but

17    there was misinformation given by the ALPA officials and ALPA

18    lawyers.  There will be a lot of testimony about that.  I

19    just want to give you one exam will, just one example.  At

20    this meeting pilots like Ted Case, he was there, they asked

21    the ALPA lawyers, well, if the Court eliminates our contract,

22    what happens?

23          You know, if we keep fighting this motion and we

24    lose and the Court takes our contract away, do we have the

25    right to strike?  Seems like a logical question for a union

1    member to ask.  Will we have the right to strike?  And the

2    answer given by the ALPA lawyers was, I am not so sure about

3    that.  Probably not.  That is what was told the MEC.

4    Probably not.  But that is not what those same lawyers told

5    the bankruptcy Judge two days earlier.  Remember the meeting

6    was April 2.  March 30, that was a Monday.  March 31, the

7    last business day before this meeting, ALPA filed a 28 page

8    brief in the bankruptcy court telling that bankruptcy Judge

9    all the reasons why you can't take away the TWA pilots

10   contract.

11           28-page brief.  And in that brief they told the

12   Judge the right to strike, if you grant this motion, the

13   right to strike is clear.  The TWA pilots will have a clear

14   right to strike.  That is what the lawyers told the Judge.

15   That was lawyers have a duty to tell the truth.  That is not

16   what they told my client three days later.  No, you don't

17   have a right to strike.  That was just one little, you know,

18   about it of misinformation, we believe, and it was very

19   important to the voting members of the MEC.  Having the right

20   to strike would have been something, a powerful economic

21   weapon in their arsenal.  All right.

22           So in a matter of one week I you have ALPA

23   officials coerce the negotiators to offer up 800 TWA pilots

24   to a staple.  And you have two other huge concessions.  You

25   have Roland Wilder ignored, the lawyer, who wants to file the

1   a suit, he is ignored.  Then they come down and tell the

2   member you got to give up, you got to surrender.  This all

3   happened in one week, ladies and gentlemen.  The route was

4   on.  The route, American airline pilots route of the TWA

5   pilots, it was on.  And for his part, the president of ALPA,

6   Duane Woerth, he used this to solidify his standing with the

7   American pilots.

8          Remember I told you in November of 2000 he had been

9   down there to speak with them and try to get them to join

10  ALPA.  Three days after there, April 5, President Woerth   is

11  back in front of the American pilots.  He gets invited for a

12  second appearance.  On April 5.  What does he do.  He goes

13  down there to Dallas and he tells the American pilots, my

14  guys need to get rid.  The two day, the TWA pilots have

15  unrealistic expectationS IN their seniority negotiations and

16  they need to, quote, get real.  Thinks the president of the

17  union going down telling the adversary those words.  Is that

18  the way a union boss talks?  We don't think so.  That is what

19  the evidence is going to show.

20         Mr. Case has informed me I have been going 45

21  minutes.  At this point I told him to do that so, because I

22  would like to take a little stretch break.  If everybody

23  wants to stand up, whatever you all want to do.

24         THE COURT:  We will take a 10-minute break to let

25  the jury stretch, relax, and then we will bring them back in

```
 1    10 minutes, and resume with your opening statement.

 2                MR. PRESS:  Thank you, your Honor.

 3                (Jury leaves the courtroom).

 4                (Recess)

 5                (Jury enters the courtroom.)

 6                THE COURT:  Mr. Press, you may continue.

 7                MR. PRESS:  Thank you, Judge.

 8                Before I plow on, hopefully it will be the last

 9    break we take while I am speaking.  I said hopefully,

10    remember.

11                Before I go on with the chronology I of things I

12    want to take a step backwards.  Remember at the meeting I

13    told but the right to strike and how they put in their brief

14    that they filed with the Court that the right to strike was

15    clear and three days later they come and tell the MEC, the

16    pilots leaders, that no, you probably don't have a right to

17    strike.

18                Remember, I told you about that.  Six months later

19    ALPA is filing a motion in the bankruptcy court to get their

20    legal fees paid, over $700,000 in legal fees.  And in that

21    motion they say, Judge, you should award us all in this money

22    because we averted a strike.  We got the MEC to capitulate

23    and we avoided a strike.  Just another odd little wrinkle in

24    this case and you are going to hear lots of them.

25                Moving forward you have the president of the union,
```

1    down in front of the American pilots saying my guys need to

2    get real.  Word of that comment got out quickly.  To the TWA

3    pilots.  And they were not too happy to hear that their

4    president had said words that would just clearly embolden the

5    other side, and they were upset.  They called President

6    Woerth to a meeting of the MEC.  On April 23.  He flew in to

7    St. Louis and they, and there was a meet.

8              President Woerth was confronted about his comment,

9    his get real excellent.  He didn't really deny it.  He didn't

10   admit it.  What he did was just kind of dance around it.  Ted

11   Case was at that meeting.  And he was, he will testify that

12   he was upset about where the TWA pilots were at this

13   position.  They had given up their best leverage, the

14   negotiations were not going well with the American pilots,

15   and he was upset with his union and he pressed Captain

16   Woerth, President Woerth, for a commitment.  He pressed him

17   for a commitment to use the full resources of the union, and

18   to bring any litigation that would be necessary and

19   appropriate.  He pressed the president before that

20   commitment, and President Woerth gave it.  It was lip

21   service.

22             You are going to hear two more litigations that

23   were come up with that were not authorized.  But

24   face-to-face, that that is what the president told the

25   pilots, the TWA pilots.  He assured them appropriate

1   litigation would be pursued and quote, "any stone would be

2   overturned."

3         Now, the following five months after this saw a

4   whole series of negotiations between the two pilot groups  a

5   negotiating with seniority.  Okay, from the summer of 2001

6   there was a whole series of negotiations and meetings.  The

7   TWA negotiators made a comprehensive proposal to American.

8   They backed off this date of hire, date of hire concept and

9   proposed a seniority integration that they believed would

10  protect everybody's career.  This were given a name for that.

11  Right annual place proposal.  You will see it.  It is a very

12  extensive document.  That proposal was made in June of 2001,

13  and unfortunately, it was not accepted, and the American

14  pilots never really got off their position that two thirds of

15  the TWA pilots had to be put in the bottom.  They never

16  softened.

17        So what were the, what do the pilots do?  Again

18  they go to their union and ask for help.  The head of this

19  negotiating committee was a TWA captain, very senior pilot,

20  named Mike Day.

21        And he will testify what he did.  He went to ALPA's

22  executive counsel.  On June 23, that is a group of executives

23  sitting in a conference room and making decisions.  Captain

24  Day went in front of that board on on July 23 and asked for

25  help.  He explained exactly what was going on at the time.

1    He was getting beat up.  He was not getting American to

2    soften their position.  And he wanted help from his union.

3         He asked for two things at this meeting that

4    wouldn't have cost ALPA a nickel to provide.  But in  Captain

5    Day's opinion, either one of them or both of them together

6    would have provided much needed leverage that he needed in

7    negotiating, because he didn't have any.  All he had and he

8    will tell you was his power of persuasion and his good looks.

9    That didn't go very far.  He needed help.  So he went to the

10   executive counsel on this day and asked for help.  Again, two

11   things.  One thing, he wanted to threaten a jump seat war.

12   Jump seat.  Well, what is that all about?  Sounds

13   interesting.  Here is what his strategy was.

14        In every airplane there is at least one extra seat

15   in the cockpit.  It is called a jump seat.  And the captain

16   of that plane, he has a privilege to allow anybody, well,

17   before 9-11 he had the privilege to allow anybody to sit

18   there that he wanted, that he or she wanted.  The captain on

19   could let anybody they wanted to sit in the jump seat.  Okay.

20   So here is how this is important.

21        Many, many pilots don't live where they are based.

22   Like Ted's case, he lives in Atlanta and he flies out of St.

23   Louis.  He has to get to work.  Getting to work for him means

24   flying to Saint Louis.  This is a common in the piloting

25   industry.  Pilots commute to work and they take planes to get

1    there.  Many of them.  And so there was reciprocal agreements

2    American's all the major airlines that the captains for every

3    airline would let captains from other, or pilots from other

4    airlines fly in their jump seat in they needed to get to

5    work.  What you do is you show up at the airport like Ted

6    would show up at the airport in Atlanta, go to the Delta

7    counter, find the next Delta flight going to Saint Louis and

8    talk to the capital and the captain would say can I sit in

9    your jump seat.  That is how it happened.  The captain says

10   sure.  It was that easy.

11          American pilots were flying Delta, planes to work.

12   TWA planes to work, United planes to work, U.S. airplanes to

13   work.  They were using ALPA jump seats to get to work.  He

14   wanted to stop that.  He wanted, Captain Day wanted ALPA to

15   organize a jump seat, suspend those privileges for American

16   pilots on every flight.  If an American pilot shows you up,

17   you can't use it.  Delta captain, can't use my jump seat.

18   U.S. Air capital, American pilot shows up, no, you can't sit

19   in my jump seat.  This is what he wanted to do.  What would

20   that have done.  Let take Ted.  He shows up at the Delta

21   counter.  He wants a jump seat to St. Louis.  The captain

22   says no.  What does he have to do, he has to buy a ticket?

23   There is no other ticket.  He has got to get to work.

24          So Captain Day thought that this would provide some

25   much needed leverage.  Imagine if one day all of a sudden

```
1    American pilots across the country can't get to work unless

2    they buy their own tickets.  There is going to be an uproar.

3    And it was Captain Day's opinion that just threatening a jump

4    seat war, just threatening it, would have created some

5    leverage and very quickly.  And he asked for permission to do

6    that.  He said ALPA, please organize it.  Get the word out to

7    all of your members, all 60,000 of them, and tell them to

8    stop letting American pilots jump seat, use your jump seat.

9    Well, what did the executive council do?  No.  We are not

10   going to do that without giving any reason.  We are just, no,

11   we are not going to do that.  Okay.  Well, so then you got,

12   he had another idea.

13          ALPA is part of something bigger.  You have heard

14   of the AFL-CIO.  American Federation of Labor.  ALPA was a

15   member.  This organization represents ten million people or

16   more.  Every major union in the country is a member,

17   affiliated member, and ALPA was.  The American pilots union

18   was not.  ALPA was the piloting union representative of the

19   AFL-CIO.  What Captain Day wanted to do, again, the AFL-CIO

20   maintained a boycott list.  He said these, here is a list of

21   companies that you should not do business with.  They are

22   unfair to labor, and you shouldn't do business with them.

23   And there is literally a list of companies, and it could be

24   anything.  And they published that list to all their members,

25   that don't do business with these people.  And this boycott
```

1    is designed to create some leverage.  To soften up the

2    company.  What Captain Day wanted to do, he wanted ALPA to go

3    to the AFL-CIO and say hey, put American Airlines on your

4    boycott list.  Okay.  Put American Airlines on that list.

5    Again, doesn't cost a nickel.  ALPA said.  What did they say

6    on July 23, no, not doing that either.  Can't have the jump

7    seat water war, we are not doing that.  We are not going to

8    put American on the boycott list.  Mike Day, he is a pilot.

9    He is not an expert in these matters.  These are two things

10   he thought of.  Okay, do you have any ideas?  No, no, there

11   was no ideas.  The experts, the biggest pilot union in the

12   world, had nothing to offer.

13           Why would a union take such simple actions.  They

14   don't cost anything.  It go back to the conflict of interest.

15   They didn't have the stomach to fight.  They wanted it over

16   as quickly and painlessly as possible.  Sadly there is a

17   whole lot more, there is no way I could cover anything in

18   this short talk up here.

19           And while at the same time Captain Day is in front

20   of the executive counsel the pilots lawyer, Mr. Wilder, he

21   comes up with another strategy, another litigation he wants

22   to file.  He is a lawyer.  That is what he wants to do.  And

23   he comes up with the strategy and he, to sue American and sue

24   the American airline pilots.  I won't get into his theory.

25   I will let him describe it.  He will do a much better job.

1          He wants to suit the American, and the American

2     Airlines pilots.  He drafted a detailed memo and sent it to

3     ALPA for their review like he did in March.  This is July, I

4     think it is July 2 he wrote this memo and sent it up.  He

5     asked for permission to file the lawsuit he wanted to file.

6     Again as we saw in March, he is rebuffed.  He is not given

7     permission.  You got Captain Day asking for help, you got the

8     lawyer for permission to file lawsuits and again the union is

9     simply saying no.

10          So what happened?  Well, without any leverage, the

11     TWA pilots were left to basically, they were at the whim of

12     the American pilots.  And so what happened was the American

13     pilots entered into a side agreement with American Airlines

14     on how the integration is going to work.  They did it on

15     their own.  And they planned to simply foist that agreement

16     on to the TWA pilots.

17          You are going to hear the TWA pilots calmed it the

18     cram down because they, it is just being crammed down their

19     throats.  That was the seniority integration.  Now, here we

20     have Mr. Wilder injecting  himself again with another

21     strategy.  He wanted to stop the cram-down from happening.

22          Now we are into September.  I don't remember the

23     date.  Mr. Wilder comes up with another strategy.  He want to

24     stop the cram down, wants to go to court and get an

25     injunction.  An injunction is an order from the Court saying

```
1   you can't do that.  Mr. Wilder wanted to go to court and get

2   an injunction saying American, and their union, you can't

3   enter into this cram down agreement.  You can't do it.

4   Again, he draft a very detailed memo and submits it up to the

5   ALPA lawyers for their review and asks for permission to file

6   the suit.  A meeting followed.  In Washington, ALPA's

7   headquarters.  Mr. Wilder met with the president of the

8   union.  This time he gets a different response.  The

9   president says, okay.  When the time comes, and this cram

10  down is imminent, when the time comes you can file that.  You

11  can seek your injunction, Mr. Wilder.  Oh, good.  And that

12  was the plan.  If the TWA pilots couldn't negotiate an

13  agreement, they would seek this injunction if they had to.

14          Well, the day came on October 23, the day came to

15  file the injunction, that is, 10, 23.  There is a series of

16  meetings in Washington, D.C.  between the two pilot

17  negotiating committees in Washington on October -- it began a

18  few days before that.  They broke down on October 23 and a

19  final impasse was reached.  American pilots are saying we

20  need to staple 1200  of your guys, TWA is saying no, we are

21  not doing that, and there was an impasse.  The time has come

22  to seek this injunction.  So the pilots, the whole MEC was

23  there, Mr. Case was there, they called the president and said

24  okay, it is time.  And what did he do?  He reneged.  He had

25  committed to file this lawsuit.  Before, in September.  But
```

1    when the time same, remember he said when the time comes we

2    will do it.  The time was at hand and he reneged on his

3    promise and said we are not doing that.  The pilots said,

4    well, why?  The answer, "I don't sue other unions."

5             What kind of reason is that?  "I don't sue other

6    unions."  The evidence is going to be, first of all, it is

7    not a truthful statement, they do sue units, but that was the

8    reason given.  So the injunction can't get filed.  Again,

9    ALPA has to authorize this.  The pilots can't do it on their

10   own.  And so even that isn't the end.  The TWA pilots have at

11   least one more card in their hand and this gets to an

12   entirely different subject.  The pilots, they know this is

13   not going well and so they came up with an idea of hey, let's

14   go to Congress and get some help there.  Let's get a law

15   passed that might help us.  And they did that.  They drafted

16   their own law, and the sponsor of this bill was a senator

17   from Missouri named Kit Bond who recently retired from the

18   Senate and they approached Senator Bond, Ted Case and another

19   pilot named Matt Comlish will tell you about.  They went so

20   Senator Bond and said we need you your help.  The senator

21   said go draft a bill, bring it back and I will get it and I

22   will sponsor it if it is appropriate, so they did.  With the

23   help of their lawyer, Roland Wilder, they drafted this bill.

24   It got to be called the Bond bill.

25            And this bill, what it would have done was remember

those scope protections I talked about that got waived, the
negotiation, mediation, arbitration, that would have been the
law of the land for this transaction.  Congress, this bill
would have said American airline pilots, you have to follow
this procedure.  You can't do your own cram-down.  There is
going to be a fair process for this integration.  That is
what the Bond bill is designed to do.  Kit Bond, Senator
Bond, did approve it and he did sponsor it, and that was in
very early October.  And the thing had legs, lo and behold.
There was a massive, I don't know, maybe not massive, there
was a significant grass roots lobbying efforts by TWA pilots
and TWA flight attendants.  They went on Capitol Hill, talked
to senators, talked  to staffers, talked to Congress people,
and this bill had some legs.  It got through the Senate.
Okay.  And it got attached to a defense appropriation bill.

        Now, what is important about all of this Bond bill
stuff is the fact that ALPA didn't do anything of substance
to help get it passed.  And ultimately the bill did fail.  It
got through the Senate but it didn't get through the Congress
and it failed.  ALPA touts as one of the mighty swords, its
connections on Capitol Hill.  It was a whole department
devoted to lobbying, a whole group of lobbyists.  One of that
was employed by the TWA pilots in support of this bill.  That
is what our evidence will show.

        We can't sit here and tell you the bill would pass

1  if ALPA had got even behind it appropriately but we can tell

2  you that is what the TWA pilots expected, that is what ALPA

3  has done in the past to help pilots in trouble and it didn't

4  happen here.

5          The only tangible evidence of any support for this

6  bill that at least I am aware of today was a letter that

7  President Woerth wrote to Kit Bond, again, Senator Bond was

8  the sponsor of the bill and the president writes a letter

9  saying we support that.  That is not support.  Writing to the

10  Senator or the Congress men that sponsors a bill and saying

11  hey, we like that, that is meaningless.  You need to write

12  and go talk to those politicians that maybe aren't in favor

13  of on it.  That is what lobbying is about.  That didn't

14  happen here.

15          So the bill finally gets defeated in December, and

16  we turn into the dark winter, and in January, and February,

17  there is an effort amongst some TWA pilots, Ted Case again

18  being $1 of them, to say, hey, we got to put up a legal

19  challenge to this cram-down, this seniority integration is

20  going to be imposed on us.  We need to go to court and

21  challenge it and he asked for permission to do that from his

22  union and ALPA said no, we are not doing that.  So then the

23  TWA MEC went to ALPA and said, well, you have got this war

24  chest of money called a major contingency fund, and it is

25  tens and tens of millions of and it is used to help pilots

1    groups in trouble, paying for striking and all kinds of

2    activities.  What the TWA pilots asked for said ALPA, you if

3    you are not going to bring this lawsuit, give us some money

4    so we can do that.  Give us that permission.  We want to

5    challenge the seniority integration in court.  We want to do

6    what we can to try to protect out seniority and ALPA said no,

7    we are not going to give you any money.

8           The end, ladies and gentlemen, finally came on

9    April 2, the last date I am going to write, April 2, 2002.

10   That is when TWA was finally integrated into American

11   Airlines for purposes of labor laws, and the American

12   Airlines union then became the bargaining agent for the TWA

13   pilots.  On that day, ALPA no longer represented the TWA

14   pilot, they were not represented represented by the American

15   pilot union.  On that day this cram-down agreement I talked

16   about took effect.  It took effect on that day.  And what

17   happened?  Well, this is after 9-11, and you may recall that

18   9-11 spurned a lot of layoffs and downsizing in the airline

19   industry.  Not a good time for that industry.  And American

20   laid off pilots.  TWA had laid off pilots.  And much of that

21   happened before April 2, 2002.

