```
 1              IN THE UNITED STATES DISTRICT COURT.
                       FOR THE DISTRICT  OF NEW JERSEY
 2                     CIVIL 02-2917  (JEI)

 3         THEODORE A. CASE, SALLY YOUNG,
           HOWARD HOLLANDER, PATRICK BRADY
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                             Plaintiffs,
 6                                            VOLUME 2
                V.                        TRIAL TRANSCRIPT
 7
           AIR LINE PILOTS ASSOCIATION,
 8
                             Defendant.
 9
                                    CAMDEN, NEW JERSEY
10                                  JUNE 8, 2011

11         B E F O R E:   HONORABLE JOSEPH E. IRENAS
                          UNITED STATES DISTRICT JUDGE
12
                       A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                     AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:  STEVEN FRAM, ESQ.
19                   AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH GINSBERG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10            LYNNE JOHNSON, CSR, CM, CRR
           OFFICIAL COURT REPORTER
11          UNITED STATES DISTRICT COURT
           P.O. BOX 6822
12          LAWRENCEVILLE, NJ  08648
           PHONE:   609 896 1836
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury enters the courtroom.)

 2                    THE COURT:  Good morning, everybody.  Please be

 3    seated.

 4                    THEODORE CASE, previously sworn.  Resumes.

 5                    CONTINUED DIRECT EXAMINATION

 6                    MR. PRESS:

 7                    THE COURT:  Good morning.  You are still under

 8    oath.  You may continue.  Have a seat.

 9                    MR. PRESS:  Thank you, your Honor.

10    Q.   Mr. Case, when we stopped yesterday we were talking

11    about the scope waiver provision and the as asset purchase

12    agreement?

13    A.   Yes.

14    Q.   Which asked TWA to amend certain, amend your collective

15    bargaining agreement to eliminate certain provisions?

16    A.   Yes, sir.

17    Q.   Are you familiar with the collective bargaining

18    agreement between ALPA and TWA?

19    A.   Yes, sir.

20                    MR. PRESS:  Judge, can I approach the witness?

21                    THE COURT:  Yes.

22    Q.   Mr. Case, I handed you what we marked exhibit P 256?

23    A.   Yes, sir.

24    Q.   What is that?

25    A.   This is a copy of the 1998 agreement between Trans World
```

1    Airlines, Inc., and the Air Line Pilots Association, Trans

2    World Airlines, Inc..

3    Q.   Was this the collective bargaining agreement in effect

4    between ALPA and TWA in 2001?

5    A.   Yes, sir, this is section 1 of that agreement.

6              MR. PRESS:   We would move for admission of P 256.

7              THE COURT:   Any objection?

8              MR. FRAM:    No objection.

9              THE COURT:   In evidence.

10   Q.   Effective when?

11   A.   September 1, 1998.

12   Q.   What was the term of this, when was it, you mentioned

13   that collective bargaining agreements, they don't expire,

14   they become amendable.   When was this to become amendable?

15   A.   This one was to become amendable in September, 2003.

16   This is the contract that I worked on at the negotiating

17   committee, while I was on the negotiating committee.

18   Q.   Very good.   Now, the provisions that American wanted TWA

19   to eliminate, are you familiar with those provisions?

20   A.   Yes, sir, I am.

21   Q.   Can, if you look at the exhibit I handed you, how many

22   pages does that cover of stuff that you were supposed to

23   eliminate?

24   A.   Pages 1 through 11.

25   Q.   If you could give us a summary of what though those

1   provisions are so we don't look at 11 pages?

2   A.   This is the scope successorship and recognition section

3   of our contract.   The defines the global scope of the

4   contract between the pilots and the association as well as

5   the terms in the event of a transaction, a successorship

6   transaction and recognizes the Air Line Pilots Association

7   voluntarily as the representative of the TWA pilots at TWA.

8   Q.   All right.   And what else?

9   A.   Once again, can you rephrase the question.

10  Q.   You were asked to eliminate the scope, successorship and

11  benefits provisions of the collective bargaining?

12  A.   This does not include benefits.   This is just scope and

13  successorship.

14  Q.   As to successorship, what was the thrust of the

15  agreement?

16  A.   The thrust of the agreement and one of the most

17  important sections of this that I felt that in my opinion was

18  the most important to the TWA pilots was section 1 C 1.

19  Q.   Can we bring that up, 1 C 1.   What page is that on?

20  A.   On page 2.

21  Q.   Mr. Case, can you tell us, you said that in your view

22  this was the most important provision in here.   Tell us what

23  it is?

24  A.   In my view I thing the most important provision in the

25  entire contract.   We have heard some about the Allegheny

1   Mohawk 3 and 13 sections yesterday.  This particular section

2   required TWA, Inc., if they engaged in a transaction with

3   another carrier to require that carrier to assume this

4   contract, and these terms would be the terms of the surviving

5   carriers contract and it also, by language, assures that the

6   surviving union of the two combining carriers would be ALPA,

7   according to this agreement.

8   Q.   And American wanted that gone?

9   A.   Yes.

10  Q.   Now, if it had worked out that there was a merger where

11  that did apply, how would the seniority issue been resolved?

12  A.

13  Q.   Under that contract?

14  A.   Under this contract seniority integration would have --.

15          MR. FRAM:  I object.  It is a hypothetical.  I

16  don't know that this witness is qualified to give opinions

17  about the legal context of the document.

18          THE COURT:   I think it is really not an issue

19  here.

20  Q.   I will ask a better question.  According to the

21  contract, Mr. Case, what does the contract provide for the

22  process to integrate two seniority lists?

23  A.   That if it were an ALPA to ALPA merger, ALPA merger

24  policy would apply.  If it were an ALPA to non-ALPA,

25  Allegheny Mohawk, sections 3 and 13 would apply.

1              THE COURT:  In other words, the pilots would not

2    have lost their seniority.  That is the bottom line.

3    A.   Correct.

4              THE COURT:  This if this contract had been followed

5    there would have been no effective loss of seniority.

6    A.   Correct.

7              THE COURT:  To the TWA pilots.  Is that right?

8    A.   Yes, sir.

9              THE COURT:  You can't nod your head.  You have to

10   speak.

11             THE WITNESS:  Yes, sir.

12   Q.   Okay.  So that is what, that was ALPA's collective

13   bargaining agreement with TWA go knowing this merger with

14   American?

15   A.   Yes.

16   Q.   Are you familiar with Americans collective bargaining

17   agreement with its pilots union?

18   A.   Yes.

19             MR. PRESS:  May I approach the witness, your Honor?

20             THE COURT:  Yes.

21   Q.   I have handed you exhibit P 255.  What is that, Mr.

22   Case?

23   A.   This is the agreement between American Airlines, Inc.,

24   and the airline pilots in the service of American Airlines,

25   Inc., as represented by the Allied Pilots Association, and it

1    is dated effective May 5, 1997.

2    Q.   And you told us that you were familiar with that, with

3    this document.  How is it that you are familiar with it?

4    A.   This is the particular section that I work under

5    currently with American Airlines contract.  As an American

6    Airlines pilot.

7    Q.   This isn't the whole collective bargaining agreement,

8    this is just an excerpt from it, right?

9    A.   This is section 1.

10   Q.   This is the comparable provisions to that we just looked

11   at in the TWA contract?

12   A.   Yes, sir.

13   Q.   And how  is it that this contract would differ from

14   yours from a material way as to how to merge the seniority

15   lists?

16   A.   This contract in general terms, this particular section,

17   says that if American is the successor carrier, that the

18   Allegheny Mohawk 3 and 13 sections don't apply but if

19   American is the acquired carrier, they do.

20   Q.   Which means that this he --

21           THE COURT:  There is no objection to admitting this

22   in evidence?

23           MR. FRAM:  Correct, your Honor.  No objection.

24           THE COURT:  Are you offering it in evidence?

25           MR. PRESS:  Yes, I am.

 1              THE COURT:  I am going to admit P 255 in evidence.

 2    Q.   Mr. Case, there was a statement made yesterday I believe

 3    in openings that this contract required American to staple

 4    the TWA pilots to the bottom.  Does it have any provision in

 5    it like that?

 6    A.   Not that I can find.

 7    Q.   Again, all it says is we are not bound to follow the

 8    Allegheny Mohawk procedure?

 9    A.   That is correct.

10    Q.   All right.  This notion of you waiving your scope

11    provision in your contract, what did you think about that?

12    A.   I was extremely upset with that.  It concerned me a

13    great deal.

14    Q.   Why was that?

15    A.   As I stated, section 1 of our contract insured that we

16    would have continued ALPA representation in the event of a

17    merger and that our standing contract would apply.

18              That meant a lot to me.  It it meant a lot of

19    protection, union protection to me, and I was very concerned

20    when the asset purchase agreement required a  waiver of those

21    conditions.

22              THE COURT:  A waiver by the TWA pilots.

23    A.   A waiver by the TWA pilots of those conditions of the

24    contract.

25    Q.   Mr. Case, you were on the TWA MEC at the time, right?

1    A.    Yes, sir.

2    Q.    Can you tell us what the MEC's initial goal was to try

3    to negotiate a seniority agreement?

4    A.    Yes, sir, initially we intended to fight the requirement

5    to waive the Allegheny Mohawk 3 and 13 sections.

6    Q.    Tell us the first few things that the MEC did to try to

7    organize itself for this, the upcoming negotiations?

8    A.    We --

9              THE COURT:  There is a timeframe for this.

10   Q.    In 2001, January, the deal is announced January 9, 2001.

11   What were the first steps that the MEC took?

12   A.    Some of the first steps.

13             MR. FRAM:  Pardon me.  Could we have a foundation

14   of personal knowledge?  I object.  There is no foundation he

15   was directly involved.

16             THE COURT:  Yes, he was.  In January 9, when the

17   deal was announced, were you a member of the MEC.

18             THE WITNESS:  Yes, sir.

19             THE COURT:  That puts him right in the heart of it.

20             MR. FRAM:  Thank you, your Honor.

21             THE COURT:  Okay.

22   Q.    Mr. Case, the first, if you can tell us the first couple

23   things that the MEC did to try to protect your seniority?

24   A.    We appointed a merger committee.

25   Q.    What is that?

```
1    A.   When two airlines announce that they are going to merge

2    each pilot group appoints a merger committee.  Those two

3    committees are designed to work with each other to come to

4    terms on a seniority integration.

5    Q.   Do you remember who the MEC selected to be on this

6    merger committee?

7    A.   Yes, sir.  Initially they selected a gentleman by the

8    name of John Clark.  The next selection was John Swanson.

9    The remaining three were Bud Bensel, John Hefley and Gary

10   Flor.

11   Q.   These were all TWA pilots, right?

12   A.   Yes, sir, some captains, some first officers.  Kind of

13   put a blend on there that represented the entire seniority

14   ranks at TWA.  Senior to junior.

15   Q.   What support did you provide this merger committee right

16   off the bat?

17   A.   The MEC provided merger support with allowing them to

18   take trips to, take trips off, to have meetings to confer, to

19   calculate, and to come up with proposals for the other side.

20   Q.   What about legal support?

21   A.   Shortly following the merger committee appointment we

22   hired Mr. Roland Wilder as our independent merger counsel.

23   Q.   And where is -- well, from your perspective were you in

24   agreement with hiring Mr. Wilder?

25   A.   Yes, sir, he had come very highly recommended, as a
```

1    matter of several recommendations.  We sent a search team out

2    looking for a merger counsel that had experience in previous

3    airline mergers.

4    Q.   When did the MEC hire Wilder?

5    A.   I  believe it was sometime in January, early February.

6    Q.   What was the scope of his representation, what was his

7    job?

8    A.   Mr.  Wilder's job was to coordinate with the merger

9    committee oncoming up with proposals and to insure that we

10   had legal representation with that committee when they met.

11              MR. PRESS:  May I approach the witness, Judge?

12              THE COURT:  Yes.

13   Q.   Mr. Case, I have handed you exhibit, I am going to get a

14   copy as soon as we can, Judge, exhibit D?

15              THE COURT:  D?

16              MR. PRESS:  D.  Defendant's exhibit 243  Can you

17   tell us what that is?

18   A.   Yes, sir.  This is a copy of the TWA MEC meeting minutes

19   from the regular meeting scheduled on January 17 through 19,

20   2001, St. Louis, Missouri.

21   Q.   Judge, I have a copy now.

22              We would move for the admission of exhibit D 243,

23   Judge.

24              MR. FRAM:  No objection, your Honor.

25              THE COURT:  Okay.  D 243 -- there is no stamp on

Case-direct                                                                    13

1    this.  Oh, there it is.  D 243 in evidence.

2    Q.    It says on the top TWA MEC minutes, right?

3    A.    Yes, sir.

4    Q.    And the date is when?

5    A.    January 17 to the 19, 2001.

6    Q.    It is, the meeting was, covered three days, right?

7    A.    Yes, sir.

8    Q.    These, tell, give the jury some flavor for what, how the

9    minutes are prepared, and how your meetings operate, MEC

10   meetings?

11   A.    MEC meetings by ALPA's Constitution and bylaws are

12   required to be run under Roberts Rules of Order.

13   Q.    What is that?

14   A.    It is a very complex set of rules under which you

15   conduct meetings to maintain order so that people are

16   speaking in turn, there is no disorganized or disarray

17   activity while the meetings are occurring.  It is very

18   formalized, very English, and it goes back a long time.

19   Q.    The minutes, who takes the minutes?

20   A.    We have a staff secretary that would take shorthand

21   minutes of meetings while they were occurring and once the

22   meeting was concluded she would formalize the meeting

23   minutes, in a typewritten format and then they would be

24   supplied to the next meeting or a following subsequent

25   meeting for the MEC members and officers to read, amend,

1    correct, and then sign off on final publication of those

2    minutes to the, to be sent back for finalization, and to

3    become part of the official record.

4    Q.   And at the bottom of page 1 it says approved, MEC

5    resolution number 1-51.  Right?

6    A.   Yes, sir.  Each one of these sets of meeting minutes,

7    according to the rules under which we operate, were formally

8    approved by formal resolution of the MEC at the meeting at

9    which time they are approved.

10   Q.   Were there occasions that the minutes, that were

11   prepared would not be approved because you had a problem with

12   them?

13   A.   Yes, sir.  At time times there would be members that had

14   spoken that didn't agree with what the minute said.  They

15   would ask for clarification or edits, at some points in time

16   throughout, towards the end of the transaction, the minutes

17   never got formalized.  As ALPA was shutting down business we

18   just didn't conduct enough meetings or the minutes weren't

19   prepared in time for the meetings to be formally approved.

20   Q.   Can you go to page 10 of the minutes, Mr. Case.  The

21   page numbers are at the bottom.

22         MR. PRESS:  Can you blow that up, the last

23   paragraph.

24   Q.   Mr. Case, we have highlighted a provision from these

25   minutes.  Can you, first of all, this is Thursday, January

1   18, 2001, right?

2   A.   Yes, sir.

3   Q.   Can you read in case the jury can't the last

4   announcement there?

5   A.   Yes, sir.  Shwartz briefed the MEC on his conversation

6   with ALPA president Duane worth.  He said President Woerth

7   indicated he would be extremely supportive of the MEC's

8   efforts in the coming months.

9   Q.   Who is the Shwartz that is referred to there?

10  A.   At that time Scott Schwartz was our MEC vice chairman.

11  He is one of the officers that was elected by the MEC.

12  Q.   Was there any support that you saw from President Woerth

13  after this?

14  A.   In my view, no.

15  Q.   When was the first time that you had a problem with your

16  union supporting you in this deal?

17  A.   Very early on, after we hired our merger counsel.

18  Q.   Explain that if you would?

19  A.   Hiring outside consultants at ALPA for the individual

20  airline MEC's was a process.  We would interview the outside

21  consultant or attorney.  We would come to an agreement with

22  that attorney.  Then that contract had to be signed off on by

23  the ALPA National.  Once it was signed off and ALPA National

24  agreed, then that contract was finalized, signed, and that

25  outside consultant or attorney become actually employed by

1   the MEC at that time.

2           THE COURT:  The attorney would be your consultant

3   paid for out of union funds.

4           THE WITNESS:  Yes, sir.

5           THE COURT:  The MEC didn't have its own treasury to

6   pay a lawyer.  Or did it?

7   A.   Yes, it did.  Well, the budget that the MEC, the MEC

8   had, did allow authorization to pay outside counsel in an

9   ALPA to non-ALPA merger directly out of the MEC budget.

10          THE COURT:  But that money came out of union dues.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  It was allocated by the union.

13          THE WITNESS:  Yes, sir.  The Air Line Pilots

14  Association dues collection is kind of, maybe a little

15  explanation on that would help if that is okay.

16          THE COURT:  Yes.  I think you already gave it.

17          THE WITNESS:  Dues are collected from the members.

18  They come to ALPA National headquarters in Herndon and then

19  they are redistributed back to the individual MECs for their

20  budgets.  And that, those dues dollars that come back to the

21  MEC budget are what are allowed to be spent on outside

22  consultants and attorneys in certain conditions.  Other

23  conditions, if it is an ALPA to ALPA merger then the

24  individuals MEC's two merger carriers have to collect an

25  independent merger fund due to ALPA's inherent conflict of

```
 1   interest in representing two ALPA carriers in a merger.

 2   Q.    Again, what was your problem with ALPA's position in

 3   paying Mr. Roland Wilder's bills?

 4   A.    I was extremely up upset because we had hired Mr. Wilder

 5   and this was a direct merger between American, a non-ALPA

 6   represented carrier and TWA, LLC or TWA Inc. at that time, an

 7   ALPA represented carrier.  It was clearly an ALPA to non-ALPA

 8   merger and the MEC budgetary funds which should have been

 9   accessible to pay our merger counsel.

10            THE COURT:  Were they not?

11   A.    No, they were not initially.

12            THE COURT:  What do you mean by initially?

13   A.    Actually, never.  We got word back from ALPA National

14   that they refused to pay our merger counsel out of our MEC

15   budgetary fund.

16            THE COURT:  Did they approve his hiring.

17            THE WITNESS:  Eventually they did.

18            THE COURT:  And did they approve paying for it.

19   A.    Eventually they approved paying for it out of direct

20   contribution that's we raised from our pilot group as if it

21   were an ALPA to ALPA merger.

22   Q.    When was it that it was reported to you that ALPA was

23   not going to pay for Roland Wilder?

24   A.    It is in some of these minutes, I am not sure exactly

25   which ones.
```

Case-direct                                                    18

1    Q.   Let me hand you an exhibit then.  This is?

2    Q.   Exhibit D 244, Mr. Case.  What is that?

3    A.   This is a set of TWA MEC minutes from the special

4    meeting dated February 15, 16, in 2001 in St. Louis.

5              MR. PRESS:  I move for the admission of D 244,

6    Judge.

7              MR. FRAM:  No objection.

8              THE COURT:  D 244 in evidence.

9    Q.   On page 2 there is a discussion about the issue you just

10   testified to.  Right?  That is reflected in the minutes.

11   Page 2 at the bottom.

12   A.   Yes, sir.

13   Q.   What does it say there?

14   A.   Schwartz informed the MEC that ALPA National said no MEC

15   funds could be used for the merger integration attorney.

16   Q.   Okay.  Again, this is that vice chairman Schwartz?

17   A.   Yes, sir.

18   Q.   He again is a TWA pilot?

19   A.   Yes, sir, he is a TWA pilots and an elected officer of

20   the MEC.

21   Q.   Thinks the first you learned of ALPA's unwillingness to

22   pay for Mr. Wilder?

23   A.   Yes, sir, I believe it is.

24   Q.   And what was your reaction to that?

25   A.   I was extremely upset with this.  Once again, we should

Case-direct                                                    19

```
 1   have been allowed to use MEC funds to pay for this attorney

 2   if it is an ALPA to nonALPA merger, and clearly the ability

 3   to use MEC funds, we were being denied those.

 4   Q.   Go to the next page, page 3, Mr. Case.  There is a

 5   reference to there is a reference to you, is there not?

 6   A.   Yes, sir.

 7   Q.   It case case queried, well, what is it you were asking

 8   for?

 9   A.   I queried the officers, if there was going to be an

10   appeal to the executive board regarding the decision not to

11   allow our use of MEC funds for the merger integration

12   attorney.

13          I requested the officers or MEC officers explore

14   the possibility of appeal.  Our master chairman said that

15   there should be some area for an appeal and I also requested

16   documentation on how the Air Cal merger with American

17   Airlines was handled.

18   Q.   That is the last sentence.  Case requested documentation

19   on how the Air Cal merger was handled.

20   A.   Yes, sir.

21   Q.   Why did you ask for information about that?

22

23   A.   It was a previous  APA, American Airlines to ALPA

24   carrier, Air Cal was a relatively small carrier in California

25   that was ALPA represented.  That merger occurred
```

 1   approximately 1986.  That particular merger I later found out

 2   through some of this documentation was on an adjusted date of

 3   hire basis?

 4   Q.   Why did you want to know this information?

 5   A.   I felt it was very important.  We were moving into an

 6   integration scenario with a major carrier, American Airlines,

 7   I wanted to see how they had done mergers in the past.

 8   Q.   With ALPA?

 9   A.   With ALPA.

10   Q.   Learning that, did that form any expectation for you as

11   to how you would be treated in this merger?

12   A.   Of course.  I was concerned, as usual, because of the

13   loss of our section 1 of our contract.  But with this I saw

14   that there was a possibility or a potential that there was a

15   chance for a fair outcome.  They had merged the Air Cal

16   pilots into their list, the American pilots had merged the

17   Air Cal pilots into their list on an adjusted date of hire

18   basis.

19   Q.   Moving forward, Mr. Case, can you tell us what the MEC's

20   strategy was to protect your contractual rights and your

21   seniority, initially what was the strategy?

22   A.   Initially, early on, was to fight the scope waiver

23   conditions, and to prepare ourselves for an uphill battle and

24   a fight with the American Airlines pilots.

25   Q.   And did you receive any advice, again, in early stages

```
1   from anybody employed by ALPA that formulated part of your

2   strategy?

3   A.   Yes, sir.  Initially Mr. Holtzman and Mr. Warner assured

4   us that --

5   Q.   Let me stop you there.  Mr. Holtzman is who?

6   A.   He was our contract administrator.  The ALPA attorney

7   assigned to the TWA MEC.

8   Q.   And who is Mr. Warner?

9   A.   He is staff counsel for, at ALPA National.

10  Q.   Where does he work?

11  A.   He works in I believe it is Herndon, Virginia.

12  Q.   Again I interrupted you.  But what advice do these given

13  you that helped form the MEC strategy?

14            MR. FRAM:  Your Honor, could we have a timeframe,

15  please?

16  Q.   We are talking February?

17  A.   Early on, January, February timeframe.  The initial

18  advice was to fight waiving our section 1, and to try to come

19  up with a plan to get these lists interest integrated in a

20  fair fashion.

21  Q.   So the initial strategy was to fight and ALPA was in

22  support of that strategy?

23  A.   Yes, sir.

24  Q.   How did TWA respond to your recalcitrance, your failure

25  to waive the scope?
```

1    A.   Eventually TWA filed for what you heard yesterday, an

2    owe on.

3              THE COURT:   When you say TWA you mean the company.

4    Q.   TWA Inc., yes.   Thank you, Judge.

5    A.   TWA, Inc., filed a 1113 motion in federal bankruptcy

6    court to reject our contract.

7    Q.   I talked about that probably awkwardly in my opening.

8    Can you tell the jury what the 1113 is all about?

9    A.   Somewhat.   I have a little bit of experience with it

10   being ex- Eastern.   At 1113 motion came, a 1113 section of

11   the Bankruptcy Code came into effect after Continental

12   bankruptcies back in the early eighties.   And essentially

13   paraphrasing to the best of my knowledge what it means is, is

14   that a debtor in possession can apply to have a contract

15   rejected if that particular contract is onerous to the

16   reorganization plan of that debtor in possession.   It allows

17   an air carrier, for instance, to go in and say this

18   particular bargaining agreement with these pay rates and

19   these working conditions are onerous to our survival and our

20   reorganization we have not succeeded in negotiating a

21   solution and we would like the bankruptcy court to reject the

22   contract.

23             That is in lay person's terms the best I can do.

24   Q.   This is part of the Bankruptcy Code, Section 1113 of the

25   Bankruptcy Code?

1    A.    Yes.

2    Q.    Gives the bankruptcy Judge power to reject contracts?

3    A.    Correct.

4    Q.    It was motion --

5    Q.    TWA's motion --

6              THE COURT:   1113 deals specifically with labor

7    contracts, does it not?  It is not the general rejection.

8    A.    There are other rejection provisions.

9              MR. FRAM:   That's correct, Judge.

10             THE COURT:   So the jury understands, the rejection

11   of contracts in bankruptcy has been part of the Code for a

12   long time.  But 1113 was added to deal with the special

13   conditions in special situations that labor contracts

14   provided or created.  And it dealt solely with labor

15   contracts.  Not just all contracts, which was already a part

16   of the code a long time before.

17             Okay.  But his answer is still essentially correct.

18   It allows rejection under certain circumstances of labor

19   contracts by the employer.  Okay.

20   A.    And I have been subject to that threat before being at

21   Eastern.  Frank Lorenzo made the same threat at Eastern

22   airlines back when the strike was occurring when I was

23   employed there.  But, I did have some familiarity with it.

24   Q.    When did TWA file its motion under this Section 1113, do

25   you remember?

Case-direct                                                    24

1   A.   I believe it was March 15.

2   Q.   All right.  Was that something unexpected to you?

3   A.   No, sir.

4   Q.   Why?

5   A.   We had already been told and, I had already spoken to

6   Mr. Holtzman about this and he said, they will file

7   eventually if we don't waive our section 1.

8   Q.   So you had a conversation with Mr. Holtzman about this

9   Section 1113?

10  A.   Yes, sir.

11  Q.   When was that?

12  A.   Leading up, early to mid February.

13  Q.   And what good he say about the Section 1113 motion, the

14  process, how it would be handled?

15  A.   We didn't get into a definitive description of the

16  process, but the original plan was to fight the 1113 motion.

17  Q.   Did you talk with anybody else employed at ALPA again

18  before April 2 when the scope waiver went down about the

19  Section 1113 motion?

20  A.   Yes, sir.  In conversation was Mr. Holtzman, at times

21  Mr. Warner was also was also in the conversation.

22  Q.   When did you speak with Mr. Warner about the 1113

23  motion?

24  A.   Approximately the same timeframe.

25  Q.   What did he say about it?

Case-direct                                                      25

1    A.    He reiterated Mr. Holtzman's indication that we were

2    going to fight it and we had a pretty good shot at preventing

3    it.

4    Q.    So the 1113 motion gets filed on March 15 and what was

5    the MEC's strategy with respect to him dealing with it,

6    initially?

7    A.    Initially was to fight it and to the best of my

8    recollection, we had legal counsel working on a motion to

9    oppose it.

10             THE COURT:  What legal counsel?

11             THE WITNESS:  Richard Seltzer.

12             THE COURT:  You had hired Richard Seltzer for that

13   purpose?

14             THE WITNESS:  No, sir, ALPA National had provided

15   his assistance as one of our advisors.

16   Q.    Other than objecting to the motion, was there any other

17   strategy that the MEC had come up with to deal with these

18   issues?

19   A.    Several strategies.  But can you be more specific?

20   Q.    Yes.  Was there any legal strategy developed as part of

21   protecting your scope?

22   A.    Yes, sir.

23   Q.    Can you describe, first of all, who came up with the

24   strategy?

25   A.    Mr. Roland Wilder, our independent merger counsel.

1    Q.   And what was the strategy in general?

2    A.   In general, Mr. Wilder had come up with a little

3    strategy to enjoin the sale, pending a resolution of some

4    contractual issues.

5    Q.   Enjoin the sale.  What does that mean?

6    A.   It would be to hold up the sale, slow things down, and

7    the TWA MEC felt that that might provide leverage for

8    American Airlines to work a little harder on their union to

9    push them into a more fair position.  With us.

10   Q.   How was it you became aware of this strategy developed

11   by Mr. Wilder?

12   A.   Partially through my connection with one of our merger

13   committee members working directly with Mr. Wilder, and I

14   eventually got copies of the plan draft litigation that was

15   going to be filed.

16           MR. PRESS:  Can I approach the witness, Judge?

17           THE COURT:  Yes.

18   Q.   Mr. Case, I handed you what is marked a joint exhibit,

19   joint exhibit 119?

20   A.   Yes, sir.

21   Q.   Do you see that?

22   A.   Yes, sir.

23   Q.   What is it?

24   A.   This is a memorandum from our merger counsel, Roland

25   Wilder, to the TWA MEC officers.

1    Q.    What is the date of it?

2    A.    March 13, 2001.

3    Q.    Did you get a copy of this at some point?

4    A.    Yes, sir, at some point in time I did get a copy of

5    this.  I was not initially copied on it.

6               MR. PRESS: I move for admission of J 119, Judge.

7               MR. FRAM:  No objection.

8               THE COURT:  Okay.  J 119 in evidence.

9    Q.    Again, this is a multi-page memorandum.  But in it, what

10   is Mr. Wilder communicating?

11   A.    What Mr. Wilder is communicating is that there is a

12   potential to file litigation to put some measure on American

13   and APA and he is requesting guidance on what he would like,

14   what we would like him to do.

15   Q.    In this memo he is outlining precisely what is his

16   strategy?

