```
 1                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3          THEODORE A. CASE, SALLY YOUNG,
            HOWARD HOLLANDER, PATRICK BRADY
 4          AND MICHAEL FINUCAN, individually
            and on behalf of all others
 5          similarly situated,
                            Plaintiffs,
 6                                              VOLUME 3
                 V.                             TRIAL TRANSCRIPT
 7
            AIR LINE PILOTS ASSOCIATION,
 8
                            Defendant.
 9
                                     CAMDEN, NEW JERSEY
10                                   JUNE 9, 2011

11          B E F O R E:   HONORABLE JOSEPH E. IRENAS
                           UNITED STATES DISTRICT JUDGE
12
                       A P P E A R A N C E S:
13
                TRUJILLO, RODRIGUEZ & RICHARD
14              BY:  NICOLE M. ACCHIONE, ESQ.
                     AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
                GREEN JACOBSON, P.C.
16              BY:  ALLEN PRESS, ESQ.   (MO. BAR)
                AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17              For the Plaintiffs.

18              ARCHER GREINER
                BY:  STEVEN FRAM, ESQ.
19                   AND
                KATZ & RANZMAN
20              BY:  DANIEL M. KATZ, ESQ.
                FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
                ELIZABETH GINSBERG, ESQ.
22              IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3                         S/   LYNNE JOHNSON

4                         Lynne Johnson, CSR, CM, CRR
5                         Official Court Reporter

6

7

8

9

10          LYNNE JOHNSON, CSR, CM, CRR
            OFFICIAL COURT REPORTER
11          UNITED STATES DISTRICT COURT
            P.O. BOX 6822
12          LAWRENCEVILLE, NJ  08648
            PHONE:   609 896 1836

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Okay.  This was the subject of
 2    this hearing right this minute has to do with the proffered
 3    testimony of Sherry Cooper.  And the objections there to
 4    filed by, offered by the defendants which I did receive later
 5    in the day, through email.
 6              Sherry Cooper was apparently a stewardess on TWA,
 7    on international flights, but also a lawyer, apparently.
 8              MR. KATZ:  That's correct, your Honor.
 9              THE COURT:  Had gone to law school and even opened
10    an office of some kind.
11              MR. KATZ:  Yes, sir.
12              THE COURT:  It is not completely clear that, the
13    sequence of events, but she was both 20 years a stewardess,
14    and a lawyer.
15              When, as a result of the previous bankruptcy of
16    TWA, the union's were allowed representation on the board,
17    the union representing the flight attendants got
18    representation, and she I think in 1997 on Ward as a union
19    representative, on the TWA board.  And eventually IMA became
20    the union, it wasn't initially, but become the, at some point
21    in 97, 98, become the union, which is the machinists union,
22    become the union for the flight attendance as well.  I think
23    it was the IAM.
24              Now, the purpose of this testimony appears to be a
25    couple of things.  Number one, the purpose of the testimony
```

1   appears to be to try to prove that that that TWA could have

2   survived as a stand alone company.  It takes two levels.  The

3   first is that it could survive and then ALPA should have

4   taken a tougher stand because if it could have survived it

5   wouldn't have been such a bad thing if American walked away

6   from the deal.  That is the first thing.

7        The second thing it is trying to prove is that

8   American thought this was a jewel, by sticking this trophy

9   acquisition testimony.  That is the second thing, American

10  thought this was a jewel again, for the same inference to be

11  drawn, they could have walked away from the deal or that they

12  wouldn't walk away from the deal if the union had, if ALPA

13  had taken a tougher position.

14       The third purpose of this seems to be to vilify the

15  president of TWA.  I mean the whole series of testimony about

16  how he used the money from Boeing to buy a plane, from air

17  bus, as if somehow the money was earmarked when it came from

18  Boeing, don't use this sum, the money goes into a pot and

19  they made a decision, it seemed like a financial decision, on

20  the airplanes, she puts it in the sense they makes a

21  reference somebody buys something for somebody else's

22  girlfriend.  The idea is to vilify the head of TWA, which

23  talked about firing him and how they were going to fire him.

24  To my knowledge he never was fired.

25       MR. KATZ:  No, he wasn't.

```
 1            THE COURT:  When the acquisition took place, he no
 2    longer had a job.
 3            MR. KATZ:  He stayed on for a while and then --
 4            THE COURT:  In any case, he was not fired.  They
 5    were thinking of firing I am.  You have another purpose, you
 6    have a lot of testimony, pages of it, about when they were
 7    interviewing, well, it wasn't really individuals, an entity,
 8    that was going to come in, through an individual who worked
 9    for that entity.
10            MR. KATZ:  J Alex, a restructuring firm in New York
11    City.
12            THE COURT:  They were going to come in and a woman,
13    Ms. White, was going to, was going to be the co executive.
14    But very cleverly done by Ms. Rodriguez, I might add.  Did
15    they have access to a financial information, trying to create
16    the inference that, well, they wouldn't have agreed to come
17    in if they thought it wasn't a stand alone company.
18            And then there is later testimony that you hire any
19    accountants to evaluate the testimony, evaluate the
20    financials and they said yes.  She said yes, but then we have
21    no -- again, you are trying to draw the inference that they
22    agreed that it would be a stand alone company, we have no
23    idea what they said or what they did or rendered reports.  I
24    am troubled by all of it.
25            I am troubled by some of the parts that that
```

```
 1  weren't objected to.  I find the whole testimony is full of

 2  conjecture, the part about trophies.  Who in American said

 3  that?  Was it done, I think, a person said, although I have

 4  no way of knowing, an equal inference is that it was a joke,

 5  and what they were really doing is mocking TWA's inflated

 6  sense of its own self worth.  And they were using it

 7  mockingly.

 8          Did one person use it?  Did everybody use it?  I

 9  can't tell if she heard it directly from American people or

10  whether she heard it from other people who told her that is

11  what they were doing.  It has nothing to do with her

12  testimony, but she keeps throwing that in very cleverly.

13          This was not, I don't know there, why, you if you

14  want to have her testimony come by tape.  It should have been

15  done by a proper de bene esse, where you question him, they,

16  you do direct, they come in and cross.  This was purportedly

17  a discovery deposition but it was an odd one because she is

18  clearly sympathetic to the pilots, to the union.  She is a

19  union officer.  She was head of her union.  Her testimony is

20  totally sympathetic.  It seems to me, I mean her

21  unavailability, she may technically be unavailable because

22  she is outside the subpoena scope, under 100 miles for

23  subpoenas.

24          But it is pretty clear that the decision not to

25  bring her to court is a tactical one, not one that she is  a
```

1   unwilling to testify.  I mean this thing cries for cross

2   examination.  You can't cross examine her obviously if she is

3   not here.

4           Also, the question of whether TWA could have

5   survived the stand alone entity at that point clearly

6   requires expert testimony.  You know, from an accountant,

7   somebody, who viewed all, had expertise in that area, and in

8   the airline industry particularly, reviewed all the finances.

9   Here she says we were going to get so many millions of

10  dollars from the union in concessions.  First of all,

11  although they were negotiating to some degree, everything

12  would have had to have gone to the membership.  And it didn't

13  go, nothing to my knowledge, went to the membership.

14          MR. KATZ:  They were still negotiating on it.

15          THE COURT:  What?

16          MR. KATZ:  They were still negotiating on that.

17          THE COURT:  Doesn't make any difference.  Even if

18  they reached it, they had to go to the union, she said that,

19  it had to go to the union for ratification.  Then we talk

20  about there had to be investment bankers coming in.  Telling

21  me that George Soros showed interest in it, or that G E

22  Capital or other people interest.  Yeah, so did Carl Icahn.

23  And who knows what kind of interest, what terms, what

24  conditions, they would have had.  I mean it is speculation as

25  to whether, what they would have put in or not.

1          The bottom line is, I don't want to sit here and

2   argue for the next two hours over it.  I am not going to eat

3   into the jury's time.  Don't put this on today.  At 2:15 we

4   will have a hearing.  I will give everybody a chance.  I

5   wanted to say what I wanted to say.  I wanted you to know

6   where I am coming from.

7          Very troublesome very troublesome she is not here.

8   It is hard to believe that she wouldn't come.  It has the

9   smell of a tactical decision rather than a true

10  unavailability.

11         MR. PRESS:  Judge.  Miss Rodriguez had the contact

12  with Ms. Cooper.  I think if she was here.

13         MS. RODRIGUEZ:  I am here.

14         MR. PRESS:  Can you address the unavailability

15  issue?

16         THE COURT:  You have one minute.  I am going to

17  deal with that this afternoon.

18         MS. RODRIGUEZ:  I just know that she was.

19         THE COURT:  She is a friend.

20         MR. PRESS:  No, she is not.

21         MS. RODRIGUEZ:  She was not particularly, there are

22  reasons that she is not particularly --

23         THE COURT:  You think this testimony is not

24  friendly testimony.

25         MS. RODRIGUEZ:  She is not a friend of the pilots,

```
 1   your Honor.  There shall issues -- she certainly is an
 2   advocate for our position.  There are issues that --
 3           THE COURT:  You better believe she is an advocate
 4   for your position.
 5           MS. RODRIGUEZ:  There are issues that make her not
 6   available for us to bring her into court that are not
 7   tactical issues to bar her from coming in to court and not
 8   being subjected to cross examine.
 9           THE COURT:  Why wasn't it done as a de bene esse.
10   We do that all the time in this Court.  We have doctors that
11   don't want to show up because just because they are doctors.
12   We take a de bene esse.  Direct is on port.
13           MR. JACOBSON: Your Honor, she was cross examined at
14   the deposition.  Federal Rules only  provide for one type of
15   deposition.  She was deposed.  They cross examined.
16           THE COURT:  You make a valid point.  I actually
17   submitted a proposal to the rules committee to distinguish
18   twin de bene esse depositions and discovery depositions, they
19   are different animals, have different considerations.  I
20   wrote a whole long report which was taken up by the poobahs,
21   but since most of them don't know anything about trying
22   cases, they turned it /OUPB down.
23           But I don't want to eat into the jury's time with
24   argument.  A six-week trial, she can go on the next day or
25   the day after if I allow it.
```

1          MR. JACOBSON: Your Honor, it was possibly a one-

2     hour deposition.  We may actually then finish a little

3     earlier than two o'clock today.

4          THE COURT: No, no.  You got to have witnesses.

5     Folks, you told me this is going to be a six to eight week

6     trial.  You don't parse it down to try to get them in.  You

7     keep extra witnesses here.  I am telling you right now, you

8     are not going to railroad me into eating into the jury's time

9     now, and to give you argument.  I want to give you argument.

10    I want to give you argument on all these things.  But I can't

11    do it now because I would be eating into the jury's time.  We

12    are going to do it at 2:15, 2:20  this afternoon.  And you

13    can put this on the next day.  But for the future, I never

14    want to hear that you have run out of witnesses.  You have a

15    list of, if somebody has to stay an extra day, then they have

16    to stay an extra day.

17         I am not going to eat into the jury time with legal

18    argument.  You better believe that.

19         MR. JACOBSON: Your Honor, we understand.  We had a

20    set of objections they made to the pretrial, and these are

21    new objections we addressed the objections they made in the

22    pretrial.  We removed huge chunks of testimony --

23         THE COURT: We will argue all of that.  That may be

24    a valid point.  I don't know.  We will argue it not on the

25    jury time.  We will argue it, I will give you, I do have some

```
 1    motion I think this afternoon that may take a short time.  I

 2    will be here all afternoon, as long as you need.  I will give

 3    you a chance to argue it.

 4              THE COURT:  Bring the jury in.

 5              (Jury enters the courtroom)

 6              THE COURT:  Good morning, everybody.  Please be

 7    seated.  -+

 8              Mr. Case, will you please take the stand.

 9    A.   Yes, sir, your Honor.

10              THEODORE CASE, resumes.

11              REDIRECT EXAMINATION

12              BY MR. PRESS:

13              THE COURT:  Redirect, please.

14              MR. PRESS:  Thank you.

15    Q.   Mr. Case, I want to follow up on a few of the points

16    that Mr. Fram talked to you about.  Starting with the Bond

17    bill, the legislative effort that you had?

18    A.   Yes, sir.

19    Q.   Mr. Fram characterized the bill as special legislation.

20    A.   Yes, sir.

21    Q.   Who was that designed to protect, whose interests,

22    special interest he called it, special interest legislation?

23    A.   The special interest was to protect the TWA pilots, the

24    ALPA TWA pilots.

25    Q.   In your opinion, is there something wrong with that?
```

1    A.    No, sir, not at all.

2    Q.    You were characterized as a rookie lobbyist, rookie was

3    the phrase Mr. Fram used?

4    A.    Yes, sir, ways a rookie.

5    Q.    What significance did that play in the actions you took

6    with your union?

7    A.    That is why I asked for their help, because I had no

8    experience and they were getting some traction with the

9    senators, just with our grass roots efforts.  We actually

10   once again got the bill passed in the Senate without any help

11   whatsoever.

12   Q.    Now, I want to talk about the April 2 MEC meeting where

13   the scope waiver occurred?

14   A.    Yes, sir.

15   Q.    And there was a lot of testimony about Roland Wilder?

16   A.    Yes, sir.

17   Q.    Mr. Fram asked you if Mr. Wilder changed his opinion in

18   that meeting?

19   A.    Yes, sir.

20   Q.    Remind the jury how long that meeting was?

21   A.    That meeting lasted approximately, I think a little over

22   eight and a half hours.

23   Q.    At what point in the proceeding did Mr. Wilder change

24   his opinion?

25   A.    It was very late in the day, as Mr. Wilder was picking

1   up his bag to leave.  Actually, if I am absolutely certain

2   about it, Mr. Wilder left the meeting a little bit early.

3   And as he was picking up his bags to leave, what he said was,

4   I guess any contract is better than no contract.  And one

5   thing, caveat that he did add that I didn't yesterday, he

6   said, if you are going to waive, don't do it today.  Wait

7   until I am standing on the courthouse steps.

8   Q.   Mr. Fram asked you if Mr. Wilder was distraught.  You

9   agreed that Mr. Wilder was distraught?

10  A.   Yes, I did.

11  Q.   Can you expand upon that?

12  A.   He looked, Mr. Wilder is a very polite gentleman, and he

13  looked extremely disappointed, to the point of disgusted as

14  he picked up his bags and was departing.

15  Q.   Mr. Fram talked that there were six other lawyers in the

16  room besides Mr. Wilder?

17  A.   Yes, sir.

18  Q.   I think that was the number?

19  A.   He said eight.  There were six.

20  Q.   Of all the lawyers in the room who was the one lawyer

21  who had any experience in negotiating a seniority integration

22  with another airline?

23  A.   To the best of my knowledge, only Roland Wilder, our

24  merger counsel.

25  Q.   To the best of your -- who among the seven lawyers in

1    the room who was the only one that was negotiating for you,

2    seniority integration?

3    A.   Roland Wilder.

4              MR. PRESS:  That is all I have.

5              THE COURT:  Recross.  But limited to the scope of

6    direct.

7              MR. FRAM:  No recross, your Honor.  Thank you.

8              THE COURT:  Okay.  Thank you.

9              THE WITNESS:  Thank you, your Honor.

10              (Witness excused)

11              THE COURT:  Call your next witness.

12              MR. PRESS:  Our next witness is going to be by

13    video deposition, Judge.

14              THE COURT:  Okay.  Tell me who it is.

15              MR. PRESS:  I am sorry?

16              THE COURT:  Tell me the name.

17              MR. PRESS:  Jalmer.  J A L M E R, Johnson.

18              THE COURT:  Jalmer.  Last name?

19              MR. PRESS:  Johnson.

20              Can I give a brief instruction to the jury about

21    the videotapes..

22              THE COURT:  Ladies and gentlemen, under our

23    practice under certain circumstances, evidence can be

24    presented from, by videotape.  It is sworn testimony, meaning

25    the witness is taking the oath to tell the truth and you

1  should give it the same weight that you give testimony that

2  comes from the witness, live from the witness stand.  Don't

3  give it any more weight, don't give it any less weight, just

4  because it is coming to you through the miracle of

5  electronics.

6          It is entitled to the same weight as live

7  testimony.

8          Okay.

9          MR. PRESS:  I am sorry.

10          THE COURT:  Introduce it, tell the jury.

11          MR. PRESS:  We are going to play an excerpt or a

12  few excerpt from a deposition we took of Jalmer Johnson, the

13  general manager of ALPA.  We videotaped his deposition in

14  Washington, DC, and we want to show that to you now.

15          (Videotape deposition of Jalmer Johnson is played

16  for the jury)

17          MR. PRESS:  Judge, we would like to move the

18  exhibit of plaintiff's 113.

19          THE COURT:  Is that a plaintiff's exhibit?

20          Any objection?

21          MR. FRAM:  No objection.

22          THE COURT:  Plaintiff's 113 is in evidence

23          (VIDEOTAPE Continues)

24          MR. PRESS:  That is the end of the excerpts from

25  Mr. Johnson's deposition.  Our next witness is another

```
 1    deposition that we want to show, Stephen Tumblin.

 2              THE COURT:  Let me --

 3              MR, KATZ:  Your Honor, objection to that.  They

 4    haven't been addressed.

 5              THE COURT:  All right.  Let me send the jury out.

 6    We will take a look at that.

 7              Ladies and gentlemen, we are going to take a short

 8    break.  I don't want to have, I don't want to be at sidebar

 9    and have you sitting here.  You might as well walk to the

10    jury room.

11                  (Jury leaves the courtroom)

12              THE COURT:  Okay.  Is there something I can look

13    at?  Where is it, in the final pretrial order?

14              MR. KATZ:  No, your Honor.  They modified the

15    portions of the Tumblin deposition that they intended to show

16    from the joint pretrial order.

17              THE COURT:  So you had no objection to what was in

18    the joint pretrial.

19              MR. KATZ:  Yes, we did have objection to that.

20    Those are in the pretrial order.  This is a different

21    document --

22              THE COURT:  You don't have a page number.

23              MS. RODRIGUEZ:  Do you have a page number?

24              MR. JACOBSON: The changes were deletions the

25    sections.
```

1          MR. KATZ:  There are an also additions we wanted

2     and we have been corresponding about this.  They gave us

3     revised objections, revised designations, and that was

4     earlier this week.  Like on Monday night.  And yesterday we

5     gave them our response.  I have offered to discuss them with

6     them and they haven't responded to what I gave them last

7     night.

8

9          MR. KATZ:  Tumblin is a lawyer in Salt Lake City.

10    We had items we thought should be added to the deposition.

11    For instance, he described in his deposition what his

12    recollections were of the meeting of April 2 where he was

13    present, and they didn't have that as designated as part of

14    the clip.  It makes sense to show one clip with his

15    recollection of the meeting, as well as what they wanted to

16    show.

17          They have one section of what he wanted to, of what

18    he remembered about discussions of the right to strike, which

19    was discussed in the April 2 meeting and they left out other

20    portions of his discussion of the right to strike.  So we

21    wanted to have the complete recollections that he had of the

22    discussion of that issue at the meeting.

23          They have also added exhibits that they wanted to

24    include in this, and we have objections to many of those.

25          MR. JACOBSON:  Your Honor, some of the statements

1    made are inaccurate.

2            THE COURT:  Where?  I can't find, where is all this

3    discussd in the final pretrial.

4            MS. RODRIGUEZ:  In exhibit D, your Honor, exhibit D

5    to the joint final pretrial order.

6            THE COURT:  Is page 56, Stephen Tumblin.

7            MR. JACOBSEN:  Page 17 of 56, document 348-4 on the

8    docket.  Exhibit D to the final pretrial order.

9            THE COURT:  How can I rule on this?  Do you have a

10   copy of what it is you propose to put in?

11           MR. KATZ:  I suggest we do what we did with Ms.

12   Cooper, have the plaintiff's prepare a transcript of what

13   they propose to put in.

14           MS. ACCHIONE:  I have a transcript.

15           MR. KATZ:  I haven't seen it.

16           MS. ACCHIONE:  I sent it via email.

17           MR. KATZ:  I don't have that, Nicole.

18           THE COURT:  Give it to me.

19           MR. KATZ:  We after objection to page 33, lines --

20           THE COURT:  Just a minute.

21           MR. KATZ:  Page 33, lines 1 to 25, your Honor, this

22   is a discussion of an email, with a petition concerning

23   Michael Glanzer's proposed fee.  Totally hearsay as to what

24   Glanzer expected to receive as a success fee, which is why

25   they want to put it in.  They want to show Mr. Glanzer's

1  advise was colored by his anticipation of a large success

2  fee.

3         MR. JACOBSON:  He denied he had a success fee.  It

4  was a $2.5 million document requested for in the ALPA

5  document that was prepared, we believe, by Mr. Tumblin,

6  certainly was sent by Mr. Tumblin, then why did he lie about

7  it?

8         MR. KATZ:  Mr.  Glanzer was deposed.  He has been

9  subpoenaed for the trial.  And he has been served.  The fact

10  is if they want to prove something that was in Mr. Glanzer's

11  mind they can't do it via email from Mr. Tumblin to the

12  lawyer for TWA.  That is my objection.  It is totally hearsay

13  with respect to whatever Mr. Glanzer -- they didn't get Mr.

14  Glanzer to admit that his advice to the MEC was colored by

15  his anticipation of a large success fee.  Now they want to go

16  through a round about back door to achieve the same thing.

17         THE COURT:  Was there an agreement allegedly

18  between Glanzer and ALPA for that fee.

19         MR. KATZ:  No.  There was a written agreement he

20  was questioned about at his deposition.  It did not mention

21  2.8 million dollars success fee and he denied that he was

22  anticipating that amount.  It wasn't, that wasn't the amount

23  that was actually requested by the court and approved by the

24  court.  He was paid $200,000 pursuant to a petition --

25         THE COURT:  These adviser fees in the plural, was

```
 1    in 2.8 million just for Glanzer.

 2              MR. JACOBSON:  Yes.

 3              THE COURT:  He got 200,000.

 4              MR. JACOBSON:  Yes, he did not get the fee ALPA was

 5    initially requesting for him.

 6              MR. KATZ:  He got 200,000.  ALPA was reimbursed for

 7    that through the bankruptcy court process as part of the

 8    petition --

 9              THE COURT:  What is --

10              MR. KATZ:  Next one is 39, 23 through 40, 10.

11              THE COURT:  Through 40, 10.

12              MR. KATZ:  That's correct.  This is the email

13    reply.  In any event, it is another email.  It doesn't show

14    what Mr. Glanzer's expectation was.

15              THE COURT:  What was the email?

16              MR. JACKSON:  Jack it was an email from Mr. Tumblin

17    to others asking nor the justification of the reasonableness

18    of 2.8 million dollars request on behalf of Mr. Glanzer.

19              MR. KATZ:  It is reporting on what the lawyer for

20    TWA said to Mr. Tumblin.

21              MR. JACOBSON:  It is Tumblin's request for --

22              THE COURT:  In all this massive paper, if Glanzer

23    was entitled to a fee based on the American deal going

24    through, that is what a success fee would be, that would be

25    in writing somewhere.  Is there any document that contains
```

1    that?

2          MR. KATZ:  There is a written contract.

3          MR. JACOBSON:  There is.

4          THE COURT:  That says that.

5          MR. KATZ:  No.

6          MR. PRESS:  It has a formula for computing the

7    success sheet and was based upon the total value of the deal.

8          THE COURT:  You use the word success fee.  Success

9    fee means he wouldn't have gotten paid if the deal hadn't

10   gone through.

11         MR. PRESS:  That is the way they deal.

12         THE COURT:  Is that what it was?

13         MR. PRESS:  Yes, it was a contingent fee.

14         THE COURT:  That is being introduced.

15         MR. PRESS:  No, we did not plan to introduce the

16   agreement.

17         MR. KATZ:  They tried to prove 2.8 million dollars

18   from an email from the TWA lawyer to Steve Tumblin asking a

19   question.  It doesn't prove anything about Glanzer's

20   expectation.  They have Glanzer's contract.  It doesn't say

21   2.8 million.

22         THE COURT:  What is the next area of objection?

23         MR. KATZ:  40, 12 where the witness answers and

24   says I believe that is correct.  That goes with the previous

25   one.  The next one is 91, 4.  Page 91, line 4.  Through 92,

15.

MR. JACOBSON:  First of all this objection was not made in the pretrial.  This is a new objection.

MR. KATZ:  It was a new exhibit they are trying to offer.  MR. JACOBSON:  Same testimony that was in the pretrial and wasn't objected to.

MR. KATZ:  The plaintiffs tried to add a new exhibit and testimony, your Honor.

MR. JACOBSON:  That is not a factual statement.

MR. KATZ:  They are asking about a document with an unknown author.

THE COURT:  What is 232?

MR. KATZ:  232 is a draft by an unknown person at Loboef.

MR. JACOBSON:  It was a document from the man's law firm of an outside line for the chairman, Bob Pastore to be given at the bankruptcy hearing.  Mr. Pastore will testify he he wasn't shown it and part of the proposed testimony is you are aware that if the Court rejects your -- accepts the 1113, then you have a right to strike.

And there is going to be plenty of evidence that Mr. Pastore and the others weren't aware of that and we think that is part of the problem here is that the lawyers and advisors are telling the Court and they are aware that that there is at least a credible right to strike but they are not

1    sharing that with the MEC members.  In fact, when asked that

2    at that April second meeting they say you most probably don't

3    have any right to strike.  That is I think evidence of the

4    misinformation that is being given that helped corrupt this

5    hole process persuading the MEC members to vote to waive

6    scope.

7         MR. KATZ:  Judge Irenas, this portion of the

8    deposition and this document and exhibit, the witness says he

9    doesn't know who drafted it.  He does talk about the

10   discussion of the right to strike in other portions of his

11   deposition.  And recites what he remembers of the discussion

12   about the right to strike at the April 2 meeting.

13        MR. JACOBSON:  He does describe the document as one

14   produced by his law office.  He recognizes the coding on the

15   left, that it comes from their file.  He says he doesn't know

16   which lawyer prepared it but this was an outline intended for

17   Bob Pastore.

18        THE COURT:  Who prepared it?  What was it prepared

19   for?

20        MR. JACOBSON:  It was prepared for the bankruptcy

21   hearing.

22        THE COURT:  Yeah, but I mean, some law clerk could

23   have prepared, to start with, maybe it was something that was

24   going to be reconsidered.  Just an undated, untimed, no

25   testimony backing it up.

```
1            MR. JACOBSON:  It is dated.

2            THE COURT:  Somebody made a suggestion that --

3            MR. JACOBSON:  Jack it is dated April 5.

4            MR. KATZ:  The witness said he didn't see it.

5            MR. JACOBSON:  He said he didn't recall.

6            MR. KATZ:  He didn't remember it, he didn't draft

7    it.  It is not admissible testimony or exhibit.

8            THE COURT:  What is the next objection.

9            MR. KATZ:  Page 107, line 21, your Honor.

10           THE COURT:  To what.

11           MR. KATZ:  To 108, 9.  Same kind of thing.

12           THE COURT:  What is it.  Through 108, 9.

13           MR. KATZ:  It is an email to the witness.

14           MR. JACOBSON:  Your Honor, this is not an objection

15   that was made in the pretrial.  This is a new objection given

16   to us I think last night for the first time and the pretrial

17   order has, if the pretrial order has any teeth to it the

18   objection is supposed to be made then so everyone can deal

19   with it.

20           MR. KATZ:  They made plenty of changes to the joint

21   pretrial order.

22           MR. JACOBSON:  We are not making new objections to

23   things that have been on there for a long time.

24           THE COURT:  What is the document?

25           MR. JACOBSON:  I am sorry, your Honor.
```

```
 1              THE COURT:  What is this document?  I read this, it
 2   doesn't tell me anything.
 3              MR. JACOBSON:  It is a document that is listing
 4   points of changes in the proposed transition agreement from
 5   the existing collective bargaining agreement.
 6              MR. KATZ:  This was sent to this witness.  He
 7   didn't create it.
 8              THE COURT:  Who is Barbara Flynn?
 9              MR. KATZ:  She is a secretary at the MEC offers.
10              THE COURT:  At what office?
11              MR. KATZ:  The MEC office in Saint Louis.  We will,
12   ALPA will produce a witness who will talk about this
13   document, a witness who knows what it was and had something
14   to do with it.  But Mr. Tumblin was not, either, he didn't
15   have anything to do with it other than receiving it.
16              THE COURT:  What is the next one?
17              MR. KATZ:  112, 3 to 7.  Total lack of foundation
18   for this witness to talk about the flight pay loss bank.  He
19   wasn't involved in that:  That goes with 112, 9 to line 12.
20              MR. JACOBSON:  That goes with the prior document.
21   That is one of the points in the prior document.  He is asked
22   you as the lawyer here for TWA MEC, do you know why, he said
23   I knew once, I don't remember.
24              MR. KATZ:  He says I don't have any specific
25   recollection.
```

```
 1              THE COURT:  What is next?

 2              MR. KATZ:  122, 18, to 123, 10.

 3              THE COURT:  You basically all the stuff you didn't

 4    object to at the pretrial you decided to start objecting to.

 5              MR. JACOBSON:  Yes.

 6              THE COURT:  122, 18, to what?

 7              MR. KATZ:  123, 10.    We object to all these

 8    emails.  We did object to them.

 9              THE COURT:  What is it about this --

10              MR. KATZ:  This is about the fee request and the

11    flight pay loss bank.

12              THE COURT:  Fee request from Mr. Glanzer?

13              MR. KATZ:  It is an email from another person to

14    Tumblin.

15              MR. JACOBSON:  From Mr. Holtzman to Tumblin.  How

16    do we explain to the Saint Louis MEC why we are applying for

17    2.1 million dollars for Glanzer if we are not applying for

18    them to get the rough value of the $9,000 flight bank.  He

19    suggests an answer how to mollify the pilots by saying the

20    flight lost pay is estimated.

21              MR. KATZ:  They are trying to put in a big number

22    to show Mr. Glanzer's conflict of interest because of a large

23    fee.

24              MR. JACOBSON:  It goes to show Mr. Holtzman is the

25    ALPA employed attorney and it goes to show that ALPA's
```

```
 1   concern at this point in the bankruptcy of getting money back

 2   is to get money for advisors and not for the MEC who were

 3   creditors and had given up approximately one million dollars

 4   value of the 9,000 hours.  ALPA is going to apply for the

 5   investment bankers fee but are for the 9,000 hours.

 6             THE COURT:  A creditor is different.

 7             MR. KATZ:  We are going to have a witness, you got

 8   more --

 9             THE COURT:  You got more?

10             MR. KATZ:  Just a couple more.  125, 15, to 20.

11             THE COURT:  So far you haven't missed one.  There

12   is one another another.  After.

13             MR. KATZ:  Part of the same entry.  It it is just a

14   little later in the back and forth.

15             THE COURT:  This.

16             THE COURT:  He says he doesn't know.

17             MR. JACOBSON:  He doesn't know whether he played it

18   or not.

19             MR. KATZ:  Last one is page 143, 19.

20             THE COURT:  Page what.

21             MR. KATZ:  143, 19, to 144, 6:  It is total hearsay

22   speculation.  There is no foundation for any of this.

23             THE COURT:  To 144 1 4, 6?

24             MR. KATZ:  That's correct.

25             MR. JACOBSON:  These were not objected to in the
```

 1    pretrial, your Honor.  I think it is pretty significant that

 2    one of the advisors says yes, they were relying on us,

 3    advisors.

 4         MR. KATZ:  Total speculation for this witness to be

 5    talking about that.

 6         MR. JACOBSON:  I think as an ordinary lay

 7    observation and lay opinion that this guy who is advising

 8    them is saying that yes, the people I am advising appears to

 9    be relying on my advice, they don't appear to be experts.

