```
                    IN THE UNITED STATES DISTRICT COURT.
                    FOR THE DISTRICT  OF NEW JERSEY
                    CIVIL 02-2917  (JEI)

          THEODORE A. CASE, SALLY YOUNG,
          HOWARD HOLLANDER, PATRICK BRADY
          AND MICHAEL FINUCAN, individually
          and on behalf of all others
          similarly situated,
                              Plaintiffs,
                                                    VOLUME 4
                V.                                  TRIAL TRANSCRIPT

          AIR LINE PILOTS ASSOCIATION,

                              Defendant.

                                         CAMDEN, NEW JERSEY
                                         JUNE 13, 2011

          B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE

                      A P P E A R A N C E S:

             TRUJILLO, RODRIGUEZ & RICHARD
             BY:  NICOLE M. ACCHIONE, ESQ.
                 AND: LISA J. RODRIGUEZ, ESQ.
                    AND
             GREEN JACOBSON, P.C.
             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
             For the Plaintiffs.

             ARCHER GREINER
             BY:  STEVEN FRAM, ESQ.
                   AND
             KATZ & RANZMAN
             BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

             ELIZABETH GINSBERG, ESQ.
             IN-HOUSE COUNSEL FOR ALPA.
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10            LYNNE JOHNSON, CSR, CM, CRR
              OFFICIAL COURT REPORTER
11            UNITED STATES DISTRICT COURT
              P.O. BOX 6822
12            LAWRENCEVILLE, NJ  08648
              PHONE:   609 896 1836

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning, everybody.  Please be

2    seated.

3          Counsel, reference is made to Mr. Fram's letter of

4    June 10, 2011.

5          I want to put on the record certain rulings that I

6    made when we had a conference in my robing room, and the

7    parties do not need additional arguments on those issues but

8    I should put them on the record.

9          With respect to the deposition of Roland Wilder, I

10   ruled first that the, and I think the parties actually agreed

11   on that before I even talked to them, that the  2011

12   deposition of Mr. Wilder, the limited deposition, can be put

13   in by the defendants immediately following the, I think it

14   was 2006, the earlier version of his testimony.

15         Number 2, I, based on the objections of Mr. Press,

16   at the deposition, I am striking page 17, line 6, to page 20,

17   line 21.  Now, those, that whole line of questioning there

18   was really one issue.  It was Mr. Fram saying, well, you know

19   that Mr. Hollander, I will use Hollander as an example, that

20   Mr. Hollander had previously testified that you were present

21   on April 2, is.  Is he accurate, something to that effect.

22   Ms. Sally Young, I think the same thing.

23         Anyway, I think that line of testimony, I can't say

24   it is square on point, transgresses the Third Circuit's

25   concept of how you want to impeach a witness with contrary

```
 1    testimony.  You can, I have no problem with showing that Mr.

 2    Wilder was internally inconsistent with his deposition, but

 3    the fact that one version of his testimony may differ from

 4    another witness's testimony is for the jury to sort out.  In

 5    effect, it comes close to saying, is that person lying, and

 6    the reason the, in the reasonable context of this deposition.

 7    So I am striking that.

 8              Now, Mr. Fram has asked me that there are lots of

 9    other witnesses where he might want to ask the same type of

10    question.  Am I correct?

11              MR. FRAM:  Yes, your Honor.

12              THE COURT:  Do you know that so and so testified

13    differently than you just testified, and I mean I don't have

14    it in front of me.  It is probably, if asked once, from the

15    context of refreshing your recollection, that is meaningful,

16    but do you know if a person, do you know right now that the

17    person, it is not a question of refreshing recollection.  I

18    mean you can tell some people are bad on dates, and sometimes

19    might be permissible, you know, Sam Jones said that you were

20    there on July 1st.  And, oh, yeah, that is probably right.

21    That but for somebody who is dead sure of what happened, to

22    ask him, does somebody else's testimony refresh your

23    recollection, I wouldn't allow.

24              So, and without having a particular question in

25    front of me, that is my general ruling on hostile to the kind
```

1    of question, when so and so testified to something else, what

2    do you think about that.  That kind of question is for is for

3    argument at closing.

4              MR. FRAM:  I understand.  Thank you, your Honor.

5              THE COURT:  All right.  I am ready to bring the

6    jury in.

7              (The jury enters the courtroom.)

8              THE COURT:  Good morning, everybody.  I apologize

9    for being late.  We had a legal matter that started around

10   815 so it ran over a few minutes.  We are a few minutes later

11   and I am sorry for that.  Mr. Press.

12             MR. PRESS:  Thank you, Judge.  We would call Sally

13   Young.

14             SALLY RENETTE YOUNG, sworn.

15             DIRECT EXAMINATION.

16             BY MR. PRESS:

17   Q.   Good morning.

18   A.   Good morning.

19   Q.   Can you introduce yourself to the jury, please?

20   A.   My name is Sally Young.

21             I was hired my TWA in 1989.  Grew up in San

22   Antonia --

23   Q.   Wait.

24   A.   Too much?

25   Q.   Where do you live?

1    A.    I live in ST> Louis.

2    Q.    And what is your profession?

3    A.    I am a pilot.

4    Q.    How long have you been a professional pilot?

5    A.    A professional pilot, since 9986.

6    Q.    Can you get closer to the microphone?  Pull it to

7    yourself.  Professional pilot since when again?

8    A.    1986.

9    Q.    Very good.  Before you were a pilot what was your

10   profession?

11   A.    I was a teacher.

12   Q.    Where?

13   A.    A school teacher.  In Tulsa, Oklahoma.

14   Q.    How was it you went from being a teacher to a pilot?

15   A.    Loved teaching, got a little bit burned out.  Was

16   interested in lots of things.  And you know, it is amazing in

17   the United States you have so many choices as to what you do

18   for a living but it was a decision I thought was hard to make

19   so I went and sought professional career counselor, and he

20   gave me a couple of days worth of tests and some consultation

21   and the results of the test were that I should either be a

22   race car driver or an airline pilot.  So I took flight

23   lessons to get my private license and loved it and pursued it

24   professionally.

25   Q.    And that again was 1985?

1    A.    That was 1985.

2    Q.    Take us through your professional flying career from the

3    beginning?

4    A.    I happened to be living in Tulsa, Oklahoma, where there

5    was a highly organized flight school which allowed you to

6    obtain all your flight ratings in a slightly abbreviated

7    period of time, because they meet certain standards for

8    teaching well, and teach teaching pilots.  I have gotten all

9    my ratings there.

10              Shortly thereafter, which included private

11   instrument commercial, and instructor ratings.  So that

12   enabled me to be hired as an instructor.

13       I went to a satellite airport of Charlotte, North

14   Carolina.  I had a sister that lived in Charlotte so I

15   thought that sounded nice to be in the same city with one of

16   my siblings, and instructed for six months.

17              I was fortunate enough to be hired by a company

18   called Caribbean Express in Miami, Florida, and we flew a

19   19-passenger turbo prop airplane from almost all the cities

20   in Florida to every destination in the Bahamas, the Bahama

21   Islands, back and forth.  And did that for about six months,

22   and again was fortunate enough to be hired by a bigger

23   company that was a little more stable, CC Air which was in

24   Charlotte, North Carolina, where I flew or for two years,

25   initially on a 16-passenger turbo jet, turbo prop and then

1    eventually on a larger turbo property, a 36 passenger turbo

2    prop as a first officer and a captain.

3    Q.    That was for a company called CC Air?

4    A.    CC Air.

5    Q.    What kind of routes did you fly?

6    A.    Around the Atlantic southeast, Carolinas, the Virginias,

7    Kentucky, Tennessee, Georgia.

8    Q.    How long did you work for that airline?

9    A.    I worked there for two years, and I felt, I felt good

10   about the fact that I had the opportunity to fly for a year

11   as a capital, that made me feel qualified to apply within the

12   major airlines so I put a few applications out and got hired

13   by TWA in July of 1989.

14   Q.    July, 1989.  Take is us through your flying career at

15   TWA, if you would be?

16   A.    Initially the junior domicile was Kennedy.

17   Q.    What does that mean, Jr. domicile?

18   A.    Because pilots live within a seniority system, the

19   company puts out bids and my seniority was very low when I

20   first got hired at TWA so the only domicile that I could hold

21   bid wise was New York, which was great experience, I really

22   liked it.

23         I was a flight engineer for a six years on a 727

24   out of Newark, and then was able to, I had enough seniority

25   at that point to bid first officer in St. Louis.  Then I

1    transferred over to St. Louis and flew first officer on the

2    727 for about three years, maybe three and a half.

3              THE COURT:  That is first officer.

4    A.   As first officers, yes, sir.  And then was able to, I

5    had enough seniority at that point to fly bigger airlines so

6    I bid first officer on a 757 which we flew mostly

7    domestically but also internationally and 767s.  That is a

8    common type, you are dual qualified on both airplanes, 767

9    was almost exclusively international.  So that was a very

10   interesting and enjoyable experience.  Then I was able to

11   hold a captain bid in the year 2000, I was awarded a capital

12   bid on Boeing 717.  And so I went through Captain upgrade

13   that year.

14   Q.   That was in the year 2000?

15   A.   I went through the training in 2001.

16   Q.   When were you a captain?

17   A.   In 2001.

18   Q.   And again, take us through the rest of your career at

19   TWA?

20   A.   Well, American announced the purchase of TWA in January.

21   We endured that process as best we could, and the result was

22   that I got bumped back, almost immediately from my captain

23   position, to back to first officer on the 767, and then about

24   three months later back to the first officer position on the

25   757, and about six months later I was furloughed.

1    Q.    When was that?

2    A.    2003.

3    Q.    2003 you were furloughed?

4    A.    Yes.

5    Q.    When were you called back to employment at American?

6    A.    Initially March of 2008.

7    Q.    So you were on furlough for five years?

8    A.    Yes.  I stayed out an extra year because my sons were at

9    an age that I thought it would be better if I were still at

10   home every night for another year.  So then I opted to go

11   back a year later in March of 2009.

12   Q.    Now, here we are here to talk about your case against

13   ALPA?

14              THE COURT:  Are you still flying today for

15   American?

16              THE WITNESS:  Yes.

17   Q.    You were a member of ALPA, Ms. Young?

18   A.    I was.

19   Q.    And  you were an ALPA volunteer, did you some union

20   work?

21   A.    I did.

22   Q.    Can you tell us the first union position that you had

23   while you were flying with TWA?

24   A.    Yes.  I felt like the union was an important element of

25   our jobs in the airline, at TWA, and occasionally I would

1    hear people complain without being willing to pitch in and

2    help.  So I thought that I should pitch in.  So I volunteered

3    to help.  They utilized me as a communications person.  And

4    since on --

5    Q.   What does that mean, to be a communications person?

6    A.   I was a member of the communications committee, and the

7    communications committee's responsibility is to disseminate

8    information to the pilots, keep them informed about the

9    situation.

10             Whatever situation is going on, whether it is a

11   negotiations or the workings of the union, the latest

12   activities of the union to protect the pilots, et cetera.  It

13   happened to be when I was doing communications work we were

14   in the process of negotiating a contract which was always a

15   big deal.  And so they put me in charge of the info

16   committee, we called it the info committee and that was a

17   committee that they set up to utilize word of mouth to keep

18   the pilots informed about negotiations.  So I would --

19   Q.   Can I interrupt you?

20   A.   Yes.

21   Q.   When you say the union was in contract negotiations,

22   what year are you talking, was this and what contract are you

23   talking about?

24   A.   The contract that we called it the contract '98, so it

25   was 97 through the first part of 99.

Young-direct                                                    12

```
 1   Q.   You are talking about the collective bargaining

 2   agreement between ALPA and TWA?

 3   A.   Yes, and the TWA pilots, that's correct.

 4   Q.   Your job was to keep pilots advised of what is going on?

 5   A.   To keep them informed as best we could.  You can't tell

 6   everything that is happening at the negotiating table.  But

 7   pilots always want to be apprised and, it is their contract.

 8   So we wanted to be able to tell them as much as we could.

 9   And we found that to be better done by word of mouth, the

10   voice mail system and one on one meetings in areas where

11   pilots congregated.

12          That way we didn't have anything written down which

13   might arm which might harm the negotiations.

14   Q.   How long did you do that?

15   A.   About a year and a half.

16   Q.   What was your next ALPA position, Ms. Young?

17   A.   Then I was elected as first officer rep in St. Louis.

18   Q.   When was that?

19   A.   In late, fall of 99.

20   Q.   When you say you were elected first officer rep, that

21   made you a member of the MEC at that point?

22   A.   That's right.

23   Q.   A full voting member?

24   A.   That's correct.

25   Q.   How long did you hold that position as first officer rep
```

```
 1    in St. Louis?

 2    A.   Until ALPA was no longer our bargaining agent.

 3    Q.   Which was when?

 4    A.   2002.

 5    Q.   All right.  What, if any, training did you receive from

 6    ALPA when you went on to become a MEC member?

 7    A.   I received some of the basic training ALPA offered, some

 8    communications training, some grievance training.

 9    Q.   Anything else?

10    A.   That is essentially it.  I think when you went to

11    training at ALPA they would always give you also give you an

12    overview of what services were available from ALPA National

13    and what they can provide to you at the local level.

14    Q.   What was some of that?

15    A.   Resources, you know, that they had an economic and

16    financial analysis group, they had, you know, people who

17    could help in grievance and contract negotiations, et cetera,

18    et cetera.  They had people available to help with all

19    aspects of protecting pilots, essentially.

20    Q.   I want to segregate from your thinking what happened in

21    2001 with the MEC and what happened before.  Can you give the

22    jury a little flavor for what the, what issues come up before

23    a MEC routinely?

24    A.   Before, you know, to me the job of being a

25    representative, the most crucial part of that was to
```

Young-direct                                                    14

1    represent individual pilots who may have come across an issue

2    while they were flying, or had maybe be in a situation where

3    the company might be interested in disciplinary action.  And

4    it was a reps job, in my opinion, to make sure that the

5    company followed the contract, and that they supported the

6    pilots as best they could under the contract.  Additionally,

7    we carried on the business, if you will, of negotiating

8    contracts, supporting the pilot group as a whole in their

9    jobs.

10           We did liason with ALPA National and they were the

11   ones who collected the dues and then would send money back to

12   the local councils in order to conduct business.  So the

13   essential elements of reps job were to represent pilots,

14   especially in situations where they might be subject to

15   discipline.

16   Q.   Okay.  Now, when the American deal was announced, did

17   you have any experience in bankruptcies?

18   A.   None.

19   Q.   Did you have any experience with seniority integration

20   issues?

21   A.   None.

22   Q.   Did you have any experience in airline mergers?

23   A.   No.

24   Q.   Did you have any experience dealing with lawyers?

25   A.   None.

1    Q.    When the deal was announced, Ms. Young, the MEC met

2    right away.  Do you recall that?

3    A.    That's correct.

4    Q.    And after that we have seen evidence of meeting after

5    meeting.  Compare for the jury the amount of work that you

6    put in on the merger as compared to your MEC life before

7    that?  Did that question make sense?

8    A.    Yes.  It was quite different.  Previous to that most of

9    the business of the elected that the reps would handle were

10   handled at the local level and we would have maybe a quarter

11   of the meetings at the MEC level, which means all the reps

12   meet, not just the local reps for any particular domicile.

13          But we were meeting nearly weekly once the merger

14   was announced, and there seemed no small amount of

15   information that we had to grasp and no small number of

16   processes that we were trying to get our arms around.

17   Q.    When the deal was announced with American, Ms. Young,

18   what did you view to be the biggest challenge that the TWA

19   pilots would face?

20   A.    Seniority.

21   Q.    When the deal was announced, the seniority integration

22   that, or negotiation that you expected to occur, how long did

23   you expect that process to play out initially?

24   A.    Historically speaking, I think the shortest negotiations

25   to for seniority integration between two companies, the

1    shortest I had ever heard of was two years.  I fully expected

2    it to take, this is the biggest merger of all time so I fully

3    expected it to take at least that long.

4    Q.   Now, Ms. Young, what was the MEC, what did the MEC do

5    out of the box, if you will, on the seniority front to

6    protect its TWA pilots, what decisions did the MEC make

7    initially?

8    A.   When you first heard that we had to put a negotiating

9    committee together or merger committee to negotiate the

10   seniority, the very first thing we did was ask for

11   recommendations from ALPA National for a merger attorney.

12   Q.   And?

13   A.   And we put a group together to go interview Roland

14   Wilder, and based on their recommendation we hired Roland

15   Wilder.

16   Q.   So the MEC hired a lawyer and the MEC --

17   A.   The elected a merger chairman committee, and elected a

18   merger committee.  It was their arduous task to try to

19   negotiate a seniority integration, a fair seniority

20   integration for us.

21   Q.   Now, at the -- you were aware that one of the conditions

22   from the asset purchase contract from American was that you

23   waive scope.  And we have already had testimony what that

24   means, but what was your strategy, your thinking, about

25   whether or not to waive scope initially?

1   A.   Well, scope was the thing that we fought the hardest

2   for.  Every time we negotiate a contract it was the key to

3   the contract.  Without those labor protective provisions, the

4   contract was not valuable, in spite of the fact that you may

5   have decent pay, and work rules.  Those protections were key

6   to any pilot contract.

7   Q.   Were you, did you have any conversations or meetings

8   with any ALPA advisors about waiving scope before April 2?

9   A.   No.

10  Q.   Mr. Wilder, did you have any exposure with him?

11  A.   Roland Wilder did speak to the MEC.  He was, he did

12  provide us some insight into how he worked and what his

13  intentions were as the merger attorney, but his job was real

14  toy work with the merger committee, not necessarily the MEC.

15  But he did, we did ask him to inform us -- he did an

16  introduction and told us who he was and kind of what he had

17  in mind.

18  Q.   And what was his advice initially?

19  A.   His advice was not to waive scope.

20  Q.   Now, April 2 MEC meeting where the scope waiver decision

21  was made, you were there?

22  A.   I was there.

23  Q.   How much notice, about, did you have of that meeting?

24  A.   Very little.  I think we probably found out Friday or

25  sat that we were going to meet Monday.  I knew we are going

1    to meet that following week.  I had no idea that a camp of

2    advisors was going to come from Washington to meet with us on

3    Monday.  That we found out --

4    Q.   The meeting, April 2, was a Monday?

5    A.   Yes, it was.

6    Q.   And it is your memory that you didn't know about that

7    meeting until when?

8    A.   Until I think Friday or Saturday.

9    Q.   Okay.  Going into that meeting, Ms. Young, were you

10   aware that the issue of the scope waiver would come up, that

11   that was one of the things you would be talking about?

12   A.   I don't know that that was specifically what we were

13   going to focus on on Monday.  I knew that we had to address

14   the issue that week.  There was a deadline approaching at the

15   end of that week.

16   Q.   What deadline was that?

17   A.   The April 5 deadline.

18   Q.   Which was what?

19   A.   It was the bankruptcy deadline for determining whether

20   or not you were going we were going to waive scope or not.

21   Q.   That was part of this motion to reject the contract, the

22   1113 motion?

23   A.   Yes, correct.

24   Q.   That was set to be heard by the court in Delaware on

25   that Friday?

1    A.    Yes.

2    Q.    Okay.  So you come in to this meeting on the second and

3    you were -- were you expecting to have to vote up or down

4    whether to waive scope or not?

5    A.    No.

6    Q.    What was -- had you polled any of your constituents to

7    find out their opinions?

8    A.    I had.

9    Q.    How did you do that?

10   A.    I had experience with the communications, and I thought

11   it was important as a representative of the first officers in

12   St. Louis to talk to the first officers a little bit and get

13   input from them.  I felt a profound responsibility as a rep

14   to represent them correctly so I consider their input.  And

15   the vast majority of my people did not want us to waive

16   scope.

17   Q.    What was your intent?

18   A.    My intent was not to waive scope.

19   Q.    In has been some testimony that there was a pre meeting

20   meeting, if you will, on April 1.  Were you, did you attend

21   that?

22   A.    I did.

23   Q.    Tell the jury what that was about?

24   A.    The only thing I was involved in or the other reps, I

25   don't think, the only thing I was involved in was the dinner

1  after evidently advisors got together for some sort of a

2  working session.  But we met them for a meal, and there was

3  nothing substantial that took place at the dinner in terms of

4  work.

5  Q.   You are talking about the Sunday night before the

6  meeting?

7  A.   Yes.

8  Q.   Who was at this danger?

9  A.   I think most of advisors.  I don't think -- a couple of,

10 I don't think a couple of the reps could make it in for that

11 meeting.  I think Alan -- excuse me, Howard and Ted couldn't

12 come in until the next morning.

13           THE COURT:  Howard Hollander and Ted Case.

14           THE WITNESS:  Yes.

15           MR. PRESS:  Thank you, Judge.

16 A.   Bob pastor, Bud Bensel, most of advisors.

17 Q.   But Bensel was what?

18 A.   He was its merger committee chairman.

19 Q.   Okay.

20 A.   He was the person who installed, he was in charge of the

21 group that was with the merger.  Bob pastor was master

22 chairman.  Most of advisors, Steve Rautenberg was there, I

23 was there, I believe Allen Altman was there.

24 Q.   When you say advisors, where specifically are you

25 talking about?

1    A.   I am talking about Richard Seltzer, Michael Glanzer,

2    Bill Roberts.

3    Q.   What was Bill Roberts?

4    A.   He was a representation expert.

5    Q.   Employed by ALPA?

6    A.   Yes.  He was their senior representation expert.  Clay

7    Warner, Roland Wilder.  Bob Christy.

8    Q.   Again, remind us who Bob Christy is?

9    A.   Bob Christy was an E F and A, he had been an Eastern

10   pilot and retired.  He was a.

11   Q.   What is that?

12   A.   Economic and financial analysis.  At ALPA National.  So

13   he was employed by headquarters.

14   Q.   Okay.

15   A.   Okay.  I think I covered everybody.  Steve Tumblin was

16   there the next day.  I can't remember if he was there on sun

17   difficult night.

18   Q.   Ms. Young, were you aware beforehand that all this team

19   of ALPA advisors would be there?

20   A.   No. And I didn't know if they were invited by the MEC

21   chairman.  I didn't know if this was something that they had

22   planned ahead of time.  I was, yeah -- no, I didn't.

23   Q.   What if any business was discussed at the dinner?

24   A.   Nothing.

25   Q.   It was a social event?

1    A.    Yes.

2    Q.    So the next morning there was business discussed?

3    A.    Yes.

4    Q.    Do you recall how long the meeting lasted?

5    A.    All day.

6    Q.    When did the business of the potential scope waiver come

7    up?

8    A.    In the afternoon.

9    Q.    That was in closed session?

10   A.    It was.

11         THE COURT:  That was referred to as the executive

12   session.

13   Q.    Yes.  I am sorry.  I called it the wrong thing?

14         THE COURT:  That was before the execute.

15   A.    Yes, your Honor, executive session.

16   Q.    I would like, Ms. Young, for you to give the jury some

17   flavor for the room you are in and who the participants were,

18   where they were seated and the dynamic of that day.

19         Judge, if it is okay can she come down and draw on

20   my easel.

21         THE COURT:  Yes, she may.  But move the easel where

22   the jury can see it.

23         MR. FRAM:  Can I move over?

24         THE COURT:  Yes, Mr. Katz, you can, to.

25   Q.    We are talking about a meeting at the MEC office?

1    A.    Yes, there is the main office where we conducted our

2    meetings.

3    Q.    Just, that office was in an office building, not far

4    from the airport?

5    A.    That's correct.

6    Q.    Actually in a mall?

7    A.    That's right.  And this is how the meetings were always

8    set up and of course this particular day was such a crucial

9    moment, I remember it very well.  I believe there was a bull

10   ten board or a dry erase board here, it was a rectangular

11   room.

12   Q.    How big is the room?

13   A.    Probably 40 by 25.

14   Q.    Using dimensions, using --

15   A.    Oh, this?

16   Q.    As an example?

17   A.    It was as deep as from the wall here to that wall, and

18   as wide as from the judge's bench to probably the first of

19   those seats.

20   Q.    Okay.

21   A.    So, but no pilots were allowed.  Normally at MEC

22   meetings if they weren't in executive session, pilots could

23   sit in on the business at hand, but this was an executive

24   session.  Again, I didn't know how advisors got there but I

25   was willing to listen.  I was not an expert on any of those

Young-direct                                                    24

1    things that advisors were able to brief us about and I was

2    very interested in what they had to say.  The table where the

3    MEC sat was here.  Bob Pastore sat in the middle.

4    Q.   Who is?

5    A.   Bob Pastore is the master chairman.  The vice chairman

6    sat mere, Scott Shwartz.  Secretary treasurer sometimes sat

7    here, was not always in.  We had Michelle here taking notes.

8    She was one of the office staff.  Steve Rautenberg, Sally

9    Young -- he was the captain rep from St. Louis.  Ted Case,

10   the secretary treasurer in New York.  David Singer, Howard

11   Hollander, first officer and captain rep in New York.  Pablo

12   Lewin, captain rep in LA.  Alan Altman, first officer

13   representative in LA.

14        Mr. Seltzer was here, Steve Tumblin here, Mr.

15   Glanzer  here, sitting down here, Bill Roberts.  Bob Christy

16   was here.

17        If I remember, Roland Wilder was in this area for

18   part of the session.  He wasn't in the whole executive

19   session because he could work a little bit with his merger

20   committee, and so I remember this specifically because of how

21   the --

22   Q.   This area, this is one table?

23   A.   This is one table.  Yes.

24   Q.   What is there, seats over here?

25   A.   Folding chairs for an audience, and as I said, in the

1    past pilots could come in and watch the business of the MEC,

2    it was their union, they had to a right to be there except if

3    it was in executive situation.

4    Q.   Okay.  Now, you clipped off a few of the things.  Of the

5    ALPA advisors, let's start with this, who did the most

6    talking?

7    A.   Clay Warner initially did a presentation.  He understood

8    stood up here with an easel much like this, and went through

9    some of the scenarios that we could expect.  So this is now,

10   we are talking about the transaction being announced January

11   10 and in this is April 2.  This is the first time any ALPA

12   advisors has stepped in to give what I consider a

13   comprehensive overview of what we were facing and what

14   processes we were looking at going through bankruptcy, et

15   cetera.

16          Clay Warner.

17   Q.   This is the first time you are really hearing this in

18   any detail at all?

19   A.   Yes.  Any kind of comprehensive presentation.

20   Q.   Mr. Warner is telling you what, what is the upshot of

21   this speech?

22   A.   The upshot of his speech is we have to waive scope or it

23   will kill the deal.

24          The train is going to leave the station.

25          THE COURT:  By kill the deal you mean American

1  would back out?

2  A.   Yes, sir.

3  Q.   Where was Mr. Christy seated?

4  A.   He was here.

5  Q.   This ten years ago?

6  A.   Yes.

7  Q.   How is it that you can recall that?

8  A.   It was an important day.

9  Q.   So Mr. Christy, can you tell us some of the things you

10  remember him saying?

11  A.   He was, I remember him being very vocal at the end of

12  the meeting.  In fact I remember his screaming at Ted Case

13  here.  Basically.

14  Q.   Screaming what?

15  A.   Basically telling Ted to get his head on straight about

16  this hole situation.

17  Q.   When you say screaming, are we to take that literally?

18  A.   Yes.  He was, he had raised his voice, he was frustrated

19  that Ted was not in compliance with what advisors were trying

20  to tell us.

21  Q.   All right.

22  A.   And --

23  Q.   How did that impress you?

24  A.   Well, I thought it was rude.  But I, you know, I mean,

25  the totality of what advisors were telling us, I felt like I

1    had to listen to.  I felt that was, like that was my

2    obligation, as the person who was representing the group of

3    people at TWA who were most vulnerable to losing their jobs.

4    Q.   Now, you have got Mr. Warner at the front saying the

5    train is leaving the station.  What did that mean, as far as

6    you knew?

7    A.   As far as I was concerned that meant that we didn't have

8    any choice but to waive scope.

9    Q.   You have Mr. Christy screaming at Ted Case because he is

10   not agreeing with Mr. Christy?

11   A.   Right.  I was very interested in what advisors had to

12   say.  I specifically asked some questions of Richard Seltzer,

13   and Steve Tumblin.

14   Q.   Okay.

15   A.   I listened.

16   Q.   I am going to ask you to sit back up there and I will

17   get rid of this.  You mentioned that you had questions for

18   Mr. Seltzer?

19   A.   Yes.

20   Q.   What did you ask him?

21   A.   Mr. Seltzer was billed, advertised, if you will, at that

22   meeting as being the first and foremost authority in the

23   country on 1113 processes.

24           THE COURT:  Seltzer?

25           THE WITNESS:  Yes, your Honor.

