```
 1                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3         PATRICK BRADY, SALLY YOUNG,
           HOWARD HOLLANDER, THEODORE CASE,
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                             Plaintiffs,
 6                                                VOLUME 5
                  V.                              TRIAL TRANSCRIPT
 7
           AIR LINE PILOTS ASSOCIATION,
 8
                             Defendant.
 9
                                          CAMDEN, NEW JERSEY
10                                        JUNE 14, 2011

11         B E F O R E:   HONORABLE JOSEPH E. IRENAS
                          UNITED STATES DISTRICT JUDGE
12
                         A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                 AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:  STEVEN FRAM, ESQ.
19                 AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH GINSBERG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3                          S/   LYNNE JOHNSON

4                          Lynne Johnson, CSR, CM, CRR
5                          Official Court Reporter

6

7

8

9

10          LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
11   UNITED STATES DISTRICT COURT
P.O. BOX 6822
12   LAWRENCEVILLE, NJ  08648
PHONE:   609 896 1836

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Mr. Press, Mr. Fram, I just wanted to

 2    do one little detail before this morning.  In the Wilder

 3    video, there was an objection by defendants to one small --

 4    well, not that small -- well, a pretty small snippet.  It was

 5    line 158, 18, through line one 65, 9.  I wanted to deal with

 6    that.

 7              MR. PRESS:  One of those issues you dealt with

 8    yesterday, I thought, Judge, Wilder's testimony that he

 9    thought it was a strategic decision on the part of ALPA.

10              THE COURT:  Well, that is, I didn't know, because I

11    was, I found it on my desk and I saw the objection.  I just

12    want to make sure that I am ruling, just -- that lines 158,

13    18, through 158, 23 are okay.  That is the deposition of

14    August 8, 2008.

15              Those are the lines in which you he just reports

16    that Captain Woerth vetoed the litigation strategy.

17              The part about what goes on afterwards, I am

18    striking.

19              MR. KATZ:  Thank you, your Honor.

20              MR. PRESS:  Well --

21              THE COURT:  You want to make an argument to the

22    jury.

23              MR. PRESS:  Mr. Wilder, he testified, he had a

24    conversation with Clay Warner.

25              THE COURT:  Yeah, but he says he has a conversation
```

1    with Clay Warner.  It goes like this:  I remember when you

2    were told that Captain Woerth, the president, vetoed.  Yes.

3    Do you remember what your reaction was?  My reaction?  Well,

4    I mean yes.  I remember asking why.  Do you know Mr. Clay

5    Warner, the frustration, in his memo.

6              The words, whether he word was frustrated or not

7    frustrated is not evidence.

8              It goes on, did that just increase your frustration

9    level?  I think I mean, what I did was call Clay Warner to

10   ask, and Clay indicated that that was the decision.  He

11   wasn't certain precisely what the reason for it was.

12             But it was rather clear to me the decision had to

13   do with the overall strategy of ALPA rather than the

14   technicalities.

15             What, what does he mean it was clear to me?

16             MR. PRESS:  This is a man that dealt with ALPA for

17   30 years.

18             THE COURT:  He dealt with them, he could have dealt

19   with them for a hundred years.  His subjective reaction to

20   what was going on is not evidence.  This has more strategic

21   implications than tactical, or technical implications.  And

22   what the strategic way was not filing this lawsuit going to

23   help the pilots, the TWA pilots, according to the ALPA

24   people.  I don't know.  Nobody told me that.

25             Well, what nobody told him is not evidence.  It is

1    really just testimony by the questioner.

2              I don't know, nobody told me.  Okay, okay.

3              They just told me that this had to do with the

4    overall -- this is a question, not testimony.  They just told

5    you that this has to do with the overall strategy?  I am not

6    trying to put words in your mouth.  Of course that is what is

7    being done.

8              But I am trying to understand your testimony.

9    Well, that was certainly my impression.  It was not my

10   impression that there was any disagreement over the merits of

11   the proposed litigation itself.  Well, he is trying to say it

12   is clear that the litigation had merit.

13             Well, I don't know if it had merit or not.  That is

14   not evidence that it had merit.  It had to do with the

15   overall strategy pursued by ALPA in connection with the

16   dispute.  In other words, an issue that was being resolved

17   above my pay grade.  This was the presidential level.  Okay.

18   Because I think you testified before that it was your belief

19   that Clay Warner was even surprised by their decision.  Do

20   you remember that?

21             You are putting words in his mouth.  I didn't.  I

22   don't know what I said he was surprised.  I said he didn't

23   know the reason for it.  But he confirmed that that was his

24   decision.  Well, I let that in earlier.  I mean, that Clay

25   reported the decision, I have no problem with.

1         But all this business about impression as to what

2   he thinks, or his impression that it had nothing to do with

3   the merits of the litigation, that is not evidence.  It is

4   not evidence that is admissible.

5         There has been testimony in this case -- here is a

6   long question.  And the funny thing is, there is never an

7   answer.  He just proffered the question.  There has been some

8   testimony in the case by MEC members that they were told by

9   Captain Woerth as to why.  And you don't have to accept this

10  as any truth, but I just want to tell you what that testimony

11  was, and have you comment on it.

12        And then there is no answer.  It goes on.  But

13  asking him to list tone what other people say and then

14  comment on what they say, it is not evidence.  It is not

15  facts in the case E okay.  Here is my question.  Assuming

16  that Captain Woerth told the pilots one reason they were not

17  file a lawsuit -- well, the reason is I don't sue other

18  unions.

19        Again, you are just saying assuming that, the

20  theoretical question.

21        MR. PRESS:  There is evidence that statement was

22  made.

23        THE COURT:  That evidence can come in.  But having

24  you ask him to assume that is asking him an experts question,

25  a theoretical question.  And then you try to prove it is

```
 1    untruthful by proving, you say, okay.  I found at this point

 2    in time I can't recall any suit by ALPA against another

 3    organization.  That was his first answer.  Then he says,

 4    okay.  I found one.  And that is you talking.  That is not,

 5    that is you testifying, not him.  His answer is I don't

 6    remember any.

 7              MR. PRESS:  But I refreshed his his memory, Judge.

 8              THE COURT:  I found one.  You said, okay.  I found

 9    one.  ALPA in connection with the United pilots effort to buy

10    the airlines.

11              Number one, that lawsuit was a totally different

12    context.  I mean, that suit was a context that had, I mean,

13    that is when the pilots of America -- not America, of United

14    thought they could buy the airline and there was a big effort

15    made, I don't know how big it was but there was an effort

16    made that the pilots were going to buy the airline.  That is

17    a totally, that is, that is a suit that is a million years

18    beyond what we are talking about in this case, a suit on

19    behalf of your members to get a benefit for your members.  Do

20    you remember when that happened?

21              I do.  ALPA sued IAM.  That is you again

22    testifying.  You are refreshing recollection by, you are not

23    refreshing recollection.  You are telling him.  Were you

24    aware of that?  Wilder: Yes, I am.  Thank you.  Okay.

25    Having refreshed your memory with that one, can you think of
```

1    any others?

2         Then his answer was, with later disputes, I think

3    he means after this one.  That is it.  And then I agreed.  I

4    think that is massively confusing to a jury.  Bringing in two

5    lawsuits that -- well, one you know nothing about.  The suit

6    against IAM, I don't know what it was.  The one against

7    United, I am a little familiar with from the newspapers, that

8    was a different, a totally different context.  And I find

9    none of this evidential.  I mean, to try to plant seed with

10   the jury that are concedes with the jury that are confusing

11   and that, I don't think, evidential.  That is my ruling.  You

12   want to argue I will let you ruling.

13        MR. PRESS:  I understand your ruling.  You have

14   read the testimony.  I am confident I won't get you to change

15   your mind so we understand your ruling.  If we could have a

16   few minutes to edit the video.

17        THE COURT:  That is why I wanted to come out a few

18   minutes early.  Again, let me just for the record put, I am

19   leaving in, the objection started at 158, 18.  I am leaving

20   in 158, 18, to 158, 23.  I want them to be allowed to say we

21   don't sue -- or know that he turned it down.  And I am taking

22   out one 59, 23, all the way through 165, 9.  Page 165, line

23   9.

24        MR. KATZ:  Judge Irenas, while they are editing

25   that tape from is one other issue with regard to Roland

```
 1    Wilder's deposition video.

 2              THE COURT:  What is that?

 3              MR. KATZ:  We have counter designated about ten

 4    pages of his transcript, and the plaintiffs have declined to

 5    include those pages where with the video they are showing.

 6    We believe in all fairness that it is important for the jury

 7    to see now the parts of Wilder's deposition where I was

 8    asking him questions about the same subject matter that they

 9    examined him about.  I have a copy --

10              THE COURT:  Well, I am not going to allow it if it

11    relates to the part that I have struck because that would be

12    unfair.

13              MR. KATZ:  No, it doesn't, your Honor.  I will hand

14    up to the Court.

15              THE COURT:  I have the designations.

16              MR. KATZ:  These are the additional parts.  They

17    are not in the transcript of what the plaintiffs plan to show

18    because they left them out.

19              THE COURT:  Was this in the -- where, was this in

20    the final pretrial?

21              MR. KATZ:  It was in the final pretrial order.  It

22    is only part of what we counter designated.

23              THE COURT:  Have you seen it?

24              MR. PRESS:  Yes, it is basically Katz's cross

25    examination of Mr. Wilder.
```

1          MR. KATZ:  He says in there things like, well, I

2     will let the Court read what it says.

3          THE COURT:  What is your position on that?

4          MR. PRESS:  Your Honor, I understand that you are

5     going to allow that at some point in the trial.  If it comes

6     in now we would, we had some redirect, I would ask that that

7     be allowed as well.

8          MR. KATZ:  We don't object to that.

9          THE COURT:  I agree with you.

10         MR. PRESS:  And Judge, I wanted an instruction from

11    you, if you will allow it, to the jury before the cross is

12    played that this is ALPA's evidence, not ours.

13         THE COURT:  Well, no.  You never say that.  Any

14    cross examination, I don't say this side or the other side is

15    evidence.

16         MR. PRESS:  They haven't heard from Mr. Katz yet.

17    When they hear his voice they won't even know who he is.

18         THE COURT:  Well, cross examination, you also, the

19    cross examiner is always trying to bring his side of the case

20    out.  That is the nature of the trial.

21         MR. PRESS:  Judge, I understand that.  I just want

22    to eliminate any potential confusion with the jury.  Why are

23    the plaintiffs putting on this evidence?

