```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                         Plaintiffs,
 6                                            VOLUME 6
                V.                            TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                         Defendant.
 9
                                   CAMDEN, NEW JERSEY
10                                 JUNE 15, 2011

11     B E F O R E:   HONORABLE JOSEPH E. IRENAS
                      UNITED STATES DISTRICT JUDGE
12
                     A P P E A R A N C E S:
13
          TRUJILLO, RODRIGUEZ & RICHARD
14        BY:  NICOLE M. ACCHIONE, ESQ.
               AND: LISA J. RODRIGUEZ, ESQ.
15             AND
          GREEN JACOBSON, P.C.
16        BY:  ALLEN PRESS, ESQ.   (MO. BAR)
          AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17        For the Plaintiffs.

18        ARCHER GREINER
          BY:  STEVEN FRAM, ESQ.
19             AND
          KATZ & RANZMAN
20        BY:  DANIEL M. KATZ, ESQ.
          FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
          ELIZABETH GINSBERG, ESQ.
22        IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3                         S/   LYNNE JOHNSON

4                         Lynne Johnson, CSR, CM, CRR
5                         Official Court Reporter

6

7

8

9

10          LYNNE JOHNSON, CSR, CM, CRR
OFFICIAL COURT REPORTER
11          UNITED STATES DISTRICT COURT
P.O. BOX 6822
12          LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  Good morning, everybody.  Everyone be
 2   seated, please.
 3            Am I correct that two of the four people, Randy
 4   Babbitt, and Duane Woerth, are not going to be offered?
 5            MS. RODRIGUEZ: That's correct, your Honor.
 6            THE COURT:  I got the message correct.  It came in
 7   late.
 8            MS. RODRIGUEZ:  Yes, late yesterday afternoon.
 9            THE COURT:  That is number one.  Number 2, go back
10   again now over the order of evidence today.  We have Howard
11   Hollander on the stand.
12            MS. RODRIGUEZ:  Yes.  After Howard Hollander it
13   will be Sean Clarke, and then if we have --
14            THE COURT:  Sean Clarke is live.
15            MS. RODRIGUEZ:  It will only be live witnesses
16   today.
17            THE COURT:  Only today?  Live witnesses?
18            MS. RODRIGUEZ:  Yes.
19            THE COURT:  Okay.  All right.  So I don't have to
20   worry.  I have already finished reviewing rack forwards
21   testimony.  So Rachford is the day after --
22            MS. RODRIGUEZ:  As we have slipped a little in our
23   schedule we have had to rearrange.  I think today is
24   Hollendar, Sean Clarke and if we have time, perhaps Matt
25   Comlish but they are all live.
```

```
 1            THE COURT:  Okay.  Well, let me do this, since I

 2   have, let me give you what my, let's call it preliminary view

 3   of the Tom Rachsford, Mr. Rachford is hardly friendly to the

 4   union.  You could use the word sold me down the river in

 5   referring to his experience when he was representing Emory.

 6   Why isn't he hear?  I mean, he is not a hostile witness.  He

 7   is not --.

 8            MR. PRESS:  He is in China.

 9            THE COURT:  Permanently in China.

10            MR. PRESS:  No, he flies to China, back and forth.

11   He is based in Phoenix, Judge.  He just can't be here.

12            THE COURT:  Okay.  Well, let me give you my views

13   of the, just preliminary since he is not going to be here

14   live, I will let them be argued at a later time.  Okay.  This

15   is just to give you where my head is at from reading this

16   material.

17            The first objections are page 28, line 1, basically

18   through 30, line 10.  And my reaction is, at this time, is to

19   sustain that objection.

20            The next objection, I am breaking it up a little

21   here, is page 31, line 17, line 22, page 31, line 17 to line

22   22.

23            That, I am going to overrule the objection.  From

24   line, page 31, line 24, to page 32, line 17, I would sustain

25   the objection.  From page 32, line 18, to line 21, I would
```

1   overrule the objection.

2            On page 36, line 23, to page 37, line 8, I would

3   overrule the objection.

4            From page 39, line 3, to page 39, line 13, I would

5   overrule the objection.

6            From -- well, it looks like the objection starts on

7   my copy, around page 44, line 1, to -- 44, line 1, to 45 to

8   45, line 6, I would overrule the objection.

9            I said 45, line 6.  Yes, I would overrule the

10  objection.

11           From 45, line 7, to 53, line 18.  All the

12  objections in that stretch, I would sustain.

13           From page 56, line 17 -- no, I will call it line

14  14, from 56, line 14, to line 17, just that same page, 56, 14

15  to 56, 17, I would sustain the objection.

16           From 56, line 18 to line 25, 18 to 25 on page 56, I

17  would overrule the objection.

18           Page 57 line 1 to line 9, 57, lines 1 to 9, I would

19  sustain the objection.

20           From 57, line 11, to line 16, I would overrule the

21  objection.

22           Now, what ALPA calls completeness is really the

23  cross examination, in this case, it was Mr. Connell who was

24  the cross examiner, he is not here, I don't see him here, but

25  he was representing  ALPA, from Archer Greiner, representing

1   ALPA.

2           I am not letting it in for completeness purposes.

3   I don't even know what that means.  I am letting it in

4   because of the length of the trial and the concept that they

5   ought to hear the cross examination any time they hear

6   direct.  On the same basis I am going to allow in some of the

7   redirect later on.  I will get to that, of ALPA.  They should

8   hear that all at the same time.

9           However, although there is no objection to it, I am

10  not going to allow a little speech by Mr. Connell that is on

11  page 59, line 2, to 59, line 8.  I want that out.

12          The rest of his suggested cross examination, I am

13  going to allow.  There was no particular objection to it.

14  But I am allowing it, whether there was or was not, even if

15  there is objection.

16          Again, not so much on the rule of completeness,

17  just as the orderly presentation of evidence.

18          Now, the next time, the next point that we have

19  anything to deal with is, comes on what is the redirect, in

20  effect, the redirect of Mr. Press.  The first objection is at

21  page 137, line 15, to page 138, line 1.  In which case I am

22  overruling that objection.  When I say overruling, I mean I

23  am letting it in.  From page 138, line 25, to 139, line 5,

24  which was testimony, an exchange between counsel, I am taking

25  it out.  That is not even a, that is not even testimony.

7

```
 1              MR. PRESS:  Did we designate that.

 2              MR. KATZ:  Yes, you did.

 3              THE COURT:  You did.  At least according to my copy

 4    you did.

 5              MR. PRESS:  That was clearly done in error, Judge.

 6              THE COURT:  Yeah, because what follows immediately

 7    after that I am leaving in.  I am just taking out, like six

 8    lines of, on the back and forth, I can't even tell exactly

 9    what was happening but whatever is happening is not relevant

10    to --

11              MR. PRESS:  That was inadvertent, Judge.

12              THE COURT:  -- to the jury..

13              Now, from page 141, line 21, or line 20, to page

14    147, line 3, the sections that were objected to, I am

15    sustaining the objections however, it is not clear to me, I

16    don't think, I just note that page 145, line 8, to page 145,

17    line 12, was objected to, so --

18              MR. KATZ:  We didn't object to that.

19              THE COURT:  So that I am not -- I couldn't tell

20    here whether you objected to it or you didn't.  Since there

21    is no objection to that --

22              MS. RODRIGUEZ:  I am sorry, your Honor.  What was

23    the last set of --

24              THE COURT:  Just a little section here.  145, line

25    8 to line 12.  Which was within a section that was mostly
```

1    objected to, I couldn't tell whether they objected to it or

2    not.  He says they didn't.  So if they didn't object to it,

3    you can do it.

4              MR. PRESS:  Your Honor, I am not clear on what set

5    of objections you reviewed compared to --

6              THE COURT:  I reviewed, and this has come up here,

7    I will physically show it to you.

8              MR. PRESS:  It has been an evolving set of

9    objections.

10             THE COURT:  This is the -- they have.

11             MR. PRESS:  I don't have that.  What we have or are

12   the okay /-S set forth in the final pretrial order.

13             THE COURT:  I have done everything by line, this is

14   what I have.

15             MR. KATZ:  Thinks the latest version of the

16   objections that I sent to you.

17             THE COURT:  Does he have this?

18             MR. PRESS:  I personally don't.

19             MR. KATZ:  Neither of us has that particular

20   version but he has the information that is recorded there.  I

21   will sit with you and give you the markings.

22             MR. PRESS:  I just want to be clear that we edit

23   this thing according to your instructions.  That is all I

24   want to do.

25             MR. KATZ:  I have them marked on my copy.  I am

```
1    happy to sit with you and Nicole and work through the pieces.

2    It is what I sent either on Saturday afternoon.

3              MR. PRESS:  Okay.  Do we will deal with it after.

4              THE COURT:  I am on happy, you obviously no what is

5    in here.  You prepared this.  I am happy to let you have this

6    for the moment.

7              MR. PRESS:  Maybe after court today, if I can sit

8    with Mr. Katz with that.

9              THE COURT:  Okay.

10             THE COURT:  I will give it to the two of you.  Then

11   you can get together.  I also, you should be pretty much able

12   to tell what I just read from into the record from my notes

13   here.  I have the words no.

14             MR. PRESS:  And hell, no?

15             THE COURT:  No, I don't have that.  I have no,

16   which means I am sustaining the objection or I have okay or

17   yes, which means I am overruling the objection.  And I mean

18   at one point I noticed I have the word hearsay but that is

19   irrelevant.  That kind of comment.

20             MR. PRESS:  Judicial work product.

21             THE COURT:  Judicial work product.

22             MR. KATZ:  Should we take that out.

23             THE COURT:  As you know, I won't be here after two

24   30 today, so you will have to do it on your own.

25             MR. PRESS:  It is not a problem.
```

 1              THE COURT:  Tomorrow I will be here.  You know what
 2   I told you.  Let's get started with the jury now.
 3              MR. KATZ:  /KEU take this.
 4              THE COURT:  I will give it to you now.
 5              MR. KATZ:  Maybe there ill will be an opportunity
 6   during the fire drill.
 7              THE COURT:  Clark I have not done yet.
 8              MR. KATZ:  There are three more coming today.
 9   Rosen, Warner, and somebody else.
10              THE COURT:  Just make sure that I don't have any
11   free time.
12              MR. KATZ:  Rosen, Warner and Mogunditchen.
13              (The jury enters the courtroom.)
14              HOWARD HOLLANDER, resumes.
15              THE COURT:  About morning, everybody.
16              Please be seated.  We will see what we can do
17   before the bells start clanking.  And the super secret fire
18   drill that nobody is supposed to know about takes place.
19              Okay.  Oh, Mr. Jacobson object son.
20              MR. JACOBSON:  Hollander, if you would take the
21   stand, please.
22              Howard Hollander, previously sworn, resumes.
23              CONTINUED DIRECT EXAMINTION
24              BY MR. JACOBSON:
25   A.   Good morning, your Honor.

```
 1    Q.   Mr. Hollander, when we broke off yesterday we just
 2    talked about how you had learned about the possible American
 3    Airlines transaction from a phone call from Mr. Pastor?
 4    A.   Correct.
 5    Q.   What did you understand your obligations as a MEC member
 6    to be in connection with this American airline transaction?
 7    A.   Once I got the phone call from Bob Pastore at a certain
 8    point, an answer had been given more information, my role to
 9    plea was extremely simple.  I knew what the future, at that
10    time, was going to be.
11    Q.   Pull the microphone closer?
12    A.   I thought, I had a very confident idea what our future
13    looked like and really I shifted gears, I never of course
14    abandoned the New York pilots but the focus of my energy was
15    just to make sure that each and every TWA pilot would be
16    secured in their future with this integration.
17    Q.   Did you attend any meetings of the MEC following
18    learning about the hose, airline transaction?
19    A.   I (what.
20    A.   I can't tell you how many, there were a number of MEC
21    meetings and each and offer than one I was present for.
22    Q.   You should have in front of you a document in evidence
23    as exhibit 243?
24    A.   I have it in front of me.
25    Q.   Is that the minutes from the January 17 through 19 TWA
```

1    MEC meeting?

2    A.   That's correct.

3    Q.   Prior to this meeting after the announcement of the

4    American Airlines deal, were MEC meetings typically multi

5    day?

6    A.   Yes.  The normal routine of the MEC meetings in St.

7    Louis were as follows.  The secretary treasurer, of late Bob

8    Pastore, then of course after that Ted Case took that

9    position, but what we would do is we would set a yearly

10   calendar and they would there were typically three, sometimes

11   four day meetings, but we would meet basically three or four

12   times a year and we would set a calendar for those meetings

13   so ever pilot could obviously get their scheduled squared

14   away to be there on to be there to attend.

15   Q.   Once the merger was announced did you increase the

16   meetings from the three to four times a year rate?

17   A.   I would say a number of meetings at certain points like

18   the months of March and April almost become weekly, whether

19   in person or telephonic.

20   Q.   You attended this meeting?

21   A.   Let me take a look.  I believe so.

22            THE COURT:  What was the exhibit number you gave?

23            MR. JACOBSON:  Defendant's 243.

24            THE COURT:  J?

25            MR. JACOBSON:  It is a D exhibit, your Honor.

```
 1              THE COURT:  D 2 43.  Sorry.  Go ahead.

 2    A.    I believe I attended this meeting, yes.

 3    Q.    And did you receive reports at the meeting about

 4    contacts with the American pilots and their union and what

 5    their attitude was towards TWA pilots at that time?

 6    A.    When you say contacts.  Can you be more specific.

 7    Q.    Sure.  Look down on the first page to something referred

 8    to as the magic master chairman report?

 9    A.    Yes.

10    Q.    To speed it up can you read that paragraph to the jury?

11    A.    Briefed the MEC regarding meeting with APA.

12    Q.    Slow down.

13    A.    Briefed the MEC regarding meeting with APA president

14    John Darrah, and APA vice president Robert Ames.  Pastore

15    reported that the meeting was cordial and the APA leadership

16    appeared willing to work with our MEC to get things done in a

17    way that was beneficial to every one.

18    Q.    And if you turn to the next page was the report made by

19    the vice chairman, Scott Shwartz?

20    A.    It was, typically by the way, the master chairman and

21    vice chairman made reports.  It says.

22    Q.    You want, just the first sentence of his report?

23    A.    Detailed the meeting with APA who indicated they were

24    looking forward to having a 75 year airline as part of their

25    organization.
```

Hollander-direct/Jacobson                                              14

1    Q.   There is this is a part of the report of what the MEC

2    voting members like yourself heard at the beginning of this

3    transaction on January 17?

4    A.   That is correct.

5    Q.   Would you your Honor turn to page 18 of this document?

6    A.   This.

7              THE COURT:  This being 243?

8              MR. JACOBSON:  Yes, your Honor, same document.

9    Q.   Are you there?

10   A.   I am here.  Yes.

11   Q.   And there is a roll call vote there, and just a little

12   below the roll call, include that line below the roll call?

13   A.   I see the roll call vote.

14   Q.   You are voting on a resolution regarding secretary

15   treasurer, correct?

16   A.   That is correct.

17   Q.   And I note that in this vote you vote 20027 votes

18   against and one vote in favor?

19   A.   That is correct.

20   Q.   And the line below that, what does that say?

21   A.   Hollander, for the record, voted one against the motion

22   at the request of Tom Quigley.

23   Q.   Can you tell the jury what that is about?

24   A.   If you recall yesterday, I had mentioned the first time

25   I was voted into office was because all of Council 2, the

1    president, the vice chairman, and the secretary treasurer, in

2    layman's terms, were thrown out.  And after that, shall we

3    say, after that heated meeting where they were all removed I

4    was put in place as the first officer rep.  Captain Tom

5    Quigley was the captain rep who was removed.  Although I have

6    known Tom for the better part of my career he had publicly

7    said in front of everybody when I was elected that when ever

8    there is a roll call vote, any way you vote, I want you to

9    vote me the opposite way.  He was not joking.  He was

10   serious.  Because he had I think a little ill will.

11   Q.   And so did you that?

12   A.   At his request, every single vote from that moment I

13   always made sure I voted Tom Quigley against whatever my

14   wishes were.

15   Q.   Is that consistent with your view that your job was to

16   vote what the members wanted?

17   A.   That is consistent.  Whatever my membership wanted me to

18   pass along, whether it was one pilot, five pilots, I did what

19   they asked.

20   Q.   There is a resolution, 01-22.  Could you highlight that

21   resolution?  Do you see that resolution, 01-22?

22   A.   I do.

23   Q.   That is a resolution relating to jumpseats?

24   A.   That's correct.

25   Q.   We heard testimony, I don't think you were here, that

```
 1   the jumpseats are additional seats in the cabin that pilots

 2   ride to commute to their work?

 3   A.   That's correct.  Depending on the airplane there are one

 4   or two additional seats inside the cockpit of the airplane.

 5   Q.   Could you read the resolution to the jury so they can

 6   hear it?

 7   A.   The resolution, 01- 22 reads as follows:  Therefore, be

 8   it resolved that the TWA MEC directs the master chairman, or

 9   his designee, to immediately contact the vice president TWA

10   flight operations, and request that the American Airlines

11   pilots be moved to a priority position on the TWA reciprocal

12   jumpseat list, and be it further resolved that under this

13   priority position the American pilots would come to immediate

14   would come immediately behind the TWA pilots, and it says in

15   parens  ACM14, and ahead of OAL pilots, paren ACM17.  If you

16   need a definition I am other --

17   Q.   What is an OAL pilots?

18   A.   OAL file is a pilot from another airline, like United or

19   Pan Am pilot wanting to ride in our cockpit.

20   Q.   Sometimes it is more than one pilot wanting to ride in a

21   jumpseat?

22   A.   That's correct.  Certainly routes are more popular.

23   Q.   Why did the MEC vote to put the American pilots ahead of

24   all the other pilots?

25   A.   My recollection from that meeting was based on Captain
```

```
 1   Pastore, Captain Shwartz's very positive initial contact with
 2   American Airlines, we felt it would be, for lack of any other
 3   words, a regift, and provide some good will towards the
 4   American pilots and stir up, I think the word we used that
 5   day, was a little brotherhood and we were trying to tell the
 6   American Airlines pilots let's start off on the right foot.
 7   If you guys want to travel on our airplanes we are going to
 8   give you priority over other airline pilots.  We were just
 9   essentially trying to use a little honey.
10   Q.   Turn to page 2 of this exhibit, if you would,
11   defendant's 243?
12   A.   I am here.
13   Q.   Near the bottom of that there is a resolution, and the
14   line is, be it further resolved.
15   A.   The very last line.
16   Q.   Yes, sir.
17   A.   It says be it further resolved that a legal
18   representative of LeBoeuf Lamb Green and MacRae be in
19   attendance at all creditors committee meetings.
20   Q.   Is that referring to the creditor committee meetings at
21   the bankruptcy court?
22   A.   That is correct.
23   Q.   And if you turn to two pages letter, page 24, last two
24   lines, therefore, be resolved?
25   A.   Talking about number oh 101 - 35.
```

1    Q.    Yes, two paragraphs of resolutions?

2    A.    Therefore, be it resolved that the TWA MEC supports the

3    participation of Michael Glanzer and company, as the

4    investment banker for the TWA MEC throughout the bankruptcy

5    slash asset sale process, and be it further resolved that the

6    TWA MEC directs the master chairman to communicate regularly

7    with Michael Glanzer and refer such communications from

8    Michael Glanzer back to the MEC.

9    Q.    And the next page, page 25 of the exhibit, there is a

10   resolution that is the fifth paragraph down?

11   A.    Resolution, 01-3.

12   Q.    Yes, a resolution by you seconded by Singer?

13   A.    That's correct.  Therefore be it resolved that the ALPA

14   TWA MEC direction the TWA MEC officers to solicit the ALPA

15   Executive Council for funding to retain Roland Wilder, of

16   Baptiste and Wilder, as ALPA's TWA pilots seniority

17   integration merger counsel.

18   Q.    Is it fair to say this series of resolutions that we

19   just looked at here are the MEC's efforts to put their team

20   together and get the ball rolling for the merger negotiations

21   with the American pilots?

22   A.    That would be an accurate assessment.

23   Q.    Now, did you have a, you talked about a council.  Did

24   you have any Council meetings, Council 2 meetings, in New

25   York, concerning the merger between the TWA and American

1    pilots, with all the pilots in the New York area?

2    A.   Well, we did regularly have local council meetings which

3    was part of the ALPA Constitution and bylaws.  The next one

4    that was scheduled, and I believe it was scheduled some time

5    in February, but we did have a meeting, I can't give you the

6    exact date but we had a meeting mid March, but that was again

7    scheduled in February, and the agenda to that meeting had

8    changed but we did have one scheduled.

9    Q.   All right.  And what was the topic raised at this mid

10   March, 2001, Council 2 meeting?

11   A.   Obviously, in addition to what I would call old

12   business, or typically old business, house keeping items, the

13   hot topic of the day was obviously the American Airlines

14   merger and where we stood, some rumor control, and of course

15   the most topic was the issue of, that had come up about the

16   possibility of waiving our scope language.

17   Q.   Did any advisors make any type of presentations to the

18   pilots of Council 2 at that meeting?

19   A.   Because of the elevated motions, I had invited Roland

20   Wilder, our merger attorney, to join us at the meeting.  I

21   cannot recall if he was there in person or telephonic but he

22   did have an opportunity to address the pilots at that meeting

23   for a brief period of time.

24   Q.   All right.  What did Mr. Wilder tell your pilots in

25   Council 2 about the merger?

1   A.   About the merger, specifically?  He was optimistic, in

2   general.  He said that he just basically rere viewed his many

3   many years of experience, and questions were asked of him

4   directly about the possibility of waiving scope, and he spoke

5   against it, and the quote that came out from that meeting

6   that is engraved in me is if you are going to get into a

7   fight it is much better to stand up and ought fight than lie

8   down.  I have heard that a number of times but that is where

9   it was first said.

10  Q.   All right.  Were any actions taken either by your local

11  executive committee or by the pilots present at the

12  resolution regarding merger, scope waiver, any of those

13  items?

14  A.   There was.  After, you know, I gave my own, if you will,

15  describe as to the information that was provided to me from

16  the MEC meeting, as did Dave Singer and as did Ted Case.

17       And Bud Bensel was also present who was at the time

18  the merger committee chairman, had shall we say given a

19  presentation, and at some point after, quite a lengthy

20  debate, a floor resolution, which is a pilot in attendance,

21  had come up with a resolution, and it was recorded in the

22  record, and although I don't remember all the where as's, but

23  the final conclusion was therefore be it resolved that the

24  pilots of New York are directing its local LEC reps to vote

25  against waiving our scope language.  It was from put on the

1   floor by pilot Anthony Formica, seconded by Bud Bensel and

2   passed unanimously by pilots who attended the meeting.

3   Q.   Roughly how many pilots are were at that meeting?

4   A.   Between 50 and 60.

5   Q.   What was your typical attendance in a Council 2 meeting

6   at that time?

7   A.   Roughly 20, 25.

8   Q.   So you had roughly twice your usual attendance?

9   A.   That is correct.

10  Q.   So you received your marching orders from your pilots in

11  Council 2 and I would like to you see if you have in front of

12  you an exhibit already in evidence, defendants 223.  The next

13  one in your stack?

14  A.   I have it in front of me.

15  Q.   What is the date of that document?

16  A.   March 21, 2001.

17  Q.   Did you attend a special MEC meeting at that time?

18  A.   Stand by.  Yes, I did.

19  Q.   Was this meeting after the Council 2 meeting you just

20  discussed?

21  A.   Yes, it was.

22  Q.   During this time period were you having any personal

23  contacts with the president of ALPA, Duane Woerth?

24  A.   No, I had no personal contact with Duane Woerth.

25  Q.   Did you learn at this meeting that some of your other

 1   MEC members or officers were having direct conversation was

 2   Mr. Woerth?

 3   A.   I really -- can I --

 4   Q.   Turn to the second page, if you if you would, the vice

 5   chairman's report.

 6   A.   Okay.  One second.

 7   A.   It says here the vice chairman, Scott Shwartz, had had

 8   telephone conversation was president Duane Woerth.

 9   Q.   All right.  And did Mr. Shwartz report to you, the

10   voting members of the MEC on his conversations with Duane

11   word?

12   A.   He did.

13   Q.   What do the minutes reflect?

14   A.   Vice chairman's report from Scott Shwartz, briefed the

15   MEC regarding telephonic conference with Duane Woerth who

16   promised to ramp up ALPA's support and utilize other legal

17   venues for support.  Discussed the relaying of the

18   information to the pilots, streamline of communication

19   efforts was going to be made.  He also reported that TWA ALPA

20   had scheduled meetings with the department of Department of

21   Transportation representatives.

22   Q.   When you heard from Mr. Shwartz about Mr. Woerth's

23   attempt to ramp up support, did that dishearten you in your

24   resolve?

25   A.   It made me feel a little more comfortable.

1    Q.   At this meeting, March 21, March 22, were there any

2    presentations made by the various ALPA representatives who

3    later made presentations to you on April 2?

4    A.   Can I take a moment?

5    Q.   Sure.

6    A.   Is this is there a page that reflects that?

7    Q.   No, I am asking you if you recall such --

8    A.   No, I don't recall offhand.

9    Q.   Let me rephrase the question.  We are going to talk a

10   little bit about April 2.  All right.  My question to you is

11   at any MEC meeting before that April 2 meeting were you ever

12   told by ALPA representatives, or individual, outside

13   advisors, hired by ALPA or MEC, that you had to waive your

14   scope?

15   A.   I was not.

16   Q.   And when I talk about you, I am talking about you,

17   collectively, meaning together?

18   A.   I do not recall any MEC meetings prior to that April

19   meeting where an ALPA adviser either told me personally or

20   talked to the group about having to waive scope.

21   Q.   All right.   Was Roland Wilder present at the March 21,

22   22, meeting, do you recall?

23   A.   I do not recall.  Roland Wilder, once retained was, you

24   know, became a regular guest at the MEC meetings.  I am

25   trying to see if he was here specifically at this one.  It

```
 1    just says the list is on file.  I am trying to see if he
 2    spoke here at all.  I don't recall if he was at this meeting.
 3    Q.   You have no recollection so we will move on.  All right.
 4    At some point you heard about something called 1113 motion.
 5    A.   That is correct.
 6    Q.   When do you recall first hearing about a 1113 motion,
 7    what was the context, the situation?
 8    A.   I received a, I think it was telephonically first, that
 9    there was going to be a motion to file a 1113, and I, to be
10    quite honest, did not know what a 1113 was.
11    Q.   So what did you do when you heard about this 1113 most?
12    A.   The very first thing I did when I got word of it was
13    called the contract administrator which was the normal
14    procedure.  I called David Holtzman.
15    Q.   He is an employer who is an employee of ALPA?
16    A.   That's correct.
17    Q.   His offices were in the TWA MEC?
18    A.   That's correct.
19    Q.   You called him.  What do you ask him?
20    A.   I called David Holtzman and, you know, we joked and I
21    said David, I am embarrassed to ask you, but what is a 1113?
22    I really didn't know what the process was.  And he gave me a
23    very, very brief description of what he thought the 1113
24    process was.  I was okay with it.  It was very brief.
25    Q.   Did he give you any views about what the outcome would
```

Hollander-direct/Jacobson                                    25

1    be of the 1113?

2    A.   He told me.

3    Q.   Let me finish the question.  She won't be able to take

4    down the transcript if you talk over mere.  Did Mr. Holtz and

5    man at that time in that conversation tell you anything about

6    what he believed the outcome of the 1113 motion would be.

7    A.   I I do not recall him saying a specific thing about the

8    outcome.  His answer to me was it was something I would not

9    have to worry about, or the quote was, we, the TWA pilots,

10   will not have to worry about this.

11   Q.   Did he give any explanation for that?

12   A.   No, he did not.  He actually, he asked me if I wanted

13   more information.  He he actually provided me with Clay

14   Warner's phone number and directed me to call Clay Warner or

15   someone else at ALPA headquarters and they would be able to

16   explain it further.

17   Q.   Did you know Clay Warner at this point in time?

18   A.   I had met him once before, yes.

19   Q.   Did you call Clay Warner?

20   A.   I did.

21   Q.   We are talking about, let's opinion this down in point

22   of time.  Can you tell us, we will say, in connection between

23   the March 21 MEC meeting, and the April 2 MEC meeting, did it

24   happen before March 21, did it happen between the two

25   meetings, after, what can you tell us?

1   A.   I could not give you the date but I could clearly say it

2   was between the March 21 meeting and the April 2 meeting.

3   Q.   Someone from that 10 day period?

4   A.   In that two week timeframe.

5   Q.   Did you call Mr. Warner?

6   A.   I did.

7   Q.   How long did you talk on the phone to Mr. Warner?

8   A.   Approximately 45 minutes.

9   Q.   What did Mr. Warner tell you -- did you talk about the

10  1113 motion?

11  A.   He did.

12  Q.   What did he fell you about the 1113 motion?

13  A.   He gave me a very accurate description as to what the

14  1113 process was all about.  He explained it in great detail

15  did me and I was very thankful for.

16  Q.   What did he tell you the 1113 process was about?

17  A.   In, to reiterate he told me it was an action that would

18  be brought about, in this case, for TWA to strip away, if not

19  its entirety, but to strip away the pilots' contract, the

20  collective bargaining agreement.  Obviously there was

21  something there that was upset to go the new entity.  He

22  further explained in his point of view that what they were

23  specifically looking to do was to get rid of the scope

24  language.  He explained how the process would work in

25  Delaware and the courts.

1   Q.   Did he tell you what the standard would be for the Court

2   to pass the 1113?

3   A.   He did.  It is funny how you go back after ten years and

4   there are some things that shall a little vague and some

5   things you remember like yesterday.  And Clay Warner's

6   paraphrasing but I could say close to a quote as possible, he

7   said Howard, here is the guidelines, if you will.  He says

8   basically -- well, he said this.  He said the contract has to

9   be so onerous and burdensome that the new entity cannot

10  produce a profit.  Do you think your TWA contract is so

11  onerous and burdensome that you can't produce a profit,

12  especially if you compare it to the American Airlines

13  contract?  He says all they are after is your section 1, and

14  he says --

15          THE COURT:  Section 1 is the scope.

16  A.   Section 1 is the scope section, correct.  He was very

17  specific about it, and then he, for lack of any words, calmed

18  me down by referring to the fact that they have some of the

19  best lawyers in the world to handle there with multiple years

20  of experience.  He mentioned them by name, Kohl, Wise and

21  Simon and he said that they did not think we were were going

22  to lose this 1113 motion.

23  Q.   So he gave you a forecast of what he thought was going

24  to happen, who was going to win that motion?

25  A.   His for was cast was that the TWA pilots would prevail,

1  or ALPA would prevail.

2  Q.  Did you take notes of this conversation?

3  A.  I did.

4  Q.  Did you share those notes with anyone?

5  A.  I did.  I shared them with both David Singer and I put a

6  copy of the notes in secretary Treasurer's Ted Case's mailbox

7  at hanger 12 at Kennedy.

8  Q.  Now, just talking at the point before that April MEC

9  meeting.  Okay.  Through the rest of March of, or even, you

10  had some before we missed, through the end of March of 2001.

11  Okay?  Did you have conversations with other advisors in that

12  time period about anything?

