1

2                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT OF NEW JERSEY
3                    CIVIL 02-2917  (JEI)

4        PATRICK BRADY, SALLY YOUNG,
         HOWARD HOLLANDER, THEODORE CASE,
5        AND MICHAEL FINUCAN, individually
         and on behalf of all others
6        similarly situated,
                          Plaintiffs,
7                                           VOLUME 7
              V.                            TRIAL TRANSCRIPT
8
         AIR LINE PILOTS ASSOCIATION,
9
                     Defendant.
10
                             CAMDEN, NEW JERSEY
11                           JUNE  16, 2011

12       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
13
                      A P P E A R A N C E S:
14
              TRUJILLO, RODRIGUEZ & RICHARD
15            BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
16                 AND
              GREEN JACOBSON, P.C.
17            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
              AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
18            For the Plaintiffs.

19            ARCHER GREINER
              BY:  STEVEN FRAM, ESQ.
20                  AND
              KATZ & RANZMAN
21            BY:  DANIEL M. KATZ, ESQ.
              FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
22
              ELIZABETH GINSBERG, ESQ.
23            IN-HOUSE COUNSEL FOR ALPA.

24

25

1

2          Pursuant to Section 753 Title 28 United States
3    Code,  the following transcript is certified to be an
     accurate record as taken stenographically in the
4    above-entitled proceedings.

5                        S/   LYNNE JOHNSON

6                        Lynne Johnson, CSR, CM, CRR
                         Official Court Reporter

7

8

9

10

11               LYNNE JOHNSON, CSR, CM, CRR
                 OFFICIAL COURT REPORTER
12               UNITED STATES DISTRICT COURT
                 P.O. BOX 6822
13               LAWRENCEVILLE, NJ  08648

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.  Everybody  here?  Let's

 2    get going.

 3              (The jury enters the courtroom.)

 4              THE COURT:  Good morning, everybody.   Please be

 5    seated.

 6              The jury is not going to report me to the

 7    government start starting five minutes early.  You are not

 8    going to call up the Chief Justice of the Supreme Court and

 9    say this character started five minutes early.

10              Okay.  Mr.  Press.

11              MR. PRESS:  Thank you, Judge.  Our first witness is

12    a short video clip from Clay Warner's deposition.  And all

13    the objections are resolved, Judge, and we are ready.

14              THE COURT:  Okay.  I left my copy inside.  I didn't

15    realize you were going to do that now.

16              MR. PRESS:  I have an extra one.

17              THE COURT:  I want to keep track so I can read into

18    the record what actually took place.

19              MR. PRESS:  We are not doing everything that is

20    designated here.

21              THE COURT:  But I will keep track myself.  Okay.

22              Ladies and gentlemen, this is a video deposition,

23    you understand it has the same force and effect as the

24    testimony, as if the testimony were given here live in court.

25    It gets no more weight but no less weight than a live witness
```

1    in this Court.

2              MR. PRESS:  This is Clay Warner.  We took his

3    deposition in Washington, DC.

4              THE COURT:  This was 2008.  September 16, 2008.

5              (Videotape of Clay Warner commences).

6              MR. PRESS:  That was it, Judge.

7              THE COURT:  No further --

8              MR. PRESS:  We move for the admission of the email,

9    exhibit number, what is it.

10             THE  COURT:  What number is that?

11             MR. PRESS:  Exhibit P-144.

12             MR. KATZ:  Your Honor, we would ask for a limiting

13   instruction on that email.

14             THE COURT:  Let me look at it.

15             (Pause)

16             MR. KATZ:  It is double or triple hearsay as to

17   whether Duane Woerth said anything to the APA board of

18   directors as was the whole discussion with Clay Warner triple

19   or quadruple hearsay.

20             THE COURT: What about the rest of this email.

21             MR. KATZ:  I don't have in this.

22             THE COURT:  Let's go to sidebar.

23

24

25

```
 1              (At sidebar).

 2              Let me start.  You have an objection in front of

 3    the jury, this is offered not for the truth that Captain

 4    Woerth said this at the APA meetings but only for the

 5    reaction of ALPA when confronted with a question of whether

 6    he said it.

 7              MR. PRESS:  That is perfectly appropriate, Judge.

 8              THE COURT:  There is a paragraph here about a four

 9    by four and a planned business site, and very, very, very

10    upset.  I don't know what that means.

11              MR. PRESS:  It is some pilot blog site.

12              THE COURT:  Can we redact that out?

13              MR. PRESS:  Sure we can.,.

14              MR. KATZ:  He hasn't read that part.  What he has

15    read into the record the part that they are interested in.  I

16    don't see why we need the excerpt.

17              THE COURT:  IF it is admissible, it is admissible.

18    I am going to let it in but with redacting out what looks

19    like a peripheral issue of some kind that has to do with

20    proper use of email sites or bulletin board sites.

21              MR. JACOBSON:  Your Honor, the following sentence

22    is the, if it is true, "I am very, very, very upset."  That

23    sentence standing alone, the immediately following --

24              MR. PRESS: I don't have a problem.

25              THE COURT:  The four by four on the planned
```

```
 1    business cite.

 2              MR. KATZ:  Four X four means --.

 3              THE COURT:  What is he upset about?

 4              MR. JACOBSON:  The comment, the posting.

 5              MR. PRESS:  The post.

 6              THE COURT:  I don't --

 7              MR. KATZ:  We are trying to guess what the poster

 8    had opined.  Perhaps we can do without the exhibit all

 9    together, since they read the key part.

10              MR. FRAM:  The part where it says perhaps this

11    leaves ALPA open to a representation lawsuit.

12              THE COURT:  Yeah, there has been no testimony about

13    that, what that means.  It just sort of stands out there.

14              MR. KATZ:  It is going to be confusing.

15              MS. RODRIGUEZ:  Your Honor.

16              THE COURT:  The bottom part, I have no problem,

17    last paragraph.  And the other part, I would put in.  I mean,

18    I am very, very, very upset is apparently somebody who is --

19    who is saying that.

20              MS. RODRIGUEZ:  That is NEWBYFLYR@OAL.COM..

21              THE COURT:  Who is he or she?

22              MR. KATZ:  We don't know.

23              MR. PRESS:  A pilot.

24              THE COURT:  I am not going to let in effect

25    testimony by an unknown person as to his opinion of the
```

```
1    comment.  I am not going to allow it.  Perhaps.

2              MR. PRESS:  Judge, I don't have a problem with the

3    suggested redaction.

4              THE COURT:  Okay.  I would redact from right here.

5    See.

6              MR. JACOBSON:  Starting immediately above the line,

7    original message down to lawsuit.

8              THE COURT:  Yes.  That is a statement by some, we

9    don't know who is saying it.  I can't let that in evidence.

10   But I will let in evidence the, what effect, I already have,

11   Clay Warner's reaction to an inquiry from a pilot as to, he

12   can say that.

13             And with the limiting instruction to the jury.  But

14   --

15             MR. JACOBSON:  We will redact that.

16             MR. KATZ:  Perhaps you could explain it.

17             THE COURT:  I am not going to say redaction.  They

18   just get it that bay.  I don't want them speculating about

19   what is redacted.  We will black it out.

20             MR. JACOBSON:  I have a black marker in my bag.

21             THE COURT:  Larry.

22             MR. FRAM:  White it out.  Copy over it.

23

24

25
```

```
 1              (Open court)

 2

 3              THE COURT:  Ladies and gentlemen of the jury, first

 4    of all, I want to read the pages from Mr. Warner's deposition

 5    that were read into the record.  Did we take that off my

 6    desk, the Warner deposition?

 7              MR. PRESS:  Wasn't me.

 8              THE COURT:  What date was the Warner deposition?

 9              MR. PRESS:  September 16.

10              THE COURT:  '08.

11              MR. PRESS:  '08.

12              THE COURT:  Okay.  I want to reflect that we

13    replied by videotape page 7, line 9, to page 7, line 18.

14    Page 11, line 6, to page 12, line 11.  And page 125, line 3,

15    to page 1 30, line 21.  That is part of the record, if

16    anybody might be interested.

17              As to P-144, I am admitting it into evidence on the

18    condition that I discussed with you at sidebar.

19              I am instruct being the ladies and gentlemen of the

20    jury that this evidence is offered not to prove that Captain

21    Woerth said anything in particular at the APA meeting:  I am

22    offering -- I am allowing it in only to, as evidence of the

23    reaction of ALPA when a pilot played an inquiry as to Captain

24    Woerth said what he was reported to said.

25              Do you understand the distinction?  It is not proof
```

 1   that he said it.  It is merely proof what the reaction of

 2   ALPA was when confronted with a query as to what he said.

 3   Okay.  You may proceed.

 4            MR. PRESS:  Thank you, your Honor.  We call Sean

 5   Clarke.

 6            SEAN CLARKE, Sworn.

 7            DIRECT EXAMINATION

 8            BY MR. PRESS:

 9   Q.   Mr. Clarke, can you tell the jury where you live, start

10   there?

11   A.   I live in Huntsville, Missouri, just outside of St.

12   Louis.  548 Elm Creek Drive.

13   Q.   What do you do for a living, currently?

14   A.   Currently I own a small landscape and pool installation

15   business.

16   Q.   Before that were you a pilot, professional pilot?

17   A.   Yes, I was.

18   Q.   Let's, you flew for TWA?

19   A.   Yeah, I flew for TWA from 1996 until my furlough in May

20   of 2003.

21   Q.   Let's back up and take the jury through your flying

22   career from the beginning.  I may interrupt you here and

23   there.

24   A.   Okay.  I went to school at the University of Nebraska.

25   They had a flight program there.  Basically got all my

Clarke-direct/Press                                           10

```
 1   ratings.  Flight instructed.  I went to school at night.
 2   Built up my hours.  Started flying freight.  After about a
 3   year and a half of that.
 4   Q.   When was that?
 5   A.   Probably 2000, no, 1994 to '95.  It was a great
 6   schedule.  We started in Gillette, Wyoming, in a little 19-
 7   seat airline, loaded cargo and freight, loaded 1,500 pound of
 8   freight.  Flew to Scott's Bluff, Nebraska, loaded 1,500 more
 9   pounds of freight.  Flew to Denver, off loaded 3,000, loaded
10   3,000, flew to Riverton, Wyoming, offloaded, loaded 3,000
11   pounds of freight, flew back to Denver, flew back to Scott's
12   Bluff, back to Gillette, every night.
13   Q.   That was flying freight?
14   A.   Yes.
15   Q.   What's your next job?
16   A.   I flew for Training States, a commuter airline out of
17   St. Louis.
18   Q.   How long did you do that?
19   A.   Did that for a year.
20   Q.   And then you went to TWA after that?
21   A.   Yeah, then I went to, got hired in TWA in 1996.
22   Q.   What, take us through your TWA career, the planes you
23   flew and your rank?
24   A.   I started as a flight engineer.  That was my first class
25   I had to go to, and become a flight engineer.  Shortly
```

1    thereafter I was a co-pilot on the DC 9.

2            THE COURT:  That is first officer.

3            THE WITNESS:  First officer on the DC 9.  And I

4    moved up to the MD 80, as a first officer.  And then

5    eventually to the 757 and 767 as a first officer.

6    Q.   And where were you based?

7    A.   I was initially first couple of months out of New York

8    and then St. Louis.

9    Q.   And when were you, you said you were laid off, when was

10   that?

11   A.   The end of May of  2003.

12   Q.   Have you been recalled by American Airlines for flying?

13   A.   Yes.  For a July class of this year.

14   Q.   You were just recently recalled?

15   A.   Just called a couple weeks ago.

16   Q.   So you were on furlough for over eight years?

17   A.   Correct.

18   Q.   Mr. Clarke, you are a member of ALPA, right?

19   A.   Correct.

20   Q.   And you did some ALPA work.  Can you take us through the

21   first ALPA position you had?

22   A.   In 1998, the TWA pilots signed a new contract.

23   Basically this recruited or asked for volunteers to work on

24   the grievance committee because, just because you got the

25   contract, until you enforce it, and make sure the company is

Clarke-direct/Press                                    12

1    living by it, it is not going to do you any good so they

2    asked for pilot volunteers to help other pilots learn the

3    contract and to make sure that the company was living up to

4    their side of the deal, basically.

5              So I started on the grievance committee in 1998.

6    And basically our job was to, if a pilot had a problem, he

7    would call us, and we would, now, tell him okay, you know,

8    fly your trip, do whatever, but we will contact the company

9    on your behalf if, if we don't get an answer from them that

10   is satisfactory, then we would start the grievance process

11   which we would just have a meeting with the chief pilot and

12   discuss the, discuss the infraction, and see if we can't get

13   it resolved at that point.

14   Q.   There is a whole process after that if it doesn't get

15   resolved?

16   A.   Yeah, if it doesn't get resolved basically we go do

17   arbitration.  And then we go in front of an arbitrator and we

18   present the pilots case, and the company presents their case,

19   and the arbitrator decides.

20   Q.   And you, were you involved personally in any of those

21   kind of proceedings?

22   A.   Yes.

23   Q.   How long did you do that, grievance work?

24   A.   Basically up until the end.  I did the grievance work

25   until 2001, and then I was elected to the merger committee,

Clarke-direct/Press                                                    13

1    at that point.

2    Q.   Okay.  When were you elected to the merger committee?

3    A.   I was one of the first once.  I think it was in January,

4    2001.

5    Q.   January 2001.  And tell the jury what the merger

6    committees job was?

7    A.   Our job was to negotiate with the American pilots, and

8    try and get seniority, the best possible seniority

9    integration that we could with the American pilots.

10   Q.   When you joined the committee in January, who else was

11   on it?

12   A.   It was myself, Bud, and John Swanson.

13           THE COURT:  Bud is Bud Bensel.

14   A.   Bud Bensel.

15   Q.   Who else?

16   A.   John Swanson.

17   Q.   So initially there were three, did it expand after that?

18   A.   Yeah, then they elected John Hefley, he was a first

19   officer, and Gary floor, who was a captain.

20   Q.   The composition of the committee at that time, were you

21   the most junior pilot?

22   A.   Yes.

23   Q.   Okay.  Now, Captain Bensel, he was the chairman of the

24   committee?

25   A.   Yes.

Clarke-direct/Press                                    14

```
 1    Q.    Initially?

 2    A.    He was elected the chairman.

 3    Q.    And he was replaced at some point.  Can you tell the

 4    jury how that happened and when?

 5    A.    He had health problems, so he was, he had to resign his

 6    position.  I think it was heart problems.

 7              THE COURT:  When?

 8    A.    Mid March, I believe, beginning of March.

 9              THE COURT:  Of 2001.

10    A.    Of 2001.

11    Q.    Who was nominated to replace Captain Bensel?

12    A.    Captain Mike Day.

13    Q.    Okay.  How long, Mr. Clarke, did you serve on the merger

14    committee?

15    A.    Until, pretty much until the end.  Until I resigned.

16    Q.    Did you ever hold any other ALPA offices?

17    A.    After that, I was a local representative.  After.

18    Q.    What do you mean?

19    A.    After, after the American, the after the cram-down,

20    after the American pilots gave us the cram-down there was a

21    large vote in St. Louis to elect new pilot representatives

22    and I was elected.

23    Q.    To be what precisely?

24    A.    A first officer representative out of the St. Louis

25    base.
```

Clarke-direct/Press                                              15

```
 1                THE COURT:  Represent on what?  When they were

 2    merged, eventually ALPA was no longer the bargaining agent.

 3                THE WITNESS:  There was a short time where, between

 4    the --

 5                THE COURT:  When it was still TWA LLC.

 6    A.   Right.  Before they went to a single carrier and before

 7    we were American, they basically --

 8                THE COURT:  You resigned from the merger committee

 9    before that occurred.

10                THE WITNESS:  Correct.

11                THE COURT:  And from that point until they became a

12    single carrier you were on the MEC.

13                THE WITNESS:  Correct.

14                THE COURT:  From St. Louis.

15                THE WITNESS:  Yes.

16                THE COURT:  Council 3.

17                THE WITNESS:  Council 3, yes.

18    Q.   And in mid November of 2001 you were elected to be a

19    first officer rep in St. Louis?

20    A.   Yes.

21    Q.   On the MEC?

22    A.   Yes, I was.

23    Q.   Are there any other ALPA positions you have held?

24    A.   I was the grievance chairman at some point, after I

25    joined the grievance committee and I was on the grievance
```

1    committee for I think a year then.  I was eventually elected

2    to be the grievance chairman.

3    Q.    Anything else?

4    A.    That is it.

5    Q.    Mr. Clarke, we are going to talk about your merger

6    committee work primarily.  That committee was formed in

7    January, 2001, to negotiate seniority with the American

8    pilots?

9    A.    That's correct.

10   Q.    And you were, were you involved in that?

11   A.    Yes.

12   Q.    When you went in to the process, when the process

13   started, what was your expectation, Mr. Clarke, as to what

14   sort of seniority integration you could achieve?

15   A.    Well, we did a lot of research and a lot of studying

16   before we even came up with that, but the basic premise was

17   always starts with date of hire.  Because that is, in an

18   airline career of the pie pilot, that is your ticket.

19          THE COURT:  Is that what you wanted or what you

20   expected.

21          THE WITNESS:  Both.

22   A.    We fully expected date of hire, with conditions and

23   restrictions.

24   Q.    Can you explain what that means?  First of all, can you

25   explain what date of hire means, just so it is clear?

1   A.   I was hired September 5 of 1996.  And basically there

2   are 20, I believe 20 guys hired in my class, so they also had

3   a class, the 25 of September.  Well, I was senior to those

4   guys because, and basically I always got to bid ahead of them

5   so if a new opening came open for a larger airplane to bid

6   for a first officers receipt, then I would be able to bid

7   that seat first which means more money, possibly better

8   schedules, all of that, vacation time.  Everything, for a

9   pilot is his seniority, and that seniority, almost 100

10  percent of the time, is based on what day you were hired at

11  that airline.

12  Q.   So in a straight date of hire integration, would you

13  have been slotted on to the American list with other

14  September 5, 1995 hires?

15  A.   '96.

16  Q.   '96 hires?

17  A.   Yes.

18  Q.   Okay.  That what is that means, date of hire?

19  A.   Correct.

20  Q.   Then you said you expected perhaps some restrictions and

21  conditions.  Can you explain what that means?

22  A.   Yeah.  When we started the process, just as an example,

23  TWA did not have triple  sevens, 777 flying, so it wasn't

24  probably our expectation at the time of the merger that TWA

25  pilots would fly triple sevens any time in the near future

Clarke-direct/Press                                                  18

1    because we did not have that airplane and we knew that the

2    American pilots were, that they were very protective of that

3    flying because it is higher pay, better schedules, longer

4    flights, all of that.

5           So what you can do is basically just say, hey, we

6    will do a date of hire seniority, but we will restrict

7    ourselves off of triple seven flying.  We don't want to fly

8    that airplane for a certain amount of time because we realize

9    that we didn't have triple sevens at that time.

10          And you know, we did not have a base in Dallas, and

11   they do.  So they would not want us to all of a sudden if,

12   come in and bid ahead of their guys that may have worked for

13   American, that had the expectation to fly out of Dallas, that

14   we wouldn't be able to come in to their base right away and

15   fly out of Dallas.

16   Q.   So those are conditions and restrictions?

17   A.   Yeah.

18   Q.   Okay.  Now, this expectation after date of hire

19   integration, Mr. Clarke -- let me back up.

20          What was the first significant thing the merger

21   committee did once it was formed, as you can recall.

22   A.   The first thing we did was we went to Herndon where ALPA

23   National is, at a committee to basically meet with our new

24   merger council as well merger counsel, as well as some of the

25   ALPA represents reps or ALPA advisors.

Clarke-direct/Press                                          19

1    Q.   When was that meeting, Mr. Clarke?

2    A.   Towards the end of January, 2001.

3    Q.   Did the whole committee go down to Herndon?

4    A.   Yes.

5    Q.   And you mentioned you met with your merger counsel, that

6    would be?

7    A.   Roland Wilder.

8    Q.   Who at ALPA, ALPA employees, who was there at the

9    meeting?

10   A.   Bob Christy was there.  Clay Warner, was in and out.

11   Those are the two primary once that I remember being there.

12   Q.   And what was the point of these meetings?  What was the

13   purpose?

14   A.   Well, just kind of give us, you know, the lay of the

15   land.  It was the first seniority merger, you know, that we

16   had been through.  So it was, or not we, that I myself had

17   been through.  So kind of to be sort of a training session, I

18   guess.

19   Q.   How many days did the meeting last, if you remember?

20   A.   I think we were down there for three or four days and

21   then he may have went back also.

22   Q.   Mr. Clarke, this notion that you expected a date of hire

23   integration, was that discussed in these meetings with Mr.

24   Christie or Mr. Warner?

25   A.   Yeah.  Yeah.

Clarke-direct/Press                                          20

1   Q.   What was discussed about that?

2   A.   Well, I mean it was just talking about, you know, our

3   expectations, what we expected to negotiate for, and what our

4   expectations were.  We felt we could get that done with

5   conditions and restrictions.

6   Q.   Did either Mr. Christie or Mr. Warner say anything along

7   the lines, well, that is just pie in the sky, that is

8   unrealistic?

9   A.   No.

10  Q.   Anything like that?

11  A.   No.  There was more, it was more, okay, yeah.

12  Q.   Now, Mr. Wilder, he gave you a warning during those

13  meetings, didn't he?

14  A.   Yes.

15  Q.   What was his warning?

16  A.   Well, it is kind of funny because you know at the time

17  America had just bought TWA and we were kind of, of course we

18  were happy about that.

19          THE COURT:  It hadn't closed yet in January,

20  though.  They just had signed the agreement to do it in the

21  future.

22          THE WITNESS:  Correct, yeah.

23          THE COURT:  All right.

24  A.   Obviously we were happy about the upcoming portion of

25  America buying TWA, and you know, we felt that, you know, we

 1   were pretty confident that we could secure the date of hire

 2   with the conditions and restrictions, and Roland Wilder

 3   basically kind of told us that we were in for a huge, huge,

 4   huge fight, and it kind of, you know, pushed me -- I was like

 5   whoa, you know, this is not supposed to be that difficult.

 6   Date of hire is date of hire.  That is the standard, the

 7   norm, and he basically was setting us up to realize that this

 8   wasn't going to be a very fun fight.

 9   Q.   Wasn't going to be so easy getting the date of hire?

10   A.   Wasn't going to be easy, yeah.

11   Q.   Moving forward, you leave Herndon.  What happened in

12   February of 2001 with your merger committee?

13   A.   We had meetings between each other.  We met with the

14   American pilots for dinner one night.

15   Q.   When you say you met with the American pilots, they had

16   a committee constituted similar to yours, right?

17   A.   Correct.

18   Q.   It wasn't just one person?

19   A.   Yeah.

20   Q.   How many folks were on their committee?

21   A.   Kind of guessing but probably around seven.

22   Q.   All right.  Who headed their committee??

23   A.   Ed White, Captain Ed White.

24   Q.   Like your committee was comprised of pilots?

25   A.   Yes.

Clarke-direct/Press                                          22

1   Q.   So the meetings in February that you had with the

2   American merger committee, can you tell us anything of

3   substance that happened?

4   A.   Well, we had dinner, and you know, trying to read each

5   other, and see how everybody, what, you know, informal

6   discussions, and then we had a meeting later on and we

7   basically went into a big conference room and we sat on one

8   side of the table and they sat on the other side of the

9   table, and at that time Captain Bensel was our lead guy, so

10  he gave his introduction and his speech to the American

11  pilots and Ed White, the chairman of the APA's committee gave

12  his speech and as the talks kind of progressed, it was

13  apparent to the APA that we were going to be going for date

14  of hire with conditions and restrictions.

15          At that point, Captain White from the APA basically

16  lifted up his American Airlines ID and told us that, see

17  this?  This is an American Airlines date of hire.  You don't

18  have that.  You don't have a date of hire at American

19  Airlines.  You were acquired by American Airlines.  See that

20  guy, pointing to his committee, these guys have American

21  Airlines date of hire.  You don't have that.

22  Q.   So the fight is on?

23  A.   So the fight was on.  Yeah.  The fight was on.

24  Q.   What, if anything, at that point in time -- let's be

25  clear, where are we in time when this is happening?

1    A.    That was St. Louis.

2    Q.    But what, February, March?

3    A.    Yeah, I believe that was like the beginning of March,

4    probably the first week in March.

5    Q.    Okay.  Did they make a proposal at that time?

6          THE COURT:  They, who?

7          MR. PRESS:  Thank you, Judge.

8    Q.    The American pilot committee, did they make any sort of

9    proposal?

10   A.    It was pretty much intimated that there was going to be

11   a rather, they wanted a rather large, what we call a staple

12   job, where a lot of our pilots would be put on the bottom of

13   the seniority list.

14   Q.    And can you recall how many pilots they were suggesting

15   should be stapled at that time?

16   A.    Two thirds of our pilot list.

17   Q.    This is March 1, Mr. Clarke, and this is their opening

18   proposal?

19   A.    Correct.

20   Q.    They are saying we need to staple two thirds of you

21   guys.  What did you think about that?

22   A.    I wasn't very happy.  I mean, it was -- let's not, just

23   not fair.  That is not right.

24   Q.    Two thirds stapled.  So what is the strategy after that.

25   First of all?

 1              THE COURT:  You mean TWA strategy.

 2    Q.   TWA merger committees strategy?

 3    A.   We are basically, our strategy was to do anything that

 4    we could to get date of hire still at that point, and to, you

 5    know, obviously that is opening positions, you know.  We

 6    definitely, you know, still felt strongly that with the right

 7    restrictions and conditions, with the right support, we were

 8    going to get there.

 9    Q.   Okay.  So moving forward, did you have follow-up

10    meetings with the American negotiators.

11    A.   Yes.  At the end of March we met again.  At that point

12    we were there to give them a more detailed proposal, what we

13    were thinking.

14    Q.   Mr. Clarke, do you recall the date of that specifically?

15    A.   March 28.

16    Q.   Was a proposal made that day?

17    A.   Yes.

18              THE COURT:  Where was that?

19              THE WITNESS:  That was in Dallas.

20    Q.   I am going to refer to exhibit J 299.  Mr. Clarke, I

21    gave you J 299.  Can you tell the jury what that is?

22    A.   This is a letter that is basically APA's understanding

23    of TWA's verbal proposal on 28 March, '01.

24    Q.   It is labeled APA's understanding of your proposal.  Is

25    it an accurate depiction of what you did proposal propose?

1    A.    Primarily, I believe so, yes.

2              MR. PRESS:  We move for the admission of J 299,

3    Judge.

4              MR. FRAM:  No objection, your Honor.

5              THE COURT:  Okay.  There being no objection,

6    exhibit J 299 in evidence.

7    Q.    Without going into great detail what this proposal --

8    can you explain it simply?

9    A.    I  mean basically real quick, what it is, as we talked

10   about we knew the American pilots were very protective of

11   their triple seven flying, and normally a triple seven

12   captain is senior on the seniority list.  He is up in the top

13   500 pilots.

14             But also in there, if you took all the triple seven

15   captains at American they all wouldn't line up one through

16   150.  So because some people don't want to fly that airplane.

17   What you do is look at the list and say, hey, the majority of

18   their triple seven captains fall in this range.  So what we

19   did is we said hey, our senior captain will fall below that

20   range at somewhere, I believe, seniority number 416, and then

21   we would feather our pilots down until we got to a point

22   where our pilots would be better than date of hire.  We

23   didn't want it to appear that we were trying to get something

24   better than date of hire.  So where that pilot came into the

25   list and he was maybe above his date of hire, we would put

1    him back to his date of hire and then we would move, all the

2    rest of the pilots that would fall on to the list with the

3    date of hire.  And then we, if you look at number 4,

4    basically we had the following fences, and conditions and

5    restrictions, basically we couldn't fly this, if you look at

6    first officers, none of the TWA pilots would be able to fly

7    on the triple seven as a co-pilot until all of the American

8    Airlines pilots on the list had a chance to do that first.

9    Because they could have expected that.  So it was a pretty

10   reasonable proposal.

11   Q.    And that was delivered to the American negotiating team

12   on March 28?

13   A.    Yes.

14   Q.    And that was a full day meeting?

15   A.    Yeah, for the most, I mean we talked and discussed and

16   then Captain Flor presented this proposal to the APA.

17   Q.    Mr. Clarke, was the proposal accepted?

18   A.    No. No.

19   Q.    So was there a plan to have follow-up meetings the next

20   day?

21   A.    Yeah, we were going to meet the next day so that they

22   could, they basically could look the proposal over and come

23   back and we would meet the next day, assuming to get their

24   response.

25   Q.    The meetings were in Dallas.  Where were you staying, at

1    a hotel?

2    A.    Yeah.

3    Q.    When you got back to your hotel who did you find there?

4    A.    There were some ALPA advisors that had shown up.

5    Q.    Who specifically?

6    A.    Bob Christy was there.  There bass another gentleman

7    there that was with him.  I believe Clay Warner may have been

8    there.

9    Q.    Mr. Clarke, were those ALPA representatives invite

10   /PWAOEUD your merger committee?

11   A.    Not that I know of.

12   Q.    When --

13   A.    We were told that we got somebody on our committee got a

14   phone call and said hey --

15            MR. FRAM:  I object unless there is a foundation of

16   personal knowledge.  He says we were told.  We don't know

17   who.  We don't know if it is hearsay.

18            THE COURT:  Can you lay a foundation, Mr. Press?

19   Q.    Explain what you know firsthand about how these ALPA

20   advisors showed up at your meeting?

21   A.    We were, we received a phone call.

22            THE COURT:  Who is we?

23   A.    Our committee.

24            THE COURT:  Did you --

25   Q.    Were you part of the conversation?

1    A.   I assume I was not part of the conversation.  It was

2    probably Captain Day at that point.  He was the chairman.

3    Q.   Well, what was reported to you?

4              MR. FRAM:  Your Honor.

5              THE COURT:  I am going to allow that.  We are

6    talking about how they got their meeting.  I am going to

7    allow that.

8    A.   Basically they said hey, you are, your ALPA advisors are

9    here.  They want to take you to dinner and have some

10   discussions.

11   Q.   Was there a dinner?

12   A.   Yes.  We went to dinner.

13             THE COURT:  Who is we?

14   A.   With the ALPA advisors.

15             THE COURT:  Who are.

16   A.   Bob Christy.

17             THE COURT:  Clay Warner?

18   A.   Clay Warner, and Roberts, I believe.

19             THE  COURT:  Who?

20             MR. PRESS:  Bill Roberts.

21   A.   Bill Roberts.  And those guys were basically the same

22   people that we had met with in January, that were kind of

23   like, supposed to be helping us through this process.

24   Q.   All right.  Tell us what was discussed after dinner with

25   these ALPA --

```
 1              THE COURT:  Where were you, by the way, when this
 2   meeting was taking place?
 3              THE WITNESS:  After dinner, then we went --
 4              THE COURT:  Dinner, what city were you in?
 5              THE WITNESS:  Dallas.
 6              THE COURT:  Advisors came into Dallas.
 7              THE WITNESS:  Correct.
 8              THE COURT:  They in fact came to Dallas.
 9              THE WITNESS:  Yes.
10   Q.   And you in fact had a dinner with the ALPA advisors?
11   A.   Yes, we did.
12   Q.   After dinner what happened?
13   A.   After dinner we went to a conference room and --
14   Q.   At the hotel?
15   A.   At the hotel.
16   Q.   Okay.
17   A.   And basically Bob Christy, the ALPA adviser, came in and
18   said he had he had information that would lead us to get a
19   negotiated seniority agreement but we had to staple 80025 of
20   our own pilots.
21   Q.   Did he say, provide any basis for what he was saying?
22   A.   No.  Through the process they talked a lot about back
23   channel negotiations, not negotiations, but back channel
24   communications where they might have somebody that would be
25   able to kind of let them know what the other side is
```

Clarke-direct/Press                                                30

1    thinking, I guess.

2    Q.   Mr. Christy told your committee that to get a deal done

3    you are going to have to offer up 825 pilots to be stapled?

4    A.   Correct.

5    Q.   How did you personally --

6         THE COURT:  That would be the most junior of the

7    TWA pilots.

8    A.   825 guys would be on the bottom of the seniority list.

9         THE COURT:  But they were already on the bottom of

10   the TWA list, then they would go to the bottom of the

11   combined list.

12        THE WITNESS:  Correct.  But our pilots, 825 of our

13   pilots on the bottom of the list is a lot different than

14   being on the bottom of the other list, because our eight

15   hundred eight hundred 25 guy was probably around my seniority

16   that had already been flying for eight to ten years.  So it

17   wasn't that they were just going, 825 were going from the

18   bottom of one list to the bottom of the other list.  They

19   were around my seniority, and basically we, I was already

20   flying the 757.  I had paid my dues, so to speak, and was up

21   on 825.

22        So to say that 825 just go from the bottom of one

23   to the bottom of the other --

24        THE COURT:  No, I am just trying to establish that

25   the 825, or the 825 most junior TWA pilots --

```
 1                 THE WITNESS:  That's correct.

