```
 1                   IN THE UNITED STATES DISTRICT COURT.
                    FOR THE DISTRICT  OF NEW JERSEY
 2                  CIVIL 02-2917  (JEI)

 3         PATRICK BRADY, SALLY YOUNG,
           HOWARD HOLLANDER, THEODORE CASE,
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                            Plaintiffs,
 6                                              VOLUME 9
                V.                              TRIAL TRANSCRIPT
 7
           AIR LINE PILOTS ASSOCIATION,
 8
                            Defendant.
 9
                                      CAMDEN, NEW JERSEY
10                                    JUNE  22, 2011

11         B E F O R E:  HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                      A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                 AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:  STEVEN FRAM, ESQ.
19                  AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH  GINSBURG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter

6

7

8

9

10            LYNNE JOHNSON, CSR, CM, CRR
              OFFICIAL COURT REPORTER
11            UNITED STATES DISTRICT COURT
              P.O. BOX 6822
12            LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning, everybody.

2          MR. KATZ:  Good morning, Judge Irenas.

3          THE COURT:  Good morning to some of you.  Everyone

4   please be seated.

5          Okay.  I will make some rulings here.

6          I received Mr. Press's response to the objections

7   that ALPA had which I previously received in another email,

8   and he made a list of the things he was going to withdraw,

9   and those things that he was going to stick to his guns, and

10  offer.

11         MR. PRESS:  Correct.

12         THE COURT:  So get your pencils outright now.  I

13  will tell you my ruling.  If either of you want to argue it,

14  or ask for an explanation, just do so.  Otherwise, I am just

15  going to go through, I am not going to comment where it is

16  withdrawn, I just marked my copy as withdrawn.  I assume you

17  know that already.

18         MR. PRESS:  Yes.

19         THE COURT:  You don't need me to comment on that.

20  I am only going to deal with the issues where it is not going

21  to be withdrawn.  Okay.

22         The first is page 52, line 3, to 56, line 14.  And

23  I am overruling the objection to that.

24         Okay.  Next is page 70, line 18, to 71, line 1.  I

25  am overruling the objection to that.

1          71, 20, to 72, 2, I am overruling the objection to

2    that.

3          For 99, 23, to 100, line 8, I am overruling the

4    objection but I am sustaining the objection to page 100, line

5    9, to 101, line 10.

6          I am sustaining the objection to 100, line 9, to

7    101, line 10.

8          On the next objection I am also splitting it.  137,

9    line 2, to line 8, is, I am overruling the objection.  But I

10   am sustaining the objection to 137, line 9, to line 16.  137,

11   line 9, to 137, line 16.

12         One 87, line 19, to 189, line 2, I am overruling

13   the objection.  Page 215, line 7, to 216, line 11, I am

14   overruling the objection.

15         218, lines 3 to 9, I am sustaining the objection.

16         By the way, the next one which is line 251, 20, to

17   22, it is being withdrawn but I think line 23 goes out as

18   well.  I think it should be not 20 to 22, but 20 to 23.  That

19   is page 251.  I don't know if that is just a typo.  Is that

20   right?

21         MR. PRESS:  Yes.

22         THE COURT:  Okay.  The next is page 255, line 17 to

23   19, I am sustaining the objection.

24         Page 268, line 8 to 10, I am sustaining the

25   objection.

1              Page 269, line 5 to 9, I am sustaining the

2    objection.

3              Excuse me.  Page 269, line 18 and 19, lines 18 and

4    19, I am overruling the objection.  They can stay.  However,

5    I don't see an objection to it, but I think page -- let me

6    just look at this, 272 -- I just can't tell.  272, line 20 to

7    24 should be out.  Now, they may already be out.  I couldn't

8    tell on my copy.  They were marked in yellow that somebody

9    put --

10             MR. PRESS:  It is out, Judge.

11             THE COURT:  It should be, not only is it out, it

12   should be out.  And I also had 273, lines 1 to 6, should be

13   out.

14             MR. PRESS:  They are.

15             THE COURT:  Again, my marked up copy, this wasn't

16   clear whether they were out or not.  But they were, as I

17   said, they should be out.

18             Now, 273, line 7, to 274, line 3, I am overruling

19   the objection.  That can stay in.  -- well, no.  I am sorry.

20   273, 7 to 15 will be in.  273, line 16 to 274, line 3 will be

21   withdrawn.  But the part that is being offered, I am

22   overruling the objection I think that covers it all.

23             MR. PRESS:  Can you clarify the ruling on page 269,

24   line 19 to 270, line 3.

25             THE COURT:  I am overruling the objection.  2 --

```
 1              MR. KATZ:  I have a question.  We had one item to

 2    add for completeness.  Have you gotten to that?  Page 150.

 3              THE COURT:  It was in the initial submission.

 4              MR. KATZ:  Yes, sir.

 5              THE COURT:  Let me look at that.  For some reason I

 6    don't have notes on that.  Let me just look at it.

 7              As a general matter, Mr. Katz, you had marked on

 8    this original item, the original draft I had gotten from you,

 9    an a lot of items.

10              MR. KATZ:  We have withdrawn those based on your

11    prior rulings.

12              THE COURT:  My position on those generally, this is

13    Rindfleisch, he worked for ALPA.  Not only did he work for

14    ALPA, I think he was in the organizing or the membership, I

15    don't know what they call the division that dealt with

16    membership campaigns, and those kind of things.

17              MR. KATZ:  Correct.

18              THE COURT:  You want to call him as a witness, you

19    know, and have him tell his story, that is fine with me.  But

20    he had a lot of contact with American pilots, at some point

21    he was made aware of the cards, memos come, very apparently

22    substantial traffic in emails from American pilots to

23    Rindfleisch.  He had some contact with superiors within his

24    own organization, he either forwarded emails to them, we

25    don't know, his memory was somewhat cloudy on that issue.
```

1    But I tended not to add, I tended to, in this case, I thought

2    I was going to leave it to you to call him and have him

3    testify as to whatever you want him to testify to, and then

4    the plaintiffs could cross examine him.

5              MR. KATZ:  Just one page.

6              THE COURT:  I am going to look at it right this

7    second.

8              THE COURT:  I did review this section.  It falls

9    rather squarely within the comments I just made.  The line of

10   questioning here, and I guess it was Mr. Press who was doing

11   the questioning, the, apparently, ALPA has hard goods,

12   stickers, pens, buttons, things like that, that they will

13   give out for use in an organizing campaign.  If they want to

14   put various things on their cars, bumper stickers and pens

15   and key chains, and goodies like that, and the question was

16   asked of Rindfleisch as to whether he had supplied those, and

17   his series of answers to the questions seem to have been he

18   was making some distinction between a card campaign where he

19   wouldn't supply those things, and possibly a merger campaign.

20   I don't know.

21              I am not sure, he was making some kind of thing.

22   The bottom line is he denied having supplied any of that

23   stuff.  Or at least he didn't recall doing it.  Let me put it

24   that way.  He didn't recall it.  That may be.  That may be

25   something you want to bring out if he is here on the stand is

1   that he didn't supply those kind of things, and whatever the

2   reason was that he didn't supply them.

3          But I am not going to, for the very reasons I just

4   articulated it, and why, you know, I don't think that makes

5   any prior answer of his misleading.  Those I would put, even

6   if I thought there there were things that made a prior answer

7   misleading and you left out something that was needed to

8   understand the entire answer, so the jury wouldn't be misled,

9   that would be one thing.

10         But I don't think the sections being offered by the

11  plaintiff -- it is part of their case but I don't think the

12  answers are particularly misleading.

13         MR. KATZ:  That was our intent, to clarify earlier

14  answers.

15         THE COURT:  I understand.  And I mean in one sense,

16  the various things, marked, at least my initial draft here,

17  you know, they weren't misleading, they were just, they gave

18  a fuller and completer picture but I don't think it is the

19  plaintiff's obligation in an adverse deposition, in deposing

20  an adverse party, to put every aspect of that person's

21  testimony into the record.  You can't mislead, but if line

22  ten or eleven changes the answer, that is different from

23  wanting to put the whole case in, the whole story in.  This

24  is your witness, he is welcome here in court and he can

25  testify, and whatever he says he says, the jury will hear it.

1    But no, I am not going to allow that.

2            MR. KATZ:  That is fine, your Honor.  We can deal

3    with that in ALPA's case in chief.

4            THE COURT:  Yeah.  Particularly Rindfleisch, I

5    can't believe there is another witness who might be, again, I

6    don't know what your plans are but he might be a central

7    witness.

8            MR. KATZ:  He is still an employee of ALPA's and he

9    is on our witness list.

10           THE COURT:  Is he still?

11           MR. KATZ:  He is still an employee of ALPA's and he

12   is on our witness list.

13           THE COURT:  All right.  It is 25 after.  Anything

14   else?

15           MR. KATZ:  No, sir.  Nothing from ALPA, your Honor.

16           THE COURT:  Anything from the plaintiffs.

17           MR. PRESS:  No.  Your Honor, well, yes, there is.

18   There is one exhibit in the first video of Mr. Rindfleisch

19   that hasn't been admitted yes, exhibit P 29 which we would

20   offer.

21           THE COURT:  Let me --

22           MR. PRESS:  It is a February 25, he email --

23           THE COURT:  P 29.  Is that going to be offered?  Of

24   course it is.  You are offering it in evidence.

25           MR. PRESS:  Yes.

```
 1              THE COURT:  Any objection?

 2              MR. KATZ:  No objection.

 3              THE COURT:  Okay.  That is in evidence.

 4              Okay.  Forget I am here.  I am going to do some

 5    housekeeping.

 6              (Pause)

 7              THE COURT:  One thing.  Rindfleisch one, his 2006

 8    dep, you are not reading from?

 9              MR. PRESS:  We are are, now.

10              THE COURT:  Later?

11              MR. PRESS:  We are playing that first.

12              THE COURT:  Have we covered everything in there?

13              MR. PRESS:  Yes, we have.

14              THE COURT:  I only dealt with two last night.

15              MR. KATZ:  Weren't there two objections on that?

16              MR. PRESS:  They were ruled on Monday.

17              THE COURT:  You pulled them?

18              MR. PRESS:  Yes.

19              THE COURT:  Yes.

20              MR. PRESS:  The objections were overruled.

21              THE COURT:  I ruled on them.

22              MR. PRESS:  Yes, you did.

23              THE COURT:  Okay.  That is fine.

24              MR. PRESS:  Your Honor.

25              THE COURT:  Yes, sir.
```

```
 1              MR. PRESS:  We removed a lot of stuff that was

 2     originally designated in the first Rindfleisch deposition.