22          So what happened?  When that cram-down agreement

23   took effect on that day all the American pilots that had are

24   be furloughed, not all, almost all, they got the jobs back

25   and they got replaced on the street by TWA pilots.  Remember

1    I told you that 1,200 TWA pilots had been stapled, war

2    stapled to the bottom of the list.  That is this cram-down

3    agreement.  It took effect on April 2, and everybody on the

4    American pilots that had been laid off, because of 9-11, they

5    got replaced by TWA pilots.  And it got worse from there.

6    There was continuing layoffs in the industry.  And ultimately

7    as I told you, an hour and a half go, 1,400 TWA pilots

8    ultimately lost their jobs.

9           I want to talk some more about this conflict of

10   interest.  In the midst of all the seniority negotiations, in

11   the midst of all of that, remember ALPA had been publicly

12   courting the TWA pilots to before the American TWA deal was

13   announced.

14          But they couldn't do that openly.  Just, it would

15   just be too obvious.  What happened was some American pilots

16   started their own campaign to bring ALPA back to, to elect

17   ALPA as their bargaining agent.  They started their own

18   campaign do to do that.  And you will see that ALPA was

19   heavily involved in that process.  So now their conflict of

20   interest is clear.  And once this campaign to elect them

21   started, there was a fellow named Ron Rindfleisch, who is an

22   ALPA organizer in Washington, D.C..  He was assigned to

23   coordinate with the American pilots and interface with them.

24   You will see he did that.  There was almost daily email

25   between this Mr. Rindfleisch and the two American organizers

1    that were spearheading this campaign, almost daily

2    communication.

3         None of this was disclosed to the TWA pilots.  Not

4    at all.  But it was disclosed to the ALPA leadership.  They

5    were kept aware of step of the way what was going on with

6    this American campaign.  After these two pilots had spent a

7    lot of money trying to organize and join ALPA, they asked to

8    be paid.  They asked ALPA to reimburse them for their

9    expenses.  Now, Mr. Rindfleisch was happy to oblige.  You are

10   going to see repeated promises that he made to those American

11   pilots to pay them their expenses.  And you are going to hear

12   one of those American pilots, a fellow named Mark Hunnibell,

13   you are going to hear him testify that to have received the

14   payment that was promised, to have his expenses repaid by

15   ALPA, would have violated federal labor law.  That is what he

16   said under oath.  This is ALPA.  Apparently doing something

17   that would have violated the law.  But that is what they

18   promised.

19        Right after this promise was made you are going to

20   hear about something else.  This campaign, the nuts and bolts

21   of it, was that they sent what are called authorization cards

22   to every American pilot, and these authorization cards, if

23   enough were returned, that would prompt an election to have

24   ALPA be the agent.  This is how unions get picked.  They are

25   elected initially.  So these cards were sent out.  And they

1   were signed, many of them were signed and returned, saying,

2   yeah, we would be in favor of that.  Now, these cards, again,

3   right after this prompts to pay, there is a meeting in Las

4   Vegas where President Woerth again is there, and this

5   American pilot named John Clark who was collecting these

6   cards, John Clark, he is invited there, and he gives all of

7   those cards to ALPA at this meeting.  He delivers those cards

8   to them.

9           Now, mysteriously, those cards disappeared.  No one

10  can explain what happened to them after that.  ALPA

11  acknowledges they did exist and they acknowledge that they

12  received them in last vague goods.  Now, what is funny, we

13  took John Clark's deposition, he steadfastly denied he

14  delivered the cards.  He testified under oath, I asked him,

15  now, you delivered those cards to ALPA, didn't you?  Oh, no.

16  You will see this.  Why would he do that?  ALPA later

17  admitted to it all.  Why would this American pilot, Clark,

18  say something different?

19          By the way I should mention to you that there is

20  going to be quite a bit of evidence presented to you on

21  televisions.  There are witnesses in this case disbursed

22  throughout the country that we don't have the ability to, the

23  power to subpoena to come here and talk to you life.  So what

24  we did was we took depositions of them under oath and we

25  videotaped them so you can see the witness and here their

 1    words.  And we will be playing several, not the entire thing,

 2    but excerpts from several video depositions, okay.  Just to

 3    give you a warning.

 4          And this John Clark is one of those witnesses.

 5          Now, his campaign, to elect ALPA, didn't

 6    materialize into a successful campaign but it certainly

 7    fueled ALPA's conflict of interest.  We believe, again,

 8    infecting this whole process and explaining to you why this

 9    union didn't behave the way you would expect, why it didn't

10    do what was requested of its members.

11          And that, ladies and gentlemen is what we think the

12    evidence is going to show in a very broad brush.  I know it

13    was, it was broad.  There is going to be a lot more said.  We

14    are going to have a lot more critical things to say about

15    this union than I mentioned here this morning.

16          Before I close, I want to talk a little bit about

17    why this case is going to take as long as it will.  As I

18    showed you, the events played out over a very long period of

19    time, and many of the issues are complex.  We will do our

20    best to make them understandable, but they are complex and,

21    but even though those issues are come flex, I think you will

22    find your decision is an easy one at the end of the day.

23          The end is going to come in a few weeks.  And we

24    understand the imposition this is on your folks and we are

25    going to do our best, our team will do our best to speed

1    things along and get this concluded as quickly as we can.

2    But please, do understand that this is our one shot to get

3    you to see this case through our client's eyes.  We are going

4    to do what we need to do to try to get you to do that.

5           So this is going to take a little time.  Or this

6    will take a lot of time.

7           But again, we are going to do our best to move

8    things along.

9           Another thing I can almost promise you is that you

10   are going to find this hard.  Sitting there every day

11   listening to witnesses testify, watching the video

12   depositions, listening to lawyers, this is not easy.  You are

13   going to find this to be hard work.  And so on behalf of my

14   clients, and on behalf of the class of former TWA pilots, we

15   thank you for the work you are about to begin.

16          That is all.  Thank you.

17          THE COURT:  Mr. Fram, Mr. Katz, do you want a

18   little break to organize.

19          MR. FRAM:  We would appreciate that, your Honor.

20          THE COURT:  We will take a ten-minute break.  It is

21   now time for the defendants to make their opening statements.

22   Then we, I will do the same thing I did for plaintiffs, give

23   them a ten-minute period to get them organized, and moving

24   on.  All rise.

25          (Jury leaves the courtroom).

```
1              THE COURT:  Do not discuss the case among

2    yourselves.  Keep an open mind until you have heard all the

3    evidence.

4              (Jury leaves the courtroom)

5              (Recess).

6              (Jury enters the courtroom)

7              THE COURT:  I now recognize Mr. Fram to make the

8    opening statement on behalf of the defendants.

9              MR. FRAM:  Your Honor, thank you.  Ladies and

10   gentlemen of the jury, as you heard I represent the Air Line

11   Pilot Association, referred to as ALPA.  As you have also

12   heard the plaintiff in this case claim that ALPA breached its

13   duty of fair representation to the TWA pilots, to the union

14   members.  And what they allege is not simply that ALPA was

15   sloppy or negligent, they allege, as you heard, that ALPA

16   affirmatively acted to harm the TWA pilots.

17             We will prove during trial that those allegations

18   are false, that ALPA did its job and did its job well, and

19   indeed that it did everything within its power to assist the

20   TWA pilots.

21             This case from our perspective involves two

22   decisions, and those are decisions that were made by the TWA

23   Master Executive Council.  You heard reference to the MEC.

24   The MEC is a body of elected officials from within the TWA

25   pilots.  You have heard that there are three separate
```

1    council's, and each council, one in New York, 1 in Saint

2    Louis and one in Los Angeles, elects officials.  You have a

3    capital representative, and a first officer representative,

4    that is elected from each of the three councils.  These are

5    the pilot's electing their own representatives just in the

6    way that we elect members of Congres, and the responsibility

7    of those elected representatives is to gather information,

8    get advice, and to make decisions.

9          In this case, those MEC members, the six who were

10   actually voting members, had to make some decisions that

11   would bind all of the TWA pilots.  ALPA as a national

12   organization provided resources, advice, and guidance to

13   those members of the MEC.

14         The first decision that you have heard about to

15   some degree was a decision made on April 2 of 2001.  The

16   decision there was not the decision, a decision to waive the

17   scope.  It was a decision to accept a new collective  a

18   bargaining agreement with an entity called TWA LLC.  There is

19   a little detail here.  I am going to walk you threw it so you

20   understand some of the mechanics of what happened.  TWA files

21   for bankruptcy.  American is going to purchase the assets of

22   TWA if the transaction is approved by the bankruptcy court.

23         American sets up a wholly owned subsidiary that it

24   /KOLS and that entity is called TWA LLC.  This entity is

25   going to be a transition entity.  The TWA pilots, if they

approve on April 2, as they do, the collective bargaining

agreement, they become employees of TWA LLC.  So the time

line here in  terms of their employment, this is a little

complicated, but this is what happens in corporate

transactions and bankruptcies, is they are employees of TWA,

Trans World Airline, the bankrupt company, up until mid April

of 2001, when this collective bargaining agreement is

accepted on April 2 of 2001, they become employees of TWA

LLC, this wholly owned subsidiary of American Airlines, and

then as you have heard in April of 2002, almost a year later,

when the transition is complete, they then became employees

of American Airlines.

        The evidence in the trial will establish that this

decision  made on April 2 by the MEC to accept this

collective bargaining agreement was the right decision.  The

voting members of the MEC were well informed, they had plenty

of time to make the decision.  They were experienced.  They

were sophisticated.  And they listened to the information and

made a decision to accept a collective bargaining agreement

that had some very significant benefits to the pilots which I

will talk about in just a little bit.  Part of the deal, part

of the proposal for them on the  table, put on the table by

American Airlines was you have to waive one aspect of what

has been referred to as scope and I will come to that in just

a couple of minutes.

1          But the package that they accepted after a lot of

2     deliberation, a lot of thought, was a package that provided

3     very significant benefits, a lot of up side.  Jobs with

4     American Airlines which at that time was the largest, most

5     financially successful airline in the country.

6          The one thing they gave up is the right to

7     arbitrate seniority disputes.  And we will talk in a bit

8     about that.  But let me give you some background because I

9     think one thing that is very important to understand, here we

10    are ten years later, we need towing back and you are going

11    you are going to be asked to go back during the trial and put

12    yourselves in the timeframe of early 2001 when TWA files for

13    bankruptcy.

14         So I want to give you a little background about

15    three issues so that you understand the decision that is made

16    on April 2, is to put in context this other information.  So

17    they talk first about it was financial condition.  Back in

18    2000, I want to talk about pilot seniority integration

19    generally, because this transaction is not the first

20    transaction where pilots had to figure out how to get

21    together and then I want to talk to you about the

22    relationship that American Airlines had with its pilot union

23    and that union is the Allied Pilots Association which is

24    referred to as the APA.  Add that other acronym to your list.

25    But let me start by giving you a little background about what

```
 1    TWA had been through leading up to this bankruptcy filing.

 2    TWA filed for bankruptcy in 1992, the first bankruptcy.  It

 3    filed for bankruptcy again in 1995, the second time.  And the

 4    connection with those bankruptcies, the TWA pilots, learned

 5    some hard lessons and had to make some sacrifices.  They had

 6    to take a 18 percent pay reduction.  They had to be submitted

 7    to some work change rules that saved the company a lot of

 8    money, and over the 1990s as a result of those bankruptcies,

 9    they lost one of their benefit plans, contributions to that.

10            The company, TWA, at the expense of the pilots,

11    saved about 330 million dollars.  And the fact of the matter

12    is the company was mortally wounded because of things like

13    the Karabu ticket deal that Mr. Press mentioned to you.  This

14    fellow, Carl Icahn, came in and had control of TWA for a

15    period of time and used it for his benefit and the detriment

16    of the company.  So this proud company that once had been one

17    of the premiere airlines in the United States was brought

18    down by corporate transactions and by the time we get up to

19    late 2000, the company really is limping along.  And the

20    pilots into it.  But let me give you a couple statistics so

21    you get a sense of what is going on.

22            In 19 in 1997 TWA suffers operating losses of $30

23    million.  I am going to write these in red.  1998, operating

24    losses, 65 million dollars.  And then in 1999, 348 million

25    dollars.
```

 1          By the time the end of 2000 rolls around TWA is in

 2     desperate desperate shape.  What has happened during 2000 is

 3     that the management of the company has attempted to

 4     restructure, they have attempted to tear down the operation

 5     to see if they can survive.  They realize that TWA cannot

 6     continue on a so-called stand alone basis as a company by

 7     itself, and management goes and they shop the company around,

 8     to seven other airlines, including Delta, continental,

 9     united, U.S. Air.

10          The only airline that expresses an interest at the

11     very end of this is American Airlines.  American says yeah,

12     we like your routes, your routes and your flights.  We think

13     we can integrate them into American Airlines.  And it is

14     undisputed, you will hear the evidence at trial, that but for

15     the American deal in January of 2001, TWA would have gone

16     into what is called a free fall Chapter 11.

17          Chapter 11 is a section of the Bankruptcy Code that

18     deals with corporate reorganization attempts, liquidation is,

19     you go into bankruptcy, the company or its assets cannot be

20     sold as a going concern, as a concern that operates, and the

21     assets just get broken up and sold off.  A so-called free

22     fall liquidation.  That is what would have happened to TWA

23     but for the American deal.

24          TWA was in such bad shape on January 10 when it

25     filed for bankruptcy that it had only 20 to $30 million in

1    cash, it needed $40 million to operate the next day.  This

2    company was done.  And the American deal was the only way it

3    was going to survive.

4           Now, the TWA pilots new all about, and by the way,

5    the facts I just told you about, those are undisputed.  Those

6    are facts that were found by the federal bankruptcy Judge in

7    Wilmington who heard the TWA bankruptcy case, and after

8    months of testimony and evidence, those facts are ones that

9    he found and put in an opinion on April 2, the very day that

10   the TWA made the decision that we talked about to accept this

11   new collective bargaining agreement.  I think you heard Mr.

12   Press say that some of the pilot witnesses are going to come

13   in and say that TWA wasn't really in such terrible shape.  A

14   couple of the pilots were on the board of TWA are going to

15   say the company didn't have to file for bankruptcy.  Well,

16   that is just wrong.  Federal bankruptcy Judge who is an

17   expert in financial issues found exactly what I am describing

18   to you.

19           MR. PRESS:  Judge, I don't mean to interrupt, but I

20   do object to this opening statement, this line here.

21           THE COURT:  On what basis?

22           MR. PRESS:  It is hearsay, Judge.

23           THE COURT:  I am going to allow it.  Go ahead.

24           MR. FRAM:  Thank you, your Honor.

25           The TWA pilots having been through the bankruptcies

 1   in 1992 and 1995, they got some possessions concessions back

 2   from TWA as a result of giving up pay, giving up pension

 3   benefits and the like.  One of the concessions they got is

 4   they got aboard, a seat on the board of TWA.  And as you  a

 5   probably know, corporations are run at the highest level by

 6   their boards.  The board appoints officers and directors, I

 7   am sorry, the directors are on the board.  The directors on

 8   the board appoint officers who operate the company

 9   day-to-day.  But the boards make the big decisions, the big

10   decisions about whether to sell the company, whether to

11   liquidate, those kinds of things.  So will pilots got that

12   right.

13         The union representing the other employees of TWA,

14   I think you have heard that there were about 2,300 pilots in

15   total TWA, TWA had about 20,000 employees.  It had mechanics,

16   it had flight attendants, it had customer service personnel

17   the.  They were represented by a separate union, the

18   International Aeronautics Mechanics, IAM it is referred to,

19   and they got three seats on the board.

20         So TWA from the mid 1990s on has a very strong

21   labor presence on its board.  And it was represent and TWA's

22   representative, the pilots representative on the board

23   initially is a fellow named Steve Tumblin.  Steve Tumblin is

24   a lawyer that worked in Salt Lake City and Tumblin is

25   designated by the TWA MEC, this Master Executive Council, to

1    sit on the board and represent the pilots.  He does that up

2    until the point in 1999, and then another fellow, fellow

3    named Robert pastor who is a pilot takes that over.  But

4    during this period the pilots are getting financial

5    information, they are being told about the efforts of the

6    company to sell itself and all the plans, and the pilot

7    representative on the board in 2000, and early 2001, when the

8    American Airlines deal was approved, he votes in favor of it.

9    Robert pastor who I think you are going to hear testify votes

10   in favor of the bankruptcy filing, he acknowledges the

11   company is in terrible shape, and he votes for the American

12   Airlines contract to buy the assets of TWA that you have

13   heard about, a contract that specifically says that a

14   condition of the contract is that the TWA pilots have to

15   waive there scope and successorship rights.  You have heard

16   those described.  Those are the rights, it is seniority, if

17   seniority integration cannot be agreed upon that is the right

18   ultimately to go to seniority arbitration, to have a third

19   party decide what you get or don't get.  And that is the crux

20   of the plaintiff's case here.  What did the TWA pilots give

21   up on April 2.  They gave it up the right to go to  a

22   arbitration over seniority.  We will talk about that a little

23   bit more.

24          Now, what happens is the aftermath of the

25   bankruptcy filing and the American deal is that the TWA

pilots learn something important about American Airlines and its union, that is critical to the case.  And what is important is that American Airlines, like TWA, has a labor contract with its union.  And that labor contract has a provision about the purchase of other airlines and the bringing in of other pilots that is very, very important.  It is the reason why there is the reason why there is a dispute. You have heard that the TWA labor contract had this scope and successorship provision, these so-called labor protected provisions which said that if there is a dispute between the pilots groups you go to arbitration.  The American labor contract was very different.

         The contract that American had with its pilots said if another pilot group came in to American Airlines, the other pilot group got stapled, got put at the very bottom of the seniority list.  So what you have from the get-go in terms of the bankruptcy and the asset purchase agreement is in direct conflict between the labor contracts.  And the question then becomes how does that conflict get resolved? American made it very clear when it signed the asset purchase agreement for TWA that it was not going to do the deal unless this seniority integration issue got resolved by a waiver of scope.  Right in the documents, the TWA pilots have to waive scope.  And American did that for a couple of reasons.  One, it didn't want to have a big fight with its own labor union.

1    It has got 11,500 pilots who fly for American.  They are very

2    powerful.  There had been some bad blood, some disputes

3    between American pilots as between American and its pilots as

4    early as the year before.  American wasn't going to take on

5    and get into a big fight with its own pilots.  It signed a

6    contract that made it clear and intended to live up to the

7    terms of the contract.

8            The other thing that American made clear not only

9    was the deal was signed us but month after month into early

10   2001 it, is that it wasn't going to have the process of

11   trying to prop up TWA to go on month after month after month.

12   TWA is losing money left and right.

13           You may have heard of the term burn rate.  Burn

14   rate is the amount of money a company is losing on a daily

15   basis.  TWA after it files for bankruptcy is in deep trouble.

16   People know it is in bankruptcy.  It is unclear at that point

17   if the American deal is going to go through.

18           As you may know, when purchase deals are proposed

19   in bankruptcy they have to be approved by the bankruptcy

20   Judge.  That is something that takes a couple months.  So

21   people hear that TWA is in bankruptcy and what do we do?