17   A.    He is outlining his strategy to enjoin the sale.  In

18   essence what Mr. Wilder's initial strategy was, was to file a

19   grievance based on TWA, Inc., insistence that we amend our

20   contract.  Obviously from the paragraph that I read earlier

21   in our section 1, the transaction did not allow, or was a

22   breach of our contract and what Mr. Wilder wanted to do was

23   file a grievance on that and enjoin the sale pending the

24   outcome of that grievance.

25   Q.    He wanted to -- okay.  You have explained it.  Now, at

1    the end of his memo on page 5?

2    A.   Yes, sir.

3    Q.   He has a section called risks.

4    A.   Yes, sir.

5    Q.   Can you read that because it is kind of blurry?

6    A.   Labeled number 4.  Risks.  The risk in pursuing the TWA

7    pilots legal remedies is that AA will decide to abandon the

8    transaction.  There is no credible evidence that will occur.

9    On the other hand, the risk in waiving or not enforcing the

10   TWA pilots scope protections is that AA and APA will be free

11   to treat them arbitrarily under the LLC structure.  This

12   would include moving the TWA pilots flying out of the LLC to

13   the AA system and furloughing them.  If ALPA does not agree

14   to APA's seniority demands as to allow integration.  All

15   evidence suggests that this is a genuine threat.

16   Q.   Were you supportive of this strategy that Mr. Wilder

17   came up with?

18   A.   Absolutely.

19   Q.   What is the date of that?

20   A.   March 13, 2001.

21   Q.   Was there a MEC meeting shortly after that memo was

22   drafted and distributed?

23   A.   I am certain there were.  There were many, many

24   meetings.

25   Q.   I have some minutes.

1              MR. PRESS:  Can I approach the witness, Judge?

2              THE COURT:  Yes, you may.

3    Q.   I have handed you exhibit D 223.  Right?

4    A.   Yes, sir.

5    Q.   What is that?

6    A.   This is a copy of the approved TWA MEC meeting minutes

7    from the special meeting dating March 21 and 22 in St. Louis

8    Missouri.

9    Q.   Were you there?

10   A.   I believe so, yes, sir.

11   Q.   Look at the front page?

12   A.   The front page says I am there.

13   Q.   At that meeting did you discuss Mr. Wilder's strategy?

14             THE COURT:  Are you offering it in evidence.

15             MR. PRESS:  Oh, I am sorry.  Yes, I move for

16   admission of D 223.

17             MR. FRAM:  No objection.

18             THE COURT:  D 223 in evidence.

19   Q.   At this meeting was Mr. Wilder's strategy discussed,

20   that you can recall?

21   A.   I believe so.

22   Q.   Vice Chairman Schwartz makes a report that is reflected

23   in page 2, on page 2 at the top?

24   A.   Yes, sir.

25   Q.   Can you read the sentence which begins brief, "Brief the

1    MEC."  Four lines down?

2    A.    "Brief the MEC regarding teleconference with Duane

3    Woerth, who promised to ramp up ALPA support and utilize

4    other legal venues for support."

5    Q.    Okay.

6    Q.    That is what you expected, ramped up support?

7    A.    Yes, sir.

8    Q.    Including the legal strategy your lawyer had come up

9    with?

10   A.    Yes, sir.

11   Q.    What happened after that with respect to pursuing that

12   legal strategy?

13   A.    It never happened.

14   Q.    Was there a request, a formal request to ALPA that

15   authority be given to file the lawsuit?

16   A.    Many times.

17   Q.    Was it ever in writing that you are aware of?

18   A.    Yes.

19          MR. PRESS:  May I approach the witness.  I am

20   getting the sense I don't need to ask that.

21          THE COURT:  Now, don't need to ask.

22   Q.    I have handed you joint Exhibit 41.  J 41.  Right?

23   A.    Yes, sir.

24   Q.    What is this?

25   A.    This is another letter from our merger counsel, Roland

1    Wilder, to Captain Woerth.

2    Q.    What is the date of it?

3    A.    This is dated March 26, 2001.

4              MR. PRESS:  We move for the admission of exhibit J

5    41.

6              MR. FRAM:  No objection.

7              THE COURT:  J 41 in evidence.

8    Q.    Can you read the first, first of all it is a letter to

9    Captain Duane Woerth, it is on Baptiste and Wilder's

10   letterhead?

11   A.    Yes.

12   Q.    That is Mr. Wilder's law firm?

13   A.    Yes.

14   Q.    March 26, 2001.  He writes to the president of your

15   union.  Right?

16   A.    Yes, sir.  That's right.

17   Q.    Can you read the first paragraph?

18   A.    Dear Captain Woerth:  This is to advise that the TWA

19   Master Executive Council will decide as early as March 30,

20   2001, whether whether suit should be instituted against TWA

21   and AA to compel arbitration of the minor dispute created by

22   the carrier's violation of the successorship provisions of

23   the TWA ALPA collective bargaining agreement.  In preparation

24   for this eventuality, the master chairman instructed me to

25   seek your authorization under the ALPA Constitution to sue

1   the carriers for the reasons set forth below."

2   Q.   Let me stop you right there.  He says he was instructed

3   by the master chairman.  Who is that?

4   A.   That is Captain Pastore, MEC master chairman.

5   Q.   Is that a direction that the MEC gave to Captain

6   Pastore?

7   A.   Yes, sir.

8   Q.   So he is seeking authorization.  How does he conclude

9   his letter?  He describes his strategy in the heart of the

10  letter?

11  A.   Yes.

12  Q.   He goes on for a page and a half.  He concludes by

13  saying what?  "It is our opinion."

14  A.   "It is our opinion that this litigation is necessary

15  both to preserve the TWA pilots rights under the

16  successorship provision of the CBA and to enhance ALPA's

17  ability to defend the Section 1113 motion.  For these reasons

18  we request that you authorize the following litigation on

19  ALPA's behalf against TWA and AA.  Please feel free to

20  contact me with any questions regarding this request."

21  Q.   If you go to the next page and the pages that follow

22  there is an attachment to the letter.  Right?

23  A.   Yes, sir.

24  Q.   What is attached?

25  A.   A draft of a proposed litigation, and it is a

```
1    confidential draft at that time, litigation, the Air Line

2    Pilots Association International, AFL-CIO, plaintiffs, versus

3    Transs World Airlines,, Inc., and American Airlines, Inc..

4    This is what Mr. Wilder proposed to file on our behalf.

5    Q.   This is a draft of the lawsuit he wants to file?

6    A.   Yes, sir, the complaint.

7    Q.   He sought permission from your union to file this

8    lawsuit and what happened?

9    A.   It never happened.

10   Q.   What never happened?

11   A.   The lawsuit was never filed.  It was not authorized.

12           THE COURT:  Mr. Case, on the date this memo was

13   received, was TWA in bankruptcy?

14           THE WITNESS:  Yes, sir.

15           THE COURT:  Was there any discussion with Mr.

16   Wilder or among the committee about the impact on the suit

17   and the fact that TWA was already in bankruptcy?

18   A.   Yes, sir.  Mr. Wilder felt confident and he stated

19   earlier that the transaction would proceed, and that this

20   would provide leverage.

21           THE COURT:   No, no.  Was there any discussion as

22   to what, if it was appended to the bankruptcy, would impact

23   the ability to bring this suit?

24   A.   I don't believe that was discussed.  I didn't expect him

25   to be -- I don't think we discussed that.
```

Case-direct                                                    34

```
 1              THE COURT:  Okay.  Go on.
 2   Q.   Okay.  In so there was no authority to file the lawsuit.
 3   What happened instead?  If you want to jump April 2?
 4   A.   On April 2 we had a special MEC meeting.
 5   Q.   And what was the main agenda?
 6   A.   The main agenda on that special MEC meeting was the
 7   waiver of our section 1, and our benefits provision of our
 8   contract as required by the asset purchase agreement.
 9   Q.   Who attended that meeting, what TWA pilots, if you want
10   to?
11   A.   Generally, the TWA MEC was there, we had committees
12   there, the merger committee.  The negotiating committee.
13   Some of the members were there, and several ALPA advisors.
14   Q.   Can you tell who these ALPA advisors were by name?
15   A.   Yes, sir, I believe I can.  I may leave one or two out.
16   At that time Randy Babbitt, who was acting as a consultant
17   for us.  Bill Roberts, who was ALPA legal.
18   Q.   When you say ALPA legal?
19   A.   ALPA National legal department.  They have an internal
20   legal department as well as outside general counsel.
21   Q.   Okay.
22              THE COURT:  He is a lawyer.
23   A.   A lawyer.
24   Q.   And employed by the union?
25   A.   Employed by the union.
```

1   Q.   In who else was there?

2   A.   Clay Warner.  Another lawyer, ALPA lawyer employed by

3   the union.  Roland Wilder was there.  That may be it.

4   Q.   Anybody from an outside law firm?

5   A.   Mr. Wilder.

6   Q.   Any others?  Bankruptcy counsel?

7   A.   Mr. Seltzer.  Excuse me.

8   Q.   Who is he?

9   A.   He was the bankruptcy expert assigned to us from

10  National ALPA during our bankruptcy, when our previous

11  experience when the, when an airline goes through bankruptcy

12  the MEC is given bankruptcy counsel by ALPA National.  We did

13  not have in-house legal counsel that specialized in the

14  bankruptcy field.  ALPA provided that assistance.

15  Q.   At the end of the day what was the outcome of this MEC

16  meeting?

17  A.   The outcome of the MEC meeting was that it was agreed to

18  waive scope and benefits.

19          THE COURT:  You agreed to do what the contract

20  between TWA and American wanted you to do?

21  A.   Yes, sir.  It was voted, and Mr. Fram yesterday put the

22  vote tallies up.  It was vote the in favor with one opposed.

23  Q.   Were you in favor of that decision?

24  A.   No, sir, not at all.

25          THE COURT:  Were you the one negative note?

Case-direct                                                  36

1    A.    No, sir, at that time I was a nonvoting member.  The one

2    negative vote was Mr. Hollander.

3              THE COURT:  You didn't vote at all?

4    A.    Didn't get a chance to vote.

5    Q.    Can you explain that, you were a nonvoting member of the

6    MEC?

7    A.    Yes.  As I told you yesterday when the MEC's originally

8    had aircraft with three persons in the cockpit and flight

9    engineers we had flight engineer representatives which would

10   have meant three representatives for each individual counsel,

11   a capital representative, first officer representative and a

12   flight engineer representative.  When the three man aircraft

13   disappeared from the fleet, that flight engineer position was

14   relegated to a secretary treasurer position that was a

15   non-voting capacity member of the MEC.

16   Q.    Okay.  And were there minutes prepared of this meeting?

17   A.    Yes, there were.

18   Q.    I have handed you exhibit D 74, Mr. Case.  What is that?

19   A.    Yes, sir.  This is a copy of the approved TWA MEC

20   special meeting minutes for April 2, 2001, Saint Louis,

21   Missouri.

22             MR. PRESS:  I move for the admission of this

23   document, Judge.

24             MR. FRAM:  No objection, your Honor.

25             THE COURT:  D 74 in evidence.

Case-direct

1   Q.   Did you say anything at this meeting?

2   A.   Yes, sir, I did.

3   Q.   Without looking at the document, we will look at it

4   again, what was your position that you articulated to the

5   MEC?   On the scope waiver?

6   A.   I articulated to the MEC that I was not in favor of the

7   scope waiver and I felt that it did not enhance our

8   negotiating position in any way, shape or form.

9   Q.   If you look at page 5?

10  A.   Yes, sir.

11  Q.   There is a statement there from you, it says for the

12  record.  Can you read that?

13  A.   Yes, sir.  This is verbatim statement from me that was

14  prepared and given to our secretary to be put into the record

15  when I read it.

16          "Case, (for the record,) spoke against resolution.

17  Not convinced that scope would not survive.  Stated that the

18  possibilities and potential outcomes post 1113 bankruptcy

19  hearing had not been answered to his complete satisfaction.

20  Case said he saw absolutely no improvement of ALPA's leverage

21  for a fair seniority integration moving into the TWA LLC by

22  waiving scope.  To the contrary, he saw the opposite.  No

23  incentive for APA or AMR to ever treat the TWA pilots fairly.

24  If the goal was fair seniority list integration, using every

25  piece of potential leverage was the key.  Waiving scope

1    voluntarily wasn't the answer."

2    Q.   Were there any other voices in opposition to that?

3    A.   Yes.

4    Q.   Who?

5    A.   Capital Hollander.

6    Q.   Anybody else?

7    A.   Roland Wilder, our independent merger counsel.

8    Q.   And who wore the voices in support of waiving the scope.

9    Let's start with the advisers?

10   A.   Every one of the ALPA advisors that were there supported

11   waiving scope.  Randy Babbitt, Bill Roberts, Clay Warner,

12   Richard Seltzer, David Holtzman.

13   Q.   Mr. Fram in his opening, he had a chart with dates on it

14   with meetings and telephone conferences all in March.  It may

15   have gone into February.  I don't recall.  But you

16   participated in a lot of communication with ALPA before April

17   2 about these issues, right?

18   A.   Yes, sir.

19   Q.   Can you give us a flavor of how many times?

20   A.   I wouldn't even hesitate to guess.  There were a number

21   of times.

22   Q.   In any of those conversations before April 2 with

23   anybody employed by ALPA did you hear them say you are going

24   to have to waive scope?

25   A.    No, sir.

1    Q.   When was the first time you heard it?

2    A.   At that meeting.

3              THE COURT:  At that meeting, April 2.

4              THE WITNESS:  April 2 meeting.

5              THE COURT:  In fact, you did waive scope that day?

6    A.   They authorized waiving scope that day, yes, sir.

7              THE COURT:  Is this a convenient time for a break?

8              MR. PRESS:  It is.

9              THE COURT:  I have to put my head in a meeting that

10   will take only five minutes.  Can we take a 15-minute break.

11   Quarter of 10.

12             Don't discuss the case American yourselves.  Keep

13   an open mind until you have heard all the evidence.  All rise

14   when the jury leaves.

15             (The jury leaves the courtroom.)

16             (Recess)

17

18              (Jury enters its courtroom)

19             THEODORE    CASE, resumes.

20             THE COURT:  Mr. Press.

21             CONTINUED DIRECT EXAMINATION.

22             BY MR. PRESS:

23   Q.   At the April 2 meeting when the scope waiver as made,

24   exhibit 74, I want to have you talk about some of the people:

25   Page 6.  Can you highlight the where the list of names is?

Case-direct                                                              40

1          Mr. Case, we have emphasized where there are some

2     tallying of votes, right?

3     A.    Yes, sir.

4     Q.    Who are these people, Hollander, Council Number 2?

5     A.    Captain Hollander was the LEC, captain representative.

6     Q.    This list of names, these are the people that got to

7     vote, right?

8     A.    Correct.

9     Q.    And Mr. Singer, who is he?

10    A.    He was the first officer representative in New York.

11    Q.    And Rautenberg, who is he?

12    A.    He was the captain representative in St. Louis.

13    Q.    Young, who is she?

14    A.    She was the first officer representative in St. Louis.

15    Q.    And Lewin, who was he?

16    A.    He was the captain representative in LA.

17    Q.    Altman, who is he?

18    A.    He was the first officer representative in LA.

19    Q.    This shows who voted which way, right?

20    A.    Yes, it does.  I can give you a little better

21    perspective of the numbers.  At the LECs, each one of the

22    representatives represents a group of pilots.  The captain

23    represents the captains that fly there, so the numbers you

24    see besides their names are the total number of pilots that

25    they actually independently represent as their counterpart,

Case-direct                                                        41

```
 1    their captain representative, first officer representative.

 2    Q.   Now, Mr. Hollander says had 55 votes for the scope

 3    waiver, and against it says 180.

 4    A.   Yes.

 5    Q.   How is that possible?

 6    A.   We held multiple meetings with our constituents

 7    throughout this timeframe, Howard and I and David Singer

 8    would meet, call routine meetings, call special meetings, and

 9    we would try to go, what we call the ramp office where we

10    would see our constituents on a daily basis, when we were

11    flying we would meet up with them in operations, ask their

12    opinions, give them information, try to get feedback from

13    them so that we were voting their interests, rather than just

14    going up there and voting on their behalf without asking them

15    how they wanted to be voted for.  It was, like I said, a

16    representative democracy.

17    Q.   This meeting, when did it start?

18    A.   I believe it started on the first of April.

19    Q.   No.  No.  I am sorry.  Maybe it did.  Can you tell from

20    the minutes when the meeting began?

21    A.   The official meeting began on April 2 at 9:04

22    Q.   In the morning?

23    A.   In the morning.  April 2, 2001, 9:04  in the morning.

24    Q.   When did it end?

25    A.   It ended at 6:27 local time in the afternoon.
```

Case-direct                                                      42

1    Q.    That is a long meeting.

2    A.    Yes, sir.

3    Q.    Who did most of the talking, was it pilots or advisors?

4    A.    Most of the talking was done by advisors during that

5    meeting.

6    Q.    Did you hear any ALPA employee say that now you know if

7    you waive scope, that the game is over as far as the

8    seniority negotiation?

9    A.    No, sir.

10   Q.    How did you feel about the Scope waiver, Mr. Case, when

11   you left that meeting?

12          THE COURT:  Ask him for information.

13   Q.    Mr. Case, were you, you were opposed to the scope

14   waiver?

15   A.    Yes, sir.

16   Q.    And why?

17   A.    Multitude of reasons.  I felt it was leverage.  Our

18   merger counsel had established a potential litigation

19   strategy to provide leverage and I felt like we were giving

20   away opportunities to better position ourself in negotiations

21   with the American pilots.

22          THE COURT:  Did any of people who voted for the

23   waiver express views as to why they were favoring the waiver.

24   A.    Primarily because they were advised to by counsel, from

25   the employees I spoke to.

```
 1              THE COURT:  At the meeting.

 2    A.   At the meeting.

 3              THE COURT:  Nobody spoke up in favor of the waiver.

 4    A.   Advisers.

 5              THE COURT:  I am talking about the pilots.

 6              THE WITNESS:  No, not that I recall, not one pilot.

 7              THE COURT:  Notwithstanding that they voted heavily

 8    in favor of it.

 9              THE WITNESS:  Correct.

10    Q.   Now, going forward after April 2, tell us generally what

11    the process was?  You don't have an agreement with the

12    American pilots on how to integrate the two lists, right?

13    A.   Correct.

14    Q.   You have done this scope waiver.  Let me back up.  The

15    scope waiver, what did that do with respect to the 1113

16    motion to reject your contract?

17    A.   Once the scope waiver was officially conducted, the 1113

18    motion was withdrawn from the bankruptcy court.

19              THE COURT:  Did you get anything from American

20    Airlines in return for your scope waiver.

21              THE WITNESS:  Yes, sir.  We got a, I believe what

22    they called the reasonable best efforts letter of agreement.

23    Q.   What was that, Mr. Case?

24    A.   It was a letter written by American Airlines that said

25    that they would use their resources, paraphrasing, use their
```

1    resources to provide a process to achieve a fair and

2    equitable seniority integration.

3    Q.    And what did that do for the TWA pilots?

4    A.    In my opinion, nothing.

5    Q.    Again, looking at exhibit 74, therefore, be it resolved

6    on page 6 there are some resolutions, right?

7    A.    Yes, sir.

8    Q.    Can you read the first one?

9    A.    Therefore, be it resolved that the negotiating committee

10   is directed to seek clarification immediately on all

11   outstanding issues arising from the proposed agreement

12   covering the operations of TWA LLC and the LLC CBA and to

13   finalize the LLC CBA.

14   Q.    This is the MEC directing the negotiating committee to

15   finalize the LLC CBA, right?

16   A.    Yes.

17   Q.    What does that mean, what is that a reference to?

18   A.    That was a reference to the TWA transition.

19   Q.    First of all the reference to LLC, what is that a

20   reference to?

21   A.    That is a reference to TWA LLC, the limited liability

22   corporation that American set up as the wholly owned

23   subsidiary to place the TWA employees and its assets into.

24          THE COURT:  But it was owned by American.

25   A.    Wholly owned by American, yes, sir.

1    Q.   And you were employed at that time by a company called

2    TWA, Inc.?

3    A.   Correct.

4    Q.   And this new entity that American owns called TWA

5    limited liability company, or LLC, they are going to employ

6    you after this?

7    A.   Correct.

8              THE COURT:  They did employ you after this?

9    A.   Yes, they did.

10             THE COURT:  Who was the bargaining representative

11   at this point?

12   A.   At this point, the Air Line Pilots Association.

13             THE COURT:  ALPA continued to be the bargaining

14   representative when TWA LLC was created?

15   A.   Yes, sir, they did.

16             THE COURT:  And it flew under the TWA flame?

17   A.   Yes, sir.

18   Q.   So this, TWA LLC, CBA, what is a CBA?

19   A.   A collective bargaining agreement.

20   Q.   Was there a collective bargaining agreement between ALPA

21   and this TWA LLC at that time?

22   A.   At that time, no.

23   Q.   Had you ever seen a draft of one?

24   A.   No.

25   Q.   At that time?

1    A.   At that time, no.

2    Q.   Did you come to understand that 1 was entered into?

3    A.   Eventually, yes.

4    Q.   When was that?

5    A.   I believe it was April 9, 2001.

6    Q.   So a week after the scope waiver?

7    A.   Yes, sir.

8    Q.   Is that a document you are familiar with?

9    A.   Yes, sir.

10   Q.   The asset purchase agreement that American made  with

11   TWA to buy its assets, it required you to amend your existing

12   collective bargaining agreement to remove some provisions.

13   A.   That's correct.

14   Q.   This notion of entering into a new collective bargaining

15   agreement, when did that notion arise?

16   A.   I am not sure the genesis of it or the exact  date, but

17   it came from David Holtzman.   There was no bankruptcy

18   requirement to come up a new collective bargaining agreement.

19   We had one in full effect.

20   Q.   Would it have remained in effect if you hadn't replaced

21   it?

22   A.   Yes, sir.

23   Q.   Even though you have a new employer?

24   A.   Yes, sir.

25   Q.   How is that?

1    A.    Go ahead.

2    A.    Lay person's terms?

3    Q.    Please.

4    A.    Okay.  We had a contract in effect.  It was amendable, I

5    told you the date, it was not amendable until 2003.  Those

6    terms and conditions of that contract continue on in the

7    event of a sale or a change of ownership until a new

8    bargaining agreement can be bargained for by, if it is a

9    transaction, the new bargaining agent.  It is status quo is

10   the term that is generally referred to by pilots, that the

11   provisions of that CBA that you were working under continue

12   on.

13          THE COURT:  But on April 2 you waived some of the

14   provisions, so even if it carried on it didn't carry on

15   fully.  Because of your waiver on the second, the pilots

16   waiver.

17   A.    Correct.  Because we entered into a new bargaining

18   agreement, is how it --

19          THE COURT:  Well, before even you entered the new

20   agreement, if it carried on, it carried on subject to your

21   waiver.

22          THE WITNESS:  Correct.

23   Q.    Yes.  If you would have agreed to just simply remove the

24   scope protections from your contract, the rest of the

25   contract would have remained in effect, though?

Case-direct                                                   48

```
 1    A.   Yes, sir.  Had we complied with the exact terms of the

 2    asset purchase agreement, had we waived two sections of our

 3    31 section contract, that particular contract would have

 4    continued on into the transaction.

 5    Q.   But what happened was something different?

 6    A.   Yes.

 7    Q.   What was that?

 8    A.   We came up with a whole new collective bargaining

 9    agreement.

10    Q.   And you are familiar with that document?

11    A.   Yes, I am.

12    Q.   Mr. Case, I handed you exhibit P-139.  Is that correct?

13    A.   Yes, sir.

14    Q.   What is that?

15    A.   This is the transition agreement between TWA airlines

16    LLC and the airline pilots in in the service of TWA airlines,

17    LLC, represented by the Air Line Pilots Association

18    international effective date April 9, 2001.

19    Q.   /TPRES?

20              MR. PRESS:  I move for the admission of P-139.

21              MR. FRAM:  No objection.

22              THE COURT:  In evidence.

23    Q.   Now, this is your new collective bargaining agreement

24    with your brand new employer, Trans World Airlines, LLC,

25    right?
```

 1   A.    Yes, sir.

 2   Q.    When did you become employed there?

 3   A.    On April 10, 2001.

 4   Q.    Before that did TWA LLC ever fly an airline?

 5   A.    No.

 6   Q.    And did it have any employees?

 7   A.    No.

 8              THE COURT:  It was newly created?

 9              THE WITNESS:  Correct.

10              THE COURT:  It was created by American?

11              THE WITNESS:  Yes, sir.

12   Q.   And this is ALPA's first contract with this new carrier,

13   right?

14   A.    Yes, sir.

15   Q.   Are you aware of any policies at ALPA about how to

16   negotiate a first contract and what is required?

17   A.    Just in general, yes.

18   Q.   Are you aware --

19              THE COURT:  Before you answer, this was always

20   intended to be short term, wasn't it?

21              THE WITNESS:  This particular transition agreement

22   was.

23              THE COURT:  And this was not intended to be a

24   regular long term labor contract.

25   A.    This particular agreement was not.

```
 1              THE COURT:  The word transition means something was

 2   going to follow pretty quickly.

 3              THE WITNESS:  Yes, sir.

 4              THE COURT:  Okay.  Go ahead.

 5   Q.   Mr. Case, this is a rather lengthy document.  For the

 6   most part, does, for the most part, does this agreement track

 7   the language in your old collective bargaining agreement with

 8   TWA, Inc.?

 9   A.   For the most part.

10   Q.   For the most part it tracks it.  It does not include the

11   scope and successorship protections that you had in your old

12   agreement?

13   A.   That's correct.

14   Q.   And does it have any other material differences from

15   your old collective bargaining agreement, provisions that you

16   find important?

17   A.   Yes, sir, it did.

18   Q.   And when I say important, important in a detrimental

19   way, are there any of those?

20   A.   Yes, sir.  In my opinion there are.

21   Q.   Can you give us an example of one?

22   A.   Yes, sir.  TWA through the years had bankruptcies, the

23   union and the company had worked at length together to

24   provide each other with a little better opportunity to work,

25   and in those discussions throughout the years we had
```

```
1    negotiated with the company at what they call a 9,000 hour

2    flight pay loss bank.

3    Q.   What is that?

4    A.   When pilots do union work, as the Judge explained

5    yesterday, sometimes we lose trips, and when we lose those

6    trips we don't get paid for them while we are doing the union

7    work unless we get reimbursed.  And that reimbursement

8    usually comes out of union dues.

9            However, we have been fortunate enough to negotiate

10   with TWA Inc. a provision that allowed the company to provide

11   a 9,000 hour flight pay loss bank.  So if I took a four-day

12   trip off, worked 20 hours to do worth 20 hours to do union

13   work, we billed that to TWA rather than union dues and TWA

14   would pay for my four-day trip out of that 9,000 hour bank.

15   The bank was roughly a little over a million dollars.

16   Q.   Does the company agreed to pay for your union work?

17   A.   Yes, they did.

18   Q.   That 9,000 hour bank, that was in your old collective

19   bargaining agreement?

20   A.   Yes.

21            THE COURT:  Is that 9,000 hours a year?

22   A.   Yes, sir, a year.

23   Q.   What was that worth in money terms?

24   A.   A little over a million dollars.

25   Q.   Was that provision carried over to the new collective
```

1    bargaining agreement?

2    A.    No, sir, it was not.

3    Q.    Were you aware of that at the time?

4    A.    Yes, sir.

5    Q.    What did that mean for your MEC going forward, not

6    having the company paying for your union work?

7    A.    It meant that we had a million less dollars to operate

8    our TWA MEC functions with.

9    Q.    Was that detrimental going forward?

10   A.    Yes, sir, it taxed the MEC budget rather dramatically.

11   Q.    Okay.  So this is an agreement between TWA LLC and the

12   Air Line Pilots Association.  Right?

13   A.    Yes, sir.

14   Q.    ALPA?

15   A.    Yes, sir.

16   Q.    Was there anything else that ALPA gave up in this

17   agreement that you found to be detrimental?

18   A.    Yes, sir, in my opinion there were a couple things.

19   One, in this contractual Pennsylvania gave up the ability to

20   bargain.  They put a provision in here that basically says,

21   in lay persons terms, you can do anything that you want to

22   the TWA LLC pilots with a 21 day notice to us as long as it

23   complies with our American Airlines contract terms, or

24   mirrors those terms.

25   Q.    Let me interrupt you.  I want to show that language.

1   Page 4 of the agreement.  It is a section 1 B.  This case,

2   Mr. Case, how does it start?

3   A.   It stars.  TWA LLC may implement changes in benefits

4   plans and benefits as described below either during the

5   initial 15 days of operation of TWA LLC, following closing of

6   the transaction, or thereafter, upon 21 days notice to ALPA.

7   Q.   Let me stop you right there.  The company can change

8   your benefits on 21 days notice to the union?

9   A.   Yes, sir.

10  Q.   Now, how is that different than what your old agreement

11  provided?

12  A.   The old agreement would have required direct negotiating

13  for any of those changes.

14  Q.   And why was that important to you?

15  A.   It was very important to me because that is union

16  representation.  If you give someone carte blanche to do

17  whatever they want to you with 21 days notice there is no

18  bargain in there.

19          THE COURT:  Those, the right to change plan is not

20  unlimited, though.  There were limb stations on that.