10         MR. KATZ:  How would this witness into?

11         MR. JACOBSON:  Standard lay opinion.

12         MR. KATZ:  Judge Irenas, we also have four entries

13    that we counter designated that should have been included, if

14    we are going to show a video of this witness it seems to me

15    there ought to be one video where the information is given to

16    the jury as to what he testified.  They have shown part of

17    his testimony about the discussion of the right to strike,

18    and left out other portions of his testimony where he goes

19    into greater detail about the same discussion at the April

20    2nd meeting.

21         MR. JACOBSON:  I don't believe it is the same

22    discussion.  These are not completeness type designations and

23    certainly it is not unusual for a deposition to, when one

24    party place a part of the deposition or uses part of a

25    deposition under the Federal Rules the other side has the

```
 1   right to use any other part of that deposition in their case.

 2   I don't think we are required to put on their case in our

 3   case, your Honor.

 4           MR. KATZ:  It is certainly, these are certainly

 5   proper completeness designations.

 6           THE COURT:  Completeness is not really the standard

 7   for offering this.  It is only if it is misleading, not if it

 8   is incomplete.

 9           MR. KATZ:  That is exactly our point, it would be

10   misleading without the sections of the deposition that also

11   cover the same issue.

12           MR. JACOBSON:  In addition, I would note the last

13   two of these additional designations they have were not

14   mentioned in the pretrial order, and the first two were

15   mentioned as supplements to sections that we have removed

16   from our portion.  So they were supplementing portions that

17   we aren't using any more.  They certainly can use it in their

18   part of the case, but we have removed the part that they were

19   supposed to be supplementing.

20           THE COURT:  Is that true?

21           MR. KATZ:  No, your Honor.  It is not.

22           THE COURT:  It is what?

23           MR. KATZ:  130, line 13, talking about the right to

24   strike.  And what the witness remembered about discussions

25   concerning the right to strike.  That is still part of the
```

```
 1    tape that they want to show.

 2              THE COURT:  Where in the pretrial order are the

 3    designations and the counter designations.

 4              MS. RODRIGUEZ:  In exhibit D.

 5              THE COURT:  Do I have that?  Do you have it?  Does

 6    somebody have it.

 7              MR. JACOBSON:  We have a hard copy of it, your

 8    Honor.

 9              THE COURT:  Can I have a hard copy of it?

10              THE COURT:  Was a motion for two million eight all

11    actually filed in the bankruptcy court?

12              MR. PRESS:  Yes.

13              THE COURT:  You, it is referred to here as a draft

14    motion.

15              MR. PRESS:  I don't know.

16              MR. KATZ:  It referred did a draft motion.  There

17    was an actual motion.

18              MR. PRESS:  Judge, I am not so clear on that.  I

19    don't want to mislead you.  I don't know.

20              THE COURT:  Was it actually filed in the bankruptcy

21    court.

22              MR. PRESS:  There was a motion filed.  I am not

23    going to represent how much it was for.  I don't know.

24              MR. KATZ:  The motion to reimburse ALPA for

25    expenses.  Is that what you are asking about?
```

```
1          THE COURT:  Here this is a draft motion, which are
2   going to ask for Glanzer for two million eight for financial
3   advisory services.  They describe it as a draft motion.
4          MR. KATZ:  That is what it was.  The motion asked
5   for $965,000, the Court -- TWA consented to that.  The
6   bankruptcy Judge approved that.  That amount was paid, and
7   was used to reimburse ALPA for the expenses it had initially
8   paid for in terms of services by Tumblin, Glanzer, Richard
9   Seltzer and others.  With the amount was $965,000, the final
10  application.
11         MR. JACOBSON:  Ultimately, your Honor, the question
12  isn't necessarily what was ultimately asked for by the court
13  but what the expectations were, how that might have infected
14  this process and through the drafts we see, exceeded the
15  expectation, at least at that early stage it appears to be
16  two point eight million dollars for Mr. Glanzer.  That is
17  different than as you mentioned yesterday, Mr. Wilder has an
18  expectation of fees.  Getting an hourly fee is different than
19  getting two point eight million.  It is a different kind of
20  expectation.
21         THE COURT:  Is Glanzer going to testify?
22         MR. KATZ:  Yes, he has been subpoenaed and served
23  and is on our witness list.  They asked him about that at the
24  deposition.  They don't like the answers they got, so they
25  are trying to prove Glanzer's expectations through an email
```

```
 1   from -- with an email between Tumblin and a lawyer for TWA.
 2   I think that is improper.
 3           We should be able to add four short clips we
 4   notified the other side about, in fairness, that discuss Mr.
 5   Tumblin's recollections of discussions about the right to
 6   strike and other advise that was given at the MEC meeting on
 7   April 2.  They include some of that, but not other portions
 8   that they don't like.
 9           THE COURT:  You can ask other witnesses to explain
10   this.  The jury is not going to have any idea who Barbara
11   Flynn is.  How are they going to know who they are?
12           MR. JACOBSON: Not all the evidence comes in at
13   once.
14           THE COURT:  The question is, you understand that.
15           MR. JACOBSON: Yes.
16           THE COURT:  What are the plaintiffs trying to prove
17   about the email from Barbara Flynn?
18           MR. PRESS:  Your Honor, it is a list.
19           THE COURT:  13 things.
20           MR. PRESS:  Yes.  13 things waived in the
21   transition agreement that were not required by the asset
22   purchase agreement.  These were extra concessions ALPA made
23   for no consideration that were, that wasn't even required to
24   close the sale.
25           THE COURT:  This was not in the April 2 waiver.
```

```
 1    This was in the transition agreement.

 2             MR. PRESS:  Correct:

 3             MR. KATZ:  This witness had no knowledge of that.

 4             MR. PRESS:  We just want to authenticate the

 5    document.

 6             MR. KATZ:  We will have a live witness who is

 7    familiar with the document.

 8             MR. JACOBSON: That is not our case.  We will

 9    authenticate it in our case.  You.

10             THE COURT:  Barbara Flynn didn't prepare the

11    document.

12             MR. JACOBSON: No, she is the center of

13    communications at the TWA MEC.

14             MR. PRESS:  She was Mr. Holtzman's secretary,

15    Judge.

16             MR. KATZ:  This is not an ALPA document.  ALPA

17    didn't create this document, Judge.

18             MR. JACOBSON: The TWA MEC is part of ALPA.

19             THE COURT:  Whose, who created this document?

20             MR. PRESS:  I don't know that.  Mr. Tumblin

21    authenticated it, that yes, this is a list of things that we

22    gave up.

23             THE COURT:  Doesn't he say he has no recollection?

24             MR. PRESS:  If Mr. Katz says that there is going to

25    been a witness that testifies about it --
```

```
 1              THE COURT:  He says he has no recollection.

 2              MR. PRESS:  I am suggesting perhaps we can

 3    stipulate to its admissibility and we don't have to play

 4    that, Judge.

 5              If Mr. Katz is going to use it through 1 of his

 6    witnesses it seems to me it should be a joint exhibit and we

 7    don't need to play that excerpt from the dep.

 8              THE COURT:  If he is going to to use it -- all

 9    right.

10              MR. KATZ:  Let me talk to co-counsel about that.

11              MR. JACOBSON: Your Honor, while they are talking

12    there are a number of other depositions down the road.  There

13    were a fair number of objections made.  We have withdrawn,

14    had taken the laboring oar and withdrawn substantial portions

15    of the especially deposition designations in response to

16    objection.

17              The new objections seem to be springing up like

18    mushrooms out of the rain.  We need to get a process so we

19    are not taking up jury out of here.

20              THE COURT:  Between the two of you the jury would

21    be in the jury room forever.

22              MR. JACOBSON: We can't do it that way.  We have to

23    not waste their time.  We suggest that we have a session with

24    the Court after one of these court days when the Court is

25    available so we can go through it.  The Roland Wilder
```

```
 1    deposition alone is a three-hour deposition.   There were many

 2    objections with withdrew portions of it.  We were told that

 3    the defendants would be removing their objections, except as

 4    to hearsay, they are removing foundation and, foundation and

 5    relevancy once.  And so we thought we would be dealing with a

 6    much reduced set of objections, but we don't seem to be.  And

 7    we want to be able to get these resolved in a way that is not

 8    interfering with jury time.

 9            MR. KATZ:  Your Honor, we got this three-hour tape

10    of Wilder's designations as provided by the plaintiffs just

11    yesterday.

12            MR. JACOBSON: We didn't add anything, your Honor.

13    We only removed things.  So the objections that they had

14    before, we responded to most of them by removing the portion

15    they found offensive.

16            MR. KATZ:  With regard to Wilder, there are a

17    number of counter designations that ALPA needs to put in,

18    based on what is in, what plaintiff's want to show.  We are

19    happy to have a session with the Court to discuss these

20    matters.

21            But I think that this afternoon should be limited

22    to Cooper and perhaps Tumblin.

23            MR. JACOBSON: I think we have just used a lot of

24    time with Tumblin.  I think the Judge is going to tell us to

25    play.  We can put on Mr. Altman while the videographer makes
```

1    the changes.

2             MR. FRAM:  Counsel asked if we would stipulate to

3    P-237.  I don't think we have a problem with that.  We can

4    make that a joint exhibit.  We will just agree it can go into

5    evidence.  That doesn't mean that certain witnesses can

6    testify about it, but as to the document we do not contest

7    that, we do not contest its admissibility.

8             THE COURT:  The word success is not used anywhere

9    in the tape, is it?  I didn't see it used, in what you

10   offered.  He got a fee for advisory services.

11            MR. JACOBSON: I don't recall it being used.  I can

12   double check here.

13            Your Honor, I don't see the phrase used in the

14   excerpts we have designated.  Sometimes people like to be

15   overly delicate in talking about contingency fees.

16            THE COURT:  Nothing here tells me it is a success

17   fee as opposed to just an advisory fee.

18            MR. JACOBSON: Right.

19            THE COURT:  I mean if Glanzer was ALPA's adviser,

20   right?

21            MR. KATZ:  No, he he was retained by the MEC in

22   April, two --

23            THE COURT:  That is ALPA's, the union side.

24            MR. KATZ:  Yes.

25            THE COURT:  He wasn't adviser on the transaction

1    itself.  I see a success fee, if you are a financial adviser

2    to one of the parties to a transaction --

3              MR. JACOBSON: Part of his job as the ALPA financial

4    adviser was to seek out other merger partners and to help

5    bring potential deals to the table.  The union pays --

6              THE COURT:  You have to look at the contract in the

7    context of success fees.

8              MR. JACOBSON:  As you can see from Ms. Cooper's

9    deposition the union representatives were highly involved in

10   attempting to restructure and change the company moving

11   forward.  Ms.  Cooper's union was single largest shareholder

12   in TWA, Inc., and like all good owners, took an active role

13   in their business.

14             MR. KATZ:  I believe Ms. Cooper.

15             THE COURT:  237 is the one you are talking about?

16             MR. KATZ:  Yes.

17             (Pause)

18             THE COURT:  Man, this is thin.

19             All right.  Here is what I am going to do for this

20   one.

21             I am going to overrule the objection to 33, 1, to

22   33, 25.  I am going to overrule the objection as to 39, 23,

23   to 40, 10.  I am going to sustain the objection to 91, 4, to

24   92, 15.  That, by the way, is the draft examination from an

25   unspecified source.  I am not going to let you use take a

1    draft from a lawyer, we don't know who he is, the purpose he

2    wrote it for, whether it was used -- I mean, I see no basis

3    for its admission.

4            I am overruling the objection from 107, 21, to 108,

5    9.  And likewise, with the same one, from 112, 3, to 112, 12.

6    Overruling the objection.

7            I am sustaining the objection to 122, 18, 123, 10.

8    That has apparently trying to juxtapose the 2.5 million which

9    in fact was never paid with the flight bank.  What probative

10   value that has I can't see.  And it opens up legal issues as

11   to the status, as to whether they appear in bankruptcy court

12   with the same status.  Maybe there is a valid reason why one

13   is not covered and the other is.  And I, and likewise,

14   sustain the objection to 125, 15, to 125, 20, which is the

15   same issue.

16           I am going to overrule the objection to 143, 19, to

17   144, 6.

18           MR. KATZ:  Your Honor, counter designations --

19           THE COURT:  I am not finished.  What did you say.

20           MR. KATZ:  I said I am sorry.  I didn't mean to

21   interrupt you.

22           THE COURT:  I haven't finished yet on the question

23   of additions.

24           Because the testimony is so thin and we are getting

25   into areas that the witness really doesn't know anything

```
 1   about, or knows very little about, other than a particular
 2   communication to a document and because I think the potential
 3   for confusing the jury is great on this testimony, we are
 4   really far afield in the issue of -- well, you say Glanzer
 5   had self interest.  He doesn't have a self interest to get
 6   paid for his services.  Whether he has a success fee based
 7   specifically on something happening or he doesn't get it if
 8   it doesn't happen, nothing in this testimony says that.
 9             I am going to allow the counter designations.
10             MR. KATZ:  Thank you, your Honor.
11             THE COURT:  It gives a fuller picture of what went
12   on with this witness.  I think it eliminates some of the
13   confusion.  So that is my ruling.
14             MR. KATZ:  Thank you.
15             THE COURT:  You need time to put it together.
16             MR. JACOBSON:  As a technical matter, they have the
17   same system.  Our guy is working on eliminating the portions
18   you indicated were sustained.  If it is possible, could their
19   people have their clips cued up and they play theirs right
20   after ours?
21             THE COURT:  I overruled the objections.
22             MR. KATZ:  He is going through and eliminating the
23   ones you sustained.  If they could put together their clips,
24   they can play ours and we could play ours.
25             MR. FRAM:  We don't have the technical people here
```

```
 1    to do that.

 2              MR. JACOBSON:  I thought you did.

 3              THE COURT:  I can read it.

 4              MR. KATZ:  Four segments that we have given him in

 5    an email last night.  I am not sure the Court has.  I have

 6    them here on my computer.

 7              THE COURT:  I have the ones that I read.  I don't

 8    want any that I haven't read.

 9              MR. KATZ:  I am not sure.

10              THE COURT:  I have read, I am allowing page 81,

11    line 1, through 85, line 25:  Actually, line 24.

12              Page 86, line 1 through 88, line 24:  Page 130,

13    line one through 135, line 21.  The last one, I think it is

14    the last one, is page 141, line 3, through 143, line 18:

15              MR. JACOBSON:  I will give those to the technician

16    now.

17              THE COURT:  Did you get those?

18              MR. KATZ:  Yes, sir.

19              THE COURT:  I had them right, didn't I?

20              MR. KATZ:  Yes, thank you.

21              THE COURT:  Do you know how long it is going to

22    take:  So I can go offer the bench for a few minutes.

23              THE COURT:  All right.  I will see you in 15

24    minutes.  Tell me when they are done.

25              (Recess)
```

```
 1              (The jury enters the courtroom.)

 2              THE COURT:  Mr. Press, you may proceed.

 3              MR. PRESS:  Ladies and gentlemen, our next witness

 4    is again going to the via video.  This is Steve Tumblin,

 5    whose deposition was taken in Salt Lake City.  And so that is

 6    it.

 7              THE COURT:  Again, ladies and gentlemen, the same

 8    instruction concerning this deposition as the previous one.

 9    It has the same force and effect as if he were here in court.

10              (Videotape of Steve Tumblin played)

11              MR. PRESS:  Your Honor, we would move for the

12    admission of exhibit P 223, Judge.

13              THE COURT:  Any objection?

14              MR. FRAM:  No objection, your Honor.

15              THE COURT:  Okay.  P 223 is in evidence.

16              (Videotape continues)

17              MR. PRESS:  We move for the admission of exhibit P

18    225.

19              MR. KATZ:  No objection.

20              THE COURT:  Okay.  P 225 in evidence.

21              (Videotape continues)

22              MR. PRESS:  Judge, we move the admission of exhibit

23    P 226.

24              MR. KATZ:  No objection.

25              THE COURT:  P 226 in evidence.
```

```
 1              (Videotape continues)

 2              (Off-the-record discussion).

 3              MR. FRAM:  Pardon us for just a moment, your Honor.

 4              THE COURT:  Sure.

 5              (Off-the-record discussion).

 6              MR. PRESS:  Judge, we are going to move the

 7    admission of plaintiff's exhibit 227, plaintiff's exhibit

 8    228, plaintiff's exhibit 229, and joint exhibit 136 as a

 9    group.

10              THE COURT:  136?.

11              MR. PRESS:  Yes.

12              THE COURT:  Is there any objection?

13              MR. FRAM:  No objection.

14              THE COURT:  P-227, P-228, P-229 and J 136 are in

15    evidence.

16              MR. KATZ:  Objection, your Honor.  That is one of

17    the entries that was to be excluded.

18              THE COURT:  What line and page is that?

19              MR. KATZ:  125, 15 to 20.

20              THE COURT:  125.  Yes, I took out 15 to 20.

21              MR. JACOBSON: Sorry, your Honor.

22              THE COURT:  Well, it is not very harmful.  Let's

23    just keep going.

24              (Videotape continues) (video concludes.

25              THE COURT:  Who is next.
```

1              MR. PRESS:  Alan Altman who my partner is going to

2    get right now.  He is outside the courtroom.  Alan Altman.

3              A L A N   A L T M A N.  Sworn.

4              DIRECT EXAMINATION.

5              BY MR. PRESS:.

6              MR. PRESS:

7    Q.   Can you please introduce yourself to the jury and tell

8    them where you live?

9    A.   Good morning.  My name is Alan Altman.  I live in Las

10   Vegas, in evidence.

11   Q.   What is your profession?

12   A.   Airline pilot.

13   Q.   Where are you currently working?

14   A.   I currently work for Jet Blue Airways based in Long

15   Beach, California, suburb of Los Angeles.

16   Q.   How long have you worked for Jet Blue?

17   A.   My sixth year now.

18   Q.   What kind of plane do you fly there?

19   A.   Air bus 832, 153-passenger aircraft.

20   Q.   How long have you been an airline pilot?

21   A.   Going on 20 years.  Longer than that.

22   Q.   When did you first get a pilots license?

23   A.   I started flying in college.  In Arizona State in 1981.

24   Q.   And?

25   A.   I got my pilots license after I graduated college, doing

```
 1   it for fun initially, when I was in school and I needed to

 2   concentrate on my studies.  I waited until I got out of ASU.

 3   Q.   Arizona State?

 4   A.   Arizone State.

 5   Q.   What years were you there?

 6   A.   1980 to 1984.

 7   Q.   Did you graduate with a degree?

 8   A.   Yes.

 9   Q.   What was that?

10   A.   Bachelor of science in justice studies.

11   Q.   But you, after you graduated what did you do for a

12   living then?

13   A.   After I graduated my family has an insurance business up

14   in New York where I am originally from and they wanted me to

15   give it a try.  I had been wanting to fly, but out of respect

16   I said sure I will give it a shot and I went to work for my

17   father in the insurance business in New York.

18   Q.   How long did you last in the insurance business?

19   A.   Six months.  I started to fly at the same time while I

20   was working at the airport in white planes, New York, I was

21   trying to get my license as well working for my family.

22   Q.   When did you first fly for a commercial carrier?  When

23   did you first earn a paycheck to fly.  How about that?

24   A.   I was a flight instructor.  I moved back to Arizona.

25   The weather in New York was not conducive to trying to learn
```

1    to fly quickly.  Especially early on.  You really have to

2    have good weather to do it.  So I went back to Arizona where

3    the weather is 350 days out of the year you can fly.  It

4    would be quicker, it would also be cheaper to do it that way

5    also.  I started my instruction job in 1989.

6    Q.   How long did you, were you --

7         THE COURT:  You got the rating, you got a flight

8    instructors rating.

9    A.   Yes, I got a multi-engine instructor also.

10   Q.   I didn't hear that?

11   A.   It was, flight instructor ratings along with my multi

12   engine ratings, two separate ratings also.

13   Q.   How long were you a flight instructor?

14   A.   I instructed for three years at a flight school in

15   Scottsdale, Arizona.  Part of the time I was working for

16   their regular student pilot program that they had people off

17   the street.  We also had a program, at the time they still

18   do, at foreign airlines would come over to the United States

19   with their students, again, because the weather is so good,

20   it is a lot cheaper.  I was working for Sabina Airlines which

21   at the time was the Belgian airline, training their students?

22   Scottsdale, initial.

23   Q.   When was it that you first flew passengers for your

24   living?

25   A.   I went and I got a job in 1992 working for a small

1  company based out of the Grand canyon flying air tours called

2  Air Grand Canyon.

3  Q.   What kind of plane did you fly?

4  A.   It was called a Cessna 207, a 7 to 9 passenger, single

5  engine airline.  We would fly tours over the Grand Canyon

6  starting at the airport at the south rim, usually did a loop

7  around the Canyon.  I did that for about nine to ten months.

8  Q.   Then what did did you do?

9  A.   Got a job, I was offered a position at a company called

10 Air Nevada which was based in Las Vegas.  It was a step up.

11 It was the multi engine aircraft which when you want to get

12 an airline job you need to get multi engine time and it is

13 hard to get.  It was a great opportunity.

14        I knew some people over there, offered me the job

15 and I moved to Las Vegas to fly.  Similar idea, it was air

16 tours and there were some small scheduled operations to

17 certain cities in the desert southwest.

18 Q.   How long did you fly for that airline, Air Nevada?

19 A.   It was under a year.

20 Q.   What was your next flying job?

21 A.   My next flying job I had been applying to commuter

22 airlines to take the next step, and I was offered a position

23 at Trans States, Trans World Express in Saint Louis,

24 Missouri.

25 Q.   What kind of flying did you do there?

```
 1   A.   I was hired on to the ATR.  It is a European make

 2   aircraft.  It is a big airplane for a commuter, it was a twin

 3   engine turbo prop, they would hold either 42 or 72 people.

 4   It was pressurized, it had air conditioning, which is very

 5   nice.

 6   Q.   How long did you fly for Trans States?

 7   A.   Trans States.  Three years.

 8   Q.   What year are we up to now, Mr. Altman?

 9   A.   This would be now 1997.

10   Q.   When did you first start applying to one of the major

11   airlines?

12   A.   Right away.

13   Q.   It is the goal of every pilot to fly for a major

14   airline.  Even if you don't have the qualifications they are

15   looking for, you would apply to basically get your name

16   known.  Think keep seeing resumes updated every six months,

17   it goes in your file, six inches thick and that was the idea

18   behind that.

19   Q.   Which major airline did you go to work for first?

20   A.   Trans World Airline.

21   Q.   What year was that?

22   A.   January, 1997.

23   Q.   And why did you pick TWA?

24   A.   I had been flying in St. Louis which was which was TWA's

25   headquarters for trans world express.  I ended up meeting a
```

1   lot of people, became friends with a lot of people at TWA.

2   And I was really interested and I really wanted to work.  I

3   actually targeted TWA as my airline of choice, where I wanted

4   to work.

5   Q.   And and you did, January, 97?

6   A.   Yes, sir.

7   Q.   How long did you stay working for TWA?

8   A.   I stayed with TWA until January of 2003, when I was

9   furloughed.

10  Q.   You were actually furloughed from this new company owned

11  by American called TWA LLC?

12  A.   That's correct.

13  Q.   All right.  Were you ever a member of ALPA?

14  A.   Yes, I was.

15  Q.   When did you first become a member of the union, that

16  union?

17  A.   At Trans States.  That was the first union carrier that

18  I worked for.

19  Q.   ALPA rented the pilots at Trans States airlines?

20  A.   Yes, they did.

21  Q.   Do you remember what year you joined the union?

22  A.   I don't remember what year I joined.  It would probably

23  be /SAOUPB after I arrived on the property, but I don't

24  remember exactly when.

25  Q.   When you work to TWA did you join the union again?

1   A.   Yes, I did.

2   Q.   Mr. Altman, while you were an ALPA represented pilot did

3   you do any union work?

4   A.   Yes, I did.

5   Q.   Can you take us through that work history from the first

6   volunteer position to, well, I will interrupt you I am sure,

7   start with the first one?

8   A.    Initially, when I was at Trans State, Trans World

9   Express I did some volunteer work on scheduling committees.

10  When I got to TWA, I was new hire.  A new hire and I flew

11  with the person who was the chairman of the grievance

12  committee.  He said you would be perfect.  I would like you

13  to come on board.

14  Q.   What kind of work does the grievance committee do?

15  A.   The grievance committee is a committee that we have a

16  contract, collective bargaining agreement.  And if somebody

17  has a dispute or they feel that they have been wronged by

18  scheduling, the company in some way, they would go to the

19  grievance committee and ask for help.  We were the

20  intermediary so that the pilot doesn't go to the company on

21  their own.  We are their representatives, we would go in

22  there and hopefully try to resolve the situation as quickly

23  and as easily as possible.

24  Q.   Just give us a flavor for what kind of disputes arise

25  that the grievance committee would deal with?

Altman-direct                                                50

```
 1    A.    You would finish a trip, you think you are going home,

 2    and they try to tell you that we need you to fly another day.

 3    They are trying to extend you into a day off.  Let's say your

 4    contract says no.  That was not allowed.  So the pilot would

 5    then call after, the scheduling, they would call the

 6    grievance committee.  Somebody would pick up the phone and

 7    hopefully right then and there say you can't do this,

 8    according to the section every the contract, he has to have

 9    24 hours off.  He has to go home.

10            If that didn't resolve the situation you would tell

11    the person to fly the trip.  Don't refuse if you don't want

12    to get into any other type of trouble but then there were

13    further procedures that would follow where a grievance would

14    be filed and you would go through a process to correct the

15    wrong.

16    Q.    How long were you on the TWA grievance committee?

17    A.    I did that for about a year.

18    Q.    What was your next ALPA position?

19    A.    The next position was the negotiating committee.  I was

20    nominated for, the negotiating committee in 1999.

21    Q.    How were you nominated, and by who?

22    A.    I had been working in the ALPA office, the MEC office in

23    St. Louis, got to know everybody, and the chairman of the

24    committee had openings, and I expressed an interest and I was

25    selected.
```

Altman-direct                                                      51

 1   Q.    And that was in 1999?

 2   A.    1999.

 3   Q.    There was some testimony yesterday that -- well, you

 4   just tell us.  Was there already a collective bargaining

 5   agreement in place?

 6   A.    Yes, there was.

 7   Q.    That was the year before you got on the negotiating

 8   committee?

 9   A.    That's correct.  1998.

10   Q.    So if there is already a contract, why do you need a

11   negotiating committee?

12   A.    If -- it is a standing committee.  There may be issues

13   that arise after you have your contract that either one side

14   or the other, or both sides, agree doesn't work.  You can go

15   in and try to fix issues.  Anything that could come up that

16   would be related to either your contract, or to business,

17   that pertains to the pilots, you need a negotiating

18   committee.  So it was a standing committee.  Many times there

19   wasn't much work to be done.

20   Q.    Was that the case when you were on the committee, at

21   least up until 2001?

22   A.    Initially, there was not a lot going on.  The first real

23   business that I was involved with was a possible code chair

24   agreement.

25   Q.    You said code chair?

1   A.   Yeah.

2   A.   Yes, it was with America West Airlines at the time.

3   What it does, TWA doesn't fly from Phoenix to San Francisco.

4   But what you do when you enter into this business agreement

5   is that you book, meaning TWA will book their code on that

6   America West flight so the America West flight, it is marked,

7   it will say America West flight one, San Francisco.  TWA,

8   Transport Airline, flight 1001.  In the reservation system a

9   person who goes to book a reservation or goes on line to book

10  a flight, TWA's website, they see that.  It is a way to

11  expand your network without having to buy 3,000 airplanes.

12  It is a marketing agreement.

13  Q.   You were involved in negotiate thanking with America

14  West?

15  A.   Yes, I was.

16  Q.   When you got appointed to the negotiating committee, Mr.

17  Altman, did you receive any training from ALPA?

18  A.   No, I did not.

19  Q.   Other than this America West code share negotiate, what

20  was the most significant project your committee was faced

21  with while you were on the negotiating committee?

22  A.   The most significant project we were faced with was the

23  asset purchase agreement between TWA and American Airlines in

24  2001.

25  Q.   Well, was that something you negotiated?

1    A.    No. We were dealing with the after effects of the

2    airlines entering into this agreement.   Now you are trying to

3    merge two airlines, two different contracts, two companies.

4    There was a lot to be done.

5    Q.    Okay.  Did you -- well, at some point you were elected

6    to the TWA Master Executive Council or MEC.   Right?

7    A.    That's correct.

8    Q.    When was that?

9    A.    I was elected in late 2000.  I was living in Los Angeles

10   at the time and there was an opening for a first officer

11   representative in what we call Council 4 which was the Los

12   Angeles west coast base.  So I ran for that position.  And I

13   was elected.  And it was to take effect in February 15, 2001.

14   Q.    Okay.  So you assumed responsibilities as a MEC member

15   in February, 2001?

16   A.    That's correct.

17   Q.    You had no experience on the MEC before that?

18   A.    No, I did not.

19   Q.    Now --

20           THE COURT:  That was after the American TWA deal

21   had been signed, right.

22   A.    That's correct.

23   Q.    Six weeks later after you took your position, you were

24   involved in a decision to waive scope, right?

25   A.    That's correct.

1    Q.   Six weeks after you --

2    A.   Yes.

3    Q.   Explain for the jury just a little bit, what the

4    responsibilities of a MEC member were.  Let me back up.  Mr.

5    Case explained he was a none voting member in the winter of

6    2001.  But you were a voting member.

7    A.   That's correct.  I was a voting member.  One of six that

8    we had, that -- the role of the MEC is to vote the will of

9    your constituents.  So I had a number of first officers in

10   Los Angeles that I was to vote their will, what did they want

11   in issues that would arise.  So we would hold regular

12   meetings with our counsel.  You try to do it once a month if

13   you could.

14        Email wasn't as prevalent then as it is now.  We

15   did a lot of phone calls, if issues were up.  You try to get

16   as many people as possible to respond.  Then you would rate

17   your votes based on constituents.  It should not have been

18   what my personal opinion was, if I am representing 120

19   pilots, I have to find out what they want me to do.

20   Q.   That is what you understood your job was?

21   A.   Yes, I did.

22   Q.   Why did you run for that position?

23   A.   I like to be involved.  I believed in the union.  I

24   believed in the process.  I am not one that sits on the side

25   lines and just throw stones or watches or gripes.  I want to

1   be involved and I believed in this.

2   Q.   When you say you believed in it, what do you mean by

3   that?

4   A.   I believed in the union.  They had done a lot of good

5   throughout history in terms of airline safety, contracts.  It

6   was a good job, and I credited a lot of that to the work of

7   the Air Line Pilots Association and the Union.

8   Q.   Now, Mr. Altman, this deal with American to buy TWA,

9   when did you first find out about that?

10  A.   It was early January, 2001, I believe it was the date

11  prior, it was announced, that would be January 8.  It was

12  fairly late, it was a conference call from our Master

13  Executive Council Chairman, Bob Pastore, called everybody to

14  tell us this is what happened, this is what is going to be

15  announced tomorrow.  We are giving you the heads up.

16  Q.   What did you think about the deal when you first heard

17  about it?

18  A.   Obviously I thought it was honestly I thought it was a

19  great deal.  At the time American was growing, that it was a

20  chance to merge two companies, the slogan they used, two

21  great airlines, one great future.  Who doesn't want to be

22  part of the largest airline in the world or in any business,

23  you want to be the biggest.  And it was very exciting.  I

24  thought this would be a great opportunity for everybody.

25  Q.   Okay.  Despite that opportunity, do you recognize there

1    would be some challenges with this transaction.  Is that

2    right?

3    A.    That's correct.  There would be significant challenges.

4    Q.    What did you consider the biggest challenge was going to

5    be?