```
 1              THE COURT:  He was the bankruptcy expert?
 2   A.    Yes, your Honor.  They told us he was the foremost
 3   expert on those processes, and he had more experience with
 4   them, you couldn't find anybody who had more, you know, wise
 5   advice when it came to those processes.
 6   Q.    And what question did you have of him?
 7   A.    The question I asked him is what are the chances of us
 8   prevailing in the 1113 process in the bankruptcy court.  And
 9   he said 99.97 chance, percent chance of failure.
10   Q.    Now, we saw this with Mr. Altman, a lengthy 30-page
11   brief that Mr. Seltzer had filed three days earlier on March
12   30.  Were you given a copy of that?
13   A.    I was not.
14   Q.    Did he even mention that he had filed a brief?
15   A.    He did not.
16   Q.    Did he mention any of the arguments that he had made in
17   his brief?
18   A.    That I know he did not.
19   Q.    Well, you know --
20   A.    I know, he might have mentioned that they were prepared
21   to file a brief.  He spoke nothing of the arguments made in
22   that brief.  The first time I saw that breach was in
23   discovery.
24   Q.    What do you mean in discovery?
25              THE COURT:  In this case.
```

1           THE WITNESS:  In this case.

2   Q.   You mean when ALPA gave documents to us?

3   A.   To you, and I got to see them at your office.

4   Q.   Mr. Seltzer was the bankruptcy lawyer.  Did he tell you

5   that that there was going to be a hearing on fly day Friday

6   in the bankruptcy court?

7   A.   Yes, we knew that.

8   Q.   Did he tell you what preparations he had made for the

9   hearing?

10  A.   No.

11  Q.   Are you aware that any preparations were made?

12  A.   I certainly wasn't aware that he had arguments that

13  were, that would possibly provide us options to waiving

14  scope.  I had no knowledge of that.

15  Q.   And he told you what again?

16  A.   There was a 99 point 97 percent chance we would fail in

17  the 1113.

18  Q.   You mentioned that you had questions for Mr. Tumblin as

19  well?

20  A.   Mr. Tumblin was there from Leboeuf Lamb in Salt Lake

21  City.  He came to that meeting because the original

22  bankruptcy Judge we hired to advise was unable to attend,

23  Judge Mabey.

24           Steve Tumblin was supposedly a very reputable

25  attorney who we worked somewhat on the TWA MEC.  I asked him

1  about the language in the asset purchase agreement, what it

2  meant for us.

3  Q.   What specifically, without looking at the document, I

4  will get the document up, but what did you ask him?

5  A.   Well, the language I was focusing on which was its

6  language that I thought was key to us was in the asset

7  purchase agreement, American had a sentence in there that

8  said that they would provide, that they would pay us, pay and

9  benefits equivalent to similarly situated employees at

10 American.  And what that meant to me was that as a 13-year

11 captain at TWA, I would be making the same, I would receive

12 the same pay and benefits as a 13-year captain at American.

13 Q.   I want to refer to a joint exhibit 272, Mr. Fram, write

14 was the asset purchase agreement, it is in evidence already.

15 With you bring that up, Will.

16        This, Ms. Young is the asset purchase agreement

17 cover create cover sheet, right.

18 A.   Yes.

19 Q.   The provisions you referred to are on page 41.  Let's

20 call those up.  You will see it on your screen?

21 A.   Okay.

22 Q.   Can you make that section bigger, 10.1.

23 A.   Provide employment benefits and post-retirement benefits

24 to all employees.

25 Q.   Where are you reading?

```
 1   A.    Iii.

 2   Q.    Iii.  How far down?

 3   A.    Halfway down.

 4   Q.    This is American's promise, right?

 5   A.    Yes.

 6   Q.    To, quote, provide what.  Read that?

 7   A.    Provide employment benefits and post-retirement benefits

 8   to all employees actually hired by purchaser pursuant to i,

 9   and ii, above/ at levels substantially no less favorable than

10   those benefits provided to purchaser's similarly situated

11   employees.

12   Q.    What did that mean to you?

13   A.    It meant to me that I would be on --

14   Q.    No less favorable than those benefits provided to

15   American similarly situated employees?

16   A.    Right.

17   Q.    That what is they promised to give you?

18   A.    That's correct.  I asked Steve Tumblin about that

19   language.

20   Q.    What did he say?

21   A.    I asked him if that was language that could be argued in

22   court effectively.

23   Q.    Argued to do what?

24   A.    Well, if we waived scope, and things didn't go well,

25   could we take American to court for to not following through
```

```
 1    on this commitment to the TWA employees.

 2    Q.   To treat you like similarly situated captains at

 3    American?

 4    A.   Correct, right.

 5    Q.   What did you expect this contract to provide for you in

 6    that regard?  You were, at that point you were a 13-year

 7    captain or 12-year captain?

 8    A.   12-year captain.

 9    Q.   What did you expect?

10    A.   I expected to be a 12-year captain at American.

11    Q.   And what did, because what is written here?

12    A.   Because of this commitment.

13    Q.   What did Mr. Tumblin say about that notion?

14    A.   He said absolutely.  He said that is strong language.

15    Yes.

16    Q.   Strong language?

17    A.   It is strong enough to support legal effort.   A

18    lawsuit.

19    Q.   Did you have any other questions for Mr. Tumblin?

20    A.   That is the one I remember most clearly.

21    Q.   Now, Mr. Wilder, he was there on April 2?

22    A.   Yes, he was.

23    Q.   And what was his speech about?

24    A.   He was in favor of not waiving scope.  He had stated

25    that position previously, and he reiterated that position at
```

1    the meeting.

2    Q.   We have seen, there has been some evidence about a

3    litigation strategy that Mr. Wilder had come up with to try

4    to hold the deal hostage, basically.  Was that discussed at

5    the meeting on April 2?

6    A.   No, the first time I saw that document was in your

7    office this year.

8    Q.   No mention of his litigation strategy?

9    A.   None.

10   Q.   That was not presented to you as an option?

11   A.   It was not presented to us.

12   Q.   But Mr. Wilder was still recommending you not waive

13   scope?

14   A.   That's correct.

15   Q.   Do you remember anybody responding, anybody in the room,

16   responding to Roland Wilder?

17   A.   Yes.

18   Q.   Go ahead?

19   A.   Roland had made his presentation and had argued somewhat

20   differently than the rest of advisors, and at that point in

21   time, after his presentation he sat down and Michael Glanzer,

22   who was the investment banker who had been advising us about

23   potential mergers, got very angry, and in fact stood up and

24   went over toward Roland Wilder and again was screaming,

25   American is not going to do the deal if you don't waive

1    scope.  They are going to walk.

2    Q.   And again, screaming?

3    A.   Screaming.

4    Q.   Now you have got Mr. Christy screaming at Ted Case, you

5    got Michael Glanzer screaming at Roland Wilder?

6    A.   Correct.

7    Q.   What did you think when you have one adviser yelling at

8    another one?

9    A.   Well, I was trying to listen to the advice of the

10   experts.  I didn't think it was, I mean I thought it was that

11   important.  To me they were trying to make a point that it

12   was that crucial, that they waive scope.  And unfortunately

13   at the end --

14   Q.   Ms. Young, before you answer that.  Was this the first

15   time you had ever been at a MEC meeting where you were, where

16   you had lawyers make presentations to you?

17   A.   We had probably heard from, you know, like I said,

18   Roland Wilder a little bit.  We have our own in-house

19   attorney, David Holtzman.  Yes, this was at first time there

20   was any real presentation or advice given to us about the

21   situation with we were in with the purchase.

22   Q.   After Mr. Glanzer is screaming at Mr. Wilder did he

23   change his position, Mr. Wilder, that is?

24   A.   He did.  He capitulated and he looked defeated.  You

25   know, his body language was, and he said, he ended his

```
 1    presentation by saying, you know, a contract is better than

 2    no contract, and I suppose if you have to waive, I would just

 3    advise you to wait until the courthouse steps.

 4    Q.   Meaning wait until Friday?

 5    A.   Yes.

 6    Q.   At the hearing?

 7    A.   Yes.

 8    Q.   Correct.

 9    A.   Yes, correct.

10    Q.   Ms. Young, before the vote was made did you take a straw

11    pole for an opinion?

12    A.   I did.  Again I was looking for all the information that

13    I could gather that day and I spoke to everybody in the room

14    who I knew, I spoke to Bud Bensel, the merger committee

15    chairman.  I spoke to two of the merger committee members who

16    were there.  I spoke to a couple of the negotiating committee

17    members who were there.  I knew where the MEC members stood.

18    And everybody in that room, after listening to advisors, had

19    the opinion that we had to waive scope.  Except for three

20    people.

21    Q.   Who?

22    A.   Howard Hollander, Ted Case and John Hefley.  John Hefley

23    was a member of the merger committee.

24    Q.   And how did you vote then?

25    A.   No.
```

 1            THE COURT:  The vote though was limited to the MEC

 2   members, right?

 3            THE WITNESS:  That's correct, your Honor.

 4   Q.   The six sitting at the table you drew?

 5   A.   Yes, sir.

 6            THE COURT:  The merger committee members and the

 7   negotiating committees, members, unless they were MEC

 8   members, didn't have a right to vote.

 9   A.   That's correct.  Because we didn't have one that had

10   both rolls, Alan Altman.

11   Q.   D 74, which is minutes from the meeting.

12            Ms. Young, these are minutes from the April 2

13   meeting, right.

14            THE COURT:  In evidence already.

15   Q.   Yes, these are in evidence.  You want to go to the

16   second to last page, I believe, where the vote tally is.

17            Ms. Young, what we were showing on the screen here,

18   what is that?

19   A.   This is the record of the roll call vote.

20   Q.   And again, what does that mean, roll call?

21   A.   Normally each representative just has one vote.  But if

22   one of the MEC representatives sees a situation that is

23   important enough, they can use their number of people that

24   they represent as extra power.  And that is what Steve

25   Rautenberg did here.

```
 1              Steve and I represented more pilots than the other

 2   representatives in the other two domiciles, so Steve called

 3   for a roll call vote, and we are then required to vote some

 4   portion or all of our persons that we -- pilots that we

 5   represented either for or against a particular resolution.

 6   Q.   Is this an accurate tally of how the representatives

 7   voted that day?

 8   A.   Yes.

 9   Q.   Sally, Ms. Young, for it says, Young, 400 votes for.

10   For what, for waiving scope?

11   A.   To waive scope, yes.

12   Q.   Against, it says Young, 205?

13   A.   That's correct.

14   Q.   So you split your vote?

15   A.   I did.

16   Q.   Can you tell the jury how you came up with that

17   decision?

18   A.   That was the line of demarcation that I arrived at in

19   general terms of the number of pilots I represented who were

20   most vulnerable to furlough and job loss.  I represented in

21   St. Louis 605 pilots.  400 of those pilots were on the junior

22   end.  I considered 200 to be in the range that were if not

23   already, had a captain bid, then would be, have reasonable

24   expectation to upgrade to captain very soon.  And to me

25   people who were -- historically speaking, people who were
```

```
1   either captains or very close to being captains were almost
2   never subject to potential job loss or furlough.  And so in
3   my mind I thought that 400 of my constituents would not want
4   me to waive -- would want me to waive scope and 205 would
5   not.
6   Q.   So that is how you made your decision?
7   A.   It is.
8   Q.   If you look at page 5, the last whereas clause, says the
9   MEC had considered extensive advice from its bankruptcy
10  counsel, Steven Tumblin and Richard Seltzer?
11  A.   That this that is true.
12  A.   Yes.
13  Q.   And merger counsel Roland Wilder who was there?
14  A.   Yes.
15  Q.   Advice from Glanzer, Babbitt, that is one we haven't
16  talked about?
17  A.   He was sitting actually to the left, to the -- to the
18  right of Michael Glanzer and Bill Roberts.
19  Q.   Do you remember anything in particular he said?
20  A.   He did make a brief presentation.  He was supportive of
21  what the ALPA advisors were saying.  He was a consultant.
22  Q.   It says going on that he you received advice from Bill
23  Roberts.  What did he say as you recall?
24  A.   Bill Roberts was the representation expert who said that
25  there was absolutely no obligation on the part of TWA to
```

1    recognize ALPA as the bargaining entity because we had never

2    had a certification process at TWA that TWA had always, the

3    company, TWA, had always voluntarily recognized ALPA as our

4    bargaining agent.  And in a post 1113 bankruptcy process that

5    we might have no union, that we might --

6    Q.   Bill Roberts said what, that you might, that ALPA won't

7    be your union any more if this motion is granted?

8    A.   Yes.  If our CBA is stripped, we quite possibly would

9    have no union, we would have no grievance process, no way to

10   protect pilots.  Their jobs could be unilaterally changed by

11   the company.  They could walk off large numbers of pilots if

12   they so sought to do so.

13   Q.   Let me interrupt you.  You with we saw Thursday in Mr.

14   Seltzer's brief to the bankruptcy court the one thing TWA was

15   not seeking to reject was ALPA's representation of the

16   pilots.  Did Mr. Seltzer correct Mr. Christy and tell him he

17   was wrong?

18   A.   Absolutely not.

19   Q.   Mr. Roberts, I am sorry.  Mr. Seltzer did not correct

20   him?

21   A.   No, absolutely not.

22   Q.   How important to your decision was Mr. Roberts threat

23   that you are you will lose ALPA representation if this motion

24   is granted?

25   A.   It was crucial.  I represented most of the junior pilots

1    at the council meeting and they were the ones subject to

2    career tragedy if we didn't have a union.

3    Q.   Ms. Young, other than waiving scope, was there any other

4    option presented to the MEC that day?

5    A.   There was not.

6    Q.   We have got a group of six or seven lawyers and no one

7    has an idea other than surrender, is that right?

8    A.   They presented no other alternative than basically to,

9    comparison of waiving scope or not waiving scope.  They made

10   it, a very clear case for waiving scope.

11   Q.   Do you remember any discussion about, well, if the

12   bankruptcy court takes our contract, rejected our contract,

13   will we then have a right to strike.  Do you remember any

14   discussion about that.

15   A.   I do remember some discussion at the very end.  But I

16   don't remember exactly what was said., you know, the right to

17   strike is such a crucial element for an employee group

18   because it is the one bargaining behavior that they have to

19   keep the company from making unilateral changes to a

20   contract.  The threat of a strike, I should say.

21   Q.   Can you, without remembering specifics, can you remember

22   the gist of the conversation that day about whether or not

23   you would have a right to strike?

24   A.   They said we would not have a right to strike.

25   Q.   Who is they?

1    A.    Well, Bill Roberts and company.

2    Q.    Again, did Mr. Seltzer, who had filed a brief saying

3    there was a clear right to strike, did he correct Mr.

4    Roberts?

5    A.    He said nothing.  He said nothing about it.  He did not

6    mention that he had filed that in his brief.

7    Q.    If you had known that, had you known that striking would

8    have been an option for you even if you lose in the

9    bankruptcy court, would that have been something important to

10   you that day to know?

11   A.    Absolutely.

12   Q.    Did anyone -- did any of the ALPA advisors present that

13   day tell you, you know, you need to understand something,

14   that if you do waive scope, it is going to be game over with

15   respect to the seniority issue?

16   A.    No. In fact, Steve Tumblin told us we had a back stop in

17   the asset purchase agreement.  They, ALPA, ALPA had told us

18   that they were going to be supportive, that this was the only

19   way to go, we would still have a process, that the reasonable

20   best efforts grievance was real, that the asset purchase

21   agreement language was real, that those were elements of

22   leverage that would provide us a process that would be, that

23   went, that end in a fair integration and discussions for

24   integration.

25   Q.    Of course you still had the biggest pilot union in the

1   world on your side?

2   A.   That's correct.

3   Q.   What comfort did that give you, and what did you expect

4   from your union going forward?

5   A.   I expected them to make a full court press in

6   representing us, and supporting us.

7   Q.   And you recall that that is indeed what was promised?

8   A.   That's correct.   I didn't see any reason not to.   We

9   had councils 2, 3 and 4.

10  Q.   What does that mean?

11  A.   We were the founding members of ALPA we had been members

12  since it began.   Councils, the council was a local group of

13  pilots who are domiciled in a particular city and that is

14  considered your local local council.   We had Councils 2, 3

15  and 4, when it very first began.

16  Q.   P 316.   Don't put it up yet.

17         MR. PRESS:   This is a new one, Judge.

18  Q.   Ms. Young, I have handed you what we marked exhibit P

19  316 before the trial.   What is that.

20  A.   This is a letter from Duane Woerth, the president of

21  ALPA National, excuse me, National ALPA, to the members of

22  TWA ALPA.

23  Q.   It is a letter from the president of the union to all

24  TWA pilots, it says?

25  A.   That's correct.

Young-direct                                                    43

1    Q.   What is the date of that?

2    A.   May 31, 2001.

3            MR. PRESS:  We move for the admission of P 316,

4    your Honor.

5            MR. FRAM:  No objection.

6            THE COURT:  P 316 in evidence.

7    Q.   It says in the third paragraph, can you read that, TWA

8    pilots overcame many obstacles?

9    A.   On what has been along and tortuous journey to secure

10   your careers.  Overcame many obstacles on what has been a

11   long and torturous journey to secure your careers.  The

12   difficult decisions made by your MEC in the last days of

13   bankruptcy to avoid chapter 7 liquidation and affect the

14   transition to TWA LLC were but one more chapter in a

15   voluminous but difficult decision forced upon TWA within the

16   last few decades.

17           "I fully realize that much more lies ahead before

18   TWA pilots are truly in safe harbor.  Your fellow ALPA pilots

19   leaders also realize this and at your recently concluded

20   executive board meeting passed a supporting resolution which

21   concluded:   Quote, "Therefore, be it resolved that the

22   executive board pledges the full moral support of the

23   association, along with necessary funding in accordance with

24   current ALPA policies, and with the ALPA Constitution and

25   bylaws, to enable the TWA MEC to properly represent the TWA

1    pilots through this crisis and to properly complete the tasks

2    before them."

3    Q.    Ms. Young, before getting to the last paragraph, this

4    pledge from, first of all, this reference to the executive

5    board, what is that a reference to?

6    A.    The executive board is the, it is a voting body which

7    directs the business of ALPA National.   Executive board

8    members are representatives.

9    Q.    It says you were, your full moral support.   Were you

10   asking for full moral support?

11   A.    We needed all the support we could get.

12   Q.    He concludes his letter, as president, what, what did he

13   say?

14   A.    I will continue to coordinate with your MEC and your

15   merger committee to ensure --

16   Q.    Stop.   He says I will continue to coordinate with your

17   MEC.   Had he ever coordinated anything with you up until this

18   point in time?

19   A.    No.   Not me personally.

20   Q.    Did he coordinate anything after that?

21   A.    Well, you know, later I came to find out that he

22   somewhat did in a back door manner but not directly.

23   Q.    Okay.   We will get to that.   That comes at the end,

24   right?

25   A.    Right.

1   Q.   But up to May 31 he hadn't done anything tangible for

2   the MEC?

3   A.   That's correct.

4   Q.   And he says here, he is going to coordinate to do what,

5   to ensure?

6   A.   Pilots are fairly and equitably integrated into the

7   American pilots seniority list and ensure that the executive

8   pledge is fulfilled.

9   Q.   Did President Woerth do anything to ensure ha fair and

10  equitable integration with the American pilots?

11  A.   No.

12  Q.   Now, going forward, Ms. Young, your merger committee met

13  with the American pilots merger committee to negotiate

14  seniority.  Right?

15  A.   That's correct.

16  Q.   And you were kept apprised and informed that those

17  negotiations didn't go well?

18  A.   That's correct.

19  Q.   And then there was some testimony about a meeting in

20  October in Washington, D.C., kind of the end of the road?

21  A.   Correct.

22  Q.   Were you there?

23  A.   I was.

24       MR. PRESS:   This a good time for a break.  This is

25  a new topic.

 1            THE COURT:  Yes.  If you would like to take a break

 2    now, it is fine.  It is close to 20 of 10.  We will take a

 3    15-minute break.  Until about five of 10.

 4            All rise when the jury leaves.

 5            (Recess)

 6

 7

 8            (Jury enters the courtroom.)

 9            SALLY YOUNG, resumes.

10            CONTINUED DIRECT EXAMINATION

11            BY MR. PRESS:

12            THE COURT:  Mr. Press, you may proceed.

13    Q.   We jumped forward.  I want to step backwards for a bit.

14    I want to refer to exhibit P 113 which is in evidence.  Ms.

15    Young, can you see that on the monitor?

16    A.   I can.

17    Q.   You recognize the name Jalmer Johnson at the bottom?

18    A.   I do.

19    Q.   ALPA's general manager?

20    A.   Correct.

21    Q.   You recognize the names of the recipient of his January

22    25 letter?

23    A.   Yes, I do.

24    Q.   Captain Darrah is the president of the American pilots

25    union?

1   A.   That's correct.

2   Q.   How does he open up his letter.  I understand?

3   A.   "I understand that your board is considering taking

4   action to continue looking at a possible affiliation between

5   ALPA and APA."

6   Q.   This is three weeks after the merger is announce

7   announced, right?

8   A.   Yes.

9   Q.   He goes on about providing information to your

10  membership about our union, right?

11  A.   Correct.

12  Q.   He says we are willing to pay for the cost of

13  distributing that information, as well as the cost of any

14  polling of your membership that may accompany this campaign.

15       Did you get a copy of that letter back then?

16  A.   No.

17  Q.   When did you first see it, do you remember?

18  A.   In discovery in your office.

19  Q.   This campaign, what campaign?

20  A.   The campaign to have ALPA become the bargaining entity

21  for APA.

22  Q.   Which was a campaign that, what was going on before the

23  American TWA merger was announced?

24  A.   That's correct.

25  Q.   What was your understanding --

```
1             THE COURT:  Were you aware that it was going on.