24         THE COURT:  They are not putting on the evidence.

25    It is cross examination.

```
 1              MS. RODRIGUEZ:  I think that is Press's point, just
 2      in the normal testimony there is a pause and then it is clear
 3      that the podium is then turned over to the other side for
 4      cross examination.  So we just thought that there needed to
 5      be some designation within the --
 6              THE COURT:  I think you are probably right on that.
 7              MR. KATZ:  Stop the tape and announce that this is
 8      cross examination by ALPA's counsel.
 9              THE COURT:  I agree with you.
10              MS. RODRIGUEZ:  That is all we are asking for.
11              THE COURT:  Oh, I agree with that.
12              MR. PRESS:  Okay.
13              THE COURT:  But it is not him putting his evidence
14      on.  It is cross examination.
15              This cross doesn't appear to be related to the
16      areas I struck.
17              MR. KATZ:  No, your Honor.
18              THE COURT:  That I wouldn't allow.
19              Okay.  I will allow it.
20              MR. KATZ:  Thank you, Judge.
21              THE COURT:  With the caveat --
22              MR. KATZ:  That we will tell them it is cross
23      examination.
24              THE COURT:  Yes, we will tell the jury it is cross
25      examination, making sure they are not confused by some of the
```

```
 1    other things in your case.  I think it is proper.

 2              MR. PRESS:  Okay.

 3              THE COURT:  Now, you also had, there was another

 4    day, you had the August 11 -- not August.  The 2011

 5    testimony.

 6              MR. KATZ:  They tacked that on to the tape.  It is

 7    not going to show the transcript, it will show the live

 8    video.

 9              MS. ACCHIONE:  It will show the live video.  We

10    don't have the ability to sync up the exhibits.

11              MR. FRAM:  That is fine as long the exhibits go

12    into evidence.

13              MS. ACCHIONE:  We don't have objection.

14              THE COURT:  Apparently Mr. Press is going to

15    deliver a bunch of exhibits.

16              MR. PRESS:  Yes.

17              THE COURT:  And they were agreed to, I gather.

18              MR. PRESS:  Yes.

19              MR. FRAM:  I hope he has cones of ours.  I gave

20    them one copy.  Do you have a second copy?

21              MR. PRESS:  I don't have yours.

22              MS. ACCHIONE:  I have them.

23              THE COURT:  Read me the numbers.

24              MR. PRESS:  P 117.  J 118.

25              THE COURT:  P 117.
```

```
1              MR. PRESS:  I have a list like you asked me to
2    provide.  Would you rather have it done that way?
3              THE COURT:  I want to make sure I have them.
4              MR. PRESS:  Here is yours.
5              THE COURT:  Okay.
6              THE COURT:  Let me read them for the record.  Then
7    I am admitting them in evidence.  P 117.  J 118, P 120.   P
8    121.  P 123.  J 124.  J 125.  P 126.  J  127.  P 128.  P 129.
9    J 130.  P 131.  P 133.  P 134.  And J 135.  They are all
10   without objection in evidence.
11             MR. FRAM:  Two other ones that counsel put up on
12   the bench, your Honor, the ones that --
13             THE COURT:  Tell me what they are.
14             MR. FRAM:  D 176.
15             THE COURT:  These will be on cross.
16             MR. FRAM:  These are the supplemental deposition,
17   your Honor.
18             THE COURT:  It is really cross, it --
19             MR. FRAM:  Yes, that is fair.  D what.
20             MR. FRAM:  D 176, and D 236.
21             THE COURT:  236?
22             MR. FRAM:  Yes, your Honor.
23             THE COURT:  Mr. Press, any objection to those?
24             MR. PRESS:  No, your Honor.
25             THE COURT:  Okay.  D 176, and 236 are in evidence.
```

```
 1              MR. FRAM:  Thank you, your Honor.

 2              MR. KATZ:  Judge Irenas, I wanted to give the Court

 3    a warning shot on one other.

 4              THE COURT:  A what?

 5              MR. KATZ:  A warning shot.

 6              THE COURT:  You are shooting at me?

 7              MR. KATZ:  No, another direction.

 8              THE COURT:  Why would you shoot at me?

 9              MR. KATZ:  Because, a heads-up.

10              THE COURT:  Oh, a heads up.

11              MR. KATZ:  There is coming soon.

12               THE COURT:  Something over the bow.

13              MR. KATZ:  The plaintiffs have told us yesterday

14    they plan to show tomorrow a deposition videos for Tom

15    Ratsberg, Duane Woerth, John Clark and J Randolph Babbitt.

16    We have objections and counter designations.  We will deliver

17    to the Court during the day.

18              THE COURT:  To all of them?

19              MR. KATZ:  To all of them.  And we have been unable

20    to resolve them by discussion with the plaintiffs.  We will

21    have during the day a transcript of the portion --

22              THE COURT:  So do you have objections to part of

23    them?

24              MR. KATZ:  To part of them, yes.  Just the

25    designated lines, pages and lines, and we will mark a
```

```
1    transcript of what they plan to show, and provide a

2    transcript of any counter designations that we wish to show

3    in addition to those four people.

4              THE COURT:  Mr. Press, will you let us know the

5    order in which they are being played so I can attack the

6    problem in order.

7              MR. PRESS:  Yes.

8              THE COURT:  So I don't take the one that is last

9    and it turns out I am missing the first.

10             MR. PRESS:  Yes, I am I will do that.

11             THE COURT:  That is tomorrow.

12             MR. KATZ:  That is what the plaintiffs said.

13             THE COURT:  That means Baehler --

14             MS. RODRIGUEZ:  Baehler has been moved to Thursday.

15             THE COURT:  Originally, he --

16             MS. RODRIGUEZ:  He was originally scheduled for

17   tomorrow.

18             THE COURT:  He is now at the back end of that list.

19             MS. RODRIGUEZ:  Yes.

20             THE COURT:  , at some point today give me the list

21   of the order and the materials I am going to receive, and I

22   will deal with them.

23             MR. FRAM:  Your Honor, may I inquire of counsel, is

24   there going to be a live witness tomorrow?

25             MR. PRESS:  Yes.  At least one.  John Clark and
```

```
 1    maybe Matt Comlish.

 2              MR. FRAM:  Thank you.

 3              THE COURT:  Okay.  Can, are we ready to go?

 4              MR. PRESS:  Yes.  Gentlemen?  We will be reading

 5    the brief Schneider excerpts  after Wilder.  We can talk

 6    about that during the break.

 7              THE COURT:  All right.  Let's get Mr. Wilder going.

 8    There is a lot of transcript left.  A lot.

 9              MR. PRESS:  Yes.

10              MR. FRAM:  Couple hours.

11              THE COURT:  I think at least a couple of hours.

12              MR. PRESS:  Will you call a break or should I

13    suggest a time to break?

14              THE COURT:  Well, after an hour, I will leave it to

15    you, if you think you have a place that is logical to break,

16    you will know better than I what from a, presenting a case

17    point of view, where a logical break is so I don't break it

18    up like in the middle of a thought of some kind.  After an

19    hour, you can suggest it.  If you don't, if you go too long I

20    will do it.  But you know your case.  You will know where the

21    logical break point is.

22              MR. PRESS:  Okay.

23              (The jury enters the courtroom.)

24              THE COURT:  Good morning, everybody.

25              Please be seated.  I believe, ladies and gentlemen,
```

1   that Mr. Press is going to resume the video testimony of

2   Roland Wilder.

3            MR. PRESS:  That is true.

4             (Videotape of Roland Wilder continues)

5            MR. PRESS:  Your Honor, this is a good time for a

6   break.

7            THE COURT:  We will take a break.  Sometimes

8   watching the screen is more tiring than live testimony.  We

9   will take a 15-minute break.  It is 25 of 10 now.  We will go

10  until ten of 10.

11            (The jury leaves the courtroom.)

12

13             (Recess.

14

15            (Jury enters the courtroom.)

16            THE COURT:  Mr. Press, you can resume with the

17  video.

18            MR. PRESS:  Thank you, Judge.

19             (Videotape of Roland Wilder, resumes).

20

21            MR. PRESS:  Your Honor, I think we are going to

22  seque into a new kind of topic.

23            I understand there is 40 more minutes of direct

24  testimony before the cross examination begins.

25            THE COURT:  If you think it is a good spot topic

```
1    wise.

2              MR. PRESS:  I do.

3              THE COURT:  Ladies and gentlemen, we will, it has

4    been an hour since the last break.  We will take a 15- minute

5    break.  My watch says ten of 11.  We will break until 11:05.

6              Do not discuss the case amongst yourselves.  Keep

7    an open mind until you have heard all the evidence.

8              (Jury leaves the courtroom.)

9              (Recess)

10

11             (The jury enters the courtroom.)

12             THE COURT:  Mr. Press, you may continue.

13             MR. PRESS:  Thank you, Judge.

14              (Videotape of Roland Wilder continues).

15             MR. PRESS:  Your Honor, that is the end of the

16   direct examination by Mr. Wilder.

17             THE COURT:  I will explain to the jury now.  Okay.

18             MR. PRESS:  Yes, thank you.

19             THE COURT:  Ladies and gentlemen, at the time this

20   video was made, not at the same time, the video was made,

21   there was cross examination by Mr. Fram.

22             MR. FRAM:  By Mr. Katz.

23             THE COURT:  By Mr. Katz, who is co-counsel with Mr.

24   Fram.  He has been fairly quiet so far, but he has been

25   actively participating in the case and he has been co-
```

```
 1    counsel to Mr. Fram.

 2              We are now going to see, again on video, the cross

 3    examination by the defense of this witness.

 4              I want to emphasize to you this is not testimony

 5    being offered by the plaintiff.  This is cross examination,

 6    in the usual fashion we had, if we had a witness here on the

 7    stand, the plaintiff could give direct examination, and then

 8    the defendant would cross examine.  We are doing this, in a

 9    sense the same thing here, but we are doing it through video.

10    Again, it all has the same force and effect, both the direct

11    testimony and the cross, as though given here in court as

12    oral testimony, you treat it just as you would here in court.

13    Give it no more weight, no less weight.

14              MR. PRESS:  Thank you, Judge.

15                 ( Videotape of cross examination by Mr. Katz of

16    Roland Wilder is played)

17              MR. PRESS:  Your Honor, that objection I would like

18    it ruled on.

19              THE COURT:  I am going to allow it.  Go ahead.

20                (Tape continues)

21

22

23              MR. PRESS:  That concludes Katz's cross

24    examination.

25              THE COURT:  That concludes it.
```

1           MR. PRESS:  Yes, sir.  I had a little bit of

2    follow-up examination after that.

3           Forget it.  We are not going to offer the redirect,

4    Judge, of Mr. Wilder.

5           THE COURT:  So you are not offering it.

6           MR. PRESS:  No, I am not going to.

7           THE COURT:  Does that complete Mr. Wilder's

8    testimony.

9           MS. ACCHIONE:  Your Honor, we still have to play

10   the supplemental deposition, that was taken in 2011.

11          THE COURT:  Okay.

12          MR. PRESS:  Again, your Honor, the direct of that

13   deposition taken this year was taken by Mr. Fram.  So if we

14   could have the same instruction to the jury.

15          THE COURT:  Meaning?

16          MR. PRESS:  It is not our evidence.

17          THE COURT:  It is really in the nature of cross

18   examination.

19          MR. PRESS:  Correct.

20          THE COURT:  We are going to hear further there was

21   a further videotape deposition taken of Mr. Wilder three or

22   four months ago, was it three or four months ago.

23          MR. FRAM:  Yes, your Honor.  March.

24          THE COURT:  It is again in the nature of cross

25   examination, it is not being offered by the plaintiff.  It is

```
 1    the nature of what we have here in the courtroom, cross
 2    examination.  So you can proceed with that.
 3                 (Videotape of Roland Wilder is played)
 4
 5              MR. FRAM:  No, no.  Stop.  We haven't heard the
 6    rest of the testimony.
 7              THE COURT: You dropped a whole lot of testimony.
 8    You dropped it.  You did that the last time by the way.
 9              MR. FRAM:  Let's do this.  Can we play --
10              MR. PRESS:  This is not our technical issue.
11              THE COURT:  I didn't say it was  I am not trying to
12    blame anybody.  I am trying to fix it.
13              MR. FRAM:  Can we play the tape through, what we
14    agreed to play without trying to switch the documents.  Then
15    just show the document at the end.  I think that will solve
16    our problem.  Play through the rest of my exam and then go
17    directly into the additional examination by Mr. Press.
18    Without flipping through the documents.
19                 (Off-the-record discussion)
20              MR. FRAM:  Do your best.
21                 (Videotape continues).
22
23              THE COURT:  Are we switch switching to redirect
24    now?
25              MR. PRESS:  Yes.
```

1              THE COURT:  I want to tell the jury.

2              This completed the cross examination of Mr. Fram.

3              As you know, in our procedure, after cross we

4    usually give the other side a chance for what we call

5    redirect, to elicit testimony on their own.  So what you hear

6    from this point is Mr. Press's questions on redirect

7    examination.  This is the plaintiff offering this witness.