13  A.  No. I don't recall any specific conversation.

14  Q.  Do you know do you know Michael Glanzer?

15  A.  You will do know Michael Glanzer.

16  Q.  Who is Michael Glanzer?

17  A.  Michael Glanzer was retained by the MEC as adviser.  He

18  was an investment banker.

19  Q.  Did you have interactions with Mr. Glanzer prior to the

20  April 2 meeting?

21  A.  I can't remember the timeframe.  I did have interactions

22  with Michael Glanzer and then somewhat of a personal, but I

23  couldn't tell you the exact timeframe.

24  Q.  All right.  Just setting that April 2nd meeting where

25  everyone told you you have to waive scope, were your

```
 1   interactions, personal interactions with him before or after

 2   that meeting?

 3   A.   I had at least one interaction with him which was after

 4   the March 22 meeting.

 5           THE COURT:  But before the April 2.

 6   A.   But before the April 2 meeting.

 7           THE COURT:   Between March 22 and April 2.

 8   A.   Correct.

 9   Q.   Did you travel with Mr. Glanzer?

10   A.   I did.

11   Q.   Can you tell the jury the circumstances under which you

12   were traveling with Mr. Glanzer?

13   A.   Being the local New York rep, and living in New York,

14   when the MEC meetings would conclude, again, depending on the

15   time but the first available flight home to New York was

16   usually my norm, I would leave the meeting, if it was very

17   late I would spend the night and take the first flight out in

18   the morning.  Michael Glanzer lived in Manhattan, and we had,

19   on at least two occasions, sat next to each other on an

20   aircraft going back to LaGuardia.

21   Q.   And did you have conversation was him?

22   A.   I did.

23   Q.   Did you stay with him after landing at LaGuardia?

24   A.   On two occasions I actually drove him right to the door

25   of his house or his brownstone.
```

 1   Q.   Did he talk to you in those conversations about his

 2   views about TWA and its future?

 3   A.   He did.

 4   Q.   What did he tell you?

 5   A.   Mr. Glanzer's, and he was firm in his position,

 6   basically all the way through, Mr. Glanzer's view was that

 7   TWA, and all airlines, he believed that --

 8   Q.   You say something specific to TWA or something that is

 9   true about all airlines?

10   A.   He actually said both, but in the conversation he was

11   referencing specifically TWA, and he believed wanted to marry

12   --

13             THE COURT:  I believe that is the fire drill.

14             What a surprise.

15

16             Recess)

17

18             (The jury enters the courtroom.)

19             Howard Hollander, resumes.

20             CONTINUED DIRECT EXAMINATION.

21             BY MR. JACOBSON:

22             THE COURT:  Mr. Jacobson.

23   Q.   Mr. Hollander, before we broke for the fire drill we

24   were just starting to ask about the conversations you had

25   with Mr. Glanzer while traveling with him back from St. Louis

1    to New York.  Is that right?

2    A.    Correct.

3    Q.    And you were just starting, I think you were saying

4    married was the word you said when the alarm went off.  Tell

5    us what Mr. Glanzer said about TWA and other airlines getting

6    married?

7            MR. FRAM:  Could we have a timeframe, your Honor?

8    Q.    Did you tell them when the conversation was, I think we

9    discussed it early?

10   A.    This  conversation took place definitely between March

11   22 and April 2.  I recall to the best of my recollection

12   returning to New York from that March 21 meeting.  If we look

13   at the date, it may have been March 23 when we traveled home

14   together.

15   Q.    All right.  Can you tell us what he said on that

16   subject?

17   A.     Mr. Glanzer's comments were as follows.  He was

18   steadfast that he believed TWA as an airline needed to

19   partner up, his quote was, Mary up with another airline.  And

20   he expressed that a number of times, and to, not to simplify

21   it but he forecasted that by the year 2010 there would only

22   be four or five airlines flying around in general.

23   Q.    And did he indicate that this was, this marrying thing

24   was something  that was unique to TWA and its situation or

25   was it something more general application to airlines in

1    general?

2    A.    No. He indicated that he was specifically that that this

3    was a good thing for TWA and he wanted to see its conclusion

4    at all cost.

5    Q.    What are you talking about -- well?

6             THE COURT:  I am sorry.  That means good for TWA.

7             THE WITNESS:  Yes, he thought it was good for TWA.

8    Q.    Did he, you were involved in this hiring?

9    A.    That's correct.

10   Q.    All right.  What was his compensation arrangement?

11   A.    I know when we, the technicalities of his contract was

12   more for the secretary treasurer but it was put before the

13   MEC.  I recall him getting a monthly salary of $10,000 a

14   month for his work, and I don't recall but I know there was

15   a, what I would call a success fee, if a transaction was

16   completed, he got a certain percentage at the end, and I

17   don't recall what the percentage was.

18   Q.    All right.  Would he get that percentage under what

19   conditions?

20   A.    He would get that percentage under a successful

21   marriage, or a successful merger with another airline.

22   Q.    If TWA did not merge with another airline would he get

23   that success fee?

24   A.    No, he would not.

25   Q.    Did Mr. Glanzer express any complaints to you about

1   having taken this job?

2   A.   He expressed frustration.  You know, in a ride back to

3   his apartment, he just was, his quote was I didn't think I

4   would have to spend so much time with this deal.  He thought

5   that, and I don't know if that was because there were

6   internal issues with him and what was going on with his

7   company but he expressed that his traveling out to St. Louis

8   was a burdensome thing.

9   Q.   All right.  So I want to put you back, if I can,

10  mentally at the end of March of 2001.  All right?

11  A.   Okay.

12  Q.   At that point in time what was your understanding, based

13  on everything that you had heard from advisors and at MEC

14  meetings, from Mr. Wilder, all the sources of information you

15  were getting, what was your understanding at the time about

16  what the likely outcome was of the 1113 motion, whether TWA

17  or the pilots would win?

18  A.    It was that we were being prepared to fight the 1113

19  and that the TWA pilots, to the best of my knowledge, were

20  going to prevail in these proceedings.

21  Q.   That was based on what advisors told you.  Is that

22  correct?

23  A.   That is correct.

24  Q.   What was your view, once again, at the end of March of

25  2001, what was your view in your mind as to what your

```
 1   attitude was towards the notion of waiving scope for the TWA

 2   pilots, was it something you were going to do or something

 3   you were going to oppose?

 4   A.    I was not going to waive our section 1, our scope and

 5   successorship rights.  Between the advice given, between the

 6   information being circulated and between a resolution from

 7   the pilots of New York, and I want to say I think it is fair,

 8   it wasn't just from that meeting.  I mean, you spent an

 9   enormous amount of time, I am sorry, but hanger 12 if I

10   hadn't mentioned it before, is TWA's big hanger at John F

11   Kennedy airport where the pilots, flight attendance answer,

12   mechanics, all of our mailboxes, that is the place for us to

13   go.  I would on my days off hang out there and talk to the

14   pilots and discuss with them what was happening to the best

15   of my ability.

16         With few dissensions and their dissensions were not

17   about waiving scope for reasons of American Airlines like as

18   a pay issue.  Their reasons, some pilots were like, for

19   example, I think it is important, we had in New York a lot of

20   pilots who lived in Florida.  It was an easy commute to get

21   from south Florida to New York with the number of flights TWA

22   had.  There were a number of pilots, if this deal goes

23   through maybe I won't have to commute to New York because

24   American Airlines has an enormous hub in Miami.  I would

25   spend enormous time in the hanger 12 talking to them and the
```

1   overwhelming view was not to waive scope, please don't waive

2   our scope rights.

3   Q.   Was it your intention at that time not to waive scope?

4   A.   That's correct.

5   Q.   What was your view about the negotiations, about how one

6   might put leverage or pressure on the American pilots to

7   improve the negotiations, and this is as of the end of March,

8   2001?

9   A.   I only knew of, I think I knew of one that was proposed,

10  most certainly my information I think or the MEC's

11  information was coming either through Roland Wilder or

12  through the merger committee that there were strategies being

13  looked at.  I can't remember specifics about those

14  strategies.

15  Q.   All right.  Now, let's move to the special meeting of

16  April 1 and April 2.  All right.  Was this a regularly

17  scheduled meeting or a special meeting, to your recollection?

18  A.   This was a special meeting.

19  Q.   How much against notice did you have on of the special

20  meeting?

21  A.   I probably had about 24 hours notice.

22  Q.   Did you attend the meetings on April 1 of 2001?

23  A.   I was not, I was not at any meeting on April 1, and I

24  don't recall being called to a meeting from the message that

25  went out, it was specified to be a work session.

1    Q.   All right.  Were you at the work session or meeting on

2    April 1?

3    A.   I was not.

4    Q.   Let me finish the question?

5    A.   I apologize.

6    Q.   Were you at the work session or meeting on April 1 of

7    2001?

8    A.   I was not.

9    Q.   Why not?

10   A.   With the short notice, whatever, I can't recall what was

11   happening at the time, maybe I was flying when I got the

12   notice, but I traveled in to Saint Louis on the evening of

13   April 1.

14   Q.   Okay.  Now, let's move then to on -- did you meet with

15   any of advisors on the evening of April 1?

16   A.   I did not.

17   Q.   All right.  What did you do?

18   A.   I actually, the first thing I did when I got there is I

19   was just talking to the pilots in the ramp office in St.

20   Louis, similarly like what I would do in New York and I was

21   hanging out specifically, Ted Case had called me and gave me

22   his flight information and I was waiting for him to arrive

23   and we actually traveled to the hotel together that evening.

24   Q.   So you arrived at the, did you go to the MEC office that

25   day at all?

1    A.    No.

2    Q.    You just went to the hotel?

3    A.    That is correct.

4    Q.    Any encounters, conversations, meetings of any kind,

5    with any of the the advisors on April 1?

6    A.    No.

7    Q.    So let's move April 2.  There has been a lot of

8    testimony already about the April 2 meeting.  I don't think

9    you were here for most of it.  So I would like to go through

10   in a more abbreviated fashion if we can.  Is that all right?

11   A.    That is fine.

12   Q.    You have in front of you, this maybe helpful to you, a

13   document that that is already in evidence as D 74, the next

14   one in your pile?

15   A.    That's correct.

16   Q.    Those are the minutes for the April 2 meeting date?

17   A.    That's correct.

18   Q.    It says special meeting date, April 2, 2001.  Is that

19   correct?

20   A.    That is correct.

21   Q.    It doesn't say special meeting date, April 1 and April

22   2, does it?

23   A.    No, it just says April 2.

24   Q.    Now, did you start off at the beginning of the day

25   talking about the waiver of scope or the collective

 1    bargaining agreement with the TWA LLC?

 2    A.    There was, what I will call silent or in-house

 3    discussions in break rooms regarding the issue of the waiver

 4    of scope, nothing about a collective bargaining agreement but

 5    everybody was talking scope, scope, scope.

 6    Q.    All right.  And did you deal with ordinary business as

 7    well at the beginning of the meeting?

 8    A.    Yeah, we did.

 9    Q.    Was there a point in time when the MEC went into

10    executive session?

11    A.    There was.

12    Q.    Before we get to that, I would like to turn to the

13    second page.  Under questions and answers, there is a

14    paragraph about you.

15    A.    That's correct.

16    Q.    Could you read that to the jury?

17    A.    Questions and answers:  Hollander stated for the record

18    that he was disappointed that Captain Woerth was not present

19    at the bankruptcy hearing in Delaware and had not come to any

20    of the MEC's special meetings.  Hollander said he appreciated

21    Captain Woerth's busy schedule but would like to see him

22    face-to-face at least once.

23          Hollander with the MEC hope could engage more

24    support from Woerth and ALPA National.

25    Q.    Was this something that was an issue to you having the

 1    president of the association involved in your meetings at

 2    this present time?

 3    A.   It was.

 4    Q.   Why?

 5    A.   My answer to that would be it had been relayed through

 6    the master chairman and through the vice chairman and even

 7    other parties that Captain Woerth would take a quote very

 8    active role in this integration.  Promises were made.  And

 9    having sat in the bankruptcy court, in Wilmington, Delaware,

10    in Judge Walsh's court, I was extremely disappointed that he

11    did not make an appearance.

12         I was disappointed he didn't contact us.  I was

13    disappointed that he never even reached out and posted a

14    phone call to us, and you know, with the onset of what was

15    about to happen or that was rumored about to appear, I would

16    have thought on such a momentous occasion that Captain Woerth

17    would have made his presence in some form.  I was extremely

18    disappointed and that is why I wanted to state that on the

19    record.

20    Q.   Were you standing alone in expressing these opinions at

21    the MEC meeting on April 2?

22    A.   I don't believe so, no.

23    Q.   Turn to the next page, please, the second and third

24    paragraphs.  Are you there at the top, second and third

25    paragraphs of page 3 of this exhibit, the April 2 MEC

 1   minutes?

 2   A.   You want me to start, Lewin.

 3   Q.   Yes.

 4   A.   Lewin for the record agreed with Hollander's earlier

 5   statement and he was also a disappointed that the president

 6   of ALPA had not become more involved with TWA's plight and

 7   hope that this would change in the near future.  Case, Singer

 8   and Altman, for the record, also added their disappointment

 9   as well.

10           THE COURT:  This is the April 2 minutes.

11           THE WITNESS:  This is April 2 minutes, yes, your

12   Honor.

13   Q.   Did you personally atempted to contact Duane Woerth to

14   get him involved?

15   A.   I never called Duane Woerth, never.

16   Q.   Is there a reason why?

17   A.   I didn't think that was appropriate.

18   Q.   Who is supposed to contact the ALPA president on behalf

19   of the MEC?

20   A.   Following our normal protocol, that type of arrangement,

21   the MEC would also designate somebody, in this case the norm

22   would be either master chairman or the vice chairman or

23   sometimes the secretary treasurer.

24   Q.   As designated by the MEC?

25   A.   As designated by the MEC.

1    Q.    All right.   Now, as rapidly as you can, because there

2    was a long meeting and a lot of things were said, can you

3    tell the jury what was told to you and the other MEC reps by

4    the various advisors at the April 2 meeting concerning

5    waiving of scope?

6    A.    You are talking about specifically the conversations

7    that took place in executive session.

8    Q.    If that is where that took place?

9    A.    That is where it took place.

10   Q.    Were, was all the advice given by the at advisors, other

11   than Mr. Babbitt's earlier introduction and comments, all

12   done in executive session?

13   A.    Yes.

14   Q.    And the executive session excludes the general pilot

15   population?

16   A.    That is correct.   And anybody else the MEC wishes to

17   exclude.

18   Q.    And it does include normally who?

19   A.    Normal executive session would be the three MEC

20   officers, and then the, in this case, Council 2, Council 3,

21   and Council 4.   That was the norm.   If we asked or wanted

22   somebody specifically to be there, it was usually put on the

23   record.   In this particular case at this meeting the

24   additional people that were invited to executive session were

25   advisors that were present at the meeting.

1    Q.   What about the negotiations with committee members and

2    merge committee members.  Were they invited?

3    A.   I cannot recall if those committee members were invited

4    in or not.

5    Q.   Can you recall what the individual advisors said to you,

6    and if you can't recall, can you recall what any of them

7    said?

8    A.   You know, it is an interesting statement.  I can tell

9    you what was said that day as if I was there yesterday.

10   Sometimes it is a little vague as to who said what.  Clay

11   Warner was an active speaker.

12         Michael Glanzer did speak.  Bob Christie did speak.

13   Roland Wilder attempted to speak.  So I can remember that.

14   But let me phrase it as this:  I am from New York.  To me it

15   almost looked like a Broadway play.  That is how I look at it

16   today.

17         Everybody was singing the same song and distancing

18   to the same step, with one exception which was Roland Wilder.

19   Q.   Now, you said Roland Wilder attempted to speak.  What

20   did you mean by that?

21   A.   I often tried to get his points across.  At least once

22   or twice tried to offer other suggestions and he was

23   interrupted in his speaking.  He was not like, I am not

24   saying like allowed, but he was cut off.  Mr. Wilder, we will

25   get to that.  Mr. Wilder, we don't share your opinion on

 1   that.  It was that type of a conversation.

 2   Q.   All right.  You said Clay Warner was an active

 3   participant in that conversation?

 4   A.   He was active, yes.

 5   Q.   What did Mr. Warner say as best as you can recall?

 6   A.   Again, it was singing the same tune.  His recollection

 7   -- the best of my recollection, Mr. Warner's advice was that

 8   this deal had to go forward at all costs.  It was in the best

 9   interest of the pilots.  His quote that day, and again I told

10   you how you remember specific things.  At least a half a

11   dozen times, the quote of the day that I, that is ingrained

12   in my head is the train is leaving the station.  You are

13   either going to get on board or you are going to be left

14   behind.

15        That is what was repeated over and over again.

16   Even at a certain point, I think it was, I used today's

17   phrase, sugar coated.  If you folks will vote to waive your

18   scope as the first union in front of the flight attendants

19   and in front of the mechanics, there may be some extra to

20   get.  You will be perceived as the good people.  American

21   Airlines may owe you one, in some phrase they thought that

22   there was some benefit to have by being the first union to

23   get on board.

24   Q.   Do you recall when that particular statement was made

25   relative to Mr. Wilder's departure from the meeting?

 1    A.    No.

 2    Q.    Was it before or after you departed?

 3    A.    I couldn't tell you if it was before or after.  Mr.

 4    Wilder's departure was has actually done.

 5    Q.    Can you describe Mr. Wilder's departure?

 6    A.    At some point I think Roland Wilder, our merger

 7    attorney, and this is an opinion, was frustrated.  We all saw

 8    a video here yesterday.  Roland Wilder is a fairly frail man,

 9    well spoken, soft spoken.  He literally grabbed his

10    briefcase, and he headed for the door, and he had this look

11    on his face, you know, with bloodshot eyes, almost, and his

12    departing comments were this:  He said look, maybe some deal

13    is better than no deal, but I can tell you if you are going

14    to do this, you don't have to do it today.

15          And then to the best point just walked out the door

16    and we hadn't seen him for the rest of that meeting.

17          THE COURT:  Do you know what time of day that was,

18    morning, afternoon, when he stormed out, not stormed out,

19    when he left the room.

20    A.    Midday, your Honor.  It was definitely not in the

21    morning and definitely not late in the afternoon.  It was

22    lunch hour, around that time.

23          THE COURT:  Your testimony.

24    A.    I will say midday.

25          THE COURT:  All right.

1    Q.   Now, during this executive session that you were all

2    sitting there discussing this thing, was there any discussion

3    at all about entering into a new collective bargaining

4    agreement with TWA LLC?

5    A.   I can't recall.  The main subject matter was the issue

6    of scope.  And if other words were mentioned, I can't tell

7    you.  It would be, I can't recall to the best of my

8    recollection, a new CBA being mentioned but the subject

9    matter was whether to waive scope or not.

10   Q.   Did anyone provide you either at that meeting or before

11   that meeting with a copy of a document which they said would

12   be the new collective bargaining agreement you would have,

13   you, the pilots would have, with TWA LLC if you were to waive

14   scope?

15   A.   I can't recall, no.

16   Q.   You never, did you see any such thing as far as you

17   remember?

18   A.   You know what?  I remember there was something that was

19   circulated but it wasn't like a transition agreement.  It was

20   something, it may have been like similar to the October

21   meeting where it was like a bullet point type thing where

22   this would remain the same, this was not going to be the

23   same.  This would remain the same.  It certainly wasn't a

24   detailed document.

25   Q.   It wasn't a contract document?

1   A.   No.

2   Q.   To the best of your knowledge did you ever see an actual

3   transition agreement, collective bargaining agreement, before

4   it was signed by Bob Pastore, the master chairman?

5   A.   I do not recall seeing a finalized document before it

6   was signed.

7   Q.   Now, you talked earlier about the conversations you had

8   with Mr. Holtzman, and Clay Warner, about the 1113, before

9   this April 2nd meeting, correct?

10  A.   Correct.

11  Q.   And Mr. Holtzman told you it wasn't something to worry

12  about?

13  A.   Correct.

14  Q.   Did he change his tune at the April 2 meeting?

15  A.   180 degrees.

16  Q.   What did he say at the April 2 meeting?

17  A.   Again, I don't recall the specifics of him talking but

18  he was in agreement with the mass amount of advisors that

19  were there, that this was the best way to proceed.

20  Q.   What about Clay Warner, you talked about a 45- minute

21  conversation with him before April 2.  Right?

22  A.   Right.

23  Q.   At that conversation you told us he said, the pilots

24  will prevail on this motion?

25  A.   That was correct.

Hollander-direct/Jacobson                                    47

1    Q.    Did he tell you the same thing on April 2?

2    A.    He did not.  Also a 180 degree shift of events.

3    Q.    What advice did they give you and the other MEC members

4    about about waiving scope?

5    A.    It was, again, it was something, in their opinion, had

6    to be done.  They did discuss, and I don't have it here in

7    front of me but there was a reasonable best efforts letter

8    that American was proposing to the TWA pilots that they were

9    going to do certain things to, I think the words were, secure

10   a fair and equitable seniority integration.

11          Someone else, and I can't remember who, it might

12   have been Ms. Young, had asked the question, does that

13   letter, would stand up in court or is it something that could

14   be endorsed and the advice was yes, the letter actually had,

15   quote, teeth, to it, statements like that.  This is what we

16   were being told this was not the end.  There was a positive

17   outcome that could be achieved if we waived scope but the

18   important thing was to waive it so the merger, marriage, if

19   you will, could go forward.

20   Q.    Did anyone tell you that if you waived scope at that

21   meeting, then the game was over as far as seniority

22   integration talks?

23   A.    No, no one told me that.

24   Q.    Anyone tell you that after you voted for it, to waive

25   scope?

1    A.    No.

2    Q.    Now the game is over, you will take whatever they give

3    you?

4    A.    No, no one told me that.

5    Q.    Did they tell you that you still had options for a

6    better result?

7    A.    That is correct.

8    Q.    I want to ask you about the MEC and the MEC members as

9    of April 2, focusing on how experienced they were with MEC

10   matters and union matters generally, all right?

11   A.    Fair enough.

12   Q.    You told us before about the year you first joined the

13   MEC?

14   A.    Late 1998.

15   Q.    All right.  So what, under two years prior to this?

16   A.    On the MEC, under two years.

17   Q.    Okay.  And was anyone, any voting member of the MEC at

18   that time more experienced than you as a voting member of the

19   MEC?

20   A.    The answer to that question is yes.

21   Q.    Who was?

22   A.    I know Pablo Lewin was on the MEC approximately six to

23   eight months prior to my getting there.

24   Q.    What was he on on here, two years, plus or minus?

25   A.    If I had a reasonable good guess would be approximately

```
 1   two plus year years, two and a half years on the MEC.

 2   Q.   Anyone else more experiencedd than you on the MEC?

 3   A.   Voting member?

 4   Q.   Voting member is what I am talking about.

 5   A.   I am talking about, a voting member, the answer would be

 6   no.

 7   Q.   You had something under two years of MEC experience?

 8   A.   That is correct.

 9   Q.   And Pablo Lewin had something a little over two years

10   voting experience?

11   A.   That's correct.

12   Q.   What about nonvoting members on the MEC.  There are

13   several, correct?

14   A.   There are three nonvoting members.  Glenn Stieneke, the

15   Los Angeles secretary treasurer was probably the senior

16   person of the bunch with approximately three years.  And that

17   would be it.  Ted Case, although relatively new to Council 2

18   as a secretary treasurer, had been on the MEC once before as

19   a Council 3 member.  And I couldn't tell you his length of

20   time as a Council 3 member.  But he was a previous MEC

21   member.  And David Singer was extremely junior and new to the

22   MEC.

23   Q.   How new?

24   A.   Well, he would have been put in office in some time

25   early 1999 so I would say about a year.
```

1   Q.   Okay.

2   A.   Alan Altman was I believe the most junior one with about

3   six weeks.

4   Q.   How about Sally Young?

5   A.   Sally Young was a little more than Alan Altman, again,

6   very, very junior, just a few months on the MEC.

7   Q.   Talking about the officers, Mr. Pastore, Mr. Shwartz and

8   Mr. Stow, had Bob Pastore be a voting member of the MEC?

9   A.   No, he was not.  Let me rephrase that.  Bob Pastore was

10  not a regularly voting member of the MEC.  MEC policy is that

11  if there is a tie, and the MEC can't come to an agreement on

12  an issue, the master chairman was allowed to break the tie.

13  But it should be noted for the record Bob Pastore's position

14  was he would never brick a tie and to the best of my

15  knowledge never cast a vote.

16  Q.   Had he been a voting member of the MEC before he became

17  master chairman?

18  A.   No, he was not.

19  Q.   How about Mr. Shwartz, had he been a voting member of

20  the MEC, let me go back to Mr. Pastore.  How long had Mr.

21  Pastore beenthe master chairman?

22  A.   He was relatively new.  A few months, no, more than a

23  few months.  The previous master chairman, Tom Brown, was

24  recalled in 1999.  I can't tell you the month.  I know it was

25  1999.  And so he was on the MEC as master chairman for a

1    year.

2    Q.   Okay.  And Mr. Shwartz?

3    A.   Mr. Shwartz had been on the MEC in I believe a couple of

4    different positions but he had been a vice -- he had been the

5    secretary treasurer -- I am sorry, the vice chairman before,

6    once before Bob Pastore had been the mass they are chairman.

7    When Bob Pastore was elected as master chairman he had asked

8    Scott Shwartz to be his vice chairman.

9    Q.   I am a little confused from that.  How much experience

10   did capital Shwartz have on the MEC?

11   A.   I would say a couple of years.

12   Q.   What about Captain Stow?

13   A.   Captain Stow had at least be on the secretary treasurer

14   for a couple of years.

15   Q.   All right.  Can you compare the experience of the MEC

16   you were part of with MEC's in years as that the TWA?

17   A.   I will summit up and say it was a very Jr. MEC.  There

18   had been MEC's in the past with pilots with five, ten years

19   of experience on here.  Again, the most senior member of the

20   voting bunch was two years and I was number 2, and the rest

21   of us with less than a year.  It was a very junior MEC.

22   Q.   Had you been given any special training, or education by

23   ALPA in connection with becoming a MEC member?

24   A.   No, I did not.

25   Q.   Traditionally in the past, had MEC members been taken

```
 1   down to Herndon and given some training?

 2   A.   Yes.  That had taken place.

 3   Q.   Are you aware of any of the other MEC members who are

 4   serving with you, voting members, who had been taken down to

 5   Herndon and given any training on negotiations or any other

 6   aspects?

 7   A.   I am not aware of anyone who received additional

 8   training.

 9   Q.   So you are untrained.  Is that fair?

10   A.   That would be fair.

11   Q.   New and inexperienced?

12   A.   That would be fair.

13   Q.   Compared with MEC's in the past?

14   A.   That would be very fair.

15   Q.   I think this has been talked about earlier.  I want to

16   touch on it very briefly.  When advisors, the lawyer

17   advisors, talked to the MEC members, including yourself,

18   advising waiving the 1113, giving up on 1113, did they give

19   you any legal arguments or legal reasons why you should do

20   that?

21   A.   No, they did not.

22   Q.   Did you, other MEC members, ask for that?

23   A.   I can't recall if anybody asked us a specific question

24   about legal terms.  I can't recall.

25   Q.   Did they give you any examples of cases or things they
```

 1   may have argued in the court or anything else that would give

 2   you a legal basis for their advice?

 3   A.   No. The only statements that was made, and I refer to

 4   this, that is engrained in my head is Mr. Richard Seltzer had

 5   given an opinion because he was the most experienced attorney

 6   dealing with 1113.

 7               THE COURT:  He was a bankruptcy attorney.

 8               THE WITNESS:  He was a bankruptcy attorney.  Yes,

 9   your Honor.

10   A.   And his quote of that afternoon was, you stand a 99.9

11   percent chance of losing at the bankruptcy hearing.

12   Q.   All right.  Did Mr. Seltzer tell you that he filed a

13   brief in opposition to it?

14   A.   He did not.

15   Q.   Did he tell you anything about any arguments he made?

16   A.   He did not.

17   Q.   Was there a discussion about whether you could strike if

18   your contract was removed?

19   A.   There was not.

20   Q.   At some point during the session this issue had come up

21   to a vote.  Correct?

22   A.   That is correct.

23   Q.   Did you have any views about whether the MEC should be

24   voting for this or whether the pilots as a whole should be

25   voting for it?

1    A.    My personal view was considering what was at stake, it

2    is not a personal thing, it is a group of 2,200 plus pilots.

3    My opinion was expressed that this vote should not be amongst

4    the MEC, it should go to a membership vote of all the TWA

5    pilots.

6    Q.    Did you ask the ALPA people back there to arrange a

7    vote?

8    A.    I did.

9    Q.    What response did the ALPA -- do you recall who you

10   asked there?

11   A.    It.

12   Q.    Or was it the group as a whole?

13   A.    It was the group as a whole.  I can't recall if your

14   next question was who replied but the answer that came back

15   is there was not enough time for this.

16   Q.    Were there methods of rapid vote available to ALPA at

17   that time?

18   A.    Yeah, there were.  Grant Wednesday didn't have what we

19   have today, but ALPA had in the past besides their normal way

20   of voting, which was by ballot, they could have set up an 800

21   number to call in, push one for yes, two for no, there were

22   methods available.  I was disappointed in their answer.

23   Q.    Did you try push for the vote.

24   A.    I did.

25   Q.    But it was rejected?

1    A.    It was rejected.

2    Q.    There was a vote.  There was a vote made by the reps?

3    A.    We came out of executive session and returned to the

4    regular meeting, and a resolution was put on the floor

5    regarding the waiving of scope.

6    Q.    Okay.

7    Q.    How did you vote normally, the voting sequence, if you

8    want to look at page 6 there?

9    A.    I have it.  The normal voting process is very easy.  You

10   know, all those in favor, usually we did a show of hands so

11   Bob Stow could get a clear record as to who was voting which

12   way, but all those in favor say or raise your hand, aye, all

13   those opposed nay, or raise your hand nay, and that was the

14   normal voting process.

15   Q.    Did that process take place at this meeting?

16   A.    It did take place.  First a show of hands.

17   Q.    How did the show of hands go?

18   A.    Well, every voting members hand went up except for mine.

19   Q.    And did you then ask the --

20   A.    I asked for the roll call vote.

21   Q.    Is that your right as a MEC member?

22   A.    It is.

23   Q.    The roll call votes it has been explained before is each

24   pilot has a weighed vote, depending how many pilots they

25   represent?

1   A.   That's correct.

2   Q.   How did the roll call voting?

3   A.   What happens is the first thing that happens next is the

4   secretary treasurer, we grab our pencils, the secretary

5   treasury reminds everybody how many votes we have because at

6   any given meeting sometimes pilots transfer between Council

7   2, 3 or 4?  And it is not always the same.

8             Once the secretary treasurer rear informs, in this

9   case, you know, you say Captain Rautenberg, you have 724

10  votes to vote.  He would go through this for everybody, and

11  once those numbers were put on the record the vote would

12  commence.  In this case he started around the room, just the

13  way it went, Captain Rautenberg went first.  Then Ms. Young,

14  then he skipped Jim Arthur because he doesn't vote.  Dave

15  Singer, myself and Alan Altman and Pablo Lewin.

16  Q.   How long does the roll call vote take?

17  A.   Relatively quick.

18  Q.   You voted a split of your vote?

19  A.   I did.

20  Q.   Some in favor, some against?

21  A.   I did.

22  Q.   Can you explain to the jury how you came to vote the way

23  you did?