 2                 THE COURT:  -- they would be stapled, they would be

 3    behind somebody just hired two days ago from American

 4    Airlines.

 5                 THE WITNESS:  That's correct.

 6    Q.   Did you advise Mr. Christy of the proposal that the

 7    American negotiators had suggested, offering --

 8    A.   After I went crazy.

 9    Q.   Well, okay.

10                 THE COURT:  I am sorry.  Your question is?

11    Q.   Was Mr. Christy aware that the American negotiators were

12    wanting to staple two thirds of your pilot group to the

13    bottom of their list?

14    A.   Yeah.

15    Q.   And he comes in at 825, that's roughly a third, right?

16    A.   Right.

17                 THE COURT:  No, it is more than that.  40 percent.

18    A.   So, I mean, I was --

19    Q.   Go ahead.

20    A.   I was mad.  I mean, here we just presented an offer to

21    the APA that was based on a date of hire, that was stapling

22    nobody without a response from the APA.

23    Q.   You had an offer on the table?

24    A.   Which had an offer on the table.  Here comes ALPA and

25    they want us staple 825 of our own guys.  I said you guys are
```

```
 1    out of your mind.  There is no way.  How can we as pilot

 2    representatives, somebody that is supposed to be watching our

 3    backs of the guys that we have flown with for these years and

 4    just come in and say yeah, let's throw 825 of them on the

 5    bottom of the list.  It is crazy.

 6    Q.   How did Mr. Christie explain himself, what did he say?

 7    A.   Basically he was, we were coming to the April 2nd, its

 8    April 4 when we were going to be forced to make a decision on

 9    the scope waiver.

10    Q.   Right.

11    A.   So everybody, in everybody's best interest, a deal would

12    be better than having to make that decision, if we could get

13    a deal that we could swallow.  That deal you can't swallow.

14          That is what I told them, I said we cannot go from

15    a date-of-hire proposal and the next day show up, and offer

16    to staple 825 of our own guys.

17          First of all, that is not very good negotiating to

18    come in and negotiate against yourself.

19          And second of all, how can you really do that?  How

20    can you do that to somebody?  How can I do that to my friends

21    and my co-workers.

22    Q.   So what happened?  How did the meeting end?

23    A.   Well, we stayed until probably about one or two in the

24    morning.  And eventually Bob Christy and the ALPA advisors

25    were able to convince the more senior members of our
```

1    committee that that obviously weren't going to be stapled

2    that there had to be some sort of a staple for the American

3    pilots to go with this.  And they wanted to get a deal.  So I

4    kept arguing and arguing and arguing, and trying to convince

5    them that this was not good, and eventually we ended up where

6    our proposal would be to staple 400 something pilots.  So I

7    got it down to half.

8    Q.   And that proposal was that made the next day, the next

9    morning?

10   A.   Yeah.

11        THE COURT:  Which is what, the end of March?

12   A.   March 29, the next day.

13        MR. PRESS:  This is J 301, Mr. Fram.

14   Q.   Mr. Clarke, I handed you exhibit J 301, right?

15   A.   Yes.

16   Q.   What is this?

17   A.   This is the proposal that we presented to the APA.

18   Q.   On?

19   A.   March 29.

20        MR. PRESS:  We move for the admission of exhibit J

21   301.

22        MR. FRAM:  No objection.

23        THE COURT:  Well, before, this was, was this

24   prepared by APA, this document?

25        MR. PRESS:  It says APA's understanding of TWA's

1    verbal proposal on March 29.  Right?

2    A.   Yes.

3         THE COURT:  This was their understanding of your

4    proposal?.

5    A.   Yes.

6         THE COURT:  I got to follow up with the question,

7    is it accurate?  Does it fairly present what you had, what

8    your committee had presented?

9         THE WITNESS:  Yes.

10        THE COURT:  Okay.  Then I am going to admit J 301

11   into evidence.

12   Q.   This does accurately reflect what your committee

13   proposed the following day?

14   A.   Yes.

15   Q.   On March 28 you were proposing basically date of hire

16   with certain restrictions, correct?

17   A.   Yup.

18   Q.   And then the ALPA guys come in and say you got to offer

19   up a third of your pilots to a staple.  You come in the next

20   morning and deliver this.  Is that what happened?

21   A.   Yes.

22   Q.   If you look in the middle, 434, what does that say

23   there?

24   A.   The bottom 434 TWA pilots placed at the bottom of the AA

25   seniority list.

Clarke-direct/Press                                              35

```
 1   Q.   Now, before you guys presented this new proposal, had

 2   they even responded to the offer you had made the day before?

 3   A.   No.

 4   Q.   They hadn't even rejected it?

 5   A.   No.

 6   Q.   Sean, Mr. Clarke, were you in favor of making this

 7   proposal?

 8   A.   No.

 9   Q.   And how did the American negotiators respond to it?

10   A.   Basically took it and left.

11         THE COURT:  Well, they must have prepared it and

12   given it to you, someone took the time to prepare --

13         THE WITNESS:  Right.  After the fact they probably

14   came in with this letter and said --

15         THE COURT:  Here is what we understand your offer.

16         THE WITNESS:  Right.

17   Q.   Did they  respond by rejecting it?  How did they respond

18   or how did they respond?

19   A.   They basically said they would look it over and, yeah, I

20   mean basically they rejected it and left the room and said

21   that they needed to go talk to the U.S. Air pilots.

22   Q.   What did they need to talk to them about, did they say?

23   A.   The U.S. Air pilots, they were negotiating, there were a

24   certain amount of U.S. air  pilots in the whole transaction

25   that were going to come over to American Airlines also, that
```

Clarke-direct/Press                                                36

```
 1   were going to be offered employment.

 2   Q.    There hasn't been any evidence of that.  Can you

 3   describe what you are talking about?

 4   A.    As part of the TWA transaction, I believe, it is a

 5   little vague, but my memory back to that part of it, but

 6   there was a certain number of U.S. Air pilots that would be

 7   allowed to come over to American because American was going

 8   to purchase some of their airplanes, and with the airplanes

 9   they were going to need the pilots so those guys were going

10   to come over with it.

11   Q.    Do you know how it was proposed that those pilots would

12   be integrated into the Americans seniority list?

13   A.    They were to receive the provisions of the Allegheny

14   Mohawk, or they would have the arbitration and be allowed to

15   have a process.

16   Q.    So American was offering that to the U.S. Air pilots?

17   A.    Correct.

18   Q.    But they were requiring something different of you?

19   A.    Yeah, they were requiring us to waive scope.

20   Q.    And that brings us April 2, the scope waiver.  There has

21   been a lot of testimony about that to date.  When that scope

22   waiver was made, what was, how did -- what is the right

23   question?  What did you think about that as far as what it

24   would do to your ability to negotiate a fair deal with the

25   American pilots?
```

Clarke-direct/Press                                        37

```
1    A.   I knew it would make our job a lot harder but I also
2    knew that I had the Air Line Pilots Association on my back.
3    I mad the largest pilot union in the world behind me.  So,
4    and we weren't negotiating, American pilots were not part of
5    that union, so therefore I could expect my union to represent
6    me to my fullest and to get me a good deal and I knew that
7    they should be there for us.
8             So yeah, it would make our job a lot more
9    difficult, and probably wasn't that happy about it, but I
10   still had faith that we would come out of it okay.
11   Q.   Now, I wrote up here on the top of this March first, two
12   thirds staple.  That was, the American pilots original
13   proposal to you, right?
14   A.   Yes.
15   Q.   And before the scope waiver, had they come off that
16   position?
17   A.   I don't believe so.
18   Q.   As part of the scope waiver, American and TWA gave ALPA
19   a letter.  Do you recall that?
20   A.   Yes.
21   Q.   Some sort of letter agreement.  This is exhibit D 222,
22   that I am going to hand you.
23        What is exhibit D 222, Mr. Clarke?
24   A.   This is a letter from TWA to Captain Pastore who is our
25   MEC chairman at the time.
```

1          MR. PRESS:  I move for the admission of exhibit D

2    222, Judge.

3          MR. FRAM:  No objection, your Honor.

4          THE COURT:  D 222 is in evidence.

5    Q.   Can you go to the third page, will.  And Mr. Clarke, if

6    you look at the third page, this document is signed by what

7    companies?

8    A.   TWA LLC, American Airlines, and the Air Line Pilots

9    Association.

10   Q.   So this is a three-way deal between TWA LLC, American

11   Airlines and your union?

12   A.   Correct.

13   Q.   And I want to refer you to paragraph 5 on the second

14   page can you read that for us?

15   A.   It says process:  For its part, American Airlines agrees

16   to use its reasonable best efforts with its labor

17   organizations representing the airline pilots and flight

18   engineers, crafts, or classes, to secure a fair and equitable

19   process for the integration of seniority.  In that regard

20   American will engage a facilitator to organize meetings with

21   the labor organizations.

22

23   Q.   Okay.  So American is promising to engage a facilitator

24   to organize meetings, right?

25   A.   Correct.

1    Q.   And this is what you guys got in return for waiving

2    scope?

3    A.   Yeah.

4              MR. FRAM:  Your Honor, I object.  The leading

5    question, and it is also not accurate.  That is not what they

6    got in return for waiving scope.

7              THE COURT:  Take that up on cross examination.

8    Q.   Mr. Clarke, this notion and this reasonable best efforts

9    promise about engaging a facilitator, did that happen?

10   A.   Yes, they did.

11   Q.   Tell us, were there meetings?

12   A.   Yeah, we had, we had over ten meetings where the

13   facilitator was there, and we were negotiating again.

14   Q.   Before we get into that, were you here for Mr. Warner's

15   video presentation?

16   A.   Yes.

17   Q.   And this business about Captain Woerth supposedly going

18   down to the APA board on April 5 and making this get real

19   comment, was that something that you were aware, at least

20   that there was an allegation about that?

21   A.   Why.  We had heard about that.

22   Q.   And there has been some testimony about an April 23 MEC

23   meeting in St. Louis that Captain Woerth attended.  Were you

24   there?

25   A.   Yes.

Clarke-direct/Press                                               40

1   Q.   Can you tell the jury what you heard any pilot ask Duane

2   Woerth about the get real comment?

3   A.   Yeah, they asked him if he had made that comment, and we

4   received a very political round about answer that --

5               MR. FRAM:  Your Honor, I object to the

6   characterization.  Can we just have him testify as to what

7   was said?

8               THE COURT:  Just tell us what was said.  Don't put

9   your spin on it.

10  Q.   Do you understand the judge's instruction?

11  A.   Yes.

12  Q.   Okay.

13  A.   Basically, he denied it but not very forcefully.  In my

14  opinion --

15              MR. FRAM:  Your Honor irks object.

16              THE COURT:  No, what did he say?  He said he denied

17  it.

18              THE WITNESS:  Yes.  Sorry.

19  Q.   Now, you had made a proposal at the end of March right

20  before the scope waiver offering to staple 434 pilots or so,

21  right?

22  A.   Yes.

23  Q.   Was that ever responded to officially by the APA

24  negotiators?

25  A.   At some point before the facilitated meetings they came

Clarke-direct/Press                                         41

1    back and basically had moved their staple point 50 pilot

2    numbers in favor of us.

3    Q.   They reduced the staple from 1,500 to what?

4    A.   I think it was 17, maybe 1675, 1675, somewhere in there.

5    Q.   They made another proposal offering to staple 50 less

6    pilots.  Is that what happened?

7    A.   Correct.

8    Q.   When about was that?

9    A.   That was shortly before the facilitated meetings that we

10   had.

11   Q.   Okay all right.  And what was your committee doing at

12   that time?

13   A.   We were working on a proposal that I will refer to as

14   the Tanen proposal.  Michael Tanen was an economist we hired

15   to come up with a proposal that would be not only fair to

16   look at and, you know, when somebody looks at a presently and

17   said what did I get, what did this person get, that it would

18   be mathematically fair.  Economically it would be fair.

19   Basically what it was is they took the pilots and said what

20   is a September 1998 American pilot, what does he expect to do

21   in his career.

22          And what does a January of 1996 pilot, or a January

23   of 1969 pilot, what do those guys expect to do, or gals,

24   expect to do in their career flying for American or TWA, and

25   then they basically merged the seniority lists on that, so it

```
 1    was something that kind of took, was hopefully going to take

 2    the emotion out of it, that could be proved that, that if

 3    someone,  a neutral party, would look at it and say yeah,

 4    this is a fair -- something that we could stand behind,

 5    basically.

 6    Q.   All right.  And he developed a rather --

 7    A.   It took him a long time.

 8    Q.   -- a rather thick document?

 9    A.   Yeah.

10    Q.   We will get to that.  But first I want to show you

11    Exhibit  316 which is already in evidence?

12              THE COURT:  I am sorry.  D, J?

13              MR. PRESS:  P, Judge.

14              THE COURT:  P 316.

15              MR. PRESS:  Yes.

16              THE COURT:  It is already in evidence.

17              MR. PRESS:  It is already in evidence.

18    Q.   Mr. Clarke, this is a May 31 letter from Duane Woerth to

19    all the TWA pilots, right?

20    A.   Yes.

21    Q.   You would have received a copy of this, correct?

22    A.   Yes.

23    Q.   Can you read the last paragraph out loud?

24    A.   As president, I will continue to coordinate with your

25    MEC and your merger committee to ensure TWA pilots are fairly
```

1    and equitably integrated into the American pilots seniority

2    list and ensure that the executive board pledge is fulfilled.

3    Q.   He says that he will continue to coordinate with not

4    only the MEC, but your committee, right?

5    A.   Correct.

6    Q.   At that point in time, May 31, '01, has Duane Woerth

7    done anything with your committee?

8    A.   No.

9    Q.   He says he is going to work, he is going to continue

10   working with you to ensure that you are integrated fairly and

11   equitably, right?

12   A.   Right.

13   Q.   Had he done anything that you are aware of to ensure a

14   fair and equitable integration?

15           MR. FRAM:  Your Honor, no foundation.  I object.

16   No foundation that the witness investigated this issue,

17   talked --

18           THE COURT:  Yeah.

19           MR. PRESS: I asked what he is aware of.

20           THE COURT:  I will allow him to do that, what he is

21   aware, with the understanding that you haven't established

22   any foundation that he would be aware of everything.

23           MR. PRESS:  He can't know everything.

24   Q.   Were you aware of anything?

25   A.   No.

1    Q.   I want to make a point.  Other than the merger committee

2    that you were part of, was there any other group of TWA

3    pilots that were responsible for negotiating seniority with

4    the American pilots?

5    A.   No.

6    Q.   That was your job solely?

7    A.   That was us.

8    Q.   Okay.  This Professor Tanen's proposal, that was exhibit

9    P-318 and I have that.  Mr. Clarke, I have handed you exhibit

10   P-318.  What is that?

11   A.   This is the Rightful Place proposal that we submitted to

12   the APA.

13   Q.   This is, this is what Professor Tanen came up with as

14   far as a seniority proposal?

15   A.   Correct.

16            MR. PRESS:  I move for the admission of exhibit

17   P-318.

18            MR. FRAM:  No objection, your Honor.

19            THE COURT:  Okay.  P-318 is in evidence.

20   Q.   Is this is just the cover page that is shown to the

21   jury.  The date is June 14, 2001?

22   A.   Correct.

23   Q.   Was this submitted to the American pilot merger

24   committee on or around that date?

25   A.   Yes.

1   Q.   Now, did this proposal also get distributed to TWA

2   pilots?

3   A.   Yes.

4   Q.   How do you know that?

5   A.   It was done by a video, I got one.  The other pilots got

6   them, it was sent out to everybody.

7   Q.   I mentioned a video?

8            THE COURT:  Did you send out like a CD.

9            THE WITNESS:  Yeah, it was a video, and there was

10  an introduction to the proposal, and kind of to try and

11  explain the proposal, and basically say this is something

12  that should stand the test, you know.

13           THE COURT:  Who prepared the video?

14  A.   I believe Roland Wilder did, in conjunction with ALPA

15  National.

16  Q.   That video was meant to communicate to the TWA pilots

17  what it was you were proposing with this Rightful Place

18  proposal?

19  A.   Right, because up until --

20           THE COURT:  Before you do that, ALPA did help you

21  prepare that, that video?

22  A.   On June 14.

23           THE COURT:  So that was something they did to help

24  you.

25           THE WITNESS:  Correct.  After May 31.

1              THE COURT:  Right.

2    Q.   And that video, is it ready?  We marked this video

3    exhibit P 428 and we would like to play?

4              THE COURT:  First of all, let's move it.

5              MR. PRESS:  For more the admission of P-428.

6              THE COURT:  Give me a second here.

7              THE COURT:  You are going to play a portion of.

8              THE COURT:  Yes.

9              MR. PRESS:  Just the introductory remarks.

10   Q.   When it starts up, Mr. Clarke, I would like for you to

11   stop it and Mr. Clarke, for you to tell the jury who is

12   speaking?

13   A.   Okay.

14              (Videotape commences.)

15   A.   That is Captain Duane Woerth.

16              (Videotape continues)

17   Q.   ALPA will be at your side was the promise.  Was it

18   fulfilled?

19   A.   No.

20              MR. FRAM:  I object to this.

21              THE COURT:  I will sustain the objection.  Just

22   tell us what happened.

23   Q.   What happened, this was in June, mid June, right?  What

24   happened was that these facilitate tours --

25              THE COURT:  No, no, you can't testify.  Ask him

Clarke-direct/Press                                          47

1    questions.  Let him tell you what he knows.

2    Q.   I am sorry.  What happened next, moving forward from?

3    A.   Well, I think, you know, at some point we scheduled more

4    facilitated meetings that we would have and have discussions.

5    Q.   Over what period of time did you have these, first of

6    all, what is the facilitator, what was that all about?

7    A.   Basically American hired a, what would probably

8    normally, like a mediator, somebody that should be there to

9    make sure everybody is playing friendly and talking friendly

10   to each other.

11          THE COURT:  Is this the facilitator?

12          THE WITNESS:  The facilitator, yeah, and kind of

13   guide the discussions so that they are more productive as

14   they go.

15          But this facilitator had no -- I mean he couldn't

16   -- he wasn't there to mediate or arbitrate.  He was there to

17   set the meetings, is basically all APA would allow him to do,

18   schedule meetings.  He had very, very, very little input.

19   Q.   And over what period of time were these negotiations,

20   facilitated negotiations, taking place?

21   A.   They were in the summer of 2001.

22   Q.   How many sessions did you have with the American pilot

23   negotiators?

24   A.   Over ten.

25   Q.   All right.

1    Q.   Going into this facilitated negotiation process, what

2    was the American pilots position on seniority?

3    A.   I mean basically that they were going to staple the

4    majority of the TWA pilots to the bottom of the seniority

5    list.  That was pretty -- their proposals were pretty simple.

6    Q.   And throughout the facilitated process, how did they,

7    how did they move, if at all, from their position?

8    A.   They really didn't.  Because at that point they didn't

9    really, there was nothing, they weren't, they didn't have any

10   reason to.  They --

11            MR. FRAM:  Your Honor, I object to his

12   interpretation of why American pilots did what they did.

13            THE COURT:  Yeah.  Ask him what he knows.  Who said

14   what, who did what?  He is not here to express the opinion

15   that he has got a good case.

16            MR. PRESS:  Right.

17            THE COURT:  We all know that is his opinion.

18   Please.

19   Q.   American's position, how did it, if at all, change

20   throughout the facilitated negotiation process?

21   A.   Through the end of the facilitated meetings it didn't

22   change.

23   Q.   Not one bit?

24   A.   No, basically we did a lot of leg work on, I kind of

25   called it busy work, where we really, we were getting

1   financial information from our advisors on why TWA was a good

2   purchase for American, and American was getting information

3   that, about how many airplanes we had, and back and forth,

4   and it was, it was a whole lot of busy work getting not much

5   done.

6   Q.   Did anyone from ALPA attend any of those meetings with

7   you?

8   A.   Yes.

9   Q.   Who?

10  A.   Finally Duane Woerth.

11  Q.   When you say finally, at what point in the process was

12  it?

13  A.   It was towards, I think it was in July when he came in,

14  and he met about with, before we went into the meeting with

15  the American pilots, we met together as a committee.  And we

16  basically showed him, you know, talked to him about what the

17  American pilots were proposing to do to us.

18  Q.   And how did -- what did he say in response to that?

19  A.   He said that is not going to happen to my pilots.  We

20  are not going to allow that to happen to our pilots.

21  Q.   How did you react?

22  A.   I was excited.  I was like finally, here he is, the

23  White Knight is here.

24        MR. FRAM:  Your Honor, I object to the

25  interpretation and his opinion.  Can't we get the facts?

1            THE COURT:  Just say what happened.  We know how

2   you feel about the case.  Tell us what happened.

3   A.   We explained to him the proposal.  He told us that that

4   was not going to happen to his pilots.  And he told us that,

5   don't expect that to happen.

6   Q.   Okay.  And that was just in a private meeting with your

7   committee?

8   A.   Correct.

9   Q.   Outside the presence of any American pilots?

10  A.   Correct.

11  Q.   And then did you then go into a joint meeting?

12  A.   Yeah.

13  Q.   And what did Mr. Woerth say then?

14  A.   He didn't say that -- he didn't say what he expressed to

15  us.  I was disappointed.  He basically went in, they talked

16  about how everybody should work towards a, you know, a

17  negotiated agreement, and we should come up with a negotiated

18  seniority integration that would work for both sides.  But he

19  didn't, he did not say, he did not say you are not going to

20  do this to our pilots.  He did not say that.  And that is

21  what we needed him to say.

22  Q.   Well, why do you think, why did you want him to say

23  that?

24  A.   To give us leverage.  I mean, we needed leverage.  We

25  needed the largest airline pilot union to help us.  We needed

Clarke-direct/Press                                              51

1    that.  We were waiting for that moment for some sort of

2    leverage to come to us to get them off of stapling two thirds

3    much our pilots and we, as a group, we all thought it bass,

4    you know, we were hoping and we thought that it was going to

5    happen so at that point we were kind of excited that hey, it

6    is going to happen.  Now, here it is, and can I use an

7    analogy?

8              THE COURT:  No.  Ask your next question.

9    Q.   So this is the summer, right?

10   A.   Yes.

11   Q.   Summer.  They are not coming off their stapling two

12   thirds, right?

13   A.   No.

14   Q.   Now,  at some point the negotiation process ended,

15   right?

16   A.   Yes.  September.

17   Q.   September.  Do you remember about when, was it post 9-11

18   or before?

19   A.   Yeah, September 18, I believe.

20   Q.   You got a letter and it is in evidence already from Ed

21   White, correct?

22   A.   Right.

23   Q.   It basically says what?

24   A.   Basically said that they were done negotiating, they

25   were going to impose the seniority integration, and come up

```
 1   with what they wanted to come up with, and that is what we

 2   would get.

 3   Q.   At that point, September 18, the negotiations were

 4   concluded?

 5   A.   Correct.

 6   Q.   But there were more discussions, there were more

 7   negotiations in October, right?

 8   A.   Right.

 9   Q.   When was that?

10   A.   Well, we had some pilots that came to be active on the

11   legislative front, and went to Washington, D.C. and started

12   knocking on doors of Congressmen and women and basically

13   explaining to them what was going on and saying this is what

14   is happening to us.

15             MR. FRAM:  Your Honor.

16   Q.   Were you part of that process, the lobbying?

17             THE COURT:  I am sorry?

18             MR. FRAM:  I was concerned about a foundation.  I

19   think that next question rectifies that.

20   Q.   Were you part of that?

21   A.   Yes, I did go out there.  Not as much as everyone else

22   was but I was involved in it.

23   Q.   That Bob league effort, do you recall when it was in

24   October?

25             Lobbying effort.
```

Clarke-direct/Press                                         53

```
1    A.   It was I believe more towards the beginning of October.

2    Q.   And at what point did you the American pilots come back

3    to the negotiating table?

4    A.   After, after they caught wind of the basically that

5    there was a good chance that Senator Bond was going to put an

6    amendment that would basically give us an arbitrated

7    settlement.

8    Q.   And when was, when were these, your meetings, with the

9    American pilot negotiators, in October, when were they?

10   A.   Towards of end of October, the 20, somewhere in there.

11   Q.   And you were there?

12   A.   Yes.

13   Q.   Mr. Clarke, at that point, after the Bond bill is

14   introduced and there is lobbying going on, did the American

15   pilots finally soften their position?

16   A.   Yes.

17            MR. FRAM:  Your Honor, I object to the leading

18   question.  Can't counsel just ask what the American pilots

19   position was?

20            THE COURT:  Yes, he can.  Yes, he will.

21   Q.   Mr. Clarke, what was the American pilots position now at

22   this time?

23   A.   Now they had offered to staple, I believe it was around

24   1,250 pilots, so they came off of their staple point by a

25   couple hundred pilots.
```

```
 1              THE COURT:  By 400, right?  The original was 16

 2   something.  Right?

 3              THE WITNESS:  Yeah, yeah, I can't remember the

 4   exact number.

 5              THE COURT:  Down to 12, it is off by 400.

 6   Q.   Around 55 percent?

 7              THE WITNESS:  55 percent of the pilots would then

 8   be stapled.

 9   Q.   Okay.  Which is an I am profit from where they were

10   before?

11   A.   Yeah.

12   Q.   Were you in Washington, D.C. as part of a MEC meeting in

13   late October?

14   A.   Yes.

15   Q.   Were you present in the conference room when President

16   Woerth called or was called about the litigation strategy?

17   A.   Yes.

18   Q.   Can you tell the jury what happened?

19   A.   Basically we had prepared a strategy.

20              THE COURT:  Who was there.  Set the stage.

21   A.   It was myself, the merger committee.

22              THE COURT:  Your entire merger committee?

23              THE WITNESS:  I believe so, yes I believe so, yes.

24   The MEC, and our staff members, ALPA staff members were

25   there.
```

Clarke-direct/Press                                          55

1              THE COURT:  Was Roland Wilder there?

2    A.   Roland Wilder.   James Baehler.

3    Q.   Before we get into that can be you explain to the jury

4    what happened to this proposal from the American pilots, was

5    it accepted or rejected?

6    A.   We rejected it.

7    Q.   What did it became known as ultimately?

8    A.   Supplement CC.

9    Q.   All right.  And what was the strategy going forward

10   after you rejected their final offer?

11   A.   Well, all along we talked about if we couldn't come to a

12   negotiated settlement, then we couldn't agree on the

13   seniority since we did not have the scope provisions that we

14   would file an instruction and try and prevent the seniority

15   list from being accepted and put into plays, and that was a

16   strategy that Roland Wilder and the merger committee had come

17   up with, and passed by, and talked to ALPA National about it,

18   so they had known that if we get to this point, here is what

19   we want to do after that.

20             THE COURT:  The date of this is all happening when?

21   A.   This is the end of October.

22             THE COURT:  End of October.  Continue.

23   Q.   There has been some MEC minutes from that meeting

24   discussed here in court and the date was October 23 reflected

25   in that.  Does that sound about right?

```
 1    A.   Yes.

 2           THE COURT:   It was before Supplement CC was

 3    formally adopted?

 4    A.   Correct.

 5    Q.   Now, Mr. Clarke, after the MEC rejected the American

 6    proposal, what was done then?

 7    A.   At that point we called Captain Woerth to let, to kind

 8    of give him an update since he was not there, to let him know

 9    where we were, and then to tell him that we were going to go

10    with, I guess, plan C at that point which was to file the

11    injunction against APA and --

12           THE COURT:   You mean file the request for an

13    injunction.

14    A.   Yes.

15    Q.   What did Duane Woerth say in response to that?

16    A.   He said he is not going to allow his union to sue

17    another union.

18           THE COURT:   Just a minute.  Did you hear him say

19    this?

20    A.   Yes, I did.

21           THE COURT:   Okay.  He said he was not going to

22    allow his union to sue another union.

23           THE COURT:   Was he on speaker phone?

24           THE WITNESS:   Yes.

25           THE COURT:   So this was heard by all the people at
```

Clarke-direct/Press                                        57

1    your committee, the MEC, advisors?

2    A.    Correct, yes.

3    Q.    Mr. Clarke, you testified that Duane Woerth attended one

4    of the negotiating sessions in the summer of 2001.  Did he

5    attend any after that?

6    A.    No.

7    Q.    Between that summer meeting and this October conference

8    call with Duane Woerth, how many conversations did you have

9    with him?

10   A.    I had none.

11   Q.    How many meetings?

12   A.    None.

13              THE COURT:  Were.

14              THE COURT:  Pick a good time to break.  It has been

15   almost an hour and a half.

16              I want to give the jury a break.

17              MR. PRESS:  We can stop now.

18              THE COURT:  Can you go a few minutes.  Whatever is

19   convenient for you.

20              MR. PRESS:  This is fine.

21              THE COURT:  Okay.  Ladies and gentlemen, we are

22   going to take a break until ten after ten, it is about five

23   of ten now.  Do not discuss the case among yourselves.  Keep

24   an open mind until you have heard all the evidence.  All rise

25   when the jury leaves.

```
 1                    (The jury leaves the courtroom.)

 2                    (Recess.)

 3                    (Jury enters the courtroom.)

 4                    SEAN CLARKE, resumes.

 5                    THE COURT:  Mr. Press, you may continue.

 6                    CONTINUED DIRECT EXAMINATION

 7                    BY MR. PRESS:

 8   Q.   Mr. Clarke, the meetings in late October in Washington,

 9   D.C. ended without an agreement.

10   A.   Correct.

11   Q.   And without a litigation being filed?

12   A.   Correct.

13   Q.   What did you do next?

14   A.   Shortly thereafter, I resigned from the merger

15   committee.