 3     We have shortened it substantially.  And I don't know if I

 4     sent you the lines that we were deleting or on or not.

 5              THE COURT:  Well, the answer is, don't worry

 6     because I follow it and make my notes.  I don't rely on

 7     anybody, this case has been so many changes, that when I am

 8     keeping the record so I can read it in for the appellate

 9     court, if there is going to be an appellate court, I take it

10     not from any list anybody has given me.  I actually follow it

11     in the transcription.  As it is being played.

12              MR. PRESS:  Okay.

13              THE COURT:  So even if I didn't mark it on some

14     other document you gave me, or on the transcript itself that

15     you have given me, I always, in all cases, follow it as it is

16     being given.

17              MR. PRESS:  Okay.

18              THE COURT:  So I don't want there to be any mistake

19     as to what the record is, and all the things that are

20     submitted, they are really not part of the record and this

21     way if I take it down and I am listening to it and I relay it

22     to my court reporter what I saw played, I am satisfied with

23     that.

24              MR. PRESS:  I just didn't want to create any

25     confusion.
```

```
 1            THE COURT:  No, you haven't been.  As I say, on

 2   that score, I, from day one, I have relied on what I actually

 3   hear in the courtroom.

 4            MR. PRESS:  The only other thing, Judge, we would

 5   have is we will need a short break to edit the second

 6   Rindfleisch deposition according to your orders this morning.

 7            THE COURT:  Yes.  No problem.

 8            MR. PRESS:  All right.

 9            THE COURT:  If I forget, remind me.

10            MR. FRAM:  Good morning.

11            THE COURT:  Yes, Mr. Fram.  You got your sunglasses

12   off now?

13            MR. FRAM:  I do, your Honor.

14            THE COURT:  I saw some shadowy figure walking into

15   the courtroom.

16            MR. FRAM:  They weren't very helpful in the

17   downpour I got caught in.

18            One question.  There was an open question about

19   whether Mr. Pastor will be here to testify.

20            THE COURT:  He said he didn't know.  There were two

21   possible witnesses.  Mike Day and Captain Pastore, were two

22   possibilities, and he thought he was going to call Captain

23   O'Day?

24            MS. RODRIGUEZ:  Captain Day.

25            THE COURT:  Captain Day, is it Day?
```

1          MS. RODRIGUEZ:  Just Day, yes.

2          THE COURT:  Captain Day.  O'Day sounds nice, I like

3    it.

4          THE COURT:  Captain Day, and Captain Pastore.  What

5    is the story?

6          MR. FRAM:  I was hoping for an update so we know

7    who would be here.

8          THE COURT:  Is Pastore going to testify?

9          MR. PRESS:  Not today.  And Judge, most, almost all

10   the evidence that we would have presented through Captain

11   Pastore has already been admitted with one --

12         THE COURT:  I am taking no position.

13         MR. PRESS:  There is an open issue.  The financial

14   condition of TWA is something that he was going to testify

15   to.  But you have ruled that that is irrelevant and out of

16   the case.

17         So we would be inclined not to present him at all.

18         THE COURT:  Well, when I said irrelevant, the

19   perception of the union as to what that condition was might

20   be relevant, as distinct from the fact of it.  I mean, it is

21   not like you would call a witness who would then go through

22   all the public records of TWA and then express an opinion, it

23   is viable for six months, viable for nine months, viable

24   forever.  That I considered irrelevant.

25         But I think I made it clear that I did consider it

```
 1   relevant that if ALPA, for instance, there was a discussion

 2   between ALPA, saying this company is a good strong company,

 3   it can last forever, the two of them said this is a terrible

 4   company, and you know, it doesn't have three months of life

 5   left in it, well, that is another.  Also the perception of

 6   the pilots themselves, there was direct evidence of how the

 7   pilots perceive it, not, not as an expert, not as they come

 8   in and say, remember what was her name?

 9        MR. PRESS:  Sherry Cooper.

10        THE COURT:  She is there live, I didn't plan for

11   this, I didn't plan for that.  We were going to do the

12   concession from this union, concession from that union,

13   concession from the mechanics, there was going to be an

14   unnamed investor or a pool of investors who were going to

15   come in, George Soros, and I think she said, he expressed an

16   interest.

17        That is all very fine and good, but unless somebody

18   in either the pilot group, meaning the MEC or pilots -- or in

19   the ALPA, failing some managers, have perception, you know,

20   or were studying it or reached their own conclusion, you

21   know, I didn't say she was wrong or right.  I just said it

22   was not relevant.

23        So that was the distinction I made.  I think I made

24   that on the record.  If I didn't make it on the record, I am

25   making it on the record now.
```

1          MR. FRAM:  I think you did.

2          The other point is after March 12 when Judge W

3     alsh approved the American acquisition.

4          THE COURT:  Judge Walsh's determination is part of

5     the record.  We know both sides absorbed that with great

6     interest.  That is different.  That is an external fact, not

7     -- the accuracy of the conclusion, the fact that he made that

8     conclusion.

9          MR. PRESS:  Judge, they offered that clearly for

10     the truth of it.  Nothing besides that.  Not somebody's

11     perception.  They have offered that for the truth, and quite

12     honestly, if it is going to stay in the record for the truth

13     of --

14          THE COURT:  I would have no problem with the

15     pilots, among themselves, having said this is not true, we

16     are going to appeal it, we think this was inaccurate,

17     anything like that, I wouldn't keep out, because it goes to

18     their perception of what he said.  And their reaction to it.

19          But I thought that sort of, I don't want to say

20     deus ex machina, but things outside, even though, I am sure

21     one could today just going on the computer, find a lot of

22     financial information about TWA as it existed then.  And for

23     all I know, people could reach different conclusions as to

24     what, one might say this is one expert might say this is a

25     company, with a little creativity, they used to say,

1    reasonable use of credit, is it viable, is an even viable

2    entity and another expert says no, nothing is going to save

3    this company at that time.

4           MR. PRESS:  Can I ask a question?

5           THE COURT:  Yes.

6           MR. PRESS:  If defendant's witnesses are allowed to

7    testify that they perceived TWA to be weak financially and on

8    the verge of collapse and in a free-fall bankruptcy, if that

9    was their perception, why aren't we allowed to say factually

10   that is incorrect through witnesses who have firsthand

11   knowledge?

12          THE COURT:  What if it was incorrect?

13          MR. PRESS:  What?

14          THE COURT:  This is a breach of duty of fair

15   representation.

16          MR. PRESS:  That is our point.

17          THE COURT:  Well, let me put it this way.  It may

18   well be that if they had a perception, it was so patently

19   false, you can come in and show it was false, I have to look

20   the an it in context.  I haven't heard anything like that, or

21   anything close to that.

22          MR. PRESS:  I am getting the sense this issue is

23   probably more rebuttal type evidence.

24          THE COURT:  It may be.  I don't want to make any

25   hard and fast rules.  I have a concept.  Look, they said we

```
 1    believe the moon is made of green cheese.  We are very sure

 2    of that.  That is what we are basing our actions on, the

 3    green cheeseness of the moon, I would let you come in and

 4    prove that the moon was not made of green cheese but

 5    limberger, the answer is of course I would.  The belief

 6    system  is a coverup for the truth, a willful disregard of

 7    the truth , but you know, talking about financial condition

 8    of TWA, clearly this was a troubled airline.  I mean, even

 9    witnesses favorable to you -- Gordon was her name?