22   When you hear a company filed for bankruptcy you say gee wiz,

23   should I buy a ticket for that airline.  What if I buy the

24   ticket and the airline is out of business when I want to fly

25   in two months.  TWA goes south even more in terms of its

```
 1   financial condition.  American says we will prop TWA up for a

 2   little bit.  They provide what is known as debtor in

 3   possession financing, sometimes referred to as DIPa.

 4   American is going to provided debtor in possession financing

 5   for a -- to TWA for a limited period of time.  If it goes

 6   down and down and there is opposition to the deal and there

 7   are problems American makes it very, very clear again and

 8   again and again that it is prepared to walk away from the

 9   deal.

10           We will do this deal if we can do it quickly and

11   without fighting with our union.  If that doesn't work, then

12   so be it.

13           TWA ends up into the pre fall liquidation process.

14           Let me digress for a minute so you understand a

15   little bit more detail about the whole seniority integration

16   process because that is a lot of what this case is about.

17           There had been dozens and dozens of signatures

18   before, early 2001, when pilot groups had to get put

19   together, not only bankruptcies but mergers and acquisitions

20   and the like and there are a lots of different ways that have

21   been identified to do this in the various circumstances.  And

22   I just want to walk you through a couple of those very

23   quickly.

24           One way to do it is so called date of hire.

25           Date of hire is just what it says.  You got pilot
```

1    groups.  You go and look and see when were the pilots hired.

2    You consolidate them into a combined list.  Whenever you were

3    hired at your airline is where you stand on the seniority

4    list.  A different method you may have heard Mr. Press

5    mention is a ratio method.  The ratio method might be one

6    where you say we have a big group of pilots here, small group

7    here.  We will combine them together by taking three pilots

8    from their group and one from here, and then going back to

9    three and then going one and you combine them in that way.

10          A third way I just described, and that is stapling.

11   Stapling is really, you take the pilot group that is coming

12   in to typically the bigger airline and put them at the

13   bottom, whatever order they are in, they go at the very

14   bottom.  And you could have combinations.  You can have

15   variations on these methods.  It doesn't have to be all one.

16          So for example, what you could do is you could say

17   allright, we are going to take the top half, 50 percent of

18   the pilot group that is getting integrated in and we will use

19   a ratio method.  They will get integrated say on a three to

20   one basis.  Then the bottom half, 50 percent of the most

21   junior pilots from that second group, we will staple them at

22   the bottom.  That is one way in which you sort of mix and

23   match, if you will.

24          There is another concept that is used from time to

25   time and you will hear about it, and that is a so-called

protective cell.  I mentioned before that TWA has three

different, they are called domiciles, three different areas

where the pilots fly out of, New York, St. Louis and Los

Angeles, and what ultimately happens here is, you will hear

more detail later, is that everything under the American

regime gets moved to St. Louis which is where most of pilots

live and work.  And part of the seniority integration that

happens here is a so-called protective cell, where the TWA

pilots notwithstanding the other aspect of the integration

process, they get super seniority, they get preference for

flights out of the St. Louis hub.  South of the St. Louis

domicile.  So it is a complicated process, and it is one that

could take some time to work through.

          Now, you have heard discussion of the so-called

labor protective provisions, the provisions that were

included in the TWA pilots contract or collective bargaining

unit.  I want to take a minute to make sure we all understand

what that is about.  The concept goes backs to a decision of

the Civil Aeronautics Board known as the CAB in 1972.  The

CAB was the government agency back in the seventies that

over-saw the airline industry.  And in a case called

Allegheny Mohawk, those were the two airlines involved, the

CAB trade to set down some guidelines for how seniority

integration takes place.

          And what the CAB said is when pilot groups get

1    together and they are under our jurisdiction, two things have

2    to happen.  One is the pilot groups have to try to work

3    together to come up with an integration process that is, that

4    is fair, a process that is fair and equitable is kind of the

5    magic language that the CAB uses.

6         I am not clear exactly what that means but the

7    pilot groups have to work together and try to use these

8    different techniques and make their arguments and work it

9    out.  That is section 3 of Allegheny Mohawk.  If they can't

10   work it out what do you do?

11        CAB says if you can't work it out then you go to

12   arbitration.  You have an independent third party who has

13   some knowledge of how the industry works.  That party hears

14   the arguments from both sides and says this is the deal.

15   This is what I am proposing.  You have heard of arbitration

16   in other contexts.  You hear about it in baseball.  People

17   can't agree.  You go to an arbitrator, the arbitrator makes

18   the call.  This is the process that the CAB says should be

19   used when pilot groups can't agree.  The CAB ends up

20   disappearing as part of the regulation from the 1980s.  And

21   it says basically on its way out, look, we are not going to

22   be in the business of requiring this from airlines, if unions

23   think this is important and companies think it is important,

24   put it in your labor contract, put it in the collective

25   bargaining agreement.

1          ALPA is able to do that on behalf of many of its

2     pilot groups, and it does it for the TWA pilots.  The problem

3     is not every company and not every union agree on it.  As I

4     mentioned before, in the case of American Airlines, American

5     is big, financially secure, its pilots are smart.  Its pilots

6     know that most of the transactions in which American is going

7     to get involved, the ones are where American is bringing

8     other pilots group in.  These guys are important to the

9     company, and will, and they have leverage.  They go to

10    American and say we want our labor contract to provide that

11    if you bring in any other pilot groups they get stapled.  And

12    that is what happens.  That is why we have this conflict that

13    we discussed before.

14          Now, you have this conflict, and something has got

15    to give.  And the Bankruptcy Code is American's solution to

16    how you buy the TWA assets.  Even though you have these

17    conflicting labor provisions.  Let me talk a little bit about

18    the Bankruptcy Code.

19          The Bankruptcy Code has its own set of rules that

20    kick in when a company files for bankruptcy.  One of them is

21    a so-called automatic stay, under section 362.  Company files

22    for bankruptcy.  The automatic stay prevents creditors or

23    others from going out and suing them except in very limited

24    circumstances.  The idea behind bankruptcy is the bankruptcy

25    court wants to get everybody together in one place, see who

1    is owed what, and try to work it out.

2          And if you have a bankruptcy in Wilmington,

3    Delaware, you don't want a creditor going offer and filing a

4    lawsuit in California, or some place else.  It is disruptive,

5    it may force the company to incur legal fees.  That would be

6    a violation in those circumstances of the automatic stay.

7    Bankruptcy judges have other powers.  Some would say that

8    they are super powers, to reorganize companies.  For example,

9    a bankruptcy Judge can appoint a trustee to oversee the

10   operation of a company.

11         Management gets kicked out, the trustee comes in

12   and operates the company and answers only to the bankruptcy

13   court.  The bankruptcy judges in bankruptcy court allow

14   things called preference actions, money has been paid to a

15   creditor during the period before a bankruptcy, and the

16   bankruptcy system allows money to be drawn back in to the

17   whole bankruptcy process.  And these super powers that I have

18   described are subject of course to oversight by district

19   judges, federal district judges, like Judge Irenas,

20   bankruptcy judges don't have complete discretion, they have

21   to do things within the code and subject to appropriate

22   review.

23         One of the special provisions of the Bankruptcy

24   Code that you heard about is Section 1113.  Section 1113 is

25   the code provision which says that a bankruptcy court under

 1   appropriate circumstances can reject, can abrogate, can

 2   cancel, a labor contract.  And everybody knows when TWA filed

 3   for bankruptcy the third time in 2001, and the American

 4   agreement gets announced, everybody knows that the club that

 5   American has, if this whole seniority integration issue

 6   doesn't get worked, is Section 1113.  That an 1113 motion can

 7   be used.

 8          An attempt is first made in early 2001 to get the

 9   pilot groups together, to try to negotiate, to work it out,

10   to have them talk about the ratios, and the dates of hire and

11   everything else.  And to try to reach agreement.  But the

12   American pilots have the upper hand.  They have a contract

13   provision.  They know American can't, in any way, violate

14   that, and the last thing they want to protect their members,

15   the TWA pilots coming in and getting seniority.  They look at

16   the TWA pilots and say, you know, it is unfortunate but you

17   guys work for a company that was in terrible shape

18   financially, that was going into bankruptcy.  You are lucky

19   to have jobs at American.  We welcome you here with the

20   understanding that you are lucky to have jobs and you need to

21   go to the bottom of the list.

22          What becomes clear after the first couple sets of

23   discussions and I want to walk you through a little bit of

24   the time line here so you understand, is that the American

25   pilots are going to continue to take this hard line and the

```
 1    TWA pilots just can't symptom ago the idea of capitulating at

 2    this point.  They want to see what kind of deal they can

 3    negotiate.  So let me walk you through some of the key events

 4    here so you have them fresh in your mind, and follow some of

 5    the other detail I am going to give you.  I have a couple of

 6    time lines.

 7              Your Honor, I have some printouts of these so you

 8    can follow along.

 9              THE COURT:  Thank you.  There are time lines.  Time

10    lines, your Honor, and then a blowup that I will refer to.

11    All right.  Just so we have the dates in mind, we have the

12    asset purchase agreement, you heard signed January 9.

13    Followed immediately by the bankruptcy filing.  Then you have

14    this period in January and February where the pilots are

15    meeting directly.  You see references to the merger

16    committee.

17              The TWA MEC has a merger committee and the American

18    pilots, APA, they have a merger committee and they pilots get

19    together and talk and try to work things out.  Those meetings

20    are February 8, 9, '01 and another meeting February 22.

21    These initials, kind of get to know you meetings where people

22    establish relationships and talk about issues.  They have

23    another meeting on March first.  And that is the first

24    meeting at which written proposals get exchanged by the

25    pilot.  The TWA pilots hand over a written proposal, the
```

1   American's pilots do the same.  Needless to say, they are

2   miles apart.

3          In fact, the meeting gets a little bit acrimonious.

4   Harsh words are exchanged.  People walk away.  And what is

5   understood clearly by all the pilots as a result of that

6   meeting is that the pilots are not going to be able to work

7   this issue out voluntarily.  Something is going to have to

8   happen.  What is going to happen.  I mentioned before the

9   backup, the club, did you will, that American has is Section

10  1113.

11         What happens March 12 of 2001 is the hearing where

12  the bankruptcy Judge in Wilmington, his name is Peter Walsh.

13  He approves the American deal.  And you will hear that there

14  are many, many TWA pilots there.  The TWA pilots

15  notwithstanding what you have heard so far in this case, the

16  TWA pilots from day one strongly support the American deal.

17  They understand that this is their last and really only hope

18  to continue as pilots and to get anything really other than

19  just being out there and looking for jobs.  So they support

20  the deal in January, they support the deal in bankruptcy

21  court.

22         They appear, there is actually a multi day hearing

23  in the bankruptcy court that starts the prior week, they go,

24  and they support it.  In fact, one of them even testified on

25  behalf of the TWA, MEC and the pilot before the bankruptcy

 1    job whose name is Peter Walsh in support of it.  Judge Walsh

 2    on March 12, he approved the American deal, which is great.

 3    It is a milestone path.  And then within just a couple of

 4    days the TWA, which at this point of course is being

 5    controlled by American, they go ahead and file their Section

 6    1113 motion.  This is the club.  You guys haven't been able

 7    to work it out.  You now need to put some pressure on.  They

 8    follow up immediately.

 9         TWA LLC, this new transition entity we talked

10    about, that entity has been in discussion with the TWA pilot

11    about the new labor contract.  And within a couple of days

12    after the 1113 filing they hand over a proposal which

13    includes jobs, it includes pay raises, it includes

14    contributions to a pension program, it has a lot of really

15    good benefits.  The one thing it doesn't have, it doesn't

16    have this right to go to seniority arbitration.

17         Again, that is the day one, something you are not

18    going to get.  When that proposal gets handed over, it

19    specifically says that this proposal was only good up until

20    the hearing date on the Section 1113 motion.

21         I think you heard Mr. Press mention when the

22    Section 1113 motion gets filed on March 15 it is immediately

23    scheduled for a hearing in the bankruptcy court.  The

24    proposal says this is good only until the Section 1113

25    hearing starts.  After that all bets are off.  We are not

1    allowing anything.

2         There  are a bunch of other events that take place

3    in the interim that I will come to in a couple minutes.

4         On March 31 a much more detailed agreement, this is

5    kind of an outline, March 17, a very detailed agreement.  A

6    collective bargaining agreement that is about 80 pages long

7    and it talks about jobs and benefits, all the kinds of things

8    that you need in a complex industry like this.  That gets

9    forwarded by the TWA LLC people to the TWA pilots.  The TWA

10   pilots then get together, it is not on here but we will talk

11   about it, they get together on April 1 to talk and decide

12   what to do, they meet with advisors and then they have a

13   formal meeting on April 2 where they discuss it further,

14   where the MEC as a group votes to accept this new agreement

15   and it is part as part of accepting it they give up the right

16   to go to seniority arbitration.

17        And then the bankruptcy court is told about the

18   fact that we have worked out a deal.  It is stipulation says

19   it is on the 6.  The transition agreements gets finalized.  A

20   couple loose ends that need to get negotiated.  Once that is

21   resolved, American says great.  We got what we told you back

22   in January we needed as a condition of the deal.  We have

23   this seniority arbitration issue resolved.  We are going to

24   go ahead and close the deal.  That is kind of the time line

25   of what happens here.

1          Now, one of the things that is important to you to

2     for to you understand about the TWA pilots is that ALPA is

3     not making decisions for them.  The TWA pilots, as I

4     mentioned before, they have these elected representatives,

5     two from each of the councils, New York, St. Louis, and Los

6     Angeles.  You got six people who are entitled to vote,

7     proposals.  And they are the ones who vote on April 2 to

8     accept.

9          They are assisted within the pilot group by some

10     officers, the six elect officers, a master chairman, a

11     secretary, and then what they also do is they appoint

12     committees.  I think I saw a reference before to the merger

13     committee.

14          The six elected members can participate in

15     committees, typically what they do, these are volunteers, is

16     they spread responsibility around.   They get other pilots

17     who are interested in helping out and they get put on the

18     merger committee.

19          I think you heard reference to a negotiating

20     committee.  The negotiating committee is the committee that

21     is dealing with TWA and TWA LLC.  So there are a bunch of

22     committees, the two that are important during the timeframe

23     we are talking about are the merger committee, meeting with

24     the American pilots and the negotiating committee which is

25     meeting with TWA.  They are kind of on parallel tracks and

1    they are talking to each other, they are reporting back to

2    the MEC, providing information and the like.

3         Now, pilots for the most part are well organized,

4    they are analytical.  A lot of them are very highly educated.

5    I think pretty much all of them have college degrees.  You

6    will hear some of them who have MBAs, business degrees, some

7    of them have law degrees.  These people are very

8    sophisticated and if you think about what pilots do, they

9    have a lot of responsibility when they get in the cockpit of

10   a plane, they are taking people's lives in their hands so

11   they have to be well trained, and well organized and they

12   have to be independent thinkers, they have to be people who

13   make decisions.  These are all characteristics real, really

14   attributes that I think we all respect.

15        As you will hear they are not the kind of people

16   who let other people tell them what to do.  They are given

17   information, they analyze it.  They think it through.

18        So you have a group of pilots and these in many

19   respects, they are kind of the cream of the cream.  They are

20   elected by their fellow pilots, because, so the other pilots

21   respect them, for their judgment, for their experience.  In

22   addition to having those attributes, that they are organized

23   and analytical, these pilots have the experience of, having

24   gone through the prior bankruptcies.  They have a sense of

25   the bankruptcy process.  They know what they are having to

 1    deal with.

 2           They have some advisors.  I want to walk you

 3    through advisors a little bit.  I am not going to spend a lot

 4    of time on there but you are going to hear advisors' names a

 5    lot during trial.  There are different groups of advisors.

 6    One of the advisors who is working with the MEC is a fellow

 7    named David Holtzman.  He is an employee of ALPA who is the

 8    so-called contract administrator for the TWA MEC.  He is in

 9    bed with the MEC and has worked with the MEC on a full-time

10    basis since the early nineties.  He knows the issues.  He has

11    been through the bankruptcies, he knows the pilots.  He is

12    their full time contact.  He happens to be a lawyer.  You

13    will hear him testify.  He is a very thoughtful fellow.  Like

14    the pilots, well organized, analytical.

15           I mentioned before a fellow named Steve Tumblin who

16    is from Salt Lake City who is the first TWA representative

17    pilot on the board of TWA, back in the early 90s.  Tumblin is

18    a bankruptcy lawyer.  When TWA files for bankruptcy for the

19    third time in early 2001, Tumblin is re-engaged, he is

20    brought back in and he provides advice about the bankruptcy

21    process.  Michael Glanzer is an investment adviser.  Glanzer

22    was initially retained by the TWA MEC in April of 2000.  This

23    is the year before the bankruptcy.  The pilots concede the

24    financial circumstances were deteriorating.

25           What do they do?  They hire their own investment

1    banker.  He happens to be a lawyer but they hire their own

2    investment banker to look over it was shoulder and to

3    evaluate proposals that TWA is making and also independently

4    to see if there are deals out there that can help save the

5    company and save the pilot jobs.

6         After the bankruptcy filing where we get into this

7    period I have described in early 2001, the TWA MEC gets

8    additional advisors.  They get a fellow named Randy Babbitt.

9    Randy Babbitt had been the president of ALPA.  ALPA is a

10   national organization of airline pilots.  You heard at one

11   time it had as many as 60,000 members. Babbitt had been the

12   president of ALPA and was a well known figure in the

13   industry.  Having him on your team is a benefit.

14        After the bankruptcy is well -- there is a

15   bankruptcy lawyer filling in, Richard Seltzer, who is one of

16   the nation's leading experts in Section 1113 motions in

17   dealing with labor unions and bankruptcies.  Very bright guy.

18   Very knowledgeable, very experienced.  You will hear him

19   testify about the circumstances, the predicament, really that

20   the TWA pilots have.

21        In addition, you have an in-house lawyer named clay

22   Water who is an expert on labor law issues who gets involved

23   to help out and a final lawyer, Roland Wilder who I will talk

24   about in just a minute.  Those are the primary advisors.

25   There are additional advisors back them up but this is a

group of people with expertise and experience when are there

not to tell will the MEC what to do, but they are there to

provide expertise, to gather information, help the MEC make

the decision.

And just to give you a sense of how much time and

how thoughtful, how methodical, if you will, the pilots were

in making this decision.  I just want to walk you through

quickly some of the many events that lead up to this vote on

April 2 because we think the evidence is going to show that

this idea, you may have heard about from Mr. Press, that the

pilots were somehow rushed into making a decision on April 2

is just absolutely not so, that these issues were coming for

a long time, lots of meetings, lots of interaction.

So what I am putting up here, I hope people can see

it.  If not, I will move it closer.  What I am putting up

here to give you a sense, you probably can't see it, but let

me just walk you through to give you a sense.  This is a

calendar beginning February 22 and February 28.  Just noting

that the merger committees of the two companies meet.

Different pilots groups.

February 28, the negotiating committees, this is

the committee of pilots meeting with representatives of TWA.

March 1 is this merger committee meeting I mentioned before

where it becomes clear as day that there will be no agreement

with American, that the American pilots are going to take a

1    hard line.

2         And that is the point at which everybody realized

3    that a Section 1113 motion is inevitable, it is going to

4    happen and we need to prepare to deal with it and the

5    consequence of it.

6         What happens is there is immediately a conference

7    call of the MEC officers, committee members and advisors, you

8    will see the agenda for the call.  Here about the issues.