21  A.   Yes, there were limitations.

22          THE COURT:  They couldn't give you a worse deal

23  than they were giving the American airline pilots.

24          THE COURT:  No, sir.

25          THE COURT:  They were, it wasn't unrestricted, they

```
 1   wouldn't say they wanted to eliminate the benefits plans.

 2   They had to give you at least what they gave the American

 3   Airline pilots.

 4           THE WITNESS:  That's correct.

 5   Q.   Were changes like that made?

 6   A.   Yes, sir.

 7   Q.   The language was mirror the American pilot benefits?

 8   A.   Yes, sir.

 9   Q.   In some instances, with were those changes detrimental

10   to you, your benefits were better?

11   A.   Three were better.  There were certain conditions in our

12   old contract that were better than Americans contract.

13   Yesterday when I spoke to you about the bidding process of

14   planning your monthly schedule, we had preferential bidding

15   at TWA, so you could plan your schedule, bid your schedule

16   according to your wishes and desires and the computer would

17   build that schedule for you.  American does not have that

18   policy.

19           They don't have it today so you are stuck with what

20   they give you.  TWA's contract, because of the previous

21   years, and the pay degradations gave us an opportunity, TWA,

22   to fly high time if we chose.  So we could build our flying

23   time per month up to the FAA maximum flying time to build a

24   higher paycheck.  American didn't have those provisions in

25   their contract, and they don't  --
```

1          THE COURT:  Do you think American would have agreed

2   to give the TWA pilots a better deal than they gave their own

3   pilots?

4   A.   I believe they have actually stated that in writing, it

5   would have been.

6          THE COURT:  Would have what?

7   A.   The TWA LLC contract would have been a higher paying

8   contract than the American contract was.

9          THE COURT:  They thought that it was or --

10         THE WITNESS:  They explained, there pilots at one

11  time wanted to push us to their contract early and American

12  stated that that meant that we would make more money as a TWA

13  LLC pilot than an American pilot did.  I have counterparts

14  that made more money while flying at TWA, Inc., than they can

15  make at American.

16         THE COURT:  But on the whole, weren't American

17  pilots paid better than TWA?

18  A.   Hourly rate, yes, sir, just purely hourly rate.

19  Q.   Well, can you describe that, how is it that you could

20  make more money if you get paid less per hour?

21  A.   As I stated, the American contract limits the amount of

22  flying time you can do in a month and you cannot arbitrarily

23  pick up time.  You could as an a TWA pilot fly up to 100

24  hours a month.  So even though American may have had a higher

25  pay rate, they couldn't fly 100 hours word of that pay rate

1    to make the money.  They could only fly 75 or 76 hours.  And

2    I believe at that time, I hesitate to guess, I am not quite

3    sure exactly what the maximum flying was at that time for the

4    American contract.

5    Q.   All right.  So they have given up your flight pay loss

6    bank, given up any duty to bargain about benefits, anything

7    else about this new contract that troubled you?

8    A.   Yes, sir.  Once again, as I stated yesterday, from my

9    experience in writing some of these contracts as a

10   negotiating committee member, this particular agreement has

11   an explore roar exploration or termination date in it.  Most,

12   if not all, collective bargaining agreements between ALPA

13   pilots and their carrier contained an amendable date.  I

14   thought that was a huge piece of leverage we gave up.

15   Q.   Explain how going from an amendable date which is

16   September, 2003, to having an expiration date, first of all,

17   when was the expiration date?

18   A.   It wasn't a date.

19   Q.   What was it?

20   A.   The expiration date on this contract was a specific

21   action taken by the national mediation board.

22   Q.   Explain that?

23   A.   In section 30 of the contract, effective dates and

24   conditions.

25   Q.   Yes, sir.  On page 75?

1    A.    Yes, sir.  Page 75.  Not marked 75, but it is the 75

2    page.

3    Q.    74 page actually.  I am sorry.  Where the signatures

4    are?

5    A.    Yes.

6    Q.    What does it say about expiration of the contract?

7    A.    This transition agreement is conditioned on and will be

8    effective as of the date of closing of the asset purchase

9    agreement between American Airlines, Inc., and Trans World

10   Airlines, Inc., dated January 9, 2001.  As amended, and the

11   commencement of operations by TWA LLC.

12   Q.    So that is when it takes effect.  When does it expire?

13   A.    This transition agreement, I am reading slow for her

14   benefit, here.  This transition agreement will remain in

15   effect and not amendable until integration of the TWA LLC and

16   American Airline pilot craft or classes, specifically, action

17   by the National Mediation Board pursuant to Section 2-9 of

18   the Railway Labor Act, recognizing the inclusion of TWA LLC

19   pilots under the American Airlined NMB certification for

20   pilot craft or class.  This transition agreement will

21   terminate in all respects as of the date of such action by

22   the National Mediation Board.

23   Q.    That is five mouth fulls.  What does that mean?

24   A.    It means that this contract can only be terminated by a

25   specific action taken by the flat mediation board.

```
 1              THE COURT:  What if but it was an action that was

 2      contemplated?  Everybody knew that was coming.

 3      A.   It was certainly a possibility, but if the board had not

 4      certified the APA, this contract would have continued on

 5      forever.

 6              THE COURT:  So it didn't have an expiration date.

 7      It had, the two pilot groups were integrated into one there

 8      would be no purpose for this contract.

 9      A.   Only if the, if it was certified --

10              THE COURT:  It was anticipated --

11      A.   There was an anticipation of that.  However, had it had

12      an amendable date rather than a termination date it would

13      have given you us bargaining leverage.

14      Q.   Explain that?

15      A.   The amendable date of the contract is what allows either

16      party who is unsatisfied or dissatisfied with the contract to

17      open negotiations to that contracts terms.  The Railway Labor

18      Act is explicit with regard to when that can occur.  That

19      section 6 opening is what I told you about yesterday, section

20      6 of the act allows the contract to be opened within a

21      certain number of days prior to the amendable date.

22              THE COURT:  That would have no meaning if the

23      Mediation Board declares them a single carrier.  You can't

24      have two different labor unions for an integrated group of

25      pilots.
```

1          THE WITNESS:  It has happened in the past.  There

2    is legal precedent on it.

3    Q.   Can you address the judge's concern in more detail?

4          MR. FRAM:  Your Honor, pardon me.  I object.  I

5    don't know that the witness is qualified to give legal

6    opinions.

7          THE COURT:   Do you have expertise in the impact of

8    a national labor -- of a National Mediation Board decision

9    declaring them to be one integrated union, one integrated

10   group of pilots?

11   A.   From some of the research that I have done.  Yes.  I am

12   not a lawyer.

13         THE COURT:  I think you have to get off it.

14         MR. PRESS:  Objection your Honor.

15         THE COURT:  I think you are trying to get him to

16   give very detailed and complex legal opinions and he is not

17   qualified to give those.

18         MR. PRESS:  Can we address this briefly at sidebar?

19         THE COURT:  Sure.

20         )At sidebar).

21         MR. PRESS:  Your Honor your Honor, I was very close

22   to concluding my line of questioning on this.

23         THE COURT:  When you are trying to get him to say

24   that the union was disadvantaged by not having amendable

25   date, that is a legal, I am not sure that is accurate and I

Case-direct                                                          60

```
 1   am not, I -- is it accurate?  Are in your opinion.

 2          MR. KATZ:  No.

 3          THE COURT:  From my understanding of the law, it is

 4   totally inaccurate.  He is up here giving legal, in effect,

 5   very detailed legal stuff.

 6          MR. PRESS:  I know.  When you struck our expert,

 7   Judge, several years ago, you said the pilots can testify to

 8   all of this.  So that is what we are trying to do.  He is

 9   well researched in this area, Judge.  He is as smart as the

10   lawyers in the room when it comes to this Railway Labor Act

11   stuff.  I mean his knowledge of this is extensive.  It really

12   is.  And if he said something wrong I am sure Mr. Katz will

13   clear it up.

14          THE COURT:  You are almost finished?

15          MR. PRESS:  We are.

16          THE COURT:  Then go ahead, finish it up.  But I

17   assume just a few more questions.

18          (In open court)

19          BY MR. PRESS:

20   Q.   This whole amendable date versus expiration date

21   business, tell the jury, if you will, why that was a

22   concession on ALPA's part.

23   A.   You believe that was a concession on ALPA's part because

24   once against it denied us certain access to sections of the

25   Railway Labor Act that we were entitled to.  Had it had an
```

1    amendable date in it, leading up to that amendable date we

2    could have asked to reopen this contract if we weren't happy

3    with the way seniority integrations were going we would have

4    been back in discussions with the company or we would have

5    been entitled to certain provisions of the Act such as self

6    help to address our concerns.

7    Q.   Did that, having an amendable date taken away from your

8    contract, did that benefit the TWA pilots?

9    A.   No, sir.

10   Q.   Who did it benefit?

11   A.   It benefited the American pilots.

12   Q.   Was this new collective bargaining agreement -- first

13   of all, did the TWA MEC, did the MEC have any  standing

14   rules about how we enter into collective bargaining

15   agreements?

16   A.   Yes, sir.

17   Q.   And what was the standing rule?

18   A.   The standing rule was that we entered into those under

19   section 6, or with authorization given by the TWA MEC to the

20   negotiating committee to enter into discussions over issues.

21   Q.   What about membership ratification, was there anything

22   about that?

23   A.   There were previously resolutions passed that required

24   ratification of any new collective bargaining agreement by

25   the TWA pilots.

```
1   Q.   All right.  We will get the paperwork out later.  What

2   did that resolution say, when was it made?

3   A.   I believe that resolution was in November of 2000 and it

4   required, the resolution requiring membership ratification of

5   any new collective bargaining agreement.

6   Q.   This new --

7            THE COURT:  That would be by a vote of the

8   individual pilots.

9   A.   That was a vote by the MEC, sir.

10           THE COURT:  Ratification would be a MEC vote, not

11  all 2,300 pilots.

12  A.   It would be all 2,300 pilots. .  Resolution required the

13  MEC to put any new contract up for membership ratification.

14           THE COURT:  Which means each of the pilots get a

15  vote.

16  A.   Yes, sir.

17           THE COURT:  Everyone gets a vote.

18  A.   Yes, sir.

19  Q.   The resolution was that before the MEC can enter into a

20  collective bargaining agreement that issue has to go out for

21  membership wide vote?

22  A.   Yes, sir, that's correct.

23  Q.   Was there a procedure for that?

24  A.   Yes, sir.

25  Q.   What is that?
```

```
 1   A.   Generally ballots were sent out and the ballots were

 2   tallied once they were returned by the pilots and it was a

 3   simple majority vote.

 4   Q.   Just straight up or down, 51 percent?

 5   A.   Straight town hall, here is the issue, here are the

 6   ballots.  Boom.

 7   Q.   Was that resolution withdrawn between November, 2000,

 8   when it was entered into and when this document was signed?

 9   A.   No, sir, not to my knowledge.

10   Q.   Was this new collective bargaining agreement put up for

11   membership ratification?

12   A.   No, sir.

13   Q.   At the April 2 MEC meeting a week prior to this, was the

14   issue of membership ratification brought up?

15   A.   In sidebar between Captain Hollendar and myself.

16   Q.   Was that presented as something that you asked ALPA to

17   do?

18   A.   Yes, sir.

19   Q.   And what response did you get?

20   A.   There was not enough time to conduct a membership vote.

21   Q.   And who at ALPA said that?

22   A.   I believe, if I am not mistaken, everyone of the

23   advisers we spoke to.

24   Q.   So you waived scope, you have entered into a new

25   collective bargaining agreement without membership
```

```
 1   ratification?

 2              THE COURT:  That was on the 9th, seven days later.

 3              MR. PRESS:  Yes, that is when it became effective.

 4   Q.   Mr. Case, going forward, and we looked at some

 5   resolutions about Captain Woerth's support.  Was there ever a

 6   time he came to St. Louis and met with the MEC?

 7   A.   Yes, sir, he did, once.

 8   Q.   When was that?

 9   A.   I don't recall the exact date.  If you show me the

10   minutes I can show you.

11   Q.   I handed you D 78, what is this?

12   A.   This is an approved set of MEC meeting minutes from a

13   special meeting dated April 23 to 24, 2001, St. Louis,

14   Missouri.

15   Q.   What is the date of the meeting?

16   A.   April 23 to the 24, 2001, in Saint Louis.

17   Q.   Were you present?

18   A.   Yes.  Yes, sir.

19   Q.   I move for admission of D 78, Judge.

20              MR. FRAM:  No objection.

21              THE COURT:  D 78 in evidence.

22   Q.   Now, you mentioned that President Woerth addressed your

23   MEC one time?

24   A.   Yes, sir, he did.

25   Q.   Was this the time?
```

```
 1    A.   To the best of my recollection, this is the only time.

 2    Q.   Did you confront him?

 3    A.   Yes, sir, I did.

 4    Q.   Are your remarks reflected in these minutes?

 5    A.   Yes, sir, they were.

 6    Q.   Would you go to page 2.  Third paragraph.  Mr. Case, can

 7    you read for the jury the remarks you made?

 8              MR. FRAM:  I object.  If the witness recalls what

 9    he said he should so testify.

10              THE COURT:  Once it is in evidence, he is allowed

11    to point to it.  I will allow it.  I don't want everything

12    read in, the jury will have it.  He can highlight parts.  I

13    will allow that.

14    Q.   Mr. Case, the remarks aren't long.  If you could read

15    them?

16    A.   Sure.  I will paraphrase some of it.  Basically I gave

17    --

18              THE COURT:  Do you remember sitting here now even

19    without this, do you remember that meeting?

20    A.   Yes, sir.

21              THE COURT:  You remember what you said?

22    A.   Yes, sir.

23    Q.   What did you say?

24    A.   I said that TWA had presented itself with a long history

25    of ALPA membership.  We were one of the founding airlines in
```

1    the association, that we had given millions of dollars to the

2    association over the years, that we put countless hours of

3    TWA pilots time into building a better safety, better union.

4    And that as one of those founders that we deserved the full

5    support of the association and I asked directly from Captain

6    Woerth if he would use the full resources of the association,

7    including litigation, if possible, or necessary, against the

8    APA, AMR, to ensure the pilots were integrated into the

9    American Airlines list other than through a staple job.

10   Q.   You wanted the full resources of your union?

11   A.   Yes, sir.  Our pleas were going unanswered.  I figured

12   if I cornered the man directly and got a response directly I

13   could count on him telling me face-to-face.

14   Q.   What did he tell you?

15   A.   Captain Woerth responded if there were any basis for

16   litigation, ALPA would do what was necessary to protect the

17   pilots.  ALPA would not leave any stone unturned to protect

18   the TWA pilots.

19   Q.   Do what was necessary.  Is that what you received from

20   your union going forward from here?

21   A.   In my opinion, no, sir.

22   Q.   Was there any stone unturned?  This says no stone would

23   be, as far as you know, was any stone unturned?

24   A.   Not that I am aware of.

25              THE COURT:  No, your question was, was any stone

1    turned.

2                  MR. PRESS:  Yes.

3                  THE COURT:  Not was any left unturned.  Was any

4    stone turned.

5                  MR. PRESS:  Right.

6    Q.   No stone was turned?

7    A.   The only stone seemed to keep falling on on our feet.

8    Q.   Now, Mr. Case, we have already seen a month before March

9    26 the letter I showed you, where your lawyer, Mr. Wilder,

10   wrote to Mr. Worth, President Woerth, asking for permission

11   to file the injunction?

12   A.   Yes, sir.

13   Q.   Now he tells you a month later, any basis for litigation

14   we will pursue that.  Did you believe it?

15   A.   I was hoping the man would be true to his word.  I was

16   still holding out hope that that would happen.

17   Q.   Going forward --

18                  THE COURT:  It was a pretty short window for that,

19   the deal was about to close in five or six days, right.

20   A.   Yes, sir.

21                  THE COURT:  And in fact did it?

22   A.   Yes.  It was very quick.

23   Q.   The prospect of trying to hold up the deal, that was

24   moot by April 10?

25   A.   Yes, sir.

1    Q.    Actually April 2?

2    A.    It was moot by April 2.

3    Q.    Going forward, Mr. Case, you mentioned that you had this

4    merger committee that you, the MEC had set up to negotiate

5    seniority, right?

6    A.    Yes, sir.

7    Q.    Were you on that commit?

8    A.    No, sir, I was not.

9    Q.    But were you kept abreast of their status, their

10   negotiations?

11   A.    Yes, sir, routinely they would give reports to the MEC

12   and I was very close to one of the merger committee members.

13   He was a classmate of mine at TWA.

14   Q.    And some representatives from the committee will say

15   what they did.  I just want you to tell the jury just

16   generally what progress, if any, was reported to you.  And

17   during what time period?

18   A.    From the onset of the, discussions there was never any

19   progress reported.  It just didn't happen.

20   Q.    Over what time period did you understand your merger

21   committee was negotiating for your seniority?

22   A.    Early on, in the January, 2001, to probably April

23   timeframe.

24          THE COURT:  Beginning April.

25   A.    Early over that.

1    Q.   There were more negotiations?

2    A.   Yes.

3    Q.   Over what period of time did that occur?

4    A.   I am not sure.  I think it was between April and June,

5    June or July of 2001.

6    Q.   And pass that were there negotiations in the summer of

7    2001 that you were aware of?

8    A.   Yes.

9         THE COURT:  Were you negotiating with a pilot group

10   from American?

11   A.   Yes, sir.

12        THE COURT:  It was pilot to pilot negotiations.

13   A.   That was every negotiation that was ever held, yes, sir.

14   Q.   And at some point were you informed that the American

15   pilots were done negotiating, were finished negotiating?

16   A.   Yes, sir.  They did send us a letter that send we are

17   done with you.  We are moving on.

18   Q.   When was that?

19   A.   I believe it was September 18.  2001.

20   Q.   I handed you J 329.  What is that?

21   A.   This is a letter from Captain Ed White who was chairman

22   of the American merger committee to our TWA LLC merger

23   committee chairman Mike day, dated September 18, 2001.

24   Q.   Without reading, first of?

25        MR. PRESS:  I move for admission of joint Exhibit

1    329.

2              MR. FRAM:  No objection, your Honor.

3              THE COURT:  J 329 in evidence.

4    Q.   And what is the up shot of this letter without reading

5    it, Mr. Case?

6    A.   The up shot of this letter is that the talks are

7    finished.  Any discussions Mr.  Seniority integration are

8    complete, and they are finished.

9    Q.   What do they say there what they are going to do?

10   A.   They say that the APA mergers and acquisition committee

11   is going to go back and report to the APA board of directors

12   that negotiations with TWA L with TWA MEC are concluded, and

13   the proposals and information advanced by the committees with

14   Mr. Valtin's assistance.  Based on the report we will receive

15   instructions from the board.  Based on section 13 of their

16   contract, they presented -- presented for implementation by

17   American Airlines.

18   Q.   So hey say they are just going to go cut their own deal

19   on seniority?

20   A.   They are done talking to us.  They are going to American

21   and tell American what they want done.

22   Q.   That was September 18, '01, right?

23   A.   Yes.

24   Q.   A week after 9-11?

25   A.   Yes.

1    Q.   Mr. Case, you personally, at that point in time, what,

2    the negotiations are over.  So what did you personally do to

3    try to keep up the process?

4    A.   It didn't seem to be going very well at all, as you can

5    imagine, and I phoned our legislative affairs committee

6    chairman, Matthew Comlish.

7    Q.   And?

8    A.   Matt happens to be, he was our political connection on

9    Capitol Hill.  He was a TWA pilot who lived in DC most of his

10   life and conducted some lobbying part time before he became a

11   pilot.  I talked to Matt about a potential legislative

12   solution to our seniority integration problem.

13   Q.   Okay.  What did you have in mind?

14   A.   What we had in mind was to go to Congress and take some

15   select senators we thought might be favorable to our position

16   and convince them to sponsor legislation that would require a

17   fair and equitable integration to the seniority integration.

18   Q.   You wanted a law passed?

19   A.   Wanted a law passed.

20   Q.   That would protect you?

21   A.   Yes, we did.

22   Q.   Who did you go to as a potential sponsor for this?

23   A.   We knew from advanced discussions with Matt that Senator

24   Kit Bond, Christopher Kit Bond of Missouri, a longstanding

25   Missouri Senator.  We went to Mr. Bond's office and asked him

Case-direct                                                        72

 1   for help.

 2   Q.   When was in approximately?

 3   A.   Mid to late September, it was shortly following this

 4   letter from Captain Ed White.

 5   Q.   When you say we, who was the we?

 6   A.   Initially Matthew Comlish, myself and a couple of other

 7   TWA pilots.

 8   Q.   And in this meeting with Senator Bond generally what was

 9   discussed?

10   A.   We discussed with Senator Bond the problems we were

11   having, the difficulties and problems we were having with the

12   American pilots and Senator Bond was sympathetic to our

13   cause.

14        I won't get into all the details as to how

15   legislation is built, but what the senator's office did was

16   he had his transportation coordinator liaison work with us on

17   writing legislative language that he could sponsor that

18   would, we felt was a solution to our problem.

19   Q.   Were there any ALPA employees at this meeting?

20   A.   No, there were not.

21        THE COURT:  Well, did you discuss with ALPA prior

22   to the meeting what you were trying to do.

23   A.   I believe Matthew Comlish did that, he was our

24   legislative affairs chairman and he was the conduit to ALPA's

25   legislative affairs department.

```
 1              THE COURT:  I know he was the conduit.  Are you --
 2    A.   I did not.
 3              THE COURT:  So you think that he talked with the
 4    ALPA committee but you are not sure.
 5    A.   I believe so.  I believe he will testify later.
 6              THE COURT:  Yes.
 7    Q.   So you had this meeting with the Senator.  He is
 8    sympathetic and going forward, what did you do?
 9    A.   With that, I went with our, contacted, went to our
10    merger counsel's office which was right down the street.
11    Q.   Who is that?
12    A.   Roland Wilder, our independent merger counsel and
13    informed him we had a very positive meeting with Mr. Bond and
14    we had some potential legislative language that he needed to
15    come up with, and we sat down and wrote what was later termed
16    Bond, the Bond bill.
17    Q.   You helped draft this thing, huh?
18    A.   Yes, I did.
19    Q.   And when was it drafted?
20    A.   It was drafted in late September, I believe, and it was
21    rather hectic.  We started pushing for this pretty early on,
22    and we knew it couldn't be a bill directed to a specific
23    transactions, so we wrote it in a fashion so that it wasn't
24    specifically for just American and TWA.
25    Q.   Once you had a bill drafted, what did you do?
```

```
1   A.   We went out on a grass roots lobbying campaign, visited

2   hundreds of senators and Congressmen and lobbied for our

3   position to have their support for the Bond bill.

4   Q.   Before getting into that, did you send the bill to

5   anybody at ALPA?

6   A.   I, after we constructed the final bill, yes, we did.  We

7   faxed it over to National ALPA.

8            THE COURT:  Who at National ALPA?

9            THE WITNESS:  Duane Woerth.

10  Q.   Why did you fax the bill to the president, President

11  Woerth?

12  A.   I wanted to solicit support from President Woerth.  We

13  had not been getting any support whatsoever on the litigation

14  front.  And I expected a request of him to assist us with the

15  legislative action, might come across a little better.

16  Q.   Why would you expect that ALPA would be involved in

17  trying to get a bill passed?

18  A.   My experience with ALPA, they are the worlds most

19  powerful political lobbying machine for airline pilots.

20  Q.   What experience are you referring to?

21  A.   My experience at Eastern, throughout TWA's timeframe and

22  working on the various MEC's.

23            MR. PRESS:  419.

24            THE COURT:  What number, P-419?

25            MR. PRESS:  Yes, your Honor.
```

1    Q.    Once the bill got drafted, did Senator Bond publicize

2    that?

3    A.    He eventually did in a press release.

4    Q.    I handed you P-419.  What is that?

5    A.    I believe this is a copy of what Senator Bond release

6    order his website, and it quotes the press release.

7          MR. PRESS:  I would like to move for the admission of

8    419.

9               MR. FRAM:  I object to this, your Honor.  It is

10   filled with hearsay.

11              THE COURT:  The basis of the objection?

12              MR. FRAM:  Hearsay, your Honor.

13              THE COURT:  I am going to admit it on the basis

14   that it is not being admitted for the truth of what is in

15   here, simply being admitted because it shows what Senator

16   Bond said about the bill, whether it is true or not true.  I

17   don't, I am accepting it not for the truth but for the fact

18   that that was something that Senator Bond issued about the

19   bill.

20              MR. PRESS:  Yes, your Honor.

21   Q.    All right.  This is a press release from the Senator?

22   A.    Yes, I believe this is a copy of a web website, copy of

23   a press release.

24   Q.    Can you go to the title, "Bond writes", and highlight

25   that.

1              What is the name of the bill?  Bond writes Airline

2    Workers Fairness Act.

3    A.    That is what we called the bill, Airline Workers

4    Fairness Act.

5    Q.    Says seeks third-party mediation for seniority talks.

6    Is that what you were seeking?

7    A.    Also arbitration as well.

8              THE COURT:  And the next to last paragraph.

9    A.    Yes.

10             THE COURT:  So this bill would have made

11   arbitration mandatory in this kind of seniority dispute.

12             THE WITNESS:  Yes, sir.  And it was a fairly

13   limited legislation, yes, sir.

14             THE COURT:  Limited in the real world it would

15   apply only to your airline.

16             THE WITNESS:  Paraphrasing, yes, sir.  It was

17   written generically.

18   Q.    You have testified that you sent the bill, copy to

19   President Woerth and you expected some assistance.  Did you

20   ever formally ask for ALPA support for the bill?

21   A.    Yes, sir.

22   Q.    Describe that.

23   A.    If I am not mistaken, I think we sent several letters

24   back and forth.  And I know verbally we did ask ALPA for

25   support at every turn.

1    Q.    Who specifically did you talk with and ask for help?

2    A.    I am trying to remember who all we did talk to.  Almost

3    every one that we could get our hands on at National ALPA.

4    Q.    You mentioned ALPA's structure with these various tiers.

5    Did you ever present to one of these boards or councils at

6    ALPA National?

7    A.    Yes, sir.

8    Q.    And ask about help for this?

9    A.    Yes, sir, we did.

10   Q.    And describe that.

11   A.    That was ALPA's executive council.  We took a break one

12   day from lobbying and went to Herndon while the executive

13   council was in session.  That is if you recall the ALPA tier,

14   the president, vice president and secretary treasurer, then

15   the executive council, all the airline MEC chairman, big

16   airline chairman.  We went to their council meeting and we

17   asked  them for continued support in our transaction and

18   asked them for directors, direct support with regard to this

19   bill.

20   Q.    What response did you receive from the ALPA Executive

21   Council?

22          MR. FRAM:  Could we have some more detail about who

23   was involved with the executive council and what it --

24          THE COURT:  You can cross examine.  He identified

25   who they are.  I will let you go ahead.

Case-direct

1   Q.   Go ahead, Mr. Case.

2   A.   We received a fairly warm welcome from a couple of the

3   ALPA executive council members.  Tom rashberg was one of the

4   ones.  I am not quite sure if I would called the United

5   Airlines executive vice president, but those two were

6   probably the only two that gave us a warm reception.  The

7   Delta representative was very hostile to us.  He felt that

8   TWA had been a plague on the association for years and done

9   nothing but drag down wages from our concessionary contract.

10  We once again did not get a very warm welcome from the

11  executive council.

12            THE COURT:  Was Delta one of the larger

13  members?

14  A.   Yes, sir, Delta was one of the larger members.

15            THE COURT: So through a merger Delta would

16  more likely be an acquirer than an acquiree?

17  A.   Yes, sir.

18            THE COURT:  As an acquirer of American they might

19  oppose it.

20  A.   No, sir.  They are, they were  --  if there was an ALPA

21  ALPA carrier they are subject to merger policies.  If it was

22  non-ALPA to ALPA, and they were the acquirer, they were still

23  subject to --

24            THE COURT:  They may be subject.  But they, Delta

25  didn't support this.

1    A.    No, he was hostile to the fact that we were TWA people

2    asking for this.

3              THE COURT:   What about United?

4    A.    They were the ones -- United was in favor and at the

5    time United was, if I am not mistaken, the largest carrier in

6    the world.

7    Q.    So at the end of the day what support, if any, did you

8    receive from the executive council pursuant to your request?

9    A.    We did not receive support.

10   Q.    So going forward from there, what did you do to try to

11   get your bill passed?

12   A.    We continued a grass root lobbying campaign.  We would

13   organize on -- at a given point, and my task, as I saw it,

14   was to coordinate the small groups of lobbyists, and send

15   them out, give them a list of senators and Congress.

16   Q.    Can I interrupt you?  I am sorry.  When you say grass

17   roots, what do you mean?  Who was involved in the lobbying?

18   A.    In the grass roots lobbying campaign TWA pilots and

19   flight attendants primarily.  We had some ground work

20   machinists that would go with us, but it was mostly pilots

21   and attendants.  We were in uniform, walked the halls of

22   Congress, we would set them up groups and let groups of four

23   or five go to visit different senators and congressmen and

24   and ask for support for the Bond legislation.