6    A.    The seniority integration or the integration of the two

7    pilot work groups into one.

8    Q.    When did you become aware of the fact that the asset

9    purchase agreement had this condition that the TWA pilots had

10   to waive scope?

11   A.    We were told that by Bob on the conference call.

12           THE COURT:  Bob?

13           THE WITNESS:  Bob Pastore.

14   A.    Bob Pastore said this was in the asset purchase

15   agreement, didn't go into it much further until a couple of

16   days later, in a meeting in Saint Louis, that described yes,

17   the, described the asset purchase agreement in detail.

18   Q.    When you found out about this condition of the deal,

19   what did you think about that?

20   A.    I was surprised.  It had never been done before.  This

21   was something, and I had limited experience but I knew that

22   this had never been asked before.  And it was actually quite

23   surprising.  When you negotiate a contract, the first thing

24   that you negotiate are your job protections.

25           So when they asked us to waive what they call scope

1    and successorship provisions in your contract, that is your

2    job protection provision in case of mergers, buy-outs, what

3    they call fragmentation, they might split the company up, any

4    number of scenarios, that is your protection and we were

5    being asked to waive our protections going in to this deal.

6    Q.   Okay.  Did you remain on the negotiating committee and

7    the MEC throughout this process?

8    A.   Yes, I did.  I wore two hats during the process.

9    Q.   Can you tell us on the negotiating -- well, what was the

10   first substantial thing that you did to face the challenges,

11   or to deal with the challenges faced by the TWA pilots, I

12   should say?

13   A.   The first thing that we did, negotiating committee, we

14   had a meeting in January of 2001.  It began on the 23rd of

15   January and lasted until the 25th.  It was with the

16   negotiating committee.  The merger committee that was

17   appointed at the time that would handle the actual

18   integration talks between the two carriers.  And ALPA

19   advisors down in Herndon, Virginia.

20   Q.   A three-day meeting at ALPA headquarters, January 23

21   through the 25?

22   A.   That is correct.

23   Q.   What was the, I don't know, the agenda for the meeting?

24   A.   The agenda of the meeting and it was set up by our

25   contract administrator, our ALPA contract administrator in

1    our St. Louis office, Mr. David Holtzman and it was to be for

2    planning and strategizing because the deal had just been

3    announced.  We needed to get together with our advisors,

4    people, the full merger committee and negotiating committee

5    and start drawing out a plan of action as to what we wanted

6    to do and how we wanted to proceed.

7    Q.   All right.  And who from ALPA, employees of ALPA,

8    attended your meetings there?

9    A.   We had our contract administrator, Mr. David Holtzman,

10   clay Warner from ALPA legal and a gentleman named Bob Christy

11   who was the economic and financial analysis department at

12   ALPA National.

13        THE COURT:  He was an employee of ALPA?

14   A.   Yes, he was.

15   Q.   And tell us how the meeting started?

16   A.   We were down talking acknowledge ourselves, the

17   negotiating group, we were in a conference room, we were

18   talking, the merger committee was talking and the three ALPA

19   advisors, Mr. Holtzman, Mr. Warner, Mr. Christy, came in the

20   room and sat down in front of us, which I thought was a

21   little unusual.

22        Normally, when you are not adversarial, you are on

23   the same side, you kind of mix in together, sit and talk.

24   And it was a little, I was a little surprised by that.

25   Didn't say much initially before it started.  I was talking

1    with our chairman of the negotiating committee, Mr. Ron Kiel.

2    And in Christy leaned over and made a comment to us.

3    Q.   What did he say?

4    A.   Surprised me.  He said you know you are going to have to

5    waive your scope.  And it was -- I stopped for a moment.

6              THE COURT:  Who said this?

7    A.   Mr. Christy.

8              THE COURT:  Who is he again?

9    A.   He was the economic and financial analysis.

10             THE COURT:  He was from ALPA?

11   A.   Yes.

12   Q.   Out of the blue he says you know you are going to have

13   to waive scope?

14   A.   Yes.  It is not a formal presentation, he leaned over

15   and made that comment to us.  Ron Kiel and I both turned

16   around, we looked at each other.  We hadn't even started

17   talking strategy, and he just made this comment.  I don't

18   know why he made the comments or what the intent was.  It

19   just struck me as being very odd.

20             MR. FRAM:  Pardon me.  Can we get facts from the

21   witness and not impressions?

22             THE COURT:  Yes.  Let's get facts.  Who said what

23   to whom instead of impress goes.

24   Q.   You understand the judge's instructions?

25   A.   Yes, I do.

1  Q.   Mr. Altman, this was in the beginning of the meeting.

2  It was a three day meeting.  Did can you tell us when you

3  left what was the overall --

4           THE COURT:  Can we get the dates of the meeting?

5           MR. PRESS:  January 23 through 25.  Is that right?

6           THE WITNESS:  That's right.

7           THE COURT:  All day for those for those days.

8           THE WITNESS:  Yes, it did.

9  Q.   What was the strategy you had developed by the end?

10 A.   The strategy was the merger committee would be dealing

11 with the Allied Pilots Association, their counterparts at

12 American Airlines, the pilots union on their merger committee

13 and on the negotiating committee we would just gather as much

14 information as we possibly could.  Again, this was new.  We

15 didn't have all the facts.  We needed to do a fact-finding

16 mission to gather information.

17 Q.   This notion of waiving scope, what was the strategy for

18 that, yeah, we will do that or what?

19 A.   Oh, no, it was we are not going to do that.

20 Q.   Was there any discussion at this stage, again, this is

21 January 23, of a 1113 motion in the bankruptcy court?

22 A.   Yes.  We did have Mr. Bill Wilder, who was one of our

23 merger attorneys, that we had hired, with his father, their

24 firm, Roland Wilder, and he gave us a brief discussion on

25 what the 1113 is, and whether he thought it would prevail or

 1   not.

 2   Q.   And what was the opinion of that Mr. Wilder expressed to

 3   you at that meeting?

 4   A.   The opinion expressed was that a 1113 motion would not

 5   prevail.

 6   Q.   This was Bill Wilder, Roland's son?

 7   A.   Yes.

 8   Q.   He is a lawyer, though?

 9   A.   Yes, he is.

10   Q.   You mentioned Mr. Holtzman, Warner and Christy were at

11   the meetings.  Were any of those gentleman present for Mr.

12   Wilder's talk about the bankruptcy motion?

13   A.   Yes.

14   Q.   Who?

15   A.   All three of them.

16   Q.   Did any of them express anything along the line, Mr.

17   Wilder, you are wrong or disagree with anything he was

18   saying?

19   A.   There were no disagreements.

20          THE COURT:  Mr. Altman, when you talked about 1113,

21   you talked about what it was they were, was being rejected,

22   did he talk specifically about the scope rights?

23   A.   Yes, he talked about how you have to negotiate and

24   bargain both sides and then the Court would make a

25   determination on the economic, if it is economically needed

 1   for the process to continue.  That was what the discussion

 2   was about.  He said I didn't see, he he didn't think the

 3   Court would grant in this case.

 4   Q.   And again, that he was who?

 5   A.   Bill Wilder.  Our merger attorney.

 6   Q.   Did Mr. Holtzman or Warner or Christy make any

 7   statements to the effect that they agreed with Mr. Wilder's

 8   opinion?

 9   A.   No. There was no agreement or disagreement at this

10   meeting.  People were just listening.

11   Q.   Now, at that point there hadn't been a 1113 motion

12   filed.  That came later?

13   A.   That came later.

14   Q.   Why were you even talking about that?

15   A.   It was one of the threats, I guess, coming, that if we

16   were told by TWA corporation that if you didn't do this, this

17   would be the next step that they would have to take and that

18   would be to file a 1113 motion.

19   Q.   So you just planned it?

20   A.   That is exactly what the meeting was for.  What are the

21   options, what are we phased with.  What could happen?

22   Q.   Mr. Altman, as an ALPA member, a MEC member, were you

23   aware of any efforts before the American TWA transaction was

24   announced, so now we are in the year 2000, were you aware of

25   any efforts by ALPA to get the American pilots to rejoin

1    ALPA?

2    A.   Yes, I was.

3    Q.   Can you tell us what you understood at the time?

4    Q.   Again, we are talking before the merger deal was

5    announced in January?

6    A.   There were a number of airlines that had split off from

7    ALPA in the past.  And for various reasons.  And ALPA was

8    making a concentrated effort, rightfully so, I believe, to

9    bring it back into one union.  The airlines in question were

10   Federal Express, Continental, and American.  So I had known

11   that -- well, Federal Express and Continental had rejoined

12   ALPA, knew that.  And we knew that, or I knew personally from

13   press reports and what I had read in ALPA magazine and other

14   publications that, you know, there is an effort, we would

15   like to get American back into the ALPA fold.

16   Q.   Okay.  Now, did that subject come come up at these

17   January, late January, meetings?

18   A.   Yes, it did.

19   Q.   Tell us how, the subject was raised?

20   A.   The merger committee chairman for our side, Mr. Bud

21   Bensel, asked the question.

22   Q.   Asked it of whom?

23   A.   He asked it of the ALPA advisors, Mr. Holtzman, Mr.

24   Christy and Mr. Warner, and it was phrased, what are you

25   doing with American, and the American pilots.

1    Q.   And was a response made?

2    A.   Yes, there was a response from Mr. Christy who said we

3    are washing our hands of them, we are walking away.

4    Q.   Why did that issue come up?

5    A.   It was important --

6            THE COURT:  Who raised the issue.

7            THE WITNESS:  Mr. Bud Bensel, our merger committee.

8            THE COURT:  How can he testify as to why Mr. Bensel

9    --

10           MR. PRESS:  I withdraw the question.

11   Q.   When you heard the question did you think, well, that is

12   a good question?

13   A.   Yes, I did.

14           MR. FRAM:  Objection, your Honor.

15           THE COURT:  No, I will allow that.

16   Q.   Why was it important to you to have an answer to that

17   question?

18   A.   In my opinion, my mind, I wanted to make sure that the

19   union that was representing me against the American pilots,

20   our adversary, was not trying to do anything to bring them

21   back to ALPA during this time period.

22   Q.   Why?

23   A.   It is a conflict of interest.

24   Q.   Can you put up exhibit P 113.

25           THE COURT:  Is that in already.

1              MR. PRESS:  Yes, it is.

2  Q.   Mr. Altman, I want to hand you an exhibit -- you have it

3  right there.  Exhibit 113 was admitted into evidence earlier

4  this morning.  We will blow it up.

5              This is the letter dated January 25, 2001, right.

6  A.   Yes.

7  Q.   Do you recognize the flame at the bottom who sent this

8  letter?

9  A.   I recognize the name, yes, I do.

10 Q.   Mr. Johnson.  This was, this letter was sent when you

11 were at ALPA headquarters, right?

12 A.   That's correct.

13 Q.   Where was Mr. Johnson's office?

14 A.   ALPA headquarters, I would assume.

15 Q.   And he is writing to, do you recognize the name he is

16 writing to, Captain John Darrah, president, Allied Pilots

17 Association?

18 A.   Yes, I do.

19 Q.   Tell the jury what this gentleman, his position was?

20 A.   Captain Darrah was the equivalent of our Bob Pastore.

21 He was the chairman of their union.

22 Q.   There being who?

23 A.   APA, American pilots.

24 Q.   Who represented?

25 A.   The American pilots.

1    Q.   Oh, I am sorry.  How does he start the letter?  Go ahead

2    and read the first sentence.  Dear John?

3    A.   Dear John --

4              MR. FRAM:  Pardon me, your Honor.  The letter is in

5    evidence.

6              THE COURT:  The letter is in evidence.  He can add

7    that he knew it was written, or it had some role in its

8    creation.  Then I think he can testify to that.

9              MR. FRAM:  There is no foundation even he knew

10   about it.

11             THE COURT:  That is my point.

12             MR. PRESS:  I am moving on.

13   Q.   Mr. Altman, were you shown this letter when you were at

14   Herndon?

15   A.   No, I wasn't.

16   Q.   If you --

17             THE COURT:  No, no.  The question of what he would

18   have done were he shown is not a proper question.

19             MR. PRESS:  All right.

20   Q.   When did you first see this letter?

21   A.   Last month, while preparing for this trial.

22   Q.   And when you saw it --

23             THE COURT:  No, no.  His reaction when he saw it is

24   not evidence.

25   Q.   So, leaving these meetings, the overall strategy again

1   was what?

2   A.   Information gathering.

3   Q.   All right.

4         THE COURT:  We are talking, we are back to the

5   three day meeting.

6   A.   That's correct.  January 23 through 25.

7   Q.   As a member of the negotiating committee were you

8   involved in any negotiations for the scope waiver?  Was that

9   your committees job?

10  A.   It was our commit -- our committee was discussing this,

11  the MEC members, the voting members are the ones that

12  actually vote order the scope waiver.

13  Q.   When did the subject first come up for your negotiating

14  committee, the notion of a scope waiver?

15  A.   We had a meeting late February, 2001.  I believe it was

16  the 28 of February.  We were down, I believe it was downtown

17  St. Louis at the TWA corporate headquarters.  And we were

18  told by Terry Hayes who was the vice president of labor

19  relations of TWA and Mr. Bernie Plum who was a TWA bankruptcy

20  counsel, bankruptcy attorney, that we would have to waive our

21  scope, that that is one of the pre conditions of the asset

22  purchase agreement, and that they were going to put TWA into

23  what they called a LLC.  A limited liability corporation, to

24  be known as TWA LLC.

25  Q.   This is on February 28, you meet again with whom?

1    A.   Mr. Terry Hayes and Bernie Plum.

2    Q.   They were representatives of what?

3    A.   They were TWA.

4         THE COURT:  TWA, Inc..

5         THE WITNESS:  TWA, Inc., that's correct.

6    Q.   And they mentioned this LLC.  Is that the first time you

7    ever heard of that?

8    A.   Yes, it was.

9    Q.   Did you ask any questions about that?

10   A.   I didn't personally ask any questions.  I mean we just,

11   that I can remember.  It was just more of what is a LLC.

12   What is this?  We didn't know.

13        THE COURT:   You did know it was going to be owned

14   by American.

15        THE WITNESS:  That's correct.

16        THE COURT:  This wasn't going to be a TWA

17   subsidiary, you knew this was going to be an American

18   subsidiary.

19   A.   That's correct.  We didn't know how it was going to

20   work.

21        THE COURT:  Had you read the contract, the actual

22   asset purchase agreement, before that meeting.

23        THE WITNESS:  Yes, I had.

24        THE COURT:  So you knew about the scope waiver that

25   was in the contract itself.

```
 1              THE WITNESS:  It was in the contract.  No one had

 2    told us that you are going to have to do this per the asset

 3    a purchase agreement.  We knew it was there.

 4    Q.   So the TWA management folks, they said you are going to

 5    be what, employed by a new company, this LLC.  Is that what

 6    she said?

 7    A.   That's correct.

 8    Q.   That was the first time you have heard that?

 9    A.   First time we ever heard of it.

10    Q.   So what happened after that?  What did your committee

11    do?

12    A.   We went back to --

13              THE COURT:  Are you talking about the merger

14    committee.

15              MR. PRESS:  Negotiating.

16              THE COURT:  The negotiating committee.

17              MR. PRESS:  Yes.

18    Q.   This is confusing.  There is the negotiating committee

19    that negotiates contractual issues, right?

20    A.   Yes.

21    Q.   And the merger committee negotiates seniority with the

22    American pilots?

23    A.   That's correct.

24    Q.   You are dealing with TWA and the merger committee is

25    dealing with American pilots?
```

1    A.    That's correct.

2    Q.    All right.  What was the next thing, significant thing,

3    that the negotiating committee do?

4    A.    We went back to our offices in Saint Louis, and we sat

5    down with our contract administrator, ALPA contract

6    administer, local, David Holtzman, and we came up with a

7    proposal that we sent over to TWA airlines, Inc., based on

8    what they had told us in the meeting about what they thought,

9    and it hadn't been put in stone yet, that this was going to

10   happen, but based on what we were told, we came up with an

11   offer.

12   Q.    Okay.  I think I have that.

13         MR. FRAM:  What is the number, please?

14         MR. PRESS:  Joint 168.

15   Q.    I handed you J 168:  What is this exhibit, Mr. Altman?

16   A.    This is the letter that that we sent over, the offer, to

17   TWA.

18         THE COURT:  Are you offering it in evidence?

19         MR. PRESS:  Yes.

20         THE COURT:  I assume because it is joint there is

21   no objection.

22         MR. FRAM:  Correct, your Honor.

23         THE COURT:  There being no objection, J 168 is in

24   evidence.

25   Q.    The date of it is March 5, right?

1   A.    That's correct.  March 5, 2001.

2   Q.    And if you go to the third page, who signed this letter?

3   A.    The signature is captain Ronald Kiel, chairman of our

4   TWA negotiating committee.

5   Q.    But this was a letter that you had participated in it?

6   A.    We all did, yes.  The whole committee.

7   Q.    You certainly approved of it being submitted to TWA?

8   A.    Yes.

9         THE COURT:  Who was the scribner, somebody had to

10  write it, never mind who participated in it.  Who wrote it?

11  A.    That would have Mr. David Holtzman, our contract

12  administrator.

13  Q.    From?

14        THE COURT:  From ALPA.

15        THE WITNESS:  From ALPA.

16  Q.    Was Mr. Holtzman involved, he didn't just type it, he

17  was involved incoming up with the ideas expressed in the

18  letter?

19  A.    Yes.  Actually, we go to the first page.

20  Q.    What are you going to refer us to?

21  A.    Number one on the first page where it says a process

22  agreement.  That was actually David Holtzman's idea.

23  Q.    Let back up and get some context to that.  You write,

24  ALPA proposes that it will waive the scope and successorship

25  provisions upon the execution by the appropriate parties of

Altman-direct                                                72

1    the following agreements.  And you list them.  You say we

2    will waive if you do one, two, three, four, five and six

3    things.  Right?

4    A.   That's correct.

5    Q.   And the first thing you said we will waive if you do

6    what?

7    A.   A process agreement that would assure a fair and

8    equitable seniority integration which was our primary

9    concern, as to how you were going to integrate these

10   companies.  And the end it says, the process agreement would

11   end in, there is no decision, mutual, among the parties in

12   arbitration.  You let a third party, neutral, make the

13   decision.

14   Q.   The phrase process agreement is in quotes.  Why is that?

15   A.   I don't remember.

16   Q.   All right.  But any way you said we will waive that

17   section of our contract or those sections if you give us a

18   process agreement and a, a process agreement assuring fair

19   seniority integration.  Right?

20   A.   That's correct.  That is all we wanted.

21   Q.   Number 2, another condition to your scope waiver was

22   what?   And this is  addressing TWA's statement up here a

23   week ago that there is going to be this limited liability

24   company?

25   A.   That's correct.  We had a contract, collective

Altman-direct                                                        73

1    bargaining agreement, with TWA.  The TWA LLC would be a new

2    company.  And you would need to have a contract going in to

3    the new company.  We were told that usual contract with TWA

4    would not be valid so what we proposed here would be, what we

5    have in our contract now minus the provision we would waive

6    into the new TWA LLC collective bargaining agreement.

7    Q.    You write this new collective bargaining agreement will

8    include all of the provisions of the current collective

9    bargaining agreement except for scope and successorship,

10   right?

11   A.    That is correct.

12   Q.    So we will waive if you give you a process agreement and

13   a collective bargaining agreement that mirrors our current

14   one?

15   A.    That's correct.

16   Q.    All right.  What was the next thing, significant thing,

17   that happened, Mr. Altman, with respect to the issues

18   expressed in this letter?

19   A.    At the bankruptcy court proceedings, you want to say it

20   was March 9, I was down at the hearing, and with David

21   Holtzman, we were handed a handwritten piece of paper from

22   Mr. Terry Hayes who was the vice president of labor, TWA,

23   with a different proposal for a process agreement.  It was

24   just a one paragraph, handwritten note.

25

1              MR. PRESS:  P-171.

2              THE COURT:  P-171?

3    Q.   I am going to hand you an exhibit?

4    Q.   I handed you exhibit P-171, Mr. Altman.  What is that?

5    A.   This is the, I guess you could call it a response that

6    came from TWA to our March 5 letter that talked about a

7    process, their proposal for a process.

8              MR. PRESS:  We move for the admission of 171,

9    Judge.

10             MR. FRAM:  No objection, your Honor.

11             THE COURT:  Okay.  P-171 in evidence.

12   Q.   The first page of that exhibit is an email that you

13   don't seem to be copied on, right?

14   A.   That's correct.

15   Q.   From Mr. Holtzman to who, Mr. Warner?

16   A.   That's correct.

17   Q.   But the attachment, the next page, what is that?

18   A.   This is what, a typed up version of the handwritten

19   message that Mr. Terry Hayes had given to us.

20   Q.   So this is, you had proposed we need a process agreement

21   that would end an arbitration if we can't agree on seniority?

22   A.   That's correct.

23   Q.   This is what you got back as a counter proposal on that

24   subject?

25   A.   Yes.

Altman-direct                                                        75

1    Q.    You got it on March 9.  Is that right?

2    A.    Yeah, I believe it was March 9.

3    Q.    AA will use reasonable best efforts with its labor

4    regulation to, representing pilots to secure a fair and

5    equitable process for integration of seniority.  We are going

6    to engage a facilitator to organize the meeting.  When you

7    received this, Mr. Altman, did you understand what any of

8    this meant?

9    A.    No, I did not understand what this was.  I turned to

10   David and I asked what is this, and he said, I am not sure.

11   We need to look at this.

12   Q.    All right.  What was the next step or next significant

13   event in the negotiation, if you can recall?

14   A.    We sent another proposal to TWA that was, basically a

15   response, to, it was what we had originally proposed in the

16   first letter.  What we did this time was we, instead of doing

17   it in a letter format, it was more bullet point format, but

18   it was what we had asked for originally with a process

19   agreement, we contracted with the LEC, no changes.

20            MR. PRESS:  D 359.

21            THE COURT:  D 359.

22   Q.    What is exhibit D 359?

23   A.    This exhibit is our proposal, the negotiating committee

24   ALPA, back to TWA.

25            MR. PRESS:  We move for the admission --

```
 1                  THE COURT:  Can I ask a question?

 2                  MR. PRESS:  Yes.

 3                  THE COURT:  D 359, there is no letterhead on it,

 4        just plane white paper.  That is surprising.

 5                  MR. PRESS:  That is the way it was produced to us

 6        by the defendant, Judge.

 7                  THE COURT:  So the defendant doesn't in any way

 8        challenge this is a genuine ALPA response.

 9                  MR. FRAM:  That's right.

10                  THE COURT:  Do you know why it was on plain white

11        paper rather than letterhead.

12                  MR. FRAM:  Most of the proposals went back and

13        forth, your Honor, are like that.

14                  THE COURT:  Okay.

15                  MR. FRAM:  The course of dealing, if you will.

16                  THE COURT:  Okay.  You have no objection to it

17        being in evidence.

18                  MR. FRAM:  Correct.

19                  THE COURT:  D 359 in evidence.

20        Q.   Mr. Altman, what is this document?

21        A.   Again, this was our proposal, counter proposal, back to

22        TWA after we received the March 9 process.

23                  JUROR NO. 12: Can you move that out of the way?

24        Q.   Mr. Altman, this is a proposal that your committee

25        submitted to TWA on March 15.  Is that right?
```

1   A.   That is correct.

2   Q.   And without looking at all the provisions, what is the

3   gist of what you are offering?

4   A.   What we had originally offered, we wanted a process

5   agreement that would ensure fair and equitable integration

6   that would end in arbitration if the parties could not agree

7   mutually.

8   Q.   On March 9 the week before you had been given this

9   reasonable best efforts language from TWA.  So you were

10  rejecting that?

11  A.   We were rejecting it.  We hadn't had a, it hadn't come

12  back to us as to what the analysis was at that time.  We just

13  countered, we want our process agreement.  The process

14  agreement was, like I said, our ALPA contract administrator's

15  idea and he said stick to this.

16  Q.   To address the judge's question, why doesn't it look

17  more for mal?

18  A.   There were a lot of proposals that would go back and

19  forth, and this is normally the format they were done in.

20  This is not unusual.

21  Q.   Did you receive a response to your March 15 proposal?

22  A.   Yes, we did.

23  Q.   When was that?

24  A.   March 17.

25            MR. PRESS:  D 386, Mr. Fram.

```
 1              THE COURT:  The number?

 2              MR. PRESS:  D 386.

 3              THE COURT:  D?

 4              MR. PRESS:  D 386.

 5  Q.   What is that document, Mr. Altman?

 6  A.   This is a counter proposal from TWA from Terry Hayes who

 7  was their vice president in labor relations and it was a

 8  counter to what we had proposed just a couple days prior.

 9              THE COURT:  A counter from.

10              THE WITNESS:  TWA.

11              THE COURT:  Why was there a counter --

12  A.   ALPA to TWA, top corner.

13              THE COURT:  E so three 59 is not a proposal to

14  American, or American pilots, or it was a proposal to TWA.

15  A.   Yeah, this was the negotiating committee --

16              THE COURT:  I want to be clear, instinct tells you

17  the people you are negotiating with --

18  A.   This was with the negotiating committee on our side, the

19  TWA pilots.  We were negotiating the contract, the new

20  contract, and what we wanted going into the new company.  So

21  that --

22              THE COURT:  The new company was an American

23  company.

24  A.   It was very interesting how it worked.

25              THE COURT:  Not a TWA company.
```

1    A.   You bring up an interesting point.

2              THE COURT:  Thank you.

3    A.   We had to deal with the TWA management people who then

4    had to go to American.  They were really I guess you could

5    say the middle men.  They would go to the counterparts,

6    whoever they were talking with at American, and American

7    would give them a response and then the TWA people would come

8    back to us.  It is very confusing.

9              THE COURT:  Yes.  It seems to be.  Yes.  I agree.

10   So you were actually sending your proposals to, the hours and

11   that stuff, to TWA, and TWA presumably was forwarding it to

12   American.

13             THE WITNESS:  That is what we thought.

14             THE COURT:  Okay.  By the way, 386, any objection?

15             MR. FRAM:  No objection.

16             THE COURT:  You want it in evidence.

17             MR. PRESS:  Yes.

18             THE COURT:  386 in evidence.

19   Q.   Mr. Altman, these negotiations we are talking about that

20   began February 28 saying you are going to need an agreement

21   with TWA LLC, this new company we are forming, right?

22   A.   Yes.

23   Q.   That is all this, that we talked about since then, all

24   led up ultimately to this document that was marked as exhibit

25   139 yesterday, the transition agreement, with TWA LLC,

```
 1   correct?

 2   A.   That's correct.

 3           THE COURT:  But TWA LLC was not run by the TWA,

 4   Inc., management.

 5           MR. PRESS:  That's right.

 6           THE COURT:  I mean the person would have to sign

 7   off on it on some kind of interim labor agreement, would be

 8   the American folks.

 9   A.   They had us dealing with the TWA people.  If it was, it

10   was confusing to us and it was a delay and a lag in

11   information coming coming back and forth because of that.

12   Q.   Did the people you were negotiating with over this

13   contract were TWA, Inc., employees?

14   A.   That's correct.

15   Q.   Not American employees?

16   A.   That's correct, we never met with --

17   Q.   Did they have any authority to agree on anything that

18   you proposed?

19           MR. FRAM:  Objection.

20           THE COURT:  No, I think.

21           MR. FRAM:  No foundation that the witness would

22   know.

23           THE COURT:  I think he would know.

24   Q.   What did they tell you about their own authority?

25   A.   They said they told us, they have to give this to
```

1    American.  American has to be the ones to approve this.

2    Q.    Were you given any access to anybody in American to

3    negotiate this contract?

4    A.    No, we we dealt with the TWA, Inc., people.

5    Q.    Did Mr. Holtzman make any --

6          THE COURT:  What about the APA, in this timeframe,

7    like March, of 2001, were there any reaching out to the APA

8    people, the union for the American pilots, was there some

9    kind of negotiation going on there?

10   A.    That was with our merger committee, they were actually

11   talking to the APA themselves about working proposals, trying

12   to do an integration, a seniority integration.

13         THE COURT:  They were in a sense duplicating in

14   some sense your work.

15         THE WITNESS:   They were working more on the actual

16   agreement.  This was more if you were going to waive your

17   scope, which was your job protections and the new contract

18   going in on that would cover us into this new American-owned

19   subsidiary.

20   Q.    Did people, the people negotiating with the American

21   pilots union were negotiating over what?

22   A.    With the union.

23   Q.    Your merger committee?

24   A.    The merger committees were talking about how you would

25   merge the TWA pilot list of pilots and the American pilots

Altman-direct                                          82

```
 1   and how would you integrate that into some combined list.

 2   Q.    Those negotiations weren't part of your committees

 3   negotiations over a contract with your employer?

 4   A.    No, this was a contract with the employer.  A new

 5   company.

 6             THE COURT:   The interim CBA with this new airline.

 7   A.    That's correct.

 8   Q.    Okay.  Let's go back to TWA's counter proposal to you of

 9   March 17.  It was Exhibit 386.  Do you have that?

10   A.    Yes, I do.

11   Q.    You had asked for a process agreement that would ensure

12   fair and equitable seniority integration culminating in

13   arbitration if necessary?

14   A.    That's correct.

15   Q.    How do they counter that?

16   A.    They didn't put in here what we wanted.

17   Q.    They were not agreeing to that?

18   A.    They were not agreeing to that.

19   Q.    Are you on page 3, Mr. Altman?

20   A.    Yes, I am.

21   Q.    This is, who prepared this, as far as you know?  It says

22   agreement between TWA LLC and ALPA?

23   A.    I honestly don't know who prepared this.  I suspect it

24   would be the TWA people who we were dealing with.

25   Q.    Is this the first time that, in your negotiations that
```

1    there was anything, a document exchange that had the word

2    agreement, that looked like a contract?

3    A.    Yes, it is.

4    Q.    The first time that you go through two more pages, the

5    first  time you have anything prepared that had signature

6    lines on it, if it would have been agreed to?

7    A.    That is correct.

8    Q.    Now, in you go to the last page, March 17, 01,

9    memorandum of understanding for changes to the TWA ALPA

10   collective bargaining agreement.  Right?

11   A.    That is correct.

12   Q.    And what is this list of things, without being specific,

13   what does this represent?

14   A.    Just items that would have to be removed from our

15   contract, the current contract, that we had, that would

16   pertain to what the asset purchase agreement was calling for

17   when we were waive or remove our scope of successorship.

18   Anything that would mention the scope or successorship in the

19   contract would be listed here and have to be removed.

20   Q.    Does this list also include other things that weren't in

21   the asset purchase agreement?

22   A.    It did.  It included a couple things that were not.

23   Q.    Tell us any that are significant.  By the section

24   reference?

25   A.    Section 2.

1    Q.    Section 2.

2    A.    O, I believe it was, what we had, was a flight pay loss

3    bank that was paid for, we negotiated in our contract that

4    TWA would pay 9,000 hours a year for our ability to do

5    business as a union, locally, with the company.  So if I

6    needed to come in and negotiate, that the company was

7    actually paying for my trip, if I was over a trip or on days

8    off, they were actually paying me.  We negotiated this bank

9    with TWA that would pay for this.  And it shows up as needing

10   to be removed.  And that was no where in the asset purchase

11   agreement.

12             The other --

13   Q.    Hold on.  This list of stuff that they want you to

14   remove from your contract, Section 2, O, that is the flight

15   pay loss section?

16   A.    That is the flight pay loss.  That was not in the asset

17   purchase agreement.  There was no cover letter that asked

18   about this, or said anything about it.  It was just shown up

19   on this document here.