2   A.   I was aware that it was ALPA's goal to bring all

3   companies who were not ALPA members into the ALPA membership,

4   but a global goal.

5             THE COURT:  I am sorry, go ahead.

6   Q.   Ms. Young, what was your understanding as to the status

7   of that campaign after the American TWA transaction was

8   announced in early January?

9   A.   It is astounding to me that they had communications, it

10  is  completely inappropriate.  Their obligation was to the

11  TWA pilots.

12  Q.   Whose?

13  A.   ALPA National.

14  Q.   ALPA's?

15  A.   Yeah.

16  Q.   Why does this astound you?

17  A.   It is inappropriate contact.  It is inappropriate

18  communication.  That campaign should have been stopped for

19  the duration of the integration process.

20            THE COURT:  By integration, you mean integration of

21  the American pilots with the TWA pilots.

22            THE WITNESS:  Yes, your Honor.

23  Q.   Why do you say it should have stopped, who is to say

24  that?

25  A.   This, to me, this indicates that they are completely
```

1    conflicted.  Their full concentration should have been on

2    supporting the TWA pilots, not on winning the APA pilots

3    over.

4    Q.   And Ms. Young, to have known of this continuing campaign

5    and this kind of communication between the two unions, would

6    that have been important to you to know on April 2 when you

7    made your decision?

8    A.   Absolutely.  I had no idea.  To me that is a clear

9    indication of conflict.

10   Q.   Now let's go to October?

11   A.   Okay.

12   Q.   Why were you in Washington meeting with the American

13   pilots?

14   A.   The negotiations had continued to go badly.  The TWA

15   pilots sought support from Washington to re-establish the

16   Allegheny Mohawk 3-13 provisions.

17   Q.   You are talking about the Bond bill?

18   A.   Yes, I am.

19   Q.   Okay.

20   A.   All we wanted was a provision attached to the

21   appropriations bill, post 9-11, that reinstated arbitration.

22   And you know, to us that was a no cost item.  It was

23   essential to not only the employees of all the airlines such

24   as, but to the traveling public.  It is not only more fair

25   but it is safer to have pilot groups integrated fairly.

1  Q.   How is that a safety issue?

2  A.   Well, it is, it can be a very contentious issue, and I

3  think there can be safety implications, if a pilot is

4  completely, if his career, his or her career is completely

5  ruined by the integration process, I think you have got

6  potential for serious stress.

7  Q.   Okay.

8  A.   So we sought help from Washington, and we began

9  lobbying.

10 Q.   Were you involved in the lobbying personally?

11 A.   I was.

12 Q.   How much time do you think you devoted to lobbying on

13 Capitol Hill for the Bond bill?

14 A.   As much as I could.

15 Q.   What does that mean?

16 A.   Several weeks worth of lobbying.  We would typically

17 travel up on, to Washington for at least two or three days at

18 a time and then go back home and tend to family business.

19 Q.   Now, we saw Ted Case.  He had a stack of business cards

20 with folks on the hill that he had spoke with.  Did you

21 personally speak with legislators?

22 A.   I did.

23 Q.   Ms. Young, in the weeks that you were on Capitol Hill

24 lobbying did you ever once see anybody from ALPA National?

25 A.   Did not.

1    Q.    Did you ever speak with anybody from ALPA National about

2    your lobbying effort?

3    A.    We did.  We eventually, because we didn't see them on

4    the hill we eventually sought their assistance on I think two

5    occasions, we went over to Herndon to seek their assistance.

6    Q.    When you say we, who are you referring to?

7    A.    On one occasion it was Ted Case, myself, John Hefley,

8    and Howard Hollander.  We heard there was an executive

9    council till meeting going on so we went to plead for their

10   assistance in this lobbying effort.

11   Q.    Who did you speak with, the council?

12   A.    The council.

13   Q.    What response did you receive?

14   A.    It it was harsh.

15   Q.    What do you mean?

16   A.    That was the first time in my memory that, we were,

17   after waiting for an hour, we asked them for five minutes.  I

18   remember this is the largest integration of all time,

19   founding members of ALPA, and we asked for five minutes of

20   the executive council sills time.  They were frustrated with

21   us that we were bothering them.  They made that clear.

22            MR. FRAM:  Pardon me.  Could we have facts as

23   opposed to characterization.  I really object because because

24   it is not talking about what was said but instead

25   characterizing it.

```
 1              THE COURT:  I am going to allow it up to now.
 2    Let's continue.  You heard the objection.
 3    Q.   You were just about to say they made that clear, what
 4    did they say?
 5    A.   One member, I believe it was a Con Air  MEC, or maybe
 6    Delta, I think Con Air, told us that TWA had dragged ALPA
 7    down for years and they weren't going to spend any more money
 8    on us, to our faces.
 9    Q.   So what support are you aware of that ALPA lent to the
10    lobbying effort, any?
11    A.   I am not aware of any.
12    Q.   Now, Ms. Young, this Bond bill, created some traction
13    for additional negotiations with the American pilots?
14    A.   It did.
15    Q.   And you were there for that?
16    A.   I was.
17    Q.   And you recall when?
18    A.   In, I believe it was the first day was October 21, 2001.
19    Q.   All right.
20              THE COURT:  I am sorry.  What happened on that day?
21              THE WITNESS:  That was, I believe that was the
22    first date that we met in Washington for the MEC meeting and
23    the negotiations with American and APA, at the Mayflower
24    Hotel.
25              THE COURT:  You actually met with the American
```

1    folks?

2    A.   We did, part of the weekend.

3    Q.   Ms. Young, those negotiations went over three days, is

4    that pretty much it, the 21, 22, 23, they ended?

5    A.   The meetings were over three days.  I think, yeah, the

6    negotiations ended just prior to that.

7           THE COURT: You are talking about negotiations with

8    American, APA and the American pilots.

9           THE WITNESS:  Both APA representatives and

10   representatives from the company, American, were there.

11          THE COURT:  Both the airline, the management was

12   there as well as labor.

13          THE WITNESS:  That's correct.

14   Q.   And the issue was the seniority integration?

15   A.   Yes.

16   Q.   And can you recall what generally the last proposal

17   made by the American pilots was on how to integrate the two

18   lists?

19   A.   Yes.  I remember it, it was very brief proposal.  One

20   page.  And essentially it proposed to begin the integration

21   of the senior most TWA pilots, Captain Upp, at somewhere

22   around the 5,000 seniority mark.  And then to provide for an

23   a ratio integration down to a point where twelve, over 1,200

24   pilots, TWA pilots, which was over half, would be stapled at

25   the bottom of the list.

1    Q.   And you were part of the that proposed staple, weren't

2    you?

3    A.   I was.

4    Q.

5              THE COURT:  Now, that was a proposal of TWA

6    /EUFRPBLGTS /THAEUFRPBLT was from APA to TWA.

7              THE COURT:  That was a proposal to you.

8              THE WITNESS:  Yes.

9    Q.   That, that was American pilots last proposal, right?

10   A.   It was.

11   Q.   Did the MEC vote on that?

12   A.   We did.

13   Q.   And how did that voting?

14   A.   We decided not to sign or to accept the proposal.

15   Q.   And how did you   specifically vote?

16   A.   I voted no.

17   Q.   Why?

18   A.   It was a horrendous integration.

19   Q.   That would have done what to your constituents?

20   A.   It would have put all of my constituents at risk.  It

21   did put all of my constituents at risk.

22   Q.   Was there anybody on the MEC, again there are six

23   members, right?

24   A.   Yes.

25   Q.   Did any of them vote in favor of this proposal?

```
 1    A.    One representative did.

 2    Q.    Who was that?

 3    A.    Steve Rautenberg.

 4    Q.    He was the captain rep in Saint Louis?

 5    A.    Correct.

 6    Q.    Now, after the proposal is rejected what did the MEC do

 7    then?

 8    A.    Well.

 9    Q.    That wasn't the end of the game, right?

10    A.    Well, we sought -- there was some discussion about a

11    counter proposal.

12    Q.    Before that?

13    A.    We called Duane Woerth.

14    Q.    What was the purpose of calling Duane?

15    A.    Called Duane Woerth so we could initiate the three part

16    strategy Roland Wilder had designed to -- if the negotiations

17    didn't go well, to seek relief from the implementation of

18    that bad integration.  And it was a three part strategy

19    involving an injunction, and continued lobbying, and you

20    know, it was a legal strategy along with a lobbying strategy.

21    Q.    So you had this legal strategy that Mr. Wilder had to

22    get an injunction, right?

23    A.    That's correct.

24    Q.    So you called President Woerth and asked what?

25              THE COURT:  An injunction against what.
```

```
 1    A.    An injunction against the implementation of the

 2    integration.

 3              It was to prevent American from implementing the

 4    bad --

 5              THE COURT:  Is this after they had implemented it

 6    or this was going to be beforehand.

 7    A.    Before they implemented.  He was going to -- he was

 8    literally going to finish that brief and file it immediately

 9    on Monday.

10    Q.    I guess we should give more context to this.  The

11    American pilots union, APA, had made what they said was their

12    final proposal which included staple over 1,200 TWA pilots?

13    A.    Correct.

14    Q.    In they said this was it.  What was going to happen next

15    if you didn't accept that agreement or do something?

16    A.    We had the strategy that Roland --

17    Q.    No, what did the American pilots tell you was going to

18    come next if you don't accept this, what did you understand

19    they were going to do?

20    A.    That it could get worse.

21    Q.    Well, did you understand they would act unilaterally?

22    A.    Yes.

23    Q.    And specifically what did you understand they could do?

24    A.    They could change the seniority to actually to get

25    worse, they could exclude any protection that's they had
```

1    decided to keep in the integration.  That was going to be a

2    unilateral decision between them and American Airlines and

3    not us.

4    Q.   The point is they don't need your agreement, right?

5    A.   That's correct.

6    Q.   American Airlines and its pilots union could enter into

7    whatever they wanted to?

8    A.   That's correct.

9    Q.   And that was the threat, right?

10   A.   That's correct.

11   Q.   So Mr. Wilder's injunction is to stop that from

12   happening?

13   A.   That's correct.

14   Q.   Was there a term that you all used to refer to a

15   seniority integration that would just be imposed on you, did

16   you have a term for it?

17   A.   Cram-down.

18   Q.   Cram-down.  Meaning what?

19   A.   Meaning cram the bad seniority integration down on the

20   TWA pilots.

21   Q.   And Mr. Wilder's idea was to go to court and seek an

22   injunction to stop that --

23              MR. FRAM:  Your Honor, these are all leading

24   questions.

25              THE COURT:  You are getting very leading.

```
 1              THE COURT:  Is that your objection?

 2              MR. FRAM:  Yes, leading.

 3              THE COURT:  You are testifying now, not the

 4   witness.

 5   Q.   Ms. Young, what did you understand Mr. Wilder's strategy

 6   would do about this cram-down notion?

 7   A.   He would prevent, the strategy would prevent the

 8   implementation of the cram-down.

 9              THE COURT:  You say would prevent.  He told it

10   would prevent.

11              THE WITNESS:  That's correct.

12              THE COURT:  You didn't know whether it would work

13   or not.

14   A.   That's correct.

15   Q.   And so again getting back to your conversation, do you

16   recall, that you, your call with President Woerth.  What was

17   the point of that?

18   A.   Shockingly, in spite of the --

19              THE COURT:  No, don't, just answer.

20   Q.   What was the point of calling him?

21   A.   The point of calling him was to tell him that we had not

22   signed and we were going to move forward with the three part

23   strategy that had been heretofore supported by ALPA National.

24   Q.   What did Mr. Worth say?

25   A.   No.
```

1    Q.   No what?

2    A.   He said he is not going to sue another union.  He is not

3    going to sue anybody that he doesn't have a contract with.

4    Q.   So what was the reaction of the MEC?

5    A.   Shock.   Roland Wilder was equally shocked.   I watched

6    his reaction personally because he to me was a man of

7    integrity and experience, and I specifically watched Roland

8    Wilder because I wanted the truth about whether or not ALPA

9    had supported the strategy prior to that, and I could see

10   very clearly that Roland had been sold out.

11              MR. FRAM:   Your Honor, I object and move to strike.

12              THE COURT:   That is kind of an opinion.   Let's just

13   stick to the facts.

14   Q.   Ms. Young, do you understand the instruction from the

15   Judge?

16   A.   Yes, sir, I do.

17   Q.   Okay.   So going forward, what was the strategy then, you

18   don't have the litigation option.   What was the strategy, if

19   any?

20   A.   Well --.

21              THE COURT:   And what timeframe.

22   Q.   Going forward after October 23?

23   A.   Yes.

24              THE COURT:   But before American and the pilots had

25   acted unilaterally?

1              MR. PRESS:  Correct.

2    A.   Yes.  We were, we still had, we thought we still had

3    potential to lobby for the Bond bill.  We, I think, my memory

4    is we went back to St. Louis to try to regroup and see if

5    there was any leverage we could get, any leverage  we could

6    get by any legal strategy and move ahead.

7    Q.   Okay.  Now, at that time, in late October, there was,

8    TWA had made a decision to close the bases in LA and New

9    York, right?

10   A.   We were notified in the middle of October that those two

11   bases were going to be compressed into St. Louis so at the

12   meeting in October we had an obligation to handle the issue

13   --

14   Q.   Before you get into that, what does this mean they were

15   going to close the bases?

16   A.   They were going to compress all the pilots into one

17   domicile, St. Louis.  American was not going to allow to us

18   maintain our New York and LA domiciles so all the pilots were

19   going to be sequestered, if you will, to St. Louis.

20   Q.   Now, what did that mean as far as the composition of the

21   MEC, once those two bases were closed?

22   A.   It did post a technical issue because we had two

23   representatives in each domicile.  Considering the fact that

24   there would only be one domicile we had a decision to make as

25   a MEC as to how we would handle the representation.  Nobody

1    on the MEC thought it was fair to have one captain rep and 11

2    FO rep for the whole company, and we discussed the fact that

3    one of the options was to maintain, remain status quo.  Those

4    pilots had been duly elected in those two domiciles, New York

5    and LA.  And I thought it seemed fair and right to allow

6    even, even though we were all sequestered in Saint Louis, to

7    allow those pilot reps to continue to represent the pilots

8    who had formerly be in those domiciles and were duly elected.

9    Q.   So what was the --

10   A.   The whole MEC voted on that possibility, and everybody

11   voted yes with one exception.

12   Q.   Who was that?

13   A.   Steve Rautenberg some.

14   Q.   So without unanimous decision on that issue, what did

15   that mean?

16   A.   Well, ALPA claimed that it didn't have text in the

17   Constitution bylaws that described how to handle such a

18   situation.  So without unanimous approval of the status quo,

19   they felt like we had to go ahead and follow through with new

20   elections.  The problem was we had, the Constitution bylaws

21   for ALPA describes a time line within which you have to have

22   elections and this ensures that people who are traveling like

23   pilots have time to find out who is running, consider their

24   options, and then vote in the election.

25            And I believe that was about a three-week timeframe

1    between sending out ballots and waiting for pilots to respond

2    with their vote.

3    Q.    So what happened was for a time period there was only

4    Steve Rautenberg and yourself that comprised the MEC?

5    A.    That's correct.

6    Q.    Over what time period was that the case?

7    A.    From November 1 until, I believe November 13 or 14.

8             THE COURT:  The two of you were the entire MEC.

9             THE WITNESS:  That's correct.

10   Q.    Representing over 2,300 pilots?

11            THE WITNESS:  That's correct.

12   Q.    Do you remember having a MEC meeting on March -- October

13   31?

14   A.    I do.

15   Q.    Okay.

16            THE COURT:  We are still in 2001.

17            THE WITNESS:  Yes, your Honor.

18            MR. PRESS:  Exhibit D 257.

19            THE COURT:  Say that again.

20            MR. PRESS:  D 257.

21            THE COURT:  This is not in evidence.

22            MR. PRESS:  No, it is not.

23   Q.    What is exhibit D 257, Ms. Young?

24   A.    It looks like it is the TWA MEC minutes from that

25   special meeting on October 31, 2001.

```
 1              THE COURT:  Are you offering it.

 2              MR. PRESS:  Yes, your Honor.

 3              THE COURT:  Are you offering it D 257 in evidence.

 4   Any objection.

 5              MR. FRAM:  No objection, your Honor.

 6              THE COURT:  D 257 in evidence.

 7   Q.    I want to refer you to page 6 of this document, okay?

 8   There are some resolutions there at the top.  MEC reserved --

 9   what did you reserved?

10   A.    That any proposed integrated seniority.

11   Q.    Say --

12   A.    Any proposed integrated seniority list agreed to between

13   the TWA ALPA elected representatives and AMR APA

14   representatives shall be unanimously agreed to by each and

15   every individual TWA MEC member, and the TWA MEC chairman,

16   and be it further resolved that absent unanimous agreement of

17   each TWA MEC member and TWA MEC chairman, the acceptance of

18   an integrated seniority list is a decision best made by the

19   TWA ALPA pilots themselves --

20   Q.    Okay.  So those two resolutions, what was the point in

21   doing that, requiring unanimity?

22   A.    At this point we knew it was going to be down to two

23   representatives and we wanted to prevent any one

24   representative from trying to conduct business, the business

25   of representing pilots unilaterally.
```

```
 1              THE COURT:  I am sorry.  Repeat that.
 2    A.   We only had two representatives, myself and Steve
 3    Rautenberg.  And --
 4              THE COURT:  Well, not at this meeting.
 5              THE WITNESS:  That's correct.  I am sorry.
 6              THE COURT:  This meeting you had everybody was
 7    voting.
 8              THE WITNESS:  That's correct.
 9    Q.   But the next day?
10    A.   The next day, on November 1, we were going to be down to
11    just the two representatives.
12              THE COURT:  One couldn't do it because if one side
13    or the other it would be split 50-50.  So it, with a two man
14    board, it LAD to be unanimous.  There was no other way you
15    could operate.
16    Q.   Unless Mr. Rautenberg called for a roll call vote?
17              THE COURT:  The roll call vote was two people.
18    Q.   Explain to the Judge how that worked, Mr. Rautenberg
19    could conduct business on his own?
20    A.   As it so happened I got a phone call from --
21    Q.   Well.  Can --
22              MR. JACOBSON:  Wait.
23    Q.   Can you answer my question, address the judge's concern?
24    A.   A recall vote would enable who, between the two
25    representatives, if this is down to 2 representatives, a roll
```

1   call vote would allow whoever represented the most pilots to

2   have sway over the representative who didn't have as many

3   pilots that they represented.

4           THE COURT:  Okay.  Go ahead.  In other words, it

5   was in effect weighted voting.

6           THE WITNESS:  Correct.

7           THE COURT:  What you are in effect is saying is

8   Rautenberg represented more pilots than you represented,

9   therefore, his vote was more heavily weighted than yours.

10  A.   Yes.

11          THE COURT:  That is in effect what you are saying.

12          MR. PRESS:  That is exactly it, yes.

13  Q.   So this resolution was passed to avoid that, Mr.

14  Rautenberg from conducting, or you, conducting business on

15  your own?

16  A.   Correct.

17  Q.   Again, during that interim time period where there is

18  only two reps?

19  A.   Right.

20  Q.   So what happened a week later, Ms. Young?

21  A.   A week later on November 6 I  got a phone call on my

22  personal cell phone from Duane Woerth.

23  Q.   What did twain worth want?

24  A.   I was surprised to hear from him since I hadn't spoken

25  to him much in the hole process.  I asked him how he got my

 1   cell phone and he said he had got init from the office.  I

 2   asked him what was happening, and he said he wanted to have a

 3   meeting the next day.

 4           THE COURT:  This was November 5.

 5   A.   November 6.

 6           THE COURT:  2001.

 7           THE WITNESS:  Correct.

 8   Q.   Had Duane Woerth ever called you before?

 9   A.   No.

10   Q.   And he called a meeting of what?

11   A.   Just Steve Rautenberg and I, and I asked him the purpose

12   of the meeting, and he said he was, he thought we were going

13   to have another shot at signing the integration.

14   Q.   This is President Woerth speaking?

15   A.   President Woerth.

16   Q.   And had he ever called a MEC meeting before?

17   A.   Not to my knowledge.

18   Q.   Was there a meeting the next day?

19   A.   Yes, there was.

20   Q.   Can you recount what happened in general terms at that

21   meeting?

22   A.   Well, on the phony suggested, I asked why we were going

23   to have, what had precipitated to provide this opportunity to

24   sign this integration again.  And he claimed that he had been

25   in conversation with Jeff Brundage, the VP of H R at American

 1   Airlines, and that we might have a chance to get an improved

 2   integration.  I didn't know how all that was working.  It

 3   seemed a little bit shady to me that those discussions would

 4   be taking place without any direction from us.  I would never

 5   want to turn --

 6              THE COURT:  Who was us.

 7   A.   The governing body, the TWA MEC.  I was always available

 8   to listen to a better deal, and so I was determined to go to

 9   the meeting and conduct the meeting.

10   Q.   And what happened at the meeting?

11   A.   Well.

12              THE COURT:  The meeting was the 7th.

13              THE WITNESS:  The meeting was on the 7th.  It

14   started at noon.  And Mr. Rautenberg very early in the

15   process, Captain Rautenberg, very early in the process tried

16   to make a motion and second it himself that we sign the

17   integration that we had in fact voted not to sign two and a

18   half weeks prior.

19   Q.   So, let's clarify that.  This supposed better deal that

20   President Woerth said might be available, what was this

21   better deal, as far as you understood?

22   A.   I thought we were going to get more in the integration.

23   But what was the motion was the same document that we saw two

24   and a half weeks prior in Washington.

25   Q.   The same proposal that the full MEC had rejected on

1    October 23?

2    A.   That's correct.

3          THE COURT:   That is stapling 1,200 pilots below the

4    line.

5    A.   That's correct.

6    Q.   Captain Rautenberg's motion was to do what?

7    A.   To sign it.

8    Q.   And Ms. Young, what did you do in response?

9    A.   I threatened to leave.

10   Q.   What do you mean?

11   A.   Without both representatives there we would not have a

12   quorum so business could not take place.

13   Q.   Okay.

14   A.   And so he would not have been able to conduct that

15   business if I left.

16   Q.   And what was the response, first of all, were there any

17   ALPA advisors at the meeting?

18   A.   Yes.  Again, unbeknownst to me, Clay Warner and Marta

19   Wagner were invited and showed up on their own to this

20   meeting.

21   Q.   What did Mr. Warner say about you leaving the meeting

22   and denying a quorum so Mr. Rautenberg couldn't pass that

23   motion?

24   A.   He basically threatened me with consequences.  He said

25   there would be consequences.

1    Q.   Did he tell you what consequences?

2    A.   No.

3    Q.   And Ms. Young, what did you do next?

4    A.   Well, Bob Pastore, the master chairman, Ted Case, the

5    secretary treasurer, and I took a break to discuss the

6    situation.  And.

7            THE COURT:  Well, they were no longer, weren't they

8    all --

9    A.   The officers are not the elected people but they still

10   stayed as the officers of the Master Executive Council.

11           THE COURT:  Non-voting --

12           THE WITNESS:  That's correct.

13   Q.   And you had a meeting and discussed what?

14   A.   -- Well, we spoke about the fact that Roberts Rules of

15   Order which are the, which is the system by which you conduct

16   ALPA meetings, and which had been used since day one, at

17   ALPA, required that in order to conduct business you had to

18   have a second.

19           In order to put a motion on the table you have to

20   have a second.  That is a basic tenant.

21   Q.   What does that mean?

22   A.   That means one person can't conduct business on their

23   own.

24   Q.   What is a second, what does that mean?

25   A.   Oh, it, if one person makes a motion which means that

```
 1  they have a desire to discuss a certain type of business,

 2  somebody else has to say yes, I agree.  We we would like to

 3  discuss that and we agree with the basic information in this

 4  motion and we would like to discuss there and bring it to the

 5  voting group.