8              MR. PRESS:  Thank you, Judge.

9              (Videotape continues)

10             Okay.

11             MR. PRESS:  That concludes Mr. Wilder's testimony,

12   Judge.

13             THE COURT:  I think we ought to take a break.  I

14   want to take the technical -- let us take until quarter to

15   one, twelve 45 we will return.

16             (The jury leaves the courtroom.)

17             THE COURT:  Don't discuss the case among

18   yourselves.  Keep an open mind until you have heard all the

19   evidence.

20             (The jury leaves the courtroom.)

21             THE COURT:  I hate to bore you but I want to put on

22   the record the pages and lines that were read.  They are part

23   of the transcript.  If there is an appeal I want there to be

24   a memorialization of what had been played in court.  I had

25   the transcript so I was following it and noting it as it

1    came.

2            This is going to be boring but I have to take a

3    couple of minutes.

4            With respect to the deposition of August 8, 2008, I

5    am, we picked up today starting at page 42, line 5, to page

6    53, line 12.  And continued with page 53, line 15 to page 72,

7    line 16.  We went to page 73, line 7, to page 78, line 11.

8    We went then to page 82, line 6, to page 84, line 7.

9            We went to page 85, line 14 -- line 4, to page 91,

10   line 17.  Then we went to page 92, 10, to page 93, line 6.

11           We then went to page 94, line 3, page 94, line 13.

12   We then went to page 95, line 7, to page 97, line 24.

13           Then went to page 98, line 1, to page 1 oh one line

14   5.

15           Went to 101 line 8 to 102, line 9.  Then we went to

16   104 line 5 to page 105 line 15.  Then to 106 line 4 to page

17   108, line 9.  We went to page 108, line 11, to 110, line 15.

18           We went to page 111, line 19 to page 113, line 8.

19   Went to page 115, line 22 to page 121, line 13.  Then went to

20   page 122, line 9, to page 123, line 19.  Then went to page

21   125, line 16 to page 127, one.  We then went to page 127, 18,

22   to page 138, line 23.

23           Then went to page 139, line 5 to page 140, line 22.

24   Then to page 141 line 2 to page 145, line 1.

25           We then went to page 145 line 12 to 146 line 22.

1    We then went to page 146 line 24 to page 153, line 15.

2          We then went to page 155 line 7 to page 158, line

3    23.

4          Went to page 165, line 13 to page 166, line 4.  We

5    then went to page 167, line 7, to page 168, line 13.

6          We then went to page 179, line 21, to page 182,

7    line 23.  Then went to page 183, line 1, to page 183, line

8    24.  We then went from page 184 line 3 to one 84, line 12.

9    And then the last segment of the direct was page 187 line 22

10   to page 188, line 15.

11         On that same deposition the cross examination was

12   Mr. Katz, was page 198, line 22 to page 212, line 10.

13         Now, in the deposition of March 21, 2011, there was

14   cross examination by Mr. Fram from page 4, line 1, to page

15   17, line 5.  There was redirect examination by Mr. Press from

16   page 20, line 22, to page 22, line 11.

17         Sorry to bore you with that, but I think the record

18   ought to be clear what was said here in the courtroom and

19   what the jury heard.  So.

20         MR. PRESS:  Thank you, your Honor.

21         THE COURT:  I am sorry to subject you to that.  I

22   will see you all at quarter to one.  What is next.

23         MR. PRESS:  Howard Hollander.

24         MR. PRESS:  A short reading.

25         MS. RODRIGUEZ:  Really short.  Five minutes.

```
 1              THE COURT:  Really short.

 2              MS. RODRIGUEZ:  Seven minutes, tops.

 3              THE COURT:  Who is going to do the reading.

 4              MS. RODRIGUEZ:  I am going to ask the questions and

 5   Mr. Jacobson is going to ask the questions.

 6              THE COURT:  Any members of Actors Equity?

 7              MS. RODRIGUEZ:  No.

 8              THE COURT:  Is there any cross on that.

 9              MR. KATZ:  I will ask a few questions, Judge.  Same

10   witness.

11              THE COURT:  But I mean who is going to read the it.

12              MR. KATZ:  I will read the questions that I asked

13   at the deposition.

14              MS. RODRIGUEZ:  Mr. Jacobson can still provide the

15   answers.

16              THE COURT:  You will still play the role of the

17   witness.

18              MR. JACOBSON:  Correct.

19              THE COURT:  All right.  I will see you all in 15

20   minutes.

21              (Recess)

22              THE COURT:  I understand, Ms. Rodriguez, there is

23   an objection of some kind you want me to rule on before the

24   jury comes out.

25              MS. RODRIGUEZ:  There is an evidentiary objection.
```

```
 1    This is the document, P-435.  The witness on the stand --

 2              THE COURT:  This relates to the reading we are

 3    going to do.

 4              MS. RODRIGUEZ:  Yes.

 5              THE COURT:  This is a document not yet in evidence.

 6              MS. RODRIGUEZ:  That's correct.

 7              THE COURT:  Okay.  Tell me what the issue is.

 8              MS. RODRIGUEZ:  The witness on the stand is Mr.

 9    Reifsnyder who identifies the document.  He recognize it is

10    as an email that is part of a union bulletin board, and

11    recognizes the electronic signature on it as his.  We are

12    requesting Mr. Reifsnyder about the portion of the email

13    towards the bottom, that says, Duane.

14              THE COURT:  Let's start out.  Who is the email from

15    and to?

16              MS. RODRIGUEZ:  From Robert Reifsnyder.

17              THE COURT:  That is not what it says.

18              MS. RODRIGUEZ:  Robert Reifsnyder.

19              THE COURT:  I see it, this is a previous message.

20    He is sending it to  --

21              MS. RODRIGUEZ:  He is sending it to Allied pilots,

22    I believe.  He testifies.

23              THE COURT:  Allied?

24              MS. RODRIGUEZ:  Allied.

25              THE COURT:  APA.
```

```
1              MS. RODRIGUEZ:  APA.

2              THE COURT:  And the subject, ALPA won't take us.

3              MR. KATZ:  Another email, your Honor, it says he is

4    sending it to Robert Johnson, Jr..

5              THE COURT:  That is a different, that is the

6    original, this is normally when you are putting the history,

7    you have, it says original message.

8              MR. KATZ:  That is the part Ms. Rodriguez read to

9    Mr. Reifsnyder during his deposition.

10             THE COURT:  Who is there Johnson.

11             MS. RODRIGUEZ:  I don't know who Mr. Johnson is.

12             THE COURT:  You don't know.  You have no idea who

13   is.

14             MS. RODRIGUEZ:  No.

15             THE COURT:  Anybody know who is he?

16             MR. KATZ:  Don't know.

17             THE COURT:  Somebody waving in the back, I be he

18   can get an answer.

19             MS. RODRIGUEZ:  He is a  American pilot.

20             THE COURT:  Just a American pilot.  Okay.  And who

21   is Reifsnyder.

22             MS. RODRIGUEZ:  Mr. Reifsnyder is also a American

23   pilot.  And a member of APA.

24             THE COURT:  So Bob, this is, Bob, why I disagree

25   with many of the documents, either I can see the rationale
```

```
 1   for your argument.  Generally I can see the rationale for

 2   your argument.  Here I can't.  Do you think, it, you you

 3   think he decides to keep $15,000 out of ALPA.  It goes on

 4   about the dispute and the Ozark merger, specificcally ignored

 5   merger policy.  Duane Woerth stood in front of the APA, told

 6   us the TWA pilots to get real on the aspirations of the

 7   seniority.  Pandering?  Maybe.  The kind of talk it seems to

 8   he has any idea he might have on the seniority integration.

 9            What is this being offered for?

10            MS. RODRIGUEZ:  It is not being offered for the

11   truth of the matter.  The document was shown to Mr.

12   Reifsnyder during his five-minute deposition, and he

13   identified it as an email that he sent as part of, that is

14   part of a union bulletin board, and owe on.

15            THE COURT:  Where do we get this union bulletin

16   board business?  I mean, something, is this posted for all

17   American pilots.

18            MS. RODRIGUEZ:  It was posted for American pilots

19   to see.  He testifies as to that, your Honor.  It is a place

20   for --

21            THE COURT:  What contested fact in this case is

22   this being offered proof of.

23            MS. RODRIGUEZ:  It is offered for Mr. Reifsnyder

24   wrote the email to reflect that Duane Woerth came to the APA,

25   and said it is time for the TWA --
```

```
1              THE COURT:  It is offered for the truth of that.

2              MS. RODRIGUEZ:  No.

3              MR. KATZ:  That is what they are offering it for.

4              THE COURT:  If you are offering it to try to get

5    something Duane Woerth said in front of a group, you are

6    offering it for the truth of the matter.

7              MR. KATZ:  That's correct.

8              MS. RODRIGUEZ:  And Duane Woerth is a party.

9              THE COURT:  First of all, there is going to be

10   plenty of proof, I believe, that what, the get real comment.

11   This is not the only proof of the get real.

12             MR. KATZ:  This is only their best proof.

13             THE COURT:  Don't know about best proof.  I heard

14   it.  I have seen it in stuff I reviewed.

15             MS. RODRIGUEZ:  This email was circulated to, was

16   also circulated to members of the TWA pilots as well.  I mean

17   it had legs and it found its way into other people's

18   mailboxes.  But Mr. Reifsnyder was the scrivener, if you

19   will, of the email.

20             MR. KATZ:  Double and triple hearsay.

21             THE COURT:  Then you are trying to prove that Duane

22   Woerth stood up in front of an APA group.

23             MR. JACOBSON:  Board of directors.

24             THE COURT:  BOD, board of directors, right.  And

25   said that he had told the TWA pilots to get real.  That is
```

1    the fact you want to prove.

2              MS. RODRIGUEZ:  Yes.

3              THE COURT:  Mr. Jacobson.

4              MR. JACOBSON:  Your Honor.

5              THE COURT:  You leaped up.

6              MR. JACOBSON:  We don't want to prove the truth

7    that he told the TWA pilots to get real.  We want to prove

8    that he told the APA that he told the, to get real.

9              THE COURT:  I understand.  I understand that.  I

10   understand there is a very fine distinction there.  You want

11   to show he was pandering in effect to the APA pilots.  But

12   this, why is this direct testimony of that?  Bob Johnson is

13   the one who apparently saw this.

14             MS. RODRIGUEZ:  No, Robert Reifsnyder sent it.

15             THE COURT:  He sent the email, but Bob -- okay.  He

16   sent the email.