24  A.   I winged it.  I just guessed.  When the vote came to me,

25  there was no number that I could put down that was going to

1   change the outcome of the vote.    Because Council 3 had more

2   pilots than Council 2 and even Council 4 combined.

3            Once those votes were cast it didn't matter whether

4   I put all my votes one way or stayed with Tom Quigley's one

5   vote, or put them all the other direction, the tally was

6   going to be the same.  So what I did is I just said basically

7   in my head, 75, 80 percent, against waiving the scope.

8   Approximately 25 percent in favor.  Because there were a few

9   pilots again who wanted to see this transaction completed and

10  I respected their wishes.  So I just winged up a number

11  basically in my head and said 75 in favor, maybe 25 against.

12  Actually 75 against and 25 in favor.

13  Q.   Okay.

14            THE COURT:  The it is waiving scope, what you were

15  voting on here is waiving scope?

16            THE WITNESS:  That's correct, waiving scope.

17  Q.   After the vote took place, what happened next, did you

18  go somewhere?

19  A.   There was a recess.

20  Q.   And what did you do?

21  A.   I walked out of the MEC office with a bit of unhappy

22  look on my face and I headed to the vending machines to get a

23  cold something, to suit myself.  I am on the way out, I

24  directly in front of me was what I will just call the

25  remaining ALPA advisors.  I know, I think one or two like I

1    say said may have left the meeting but the ALPA advisors that

2    were present were directly in front of me walking down the

3    hall, and had made a stop at the reception area, and

4    specifically had asked if there was a room they could use so

5    they could have a private discussion.

6           The young lady working the front desk, a Leane

7    Pillar, had directed them to the one room that was not in

8    use, and it was called the Trans World Express office.

9           Within the TWA MEC office, we had a room that was a

10   TWA airlines and TWA Express, and this no longer is really in

11   existence today, but it was a small propeller outfit that

12   worked out of St. Louis Lambert Field and they had a fairly

13   respectable size one-room office that they could use.  She

14   directed them to where it was and that room happens to be

15   right next to the vending machines.

16          So I proceeded to follow them, and they went in the

17   office and closed the door in front of me so that I could not

18   hear their conversation.

19   Q.   And what did you do?

20   A.   It sparked my interest, so I went to the office next

21   door and pressed my ear up against the wall so I could hear

22   them.

23   Q.   Can you tell the jury what you heard through the wall,

24   the conversation of advisors, immediately following the vote

25   of the MEC to waive scope?

 1   A.   You know, I cannot express the exact language used, but

 2   I will say this.  They picked up a phone, they picked up the

 3   telephone and they must have put it on speaker because I

 4   heard a dial tone and they dialed a number.  I have no idea

 5   who they called.  I know I expressed to Bob Pastore after the

 6   fact --

 7   Q.   Not after the fact.  What did you hear through that

 8   wall?

 9   A.   Through the wall i heard them place a phone call and

10   whoever answered the phone, they said the following:  We won.

11   We are off the hook.  We don't have to worry about this any

12   more.

13          And someone, I couldn't hear the reply from the

14   phone.  But the next thing was a description of the event

15   that just took place.  My name was mentioned with some

16   colorful metaphors attached to it, that I can't repeat in

17   court, but Hollander did this, Hollendar tried to table it.

18   He tried to postpone it.  He tried to get a member

19   ratification, and we -- that didn't happen.

20          And in the end he called for a roll call vote and

21   they went right down the list and said Captain Rautenberg

22   voted this way, First Officer Young voted this way.  They

23   explained to him, and they said we are off the hook.  Now we

24   don't have to worry about this any more.

25   Q.   All right.  Did you share what you had heard on this

 1   phone call with any of the other MEC officers or members?

 2   A.   I went and I found Captain Bob Pastore and I explained

 3   to him exactly what happened.

 4   Q.   All right.  Did this affect your confidence in ALPA?

 5   A.   From that date forward I never trusted another ALPA

 6   adviser for the rest of my ALPA career.

 7   Q.   All right.

 8   A.   Never once.

 9   Q.   Did you and the other MEC members adopt any informal

10   rules about dealing with advisors or with ALPA?

11   A.   I can't remember how many rules.  I know one thing that

12   was adopted soon thereafter is we passed a policy, if you

13   will, that any time somebody spoke to an ALPA adviser,

14   somebody from Herndon, that it could not be a one-on-one

15   conversation.  It always had to be at least two people and we

16   even designated it could be a MEC officer, a LEC officer, we

17   didn't want any one-on-one conversations with anybody from

18   ALPA National.

19   Q.   Now, at the time of that meeting, going back to the

20   meeting for a second, what justification did the ALPA

21   advisors give you for why you should waive scope?

22          What did they say about what American Airlines

23   would do or might do?

24   A.   That was the big hammer, so to speak.  We were told in a

25   number of ways that it was their opinion that if we did not

1    voluntarily waive our scope language that American may walk

2    away from this deal.

3    Q.   This they say may?

4    A.   Their words were possible, may, we think, we believe.  I

5    mean there was no guarantee that they would walk from the

6    deal, but it was their position, they believed American would

7    not complete the transaction.

8    Q.   All right.  Did you believe --

9    A.   I did not.

10   Q.   Why not?  Why did you not believe that American Airlines

11   would walk away if you did not waive your scope?

12   A.   There is no one answer to that.  It is a feeling.  I was

13   educated on what American wished to do.  I was being educated

14   on what was happening in the industry, the U.S. Air/United

15   merger was being talked, it was a different deal going on

16   with northwest at the time.

17            Mr. Carty had, on a number of occasions, even

18   expressed to us personally how he was happy to do this deal

19   and how he was looking forward to completing the deal.  I am

20   not going to, I mean Mr. Carty, I know, you have to meet the

21   man.  He has one hell of an ego.  He really does.  He always

22   wanted to be the biggest and the best and he was going to go

23   down to number three or four without this deal.  I never

24   thought for a minute American would walk out of this deal.

25   Never.

1  Q.   Did American provide you, did TWA people pamphlets,

2  banners and so on, to decorate your offices after the deal

3  was announced?

4  A.   E got a number of novelties.  We got hats, we got bags,

5  we got banners, all over the St. Louis airport and Kennedy.

6  There was a lot of hoopla about this American Airlines TWA

7  deal.

8  Q.   You happened to bring something with you that you had in

9  your closet.  Where did you get this item?

10 A.   This particular banner I took it down from the St. Louis

11 airport.  It was hanging in multiple spots.  I had a couple

12 of them.  I just took one that this one came from the Saint

13 Louis Lambert airport.

14          MR. JACOBSON:  I will just display it for the jury.

15 Q.   Can you just for the record describe the banner and what

16 is written on it?

17 A.   This was one of the smaller ones at the airport, and it

18 says two great airlines, it says, it has symbols of American

19 Airlines and TWA, one great future.

20 Q.   And had anyone at American Airlines, and the hold court

21 of you dealing with the merger and waiver of that, had any of

22 the people you dealt with at American Airlines ever suggested

23 to you that TWA wasn't a great airline?

24 A.   No.

25 Q.   Or that you guys were a piece of failure and they were

1   just saving your butts?

2   A.   No.

3   Q.   All right.  There has been -- before I get to that.  You

4   should have in front of you D 35?

5   A.   Council 2 letter.  I have it.

6   Q.   Turn to the last page, several signatures.

7   A.   Correct.

8   Q.   You signed that?

9   A.   Yes.

10   Q.   Who else signed it?

11   A.   David Singer, Ted Case.

12   Q.   What is the date of this letter.

13   A.   April 10, 2001.

14   Q.   What was the purpose of this letter that you and the

15   other LEC members from Council 2 sent to the Council 2

16   pilots?

17   A.   We thought it was at that time one of the best ways to

18   communicate.

19          Again, I had a very positive and good relationship

20   with our chief pilot in New York, and first officer case was

21   actually the author of this letter.  And what we did is after

22   it was printed, we circulated it, it may have even been

23   mailed from ALPA to every pilot, but I can't recall, but we

24   circulated this and put this in each and every pilot's New

25   York mailbox.

```
 1    Q.   The purpose is what?

 2    A.   The purpose was to share some opinions, some thoughts,

 3    and, you know, the best way possible bringing the New York

 4    pilots up to speed with what was going on.

 5    Q.   I would like to show you a new exhibit, it is going to

 6    be P 174.

 7              THE COURT:  P 174?

 8              MR. JACOBSON:  Yes, your Honor.

 9    Q.   Do you have the document?

10    A.   I have it.

11    Q.   Do  you recognize it?

12    A.   I am have seen it before.

13    Q.   Is it an email addressed to you forwarding some

14    material?

15    A.   It is.

16    Q.   All right.  Dated April 18, 2001?

17    A.   Correct.

18    Q.   Before I offer in evidence, during this negotiation

19    period, did TWA, ALPA, try to provide information to its

20    pilots that it wanted to keep confidential?  Yes?  About the

21    negotiation process?

22    A.   Yes.

23    Q.   And the merger process?

24    A.   Yes.

25    Q.   And was was it your understanding that the American
```

Hollander-direct/Jacobson                                    65

1  airline pilots union, APA, also was providing information to

2  its members, its pilots, that it wanted to keep confidential

3  from you?

4  A.   I have no doubt that that was going on, but I can't

5  swear that I knew.  I am confident of that happening.

6  Q.   Did you and the other MEC members from time to time

7  receive copies of communications from APA to the American

8  pilots that were forwarded to you by someone within the APA?

9  A.   We did.

10 Q.   That person was providing you with copies of this stuff

11 on a regular basis?

12 A.   Yes.

13 Q.   All right.  Was this document, this exhibit, P-174, one

14 of the documents provided to you that was not intended

15 initially for your eyes?

16 A.   I would agree with that.

17          MR. JACOBSON:  At this point I would like to offer

18 P-174 in evidence.

19          MR. FRAM:  Objection.  It is unreliable hearsay.

20 It it is a letter filled with hearsay and information we

21 believe is completely inaccurate.  We strongly object to this

22 exhibit going in.

23          THE COURT:  What is the basis for its admission?

24          MR. JACOBSON:  Your Honor, the last portion of the

25 letter gave rise to actions by Mr. Hollander and the rest of

 1    the MEC.

 2              THE COURT:  Let's do this.  Let's have the jury

 3    take a break and we will discuss it.  Okay.

 4              Do not discuss the case among yourselves.  Keep an

 5    open mind until you have heard all the evidence.  We will be

 6    back in a few minutes.

 7              (The jury leaves the courtroom.)

 8              THE COURT:  Do you want a voir dire on this?

 9              MR. FRAM:  Yes, I think that would be helpful, your

10    Honor.

11              THE COURT:  Go ahead.

12              MR. FRAM:  Thank you.

13              VOIR DIRE EXAMINATION.

14              BY MR. FRAM:

15    Q.   Do you have the exhibit in front of you, sir?

16    A.   I do.

17    Q.   What you wanted to testify is about the fact that Mr.

18    Woerth allegedly said at at a meeting of the APA board on

19    April 5 that the TWA pilots had to get real.  Right?

20    A.   If that is the question to be asked.  Yes.

21    Q.   You knew that was the question that was going to be

22    brought out, right?

23    A.   I suspected so, yes.

24    Q.   Okay.  And were you present at the meeting of the APA

25    board on April 5, 2001, when Mr. Woerth allegedly made that

1   remark?

2   A.   I was not present.

3   Q.   Do you have any personal knowledge whatsoever of what he

4   said at that meeting?

5   A.   Personal knowledge, no.

6   Q.   Isn't it a fact that Mr. Woerth appeared before the TWA

7   MEC on April 23 and 24 of 2001, and told the MEC that he had

8   been misquoted, that one of the American pilots had misquoted

9   what he said to the APA board?

10  A.   I know Mr. Woerth was at that meeting.  I couldn't swear

11  under a Bible what his quote was that day.

12          THE COURT:  Who is Cathy O'Leary?

13  A.   It is  Keith O'Leary.

14          THE COURT:  I know Cathy O'Leary.  I know a Cathy

15  O'Leary.  Who is Keith O'Leary.

16  A.   Keith O'Leary to my recollection, your Honor, was at the

17  time of TWA MEC's communication officer.  He would deal with

18  emails and publications.

19          THE COURT:  Okay.  How many people were present, if

20  you know, at the APA special board of directors meetings.

21  A.   I would have no idea of their attendance, your Honor.

22          THE COURT:  Okay.  So your knowledge about what

23  went on in that meeting comes from this email.

24          THE WITNESS:  That is correct.

25  Q.   And you don't even know if the material that Mr. O'Leary

 1   forwarded was genuine, right?

 2   A.   I do not, no.

 3   Q.   You have no idea who prepared this alleged report, yes?

 4   A.   I just received it as an email.

 5           MR. FRAM:  Thank you.

 6           MR. JACOBSON:  May I cross on the voir dire?

 7           THE COURT:  Yes.  You can.

 8           VOIR DIRE EXAMINATION.

 9           BY MR. JACOBSON:

10   Q.   Mr. Hollander, as a result of receiving this email, did

11   the MEC take any action?

12   A.   The MEC had concern and took action, yes.

13   Q.   The action you took was what?

14   A.   I can't remember specifically, but one thing we did was

15   request that Mr. Woerth address these issues.

16   Q.   Did Mr. Woerth come to your meeting?

17   A.   He did.

18   Q.   Was that the only MEC meeting that Mr. Woerth attended

19   throughout the entire American Airlines merger process?

20   A.   That's correct.

21           THE COURT:  That is not voir dire.  That has

22   nothing do with this.  You can question about Woerth's

23   appearance and what he said he heard.  But that has nothing

24   to do.

25           MR. JACOBSON:  I am sorry.

1   Q.   And did Mr. Woerth, Captain Woerth, deny this statement

2   that is in here?

3   A.   He did not deny the statement.  I believe he said that

4   he was misquoted.  But he did not deny the statement.

5           THE COURT:  Look, you can question what worth said,

6   if somebody asked him that question, can you say that.  I

7   don't know what happened at another meeting.  But this is,

8   you are offering this to have Woerth say,  having said

9   something --

10          MR. JACOBSON:  To the Allied pilots.

11          THE COURT:  At a meeting that this witness wasn't

12   present for.

13          MR. JACOBSON:  That's correct, your Honor.

14          THE COURT:  And this is yet by another person who

15   we have, who apparently is not going to testify, as to what

16   Woerth said, and at that meeting.  I mean, that is hearsay.

17          MR. JACOBSON:  Your Honor, I think the fact that

18   they have the statement  that Captain Woerth met with them

19   and told them to get real on associated senior merger

20   settlement --

21          THE COURT:  The circumstances of what he said, the

22   context, he doesn't know.

23          MR. JACOBSON:  The importance of this to me is with

24   this witness, is that the MEC then invited Captain Woerth to

25   come to the meeting, they queried him about this.  He danced

 1   around it, he didn't admit or deny.  He said he was quoted

 2   out of context.

 3              THE COURT:  He can say that.  He can testify as to

 4   what Woerth said, what questions were asked of Woerth, what

 5   was the response of  --

 6              MR. JACOBSON:  Without offering the document.  What

 7   about the fact.  All I really want is that --

 8              THE COURT:  I know what you want out of that.  That

 9   is clear.  You want to get something that will go in the jury

10   room and it says that Captain Woerth said the TWA pilots have

11   to get real.  That doesn't make this admissible.

12              MR. JACOBSON:  What about just the two lines that I

13   want to read, have him read, not the document itself?

14              THE COURT:  No, you are trying to put in evidence

15   something that you can't, he testifies, I will have to hear

16   it, but he can testify about Woerth's appearance, what

17   questions he was asked.  So you will really get into evidence

18   to the extent, if it was happening, that somebody asked him

19   did you tell the board of directors of ALPA that I, I am

20   sorry, the APA, did you tell the APA board of directors that

21   the TWA pilots have to get real and what his response was.

22              MR. JACOBSON:  I understand. I can ask that

23   question.

24              THE COURT:  That is direct testimony.  If he heard

25   that, you know, whatever that, when that meeting, that he

1    attended, I mean, we have been listening for, there has been

2    no objection and I wouldn't sustain an objection where he is

3    present and hears this and can say what he hears.

4         MR. JACOBSON:  I understand your ruling, your

5    Honor.

6         THE COURT:  And it may well be that you will get

7    before the jury that somebody asked him, did you tell the APA

8    directors that the TWA pilots have to get real.  And then he

9    said X.  Y, I don't want to something suggest something, but

10   whatever he says the answer is to that.  That is direct

11   testimony.  That is his observation with his eyes, his ears,

12   his senses.

13        MR. JACOBSON:  I understand, your Honor.

14        THE COURT:  And Woerth is the president of the

15   defendant.  So that is a party admission in effect.  So I

16   allow all that.

17        But putting before them a detailed report before

18   the jury of what went on in a meeting, that it is not a

19   business record of ALPA, it is, it is like ALPA minutes, you

20   know, or the MEC minutes or even the board of ALPA minutes

21   probably are admissible as business records of a party in

22   this case, ALPA.

23        But I don't know what this is.  He doesn't know.  I

24   think you can get actually pretty close to what you want to

25   do, but you but you can't do it through this.

```
 1                    MR. JACOBSON:  I understand, your Honor.

 2                    MR. FRAM:  Thank you, your Honor.

 3                    THE COURT:  Okay.

 4                    THE COURT:  You want to call the jury back.

 5                    (Jury enters the courtroom)

 6                    THE COURT:  Mr. Jacobson, you may continue.

 7                    CONTINUED DIRECT EXAMINTION.

 8                    BY MR. JACOBSON:

 9   Q.   Mr. Hollander, after you received the document that is

10   marked as plaintiff's exhibit 174 for identification, did you

11   and the MEC ask the ALPA president Duane Woerth to come to a

12   MEC meeting to discuss the subjects raised in the email?

13   A.   I did not personally, but it was conveyed to him I

14   believe through Bob Pastore to please try to come to our next

15   MEC meeting.

16   Q.   Did the MEC members ask chairman Pastore to do that?

17   A.   They did.

18   Q.   Did Mr. Woerth then show up at the MEC meeting?

19   A.   He did.

20   Q.   Was this the first time he showed up to a MEC meeting

21   since the American airline transaction was announced?

22   A.   It was.

23   Q.   Did he ever show up to a MEC meeting after that?

24   A.   No, he did not.

25   Q.   This is the one time?
```

1    A.   This is his sole time.

2              THE COURT:   When was this meeting?

3    A.   This was April 23, your Honor.

4              THE COURT:   April 23.

5    Q.   Were you present at that April 23 meeting?

6    A.   I was.

7    Q.   Was Captain Woerth asked about his visit to the allied

8    pilots, that is the American airline union, board of

9    directors?

10   A.   He was.  He was questioned about not only going there

11   but his comment.

12   Q.   All right.  And did he tell you when he had gone to the

13   Allied Pilots board of directors meeting?

14   A.   He did.

15   Q.   What day had Captain Woerth attended a meeting of the

16   board of directors of Allied Pilots?

17   A.   April 5.

18   Q.   So that is three days after you voted to waive scope?

19   A.   That would be correct.

20   Q.   One day before the date that the 1113 motion had been

21   scheduled to be heard in bankruptcy court?

22   A.   That is a correct sequence of event.

23   Q.   All right.  Did you or one of the MEC members ask

24   Captain Woerth at that meeting whether he told the American

25   pilots union's board of directors that the TWA pilots had to

 1  get real?

 2  A.   He was questioned about that comment.

 3  Q.   What specifically, as best you can recall, was Captain

 4  Woerth asked about the comment that he had allegedly made to

 5  the APA?

 6  A.   He was asked specifically if he made the comment and

 7  what he meant by it.

 8  Q.   Was he told what the comment was that he was alleged to

 9  have made?

10  A.   He was.

11  Q.   What was he told that he was alleged to have said to the

12  Allied board?

13  A.   The TWA MEC had concern because it was relayed to us

14  that Captain Woerth told the Allied Pilots Association, our

15  opposite union, that the TWA pilots need to, quote, "get

16  real."

17  Q.   Get real on what?

18  A.   It just said get "get real."  We obviously took an

19  assumption that he was referencing the seniority integration,

20  and the proposal of such.

21  Q.   Can you recall one way or the other whether seniority

22  integration itself is specifically mentioned in connection in

23  connection with the get real excellent?

24  A.   It was.

25  Q.   Did Captain Woerth deny having made that statement?

1   A.   He did not deny making the statement.

2   Q.   Okay.

3   A.   He did not.

4        THE COURT:  Let him finish his answer.  Go ahead.

5   A.   He did not deny making his this statement but his

6   complete answer was he believed he was misquoted.

7   Q.   All right.  He doesn't deny that he made the statement

8   that you had to get real, but somehow he was misquoted.

9        MR. FRAM:  Your Honor, I object to the leading

10  questions.  We should hear the testimony from the witness.

11       THE COURT:  Yeah.  Ask him what was said.  He does

12  have recollection on this subject.

13  Q.   What else did he say in context with that?

14  A.   Mr. Woerth said that his entire comment was -- he spoke

15  extremely briefly at the meeting, and that when asked about

16  the seniority integration, we queried him on the question of

17  get real.  And his reply was, is that he didn't deny the

18  statement of get real.  He just said it wasn't a complete

19  answer, and it was taken out of context.

20  Q.   Did he tell you what the complete answer was?

21  A.   He did not.

22  Q.   This was you you said April 22, April 23 --

23  A.   This was at the April 23 meeting, yes.

24  Q.   I would like you to look at defendant's exhibit 78.

25  Those are the minutes of the special meeting of April 23 and

1    24.

2    A.    Correct.

3    Q.    There is a discussion there on the second page relating

4    to Captain Woerth's visit.  Is that correct?

5    A.    I am sorry.  What page?

6    Q.    On the second page of this.

7              THE COURT:  What is this?

8              MR. JACOBSON:  This is exhibit D 78, the minutes

9    from the April 23, 24, 2001, MEC meeting.

10             THE COURT:  Is that already in evidence?

11             MR. JACOBSON:  Yes, your Honor.

12             THE COURT:  Go ahead.

13   A.    Hang on for a second.

14   Q.    Yes.  What is it you wanted?

15   Q.    I asked if the second page discussed Captain Woerth's

16   comments to the MEC?

17   A.    Duane Woerth, president.

18   Q.    You want me to read from there?

19   Q.    Just read the first paragraph of that?

20   A.    Captain Duane Woerth briefed the MEC regarding the

21   Delta's tentative agreement, the Conair strike, legislative

22   progress on the age 60 rule, and his presence at an APA board

23   meeting in Dallas.  Captain Woerth discussed the current

24   situation of the TWA pilots and stated the TWA MEC made one

25   of the most difficult decisions any MEC could be faced with,

Hollander-direct/Jacobson                                    77

```
 1   waiving their scope protection.  Captain Woerth stated the

 2   MEC's decision, although tough, was the right decision and

 3   that he was extremely proud of the courage displayed by the

 4   TWA MEC.

 5   Q.    Drop down, there is a questions and answers section.

 6   Look, there is a Ted Case's comments for the record.  That is

 7   already in evidence.  Look at the next paragraph.  It says

 8   Captain Woerth?

 9   A.    Captain Woerth responded if there is any basis for the

10   litigation, ALPA would do what was necessary to protect the

11   pilots.  ALPA would not leave any stone unturned to protect

12   the TWA pilots.

13   Q.    In this meeting did Captain Woerth tell you and the rest

14   of the MEC that as a result of having waived scope back on

15   April 2 that the game was over, as far as seniority

16   integration was concerned?

17   A.    Captain Woerth never explained to me or through the

18   parties at this meeting that the game was over.

19   Q.    All right.  And did you take any comfort in the fact

20   that he was stating that if there was any basis for

21   litigation, ALPA would do what was necessary?

22   A.    It was a comforting statement to hear, but you know.

23   Yeah.  It it was comforting to hear.

24   Q.    Were you satisfied by Captain Woerth's explanation of

25   the get real comment?
```

1   A.   No. I was not.

2   Q.   Turn to the next page, if you would.  Page 3 of this

3   exhibit.  There is a report by the secretary treasurer, Bob

4   Stow.

5   A.   I see it.

6   Q.   Could you please read for the jury the first sentence of

7   that report?

8   A.   Stow reported due to contractual changes under TWA LLC

9   ALPA would no longer have the 9,000 hour flight pay loss

10  bank.

11  Q.   Next sentence?

12  A.   This translated into approximately a 40 percent

13  reduction in funding for union work.  He also --

14  Q.   At the time that you and the MEC met on April 2 to

15  decide whether to waive scope, did anyone inform you that the

16  collective bargaining agreement you had would be modified to

17  eliminate this 9,000 hour flight pay loss?

18  A.   No one notified me.

19  Q.   What kind of an impact did that have on your ability to

20  forcefully push the TWA pilots position in negotiations with

21  the American pilots?

22  A.   Well, it most certainly put an extreme limit on how much

23  time you could donate without that 9,000 flight pay loss, it

24  was extremely beneficial to TWA MEC and LLC reps.  Whether

25  ALPA National would pick up the slack on that and put aside

     1    extra funds for us was unknown at this time.  But clearly

     2    that was a big arsenal in our weapon.

     3    Q.   Was that money that you, the MEC, had control over, that

     4    you could spend, time you could spend, without ALPA's

     5    approval?

     6    A.   Yes, it was.

     7    Q.   And once that was gone you would need ALPA National's

     8    approval for flight loss?

     9    A.   That would be correct.

    10    Q.   Now, is flight loss pay solely a money issue or is it

    11    also a time issue?

    12    A.   It is both.

    13    Q.   All right.  And I don't think it has really been

    14    explained to the jury very clearly how flight loss pay works.

    15    Are you familiar with it?

    16    A.   Very.

    17    Q.   All right.  Can you explain, what right, if any, does a

    18    pilot have, not to show up for his job and fly a flight in

    19    order to do union work?

    20         Does a pilot have a right to not show up for a

    21    flight and do union work in the absence of flight pay loss?

    22    A.   You use the word "right".  Best answer this way.  If I

    23    want to do union work, if a pilot is in trouble and he needs

    24    me, they always came first.  If I happened to be scheduled to

    25    fly the next day, I would remove myself from the flight, and

1    I would submit a form to be reimbursed for the flight, and

2    the secretary treasurer would see the reason why, and the

3    flight computer wise I was removed from the flight, another

4    pale lot would take my place and that pay would not come out

5    of my monthly salary.  MEC meetings, special MEC meetings,

6    were what I would call a no brainer because the secretary

7    treasurer of the MEC obviously would extend an invitation for

8    all the LEC reps to be there and if they happened to be on

9    there he took care of that and would remove them from the

10   flights and the pay remained the same.

11   Q.    If you were absent and you had approved flight pay loss,

12   then that was a authorized absence from the flight.  Correct?

13   A.    That would be correct.

14   Q.    If you didn't have a flight pay loss approved would your

15   absence be authorized or unauthorized?

16   A.    Almost all the time, in the past, it used to be

17   authorized.

18   Q.    No, if you did not get flight pay loss, if the union did

19   not approve a flight pay loss for you, in the eyes of

20   management, would your absence from that flight be authorized

21   or unauthorized?

22   A.    Unauthorized under that situation.

23   Q.    All right.  And would you be subject to any kind of job

24   action if you had an unauthorized absence from your job?

25   A.    I am going to say no to that.  The only penalty to that

 1   would there would be no pay.  I would receive a reduction in

 2   my salary.  They wouldn't call me in the offers and say you

 3   are going to get fired for this.  They would not pay me for

 4   it.

 5   Q.   What if you were repeatedly absent on an unauthorized

 6   basis from flight?

 7   A.   I guess if there was a multiple offender, the issue

 8   would have to be raised at some point.

 9   Q.   But if you were out with union approved flight pay loss

10   then it was authorized absence, correct?

11   A.   That would be correct.

12   Q.   Now, there was a lobbying effort that took place in

13   Washington?

14        THE COURT:  I didn't hear that.

15   Q.   A lobbying effort that took place in Washington, D.C..

16   When did that begin, or your participation in that begin?

17   A.   I couldn't tell you the first time I went down to, to

18   the best of my recollection.  Shall we say late summer of

19   2001.

20   Q.   And how did you first get involved in the lobbying

21   effort?

22   A.   I received a phone call from a Mr. Matt Comlish, who was

23   a TWA MEC's government affairs officer.  Mat is an extremely

24   knowledgeable young man when it comes to working on Capitol

25   Hill.  He lives, I believe, in Virginia at the time, and he

```
 1    had extensive knowledge in this area and he had developed

 2    this plan, if you will, to basically try to solicit and

 3    become lobbyists and walk the halls of Congress and the

 4    Senate buildings and try to get senators and Congress men to

 5    hear our complaint in the hope that we would pass a bill that

 6    might offer some leverage.

 7    Q.   And did you walk the halls of Congress?

 8    A.   I did.

 9    Q.   And how much time did you spend lobbying, if you can

10    recall?

11    A.   Quite a bit.  Quite a bit.

12    Q.   Did you bring with you a collection of business cards

13    that you collected while you were --

14    A.   I did.

15    Q.   Do you have them with you?

16    A.   They are in my pocket.

17             THE COURT:  Wait.  Just ask him who he saw, that

18    will refresh his recollection who he saw.

19    Q.   I will.  Did you concentrate your particular efforts

20    with any particular group of elected representatives?

21    A.   For the most part, I concentrated more on the senators.

22    Q.   On senators?

23    A.   Correct.

24    Q.   Was that the general pattern there, to focus on the

25    Senate?
```

 1    A.    The push was to do the Senate first and House on the

 2    second half of our campaign.

 3              THE COURT:   The bill was originally a Senate bill.

 4    A.    That's correct.

 5    Q.    Did ALPA have offices and facilities in Washington, D.C.

 6    close to the Capitol?

 7    A.    They did.

 8    Q.    Did you use those facilities in connection with your

 9    lobbying efforts?

10    A.    We did not.

11    Q.    Whose facilities, was there some union facilities that

12    you did use during your lobbying?

13    A.    Yes.

14    Q.    Whose facilities did you use?

15    A.    We were using the facilities of a gentleman by the name

16    of Mr. Robert Roche, who was, I can't remember his title,

17    president, vice president, way up there with the

18    International Association of Machinists, IAM.

19    Q.    The IAM is another AFL-CIO union?

20    A.    That's correct.

21    Q.    Can you tell the jury how you came to be using the IAM's

22    facilities in Washington, D.C. for your lobbying efforts?

23    A.    To the best of my recollection, while walking through

24    Washington, we had been invited to a photo shoot that took

25    place in front of the Capitol building.  There was a full-

1    page actual Washington Post or whatever ad eventually it

2    appeared in, but at that particular photo shoot introductions

3    were exchanged and they saw us because we were always in our

4    uniforms, as were the flight attendants, and the flight

5    attendants were members of the IAM.

6              We told them, I didn't tell them, but someone else

7    there, Mr. Comlish was there and explained to him what we

8    were doing, and to the best of my knowledge he opened up his

9    facilities and his office to help us in anything we needed to

10   do.