16   Q.   And you wrote a letter to MEC vice chairman Bob Pastore,

17   right?

18   A.   Yes.

19   Q.   This is P-349.  Mr. Clarke, what is exhibit P-349?

20   A.   I am sorry?

21   Q.   What is exhibit P-349 what that I handed you?

22   A.   This is my resignation letter, and then also a letter

23   back from Bob Pastore, the MEC chairman.

24   Q.   We move for admission of P-349.

25                    MR. FRAM:  We have an objection.  It is full of
```

 1    opinions and interpretations and accusations, your Honor.

 2              THE COURT:   Come to sidebar for a minute.

 3              (At sidebar)

 4              THE COURT:   Okay.   This is, what is the number

 5    again?   This is P-349.

 6              Did Woerth ever answer this letter?

 7              MR. FRAM:   No, your Honor, it was not sent to him.

 8    It was spent to Pastore.

 9              THE COURT:   But it was forwarded to him.

10              MR. PRESS:   The answer is no to that, Judge.

11              THE COURT:   It says it was forwarded to him.   I

12    don't know if it was really was.   It says that.

13              My problem is that when, this is his interpretation

14    of events.   It reads almost like a legal brief, I mean legal

15    argument.   And he talked about knifed in the back.   Certainly

16    he can testify he, I have no problem with him testifying that

17    he resigned.   I have no problem with him testifying to the

18    fact he was unhappy with the support he was getting from

19    ALPA.   I think that is legitimate.   But some of this is just

20    too, I mean, you know, his, I always felt there was a process

21    that ALPA would be there to help us, we thought we would be

22    knifed in the back.

23              MR. KATZ:   That is inflammatory.

24              THE COURT:   I am not going to let this in.

25    Although I am going to allow him to testify he was unhappy

1   with ALPA's support.  You can ask him why he was unhappy.

2   Not that I felt that.

3                MR. PRESS:  I understand.

4                THE COURT:  But they did this or that or didn't,

5   maybe the answer is didn't do this or didn't do that.  That I

6   will allow.  When he started saying I felt that.  When those

7   words appear, I am not interested in what he felt.  I am

8   interested in what he perceived was done or not done in this

9   case, more to the point what was not done.

10               MR. FRAM:  Can we stay away from his opinions.  I

11  wouldn't want him to say we felt, or it was my view we were

12  knifed in the back.

13               MR. PRESS:  I will preface my question with don't

14  tell us how you felt, just tell us why you resigned.

15               THE COURT:  I think he should be allowed to testify

16  why he resigned.  I really do.  And if he, and he can say

17  like I think ALPA should have done this or that, whatever

18  "this" is, whatever "that" is.  I think he should have done

19  this or they did this, when, and should have been done this.

20  That is one thing.  That is evidence.  I mean, that is his

21  perception of what they did.

22               When it gets into this, I felt I was knifed in the

23  back, I felt outraged.  I felt they had shown tenacity, you

24  know, those are all kind of subjective, not really of

25  evidence.  So I hope that is helpful.

1              MR. PRESS:  It is.

2              MR. FRAM:  My concern is.

3              THE COURT:  You are concerned they might get some

4    bad evidence in.

5              MR. FRAM:  Look, your Honor, as I think you have

6    commented before, there is nothing wrong with prejudicial

7    evidence.

8              THE COURT:  All evidence is prejudicial.  That is

9    what makes it admissible.

10             MR. FRAM:  If it is unduly prejudicial.

11             THE COURT:  Unfairly.  403.  I think the words are

12   unfairly prejudicial.

13             MR. FRAM:  So my concern, your Honor, is that once

14   he says I resigned because I was unhappy, to permit him to

15   explain, we are going to get the same kind of invective we

16   have in the letter.

17             MS. RODRIGUEZ:  Mr. Press will limit it.

18             THE COURT:  He, if he gets into the invective, I

19   will stop it and reverse my ruling.  I am trusting that --

20             MR. PRESS:  I am going to preface my question with

21   an instruction.

22             THE COURT:  He knows where I am coming from, and I

23   am really trying to be fair to both sides.  That is the way I

24   slice the baby here.

25             MR. FRAM:  Thank you, your Honor.

1          THE COURT:  We try.

2          (Open court).

3          THE COURT:  Go ahead.

4          BY MR. PRESS:

5     Q.   Mr. Clarke,  you resigned from the merger committee

6     when?

7     A.   October 26.

8     Q.   And without filling your answer with how you felt at

9     that time, tell us factually why you resigned?

10    A.   I resigned  from the committee because we were not,

11    there was nothing else I felt I could do because I did not

12    have the resources behind me, the leverage behind me, from

13    ALPA National to continue to pursue an agreement with them.

14    It was not going to work because they were not giving us the

15    tools that we needed.

16    Q.   Mr. Clarke, and you were a member of the merger

17    committee from the beginning to the end, right?

18    A.   Correct.

19    Q.   What was it --

20         THE COURT:  Excuse me.  When you resigned, did the

21    merger committee continue after your resignation or was that

22    functionally the end of the committee?

23         THE WITNESS:  There were still members but it was,

24    they didn't do much, I guess.

25         THE COURT:  So functionally, what you are saying is

Clarke-direct/Press                                              63

1    functionally they didn't really --

2    A.    For a short time thereafter, the members that remained

3    still, they were still working on another portion of it, that

4    we maybe are going to get to.

5    Q.    Remind the jury when the cram-down came.  You resigned

6    October 26.  When did the cram-down come?

7    A.    Shortly thereafter is when --

8              THE COURT:  Was it November 8, when they executed

9    the CC?

10             THE WITNESS:  Yes.

11   Q.    Okay.

12             THE COURT:  Was it November 8?

13   Q.    Tell the jury what additional support you wanted from

14   ALPA in your negotiations with American pilots?

15   A.    We wanted, we wanted them to give us leverage.  We

16   needed them to give us leverage.  We had to have it.  We were

17   in a position --

18             THE COURT:  What does that mean?

19             THE WITNESS:  We wanted Duane Woerth to attend, why

20   couldn't he attend more meetings.  Why didn't Duane Woerth go

21   into that room after he told us, you are not going to do they

22   are not going to do this to our pilots.  We wanted him to go

23   in and say that to them.

24             We wanted him to not visit the APA, and in some

25   way, make a statement that somehow could even remotely be

1    construed that we need to get real.  We wanted him to

2    threaten something, we are the largest airline pilot union in

3    the world.  Threaten a strike.  Say that, hey, you know what?

4              You are not going to do this to our pilots and if

5    you do, United may not start their airplanes up tomorrow,

6    Delta may not start their airplanes up tomorrow.  We needed

7    that.  We needed them to give us something.

8              We needed them to support us more in the

9    legislative effort.  We needed them at the eleventh hour,

10   when  it was time to file for the injunction, not to just

11   pull the rug out from under us and leave us standing there in

12   a room with nothing left because he refuses to sue another

13   union, who he said in their letters, which was just now it

14   appears was lip service, saying, hey, you have the full

15   support.

16             Well, we didn't.  We didn't have the full support.

17   And some of the things that were coming out were actually

18   detrimental to us, and that is what we needed.  We needed

19   them on our side more than what they were.

20             When you go into a crowded place sometime and you

21   are by yourself and you are the only guy standing there, and

22   there is a group of three or four other guys standing down at

23   the end of the bar and they are talking, whatever --

24             THE COURT:  All right, all right.

25   A.   You want your buddy to --

1              THE COURT:  This is not a fight in the bar.

2    A.   It is not a fight in the bar, but we wanted them to

3    have --

4              THE COURT:  Wait, wait.

5    A.   We wanted them to have --

6              THE COURT:  NO.  Wait for the next question.

7    Q.   Mr. Clarke, you wanted more support?

8    A.   Yes.

9              THE COURT:  He has answered that question.  Go to

10   the next question.

11   Q.   What effect do you believe additional support from your

12   union would have had on the negotiations themselves?

13             MR. FRAM:  Objection.  Calls for speculation.

14             THE COURT:  I am going to sustain that objection.

15             MR. PRESS:  That is all the questions we have,

16   Judge.

17             THE COURT:  Cross examine.

18             CROSS EXAMINATION.

19             BY MR. FRAM:

20             MR. FRAM:  Thank you, your Honor.

21   Q.   How old are you, please?

22   A.   40.

23   Q.   So back during 2001 when these events were happening,

24   you were 30 years old?

25   A.   Correct.

Clarke-direct/Press                                              66

1   Q.   You graduated from University of Nebraska?

2   A.   Yes.

3   Q.   What year?

4   A.   '96.

5   Q.   I think you said you started flying at TWA in 1996.

6   Yes?

7   A.   No, '95, because I still had one class to finish up so I

8   did that on line and then I finished so I could get my degree

9   so I could get hired by TWA.

10           THE COURT:  Your bachelor's degree.

11           THE WITNESS:  Correct.

12   Q.   You got your bachelor's in '95?

13           THE WITNESS:  '95, I believe, yeah.

14   Q.   Even then you had the good fortunate to get a job at a

15   major airline, TWA,  and begin work there September 5 of

16   1996?

17   A.   Correct.

18   Q.   And you have been flying about, I guess about five

19   years, or a little bit more than four years when the

20   bankruptcy took place?

21   A.   Yes.  Well, yes.  Five years.

22   Q.   You started at TWA after the first two bankruptcies,

23   right?

24   A.   Yeah, '96.

25   Q.   You understood in 2001 this was the third time that TWA

1   had filed for bankruptcy?

2   A.   It was the first time for me.

3   Q.   I think you mentioned a landscape business of some kind?

4   A.   Sure.

5   Q.   When did you start that?

6   A.   After I got laid off in 2003.

7   Q.   So you didn't have a landscape business back in 2000 or

8   2001?

9   A.   I always, I didn't have a landscape business.  I cut a

10  few yards on the side.

11  Q.   So you had a side job that you had at the same time as

12  you were a pilot?

13  A.   Correct.

14  Q.   How were you able to do that if you were a pilot for

15  TWA?

16  A.   Because basically we didn't fly every single day.

17  Q.   And after you got laid off you expanded your landscape

18  business.  Is that what happened?

19  A.   Well, actually, in '98 I did not have the landscape

20  business any more, and then in 2003, that is when I started

21  it up again.

22  Q.   The other members of the merger committee beginning back

23  in early 2000, I want to make sure we have their names.  Why

24  don't we bring up the board here.

25           THE COURT:  You are going to bring up an exhibit.

```
 1              MR. FRAM:  We are going to bring up the tablet,
 2    your Honor.
 3              THE COURT:  Oh, okay.
 4    Q.    Do me a favor.  Give us the names in terms of most
 5    senior.  Was the most senior guy Mr. Bensel?
 6    A.    ?yes.
 7    Q.    Give me a sense of how senior he was, either in terms of
 8    age or seniority at TWA?
 9    A.    I don't know his exact seniority number, but he was at
10    that time he was probably in his mid to upper fifties.  A
11    relatively senior TWA captain.
12    Q.    Okay.  Can you give us any estimate of where he would
13    have been on the list in terms of, like percentage, like top
14    ten of the seniority list?
15    A.    I would be guessing but probably top ten, 20 percent,
16    somewhere in there.
17    Q.    Let's put down continue to 20 percent?
18    A.    Yes.
19    Q.    You mentioned a Swanson.  Is that John Swanson?
20    A.    Yes.
21    Q.    Is he the next most senior of the people on the
22    committee?
23    A.    I don't know.  Either him or Gary Flor.
24    Q.    You think Flor might have been.  Give me a sense, how
25    old was Flor?
```

Clarke-direct/Press                                            69

1    A.    52, maybe, fifties.  He was in his fifties also.

2    Q.    Early fifties, you think?

3    A.    Probably.

4          THE COURT:  When?  Now or back in 2001.

5    A.    Back then.

6    Q.    We are asking back then.  Are you with me in terms of

7    back in 2001?

8    A.    Yes.

9    Q.    Say early fifties.  Where do you think he was, what is

10   your recollection of where he was, let's take a step back.

11   When you were having discussions with the other members of

12   the merger committee you would have known at the time where

13   everybody was on the seniority list, right?

14   A.    We knew kind of who was which range, yeah.

15   Q.    Can you give us an estimate in terms of percentage of

16   where Flor would have been, pretty close to Bensel?

17   A.    Well below Bensel.  Maybe the 30, 30 to 40 percent.

18   Q.    Juan son would have been next?

19   A.    Just below Flor, probably.

20   Q.    Early fifties as well?

21   A.    Yeah.

22   Q.    And about the same in terms of the seniority?

23   A.    Yeah.

24   Q.    And then was Hefley the next guy?

25   A.    Yes.

Clarke-direct/Press                                          70

1   Q.   Give me your best recollection of his age?

2   A.   John was probably around 40.

3   Q.   Where do you think he would have been in terms of

4   seniority?

5   A.   He was probably about 300 numbers senior to me, maybe.

6   3, 400 numbers senior to me.

7   Q.   There were about 2,400 pilots?

8   A.   Correct.

9   Q.   What was your number at the time?

10  A.   I think I was around 1600.

11  Q.   So he would have been twelve to 1300?

12  A.   Yeah, he was just short of captain, I believe.  Probably

13  around 13, 1,400.

14  Q.   That would have put him what, in maybe a 55 or 60

15  percent, something like that?

16  A.   Sure.

17  Q.   Was there another member of the merger committee?

18  A.   Just me.

19  Q.   Just you.  Okay.  We talked about you.  You are the

20  youngest by far of the members of the merger committee?

21  A.   Correct.

22  Q.   And how far from the bottom were you?

23  A.   I think I had probably around six to 800 pilots below me

24  maybe, somewhere in there.

25  Q.   So on a percentage basis, maybe what, 75, 80 percent,

Clarke-direct/Press                                                71

 1    something like that?

 2    A.    Yeah, probably somewhere in there.

 3    Q.    These older guys had, they had wives, families to

 4    support?

 5    A.    Yes.

 6    Q.    They were pretty concerned about making sure that they

 7    had jobs going forwarded?

 8    A.    I think everybody wanted a job.

 9    Q.    And a couple of these guys were, at this point in time,

10    back in '01 the mandatory retirement age for pilots was 60?

11    A.    Correct.

12    Q.    At least a couple of these guys had ten years or less to

13    continue flying?

14    A.    Yes.

15    Q.    And I think you mentioned that when the ALPA advisors

16    meant with you and the merger committee on the evening of

17    March 28 a, that they suggested a proposal to the APA.  Is

18    that correct?

19    A.    Correct.

20    Q.    And the proposal would have stapled how many of the TWA

21    pilots?

22    A.    825.

23    Q.    825.  Okay.  And I think you said there was a pretty

24    meted discussion about that?

25    A.    Yes.

Clarke-direct/Press                                                    72

1    Q.   Did you also say that the ALPA advisors say that they

2    had some backdoor communication was people at American which

3    led them to believe that the American pilots would accept

4    stapling of 825 people?

5    A.   They said that is where we were going to need to start

6    to get a deal.

7    Q.   Okay.  And the discussion among the members of the

8    merger committee about that, you were pretty adamant you said

9    that you didn't want to see that many TWA pilots stapled,

10   correct?

11   A.   Correct.

12   Q.   What did the other people on the merger committee, the

13   people with a lot more seniority than you, say about that 825

14   number?

15   A.   At that point Bud Bensel is not on the committee.

16   Q.   Oh.  I thought Bensel was the fellow who began on the

17   committee, and then resigned in March because of health

18   problems?

19   A.   Right, but now we are at March 28.

20        THE COURT:  So he is off.

21   A.   So Bensel is off and Mike Day was the captain.

22   Q.   Okay.  Let's fill in Mike Day.  Can you give us the same

23   type of information for Mike Day, another senior guy?

24   A.   Mike was probably a little bit older than Bensel.  I

25   think.  But probably around the same seniority.

Clarke-direct/Press                                                    73

1    Q.   Let's put day below.  So you think mid to late fifties,

2    maybe?

3    A.   Yeah.

4    Q.   But mid fifties, certainly?

5    A.   Yup.

6    Q.   All right.  We will say the time.  All right.  So you

7    are having a discussion with the other people on the

8    committee, day, Flor, Swanson and Hefley?

9    A.   Correct.

10   Q.   Some of them were in favor of going with the proposal

11   being, being advised by the ALPA advisors?

12   A.   I don't think anybody really wanted to do it.  But they

13   were being put into a position where they felt that if that

14   is what was going to get a deal, that they would at least

15   look at it, but no one started to say, I don't think any

16   pilot would admit they wanted to staple 825 other pilots.

17   Q.   Setting aside your interpretation, what did they say?

18   Did they say we are willing to recommend this if that will

19   resolve this issue quickly so we can move on with other

20   matters?

21   A.   At some point they may have considered that, but

22   obviously we didn't go with that.  That was not -- they did

23   not agree to on do that.

24   Q.   My question is a little different.  Do you recall, do

25   you fully recall the specifics of who said what at this

Clarke-direct/Press                                          74

1   meeting?

2   A.   You mean as far as of single word, no, but I remember

3   the general atmosphere of the meeting.

4   Q.   Well, do you recall any of these people, Day, Flor,

5   Swanson, Hefley, saying yeah, let's propose 825 to the

6   American pilots tomorrow?

7   A.   Mike Day did not, because he is ultimately the one that

8   decided that, you know, where we would come up, he was the

9   chairman.  So he said that, myself and Hefley were against

10  it.  Flor and Swanson, I wouldn't say were for it but once

11  we, as a committee we negotiated between each other and

12  talked amongst other each other, we agreed with the 400

13  number.

14  Q.   What was that specific number, 400 --

15          THE COURT:  36 or something.

16  Q.   Do you recall it or do you have to make reference to the

17  notes.  You are referring I assume to J 301?

18  A.   Yeah.  434.

19  Q.   Okay.  I think you said before that you were the one who

20  fought hardest against the 825 number?

21  A.   Myself and Hefley.

22  Q.   Did you get the sense that the other guys were willing

23  to go with a number that was a little bit higher?

24  A.   I got the sense that if they thought, without certainty,

25  that they would arrive at a deal with this proposal, that

1    they would consider it.

2    Q.   Now, whether 825 were stapled or 434 were stapled, that

3    wouldn't have mattered for day and Flor, right.  They had

4    enough seniority so that they weren't going to get stapled,

5    right?

6    A.   Well, can I explain that?

7             THE COURT:  Yes.  Well  --

8    A.   If you staple 434 pilots, number 435 starts here, and

9    then you work up the list.  So the top guy is going to be

10   higher up on the list by only stapling 434.

11            So would it have, did it -- would it ultimately

12   have helped Day, Flor, and Swanson if we didn't staple 825

13   and we only stapled 434, most definitely.  Stapling 825 would

14   have put them a lot lower, even though they were above the

15   staple point.  It would have put them a lot lower, still, on

16   the seniority list.

17   Q.   Then we agree that even at 825 that at least Swanson,

18   Flor, and Day, would not have been stapled, correct?

19   A.   They would not have been on the bottom of the seniority

20   list.

21   Q.   At 825 you and Hefley would have been stapled, right?

22   A.   I don't know that Hefley would have been.  I probably

23   would have been.

24   Q.   All right.  And  you were upset about the prospect --

25   A.   It wasn't about me.

Clarke-direct/Press                                              76

1    Q.   Right.  But just answer my questions, please.  You were

2    upset at the prospect of getting stapled, right?

3    A.   I wasn't upset I was getting stapled.  I was upset 825

4    people were getting stapled.

5    Q.   The number of pilots who ultimately got stapled under

6    Supplement CC was how many?

7    A.   1,250, I believe.

8    Q.   And that was in November, November 8 of 2001?

9    A.   Correct.

10   Q.   If the American pilots had agreed to staple only 825 in

11   March of  2001, that would have been a better deal for the

12   TWA pilots  than the deal that ultimately was achieved,

13   right?

14   A.   No.

15   Q.   So 825 is not a lower number than 1,250?

16   A.   You have to look at the deal as a whole.

17   Q.   So you think?

18   A.   If they stapled 1,250 pilots but they have protections

19   and they have furlough protection and they have a lot of

20   other  things that can come with that, that is not

21   necessarily -- I mean everybody wants to look at the staple

22   and say how many people were on the bottom of the list and

23   that, while that hurts, you got to also look at the deal as a

24   whole.

25   Q.   Right.  But just taking it one issue at a time.  The

Clarke-direct/Press                                          77

1    staple deal that was recommended by ALPA in March, late

2    March, of 2001, was better than the staple aspect of

3    Supplement CC.  Just by virtue of the numbers, right?

4    A.   825 on the bottom of the list, probably would have been

5    better than 1,250.  Depending on the rest of the deal.

6    Q.   Right.  Any discussion in March about protective cells?

7    A.   Yes.

8    Q.   And protective cell ended up getting to be part of

9    Supplement CC, right?

10   A.   Well, I don't know if it was protective cells, I have to

11   take that back.  It was fences.  We were fenced off of

12   certain airplanes.  There were no cells.

13   Q.   Can you explain to us how a fence is different from a

14   cell, a protective cell?

15   A.   A protective cell is when they basically take all the

16   TWA pilots and push them into Saint Louis, and that is where

17   we have to work out of.  A fence, or, I should say a

18   condition or restriction would be you can't fly a triple

19   seven for a certain period of time and you can't fly an MD 11

20   or whatever airplanes they had that we wouldn't have, so when

21   we proposed that, we set a ten-year fence from flying the

22   triple seven captain.

23   Q.   Just so --

24   A.   The cell, there was never any discussion about us just

25   being in St. Louis at that point.

Clarke-direct/Press                                              78

1    Q.   So just so we are clear.   In terms of how you define the

2    fence versus a protective cell, was a protective cell on the

3    table in March during these discussions with the American

4    pilots?

5    A.   It is kind of a mixed word.   A fence off of the triple

6    seven and the A 300 was in the discussions.   That was at

7    least in our proposal.

8    Q.   Just to cut to the chase, in your view, is a deal that

9    was ultimately imposed in Supplement CC in November, was that

10   a better overall deal for the TWA pilots than the proposal

11   that your committee made on March 29 of 2001?   If it is not a

12   yes or no question, you should feel free to say so.

13   A.   I don't think so.   That is a pretty broad statement to

14   just say yes or no to.

15        What we ultimate had done to us was not good.

16   Stapling 825 --

17        THE COURT:   No, no, the question is, he has asked

18   you to compare two things, CC, and then the earlier proposal

19   with how many staples, eight hundred --

20        MR. FRAM:   825.

21        THE COURT:   He is asking which would have been a

22   better deal.

23   A.   Oh, yeah, looking back, you know, looking back on it and

24   knowing now what I guess I should have known then, 825 would

25   have been a better deal.

Clarke-direct/Press                                        79

1    Q.    So the ALPA recommendation, if accepted by your

2    committee, and accepted by American, would have been better

3    in the long run for the TWA pilots?  Yes?

4    A.    There is a lot of if's in there.

5              THE COURT:  But you know what the proposal was, the

6    825, you know what CC was.

7    A.    We are also assuming that American would have accepted

8    it, and the APA would have accepted it.

9              THE COURT:  It is a theoretical question.  If the

10   question is, which would have been better for the pilots?

11   A.    The 825 would have been better.

12   Q.    Yeah, but you explained that it wasn't just 825.  It was

13   a whole package.  The March package recommended by ALPA, if

14   accepted, would have been better than Supplement CC, yes?

15   A.    Yes.

16   Q.    Did you testify before that you expected when this whole

17   process began to get date of hire, in terms of seniority

18   integration?

19   A.    Yes.

20   Q.    Did you know at the time you were appointed to the

21   committee what the ALPA contract, the TWA pilots contract

22   with TWA said about seniority integration?

23   A.    Say that again.

24   Q.    Were you familiar with the seniority, the scope and

25   successorship provisions of the TWA pilots contract, the one

Clarke-direct/Press                                            80

1    they had with TWA?

2              THE COURT:  You mean ALPA.

3    Q.   The ALPA contract?

4    A.   Somewhat, yeah.

5    Q.   What did they say about date of hire, did they say that

6    the TWA pilots would get date of hire in the event of a sale

7    of the company?

8    A.   Who is they, the contract?

9    Q.   The contract.  Yeah.  Did the TWA, the contract that you

10   were living under at the time of the bankruptcy, what did it

11   say about date of hire?

12   A.   It said we would have access to a process which would

13   result in arbitration to determine what our seniority would

14   be if we were merged.

15   Q.   All right.  So it said that the pilot groups would try

16   to negotiate and if they couldn't agree there would be

17   seniority arbitration, yes?

18   A.   Correct.

19   Q.   Now --

20             THE COURT:  Did it guarantee date of hire?  Did it

21   say if there is a merger with it, we must get date of hire?

22   Did it say that?

23             THE WITNESS:  I don't believe so.

24   Q.   It said nothing about date of hire, correct?

25   A.   Correct.

Clarke-direct/Press                                          81

1    Q.    Did seniority arbitration in your mind mean date of

2    hire?

3    A.    If you look -- yeah, I mean, it meant something around

4    date of hire.  Something, date of hire, conditions,

5    restrictions, but it would be molded from date of hire.  That

6    is whatever -- that is the standard.  That is what everybody

7    knows is when you get hired.

8    Q.    Under seniority arbitration an arbitrator would be

9    appointed, right?

10   A.    Correct.

11   Q.    The arbitrator would hear the positions of the different

12   pilot groups, right?

13   A.    Correct.

14   Q.    The arbitrator would decide what he or she felt was fair

15   and equitable, right?

16   A.    From what I understand, the arbitrator would decide

17   which proposal to clues.

18   Q.    So your understanding is that the arbitrator, it would

19   be like baseball arbitration where you pick one side or the

20   other side, but don't decide something in the middle?

21   A.    The arbitrator would ultimately have the final say, and

22   that is what you would get.

23   Q.    Okay.

24         THE COURT:  But the arbitrator wasn't limited to

25   the proposals of the parties.  He could give some of what

Clarke-direct/Press                                                    82

1    what one party wanted and some of what the other party

2    wanted?

3    A.    Correct.

4    Q.    If you go to seniority, arbitration and one pilot group

5    says staple and the other pilot groups says date of higher,

6    the arbitrator could decide to staple, the arbitrator could

7    decide date of hire or the arbitrator could decide anything

8    in between, right?

9    A.    I believe so, but I can't say that with certainty.

10   Q.    Do you agree that if the TWA pilots had gone to

11   seniority arbitration, that there was no guarantee of any

12   particular outcome?

13   A.    Yeah, there is never a guarantee.

14   Q.    The outcome would depend upon whether or not the

15   arbitrator was on the positions of the, on the positions of

16   the parties, on the arbitrators analysis, perhaps on how the

17   arbitrator felt that day.  There would be a whole bunch of

18   fairly  complex factors that would lead to some result, yes?

19   A.    If it got to arbitration.

20   Q.    So you agree that when the TWA pilots gave up seniority

21   arbitration, they gave up something that was indefinite and

22   uncertain?

23   A.    When the ALPA advisors advised us to give up scope, we

24   assumed and believed that ALPA National would be behind us,

25   would stand behind us, would take us through this process.

Clarke-direct/Press                                                        83

```
 1              THE COURT:  That is not the question.

 2   Q.   Let me ask the question again.

 3              THE COURT:  Let him answer the question again.

 4   Q.   Do you agree that when the TWA pilots gave up seniority

 5   arbitration, they gave up something that was uncertain and

 6   indefinite in terms of the end result?

 7   A.   Yeah.

 8   Q.   The position taken by the American pilots consistently

 9   in the early discussions was we are than tiled to have the

10   TWA pilots stapled.  Do you recall that?

11   A.   They said that, yes, stapling two thirds of the list.

12   Q.   Well, you had said before when the deal was announced

13   that you expected date of hire, right?

14   A.   Correct.

15   Q.   Did you learn at the time what the American Airlines

16   contract, what the APA said, about new pilot groups coming

17   in?

18   A.   Alls I knew is, I didn't know what the APA's contract

19   was, no.

20   Q.   You weren't told by other people on the MEC --

21   A.   I was told that we had to waive our scope.

22   Q.   My question is a little different, though.  I am asking

23   you about your recollection, if you have one, of what the

24   American contract with its pilots said.  Do you recall being

25   told early in this process, in January, for example, that the
```

Clarke-direct/Press                                                84

```
 1    American pilots contract was one that entitled them to have

 2    new pilot groups be stapled.  Do you recall that?

 3    A.   I don't recall that.

 4    Q.   Well, what did what do you recall about the American

 5    pilots contract?

 6    A.   We, it wasn't my job to know the American pilots

 7    contract.  I knew that as part of the deal, that they wanted

 8    us, or were requiring us to waive our scope provisions, which

 9    that was our contract.  That is what we were living under.

10    Q.   You were a member of a committee that was charged with

11    negotiating with the American pilots?

12    A.   Correct.

13    Q.   You do you agree that when you are negotiating, that you

14    need to know what the other side's position is, and what

15    legal rights and arguments they have?

16    A.   It would be helpful, yes.

17    Q.   You need to know where they are coming from in terms of

18    a negotiation process?

19    A.   Sure.

20    Q.   Did you have any experience back in 2001 in

21    negotiations?