10              MS. RODRIGUEZ:  Cooper.

11              THE COURT:  Ms. Cooper's, even her own testimony

12    bespeaks of an airline in big trouble, and she was trying to

13    extract tens of millions of concessions by, well, at least

14    three different groups.  Flight attendants, the IAM folks and

15    the pilot folks.  And talking about Soros, and some investors

16    coming in, you look at them together you are looking at a

17    troubled institution.  By her own testimony, which you were

18    going to offer.  So, and I said look, the fact that she had a

19    belief that if she could put some package whose terms were

20    not even clear at this point together, that she might be able

21    to save the airline, the last time TWA tried that they wound

22    up with Carl Icahn.  You know, whether George Soros would be

23    better?  I don't know.  I don't want to say anything nasty

24    about Mr. Soros.  I know who he is and what he does, whether

25    he would have been the savior of TWA or its undertakers, I
```

```
 1   have no idea.
 2              The answer is, also, you are right, to the extent
 3   he could open doors for you --
 4              MR. PRESS:  We will try to keep those doors closed.
 5              THE COURT:  That would let you, you know, drive a
 6   MAC truck through them, or fly a wide body through them,
 7   either one.
 8              MR. FRAM:  Your Honor, my question about Pastore
 9   was primarily for planning purposes.  We need to know what
10   witnesses to have lined up.  I would like to know if is he
11   going to come up.
12              MR. PRESS:  In light of what we discussed this
13   morning, we will reserve him as rebuttal issue.
14              THE COURT:  If that is the area he basically was
15   going to testify to, that may be the smarter move.
16              MR. JACOBSON: Yes.
17              THE COURT:  I mean, sort of from a strategic
18   attack, the best point to put it, the answer is in the next
19   few days you don't have to worry about preparing the cross
20   examination.
21              MR. PRESS:  Our next live witness is Captain Day
22   who has nothing to do with Rindfleisch.  I asked if he could
23   sit in the courtroom instead of being sequestered in the
24   hallway.
25              MR. FRAM:  What is the question?
```

1          MR. PRESS:  Can Mike Day sit in the courtroom

2  during the playing of the tape?

3          MR. FRAM:  No objection to that.

4          MR. PRESS:  I won't ask him any questions about

5  Rindfleisch.

6          MR. FRAM:  No objection.

7          THE COURT:  We will let the captain have a seat.

8  Bring the jury in.

9          (The jury enters the courtroom.)

10          THE COURT:  Good morning, everybody.  Please be

11  seated.  I will ask Mr. Press to continue with his next

12  witness.

13          MR. PRESS:  Our next witness is Ron Rindfleisch via

14  video.  He was deposed twice, the first time in '06 in

15  Washington, and another time in 2008, again in Washington,

16  D.C.  Ron Rindfleisch.

17          (Videotape of Ron Rindfleisch dated November 13,

18  2006, played).

19          MR. PRESS:  Your Honor, that is it for the first

20  deposition of Mr. Rindfleisch.

21          THE COURT:  Give me a second.

22          Let's give the jury a break as we prepare for the

23  second one.  Okay.

24          Ladies and gentlemen, do not discuss the case among

25  yourselves.  Keep an open mind until you have heard all the

1    evidence.  All rise.

2               (Jury leaves the courtroom).

3               THE COURT:  Now, Mr. Press, first you put P 29 in

4    evidence.  Are there any other documents.

5               MR. PRESS:  No.

6               THE COURT:  They are all taken care of.

7               MR. PRESS:  Yes.

8               THE COURT:  Let me read what I got out of the, out

9    of what was read into the record from the November 13, '06

10   deposition of Ron Rindfleisch.

11              Page 5, line 7, to line 12.

12              Page 6, line 6 to page 10, line 16.

13              I may have been slightly over inclusive there, but

14   nothing harmful.

15              Page 23, line 1, to page 25, line 22.

16              Page 29, line 10 to 31, line 11.

17              Page 33, line 2, to page 34, line 1.  Page 37, 6,

18   to page 40, line 8.  Page 51, line 17, to page 56, line 5.

19   Page 56, line 6, to 56, line 22.

20              Page 63, line 10, to page 64, line 2.  Page 74,

21   line 1, to 76, line 20.

22              Page 90, line 7, to page 90, line 20.  Page 98,

23   line 12, to page 99, line 22.  Page 103, line 5, to 104, line

24   14.

25              Page 105, line 4, to page 105, line 12.

```
 1              Page 105, line 14, to 106, line 13.

 2              110, line 12, to 110, line 20.  Page 111, line 1,

 3   to page 1 11, line 11.

 4              Page 120, line 21, to page 123, line 15.  Page 133,

 5   line 7, to page 134, line 20.

 6              Page 136, line 18, to page 139, line 8.

 7              Page 141, line 1, to page 143, line 8.

 8              Page 149, line 4, to page 150, line 8.

 9              Page 157, line 19, to page 159, line 8.

10              Page 159, line 12, to page 165, line 17.

11              Page 171, line 12, to page 181, line 4.

12              Page 182, line 1, to page 185, line 3.

13              Page 195, line 20, to page 198, line 21.

14              Page 202, line 9, to page 203, line 10.

15              Right.  Mr. Katz, okay?

16              MR. KATZ:  ALPA has no corrections, your Honor.

17              THE COURT:  Is that okay, Mr. Press.

18              MR. PRESS:  Yes, it is, Judge.

19              THE COURT:  Okay.  Let's take about a ten-minute

20   break to give everybody a breather, and then we will resume

21   with Rindfleisch, 2, when we return.

22

23              (Recess)

24              (Jury enters the courtroom.)

25              THE COURT:  Mr. Press, you may continue.
```

1          MR. PRESS:  We would show the second Rindfleisch

2    deposition.  Before doing that, Judge, I would like to move

3    into admission the email binders exhibits 147.

4          THE COURT:  P.

5          MR. PRESS:  Binders P-147 and P-148.

6          THE COURT:  Any objection, Mr. Katz.

7          MR. KATZ:  ALPA does not object to those exhibits.

8          THE COURT:  P-147 and 148 in evidence.

9          Before you start the tape, let me make sure I get

10   them.

11         MR. PRESS:  There were two other exhibits

12   identified in the video, Judge, P-146 --

13         THE COURT:  Let me get these first.

14         (Pause)

15         THE COURT:  Okay, what are the next ones?

16         MR. PRESS:  P-146 and 149.

17         THE COURT:  Are you offering those?

18         MR. PRESS:  We are.

19         THE COURT:  Any objection?

20         MR. KATZ:  No objection.

21         THE COURT:  P-146 and 149 in evidence.  Again,

22   before you play them get me get them.

23         THE COURT:  Is that all the exhibits.

24         MR. PRESS:  Yes.

25         THE COURT:  You can now proceed with the deposition

1    of August 27, 2008, of Mr. Rindfleisch.

2              MR. PRESS:  Thank you, your Honor,

3                (Videotape played)

4              MR. PRESS:  This would be a good place for a break

5    as far as subject matter goes.

6              THE COURT:  Okay.  Ladies and gentlemen, we will

7    take a break.  Do not discuss the case among yourselves.

8    Keep an open mind until you have heard all the evidence.

9              All rise.

10             (The jury leaves the courtroom.)

11             .

12             THE COURT:  From the deposition of Ron Rindfleisch

13   on August 27, 2008, exhibits 146, 1 47, 1 /TPRA*EULT, 149,

14   P-146 through 149 are put in evidence.  The following

15   extracts were played for the jury.  Page 7, line 21 to page

16   8, line 24.

17             Page 9, line 7 to page 12, line 16.

18             Page 17, line 15, to 18.

19             Page 19, lines 15 through 23.

20             Page 20, lines 1 through 4.  Page 20, line 17 to

21   page 21, line 2.

22             Page 21, line 6, to line 19.

23             Page 24, line 2, to page 24, line 9.

24             Page 24, line 22, to page 26, line 3.

25             Page 27, line 10, to page thirty, line 15.

1           Page 34, line 15, to page 37, line 17.

2           Page 37, line 21, to page 38, line 6.

3           Page 38, line 13, to page 39, line 11.

4           Page 49, line 18, to page 52, line 21.

5           Page 68, line 1818 through 21.

6           Page 69, line 13, to page 72, line 6.

7           Page 79, line 16, to page 83, line 6.

8           Page 84, line 17, to 20 on page 84.

9           Page 85, line 8, to page 86, line 22.

10          Page 88, line 19 to page 89, line 9.

11          Page page 89, 13, to 91, 18.

12          Page 93, line 7, to page 100, line 7.

13          Page 101, line 22, to page 102, line 9.

14          Page 126, line 11, to page 127, line 4.

15          Page 127, line 8, to page 128, line 21.  Page 130,

16    line 24, to page 131, line 1.

17          Page 131, line 6 to page 131, line 8.

18          Page 131, line 18, to page 133, line 22.

19          Page 134, lines 1 and 2.

20          Page 34, line 23 to page 137, line 8.

21          Page 139, line 15, to page 141, line 4.

22          Page 141, line 9, to page 141, 18, line 18.

23          Page 142, line 8, to page 142, line 19.  Page 143,

24    line 19, to page 146, line 16.  Page 146, line 19, to page

25    146, line 24.

```
 1                    Page 149, line 9, to page 149, line 24.

 2                    Finally, page 151, line 2, to page 151, line 19.

 3                    Is that okay, everybody?

 4               MR. KATZ:  No objections, your Honor.

 5               MS. ACCHIONE:  I don't think you included pages we

 6      played from 53, 54, and 55.

 7               THE COURT:  I have, the last one I have is 52, 21.

 8               MS. ACCHIONE:  We played from, continuing on.

 9               THE COURT:  Let me get to it.

10               THE COURT:  Yeah, you did play --

11               MR. KATZ:  55, 21.

12               THE COURT:  The last line was 55, 21.

13               MS. ACCHIONE:  That's correct.

14               THE COURT:  I am trying to get the first line.

15      Would have been 52, line 3, page 52, line 3, to 55, 21.

16               MS. ACCHIONE:  That's correct.

17               THE COURT:  I am sorry.  I don't know where I was.

18      Okay.  Anything else?

19               MS. ACCHIONE:  No, that was it, your Honor.

20               THE COURT:  Okay.

21               All right.  Let's take a ten-minute break.

22               (Recess)

23               (The jury enters the courtroom.).

24               THE COURT:  Mr. Press, you may continue.

25               MR. PRESS:  Thank you.
```

```
 1              (Videotape of Ron Rindfleisch continues).

 2              MR. KATZ:  I object.  We are going through the same

 3    thing.

 4              THE COURT:  Stop the machine.  You are going

 5    backwards.  I was at page 227, all of a sudden I am getting

 6    page 217.

 7              MR. KATZ:  We have seen it all right.

 8              MS. ACCHIONE:  We had a technical glitch when we

 9    made the edit.

10              THE COURT:  You had a technical glitch?  Maybe you

11    should tell me about that.  You can't turn around and go

12    backwards.

13              MS. ACCHIONE:  We are correcting it right now.

14              THE COURT:  Tell me what you are reading now.  I

15    was going along fine.  All of a sudden I looked up and I see

16    you are seven pages back.  Contact.

17              MS. ACCHIONE:  We should be starting at page 225 --

18    no, 224, line 12.

19              THE COURT:  You have already read 224, line 9.  So

20    you are picking it up at line 12.

21              MS. ACCHIONE:  That's correct.

22              THE COURT:  224, line 12.  Okay.

23               (Videotape commences)

24

25              MR. PRESS:  We are stopping it here.
```

```
 1              THE COURT:  What line is that.

 2              MR. PRESS:  255, line 11.  That finishes the whole

 3   dep?

 4              MR. PRESS:  Yes.

 5              THE COURT:  Okay.

 6              Ladies and gentlemen, we will take our last break

 7   of the day.  I will see you in a few minutes.  All rise when

 8   the jury leaves.

 9              (The jury leaves the courtroom.)

10              THE COURT:  Please be seated.

11              From the lines from the second involve Rindfleisch,

12   8/27, 08.  I will continue what I consider being read in.

13              On one or two occasions I was having a little

14   problem following so interrupt me if you think I don't have

15   it right.

16              154, line 22, to 155, line 20.

17              156, line 21, to 158, line 24.

18              159, line 16, to 160, line 3.

19              160, line 11, to 164, line 7.