9    Section 1113 is a big issue discussed.  The motion has not

10   even been filed.

11        You recall from my time line that the 1113 motion

12   doesn't even get filed until March 15.  But everybody knows

13   it is coming.  They talk about it.  The TWA MEC has a special

14   meeting on March 2, the negotiating committees meet the same

15   day and report back.  More meetings of the negotiating

16   committee, March 5, 6 and March 8 to 9.

17        What is happening here is that the pilots are

18   negotiating with TWA and they are trying to negotiate the

19   best possible collective bargaining agreement.  They want to

20   get the best package of benefits possible.  They sit down and

21   decide are we willing to waive our seniority arbitration

22   rights, they really have satisfied themselves and the pilots

23   they represent that they have max'd TWA out.  That they have

24   got the best possible deal so they continue to meet.  There

25   is another meeting of the entire MEC on March 8, where

```
 1    advisors are present.  They talk about these issues.  You
 2    have another meeting on the 14th, you have the negotiating
 3    meeting.  Again, negotiating committee meeting on the 15th.
 4    You have this proposal that I mentioned before on the time
 5    line that comes from TWA LLC.  You have another meeting of
 6    the negotiating committee.  You have a special meeting over
 7    two days, March 21 and 22 of the MEC, or the advisors come
 8    and give a presentation, they talk about what the Section
 9    1113 motion means, what happens if it is granted, what
10    happens if it is denied, and I will walk you through the
11    advice that is needed at these different meetings.
12         At that meeting the negotiating committees keep
13    meeting, every time the MEC meets they say all right, we know
14    we are in trouble here.  Go back and see if you can squeeze
15    TWA for a little bit more, see if you can get a little bit
16    more, a little bit more to our pension program, a little bit
17    more in terms of whatever is out there.  The merger
18    committees meet again on March 27 to 29, one of the
19    directives from the MEC at the meetings is go back and all
20    talk to the American pilots, see if they changed their minds,
21    see if they give ground.  Of course they haven't.  You have a
22    meeting of one of the councils.  I mentioned the three
23    different councils, New York, Saint Louis, Los Angeles.
24         Council 4 in Los Angeles has a meeting.  The
25    members get together and they hear a presentation from the
```

1  master chairman of the MEC, this fellot Bob Pastore, who had

2  been on the board of TWA, who is sort of overseeing the MEC,

3  and the two pilot reps from that particular, called a

4  domicile, Pablo Lewin and Alan Altman, they go and give a

5  presentation.  They have been in the know.  They have been

6  part of the meetings, part of the discussion was TWA, with

7  the American pilots, they have heard the advice of advisors.

8          They are now going back to their constituents

9  saying this is what we learned.  This what is is on the

10 table.  This is what we think we need to do.  Altman and

11 Lewin, the two reps, get guidance from their constituents at

12 the meeting, and as I will describe in a meeting, they vote

13 in a particular way.  You then have a strategy session on

14 April 1.  This is interesting.  This is scheduled by Mr.

15 Holtzman.

16         I mentioned before that Mr. Holtzman is the

17 contract administrator who has been working with the MEC for

18 about ten years.  He realizes that this is an important

19 decision to be made on the second, that people need time to

20 sit and talk it through, he scheduled a working session on

21 April 1, which is a Sunday, solely for the purposes of the

22 advisors talking and answering questions and people having a

23 chance to think about it.

24         The pilots come back April 2.  They debate it some

25 more, they deal with some other issues and then they vote In

1    the way I have described.

2          What is the advice?  What is the analysis that

3    leads to the vote which, as you know, was to accept the

4    package of benefits?  The analysis is if if the Section 1113

5    motion is granted, that you are not going to have a labor

6    contract.  You are not going to have a job.  You are going to

7    be just sort of out there, and you are going to lose because

8    of the agreement, the transition agreement, that American has

9    proposed, you are going  to lose all the benefits that

10   American is offering to you.  Significant pay increases,

11   contributions to pension fund.  Jobs, job security.  That is

12   what you are giving up, if you don't agree to the proposal on

13   the table, and if the Section 1113 motion is granted.  You

14   are just sort of out in limbo.

15         If you fight the 1113 motion and the motion is

16   denied, on the other hand, what happens?  Well, I said before

17   that American was willing to carry TWA for a certain amount

18   of time.  And that if it got too expensive and became too

19   difficult, American was prepared to get up and walk away and

20   during the entire period we have been discussing people are

21   in communication with representatives of the American and the

22   American people keep saying, look.  If we can't get you to

23   waive seniority arbitration and work with us, if we lose the

24   Section 1113 motion, the deal is off.  We are going to walk

25   away.

1          So the Section 1113 motion is a lose-lose

2    proposition.  If the motion is granted the pilots have

3    uncertainty and no benefits.  If the motion is denied,

4    American probably walks away.  That is what American is

5    saying.  They are just going to walk away from the deal.  We

6    have had enough.

7          Your Honor, is this a good point to maybe take that

8    break.

9          THE COURT:  I think so.  I will let you call it.

10         MR. FRAM:  Thank you.

11         THE COURT:  Ladies and gentlemen, we will let him

12   catch his breath and give you time to stretch.  We will take

13   a ten-minute break.  Do not discuss the case among

14   yourselves.  Keep an open mind until you have heard all the

15   evidence.  All rise.

16         (Jury leaves the courtroom.)

17         (Recess.)

18         THE COURT:  Mr. Fram, you may continue.

19         MR. FRAM:  Thank you thank you, your Honor.

20         We talked a little bit about the events on April 2,

21   about the number of meetings, about the amount of time spent,

22   and I just described for you the advice that that was given

23   consistently throughout the month of March, the advice that

24   the Section 1113 motion, it is a lose-lose proposition.  The

25   motion is granted you have no job, no contract.  You are out

1    there.

2          If the motion is denied, American probably walks

3    away from the deal.  There is one advisor out of the whole

4    group that I mentioned and I haven't actually identified

5    every single advisor.  I just told you about the most

6    prominent ones, but there is one advisor from within the

7    group who has a partial disagreement.  That is Roland Wilder.

8          Wilder says well, yeah, I have observed this

9    bankruptcy Judge, too.  I have been to court, I have got a

10   clear sense from how Judge Walsh has ruled that he is going

11   to do whatever it takes to make sure that the deal goes

12   ahead.  There is no question in my mind that Judge Walsh is

13   going to grant this 1113 motion and reject the entire

14   contract that the TWA pilots have.

15         But some of the pilots are uncomfortable with being

16   boxed in, with basically being told and really concluding

17   themselves they don't have much of a choice.  People like to

18   have options.  They like to know is there some other way to

19   go.  Wilder comes up with this idea of going to court and

20   filing a lawsuit, filing a lawsuit to upset the apple cart, a

21   lawsuit to enjoin this entire transaction that has now been

22   approved by the bankruptcy Judge and that the transaction, if

23   it proceeds, that not only secures the jobs of the TWA

24   pilots, but you have 18,000 other employees of TWA who also

25   have jobs at stake.

1           Wilder says I have this idea.  We will file this

2   lawsuit and of course we don't really want to stop the

3   transaction because everybody loses jobs.  But let's use this

4   as a way to threaten the American with a delay of the

5   transaction.  Send the signal to American that they have to

6   do something for us.

7           Well, if you think about it, what is American going

8   to do for them?  American is in a predicament in the sense

9   that it has a labor contract with the APA, the American

10  pilots, and that contract says new pilots, including the TWA

11  pilots, get stapled.  So are you really going to get a lot of

12  leverage over American Airlines?  Probably not.

13          But there is a bigger problem with the idea of

14  filing this lawsuit and the bigger problem goes back to what

15  I mentioned before, about the role of bankruptcy.  You heard

16  me mention the automatic stay.  Companies in bankruptcy, you

17  automatically, the automatic stay prohibits lawsuits that

18  disrupt the bankruptcy process.  So if you go and file the

19  lawsuit that Wilder is suggesting, A, you have a very angry

20  bankruptcy Judge who is on top of this bankruptcy, who has

21  had hearings.

22          The hearing that ended on March 12 began the week

23  before, went on a Saturday.  This bankruptcy Judge is working

24  so hard he had a hearing continue on a Saturday, on March 10.

25  You have a very angry bankruptcy Judge, and he is probably

1    going to find that you violated the automatic stay.  So you

2    shoot yourself in the foot, you are probably looking at

3    sanctions from the bankruptcy court.  But even if you don't

4    get sanctioned and criticized for trying to stop the

5    transaction that everyone wants to have happen, if you are

6    successful, what happens if you successful in doing the

7    transaction, American is going to do what it is has been

8    saying for months and months it will do.  It is pouring

9    money, millions and millions of dollars day after day into

10   TWA.  American is going to walk away from the deal.  If you

11   make it too difficult and you make it too expensive, American

12   is going to say fine, we took our shot at it.  We tried to

13   save TWA, but the pilots, they over-played their hand.  So

14   once again, you have a lose-lose situation.  You file this

15   lawsuit.  You either get whacked by the bankruptcy Judge or

16   if you are successful in delaying the process, American

17   probably walks away and you get nothing.

18          And the members of the MEC who I described to some

19   degree before, these experienced pilots, these analytical

20   people, they listened to Wilder and with the exception of one

21   person gets the vote.  They all say, that makes no sense.

22   Advisors listen to Wilder's properly and say, among other

23   things, they think it is absolutely irresponsible, it

24   violates the law.  It makes no sense in terms of trying to

25   protect the public's rights.

 1          And what happens when the vote takes place on April

 2     2.  I want to talk to you in a little detail about this

 3     because you are going to hear many of the people who actually

 4     vote and participate testify in this trial.  I mentioned

 5     before that you have the six elected members of the MEC.  The

 6     three different domiciles.  Okay.  You have two people from

 7     Council 2, New York.  Howard Hollander and David Singer.  You

 8     have two people from Council 3 in Saint Louis, Steve

 9     Rautenberg and a woman named Sally Young.  And then you have

10     have two representatives out of Council 4 in Los Angeles,

11     Pablo Lewin and Allen Altman.

12          You are going to hear a number of these people

13     testify in trial, and I mentioned before as well that they

14     are elected by the actual pilots, and the different domiciles

15     have different numbers of pilots.  So what you see, if you

16     look, for example, at Los Angeles, number 4, Lewin is the

17     captain representative, and Altman is the first officer

18     representative.  Collectively they represent 180 pilots.  Los

19     Angeles is fairly small.  If you look at Council 3 out of

20     Saint Louis, Rautenberg is the captain representative, 724

21     pilots he represents and Sally Young represents 605.

22     Collectively they represent over 1300 of the pilots.  And

23     then New York, as you can see, Council 2, the numbers are a

24     little  bit less.

25          What happens when they come to a vote.  The MEC can

1    vote in different ways.  It can simply call a vote and have

2    the six people raise their hands and have the vote be six to

3    zero, or five to one, whatever.

4           But members of the MEC also have a right to call

5    for a voice vote, where you announce exactly what your

6    numbers are, how many pilot votes, you are voting in favor or

7    against.  And as you can see, the pilot reps, the MEC members

8    have the right to split their vote.  They can say, you know,

9    I am divided in my mind about whether there is a good thing

10   or a bad thing.  I want to vote all my vote in favor.  You

11   have some of that here.

12          What you see is Howard Hollander, who is part of

13   the plaintiff's group, one of the class representatives, he

14   is the only MEC member who votes a majority of the votes

15   against this package, this collective bargaining agreement.

16   He votes 180 against and 55 for.

17          David Singer also from Council 2, first officer

18   rep, 142 in favor, 65 against.  Steve Rautenberg, the captain

19   rep in St. Louis, there is no question in in his mind.

20   Rautenberg whose testimony we hope to hear, very experienced

21   guy, had been through the bankruptcy wars, had been

22   furloughed, had suffered along with many other TWA pilots in

23   the earlier bankruptcies, had been out in business, had gone

24   back to school during one of the furloughs, gotten an MBA, a

25   master's of business administration.

1          No question in Rautenberg's mind this is the right

2     thing to do.  All 724 votes in favor of the deal.  Sally

3     Young splits.  The two fellows from Council 4 in Los Angeles

4     mentioned before on my chronology, Council 4 had a meeting

5     the Friday before, on March 30, where Altman and Lewin along

6     with Pastore reported back to the pilots in Council 4.  They

7     got clear direction in terms of how their pilots felt about

8     the whole situation, and that is reflected in the fact that

9     all 180 of their votes were in favor of the deal.  The final

10    tally is 1501 in favor.  450 against.

11         What I have been telling you for the last hour or

12    so is that the TWA MEC, the pilots, have a decision that

13    these were people who were intelligent, analytical,

14    experienced, well advised, that they made the right decision,

15    they made the decision to save the jobs of the pilots, to get

16    pay raises, which I will talk about in a minute, to get

17    contribution to say a pension program, they did the right

18    thing.

19         And you are probably sitting there and wondering

20    well, if what I say is so, this really was the right

21    decision.  If ALPA properly advised them why are we here?

22    What is this lawsuit all about?

23         And the evidence will show that the reason we are

24    here is that there were a handful of people within the MEC

25    back on April 2 who opposed the transaction, who opposed

1    accepting the deal, and who like Roland Wilder, were willing

2    to roll the dice.  Howard Hollander opposed the deal.  He

3    thought back then it was a bad deal.  There was another

4    person you hear mentioned, Ted Case.  He, Ted Case, was not a

5    voting the MEC.  He was on one of the committees.  He was at

6    the meeting on April 2.

7            As you will hear, he made a statement for the

8    record.  He wanted the official meetings of the MEC to

9    reflect that he thought accepting the deal on the table and

10   avoiding the problems with the ruling on the 1113 motion, he

11   thought that was a bad idea.  He agreed with Howard Hollendar

12   He appeared to also be from Council 2.  He made a statement

13   you will hear about.

14           Case and Hollander were unhappy with the deal back

15   on April 2,a and what they did after the deal, what they have

16   done all the way up to today, is to try to persuade other

17   pilots and they will try to persuade that you the decision

18   made on April 2 was a bad decision.  But what you need to

19   remember as you hear the testimony is that they don't speak

20   for the MEC, and they don't speak for the group of pilots who

21   made the decision on April 2 who voted.  They don't speak for

22   Dave Singer.  They don't speak for Steve Rautenberg.  They

23   don't speak certainly for Pablo Lewin.  You are going to get

24   at half of story, less than half of the story.  You are going

25   to get the pilots who were unhappy then and unhappy today.

1          The story of this case and the reason we are here

2     is beginning on April 2 and right up until today Hollander

3     and Case, and to some degree, Sally Young, who you will hear

4     a little bit more about, have tried to persuade people that

5     the decision was the wrong decision.  One of the things they

6     did, David Singer, was the first officer rep out of Council

7     2, in the afternoon after the meeting is that Hollander and

8     case were part of a recall effort.  They criticized David

9     Singer because of the decision he makes to vote most of his

10    votes in favor of the deal, and they were willing to get

11    their friends in Council 2 to recall Singer.

12          Singer got thrown offer the MEC.

13          And when we come to events later  in 2001 and the

14    fall, who do you think Singer gets replaced by as the first

15    officer rep?  Ted Case.

16          Singer, who you are going to hear testify, is a

17    bright guy.  He is an experienced guy.  He happened to have a

18    law degree and practiced law before doing what he really

19    loved, which was flying, and he is one of the people in the

20    MEC who went out and did his own research, analyzed the

21    decision that had to be made and interpolated.  Case went to

22    Singer before the vote and said I oppose this.  I want you to

23    cast my vote against the deal and that is reflected in the

24    fact that Singer voted some of the vote against the deal.

25          But as you will hear during the case there is

1    retaliation against Singer in Council 2 because this group,

2    this faction, is in the MEC, on April 2, is unhappy with the

3    outcome.

4            I want to focus for just a minute  on what was

5    given up and what the plaintiffs keep focusing on in terms of

6    what was waived.  They are going to talk about waiving scope.

7    We talked before about seniority arbitration.  What was given

8    up in order to get this package of benefits from TWA LLC was

9    the right in the event of the dispute to go to arbitration

10   before an independent third party.  And I just want you to

11   bear in mind as you listen to the testimony that that is

12   nothing definite.  That is something that is very

13   uncertainty, very amorphous.

14           You don't know when you go down the arbitration

15   road who the arbitrator is going to be.  You don't know how

16   the arbitrator is going to view the different positions.  The

17   arbitrator could look at the position of the TWA pilots who

18   are looking to lose their jobs in the bankruptcy and look at

19   the position of the American pilots who are in a healthy,

20   financially secure airline, who have a contract right to have

21   people stapled.

22           If this had gone to seniority arbitration it is

23   impossible to know what would have happened.  An arbitrator

24   might well have looked at this and stayed, let's staple the

25   TWA pilots.  That is what is appropriate near.  Or the

1    arbitrator might have done any number of other things.  What

2    ends up happening in terms of the seniority integration and

3    that is the second half of the story I will come to in a

4    minute.  It is going to be going much quicker.  I am not

5    going to spend nearly as much time telling you what happened

6    later in the year.  We believe what happened during the

7    period leading up April 2 is what this case is all about.

8            Once this right to arbitrate seniority is given up

9    on April 2 it is unfortunate, but the TWA pilots are to a

10   large degree kind of at the mercy of the American pilots.

11   They don't have a lot of leverage.  They try to generate

12   leverage through different ideas that I will talk about in a

13   moment.

14           But we believe that the games to a large degree is

15   over.  The TWA pilots voted as they did with their eyes wide

16   open realizing that the seniority integration process would

17   be a difficult process.  So let me talk for a little bit

18   about the second phase of the case, what I refer to as the

19   second decision.

20           The first one being April 2nd.

21           What happens after this vote, we have a second time

22   line.  To just let you follow along is, you heard reference

23   to the different proposals that get exchanged.  The TWA pilot

24   put together a rightful place proposal.  It is a white paper.

25   It is a position paper.  This is what we think we are

entitled to in terms of seniority integration.  The American

pilots take the month or so and they write back, a 20-page

document where they go down point by point and disagree with

everything that the TWA pilots have said.  They basically say

look, you guys worked at an airline that was financially

unsuccessful, it is the third bankruptcy.  You are lucky to

have jobs and you are really not entitled in terms of

seniority to getting a whole lot more.

        So once again the pilots continue to disagree as

they did earlier in the year.  At this point American gets a

facilitator involved, a third party to try to talk to the

pilots.  Sometimes when groups of people get together

directly, personalities get in the way, people find it tough

to get to the real issues.  A facilitator can talk to one

group separately and then talk to the other group.  Sometimes

it works, sometimes it doesn't.  But those facilitating the

negotiations continue on a bunch of days in July and a bunch

of days in August and the negotiations are still unresolved.

        When 9-11 hits, when the terrorist attacks take

place, and of course the terrorist attacks have an enormous

impact and immediate impact on the airline industry as well

of course on the whole country.  They are horrific.