25   Q.    How did that work?  Take us through a typical day.

```
1   A.   It went very well, believe it or not, we got a warm

2   reception.

3   Q.   I am sorry.

4                   MR. FRAM:   Your Honor?

5   Q.   Organizing this grass roots lobbying, what did you do on

6   a daily basis?

7   A.   I was the coordinator.  I would basically collect the

8   people together, assign them a task, assign them which

9   Senator and Congressmen to see and give them a script to read

10  from and let them go out and make a pitch.  We would usually

11  concentrate people within the  group going to their

12  constituent representatives.

13  Q.   Did you also personally visit politicians, senators and

14  Congress people?

15  A.   Yes, sir, I did.

16  Q.   I handed you a stack of business cards.  What is that?

17  A.   A partial stack of Congress men's and senators offices

18  and people that I visited personally.

19  Q.   Those are cards you collected personally?

20  A.   Yes, sir.

21  Q.   Can you flip through and give us some names?

22  A.   Patrick Lahey, Barbara Boxer, Hillary Rodham Clinton,

23  Tom Dashill.  Max Cleland.  Senator, Congressman Oberstar.

24  Q.   Congressman Oberstar, who was he?

25  A.   He was the, I believe at the time, the house chair for
```

1    the department, the Transportation Department of the House.

2    Transportation committee of house.

3    Q.   Tell us about your meeting with him?

4            MR. FRAM:  Well, I object, your Honor, to any

5    statements made that would be hearsay.  I don't object if he

6    wants to talk about when the meeting was there, who was

7    there, but any substance would be objectionable.

8            THE COURT:  I will allow it.  Go ahead.

9    A.   I made a very detailed presentation to Congress

10   Congressman Oberstar.  He was the chairman of the committee

11   that would be intimately involved with the legislation on the

12   House side.  Spent probably an hour or so with the gentleman

13   explaining to him exactly what this integration was going to

14   do and how terribly harmful it was going to be to Missouri,

15   primarily as well as how unfair it was to the employees.

16           THE COURT:  Is he from Missouri?

17   A.   No, sir, he is not.  He Mr. Oberstar at the conclusion

18   of the meeting simply said, "Mr. Case, you give a great

19   presentation.  Where does ALPA stand on this?"

20   Q.   And what was your response?

21   A.   My response to him was, I asked him had he not already

22   heard from ALPA about this and he said no.

23           MR. FRAM:  Your Honor, I object.

24           THE COURT:  I am going to allow that.  Go ahead.

25   Q.   Can you repeat that, Mr. Case?

1   A.   Yes, sir.  He said where was ALPA on this issue, and I

2   said haven't you heard from ALPA?  And he said no.

3   Q.   And over what period of time did this lobbying go on,

4   really intently?

5   A.   The extensive lobbying went on from mid to late Septe

6   amber all the way up until mid October, primarily.

7   Q.   How much time did you spent personally in Washington,

8   D.C. during that time period?

9   A.   A lot of time.

10  Q.   Can you quantify?

11  A.   Probably four days a week.  Three to four days a week

12  over that period of time I would estimate.

13  Q.   And during that month time did you ever see anybody from

14  ALPA on Capitol Hill?

15  A.   Twice.

16  Q.   Okay.

17  A.   Captain Woerth was there one day for a photo op with a

18  AFL-CIO function, and as I said, all of our pilots were in

19  uniform and flight attendants, and walked over where we were,

20  he grabbed us and put us in the picture with him.  I saw him

21  there that one day.  Like I said it was a photo op.  And just

22  one other time I saw Paul Hallison, who was the ALPA

23  legislative affairs department, one of their lobbyists.

24  Q.   Did anybody at ALPA, this Mr. Hallisay, what is his job

25  title at ALPA?

1   A.   I believe he is in legislative affairs.  He is

2   essentially one of ALPA's lobbyists.

3   Q.   Did ALPA assign Mr. Hallisay or some other lobbyist to

4   help?

5   A.   Not that I am aware.

6   Q.   Did anybody help you from ALPA?

7   A.   Not that I am aware of.  Matt Comlish did most of the,

8   he was mostly the communicator between ALPA  legislative

9   affairs department and our little groups.  I was just on some

10  speaker phone calls with Matt and Mr. Hallisay a couple of

11  times, but it was generally Matt that was the conduit to the

12  ALPA legislative affairs department.

13  Q.   You mentioned this meeting with Mr. Oberstar.  Again, he

14  was a Congressman from where?

15  A.   I am not exactly sure what state I was from at that

16  time.  He was a longstanding house member and chaired the

17  committee we were interested in targeting.

18  Q.   You asked him if he had been in in contact by ALPA?

19          THE COURT:  No, you asked the question, that has

20  been asked and answered.  Move on.

21  Q.   After your meeting with Mr. Oberstar what did you do

22  with respect to soliciting ALPA support for the bill?

23  A.   We continued to request once again via conduit through

24  Matt some support.  What we were after was we wanted some

25  back up from the worlds powerful airline pilot lobbying

```
 1    machine.

 2    Q.   Did you call anybody at ALPA seeking help?

 3    A.   I don't recall.

 4           THE COURT:  Did you write to ALPA seeking help?

 5    A.   I am pretty sure there was correspondence that went back

 6    and forth.  I was extremely busy coordinating the lobbying

 7    effort.

 8           THE COURT:  Did you ever write a letter to ALPA

 9    asking for support?

10    A.   I believe Captain Pastore did.

11           THE COURT:  Okay.  The answer is you didn't.

12           THE WITNESS:  No.

13    Q.   Did you see any evidence of any support from ALPA in any

14    of the offices, Senate offices, you went to?

15    A.   No, sir, not that I could see.

16    Q.   What happened to the bell as to the bill as far as

17    getting through the Congress?

18    A.   Getting through the Congress.

19    A.   It was just passed on the Senate floor by unanimous

20    consent and eventually stripped out of the defense

21    appropriations bill that we had attached it to in the House

22    Senate conference committee.

23    Q.   I handed you exhibit P 418.  What is that?

24    A.   This is a press release from Senator Kit Bond.

25    Q.   What is the date of it?
```

```
1    A.   It is dated December 8, 2001.

2              MR. PRESS:  Move for the admission of P-418, Judge.

3              MR. FRAM:  I have the same objection as before,

4    your Honor.  Did it is admitted for the truth I object.  If

5    for nonhearsay purposes.  I understand the Court's ruling.

6              THE COURT:  Well, to the extent it has facts, do

7    you have any dispute with what it says in here?

8              MR. FRAM:  Not with respect to the facts.  But

9    there are some opinions and understandings.

10             THE COURT:  To the extent it is Bond's opinion, we

11   are not offering it for the truth.  We are not saying whether

12   his opinions are accurate or inaccurate.  I am going to allow

13   it.  P-418.

14             MR. PRESS:  Yes, your Honor.

15   Q.   This is a press release dated December 8, '01, from the

16   Senator?

17   A.   Yes, sir.

18   Q.   Just read the tag line at the top?

19   A.   Senate adopts Bond airline workers fairness act.

20   Requires third-party arbitration for seniority talk.

21   Q.   It got through the Senate, your bill, that you drafted?

22   A.   Yes, sir.  I didn't draft it completely.

23   Q.   What happened to the bill after that?

24   A.   As I stated before, in the House Senate reconciliation

25   conference it was stripped.
```

1   Q.   When was that?

2   A.   I don't recall the exact date.

3   Q.   You testified that for about a month, three or four days

4   a week you were in Washington, D.C. lobbying?

5   A.   Yes, sir.

6   Q.   You mentioned the flight pay loss before?

7   A.   Yes, sir.

8   Q.   Where the company would pay for the time off work?

9   A.   Yes, sir.

10  Q.   Were you compensated for your time lobbying at some

11  point?

12  A.   I was reimbursed for the trips that I had to miss to

13  conduct my lobbying experience, yes.

14  Q.   By who?

15  A.   By our ALPA budget, or TWA budget.

16  Q.   What was the process for you to be paid?

17  A.   The process was, as a pilot would drop a trip for

18  conducting union work, a slip of flight pay loss request

19  would go up the chain to National ALPA.  They had to approve

20  all of the flight pay loss and once they approved it and sent

21  it back, then the pilot would be paid for the days that he

22  was available for his trip, while he was doing the union

23  work.

24  Q.   ALPA had been playing flight pay loss claims for your

25  lobbying efforts?

1   A.    It was TWA dollars.  All they are doing is authorizing,

2   TWA MEC's budget moneys pays for the trips that were lost.

3   Q.    Was there a time that ALPA stopped doing that?

4   A.    Yes, there was.

5           MR. FRAM:  Can we know what exhibit is being handed

6   out?

7           MR. PRESS:  357.

8           MR. FRAM:  I would ask counsel if he could announce

9   them earlier.

10          MR. PRESS:  I am sorry.

11          THE COURT:  Is it P-357.

12  Q.    I have handed you exhibit P-357.  What is that?

13  A.    It starts with fax cover to Bob Pastore, Ted Case, and

14  Kevin Dillon.  It is from Jalmer Johnson, dated 12/12/01.

15  Q.    Is it is a fax from Jalmer Johnson to you and others?

16  A.    Yes.

17  Q.    Who is Jalmer Johnson?

18  A.    At the time I believe his title was general manager of

19  ALPA.

20          MR. PRESS?  I  move for admission of Exhibit 357,

21  Judge.

22          MR. FRAM:  No objection.

23          THE COURT:  Okay.  P-357 in evidence.

24  Q.    There is the cover page, right?

25  A.    Yes, sir.

1    Q.    Go to the next page?

2    A.    Yes, sir.

3    Q.    What is this form, what is this?  It is from you, right?

4    A.    Yes, that's correct.

5    Q.    To Mr. Johnson dated December 12, 2001.

6    A.    Yes, sir.

7    Q.    What is this?

8    A.    This is the flight pay loss form that had to be sent up

9    to National ALPA for approval to pay the pilot for the trip

10   that was missed.

11   Q.    And did you prepare this document?

12   A.    Yes, I did.

13            THE COURT:  By the way, was this one for your loss

14   or somebody else's loss?

15   A.    This particular ONE was for Captain Hollander's  loss.

16            THE COURT:  You were doing it at his behalf.

17   A.    At this time I was the TWA MEC's secretary treasurer.

18   It was my job to apply for the flight loss due for the

19   committee members.

20            THE COURT:  This was for Mr. Hollander.

21   A.    There was for Mr. Hollander's work on Capitol Hill.

22            THE COURT:  This is for work done after the Bond

23   bill had passed?

24            THE WITNESS:  Correct, sir.

25            THE COURT:  Okay.

1          THE WITNESS:  The Bond bill had simply passed the

2  Senate.  We had to make a major push for the house which was

3  why I was requesting these trips be dropped so they could

4  come lobby the house.

5  Q.   Your bill, on December 8 we saw the bill had gotten past

6  the Senate?

7  A.   Yes.

8          THE COURT:  Wait.  Did you submit this before the

9  trip was dropped?

10  A.   Yes, sir.

11          THE COURT:  It wasn't that you dropped a trip and

12  then after the fact you were asking for permission to drop

13  the trip, and then get paid for it?

14  A.   No, you had to, if you wanted to make sure you were

15  going to get paid, you had to do it prospectively.

16          THE COURT:  Prospectively.

17  A.   Prospectively.  On the 12th of December I sent this trip

18  drop request up to Mr. Johnson, and the trip that Mr.

19  Hollander wanted to drop operated over the 13th and 14th of

20  December.

21          THE COURT:  Right.

22  Q.   And you are asking ALPA to do what?

23  A.   Asking ALPA to provide reimbursement for the trip that

24  was going to be dropped, for the purpose of ongoing seniority

25  integration issues with legislative work in DC.  That is in

Case-direct                                                    90

1    the purpose column over on the right.

2    Q.   When you sent this to Mr. Johnson on December 12, did it

3    have that handwriting there at the bottom?

4    A.   No, sir.

5    Q.   That is what came back to you, it was faxed back to you,

6    right?

7    A.   Eventually, yes, sir.

8    Q.   And the note says what?

9    A.   It says denied.  JAJ.  12/12/01.

10   Q.   So your application for Mr. Hollander to be compensated

11   for loss flying to go lobe to go lobby was denied?

12   A.   Correct.

13   Q.   Was this the first time ALPA had denied one of these

14   claims that you are aware of?

15   A.   Not the first time they ever denied a claim.

16   Q.   I mean for the lobbying?

17   A.   For the log beers, as far as I know this is the first

18   time I had one rejected.

19   Q.   If you go to the next page.  This is a similar form but

20   this one was sent on December 10 by Captain Pastore.  Right?

21   A.   Yes, sir.  Two days prior to the one I sent.

22           THE COURT:  Why did Pastore send upon and you send

23   the other one?

24   A.   Any of the MEC officers could request flight pay loss

25   for committee workers.  I may have been in Washington.  I am

1    not sure where I was.  Captain Pastore may have been in the

2    office.  It might have simply be a conflict for him.

3              THE COURT:  Who is Jim Arthur and Lisa Mauro.

4    A.   These are TWA pilots enlisted to help in the legislative

5    work in DC.

6    Q.   The claims played on December 10, what is the note?

7    A.   Denied.  JAJ.  12/12/01.

8    Q.   If you go to the next page, it is a similar form form,

9    this one is from you dated December 12, right?

10   A.   Yes, sir.

11   Q.   And you are making claims for three pilots to miss work,

12   correct?

13   A.   Yes, sir, that's correct.

14   Q.   Number one, Mr. Cutler.  His claim was what?

15   A.   For ongoing legislative work in the MEC office on 7

16   hours and 30 minutes.

17   Q.   And what was the response on this claim?

18   A.   Denied.

19   Q.   Is that the one with the circle?

20   A.   Yes.

21   Q.   And two, Jeff Darnell, that claim wasn't for lobbying,

22   was it?

23   A.   No, sir.

24   Q.   It was for ongoing communication, it says?

25   A.   Yes, sir, he was our vice chairman of the communications

1    committee.  Jeff basically put up, what we called code-a-

2    phones.  We would record messages and put them on a recorded

3    1-800 number for pilots to call in, get information and he

4    would publish like any type of messages that went out to the

5    pilots, he was the communications guy.

6    Q.   His claim isn't for lobbying and his claim is what?

7    A.   OK'd.

8    Q.   And the first is Ron Vesser?

9    A.   Captain Ron Vesser..

10   Q.   His application is for lobbying and what happened to

11   his?

12   A.   It was denied.

13   Q.   This is December 12, four days after you got the bill

14   through the Senate, right?

15   A.   Yes, sir.

16            THE COURT:  Mr. Press, is this a good time for you

17   to take a break?  It is an hour and a half.  Time to give the

18   jury a break to do whatever they want to they want to do it.

19            Do not discuss the case among yourselves.  Keep an

20   open mind until you have heard all the evidence.  We will see

21   you in 15 minutes.  Which is about, a little eleven or twelve

22   after eleven.

23            (The jury leaves the courtroom.)

24            (Recess)

25            (Jury enters the courtroom).

```
 1            THE COURT:  Mr. Press, you may continue.

 2            BY MR. PRESS:

 3   Q.   When we left off you were talking about the pay loss

 4   claims that were denied?

 5   A.   Yes, sir.

 6   Q.   Did anybody at ALPA explain to you why they were being

 7   denied?

 8   A.   I am not sure if there was any written correspondence

 9   back but absent the written correspondence I am not sure.

10   There was no information.

11   Q.   I am going to refer to exhibit D 3, Mr. Fram?

12            THE COURT:  Three?

13   Q.   D 3.

14   Q.   We were talking about membership ratification of the

15   agreement.  I was fumbling for a document that I wanted to

16   show you.  What is exhibit D 3?

17   A.   This is an TWA MEC special meeting on November 2, 2001.

18   Compilation of actions, reports, for a specific resolution,

19   0097, which was passed in executive session.

20   Q.   I move for the admission of D 3.

21            MR. FRAM:  No objection, your Honor.

22            THE COURT:  Okay.  D 3 is in evidence.

23   Q.   Can you, this is a formal resolution of the MEC.  What

24   is the date of it?

25   A.   November 2, 2000.
```

Case-direct                                                      94

```
 1   Q.   What is the last resolution there, can you read that?

 2   A.   Been it further resolved that any changes to the CBA

 3   will be ratified by the entire pilot group.

 4   Q.   And the reference to CBA is to collective bargaining

 5   agreement?

 6   A.   Yes, sir.

 7   Q.   This resolution was not followed on April 2, was it.

 8            MR. FRAM:  Objection.  That is leading, your Honor.

 9   Q.   Was this resolution withdrawn, Mr. Case?

10   A.   Not to my knowledge.

11            THE COURT:  This is a MEC resolution.  A TWA MEC

12   resolution.

13   A.   Yes, sir.

14   Q.   Now, the Bond bill.  Did it provide some unexpected

15   leverage for you?

16   A.   I believe it did, sir.

17   Q.   Can you describe that?

18   A.   Well, as we have already seen in the previous letter

19   from Captain Ed White to the pilots, to Mike Day, it said, we

20   are done with you on September 18, we are going to our board

21   and we are going to tell them what we are going to do.

22   American Airlines and the Allied Pilots Association got wind

23   of our lobbying efforts in Washington.  Those lobbying

24   efforts produced a call from Senator Bond's office to the ADA

25   and they agreed to come to Washington and discuss seniority
```

```
 1   integration issues even though they said they were done.

 2   They agreed to come back to DC October 21 to 23 of 2001.

 3   Q.   We saw the letter from the American pilot chairman, Ed

 4   White.  That was September 18?

 5   A.   Yes, sir, it was.

 6   Q.   He is telling the TWA pilots we are done negotiating

 7   with you?

 8   A.   Done.

 9   Q.   You guys get this bill introduced and lobbying and they

10   come back to the table?

11   A.   Yes, in my opinion the bill provided leverage for them

12   to come back to the table, if nothing else.

13   Q.   These meetings with the American pilot negotiating team,

14   when were they?

15   A.   October 21 through the 23rd, 2001, at the Mayflower

16   Hotel.

17   Q.   Where?

18   A.   Washington, D.C.

19   Q.   Did those negotiations produce an agreement?

20   A.   No, they did not.  I.

21   Q.   Do you remember in general terms what their final

22   proposal to the TWA pilots was on the seniority issue?

23   A.   It was essentially same thing that they already agreed

24   do or this that they had ever agreed to.

25   Q.   Go ahead.
```

1   A.   In Supplement CC, of what they considered Supplement CC

2   of the contract.

3   Q.   And what in general terms was the seniority integration

4   going to be that they had proposed?

5   A.   It was going to be the staple or end tail, the majority

6   of the TWA pilots were below the newly hired, and on a ratio,

7   of a 1 to eight ratio of the roughly 35 percent of the pilots

8   into their list, starting at the bottom, integrating our 1962

9   hires with their 1986 hires.

10  Q.   Mr. Case, was that proposal voted on by the full MEC?

11  A.   Yes, it was.

12  Q.   At that time were you a voting member?

13  A.   Yes, sir, I was.

14  Q.   Can  you tell us how the vote went?

15  A.   The vote was no.

16  Q.   How did you vote?

17  A.   I voted no.

18  Q.   Why?

19  A.   I put a statement in the record, I did not think that

20  that integration was a fair representation of my pilot

21  constituents who also shared anywhere from 13 to 15 years of

22  seniority, being stapled below a new hire American Airlines.

23  Q.   You have rejected the American pilots final offer they

24  are telling you?

25  A.   Yes, sir.

Case-direct                                                        97

```
 1   Q.   What was the strategy to have anything good happen?

 2   A.   Once again, litigation.

 3   Q.   And describe what was proposed?

 4   A.   We knew Roland Wilder had come up with another

 5   litigation strategy, and we were asking the president once

 6   again to sue on our behalf.

 7   Q.   What in general terms what was Mr. Wilder's strategy at

 8   this point?

 9   A.   Mr. Wilder's strategy at this point was to on enjoin

10   amount and APA from implementing Supplement CC.

11   Q.   And again, Supplement CC was what you referred to as,

12   what would --

13   A.   It was the agreement that American and the Allied Pilots

14   Association, APA, had decided that they were going to use to

15   integrate us.

16   Q.   Mr. Wilder wanted to go to court and stop that from

17   happening?

18   A.   Yes.

19   Q.   What was your understanding as to whether or not that

20   strategy had been preliminarily approved by ALPA, did you

21   have an understanding?

22   A.   It was my understanding that that, once again, as we had

23   received multiple assurances from Captain Woerth, that if

24   litigation was possible, it would be conducted and it was my

25   understanding that the association had already given a thumbs
```

1   up once again that that was an okay litigation that they

2   would support.

3   Q.   Now, the negotiations with the American pilots broke

4   down on what day?

5   A.   On the 23 of October.

6   Q.   And what did your, what did the MEC do in response to

7   that, they rejected the proposal, then what happened?

8   A.   We participated, we sent our merger counsel over to his

9   office to begin working on.

10              THE COURT:  His?

11  A.   Yes, sir.

12              THE COURT:  Who is "his?"

13              THE WITNESS:  Excuse me.  Roland Wilder's office,

14  our merger counsel, Roland Wilder, we sent him back to his

15  office to begin work on the injunction paperwork.  I directly

16  asked him, is the injunction ready to file?  He said no.  I

17  have to get depositions and some testimony lined up.  And I

18  said you better start.  He left the meeting to go to his

19  office to begin the work on the injunction problem.

20  Q.   Then what happened?

21  A.   While Mr. Wilder was in his office working on it the MEC

22  finally cornered Duane Woerth again on a telephone speaker

23  conference.  At that meeting late in the day, not too late in

24  the day.

25  Q.   Did you participate in the call?

1    A.   Yes, I did.

2    Q.   What was said by, well, what did you say to the, to

3    President Woerth?

4    A.   We listened, mainly.  What I directly heard from Captain

5    Woerth almost is, rings true in my memory forever, is, I will

6    not authorize nor will I approve suing another labor union or

7    an airline at an airline where I don't represent the pilots.

8    Q.   Which means what as to pursuing?

9    A.   There was not going to be a lawsuit pursued and there

10   was no litigation authorized by the president of the

11   association.

12   Q.   Did you say?

13        THE COURT:   Because this suit would have been

14   against APA and American.

15        THE WITNESS:   Correct.

16        THE COURT:   To keep them from implementing cc.

17        THE COURT:   Correct.  Captain Woerth stated he did

18   not sue other labor unions.

19   Q.   Did anybody respond to President Woerth?

20   A.   Yes.  There was more than a few responses.

21   Q.   Can you recall any of them?

22   A.   They were rather heated.  And very intense.  There was a

23   lot of, from my perspective, I was very, myself, I was very

24   upset that he was not conducting himself in a fashion that he

25   assured us he would throughout this process.

Case-direct                                                      100

1    Q.   So the Supplement CC, Mr. Case, the seniority

2    integration that was going to be foisted on the TWA pilots,

3    when was that actually accomplished?

4    A.   I believe it was on November 7, 2001 is when the APA and

5    their board of directors finally approved what they had

6    termed Supplement CC, their version of how they were going to

7    integrate us into their list.

8    Q.   It is called supplement CC because it is a supplement to

9    their collective bargaining?

10   A.   It is a supplement to the American Airlines collective

11   bargaining agreement.

12   Q.   I hand you exhibit J 352.  What is that?

13   A.   This is the Allied Pilots Association, cover letter from

14   the Allied Pilots Association to Captain Bob Pastore from

15   Captain John Darrah, who was his, they don't have any MECs.

16   At APA.  They have something similar.  His counterpart would

17   have been John Darrah,, he would have been the MEC chairman

18   for APA.

19   Q.   He was the president?

20   A.   He was the president of their association.

21   Q.   What does he enclose with the fax?

22   A.   A copy of Supplement CC, the agreement between American

23   Airlines, Inc., and the Airlines Pilots Association and

24   American Airlines as represented by the Allied Pilots

25   Association.

1          THE COURT:  Are you offering this?

2          MR. PRESS:  Yes, I move for the admission of J 352.

3          MR. FRAM:  No objection.

4          THE COURT:  Okay.  J 352 is in evidence.

5  Q.   The last three pages of the exhibit shouldn't be there.

6  Do the last three pages of this exhibiting with supplement

7  CC?   Oh, they are part of the fax?

8          THE COURT:  Supplement CC is the fax.

9          MR. PRESS:  Yes.  I made a mistake, Judge.

10 Q.   This document, is this a document you are familiar with,

11 Mr. Case, supplement CC?

12 A.   Yes, sir.

13 Q.   What does this document do?

14 A.   This document basically contains the provisions with

15 which former TWA pilots worked at American Airlines.

16 Q.   Does it say how the TWA pilots are going to be put on

17 the American seniority list?

18 A.   Yes, sir, it does.

19 Q.   Again it is a lengthy document.  But in general terms

20 how was it to be done?

21 A.   As I stated earlier, with the majority being stapled to

22 the bottom and the others being ratioed in eight for one from

23 the bottom up.

24 Q.   As far as you know, what became the ultimate seniority

25 integration, the Supplement CC, was that in any material way

```
 1    different than what had been proposed in Washington, D.C. a

 2    few weeks earlier?

 3    A.    No, it wasn't.  And I did ask Mr. Brundage who also

 4    attended those meetings.

 5    Q.    In who is Mr. Brundage?

 6    A.    He was the vice president of the labor relations at

 7    American in charge of Americans negotiations with this deal.

 8    If there was on the 22nd, I believe the 22nd or 23rd, I asked

 9    him directly, is there any difference between what you have

10    already agreed to do and what you are offering us today and

11    he said virtually none.  Aside from a couple of conditions.

12    Q.    Now, this supplement CC, it was?

13          THE COURT:  It didn't become immediately effective,

14    though.

15          THE WITNESS:  No, sir, it did not.

16          THE COURT:  Some things had to happen.

17    A.    Yes.

18    Q.    That was my next question, what were those things?

19          THE COURT:  I turn it back to you.

20    Q.    What were those things that had to happen for this

21    seniority plan to be effective?

22    A.    For this seniority plan to become effective a single

23    carrier transportation certification had to be made by the

24    National Mediation Board.

25    Q.    And again, I think you described that a little bit
```

1    yesterday.  Can you tell the jury what that means again?

2    A.   When two carriers are merging and they obviously have

3    two pay schemes, two routes beings, two pilots groups, two

4    flight attendant groups, they are different.  As they blend

5    together, once they get to a certain stage so they can hold

6    themselves out as a single airline carrier they apply to NMB

7    for what called a single carrier determination.  The NMB Say

8    you are airline X.  You were Z and Y before, now you are

9    airline X or whatever.  You function as a single carrier, and

10   it also allows NMB to make a determination as to who the

11   bargaining agent is for the union representatives of the

12   employees for that carrier.

13   Q.   What is the process for single carrier determination to

14   be made?

15   A.   Either the air carrier or the labor union can apply with

16   the National Mediation Board requesting an investigation

17   begin to begin the process for making it a single carrier

18   determination.

19   Q.   Somebody has to ask for that?

20   A.   Somebody has to ask for it.

21   Q.   Who did?

22   A.   APA, Allied Pilots Association did so on November 8, I

23   believe.  The day after they negotiated.

24   Q.   Is there there a process for somebody to object to a

25   request for a single carrier finding?

1   A.   Yes, there is.

2   Q.   Did you ask ALPA to object?

3   A.   Yes, I did.

4   Q.   Was there an objection.

5   A.   Yes, there was.

6   Q.   How many times did you have to ask for an objection be

7   filed before it got done?

8   A.   Several times.  However, it did eventually gets done.

9   They put me in charge of filing it with Clay Warner.

10  Q.   Who is they?

11  A.   I got a call from Clay saying that he and I were going

12  to be the ones writing the objection.

13  Q.   And Clay again is who?

14  A.   Is an attorney for ALPA, one of the staff attorneys at

15  ALPA H.

16  Q.   Now, objecting to single carrier finding, what was the

17  goal in doing that?

18  A.   The goal at that point in time was to delay.  We

19  obviously, we saw what American and the APA were going to do

20  with us and the primary goal was to delay, and with that

21  delay look for other litigation strategies or possibly engage

22  other legal counsel, since we have been unsuccessful with

23  having Captain Woerth fulfill his promises.

24  Q.   When you saw supplement CC were you able to figure out

25  where you were going to be on that list?

Case-direct                                                          105

1   A.    /PRET pretty quickly.

2   Q.    3 65.

3             THE COURT:  It is J --

4             R. PRESS:  Yes.  J 365.  I apologize.

5   Q.    I handed you J 365.  Can you tell us what that is?

6   A.    This appears to be a joint seniority list between

7   American and the TWA LLC pilots.

8   Q.    I move for admission of J 365.

9             MR. FRAM:  No objection, your Honor.

10            THE COURT:  Okay.  J 365 is in evidence.

11  Q.    Now, if you go to the second page?

12            THE COURT:  First do we know when this was

13  prepared?

14  Q.    Mr. Case, can you address that?

15  A.    I am not sure the exact date.

16            THE COURT:  Was it after the CC was adopted.

17  A.    This was part of supplement CC.

18            THE COURT:  Oh, this was actually part of it.

19            THE WITNESS:  Part of supplement CC was the APA

20  included the joint MEC seniority list and this was submitted

21  to the National Mediation Board.  That is my understanding.

22            THE COURT:  You mean when they petitioned for

23  single carrier status?

24  A.    Yes, there was attached to it.  Or a version of this.  I

25  am not sure if this is the exact version.

1   Q.   In is a combined seniority list of the American and TWA

2   pilot after supplement CC was adopted?

3   A.   Yes, sir.

4   Q.   There are all kinds of lines of data on here.  Can you

5   tell us what this represents?