20   Q.    Is there anything else significant in this list of

21   things that American is now for the first time asking for you

22   to remove?  From your contract?

23   A.    Yes.  It would be a section 30.

24   Q.    What is section 30.  That is in the middle?

25   A.    That would be the amendable date of the contract.

1   Q.   And can you explain what that means?

2   A.   Amendable date, you have a contract and your date is,

3   let's say, January, 2011, when you have that amendable date,

4   the contract is still in force, it doesn't go away.  At that

5   point you have the right to bargain.  And either side can do

6   it.  Both sides can agree but you can say may, we don't like

7   this, this, this.  We would like to open up the contract

8   negotiations to renegotiate either certain sections or even

9   the entire contract.  It just depends, either side had that

10  ability to do that.

11  Q.   American was now demanding you remove that?

12  A.   Yes, they were.

13  Q.   And, going forward, this was March 17?

14          THE COURT:  They say remove it only in the

15  transition agreement.  Right?

16          THE WITNESS:  But that would be our new contract.

17  They wanted --

18          THE COURT:  But it was anticipated that that

19  contract would become of no effect as soon as the two

20  airlines were merged together.

21          THE WITNESS:  There was a question about that,

22  because the, we were told initially that American anticipated

23  the LLC lasting for three to five years.  So when we saw this

24  removal of the amendable date, it raised a red flag because

25  that went against what, if American is saying they thought it

Altman-direct                                                    86

```
 1   could last three to five years --

 2              THE COURT:  It didn't last a year.

 3   A.   It didn't at that point.  They told us initially they

 4   thought three to five years.  So when they were doing this it

 5   caught your attention, wait a minute.  If you are thinking it

 6   is going to be around for three to five years, if you want to

 7   remove your amendable date and take it away so the contract

 8   just goes away in a year, what do you do for the other two to

 9   four years that you are in the LLC.

10              It was very confusing again to us.  We didn't

11   understand where this came from.  It wasn't required.

12   Q.   It wasn't required, when we looked at your proposal on

13   March 5,   you are saying we will waive scope but this new

14   collective bargaining agreement is going to be identical in

15   every other way to our old one?

16   A.   That's correct.

17   Q.   And that would have included the September, 03,

18   amendable date?

19   A.   That's correct.

20   Q.   That was your intention?

21   A.   That was our intention.

22   Q.   Why was that important to you?

23   A.   Again, we were told initially that the LLC, the new

24   corporation, could last three to five years.  If they removed

25   the amendable date of the contract, the contract goes away.
```

1    Once that is removed, the contract is go, you don't have the

2    right to request, to bargain.  So where are you?  You have no

3    contract, you have no right to bargain a contract.  It just

4    goes away.  And it concerned us.

5    Q.   Who would have benefitted by that, by removing the

6    amendable date from the contract?

7    A.   That would have been the American airline pilots.

8              THE COURT:  But it turned out to be all theoretical

9    because the LLC didn't last a year.  Right?  The two that

10   were integrated the two lists were integrated the interim

11   contract would just go away.

12             THE WITNESS:  No.  If they wanted to remove the

13   amendable date, or --

14             THE COURT:  No, in fact, as to what happened.

15   Whatever contract the pilots had with LLC, these two lists --

16   A.   I see what you are saying.  Because it was an expedited.

17             HE COURT:  Because the National Mediation Board

18   integrated the two groups.

19             THE WITNESS:  We didn't know that was going to

20   happen.

21             THE COURT:  No, but in fact you weren't really

22   hurt, as it worked out, the change in the date really didn't

23   make a difference.  It might have if it lasted three to five

24   years, but as it played out, it didn't make a difference.

25   A.   In the end it didn't.  You are right, but we didn't know

 1    that, and that is where the concern was.

 2              THE COURT:  I understand why you are concerned, but

 3    as it turned out the three to five year lasting thing never

 4    happened.

 5    A.   That's correct.

 6    Q.   Now, moving forward from March 17 to the negotiation of

 7    what became that big document there.  What happened after

 8    this?

 9    A.   When we received the document, meaning the negotiating

10    committee, we looked at the changes that were proposed.  We

11    did question our contract administrator, where is this coming

12    from?  What is this?  We don't agree to this.  Again, we

13    wanted to process agreement and we were standing firm on

14    that.  We saw the removal of the flight pay loss, I asked the

15    question.  Why is that in there?  And Dave had got in touch

16    with --

17    Q.   David who?

18    A.   David Holtzman, our contract administrator, got in touch

19    with Terry Hayes, the TWA vice president of labor and asked

20    why is that there?

21              And the response was the APA doesn't have that and

22    they are not going to like that you have that.  And I sat

23    there and I looked over to David Holtzman and I said who

24    cares?

25              We are two separate unions at this point, two

Altman-direct                                                    89

```
 1   aseparate contracts.  What does it matter if we have that and
 2   we negotiated that in previous years, why do we take that out
 3   because obviously, or TWA said to us, American pilots won't
 4   like it.  It didn't, I didn't understand --
 5             MR. FRAM:  Your Honor.
 6   A.   I didn't understand the dynamics.
 7             MR. FRAM:  I object to the impressions and
 8   speculations.  Let's just get the facts, please.
 9             THE COURT:  I agree with that.
10   Q.   What was Mr. Holtzman's response?
11   A.   He didn't understand.  Same thing.  He just didn't
12   understand what Terry was saying saying at the time.
13   Q.   Were there any further negotiations between March 17 and
14   when this document got forwarded to you?
15   A.   No. What we did was we told David Holtzman that we don't
16   agree to this, send back the counter.  What we had sent
17   previously.  And we would wait and see what the reply would
18   be from TWA, which we never received one.
19   Q.   Did Mr. Holtzman do as you instructed him to inform the
20   other side that you were not agreeing to their proposal?
21   A.   I don't know.
22   Q.   Let me hand you D 115.
23             THE COURT:  D 115?
24             MR. PRESS:  Yes, your Honor.
25   Q.   What is exhibit D 115?
```

1           THE COURT:  Before we get to D 115, I want to ask

2      one more question.  When you were going into LLC, before any

3      integration, and flying under the LLC banner, even though it

4      was owned by American, was it anticipated in the negotiations

5      that you would be paid Americans rates or TWA's rates.

6      A.    Initially it would be TWA's rates and there was some

7      discussion as to when the effective date of the pay would

8      take effect.  And we had kind of gone back and forth as to

9      the date, originally.  I don't remember the exact date but it

10     was a little further out than we had wanted.  And we had

11     wanted the date, we wanted it closing.  We couldn't seem to

12     get that to happen.

13          THE COURT:  When did it happen?  Did it happen

14     while LLC was still flying.

15          THE WITNESS:  Yeah, it did.  It happened during the

16     LLC.  I don't remember the exact time table.

17          THE COURT:  Even before integration, whatever

18     agreement you had with LLC did raise your rates.

19          THE WITNESS:  It raised the rates.

20          THE COURT:  To the American rates.

21          THE WITNESS:  Yes, it did.

22     Q.   And when you went to the American pay rates and their

23     other contractual provisions from 2002, I believe, did you

24     make less money or more money?

25     A.   As a total package, I made less money.

Altman-direct                                                      91

1   Q.   How is that possible, if you are getting paid a higher

2   hourly rate, how is it possible for you to make less money.

3              MR. FRAM:  I object.  This gets --

4              THE COURT:  No, I will allow that.

5   Q.   I want to answer your question?

6              THE COURT:  I will allow it.

7   A.   There is more to pay than just getting a paycheck with

8   an hourly rate.  We have, as you have seen examples of the

9   contract, quite thick.  Your work rules add a lot to what I

10  would call the bottom line.

11  Q.   To most, to many people, this phrase, work work rules,

12  has to meaning.  What is that?

13  A.   Work rules would be how owe on.

14             THE COURT:  It comes out to how many hours you fly.

15  A.   How many days you are away from home, how many hours you

16  might fly.  Along, exactly along those lines.

17             So if you can work less or you can work as much as

18  you want, let's say I am single.  I don't have a family, and

19  our contract at TWA was not, there were no pay caps.  There

20  were no limits to what you could fly other than what the FAA,

21  the Federal Aviation Administration, puts down as the

22  absolute minimums.

23             THE COURT:  And maximums..

24  A.   Exactly.  Minimums and maximums.  Exactly.  You could

25  make as much as you basically wanted to make if you were

1   willing to work.  If you didn't mind being away from home.

2             Just the opposite, if you had family and you wanted

3   to spend more time at home, you could do do that.  We had

4   those options.  It is very complicated.

5   Q.   NOw, when you say we you mean when you were employed by

6   TWA?

7   A.    TWA pilots.  It is very, very complicated.  And when

8   people always have their own certain sections  that they

9   might likes more than something else, depending on their

10  circumstances of how they want to work, what their lifestyle

11  might be.  So there is a lot more to it.  You can't just say

12  here is pay rate A, here is pay rate B.  Because while on

13  paper there is a big difference and sometimes it can be

14  significant, I will grant that, it doesn't work out that way

15  when you actually are able to bid for your trips, which you

16  do the month prior to every month, how you do that.  How you

17  pick what you like to fly.  Your ability to do this.  It is

18  the ability to drop trips.  How easy if you need to have time

19  off can you drop something or you are stuck with it.

20            THE COURT:  Mr. Altman, this is all very complex.

21  The bottom line is you said you made less money because you

22  had you got to fly less hours, right?

23  A.   Y.

24       Es.

25            THE COURT:  The work rules of TWA you said gave you

Altman-direct                                           93

 1   TWA pilots cumulatively less hours than you had at TWA.

 2   A.   You had more flexibility.

 3            THE COURT:  Were you getting as many hours, were

 4   some pilots getting as many hours as they wanted?

 5   A.   Yes.

 6            THE COURT:  Those pilots were making a lot more

 7   money than they made at TWA?

 8   A.   Yeah, they were, at TWA you could make more.

 9            THE COURT:  That is what I mean.  At TWA.

10   A.   You could work as much as you wanted basically within

11   the FAA constraints.

12            THE COURT:  But not so with American.

13            THE WITNESS:  That's correct.

14            THE COURT:  So you were working less hours with

15   American, and notwithstanding the higher rate of pay, even a

16   significantly higher rate of pay, you were making less money.

17   A.   That's correct.  That is the easy way of saying it.

18   Q.   Thank you, Mr. Altman.  Did I hand you  exhibit D 115?

19   A.   Yes.

20            THE COURT:  First of all, any objection?  You are

21   offering it in evidence?

22            MR. PRESS:  I will.  It is a defendant's exhibit.

23            THE COURT:  Any objection?

24            MR. FRAM:  There is.  I don't think this witness

25   can authenticate or testify about it, your Honor.

 1              MR. PRESS:  It is on their exhibit list.

 2              MR. FRAM:  Pardon me?  Are we looking at the same

 3     document?

 4              (Off the record discussion.

 5              THE COURT:  Let me tell you what I have.  I have a

 6     cover letter which has an attachment 1, 2, 3, 4, 5, 6, 7,

 7     eight documents.

 8              MR. FRAM:  We had a mix-up.  I am sorry.

 9              THE COURT:  Excuse me.  Let me finish.  One of

10     those eight is attached.  It is that one-page proposal of TWA

11     which is the seventh of the eight shown.  The other seven

12     documents are not attached to my copy.  Do you see what I am

13     talking about?

14              MR. FRAM:  I do, your Honor.

15              THE COURT:  So you are offering the cover and just

16     that one?

17              MR. PRESS:  That is the way it came to us, and yes,

18     Judge.

19              THE COURT:  Are you objecting to that?

20              MR. FRAM:  No.  We had a mix-up with numbers.

21     Counsel has shown me what he wants to do.  I do not object to

22     this.

23              THE COURT:  He is only admitting D 115.  But I am

24     admitting it in the form it is now.  In other words, I am not

25     necessarily admitting the other seven attachments.  They may

1    be admissible at some later time in some other world.  But as

2    you see, of the seven attachments, the eight attachments, the

3    seventh is said, CBA proposal.  And that is what is, I

4    believe, is the one attached as part of 115.  That is what I

5    am admitting.

6              MR. PRESS:  Yes.

7              THE COURT:  In evidence in its current form.  And

8    there is no objection to it.

9              MR. FRAM:  Thank you, your Honor.

10   Q.   This is an email dated March 31, oh one, from Terry

11   Hayes, TWA vice president?

12   A.   Yes.

13   Q.   And he is sending it to somebody at Earthlink.net, that

14   is not you?

15   A.   No.

16   Q.   To David Holtzman, correct?

17   A.   Yes.

18   Q.   He cc's, Bernie Plum, that was his --

19   A.   It was a lawyer.

20   Q.   The subject is March 31, 2001, company proposal to ALPA.

21   Right?

22   A.   That's correct.

23   Q.   And apparently there were a number of attachments as the

24   Judge referenced, but only one is actually attached to what

25   we have, right?

1    A.   That's correct.

2    Q.   My question, Mr. Altman, is did David Holtzman forward

3    this email to you?

4    A.   No.  I had not seen this before.

5    Q.   Do you know what proposal was attached to any of, was

6    part of any of those attachments?

7    A.   No, I can't speak to any of that.  I hadn't seen it.

8    Q.   What was the next thing that happened important in the

9    negotiation of what came to be the actual transition

10   agreement?

11   A.   We have the actual meeting, MEC meeting on April 2.

12   Q.   On April 2.  So in between, you made a proposal --

13            THE COURT:  Counsel, prior to that April 2 meeting

14   TWA had filed a 1113 motion to reject your contract.

15            THE WITNESS:  That's correct.

16            THE COURT:  I mean ALPA, TWA contract.

17   A.   That's correct.

18   Q.   Between March 15 when you made your proposal and April 2

19   when the scope waiver decision was made, were there any

20   negotiations that your committee was part of?

21   A.   No.  We had not received back a counter to what we had

22   sent, or we had asked David Holtzman, we don't agree to that,

23   could you send it to them.  Let's see what they send back.

24   We never heard anything back.

25   Q.   Mr. Altman, this transition agreement, when was the

 1    first time you saw this, in this form?

 2    A.    I don't remember the exact date but it was within the

 3    week after the April 2nd meeting.   2001.

 4    Q.    Were you part of negotiating this at all?

 5    A.    Not that document.   No.

 6    Q.    The document you had seen from TWA was this little five-

 7    page thing, Exhibit 386, right?

 8    A.    That was the last document we had seen, was five pages.

 9    Q.    Do you know who negotiated the transition agreement

10    between TWA LLC and ALPA?

11    A.    No, I don't.

12    Q.    What committee in ALPA is charged with responsibility

13    for negotiating collective bargaining agreements?

14    A.    That?

15    A.    Would have been our negotiating committee.

16            THE COURT:   What exhibit number is that?

17            MR. PRESS:   Which one, the transition agreement?   P

18    139.   It is in evidence.

19            MR. PRESS:   This would be a good time for a break,

20    Judge.

21            THE COURT:   I am just looking at my watch.   The

22    jury has been very patient.   But they want to get the job

23    done.   They want to keep moving.

24            Do not discuss the case among yourselves.   Keep an

25    open mind until you have heard all the evidence.   All rise

```
 1    while the jury leaves.

 2                (The jury leaves the courtroom.)

 3                (Recess)

 4                (The jury enters the courtroom.)

 5            A L A N   A L T M A N, RESUMES

 6                THE COURT:  Mr. Press, I have a few things I want

 7    to ask Mr. Altman.  Mr. Altman, do you have P-139?

 8                MR. PRESS:  Our copy is with Larry.

 9                THE COURT:  Can I have that?

10                THE COURT:  Pretty thick.  Like the space between

11    my ears.

12                THE COURT:  Mr. Altman, this is the collective

13    bargaining agreement that governs the relationship between

14    TWA airlines, LLC, and ALPA.

15    A.   That's correct.

16                THE COURT:  It started after the closing of

17    American, it was transferred to this new entity.  And was

18    scheduled to end at such time as the National Mediation Board

19    ruled they were one integrated airline.

20    A.   That's correct.

21                THE COURT:  And you didn't know it back in March or

22    whenever, you don't know how long that was going to be, it

23    could be two years, three years, five years.

24    A.   That's correct.

25    Q.   Did you play any role in the creation of this document?
```

Altman-direct                                                99

```
1    A.   No.  This document, I did not.

2              THE COURT:  That is what I am talking about.  139.

3    Did your negotiating committee have any role.

4    A.   Not that I know of, no.

5              THE COURT:  Well, turn to, towards the very end.

6    It would be after page, this page is unnumbered.  About 74.

7    Do you see that the signature page.  Do you have that

8    signature page?

9    A.   Yes.

10             THE COURT:  It is signed by Ronald A Kiel, chairman

11   of the TWA MEC negotiating committee.  Was he in fact

12   chairman of that committee?

13   A.   Yes, he was.

14             THE COURT:  That was a committee you were on?

15   A.   That's correct.

16             THE COURT:  At least he had something to do with

17   it, he signed it, right?

18   A.   I don't know.  I think what -- I.

19             THE COURT:  Okay.  If you don't know.

20   A.   I don't know.

21             THE COURT:  Robert A Pastore signed it.  Right?  He

22   was chairman of the MEC.  Of the TWA MEC.  And Duane Woerth,

23   he was the president of the union, if I recall.

24   A.   That's correct.

25             THE COURT:  Was he full time in with the union.
```

Altman-direct                                                    100

 1   A.   Yes, he was.

 2          THE COURT:   Okay.  Now, number 2.  This agreement,

 3   so long as it was in effect, however long, didn't affect your

 4   seniority?

 5   A.   No, this was not a seniority.

 6          THE COURT:   This was preserved by its terms, I am

 7   looking at page 65, preserved the seniority you had at TWA,

 8   at TWA, Inc.  Right?

 9          In other words, American pilots couldn't come in

10   and jump you and take these TWA LLC flights.

11   A.   They couldn't have done the flights in the first place.

12          THE COURT:   It doesn't make a difference.  Your

13   seniority, I mean the TWA pilots' seniority, wasn't affected

14   by this agreement.  Work rules were affected, right.  Work

15   rules, pay rates were affected.

16   A.   That's right.

17          THE COURT:   But seniority was not.

18   A.   Seniority in the company is the date of hire with TWA.

19          THE COURT:   Yes, but they define it here as either

20   LLC or any previous company that had been taken over which

21   would of course be TWA, Inc.

22   A.   Correct.

23          THE COURT:   There was no seniority effect, this

24   didn't adversely affect --

25   A.   This wasn't going to affected seniority.

1              THE COURT:  It affected other things, but as I

2      said, some things good, some things bad.  But it didn't

3      affect seniority.

4      A.   No.

5              THE COURT:  Go ahead.

6              BY MR. PRESS:

7      Q.   Mr. Ron Kiel was the chairman of the negotiating

8      committee.  How many people were on the committee besides

9      yourself.

10     A.   I believe four.  Four or five.  I don't remember

11     exactly.

12     Q.   Would the committee, when I think of a committee, I

13     think of of people getting together, working together.  Is

14     that how your committee worked?

15     A.   That's correct.

16     Q.   When did you committee business you did it as a group?

17     A.   Yes.

18     Q.   Was there one meeting where that document was discussed?

19     A.   No. No.  This document in its entirety was never

20     presented to the entire negotiating committee.

21     Q.   Other than the fact that Mr. Kiel signed it, are you

22     aware of any evidence that anybody else on the negotiating

23     committee ever saw in before it got signed?

24     A.   No.

25             THE COURT:  When did you first see it?

Altman-direct                                            102

 1   A.   It was after the April 2, it was within the week, right

 2   after they signed it, I forget the date.

 3            THE COURT:   April 6.

 4   A.   April 6, it was in that timeframe we got a copy of it.

 5   Q.   Mr. Altman, April 2 was the date that the MEC voted to

 6   waive scope, right?

 7   A.   That's correct.

 8   Q.   You were at that meeting?

 9   A.   Yes, I was.

10   Q.   Were you aware before that meeting that TWA, Inc., in

11   the bankruptcy court had filed a motion under that Section

12   1113 to reject your contract?

13   A.   I knew they filed a motion to reject the contract, yes.

14   Q.   What was the MEC strategy as far as dealing with that

15   motion, before April 2?

16   A.   Before April 2, all advisors that we had been dealing

17   with had told us that there was no reason to waive your

18   scope.  Don't do it.  You saw previous examples here, we were

19   going on the assumption of a processing agreement.

20   Q.   I want to interrupt you.  You said all advisors.  Who

21   specifically were you referring to?

22   A.   We had a group of advisors that were advising the MEC

23   merger committee, negotiating committee.  We had Roland and

24   Bill Wilder who are our merger attorneys.  We had our

25   contract administrator, Mr. David Holtzman.  ALPA National

 1   had provided a number of advisors.  Clay Warner in legal, we

 2   had Mr. Bob Christy.  Mr. Seltzer.  I forget the first name.

 3            THE COURT:  Seltzer was the bankruptcy guy?

 4   A.   I believe so.  I forget the first name.  We had a

 5   gentleman by the name of Michael Glanzer.  He was a financial

 6   guy --

 7   Q.   Investment banker?

 8   A.   He was an investment banker.  Thank you.  We had Steve

 9   Tumblin.  He was a bankruptcy lawyer, attorney.  So we had a

10   number of different people, varying backgrounds, that were

11   advising us.

12   Q.   Mr. Altman, before the April 2 meeting, before that, did

13   you have personal contact with any of those advisors,

14   discussing the 1113 motion, and the notion of waiving scope?

15   A.   We had had meetings, you know, throughout the timeframe,

16   where scope, that was the number one primary topic.  You have

17   to waive your scope, that is what the company was asking for,

18   the asset purchase agreement, TWA, American, but advisors

19   were all stating there is no reason to.  Don't waive your

20   scope.

21   Q.   Let's be specific.  Who said that?

22   A.   Clay Warner, David Holtzman, Michael Glanzer, Steve

23   Tumblin, Mr. Seltzer.  Did I leave somebody out?  Mr.

24   Christy.  Officially in the meeting.  Everyone said there is

25   no reason to waive your scope at the time.

1   Q.   I thought Mr. Christy was the one who said you had to?

2   A.   I made the comment in the meeting but that was just, he

3   didn't stand up publicly, that was just 2 people.

4   Q.   So going into the April 2 meeting, did you have a feel

5   for how you were going to decide the issue?

6   A.   Yes.  I had no reason to vote to waive my scope.  I was

7   listening to what our advisors were telling us, I trusted

8   advisors and I listened to them.   I wasn't going to waive

9   the scope.

10  Q.   Were you listening to anybody else to reach that

11  opinion?

12  A.   We had a meeting, Council 4, the Los Angeles domicile,

13  we had a meeting on March 30, 2001, went out, talked to the

14  pilots at a local hotel in Los Angeles, we gave an update of

15  what was going on, that would be my name, Glenn Steinke and

16  Pablo Lewin were the other officers for Council 4.  Captain

17  rep and secretary treasurer.  I had done an email to my first

18  officers, in Los Angeles, and all but one said don't waive

19  scope.

20  Q.   And how many pilots in total about would that have been

21  that responded to your question?

22  A.   It was roughly about 90 that responded.

23  Q.   How many pilots did you represent?

24  A.   I think there were about 120 total I think out there but

25  I think the number was closer, but I got a response from

1    about 90.

2    Q.   So your constituents were wanting you to protect your

3    scope?

4    A.   That's correct.

5    Q.   The  meeting you just mentioned, March 30, from Los

6    Angeles, were the minutes prepared of that meeting?

7    A.   I believe there were, yes.

8    Q.   D 365.

9             THE COURT:  These are minutes of the March 30

10   meeting.

11            MR. FRAM:  No objection to that going into

12   evidence, your Honor.

13            THE COURT:  Okay.  You are offering it, Mr. Press?

14            MR. PRESS:  Yes.

15            THE COURT:  D 365 is in evidence.

16   Q.   Exhibit 365, are those minutes of the meeting you just

17   referenced, Mr. Altman?

18   A.   That's correct.

19   Q.   Did you, if you go to the second page there you see a

20   list of attendees, right?

21   A.   That's correct.

22   Q.   All right.  30 people attended the meeting it looks

23   like, right?

24   A.   Correct.

25   Q.   With that number of pilots showing up for a local

1    council meeting, would that be a good turnout, bad turnout or

2    about in the middle?

3    A.    In Los Angeles, that was about average.

4    Q.    Did you speak at this meeting?

5    A.    Yes.

6    Q.    What did you talk about?

7    A.    I gave a briefing on the 1113 motion that had been

8    filed, being that I was on the negotiating committee, and I

9    was the one that was going to give the speech.  I used a set

10   of talking points that I received from Roland Wilder, our

11   merger attorney, merger counsel, so that I didn't speak out

12   of turn or say something that wasn't right and I didn't want

13   to get into too much detail.

14   Q.    What was the upshot of what you were telling the pilots

15   about the 1113 motion?

16   A.    Basically it was expected.  It wasn't a surprise because

17   we weren't waiving our scope, that advisors that we had been

18   speaking with had told us that there is no reason to waive

19   your scope, it is not necessary, it is not needed, don't do

20   it.

21   Q.    If you go to the second page of the minutes there are

22   some resolutions, it says passed unanimously at the meeting?

23   A.    I see that.

24   Q.    Be it further resolved one.  Can you read that?

25   A.    "Be it further resolved that Council 4 pilots instruct

1    the Council 4 LEC officers to vigorously pursue the

2    protections that at all times the current and future TWA LLC

3    pilots and the retired pilots of TWA, Inc., shall be covered

4    by a collective bargaining agreement."

5    Q.    What did you understand that to mean to you?

6    A.    In any of our discussions we had with the pilots

7    present, it was we know you guys are working hard.  You have

8    got a lot more information going than we know.  Go out there,

9    do your best job for us.  Get the best protections that you

10   can for the pilots.

11              THE COURT:  That is not what this resolution is

12   about.  This resolution, isn't this resolution about having

13   the continuation of ALPA so long as TWA LLC was flying as a

14   separate entity?  Isn't that what this is all about?

15   A.    Well, we were going to remain ALPA.  I mean the union

16   wasn't going away.

17              THE COURT:  No, only so long as there was a

18   separate --

19   A.    Once there was a single carrier, that would go away.

20              THE COURT:  ALPA would go away.  But you wanted to

21   be sure that ALPA represented you while LLC was still flying.

22   A.    They didn't want to have just a nothingness.

23              THE COURT:  And you got that.  ALPA remained -- TWA

24   LLC's bargaining agent until the two airlines were

25   integrated.

1    A.   Yes.

2         THE COURT:  As long as TWA LLC was flying as a

3    separate airline.  You achieved what this resolution wanted

4    you to achieve.

5    A.   But in the gist of the conversation that we had that

6    were there --

7         THE COURT:  You can testify about that, but this

8    resolution, therefore, just two paragraphs, therefore, be it

9    resolved that Council 4 pilots instruct Council 4 LEC

10   officers vigorously pursue representation of the TWA LLC

11   pilots by the airline pilots association.  Be it further

12   resolved the Council 4 instruct its officers to vigorously

13   pursue the protections at all times, to current and future

14   TWA LLC pilots and the retired pilots of TWA shall be covered

15   by the collective bargaining agreement.  You achieved it.

16   A.   And what was included in that, we did not want to waive

17   sections of  our collective bargaining, they gave us

18   protections, and that was the gist of it.  We wanted a full

19   contract.

20        THE COURT:  In this agreement, though,  there was

21   no waiver of seniority.  TWA LLC labor agreement, this one

22   that you had, you didn't waive seniority.

23   A.   The transition agreement was given to us only if we had

24   waived scope.  If we didn't waive our scope of successorship,

25   we weren't going to have the transition agreement.  They were

```
 1    going to go forward with the 1113 motion and we didn't know
 2    at that point it would be a different scenario.  The
 3    transition agreement was given to us as conditional upon if
 4    you would waive your scope and successorship you will now
 5    have these protections.
 6                 THE COURT:  All right.
 7    Q.    Following up on the judge's comment, your constituents
 8    wanted to make sure you were still represented by your union,
 9    right?
10    A.    That's correct.
11    Q.    You agreed with that?
12    A.    I did.
13    Q.    Was was it important to have a union?
14                 THE COURT:  Not only a union, but this union.
15    Q.    This union.  Yes.
16    A.    We needed union representation.  There is no way that
17    you could go into a situation like this, a merger between two
18    companies and not be represented.  How would you do this?
19    You were going to have 2,300 pilots going off on their own
20    trying to negotiate their own seniority.  It doesn't make
21    sense.  You wanted to keep the union, wanted to keep the Air
22    Line Pilots Association as your bargaining agent.
23    Q.    On April 2 when you made the scope waiver, the committee
24    that was making the agreement with the pilots, they had not
25    reached agreement?
```

1   A.   No, there was no agreement.

2   Q.   You understood the two sides were far apart?

3   A.   Yes, the merger committees were far a part.

4        THE COURT:   Between the American pilots and ALPA,

5   there never was an agreement.   Ever.

6   A.   It wasn't mutually agreed upon.   That's correct.

7   Q.   So you knew that the struggle, seniority struggle,

8   between the two pilot groups was going to continue after

9   April 2?

10  A.   That's correct.

11  Q.   Your pilots were saying we need to have ALPA behind us?

12  A.   That's correct.

13  Q.   Okay.

14  Q.   The meeting on April 2 was in St. Louis, right?

15  A.   That's correct.

16  Q.   Were you living in St. Louis at the time?

17  A.   I was living in Los Angeles at the time

18  Q.   When did you come in for the meeting?

19  A.   I came in that prior Sunday evening.

20  Q.   And the meeting started at 9, you were there?

21  A.   That's correct.

22  Q.   In the morning, what was, what business was conducted in

23  the beginning of the meeting?

24  A.   In the beginning of the meeting we had normal MEC

25  business that we were conducting that we normally would have

Altman-direct                                              111

1    to do, issues that would come up that would require the MEC

2    to vote, whether it be by resolution or discussion.

3              We received four or five I think issues that we

4    were talking about, I don't remember exactly which ones.

5    Q.   And  then you got to the issue at hand, the scope

6    waiver?

7    A.   We took a break.  We had a lunch break.  We came back in

8    the afternoon.  One-something in the afternoon.  And the

9    scope waiver issue came up and we went into what is known as

10   executive session, where you would have guests and members.

11   Anybody could sit in on a MEC meeting, it was open.

12             THE COURT:  You mean open to pilots.

13   A.   Not the public, right, the public is into the sitting

14   in.  Any pilot could come and sit in.  Once you go into

15   executive session, there are a number of reasons why, you

16   might be talking about a person having a discipline issue.

17   Those  can't be out in public.  You go into executive

18   session.  In this situation, because it was a very

19   confidential subject that was going on, we had to go into

20   executive session.

21   Q.   And how long did you remain in executive sessions

22   talking about the scope waiver?

23   A.   Until late in the afternoon, I want to say about five,

24   5:30 in the afternoon.

25   Q.   Were there any ALPA advisors at this meeting?

Altman-direct                                                    112

1    A.   Yes, there were.  We had, our entire group of advisors

2    that were with us, David Holtzman, Mr. Glanzer, Mr. Tumblin,

3    Mr. Warner, Mr. Christy.  Randy Babbitt had been there.  He

4    was the former president of ALPA, now had his own consulting

5    firm.

6    Q.   When you saw Mr. Babbitt there, former ALPA president,

7    did you ask why the current president isn't here instead?

8    A.   I did actually.  I asked where is Mr. Woerth, who is the

9    current president.  This is a big issue.  Why is he not

10   available.  He had prior commitments.  He was busy.

11   Q.   Okay.  So these advisors, did they go in with you, was

12   Roland Wilder there?

13   A.   Our merger attorney, Roland Wilder, was there.

14   Q.   Did all those advisors go into executive session with

15   you?