 6  Q.  You make a motion and I go, I second that motion?

 7  A.  Yes.

 8          THE COURT:  At that point in time there are only

 9  two voting members.

10          THE WITNESS:  Correct.

11          THE COURT:  Could it be seconded by a nonvoting

12  member?

13          THE WITNESS:  Not according to Roberts Rules of

14  Order.

15          THE COURT:  Which means as a practical matter if

16  you both didn't agree on any motion, there, nobody could ever

17  do a, anybody could never do a motion.

18  A.  That's correct.

19  Q.  Does that get to the point of what you were discussing,

20  Ms. Young?

21  A.  Yes, it is.  That is what we discussed.  We decided to

22  ask for clarification on this particular issue from ALPA

23  National.

24  Q.  What was the response from them?

25  A.  We asked for a rendering of an opinion in writing from
```

1    Jerry Muggerditchen who is the secretary treasurer of the

2    ALPA National, a ruling in writing about whether or not a

3    second was required.

4    Q.   Did you receive that?

5    A.   We did.

6    Q.   And what what's his spin?

7    A.   Well, he said in my opinion, he couldn't, co provide no

8    reference to Roberts Rules  of Order or any other system to

9    conduct meetings that would back up his statement.  He said

10   it was his bin opinion that a second was not required when

11   there were only two representatives.

12   Q.   Did you go back into open session and begin again the

13   MEC meeting?

14   A.   We did.

15   Q.   What did you do with respect to second go Mr.

16   Rautenberg's motion?

17   A.   I still didn't second it.

18   Q.   Why?

19   A.   I didn't believe that we should consider business that

20   had been fully voted on two and a half weeks prior to that.

21   I didn't think that was representing the TWA pilots in any

22   way, shape or form.

23   Q.   Now, this meeting, and what happened, how did the

24   meeting end?

25   A.   We did not take a vote.

1    Q.    You refused to second Mr. Rautenberg's motion?

2    A.    Yes.

3    Q.    Were you aware that that meeting was recorded by one of

4    the TWA pilots in attendance?

5    A.    I became aware of it later.

6    Q.    Were you aware of it that day?

7    A.    Actually, yes, I was.

8    Q.    At the time it was being recorded were you aware?

9    A.    Yes, yes.  I knew of the possibility that it might be

10   recorded.  Let me put it that way.

11   Q.    Okay.  Have you heard that recording?

12   A.    Parts of it.

13         MR. PRESS:  We have a short audio clip from this

14   recording that was made that I would like to play for the

15   jury.

16         THE COURT:  First let's start, is there there an

17   exhibit number.

18         MR. PRESS:  It was.  Mr. Fram, is there going to be

19   an objection?

20         THE COURT:  Let's start with the exhibit number.

21   One step at a time.

22         MR. PRESS:  I wasn't going to move it to admit it.

23         THE COURT:  It is in evidence.

24         MR. PRESS:  Okay.

25         MR. FRAM:  There is no objection, your Honor.

1          THE COURT:  There is no objection.  It is in

2    evidence, so the jury would get to have it in their

3    deliberations, they could listen to it.  You got to put it in

4    evidence.  You got to create a record.

5          MR. PRESS:  P-431 and P-432.

6          THE COURT:  Where are there two numbers?

7          MR. PRESS:  I think we are only going to show from

8    one.  431 is what we are playing.

9          THE COURT:  You say there is no objection.

10         MR. FRAM:  Correct, your Honor.

11         THE COURT:  To putting it in evidence.

12         MR. FRAM:  Correct.

13         THE COURT:  P-431 in evidence.

14         MR. PRESS:  The sound quality is not perfect.

15         THE COURT:  Do you have transcript for the jurors.

16   Press breast I do.  I thought.  If you have agreed upon

17   transcript.

18         MR. FRAM:  We do, your Honor.

19         THE COURT:  Why not distribute it to the jury.

20   That way they can follow it.

21         MR. FRAM:  I am not sure we have enough copies.

22         MR. PRESS:  We will make the transcript available

23   to the jury at the conclusion of the trial.

24         THE COURT:  All right.  I just thought while they

25   are listening to the it now it would be helpful.  If you

1    don't have it, you don't have it.

2    Q.   Ms. Young, what I want when we play this is stop it

3    periodically and tell the jury who is talking.  Okay?

4    A.   Okay.

5              MR. PRESS:  Your Honor, can we proceed.

6              THE COURT:  This is P-431, which is referred to as

7    disk two, actually.  You have disk one as 430.  Disk two is

8    431.  And disk three is P-432.

9              MR. PRESS:  I am sorry.  We misspoke.  It is 430.

10             THE COURT:  All right.  430.  You still don't

11   object, I assume.

12             MR. FRAM:  Correct, your Honor.

13             THE COURT:  Okay.

14                (Taped played)

15   Q.   Who is that speaking?

16   A.   Clay Warner.

17   Q.   That is Clay Warner speaking.  Okay.

18                (Tape continues).

19   A.   That is Steve Rautenberg.

20   Q.   Who is that?

21   A.   That is David Holtzman.

22                (Tape continues).

23   Q.   Who is that speaking?

24   A.   Steve Rautenberg.

25   Q.   Who is that?

```
 1    A.    Bob Pastore.

 2              (Tape continues)

 3    Q.    Somebody just said I am appealing that ruling.  Who is

 4    what that?

 5    A.    Steve.

 6              (Tape continues).

 7    A.    Who is that speaking?

 8    Q.    That is Clay Warner.

 9    Q.    Who was that that gave that speech?

10    A.    That was Clay Warner.

11              (Tape continues).

12    Q.    Who was that telling you you have to live with that

13    decision if you leave?

14    A.    Clay Warner.

15              (Tape continues)

16    Q.    Who was that that just spoke with the cram-down is going

17    to be worse than what is on the table now?

18    A.    Clay Warner.

19              (Tape continues).

20    Q.    Was that Mr. Rautenberg?

21    A.    Yes.

22    Q.    He used pilot time, 1330, what was I saying?

23    A.    He was saying we would wait a half an hour and I think

24    that was about the timeframe, and then reconsider the motion.

25    Q.    Okay.
```

1           (Tape continues)

2

3   Q.   That last speaker, consequences, who was that?

4   A.   Clay Warner.

5   Q.   That conversation was an open session, we heard

6   clapping?

7   A.   It was.

8   Q.   Who was applauding?

9   A.   There were over 100 pilots in attendance that day, TWA

10  pilots.

11  Q.   Did you, after that, soon after that, go into a closed

12  session?

13  A.   We did.

14  Q.   Did Mr. Warner go in with you?

15  A.   Mr. Warner requested the closed session.  He and Marta

16  Wagner, David Holtzman, Bob Pastore, Ted Case, Jim Arthur and

17  myself went in to Bob Pastore's office.

18  Q.   What did Mr. Warner tell you then?

19  A.   Told me clearly that ALPA would not be able to defend

20  me.

21  Q.   What do you mean, defend you?

22  A.   In the case that TWA pilot would sue me personally.

23  Q.   Can you explain what you are talking about?

24  A.   Well, if a TWA pilot didn't like the fact that we didn't

25  sign the integration, and sought to sue me personally, that

 1    ALPA would in fact not defend me.  That was a threat.

 2    Q.   Did he  make any other threats to you?

 3    A.   He, you know, he basically said that day I was

 4    responsible for the careers of the pilots.

 5    Q.   How did that day end, was there a motion?

 6    A.   There was no vote taken.

 7    Q.   Now, what happened shortly after that, at American

 8    Airlines, and with this seniority integration?

 9         THE COURT:  Begin, remind the jury, all this

10    testimony is in 2001, on the tape, and that you are

11    testifying about.  It was November 7, 2001.

12    A.   Yes, your Honor.

13    Q.   The next day, the APA and American made their cram-down?

14    A.   They did.

15    Q.   What was that call, it was given a name?

16    A.   Supplement CC.

17    Q.   Right.  And we heard Mr. Warner tell you that if you

18    don't accept what is on the table now, the cram-down is going

19    to be worse?

20    A.   He did.

21    Q.   Was that a truthful statement?

22    A.   It was not.

23    Q.   How did Supplement CC differ from what was proposed

24    three weeks later that you all rejected?

25    A.   It didn't.  It was essentially the same.

1          THE COURT:  So it was that one-page term sheet was

2     basically Supplement CC.

3     A.    That's correct.

4     Q.    And under Supplement CC, Ms. Young, without getting out

5     those seniority rosters, can you tell us from your own memory

6     what happened, where you were on the TWA seniority list?

7     A.    I was 1,200 something, at TWA.  And I ended up being --

8          THE COURT:  That was out of 2,300 pilots.

9     A.    Yes, your Honor.

10         THE COURT:  You were close to the middle of the

11    list.

12         THE WITNESS:  That's correct.  I was about middle

13    of the list at TWA.  And at American, out of 14,000 pilots I

14    was 13,300, maybe, 500, 13,000, very near the bottom, very

15    bottom.

16    Q.    And what, if anything, did ALPA do that you know of to

17    stop that from happening?

18    A.    No, sir.

19         MR. PRESS:  That is all the questions I have,

20    Judge.

21         THE COURT:  Okay.  Cross examine.

22         MR. FRAM:  Thank you, your Honor.

23

24

25

```
 1              CROSS EXAMINATION.

 2              BY MR. FRAM:

 3   Q.   Ms. Young, there were other members of the MEC who

 4   expressed a concern that Mr. Warner expressed that if the MEC

 5   didn't agree to what American was proposing, that the

 6   cram-down would be worse.  Isn't that so?

 7   A.   I believe so.

 8   Q.   In fact, Mr. Rautenberg, the other pilot rep from

 9   Council 3, had expressed that concern?

10   A.   Correct.

11   Q.   So is it fair to say that there was a division, there

12   was an an a disagreement twin the MEC about whether a deal

13   would be better if it was agreed to, or not?

14   A.   That's correct.

15   Q.   Now, you just testified that Mr. Warner told you that

16   there would be consequences if you prevented a vote.  Do you

17   recall that?

18   A.   Yes.

19   Q.   And you said that he wasn't specific about the

20   consequences when the meeting was taking place?

21   A.   That's correct.

22   Q.   Do you recall being deposed in this case, Ms. Young,

23   back, back on September 15, 2006?

24   A.   I do.

25   Q.   Do you recall being sworn to tell the truth, the whole
```

1    truth, and nothing but the truth?

2    A.   Yes, sir.

3    Q.   You understood that your deposition testimony was an

4    important part of preparing for the trial potentially of this

5    case?

6    A.   Yes.

7    Q.   I am going to show you a copy of the transcript of your

8    deposition and ask you please to turn to page 118.

9              THE COURT:  119?

10             MR. FRAM:  118, your Honor.

11             THE COURT:  118.

12   Q.   118, line 3.  Let's go back to 117, so we have the

13   context.  117, line 20.  You are talking about the meeting of

14   November 7.  Correct.  You said at that meeting again Clay

15   Warner and Marta Wagner appeared without any prior knowledge

16   of mine about the situation and/or request of mine certainly,

17   and during the course of the day ALPA National supported

18   Steve Rautenberg to move, second and pass a resolution on his

19   own without a second, to sign the integration which had

20   already been duly voted on two or three weeks prior.  That is

21   your testimony so far?

22   A.   That's correct.

23   Q.   You said when I objected, complained about the

24   situation, made a comment about potentially leaving the

25   meeting, to prevent such a vote, Clay Warner stood up and

1    screamed at plea that if I left the meeting I would be held

2    personally liable for the careers of the 2,300 TWA pilots.

3    And there are about 100 witnesses to that.  That was your

4    testimony?

5    A.   That was exactly my impression of what he communicated

6    to me that day.

7    Q.   That was your testimony, correct?

8    A.   That's correct.

9    Q.   When you heard the tape today he didn't scream at you

10   and where he didn't say that you would be responsible for the

11   careers of the TWA pilots, correct?

12   A.   Correct.

13   Q.   So you exaggerated what happened when you gave your

14   testimony back in September of 2006?

15   A.   No.

16   Q.   You knew back on November 7 of 2001 that the meeting was

17   being recorded, yes?

18   A.   I, as I said, I thought it might be recorded.

19   Q.   There was a movement underway among some of the TWA

20   pilots become in November to try too file a lawsuit against

21   ALPA, correct?

22   A.   I am sorry.  Say that again.

23   Q.   Isn't it a fact that there were pilots, TWA pilots, all

24   the way back in October of 2001 who wanted to file a lawsuit

25   against ALPA?

1    A.    That's correct.

2    Q.    And in, and those were the pilots who you understood

3    wanted to record this meeting.   Yes?

4    A.    I don't know that that is true.   I don't remember that.

5    Q.    Ms. Young, do you recall at the meeting on November 7

6    asking Mr. Warner some questions about what had happened

7    earlier in the year?

8    A.    Can you tell me in specific terms what you are referring

9    to?

10   Q.    Have you had an opportunity to listen to the entire tape

11   of the meeting?

12   A.    No, I have not.

13   Q.    Have you seen the transcript that was prepared by your

14   lawyers?

15   A.    I haven't read the transcript, unfortunately.

16   Q.    Can you slow down a little bit.   I will ask the

17   question, an entire question, if you could respond.   Have you

18   seen the transcript that your lawyers prepared of the tape,

19   part of what we just heard?

20   A.    Parts of it.

21   Q.    Have you seen the parts at the beginning of the

22   transcript where you were quizzing Mr. Warner about some

23   earlier events?

24   A.    I haven't looked at that.

25   Q.    I see.   I am going to show you the transcript.

```
1              MR. FRAM:  Your Honor, can we mark it as D 399.

2              THE COURT:  That is not on the list, right.

3              MR. FRAM:  Correct, it is a new exhibit for

4    impeachment purposes.

5              THE COURT:  How would I describe it?

6              MR. FRAM:  It is headed, your Honor, transcript of

7    TWA Master Executive Council meeting held November 7, 2001.

8              THE COURT:  Okay.

9    Q.   Ms. Young --

10             THE COURT:  Are you offering it?

11             MR. FRAM:  I will offer this in evidence.

12             MR. PRESS:  We are not going to have any objection,

13   to it but Mr. Fram's statement that the lawyers prepared it

14   is not true.  I don't want it described as something the

15   lawyers prepared.

16             MR. FRAM:  Your Honor, that was my understanding.

17   But I hope we can agree that it --

18             THE COURT:  Well, I am not admitting it on the

19   basis that the lawyers prepared it.  Nobody is questioning

20   its accuracy.  That is my major concern is not who prepared

21   it but whether the parties agree that it is an accurate

22   transcript.

23             MR. FRAM:  I think we do.

24             THE COURT:  Is that true, Mr. Press?

25             MR. PRESS:  Yes, there is no objection, Judge.
```

```
 1                THE COURT:  Okay.  D 3 99 in evidence.  That is a

 2   transcript of all three tapes?

 3                MR. FRAM:  I believe so.

 4                MR. PRESS:  Yes.

 5                THE COURT:  Remember we have 430, 431 and 432, P

 6   exhibits.  These are the tapes.  We heard only 430.  This

 7   transcript is all three tapes.

 8                MR. FRAM:  That is my understanding.

 9                THE COURT:  Correct.

10                MR. FRAM:  Yes.

11   Q.   Turn to the third page of the transcript, please.  See

12   halfway down, SY, that refers to you.  Yes?

13   A.   Yes.

14   Q.   SY:  Clay, when, I am going to ask you some of the same

15   questions we talked about the other day on the phone.  When

16   ALPA National recommended.  When the attorneys at ALPA

17   National recommended so strongly that we waive scope, when we

18   started this process, and then Mr. Warner responded, Sally,

19   that is fine.  But that was a privileged discussion.  You

20   then said, we waive scope.  I think it is common knowledge

21   that ALPA National recommended we waive scope.  Is that not

22   true?

23                Mr. Warner said you would have to tell me what

24   common knowledge is.

25                You said okay.  What was, let me ask you this:
```

1    What was your recommendation, your personal recommendation,

2    and you may not want to answer this, but what was your

3    personal recommendation when you came down to our MEC meeting

4    during the summer, what did you tell us our best option was?

5            Mr. Warner responded:  I, I am going to have to, I

6    was at four or five MEC meetings.  You are going to have

7    to --

8            You then said it was the one you came to by

9    yourself over the summer.

10       He then said, what was the issue before the MEC, Sally.

11   I am sorry.

12       You then said, What strategy wise was our best bet

13   moving forward, when when we saw this the seniority

14   integration was really ugly, proceeding down that course?

15           THE COURT:  For the record, D 399 is in evidence.

16           MR. FRAM:  Oh, okay.  Thank you, your Honor.

17           THE COURT:  There is no objection.

18   Q.  Mr. Warner then said I am sorry if I can't remember

19   exactly what that was, but you know, let me just say in the

20   event, I am uncomfortable reciting things that I said to the

21   MEC in closed session.  I am sorry.

22           MR. PRESS:  Mr. Fram is reading well, but is there

23   a question, Judge?

24           THE COURT:  Yes.

25           MR. FRAM:  Of course, your Honor.

```
 1    Q.   Did you ask Mr. Warner those questions, were you

 2    quizzing him in the way I just described in this open meeting

 3    with 100 or so TWA pilots?

 4    A.   Yes.

 5    Q.   And what was the point of doing that?

 6    A.   I think that, you know what?  This is the first time I

 7    looked over this section.  So I don't know what my intent

 8    was.  In looking back.  So I think it would be speculation.

 9    Q.   So you are saying you don't recall why you were quizzing

10    Mr. Warner about these prior events?

11    A.   No, I think I was, it would be speculation.  But I am, I

12    didn't know why Clay Warner showed up at that particular

13    meeting, and --

14              THE COURT:  What particular meeting?

15              THE WITNESS:  The November 7 meeting.

16    A.    I don't know if you could understand it on the tape,

17    but I and Steve Rautenberg had coordinated that morning

18    without any information to me, they had already talked about

19    the fact that they were going to support the fact that there

20    was required a second on the signing of the document.  That

21    is recorded.

22              Steve Rautenberg admitted it, and so did Clay.  So

23    I think -- my guess is that I was trying to make sure that

24    the people who were there knew Clay's position.

25    Q.   Were you asking these questions with knowledge that the
```

1   meeting was being recorded to try to set out ALPA National up

2   for a lawsuit?

3   A.    Absolutely not.

4   Q.    There were a number of efforts before this meeting to

5   try to reach agreement with American about the issue of

6   seniority integration, correct?

7   A.    Correct.

8   Q.    There had been an effort in early October to meet with

9   representatives of American in Dallas Fort Worth, correct?

10  A.    Please be more specific.

11  Q.    American invited the merger committee of the TWA MEC to

12  come down to Dallas Fort Worth on October 6, or thereabouts,

13  to sit and meet?

14  A.    I believe that is true.

15  Q.    And talk about seniority integration?

16  A.    I believe that is what happened.

17  Q.    What happened is the MEC decided it wouldn't send the

18  merger committee, correct?

19  A.    I don't remember the specific decisions made surrounding

20  that meeting.

21  Q.    Well, do you recall that the MEC made a decision which

22  you supported that Mr. Pastore, the master chairman, would go

23  down to Dallas Fort Worth by himself and tell the

24  representatives of American that he was not authorized to

25  negotiate?

1   A.   I believe that we did conclude that to be the best

2   action at the time.

3   Q.   And do you recall the MEC with your agreement, having

4   Mr. Pastore tell the people from American that the meeting

5   should be confidential in the sense that nobody could

6   acknowledge that there was even a meeting.  Do you recall

7   that?

8   A.   I don't remember those specific terms.  Or those

9   conditions.

10  Q.   Okay.  And a couple of days after that did

11  representatives of the MEC meet with Senator Bond and make

12  some representation to Senator Bond about American's

13  unwillingness to discuss seniority integration?

14  A.   That is possible.

15  Q.   Well, don't say it is possible if you don't recall it.

16  If you recall it, great.  If you don't, just say so?

17  A.   I don't recall.

18  Q.   Do you recall Mr. Brundage sending a very strong letter

19  on October 12 of 2001 where he complained about the fact that

20  captain Pastore came down without any authority to further

21  the negotiations?

22  A.   I don't recall.

23  Q.   Do you recall Mr. Brundage complaining that Mr. --

24           THE COURT:  Who is Mr. Brundage.

25  Q.   Mr. Brundage was the vice president for employment,

1    employee policy and relations at American Airlines, correct?

2    A.   Correct.

3    Q.   He was a high level employment person within American

4    Airlines, correct?

5    A.   Correct.

6    Q.   You knew who he was in the fall of 2001?

7    A.   Correct.

8    Q.   Yes.

9    A.   Yes.

10   Q.   You had interacted with him earlier in the year, yes?

11   Q.   If you don't recall, just say you don't recall?

12   A.   I don't recall.  I know we --

13   Q.   Okay.

14   A.   I know we spoke to Bob Baker, who was a high level

15   person --

16   Q.   Do you recall being aware that Mr. Brundage was very,

17   very upset about the fact that Captain Pastore showed up

18   without authority to negotiate and then representatives went

19   and talked to Senator Bond?

20   A.   I do not recall that.

21   Q.   Okay.  Well, I am going to show you D 16 which is a

22   letter dated October 12, 2001, and ask if that refreshes your

23   memory.

24              THE COURT:  What is the number again?

25              MR. FRAM:  D 16.

```
 1                THE COURT:  That is a new document.

 2                MR. FRAM:  Yes, it is, your Honor.  D.

 3                THE COURT:  I can get you my copy.

 4   Q.   Your Honor, if you are okay to look along, that is

 5   great.  I was looking for your copy.  Thank you.

 6                THE COURT:  I have D 16 here.

 7                MR. FRAM:  All right.

 8   Q.   Do you recall becoming aware of that letter shortly

 9   after October 12, 2001?

10   A.   What I have on the screen and what I have in my hand are

11   two different items.

12   Q.   The screen is wrong.

13                THE COURT:  Is D 16, you have on the screen D 16.

14   I am looking at my copy of D 16.  And it is what you had on

15   the screen.

16                MR. FRAM:  I am looking at October 12.  I hope we

17   didn't miss mark the exhibit.

18                THE COURT:  D 16 is April 3rd, 2001, the date of

19   the --

20   Q.   All right.  We will set this aside.  We had a mix-up

21   with exhibits?

22                THE COURT:  D 16 is not withdrawn.

23                MR. FRAM:  I am withdrawing it for now.  We have a

24   mix up with the numbering.