17             MR. PRESS:  Your Honor, if I may.

18             THE COURT:  So the fact that he said it, that is

19   the truth of it, and he is not in court.  You can't cross

20   examine that he used those words, is that what you said, how

21   did you say it.  I mean, if somebody got up and said I was in

22   the room, got on the stand and said I heard, I was, I

23   attended the meeting of the American pilots, and I heard

24   Duane Woerth address us, and he got up and said, quote, this

25   quote here.  That is direct evidence.

```
1              MR. PRESS:  That is Mr. Reifsnyder's testimony,

2    that he was at the meeting and he made that post.

3              THE COURT:  I understand.  So what is wrong with

4    that?

5              MR. KATZ:  The witness says he doesn't remember --

6              THE COURT:  Is Reifsnyder --

7              MS. RODRIGUEZ:  Mr. Reifsnyder is the one whose

8    deposition transcript we have and he says, and, do you

9    recognize this document?  Yes.  Can you tell me what it is?

10   It looks like an email, that is an email of a post that I

11   made on a union bulletin board.  And is that bulletin board

12   refer to as a challenge and response bulletin board.

13             "ANSWER:  Yes.  And you tell me what the purpose of

14   the challenge and response bulletin board is?  It is for

15   pilots to share ideas, comments --

16             THE COURT:  If Reifsnyder, this, if is, because he

17   is writing to Johnson, if Reifsnyder's direct testimony is

18   that I was present, you know, when Duane Woerth got up, and

19   said, was quoted here, and I agree with you, that question,

20   it is not a question that I it is really true that he said

21   that to the TWA pilots, what is relevant is that he told it

22   to the American pilots what that he said it.

23             And I agree with that.  Now, if somebody wants an

24   instruction to the jury on that point, that it is not for the

25   fact that he really said it to the TWA pilots but that he did
```

```
 1    say, used that testimony, I will give that clarifying

 2    instruction.

 3            MS. RODRIGUEZ:  Your Honor, I will raise the point

 4    to save Mr. Katz the trouble of doing it.  What he does say

 5    was --

 6            THE COURT:  He doesn't want you to make his

 7    arguments for him.

 8            MR. KATZ:  With the them three of them talking

 9    about this, maybe I could be permitted to say a word.

10            THE COURT:  I will give you time.

11            MR. KATZ:  You won't suffer from an undelivered

12    argument.

13            MR. KATZ:  Mr. Reifsnyder says he doesn't remember

14    what Mr. Worth said at the April 5, 2001 board of directors

15    meeting.  He doesn't remember --

16            THE COURT:  Who says that.

17            MR. KATZ:  The witness, Reifsnyder.

18            MS. RODRIGUEZ:  What he says, your Honor, is I show

19    him the document.  He recognizes it as his document, his

20    email.  He identifies it as his email.

21            I said do you recall writing this.  He said not

22    specifically.

23            Did you attend the APA board of directors meeting

24    on April 1, I mean, I am sorry, April 5, 2011?

25            Yes.
```

1          Do you recall whether or not Duane Woerth attended

2    the meeting?

3          I do recall, he did attend.  Yes.

4          And Duane Woerth was the president of the Air Line

5    Pilots Association.  Yes.

6          Did Mr. Woerth speak at the APA board meeting?

7    Yes.  Do you recall Mr. Woerth making a statement concerning

8    the TWA pilots and he says not specifically, but I have no

9    reason to believe, I mean I wrote this email and I don't have

10   any reason to believe that he didn't from what I wrote here.

11          THE COURT:  What is the date of the email?

12          MR. PRESS:  Contemporaneous.

13          MR. KATZ:  April 17.

14          THE COURT:  I am sorry.  I don't see the date.

15          MR. JACOBSON:  April 17, 2001, your Honor.

16          THE COURT:  So it is not immediately

17   contemporaneous but it is very.

18          MS. RODRIGUEZ:  In the same, in the ballpark.

19          THE COURT:  If it is not present recollection

20   recorded it is past recollection recorded.  And it is

21   recorded just days, something he wrote just days.  I am going

22   to admit that.

23          MR. KATZ:  Your Honor --

24          THE COURT:  Go ahead.

25          MR. KATZ:  803 (5) on recorded recollection says --

1          THE COURT:  Let me get it out, please.  803 (5).

2          MR. KATZ:  Yes, sir.

3          THE COURT:  Just a minute.  Let me get it.

4          THE COURT:  I have it.  Recorded recollection.

5          MR. KATZ:  Second sentence toward the even end of

6    the paragraph says for a recorded recollection the memorandum

7    or record may be read into evidence but may not itself be

8    received as an exhibit, unless offered by an adverse party.

9    We are not offering it.  We are objecting to it.  We have

10   objected to it in the pretrial order.  So while it may be

11   read into the record, it may not be received as an exhibit.

12         THE COURT:  Okay.  But that is, I don't think the

13   plaintiff is objecting to that.  It just won't be an exhibit

14   that goes to the jury.

15         MR. KATZ:  The plaintiffs are asking for it to be

16   received in evidence and go to the jury.

17         THE COURT:  How about withdrawing that?

18         MR. PRESS:  Withdrawn.

19         THE COURT:  See?  They are so accommodating.  I

20   just utter the word withdrawn and he withdraws.

21         MR. KATZ:  He didn't say that when I asked him.

22         THE COURT:  You must not have a black robe on.

23         Just like, it is just like an airline captain.  He

24   has gold bars here, gold bars there, we know he is a captain.

25   So I don't have gold bars but I have a shoddy, shabby robe.

1    You know, when my former partner 20 years ago sent me this

2    robe as a gift, I opened it up, and it said, there is a

3    little printed note that said we hope that you and the other

4    members of the choir will get great use out of it.

5            So what can I tell you.

6            All right.  I am going to let it in, under 803 (5).

7    I think it is close enough in time to be recorded, a recorded

8    recollection under circumstances that has, you know, the ring

9    of truth.

10           But I agree with Mr. Katz and Mr. Press apparently

11   agrees, too, that the document itself will not be an exhibit,

12   will not go to the jury.  You can refer to the testimony like

13   any other testimony.

14           MR. JACOBSON:  Your Honor, when in the course of

15   reciting the testimony with can I read in that email then.

16   Because he doesn't read it in.  He identifies it, talks about

17   it generally but it is not actually read in his deposition.

18           MS. RODRIGUEZ:  Part of it is.

19           MR. KATZ:  I think that we are stuck with whatever

20   the transcript shows.  We can't make up things that didn't

21   happen.

22           MR. JACOBSON:  The document happened.  We can read

23   the document.  It is just that it can't be in evidence as an

24   exhibit.  I want to know when I should read the document.

25           THE COURT:  It is a technical matter.  If he was

```
1    here, you know, you would just, and he gave exactly the same

2    testimony we talked about, which, this is my document but I

3    was there, I heard Captain Woerth.  But you know, I don't --

4    I sitting here today ten years later don't remember these

5    exact words.  I would let him read it in.

6              MR. JACOBSON:  May I read it in at the close of Ms.

7    Rodriguez's questions and before the cross examination.

8              MS. RODRIGUEZ:  It is --

9              THE COURT:  What are you saying, Ms. Rodriguez.

10             MS. RODRIGUEZ:  It is close enough to be here.

11             MR. JACOBSON:  It is not really in there, no.

12             MS. RODRIGUEZ:  Once to direct your attention to

13   the bottom third of the airline, the line that begins.  --

14             THE COURT:  Don't mumble.  I have lots of thread of

15   what you were saying.

16             MS. RODRIGUEZ:  Mr. Jacobson wants to read it in at

17   the end of his testimony.

18             THE COURT:  What is in the testimony that we have

19   now?

20             MR. JACOBSON:  The phrase "get real" but not the

21   full sentence.

22             MR. KATZ:  Ms. Rodriguez poses a question.  She

23   says I want to direct your attention to the bottom third of

24   the email, the line that begins Duane Woerth stood in front

25   of the APA and the BOD, board of directors, and told us that
```

```
1    he had told the TWA pilots to get real on their aspirations

2    of the seniority merge, pandering, maybe, but hardly the kind

3    of talk did that would seem to counsel against any ideas we

4    might have seniority integration.

5              THE COURT:  So it is in the testimony.  Because the

6    other parts of this, Mr. Jacobson, the other parts I am not

7    sure are admissible.

8              MR. JACOBSON:  Okay.  What is a recollection.  That

9    is a recollection recorded.  When he says, gives his opinion

10   as to what ALPA National would do, that is not a recollection

11   recorded.  That is his opinion.  I don't know if that is

12   admissible particularly.

13             MR. KATZ:  His description of TWA and Ozark.

14             THE COURT:  I don't want that, the jury shouldn't

15   have to consider what the TWA and Ozark merger was all about

16   or what the issue was in that case or how that issue was

17   resolved.

18             MR. KATZ:  We think we should stick with the

19   transcript, your Honor.

20             MR. JACOBSON:  I am persuaded.

21             THE COURT:  I think that, I wanted that line in,

22   but apparently it is in.  So I am going to let it go just

23   like it is.

24             MR. KATZ:  Thank you, your Honor.

25             THE COURT:  I will I am allowing it in and I accept
```

1    Katz's objection now agreed to by Mr. Press.  You can't get

2    the document in.

3              And by the way, the fact that there are owe many

4    other things in here that are not admissible, I thought it, I

5    would send it in on a redacted basis or something but I think

6    with the rule says you don't introduce the document, that

7    will cover it.  I think whoever took the deposition did it

8    right, and got it in.  And we will go that way.

9              MR. JACOBSON:  All right.

10             THE COURT:  Okay.

11             MS. RODRIGUEZ:  Thank you, your Honor.  Then we are

12   ready.

13             THE COURT:  We are ready.

14             MS. RODRIGUEZ:  Your Honor, are you going to

15   instruct the jury, I am going to have Mr. Jacob sit in the

16   witness box.

17             THE COURT:  I am going to tell them that the

18   plaintiff is offering up some testimony, Robert Reifsnyder.

19             MS. RODRIGUEZ:  Yes.

20             THE COURT:  Robert Reifsnyder, that his deposition

21   was not video'd.  They are used to videos now, it was not

22   video'd so we are going to read it and I am going to explain

23   that Mr. Jacobson is going to play the role of the witness.

24   And the lawyers will play themselves.  For the direct

25   examination of, and the cross examination.

```
 1              MS. RODRIGUEZ:  Thank you.

 2              THE COURT:  Okay.

 3              THE COURT:  Does the defendant want an explanation

 4   of the fine points of the hearsay rule?  I would think they

 5   wouldn't, but.

 6              MR. FRAM:  With respect to this issue, your Honor?

 7              THE COURT:  Just the issue that it is not for the

 8   fact that he really said it.  Before the TWA pilots, as

 9   opposed to the American.

10              MR. FRAM:  I don't think so, your Honor.

11              THE COURT:  You okay.

12               (Jury enters the courtroom)

13              THE COURT:  Ladies and gentlemen, I am sorry for

14   the short delay.  We had a legal matter we had to take care

15   of.  It eight up a few minutes.

16              Now, ladies and gentlemen, the plaintiff is going

17   to be offering some testimony of somebody by the name of

18   Robert Reifsnyder.  His deposition was taken and it is going

19   to be offered in the form of deposition testimony.  But this

20   testimony was not videotaped.  In other words, it was taken

21   by a court reporter like our fine court reporter here who is

22   taking it, but all we have now is a transcript.  We don't

23   have a video screen to show you.  So we are going to have Mr.

24   Jacobson, the good-looking fellow back there, sitting in,

25   raise your hand, if you would, he is going to play Mr.
```

1    Reifsnyder.  He will get on the stand and be Mr. Reifsnyder.

2    The lawyers will be themselves.  The lawyer who took the

3    deposition, was it you, Ms. Rodriguez.

4            MS. RODRIGUEZ:  Yes, your Honor.

5            THE COURT:  Ms. Rodriguez will be Ms. Rodriguez,

6    and then the cross was done by Mr. Katz.

7            MR. KATZ:  That's correct, your Honor.

8            THE COURT:  And Mr. Katz will play himself doing

9    the cross.  Okay.  But again, it has the same force and

10   effect as testimony under oath, and has the same force and

11   effect as if it were given right here in the courtroom by Mr.

12   Reifsnyder.

13           Okay.  So you may proceed.

14           Mr. Reifsnyder.

15           MS. RODRIGUEZ:  Mr. Reifsnyder, take the stand.

16           (DEPOSITION TESTIMONY OF ROBERT REIFSNYDER READ AS

17   FOLLOWS).

18             (EXAMINATION BY MS. RODRIGUEZ)

19           THE COURT:  You are sworn.

20   Q.   Good evening, Mr. Reifsnyder.  My name is Lisa

21   Rodriguez.  I am an attorney representing the plaintiffs in

22   an action against the Air Line Pilots Association, ALPA, and

23   I appreciate the time you are taking tonight to sit for this

24   deposition.