11   Q.  What did he say to you and the others standing there on

12   Capitol Hill about use of their offices?

13             MR. FRAM:  Your Honor, this is hearsay for for the

14   truth, I am going to object.

15             I don't know what the point is.

16             THE COURT:  I don't know, what office they used,

17   what does that have to do with the case?

18             MR. JACOBSON:  It does connect to the case, your

19   Honor.

20             THE COURT:  What is the question?

21   Q.  What use were you given of the office?  Were you just

22   given a limited use, unlimited use, how much use were you

23   given of the IAM office?

24   A.  We were invited to the IAM office and we were told we

25   could use their facilities carte blanche.

1           THE COURT:  Which meant what?  Their Xerox

2     machines?

3     A.   Xerox machines, telephones, secretarial staff helped us

4     type some letters.

5     Q.   Were you using the IAM facilities because you didn't

6     want to use ALPA's facilities?

7           MR. FRAM:  I object to the leading questions.

8           THE COURT:  Yes.  You got to stop testifying.  You

9     got to let him testify.

10           MR. JACOBSON:  I am not sure how to ask that

11     question otherwise.

12           THE COURT:  ALPA's facilities were in Herndon,

13     Virginia.

14     A.   ALPA has a major presence in Herndon, but ALPA had an

15     office on Massachusetts Avenue in Washington.

16           THE COURT:  Why didn't you use the ALPA office?

17     A.   I couldn't answer that question.  I don't know.

18           THE COURT:  Okay.  He doesn't know why.

19     A.   I really don't know.

20     Q.   Okay.  Do you remember the names of any senators that

21     you spoke with in connection with this lobbying effort?

22     A.   I could name as many as you would like me to name.  I

23     have every one, either Senator or the aid, that is why I

24     saved the card.  But I mean I spoke to approximately 35

25     senators and/or their aids.

1    Q.    All right.   Do you recall without looking another the

2    cards the flames of any of these people?

3    A.    Senator Hillary Clinton, Chuck Schumer, Barbara Boxer.

4    Kay Baily Hutchinson.   I mean.

5           THE COURT:   Were these people -- did you speak to

6    them directly?

7    A.    I spoke to them directly.

8    Q.    And in the course of your discussions with them, did the

9    topic of ALPA's position on this bill come up tall?

10   A.    ALPA's position?   No.   Not really.   What we would do to

11   clarify is we would explain our position, our specific

12   position.

13          THE COURT:   You mean the pilots?

14          THE WITNESS:   The pilots position.   Yes, your

15   Honor.

16   A.    And we were soliciting obviously their support.   Me

17   personally, and I was, and we did this the same thing, we

18   were in small groups of approximately four or five people.   I

19   would always ask whomever I was speaking to, be it the

20   Senator or his or her aid, had they heard from our national

21   office.   And that is why I brought these cards with me to

22   show, obviously I can't show them to you, I don't know, but I

23   explained to my attorney that the last question I would ask

24   is have you heard from our national office, and the answer

25   obviously --

```
 1              MR. FRAM:  Your Honor, pardon me.  This is obvious

 2    hearsay.  He is trying to -- we talk about this before.

 3              THE COURT:  No, it is direct testimony that he

 4    asked the question, that is direct testimony.  It is not

 5    hearsay.

 6              MR. FRAM:  To the extent there is a response but

 7    the response is being offered for the truth.

 8              THE COURT:  I am going to allow it.  You asked that

 9    any time you met.

10    A.   I  asked that each and every time.

11              THE COURT:  Were the answers different or the same?

12    A.   The answers were always the same.

13              THE COURT:  What was the answer?

14    A.   The answer was no.

15              THE COURT:  I will allow that question.

16              MR. JACOBSON:  Thank you, your Honor.

17    Q.   Did you, during this --

18              THE COURT:  Hold it.  Mr. Press, you want to say

19    anything?

20              MR. JACOBSON:  He thought, he wanted me to ask the

21    it again.  He thought it wasn't audible.

22              THE COURT:  Ladies and gentlemen, have you been

23    hearing everything that is going on so far?

24              MR. JACOBSON:  Good.

25              THE COURT:  I might ask as a general matter, if you
```

1   don't hear something, don't hesitate to raise your hand and

2   say, "Repeat it.  I didn't hear it."  Absolutely.  I want to

3   make that clear.

4           JUROR NO. 2:  Sometimes we can't hear the lawyer.

5   The lawyer.

6           THE COURT:  You mean Mr. Fram:

7           JUROR  NO. 2:  Sometimes we have trouble hearing

8   you.  Mr. Fram.

9           MR. FRAM:  I will keep my voice up.

10          THE COURT:  Again.

11          THE COURT:  Again, if you can't hear, please.

12          JUROR NO. 2:  He starts out low and then goes high.

13          THE COURT:  Please, because you are very attentive

14  jury, and you know, I know you want to hear what is being

15  said.  So raise your hand.

16          His answer up to this point, I think the last five

17  minutes, has been very clear.  His answers were audible and

18  could be heard by the jury.

19  Q.   Mr. Hollander, during these lobbying efforts in

20  Washington, D.C., did you make any attempts to contact Duane

21  Woerth?

22          THE COURT:  Did you personally try to reach Mr.

23  Woerth about the lobbying efforts?

24          MR. JACOBSON:  Yes.

25  A.   I did not, in the meaning -- context of contact, I did

```
 1   not phone him, I did not email him.  On two occasions, at the

 2   end of an exhausting day of walking, if we happened to end up

 3   near Massachusetts after where the ALPA office was, we had,

 4   again, two occasions just walked into the building, see if

 5   Captain Woerth was there.  And asked if we could speak with

 6   him.

 7   Q.   And was he there on either of those occasions?

 8   A.   On at least one occasion he was present and we asked if

 9   he would spare us five minutes.

10   Q.   And did he?

11   A.   He did.

12   Q.   Did you speak to them then?

13   A.   We spoke.

14         THE COURT:  Were you present?

15   A.   I was present.

16   Q.   What did you all say to Captain Woerth at the same time

17   that you saw him at his office on Massachusetts Avenue during

18   this lobbying contain?

19         THE COURT:  Who was with you when you met with

20   Captain Woerth.

21   A.   I couldn't tell you the time, approximately four or five

22   in numbers, the time I did speak with him,  Mr.  Jim Arthur,

23   who was the Council 3 secretary treasurer was with me.  To

24   the best of my knowledge I couldn't tell you who the other

25   three parties are.
```

Hollander-direct/Jacobson                                        90

```
 1              THE COURT:  Okay.  Go ahead.
 2    Q.   On this occasion what with the group of four or five
 3    pilots who got in to see Captain Woerth, the president of
 4    ALPA, what did you say to him?
 5    A.   It was brief, but basically, my position, my statement
 6    to him was that to bring him up-to-date what we were doing,
 7    today, I said, Captain Woerth, we spoke with at least six
 8    senators and/or their aids today and I brought it to his
 9    attention that might, similarly departing question was had
10    you heard from our national office and they all said no.  I
11    brought it to his attention that, in a reminder type of way,
12    I thought we had your support on this.
13              How come the people that I have personally visited
14    have not heard from either you or any of the other
15    representatives from this organization.
16    Q.   What did Captain Woerth reply to you?
17    A.   That he was working on it.
18    Q.   Did he give you any more details about how he was
19    working on it?
20    A.   He said the, the only thing he said is he has Paul
21    Hallisay working on it.
22              THE COURT:  Who is Paul Hallisay.
23    A.   I later found out Paul Hallisay is the   ALPA national
24    legislative affairs officer.
25              THE COURT:   He is a full-time employee of ALPA?.
```

 1   A.   Yes.

 2   Q.   Had you ever heard of Mr. Hallisay before this meeting

 3   with Mr. Woerth?

 4   A.   I had not heard the name before that time.

 5   Q.   Did you make any suggestions to Captain Woerth in that

 6   time about further items of support that ALPA could give you

 7   in your efforts?

 8   A.   We made one suggestion.  We had asked if it was possible

 9   for the Air Line Pilots Association to deny jumpseats on all

10   ALPA carriers for American Airlines pilots.

11           THE COURT:  Was that in this very meeting you are

12   talking about?

13   A.   Yes, it was, your Honor.

14   Q.   And what did Captain Woerth say in response to your

15   request to deny a jumpseat privileges to the American pilots?

16   A.   He was not in favor of that.

17   Q.   Did you ask him why?

18   A.   We did.

19   Q.   And --

20   A.   His reply was that although he understood what we were

21   trying to do, that there are also pilots who are members of

22   ALPA who use American Airlines to go to work, and he didn't

23   want to disadvantage those pilots by not being able to

24   jumpseat on American Airlines if  -- he thought of course

25   they would retaliate it the same.

1  Q.   Did you find that response credible?

2           THE COURT:  Oh, that.

3           MR. JACOBSON:  Okay, your Honor.

4  Q.   How many pilots were in ALPA at that time?

5  A.   63,000 plus.

6           THE COURT:  What?  How many?  -- oh you, mean the

7  whole ALPA union?

8           MR. JACOBSON:  Yes.

9  Q.   How many American pilots at that time?

10 A.   Just over 10,000, I believe.

11 Q.   Did you have any further exchange with Captain Woerth at

12 that meeting?

13 A.   No, I don't recall any additional change.

14 Q.   Did you ever actually have a conversation with Mr.

15 Hallisay who you heard about hat this meeting?

16 A.   I had had, well, there was a conversation with Mr.

17 Hallisay.  It was not a one-on-one meeting.  Had called a MEC

18 meeting in October.

19 Q.   And can you tell the jury what the exchange was between

20 Mr. Hallisay and the MEC at that October MEC meeting?

21 A.   At the October MEC meeting which was held in Washington,

22 D.C. at the Mayflower Hotel, this was the time we referred to

23 as the cram-down meeting, where our negotiating committee,

24 and the American Airlines negotiating committee were meeting

25 in another room down on the same floor on of the hotel.  Mr.

```
 1   Hallisay, the recollection is this:  We had decisions to

 2   make, and you know, part of our decision process was how is

 3   this legislative effort going, I mean, could we see some

 4   success with this, this would have gained us a tremendous

 5   amount of leverage.

 6           And unsolicited, a phone call had come in from Mr.

 7   Hallisay, and he addressed the MEC on his view of how the

 8   legislative effort was working and coming along.

 9   Q.   And what what did Mr. Hallisay tell you about that?

10   A.   Again, paraphrasing, he said we did not stand a chance

11   in getting the bill passed.

12   Q.   All right.  Did he make any comments about whether he

13   himself was working on?

14   A.   Yes.   He had been working on it at great length and

15   tack contacting people, and again, he said that you have no

16   chance of this legislation passing in either the House or the

17   Senate.

18   Q.   Did you say anything to Mr. Hallisay at this time in

19   response to his statement that he had been working on it?

20   A.   I did I will not deny that practices probably the first

21   time I think my voice got elevated and I yelled at him and

22   called him a liar.

23   Q.   Did you say anything more besides that?

24   A.   No, I think I was done.

25   Q.   I will step back slightly in time to July 23, 2001.  I
```

```
 1   will give you a document not yet in evidence, exhibits

 2   defendant 250.

 3   Q.   Mr. Whole, do you have exhibit defendant 250 in front of

 4   you?

 5   A.   I do.

 6   Q.   Is that a special telephonic, minutes of a TWA MEC

 7   special telephonic meeting July 23, 2001?

 8   A.   It is.

 9           MR. JACOBSON:  I would offer defendant 250 in

10   evidence.

11           MR. FRAM:  No objection.

12           THE COURT:  D 250.  I assume no objection.

13           MR. FRAM:  Correct.

14           THE COURT:  Okay.  D 250 in evidence.

15   Q.   I would like you to turn to the last page of this

16   document, if you would.  There is a resolution there.  Do you

17   see the resolution, do you recall it?

18   A.   01-80.

19   Q.   Yes, sir.

20   A.   I see it in front of me.

21   Q.   Do you recall that resolution?

22   A.   I do.

23   Q.   Can you tell the jury what were the circumstances or

24   situation that led up to the MEC passing this resolution in

25   July 23, 2001?
```

Hollander-direct/Jacobson                                    95

1   A.   I think again the circumstances surrounding it was we

2   wanted to again put it down in writing, because we felt we

3   weren't getting the support that we felt the TWA pilots

4   needed so we passed a resolution requesting a pledge from the

5   ALPA executive council till council.

6   Q.   A pledge for what?

7   A.   For their absolute full resources of the association

8   during the integration.  In other words, we just didn't feel

9   we were getting it and we thought if we passed the resolution

10  and had it forwarded from our master chairman over to the

11  executive board that it might be another push that, you know,

12  hey, get off your -- get out of your seats and we need a hand

13  here.

14  Q.   Had you previously received a pledge from the National

15  ALPA of moral and financial support?

16  A.   I can't remember if it was in those words but we had

17  been pledged their full supporting go all the way back from

18  the April meeting.

19  Q.   Had you seen that support yet in your view?

20  A.   Lip service as far as I was concerned.

21  Q.   There came a time when, moving away from that document,

22  where the TWA domiciles closed?

23  A.   I recall that.

24  Q.   Do you recall when that happened?

25  A.   Domiciles closed on October 31 of 2001.

Hollander-direct/Jacobson                                    96

1    Q.    Did you have any view about whether or not American

2    Airlines or TWA LLC were contractually permitted to close

3    those domiciles?

4    A.    The contractual requirement for closing a domicile were

5    as follows:

6          If the company wanted to close with, in this case

7    both, or one domicile they had to schedule a meeting with the

8    local union members, not only to explain why, but it was

9    always thought that maybe there could be some final

10   resolution as to not closing a domicile.  There is obviously

11   a cost factor for the company to move all the pilots.  Once

12   that meeting was completed, the company was required to give

13   30 days notice to the domiciled LEC reps, and the company had

14   to do this on 30 days notice, to close a domicile, to have

15   the pilots prepare.  It was very fair.

16   Q.    Do you participate in any type of grievance or other

17   action in response to the closing of those domiciles?

18   A.    I did.  I filed personally a grievance with my then

19   chief pilot, Scott Foster, because we were given 13 days

20   notice before the closing of the domicile.

21   Q.    What was the result of that grievance?

22   A.    It was actually the last TWA grievance with arbitrator

23   Casher and TWA prevailed in that grievance and won the

24   grievance.

25   Q.    You say TWA, what do you mean?

1   A.    TWA   LLC.   Because of the scheduling of the grievance,

2   soon after the grievance was heard, the National Mediation

3   Board --

4   Q.    Did the company win the grievance or the union?

5   A.    The union won the grievance.   The company did not win

6   the grievance.   They were found violating the contract.

7             THE COURT:   They meaning LLC.

8   A.    TWA LLC.

9   Q.    And once that finding was made, was there a further

10  hearing scheduled on the grievance?

11  A.    The grievance was heard, and the protocol is that once

12  the arbitrator makes his decision who the winner and the

13  loser is, there is a post arbitration hearing on the remedy,

14  the fix, whether it is a financial fix, or how do you fix

15  this problem, what do you do about it.

16  Q.    And did you ever have a hearing on that?

17  A.    There was a hearing scheduled.   But I did not attend it.

18  Q.    And why is that?

19  A.    Because by the time the arbitrator made his ruling, and

20  by the time that post hearing was scheduled, the National

21  Mediation Board had ruled that American and TWA were one

22  carrier, and therefore, ALPA was no longer our collective

23  bargaining agent any more.

24  Q.    Did someone show up in your place for the remedy

25  hearing?

1    A.    Somebody else showed up in my place.

2    Q.    Was that somebody from where?

3    A.    It ended up being Bob Stow and another member of -- 2:00

4    a.m. airline pilots went down in not my place, it wouldn't

5    have been my place, it would have been the system boards

6    place.  In exchange for the normal people who would have been

7    there, 2:00 a.m. airline pilots took our place, who

8    represented the APA.

9    Q.    Now, in connection with the domiciles, did your MEC pass

10   any resolutions relating to MEC votes on seniority

11   integration?

12   A.    I personally put a resolution on the floor on the

13   October 31 meeting concerning that very thing.

14            THE COURT:  Meeting of what?

15            THE WITNESS:  There was a special meeting of the

16   MEC in St. Louis on October 31, your Honor.

17            THE COURT:  The MEC of what?

18            THE WITNESS:  Of TWA.

19            THE COURT:  TWA LLC.

20            THE WITNESS:  Yes.

21            THE COURT:  ALPA was still your bargaining

22   representative as of that point.

23            THE WITNESS:  That is correct.  Yes.

24            THE COURT:  Mediation board had not yet made single

25   carrier ruling.

 1                THE WITNESS:  That is correct.

 2                THE COURT:  Go ahead.

 3   Q.   I am sorry I didn't make that clear, your Honor.  So at

 4   this point, while ALPA is still your bargaining

 5   representative, and the two, Council 2 and Council 4 being

 6   closed, what was the resolution that you put forward at the

 7   MEC, special MEC meeting, of October 31?

 8   A.   I had great concern that another meeting might be

 9   scheduled and again bring you up the subject of the

10   integration.  I thought it was extremely unfair that, when

11   Council 2 and Council 4 had closed the MEC body, voting

12   members of 6, and the body in general of nine individuals are

13   now going to go down to three individuals, of which only two

14   can vote.  Obviously, and undisputed Captain Rautenberg and

15   First Officer Young really had no time to talk to the New

16   York pilots or the LA pilots, and unfortunately, and it would

17   be I think extremely important to explain, we had had a

18   gentleman by the name of bill Kents physically go to ALPA and

19   Bill Kents, by the way, was an executive vice president.

20                MR. FRAM:  I object unless there is a foundation of

21   personal knowledge.

22                THE COURT:  First of all, who is he is?

23   A.   Mr. Bill Kents is a former executive vice president of

24   ALPA for TWA, and we had sent him to Herndon to request that

25   the MEC be kept intact with the closure of the --.

```
1              MR. FRAM:  He is going to testify about what Mr.

2    Kents said back, that is hearsay.

3              THE COURT:  At this point, your goal was to try to

4    keep the six people, notwithstanding that the two /H*UBS, or

5    two centers were being closed?

6    A.    That is absolutely correct.

7              THE COURT:  You felt that better have six voting

8    members than two?

9    A.    That's correct.

10             THE COURT:  More representative.

11             THE WITNESS:  Yes. That is correct.

12             THE COURT:  Did that ever come to pass?

13   A.    That request was denied.

14             THE COURT:  Denied by whom?

15   A.    Denied by the ALPA Executive Council.

16             THE COURT:  Do you know when?

17   A.    It was denied the third week of October of 2001.

18             THE COURT:  Okay.

19   A.    You couldn't give you the date.  Why didn't you pick up

20   from there.

21   Q.    You had that denial.  So what was your resolution that

22   you had proposed on March, on October 31?

23   A.    I proposed this resolution because ALPA National had

24   sent back, in writing, their counter to Bill Kents' request,

25   was to, and this was what was said to mirror what appears
```

```
 1    what happens at America West airlines.  What happens at
 2    America West airlines is this.  They only have one hub,
 3    Phoenix, but they have such a large body of pilots, they also
 4    feel it is not fair for just two people to deal with so many
 5    pilots so they have two captain representatives and two first
 6    officer representatives, and a secretary treasurer.  So
 7    basically, their MEC is composed of 5 people to help with
 8    their numbers in their airline.
 9              THE COURT:  Even though there is only one hub.
10    A.   Even though there is only one hub.
11              THE COURT:  That was ALPA's suggestion or proposal.
12              THE WITNESS:  That was ALPA's proposal.
13              THE COURT:  To your men?
14              THE WITNESS:  That's correct.
15              THE COURT:  Go ahead.
16    A.   So because of that, a scheduled meeting in Saint Louis
17    had been -- a meeting had been scheduled in Saint Louis for
18    November 15, to elect these new representatives, and bring
19    the TWA MEC back to a body of five people.  So for a period
20    from November 1 through November 15, the TWA MEC was only
21    going to consist of two individuals.  And I put forth this
22    resolution basically to protect them.  I set forth the
23    resolution that should the subject of an integration come up,
24    specifically an integration, it said, that unless the master
25    chairman, or vice chairman and the secretary treasurer of,
```

1    the three officers, in addition, Captain Rautenberg and First

2    Officer Young, agreed then the subject of an integration

3    could not be discussed.  My theory in my head was if five

4    people think this is a good thing, it must be a good thing.

5    If they want, unanimously  think it is a good thing, then

6    let's just put it off until the 15th.

7    Q.    Did that resolution pass?

8    A.    It passed with one abstention.

9    Q.    The abstention was?

10   A.    From Captain Rautenberg.

11   Q.    Did you make any presentations to the ALPA executive

12   board in 2002 for additional help?

13   A.    He we did.

14   Q.    What kind of presentation did you make to the ALPA

15   executive board.

16                MR. FRAM:  I object.

17                THE COURT:  I am sorry.

18                MR. FRAM:  I object.  It is beyond the scope of the

19   case.  It is framed on in --

20                THE COURT:  I don't know.  You must know why you

21   are going.

22                MR. FRAM:  He is going into 2002 and as a

23   consequence it is beyond the scope of the case.

24                MR. JACOBSON:  Before single carrier.

25                THE COURT:  Single carrier was April 5, 2002.  That

```
 1   is when the National Mediation Board ruled they were a single

 2   carrier, I think.

 3            MR. JACOBSON:  Yes.

 4            MR. FRAM:  There is no dispute about that.  This

 5   sounds like a totally different area.

 6            THE COURT:  I am not overruling your objection.  I

 7   want to hear a little more of the question.

 8            MR. JACOBSON:  Let me rephrase the question.

 9   Q.   Mr. Hollander, I am talking only about the time period

10   before the National Mediation Board found single carrier

11   between TWA and American Airlines.  Okay?

12   A.   Okay.

13   Q.   In that period did you go to the ALPA executive board to

14   ask for more help?

15   A.   Did -- not alone but I did.

16   Q.   When was that?

17   A.   I cannot recall the date.  I can only recall that there

18   was a time--

19            THE COURT:  Well --

20   A.   I cannot recall the date, your Honor.

21            THE COURT:  Before that, was it April 3rd, I was

22   wrong, I sad April 5, April 3rd, 2002, was when you were to

23   pay a single carrier.

24   A.   It was prior to that.

25            THE COURT:  On that basis I will let Mr. Jacobson
```

1    object, before that date --

2              MR. FRAM:  I am concerned more about the subject

3    matter.

4              THE COURT:  At this point, unless I hear, I will

5    strike it if I think it is out of order, but you may proceed,

6    Mr. Jacobson.

7    A.   All I can answer is prior to --

8              THE COURT:  There is no question pending.  The

9    answer is yes you went to them.  To seek something.  Wait for

10   the next question.

11   Q.   Let back up and give you a new exhibit, exhibit 259.

12             THE COURT:  Did what?

13             MS. RODRIGUEZ:  259.

14             MR. JACOBSON:  D 259.

15             THE COURT:  Okay.  D 259.

16             THE COURT:  Ask your next question.

17   Q.   Do you recognize this document, exhibit exhibit D 259,

18   Mr. Hollander?

19   A.   I do.

20   Q.   What is it, sir?

21   A.   It is a special meeting -- excuse me, it is the minutes

22   of the special meeting dated December 4, 2001.

23   Q.   Do you recall this meeting?

24   A.   Yeah, I recall the meeting.

25             THE COURT:  At this stage there were only two

1   voting members, right, or were there 94 voting members?

2          THE COURT:  On this date, December 4, 2001, do you

3   remember?

4   A.   I am sorry.  Are you asking me, your Honor?

5          THE COURT:  Yes.

6   A.   They would have had to have been four voting members, I

7   believe.

8   Q.   This was after November 15?

9   A.   This was after November 15 when the additional officers

10  were voted upon.

11         THE COURT:  On the top it only refers to one

12  captain rep and one first officer rep.

13  A.   I am looking at the exact same thing, your Honor.  Yet

14  on the third line down it says members present, Steve

15  Rautenberg, Howard Hollander and Sean Clarke.  Sean Clarke

16  and myself were the two additional members voted on to the

17  MEC on the November 15 meeting.

18         THE COURT:  Even though it didn't say so here.  Up

19  on the top.

20  A.   I am in agreement with you, your Honor, it does not say

21  it.

22         THE COURT:  It refers only to Rautenberg as the

23  captain rep and Sally Young as the first officer rep.

24  A.   That's correct.  I agree with you.

25         THE COURT:  It says below present, Rautenberg,

1    Scott Hollander, whose name doesn't even appear up there,

2    Sean Clarke.  Members of what.

3    A.   With are members of the MEC.  The only thing I can offer

4    you, your Honor, is if you look through the notes.  Only MEC

5    members can vote and put up proxies and resolutions and

6    throughout this document you see that myself and Sean Clarke

7    were both voting and putting up resolutions and simply doing

8    MEC business.

9            THE COURT:  Notwithstanding what was printed on

10   top, you believe at this point on December 4, 2001, you and

11   Sean Clarke were two voting members of, as well as Sally

12   Young and Rautenberg.

13   A.   That would be correct.

14   Q.   Let's go back on that.  On November 15 was an election

15   held for the two additional reps?

16   A.   It was.

17   Q.   Who was elected the additional captain rep?

18   A.   You were selected the Council 3 capital rep.

19   Q.   Okay.  Was there another Council 3 -- let me rephrase

20   it.  Were only two seats voted for, or four receipts?

21   A.   2 seats were voted on.

22   Q.   Mr. Rautenberg continued as a captain rep?

23   A.   Correct.

24   Q.   Ms. Young continued as a first officer rep?

25   A.   Correct.

1    Q.    Who was elected as an additional captain rep?

2    A.    I ways a capital rep.  First officer Sean Clarke was

3    offered as a first officer rep.  There were two captain reps

4    and two first officer reps, as directed by ALPA.

5    Q.    You were one of the captain reps?

6    A.    That's correct.

7    Q.    Do you recall this meeting?

8    A.    I do.

9          THE COURT:  Three of the four were present, Sally

10   Young, was not present here.

11   A.    Yes, that's correct, your Honor.

12         THE COURT:  So three of the 94 voting reps, if you

13   will, were present.

14   A.    That's correct.

15   Q.    If you turn to the second page, the third paragraph.

16   Was Ms. Young present for most of the meeting?

17   Q.    See the 9-18 entry?

18   A.    It says Sally Young arrived at 9:18.

19   Q.    The meeting started at nine o'clock?

20   A.    Always.

21         MR. JACOBSON:  Your Honor, I move exhibit

22   defendant's 259  in evidence.

23         THE COURT:  Okay.  Counsel.

24         MR. FRAM:  No objection to the document.

25         THE COURT:  Okay.  D 259 is in especially is in

1    evidence.

2    Q.   What was the primary subject of this recollection?

3    A.   May I take a moment?

4    Q.   Let's walk through.

5         THE COURT:   No, he can, I think it might be helpful

6    if he looked at the document.

7         MR. JACOBSON:   Thank you, your Honor.

8    Q.   What were the primary topics of this meeting?

9    A.   It was a concern about ALPA recruiting AMR pilots.

10   Q.   AMR, what is that?

11   A.   I am sorry.  American Airlines pilot.

12   Q.   That is the parent company?

13   A.   That's correct.  AMR is the parent company of American

14   Airlines.

15   Q.   So when you say recruiting, what do you mean?

16   A.   It appeared American Airlines was looking, for lack of a

17   better word, or interested in being the collective bargaining

18   agent for American Airlines, or a suspicion was raised when

19   they wanted to be the collective bargaining agent for the new

20   entity, once it was combined.

21   Q.   You said American Airlines was interested in being the

22   bargaining agent?

23   A.   ALPA was interested in becoming the collective

24   bargaining agent for American Airlines.

25   Q.   Did you and the rest of the MEC on December 4 pass any

1    resolutions?

2    A.   It looks like we did.

3    Q.   I would like to direct your attention, if I could, to

4    page 7.  Of this.

5    A.   Okay.  I am on page 7.

6    Q.   Is that one of the resolutions that was passed by the

7    MEC that day?

8    A.   It indicates that it was.

9    Q.   I am not going to go through all the whereas's, there

10   are many of them.  I would like to look at the "therefore?"

11   A.   In the middle of the page.

12   Q.   Therefore, be it resolved?

13           THE COURT:  In bold.  It is in bolder type.

14           MR. JACOBSON:  It is.  You are right.

15   A.   Would you like me to read it?

16   Q.   Would you read that to the jury, please?

17   A.   Therefore be it resolved that the TWA MEC requests from

18   ALPA additional MEC funding in the initial amount of three

19   million dollars to be drawn from ALPA National budgets or the

20   major contingency fund, as may be decided by the appropriate

21   ALPA authority, and be it further resolved that this

22   resolution be immediately transmitted by the master chairman

23   to ALPA president Duane Woerth, ALPA executive committee and

24   ALPA executive board;.

25           And be it further resolved that the funds requested

 1   shall be allocated to reimbursing the TWA MEC budget for

 2   extraordinary bankruptcy and legal fees and continuing

 3   seniority integration issues.

 4   Q.   All right.  The three million dollars sounds like a lot

 5   of money to me.

 6            Why did the MEC request this money from ALPA at

 7   this time.

 8   A.   I cannot give you the very specification, but the

 9   genesis of this was the Air Line Pilots Association, ALPA,

10   had recovered this type of money through the bankruptcy

11   courts.  And it was a general feeling that this money

12   belonged, per se, to the TWA pilots and to our cause and we

13   felt being ALPA recouped this cost from the bankruptcy

14   Court's, it should be made available to the TWA pilots.

15   Q.   What were you going to use the money for?

16            MR. FRAM:  Your Honor, I object.  This is beyond

17   the scope of the pretrial order.  There is no foundation that

18   he has knowledge of the appropriate rules and regulations in

19   terms of what could or should happen to the money.

20            THE COURT:  I don't want you to guess.  I mean if

21   you know what this meeting they intended to use the money

22   for, I am going to let him testify to that.  But if you

23   don't, if you are just sort of guessing or surmising what it

24   was for, I don't want that.

25   A.   What, to clarify, your Honor, I am not familiar with the

 1    bankruptcy codes.  We just were --

 2              THE COURT:  He already answered the question as to

 3    what the genesis of the request was, was that he felt, he

 4    believed that ALPA had gotten this money back from the

 5    bankruptcy assets.  He felt it should be returned.  Beyond

 6    that, unless he knows, I don't want him to guess.

 7              MR. JACOBSON:  I am asking him what the MEC wanted

 8    the money to use it for.

 9              THE COURT:  If he knows.

10              MR. JACOBSON:  Yes.

11    Q.   Did the MEC, did you know, the MEC had a purpose to use

12    this money in connection with, as you say, extraordinary

13    bankruptcy legal fees and continuing seniority integration

14    issues?

15              THE COURT:  The bankruptcy, there was nothing going

16    on in bankruptcy by December 5.

17              MR. JACOBSON:  I don't know.  I am asking him, your

18    Honor.

19              THE COURT:  Do you know what MEC planned to use

20    this money for.

21    A.   We were going to use it to explore additional litigation

22    against AMR or APA.  That is what we were going to use it

23    for.

24              THE COURT:  Okay.

25    Q.   Did ALPA grant the application for these funds.  To the

 1   best of my knowledge we were denied?