22    A.   Did I specifically?

23    Q.   Yes.

24    A.   Yes, on the grievance committee.

25    Q.   Okay.  And if you don't recall this just say, but do you
```

Clarke-direct/Press                                              85

1    recall when you got involved in the merger committee, getting

2    some background materials about what the American pilots

3    position was?

4    A.    I know that that is when Roland Wilder, at the initial

5    January meeting, basically was saying, it was going to be a

6    fight and that they were not going to just come in and give

7    us what we wanted.

8    Q.    Yeah, but you met face-to-face with the American pilots,

9    right?

10   A.    Yes.

11   Q.    Do you recall the dates of those meetings?

12   A.    There was one where we had a dinner and then in

13   February, then we met.

14   Q.    Do you recall the dates of the meetings?

15   A.    The exact date, no.

16   Q.    Did you have, did you take the time to review any

17   documents before you came in to testify in this case?

18   A.    Yeah, I have a big box in my basement with all the

19   notes, and I went through as many as I could.

20   Q.    I am going to hand you three documents.  In order.  Then

21   we are going to walk through them real quick.  The documents

22   are J 283.  J 284, and J 285.  Do you recognize J 283 as a

23   letter to Leroy Bensel, March 2, 2001, from fellow named Ed

24   White who was the chairman of the APA negotiating committee?

25   A.    Yes.

1    Q.   You would have received a copy of this letter back

2    around March 2 of 2001?

3    A.   I don't know that I would have received it.  It is not

4    to me.  I was to Bud.

5    Q.   Do you recall seeing a copy of this letter back in early

6    March of 2001?

7    A.   The letter looks familiar.

8    Q.   The first, well, I will move it into evidence, your

9    Honor.  And we will see if?

10             THE COURT:  Which one?

11             MR. FRAM:  J 283.

12             THE COURT:  Any objection.

13             MR. PRESS:  No objection.

14             THE COURT:  J 283 in evidence.

15             MR. FRAM:  Thank you.

16   Q.   All right.  The first paragraph of the letter says dear

17   Bud:  We are sorry that you and your committee abruptly

18   terminated our meeting on March 1, 2001, without giving us an

19   opportunity to review and explain our written response to the

20   quote ALPA proposed seniority list integration, close quote,

21   which you presented to us earlier in the day.

22             The next paragraph refers back to a meeting on

23   February 9.  As we outlined to you at our February 9 meeting

24   in St. Louis, he goes on and says some other stuff.  Does

25   that refresh your memory that there were meetings of the

1    merger committee with the APA merger committee on February 9

2    and March 1.

3    A.    Yes.

4    Q.    Do you recall anything that happened at the meeting on

5    March 1 of 2001?

6    A.    On the March first meeting?

7    Q.    Yes, sir?

8    A.    Can I read the letter real quick?

9    Q.    Take it a step at a time.  Do you recall, without

10   reading the letter, anything that happened at the meeting on

11   March 1?

12   A.    I believe that is where they showed us their IDs.  Said

13   that they weren't talking about date of hire.

14   Q.    Do you recall anything about the March 1 meeting?

15   A.    That.

16   Q.    Do you recall anything else about the March 1 meeting?

17   A.    No.

18   Q.    Do you recall a meeting of the merger committees where a

19   American pilot came across the table at Bud Bensel?

20   A.    Came across the table?

21   Q.    Yeah.

22   A.    Like physically?

23   Q.    Yeah.  Do you recall a fellow named Mickey Malersky

24   physically coming across the table to try to attack Bud

25   Bensel?

Clarke-direct/Press                                                    88

 1  A.   Oh, not -- I mean I don't think that anybody was going

 2  to jump up and have a fight.

 3  Q.   I am simply asking you factually if you recall

 4  something.  If you don't, just say so.

 5  A.   I don't remember that, no.

 6  Q.   This letter asserts that your committee, your merger

 7  committee, abruptly terminated the meeting on March 1.  Do

 8  you recall a abrupt termination to that meeting?  In other

 9  words, do you recall what do you recall what happened that

10  may have led him to write that?

11  A.   No.

12  Q.   Do you see in the third paragraph of the letter, as we

13  stated, the March 1 meeting everyone's concept of, quote,

14  "fair" differs according to his or her point of view.

15  A.   Yes.

16  Q.   So you do recall in early March that the American pilots

17  had a completely different idea of what was fair in terms of

18  seniority integration from the TWA pilots?

19  A.   Yes.  In all negotiations.

20  Q.   You recall at around this meeting, the American pilots

21  saying we are entitled to have you stapled to the end of our

22  seniority list?

23  A.   Yeah.  They always told us that that is what they could

24  do.

25  Q.   All right.  So does that refresh your memory that they

Clarke-direct/Press                                                    89

1   had a contract that, that they referred to a contract and

2   said we have a contract that entitles you to be stapled to

3   the bottom of our list?

4   A.   They probably mentioned that.

5   Q.   Okay.  When they mentioned that, did that sort of

6   explode any ideas you had in your head about whether date of

7   hire was a reasonable outcome here?

8   A.   Not really.  It is opening positions and you know, they

9   are basically saying, hey, this is what we can do to you, but

10  we are not, we are just going to do it to two thirds of you.

11  Q.   J 284 is the next document.  It is a March 5 letter also

12  from Captain White to Captain Bensel.  Have you seen that

13  letter, did you see that letter back in March of '01?

14  A.   Yeah, I remember this letter.

15              MR. FRAM:  I move J 284 into evidence, your Honor.

16              MR. PRESS:  No objection, Judge.

17  Q.   The first --

18              THE COURT:  Any objection?

19              MS. RODRIGUEZ:  No, your Honor.

20              MR. PRESS:  No.

21              THE COURT:  J 284 in evidence.

22              MR. FRAM:  Thank you.

23  Q.   The first paragraph of the letter.  Let's blow that up,

24  please.  You wrote:  Dear Bud.  This morning we were

25  distressed to learn that a detailed account of the merger

1   committee's March 1 meeting had been posted in a forum on the

2   planebusiness dot com website under the screen name Saint A.

3   Do you see that?  Do you see what I read?

4   A.   Yes.

5   Q.   Do you recall this incident where the APA, the American

6   pilots were upset that discussions between the merger

7   committees were being publicly disclosed?

8   A.   Yeah, I remember that because we felt that we knew it

9   wasn't nobody on our committee, but we felt that it was them

10  putting that out.

11  Q.   Was there an agreement among the two merger committees

12  that their discussions would be confidential?

13  A.   Yes.

14  Q.   And why was that?  Do you recall?

15  A.   Well, just because, you don't want to get everybody, all

16  the pilots worked up.  I mean, you just don't want that

17  getting out because of the discussions that are going on.

18  Q.   And your committee did some kind of investigation to

19  confirm that nobody on your committee had leaked this

20  information?

21  A.   Right.

22  Q.   And you concluded that it was an American pilot who was

23  doing it?

24  A.   We assumed.  We didn't know who did it.  But we knew

25  that we didn't.  And we knew we were the only ones with that

1    information.

2    Q.   So was it clear to you in early March that

3    misinformation was potentially getting out there?

4    A.   From their side?

5    Q.   Yes, sir.

6    A.   Yes.

7    Q.   And that was the same kind of misinformation that an

8    American pilot circulated when he reported that Duane Woerth

9    said at a meeting that the TWA pilots had to get real.

10   Right?

11   A.   I don't think that was misinformation.

12   Q.   Didn't you tell us when you attended the meeting on

13   April 23 that Captain Woerth denied making that statement,

14   that was your testimony this morning, right?

15   A.   When I first said that he kind of politically danced

16   around it, yes.

17   Q.   You said he denied it, right?

18   A.   Okay, yes.

19   Q.   So you understood when he said I never said that, that

20   this was misinformation that was being circulated by the

21   American pilots to try to embarrass Captain Woerth and try to

22   cause unrest or disquiet within the TWA pilot ranks, right?

23   A.   Or he wasn't telling the truth when he said he didn't

24   say it.

25   Q.   Oh, so did it occur to you that the American pilots --

Clarke-direct/Press                                              92

1    let's take a step back.  In April, the seniority integration

2    process between the American pilots and the TWA pilots has to

3    continue, right?

4    A.   Say that again.

5    Q.   As of April, late April, everybody knew that the

6    seniority integration negotiations between the TWA pilots and

7    the American pilots were going to continue, yes?

8    A.   Yes.

9    Q.   And those negotiations had been pretty contentious in

10   months prior to that, yes?

11   A.   Yes.

12   Q.   So it didn't occur to you when you heard about this

13   alleged remark by Captain Woerth that one of the American

14   pilots had deliberately misquoted him to get the TWA pilots

15   upset?

16   A.   I guess I don't understand what benefit that would have

17   to them.

18   Q.   Well, wouldn't that drive a wedge between the TWA pilots

19   and ALPA?

20   A.   We didn't want a wedge.  We wanted them to help us.

21   Q.   Wouldn't that get TWA pilots upset at their own union?

22   A.   It definitely would, but at the same time we are asking

23   for their help.  We, and still even after hearing that we

24   needed their help.

25   Q.   Okay.  But my question to you, is didn't you understand

Clarke-direct/Press                                                    93

1    that this that this was a tactic by the American pilots to

2    try to get TWA pilots upset and to lose confidence in ALPA?

3    A.   That particular instance with Duane Woerth, I don't

4    believe that.

5    Q.   What I just said never occurred to you?

6          THE COURT:   Did you make any effort to find out who

7    Saint A was?

8    A.   We basically looked at our committee, the people who

9    knew, who had access to that information.

10         THE COURT:   Do you know, do you know what the

11   reference to Saint A was?

12   A.   No, I don't.

13         THE COURT:   A famous college fraternity known as

14   Saint Anthony's, known as Saint A's all over the country.

15   A.   I didn't know that.

16   Q.   Do you recall being invited to the, to an MEC meeting on

17   April 1 and 2 of 2001?

18   A.   Yes.

19   Q.   Do you recall getting an email that I am looking for now

20   that announced that meeting which advised you had and every

21   other pilot that there would be a working session on Sunday,

22   April 1, and a formal meeting of the MEC on April 2?

23   A.   I don't remember the details but I am assuming that is

24   correct.

25   Q.   We will find that if we need to refresh your memory.

Clarke-direct/Press                                                94

1    Did you attend a working session of the MEC and advisors on

2    Sunday, April 1, 2001?

3    A.   I don't know that the merger committee, at least the

4    committee, maybe the chairman worked with them but I don't

5    know that we actually, because I believe that was more on

6    scope waiver, and things that were going to be available or

7    not available and that kind of stuff.

8    Q.   My question is very direct.  Did you attend a meeting of

9    April --

10   A.   April 2nd I would have been there.  April 1, probably, I

11   am assuming I would have been there.

12   Q.   So you think you were at a meeting on April 1, 2001 --

13   A.   Where was the meeting at?  That may help.

14   Q.   Let's not cut each other off.  The meeting I believe was

15   in St. Louis.  My question is do you recall attending a

16   meeting of TWA pilots and some of advisors on Sunday, April,

17   2001?

18   A.   I don't recall that.

19   Q.   Do you recall a meeting of the MEC with advisors present

20   on Monday, April 2, of 2001?

21   A.   Yes.

22   Q.   Did you stay for the whole meeting?

23   A.   Yeah, I believe so.

24   Q.   Was Roland Wilder there?

25   A.   Yes, I believe so.

Clarke-direct/Press                                                95

```
 1    Q.    What do you claim he said at the meeting, if anything?

 2    A.    I know he was against waiving scope.

 3    Q.    Do you recall a vote being taken at that meeting?

 4    A.    In the MEC?

 5    Q.    Yes, sir?

 6    A.    Yes.

 7    Q.    What did the MEC vote to do?

 8    A.    They voted to waive scope.

 9    Q.    To your recollection, did they vote to do anything else

10    on April 2 of 2001?

11    A.    Not to my recollection.  I am not sure what else was on

12    the --

13    Q.    Did you review the minutes of the April 2, 2001, meeting

14    before coming in to testify in court hear today?

15    A.    I don't believe so.

16    Q.    In October of 2001 there were some efforts to continue

17    negotiations with the American pilots about seniority

18    integration?

19    A.    There was, repeat that question.

20    Q.    Did you tell us this morning that there were some

21    efforts in October of 2001 to continue negotiating with the

22    American pilots about seniority integration?

23    A.    The APA wanted to negotiate again.

24    Q.    The merger committee at that point, just so we are

25    clear, was the merger committee at that point still day,
```

Clarke-direct/Press                                                    96

1    Flor, Swanson, Hefley and you?

2    A.    No.

3    Q.    How, and I am focusing on the period before you resigned

4    in late October.  How had the merger committee changed?

5    A.    There was still day, it was Flor, Flor was gone.  D J

6    Glassby was a member.  And myself.   And Hefley.  But I don't

7    think Hefley was there.

8    Q.    But he was still on the committee?

9    A.    Correct.

10   Q.    How about Swanson?

11   A.    Still on the committee.

12   Q.    Still there.  And the other fellow who joined was a D J

13   Glassby?

14   A.    Yes.

15   Q.    How senior was he?

16   A.    He is probably right around Flor, seniority.

17   Q.    We will just put that.  Did the members of the merger

18   committee agree about how to proceed?

19   A.    We wanted a better deal, so yeah, we were willing to

20   talk.

21   Q.    In terms of the proposal that was on the table by the

22   APA, did there ever come a point where there was a

23   disagreement between the merger committee about whether to

24   accept the APA's proposal?

25   A.    Which proposal and when?

Clarke-direct/Press                                              97

1   Q.   I am just asking generally.  I am asking if there was

2   ever a point where there was a proposal on the table, and,

3   for example, Day said I think we should take this, this is

4   the best we are going go to get, and other people, perhaps

5   you, said no way, we shouldn't accept that.

6   A.   March 28 meeting, yeah.

7   Q.   Yeah, but I am asking you about October.  I am asking

8   about the October timeframe?

9   A.   So, so after we negotiated with the APA, in October, in

10  Washington, D.C..  Is that what you are asking?  I am not

11  sure what you are asking.

12  Q.   I am asking about whatever negotiation took place in

13  October, whether it was directly with the APA, whether it was

14  with Jeff Brundage, whether it was with Senator Bond,

15  whatever discussions that took place, was there ever a point

16  where there were disagreements among the members of the

17  merger committee about whether to accept or not accept the

18  deal?

19  A.   Yeah.

20  Q.   Okay.  Tell me what the disagreements were.

21  A.   Well, at the end of the Washington, D.C. meetings --

22  Q.   Those are the ones at the Mayflower hotel?

23  A.   Yes.

24  Q.   Okay.

25  A.   We voted down the proposal.  Duane Woerth said he wasn't

1   going to sue another union, and then the MEC wanted us to re-

2   vote to see what, if that would change anything, because we

3   didn't have the support from ALPA.

4   Q.    Do you recall a point where Mike Day said look, I am not

5   excited about the deal but I think it is the best deal we are

6   going to get, and I think we should accept it.

7   A.    Yeah.

8   Q.    And do you recall him explaining that you would get a

9   better deal, the pilots would get a better deal, from the

10  American pilots by agreeing to something as opposed to not

11  agreeing and having something simply imposed?

12  A.    That was his opinion.

13  Q.    Do you recall him saying that there was a benefit to

14  signing on to a deal with American and the APA because if you

15  didn't sign on to a deal and it was just between American and

16  the APA, they could unilaterally change the deal later on?

17  A.    It was always going to be part of their contract,

18  Supplement CC, so that is always open to change.  There was

19  no guarantee set up, us signing the contract was going,

20  signing the proposal, was going to get us anything more than

21  what was in the proposal.

22  Q.    Right.  But did Mr. Day say, did he articulate that if

23  the TWA pilots signed on to a deal and it was a three party

24  deal, that they would be able to lock the deal in, and

25  wouldn't be in a position where the APA and American could

1   change the deal later on?

2           MR. PRESS:  Your Honor, I object to the question.

3   The pilots don't sign anything.  It is the union.  These are

4   intentionally misleading questions.

5           THE COURT:  I will accept that with that

6   understanding.  But I think the question is a fair one.

7   Q.   Do you understand my question or should I try to

8   rephrase it?

9   A.   It was Mike Day's opinion that if we signed, there would

10  be --

11          THE COURT:  If we sign what?

12          THE WITNESS:  If we signed on to Supplement CC

13  because -- and if we are going to talk about what his opinion

14  was, his opinion was only because ALPA would not support us

15  in the litigation.

16           So at that point he said it might be better to

17  take the deal if we can sign on it, and if we can have

18  protections or if we can have a say in how this is enforced

19  down the road, but there was none of that in Supplement CC.

20  There was never something that said you are going to have a

21  dispute resolution committee.  There was nothing, I mean we

22  had, his opinion was flawed, in my opinion.

23  Q.   Well, is that the question I asked you, whether his

24  opinion was flawed?

25  A.   Well, you are asking me a lot about his opinion and I

1    don't know, I mean I can tell you yes, what you asked me, did

2    he say that it was better to take a deal than no deal and not

3    sign a deal, yes, he did.

4    Q.    My question was did he explain that a three-party deal

5    is better and two-party deal because if it was a three-party

6    deal the other two parties can't change it?

7    A.    That is, but I don't believe that is true.  You still

8    have two votes to one.

9    Q.    I am sorry.  You think that if three parties sign a

10   contract, that two parties can unilaterally change it without

11   the --

12   A.    If it is part of their contract.

13   Q.    Listen to the question.  Do you think that if three

14   parties sign a contract, and two parties later decide to

15   change it, they can just disregard what the third party wants

16   to do?  Is that your understanding of how contracts work?

17   A.    It is my understanding also that the APA, even without

18   our signature, would still have their duty of fair

19   representation to represent us, no matter what we signed or

20   didn't sign.

21           Once we are on their seniority list and once the

22   APA represents us, they have to represent us.  They can't

23   come in and do something that would be detrimental to one

24   group of pilots.  They can't come in after the fact, so

25   signing Supplement CC had no meaning on that part of it.

1    They would have a duty to represent us.  They couldn't change

2    it.  They would get a DFR suit or a lawsuit.  Either way they

3    would have still got sued.

4    Q.   Do you have any legal background?

5    A.   Do I?

6    Q.   Yes.

7    A.   I -- no.  I mean I was on the grievance committee for

8    three years and worked with a lot of lawyers.

9    Q.   Any legal or contract training back in 2001?

10   A.   Yeah.

11   Q.   What was your legal or contract training back in 2001?

12   A.   The grievance, well, not 2001.  98, when we were doing

13   the grievance committee, we were trained by ALPA.

14   Q.   Do you recall Roland Wilder telling the pilots,

15   including the merger committee, that you are better off with

16   a three-party deal than a two-party deal?

17   A.   When was that?

18   Q.   Back in October or November of 2001, do you recall that

19   advice from your merger attorney, that the pilots are better

20   with a three-party deal than with a two-party deal that is

21   simply imposed?

22   A.   I remember him saying that because we don't have ALPA

23   support to file the litigation, you are probably, you would

24   be dancing in the streets naked if you don't accept that

25   deal.  That is basically was saying you don't have ALPA's

Clarke-direct/Press                                                    102

1   support so you might as well take the deal.  That is what he

2   said.

3   Q.   So he recommended that you take the deal?

4   A.   Yeah, because we didn't have nobody else.

5   Q.   What kind of lawsuit did you think should be filed back

6   in October, around the time you resigned?

7   A.   I didn't know what kind of lawsuit because, as you

8   stated, you don't have a whole lot of legal background but I

9   knew that that was still going to be an option, and that --

10  Q.   That what was going to be an option?

11  A.   That we would still be able to have a litigation option.

12  We have got 2,500 pilots that didn't like what happened.

13  They would come together and try and right the wrong.

14  Q.   So you thought if a big group of people is unhappy, that

15  they have the right to file a lawsuit?

16  A.   On something like that?

17  Q.   Yes.

18  A.   Oh, yeah.

19  Q.   Who was the lawsuit going to be filed against?

20  A.   Whoever could get our seniority, whoever could help us

21  get seniority.

22  Q.   Who would the lawsuit be filed against, though?

23  A.   I think originally the lawsuit was filed against Bud by

24  the APA.

25  Q.   No.  We are back in October and November of 2001.  You

1   said before that you felt some kind of lawsuit should be

2   filed, you think you said an injunction?

3   A.    Correct.

4   Q.    And the Judge commented that you don't file for an

5   injunction.  You file to request an injunction.  Do you

6   recall that?

7   A.    Yes.

8   Q.    Who was the defendant going to be, who did you think

9   should be sued?

10   A.    American and APA.

11   Q.    Okay.  And did anybody tell that you there was legal

12   merit to that lawsuit, that there was a basis for filing a

13   lawsuit against American and the APA?

14   A.    Roland Wilder, who had discussed it with ALPA National,

15   had both said that that was -- ALPA National knew about that

16   plan.  It wasn't something that we just came up with on the

17   last day.  ALPA National knew all along, when we were

18   negotiating, we knew things weren't going good, so Roland

19   Wilder, our merger attorney, basically said okay, here is

20   what is going to happen if you don't get what you want, then

21   we are going to file for an injunction, or to have one put

22   in, so that this seniority list would not have to be put

23   together, and we would basically prevent them from doing that

24   and be able to hopefully get better seniority.

25   Q.    And the legal action that pal Pennsylvania filed was the

Clarke-direct/Press                                                  104

1    best efforts grievance, right?  ALPA did file a legal action,

2    correct?

3    A.   They filed a grievance.  I think I filed it.

4    Q.   Well, ALPA pursued the grievance, claiming that American

5    did not exert its best efforts in accordance with the March

6    letter that we talked about before, right?

7    A.   They did file a grievance.

8    Q.   And they pursued the grievance, right?

9    A.   Yes.

10   Q.   And you testified at the grievance?

11   A.   Why he.

12   Q.   Hefley and Flor and a couple other people testified at

13   the grievance hearing, right?

14   A.   Yes.

15   Q.   And the ALPA lawyers work with you and the other members

16   of the merger committee to persuade the arbitrator that the,

17   that American had not used its best efforts?

18   A.   Yes.

19   Q.   Marta Wagner, who is here in court, presented your

20   testimony to the arbitrators?

21   A.   Yes.

22   Q.   What did the arbitrators decide about whether American

23   failed to use its best efforts?

24   A.   Basically that the language was so weak that ALPA

25   secured us, that yeah, American Airlines, they got the

1    facilitator and that is what they said they were going to do,

2    and other than that, there is nothing else legal to it.

3    Q.   The arbitrators decided that American had fulfilled its

4    obligation to use its best efforts in --

5    A.   No, they fulfilled their obligation to hire the

6    facilitator.  That is what the reasonable best efforts letter

7    said.

8    Q.   So you don't recall that the arbitration decision

9    specifically found that American had fulfilled the obligation

10   in the March letter to use its best efforts to ensure a fair

11   and reasonable --

12   A.   No, I don't recall that.

13   Q.   But what the arbitrator --

14                THE COURT:  He said he doesn't recall that.

15   Fine.

16   Q.   Okay.  You talked about lobbying for the bond amendment?

17   A.   Uh hum.

18   A.   Yes?

19   Q.   Do you recall what the reaction of the American pilots

20   was to lobbying for the bond amendment?

21   A.   Of course they probably didn't want that to happen.

22   Q.   Don't guess.  Do you recall or no?

23   A.   Yeah, they weren't happy with it.

24   Q.   They opposed it, right?

25   A.   Correct.

Clarke-direct/Press                                        106

1   Q.   They sent out four times as many people to Capitol Hill

2   as your team had to lobby against it, right?

3   A.   You know what?  That is true because ALPA National

4   didn't enlist any of our 60,000 members and put a

5   code-a-phone out and say, hey, why don't you guys come help

6   them.  We had 60,000 that that could have been there.

7   Q.   Okay.  And the position taken by the American pilots was

8   that the TWA pilots had made a deal back on April 2 to accept

9   the new collective bargaining agreement and to give up the

10  right to seniority arbitration.  Right?

11  A.   Say that again?

12  Q.   Wasn't the position being taken by the American pilots

13  that the legislation was trying to get the TWA pilots out

14  from under an agreement that they had made on April 2??

15  A.   No.

16  Q.   That this was an end-run around a deal that the American

17  pilots had reached?

18  A.   It wasn't an end-run.  It was basically an effort on our

19  own local council's behalf.  We were doing it ourselves.

20  Anything to get leverage, anything to get leverage.  So if it

21  takes us sending people to walk the halls and if it is only

22  three against their 4,000, we did it, and we took that and we

23  took that and tried to create our own leverage because we

24  couldn't get any anywhere else.  So I don't feel bad about

25  doing that, and I don't feel bad --

1          THE COURT:  Nobody asked you whether you felt bad

2    or not.

3    A.   He said we --

4          THE COURT:  No.  Nobody asked you if you felt bad

5    about it.  I think we can figure out that you didn't.

6    Q.   Do you understand that I am asking you about the

7    position being taken by the American pilots?  Do you

8    understand that?

9    A.   Yeah, that they didn't want that to happen.

10   Q.   Did they take the position in response to your lobbying

11   effort that this was unfair by the TWA pilots, to try to

12   change a deal that the TWA pilots had made with American --

13   with TWA LLC --

14   A.   I don't know about all that.  Alls I know is this --

15         THE COURT:  He doesn't know.  Next question.

16   Q.   Do you need to hear the full question before you

17   respond?

18   A.   I know what you are going to ask me.  But yeah, sure.

19         THE COURT:  It is very self evident.

20   Q.   I am trying to get a complete record here.    So let's

21   slow it down.

22         THE COURT:  Okay.

23   Q.   Do you recall that the American pilots took the position

24   that this was unfair conduct on the part of the TWA pilots,

25   and that the TWA pilots were trying to get out from the

Clarke-direct/Press                                                  108

```
 1   deal --
 2              THE COURT:  It is a compound question.
 3              MR. FRAM:  All right.
 4   Q.  Do you recall that the American pilots felt that what
 5   the TWA pilots were trying to do with the Bond Amendment was
 6   unfair.
 7              MR. PRESS:  Your Honor, it has been asked and
 8   answered.
 9              THE COURT:  I will let him answer.
10   A.  Yeah, I don't really care what they thought at that
11   point.
12              THE COURT:  No, the answer is you knew that the
13   American pilots thought the Bond Amendment was unfair.
14   Right?
15              THE WITNESS:  Yeah.
16              THE COURT:  You knew they thought it was unfair
17   because they took the position that when you signed the
18   waiver, you were trying to go back on your own April 2
19   decision.  Right?  That is what they said.
20   A.  That is what the American pilots said.
21              THE COURT:  I know that you didn't care.  But that
22   is what they said.  Okay.  We got that.
23   Q.  What was the American Airlines position with respect to
24   the Bond Amendment, do you recall?
25              MR. PRESS:  Objection, calls for speculation.
```

Clarke-direct/Press                                         109

```
 1              THE COURT:  If he knows.  Let's start out, he you
 2    are now talking about management, the pilots --
 3              MR. FRAM:  If he doesn't know what the position is,
 4    he should say so.  I don't have to start by saying, "Do you
 5    know what their position was?"
 6              THE COURT:  Well, in this case, he works for
 7    American, he does now.
 8    A.   No, I don't.
 9              THE COURT:  What?
10              THE WITNESS:  I don't.
11              THE COURT:  But you did then.
12              THE WITNESS:  Yeah.
13              MR. FRAM:  I will rephrase it.
14    Q.   What position, if you recall --
15              THE COURT:  If you know.
16    Q.   -- did American Airlines communicate about what it would
17    do if the Bond Amendment passed?
18    A.   If the Bond Amendment passed, there was some threat that
19    they would shut down TWA.
20    Q.   TWA LLC?
21    A.   Which --
22              THE COURT:  Which was already operating.
23    A.   Which was already operating, which I don't think that
24    the government was going to let all of air service to St.
25    Louis cease and desist because American Airlines was mad at
```

```
 1    the TWA pilots.  I don't think they were going to shut us

 2    down.

 3              MR. FRAM:  I object and move to strike.

 4              THE COURT:  I know you are very worked up about

 5    this.  The only answer is they threatened to shut down.  He

 6    didn't ask whether it was legal or not legal.  That was their

 7    threat, right.

 8    A.   Sorry.  Okay.

 9              MR. FRAM:  That is all I have.  Thank you,  your

10    Honor.

11              THE COURT:  Any redirect?

12              MR. PRESS:  Briefly.

13              REDIRECT EXAMINATION

14              BY MR. PRESS:

15    Q.   How many TWA pilots were there in round numbers?

16    A.   2,500.  2,400.

17              THE COURT:  2,300.

18              THE WITNESS:  2,300.

19    Q.   And some change?

20    A.   Yeah.

21    Q.   And they, the proposal from the American pilots was to

22    staple two thirds, in round numbers, about how many would

23    that be?

24    A.   1600.

25    Q.   They wanted to staple 1600.   As Mr. Christy came in to
```

1    you guys at the end of March and said you need to offer what,

2    staple what?

3    A.   800 something.

4    Q.   Staple 800?

5          THE COURT:  Is that where he said he had some back

6    door communications?

7    A.   Correct.

8    Q.   Did he say that that would get a deal done or that would

9    be where you should start?

10   A.   That is what we needed to do to start to get a deal

11   done.

12   Q.   This would -- did he tell you that the APA will agree to

13   this?

14   A.   He said that that is where we needed to go to start

15   getting a deal done.

16   Q.   Okay.  Okay.  Now, if you do this different, they were

17   at 1600, the ALPA guy says you got to offer up 800 to start.

18   What is the difference there?  If you landed right in the

19   middle, where would it be?

20   A.   1,200.

21   Q.   How many were stapled at the end of the day?

22   A.   About 1250.

23          MR. PRESS:  Thank you.  That is all I have.

24          THE COURT:  Any recross?

25          MR. FRAM:  No, thank you, your Honor.

```
 1                THE COURT:  Okay.  Thank you very much.

 2                (Witness excused).

 3                THE COURT:  Call your next witness, Mr. Press.  Or

 4   Ms. Rodriguez.

 5                MR. PRESS:  We would call Jim Baehler to testify.

 6                Your Honor, one of our clients who hasn't been

 7   introduced is here with us.  Can I introduce him to the jury?

 8                THE COURT:  Sure.

 9                MR. PRESS:  This is Captain Pat Brady, one of the

10   plaintiffs in the case.

11                THE COURT:  I assume a former TWA pilot.

12                MR. BRADY:  Yes, your Honor.

13                THE COURT:  Thank you.

14                MS. RODRIGUEZ:  Mr. Baehler has been sequestered,

15   your Honor.

16                MR. FRAM:  Your Honor, may we approach for one

17   moment on an issue about this witness?

18                THE COURT:  Okay.

19

20

21

22

23

24

25
```

1                  (AT SIDEBAR).

2              THE COURT:  Apparently Mr. Jacobson --

3              MR. FRAM:  Your Honor, he has submitted some marked

4    portions of this witness's deposition testimony.

5              THE COURT:  That is what he was going to do, with

6    the dep.  Now we have it live.

7              MR. FRAM:  I wanted to call your attention, we had

8    objections to him giving an expert opinion.  We don't object

9    to him giving lay opinion based upon things he was directly

10   involved in, but the deposition indicated he wanted to give

11   some opinions about whether things were properly handled or

12   not on April 2.  I hope counsel are not going to try to get

13   into that.

14             MS. RODRIGUEZ:  He got brought in April 2.  He is

15   really fact witness.  He was asked.

16             THE COURT:  He is a fact witness.

17             MS. RODRIGUEZ:  He is not listed as an expert.

18   They brought him in as negotiating consultant.  He wasn't

19   brought in to this case as an expert.  They asked him, we

20   need help.  We need help.  He said, well, first of all, you

21   waived your scope.  That is, that was a big mistake.  That is

22   an opinion, a factual opinion, just like their lawyers said

23   you need to waive scope.  I mean their lawyers were not, they

24   were not offered as experts either.

25             THE COURT:  The question is did he think waiving

```
 1    scope was a mistake.  I will allow that.

 2            MR. FRAM:  He wasn't there.  He has no factual

 3    basis.

 4            THE COURT:  He knows the basis.

 5            MR. KATZ:  Rule 701 talks about the personal

 6    observations of the witness, he wasn't there in April.  He

 7    can't give personal testimony about what he saw.

 8            MS. RODRIGUEZ:  He is not base basing his decision,

 9    you can cross examine him.  He is not basing his decision on

10    anything that the advisor said.  He is basing his decision

11    on, he is a negotiating consultant.  And he told them in any

12    negotiation, any negotiation, start by saying, what do you

13    want?  What does the other side want?  And in any

14    negotiation, you look at what you have for leverage.  This is

15    what their leverage was.  You gave up your leverage.  What

16    did you get?  You gave up that leverage.  Now we need to get

17    additional leverage.  How do we get additional leverage?

18            That is a fact.  That is what he advised them on in

19    that April timeframe.

20            MR. FRAM:  It is expert testimony.

21            MS. RODRIGUEZ:  It is not expert testimony.  We are

22    prepared to offer -- Mr. Baehler traveled from New York, he

23    has been here overnight.  We are prepared to brief it.  They

24    didn't brief the issue.