20              The next thing I have is just line 9, 154.

21              MS. ACCHIONE:  It is actually line 10.

22              THE COURT:  Line 9 and 10.

23              MS. ACCHIONE:  No, just line 10.

24              MR. KATZ:  That's correct.

25              THE COURT:  Just one line.  Okay.
```

1              164, line 10.

2              165, line 7.  To 168, line 6.

3              174, line 3, to 175, line 4.

4              175, line 15, to 18.  Line 175, 24, to line 177, 6.

5              Line 181, 19 -- sorry.  Page 181, line 19, to 184,

6       12.

7              Page 184, 13, to page 185, 12.

8              Page 185, 16, to 187, 23.

9              188 -- to 188, 23.  Then 189, lines 4 to 6.

10             Now, the next one, I start at 192, line 9, but I

11      couldn't get the ending.  Line 9 to what?

12             MS. ACCHIONE:  194, line 1.

13             THE COURT:  194, line 1.  So 192, line 9, to 194,

14      line 19.

15             Then 197, line 6, to 199, line 22.

16             204, line 12, to 207, line 4.

17             207, line 10, to 208, line 23.

18             Page 213, line 1, lines 1 to 6.

19             Page 213, line 13, to page 214, line 14.

20             Page 215, line 7, to page 216, line 11.

21             Page 217, lines 3 to 9.

22             Page 217, line 10 to page 218, line 2.

23             Page 218, line 10 to page 224, line 9.

24             Page 224, line 12, to 226, line 11.

25             Page 226, line 14, to page 229, line 1.  Page 230,

```
 1   lines 2 to 22.

 2              Page 231, line 7 to page 232, line 10.

 3              Page 232, line 19, to page 235, 8.

 4              Page 235, 12, to 237, 15.

 5              Page 237, 20, to 241, line 22.

 6              249, line 8, to 2 51, line 3.

 7              And the last entry I have is 251, line 24, to 255,

 8   line 11.

 9              Okay.

10              MS. ACCHIONE:  That's correct.

11              THE COURT:  Is that correct?

12              MR. KATZ:  Yes, your Honor.

13              THE COURT:  Okay.  Mr. Press, who is next?

14              MR. PRESS:  Mike Day.

15              THE COURT:  Who or what is next?

16              MR. PRESS:  Mike Day.

17              THE COURT:  Okay.  It will take, we will take a

18   ten-minute break.  Then we will resume with Mike Day.

19              (Recess)

20              (The jury enters the courtroom.)

21              THE COURT:  Mr. Press.

22              MR. PRESS:  Our next and last witness is Michael

23   Day, who we would like to call.

24

25
```

1              MICHAEL DAY, sworn.

2              DIRECT EXAMINATION.

3              BY MR. PRESS:

4    Q.   Mr. Day, where do you live?

5    A.   I live in I live in Cedar Key, Florida.

6    Q.   What part of Florida is that?

7    A.   That is by Gainsville, about 70 miles to the west, out

8    in the Gulf of Mexico.

9    Q.   What is your profession currently?

10   A.   I am currently retired.  I am a part time flight

11   instructor, part time charter pilot.  Once in a while I get

12   dragged into part time law.

13   Q.   Part time law?

14   A.   Yes.

15   Q.   You are a retired pilot.  Well, semi retired pilot?

16   A.   Semi retired, retired airline pilot.

17   Q.   What airline did you retire from?

18   A.   Retired from TWA slash America in 2005, after flying for

19   39 years.

20   Q.   What was the highest rank that you achieved as an

21   airline pilot?

22   A.   I was a 767 captain, check airman, line instructor.

23   Q.   Captain Day, can you tell us from the beginning of your

24   flying career, and I may interrupt you, I am sure I will as

25   you go through.