        But if you recall within a couple of weeks, within

a couple weeks after the terrorist attacks airplanes stopped

flying.  The skies go silent and even when planes start to

```
 1    fly again people are uncertain about whether it is safe, and
 2    what happens of course is that the airlines go into a, almost
 3    a death spiral in terms of their financial condition.  They
 4    have to run to Congress to, if you recall a statute, a bill
 5    is passed that allocates five billion dollars to the airlines
 6    to try to keep them afloat until everybody, with what is
 7    going on, until the airlines can get back on their feet.  One
 8    of the results of that is what Mr. Press referred to before,
 9    which is that TWA pilots end up getting furloughed.  American
10    pilots end up getting furloughed.  There are pilots all
11    across the industry who are impacted by this.
12          You have this period in September and October where
13    the whole industry is in a state of uncertainty.  Efforts are
14    made between the TWA pilots and the American pilots to get
15    back on track and try to work out their seniority integration
16    issues.
17          As you might imagine, with everything going on in
18    the world and the country in the aftermath of 9-11, this is
19    not the highest priority for a lot of people.  You heard
20    mention of attempts to get a statute passed, a law passedd in
21    Congress, the Bond amendment.  This is classic special
22    interest legislation.  The Bond amendment is not a bill that
23    says for the entire airline industry that when you have pilot
24    groups getting together that you have to have the Allegheny
25    Mohawk provisions we talked about ending with seniority
```

1    arbitration.  That is not what it says.

2         The Bond amendment says that for this particular

3    transaction, the one where American has purchased the assets

4    of TWA, that the TWA pilots get special treatment, that they

5    get the arbitration.  And you can only imagine how the people

6    at American reacted to that.  The people at American said

7    wait a minute, we had, we proposed a contract to you.  You

8    voted to accept it with your eyes wide open, and knowing that

9    you were giving up seniority arbitration.  Now you are trying

10   to do an end run around that, now you are going to go to

11   Congress and have Congress give you something that you agreed

12   to give up?

13        The people in American and the American pilots are

14   just furious about this.  Some would say, you will hear

15   testimony, I suggest, that if the effort on the part of some

16   within the TWA MEC to get this special interest legislation

17   passed just backfires.  When negotiating the pilots are

18   negotiating trying to reach agreement, people are trying to

19   persuade American Airlines and the APA to treat the TWA

20   pilots with some compassion, with some generosity, and in the

21   midst of that you have people running to Congress and trying

22   to make life difficult.

23        You heard some other suggestions of what some

24   members of the MEC wanted to do, to get leverage over the

25   American pilots and over American.  And again, a lot of what

1    you have heard is not the MEC speaking.  A lot of what you

2    have heard are individuals within the MEC who have ideas like

3    Hollander did back on April 2 in terms of Wilder.  It is

4    individuals who are uncomfortable with the idea that they

5    don't have a lot of leverage, they want to think of some way

6    to get a better position.

7          You have all heard the expression that when

8    attracting flys that honey is more effective than vinegar.

9    Well, there is a disagreement.  There is a division within

10   the MEC over tactics toward the end of the year, you have

11   this  faction led by Hollander and Case.  By this point in

12   time I mentioned Case has replaced Singer on the MEC and

13   Sally Young.  These people want to fight.  They want to

14   deprive other pilots of jump seat privileges.  They want to

15   go to Congress and upset the American Airline pilots.  They

16   want to do a lot of stuff to be very aggressive.  Other, some

17   would say, calmer approaches, are out there as well..  Other

18   people within the MEC are saying this is not such a good

19   idea.  It doesn't help if you antagonize the American pilots.

20         And what happens as a consequence of this division

21   within the MEC, a number of efforts are made during this

22   period in October to get the pilots together again, to get

23   them to agree and nothing comes of it.

24         Jeff Brundage is one of the top labor

25   representatives of American Airlines.  He tries to sponsor

1    some direct negotiations down in Dallas Fort Worth.  Nothing

2    comes of that.

3         The MEC meets, they strategize, there are

4    additional negotiations in October.  There is an additional

5    meeting, October 31 of the MEC, where there is a proposal on

6    the table, from American to try to resolve the seniority

7    integration process.  And the MEC is, can't agree.  What ends

8    ends up happening is there is another meeting on November 7

9    where an attempt is made by Steve Rautenberg to get the MEC

10   to agree to a proposal that he thinks is a fair proposal, and

11   that is the best the pilots can get.  What happens, and I

12   will walk you through this quickly, is on November 1, after

13   American has taken over the operations of TWA, American

14   collapses two of these domiciles.  It closes number 2 in New

15   York and number 4 in Los Angeles.

16        And as a result of that, they disappear for

17   representation period, purposes, temporarily.  There is a

18   verdict of a couple of weeks.  We only have one domicile and

19   the pilots who were represented Council 2 and Council 4, they

20   all get dumped into Council 3.  And you have a meeting on

21   November 7 where Rautenberg and Young collectively represent

22   all of the pilots.

23        Rautenberg represents the majority of the pilots

24   lots.  We come to this meeting on November 7 where Rautenberg

25   is very thoughtful, a very experienced fellow, says look,

this is the best we are going to do.  If you don't agree to

this now, who knows what the American pilots will try to

impose upon us.  He wants to vote to accept the deal that is

on the table at that point in terms of seniority arbitration.

He has the majority of the votes.  There is a parliamentary

dispute you will hear about.  Sally Young refuses to second

his motion to accept the deal.

ALPA National gives advice and says you can't do

that.  You can't refuse to second a vote when you only have

two MEC members, you, if the result is that there is a log

jam.  In effect you are vetoing what the majority of the

pilots want to do.  She won't go along.  Robert Pastore who

who by this point is in plaintiff's camp.  He is goes along

with Hollendar and Case.  He doesn't back ALPA National.  The

meeting degenerates.

As a result of that, the MEC is unable to vote to

accept the deal on the table.  What happens, the next day, on

November 8, American and APA say enough.  We are done going

round and round and round.  Here is the deal.  It is called

Supplement CC.  You don't have to agree to it.  It is what it

is, and we are imposing it.

You heard reference to a cram-down.  It is not a

cram-down.  It is the last step in a process that is

inevitable.

If you go on for month after month after month

1   after month and won't agree to something, American and the

2   APA have to get on with their lives.  They got to get on with

3   running their lives and they have taken it into their hands

4   to resolve it.  That is what happens to bring Supplement CC

5   to a conclusion.

6           Supplement CCI will tell you, it is not terrible.

7   It is a lot better than getting stapled.  It has, what

8   happened in Supplement CC is that 46 percent of the TWA

9   pilots, pre acquisition, get interspersed.  They get

10  consolidated with the American pilots, and then the other 54

11  percent are placed immediately junior to the last American

12  pilot hired on April 9 of 2001.

13          You saw in the first time line April 9 is when the

14  transaction becomes effective.  They don't get stapled.  They

15  get put after American pilots.  There are actually about 475

16  American pilots who are hired after that so they are senior

17  to them.  There is one other major benefit that the TWA

18  pilots get out of this.

19          I mentioned before the idea of a proceed second

20  cell, they get a protective cell with respect to Saint Louis.

21  And that means that they have bit that  preference over

22  American pilots for what becomes American flights in and out

23  of Saint Louis.  That is significant.  That is a significant

24  benefit.  You can see from the numbers there a majority, a

25  large majority of the TWA pilots are operating out of St.

1    Louis.

2            So that is a big plus.  And again, it is certainly

3    significantly better than what the pilots get, would have

4    gotten, being stapled.

5            Now, you heard an argument before by Mr. Press to

6    the effect that ALPA fell down in its job, that it

7    deliberately didn't do all kinds of things it should have

8    done.

9            We think the evidence is going to show that ALPA

10   provided proper support and that the TWA, the  pilots, the

11   MEC made sound decisions and did the right things in the way

12   that I described.

13           I want to point out a couple of things about the

14   claims you heard.  You referred to a card campaign that two

15   American pilots were operating, John Clark and John

16   Hunnibell, they got the idea it would be good for the

17   American pilots to join ALPA, but I don't know that he

18   mentioned to you that the card campaign they started within

19   ALPA is something they started in mid May of 2001.  In mid

20   May they got the idea that this was a good thing, that they

21   should promote ALPA within the APA.

22           It wasn't ALPA's idea.  They said to do it.

23           I want to point out to you that to the extent there

24   has been a suggestion that that the idea of the card campaign

25   was somehow, it somehow affected what the ALPA advisors did

1   during the period leading up April 2, the scope that was most

2   important, couldn't have happened.  The card campaign didn't

3   even exist.

4        The ALPA people couldn't have known about it,

5   obviously it had no impact.  The other theory that I think is

6   out there is there is sort of a grand conspiracy on the part

7   of the ALPA advisors.

8        You heard  dramatic testimony about the ALPA

9   advisors ganging up on the members of the MEC at some

10  meetings in March, and on April 2.  The evidence will refute

11  that.  That is not what happened.  I will note for you as I

12  wrap up that some of advisors who are working with the MEC

13  are not ALPA advisors.  We talked before about this fellow,

14  Steve Tumblin, the bankruptcy lawyer from Salt Lake City.  He

15  has been working with the TWA for 10 years.

16       ALPA doesn't tell him.  He is an outside

17  independent professional.  Michael Glanzer, the investment

18  banker and the lawyer who was hired by TWA MEC in April of

19  2000, the year before any of this happened, nobody at ALPA is

20  telling Mr. Glanzer what to do.  He answers to the MEC.

21  Tumblin and Glanzer you will hear give the same advice that

22  all the other advisors do, with the exception of Wilder.

23  Wilder doesn't disagree with about what is going to happen

24  with the Section 1113 motion.

25       Wilder just says let's think about trying to upset

 1    the apple cart.  Let's think about trying to get more

 2    leverage here and Glanzer and Tumblin, along with everybody

 3    else, say that is a really bad idea.  You will want to, you

 4    don't want to cross that bankruptcy Judge and you really

 5    don't want to take the position that American is playing,

 6    because if American is serious, as we think it is about

 7    walking away from the deal, you are the ones that are going

 8    to have to answer to all the pilots who have no jobs.  That

 9    is what the story of this case is about from our perspective.

10         The same, I mentioned to you before that there is

11    this division within the MEC that I showed you in terms of

12    the numbers back in April, that division continues through

13    the rest of your, in fact, the group that is a distinct

14    minority of Hollander and Case on April 2, as the year goes

15    on, and as life unfortunately gets worse for the TWA pilots,

16    not because of seniority integration as much  as 9-11,

17    everything that happens, as the year goes on, that division

18    gets wider.  People get along worse.

19         And that is the story in this case again, you got a

20    group that started as a faction and is still a faction.  And

21    I want you to just understand as you hear the testimony that

22    they don't speak for the MEC.  And they don't speak for the

23    people who on April 2 made the sound and responsible

24    decision, the Rautenbergs and Singers, and the Lewins.  They

25    have attracted some other pilots to their position to be

1    sure.

2            But we will demonstrate to you that the decision

3    made back on April 2 was the right decision and ALPA did

4    everything that was reasonable and responsible.  It didn't do

5    things that were rash.  It didn't do things that were going

6    to upset bankruptcy judges.  It didn't do things that were

7    going to offend American and make the American pilots even

8    more difficult to deal with.  ALPA used its resources, and

9    its contacts to try to get the best possible deal for the TWA

10   pilots, and it did.

11           Thank you very much.

12           Thank you, your Honor.

13           THE COURT:  Okay.

14           Ladies and gentlemen, we will take a short break

15   now.  About ten, 15 minutes.  15.  We will take a 15-minute

16   break now.

17           Rule number 1, do not discuss the case among

18   yourselves.  Keep an open mind until you have heard all the

19   evidence.

20           All rise when the jury leaves.

21           (Jury leaves the courtroom)

22           THE COURT:  Mr. Press, I want to be sure you are

23   ready to go with your first witness.

24           MR. PRESS:  We are, Judge.

25           THE COURT:  That is going to be Mr. Case?

1            MR. PRESS:  Yes.

2            THE COURT:  We will start with Mr. Case at quarter

3    to one.  Then we will go until 2.  At 2 we will break.  Thank

4    you.  See you in 15 minutes.

5            (Recess)

6            (Jury enters the courtroom.)

7            THE COURT:  Mr. Press.

8            MR. PRESS:  We would call Ted Case.

9            T H E O D O R E   C A S E, Sworn.

10           DIRECT EXAMINATION.

11           BY MR. PRESS:

12           THE COURT:  You may  proceed.

13   Q.   Can you introduce yourself to the jury, please?

14   A.   Theodore Case, I go by Ted.  Once again.  T H E O D O R

15   E,  C A S E.

16   Q.   You are a former TWA pilot?

17   A.   Yes, I am.

18   Q.   You are one of the former pilots that brought this

19   lawsuit?

20   A.   Yes, I am.

21   Q.   What do you understand your role to be in this case,

22   this class action?

23   A.   I am a named plaintiff.  I am one of originally twelve,

24   now five, named plaintiffs in this particular class action

25   litigation.

```
 1    Q.    In this class action how many members of the class are

 2    there, approximately?

 3    A.    Approximately 2,300.

 4    Q.    And they are all former what?

 5    A.    TWA pilots.

 6    Q.    Now, there has been this notion brought up a few minutes

 7    ago that you are part of some fringe faction.  The Judge

 8    talked about opting out of the case.

 9              MR. FRAM:  Your Honor, I object.

10              MR. PRESS:  I didn't ask a question.

11              THE COURT:  Is your question how many opted out?

12              MR. PRESS:  Yes.

13              THE COURT:  I will allow him to answer that.

14    Q.    How many of your former brethren at TWA opted out of

15    this lawsuit?

16    A.    5, including Mr. Rautenberg and Mr. Lewin.

17    Q.    Now, where do you live, sir?

18    A.    I live in Snellville, Georgia.  S N E L L E V I L L E,

19    Georgia, just outside Atlanta.

20    Q.    Where are you from originally?

21    A.    I was born in Anchorage, Alaska.  I kind of claim as

22    home a bunch of different cities.  I kind of grew up in the

23    airline business.

24    Q.    How is that?

25    A.    My father was a pilot for Eastern Airlines.
```

Case-direct/Press                                        118

1    Q.    Where do you work currently?

2    A.    I am currently on American Airlines pilot based in St.

3    Louis.

4    Q.    And what do you do?

5    A.    I am, what we call a first officer on a McDonnell

6    Douglas MD 80 aircraft.

7    Q.    How big a plane is that?

8    A.    Seats about 140 people.  Primarily does domestic flying,

9    some inter national, to international to Canada and Mexico.

10   Q.    How long have you worked as a pilot, Mr. Case?

11   A.    Since 1985.

12   Q.    When did you figure out you wanted to be a pilot?

13   A.    I want, when I was about 13 years old my father asked me

14   then if I wanted to be an airline pile let and his job looked

15   like a really good job and it sounded like a great idea so he

16   took me flying a couple different occasions, about 13 years

17   old I decided I was going to be an airline pilot.

18   Q.    Okay.  Now, before that did you go to school?

19   A.    Yes, sir.

20   Q.    Can you tell the jury a little bit about your

21   educational background?

22   A.    Yes, sir.  I went to high school in Atlanta, Georgia,

23   finished a bachelor's degree program at Georgia State

24   University.

25   Q.    Why didn't you just go straight to being a pilot?  Why

```
 1   did you go to college?
 2   A.   At the time that I wanted to become an airline pilot, if
 3   you did not have a four-year degree they basically would
 4   overlook you and choose some other candidate who did have a
 5   four-year degree with piloting experience required to get on
 6   with an airline.
 7   Q.   What year was it that you graduated?
 8   A.   1978.
 9   Q.   But you said you didn't become a pilot, working as a
10   pilot until 1985?
11   A.   That's correct.
12   Q.   That is a seven-year gap.  Tell us what happened there.
13   A.   Just out of college I was fortunate enough to get a job
14   with Delta Airlines as a mechanic.  While I was a mechanic
15   for Delta and with my father's connections in the airplane
16   business, I worked on my licenses and ratings.  Your have to,
17   to become an airline pilot, you have to be able to achieve a
18   certain number of hours and ratings in different aircraft so
19   that you can qualify to fly larger jet aircraft.
20   Q.   That is this MD 80 you fly now?
21   A.   Yes, sir.
22   Q.   What kind of training do you have to have to qualify to
23   do that?
24   A.   You have to go through complete airline training program
25   to start with the aircraft.  It is generally a training
```

1    syllabus that lasts several months.  Per aircraft that you

2    choose to fly.

3    Q.   I am sorry.  Not American's training but the

4    certificates that you said you have to get first?

5    A.   Oh.  Leading up to that you have do to go through the

6    basic gamut, you become a private pilot.  Then you have to

7    become a commercial pilot.  You have to become instrument

8    rated, and then multi-engine rated,  and eventually airline

9    transport pilot category rated.  And what each one of those

10   steps, with each one of those steps, a certain minimum number

11   of ours hours are required to be under your belt for

12   experience to be able to move up to the next step.

13   Q.   Is that process and framework, is that all under some

14   governmental department?

15   A.   Yes.  Federal Aviation Administration.

16   Q.   Okay.  Take us, if you would, Mr. Case, through your

17   commercial flying career; when did it start and with whom?

18   A.   Okay.  Just out of the Delta mechanic training that I

19   had I was building flying time, like I said, and I achieved

20   enough hours and enough ratings to be hired by Atlantic

21   Southeast Airlines.

22   Q.   All right.

23   A.   That is a regional connection carrier for Delta

24   Airlines.  They were based in the Atlanta primarily and flew

25   much of the feeder flight for Delta's main line hub in

 1   Atlanta.

 2   Q.   And how long did you work for that?

 3   A.   I flew for, we abbreviated ASA, pilots like acronyms.

 4   We abbreviated ASA and  I flew there from 1985 until 1987.

 5   Q.   Where did you go in 1987?

 6   A.   1987 I went to work for Eastern.  My father's  alma

 7   mater.  He was flying there at the time and I thought it

 8   would be great if Dad and his son could fly together.

 9   Q.   You got hired by that airline?

10   A.   Yes.

11   Q.   Where were you based?

12   A.   You based primarily in Atlanta.  Through the years the

13   brief period of time I was fully there, Atlanta, Miami

14   primarily.

15   Q.   How long did you fly for Eastern Airlines?

16   A.   From 1987 until 1989.

17   Q.   Then where did you go?

18   A.   Well, 1989 is my first experience -- 1987 was my first

19   experience with ALPA.  In 1989 you may or may not be aware

20   but Eastern Airlines had a major problem and a major strike

21   that occurred.

22   Q.   Can I interrupt you??

23   A.   Yes, sir.

24   Q.   You said in '87 was your first experience with ALPA.

25   A.   Yes, sir.

1    Q.    In what way was that?

2    A.    Eastern was the first ALPA carrier that I actually flew

3    for.

4    Q.    Which meant what?

5    A.    I joined the association.  Based on my experience from

6    my father's career, Eastern, and from what I understood the

7    Air Line Pilots Association to be as a brotherhood of pilots

8    that took care of their own, and had amazing amount of

9    resources to be able to insure that the piloting profession

10   was safe, effective, and protective of its pilots.

11   Q.    Now, continue.  Before I interrupted you, you were

12   talking about your flying at Eastern and how it ended?

13   A.    Yes, sir.  Eastern Airlines, corporate raider had taken

14   control of Eastern Airlines.  A gentleman by the name of

15   Frank Lorenzo.  He was an anti labor union busting type, he

16   went to war with the International Association of Machinists

17   who was the ground personnel and mechanics union at the

18   airline, and when they refused to sign a contract with them

19   they ended up going on strike.