6   A.   With the magnifying glass.

7   Q.   Tell the jury what all this is about?

8   A.   It mass a column for company seniority date.  This is,

9   mean it is hard to read this.  Couple seniority date lines,

10  new seniority number.  The name of the pilot.  And the date

11  of hire of the pilot.  And a retirement date.

12  Q.   This first line, Mr. Case, this means, this is American

13  airline pilot number 1?

14  A.   Yes.

15  Q.   It is a fellow named Kennedy?

16  A.   Yes.

17  Q.   2, three and so on?

18  A.   Correct.

19  Q.   Go to the last page.  Who is the last one on the list

20  here?

21  A.   Gentleman by the name of J. K. Viele.

22  Q.   All right.  Where are you on this list?

23  A.   It will take a minute to find me.

24          I am on page 7140.

25  Q.   What is your number?

1    A.    On this page it shows my number my number as 12,860.

2    Q.    That was your seniority number at American Airlines?

3    A.    Yes, sir.

4    Q.    Do you know what your seniority number was at TWA?

5    A.    I believe it was 1360.

6    Q.    Do I need to get out a document or do you know that?

7    A.    I am pretty sure of that number.  It is close.  It may

8    not be exact.

9    Q.    You went from being what number?

10   A.    1360, about halfway through the list, is a 13 year 727

11   international first officer.

12   Q.    You went to 12,860, which was where proportion wise on

13   the combined list?

14   A.    Probably in the 95th percentile, about to be furloughed.

15   Q.    How much seniority did you lose?

16   A.    All 13 years.

17   Q.    Now, getting back to single carrier thing with the

18   National Mediation Board.  While your objection was pending,

19   an objection was filed to, as you mentioned to draw things

20   out.  While it was pending did you ask your union to make a

21   challenge to supplement CC?

22   A.    Yes, sir.

23   Q.    Who did you speak with about that?

24   A.    I discussed this with Mr. Holtzman, once again, ALPA's

25   contract administrator assigned to the MEC.

Case-direct                                                        108

1    Q.    Did you have something specific you asked him to do?

2    A.    Yes, sir.  I explored with him the possibility of a

3    bargaining interference claim with, against the Allied Pilots

4    Association and American Airlines.  It is clear who owned our

5    bargaining rights at the time.  That time was, at that time

6    it was ALPA.

7    Q.    Does it mean owned your bargaining rights?

8    A.    In lay persons terms.  When, under the Railway Labor Act

9    which was explicit to us and the way we function, members

10   join the union.  The union essentially acquires the exclusive

11   bargaining rights for that group of people.  I can't go out

12   and say I want a pay raise.  My union has to do that for me.

13         As such, anything with regard to any bargaining

14   related to me can only be done by my exclusive bargaining

15   agent.  It is just that.  That is the only person that can

16   bargain on my behalf.  At that time ALPA was my bargaining

17   agent and I was being placed into someone else's contracts

18   specifically by name, by another labor union, with a parent

19   company at American Airlines.  And it seemed to me like a

20   broad bargaining argument we could make in court.  Once again

21   I was always trying to overturn every rock I could for

22   leverage to try and prove our position.

23   Q.    And so you asked Mr. Holtzman to do what?

24   A.    I asked him to investigate the possibility of firing a

25   bargaining interference claim.

1    Q.    Against?

2    A.    American Airlines and APA.

3    Q.    What response did you receive from Mr. Holtzman?

4          THE COURT:  Where would that be filed.

5    A.    In federal court.

6          THE COURT:  It would be a lawsuit, not from an

7    agency.

8          THE WITNESS:  Correct, it would and lawsuit.

9    Q.    Mr. Case, what response did you receive from Mr.

10   Holtzman?

11   A.    A typical response, is this another one of your

12   crackpot legal duties.  I said no.  That there is clear

13   evidence that ALPA has gone to court before, and filed suit,

14   in bargaining interference claims and they did it fairly

15   routinely in my opinion over the last 50, 60 years.

16   Q.    When was it you were asking for that help?

17   A.    Shortly after single carrier filing was filed.  That

18   would be back in November, 01, timeframe to December,

19   timeframe.

20   Q.    So no challenge to supplement CC was made.  Is that

21   right?

22   A.    No, it was not.

23         THE COURT:  Well, by -- posing single carrier

24   determination you are there effect opposing the CC, aren't

25   you, because if they don't grant it, then CC doesn't go into

1    effect.

2              THE WITNESS:  That's correct.

3              THE COURT:  So when ALPA filed opposition to single

4    carrier designation they were opposing CC.

5    A.   They were opposing CC via the objection.  However, I

6    felt the objection was just short term.  It was simply to buy

7    time to get into federal court, in my opinion, back then.  I

8    didn't expect the objection to keep the NMB from making a

9    decision for an extended period of time.

10   Q.   The ALPA lawyer that worked with you on that was Mr.

11   Warner, right?

12   A.   Mr. Holtz plan and Mr. Warner.

13   Q.   What did they say as to what we can get out of this

14   objection to single carrier?

15   A.   A delay.

16   Q.   There wasn't going to eradicate Supplement CC?

17   A.   They didn't believe so.  And I don't believe so either.

18   I filed the objection, I requested the objection be filed

19   simply to delay to buy time to find some other way to get

20   into federal court.  That was the principal design behind the

21   objection to the single carrier determination.

22             THE COURT:  Who prepared the objection?

23             THE WITNESS:  Myself and Mr. Warner.

24   Q.   Mr. Case, the National Mediation Board made its ruling

25   when?

1    A.    March 5, 2002.

2    Q.    They found what?

3    A.    They found that American was sufficiently integrated

4    with TWA LLC, to act as a single carrier.  That is the day

5    single carrier determination was issued.

6    Q.    As part of that finding, what did the National Mediation

7    Board say about union representation?

8    A.    The National Mediation Board allowed a window of time

9    for ALPA to express interest in representing the combined

10   pilot group at the surviving American carrier.

11   Q.    Do you remember what position ALPA took on that?

12   A.    They declined that invitation.

13   Q.    So what happened?

14   A.    This lawsuit ensued.

15   Q.    Well, there was a certification made by the board,

16   right?

17   A.    On April 3rd, 2002.

18               THE COURT:  April 5.

19               THE WITNESS:  April 3rd.  2002.

20               THE COURT:  Right.

21   A.    Yes.

22   A.    A certification by the NMB was made, issuing the ruling

23   that the Allied Pilots Association was now the bargaining

24   agent for the combined carriers.

25               THE COURT:  And that in effect extinguished ALPA's

```
 1   ownership, to use your word, of the bargaining rights that

 2   had once been with the TWA pilots.

 3   A.   Yes, it extinguished and that is extinguished TWA LLC as

 4   far as an entity for bargaining purposes.

 5   Q.   On April 2, 2002, you stopped being represented by ALPA?

 6   A.   Yes, sir.

 7   Q.   Your status as a MEC officer was over?

 8   A.   Very close to over.

 9   Q.   What happened to the MEC office in Saint Louis?

10   A.   It was almost immediately shut down and the

11   representatives were denied access to get back in the

12   building.

13   Q.   Who shut it down and denied access?

14   A.   I can only --

15   Q.   If you don't know, you don't know?

16   A.   I don't know.

17   Q.   Before you left, your final act of ALPA business, do you

18   remember writing some letters to ALPA?

19   A.   Yes, I do.

20          MR. PRESS:  P-376, P-377, and P-378.

21          THE COURT:  Okay.

22   Q.   I put before you three letters.  What are the exhibit

23   numbers I have given you?

24   A.   These are plaintiffs P-376, 377 and 378.  They are three

25   letters that I wrote on the 3rd of April, 2002.
```

```
 1    Q.      And you wrote and sent these letters to who?

 2    A.    Captain John Feldvary.

 3    Q.    Who is he?

 4    A.    He was the vice president of finance at the Air Line

 5    Pilots Association.

 6    Q.    So these are letters you prepared and you signed and

 7    sent to ALPA?

 8    A.    Yes, sir.

 9              MR. PRESS:  I move for the admission of these three

10    letters.

11              MR. FRAM:  We objected to all these hearsay.

12    Hearsay.  They are opinions the witness is not qualified to

13    give.  We, they are inaccurate --

14              THE COURT:  This is not hearsay.  This is direct

15    testimony what he did.

16              MR. FRAM:  No, your Honor.

17              THE COURT:  The statements of letters he wrote.

18              MR. FRAM:  The statements, there are statements in

19    the letters --

20              THE COURT:  He is subject to cross examination on

21    that.  If you think there is something in here that is

22    inaccurate, that is stuff for legitimate cross.

23              MR. FRAM:  It is hearsay.

24              THE COURT:  What makes something hearsay is, it is

25    an out-of-court statement.  I am going to allow it.  I think
```

```
 1   his relationship with ALPA is relevant to the case.  He is

 2   here to be cross examined on that.  I will allow it.

 3   Q.   Mr. Case, let's take three 76 first?

 4   A.   Yes, sir.

 5   Q.   This letter, what are you asking?

 6   A.   What I am asking for in this letter is a reimbursement

 7   of legal fees that were a direct expense of the TWA MEC

 8   throughout the bankruptcy transaction.  As I stated before,

 9   Richard Seltzer, the bankruptcy expert from ALPA, the ALPA

10   lawyer, bankruptcy expert, presented several things at the

11   bankruptcy court on our behalf.  He had to be paid.  He was

12   paid out of our MEC budget, our dues dollars, the TWA pilots

13   dues dollars.  Once those fees had been paid, ALPA approach

14   the bankruptcy court and asked for reimbursement of those

15   fees.  Back to ALPA.  And they got that reimbursement I was

16   asking ALPA to give us the reimbursement they applied for

17   with the bankruptcy court because this was our money to start

18   with.

19            THE COURT:  Us.

20   A.   TWA pilots dues.

21            THE COURT:  What were you going to do with that?

22   A.   600 plus thousand dollars.

23            THE COURT:  Yes.

24   A.   It was going to be start of a legal fund.  They were our

25   dues dollars that the association recouped from bankruptcy,
```

1    that were spent out of our budget.

2            THE COURT:  Well, all of ALPA's money was dues

3    dollars.  That is your only source of money.

4            THE WITNESS:  Correct.

5            THE COURT:  They gave it to you, and then they got

6    it back.  And it was paid to the lawyers and they got it

7    back.

8            THE WITNESS:  Correct, but it was, TWA pilots dues

9    dollars that paid --

10           THE COURT:  Everything was dues dollars.

11           THE WITNESS:  Correct.

12   A.   Then they got a reimbursement of the dues dollars from

13   the bankruptcy court.  That reimburse meant did not come back

14   to the pilots, it came back to ALPA.

15           THE COURT:  Once you pay the dues, it is ALPA's

16   money, isn't it?  You don't retain a string to it.

17   A.   Well, it is technically, everything --

18   A.   That is true.

19           THE COURT:  Once, the dues you paid are paid.  Once

20   they get it, it is ALPA's money.  They may allocate some of

21   it for your use, but it is their money once the dues are

22   paid.

23   A.   Correct.

24           THE COURT:  The pilots from a particular airline

25   don't have a string on that money.

```
 1              THE WITNESS:  That's correct.

 2              MR. FRAM:  Your Honor, may counsel approach on

 3    this?

 4              MR. PRESS:  I am not going to ask any more

 5    questions.

 6              THE COURT:  All right.

 7              MR. PRESS:  Other than one.

 8    Q.   The request was denied?

 9    A.   Yes.

10    Q.   Mr. Case, the other two letters I hand you, you are

11    making other requests for reimbursement of moneys, right?

12    A.   Yes, sir.

13    Q.   The response was?

14    A.   No.

15    Q.   And Mr. Case, that is all the questions I have.

16              THE COURT:  One question.  You wanted that money

17    back and you were going to use it to sue the people you were

18    asking for the money from.

19    A.   No, sir, we were not --

20              THE COURT:   You were going to sue ALPA.  You did

21    sue ALPA?

22    A.   Eventually we did.

23              THE COURT:  Eventually?   This was 2002.

24    A.   No.

25              THE COURT:  You sued ALPA.
```

1    A.   Yes, sir, eventually.

2              THE COURT:  Eventually.  2002.

3    A.   This is true.

4              THE COURT:  I mean it was, it was not, it was six

5    months afterwards or five months after wards.  September,

6    wasn't it, 2002?

7              THE WITNESS:  That's correct.

8              THE COURT:  Up were going to use it to sue ALPA.

9    A.   I will under oath tell you that this recovery was the

10   same request that I asked of ALPA for the three million

11   dollars legal fund, I offered ALPA indemnification from

12   litigation if they gave me the money.

13             THE COURT:  Right.  Cross examine.

14             MR. FRAM:  Thank you.

15             CROSS EXAMINATION.

16             BY MR. FRAM:

17   Q.   Mr. Case, on this last point you and others within the

18   MEC had made threats to sue ALPA even before the letters we

19   are talking about in April, 2002, correct?

20   A.   I don't recall making a threat to sue ALPA.

21   Q.   You don't recall.  Are you saying it didn't happen?

22   A.   I don't recall ever making a threat to sue ALPA prior to

23   suing.

24   Q.   So?

25   A.   Others may have.

1    Q.   Well, are you aware of others within the MEC who were

2    threatening to sue ALPA well before, months and months before

3    the letters that you wrote in April?

4    A.   Within the MEC, not that I am aware of.

5    Q.   Let's make sure we understand your involvement in the

6    MEC.  I think you testified yesterday that you were elected

7    out of council three in St. Louis.  At some point in 1998,

8    and then you were recalled?

9    A.   Yes, sir.

10   Q.   In mid 1999?

11   A.   I can't recall exact dates but yes, sir, I was recalled.

12   Q.   Did you have any involvement in the MEC, when was your

13   next involvement with the MEC after being recalled?

14   A.   I believe when I came back as a non-voting secretary

15   treasurer to replace John Hefley.

16   Q.   A non-voting secretary treasurer out of Council 2?

17   A.   Yes.

18   Q.   How did you get from Council 2 in Saint Louis to Council

19   3 in New York?

20   A.   I was based in New York almost my entire career.  I was

21   elected by the St. Louis pilots because I felt I more

22   represented their interests.  I was still a New York pilot

23   when I was elected Council 3 rep.

24   Q.   All right.  And you were elected as secretary treasurer

25   and your term on the MEC became effective when?

1    A.   You are talking about the secretary treasurer Council 2.

2    Q.   Secretary treasurer Council 2 out of New York.  When did

3    that became effective?

4    A.   I don't recall exactly when it became effective.  I

5    believe it was some time in December, 2000 or January, 2001.

6    Q.   Do you have in front of you defend Exhibit 3 which is in

7    evidence.  This is the compilation of actions, November 2 of

8    2000?  TWA MEC meetin?

9              THE COURT:  Number 3.

10   Q.   D 3 in evidence.

11   A.   I don't believe I have D 3.

12             MR. FRAM:  May I approach and show the witness?

13             THE COURT:  Sure.

14   Q.   A copy of it?

15             THE COURT:  Think it is in evidence.

16   Q.   Is that the resolution that Mr. Press asked you about a

17   little while ago?

18   A.   Yes.

19   Q.   And were you involved in the MEC when that resolution

20   was passed?

21   A.   No, I don't believe so.

22   Q.   So were you at the meeting where this resolution was

23   discussed and adopted?

24   A.   I don't recall if I was at the meeting or not.

25   Q.   And the resolution, let's refer to the first therefore

1    clause, therefore be it resolved that the negotiating

2    committee is authorized by the TWA MEC to engage TWA in

3    discussions and negotiations pursuant to the term sheet dated

4    November 2, 2000?

5    A.    Yes.

6    Q.    So when the MEC resolved on November 2, the one talking

7    about pilot ratification, when the MEC resolved on November 2

8    that any changes due the term sheet had to be ratified by the

9    full membership, that was specific to the term sheet referred

10   to there, correct?

11   A.    That is not what the last sentence says.

12   Q.    So you don't understand that the resolution there was

13   specific to the term sheet being discussed at that time, sir?

14   A.    I understand that the resolution has a specific clause

15   in it.  I am not sure if that trumps the last "Therefore, be

16   it resolved."

17   Q.    You weren't at the meeting and don't know what the

18   people  at the meeting meant when they adopted the

19   resolution?

20   A.    That's correct.

21   Q.    Let's talk for a couple of minutes about the Bond

22   amendment.    What I would like to do is show you D 162.

23              THE COURT:  Which one?

24              MR. FRAM:  D 162.

25              THE COURT:  D 162.

1              THE COURT:  Do you have one for me?

2              MR. FRAM:  Within the notebook.  In the binder.

3              THE COURT:  Okay, good.

4    Q.   Do you recognize D 162 as a copy of the Bond bill that

5    you testified that you worked with Roland Wilder to draft at

6    some point shortly after September 18 of 2001?

7    A.   Yes, sir.  Roland and his son bill.

8              MR. FRAM:  I move D 162 in evidence.

9              MR. PRESS:  No objection.

10             THE COURT:  D 162 in evidence.  What we are calling

11   the Bond bill, is in evidence.

12   Q.   The two page document, correct?

13   A.   Yes, sir.

14   Q.   Let's look to the second page.  The second page defines

15   the covered transactions.  Do you see that.  Paragraph 4?

16   A.   Yes, sir.

17   Q.   And what it says is that covered transaction means a

18   transaction, A, that is a transaction for the combination of

19   /PHRULT pal carriers into a single carrier.  B.  Involves the

20   transfer of ownership or control of, it discusses that there,

21   C, was pending or had been completed during the period

22   beginning January 1, 2001, and ending on September 11, 2001.

23   Correct?

24   A.   Yes, sir, that's correct.

25   Q.   So the way this bill is drafted is it doesn't operate

1    with respect to, it doesn't apply to any transaction in

2    transactions in the future?

3    A.    That's correct.

4    Q.    It only applies to transactions that have already taken

5    place but only transactions between January 1, 2001, and

6    September 11, 2001, correct?

7    A.    Yes, sir, that's correct.

8    Q.    Were there any transactions that met that condition

9    other than the American Airlines TWA transaction?

10   A.    No, sir.

11   Q.    B was did not result in the creation of a single air

12   carrier by September 11, 2001, right?

13   A.    Yes.

14   Q.    So this bill as you and Mr. Wilder drafted it was

15   designed to apply to a single transaction, the American

16   Airlines TWA transaction, correct?

17   A.    Correct.

18          THE COURT:  It was designed to look like a general

19   bill but to apply only to this very transaction.

20          THE WITNESS:  Correct.

21   Q.    And people figured out pretty quickly that this was a

22   piece of special interest litigation, correct?

23   A.    I wouldn't hesitate a guess as to what people figured

24   out.

25   Q.    Well, when you walked the halls of Congress and talked

1    to Congressmen and other people, did you explain to them that

2    this was a lawsuit, I am sorry, a bill, a law, a proposed

3    law, that wrote benefit only the TWA pilots?

4    A.   No, sir.

5    Q.   When you described this proposed bill to people, did you

6    present it as something that would benefit anybody other than

7    the TWA pilots?

8    A.   No, sir,, we described it as a bill that would treat

9    people fairly.

10   Q.   All right.  So the timing of the bill, you were helping

11   to prepare this and presenting it to Senator Bond in the

12   first instance during the period leading up to October one?

13   A.   Yes, sir.

14   Q.   So that is a matter of weeks after the terrorist attacks

15   on September 11?

16   A.   Yes, sir.

17   Q.   Were there other things to your recollection happening

18   on Capitol Hill during that timeframe?

19   A.   A number of things.

20   Q.   A number of things that related directly to the airline

21   industry, correct?

22   A.   Yes, sir.

23   Q.   What had happened after September 11 is that the planes

24   stop flying for a number of weeks because of security

25   concerns, correct?

Case-cross/Fram                                                    124

```
 1    A.    Yes.

 2    Q.    What impact did that have on the airline industry?

 3    A.    That was devastating the airline industry.

 4    Q.    Some of the the airlines started talking about

 5    potentially filing for bankruptcy?

 6    A.    Yes.

 7    Q.    Was American one of those airlines?

 8    A.    I don't recall if American was, almost all of them did.

 9    Q.    Did Congress do something to try to assist the airline

10    industry?

11    A.    Yes.

12    Q.    What do you recall Congress doing?

13    A.    They passed a technically an airline bail-out bill.

14    Q.    They paced the air transportation safety and system

15    stabilization act, correct?

16    A.    Correct, that is originally what we wanted to attach

17    this to.

18    Q.    That was past order September 22, 2001?

19    A.    Yes.

20    Q.    That act provided for five billion dollars in money to

21    the airline industry, correct?

22    A.    Yes.

23    Q.    It provided an additional ten billion dollars in loans

24    if the airlines needed loans to survive, correct?

25    A.    That's correct.
```

Case-cross/Fram                                              125

1    Q.   And airline traffic continued to be down, could be, to

2    be very slow for months and months after the September 11

3    terrorist attacks, correct?

4    A.   To the best of my knowledge, yes.

5    Q.   What impact did the lower traffic and the financial

6    problems of the airlines have on the pilots?

7    A.   Early on it was expected there were going to be layoffs.

8    Q.   And there were, the term furlough, is that the term that

9    is used in the industry to talk about people who are laid

10   off?

11   A.   Yes, sir.

12   Q.   So pilots at many airlines were furloughed in the

13   aftermath of September 11?

14   A.   Yes.

15   Q.   And pilots working at TWA LLC were also furloughed in

16   that period, correct?

17   A.   Yes, that's correct.

18   Q.   The American pilots understood when they heard about the

19   Bond amendment that it was special interest legislation

20   designed to help the TWA pilots at the expense of the

21   American pilots.  Correct?

22   A.   I can't speak for them.

23   Q.   So you didn't --

24        THE COURT:  You don't have any doubt that they

25   understood what was happening.

```
 1              THE WITNESS:  They understood what was happening.
 2   Q.   Mr. Case, did you hear back from the American side what
 3   they felt about the Bond amendment?
 4   A.   Not directly from American, or the APA pilots.  What we
 5   heard back from was some staffers at the offices we visited.
 6   Q.   So did you understand that the American pilots were
 7   upset about the Bond amendment because it would harm their
 8   seniority?
 9   A.   They opposed it.
10   Q.   Did you hear --
11   A.   They opposed the Bond bill..
12   Q.   Did you hear back the American pilots are upset back
13   they felt the TWA pilots on April 2 had agreed to waive their
14   Allegheny Mohawk rights?
15   A.   Yes.
16   Q.   We talked about the labor protective provisions, part of
17   the agreement that came out of April 2, 2001, is that the TWA
18   pilots would get a new collective bargaining agreement and in
19   return for that they would give up the labor protected
20   provisions, the right to go to arbitration, seniority
21   arbitration, that was revealed?
22   A.   Can you restate that?
23   Q.   Yes, that was a long question.  The deal on April 2 of
24   2001 is that the TWA pilots would get a new collective
25   bargaining agreement, TWA LLC, and would give up their right
```

```
 1   to arbitrate seniority issues with the American pilots?

 2   A.   I don't, no one was asking for any contract.

 3   Q.   I am sorry?

 4   A.   The LLC contract, I am kind of confused as to that

 5   question.

 6   Q.   I am simply asking you what the MEC agreed to do on

 7   April 2, 2001?

 8   A.   They agreed to amend their contract by writing a new

 9   contract.

10   Q.   They agreed to a new contract that did not include the

11   right to seniority arbitration?

12   A.   Did not include the contractual provision entitling them

13   to Allegheny Mohawk 3 and 13, correct.

14   Q.   The Bond bill would have required the American pilots to

15   /AR participate in seniority arbitration, correct?

16   A.   Yes, that's correct.

17   Q.   It would put back in something that the TWA pilots gave

18   up on April 2, correct?

19   A.   Yes, sir, that's correct.

20   Q.   That is one of the reasons why American pilots were

21   upset.  They said we had a deal with the TWA pilots and now

22   they are trying to have Congress unundo it.  Yes?

23   A.   I am not speaking for them, but yes.

24   Q.   Sir, if you didn't hear that coming back from the

25   American side, don't agree with me?
```

1    A.    I didn't hear anything.  I haven't even talked to the

2    American side.

3    Q.    So at the time you were pushing for the Bond amendment

4    you had no idea what the American pilots position was?

5    A.    I didn't pay much attention to the American pilots

6    position at that time.  I was concentrating on lobbying the

7    feedback I received was from the staff at the Congressmen's

8    and senators offices and with the American pilots --

9    Q.    Okay.  We don't want you to tell us what people in

10   Congress may have said back to you.  I am trying to get your

11   understanding if you have one of the American pilots position

12   of why they were opposed to it?

13   A.    They were opposed to the Bond bill.

14   Q.    You you are telling us you have no recollection or

15   understanding of why, what they said about why they were

16   opposing it?

17   A.    Occasionally, obviously, I knew why they were opposing

18   it.

19   Q.    You gave some testimony about P-357, which are the

20   flight pay pay loss documents.  Are you able to find that.

21   It is in evidence.

22          THE COURT:  That is where they were denied the

23   compensation for lobbying efforts?

24   A.    Yes.

25   Q.    Do you have that handy?

1    A.    Yes, I do.

2    Q.    I think you told us that you began to push for the Bond

3    amendment back in late September?

4    A.    That's correct.

5    Q.    You testified that you were walking around Capitol Hill

6    3, four days a week for some period of time?

7    A.    That's correct.

8    Q.    So what period of time, beginning in late September all

9    the way up to September?

10   A.    Mid to late September through most of October.  And we

11   were getting ready for the House after that.

12   Q.    What about October, most of October and into November as

13   well?

14   A.    Possibly.  I don't recall exact dates after October 23.

15   Q.    You put in for flight pay loss during that entire

16   period.  Correct?

17   A.    I believe I would have, yes.

18   Q.    So mid September Al all the way up to early December

19   when you got the first rejections, right?

20   A.    Correct.

21   Q.    So about three months?

22   A.    Yes.

23   Q.    How many days would you say that you personally spent on

24   Capitol Hill lobbying for the Bond amendment?

25   A.    Oh, I would hate to take a guess.  I didn't keep, I

1   don't have any records with me.  It was a number of days.

2   Q.   Can you give us an estimate in terms of 40 days, 50

3   days?

4   A.   Probably 50 to 40 to 50 days.

5   Q.   And there were other people working with you, I think

6   you mentioned --

7              THE COURT:  Pilots.

8   Q.   Yes, other pilots working with you.

9   A.   Yes, there were other pilots and flight attendants

10  working with us.

11  Q.   How many other pilots were there?

12  A.   Depending on the day, sometimes four or five, sometimes

13  eight or nine, sometimes one or two.

14  Q.   And they all put in for flight pay loss as well?

15  A.   No, they did not all put in for they.

16  Q.   Is there a reason some of them were not put that in?

17  A.   Some were on days off and were put in locally and others

18  were off trips who were staying there.

19  Q.   The ones giving up flights where they would have been

20  paid by TWA LLC, to the best of your knowledge they put in

21  for flight pay loss?

22  A.   Yes.

23  Q.   They would have been over the period we are discussing,

24  mid September to early December?

25  A.   Yes.

Case-cross/Fram                                              131

1    Q.    How many days in total did those other people put in for

2    flight pay loss?

3    A.    I would not even hesitate a guess.   There were a number

4    of people.   I don't know.

5    Q.    Collectively, can you tell us how many total person days

6    of flight pay loss would have been submitted during that

7    roughly three-month period for you and the other teams who

8    were working with you?

9    A.    I couldn't hesitate to take a guess.

10   Q.    Who it have been in the hundreds?

11   A.    Probably not.   Most of the people that came were trying

12   to come on days off.   Most of the people who came weren't

13   necessarily other ALPA committee volunteers.   There were a

14   lot of folks who slowed up, grass roots, during that time.

15   Q.    I think you said when this document came back with the

16   denied on it, you were up upset about it?

17   A.    Yes.

18   Q.    Did you contact Mr. Johnson at ALPA or someone else at

19   ALPA and demand an explanation?

20   A.    I didn't demand an explanation.   I asked why they were

21   denied.

22   Q.    And what were you told?

23   A.    Didn't get much of an explanation.

24   Q.    In sir, let's be real specific here.   Did you talk to

25   somebody at ALPA?

```
 1    A.    I believe --

 2    Q.    If you don't recall, just say you don't recall?

 3    A.    I don't recall.

 4    Q.    So you you don't recall whatever explanation was given

 5    to you?

 6    A.    Correct.

 7    Q.    So you recall somebody telling you that three months was

 8    sufficient time to put the TWA pilots position out in front

 9    of Congress?

10    A.    No. I do not recall that.

11    Q.    Do you recall somebody telling you that there the

12    aftermath of 9-11 that there was no chance whatsoever that a

13    special interest piece of legislation like this was going to

14    slip through?

15    A.    Yes, sir.

16    Q.    Do you recall people telling you that because supplement

17    CC, as of early December, had already been imposed, that it

18    would be virtually impossible to get this  legislation

19    passed?

20    A.    No, sir.

21    Q.    Do you recall people telling you that in light of the

22    size and power of the Texas delegation, which is where

23    American was headquartered, that there was no way the Texas

24    Congressional delegation would let this bill get passed?

25    A.    That was a concern.  I don't recall saying, or who would
```

1   have been in authority telling me it couldn't get passed.

2   Q.    Do you recall being remained D that the new president,

3   President Bush, was from Texas and that American was based

4   there, and that American was very powerful in Texas?