16   A.   We had a meeting room we used in our MEC offices in St.

17   Louis.  Every everybody came in an in there and we shut the

18   door.

19   Q.   At the end of the day, Mr. Altman, how did you vote?

20   A.   I voted to waive scope.

21   Q.   And we looked at the minutes yesterday that showed how

22   you voted your ballots.  You voted all of them to waive

23   scope?

24   A.   That's correct.

25   Q.   My question is why?  You went in intending not to and

1    you did just the opposite?

2    A.   When we went in to this meeting, advisors' advice

3    changed.

4    Q.   What do you mean?

5    A.   Instead of what we had been told, don't waive scope,

6    there is no reason to.  We were told you have to waive scope,

7    you have to do it now.  If you don't waive scope -- and it

8    was, there were emotions involved.

9              THE COURT:  Emotions?  Not motions.  Emotions?.

10   A.   Exactly.

11             MR. PRESS:  One motion.  1113.

12   A.   There was a lot of emotions involved and it was told

13   that you have to waive the scope, you have to do it now.

14   There is no time.  It has to be done today.  And what

15   convinced me were the comments, if you don't waive your

16   scope, the 1113 motion will be granted by the court, and it

17   was told it will happen.  You will lose your contract.  You

18   will lose your union representation.  You will lose your

19   ability to grieve issues.  And you will go into this new

20   company, TWA LLC, as nonunion, noncontract, at will

21   employees.  And that concerned me.

22             The job of the LEC members is to protect jobs.  All

23   but one of our advisors, Roland Wilder was the only one that

24   disagreed with the comments that afternoon, were telling us

25   to do this.  My job as a MEC member and as per resolution was

1    to protect the job.

2            So at the end of the day I could not, my personal

3    feelings an aside, I could not make the decision based on

4    what advisors were telling us that theoretically could

5    jeopardize everybody's job.

6    Q.   How many?

7    A.   2300 pilots, roughly, at TWA.  The pressure was on.  I

8    had to make a decision that would protect the jobs.

9    Q.   Good  they tell you a decision had to be made on April

10   2?

11   A.   No.  And that was part of the emotional conversations

12   that were going to going on.  Comments were made that the

13   train had left the station.  We heard that a number of times.

14   I didn't understand what that meant.  It was just thrown out.

15           But it was a sense of urgency that I hadn't seen

16   before.  There had been no urgency, it had been fairly

17   relaxed.  You don't have to do it.  Don't worry about it.  It

18   is not going to succeed.

19           And then we are told immediately, the total change

20   that it is going to happen, you are going to lose everything,

21   and you are all going to be at will employees, and AMR is

22   American, and American, they have had a history of bad

23   relations.  You want to subject everyone to being at will

24   employees in a situation like that, where if you called in

25   sick you could lose your job, theoretically.  Couldn't do

Altman-direct                                         115

```
 1    that.

 2    Q.    These ALPA advisors, other than telling you to waive the

 3    scope, did they give you any alternative strategies?

 4          MR. FRAM:  Could we know who the witness is saying

 5    the specific individual who allegedly made the statement as

 6    aopposed to grouping them.

 7          THE COURT:  He can only testify to what he

 8    remembers.

 9    Q.    Can you address that objection?

10    A.    I do remember one name in particular.

11          THE COURT:  Okay.

12    A.    I will say that it was Mr. Warner.  I had dealt with

13    Clay Warner before, and this was a very different attitude

14    coming from him.  It was 180 agree agrees and it sticks in my

15    mind because I had known him a little better than some of the

16    others because of the feelings on the negotiating committee.

17          THE COURT:  He is an attorney with ALPA.

18    A.    ALPA leg.

19    Q.    He is an ALPA staff lawyer in Washington D.C.?

20    A.    That's correct.

21    Q.    That you dealt with.  He assured you you shouldn't be

22    waiving scope.  And we are going to win the 1113?

23          THE COURT:  No, no.  No.  You are leading.

24    A.    All right.

25    Q.    What did he tell you before April 2?
```

Altman-direct                                          116

1    A.    Just what we were told, there is no need to waive scope.

2    You don't have to do it.

3    Q.    On April 2 he flip-flopped and his opinion was what?

4    A.    You have to do it, you have to do it now.  There is no

5    time.

6          I did raise the question, because it was such a

7    huge decision, and normally we would send things out of a

8    magnitude like this to the pilot group, hey, this is what is

9    facing us, how do you vote.  Yes or no.  We would like to get

10   a pilot ratification.  I was told specifically there is no

11   time.

12   Q.    Wait.  You asked for that to happen on April 2?

13   A.    I would like to have this go out.  That is a huge

14   decision to put on our shoulders.  And we need to put this

15   out to, this is a total change in, you know, a

16   recommendations coming from advisors.  So we should, in good

17   conscious, put this out to the pilot group and it had to be

18   done that day.  And no one ever told us why.

19   Q.    Other than waiving scope did they give you any

20   alternative strategy?

21   A.    There were no alternatives offered.

22   Q.    Did any of the MEC members suggest alternative

23   strategies?

24   A.    Yes.  The question was asked?

25   Q.    What was that?

Altman-direct                                           117

1   A.   Alternative strategies was raised by Mr.  Ted Case about

2   the ability, if they took the contract, of the right to

3   strike.

4            THE COURT:  In other words, if there was no labor

5   contract at all, if the 1113 was granted, the issue raised

6   was --

7   A.   Can you strike, without a labor contract.

8   Q.   Before getting into what the response was, this right to

9   strike, a pilot that has an existing, that is working under a

10  collective bargaining agreement does not have the right to

11  strike.  Is that correct?

12  A.   Yes.  That's correct.  Certain circumstances through the

13  process negotiating, whatever might happen, and it is a very

14  long, lengthy drawn-out process before you are given that

15  Wright to walk off the job.

16           THE COURT:  That is peculiar to the Railway Act as

17  distinct from the National Labor Relations general law

18  governing, right?

19  A.   That's correct.

20  Q.   The question was if the bankruptcy court rejects our

21  contract, and we don't have one, does that mean we have the

22  right to strike.  That was the question posed?

23  A.   That was the question.

24  Q.   And who responded and what was the response?

25  A.   The response was from Clay Warner and he said no.

```
 1   Absolutely you do not have the right to strike.

 2   Q.   Do you recall any other advisors responding to the

 3   question?

 4   A.   I don't recall the others.  I just remember Clay,

 5   speaking to that.

 6   Q.   P 136.

 7              THE COURT:  J?

 8              MR. PRESS:  P 136.

 9              THE COURT:  J.

10              MR. PRESS:  It is J, I am sorry.

11              THE COURT:  I have J 136.

12              MR. PRESS:  J 136.  That's correct.

13   Q.   Do you have that in front of you?

14   A.   Yes, I do.

15   Q.   Mr. Seltzer was the bankruptcy lawyer.  He was there, on

16   April 2?

17   A.   That's correct.  One of the advisors present.

18   Q.   What did he say about your chances or prospects of

19   prevailing in the bankruptcy court on this 1113 motion?

20   A.   99 point 99 percent that you won't.

21   Q.   Is that a quote?

22   A.   That was a quote.

23   Q.   99.9 chance you will fail and the Court will take your

24   contract and reject it?

25   A.   That's correct.
```

```
 1   Q.   This is a brief that was filed in the bankruptcy court

 2   three days before your meeting.

 3            THE COURT:   What are you showing?

 4            MR. PRESS:   Exhibit J 136.

 5            THE COURT:   Okay.

 6   Q.   Just for, let's start, stay at the front page.   What is

 7   the document titled after you get a court caption.   Then

 8   there is a title to it.   Objection.   Do you see that?

 9   A.   Objection of Air Line Pilots Association International

10   in opposing to the debtor TWA's motion for an order

11   authorizing the rejection of its collective bargaining

12   agreement pursuant to Section 1113.

13   Q.   So this is ALPA's objection to the 1113 motion.   Right?

14   A.   Yes.

15   Q.   If you go to page 30 there are some signatures there.

16   There is one signature, three law firms are listed there,

17   right?

18   A.   That's correct.

19   Q.   The middle one is Cohen, Weiss, and Simon and Richard

20   Seltzer, correct right?

21   A.   That's correct.

22   Q.   Mr. Tumblin's firm is LeBoeuf?

23   A.   That's correct.

24   Q.   Both of those gentlemen were at this meeting, correct?

25   A.   Yes, they were.
```

Altman-direct                                                    120

1    Q.   Did they bring a copy of this and distribute it at the

2    meeting?

3    A.   No.

4    Q.   This brief?

5    A.   No.

6    Q.   For the record, how many pages of argument is in this

7    brief, before they signed it?

8    A.   29 pages.  30.

9              THE COURT:  Not counting exhibits.

10             MR. PRESS:  Not counting exhibits.

11   A.   Looks like 30 pages.

12   Q.   30 pages, and they sum up, they conclude saying for the

13   foregoing reasons in those 30 pages, what?

14   A.   The TWA's motion to reject the CBA under Section 1113

15   should be denied.

16   Q.   30 pages of reasons why it should be denied.  Did they

17   articulate any of those reasons to you on April 2?

18   A.   No.

19   A.   I never seen this document.

20   Q.   If you go to page 29 of the brief, Mr. Altman, you will

21   see a footnote.  I think it is footnote number 24.

22   A.   Okay.

23   Q.   Can we have that enlarged?  Can you read the first

24   sentence of that footnote 24, the first footnote?

25   A.   A union's right to strike after a bankruptcy court

1    approves rejection of collective bargaining agreement is

2    clear.

3    Q.   The right to strike is clear is what the lawyer said in

4    the brief, right?

5    A.   That's correct.

6    Q.   What  did they tell you at your meeting three days

7    later?

8    A.   Absolutely not.  There is no right to strike.

9    Q.   If you go to page 5 of the brief.  Paragraph 7.  Can you

10   read that?

11             THE COURT:  Footnote 7.

12             MR. PRESS:  I am sorry.  Paragraph number 7 in the

13   body.

14             THE COURT:  Okay.

15   Q.   What are the bankruptcy lawyers telling the Court in

16   that, subsection A?

17   A.   Of section 1 provides for recognition of ALPA as the

18   representative of TWA's pilots, and is the one subsection of

19   section 1 that TWA does not seek to reject.

20   Q.   Okay.  Now, what does that mean when you read it, what

21   do you understand that to mean?

22   A.   It is going to, ALPA will be recognized as our

23   bargaining agent.

24   Q.   TWA, while they were seeking to reject your collective

25   bargaining agreement they were not seek to go terminate

1    ALPA's representation?

2    A.   No.

3    Q.   That what is this said?

4    A.   They would copy ALPA as the bargaining agent.

5    Q.   What do they tell you three days later about that?

6    A.   If we went through with the 1113 and it would be granted

7    that we would lose not only the contract but our bargaining,

8    our representative.

9    Q.   And remember, getting back to your meeting that the

10   Judge was talking to you about with your local council and

11   their concern was what?

12   A.   Best deal you can do.

13   Q.   And don't lose ALPA representation?

14   A.   Don't lose ALPA representation.  Yeah.  No one wanted to

15   remove ALPA as our representative.

16   Q.   And according to this brief, that wasn't, there was no

17   chance of that happening, right?

18   A.   According to the brief.

19   Q.   At this meeting on April 2 did anybody use words to this

20   effect that if you waive scope, you need to understand that

21   when it comes to the seniority negotiation, that is going on,

22   game over.  Quote.  Did anybody use words to that effect?

23   A.   I have never heard that mentioned before.

24   Q.   Mr. Altman, you were not involved in the seniority --

25   there were seniority negotiations between the two pilot

 1  groups after this, right?

 2  A.   That's correct.

 3  Q.   You were not involved in that?

 4  A.   I was not a member of the merger committee so I was not

 5  involved.

 6  Q.   But you were still on the MEC and stayed advised of

 7  their status?

 8  A.   That's correct.

 9  Q.   Generally tell us what the status was come October?

10  A.   Not good.  No agreement had been reached.  The APA came

11  out and said they were going to staple more than half the TWA

12  pilots to the bottom of the list, in other words, we were all

13  slotted on the bottom,  and they were going to do roughly and

14  eight to one ratio starting from the bottom of the list

15  working up for the rest of the people.

16  Q.   There was testimony by Mr. Case about a meeting in

17  Washington, DC, the end of October, October 23.  Were you

18  there?

19  A.   Yes, I was.

20  Q.   And there was a vote by the MEC on whether to accept the

21  American pilots seniority proposal.  Correct?

22  A.   That's correct.

23  Q.   How did you vote?

24  A.   I abstained from that vote.  In other words, I couldn't

25  vote yes, I couldn't vote no.  And the reason being, if we

```
 1   were handed three pages of bullet points, and I did not know
 2   what three pages of bullet points would turn into, reference
 3   back to earlier in the timeframe when we were working on a
 4   transition agreement, the last document I had seen was five
 5   pages long.  Comes back down after the fact and I don't know,
 6   100 something pages long, so I didn't have time to study that
 7   and no what, and I didn't see a complete language package
 8   presented in front of me --
 9            THE COURT:  Who prepared this bullet points?
10   A.   I don't remember where the bullet points came from.  It
11   bass handed to us by Jeff Brundage who was the vice president
12   of labor at American itself.  I don't know who prepared them,
13   though.  He may have gotten them from the APA.  I just didn't
14   have the information to vote either up or down.  I just
15   couldn't do it.  I wasn't going to do it.
16   Q.   Now, what came down shortly after that meeting, first of
17   all, the MEC did reject the proposal, right?
18   A.   That's correct.
19   Q.   And what came shortly was this Supplement CC, which was
20   which was the seniority of the two, the integration of the
21   two lists, right?
22   A.   That's correct.
23   Q.   And did that differ in any important way from what you
24   understood the proposal was in October?
25   A.   No, it was the same.  It was more than half stapled and
```

1     the ratio, the slots from the bottom to the top of the list.

2     Q.   Mr. Altman, you were hired in January, 97, by TWA.

3     Correct?

4     A.   That's correct.

5     Q.   Were you part of the staple?

6     A.   Yes, I was.

7             THE COURT:  Was that based on your seniority, the

8     fact that you were one of the 1300 that were stapled.

9             THE WITNESS:   Yeah, where they came with the

10    number.

11            THE COURT:  TWA took the list and stapled the

12    bottom two thirds.

13            THE WITNESS:  Yup.  They drew a line and said there

14    you, you go, you are stapled.

15            THE COURT:  People above that seniority got the one

16    in eight figure.

17    A.   Starting from the reverse up, is how they did it.

18    Q.   Exhibit J 314, Mr. Fram.

19            MR. FRAM:  Thank you.

20            THE COURT:  Any objection?

21            MR. FRAM:  No, none of the J's, your Honor.

22            THE COURT:  Okay.  J 314 is in evidence.

23    Q.   Exhibit J 314 is a lengthy document.  What is it, Mr.

24    Altman?

25    A.   It looks like a seniority list of TWA pilots.

Altman-direct                                          126

```
 1    Q.    Are you on it?

 2    A.    Yes, I am.

 3    Q.    Where?

 4    A.    There is no page number.

 5               THE COURT:  Near the bottom.

 6               THE WITNESS:  Thanks.

 7               MR. PRESS:  Not really.  Let's be clear.  This is

 8    just TWA pilots.  Right?

 9    A.    Yes.

10    Q.    This was a list before the American deal?

11    A.    That's correct.

12    Q.    Before you got integrated with the American pilots?

13    A.    That's correct.  If you look next to my name on the left

14    side, 17 38.  On the far left.  Seniority number.

15    Q.    If you will look at the bottom, there is ALPA number,

16    document numbers, what page are you on?

17    A.    Looks like 028928.

18    Q.    Your seniority number was what?

19    A.    1738.  1738.

20    Q.    And approximately how many TWA pilots were behind you?

21    A.    The list ends at 2349.

22    A.    Six, 700 people.

23    Q.    All right.  But when you were hired in '97 you were the

24    last?

25    A.    I was at the bottom of the list.
```

1    Q.   So in the four years that you were employed, 600 pilots

2    were hired behind you?

3    A.   I moved up the list fairly quickly.

4    Q.   And why, how was that possible?

5    A.   TWA was doing a lot of hiring.  There was growth, there

6    were new airplanes coming.  So it was actually a very

7    exciting time to be moving up a list that quickly.

8    Q.   I am going to hand him J 365 which is the combined list.

9    The original is with Larry.  I don't want him to dig it out

10   so I will give you my copy.

11          THE COURT:  That is in evidence.

12          MR. PRESS:  It is in evidence, Judge.

13   Q.   That is the combined list, after you guys got stapled to

14   the American list, right?

15   A.   That's correct.

16   Q.   Where are you on that.  If you go to page 7143, if you

17   need this?

18   A.   I will try to find the page.  I don't have a 7143, 43.

19   I have a 70  -- it may take me a few minutes to look for it.

20   Q.   7143.  The document numbers?

21   A.   Oh, okay.

22   A.   I have it.

23   Q.   Where are you on the combined seniority list with the

24   American pilots?

25   A.   Looks like 13,236.

Altman-cross/Fram                                            128

1    Q.   How 67 seniority did you lose?

2    A.   A lot.

3    Q.   You were furloughed from TWA LLC when again?

4    A.   January, 2003.

5    Q.   Have you been called back by American to work?

6    A.   No, I have not.

7    Q.   Just so the jury understands that, recalls from furlough

8    happen in inverse seniority order, right?

9    A.   That's correct.  So they are going from the top of the

10   list, they work their way down.

11   Q.   They haven't made their way down to you yet?

12   A.   No, they haven't.

13           MR. PRESS:  That I that is all I have, Judge.

14           THE COURT:  Okay.  Cross examine.

15           MR. FRAM:  Thank you, your Honor.

16           CROSS EXAMINATION.

17           BY MR. FRAM:

18   Q.   Mr. Altman, you testified here today that you attended a

19   meeting on April 2 of 2001 of the TWA MEC?

20   A.   That's correct.

21   Q.   You testified that Richard Seltzer, an attorney, was

22   present at the meeting?

23   A.   That's correct.

24   Q.   It is your testimony, sir, that Richard Seltzer advised

25   you and the other members of the MEC that there was a 99.9

1    percent chance that the Section 1113 motion would be granted?

2    A.   That's correct.

3    Q.   Sir, do you recall when Mr. Katz took your deposition in

4    this case on April 28 of this year, about six weeks or so

5    about six weeks or so ago?

6    A.   I remember the deposition.

7    Q.   Do you recall being deposed in Las Vegas as part of the

8    preparation for this trial?

9    A.   That's correct.

10   Q.   Do you recall, sir, being sworn to tell the truth, the

11   whole truth, and nothing but the truth, before you gave your

12   deposition testimony?

13   A.   That's correct.

14           MR. FRAM:  Your Honor, I have the original of the

15   transcript for your Honor.

16           THE COURT:  Okay.

17   Q.   Again, sir, I show you a copy of the transcript of your

18   deposition.  I am going to ask you, sir, to turn, please, to

19   the --

20           THE COURT:  Let me tell the jury, I think you know,

21   that in our pr aactice the attorneys are allowed to question

22   potential witnesses outside the Court before a trial starts,

23   and it is usually done in a lawyer's office, but it can be

24   done anywhere, and the witness is placed under oath, and

25   those answers given to any questions have the same force, if

Altman-cross/Fram                                                    130

```
 1   they are admitted here or heard in court, have the same

 2   effect as the testimony would have in court.

 3           MR. FRAM:  Thank you, your Honor.

 4   Q.  Mr. Altman, turn, please.  --

 5           MR. PRESS:  Mr. Fram, do you have a copy of the

 6   transcript for me?

 7           MR. FRAM:  I don't know if we have an extra copy.

 8           THE COURT:  If you don't have it, you can use mine.

 9           MR. FRAM:  Or look over my shoulder.

10           THE COURT:  Keep things rolling.

11           MR. FRAM:  We have one, your Honor.  Page 168.  I

12   would ask you to refer to line 12.  You are being questioned

13   about what happened at the April 2 meeting.  Mr. Katz asked

14   you:

15           "What did Richard Seltzer say at the April 2

16   meeting?"

17           Your answer was, "I don't recall who said what to

18   us on an individual basis."

19           "QUESTION:  Do you recall anything that Richard

20   Seltzer said at the meeting?

21           "ANSWER:  No, I remember what was told to us."

22           Did I read that correctly, sir?

23   A.  Yes, you did.

24   Q.  So your recollection of the April 2 meeting is better

25   today than it was about six weeks ago?
```

1    A.   When I went to the deposition --

2    Q.   Can you answer my question?  Is your recollection better

3    today?

4    A.   Yes, it is.

5    Q.   When you were deposed back in April you testified that

6    you hadn't looked at any documents or even thought about any

7    of these issues for ten years.  Do you recall that?

8    A.   That's correct.

9    Q.   Have you taken some time since your deposition to look

10   at documents and to try to recall what happened?

11   A.   Yeah, I prepared for this trial.

12   Q.   Okay.  And how soon before your deposition on April 28

13   were you contacted about you being involved in this trial,

14   sir?

15   A.   Maybe a week before beforehand.   It wasn't very long.

16   Q.   And the person who contacted you was what?

17            MR. PRESS:  Judge, I think this invades the

18   privilege.

19            MR. FRAM:  Oh, no.  Let me rephrase, your Honor.

20            THE COURT:  All right.  Skirt around that.

21   Q.   The person who contacted you was Howard Hollander,

22   correct?

23   A.   Yes.

24   Q.   Mr. Hollander asked you if you would spend some time

25   with the attorneys representing him in this case.  Yes?

 1    A.    No.

 2    Q.    I see.

 3    A.    No.  What Howard asked me, if I would be willing to

 4    possibly testify at the trial, and I said sure.  Whatever you

 5    guys need, I can do it.  I haven't been involved in ten

 6    years, but you I can do it if you would like.

 7    Q.    Sir, did you attend a meeting of the TWA MEC on March 21

 8    and 22 of 2001?

 9    A.    I am trying to remember the dates.  I don't remember.

10    If there was a MEC meeting, I would suspect that I did.

11    Q.    Did you review documents to try to bring events back to

12    you in preparation for you your testimony?

13    A.    Yeah, there are a lot of documents and a lot of dates.

14    Q.    Did you review any documents other than the ones you

15    were asked about by Mr. Press on direct?

16    A.    I went through a lot of different documents.

17    Q.    Let me ask you, I am going to refer you to D 223 which

18    is in evidence, and ask if you recognize those as the

19    official minutes of the TWA MEC meeting on the dates

20    indicated, March 21 and 22?

21    A.    Yeah, okay.  That's correct.

22    Q.    You listed under Council 4?

23    A.    Yes, that's correct.

24    Q.    Now, there was some discussion at that meeting about the

25    fact that a Section 1113 motion had been filed.  Do you

1    recall that?

2    A.   On the second page, vice chairman gave a brief on it,

3    that's correct.

4    Q.   Do you recall any comments that were made by advisors

5    during that meeting?

6    A.   And tell us, sir, without looking at the document, do

7    you recall without looking at the document anything that any

8    of advisors said at the meeting.

9    A.   Not, I can't speak to that because it was ten years ago.

10   Without looking at the document, I don't know who was present

11   and who wasn't.

12   Q.   Do you recall that there was a period of time when the

13   meeting went into executive session?

14   A.   I don't remember, but if it says it did, it did.  Ten

15   years ago.

16   Q.   Page 3 of the document document, please.  Thursday,

17   March 22, 2001.  Just blow up where it says transaction

18   update on the very bottom, merger committee.

19   A.   Okay.

20   Q.   You see it says 9:15 RAUTENBERG/YOUNG move to enter into

21   executive session.  Vote passed?

22   A.   I see that.

23   Q.   Do you agree on the next page that the MEC remained in

24   executive session until 12:30.  Which would have been over

25   three years.

Altman-cross/Fram                                                    134

1    A.   That's correct.

2    Q.   Do you recall advisors saying things to the members of

3    the MEC about the pending 1113 motion?

4    A.   I don't remember who was at this meeting in terms of

5    advisors.

6    Q.   Well, do you remember advisors -- regardless of whether

7    you remember who was there, do you remember advice about the

8    Section 1113 motion?

9    A.   All the advice that we had received prior to April 2nd

10   was you don't need to waive your scope.

11   Q.   Okay.  My question, sir, was about the 1113 motion.  Are

12   you with me?

13   A.   Yeah.

14   Q.   Do you agree that the issue of whether the 1113 motion

15   would be granted or denied was different from the issue of

16   whether scope had to be waived or not?

17   A.   I don't remember if it was discussed at that executive

18   session.  I am not going to speak on that if I don't remember

19   it.

20   Q.   I asked you whether you understood that the Section 1113

21   motion, the issue of whether it would be granted or denied,

22   was a separate issue from waiving scope?

23   A.   Yes, 1113 was a separate issue.  That was if we did not

24   waive our scope they would go ahead with the 1113 motion.

25   Q.   But what was TWA, as you understand it, trying to

Altman-cross/Fram                                            135

1    achieve through the 1113 motion?

2    A.    They wanted to, or what they told us, was that if we

3    didn't voluntary waive our scope and successorship that they

4    would go to the Court and ask for it that way.

5    Q.    Do you recall that the Section 1113 motion sought to

6    reject the entire collective bargaining agreement?  Do you

7    recall that?

8    A.    Yes, I do.

9    Q.    Let's go back to this meeting.  Do you recall what any

10   of advisors said with respect to Section 1113 or anything

11   else during that meeting?

12   A.    No.

13   Q.    No?

14   A.    No.  Not in the executive session, I sure don't.

15   Q.    Do you recall what Mr. Seltzer said about the chances

16   that the Section 1113 motion would be granted?

17   A.    Not in this meeting, I don't.

18   Q.    But you do recall that the, that he told you and others

19   on April 2 that there was a 99 percent chance it would be

20   granted?

21   A.    That's correct.

22   Q.    You testified that you were surprised because that was

23   contrary to the prior advice, yes?

24   A.    That's correct.

25   Q.    Does that help you remember that the advice Mr. Seltzer

 1   would have given on March 22 would have been that the Section

 2   1113 motion would not be granted?

 3          MR. PRESS:  Judge, I object.  He is really trying

 4   to pull stuff out of his head that isn't there.  I object to

 5   it.  He is asking him to speculate.

 6          THE COURT:  He seems to be handling it pretty well.

 7          MR. PRESS:  Okay.

 8          THE COURT:  I am going to let him move forward.

 9   Q.  Mr. Altman, let's break it down while we are on the same

10   page.  You testified that Mr. Seltzer told you and the other

11   MEC members on April 2 that there was a 99.9 percent chance

12   that the Section 1113 motion would be granted, right?

13   A.  That's correct.

14   Q.  You said that was a surprise, that that was different

15   from the advice that you had received previously.  Yes?

16   A.  That's correct.

17   Q.  So does that refresh your memory that the advice on

18   March 22 was that, was something other than that, with

19   respect to the Section 1113 motion?

20   A.  No, because I don't remember if they were there on the

21   22nd.  I can't speak to the date of when, you know, if they

22   said it that day or not.

23   Q.  In fact, in your mind, all of the meetings in March ran

24   together and you were unable to distinguish what was

25   discussed back and forth at those meetings, right?

Altman-cross/Fram                                        137

 1   A.   No.  I could distinguish what was being discussed.  We

 2   had daily meetings.  It was normally the same topic over and

 3   over again, it was the topic of what was important to us.

 4   But as to what was talked about in the executive session, if

 5   I don't even know if advisors were at this meeting on that

 6   day.  I know what advice we were given prior April 2.  We

 7   were all given the same advise.

 8   Q.   Do you recall Mr. Warner at the meeting on March 22

 9   drawing on the flip board outlining the different possible

10   outcomes of the Section 1113 motion?

11   A.   No.

12   Q.

13   A.   I don't remember if he was there on the 21, 22.

14   Q.   Do you remember any of advisors who were there on the

15   21?

16   A.   Actually I don't remember any of advisors being there.

17   Q.   You testified before that a meeting on January 23, 24,

18   and 25, was the first time you heard about the likelihood

19   that the TWA pilots would have to waive scope?

20   A.   No, that is not what I heard.

21   Q.   What did you hear, you said you heard about something

22   for the first time on that meeting?

23   A.   No, it was a passing excellent that was made comment

24   that was made to myself and other members of the negotiating

25   committee, it was just you guys are going to have to waive

1    scope.   It came from the economic and financial analysis

2    adviser, Mr. Bob Christy.   It wasn't done in the formal

3    setting when we started the meeting, he made the comment to

4    us and I just brushed it off.

5    Q.   And was that that the first time that you heard that the

6    pilots might have to waive scope?

7    A.   /TPHAFRPBLGTS was the first time anybody had said

8    something like that to us.

9    Q.   I am going to hand you, sir, D 242.   And ask you to

10   confirm that these are the official minutes of the TWA MEC

11   meeting on January 11, 2001?

12             THE COURT:   The MEC?

13             MR. FRAM:   Yes, your Honor.

14   A.   Well, I would say they are the minutes.   I haven't seen

15   these in ten years, nor have I had access to them.   So I will

16   say that they are and they have to be official.

17             MR. FRAM:   Your Honor, I move D 242 into evidence.

18             MR. PRESS:   No objection.

19             THE COURT:   Okay.   D /STWO 42 in evidence.

20   Q.   Mr. Altman, so this was not among the documents that you

21   reviewed to prepare for your testimony in court.   Correct?

22   A.   I don't remember seeing this one.

23   Q.   Do you agree you were present at this meeting?

24   A.   Yes, I was.

25   Q.   And it shows you I guess as a committee member.   Let's

Altman-cross/Fram                                              139

```
 1   blowup where it says committee members.  I see you are listed

 2   as a sergeant at arms.

 3   A.   That's correct.

 4   Q.   And the first thing that happened below that at 9 ten

 5   was master chairman report Bob Pastore.  Captain Pastore

 6   talked about the events leading up to the bankruptcy, yes?

 7   A.   That's correct.

 8            THE COURT:  It says committee members.  What

 9   committee.

10   A.   I was on the negotiating committee.

11            THE COURT:   So that referred to the negotiating

12   committee.

13   A.   We had negotiating people there, I see --

14            THE COURT:  No, no.  It says committee members.

15   There is a list of, I want to know what committee.

16   A.   Not all of them.  They are different committees.

17            THE COURT:  Anybody who was a member of a committee

18   is on here.

19            THE WITNESS:  If he was available.

20   Q.   All the committee members get lumped together for the

21   purposes of the note?

22   A.   That's correct.

23   Q.   The committee you were on that point was the negotiating

24   committee?

25   A.   That's correct.
```

Altman-cross/Fram                                          140

1   Q.   You had been on the negotiating committee for most of

2   2000.  Is that correct?

3   A.   That's correct.

4   Q.   As part of your work on the negotiating committee had

5   you learned information about TWA's financial affairs?

6   A.   Yes.

7   Q.   One of the things that happened in 2000 is that TWA

8   stopped making payments into the so-called DAP fund.  Do you

9   recall that?

10  A.   Yes, I do.

11  Q.   TWA came back to the pilots, their own pilots and asked

12  for some concessions because of it is difficult financial

13  circumstances?

14  A.   That's correct.

15  Q.   And you became aware in your role on the negotiating

16  committee that TWA was being shopped around for a potential

17  transaction because of its bad financial status.  Correct?

18  A.   No.  That is not correct.  Not because of their bad

19  financial status.  The industry at the time, there were a lot

20  of mergers that were being talked about.  That was pretty

21  standard at that timeframe.

22  Q.   What was your understanding of TWA's financial condition

23  toward the end of 2000?