25                THE COURT:  Okay.  I am crossing out, and you got
```

 1   to cross it out, too.

 2   Q.   Do you recall discussions about further negotiations

 3   with American in late October, before this meeting on October

 4   12, I am sorry, this meeting on October 31 you are talking

 5   about?

 6   A.   Can you please be more specific?

 7   Q.   Do you recall Mr. Rautenberg, your fellow

 8   representative, from Council 3, writing a letter dated

 9   October 25 of 2001?

10   A.   I don't.

11   Q.   You don't recall him complaining about some of the

12   issues that had arisen up until that point?

13   A.   I do not.

14   Q.   Let me hand you what I hope was previously marked as D

15   21.  All right.  Your Honor, I have been helped mere.  Let's

16   go back and do this in order.  I now have I now have D 2

17   hundred?

18               THE COURT:   200.

19               MR. FRAM:   D 200.

20               THE COURT:   A letter from Jeff Brundage.

21               MR. FRAM:   Yes, your Honor.

22   Q.   You now have D 200.  Does that refresh your recollection

23   that Mr. Brundage was upset about some events that had taken

24   place up until October 12, 2001?

25               THE COURT:   That was October 12, right?

 1              MR. FRAM:  Yes, your Honor.

 2              MR. PRESS:  The question is does this refresh her

 3      recollection of Mr. Brundage being upset.

 4              MR. FRAM:  Yes.

 5              MR. PRESS:  I object to that question.

 6              THE COURT:  She said she hasn't recollected it.

 7      Let's start with that.  Let's start by asking her if she is

 8      familiar with this letter.  If she knows anything about it.

 9      Then if you want to try to refresh her recollection, that is

10      up to you.  But you, she has to have a failure of

11      recollection before you can refresh somebody's recollection.

12              Do you have a copy for me of that?

13              MR. FRAM:  That was the one that was mis-marked

14      before.  That was the October 12 letter that I thought was --

15              THE COURT:  D 200?

16              MR. FRAM:  D 200.

17              THE COURT:  You give me --

18              MR. FRAM:  Sorry about that.

19      Q.   So do you recall this letter?

20      A.   I don't recall it.  It does refresh my memory a bit.

21      Q.   Does it refresh your memory about Mr. Brundage being

22      very upset that he felt snubbed by TWA MEC.

23      A.   No, you know, I read the letter.  I see what Mr.

24      Brundage wrote.  I am not sure that he is correct in his

25      description of what happened.  It is possible he is but I

1  don't -- I don't ever remember the TWA MEC wanting to go to

2  Dallas.  We never sent the MEC, we always sent the merger

3  committee.  That was the appropriate system.

4  Q.  Do you recall the letter, having read it, do you now

5  recall seeing a copy of it back in October?

6  A.  I don't.

7  Q.  Great.  I am handing you now what, a new exhibit, which

8  is D 21.

9         THE COURT:  So this isn't being offered in

10  evidence?

11         MR. FRAM:  Right.

12  Q.  D 21, do you recognize that that as a letter that Mr.

13  Rautenberg, the other pilot rep, from Council 3 sent to all

14  of the Council 3 pilots dated October 25 of 2001?

15  A.  It is a gated October 25, and it is signed by Steve

16  Rautenberg.

17  Q.  Do you recall seeing this letter back in October, 2001?

18  If you don't, please just say --

19  A.  I am sure I saw the letter by I haven't read it

20  recently.  I haven't refreshed my memory of this letter

21  recently.

22  Q.  Were you in regular communication with Mr. Rautenberg

23  back in October, 2001?

24  A.  I think it is safe to say the communications between

25  Captain Rautenberg and myself broke down.

1    Q.    When did that happen?

2    A.    Along the time that -- in the fall, in the fall.  I was

3    never impolite to Captain Rautenberg, but he seemed to be of

4    a different opinion about the proceedings, and whether or not

5    it was a good thing after the -- for the TWA pilots.  We

6    didn't discuss anything besides business.

7    Q.    Well, did there come a point when you stopped

8    communicating with him about business?

9    A.    No, I always spoke to him at meetings.  This might be

10   the first time that I didn't sign a communication from

11   Captain Rautenberg to the Council 3 people.

12   Q.    Is it fair to say that you and Mr. Rautenberg disagreed

13   about the most effective way to represent the TWA pilots?

14   A.    It is fair to say that.

15   Q.    Turn, please, to the third page of the letter.

16   A.    I am sorry?

17   Q.    The third page of the letter.

18             THE COURT:  The letter is D 21.

19             MR. FRAM:  Yes.  I may not have offered it.  I

20   offer D 21 in evidence.

21             THE COURT:  Any objection.

22             MR. PRESS:  None, your Honor.

23             THE COURT:  D 21 in evidence.

24   Q.    See number 2.  Talking about the terms being proposed by

25   American, he wrote.  Are the terms better than we would do in

 1   a cram-down.  American had unequivocally stated that in the

 2   absence of settlement there would be, one, no guarantees as

 3   to the STL staffing level -- STL refers to St. Louis?

 4   A.   Yes.

 5   Q.   2, know furlough protection for any TWA pilot and 3,

 6   placement of TWA LLC furloughees upon recall would be subject

 7   to agreement between APA and AA.

 8            Do you see that?

 9   A.   That is correct.  And that is exactly what happened.

10   Q.   And then at the bottom of that paragraph he wrote, it

11   was absolutely clear to me that the terms under consideration

12   were significantly superior to that which we could expect in

13   a cram-down.

14            Do you see that?

15   A.   I do see that.

16   Q.   Mr. Rautenberg's position in October was that the TWA

17   pilots would get a better deal from American if they agreed

18   to something rather than if they said no, we won't agree,

19   just impose something.  Yes?

20   A.   It appears that that is how he feels.

21            THE COURT:  How he felt.

22   A.   Felt.  Thank you.

23   Q.   Now, what did you think, what was your opinion about

24   what should happen, or would happen, if the TWA pilots

25   rejected the proposal being made by American?

1           THE COURT:  You say proposal, that is that one-page

2    sheet that was testified to.

3           MR. FRAM:  Based upon whatever proposals were out

4    there, let's put it in context.

5    Q.   As of November 7, this meeting we heard some clips from,

6    as of November 7 there was a proposal on the table by

7    American.  Correct?

8    A.   Correct.

9    Q.   And American made clear that if the deal wasn't agreed

10   to, that they would simply impose something.  Yes?

11   A.   Absolutely.  That is absolutely incorrect.  The content

12   of that meeting, and the proposal that was on the table was

13   completely unclear to me.  That is why I asked Duane Woerth

14   about it and why I asked multiple times David Holtzman about

15   it.

16          I didn't understand what was being proposed that

17   day.  And when Steve Rautenberg put it on the table, he put

18   the exact same thing on the table, and the motion was to sign

19   the exact same things we had seen two and a half weeks

20   before.  I was shocked by the fact it was not any different.

21   Q.   What did you think was going to happen if the MEC turned

22   down the proposal on November 7?

23   A.   My impression was that the exact same thing that was

24   going to happen with our signature would happen without our

25   signature, or vice versa.  That was my impression.

1   Q.   So you knew there would be what has been referred to as

2   a cram-down, correct?

3   A.   Yes.

4   Q.   And at that point in time you and others within the MEC

5   wanted there to be a cram-down so that you could try to

6   pursue litigation against American Airlines and the APA,

7   right?

8   A.   That is could a completely untrue statement.

9   Q.   What did you see as the next step?

10  A.   I absolutely did not want a cram-down.  That was the

11  last thing I want.

12  Q.   What did you see as the last step after American and the

13  APA agreed to something without the TWA MEC being involved?

14  A.   Prior to the November 21 meeting in Washington, we had

15  been apprised that there was a three part strategy by Roland

16  Wilder.  That is what we thought was going to happen.

17  Q.   What was the next step?

18  A.   The next step was to go back to St. Louis and re group.

19  I am being absolutely truthful with you.  In my mind, at that

20  point in time, going back to Saint Louis, I was completely

21  discouraged.  I didn't --

22             THE COURT:  Give me a date on that.

23             THE WITNESS:  October 21.  October 24, after the

24  Washington meeting.

25  Q.   We are talking about November 7?

1                THE COURT:  That is why I asked the question,

2      because I was confused.

3      Q.   What did you what did you see as the next step after

4      November 7 and what you referred to as the cram-down?

5      A.   I think we did think it was important to preserve any

6      legal strategy available to us by not signing that

7      integration.  I don't know if --

8                THE COURT:  What did you think was going to happen

9      next?

10     A.   I didn't know.  I wasn't an expert in this whole thing.

11     I thought we were are we were going to re group.

12               It was important to me to have the rest of the

13     representatives included in the MEC and to devise a strategy

14     with the whole group, not just Steve Rautenberg and I.  I

15     didn't think, I don't think the pilots were represented.

16     Q.   Weren't there discussions before November 7 about filing

17     a lawsuit against American and the APA?

18     A.   There were.

19     Q.   Was that what you saw as the next step after what you

20     referred to as the clam down?

21     A.   I wasn't the expert on it.  I am sure that was part of

22     what we consider.  That wasn't first and foremost in my

23     mind.  That wasn't what I thought, okay,  on November 8 we

24     need to file.  That was not in my mind.

25     Q.   You said before, you talked before about a conversation

1   with Duane Woerth said ALPA doesn't sue companies who they

2   have contracts with, or ALPA doesn't sue unions.

3   A.    That's correct.

4   Q.    Do you recall that conversation?

5   A.    Yes.

6   Q.    When was that conversation?

7   A.    October 21.

8   Q.    That conversation is in the context of Roland Wilder

9   having said that if there is a cram-down we can sue American

10  and the APA, right?

11  A.    Yes.

12  Q.    And Duane Woerth said that is a fool's errand, that

13  lawsuit will fail.  Do you recall that?

14  A.    I recall him saying no.

15  Q.    Do you recall him using the phrase, "It is a fool's

16  errand?"

17  A.    I don't.

18  Q.    Do you recall Mr. Rautenberg saying it is a waste of

19  time, we are going to lose, we will negotiate the best deal

20  we can?

21  A.    I believe, I don't recall Steve Rautenberg saying that,

22  but I think I understood that is how he felt.

23  Q.    Were you in favor in October of letting American and the

24  APA impose seniority and then pursuing litigation against the

25  APA and American?

1   A.   I was in favor of anything that would help me represent

2   the TWA pilots.  I didn't specifically have that set of

3   events in my mind.  I thought we were going to, I was hopeful

4   that we were going to to Washington and I was hopeful that

5   there would be some sort of reasonable integration proposed

6   to us.

7   Q.   All right.  So were you in favor of litigation if there

8   was a cram-down or not?

9   A.   Absolutely.  Anything that represented -- anything that

10  helped the TWA pilots gain some sort of fair seniority, I

11  would have supported, as long as it was legal.

12  Q.   All right.  So you did support the idea of filing a

13  lawsuit if there was, what you referred to as a cram-down?

14  A.   Yes.

15  Q.   That was part of your thinking during this meeting on

16  November 7 of 2001?

17  A.   Certainly.  When, in discussions with Roland Wilder,

18  yes, I was supportive of what he wanted to do.

19  Q.   And what did the other ALPA advisors, what did the other

20  advisors say about the likelihood of succeeding in a lawsuit

21  against the APA and American Airlines?

22  A.   I just remember Duane Woerth saying no.

23  Q.   What base I if any did you have for believing that that

24  there was any chance of success to a lawsuit by ALPA against

25  American Airlines and the APA?

1    A.    I had no experience with those types of things.

2    Q.    What?

3    A.    I was just hopeful.

4    Q.    So was your only basis some remarks that you recall

5    being made by Mr. Wilder?

6    A.    Yes, I believe that he was the expert, and we should

7    follow his advice.

8    Q.    And what do you recall Mr. Wilder saying, if you recall

9    anything, about the likelihood that such a lawsuit would be

10   successful?

11   A.    Well, I asked him that specific question, in closed

12   session.

13   Q.    Okay.  And what did he tell you --

14   A.    Zoo slightly better than 50 percent.

15   Q.    Beg your pardon?

16   A.    Slightly better than 50 percent.

17   Q.    You say this was a closed session?

18   A.    Correct.

19   Q.    Give us the approximate date, if you can?

20   A.    I believe it was on the Saturday.

21   Q.    Which Saturday?

22   A.    The October meetings, so it would have been maybe the

23   22nd.

24   Q.    Was anybody --

25   A.    Everybody was there.  I was the one that asked him how

 1    likely it would be for his strategy to work, because that was

 2    an important question I felt I needed to ask.

 3    Q.    You think everybody was present, all of the members of

 4    the MEC?

 5    A.    The whole MEC, and the officers, we had Bill Kemp in the

 6    room who was our past EVP.  He was a representative of the

 7    executive council.

 8    Q.    Was there a vote of the people present to approval the

 9    lawsuit that you say Mr. Wilder was discussing?

10    A.    Yes.

11    Q.    When was that?

12    A.    That was the second day we were in Washington.

13    Q.    Give me your best recollection of the date?

14    A.    Saturday.  Whatever date that is, the 22nd.

15    Q.    Can you point to any MEC minutes where it references the

16    vote to approve litigation, the litigation you have been

17    discussing?

18    A.    You know, I don't remember that we took a vote.  I think

19    we were supportive of, I don't remember.  I think we were

20    supportive of Roland Wilder.  I don't remember anybody

21    speaking in -- counter to his three-part strategy.

22    Q.    Do you --

23            THE COURT:  The question is was there a resolution,

24    where you resolved to follow --

25    A.    I don't know that -- yes, sir, I don't know that there

1    was a formal resolution.  I know that he made his

2    presentation, and I thought we were supportive.  I thought

3    the whole MEC was supportive.

4              THE COURT:  That is a pretty big decision, to sue

5    somebody, to engage in litigation, wouldn't there be a

6    resolution supporting that?

7    A.    I don't know that that is true.  I mean we hired Roland,

8    and he was the expert, and the merger committee was support

9    supportive of his strategy and they coordinated more closely

10   with Roland.   It is possible we took a vote.

11   Q.    You agree that there is a difference between being

12   supportive and actually voting and resolving to take specific

13   action.  Yes?

14   A.    I agree.

15   Q.    You agree that no formal vote was taken and no

16   resolution was adopted on the part of the MEC to file the

17   lawsuit that you have been referring to?

18   A.    That may be true.  I don't recall.

19   Q.    And in the absence of a formal resolution, there was no

20   basis for the MEC to request that ALPA file that lawsuit,

21   correct?

22   A.    Incorrect.  ALPA agreed to hire Roland Wilder.  ALPA

23   supported Roland's strategy prior to the November 21 meeting,

24   and we reported back to Duane Woerth that we in fact did want

25   him to move ahead with the expert who he agreed to hire, his

1    strategy.  I don't believe there is any formal resolution

2    that needs to happen there.

3    Q.   ALPA hired or authorized the MEC to hire Mr. Wilder back

4    in January or February, correct?

5    A.   Correct.

6    Q.   Just because they hired him or authorized him to be

7    hired, doesn't mean they approved of everything litigation,

8    ever lawsuit idea he came up with, right?

9    A.   Possibly.

10   Q.   Did you think that when Wilder got hired in January or

11   February that ALPA was automatically authorizing him to file

12   whatever lawsuits I thought should be filed?

13   A.   I think they supported him.

14             THE COURT:  No, no.  Come on.  Answer the question.

15             THE WITNESS:  Roland, don't know the answer to that

16   question.

17             THE COURT:  Well, you knew that before you could

18   sue anybody you needed the boards approval.  You knew that.

19   Or didn't you.  Did you know that before ALPA could sue

20   anybody they needed the boards agreement.

21             THE WITNESS:  That's correct.

22   Q.   Do you recall attending a meeting of the MEC on October

23   20 to 22 of 2001?

24   A.   Yes.

25   Q.   This was shortly before Mr. Rautenberg's letter of

1    October 25.

2    A.    Yes.

3    Q.    D 88.

4          Do you recognize D 88 as the official minutes of

5    that meeting.

6    A.    Yes.

7    Q.    You were present at the meeting?

8    A.    Correct.

9    Q.    You said earlier today that you were somehow upset, I

10   think you said you were upset that Duane Woerth had been

11   talking to Jeff Brundage.  Do you recall giving that

12   testimony?

13   A.    Yes.

14   Q.    Did you know in 2001 that Jeff Brundage had previously

15   worked at ALPA?

16   A.    I did.

17   Q.    Did you know that he was friends with Randy Babbitt who

18   had been president of ALPA?

19   A.    I did not.

20   Q.    Randy Babbitt was one of the advisors who was working

21   with the TWA MEC?

22   A.    That's correct.

23   Q.    You didn't know in 2001 that Jeff Brundage, this high

24   level employment person at American, was friends with Randy

25   Babbitt?

 1   A.   Not specifically Randy.  I knew he was new, he knew all

 2   of the high level people at ALPA.  I will say it that way.

 3   Q.   You knew that because he had worked at ALPA with whoever

 4   was there?

 5   A.   That's correct.

 6   Q.   So you were surprised that Mr. Woerth in the fall of

 7   2001 was talking to Jeff Brundage?

 8   A.   I was surprised that Duane Woerth called Jeff after the

 9   MEC voted not to sign the integration agreement.  I was

10   surprised without direction from the MEC that Duane Woerth

11   would reach out and have conversations with Jeff Brundage at

12   that point.

13   Q.   Why were you surprised that Mr. Woerth was trying to

14   keep an open line of communication and see what the best

15   possible deal was for the TWA pilots?

16   A.   I guess I wasn't aware of anything, any conversation

17   that would change, that he would could have with Jeff

18   Brundage that could change the context of the cram-down.

19   Q.   So you are saying that when this vote took place on

20   October 31 to reject the American proposal, you thought that

21   should be the end of it, that there should be no further

22   discussions with American or the APA.  Yes?

23   A.   The vote took place in the third week of October, not on

24   October 31.  It was on October 22, I believe --

25               THE COURT:  During that three-day meeting.

```
 1   A.   I during the three-day meeting.  October 31 meeting was

 2   a separate one day meeting, a special meeting back in St.

 3   Louis, MEC meeting.

 4            THE COURT:  Are you offering 88 in evidence?

 5            MR. FRAM:  Yes, I move 88 in evidence.

 6            MR. PRESS:  No objection.

 7            THE COURT:  D 88 will be in evidence.

 8   Q.   Your position after this vote on October 22 was that

 9   there should be no further discussions between the TWA MEC

10   and the American or the APA?

11   A.   That is incorrect.

12   Q.   What further discussions did you think should take place

13   after the vote you just described?

14   A.   I was in favor of any interaction that would provide us

15   a better integration.  Duane Woerth did that, made that

16   /TPAOEP call, without any discussion about what his strategy

17   was in trying to obtain us a better integration.  Now, that

18   is why I asked him when he called me on the phone, I said

19   what precipitated this meeting, this special meeting that you

20   are calling 24 hours ahead and he said we are, you know, we

21   are talking to I think he said he talked to Jeff Brundage.

22   And he said I think we are going to get, maybe going to get a

23   look at a better deal.  I was all for that.

24   Q.   Just because Mr. Woerth wasn't talking to you doesn't

25   mean he wasn't talking to Captain Pastore, correct?
```

1    A.    That's correct.

2    Q.    The meeting on November 7 that you talked about, that

3    meeting was called by Captain Pastore, correct?

4    A.

5    Q.    You said it was called by Mr. Woerth.  In fact, the

6    meeting was called by the master chairman of the MEC.

7    Correct?

8    A.    In compliance with Duane Worth's wishes.

9    Q.    Members of the MEC had complained earlier in the year,

10   in the March and April timeframe, that Duane Woerth was not

11   sufficiently engaged in helping the TWA pilots, correct?

12   A.    That's correct.

13   Q.    So what happened later in the year is Mr. Woerth got

14   more actively involved in terms of trying to assist the TWA

15   pilots and protect their rights, yes?

16   A.    I would not consider that to be a true statement.  He

17   told us he wouldn't support the three part strategy.  That is

18   not more involved.  That is less involved.

19   Q.    And you didn't think it was helpful because he didn't

20   have the same philosophy about how to get the best deal that

21   you had, right?

22   A.    That is possible.  That is possible.  He never told us

23   his strategy.

24   Q.    So you felt his involvement was only helpful if he

25   agreed with the way you wanted to approach it?

1    A.    Incorrect.

2    Q.    I am sorry?

3    A.    Incorrect.  He never shared his strategy with me.  I

4    thought in my mind, you thought he was trying to obtain a

5    signature from me on the cram-down, and at that point I was

6    offended by interaction that he had on the phone between he

7    and Jeff Brundage because I thought I was being kind in

8    putting a signature on a document that the MEC had refused to

9    sign two and a half weeks prior.

10   Q.    The MEC prior to the meeting on November 7, the MEC

11   talked directly to Jeff Brundage about --

12   A.    Yes.  He attended our meeting.

13   Q.    I beg your pardon?

14   A.    He attended our meeting.

15   Q.    Jeff Brundage attended your meeting?

16   A.    Yes.

17   Q.    Which one, the October 22?

18   A.    The one on the second day, whatever date that is.

19   Q.    The second day.  The meeting in October?

20   A.    Yes.

21   Q.    You say he attended in person?

22   A.    He attended the TWA MEC meeting in person.  He came and

23   talked to us about the integration.

24   Q.    D 88, turn to page 9, please.

25         THE COURT:  By the way, D 200 you never offered in

```
 1    evidence.  Is that correct?
 2              MR. FRAM:  Yes, I believe that is the letter --
 3              THE COURT:  The letter to Duane Woerth from
 4    Brundage.
 5              MR. FRAM:  Yes.  I wasn't.
 6              THE COURT:  I just want to make sure I didn't miss
 7    it.
 8    Q.  Are you with me on page 9, at the very stop?
 9    A.  Yes.
10    Q.  Discussion with Jeff Brundage, vice president, employee
11    relations, American Airlines.  Do you see that?
12    A.  Yes.
13    Q.  Via phone.  Does that refresh your memory he was not
14    there in person but that he participated by telephone?
15    Q.  Are you on with me on page 9?
16    A.  I am.  I am trying to figure out what date we are
17    talking about.
18              THE COURT:  These are the minutes of the three- r
19    day meeting.
20    A.  Okay.  It is that, it is possible he phoned in later to
21    talk to us again after he met with us in person.  That might
22    be what this is referring to.
23    Q.  Page 6.  Monday, October 22?
24    A.  Okay.
25    Q.  That is when it starts?
```

1   A.   Okay.

2   Q.   When we get to page 8 we are still talking about what he

3   had said?

4   A.   Okay.

5   Q.   Do you see somewhere earlier or do you see some place

6   else in the minutes where it indicates that he was there in

7   person?

8   A.   I haven't looked at these minutes lately.   He was there

9   in person.

10  Q.   In the October timeframe?

11  A.   Yes.

12  Q.   All right.  Let's focus on what he communicated to the

13  MEC?

14  A.   Okay.

15  Q.   Brundage said that there were some options, if there

16  wasn't an agreement things would remain status quo.  AMR has

17  tentative language with APA will file for single carrier

18  status.  AMR said from day one they want to be a single

19  carrier.  The other option is arbitration.  Brundage stated

20  Don Carty told Senator Bond if the bill passed he would shut

21  down TWA LLC.  Do you see that?

22  A.   I do.

23  Q.   So the reference there to the Bond, to the bill was the

24  Bond bill.  Was that the, that the TWA pilots were lobbying

25  for, correct?

1    A.    That's correct.

2    Q.    Brundage communicated clearly that if the Bond bill

3    passed, that your employer, TWA LLC, would be shut down.

4    Yes?

5    A.    That is what he says.

6    Q.    And that meant that all of the TWA pilots would lose

7    their jobs, yes?

8    A.    According to him.

9    Q.    That is what he said?

10   A.    Yes.

11   Q.    Did you think he was bluffing?

12   A.    Yes.

13   Q.    Did you think Don Carty, the CEO of the of American, was

14   bluffing when he made that threat?

15   A.    Yes.

16   Q.    You thought Don Carty, the CEO of one of the largest and

17   most successful companies in the country, was the kind of

18   that would make idol threats?

19   A.    I  thought Don Carty was very good at negotiating.

20   Q.    You thought this was an idol threat?

21   A.    Yes.

22   Q.    Brundage said AMR made a commitment to its employers,

23   right or wrong.  AMR employees cannot fathom an arbitrated

24   seniority list.  AMR committed to its employees that AMR

25   would not support arbitration for seniority.  If the bill

1    passed, AMR would shut down the TWA LLC and cannot afford to

2    upset the apple cart.  So Mr. Brundage was pretty clear about

3    the position being taken by Mr. Carty, the CEO of American?

4    A.   Yes.

5    Q.   So that position as communicated by Mr. Brundage

6    directly to the MEC, did that position ever change?  To your

7    knowledge?  Did it ever come to your attention that Mr.

8    Brundage or Mr. Carty were backing off from the positions

9    that were summarized in these minutes?

10   A.   Well, as I said, I did not believe that they were

11   serious.

12   Q.   Yeah, you said that.  But my point, my question is, in

13   terms of the positions that he were taking, what they were

14   saying, did they ever back off from that?  Did they ever come

15   back and say we were kidding, call their bluff?

16   A.   No.

17   Q.   Did the TWA MEC people who were lobbying for the Bond

18   bill, trying to get this legislation passed, did they back

19   off after these statements were made?

20   A.   No.

21   Q.   They continued right up into December, right?

22   A.   Correct.

23   Q.   Were you in favor of having them continue to lobby for

24   the Bond legislation?

25   A.   I was.

Young-cross/Fram                                                    114

```
 1   Q.   You were willing to take a risk that if the legislation

 2   was passed, that all of the TWA pilots would lose their jobs,

 3   yes?

 4   A.   That risk was not in my mind because I thought it was a

 5   bluff.

 6   Q.   Well, did you know for certain that it was a bluff?

 7   A.   No.

 8   Q.   So you realized that there was some chance that Mr.

 9   Carty and American would follow through, correct?

10   A.   Yes.

11   Q.   So there was some risk that American would close down

12   TWA LLC and all the TWA pilots would lose their job, yes?

13   A.   Yes.

14   Q.   You were will to go take that risk and push ahead with

15   the Bond bill and potentially endanger the jobs of all the

16   TWA pilots?

17   A.   I didn't see it as a risk because I thought they were

18   bluffing.

19   Q.   Let's go back to a little bit earlier in the year.  You

20   had talked to interest, interacted with Mr. Brundage

21   previously, hadn't you, before the October timeframe?