25             And I will be brief and take as little time, as

```
 1    little of your time as possible.  Can you please state your
 2    name for the record?
 3    A.    Robert Harlan Reifsnyder, Jr..
 4    Q.    And Mr. Reifsnyder, are you a pilot for American
 5    Airlines?
 6    A.    I am.
 7    Q.    Are you also a member of ALPA?  I am sorry.  Are you
 8    also a member of the APA?
 9    A.    Yes.
10    Q.    And how long have you been a member of the APA?
11    A.    17 and one half years.
12    Q.    Are you a member of APA's board of directors?
13    A.    No.
14    Q.    I am sorry?
15    A.    No. I am not.
16    Q.    Have you ever been a member of the board of directors?
17    A.    No.
18    Q.    Okay.  The court reporter is going to hand you a
19    document that has been marked.  Do you have that document?
20    A.    I do.
21    Q.    And do you recognize this document?
22    A.    Yes.
23    Q.    Can you tell me what it is?
24    A.    It looks like an email, that is an email of a post that
25    I made on a union bulletin board.
```

1   Q.   And is that bulletin board referred to as a challenge

2   and response bulletin board?

3   A.   Yes.

4   Q.   Can you tell me what the purpose of the challenge and

5   response bulletin board is?

6   A.   It is for pilots to share ideas, comments, about

7   airline, union, and other stuff, that may not have anything

8   to do with any of those.

9   Q.   Okay.  And I want to direct your attention to the bottom

10  third of the email.  To the line that begins, Duane Woerth

11  stood in front of the APA, and it says BOD, board of

12  directors, and told us that he had told the TWA pilots to,

13  quote, get real, close quote, on their aspirations of the

14  seniority merge.  Pandering?  Maybe.  But hardly the kind of

15  talk that would seem to counsel against any ideas we may have

16  on the seniority integration.  And then it is signed Reif.

17  Is that your signature, electronic signature?

18  A.   Yes.

19  Q.   Do you recall writing this?

20  A.   Not specifically.

21  Q.   Did you attend the APA board of directors meeting on

22  April 1, I mean, I am sorry, April 5, 2001?

23  A.   Yes.

24  Q.   Do you recall whether or not Duane Woerth attended that

25  meeting?

1    A.   I do recall that he did attend, yes.

2    Q.   And Duane Woerth was the president of the Air Line

3    Pilots Association at that time, is that correct?

4    A.   Yes.

5    Q.   Did Mr. Woerth speak at the APA board meeting?

6    A.   Yes.

7    Q.   Do you recall Mr. Woerth make being the statement

8    concerning the TWA pilots?

9    A.   Not specifically.  But I have no reason to believe, I

10   mean, I wrote this email, and I don't have any reason to

11   believe that he didn't, from what I wrote here.

12   Q.   Did you post on the message -- when you post on the

13   message board, it is not your intention to mislead people, is

14   it?

15   A.   That's correct.

16   Q.   And you generally, it is generally your intention to be

17   truthful and honest when communicating on the board?

18   A.   That is correct.

19   Q.   Okay.  I have no further questions.

20            CROSS EXAMINATION

21            BY MR. KATZ:

22            THE COURT:  Okay.  Now will be the cross

23   examination.

24   Q.   Mr. Reifsnyder, I am Dan Katz.  I am the lawyer for the

25   Air Line Pilots Association.  I have never met you but I do

 1   have a few questions about the same email.

 2   A.   Okay.

 3   Q.   You said in answer to Ms. Rodriguez's question that you

 4   didn't specifically recall after making the statement that

 5   you have quoted in the challenge and response entry.   That is

 6   right?

 7   A.   That's correct.

 8   Q.   Was this challenge and response entry in response to the

 9   one cent out above it on this deposition exhibit from Robert

10   Johnson, Jr.?

11   A.   Yes.

12   Q.   And his subject line is ALPA won't take us.   Would you

13   agree that he is being facetious?

14   A.   Give me just a second.   Open even paren, reading, close

15   paren.   First of all, I don't know if he was the, let me

16   start from the beginning so we get, make sure we get the

17   specific question.

18   Q.   Okay.

19   A.   I don't know that that is his subject line.   You noticed

20   that is a we, i.e., regarding that topic.   I don't know

21   whether or not he was the original poster of that thread.   So

22   we will just start with that.   So is that what you were

23   talking about, whether he was being facetious or facetious in

24   the bottom of his -- in the body of his email.

25   Q.   I am talking about both?

1    A.    Well, again, I don't recall the thread.  I don't recall,

2    you know, so I certainly don't recall who was the original

3    poster in that thread who would have written it first.  ALPA

4    won't take us.  I do not think he is being facetious in the

5    body of his email.

6    Q.    He says what I was wondering was, would ALPA take us if

7    we stapled TWA to the bottom of our list and then getting to

8    the last sentence of his entry, might they block an attempt

9    to reaffiliate.  Do you think that he is joking or not?

10   A.    No, I don't think he is joking.  I think he is asking, I

11   think he is asking an honest question.  I think he is

12   wondering would they block us, based on how they treated the

13   TWA pilots.  I think that is what he is asking.

14   Q.    Do you know him to be a supporter of reaffiliation with

15   the Air Line Pilots Association?

16   A.    I don't remember.  I don't recall either way.  I don't

17   recall either way.

18   Q.    And do you recall having any conversations with Captain

19   Johnson, either on the phone or in person?

20   A.    No.

21   Q.    Do you know him?

22   A.    Yes.

23   Q.    But you don't know whether he was an ALPA supporter or

24   not?

25   A.    I do not know.

1    Q.   It was long time ago.  Do you remember anything that

2    Duane Woerth said?

3    A.   I am sorry.  I don't know where you are.  That is not

4    the next question on this sheet.

5    Q.   Line 13 and 14.  It was a long time ago.  Do you

6    remember anything that he, that is, Duane Woerth, said?

7    A.   Not specifically.

8    Q.   And you don't, as we are sitting here today, if it

9    weren't for this email, you wouldn't remember him saying the

10   words, get real, would you?

11   A.   Probably not.

12           MR. KATZ:  That is it.

13           THE COURT:  Okay.  Thank you very much, Mr.

14   Jacobson.

15           Okay, Mr. Press.  Before we go on, I am sorry, I

16   would like the date of that deposition that was taken, I

17   don't have it in front of me.  Gave me the date.

18           MS. RODRIGUEZ:  September 17, 2008.

19           THE COURT:  Anyone, 17, '08.  What were the page

20   and lines.

21           MS. RODRIGUEZ:  Page 4, line 15 -- 15 through 25.

22           THE COURT:  Am sorry.  4, 15, to 4, 25.

23           MS. RODRIGUEZ:  Direct.  Page 5, line 1, through

24   25.

25           THE COURT:  To 5, 25.

```
 1              MS. RODRIGUEZ:  Yes.  6, line 1, through 25.  Page
 2    7, line 1 through 25.  Page 8, 1 through 25.
 3              Now, this is Katz's cross examination.
 4              THE COURT:  I want everything.
 5              MS. RODRIGUEZ:  Page 9, one through 25.  Page 10,
 6    lines 1 and 2, and then Mr. Katz skipped some lines.
 7              THE COURT:  Where you pick up --
 8              MS. RODRIGUEZ:  Page 10, line 13 through 19.
 9              THE COURT:  That is it.
10              MS. RODRIGUEZ:  That is it.
11              THE COURT:  Okay.  I just want again the record to
12    reflect what was actually included that won't appear in the
13    transcript.  Okay.
14              You may proceed, Mr. Press.
15              MR. PRESS:  Our next witness is Howard Hollander.
16              Mr. Jacobson will be asking him the questions,
17    Judge.
18              HOWARD HOLLANDER, Sworn.
19              DIRECT EXAMINATION BY
20              MR. JACOBSON:
21              THE COURT:  You may proceed.
22    Q.   Good afternoon, Mr. Hollander.  I would like to first
23    ask you a few background questions about who you are and
24    where you are from, okay?
25    A.   Fair enough.
```

1    Q.    Where did you grow up, sir?

2    A.    Born and raised in the Bronx.  Latter part of it was up

3    in West Chester County, New York.

4    Q.    You are one of the plaintiffs in this case?

5    A.    I am.

6    Q.    I would like to ask you about your education.  How much

7    education did you go through, sir?

8    A.    Graduated high school, graduated college.

9    Q.    All right.  And at some point you became interested in

10   becoming an airline pilot?

11   A.    That is correct.  In my high school years.

12   Q.    Tell the jury how you first got involved with flying and

13   become a pilot?

14   A.    I was 16 years old, a friend of mine from high school, I

15   believe we were, can't remember if we were eleventh graders

16   or 12th graders but his father had given him a pair of

17   tickets, so to speak, to take a parachuting jump lesson.  And

18   as being good friends he chose me and although my career was

19   somewhat different, I was planning on an electrical

20   engineering career, I joined my partner on a trip up to

21   Orange County, New York, where there was a morning

22   instructional  class, and then the afternoon we boarded a

23   McDonnell Douglas DC three, and took a ride and at some point

24   were pushed out of the airplane.

25            It was a successful landing on both parts, and

Hollander-direct/Jacobson                                    49

1    following that there was some discussion on the ground with

2    the instructors and the pilots and I was impressed with what

3    they do.  They told us that we were the foolish ones to jump

4    out of a perfectly good airplane and I was invited back to

5    take a free lesson and I was, I was instantly turned on.  I

6    said I can do this.  From that date forward I focused on an

7    aviation career.

8    Q.   So you are 16 years old?

9    A.   Pretty much.

10   Q.   What did you do to get the licenses, and certifications

11   you need to become a pilot?

12   A.   I did start some introductory lessons at a local airport

13   by me.

14        At some point I was advised that because I was

15   accepted into Emory Riddle down in Daytona Beach, Florida, it

16   is an aviation school, that I should stop taking the classes

17   because no matter what I did in this private school, they

18   were going to start me from the very beginning any way.  So I

19   ceased my private lessons at West Chester and eventually in

20   the fall of 1981 started my four-year tenure at  Emory Riddle

21   and they started me off from exactly what they said, square

22   one, and provided me with the education and licensing for all

23   the documents that I possess today.

24   Q.   Was that a four-year program?

25   A.   That was a four-year program.  Graduating with a

1   bachelor of science in aviation sciences.

2   Q.   What year did you graduate, sir?

3   A.   1985.

4   Q.   And did you then look for a job as a pilot?

5   A.   I did.

6   Q.   And where did you look, what kind of job did you get?

7   A.   Well, we found out, again, they are fairly educated,

8   they educate us fairly well.  Flying jobs for like TWA or Pan

9   Am or Eastern were not exactly readily available to such

10  unexperienced pilots.  So we tend to  find, shall we say

11  smaller type jobs to, what would be a good word to say, we

12  find smaller jobs to accumulate experience and flight time

13  hours unless of course you chose the military which nicely

14  provided that for you free of charge.

15           But my first job actually was working for the

16  school as an instructor for a short period of time and then I

17  transferred back to New York because Florida just didn't suit

18  my lifestyle very well.  My first job was Poughkeepsie, New

19  York for a company called Richmore Aviation which was a

20  flight school and charter department, and from there I was

21  eventually hired by another airline which some of you may

22  recognize, but the original name was Allegheny Airlines and I

23  was based out of Atlantic City, New Jersey.