 2   Q.   Did they grant you part of the funds?

 3   A.   We were denied.  In whole.

 4   Q.   Zero?

 5   A.   Zero.

 6   Q.   Turn if you would to the next page, page 8 of exhibit

 7   exhibit D 259.  Do you see a resolution there, 01-119?

 8   A.   I do.

 9   Q.   That is a resolution by you?

10   A.   It says it is by me, yes.

11   Q.   Do you recall this resolution?

12   A.   I would have to read it and refresh my memory.

13          THE COURT:  Which are you talking about?

14   Q.   01-119, page 8?

15          THE COURT:  What page?

16          MR. JACOBSON:  Page 8, your Honor.

17          THE COURT:  Okay.

18   A.   From there, it  starts with the next to last paragraph

19   on page 8, right?

20          MR. JACOBSON:  No.  The resolution 01-119 starts,

21   it is the fifth paragraph down.

22          THE COURT:  What do you want him to do?

23          MR. JACOBSON:  To review it.  He said he needs to

24   review it.

25   A.   I am reading it.

 1  A.    Okay.

 2  Q.    Do you recall that resolution?

 3  A.    I do.

 4  Q.    And do you recall your reasons for proposing this

 5  resolution?

 6  A.    I opposed it?

 7  Q.    No, proposing it?

 8  A.    Proposing it.  Okay.

 9  Q.    I am sorry.

10  A.    The reasons for this particular resolution was again

11  because of the date, it, TWA MEC had been denied through ALPA

12  National, every legal strategy or proposed legal strategy to

13  date, and we were extremely disappointed that as it looked

14  like basically in layman's term the ship was sinking for us,

15  so what we were trying to do is  pass the resolution and get

16  it forwarded to ALPA, we wanted the authority to engage

17  outside legal counsel.  We wanted to engage an attorney that

18  had nothing to do with ALPA, you know, no connections.  .

19  Q.    All right.  And look at the third "whereas" in that

20  resolution.

21            THE COURT:  Back on page 8.

22  A.    Whereas ALPA National legal staff has stated they have

23  no interest in taking any further actions to enforce the ALPA

24  promises of fair and equitable treatment of the TWA pilots by

25  APA and AMR.

1    Q.   What was your basis for including that "whereas" in your

2    resolution, sir?

3    A.   Because we asked repeatedly a number of times and a

4    number of people to help us, and with any theory or any legal

5    strategy that could gain us some leverage and not be, you

6    know, basically stapled to the bottom of AMR's list and we

7    were rejected on all fronts.  We felt that there was nothing

8    else that, ALPA said we are done with you.

9    Q.   Was this based on conversations you had with specific

10   ALPA employed lawyers?

11   A.   It was not based on my specific conversations, no.

12   Q.   Whose conversations?

13   A.   I couldn't tell you.  It could have been the merger

14   committee people, it could have been someone from the office.

15   It was not my direct communication.

16           MR. FRAM:  In light of that, your Honor, I move to

17   strike the testimony.  There is no personal knowledge of

18   ALPA's position as he has articulated it.

19           THE COURT:  I am going to let it stand.  Go ahead.

20   Q.   I would like to ask you, finishing up on this

21   resolution, I would like to ask you about the next whereas

22   clause.

23   A.   Where as it has been recently discovered that ALPA

24   National has been receiving representations pledge cards from

25   pilots at American Airlines, at the same time TWA MEC had

 1   been attempting to negotiate with APA and AMR on behalf of

 2   the TWA pilots.

 3   Q.   Was this one of the reasons why you wanted outside --

 4            THE COURT:  Counsel, do you have personal knowledge

 5   of that?

 6   A.   Do I have personal --

 7            THE COURT:  Do you have personal knowledge that --

 8   A.   No, I did not.

 9            THE COURT:  Okay.

10   A.   It was transmitted to me from another source, another

11   member of the MEC.

12            THE COURT:  What is the next question?

13   Q.   Based on this information that you had from whatever

14   source, was that a basis for your request for money for

15   independent counsel?

16   A.   Yes, it was.

17   Q.   You stated earlier that you all had directed the master

18   chairman to transmit these motions, resolutions, to ALPA?

19   A.   We did.

20   Q.   I would like to show you what is marked as exhibit

21   p-110.

22            THE COURT:  P?

23            MR. JACOBSON:  110, your Honor.

24   Q.   Mr. Hollander, do you  recognize P 110?

25   A.   I recognize P 110.

1    Q.   You received a copy of this document on or around

2    December 6, 2001?

3    A.   I did.

4            MR. JACOBSON:  I move exhibit P 110 in evidence.

5            MR. FRAM:  No objection to authenticate, your

6    Honor.

7            THE COURT:  No, the question is about you object to

8    its admission.  He is moving it.

9            MR. FRAM:  I don't, your Honor.

10           THE COURT:  Then P 110 is in evidence.

11   Q.   What is this document?

12   A.   This is basically in my opinion a cover letter and it is

13   confirming exactly what the MEC had requested of Captain

14   Pastore to do, forwarding the resolutions directly to Duane

15   Woerth, the president of the pilots association.

16   Q.   And the resolutions that are listed there and attached

17   to this document, were those resolutions that are passed two

18   days earlier at your December 4 meeting?

19   A.   They are.

20   Q.   I have one more document for you, sir, I think?

21   Q.   Let me give you what has been marked as defendant's

22   exhibit 40, D 40.

23           Can you identify this document, Mr. Hollander.

24   A.   I can.

25   Q.   Is this a TWA MEC regular meeting minutes?

1    A.   This is not minutes.  This is --

2           THE COURT:  I it it it is an agenda.

3    A.   It is a two-page document.  It is a proposed resolution.

4    Q.   Proposed resolution.  I am sorry.  This resolution was

5    offered when?

6    A.   I am sorry?

7    Q.   What is this resolution for?

8    A.   Give me just a moment.  This was a resolution proposed

9    in January, 2002 --

10          THE COURT:  First of all, who prepared this?

11          THE WITNESS:  The actual authorship would have been

12   Ted Case.

13          THE COURT:  It is clearly not minutes.

14          THE WITNESS:  No, this is a resolution.  This is a

15   resolution.  We were in a meeting --

16          THE COURT:  Well, but, who prepared -- was this

17   prepared for a meeting?

18          THE WITNESS:  This was prepared for a meeting.

19   Yes.  It was prepared for a meeting.

20   Q.   Did you cooperate with Mr. Case in the preparation of

21   this?

22   A.   I did.

23   Q.   It says up in the corner, agenda.  Agenda number.

24   02: 09 is 1crossed out and ten is put there.

25          10, that is put there.  Is this a suggestion for an

1    an agenda item?

2    A.    It has been quite some time, your Honor, but I would

3    speculate to see in was a published agenda item for this

4    meeting.  It is just the an agenda numbering, corrected it

5    with the number 10.

6              THE COURT:  Are you offering it in evidence.

7              MR. JACOBSON:  Not yet, your Honor.

8              THE COURT:  Go ahead.

9    Q.    What was the usual practice at the MEC with regard to

10   resolutions that were planned to be offered at the meeting?

11   A.    They would be distributed.   The proposed agenda would

12   be forwarded to the MEC office and it would be distributed

13   amongst the MEC members so that they would have advance

14   notice that this particular item would be discussed at the

15   meeting.  That was the normal agenda.

16   Q.    The agenda would have what, a list of events?

17   A.    Yes.

18   Q.    Would it also have attached proposed resolutions?

19   A.    It would.

20   Q.    We haven't seen proposed resolutions before which is why

21   this looks different.  Was this a proposed resolution?

22   A.    This was something I was proposing, yes.

23   Q.    And who did you work on this with, to prepare this?

24   A.    With Ted indication.  We worked on this together.

25   Q.    Anyone else?

1    A.    Not to my recollection.

2    Q.    And did you in fact propose this resolution?  Was it

3    presented at the meeting as far as you recall?

4    A.    As far as I recall it was presented at the meeting.

5    Q.    And this is very near the end of the MEC's existence.

6    Was the MEC --

7                THE COURT:  The date of this is January 24, '02.

8                MR. JACOBSON:  Yes, your Honor.

9                THE COURT:  2002.  We know the exact date the MEC

10   ended.

11               MR. JACOBSON:  Correct.

12               THE COURT:  Which is what?

13               THE WITNESS:  April.

14               THE COURT:  Third.

15   A.    Appear.

16               MR. JACOBSON:  April 3rd.

17               THE COURT:  When they were made a single carrier,

18   that TWA MEC ceased to exist.  Is that right?

19   A.    That's correct.

20               THE COURT:  So this was two months or less than two

21   months.

22   A.    Approximately two months.

23               THE COURT:  It is two months, two months and a

24   week.

25   A.    If I was at a baseball game I would say the bottom of

1    the 9th.

2              THE COURT:  Okay.  Go ahead.

3    Q.   Did the procedures at the TWA MEC continue to run in the

4    same way as far as productions of minutes and so on, once you

5    got into 2002 as they had prior to that?

6    A.   To the best of my knowledge, yeah.

7    Q.   All right.

8    Q.   What action were you seeking, for the MEC to take in

9    connection with this resolution?

10   A.   Well, the action was this:  We were asking the MEC to

11   approve this resolution.

12             THE COURT:  You planned it, so far, this is only a

13   suggestion.

14   A.   This is a suggestion, your Honor, yes.  We hoped to turn

15   the suggestion into a viable passed resolution and the

16   resolution was again formerly to again ask ALPA National to

17   bring forth litigation against American Airlines for failing

18   to, in our point of view, use its reasonable best efforts to

19   secure our fair and equitable seniority integration bus at

20   this particular time it was clearly indicated on what the new

21   seniority integration was going to look like.

22   Q.   And were you still trying to make efforts to fight on

23   behalf of TWA pilots at this point in time?

24   A.   I was.

25             THE COURT:  You are not offering it?

1          MR. JACOBSON:  No.

2          THE COURT:  I just want to know.

3          MR. JACOBSON:  I want to get his testimony in.

4          THE COURT:  Okay.

5     Q.   Let's talk about the results that you experienced from

6     the American airline TWA transaction with respect to your

7     seniority, your work and the rest of that.  Okay, sir?

8     A.   Okay.

9     Q.   Prior to the merger, do you recall what your seniority

10    number was at TWA?

11    A.   I don't want to give an exact number but I will say 960,

12    980, somewhere in that range.

13         THE COURT:  You were in the top half?

14    A.   I was in the top half.  Yes, your Honor.

15    Q.   In fact, you were in the top 40 percent then roughly?

16    A.   You could say that, yes.

17    Q.   We have heard about the stapling and the stapled points.

18    Were you above or below the staple point?

19    A.   I was not stapled.

20    Q.   You were not stapled?

21    A.   I was not a stapled pilot.

22    Q.   Did you escape the merger unaffected?

23    A.   Unaffected?

24    Q.   Yes.  Were you unaffected by it since you weren't

25    stapled?

```
 1    A.   I would not characterize that as unaffected at all.

 2    Q.   How were you affected, sir?

 3    A.   I was -- my domicile had closed, I was forced to commute

 4    to St. Louis.  I eventually went from, I lost my captain's

 5    position and was bumped back to first officer.

 6    Q.   Being bumped down to first officer, what does that do to

 7    your pay rate?

 8    A.   It reduces it by 35 percent.

 9    Q.   Okay.  Continue.

10    A.   My quality of life just went in a spiraling down hill

11    because of the integration.

12    Q.   All right.  Did your income go down as well?

13    A.   My income went down.

14              MR. FRAM:  Your Honor, I really object to this.  We

15    talked about this pretrial.

16              THE COURT:  I am going to leave the answers stand.

17    What is your next question?

18    Q.   Did you receive a furlough notice?

19    A.   I do.

20    Q.   Were you in fact furloughed although, although not

21    stapled, were you still furloughed?

22    A.   I received a notice in the mail that I was to be laid

23    off from American Airlines.  Prior to the date.

24              THE COURT:  When did you receive that?

25    A.   I couldn't tell you the date, your Honor.
```

```
 1              THE COURT:  Do you remember the year?
 2    A.   It was 2003.
 3              THE COURT:  This is long after the merger?
 4    A.   Yes, it was, your Honor.  Absolutely.
 5              THE COURT:  Well, were there American pilots who
 6    had never been at TWA also furloughed.
 7    A.   There were some American Airlines pilots that were
 8    furloughed.  What happened, your Honor, if it helps, the
 9    aftermath of 9-11, American Airlines continued to shrink as
10    an airline and every couple of months --
11              THE COURT:  That had nothing to do with the merger.
12    That was because of 9-11.
13              THE WITNESS:  American Airlines shrunk I think
14    primarily because of 911, yes, but it continued to layoff
15    pilots for years after that and it just kept, I was not
16    stapled to the bottom but eventually it got to me.
17              THE COURT:  You were in an area where you were
18    surrounded on the list by pilots who were American pilots.
19              THE WITNESS:  That's correct.
20              THE COURT:  They were roughly in your area of
21    seniority, they also got the same furlough.
22              THE WITNESS:  That's correct.
23    Q.   Although they seniority numbers similar to yours, how
24    many years of service did they have, like a person right
25    immediately above you, the American pilot immediately above
```

1   you?

2   A.   I think the person immediately above me was in high

3   school when I was flying Lockheed's 1011s for TWA.

4           The direct answer is I lost twelve and a half years

5   of seniority.

6   Q.   Are you a captain now?

7   A.   I am sorry.  I just got a notice in the mail that I will

8   be returning to the seat of captain come this month.  As a

9   matter of fact, as soon as Mr. Fram and Mr. Jacobson are done

10  with me I am to report for training.

11          THE COURT:  Back up to captain?

12          THE WITNESS:  Back up to captain.  My class was

13  last week and because of this trial, they have granted me an

14  extra week to finish my testimony and I am supposed to report

15  to Dallas.

16          THE COURT:  For American.

17          THE WITNESS:  For American Airlines.

18  Q.   Do you have a date of hire, as American Airlines

19  considered you to have a particular date of hire with the

20  airline?

21  A.   It does.

22  Q.   What is your date of hire at American Airlines,

23  according to the airline?

24  A.   American Airlines, Inc., or AMR Corp., recognizes my

25  date of hire by virtue of my identification and what is

Hollander-direct/Jacobson                                    125

```
 1    listed in their computer system as September 30, 1988.

 2    Q.    And that is the date you were hired by TWA?

 3    A.    It is.

 4    Q.    Do you have your ID card with you, sir?

 5    A.    I do.

 6    Q.    May I see it?

 7    A.    You will laugh at the picture.

 8              THE COURT:  All right.

 9    Q.    Where on the card is your date of hire reflected?

10    A.    Right under the words American airline, it says,

11    company, seniority, date.  Right above it is the company

12    seniority date.

13    Q.    All right.  So it is in that blue strip?

14    A.    It is in the blue strip.

15              MR. JACOBSON:  Your Honor, play I publish this to

16    the jury so they can see the date.

17              THE COURT:  Why?  I mean, what date is on there?

18              THE WITNESS:  The date reads 9:301988.

19              THE COURT:  That is what he testified to.  They

20    don't have to see that.

21              MR. JACOBSON:  All right.  That is fine.

22    Q.    At the time of the merger, how many pilots were flying

23    for?

24              THE COURT:  How many.

25              MR. JACOBSON:  How many flights were flying for TWA
```

1    out of St. Louis.

2    A.   I don't have an exact number but I can say over 400 a

3    day.

4    Q.   And today how many flights are flying out of St. Louis

5    for American Airlines?

6    A.   Somewhere between 30 and 35.

7    Q.   And those are the flights that are, in your seniority

8    list are you restricted to flying out of a particular

9    airport.

10            MR. FRAM:  Your Honor, I object.

11            MR. JACKSON:  This is the --

12            THE COURT:  I will allow it.

13   A.   The airplane that I currently fly obviously because of

14   the reduction of flying in Saint Louis allows all the former

15   TWA pilots a very limited schedule.  The plane I fly only

16   travels to Dallas, Chicago, Los Angeles, Miami, and New York.

17   So those are the only destinations my airplane goes goes to.

18            THE COURT:  The reduction in flights in St. Louis

19   isn't a product of the seniority integration.  It has nothing

20   to did with it.

21   A.   It has nothing to do with it, it is a product of

22   American Airlines, your Honor.

23            THE COURT:  Yeah, but that is a different story.

24   This suit is about the seniority integration.  I mean --

25   A.   All I can say about it is it goes to --

1            THE COURT:  Clearly if there are 30 flights instead

2    of 400, there are a lot less pilots flying.

3            THE WITNESS:  Absolutely correct.

4    Q.   Let me tie it together there.  Your Honor.  That is a

5    good question.  Under Supplement CC agreement, that controls

6    your effective seniority with American Airlines.  You are

7    familiar with that?

8    A.   I am overly familiar with Supplement CC.

9    Q.   Do you have a different seniority in connection with St.

10   Louis former TWA hub as you do all the other hubs operated by

11   American?

12   A.   I am not sure what you mean by a different seniority

13   number.  My --

14           THE COURT:  Put it another way, are there a smaller

15   group of pilots that are limited who are sought after for St.

16   Louis than for the rest --

17   A.   Let me answer by saying, in St. Louis, there are

18   primarily only former TWA employees there.

19           THE COURT:  I think the question he was trying to

20   get at, that is because of Supplement CC provides that.

21           THE WITNESS:  Absolutely.

22           THE COURT:  That only the ex - TWA pilots can have

23   St. Louis.

24           THE WITNESS:  That's correct.

25           THE COURT:  But that number, because of the number

```
 1   of flights that are flown, obviously means many fewer pilots

 2   are flying.

 3            THE WITNESS:  Correct.

 4            THE COURT:  But that is for business reasons, not

 5   because of integration reasons.

 6            THE WITNESS:  That is correct.

 7            THE COURT:  Okay.

 8   Q.   Under cc, the St. Louis hub was reserved essentially for

 9   the TWA pilots.  Correct?

10   A.   That is correct.

11   Q.   Are you able with your seniority number to go out and

12   bid on a job, first will of all, are you able to bid to be at

13   one of the other American airline hubs, based on your

14   seniority number?

15   A.   No, I am not allowed to bid out of St. Louis.

16            MR. JACOBSON:  No further questions.

17            THE COURT:  You are not allowed to bid for a job

18   anywhere but Saint Louis?  You weren't stapled.  You are

19   above.  Why can't you --

20            THE WITNESS:  You are correct, your Honor, I was

21   not stapled, but here is how it works.  I am sorry, but here

22   is how it works.

23            I am in St. Louis.  I cannot trade out of St. Louis

24   and I cannot bid out of St. Louis.  The company will not

25   allow it.  The only thing I can do in St. Louis, that is what
```

1    I think was going to your other question, I can be what is

2    called displaced out of St. Louis.  In other words, you

3    referenced the number of flights, so if we had 400 and now we

4    have 30, they have too many pilots.  So American Airlines

5    says some of you must go.  And they kick us out of St. Louis.

6            THE COURT:  You have been promoted, you have just

7    been promoted.

8    A.   I have just been promoted, yes.

9            It is due to retirements over the years.  That is

10   how I got it back.  But they have kicked out a number of TWA

11   pilots out of St. Louis and they are flying in Miami and New

12   York and other bases and of course their seniority number

13   basically ships down to the bottom of the list outside of St.

14   Louis.  That is the only way to get out of jail.

15           THE COURT:  If you were displaced in St. Louis,

16   then you would be flying out of other locations.

17           THE WITNESS:  That's correct.

18           BY MR. JACOBSON:

19   Q.   Could you get to choose the location or would it be

20   imposed on you by the company?

21   A.   When you get a notice, what happens first is a process.

22   You get a notice you are going to be displaced.  They tell

23   you to put in the computer a list of your choices, and they

24   try to give you your best list.  But if you ask for Los

25   Angeles, that is the most senior base that is not available,

Hollander-direct/Jacobson                                         130

1    they look at your second choice, third choice, depending on

2    what is available when you are displaced, that is what you

3    get.

4    Q.   Unless you are displaced can you bid for any other place

5    other than St. Louis?

6           THE COURT:  If you are not displaced you are

7    limited to St. Louis?

8    A.   If I am am not displaced I am basically camped out in

9    St. Louis.

10          THE COURT:  If you are displaced then you can bid.

11   A.   Once you are out --

12          THE COURT:  And your regular seniority number, not

13   your special St. Louis number, is what will apply?

14   A.   Absolutely correct.  Absolutely correct.

15          MR. JACOBSON:  Thank you.  No further questions of

16   this witness.

17          THE COURT:  Okay.

18          MR. JACOBSON:  Is this a good time for a break?

19          THE COURT:  I didn't mean to interrupt you.

20          MR. JACOBSON:  Nothing, your Honor.

21          THE COURT:  I think we should have a break now.

22   And then we will, we will break until noon..  Resume at noon.

23   I think we will be resuming with the cross examination.

24          MR. FRAM:  Yes, your Honor.

25          THE COURT:  Mr. Fram, you are going to conduct

 1    cross?

 2              MR. FRAM:  I will.

 3              THE COURT:  Mr. Fram's cross will start at noon.

 4               (Jury leaves the courtroom)

 5              THE COURT:  Don't discuss the case amongst

 6    yourselved.  Keep an open mind until you have heard all the

 7    evidence.

 8              (The jury leaves the courtroom.)

 9

10              (Recess)

11

12              (The jury enters the courtroom.)

13              HOWARD HOLLANDER, resumes.

14              CROSS EXAMINATION.

15              BY MR. FRAM:

16              MR. FRAM:  Mr. Fram, I recognize you for cross

17    examination.

18              MR. FRAM:  Thank you, your Honor.

19    Q.   Mr. Hollander, I want to ask you about some of the

20    events leading up to the meeting on April 2, 2001.  You

21    talked earlier about a meeting in late January of the MEC.

22    Do you recall that?

23    A.   We did have a meeting in late January, yes.

24    Q.   Was that the first meeting after the announcement of the

25    TWA bankruptcy?

1    A.   To the best of my knowledge, yes.

2    Q.   I put some exhibits in front of you, sir.  Do you see D

3    242 on top.  Do you recognize that as the minutes of a MEC

4    meeting on January 11, 2001?

5              THE COURT:  D 242.

6              MR. FRAM:  Yes, your Honor.  In evidence.

7    Q.   Do you recognize that, sir?

8    A.   I do.

9    Q.   Does that refresh your memory that that was the first

10   meeting after the announcement of the bankruptcy?

11   A.   That would be correct.

12   Q.   Were you present at the meeting?

13   A.   It shows that I was.

14   Q.   Do you recall --

15             THE COURT:  I am sorry.  D 242 is not in evidence.

16             MR. FRAM:  It should be.  The witness has the copy

17   that is marked in evidence.

18             THE COURT:  I have 243, 244, 245.

19             MR. FRAM:  Well, I move it into evidence, your

20   Honor.

21             THE COURT:  What?  Let me check.

22             My notes have it marked in evidence so you can put

23   it on the chart.  Your right.  242 is in evidence.

24             MR. FRAM:  Thank you, your Honor.

25   Q.   So do you recall, sir, that there was a report at that

```
 1    meeting on June 11, with respect to some of the bankruptcy

 2    matters?

 3    A.   I recall there was information about bankruptcy matters,

 4    yes.

 5    Q.   So there is a meeting on one, eleven, 01-.  Do you

 6    recall that Bill Compton, do you know Bill Compton?

 7    A.   I know ho he is.

 8    Q.   Who is he?

 9    A.   Bill Compton at the time, I believe his title was CEO of

10    TWA, Inc., I guess, no, TWA, Inc. at this time.

11    Q.   Do you recall Mr. Compton coming and speaking to the TWA

12    MEC on January 11?

13    A.   It says in the minutes, it says, my recollection I can't

14    recall, but it says here he was.

15    Q.   You are referring to the bottom of the second page?

16    A.   I am.

17    Q.   Can you pull that up, please?

18    Q.   The bottom of the second page, it says, Compton briefed

19    the body on the current deal with American.  Discussed the

20    some -- the problem for TWA, including scope and Karabu,

21    other issues included fleet international operation.

22    Discussed the beginning of talks with American, first attempt

23    to complete the deal outside of bankruptcy, but that turned

24    out not to be possible.

25              Do you recall Mr. Compton telling the MEC at this
```

1   meeting that TWA made a judgment that it could not survive

2   without filing for bankruptcy?

3   A.   It is in the record.  I can't recall his words here

4   today ten years later, but it is in the record.

5   Q.   He said the key to the deal or any deal was to protect

6   all the TWA employees.  Every union employee will be offered

7   a job with American.

8   A.   I remember that statement, yes.

9   Q.   Do you recall that the MEC enthusiastically supported

10  the American purchase of TWA assets?

11  A.   I recall -- yes.

12  Q.   And you personally supported the American purchase of

13  TWA assets and the preservation of pilot and other jobs?

14  A.   I always support the protection of union employees and

15  other pilot jobs.  Personally, I was neutral on American

16  Airlines.  I thought we had a better deal some place else but

17  I was neutral.

18  Q.   So on January 11 you were neutral in terms of whether

19  you supported the transaction?

20  A.   That's correct.

21  Q.   Do you see on the third page of the minutes, about 60

22  percent down under Questions and Answers, Steve Parella,

23  Council 3.  It says addressed the MEC regarding his concerns

24  about the TWA MEC.  Expressed his concerns that the TWA MEC

25  could cause potential damage for the dial.  Urged the MEC to

Hollander-cross/Fram                                              135

1    remember other instances at airlines where the union

2    involvement messed up the transaction.  Do you recall those

3    comments being made?

4    A.   I do not, but they are in the record.

5    Q.   Do you recall whether people expressed a concern that

6    unions had over played their hands in certain prior

7    situations with airlines as a, and as an a consequence the

8    airlines had gone out of business and pilots lost jobs?

9    A.   I don't recall any pilot bringing those concerns to this

10   meeting but that doesn't mean it didn't take place, I just

11   don't recall it.

12   Q.   Do you recall those types of concerns being expressed at

13   any point up until April 2, 2001?

14   A.   I do not.

15   Q.   So all right.  Let's move on, 243 which is in evidence

16   is the next set of minutes.  Those are the ones you talked

17   about, 1-17 to 1-19?

18   A.   That's correct, another MEC meeting.

19   Q.   Okay.  And you attended?

20   A.   Yes.  I believe so.

21   Q.   Do you recall without looking at the minutes the

22   specifics of any of these meetings?

23   A.   No, I do not.  I have to be refreshed.

24   Q.   Okay.  Do you recall getting updates at that particular

25   meeting about the bankruptcy and the issues that were

1   ongoing?

2   A.   I don't recall specifically.  No.

3   Q.   Do you recall it being reported at that meeting a Duane

4   Woerth had been in touch with Mr. Shwartz?

5   A.   It was stated for the record, and I believed it to be

6   true.

7   Q.   Did you know that Mr. Woerth was in regular

8   communication with officers of the TWA MEC up until April 2,

9   2001?

10  A.   So I am clear, give me your definition of what is

11  "regular" so I have some idea.

12  Q.   Every week or so?

13  A.   I was not aware of that, no.

14  Q.   You talked this morning about your disappointment that

15  Mr. Woerth did not physically appear at certain meetings.

16  A.   Correct.

17  Q.   Do you recall that?

18  A.   Yes.

19  Q.   Did the MEC ever formally invite Mr. Woerth to attend

20  any of its meetings up until April 2?  Let's limit it to

21  that.

22  A.   A formal invitation, to the best of my knowledge, no.

23  Q.   Are you aware that under ALPA protocol that the

24  president of the organization does not attend meetings unless

25  there is a formal invitation?

 1                THE COURT:  You mean MEC meetings?

 2                MR. FRAM:  Yes, your Honor.

 3    Q.   Do you understand that under ALPA protocol, the

 4    president, Mr. Woerth, does not attend meetings of the MEC

 5    unless he is invited?

 6    A.   I was not aware of that protocol, no.

 7    Q.   The way ALPA worked is that the MEC was empowered under

 8    the ALPA bylaws and Constitution, to make decisions of

 9    concern to their pilots, right?

10    A.   Correct.

11    Q.   Do we agree that ALPA was not empowered, and it wasn't

12    anticipated that ALPA would make decisions for the pilots?

13    A.   We could agree on that.

14    Q.   ALPA's role was to provide support, financial expertise

15    and the like, yes?

16    A.   Correct.

17    Q.   Is there something that you thought, having Duane Woerth

18    present at meetings in early 2001 would have added to the

19    substance of what was discussed, or the information being

20    provided to the MEC?

21    A.   I guess my answer to that be would that I personally

22    thought a physical presence and sometimes people say that

23    face-to-face discussions are better than transparent emails

24    or pieces of paper.  I thought as announced that this was the

25    largest merger of any two carriers, and I guess I was

```
 1   expecting more of a personal role on behalf of the president

 2   of the association.

 3           So that is why I was disappointed.

 4   Q.   This was a liquidation.  This was a sale of TWA assets,

 5   correct?

 6   A.   That is what it was characterized, yes.

 7   Q.   It wasn't a merger of two carriers, right?

 8   A.   In the respects of the bankruptcy courts, I would agree

 9   with you, that is what it was labeled at.  If today Mr. Fram

10   you asked ever TWA pilot, I guarantee you that 75 percent

11   would probably just call it a merger.

12   Q.   Well, we are just --

13           THE COURT:  What exactly happened was that the

14   assets were purchased out of a bankruptcy proceeding.

15           THE WITNESS:  Absolutely correct, your Honor.

16   Absolutely correct.

17   Q.   So with respect to Mr. Woerth you thought that it was

18   important for him to be there for appearance sake.  Is that

19   fair?

20   A.   I thought it was important for him to at least give the

21   appearance that he had hands on or at least more of a hands-

22   on involvement in this integration.

23   Q.   So the way it projected is something that you felt was

24   important?

25   A.   That is correct.
```

1    Q.    And those kinds of appearance are important to you, yes?

2    A.    They are important to me and when I say me I think it

3    was important to my members, to the people I represented.

4    Q.    So you felt it was important that your members knew that

5    you were appearing to be diligent and you were projecting

6    that this was all very important.  Yes?

7    A.    I think this integration is extremely important, and I

8    think that the membership, through me, if you will, should be

9    entitled to know that our founding ALPA brothers and sisters

10   were taking this at a very serious pace and 100 percent

11   interest in this, yes.

12   Q.    You took it very seriously during the period up until

13   April 2, 2001, and thereafter, yes?

14   A.    I took it seriously all the way through, yes.

15   Q.    Mr. Glanzer gave a report during the meeting on January

16   17.  Is that correct?

17   A.    If it says so, yes.

18   Q.    Do you recall him giving a report?

19   A.    I do recall him giving a report.  I just can't remember

20   the substance.