25            MR. KATZ:  We raised this --
```

1          THE COURT:  They have raised it.

2          MS. RODRIGUEZ:  It is clearly 701 testimony.  He

3     was, he is a fact witness.  He has facts, he is not opining

4     on hypotheticals.  It is clearly within his purview, it is

5     clearly what, from what he advised the merger committee, when

6     he was brought in.  It is the basis of --

7          THE COURT:  He was brought in by whom?

8          MS. RODRIGUEZ:  He was brought in by the merger

9     committee.  He is not a negotiator.  He is a negotiating

10    consultant.  He has a history with TWA.  He has given them

11    seminars on negotiating techniques.

12         THE COURT:  That is something, that is beginning to

13    sound like expert stuff.

14         MS. RODRIGUEZ:  But he was not, I mean he was

15    there.  They brought him in as a hired gun, if you will.  But

16    he is not here to opine globally on hypothetical issues.  He

17    is going to testify about information he was given, what he

18    did as a result of information that he was given, how he then

19    advised the merger committee based on information he was

20    given.

21         MR. KATZ:  Take a look at Rule 701.  701 doesn't

22    talk about a witness who comes in and gives his opinions

23    about something that happened a month before he was hired.

24         MR. FRAM:  Your Honor, we agree that some of this

25    testimony is admissible.  I want to alert you to the fact

1   that we are going to object if he gives expert testimony.

2   That is all.

3          THE COURT:  It is hard for me at this point, the

4   line there is very thin.

5          MR. JACOBSON:  May I add something to this, which

6   is --

7          THE COURT:  Sure.

8          MR. JACOBSON:  He was brought in to give advice,

9   any opinions, he is giving opinions now are the opinions he

10  was giving to TWA merger committee at the time to explain to

11  them their situation, the steps they needed to take.  It is

12  in fact the facts of what he was doing at that time as their

13  adviser we included commenting on.

14         THE COURT:  Here is part of the problem I have, is

15  the question of whether agreeing to waive scope or not, which

16  was the condition precedent to the American airline TWA Inc.

17  the deal, is to some degree based on a perception of whether

18  American Airlines will walk from the deal.  Okay.  That has

19  to do with a lot of considerations that have nothing to do

20  with, nothing to do with, the artifacts of negotiation, you

21  know, where, where you get tough, if you thought, if you had

22  100 percent certainty that American was going to walk from

23  the deal, that might yield one result.

24         If it was 20/80 that they would not, well, that

25  might yield another result.

1              MR. JACOBSON:  Your Honor --

2              THE COURT:  He is not really an expert in that

3     area.  He is not really.  He is an expert in the artifacts

4     of, I will call it the artifacts, the techniques of

5     negotiation.

6              There is some question about that.  That is why he

7     was there is no question about that.  That is why he was

8     hired.  But not in the mindset of American Airlines, and not

9     in the financial condition.  And indeed, the mindset of

10    American may or may not be accurate in terms of what the

11    financial condition was.  They might be willing to walk, even

12    if it was a good deal for them.  We don't know what their

13    mindset.  That is my problem, is what, when he says it was a

14    mistake, he is really opining as to a different issue.

15             MR. JACOBSON:  Your Honor, what he is actually

16    saying is on the artifacts.  But he says when someone makes a

17    threat like that, the typical thing to do is see whether they

18    pile up.  He says usually the door isn't completely closed.

19    If you say we are not doing it, then we are done, we are

20    gone.  He says okay.  There is a certain way you advance

21    here.  When --

22             THE COURT:  But they may not have a job, they may

23    send a letter, we back out of the deal.  You didn't get it

24    done.

25             MR. FRAM:  It is like walking out of a car

1    dealership.

2        THE COURT:  That's right.  The analogy to walking

3    out and not buying a new BMW Series 7.

4        MS. RODRIGUEZ:  But these are facts, your Honor.

5    This is not -- He is not here to opine on whether or not

6    American is going to walk.  He is here to say, I got involved

7    in this discussion.  I was brought in.  These guys, they tell

8    me first thing we do, where were he.  We waive scope.  That

9    was leverage.

10        In any discussion, what you need to do is, now, he

11   is advising the merger committee.  You need to see what your

12   leverage is, what they want, what you want.

13        THE COURT:  Commenting what  they did in the past,

14   you say okay, you waive scope.

15        MS. RODRIGUEZ:  You waive scope.

16        THE COURT:  Now you want to say what advice he gave

17   forward, if you want to ask him that, that is one thing.  I

18   have no problem with that.

19        MR. FRAM:  That is fine.

20        THE COURT:  If you want to say I advised them to do

21   this or that, that is --

22        MS. RODRIGUEZ:  You waived scope, you gave up a

23   major piece of leverage.

24        THE COURT:  No, no.  That is different.

25        MS. RODRIGUEZ:  But that is, that forms the basis

1    of the advice that he gave them.

2              THE COURT:  You may be able to argue that.  But --

3              MR. FRAM:  No, it doesn't.

4              MS. RODRIGUEZ:  Of course it does.

5              MR. FRAM:  He is negotiating based upon the fact

6    that scope has been waived.  His advice is going forward.

7    His opinions whether or not it was a good idea to waive scope

8    in the past are irrelevant.

9              MR. JACOBSON:  He says it gives up leverage.

10             MS. RODRIGUEZ:  He says he gave up leverage.

11             MR. FRAM:  He went way beyond that in his

12   deposition.

13             THE COURT:  If that is all he said, I think there

14   is no question you surrender leverage.  There is no question

15   about that.  It is the gloss you want to put on it.  I think

16   he wants to say a lot more than you are saying he wants to

17   say.

18             MS. RODRIGUEZ:  I will try.

19             THE COURT:  That is from the deposition.  Let's go

20   forward.  You run the risk, if he starts getting, you know, I

21   am going to clamp down on him.  Let's see where we go.

22

23

24

25             (Open court)

Baehler-direct/Rodriguez                                    120

1              JAMES BAEHLER Sworn.

2              DIRECT EXAMINATION.

3              BY MS. RODRIGUEZ:

4    Q.   Good morning, sir.   Please introduce yourself to the

5    jury and tell them where you reside?

6    A.   New York City.

7    Q.   And your name, sir?

8    A.   James Baehler.

9    Q.   Mr. Baehler, can you tell me what your occupation was in

10   2001?

11   A.   Negotiations consultant.

12   Q.   What was your training for that position?

13   A.   I began as a salesman with Science Research Associates.

14   And what I discovered in my selling career was that I was

15   good at getting people to want what I was selling, but when

16   it came to getting them to pay for it, it was a problem.

17             THE COURT:   That is life's problem.   Wanting

18   something and not being able to pay for it, and not want to

19   go pay for it.

20   A.   I realized there was another part to selling which was

21   the negotiation over price.   And I began reading books, and

22   looking into how to correct this deficiency.   So I became

23   pretty good at it, and was then used by the company to train

24   other sales people in setting and negotiating, sales

25   negotiations.

Baehler-direct/Rodriguez                                    121

1   Q.   Let me stop you one second.  When you say the company,

2   what company?

3   A.   Science Research Associates.

4        THE COURT:  What were they selling?

5   A.   Educational materials to schools.

6        THE COURT:  So your customers were school boards,

7   thing likes that?

8        THE WITNESS:  Yes.

9   Q.   Please continue.  Continue with your training.

10  A.   Then, you want my career after that?

11  Q.   Well, your training for your consulting services?

12  A.   The training was on the job.  There was no formal

13  training.

14  Q.   Thank you.

15  A.   Negotiating is like dancing.  You could read about it.

16  But you have to do it.  And that is the only way you can

17  learn to do it, is by doing it.

18       THE COURT:  You could take lessons from Arthur

19  Murray or something, couldn't you?

20  A.   I couldn't hear you.

21       THE COURT:  You could take lessons from Arthur

22  Murray?

23  A.   And the lessons, you are doing it.  You are not reading

24  about it.  Right.

25  Q.   Sir, prior to 2001, had you ever provided negotiating

1    services to the TWA pilots?

2    A.    Yes.

3    Q.    What were those services, in, and what context did you

4    -- how, what services did you provide to them?

5    A.    I would make, on a fairly regular basis with the MEC,

6    and/or the negotiating committee, and do a one-day seminar.

7          THE COURT:  When were you retained.

8    Q.    We are talking prior, prior to 2001 now, your Honor?

9          THE COURT:  Okay.

10   A.    This began in 1988.  Let me go back there.

11         In 1988 I was on an airplane coming back from San

12   Francisco, and next to me was a tall, handsome fellow and we

13   began talking, and turned out he was a pilot.  And he told me

14   that TWA had recently been acquired, or at least had a

15   controlling interest by a fellow named Carl Icahn and that

16   the pilots had been engaged in their first negotiation with

17   Carl Icahn and had not been very successful.  I asked who was

18   on your side of the table?  He named some people.  I said are

19   they all pilots?  He said yes.

20         I said, well, who was on the other side of the

21   table?  Carl Icahn, Buck Stein, and some lawyers and so on.

22   I said so you were up against some of the sharpest minds on

23   Wall Street.  Is that correct?  He said yeah, we now know

24   that.  I said, well, if Carl Icahn stepped on this plane

25   before we took off and decided to fly to San Francisco, you

1    would have been laughing about it, wouldn't you?  He said

2    yeah.  That is all I can tell you.  Carl Icahn may not have

3    shown it, but when you pilots walk in the room alone, he was

4    laughing, but you were out-matched.

5             So this seemed to make sense to Tom and when he got

6    back to New York he contacted Tom Ashwood, who was the head

7    of the MEC at the time, and said you ought to talk to this

8    guy, Baehler.  He makes a lot of sense and I think he can

9    help the MEC and the negotiating committee.  I had lunch with

10   Tom Ashwood, which didn't come to anything, for whatever

11   reason, but later, soon after, Tom Ashwood was replaced by

12   Kent Scott, and Bill Compton became head of the negotiating

13   committee, and they invited me in for a one-day seminar with

14   the MEC on basic negotiating techniques.  The understanding

15   was that if what I had to offer didn't make up sense to them,

16   then it was thank you and goodbye.

17            But if they liked what they heard, then there would

18   be more work in the future.  They must have liked what they

19   heard because for the next 13 years I made regular --

20   conducted regular seminars for the MEC and the negotiating

21   committee, and the personnel would change on a fairly regular

22   basis.

23   Q.   Now, we have been talking here Mr. Baehler over the past

24   two weeks or so about a transaction in which American

25   acquired the assets of TWA.  Are you aware of that

Baehler-direct/Rodriguez                                    124

 1    transaction that occurred in 2001?

 2    A.    Yes.

 3    Q.    And did there come a time when you were retained by the

 4    merger committee to assist the merger committee and the MEC

 5    in connection with negotiations that were transpiring?

 6    A.    Yes.

 7    Q.    Can you tell me what that happened?

 8    A.    That was in April, 2001, shortly after the merger had

 9    been completed, and shortly after, shortly after the merger

10    was completed.

11          THE COURT:  When did you understand the date it was

12    completed?

13    A.    My understanding of the date of completion was some time

14    in early April, 2001.

15          THE COURT:  Okay.

16    Q.    And what was your role when you came in April.  Do you

17    have a rough date when you came in, sir?

18    A.    After the merger was completed between American and TWA,

19    then it was necessary to integrate the two, the seniority

20    listings of the two airlines, the two groups, the American

21    pilots and the TWA pilots.  And a merger committee was formed

22    for each pilot group that was to meet and work out the

23    solution to how you integrate those two seniority lists.  And

24    I was brought in by Keith O'Leary, the vice president of the

25    TWA MEC to work with the negotiating committee for the pilots

Baehler-direct/Rodriguez                                    125

1    in their meetings with the pilots from American.

2              THE COURT:  When were you brought in, is there a

3    date you were brought in?

4    A.   The exact date, it was somewhere in mid April.

5              THE COURT:  You mean like April 10, April 15?

6    A.   Could have been.

7              THE COURT:  Had LLC already started flying, had the

8    deal closed when you came?

9              THE WITNESS:  That is my understanding.

10             THE COURT:  TWA LLC was already in the air, they

11   had already completed the purchase of the assets?

12             THE WITNESS:  That is my understanding.

13   Q.   You referred to the negotiating committee.  But in fact

14   you are talking about the committee that was tasked with

15   negotiating with the American pilots.  Is that correct?

16   A.   Right.  Called it the merger committee.

17   Q.   The merger committee?

18   A.   Right.

19   Q.   And what was the first thing you did when you were

20   brought in by the merger committee?

21   A.   I sat down with them and I said, I haven't been

22   following this in the newspapers, and I need you to bring me

23   up to speed.  And they began telling me about the various

24   things that had gone on, and then they mentioned that they,

25   as part of this transaction, the merger, that they had

Baehler-direct/Rodriguez                                    126

```
 1    voluntarily given up their scope.
 2              THE COURT:  When you say voluntarily.  You mean
 3    they just voluntarily, they popped up and said I will give,
 4    we will give up our scope.
 5    A.   That was my question.  I said what do you mean
 6    voluntarily, and they said that they had been advised.
 7              MR. FRAM:  Your Honor, pardon me.  This sounds
 8    like, we may get this hearsay.
 9              THE COURT:  I don't know.  Did you know, did you
10    study when you took the terms of the deals between TWA and
11    American, did you look at the acquisition agreement.
12              THE WITNESS:  No.  No, I did not.
13              THE COURT:  Did you know its terms and conditions?
14              THE WITNESS:  That is what I was asking about.
15              THE COURT:  You were asking them to tell you what
16    it was.
17              THE WITNESS:  Correct.
18              THE COURT:  All right.  Go ahead.
19    A.   And I said what do you mean you voluntarily gave up your
20    scope?  They said, well, we were told by advisors from ALPA
21    that --
22              MR. FRAM:  Your Honor, I object.
23              THE COURT:  I am going to allow this.  Go ahead.
24    You were told by advisors of ALPA what?
25    A.   We were told  -- what they told me, we were told by
```

Baehler-direct/Rodriguez                                    127

 1   advisors from ALPA that Don Carty, the president of American

 2   Airlines, had said that unless the TWA pilots voluntarily

 3   gave up their scope --

 4   Q.   Their labor protection agreements?

 5   A.   Exactly.

 6            THE COURT:  Was this in the contract or this is

 7   something he said in a news conference?

 8   A.   Well, that is a good question.  Unless they did that,

 9   Don Carty would call off the whole merger and all of the

10   pilots were told by ALPA advisors they would be out of a job

11   and TWA would go out of existence.

12            THE COURT:  Did you know what 1113 was?

13            THE WITNESS:  No.

14            THE COURT:  Did you know there was a whole other

15   issue besides American walking away that was involved in this

16   suit?

17   A.   No.

18            THE COURT:  Did you know there was a bankruptcy

19   hearing on the 6th of April on Section 1113.

20   A.   I knew there was a bankruptcy hearing. I  didn't know it

21   referred to 1113.

22            THE COURT:  Did you know what it was about?

23   A.   It was about whether or not TWA was a viable entity.

24            THE COURT:  Did you know, that is not 1113.

25   A.   On, no.

1              THE COURT:  Did you know that the bankruptcy court

2    had the power to void the collective bargaining agreement, to

3    reject, I guess is the right way, the collective bargaining

4    agreement between TWA and its pilots, and ALPA?

5    A.   I know bankruptcy courts have that kind of power, yes.

6              THE COURT:  Did you know there is a specific

7    section of the law dealing with labor contracts?

8    A.   I do not know that.

9              THE COURT:  Did you know then?

10             THE WITNESS:  No, I did not know it then.

11             THE COURT:  Did you know that that was a factor in

12   the decision, that was one of the, in addition to the

13   contract provision between TWA and American, the 1113 motion

14   was also a factor.  Did you know that?

15   A.   They did not tell me that.

16             THE COURT:  Go ahead.

17   Q.   So Mr. Baehler, when you are brought in, the 1113 motion

18   is already, those issues have been resolved?

19             THE COURT:  No, they haven't.

20             MS. RODRIGUEZ: They were resolved.

21             THE COURT:  They were not resolved.  That is not

22   accurate.  That motion was withdrawn because of the waiver.

23             MS. RODRIGUEZ:  So the issue was no longer a

24   pending issue because it had been withdrawn.

25             THE COURT:  He is  trying to give his opinion on

1    something that happened before it was withdrawn.

2              MS. RODRIGUEZ:  No, let me clear it up, sir.

3    Q.   When you are brought in you are brought in for the sole

4    purpose of helping the merger committee negotiate now with

5    the American pilots, is that correct?

6    A.   Right, right.  In order to do that I needed to have an

7    understanding of the situation as it was seen by the TWA

8    pilots.  And the crux of the situation to me --

9              MR. FRAM:  I object.  It is not responsive.

10             THE COURT:  I am going to allow it.

11   Q.   Go ahead, sir.  What did you conceive was the crux?

12   A.   The crux of the situation to me was that they had very

13   little, if any, leverage in the negotiation because they had

14   given up their scope.  And --

15             THE COURT:  Didn't you have to know all the factors

16   that went in to them giving up their scope?  I mean.

17   A.   No.

18             THE COURT:  You didn't want.

19   A.   I was looking at this from the point of view of a

20   negotiator.  And I could not imagine a situation in which one

21   side would voluntarily give up whatever leverage they had --

22             THE COURT:  You are using the word voluntary.

23   Where do you get the word voluntary?  You don't even know

24   what the 1113 motion was.

25   A.   That was the term that was used when they were

Baehler-direct/Rodriguez                                    130

1    explaining the situation to me.  So if that is an incorrect

2    term, then I will choose another one.

3              THE COURT:  Let me ask you, if it isn't the right

4    term, was your advice incorrect?

5    Q.   You weren't there, sir, to advise them on bankruptcy

6    law, were you?

7    A.   No.  I was there to bring some perception --

8              THE COURT:  He tell what he advised them.  I think

9    you have to stop this effort to get him to opine on something

10   he disclaims, he doesn't know anything about the bankruptcy

11   law.  He never looked at the contract.  Get him to opine that

12   it was voluntary or it was a good idea or a bad idea.

13             MS. RODRIGUEZ:  I think what his testimony --

14             THE COURT:  He can opine what he told them going

15   forward.

16             MS.  RODRIGUEZ:  I think what his testimony was

17   that they had given up leverage.  Strike the word voluntary.

18             THE WITNESS:  All right.  They no longer had scope.

19             THE COURT:  But the amount of leverage they had, to

20   begin with, may have been severely impaired by the contract

21   and by the 1113 motion.

22   A.   It may have been.  I don't know that.

23             THE COURT:  You don't know that. All right.

24   A.   No.  All I knew --

25             THE COURT:  You knew they had given it up.  That is

Baehler-direct/Rodriguez                                        131

1   what you knew.

2   A.    Correct.  I knew it had been given up.  I knew that

3   whatever leverage that might have existed no longer did.

4            THE COURT:  Okay.

5   Q.    Okay.  And so from there, what was the next thing that

6   you did, sir?

7   A.    We then tried to determine if we don't have this kind of

8   leverage in the negotiation, what do we have to work with.

9   And what I said to them is that, if the American pilots are

10  meeting with you, then they must want something from you.  So

11  our job I think is to find out what do they want from you,

12  and then what they willing to give in return for that.

13           THE COURT:  By the way, when they gave up, waived

14  scope, on April 2, what did you perceive they were giving up?

15  What did you perceive they had given up?

16           THE WITNESS:  Well, whatever rights they had --

17           THE COURT:  No, what rights had they given up?

18  What had they surrendered?  What had they waived?  What is it

19  that they gave up?

20  A.    Right now, I am sorry.  In specific terms, I can't tell

21  you.  I don't know at this point.  That was ten years ago.

22  Q.    But you were concerned, sir, were you not, not with what

23  the specifics or the legalities of what they had given up,

24  only that they had given up leverage, is that correct?

25  A.    Yes.

Baehler-direct/Rodriguez                                    132

1           THE COURT:  Hold on.   You have to know what they

2    gave up to understand the strengths or weaknesses of

3    leverage, don't you?

4    A.   What I did know was that they ended up in a situation

5    where they had little or no leverage in the negotiation.

6    Now, that what leverage consisted of beforehand, I don't know

7    what the totality of it might have been.  But whatever there

8    was before no longer existed, whatever it is.

9           THE COURT:  Sitting here now you don't know what it

10   is they actually gave up.

11          THE WITNESS:  No.

12          THE COURT:  Okay.  Go ahead.

13   Q.   So again, so you are now in the mid April timeframe, and

14   you are looking forward, what was the next thing that you

15   did, sir?

16   A.   Well, okay.  So, as I said, we need to find out what

17   they want from us, from the TWA pilots, and what are they

18   willing to give up in return.  We talked about that in great

19   detail.  And they weren't quite sure of exactly what TWA

20   wanted from them.  I said, well, then let's list some

21   possibilities, and then we will test those as we meet with

22   the American pilots, and --

23          THE COURT:  And the merger committee.  The American

24   pilots merger committee.

25   A.   Yes.  And until we find out what their goal is in this

Baehler-direct/Rodriguez                                    133

1   negotiation, what do they want from you, because then we will

2   know, have some idea, what they might be willing to give in

3   return.

4   Q.   And then what was the next thing that happened?

5   A.   Then we began meeting with the American pilots.

6          THE COURT:   When was the first meeting, do you

7   remember, that you attended.

8   A.   The date?

9          THE COURT:   Not the exact date.  Roughly, when did

10  you come on?

11  A.   I think again it was still in April.  I think the first

12  meeting that I attended was in April.

13  Q.   Did you actually attend the negotiations with the merger

14  committee?

15  A.   I sat in on the face-to-face negotiations.

16  Q.   What was your role in that process?

17  A.   Observer.

18  Q.   You just kind of sat back and watched the negotiation?

19  A.   Right.

20  Q.   Did you meet with the merger committee prior to meeting

21  with the American pilots?

22  A.   Oh, yeah.

23  Q.   Did you give them any advice an on how to proceed with

24  the negotiations?

25  A.   The general advice I gave was, let's not make speeches.

1    Let's ask questions.  One of the problems with negotiators

2    very often is that they think they can win the day with

3    eloquence and sweeping the other person off their feet.  It

4    doesn't work that way.  That you are much better off asking

5    questions, listening to the answers, observing the other

6    side, and drawing inferences as to what their real objectives

7    are as to what their perhaps stated object objectives are.  I

8    said let's ask questions and listen and watch and see what we

9    can learn, in the initial session.

10   Q.   And did you, did they do that?

11   A.   To a certain extent.  Not as much as I would have liked.

12   I think they got pretty quickly into talking about the planes

13   that were going to come on stream, up -- at that point.

14          THE COURT:  I am sorry.  Explain what you mean by

15   that.

16   A.   Airplanes.

17          THE COURT:  The planes TWA was purchasing.

18   A.   No, no.  They had, American Airlines had provided the,

19   both teams, I guess, with a list of additional aircraft that

20   they were going to bring on stream in the next few years and

21   the additional routes that those planes would be flying.  And

22   the discussion then got into who would fly these additional

23   planes, and these additional routes, whether they would be

24   TWA pilots or American pilots or some combination, and how

25   all of that would then affect the seniority listings of the

Baehler-direct/Rodriguez                                      135

 1   two pile on the groups.

 2   Q.   And during any of these meetings, either with the merger

 3   committee or, let me start with the merger committee.   During

 4   the time you met with the merger committee were there ever

 5   any representatives from ALPA National present at these

 6   meetings?

 7   A.   No.

 8   Q.   Did you ever talk to the merger committee about the need

 9   to try to find additional avenues of leverage?

10   A.   Yes.

11   Q.   What did you say to them?

12   A.   I began by telling them that any time there is a union

13   dispute that involves the public, that the public has an

14   interest in it, and that they should enlist the help of ALPA

15   in mounting a public relations campaign to win, first, public

16   support for the position of the TWA pilots, and then

17   hopefully to begin a lobbying campaign that would enlist the

18   support of the members of Congress who could then take some

19   action that would be of benefit to the pilots.

20   Q.   Did you have any other suggestions for leverage that the

21   pilots -- that the merger committee might be able to use?

22   A.   I thought they also should look into some possibility of

23   litigation, that ALPA has lawyers on their staff, they have

24   experience in these areas, and maybe there is some areas

25   where they could either file a suit of some nature, or

```
 1   threaten to do so, in order to give the TWA pilots a little

 2   more leverage.

 3   Q.   But you are not a lawyer.  Isn't that correct?

 4   A.   Correct, I am not a lawyer.

 5   Q.   You were just looking at other areas where they could

 6   try to get some leverage in negotiations?

 7   A.   Correct.  At this point I was kind of desperate.  We got

 8   to find some kind of leverage here.  We don't have any, and

 9   we got to find something.

10   Q.   Did you, yourself, ever speak with anyone at ALPA?

11   A.   No. Well, at one point Bob Stow, the treasurer for the

12   TWA pilots.

13            THE COURT:  The MEC.

14            THE WITNESS:  The MEC.

15   A.   Wanted ALPA to pick up my fees.  And they eventually

16   agreed to do so for eight days.  And they assigned one much

17   their attorneys, Clay Warner, to meet, to talk to me about

18   the arrangements of making this happen, and to, to provide me

19   with a contract that I signed.  That is the only ALPA

20   representative I ever spoke to you, but it was about my fee

21   and not about the issues that we were dealing with.

22   Q.   Now, you talked about meeting with the merger committee.

23   Did you ever meet with the MEC?

24   A.   Yes.  We worked from April to October, and on a fairly

25   regular basis we would meet with the MEC and bring them up to
```

1    speed on what was happening and what our plans were and that

2    sort of thing.

3              THE COURT:  You stopped working for them in

4    October.

5              THE WITNESS:  Yes.

6              THE COURT:  Do you remember when in October?

7    A.   The date?

8              THE COURT:  Yes.

9    A.   No.

10             THE COURT:  Do you remember, was there an event

11   that led to you stopping in October, was it something, you,

12   do you associate your leaving with any particular event.

13   A.   No.

14   Q.   When you came on board had members of the MEC told you

15   about the alleged threat from Don Carty that American would

16   walk from the deal if certain things didn't happen?

17   A.   Yes.

18   Q.   And did you have any discussions with the merger

19   committee about that threat?

20             MR. FRAM:  Your Honor, I object.

21             THE COURT:  Well, I will see what he is going to

22   say at this point.  I will allow it.

23   A.   I am not sure if it was a discussion.  When they told me

24   that Don Carty had threatened to call off the entire merger

25   if the TWA pilots did not waive their scope rights, I said, I

Baehler-direct/Rodriguez                                    138

```
 1   don't believe it.
 2              MR. FRAM:  Your Honor, I object and move to strike.
 3              THE COURT:  You had an insight, a pathway into the
 4   mind of American?
 5   A.   No, no, obviously not.   I was only thinking in terms of
 6   rational business decisions.  It did not seem to me to make
 7   sense that a merger that would have created the largest
 8   domestic airline would have been called off because two pilot
 9   groups couldn't come -- one pilot group wouldn't waive their
10   scope rights.  To me that --
11              THE COURT:  You thought that was the only
12   consideration as to why they would call it off?
13   A.   Well, that was, that was what was presented to me, that
14   Don Carty was going to call off the whole merger unless the
15   TWA pilots waived their scope rights.
16              THE COURT:  Were you told he wouldn't have to call
17   it off if he won the 1113 motion in bankruptcy court?
18   A.   Nobody said that.
19              THE COURT:  Nobody told you that?
20   A.   Nobody said that.
21              THE COURT:  That the scope rights would have been
22   lost anyhow if the 1113 had been won in bankruptcy on April
23   6?
24   A.   Nobody said that.  All I was dealing with was this
25   alleged threat by Don Carty, and I just couldn't believe it.
```

Baehler-direct/Rodriguez                                   139

```
 1              THE COURT:  What was the relative size of the two
 2   groups?
 3   A.    American had I think 18,000 pilots and TWA had about
 4   1,200 as I recall.  Something like that.
 5   Q.    Now, during this time of meeting --
 6   A.    Wait.  Let me add something more here.  After I was
 7   deposed, I said --
 8              MR. FRAM:  Pardon me, but I object to the comments.
 9              THE COURT:  No.  You ask questions, Ms. Rodriguez.
10   A.    I am sorry.  Go ahead.
11              THE COURT:  She is a very good questioner.  Let her
12   do her thing.
13              MS. RODRIGUEZ:  And I have sat quietly for two
14   weeks.
15              THE COURT:  Let her do her thing.
16   Q.    During this, we had, Mr. Sean Clarke testified earlier
17   this morning and he talked about the Tanen proposal.  Is that
18   something you are familiar with, sir?
19   A.    Yes.
20              THE COURT:  What proposal?
21              MS. RODRIGUEZ:  Tanen proposal.
22   Q.    Can you tell me what that is?
23   A.    Well, it was, the basis of it was that with newer, with
24   the additional airplanes, and additional --
25              THE COURT:  That is before that.  Why do you call
```

```
 1   it the Tanen proposal?

 2          THE WITNESS:  Oh, it was offered by a professor

 3   from NYU in economics --

 4          THE COURT:  They hired a consultant, didn't they?

 5   Who prepared the proposal?

 6   A.   Yes, yes.

 7          THE COURT:  Okay.

 8   A.   The TWA pilots hired professor Tanen from, I believe New

 9   York University, who was an economics professor, to prepare a

10   proposal based on the fact that American was going to add

11   additional planes, and additional routes, and how that might

12   affect the seniority of the two pilot groups.  And he

13   developed a proposal called the Rightful Place, I think.

14   Something like that.  And demonstrated to me fairly

15   authoritatively that since there was only -- TWA pilots

16   represented a small portion of the total pilots at American,

17   that the TWA pilots could be, could retain their seniority

18   rights, and with the additional planes, flying those

19   additional planes, would not cause any loss of upward

20   momentum on the part of the American pilots.

21          It was very detailed, and it would seem to me to be

22   very persuasive.

23   Q.   And were you at the meeting when that Tanen proposal was

24   presented to the APA pilots?

25   A.   Yes.
```

Baehler-direct/Rodriguez                                    141

```
 1    Q.    What was the reaction?

 2    A.    They said they wanted to study it.  They did not give an

 3    immediate yes or no.  They said they wanted to study it which

 4    made sense because it was very detailed and fairly complex,

 5    they wanted to study it.  I thought that was a reasonable

 6    response.

 7    Q.    And did they study it?

 8    A.    They did.

 9    Q.    And they came back some days later with a 20-page

10    analysis that found, in their thinking, flaws in the

11    methodology and in the outcome, mostly, and they rejected it.

12             THE COURT:  Do you remember when it was presented?

13             THE WITNESS:  No, I don't.

14             THE COURT:  Do you remember when, the 20-page

15    response was.

16             THE WITNESS:  The dates, no.

17    Q.    Would it be fair to say that it was in the summer of

18    2001?

19    A.    Yes.

20    Q.    It was certainly before 9-11, that is a date that sticks

21    out in your mind?

22    A.    Oh, yes.  Yes.

23    Q.    Again, during any of those meetings were there

24    representatives from ALPA National present?