```
 1              Start in the beginning and tell us about your
 2    flying career?
 3    A.   Okay.  I started out, I graduated from college in St.
 4    Louis with a degree in aeronautical engineering.  Next day I
 5    drove to Kansas City and was fortunate enough to start
 6    flying.
 7              In those days we were hired as pilot flight
 8    engineers, and I got trained on the Boeing 727.
 9    Q.   What airline?
10              THE COURT:  Excuse me.  Do you have a private
11    license before then?  While you were at college did you get a
12    private license?
13              THE WITNESS:  Yes, your Honor.
14              THE COURT:  They didn't hire you cold, you were
15    already a licensed pilot?
16    A.   I had a wopping 220 hours.
17              THE COURT:  Okay.  That is 80 or 90 more than I
18    had.
19              Go ahead.
20    Q.   What year are we in right now?
21    A.   We are in December of 1966.
22    Q.   And what airline are you working for?
23    A.   That was with TWA.
24    Q.   You went straight out of college to working for TWA?
25    A.   In those days, that is what happened.  Yes.
```

1   Q.   Oh, okay.  Take us through, I guess your career at TWA

2   then?

3   A.   Okay.  We got checked out as flight engineers, still had

4   flight engineers in 66, but we were considered pilot flight

5   engineers because we were actually hired as pilots.

6        However, they had professional flight engineers, and

7   they had their own union which was the FEIA, Flight Engineers

8   International Association.  So we all became part of that

9   union.  And right about that time is when ALPA started a card

10  campaign to try to get us all into ALPA and they were

11  successful, so we all became apprentice members of ALPA right

12  about that time.

13           I then became based in Newark, and approximately a

14  year later started flying out of no, Kennedy and LaGuardia as

15  a first officer on the 727.

16  Q.   As a first officer.  What year is this now?

17  A.   That would have been about '67.

18  Q.   And when you were based in Newark did you live in New

19  Jersey?

20  A.   I did.  I lived in Lyndhurst for a while, lived in

21  Rutherford for a while.

22  Q.   And how long were you based in the Newark, New York

23  area?

24  A.   It must have been close to seven, about seven -- well,

25  actually I was, I lived there for up until I was 28, but I

1    was based in the New York, Newark, area, a good part of my

2    career.  I would say 15, 20 years, at that time.

3    Q.   At some point you went to Rutgers law school, is that

4    right?

5    A.   Yes.

6    Q.   Go ahead.

7    A.   What happened was, I was advancing pretty fast.  The

8    next year I checked out of the 707 international first

9    officer, and then the bottom fell out.  TWA started

10   furloughing 50 pilots a month.

11          When they got to about 600 of them I could see that

12   either I was going to be unemployed or I was going to be very

13   senior 727 flight engineer again since I had been demoted, so

14   I picked something I thought I had at the least aptitude for,

15   since I had math and science so I took the LSAT, which was

16   the law school test to get in, and I got accepted to three

17   out of the four schools and started at Seton Hall the next

18   year.  I went to Seton Hall.

19   Q.   What year is this now, early seventies somewhere?

20   A.   That would have been the early seventies, that's

21   correct.

22   Q.   Okay.

23   A.   So I would try to fly on weekends primarily because I

24   was still flying with TWA at the time, and I went a year and

25   a half at Seton Hall, down town Newark, and then I

 1   transferred over to Rutgers for the next year and a half.

 2   And during that period of time I started doing union work.  I

 3   became the grievance chairman in the New York area for the

 4   pilots.

 5   Q.   I am sorry, Captain Day.  Let me interrupt you.  Did you

 6   ultimately obtain your law degree?

 7   A.   I did.  I graduated, received a degree, and passed the

 8   New Jersey bar, become a member of the New Jersey bar, also

 9   became a member of this bar at the time, and at that time I

10   had started a flight school, too, and kind of got burned out

11   so wound up selling the flight school, and selling the house,

12   and moving to Florida and starting to commute to New York.  I

13   was still flying out of New York.

14   Q.   Go ahead.

15   A.   I took the Florida bar, and became licensed to practice

16   in Florida also, and started working part time as in-house

17   counsel to a very large developer, as a matter of fact, he

18   had led Dade County in condo sales the year before.

19   Q.   What year is this that you moved to Florida?

20   A.   Well, I was approximately 28, so that would have been

21   '73 or '74.

22   Q.   Okay.  Have you lived in Florida ever since then?

23   A.   Pretty much so.  I lived in St. Louis for a brief stint

24   when I wasn't commuting but for the most part I have always

25   maintained a place in Florida.  That is where I was born,

1    grew up.

2    Q.   Would it be from the time you set up a law practice in

3    Florida and you were flying at the same time were you always

4    engaged in both professions?

5    A.   Pretty much so.  I, at some point I really started

6    getting a little burned out.  You can do it when you are

7    younger but as you get older it gets a little more tire some,

8    so as time went on, I stopped working for the developer and I

9    became what I would refer to as a hobbyist lawyer, and really

10   spent more time in the aviation part.  Practicing law is a

11   lot of work.

12   Q.   Let's just focus on your flying career, just take us

13   briefly through that at TWA from the time you, well, I guess

14   we were talking about you were based in New York City.  So

15   from there?

16   A.   I was based in New York, and at that point in time, I

17   was then flying the 747, Lockheed 1011 as flight engineer,

18   but we had a provision where they would allow us to be, they

19   call it instantly qualified the first officers, they took the

20   senior flight engineers and a allowed you this option, so

21   from month to month I would fly the 707 as a first officer,

22   and I did that until I ultimately got a first officer bid, in

23   St. Louis.

24        TWA just purchased some MD 80s, and I was in the

25   first group, we got trained by McDonnell Douglas out on the

1    west coast.  And I transferred to St. Louis at that time.  It

2    was rather ironic because the MEC office which had been in

3    down town Manhattan also transferred to St. Louis about that

4    time.

5          So I started doing some union work at the MEC

6    level.  We started something new called the grievance review

7    board, and at the time TWA was getting an awful lot of

8    grievances.

9          We had over 100 grievances outstanding and they

10   were pouring in and they were all being pretty much

11   arbitrarily denied at the first level so the grievance review

12   board's function was to take the grievances and review them

13   and study them and make a recommendation to either proceed to

14   the next level which is called the system board, or recommend

15   that the grievant withdraw the grievance.

16   Q.  What year are  you talking about now you got on this

17   grievance board?

18   A.  That would have been in the late seventies, early

19   eighties, in that area there.  I was working with ALPA

20   attorney, Barbara Gumbel, who had just recently been hired by

21   ALPA.  She was probably the finest, one of the finest

22   attorneys I have ever worked with.

23   Q.  Captain Day, was that the first piece of union work that

24   you got involved in?

25   A.  Well, no, I had been grievance, local grievance chairman

1   in New York.  That was my first bit of work at the MEC

2   helpful level.

3   Q.   In has been some testimony about what the grievance

4   committee does.   Can you tell us briefly what you were

5   doing?

6   A.   Well, the grievance committee, when I pilot feels like

7   he or she is being mishandled, and the company is not

8   handling them the way the collective bargaining agreement

9   would say, for instance, they are calling them on their days

10  off or doing other such things, they would try to call the

11  company and complain and if they didn't get anywhere, then

12  they would call a member of the grievance committee, and the

13  grievance committee would send somebody in to try to get it

14  worked out.

15          If it couldn't get worked out, there is a whole

16  formal process you go through where you file a grievance

17  within a certain amount of time and then you have a hearing

18  before somebody, your chief pilots' local office, and they

19  have so much time to either grant you your relief that you

20  are seeking or to deny it and then you have another period of

21  time, it is pretty much like a miniature court proceeding and

22  then it continues on up until ultimately it would go before

23  something called the system board of adjustment, which brings

24  in either two persons from the company and two persons from

25  the union to review it at the highest level, or they can also

 1   bring in a fifth person which would be an arbitrator, and

 2   normally the arbitrator would make that decision.

 3   Q.   When you are doing grievance work, is there any

 4   particular dispute that sticks in your mind as something you

 5   are proud of or as particularly interesting that you can tell

 6   us?

 7   A.   Well, they are all pretty interesting to the grievant.

 8             But no, I can't, I can't think of any specific

 9   ones.  I am sure if I sat up here and thought about it a

10   while, I would.

11   Q.   Fair enough.

12             So that was your first bit of union work.  What was

13   the next thing, the grievance board?

14   A.   The grievance review board then became the next step in

15   the process, and that was something we had just worked out

16   and negotiated into the collective bargaining agreement with

17   the company.  So that was something where, it was actually

18   pretty innovative because we had our own database that we

19   created, and we would actually go to the individual pilots

20   and talk to them so they didn't feel like nothing was

21   happening.

22             That was one of the problems, it was terribly

23   frustrating from a pilots standpoint to go file a grievance

24   and not here anything for a period of time and thinking that

25   your union had left you in the cold.

1              So part of it was a PR campaign and part of it was

2     an informational type campaign where you would be gathering

3     information.

4     Q.    All right.  Moving forward, what was the next union job

5     you had?

6     A.    Well,  after the grievance procedure, I then would, this

7     would have been in '94 -- well, no, I am going to back up a

8     minute.  About that time Carl Icahn came in and bought the

9     airlines.

10             We had gone through our first bankruptcy, and after

11    Carl bought the airlines, there was a pretty big rift within

12    the pilot group.

13             ALPA had negotiated a contract in which we agreed

14    to 28 percent pay concessions.  That was what the pilots

15    thought they had agreed to, only to find out after Carl came

16    on board that that was 28 percent aggregate crew cost, which

17    apparently, whoever negotiated the  agreement didn't know

18    what that meant because it would have been a 44 percent pay

19    cut.

20             So what happened was, there was a group of pilots,

21    they didn't like ALPA any way, and they formed their own

22    union.  It was called the Airline Pilots Union, APU, for

23    short, and they started a card campaign against ALPA to try

24    to become the certified carrier -- representative for the

25    carrier.  And I ultimately got involved with them although I

1    was, initially, my sympathies laid there.

2           And then I became quite involved with them although

3    I didn't hold any office.

4           THE COURT:  Them meaning the APU?

5           THE WITNESS:  Yes, sir.

6           THE COURT:  Okay.

7    A.    Yes, sir.   I got to the point I was maintaining the

8    data base, they used to joke and say we had a better database

9    than alpa today because we were sending cards out.  Pilots

10   are notorious for not providing information.  They are pretty

11   mobile.

12          At one point I finally decided I couldn't really

13   justify being the member of two unions, and I resigned from

14   ALPA, although I continued to pay dues.  And we continued to

15   try to collect cards and ultimately a year later, we got to

16   the point where we had actually collected about 85 percent of

17   the cards we needed to petition the National Mediation Board,

18   but that wasn't enough, and after a year the cards start

19   becoming stale, they have to be less than a year old.

20          So at that point, I made the decision that this

21   wasn't going to work.  Pilots had decided they could live

22   with what they had and I decided to come back into ALPA and

23   try to make the changes from within the union, so I parted

24   with the group that ALPA used to refer to as the dissidents,

25   and I came back into the union.  At that point in time I

1    started doing local grievance work again, but in 1994 I ran

2    for and was successful becoming the St. Louis LEC captain

3    representative.  At that level.

4    Q.    That made you a member of the MEC, the Master Executive

5    Council?

6    A.    Yes.  There was either nine or twelve members at that

7    point in time.  New York had two councils of three each, we

8    had three pilots in Los Angeles, had three pilots, somewhere

9    in their, Los Angeles, Los Angeles, eventually got closed and

10   New York shrunk down to one council.  During --

11   Q.    How long did you serve as the captain rep in St. Louis?

12   A.    The term is for two years.  And it was an interesting

13   term because that is when TWA decided to go through its

14   second bankruptcy.

15   Q.    Let me stop you right there.  Were any TWA pilots

16   furloughed in the first or second TWA bankruptcies?

17   A.    I believe so.  During the first one.  But I am not 100

18   percent positive.

19   Q.    Okay.  If you don't know --

20   A.    I am not certain at all.  We had something at one time

21   called the phantom furlough.  TWA had threatened to furlough

22   200 pilots and ALPA immediately jumped in and said what can

23   we do to prevent it, and we gave concessions and there was no

24   furlough and there was always a suspicion that the furlough

25   never was going to happen any way, but that is what -- that

1   was somewhere, I think that was around the first one but I

2   can't say for sure.

3   Q.   Before I interrupted you you were going to tell us

4   something in connection with your MEC work in the second and

5   the second bankruptcy?

6   A.   Yes.  As part of that the company came to us again for

7   concessionary contract which seemed to be happening with

8   regularity, and at that point, that was '94, I had been with

9   the company for, oh, 17 years, and I developed a certain

10  amount of skepticism.

11  Q.   Skepticism about what?

12  A.   Skepticism about the company being able to justify their

13  position.  It seemed to me that the pilots would roll over

14  too easy, that was one of the reasons I wanted to be on the

15  MEC.  And a lot of times I felt like I was a lone vote, but