20        The pilots, Air Line Pilots Association, this is where I

21   found the vast resources that they have, went on and

22   conducted a sympathy strike.  What we did is refuse to cross

23   the picket lines, the pilots.  That strikes was probably in

24   my opinion one of the best organized strikes in the airline

25   piloting history.  ALPA was at war with Frank Lorenzo as well

1    and he was a union buster and we were making every attempt as

2    an association to make sure that that did not carry through

3    to the Air Line Pilots Association.  During the strike ALPA

4    went so far as to collect assessments from their 40,000 plus

5    members and hand me a paycheck while I walked the picket

6    line.

7    Q.   How long did that last, how long were you on strike?

8    A.   Just shy of a year.

9    Q.   How long did ALPA pay for you to walk the picket line?

10   A.   Just shy of a year.

11   Q.   When did you leave employment at Eastern Airlines?

12   A.   I left employment at Eastern Airlines when I went to TWA

13   in 1990.

14   Q.   Okay.  And when you hired on with TWA, what was your

15   position?

16   A.   I was hired on at TWA as a flight engineer, on a 727.

17   That is a different version of an aircraft that used to have

18   three engines and three cockpit crew members, they are no

19   longer flying for commercial travel for for passenger

20   service.

21   Q.   When I give my opening statement I mentioned captains

22   and first officers.  You just said you were a flight

23   engineer?

24   A.   Yes, sir.

25   Q.   What is that?

1   A.   A flight engineer, on the older aircraft with the three

2   man cockpit system, most of the environmental controls, field

3   controls, hydraulic controls are controlled by a third body

4   in the cockpit, that would be the flight engineer.  What he

5   was responsible for was ensuring that the fuel load was

6   balanced,  that the aircraft did not have any electrical

7   problems, and the aircraft back then weren't quite as

8   automated, and it was a rather diligent job to make sure that

9   the passengers were kept warm or cool, and that everything on

10  the aircraft systems worked just fine and the two pilots up

11  front were primarily responsible for making sure that the

12  flight went okay.

13  Q.   And when did TWA stop using flight engineers on its

14  flights?

15  A.   I am not exactly sure the date.  It was probably in the

16  mid 90s.

17  Q.   Okay.  Take us through your career at TWA, up until the

18  -- go ahead.

19  A.   Started at TWA as a 727 flight engineer.  You still,

20  with the airline business back then you still had to have all

21  the same ratings as if you were a pilot of the aircraft and

22  seniority is what governed everything as you came into the

23  airline, as you stepped into the airline, you start at the

24  bottom on the lowest paying piece of equipment and the lowest

25  paying seat.  Usually that was the flight engineer's seat on

1    the smallest aircraft on the property.

2            As your seniority increased you moved from that

3    seat to the right seat which paid more, now we were flying

4    aircraft.  You move as your seniority improved, you moved

5    from that seat to the right seat.

6    Q.   You moved to the right seat, what does that mean?

7    A.   That means when your seniority entitles you to, you

8    proffer or what you do  is you ask for a position that is

9    available as a co-pilot or first officer which is the right

10   seat of the aircraft.

11   Q.   Okay.

12   A.   From there as your seniority improves you move from the

13   right seat or co-pilot seat to the captain's seat.  Seniority

14   among airline pilots is the utmost, it is the pinnacle of

15   everything.  Very much exclusively the airline business, a

16   seniority number, one day difference between you and another

17   person can mean a difference of 35 percent in your paycheck.

18   The difference between a senior first officer and a junior

19   captain, just being able to have that one number to move you

20   from the first officer's seat to the captain's seat could

21   mean up to 35 percent of your pay.  It controls everything.

22   It controls where you work, what you fly, what seat you are

23   in, what city you have to live in or fly out of.

24            Seniority is the animal.  That was what my father

25   taught me early on.  He said get a job with a major airline.

1    Get a seniority number, get a seniority number, get a

2    seniority number.

3    Q.   You have described how the seniority can affect your pay

4    once you became a captain you get a raise.  How does it

5    affect these other things you ticked off, Mr. Case?  Let's

6    start with the dates.  How is it that seniority affects that.

7    A.   Bases are also bid by seniority.  You hold the

8    particular domicile that --

9    Q.   Wait.

10   A.   A domicile is a pilot base.  Excuse me.  You are able to

11   hold a particular pilot base or domicile based on your

12   seniority, in the seat that you are able to hold.  Generally

13   speaking, in the past, the domiciles that the airlines have,

14   the pilot hubs, pilot bases that the airlines have tend to

15   have trends to some being more junior  bases to some being

16   more senior bases.

17       You can probably imagine LA based, California based, it

18   is a pretty senior based.  You have to have a fair amount of

19   seniority to get to California and live out there.  Likewise

20   New York used to be a pretty junior base.  That is where

21   everybody had to go to start off.

22   Q.   Okay.  How is it that seniority affects these other

23   things you talked about?

24   A.   It affects everything.  Your monthly flying, as most of

25   you probably have a normal job, it is Monday through Friday

1    or you  have set hours, the piloting profession, it is

2    completely different.  Most carriers, when I started back at

3    TWA and Eastern, the company would construct what they would

4    call a monthly bid package, and what this monthly bid package

5    was was an opportunity for you to exercise your seniority and

6    picking and choosing what you wanted your flight schedule to

7    look like for the month.  They would publish a schedule that

8    might say you are going to fly the first three days of the

9    month, you are going to be off twp, you will work four, off

10   three, and they cycled it that way.  Each and every pilot got

11   to bid on that particular monthly schedule based on their

12   seniority.

13   Q.   So three pilots bid for the same flight sequence, the

14   person with the highest seniority gets that --

15   A.   Gets that sequence.  People below him get their next

16   choice if it is available.

17   Q.   Again, take us through the sequence of your career as

18   you progressed from flight engineer at TWA, and what year it

19   was?

20   A.   Okay.  I started at TWA in 1990 as a flight engineer on

21   a 727.  From there at about '96 I moved up to a 727 first

22   officer's position, which was a higher-paying position on the

23   airplane.  In 1998 I moved up to the first officer position

24   on the 757, 767 aircraft.  That is a much larger aircraft.

25   It is roughly 180 to 200 passengers depending on the

```
 1   configuration.  And I was at the time flying at end of my TWA

 2   career I was flying the 767 internationally to Paris, Milan,

 3   Cairo, Tel Aviv, places like that.  As a first officer.

 4   Q.   When did you last fly for TWA?

 5   A.   Officially on April 2, 2002.

 6   Q.   Okay.  Now, and then you became employed by a different

 7   company but it still had the name TWA?

 8   A.   Just prior to that, TWA LLC, right.

 9   Q.   And we will get into that in more detail.  When did you

10   last fly for that company?

11   A.   TWA LLC?

12   Q.   Yes, sir.

13   A.   I misspoke.  TWA LLC I started flying for them April 11,

14   2001.  And I stopped flying for them and moved to American on

15   April 2, 2002.

16   Q.   And then when did you last fly for them?

17   A.   For American?

18   Q.   For TWA LLC?

19   A.   LLC, April 3rd, 2002.

20   Q.   When?

21   A.   I kept, excuse me.

22            THE COURT:  April 1, 2002.

23            THE WITNESS:  No.  That was, flying for LLC.

24   Q.   Did you get laid off from TWA LLC?

25   A.   Yes.
```

1    Q.   When was that?

2    A.   July 3 -- July 1st, 2003.

3    Q.   How long did you remain, first of all, I just used --

4            THE COURT:  TWA LLC, did that exist in 2003?

5            THE WITNESS:  Yes, sir.

6            THE COURT:  All right.

7    Q.   I just used the term "layoff" but that is not what

8    pilots call getting it laid offer.  What do you call it?

9    A.   Furloughed.

10   Q.   That is what it means?

11   A.   It means you are laid off, unemployed.

12   Q.   You were furloughed July, 2003.  How long did you remain

13   furloughed?

14   A.   Approximately from July, 2003 until December, '04.

15   Q.   And during that period were you earning any pay checks

16   from American Airlines.

17           MR. FRAM:  Your Honor, I object.  We had an in

18   limine ruling on how far beyond April of 2003, that testimony

19   is --

20           THE COURT:  Well, I will allow him to go -- This

21   has, this has nothing to do with the case, but, what happened

22   in the period of 2001 and 2.  I will let him give general

23   background.

24   Q.   Did that impact you financially, to be furloughed?

25   A.   Yes.

1    Q.    In a negative way?

2    A.    Yes.

3              THE COURT:  Whether it impacted him financially has

4    nothing to do with this case.

5              MR. PRESS:  That is the last question, Judge.

6              THE COURT:  Okay.

7    Q.    You are flying today for what airline?

8    A.    I am back on the property at American Airlines.

9    Q.    How long have you been there?

10   A.    Since April, 2008.

11   Q.    You mentioned that you were a member of ALPA at Eastern

12   Airlines?

13   A.    Yes.

14   Q.    When you became an employee of TWA, did you maintain

15   membership in that union?

16   A.    Yes, I did.

17   Q.    Did you ever do any work for ALPA?

18   A.    Yes.

19   Q.    Over what period of time?

20   A.    Probably, I may not be exact on the dates here, but

21   probably in the '94 to 2002 timeframe.

22   Q.    Okay.  I want you to tell the jury something about

23   ALPA's structure, how it is structured?

24   A.    Okay.

25   Q.    First of all, does it have locals like we hear about in

 1   other unions?

 2   A.    They call them locals but they are not like a normal

 3   union would be.  ALPA is structured such that each individual

 4   airline, as you have heard some of the acronyms, each ALPA

 5   carrier has what they call a MEC that is part of that ALPA

 6   carrier.  Our examples at TWA, it was TWA MEC.  That MEC

 7   happens to be made up of local council representatives which

 8   are about as close as you are going to get to a local as you

 9   can get with the airline business.  Each one of the local

10   councils, which was as Mr. Fram illustrated on his board, New

11   York, St. Louis, and LA, each one of those local councils had

12   a number, 2, 3 and 4, those were the second, third and fourth

13   ALPA councils ever established.

14           And in that group the first officers and the

15   captains at each one of those pilot domiciles elects a

16   representative to represent them.  That local council

17   representative also functions as part of the TWA MEC.  The

18   TWA MEC is made up of the local counsel voting members as

19   well as officers that that local counsel group elect as MEC

20   officers.  It is kind of a, like a wedding cake hierarchy.

21   Q.    These local councils, that, the individual basis?

22   A.    Yes.

23   Q.    And TWA had these local councils in which cities?

24   A.    In New York, St. Louis and LA.

25   Q.    And there is a captain rep and first officer rep in each

1    one of those local councils?

2    A.    Yes, as well as a -- year's past, when they had the

3    three-man aircraft they also had to have a flight engineer

4    representative as well.  There used to be three voting

5    members in each one of the councils.  After the elimination

6    of the three-man airplanes each one of the councils had an

7    option to carry a secretary treasurer ear of that local

8    council as a none voting men and I believe two of the

9    councils did for most of the time.

10   Q.    Mr. Case, tell us generally what is a function of a

11   local council?

12   A.    A local council is the officers of the local council are

13   tasked with insuring the contract between the carrier and the

14   union is upheld at the local level.  When a pilot feels that

15   they have a grievance to file they come to the local council

16   rep, much like you would a shop steward and that council rep

17   is the one that represents you or takes you through the

18   grievance process, the first step to resolve it with your

19   chief pilot or pay  administration.

20   Q.    Let me interrupt.  What is a grievance?

21   A.    A grievance is a, pretty much like it sounds.  When you

22   are working under a contract and you believe the contract has

23   been violated, you can file or petition a grievance to make a

24   claim that I believe my contract is being violated and I am

25   being treated in a fashion the contract does not allow for.

1   Therefore I would like remedy that problem.

2   Q.   And in that process, how is the local council involved?

3   A.   The local council representatives will kind of father

4   you, mother you, through the process and kind of oversee it

5   if you choose.  Can you do it individually but generally they

6   are there with the experience or having had a little bit of

7   background work with it to be able to get you to through the

8   process a little cleaner.

9   Q.   Is there anything else that a local council does besides

10  assist in these grievances?

11  A.   They hold routine meetings.

12  Q.   What kind of issues come before it, to decide?

13  A.   It could be anything from complaining about the aircraft

14  food to complaining about the hotel bed that you had to sleep

15  in last week, to pay issues, to contractual issues.  It gets

16  very heated around contract time.  It is like a local council

17  meeting.  And everybody shows up, it is represented, all the

18  pilots that are represented by that local council show up at

19  these meetings and tell the representatives, and give the

20  representatives direction.  It is truly, if it functions

21  properly, it is a representative democracy.  They do what

22  their membership tells them to do.

23  Q.   Now, that is the local council.  You said the local

24  council members, the captain and first officer, they are part

25  of, or they make up the Master Executive Council or MEC?

1   A.   That's correct.

2   Q.   Okay.  So now  there would have been six MEC members for

3   TWA?

4   A.   Six total voting MEC members.

5   Q.   And what is the function generally, Mr. Case, of the

6   MEC?  What is its function?

7   A.   The MEC takes a little more of a global look at the same

8   picture that they do at the local levels.  But they address

9   issues that are usually above the local level issue.

10  Q.   Like what?

11  A.   If it is something like the company wants to negotiate,

12  or hook up with another airline for a co-chair agreement, or

13  if they want to change something in the contract, or if they

14  would like to be able to pick up some charter flights that

15  weren't necessarily covered by the contract, the Master

16  Executive Council kind of deals with those issues on a

17  routine basis.

18  Q.   Now, the MEC, TWA MEC, where was the head office, where

19  was the office?

20  A.   In Saint Louis, Missouri.

21  Q.   Did it have an office in Washington, D.C.?

22  A.   The national union did, yes.

23  Q.   Explain that structure, the national union?

24  A.   The national union is, starts, according to the

25  paperwork, as the gross membership, all the ALPA members, all

 1    the ALPA represented carriers, they are at the bottom tier of

 2    the wedding cake, if you will.  ALPA portrays this as this is

 3    an upside down wedding cake, that the members who are at the

 4    base eventually will be at the top telling everybody what to

 5    do.

 6         As those members each have local executive councils

 7    at each one of the carriers that represent each pilot base

 8    within that carrier, all the carriers combined make up, in

 9    the representatives of those carriers combined, all the

10    members of those carriers make up what they called the board

11    of directors.

12         From there, there is a next tier of representation

13    that is called the executive board.  The executive board is a

14    group of MEC chairman from each one of those MEC represented

15    airlines that sit on the executive board.

16         So as you can see, the pieces of the wedding cake

17    are getting smaller and more concentrated as well as this

18    executive board, also, has within it an executive council.

19    The executive council is the upper, or just below the

20    officers, the national officers of the association, the

21    executive council consists of executive vice presidents from

22    each one of the different major carriers and then some of the

23    smaller carriers are grouped into what they call group B, C

24    and D carriers and each one of the groups of smaller carriers

25    elect in an EVP or executive vice president to represent

 1    them.  That council sits below the three top officers of the

 2    association.

 3    Q.    Which are three?

 4    A.    President, vice president and secretary, and I think

 5    they now have a separate treasurer position.  It used to be

 6    secretary treasurer.

 7    Q.    Now, if you can, tell us what the function of the

 8    national union is?

 9    A.    The national union is set goals, policy and to protect

10    safety, and the airline piloting profession, to improve, and

11    ensure that it is an ongoing profession, and to ensure that

12    each one of the carriers that are represented by them, are

13    covered by the umbrella of the associations' protections, and

14    their goal and direction.

15            THE COURT:  Do they have a full time paid staff?

16    A.    Yes, they do.  Quite a large one with extremely high

17    wages.

18    Q.    And tell us how large of a staff ALPA had when you left

19    it, being an ALPA member?

20    A.    I wouldn't even hesitate to guess.  They are quite a

21    significant operation.  They have, basically, they rented or

22    partially own an entire office complex in Herndon, Virginia,

23    and they had a major office at 1625 Mass Avenue in

24    Washington, D.C. which I believe they since sold.  But I am

25    not sure.

1   Q.   Is that Massachusetts Avenue ovvice in Washington, D.C.,

2   where about is that?

3   A.   Down close to the capitol.

4   Q.   This office complex you mentioned in Herndon, Virginia.

5   Where is Herndon?

6   A.   Just outside Falls Church, Virginia.  It is in between

7   DC, the capitol and Dulles.

8   Q.   It is a Washington suburb?

9   A.   A Washington suburb.

10  Q.   Describe, if you can, this office complex ALPA operates

11  out of?

12  A.   It is rather extensive office complex with multiple

13  floors and a lot of staff.

14  Q.   All right.

15  Q.   Mr. Case, you said that you have done ALPA work?

16  A.   Yes.

17  Q.   Can you take us through I guess a chronology of your

18  doing union work?

19  A.   One of the things that got me interested in Union work

20  was my Eastern experience.  I found it was unfathomable to me

21  being that young, being there, that they were doing for us

22  what they were doing as Eastern pilots, trying to eradicate

23  the industry with the corporate raider, paying our paycheck

24  while working with the picket lines.  With that experience

25  behind me I went to TWA with a rather gleeful work about what

 1    ALPA work would be like, so I decided to volunteer  myme

 2    time.  In 1994 I joined up what we call Council 2 system

 3    schedule committee.

 4    Q.   What does that committee do?

 5    A.   The system schedule committee, what they would do is

 6    each month, remember the bid package I told you about with

 7    the monthly flying you bid on and your 30-day monthly flying

 8    may look like this.

 9              As a systems schedule committee member we were

10    responsible for coordinating with the company to insure that

11    the bid packages that they put out were, one, legal,

12    according to the FAA regulations, and two, legal within

13    accordance with our contractual provisions were usually a

14    little more restrictive than the FAA guidelines.

15    Q.   What was the point of all that?

16    A.   It was a watchdog committee.  They were protecting the

17    pilots' rest and the pilots' ability to be in a cockpit in a

18    safe manner.

19    Q.   And how long did you serve on that committee, Mr. Case?

20    A.   From about '94 to '96.

21    Q.   What was your next ALPA position that you held?

22    A.   While I was doing that I also joined the preferential

23    bidding task force which was a push at the time to move from

24    the monthly 30-day bidding period, bidding concept, to a more

25    pilot friendly concept of allowing the pilot to simply put

```
 1   his preferences into a computer and let the program on the

 2   computer build your sequence of flying for the month.  That

 3   task force took probably about a year, that was an about a

 4   year of the '94 to '96 timeframe.

 5   Q.   What was your next ALPA position?

 6   A.   You moved from there to the TWA MEC negotiating

 7   committee.

 8   Q.   What is the negotiating committee, what is that?

 9   A.   Negotiating committee, all negotiating committees at

10   ALPA are standing committees that are tasked with ensuring,

11   while the contract is in effect, what they are tasked with

12   ensuring is that nothing gets too far astray from that

13   contract.  They want to make sure that the contracts is

14   complied with --

15   Q.   I am sorry to interrupt.  This contract you are talking

16   about, what is it you are referring to?

17   A.   Pilots at an ALPA carrier, everything within your life

18   is controlled by contract.  We have explicit rules that we

19   have to go by.  Scheduling rules.  Retirement rules.  Pay

20   rules.  You ask a pilot anything about his contract, he will

21   say I got to get the contract.  Ask him how much he gets

22   paid.  I got to see the contract.  Ask him anything about it,

23   that is, that covers everything.  It is your working life

24   contained within that contract.

25   Q.   What contract?
```

1    A.    Collective bargaining agreement.

2    Q.    Who is that between?

3    A.    That bargaining agreement is between the company and the

4    Air Line Pilots Association International.  At that

5    particular airline.  For us it was TWA.