5   A.    Yes.

6   Q.    And given all of those explanations, did you still think

7   in early December, 2001, that this bill had any chance

8   whatsoever of getting passed?

9   A.    Any chance?  Yes, there was some chance it could be

10  passed.  It already passed unanimous consent if the Senate.

11  Q.    Passed the Senate and got out in the joint house Senate

12  conference.  Did you have any prior experience in trying to

13  get legislation passed by Congress?

14  A.    Floss.

15  Q.    This was the first time?

16  A.    Yes.

17  Q.    So you were a rooky when it came to try trying to get

18  legislation passed?

19  A.    Yes, sir.

20  Q.    You testified this morning about some aspects of the

21  American Airlines contract.  Do you recall that?

22  A.    Yes, I do, I believe so.

23  Q.    And I think you testified that the contract did not

24  require the stapling of the TWA pilots, in the context of the

25  American TWA transaction that was announced in January?

```
1    A.    Correct.  I did coy not find the records.

2    Q.    Do you have that document handy, it is P-255.  And it is

3    in evidence.

4    A.    I got it.

5    Q.    Just to go back, you are a college graduate, yes?

6    A.    Yes, sir.

7    Q.    Any legal training?

8    A.    Just a couple business law courses in my degree program.

9    Q.    I am sorry?

10   A.    Just a couple business law courses in my degree program.

11   Q.    Any on the job legal training, did you ever work as a

12   parallel at a law firm or anything like that?

13   A.    No, sir.

14   Q.    And you read through this contract?

15   A.    Yes, sir.

16   Q.    Can I ask you, please, to turn to section 13, which is

17   seniority.  The date is one, 3 --

18              THE COURT:  Do you have a page number.

19              MR. FRAM:  Looks like 13-1, your Honor.  Doesn't

20   look like they are numbered 1 consecutively.  It misspoke.

21   13-1.

22              THE COURT:  I found it.

23   Q.    Can I invite your attention please to the very top

24   paragraph.  Paragraph A?

25   Q.    Do you see where it says seniority as a pilot shall be
```

1    based upon the length of service as a flight deck operating

2    crew member with the company except as otherwise provided in

3    sections eleven and 12 of this agreement.

4    A.    Yes, sir.

5    Q.    Did you understand that to mean that seniority would be

6    based upon length of service with the company.  In other

7    words, when you got hired by American would dictate where you

8    stood on the seniority list?

9    A.    The way I understood this section is that this section

10   was not necessarily apply to mergers.  This is a traditional

11   new hire section.  Air, as airline pilots are hired, we call

12   them new hires.

13   A.    You know what a defined term was.

14   A.    Yes.

15          THE COURT:  The company is a defined term??

16   A.    Correct.  American Airlines.

17          THE COURT:  So you could read it, based upon length

18   of service as a flight deck operating crew member with

19   American Airlines.

20   A.    Yes.

21   Q.    Does that refresh your memory that it was understood

22   from the American pilots perspective, their contract, that

23   they had the right to insist that TWA pilots coming in to

24   American would have seniority based upon when they were hired

25   by American?

1    A.   Yes, sir, but that is a logistical impossibility with a

2    merger.

3    Q.   Why do you say it is logistically impossible.  Wasn't

4    there a specific date when the TWA pilots would be deemed to

5    become employees of American?

6    A.   Yes, sir.  That date would have been April 3rd, 2002.

7    And on that date Americans tradition of how they, that means

8    the 222,300 pilots were hired on that day.  Americans

9    tradition is to arrange those pilots by age.  That is what

10   their history is, so they would have had to reorganize the

11   list by age.

12   Q.   I am sorry.  What does this paragraph say about age.  It

13   says nothing about age?

14   A.   How classes are structured at the air carrier.

15   Q.   Are you focusing go with me on the contract language as

16   opposed to what you know or think you know about American

17   traditions.  Did you understand under the contract that

18   American had the right, the American pilots had the right to

19   insist that when the TWA pilots finally became employees of

20   American, in April, 2002, that they would all go at the

21   bottom of the seniority list?

22   A.   That they would all have a hire date of April 3rd, 2002.

23   Q.   That position of what I just  articulated that the

24   American pilots had the right to insist that the TWA pilots

25   be stapled, that is the position that the American pilots

 1  took consistently beginning after January of 2001.  Correct?

 2  A.    Partially stapled, correct.

 3          THE COURT:  But they took the position they had a

 4  legal right to insist on stapling, even if they were willing

 5  to negotiate some of it away, they had the legal right to

 6  insist.

 7          THE WITNESS:  Yes, that's right.

 8  Q.    I think you told us before, correct me if I am wrong,

 9  you didn't attend any of the meetings of the merger

10  committee?

11  A.    That's correct.

12  Q.    That was the committee of TWA pilots who were meeting

13  directly with American pilots, right?

14  A.    Yes.

15  Q.    You also didn't personally attend any meetings of the

16  negotiating committee.  That committee being the one with TWA

17  pilots, negotiating with TWA representatives?

18  A.    That's correct.

19  Q.    But you heard back from both committees?

20  A.    Yes.

21  Q.    That the American pilots were taking the position based

22  upon their contract that they had the right to staple all of

23  the TWA pilots?

24  A.    Correct.

25  Q.    Okay.

1    Q.   You talk a little bit about the event leading up to the

2    vote on April 2, correct?

3    A.   Yes.

4    Q.   I want to show you the log that we have of some of those

5    events and ask you about the degree to which you were

6    involved or not involved?

7              What I am going to do if I find it is show you the

8    list and I will put up the board, the poster board -- maybe

9    we will just put up the poster board.

10   Q.   I am going to hand you a copy so you don't have to

11   strain your eyes.

12             THE COURT:  I have a copy.

13             MR. FRAM:  Let me give it to the witness as well.

14   Q.   I want to get a sense of he degree to which you were

15   involved.  We have merger and negotiating committee meetings

16   on February 22, 28 and March 1.  Were you present at those?

17   A.   No, sir.

18   Q.   You didn't hear directly what the American and TWA

19   representatives were saying about the different issues,

20   correct?

21   A.   No, other than my corrections with the merger kit me.

22   Q.   There was a conference call on March first involving MEC

23   officers and others including advisers about some issues.

24   Did you participate in that?

25   A.   No.

1    Q.   How about the special meeting of the MEC on March 2,

2    2001, did you attend that?

3    A.   I would have to check the roster.

4    Q.   Let me show you the minutes of that meeting and see if

5    it refreshes your recollection.  This is D 245.

6              THE COURT:  Is that in evidence.

7              MR. FRAM:  Not yet, your Honor.

8    Q.   Do you recognize D 245 as the official minutes of the

9    TWA MEC meeting that took place on that date?

10   A.   These are the approved minute meetings from the special

11   meeting date March 2, 2001, September.  St. Louis.

12             MR. FRAM:  I offer D 245 in evidence.

13             MR. PRESS:  No objection.

14             THE COURT:  No objection, D 245, the MEC minutes of

15   March 2, will be in evidence.

16   Q.   You at that point, March 2, were already the secretary

17   treasurer of Council 2?

18   A.   I believe I was.

19   Q.   Can we just blowup the paragraph where it says Council

20   2.  The list of people who attend for Council 2.  Does that

21   refresh your memory that you did not attend that neck

22   meeting?

23   A.   No, sir.  If you look at the committee members present

24   it shows I was.

25   Q.   Aha.  Committee members.  So you were not.  Were you at

```
 1    that point a secretary treasurer to Council 2?

 2    A.    I  believe I was.

 3    Q.    Can you tell us why you weren't listed under Council 2,

 4    New York?

 5    A.    At one point in time, this is my perspective of what

 6    happened, I was perceived as a little bit too tough, and the

 7    association came down with a ruling from somewhere saying

 8    non-voting secretary treasurer members couldn't participate

 9    at the MEC level.

10    Q.    Mr. Case, do you see under Council 4 they listed Glenn

11    Stein key?

12    A.    Yes.

13    Q.    As secretary treasurer?

14    A.    Yes.

15    Q.    Why did they list him and not you?

16    A.    I am not quite sure.

17    Q.    You are listed you point out as a committee member.

18    What committee were you on given that you told us you were

19    not on the merger or negotiating committees?

20    A.    At there point in time I am not sure I was on a

21    committee.

22    Q.    Are you sure you were at this meeting?

23    A.    I will read through the record and see what it says.

24    Q.    There you are looking to see if there was a reference to

25    you seeing?
```

1    A.    No, I if I was not one of the sitting members I would

2    not have been able to speak.

3    Q.    To save time let's look at in as at break, we will come

4    back.  To move on the chronology we agree you would not have

5    attended a negotiating committee meeting on March 5, 6, 8 or

6    9, correct?

7    A.    Unless it was associated with a MEC meeting, correct.

8    Q.    We have a member meeting March 8 to 10?

9    A.    Yes.

10   Q.    Were you present for that?

11   A.    I would have to see the minutes to know.

12   Q.    That was a meeting that took place in Wilmington,

13   Delaware, do you recall that?

14   A.    There were multiple meetings in Wilmington.

15   Q.    Do you recall a meeting during the period leading up to

16   the hearing on March 12 when Judge Walsh ruled on the

17   American TWA transaction?

18   A.    Yes.

19   Q.    Were you in court for that?

20   A.    I was in court multiple times for, during the process.

21   Q.    D 246.  I am going to hand you the minutes of the March

22   8 to 10 meeting.  Do you recognize that document as the

23   minutes, the official minutes of that meeting?

24   A.    These are the approved minutes of the regular meeting

25   scheduled March 8 through 10, Wilmington, Delaware.

1           MR. FRAM:  I offer D 246 in evidence.

2           MR. PRESS:  No objection.

3   Q.   All right?

4           THE COURT:  Just one second.  D 246 -- I am sorry.

5   D 246 in evidence.

6           MR. FRAM:  Thank you, your Honor.

7   Q.   Mr. Case, we believe you we agree you are not listed

8   under Council 2 New York?

9   A.   That's correct.

10  Q.   I see there are committee members listed.  Do you agree

11  that you are not listed there either?

12  A.   That's correct.

13  Q.   All right.  To wrap this up?

14  A.   But I am there.

15  Q.   Oh.  What did I miss?

16  A.   On page 2.  Little past halfway down.  Ted Case, Council

17  2, urged MEC to follow guidelines for funding the merger

18  activities and not pass another merger section. The

19  guidelines are very clear on the merger with non-ALPA

20  carriers.

21  Q.   Mr. Case, can you given me an explanation for why you

22  are not listed on Council 2 here?

23  A.   I am not sure.

24  Q.   Were you the secretary treasurer for Council 2 at this

25  point?

1    A.    To the best of my recollection, yes.

2    Q.    There were points when the MEC went into executive

3    session?

4    A.    Yes.

5    Q.    Tell us what that means, please?

6    A.    Executive session is basically when the officers and the

7    local counsel representatives go behind closed doors.  They

8    take the member?  Ship and excuse them from the meeting and

9    they go behind closed doors to discuss issues.

10   Q.    And the individuals who are entitled to be there in

11   executive session are the voting members of the MEC, and the

12   officers.  Is that correct?

13   A.    And anyone they choose to allow to come in.

14   Q.    When you were at these meetings as secretary treasurer

15   for counsel two were you permitted to be in executive

16   session?

17   A.    Yes.  When I was secretary treasurer, yes.

18   Q.    And you think you were secretary treasurer as of March 8

19   to 10?

20   A.    I believe I was.

21   Q.    The sentence, the paragraph you just read about

22   following guidelines, funding the merger activities.  You

23   testified this morning that you had a complaint or a concern

24   that ALPA would not directly fund Roland Wilder as merger

25   counsel?

1    A.    Yes, sir.

2    Q.    Do you recall that?

3    A.    Yes, sir.

4    Q.    And I think you said that there had been prior

5    situations where ALPA did agree to fund merger counsel for

6    unions.  Yes?

7    A.    I didn't say that, I don't believe.

8    Q.    What was your, tell us, please, why were you upset or

9    complaining about the fact that ALPA would not directly fund

10   Mr. Wilder?

11   A.    I was complaining about the fact because it was an

12   appropriate expense of the MEC budget to pay for merger

13   counsel because this was a non-ALPA merger.

14   Q.    Didn't ALPA have a policy that said if another ALPA

15   airline was involved that it would not fund merger policy?

16   A.    In a direct ALPA to ALPA merger, yes.

17   Q.    Part of the discussions that American had when the TWA

18   deal was announced was also potential purchase of U.S. Air.

19   Do you recall that?

20   A.    Yes, there was a potential to pick up a piece of U.S.

21   Air.

22   Q.    U.S. Air was an ALPA carrier?

23   A.    That's correct.

24   Q.    When you raised this issue about ALPA not funding merger

25   counsel, the explanation for why ALPA would not do that was

1    that another ALPA carrier, U.S. Air, was involved, they were

2    part of the discussions, correct?

3    A.   Correct.

4    Q.   Just to finish up the thought on these dates.  I am not

5    going to go through all the minutes.  Do you recall receiving

6    the TWA LLC proposal on or about March 17, becoming aware of

7    that?

8    A.   No, I did not.

9    Q.   Do you recall being present at the TWA MEC special

10   meeting on March 21 and 22?

11   A.   Again, I would have to see the minutes.

12   Q.   You don't have any present recollection of what

13   happened?

14   A.   March 21, 22.  I have to see the minutes.

15   Q.   You do recall being present at the meeting on April 2 of

16   2001, correct?

17   A.   Yes, I do.

18   Q.   When did you first recall people talking about the

19   Section 1113 issue?

20   A.   Much probably in passing, being brought up in the

21   February, March, early March timeframe.

22   Q.   Did you at that timing and look at Section 1113 of the

23   Bankruptcy Code?

24   A.   No, sir, I did not at that time look at it.

25   Q.   Did you ever and and look at Section 1113 of the

Case-cross/Fram                                                146

1    Bankruptcy Code?

2    A.   Yes, sir, I looked at it prior to those meetings.

3    Q.   Prior to which meetings?

4    A.   All those meetings, I looked at 1113 after Eastern filed

5    it.

6    Q.   You said after Eastern.  Did you tell us yesterday you

7    worked at Eastern up until about 1989?

8    A.   That's correct.

9    Q.   What happened to Eastern?

10   A.   It eventually went out of business.

11   Q.   Eastern went into bankruptcy?

12   A.   Yes, they did.

13   Q.   They went into bankruptcy in 1991 and all the pilots

14   lost their jobs, right?

15   A.   Yes, they did.  Due to the strike.

16   Q.   Due to the strike that you described yesterday?

17   A.   Correct.

18   Q.   That was a situation where the union took too hard a

19   line, and, in being adverse to the employer, the airline, and

20   the result was the pilots lost their jobs?

21   A.   You could put it that way.

22   Q.   Well, did that experience, you were fortunate in that

23   you had left Eastern before it went into bankruptcy and

24   everybody lost their jobs, right?

25   A.   Correct.

Case-cross/Fram                                                    147

 1    Q.   But your knowledge of Eastern, did that impact, would

 2    that affect your perspective on how to approach issues with

 3    TWA?

 4    A.   Yes.

 5    Q.   In fact one of the loans you were recalled in 2000 by

 6    counsel sill three is that people in Council 3 thought you

 7    were being too aggressive with the company and that the

 8    company might have worse financial problems, right?

 9    A.   I don't exactly know why I was recalled.  That is

10    possible, yes.

11    Q.   Mr. Case, are you telling us that no one explained to

12    you why you were recalled?

13    A.   What I am telling you is that there were some management

14    officials who explained to me why I was recalled.

15    Q.   Mr. Case, did you attend a meeting of Council 3 in St.

16    Louis?

17    A.   Yes, I did.

18    Q.   Around the time you were recalled?

19    A.   Yes.

20    Q.   Where people talked about you and debated whether you

21    were doing a good job or not?

22    A.   Yes.

23    Q.   You are telling us you don't understand from talking

24    directly from the other pilots what some of them felt about

25    you, how you have been performing?

1   A.   Yes, some of them felt that way and some felt I was

2   doing a fine job and it was about a 50-50 split.

3   Q.   The ones who wanted you recall, do you recall what they

4   said about their concerns with respect to your job

5   performance?

6   A.   They were concerned that I was too tough on the company.

7   Q.   Too tough in what respect?

8   A.   Expecting more out of the company than they were giving.

9   Taking a harder bargaining lines than they expected.

10  Q.   Could you be more specific in terms of the positions you

11  had taken that people were critical of, you say taking a hard

12  line, in terms of asking for higher wages, taking a hard line

13  in terms of asking for other benefits.  What was the specific

14  issue?

15  A.   It was generally asking or demanding higher wages.

16  Q.   You knew from that experience that there were people

17  among the pilot ranks who were concerned about pushing TWA

18  too far?

19  A.   Yes.

20  Q.   Did any of these people express concern to you that TWA

21  might be forced into a third bankruptcy if the pilots took

22  too hard a line?

23  A.   I didn't have that directly expressed but I assume that

24  was on some of their minds, yes.

25  Q.   Did you say yesterday that you were surprised when TWA

1    filed for bankruptcy?

2    A.   Yes.

3    Q.   Were you getting --

4    A.   I didn't say I was surprised.  I said it was a pre

5    condition to the sale.

6    Q.   I am sorry.  Did you say yesterday you were surprised or

7    know.  Do you recall?

8    A.   I don't recall if I said I was surprised.

9         THE COURT:  Prior to the deal with American being

10   go back to 2000, did the TWA MEC reach any conclusions about

11   TWA's financial condition.

12   A.   Yes, sir, they did.  And we have proven to be very

13   resilient.  We had already been through 2 bankruptcies.

14        THE COURT:  That is not the question I asked you.

15   Did the MEC come to any conclusions about the financial

16   condition of of TWA before the American --

17   A.   Yes.

18        THE COURT:   What were those conclusion goes.

19   A.   The conclusions was that TWA it was not in great

20   financial shape and to start searching for a merger partner.

21        THE COURT:  Would you say that they concluded there

22   was a serious financial crisis, the MEC itself concluded

23   there was a serious financial crisis?

24        THE WITNESS:  Yes.

25        THE COURT:  And that the situation, the cash flow

1   projections were grave?

2   A.   Yes.

3        THE COURT:   In other words, before American came on

4   the scene, the MEC was concerned?

5        THE COURT:   Yes, sir.

6        THE COURT:   That, at TWA's financial condition was

7   very concerned.  Is that right?

8   A.   That's correct.

9   Q.   Do you recall around that time that the MEC hired its

10  own investment banker?

11  A.   Yes.

12  Q.   Do you recall Mike glance err being hired in April of

13  2000 to advise the MEC about TWA's condition and advised MEC

14  about any deal that TWA might come up with to try to survive?

15  A.   Yes.

16  Q.   Did you also recall that Mr.  Glanzer was hired to

17  independently search out potential merger partners for TWA?

18  A.   Yes, in accordance with the scenario committee.

19  Q.   What was the scenario committee?

20  A.   The scenario committee was a group of TWA pilots that we

21  appointed, or the MEC appointed to search out and investigate

22  any potential merger partners.

23  Q.   When was the scenario committee appointed.  Do you

24  recall?

25  A.   I don't recall the dates.

1   Q.   Was it common knowledge the TWA pilots that there was,

2   that Mr. Glanzer was hired and that the scenario  committee

3   was appointed to evaluate the potential merger partners?

4   A.   That may have been put on some code a phones.  We were

5   trying to keep it fairly under wraps because we were

6   searching for a merger partner.

7   Q.   But you knew about it?

8   A.   Yes.

9   Q.   Was it common knowledge that TWA was shopping itself

10  around?

11  A.   Yes.

12  Q.   Pretty much to every other airline to see if they might

13  be interested in purchasing it?

14  A.   Yes.

15          THE COURT:  Mr. Fram, I want to give the jury a

16  break before the final push to two o'clock.

17          MR. FRAM:  Now is a great time, your Honor.

18          THE COURT:  If you need a few more minutes, but it

19  is okay now.

20          MR. FRAM:  Absolutely.

21          THE COURT:  Ladies and gentlemen, we will take a

22  15-minute break.

23              (Jury leaves the courtroom)

24          THE COURT:  You are looking, I am raising my

25  finger, rule 1, do not discuss the case among yourselves.

1   Keep an open mind until you have heard all the evidence.

2              All rise.

3              (Jury leaves the courtroom).

4              (Recess)

5              THEODORE CASE, resumes.

6              THE COURT:  Mr. Fram, you may continue.

7              MR. FRAM:  Thank you.

8              CONTINUED CROSS EXAMINATION.

9              BY MR. FRAM:

10  Q.   Mr. Case, I asked you before if you would take a, take

11  the time to review the minutes of the March 8 to 10 meeting

12  and tell us if you could recall whether you were present?

13  A.   Yes.

14  Q.   Have you had a chance to do that at the break?

15  A.   Yes, sir.  On page 2 it indicates at least on March 8

16  that I spoke during membership and guest hour speaking.

17  Q.   To the fact that you are not identified as the counsel

18  to the secretary treasurer in the March 2, on March 8 or ten

19  minutes, does that refresh your memory that you didn't become

20  official as secretary treasurer until March 13, or

21  thereabouts, of 2001?

22  A.   No. I am not quite certain.  There was a period of time

23  as I stated earlier that the administration of ALPA was being

24  queried as whether or not non-voting secretary treasurer

25  could be members of the MEC or sitting members of the MEC.  I

1    am pretty certain it was around that time.

2    Q.   Let's focus on Section 1113.  I think you testified

3    before the break that you did read it at some point?

4    A.   Yes, I did.

5    Q.   And give us your understanding of what had to happen

6    under Section 1113 for a labor contract, a collective

7    bargaining agreement, to be rejected by a bankruptcy court?

8    A.   In basic terms,  as I can.  It allows a company in

9    bankruptcy, a debtor in possession to file a petition with

10   the bankruptcy court that attempts to reject a collective

11   bargaining agreement for purposes of it not being able to

12   reorganize, using the terms that were included in that

13   bargaining agreement.  In other words, the term of that

14   bargaining agreement had to be proven to be onerous to the

15   reorganization plan which would allow the Judge justification

16   to reject the agreement in total.

17   Q.   All right.  And do you recall Section 1113 requiring the

18   debtor, the bankrupt company, to make a proposal for a new

19   collective bargaining agreement to the employees?

20   A.   Yes, they have to negotiate and bargain in good faith

21   and make a proposal for a new collective bargaining agreement

22   in the event that they are going to reject the contract.

23   Q.   And part of bargaining in good faith was providing

24   financial and other information about the company to the

25   union.  Correct?

1    A.    Yes.

2    Q.    And then was another condition of 1113 that the union

3    had to reject the proposed contract?

4    A.    Yes.

5    Q.    And they would have to reject it without good cause,

6    correct?

7    A.    Without good cause, correct.

8    Q.    And the bankruptcy Judge court, the bankruptcy Judge,

9    would have to conclude that it was necessary for the

10   reorganization for the existing contract to be rejected?

11   A.    Yes.

12   Q.    Now, at the point in time when you first had your

13   discussions, I think you said with Mr. Holtzman and Mr.

14   Warner, in mid February, about Section 1113?

15   A.    Mid to early, mid February to early March.

16   Q.    As of mid February TWA mad not yet made a proposal for a

17   new collective bargaining agreement, correct?

18   A.    That's correct.

19   Q.    As of that point in time there is no way under Section

20   1113 TWA could have moved to reject the existing contract,

21   right?

22   A.    I am not certain.

23   Q.    Didn't we talk about the fact that a condition of

24   granting a Section 1113 motion is that a contract proposal be

25   made, that there be good faith bargaining and the like, yes?

1    A.    Good faith bargaining and rejection.

2    Q.    None of that had happened as of mid February, right?

3    A.    Correct.

4    Q.    And what happened in late February into March is that

5    TWA stepped forward and made a series of proposals and the

6    negotiating committee met with TWA representatives on

7    numerous occasions, do you have the list handy?

8    A.    Yes.

9    Q.    There were meetings on February 28, March five and six

10   and 8 and 9 and March 15, and March 26, yes?

11   A.    Yes.

12   Q.    During those negotiating committee meetings the pilots

13   assisted by ALPA were trying their best to get TWA to offer

14   up a new collective bargaining agreement that had the best

15   possible provisions for the TWA pilots, right?

16   A.    That is what they did, yes.

17   Q.    Okay.  This was a process where there was back and

18   forth, and the terms changed, and in many respects improved

19   overtime, right?

20   A.    That is subjective opinion, yes.

21   Q.    With what TWA did on November 15 when it filed its

22   motion to reject under Section 1113, is that it outlined for

23   the bankruptcy Judge all of the back and forth and it argued

24   in its motion papers that I it had made a proposal, that

25   there had been good faith negotiations, and that the TWA MEC

1   had refused in good faith to accept the proposal.  Yes?

2   A.   Yes.

3   Q.   What happened after that was the negotiating committee

4   was instructed by the MEC to go back and spend more time and

5   try to make an even better deal.  Right?

6   A.   I believe so.

7   Q.   The difference meetings you say you attended, that you

8   attended back in March.  Give us your estimate.  Can you

9   estimate the number of meetings you recall attending, was it

10  five, was it ten?

11  A.   Probably in the five to ten range.  There were a lot of

12  meetings.

13  Q.   And you talked to people between the meetings?

14  A.   Yes.

15  Q.   You were focused on that?

16  A.   To some degree, yes.

17  Q.   Is it fair to say what was happening during March is

18  that the proposals by TWA were evolving and getting better

19  and better, and the analysis of Section 1113, and the

20  analysis of whether a Section 1113 motion was likely to be

21  granted was changing as the proposals got better.

22  A.   My position at that time was that, in the discussions

23  that I had with the parties, was that there was no need for a

24  new contract.  All they had to do was waive the two

25  provisions and there was no need for a 1113 motion.

1   Q.    Well, regardless of your opinion, once TWA filed the

2   1113 motion on March 15, it had to be dealt with, right?

3   A.    Correct.

4   Q.    I mean the fact that you felt there was no need for it,

5   you could have called them up and said there is no need for

6   this but that would not have led them to withdraw it,

7   correct?

8   A.    If you said there is no need, here is your waiver for

9   those two provisions I am assuming it would have been

10  withdrawn.

11  Q.    Were you personally prepared to recommend that the scope

12  from successorship provision be waived in March of 2001?

13  A.    Initially, no.

14  Q.    In any event, once the motion got filed it had to be

15  dealt with, right?

16  A.    Correct.

17  Q.    What did the -- let me ask you, did you have a sense

18  from what people were telling you about how Judge Peter

19  WAlsh, the bankruptcy Judge, what his perspective was with

20  respect to the TWA bankruptcy?

21  A.    From my perspective and my discussions with other

22  parties, Judge Walsh was very much in favor of the American

23  transaction going through.

24  Q.    And when he approved that transaction on March 12, he

25  made specific findings that the transaction was essential to

1    the reorganization of TWA, and that if the transaction did

2    not go forward, the TWA would go into a free fall

3    liquidation, yes?

4    A.    That is what the Judge said.   That is not necessarily my

5    opinion.

6    Q.    So you disagreed with the factual findings that a

7    bankruptcy Judge made about the possibility that TWA would

8    survive?

9    A.    No, sir, I don't say that they could survive, if there

10   were other offers on the table.

11   Q.    You are saying you do, I you disagreed with the

12   bankruptcy judges conclusion, that the American deal was the

13   only viable deal for TWA?

14   A.    Yes, I disagree with that conclusion.

15   Q.    Why do you think -- well, never mind.   I withdraw that.

16          All right.   As you understood it, what were the

17   consequences of the Section 1113 motion being granted and the

18   TWA contract being rejected.

19   A.    The consequences of that were the collective bargaining

20   agreement we worked under would be rejected and told and we

21   would be absent a collective bargaining agreement and subject

22   to whatever the bankruptcy court approved TWA, Inc., to apply

23   to us.

24   Q.    From your perspective would that have been a good thing

25   or a bad thing for the pilots?

1    A.   In my opinion at that time, it would have presented more

2    leverage for the pilots.

3    Q.   You are saying the rejection of the contract in no

4    collective bargaining agreement to protect the pilots was a

5    good thing?

6    A.   No, sir, I am saying it would have provided leverage.

7    Q.   Leverage to do what, Mr. Case?

8    A.   Exercise certain rights under the Railway Labor Act.

9    Q.   What rights do you as a layperson and not a lawyer think

10   the TWA pilots could have exercised under the Railway Labor

11   Act?

12   A.   A job action, if necessary.

13   Q.   Okay.  And what type of job action do you think could

14   have been exercised that in any way, shape or form, would

15   have benefited the TWA pilots?

16   A.   Any number of them.

17   Q.   Give us some examples of what you were thinking about

18   back in March when you felt that it was fine from the

19   perspective of the TWA pilots to let the bankruptcy court

20   grant the 1113 motion and rejected the contract?

21   A.   Well, my position was, you are asking for my personal

22   opinion and my personal position.

23   Q.   I am asking for the position that you took back in jar

24   of 2001, with respect to there Section 1113 issue?

25   A.   My position was if they took our contract, and the deal

1    closed, following the closing of the deal that we would have

2    access to self help.  After the deal was closed financial

3    conditions were no longer an issue.  American Airlines owned

4    the company at that point in time.  It would have been

5    American Airlines we would be fighting with.

6    Q.   Can you define for us what you described as self help?

7    A.   Any type of legal job action, slow down, all the way up

8    to a strike, if necessary.