24  A.   Nothing different than it had been since I had been

25  there, it had never been a very strong financially sound

Altman-cross/Fram                                                        141

```
 1   carrier.  I had no reason to believe that it was in any worse
 2   situation than it had been.  No one of showed us any proof,
 3   any numbers, or anything else, anything different.
 4   Q.   So were you not getting reports from Mr. Pastore who was
 5   on the board of TWA about its dire financial condition.  Is
 6   that your testimony?
 7   A.   It wasn't reports of dire financial situation.  You
 8   brought up the point that the company had asked for
 9   concessions, and one of their main sticking points in their
10   concessions was that they wanted to have none seniority list
11   instructors in the training center and their total savings
12   was 17 million dollars a year in their concession package.
13   If you are in dire financial straits, I don't know how 17
14   million dollars is going to save the company.
15   Q.   Let's turn to the second page of the minutes, please.
16   Under questions and answers.  You see where it says Judge
17   Ralph Mabey. LeBouef, Lamb, Green and McRae.  Do you see
18   that?
19   A.   Yes,I do.
20   Q.   Who was Judge Mabey?
21   A.   He was a partner with Steve Tumblin, in their firm.
22   Q.   And he was a retired federal bankruptcy judge, correct?
23   A.   Correct.
24   Q.   He had enormous expertise and experience in dealing with
25   bankruptcy issues, correct?
```

1    A.    Yes.

2    Q.    He gave a briefing with respect to one of the bankruptcy

3    hearings?

4    A.    He gave us a briefing on it, that's correct.

5    Q.    And I am just going to pick up on the third line.  The

6    minutes indicate that the court, referring to the bankruptcy

7    court, also ruled on the sale or auction of the airline on

8    January 27.

9          The sale must be concluded by May 30.  What sale

10   did you understand him to be referring to?

11   A.    That would be the asset purchase.

12   Q.    That would be the sale of TWA's assets to American

13   Airlines?

14   A.    That's correct.

15   Q.    And then he said, it says here, Mabey addressed employee

16   matters.  Before the sale closed TWA shall amend the

17   collective bargaining agreement with regard to scope,

18   benefits, and seniority integration.  ALPA's scope is in

19   place and cannot be changed by TWA, but could slow the

20   process down.  However, if American walks away, what do you

21   have left?  This means that we will need to negotiate the

22   best possible deal.  We can take this to court, but risking

23   American walking away from the deal."

24          That is what he said.

25   A.    I don't agree with the walking away comment that was

Altman-cross/Fram                                          143

 1    made.

 2                THE COURT:  The question is not whether you agree

 3    with it.  The question is, is that what he said.

 4    A.    That was his opinion.  This is the judge's opinion in

 5    the case.

 6    Q.    That is the information and advice he communicated to

 7    the group.  Yes?

 8    A.    That is what he said, yes.

 9    Q.    Well, did you have any reason to disagree or not credit

10    what this former federal bankruptcy judge was telling you and

11    the other members of the MEC?

12    A.    Yes, we did.

13    Q.    Why, let me ask you a question.  Why were you skeptical

14    of what Judge Mabey was telling the pilot group?

15    A.    In.

16    A.    In public communications, American Airlines was putting

17    out about this deal, they were talking about how great this

18    was.  Bragging about this in the press.  We are going to be

19    the largest airline in the world.  There was a third party

20    involved there.  It was going to be part of U.S. Air.  It was

21    going to be a three-  party deal originally.  Mr. Don Carty

22    who, was the CEO of American Airlines at the time, was

23    staking his reputation and said he was staking his reputation

24    on this deal.

25                THE COURT:  Who was present?

1    A.    Don Carty.

2          THE COURT:   How do you spell that?

3    A.    C A R T Y.

4          THE COURT:   President of?

5    A.    CEO of American Airlines, AMR Corporation.  He publicly

6    came out and said I am staking my reputation on this.   So

7    when you heard the public comments coming from the American

8    side, how great this was going to be, we are going to be

9    number 1, we need this to be competitive, Mr. Bob Keuwa, who

10   was vice president of flight at American Airlines was telling

11   his people this was a great deal.  We need this to be number

12   one, we need this to be competitive.  Why would they in one,

13   publicly go out and say what a great deal this is, and then

14   turn around and say if you don't like the scope, your job

15   protections, as I said earlier, the best protection you have

16   in the contract, we are going to walk away from the deal.  It

17   didn't make sense.  It was conflicting.

18   Q.    But the American people were communicating that if the

19   deal with did not move forward quickly that they would walk

20   away, right?

21   A.    No, that wasn't communicated by American to us.

22   Q.    Wasn't that communicated to you as Americans position?

23   A.    That was told to us that was Americans position, but I

24   never heard from anybody at American Airlines say that to me.

25   He heard Mr. Terry Hayes.

Altman-cross/Fram                                                    145

1    Q.    Terry Hayes, who was with TWA, say American is going to
2    walk away from the deal?
3    A.    Yes.
4    Q.    And you thought American was walking, right?
5    A.    I didn't believe it.  It didn't make sense.  There was
6    conflicting information.  You just figured it was standard
7    negotiating ploys and tactics.
8    Q.    You thought is what scare tactics, right?
9    A.    Yes, I did.
10   Q.    You told us in your deposition that you thought it was,
11   it was a BS excuse, right?
12   A.    That's correct.
13   Q.    A BS excuse so that American and TWA could get the upper
14   hand on the TWA pilots, in negotiations?
15   A.    That's correct.
16   Q.    Now, what Judge Mabey told the group on May 11 was that
17   he reminded the group that the asset purchase agreement
18   required a waiver of scope.  Yes?
19   A.    That's correct.
20   Q.    You all understood that?
21   A.    Yes.
22   Q.    He also told everybody there was the danger of American
23   walking away from the deal?
24   A.    That was his opinion.
25   Q.    And his advice at that point in time was that the TWA

Altman-cross/Fram                                          146

```
 1    pilots would need to negotiate the best possible deal with

 2    American.   Yes?

 3    A.    That was his opinion, yes.

 4    Q.    And you disagreed with his opinion.  Is what that what

 5    you are telling us.  You felt there were options other than

 6    negotiating the best possible deal?

 7    A.    Our bankruptcy, our merger county, Roland Wilder, had

 8    differing opinions, and we had a did number of different

 9    advisors.  Most all were saying the same thing, the same

10    tactic of you don't have to waive your scope, but Mr. Wilder

11    said no, you don't, I have a plan, I have an idea here.

12    Going forward.  It was too early in the process to just throw

13    in the towel like this and say we are done, we are going to

14    waive scope.

15    Q.    And what happened is you and the other members of the

16    negotiating committee negotiated back and forth through

17    February, through March, and got the best possible deal that

18    you could get on the table from TWA.  Correct?

19    A.    No.  We negotiated for twelve days and then we, or

20    fourteen days, and we never heard from them again and they

21    presented a transition agreement that I had not seen.  That

22    was not negotiated by me.

23    Q.    When do you claim the last negotiation sessions were

24    made?

25    A.    Their counter, on the 17th, that they gave us on the
```

Altman-cross/Fram                                          147

1    17th of March.

2    Q.   Isn't it a fact, sir, that there were further proposals

3    exchanged by the negotiating committees on March 20?

4    A.   I don't remember that many.

5    Q.   Isn't it a fact that the negotiating committees met by

6    telephone on March 26 of 2001?

7    A.   The negotiating committee, we talked every single day.

8    Q.   Sir, isn't it a fact that the negotiating committees of

9    the TWA MEC negotiating committee met by telephone, had a

10   telephone conference with the representatives of TWA on March

11   on March 26?

12   A.   I don't recall that phone call.

13   Q.   Are you saying it didn't happen or are you just saying

14   this is one of the many events in the timeframe?

15   A.   No, I don't recall.

16        THE COURT:   He doesn't recall it.

17   A.   I don't recall.

18        THE COURT:   Doesn't remember.

19   Q.   But you are saying that the negotiating committee, the

20   members of the negotiating committee, of the TWA MEC, that

21   you all met or talked every day?

22   A.   We talked all the time.

23   Q.   You were asked some questions about the scope waiver

24   issue.  Do you have J 168 handy, this is the letter of March

25   5, 2001.

Altman-cross/Fram                                            148

1    A.    Hold on a second.

2          THE COURT:  168.

3    Q.    J 168, March 5, 2001.

4    A.    Yes, I do.

5    Q.    And you testified that paragraph 1, the first numbered

6    paragraph, can we pull that up, that first numbered

7    paragraph.  You testified that the MEC communicated in this

8    paragraph that it would insist on seniority arbitration.  Do

9    you recall that?

10   A.    Who insisted on that?

11   Q.    You indicated that the MEC negotiating committee

12   insisted in its communications with TWA that it would not

13   waive scope and would insist on seniority integration.  I am

14   sorry.  Seniority arbitration?

15   A.    That is what we were pressing.

16   Q.    That is your testimony about what was being conveyed in

17   this letter, yes?

18   A.    Yes.

19   Q.    Seniority arbitration.  Can you show us in paragraph 1

20   where there is any reference to arbitration.

21   A.    Our process agreement that we came up with and what we

22   had talked about was process agreement that would end in

23   arbitration and that is what was conveyed, the process

24   agreement and probably why now, I was asked why it is in

25   parentheses, because the process agreement, there is an

1    explanation as to what it entailed.

2    Q.   You meant in quotation marks?

3    A.   Quotation marks, excuse me.

4    Q.   Is there any discuss or explanation in here that process

5    agreement means arbitration?

6    A.   We would have had that in our notes.

7    Q.   Right.  About you in the letter, the formal proposal

8    that went to TWA, is there anything in this letter that you

9    are aware of that refers to arbitration?

10   A.   Not in this letter.  They knew what we wanted.  They

11   countered with something totally different.

12   Q.   Let's turn to D 359.  Which is in evidence.  This is the

13   ALPA comprehensive proposal, March 15, 2001?

14           THE COURT:  What is the number again?

15           MR. FRAM:  D 359.

16   Q.   Do you have that?

17   A.   Yes, I do.

18   Q.   Paragraph A, a process agreement assuring a fair and

19   equitable seniority integration executed by all of the above.

20   Do you agree there is no reference in there to arbitration?

21   A.   In this paragraph it does not say that.

22   Q.   It doesn't say it in any of the documents that were sent

23   by the negotiating committee, TWA, after March 1 of 2001,

24   correct?

25   A.   The process agreement that we communicated to TWA was

1    that it would end in arbitration.  The process agreement idea

2    was ALPA's contract administrator, Mr. David Holtzman, and he

3    said you do not waive scope and successorship without a

4    process agreement that ends in arbitration.

5    Q.   But is there some document you can point us to which

6    explains what process agreement means, and which explains

7    that process agreement includes, or ends with seniority

8    arbitration?

9    A.   I would have been able to if I had access to my notes

10   that were taken from us.

11   Q.   So you do think that such a document exists?

12   A.   Yes.

13   Q.   Can you tell us what date it is?

14   A.   No, I can't.

15   Q.   The March 31 transition agreement that was emailed to

16   Mr. Holtzman, do you remember the email conveying to

17   document?

18   A.   The two-page document?

19   Q.   Yes, sir.  One of the documents attached to that was the

20   transition agreement that was ultimately signed, the one that

21   was signed by Mr. Kiel and by Mr. Pastore.  Do you recall

22   that?

23   A.   Yes.

24   Q.   I am handing you P-139 in evidence.  You may have it.

25   You got it handy?

Altman-cross/Fram                                              151

1    A.    Yes.

2    Q.    Okay.  Can you find it for me real quick?

3    Q.    Take this copy.  Move it along.  You testified about

4    attending the meeting on April 2, yes?

5    A.    That's correct.

6    Q.    Did you also attend a meeting on April 1 of 2001 in St.

7    Louis?

8    A.    I flew in and I had dinner.

9    Q.    Are you aware that there was a meeting on April 1, that

10   afternoon of the members of the MEC and of advisors?

11   A.    I don't know any of the MEC members that showed at the

12   meeting.  I came in from Los Angeles.  I knew that there had

13   been an email sent out that they would like to have a

14   gathering on April 1, prior to the April 2nd MEC meeting.  I

15   didn't get in town in time.

16   Q.    All right.  So you knew that a meeting was scheduled on

17   Sunda ay, April 1, at one o'clock p.m. to talk about issues

18   and prepare for the formal MEC meeting the next day?

19   A.    That's correct.

20   Q.    You are saying that you didn't attend that meeting?

21   A.    No. I couldn't make it in in time.

22   Q.    What time did you arrive in town on the first?

23   A.    It was late in the afternoon, maybe early evening.  I

24   came in and had dinner with a couple members of the MEC.

25   Q.    Who do you recall having dinner with?

1    A.   The only person I remember was Sally Young and Bob

2    Pastore.

3    Q.   Turn to your deposition transcript, please, page 171.

4    Line 12.  You were asked about Mr. Wilder.

5             "QUESTION.  What did Mr. Wilder -- what did Roland

6    Wilder say on April 2.

7             "ANSWER:  Roland did not want us to waive our

8    scope.

9             "QUESTION.  What did he say?

10            "ANSWER:  I don't remember what he said.  I know he

11   was against it.

12            "QUESTION:  Are you sure he was there on April 2?

13            "ANSWER:  I don't remember exactly who was there on

14   April 2.  Actually, no.  Roland, I don't know if he was there

15   or not.  He was there with us on April 1."

16            Did I read that correctly?

17   A.   That's correct.

18   Q.   So were you there for the meeting on the first?

19   A.   I had dinner.

20   Q.   It were were you not?

21   A.   It was dinner.  This is ten years ago.  When I went into

22   this deposition, like I said, I went in with a week's notice

23   if I could do this, trying remember dates.  I remembered what

24   was said a lot of time, comments, I don't remember when I

25   said, who said what, when I couldn't,  you know tell you what

1    a person said because I don't know who said it.  Also the

2    dates at that time.  I mean now I know what the dates are

3    because I have looked at the documents and I can refresh my

4    memory.

5              When I went into the deposition I was cold.

6    Literally, after ten years I walked in cold and I was trying

7    to answer the question.

8    Q.   So are you saying you didn't take any time to prepare

9    before you gave your sworn deposition testimony?

10   A.   I spent two hours the day prior with Mr. Press the first

11   time I met him.

12   Q.   So let's opinion this down.  Was your testimony during

13   your deposition April 28, about meeting with Mr. Wilder on

14   the first, was that accurate or was it inaccurate?

15   A.   Roland may have been at the dinner.  I honestly don't

16   remember if he was or not.  I remember two people sitting at

17   the table with us, and that is what I remember.

18   Q.   Well, take it a step at a time.  The deposition

19   testimony, to the extent you told us that you were at a

20   meeting on the first, where Roland Wilder was present?

21   A.   That would have been the dinner meeting.

22   Q.   You think it was a dinner meeting?

23   A.   Yes, it was.  I was flying.  I was coming in from Los

24   Angeles.

25   Q.   Are you now remembering when you had dinner that evening

Altman-cross/Fram                                              154

```
 1    that there were three people present?

 2    A.   No, I am not saying that.  I am saying there if there

 3    was a meeting on the first that would have been a dinner

 4    meeting and if Roland was there, he was there.  There

 5    probably were more than three people there.  I don't

 6    remember.

 7    Q.   All right.  Do you have a recollection of being told

 8    before the meeting on April 2 that Mr. Wilder couldn't be

 9    there on  second because he had a conflicting business

10    engagement?

11    A.   Roland was there on the second.

12    Q.   You are confident that Roland was there on the second?

13    A.   Yes, I am.

14    Q.   Okay.  Do you recall Roland saying at the end of the

15    debate on the 2nd, that after hearing what everybody else had

16    to say, that he agreed that the MEC should vote to accept the

17    collective bargaining agreement that was on the table?

18    A.   No.

19    Q.   And as part of that you would agree to waive scope?

20    A.   No.  Roland was the one adviser who always stood firm

21    and told us not to waive scope.  When Roland left the meeting

22    -- Roland was a dissenting view among advisors.  Roland was

23    being treated poorly by the others in that room, the other

24    advisors.  Roland left.  I remember this because his bag,

25    garment bag, was behind me.  He grabbed his garment bag, he
```

1    is walking out the door.  He stopped.  My characterization of

2    Roland's face was he looked defeated.  He looked very upset.

3    And he turned around and he said, "I guess some contract is

4    better than no contract."

5            And as he turned, he said, if you are going to

6    waive scope, you don't have to do it now.  You can do it on

7    the courthouse steps.

8    Q.   This was on April 2, a Sunday -- I am sorry.  This was

9    on April 2, a Monday, of 2001, correct?

10   A.   That's correct.

11   Q.   Now, the March 31 transition agreement, P-131, this

12   thick document that we talked about before, the one signed by

13   Mr. Kiel and Mr. Pastore, that document was discussed on

14   April 2, do you recall that?

15   A.   It was in a resolution that was passed by the MEC for

16   the negotiating committee to go out, tie up loose ends, with

17   the transition agreement, and have it became for Mr. Pastore

18   ato sign, Bob Pastore, on April 5.

19   Q.   So the direction of the MEC was for people to spend more

20   time on the transition agreement, and to negotiate the best

21   possible wrap ups they could and then sign it?

22   A.   That was the direction of the MEC.

23   Q.   That was the resolution that passed, yes?

24   A.   That's correct.

25   Q.   And when you cast the 90 votes that you were entitled to

Altman-cross/Fram                                          156

 1  cast all 90 of them in favor of that, correct?

 2  A.   No, the resolution was not a vote of my constituent

 3  votes.  The resolution just passes with a voice vote, of MEC

 4  members, you put your hand up.  That was a totally separate

 5  issue.

 6  Q.   Let's refer to D 74, please?

 7          THE COURT:  Is that new?

 8          MR. FRAM:  No, it is in evidence, your Honor.

 9  Q.   Do you recognize D 74 as the official minutes of the TWA

10  MEC meeting of April 2, 2001.  Do you recognize those

11  minutes, sir?

12  A.   Yes.

13  Q.   Is that one of the documents that you did review to

14  prepare for your testimony here today?

15  A.   I actually also have this document at home in my

16  personal possession.

17  Q.   Okay.  Well, regardless of where you have it, did you

18  review it to prepare for today?

19  A.   Yes, I did.

20  Q.   Can you turn, please, to the bottom of page 5 where it

21  references resolution oh 164?

22  A.   Yes, sir.

23  Q.   By Rautenberg and Lewin?

24  A.   Yes.

25  Q.   Lewin was the other pilot representative from your

Altman-cross/Fram                                                    157

```
 1    counsel.

 2    A.   He was the captain representative for Council 4, that's

 3    correct.

 4    Q.   And after we get beyond the whereas clauses, if we turn

 5    to the next page you have therefore, be it resolved, I guess

 6    you have actually five paragraphs with resolved.  Do you see

 7    those?

 8    A.   Yes.

 9    Q.   You said before this came to a voice vote?

10    A.   No. The voice vote is over the, go forward with the

11    agreement to get the negotiating committee to finish the

12    transition agreement.  The actual vote here on the numbers,

13    there was, when it came down to the scope waiver, there was a

14    aroll call vote requested to record the votes.

15    Q.   Mr. Altman, let's make sure we understand.  Describe for

16    us, please what a voice vote is?

17    A.   Well, a voice vote, if we are sitting in the room and we

18    go around the room and you put your hands up.  This, when you

19    want to -- memorialize is a good word -- what the vote was

20    for the future, you ask for a roll call vote.  That is what

21    this was.  This roll call vote was for the scope waiver.  The

22    transition agreement would not come into effect, there would

23    be no transition agreement if there was no scope waiver.

24    That was just a, I don't want to say a byproduct, that is not

25    the word I am looking for, but that was the result of your
```

Altman-cross/Fram                                          158

```
 1    scope waivers, that you would waive your scope and
 2    successorship, you would then have this transition agreement.
 3              If we didn't waive scope and successorship you
 4    wouldn't have that agreement because it was going to go to a
 5    different avenue, different venue, it would go to the
 6    bankruptcy court.  This vote was for the scope waiver.
 7    Q.   Let's take them one at a time.  The first therefore
 8    clause decked directed the negotiating committee to seek
 9    clarification immediately on all outstanding issues arising
10    from the proposed agreement covering the operations of TWA
11    LLC, and to finalist the LLC CBA, correct?
12    A.   That's correct.
13    Q.   That would be the collective bargaining agreement that?
14              THE COURT:  139.
15    Q.   The transition agreement, correct?
16    A.   That's correct.
17    Q.   So part of the vote that follows is, that is the first
18    resolution or part, first part of the resolution that got
19    voted on by a roll call vote.  Correct?
20    A.   I would like to point out that you are forgetting the
21    beginning part of the resolution.  I think that that should
22    be read by everybody as well.
23    Q.   Why do you think that?  What do you think the beginning
24    part, how do you think that in any way addresses the issue of
25    whether there was a roll call vote on what I just read?
```

Altman-cross/Fram                                              159

1    A.   I know what the vote was about.  It was about the scope

2    waiver.

3    Q.   But Mr. Altman, show us in the minutes where there is

4    any indication that there was a voice vote as opposed to --

5    A.   There were no minutes taken.  It was an executive

6    session.

7    Q.   Okay.  Let me finish the whole question if I could,

8    please.

9         Can you show us anywhere in these official minutes

10   where there is an indication that the resolution I just read

11   was subject to a voice vote as opposed to a roll call vote?

12   A.   No.  Doesn't say that.

13   Q.   And then the second part, the second part of the

14   resolution is that the bankruptcy lawyers are directed to

15   take steps that would ensure that the LLC CBA is incorporated

16   into court documents resolving the section Section 1113

17   motion.  Do you see that?

18   A.   Yes.

19   Q.   That was part of the roll call vote?

20   A.   That's correct.

21   Q.   Then you have got the three other aspects of the

22   resolution.  Do you agree that all five of those aspects of

23   the resolution were part of what was the roll call vote?

24   A.   Again, I do agree with that, in -- with the caveat.  The

25   transition agreement, or conclusion here, was based on the

Altman-cross/Fram                                              160

```
 1   fact that you were going to waive your scope or

 2   successorship.  There was no transition agreement without

 3   that.  This was just, finish it up.  We are waiving our scope

 4   and successorship.  Go out there and finish up that document

 5   and get it back to the master chairman to sign. That is what

 6   this vote was about.   When you waived your scope you were

 7   going to get this transition agreement.  At that point, to

 8   our knowledge, had not been completed because we had not seen

 9   the document.

10   Q.   And it is your testimony, sir, that a draft of the

11   transition agreement, marked as P-139, was not discussed and

12   was not available on April 2 of 2001?

13   A.   I did not see it, no.

14   Q.   Did you say before that Mr. Wilder had a -- Mr. Wilder

15   disagreed with the other advisors?

16   A.   Yes, he did.

17   Q.   What was Mr. Wilder recommending on April 2 that the MEC

18   do?

19   A.   Roland's strategies were always litigation type

20   strategies.  One of the strategies he had, we had filed a

21   grievance on the asset purchase agreement saying we had to

22   waive our scope -- the company could not put into a deal with

23   another company what we have to waive and not waive in our

24   contract.  That is outside their authority.  The idea was we

25   would file a scope grievance, that to hear that argument, and
```

Altman-cross/Fram                                      161

1   then the idea was that Roland wanted to hold up the sale of

2   American, TWA, until that scope grievance was heard.

3            In other words, it was a delay tactic.  And the

4   delay tactic would put pressure on American, you would hope,

5   speculation, that they would put pressure on the APA, their

6   pilot union, to get something done and not hold up the deal

7   because everybody had being talking about how they wanted to

8   get the deal done quickly.  May 30 I believe was the date

9   they were trying to finalize it.

10  Q.   What lawsuit, what type of lawsuit did he want to file,

11  do you recall?

12  A.   I don't recall exactly what he called the lawsuit.

13  There was a number of different lawsuits, if he was directed

14  to seek authority to file, and he had no answer from ALPA

15  National on whether he could do it or not.

16  Q.   As of April 2, was he recommending one lawsuit or

17  potentially different lawsuits?

18  A.   He had the one lawsuit based on the, I for get what he

19  called the term, but it was to hear, wait until the scope

20  grievance was heard, in other words, you are going to delay

21  the sale until that grievance is heard and decided on.  And I

22  forget what he called it.

23  Q.   All Writs Act.

24            THE COURT:  W r i t s.

25  Q.   Do you recall he wanted to go to court and enjoin or

1   stop the American purchase of TWA's assets from going ahead?

2   A.   That's correct.

3   Q.   You thought that was a good thing?

4   A.   Yes, I did.

5   Q.   You weren't concerned at all about ham walking away from

6   the deal?

7   A.   No.

8   Q.   Explain for us, please, why if the American people were

9   communicating that they were going to walk away from the

10  deal, you thought they were bluffing, you didn't believe

11  that.

12  A.   We didn't hear that from the American people.

13            MR. PRESS:  I object.  There is no foundation for

14  that question.

15            THE COURT:  Foundation for what?

16            MR. PRESS:  As to American said anything about

17  walking from the deal.

18            MR. FRAM:  I will lay the foundation.

19            THE COURT:  Well, he said --

20            MR. FRAM:  I thought he said it before.

21            THE COURT:  Lay a foundation.

22  Q.   Mr. Altman, was it communicated back to you that if the

23  deal did not move forward, or if the Section 1113 motion was

24  denied, that American would walk away from the deal and not

25  purchase the assets of TWA?

```
 1   A.   The comments came from Terry Hayes.  They never came

 2   from American Airlines people to us.  So I don't know where

 3   the comment or why he said it.  I can't speculate on that.

 4   Q.   Didn't you --

 5            THE COURT:  Terry Hayes who I had.

 6   A.   Terry Hayes said it.  He is what?

 7            THE COURT:  He was the labor director of TWA, Inc..

 8   A.   That's correct.  Labor director, correct.

 9   Q.   Didn't you tell us this morning that Mr. Hayes and the

10   other TWA people at that point were basically working for

11   American?

12   A.   No, they were working, they were working for American.

13   I don't know what they were saying to him.  I am not going to

14   speculate.  Terry Hayes is a TWA person.  He said something.

15   I didn't hear it from an American person so I didn't take it

16   for much.

17   Q.   Did Terry Hayes communicate that Jeff Brundage, who was

18   the vice president for labor affairs for American, was saying

19   that American would walk away from the deal?

20   A.   Actually, I think he did say that.  But again, I don't

21   know if he is making that up.  It is coming through a third

22   party.  I am not going to speculate on that.

23   Q.   All right.  But regardless of whether it came directly

24   or not, when you hear that American were you hearing that

25   American might walk away from the deal?
```

Altman-cross/Fram                                              164

```
 1   A.   We heard that quite a bit.  It didn't bother us.  It is
 2   not something that --
 3            THE COURT:  When you say us.  It bothered somebody.
 4   A.   Well, most of us on the MEC, what was, if you look at
 5   the time, all the public announcements that were being made,
 6   it contradicted, so when you see a contradiction you stop and
 7   you go wait a minute.  On this hand they are saying this.  On
 8   this hand they are saying this.  The truth might be some
 9   place in the middle.  We weren't going to react to either
10   side.
11   Q.   All right.  So is it true that some people on the MEC,
12   some of your colleagues on the TWA MEC, were concerned about
13   that, and were concerned that American was serious and would
14   walk away from the deal?
15   A.   I am not going to speculate on what other people
16   thought.
17   Q.   I am not asking you to speculate.  I am asking you to
18   recall if you can what the other members of the MEC said when
19   these issues were discussed at all the meetings that we have
20   been talking about?
21   A.   Well, what is not speculation was originally the MEC was
22   unanimous in not waiving scope.  In the end, there were a
23   couple of members that switched pretty quickly, said we have
24   to do it.  But again I am not going to speculate as to what
25   was going through their mind.  Initially as a group, we were
```

```
 1    unified.  I don't know what might cause someone to change

 2    their mind.  That is not, I am not going to go into that.

 3              THE COURT:  That is a pretty massive change,

 4    though.

 5              THE WITNESS:  It was.

 6              THE COURT:  If it was all one way way and the final

 7    vote had only one dissent.

 8    Q.   Do you understand I am asking not about what was in

 9    people's minds.  I am asking about what they said in meetings

10    you attended.  Are you with me?

11    A.   Okay.

12    Q.   Do you recall what other members of the MEC, people like

13    Steve Rautenberg, and Dave Singer, Sally Young, do you recall

14    what they said in terms of their concern that American might

15    walk away from the deal.  If you don't recall, say you don't

16    recall?

17    A.   I don't recall about their walking away.

18    Q.   But in any event, when you, Alan Altman, heard what was

19    being communicated about Americans position you weren't

20    worried about them walking away.  Right?

21    A.   That's correct.

22    Q.   Do you have any background, any legal training?

23    A.   No, I don't.

24    Q.   Did you at the time have any training in mergers or

25    acquisitions or corporate transactions?
```

Altman-cross/Fram                                        166

1    A.    No, I did not.

2    Q.    Did you consider yourself an expert on Americans

3    business or its, or its business plans?

4    A.    Not by any means, no.

5    Q.    Did you think that you were any better qualified than

6    the other members of the MEC to make judgments about whether

7    American was bluffing?

8    A.    Oh, no, no.  We made the decision based on whether they

9    were bluffing based on the fact that we are hearing

10   contradictory statement.  It was just, let's wait and see

11   what is going on.  You are not going to just react because

12   you hear something.  That was part of the idea was take your

13   time, try to figure out and learn as much as you can.

14          Just because someone says they are going to walk,

15   you immediately throw in the towel and go screaming running

16   out the door, no, you don't.  That is the opinion.  That  is

17   what the opinion was, we can take our time.  We did have one

18   of our advisors, Mr. Roland Wilder, who from day one said you

19   don't need to, don't waive your scope.

20          They are not going to walk away is the other thing

21   he said.  You are getting conflicting information.  You have

22   to take your time and gather information.  That is it.

23   Q.    Once you gather the information, what basis did you have

24   for making the judgment that American was bluffing, that they

25   were not likely to walk away?

```
1    A.    Never came to that.  We had a meeting on April 2 where.

2    Q.    Opinions changed and I made a decision based on what I

3    was told at that meeting, and what my responsibilities were.

4    We never had to decide if American was going to talk what a

5    way or not.  That wasn't the issue?

6    Q.    Weren't advisors telling the members of the MEC during

7    the period leading up to April 2 that there was a danger

8    American would walk away?

9    A.    That was said by some advisors.

10   Q.    Okay.  And that was said consistently by the advisors

11   during the weeks leading up April 2, correct?

12   A.    Not consistently.  And consistently, I can say the only,

13   its only actual qualified person probably in that room was

14   Roland Wilder.  Roland Wilder was the only one with who had

15   dealt with mergers before and had done a merger between

16   airlines, and he said that is not going to happen.  So there

17   was conflicting information.  There was no reason to rush to

18   judgment, just take our time, and see what we have, collect

19   as much information as we as we can.

20   Q.    And the information got collected and people made

21   judgments on April 2, 2001, about what to do?

22   A.    The judgment was information given to us was not about

23   American walking away, that was something totally different.

24            THE COURT:  About the 1113.

25   A.    Yes, it was going to succeed and you would lose your
```

 1    representation in the contract.

 2             THE COURT:  You would lose more than if you waive

 3    scope.

 4             THE WITNESS:  That's correct.

 5    Q.   Are you saying the issue of whether American would walk

 6    away was not a factor that you considered on April 2, 2001?

 7    A.   No. No.  That is not the, the issue is not whether they

 8    were going to walk away.  That is not what we were talking

 9    about.

10             You can, in labor negotiations, threats and bluffs

11    are common.  That wasn't the point.  The point was that we

12    had conflicting evidence coming from advisors.  Some were

13    saying on April 2 you waived your scope and successorship.