22   A.   I believe so.

23   Q.   What is the first interaction you recall with Mr.

24   Brundage?

25   A.   I don't recall specifically.
```

1    Q.   Do you recall being at a meeting in March of 2001 where

2    he made some comments about the integration process?

3    A.   I do remember a meeting in the spring with Mr. Brundage.

4    Q.   Who was present at the meeting?

5    A.   I believe it was the MEC.

6    Q.   Mr. Brundage was also present?

7    A.   I believe so.

8    Q.   What do you recall him saying at the meeting?

9    A.   I don't recall.

10   Q.   I am going to show you a declaration that you took.  I

11   don't think we need to mark this, your Honor.  It was filed

12   in record on May 2, 2003.  I have a copy for your Honor.  I

13   assume counsel has it.

14            THE COURT:  This is already on the docket.

15            MR. FRAM:  It is on the docket.  Ms. Young's

16   declaration filed on May 2 of 2003.

17            THE COURT:  Ladies and gentlemen, a declaration is

18   equivalent to an affidavit, many of you are familiar with an

19   affidavit.  It is a written statement under oath, or the

20   equivalent to under oath, of the person who is making the

21   affidavit, making the declaration.  In this case, Ms. Young.

22   Q.   Ms. Young, can you turn to the second page of the

23   declaration, paragraph 3.

24            By the way, turn to the last page.  Is that your

25   signature on the last page?

1    A.    Yes.

2    Q.    You dated this April 5, 2003?

3    A.    Yes.

4    Q.    Turn to the second page, paragraph 3?

5    Q.    I want you to read that to yourself for a moment.

6    A.    The first paragraph.

7    Q.    Do you recall make thanking statement in paragraph 3?

8    A.    My memory is refreshed now.

9    Q.    All right.  So what happened is you were at a meeting in

10   St. Louis in March, 2001, where Mr. Brundage, American's vice

11   president of employee relations, was present, and Mr.

12   Brundage said that American was not involved in the seniority

13   integration, it was neutral on the issue, and the issue was

14   between the unions.

15          When he said that, and I will quote, you wrote, "I

16   spoke up and told Mr. Brundage that I found his

17   characterization of American as neutral to be disingenuous,

18   in light of American's request of the TWA pilots to surrender

19   their Allegheny Mohawk labor protected provisions, and

20   further, that American had created a very unlevel playing

21   field.  Brundage nodded and said I had a point."

22          And  then you talked about some other discussions.  I

23   read that correctly, yes?

24   A.    Yes, you did.

25   Q.    Disingenuous.  This is a meeting of how many TWA pilots

```
 1   where with this high-level employee representative of
 2   American was present.  How many people were there?
 3   A.   I don't know.
 4   Q.   There were dozens of pilots, weren't there?
 5   A.   If it was an open meeting, then there were probably a
 6   lot of pilots there.
 7   Q.   And in the presence of all those pilots you accused Mr.
 8   Brundage of being disingenuous, yes?
 9   A.   Yes.
10   Q.   Insincere, yes?
11   A.   Yes.
12   Q.   You basically called him a liar in front of the TWA
13   pilots?
14   A.   I disagreed with his characterization of the word, of
15   the American's position.
16   Q.   You didn't justice agree, you imputed an intent, an
17   intent on his part to mislead.  Yes?
18   A.   I disagreed with his characterization.
19          THE COURT:  You are talking about their neutrality.
20          THE WITNESS:  That's correct.
21          THE COURT:  You were basically saying, you say you
22   are neutral but you are not.
23          THE WITNESS:  Yes.
24   Q.   You said he was being disingenuous, yes?
25   A.   Yes.
```

1    Q.    Did you think did you think insulting him and accusing

2    him of being disingenuous in front of the pilots was going to

3    help get a better deal for the TWA pilots?

4    A.    It was not my intent to insult Mr. Brundage.

5    Q.    Didn't it occur to you when you said he was being

6    disingenuous that he might be insulted by that term?

7    A.    I don't think it did.

8    Q.    Let's go back to the April 2 meeting for a couple of

9    minutes, please?

10          THE COURT:  We are talking '01.

11          MR. FRAM:  April 2, 2001.  Yes, your Honor.

12   Q.    Let's pull up D 74, please.  Those are the minutes of

13   the April 2 meeting.  Do you have those handy?

14          THE COURT:  That is already in evidence.

15          MR. PRESS:  She doesn't have a copy in front of

16   her.

17   A.    Which number, please?

18   Q.    Here.  Do you recognize those as the minutes of the MEC

19   meeting on April 2, 2001?

20   A.    Yes.

21   Q.    You were present at the meeting?

22   A.    Yes.

23   Q.    You said this morning that the roll call vote that took

24   place at the end of the day was called for by Mr. Rautenberg.

25   Yes?

1   A.   That is what I believe happened.

2   Q.   Let pull up page 6?

3   Q.   Hollander requested roll call.  Does that refresh your

4   memory it was Mr. Hollander and not Mr. Rautenberg who asked

5   for a roll call?

6   A.   Yes.

7   Q.   You said there was a presentation that morning by Randy

8   Babbitt?

9   A.   At some point in the day there was a short presentation

10  by Randy Babbitt.

11  Q.   What was the presentation about?

12  A.   He was at the meeting, as a consultant, he had a

13  conflicting term for airline labor and airlines.  Don't

14  remember exactly what he said, but in my recollection he was

15  supportive of the ALPA advisors.

16  Q.   Turn to the first page of the minutes.  Bottom of the

17  first page.  Bankruptcy transaction update.  Randy Babbitt.

18  Eclat Consulting.  Babbitt addressed the decision making

19  process regarding the 1113 bankruptcy hearing.

20  A.   What page are you on?

21  Q.   First page.

22  A.   Are we talking about D 74.

23  Q.   Yes.

24  A.   Page 1.  I see it.

25  Q.   Bankruptcy slash transaction update.  Babbitt addressed

```
 1    the decision making process regarding the 1113 bankruptcy

 2    hearing and discussed different scenarios that could result

 3    from the bankruptcy.  Is that what you are recalling?  Is

 4    that the presentation you recall?

 5    A.   As I said, the only thing I recall about his

 6    presentation is he was not in disagreement with the ALPA

 7    advisors.

 8    Q.   Ms. Young, you arrived late at the meeting on April 5?

 9    A.   I did.

10    Q.   The minutes reflect you didn't arrive until 10:54?

11    A.   That's correct.

12    Q.   So is there another presentation by Mr. Babbitt that is

13    referred to in the minutes other than the one that took place

14    before you arrived?

15    A.   He was involved in the discussions in the afternoon with

16    the entire adviser group.

17    Q.   But we agree that you missed the presentation he gave

18    first thing but because you didn't arrive until a little bit

19    before eleven o'clock?

20    A.   That's correct.

21    Q.   Now, did you arrive in St. Louis the day before?

22    A.   I live in St. Louis.

23    Q.   You live in St. Louis.  Did you say before that you

24    attended some kind of meeting on April 1?

25    A.   It was just the dinner with advisors.
```

```
 1              THE COURT:  But you said at that dinner was no

 2   business talk, it was just social.

 3   A.    That's correct.

 4   Q.    Right.

 5   Q.    You testified on the vote on April 2 was to waive scope,

 6   correct?

 7   A.    Correct.

 8   Q.    Let's pull up the resolution.  Just go to page 6.

 9   Q.    Therefore, be it resolved, are you with me?

10   A.    Yes.

11   Q.    While we are waiting for that.  Did you have an

12   opportunity to review these minutes before you came in and

13   testified here today?

14   A.    Briefly.

15   Q.    Did you review the actual resolution that was voted on?

16   A.    I looked at it.

17   Q.    On April 2?

18   A.    I looked at it.

19   Q.    Do you agree that there were five parts to it?

20   A.    Yes.

21   Q.    Waiving scope was only one of the five parts, yes?

22   A.    Yes.

23   Q.    What was in front of the MEC on that date was a proposed

24   collective bargaining agreement from TWA LLC, yes?

25   A.    It appears that that is part of the resolution.
```

1    Q.    Do you recall that without looking at the minutes?  Do

2    you recall without looking at the minutes that on the table

3    before the MEC was a proposed collective bargaining agreement

4    between the TWA pilots and TWA LLC?

5    A.    No.

6    Q.    Let's blow up the resolution, please.  Do you recall

7    that during the weeks leading up to the meeting on April 2

8    that the negotiating committee of the MEC had a number of

9    sessions with representatives of TWA to try to hammer out the

10   new collective bargaining agreement?

11   A.    That process was kept -- yes.  I think by April 2 we

12   were aware that they were requiring us to negotiate a new

13   contract.  But we were surprisingly ill-informed about the

14   process, not because of the negotiating committee but because

15   it was not something directed lie the MEC.

16           Normally, when a new contract is negotiated, the

17   governing body, voting body, directs the negotiating

18   committee to negotiate.  So we were much less informed about

19   what was happening with a potential new contract than we

20   normally would be.

21   Q.    Weren't you getting shorts that every MEC meeting about

22   the status of the negotiating committees work?

23   A.    No.

24   Q.    Let's get through this rest resolution.  The first part

25   of the resolution was directing the negotiating committee to

1    seek clarification immediately on all outstanding issues

2    arising from the proposed agreement covering the operations

3    of TWA LLC, and to finalize the LLC CBA.  Yes?

4    A.   Yes.

5    Q.   So part of the resolution was to have the negotiating

6    committee finalize a new collective bargaining agreement,

7    correct?

8    A.   Yes.

9    Q.   The second part of it was to resolve the Section 1113

10   motion?

11   A.   Yes.

12   Q.   Did you understand on April 2 that TWA had filed a

13   motion under Section 1113 of the Bankruptcy Code to rejected

14   the contract that existed between TWA and the and its pilots?

15   A.   That TWA had filed that?

16   Q.   Yes.  Do you recall that --

17            THE COURT:  The company, TWA.

18            THE WITNESS:  Yeah, right.

19   Q.   Do you recall that on March 15 of 2001 that TWA had

20   filed a formal motion in bankruptcy?

21   A.   Yes.

22   Q.   To reject the contract between TWA, Inc., and the

23   pilots?

24   A.   Yes.

25   Q.   So the second part of the resolution was to resolve that

1    Section 1113 motion.  Yes.  Do you recall any of this without

2    looking at the notes?

3    A.   You know, I think there were so many things going on at

4    the same time, my memory of the April 2 meeting was a stream

5    focus on whether or not to waive scope.  We did have some

6    information provided to us at MEC meetings about what was

7    happening with the contract.  But it was actually me who

8    asked that at one of the meetings, why weren't we being more

9    informed about it and what was actually happening with the

10   contract negotiations.

11          THE COURT:  The contract --

12   A.   The contract between the TWA ALPA pilots and TWA.  On

13   March 15 --

14          THE COURT:  You mean LLC.

15   A.   For LLC.

16          THE COURT:  In other words, the contract that was

17   going to govern the LLC before they became integrated, in a

18   sense, an integrated airline.

19          THE WITNESS:  Yes.

20          THE COURT:  That period you are talking about?

21   A.   Yes.

22          THE COURT:  That is the contract.

23   A.   Yes.

24          THE COURT:  Okay. .

25   A.   And I was not clear on what the procedures would be for

```
1    having a contract during a period like that.  I was not made

2    -- I did not understand that we had to negotiate a new

3    contract.  I thought the requirement was for us to waive

4    scope.

5    Q.   Did you read the Section 1113 motion that was filed by

6    TWA?

7    A.   I didn't read it in its entirety.

8    Q.   Did you read any of it?

9    A.   I read part of it.

10   Q.   Were you at meetings of the MEC where advisors reported

11   on what the motion meant, and what the consequences were?

12   A.   This was the meeting where advisors were present.

13   Q.   And you are claiming that this was the only meeting,

14   April 2, was advisors were present and talked to you and the

15   other MEC members about the Section 1113 motion.  Yes?

16   A.   I don't think it is the only meeting.  It is the

17   meeting, one meeting, where all advisors came to town, and

18   actually laid out what they thought our options were.

19   Q.   You said this morning that this was the only meeting

20   where advisors were present and gave advise about the issue

21   of whether to waive scope.  Yes?  That was your testimony.

22   A.   No, that is not what I said.  What I tried to say is

23   that we had not had a comprehensive presentation.  We had

24   spoken to adviser occasionally at other MEC meetings, but as

25   far as making the decision to waive scope, and having the
```

1   situation described to you, there is the meeting.

2           THE COURT:  Well, the April 2 meeting was the only

3   time all advisors were present sort of in one place to

4   discuss waiving scope.

5           THE WITNESS:  That's correct.

6           THE COURT:  That had never happened before.

7           THE WITNESS:  That's correct.

8           THE COURT:  That is your testimony, it never

9   happened before.

10          THE WITNESS:  That's correct.  In my memory.

11          THE COURT:  Okay.

12  Q.  Let's wrap up on what the resolution is.

13          THE COURT:  Wrap that up, then the jury is going

14  to, the jury has been here a long time.  Let's give them a

15  break.

16  Q.  There were five parts to the resolution on April 2, yes?

17  A.  Yes.

18  Q.  Only one part was waiving scope, yes?

19  A.  Yes.

20  Q.  You knew that when you voted on April 2 of 2001, yes?

21  A.  Yes.

22          MR. FRAM:  Thank you, your Honor.

23          THE COURT:  Is this a good time to break.

24          MR. FRAM:  Yes.  I need to get reorganized, too.

25          THE COURT:  Okay.  Ladies and gentlemen, it is

1    almost exactly ten of 12.  We will break until five after

2    twelve.

3              (Recess)

4              (Jury enters the courtroom.)

5              SALLY YOUNG, resumes.

6              BY MR. FRAM:

7    Q.   We were talking before the break about meetings with

8    advisors where they talked about waiving the scope and relate

9    the issues?

10   A.   Yes.

11   Q.   Do you recall being present at the meeting of a MEC on

12   March 21, 22, of 2001?

13   A.   I believe so.

14   Q.   Let me show you the minutes, 223 in evidence, with

15   respect to that meeting.  Do you remember recognize those as

16   the official minutes of the meeting?

17   A.   Yes.

18   Q.   Turn to the top of the second page, please.  Do you see

19   vice chairman report, Scotch forwards.  This meeting took

20   place about nine days after the /PWHRUPT City court had

21   approved the American TWA transaction.  Do you recall that

22   (Scott Shwartz (.

23              March 12, do you recall Judge Walsh ruling on March

24   12 in the bankruptcy court that American would be permitted

25   to purchase the TWA assets.

1    A.    Yes.

2    Q.    Were you in court for any those hearings?

3    A.    I was in court I think two or three days.  I don't

4    remember exactly which days.

5    Q.    Were you in court when Judge Walsh announced his

6    decision to March 12?

7    A.    No.

8    Q.    All right.  What happened in these minutes is that Scott

9    Shwartz, who was the vice chair of the TWA MEC gave a report

10   on the status of the bankruptcy proceedings.  Yes?

11   A.    Yes.

12   Q.    He report the that the bankruptcy court would likely

13   hold a hearing on TWA Section 1113 filing on April 6, though

14   no absolute date had been set.  He then reported, stated that

15   state of -- negotiations continued on those areas of the ALPA

16   collective bargaining agreement to be amended for the

17   transition into TWA LLC?

18   A.    Yes.

19   Q.    Does that refresh your memory that as of March 21, the

20   negotiating committee was working with representatives of

21   TWA, to try to hammer out a new collective bargaining

22   agreement?

23   A.    This might have been the meeting where I asked for

24   clarification about what was being negotiated, or some sort

25   of presentation to informing the MEC as to exactly what is

 1  happening with the CBA.

 2  Q.   So you may have asked for details about what the

 3  negotiating committee was doing?

 4  A.   Yes.

 5  Q.   Did your fellow members of the MEC who were involved in

 6  that committee provide you with the details that you wanted?

 7  A.   Fellow members of the MEC wouldn't have had the

 8  information, it would have been the negotiating committee or

 9  David Holtzman or the people at the table.

10  Q.   Alan Altman was on the negotiating committee, right?

11  A.   Yes.

12  Q.   He was one of the pilot reps out of Council 4 in Los

13  Angeles?

14  A.   That's correct.

15  Q.   The other members of the negotiating committee were all

16  TWA pilots, yes?

17  A.   That's correct.

18  Q.   Did you go to them, to the extent you had questions

19  about what the specification were about what was happening,

20  did you go to your fellow TWA pilots and ask for the details

21  of what they were --

22  A.   I asked for a presentation to be made.

23  Q.   Did you ask them for the details of what they were

24  discussing with TWA?

25  A.   I believe he said I asked for a formal presentation to

```
 1   be made so that we could interact with the negotiating
 2   committee and talk about what tack we attempted to take and
 3   derive an official position in the past.
 4   Q.   What was the response to that request for a formal
 5   presentation?
 6   A.   I believe Bob Pastore said that he would make
 7   arrangements for such a presentation.
 8   Q.   Do you see in the same paragraph it says referring to
 9   Mr. Shwartz, briefed the MEC regarding teleconference with
10   Duane Woerth who promised to ramp up ALPA's support and
11   utilize other legal venues for support.  Does that refresh
12   your memory that Mr. Woerth was in communication with people
13   involved in the MEC?
14   A.   With Scott Shwartz, yes.
15   Q.   Turn, please, to the third page, the next page of the
16   minutes.  Do you see most of the way down, transaction
17   update, can we blow that up.  Negotiating committee.  Ron
18   Kiel was the chair of the negotiating committee.  Alan Altman
19   was the fellow we talked about before on the committee?
20   A.   Yes.
21   Q.   Hollander and  Altman moved at 1446 to enter executive
22   session.  Passed.   Then at 1755 which is more than three
23   hours later Hollander and you moved to come out of executive
24   session.  Yes?
25   A.   Yes.
```

1    Q.    Did you during that three-hour-plus executive session

2    have an opportunity to ask whatever questions you thought you

3    needed to ask to understand what the negotiating committee

4    was doing?

5    A.    Yes.

6    Q.    Do you see that on the bottom of that page, we are down

7    now to Thursday, March 22, transaction update.  Merger

8    committee.

9    A.    Yes.

10   Q.    So the members of the merger committee also give a

11   report.  Yes?

12   A.    Yes.

13   Q.    And it looks like that Mr. Rautenberg and you moved to

14   enter into executive session at 9:15, the bottom of the page.

15   Then it looks like Mr. Altman and you moved to come out of

16   executive session at 12:30, which was more than three hours

17   later?

18   A.    Yes.

19   Q.    Did you while in executive session have an opportunity

20   to ask whatever questions you thought you needed to ask of

21   the merger committee?

22   A.    I believe I was -- yes.  I don't remember specifically,

23   but I believe three hours is enough time.

24   Q.    Is there anything, can you sit here today and claim that

25   there was any information that you felt that was important

1    about what the negotiating committee or merger committees

2    were doing back in March that you didn't get from them

3    directly?

4    A.    There was some of merger committee and negotiating

5    committee discussions that were not discussed with the MEC.

6    I don't know if you know that.  But not having that they said

7    in the merger committee meetings and negotiating committee

8    meetings were shared with the MEC.

9    Q.    Is there anything?

10   A.    They had a confidentiality of their own.

11   Q.    Is there any specific information that you wanted to

12   know back in March of 2001 that the members of the

13   negotiating committee or the members of the merger committee

14   did not provide you with?

15   A.    Well, I mean, I think, as a voting MEC member, it was a

16   little bit frustrating to try to get a handle on all the

17   information about having that was going on.  That is not to

18   blame my fellow pilots who were trying to negotiate an

19   integration or a contract.  It was just a lot of information.

20   So it is possible that I wasn't completely in the no on those

21   processes, that is not to blame fellow pilots.

22   Q.    Is there any specific information that you asked for

23   from the negotiating committee or the merger committee that

24   they didn't provide?

25   A.    Probably not.

Young-cross/Fram                                                     133

1    Q.   Do you recall that a number of advisors, including the

2    number of the lawyers were present during these meetings on

3    March 21 and 22?

4    A.   Do I recall that?

5    Q.   Yes?

6    A.   I do not.

7    Q.   I am going to hand you what is in evidence as D 382 and

8    ask you if you recognize that as a memo sent by Robert Stow

9    on March 19, 2001, scheduling the special MEC meeting we have

10   been discussing, March 21 and 22?

11   A.   I see that, yes.

12   Q.   You are one of the recipients of that email, yes?

13   A.   Yes.

14   Q.   And what it says here is that the meeting master

15   chairman, Robert Pastore, has called for a special MEC

16   meeting to begin at 1330 CST on Wednesday, March 21, 2001 at

17   the St. Louis office.  And then it says, skipping down, the

18   agenda will include report on the bankruptcy and the filing

19   of the 1113 and 1114 motions, creditor committee report, and

20   other items regarding the bankruptcy.  There will be reports

21   from the merger committee and the Nego committee.  However,

22   because of the potential for discussions between their

23   committees and their respective counterparts, those reports

24   might be via teleconference?

25            THE COURT:  382 is not in evidence.

1          MR. PRESS:  There is no objection.

2          MR. FRAM:  I thought it was.

3          THE COURT:  I will put P 382 in evidence.

4          MR. FRAM:  Thank you, your Honor.

5    Q.   The meeting of March 21 and 22 got scheduled two days

6    before?

7    A.   Yes.

8    Q.   On March 19.  Was that unusual for some of these special

9    meetings to get scheduled on fairly short notice?

10   A.   No.

11   Q.   Do you see that the attachment to that email is an

12   agenda for the special meeting we have been discussing?

13   A.   Yes.

14   Q.   Do you see on the attachment if we flip to the second

15   page of the document, please?

16   A.   Yes.

17   Q.   Do you see it says March 21, 2001, 1505.  Transaction

18   update.  Then it lists negotiating committee, Ron Kiel.  It

19   lists five people, all of whom happen to be lawyers, right?

20   A.   Yes.

21   Q.   They were there and talked to the members of the MEC

22   about what was happening in the bankruptcy and as part of the

23   negotiating committees efforts.  Yes?

24   A.   Yes.

25   Q.   Do you recall the specifics of what any of those

1    advisors said during the meeting on March 21 or March 22?

2    A.   I don't.

3    Q.   Do you see as well that 16 20, it shows transaction

4    update continued.   Then it has the merger committee now.   And

5    it is showing Roland Wilder and Robert Christy?

6    A.   Yes.

7    Q.   Two more lawyers.   Yes?

8    A.   Yes.

9    Q.   So we have a total of seven lawyers present advising the

10   MEC at the special meeting on March 21.   Yes?

11   A.   I don't know that they were advising.   I don't remember

12   any specific advise they gave us.   If you note, they

13   presented for one hour.   Five attorneys presented for one

14   hour.

15            So I  don't know how much stuff, you know,

16   extensive information we could have gone over in that short

17   period.

18   Q.   This is the agenda?

19   A.   Correct.

20   Q.   The actual presentations, as we discussed from the

21   minutes, the actual presentations took longer.

22   A.   Okay.

23   Q.   Do you agree that?

24   A.   Yes.

25   Q.   The agenda looks like it is setting aside one hour for

 1    the negotiating committee  but we talked about how the

 2    minutes reflect executive session for more than three hours,

 3    right?

 4    A.   Yes.

 5    Q.   In same with the merger committee.  The agenda has one

 6    hour, but the executive session on the merger committee

 7    issues were actually more than three hour, yes?

 8    A.   Yes.

 9    Q.   Then you see on March 22 the final page of the document,

10    it says transaction update continued, if required?

11    A.   Yes.

12    Q.   And then eleven o'clock, MEC discussion, and direction?

13    A.   Yes.

14    Q.   Does all of that refresh your memory that April 2 was

15    not the first time that advisors sat down and talked to the

16    members of the MEC in detail about waiver of scope, Section

17    1113, and the importance the of getting a new collective

18    bargaining agreement?

19    A.   I am sure that they were there.  I am sure that this is

20    correct.  I just don't remember the substance of what they

21    told us.

22    Q.   Do you recall that after this meeting that the

23    negotiating committee went back and continued to negotiate

24    with the counterparts, the people at TWA about a new

25    collective bargaining agreement?

1   A.   Yes.

2   Q.   By the way, you knew from January of 2001 that a

3   condition of this entire deal was that the TWA pilots had to

4   waive scope and successorship, they had to waive their right

5   to seniority arbitration for this deal to go ahead?

6   A.   That is what was in the asset purchase agreement.

7   Q.   And the people at American made clear that that was

8   their position, unless the TWA pilots waived seniority

9   arbitration, the deal was off.  Yes?

10  A.   Well, that is what they reported.

11  Q.   My question is --

12  A.   I don't know that that is a final position.  To me --

13          THE COURT:  Well, was it at least the position that

14  was currentlyly --

15  A.   Yes, I agree.

16  Q.   That was the position in January and that position

17  stayed the same from American's perspective right up until

18  April.  Yes?

19  A.   That's correct.

20  Q.   And you attended the different meetings of the MEC where

21  that issue was discussed, right?

22  A.   Yes.

23  Q.   For example, do you recall attend ago meeting on January

24  11 with Judge Mabey, the bankruptcy, the former bankruptcy

25  Judge, talked to the MEC about the terms of the transaction?

1    A.   Yes.

2    Q.   And told the MEC members that the sale would not close

3    until TWA had amended its collective bargaining agreement to

4    remove scope and successorship?

5    A.   I do recall Judge Mabey coming to the MEC.

6    Q.   So that was another situation where one of the

7    professional advisors came and talked to the MEC about legal

8    issues, correct?

9    A.   Yes.

10   Q.   Do you recall being at MEC meetings on January 17 to 19,

11   on February 15 to 16, on March 2, and on March 8 to 10, all

12   in 2001?

13   A.   Yes.

14   Q.   Do you recall there being discussions where the legal

15   advice /ERS were present, the professional advisors were

16   present at those meetings where they talked about the

17   insistence that scope had to be waived and these other

18   issues.

19            MR. PRESS:  Judge, I think it is fair to I think it

20   is unfair to lump all of that into one question.

21            MR. FRAM:  Trying to move it along, your Honor.

22            THE COURT:  I absolutely agree with Mr. Press.  Any

23   question that is more than ten minutes long is probably too

24   long.

25   Q.   You were at the meeting on January 17 to 19?

1    A.    Yes.

2    Q.    Hand?

3          I am handing you 243 which is in evidence.

4          THE COURT:  P or D.

5    Q.    D 243?

6          THE COURT:  Already in evidence.

7    Q.    Do you recall being at that meeting?

8    A.    I know I never missed a meeting.  I don't recalling

9    specific specific meetings, necessarily.  I do recall the

10   April 2 because it was such an important decision.  But I do

11   remember attending all the meetings.

12   Q.    These meeting minutes, 243, are they among the documents

13   that you reviewed before you came in to testify?

14   A.    I did not review this meeting minutes.

15   Q.    Just turn to page 18.  Do you see at the top of page 18,

16   it starts on the prior page, let's go to 17.  Just put it in

17   context.  There is a resolution is proposed relating to the

18   TWA MEC policy manual and the ALPA institution and bylaws.

19   Do you see that?  There was some type of issue about whether

20   they were consistent.

21   A.    This is the resolution where we wanted to keep the

22   secretary treasurer rest involved in the process.

23   Q.    Do you recall that?

24   A.    Yes, I do.

25   Q.    You see on the next page, I want to focus you on the

Young-cross/Fram                                         140

 1  roll call?

 2  A.   Okay.

 3  Q.   Do you see the top of the second page, do you see that

 4  you requested a roll call vote on that issue?

 5  A.   Yes.

 6  Q.   Do you recall why you did that?

 7  A.   I believe I thought it should, I felt strongly about the

 8  resolution and I thought that a roll call would ensure that

 9  it would pass.

10  Q.   You wanted to make sure that there was a record of how

11  people cast their votes on that issue.  Yes?

12  A.   I don't remember.  It could have been that I wanted -- I

13  knew that we had the number of votes --

14          THE COURT:  You wanted the resolution to fail.

15          MR. FRAM:  No.  No.

16  Q.   You voted, you voted against.  You wanted 600 votes

17  against the resolution.  And 32 for.  Yes?

18  A.   Can I read the resolution so I know exactly what it

19  says?

20  Q.   Of course.  Take your time.

21  A.   Thank you.

22          (Pause)

23  A.   Okay, I understand it.

24  Q.   You wanted the roll call vote.  Do you recall the

25  specifics of why you wanted the roll call vote on that issue?

1    A.   In this case I think you are right.  I think it is

2    probably because I wanted it to be recorded.

3    Q.   This was an issue where you and Mr. Rautenberg, the

4    captain representative from Council 3, disagreed, correct?

5    A.   Yes.

6    Q.   What happened here is Mr. Rautenberg voted all of his

7    votes, 724, in favor of the resolution?

8    A.   Yes.

9    Q.   You voted 600 of your, 600 for, 32 against?

10   A.   Yes.

11   Q.   Let's move on and talk about the meeting on March 2.  I

12   will refer you to D 245 in I have.  Do you recognize those as

13   the minutes of the special MEC meeting on March 2, 2001?

14   A.   I do.

15   Q.   Is that one of the documents you reviewed to prepare for

16   today?

17   A.   It is not.

18   Q.   Turn to the third page of the document, please.  Did you

19   see in the middle it says negotiating committee report.

20   A.   I do.

21   Q.   Ron Kiel was the chairman of the negotiating committee?

22   A.   Yes.

23   Q.   Does in refresh your memory that here is another meeting

24   where the negotiating committee was reporting for the full

25   MEC about their process, their progress, rather, in trying to

1    work out a new collective bargaining agreement with TWA LLC?

2    A.   Yes.

3    Q.   And I see there that it says that there is a recess at

4    13 30.  I am sorry.  Recess, and 13 30 it reconvened.  Then

5    it says body remained in executive session to receive reports

6    from advisors.  And then you came out of executive session

7    about an hour later.  Yes?

8    A.   Yes.

9    Q.   Do you recall as you sit here today who the advisors

10   were?

11   A.   I do not.

12   Q.   Do you have any recollection of what legal advice was

13   given on March 2?

14   A.   No.

15   Q.   You testified earlier that you were surprised that

16   advisors were present on April 2?

17   A.   I was.

18   Q.   D 211 in evidence is an email dated March 29, 2001.  Do

19   you recall getting that email in connection with the

20   scheduling of the April 2 special meeting?

21   A.   I don't remember reading this email specifically.  I do

22   remember in 2001 I was not someone who checked my email

23   often.  I believe the way I found out about this meeting was

24   in a phone call from one of the other reps.

25   Q.   You said this morning that the meeting was scheduled on

1    Friday or Saturday before the Monday meeting?

2              THE COURT:  Are you talking about the April 2

3    meeting.

4    Q.   April 2, yes.  In fact an email went out scheduling the

5    meeting on Thursday, March 29.

6    A.   Okay.

7    Q.   Does this refresh your recollection?

8    A.   As I said I was not somebody who spent a lot of time on

9    email.  If the email went out and I didn't collect the email

10   that day, it might have been called that day, but I wasn't

11   informed until a day or two days --

12             THE COURT:  But that wasn't the fault of the people

13   calling the meeting.

14   A.   I didn't say it was.  I didn't find out about it until a

15   couple days before was the point I was trying to make.

16   Q.   The email told you there with would be a work session

17   beginning Sunday, April 1, at 1300 hours, is that one o'clock

18   p.m.?

19   A.   Yes.

20   Q.   Did you attend that work session or not?

21   A.   No.

22   Q.   Why not?

23   A.   I don't think we were invited.  As far as I know, no MEC

24   member was invited.  I believe it was a work session with

25   advisors and the officers.