24  Q.   Was Allegheny an airline that carried passengers?

25  A.   It was.

1    Q.    What year did you join them?

2    A.    1986.

3    Q.    And were you, was it a plane that you had two pilots,

4    was there a third officer?

5    A.    It what it was a two-pilot aircraft.  They had two types

6    of aircraft, one was called a  DeHaviland-6.  And the other

7    was a DeHaviland-7.  The only difference was, one had two

8    engines, one had four engines but the number of people, what

9    it would hold, and both planes had a captain and a co-pilot.

10            THE COURT:  The 6 is still flying.

11   A.    Both are.

12            THE COURT:  They use them out in the Caribbean.  I

13   think I flew a 6 just about a month ago.

14   A.    They do.  There is a lay over we have at American

15   Airlines where they have one on  pontoons up by Anchorage.

16   It is still in existence today.

17            THE COURT:  I thought so.

18   Q.    You were with Allegheny?

19   A.    I was.

20   Q.    Is that the Allegheny of the Allegheny Mohawk we have

21   been hearing so much about?

22   A.    Not really.  It was Allegheny airlines, it is hard to

23   explain, but it was a name for an airline and it had a number

24   of smaller airlines, Pocono airlines, Southern Jersey

25   Airways, Suburban Airways, we were all Allegheny.  We were

```
 1   the first original Allegheny.  We were based out of Atlantic

 2   City, servicing Philadelphia was the biggest hub we had,

 3   Trenton, New Jersey, Kennedy, LaGuardia, Islip, Atlantic

 4   City, Cape May, New Jersey, Baltimore and Washington.

 5   Q.   Did there come a time in your airline pilot career where

 6   you became employed by TWA?

 7   A.   I did.  I was, I had applied to TWA during the summer

 8   months of 1988.  Actually, I received a phone call from a

 9   friend who just had gotten hired there and informed me that

10   they were on the up swing of a hiring wave, and he actually

11   mailed me an application, and I filled it filled it out and

12   within weeks later I was there for an interview.

13   Q.   And you got hired then?

14   A.   I got hired.

15   Q.   When was that?

16   A.   My date of hire was September 30, 1988.

17   Q.   September 30, 1988?

18   A.   '88.

19   Q.   So at the time of the merger and everything we are

20   talking about here, you had twelve, twelve and a half years

21   of experience?

22   A.   That's correct.

23   Q.   And what kind of position did you have with the airline

24   when you first started out?

25   A.   When I was hired by TWA there were choices to be had.
```

1    Being from New York, I chose to stay in New York.   I think I

2    am the epitome of the shirt,  "I love New York" but being

3    from New York, they offered me Kennedy or St. Louis, I chose

4    Kennedy.

5           Once I picked a domicile they offered me 747 flight

6    engineers and Lockheed 1011 flight engineer.  I chose

7    Lockheed 1011.

8    Q.   The flight engineer, tell the jury what the flight

9    engineers job is on the plane?

10   A.   Flight engineers, unlike today's aircraft, they were,

11   back then they were actually at one point they were airlines

12   with four pilots.  These were three places.  Pilots.

13   Specific duties.  Captain, first officer, flight engineer.

14   Flight engineers duties were primarily the pre flight of the

15   airplane, to make sure the airplane was safe to fly, if there

16   were any maintenance issues.

17          Some of them could be started with the flight

18   engineer, but ultimately the captain had to make the final

19   decision.  Because of modern technology, a lot of things that

20   today I would say would have been on my panel, like air

21   conditioning, heating, hydraulics, fuel systems, those were

22   all the responsibilities of the flight engineer.  Today again

23   modern technology has allowed that entire panel to be

24   computerized and most of it today on the airplanes are on an

25   overhead panel where either the captain or the first officer

```
 1   can manage those systems.

 2           But the brief description is we were the managers

 3   of all the technical systems on the airplane.

 4   Q.   All right.  Now, I would like to ask you about how you

 5   got involved, did you get involved with ALPA, Air Line Pilots

 6   Association matters?

 7   A.   I got involved with the Air Line Pilots Association

 8   fairly quickly.

 9   Q.   All right.  And how did you become involved -- before I

10   ask you that.  When you are hired by the airline are you, is

11   there a probationary period?

12   A.   There is.  One year.

13   Q.   All right.  And during the probationary period do you

14   have more say and less protection than a full-time employee?

15   A.   It would be safe to say, for most airlines, new hire

16   pilot has less protections.  I think the word probationary

17   stands for itself, but specifically at TWA, you were

18   technically not afforded union protections in your first

19   twelve months with TWA.

20   Q.   All right.  So you are a first year probationary pilot.

21   The second officer, flight engineer on a Lockheed 1011?

22   A.   Correct.

23   Q.   Can you tell the jury how you, specific, the

24   circumstances that led to you becoming involved in union

25   matters?
```

1    A.   I can tell them that as long as you know that is not a

2    short answer.

3    Q.   Don't make it as long as you can.  As short as you can,

4    tell the story.

5    A.   I was hired in September.  I can tell you the date was

6    exactly two days prior to Thanksgiving.  I was coming back on

7    a Lockheed 1011 from London.  During the flight back from

8    London I perceived there was a problem with the airplane.

9    What I perceived and relayed to the captain and first officer

10   was that this airplane had developed some kind of a gas leak.

11        Part of my job, and I am not trying to be

12   technical, but just so you have a background, most airplanes,

13   the fuel is kept in the wings of the airplane, and it is,

14   bigger airplane, 747, Lockheed, it is a tremendous amount of

15   fuel, 60, 70, 80,000 pounds of fuel and the remaining fuel is

16   kept in the center tanks of the airplane.  When you take off

17   the procedure, even still today, is you burn your fuel out of

18   the center first to keep the airplane laterally stable, and

19   then when that fuel is exhausted you start drawing from the

20   wings.

21        I think you can gather that if you sucked all the

22   gas out of one wing or most of it without the other, the

23   plane would start almost tipping like a ship and I am just

24   trying to make it as generic as possible for you.  I had just

25   balanced the fuel load in this airplane before I decided to

1    go back and take a break.

2          When I returned, I noticed the plane was

3    considerably unbalanced and that concerned me so a discussion

4    began with the three of us.  And it was decided fairly

5    quickly that, let's get out what they called and referred to

6    the FIRM, F I R M, Manual, and in simplest terms, what it is,

7    it is a big fat binder that airplanes in those days had, and

8    it was somewhat of a guidance manual, things are going to

9    happen on airplanes and back then of course and even today we

10   don't have ground communication, so especially over the

11   Atlantic Ocean, so it is an a book to go to and say oh, if

12   you have this problem, here are some steps you can take to

13   either fix the problem or not fix the problem, how to best

14   proceed.

15         So we read the Firm  Manual on this fuel leak.  And

16   in simplest terms, what the Firm Manual directed the pilots

17   to do was to turn off that engine, in this case, it was

18   number 3, to turn off the number 3 engine, and isolate that

19   fuel tank, we had, I had on my panel buttons that I could

20   push to literally, like a plumber, close the valve, and

21   isolate the fuel on that side of the airplane.

22         So the captain, after reviewing that with me, said,

23   I don't want to do that because the first thing that would

24   happen is the airplane could not fly at the same altitude on

25   two engines that it could on three.  And when you are over

1    the Atlantic Ocean, I am not trying to get technical with

2    you, you are in a non-radar environment and you are really

3    not talking to anybody and it is the middle of the night and

4    if you can't stay where you are, you have to descend, there

5    is a very specific procedure to do that.  That procedure is

6    to take your airplane and turn it 90 degrees off course and

7    go ten miles, and then you may start your descent.

8            The purpose for that is there are airplanes going

9    between, shall we say, the United States and Europe, we are

10   all traveling on the same highway between the two

11   destinations.  We are just at different  altitudes, so if we

12   were to just arbitrarily go down and we can't talk to anybody

13   it is highly possible we might be descending on top of

14   another airplane.  That is why they put this procedure in.

15           The captain did not wish to do this procedure.  He

16   had a concern about doing it.  He had a concern about where

17   we were which was the middle of the Atlantic Ocean, and so he

18   chose to ignore it.  And the second thing that was decided

19   was whether indeed we were losing fuel.

20           These airplanes sometimes have had issues where the

21   gauges stick.  They have gone to full, they have gone to

22   empty, and I agreed with him.  I just told him I never saw

23   one continue to go down like this.

24           So we are professionals and we came to, shall we

25   say, an agreement, that was the following:  I said to Captain

1   Reilly, let's do the following:  Instead of following the

2   book procedure, let's burn all the gas out of the number 3

3   engine.  There is a way I can do that on my panel.  And when

4   it gets near zero we will go what we call tank to engine,

5   number 1 engine will take gas from the number one tank,

6   number 2 engines from the number 2 tank, number 3 engines

7   from the number 3 tank.  If the number 3 gauge reads zero and

8   the number 3 engines stops working I win, you lose.  If it

9   is, if it reads zero and the engine keeps running obviously

10  it is a bad gauge, you win, I lose, but just by tracking the

11  fuel and the time I can get the plane all balanced out well

12  before we make landing at Kennedy.

13          He bought the argument.  We did it.  When the

14  number 3 engine gas gauge read zero, the number 3 engine

15  quit, and we were out of gas on that side of the airplane.

16  The only good news about doing this was we gained about 200

17  miles close to the coast of the Canadian border as opposed to

18  being over the middle of the Atlantic Ocean.

19          Another thing that you have to know is planes as

20  they descend they burn more fuel, not in the descent but

21  traveling at 20,000 feet or 35,000 feet you will burn a lot

22  less gas, just like you burn less gas at 55 as opposed to 85.

23          So long story short is that we ended up getting to

24  radio communication with a center called Monkton Center which

25  is off the Newfoundland Coast and we were talking to our

1    company, and it had been decided because we don't have

2    enough, we didn't even know if we had enough gas to make

3    land.  But we were to supposed to try for St. John's

4    Newfoundland.   We headed for St. John's Newfoundland.  Air

5    Canada has a base, they will help us, they will get us a

6    jetway, so on and so forth.

7            We proceeded to St. John's Newfoundland

8    unfortunately we made an attempt to land at St. John's

9    Newfoundland, but the coast was completely fogged in.  And I

10   am telling you, I couldn't make this up.  I thought we were

11   in training but we couldn't see a thing.  All I know is at

12   some point we ended up not landing and what they call the go-

13   around procedure, we brought up the wheels and started to

14   head back up because we couldn't see the airport.

15           All I know, wherever we were going to, it wasn't

16   going to be very, very far with all the gas gauges reading

17   zero.  The captain had a military background and remembered

18   on the opposite side of island there was an old military base

19   called Stevensville, and it was not far, it was like ten, 15

20   miles on the other side of the island.

21           It was funny, one side of the island was severe

22   clear, the other side was fogged in.  We basically glided to

23   Stevensville and landed there two days before Thanksgiving

24   and it was calculated some time after that we had about four

25   minutes of fuel left on the airplane.

Hollander-direct/Jacobson                                      60

1   Q.   Did you receive any honors from TWA as a result of this

2   particular flight which was what, your second month with the

3   airline?

4   A.   That's correct.  I did not know about this as new hire,

5   but some time after the first of the year I received first a

6   phone call and then a package in the mail, that I was TWA's

7   flight crew member of the year, for my inventive procedures

8   to get this airplane to a safe airport with enough fuel with

9   some 250 or 260 people on board.

10  Q.   Were you invited to a dinner or anything like that as a

11  result of being the crew man of the year?

12  A.   That is correct.  I did not know what it was about.  It

13  was new to me.