21   Q.    Turn to page 15, please.  Pull that up?

22          THE COURT:  15.

23          MR. FRAM:  14 of 243 in evidence.  Are you with me.

24   A.    Yes.  This page has two resolutions on it.

25   Q.    Look about three quarters.  Situational update.  1719.

```
 1   Michael Glanzer.  Gave overview of some hurdles the MEC may

 2   face during the bankruptcy.  Do you see that?

 3   A.   I see that.

 4   Q.   And then questions and answers?

 5   A.   Yes.

 6   Q.   One of the hurdles he talked about is the fact that the

 7   American TWA deal provided that the TWA pilots had to waive

 8   their scope and successorship rights, correct?

 9   A.   I don't recall that.  But again, it is ten years ago.

10   But I don't recall the substance of his briefing.

11   Q.   Well, didn't you know from when the transaction was

12   first announced that a requirement of the deal is that the

13   TWA pilots had to waive their so-called labor protected

14   provisions?

15   A.   My recollection is, as I found that out at a later did

16   it and time, not in January.

17   Q.   When did you first recall becoming aware that a specific

18   condition of the closing of the American TWA transaction is

19   that the TWA pilots had to waive their scope?

20   A.   To the best of my recollection it had to be some time in

21   possibly February or March timeframe, not the January

22   timeframe.  I mean it was discussed that there were issues,

23   period, that there were some conflicts, et cetera, but there

24   was nothing to my recollection that says you have to waive

25   scope in order for this to happen come January.
```

Hollander-cross/Fram                                          141

1    Q.   Can you associate when you recall being aware of that

2    with any particular event such as a meeting or a letter or

3    something like that?

4    A.   The only thing I can associate it with firm is I know it

5    was at least, at the very least, from the middle of March

6    where it became apparent that waiver of scope would be

7    something that would have to be considered.

8              THE COURT:  No, but the question is when did you

9    learn that waiver of scope was in the written deal between

10   American and TWA, Inc..

11   Q.   Yes.

12   A.   To the best of my recollection, your Honor, I would have

13   to say some time late February, mid March.

14   Q.   Late February, mid March?

15   A.   To the best of my recollection, yes.

16   Q.   I am just going to write "deal, scope," so we can come

17   back to that in a minute.

18             Do you see on page 23 of the minutes there is

19   discussion about road shows.  Top of page 23.  There is a

20   resolution by Singer and you, Hollander, 23.  It says where

21   as the American Airlines acquisition offer to purchase TWA

22   and subsequent TWA entry into federal bankruptcy has created

23   a need for an increased information flow to the ALPA TWA

24   pilots?

25   A.   I see that, yes.

1    Q.   And it resolves that the TWA MEC and officers should

2    participate in road shows.  I am paraphrasing?

3    A.   I see that.

4    Q.   Did you participate in some road shows?

5    A.   I cannot recall.

6            THE COURT:  First of all, were there road shows,

7    after this resolution was passed, did the MEC in fact conduct

8    road shows?

9    A.   To the  best of my knowledge there were some, your

10   Honor.

11   Q.   Okay.  Do you recall any specific road shows?

12   A.   No, I do not.

13   Q.   The next document is D 244, do you recognize that as

14   minutes of the MEC meeting on February 15, to 16?

15           THE COURT:  That is already in evidence.

16           MR. FRAM:  Yes, your Honor.

17   A.   I have 244.  Yes, February 15, 16, another MEC meeting.

18   Q.   Right.  And there was some discussion at that meeting as

19   well about the bankruptcy?

20   A.   Do you have a specific page?

21   Q.   Do you recall or no?

22   A.   I don't recall offhand.

23   Q.   Do you recall at the meeting that the MEC voted to have

24   a conference call every Wednesday with everybody involved in

25   the merger committee so that people were up-to-date on what

 1    the merger committee was discussing.  If you don't recall,

 2    just say you don't.

 3    A.   I don't recall.

 4    Q.   Let me see if I can refresh your memory.  Page 10.

 5    Second paragraph, the one that begins, Pastore stated.  Blow

 6    that up.

 7              Pastore stated that a merger oversight committee

 8    had been established to support the merger committee.

 9    Shwartz was assigned to make sure everyone was in the loop.

10    Shwartz stated that a conference call was scheduled every

11    Wednesday with all those supporting the merger committee

12    included on the call.

13              Does that refresh your memory?

14    A.   It does refresh my memory.

15    Q.   In what was the merger committee assigned by the MEC to

16    do?

17    A.   To my recollection, the merger committee was at some

18    point assigned to make contact with their counterpart at the

19    Allied Pilots Association and start the process of

20    integration, of a pilot integration.

21              THE COURT:  Just for the jury, the merger committee

22    wasn't dealing with the merger of TWA and American.  It was

23    dealing with the melding together of the two pilot lists.

24              THE WITNESS:  Absolutely correct, your Honor.

25              THE COURT:  The word merger can be confusing.  When

1   we talk about it and we are using that phrase throughout the

2   trial, the merger committee means merging the two pilot

3   groups, not merging the companies.

4   A.   Absolutely correct, your Honor.

5   Q.   Do we agree that there was a separate negotiating

6   committee of the MEC that met with representatives of TWA to

7   try to negotiate a new collective bargaining agreement?

8   A.   We agree on that.

9   Q.   And that new collective bargaining agreement was going

10  to replace the collective bargaining agreement that had

11  existed between TWA and the TWA pilots before the bankruptcy.

12  Correct?

13  A.   At some point that was made did aware to me, yes.

14            THE COURT:   And that new collective bargaining

15  agreement was going to be between TWA LLC, a subsidiary set

16  up by American, and ALPA.

17  A.   That would be correct.

18  Q.   We just talked about these weekly calls every Wednesday,

19  for those interested in over seeing the merger committee.

20  Did you participate in those weekly calls after they began?

21  A.   I did not.

22  Q.   How about the negotiating committee?  Are you aware that

23  the negotiating committee prepared detailed minutes, almost

24  verbatim minutes of what was discussed with their

25  counterparts at TWA?

1   A.   I do know that the negotiating committee had taken notes

2   and minutes.  They were not always distributed to the MEC but

3   I do know notes were taken from their discussions.

4   Q.   Did you get copies of any of those notes during the

5   period leading up April 2 of 2001?

6   A.   I can't recall.

7   Q.   What if anything did you do to keep yourself up-to-date

8   in terms of what the negotiating committee was doing during

9   the period before April 2, 2001?

10  A.   To the best of my recollection, what was being

11  transmitted to the MEC, and sometimes being in St. Louis has

12  an advantage, but it was through briefings and/or an email

13  could have been exchanged  or a summation from the

14  negotiating committee as to what they did this week but it

15  was not hard copy notes from their discussions with the

16  company.

17  Q.   All right.  So other than face-to-face meetings where

18  you attended a formal meeting of the MEC, did you get any

19  information or make -- did you get any information about what

20  the negotiating committee was doing?

21  A.   The best of my recollection I can't recall unless it was

22  done by an email transmission and I don't have any of those

23  with me.

24  Q.   D 245 are the minutes of the March 2 meeting, 2001.

25          THE COURT:  Also in evidence.

1              MR. FRAM:  Yes, your Honor.

2    Q.   Do you have those in front of you?

3    A.   I do.

4    Q.   Do you recall that meeting?

5    A.   If you stand by one --

6    Q.   Beg your pardon?

7    A.   I don't know at the moment.  I am trying to see if I was

8    here.  It doesn't look like I attended this meeting.

9    Q.   Well, it says -- The first line that you were delayed

10   due to poor weather conditions in New York and, do you see

11   that line?

12   A.   I do.  Most likely my flight was either cancelled or

13   delayed and I wasn't there for the, at least the very

14   beginning of this meeting.

15   Q.   Do you recall showing up later on later that morning?

16   A.   I don't recall.  I am trying to see if it says it in the

17   minutes.

18   Q.   In page 3, where it says 11:18.

19   A.   11:18.  Hollander arrived at the meeting.

20   Q.   Okay.  Does that refresh your memory that you did

21   arrive?

22   A.   It does refresh my memory.

23   Q.   A little lower on that page, negotiating committee

24   report Ron Kiel?

25   A.   Correct.

1   Q.    Ron Kiel was the chairperson of the negotiating

2   committee?

3   A.    He was.

4   Q.    He give a report some kind?

5   A.    He did.

6   Q.    Do we see that you and Mr. Singer moved to enter into

7   executive session?

8   A.    That is correct.

9   Q.    Do you recall what Mr. Kiel reported with respect to

10  what his committee was doing?

11  A.    No, I do not recall.

12  Q.    Do you see that there was a recess and at 13:30

13  reconvened, body remained in executive session and received

14  reports from advisors.  Do you see that?

15  A.    I do.

16  Q.    Who are the advisors present during the meeting on March

17  2?

18  A.    I don't recall.  Let see if it says it on the front

19  page.  It says list on file.  I do not recall who was there

20  as the legal advice err.

21  Q.    Do you recall what issues they talked about?

22  A.    No, I do not, not specifically.

23  Q.    Do you recall discussion of the fact that a motion under

24  Section 1113 of the Bankruptcy Code was expected from TWA?

25  A.    I don't recall what was said in the substance of that

1    meeting.

2    Q.    Do you recall discussion about the fact that TWA was

3    continuing to insist, and American was continuing to go

4    insist, that the TWA pilots waive their scope and

5    successorship rights?

6    A.    I don't recall from this meeting.

7    Q.    Do you have D 246 up there?

8    A.    I do.

9    Q.    Do you recognize those as the minutes of the meeting on

10   March 8 to 10 of 2001?

11   A.    I do.

12   Q.    You attended that meeting, yes?

13   A.    Let's see.  To make sure.

14          THE COURT:  246 is also in evidence.

15          MR. FRAM:  It is.

16   A.    It says all members accounted for.

17   Q.    Do you recall this meeting without looking at the

18   minutes?

19   A.    Not at the moment, no.

20   Q.    Do you recall being at a meeting in Wilmington while the

21   bankruptcy proceedings were ongoing?

22   A.    I most certainly recall being in Wilmington, yes.

23   Q.    What was happening in Wilmington when you recall being

24   there?

25   A.    There was a hearing being conducted in I believe it was

 1   Judge Walsh's courtroom.

 2   Q.   Let's look at the bottom of the minutes, the first page,

 3   vice chairman report Scott Shwartz.

 4   A.   Very good.

 5   Q.   Schwartz stated it had been a long road getting to this

 6   transaction.  There were still obstacles and ALPA would use

 7   every effort to overcome those obstacles and insure the

 8   transaction was done right.  The next challenge will be

 9   seniority integration, could be the greatest obstacle to

10   overcome.  Shwartz said the merger committee, along with

11   outside counsel, had been working diligently.   He thanked

12   the ALPA staff.

13           Do you recall what obstacles Shwartz talked about

14   with respect to closing the transaction?

15   A.   With respect to closing the transaction, no, I don't

16   recall.

17   Q.   Do you recall what obstacles he referred to that led to

18   these minutes, to report to obstacles and ensuring that the

19   transaction was done right?

20   A.   No, I don't recall.  The only thing I recall Scott

21   Shwartz saying or doing is that one time he had, I don't know

22   to me personally or to the group, had a concern that this

23   would be a difficult seniority integration because at the

24   present time TWA had a large number of very senior pilots as

25   opposed to the American side.  But that you didn't have

Hollander-cross/Fram                                           150

1   anything to do with the transaction.

2   Q.   Do you recall people talking about the fact it would be

3   a difficult seniority integration because the American

4   pilots, the represented by the Allied Pilots Association, had

5   a contract that did not provide for seniority arbitration?

6   A.   My answer to you is I recall that being raised.  I just

7   can't recall if it was at this particular time.

8   Q.   When do you first recall becoming aware that the

9   American pilots had a contract, that did not provide for

10  seniority arbitration?

11  A.   I really can't say with certainty.

12  Q.   Well, did --

13            THE COURT:  Did you become aware of it before April

14  2?

15  A.   I did become aware of it before April 2, I will say

16  that.

17  Q.   Did you become aware before March 8 to 10 of 2001?

18  A.   I couldn't say with certainty.

19  Q.   Did you become aware at some some point the American

20  pilots were taking the position that they had the right under

21  their contract to have all the TWA pilots stapled to the

22  bottom of their seniority list?

23  A.   I never heard that said until some time after April.

24  Q.   You never heard that until some time after April 2?

25  A.   Your question was did I hear that, just, can you

1    rephrase your question.

2    Q.    My question was when did you first hear that the

3    American pilots were taking the position that they had the

4    right under their contract to have the TWA pilots stapled at

5    the bottom of their seniority list? --

6              THE COURT:  All of them?

7    A.    I am not sure.  I can't recall any date on that.

8    Q.    Was it before or after April 2 of 2001?

9    A.    I couldn't even be sure on that answer.

10   Q.    Can you associate when you became aware of that with

11   some event?

12   A.    No, I cannot.

13   Q.    In the same minutes, page 13.  1802.  TWA president and

14   CEO William Compton.  Do you see that?

15   A.    I do.

16   Q.    Do you recall Mr. Compton coming to a meeting and

17   talking to the TWA MEC?

18   A.    I do recall him being there.

19   Q.    You see where it says in the last sentence, Compton

20   stated that this was a homerun for the TWA employees, and he

21   would do everything he could to facilitate a fair and

22   equitable seniority integration?

23   A.    I believe he said that.

24   Q.    Do you recall as of the date of the meeting what

25   concerns, whether there were concerns about achieving a fair

1    and equitable seniority integration?

2    A.    I cannot recall what any specific concerns as far as a

3    process, no.

4    Q.    Well, did you ever become aware that there were concerns

5    on the part of the TWA pilots about achieving a fair and

6    equitable seniority integration?

7    A.    Prior to waiving our scope language, no, I don't think

8    there was any concern on my part.

9    Q.    So you are saying prior April 2, before April 2 of 2001

10   you don't recall any concerns about achieving a fair and

11   equitable seniority integration.  Is that your testimony?

12   A.    That would be my testimony, yes.

13   Q.    Do you recall getting reports back from members of the

14   merger committee who had attended a meeting on March 1 of

15   2001?

16   A.    You would have to -- the answer to the question is you

17   would have to jog my memory.  Is there something specific

18   would you like to bring out from that meeting?

19   Q.    Do you recall as of March 8 to 10 that the members,

20   members of the merger committee were meeting with members of

21   the APA merger committee?

22   A.    To the best of my recollection, they were meeting.  I

23   can't remember the specific dates, but now they were meeting.

24   Q.    Were you talking to any of people on the merger

25   committee?

1    A.    No, I was not.

2    Q.    Do you recall that there was a meeting of the merger

3    committee on March 1 of 2001?

4    A.    I can't, I could recall there was a meeting.  It was

5    March 1, I will take it for granted.

6    Q.    Well, don't agree with something just because I say it.

7    If you don't recall, just say you don't recall?

8    A.    I don't recall it.

9    Q.    Do you recall hearing at some point about a meeting of

10   the merger committee where one of the American pilots came

11   across the table, literally lunged across the table to try to

12   attack Bud Bensel?  If you don't recall, just say you don't

13   recall.

14            THE COURT:  You don't have photographs of that, do

15   you?

16   A.    I am sure people would like to see that.

17            THE COURT:  I would like to see that.

18   A.    I don't recall.  I don't recall.

19            MR. FRAM:  We need more visuals.

20            THE COURT:  Definitely.

21   Q.    Do you know who Bud Bensel was?

22   A.    I  know who Bud Bensel was and who Bud Bensel is..

23   Q.    What was his involvement in the MEC back in March of

24   2001?

25   A.    In the early part of this he was the merger committee

1   chairman.

2   Q.   He resigned at some point, yes?

3   A.   He did.

4   Q.   Do you recall being told that one of the other American

5   pilots at an early meeting of the merger committee made an

6   obscene gesture with the written proposal that the TWA MEC

7   merger committee had provided?

8   A.   No, I don't recall.

9   Q.   Let's go through this quickly.  Do you recall attending

10  a meeting with advisors to the TWA MEC on March 14 of 2001?

11  A.   I believe I was there.  I mean I would like to check the

12  minutes but I believe I was there.  So many meetings, even

13  your board displayed so many meetings, both in person and

14  telephonically, it is sometimes difficult to remember which

15  exact ones I was present and not present for.

16  Q.   There were a lot of meetings?

17  A.   There were a number of means.

18  Q.   Do they run together at points?

19  A.   Sometimes they were multiple days, we go home and have

20  another meeting the next week.  Sometimes if we couldn't get

21  together, they were done telephonically.

22          THE COURT:  Did seniority integration come up as a

23  consistent, persistent issue in this series of meetings and

24  telephone calls?  I mean prior April 2, the continuous

25  meetings and apparently telephone calls as well, was,

1    forgetting your memory at any particular meeting or

2    particular telephone call, was seniority integration between

3    the American pilots and the TWA pilots a consistent or

4    persistent topic in these meetings?

5    A.    I would say, your Honor, the seniority integration was

6    inconsistent.  What was consistent at a certain point was

7    best described as stumbling blocks that had to be over-

8    achieved, a/k/a waiving scope, to complete this transaction.

9    I think the merger committee was pretty much working behind

10   closed doors.

11           THE COURT:  If you agreed with American on the

12   seniority integration with the APA, waiving scope wouldn't

13   have been a problem.

14   A.    Absolutely.

15           THE COURT:  Because you would have had an

16   agreement.  The two issues are really the same.  They are

17   different sides of the same issue.

18   A.    Absolutely.

19           THE COURT:  In February, you and American, I say

20   you, ALPA and American had agreed on a seniority integration,

21   waiving scope would be almost just pro forma.  I mean, it

22   would be a technical thing.  But had to be done.  But it

23   wouldn't have affected you because you would have an

24   agreement in place.

25   A.    I say with a thousand percent certainty, if the merger

```
 1    committee, as to one of these March meetings, would have come

 2    back to the MEC and said we have agreed to do a date of hire

 3    seniority integration, that waiving scope would not have been

 4    an issue.

 5              THE COURT:  So the answer is waiving scope, or was

 6    it persistent, a consistent issue throughout, really from

 7    February at least April 2.

 8    A.   That would be an accurate statement, your Honor.

 9    Q.   And you recall the merger committee making an effort to

10    work with the American pilots to agree upon seniority

11    integration so that this issue of waiving scope could be

12    avoided, yes?

13    A.   I do remember that meeting, yes, I do.

14    Q.   Okay.  But just on this March 14 meeting, do you recall

15    where that was?

16    A.   I do not.

17    Q.   Do you recall who was present?

18    A.   Was March 14 when we were in Delaware?

19    Q.   I am not permitted to answer questions.  Either you

20    recall or you don't?

21    A.   I don't.

22    Q.   Do you recall a special meeting of the MEC, TWA MEC on

23    March 21 and 22?

24    A.   I recall.

25    Q.   Where was that?
```

1    A.    In Saint Louis.

2    Q.    Who was present?

3    A.    I really can't tell you who was present.  I would

4    imagine, best guess would be most of the MEC.

5    Q.    Were any advisors there, let's take take it a step at a

6    time.  Were any advisors at that meeting?

7    A.    Without looking at the notes I couldn't say.

8    Q.    Do you recall if there was any professional advice,

9    legal advice, bankruptcy advice, given at the meeting?

10   A.    I couldn't say without looking at the minutes.

11   Q.    You talked this morning about a meeting in Council 2.

12   Do you recall that?

13   A.    In March of in March of '02? ?  I mean March for Council

14   2.

15   Q.    You said you attended a meeting of Council 2 in March

16   where the issue of whether to waive scope was discussed.

17   Yes?

18   A.    Correct.

19   Q.    And you said that --

20         THE COURT:  That was New York.

21   A.    That was held at the Ramada Inn in New York, yes, by JFK

22   airport.

23   Q.    You said 50 to 60 people who attended that, they were

24   unanimous in wanting the MEC not to waive scope.  Right?

25   A.    That is correct.

1    Q.   What was the date of that meeting?

2    A.   I don't have the date.

3    Q.   Have you seen --

4         THE COURT:  Can I, for a second, they didn't want

5    to waive scope absent an agreement with the APA on seniority

6    integration.

7    A.   That was not the part of the resolution.  It was just a

8    generic, don't waive scope.

9         THE COURT:  It was implicit.

10   A.   You could say that.  I don't have the date, counsel.

11   Q.   You said this morning you have a clear recollection of

12   this meeting, it is vivid in your memory, yes?

13   A.   I do.

14   Q.   Why, if you could tell us, why do you recall that

15   meeting so vividly but you can't recall the specifics of most

16   of the meetings that we discussed that took place in January,

17   February, and March?

18   A.   I think there are two issues.  I think first with regard

19   to MEC meetings, they happen so frequently and I was, and

20   best described, an invitee.  You show up at a meeting, this

21   many people may be there, this may people there, this may

22   advisors.

23        I am an invitee and I am trying to absorb the

24   information.

25        And so trying to recall this information some ten

1    years later is a little vague on what dates and who spoke at

2    what meeting.  And when you ask me about a specific local

3    Council 2 meeting, that is my meeting.  I called it.  I set

4    the agenda.  I am the head attorney at the case.  I get to

5    speak to these pilots.  And I know exactly what I am saying.

6    I know exactly what my agenda was and who I invited.  I can

7    even almost tell you the food that was there that day because

8    I set it up.  So it is a different forum to me.

9    Q.   Tell us in relation to these other meetings and events

10   we have in the blowup, tell us when that meeting of Council 2

11   took play?

12   A.   I can tell you mid March.  My notes were on my ALPA

13   laptop computer which was,  you know, unfortunately

14   confiscated with some personal items at the ALPA office.

15   Q.   Are there minutes of the meeting which you claim took

16   place in March?

17   A.   There were minutes of the meeting.

18   Q.   Have you seen those minutes at any point over the past

19   ten years?

20   A.   I have not.

21   Q.   Would it surprise you to hear that ALPA records show

22   that the only meeting of Council 2 before April 2 of 2001,

23   was on February 8, 2001.

24   A.   That would be a surprising date to me, yes.

25   Q.   That date would be before you claim you first became

```
 1    aware that the American deal required the waiver of scope.

 2    Right?

 3    A.    That would be correct.

 4    Q.    You told me before, you claim you first became aware

 5    that scope had to be waived in late February or mid March?

 6    A.    That would be correct.  That was my testimony.

 7    Q.    So all right.  So let's talk about the March 21, 22,

 8    meeting, for just a minute.  But before we do that, you were

 9    present on March 12 in bankruptcy court when Judge Walsh

10    ruled on the American transaction, he approved the

11    transaction.

12    A.    I was present in Wilmington, Delaware, yes.

13    Q.    Were you in court when Judge Peter Walsh of the United

14    States bankruptcy court approved the American purchase of

15    TWA's assets?

16    A.    I was in his court on and off through my time in

17    Wilmington.  Whether I was actually sitting in the courtroom

18    when he pronounced, I couldn't tell you.

19    Q.    I am showing you what is marked as D 11.  This is some

20    excerpts of the transcript of the proceedings before Judge

21    Walsh on March 12, 2001.  Do you recognize the document as

22    such.

23              MR. JACOBSON:  Mr. Fram, do you have a copy for me?

24              MR. FRAM:  Yes, I do.

25              THE COURT:  D 11 has not been marked in evidence,
```

```
 1    unless I missed that one, too.

 2              MR. FRAM:  No, not yet, your Honor.

 3    Q.   Do you recognize the transcript?

 4    A.   I recognize it as a transcript, yes.

 5              MR. FRAM:  I move it into evidence, your Honor.

 6              MR. JACOBSON:  Objection, your Honor.  Hearsay.  It

 7    is all hearsay.

 8              MR. FRAM:  Well, first of all --

 9              THE COURT:  Well, let's start out, this is an

10    official record of a transaction in court and I believe there

11    is an exception in any case,  that says, with hearsay rule 4,

12    official records, what transpires in court.  I think what

13    transpired before Judge Walsh in this, in the TWA bankruptcy

14    is relevant and his approval of the TWA transaction is

15    relevant.  I am going to allow it.

16              MR. JACOBSON:  Your Honor, may I expand on  my

17    objection?

18              THE COURT:  Yes.

19              MR. JACOBSON:  This is testimony from a prior

20    proceeding.  It is only admissible in evidence against a

21    party who had an opportunity to participate, cross examine,

22    and the rest of it.  The TWA pilots did not, were not

23    parties.  They were not, they had no ability to cross

24    examine.

25              THE COURT:  I agree with you that they were not
```

 1    parties, and cross examination, but we are dealing, I

 2    believe, what I believe we have here, let me check  --

 3              MR. FRAM:  It is the Court's decision.

 4              THE COURT:  This is a court decision.  This is not

 5    examination of witnesses.  I would take a different view of

 6    that, if it was a question of examination of witnesses it

 7    might be relevant that you were not a party and didn't have a

 8    chance, but this is a decision of the Court.  I am going to

 9    allow it in.

10              MR. FRAM:  Thank you, your Honor.

11    Q.   Turn to page 7 of 18, if you look in the middle on the

12    bottom.  7 of 18.  My question, the paragraph in the middle

13    of the.  A denial of the motion.  I want to confirm you

14    recall being aware of this in March the judge found a denial

15    of the motion would put this Chapter 11 case in a free fall

16    context, and I agree with the uncontested testimony of Mr.

17    Compton that would result in a collapse of TWA with the

18    consequent dramatic loss in value for most all creditor

19    constituencies in this case.

20              Do you recall that finding?

21    A.   I see it written here, yes.

22    Q.   Do you recall being aware around the time of this that

23    the bankruptcy judge felt that the American transaction was

24    the only viable way for any part of TWA to continue?

25    A.   It appears that was his opinion, yes.

1    Q.    And you were aware of that back in mid March, right?

2    A.    I was made aware of it in mid March, yes.

3    Q.    Turn to the next page, please?

4          THE COURT:  Page 19.

5          MR. FRAM:  No, page 8 of 18.  Do you see the first

6    full paragraph where the Judge found I am convinced he.

7    A.    I see it.

8    Q.    That given this debtor's history if this Court were to

9    reject or deny the motion that there would be an immediate

10   and precipitous decline in the financial affairs of the

11   debtor, and with a very, very high probability, if not

12   certainty, of a liquidation.  And I think it is in the best

13   interests of the estate for that not to happen.

14         Yes.

15   A.    That is what he wrote, yes.

16   Q.    You understood as a consequence of the findings that the

17   American deal was going to go ahead.  Yes?

18   A.    I understood that that was his opinion.  I didn't share

19   his opinion on this but this is what he said.

20   Q.    Well, you thought Judge Walsh was wrong in his findings

21   with respect to the financial condition of TWA?

22   A.    My statement stands.  I didn't agree with his opinion.

23   I didn't agree that TWA was imminent in closing the door.  I

24   didn't think TWA was imminent in a financial failure.  I

25   didn't.

1    Q.    What factual basis, if any, did you have for

2    disagreeing with the findings of the federal bankruptcy

3    judge?

4    A.    In this particular timeframe, I had two schools of

5    thought.  I think it would be relevant to share them both.

6            TWA was more or less asked, and I use that word,

7    asked, to go into a bankruptcy, and asked to do certain

8    specific things.

9            Really in the beginning we we are were told by that

10   very same person, Mr. Compton, to get rid of the Karabu

11   agreement which was Carl Icahn.   I don't think anybody would

12   object to getting rid of Carl Icahn, that that was not a good

13   thing.

14           My history with TWA was we had been through two

15   bankruptcies before.  We had been through a financial status

16   of questionable future before and somehow always prevailed.

17           I did not think that anything was different this

18   time around.

19   Q.   Did you think that you had as much factual information

20   about TWA's financial condition as Judge Walsh did?

21   A.   I don't know what he had.  I can't comment on that.

22   Q.   Did you have any expertise in bankruptcy, mergers,

23   liquidations, anything that pertained to TWA's prospects for

24   survival?

25   A.   I have no expertise, no.

Hollander-cross/Fram                                           165

 1   Q.   Do you have any experience?

 2   A.    Personal experience, no.  Just being a pilot amongst

 3   the airline and having more inside information as a MEC

 4   member as opposed to not.  But personal experience no.

 5   Q.   The bottom line is you you thought Judge Walsh was

 6   wrong?

 7   A.   I just disagreed with his opinion, yes.

 8   Q.   What did you want to see happen with TWA's as assets if

 9   not a sale to American?

10   A.   I would have hoped TWA would have stood alone as a

11   stand-alone airline and there was a plan in place for such a

12   thing, or being worked on at this current era in our life.

13   There were other potential mergers.  I mean, I am using the

14   word mergers, that were --

15            THE COURT:  Or acquisitions.

16            THE WITNESS:  Or acquisitions that were on the

17   table prior prior to this particular deal.

18            THE COURT:  I am sorry.  On the table?

19            THE WITNESS:  On the table being discussed.

20            THE COURT:  You mean an offer had been made?

21   A.   I am not saying an official offer had been made, your

22   Honor.

23            Probably best answered was there was an interest of

24   a marriage, and I am using Mr. Glanzer's word, between TWA

25   and America West airlines.  Those discussions were taking

 1   place and discussed with people like Boeing, with the

 2   municipalities of St. Louis and Kansas City.

 3             THE COURT:  America West is not --

 4   A.    That is hubbed in Phoenix.  At 2000, I believe it was,

 5   2000 bought a board meeting down at the Fountain Blue Hilton

 6   in the America West MEC and the TWA MEC were in rooms

 7   discussing the possibility of a future together.  This was

 8   not a fathom thought, is what I am trying to say.

 9   Q.    Regardless of what you thought of that other deal, when

10   Judge Walsh ruled on March 12 that the TWA assets were

11   American, any other possibility disappeared, right?  All that

12   became irrelevant?

13   A.    That would be correct.

14   Q.    And what is one of the first things that TWA did after

15   Judge Walsh approved the American purchase of its assets?

16   A.    I am not quite understanding where you are going with

17   that question.  Is there something specific?

18   Q.    Did TWA and American take steps after the approval the

19   transaction by Judge Walsh to proceed with the transaction?

20             THE COURT:  That is March 12, 2001.

21   Q.    March 12, do you recall any significance events on the

22   part of TWA or American to consummate the deal?

23   A.    I just know that they did consummate the deal.  I don't

24   know, I can't recall any specific event that took place but

25   they did consummate the deal.

1    Q.   Do you recall a motion under Section 1113?

2    A.   Our motion I believe, if I recall, was withdrawn.

3             THE COURT:  No, no, the motion was TWA's motion.

4    Q.   Do you understand that TWA filed a motion under Section

5    1113 of the Bankruptcy Code to reject the contract that

6    existed between TWA and the TWA pilots?

7    A.   I do understand that.  That was filed, yes.

8    Q.   You you understand that that motion was filed on March

9    15 of 2001?

10   A.   I do understand that to be the date, yes.

11   Q.   And what was the reason as you understood it why TWA

12   filed that motion.

13   A.   My understanding is they were specifically targeting

14   section 1 of our contract to do with waive --

15   Q.   The motion requested that the bankruptcy court reject

16   the entire contract.  Do you recall that?

17   A.   Yes you, I do recall that.

18   Q.   Did you actually read the motion?

19   A.   No, I did not read the motion.

20   Q.   So what you know about the motion is information you

21   know from other people, yes?

22   A.   Yes.

23   Q.   Do you recall being invited to the meeting on March 21

24   and 22, so that the MEC could talk about the motion and plan

25   its next steps?

 1   A.   I recall being invited to to that meeting, yes.

 2   Q.   And do you recall being told that the agenda for the

 3   meeting would include, can we pull that up?

 4            THE COURT:   What is the number?

 5   Q.   382, your Honor?

 6            THE COURT:   Defendant or plaintiff?

 7            MR. FRAM:   Defendant, your Honor.   It is in

 8   evidence.