25    A.    The only time, while we were talking about the Tanen
```

Baehler-direct/Rodriguez                                    142

 1  proposal, no.

 2  Q.   And how about when the APA pilots produced their

 3  response, did there come a time where they produced a

 4  response to the Tanen proposal?

 5  A.   Yes.

 6  Q.   What was that called?

 7  A.   I don't, I don't know what they called it, but it was a

 8  rejection.  They said no, this doesn't work.  It is not for

 9  us.  And we have got to find something else.

10  Q.   Did they present something else, ultimately did they

11  have a --

12  A.   Ultimately they employed KPMG to produce a counter

13  proposal.

14            THE COURT:  That is the accounting firm?

15            THE WITNESS:  Yes.  Yes.

16  A.   And that was presented to us at some time in the summer,

17  by "us" I mean TWA merger committee.  And we looked at it and

18  examined it, put it, just as thoroughly as they had with the

19  Tanen proposal, and we found, when I say we, I was not part

20  of the analysis.  The members of the merger committee

21  examined it, analyzed it, and found serious flaws in it, and

22  said that this isn't going to work either, and we better find

23  something else.

24  Q.   Okay.  Now, you talked a little bit earlier about

25  talking to the merger committee about the needs, the need to

Baehler-direct/Rodriguez                                    143

1    find additional sources of leverage and you talked about a

2    public relations campaign.  Did that ever happen, that you

3    know of?

4    A.   Not that I know of.

5    Q.   How about the lobbying effort you talked about, did that

6    happen?

7    A.   I think Matt Camlish, one of the pilots stationed in

8    Washington --

9            THE COURT:  Comlish?  C O M L I S H?

10   A.   Comlish, was working to get some kind of legislation

11   through Congress that would have benefited the TWA pilots in

12   this situation.

13   Q.   But as far as you know, ALPA National never provided any

14   additional --

15   A.   Not that I am aware of.

16   Q.   We were talking about meetings.  Were you there?  The

17   merger committee was there.  Did you ever see ALPA National

18   at any meeting?

19   A.   Yes.

20   Q.   When was that?

21   A.   That date I think I remember.  I think it was August 27.

22   Duane Woerth and Kevin Dillon.

23   Q.   Let me stop you there.  Who is Kevin Dillon?

24   A.   I am not sure.

25   Q.   What is, what has his role?

Baehler-direct/Rodriguez                                    144

1    A.   What his position is at ALPA I don't know.  I assumed he

2    was one of Duane Worth's higher-ups.

3    Q.   Go ahead.

4    A.   Came to the meeting, joint meeting between the two

5    merger committees.  And when I heard about it, that Duane

6    Woerth was coming down, I thought hey, great.  Our big

7    brother is getting involved in this tussle and he is not

8    going to let these rough guys push us around any more, so I

9    was very glad to hear this.

10        Unfortunately, when Duane Woerth came down, he

11   began with a very arms length dispassionate or disinterested

12   approach, asking both sides to find some compromise that the

13   industry needs this compromise, and so does ALPA, and that we

14   need to work together, and it was all very vague, and there

15   wasn't any substance that I could see.

16        THE COURT:  Mr. Baehler, you keep talking about

17   leverage for the TWA pilots.  Did the American pilots have

18   leverage?  And if so, what was their leverage?

19   A.   My understanding is that if it came down to the end, and

20   no agreement was reached, that the American pilots would be

21   able to impose any kind of a settlement, any kind of a plan,

22   that they chose.  And that the TWA pilots  --

23        THE COURT:  How would they do that?

24        THE WITNESS:  Just by  -- well, the term that was

25   used in our discussion was at any point, if they really want

Baehler-direct/Rodriguez                                    145

```
 1   to, they can staple the entire TWA seniority list to the

 2   bottom of their list.  That was the phrase that was used.

 3              THE COURT:  And they had the legal right to do

 4   that?  .

 5   A.   That was our understanding.

 6              THE COURT:  The legal right to do that.

 7              THE WITNESS:  I assume so.

 8              THE COURT:  That was their leverage?

 9              THE WITNESS:  Yes.  That was our understanding.

10              THE COURT:  That is a lot of leverage.

11              THE WITNESS:  Of course.

12              THE COURT:  And there is no appeal from that?

13   A.   I don't know if there is an appeal.

14              THE COURT:   Okay.

15   Q.   So you are referring to a meeting in August of 2001,

16   and --

17   A.   Yes.

18   Q.   Where you saw Duane Woerth and Kevin Dillon?

19   A.   Afterwards, see, I could, I couldn't believe what I was

20   hearing, because I thought that there was going to be a lot

21   of support, a lot of muscle in Duane Worth's appearance and

22   there wasn't.

23              So afterwards, when we finally broke, I turned to

24   the TWA guys and I said what is going on here?  I thought

25   ALPA is your big brother.  And the pilots said you don't
```

```
 1    understand --

 2                MR. FRAM:  Your Honor, I object.

 3                THE COURT:  Yeah, your conversation, these

 4    conversations are not evidence.

 5                MS. RODRIGUEZ:  Okay.

 6                THE COURT:  Your observation was that the report,

 7    that Duane Woerth wasn't giving you support, giving you union

 8    support?

 9    A.   Right.  Correct.

10                THE COURT:  I don't think his conversation is for

11    this --

12    Q.   We will just stop there.  What happened after the

13    August, what was your role in the negotiations following this

14    August 27 meeting with Duane Woerth?

15    A.   It continued to be the same.  In our private meetings we

16    would discuss -- caucuses, we would discuss what the

17    situation was and how we would deal with each of the problems

18    as they came up, and I would give my observations of the

19    other side.

20                And it seemed to me that the basic problem was

21    that, and if it was expressed by Mickey Malersky.

22                THE COURT:  Who is Mickey Malersky?

23    A.   One of the other American pilots.

24                THE COURT:  Was he on the merger committee?

25    A.   Yes.
```

1            THE COURT:   Americans merger committee?

2    A.   Yes.   On any number of occasions he said the same thing.

3    I will never agree to any plan that puts a single TWA pilot

4    ahead of me on the seniority list.

5            THE COURT:   By in fact he did, ultimately.

6    A.   He may have   I don't know.

7            THE COURT:   Do you know what the final resolution

8    of the negotiations were?

9    A.   The final resolution was that a great, most -- at least

10   half, approximately half of the TWA pilots were stapled to

11   the bottom of the --

12           THE COURT:   But half were not.

13           THE COURT:   And half were not.

14           THE COURT:   So apparently American did agree that

15   at least some TWA pilots.

16           THE WITNESS:   Correct.   Correct.

17           THE COURT:   So whatever he said before, he didn't

18   stick to it.

19   A.   Well, but what, they still may not have been ahead of

20   Mickey Malersky.   You don't know.

21           THE COURT:   Was he number 1?

22   A.   No, he was about the middle, as I recall.

23   Q.   Sir, let me --

24   A.   But the point of his remark was that he was not just

25   making the statement for himself.   Because when he would make

1    the statement, I would look at Reif Snyder  who is another

2    member of the merger committee --

3              THE COURT:  On your side?

4    A.    On the American side.  He would be nodding in agreement

5    as would most of the other members of the merger agreement.

6    It appeared to me from observing the American pilots that

7    this was a position that they were not going to back off

8    from, that whatever solution was arrived at would not involve

9    placing TWA pilots ahead of American pilots on the seniority

10   list.

11             THE COURT:  What do you mean by "ahead."  I don't

12   understand what that means.

13   A.    The seniority list is just.

14             THE COURT:  Are you talking, they would insist the

15   entire TWA being stapled to the bottom.

16             THE WITNESS:  Yes.  Wait.  I am sorry.  I didn't

17   hear the question.

18             THE COURT:  He wouldn't put, I don't understand,

19   you wouldn't put a TWA pilot ahead.  What do you mean by

20   that?

21   A.    Seniority list is based on date of hire.

22             THE COURT:  Right.  So no TWA pilots would ever get

23   seniority based on date of hire?

24             THE COURT:   No.  What I think Mickey Malersky was

25   saying was regardless of date of hire, I don't care if

```
 1    somebody was hired ten years before I was, if he was from

 2    TWA, he doesn't go ahead of me on the seniority list.

 3           THE COURT:  And you think that was the result of

 4    when they went ahead unilaterally and imposed what we call

 5    CC, Supplement CC, that that was the result?

 6           MS. RODRIGUEZ:  Your Honor, this witness wasn't

 7    there after that CC.

 8    A.   I wasn't there when that was done.

 9           THE COURT:  Do you know what was done, what the

10    ultimate outcome was?

11    A.   In detail, no.  I have to be honest, Judge.

12           THE COURT:  That is a good idea.

13           THE WITNESS:  Right.  To put it that way.  After

14    9-11 I -- my attention was not what it should be.  I live in

15    New York City.  And when I saw the two towers come down, and

16    heard that there were 200 fireman who died.

17           THE COURT:  And more than 3,000 other people.

18    A.   I know that.  But I knew that the special ops unit for

19    the fire department is on Roosevelt Island where I live.

20           THE COURT:  You take that tram across?

21    A.   Yes, I do.  Every day.  And I knew the chief, and some

22    of the other special ops people and I knew they were dead.

23    And I knew there were 3,000 other people dead, but it means

24    more when you know personally some of the people involved.

25           THE COURT:  Oh, certainly.
```

Baehler-direct/Rodriguez                                    150

1    A.   So I will confess that after 9-11 my attention, my

2    focus, my focus was not all that it should have been.

3    Q.   I should take a step back.  You have been talking about

4    the merger committee.  Who were you, who was on the merger

5    committee when you were involved in consulting them?

6    A.   Mike Day was the chairman.  John Swanson.  Sean Clarke.

7    D J Glassby.  Gary Buchard.  John Hefley.

8         That was ten years ago.  There might have been

9    somebody else, but those are the names I remember.

10   Q.   So after the August meeting that you talked about, was

11   there anything else of note in your consulting, and

12   consulting the merger committee in connection with the

13   negotiations, was there anything of note that transpired?

14        THE COURT:  After what date?

15   Q.   After the August meeting?

16   A.   The one incident I remember is that on a Friday

17   afternoon we were told by Ed White that they would have a new

18   proposal for us on Monday that we would be happy with.  So we

19   went away over the weekend feeling pretty good.  But on

20   Monday we got exactly the same proposal that KPMG had

21   proposed with very slight modifications, and we were a little

22   bewildered because there wasn't anything new and we certainly

23   weren't going to be happy with it.

24        At  the break, you turned -- I am sorry.  At some

25   point Mike Day turned to Ed White and said, is this take it

Baehler-direct/Rodriguez                                         151

```
 1   or leave it?  And Ed White said yes, but we are prepared to
 2   discuss it, but no changes can be made.
 3              Well, once that was said, I didn't know where we
 4   were going to go.  Here is a proposal in which we can talk
 5   about it but nothing can be changed, then what is the point
 6   of talking about it.
 7              So to answer your question, that is one thing that
 8   sticks in my mind after, in late August.
 9   Q.   And prior to the time that you stopped being involved,
10   there was never any serious proposal put on the table other
11   than the one that you referred to by Mr. White.  Is that
12   correct?
13   A.   When you say after I was involved?
14   Q.   Well, no, prior --
15   A.   Prior.
16   Q.   Prior to your leaving?
17   A.   Right.
18   Q.   Was there ever any substantial proposal put on the table
19   by APA, other than the ones you have just talked about?
20   A.   By the American pilots.
21   Q.   Yes.
22   A.   No.  The only proposal that we were ever given in
23   writing was the KPMG proposal, because in fact, to continue
24   that conversation, when Mike Day said is this a take it or
25   leave it?  And Ed White said yes.  And, but we will discuss
```

Baehler-direct/Rodriguez                                    152

 1  it.  And he said can we have it in writing?  Ed White said

 2  no.

 3         THE COURT:  Have what in writing?

 4  A.  The proposal that they were making that day.

 5         THE COURT:  The proposal was in writing?

 6  A.  That they were making that Monday.

 7         THE COURT:  It was not in writing?

 8  A.  Well, it was a white board proposal.  It was not

 9  something we were handed.

10  Q.  When you say white board you are talking about somebody

11  has a marker and a grease pen?

12         THE COURT:  A blackboard, a black pen on a white

13  surface,  or white chalk on a blackboard or black chalk on a

14  white surface.

15  A.  Exactly.

16         THE COURT:  What I understand is you your testimony

17  is really the accountant's proposal, just slightly modified.

18  A.  That was my impression.

19  Q.  And you testified or told the Judge what happened after

20  9-11.  During your time with the merger committee, did you

21  ever see any evidence of ALPA support for the pilots in their

22  seniority integration negotiations?

23  A.  No.

24  Q.  During that time did Mike Day or anyone else from the

25  merger committee ever tell you about any support they got

```
1    from ALPA National in connection with their --

2    A.   No.

3              MR. FRAM:  Objection.

4              THE COURT:  I am going to allow it.

5    Q.   In this connection --

6              THE COURT:  The question is was he told by them he

7    had gotten support.  The answer is no.  Okay.

8              MS. RODRIGUEZ:  I have no further questions, your

9    Honor.

10             THE COURT:  Ladies and gentlemen.  You want a break

11   now?  It has been a while.  It has been an hour and a half.

12   Let's take a break.  Do not discuss the case among

13   yourselves.  Keep an open mind until you have heard all the

14   evidence.  We will be back at 25 of one.

15             (Recess).

16             JAMES BAEHLER, resumes.

17             (The jury enters the courtroom.)

18             THE COURT:  Mr. Fram.

19             MR. FRAM:  Your Honor, I have no questions of this

20   witness on cross examination.

21             THE COURT:  You are done.  You can go home.

22   A.   Thank you, Mr. Fram.

23             THE COURT:  Take the tram.

24

25             THE WITNESS:  Thank you, Judge.
```

1                    (Witness excused)

2              THE COURT:  Ms. Rodriguez, call your next witness.

3              MS. RODRIGUEZ:  He is sequestered.  Mr. Press went

4    to get him.

5              MATTHEW COMLISH sworn.

6              DIRECT EXAMINATION.

7              BY MS. RODRIGUEZ:

8    Q.   Good afternoon, Mr. Comlish.

9    A.   Good afternoon.

10   Q.   Can you tell the jury where you presently reside?

11   A.   I reside in Roswell, Georgia.

12   Q.   That is near Atlanta?

13   A.   Yes, it is.

14   Q.   And Mr. Comlish, are you a professional pilot?

15   A.   Yes, ma'am.

16   Q.   Can you take us through your professional pilot flying

17   car?

18   A.   I went to flight school in 1991.  Shortly thereafter, in

19   1991.  In 1993, I began with Zantop International Airlines.

20   Q.   What was Zantop?

21   A.   It was a cargo airline in Detroit, Michigan.  I left

22   Zantop and went to Emery Worldwide Airlines in around 1996.

23   Q.   Was that, what did you fly at Emery, was that a

24   passenger airline?

25   A.   That was cargo also.

Comlish-direct/Rodriguez                                          155

1    Q.   Some what did you fly there?

2    A.   McDonnell Douglas DC 8.

3    Q.   Go on.

4    A.   I left Emery Worldwide Airlines in 1998.  Excuse me,

5    1999.  And went to Trans World Airlines.

6    Q.   And prior to coming to Trans World Airlines, were you

7    ever a member of ALPA?

8    A.   I was a member of an ALPA, at Emery Worldwide Airlines.

9    Q.   Did you hold any positions in ALPA while at Emery?

10   A.   No, I did not.

11   Q.   So you started in TWA at 1999.  Correct?

12   A.   That's correct.

13   Q.   Were you a first, what was your position when you

14   started in 1999?

15   A.   I was hired as, on a McDonnell Douglas MD 80.

16   Q.   As a first officer?

17   A.   As a first officer.

18   Q.   And did you join ALPA when you joined TWA?

19   A.   I did.

20   Q.   Did you hold any specific office in ALPA once you

21   started at TWA?

22   A.   Not initially.  I eventually became the chairman of the

23   government affairs committee.

24   Q.   When you say not initially, why was that?

25   A.   I was on probation for a year, and as soon as I got off

1    of probation I assumed the office.

2    Q.    Probation wasn't any kind of negative thing.  All pilots

3    start on probation.

4    A.    All pilots are on probation for a year initially when

5    they start a new airline.

6    Q.    You said you went on government affairs committee,

7    correct?

8    A.    That's correct.

9    Q.    And in the government affairs committee what were your

10   responsibilities?

11   A.    My responsibilities were to handle state, local, and

12   federal issues, that impacted the pilots.

13   Q.    How did you come to get this assignment as the

14   government affairs, on the government affairs --

15   A.    I am originally from Washington, D.C. and I was also

16   interested in government affairs, and I knew that ALPA had

17   the best lobbying department of all labor, and I want to be

18   part of that.

19   Q.    Did you have any background that made that an

20   appropriate position for you?

21   A.    I was an internal in my last year in college and on into

22   after college for a short period of time with a government

23   affairs lobbying firm, called Hill & Knowlton in Washington,

24   D.C..

25            THE COURT:  That is a big one.  Hill Knowlton is

Comlish-direct/Rodriguez                                    157

1    large, isn't it?

2             THE WITNESS:  Yes, it is.

3             THE COURT:  They have a lot of people in it?

4    A.   Sure does.

5    Q.   Once at TWA and on the ALPA governmental affairs

6    department, did you get any training?

7    A.   No formal training.  I did proceed to the file that

8    existed  at the TWA MEC office and retrieved literature, I

9    read literature about ALPA and their government affairs --

10   Q.   How many members were there on the governmental fares

11   committee?

12   A.   When I initially took office I was the only one.

13   Q.   Did that change over time?

14   A.   It did.  As demand increased for my services, I was

15   forced, I recommended, and was able to add four members to my

16   committee.

17   Q.   And who were those four members?

18   A.   That was Larry Cutler, Lisa Mauro, and Ron Besser.

19             THE COURT:  That is three.

20   A.   I am sorry.  That is three.  I am the fourth.

21             THE COURT:  You are the fourth.

22             THE WITNESS:  Sorry.

23   Q.   Can you give me a timeframe?

24   A.   They would have been added on in September of '01.

25   Q.   Mr. Comlish, you are aware, are you not, of the

1    announced asset purchase of TWA by American in January, 2001?

2    A.   Yes, I am.

3    Q.   And as a government affairs chairman, did you have any

4    role in any of the subsequent negotiations?

5    A.   I didn't, that was the merger committees job, to

6    negotiate seniority.

7    Q.   You involved in any way in the seniority negotiations?

8    A.   Other than to work with Senator Bond to facilitate a new

9    round of negotiations in October of 2001.

10   Q.   Okay.  But right now I am talking about the January,

11   spring, timeframe, did you have any role?

12   A.   Yes, I did.  There was a series of hearings that took

13   place in Congress about the about the transaction between

14   American Airlines and TWA.  The first one was the commerce

15   science and transportation committee hearing.  The second one

16   was the Department of Justice hearing.  And there was also

17   some approvals by the Department of Transportation.

18   Q.   Do you have a timeframe for those hearings?

19   A.   They began in February, and the first one began in the

20   first week of February, and I believe the last week of

21   February was the Department of Justice.  It may have gone

22   into March, though.

23   Q.   What was your role?

24   A.   I would go to these meetings and I would take notes and

25   report back to the MEC as to the status of what the

```
 1   government was saying about the transaction as to whether or

 2   not they were going to approve the transaction.

 3   Q.   And you wanted the transaction approved at that time,

 4   did you not?

 5   A.   Yes, I did.

 6   Q.   Mr. Comlish, I am going to hand you a document that has

 7   been marked D 154.  Mr. Comlish, do you recognize that

 8   document?

 9   A.   I do.

10   Q.   Can you tell me what it is?

11   A.   This is a script that I wrote for a, what they call an

12   as pen users message.  As pen was our voice mail system and

13   it was essentially a script for voice mail that went out to

14   all the TWA MEC.

15            MS. RODRIGUEZ:  Your Honor, I would like to move D

16   154 into evidence.

17            MR. FRAM:  No objection, your Honor.

18            THE COURT:  Let me ask you this.  Does that include

19   this handwritten stuff on here?  The whole document?

20            MS. RODRIGUEZ:  Do you have any objection to the

21   handwritten notes?

22            MR. FRAM:  I assume it is the witness's notes, your

23   Honor.

24            THE COURT:  Let me ask him.  Is that your

25   handwriting?
```

```
 1                THE WITNESS:  Yes, your Honor, it is.

 2                THE COURT:  Okay.  Then, you have no objection?

 3                MR. FRAM:  Correct, your Honor.

 4                THE COURT:  I am going to admit D 154, including

 5      the handwriting, into evidence.

 6      Q.   So again, can you tell me what was the purpose of --

 7      A.   The purpose of this was to give them an update as to

 8      what was going on in Washington.  At this time it was the

 9      commerce, science and transportation committee hearings.

10      Q.   You were encouraging the pilots to get out and support

11      the transaction?

12      A.   Yes, come out and see what is going on in Washington and

13      support the transaction.

14      Q.   You were aware during this February timeframe, were you

15      not, that one of the provisions of the TWA American asset

16      purchase agreement required the waiver of scope?

17      A.   Yes, I was.

18      Q.   And you knew what that entailed?

19      A.   Yes.

20      Q.   But nonetheless you were still encouraging the pilots to

21      come out and support the transaction?

22      A.   Yes, I was.

23      Q.   Why was that, Mr. Comlish?

24      A.   I felt this was going to be quite different than the

25      turned out, obviously, but I felt it was going to be a good
```

1    transaction.  I felt we could overcome the potential hurdles

2    of waiving scope.  We had the largest union, 64,000 pilots.

3    We were protected as far as I was concerned.  I felt good

4    about the transaction.

5    Q.   Okay.  You have testified about the different

6    Congressional hearings that you attended, and did you have

7    any other meetings with anybody in this spring, 2001,

8    timeframe?

9    A.   I met with Secretary Mineta.

10   Q.   Tell us who Secretary Mineta?

11   A.   Norm Mineta was the Department of Transportation

12   Secretary.

13   Q.   Why did you meet with Mr. Mineta?

14   A.   I met with Mineta initially to see what DOT was going to

15   do, and if there were going to be any hurdles with DOT.

16   Department of Transportation.

17   Q.   And did you get any response from Secretary Mineta?

18   A.   He was very much in favor of the transaction.

19   Q.   Did you ever have any formal meetings with Mr. Mineta or

20   representatives of his office?

21   A.   Yes, I did.

22   Q.   Can you tell me when that was?

23   A.   That was in the spring of 2001.  It was, I can't

24   speculate.  I believe it was March.

25   Q.   What was the purpose of that meeting?

Comlish-direct/Rodriguez                                        162

1    A.    The purpose of that meeting was to have Scott Shwartz

2    who was the vice chairman of the MEC to sit down and talk to

3    them about the transaction, and if there was anything the

4    Department of Transportation could do to put pressure on the

5    situation, and to involve themselves possibly in dealing with

6    seniority integration.

7    Q.    I am sorry.  Can you tell us who was at that meeting?

8    A.    There was a woman from the Department of Transportation,

9    and Scott Shwartz, and I am sold told that Mr. Clay Warner

10   was there but I don't recall him being there.

11   Q.    What was the upshot of that meeting?

12   A.    The upshot of that meeting was the Department of

13   Transportation would get back to us with some information as

14   to what they could do.

15   Q.    Did they get back to you?

16   A.    Yes.

17   Q.    What was their response?

18   A.    I believe they were going to continue to monitor the

19   situation.  I spoke to Norm Mineta about it.  His answer to

20   me was we are going to monitor how things are going with the

21   transaction.

22   Q.    How did you come to have access to Mr. Mineta?  You are

23   a pretty young guy, new on the governmental affairs

24   committee.  How did you come to have access with him?

25   A.    My father had known Norm Mineta for many years, working

1    with him in Washington.  They were friends, and the outgoing

2    government affairs chairman from TWA was his stepson.  And I

3    spoke to him.  Later on we became friends.

4    Q.   So during this timeframe, now I am talking about the

5    spring of 2001, how often did you have conversations with

6    Secretary Mineta?

7    A.   Quite often.  I had contact with him I would say at

8    least once a month.

9    Q.   And again we are talking about the spring of 2001?

10   A.   Spring of 2001.  I spoke to him on the phone once during

11   March or so.  And then again, it is hard for me to recall but

12   there were several phone calls.

13   Q.   The phone calls were do keep him apprised of what was

14   going on?

15   A.   That's correct, yes.

16   Q.   Other than trying to get the Secretary of Transportation

17   or his department involved in what was going on in connection

18   with seniority, did you try to do anything else in the spring

19   of 2001, again, focused on trying to achieve a fair seniority

20   integration?

21   A.   Yes, I did.  In the spring of 2001 I approached ALPA

22   National.  I began to realize that my office could generate a

23   significant amount of leverage.  Government affairs was

24   important.  And I was seeking funds from ALPA National.  And

25   those funds were going to be used to hire lobbyists, in the

```
 1    event that we needed to communicate more effectively with

 2    Congress over whether or not American Airlines was living up

 3    to its promises.

 4    Q.   Who did you ask for those funds?

 5    A.   I went through the chain of command and I asked Bob

 6    Pastore, actually, and then began working with Keith O'Leary

 7    on that.  And they sent a request over to ALPA National and

 8    it came back it was denied.

 9    Q.   At some point you were personally involved in an effort

10    to seek a legislative solution.  Is that correct?

11    A.   That is correct.

12    Q.   Can you tell me, first of all, when that happened?

13    A.   It began in the week of September 17.

14    Q.   And whose idea was it to seek the legislative solution?

15    A.   It was mine.

16    Q.   How did that come about, tell me what transpired?

17    A.   What transpired was that we had received a letter from,

18    I didn't receive a letter, but our merger committee chairman,

19    Mike Day, received a letter from merger committee chairman Ed

20    White of APA saying we are finished with you, we are moving

21    forward to impose a seniority integration on the TWA pilots.

22    When I saw that letter I began to realize that something

23    fishy was going on and I must act, and I must act quickly.

24    Q.   And so what did you do?

25    A.   I immediately scheduled a meeting with Senator Jean
```

1    Carnahan's office of Missouri, and spoke to her staffer, and

2    sought out any solution that she could bring to help our

3    cause.

4    Q.   What was her response, did she have any solutions?

5    A.   He came back to me.

6    Q.   He, you are talking now the aid?

7    A.   Yes.  The Congressional aid, yes.  He came back and said

8    that Jean Carnahan --

9             MR. FRAM:  I am going to object.  I object to any

10   hearsay that the witness may want to offer.

11            THE COURT:  Well, is this a conversation between

12   you and the aid?

13   A.   Yes, it is.

14            THE COURT:  I will allow it.

15   Q.   Go ahead.

16   A.   He said that Senator Carnahan would be interested in

17   giving us enhanced unemployment benefits.  I felt that was

18   not really what we were seeking.  We were seeking to save

19   jobs, and to ensure that we got a fair and equitable

20   seniority integration.

21   Q.   So what did you do next?

22   A.   I went across the hall to Senator Bond's office, the

23   other Senator from Missouri.

24   Q.   Did you meet with Senator Bond?

25   A.   I did.

Comlish-direct/Rodriguez                                    166

1    Q.   What occurred during that meeting?

2    A.   You explained to him our situation.  He said that he

3    wanted to speak to other members of our MEC.

4    Q.   And that first conversation with Senator Bond, was it

5    just you and Senator Bond?

6    A.   Yes, it was.

7    Q.   What happened next?

8    A.   I picked up the phone and began calling MEC members and

9    told them what transpired, Senator Bond could very well be

10   interested in sponsoring legislation, or producing

11   legislation, that would be favorable and give us leverage in

12   this transaction.

13   Q.   And was there a follow-up meeting?

14   A.   There was.  Several of the MEC members descended upon

15   Washington.

16   Q.   Who were they?  Let me stop you.  Who were the MEC

17   members that descended upon Washington?

18   A.   Ted Case, Howard Hollendar, Jim Arthur and Sally Young.

19   Q.   What did you do?

20   A.   We met with senators --  we all met with Senator Bond

21   and he said I would love to help you guys, I would like to

22   sponsor some legislation.

23   Q.   Can you give us a timeframe, Mr. Comlish?

24   A.   This was probably the following week, September 20

25   timeframe, somewhere in that timeframe.

1    Q.    Then what happened?

2    A.    Well, we had our marching orders, and so some of the MEC

3    members went back to Saint Louis, Ted Case and I then

4    proceeded to Roland Wilder's office, that is our attorney in

5    Washington, and we sat down and told him what the Senator had

6    said, and since he is an attorney, I thought, I asked Roland,

7    I said Roland, can we craft legislation the Senator will

8    accept?  And he did.  We started putting it together and we

9    sent it over to Senator Bond's office.

10   Q.    What was Senator Bond's response?

11   A.    Senator Bond wanted to have approval from the president

12   of the association, Duane Woerth.  So we went back and we

13   sent the -- we called Woerth, Duane Woerth, immediately.

14   Q.    When you said you went back, where did you go back?

15   A.    We went back to Roland Wilder's office and we phone

16   called Duane Woerth, and --

17              THE COURT:  The we is you and --

18   A.    Me and Ted Case, to inform him of this pending

19   legislation or this idea we are going to have some

20   legislation that Senator Bond is going to introduce a bill.

21   And Ted called Duane Worth's office and left -- he wasn't

22   there, so he left a message and we waited and we waited, and

23   there was no -- nobody returned the call.

24              So then we called Paul Hallisay, the government

25   affairs person.

Comlish-direct/Rodriguez                                    168

1    Q.   Also at ALPA?

2    A.   At ALPA National, yes.  And there was no answer there so

3    we left a message and waited and waited so finally, we took

4    the draft of what  we put together and we put it on the fax

5    and sent it to ALPA National headquarters.

6         Within minutes of us sending that fax we got a call from

7    Paul Hallisay.

8    Q.   What did Mr. Hallisay say?

9    A.   He said "Interesting.  This bill will never hit the

10   floor of the United States Senate."

11          And he said it with such a tone, I will never

12   forget it.

13   Q.   Did you ask him what he meant when he said this bill

14   will never hit the floor of the United States Senate?

15   A.   He said it would get tied up in committee.

16   Q.   Did he say anything else?

17   A.   He says, "Well, let me take a look at it.  I will see

18   what we can do."  And the conversation ended and we waited

19   for him to get back to us.

20   Q.   Did he ever get back to you?

21   A.   Yes, he did.

22   Q.   And again, what is the timeframe that we are talking

23   about?

24   A.   That is still the week of, I want to say the 21st, in

25   that timeframe, that week.

```
 1                THE COURT:  21st of what?

 2                THE WITNESS:  We are going into September, yes.  So

 3   we are going towards the end of September.

 4   Q.   How long did it take him to get back to you?

 5   A.   It, let me back up for a second.  This was the last week

 6   of September, the Monday of the last week of September is

 7   when it started.  Okay.

 8                It took several hours, I believe, it may have been

 9   the next day.  It has been a while.  I am trying to remember.

10   But he did get back to us.  And his response was that there

11   were some problems with the language.

12   Q.   Did he tell you what the problems were?

13   A.   He said it was too broad.  We needed to restrict the

14   language, confine the language further, and he explained to

15   us what that meant was that the language covered the pilots,

16   the flight attendants and the mechanics.  He felt that the

17   IAM who represented the mechanics were going to object to

18   this legislation.  And they were going to object to this

19   legislation because the mechanics already had a deal on

20   seniority.