16  we did get a concessionary contract, or working agreement,

17  and I can remember to this day that an I think it is probably

18  the finest concessionary agreement in the industry at the

19  time.

20       We got such things, I remember the negotiating

21  committee giving its report to the MEC and me telling them

22  all right, if we are going to give a concessionary contract,

23  let's clean up some of these horrible areas we got.

24       For instance, being on reserve means you are on

25  call and you are guaranteed in those days, you were

1   guaranteed ten days off.  Well, the other 20 or 21 days you

2   were at the company's mercy and since an awful lot of pilots

3   were commuters, you have to come up and either stay in a

4   hotel at your own expense, or you have to come up and stay in

5   a commuter pad, we call it, which is a half a dozen pilots

6   sharing a one-bedroom apartment.

7        So I suggested let's change it.  Let's go to 14

8   days off.  Let's change the whole concept, and I remember the

9   negotiating chairman telling me that they will never buy it,

10  Mike, they will never buy it.

11       Well, I said I am not going to sign off on this

12  thing and of course they wanted our signatures because they

13  were threatening to close the airlines down, and so on.  So

14  came back with 14 days off and all sorts of other innovative

15  type things.  It was quite a contract.  But I remember the

16  pressure of being up half the night with discussions going

17  back and forth, and those days, Bill Compton who ultimately

18  became the CEO of TWA was our Master Executive Council

19  chairman, and --

20  Q.   Let me interrupt you, Captain Day.  How many terms did

21  you serve on the MEC?

22  A.   Just the one.

23  Q.   And you told that story of some work you are personally

24  proud of that you did.  Do you remember the pilots at Eastern

25  Airlines striking when you were a younger pilot?

1    A.   Absolutely.  I remember I remember it pretty well

2    because when I started flying for TWA, I was making $500 a

3    month.  That is what, for the first six months, living in New

4    Jersey.  Paying about 115 for an apartment.  And it wasn't

5    much after that that we got our pay increases, but still we

6    weren't make ago whole lot of money, and the Eastern pilots

7    went on strike, and as part of that strike ALPA National

8    assessed all the pilots, including the TWA pilots.  That is

9    what you are supposed to do, you are supposed to support your

10   fellow pilots when they go on strike.  And we went for 24

11   months, every month, sending a check in, it was about a

12   hundred something dollars, it was big amount in those days

13   and even though we grumbled we understood that those pilots

14   were carrying the water.  But they needed our support.  That

15   to me was my introduction to unionism.

16   Q.   And you carried that forward in your own work, that

17   principle?

18   A.   I tried.

19   Q.   Take us then to your next union job, if you can recall.

20   We left, you were an MEC member in the mid nineties?

21   A.   Yes, the next one, Barbara Gumbel referred to as a

22   committee that didn't exist.  It was called, affectionately

23   called the dirty tricks committee.

24   Q.   Who is Ms. Gumbel again?

25   A.   She was our staff attorney, ALPA's staff attorney, based

 1    out of St. Louis.

 2    Q.    Was she the contract administrator like?

 3    A.    Yes.

 4    Q.    We heard about Mr. Holtzman?

 5    A.    She was Mr. Holtzman's predecessor.

 6    Q.    Okay.  And she had this, what did you call it?

 7    A.    Well, she called it the dirty tricks committee.  We had

 8    been, our contract had been amenable for over two years.  In

 9    other words, we felt we were working without a contract, and

10    we were working with the old contract.  And even though there

11    was, you had certain rights, we understood, you know, that

12    there was rights to strike and so on, that there was also

13    other things that could be done, and there was a group put

14    together, and we put together a play book, we called it, for

15    the MEC chairman, and this was something, the MEC chairman

16    could pull out and say okay, this week we are going to do

17    this.

18    Q.    Like what?

19    A.    Well, I can remember one where he said, we are declaring

20    this as LAW week, log book awareness week.

21             THE COURT:  Law book?

22    A.    Log book.  Log book awareness.

23             THE COURT:  I thought you said law book awareness.

24    A.    Original was Law.  L A W.  Work by the law was the

25    slogan.

 1              When Bill set this up, well, I will give you an

 2     example.  I was on layover down in Miami and we came out that

 3     morning for our flight.  And I was flying on the MD 80, and I

 4     walked around to do a pre flight, we would alternate, the

 5     captain would do one, the first officer would do one, and

 6     there were a few drops of oil on the bottom of the engine

 7     cowls and I instructed the first officer to call maintenance

 8     and write up the oil leak and the maintenance foreman came

 9     running out and said that is normal.  They all have a few

10     drops of oil.  If you write that up I have got to take the

11     whole cowl up, and have an hour and a half delay.

12              Well, you can see where that was going.  I told him

13     if it is normal, then sign it off as normal.  It really went

14     into his lap.

15              So this kind of went on for a week and the theory

16     was, yes, you are inconveniencing people, probably not as

17     much as a strike, though, but the idea is to try to exercise

18     some leverage against the company so that they will come back

19     and negotiate with you.  That would be one example.

20              I can tell you there was an awful lot of 10-11's

21     that had windshields changed because the pilots claimed they

22     couldn't see out of them as clearly as they should.  Captains

23     have a tremendous amount of authority with the airlines, and

24     there is a gray issue, on, you can fly with an awful lot of

25     things, at the captain's discretion on whether to fly with

1    them or not.  The captain doesn't have to.

2    Q.   This was the dirty tricks committee?

3    A.   That was the dirty tricks committee.

4    Q.   You were part of that committee?

5    A.   I was part of that committee.

6    Q.   Okay.

7    A.   I guess I was always considered a bit of a rebel, and I

8    would get dragged into these things.

9    Q.   The next committee.

10   A.   The next committee I served on was called the scenarios

11   committee.

12   Q.   Okay.  This, what year are we in now, about?

13   A.   I would say we were into the later nineties.

14   Q.   All right.

15   A.   At that point, the handwriting was on the wall that most

16   of the airlines were starting to look at mergers.  So we

17   wanted to be prepared for it.  So one of the things we did

18   was myself and another pilot named John Berlin went out and

19   started interviewing potential merger attorneys, and that was

20   my first introduction to meeting Roland Wilder.  But then a

21   committee was set up to start studying this in more detail,

22   so the first thing that came along was potential merger with

23   America West, and of course it was all hush-hush, because

24   none of this was supposed to be public information.  So my

25   job was to interact with America West, and exchange seniority

 1    lists and start trying to look at those.

 2            THE COURT:  What was the union for America West?

 3            THE WITNESS:  That was ALPA.

 4            THE COURT:  So it was an ALPA to ALPA?

 5    A.   Yes, sir.

 6            THE COURT:  That is a lot different than an ALPA to

 7    non-ALPA.

 8            THE WITNESS:  That is a piece of cake.

 9            THE COURT:  Because everybody is on the same side?.

10    A.   Yes, sir.

11            THE COURT:  Go ahead.

12    Q.   Actually, when ALPA --

13            THE COURT:  No leading questions.  I can ask

14    leading questions.

15    Q.   We will get to that later.

16    A.   Okay.

17    Q.   The scenarios committee?

18    A.   Okay.  But the America West thing never materialized,

19    although they did take our -- it is funny, our MEC chairman

20    always rise to different positions.  Joe Kronik was the MEC

21    chairman later on and he ultimately wound up becoming vice

22    president of flight operations for America West.

23            But the scenarios committee, after that, evolved

24    into a committee to start dealing with Bill Compton.  Bill

25    Compton by now had become the president or CEO of TWA, and

1   the scenarios committee was supposed to be looking at all

2   these different possibilities that perhaps the company wasn't

3   being aggressive enough, as far as looking at potential

4   mergers and/or other types of relationships.

5   Q.   Okay.  So what work did you do on that committee?

6   A.   Well, I was one of the senior advisors on it, I guess

7   you could say.  We would just basically meet and try to come

8   up with different ideas.  It was more of a think tank than

9   anything else.

10  Q.   And going forward, when did you leave the scenarios

11  committee and go join another committee, if you did?

12  A.   Well, at that point I was back flying out of New York on

13  the  7-6 and I was doing the check airman work.

14           THE COURT:  What is that?

15           THE WITNESS:  Well, somebody has to give the pilots

16  their annual line checks.

17           THE COURT:  You were checking out pilots.

18           THE WITNESS:  Checking them out, giving the line

19  instruction on transitions and so on, check rides and that

20  type of thing.

21           THE COURT:  All right.

22  A.   So what happened after that, I guess, is the start of

23  what this is sort of about.  In January of '01 is when all of

24  a sudden we all found out that American wanted to buy TWA.

25  Q.   Okay.  And what union work did you do first?

1          THE COURT:  How did you find that out?

2     A.   I got a telephone call from another pilot one morning,

3     Judge.  At home.

4          THE COURT:  Another TWA pilot?

5     A.   Yes, sir.  Saying did you hear the news?  So of course

6     we were all pretty excited about it, because American was a

7     very large, stable airlines.  So initially I wasn't doing

8     anything, I was quite happy doing my check airman duties and

9     flying to Kona or taking a trip to Cairo or whatever.  And

10    then in February I got a call and asked if I would come join

11    the -- to become the ALPA representative on the, see if I can

12    get this terminology right -- the TWA bankruptcy, unsecured

13    creditors committee.

14    Q.   What did that job involve?

15    A.   Well, there was six persons on that committee, and at

16    least twice as many attorneys in there, too.  And that

17    involved going between, well, where I was living in Florida

18    and up to Wilmington, up to New York, and back to St. Louis,

19    and meeting with this group, and the group was comprised of

20    myself  and another labor representative from the IAM which

21    basically represented most of the rest of the TWA employees

22    and there were two from the unsecured bond holders and then

23    there was two other ones, one representative from Papsy

24    (phonetic), and the other one from Pratt and Whitney.

25         THE COURT:  What was the unions, I, unsecured debt,

1   I know it was ALPA's unsecured debt.

2   A.   Our wages beyond what the bankruptcy court would give

3   priority to.  As I understood it.

4            So we would meet in Delaware and I would have two

5   attorneys, Steve Tumblin, then we had a local counsel in

6   Manhattan, and we would all meet down in Delaware, and the

7   idea was that we were supposed to try to get the best deal

8   for the unsecured creditors.

9   Q.   The bankruptcy court was in Delaware?

10  A.   The bankruptcy court was in Delaware, Wilmington,

11  Delaware.

12           So as part of that, it was --

13           THE COURT:  Was the filing before American signed

14  the deal or after, signed the deal to buy --

15  A.   I believe that the filing was right after.  They didn't

16  file it and then go look for American.

17           THE COURT:  In other words, it was the other way

18  around, American signs the deal and then they go --

19  A.   As part of the deal we had to go through this bankruptcy

20  and shed these debts.

21           THE COURT:  Okay.

22  A.   And one of those debts was something called the Karabu.

23           MR. PRESS:  When Mr. Day responds to the Judge, can

24  you all hear him?

25           THE JURORS:  Yes.

1   A.   I will try to talk louder.

2           One of the debts was something called the Karabu

3   arrangement which was a, I was going to say a hangover, a

4   legacy from Carl Icahn.  And this was something that gave

5   Carl Icahn a preference to buy all of these very cheap

6   tickets.  As a matter of fact, he had a website I think,

7   original cheap tickets website.  And according to Bill

8   Compton it was draining us royally.  I had actually written

9   Bill Compton a private memo one time and said why don't you

10  go through bankruptcy on your own before this.  We can't do

11  that.

12          Our attorneys say there is no way we can get rid of

13  the Karabu agreement.  Well, that was part of the deal with

14  American, was to get rid of this agreement.  So Carl Icahn

15  still had a big interest in TWA.  And --

16  Q.   You mean stock ownership?  Is that what you mean by

17  interest?

18  A.   No, I mean this agreement where he was guaranteed all of

19  these tickets at these ridiculously low rates.

20          So one day, one of the, one of the unsecured bond

21  holder representatives, Mo Meeks, I believe his name was,

22  said, oh I just got a call from Carl last night and he has

23  got a much better deal for us.

24          Well, that perked my ears up because Carl Icahn was

25  never really considered a friend of labor at that point in

1    time.  So I began listening up, he says Carl wants to come in

2    and tell us his deal.

3            I said no, no, we don't want Carl in here, the

4    whole meeting.  Let him send his proposal in in writing, or

5    send his attorney, whatever.

6            Well, the next thing I know, Carl Icahn is walking

7    in to our unsecured creditors meeting with his attorney, and

8    the first thing he is doing is saying I need to know, are you

9    boys with me or not?  And Mo Meeks pipes up, we are all with

10   you, Carl.  We are all with you.  And he looks across the

11   room at me, and, no, I need to know where he is at.

12           Well, I didn't know Carl Icahn had any idea who I

13   was.  And he says I want to know how you are going to vote.

14   And I said, well, Mr. Icahn, I am going to vote in the

15   interest of the unsecured creditors.  No, no, I really want

16   to know how you are going to vote.  I repeated it again.  He

17   said I want to know ALPA's position.

18           I said, well, then you are going to have to talk to

19   our MEC chairman, at that point in time.  He said no, I want

20   you to tell me.  Well, if I was sitting where you are

21   sitting, I would want to know, too, but that is my answer.

22   He just looked at me, burst out laughing, didn't bother me

23   any more.

24           He was a pretty intimidating character, and he was,

25   he was serious about coming in and competing with American,