6    Q.    You were explaining your work on the negotiating

7    committee?

8    A.    Yes.

9    Q.    And you said it was contract work?

10   A.    Yes.

11   Q.    It had to do with this collective bargaining agreement?

12   A.    Yes.

13   Q.    Can you continue again, your work on the negotiating

14   committee?

15   A.    I worked on the negotiating committee from about '96 to

16   '98.  We were in what we call Section 6 negotiations, ask a

17   pilot, any pilot in the airport if you are in Section 6, that

18   means we are in contract negotiations.  It it is a Railway

19   Labor Act term.

20   Q.    What is the Railway Labor Act?

21   A.    The Railway Labor Act is what all pilots work under that

22   are organized.

23   Q.    Okay.

24   A.    Union wise.

25   Q.    The Railway Labor Act is a federal labor law?

1    A.    Yes, it is a federal labor law that was written back in

2    the twenties.  It was amended a couple of times to include

3    airlines, it doesn't sound right.  But airlines are

4    controlled by the Railway Labor Act.  How airline management

5    and the union that represents the pilot at that union, how

6    that happens is all controlled by the labor law called the

7    Railway Labor Act.

8    Q.    Okay.  Now, Mr. Case, when you were on the TWA MEC

9    negotiating committee, were you involved in the Section 6

10   negotiations?

11   A.    Yes, sir.

12   Q.    Can you tell the jury what that means?

13   A.    What that means is that when the contract becomes

14   amendable --

15   Q.    What does that mean?

16   A.    Railway Labor Act, to the best of my understanding, one

17   of the principle reasons behind its conception in Congress

18   was a continuity of service theme.  Congress didn't believe

19   that railroads should be able to just shut down when contract

20   time came or airlines should be able to shut the doors and

21   say we got a contract going on, it is expired, no flights

22   today.

23            Congress enacted the Act to ensure that a

24   continuation of service happened while the contracts were

25   being negotiated.  Therefore, Railway Labor Act contracts

1    have amendable dates in them.  They don't expire.  They have

2    amendable date and that date triggers certain aspects of the

3    statutory requirements of the act.  Once that date occurs,

4    you can what we do is call open the contract for

5    negotiations.  That is the amendable dates allows either

6    party without the others consent to open the contract and say

7    we want to talk about the contract.

8    Q.   All right.

9    A.   And negotiate the terms of a new one.

10   Q.   You were involved in that process at TWA?

11   A.   Intimately.

12   Q.   What years was that?

13   A.   '96 to '98.  Trained  by ALPA to do so.

14   Q.   Describe that.

15   A.   When you get elected to these committees, once again,

16   ALPA has a massive amount of resources to it.  We were all

17   sent to the George Meedy Institute  of Labor Studies.  What

18   we do is we went there to learn about the Railway Labor Act

19   and learn about what we were empowered to do under that Act

20   as well as how to write contracts to comply with the Act as

21   well as, it is a short course in labor law.  Is basically

22   what it is.

23   Q.   Who puts that on?

24   A.   Air Line Pilots Association sponsors that for all

25   incoming members of the negotiating committee.

Case-direct/Press                                           143

 1   Q.   What was your next, you left the negotiating committee

 2   in nature.  What was your next position?

 3   A.   I was elected Council 3, which is the St. Louis Council,

 4   first officer representative.

 5             THE COURT:  On the MEC.

 6   A.   On the MEC, yes.

 7   Q.   Mr. Case, how long did you serve on the MEC at that

 8   time?

 9   A.   I believe it was about a year and a half.

10   Q.   Why did you leave?

11   A.   I  was recalled.

12   Q.   Which means what?

13   A.   The membership who elected me decided that they wanted

14   to change direction and they, with the largest vote turn out

15   of in recall, I was recalled by 60 votes.

16   Q.   Did that, well, tell us, did you hold --

17             THE COURT:  When was that.

18   A.   That was in '98, '98, I believe.

19             THE COURT:  1998.

20   A.   Yes, sir.

21   Q.   You told us you were elected to the MEC in 1998?

22   A.   No.  Yes, I was elected in 1998.  It might have been

23   '99, mid '99.

24   Q.   When were you recalled?

25   A.   Mid '99.

```
 1    Q.    What was your next position, ALPA position?

 2    A.    I was subsequently elected again back to the Council 2

 3    secretary treasurer position.

 4    Q.    When was that?

 5              THE COURT:  To the MEC again.

 6    A.    Yes.

 7    A.    Union politics.  That was probably, I believe around

 8    2000.

 9    Q.    How long did you serve in that position?

10    A.    Until I was elected first officer representative,

11    interim first officer representative in Council 2.

12    Q.    Okay.  When was that?

13    A.    That was after David Singer was recalled and I replaced

14    him.

15    Q.    When was that?

16    A.    That was I believe, I am not sure of the date.  Oh one.

17    Q.    What year was it?

18    A.    2001.

19    Q.    How long did you hold that post?

20    A.    I held that post until I was elected by the MEC to be

21    the TWA MEC secretary treasurer.

22    Q.    When was that?

23    A.    That was in November of that same year.

24              THE COURT:  2001.

25              THE WITNESS:  2001.
```

1    Q.   How long did you serve in that position?

2    A.   From that time until ALPA was no longer the exclusive

3    were gaining agent for the TWA MEC pilots.

4    Q.   All this union work, Mr. Case, were you paid for any of

5    that?

6    A.   No, sir.

7    Q.   Why did you do it?

8    A.   Once again, my experience with Eastern taught me that

9    you could make a difference as an ALPA member and as an ALPA

10   volunteer you could make a bigger difference.  And I felt an

11   obligation to the TWA pilot friends that I had to try and

12   improve their life and that is what I did primarily, on the

13   negotiating committee with the contract, one of the reasons

14   why I was recalled is because I was one of the staunch

15   advocates for demanding more money and some of the more

16   concessionary pilots had complained about that to management

17   and management didn't like the fact that I was pushing for

18   more money.

19        THE COURT:  Didn't the union compensate you if you

20   cement time on union matters?

21   A.   They would reimburse any time that you lost.

22        THE COURT:  So you did, I mean it wasn't totally

23   charitable act on your part.  You did get some compensation

24   to make up for the time you lost?

25        THE WITNESS:  Only if the union work that you did

```
 1    transgressed a trip that you should have flown.  So it is

 2    generally a volunteer position.

 3              THE COURT:  In your particular case you you got

 4    compensatory pay from the union?

 5              THE WITNESS:  Correct, on most occasions and the

 6    officers in the MEC are almost, they are -- spend a lot of

 7    time in the office and most of their trips are bought off by

 8    the union, yes.

 9    Q.   ALPA National, when were you last a member of that

10    union?

11    A.   April 3, 2003.  2002, excuse me.

12    Q.   At that time, how many airline, how many different

13    airlines did ALPA represent the pilots at?

14    A.   I wouldn't even hesitate a guess.  It is probably in the

15    70 or so range.  There is a lot of airlines.

16    Q.   Can you tell the jury some of the largest carriers that

17    ALPA represented their pilots?

18    A.   Delta, United.  Northwest.  U.S. Air.  All before the

19    mergers and the bankruptcies.

20    Q.   Again, when you were last a member, April, '02, about

21    how many ALPA members were there nationwide?

22    A.   Approximately 60,000.

23              THE COURT:  When you cease to be a member of ALPA

24    did you join American's union.

25              THE WITNESS:  No, sir.
```

  1              THE COURT:  You weren't required to?

  2              THE WITNESS:  At that time, no.

  3              THE COURT:  Did you wind up joining now?

  4    A.    Finally, yes.

  5              THE COURT:  They changed it that you have to?

  6    A.    They make you pay the dues whether you join or not.

  7    Q.    Mr. Case, besides ALPA, are there other unions that

  8    represent commercial airline pilots?

  9    A.    Yes, sir, there are.

 10    Q.    Can you name some?

 11    A.    Sure, Teamsters, represent Polo Air Cargo and a couple

 12    other airlines.

 13              THE COURT:  Who represents American?

 14    A.    Allied Pilots Association.

 15              THE COURT:  Same one that was there back in 2001

 16    and 2?

 17    A.    The American split off from ALPA in 1963 and they have

 18    remained an independent union since, the Allied Pilots

 19    Association.

 20              THE COURT:  That hasn't changed since 2001?

 21              THE WITNESS:  No.

 22    Q.    And just to close the loop on that, the Allied Pilots

 23    Association represents the pilots of what airline?

 24    A.    Only American Airlines.

 25    Q.    And what is the shorthand way to refer to that union?

Case-direct/Press                                        148

1    A.    APA, another acronym.

2    Q.    APA.  Does the APA represent any pilots besides the

3    American airline pilots?

4    A.    Not at this time.

5    Q.    You mentioned the Teamsters.  We have this APA and ALPA.

6    Of all the unions out there, which union represents the most

7    pilots?

8    A.    ALPA, by far.

9    Q.    ALPA's office complex and its different functions, how

10   is that all paid for?

11   A.    It is paid for by union dues.

12   Q.    Can you just tell us briefly how that works?

13   A.    Yes, sir.  If my recollection serves me, I was working

14   two bases, MEC secretary treasurer.  Essentially the union

15   dues come in from each and every member pilot.  Those dues

16   that come in, as you can imagine, all come in to a big pool

17   at National ALPA.  I will refer to them as National ALPA.

18   Q.    Let me stop you there.  When you last were an ALPA

19   member, how much in dues did you pay?

20   A.    1.95 percent of your gross pay.

21   Q.    Was that across the board for all members?

22   A.    That was across the board for all members.

23          THE COURT:  When you checked off, or did you

24   voluntary write checks?

25   A.    I wrote checks.  You could do dues check-off.

```
 1              THE COURT:  It was not required?.

 2    A.    It was not required.

 3    Q.    Again, I interrupted you.  You will explain the process

 4    how the dues --

 5    A.    As the dues come in, they collect 1.96 percent from

 6    everybody's dues.  Once that money goes into the big pool,

 7    what they have to do is they have to figure out how to allow

 8    these individual carriers to represent themselves with these

 9    MECs that I was speaking of.  As you can imagine,, it is true

10    brotherhood in unionism.  Essentially, the smaller carriers,

11    there is an airline called Cc Air.  You probably never heard

12    of it.  It probably has maybe 20 pilots.  They were ALPA

13    represented at one time.  Those 20 pilots have to conduct the

14    same type of contract negotiations that the major carriers

15    do, they have to have the same type of committee

16    representation at the local levels that the majors do, and

17    you can only imagine that 1.96 percent  of 20 pilots income

18    does not allow them to represent their pilots in a very

19    efficient fashion.

20              So therefore what ALPA does is the larger carriers

21    essentially subsidize the smaller carriers' ability to

22    represent themselves, which is once again the way the union

23    works.  All the money that comes in to ALPA, out of all that

24    money that comes in, they pile it all up, and roughly for the

25    major carriers they send 26 percent of the total dues income
```

1   from that carrier back to the major airline to operate its

2   local MEC for the year.  The remainder of the dues income

3   between the 26 percent and what they sent back, they use to

4   help subsidize the smaller carriers and to use surplus for

5   the ALPA budget for the administration of ALPA which once

6   again  is extremely large with a very stiff extensive

7   payroll.

8   Q.   Mr. Case, do you know what ALPA was formed?

9   A.   In 1931.

10  Q.   Do you know how it was formed?

11  A.   It was formed by a guy named Dave Benke.  It was

12  primarily formed because at that time most air carrying was

13  male carriage and it was formed primarily because of the

14  unsafe conditions that these pilots were being asked to fly

15  in and continue to work in.

16  Q.   So there was?

17  A.   It was primarily a safety concern.

18  Q.   This Mr. Benke formed the union.  Do you know which

19  pilot groups were some of the first to join?

20  A.   Northwest, TWA, and Pan Am, Eastern.  Some of them are

21  long-gone names.

22          THE COURT:  American?

23  A.   American, one of the founders as well.

24  Q.   And when was it that TWA and American were finding this

25  union, or chartering it?

 1   A.   Back in the mid thirties.

 2   Q.   You mentioned a collective bargaining agreement?

 3   A.   Yes.

 4   Q.   That is something that ALPA enters into with the lawyer.

 5   When did ALPA first have a collective bargaining agreement

 6   with TWA?

 7   A.   In 1946.

 8   Q.   Was there a collective bargaining agreement in place

 9   between ALPA and TWA from 1946 all the way to the end?

10   A.   Yes.

11   Q.   Of TWA?

12   A.   Yes.

13   Q.   When did ALPA cease to be the union for the TWA pilots,

14   when did that end?

15   A.   That ended on March 5, 2002.

16   Q.   Can you tell the jury the circumstances of that?

17   A.   That was the result of a, what they call a single

18   carrier filing.  With the national mediation board.

19   Q.   All right.  You are going to have to explain that if you

20   can?

21   A.   More acronyms.  When two car carriers merge there is

22   eventually a requirement for that carrier to say we are one

23   airline.  And someone has to make that determination.  The

24   determination for making -- the entity for for making that

25   determination is the, is called the National Mediation Board.

1            What their job is to do is to investigate and

2    explore as to whether or not this carrier  is a single

3    carrier for transportation purposes and advertising as such

4    and everything matches up as such and make that determination

5    as well as determining once that is made, who the collective

6    bargaining agent is for that particular carrier's employees.

7            THE COURT:  Mr. Case, I don't know if it makes a

8    difference, but on March 5 the board declared American and

9    TWA to be a single carrier.

10   A.   Single carrier.

11           THE COURT:  But they didn't certified the

12   bargaining unit until April 3rd.  So ALPA was still on board

13   until April 3rd, 2002.  That is when they were no longer

14   bargaining, not March 5.

15   A.   Correct.

16   Q.   On April 3rd, 20002, ALPA lost its bargaining rights

17   over TWA pilots?

18   A.   Yes.  What I confused that, the national mediation board

19   issued a ruling on March 5.

20           THE COURT:  Single carrier.

21   A.   Sinks he will carrier ruling and said ALPA, if you want

22   to show interest in this, we will give you time to do so.  Do

23   you want to be the bargaining agent for the collective group

24   of pilots that are going to remain at American Airlines.

25   Q.   Okay.  The single carrier determination was made with

 1   respect to which two airlines?

 2   A.   American Airlines and TWA LLC.

 3          THE COURT:  But TWA LLC was owned by American.

 4   A.   Yes.

 5          THE COURT:  I mean American and its own

 6   subsidiaries.

 7          THE WITNESS:  That was several of the other

 8   problems.

 9          THE COURT:  That was the point.

10          THE WITNESS:  Yes.

11   Q.   What did that mean, the sink he will carrier

12   determination, what did that mean with respect to your

13   collective bargaining agreement?

14   A.   Can you restate the question?

15   Q.   Yes.

16          THE COURT:  Mr. Press, he already answered that

17   question.  He said it was time for ALPA, he indicated it had

18   an interest in representing the new joined group but what he

19   in effect said is that they didn't so on April 3rd the board

20   certified APA as the sink he will bargaining rep for the

21   whole group of pilots.  Is that right?

22          THE WITNESS:  Yes.

23   Q.   As far as the contract that governed you, what contract

24   would you be under from that point forward?

25   A.   From that point forward we would be under the contract

1    that was in effect with American Airlines.

2    Q.   And its union?

3    A.   And its union.

4            THE COURT:  APA.

5            THE WITNESS:  APA.

6    Q.   Now, this merger between American and TWA that you

7    talked about, what was the genesis of that, when did that

8    process begin?

9    A.   In July 9, 2001.

10   Q.   July?

11   A.   January 9, excuse me.  J month.  January 9, 2001.

12           THE COURT:  That was the contract between TWA and

13   American than where American agreed to buy out under certain

14   conditions TWA.

15   Q.   Mr. Case, that is a contract you are familiar with?

16   A.   Yes, fairly well.

17           MR. PRESS:  I would like to refer to P 272.

18           THE COURT:  I am sorry.  P 272.

19           THE COURT:  Any objection to putting that in

20   evidence.

21           MR. FRAM:  No, your Honor.

22           THE COURT:  P-272 is in evidence.  Show it to him

23   and ask him questions:

24   Q.   What is exhibit P-272?  It I is called J for joint.  J

25   272.  What is it?

1    A.    That is the asset purchase agreement between American

2    Airlines, Inc., as purchaser and Trans World Airlines, Inc.,

3    as seller, dated January 9, 2001.

4    Q.    We put on the monitor just the cover page of there

5    document?

6    A.    Yes.

7    Q.    It is a multi-page thing.  This is a document you are

8    familiar with?

9    A.    Yes, sir, fairly familiar.

10   Q.    And can you tell us, it says asset purchase agreement.

11   What assets were being purchased?

12   A.    Virtually all of TWA's assets, their aircrafts, their

13   gates, their routes, their slots, their equipment, the ground

14   equipment, their jetways.  Virtually everything that TWA

15   owned was subject to the asset purchase agreement that they

16   chose to take.

17   Q.    At that time, January, 2001, Mr. Case, where did TWA

18   rank as far as airline size in the country?

19   A.    They were the seven largest carrier representing about

20   four percent of the total market share.

21   Q.    Its annual revenues were approximately what?

22   A.    Approximately $4.5 billion, 4.5 billion dollars  a year.

23   Q.    You mentioned that American was agreeing to basically

24   buy all the assets of TWA.  Can you tell us not to the level

25   of staplers, and what not, some of the most valuable things

1    that were going to be part of this transaction that American

2    was buying?

3    A.    Okay.  TWA, believe it or not, had one of the youngest

4    fleets flying.  We were getting new aircraft.  Routinely.  So

5    they purchased the lease obligations or the ability to lease

6    the aircraft if they chose to lease, newer aircraft TWA had.

7    They purchased a third chair.

8    Q.    Let me stop you there.  Just the number of planes.  How

9    many are we talking about?

10   A.    Roughly 200 aircraft.

11   Q.    Of what variety were they?

12   A.    They ranged anything from a DC 9 which was somewhat

13   similar to the MD 80 I was explaining that I flew, which is a

14   140 seat.  DC 9 is a little smaller, same twin engine

15   aircraft.  To the MD 80s.  We had a fleet of about 106 MD 80s

16   which were compatible with American's fleet, as far as the

17   same type ofaircraft.  757s which were shy of the wide body,

18   at all, long leg, skinny, 180-seat Boeing aircraft.  757s are

19   which are the 200-seat wide body that do most of the

20   international flying we were doing.

21   Q.    You mentioned TWA's flight was one of the newest in the

22   industry?