9    Q.   So your view is it was not a bad thing if the contract

10   was rejected, the TWA pilots had no labor agreement, and they

11   went on strike?

12   A.   No, sir, I did not say that was my view.  It I said it

13   would have provided leverage.

14   Q.   Okay.  Leverage to do what?  Leverage to negotiate a

15   better deal with TWA?

16   A.   With American at that time.

17   Q.   All right.  What about the Section 1113 motion being

18   denied.  What did you think was going to happen if the

19   Section 1113 motion was denied by Judge Walsh?

20   A.   If the section 13 motion was denied, and the contract

21   was not rejected, we would have been back on the negotiation

22   page for American, at that point in time, could have declined

23   to pursue the transaction.

24   Q.   American could have walked away from the deal, right?

25   A.   Of course.

Case-cross/Fram                                                  161

1    Q.   What would have happened if American had walked away

2    from the deal is that TWA would have disappeared, right?

3    A.   That is speculation.

4    Q.   Beg your pardon?

5    A.   That is speculation.   There were multiple offers on the

6    table besides American.

7    Q.   What other offers were on the table besides American?

8    A.   I believe there was a JAG group offer.   Continental and

9    Northwest expressed some interest, and as a matter of fact,

10   objected to the American sale.   I guess they were considering

11   splitting up TWA and operating sections of it.   I would

12   hesitate to guess what their plans were.

13   Q.   Mr. Case, didn't Judge Walsh specifically find on March

14   12, 2001, that the only viable offer on the table was the

15   American deal?

16   A.   Yes, from the judge's opinion, that is absolutely

17   accurate.

18   Q.   Had the Judge in fact, he had set up some specific

19   procedures and requirements for people or entities who wanted

20   to come in and bid on TWA assets, correct?

21   A.   Yes, he did.

22   Q.   He specifically found that the only entity that met

23   those conditions, that provided a qualified bid for any part

24   of TWA was American Airlines?

25   A.   Absent seeing his ruling, I am not sure.

1    Q.   You don't recall?

2    A.   I don't recall.

3    Q.   But you do recall?

4    A.   The word only.   I don't recall the word only.

5    Q.   You do recall him finding on March 12 that the American

6    bid was the only qualified bid, the only bid he felt would

7    save TWA, yes?

8    A.   Yes, I agree that was the only bid he felt would save

9    TWA.

10   Q.   You justice agreed with that, right?

11   A.   I  disagree with that statement.

12   Q.   So you were willing from your perspective, you were

13   willing to go see the 1113 motion granted and, I am sorry.

14   You were willing to see the motion denied and then American

15   walk away from the deal?

16   A.   I was willing to take that chance, yes.

17   Q.   You were willing to take the chance that American would

18   wipe its hand and say we put too much money into this deal,

19   we don't want to deal with this these difficult TWA pilots.

20   We are just going to let TWA disappear?

21   A.   Yes.

22   Q.   You thought that was the best thing for the TWA pilots?

23   A.   I didn't believe TWA was going to disappear.

24   Q.   I am sorry?

25   A.   I didn't believe TWA was going to disappear.

Case-cross/Fram                                                  163

1    Q.    And what factual basis if any did you have for your

2    belief, contrary to what the Judge has held, that TWA wasn't

3    going to justice appear?

4    A.    Once again, the alternative offers that were at the

5    bankruptcy court on record and the other debtor in possession

6    financing that was being proffered by other parties.

7    Q.    You attended a meeting on April 2 of 2001 where this

8    issue was discussed, right?

9    A.    Yes, I did.

10   Q.    During the period leading up to the meeting did you

11   express the views you have just expressed today, did you

12   express those views to the people on the MEC?

13   A.    Yes, I did.

14   Q.    And with the exception of Mr. Hollander, they all

15   rejected your perspective, correct?

16   A.    That's correct.

17   Q.    And advisers, with the exception of Mr. Wilder, we will

18   set him aside, all of advisers rejected your perspective,

19   right?

20   A.    That's correct.

21   Q.    Let talk about Mr. Wilder for a minute.  Mr. Wilder had

22   a proposal to try to get the pilots some more leverage?

23   A.    Yes.

24   Q.    Tell us what you recall his proposal being?

25             THE COURT:  Put a timeframe on that question.

1    There were different things at different times.

2              MR. FRAM:  A good point.

3    Q.   Do you have the two memos that Mr. Wilder circulated,

4    one was J 119, that is the March 13 memo.  The other was J

5    41.  I believe they are both in every and you have them both.

6              THE COURT:  One is J 41.  What is the other one.

7              MR. FRAM:  J 119.

8    Q.   Tell me when you are ready, Mr. Case.

9    A.   I have J 41.  I am having a hard time finding J 119.

10   Q.   I have another copy.

11             The first one is filed, first memo, March 13.

12   A.   Yes.

13   Q.   That is before TWA filed its Section 1113 motion,

14   correct?

15   A.   Correct.

16   Q.   Part of what Mr. Wilder wants to do is establish

17   leverage.  Do you see that?

18   A.   Yes, sir.

19   Q.   And let's turn to the 4th page of the memo where it it

20   talks about risks.

21   A.   Fifth page.

22   Q.   Item 4?

23   Q.   We will blow that up.  Mr. Wilder acknowledged that

24   there was a risk in pursuing litigation, the risk being

25   American would abandon the transaction.

1    A.   I think he identified that there is no credible evidence

2    that that would occur.

3    Q.   We are coming to that.  He then said there is no

4    credible evidence that will occur.

5    A.   Correct.

6    Q.   What were the people in American saying about what they

7    would do if the transaction did not proceed quickly?

8    A.   I wasn't communicating with the people of American.

9    Q.   Okay.

10   A.   What people would you be mentioning.

11   Q.   Were you getting information from other members of the

12   MEC and advisers about Americans position?

13   A.   Yes.  Advisers primarily.

14   Q.   And advisers were telling you and the other people

15   involved with the MEC that American was not going to continue

16   dumping money into TWA indefinitely, right?

17   A.   The ALPA advisors continued to tell us American was

18   going to walk away from the deal.

19   Q.   They told you that was what American was telling them,

20   yes?

21   A.   I don't know if they referenced it that way or not.  I

22   guess that is the way they reference prefaced it.

23   Q.   What basis, if any, did you have for disbelieving the

24   American people when they said we are going to walk from this

25   deal if it doesn't go ahead?

1    A.   The, it wasn't the American people.  It, are you tack go

2    about the ALPA advisors telling us that.

3    Q.   The ALPA advisors were telling you what American was

4    communicating, correct?

5    A.   Correct.

6    Q.   Did you disbelieve that the ALPA advisors were

7    accurately telling you what American was taking?

8    A.   I wasn't sure.

9    Q.   You were skeptical about whether the ALPA advisors were

10   accurately conveying Americans position?

11   A.   Yes.

12   Q.   I see.  Did you have any basis for disbelieving that

13   American was prepared to walk away from the deal if it didn't

14   close quickly?

15   A.   Just from a personal perspective of what the deal

16   entailed.

17   Q.   Okay.  And give us your explanation for why you felt

18   that American was not going to walk away from the deal?

19   A.   Once again, American was giving a lot of value to this

20   transaction.  They were picking up a huge asset for virtually

21   zero dollars.  It was a financial windfall.  They had a power

22   point production.

23            THE COURT:  Zero dollars.

24            THE WITNESS:  In the end, after they sold their

25   share of world span, and, I wouldn't say zero dollars, I will

1    retract that statement.  Very inexpensive purchase for 4 and

2    a half billion dollar revenue generating machine.

3    Q.   So you thought the American people were bluffing?

4    A.   Yes.

5    Q.   When they said they would walk away from the

6    transaction?

7    A.   Yes.

8    Q.   And you felt that you knew enough about the facts and

9    had enough expertise in corporate actions and bankruptcies to

10   make a sound judgment about whether the American people were

11   bluffing?

12   A.   I felt that the seniority protection was valuable enough

13   to challenge that bluff.

14   Q.   My question I think was a little bit different.  You

15   have testified, have you not, that you thought the American

16   people were bluffing when they said they were going to walk

17   away?

18   A.   Correct.

19   Q.   My question is did you feel that you had enough factual

20   information about Americans business, about its perspective

21   on the transaction, and about how corporate transactions

22   work, to make a sound judgment that American was bluffing?

23   A.   Yes, in my judgment, I believed that I could make a

24   sound judgment that American was bluffing.

25   Q.   And the other members of the MEC, with the exception of

1    Mr. Hollander, they heard the same information, and evaluated

2    the same information and reached a different conclusion,

3    right?

4    A.    Yes.  And I am not sure if they had access to the same

5    information.

6    Q.    Necessity may have had access to more information,

7    right?

8    A.    They may have.

9    Q.    Is there some information that you think you had that

10   all the other people involved in the MEC did not have?

11   A.    Possibly.  Possibly not.

12   Q.    What information do you think you may have add that the

13   other people involved, that the people actually involved with

14   making the decision, did not have?

15   A.    I guess it was the same.

16   Q.    Mr. Case, if you had some special inside information

17   about what was happening in American that you thought was

18   important, you would have shared that with the people who had

19   to make this very important decision about the future of the

20   TWA pilots?

21   A.    Yes.

22   Q.    So do we agree that you had essentially the same

23   information?

24   A.    Essentially the same.

25   Q.    Or perhaps less information?

1    A.    Perhaps.

2    Q.    Than the other voting members?

3    A.    Correct.

4    Q.    Did you think you had more information or different

5    information from advisers who were trying to assist the MEC?

6    A.    No.

7    Q.    Did you think that you had as much expertise as, as many

8    qualifications, to make recommendations as any of advisers?

9    A.    Probably not.

10   Q.    Do you think you had as much, as many qualifications and

11   as much experience as any of advisers?

12   A.    No.

13   Q.    I mean, Mr. Glanzer was an investment banker and a

14   lawyer who had been working with TWA and the MEC since April

15   of 2001?

16   A.    That's correct.

17   Q.    He had vastly more experience and expertise in terms of

18   making evaluations with respect to whether American would

19   continue or walk away from the deal, right?

20          MR. PRESS:  Objection to the form of the question.

21          THE COURT:  I will allow it.

22   Q.    Do you understand the question?

23   A.    Would you restate it.

24   Q.    Mr. Glanzer, the fellow who was the investment banker

25   and the lawyer who was hired by the MEC in April, 2000, do

1    you agree?

2              THE COURT:  2000 or 2001.

3              MR. FRAM:  2000, your Honor.  He had been there a

4    whole year.

5    Q.   Mr. Glanzer had vastly more expertise and experience

6    than you do in terms of being able to make the kind of

7    judgment you we are talking about, about what American would

8    do or not do?

9    A.   Yes.

10   Q.   What was Mr. Glanzer's recommendation during and at the

11   meeting on April 2, about what the MEC should do?

12   A.   He suggested the MEC should waive scope.

13   Q.   Okay.  The issue,  just so we are clear, the issue

14   before the MEC on April 2 was whether to accept the new

15   collective bargaining agreement with TWA LLC that did not

16   have seniority arbitration, correct?

17   A.   Yes.

18   Q.   It was not waive scope or not waiver scope, correct?

19   A.   Correct.

20   Q.   Mr. Glanzer's recommendation was to take the deal that

21   TWA LLC had put on the table, correct?

22   A.   Yes.

23   Q.   How about Mr. Tumblin, the bankruptcy lawyer who had

24   been working with the TWA, what was his recommendation about

25   what the MEC should do?

1    A.    Take the deal.

2    Q.    I am not going to go through everybody.  Everybody other

3    than Mr. Wilder said take the deal?

4          THE COURT:   Other than what.

5    Q.    Mr. Wilder?

6          THE COURT:   The advisors.

7    Q.    All of the advisors other than Wilder said take the

8    deal, don't role the dice with the futures and the jobs of

9    the TWA pilots and their families, yes?

10   A.    Yes.

11   Q.    Now, Mr. Wilder's litigation proposal, we started to

12   look at the memos, as of March 26, and if you turn to J 41.

13   I think you talked about this before.  His proposal as of

14   March 26 was gone to federal District Court, where we are.

15   And try to enjoin the American acquisition of TWA's assets.

16   Yes?

17   A.    Yes.

18   Q.    And I think you may have been asked before whether or

19   not there was an issue about the automatic stay?

20   A.    Yes.

21   Q.    Did you know or were you aware back in March, as of

22   March 26, 2001, that section 362 of the Bankruptcy Code

23   prohibits the filing of certain kinds of actions against

24   companies that are in bankruptcy?

25   A.    Yes.

1    Q.    Okay.  And what was Mr. Wilder's explanation for why he

2    could run the district to distribute court and try to enjoin

3    the transaction when Judge Walsh, the bankruptcy Judge, had a

4    bankruptcy and in fact a pending motion, a motion in Section

5    1113 that had been filed?

6    A.    From personal discussion was Mr. Wilder he felt that

7    this particular litigation would have been an exclusion to

8    one of the restricted filings against the bankruptcy.

9    Q.    Do you recall his explanation as to why he had felt

10   there would not be a violation of the automatic stay?

11   A.    His explanation as to why this would not be a violation

12   is because he felt like this was a dispute over a nonmonetary

13   contract issue.

14   Q.    By the way, what had happened before this memo, this

15   letter, March 22, is that ALPA had filed two grievances

16   against TWA, with respect to the seniority integration issue.

17   Correct?

18   A.    That's correct.  It was at Mr. Wilder's direct

19   direction.

20   Q.    Okay.  So what happened is when TWA signed the

21   agreement, the purchase agreement with American, and filed

22   for bankruptcy, ALPA filed a grievance saying you signed an

23   agreement, that is contrary to the scope and successor

24   provisions of our agreement.  Correct?

25   A.    That's correct.

```
 1    Q.   And then when TWA went ahead and filed the 1113 motion

 2    on, actually at the time line, not on this, when they filed

 3    the 1113 motion on March 13, ALPA filed a second grievance

 4    against TWA?

 5    A.   That's correct.

 6    Q.   In that respect ALPA was trying to proceed secretary

 7    protect the rights of the TWA pilots?

 8    A.   Yes.

 9    Q.   Did any of advisers other than Mr. Wilder, did any them

10    agree with him that a federal District Court would have

11    jurisdiction?

12    A.   No.

13    Q.   They all to a person said we disagree with Wilder, we

14    think he is wrong, we think all you get from this is a very

15    angry bankruptcy Judge.  Yes?

16    A.   Yes.

17    Q.   Do you recall Mr. Seltzer?

18    A.   Yes, sir.

19    Q.   Mr. Seltzer was a specialist in representing unions in

20    bankruptcies, and had represented many unions in dealing with

21    Section 1113 motions, correct?

22    A.   Correct.

23    Q.   To your recollection did Mr. Wilder have anywhere near

24    as much experience or expertise as Mr. Seltzer in dealing

25    with those types of motions?
```

Case-cross/Fram                                                    174

1    A.    I would have to assume no.

2    Q.    Do you recall Mr. Seltzer at one of the meetings

3    explaining to the members of the MEC that he thought that

4    Roland Wilder was dead wrong in terms of his position that he

5    could file a separate lawsuit?

6    A.    I do not recall that.

7    Q.    Were you at the meeting on March, the meetings on March

8    21 and 22?

9    A.    I believe so.

10   Q.    Do you recall what Mr. Seltzer said at that meeting?

11             THE COURT:   That is 2001.

12             MR. FRAM:   2001.  I am sorry.

13   A.    I would have to look at the minutes again.

14   Q.    I will tell you, sir, that the discussion with advisers

15   in those minutes is an executive session so it is not

16   discussed.   So do your best.  Do you have any recollection

17   of what Mr. Seltzer said on March 21 and 22 about the

18   viability of Mr. Wilder's theory?

19   A.    No, I do not.

20   Q.    How about the meetings, April 2, do you recall what Mr.

21   Seltzer then said at that meeting?

22   A.    About Mr. Wilder's litigation?

23   Q.    About his litigation proposal?

24   A.    Did he not agree with it.

25   Q.    Do you recall the specifics, his explanation, for why he

1   didn't agree?

2   A.   I do not recall him stating that it would have violated

3   the automatic stay provision of the Bankruptcy Code.

4   Q.   Do you recall any explanation he gave for why he thought

5   it was a bad idea?

6   A.   He didn't agree with the litigation and with 100 percent

7   certainty that the 1113 hearing would remove the scope.

8   Q.   You said a couple times now he didn't agree with the

9   litigation.  Do you recall his explanation for why he didn't

10  agree?

11  A.   Not specifically, no.

12  Q.   So you are at a point of leading up April 2 where you

13  have heard Mr. Wilder make a proposal for litigation, and you

14  have all these other people, seven, eight, nine, saying it is

15  a bad idea.  We disagree.  Correct?

16  A.   Correct.

17  Q.   Tell us, sir, why you chose to go, or chose to feel that

18  Wilder's position was the right position.  How did you

19  /KPHAOUS between what piled Wilder was saying and what the

20  other people were saying?

21  A.   Frankly, some of them had conflicts of interest.

22  Secondly Mr. Wilder was an independent merger counsel that we

23  hired, TWA pilots hired.

24  Q.   Which of the advisers do you think had conflict of

25  interest?

1    A.    Michael Glanzer.

2    Q.    Why do you think Michael Glanzer had contract?

3    A.    I had a huge success in his contract if the deal went

4    down.

5    Q.    You assume because he wanted the deal to go forward that

6    that was affecting his advice as a professional?

7    A.    I considered that that may affect his advice as a

8    professional.

9    Q.    You are you telling us you went down the list of every

10   other adviser and discounted what they had to say because of

11   some kind of a conflict?

12   A.    No, sir.

13   Q.    Were there advisors who disagreed with Wilder who didn't

14   have conflicts?

15   A.    Not that I am aware of.

16         THE COURT:  Didn't Wilder have a conflict?  If he

17   brings a suit he may make money.  If he doesn't bring a suit

18   [e] doesn't make anything.

19         THE WITNESS:  That is true.

20         THE COURT:  He has the same economic incentive for

21   his advice that others might have had as well.  I mean he

22   wasn't, if that is what you call a conflict, then he has a

23   terrific conflict.

24   A.    He was being paid, we were paying him throughout  the

25   transaction.

1              THE COURT:  No, but, but retaining him for writing

2      a letter or advice is not the same as paying him to start a

3      full blown litigation.  You make a lot of, he would make a

4      lot of money if you brought a lawsuit.  And the other thing

5      is --

6              THE COURT:  Answer my question.  Yes?

7      A.   Yes.

8              THE COURT:  In that sense he has a conflict too.

9      A.   Correct.  And Mr. Wilder did inform me personally when

10     we were speaking about that this that that lawsuit he was

11     going to file could be withdrawn at any time.  It was once

12     again a piece of leverage.  It wasn't going to to necessarily

13     continue to fruition.

14             THE COURT:  Do you think lawsuits can be withdrawn

15     at any time in a case without any consequences.

16     A.   No, I didn't say without any consequences.  He could

17     withdraw the lawsuit.

18             THE COURT:  When?

19     A.   He did not indicate when.

20             THE COURT:  You just assumed anybody could withdraw

21     the lawsuit without consequences.

22     A.   No, sir irks, I didn't say without consequences.  I

23     trusted my lawyer if he told me he could withdraw the suit,

24     it could be withdrawn.

25     Q.   What did the other lawyers say, including the lawyers,

```
 1   say about whether you could simply withdraw a lawsuit that

 2   was filed with the purpose of enjoining a major corporate

 3   transaction that a bankruptcy Judge was pushing to see

 4   concluded?

 5   A.   I don't believe we spoke about that.

 6   Q.   Let's go back to my question of how you, Ted Case,

 7   decided that Roland Wilder's position was the better position

 8   as opposed to the other position.  You mentioned you thought

 9   some of the other advisors had conflicts.  Okay.  What, other

10   than to weigh conflicts for whatever impact that had how did

11   you make the decision that Wilder was right and all the other

12   people were wrong?

13   A.   The decision was based on once again tryin to establish

14   leverage to get a better bargaining agreement with the other

15   side.

16   Q.   Mr. Wilder in his March 26 letter he cited a bunch of

17   cases, do you recall that?

18   A.   Yes.

19   Q.   Do you recall In Re Ionosphere case out of the Second

20   Circuit.  Do you recall him citing that?

21   A.   Briefly.

22        THE COURT:  Refer me.

23   Q.   First page of the March 26 letter.  Maybe the second

24   page.

25
```

Case-cross/Fram                                                      179

```
 1              THE COURT:  I think it is on page 2.

 2   Q.   So do you see the reference to In Re Ionosphere?

 3   A.   Yes, sir.

 4   Q.   Did you understand from the back and forth that that was

 5   one of the legal residents he was going from?

 6   A.   Yes.

 7   Q.   You understand this in March of 2001?

 8   A.   Yes.

 9   Q.   Did you read the case to see what it said?

10   A.   No, sir.

11   Q.   Do you recall Mr. Seltzer saying Mr. Wilder had misread

12   the case, it supported his position?

13   A.   No, sir.

14   Q.   Did you read any of the cases that Mr. Wilder cited in

15   this letter?

16   A.   No, sir, at that time I did not.

17   Q.   You had no ability did assess whether Wilder was correct

18   or incorrect in terms of legal presents dent?

19   A.   I had two lawyers with differing opinions.

20   Q.   Sir, you had a group of lawyers, seven or eight of them,

21   who disagreed with one fellow, right?

22   A.   I don't think there were seven or eight, but yes, there

23   were multiple that disagreed with one.

24   Q.   Well, let's -- Glanzer, you had Tumblin, you had

25   Seltzer, you had Warner.  You had Holtzman.  Yes?
```

1   A.   Yes.

2   Q.   Who else?

3   A.   Roberts, remember him, he is a lawyer?

4   A.   That is six.

5   Q.   So six against one?

6   A.   Yes.

7   Q.   You went with Wilder?

8   A.   Yes.

9   Q.   Other than what you have said can you give us any

10  explanation for why you chose to want to follow the position

11  Wilder espoused?

12  A.   The Wilder position seemed to present some leverage we

13  may  have and the other positions didn't present any

14  leverage.

15  Q.   You  expressed your opinion about what you thought

16  should happen to the people on the MEC who had the the right

17  to vote, the people who were elected by the pilots and were

18  entrusted with doing the right thing for them, correct?

19  A.   Can you rephrase that question?

20  Q.   The opinion that you have pressed today, you reviewed

21  the Wilder, that his theory should be followed, you explained

22  that to the members ever the MEC who were voting, correct?

23  A.   Yes.

24  Q.   The six people who were entitled to vote, they have been

25  elected by TWA pilots and were the ones responsible for

1  protecting the pilots rights, correct?

2  A.   Correct.

3  Q.   Do you think there are you are any more qualified than

4  any of those people to make a decision about what the right

5  thing to do was?

6  A.   Yes.

7  Q.   Tell me, did you know Steve Rautenberg at the time?

8  A.   Yes, I did.

9  Q.   Mr. Rautenberg had been a TWA pilot since 1985?

10 A.   Yes.

11 Q.   He had lived through the first and second bankruptcies

12 and had been furloughed?

13 A.   As had I.

14 Q.   He had taken the time to go to business school and

15 gotten his MBA?

16 A.   Yes.

17 Q.   You think you were more qualified than Mr. Rautenberg to

18 weigh the different considerations and make a decision?

19 A.   May or may be, yes.

20 Q.   I am sorry.

21 A.   Yes.

22 Q.   You thought you were more qualified?

23 A.   Yes.

24 Q.   I see.  You thought you were qualified?

25           THE COURT:  You asked.  And you got an answer.

Case-cross/Fram                                              182

```
 1    Q.   Did you think you were more qualified than all of the

 2    other voting members to make a decision on this?

 3    A.   Not necessarily.

 4    Q.   All right.  Was there some kind of debate that took

 5    place at the MEC about this issue before the vote took place

 6    on April 2?

 7    A.   Yes.

 8    Q.   And I think you testified earlier today that Mr. Wilder

 9    was there and presented his position?

10    A.   Yes.  To the best of my recollection, yes.

11    Q.   All right?

12    Q.   I show you a couple of other documents?

13    Q.   Let's refer to D 179.

14              THE COURT:  This is a new document.

15    Q.   Yes, D 179 is an a denied today for a TWA special

16    meeting on April 2, 2001.  Do you recognize that as the

17    agenda?

18    A.   This is the published agenda.

19              MR. FRAM:  I offer D 179 in evidence, your Honor U.

20              MR. PRESS:  No objection.

21              THE COURT:  No approximate to 179.

22              MR. PRESS:  No objection.

23              THE COURT:  D 179, meeting agenda of April 2, is

24    admitted into evidence.

25              MR. FRAM:  Thank you.
```

Case-cross/Fram                                                      183

1    Q.    All right.   Mr. Case, do you agree that in addition to

2    the six advisors I mentioned before that Randy Babbitt was

3    also there?

4    A.    Y es.

5    Q.    So there were seven, yes?   There were seven?

6    A.    I said lawyers.   Six lawyers and one adviser.

7    Q.    Mr. Babbitt LAD be the former president of the Air Line

8    Pilots Association?

9    A.    Yes, he had.

10   Q.    New the industry pretty well?

11   A.    Yes, he did.

12   Q.    His advice with respect to the decision we have been

13   discussing was what?

14   A.    Was to waive scope.

15   Q.    His advice was to accept the collective bargaining

16   agreement that had been offered by TWA LLC?

17   A.    As it was expressed to me his advice was to waive scope.

18   Q.    All right.   And can you show me on the agenda where it

19   lists Mr. Wilder as an attendee?

20   A.    It does not list Mr. Wilder on the list as an attendee.

21   Q.    In fact, Mr. Wilder wasn't there on April 2, correct?

22   A.    I believe that is incorrect.   I believe he was there and

23   there is some dispute over that.

24   Q.    So he do you recall a meeting the day before, April 1?

25   A.    That's correct.   I did not attend that meeting.

Case-cross/Fram                                                   184

1   Q.   Let's get the home question out, on the table here?

2   A.   Excuse me.

3   Q.   You you recall there was a meeting on April 1, which was

4   an a Sunday, so everybody could get together and talk about

5   these issues before the meeting?

6   A.   He it was couched as a work session the day before the

7   meeting on the two, yes.

8   Q.   You were invited to that work session on April 1?

9   A.   Yes, I was.

10  Q.   I show you D 210 and ask if you recognize that as an

11  email that Robert Stow circulated on March 29, 2001, to

12  schedule the work session in the meeting?

13  A.   Yes.

14              MR. FRAM:  I move D 210 into evidence.

15              MR. PRESS:  No objection.

16              THE COURT:  D 210.  Mr. Press.

17              MR. PRESS:  No objection, Judge.

18              THE COURT:  D 210 in evidence.

19  Q.   You recall receiving this email on or about March 29,

20  2001.

21  A.   I am listed and I assume I did receive it.

22  Q.   The email indicates that the schedules, the MEC meeting

23  for Monday, April 2001 at nine o'clock, and it also says

24  there will be a session beginning at 1300, CDST on Sunday,

25  April 1, at the MEC office?

1    A.    That's correct, work session.

2    Q.    The April 1 meeting is the one you did not attend?

3    A.    I was unable to attend that meeting.

4    Q.    What do you say you recall Mr. Wilder telling people on

5    April 1, I am sorry April 2, with respect to his ideas?

6    A.    Mr. Wilder expressed a positive position for possible

7    position for his litigation strategy for a period of time,

8    after he listened to the ALPA advisors long enough he

9    eventually capitulated and said I I guess a contract is

10   better than no contract.  And Mr. Wilder eventually changed

11   his opinion to mirror that of advisers.

12   Q.    Do you recall Mr. Wilder appearing to be distraught as

13   the discussion went on?

14   A.    Mr. Wilder is a little hard of hearing, and it did

15   appear at time that he was a little behind on some of it, and

16   in my opinion, he looked a little distraught about being --

17             THE COURT:  I am sorry, your opinion what --

18   A.    He looked distraught about being overwhelmed by

19   advisers' advice.

20   Q.    But what he ultimately said at the end of the day at the

21   end of the discussion is that he agreed with the other

22   advisors about what the MEC should do?

23   A.    Yes, he eventually said almost verbatim, "I guess a

24   contract is better than no contract."

25   Q.    So based upon the fact that Mr. Wilder ultimately

1    agreed, tell us, why did you express the view which we saw in

2    the minutes before, that the MEC should reject the proposed

3    contract and go to court?

4    A.   Once again, that seemed to be the only course of action

5    that provided any leverage  whatsoever to improve our

6    position.

7    Q.   So even after Mr. Wilder backed away from his proposed

8    litigation, you still wanted to pursue it?

9    A.   In was no pursue the litigation once Mr. Wilder backed

10   away from it.

11   Q.   You testified this morning about this letter that Mr.

12   Wilder had sent to Mr. Worth, the March 26 letter?

13   A.   Yes.

14   Q.   Do you have that in front of you?

15   A.   Do you recall what number it is?

16   Q.   Yes.

17            MR. PRESS:  41.

18   Q.   J 41.

19   A.   Okay.

20   Q.   Didthe MEC ever vote to request approval to have Mr.

21   Wilder file litigation?

22   A.   I believe they did.

23   Q.   Tell me when you think the MEC voted to approve the

24   filing the litigation?