14    One is saying don't do it.  I am not making a decision on

15    anything because someone says they are going to walk away

16    from the deal.

17    Q.   Well, did all advisors on April 2 ultimately agree that

18    the Section 1113 motion was likely to be granted?

19    A.   That is what they told us.  I don't know why they

20    changed their mind.  Not all did.  Roland Wilder did not

21    agree to that.

22    Q.   D 15.

23             THE COURT:  What are I looking for?

24             MR. FRAM:  D 15.

25    Q.   Do you recognize that as an email report that Robert

```
 1   Pastoare, the master chairman of the MEC, circulated to all
 2   of the TWA pilots on April 3, the day after the vote we have
 3   been discussing?
 4   A.   I haven't seen this email in ten years, whatever it is.
 5   But it is coming from the MEC office, yes.
 6   Q.   It is coming from Robert Pastore who was at the meeting
 7   and who was authorized to speak on behalf of the MEC?
 8   A.   I can't speak on this letter.  I haven't seen this in
 9   ten years.  I don't even know what is in it.
10   Q.   Well, let's see if I can refresh your memory about a
11   specific issue.
12             Can you did turn to the second page of the
13   document.  See the paragraph beginning the alternative facing
14   our MEC was to fight the 1113 motion in court?
15   A.   Yes.
16   Q.   It says not one of our advisors believed that we would
17   be successful against the 1113.  The Court thus far has sided
18   with TWA and American on virtually every important issue.  If
19   we -- does that refresh your memory that all advisors,
20   including Mr. Wilder, agreed that the Section 1113 motion was
21   likely to be granted?
22   A.   No. Roland did not, like I said, when Roland walked out
23   of the room, he was upset and he just turned around and I
24   don't consider this agreeing, as he is walking out the door,
25   he says I guess some contract is better than no contract.  I
```

```
 1   can, you know, I remember Roland being abused, actually,
 2   quite heavily by the other advisors when he spoke out
 3   differently.  It was not, it was not a pleasant sight to see.
 4   It was, it had gotten nasty and I was surprised.  I hadn't
 5   seen this before.  But Roland made that comment walking out
 6   the door and I will say as a defeated person, because he had
 7   that look on his face and he was upset and there is no doubt
 8   about that.
 9   Q.   Do you recall Mr. Wilder being abused at the meeting on
10   April 2 of 2001?
11   A.   Yes, I do.
12   Q.   Describe for us what you mean by being abused?
13   A.   Voices were raised.  Actually, we were all being yelled
14   at.  This was not professional.
15   Q.   Well, let's go back?
16   A.   That is the point.  You asked what happened.  They were
17   yelling.
18   Q.   I am asking you for facts.  Not for your
19   characterizations, your interpretations.  Let's start with
20   the facts and go from there if you could.
21           Can you tell us, please, what you recall people
22   saying to Mr. Wilder which led you to make the comment about
23   him being abused?
24   A.   Yeah.  Every time Roland would try to speak and try to
25   bring up his point, members, Michael Glanzer was one in
```

 1    particular who started to yell at Roland.  Raised his voice,

 2    and it was loud.  And you are wrong.  You are wrong, you

 3    don't know what you are talking about.

 4              I was being yelled at.  I didn't, you know, I had

 5    advisors.  Advisors are there not to yell at me and say that

 6    if you don't, and fingers were being pointed, if you don't

 7    waive your scope, they are going to do this.  Okay.  Back off

 8    a minute.  That is what was going on.  So it was heated, and

 9    it was nasty.

10    Q.   Okay.  So other than recalling that Michael Glanzer said

11    to Mr. Wilder, you are wrong, do you recall, take him first,

12    do you recall him explaining or stating why he felt Mr.

13    Wilder was wrong?

14    A.   We were never given any explanation as to why they

15    changed their minds.  And came about with a different

16    viewpoint on this meeting.  So nobody said anything about

17    alternatives, why we are saying that, why you are wrong, why

18    this is going to happen.

19    Q.   So he said you are wrong but never explained it?

20    A.   That's correct.

21    Q.   That is your testimony?

22    A.   That's correct.

23    Q.   Did any of the members of the MEC ask him, Michael, can

24    you please explain why you are saying Roland is wrong?

25    A.   I don't remember anybody asking.  It was, and this is

Altman-cross/Fram                                                172

1    from my point of view.  It was not a comfortable situation.

2    Q.   I am asking you for facts.  You understand that.

3    A.   The facts are it wasn't a comfortable situation.

4    Advisors should not be yelling at us.  That is a fact.  That

5    is extremely unprofessional.  And that is unfortunately what

6    happened was it became a very unprofessional environment.

7    And tensions were high, nerves were high.

8    Q.   Sir, do you understand that I am asking you for the

9    facts which are leading you to conclude or say that it was

10   unprofessional?

11   A.   It is unprofessional.  Yelling is unprofessional.

12   Q.   Do  you understand I am asking you to give us some of

13   the details so that we can assess your conclusion in that

14   regard?

15   A.   Well, like I said, what Michael Glanzer said was you are

16   wrong and he was yelling at Roland.  What I am being told

17   that I am going to be the cause of all the pilots losing

18   their jobs, because they will lose their contract, their

19   union representation, they will be at will employees, and it

20   wasn't said in a polite manner.  It was --

21   Q.   It was --  I am sorry.  You were speaking.  Go ahead.

22   A.   It was done with voices raised.  And I was

23   uncomfortable.

24   Q.   All right.  So did anybody other than Mr. Glanzer yell

25   at or raise his or her voice to Mr. Wilder?

1    A.   Clay Warner did.

2    Q.   Tell us if you recall what Clay Warner said, if not the

3    specific words, the gist of it?

4    A.   I don't remember the specific words.  I don't.  It was

5    just, again, it just stood out because Clay did turn around

6    to Roland, again it was along the lines of you are wrong, you

7    are not right about this.  This is what is going to happen.

8    But there was no explanation as to why.  Why was this going

9    to happen.

10   Q.   Did he say what he felt Mr. Wilder was wrong about?

11   A.   No, he didn't.

12   Q.   Did anybody ask him?

13   A.   I don't remember.  I honestly don't remember if somebody

14   did.

15   Q.   Other than Mr. Glanzer and Mr. Wilder, did anybody else

16   do your recollection yell at Mr. Wilder during the meeting on

17   April 2 of 2001, with respect to any issues?

18   A.   I am not going to say an individual name.  Everybody was

19   -- voices were raised.  I am not going to attribute it to any

20   one person.

21   Q.   If you don't recall, just say you don't recall?

22   A.   I don't recall.

23   Q.   You are telling us some of advisors also yelled at the

24   members of the MEC?

25   A.   Yes, they did.

Altman-cross/Fram                                        174

1    Q.    In who do you recall yelling at the members of the MEC?

2    A.    Clay Warner.

3    Q.    And what do you recall Mr. Warner yelling about or

4    saying?

5    A.    It was the comment I made earlier, that I am going to be

6    the cause, if you don't do this, this is what is going to

7    happen.  It was very uncomfortable.  Why are you raising your

8    voice to me and telling me in this manner.  If there is a

9    real issue here, if there is something that you know, well,

10   you sit down, you say guys, this is what we found out.  This

11   is what you need to do and this is why you need to do it, and

12   you do it in just calm manner.

13   Q.    Because if you don't do this.  If you don't do what?

14   A.    Waive your scope.  Everything related to that if we

15   didn't waive our scope and successorship and we went forward

16   with the 1113 motion, that it was, you were going to lose

17   your contract, your union representation, you were going to

18   be at will employees.  You were going to lose your grievance

19   ability.  You were going to have, and the comment was made

20   and I don't remember who said the comment, but it was so if

21   you call in sick you can lose your job.  I don't remember

22   which person said it but that was said.  My ears perked up

23   because, wait a minute, people get sick.  What do you mean

24   you are going to lose your job.  It is something that that

25   made you stop.

1  Q.   Did you go into the meetings on April 2 intending to

2  vote against the collective bargaining agreement that had

3  been negotiated with TWA LLC?

4  A.   I wasn't voting on the electric collective bargaining

5  agreement.  I was voting on a scope waiver.  The collective

6  bargaining agreement was a result that if we did waive our

7  scope and successorship, that we would get this new

8  collective bargaining agreement going into this new entity,

9  TWA, LLC.  If you didn't waive your scope and successorship,

10 there was not going to be a collective bargaining agreement

11 until the issue was resolved through the courts, whichever

12 way that might have gone.

13 Q.   Wasn't the way it was presented that we will give you

14 this anew collective bargaining agreement if you agree to

15 waive scope?

16 A.   Yeah, you waive your scope and successorship, you will

17 get this.  It wasn't the other way around where you are

18 voting on a collective bargaining agreement.  We were voting

19 aon a scope waiver.  If we did this, we would get this new

20 contract.

21 Q.   So you agree it was a package deal, you give up scope

22 and get a new collective bargaining agreement?

23 A.   Yeah.  Oh, yes.

24 Q.   So --

25         THE COURT:  With TWA LLC.

1            THE WITNESS:  That's correct.  TWA LLC.

2    Q.  So what advisors were saying, with the exception of Mr.

3    Wilder, as you recall it, is take the package deal.  Yes?

4    A.  No.  They didn't, they weren't saying take the package

5    deal.  The only comment that I came was that you have to

6    waive your scope and successorship.  If you don't the courts

7    will take your contract, your union representation, your

8    right to grieve, to be, you will be at will employees.  The

9    train has left the station.

10           I still haven't figured out what legal term that is

11   and why that was mentioned to us.

12           THE COURT:  It is the Railway Labor Act.

13   A.  So it was not a package deal.  We were voting to, the

14   issue a at hand that was in the asset purchase agreement was,

15   you have to waive your scope and successorship and if you

16   don't, this is what, this is the next step of action would be

17   the 1113, or if you do, you will get a collective bargaining

18   agreement with TWA LLC.

19   Q.  Let's wrap this up with one last document you talked

20   about before, exhibit 365.  It is the minutes, the notice and

21   the minutes?

22           THE COURT:  I am sorry.  365.

23   Q.  D 365?

24   A.  What is the date on that.

25   Q.  March 30, 2001?

Altman-cross/Fram                                        177

 1   Q.   Turn to the second page of the document.  These were

 2   minutes prepared of the council meeting, March 30, 2001?

 3   A.   That's correct.

 4   Q.   I see three quarters of the way down it says

 5   representative Allen Altman who acts as vice chair of Council

 6   4 as well as vice chairman of the negotiating committee gave

 7   extensive background and update on the current status of

 8   negotiations with the company regarding the CBA.  What do you

 9   recall telling the pilots about the status of negotiations, I

10   assume with TWA, about a collective bargaining agreement?

11   A.   I don't remember specifically.  I know I went in there.

12   I know that I had spoken with Roland beforehand and I had

13   gotten a set of talking points.  I didn't want do go in on my

14   own and say something that could have been improper.  I don't

15   remember what it was that we actually discussed.  I don't

16   recall going into real detail.  I didn't think, we weren't

17   able to because they were ongoing negotiations and usually,

18   you would not go into, you know, a lot of detail in something

19   that was ongoing and open.

20   Q.   Well, it does say, well, read the next sentence, it says

21   you also spoke on the significance of the upcoming Section

22   1113 motion to be heard a week from today in the bankruptcy

23   court.  Do you see that?

24   A.   Yes.  I used Bill Wilder, it was Roland and Bill that

25   were helping us.  I used his comments about the 1113.  I

Altman-cross/Fram                                                    178

1   explained what the 1113 was because the guys didn't know.  It

2   was something new.  I gave an explanation as per our merger

3   counsel what was involved and what it entailed.

4   Q.   It says you took many questions from and provided

5   answers to the members present.  What did you tell them about

6   the likelihood that the Section 1113 motion would be granted

7   a week from the date of of this meeting?

8   A.   I wouldn't have said anything that would have been my

9   opinion.  I would have given what our counsel was advising

10  us.  We would have gone open the talking points.  I don't

11  remember what that was.  Also many questions.  We also had

12  other business going on at the time.  So it would not, I can

13  say with quite certainty that the questions would not have

14  only been about what was going on here.  It was still an

15  airline.  We were still flying.

16  Q.   Do you recall anything that you said to the pilots about

17  the upcoming Section 1113 motion?

18  A.   I don't recall what I said to them at that time.

19  Q.   Bob Pastore was also present at the meeting?

20  A.   Yes, he he was.  He lived out in LA.

21  Q.   It says he gave his perspective and insight into the

22  current negotiations underway with both TWA and AMR and APA.

23  AMR refers to American Airlines?

24  A.   Yes.  The parent corporation.

25  Q.   It says he took, he then took many questions from and

1   provided answers to the members present.  What did he say

2   about the negotiations that were underway?

3   A.    I don't remember.  This was a council meeting, 30

4   members present.  I don't know what Bob would have handled.

5   I don't know what the questions would have been.

6   Q.    Top of the next page.  Says pursuant to the

7   aforementioned presentation, a motion was offered by K Bounds

8   directing members of the LEC to ensure our continued

9   representation by ALPA after the closing date of the TWA

10  slash AMR deal.  Furthermore, the LEC was directed to secure

11  the TWA/ALPA CBA throughout the life of TWA airlines, LLC.

12          Do you see that?

13  A.    Yes, sir, I do.

14  Q.    So the contract that your negotiating committee had been

15  negotiating was the collective bargaining agreement with TWA

16  LLC?

17  A.    That's right.

18  Q.    That is the contract you had described to the members of

19  Council 4 when you spoke earlier in the meeting?

20  A.    It would have been the new contract, that's correct.

21  Q.    And the vote here was directing you to secure that

22  contract.  Yes?

23  A.    Not that contract.

24          THE COURT:  A contract.

25          THE WITNESS:  A contract.  That is it.  A contract.

1    They wanted a contract and they wanted representation, which

2    we all did.   We all wanted representation.

3    Q.   It says you were directed to secure the TWA ALPA CBA

4    throughout the life of TWA Airlines?

5    A.   Actually that is a mistake.  Because the TWA ALPA CBA

6    would not be applicable to a new entity, TWA Airlines, LLC.

7            That contract, even the way this is written, it is

8    not written properly.  We were negotiating a, it was

9    basically a new agreement into the LLC.

10   Q.   Mr. Altman, you described prior to earlier in the

11   meeting, you talked to them about the contract that you had

12   been helping negotiate.  Correct?

13   A.   Yes.  A new contract.

14   Q.   And you told the pilots in Council 4 that the TWA MEC

15   would be meeting on April 2 to make some decisions, including

16   the decision about whether to accept the contract that you

17   had been helping to negotiate.  Yes?

18   A.   No, that is not correct.  The decision, again, was not,

19   we are not voting on the contract.  We are voting on the

20   scope waiver.  You got the contract, if you voted to waive

21   your scope and successorship.  You didn't get the contract if

22   you don't vote to waive scope and successorship.

23   Q.   Mr. Altman, the contract that TWA LLC was offering was

24   one, that was an offer that they said would only remain open

25   until the beginning of the Section 1113 hearing on April 6 of

Altman-cross/Fram                                              181

1    2001.  Correct?

2    A.    That's correct.

3    Q.    Does that help you remember that the MEC was going to

4    decide at this meeting scheduled on April 2 whether to accept

5    that contract?

6    A.    No. You just made my argument that I have been saying

7    all along, is that they were --

8              THE COURT:  You are not here to make argument.  You

9    are here to give testimony.  He will make the arguments.  She

10   will make the argument and he will make the arguments, and he

11   will make the arguments.  You don't make arguments.  You just

12   say, you tell it like it is.

13   Q.    Just the facts.

14   A.    The facts were that the testimony, what the facts are is

15   that you waived your scope and successorship you get the

16   contract.  So what that offer was, is that you have until the

17   1113 motion, or it sounds like a lot like what Roland said,

18   you can wait until the courthouse steps before you waive your

19   scope to do this.  You have this, this is in place.  You

20   waive your scope, this offer of this contract is still

21   available until the motion starts.  You would get that

22   contract if you waive.  If you didn't, all bets were off.  I

23   don't know what would have happened in the 1113.

24   Q.    Did you walk out of that meeting of Council 4 on March

25   30, 2001,  with an understanding of whether you would vote on

 1    April 2 to waive scope or not waive scope?

 2    A.    I was still not going to waive scope.

 3    Q.    Okay.  But in fact when you vote on April 2 you cast all

 4    90 of your votes to waive scope along with accept goes the

 5    collective were gaining agreement, correct?

 6    A.    I voted to waive scope at that meeting, yes, I did.

 7    Q.    So are you telling us that two days after this meeting,

 8    three days after this meeting on March 30, that you did

 9    exactly the opposite of what the Council 4 pilots had told

10    you to do?

11    A.    My job was to protect their jobs.  When I --

12    Q.    Can you answer my question?

13    A.    I am answering the question.  When I was faced with

14    being told by advisors who I trusted that I would lose, or we

15    would lose our union representation, our contract, and become

16    at will employees, I had to protect their jobs.  I voted to

17    waive scope, we got the contract.  That is what we did.

18    Q.    My question is, is it your testimony that when you voted

19    on April 2 to waive scope, that your vote was directly

20    contrary to what you say you were told by the council for

21    pilots to do at the meeting we have been discussing on March

22    30, 2001?

23    A.    It wasn't contrary to what they told us to do.  You even

24    read the line here where it says, secure a contract, well, at

25    this point when we are told that you are going to lose your

Altman-cross/Fram                                                    183

1    job, or you can keep your jobs, keep the contract, keep your

2    union representation, that is what we voted to do, based on

3    the information that was being told to us by our advisors.

4    Q.   So did you do, did you vote on April 2 in a way that was

5    consistent with the direction you got on March 30?

6    A.   I voted in the direction that was consistent with what

7    the job of the MEC is to do and that is to protect jobs.

8    Q.   My question is a little bit different, sir.  My question

9    is did you vote on April 2 in a way that was consistent with

10   the direction you got from the Council 4 pilots on March 30.

11   Yes or no?

12   A.   No.  The question is that on March 30, pilots do not

13   know at that time what was said to us on April 2.  Everything

14   changed at that point.  There is a difference.  There is a

15   different --

16              THE COURT:  You are saying that they had a

17   different set of information, so you didn't rely on their

18   instructions because you got new information?

19              THE WITNESS:  Right.  There was new information.

20              THE COURT:  You were contrary to what they told

21   you, but based on your your new information.

22   A.   Yes, that is what I was trying to say.

23              MR. FRAM:  Thank you, your Honor.  I have nothing

24   further.

25              THE COURT:  Okay.

```
1              MR. PRESS:  I don't have any questions.

2              THE COURT:  Oh, no redirect.  Captain, you are

3    excused.

4              Ladies and gentlemen, we are going home for the

5    day.  I am not.  They are not.  But you are.  Have a safe

6    trip home, have a safe trip in --  Oh, no, not until Monday.

7    I am not going to see you tomorrow.  So sad.  Well, see you

8    Monday morning at 8:30.  Have a wonderful weekend.  Hope the

9    weather is good.  Don't discuss the case among yourselves.

10   Do not discuss the case with family, friends and loved ones.

11             (Juries leaves the courtroom)

12             THE COURT:  We are going to break now.

13             Be back here at 3:30.  We have a motion first.

14

15             (Recess)

16

17

18

19

20

21

22

23

24

25
```

1              MR. FRAM: Your Honor, we had a chance to confer

2     about the Wilder designation.  And we narrowed that to a

3     single --

4              THE COURT:  Wilder.

5              MR. JACOBSEN:  There is only one issue left on

6     that, your Honor.

7              MR. FRAM: You may want to take it with you,

8     whatever you want to do.

9              (Off the record discussion).

10             THE COURT:  All right.  I am not going to repeat my

11    reaction to what I said this morning.  I am going to turn it

12    over to whoever is going to handle it from -- well, I told

13    you that I found at least initially.  A lot of the

14    objections.  I told you what it was.

15             MR. JACOBSON: I understood your initial views, your

16    Honor, and that is what I am here to address.

17             THE COURT:  Now I am turning it back over to the

18    plaintiff.

19             MR. JACOBSON: Thank you.

20             THE COURT:  To make whatever argument you want.

21             MR. JACOBSON: Thank you, your Honor.  In your

22    statements this morning you suggested that you thought that

23    the testimony of Ms. Cooper lacked foundation, was

24    speculative, didn't show how she would have the ability to

25    make these statements, that there are were certain comments,

1    particularly to the mention of a trophy deal, trophy contract

2    that you thought were gratuitously in there.  The first thing

3    I would note is is you had concern about whether there was

4    cross examination.  In fact, this was a notice deposition,

5    defendant were there.

6            They cross examined, and they had a full

7    opportunity to examine her, examine all those items.  And of

8    course that cross examination can be played by them in their

9    part of the case.  Ms. Cooper, as, I know you didn't have a

10   huge amount of time to look at it, she is in addition to

11   being a flight attendant, she is a lawyer.

12           THE COURT:  I said that.  She practiced, she had

13   her own offers at one point.

14           MR. JACOBSON: And represents a lot of people in the

15   aviation industry.

16           THE COURT:  Still does?

17           MR. JACOBSON: She he yes.

18           THE COURT:  She is not a stewardess now.  Right now

19   she is only a lawyer.  Today.

20           MR. JACOBSON: I don't know.  I don't know.

21           THE COURT:  She said she never flew for anybody

22   other than TWA.

23           MR. JACOBSON: Okay.

24           THE COURT:  That is what she said.  She was on the

25   board of directors.

1          THE COURT:  If that is the case, then presumably

2     she is not flying.

3          MR. JACOBSON: She was on the board of directors,

4     elected by the board of directors by the IAM which is the

5     union representing.

6          THE COURT:  Are you sure?  I thought she was on the

7     board before IAM took over representation.

8          MR. JACOBSON:  At the time of the transaction she

9     was on the board, as one of three elected IAM

10    representatives.  She may have been on there earlier under

11    their independent flight attendants  union but at the point

12    of the deals coming to the table, IAM represented essentially

13    all of the unionized employees of TWA other than the pilots.

14    They went the flight attendants, mechanics, ground crews,

15    customer service people and the rest of that, and that union

16    through its concessions obtained in the prior bankruptcies

17    was single largest shareholder of TWA, Inc.   So they were

18    owner of a company with a strong proprietary interest in

19    having the company --

20         THE COURT:  They represented two groups, the flight

21    attendants and they also represented ground personnel.

22         MR. JACOBSON: Yes, and the ground personnel were

23    divided understood a whole number of groups, including

24    customer service and skilled mechanics.

25         THE COURT:  TWA had 20,000 employees.

1              MR. JACOBSON: 22,000.

2              THE COURT:  22,000.  And only two, only 2,300 of

3    them or something like that were pilots.  And the.

4              MR. JACOBSON: Correct.

5              THE COURT:  Most of the I assume were represented

6    by IAM.  Correct?

7              MR. JACOBSON: Yes.

8              THE COURT:  I assume that.

9              MR. JACOBSON: She was on the board.  She was not

10   simply just a board member.  She was part of the executive

11   committee of the board.  She took the leave, per her

12   testimony, in attempting to put together the stand-alone

13   deal.  She is not talking about just things that were told to

14   her.  The board of directors are the people who manage and

15   run the company at the highest level.  They select the

16   officers and they decide things like mergers, et cetera.  Her

17   testimony described in detail the work that she and her union

18   were doing to put together a stand alone future for TWA.

19   Including negotiations with Boeing in which she obtained

20   commitments to the large amount of lease concessions by

21   Boeing.

22              THE COURT:  Well, hold it.  Boeing, I mean, I heard

23   testimony about Boeing comes under the fact that Boeing was

24   mad as hell at her, not at her, but there was nothing firm

25   about, there is nothing concrete about what Boeing was

1    willing to do or on what terms they were willing to do it.

2         MR. JACOBSON: She could put the deal together and

3    get the concessions from the union that Boeing was interested

4    in doing the deal knowing is done until the paperwork is

5    signed.

6         THE COURT:  What about needing investors?

7         MR. JACOBSON: They had venture capitalists who were

8    interested in investing --

9         THE COURT:  Interested in investing in an airline

10   is not the same as saying you have the person signed up.

11        MR. JACOBSON:  There are steps to go to a signed

12   deal.  They were willing to put money in the Kansas City

13   facility in order to negotiate, TWA would be doing mechanic

14   service work for other airlines.  The meeting of April 9 at

15   which the American airline presentation was brought by Mr.

16   Conklin was the meeting at which was prepared the stand-alone

17   --

18        THE COURT:  Stand alone for how long?

19        MR. JACOBSON:  Indefinitely.  Their testimony

20   was --

21        THE COURT:  She could testify that they could stand

22   alone indefinitely.

23        MR. JACOBSON: Yes, your Honor.  Her testimony was

24   that in 2001, there budget showed they already getting, they

25   had a profit of I believe, 45 million dollars in* anticipated

1   in 2001.

2           THE COURT:  Was TWA on the calendar year.

3           MR. JACOBSON: I don't know.

4           THE COURT:  Is there a financial statement any

5   where that shows they they made 45 million dollars.

6           MR. JACOBSON: That was the company's.

7           THE COURT:  What did they make in the previous

8   year?

9           MR. JACOBSON:  They had a loss in the prior year.

10          THE COURT:  In 2000.  Is it a calendar year?

11  Fiscal year?  What kind of year?

12          MR. JACOBSON: I don't know, your Honor.  I don't

13  have the answer to that.

14          THE COURT:  Well, the prior year, whatever it was,

15  whether it was a calendar year of 2000 or a fiscal year that

16  ended before December 31, 2000.  There was a loss.  How much

17  was that loss?

18          MR. JACOBSON: I believe it was 30 million.  Is that

19  correct?

20          MR. FRAM: No.

21          THE COURT:  What was the loss the previous year,

22  what was the loss the year before that?

23          MR. PRESS:  Mr. Fram give figures in his opening.

24          MR. FRAM: We already an opinion from Judge Walsh in

25  the bankruptcy where he made specific findings about loss

1    from year to year.  Mr. Katz is handing a copy of.

2              THE COURT:  About do we have, we don't know.

3              MR. KATZ:  On page 2.

4              MR. JACOBSON: On page 23 of her deposition

5    testimony, she indicates that at the end of --

6              THE COURT:  Page 23?

7              MR. JACOBSON: Yes.  23.

8              THE COURT:  This was given to me with unnumbered

9    pages.

10             MR. JACOBSON: Look a long the left side of it,

11   number column.

12             THE COURT:  23, what line?

13             MR. JACOBSON: 23, approximately line 9 which is

14   describing the company's projected financials, projected by

15   management.

16             THE COURT:  What was their actual performance?  In

17   2001?

18             MR. JACOBSON: She wasn't asked in her deposition

19   that.  She was asked these questions.  And she said that she

20   had --

21             THE COURT:  What meaning does this probably have?

22   You also have the labor concessions would have to have been

23   voted on by the membership.  She said that.

24             MR. JACOBSON: Yes.

25             THE COURT:  She didn't even have that.  She then

1    talks about GE Capital and ILFC, whoever they are.

2          So we are looking at probably, if you take the

3    odds, venture capital list, we are looking at, then she goes

4    on.  We don't know what they are going to give.  Then Soros

5    comes out of nowhere and he is showing interest.  Instead he

6    goes to Jet Blue or something like that.  So he is gone.

7    Look, whether a company can stay -- I tried a case

8    representing Ernst and Young, you heard of them?

9          MR. JACOBSON: Yes.

10          THE COURT:  The case I tried was, they issued a

11   reported for a company, that filed bankruptcy eleven months

12   after, into the new year, after the report.  There is an

13   accounting outstanding that says that, you get a clean

14   letter, you get a clean opinion with an audit.  You are in

15   effect representing that the company with the ordinary use of

16   credit and anticipated income can operate for a year.  That

17   is implicit.

18          So this company filed in eleven months.  And a

19   large investor of the company sued Ernst and Young for

20   failure to limit their letter, you know, with an appropriate

21   -- it was a jury, and you would be surprised to know I won.

22   Even though it chose to file bankruptcy they could have

23   lasted a year, without bankruptcy, because they made the

24   decision to file..

25          When you say a stand-alone company, for how long?

1   Any accountant will tell you, any prediction after twelve

2   months as to how long a company, particularly in a volatile

3   industry like this, can stand as a stand-alone company, they

4   would, that is why they, that is why I think the accounting

5   statements only have, it is good for a year.  You are

6   representing it for twelve months.

7          MR. JACOBSON: Your Honor, as you just said, no one

8   can know what the future is.  But this is a woman who is on

9   the board of directors, she is not only on the board of

10  directors, she is on the executive committee of the board.

11  She has been on the board for years.  She is the

12  representative of the largest shareholders --

13         THE COURT:  It is her belief and she is not, she

14  has no expertise in accounting, there is a whole industry out

15  there of people who value companies to determine whether they

16  can be stand-alones or not.  I guess some management

17  consultants do it.  My brother-in-law does it.  He is

18  supporting my sister.  And valuing companies as to what their

19  future projections are.  She doesn't have any experience.

20         MR. JACOBSON: Your Honor, there will be evidence in

21  this trial that a majority of the board of directors of TWA

22  were prepared on April 9 of 2001 to vote out -- January 9, I

23  am sorry.  So much talk about April.

24         THE COURT:  When they did the deal with American.

25         MR. JACOBSON: On that day that deal was presented

1    to them they were prepared going into that meeting prior to

2    that meeting starting, prior to Mr. Compton talking about

3    that, to remove him as CEO, bring in J Alex.  The unions were

4    confident that they would bring --

5            THE COURT:  You want to somehow or other dirty up

6    the TWA CEO, to what end?  What does that prove?  The issue

7    in this case --

8            MR. JACOBSON: No.

9            THE COURT:  The issue, even if they could exist as

10   a stand-alone company which I don't think you have even come

11   close to proving, so what?  You can sell a company just

12   because --

13           MR. JACOBSON:  Your Honor, that is not the issue.

14           THE COURT:  That's right, it is not the issue in

15   the case.

16           MR. JACOBSON: The issue was as I understood you

17   asking it did they have any alternatives to going to American

18   Airline at that time, where the alternative simply American

19   Airline or liquidation and the board of directors, the

20   majority of the board of directors of the company, the people

21   who were responsible for running the company, who represent

22   the owners of the company.

23           THE COURT:  They are not here.  TWA is not a

24   defendant.  Compton is not a defendant.  It is the union, the

25   argument is that the union, because they wanted to solicit

1    the American pilots to become part of, once again, the ALPA

2    family, basically didn't give, breached its duty of fair

3    representation in negotiating for the deal.  Even if they

4    could have existed as a stand-alone company.  That is only a

5    guess at best, even with a passel of experts testifying to

6    that, it is still only a guess as to whether they could or

7    not.

8               MR. JACOBSON: The evidence that the defendants will

9    put on is that all advisors agreed, all the wise men agreed

10   that this is a company that had only two options, go into the

11   arms of American or liquidate.  They are telling --

12              THE COURT:  The answer is, where do you get that?

13              MR. FRAM: Judge, that is in one of Judge Walsh's,

14   opinions.

15              THE COURT:  Judge Walsh may have said that.

16              MR. JACOBSON: That was in their opening statement.

17   That their choice was to go into the American deal, that they

18   pressed the heart, they tried to see whether American was

19   bluffing about walking away, that the only option at every

20   term..

21              THE COURT:  Why don't you go higher an expert, have

22   the expert pour over all this data, put an expert on to say

23   clearly this is a company that could have survived.  I am not

24   saying that that is necessarily the testimony, I am saying

25   this person, who, I guess you, she clearly wants to help the

1    pilots, and she gives is sort of vague testimony, we have

2    some here, some there, venture capitalist out, there Boeing

3    is going to give.  Yeah.