```
1   Q.   Can you show me anything in the email to suggest that

2   the work session was limited to advisors?

3   A.   No. I just know that I wasn't there.

4   Q.   It says, let's read it.  Can we have this up, 210.

5            The sentence there, session?

6            THE COURT:  Get it up on the screen.

7   Q.   There will be a work session beginning at 1300 CDST, on

8   Sunday, April 1, at the MEC office.  Based on information

9   that is available now, the agenda will include contractual

10  review of proposed TWA airlines LLC/ALPA agreement, update on

11  merger talks and other negotiations which are taking place.

12  The following advisors have been requested to be at the work

13  session to review and discuss any proposals which might

14  require MEC action during the meeting on Monday.

15           Does that refresh your memory that the work session

16  was for the MEC members and advisors were invited to attend

17  to assist the MEC members?

18  A.   The MEC was not at the work session.  I don't know how

19  else to tell you.  What happened in this email and what

20  actually happened are two different things.  Again, people

21  were not constantly on their email in 2001 like they are now.

22  I didn't have a cell phone where I got emails on my cell

23  phone.  I am not sure how often I checked my emails.  I think

24  what happened was this might have been the suggested

25  methodology, but then after a phone call with Bob Pastore,
```

1    the officers decide decided to meet with advisors in a

2    working session at the MEC office on Sunday afternoon.  But

3    we were not there, the MEC.  I know that Ted Case wasn't

4    there.  I know Howard Hollander wasn't there.  I know I

5    wasn't there.

6    Q.   Can you point to anything in the invitation which

7    indicates that the members of the MEC such as yourself were

8    not invited to the work session on April 1?

9    A.   No.

10   Q.   Did think any of advisors tell you that you were not

11   invited to the work session on April 1?

12   A.   No.

13   Q.   Do you see that the email on the bottom identifies some

14   of the specific advisors?

15   A.   I do.

16   Q.   Michael Glanzer, Steve Tumblin, Roland Wilder, Randy

17   Babbitt, Bob Christy, Clay Warner.  You knew all those people

18   would be there on April 2, yes?

19   A.   Yes.

20   Q.   And you knew that Mr. Holtzman, who was the contract

21   administrator for the MEC, would also be there?

22   A.   Yes.

23   Q.   Did you claim this morning that you were surprised that

24   advisors appeared at the meeting on April 2?  Did you say

25   that?

1    A.    When I was informed about this meeting, it was by phone.

2    Q.    Did you say in morning that you were surprised?

3    A.    Yes.

4    Q.    That the advisers appeared at the meeting?

5    A.    I was surprised that this meeting happened the way it

6    did because I didn't know who invited advisors and I didn't

7    know that they were all going to be in town.

8              THE COURT:  That is because you hadn't seen the

9    email.

10   A.    I hadn't seen it.  I didn't know how it was going to

11   play out.  I didn't know who determined it.  I didn't know

12   who determined that April 2 was the day we needed to make

13   that discussion.  I don't know how that came about.  It

14   wasn't suggested by the MEC.

15   Q.    24 is a --

16   Q.    This is an email from Robert Stow, yes?

17   A.    Yes.

18   Q.    And Robert Stow was one of the officers of the MEC.

19   Yes?

20   A.    Yes.

21   Q.    Is there any indication in this email that the meeting

22   was scheduled by anybody other than the MEC?

23   A.    Bob Pastore had the ability to call meetings.  We, my

24   memory of this meeting is that we knew we were going to meet

25   this week.  I didn't realize it was going to start as a

1    dinner on Sunday evening and then --

2            THE COURT:  It didn't start --

3    A.   I didn't know it was going to start as a working session

4    with advisors and officer.  I knew there would be a dinner.

5    I knew we were meeting that week because it was obvious April

6    6 was an important date and we knew it, I I didn't know it

7    was going to play out like that.

8    Q.   And you didn't know because you didn't check your

9    emails?

10   A.   Yes.

11   Q.   Do you have D 179 in evidence, the agenda for the April

12   2 meeting?

13   A.   I do.

14   Q.   The agenda, April 2 was revised on March 30, 2001.  Do

15   you see that?

16   A.   Yes.

17   Q.   This agenda was circulated to the members of the MEC

18   before meetings, right?

19   A.   I think we probably got this on Monday morning.

20   Q.   All right.  Well, whether you got it Monday or not, the

21   document indicates this was revised on March 30 which would

22   have been the prior Friday?

23   A.   Yes, but MEC members were not required to be present in

24   the office on a daily basis.  In fact, we often were not,

25   MEC, the MEC officers were often present in the MEC office,

1   but unless we were, this would not have been mailed to me.

2   If I hadn't been in the office the previous week on say March

3   30, whatever day it was printed up, I wouldn't have gotten

4   this agenda until I showed up for the meeting on Monday

5   morning.

6   Q.   The agenda lists all the the advisors we have been

7   talking about?

8   A.   It does.

9   Q.   Holtzman, Tumblin, Glanzer, Seltzer, Warner, Babbitt and

10  Christy?

11  A.   Yes.

12  Q.   To the extent you with you were not aware they would be

13  there, that wasn't the fault of Mr. Holtzman or anything at

14  ALPA National, correct?

15  A.   That's correct.

16  Q.   The members of the MEC knew before this meeting on April

17  2 that three were going to be asked to waive scope.  Right?

18  A.   Absolutely not.

19  Q.   There, had there been discussions about waiving scope?

20  A.   We knew that we were going to have to address that

21  decision.  Absolutely.

22  Q.   Did you understand that waiving scope was a condition of

23  the new collective bargaining agreement with TWA LLC?

24  A.    I don't know if I had it in that context.  I knew it

25  was in the asset purchase agreement.

1   Q.   But knew on April 2 that the negotiating committee had

2   been working for several months to come up with a new

3   collective bargaining agreement with TWA.   Yes?

4              THE COURT:   With TWA LLC.

5   Q.   With TWA LLC?

6   A.   I don't think several months is a correct

7   characterization,  I think it was a relatively short period

8   of time and I can't tell you how long they had been

9   negotiating.

10  Q.   You knew that the negotiating committee had been working

11  for over a month?

12  A.   Okay.

13  Q.   To come up with a new collective bargaining agreement

14  with TWA LLC, is that fair?

15  A.   I  was unaware that, of the fact that we would be forced

16  to make a decision on that contract any time in the near

17  future.  I did not know that it was time central.

18  Q.   My question was did you know April 2 that for over a

19  month the negotiating committee had been working with TWA LLC

20  to come up with a proposed collective bargaining agreement?

21  A.   I knew they had been negotiating, yes.

22  Q.   And what decision did you think had to be made on April

23  2 with respect to that collective bargaining agreement?

24  A.   I don't know that April 2 was time essential, as far as

25  the collective bargaining agreement for TWA LLC.

1    Q.   Didn't you know when TWA LLC made its collective

2    bargaining agreement proposal that it specifically said that

3    its proposal would be withdrawn on April 6 which was the

4    scheduled date for the Section 1113 hearing if it wasn't

5    accepted by that date?

6    A.   On April 6?

7    Q.   Did you know on April 2 that the deadline for accepting

8    the TWA LLC collective bargaining agreement was April 6?

9    A.   I don't remember if I knew or not.  I knew that April 6

10   was an important deadline.  I didn't know April 2 was an

11   important deadline.

12   Q.   What was the importance in your mind of April 6.  What

13   had to happen by then?

14   A.   That was the 1113 process.  In Delaware.

15           THE COURT:  The bankruptcy court.

16           THE WITNESS:  Yes.

17   Q.   And what connection, if any, did you understand there to

18   be 1113 process and the collective bargaining agreement that

19   TWA LLC had put on the table?

20   A.   In my mind the collective bargaining agreement

21   negotiations were ongoing.  So I don't remember being,

22   feeling an urgency on the 2nd of April to make a decision

23   about the collective bargaining agreement.

24   Q.   So you thought the collective bargaining agreement would

25   be up here for weeks and weeks after that?

1    A.   I am not saying that.  I knew it was a process.  I

2    didn't know how that would be handled because I didn't know

3    yet what decisions we were going to make and how we were

4    going to either fight or not fight the 1113.

5    Q.   Did you claim this morning that there was pressure put

6    on the members of the MEC to make a decision on April 2?

7    A.   Yes, there was.

8    Q.   Did you understand that the time pressures we are

9    talking about were the fact that the new agreement, the new

10   collective bargaining agreement on the table would be

11   withdrawn if it wasn't accepted by the MEC within a matter of

12   days after April 2?

13   A.   No. I didn't know that.

14   Q.   Did you understand on April 2 that the collective

15   bargaining agreement was only being offered in return for

16   waiver of scope?  Did you understand the connection between

17   the two?

18   A.   I did.

19   Q.   And you were comfortable waiving scope, yes?

20   A.   I was not comfortable waiving scope.

21   Q.   Was it considered a foregone conclusion before April 2

22   that the MEC had to waive scope?

23   A.   No.

24   Q.   Do you recall, this is D 18, it is not in evidence, your

25   Honor?

Young-cross/Fram                                                   152

```
 1                THE COURT:  D 18.

 2                MR. FRAM:  D 18.

 3                THE COURT:  Okay.

 4    Q.   This is a confidential draft, strategic planning develop

 5    nth, April 1, 2001.  Do you recall seeing that document on

 6    April 1?

 7    A.   I remember this document being put together by Keith

 8    O'Leary.

 9                THE COURT:  I am sorry.  You don't or do?

10    A.   I do remember this document being put together by Keith

11    O'Leary.  I don't remember everything it says.  I haven't

12    reviewed this.

13    Q.   You remember seeing this back around April 1?

14    A.   I do.

15    Q.   What was Mr. O'Leary's involvement in this?

16    A.   Mr. O'Leary at that time.

17                THE COURT:  Are you offering it in evidence?

18                MR. FRAM:  Yes, your Honor, please.

19                THE COURT:  Any objection practices.

20                MR. PRESS:  No objection your Honor.

21                THE COURT:  Okay.  D 18 will be in evidence.

22                MR. FRAM:  Thank you, your Honor.

23    Q.   Mr. O'Leary's position with the MEC was what?

24    A.   At that time I believe he had gone from being the

25    communications committee chairman to the vice chairman of the
```

1    Master Executive Council.

2    Q.    He was the second highest-ranking officer of the MEC?

3    A.    He was.

4    Q.    I am sorry?

5    A.    He was indeed, yes.

6    Q.    All right.  He circulated this confidential draft to the

7    members of the MEC.  Right?

8    A.    Yes.

9    Q.    Turn to the second page, please?

10   A.    Okay.

11   Q.    Second paragraph from the bottom, the one that begins

12   the purpose of the strategic plan?

13   A.    Yes.

14   Q.    He wrote, the purpose of the strategic plan is to

15   provide the MEC with the maximum leverage for our pilots,

16   both before April 6 and afterwards.  Since the loss of scope

17   seems to be a foregone conclusion, our MEC needs to gain

18   leverage and engage in tactics to accomplish our objectives

19   without scope.

20          Do you see that?

21   A.    I do see that.

22   Q.    So the members of the MEC agreed as of April 1 that the

23   loss of scope, the waiver of scope, was a foregone

24   conclusion?

25   A.    This is put out by Keith O'Leary and handed to us.

 1    There was no discussion in the preparation of this document.

 2    He was not with the MEC any way.  He produced this document

 3    and he gave it to us.

 4    Q.   So did the members of the MEC agree or not agree that

 5    waiver of scope, the loss of scope was a foregone conclusion?

 6    A.   They did not agree.  People on the MEC, certain people

 7    did agree and certain people didn't.

 8    Q.   D 364, subject is proposed talking points.  Email dated

 9    3-28-01.  Do you recall receiving this from Scott Sherrins?

10              THE COURT:  This is not in evidence.

11              MR. FRAM:  Correct, your Honor.

12    Q.   On or about March 28, 2001.

13    A.   Again, this was produced by the communications folks,

14    and given to us.  I haven't seen it for a long time but I

15    seem to remember it.

16    Q.   All right.  So is this one of the documents you reviewed

17    in preparation for your testimony?

18    A.   It is not.

19    Q.   But you do recall receiving it back on or about March 28

20    of 2001, correct?

21    A.   I do.

22    Q.   And who was Mr. Sherrins?

23    A.   I am sorry.  Are you offering it in evidence?

24              MR. FRAM:  I offer it in evidence.

25              THE COURT:  Any objection, counsel?

```
 1              MR. PRESS:  No objection.

 2              THE COURT:  I am sorry?

 3              MR. PRESS:  No objection.

 4              THE COURT:  D 364 is in evidence.

 5   Q.   Who was the fellow who circulated the email?

 6   A.   It has been a long time since I heard that name, but I

 7   believe him to be someone --

 8              THE COURT:  Talking about Scott Sherrins.

 9   A.   Yes.  I believe him to be the communications department

10   at ALPA and was helping, and Mr.  O'Leary had moved from the

11   communications committee chairman, to the vice president, I

12   think that may have left an interim gap in, you know,

13   manpower in the communications area.  I think he was from

14   ALPA National, but I don't really remember.  He was in

15   communications, I know that.

16   Q.   Wasn't Mr. Sherrins a pilot, wasn't he a TWA pilot?

17   A.   He might have been.

18   Q.   The talking points, did you review these talking points

19   when they were circulated?