14        I understood in the past it was actually even more

15  elaborate, like held in London and Paris.  I was given some

16  paperwork to fill out that myself and a guest would be

17  attending a dinner, this dinner was at the Waldorf Astoria in

18  New York City.

19        I would be provided with first class air fare to

20  get there.  I would be provided an allowance to rent a

21  tuxedo, it was a black tie affair.  Basically I was supposed

22  to be at a very elaborate affair and with more good things to

23  come.  But in my conversation with this young lady from

24  Kansas city, I told her that I actually recently just

25  purchased my first apartment as a young man and I lived in a

Hollander-direct/Jacobson                                               61

```
1    place at the time called Mount Kisco, New York.

2    Q.   What was Mount Kisco New York to TWA?

3    A.   That is where the story gets funny at the.  Mount Kisco,

4    when Mr. Icahn,  when he bought the airlines, they, TWA's

5    corporate headquarters were located at 605 10th Avenue for

6    many, many years.   He happened to live I believe up In

7    Bedford Hills, the home address.  He was in the final phases

8    of building the three structures that was to be TWA's new

9    headquarters.  There were three buildings,, some of the

10   property was rented out.  But that was going to be TWA new

11   corporate headquarters.

12   Q.   What city was those in?

13   A.   Those were in Mount Kisco, New York.  So therein lines

14   the punchline of the story.

15           However, I gave this young lady all my information

16   and she said, well, we will send you a limo.  We will take

17   care of you and all these provisions were made for me.

18           Come the time of the dinner, I did all what I was

19   instructed to do.  I rented a tuxedo, the limo came for

20   myself and at the time a young lady friend, I was dating, and

21   we went down to the Waldorf Astoria to attend this fancy

22   dinner.

23   Q.   What table did you find yourself at?

24   A.   Well, when we first got there we found that there was a

25   message that I was to come down earlier, prior to the dinner,
```

Hollander-direct/Jacobson                                          62

 1    and a gentleman by the name of Kent Scott who was the then

 2    TWA MEC master chairman, Mr. Kent Scott was to pick me up at

 3    an earlier time, and I was to be escorted to the Harvard Club

 4    for a private cocktail hour with Mr. And Mrs. Carl Icahn.

 5    Q.   Let's get to the dinner and the events that led to your

 6    involvement with the union?

 7    A.   Okay.  So we go to the cocktail hour, we come back to

 8    the dinner.  When I got there, I don't in how, two young

 9    ladies' that were, you know, escorting everybody to their

10    table, and when I told them who I was, they said that you are

11    at table number 1.  Table number 1.

12          So I get to table number 1.  And everybody was, the

13    table was complete with the exception of two seats.  And

14    everybody stood up when I arrived, and it was some cheering

15    and applauding and some very nice compliments, and they all

16    introduced themselves to me.  And although I may not remember

17    each and every one of them, I can remember just about all of

18    them.

19          They stood up and they said, I am Captain Rich

20    Roberts, and this is my wife.  And I am Captain Whelan

21    Johnson, this is my wife.  I am Captain Ron Reynolds, this is

22    my wife.  I am Bill Hoar, this is my wife, Captain Kopecks,

23    this is my wife.  They all introduced themselves as captains.

24    I figured, these are my fellow pilots and these are their

25    wives and we enjoyed a very nice dinner but the conversation

Hollander-direct/Jacobson                                             63

 1    at the dinner was the interesting part.  They kept asking me

 2    about what it was like to and new hire at TWA and what I felt

 3    about the airline and they knew I was in a private meeting

 4    with Mr. Icahn and my thoughts on Mr. Icahn.  As today, I

 5    told them the truth.

 6             And the truth may not have been too pleasant for

 7    them to hear, there was a number of disgruntled employees, I

 8    didn't think very highly of Mr. Icahn.  I thought his wife

 9    was lovely, but there were a lot of problems out on the line,

10    there were a lot of upset pilots and they asked me some very

11    specific questions and I give them the honest truth.

12    Q.   Thinking they are all pilots, captains, pilots like you?

13    A.   I thought they were all captains, just like me.  The

14    dinner proceeded.  It was very nice.  It ended abruptly with

15    a speech from Mr. Icahn  and, after, almost after the speech

16    say, 75 percent of the people at the dinner left.  Before I

17    left there they gave me gifts, I got a gold ring, a clock, a

18    check for $500.  I got time off.  I got all these loverly

19    gifts.

20             When I returned to work there was a letter in my

21    mailbox that I should see the chief pilot, Captain Wally

22    Moran.  M O RA N.  I went to see Captain Moran, and he

23    politely closed the door and asked me to sit down, and

24    apparently he had gotten some reports from the people that

25    were at my table about some of the stories that were told.

1   And he wanted specific --

2   Q.   The people at your table, were they TWA management?

3   A.   I later found out that my table, although they were

4   captains, were all the highest of vice presidents at our

5   airline.  It was the vice president of training, the vice

6   president of the pilots -- they were all high up management

7   people.

8   Q.   So what did the chief pilot say to you?

9   A.   Told me that if I did not give him specific and more

10  detailed information as to my conversations at the dinner,

11  that I was going to be suspended and he was going to

12  recommend my termination.

13  Q.   So what did you do next?

14  A.   At the present time I froze.  I tried to just backtrack

15  and say I think they misunderstood some of the things that

16  were being said, and you know, there were some inaccuracies,

17  but he just told me that he just wanted me to take the time,

18  this was his quote, paraphrasing as best, that he was giving

19  me 24 hours to write down the details of who was doing what,

20  and some of these circumstances, and if I didn't produce

21  them, that I would be terminated.

22          And so one day I am being honored and very shortly

23  after I am being fired.  I left --

24  Q.   Where does ALPA come into the story?

25  A.   I left hanger 12 with a long face and I was talking to

1    some of my friends when I got home, and it was suggested that

2    I call this gentleman named  Tom Brown.  Tom Brown was a

3    local New York union rep.  And I did call Tom Brown.  And he

4    was extremely outraged at what I had told him.  And he said

5    he would pick me up the next day and he would be driving down

6    to see captain Moran together.  And he did just that.  And I

7    sat there with my hands twiddling a way nervous, and Mr.

8    Brown, in simplest terms, took care of the entire situation

9    with the how dare you intimidate these people, and you know,

10   I think there was something, TWA contract that again because

11   cell phones weren't, I don't think we had cell phones back

12   then, it said something to the effect that if we are not home

13   we have to leave a contact number as to where we would be or

14   the addresses where we would be.

15           And Tom said I am telling you right now, I am going

16   to  CDS, NBC, ABC, the Post, the Times, and all of a sudden

17   my problems disappeared.  I thanked Tom Brown profoundly for

18   his help and I asked him how I could return the favor.  What

19   he said to me is this is a very common thing that management

20   is always looking to bully pilots, or try to step on them,

21   and what you could do for me is when you get off probation,

22   he says call me up and we will get to you work for the union

23   and maybe one day maybe you can help somebody.  That is  d

24   you how it all started.

25   Q.   And did you?

1    A.    I did.

2    Q.    By the way, were you also the TWA pilot of the year

3    another year?

4    A.    The very next year.

5    Q.    You were TWA pilot of the year two years in a row?

6    A.    Correct.

7    Q.    Anyone else in the 75 year history of the airline of a

8    year more than once?

9    A.    I was told by a captain, Captain Urashell, in the 75-

10   year history at that time no employee had ever received that

11   award two years in a row.

12   Q.    Let's talk about your first volunteer work with ALPA, as

13   a volunteer in the union.

14   A.    When I called Mr. Brown, which I kept my promise, you

15   know, he took my call and he talked about things and I guess

16   maybe he just wanted it in his opinion to start me out with

17   something relatively easy and he made some phone calls and I

18   got put on what they called their membership committee which

19   is basically working with I think new hire pilots and talking

20   to them about the union.

21   Q.    How long did you serve the membership committee?

22   A.    I couldn't give you an exact date but a couple of years.

23   Q.    What was the next thing you did within the union,

24   volunteer work you did for the union?

25   A.    Well, while working for ALPA I took a specific interest

1    in grievances.  I thought that was the fun place to be.  It

2    is a position where literally an airline pilot can go into a

3    management office and wear his union hat or her union hat and

4    have a healthy debate or argument with your boss.  But you

5    kind of have this shield that you can say and do anything

6    because you are just representing the pilots, after the

7    meeting is all over you put your TWA hat back on and we are

8    all friends again.  So I liked that.  That was, maybe that is

9    as close as I could go to a lawyer that I could possibly be.

10   I don't know.  But that had an a track --

11               THE COURT:  And you consider that a good thing?

12               THE WITNESS:  Despite all the jokes, your Honor, I

13   got to tell you.

14               THE COURT:  Just checking.

15   A.   I thought that was a good thing.  I really did.  I

16   thought it was fun.  I am sure making arguments are fun.  I

17   get to make arguments on  s behalf of pilots and Tom Brown

18   introduced me to somebody at the time who was in grievances,

19   and they switched me from the membership committee to a

20   grievance committee and once that was officially done, I am

21   not sure what union paperwork happened, but I got an

22   invitation to come down to Herndon, I got to tour the place

23   and meet some of their attorneys.  There was actually some

24   very good education that I got out of that.

25   Q.   You got some training?

1    A.   I got some training.

2    Q.   Do you recall what years you were on the grievance

3    committee, when did you join it?

4    A.   Again, it is so long ago, but I am going to say I got on

5    the grievance committee in the mid nineties, maybe the late,

6    a like '94, '95, something around that timeframe.

7    Q.   Did you ever run for elective office?

8    A.   I did.

9    Q.   What was the, we heard testimony about how TWA was

10   divided into three councils, Council 2 in New York, 3 in

11   Saint Louis and 4 in Los Angeles.  Were you in Council 2?

12   A.   I  was in Council 2, which was New York.

13   Q.   What office was the first office you ran for?

14   A.   First officer representative.

15   Q.   You were at that point the co-pilot or first officer

16   level?

17   A.   I was a co-pilot.  I made co-pilot, I made co-pilot back

18   in 1989.  A year after I was hired.  There was a, I am not

19   sure, an eruption in New York back in 1998, where the New

20   York captain rep, the New York co-pilot rep, and I believe

21   the New York flight engineer rep, were the technical term was

22   recalled, simplest terms, thrown out.  The situation behind

23   that had to do with putting an attorney on the TWA board.

24   Contract 98 got the TWA pilots and the flight attendants and

25   the mechanics a seat on the board of directors.  I guess, and

1   this was, I was not present at this meeting, but the

2   direction from the pilots to their union reps were to put a

3   pilot on the board.  At a MEC meeting, it was later decided

4   to put an attorney on the board to represent the pilots'

5   interests.

6   Q.   Do you remember the name of that attorney?

7   A.   I believe the attorney was Steve Tumblin.

8   Q.   Who we have seen her on the video?

9   A.   I was not here for that.

10  Q.   So there was a recall vote of all the elected officers?

11  A.   Correct.  The elected officers were recalled.  And soon

12  thereafter, of course there was a -- New York had nobody, and

13  there was campaign cards and balloting cards were issued in

14  the mail, because everything was done by the mail, and

15  Captain Tom Kennedy was elected the captain rep.  I was

16  elected the first officer rep.  And I believe Ted Case was

17  elected the Secretary Treasurer at that time.

18  Q.   All right.

19          THE COURT:  Non-voting position, right, on the MEC?

20          THE WITNESS:  That is correct.  I can't remember

21  when, your Honor, but there came a time where that position

22  changed from a voting to a nonvoting, but when Ted was

23  elected, I believe it was a nonvoting position.

24  Q.   All right.  And do you recall when you were elected the

25  first officer rep for Council 2?

Hollander-direct/Jacobson                                    70

1   A.   That would was the year, 1998.

2   Q.   So right after that contract?

3   A.   Right after that contract was put in place.

4   Q.   Did you, was there then another opening within the local

5   council that you ran for subsequent subsequently?