 9            THE COURT:   D 382.

10            MR. FRAM:   Yes, it is in evidence, your Honor.

11            THE COURT:   Okay.

12   Q.   Do you recall this email setting the meeting on March 21

13   and 22 and advising the members of the MEC that there would

14   be reports from the negotiating committee, and the merger

15   committee?

16   A.   I recall the email, yes.

17   Q.   Do you recall the reports that were given on March 21

18   and 22?

19   A.   I know reports were given.   You can't recall the

20   substance of what was translated that day.

21   Q.   Do you recall any of the professional advisors who were

22   present?

23   A.   I do not recall any specific advice.   I know there were

24   advisors present but I can't recall their direct advice on

25   that day.

1    Q.   I have handed you D 223 in evidence.  I want you to

2    turn, please, do you recognize those minutes?

3    A.   I do recognize the minutes.

4    Q.   Is that a document, by the way, that you had an

5    opportunity to review before coming in to testify?

6              THE COURT:  I am sorry.  What is the document?

7    A.   This document.

8    Q.   The minutes.  Did you review that before coming in and

9    testifying about these issues in court?

10   A.   I did not review these minutes before coming in today.

11   Q.   Do you review any documents to prepare for you testimony

12   in this case?

13   A.   I reviewed some.

14   Q.   Give us a sense of how many, was it ten, was it 50?

15   A.   Oh, gosh.  I would have to say probably over 50

16   documents.

17   Q.   All right.  Second page of the document?

18             THE COURT:  What document.

19   Q.   223 in evidence.  The minutes of March 21 and 22?

20   A.   Second page, yes.

21   Q.   Vice chairman report Shwartz.  Shwartz reported that the

22   U.S. bankruptcy court would likely hold a hearing on TWA

23   Section 1113 filing on April 6.  Though no absolute date had

24   been set.  Stated that negotiations continued on those areas

25   of the ALPA collective bargaining agreement to be amended to

1    for the transition into TWA LLC.  The merger committee was

2    working on various fronts, legal and scope issues.  Then

3    briefed the MEC regarding teleconference with Duane Woerth.

4    Do you see that?

5    A.    I do.

6    Q.    Here is another telephone conference that Mr. Shwartz

7    had with Mr. Woerth, right?

8    A.    That's correct.

9    Q.    Does this refresh your memory that Mr. Woerth was in

10   regular communication with members of the MEC so that they

11   understood he supported the MEC's efforts, and wanted to be

12   in the loop?

13   A.    This document says that Scott Shwartz had a conversation

14   with president worth and he relayed that to us on the basis

15   of being a regular conversation, I real you couldn't say that

16   that was the case, but it says on this occasion he had it.

17   Q.    Do you recall or not that Captain Woerth was having

18   regular conversations with Shwartz and others including

19   Pastore?

20   A.    I do not recall.

21   Q.    Okay.  So do you recall from this meeting that the 1113

22   motion was scheduled for a hearing on April 6?

23   A.    It says it in this document and I would have to say that

24   at the time I would recall that.

25   Q.    What did you understand would happen on April 6 with

Hollander-cross/Fram                                                    171

 1   respect to the Section 1113 motion?

 2   A.   I would venture to say on April 6, on or about, not that

 3   day, soon thereafter, a decision would eventually have to be

 4   made either in favor or guest.

 5   Q.   If a decision was made if favor of the motion, that the

 6   motion, if the motion is granted and the labor agreement is

 7   rejected, what happened or would have happened to the scope

 8   and successorship provisions?

 9   A.   I would imagine if the if the motion was granted that

10   they would have been potentially wiped away.

11   Q.   You say potentially?

12   A.   I am not an expert in the bankruptcy but I guess from

13   what I witnessed with my own eyes it seemed in Judge WAlsh,

14   court, anybody who had an objection, the first thing that

15   happened was those particular parties were sent to some ante

16   room to go hash out a deal right there.  It seemed that was a

17   better course because some deal was usually hashed out.

18   Would we have had a better deal that day, I couldn't tell.

19   Q.   What did advisors tell you and the other members of the

20   MEC about what would happen if the Section 1113 motion was

21   granted?

22           MR. JACOBSON:  I am going to object because I am

23   not sure what date he is talking about.  There are so many

24   meetings, could he specify the time?

25           THE COURT:  Prior to April 6, prior to the date

1    that the motion was going to be heard, did you have an

2    understanding as to what would happen to your labor contract

3    if Judge Walsh granted the motion?  I think that is the

4    question.  If that is the question, I think that is a proper

5    question.

6              MR. FRAM:  That is the question, your Honor.

7    A.   My answer to being that would be that all or part of the

8    TWA contract would have been eliminated.

9              THE COURT:  Did you have an understanding as to

10   scope, section 1, I think, section one of the contract, the

11   scope part of the contract, would be in effect eliminated?

12   A.   I did have that understanding.

13   Q.   You understood TWA filed a motion because elimination of

14   scope and successorship was a condition of the deal going

15   back to January, early January.  Right?

16   A.   Well, you are saying it is a condition of the deal.  I

17   don't recall that I found out about it in early January, but

18   at some point I found out it was a condition of the deal.

19   Q.   And did you understand when this meeting took place, and

20   the Section 1113 motion was discussed, that that was what TWA

21   was trying to do, they were trying to follow through with

22   what had been agreed in early January?

23   A.   I did understand at there meeting.

24   Q.   All right.  And let's just walk through the minutes

25   quickly.  Do you see on page 3 of the minutes, transaction

1    update.

2    A.    Page 3.    Transaction update.

3    Q.    Negotiating committee, Ron Kiel and Al Altman.   They

4    were negotiating directly with TWA, right?

5    A.    They were.

6    Q.    And you are the one who moved for executive session

7    along with Altman, right?

8    A.    That's correct.

9    Q.    And you, the MEC was an executive session for over three

10   years, right?

11   A.    That is what it says.

12   Q.    What advisors were there and what did they tell you

13   about the transaction?

14   A.    I can't recall what they said in this particular

15   meeting.

16   Q.    Do you recall anything that was said?

17   A.    No, I don't.

18   Q.    Do you recall which advisors were there?

19   A.    No, I do not.  Not without looking at a list.

20   Q.    Did you say this morning, did you claim this morning

21   that advisors told you before April 2, 2001, that the Section

22   1113 motion was going to be denied?

23   A.    What I said this morning is that when I found out, and,

24   or first had recollection of a 1113 hearing, not knowing what

25   that process was, you made a few phone calls on my own and

1    two to at least two people, David Holtzman first and then

2    Clay Warner, and they gave me their expert opinion on what

3    that process was about and ventured to guess how they thought

4    it was going to proceed.

5    Q.   When did do you claim those phone conversations took

6    place?

7    A.   Before this meeting.

8    Q.   All right.  So what about at the meeting, didn't people

9    tell you at this meetings, didn't the professionals tell you

10   at the meeting that the Section 1113 motion has been now

11   filed and is likely to be granted?

12   A.   I don't recall.  I don't recall them saying that it was

13   going to be granted.

14          THE COURT:  Do you recall one way or the other what

15   they said on the subject.

16   A.   The possibility of --

17          THE COURT:  Let me finish.  Did they say anything,

18   either way, as to the possibility of success or failure on

19   TWA's 1113 motion.

20   A.   I don't recall their voicing an opinion one way or the

21   other, your Honor.

22   Q.   And you don't recall anything that was discussed at this

23   meeting by advisors, correct?

24   A.   That's correct.

25   Q.   Just down to the bottom, transaction update, merger

1    committee.  Do you see that?  It is the bottom of page 3?

2    A.   I do.

3    Q.   9:15, Rautenberg and Young moved to enter executive

4    session.  Looks like you are in executive session for over

5    three hours.  Yes?  9:15 to 12:30?

6    A.   Yes.  That looks like an accurate time.

7    Q.   It looks like two resolutions were passed.  Let's blow

8    up the resolution part in executive session.  Resolution 01-

9    - 58 and 59.  Past and executive session, not for

10   distribution.  Do you see that?

11   A.   I do.

12   Q.   What were those resolutions?

13   A.   Without seeing them, I couldn't tell you.

14   Q.   So you have no recollection as you sit here today what

15   the resolutions were?

16   A.   I do not.

17   Q.   Do you have any recollection of which advisors may have

18   spoken during this part of the executive session?

19   A.   I do not.

20   Q.   Do you have any recollection of what any of the advisors

21   there said about any of the issues we have been discussing,

22   Section 1113, waiver of scope, seniority integration??

23   A.   Well, in this particular example you are talking about,

24   which was talked about by a negotiation committee and some

25   resolution, so I don't recall any of their discussion as far

```
 1    as ALPA advisors about negotiating with, the seniority date.

 2    Q.    Well, do you recall anything whatsoever, any topic or

 3    issue, that was addressed by advisors during that part of the

 4    executive session?

 5    A.    I do not recall.

 6    Q.    Do you recall becoming becoming aware before this

 7    meeting that TWA had sent over an outline of a proposed

 8    collective bargaining agreement.  Do you recall becoming

 9    aware of that?

10    A.    No, I don't recall.

11    Q.    I hand you what has been marked as D 386 in evidence,,

12    317-01, a portion of the proposal of TWA LLC to the Airlines

13    Pilots Association.  Have you seen that document before?

14              THE COURT:  What number?

15              MR. FRAM:  386.

16    A.    Tell me when you have had a chance to read it.

17    A.    I do not recall seeing this document before.

18    Q.    Do you recall becoming aware at some point that TWA had

19    made a proposal and was communicating that the proposal would

20    be withdrawn if not accepted when the Section 1113 hearing

21    began on April 6?

22    A.    Can you restate that another way?

23    Q.    Do you recall becoming aware at any point that TWA was

24    making a proposal, TWA LLC, was making a proposal for a

25    collective bargaining agreement and they were telling you
```

1    that if the proposal was not accepted by April 6, when the

2    1113 hearing was supposed to start, that the proposal would

3    be withdrawn?

4    A.   I do not recall, no.

5    Q.   Do you have the underlying language in front of you?

6    A.   I do.

7    Q.   Read it.

8    A.   On your document, page 2.

9    Q.   Yes.

10   A.   This proposal will be deemed withdrawn at the time if

11   not accepted as binding, as a binding agreement by ALPA on

12   behalf of the pilots to be employed by TWA- LLC.

13   Q.   Okay.  And does that refresh your memory that there was

14   a short shelf life,  if you will, for TWA LLC's willingness

15   to enter into a new collective bargaining agreement?

16   A.   I could tell you I didn't think there would be  a long

17   shelf life, but I don't recall this document ever being

18   distributed to me.

19   Q.   All right.  The meetings, you talked about some of the

20   other events leading up to the meeting on March -- I am

21   sorry -- on April 2.

22          Do you recall being aware after the meeting we have

23   been discussing on March 21, 22, that the merger committee

24   was directed to go back and meet with the American pilots one

25   more time to try to hammer out the issue of seniority

Hollander-cross/Fram                                                178

1    integration?

2    A.   I don't remember a specific direction.  I know the

3    merger committee, at its will, was trying to schedule

4    meetings with its counterparts at any and all costs.  I just

5    don't remember the MEC saying, Bud, negotiating committee, go

6    down there together.  Tomorrow.  I don't recall that, no.

7    Q.   When you left the meeting on March 22 of 2001, what if

8    anything did you expect the merger committee to do?

9    A.   We expected them to do their job, which was to continue

10   to try to negotiate a deal.

11   Q.   What did you expect, if anything, the negotiating

12   committee to do?

13   A.   At least contact its counter part to try to set up

14   further discussions.

15   Q.   Do you recall --

16        THE COURT:  I want to ask the jury a question if

17   you don't mind, nothing to do with this.  It is one o'clock.

18   If you feel you need a short break now, comfort break, I will

19   give it to you.  If not, if you are willing to keep going

20   through, what I will do is let you off five or ten minutes

21   early.  What would you rather do?  Have a break now?  Or go

22   through and leave five or ten minutes.

23        JUROR:  Short break.

24        THE COURT:  Short break.  Let's give the jury a

25   short break.

1              THE COURT:  Let's give the jury a short break.  It

2    is one o'clock now.  One minute pass one.  Let's take a

3    ten-minute break.  Then we will resume cross at that point.

4              MR. FRAM:  Thank you, your Honor.

5              (Jury leaves the courtroom)

6              (Recess.) .

7

8

9              (Jury enters the courtroom.)

10             HOWARD HOLLANDER, resumes.

11             CONTINUED CROSS EXAMINATION.

12             BY MR. FRAM:

13             MR. FRAM:  Mr. Fram, you may resume your cross

14   examination.

15             MR. FRAM:  Thank you, your Honor.

16   Q.   Sir, you have in front of you a stack of documents in

17   order.  I would like to walk through them quickly.  Do you

18   recognize the first one, D 210 in evidence, as an email that

19   Robert Stow circulated on March 29 of 2001, scheduling a work

20   session of the MEC on April 1, and a formal meeting of the

21   MEC on appear April 2 of 2001?

22   A.   I recognize this document.

23   Q.   You understood from this email you and the other members

24   of the MEC were being invited to a work session with advisors

25   on Sunday, April 1, 2001?

1    A.    That is what I understood, yes.

2    Q.    Your testimony is you did not attend that work session?

3    A.    That's correct.

4    Q.    The reason you didn't attend was what?

5    A.    Short notice.  I can't remember if I was flying a trip

6    and couldn't get out of it or busy picked it up a day before

7    I couldn't make arrangements to be there in such a short

8    time.

9    Q.    Did you know as a result of the March 21 and 22 meeting,

10   and the filing of the Section 1113 motion, that the MEC was

11   going to have to make a decision at some point before April 6

12   of 2001?

13   A.    I did not know from the March 21, 22, meeting, no.

14   Q.    You knew from this email that a number of the

15   professional advisors would be at the meeting?

16   A.    I knew from this email that a number of the professional

17   advisors were going to come for a work session.  I coulc not

18   tell you from this email who was going to remain for April 2.

19   Q.    Turn to the agenda that that is the next document, D 179

20   in evidence.  Do you have that handy?

21   A.    I do.

22   Q.    Monday, April 2, 2001.  Large portion of meeting in

23   closed session.  This agenda, do you see in the lower

24   right-hand corner is dated March 30, 2001.  Yes?

25   A.    I am looking for your date.  Yes, March 30.

1    Q.    So it was and advertise paid D before the meeting that

2    moist of it would be, or of much of it would be in closed

3    session?

4    A.    It was.

5    Q.    And do you see the list of advisors who were going to be

6    there, bankruptcy transaction update, negotiating committee,

7    then it lists Holtzman, Tumblin, Glanzer, Seltzer, Warner,

8    Babbitt?

9    A.    It does.

10   Q.    It has merger committee, it also lists Robert Christy?

11   A.    It does.

12   Q.    Do you recall Roland Wilder's name does not appear on

13   this?

14   A.    I agree Roland Wilder's name does not appear on this.

15   Q.    In were you here in court yesterday when Mr. Wilder

16   testified by videotape that he was in Louisville on Monday,

17   April 2, and did not attend the meeting of the TWA MEC?

18   A.    I was here in the Court and I heard his testimony.  Yes.

19   Q.    You claim he was there on April 2?

20   A.    I claim he was there on April 2, yes.

21   Q.    Can you give any explanation for why he doesn't appear

22   on the agenda?

23   A.    I cannot.

24   Q.    The next document is D 18 in evidence.  Confidential

25   draft?

```
 1                 THE COURT:  D what?.

 2                 MR. FRAM:  D 18, your Honor.  Do you have that in

 3     front of you?

 4     A.   I have D 18 in front of me, yes.

 5     Q.   Do you recognize it as a document that was distributed

 6     to the members of the MEC by Mr. O'Leary?

 7                 THE COURT:  D 18 is in evidence.

 8                 MR. FRAM:  Yes, your Honor.

 9     A.   Does it say that was distributed by Mr. O'Leary.

10     Q.   Sir, if you don't recall the document --

11     A.   I don't recall the document.

12     Q.   And don't recall it being distributed, say so?

13     A.   I don't recall it being distributed.

14     Q.   Do you recall the members of the MEC agreeing before

15     appear April 2 that waiver of scope was a foregone

16     conclusion, something that was going to happen regardless of

17     what the MEC did?

18     A.   I do not recall that, no.

19     Q.   Do you see on the second page of this document, second

20     paragraph from the bottom, beginning the purpose of the

21     strategic plan?

22     A.   I do.

23     Q.   Do you see the second sentence which says, "Since the

24     loss of scope seems to be a foregone conclusion, our MEC

25     needs to gain leverage and engage in tactics to accomplish
```

1   our objectives without scope?"

2   A.   I see that line.

3   Q.   Does that refresh your memory that the members of the

4   MEC knew before the meeting on April 2 that scope was

5   history?

6   A.   It does not refresh my memory to that, no.

7   Q.   Let's turn for a minute or two to the April 2 minutes.

8   Do you have those handy?

9   A.   I do.

10  Q.   D 74 in evidence?

11            THE COURT:  I am sorry?

12            MR. FRAM:  D 74, the minutes of April 2, 2001.

13            THE COURT:  That is in evidence.

14  A.   Yes.

15  Q.   You were present for this meeting?

16  A.   I was present for this meeting, yes.

17  Q.   Do you recall what advisors said about the Section 1113

18  motion?

19  A.   I believe my testimony earlier is what I remember, was

20  their advice in general amongst them all, was that the TWA

21  MEC needed to waive its scope, and we needed to do this in

22  order to get this transaction done, based on the fact that it

23  was their opinion that American Airlines would not conclude

24  the transaction without it.

25  Q.   My question was do you recall what they said about the

Hollander-cross/Fram                                              184

1    Section 1113 motion?

2    A.   Not specifically about the 1113 motion.

3    Q.   Do you recall advisors saying that there was a 99

4    percent chance or something like that that the Section 1113

5    motion would be granted?

6    A.   I recall specifically Richard Seltzer making that

7    statement.

8    Q.   So you do recall being told by advisors that the 1113

9    motion was highly likely to be granted?

10   A.   I recall Richard Seltzer saying that, yes.

11   Q.   Okay.  Do you recall the other advisors agreeing with

12   that sentiment?

13   A.   No, I do not recall that.

14   Q.   Well, do you recall sending a letter to the Council 2

15   pilots that was signed by you and by Ted Case and Sally Young

16   where you reported to the Council 2 pilots that advisors were

17   unanimous in agreeing that the Section 1113 motion would be

18   granted?

19   A.   I would have to reread the letter but I can tell you

20   right off the bat that Sally Young never signed any Council 2

21   letter.

22   Q.   I am sorry.  I misspoke.  So the Council 2 letter was

23   signed, do you recall a Council 2 letter signed by you, Mr.

24   Singer and Mr. Case?

25   A.   That would be correct.

Hollander-cross/Fram                                          185

1    Q.   And in that letter did you report to the Council 2

2    pilots that advisors were unanimous in advising that the

3    Section 1113 motion was highly likely to be granted by Judge

4    Walsh in the bankruptcy court?

5    A.   I would have to reread the letter to refresh my memory.

6    Q.   You don't recall what you said in the letter?

7    A.   I don't recall what I said in the letter without

8    rereading it, no.

9    Q.   Did you understand on April 2 that if the Section 1113

10   motion was granted that scope was gone, that scope was

11   history?

12   A.   I did understand that, yes.

13   Q.   Okay.  The vote that took place on April 2, that vote

14   you said this morning was about whether to waive scope?

15   A.   That's correct.

16   Q.   Was there any other issues that were voted on by the MEC

17   on April 2, 2001?

18   A.   I think there were other resolutions that may have been

19   put forward that day.

20   Q.   Do you recall what they were?

21   A.   Not without looking at the minutes, no.

22   Q.   Do you recall a resolution relating to a proposed

23   collective bargaining agreement between TWA, LLC, and the TWA

24   pilots.  I would have to look at the minutes to refresh my

25   memory?

1   Q.   So your answer is you don't recall a resolution on April

2   2 that related to a proposed collective bargaining agreement

3   with TWA LLC?

4   A.   My recollection on April 2 was a resolution to waiver

5   our scope language in section 1.  If there were other parts

6   to that, I just don't recall it.

7   Q.   All right.  So the issue in your mind on April 2 was do

8   we waive scope or not, yes?

9   A.   Absolutely correct.

10  Q.   Now, the vote that took place on April 2, let's just

11  pull up the roll call vote real quick.  I want to make sure

12  we understand what happened here?

13  A.   Absolutely.

14  Q.   I think you said this morning that there was a voice

15  vote or a hand vote before the roll call vote?

16  A.   There was, correct.

17  Q.   And five people put of up their hands that they were

18  voting in favor of the resolution?

19  A.   That's correct.

20  Q.   So you knew before you asked for the roll call that the

21  resolution was going to pass.  Yes?

22  A.   I would say yes.

23  Q.   Since you knew the resolution was going to pass, what

24  point were you trying to make by casting a majority of your

25  votes against the resolution?

1    A.   I wanted to make two points.  First, I wanted to get my

2    weighed vote on the record.  And at the same time I wanted to

3    get the weighed vote on all the other MEC members on the

4    record.

5    Q.   You wanted to get your weighed vote on the record so you

6    can go back to Council 2 and and say I refused to agree to

7    waive scope.  Right?

8    A.   In general, yes.

9    Q.   You wanted to get the other members votes on the record

10   so that you could point at them and say they voted to waive

11   scope?

12   A.   I wanted all the TWA pilots to see how each of their

13   representatives voted.  And I think that it was significant

14   to get that on the record.

15   Q.   Significant why?

16   A.   Best answered in an example.  Captain Rautenberg, for

17   example, had 724 votes.  There were people in the room that

18   very day, and there was actually an argument between him and

19   his secretary/treasurer, Jim Arthur, who was a captain, who

20   specifically said to Captain Rautenberg, do not waive my

21   rights, and he had, I understood, a number, hundreds of

22   people who told him the same thing.  I wanted the Council 3

23   people there, for example, and all those people who

24   communicated with him to see that Captain Rautenberg did not

25   adhere to their wishes.

Hollander-cross/Fram                                    188

1    Q.   You wanted to make sure that Rautenberg and the others

2    could be made to look bad to the local council?

3    A.   It wasn't a bad or good thing.  It was so pilots in TWA

4    could see how their elected officers voted.  It wasn't a good

5    or bad thing.  It was so the pilots could see.  I let the

6    pilots make their own decision.

7    Q.   You said this morning that you had a local meeting, and

8    the unanimous vote of the local meeting was not to waive

9    scope, right?

10   A.   That's correct.

11   Q.   That is what you thought the issue was on April 2,

12   whether or not to waiver scope, yes?

13   A.   That's correct.

14   Q.   Did you ever have a meeting of the pilots in Council 2

15   where you explained to them that the Section 1113 motion was

16   almost certainly going to be granted, and that scope would be

17   waived in any event?

18   A.   I did not have a meeting specifically to tell them that,

19   no.

20   Q.   Did you have a meeting with them where you said, where

21   you told them that TWA LLC had proposed a collective

22   bargaining agreement that had some very significant benefits

23   for the TWA pilots?

24   A.   I did not have a meeting like that, no.

25   Q.   Do you recall a proposal by TWA LLC that included twelve

```
 1   million dollars in unpaid contributions to the DAP.  Do you

 2   recall that?

 3   A.   That number sounds like it came from somewhere, but I

 4   couldn't tell you exactly where.

 5   Q.   Do you recall any proposal from TWA LLC that included

 6   $60 per hour pay raises for TWA captains?

 7   A.   No, I do not recall that.

 8   Q.   So to the extent there was a proposal on the table from

 9   TWA LLC, you never went back to the pilots in Council 2 and

10   said you should know about this, tell me how you would like

11   me to vote with respect to this.  Correct?

12   A.   That would be correct.  The last meeting in March, up

13   until April 2, there was no meeting between that timeframe in

14   New York.

15   Q.   You are certain that there was a meeting of Council 2 in

16   March of 2001?

17   A.   I recall ten years later that we had a meeting in New

18   York in March of 2001.  Yes.

19   Q.   Was there also a meeting on February 8 of 2001?

20   A.   There could have been.  I don't have any minutes to

21   answer that question for you.

22   Q.   David Singer, the other rep from Council 2, you and he

23   had a philosophical difference about how to approach the vote

24   on April 2, right?

25   A.   At some point, yes.
```

Hollander-cross/Fram                                        190

1    Q.   Mr. Singer said that he articulated to you, he told you

2    that his view as a council rep is that he should listen to

3    the information and make a judgment about what he thought was

4    best for the pilots, right?

5    A.   I don't recall Mr. Singer articulating that to me.  Mr.

6    Singer's articulation was one of concern.  He was concerned

7    on April 2 that he would lose the ability to grieve, and he

8    was concerned that he might have some issues regarding his

9    medical plan, and stuff like that.   I don't recall him

10   saying he was seated there to make the decision on behalf of

11   the pilots.

12   Q.   You said this morning that your view of your role as a

13   voting member of the MEC was to cast your ballots in the way

14   in which you thought your individual pilot -- your

15   constituency would cast your votes?

16   A.   I  would agree with that.

17   Q.   Did Mr. Singer say he would agree with that?

18   A.   I don't recall Mr. Singer weighing an opinion on that.

19   Q.   How about Mr. Rautenberg, did Mr. Rautenberg agree with

20   that philosophy, that he was there simply to reflect what his

21   constituents told him to do?

22   A.   I  had no conversation with Mr. Rautenberg about this

23   subject.

24   Q.   Did you talk to any of the other members of the MEC to

25   see what their philosophy was in terms of whether they were

Hollander-cross/Fram                                        191

1    simply there to cast votes as directed, or whether they were

2    there to decide what they  thought, based upon the

3    information they received, was in the best interest of the

4    TWA pilots?

5    A.   I can't say I had that conversation with any member of

6    the MEC.

7    Q.   You agree that as a member of the MEC, that you received

8    confidential information about what the merger committee was

9    doing, what the negotiating committee was doing, about TWA,

10   that you were not at liberty to share with the members of

11   council 2?

12   A.   I did receive confidential information, that's correct.

13   Q.   That is the point of having the MEC go into executive

14   session, right?

15   A.   It is one of the points.

16   Q.   That was one of the contexts, one of the forums in which

17   the most important information was communicated to the MEC

18   executive session?

19   A.   Yes, I would agree.

20   Q.   Did you tell the members of the Council 2, did you

21   convey a long to them that confidential information?

22   A.   Absolutely not.

23   Q.   Before you got guidance from them?

24   A.   No, I would never convey to them something that was

25   confidential.

Hollander-cross/Fram                                          192

```
 1    Q.   They didn't know the details of what you knew about the
 2    Section 1113 motion, the scope issue, the bankruptcy
 3    proceedings.  How in your mind could they make an intelligent
 4    decision about what you should do or not do you in terms of
 5    voting?
 6    A.   I cannot tell you how individual pilots could make a
 7    decision.  I can only tell you this, that we, whatever
 8    information I was allowed to tell them, they based on their
 9    own decision.  If there was something of an earthquake fire
10    type of a decision, I would most certainly have told pilots
11    in New York, there is other information out there but we
12    cannot discuss with you, but I think turning left at
13    Albuquerque is better than turning right at Albuquerque, but
14    I would have made mention there is other information I am not
15    allowed to share with you.
16    Q.   You would have said to individual pilots there is a
17    whole bunch of confidential information I can't tell you
18    about that might be important to your decision about how I
19    should vote, but you should still tell me how I should vote?
20    Is that the kind of conversation you had with individual
21    pilots?
22    A.   I  think I would have said this.  I am trying to answer
23    your question.
24         If I had information that I thought would have
25    changed, if I thought would have changed their minds or I
```

1    thought that was absolutely ensured that they would change

2    their minds, I might have not, and I would not divulge the

3    confidentiality of the agreement but I would have said

4    something to them to that sort.  But because I never got any

5    information specific as to legal reasons why we would lose or

6    TWA pilots would lose the 1113 hearing, I stood by with their

7    resolution and still agreed with it.

8    Q.   You never got any information about why --

9    A.   I never got, up to the April 2 meeting.

10   Q.   Hang on a second.

11   A.   Sure.

12   Q.   You never got any information about why advisors thought

13   the Section 1113 motion would be granted?

14   A.   I never got any specific legal explanation, other than

15   to say that American would probably -- in their opinion,

16   American would not conclude the deal.  I wanted to know, and

17   it was asked of them, what specific legal grounds would Judge

18   Walsh grant or deny these motions.  And to this day I cannot

19   recall any specific answer to those questions.

20   Q.   You don't recall anything that was said during the

21   meetings on March 21 and 22, correct?

22   A.   I don't remember them today here in this courtroom, in

23   2011, no.

24   Q.   Are you saying that you never got the information, the

25   guidance, or you saying you just don't recall whatever

1   information or guidance you got?

2   A.   What I am saying is back then my decision was based on

3   the fact that I didn't get anything.   Today I can't recall

4   the exact words what was said.

5   Q.   All right.   Mr. Case, do you recall Mr. Case making a

6   statement for the record at the April 2 meeting, that he

7   opposed the resolution, that was voted on by way of roll

8   call?

9   A.   I read those minutes and I recall Mr. Case making an

10  opposition to that, yes.

11  Q.   Did you know before he made the statement that he was

12  going to do it?

13  A.   I did not.

14  Q.   Now, after the April 2 meeting Duane Woerth came and

15  talked?

16          THE COURT:   Who?

17  Q.   Duane Woerth, the president of ALPA?

18          THE COURT:   I know.

19  Q.   He came and talked to, at the meeting on April 23 or 24,

20  do you recall that?

21  A.   He did.   I mean I know he came.

22  Q.   And you said this morning that he was quizzed about some

23  remarks that were attributed to him?

24  A.   That is what I understood, yes.

25  Q.   And you are one of the people quizzing him?

1   A.    No.

2   Q.    The remark attributed to him is that he had told the APA

3   board of directors on April 5 that the TWA pilots had to

4   quote get real.   Correct?

5   A.    That was what was relayed to us, yes.

6   Q.    You said this morning that when he was asked about that,

7   he did not deny making the statement, but believed that it

8   had been taken out of context?

9   A.    That is what was relayed to me, yes.

10  Q.    Well, no.   You were there when Mr. Woerth addressed the

11  MEC on April 23 and 24, correct?

12  A.    No, I was not.

13  Q.    You weren't even at the meeting where he was asked about

14  whether he had made the statement?

15  A.    Duane Woerth's appearance was the first day of the

16  meeting.   My recollection is I was not there on the first day

17  of the meeting.

18  Q.    So how do you know that he did not deny making the

19  statement but believed it had been taken out of context?

20  A.    I was getting phone calls from almost everybody in that

21  room, every break they had.

22        THE COURT:   I am sorry.   I thought when, I asked

23  some questions about that and one of the reasons he explored

24  it, I understood that you were there.   That is why I made the

25  distinction between what I would consider hearsay as to what

1   he said, as to what came out of his own mouth.  That is what

2   you heard.

3   A.   I thought you were referencing the APA message with the

4   attorney about what was said down there.  What was said in

5   the meeting on --

6              THE COURT:  When he appeared, and when he was

7   questioned, clearly he was questioned, we know from the

8   minutes that he was questioned about what he had said, when

9   he had visited and spoke for a brief period of time at the

10  APA, I guess board of directors meeting, the board of

11  directors meeting.  Maybe I am confused.  I thought you were

12  present.