21                THE COURT:  With whom?

22                THE WITNESS:  With the American mechanics.

23                THE COURT:  They already had a deal.

24   A.   They already had a deal because they were both AFL-CIO

25   represented unions and because of that, they agreed to some
```

1    process that gave them seniority.

2              THE COURT:  Did that include the flight attendants

3    as well?

4    A.   No.

5              THE COURT:  It was just the mechanics?

6    A.   Just the mechanics.

7    Q.   So what did you do in response to his comments, Mr.

8    Comlish?

9    A.   We rewrote the legislation, and we put in the

10   legislation that any previous agreements that were made would

11   not be undone by this transaction.  By this legislation.

12   Excuse me.

13   Q.   Than did you send that back to, did you send that back

14   to Mr. Hallisay?

15   A.   We sent it back to Mr. Hallisay.

16   Q.   Did that address his concerns?

17   A.   Yes.

18   Q.   So what was the next thing that happened?

19   A.   The next thing that happened was that we, Senator Bond

20   said that is ALPA National in approval of this language, and

21   we said yes, they are.  And he said, well, we want to put out

22   a press release with regard to this legislation being

23   introduced.

24             So Senator Bond created and had a press release put

25   out to the press.

1    Q.   Now, during this whole process had you ever reached out

2    to anybody at American or APA and told them about this

3    proposed legislation?

4    A.   No, I didn't.

5    Q.   Do you know when the first press release went out from

6    Mr. Bond's office, Senator Bond's office?

7    A.   I can't recall any specifics.  I believe he had it on

8    his website on Monday, it must have been, it was on a Monday.

9    If I had a calendar in front of me it would help.

10   Q.   Did you at this point ask ALPA National for help, help

11   or support in getting the bill passed?

12   A.   Oh, yes.  We felt that ALPA National was going to play a

13   major role in helping this legislation.  As I said before,

14   this is the reason why I took the position as the chairman of

15   the government affairs committee, so I could get, be part of

16   ALPA National's lobbying department, and to get their support

17   and help.

18   Q.   Did you ask specifically for any, did you ask for any

19   specific help from ALPA National?

20   A.   Well, the first step at this point was to have the

21   legislation introduced, and then it was time to begin the

22   work.

23   Q.   I just want to hand up to you, sir, and it is already in

24   evidence, P-419, and ask you --

25            THE COURT:  P?

1          MS. RODRIGUEZ:  P.

2    Q.    That is the press release.  And ask if that is the press

3    release you are referring to?

4    A.    This is the press release.

5    Q.    That was drafted by Senator Bond's office?

6    A.    Yes, it was.

7    Q.    Thank you.  So Senator Bond issued his press release

8    announcing the legislation.  What was the next thing to

9    happen?

10   A.    Well, the press release got out, and I would say that

11   all hell broke lose.

12   Q.    Can you tell us what you mean by that?

13   A.    The APA immediately picked it up, and began to contact

14   their pilots, that, uh-oh, Senator Bond has got this bill and

15   it is going to require binding arbitration.

16   Q.    What did you do in response?

17   A.    Well, at that point, it was obvious that there was going

18   to be a big fight, we were going to have to get our troops

19   together and get as much support from ALPA National as

20   possible to beat them to the punch on Capitol Hill.

21   Q.    Did you talk to anybody at ALPA National about this?

22   A.    There were ongoing discussions with Paul Hallisay and

23   the MEC members, and I was talking to them through the chain

24   of command.

25   Q.    Through the chain of command?

1    A.   Yes.

2    Q.   What personally did you do after the bill was

3    introduced?

4    A.   I thought it was very important at this point to speak

5    to the rest of the Missouri delegation.  That included all,

6    the other Senator and all the Congressmen and Congresswomen

7    from Missouri, and make them aware of the bill and ask for

8    them to be co-sponsors of the legislation.

9    Q.   What response did you get?

10   A.   They all became co-sponsors.

11   Q.   And did you do anything in preparing --

12            THE COURT:  I am sorry.  Did Senator Carnahan

13   become a co-sponsor?

14   A.   Eventually yes, she did.

15            THE COURT:  And other senators?

16   A.   Other senators did, yes, sir, yes, your Honor.

17            THE COURT:  You aren't talking about House members.

18   A.   House members from Missouri.

19            THE COURT:  But the Senate, they can't --

20   A.   I understand.  Let me clarify.  Senator Emerson, I mean

21   Congresswoman Emerson, produced her own companion version,

22   which was identical in the  House.  So the House  members co-

23   sponsored hers and eventually Jean Carnahan in the Senate co-

24   sponsored Senate Bond's.

25            THE COURT:  There were two, and were they both

1    introduced?

2    A.   Yes.

3            THE COURT:   So a pending bill in the House and a

4    pending bill in the Senate?

5            THE WITNESS:   That's correct.

6    Q.   And did you form any kind of grass roots campaign in

7    connection with the efforts to get the Bond bill passed?

8    A.   At this point it was imperative I had to do that.

9    Because the APA was beginning their own small grass roots

10   campaign, and I began a grass roots campaign.

11   Q.   And what did that entail?

12   A.   That entailed spreading the word amongst our pilots, and

13   inviting them to come down to Washington, D.C.  And when we

14   would meet in Washington, D.C. we would meet in the hotel

15   lobby, I think we also had a breakout room, a small room we

16   would all meet in, and what I would do is I would ask each

17   pilot where they were from, and I would assign them to a

18   team.

19           And  each team had a team leader who was well

20   versed in what we were trying to achieve, and I would send

21   them, I would make appointments and then send them out to

22   their Congressmen or Senator to explain what we wanted.

23   Q.   Can you give us an approximate makes of how many pilots

24   were engaged in this grass roots effort?

25   A.   Well, there was a rotation of pilots because pilots as

 1   you know have to go and fly.  So at any one time there could

 2   be upwards of 100 to 200 TWA pilots in uniform on Capitol

 3   Hill.

 4   Q.   When, were you also on Capitol Hill at this time?

 5   A.   Yes, way.

 6   Q.   What were you doing?

 7   A.   I was organizing the groups and the grass roots

 8   committee.  I was keeping track of what they would come back

 9   with, so they would come back from a Congressman or Senator

10   and say my Congressman so and so is for this legislation.

11   And I would check off, good.  That is great.  Or they would

12   come back and say this Congressman needs a little bit more

13   work, more, maybe more literature or something, more

14   information.  So we would get that information to that

15   Congressman or Senator.

16   Q.   ALPA  National has offices up by the Hill, don't they?

17   A.   Not too far at all from the Hill.

18   Q.   Were you, this, was this grass roots campaign, were you

19   leading this grass roots campaign from ALPA National

20   headquarters?

21   A.   Well, actually we did initially.  We tried to work with

22   ALPA National.  And amongst those first phone calls we asked

23   ALPA if we could use their phones and their fax machines and

24   they said no.

25   Q.   So what did you do?

Comlish-direct/Rodriguez                                    176

1   A.   Well, the flight attendants were also interested in our

2   legislation, the IAM, the machinists, and they welcomed us

3   with open arms.  We went to their offices and used their

4   faxes and phones.

5             THE COURT:  They represented the flight attendants?

6             THE WITNESS:  Yes, your Honor.

7   Q.   Were you also on Capitol Hill during this time while I

8   were leading the grass roots campaign?

9   A.   Yes, I was.

10  Q.   And were you also meeting with Congressmen and senators?

11  A.   Yes, I was.

12  Q.   Can you give us any idea how many Congressmen and

13  senators you have met with?

14  A.   Oh, too numerous to say.

15            MS. RODRIGUEZ:  And again, your Honor, we have done

16  this with the other witnesses.

17  Q.   This is just as a visual, handing Mr. Comlish a box.

18  Can you tell me what this is?

19  A.   A cigar box I kept all my, empty cigar box that I kept

20  all my contacts of the senators and Congress men that I met

21  with.  These are business cards they gave me.

22  Q.   Can you give us some idea of just a handful of the

23  people that you met with?

24  A.   Sure.  Now, you didn't, a lot of times I didn't have the

25  clout to actually meet with the Senator or the Congressmen.

1    Only ALPA had clout like that.  I am just a pilot.  I did

2    meet with some of the staffers, occasionally I did get access

3    to the Congressman and Senator.  It was a great thing when

4    that happened.

5            But Senator Harry Reid.  Senator Dick Gephart, John

6    Kerry.  Fred Thompson.  Ted Kennedy.  Joseph Lieberman.

7    Q.    Okay.

8    A.    Okay.

9    Q.    Thank you, sir.  While you were on the Hill did you see

10   anyone from ALPA National?

11   A.    I saw Duane Woerth once on Capitol Hill.

12   Q.    When was that?

13   A.    I want to say it was October 16.  He was, I saw him

14   there.  There was a rally that Congressman Gephart was

15   giving, and there was bleachers and people everywhere and I

16   looked over and I said there is Duane.  He is in uniform.  He

17   is standing there.

18           THE COURT:  You mean captain's uniform.

19   A.    Yes, your Honor.  And I was so happy to see him there

20   and I waved to him and he gave me a dirty look.  And I

21   thought, "Uh-Oh, something is going on here."

22           MR. FRAM:  Your Honor, I really object to the

23   editorial comments.  Can't we just get the facts?

24           THE COURT:  Well, in your opinion he give you a

25   dirty look.  How far were you from him?

Comlish-direct/Rodriguez                                   178

1    A.   About the same distance between Mr. Fram.

2            THE COURT:  He gave you what he considered to be an

3    unfriendly look.

4    A.   He went like this.

5            THE COURT:  I will allow it.

6    A.   A scowl.  So I --

7            THE COURT:  Some people say that I always do that.

8    A.   So in seeing this I was alarmed.  And I said to Ted

9    Case, who was standing next to me.  I said we have got to go

10   6talk to Duane Woerth.  So when the rally broke up, there was

11   a crowd of people, we fought drew the crowd to get to Duane

12   Woerth.  He is 6-4 or so, we saw him and went to him.  When

13   we timely got up there flight attendants had beat us to him.

14           They were screaming, "Why aren't you helping the

15   pilots?  Why aren't you helping the pilots?"

16           I pushed them aside, I said you are going to get

17   them angry, don't get him angry.  I said, "Duane, Matt

18   Comlish."

19           I stuck out my hand and he refused to shake my

20   hand.

21           I said, "Duane, can you help us?  Can you help us?"

22           He says, "You pilots need to get off the Hill right

23   now."

24           And I said, "Well, he says we are going to handle

25   this in-house.  You need to get off the Hill right now."

1        And I said, "What about our opponents here?  We

2   have got to do something."

3        "I don't want to talk about it any further."  And

4   he leaves, walks off.

5   Q.   Did you ever ask him what he meant when he said we are

6   going to handle this in-house?

7   A.   I had no contact with him after that.

8   Q.   Had you talked to anybody else from ALPA National prior

9   to this time about your efforts on the hill?

10  A.   Well, you know, through the chain of commands there was

11  discussions with Paul Hallisay and the government affairs

12  department.

13  Q.   And other than that did you have any other conversations

14  with anyone else at ALPA?

15  A.   No.

16  Q.   Did you ever receive any phone calls from anybody

17  conveying --

18  A.   I am sorry.  I take that back.  There was the Mayflower

19  Hotel meetings which took place.  And just prior to that

20  there was a phone call that came in from Paul Hallisay, while

21  I was in a meeting with Senator Bond.  And that was October.

22        THE COURT:  It came into Senator Bond's office?

23  A.   That's correct, the phone call came into Senator Bond's

24  office for us, and we were discussing at the time the

25  possibility of setting up some meetings to reengage the

Comlish-direct/Rodriguez                                180

1    American pilots in negotiations.  They were coming back to

2    the table.

3    Q.   And what time period was this?

4    A.   Well, the meetings took place October 21 through 23, I

5    believe it was.  So it was just a few days prior to that,

6    maybe a week prior to that.

7    Q.   Do you know who Tom Rachford is?

8    A.   Yes, I do.

9    Q.   Some who is Mr. Rachford?

10   A.   He was an executive vice president for ALPA National.

11   Q.   Did you ever hear from him during this time period?

12   A.   Yes, I did.

13   Q.   What did you hear from him?

14   A.   Well, I heard from Mr. Rachford twice during this

15   timeframe.

16            MR. FRAM:  I object to any hearsay.  I really do.

17            THE COURT:  Didn't he say he was an ALPA.

18            MS. RODRIGUEZ:  He is an ALPA vice president.

19            THE COURT:  An ALPA vice president.

20            THE COURT:  He is an ALPA vice president.  I am

21   going to allow him, unless you challenge the fact that he is

22   an ALPA vice president.

23            MR. FRAM:  Right.  Withdrawn.

24            THE COURT:  I am going to allow it.  It was

25   directly with him.  It if it is not what he heard from

1    somebody else.

2    Q.   Did you receive a telephone call from Captain Tom

3    Rachford?

4    A.   I did.

5    Q.   Do you have a timeframe for the telephone call?

6    A.   The first phone call was October 16.

7    Q.   I have a document here perhaps that will refresh your

8    recollection as to the date.  Can you tell me what that

9    document is?

10   A.   Yes.  Of course.  This was October 4.  This was within

11   days of Senator Bond announcing that we, that he had

12   introduced our legislation.

13   Q.   And what is this document that has been marked P-335?

14   A.   This is a notes that I took after receiving the phone

15   call from Mr. Rachford.  You wanted captain Rachford.  What I

16   wanted to do is archive our conversation.

17   Q.   That is what that document is, you wrote down the notes

18   after you got it?

19   A.   Yes, I did.

20   Q.   Can you tell me what Mr. Rachford said to you?

21   A.   Mr. Rachford called me up.  He was alarmed.  He said he

22   just received on his voice mail the Aspen, ALPA Aspen voice

23   mail system, a message from Duane Woerth who said, who was

24   saying that he was commenting on the TWA pilots efforts on

25   Capitol Hill, and he was saying that Mr. Rachford was

1    sounding very angry.

2    Q.   Mr. Rachford?

3    A.   I am sorry.  Mr. Woerth was very angry in this message.

4    He was rambling on aimlessly and he was saying that they are

5    going -- the TWA pilots are going to blow this deal.  They

6    are going to blow this deal.

7    Q.   Mr. Rachford called you to convey that message to you?

8    A.   Yes, he did.  He wanted to know what this deal was for

9    and I told him I didn't know.  But I would imagine that it is

10   a deal with -- regarding the seniority.

11   Q.   You testified that you saw Duane Woerth on the Hill on

12   October 16.  Other than that one time that you saw Duane

13   Woerth on the Hill, did you see anyone else from ALPA on the

14   Hill?

15   A.   I saw.

16   Q.   ALPA National?

17   A.   ALPA National.  Yes.  I saw for the first time Paul

18   Hallisay in late December.

19   Q.   Did you talk to Mr. Hallisay when he was there?

20   A.   Mr. Hallisay was in a big hurry, and we passed each

21   other, and I said, "Paul, are you working hard?"

22            And he says, "I am working hard.  Really hard."

23   And kind of like snide to me, in a way.

24   Q.   That was --

25            THE COURT:  I am going to not speak to you.  You

 1    imitate the voices of everybody.  You sounded snide there.

 2    Okay.

 3    Q.   Can you tell me, Mr. Comlish, over what period of time

 4    this lobbying effort went on?

 5    A.   The lobbying effort went on all the way up until, I want

 6    to say it was October -- I am sorry, November, November 18.

 7              THE COURT:  You are not offering --

 8    A.   2001.

 9              MS. RODRIGUEZ:  No, your Honor, just to refresh his

10    recollection as to the date.

11              THE COURT:  Okay.

12    Q.   Did you to go on -- do you know when the meeting was at

13    the Mayflower hotel?

14    A.   Yes, it was in October.

15    Q.   Were you in attendance there?

16    A.   Yes, ways.

17    Q.   What was your role at the meeting?

18    A.   Because the meeting had been set up due to the leverage

19    we created with Senator Bond and the Bond bill --

20              MR. FRAM:  Your Honor, I object to the witness's

21    editorialization.  Can't we get the facts as opposed to his

22    interpretation of what was happening?

23    Q.   Why did you go to the meeting?

24    A.   Because it was --

25              THE COURT:  What was the meeting, the meeting at

1    the Mayflower?

2    A.   Yes,  your Honor.

3            THE COURT:  It was a meeting of what?

4    A.   It was a meeting of the allied Pilots Association and

5    TWA merger committees.

6            THE COURT:  The two committees.

7    A.   Yes.

8            THE COURT:  You mean the ALPA committee and the,

9    well -- the TWA pilots merger committee and the Allied Pilots

10   merger committee?

11   A.   Yes, your Honor.

12   Q.   You were not on the TWA merger committee, were you?

13   A.   No.

14   Q.   Why were you at the meeting?

15   A.   The meeting was set up through the auspices of Senator

16   Bond's office.

17   Q.   What was the purpose of the meeting?

18   A.   The purpose was to bring back, bring us back to the

19   table so we could work on completing seniority negotiations

20   through an agreement.

21   Q.   And was there an agreement reached at that meeting?

22   A.   No, there was not.

23           THE COURT:  Were proposals made, I mean, did either

24   side or both sides make proposals?

25           THE WITNESS:  I wouldn't call them proposals.

Comlish-direct/Rodriguez                                      185

```
 1                 THE COURT:  Okay.

 2   A.   I wouldn't.  From what was reported to me --

 3                 THE COURT:  No, you were there, you said.

 4                 THE WITNESS:  Well, I wasn't allowed in some of

 5   these rooms.  I was in the hotel area outside these rooms.

 6                 THE COURT:  Oh, so you weren't actually at the

 7   meeting?

 8   A.   Well, there was some meetings I was involved in with the

 9   MEC, and then there was merger committee meetings.

10                 THE COURT:  MEC, meaning TWA MEC.

11                 THE WITNESS:  TWA MEC.  And there were merger

12   committee meetings.  When the merger committee meets I was

13   not allowed in the room during those.

14                 THE COURT:  So I withdraw my question about whether

15   there were proposals because you weren't there.  All right.

16   Q.   The Bond bill passed in early December.  Is that

17   correct?

18   A.   Yes, that's correct.

19   Q.   And what did you do after it passed -- it passed the

20   Senate, right?

21   A.   Yes, it passed unanimously on a voice vote.

22   Q.   What was your role after the Bond bill passed the

23   Senate?

24   A.   My role at that point was to continue to keep the grass

25   roots pressure going, and keep the pilots there meeting with
```

```
 1    House members to try to make sure that we got the bill

 2    passed.

 3    Q.   Now, you are familiar with Supplement CC, are you not?

 4    A.   Yes, I am.

 5    Q.   And in connection with Supplement CC, which I believe we

 6    have been referring to as the cram-down here, and the staple.

 7    Were you above or below the staple?

 8    A.   I was below the staple line.

 9    Q.   Were you subsequently furloughed?

10    A.   Yes, I was.

11    Q.   When was that?

12    A.   At the end of November of 2002.

13    Q.   And are you still furloughed?

14    A.   Yes, I am.

15         MS. RODRIGUEZ:  I have no further questions, your

16    Honor.

17         THE COURT:  Okay.  Cross examine.

18         CROSS EXAMINATION.

19         BY MR. FRAM:

20         MR. FRAM:  Thank you.

21    Q.   Mr. Comlish, you felt when you initially talked about

22    the Bond legislation, that the  people at ALPA were not

23    getting back to you quickly enough?

24    A.   Yes.

25    Q.   In you said that, right?
```

Comlish-cross/Fram                                              187

1    A.   Yes.

2    Q.   You called them and a couple hours went by, you hadn't

3    heard back from them, and that was a matter of concern to

4    you?

5    A.   After a while it was a concern because this was

6    something that was very important.  We needed to get their

7    attention with --

8    Q.   And the timeframe when you called the people at ALPA was

9    September 16 or thereabouts?

10   A.   It was, it was beginning the last week of September, the

11   21st, I believe it was.

12   Q.   Were there some other things happening on Capitol Hill

13   in the last weeks of September?

14   A.   Yes, there were.

15   Q.   What was going on?

16   A.   There was, it was the 9-11 hearings.  There were some

17   issues, pending legislation with regard to national security.

18   Q.   The Patriot Act was passed in late September of 2001.

19   Correct?

20   A.   No. I don't believe so.

21   Q.   No?

22   A.   I don't believe it was the Patriot Act.

23   Q.   When do you think the Patriot Act was signed?

24   A.   I believe that may have been the following year.  I am

25   not an expert on the Patriot Act.

Comlish-cross/Fram                                                188

```
1   Q.    You don't recall the Patriot Act passing the Senate on

2   October 11 of 2001, passing the House the next day, and being

3   signed into law by President Bush on October 26 of 2001?

4   A.    I am not sure why I would be interested in the Patriot

5   Act.

6   Q.    Did I ask you why you might be interested in the Patriot

7   Act?

8   A.    No, you didn't.

9   Q.    Did I ask you whether you were aware that the act was

10  being debated on Capitol Hill and passed in the timeframe you

11  have been discussing?

12  A.    No, I am not, no.

13  A.    No, I was not aware.  I wasn't paying attention to that

14  particular.

15  Q.    Was there a crisis in the airline industry in the

16  aftermath of 9-11?

17  A.    Yes, there was.

18  Q.    Tell us about what the crisis was?

19  A.    The crisis was, is that the airports were not secure.

20          THE COURT:  Did they stop flying for a while?

21  A.    They did stop flying for a period of time.

22          THE COURT:  That was a tremendous impact.

23  A.    Absolutely.

24  Q.    What impact did the non-flying, the termination of

25  flights, have on the airline industry?
```

1    A.   It had tremendous impact.

2    Q.   Okay.  Were there furloughs in the aftermath, a couple

3    weeks after 9-11?

4    A.   Couple weeks?  I don't believe a couple weeks.  It would

5    be an inaccurate description.

6    Q.   Did the airlines start to experience financial distress?

7    A.   Well --

8    Q.   In the weeks after September 11?

9    A.   Well, I have to qualify that answer by saying that the

10   anticipated financial distress.

11   Q.   So they anticipated it, but didn't experience it after

12   they had shut --

13   A.   The government bailed them out.

14   Q.   Okay.  Let's take it a point at a time.  Did they

15   experience actual financial distress in the couple of weeks

16   after 9-11?

17   A.   Well, any time you are not flying airplanes you have to

18   pay for that equipment, and so there was no revenue coming

19   in, so that would qualify as financial distress.

20   Q.   Right.  And on September 22, 2001, the Air

21   Transportation Safety and System Stabilization Act was passed

22   by Congress and enacted into law,  correct?

23   A.   What is the date again.

24   Q.   September 22, 2001?  Do you recall that?

25   A.   I do.

Comlish-cross/Fram                                          190

1    Q.   Do you recall that bill as the one that allocated five

2    billion dollars of direct financial assistance to the

3    airlines?

4    A.   Yes, I do.

5    Q.   Do you recall that as the bill that also --

6    A.   Say again the date, would you?

7    Q.   September 22 of 2001.  I will hand you the statute page.

8    Does that refresh your recollection that in the weeks, in

9    late September, that the overall health and viability of the

10   entire industry was considered at risk?

11   A.   Yes, that's correct.

12   Q.   So with the entire industry at risk, you were upset that

13   people at ALPA were not getting back to you immediately about

14   potential legislation that would benefit a single pilot

15   group?

16   A.   Yes.

17   Q.   Did you say before with respect to the Bond bill, I

18   think I took this down verbatim, that the Bond bill would not

19   affect any previous agreements, I think you said no previous

20   agreements would be undone.  You said that, right?

21   A.   Yes.

22   Q.   Hadn't the TWA pilots agreed in April of 2001 to waive

23   their right to seniority arbitration with respect to the

24   American TWA transaction?

25   A.   Yes, they did.

1  Q.   And didn't the Bond bill undo that, didn't the Bond bill

2  attempt to impose upon American Airlines and its pilots

3  seniority arbitration?

4  A.   Yes, it did.

5  Q.   So you were incorrect this morning or this afternoon,

6  you were incorrect a little while ago when you told us that

7  the Bond bill would not undo any previous agreements, right?

8  A.   No, there wasn't an agreement.  We waived the scope, and

9  the scope was deleted from the contract.

10  Q.   And the point of the bill, the Bond bill, was to put

11  scope back into the relationship among the TWA pilots,

12  American, and the APA, right?

13  A.   I am sorry, Mr. Fram.  The way you coining this is not

14  accurate.  We deleted provisions from our contract --

15  Q.   Right.

16  A.   But it doesn't represent an agreement that we, we agreed

17  to keep them out.  They were always available to us, to

18  either negotiate that, or to find other leverage or means to

19  get them back.

20  Q.   Did the TWA pilots agree to waive scope on or about

21  April 2 of 2001?

22  A.   They did.  Scope was deleted from the contract.

23  Q.   And the Bond bill was an attempt to put scope back into

24  the relationship of the TWA pilots with American APA?

25  A.   That's correct.

Comlish-cross/Fram                                                    192

1    Q.   So the Bond bill was attempting to undo an agreement --

2    A.   No, it wasn't.

3    Q.   -- an agreement.  Wait for the whole question.  So in

4    your view, the Bond bill was not attempting to undo an

5    agreement that the TWA pilots had reached with American, and

6    the American -- well, let me rephrase.

7              In your opinion the Bond bill was not an attempt to

8    undo an agreement that the TWA pilots had reached with TWA

9    LLC in April of 2001?

10   A.   The fact is there was no agreement.  It was a deletion

11   from the contract.  There was no agreement.  If there was an

12   agreement, it would have said you cannot ask for these back

13   again.

14   Q.   Did the transition agreement, did the collective

15   bargaining agreement that was signed in April between the TWA

16   pilots and TWA LLC have seniority arbitration?

17   A.   No, it didn't.

18   Q.   And that is because the TWA pilots agreed that the

19   contract didn't have to have seniority arbitration, right?

20   A.   We agreed to allow those provisions to be deleted.  Do

21   you understand the distinction?

22   Q.   Do you have any legal?

23             THE COURT:  You don't ask questions.

24   A.   I am sorry, you are right.

25   A.   Sorry.

1    Q.   Do you have any legal background or training?

2    A.   No, I don't.

3    Q.   Do you have any training in contract negotiations?

4    A.   I am an airline pilot.  Airline pilots fly airlines,

5    sir.

6    Q.   That is great.  Can you answer my question?  Do you have

7    any training in contract negotiations?

8    A.   No, I don't.

9    A.   ALPA National does.

10            MR. FRAM:  I move to strike that comment, your

11   Honor.

12            THE COURT:  I will strike it.

13   Q.   Do you claim that you had a conversation on Capitol Hill

14   with Duane Woerth about the legislation that you were pushing

15   for on Capitol Hill?

16   A.   That's correct.

17   Q.   And tell us exactly what you claim Mr. Woerth said to

18   you when you went up to him at this gathering with respect to

19   the legislation you were pushing?

20   A.   He said you need to get off the Hill.

21   Q.   And you understood that to be him directing you to back

22   off from the legislation.  Right?  That was the point of what

23   you said before.  Yes?

24   A.   What I said was, he told me, me and my pilots to get off

25   the Hill.  That was the gist of the conversation.

Comlish-cross/Fram                                              194

```
 1              THE COURT:  But you understood that, or you, I will

 2   ask the question, did you understand he was telling you to

 3   stop lobbying for the Bond bill?

 4   A.   Yes.

 5   Q.   That is the conversation where you said he had scowled

 6   at you when you motioned to him before, right?

 7   A.   That's correct.

 8   Q.   Do you remember when Mr. Katz took your deposition in

 9   January of this year?

10   A.   Yes, I do.

11   Q.   And you were sworn to tell the truth, the whole truth,

12   and nothing but the truth?

13   A.   Yes.

14   Q.   You understood that it was testimony subject to the

15   penalties of perjury?

16   A.   Yes, I do.

17   Q.   You understood it was important for the purposes of

18   presenting the facts in this case?

19   A.   Yes, I do.

20   Q.   Do you recall being asked in that deposition --

21              THE COURT:  Give us all a page and --

22              MR. FRAM:  Yes, your Honor.  Let me find it real

23   quick.

24              THE COURT:  Did you have a copy, plaintiffs?

25              MS. RODRIGUEZ:  No, I don't.
```

1          MR. FRAM:  They do now, your Honor.

2          THE COURT:  Okay.

3    Q.   So page 100, sir.  Let's talk about what you said in

4    your sworn testimony in January of this year.  Page 100, line

5    3.

6          Do you see where Mr. Katz asked you:

7          "QUESTION:  Did Woerth ever say anything to you

8    directly about being opposed to your lobbying efforts?

9          "ANSWER:  How do you define directly?

10         "QUESTION:  I mean, you are face-to-face with him,

11   or you are in a telephone conversation with him.  Says

12   Comlish, I am opposed to your legislative efforts.  Something

13   like that.

14         "ANSWER:  Counsel, we had a chain of command and I

15   wanted to honor that chain of command, so many of these

16   communications went through the chain of command back and

17   forth to Duane Woerth.

18         "QUESTION:  Well, I am just asking you a simple

19   question.  Did you have a conversation directly with Duane

20   Woerth on the phone or in person in which he told you that he

21   was opposed to what you were doing?"

22         And what was your answer, sir?

23   A.   My answer was no.

24   Q.   Thank you.

25         MR. FRAM:  I have nothing further, your Honor.

```
 1                THE COURT:  Any redirect?

 2                MS. RODRIGUEZ:  No, your Honor.

 3                THE COURT:  Okay.  Mr. Comlish, you can step down.

 4                THE WITNESS:  Thank you.

 5                THE COURT:  Thank you.

 6                (Witness excused.)

 7                THE COURT:  Ms. Rodriguez, Mr. Press.

 8                MR. PRESS:  Our next witness is Captain Tom

 9    Rachford, again, via video.

10                THE COURT:  Okay.

11                MR. PRESS:  I don't know if we will get through the

12    whole clip in the half hour we have remaining.

13                THE COURT:  We will get through a half hour of it.

14                MR. PRESS:  Again, ladies and gentlemen, we took

15    the deposition of Tom Rachford.

16                THE COURT:  Do you have for me a copy of that?  Or

17    do I have it inside?

18                MR. PRESS:  I do.  This is the one you gave me.

19                MR. PRESS:  We took Captain Rachford'S deposition

20    in Phoenix, Arizona (September 25, 2008.

21                (Videotape commences.)

22                MS. RODRIGUEZ:  Your Honor, this is a natural line

23    for the break.