```
1    but at that point in time we didn't want anything to do with

2    Carl Icahn.  We thought American was the direction to go.

3    Q.   And that is the direction it did go?

4    A.   That is the direction it did go.

5    Q.   How long did you serve on this creditors committee in

6    the bankruptcy court?

7    A.   I started that in the beginning of February and the next

8    thing I knew, in March, I got another telephone call, and Bud

9    Bensel, who was the chairman of the merger committee,

10   developed a medical problem, and they asked if I would come

11   takeover his position, and I stupidly accepted.

12            So that was in early to mid March.

13            THE COURT:  Now, the merger committee was not

14   merging the two companies, it was merging the pilot groups,

15   right?

16            THE WITNESS:  That's correct.

17            THE COURT:  In other words --

18   A.   Yes, the merger, as a matter of fact, it is even more

19   confusing than that because the merger, we called it the TWA

20   merger committee.  That is what I was chairman of.  And the

21   APA, the American pilots group, called theirs the acquisition

22   and something else committee.  But we were supposed to merge,

23   to integrate the two seniority lists together.

24            THE COURT:  You weren't dealing with the business

25   side of the American TWA merger?
```

```
 1              THE WITNESS:  No, sir.

 2              THE COURT:  You were dealing with the ALPA group

 3    and a nonALPA group?

 4              THE WITNESS:  Yes, sir, that is exactly right.

 5    Q.   We have heard from Sean Clarke who was a committee

 6    member of yours, right?

 7    A.   Sean was the junior most member on the committee.

 8    Q.   And  you became, what was your position on the

 9    committee?

10    A.   I became the chairman.

11    Q.   Which meant what as far as your job responsibilities as

12    compared to people that weren't the chairman?

13    A.   Well, for one thing I was the baby sitter.  I had to

14    keep, you get five pilots together, you are going to get five

15    different opinions.  And obviously we have, we had a diverse

16    group on there.  Now, we weren't supposed to just be

17    representing our own seniority group, and I was --

18    Q.   Remind the jury, you said five, if you get five pilots

19    you are going to give five opinions.  How many committee

20    members were there?

21    A.   Five.

22    Q.   Okay.

23    A.   And, but we were supposed to be representing all of the

24    pilots.  But obviously you are going to look at things

25    differently and understand them differently from your own
```

```
 1    seniority's perspective, and Sean was, I remember Sean and
 2    John Swanson, who was the next senior person, he was a former
 3    Ozark pilot, and he and Sean would go at it left and right,
 4    and I would have to remind them that we are working on this
 5    together.
 6    Q.   As far as interfacing with the American pilot committee,
 7    did the chairman have extra responsibilities?
 8              THE COURT:  You need a  premise to that.  He can
 9    talk about what that meant and who he was  interfacing with.
10
11    A.   Well, the first --
12              THE COURT:  Let him ask the question.
13    Q.   In your own words, tell the jury what your committee's
14    job was?
15    A.   We had to, first of all, formulate a plan of integration
16    between the two pilot groups.  We had approximately 2,500
17    pilots.  They had 11,000 plus pilots.  We had to figure out
18    how we were going to merge these two together.  And my job as
19    chairman was to oversee it and do all the administrative part
20    of it, and interact more with the MEC and with our counsel
21    counsel, and advisors.
22    Q.   And as chairman, did you have any extra responsibilities
23    from normal committee members, the other four committee
24    members, I should say?
25    A.   Well, sure.
```

Day-direct/Press                                                    57

```
1    Q.   What were they?

2    A.   I was the one who would have to write the letters and

3    set up the meetings between us and the American pilot group,

4    and --

5              THE COURT:  Did the APA have their own sort of

6    counterpart committee to your committee?

7    A.   Yes, sir, and I think they had about seven members.

8              THE COURT:  That would be Allied Pilots

9    Association.

10   A.   The Allied Pilots Association, APA.

11             THE COURT:  They had a group that was kind of like

12   your group.

13   A.   Yes, sir.

14             THE COURT:  That you were interacting with?

15   A.   We would schedule meetings to meet and try to resolve

16   our issues.  Now, I came in and they already had several

17   meetings.

18   Q.   Let me interrupt you.  When did you take over as

19   chairman of the TWA merger committee?

20   A.   March 8 sticks in my mind is when --

21             THE COURT:  2001?

22   A.   In 2001, is when the MEC passed the resolution

23   appointing me as chairman of that committee.

24   Q.   And that is how that happened, some sort of election?

25   MEC, the MEC voted and approved your position?
```

1    A.    That's correct.

2    Q.    All right.  And that was in, let's say, March 8, 2001?

3    A.    Yes.

4    Q.    What was the first thing you did, first of all, did you

5    have any involvement with that committee before you were

6    elected chairman?

7    A.    No.

8              THE COURT:  But the committee had functioned before

9    you were chairman?  In other words, had existed.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  And doing things.

12   A.    Yes, sir.  Bud Bensel was my predecessor.

13             THE COURT:  And he was the chairman.

14   A.    He was the chairman.

15   Q.    What did you do when you were elected chairman?

16   A.    The first thing I did was try to get spun up on  merger

17   law, for what I would need to know.  ALPA's merger policy,

18   and where we were at between the two committees.  So I had to

19   talk to my various members and get all the paperwork that had

20   gone out between them, and there studies and what it is we

21   were trying to do.

22   Q.    You mentioned you wanted to ramp up to speed on merger

23   law.  Was there somebody in particular you looked to for

24   advice on?

25   A.    Absolutely.

1  Q.   Who was that?

2  A.   That was Roland Wilder who, I am convinced Roland is the

3  only reason we got what we did get out of this thing, was

4  Roland's -- Roland is probably, I think, the finest merger

5  attorney out there.  And he is well respected.

6            As a matter of fact, Ed White, who was their, my

7  counterpart on the APA, had mentioned that I guess they had

8  tried to hire Roland.  But we got to him first.  So he was

9  extremely well respected, and Roland did what he could to

10 spin me up, and of course.

11 Q.   And in this ramping up, getting yourself up to speed

12 mode, what did you learn in particular from Mr. Wilder that

13 sticks in your mind?

14 A.   Well, that there were different types of merger.  Before

15 deregulation there was one way that was called date of hire,

16 and that is pretty simple.  You simply take the two pilot

17 groups and create a new seniority list based on when each

18 pilot was hired by their respective company.  And there is

19 another way called ratioing them in, where you either ratio

20 the whole group in, if for instance you have got a thousand

21 pilots on one and five on the other one, you ratio them in,

22 one pilots for five pilots, or you could do it with all sorts

23 of iterrations of the two of them.  Do it within categories,

24 ratio captains in on one group, and then I learned that there

25 was ways to protect one group by using restrictions from

```
 1   flying the other company's airplanes for some period of time,

 2   we had apparently done that at TWA, with Ozark.

 3   Q.   Describe that, Ozark, what are you talking about?

 4   A.   Well, Carl Icahn, when he owned TWA, when it was still a

 5   private company at that time, I believe, decided he was going

 6   to buy Ozark, to strengthen our position in St. Louis.  So he

 7   purchased the airlines, and Ozark, we then had the same

 8   problem there.

 9            Now, I wasn't part of that merger operation, but

10   that was ALPA, that was ALPA to ALPA, and under ALPA to ALPA,

11   basically it says the two pilot groups, if they can't agree,

12   then they would go to arbitration.  But they did ultimately

13   come to an agreement and signed off between the two of them.

14   Q.   Okay.  I just wanted you to describe what Ozark airlines

15   were and why you were mentioning it in your testimony?

16   A.   Okay.  And using it as an example, that was a date of

17   hire merger where they took the two groups and that is how

18   they were factored in.  But as a result of that, there was a

19   large group of Ozark captains who would have immediately

20   become first officers because TWA was a very senior airlines,

21   and they put in what they call fences and restrictions in

22   there, so that for a period of two to three years everybody

23   would continue to fly their current position.

24   Q.   Okay.  Let's get back to Mr. Wilder's advice to you when

25   you were again, in your ramping up stage on the merger
```

 1    committee?

 2    A.    Yes.

 3    Q.    Is there anything else that you can recall that he said

 4    that was important to you at the time?

 5    A.    Well, at the time we had in our collective bargaining

 6    agreement, section 1 we had what was called scope, which

 7    offered us protection and said in case of an acquisition or a

 8    merger, whatever, we were going to be covered under certain

 9    processes to assure a fair and equitable integration.

10              THE COURT:  But the heart of that was at the end of

11    the day there would be an independent arbitrator deciding the

12    dispute if the parties couldn't resolve it themselves.  That

13    was it in effect.

14              THE WITNESS:  That summarizes it.

15              THE COURT:  The Mohawk Allegheny rights.

16              THE WITNESS:  That is in effect what that really

17    meant.  You could negotiate, but if you couldn't agree you

18    would have a third party, independent arbitrator, to come in

19    and say this is what is fair.  This is what we are going to

20    do.

21              THE WITNESS:  Yes, sir.  That is what I was going

22    to say, you took the words out of my mouth.  But that

23    simplifies it just the way I would have described it.  Thank

24    you.

25              THE COURT:  Now go to the APA contract.

```
 1   A.   Well, that is where the problem came in.

 2   Q.   Right.

 3   A.   We had this provision in our collective bargaining

 4   agreement, but apparently the APA, in their collective

 5   bargaining agreement, had a provision that said in case of a

 6   merger, pilots would go to the bottom of their list.

 7           THE COURT:  Is that the so-called staple job?

 8           THE WITNESS:  That is the staple job.  That is

 9   their green book.  Yes, sir.

10           THE COURT:  Would that be in part because American,

11   being so strong, relatively at the time, was likely to be the

12   acquirer of TWA and a lot of smaller airlines were likely to

13   be the acquired ones?

14           THE WITNESS:  Also because they were an independent

15   union and they could set up their own rules, whereas under

16   ALPA, if he, if it had been ALPA to ALPA.

17           THE COURT:  You had 60 airlines or something?

18   A.   Right.  70,000 pilots.

19   Q.   As ALPA members you all agreed to be bound by the same

20   merger policy, no matter what airline you flew for?

21   A.   Yes.

22   Q.   But the American pilots were represented by their own

23   company union, and didn't have that?