23   A.    Yes.  We just ordered, I believe, taken delivery of

24   brand new Boeing 717s, which is one I didn't mention.  It is

25   very similar to the MD 80, little bit smaller, and we had

```
 1    options I believe for 25 more that were scheduled to come

 2    within that year and a half or two years following 2001.

 3    Q.   So right at the time of this asset deal, TWA is still

 4    buying or acquiring planes?

 5    A.   Yes, and we were hiring pilots.

 6    Q.   Hiring pilots?

 7    A.   Yes, we were.

 8    Q.   Besides the planes, what else was American getting in

 9    this deal?

10    A.   They got a 33 percent share in what was then called

11    World Span.  It is a, where a computer reservation system

12    that Delta and Northwest were in partnership with TWA on,

13    which was what drove the reservation sales at the carrier.

14    That had to be spun off because American had a conflicting

15    interest with their reservation systems sale.

16              THE COURT:  Which was the dominent system in the

17    industry?

18    A.   That is arguable.

19              THE COURT:  American's was the dominant in the

20    industry, was it not?

21    A.   If you combine Delta, Northwest with TWA, I am not sure.

22    Yes, American's was the largest single, for a carrier.

23    Q.   When you mentioned American spun it off, when then spun

24    it off, this interest in World Span, how much did they net?

25    A.   I am not sure of the exact number, but it was over 200
```

```
 1   million.

 2   Q.   So that was something they got.  What else did they get,

 3   major assets again??

 4   A.   Aircraft gates, slots, air, gates, slot restricted

 5   routes and airports.

 6   Q.   What does that mean?

 7   A.   Any of you who have been at LaGuardia know what slot

 8   restrictions are.  They are small geographic airports that

 9   the federal government has limited the number of flights in

10   and out of the airport.  Those slots are given to carriers

11   and those slots are very valuable, especially in the airports

12   like LaGuardia, DC, some of the more highly concentrated

13   traffic small geographic airport areas.

14   Q.   TWA had several?

15   A.   Yes, some at LaGuardia, some at Kennedy, a number of

16   them.

17   Q.   What else was American getting that had substantial

18   value?

19   A.   Out of a four and a half billion dollar revenue flow.

20   Q.   What about the TWA route structure?  What can you say

21   about that?

22   A.   TWA's route structure at that time was pretty much

23   global.  We went almost everywhere in the United States that

24   you could go domestically and we had quite a presence

25   internationally still at that time.
```

1    Q.    And how many hubs did TWA had?

2    A.    Major hubs, New York, St. Louis, LA.

3    Q.    Which was the biggest?

4    A.    Saint Louis.

5    Q.    That is where TWA was headquartered?

6    A.    That is where it was headquartered.

7    Q.    Can you tell us approximately how many daily flights

8    came out of St. Louis at that time?

9    A.    At that time in and out of St. Louis I believe roughly

10   700 flights a day and we are down to 39 a day now.

11   Q.    What about TWA's employees, were they part of this deal?

12   A.    Yes, they were offered employment along with the asset

13   purchase.

14   Q.    How many employees were there?

15   A.    Roughly 20,000, as you heard stated earlier.

16   Q.    Can you tell us without thumbing through the document

17   how much American was agreeing to pay to purchase these

18   assets?

19   A.    Initially I believe the number was around 500 million,

20   to enter into the transaction.

21   Q.    Mr. Case, there is a provision in here about TWA filing

22   for bankruptcy.  I don't have it at my fingertips.  Perhaps

23   you can find it.

24   A.    Yes, it is on --

25              THE COURT:  Look at page 36.

1              THE COURT:  Eight one one deals with the bankruptcy

2    court ruling.

3    Q.   Are you there?

4    A.   No, sir, what page.

5              THE COURT:  35.

6    Q.   Can you go to the recitals page, third page, fourth page

7    in?

8    Q.   Recitals page, Mr. Case, you were referencing.  The

9    third whereas clause.

10   A.   Yes, sir.

11   Q.   It says there TWA intends to file and to cause other

12   sellers to file a voluntary petition for reorganize pursuant

13   to Chapter 11 of the Bankruptcy Code.  That is what it says?

14   A.   Yes.

15   Q.   Before this January 9, 2001, were you aware of any

16   notion that TWA was going to go to bankruptcy?

17   A.   No, sir.

18   Q.   Okay.

19   A.   Like I said, we were receiving new aircraft and my pay

20   checks weren't bouncing.

21             THE COURT:  You don't have to have pay checks

22   bouncing and you can be buying new equipment and still go

23   bankrupt.  You know that.  That is not proof of a bankruptcy.

24   A.   I know.

25             THE COURT:  You know.  So keep the testimony as you

1    know.

2              THE WITNESS:  Yes, sir.

3    Q.   Mr. Case, did you have an understanding before telling

4    me what it was, did you have an understanding as to why

5    American wanted TWA to go into bankruptcy?

6    A.   Yes, sir.

7    Q.   How did you gain that understanding?

8    A.   Through Mr. Holtzman.

9    Q.   Who is Mr. Holtzman?

10   A.   He was the, he was the contract administer.

11   Q.   What does that mean?

12   A.   ALPA assigns a lawyer for each one of their carriers to

13   act as contract administer at that carrier, he works with the

14   grievance committee and the MEC on legal matters.  And is a

15   conduit for ALPA for the legal issues.

16   Q.   Where was is office?

17   A.   In the TWA MEC offices in Saint Louis.

18   Q.   Now, what is, and you gained some understanding from Mr.

19   Holtzman as to why American wanted TWA to file for

20   bankruptcy?

21   A.   Yes.

22   Q.   Was that a conversation you had with him?

23   A.   Yes.

24   Q.   And what did he say?

25              MR. FRAM:  Objection, hearsay, your Honor.

1              THE COURT:  Yes.  I have no doubt, he can, he knows

2    what Mr. Holtzman said but you are offering it for the truth

3    of the proposition of why American filed.  He can't, Mr.,

4    when Mr. Holtzman takes its stand he can ask him.

5              MR. PRESS:  It is offered as an admission.

6              THE COURT:  Of whom.  American, they are not a

7    party.

8              MR. PRESS:  Of ALPA.

9              THE COURT:  Why is Holtzman an admission of ALPA.

10             MR. PRESS:  He is an ALPA lawyer, Judge.

11             THE COURT:  Then it is not an admission.  What kind

12   of admission, admission against interest?

13             MR. PRESS:  Yes.

14             THE COURT:  Why is it against interest?

15             MR. PRESS:  We will hear ALPA say TWA was bankrupt.

16             THE COURT:  Mr. Case can't testify as to why

17   American and TWA agreed to acquire, the contract actually

18   doesn't do that.  But why they and anticipated a bankruptcy

19   by TWA.

20             MR. PRESS:  I will move on, Judge.

21             THE COURT:  By the way, a structured agreement

22   appears to be that the conditions precedent, or condition,

23   yeah, whatever you want to call it, what are the right

24   phrase, the preclosing covenant, that they needed certain

25   bankruptcy court approvals to do a couple of different

1    things.  And that is 8.11.  I don't know that it is in here

2    that TWA was required as a condition of of the contract to

3    file bankruptcy.  But if they didn't get bankruptcy court

4    approval the deal wouldn't have to go through and if they

5    couldn't satisfactory that, so TWA was in a position in

6    effect of they wanted to be, if they wanted the deal to go

7    through they would file bankruptcy.  If they didn't want the

8    deal to go through they wouldn't file bankruptcy.

9    Q.   Mr. Case, in the asset purchase agreement that was a

10   condition for American's agreement that TWA do certain things

11   to your collective bargaining agreement.  Do you remember

12   that?

13   A.   Yes, sir.

14   Q.   Can you take us to where that is in the agreement?

15   A.   I believe that is under article ten, employee matters.

16   Q.   Page 41.

17              THE COURT:  Employee matters.

18              THE WITNESS:  Yes, sir.

19              THE COURT:  Union matters, page 42.

20   Q.   Are you on the page 41?

21   A.   Yes.  10.2.

22   Q.   Can you pull that up, 10.2.  There is a sentence that

23   starts in the middle of that paragraph prior to closing?

24   A.   Yes.

25   Q.   Read that.

1    A.   Prior to closing TWA shall amend all existing collective

2    bargaining agreements relating to any present or former

3    employee of TWA to provide that (i), scope, successorship,

4    and benefits provisions of the collective were beginning

5    agreement are are not applicable to or being assumed by

6    purchaser as part of or as the result of the transactions

7    contemplated by this agreement, and (ii), consummation of the

8    transactions contemplated by this article 10 will not violate

9    or breach in any way, manner any provision of any collective

10   bargaining agreement.

11   Q.   That is a mouth full.  I want you to try to explain

12   that.

13           MR. PESS:  Judge, this might be a good place to

14   break.  This is going to get into a lengthy discussion.

15           THE COURT:  It may be a lengthy discussion but we

16   are not going to make it too lengthy.  The scope provision,

17   the union has to waive the scope provisions as a condition of

18   the deal going through.  Right?

19   A.   Yes, sir, but it has been referred to by defense counsel

20   as we had to bargain a new contract.

21           THE COURT:  Well, by the end of the day, as far as

22   this deal was concerned, American didn't have to goes through

23   with the deal if the union didn't waive its scope provisions,

24   its right to arbitration, if they couldn't reach agreement.

25   A.   Correct.  There were two sections of the 31 section

 1   contract that this agreement required amendment.

 2          THE COURT:  It required you to waive them.

 3          THE WITNESS:  Correct.

 4          THE COURT:  Didn't keep you from trying to

 5   negotiate something new.

 6          THE WITNESS:  Correct.

 7          THE COURT:  But you had to waive the ones that

 8   existed.  That is what the deal required..

 9   A.  Yes.

10          THE COURT:  That was a condition precident to

11   American having to go through -- let me ask one other

12   question.  TWA had lots of debt, I am sure they had all kinds

13   of debt.

14          THE WITNESS:  Yes.

15          THE COURT:  American didn't have any, with some

16   limited exception, American didn't have to pay over the debt.

17   A.  American took over very little if any of the debt.  They

18   got a four and a half billion crown jewel.

19          THE COURT:  They bought the assets.

20          THE WITNESS:  The operation.

21          THE COURT:  And whatever was paid into bankruptcy

22   was satisfied the debts, any pre bankruptcy which was most of

23   it, correct?

24   A.  Yes.

25          THE COURT:  You you want to break now?

1              MR. PRESS:  Yes.

2              THE COURT:  Okay.  Ladies and gentlemen.  I will

3     see you at 8:30 tomorrow.  Do not discuss the case among

4     yourselves, do not discuss the case with your family,

5     friends, loved ones, insistent spouses, like I was.  Keep an

6     open mind until you have heard all the evidence.  Thank you

7     very much.

8              THE COURT:  Have a safe trip home and in tomorrow.

9              (Jury leaves the courtroom).

10             MR. FRAM:  We talked in chambers about a

11    sequestration order.  I know we advised our witnesses of

12    that.  I don't think you want to put that on the record.

13             THE COURT:  As I told you.  A sequestration means

14    that an individual who intends to testify for the party, or

15    the party intends to call, should not be in the courtroom

16    until such time as, A, he is called upon here, he or she is

17    called upon to give testimony, and then he, there is no

18    chance that the person will be recalled.  That person shall

19    should not otherwise be in the courtroom.  It doesn't apply

20    to Mr. Case because he is, if it was a criminal case we call

21    him the case agent.

22             MR. PRESS:  And the other class reps as well.

23             THE COURT:  That was never an issue.

24             MR. FRAM:  We agreed on that.

25             THE COURT:  The class reps are entitled to be here.

 1    There are five of them.  They are entitled to be here.

 2              MR. FRAM:  Your Honor, I assume that counsel

 3    understands that they will also not talk to see questions

 4    sequestered witnesses about what the testimony was.  I hope

 5    that is understood.  They not only cannot be here, but people

 6    can't tell them what the witnesses testified about.  That is

 7    my understanding of sequestration.

 8              THE COURT:  I am not going to go that far until you

 9    give me some authority on that subject.

10              MR. FRAM:  We will look it.

11              THE COURT:  You want to get the junior men in

12    Archer Greiner to crank out research tonight?

13              I don't know that, for instance, let's assume a

14    witness says something surprising, or usual.  And another

15    witness is going to testify in the same area.  I don't know

16    why you might not be able to use the --

17              MR. FRAM:  I don't feel strongly about it.  I want

18    to make sure we are all on the same page in terms of the

19    ground rules.

20              THE COURT:  I am not going to order that absent

21    some authority that I should.  In a case where there are so

22    many witnesses testifying and people are not yet, but people

23    are going to say things that are going to come as a great

24    surprise both to their own lawyers and the other lawyers.

25    Trust me.  That is going to happen.  And in this case,

```
 1   particularly it is going to happen.

 2            And I would hesitate to tell counsel that they

 3   couldn't go back and, now, say look.  What do you have to say

 4   about this?  I didn't know that, you know, that there was a

 5   meeting on April 9, and such and such as said.  Was there a

 6   meeting on April 9?

 7            So.  But if you want to give me some authority, you

 8   know, that, why I should, that is a rule of law that I should

 9   apply.  I have always applied sequestration routinely in

10   every case.  That it witnesses shouldn't be present in court

11   until such time as they testify, save the client themselves.

12   But if you think it goes further than that, it goes to even

13   talking to the witness.  I am going to want authority on

14   that.

15            MR. FRAM:  Thank you.

16            MS. RODRIGUEZ:  The question becomes has another

17   layer in this situation, and the class situation, your Honor,

18   because although, because the majority of the remaining

19   witnesses, while not class representatives, are still class

20   members which then, if the --

21            THE COURT:  I mean, you are getting, that is a

22   subject for a law review article.  Which I am not going to

23   write.

24            Let me see what he has to say.  Obviously, I will

25   give you a chance to rebut.  If you have an argument that
```

1    because of the class status of the witnesses is a member of

2    the class, falls into a different category, then just a third

3    party witness.

4            MS. RODRIGUEZ:  Certainly with regard to counsel

5    they do.

6            THE COURT:  For some purposes I agree.  I don't

7    disagree with that.  Any way, I am not ordering it.  So

8    unless, he in effect makes a motion to, you know, to do that,

9    and give me some authority, and which time I will give you an

10   opportunity to answer it.  There is no issue before me right

11   now.  I am speaking with my -- except for the five class

12   reps.  No other witness, whether class member or not a class

13   member, should be in court until such time as they testify.

14           MR. FRAM:  Marta Wagner is one of the in-house

15   lawyers.  She is our representative for the purposes of rule

16   615.  She is potential witness, unlikely.  I want the Court

17   and counsel to know she will be in court.  We view her as

18   essential to the preparation of our case.  As your Honor

19   knows under rule 615 there are exceptions for people who can

20   be  excluded.

21           I hope there is not an issue with respect to that.

22           MS. RODRIGUEZ:  We don't have an issue with that.

23   No.

24           THE COURT:  Okay.

25           MR. FRAM:  The only other thing I want to point out

1    is I did object when counsel brough out the number of

2    opt-outs and Mr. Rauterberg had opted out.  Plaintiffs made a

3    motion in limine to preclude any reference to the fact that

4    pilots opted out.

5           Your Honor granted that motion after the pretrial

6    conference and ordered on February 8, 2011, I assume based

7    upon the fact that they have now brought out that fact.

8           THE COURT:  I instructed that the fact it is a

9    class action doesn't give more weight or less weight to the

10   case.

11          MR. FRAM:  I just want to be clear since they

12   brought it out, when Mr. Rauterberg testifies, he can comment

13   that he opted out of the class since they learned that, and

14   Mr. Singer who did not opt out, but who opposes their

15   position can be questioned about.

16          THE COURT:  He didn't opt out.

17          MR. FRAM:  No, he didn't opt out.  My concern is we

18   believe there are many, many pilots who didn't opt out not

19   because they agree with the plaintiffs' position but because

20   they didn't bother.

21          THE COURT:  Whether a particular pilot agrees or

22   doesn't agree is not evidential.  Let's start with that.  You

23   think you are going to drag this down to a question of who

24   agrees or disagrees with the plaintiff, that is not a route

25   we are going down.  A pilot can testify to things he knows,

1  seen, heard, participated in, you know, what the pilots, he

2  or she did.  But whether they agree or disagree with the

3  strategy of the lawyers or the strategy of the plaintiffs, is

4  not evidence.  It is not evidence that somebody may disagree

5  with the --

6       MR. FRAM:  I wouldn't ask that but since they

7  opened the door.

8       THE COURT:  No, they didn't open the door.  You may

9  have opened the door, actually, in your opening.  I thought

10  that you opened the door to some degree on the opt-out issue

11  because you tried, you planted the seed in your opening, that

12  maybe not everybody agreed with this.  And so and I noticed

13  that when you did it, and at this point, look, he testified

14  to the five people opted out.

15       Fine.  The jury is not going to decide the case on

16  that.  That is not prejudicial.

17       MR. FRAM:  I just want to be clear when Mr.

18  Rautenberg, for example, testifies, he can be asked did you

19  opt out of the class.  Since they already brought it out, I

20  hope there is no objection to that.

21       THE COURT:  What is your position on that?

22       MR. PRESS:  Of course we brought it up.  I would be

23  a hyprocrite to object.

24       THE COURT:  So you can do it.  What I don't want, I

25  don't really think that that is, that five opted out, that

 1    was the testimony.

 2                MR. JACOBSEN:  Correct.

 3                THE COURT:  All right.

 4                That is out there.  I don't think it is going to

 5    have the kind of prejudicial effect of the jury after six

 6    weeks of trial here.  But I don't want to drag this case down

 7    to individual pilots' opinions as to whether it is a good

 8    cause of action, a bad cause of action.  If you think I am

 9    going to listen to Mr. Bensel's opinion about the cause of

10    action, you are wrong.

11                For that matter, I don't want to hear Mr. Case's

12    opinion as to whether it is a good cause of action or not.  I

13    want to hear what he knows.

14                Obviously, it is there and was involved at various

15    stages.  And of course we want to hear it.  That is true for

16    any other pilots as well.   But that will be true for union

17    people.  Union representatives, ALPA representatives who were

18    there, you know, or some consultant that that may wind up

19    testifying.

20                But people's opinions, whether it is a good case or

21    a bad case, is not what I am interested in.

22                MR. JACOBSEN:  It was offered only as a brief

23    response to the very extensive tail wagging the dog argument

24    that was made in opening.

25                THE COURT:  I thought I said that.  You want to

1    make sure I remember it.

2              MR. JACOBSEN:  Yes, sir.

3              THE COURT:  I already forgot it like two minutes

4    ago.  You are probably right.

5              No.  As I said, when it went in the way it went in

6    I thought it was proper.  The question was asked, how many

7    people opted out.  There was an objection at that time.  I

8    said you could say it.

9              I think it is done and done correctly and I have no

10   problem with it.

11             But again, I emphasize, I don't want people up

12   there telling me they think it is a good cause of action or a

13   bad cause of action, or partly good and partly bad, or why I

14   didn't opt out even though I think it is a bad cause of

15   action.

16             The idea being it is probably going to be a big

17   benefit in the case, why shouldn't I get it, even if I think

18   it is a bad cause of action.  You know.  I don't want to get

19   into that.

20             That is not evidential in this case.  That is pure

21   403 stuff.  It has almost no probative value and will add

22   confusion to the case.

23             Okay?

24             MS. RODRIGUEZ:  Yes.

25             MR. FRAM:  Thank you, your Honor.

Case-direct/Press                                          174

1              THE COURT:  All right.  I will see you tomorrow at

2    8:30.

3              (Adjourned at 2:10 p.m.)

I N D E X


Opening Statements.

        By Mr. Press.                    P. 20

        By Mr. Fram.                     P. 63


THEODORE CASE, SWORN,.

        DIRECT EXAMINATION.

            BY MR. PRESS:                116