25   A.   I wouldn't be certain about that.

Case-cross/Fram                                                        187

1   Q.   Well, you wrote the letter on March 26?

2   A.   Right.

3   Q.   The next meeting was April 2, right?

4   A.   Correct.

5   Q.   And --

6   A.   Well, I am not sure if that was the very next meeting.

7   Q.   Do you recall the meeting between April 26 and, I am

8   sorry, March 26 and April 2?

9   A.   During that timeframe there were so many meetings I

10  can't recall without seeing some minutes from the meeting.

11  Q.   Do you recall at any meeting a motion to seek permission

12  from ALPA to have Mr. Wilder file litigation?

13  A.   I believe there was a resolution to that effect at some

14  meeting.  I am not sure the timeframe.

15  Q.   You think it was before March 26?

16  A.   It may have been after March 26.

17  Q.   Was a resolution to that effect offered by anybody on

18  April 2 at that meeting, April 2, 2001?

19  A.   No, it wasn't.

20  Q.   Let's go back to your comments.  Do you have D 74 which

21  is the April 2 minutes.  I think they are in evidence.

22          THE COURT:  Give me the number.

23          MR. FRAM:  D 74.

24          THE COURT:  D 74 was put in evidence with the very

25  first group, I think it was put in actually by the plaintiff.

1    But it is in evidence.

2    Q.   Do you have it handy, Mr. Case?

3    A.   Yes, I do.

4    Q.   All right.  So turn to the fifth page, please.

5    Q.   At the very top of that page -- go back to the prior

6    page haven't?

7    A.   Page 4.

8    Q.   The bottom of page 4.  The membership and guest hour

9    ends.  There is a recess at 14:31.  Then 15:06, reconvened?

10   A.   Correct.

11   Q.   And that in regular time would be what, 3:06?

12   A.   3:06  local time.

13   Q.   And if we flip to the next page, merger committee

14   update, motion is made by Rautenberg and Singer to move into

15   executive session.  Vote passes.  Then there is a discussion

16   of some kind.  And then there is a motion at 17:28 to come

17   out of executive session?

18   A.   Yes.

19   Q.   So when 15:06 to 17:28, almost two hours, 20 minutes,

20   something like that, there is a discussion in executive

21   session?

22   A.   Yes.

23   Q.   Were you there?

24   A.   Yes.

25   Q.   What was discussed?

1    A.    The scope waiver.

2    Q.    You come out of executive session.  I see that 60

3    percent of the way down, Case, for the record?

4    A.    Yes.

5    Q.    Spoke against the resolution, not convinced that scope

6    would not survive.  You made other other comments.  Stated

7    that the possibilities and potential outcomes post 1113

8    bankruptcy hearing had not been answered to his complete

9    satisfaction.  Case said he saw absolutely no improvement of

10   ALPA's leverage for a fair seniority integration moving into

11   the TWA LLC by waiving scope.

12   A.    Right.

13   Q.    Now, did you have something written out that you

14   provided to the secretary of the meeting, the person taking

15   notes, at the time you made that statement?

16   A.    Yes.  After the discussion I hand wrote what I intended

17   to put on the record and handed it to the secretary.

18   Q.    Did you make that statement for the record after Wilder

19   had backed away from his recommendation and agreed with the

20   rest of advisers that taking the deal on the table was the

21   best thing?

22   A.    Yes.

23   Q.    What were you intending to do when you wanted to put

24   that statement on the record?  What was the point of it, of

25   having something in the official minutes?

1    A.   The point was to continue representing the pilots who

2    elected me.  Their consensus was don't waive scope.  And that

3    was why I put it on record, and it was my belief.

4    Q.   So was the point to be able to go back to the pilots in

5    Council 2 and tell them that you took the toughest stance,

6    and you tried to protect their scope rights?

7    A.   No.  It was to tell the pilots of Council 2 that I had

8    listened to what they said, and pushed, and lobbied for what

9    they wanted.

10   Q.   Was there any type of a meeting, I think you said before

11   there were a bunch of meetings of Council 2 during the period

12   leading up to there?

13   A.   There were meetings of Council 2 leading up to this.

14   Q.   What were the dates of the meetings?

15   A.   I don't recall the dates.

16            THE COURT:  They were before April 2.

17   A.   You would have to show me minutes to recall the dates.

18   Q.   I think you would have to show us minutes.  Are you

19   aware of any minutes?

20   A.   There should be some minutes somewhere.

21   Q.   You were secretary treasurer for Council 2, right?

22   A.   Yes.

23   Q.   You are the person who would have be responsible for

24   creating minutes of any meetings during the period leading up

25   April 2?

1    A.    Yes.

2    Q.    Do you recall preparing minutes of those meetings?

3    A.    Yes.

4    Q.    What, to your recollection, was the direction from the

5    council for pilots?

6    A.    The Council 2 pilots we spoke to at that meetings was do

7    not waive scope.

8    Q.    Were they unanimous in saying do not waive scope?

9    A.    I didn't hear any dissenters in the crowd.

10   Q.    But the issue we discussed on April 2 was not to waiver

11   scope.  The issue was do we accept a new collective

12   bargaining agreement which had some benefits for the pilots,,

13   right?

14   A.    Once again, it was expressed to me it was to waive

15   scope.

16   Q.    What was expressed to you?

17   A.    The advisers.  Everything was termed in the conditions

18   of waiving scope.  Not once did one adviser say you are going

19   to accept a new collective bargaining agreement.

20   Q.    Mr. Case, did you read the resolution that was prepared

21   right after you made your comments?

22   A.    Which one?

23   Q.    You made some comments?

24   A.    Yes.

25   Q.    What was the resolution on the floor on April 2 of 2001,

1    was it a resolution to waive scope or was it a resolution to

2    accept a new collective bargaining agreement?  And as part of

3    that, to give up scope, to waive scope?  Let's blow it up.

4    Resolution 01- 64 by S.  Rautenberg.  P Lewin.  Whereas the

5    negotiating committee reports that it has negotiated to the

6    best offer available from TWA and American for a collective

7    bargaining agreement applicable to TWA LLC on all issues

8    except scope, subject to minor clarifications on a handful of

9    matters.

10           So the resolution right off the bat is talking

11   about a new collective bargaining agreement, yes.

12   A.   Yes.

13   Q.   Didn't you talk this morning a little bit about that new

14   collective bargaining unit, identified as P-139?

15   A.   Yes.

16   Q.   Do you have that handy, that is the transition

17   agreement.  It is probably the thickest one you have there.

18   A.   Yes.

19   Q.   This is a document that was forwarded by the people from

20   TWA LLC, to Mr. Holtzman on March 31 of 2001.  Do you recall

21   that?

22   A.   I don't recall, I am not Mr. Holtzman.

23   Q.   Well, if you don't know, just say you don't know?

24   A.   I don't know.

25   Q.   This is the document that was in front of the TWA MEC on

1    April 2 of 2001.  Correct?

2    A.   Yes.

3    Q.   So the resolution in front of the LLC, which you started

4    to read, the resolution was to accept this transition

5    agreement, this new labor agreement, along with some

6    potential modifications, yes?

7    A.   Yes.  That is what I was opposed to.

8    Q.   And this document was circulated to the voting members

9    of the MEC and they had a chance to review it and talk about

10   it on April 1 of 2001, correct?

11   A.   I wouldn't know.

12   Q.   Because you weren't at that meeting?

13   A.   I was not at the meeting on the first.

14   Q.   Do you recall seeing this before the vote took place on

15   April 2?

16   A.   Not that I can recall.

17   Q.   So did you even have a chance to review the transition

18   agreement that was being proposed by TWA LLC before you made

19   your comments on April 2?

20   A.   Just in passing conversations, and with the negotiating

21   committee members.

22   Q.   You do you feel you were fully informed about the deal

23   on the table enough to oppose the deal?  Let me ask that

24   again.  Don't you agree, Mr. Case, that before you take a

25   position that something should be rejected that you really

1    need to sit and review it and understand it?

2    A.    Absolutely.

3    Q.    Did you take the time before you made your comments on

4    April 2, 2001, to review this 79 page document and

5    understands the benefits it offered to the TWA pilots before

6    you stood up at the meeting and said, I object.

7    A.    There were two conditions in it that were a no starter

8    for me.

9    Q.    What were they?

10   A.    They were the fact that ALPA was ceding its bargaining

11   rights on a 21-day notice basis and there was no amendable

12   date in the contract.

13   Q.    Jump to the resolution, next page?

14   Q.    D 74, top of the next page.  This?

15   Q.    Do you have that?

16   A.    Yes.

17   Q.    The top of the page, the resolution is the first part is

18   the negotiated committee is directed to seek clarification

19   immediately on all outstanding issues arising from the

20   proposed agreement covering the operations of TWA LLC and the

21   finalize, and to finalize the LLC, CBA.  That is the

22   collective bargaining agreement?

23   A.    Yes.

24   Q.    The direction to resolve all issues arising out of the

25   transition agreement that is marked as P-139?

1    A.    Yes.

2    Q.    Be it further resolved that bankruptcy counsel is

3    directed to take steps that would ensure that the LLC CBA,

4    the collective bargaining agreement, is incorporated into

5    court documents, resolving the 1113 motion.  And be it

6    further resolved that no later than April 5, 2001, the master

7    chairman is directed to execute the LLC CBA and forward the

8    LLC CBA immediately to ALPA president Duane Woerth for his

9    signature and to waive those provisions of the current ALPA

10   TWA collective bargaining agreement that must be waived as a

11   condition to the closing of the asset purchase agreement.

12          Are you with me?

13   A.    Yes.

14   Q.    Then it has further directions to the merger committee

15   to try to negotiate about seniority.  Then you have the roll

16   call vote.  I think you testified this morning that as you

17   understood it, even though you weren't there in November,

18   2000, any new collective bargaining agreements had to be put

19   out for ratification for a vote by all of the pilots?

20   A.    The membership, yes.

21   Q.    Did you say anything at this meeting, did you object at

22   the meeting and say you guys can't do this, you need to put

23   this out for a vote of the pilots?

24   A.    On multiple occasions.

25   Q.    Can you show us in the minutes where there is an

1    indication to that effect?

2    A.   That was in the executive session portion of the

3    meetings.

4    Q.   You put something else on the record?

5    A.   Yes, I did.

6    Q.   You made the statement on the record against the

7    resolution, is there some reason why you didn't make a

8    statement on the record that the MEC was violating the rights

9    of the TWA pilots by adopting this agreement without putting

10   it out for a vote?

11   A.   No, I did not put that on the record.

12   Q.   Do you think given the fact that TWA LLC had a deadline

13   for this to be accepted, April 6, do you think there would

14   have be time to put the 79 page agreement out for a vote by

15   all the pilots?

16   A.   Absolutely.  I am not quite sure what you mean by a

17   deadline.

18           THE COURT:  There would have been time.

19           THE WITNESS:  There would have been time to put it

20   out for vote.

21   Q.   If you recall the TWA LLC had put a deadline, they said

22   that their offer of a new collective bargaining agreement

23   would be withdrawn when the when the Section 1113 motion,

24   when the hearing began on April 6?

25   A.   My experience with TWA deadlines were through the years

1    of negotiating that it is a negotiating position.

2    Q.   All right.  So this is another situation where you

3    thought a company was bluffing, they were making statements

4    that they didn't really believe?

5    A.   I felt it there were, it was time to put this up for

6    ratification and the company was bluffing on their deadline.

7    Q.   You thought they were bluffing just in the way you

8    thought American was bluffing when it conveyed that it would

9    walk away from the deal?

10   A.   Yes.

11   Q.   All right.  And we talked about the vote.  Did you know

12   ahead of time how the two people from Council 2, Mr.

13   Hollander and Mr. Singer, were going to vote?

14   A.   I knew pretty much how Captain Hollander would vote.  I

15   didn't know  about Captain Singer.

16   Q.   What did Captain Hollander tell you how he was going to

17   vote?

18   A.   His constituents wishes.

19   Q.   Did he explain to you what that that was?

20   A.   Yes.

21   Q.   Did he explain why he split his vote 55 in favor, 180

22   against?

23   A.   No.

24   Q.   Did you have a discussion with Captain Singer about how

25   you felt he should vote?

1    A.    First Officer Singer, I did have a discussion with him.

2    Q.    What discussion was that, what did you tell him?

3    A.    I told David to at least split his vets to include my

4    vote as a no vote.  He was my representative at the time.

5    Q.    What did he say?

6    A.    He said he would do that.

7    Q.    When the vote came down the way it did, the MEC agreeing

8    to accept the transition agreement and to waive scope, you

9    were upset, right?

10   A.    I was concerned.

11   Q.    It would be fair to say you were irritated by what had

12   happened?

13   A.    I would say more concerned than irritated.

14   Q.    Why were you concerned?

15   A.    I was concerned because the pieces of leverage that we

16   had were going away day by day.

17   Q.    And I am sorry.  What pieces of leverage?

18   A.    Any pieces of leverage that we may have had.

19   Q.    The pieces of leverage you had in mind were things like

20   going on strike?

21   A.    No, not necessarily.

22   Q.    Well, be more specific for us, please.  Just to wrap

23   this up, what pieces of leverage did you think the TWA pilots

24   were giving up by having the MEC accept this collective

25   bargaining agreement?

1    A.    There CBA had two non-starters in it.  One was ALPA

2    waived its bargaining rights.  With 21 days notice, with

3    restrictions, American could do whatever they wanted to as

4    long as the contract mirrored theirs.

5              The second was it did not entitle us to an

6    amendable date that allowed us certain provisions of the

7    Railway Labor Act protect our rights.

8    Q.    There were some significant benefits to the TWA pilots

9    with the transition benefits, right?

10   A.    I would say there are some benefits.

11   Q.    One benefit was increased hourly wage?

12   A.    That was not necessarily a benefit in my opinion given

13   the work rules.

14             THE COURT:  It can't hurt you, no matter what the

15   work rules are, getting a higher rate of pay has got to be a

16   help.

17   A.    It is not a help when you can work more hours.

18             THE COURT:  That is a different issue.  The answer

19   is if they kept the lower rates and you worked less hours you

20   would suffer more than if you worked less hours at a higher

21   rate.  It can't hurt you.  It can only help you to have a

22   higher rate.

23   A.    I couldn't earn as much money.

24             THE COURT:  That is not because of the rate.  That

25   is because of the work schedule.

1              THE WITNESS:  Correct.

2              THE COURT:  But the rate helped you, helped you

3    know matter what hours you worked, if you worked five hours

4    or 100 hours, you were helped by the fact it was a pay raise.

5    A.   It was a better pay, yes, sir.

6    Q.   The rate for captain, TWA captains, went up by over $60

7    an hour.  Do you recall that?

8    A.   In the transition agreement.

9    Q.   Yes, sir.

10   A.   It eventually went to the American pay raise, yes.  But

11   that was a while down the road.

12   Q.   It eventually went to a rate that was over $200 per

13   hour?

14   A.   At that time, yes.

15   Q.   And the rate also went up for first officers?

16   A.   Yes, it did.

17   Q.   What did it go, what did it change from with respect to

18   first officers?

19   A.   I don't recall.  Once again, I am a pilot.  I have to

20   see the contract.

21   Q.   You don't recall the numbers on that?

22   A.   No, sir.

23   Q.   Do you recall seeing some letters go out after this vote

24   on April 2 from people who had been at the meeting reporting

25   to the other pilots on the outcome?

1    A.    Yes, sir.

2    Q.    Do you recall Mr. Past tours email to all the TWA

3    pilots?

4    A.    I don't know if I recall that.

5    Q.    Mr. Pastore was the master chairman of the MEC?

6    A.    Yes..

7    Q.    Tell us, what were his responsibilities as the master

8    chair of the MEC?

9    A.    His responsibilities were to carry out the business that

10   the MEC conducted while they were in session.  If they were

11   not at a particular session meaning he was basically the

12   representative of the TWA pilots and their wishes when the

13   MEC was not in session.

14   Q.    Let me show you what has been marked as D 15.

15            THE COURT:  D 15.

16            MR. FRAM:  D 15.

17            THE COURT:  This is a new one.

18            MR. PRESS:  It is not in evidence.

19            THE COURT:  It is a new document.

20   Q.    Sir, do you recognize that as an email that Mr. Pastore

21   sent to all of the TWA pilots on April 3 of 2001, the day

22   after the meeting?

23   A.    Yes.

24   Q.    You received it, yes?

25   A.    I probably did.

1    Q.   And you probably read it, right?

2    A.   Yes.

3    Q.

4            MR. FRAM:  Your Honor, I move D 15 into evidence,

5    please.

6            MR. PRESS:  No objection.

7            THE COURT:  D 15, which are emails from Captain

8    Pastore.

9            THE WITNESS:  Yes, sir.

10           THE COURT:  In evidence.

11           MR. FRAM:  Thank you, your Honor.

12   Q.   Just to highlight a couple aspects.  Let's go to the

13   second page.

14   A.   Yes, sir.

15   Q.   Do you see that under agreement with TWA airlines LLC.

16   A.   Yes.

17   Q.   Do you see that fourth paragraph down, the alternative

18   basing our, the alternative facing our MEC was to fight the

19   1113 motion in court.  Do you see that?  It might be easier

20   to read the document as opposed to try to, are you with me?

21   A.   Yes.

22   Q.   Then he wrote, not one of our advisors believed that we

23   could be successful against the 1113.  That is accurate in

24   terms of what happened before the vote on April 2 of 2001,

25   correct?

```
 1   A.   That's correct.

 2   Q.   The Court thus far has sided with TWA and American on

 3   virtually every important issue.  If we did not agree to the

 4   new CBA with TWA airlines LLC, and the Court granted TWA's

 5   1113 motion as expected, we would lose all of our contractual

 6   rights, including scope.  Accurate?

 7   A.   That is his statement, yes.

 8   Q.   That was, okay.  Fine.  Then he has a list there.  It

 9   says what we gain.

10   A.   Yes.

11   Q.   Put that up real quick.  What he has done is listed some

12   of the benefits of the contract.  Yes?

13   A.   In his opinion, yes.

14   Q.   Do you disagree that those were benefits?

15   A.   Not that they were benefits, but not necessarily what we

16   got got in our contractual discussion.  We already had a

17   written guarantee of employment by American Airlines purchase

18   agreement.

19   Q.   Well, the American Airlines purchase agreement was not

20   an agreement to which the TWA pilots were a party.  Right?

21   A.   No, they were not.

22   Q.   Okay.  So they didn't necessarily have any benefits from

23   the asset purchase agreement.  Right?

24   A.   I am not sure they offered to employ me with that

25   agreement.
```

1    Q.    They offered to employ the pilots subject to some

2    conditions, one of which was that seniority arbitration be

3    waived.  Right?

4    A.    Scope be waived, correct.

5    Q.    One of the benefits here I see if you go down, one, two,

6    three, four, five, six, seven, eight.  Payment of an

7    estimated twelve million dollars in late, outstanding DAP

8    payments plus interest?

9    A.    Yes.

10   Q.    What were the DAP payments?

11   A.    That is a Directed Account Plan.  It is a pilot

12   retirement plan where the company has a set percentage of a

13   pilot's pay that each month they have to put into the

14   retirement plan.

15   Q.    With interest the DAP payments that American, TWA made

16   were about 16 million dollars.  Do you recall that?

17   A.    It says 12 million in late out handing --

18   Q.    Plus interest?

19   A.    Plus interest.

20   Q.    If you don't recall, say so.  Do you recall with

21   interest  the payments at issue were about 16 million

22   dollars?

23   A.    I don't recall.

24   Q.    That is something that was not part of the TWA contract,

25   that that was being given up, correct?

1    A.   It was.  I mean, that was our contractual entitlement

2    under our old contract.

3    Q.   It was a contractual entitlement that TWA defaulted on

4    that it didn't, it defaulted because it didn't have the

5    money?

6    A.   It did not pay the payments and it was subject to

7    payments, grievance.

8    Q.   You never heard TWA defaulted because it ran out of

9    money.  Are you saying you don't know if they stopped making

10   the payments?

11   A.   I am saying I wouldn't speculate a guess as to what

12   their reasoning was.

13   Q.   Next is guarantee of American pay raise by January,

14   2002?

15   A.   Yes.

16   Q.   Those are the pay increases we talked about before

17   including a $60 hourly increase for some of the pilots?

18   A.   Yes.

19   Q.   And then the next page of the document, if we turn to

20   page 3 at the top we have what we would have lost.  The

21   downside for a pilot is the following.  It talks about all

22   the the things that might have been lost.  Do you agree that

23   that is a fair list of all the of the things that the pilots

24   would have lost if the Section 1113 motion had been granted

25   in the contract, and the contract had been rejected?

1    A.   The only one I have a major disagreement with is the

2    probable loss of union protection  resources and

3    representation.

4    Q.   Why do you disagree that that was something that would

5    have been lost?

6    A.   I am not quite sure how the union representation was

7    going to be stripped away by simply removing the contract.

8    Or reject being the contract.

9    Q.   Beg your pardon?

10   A.   I am not sure how union representation was going to be

11   lost by rejecting the contract.

12           MR. FRAM:  Your Honor, it is two o'clock.  I have

13   15 minutes.  Would you rather do it tomorrow or?

14           THE JURORS:  Stay.

15           THE COURT:  You want to stay for that 15 minutes?

16           We will stay.  2:15.  I have to go.

17   Q.   Let's show you D 35.  Which is a letter April 10, 2001.

18   To Council 2 pilots.  Do you recognize that as a letter that

19   you signed along with Howard Hollander and David Singer?

20           THE COURT:  I am sorry.

21           MR. FRAM:  D 35, your Honor.

22           THE COURT:  That is not in evidence.

23           MR. FRAM:  Correct.

24   Q.   Do you recognize the document, sir?

25   A.   Yes, sir.

1          MR. FRAM:  I offer D 35 in evidence, please.

2          MR. PRESS:  No objection, Judge.

3    Q.   You and the two other people from Council 2, you sent

4    out your own letters to the Council 2 pilots to report what

5    happened on April 2?

6    A.   That's correct.

7    Q.   This is the letter?

8    A.   Yes.

9    Q.   And you also, I am looking at the very bottom of the

10   second page, you also summarized what you felt the benefits

11   of the new agreement were.  Yes?

12   A.   Yes.

13   Q.   And just beginning at the top of page 3, you talked

14   about the pay, you talked about DAP contributions, job

15   protection.  You talked about a bunch of things?

16   A.   Yes.

17   Q.   Seniority integration, one of the things that American

18   Airlines had offered before April 2 was to use its reasonable

19   best efforts to get the allied pilots, their pilots, to agree

20   to fair and equitable seniority integration.  Correct?

21   A.   Yes.

22   Q.   And you saw that as a benefit?

23   A.   Yes.

24   Q.   And you also recited in this letter, just to go back

25   quickly to the top of page 2, you are talking about the

 1    Section 1113 motion, said if successful the hearing and

 2    judges ruling would effectively eliminate the scope problem.

 3    Flynn who attended the previous bankruptcy proceedings is

 4    aware of Judge Walsh's predisposition to press forward with

 5    this transaction.  After consultation with many professional

 6    advisories, see attached list, it was their unanimous opinion

 7    that TWA would very likely prevail in its quest before the

 8    bankruptcy Judge?

 9    A.   Yes.

10    Q.   You signed on to that, yes?

11    A.   There is not the version that, there is a very edited

12    version.  Yes, I did so in the hopes of forming some pilot

13    unit within the group or keeping Council 2 officers.

14    Q.   You signed the letter, yes?

15    A.   Yes, I did.

16    Q.   Did you agree with the statements in the letter?

17    A.   Not every provision of the letter, I did not.

18    Q.   If you didn't agree with what the letter said, why did

19    you sign off on it?

20    A.   Because I felt that it was more beneficial to show a

21    face of unity than to splinter or try to fractionalize the

22    pilots of Council 2.  They were already very upset about the

23    scope being waived.

24    Q.   All right.  The last document I want to show you and ask

25    you about is D 17.

1    A.   Is that one I already have?

2    Q.   I don't think you do.

3           THE COURT:  D 17 is not in evidence.

4           MR. FRAM:  That is council minutes from Council 2,

5    June 25, 2001.

6    Q.   Do you recognize those minutes as ones you prepared in

7    your capacity of secretary treasurer of Council 2?

8    A.   Yes, sir, I believe so.

9    Q.   All right.

10          MR. FRAM:  I move D 17 into evidence, your Honor.

11          MR. PRESS:  No objection, Judge.

12          THE COURT:  D 17 is in evidence.  That is June 26

13   meeting of Council 2.

14          MR. FRAM:  Yes, your Honor.

15          MR. FRAM:  If I may.

16          THE COURT:  I am sorry.  It is in evidence.

17   Q.   You prepared these as a result of a meeting on June 26,

18   2001.  Yes?

19   A.   Yes.

20   Q.   One of the agenda items at the meeting was the recall of

21   Mr. Singer as the first officer representative of Council 2,

22   correct?

23   A.   Yes, I believe so.

24   Q.   And that discussion in the minutes begins on the 4th

25   page where it says about 25 percent down, close the, Captain

```
 1    Hollander appeared the floor for agenda item 5.

 2    Consideration of recall of first officer representative David

 3    Singer.

 4    A.   Yes.

 5    Q.   You favored the recall of Mr. Singer, right?

 6    A.   Yes.

 7    Q.   You thought he made a wrong decision on April 2 and you

 8    were upset about it, yes?

 9    A.   I  felt he wasn't following his constituents wishes,

10    yes.

11    Q.   His constituents didn't have all of the information that

12    Mr. Singer had when he made the decision on April 2, correct?

13    A.   That's correct.  It was our job to make sure that we got

14    that information to our membership.

15    Q.   Well, Mr. Case, the members of the MEC received detailed

16    information, some of it in executive session, some of it

17    subject to legal privileges, like the attorney-client

18    privilege, during the period lied go up to their vote on

19    April 2, right?

20    A.   Yes.

21    Q.   The job of people sitting on the MEC is to make

22    decisions for the pilots they represent.  Correct?

23    A.   Correct.

24    Q.   All right.  So you spoke in favor of the recall of Mr.

25    Singer, yes?
```

1    A.    Yes.

2    Q.    That is reflected on the next page, page 5:  One of the

3    comments you made, sentence begins Ted Case stated his

4    recollection of events somewhat different.  I am going to

5    skim through this.  One of the things you said there was that

6    you felt the MEC would not afford concessionary behavior with

7    seniority integration.  Clarification on 113 issue, Roland

8    Wilder had given the MEC a strategic plan to enhance our

9    bargaining position leading up to the 1113 hearing, held up

10   copies of proposed court filing.  MEC voted to not follow

11   Wilder's legal advice with the exception of one voting

12   member, pointed to seat where Hollander was earlier sitting.

13   You said that?

14   A.    I believe somewhere someone else was taking the notes.

15   Q.    You were responsible for finalizing the minutes?

16   A.    Yes.

17   Q.    In court you held up the filing Mr. Wilder prepared to

18   go to federal District Court?

19   A.    Yes.

20   Q.    Was it accurate to tell the members of Council 2 that

21   Mr. Wilder had given the MEC a strategic legal plan to

22   enhance our barn gaining position leading up to the 1113

23   hearing?

24   A.    Yes.

25   Q.    Didn't Mr. Wilder, as you discussed before, back away

1    from his proposed litigation on April 2, and at the end of

2    the day say you know what?  I agree with the other advisors.

3    This is a bad idea, to go to court, you should accept the

4    deal?

5    A.   He did not say it is a bad idea to go to court.  No.

6    Q.   Mr. Case, before the vote on April 2 Mr. Wilder backed

7    away from his proposed litigation and said I agree.  The MEC

8    should vote to accept?

9    A.   Yes.

10   Q.   The collective bargaining agreement.  Why didn't you

11   tell that to the pilots in Council 2?  Why did you suggest to

12   them at the meeting that Wilder's plan was still on the

13   table, that he felt it was still viable when the vote took

14   place on April 2?

15   A.   I can't recall, I believe we may have actually covered

16   that point, that Mr. Wilder did capitulate and finally say I

17   don't know if it is, it is not in there, no.

18   Q.   Are you telling us that you recall a meeting that took

19   place almost ten years ago saying things that aren't in the

20   minutes?

21   A.   No, sir, I am not saying that.

22           MR. FRAM:  Thank you.  Your Honor, I have nothing

23   further.

24           THE COURT:  Okay.  We will resume with redirect

25   examination tomorrow morning.  Ladies and gentlemen of the

Case-cross/Fram                                                   213

1    jury, thank you for agreeing to stay for a few extra minutes.

2    I appreciate it.  I like to assure you some of you might

3    worry about what kind of day we had.  We had probably today

4    30 more pages of transcript than a normal trial date.  I know

5    you find that hard to believe but I know what the pages for a

6    normal day on.  We have about 30 more.

7           The system moves faster and again, I thank you for

8    your promptness in coming in in the morning, for your

9    attention through this very difficult kind of subjects we are

10   dealing with here.

11          So have a safe trip home.  Safe trip in tomorrow

12   morning.

13          See you at 8:30.  Do not discuss the case among

14   yourselves.  Do not discuss the case with your family,

15   friends or loved ones.  Keep an open mind until you have

16   heard all the evidence.

17          (Adjourned at 2:15 p.m.)

18

19

20

21

22

23

24

25

1

2                          I N D E X.

3

4          THEODORE CASE, PREVIOUSLY SWORN.

5               CON'T DIRECT EXAMINATION          P. 3.

6               CROSS EXAMINATION                 P. 117

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25