4             That is hardly proof this is a bunch of guess

5    work by what is really a very, in the case I told you I

6    tried, I heard two experts.  On the issue of whether the

7    company could stand alone.  Both were very good, by the way.

8    The jury happened to pick the one I worked for.  Both experts

9    were quite able.  They decided to leave, that is classic

10   expert testimony.  Can a business stand alone and how far can

11   you project that they will be able to stand alone.

12   Particularly in a very volatile industry, a twelve-month

13   window, a 24 month window, what is it that you can predict.

14   And in is nothing in any of his testimony, she gives number,

15   50 million here, 20 million there, 70 million here, but I

16   have no idea what TWA needed.  Maybe they needed 600 million.

17            MR. JACOBSON: Your Honor, in you you note in her

18   testimony on page 23, we had a projection at that time, the

19   company's projection was that for 2001 they are scheduled to

20   have operating profit of 87 million dollars --

21            THE COURT:  Where is that.

22            MR. JACOBSON: Page 23, beginning line 9, going

23   through line 19 where she says.

24            THE COURT:  She says we were scheduled.

25            MR. JACOBSON: We, the company.

1           THE COURT:  To have an operating profit.  Where

2    does that come from.

3           MR. JACOBSON: She says we are scheduled to have

4    that without any of these concessions, without the

5    give-aways.  She is on the board of directors of the company.

6    She testifies earlier she gets regular reports from

7    management --

8           THE COURT:  Who told her that?  She didn't figure

9    it out.

10          MR. JACOBSEN:  She gets reports from management as

11   to the financial status is.  She hired independent

12   accountants to review that and advise her.

13          THE COURT:  She talks about hiring accountants.

14   There is nothing in here that says what the independent

15   accountand said which would have been hearsay anyhow.  But

16   just as I decide to create the image, we hired an accountant.

17   That is not proof of anything.

18          MR. JACOBSEN:  Based on all the work that she and

19   the other directors did, the evidence will be that a majority

20   of the board of directors were preparing that day to move

21   forward with the stand-alone plan and the only reason they

22   didn't and bring in J. Alex as a new operating CEO through

23   Bettina white, and move her to an operations level.

24          THE COURT:  Why is it evidential that it is the

25   opinion of some director that Mr. Compton was not a good

1    leader.

2         MR. JACOBSON: It is not a matter of whether he is a

3    good leader or not.

4         THE COURT:  It has a good prejudicial value in your

5    case.  But  what is the real proof there?

6         MR. JACOBSON:  Mr. Compton is not a defendant here.

7    We don't need to get prejudice against him.

8         THE COURT:  You worked hard at it.

9         MR. JACOBSEN:  We are talking about the fact that

10   there is a company that a majority of the board of directors

11   believed are going in a direction.  He delivered an

12   alternative plan.

13        THE COURT:  Did you read that testimony like giving

14   a gift to your girlfriend?  That type of testimony is

15   designed to prejudice.  It is specifically designed to

16   prejudice.  It is nonprobative or minimally probative and

17   designed to prejudice.

18        MR. JACOBSON: So leave out that paragraph.  The

19   rest of her testimony, your Honor, is from the member of the

20   board of directors with a lot of experience representing the

21   largest shareholder group of the company who described in

22   detail that the weeks and am many hours that they put in to

23   developing this would, meetings with the primary schedulers.

24        THE COURT:  Just a minute, the Boeing deal was

25   approved by the board of directors, not the Boeing deal.

1           MR. JACOBSON: The American Airline deal.

2           THE COURT:  Yes, right.

3           MR. JACOBSON: Yes.

4           THE COURT:  They didn't have to agree with it.

5      They could have said no, we are going to be stand-alone.

6      They made that choice.  You are telling me they all thought

7      this and went ahead and approved another deal.

8           MR. JACOBSON: They had a deal brought to them to

9      become part of --

10          THE COURT:  They didn't have to accept it.

11          MR. JACOBSON: It was a very attractive deal to

12     become part of a merger partner who through acquisition of

13     sale with American Airlines.

14          THE COURT:  If it was a very attractive deal, they

15     adopted it, what is all the other stuff about stand loan have

16     to do?

17          MR. JACOBSON: A large portion of defendant's case

18     is that the ALPA advisors were not betraying the duty to

19     their clients by saying the only option was go through with

20     it.  We say there were other options.

21          THE COURT:  This woman shared all her feelings with

22     the other advisors.  How did the advisors know what was going

23     on before the board?  I can't even figure out from her

24     testimony what was going on before the board.  And I, how

25     would they know at that time investment banker.  Who was that

1    guy?

2              MR. FRAM: Michael Glanzer, your Honor.

3              THE COURT:  Glanzer.  How would he know what she

4    thought?  How do I know --

5              MR. JACOBSEN:  That choice was a good one.  Glanzer

6    is probably adviser who would be most informed about the

7    various options that TWA.

8              THE COURT:  He would be most informed because, TWA

9    was a reporting company so they clearly had a fair amount of

10   public information about out about.  Jake correct.

11             THE COURT:  And a person in the field would have a

12   much better feel for that information.

13             MR. JACOBSON: He was the person who had been

14   employed by the TWA MEC to review the investment options and

15   the partnership options and the merger options available to

16   the company in order to advise the pilots as to which way to

17   go.

18             So he would be in fact a person intimately

19   involved.  The other lawyers, the lawyers who hired, I agree

20   that they wouldn't necessarily know what was going on at the

21   board level of TWA.

22             But the union also had its own representative on

23   the board of directors, Bob Pastore, who is described, we

24   have heard about already, he is called ALPA on the property,

25   he is the representative of ALPA on the property he is a

1    member of the board of directors of ALPA.  And he is a board

2    of director member of TWA.  So ALPA has its own, a member of

3    its own board on the TWA board who has access to all this

4    information.

5           And the knowledge of an officer is in fact

6    attributed to the entity he is an officer of.  Bob Pastore is

7    an officer or a director, excuse me, on the board of

8    directors of ALPA.  The knowledge he has is imputed to ALPA

9    he was on the TWA ALPA -- the TWA board.

10          MR. KATZ:  Nowhere in Ms. Cooper's deposition

11   testimony --

12          THE COURT:  Let him finish.  You will get your

13   chance.

14          MR. KATZ:  All right.

15          THE COURT:  Look at page 25, line 4, down to the

16   end of the page.

17          MR. JACOBSON:  There --

18          THE COURT:  Read it.

19          MR. JACOBSON: "Question --

20          THE COURT:  NO, not out loud.

21          MR. JACOBSON: I am sorry.

22          THE COURT:  I don't want to see your lips moving

23   when you are reading it to yourself either.

24          (Pause).

25          MR. JACOBSON: All right.

1          THE COURT:  What does any of that prove?

2          MR. JACOBSON: Well, the pilots of TWA have

3   frequently given substantial financial concessions to the

4   company.  That is historical fact.  They have done it both in

5   connections with bankruptcies and other entities.

6          THE COURT:  Indeed, in her testimony that one of

7   the people that, one of the people at, one of the employees

8   or one of the employees of the union said you have been

9   driving our wages down.

10          MR. JACOBSON: The Delta representative.

11          THE COURT:  Delta guy said you have been driving

12   our wages down for years.  Something like that.

13          MR. JACOBSON: Correct.  TWA as part of the stand

14   alone plan was looking for an additional eight.

15          THE COURT:  The whole thing about Bettina White and

16   J Alex.  It says we agree J Alex would take his turn to

17   ensure the concessions, to ensure that the concessions were

18   accurate.

19          First of all, even if they did hire somebody to

20   tell them it was accurate, that would be hearsay of the worst

21   kind.  But they didn't go that far, it is not clear anybody

22   told them they were accurate.  All I know is they disappeared

23   from the scene.

24          MR. JACOBSON: What she says in connection with that

25   is that the airline wanted an eight percent concession from

1    the unions represented by the IAM,  that they had put

2    together a package of concessions that they give to TWA to

3    price out and TWA priced it out at being at the dollar value

4    of --

5            THE COURT:  Where does she say that?

6            MR. JACOBSON: That is earlier, your Honor.

7            (Pause)

8            THE COURT:  She would, line 22, 14.  Give or take,

9    we would make the presentation, we would cost it out, then

10   meet again and discuss other items.

11           MR. JACOBSON: There is a later spot where she says

12   they in fact cost it out but they wanted to be confident.

13   She this they made for concession goes.  They said if in fact

14   the savings you experience do not meet the level required you

15   can first eliminate the extra week of vacation, one week of

16   vacation from all employees --

17           THE COURT:   You consider that is the company.

18           MR. JACOBSON: She says what the value of that is.

19   We agreed  to eliminate overtime.

20           THE COURT:  This is a formula for a fight down the

21   road.  What investor -- If you don't get enough savings we

22   will give you more.

23           MR. JACOBSON: They were going to contractually

24   commit to four items.  One was giving up a week of vacation.

25   One was to allow certain maintenance services done on small

1    locations.  To no longer have the employees do that, but to

2    hire outside contractors.

3           And one was to kick in dollars that were being paid

4    to their pension funds, as many dollars of those as needed to

5    close the gap between what is required and what was actually

6    delivered.  So at the end of the day they said we will give

7    up our hard dollar retirement money on a dollar for dollar

8    basis to close the gap with all the other concessions don't

9    apply to the savings you say you need from us.

10          That is a pretty strong set of provisions that the

11   IAM was willing to give.  And there will be evidence I

12   believe in this case that the pilots were willing to make

13   their concessions and present to it a vote.  Obviously, it is

14   not a done deal until all the paperwork is signed and

15   everything is in place.  But you are at a point where the

16   board of directors were sufficiently comfortable with moving

17   forward with this, that they were going to remove Bill

18   Compton down to an operating level.

19          THE COURT:  They were so confident that they,

20   within days, signed a new agreement with American.

21          MR. JACOBSON: You could have a good agreement, and

22   then last minute have something come up that is even better

23   or appears to be even better.  That is what they have here.

24   They worked out something that required a lot of concessions

25   on the part of the employees, that required concessions on

1    the part of Boeing, which was a large creditor with a lease

2    holds.

3            It had no, there were a lot of moving parts.  But

4    it was a, it appeared to the board to be a workable deal.

5    Then Mr. Compton delivered something that appeared to be

6    better, a deal where you didn't need concessions, the

7    employees had worse and everyone got pay raise.

8            THE COURT:  You are asking that the stand-alone

9    would be wrong and eliminate the risk that there are too many

10   moving parts to the plan, two different unions, venture

11   capital, you had Boeing.  You had a lot of moving parts.

12           MR. JACOBSON: Right.  But the thing about it is not

13   that, that, that doesn't mean they felt stand alone wasn't a

14   likely thing to work, but the actual benefit to everybody

15   with the stand loan, the union members would have to given up

16   concessions.

17           THE COURT:  Why can't you -- yeah, can't she come

18   to court?  Why can't she come to court?  St. Louis to Newark

19   is a three-hour flight or two and a half hour flight.  Why

20   can't she come here, testify?

21           MS. RODRIGUEZ: She lives in Florida.

22           THE COURT:  Or Florida.

23           MS. RODRIGUEZ: We don't control her.

24           THE COURT:  She is so friendly to you.

25           MS. RODRIGUEZ: She is really not friendly.

1          MR. JACOBSON: No.  She did despise Bob Pastore,

2     despises most of the pilots.  She does not have a good

3     feeling toward them.  We they were at loggerheads for years.

4     She is not a friend of pilots.  We will reach out to her.

5     She is not a friend.

6          MS. RODRIGUEZ:  She was subpoenaed to come to a

7     deposition.  We took the deposition in Florida.  She wasn't

8     happy to be there.

9          THE COURT:  And Mr. Katz, did you cross examine in

10    this case.

11         MR. KATZ:  At deposition I asked her a few

12    questions on cross examination.  But I viewed most of this

13    testimony as total hearsay, speculation, no foundation.  She

14    never says that she told these things to the pilots.  She is

15    talking about what was going on with the flight attendants

16    union or the mechanics union, and there was no deal with the

17    mechanics to make concessions.  There was no deal with the

18    flight attendants to make concessions.

19         Boeing hadn't put in any money and wasn't going to

20    put in any money.  And the fact is that it is all so

21    speculative and irrelevant.  It is irrelevant, your Honor,

22    because advisors were talking on April 1 and second.  On

23    April 1 and 2nd, TWA, and its board, had entered into an

24    asset acquisition agreement.

25         THE COURT:  In January they entered into that.

1          MR. KATZ:  And during that period of time over 200

2     million in DIP financing had been put into the company.

3          THE COURT:  By whom?  American?

4          MR. KATZ:  By American Airlines.

5          THE COURT:  American did the DIP financing.

6          MR. KATZ:  Yes.  When advisors they weren't looking

7     at the situation as it existed in December.  However

8     speculative Ms. Cooper's testimony is, things had evolved

9     from then and before any other alternative could come along,

10    they would have to pay off the DIP financing.  But American.

11         THE COURT:  I have, what really, is expert

12    testimony in the most vague, speculative way, could possibly

13    be, and then it is not clear that the people that you want to

14    nail, advisors, even knew any of this.  I didn't know, it is

15    not clear to me.

16         MR. KATZ:  Ms. Cooper never says she talked to

17    anybody about it.

18         THE COURT:  That the adviser, it might have been

19    even improper for her as a board member.  How do I get that,

20    whatever she had, into these people.  This is not a case

21    where the jury is asked to decide whether the company could

22    stand as a stand-alone company or not or a stand alone

23    company for how long, for a year, which is the accounting

24    standard, accounting standard or longer.  They are not asked

25    to do decide that.  Even if they are, even if the company

 1    could have lasted for ten years.  That is not the issue.  I

 2    do agree that, you know, if --

 3              MR. JACOBSON: Your Honor, may I interrupt.  Mr.

 4    Press reminded me that Mr. Holtzman who we heard a lot about

 5    was involved on all the documentation.

 6              THE COURT:  But this is her opinion.  Nobody

 7    else's.  She doesn't even say that the accountants agree with

 8    her.  She doesn't say that.  She references that several

 9    times that accountants be brought from but not that they

10    agreed with her conclusion.  She doesn't say that.

11              MR. KATZ:  Judge Irenas, would you indulge me for a

12    minute, in terms of responding to what Mr. Jacobson has just

13    been arguing here?  I would like to refer you to D 288.

14              THE COURT:  I am sorry.  What is D 288.

15              MR. KATZ:  A document I handed up to you.

16              THE COURT:  Do I have it?

17              MR. KATZ:  I handed it up to you about 20 minutes

18    ago.

19              THE COURT:  Is it in evidence?

20              MR. JACOBSON: No.

21              MR. KATZ:  It is a ruling by Judge Walsh, April 2,

22    1002.  A bankruptcy court on a motion to stay with regard to

23    the sale --

24              THE COURT:  How did Blank Roam get in this case?

25              MR. KATZ:  I this they had a client.  If you turn

1    to the second page, your Honor, in evaluating the stay order

2    on the left column at the bottom he gives the loss, the

3    operating losses for three years that Mr. Fram mentioned in

4    the opening statement.  Towards the bottom of the page.

5    Number 3.  Approximately 29 million in 1997, 65 million in

6    1998.  And 340 --.

7              THE COURT:  There is a mention of Rothschild.

8              MR. KATZ:  Rothschild was their investment banker.

9    Then in paragraph 5, he talks about approaching all these

10   other airlines and having no success.  Paragraph 6, there is

11   a self help plan and then in paragraph 8 he finds self help

12   plan amounted to a gap measure to get TWA to a strategic

13   transaction.  It would have enabled TWA to avoid liquidation

14   over the winter of 2001 but no more.  And then flipping to

15   the next page, your Honor, in number --

16             THE COURT:  You want to prove that the Judge is

17   wrong.  Right?  Mr. Jake?

18             MR. JACOBSEN:  We want to prove.

19             THE COURT:  He paint a very clear picture here.

20             MR. JACOBSON: Yes, he does.

21             THE COURT:  And you want to prove he is wrong.

22   Don't feel bad, judges are often wrong.

23             MR. KATZ:  We would ask you to take judicial

24   notice.

25             THE COURT:  Well, I wouldn't mind.  I have to tell

1    you, I wouldn't mind as a matter of fact the fact that

2    evidence was offered contrary to what the bankruptcy Judge

3    would not per se buy in, if it was relevant to the issue

4    before me.

5            I don't know that I have to adopt  every finding he

6    ever made.

7            But my problem still is, number one, here we talk

8    about, you know, it is not the largest, one of the oldest

9    investment bankers, Rothschild, which goes back  to a

10   Rothschild representative, August -- He had different name.

11   Shernberger.  But August Belmont (phonetic).  His religion

12   changed, everything changed.  He was the original Rothschild

13   representative in this case forty years ago.  And so it is

14   very old and very respected banking firm, if not one, they

15   say TWA is in perilous financial condition, could not

16   continue to act as an airline.  That is testimony, you have

17   testimony that came in an expert like that, I would

18   understand it.  Even if you disagreed with Rothschild, I

19   would understand it.  But.

20           But here I have an airline hostess, cum lawyer, who

21   is on the board.  They are trying, and the Judge makes

22   reference to that.  He says here, on TWA, talking about the

23   self help plan, outstanding later, a lesser concession, that,

24   Boeing to avert a delay or avert a crisis, alternative to a

25   liquidation, was not intended to create, TWA to emerge from

1    its financial crisis as a stand-alone viable entity.  I just

2    have her here, just throwing little snippets out, 20 million

3    on this, eight million on this.  I don't know how much they

4    needed, this is a company that had four billion dollars in

5    revenue.

6         MR. JACOBSON: Four and a half bill in revenue.

7         MR. KATZ:  Judge Walsh finds on the next page they

8    needed 50 to 100 million dollars more to survive the winter

9    season.  On paragraph 17 on the bottom of page 3.  TWA's

10   approximate cash balance on January 10 was 20 to $30 million,

11   and TWA needed 40 million dollars to fund its operation to

12   next day.

13        He finds in the paragraph before that, in the

14   absence of the American agreement TWA would have filed for

15   Chapter 11 relief days earlier than January 10, 2001.  That

16   filing would have been a free fall Chapter 11 case with its

17   attendant outcome risks.  So he does make findings about how

18   much TWA needed and how much it had.

19        MR. JACOBSON: Your Honor, I would invoke the old

20   expression about garbage in, garbage out.  We had here at

21   this time.

22        THE COURT:  Here?

23        MR. JACOBSON: At the time of the bankruptcy here

24        THE COURT:  Before Judge Walsh.

25        MR. JACOBSON: Yes, before Judge Walsh, we had a

1  situation in which all the players on the TWA side, all the

2  players on the American Airlines side wanted this deal to go

3  in.  It wasn't that a time for them to polish the apple, it

4  was a time for them to make the apple look as rotten as

5  possible and everybody who went in there to push to make sure

6  that American became the acquirer, they didn't want to be

7  involved with Icahn again and they wanted to work for the

8  biggest airline.

9          And who told them in the agreement they were all

10 going to get jobs at increased pay rates and while the

11 shareholders would be wiped out, everyone else would live

12 happily ever after.  So sometimes bankruptcies are not the

13 most contested things in all directions.

14         THE COURT:  I agree with that to some agree.  I

15 don't see the union representative here.

16         MR. JACOBSON: They had a union representative  vice

17 chairman come in and testify.

18         THE COURT:  That is a lawyer.  There is no lawyer.

19         MR. JACOBSON: No, the airline called in the vice

20 chairman of TWA MEC.

21         THE COURT:  Even the federation, the general

22 federation of Jewish workers in Israel had a lawyer here.

23         MR. JACOBSON: Everyone has a lawyer in bankruptcy

24         THE COURT:  Everybody didn't have a lawyer but the

25 union didn't appear to have one here that I can see.  Even

1    the mysterious Karabu had a lawyer.

2             MR. KATZ:  That is Carl Icahn.

3             THE COURT:  I know it is Carl Icahn.

4             Go ahead.

5             MR. JACOBSON: As I said before, we refer to her as

6    being a flight attendant,  semi-lawyer, but she is.

7             THE COURT:  She is not a semi-lawyer.  I will give

8    her a credit for being a regular lawyer.

9             MR. JACOBSON: But she is in fact, she was a member

10   of the board of directors of the executive committee of I

11   believe the audit committee.

12            We will have evidence, we will be tying it in that

13   a majority of the board of directors were confident enough in

14   the stand-alone plan to follow it but that this other things

15   American Airlines had offered would seem a whole bother at

16   that time.

17            THE COURT:  The confidence in Mr. Compton, you are

18   talking out of both sides of your mouth.  The fact it would

19   appear from your own evidence that was, Compton, that is the

20   name?

21            MR. JACOBSON:  Yes.

22            THE COURT:  It was Compton that put this together.

23            MR. JACOBSON: Yes, he did, the American Airline

24   deal.

25            THE COURT:  The directors had enough confidence in

1  him to a proffer the deal, and approve it within days when

2  all of this was going on.

3          MR. JACOBSON: They had enough confidence in

4  American Airlines to approve the deal.  After the deal is

5  done, Mr. Compton isn't running the show any more.

6          THE COURT:  It is not just the deal with American.

7  It is what they are offering.  What did they offer?  500

8  million or something?

9          MR. JACOBSON: Later increased to 740.

10          MR. PRESS:  Mr. Case was incorrect about debt

11  assumption.  There was debt assumption about two billion

12  dollars.

13          THE COURT:  I looked at the contract.  There was  a

14  general disclaimer of debt assumption but there were

15  categories of debt they kept.

16          MR. PRESS:  In the total value.

17          THE COURT:  I couldn't figure out from the

18  agreement what it was.  You are saying it it was two billion

19  dollars.

20          MR. PRESS:  The total value of the deal exceeded

21  two billion dollars with the cash and the debt assumption.

22          THE COURT:  Together.

23          MR. PRESS:  Together.

24          THE COURT:  I knew there was some debt assumption

25  but I couldn't, they described it in ways that I couldn't

```
 1    monitize it when I was reading the agreement.  The general

 2    disclaimer of a certain debt but then there were special

 3    categories of debt that they did assume.

 4              MR. PRESS:  Remember $2.8 million fee?  That was

 5    based on one percent of the total value of the deal.  That is

 6    how you get to 2.8 million, so 2.8 billion.

 7              THE COURT:  Mr. Jacobson, tell me how even assuming

 8    that we get over the speculation and hearsay and lack of

 9    expertise problems, how do we get over the problems that

10    somehow or other the investors had access to her opinion?

11              MR. JACOBSON: Who?

12              THE COURT:  That advisors.

13              MR. JACOBSON: Advisors.

14              THE COURT:  Seven or eight advisors had access to

15    her opinion.

16              MR. JACOBSON: Mr. Seltzer had, I was involved in

17    the transaction.  Mr. Holtzman was involved --

18              THE COURT:  Mr. Seltzer was a bankruptcy lawyer.

19              MR. JACOBSON: I am sorry.  Mr. Glanzer was involved

20    and Mr.  --

21              THE COURT:  How do we know?  I assume they all had

22    access to public information.  They could go on the computer

23    and get it, you know, get annual reports and SEC filings and

24    a bunch of other stuff.

25              MR. JACOBSON:  Glanzer had access to more than
```

 1    that.  He was there as the ALPA, TWA MEC branch investment

 2    advisors in connection with attempting to get merger

 3    partners, other business combination people.  He was getting

 4    information that the union had, in addition, and Mr. Holtzman

 5    was involved in --

 6              THE COURT:  This wasn't union information.

 7              MR. JACOBSON: The union had a seat on the board and

 8    they were involved with the company, in attempting to market.

 9    They felt that any combination would likely require some type

10    of concession by labor so labor was involved in the process.

11              THE COURT:  What about the long paragraph on page

12    24 about J Alex Associates.  What does that do for the jury

13    besides confusion.

14              MR. JACOBSON: Besides confusion.

15              THE COURT:  Besides confusion, what does the jury

16    learn from all of that?  You didn't number the pages.  I hate

17    unnumbered pages.  I go, I start sweating when I get a

18    document, so I numbered them.  I sat and numbered them one by

19    one.

20              MR. JACOBSON: We generated on the fly off the

21    electronic system that coordinates the individual notice in

22    order to get to the parts we had in there.

23              THE COURT:  All right.  I will accept that.  You

24    were overwhelmed with technological gremlins.

25              MR. JACOBSON:  And the rapid pace of trial.  Fast

1   forward.

2            THE COURT:  I push the trial at lightning speed.

3   Eight years.

4            MR. JACOBSON:  I am talking about inside the

5   courtroom, your Honor.

6            MR. PRESS:  It is nine.  But who is counting?  We

7   have only been in for five.

8            MR. JACOBSON: You are talking about from roughly --

9            THE COURT:  Starting with 24, 1, looking at 23,

10  down to page 27.  27, 1.  All the next page and two thirds of

11  the following page.  What are you proving here?  Isolate some

12  fact in here that helps the jury decide whether ALPA took a

13  dive.

14            My father-in-law almost took a dive.  He was a

15  professional boxer in the old days.  The guy who was supposed

16  to fight couldn't fight.  The guy he was supposed to fight

17  was 40 pounds heavier.  He got in the ring took a swing, my

18  father-in-law who was a tough guy went down on the canvass

19  and said I am stay here on the canvass and his manager threw

20  the towel in.

21            So I know about taking a dive.  What does any of

22  this prove, whether ALPA took a dive?

23            MR. JACOBSON: Starting at page 26, 3, where he is

24  talking about providing financial information that J Alex had

25  full access to TWA books.

```
 1              THE COURT:  Let's assume they did, what does that

 2     prove?  Are you trying to squeeze an inference that Alex

 3     agreed that there was stand alone, are you trying to squeeze

 4     that inference that somehow or other J Alex or Bettina White

 5     somehow or other agreed they would could be a stand-alone

 6     company.  Is that the inference you are trying to squeeze

 7     out?  Let's assume they did.  Let's assume Alex had total

 8     access to the TWA books and the plans of the union's and the

 9     whole magilla.  What does that prove?  I am missing

10     something.

11              MR. JACOBSEN:  I hear you comment on that.

12              THE COURT:  I am talking all the way, I am talking

13     from, 23, 20, to 27, 1, page 27, line 1.  Going down, start

14     with 27, 4, 27, 4, through 28, 19.  What does that prove?

15     Anywhere in these four pages, is there something that proves

16     the disputed fact in this case?

17              MR. JACOBSON: Your Honor, we understand your

18     comments.  What we should do is trim this down a little bit

19     further to deal with the sections you are concerned about.

20              THE COURT:  I would like that.  I think you know

21     where I am coming from.

22              MR. JACOBSON: I understand your comments.  You made

23     them very clear.

24              THE COURT:  There are two categories.  The brought

25     conceptual category and the little things I consider to be
```

1      gratuitous and prejudice.  I don't like those either.

2      Trophy, that.

3              MR. JACOBSON: The trophy thing is not gratuitous.

4              THE COURT:  It might not be but coming from her at

5      this point, I don't know where she heard it.  Did she here it

6      from another TWA employee in which case it is definitely

7      hearsay.

8              It has all kinds of powerful prejudice, unfair

9      prejudicial potential.  And I don't even know where it comes

10     from.  As I say, TWA seems to have always had an inflated

11     view of itself.  And this could have been just, American

12     would be, you know, and who at American, was it the

13     president?  Everybody at American.

14             MR. JACOBSON: I believe it was supposed to have

15     come from the CEO.

16             THE COURT:  She doesn't say that.  There is a story

17     at Boeing about the girlfriend.  What does that have to do?

18     Boeing's decision to, are we criticizing now, are we go to go

19     have testimony as to whether the decision to buy an Air Bus

20     or air buses, usually, plural, from the European maker is bad

21     management?

22             MR. JACOBSON: No.  I know what the issue is.

23             THE COURT:  There could be a strong argument it was

24     good management.

25             MR. JACOBSON: Boeing was a primary creditor of the

1    company because of the lease holds.  They were negotiating

2    with Boeing.  Boeing gave a cash concession to TWA to assist

3    it through winter months and then discovered that the money

4    had gone directly to their competitor so they were very

5    disenchanted with management at that time which was causing a

6    problem because part of the stand alone program was to

7    require reworking the leases, the lease rates were high.

8             THE COURT:  Boeing was still doing a huge amount of

9    business with TWA.  So if TWA buys a few planes from Air Bus,

10   so what?  Boeing gets paid.  Boeing can take it.  Boeing is

11   angry, they are furious.  I don't know.  Who at Boeing is

12   furious?  Who?  Did somebody say?  Did she talk about Boeing

13   people?

14            MR. JACOBSON: She and Bob Pastore attended a

15   meeting with Boeing representatives about a stand-alone plan

16   and that was one of the big issues raised by Boeing was the

17   fact that, hey, last time we gave you help you gave the money

18   to our competitor.

19            THE COURT:  Boeing is trying to leverage its

20   position which is perfectly legitimate.

21            Well, work on it.  Come back to me.  I will keep

22   this.  See what you can do.  Right now I have a lot of

23   trouble --

24            MR. JACOBSON: I understand.

25            THE COURT:  I think it is very tangential to your

1    theory of the case.  I mean it is a theory  which has kept

2    this case alive and the theory of why this case is here.  It

3    is one of the reasons I didn't grant summary judgment,

4    because of your theory.  That, not that I made my findings.

5    I thought there was a real legal issue as to whether ALPA

6    breached the duty of fair representation.  I didn't think I

7    was trying a case on whether there could or could not have

8    been a stand-alone company and that question again has a

9    timeframe to it, stand alone for one year.

10           And I think if you went in to accounting standards,

11   I don't know whether it is, joint accounting principles, or

12   joint accounting standards, I am pretty sure, things may have

13   changed, but normally an accountant is only responsible for

14   certifying that for one year.

15           When they gave a key letter it was a certification

16   for one year they could be stand alone.

17           MR. JACOBSON:  I had a case against Ernst and

18   Young.

19           THE COURT:  Against them?

20           MR. JACOBSON: For a company and bank building

21   equipment.  They had a clean letter and were gone six months

22   later.

23           THE COURT:  Same issues?

24           MR. JACOBSON:  No, the issue was the person who had

25   the fraud in the company was so high up that the Court

```
1    decided his manager was to refute the company.  The

2    accounting firm was no guarantee of discovery of fraud so his

3    company was gone and --

4              THE COURT:  Was Ernst and Young sued?

5              MR. JACOBSON: Yes.

6              THE COURT:  Did they pay?

7              MR. JACOBSON: No.  I lost and the Eighth Circuit

8    affirmed.

9              THE COURT:  My Appellate Division affirmed.  But

10   same issue.

11             MR. JACOBSEN:  Similar, yes.

12             THE COURT:  It is a similar issue, and an issue

13   that had some twist to it.

14             The level of knowledge is not particularly an

15   issue.  Who to impute knowledge to.

16             MR. JACOBSON: Thank you very much for all your time

17   today.  We are going to try to catch our plane and go home.

18             THE COURT:  Get back to me.

19             MR. JACOBSON: We will get something to you as soon

20   as we can.

21             THE COURT:  Send it.  I am going to be here

22   tomorrow.  I wasn't planning on it, but I will be here

23   tomorrow.  But you won't.

24             MR. JACOBSON: We won't be here.

25             THE COURT:  I will see you Monday.  I hope my
```

```
 1   driver won't be working too much overtime.

 2              MR. JACOBSON:  Thank you.

 3              MR. KATZ:  Thank you.

 4

 5              (Adjourned at 4:45 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X.

2

3

4        THEODORE CASE, RESUMES.

5             REDIRECT EXAMINATION        P. 11.

6

7        ALAN ALTMAN, SWORN.

8             DIRECT EXAMINATION          P. 43.

9             CROSS EXAMINATION           P. 128

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25