20   A.   Did I review them?

21   Q.   Yes.

22   A.   I did.

23   Q.   And the point in preparing talking points is that

24   members of the MEC were communicating with TWA pilots about

25   what was happening.  Yes?
```

1    A.    Yes.

2    Q.    So from time to time somebody put together talking

3    points so all the members of the MEC were on the same page,

4    that they were consistent at communicating with the pilots.

5    Is that fair?

6    A.    That would, that was the reason for publishing the

7    talking points.

8    Q.    Okay.  And these talking points on March 28, they

9    summarize all of the issues that the MEC had been discussing

10   during the period leading up April 2, yes?

11   A.    I don't know that it is a total list but it does appear

12   to be a summary of sorts.

13   Q.    The first group of points summarized, seniority

14   integration.  Attempting to get fair and equitable

15   integration.  Talks thus far have been extremely difficult.

16   Would you agree that talks had been difficult with the Allied

17   Pilots Association?

18   A.    I agree.

19   Q.    They were very adamant that they did not want to give on

20   the issue of seniority.  Correct?

21   A.    Well, I know they had been difficult.  That is all.  We

22   weren't given details about exactly what was said in the

23   meetings.

24   Q.    Are you saying that the members of the merger committee

25   were meeting with the allied pilots didn't report back to the

1    to the whole MEC?

2    A.    They did reported back.  We weren't given all the

3    specific details.  The merger committee by nature of the

4    function of the group needed some autonomy.  We asked for

5    reports but we weren't given the blow by blow, so to speak at

6    the meetings.  That is just not how it functioned.

7    Q.    Did Bud Bensel, who was the chairman of the merger

8    committee on March first, did he report back, March first,

9    2001, did he report back on what happened when the merger

10   committee met with the APA representatives on that date?

11   A.    I don't know specific reports and dates correlations for

12   reports from the merger committee.  We knew that the

13   discussions were difficult.

14   Q.    Do you recall Mr. Bensel reporting that when the merger

15   committee, the MEC merger committee, submitted its

16   integration proposal to the American pilots, that one of the

17   American pilots literally tried to come across the table and

18   assault Mr. Bensel?

19   A.    I don't remember that specifically.  I remember a

20   recount of specifically of a, one of the senior negotiators

21   at American, holding up his American ID badge, and belittling

22   the TWA pilots.  That is what I remember first and foremost

23   about any details they told us.  I don't remember the story

24   you just recounted.

25   Q.    You said this morning that seniority is very, very

1    important to pilots, yes?

2    A.   Absolutely.

3    Q.   It was very important to the TWA pilots?

4    A.   Yes.

5    Q.   It was just as important to the American pilots, right?

6    A.   Yes.

7    Q.   And they were at meant that they had no obligation to

8    give up any seniority to the TWA pilots, right?

9    A.   Well, we were hoping that wasn't the case.

10   Q.   My question went to what they were communicating.  They

11   were communicating --

12   A.   I wasn't in the meetings.

13   Q.   I thought we talked about the fact that the merger

14   committee on a regular business is was reporting back to the

15   other members of the MEC.  Didn't we go through the minutes

16   where we talked about the three hour executive session where

17   they reported in March.  You still --

18   A.   I don't know what to tell you except that they had, we

19   early on in the process, the merger committee asked us for,

20   to be, enable to have some autonomy.  We understood they

21   needed some of that so that they could do the job we asked

22   them to do, the difficult job, and we didn't want, I

23   personally didn't want to micro manage them but I did think

24   we needed briefings.

25            We didn't get details about exactly what was said

1    between the two committees.  That is not how the, how it was

2    set up.  We purposely gave them our confidence, if you will,

3    and I think there there was some necessity for briefing about

4    general, the general situation, but I, for example, didn't

5    know that our people, I didn't, I just recently saw the

6    proposal that was exchanged on I believe March first.  That

7    is the first time I saw the actual proposal.  The MEC was not

8    apprised of specifics, but more in generalities.  We talked

9    about strategies more so than details with the merger

10   committee.

11   Q.   The vote on April 2, let's go back on?

12            Let's go back to the vote.  Go back to 374 and

13   let's wrap this up.  Do you recall being aware on April 2

14   that the two pilot reps from Council 4, Pablo Lewin and Alan

15   Altman had met the prior Friday with the people at Council 4.

16   A.   Can you give me a second.

17   Q.   That is the April 2 minutes?

18   A.   April 2.  I got it.

19   Q.   Referring quickly to the roll call vote.  Do you recall

20   being aware on April 2 that Lewin and Altman had met with the

21   Council 4 people the prior Friday, March 30?

22   A.   You have refreshed my memory as to that fact.

23   Q.   Okay.  Do you recall being aware on April 2 that they

24   had been told by their membership out in Council 4 to vote in

25   favor of the collective bargaining agreement that was on the

 1    table?

 2              MR. PRESS:  Judge, that miss -- I am sorry, your

 3    finish.

 4    Q.   Not quite.  My question was do you recall being aware on

 5    April 2 that they had been directed Council 4 to accept the

 6    collective bargaining agreement that was being offered by TWA

 7    LLC?

 8    A.   I do not recall.

 9              MR. PRESS:  My objection is that mischaracterizes

10    Mr. Altman's testimony on that very point.

11              THE COURT:  The fact that she, that he is asking

12    her is whether, it, whether a different set of fact is true.

13    There is nothing wrong with that.  The jury will have to

14    decide who they believe, but nothing evidentiary in error

15    because he is trying, trying to elicit testimony contrary to

16    what another witness said.  He can do that.  He may not

17    succeed but he can do it.

18    Q.   What do you recall being told about the direction given

19    to Pablo Lewin and Alan Altman by their council the prior

20    Friday?

21    A.   Well, again, I think a chief concern during that week

22    was the decision of how to proceed in the 1113 bankruptcy

23    process, and whether or not to waive scope.  I don't remember

24    there being an urgency where the CBA.

25    Q.   Well, my question went to what you recall being told on

1   April 2, about what Lewin and Altman had been directed to do.

2   If you don't recall, just say you don't recall?

3   A.   I don't recall.

4   Q.   Do you agree that they both voted all 100, they

5   collectively voted all 180 votes?

6   A.   I did.

7   Q.   In favor of the five part resolution?

8   A.   I do.

9   Q.   Did they explain at the meeting why they were voting in

10  favor of the five part resolution?

11  A.   They might have.  They might have explained.  I don't

12  remember exactly what they said.

13  Q.   Did Mr. Rautenberg who voted all 724 of his votes

14  explain why he was voting them in favor of the resolution?

15  A.   I don't remember what he said.

16  Q.   Do you remember what any of the other voting members

17  said about why they were casting their votes the way they

18  were.

19  A.   I  belief Dave Singer talked about the fact that he

20  didn't want to be left without a contract to represent his

21  people on owe if the contract was pulled in the 1113 process,

22  and the ALPA advisors were correct in their characterization

23  that we would not have a union, I believe that the grievance

24  process was of chief concern to him.

25  Q.   Did you make any statements or explain how you intended

1   to vote before the vote took place?

2   A.   I don't remember.

3   Q.   Did Mr. Hollander make any statements about how he

4   inintended to vote before?

5   A.   Yes, I believe he did.

6   Q.   Did you know before the vote took place that Mr.

7   Hollendar was going to cast most of his votes against?

8   A.   I believe he had said that that was his position.  At

9   some point in the day.

10  Q.   Did you know before April two that Mr. Hollander was

11  going to vote against accepting the new collective bargaining

12  agreement and waiving scope?

13  A.   I believe that was his intent.

14  Q.   And you knew that before April 2?

15  A.   Yes.

16  Q.   How much before April 2 did you know how Mr. Hollendar

17  intended to vote?

18  A.   I don't remember.

19  Q.   The last document I am going to show you is D 16 which

20  is not yet in evidence, your Honor.

21           THE COURT:  D 16.

22           MR. FRAM:  D 16.

23  Q.   Do you recognize this as a letter that you and Mr.

24  Rautenberg sent to a Council 3 pilots on April 3, 2001?

25  A.   I do.

1          MR. FRAM:  I move D 16 in evidence.

2          MR. PRESS:  No objection, Judge.

3          THE COURT:  D 16 in evidence.

4    Q.   Is that your signature on the third page of the letter?

5    A.   It is.

6    Q.   You reviewed the letter before you signed it and agreed

7    that it could be send to all of the pilot in Council 3?

8    A.   I did.

9    Q.   And do to the best of your knowledge were all the

10   statements in the letter factually accurate statements?  Or

11   were  they at the time?

12   A.   This is a letter that was written by Captain Rautenberg.

13   I was, in particular, I paid particular attention to the

14   paragraph about the unanimous opinion of our advisors about

15   waiving scope.

16   Q.   Let's take it a step at a time.

17   A.   Okay.

18   Q.   At the time you signed the letter, did you believe that

19   all of the factual statements in the letter were accurate?

20   A.   I think I was just trying to describe how I felt about

21   the letter.

22   Q.   Well, I thought I was asking you a yes or no question?

23   A.   Okay.

24   Q.   Were you comfortable answering with a yes or a no?

25   A.   No.

1    Q.    Okay.   Go ahead.

2    A.    This letter was written by Captain Rautenberg.   Captain

3    Rautenberg and I did not agree on all philosophies in our

4    voting.   However, I did feel that we owed it to the Council 3

5    pilots to inform them as to, you know, some of the current

6    situation.

7              It was a difficult process to go through, it was a

8    difficult decision to make.

9              And in essence, the part that I was happy to sign

10   was the section where he told the pilots that the unanimous

11   opinion of our advisors was that we needed to waive scope and

12   we would absolutely fail in the 1113.   That was the most

13   important information in this letter, in my opinion.   And I

14   think that the Council 3 pilots needed to know that that was

15   why I voted the way I did.

16   Q.    All right.   So my question was is there anything in the

17   letter factually that you can point to that you think was

18   inaccurate at the time?

19   A.    Let me read it.

20   Q.    Tell you what.   Let's go through this quickly.   I will

21   ask you specific questions.   First page of the letter, about

22   75 percent down.   Paragraph beginning, as a debtor in

23   possession.   Do you see about five lines down it says, the

24   MEC has consulted extensively with a large group of

25   professional advisors on the CBA negotiations, the merger

1   negotiations, and the bankruptcy process.  Yes?  Is that

2   factual accurate as of April 2?

3   A.   I wouldn't say extensively.  We did consult.

4   Q.   Those advisors include and it identifies them, David

5   Holtz and, Clay Warner, Richard Seltzer, Bill Roberts, Steve

6   Tumblin, Roland Wilder, Michael Glanzer, Robert Christy and

7   Randy Babbitt.  Nine advisors, yes?

8   A.   Yes.

9   Q.   Did the MEC consult with all nine of those advisors

10  about whether to waive scope and whether to enter into an

11  agreement and what to do with the Section 1113 issue?

12  A.   We did consult.  I just can't agree with the "extensive"

13  characterization.

14  Q.   So your position is that the MEC consulted but not

15  extensively?

16  A.   That's correct.

17  Q.   The next?

18  A.   We were not availed extensive consultation.  It wasn't

19  that we didn't want the consultation.  We just weren't

20  availed.

21  Q.   Do you agree that there were some meetings with advisors

22  that you did not attend or some phone conferences with

23  advisors you did not attend?

24  A.   Sometimes the officers had specific conversations with

25  the advisors that the MEC, the voting body, did not have.

1   Q.   Are you aware that there was a phone conference with

2   advisors and some MEC officers on March 14 of 2001, are you

3   aware of that?

4   A.   I didn't know that as a fact.  But I believe it to be

5   true.

6   Q.   The final paragraph of the letter.  Blow that up,

7   please, on the first page.  The union and opinion of our

8   advisors, including that of Richard Seltzer, the most

9   experienced -- the unanimous opinion was that the likelihood

10  of ALPA's prevailing in an attempt to defeat TWA's CBA

11  rejection application was virtually nil.  Do you see that?

12  A.   I believe that is what we were told.

13  Q.   Mr. Wilder agreed with that assessment, that the chances

14  of defeating the Section 1113 motion was virtually nil.

15  Correct?

16  A.   Yes.  I don't remember his position on the CBA.  I

17  remember what he finally said about waiving scope.  And

18  again, that was what we talked about principally.  On April

19  2.  That is what I remember talking about.

20  Q.   This letter went out the day after the meeting, yes?

21  A.   Right.

22  Q.   What advisors said at the meeting would have been fresh

23  in your mind when the letter went out, yes?

24  A.   I didn't write the letter.

25           THE COURT:  But you signed it, didn't you?

1              THE WITNESS:  I did.

2    Q.   You read it before you signed it, yes?

3    A.   I did.

4    Q.   You represented to all the pilots in Council 3 that you

5    were agreeing with the statements in the letter.  Yes?

6    A.   This was a letter written by Steve Rautenberg --

7              THE COURT:  If the recipients to the letter see two

8    signatures, wouldn't the recipient of the letter assume that

9    this was not only Rautenberg's view, but yours as well?

10   A.   And I guess --

11             THE COURT:  As a pilot in St. Louis who wasn't in

12   any of the, if I am a pilot, and I wasn't at any of meetings

13   and I get a letter signed by both of my representatives,

14   wouldn't I assume that they agreed that what is in that

15   letter is so?

16   A.   Yes.

17             THE COURT:  I mean a pilot who wasn't there, didn't

18   know anything about it.

19   A.   Yes.

20   Q.   The second page of the letter, about 60 percent down,

21   the paragraph beginning, "In the face of a stark reality."

22   The letter says, which you signed, "In the face of the stark

23   reality that our scope language and other portions of our

24   contract would have to be waived, or we would face virtually

25   certain loss of the entire contract and probable loss of ALPA

1    recognition by TWA LLC, the MEC voted to accept a negotiated

2    settlement.  Yes?

3    A.    Yes.

4    Q.    You agreed to do that on April 2, yes?

5    A.    We agreed to waive scope.

6              THE COURT:  Mr. Fram, let me ask the jury, it is an

7    hour and a half.  I want to know if they feel they can go a

8    whole hour without a break, you feel can you did that do

9    that.  I don't want to lose you.  That is okay.  It is about

10   five after one.

11             MR. FRAM:  That was my last question.

12             THE COURT:  Okay.

13             MR. FRAM:  Counsel needed a break to set up the

14   videos?

15             THE COURT:  First of all, let's find out if there

16   is redirect.

17             MR. FRAM:  Thank you, your Honor.

18             MR. PRESS:  A little.

19             REDIRECT EXAMINATION

20             BY MR. PRESS:

21   Q.    In no particular order.  Remember, the October,

22   Washington, D.C. meetings there was this notion of what, we

23   are going to get an injunction to stop the cram-down.  And

24   you were asked if there is a resolution to that effect from

25   the MEC.

1    A.    Right.

2    Q.    Do you have exhibit 257 in front of you?

3    A.    D or P?

4          MR. PRESS:  D.  I am sorry.

5    Q.    October 31 minutes.

6    A.    October 21?

7    Q.    Yes.

8          MS. RODRIGUEZ:  31.

9    A.    October 31.

10   Q.    Go to page 6, Ms. Young?

11   A.    Okay.

12   Q.    Are you there?

13   A.    No.

14   Q.    You want my --

15   A.    The 21ST, the 31st?

16   Q.    Here.

17   A.    I don't have one.

18   Q.    I have handed you exhibit 257.  If you go to page 6 at

19   the bottom, are you there?

20   A.    Yes.

21   Q.    What is that whereas clause, with can you read that?

22   A.    "Whereas the TWA MEC coordinating with ALPA National

23   legal and independent merger council Roland Wilder planned

24   for the prospect of such an occurrence, and whereas the plan

25   called for a federal court injunctive relief request to

1    prevent AMR/APA imposed seniority integration now, therefore

2    be it resolved ALPA TWA MEC formally requests a written

3    authorization or approval from ALPA to file such a request in

4    federal court."

5    Q.   Okay.  Does that refresh your memory  that yes, we had a

6    resolution to seek that injunction?

7    A.   Yes.

8    Q.   You were shown in the minutes from, those October

9    meetings, where it, where this Mr. Brundage spoke with you?

10   A.   Yes.

11   Q.   And you were shown a quote from the minutes that, where

12   was it, Brundage stated that Don Carty, the president of

13   American, told Senator Bond that if this bill passed he would

14   shut down TWA LLC.  You were shown that quote?

15   A.   Yes.

16   Q.   That if you got your Bond arbitration bill passed, that

17   American Airlines was going to shut down your company?

18   A.   Yes.

19              THE COURT:  What number was that?

20              MR. PRESS:  Exhibit D 88, Judge, page 9.

21   Q.   Now, this notion that American is going to shut down

22   TWA, did that, and that threat was made to Senator Bond.  Did

23   Senator Bond say anything about that to you?

24   A.   He did not.

25   Q.   Other than this Mr. Brundage apparently making

 1    statements like that, did you hear that from anybody else?

 2    A.    No.

 3    Q.    Continue on, you were again shown the next quote from

 4    that, from this Brundage statement.  AMR employees, American

 5    employees, that is, cannot fathom an arbitrated seniority

 6    list.

 7              Are you -- you guys didn't get arbitration, did

 8    you, of your seniority dispute?

 9    A.    We did not, but the mechanics in fact did.

10    Q.    Are you aware of an employee group at TWA who in fact

11    did have an arbitration with their counterparts in American

12    Airlines?

13    A.    I am.

14    Q.    Which group?

15    A.    The mechanics.

16    Q.    How are you aware of that?

17    A.    Because we, as negotiations proceeded for all the

18    groups, we then found out at some point that --

19              MR. FRAM:  Your Honor, I am going to object.  This

20    sounds like hearsay to me.  I don't think there is a

21    foundation of personal knowledge here.

22              THE COURT:  Set a foundation for how she knows what

23    another union got.

24    Q.    How do you know that the mechanics had an arbitration

25    with the mechanics at American Airlines?

1    A.   It was published.

2    Q.   And you read it?

3    A.   Yes.

4             THE COURT:  You say it was published.

5    A.   Yes.  It was made public.

6             THE COURT:  You mean like in newspapers?

7    A.   Yes.

8             THE COURT:  I am going to allow it.  I am going to

9    allow it.

10            MR. PRESS:  Thank you, your Honor.

11            THE COURT:  If you want, if he wants to recross on

12   it, you can deal with it.  I will allow what she said.

13   Q.   The statement from Mr. Brundage that American Airlines

14   can't fathom an arbitration.  That is just wrong, right?

15   A.   Yes.  That is what I thought.

16   Q.   And so his threat about, that Carty went to Senator Bond

17   and said we are going to shut down the airline, what did you

18   think about that?

19   A.   I thought it was a threat.  I thought it was a

20   negotiating ploy.

21   Q.   Jumping back April 2, the MEC meeting?

22            THE COURT:  That is 2001.

23   Q.   2001.  Mr. Fram asked you, he made the statement that

24   there was a collective bargaining agreement on the table.  Is

25   that a truthful statement?

1    A.    I don't remember that to be a truthful statement.

2    Q.    When?

3    A.    I don't remember seeing a collective bargaining.  I

4    don't remember anything --

5              THE COURT:  You mean between TWA LLC and the

6    pilots.

7              THE WITNESS:  Yes, that's correct.  I don't

8    remember, there was no, the substance of that day was about

9    waiving scope.  That was the crucial element that we had to

10   talk about.  Or that or that the, it appeared to become

11   urgent according to the advisors we had to talk about.  I

12   thought we had all week.

13             April 6 was at the end of the week but it seemed

14   to be urgent that day to advisors, and I don't remember a

15   substantive briefing  about exactly what was in the CBA nor

16   do I remember anything about, from advisors about how we

17   could handle modifying the CBA within the 1113 bankruptcy

18   process.

19   Q.    So there bass no collective bargaining agreement on the

20   table that you were voting on?

21   A.    No.

22   Q.    You were shown some minutes, or, yes, of a meeting on

23   March 21, 2001?

24   A.    Yes.

25   Q.    That was exhibit 223?

```
 1    A.    Yes.

 2    Q.    Do you have those in front of you?

 3    A.    March 21?

 4    Q.    Yes.

 5    A.    Yes.

 6    Q.    Before we, you were also shown an agenda for that

 7    meeting that was published, which had a whole list of many of

 8    the same people that were advising on April 2, do you

 9    remember that agenda?

10    A.    Yes.

11    Q.    Is there anything in those minutes, and please look at

12    them carefully --

13              THE COURT: What number is this?

14    Q.    223.  D 223.

15              THE COURT:  Right.

16    Q.    My question,  Ms. Young, is going to be after you looked

17    at the minutes, is there anything in there that reflects that

18    any of those advisors were actually at the meeting?

19    A.    No.

20    Q.    When you have guests like that, advisors, do you usually

21    note that in the minutes?

22    A.    Yes.

23    Q.    And you told, in response to my question, Ms. Young, I

24    asked you, or you testified that the first time that you ever

25    had this big group of advisors all together was on April 2?
```

1    A.   That is the first time I remember having them.

2    Q.   We see this agenda for the March 21 meeting that has

3    pretty much the same group, and my question is, did those

4    people present to you on March 21, in that cluster?

5    A.   No.

6    Q.   It is of course not reflected in the minutes either.

7              MR. PRESS:  That is all the questions I have.

8              THE COURT:  Recross.

9              MR. FRAM:  Quickly.

10             RECROSS EXAMINATION.

11             BY MR. FRAM:

12   Q.   Are you claiming advisors were not there on March 21 and

13   March 22?

14   A.   I am telling you I don't remember them being there.

15   Q.   I am going to hand you what has been marked for

16   identification as defendant's exhibit 400.

17             THE COURT:  D 400.

18             MR. FRAM:  D 400.

19   Q.   Do you recognize this, I am out of copies so I have to

20   stand next to you.  Do you recognize that as a summary that

21   was prepared by the MEC of what we discussed at the meeting

22   on --

23             THE COURT:  That is not previously marked.

24             MR. FRAM:  Correct, your Honor.

25             THE COURT:  D 400.

1          MR. PRESS:  This isn't on your exhibit list either.

2          THE COURT:  It is not on the exhibit list.

3          MR. FRAM:  It is an impeachment document.  D 400.

4    A.   What are you asking?

5    Q.   Do you recognize that as a summary that somebody from

6    the MEC put together with with respect to what happened on,

7    at the meeting on March 21 and March 22?  If you don't, just

8    say you don't?

9    A.   I don't.  I don't remember seeing this.

10   Q.   Okay.  Thank you.

11         MR. FRAM:  Thank you, your Honor.

12         THE COURT:  You are not offering that.

13         MR. FRAM:  Correct.  That is all I have.  Thank

14   you, your Honor.

15         THE COURT:  Okay.  Is there any redirect on that?

16         MR. PRESS:  Of the exhibit not in evidence?  No.

17         THE COURT:  Okay.  Let me make a note, marked for

18   identification.

19         Okay.  I think you can step down.

20          (Witness excused)

21         THE COURT:  Call your next witness.

22         MR. PRESS:  Our next witness is Roland Wilder by

23   video, Judge.  This is a deposition of Mr. Wilder that we

24   took in Washington, DC, and it is lengthy.  But we can start

25   it.

 1          THE COURT:  Can we get at least some of it in

 2    today?

 3          MR. PRESS:  Absolutely.

 4          THE COURT:  Okay.

 5          (Videotape deposition of Roland Wilder commences)

 6          THE COURT:   We are going to stop here.  I will

 7    dismiss the jury for the day and resume tomorrow at 8:30.

 8          Ladies and gentlemen, do not discuss the case among

 9    yourselves.  Keep an open mind until you have heard all the

10    evidence.  Do not discuss the case with your family, friends,

11    loved ones, space aliens, or anybody else you come across

12    during the day.

13          Have a safe trip home, a safe trip in  tomorrow

14    morning and my continued thanks for your participation.  All

15    rise when the jury leaves.

16          (The jury leaves the courtroom.)

17          THE COURT:  I want to put put on the record the

18    pages and lines that were read.  What we have heard so far

19    from Mr. Wilder was taken from the deposition on August 8,

20    2008, is that right.

21          MS. RODRIGUEZ:  Yes.

22          THE COURT:  Page and lines are as follows:  Page 7,

23    line 11  to page 17, line 21.

24          Page 19, line 5, to page 24, line 7.

25          Page 24, line 14 to page 26, line 2.

1          Page 26, line 8, to page 35, line 18.

2          Page 36, line 2, to page 41, line 9.

3          We will resume tomorrow morning with page 42, line

4    5.

5          Now, I have on the transcript a note that somebody

6    scribbled on it, I don't know who, that ALPA objects, I guess

7    starts at line one 58, 18, to line 163, 21.  I also gather

8    that plaintiff now. Consents to removing page 164 line 4 to

9    page 165 line 9.

10          MS. ACCHIONE:  That's correct, your Honor.

11          THE COURT:  Did I get that right?

12          MS. ACCHIONE:  You did.

13          THE COURT:  Okay.  I will rule tomorrow morning

14    around 8:15  be ready at 8:10.  I will rule on 158.  Line 18:

15    To line 163, line 21.  If you folks can work something out,

16    fine with me, but if not I will rule on it.

17          MR. PRESS:  Okay, Judge.

18          THE COURT:  The other item with respect to Mr.

19    Wilder, I already ruled on.  You wondered if I had it but I

20    did find it on the bench.  So I will do that.  I will also

21    begin the process of reviewing the issues relating to the

22    deposition of James Baehler.

23          MS. RODRIGUEZ:  Your Honor, I just have a

24    housekeeping question.

25          THE COURT:  Okay.  Let's keep house.

1          MS. RODRIGUEZ:  With regard to the video

2     transcripts that have been read into the record.  Will you

3     ultimately be making them a court exhibit?

4          THE COURT:  I don't think they are exhibits.  It is

5     testimony.  It has the same force and effect as line

6     testimony.

7          The reason I did what I did about two minutes ago,

8     read those page and line, I want to make sure that the

9     Circuit knows, they won't have it here, this that is part of

10    the record.  And so when you prepare your appendix, if there

11    is an appeal, you will know, can you look back and say that

12    is what was read it and include it in the appendix.  I don't

13    consider that depositions that are video or read into the

14    record are exhibits because that would give them more weight.

15    The jury has exhibits that go into the jury room.  I don't

16    send in all testimony.  I haven't considered them as

17    exhibits.  They are just testimony.  Testimony with the same

18    force and effect as what we are given.

19         MS. RODRIGUEZ:  So on appeal we would then provide

20    those portions of the transcript.

21         THE COURT:  It would be like any other portion of

22    the transcript.  I am sure both sides are familiar with how

23    one, the circuit values, under the Circuit rules one prepares

24    the appendix, I think there is supposed to be a joint

25    appendix and then each side feels that they are not getting

1    fair agreement from the other side, they can put in plenty ,

2    it is called, appellant can put in its suggested additions

3    and then I believe, and then the appellee can put in its

4    portions.

5         I think that is pretty much the way circuits, I

6    think all circuits, encourage joint appendixes, it is very

7    strong encouraging not to have separate appendixes.  I think

8    there is a provision, if something disagrees, but this to me

9    is no different than any other, we are going to have

10   thousands of pages of transcript here already, we are already

11   approaching a thousand pages.  This will be just like any

12   another portion of the transcript.  Again this is why I am

13   going to read into the record at various time the page and

14   lines because I think I have a copy of it here, I can follow

15   it  as it is being read in -- I mean video'd, so I know what

16   is in.  I want to be sure the Circuit knows.  I do it so I am

17   not guessing.

18        MR. PRESS:  Usually the lawyer reading it does it

19   for the record.

20        THE COURT:  That is absolutely correct.

21        MR. PRESS:  Your Honor, tomorrow morning before we

22   begin I, well, for the record I would like to move to

23   introduce the role of the Wilder exhibits en mass so we don't

24   have to break up the video and me run around the courtroom

25   with exhibits like we did the last time.

 1              THE COURT:  If you can work it out, present me with

 2    a list of what you jointly agree, and a list of what you

 3    propse that he doesn't agree to.  I don't know if there are

 4    any.  Just present it.  You don't have to, just give me a

 5    list, make sure the numbers are right, D exhibits or P or J

 6    exhibits, there is confusion on that, the same number, P and

 7    D and J, different exhibits.  But if you give me a list of

 8    what you agree to, and what you don't agree to.  I will rule

 9    on the ones you don't agree to, and I will accept your

10    agreement on the ones you do agree to.

11              MR. PRESS:  Thank you.

12              THE COURT:  Okay.  Anything further?

13              MR. FRAM:  Nothing.  Thank you.

14              THE COURT:  I will see you, let's plan to meet

15    about 8:10  I will come out at 8:10 and deal with some of the

16    issues I am taking care of now, and then the question of

17    exhibits we will get as many of them as we can.  Okay.  Thank

18    you all very much.

19              (Adjourned at 2:00 p.m.)

1

2                    I N D E X.

3

4        SALLY R. YOUNG, SWORN.

5                DIRECT EXAMINATION          P. 5.

6                CROSS EXAMINATION           P. 79.

7                REDIRECT EXAMINATION        P. 168.

8                RECROSS EXAMINATION         P. 175

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25