6   A.   That is true.  Very quickly after I was put in as the

7   first officer rep I was honored to get my captain's stripes

8   with TWA and I became a captain.

9            Even though I became a captain I could still serve

10  in the first officer rep position because I was elected

11  there.  I became a captain, and then I am going to say three

12  to four months after I became a captain, Captain Kennedy, who

13  was the Council 2 captain rep, had turned 60 and retired and

14  when he turned 60 and retired that seat became vacant and you

15  had to have another election and I ran for that seat because

16  I was now a captain.  And so I was, the election ballots went

17  out and I was dubbed the winner and now I was the Council 2

18  captain rep.

19  Q.   All right.  And did you remain the Council 2 captain rep

20  up until the point where Council 2 was closed?

21  A.   I was.

22  Q.   All right.  Also each of the local councils also had

23  some nonvoting positions, chairman and vice chairman and

24  secretary treasurer.  Do you recall that?

25  A.   I do.

Hollander-direct/Jacobson                                    71

```
 1    Q.   Did you serve any of those positions at the same time
 2    that you were the captain rep?
 3    A.   I was also the local council chairman.
 4    Q.   So you were chairman for the New York body of TWA
 5    pilots?
 6    A.   Correct.
 7    Q.   Do you recall when you were elected the chairman of the
 8    LEC?
 9    A.   I do not recall the day because what happened after I
10    became the captain rep, now my seat became vacant.  So we had
11    to have an an election to replace me as a first officer rep.
12         I believe that seat was later filled by a pilot by
13    the name of David Singer.  And then once David Singer was
14    seated as a first officer rep, another ballot went out in the
15    mail as to who would would be the chairman of Council 2.  So
16    I can only say that the process of the balloting, and the
17    process of the election takes four to six weeks to happen.
18    So if I had to give you a fairly good guess, I would say
19    somewhere within two to three months after seated as a
20    captain rep.
21    Q.   Were you chairman of Council 2 before the American
22    airline TWA transaction was announced?
23    A.   Yes.
24    Q.   Then you were, throughout that entire process that we
25    have heard a lot of testimony you were both the captain
```

Hollander-direct/Jacobson                                        72

1    officer and chairman of Council 2?

2    A.   That's correct.

3    Q.   What is your view as an elected rep of the LEC for TWA,

4    what was your view of your  s job, what you are responsible

5    was as the captain rep?

6    A.   I can't describe it in one word.  But basically, I was,

7    the best way I can describe it to the jury is I felt like the

8    leader of a New York family.

9                If a New York pilot had a problem I expected

10   him to call me.  If I found out about a problem I would call

11   him or her.  Any time someone in trouble could be, personal

12   problems, family issues, banging up airplanes, getting in

13   trouble with the FAA, I mean if it happened anything like

14   that, they were either expected to call their local  council,

15   of which I was in charge of, or if I found out first I would

16   call them.

17              In addition to that, we would have scheduled

18   meetings and at these meetings we would discuss problems with

19   the airline.  We were also problem solvers, or we tried to be

20   and we did a relatively good job of the it and the last thing

21   I thought the LEC reps were supposed to do is if the New York

22   pilots wanted strawberry sundaes on the airplane it was my

23   job to let the MEC know we wanted strawberry sundaes on the

24   airplane.

25              We carried their wishes to the heirarchy and

 1  hopefully resolved a lot of issues.

 2  Q.   Were there times from time to time where you had to vote

 3  on various matters?

 4  A.   On the LEC levels or the MEC levels?

 5  Q.   Let's talk about the MEC level?  Over all.

 6  A.   Well, yeah.  Very few votes ever took place on the LEC

 7  level.

 8         If the pilots wanted something specifically done,

 9  the way it would work is they would put forth a resolution,

10  the group in attendance would discuss it, debate it and after

11  the debate and discussion, it would be seconded and if it was

12  seconded, it would be voted on.

13         And if it passed, basically the New York pilots are

14  telling their captain rep, FO rep and flight engineer rep,

15  this is what they would like us to do on their behalf, and we

16  would take it to the MEC level and present almost that

17  identical resolution to the MEC level hoping to persuade

18  Council 2 and Council 3 to see it the same way, and if it was

19  adopted, then the master chairman and vice chairman and

20  secretary treasurer of the MEC would have to go forth with

21  our wishes.

22         And we did have some what we call internal issues.

23  Sometimes there was fighting over flight time, should this

24  trip belong to the New York pilots or this trip to the west

25  coast pilots.  That was what I call fun fighting.  We had

Hollander-direct/Jacobson                                      74

1   issues, but all the voting was basically done on the MEC

2   level.

3   Q.   At the MEC level did you have a philosophy about how you

4   were supposed to vote your votes?

5   A.   Yes, my philosophy was very simple.  I was there to

6   carry out the wishes of my New York constituents.

7   Q.   Did you try to do that in all your votes?

8   A.   I did.

9   Q.   How did you first learn about the proposed transaction

10  with with American Airlines?

11  A.   I believe my first indication was a phone call,

12  definitely a phone call, but I recall it being from Bob

13  Pastore, our master chairman, to tell me there was going to

14  be an imminent announcement, within a day or two, about

15  American Airlines wanting to acquire TWA.

16  Q.   Bob Pastore's name has been mentioned.  You talked

17  earlier about how the pilots had a vote on the board of

18  directors of TWA?

19  A.   Correct.

20  Q.   And there was a lawyer, Steve Tumblin, who had that

21  position?

22  A.   Correct.

23  Q.   Was he replaced at some point?

24  A.   He was.  He was later replaced.

25           THE COURT:  Later when?

1   A.   I couldn't recall, your Honor, but if you are asking for

2   a best estimate, it would be probably in 1999.

3   Q.   All right.  And who was he replaced by?

4   A.   I can't remember if Bob -- I can't remember if Bob

5   Pastore was the first one or the second one at the present

6   time, who was put on the board of directors.  I really can't

7   recall.

8   Q.   All right.

9        THE COURT:  At the time of the American

10   acquisition.

11   A.   At the time of the American acquisition Bob Pastore was

12   the pilot union rep on the board of directors for TWA.

13        THE COURT:  Mr. Jacobson, it is exactly two.  Is

14   this a convenient time?

15        MR. JACOBSON:  Any time is convenient, your Honor.

16        THE COURT:  All right.  I think we will finish for

17   today.

18        Do not discuss the case among yourselves or with

19   your family, friends, or loved ones.  Keep an open mind until

20   you hear all the evidence.

21        Most important, have a safe trip home, safe trip in

22   tomorrow morning and I will see you tomorrow morning.

23        (The jury leaves the courtroom.)

24        THE COURT:  There was reference made by Mr. Katz

25   early this morning, about ten after eight, to future video

1    depositions and the question was A, objections, and then B,

2    motions for additional read-ins.

3              MR. KATZ:  Yes, your Honor.

4              THE COURT:  I haven't gotten anything.

5              MR. KATZ:  I have with me the deposition

6    transcripts for Randy Babbitt, Duane Woerth, Tom Rachsford

7    and John Clark.

8              THE COURT:  Do you have some kind of index, that

9    tells me A ,  what is objected to, and B, what you want

10   added?

11             MR. KATZ:  These are color coded.

12             Brackets show plaintiff's designation.

13             The yellow is ALPA objections.

14             Orange is the counter designation.

15             And green are additions for completeness.  So that

16   you can follow along.

17             THE COURT:  Yes.  That is a breeze.

18             MR. PRESS:  I am color blind.

19             THE COURT:  Let me have those.  Do we have an order

20   so I can take them up in order?

21             MS. RODRIGUEZ:  Mr. Hollander, we have to finish

22   with him.   Tomorrow will be Mr. Hollander and Mr. Clark.

23             THE COURT:  Who is next after Mr. Hollander.

24             MR. PRESS:  Sean Clarke.

25             THE COURT:  Live?

```
 1              MS. RODRIGUEZ:  Live.

 2              THE COURT:  Okay.  Then --

 3              MR. PRESS:  Probably some of those depositions.

 4              THE COURT:  In what order?  I want to take them up

 5   in order.

 6              MR. PRESS:  Okay.  Rachsford.

 7              THE COURT:  Say that again.

 8              MR. PRESS:  Tom Rachsford.

 9              THE COURT:  Spell it.

10              MR. PRESS:  R A C H F O R D.

11              THE COURT:  Yes.

12              MR. PRESS:  Randy Babbitt.  Jay Randolph Babbitt.

13   And then Duane Woerth.

14              THE COURT:  Duane Woerth.  That all won't happen

15   tomorrow.

16              THE COURT:  No, I am just scheduling, to make sure

17   I get it done when it has to be ready.

18              MR. KATZ:  John Clark is after that.

19              MR. PRESS:  Yes.  Mr. Fram, do you know how long,

20   or what do you expect as far as cross of Mr. Hollander goes?

21              MR. FRAM:  Hard to say, an hour or two.  Hopefully

22   the responses on cross will be a little shorter.

23              THE COURT:  Yes.  When you are cross examination, I

24   balancing balancing fuel tanks on a jet liner.  It will be

25   very precise.
```

1              MR. PRESS:  Our next live witness traveled from St.

2     Louis today to testify tomorrow and he has to be back in St.

3     Louis tomorrow.  I am concerned that the testimony of

4     Hollander might prevent that.  Would it be okay if we took

5     Mr. Clark out of order before the cross examination.

6              THE COURT:  You are the one who is --

7              MR. FRAM:  There is no objection to that.

8              THE COURT:  I can't imagine why there would be an

9     objection.  You are the one presenting your case.

10             MR. PRESS:  Okay.

11             MS. RODRIGUEZ:  Mr. Hollander would sandwich Mr.

12    Clark.

13             THE COURT:  I understand that.  You want to do that

14    first thing, Mr. Clark first?

15             MR. PRESS:  We will see.  No, I don't want to do it

16    first.

17             THE COURT:  You want to stop and make sure you

18    leave enough time to finish Clark.

19             MR. PRESS:  Correct.

20             THE COURT:  That is okay with me.  There is no

21    objection from Mr. Fram..

22             MR. FRAM:  We will accommodate any travel issues

23    that the witnesses have?

24             THE COURT:  Okay.

25             THE COURT:  Who is the name of the witness flying

1    in?

2              MR. PRESS:  Sean Clarke.

3              THE COURT:  Sean?

4              MR. PRESS:  Sean Clarke.

5              THE COURT:  That is not John?

6              MR. PRESS:  No, John Clark.

7              THE COURT:  Sean Clarke.

8              MR. PRESS:  Okay.

9              THE COURT:  Very good.  I will see you all tomorrow

10   morning.

11             Again, try to get here just so in case something

12   pops up about 8:10 so if there are legal issues I can take

13   care of.

14             THE COURT:  I don't like to eat into the jury time.

15   Although we, I probably should alert you that nine o'clock

16   there is going to be a fire drill.  And you are going to have

17   to leave the building.  I am going to have to leave the

18   building.

19             And so about I would say 45 minutes of our time is

20   going to be robbed from us.

21             MR. JACOBSON:  I think our audience is experienced

22   in fire alarms.

23             THE COURT:  I will give them all A's.  The timing

24   point of view, I just want you to be aware that we are going

25   to lose 45 minutes.  Hollander begins, at 8:30 or 9, we will

Hollander-direct/Jacobson                                   80

1    be out of the building for 45 minutes.

2              MR. FRAM:  Thank you, your Honor.

3              THE COURT:  See you then.

4              (Adjourned at 2:00 p.m.)

1          I N D E X:

2

3          HOWARD HOLLANDER, SWORN.

4              DIRECT EXAMINATION              P. 47

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25