13             I think I even said that.

14             I made the point that I would give you full range

15  to say anything you heard him say.

16             MR. FRAM:  I heard it the same way, your Honor.

17  A.   Then I will yield and say I was mistaken.  I was not

18  there for Duane Woerth's personal appearance on the first day

19  of that meeting.

20  Q.   D 181.  Do you recognize this, sir, as an email?  It is

21  a summary of Duane Woerth's comments to the TWA MEC members,

22  April 23, that was prepared and circulated as an official

23  document of the MEC.

24  A.   I recognize it as that.

25  Q.   Okay.  Can you just read for the jury?

 1                MR. FRAM:  Your Honor, I move it into evidence.

 2                THE COURT:  I am sorry.  Let me do this.  D 181 has

 3       been offered.

 4                First first of all, is there any objection?  Did

 5       you have a copy of it, Mr. Press?

 6                MR. PRESS:  No, I know what it is.

 7                THE COURT:  Mr. Jacobson?

 8                MR. PRESS:  No objection.

 9                MR. JACOBSON:  No objection.

10                THE COURT:  D 181 will be in evidence.

11       Q.   All right.  Let's pull it up.  I am asking, I put tabs.

12       The bottom of the first page.  Read for us the first

13       paragraph beginning on the bottom of that page?

14       A.   Where he went?

15       Q.   Yeah.

16       Q.   This is summarizing what Mr. Woerth said to the MEC on

17       April 23 of 2001, correct.

18       A.   It looks like it.

19       Q.   Go ahead.

20       A.   "He went on to tell the APA that the TWA MEC had

21       recently made one of the hardest decisions he has ever seen

22       any MEC make in reaching the transition agreement with TWA

23       airlines LLC."

24       Q.   Keep going.

25       A.   Captain Woerth said that the TWA MEC had made a

Hollander-cross/Fram                                                    198

```
 1    realistic assessment of their situation and played a hard

 2    decision, and now the APA needs to get realistic and make a

 3    hard decision.  He told the APA that they have an even

 4    greater responsibility to be fair and realistic since they

 5    would not allow a third party to facilitate the

 6    negotiations."

 7    Q.   All right.  So does that refresh your memory that when

 8    Captain Woerth appeared on April 23, that he said he was miss

 9    replies quoted?

10              THE COURT:  April 25?

11              MR. FRAM:  23, your Honor.

12              THE COURT:  The meeting was two or three days long.

13              All right.

14    Q.   I think the document at the beginning, your Honor, says

15    it is summarizing April 23?

16              THE COURT:  Duane Woerth,  4/25/01.  Do you see

17    that on top.  But you are right, it does say -- the meeting

18    must have lasted multiple days.  On the top, first line of

19    the document.

20    Q.   What I was looking at is if you go down 40 percent it

21    says summary of Duane Woerth's comments, TWA MEC, April 23?

22              THE COURT:  No, I have that.  I see that.  But if

23    you look at the top page of the document, the very first

24    line, Duane Woerth's comments, 4-25-01

25              MR FRAM:.  Thank you, your Honor.
```

1          THE COURT:  All right.

2    Q.   So my question is does that refresh your recollection

3    that Captain Woerth made clear to the MEC on or about April

4    23 that his "get real" comment was directed to the American

5    pilots, and that he was saying that the American pilots had

6    to get real in dealing with the TWA pilots?

7    A.   I can only tell you that is what it says in the

8    document.  That is not what was translated to me, but that is

9    okay.

10   Q.   Don't you recall the members of the MEC understanding

11   understanding and agreeing that Captain Woerth had been

12   misquoted by the American pilots?

13   A.   The statement that was made to me was that he was

14   misquoted and danced around the subject.  That was almost

15   verbatim what he stated.

16   Q.   Danced around the subject?

17          THE COURT:  Your testimony now is that you were not

18   present when Captain Woerth, on I guess the 23rd of April,

19   addressed the TWA MEC?

20          THE WITNESS:  That would be correct, your Honor.  I

21   was not there when he addressed the MEC.

22          THE COURT:  All right.

23   Q.   Well, do you recall seeing around the same time an

24   information update out of Council 3.  I am going to show you

25   what  is premarked as D 25.  It is not yet in evidence.

```
 1            THE COURT:  Okay.

 2   Q.   Do you recall seeing that document back in May of 2001?

 3   A.   No, I don't recall it.   I don't recall this at all.   It

 4   would be not unusual for a Council 2 rep not to see a Council

 5   3 document.

 6   Q.   Thank you.  Do you recall the members of the MEC being

 7   enthusiastic in April about the fact that Captain Woerth was

 8   meeting with the APA?

 9   A.   I do not recall him being enthusiastic, no.

10   Q.   You don't recall people saying they thought it was good

11   that Captain Woerth was using his stature and his influence

12   to lobby the American pilots on behalf of the TWA pilots?

13   A.   To the best of my recollection, it was somewhat of a

14   surprise when we found out at a later date that Captain

15   Woerth went down there.

16   Q.   So you don't recall people saying that one of the

17   things, one of the valuable things he could do, given his

18   stature in the industry, was to try to persuade the American

19   pilots to treat the TWA pilots fairly?

20   A.   I don't recall that, no.

21   Q.   Did you think, did you personally think it was a bad

22   thing for him to keep an open line of communication with the

23   American pilots and to try to persuade them that they should

24   treat the TWA pilots fairly?

25   A.   I was skeptical of what Captain Woerth was doing down
```

Hollander-cross/Fram                                                    201

 1    there.  That is the best answer I can give.

 2    Q.    Why were you skeptical?  Why did you think it might hurt

 3    or could hurt the TWA pilots for him to be talking to the

 4    American pilots and saying, guys, you are going to be working

 5    in the same cockpits, these people will be your brothers in

 6    the new company.  Treat them fairly so that there are no ill

 7    feelings going forward after TWA is consolidated into

 8    American?

 9    A.    I guess the best answer I can give to you that is that I

10    would have been a little happier if I was invited to go there

11    or other MEC members or officers were joining Mr. Woerth in

12    such supposed conversation.

13    Q.    So you thought that this was about you, in the sense of

14    you being involved and you looking like you were contributing

15    to the process?

16    A.    No. It was not about Howard Hollander.  It was about

17    someone verifying what was said and someone of the TWA body

18    being  in the same room at the same time that can confirm

19    that is what he was there for and that is what he was saying.

20    Q.    You didn't trust Captain Woerth to communicate on behalf

21    of the TWA pilots?

22    A.    I definitely had a distrust with Captain Woerth, yes.

23    Q.    And what factual basis, if any, did you have in April of

24    2001 to distrust the president of ALPA in terms of looking

25    out for the best interest of the TWA pilots?

1    A.   I won't say that I won't say that it was a single think

2    but I say most certainly before after that April 2 meeting

3    when I heard what advisors had said, I lost a lot of faith in

4    ALPA as an organization and its individual employees.

5    Q.   All right.  So you are saying that you thought as of

6    April 2 that you could no longer trust Captain Woerth.  Yeah?

7    A.   I am saying after April 2.  I had very little confidence

8    and trust in ALPA, period.  Not just Duane Woerth.

9    Q.   D 42 is a memorandum dated --

10             THE COURT:  Are you offering 25 in evidence?

11             MR. FRAM:  25, he said he didn't recall, your

12   Honor, no.

13             THE COURT:  Just for identification.

14             MR. FRAM:  Yes.

15   Q.   Do you recognize D 42 as a memo that Mr. Wilder

16   circulated to the TWA Master Executive Council on May 7,

17   2001?

18   A.   I recognize that.

19             MR. FRAM:  I move D 42 in evidence, your Honor.

20             MR. PRESS:  I am sure it is in evidence as a

21   plaintiff's exhibit or joint exhibit.

22             MR. JACOBSON:  No objection.

23             MR. FRAM:  I wasn't recalling it was.

24             THE COURT:  D 42 is the, D is a D exhibit.

25             MR. PRESS:  I know the same evidence is in evidence

 1    -- it is different memo.  I am sorry.

 2              MR. FRAM:  May 7.

 3              MR. PRESS:  I am sorry.

 4              MR. JACOBSON:  Your Honor, this document has

 5    several documents stapled together.  We don't have a problem

 6    with the Wilder portion.

 7              MR. FRAM:  Pardon me?

 8              THE COURT:  What I have right in front of me that

 9    is marked D 42, although it says page 1 of 5, I have only two

10    pages.

11              MR. JACOBSON:  We have no objection to those two

12    pages.

13              MR. FRAM:  We understood there was an issue with

14    the last three, so I have taken them off.

15              THE COURT:  As long as it is understood that I am

16    admitting only the first two pages of D 42, I will admit it.

17              MR. JACOBSON:  No objection.

18              MR. FRAM:  Thank you.

19              THE COURT:  As Mr. Jacobson said, no objection.

20    Okay.

21    Q.   The D 42 you have has two pages, correct?

22    A.   I see it.

23    Q.   Let's bring it up and look at the first paragraph.

24    A.   Individual pilots have expressed interest in retaining

25    counsel who would be asked to represent the TWA pilot groups

1    in litigation against APA, AA, and perhaps ALPA, if ongoing

2    seniority integration efforts are unsuccessful in obtaining a

3    fair and equitable seniority list to become effective after

4    the operational integration.

5    Q.   All right.  So people within the TWA pilot ranks are

6    already talking in May of 2001 about suing ALPA if seniority

7    integration doesn't work out to their satisfaction, right?

8    A.   I was not aware of anybody, but that is what this

9    particular document references.

10   Q.   Mr. Hollander, weren't you one of the people who was

11   pressing to pursue litigation against ALPA as early as May of

12   2001?

13   A.   No, I was not.

14   Q.   Well, then who within the MEC was.  What if anything,

15   and if you don't know, just say you don't know, but what

16   communications with the MEC led Mr. Wilder to write a memo,,

17   a written document, where he talked about possible litigation

18   against ALPA as as early as May of 2001.  Who was behind

19   that?

20   A.   I couldn't tell you.  I really don't know.

21   Q.   No idea?

22   A.   No idea.

23   Q.   All right.  You and Mr. Case were involved in a recall

24   effort in Council 2 with respect to Mr. Singer, right?

25   A.   That is correct.

```
 1    Q.   What happened is you went back and Mr. Case went back to

 2    the Council 2 pilots and criticized for Mr. Singer for being

 3    too soft in connection with the waiver of scope issue.

 4    Right?

 5    A.   I wouldn't characterize it like that.

 6    Q.   Well, why don't you tell us how you would characterize

 7    it?  What criticisms were leveled at Mr. Singer because of

 8    the way he had voted on April 2 of 2001?

 9    A.   I am not sure any criticisms were specifically labeled.

10    We reported in some form how the vote went.

11    A.   I  can't remember if it was in paper form.  Obviously,

12    the Council 2 pilots had a right to know what was published

13    and how everybody note voted and I think it was questions

14    from Council 2 pilots as to why David Singer voted the way he

15    the bay he voted and the best way to answer that is to ask

16    David Singer.

17    Q.   Was Mr. Singer criticized for being too concessionary?

18    A.   Mr. Singer may or may not have been criticized by the

19    pilot of New York but that would be a question for them.

20    Q.   You were the chairman of Council 2, right?

21    A.   I was.

22    Q.   You heard what the pilots had to say?

23    A.   I did.

24    Q.   You heard what Mr. Case had to say, yes?

25    A.   Sometimes, yes.
```

```
 1  Q.   Mr. Did Mr. Case criticize Mr. Singer for being too
 2  concessionary?
 3  A.   If he did, it was not in my presence.
 4  Q.   D 17 is in evidence, is a set of the minutes from
 5  Council 2 meeting on June 26, 2001.  Yes?
 6  A.   Regular meeting of the, a regular meeting.
 7  Q.   You don't have to say it out loud.  Review it for
 8  yourself and confirm that you recognize the minutes.
 9          THE COURT:  Which document is that?
10          MR. FRAM:  D 17, your Honor.
11          THE COURT:  That is in evidence.
12          MR. FRAM:  Yes.
13  Q.   Do you recall being at that meeting?
14  A.   I obviously was at the meeting, yes.
15  Q.   Do you recall being at the meeting, sir?
16  A.   I recall being at this meeting, yes.
17  Q.   Page 5 of the document, please.  Did you see the middle
18  paragraph, Ted Case stated his recollection of events
19  differed somewhat.
20  A.   I see the paragraph, yes.
21  Q.   And then skipping a couple lines to move this along.
22  Fifth line says, Compton scrambled with the American
23  transaction during the late days of the negotiations.
24  Concession history was relative to today's situation, is a
25  behavior pattern, can't afford concessionary behavior with
```

```
1    seniority integration.  Clarification on Section 1113 issue,

2    Roland Wilder had given the MEC a strategic legal plan to

3    enhance our bargaining position leading up to the 1113

4    hearing.  Mr. Case held up copies of proposed court filings.

5    MEC voted to not follow Wilder's legal advice, with the

6    exception of one voting member, pointed to seat where

7    Hollander was earlier sitting.

8                Do you see that?

9    A.   I  see that.

10   Q.   We will never know whether or not not following -- we

11   will never know whether or not following that advice would

12   have benefited us with the integration.  Yes?

13   A.   I see what the says, yes.

14   Q.   So what case did at the meeting was to hold up the

15   lawsuit that Wilder prepared, and highlight the fact that you

16   had voted against waiving scope, and wanted to follow up with

17   what Wilder said but that Singer hadn't, right?

18   A.   He obviously pointed out the document and I don't know

19   that he pointed out my vote here but that is what this

20   paragraph says.

21   Q.   It says here that the MEC voted not to follow Wilder's

22   legal advice with the exception of one voting member, and

23   there he pointed to the seat where you had earlier been

24   sitting.

25   A.   That would be correct.
```

1   Q.   We highlighted the correction that you voted not to

2   waive scope and Singer and others voted to waive scope.  Yes?

3   A.   I guess you can conclude that from that, without being

4   there then years later it was like I was in favor of

5   following Roland Wilder's legal advice.  The word scope

6   doesn't appear in this paragraph.

7   Q.   So the end result of this was that Singer got recalled,

8   right?

9   A.   Singer eventually did get recalled by the pilots of

10  Council 2, that's correct.

11  Q.   He got recalled within a matter of months after this

12  meeting, right?

13  A.   I don't remember the month that he got recalled but he

14  did get recalled.

15  Q.   A resolution was passed at this meeting for him to be

16  recalled, yes?

17  A.   See.

18  Q.   Right back to page 5 at the bottom.  Bud Bensel, more

19  discussion on timing issue and signal being passed?

20  A.   Resolution passed.  A resolution was as passed at this

21  meeting, yes.

22  Q.   Now, you testified this morning that there was never a

23  point in time where the American pilots highlighted the fact,

24  or claimed that TWA was a failure, and that because TWA was a

25  failure, the TWA pilots deserved less seniority.  Yes.  That

1    was your testimony?

2    A.    That was my testimony?

3    Q.    Well, let me take this.  Do you recognize J 323 as a

4    letter from the chairperson of the American Airlines merger

5    committee, a fellow named Ed White?

6    A.    I am sorry.  Did you hand me the wrong thing?  This is

7    from Mike Day

8    Q.    Let me see.

9          (Off-the-record discussion)

10   Q.    No, it is to Mike Day.  It is a letter, July 18, 2001, a

11   letter to Mike Day?

12   A.    A letter to Mike Day, okay.

13   Q.    You see at the end it is signed by Ed White.  Edwin

14   White, the chair of the APA mergers mergers and acquisitions

15   committee?

16              THE COURT:  What document is that?

17              MR. FRAM:  J 323.

18   A.    I see at the end signed by Ed White.

19   Q.    Did you see that document during the summer of 2001 when

20   the merger negotiations were ongoing with the American

21   pilots?

22   A.    I really can't recall.

23              THE COURT:  That 323 is not in evidence.

24              MR. FRAM:  Correct, your Honor.

25              THE COURT:  Are you offering it?

Hollander-cross/Fram                                      210

1              MR. FRAM:  I am not sure the witness has said he

2     saw it.  I may have to do it with another witness.

3     A.   I don't recall seeing this document.

4     Q.   Let's set it aside.

5     Q.   We talked this morning about your efforts to pursue the

6     bond amendment.  Do you recall that?

7     A.   I do recall that, yes.

8     Q.   You said you went and lobbied a number of senators?

9     A.   I did.

10    Q.   Did you lobby anybody other than senators, did you lobby

11    Congressmen?

12    A.   I did see a few Congressmen, more senators than

13    congressmen.

14    Q.   The Bond Amendment was passed unanimously by the Senate,

15    right?

16    A.   Eventually, it was.

17    Q.   You do not know factually what ALPA did or did not do to

18    press the senators to pass it, correct?

19    A.   I  have no inside information as to what ALPA may or may

20    not have done.

21    Q.   What was the reaction of American Airlines to the Bond

22    legislation?

23    A.   My recollection is they were not in favor of it.

24    Q.   They were pretty adamant that they thought it was a bad

25    idea.  Yes?

1    A.   I can't speak for American Airlines, but I know the

2    Allied Pilots Association didn't like the idea.

3    Q.   Is it fair to say the Allied Pilots were ballistic about

4    the Bond bill?

5    A.   I wouldn't say characterize it as ballistic.  I would

6    say they were not in favor of it.   They saw it as something

7    TWA was doing to try to again reach a fair and equitable

8    seniority integration.

9    Q.   Well, wasn't their position that the TWA pilots had

10   agreed on April 2 of 2001 to give up the right to seniority

11   arbitration, and that what the TWA pilots were now trying to

12   do was go around the back door and have Congress change the

13   deal that had been agreed to on April 2?

14   A.   I can't speak for the APA, if that is what you are

15   asking me to do.

16   Q.   I am asking you to tell us what you recall, if anything,

17   about the positions being taken by the American pilots.  If

18   you don't recall, say you don't recall?

19   A.   I recall basically that they were not in favor of our

20   actions.  That is all I can tell you.

21   Q.   The Bond amendment was an amendment that would have

22   applied to only one transaction, the American, TWA

23   transaction, correct?

24   A.   I don't have the wording in front of me.  I don't know

25   if it is specific to TWA, but certainly we wanted to include

Hollander-cross/Fram                                           212

1    it in our transaction, yes.

2    Q.    Do you recall being aware back in 2001 that the Bond

3    bill would only apply to the American TWA transaction?    If

4    you don't recall, just say so, we will move on.

5    A.    Then I will say I don't recall.

6    Q.    Do you recall Jeff Brundage, do you know who Jeff

7    Brundage was?

8    A.    I know who Jeff Brundage was.

9    Q.    Who is Jeff Brundage?

10   A.    I believe his position was vice president or vice

11   chairman of labor relations at American Airlines.

12   Q.    He was a top manager at American Airlines?

13   A.    I would agree with that.

14   Q.    He had front line responsibility for dealing with the

15   seniority integration issue, correct?

16   A.    I would agree to that.

17   Q.    What position did Jess Brundage take with respect to the

18   Bond Amendment?

19   A.    I have no recollection of him having a position with it.

20   Q.    Do you recall being present at a special meeting of the

21   MEC on October 20 to 22 of 2001?

22   A.    I  was definitely there for the beginning of the

23   meeting.

24   Q.    Okay.  Were you there for the part of the meeting where

25   Mr. Brundage got on the phone and said that the Bond bill

 1   passed, that ham would close TWA LLC and all the TWA pilots

 2   would lose their jobs?

 3   A.   I don't recall him saying that, no.

 4   Q.   Turn, please, in the document I just gave you, D 88, to

 5   page 9 of 16.

 6   A.   Okay, I am on page 9.

 7   Q.   It begins, in the very top, 15 04.  Discussion with Jeff

 8   Brundage.  Brundage said there was some options.  If there

 9   wasn't an agreement, things would remain status quo.  AMR has

10   tentative language.

11        Then the third line, Brundage stated Don Carty told

12   Senator Bond if the bill passed he would shut down TWA LLC.

13   AMR made a commitment to its employees, right or wrong.  AMR

14   employees can't fathom an arbitrated seniority list.  Do you

15   see that.

16   A.   I see that.

17   Q.   Does that refresh your memory that American was taking

18   the position that if the Bond bill passed, it would close

19   down TWA LLC?

20   A.   It is here and it is stated, but I just can't recall it

21   being said.  What I can recall being said is Don Carty had

22   actually gone and visited with Senator Bond in his office and

23   the quote that day was, let's hold the phone here, my pilots

24   have a deal, the TWA pilots are going too low.  In other

25   words, the impression from the Senator's mouth to us, not me

1    personally, delivered in front of seven people --

2    Q.    If you weren't personally there, we really don't want to

3    hear it.

4    A.    I was there with 7 other witnesses, Senator Bond told us

5    in his office, with his staff and seven other TWA pilots,

6    that Don Carty had just left his office and that the TWA

7    pilots are going to love -- well, quote was, APA has a deal

8    that the TWA pilots are going to love.  End quote..

9    Q.    Sir, that was a meeting that took place before October

10   21, 22, correct?

11   A.    Just before, yes.

12   Q.    And Brundage put you squarely on notice at this meeting

13   that if the Bond bill passed, that you all were going to lose

14   your jobs, right?

15   A.    If that is what he said, then that is what he said.

16   Q.    Okay.  And did you and other members the MEC continue to

17   lobby for the Bond bill in the face of what Carty told you,

18   or what Carty communicated from Brundage?

19   A.    We continued to lobby, yes.

20   Q.    So do you basically thumb your nose at the president of

21   American Airlines?

22   A.    I saw no future for either myself or fellow TWA pilots

23   if there was no reasonable seniority agreement.  In other

24   words, Out of business, out of work is out of business and

25   out of work.

1    Q.    So you thought having no job was better than having a

2    job where you were a little bit lower down seniority list?

3    A.    I didn't know where I was going to be exactly on the

4    seniority list.  No job is still no paycheck, is no paycheck.

5    Welfare is welfare.  It is what it is.

6    Q.    So was no job better than a job with lower seniority?

7    A.    A job with lower seniority would be better than no job,

8    if that is what you are looking to see.

9    Q.    So if that is the case, why did you continue to push for

10   the Bond bill in the face of what Carty had communicated?

11   A.    Well, this was not Mr. Carty.  This is Mr. Brundage

12   communicating.

13   Q.    Mr. Brundage was communicating Mr. Carty's position,

14   yes?

15   Q.    Yes?

16   A.    Yes.

17   Q.    Okay.  Now, you testified about some things that

18   happened on on October 31.  There was some kind of resolution

19   passed that was an attempt to prevent a two-member MEC from

20   taking action?

21   A.    That's correct.

22   Q.    And the action that you wanted to stop was what?

23   A.    I wanted to -- let me rephrase.  It wasn't a stop.  I

24   wanted to -- I had concerns about, in the interim, of a two-

25   man MEC as opposed to a four-voting member, five member

 1    voting MEC, I had concerns about the subject of integration

 2    coming up.

 3    Q.    There were proposals being made by American and the APA

 4    to resolve the issue of seniority integration.  Correct?

 5    A.    I know of no proposal.  As a matter of fact, the last

 6    proposal that I know of was at the recommendation of Mr.

 7    Roland Wilder on, our merger attorney, in October at the

 8    Mayflower hotel, when what was now Supplement CC was put in

 9    front of the merger committee and we voted not to accept it,

10    it was Mr. Wilder's advice to the MEC not to walk away from

11    the negotiations, but to return some sort of a proposal,

12    which I understood we did.

13           But the APA members had left Washington and just

14    said we are done and went home.  His legal advice was we

15    would be the party to be seen as never walking away from the

16    negotiations.

17    Q.    Was there a seniority integration proposal on the table

18    on October 31 of 2001 or not?

19    A.    Not that I -- you have to restate the question.  You

20    mean something different than October 22?

21    Q.    Take a step back.  Was there a seniority integration

22    proposal on the table on October 22?

23    A.    There was a seniority integration.

24           THE COURT:  Prepared by whom?

25           THE WITNESS:  To the best of my knowledge, Mike Day

Hollander-cross/Fram                                            217

1    came into the committee and it was a prepared document from

2    the APA.  From American Airlines to our committee and he

3    brought it into the room.

4    Q.   And there are people when the MEC who wanted to accept

5    that seniority integration proposal, right?

6    A.   There was at least one.

7    Q.   There were people, who do you say the one was?

8    A.   The one person I recall that wanted to accept the

9    integration was Captain Rautenberg.

10   Q.   Didn't Mike Day also want to accept the proposal?

11   A.   Mike Day's recommendation was that he thought this was

12   the best that they could achieve.  I don't recall Mike Day

13   saying go ahead, take this.  But he said this was the best.

14   Q.   We will come back to that in  a  minute.  Is it fair to

15   say that as of late October there were people within the MEC

16   who wanted to take the deal, the best deal they could get,

17   from American and the APA and move on?

18   A.   I would say there was at least one person.

19   Q.   Other people within the MEC didn't want to accept the

20   deal?

21   A.   I would say that's correct.

22   Q.   Okay.  And what was the strategy of the people who were

23   saying let's not take the deal.  What did you expect to

24   happen?

25            Let me take a step back.  You were among the people

1    who thought it was a bad idea to accept a seniority

2    integration proposal.  Right?

3    A.   I was one of the people who thought the seniority

4    proposal in front of me was not fair and equitable.

5    Q.   So you were in favor of rejecting it, yes?

6    A.   I was.

7    Q.   What did you think was going to happen with respect to

8    the issue of seniority integration if there was no agreement

9    between the TWA pilots and the American and the APA?

10   A.   I imagined two things going forward.  I imagined one,

11   they would just enforce what they proposed and two, we would

12   be able to go forward with a litigation strategy developed by

13   Roland Wilder.

14   Q.   The litigation strategy was to sue American and the APA?

15   A.   I believe that's correct.

16   Q.   You said this morning ALPA didn't do anything to try to

17   enforce the best efforts letter that American had signed.  Do

18   you recall that?

19   A.   I do.

20   Q.   In fact, ALPA filed a grievance against American,

21   claiming that American had not used its best efforts to get

22   the APA to agree to fair and equitable seniority integration,

23   right?

24   A.   There was a grievance filed.

25   Q.   And there was an arbitration hearing, right?

Hollander-cross/Fram                                                  219

1    A.    There was.

2    Q.    What did the arbitrator find with respect to the

3    allegation, the claim, that American had not used its best

4    efforts?

5    A.    I believe he ruled in favor of American Airlines.

6    Q.    He rejected it, right?  He said that American had in

7    fact fulfilled its promise to the TWA employees, right?

8    A.    That was, I believe, his ruling, yeah.

9    Q.    With respect to Roland Wilder's suggestion that a

10   lawsuit should be filed against American Airlines, other

11   advisors disagreed about that, right?

12   A.    That's right.

13   Q.    The ALPA advisors said you can't do.  We can't file

14   suit.  The TWA pilots can't file suit against a union that

15   doesn't represent them, right?

16   A.    I don't recall their exact words, no.

17   Q.    Okay.  Well, what did Wilder say about the legal basis,

18   if any, to file suit against the APA, or was this another one

19   of Wilder's arguments that we should just file a lawsuit to

20   upset people or upset the apple cart?

21   A.    I can't recall the exact words.  I just know that Mr.

22   Wilder had developed a plan and he had discussed it

23   personally and generally that he thought his litigation

24   strategy would gain the TWA pilots leverage.  That is all I

25   can recall.

1    Q.    You had Wilder on one side saying I have this litigation

2    strategy.  I want to sue the APA.  You have ALPA people on

3    the other side saying you can't do that.  There is no legal

4    basis for it, yes?

5    A.    Pretty much so, yes.

6    Q.    How did you, a nonlawyer, decide between the strategies.

7    How did you come to conclude that Wilder had the better of

8    the argument about whether there was merit to this?

9    A.    I think there were two things there.  First I had a

10   distrust for the ALPA advisors and I had more faith in Roland

11   Wilder.  I think that was one very, very considerable thing

12   in my decision making.

13   Q.    Was there anything else?

14   A.    Not really.  Just what was proposed from Mike Day, what

15   Mike Day had brought forth from his meetings with the Allied

16   Pilots Association was an unacceptable seniority integration

17   and you I put those two together.

18   Q.    Well, do you recall the advisors telling you that you

19   will be better off if you have a deal, even if it is not the

20   best deal, but you are better having a deal that you signed

21   onto than not having a deal?

22   A.    I don't recall, no.

23   Q.    Do you recall them telling you that if you sign off on a

24   deal that American and the APA won't be able to change it.

25   Do you recall that as a concern?

1    A.   I do not.

2    Q.   Were you here yesterday when Mr. Wilder's videotape

3    testimony was played, and he talked about how a three-party

4    agreement was better than a two-party agreement?

5    A.   I was in and out of the room yesterday, but I don't

6    recall his specific mentioning that line.

7    Q.   Did you understand in the case of a cram-down where

8    American and the APA say this is the deal, that they could

9    come back a month later, if circumstances changed, and say we

10   want to change the deal.  We want to give the TWA pilots less

11   seniority, or take away from benefit.  Did anybody explain

12   that to you?

13   A.   No one explained that to me, no.

14   Q.   So you didn't understand that by having it be a three-

15   party deal, that the TWA pilots signed on to, that American

16   and the APA would be locked in, that they couldn't come back

17   a month or two or six months later and try to change the

18   deal?

19   A.   No, I don't recall that, no.

20        MR. FRAM:  That is all I have, your Honor.  Thank

21   you very much.

22        THE COURT:  Okay.  Mr. Jacobson.

23        MR. JACOBSON:  No redirect, your Honor.  We have no

24   redirect.

25        THE COURT:  No redirect.  He is complete for the

```
 1    day.

 2              MR. JACOBSON:  He is done.

 3              THE COURT:  Complete, period.

 4              MR. JACOBSON:  Yes, your Honor.

 5              THE COURT:  Thank you very much, Captain Hollander.

 6    A.   First Officer Hollander.  Not until next week, Judge.

 7              THE COURT:  Okay.

 8    A.   I know you like the record accurate.

 9              THE COURT:  I am going to give you credit for being

10    a captain even now.

11              THE WITNESS:  Thank you, your Honor.

12              THE COURT:  You once were a captain.  You get to

13    keep the highest rank you ever had.

14              THE WITNESS:  I can't wait.

15              But thank you, your Honor.

16              THE COURT:  Okay.  Ladies and gentlemen of the

17    jury, that is it for today.  We will see you without a fire

18    drill tomorrow at 8:30.

19              Have a safe trip home.  Have a safe trip back.  Do

20    not discuss the case among yourselves.  Do not discuss the

21    case with your family, friends, loved ones.  Keep an open

22    mind until you have heard all the evidence.  Again my

23    continued thanks to a wonderful jury, and all rise when the

24    jury leaves.

25              (Jury leaves the courtroom)
```

1          THE COURT:  Counsel, give me a picture for

2    tomorrow.  We don't have to do it on the record.

3               (Off-the-record discussion).

4          Adjourned at 2:15 p.m.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    I N D E X.

4

5         HOWARD HOLLANDER, RESUMES.

6              DIRECT EXAMINATION          P. 10.

7              CROSS EXAMINATION           P. 131

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25