24                THE COURT:  The last line was Page 26, line 1.

25                MS. ACCHIONE:  Yes.
```

```
 1              THE COURT:  Okay, ladies and gentlemen.  The long
 2   weekend begins.
 3              Do not discuss the case among yourselves.  Keep an
 4   open mind.  Do not discuss the case with your family,
 5   friends, loved ones, bus drivers, or anybody else.  Have a
 6   great weekEND.  Have a safe trip home, have a safe trip in
 7   Monday morning.  See you Monday morning at 8:30..
 8              And thank you.
 9              (Jury leaves the courtroom.)
10              THE COURT:  I want to read into the record the
11   pages that were read.  This was Thomas Rachford deposition of
12   September 25, 2008.  And what was video'd insofar is page 5,
13   line 4 to page 6, line 12.  Page 7, line 17 to page 14, line
14   3.  Page 14, line 6, to page 23, line 10.
15              Line 23, 20, and I think we stopped at 26, line 1.
16   That is where I assume you will pick up on Monday morning.
17              Now, can you give me the order of, for Monday.
18              MR. PRESS:  Our next live witness will be Mike Day.
19   He will be a long witness.
20              THE COURT:  Is he after Mr. Rachford?
21              MR. PRESS:  He could be.
22              THE COURT:  I want to know if there is any videos
23   that I have to work on over the weekend.
24              MR. PRESS:  Yes.
25              THE COURT:  Thank you.
```

1          MR. PRESS:  I do have an alternative method of

2    doing this, Judge.  We could just play the video and when the

3    defendant wants to make an objection we can stop it.

4          THE COURT:  I would prefer to rule on it in

5    advance.  It is more work for me in advance but I hate those,

6    I think it is better for the jury if they hear it sort of

7    consecutively rather than, you know, chopped up.  That is the

8    one advantage of a video, is that you can avoid sidebars and

9    that kind of thing.

10          Look.  I will look at it.  If I decide to let it go

11    and do it the way you suggest, but I want to know what it is

12    so I can at least look at it.

13          MR. PRESS:  Did you look at John Clarke yet?

14          THE COURT:  Yes.  I haven't finished it but I

15    started it.

16          MR. PRESS:  Here is our problem.  We had

17    anticipated playing much more video by now at this point in

18    the case.

19          It is noone's fault, it is just the way the

20    presentation has gone.  We are going to get backed up with a

21    lot of videos at the end, unfortunately.  When I say a lot, I

22    think maybe seven.  But we are going to create a lot of

23    burden on you.

24          THE COURT:  I am not complaining.

25          MR. PRESS:  I am not comfortable with it.

```
1              THE COURT:  I am not complaining.  I mean, I want
2     to look at John Clark.
3              THE COURT:  Do I have John Clark?
4              MR. KATZ:  Yes, you do, your Honor.
5              THE COURT:  Probably inside.  I have a few of these
6     inside.  John Clark is next.  After, we are going to finish
7     rack forwards.  Then you are going to have the live witness.
8              MR. PRESS:  Well, if we have enough videos cleared
9     for Monday I would rather just have Monday.
10             THE COURT:  What would you like cleared for Monday
11    first?
12             MR. PRESS:  Clark.
13             THE COURT:  Tell me what you want cleared.
14             MR. PRESS:  Seth Rosen, cleared.
15             THE COURT:  Seth Rosen, I finished that.
16             MR. PRESS:  Jerome Mugenditchian.
17             THE COURT:  Let me get what I had Seth Rosen is
18    relatively short.
19             MR. PRESS:  Yes.
20             MR. KATZ:  While we are talking about this, your
21    Honor, there is a single issue that is thread through the
22    remaining videos involving John Clark, Seth Rosen.
23             THE COURT:  I have John Clark here and Seth Rosen
24    here.
25             MR. KATZ:  Jerome Mugerditchian.
```

1          THE COURT:  I have Mugerditchian.

2          MR. KATZ:  In the last day they have given us what

3     they want to so with regard to Mark Hunnibell.

4          THE COURT:  That I don't have.

5          MR. KATZ:  We are going over that.  We just have it

6     like yesterday, and this morning we got Ron Rindfleisch, part

7     two.  There are two parts to that.

8          THE COURT:  I have two.

9          MR. KATZ:  You don't November Hunnibell or

10    Rindfleisch.  Those two depositions and the ones we

11    mentioned, Clark, Rosen, Mugerditchian, all involved the

12    issue of spoliation.

13         THE COURT:  Except Rosen, there was a question of

14    spoliation.

15         MR. KATZ:  Exactly, the authorization cards.

16         THE COURT:  I am trying to walk the line between my

17    ruling that you don't get an inference of spoliation in my

18    charge, or, but where they are allowed certain leeway because

19    the evidence has disappeared and it is not the plaintiffs'

20    fault that it disappeared.  I am talking about the cards

21    right now.

22         MR. PRESS:  At joint final pretrial offers.

23         THE COURT:  And Seth Rosen's deposition, he talked,

24    I think almost exclusively when it came to spoliation he was

25    talking about the cards much some undetermined number,

1    candidly, either a thousand or 2,300, that were signed by the

2    American pilots.  We all know what we are talking about, we

3    are talking about the indication of union preference, that

4    were concededly delivered to ALPA, I don't think anybody

5    denies that.

6            MR. KATZ:  Well, there is no stipulation as to the

7    number of cards that were delivered.  That is why Mr. Rosen

8    was uncertain about that.  There is some stipulation that

9    there is some number of cards --

10           THE COURT:  Let me tell you what I did for Mr.

11    Rosen.  This one I have that.

12           First, do you have it, Mr. Press?

13           MR. PRESS:  I do.

14           THE COURT:  The first point, I am going to, the

15    first point for ALPA -- page 33, line 2, to page 33, line 10.

16    And again I am going to allow that not so much on the basis

17    of completeness but on the basis of that what is, what would

18    be a cross, sort of a legitimate cross should -- I am going

19    to allow that.  That is going to the spoliation.  The first,

20    the next objection I have is page 136.

21           MR. PRESS:  Yes.

22           THE COURT:  Line 8.  I think it is to line 24.

23           MR. PRESS:  Yes.  We would ask you to overrule that

24    objection.

25           THE COURT:  I am going to overrule it.  I am

```
1    overruling that objection.  I think, if there is a little

2    uncertainty in his, in Seth Rosen's recollection of the

3    number it is not his fault.  I mean, I will allow a little

4    leeway when ALPA itself can't produce the documents.  So I am

5    overruling 8th through 24 on page 136.

6              MR. KATZ:  Your Honor, those if those lines are

7    coming in --

8              THE COURT:  Let me just continue.

9              MR. KATZ:  There is a correction later.

10             THE COURT:  I am also going to overrule the

11   objection on page 137, lines 10, up to line 10 however, I am

12   willing to allow page 137 line 11 to line 24.

13             MR. PRESS:  I have a note next to that saying okay.

14             THE COURT:  That is my okay here.

15             MR. PRESS:  I made my own okay last night.

16             THE COURT:  My okay is the one that counts.  So I

17   am going to allow that.

18             Now, the next thing I have for ALPA completeness,

19   here I wasn't clear, it wasn't marked too clearly, I think we

20   are dealing with page 140, line 11, to line 24.

21             MR. PRESS:  I object to that on, that it is not

22   completing and it is just merely self-serving so I do have an

23   objection to that, Judge.

24             MR. KATZ:  I think that is proper questioning about

25   the same subject matter that was already being discussed, we
```

1    shouldn't have to wait until ALPA's case to have the jury

2    here that part of the discussion.

3          THE COURT:  You are trying to get all the way, I

4    think, tell me, wasn't there, what is it you want, give me

5    the page and line that you are seeking.  Start, I know it

6    starts at page 140, 11.

7          MR. KATZ:  140, 11, to 143, 14.

8          THE COURT:  You want the whole -- okay.

9          MR. PRESS:  Your Honor, this is their witness.

10   This isn't completing testimony.

11         THE COURT:  It may be -- well, when you call an

12   adverse witness you always have, what do you call it, is it

13   cross examination?

14         MR. PRESS:  But this isn't the situation where the

15   other videos, Judge, where Mr. Katz was actually cross

16   examining.  These are my questions and it is not completing.

17   I don't think it is proper.

18         MR. KATZ:  You want to cherry pick the testimony

19   and put in what they like.

20         THE COURT:  He can do that with an adverse witness.

21   There is nothing sort of ominous about cherry picking.  I

22   mean that is what you do, particularly, unless, if it is his

23   own witness, de bene esse, I am not sure I would let cherry

24   picking in that situation, but this is basically a discovery

25   deposition for which parts are being selected.

```
 1              MR. PRESS:  Exactly.

 2              THE COURT:  There is a witness you could call.  I

 3    mean if you chose to call this witness, you meaning Mr. Katz.

 4              MR. PRESS:  He is on their witness list.

 5              THE COURT:  I would let them call him anyhow, if he

 6    is on the list or not.

 7              Hold on a second.

 8              That is really your case, or maybe something that

 9    you think is part of your case.  I don't know if it is or

10    not.  But I am going to sustain the objection from 140, line

11    11, to 144, line 14.

12              MR. PRESS:  143, 14.

13              THE COURT:  I am sorry.  You are absolutely right.

14    143, 14.

15              MR. KATZ:  The next section reads that we

16    designated --

17              THE COURT:  Now, you objected to the designation of

18    143, 15, I believe to 144, 9.

19              MR. KATZ:  That's correct, your Honor.

20              MR. PRESS: Before you read that, Judge, if I can

21    give you a little context.  This deposition was taken under

22    Rule 30 (b)(6).

23              THE COURT:  He wasn't named, he was the designee.

24    You asked for a 30 (b)(6) representative of ALPA and that is

25    who they produced.
```

1           MR. PRESS:  That's correct.  One of the topics

2      specifically was where are the cards, what happened to them:

3           THE COURT:  Mr. Katz, what is it that you find

4      objectionable?  I mean I am trying to figure out --

5           MR. KATZ:  The concern I have got, your Honor, is

6      are we going into this Whole area of spoliation and what

7      happened to the cards, and you know, in there, the

8      plaintiffs' motion, spoliation --

9           THE COURT:  The plaintiff has a problem here.  It

10     these cards really existed, they were really, they really

11     were designed by the American pilots, they really were sent

12     to, and so why, the jury knows about discovery, if anything

13     they know now, they know about pretrial discovery.  And I

14     think he is entitled to explore why they haven't been

15     produced.

16          None of these questions suggest malfeasance or

17     spoliation or anything like that.  If he tried to do that, I

18     won't let him do it.  But that, I think he is entitled to

19     show that they looked for them and they don't have them.

20          MR. KATZ:  My only concern is that they argued in

21     the spoliation motion --

22          THE COURT:  Yeah, but this is not the spoliation

23     motion.  There may be a question of what he can say at

24     closing.  I don't recall that there was anything in here from

25     Seth Rosen about spoliation.

1          MR. KATZ:  Just what happened to the cards and --

2          THE COURT:  Well, I am going to overrule the

3    objection on page 143, line 15, to page 144, line 9.

4          Now, the next part was when you started, Mr. Katz,

5    was the questioning, I am now looking at line, I am sorry,

6    page 147, line 18.

7          MR. KATZ:  Yes, your Honor.

8          THE COURT:  Okay.  This was a lot of discussion

9    about, you know, 35 percent.  And Seth Rosen was very clear

10   that it was lower, I think he was lowered to 30 percent.  But

11   that is not part of his case.

12         MR. PRESS:  It is in the completing of anything.

13         THE COURT:  He is not arguing, I don't think he is

14   arguing and I don't think I would let him argue, at least on

15   the record so far, that there was more than 35 percent.

16         MR. KATZ:  Mr. Press asked him about the number of

17   cards and this questioning goes to what that number

18   represents in terms of the overall percentage of the group --

19         THE COURT:  But he puts, when you call Seth Rosen

20   as a witness, ask him that if you think that helps your case.

21   But there is no argument here that the campaign had gone so

22   far, than the jury has heard endlessly there is anywhere from

23   11,000 to 18,000 American pilots, depending on who they were

24   listening to.

25         We had one witness who said 18,000, I think he was

```
1    wrong, but the jury knows there is 11 or 12,000 pilots.

2    Rosen testified, and I let that in, that the number was

3    2,300.  Or a thousand.  But either of those numbers is way

4    below 35 percent.  If you want to put that in, if you think

5    that helps your case to prove the number was below 35

6    percent, to prove that is the rules of the National Mediation

7    Board, call Rosen, he is a general -- he was general counsel,

8    wasn't he?

9              MR. KATZ:  No, your Honor, he was the director of

10   representation.

11             THE COURT:  That was a big job, though.

12             MR. KATZ:  Yes, sir.  Very well.  We will abide by

13   that ruling.

14             THE COURT:  Yeah.  I have to check here.  The next

15   section you call completeness was line 22 to line 24 on page

16   148, and then on page 149, line 1, through 10.  I think you

17   are out.  I am not letting you, the rule of completeness

18   again, whether I let you say that when he gets called, that

19   is --

20             MR. KATZ:  What are the lines again?

21             THE COURT:  I think the starts on 148, line 22, and

22   goes to page 149, line 10.

23             MR. PRESS:  It should actually start at line 21.

24   There is a question there.  The way it was bracketed for me

25   is 22.  But you are right.  Line 22 begins half an answer --
```

```
 1    half a question.  It is, you are absolutely right.  It is

 2    really line 21, the middle of a question on line 22.  So it

 3    is line 21, page 148, to line 24 on page 149.

 4            Now, at 150 I have a bracket that looks like it is

 5    suggested, is that suggested by the plaintiff or by the

 6    defendant?

 7            MR. PRESS:  No, this is some of their completeness,

 8    on the 35 percent business.

 9            THE COURT:  I think again, this may be proper, it

10    may be something that is relevant to his case, that the

11    number of cards is very, was way less than the rule of thumb

12    or anything.  But I think that is his case.  You don't want

13    to do it, I don't think you have to do it.

14            MR. PRESS:  Thank you.

15            THE COURT:  Since that is part of the completeness

16    objection, I couldn't tell whose it was.  Then I am

17    sustaining from -- I am not allowing it for completeness from

18    page 149, line 22, to page 151, line 11.

19            MR. PRESS:  Your Honor, everything else --

20            THE COURT:  Everything else is.

21            MR. KATZ:  What about 166, 5 --

22            MR. PRESS:  Hold on.  Plaintiffs is removing the

23    designations on pages 153 through 156.

24            THE COURT:  Let me make a note.  I you have a lot

25    of designations.
```

1          MR. PRESS:  I am removing everything else we have

2  designated to the end.

3          MR. KATZ:  From 153 to the end.

4          THE COURT:  To the end.

5          MR. PRESS:  Right.

6          THE COURT:  153, line 23 to end.

7          MR. PRESS:  To end.

8          THE COURT:  Okay.  One more, though, I think.

9          MR. KATZ:  There is just one did I mentioned, 166,

10 5 to 19.  That is where Mr. Rosen --

11         THE COURT:  I have no marking on mine.  Mr. Katz,

12 look up.

13         MR. KATZ:  I am sorry, your Honor.  It is a very

14 short passage.  Let me just tell you what it is.

15         THE COURT:  Give me first, to start with, give me

16 the page and line.

17         MR. KATZ:  166, 5.

18         THE COURT:  166, 5.

19         MR. KATZ:  To 166, 19.

20         THE COURT:  This is ALPA wants for completeness.

21         MR. KATZ:  No.  We want to add this to deal with

22 the 2,300 number.  This is where he corrects the 2,300 number

23 to be something like a thousand.

24         THE COURT:  I will allow that.  That goes to areas

25 that you inquired into.

1          MR. KATZ:  Thank you.

2          THE COURT:  I will allow just those lines.  Okay.

3          MR. FRAM:  Your Honor, when we --

4          MR. PRESS:  Hold on.  I want it clear on the

5    record.

6          We are going to read page 165, line 23 through 166

7    of --

8          THE COURT:  No.  No.  I have 166 line 5.

9          MR. PRESS:  Five to 19.

10         THE COURT:  Five to 19.  That is what I have.  If I

11   am wrong, tell me.

12         MR. KATZ:  No, that's correct.

13         THE COURT:  Okay.

14         MR. FRAM:  Just, could we edit out the colloquy.  I

15   think one of these other tapes there was colloquy among

16   counsel.

17         THE COURT:  If you counsel can agree, the more

18   colloquy that the lawyers have that can be omitted, that is

19   fine with me.

20         MR. FRAM:  The other issue I have is we are trying

21   to figure out whether we need to be prepared to bring in

22   witnesses next week.  I have two requests.  One, can we know

23   who the next couple of live witnesses are after Day?

24         THE COURT:  Before we get to that, I will get to

25   that.  I want to know again now, is John Clark, do you want

1    him tomorrow, I mean Monday.

2              MR. PRESS:  If we could, that would be great.

3              THE COURT:  I will do it.  I haven't done it yet.

4    I have read some of it, I haven't made up my mind on anything

5    yet.  So, I will do it over the weekend.

6              MR. PRESS:  Okay.  Now, who else do you want, you

7    want this fellow, Mugerditchian.

8              MR. PRESS:  That is a short one.  I don't think we

9    have a dispute on any of that.

10             MR. KATZ:  You have agreed to add the portions we

11   wanted to add.

12             THE COURT:  There are objections, not objections,

13   there are completeness answer.

14             MR. KATZ:  The spoliation arguments we have on two

15   very brief items.

16             THE COURT:  Page 1 -- starting with page 146, page

17   148.

18             MR. KATZ:  That's correct.

19             THE COURT:  And then also on page 156 -- no, 155,

20   there are some things they want in, not out.  And same thing

21   on page 156.  Do you have those designations?  I thought you

22   had the same copy I have.

23             MR. PRESS:  I do.

24             MR. KATZ:  We have about a dozen items we wanted to

25   add throughout.

```
 1              THE COURT:  Then there is page 165.  182.

 2              MR. KATZ:  Right.

 3              THE COURT:  Page 184, page 185.  Oh, 183 at the

 4    bottom.

 5              MR. KATZ:  And 139.  We have something we wanted to

 6    add.  139, 140, 141, 144.

 7              THE COURT:  Yes.  Right.  I have 139, 140, 141.

 8    Page 142.  Page 144, I think going down to 145.

 9              MR. PRESS:  I don't have a problem with anything

10    they are offering on those pages you just read.

11              THE COURT:  All of them?

12              MR. PRESS:  Yes.

13              THE COURT:  Well, if that is the case, then.

14              MR. KATZ:  There are just two objections.

15              THE COURT:  Can I just mark okay on this one?

16              MR. PRESS:  I didn't mark up yours.

17              MR. KATZ:  There are two objections page 146, line

18    18 to 20.

19              MR. PRESS:  I have agreed to take it out.

20              MR. KATZ:  He agreed to take it out.

21              THE COURT:  Let me look at it.

22              MR. KATZ:  Then on the next page, 148.

23              THE COURT:  146, lines 18 to 20, you agree they are

24    out?

25              MR. KATZ:  Yes, we resolved all the issues on that.
```

```
 1              THE COURT:  I will grant the objection.  Okay.

 2    What was the other one?  Here it is.  Page 148, line 6, all

 3    the way down to page 149, line 11.

 4              MR. KATZ:  Correct.

 5              MR. PRESS:  And I made a note that that is okay to

 6    come out.  We have no problem.

 7              THE COURT:  Okay.

 8              THE COURT:  Now can I say that this entire

 9    transcript is now okay.

10              MR. KATZ:  Right.

11              MR. PRESS:  They have completeness designations at

12    155, 156.

13              THE COURT:  That one is ready for you.

14              MR. PRESS:  No, I do have one hiccup, page --

15              THE COURT:  Tell me where.

16              MR. PRESS:  Page 165.

17              THE COURT:  Page 165.

18              MR. PRESS:  Yes.  Well, and 184.

19              THE COURT:  Let me find it.

20              THE COURT:  I see 165.  They want it in, and you

21    agree to it.  Line 2 through 18.

22              MR. PRESS:  No, I disagree.  It is not completing,

23    Judge.

24              THE COURT:  Oh, this is one where you, so you agree

25    on everything else.
```

1        MR. PRESS:  It is not okay, Judge.

2        THE COURT:  I am just going by what you earlier

3   said, that everything is okay.  Let me read it.

4            (Pause)

5        THE COURT:  That is about expenses, that is about

6   the extent to which ALPA paid expenses, and of course it is a

7   little confusing because I think the distinction being made

8   is being paid out of a budget allocated to the MEC, and

9   distinct from payment from general funds of ALPA.  But any

10  way, put it in his case, if he thinks it is relevant.

11       MR. PRESS:  Okay, so that is out.

12       THE COURT:  So that is going to be out.  I am not

13  going to add that.  That is  line 3, page 165, to line 18,

14  page 165.

15       All the other additions he wants you are agreeing

16  to?

17       MR. PRESS:  No.  It was him that said I agreed.  I

18  was disagreeing.  Page 184, there is a completeness

19  designation we object to.

20       THE COURT:  Page 184.

21       MR. PRESS:  It actually starts on 183.

22       THE COURT:  Yeah, line 22.

23       MR. PRESS:  Yes.

24       THE COURT:  I agree, this is your case, defendants.

25  This is the heart of your case.  This is the core, in some

1    sense.  Partially.  I mean it goes, I mean here he is denying

2    that there was any campaign during the year 2001.  I have no

3    problem with him testifying to that.  The jury will decide

4    whether to believe that or not.  But you know.

5         MR. KATZ:  We will have a witness who will cover

6    that.

7         THE COURT:  Seth Rosen himself can come in and

8    cover that if he wants to.  I am not banning him either.

9         MR. KATZ:  Which lines?

10        THE COURT:  I am not going to allow page 183, line

11   22, to page 184, line 25.  Actually it goes to line -- it

12   goes to actually 185, line 1.  Page 183, line 22, to page

13   185, line 1.

14        MR. PRESS:  Actually line 5.

15        MR. KATZ:  Line 5.

16        THE COURT:  That's right.  It goes on to line 5.

17        MR. KATZ:  That is part of the answer.

18        THE COURT:  Yes.  No.  No.  I am not going to -- I

19   mean I would allow it if Rosen came in as part of the defense

20   case to do that.  Or I an I would allow some version of this,

21   I surely would.  I don't think you have to be forced to put

22   it in on your case.  For this kind of witness.

23        MR. PRESS:  I understand.  Thank you, Judge.

24        THE COURT:  I might rule differently on a different

25   kind of witness but not on this witness.

1          Now, can I say other than the ones, the other

2     additions you agree to, are there some you object to?

3          MR. PRESS:  We are backed up now.  We are waiting

4     for the defendant to turn around some stuff.

5          THE COURT:  I am talking.

6          MR. PRESS:  On Mr. Mugerditchian, we are finished.

7          THE COURT:  I don't have to do that this weekend.

8     We are done.  We are done with Rosen, we are done with

9     Mugerditchian.  I will do Clark before the weekend is out and

10    give it to you Monday.

11         MR. PRESS:  That's correct.

12         THE COURT:  Is there anything else for Monday, that

13    you want me to do.

14         MR. PRESS:  I don't think -- the other names you

15    mentioned, I don't have anything, I don't have a transcript,

16    I don't have proposals.

17         MR. PRESS:  On Mark Hunnibell, Mr. Katz, can you

18    get us our final objections tomorrow so I can submit that to

19    the Judge?

20         THE COURT:  I am coming in.  Sometimes I take

21    Fridays days off because I am an old man.  But I am coming in

22    tomorrow, I will be here certainly until, from nine in the

23    morning until 2:30.

24         MR. KATZ:  I can't get it done by then.  I just got

25    /ET yesterday.

```
 1              MR. PRESS:  There are a team of lawyers here, why.
 2              THE COURT:  Well --
 3              MR. PRESS:  We made our designations in October.
 4              MR. KATZ:  You are revising them every two weeks.
 5              MR. PRESS:  I don't want to bicker.
 6              THE COURT:  Let's keep civil.  No one ever
 7    appointed me to the committee on civility.  I don't know why.
 8    They have a bar committee.  I keep wanting to get appointed.
 9    Everyone says over my dead body.
10              MR. FRAM:  But you did get the Geary award.
11              THE COURT:  I did get the Geary award.  That is
12    comforting.  Somebody must have felt sorry for me.
13              Look, tomorrow, get me anything you can.
14              MR. PRESS:  I will get you the designations based
15    upon the objections they made originally.
16              THE COURT:  Yes.  Get me something, you know,
17    because I can start reading it, and even if there is changes
18    in the designations or changes in the objections, I will be
19    familiar with the gist of the home whole thing, which makes
20    it easier to rule on.
21              MR. PRESS:  All we are talking about is us short
22    even go things.  We will get it to you, Judge.
23              THE COURT:  Okay.
24              MR. PRESS:  I can look at their final pretrial
25    order and note their objections.
```

```
 1              THE COURT:   You are representing all these pilots.
 2   Not one of them knows how to fly a Piper Cub J 3 like I do.
 3   That is where I learned to fly.  I would pick up the plane
 4   and take it out of the hanger myself, watch it prop, and the
 5   gas gauge is on the outside of the plane.  That is a little
 6   quirk that goes down.  It has a throttle.  I think it had a
 7   compass, But not an electronic one.  Simple magnetic compass
 8   No radios.  When I used to fly they used to pass me on the
 9   highway.  Their speed is 70 and of course a 30-mile an hour
10   head windy got cars zooming by me on 295.  That --
11              (Off-the-record discussion).
12              THE COURT:  What do you want, anything else?
13              MR. PRESS:  No, thank you.
14              MR. FRAM:  I have, I would like to know a few
15   things.
16              THE COURT:  Yeah, what about the order of march.
17              MR. PRESS:  My witnesses.
18              THE COURT:  You have these three and a live witness
19   as well.  For Monday.
20              MR. PRESS:  I would like for Monday to be
21   completely consumed by boring videos, and bring in our next
22   live witness on Tuesday.
23              THE COURT:  Okay.  Well, maybe Wednesday.  There
24   is one day next week I have to go to the doctor.  I don't
25   know which day, I don't know whether it is Tuesday or
```

1    Wednesday.  But the next day.

2              MR. PRESS:  Is there a way for us to have that

3    information, whether it is going to be Tuesday or Wednesday

4    before we leave?

5              THE COURT:  Yes.  I will look at it.  I have it

6    home.  I forgot to look at it this morning.

7              MR. FRAM:  You are going to today the day off

8    Tuesday or Wednesday.

9              THE COURT:  One day I have to go to North Jersey

10   for some ticker tests.  Heart.  Up to Saint Barnabus.  I got

11   two kinds of test, two kind of heart tests, stress test, and

12   something else that has to do with the heart.

13             MR. FRAM:  One of the live witnesses, I would like

14   to know, they mentioned day.  I would like to know who is

15   after day.  The bigger issue is should we expect to have to

16   bring our witnesses in next week.  Sounds like we are only

17   going three days.

18             THE COURT:  Only three days next week.

19             MR. FRAM:  That helps.

20             MR. PRESS:  Day, and/or Pastore.  I don't know the

21   order.

22             THE COURT:  You are going to call Pastore.

23             MR. PRESS:  It could be both, could be just one.

24   Those are the positions we are going to collaborate on over

25   the weekend, see where we are.

1          THE COURT:  But depositions, if you are looking for

2     rulings from me, you have to, I mean I am willing to work

3     this weekend.  I am willing to review this stuff for you.

4     And telling Monday morning, to clean them up.  But if I don't

5     have them, I can't do it.

6          MR. PRESS:  We will get them to you, Judge.

7          THE COURT:  As I say it would be helpful if you got

8     it to me in these old forms, where your initial proposal and

9     their initial objections that would be helpful.

10          MR. PRESS:  I will file the same format, they have

11     been, you know, objected, write on the transcript.

12          THE COURT:  That is very useful to me.  As I say,

13     if I get a chance to read it, even if it gets changed

14     somewhat, as to what the proposal would be that he objects

15     to, if I have read it all it makes it easier for me to rule.

16     Later when you raise it, like, you can take a second or two

17     for me to make a ruling.  If I, if I am already familiar with

18     the thrust of the testimony, I will know what it is.

19          MR. FRAM:  Your Honor, I want to confirm, I think

20     Mr. Past pad said the last live witness would be day or Mr.

21     Pastore.

22          THE COURT:  Did you say that?

23          MR. PRESS:  I do.

24          THE COURT:  You have two or three?

25          MR. PRESS:  Two.  One or two.  One or two, no more

1    than two more life witnesses, Judge.

2              MR. FRAM:  That is all I need to confirm.  So I

3    don't have to prepare for other live witnesses.

4              THE COURT:  Just so I know, who, the videotapes, in

5    addition to Mr. Mugerditchian, Rosen, and Clark, what is the

6    name, Mark Hunnibell.

7              MR. PRESS:  Mark Hunnibell.  Who else?

8              MR. PRESS:  Ron Rindfleisch.

9              THE COURT:  Anybody else?

10             MR. PRESS:  That is it.

11             THE COURT:  Okay.  Well, if it is only those two, I

12   think you should be able to get them to me.

13             MR. KATZ:  Your Honor, we have in the joint final

14   pretrial order, there are designations.

15             THE COURT:  Believe it or not, that was an exhibit,

16   that is an exhibit D or something.  That was not printed out

17   for me.  I don't have that in front of me.

18             MS. RODRIGUEZ:  I have an exhibit D if you want

19   one.

20             MR. PRESS:  Rindfleisch was deposed twice.

21             THE COURT:  I need the transcript.  Just having the

22   designations doesn't --

23             MR. KATZ:  That is true.

24             THE COURT:  Doesn't help me.

25             MR. KATZ:  We can get you those electronically and

222

1   in paper form.

2          THE COURT:  If I am at home, I can't, my printer is

3   a beautiful color printer if I am doing photographs, but if

4   you are providing transcript, it is here.

5          MR. KATZ:  They are hundreds of pages here.

6          THE COURT:  You have to get to me like by noon

7   tomorrow if I am going to print them out.  I have got high-

8   speed printers here.  My printer at home, although I access,

9   is out of, my printer is not high speed.  At home.

10          MR. KATZ:  We can get you those.

11          THE COURT:  If there is any bulky transcripts, try

12   to get them to me by tomorrow before 2:30 so I can print them

13   out.  I have two high speed printers in my house.  I have

14   none at home.  I have a very, very slow, it is a color

15   printer, the quality is great, but for doing photographs it

16   is wonderful.  For photo shop.  But it is not good for high

17   speed transcripts.

18          MR. KATZ:  We are talking about the Hunnibell and

19   Rindfleisch transcripts of the deposition.

20          MS. RODRIGUEZ:  Your Honor, can I be excused?

21          THE COURT:  Oh, yes.  Today is the day.

22          Congratulations.

23          MS. RODRIGUEZ:  This my son's graduation.

24          THE COURT:  I know.  Congratulations.  That you

25   have a son who graduated.

```
 1              (Off-the-record discussion).

 2              THE COURT:  Okay.  Anything else?

 3              MR. PRESS:  No, Judge.

 4              MR. FRAM:  No, thank you, your Honor.  Have a nice

 5  weekend.

 6              THE COURT:  Get those transcripts to me if I can so

 7  I can read them over the weekend.  Thank you very much.

 8              (Adjourned at 2:35 p.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I n d e x.

2

3          SEAN CLARKE, SWORN.

4              DIRECT EXAMINATION          P. 9.

5              CROSS EXAMINATION           P. 65.

6              REDIRECT EXAMINATION        P. 110.

7

8          JAMES BAEHLER, SWORN.

9              DIRECT EXAMINATION          P. 112.

10

11         MATTHEW COMLISH, SWORN.

12             DIRECT EXAMINATION          P. 154.

13             CROSS EXAMINATION           P. 186

14

15

16

17

18

19

20

21

22

23

24

25