24   A.   So we had an ALPA to non-ALPA merger in this case.

25   Q.   Right.  And Roland was explaining what to you about
```

1   that?   I said Roland.  Mr. Wilder?

2   A.   Well, Roland, Mr. Wilder, he felt as long as we had a

3   process, we had a good chance at having a fair and equitable

4   integration.

5   Q.   What do you mean, process?

6   A.   Well, either, as the Judge has said, arbitration, or

7   something along that line.  But not stapled.

8   Q.   Were you led to believe that that was something that Mr.

9   Wilder was seeking to achieve, that when he took over as

10  chairman?

11  A.   Absolutely.

12  Q.   Okay.

13          THE COURT:  I am sorry.  When he took over as

14  counsel.

15  Q.   No, took over as merger committee chairman?

16          THE COURT:  Mr. Wilder.

17  Q.   No?

18          THE COURT:  I thought you said Wilder became

19  chairman.  I got you.

20  Q.   What did Mr. Wilder say about this process agreement.

21  Let's do it that way.

22  A.   I felt it was essential.  Otherwise, I think his phrase

23  was we would be dancing naked in the streets.

24  Q.   When you took over as merger committee chairman, Captain

25  Day, did you learn whether or not there had been any

 1   negotiations between the two pilot committees?

 2   A.   Yes.  There had.

 3   Q.   And did you come to understand what the status of the

 4   negotiation was?

 5   A.   Yes.

 6   Q.   Without telling us --

 7            MR. PRESS:  Judge, this would be a perfect time to

 8   break.

 9            THE COURT:  Okay.  It is two o'clock exactly on the

10   head.  Okay.

11            Ladies and gentlemen, we had a busy day today, a

12   full day, for which you can thank the lawyers for keeping the

13   case moving.  And please do not discuss the case among

14   yourselves.  Do not discuss the case with family, friends or

15   loved ones.  Keep an open mind until you have heard all the

16   evidence.

17            I might report you can never be sure of these

18   things, it looks like our initial estimate of the length of

19   the trial is going to be somewhat shorter than we, a little

20   shorter than we thought.  I think that probably some number

21   of days after the 4th of July we will be finished with the

22   case, which is somewhat shorter than we had anticipated.  I

23   guess that falls in the category of good news.  I think the

24   plaintiffs will be done tomorrow, am I right?

25            MR. PRESS:  We will be finished tomorrow, Judge.

1          THE COURT:  And of course, as you know, it becomes

2     the defendant's turn to put its case on.  So the attorneys

3     are moving along.  That is a good thing.

4          Have a very safe trip home and a safe in tomorrow

5     morning at 8:30.

6          (The jury leaves the courtroom.)

7          THE COURT:  Thank you, Captain.  You can step down.

8          Everyone please be seated.

9          Mr. Katz, you rise.

10         MR. KATZ:  Yes, your Honor.  In the spirit of

11    moving things along smartly, there are some videos that ALPA

12    would like to show as part of its case, and may arise as soon

13    as tomorrow.

14         We discussed it on Monday, to some extent, and with

15    regard to Jeffrey Brundage's video, this is a situation where

16    plaintiffs did not designate any portions of Mr. Brundage's

17    deposition to show as part of their case.  However, ALPA did

18    designate plaintiffs.  Plaintiffs had objection and counter

19    designations and we have color coded in the fashion to which

20    you have been accustomed the --

21         THE COURT:  Give it to me.

22         MR. KATZ:  -- the designations and counter

23    designations and the objections and I have a copy of the same

24    thing for opposing counsel.

25         We would like to, I think we will need to show that

1   tomorrow.

2           THE COURT:  Okay.  Mr. Press, Mr. Jacobson.

3           MR. PRESS:  Ms. Rodriguez will be handling this.

4           THE COURT:  I don't know who will do there, but I

5   would go over this if you can this afternoon and if you could

6   email me, if there is any objections that you have that are

7   not on here.  Okay.  So we will make sure, tonight I get as

8   many of the objections I know I don't want to see once

9   tomorrow morning I haven't seen.  It is not that long.

10          MR. KATZ:  No, I think it is use pages long.

11          THE COURT:  It looks like a rather short one.  It

12  should be, to check out the objections shouldn't be, he has

13  them marked here in yellow, the objections just make sure for

14  whatever reason, so nothing is lost in translation.

15          MR. PRESS:  We will do that.

16          MR. KATZ:  Your Honor, we talked about Mr. Babbitt,

17  and he is a case where plaintiffs did designate, we counter

18  designated and there are objections.

19          THE COURT:  Well, the key now, he is not offering

20  those.

21          MR. KATZ:  We are going to offer Babbitt.

22          THE COURT:  The question is whether you offer it

23  and what does he object to and what does he ask for.

24          MR. KATZ:  Precisely.  We are prepared to stick

25  with what is in the joint pretrial order unless the parties

1    have some different position on that.

2         THE COURT:  Do I have Babbitt, though?  I don't

3    recall seeing the transcript itself.

4         MR. KATZ:  I don't think you have, you don't have

5    the transcript itself.  We are happy to supply that to you.

6         THE COURT:  I think I have exhibit D.

7         MR. KATZ:  You have exhibit D.  His items are on

8    page 29 to 30 of exhibit D.  Are the Babbitt designations and

9    counter designations.

10        THE COURT:  I have the exhibit here.  What I need

11   is the transcript itself.

12        MR. KATZ:  We can provide that to you this

13   afternoon.

14        THE COURT:  You are not going to get to Babbitt

15   tomorrow, are you?

16        MR. KATZ:  I am not sure.  What do you think?

17        MR. FRAM:  Unlikely, your Honor.

18        THE COURT:  I think the key thing is, Thursday is

19   coming up, and it is a three-day weekend, put together as

20   many of these transcripts as you can, get them printed up,

21   and so we, the weekend is a good time for me to work on them.

22        MR. KATZ:  There is one final item related to that,

23   not exactly the same.  We have an exhibit that is an ALPA

24   exhibit, D 290, which is a transcript of Compton's testimony

25   before Congressional committee, a Senate committee on

1    February 7, 2001.  And we were like.

2              THE COURT:  Compton's testimony before the Senate?

3              MR. KATZ:  Yes, sir.

4              THE COURT:  On what issue?

5              MR. KATZ:  He was testifying about the American TWA

6    acquisition before the Senate Commerce Committee.  And in the

7    course of that testimony he talked about TWA's situation and

8    the fact that it needed the transaction to survive and that

9    he had gone to all the other airlines and tried to get a

10   merger and was only met with one offer and that was the one

11   from American.  In the course of discovery, the plaintiffs

12   noticed the deposition of Bill Compton, and we suggested,

13   this testimony should be used in lieu of having him appear

14   live at trial.  And the plaintiffs agreed to that so the

15   deposition --

16             THE COURT:  The last guy that refused to go to a

17   deposition was Howard Hughes, and that went to the United

18   States Supreme Court.

19             MR. KATZ:  And they said he had to be deposed?

20             THE COURT:  No.  They sanctioned him millions and

21   millions of dollars, and I think they reversed that sanction.

22   But go ahead.

23             MR. KATZ:  Mr. Compton was prepared to testify at

24   his deposition, but because the parties stipulated that we

25   could use the Senate tell instead --

1           THE COURT:  Where is that stipulation embodied?

2           MR. KATZ:  It is embodied in an exchange of emails.

3           THE COURT:  Let me ask you, Mr. Press, or anybody,

4   whether is your position on that?

5           MR. PRESS:  We did have that discussion during the

6   discovery phase of this case, but now we are in trial and you

7   have made some rulings on Sherry Cooper that I think apply

8   equally with Bill Compton.  His testimony is no different in

9   substance from hers other than he has a different conclusion.

10          THE COURT:  Well, big difference.  That is not

11  exactly --

12          MR. PRESS:  He was not subject to cross

13  examination.  He wants to show a video of this man

14  testifying.  It is hearsay.  It lacks foundation, and it is

15  opinion testimony, in our opinion.

16          MR. KATZ:  Here is the exchange of emails with

17  months Rodriguez.

18          MR. PRESS:  Judge, before you read that, please

19  recall that we had a stipulation on Steve Rautenberg as well

20  during the same time period that was, he was allowed to get

21  out of.

22          MR. KATZ:  There was no stipulation on Mr.

23  Rautenberg.  This was an exchange of emails, it was about --

24          THE COURT:  I am not going to read it now but I

25  will look at it.

```
 1                MR. KATZ:  Fine.

 2                THE COURT:  So.

 3                MR. KATZ:  We would like to show.

 4                THE COURT:  Mr. Press, you were taking the position

 5      that they can't show it.

 6                MR. PRESS:  I am.  It is irrelevant.

 7                THE COURT:  I just want to know.  And your position

 8      is it is like, you know, his opinion as to the.

 9                MR. PRESS:  The viability of the airline basically.

10                THE COURT:  Well, there is a difference between

11      saying I shopped the airline everywhere and only got one

12      offer and saying it wasn't viable.

13                MR. PRESS:  That is not the substance of the man's

14      testimony.

15                MR. KATZ:  We have excerpted parts of the

16      testimony.  It is a short excerpt.

17                THE COURT:  How do I know --

18                MR. KATZ:  We will submit to you, your Honor, the

19      portions of the testimony that we want to --

20                THE COURT:  This will not be tomorrow.

21                MR. KATZ:  We can submit it this afternoon.

22                THE COURT:  Remember, I am leaving in 20 minutes.

23                MR. KATZ:  We don't need it tomorrow.

24                THE COURT:  All right.  So you will get me,

25      tomorrow you will get me the transcript of Mr. Compton, what
```

```
 1   you want to play of Mr. Compton.

 2              MR. KATZ:  Yes, your Honor.

 3              MS. RODRIGUEZ:  Your Honor, this letter, this email

 4   maintains that.

 5              THE COURT:  What are you talking about?

 6              MS. RODRIGUEZ:  Mr. Katz handed me a compilation of

 7   email exchanges from 2008.

 8              THE COURT:  Dealing with Compton.

 9              MS. RODRIGUEZ:  In which you said we will permit

10   plaintiffs to retain their potential objections to Compton's

11   potential objections, to Compton's testimony in Congress --

12              THE COURT:  I have to look at it.  I would rather

13   look at  it at the same time that we are looking at what it

14   is they want to play of Compton.  Mr. Press pointed  out to

15   me, and I agree with him, that defendant may open the door,

16   and I may decide to let in stuff, you know, to let in by

17   rebuttal, I think by Ms. Cooper.

18              MS. RODRIGUEZ:  Sherry Cooper.

19              THE COURT:  Play Ms. Cooper's portions of her

20   deposition, et cetera, as rebuttal.  I am going to see.  I

21   just don't, I am going to see where it goes.

22              MR. PRESS:  Okay, that is great.

23              THE COURT:  Try to get me --

24              MR. KATZ:  Thank you, your Honor.

25              THE COURT:  Try to get me Mr. Compton's stuff.  The
```

Day-direct/Press                                                    72

1    weekend is the best, during the week I don't have a whole lot

2    of time between leaving court and medical treatment, and, you

3    know, getting, the weekend is a good time for me.

4              As much as you can get to me for the weekend is

5    great.

6              Anything else.

7              MR. PRESS:  No, not from the plaintiffs.

8              MR. KATZ:  No, thank you, your Honor.

9              THE COURT:  Okay.  Thank you very much.

10             (Adjourned at 2:10 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I n d e x.

MICHAEL DAY, SWORN.

        Direct Examination              P. 30