```
1              IN THE UNITED STATES DISTRICT COURT.
               FOR THE DISTRICT  OF NEW JERSEY
2              CIVIL 02-2917  (JEI)

3         PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
4         AND MICHAEL FINUCAN, individually
          and on behalf of all others
5         similarly situated,
                         Plaintiffs,
6                                          VOLUME 10
              V.                           TRIAL TRANSCRIPT
7
          AIR LINE PILOTS ASSOCIATION,
8
                         Defendant.
9
                                      CAMDEN, NEW JERSEY
10                                    JUNE  23, 2011

11        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                     A P P E A R A N C E S:
13
              TRUJILLO, RODRIGUEZ & RICHARD
14            BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                    AND
              GREEN JACOBSON, P.C.
16            BY:  ALLEN PRESS, ESQ.  (MO. BAR)
              AND:  JOE D.  JACOBSON, ESQ.  (MO. BAR)
17            For the Plaintiffs.

18            ARCHER GREINER
              BY:  STEVEN FRAM, ESQ.
19                 AND
              KATZ & RANZMAN
20            BY:  DANIEL M. KATZ, ESQ.
              FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
              ELIZABETH  GINSBURG, ESQ.
22            IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.

3                              S/   LYNNE JOHNSON

4                         Lynne Johnson, CSR, CM, CRR
5                         Official Court Reporter

6

7

8

9

10             LYNNE JOHNSON, CSR, CM, CRR
               OFFICIAL COURT REPORTER
11             UNITED STATES DISTRICT COURT
               P.O. BOX 6822
12             LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  I just want to put on the record a

2     couple of things.  I had a conversation with counsel this

3     morning concerning the deposition of Jeffrey Brundage that

4     was proposed to be read into the record.  I was very unhappy

5     with this deposition.  Mr. Brundage was pretty much -- this

6     is not to question his sincerity or his honesty, but he was

7     very much an out of control witness, in the sense that you

8     ask a question, he would launch into a three- page answer.

9          He rarely gave an answer that was less than a full

10    paragraph and in many cases he gave answers that took up two

11    pages of transcript, that often, usually, launched into areas

12    that had nothing to do with the question that was being

13    asked.  And of course, this was a discovery dep but, it

14    wasn't a de bene esse dep, and so when Ms. Rodriguez would

15    ask leading questions, which is not an improper technique in

16    a discovery dep because you sometimes want the witness to

17    sort of go on and on.

18          Mr. Katz started questioning him, in in many cases

19    with leading questions but even when there was a leading

20    question the answer was, he wouldn't even respond to the

21    leading question, even when he was being led he would go off.

22    So we have, we talked about this, we did that, we did this.

23    You know, their position with this.  But you have no idea,

24    you know, who was talking to whom, where it was, who was

25    present, what was said.  And I would, as I say, at some point

1    the objections of plaintiff are just, toward the end it is

2    like 28 pages, just, of objections I added up the pages, I

3    think it was 28 pages.  But you know, that are objected to.

4           But in many cases, it is not, if not most cases, of

5    value.  I just feel like I could not let any of this in

6    unless it was cleaned up some way or Mr. Brundage came to

7    court and that I could control the questioning, you know,

8    have it done the right way.

9           Now, Mr. Katz said he was going to go back and look

10   at this and, you know, see if he can work something up,

11   narrow what is being offered, et cetera.  But right now I am

12   not going to let this be played in this form.

13          And the second point is on the issue of the

14   testimony of the TWA CEO, what was his name again?

15          MR. KATZ:  Bill Compton.

16          THE COURT:  Compton before the Senate when they

17   were investigating the acquisition of American -- not

18   investigating -- well, maybe investigating is the right word.

19   I don't know.  Looking into the American acquisition, there

20   is a tape that defendant wants to play of Compton's

21   testimony.  And there clearly was some kind of agreement

22   between the parties related to Compton, because his

23   deposition wasn't taken and the exchange keeps talking about

24   stipulations.

25          But for the life of me I couldn't figure out what

```
1    was stipulated to.  I couldn't figure out what the actual
2    contours of the agreement were.  I suspect at the time
3    everybody knew, but sitting here today I don't know.  And
4    right now plaintiff objects to it, and so what I am going to
5    do is, Mr. Katz kindly gave me a complete transcript, he
6    gave  me both the transcript, complete transcript, and then a
7    transcript of what he intends to play.  Is that correct?
8              MR. KATZ:  That's correct, your Honor.
9              THE COURT:  And I am going to review that at some
10   point.  But I want to make clear that at least today, if the
11   plaintiff has time to proceed we have to proceed with
12   something other than these two items.  They can't proceed
13   today with Brundage.
14             MR. PRESS:  Defendant.
15             THE COURT:  What?  Defendant, I mean.  Can't
16   proceed with Brundage and can't proceed with Compton's Senate
17   testimony.  I am not making a final ruling.  At the end of
18   the day some of this might get in, but it is not in a form
19   right now.
20             MR. KATZ:  We understand.
21             THE COURT:  It is not that I am uncomfortable.  I
22   haven't read it.  I can't be confident we have, I have any
23   feeling until I see it.
24             MR. KATZ:  We understand, your Honor.
25             THE COURT:  Brundage I unfortunately have read, on
```

```
 1    several occasions and I am uncomfortable with that.  Okay, I
 2    just want to get that on the record.
 3              MR. KATZ:  One other loosened is the video
 4    testimony of Randy Babbitt.  We have marked the transcript.
 5              THE COURT:  I haven't looked at that.
 6              MR. KATZ:  I haven't given it to you yet.
 7              THE COURT:  That explains why I haven't looked at
 8    it.
 9              MR. KATZ:  I think that is a good excuse for not
10    looking at it.
11              MR. PRESS:  I sent you our objection, we had four.
12              THE COURT:  They came by email.  I opened up the
13    email, and in fact.
14              MR. PRESS:  I thought you had the transcript.
15              THE COURT:  You sent it to two different addresses
16    both of which my blackberry picks up so I had your memo
17    twice.
18              MR. KATZ:  Your Honor, I have written on the top
19    what the information is that was in Mr. Press's email.  The
20    objections that are noted on the top are the ones that he
21    described in the email.  The color coding, however, was put
22    on before we received that so there is more objections than
23    what plaintiff's are asserting now.
24              THE COURT:  As I say, I have his memo.
25              MR. KATZ:  You can ignore the color coding.
```

```
 1              THE COURT:  Does the plaintiff have this?

 2              MR. KATZ:  I gave them a copy.

 3              MS. RODRIGUEZ:  We have a copy.

 4              THE COURT:  Let's get the jury out and continue

 5    with Captain Day.

 6              MR. FRAM:  Your Honor, can I make one remark?

 7              THE COURT:  You feel left out of this, Mr. Fram?

 8              THE COURT:  You feel your level of participation

 9    isn't high enough right now.

10              MR. FRAM:  I am sure it is going to rise in a

11    little bit.

12              THE COURT:  So am I.

13              MR. FRAM:  Your Honor, we are intending to make a

14    motion under Rule 50 at the conclusion of the plaintiff's

15    case.  And we are intending to make it in writing.  Obviously

16    right -- obviously we can't do that until after today.  I

17    want to let counsel know, we will try to file that, your

18    Honor --

19              THE COURT:  My reaction right now, as I am

20    listening to the case, is certainly not to grant it.  But I

21    believe, those pesky rules, I have a right to defer until

22    after the jury comes back, do I not?

23              MR. FRAM:  I believe you do.  But we are required

24    to file the motion, your Honor.

25              THE COURT:  Oh, no, no, no, yes.  You don't want to
```

1   waive your rights.  But my reaction is right now, unless

2   there is a change, is to defer until after the jury comes

3   back.

4           MR. FRAM:  I understand.  We just want to let

5   everybody know we will be filing, your Honor.

6           THE COURT:  Okay, that is fine.

7           MR. FRAM:  Thank you.

8           THE COURT:  Okay.  We are still on direct.

9           MICHAEL DAY, resumes.

10          CONTINUED DIRECT EXAMINATION.

11          BY MR. PRESS:

12          (The jury enters the courtroom.)

13          THE COURT:  Good morning, everybody.  Once again my

14  apologies for the delay, but once again, I have been out here

15  since eight o'clock working with counsel, so it is not that

16  we were not doing anything.  I try to do things, legal

17  things, with the lawyers that won't eat into your time.  That

18  is why I do them early in the morning.  Every now and then we

19  slip a few minutes.  My apologies.

20          I do not like to waste jury time.  I think you

21  figured that out already.

22          Mr. Press, you may continue your direct examination

23  of Captain Day.

24  Q.  Captain Day, when we left off yesterday you had been

25  appointed merger committee chairman and you had, you

1   described how you tried to ramp up to speed.  What did you

2   learn as to the status of the negotiations when you took over

3   as chairman?

4   A.    There had been two proposals up to that point in time.

5   TWA pilot proposal.  And that one was essentially was date of

6   hire was five and the three year fences and restrictions.

7   And then the Allied Pilots Association's proposal was to take

8   approximately --

9   Q.    Let's break it up.  I am sorry to interrupt you.  The

10  TWA pilots proposal, was that something in writing that you

11  recall?

12  A.    I recall seeing something in writing.

13             I think the proposal initially --

14             MR. PRESS:  Can you put up 308, maybe it is joint

15  308.

16             THE COURT:  Is this joint 308 or P-308.

17             MR. PRESS:  I thought it was joint.

18             THE COURT:  Joint 308?

19             THE COURT:  There is no 308.  It is 309, is that Is

20  that J 309?

21             MR. PRESS:  Then it should be P-309.

22             MR. FRAM:  D 308 and 9.

23             THE COURT:  D.

24             MR. PRESS:  D 309.  Yes, that is absolutely

25  correct.

1                    THE COURT:  D 309 is not in evidence.

2                    MR. PRESS:  I thought it went in with Mr. Clarke.

3    Or D 308.

4                    MR. FRAM:  They are D exhibits.  We will stipulate

5    to them.

6                    THE COURT:  Which ones do you have?  Give me the

7    numbers you want in.

8                    MR. PRESS:  D 308, D 309.

9                    THE COURT:  Okay.  D 308 and D 309 are in evidence.

10                   THE COURT:  308 is ALPA proposed seniority list

11   integration.

12   Q.   Is that what you are looking at?

13   A.   Yes.

14   Q.   Describe for the jury generally what was proposed by the

15   TWA pilots on March first to the American pilots?

16   A.   My understanding was that this was essentially a date of

17   hire proposal.  And then there were some fences and

18   restrictions put in to protect the American pilots.

19   Q.   Such as?

20   A.   Five-year restriction off the triple seven, MD 11s, 3

21   year restrictions off the A 300.  That is the way I remember

22   it.

23                   THE COURT:  Those are plains TWA didn't fly?

24                   THE WITNESS: Yes, sir.

25                   THE COURT:  She they didn't want TWA pilots bumping

```
 1   American pilots on those aircraft.

 2              THE WITNESS:  Yes, sir, that's correct.  That is

 3   why apparently the merger committee proposed that restriction

 4   initially.

 5   Q.   So right up front in the process, the TWA merger

 6   committee was making concessions, or not concessions but not

 7   trying to grab their flying.

 8              MR. FRAM:  Your Honor, I object, that is leading.

 9              THE COURT:  I agree.  I sustain that objection.

10   Q.   Captain Day, describe if you will what this business

11   about restrictions is all about?

12   A.   American had approximately 350 captains qualified on the

13   Boeing triple seven.  And it was not the TWA pilots intent to

14   come in and displace any of these pilots off of it, even

15   though we had pilots --

16              THE COURT:  You say triple seven, is that the

17   Boeing 777.

18              THE WITNESS:  Yes, sir.

19   Q.   Which was a plane that TWA had or not?

20   A.   TWA did not have that airplane in its fleet.

21   Q.   Okay.

22   A.   So our intent would have been to assure the American

23   pilots that this was not a job grab, and that their pilots

24   would continue to fly this airplane for at least five years.

25   Q.   Let me stop you.  The proposal was date of hire with
```

1    these restrictions on certain aircraft and what not?

2    A.   Yes.

3    Q.   Captain Day, with your level of seniority at that time,

4    if you would have had straight date of hire without any

5    restrictions, would you have qualified to fly the triple

6    seven?

7    A.   I probably would have been a pretty senior captain on

8    it.

9           THE COURT:   Yeah, but you would have to be

10   qualified on that craft.  I mean you couldn't walk in the

11   first day.

12          THE WITNESS:  Absolutely.  Yes.

13          THE COURT:   You would have to go and get a

14   certification?

15   A.   Yes.

16          THE COURT:   That you could fly that.

17   A.   I that probably would have taken three or four months.

18   Q.   Was there ever a plane that you tried to be certified on

19   that you didn't for some reason or another?

20   A.   No.   Actually, I got certified twice on the 767.  TWA

21   sent me through it and then when we went over to American,

22   they insisted that we all go completely through their school

23   starting from scratch like we had never flown it, so I got

24   the opportunity to do it two times.

25   Q.   But assuming you got certified, your seniority with the

Day-direct/Press                                        13

```
 1   straight date of hire, you would have been able to out bid
 2   some American pilots on the triple seven?
 3   A.   Certainly.
 4   Q.   So the TWA pilot proposal did what as to that kind of
 5   thing?
 6   A.   Well, as far as date of hire, it would have put our
 7   pilots ahead of theirs.
 8   Q.   And so what accommodation --
 9   A.   They had super seniority is what it would amount to.
10   Q.   What accommodation was made to the American pilots right
11   up front?
12   A.   To protect their pilots for a period of five years on
13   that aircraft.
14   Q.   And you understand that the American negotiating
15   committee had made an initial proposal before you became
16   chairman?
17   A.   Yes.
18   Q.   What did you understand that proposal was all about?
19   A.   Well, they proposed to take approximately the top third,
20   I think it was 80023 of our pilots, and ratio them in, a
21   ratio of one TWA pilot to five American pilots, starting at
22   the bottom of their list, somewheres around the number
23   11,000, and ratioing upwards, and taking the remaining
24   1,50025 -- two thirds, and placing them on the bottom of the
25   seniority list.
```

1    Q.    That was their initial proposal?

2    A.    Yes.

3    Q.    To integrate how many TWA pilots?

4    A.    Well, we had approximately 2,300 pilots.

5    Q.    Staple how many?

6    A.    About 1,500.

7    Q.    Then the other 800 or so would be integrated on what

8    basis, again?

9    A.    They would be integrated on the basis of one TWA for

10   five American, starting at the bottom of the list and working

11   up which would have put our senior captain, Captain Upp, who

12   had been hired in 1963, about, somewhere in the 7000's,

13   paired up with pilots ahead, even, that hadn't even been born

14   yet.

15   Q.    You would have been in that group personally?

16   A.    I would, I was actually about 150 behind him, behind

17   Captain Upp on our group.  So I would have been at least

18   another 750 behind that.

19   Q.    Do you recall what response the TWA merger committee

20   made to this initially proposal by the American pilots,

21   Captain Day?

22   A.    Well, all the proposals, as I understood it coming in,

23   had been rejected.

24   Q.    Okay.  Did you understand the basis for the American

25   negotiators proposal?

1    A.    Yes.

2    Q.    Okay.  What was that?

3    A.    Well, first of all they were very concerned about the

4    top third of our seniority list.  It was very senior, date of

5    hire wise, compared to their list.  And they felt that the

6    only protected jobs would be sustainable captain jobs.  They

7    felt that a 767 first officer position at American was new

8    hire position, so that all of these pilots should go on the

9    bottom of their list.  But that wasn't just on the bottom of

10   the list, that was on the bottom of pilots that were

11   continuing to be hired as we were negotiating.

12   Q.    All right.  Now, their opener was to staple two thirds

13   approximately to the pilot seniority list, right?

14   A.    Yes.

15   Q.    But the Judge, Judge Irenas, yesterday, asked you if the

16   APA, or the American pilots had the right to staple all of

17   you, and you I think, what was your response to the Judge?

18   A.    Well, I didn't argue with the Judge.  And I agreed that,

19   with him.

20   Q.    And what was the basis for your belief in that?

21   A.    Well, what we had been continually told by the APA that

22   their green book required all pilots to be put on the bottom

23   of of their list.

24         THE COURT:  The green book, is the collective

25   bargaining agreement.

1            THE WITNESS:  Their collective bargaining

2    agreement.

3    A.   And that because that basically was what they kept

4    pushing.

5    Q.   So this notion that there could be 100 percent staple,

6    that was something the American negotiators said?

7    A.   Continuously.

8    Q.   Since court yesterday, have you looked at this green

9    book, the scope section of it?

10   A.   I did go back and review it.

11   Q.   Okay.  And it has been marked as an exhibit, that was

12   P-255.  If we can have that, please.

13           THE COURT:  P-255 is already in evidence?

14           MR. PRESS:  It is, yes.

15   Q.   Is this what you looked at, Captain Day?

16   A.   Yes.

17   Q.   If you go to beige 14 of this exhibit, you see the

18   section that has been highlighted called successorship?

19   A.   I do.

20   Q.   Now, can you describe for the jury what, how you

21   interpret the contract language on how the seniority list

22   would be merged in the context that you found yourself in.

23           MR. FRAM:  I object, your Honor.  I don't see that

24   there is any foundation that the witness knew about these

25   provisions at the time.  He has testified about what

1    Americans position was.  And there is no indication he

2    disagreed with Americans position.  I really think this is

3    leading in terms of trying to get him to change testimony he

4    has already given.

5              THE COURT:  I am going to allow it.  Go ahead.  Go

6    ahead.

7    Q.   Captain Day, what does this contract say about how the

8    list would be merged?

9    A.   Well --

10   Q.   First of all, tell the jury what provision you are, you

11   want them to focus on?

12   A.   I am looking at section I there, successorship.  We are

13   talking about seniority list merger which is Section 2 behind

14   it.  It talks first, if the successorship is an affiliate of

15   the air carrier, which it is not.  If it were it would have

16   been essentially go under, as the Judge pointed out

17   yesterday, arbitration.

18             But then we get to the end where it says the

19   requirement of this provision does not apply to the company's

20   acquisition of all or part of another air carrier in a

21   transaction which includes the acquisition of aircraft and

22   pilots, and that would be this specific transaction.

23   Q.   Is there anywhere in there that says there has to be 100

24   percent staple, that you read?

25   A.   No.

1    Q.    And that, we see that wasn't there, even their opening

2    position, right?

3             MR. FRAM:   I object, this is leading.

4             THE COURT:   Yeah, I sustain that objection.

5    Q.    Going forward, what was, you have taken over now as

6    chairman, got yourself up to speed, going forward, what was

7    the merger committee's goal as to how to resolve the

8    difference there, between your proposal and theirs?

9    A.    Well, at the time Professor Tanen had been engaged, and

10   was attempting to create a seniority list based on scientific

11   principals.

12   Q.    Let me back up.  Who is Professor Tanen and who hired

13   him?

14   A.    Roland Wilder hired Professor Tanen.

15             He was an eco -- - econmologist at Colgate

16   University.

17   Q.    What was he tasked to do, what was he hired to do?

18   A.    He was to take the two seniority lists and merge them

19   based on career expectations.

20   Q.    This notion of career expectations, where did that come

21   up, how did that arise?

22   A.    This was what the American pilots kept telling us that

23   not a single American pilots career expectations were to be

24   disturbed.

25             And Professor Tanen had successfully used this with

 1   Roland Wilder in a previous merger, that was an ALPA to ALPA

 2   merger.

 3   Q.   All right.  And so what was he going to do to try to

 4   appear piece the American pilots concerns about career

 5   expectations (a peace?

 6   A.   Rather using arbitrary dates of hire or ratios, he was

 7   going to attempt to look at what a pilots next career

 8   progression would be, and base that on where the pilots

 9   should be merged together, on what term, the running mate

10   concept.

11   Q.   That is complex.  Can you simplify that for us?

12   A.   Yes.  He took the pilots and he tried to break them down

13   into groups.  First of all, he saw that TWA didn't have any,

14   what we term large wide bodies.  This was a the Boeing 777,

15   and the MD 11.  And the pilots that were flying those were to

16   be protected.  We had no no expectations of flying those

17   aircraft.

18          However, those 345 pilots, as I said, that actually

19   that flew them, you couldn't just protect the first 345

20   numbers bus it went down through their seniority list.  It

21   went way down through their seniority list.  So he determined

22   that a reasonable place to break it off would be where the 95

23   percent pilot was, because after that these other pilots were

24   flying in the issue, and the ratios really didn't match up.

25   He called them outliars.

1          So from that point, the top of their seniority list

2     down to that point, there was no TWA pilots to be permitted

3     in there.  But the next group is what we call the small wide

4     bodies, that was the 767,  757, which both companies had, and

5     the A 300 which American had but was approximately the same

6     size as the 767.  So he then took those pilots and made that

7     a group, and would merge them together.  And that was

8     basically merged together using a ratio.

9          When he went down to the next group was the

10    remaining, and these were the captains, when he went down to

11    the next group of captains those were the captains flying the

12    narrow body aircraft.  These would be like your MD 80s, and

13    that type of thing.  And he felt that their next logical

14    progression was to move up to the next bigger airplane which

15    paid more.  So he would determine with his computer model

16    when that would be, and that is how he merged that group

17    together.

18    Q.   Okay.

19    A.   And he did the same thing with the first officers whose

20    next logical progression was to move up to captain and he

21    determined when that was going to be.

22    Q.   Now, Professor Tanen, is that somebody you worked with

23    personally?

24    A.   Yes.

25    Q.   Captain Day, do you know when he was retained?

1    A.    No. I don't know the exact date but it was somewhere

2    within that timeframe.

3    Q.    In early --

4              THE COURT:  In what timeframe.

5              THE WITNESS:  The timeframe when I came aboard

6    because I remember --

7              THE COURT:  You came aboard in March.

8              THE WITNESS:  Yes yes, sir, I came aboard I think

9    March 8 is when I came aboard, so at that point I knew Roland

10   had been talking to him.  I don't know whether he had been

11   officially hired or not.

12             THE COURT:  But within last and month TWA pilots,

13   the TWA MEC waived its scope rights.

14             THE WITNESS:  Yes, sir.

15             THE COURT:  April 2, I think.

16             THE WITNESS:  Yes, sir.

17             THE COURT:  That changed the negotiating posture,

18   though, didn't it.

19             THE WITNESS:  Judge, unfortunately, it did.

20             THE COURT:  I mean, unfortunate depending on who

21   you are looking at it.

22             THE WITNESS:  That is true.

23             THE COURT:  But as of April 2, the TWA pilots

24   themselves, the MEC, the TWA MEC.

25   A.    MEC, yes.

```
 1              THE COURT:  I am sorry.  The MEC, voluntarily, at

 2    least according to the testimony I have heard, voluntarily

 3    waived their scope rights.

 4              THE WITNESS:  Yes, sir.  We still had to meet and

 5    try to come up --

 6              THE COURT:  That doesn't mean there still wasn't

 7    negotiation going on for, the ratio and all, but it changes

 8    the playing field.

 9    A.   Yes, sir, I was made painfully aware of that.

10              THE COURT:  Okay.

11    Q.   Well, you have got this Professor Tanen working.  Was

12    there a time table for him to complete his work?  What did

13    you expect about that?

14    A.   Well, he told us it was going to take at least another

15    one to two months.  It was a complex process that had to be

16    run through the computer numerous times.

17    Q.   So what was your intent as far as negotiating with the

18    American committee?  Wait for Professor Tanen's proposal or

19    just go ahead on your own?

20    A.   No, we had to keep meeting with him.  However, we wanted

21    to keep our proposals where it was, it would be something, at

22    least as good as what Professor Tanen was going to ultimately

23    come up with, whatever that was going to be.

24    Q.   When was the first time, Captain Day, that you had an

25    actual negotiation session with the American committee?
```

1    A.    That was March 27 in Dallas.

2    Q.    Okay all right.  Tell the jury what happened on that,

3    and first of all, was that just one day or was that a several

4    day meeting?

5    A.    That was scheduled for four days of meetings in Dallas.

6    Q.    And tell us what happened on the first day?

7    A.    Well, the first day I was informed by Ed White.

8    Q.    Who was?

9    A.    Chairman of their committee, that A, there was going to

10   be no arbitration,  B, there was going to be no date of hire,

11   and C, that they were only interested in sustainable captain

12   jobs, which I just explained their theory on the first

13   officer positions.

14          So we met for a complete day and I tried to

15   understand what their concerns were, and we came in the

16   second day with a proposal based on what we thought their

17   concerns were up to that point in time.

18   Q.    The second day would be March 28, right?

19   A.    That's correct.

20   Q.    There was a proposal made.  Do you remember generally

21   what was proposed?

22   A.    Yes.

23   Q.    There is a document in evidence but if you don't need to

24   look at it, just tell us?

25   A.    I can explain.  We took this number that they had, 823,

```
 1    and used that number.  I think we used maybe 826, somewhere

 2    in the 820s.

 3    Q.    Remind us what that number signified?

 4    A.    That was the top third of our group and we knew that

 5    that was a concern of concern of theirs.  So now we came in

 6    and we started that number down below 400 number, and we

 7    started ratioing down at one to five.  In other words, we

 8    were using what they started with, the bottom of the list but

 9    we were starting closer to the top of their list and we

10    ratioed down until we reached a point where the dates of hire

11    were the same.

12            And then we proposed merging by date of hire from

13    that point on.  And we extended the fences, the protections

14    for them on their pilots.

15    Q.    And why did you do, make those moves?

16    A.    Well, we were trying to compromise and alleviate their

17    concerns.

18    Q.    How did they respond, that that was on March 28.  How

19    did the American negotiators respond?

20    A.    Well, they did not accept it, but they listened to it

21    and expressed their concerns and so on.  So we expected to

22    resume the next day and, with the hope that they would have a

23    counter proposal back to us.

24    Q.    All right.  When the negotiating session on March 28

25    ended where did you go?
```

```
 1   A.   Well, we were staying at the same hotel, so we

 2   essentially went back to our conference room and met there.

 3   Q.   And who was there when you got there?

 4   A.   Well, Roland Wilder had come with us, but when we got

 5   back this time we had three of national ALPA's advisors.

 6   Q.   And specifically who were they?

 7   A.   Had flown in.  It would have been Bob Christy, clay

 8   Warner, and Bill Roberts.

 9   Q.   Who had invited those three gentlemen to your meeting?

10   A.   I don't know.

11   Q.   Did you?

12   A.   No.  I know Roland hadn't, so we thought it was great

13   they were coming because now we knew we were going to get a

14   good dinner.

15   Q.   So what happened?

16            THE COURT:  Did you get a good dinner?

17            THE WITNESS:  We got a wonderful dinner, your

18   Honor.  ALPA National does very well on the dinners.  And I

19   picked out one of the more expensive restaurants and we all

20   went out to dinner and I thought maybe they were coming to

21   pump us up.

22            MR. FRAM:  Your Honor, I object to the witnesses

23   impressions and thoughts.  Can we just get the facts?

24            THE COURT:  I agree.  Just stick to the facts.

25   Q.   Captain Day, do you understand the judge's instructions?
```

Day-direct/Press                                              26

1    A.    I believe so.

2    Q.    Continue with what happened to the dinner meeting that

3    is significant to why we are here today?

4    A.    The significant part was we were told, we had to get a

5    deal done.  We had to get it done now.

6    Q.    Who told you that?

7    A.    I can't recall which of the three or all three of them

8    said it.

9    Q.    All right.

10   Q.    But we were told, it had to be done because there was a

11   potential 1113 hearing on the horizon.  And in order to get a

12   deal we would have to staple at least 800 pilots?

13   Q.    All right?

14             THE COURT:  Who told you that?

15   A.    I don't remember which of advisors, but one of the three

16   advisors did.

17   Q.    This notion of having to offer up 800 pilots to a

18   staple, was that the first time you had ever heard anything

19   like that?

20   A.    Well, that was the first time we had addressed it.

21   Q.    All right.

22   A.    Nobody from National ALPA had told us we were going to

23   have to do that.

24   Q.    Did any one of those ALPA representatives tell you why

25   they believed you needed to take that position?

1    A.    Well, they told us that the 1113 was looming, and if the

2    1113 motion was successful, that we would be working without

3    a CBA.

4              THE COURT:   Collective bargaining agreement.

5              THE WITNESS:   Collective bargaining agreement.

6    Q.    And so?

7    A.    And so we had to get the deal done.   It was being

8    impressed upon us to get the deal done, and we went back to

9    the hotel and we had a huge argument among the committee, and

10   advisors.

11   Q.    Describe the argument, how that went?

12   A.    Well, especially the junior portion of the committee was

13   outraged.   And I felt it was too early to offer to staple

14   anybody.

15             We didn't know where Professor Tanen's proposal was

16   going to be at this point in time.   We actually called

17   Professor Tanen to see if he could give us some guidance.   He

18   gave us some general numbers, about where he thought he was

19   at, but nothing exact.

20             THE COURT:   What date is this now, the 28 of March?

21             THE WITNESS:   This was the evening of the 28th of

22   March.

23             THE COURT:   The 28th.

24             THE WITNESS:   Yes, sir.

25             THE COURT:   Did you know that the 1113 was

1    scheduled for April?  To be heard.

2         THE WITNESS:  I didn't know the exact date, but I

3    knew there was a potential.

4         THE COURT:  There was a hard date looming, you knew

5    that?

6    A.   Not really, your Honor.

7         THE COURT:  Oh, you didn't know.  All right.

8    Q.   How did the evening progress as far as ALPA telling you

9    you had to offer up 800?

10   A.   Well, I finallly had to make a decision.  And what I

11   did was I compromised.  And decided we would offer a staple

12   of 400 and something.

13   Q.   Why did you do that?

14   A.   I felt pressured.  I felt pressured.

15        THE COURT:  Felt they they had, they had knowledge

16   that I didn't have.  We knew Jeff Brundage was their vice

17   president of labor relations, he had been a former ALPA

18   employee.  I presumed they were still communicating.  And it

19   wasn't something I wanted to do, it was something I

20   regretted, but I felt we had to do it based on what I was

21   being told.

22   Q.   And the next morning you resumed the meeting with the

23   American pilot negotiators?

24   A.   We did.

25   Q.   And what did you do?

1   A.   We negotiated against ourselves, is what we did.  We

2   came in and gave them another proposal.

3   Q.   Had they responded to the properly you made the day

4   before?

5   A.   No. No.

6        We felt if we came in and made another proposal we

7   still had two days left and we could hopefully get this deal

8   done.  I was putting the feeler out there that we were

9   willing to compromise on this.  It was the first time we had

10  agreed on any staple.  I wasn't even sure that I even had the

11  authority to do this, and so I went out on a limb, and the

12  proposal that we made was as close to what we thought

13  Professor Tanen was going to be providing us, yet give a

14  little bit of wiggle room.  His was outside of that.

15  Q.   And the proposal was what?  What proposal did you make?

16  A.   Well, first of all we proposed the 430 something pilots

17  be put on the bottom of the list.

18  Q.   Approximately half of what the ALPA advisors told you

19  the night before to do?

20  A.   Yes.

21  Q.   What did you think about that notion when you made that

22  proposal, Captain Day?

23  A.   I thought that it was going to weaken our position

24  considerably, and.

25  Q.   Why?  Why did you think that?

1   A.   It would show a sign of weakness, offering that type of

2   a staple that early into the game.  We suspected that there

3   was going to be some position that even Professor Tanen's

4   analysis was going to show that certain TWA pilots belonged

5   on on the bottom of the list but it was going to have a

6   basis, not just an arbitrary number pulled out and do this.

7   Soy I really wanted something concrete that I could use

8   rather than that.

9   Q.   You mentioned in response to a previous question that

10  this was something you regretted doing?

11  A.   I regretted it.  I have regretted it for ten years.

12  Q.   Why?

13  A.   Because it was the wrong thing to do.  And I made the

14  decision.

15  Q.   So, but that proposal was made, right?

16  A.   The proposal was made.

17  Q.   This is March 29, right?

18  A.   March 29, Gary Flor was one of our members of the

19  committee and he made a very elegant proposal.  I think they

20  understood it.  I expected some discussion on it.  There was

21  very little discussion.

22          In fact, that is when we were informed that, thank

23  you, we will take your proposal, and oh, by the way, we are

24  going to have to leave today and cut the meeting today and we

25  are canceling tomorrow because we have to go meet with the

```
 1   U.S. Air pilots.

 2   Q.   Did they tell you why they had to meet with U.S. Air

 3   pilots, what was that all about?

 4   A.   American was talking to U.S. Air about purchasing

 5   airplanes and taking pilots.

 6   Q.   From U.S. Airways?

 7   A.   From U.S. Air.

 8   Q.   And so?

 9   A.   So it was urgent that they went and started discussions

10   with U.S. Air pilot group.

11             THE COURT:  Was that an ALPA group?

12             THE WITNESS:  It was another ALPA group.

13             THE COURT:  That would have been ALPA to ALPA?

14   A.   No, still would have been American which was nonALPA.

15             THE COURT:  Oh, it was American, so the same thing.

16   A.   It would have, it would have made some interesting

17   scenarios had they come up with a different --

18             THE COURT:  Did it ever happen.

19             THE WITNESS:  No, sir, it didn't.

20   Q.   Do you have an understanding of what was being offered

21   to the U.S. Air pilots as far as seniority?

22             MR. FRAM:  I object.  He has no personal knowledge.

23   He will never have that.

24             THE COURT:  I will sustain the objection unless you

25   can establish that, and on relevance grounds as well.
```

1    Q.   From what the ALPA advisors had told you -- by the way,

2    did the ALPA advisors accompany you to the follow-up meeting

3    on the March 29, when you offered up 400 pilots to be

4    stapled?

5    A.   No.   The APA had a rule, their own rule, they didn't

6    want any advisors or attorneys in the room.

7    Q.   All right.

8    Q.   When you made that proposal what was your expectation

9    from what you learned from the ALPA advisors as to how the

10   negotiations would proceed from there?

11   A.   I expected a counter proposal at that point in time, so

12   we would --

13   Q.   Why did you expect that?

14   A.   Because they stressed the urgency of doing this.

15   Q.   They being who?

16   A.   National ALPA advisors.

17   Q.   And what happened?

18   A.   We went home early.   And I had to decide how I was going

19   to try to explain this to MEC that was not going to be happy

20   to hear it.

21   Q.   Why was there trepidation about doing that?

22   A.   The MEC really had never given me any guidelines, but I

23   knew they did not expect to start on a staple at this point

24   in time.

25   Q.   And so?

1    A.    And so they were not happy.  Unfortunately they didn't

2    fire me.

3    Q.    April 2nd the Judge mentioned was the MEC meeting where

4    the MEC voted to waive scope.  Were you present in St. Louis

5    for that meeting or in the office that day, any way?

6    A.    I was in the office meeting with my committee and with

7    Roland Wilder.  I wasn't part of the MEC proceedings.

8    Q.    You left Dallas with the American negotiating team on

9    March 29.  Is that right?

10   A.    Yes.

11   Q.    And then the MEC meeting is on April 2, that is four

12   days.  Did you have any conversations with any ALPA advisors

13   in that intervening time period?

14   A.    I spoke with Randy Babbitt.

15   Q.    Remind us who Randy Babbitt is or was?

16   A.    Randy Babbitt is currently the FAA administrator, the

17   highest post on there, but Randy Babbitt had previously been

18   the president of ALPA before Duane Woerth.

19   Q.    Why did you reach out to him?

20   A.    That was the first time I learned that Randy was a

21   resource that we had, that hired -- he was in a consulting

22   firm at this time, I he had his own consulting firm.  So I

23   was told I could utilize him as a resource.  So I left a call

24   in for him, and I remember his, when he, not the exact date

25   but that approximate timeframe, I member I was driving across

1    the Everglades and my cell phone went off, which I was

2    surprised I got service.  And it was Randy Babbitt, and I

3    explained why we were at on this and I explained my concerns

4    on this whole 1113 notion, and waiver of scope and the

5    position of APA pilots at the time, and that I felt I needed

6    to, I needed leverage.  I needed more support.

7    Q.   And what did he say?

8    A.   Well, he said I just spoke with Duane Woerth, and Duane

9    informed me, quote, that once these bankruptcy proceedings

10   are over, the gloves are coming off.  I remember that phrase.

11   Q.   Was he specific in any way as to what that meant?

12   A.   No.

13   Q.   How did you react to that?

14   A.   Well, I reacted quite favorably.  It was something

15   positive.  For once I could tell my committee that Duane

16   Woerth was going to take the gloves off, and I felt that was

17   a good thing.

18   Q.   Okay.  Now, getting into American April 2, you were in

19   second lose.  The MEC meets in its own spot, right?

20   A.   Yes.  And I was attempting to stay out of that room.

21   Q.   Okay.  There has been some description of the office

22   space.  Did you attend any portion of the actual MEC meeting

23   that day?

24   A.   I don't remember.  You know, I may have poked my head in

25   occasionally, but I tried to avoid it.

```
 1   Q.   So why were you there?

 2   A.   I was there meeting with my committee, formulating

 3   strategy and with Roland Wilder.

 4   Q.   Now --

 5            THE COURT:  Was Roland Wilder going back and forth

 6   between where you were and where the MEC was?

 7   A.   I didn't know it at the time, but Roland did leave, and

 8   I went in search of him.  And I looked, and I thought maybe

 9   that is where he would have been.  He wasn't at that time but

10   I am sure he was being asked questions by the MEC.

11   Q.   Now, you mentioned you went to go look for Roland.  Why

12   was that?

13   A.   Well, we had questions for him.  He had been gone for a

14   little bit.

15   Q.   Where did you find him?

16   A.   I found him in the library.

17   Q.   Okay.  Who did you find with him?

18   A.   About four or five ALPA advisors.

19   Q.   What did you observe?

20   A.   I observed Roland on one side of the table, and the five

21   advisors on the other side of the table.

22   Q.   And what was being discussed?

23            MR. FRAM:  Your Honor, could we know who advisors

24   allegedly were?

25            THE COURT:  Yes.  Who were these advisors?
```

1    Q.   Can you describe who, or tell us who they were?

2    A.   It would have been Bob Christy, it would have been Clay

3    Warner, I think Steve Tumblin might have been there.  And I

4    don't recall the names of the other two.

5    Q.   All right.  But you recall specifically Mr. Christy and

6    Mr. Warner?

7    A.   Yes.

8    Q.   All right.  And what did you hear those gentlemen

9    discussion discussing with Mr. Wilder?

10            THE COURT:  First of all, did you hear them

11   discussing with Mr. Wilder?

12   A.   Yes, Judge, I did.

13            THE COURT:  Okay.

14   A.   I walked in to the room.  I saw Roland in the corner and

15   I decided I was going to to make myself at home.

16            I got glares, but I sat down and what was happening

17   was I felt they were beating up on Roland.  What they were

18   doing was they were, they were attempting to say --.

19            MR. FRAM:  I object to his characterization.  Can

20   we please have the facts and not his impressions or

21   interpretations?

22            MR. PRESS:  He was just getting ready to say what

23   they were doing.

24            THE COURT:  Yeah, to some extent I will sustain the

25   objection.  I want to know what was being said, not your

1    impression of what they were doing.

2    A.    The discussion was focused on the MEC's discussion of

3    the waiver of scope.  Roland was the only one of advisors who

4    was advising it not be done.

5              THE COURT:  That scope not be waived?

6              THE WITNESS:  That scope not be waived.

7    A.    The other advisors were attempting to persuade Roland to

8    change his position.

9              THE COURT:  What ammunition were they attempting to

10   use to do that persuasion?  If you know.

11   A.    The 1113 argument.  That was the primary one.

12             If the 1113 motion was granted, that the collective

13   bargaining agreement was going to be taken apart and we

14   didn't want to be in that position.

15   Q.    How was Mr. Wilder responding to all of this?

16   A.    Well, he was arguing against it.  Roland was our

17   attorney.  He was representing the merger committee.

18             THE COURT:  And the MEC, too.

19             THE WITNESS:  To some extent, Judge.  I always

20   looked at him as the merger committees attorney but obviously

21   the MEC and the merger committee were normally on the same

22   wavelength.

23   Q.    And these ALPA advisors persuasion over Roland Wilder,

24   what tone and volume were they using to persuade?

25   A.    They were loud.

1    Q.   All right.

2    A.   These were all advisors or attorneys.

3    Q.   How did you react to seeing this?

4    A.   I was pretty upset.

5    Q.   Why?

6    A.   Well, I felt they were beating up on our attorney, and

7    he was representing our interest, and they were attempting to

8    do something that was going to make my job impossible.

9    Q.   The scope waiver was made, right.  You were not part of

10   that decision?

11   A.   No.

12   Q.   All right.  And the scope waiver in particular, what did

13   that do?  What was your understanding?  What happened -- what

14   is the right word -- what did the TWA pilots give up in the

15   scope waiver?

16   A.   Arbitration.  A neutral being able to make a decision on

17   how the two pilot lists were to be integrated.

18   Q.   A process?

19   A.   A process.

20   Q.   And what was replaced, if anything, by the process in

21   your collective bargaining agreement?

22          THE COURT:  Your meaning ALPA?

23   Q.   The ALPA -- yes, sir, what did ALPA replace of the

24   arbitration waiver, as far as any process?

25   A.   Mediation.

1    Q.    And there has been some testimony about this reasonable

2    best efforts letter that American and TWA signed.  We don't

3    need to get it out, but you say mediation was the process you

4    got.

5              Can you be descriptive and in context with that

6    letter?

7    A.    They called it facilitation.

8    Q.    All right.

9    A.    That American would use its reasonably best efforts to

10   have a facilitation process.

11   Q.    Which meant what?

12   A.    Which meant they would have a mediator who would have no

13   power to do anything except try to help us come to a

14   decision.

15   Q.    How does having a mediator with no power compare to an

16   arbitration?

17   A.    There is no comparison.  A good mediator could help, but

18   unless both groups are willing to give and take, mediator is

19   not going to be able to do a thing.

20   Q.    And that was the trade-off that ALPA agreed to, right?

21   A.    Yes.

22   Q.    Are you familiar with ALPA's merger policy, a written

23   merger policy?

24   A.    Somewhat, yes.

25   Q.    I would like to show you exhibit P 20.  If you can call

 1    that up.

 2              THE COURT:  That is in evidence already?

 3              MR. PRESS:  It is, Judge.  It says on the cover,

 4    merger and fragmentation policy, right.

 5    A.    Yes.

 6    Q.    This is something you are familiar with?

 7    A.    Yes.

 8    Q.    Is there a section in there that, first of all, what is

 9    the subject matter of this policy?

10    A.    Well, this is supposed to provide a process for any time

11    there is mergers.

12    Q.    A process for what?

13    A.    For integrating the two pilot groups.

14    Q.    All right.  Can you be more descriptive of what this

15    policy is all about?  This is ALPA's policy, right?

16    A.    This is ALPA's policy, so it would only be binding on

17    both groups if both were ALPA carriers.

18    Q.    And what is the thrust of, what process is laid out in

19    that policy?

20    A.    It gives various time tables, but the ultimate thrust of

21    it is the if the two groups cannot agree there will be

22    arbitration.

23    Q.    And is there anything in this policy that talks about if

24    the merger is between an ALPA airline and a nonALPA airline,

25    is there anything in there about that?

1    A.    There is.

2    Q.    Okay.  I want to show that to you, at least what I think

3    it is.  Page 15.  At the bottom there is a paragraph E.  Are

4    you there, Captain Day?

5    A.    I am.

6    Q.    Can you read, first of all, what is the subject of that?

7    A.    Paragraph E is nonALPA or unorganized airlines.

8    Q.    All right.  What does it say there that ALPA's policy

9    is?

10   A.    When the circumstances surrounding a merger preclude

11   adherence to ALPA merger policy, in other words, when a non-

12   ALPA or unorganized pilot group is involved, reasonable steps

13   shall be taken by the president to seek acceptance of a

14   procedure that will enable the parties to proceed to a fair

15   and equitable resolution in a timely and expeditious manner.

16        THE COURT:  That is apple pie and motherhood, isn't

17   it?

18   A.    That would be pretty accurate, sir.

19   Q.    And Chevrolet.

20        THE COURT:  I will accept that.

21   Q.    Captain Day, this is ALPA's principle policy, what the

22   president is supposed to do in a situation that was

23   comparable to the one you were facing?

24        MR. FRAM:  Your Honor, that is leading.  I object.

25        THE COURT:  Yeah, I sustain the objection.

```
 1    Q.    How does this policy apply to the situation you found

 2    yourself in?

 3    A.    It is directly applicable.

 4    Q.    Again, what is the president supposed to do?

 5          MR. FRAM:  I object.  The document speaks for

 6    itself, and he just read it.

 7          THE COURT:  I will allow him did try to answer the

 8    question.

 9    A.    Well, I understood --

10          THE COURT:  What did you understand the president

11    was supposed to do.

12    A.    I understood the president was supposed to step up to

13    the plate, your Honor.

14          THE COURT:  And do what.

15          THE WITNESS:  And use whatever power he has got to

16    come up with a process that will work.

17    Q.    And up to this point of the scope waiver where you got

18    this facilitator agreement, what, did you see yourself

19    personally or hear yourself personally, the president do

20    anything to seek acceptance of a fair procedure?

21    A.    I didn't, no.

22    Q.    Have you become aware after that date, in anything you

23    have read or heard, that any steps were taken along those

24    lines by the president?

25    A.    No.
```

1    Q.   Now, moving past April 2, do you recall getting a

2    response to the proposal you had made in late March in Dallas

3    with the American negotiating team?

4    A.   Ultimately they responded?

5    A.   They did.

6    Q.   Okay.  Do you remember about when that was?

7    A.   That was in early April.  And it was, they did not

8    accept our proposal.

9    Q.   Did you get a letter from them?

10   A.   We did.

11   Q.   Okay.  Is exhibit P-309 in evidence?

12           THE COURT:  Yes.

13           MR. PRESS:  Thank you.

14           THE COURT:  I just put it in evidence by consent.

15           MR. PRESS:  It is a joint exhibit.

16           THE COURT:  It is a P exhibit.  P-308 and exhibit.

17           MR. FRAM:  You put in D 308 and 9.

18           THE COURT:  Oh, that's right.  D 308 and D 309 are

19   the ones in evidence.

20           MR. FRAM:  Your Honor, there is no objection to J

21   309 going in I have.

22           THE COURT:  J 309 is a new one.

23           MR. FRAM:  Yes.

24           THE COURT:  J 309 in evidence.

25           MR. PRESS:  Too many prefixes.

1            THE COURT:  309 in evidence.

2    Q.   What is Exhibit 309?

3    A.   Well, Ed whites response back to our proposal, and a

4    counter proposal.

5    Q.   The letter is addressed to you, right?

6    A.   Yes.

7    Q.   Without getting in all the minutia of this letter

8    because it is several pages long, what was the thrust of what

9    Ed White was proposing?

10   A.   Well, they had come off their original position of the

11   823 pilots that they were going to ratio in.  And they had

12   come up about 58 pilots.

13   Q.   So what would that do to the staple point?

14   A.   Move the staple point by 58 members.

15   Q.   Let's say what, 14 50, rounded?

16   A.   Approximately.

17   Q.   So they had improved, after the scope waiver, they had

18   improved their offer by 58 pilots?

19   A.   Yes.  And they also picked a point and were ratioing

20   down now but the practical effect was it was not much further

21   than where we were going the opposite direction.  So it was a

22   difference in concept of ratioing downward.

23           THE COURT:  When you are ratioing downward the key

24   is where the highest-ranking TWA pilot enters the system, you

25   are going go down from there.  If he goes in at number 1,

```
1    everybody is up high.  If he goes in at 3,000, and ratioing

2    down ultimately depends on where the top person slots in.

3              THE WITNESS:  Yes.  That was exactly what happened

4    here.  And I don't know, it moved up maybe four or 500

5    numbers.

6              THE COURT:  Where would the top TWA pilot be

7    slotted in?

8    A.   Around 7,000.

9              THE COURT:  And down from there.

10             THE WITNESS:  And it went down from there.  So it

11   was two thirds of the way down their list.

12   Q.   Okay.  I want to show you -- well, how did you respond?

13   Did you respond to this proposal that we see up here, April

14   18?

15   A.   Well, we didn't accept it.

16   Q.   Did you write Captain White a letter?

17   A.   I did.

18   Q.   Okay.  Let me hand you up what is marked exhibit 310.

19             THE COURT:  No objection.

20             MR. FRAM:  No objection, your Honor.

21             THE COURT:  Okay.  310 in evidence.

22             MR. PRESS:  Your Honor, here are copies of J 309

23   and 10.

24             THE COURT:  Thank you.

25   Q.   What is exhibit 310, Captain Day?
```

```
 1            THE WITNESS:  That is my response back to Ed White.
 2    Q.   And again, without getting into all the details of the
 3    letter, what is the thrust of what you are telling him?
 4    A.   Well, I told him I was disappointed and that this wasn't
 5    just about pilots, this was about what TWA was bringing to
 6    this acquisition.
 7    Q.   And?
 8    A.   And that was 178 additional airplanes, loyal customer
 9    base, we had a midwest hub, St. Louis, many hubs, numerous
10    gates, slots, international route authorities.  That is
11    pretty much the gist of it.
12    Q.   In your letter did you make a counter proposal?
13    A.   Not a counter proposal, but we said we, you know, agreed
14    with the basic objectives.
15    Q.   What did you see in your letter about -- well, if you go
16    to the second page, it talks about what is going to happen at
17    our next meeting, do you see that?  This is the middle
18    paragraph?
19    A.   Well, what I did was tell him we were working on a
20    counter proposal that was going to attempt to address their
21    concerns.  Preserving the legitimate expectations of TWA
22    pilots and career expectations of AA pilots.
23    Q.   Okay.  And you say in that second sentence what, each
24    pilot?
25    A.   Each pilot on the consolidated post merger seniority
```

1   list will occupy his rightful place, that is the seniority

2   position in relation to his peers that will assure

3   realization of his career progression without harming the

4   expectations of others.

5   Q.   All right.  And is this a reference to the work that

6   Professor Tanen was still undertaking?

7   A.   Yes, it was.

8   Q.   So what was your expectation going forward as far as the

9   process?

10  A.   Well, I wasn't excited about the process.

11  Q.   I guess I asked a bad question, Captain Day.  As far as

12  this Tanen proposal, when did you expect you would unleash

13  that, or propose that to the other side?

14  A.   It was probably at least another month away.

15  Q.   Okay.  And was it your intent to make any proposals

16  before Tanen, Professor Tanen, was finished with his work?

17  A.   We hoped not to.

18  Q.   Okay.  Now, I want to, we saw Captain White's letter to

19  you, April 18 letter, where he dropped the staple, 50 pilots,

20  right?

21  A.   58.

22  Q.   Shortly after that do you remember attending an MEC

23  meeting in St. Louis in which Duane Woerth was present?

24  A.   Yes.

25  Q.   Do you remember when that was specifically?

1    A.    Mid April.

2    Q.    Now, this meeting, Captain Day, when did the actual

3    meeting start, the MEC meeting?

4    A.    I recall it starting in the afternoon.

5    Q.    All right.  And before the meeting, what did you do?

6    A.    We all went out to lunch together.

7    Q.    When you say we, who is the we?

8    A.    Well, the entire MEC and the merger committee and Duane

9    Woerth.

10   Q.    Okay.

11   A.    We went to the 94th air squadron and I made sure that I

12   was going to have the opportunity to sit next to Duane so

13   that I could discuss my concerns with him.

14   Q.    And did you?

15   A.    I did.

16   Q.    What did you discuss, what did you tell him and what did

17   he tell you?

18   A.    Well, I explained where we were at.  I explained the

19   position that we now found ourselves in.  We waived scope,

20   and I didn't feel we had a meaningful process agreement and

21   and I needed ALPA National to help create some leverage.  I

22   was goes go into the meetings without anything to bargain

23   with.

24         So Duane asked, what did I suggest and I said,

25   well, I have got one thought right off the top of my head.

1    Q.   And what was that?

2    A.   Well, I suggested that he telephone up and call the

3    president of APA, John Darrah, and tell him to treat us right

4    and stop this nonsense, or there wasn't going to be an

5    American pilot riding on an ALPA jumpseat in the future.

6    Q.   Describe, I don't think anybody has testified about this

7    jumpseat.  Can you tell us what you mean, what is a jumpseat,

8    first of all?

9    A.   A jumpseat  is the seat, any seat in the cockpit we

10   refer to as a jumpseat.  Some of them actually fold down.

11   And a great number of pilots commute to work.  They fly in to

12   work.

13        At this point in time one of the predominant ways

14   of getting to work was, we had this wonderful agreement,

15   reciprocity among virtually all the airlines where you could

16   show up, I could show up in Fort Lauderdale to go to JFK for

17   my trip and show my ID, and my pilots license, to the gate

18   agent, in Jet Blue, gate agent would go out and show it to

19   the captain, it was always the captain's discretion to

20   whether to take the jumpseat, but never seen a case where it

21   was refused.  I certainly never refused anybody.  And they

22   would accept you and if there was a seat in the back, you

23   would get that.  If not, you would get a seat in the cockpit.

24        As a matter of fact, even when the cockpit filled

25   out, Jet Blue was kind enough to Mike Day to put him in a

1    flight jumpseat in the back.  We didn't have that authority

2    at TWA, but apparently Jet Blue did.

3    Q.   Captain Day, you live  in Cedar Key, Florida, how did

4    you get to work?

5    A.   That was when I was in Fort Lauderdale.

6    Q.   Okay.

7    A.   But I judged jumpseats.  And if you if your own airlines

8    was there you could use your own airlines passes, if you had

9    them.  The other alternative was of course to buy a ticket.

10   But the company does not provide you transportation to get to

11   work.  That is up to you.  So this was probably the

12   predominant means of pilots getting to work, is using that

13   jumpseat as their backup.

14   Q.   Can you recall what airlines other than TWA you used the

15   captains jumpseat to get to work?

16   A.   Well, I have flown on a lot of them depending on where I

17   was coming from, Delta, when national was in existence I flew

18   on National, Eastern.  Just about most of them.

19   Q.   All right.  From your experience as a tile lot for over

20   30 years, Captain Day, how prevalent was the use of jumpseat

21   access for pilots of airlines nationwide to get to work?

22   A.   It was an accepted practice.

23   Q.   Which meant what as far as its prevalence?

24   A.   It was very prevalent because as I said, an a great

25   number of pilots, I had originally done a study in New York,

```
 1    at that time, over 50 percent of the pilots were flying in  a

 2    rather than driving.

 3    Q.   Can you recall ever letting an American pilot use your

 4    jumpseat?

 5    A.   Oh, yeah.

 6    Q.   Okay.  Now, getting back to this lunch with Duane

 7    Woerth, what were you asking him to do with respect to this

 8    jumpseat --

 9              THE COURT:  When was this, by the way.

10              THE WITNESS:  This was, I believe it was April 18.

11    It was mid April.

12              THE COURT:  It was after the waiver, after April 2.

13              THE WITNESS:  Yes, yes.

14    Q.   And what did you specifically ask Duane Woerth to do

15    with respect to this jumpseat privilege that captains had?

16    A.    I asked him to use this as a club, call it the

17    president of APA, and threaten to withdraw and have all the

18    ALPA carriers be notified that they had to support their TWA

19    pilots, because it completely changed the leverage.

20    Q.   Wait.  And do what?  Called the president of the APA and

21    tell him what?

22    A.   And tell him to tell his negotiating committee that they

23    had to negotiate with us in good faith.

24    Q.   And if they don't?

25    A.   And if they don't, there would not be an American pilot
```

 1   riding on an ALPA carrier.

 2   Q.   Which --

 3   A.   Since there was 11,000 of their pilots and 70,000 ALPA

 4   pilots, it changed the entire leverage.

 5   Q.   Well, it could have, had it be used?

 6   A.   Right.

 7   Q.   And what did Duane Woerth say in response to that?

 8   A.   He looked at me and said, I can't start a jumpseat war.

 9   Q.   Did you ask him why?

10   A.   I was just flabbergasted.  I tried to explain that this

11   was unionism.  He was representing TWA pilots, not American

12   pilots.  But that was his response and he wasn't going to

13   change it.

14   Q.   What did you say in response, if anything, Captain Day?

15   A.   I don't recall my exact words.  I was so angry, I just,

16   I was afraid to say anything.

17   Q.   Now, this was at lunch, right?

18   A.   This was at lunch.

19   Q.   Now, and then the Meg meeting followed that, the actual

20   meeting, right.  Back at the MEC office?

21   A.   Well, we went back as to the committee first, and I

22   explained to the committee what happened, and I was still

23   upset.  So we all decide to go in and listen to Duane speak

24   to the MEC and to the members.

25   Q.   And the minutes of that meeting are in evidence already.

 1    It is exhibit D 78.  I would like to show you that.

 2              THE COURT:  D?

 3              MR. PRESS:  D 78.

 4              THE COURT:  This is in evidence.

 5              MR. PRESS:  It is in evidence.

 6              THE COURT:  D 78.

 7    Q.   I think on the second page of that exhibit there are

 8    some comments attributed to Captain Woerth, Duane Woerth.  If

 9    you can look at those.  Scroll down some.  In the middle,

10    Captain Woerth.  Do you see the statement there attributed to

11    Captain Woerth, responded if there are any basis for

12    litigation ALPA would do what was necessary to protect the

13    pilots.  ALPA could not leave any stone unturned to protect

14    the TWA pilots.

15              Does your memory, is your memory consistent with

16    having heard Duane Woerth say that.

17    A.   Yes.

18    Q.   Now, how does the statement compare to what really

19    happened as far as you know?

20              MR. FRAM:  Your Honor.  I object.  There is no

21    foundation in terms of what really happened.

22              THE COURT:  Oh, I think there is.  He is on the

23    negotiating committee.  I think there is a foundation, he has

24    knowledge of that.  You can try to answer the question.

25    Q.   I will ask a better question if you can't answer that

1    one, Captain Day.

2         THE COURT:  All right.  Ask another question.

3    Q.   How does his statement compare to what you saw Duane

4    word really do?

5    A.   I didn't see Duane Woerth do anything.

6    Q.   There is a statement in these minutes attributed to you,

7    Captain Day, if you look at page 3.  Down at the bottom.

8    Oath says you updated the MEC regarding the status of things

9    with your committee.  What did you say about ALPA support?

10   A.   I said indicated that full support of all of ALPA would

11   be necessary going forward.

12        That was the closest, I felt, that was the closest

13   I felt I could say without causing some damage between Duane

14   Woerth and myself.

15        THE COURT:  Now, at this point, April 8 or 12, TWA

16   LLC was already flying.  The deal had closed with American.

17   Right?  Do you know when the deal closed and when TWA LLC

18   began flying as an American subsidiary.

19   A.   I am thinking that was, the deal, I thought the deal

20   closed on the 9th.

21        THE COURT:  That's right.  They started flying --

22   they entered an agreement on the 9th and then started flying

23   on the tenth.  Am I correct?

24        MR. PRESS:  I think the deal closed on the 10th.

25        THE COURT:  And they signed the 9th, they signed an

1    ALPA, and TWA LLC signed an agreement, didn't they?

2              MR. PRESS:  I believe that's correct.

3              THE COURT:  Then on the tenth the deal closed.

4              MR. PRESS:  That is the chronology of things as I

5    understand it.

6    Q.   Captain Day, Randy Babbitt had told you that, the words

7    said the gloves are coming off.  We are proceedingt o

8    bankruptcy now at this meeting?

9    A.   We are.

10   Q.   You had been told at this lunch just a couple of hours

11   ago, well, when you made your request for a jumpseat war, how

12   did, was that part of the gloves coming off?

13   A.   Sure didn't seem to be to me.  That is not the response

14   I expected.

15   Q.   Why aren't there any comments in these minutes, Captain

16   Day, that reflect some of your anger, why didn't you say

17   anything?

18             THE COURT:  First of all, you didn't prepare those

19   minutes, did you?.

20   A.   No, Judge, I did not.

21             THE COURT:  I assume it was someone else preparing

22   them.

23   A.   Yes.  ALPA LEC staff, or MEC staff.  These are

24   apparently approved minutes.

25   Q.   Did your comments to the MEC reflect any of your

1    disappointment with Duane Woerth?

2    A.    No, because these were being held out in open, and I was

3    not trying to embarrass our president publicly because I

4    didn't see how that could possibly help us.

5              MR. PRESS:  Is this a good time for a break?

6              THE COURT:  Yes, it is, if it is convenient for

7    you.

8              MR. PRESS:  It is.

9              THE COURT:  Ladies and gentlemen, we will take our

10   first morning break.  15 minutes.  Let's say quarter after

11   ten.  Quarter after ten.

12             THE COURT:  Do not discuss the case among

13   yourselves.  Keep an open mind until you have heard all the

14   evidence.  All rise.

15             (The jury leaves the courtroom.)

16             (Recess)

17             (The jury enters the courtroom.)

18             THE COURT:  Mr. Press.

19             MR. PRESS:  Thank you.

20   Q.    Captain Day, I want to show you a document already in

21   evidence called or marked exhibit 316.  P 316.  There it is.

22   Can you highlight the last paragraph.  First of all, do you

23   remember, can you go back.  Captain Day, do you remember

24   receiving a copy of this letter?

25   Q.    This letter to all TWA pilots?

```
 1    A.   In general.  Yes.

 2    Q.   And did you highlight the last par can you highlight the

 3    last paragraph, please?  Again worth says as president I will

 4    continue to coordinate with your MEC and your merger

 5    committee to ensure a fair and equitable seniority

 6    integration.  At that point had Duane Woerth coordinated

 7    anything with your committee?

 8    A.   No, he hadn't.

 9    Q.   The merger committee, that is a reference to your

10    committee, right?

11    A.   Yes.

12              THE COURT:  What is, this is 316.

13              MR. PRESS:  P 316, Judge.

14              THE COURT:  P.  Okay.  Go ahead.

15    Q.   When you, was this a truthful statement, I will continue

16    to coordinate with the merger committee?

17    A.   Well, he hadn't been coordinating up-to-date, so so I

18    don't think so.

19    Q.   Did he coordinate going forward with you?

20    A.   No, no.

21    Q.   Well, how did you react to this letter, Captain Day,

22    when you got it?

23    A.   I was pretty upset.

24    Q.   You can take that down, Will.

25              At some point this Professor Tanen finished his
```

1    work, right.

2    A.    He did.

3    Q.    We saw with Sean Clarke his Rightful Place proposal.

4    Who submitted that to the American pilot negotiating

5    committee, was that something you did?

6    A.    I did.

7    Q.    When did you do that?

8    A.    Well, I am remembering mid June.

9    Q.    Was that in connection with a meeting?

10   A.    Yes.

11   Q.    Okay.  And how was, how did the American negotiators

12   respond initially to the Tanen proposal?

13   A.    Well, first they started snickering at the name of it,

14   Rightful Place.  He and they were uncomplimentary to it.

15   They did not respond favorably.

16           THE COURT:  They meaning the --

17           THE WITNESS:  The committee.

18           THE COURT:  -- the APA committee?

19   A.    The APA committee did not respond favorably, Judge.

20   Q.    And you are in negotiations with them, you said mid

21   June?

22   A.    Yes.

23   Q.    So what was the strategy to try to get these guys to,

24   you know, make some sort of acceptable counter proposal to

25   you?

1   A.   Well, we were running out of strategies.  We -- Roland,

2   of course, never at a loss for ideas, come up with another

3   legal strategy.

4   Q.   What timeframe was this?

5   A.   In was in either the end of June, beginning of July, in

6   this timeframe.

7   Q.   Can you tell us in general terms what strategy you are

8   talking about that Roland Wilder had come up with in that

9   timeframe?

10  A.   Well, he wanted, I believe he wanted to file another

11  injunction, it was primarily a tactic to -- no, that was the

12  one at the end he wanted to file it.  Roland had so many

13  strategies, it is difficult for me to keep them all straight.

14  Q.   Well, let me help you out.  We heard from his video

15  deposition there was a document --

16            MR. FRAM:  Your Honor, I object.

17            THE COURT:  If he can orient him I will allow it.

18  But don't lead him.  Just orient him towards something.

19  Q.   There was a document admitted through Roland Wilder's

20  testimony marked J 27, if I could show that to you.

21            MR. FRAM:  There has to be a foundation that it

22  might refresh his memory, your Honor.  Without that --

23            THE COURT:  I am going to let him show him a

24  document in evidence.  It is not that he is a stranger.  He

25  was on the merger committee.  He was the chairman of it.  So

1   I am going to allow him to show it, let him look at it and

2   see what the next question is.  You can show him the

3   document.

4   Q.   This is a memo dated July 2, 2001.  Have you seen, were

5   you provided a copy of this --

6            THE COURT:  What is the number of that?

7            MR. PRESS:  J 127, Judge.  Many.

8            THE COURT:  Go ahead.

9   Q.   Was this a document you were provided, Captain Day, at

10  around this time?

11  A.   It was.

12  Q.   It is addressed to the ALPA representation and legal

13  departments.  Right.

14  A.   It is.

15           THE COURT:  Did you see this, was this, a copy of

16  this given to you.

17           THE WITNESS:  Yes, sir, it was.

18           THE COURT:  Even though it wasn't addressed to you.

19           THE WITNESS:  It was given to me.  Roland --

20           THE COURT:  Let's wait for the next question.

21  Okay.  You have seen it.  Next question.

22  Q.   My next question is, finish your thought.

23           THE COURT:  That is not a question.

24  A.   Roland explained it to me, and although I didn't get all

25  of the nuances of it, I understood the purpose of it, was to

1   help create us leverage, and anything that Roland could do, I

2   was in favor of that.

3   Q.   This strategy that is reflected in this memo, that was

4   something you and Mr. Wilder discussed personally?

5   A.   We discussed it.  But as I said, I didn't get into it in

6   any great detail with him.

7   Q.   But Captain Day, was this something you were supportive

8   of Roland Wilder asking the ALPA legal department to

9   authorize?

10  A.   I was 100 percent behind him.

11            MR. FRAM:  Your Honor, leading.  These questions

12  are all leading.  I really object.

13            THE COURT:  Ask your next question.  Try not to

14  lead.

15  Q.   And Captain Day, let's just go right to the bottom of

16  the memo, page 3.

17            THE COURT:  Do you know what the heart of the

18  strategy was, in your words, what did you understand the

19  stratgy to be.

20  A.   What I understood was that APA was negotiating with

21  American.  And as part of that negotiations they were

22  negotiating a draw down schedule, and certain things that

23  were going to to be affecting the TWA pilots.  And what role

24  land was trying to do was to get us a seat at that table, or

25  to pull that out.

```
 1              THE COURT:  How was he going to do that?

 2              THE WITNESS:  By --

 3              THE COURT:  A lawsuit?

 4   A.   By instituting a lawsuit.

 5              THE COURT:  Against whom?  Did you understand he

 6   was going to sue?

 7   A.   This was going to be American and A and APA.

 8              THE COURT:  Who was going to be the plaintiff, TWA

 9   MEC or the union, ALPA?

10   A.   Roland always felt it had to be ALPA.

11              THE COURT:  The new strategy was to have ALPA sue,

12   as you understand it?

13   A.   That's correct.

14              THE COURT:  Have ALPA sue American and APA.

15              THE WITNESS:  That's correct, Judge.

16              THE COURT:  And the goal was to keep them from

17   unilaterally making their own integration without you at the

18   table.

19              THE WITNESS:  That was my understanding.

20              THE COURT:  That was your understanding.  That is

21   all we want is your understanding.  Okay.  Go ahead.

22   Q.   Captain Day, if you look at, I think it is the last

23   sentence of the memo, how does Roland Wilder conclude his

24   brief to the ALPA legal department.  Can you read that?

25   A.   This is an opportunity to generate much needed leverage
```

```
 1   for the TWA merger representatives.

 2   Q.   And how did you view this as something that you were in

 3   favor of or?

 4   A.   I was 100 percent in favor of this.

 5   Q.   Do you know what response Mr. Wilder received to this?

 6           THE COURT:  Why didn't we ask him what he did.  Did

 7   you discuss this proposal with anybody at ALPA, the president

 8   on down?  Did you go to the president and say, here is Roland

 9   Wilder's proposal.

10           THE WITNESS:  No, sir, I left that up to Roland to

11   discuss that with them.

12           THE COURT:  Why would you, you wouldn't you,

13   yourself, go to --

14           THE WITNESS:  I did not feel that I was that

15   familiar with the legal nuances involved in it.  Judge.

16           THE COURT:  Did you ever have a conversation with

17   Woerth about that strategy?

18           THE WITNESS:  No, sir.

19           THE COURT:  Did you ever have a conversation with

20   Clay Warner about that strategy.

21           THE COURT:  I am referring to one of the lawyers in

22   ALPA.

23   A.   I can't recall having a conversation.

24           THE COURT:  Did you have a conversation with

25   anybody at ALPA in the power structure at ALPA about this
```

 1   proposal.

 2   A.    Not this specific one, just in general, on this

 3   litigation strategy.

 4          THE COURT:  This is a very specific proposal, this

 5   was a very pointed proposal, and it was not in generalities.

 6          THE WITNESS:  No, no, Judge, I can't recall that.

 7          THE COURT:  He had a strategy.  What I am asking

 8   you is, given that you knew what it was, did you talk as

 9   chairman of the merger committee, discuss it with any of the

10   five or six people who you you have identified as being kind

11   of in the power structure ALPA, from Duane Woerth on down.

12   A.    No, Judge.  I left that part up to Roland.

13          THE COURT:  Okay.  Go ahead.

14   Q.    Why did you defer to Roland to communicate your desires

15   with the ALPA legal department?

16   A.    Roland is the expert in this field.  He is very

17   persuasive.  This is not my field of expertise.

18   Q.    All right.  And to follow up on the judge's question,

19   did anybody, did anybody in the ALPA legal department call

20   you to discuss this strategy?

21   A.    No.

22          THE COURT:  I didn't say who called who.  I said

23   did you have a discussion with anybody at ALPA, whether they

24   called you or you called them, I didn't make that

25   distinction.

1    Q.   There could have been a call that went unreturned?

2             THE COURT:   That is possible but that is not too

3    valuable.

4    A.   Nobody contacted me regarding this proposal.  I never

5    heard anything more of it.

6             THE COURT:   Were you ever -- And you never

7    contacted them?

8             THE WITNESS:   And I never contacted them.

9    Q.   Do you have an understanding, and if so how, has to

10   whether or not this strategy was authorized by ALPA legal

11   department?

12   A.   I understood it was not.  Roland told me it wasn't.

13   That was as far as it went.

14            THE COURT:   Well, there is no dispute that no such

15   suit was every instituted, that you know of.

16            THE WITNESS:   That's correct, Judge.

17   Q.   Roland's memo, Mr. Wilder's memo is dated July 2, 2001.

18   Shortly thereafter did you receive any formal correspondence

19   from the American pilot negotiating committee?

20   A.   We received a rather detailed denial of our proposal.

21            THE COURT:   You mean the fair placement proposal?

22   A.   Yes, sir.

23   Q.   I have got a copy of that.  This is marked J 323.

24            THE COURT:   That is already in evidence.

25            MR. PRESS:   I don't think so.  I have got the

```
 1    original sticker with me.

 2               THE COURT:  323?

 3               MR. PRESS:  Yes.

 4               THE COURT:  You are correct, it is not in evidence.

 5               THE COURT:  You have no objection?

 6               MR. FRAM:  Correct, no objection.

 7               THE COURT:  323 in evidence.

 8    Q.   What is exhibit J 323, Captain Day?

 9    A.   This is a letter from Ed White, chairman of their merger

10    committee, to myself.

11    Q.   What is the date of it?

12    A.   July 18, 2001.

13    Q.   And it is quite a lengthy letter.  How many pages is it?

14    A.   It is a 20-page letter.

15    Q.   Single spaced?

16    A.   Yes.

17    Q.   And in it what is the gist of what he is telling you in

18    this letter?

19    A.   He is going in to great detail in rejecting our

20    proposal.

21    Q.   That is July 18.

22               MR. PRESS:  We move for the admission -- it is

23    already in.

24               THE COURT:  I just let it in right now.  There was

25    no objection.
```

```
 1              MR. FRAM:  We stipulate to it, your Honor.

 2              THE COURT:  Okay.

 3   Q.   In this letter, Captain Day, did the American -- this

 4   was from Ed White, right?

 5   A.   Yes.

 6   Q.   Did Mr. White make a counter proposal of any kind?

 7   A.   No. He finishes saying we can truly put the past behind

 8   us and move forward, talking about our facilitation.

 9   Q.   The reference to the facilitation.  And you talked about

10   this, you got this facilitation agreement as part of the

11   scope waiver, right?

12   A.   Yes.

13              THE COURT:  There is going to be a facilitator?  An

14   individual playing the role of facilitator?

15   A.   Yes, sir.  Rolf Dalton.

16              THE COURT:  Spell the last name.

17   A.   I believe it is D A L T O N.  Rolf Dalton.

18              THE COURT:  When did he come aboard as facilitator?

19   A.   It was somewhere in this timeframe, right before us, the

20   two attorneys agreed to agree to him.

21              THE COURT:  The two attorneys being?

22              THE WITNESS:  Roland Wilder and Mr. Kennedy, their

23   attorney.

24              THE COURT:  Their meaning?

25              THE WITNESS:  The APA's attorney.
```

```
 1              THE COURT:   The APA's merger committee attorney?

 2   A.   Yes, sir.   They went through a list and that is who they

 3   chose, that is who they could agree on.

 4   Q.   This facilitator, he is going to act like a mediator,

 5   right?

 6   A.   That's correct.

 7   Q.   When was he hired, about?

 8   A.   Well, as far as I can recall right in that timeframe we

 9   are discussing.

10   Q.   So at that point there hadn't been any of these

11   facilitated negotiations as of Mr. White's July 18 letter?

12   A.   No.   No.

13   Q.   Were any meetings planned?

14   A.   Yes.

15   Q.   When were they planned for?

16   A.   They were planned for, I believe it was in August, and

17   the first meetings were going to be in Chicago.

18   Q.   Okay.   Now, you get this July 18 letter from Captain

19   White, 20 page letter, telling you your Tanen proposal is no

20   good, right?

21   A.   Yes.

22   Q.   What did you do in response?   First of all, how did you

23   react to that?

24   A.   Well, I was concerned, to say the least.

25   Q.   Why are you concerned?
```

 1   A.   Well, this was our crown jewel, the Tanen proposal, and

 2   if they weren't --

 3            THE COURT:  What was your crown jewel?

 4            THE WITNESS:  The Tanen proposal.

 5            THE COURT:  Jewel  --

 6   Q.   What do you mean by that?

 7            THE COURT:  What do you mean by  that?

 8   A.   This was where we had all been leading up to.  This as a

 9   proposal.  And we had hoped that that would be persuasive.

10   And for them to go into such detail, and deny it, it was a

11   problem for us.

12   Q.   And so what did you do specifically to wrestle with this

13   problem?

14            THE COURT:  Excuse me.  They explained line by line

15   why they were disagreeing, whether they just said, forget it,

16   we are not interested.  They went line by line, didn't they,

17   basically?

18   A.   Yes, sir, they did.

19            THE COURT:  It is not paragraph by paragraph, they

20   told you why they disagreed.  There was a reason, a response,

21   maybe you don't agree about with it, but it wasn't just get

22   lost, guys.  Somebody put a fair amount of effort into it?

23            THE WITNESS:  Yes, Judge, they did put a fair

24   amount of effort, but we didn't have a counter proposal.  We

25   were still working on the last, on the last staple.

1   Q.   Which was 1450 TWA pilots to the bottom of the list?

2   A.   Approximately, two thirds.

3   Q.   You get this letter that is alarming you.  You are

4   heading into this facilitated negotiations, what do you when

5   did you do to address this problem that you perceived,

6   Captain Day?

7   A.   I believe that Roland Wilder came up with another plan.

8   Q.   What was that?

9   A.   Well, it was another plan to take to ALPA National.

10  Q.   Let's talk about your plan.  What did you do at the end

11  of July to try and garner some leverage for your committee?

12  A.   Well, what I did was, I decided to go to the executive

13  council sill, which is ALPA's highest governing board.  And

14  address my concerns directly to them.

15  Q.   How was that meeting arranged?   A the meeting was

16  already arranged, ALPA did that.  How was your appearance at

17  the meeting arranged?

18  A.   Bob Pastore, our MEC chairman, and Bud Bensel, my

19  predecessor, had already arranged to address the board, so

20  this was actually the executive council sill and I asked to

21  be included in that.

22          THE COURT:  Was the executive council a subset of

23  the executive board?

24  A.   It is comprised of executive vice presidents and it is a

25  much smaller group.

```
 1              THE COURT:  As opposed to the full board.

 2              THE WITNESS:  Yes, sir.

 3   Q.   This is some sort of policy making council at ALPA?

 4   A.   This would be like Duane Woerth's boss, as I saw it.

 5              THE COURT:  This would be like going to the

 6   executive committee of a major corporation.

 7              THE WITNESS:  That's correct, Judge.

 8              THE COURT:  The board of a corporation.

 9              THE WITNESS:  Right.

10   Q.   Were you alowed to speak, first of all, when about was

11   this executive council meeting that you attended?

12   A.   Mid July.

13   Q.   Were you allowed to speak?

14   A.   I was.

15   Q.   What did you say?

16   A.   I made an impassioned plea.  I explained that Bensel and

17   Pastore and myself, between the three of us, we had 105 years

18   of seniority.

19              TWA was one of the original groups in ALPA and gave

20   them a run-down where we were at on this, their last offer

21   was two thirds stapled, and I said we mad already waived

22   scope, and now we got this denial of our latest proposal,

23   which I went in to in great detail with them, provided them

24   tapes so that they could see, DVDs, I guess, and I said we

25   needed some leverage.  We didn't have anything.  And I went
```

1    in to some suggestions, starting with the jumpseat one.  I

2    explained that one.  I went into several other ones.  I told

3    them these are only ones I had thought of, but you have got a

4    huge staff here that certainly can come up with better ideas

5    than I can.

6    Q.  Let me interrupt you, Captain Day.  You testified that

7    you asked Duane Woerth to authorize a jumpseat war, as you

8    call it, in April, three months prior.  Right?

9    A.  Right.

10   Q.  Now you are in front of the executive council.  Why

11   would you think a decision might be different?

12   A.  I thought they might persuade Duane --

13          THE COURT:  Duane Woerth was at this meeting, was

14   he not?

15   A.  He was at the meeting.

16          THE COURT:  The one in July, he was there?

17   A.  Yes, Judge.

18   Q.  When we were talking about this jumpseat war notion, I

19   don't think I asked you why you thought that this would

20   provide you any leverage.  Can you describe that?

21   A.  Well, it would call attention to what was happening, and

22   perhaps the individual American pilots then would go to their

23   representatives, and want to know what is going on.

24   Q.  Why in your thinking would an American pilot be

25   motivated to do that because of this jumpseat restriction?

1    A.    Because he is going to be having to pay money to get to

2    work, or start missing flights.

3    Q.    Describe that.

4    A.    Well, if he can't get on this airplane to assure that he

5    is going to be getting to work, he is probably going to have

6    to buy a ticket.  Most of the people that were doing the

7    jumpseat were doing them on other airlines.

8    Q.    And this plan of yours, how did you sort it out in your

9    head how this would actually do something beneficial for your

10   group?

11   A.    Well, I just started coming up with ideas.

12   Q.    No, no, what did you think this would do, as a practical

13   matter, if ALPA had done what you requested, in your mind,

14   what would have happened?

15   A.    As a practical matter, I felt that this would force the

16   APA merger and acquisition committee to come to the table and

17   help make a more reasonable, fair and equitable proposal.

18            THE COURT:  Instead of the word force, would the

19   word encourage be more accurate?

20   A.    Encourage, I would accept that, Judge.

21   Q.    And why did you hold that belief?

22   A.    Because it would have affected me in that manner, if I

23   couldn't jumpseat.

24   Q.    So you presented this executive council in July and you

25   asked for ALPA to engage in this jumpseat war, right?

1    A.   Yes.

2    Q.   Did you have any other ideas that you expressed to the

3    executive owe on?

4         THE COURT:  Before you go off the jumpseat, if you

5    deny an American pilot a jumpseat, that is a pretty -- that

6    was then a pretty big airline, a fairly large number of

7    routes.

8         What if they started denying jumpseats to all the

9    other pilots, wouldn't that, I mean, wouldn't the pilots

10   think twice, wouldn't a union think twice about, yeah, you

11   will block American pilots but they are going to block our

12   entire membership from doing this, and that is a pretty big

13   airline.

14        Did anybody express that view?  I mean what is good

15   for the goose is good for the gander.

16        THE WITNESS:  Judge, there was certainly that

17   threat.  However, there were 70,000 National ALPA members

18   versus 11,000 APA members, so it reversed the leverage.

19        THE COURT:  Well, it is not just numbers of pilots,

20   it is number of routes that you had.  I mean the number of

21   people using jumpseats are not necessarily going to be

22   exactly proportional to the number of pilots.

23        THE WITNESS:  That is true, there is not an exact

24   correlation.

25        THE COURT:  Some Emery pilots or Fed Ex pilots or

Day-direct/Press                                          75

1   Alaska Airlines pilot might not be using jumpseats as much.

2   There is, you know, there is a difference there.  I am just

3   wondering, did anybody discuss that issue?

4   A.   No, we didn't get into that aspect of it, Judge.

5           THE COURT:  It could hurt ALPA.

6   A.   I knew there were going to be sacrifices and I explained

7   that, that, you know, that is what unionism was about, and

8   giving some examples of strikes and so on.  But that we would

9   have to pull together as a union, and who are we representing

10  here.

11          THE COURT:  Okay.

12  Q.   Staying with that same line the Judge had, what

13  carriers, what major carriers, did ALPA represent?

14  A.   United.  Delta.  Northwest.

15          THE COURT:  Continental?

16  A.   Continental came somewhere in there.  I don't know

17  whether they were back at that time yet.

18  Q.   And what carrier, or single carrier, did the APA

19  represent?

20  A.   Just American.

21  Q.   All right.  And this notion that, yeah, there could have

22  been a reciprocal reaction from the APA, they might deny

23  jumpseat privileges to ALPA pilots, right?

24  A.   I am I am sure they would.

25  Q.   In so why did you expect your union to go along with

1    something like that?

2    A.    Because that is what unionism is about, it is protecting

3    your members.

4    Q.    All right.  But why, why would a Delta pilot, let's say

5    he or she shows up for work or to jumpseat to get to Chicago

6    or wherever.  And that, and he wants to get on an American

7    flight.  Dent jumpseat.  Why would that pilot want to sign up

8    for something like that?

9    A.    Well, nobody would want to, but it is the same as an

10   assessment,  you do it because you are all in the same union

11   and you are all trying to protect one another.

12   Q.    At this meeting where you asked to engage a jumpseat

13   war, did you make a specific request for action?

14   A.    I threw out several ideas.   I suggested informational

15   picketing.  I suggested the threat of litigation.  I

16   suggested that they go to the AFL-CIO and have them put

17   pressure on the APA saying that they didn't, they would not

18   let them know that organization because ALPA was part of that

19   which was even bigger yet.  I suggested that they go back to

20   American and threaten American to put them on the "do not

21   buy, boycott list" that the AFL-CIO had.

22   Q.    What is the AFL-CIO and how is ALPA connected to it?

23   A.    That is a confederation of more unions, on a bigger

24   scale.  At that time it might have had, I would be

25   speculating, but it was in the millions of members.

1    Q.    And ALPA was part of that?

2    A.    ALPA was part of it.

3    Q.    You talked about this boycott list.  What is that?

4    A.    Boycott list is a list that the AFL-CIO puts out and

5    says these companies don't treat their employees right, and

6    don't support their products.  Don't buy them, or don't use

7    their services.

8    Q.    Okay.  In your experience with the union, is this

9    boycott list something that is, what is the right word, taken

10   seriously by union members?

11   A.    Sure.  Absolutely.

12   Q.    Have you conformed your buying practices?

13   A.    If I know somebody is on the list, yes.

14   Q.    Whose list is it, the boycott list, is that ALPA's list?

15   A.    AFL-CIO, which ALPA is part of.  They used to publish it

16   in their magazine.

17   Q.    Who used to publish the list in whose magazine?

18   A.    The airline pilots magazine.  ALPA published it monthly.

19   Q.    And as part of that publication --

20   A.    There would be a boycott list.

21   Q.    I have got an example of ALPA pilot magazine from the

22   time period.  With this boycott list.  I want to show that to

23   you.  Exhibit P-440.  What is exhibit P-440, Captain Day?  It

24   is just two pages, right?

25   A.    Pages 48 and 49 of the Airline Pilot, October, 2001

 1   issue.

 2            MR. PRESS:  I would like to move for the admission

 3   of P-440, your Honor.

 4            MR. FRAM:  No objection.

 5            THE COURT:  P-440 in evidence.

 6   Q.   I want to hand you, Captain Day, are you finished?

 7   A.   I am finished with this.

 8            MR. PRESS:  No.  On --

 9            THE COURT:  Were there any airlines on this list?

10   A.   I don't see anything under transportation and travel,

11   Judge.

12   Q.   I handed you a magazine.  Can you show that to the jury

13   and tell them what it is.  I am not going to mark it as an

14   exhibit?

15   A.   This is a monthly publication by the Air Line Pilots

16   Association, it goes out to all their members, and certain

17   other groups, libraries, whatever.

18   Q.   That one is dated what?

19   A.   October, 2001.

20   Q.   Is that where these two pages came from?

21   A.   That is where these two pages came from..

22   Q.   Let's look at the first page shown up there.  What is

23   that chart there, off to the left?

24   A.   That is the boycott list I was referring to.  The "don't

25   buy" list.

Day-direct/Press                                      79

1   Q.   If you go to the next page, this is the next page in the

2   magazine, right?

3   A.   Yes.

4   Q.   Who is that advertised at the top right?

5   A.   American Airlines American Eagle.  That looks like

6   school of aviation promoting American Airlines American

7   Eagle.

8   Q.   Instead of seeing ALPA allow American Airlines to

9   advertise in your magazine, where would you have like to have

10  seen them?

11  A.   Well, I would like to have seen them, American, put on

12  the threat to put American on the boycott list.  I don't know

13  that it ever would have come to that, but at least put the

14  threat out.  Start with the threat.

15  Q.   And that is what you asked for in July in front of the

16  executive council?

17  A.   Yes.

18  Q.   Did you ask for anything else, jumpseat war, ticketing,

19  boycott?

20  A.   Those are the things I asked for.

21  Q.   Did -- being.  What response did you receive from the

22  executive council that day?

23  A.   I remember one Delta captain, one of the executive vice

24  presidents, pointed at me and say you are just here looking

25  for more money.  I said, I haven't asked for money.  What I

```
 1   need is leverage and support.  That is what I was looking

 2   for.

 3   Q.   Did you come to learn how the executive council ruled on

 4   your request?

 5   A.   Probably about a week later, somewhere in that

 6   timeframe, they published their resolutions and they

 7   published a resolution providing their full moral support.

 8   Q.   And how did you react to that, Captain Day?

 9   A.   I was pretty disappointed.

10   Q.   And so what did you do?

11   A.   Well, I was, I guess at that point I was so disgusted, I

12   sent Bob Pastore a letter.

13   Q.   Which said what?

14   A.   A letter of resignation, which --

15           THE COURT:  What is the date of this now?

16           THE WITNESS:  This was in.

17           THE COURT:  Early August?

18           THE WITNESS:  Early August or the end of July.

19   Which I basically was just totally frustrated, and Bob called

20   me up and talked me out of doing it.  Wouldn't accept it.

21   Whatever.

22           THE COURT:  Was he chairman of the MEC at that

23   time?

24           THE WITNESS:  Yes, Judge, he was chairman of the

25   MEC at that point.
```

1   Q.   Captain Day, you tried to resign, but Captain Pastore

2   wouldn't accept your resignation?

3   A.   He wouldn't accept it.  He talked me out of it.

4   Q.   Why did you want to resign?

5   A.   I was frustrated.

6   Q.   At what?

7   A.   The lack of support.  I didn't have any leverage.  I

8   expected my union that I had been part of for the whole 35

9   years I had been with the airlines, to provide me some

10  leverage.

11  Q.   At this point you were just going in to the beginning of

12  this facilitated negotiation process, right?

13  A.   That's correct.

14  Q.   What view did you have at the time as to how these

15  different measures, Roland's litigation, boycotts, the things

16  you asked for, how that would have impacted the APA

17  negotiators going in to that process?

18          MR. FRAM:  I object, it calls for speculation.

19          THE COURT:  I will allow it.  Go ahead.

20  A.   Based on my interactions with these pilots.

21          THE COURT:   These pilots.

22          THE WITNESS:  The APA merger and acquisition

23  committee.

24          THE COURT:  Captain White's group.

25  A.   Yes, Judge.  I felt it would motivate them to negotiate

```
 1   with us.  There wasn't any, I didn't feel there was really
 2   much negotiation going on.
 3   Q.   Well, negotiation negotiations are just words.  How
 4   would it impact their actions?
 5   A.   That is what I was hoping it would change the actions.
 6   Q.   Hope is one thing.  What did you expect that these
 7   things that you were asking for would actually do for you?
 8   A.   Well, obviously I expected if they had been done they
 9   would have changed the outcome of our sessions.
10   Q.   And in what way?
11   A.   Well, we would have come up with some meaningful
12   integration.  Meaningful talks.
13   Q.   With what sort of result did you expect?
14   A.   I expected something much closer to the Tanen proposal.
15   Q.   But going in to these negotiations, this facilitated
16   process with the mediator, you went in with what in your
17   holster?
18   A.   I went in with nothing.
19   Q.   And how did the processing?
20   A.   It was a waste of time.
21   Q.   How long of a process was it, and over what period of
22   time?
23   A.   It was almost ten days, we met initially in Chicago, and
24   then we met, well, we were trying to choose neutral grounds
25   to meet on, so we met in Washington for several days after
```

 1   that.  This went on for probably a month.

 2   Q.  All right.  And what support from ALPA National did your

 3   committee receive throughout that process?

 4   A.  Well, at one point when we were in Washington, Duane

 5   Woerth did attend one of our sessions.

 6   Q.  How did that come about, first of all?

 7           THE COURT:  A session, you mean a negotiating

 8   session.

 9           THE WITNESS:  Negotiating session, Judge.

10           THE COURT:  The APA was there, and the APA merger

11   committee and your committee.

12   A.  Yes, sir.

13           THE COURT:  Go ahead.

14   Q.  How did it come about that he attended?

15           MR. FRAM:  Objection, there is no foundation of

16   personal knowledge, your Honor.

17           THE COURT:  Do you know how he came to attend?  Did

18   you invite him?

19           THE WITNESS:  He was always invited.

20           THE COURT:  No, no.

21           THE WITNESS:  I --

22           THE COURT:  Specifically for this.

23   A.  I can't recall whether I invited him or not, Judge.

24           THE COURT:  But he showed up.

25           THE WITNESS:  He showed up.

 1   Q.   And first, where did he show up first?

 2   A.   Well, he showed up with, met with our committee prior to

 3   us all meeting together.  With their committee.

 4   Q.   How did you react to seeing Duane Woerth show up at one

 5   of your sessions?

 6   A.   I was elated.

 7   Q.   Why?

 8   A.   I thought that finally we were going to get some

 9   support.

10          THE COURT:  Do you have a time when this meeting

11   took place, when he showed up.

12   A.   Early September, Judge.

13          THE COURT:  And you were at the meeting?

14          THE COURT:  And where was the meeting.

15          THE WITNESS:  In Washington, DC.

16   Q.   And what, and in the meeting with just your committee

17   and Duane Woerth, what did he discuss, what did he say?

18   A.   I don't recall his exact words, but the gist of it was

19   we are not going to let them do this to you, we are going to

20   -- ALPA is going to support you.

21   Q.   Not going to let them who do what to who?

22   A.   He knew we were upset with the staple job.  So he pumped

23   up my committee is what he did.

24   Q.   Okay.  Pumped them up how?

25   A.   By this pep talk.

1    Q.   And then did he accompany you in to the negotiating

2    session with the American committee?

3    A.   Yes.  He sat off to the side with another National ALPA

4    officer.

5              THE COURT:  Who?

6    A.   I can't recall.

7    Q.   And did Duane Woerth make any remarks at the joint

8    session?

9    A.   Not during the meeting.  Just observed.

10   Q.   Okay.  He just observed.  Did he say anything to the

11   American negotiating committee?

12   A.   Not until the end.

13   Q.   What did he say?

14   A.   Again, I don't know the exact words, but it was

15   something to the effect of you all are going to have to be

16   flying together, so let get this thing worked out together.

17   It was no show of force.

18   Q.   Well, what did you expect him to say?

19   A.   I expected him to say, I don't like what I am seeing,

20   and we are not going to accept this staple job.

21   Q.   And when you didn't hear that kind of talk from your

22   union president, how do how did you react?

23   A.   Once again, I felt we were running out of options.

24   Q.   You mentioned this was early September?

25   A.   Yes.

1    Q.   Do you recall that shortly after that the American side

2    terminated negotiations?

3    A.   They did.  I met with Ed White, the facilitator and

4    Roland Wilder and the four of us met up in Chicago, and that

5    is when Ed White said we hadn't come to an agreement so I am

6    going to come back, I am going back to my governing board at

7    the APA and the APA and American will come up with an

8    agreement.

9    Q.   An agreement.  What do you mean?

10   A.   Integration.

11   Q.   And they will do what with it?

12   A.   Well, this was the infamous cram-down.

13   Q.   At that point in time, do you recall specifically when

14   that was?

15   A.   Just -- mid September.

16         THE COURT:  What was mid September, the meeting or

17   the cram-d a own.

18   A.   The meeting, the meeting.

19         THE COURT:  The meeting.

20   Q.   Let me put up J 329.  It is in evidence.  We put up a

21   letter dated September 18, 2001.  That is a letter to you?

22         THE COURT:  Is that J 329.

23         MR. PRESS:  Yes, your Honor.

24   Q.   Is that a letter you received, Captain Day?

25   A.   Yes.

Day-direct/Press                                               87

1   Q.   It is signed by who?

2   A.   Ed White.

3   Q.   And the gist of the letter, was this just kind of like

4   confirming what he said in the meeting?

5   A.   Yes.  Essentially what I just said.

6   Q.   So now you had gone through this entire facilitated

7   negotiation process.  You are told negotiations are over.

8   Where had they moved?  What was their position as to how many

9   pilots would be stapled?

10  A.   The last proposal was 58.

11  Q.   Had they come off the April 18 deal?

12  A.   No.

13  Q.   And they are threatening a cram-down.  Captain Day, what

14  was your strategy to respond to that threat?

15  A.   We were starting to run out of options, but this is when

16  I believe Roland came up with another strategy, because by

17  now we had 9-11, and we knew that furloughs were coming.  And

18  American was sanction to integrate the two groups and come up

19  with single carrier.  The APA was anxious for this to happen

20  so that they could put our pilots on the bottom where the

21  furloughs would occur.  So Roland came up with a new strategy

22  to go in there based on the fact that it was a violation of

23  of our scope agreement, and this grievance had never been

24  heard.

25            And the NMB, National Mediation Board, didn't have

```
 1   jurisdiction at this point to declare that there was, that

 2   the APA would be representing our pilots and there were still

 3   two separate groups.  The effect that this would have had is

 4   that American then would have had to furlough from both

 5   sides.

 6            So instead of our first 1,500, our bottom 1,500

 7   pilots becoming furlough fodder, they would have to start

 8   furlough go their pilots as well as ours.

 9   Q.  All right.  And specifically what did you understand Mr.

10   Wilder wanted to ask a court to do?

11   A.  He wanted to ask the Court to enjoin the National

12   Mediation Board from declaring single carrier status until

13   the conclusion of this grievance.

14   Q.  Okay.  Now, this strategy, were you part of any meetings

15   at ALPA National where this strategy was discussed?

16   A.  One meeting.

17   Q.  Who was there on the TWA pilots side?

18   A.  Well, I remember I was there.  And of course, Roland was

19   there.

20   Q.  And who did you meet with?

21   A.  Duane.

22   Q.  Duane Woerth?

23   A.  Duane Woerth.  Clay Warner.  And to the best of my

24   recollection, Seth Rosen.

25   Q.  And what was the subject of this meeting, Captain Day?
```

Day-direct/Press                                                      89

```
 1   A.   Duane explained, I mean, Roland explained his entire
 2   strategy to these attorneys, and to Duane.
 3   Q.   And what was the response you received?
 4   A.   Well, I can only tell you what I felt the response was.
 5              MR. FRAM:  Your Honor.
 6   Q.   No, what words were spoken.
 7              MR. FRAM:  Can we know when the meeting was?
 8   Q.   Okay.  When about was this meeting, Captain Day?  We
 9   saw, wait.  Maybe this could be a reference.  You saw the
10   September 18 letter from you, or from Mr. White to you.  And
11   in reference to that?
12   A.   Well, it would have been second half of September.
13   Q.   All right.  And what do you recall either Mr. Rosen, Mr.
14   Warner or Duane Woerth saying about this strategy that Roland
15   Wilder had?
16   A.   I recall us getting the green light.  At the appropriate
17   time.  Not to institute it at that moment but at the
18   appropriate time.
19              THE COURT:  Can I ask you a question?  You made
20   reference to a grievance being filed by ALPA.  When was that
21   grievance filed?
22   A.   That grievance was filed very early on, as I remember,
23   but I wasn't?
24              THE COURT:  Give me a definition of early on.
25   A.   I thought it was filed -- I can't tell you the exact
```

1    time.  That was part of the grievance proceeding.

2              THE COURT:  It was filed after April 2, certainly.

3    A.  Well, I think so, Judge.

4              THE COURT:  Wasn't the basis of the agreement that

5    American wasn't using its best efforts to integrate the two

6    pilot lists?  Was that the grievance?

7    A.  Let me think a moment and see what the --

8              THE COURT:  Didn't ALPA file that grievance?

9    A.  That is correct.  Yes, Judge, that is exactly correct.

10             THE COURT:  So there was an action there.  You

11   can't say they did nothing.  Who filed that grievance?

12   A.  Well, our grievance, the MEC grievance committee, filed

13   the grievance.

14             THE COURT:  Filed that grievance.

15             THE WITNESS:  Filed a grievance with TWA or the TWA

16   LLC.  But the grievance had not been heard yet.

17             THE COURT:  But it was a complaint about the

18   alleged violation of American's best efforts letter.

19   A.  That's correct.

20   Q.  So the point of this injunction as it rights to that

21   grievance that your grievance committee filed, how do the two

22   relate to one another?

23   A.  Well, the injunction was to prevent American, the

24   practical effect of it was to prevent American from doing it,

25   and the APA from doing the cram-down.  It was to delay them

1    until the grievance was heard.

2    Q.   Now, there has been --

3            THE COURT:  Wasn't it in effect to try to delay

4    single carrier certification by the National Mediation Board.

5    Isn't that what you were trying to do.

6            THE WITNESS:  That's correct.

7            THE COURT:  And the cram-down didn't become

8    effective unless this was right in the cram-down, so-called

9    Supplement CC, was a condition, it became effective when the

10   National Mediation Board said they were one carrier,

11   certified under a single carrier, isn't that right.

12           THE WITNESS:  Yes, Judge.  It was to keep the two

13   seniority lists separate.

14   Q.   Moving into October, you were aware Senator Bond from

15   Missouri had proposed legislation designed to help the TWA

16   pilots and flight attendants.  You were aware of that?

17   A.   Yes.

18   Q.   Well, September 18 you sent a letter saying no more

19   negotiations.  But in fact, was that the end of your merger

20   committee negotiations with the American committee?

21   A.   No. After Senator Bond started his work and this bill

22   came out, I got a telephone call from Ed White saying they

23   had a new proposal and that, quote, we were going to love it.

24   Q.   Okay.  All right.  So what did that lead to?

25   A.   That led to meetings in the beginning of October.  In

 1   Washington.

 2              THE COURT:  With the.

 3              THE WITNESS:  With --

 4              THE COURT:  With your committee and White's

 5   committee.

 6   A.   Yes, sir.

 7   Q.   I hate to cross examine you, but are you sure it was

 8   early October?

 9   A.   Mid October.  Mid to late October.

10   Q.   Okay.  Did you toned attend those meetings?

11   A.   I did.

12   Q.   Where were they held?

13   A.   Washington, DC.

14   Q.   And did the American committee show up with a new

15   proposal?    Not whether you loved it, did they have a new

16   proposal?

17   A.   It wasn't a -- well, yes.  This was, this is when they

18   showed up with what later became the basis for Supplement CC.

19   Q.   And remind the jury what Supplement CC was?

20   A.   Supplement CC is the integration agreement that became

21   part of the APA's green book, the collective bargaining

22   agreement, which integrated the two pilot groups.

23   Q.   All right.  And let's --

24              THE COURT:  Again, would become effective when the

25   National Mediation Board ruled they were a single carrier.

```
 1              THE WITNESS:  Yes, Judge.

 2              THE COURT:  Go ahead.

 3   Q.   So what later become Supplement CC, that was first

 4   proposed to you when?

 5   A.   October 15, 18, somewhere in that range.

 6   Q.   All right.  And what was the, what was the proposal?

 7   A.   Well, the proposal had changed the staple point.  And

 8   now there would be a 1188 pilots stapled.

 9              THE COURT:  Instead of 1450.

10              THE WITNESS:  Instead of approximately 1450.  And

11   the point where we would begin getting integrated in went up

12   to about 25 to 2600, and then we would get integrated in a

13   downward ratio of approximately one to eight until we reached

14   the staple point.  And all, and the staple point was behind

15   the, behind approximately 400 American pilots that had been

16   hired during the time that American announced the acquisition

17   in January.

18   Q.   Now, as a committee, as a whole, was this proposal

19   acceptable to the merger committee?

20   A.   Not as it stood, no.

21   Q.   And we have seen minutes of the MEC where this was voted

22   on, do you understand how the --

23              THE COURT:  Before the voting on it, did the

24   proposal have any -- it is not just stapling and ratioing in.

25   Were there any other aspects to the proposal?
```

Day-direct/Press                                                    94

1    A.   The proposal had fences and restrictions, provisions for

2    a proceed protective cell for the TWA pilots in St. Louis.

3                THE COURT:   In other words, they couldn't be

4    bounced by American.

5    A.   They couldn't be bounced, and certain captain

6    protections.   There would be a minimum number of TWA captains

7    protected which varied with the size of the, and the number

8    of captains that American had, and TWA had, former TWA pilots

9    had in Dallas and Chicago.   There was a ratio.

10   Q.   And there has been some reference to this fence in St.

11   Louis as a protective cell.   Captain Day, the October

12   proposal they made, was that the first time they had

13   introduced that concept?

14   A.   Yes.

15   Q.   So the staple point moves significantly, you would

16   agree?

17   A.   Well, I don't --

18   Q.   Well, okay.   You characterize it?

19   A.   I don't know that I would say significantly.

20   Q.   You are right.

21   A.   It moved.

22   Q.   It did move.   Then  you have this new feature, this St.

23   Louis corral or protective cell, right?

24   A.   We have still got over 50 percent of our pilots --

25                THE COURT:   The answer to that question is yes,

1    isn't it?  It is a new concept, it hadn't been --

2    A.   I thought he asked a bit, did you say change or improve

3    significantly?

4    Q.   My question was, I asked a bad question.  Up in here,

5    you know, the three prior proposals they had made, did any of

6    them include as a feature the notion of a protective cell in

7    St. Louis?

8    A.   No.

9    Q.   What do you attribute that movement to?

10            MR. FRAM:  I object.  Calls for speculation.

11            THE COURT:  I will sustain that objection.

12   Q.   What had changed between September 18 and last offer or

13   mid October when they made this new proposal?

14            MR. FRAM:  Your Honor, it is the same question, I

15   object.

16            THE COURT:  I am going to allow it.  What had

17   changed was the Bond bill?

18            THE WITNESS:  That's right.

19   Q.   Had ALPA National given you any new leverage?

20   A.   No.

21   Q.   As presented to you by the American committee, was it

22   presented as take it or leave it, or was there a negotiation?

23   A.   There was a couple of extra little tiny tidbits that

24   were thrown on it, that I felt were window dressing, that if

25   we took it and there was a very tight timeframe, almost 24

1    hours that the MEC had to accept it.

2    Q.   And did you understand whether or not the MEC accepted

3    the proposal?

4    A.   There seems to be a bit of confusion on that.  But they

5    did not accept that proposal as it was within the timeframe

6    that was allowed.

7              THE COURT:  Why is there confusion?

8              THE WITNESS:  Because they thought they accepted

9    with a counter proposal, I believe, Judge.  There was a lot

10   of confusion that day.

11             THE COURT:  What day?

12             THE WITNESS:  This was the day that this proposal

13   had been announced to us, and the MEC first started.

14   Q.   Well, was the proposal accepted or not by the MEC?

15   A.   It was not accepted as it was.  No.

16   Q.   Right.

17   A.   There was a counter proposal.

18   Q.   Which American --

19   A.   Declined.

20   Q.   So there is no agreement in these Washington, D.C.

21   meetings, right?

22   A.   No.

23   Q.   So what is the strategy going forward?  What did you

24   hope to do then?

25   A.   Well, at that point, Roland actually left the meeting to

```
 1   go back to his office to prepare paper paperwork for what we

 2   had discussed before.

 3   Q.   Which was what specifically?

 4   A.   As the Judge mentioned, the grievance relating to their

 5   best efforts, and so on.

 6   Q.   Well, what, you testified about a meeting you had in

 7   Washington the month prior, getting approval for what?

 8   A.   Well, that is what I am talking about here.

 9   Q.   And I want you to be more specific, what it was that was

10   happening here?

11   A.   Okay.  Well, what was happening here was, we were attem

12   pting to slow down the process.  Roland was going to file for

13   an injunction.

14           THE COURT:  Injunction against whom?

15   A.   An injunction against American and APA.

16           THE COURT:  From doing what?

17           THE WITNESS:  From instituting this cram-down.

18           THE COURT:  I mean from having single carrier

19   status.

20   A.   This was related to single carrier.  He was going to say

21   the NMB did not have jurisdiction yet.

22   Q.   Captain Day, this lawsuit that Mr. Wilder is working on,

23   is this the same concept that had been green lighted a month

24   earlier --

25   A.   That's correct.
```

```
 1              MR. FRAM:  Your Honor, objection.  It is leading.

 2              THE COURT:  I will allow it.  Go ahead.

 3   A.   Yeah, that is what we just talked about a minute ago.

 4   Q.   All right.  And so what happened next?

 5   A.   Duane Woerth called over into the MEC meeting.  And he

 6   was filled in or he already knew --

 7   Q.   Let me ask some foundational questions.  He called in.

 8   Where were you?

 9   A.   I was sitting in the room with the MEC.

10   Q.   What kind of room was it, describe the room.

11   A.   I  was a big long room with a big long desk.  I was

12   sitting on one end and Bob Pastore, the MEC chairman, was

13   sitting on the other end, and the MEC representatives were

14   sitting along the side.  There was a speaker phone down here

15   near the other end, near Bob Pastore.

16   Q.   Did you guys call Duane Woerth or did he call in to your

17   meeting?

18   A.   I don't remember who instituted the call.

19   Q.   How did the conversation go?

20   A.   Duane told us that there was not going to be any

21   lawsuit.

22   Q.   How did you react to that, you personally?

23   A.   I jumped out of my chair and screamed out bull -- BS,

24   and told him that is not what he had agreed to.  He then

25   said, I don't sue fellow unions.  And bedlam occurred after
```

1    that.

2    Q.   Okay.  What do you mean, bedlam?

3    A.   MEC kind of went into meltdown for a while.  I left to

4    go over to Roland's office, we was preparing this, and tell

5    him what had happened.

6    Q.   So you can't file the lawsuit that you wanted to file?

7    A.   Right.

8    Q.   What was the strategy going forward, if there was one,

9    to try to get a better deal?

10   A.   That was going to be the end of the road.

11   Q.   And and so ultimately, Captain Day, what was your

12   recommendation to the MEC?

13   A.   At that time my recommendation was accept the deal, we

14   are at the end of the road.  Our coach, Jim Baehler, had said

15   when you reach that point, don't leave anything on the table.

16   There were a couple little things that were on there, on the

17   table, but the big reason I recommended it was that it would

18   then become a three-party agreement, and I didn't feel that

19   portions of it could be changed later.

20   Q.   And that was your advice to the MEC?

21   A.   Yes.

22   Q.   The MEC --

23   A.   That was my personal advice.  The committee could not

24   come to a consensus.

25   Q.   And the MEC, they did ultimately, ultimately what did

1    they do?

2    A.   Well, they countered.  They began negotiating

3    themselves.

4    Q.   All right.  Now, Captain Day, from that point forward,

5    did you have any involvement in the process of trying to

6    negotiate anything?

7    A.   No.

8    Q.   Do you remember being at an MEC meeting in St. Louis on

9    October 31, the end of October?

10   A.   Yes.

11   Q.   Exhibit D 257, is that in evidence?

12            MR. FRAM:  I believe it is.

13            THE COURT:  D 257 is in evidence.  It was put in on

14   the 15th of June.  That is the minutes.  They are in

15   evidence.

16   Q.   There are some remarks attributed to you, Captain Day,

17   on page 2.  Without reading the whole thing, Captain Day,

18   what were you telling the MEC, what was the point of you

19   speaking to the MEC that day?

20   A.   Well, it was kind of a wind-up, and that was basically

21   it.

22   Q.   There is a comment in the middle there, after September

23   11 changed -- September 11 changed everything.  It says "the

24   process failed us."

25            Can you explain what you meant by that, "the

1   process failed us".

2            MR. FRAM:  Your Honor, is he asking the witness

3   what he said at the time.

4            MR. PRESS:  Yes.

5            MR. FRAM:  Because I object to what might be said

6   today.

7   Q.   This isn't a verbatim transcript of what you said?

8   A.   No, I am not ensure it is accurate.  I have never had a

9   chance to look these over like normal minutes, and make

10  comments to them.

11  Q.   Let me ask you just directly, what did you tell the MEC

12  about the process that you participated in personally?

13  A.   I basically said it didn't exist.  We didn't have a

14  process.  And I don't agree, I don't even know why we got

15  into this discussion on the asset purchase agreement because

16  I never said that.

17  Q.   Captain Day, I didn't direct you there.  I want to talk

18  about something different actually.  You can take that down,

19  Will.  Do you remember this goes back to the beginning of the

20  process.  You are brand new to the committee.  I want to show

21  you a memo from you, and it is marked P-405.  What is exhibit

22  P-405, Captain Day?

23  A.   It is an informational memo from myself to the MEC,

24  negotiating committee.

25  Q.   What do you include, without going into each page, there

 1  are several pages, but what is it that you are transmitting

 2  here?

 3  A.   Information on prior mergers.

 4          MR. PRESS:  I move for the admission of exhibit

 5  P-405.

 6          MR. FRAM:  No objection, your Honor.

 7          THE COURT:  No objection, then P-405 is in

 8  evidence.

 9  Q.   I would like for you to look at the second page, I would

10  like for us all to look at it.  There is a memo or document a

11  that says, signed at the bottom, or there is a name.

12  Jonathan A Cohen.  Do you know who that person is?

13  A.   Mr. Cohen.

14  Q.   Who is he?

15  A.   At the time he was director of legal department for

16  ALPA.

17  Q.   This is a memo you collected from ALPA.  Where did you

18  get it?

19  A.   1 of our former executive vice presidents went to ALPA

20  and they prepared it.

21  Q.   And the subject of this memo from Mr. Cohen is pertinent

22  facts regarding the TWA Ozark transaction?

23  A.   Yes.

24  Q.   What is this a reference to, the TWA Ozark transaction?

25  A.   That was the, when Carl Icahn bought Ozark airlines and

```
 1    we had to merge the two seniority lists for the pilots.

 2               THE COURT:  Was Ozark an ALPA --

 3    A.   Yes, it was, it was ALPA to ALPA.

 4               THE COURT:  This was ALPA to ALPA, in other words,

 5    both sides of this equation were --

 6    A.   Bound by --

 7               THE COURT:   -- bound by the ALPA policies?

 8               THE WITNESS:  Yes, sir.

 9    Q.   And it turned out that the Ozark Airline pilots got a

10    little cross wise with Carl Icahn and TWA management, right?

11               MR. FRAM:  Objection, leading, your Honor.

12               THE COURT:  I will allow that.

13    A.   They did get cross wise because Carl Icahn used a Frank

14    Lorenzo tactic that he had used in Continental Eastern,

15    started transferring airplanes, initially.  And as he

16    transferred airplanes he would, they would furlough pilots.

17    And of course TWA said they weren't bound by ALPA merger

18    policy and they could pretty well do what they wanted.

19    Q.   And if you look, Captain Day, at the seventh bullet

20    point of this memo, there is some talk about some proposed

21    litigation on behalf of the Ozark pilots.  Do you see that in

22    the middle of that paragraph?  Are you there?

23    A.   I believe so.

24    Q.   Can you read the two sentences starting, the Ozark

25    pilots?
```

1   A.    "The Ozark pilots representatives and their chosen

2   council concluded that the chances of prevailing in

3   litigation challenging TWA's actions were slim.

4   Nevertheless, ALPA offered to pursue litigation and

5   grievances and to take whatever action the Ozark pilots

6   desired."

7            THE COURT:  This was not an action by the pilots

8   against another union.  This was an action against the

9   management.

10           THE WITNESS:  Against TWA.

11           THE COURT:  Right.

12           THE WITNESS:  That is true.

13           THE COURT:  It couldn't, because ALPA wouldn't sue

14  itself.

15           THE WITNESS:  ALPA wouldn't sue it, but they never

16  had --

17           THE COURT:  My question is, this is not a question

18  of ALPA suing another union.  This is ALPA suing management.

19           THE WITNESS:  That's correct, Judge, yes, sir.

20  Q.   So Mr. Cohen is reporting that even though the

21  litigation has a slim chance, he says slim, of prevailing,

22  ALPA is offering to do what?

23  A.    ALPA is offering to sue TWA.

24  Q.   And take whatever actions Ozark pilots desire, that is

25  what desired.  That is what he said, right?

1   A.   That is what he said.

2   Q.   Compare that to what happened to you.

3   A.   We never got any offers to sue anybody.

4   Q.   And the actions you wanted to take?

5   A.   They were never authorized.

6            MR. PRESS:  Your Honor, that is all the questions I

7   have of Captain Day.

8            MR. FRAM:  Thank you, your Honor.

9            THE COURT:  Mr. Fram.

10           CROSS EXAMINATION.

11           BY MR. FRAM:

12           THE COURT:  405 I put in evidence.

13           MR. PRESS:  Yes.

14           THE COURT:  Without objection.

15  Q.   What year did you graduate from Rutgers Law School?

16  A.   '73 or '74.

17  Q.   I am sorry, which was it?

18  A.   Either 1973 or '74.  I believe.

19  Q.   When did you get admitted to the New Jersey bar, what

20  year?

21  A.   Approximately 1974.

22  Q.   You say approximately.  Do you recall what year?

23  A.   No, I don't.

24  Q.   What year were you admitted to the Florida bar?

25  A.   Approximately 1975.

Day-cross/Fram                                                    106

1    Q.   So you don't recall the specific date you were admitted?

2    A.   No.

3    Q.   You practiced law for a period of time on a part-time

4    basis?

5    A.   Yes.

6    Q.   For over what years did you practice law on a part-time

7    basis?

8    A.   About 1975, and I still practice part time in Florida.

9    Q.   So you have been practicing law continuously on a

10   part-time basis for about 35 years now?

11   A.   Yes.

12   Q.   And you have been practicing law on a part-time basis

13   for about 25 years when you first got involved in the

14   American Airlines TWA transaction back in February of 2001.

15   Is that correct?

16   A.   That's correct.

17   Q.   And did you tell us that your first involvement in the

18   transaction was as part of the unsecured creditors committee?

19   A.   Yes.

20   Q.   And you were there as a representative of ALPA, is that

21   correct?

22   A.   I was a representative of ALPA, but I was representing

23   also the unsecured creditors.

24   Q.   ALPA was given a seat on the unsecured creditors

25   committee, correct?

1    A.    That's correct.

2    Q.    Did you review the asset purchase agreement between

3    American Airlines and TWA that was the basis for the

4    bankruptcy and the transaction that was proposed in the

5    bankruptcy?

6    A.    I believe I did.

7    Q.    And were you aware that one of the conditions of the

8    American TWA deal was that the TWA pilots had to waive their

9    scope and successorship provisions?

10   A.    Yes.

11   Q.    When did you first review the, and by the way, did you

12   know that was required, that condition was required, by

13   American because American had a collective bargaining

14   agreement with the own pilots represented by the APA, and

15   that collective bargaining agreement had different

16   provisions.

17   Q.    Different provisions from the agreement between TWA and

18   the pilots.  Do you recall that?

19   A.    I do.

20   Q.    Okay.  And did you testify this morning that the

21   position taken by the American pilot was that they were

22   entitled under their collective bargaining agreements, to

23   have the TWA pilots stapled?

24   A.    Yes.

25   Q.    And then you said this morning when Mr. Press put P-255

1   up that you had reviewed the agreement last night and had a

2   different view today of what that agreement required, right?

3              MR. PRESS:  Judge, I think that mischaracterizes

4   the testimony.

5              THE COURT:  Well, I don't know.  I heard something

6   like that.

7   Q.   Let's put it up, let's bring up P-255, and let's look at

8   the successorship provision that the witness referred to.  On

9   page  1-14.

10             Let's blow up those couple paragraphs, the one

11  agreement binding on successor.  Seniority list merger.

12  These are the ones that we talked about a little bit this

13  morning, right?

14             Now, are you telling us that your reading today of

15  these provisions is that the American pilots did not have the

16  right to have the TWA's pilots stapled.

17  A.   No.

18  Q.   Okay.  What relevance, if any, do you think this --

19             THE COURT:  So your you think, let me turn that

20  question around.

21             Do you agree that under this agreement American

22  could have stapled the TWA pilots, if this agreement was

23  carried out?

24             THE WITNESS:  I agree they had the right to do

25  that.

1           THE COURT:  Okay.

2  Q.   Didn't you testify this morning that agreement binding

3  on successor provision, that that provision applied to the

4  transaction between American and TWA?

5  A.   Yes.

6  Q.   What do you understand the successor referred to in that

7  paragraph to be, are you saying that successor there was TWA?

8  A.   Well, yes.

9  Q.   All right.  So you read the sentence, the agreement

10 shall be binding upon any successor.  You felt in that

11 paragraph that successor would encompass TWA.  Yes?

12 A.   Yes.

13 Q.   Are you aware, sir, that successor is a defined term in

14 this agreement?

15 A.   Not right now, no.

16          THE COURT:  Before that, as a lawyer, you know what

17 we mean when we talk about a defined term.

18          THE WITNESS:  Yes, sir, I do.

19          THE COURT:  Okay.

20 Q.   Did you look at the definitions to this agreement last

21 night when you looked at this one particular provision?

22 A.   No, I did not.

23 Q.   I mean you know as a lawyer from your legal training

24 that a contract has to be read in its entirety to understand

25 the document and what it means, right?  Are you familiar with

1    that provision of contract law?

2    A.   Yes.

3    Q.   Let's turn to page 1-2, and focus for a minute on

4    paragraph 16 which defines successor.  Would you blow that up

5    for us, please?

6              It says the term successor shall include, without

7    limitation, any assignee, purchaser, transferee,

8    administrator, receiver, executor, and/or trustee of the

9    company, or of all or substantially all of the equity

10   securities and/or assets of the company.

11             So within that definition, sir, was TWA successor

12   of American?

13   A.   Not within that definition.

14             THE COURT:  You you understood that the word

15   "company" referred to American, not to TWA, not to anybody

16   other than American?

17   Q.   Yeah, we can go back to paragraph 6 which defines the

18   company as American Airlines, Inc..  Right?  So you

19   understood "successor," from your legal training, to be a

20   company that somehow continued the operation of American

21   Airlines, Inc.?

22   A.   Okay.

23   Q.   Yes?

24   A.   Yes.

25   Q.   So let's go back to the successorship provision, back to

1    page 1-14.  Blow those two paragraphs up.

2              So do you now agree that paragraph 1 relating to

3    the agreement shall be binding upon any successor?  And the

4    discussion in that paragraph about a seniority list had

5    absolutely no application to the transaction between American

6    and TWA?

7              (Pause)

8    Q.   Sir?

9    A.   I am thinking about it.  I am reading it.

10   Q.   You didn't read it carefully last night?

11             THE COURT:  Let him read it.  Read it and and then

12   answer the question.  Take your time.

13             THE WITNESS:  Thank you, Judge.

14             (Pause)

15   A.   In that regard, it probably does not.

16   Q.   There is some specific language in the second numbered

17   paragraph, there.  Seniority list merger.  Do you see that?

18   A.   Yes.

19   Q.   It says if the successor is an air carrier or an

20   affiliate of an air carrier, the company shall, at the option

21   of the association, and the association of course refers to

22   the Allied Pilots Association, right?  Do you recall this?

23   A.   Yes.

24   Q.   It says at the option of the APA the company shall

25   require the successor to agree to integrate the pre

```
 1    transaction pilot seniority lists of the company and the

 2    successor in a fair and equitable manner within twelve

 3    months, and then it makes reference to sections 3 and 13 of

 4    the Allegheny Mohawk labor protective provisions, right?

 5            So what that means is that if American was

 6    purchased by a company, or went in to receivership or was

 7    taken over in some way, that the American pilots had the

 8    right to the labor protective provisions of Allegheny Mohawk,

 9    correct?

10    A.   That's correct.

11            THE COURT:  Which is the mandatory arbitration.

12    Q.   Yeah, in seniority arbitration, right?

13            Now, you see that final --

14            THE COURT:  The answer to that is yes.  You can't

15    nod..

16    A.   Yes.

17    Q.   Do you see that final sentence there?

18    A.   Yes, I do.

19    Q.   "The requirement of this provision does not apply to the

20    company's acquisition of all or part of another air carrier

21    in a transaction which includes the acquisition of aircraft

22    and pilots."  Do you see that?

23    A.   I do.

24    Q.   That last sentence refers directly to the type of

25    provision, the type of transaction that American was entering
```

Day-cross/Fram                                                    113

1   into with TWA, right?

2   A.   Yes.

3   Q.   So that last sentence tells us that the two paragraphs

4   we just spent a couple minutes on have nothing to do with the

5   American TWA transaction.   Correct?

6   A.   Yes.

7   Q.   Now, did you read, when you went through this document

8   last night, did you make reference to the specific provisions

9   of the document that deal with seniority, did you look at

10  section 13 of the document?

11  A.   I did.

12  Q.   Let's pull up section 13.   The third page from the end

13  of the document.   Let's blow up the paragraph that says

14  "service with the company."

15          "Seniority as a pilot shall be based upon the

16  length of service as a flight deck operating crew member with

17  the company, except as otherwise provided in sections 11 and

18  12 of this agreement."

19          That paragraph means that when new pilots come to

20  American, that their seniority is based upon when they are

21  hired by American.   Yes?

22  A.   That is not the way it was explained.

23  Q.   Well --

24  A.   They have an occupational date that they use for their

25  seniority, not date of hire.

1  Q.   Okay.  Length of service as a flight deck operating crew

2  member.  Length of service would be based upon the date that

3  you are hired.  Do you agree with that?

4  A.   No.

5  Q.   Okay.  What do you think owe on?

6          THE COURT:  Next question.

7  Q.   All right.  So you have a different understanding of

8  what the American pilots were entitled to in materials of TWA

9  pilots coming in?

10  A.   Yes.

11  Q.   Tell me your interpretation of that paragraph, please?

12  A.   The American pilots made a big deal out of something

13  they called occupational seniority date.  It was not the same

14  as their date of hire.

15  Q.   How did you understand it to be different?

16  A.   Well, for one thing it was, I am not sure what

17  determined it, but I, the feeling that I got from it, was

18  that it was perhaps a date that they finished ground school.

19  It was usually a later date than their date of hire.  But it

20  was not, it was something entirely difference represent than

21  date of hire.

22  Q.   So in terms of seniority it was even worse, the TWA

23  pilots would have even less seniority than date of hire?

24  A.   If you based it on -- my occupational date with American

25  was 1986.  Not April 9, or April 8 of 2001.

Day-cross/Fram                                                       115

```
 1              THE COURT:  That is because that is the deal that
 2   was made.  That is not because of this clause.  Supplement CC
 3   was better.
 4   A.   That's correct.
 5              THE COURT:  Supplement CC was better than the APA
 6   contract would have been?
 7   A.   Well, I don't, I am sorry, Judge, I just don't agree
 8   with this interpretation.
 9              THE COURT:  So you think it would have been better
10   under this contract?
11              THE WITNESS:   No.  What I am saying is that it
12   gave them, they had the right to do that, but not the
13   obligation.
14              THE COURT:  I agree, but they had the right to
15   credit only your service with American in determining
16   seniority.  They had that right.
17   A.   That's correct, Judge.  I didn't know --
18   Q.   And your service with American would have started at the
19   earliest on April 10, 2001.
20   A.   That's correct.
21              THE COURT:  That's assuming we count TWA LLC, that
22   is itself a question.  Okay.
23              Go ahead.
24   Q.   All right.  So do we agree that when you first got
25   involved in assisting the MEC and TWA pilots, you understood
```

```
 1    that the American pilot position was TWA pilots could be

 2    stapled.  Yes?

 3    A.   Yes.

 4    Q.   And did you know --

 5              THE COURT:  And they made that known to you?

 6    A.   Yes, they made it abundantly clear.

 7    Q.   And everybody on the TWA side understood that the

 8    collective bargaining agreement between the American pilots

 9    and American allowed them to did take that position, yes?

10    A.   Yes.

11              THE COURT:  And by the way, was it clear to you

12    that when, if and when, I should say, they were declared a

13    single carrier, that ALPA wouldn't even be your bargaining

14    agent, you would now be represented by APA and the APA

15    contract is the one that would apply?

16    A.   Yes, your Honor.

17              THE COURT:  Okay.

18    Q.   You were flying 767s at the time of the transaction?

19    A.   767, 757.

20              THE COURT:  Is that the Dream Liner.

21    A.   I wish.  No, sir.

22              THE COURT:  What is the dream liner?

23    A.   That is the 787.

24              THE COURT:  787 is the Dream Liner.

25    Q.   In terms of the implementation of Supplement CC, what
```

```
 1    planes were you flying after, what planes did you continue to

 2    fly from 2002, start with that?

 3    A.   Same, 767, 757.

 4          THE COURT:  Even after you became an American

 5    pilot?.

 6    A.   Yes, Judge.

 7    Q.   So was your seniority in terms of the kinds of planes

 8    you were flying, was that adversely affected?

 9    A.   Not relative to the airplanes I was flying, no.

10    Q.   Did you make less money in 2002 than you had in 2000 and

11    2001?

12    A.   I can't say for sure, but I don't think I did.

13    Q.   All right.  So you were senior enough at TWA so that

14    when Supplement CC was imposed, it really didn't hurt you.

15    Is that fair?

16    A.   I was not adversely affected, no.

17    Q.   And there were a substantial number of TWA pilots who,

18    like you, had significant seniority and they were also not

19    adversely impact financially.  Right?

20    A.   Well, I don't know if I would agree with "substantial,"

21    but there were a number of pilots, that's correct.

22          THE COURT:  But the hourly rate went up actually.

23    A.   The hourly rate went up, certain working conditions

24    changed.

25    Q.   The hourly rate for people at your level went up by over
```

1    $60 per hour, yes?

2    A.   That sounds about right.

3    Q.   It went up from 130 something to about $200 per hour,

4    yes?

5    A.   Well, the hourly rate went up, but before I had the

6    ability to fly up to 100 hours at our other rate.  So yes.

7    The hourly rate went up.

8    Q.   And although, you are saying that although the hourly

9    rate went up, you now became subject to American set of rules

10   in terms of the number of hours that people would fly, yes?

11   A.   Yes.

12   Q.   American didn't impose a more restrictive set of rules

13   on former TWA pilots, did they?

14   A.   No, they did not do that.

15   Q.   But the chairman of the MEC who you referred to, Robert

16   Pastore, he had only a couple years left before he had to

17   retire as of 2002, correct?

18   A.   I don't know that for a fact, but I know Bob was older

19   than me.

20   Q.   You don't recall Mr. Pastore telling the members of the

21   MEC that they should worry about themselves and not be too

22   concerned about him, because he would have to retire in a

23   couple more years and that no matter what deal got imposed --

24   A.   No, no, I don't recall that specific --

25   Q.   Okay.

Day-cross/Fram                                                        119

1    A.   I am not saying he couldn't have said it.  I am just

2    saying I don't recall.

3    Q.   Did you say before there were a substantial number of

4    TWA pilots who had a lot of seniority?

5    A.   Yes.

6    Q.   There was a large group of TWA pilots who expected to

7    retire within the five or so years after this deal, after

8    2001, yes?

9    A.   Yes, that would include me.

10   Q.   And about how many pilots would you say, and by the way,

11   as of 2001, the mandatory retirement age for pilots was 60,

12   correct?

13   A.   That.

14   A.   That changed a year after I retired.

15   Q.   So you were subject to mandatory age of 60 and that is

16   why I you retired in 2005, yes?

17   A.   That's correct.

18   Q.   Give us your best estimate of the number of TWA pilots

19   who are looking at mandatory retirement within five years as

20   of 2001?

21   A.   Between 2001 and 2005?

22   Q.   Yes, sir.

23   A.   100 to 125.  That were senior to me.  There were

24   certainly some that were junior to me.  I don't know.  It

25   would be a guess.  I could get you those numbers but about I

 1   don't have them off the top of my head.

 2   Q.   You said one of your complaints about Duane Woerth is

 3   that he would not authorize a jumpseat war.  Do you recall

 4   that?

 5   A.   That's correct.

 6   Q.   You said you had lunch with him before the meeting of

 7   the MEC on April 23 of 2001, and yes to the lunch about a

 8   jumpseat war?

 9   A.   Yes.

10   Q.   What did he say about why he would not a proffer a

11   jumpseat war.

12   A.   He said he wasn't going to get into a jumpseat war.

13            THE COURT:  Did he give a reason?

14   A.   He didn't get into specifics that I recall.

15   Q.   He didn't explain that a jumpseat war would cause

16   financial harm to pilots throughout the industry?

17            MR. PRESS:  I object.  He just asking --

18            THE COURT:  I think it is appropriate.

19   A.   I don't remember.

20            THE COURT:  All right.

21   Q.   You are saying he gave absolutely no explanation, he

22   just said no jumpseat war?

23   A.   It was, it was pretty heated.  And I don't, I don't

24   recall him getting into specifics.

25   Q.   Okay.  Did he explain to you that ALPA had a specific

1    policy, section 15, of the ALPA administrative manual which

2    provided --

3              MR. PRESS:  Your Honor -- go ahead.

4              MR. FRAM:  Can I ask the whole question first?

5              MR. PRESS:  I am sorry.  I thought you with were

6    finished.

7    Q.   Did he tell you at that time that section 15  -- 115 of

8    the ALPA Administrative Manual specifically prohibited the

9    denial of jumpseat privileges as a means of punishing,

10   coercing or retaliating against other pilot groups or

11   individuals not supported by ALPA?

12             MR. PRESS:  Your Honor, I object.  He is asking the

13   same questions now five times.

14             THE COURT:  No, but I think, I mean I think that is

15   legitimate cross examination.  The answer may be no, in which

16   case that is the end of it.  But I think that is legitimate

17   cross, particularly if he has -- well, I will allow it.

18   A.   I am going to tell you.  Absolutely not.  That is the

19   first I heard of it, is you reading this.

20   Q.   Were you familiar with the ALPA administrative manual

21   back during the period in which you were a member of the TWA

22   MEC?

23   A.   Familiar with it?  I knew it existed.  Did I study it?

24   No.

25   Q.   Did you have a copy of it back in the nineties when you

1    were a member of the MEC?

2    A.    I believe they give a copy to each new LEC officer.

3    Q.    When you got appointed to the unsecured creditors

4    committee in February of 2001, did you have a copy of,

5    accessible to you then?

6    A.    There was one I am sure in the MEC office.

7    Q.    When you became chairman of the merger committee, did

8    you have a copy of the ALPA administrative manual accessible

9    to you then?

10   A.    Same answer.

11   Q.    Well, did you understand that when you were acting as

12   merger chairman, chairman of the merger committee, that you

13   were expected to act consistent with ALPA's Constitution,

14   bylaws, and other regulations?

15   A.    Yes.

16   Q.    Did you make reference to the Constitution, bylaws, and

17   other regulations to satisfy yourself that what you were

18   doing was consistent with them?

19   A.    No. It was a reference made.

20   Q.    When you weren't before the ALPA executive board, I

21   think you said it was some point in July or thereabouts and

22   made your plea for them to authorize a jumpseat war.  Do you

23   recall talking about that earlier today?

24   A.    You are are you talking about the executive board or the

25   executive council.

 1   Q.   Which did you say it was, did you say it was the

 2   executive council?

 3   A.   What I refer to as the executive council.

 4   Q.   That is the group --

 5             THE COURT:   That is the smaller group?

 6   A.   Yes, sir.

 7   Q.   That is the smaller group that has representatives of

 8   all of the other pilot groups, all the other pilot groups

 9   that were represented by ALPA, yes?

10   A.   Yes.

11   Q.   Tell  us how many people were there at that meeting

12   where you and been Bensel and Pastore, was he the third guy

13   there?

14   A.   Yes, he was.

15   Q.   How many other pilot representatives were there when you

16   and Bensel and Pastore made your plea?

17   A.   Are you talking about how many persons were on the

18   executive council or how many pilots were in the room.

19   A.   Well, let's find out how many other pilot were in the

20   room.  How many nonTWA pilots were in the room.

21   A.   I am guessing seven to ten.

22   Q.   How many other pilot groups, pilot airplane groups,

23   airline groups, did they represent?

24   A.   Well, the executive council represented all of ALPA's

25   carriers.

1   Q.   So dozens and dozens of other carriers, yes?

2   A.   Yes.

3   Q.   And they told you when you asked for a jumpseat war that

4   they would not agree to it, yes?

5   A.   No, they didn't tell me anything at that time.

6   Q.   So you got no reaction whatsoever to your request for a

7   jumpseat war?

8   A.   The reaction that I got was dealt take pilot telling me

9   I was there asking for money.  That was the reaction I got.

10  Q.   So did you get any explanation for why any of those

11  people felt, let me take a step back.  Did any of them

12  communicate to you that they thought a jumpseat war was a bad

13  idea?

14  A.   I do not remember that.  You are reading that to me for

15  the first time that I have heard that.

16  Q.   Well, during the entire period in which you were

17  pressing for a jumpseat war, are you telling us that no one

18  ever told you that ALPA had a policy which prohibited the use

19  of jumpseat wars?

20  A.   That is what I am telling you.

21  Q.   To get leverage over another pilot group?

22  A.   That is the best of my recollection.

23  Q.   You talked about some litigation ideas this that Mr.

24  Wilder had.  Do you recall that?

25  A.   Yes.

Day-cross/Fram                                                    125

 1   Q.   Do you agree as a lawyer that it is important before

 2   filing any type of lawsuit to make sure that there is an

 3   appropriate factual and legal basis for the lawsuit?

 4   A.   Yes.

 5   Q.   You weren't expecting ALPA to have the lawyers file any

 6   frivolous lawsuits, were you?

 7   A.   Of course not.

 8   Q.   When Mr. Wilder made his different litigation proposals,

 9   did you review the cases that he relied upon in making those

10   proposals?

11   A.   No.

12   Q.   So in terms of your work as the chairperson of the

13   merger committee and your interaction with Mr. Wilder, did

14   you interact with him solely as a pilot, or,, and did you

15   take off your lawyer's hat, is that what happened?

16   A.   I was not acting an as as attorney while I was on the

17   merger committee.

18   Q.   All right.  So you approached your responsibility solely

19   as a pilot.  Is that fair?

20   A.   That is fair.

21   Q.   You talked about a July 7 memo that Mr. Wilder prepared

22   in which he proposed a lawsuit.  Do you recall that?

23   A.   Yes.

24   Q.   Are you aware that the ALPA in-house lawyers analyzed

25   the litigation proposed by Mr. Wilder and prepared their own

1    memo?

2              MR. PRESS:  Again, your Honor -- well.

3              MR. FRAM:  He is  either aware or he is not?

4              THE COURT:  I will allow that question.

5    Q.   Are you aware of that question?

6              THE COURT:  The answer is yes or no.  Either he was

7    aware or wasn't away.

8    A.   The question again?

9    Q.   Are you aware that the ALPA in-house lawyers prepared

10   their own memos analyzing the litigation theories that Mr.

11   Wilder was proposing?

12   A.   No.

13   Q.   So did anybody ever tell you that they had analyzed the

14   theories, and found that there was no appropriate legal basis

15   for them?

16   A.   No.

17   Q.   Did you ask, I think you said that you had some contact

18   at different points with a Mr. Clay Warner.  Yes?

19   A.   Occasionally.

20   Q.   Did you know that he was one of the in-house lawyers at

21   ALPA?

22   A.   Oh, yes.

23   Q.   Did you ever ask him to explain why ALPA was not

24   following through on some of the litigation theories that

25   were being proposed by Mr. Wilder?

Day-cross/Fram                                                    127

1    A.   No, I didn't.

2    Q.   Did you ever ask anybody else from ALPA to explain why

3    they weren't following through on the theories?

4    A.   No, you didn't.

5    Q.   Did you have any understanding about why ALPA was not

6    pursuing the litigation theories that Mr. Wilder was putting

7    out there?

8    A.   I didn't have any understanding from ALPA, just my own

9    theory.

10   Q.   Well, did you have an understanding from Mr. Wilder, for

11   example, did Mr. Wilder come back and say I propose this

12   novel theory, but got shot down by the people from ALPA,

13   because they thought we would be subject to anxious if we

14   file filed that lawsuit.  Ever have that kind of conversation

15   with Mr. Wilder?

16   A.   He would, he had told me that they didn't agree with

17   him.

18   Q.   Did he explain to you why they didn't agree with him?

19   A.   No.

20   Q.   Did you ask him for an explanation of why they didn't

21   agree?

22   A.   No.

23   Q.   If you thought it was so important, Mr. Day, to get

24   leverage against the APA through litigation, why didn't you

25   ask for an explanation of why ALPA was not pursuing these

```
 1   litigation ideas of Mr. Wilder?

 2   A.    Because I was relying on Roland Wilder.

 3              THE COURT:  Mr. Fram, can we take a break now.

 4              MR. FRAM:  This is a good point.

 5              THE COURT:  Yes.  The reason I ask, because of

 6   obviously a huge mistake, I am the chairman of the security

 7   committee in this building and I have a meeting that will

 8   last about 15 minutes.  To make sure that we are all safe and

 9   sound.

10              MR. FRAM:  Yes, of course.

11              THE COURT:  We have been at it for more than an

12   hour and a half.

13              MR. FRAM:  Thank you, your Honor.

14              THE COURT:  Ladies and gentlemen, do not discuss

15   the case among yourselves.  Keep an open mind until you have

16   heard all the evidence.  Let's go to about 12:20.  I will

17   give you an extra five minutes so I can get upstairs.  Okay.

18              (Recess.)

19              (The jury enters the courtroom.)

20              THE COURT:  Ladies and gentlemen, I can report the

21   building is secure.

22              Everyone please be seated.  Mr. Fram, you may

23   continue.

24

25
```

1               CONTINUED CROSS EXAMINATION

2               BY MR. FRAM:

3               MICHAEL DAY, resumes.

4    Q.   I have handed the witness some exhibits.  Do you see

5    what I put in front of you, sir.  Let's start with D 395, and

6    the others that the witness has are D 396, 397, and 398.

7               MS. RODRIGUEZ:  Are these new documents?

8               MR. FRAM:  They are not in evidence.

9               MS. RODRIGUEZ:  Do you have copies?

10              THE COURT:  Are you going to offer these?

11              MR. FRAM:  Once he authenticates them, yes.

12              THE COURT:  Okay.

13   Q.   Mr. Day, we are going back to when you first got

14   involved in the TWA bankruptcy, February of 2001, correct?

15   A.   That's correct.

16   Q.   Do you recall receiving the four documents that we put

17   in front you of you, 395, 96, 97 and 98, from one of the

18   lawyers who was representing ALPA in the bankruptcy?

19   A.   No.

20   Q.   Do you recall a lawyer named Richard Seltzer?

21   A.   I do.

22   Q.   Is he the fellow you received referred to yesterday when

23   you say that Steve Tumblin and his firm were the bankruptcy

24   lawyers and they had some local counsel from Manhattan?

25   A.   I don't remember the name of the individual from

1    Manhattan, it was not Seltzer.

2    Q.   Seltzer.  Do you recall  the firm Cohen Weiss, does that

3    ring any bells?

4    A.   I have heard the name.  As I am saying, one of the

5    fellows that accompanied me was not one of those.

6    Q.   Do you see on, just turning to the final page of 395, D

7    395, the signature page, do you see it shows a long list of

8    carbon copies?

9    A.   Yes.

10   Q.   Bob Pastore, S.  Shwartz.  You are one of the people who

11   is shown on the letter.  Yes?

12   A.   Yes.

13   Q.   You are telling us you have no recollection of receiving

14   D 395, which for the record is a letter, Cohen Weiss and

15   Simon dated February 26, 2001.  You have no recollection?

16   A.   No, sir, I didn't say that.  I said I have no

17   recollection of receiving all of these.

18           THE COURT:  Let's take it one on one.  Start with

19   395.

20   Q.   Do you recall receiving D 395?

21   A.   I don't recall receiving it.

22   Q.   I am sorry?

23   A.   I don't recall receiving it, but yes, it has my name on

24   it.

25   Q.   Do you recall receiving D 396, which is dated March 8,

 1    2001, also from Cohen Weiss?

 2    A.    No, I wasn't on the creditors committee at that time.

 3    Q.    When did you go on the unsecured creditors committee?

 4    A.    I went in in February.

 5    Q.    And the first letters we discussed is February 26, 2001?

 6    A.    Sir, you just asked me about 396.

 7    Q.    396 is March 8 of 2001?

 8    A.    That is when I got appointed to the merger committee.  I

 9    was no longer on the creditors committee at that point in

10    time.

11    Q.    Right.  So you don't recall receiving D 396.  Is that

12    your testimony?

13    A.    Yes, sir.  That is my testimony.

14          THE COURT:  Okay.

15    Q.    D 397 is March 16, 2001.  It also shows a carbon copy to

16    you.  Do you recall receiving it back in or about March 16 of

17    2001?

18    A.    I don't recall that.

19    Q.    Have you had a chance to look at it?

20    A.    I just scanned it.

21    Q.    Okay.  And is it also your testimony that you don't

22    recall receiving D 398, which is dated March 21 of 2001?

23    A.    Same, I don't recall.  I wasn't on that committee.

24          THE COURT:  The question is not what committee you

25    were on.  The question is you are listed as a cc and do you

 1   recall receiving it.

 2   A.   No, I don't recall.

 3   Q.   Do you recall receiving?

 4           THE COURT:  You are not going to offer these?

 5           MR. FRAM:  Correct, not through this witness.

 6           THE COURT:  They will be offered, not through this

 7   witness.  I will mark them for ID only.

 8   Q.   D 381 which I think is in evidence, your Honor?

 9           THE COURT:  Say again.

10           MR. FRAM:  D 381.

11   Q.   That is an email from Barbara Flynn, March 12, 2001,

12   with an agenda for March 14, 2001?

13           THE COURT:  No, D 381 I don't have it in.

14   Q.   Let me see if I can authenticate it.  Do you recall

15   receiving that email, sir?  On or about March 12, 2001?

16   A.   Sitting here today, I don't recall it.

17   Q.   You agree that it has your name listed as one of the

18   recipients?

19   A.   Yes.

20   Q.   Do you recall that on March 12 of 2001 the bankruptcy

21   Judge in Wilmington, Delaware, Judge Peter Walsh, approved

22   the American purchase of TWA assets?

23   A.   I don't recall the specific date, but yes, I recall that

24   that happened.

25   Q.   Were you in court when Judge Walsh approved the deal?

1    A.    March 12?

2    Q.    Well, when ever it was.  It happened to have been March

3    12.  My question is were you in court, do you recall being in

4    court?

5    A.    I don't recall being in court.

6    Q.    Were you ever in bankruptcy court in Delaware with

7    respect to the TWA bankruptcy?

8    A.    Yes, I was.

9    Q.    Have had a chance to look at the agenda that is part of

10   D 381.  It says TWA scope, seniority, integration and Section

11   1113 issues.

12   A.    Why are where are you at on it?  Okay.

13   Q.    Do you recall receiving that agenda, sir?

14   A.    I don't recall, today, I don't recall receiving it.  I

15   am not saying I didn't receive it.  I am just telling you I

16   don't recall receiving it.

17   Q.    You were the chairperson of the committee responsible

18   for seniority integration issues back on March 12 of 2001?

19   A.    Yes.

20   Q.    Do you recall attending a meeting on March 14 of 2001

21   where scope, seniority integration and Section 1113 issues

22   were addressed?   If you don't recall, just say you don't

23   recall.

24   A.    I don't recall specifically the date.

25   Q.    All right.

Day-cross/Fram                                                    134

```
 1              THE COURT:  You don't recall that document?

 2   A.   No, Judge.  I don't recall this document.

 3              THE COURT:  So ID only.

 4              MR. FRAM:  Yes, your Honor.

 5   Q.   The next two, your Honor, are D 378 and D 380 for

 6   identification?

 7   Q.   Sir, can you refer first to D 378, that is a March 13,

 8   2001, confidential memo from David Holtzman to Richard

 9   Seltzer regarding Section 1113.  Do you see that?

10   A.   I do.

11   Q.   Do you see that there is a long list of carbon copies on

12   the second page of the memo?

13   A.   I see them.

14   Q.   Do you agree that you are one of the people shown as

15   receiving a copy of this memo?

16   A.   I do agree.

17   Q.   Do you recall who David Holtzman is, yes?

18   A.   Yes.

19   Q.   He was a contract administrator for the TWA pilots, the

20   MEC?

21   A.   Yes.

22   Q.   Do you have any recollection as you sit here today of

23   who Richard Seltzer was?

24   A.   If I recall he was one of the advisors.

25   Q.   Do you recall Section 1113 becoming an issue after TWA
```

1    filed for bankruptcy?

2    A.    Yes.

3    Q.    What, give us your understanding, please, of what

4    Section 1113 of the Bankruptcy Code involved?

5    A.    My understanding of Section 1113 is that it was enacted

6    after the continental bankruptcy.  And it was supposed to

7    provide standards for a court to remove provisions of a

8    collective bargaining agreement.

9    Q.    Do you recall becoming aware that TWA filed a motion

10   under Section 1113 to reject its contract with the TWA

11   pilots?

12   A.    Yes.

13   Q.    Do you recall receiving this memo back on or about --

14              THE COURT:  This memo being?

15              MR. FRAM:  378.

16   Q.    Do you recall receiving this back on or about March 13

17   of 2001?

18   A.    Mr. Fram, I am not saying I didn't.  I am just saying I

19   don't specifically recall it.

20              THE COURT:  That is all he asked you.  He asked you

21   if you recall receiving it.

22              THE WITNESS:  No.

23   Q.    The next one?

24              THE COURT:  That is going to be ID only.

25              MR. FRAM:  ID only.

1    Q.   Did I give you two of the only.  Do you have 380 there?

2    A.   I have 380.

3    Q.   All right.  380.  Another memo, March 13, 2001, also

4    from Mr. Holtzman, yes?

5    A.   Yes.

6    Q.   And you  also were shown as receiving a carbon copy,

7    yes?

8    A.   Yes.

9    Q.   Do you recall receiving that memo back on or about March

10   13 of 2001?

11   A.   No.

12   Q.   Do you recall any discussion --

13          THE COURT:  That is going to be ID only.

14          MR. FRAM:  Yes, your Honor.

15          THE COURT:  Okay.

16   Q.   Do you recall what impact the Section 1113 motion was

17   going to have on the seniority integration process?  If  any?

18   A.   What we were told was, it was going to totally abrogate

19   our collective bargaining agreement and we would be working

20   without a collective bargaining agreement.  And that there

21   was a good possibility ALPA would not be representing us.

22   Q.   Do you recall that the TWA ALPA collective bargaining

23   agreement had the labor proceed protective provisions, the

24   Allegheny Mohawk provisions that provided for seniority

25   arbitration?

1   A.   Yes.  Scope.

2   Q.   Did you understand that the Section 1113 motion grant if

3   granted, would do away with those labor protective provision

4   goes and would eliminate any right to have seniority

5   arbitration?

6   A.   That is what was told to us.

7   Q.   Right.  So the Section 1113 motion --

8            THE COURT:  I ask, did you understand also it might

9   result in the entire labor contract being rejected, not just

10  -- I think it was paragraph 1, not just section 1, but the

11  whole agreement?

12           THE WITNESS:  That is what was told to us, Judge.

13  Yes.

14  Q.   Right.  So the Section 1113 motion, if granted, had a

15  profound effect on the seniority integration process, yes?

16  A.   Yes.

17  Q.   Do you recall being concerned at the time about whether

18  the 1113 motion was likely to be granted or not granted?

19  A.   Well, of course.

20  Q.   Do you recall attending meetings where that issue was

21  discussed, whether the motion was likely to be granted or

22  not?

23  A.   I don't recall specifically the meetings.

24  Q.   Do you recall shortly after TWA filed its Section 1113

25  motion that TWA LLC offered up a new collective bargaining

```
 1   agreement for the TWA pilots?

 2   A.   Vaguely.

 3   Q.   Vaguely.  Okay.  Was there a connection in your mind

 4   between the new collective -- by the way, did you understand

 5   that TWA LLC was a wholly owned subsidiary of American

 6   Airlines?

 7   A.   Yes.

 8   Q.   You understood it was going to be the transition entity,

 9   to transition the TWA pilots from TWA, Inc., to American

10   Airlines?

11   A.   Yes.

12   Q.   Okay.  Did you understand when TWA LLC offered this new

13   collective bargaining agreement that it was connected in some

14   way to the Section 1113 motion?

15   A.   I don't recall the timing.

16   Q.   Did you have an opportunity, sir, before coming here to

17   testify, to review any documents that go back to the

18   February, March, or April timeframe of 2001?

19   A.   A few.

20   Q.   A few.  Did you review what is marked as D 386, which is

21   in evidence, your Honor, and is?

22             THE COURT:  D 386.

23             MR. FRAM:  Yes, your Honor.

24             THE COURT:  Okay.

25   Q.   It is a fax from Terry Hayes to ALPA MEC office, Clay,
```

1   Al, and Bob, and it attaches a portion of a proposal of TWA

2   LLC to the air Air Line Pilots Association.  Do you recall

3   that document, sir?

4   A.   No, Mr. Fram.  I didn't get a chance to review it.  I

5   don't recall the document.

6   Q.   Do you recall a meeting of the TWA MEC on March 21 and

7   22 to discuss the Section 1113 motion and the proposal that

8   had been put on the table by TWA LLC?

9   A.   I don't recall it right now, no.

10  Q.   I am handing you what is in evidence as D 382.  Do you

11  recognize that as an email that you received that is dated

12  March 19, 2001, from Robert Stow, giving notice of a special

13  MEC meeting?

14          THE COURT:  What number, is this 386?

15          MR. FRAM:  382, your Honor.

16  Q.   Do you recall receiving that email, sir.  Robert Stow

17  was who?

18  A.   Robert Stow was the vice MEC chairman.  Am I on this?

19  My name, is my name on here?

20          THE COURT:  382 is in evidence.

21  Q.   Do you see your name on there?

22  A.   Is my name on here.  I am looking.

23  Q.   Do you see it?

24  A.   No, I don't.

25  Q.   All right.  Do you recall becoming aware of the

1   scheduling of this meeting?

2   A.   No.

3   Q.   If you don't, just say you don't?

4   A.   No.

5   Q.   Second page, put up the second page.

6           THE COURT:  This is the second page of 382?

7           MR. FRAM:  Yes.

8   Q.   Transaction update continued.  50 percent down.  Merger

9   committee.

10          You were the chair of the merger committee as of

11  March 21 and 22, 2001, right?

12  A.   I was.  Yes.

13  Q.   Do you agree that the agenda has you and the other

14  members of your committee down to provide an update, a

15  transaction update?

16  A.   Okay.

17  Q.   Does that refresh your memory that you were advised of

18  this meeting?

19  A.   Well, I would have to say that I must have been advised

20  of the meeting if I was on the agenda.

21  Q.   Do you recall attending the meeting on either March 21

22  or March 22?

23  A.   I don't recall.

24  Q.   I am going to show you --

25  A.   I am sure I did, but I don't recall.

1    Q.    I am going to show you D 223 in evidence.  Do you

2    recognize those as the minutes, the official minutes of the

3    TWA MEC meeting on March 21 and 22 of 2001?

4    A.    Yes.

5    Q.    Turn, please, to page 3 of the minutes.  Do you see on

6    the very bottom, under Thursday, March 22, where it says,

7    transaction update, merger committee.  Do you see that?

8    A.    We are on page 3.

9    Q.    Yes.  On page 3.  Go up to Thursday, March 22, 2001.  Do

10   you see where it says committee members?

11   A.    I am looking at this page 3 you got up here.  Okay.

12   Q.    You see committee members, it lists a bunch of names.

13   Jim Arthur, Gary Flor, Jonathan Goldstein, Jim Swanson, Mike

14   Day, John Hefley?

15   A.    Can you zero in on it.

16   Q.    Can you blow that up, please?

17   A.    Sorry.

18   Q.    I see that.

19   A.    I see it.

20   Q.    Flor, Swanson you and Hefley were on the merger

21   committee?

22   A.    Yes.

23   Q.    The item below that, transaction update, merger

24   committee, it says 9:15 Rautenberg/ Young move to enter into

25   executive session.

 1    A.    I see that.

 2    Q.    It looks like the MEC was in executive session for over

 3    three hours or until 12:30.  Top of the next page.  Do you

 4    agree that is what the minutes show?

 5    A.    That is what the minutes show.

 6    Q.    Do you have any recollection of what recorded

 7    presentation was given by you or the merger committee during

 8    that three-hour timeframe?

 9    A.    I am sure we brought them up-to-date.

10    Q.    Do you recall the specifics of what you told them at

11    that point in time?

12    A.    No.

13    Q.    Do you have any recollection of the two resolutions that

14    are referred to, resolution number 01-58 and 01-59, the

15    minutes indicate that they were passed in executive session,

16    not for distribution?

17    A.    No, I don't recall those.

18    Q.    Do you recall the MEC putting together some talking

19    points so that the TWA pilots at large could be kept

20    up-to-date about what was happening in connection with the

21    seniority integration and other things that were happening?

22    A.    No, not specifically.

23    Q.    All right.  So I am handing you D 364.  In evidence.  Do

24    you agree that on the email list for D 364 you are one of the

25    people shown?

1    A.    Yes.

2    Q.    Looks like your email address is Sunshine dot Lawyer at

3    ATT dot net?

4    A.    That is what it was, yes.

5    Q.    And you have no recollection?

6          THE COURT:  364, I have this marked for ID, but not

7    in evidence.

8          MR. FRAM:  I had it marked in evidence.

9          THE COURT:  Any objection to 364?

10         MR. PRESS:  If I could see it.

11         THE COURT:  Take a look at it.

12         MR. PRESS:  No objection.

13         THE COURT:  D 364 will be in evidence.

14   Q.    Mr. Day, do you have any recollection of receiving those

15   talking points?

16   A.    I don't recall it right now, no.

17   Q.    Is it fair to say that you don't recall the specifics of

18   many things that we know happened during the period leading

19   up to March 28 of 2001?

20   A.    I don't recall the specifics of many things that

21   happened ten years ago.  That is a correct statement.

22   Q.    But you do recall the specifics of what happened on the

23   evening of March 29 of 2001 when you say three advisors from

24   ALPA came and pressured your committee to make a proposal to

25   the APA, right?

1   A.   That directly affected us, that's correct.   That made a

2   profound impression on me.

3   Q.   And you claim that the urgency to reach a decision, to

4   resolve the seniority issues, was urgency that came from the

5   ALPA side.   Is that correct?

6   A.   Yes.

7   Q.   Was there any indication from the APA side that they

8   wanted to reach an agreement quickly?

9   A.   No.

10  Q.   Do you recall giving sworn testimony during the best

11  efforts arbitration that took place in December of 2001?

12  A.   I don't recall that, no.

13  Q.   Well, do you recall that ALPA filed a grievance as a

14  result of the claim that American had not used its best

15  efforts to press the APA to agree to fair and equitable --

16  A.   Yes, I remember that.

17  Q.   You remember the grievance?

18  A.   Yes.

19  Q.   Do you remember there was a hearing on the grievance?

20  A.   Yes.

21  Q.   What was the outcome of the hearing?

22  A.   I believe it was denied.

23  Q.   Okay.   The arbitrators found that American had fulfilled

24  its obligation to use its best efforts with respect to the

25  APA, yes?

1    A.    Sounds right.

2    Q.    Well, don't agree with me if you don't recall, sir.   If

3    you don't recall, say you don't recall?

4    A.    I don't recall the exact wording, no.

5    Q.    All right.  So do you recall testifying before the

6    arbitration panel that was hearing the best efforts

7    arbitration back on December 12 of 2001?

8    A.    No, I don't.

9    Q.    You want to look at the transcript I just handed you and

10   see if that refreshes your memory?

11   A.    Okay.

12   Q.    What I am going to ask you to do, sir, is to turn to

13   page --

14           THE COURT:  117.

15   Q.    117.  Thank you, your Honor.  You see it starts on page

16   1 16.  You will tell us when you are ready.

17   A.    I am ready.

18   Q.    Do you see, page 116, line 17.  Mr. Warner:  And do you

19   recall that the reference there to Mr. Warner was Clay

20   Warner, one of the in-house attorneys at ALPA?

21   A.    Yes.

22   Q.    Says "That is a different story.  ALPA would like to

23   call Captain Mike Day.

24           "Whereupon Michael Day was called as a witness and

25   having first been duly sworn was examined and testified as

Day-cross/Fram                                                   146

 1   follows?"  Do you see that?

 2   A.   Yes.

 3   Q.   Does that refresh your memory that you gave sworn

 4   testimony before the arbitration panel back on December l2 --

 5   A.   Obviously I did.  I don't recall the specifics.

 6   Q.   Well, do you recall hearing the other members of the

 7   merger committee testify during the same proceeding?

 8   A.   No.

 9   Q.   Do you see on page 118 at line 6.  Actually, line 3.

10   You were asked, when was the first, what was the date of the

11   first meeting with the APA merger committee you attended.

12          "ANSWER:  The first meeting I attended was the one

13   described by John Hefley.  Question:

14   A.   Yes.

15   Q.   That was the week of March 29.

16          "ANSWER:  That's correct.

17   A.   Yes.

18   Q.   You were referring back to testimony that Mr. Hefley had

19   just given while you were present at the hearing.  Yes?

20   A.   Yes.

21   Q.   Do you recall Mr. Hefley testifying that the APA put

22   pressure on the merger committee to reach an agreement

23   quickly within three weeks, because the APA had to turn its

24   attention to negotiating with U.S. Air and because the APA

25   also had to negotiate with American Airlines.  Do you recall

1   that?

2   A.   I don't recall that.

3   Q.   So you don't recall that the pressure to meet late March

4   and try to reach an agreement was pressure that came from the

5   APA and American.  That is what you are telling us?

6   A.   I am telling you that the pressure was not coming from

7   APA.  The pressure was coming from ALP national.

8   Q.   So you don't recall anything from the APA side saying we

9   need to do this quickly because of these other issues.  That

10  is your testimony?

11  A.   That's correct.

12  Q.   In terms of the offer that was made by your committee,

13  the one I think it involved stapling about 425 pilots?

14  A.   Yes.

15  Q.   You agreed to make that offer, yes?

16  A.   I did.

17  Q.   You as the chairperson of the merger committee agreed to

18  make the offer, yes?

19  A.   I did.

20  Q.   Was there a division within the committee about whether

21  that was a good idea or a bad idea?

22  A.   We didn't have a vote, if that is what you mean.  But

23  there there was certainly discussion and arguments on it.

24  Q.   You claim that the people from ALPA who you identified

25  recommended that you offer to staple over 800 people?

1   A.   Yes.

2   Q.   What did they say about why they were recommending that,

3   do you recall?

4   A.   Not specifically.

5   Q.   You have no recollection of why they swooped in,

6   unannounced, and said, you have to agree or propose that 825

7   people be stapled?

8   A.   They told us this was what it was going to take to get

9   the deal done.

10  Q.   Do you recall them saying anything else about why they

11  were making that recommendation?

12  A.   No, I don't.

13  Q.   Your committee disregarded the recommendation.  Right?

14  A.   Well, we disregarded 800, yes.

15  Q.   The recommendation was 800, and you disregarded it,

16  right?

17  A.   That's correct.

18  Q.   I think you told us yesterday about Carl Icahn showing

19  up at one of the bankrupt bankruptcy hearings and trying to

20  bull Lee people.  Do you remember that?

21  A.   Yes.

22  Q.   You weren't bullied by Carl Icahn, were you?

23  A.   Not at that upon one, no.

24  Q.   You weren't bullied by these ALPA advisors on the

25  evening of March 29, right?

1    A.   I was pressured.

2    Q.   Pressured.  Pressured in the sense that they explained

3    to you why they thought their suggestion was a good idea?

4    A.   I was pressured in that they were conveying an urgency,

5    and that they knew something I didn't know.

6    Q.   Well, did you ask them whether they knew that you didn't

7    know?

8    A.   I don't recall if we got into those specifics or not.  I

9    am sure it came it up.  But I don't recall.

10   Q.   Within the committee, the most junior member of the

11   committee, Sean Clarke, was the one who was most upset about

12   the idea of stapling TWA pilots, right?

13   A.   Yes.

14   Q.   And the other members of the committee, what views, if

15   you recall, did they express about the idea of stapling as

16   many as 825 TWA pilots?

17   A.   I don't think anybody was in favor of it.

18   Q.   Who was in favor of stapling 425?

19   A.   Well, I don't think anybody was in favor of it.  I can't

20   recall who was adamantly against it and who wasn't.

21   Q.    If no one was in favor of it, how did it come that your

22   committee proposed that to the APA the next day?

23   A.   What I am saying here, Mr. Fram, is that we reluctantly

24   decided to do it.  Nobody was in favor of it.  We didn't

25   vote.

1    Q.   Right.  That same day, do you recall receiving D 210,

2    which is in evidence?

3              THE COURT:  P 210.

4              MR. FRAM:  D.

5    Q.   The same day we are discussing, March 29, do you recall

6    receiving D 210 in evidence which is another email from

7    Robert Stow, March 29, 2001.

8    A.   I don't recall specifically receiving it but I see that

9    I am on here as a recipient of this.

10   Q.   This email invited you and others to attend a work

11   session of the MEC in St. Louis on Sunday, April 1, 2001, and

12   then a formal meeting on Monday, April 2 of 2001.  Yes?

13   Q.   Is this one of the documents you reviewed before you

14   came to court to testify?

15   A.   No.

16   Q.   Do you recall this email at all?

17   A.   No.

18   Q.   Do you recall being in St. Louis on April 1 of 2001?

19   A.   I know I was there on April 2.

20   Q.   I see.  Did you review any document before today which

21   reminded you that you were there on April 2, 2001?

22   A.   I can't recall.

23   Q.   D 179 in evidence is the agenda for the April 2 meeting.

24   Can you blow that up, please?

25              THE COURT:  179?

1              MR. FRAM:  Yes, your Honor, it is in evidence.

2    Q.   Do you see under bankruptcy slash transaction update?

3    A.   Yes.

4    Q.   You see it is listing the merger committee.  Do you see

5    your name there listed with the other members of the merger

6    committee?

7    A.   No.

8    Q.   Okay.  Can you tell us, sir, all of the other members of

9    the merger committee apparently were expected to attend the

10   meeting on April 2 but you are not listed?

11   A.   No, I can't.

12   Q.   You were the chairman of the merger committee, right?

13   A.   Yup.

14   Q.   You were the one responsible for over seeing its

15   activities and reporting back to the MEC at large about what

16   the merger committee was doing?

17   A.   That's correct.

18   Q.   You have no explanation for us of why you are not on the

19   agenda?

20   A.   No. I don't know why my name is not on here.

21   Q.   Are you not on the agenda because you told people in

22   advance that you couldn't make it to the meeting on April 2

23   of 2001?

24   A.   I don't recall that.

25   Q.   Okay.  You claimed earlier today that you were in St.

```
 1   Louis at the MEC offices on April 2 of 2001 when they were
 2   meeting, right?
 3   A.   That was the best of my recollection, that's correct.
 4   Q.   The best of your recollection.  And you say you didn't
 5   actually attend the meeting, right, you said that?
 6   A.   The MEC meeting?
 7   Q.   Yes, sir.
 8   A.   I didn't, I don't recall being at the MEC meeting, no.
 9   Q.   Well, tell us why if you were in St. Louis on the  2nd,
10   and if your committee was responsible to report to the MEC,
11   why wouldn't you have walked down the hall and been there
12   when your committee gave its report?
13   A.   I may have had to leave early for something.
14   Q.   Do you have a recollection of having to leave early for
15   something?
16   A.   No, I don't.
17   Q.   But you have a recollection of being there?
18   A.   Yes.  I have a recollection of that meeting?  That
19   library with advisors and Roland Wilder.  That is what I have
20   aa recollection of.
21   Q.   You have no recollection of being at the meeting on
22   March  22 of 2001 when your committee reported for over three
23   hours, but you do recall being at a meeting on April 2 where
24   you are not even listed on the agenda.  That is what you are
25   saying, right?
```

1   A.   That specific occurrence that I just told you about, I

2   have a full recollection of that.

3   Q.   That stands out in your mind because you thought it was

4   a dramatic confrontation?

5   A.   Yes.

6   Q.   Between Mr. Wilder and the other advisors, yes?

7   A.   Yes.

8   Q.   April 2 of 2001.  Yes?

9   A.   To the best of my recollection, that was the date.

10  Q.   Are you aware that Mr. Wilder has testified under oath

11  in this proceeding that he is 100 percent certain that he was

12  not in St. Louis on April 2 of 2001, that he left the prior

13  evening to go to Louisville?

14  A.   I am not aware of that.

15  Q.   Did you talk to Mr. Wilder after this confrontation that

16  you claim you observed?

17  A.   We met back in the conference, or the conference room

18  that we were using.

19  Q.   So?

20  A.   With the merger committee.

21  Q.   So you did talk to him, yes?

22  A.   Yes.

23  Q.   Tell us what you claim you recall being discussed on

24  April 2, a day when Mr. Wilder claims he was Louisville?

25  A.   Maybe it was April 1.  I don't know why I am not on

Day-cross/Fram                                                          154

 1   here.  All I know is that what I told you occurred.  Whether

 2   it was the first or the second, I don't recall.

 3   Q.   Tell us what you claim was discussed during a meeting

 4   after the confrontation that you claim occurred?

 5   A.   Met back with the merger committee, and began discussing

 6   merger related items.  I don't recall specifically what we

 7   were discussing.

 8   Q.   Well, did the merger committee tell you that they had

 9   just been present when the MEC voted to waive scope?

10   A.   I don't recall that.

11   Q.   Did the merger committee tell you they had been present

12   when the MEC had voted to accept a new collective bargaining

13   agreement with TWA LLC?

14   A.   I don't recall that.

15   Q.   Do you recall waiver of scope had a big impact on what

16   your committee was trying to do, right?  We talked about that

17   before.

18   A.   Absolutely.

19   Q.   When do you recall becoming aware that the labor

20   protective provisions had been waived by the MEC?

21   A.   I don't recall the exact time.  Obviously it was some

22   time after April 2.

23   Q.   How long after April 2 was it?

24   A.   I don't know.

25   Q.   Can you associate when you became aware of that with an

```
 1   event or a conversation?

 2   A.   No. I can only surmise here that I had a trip or I had

 3   some reason that I had to leave St. Louis.  And somebody

 4   probably called me.  But I don't know, I can't tell you the

 5   specifics of it.

 6             THE COURT:  Can I, Captain Day, were you present

 7   when the MEC voted to waive scope?  Were you present in the

 8   room?

 9   A.   I do not remember being present, Judge.

10   Q.   Right.

11             MR. FRAM:  Pardon me for one second.

12             THE COURT:  Sure.

13   Q.   Oh, did you know before the MEC voted to waive scope on

14   the second that there were going to do that, that they were

15   going to waive scope?

16   A.   No.

17   Q.   Do you recall any recommendations that were made by any

18   of advisors before April 2 about whether the MEC should waive

19   scope?

20   A.   I recall advisors recommending that scope be waived,

21   except Roland was not recommending that.

22   Q.   When do you recall hearing that?

23   A.   I don't know unless it was April 1.  I don't know.  I

24   didn't remember.

25   Q.   Did you have your own opinion before April 2 about
```

Day-cross/Fram                                                    156

```
 1   whether the MEC should waive scope, and do the other things
 2   that it did on April 2?
 3   A.   Yes.
 4   Q.   Okay.  What was your opinion about whether that was the
 5   right thing to do for TWA pilots?
 6   A.   My opinion would be not to waive scope.
 7   Q.   You were shown before the minutes of the meeting on
 8   October 31 of 2001, D 257 in evidence?
 9            THE COURT:  I am sorry, D?
10            MR. FRAM:  257 in evidence.
11   Q.   Do you recall attending that meeting, correct?  Yes?
12   A.   Yes.
13   Q.   All right.  Turn to that second page at the top where it
14   says questions and answers?
15   A.   Okay.
16   Q.   Actually, let's go at the very first paragraph, the one
17   referring to John Swanson, let's blow that up and look at
18   that.
19            John Swanson, council number 2, addressed the MEC
20   regarding seniority integration.  ALPA and the APA were far
21   apart and would never reach a list based on date of hire.  He
22   felt that APA's offer last week was their bottom line because
23   he had been around them long enough to believe it to be.
24   Swanson outlined APA's proposal and explained why he was for
25   the proposal.  Discussed the protections for the STL cell.
```

```
 1              Yes?

 2   A.    Yes.

 3   Q.    You recall Mr. Swanson making  comments to that effect?

 4   A.    Yes.

 5   Q.    STL refers to St. Louis, right?

 6   A.    Yes.

 7   Q.    And Mr. Swanson was still on the merger committee with

 8   you as of October 31, 2001, yes?

 9   A.    Yes.

10   Q.    It then said questions and answers.  Mike Day, council

11   number 2.  You were shown some of these remarks before.

12   Addressed the MEC regarding seniority integration.  He echoed

13   what Swanson just stated.  Yes?  You agreed with what Mr.

14   Swanson just stated at this meeting.  Yes?

15   A.    That is fair characterization.

16   Q.    Let's skip down to the fifth line.  It says, "Also

17   September 11 changed everything.  The process failed us."

18   Then it says, "Even though we waived scope in the asset

19   purchase agreement, the Judge would have waived it for us."

20   Do you see that?

21   A.    I see that.

22   Q.    So you announced to a room full of TWA pilots on October

23   31 that scope would have been waived by the Judge regardless

24   of what the MEC did.  Right?

25   A.     Athat is not what I said.
```

Day-cross/Fram                                              158

```
 1              THE COURT:  So the minutes are inaccurate?

 2              THE WITNESS:  Judge, these minutes were never

 3    approved.  Yes.

 4              THE COURT:  Well, my question is they are

 5    inaccurate?

 6              THE WITNESS:  That's correct, Judge.

 7              THE COURT:  Okay.

 8    Q.   So you were misquoted?

 9    A.   I was misquoted.

10    Q.   Who do you think on the MEC misquoted you?

11    A.   The MEC doesn't do the minutes.  The staff does the

12    minutes.  I don't know who put these minutes together.

13    Q.   All right.  So you never said on October 31, 2001, that

14    even though we waived scope in the asset purchase agreement

15    the Judge would have waived it for us?

16    A.   Could have waived it for us.

17    Q.   It says would have waived it for us?

18    A.   I didn't say that.

19    Q.   Let's go back.  You think the Judge, if he had ruled on

20    the Section 1113 motion, would have denied the motion.  Is

21    that your testimony, sir?

22              If you don't recall what you thought at the time,

23    just say you don't recall.

24    A.   Are you asking what I thought then?

25              THE COURT:  Yes, that is exactly what we are doing.
```

```
 1   Q.   What  did you think before April 2, 2001, about whether

 2   Judge Walsh, the bankruptcy Judge in Wilmington, Delaware,

 3   would do in terms of granting or denying the Section 1113

 4   motion?

 5           THE COURT:  Before you answer that question,

 6   wouldn't it be very important to your negotiating position,

 7   your perception of what Judge Walsh would or would not do,

 8   would that be very crucial to how strong or weak you felt in

 9   negotiating with APA.  Wouldn't that be very significant to

10   you?  To anybody.  Not to -- to anybody in your position, not

11   just you, anybody on the merger committee or anybody on the

12   MEC, tasked with dealing with this issue?  Wouldn't that be,

13   you know, a major, major concern?

14   A.   What the Judge was going to do --

15           THE COURT:  Just your perception of what you

16   thought the Judge was going to do, if you thought it was

17   50/50, if you thought it was 90/10, 100/zero.

18   A.   Yes, Judge.

19           THE COURT:  One way or the other, wouldn't your

20   perception, right or wrong, of what the Judge was going to do

21   be extraordinarily influential in how you approached your

22   negotiations?

23   A.   Yes.

24           THE COURT:  Now you can answer the question asked.

25   Q.   In fact, when you met with the APA on March 28 and March
```

1    29, about a week before the Section 1113 motion was going to

2    come before the bankruptcy judgment?

3              THE COURT:  April 6, I think.

4    Q.   Which was April 6, when you had those those negotiations

5    with the APA, your thoughts about whether the Judge was going

6    to grant the motion or deny the motion would have influenced,

7    in a very significant way, the positions you took in

8    negotiating with the APA, right?

9    A.   Yes.

10   Q.   If you thought the 1113 motion was going to be denied,

11   you would be inclined to take a harder line and you could sit

12   there and say, well, the motion will be denied, we are going

13   to get seniority arbitration, right?

14   A.   That's correct.

15   Q.   And if you thought the motion was being granted, and

16   seniority arbitration was going to go out the window, then

17   you would have been included to give more ground and agree to

18   a greater number of people being stapled, right?

19   A.   Which is what we did.

20   Q.   Okay.  So does that refresh your memory that you were

21   fairly well convinced during the period leading up April 2

22   that Judge Walsh was going to grant the 1113 motion, and you

23   were going to lose scope?

24   A.   No.

25   Q.   Well, let me ask you this.  What business is, if any,

```
 1   did you have for believing back in late March that the

 2   Section 1113 motion was going to be denied?

 3            THE COURT:  Did you believe it was going to be

 4   denied?  Did you have any belief about what it was going to

 5   be, or what he was going to do?

 6   A.   We based our opinions, Judge, on what Roland was telling

 7   us.

 8            THE COURT:  Roland wasn't a bankruptcy lawyer, as I

 9   understand it.  Seltzer I think was a bankruptcy lawyer.

10            MR. FRAM:  Yes, your Honor.  And Tumblin.

11            THE COURT:  At least one other.

12            MR. FRAM:  Tumblin.

13            THE COURT:  What?

14            MR. FRAM:  Steve Tumblin.

15            THE COURT:  He was a bankruptcy lawyer interacting

16   with the MEC and the negotiating committee, what was your

17   perception, I am trying to get a sense of what your

18   perception was back in the days leading up April 2 as to what

19   Judge Walsh was going to do.

20   A.   We we were concerned, Judge, obviously we were

21   concerned.

22            THE COURT:  No, no, I know you were concerned.  But

23   did you have a perception?  You have been a lawyer, people

24   ask you, what is going to happen, where does the law lie on

25   this issue?  What has what happened in the past.  It is not
```

1    an 1113.  I think there was only a handful of prior cases in

2    the airline industry on that, and you researched what had

3    been done.

4    Q.   What is your reading of the Judge, how do you feel this

5    particular Judge in light of what he had done in the case was

6    likely to do on this motion.  Haven't you had that kind of

7    conversation with clients, as a lawyer, many times over the

8    years?

9    A.   I was the client.  Roland was the attorney.

10             THE COURT:  Well, he was an attorney.

11   A.   He was our attorney, Judge.  I relied on Roland Wilder.

12             THE COURT:  Did Roland Wilder tell you that they

13   would defeat the motion?

14             THE WITNESS:  Not with 100 percent certitude, but

15   he told us that he thought, I think he told us that there had

16   never been a successful 1113, and that --

17             THE COURT:  You are not serious.  He told you there

18   had never been a successful 1113 in the airline industry?

19   A.   Where the CBA had been abrogated to that point in time.

20   He felt it was premature, and that there was a good chance

21   that it could be beat.  Based on the equities of it.

22   Q.   All right.  So just to wrap this up.  So your opinion

23   back before April 2 with respect to whether the Section 1113

24   motion was going to be granted was what, was it a 50-50, was

25   it 75 percent, what is your recollection?

Day-cross/Fram                                                    163

```
 1    A.   My recollection was we were concerned, and that I don't

 2    think I can quantify it for you.  I think that Roland told us

 3    that we had a good chance of winning at motion.  I don't

 4    recall if he gave us specific numbers on it.

 5    Q.   What did the other advisors, the other lawyers, Seltzer,

 6    Tumblin, what did they say about the likelihood that Judge

 7    Walsh would grant the Section 1113 motion, do you recall?

 8    A.   Well, to the best of my recollection, they were all

 9    saying that he would approve it.

10    Q.   Is there some reason why you chose to credit what Wilder

11    was saying or over what these other people were saying in

12    terms of the likelihood that the Section 1113 motion would be

13    granted?

14    A.   Well, yes, there was.

15    Q.   You want to tell us what it was?

16    A.   I felt Roland Wilder was hired by us, and he had our

17    best interest at heart.

18    Q.   This was Roland Wilder who had, are you aware that Mr.

19    Wilder had handled all of one pilot seniority negotiation

20    prior to being hired by the TWA pilots?

21    A.   One?  He had handled integrations.

22    Q.   Did he tell you that -- did he ever represent to you

23    that he had handled more than one pilot seniority

24    integration?

25    A.   Well, I thought he had.  Whether he represented it or
```

Day-cross/Fram                                                    164

 1    not, I thought he had.

 2    Q.   Were you aware that there were other people out there

 3    who had handled many more pilot seniority integrations, many

 4    more than Mr. Wilder had handled?

 5    A.   No, I thought it was a short list.

 6    Q.   All right.  You give a little testimony before about

 7    this April 23 meeting.  You told us about the lunch you had

 8    with Duane Woerth?

 9    A.   Yes.

10    Q.   Do you recall that?

11    A.   Yes.

12    Q.   Do you recall discussing with Mr. Worth, with Captain

13    Woerth, the fact that he had met with the board of the

14    American pilots, the APA?

15    A.   Did I bring that up?

16    Q.   Let me ask you this.  Do you recall the fact that

17    Captain Woerth had met with the board of the APA some weeks

18    earlier coming up on April 23?

19    A.   Yes.

20    Q.   Okay.  Do you recall him reporting on the attempt he had

21    made to persuade the APA board to treat the TWA pilots

22    fairly?

23    A.   To me, or to the MEC?

24    Q.   Let's break it down.

25    A.   Are you talking about my discussion with them or his

1    report to the pilots.

2    Q.    Let's talk first about your discussion with him at

3    lunch.  Did you and he talk about the fact that he had gone

4    to the board of the APA and had advocated on behalf of the

5    TWA pilots?

6    A.    No, because there there was a rumor floating around that

7    that is not what happened.

8    Q.    So you didn't talk to him at lunch about it.  Is that

9    what you are saying?

10   A.    I don't recall talking to him at lunch about that.

11   Q.    Do you recall him talking to the MEC and being

12   questioned by members of the MEC about what he had discussed

13   with the board of the APA?

14   A.    I do recall that.

15   Q.    Okay.  What do you recall him saying?

16   A.    I thought that he danced around the issue.  I don't

17   recall anything specific.

18              MR. FRAM:  Can I have D 181?

19              THE COURT:  In evidence?

20              MR. FRAM:  It is in evidence.

21              THE COURT:  181.

22              MR. FRAM:  181.

23   Q.    You got communications from the TWA communications

24   people just like all the other pilots did, right?

25   A.    We were inundated with paperwork, that's correct.

1   Q.   And is D 181 an MEC summary of comments made by Duane

2   Woerth to the MEC on April 23 of 2001?

3   A.   Yes.

4   Q.   Do you recall receiving this?

5   A.   I don't recall specifically receiving it.  I am sure I

6   may have.

7   Q.   Without looking at this, do you recall Duane Woerth

8   explaining at the meeting a number of things he was trying to

9   do to put pressure on the APA to treat the TWA pilots fairly?

10  A.   No, not without looking.

11  Q.   So do you recall, let's walk through.  Top of the second

12  page.  First of all you see on the bottom of the second page

13  where it begins, he went on to tell the APA that the TWA MEC

14  had recently made one of the hardest decisions.  Do you see

15  where it begins there?

16  A.   No.  About what line are you on.

17  Q.   It is the last paragraph on the first page?

18  A.   Oh, the first page.

19  Q.   It starts on the first page.

20  A.   Yes.

21  Q.   You referred to some kind of rumor before.  There was a

22  rumor floating around that Duane Woerth had made a comment to

23  the American pilots that the TWA pilots had to, quote, "get

24  real."  Is that what you are referring to?

25  A.   That is the rumor.

1   Q.   And he directly addressed that and said at the meeting

2   that he had been misquoted, right?

3   A.   I don't recall.

4   Q.   All right.  So let's just move to the top of the next

5   page and refresh your memory about some of the things that

6   Captain Woerth talked about.  The second paragraph, Captain

7   Woerth told the MEC that he would send a letter to the TWA

8   pilots and others to be sure they all know what his position

9   is.

10          "Captain Woerth pledged the financial support of

11   the entire association for the TWA pilots.  In light of

12   losing the 9,000 hour flight pay loss bank previously

13   negotiated with TWA, Captain Woerth assured the MEC and the

14   other members present that the TWA MEC will be provided with

15   funds and other support necessary from ALPA to process MEC

16   activities."  Do you see this?

17   A.   Yes, I do.

18   Q.   Tell us about the 9,000 hour flight pay loss, what was

19   that?  Do you recall?

20   A.   I recall that we had an agreement with the company that

21   would allow us --

22          THE COURT:  The company being TWA.

23          THE WITNESS:  TWA.

24   A.   That allowed us so many hours of flight pay loss to do

25   union business and we had just lost that.

1   Q.   And Captain Woerth told the MEC that ALPA would step up

2   and would provide substitute financing so that the MEC

3   members and the committee members could continue to work on

4   behalf of the TWA pilots, right?

5   A.   That's correct.

6   Q.   That was significant in terms of financial support, yes,

7   that turned out to be hundreds of thousands of dollars,

8   didn't it?

9   A.   I don't know how much it was, but I would say that is

10  probably correct.

11  Q.   And that enabled you and the other pilots to attend I

12  think you said over ten days of merger committee

13  negotiations, that enabled TWA pilots dozens, dozens of them,

14  to walk on Capitol Hill and lobby in favor of the Bond

15  Amendment.  Isn't that so?

16  A.   I can only speak on my merger committee.  I don't know

17  how the money was spent on the political committee.

18  Q.   ALPA supported your --

19           THE COURT:  Did you get payments from them, you

20  were doing a lot of work.

21  A.   Yes.

22           THE COURT:  Did you get paid?

23  A.   We got flight pay loss.

24           THE COURT:  In their case from the union rather

25  than from TWA.  From ALPA, rather than TWA.

1    Q.    Yes?

2    A.    I never questioned where it was coming from.  But if the

3    company wasn't providing it, then I guess the union was

4    providing it.  Yes, sir.

5    Q.    Did you ever put in for flight pay loss and not have it

6    paid by ALPA?

7    A.    No, no, never did.

8    Q.    Any members of your committee ever complain that ALPA

9    wasn't supporting them financially?

10   A.    No.

11   Q.    Do you see under questions and answers, question:  What

12   is APA status with regard to the AFL-CIO?  Can we blow that

13   question and answer up.

14          The answer was the APA has been trying to get into

15   the AFL-CIO for a long time and they have not been

16   successful.  They need to be true members of the labor

17   movement if they want the political support and clout that

18   goes along with a national union.

19          That was something, wasn't it, in terms of ALPA

20   trying to put pressure on the APA.  Yes?

21   A.    Pretty weak.

22   Q.    Skip down, we are not going to do then them all.

23          Question.  Do we have your commitment, the

24   resources of ALPA, including litigation, to ensure that TWA

25   pilots are integrated fairly?

1          Answer.  If we have any basis for litigation we

2   will do what is necessary, including litigation.  We hold the

3   bargaining rights, we don't need MCF for litigation."  Do you

4   see that?

5   A.   I see it.

6   Q.   Okay.  Can you identify any piece of proposed litigation

7   that was meritorious, that was the kind of lawsuit that a

8   lawyer could sign off on, consistent with the rules of

9   professional responsibility and Rule 11, that ALPA didn't

10  approve?

11  A.   Are you asking me as a real estate attorney to

12  second-guess Roland Wilder, a Railway Labor Act attorney,

13  decisions?  What is it you are asking me, sir?

14  Q.   Your experience as a lawyer has been limited solely to

15  real estate?

16  A.   Pretty much so.

17  Q.   Okay.  So are you telling me that you don't feel

18  qualified to make any judgments about whether lawsuits were

19  meritorious or not?

20  A.   As an attorney, no.

21  Q.   Okay.  So you have no idea whether the lawsuits that

22  Roland Wilder was suggesting had merit, right?

23  A.   I don't have any knowledge of that.  No.

24  Q.   So your position at the time was simply because a lawyer

25  is proposing a lawsuit, I think it should be filed?

1    A.   Our lawyer.

2    Q.   All right.  So because he was the MEC's lawyer, you

3    thought the lawsuits I was proposing necessarily had merit?

4    A.   That's correct.

5    Q.   We are moving down to question.  What is your assessment

6    of the APA board of directors?  How did they receive you?  Do

7    you see that.

8    A.   I do.

9    Q.   There is a fairly long answer.  The merger committee and

10   the MEC were happy that Duane Woerth had a line of

11   communication open with the board of the APA, right?

12   A.   Well, we -- yes.

13   Q.   That was a good thing in the sense that he could go and

14   lobby them and try to persuade them to treat the TWA pilots

15   fairly, yes?

16   A.   That is what was felt at the time.

17   Q.   Did anybody at the time say, Captain Woerth, you have to

18   stop talking to them, they are our adversaries?

19   A.   No.

20   Q.   People agreed that any information that he could get

21   about the APA's position, about what was happening internally

22   at the APA, would be good, that that would be information

23   that might be useful to the merger committee and the TWA

24   pilots, right?

25   A.   Yes.

1    Q.   And in fact, the TWA pilots made an effort when you were

2    chairman of the merger committee to get their own information

3    about what was happening internally at the APA, right?  Do

4    you recall that?

5    A.   I am not sure what you are referring to.

6    Q.   Do you recall that the TWA pilots were going on the

7    internet to try to get information about what the APA was

8    thinking internally.  Do you recall that?

9    A.   Was this something the MEC was doing?

10   Q.   Yes.  Do you recall the MEC, let me ask it in way.  Do

11   you recall people within the MEC communicating about

12   information in, internal information, about the APA, that

13   they had been able to obtain?

14   A.   I was provided whatever information they could find out.

15   Q.   Let me see if I can refresh your memory a little bit.

16             MR. FRAM:  Your Honor, I have marked for -- I

17   thought I marked it -- I am going to mark for impeachment

18   purposes, I will skip a couple.

19             THE COURT:  Just give me a number of the document

20   you are about to use.

21             MR. FRAM:  D 410.

22             THE COURT:  That has not been premarked.

23             MR. FRAM:  Correct.

24             THE COURT:  Can you give me a brief description?

25             MR. FRAM:  It is an email from Keith O'Leary dated

1    3/24 --

2            THE COURT:  D 410 is an email from --

3            MR. FRAM:  Keith O'Leary.

4            THE COURT:  O'Leary to who?

5            MR. FRAM:  To a number of individuals, your Honor.

6            THE COURT:  Give me the first name.

7            MR. FRAM:  Alan Altman.

8            THE COURT:  Spell that.

9            MR. FRAM:  A L T M A N.  He was here, your Honor.

10           THE COURT:  And the date.

11           MR. FRAM:  The email is March 24.

12           THE COURT:  March 24, 01.

13           MR. FRAM:  Yes, your Honor.

14           THE COURT:  I will mark that as in evidence.

15           MR. PRESS:  294.

16   Q.   It is premarked as plaintiff's 294?

17           THE COURT:  This is D or P?

18           MS. RODRIGUEZ:  P-294.

19           MR. FRAM:  It was premarked, your Honor.  I

20   misspoke.  It was P-294.

21           THE COURT:  That is not in evidence.

22           MR. FRAM:  Not yet, your Honor.  Let me try to

23   authenticate it, if I may.

24           THE COURT:  Go ahead.

25   Q.   Mr. Day, do you recall receiving this email from Keith

1  O'Leary on or about March 24, 2001?

2  A.   I don't recall it specifically, no.

3  Q.   Well, do you see that he is forwarding an email from

4  captain John Darrah, the president of the Allied Pilots?

5  A.   Yes, I do.

6           THE COURT:  I think, my courtroom deputy thinks it

7  is J 294.

8           MR. FRAM:  If it is a J exhibit I move into it

9  evidence.

10          THE COURT:  First of all let's find out what it is.

11          MS. RODRIGUEZ:  It is J, your Honor.

12          THE COURT:  I see J 294 here.  Email from O'Leary

13  to Altman.

14          MR. FRAM:  We clearly have too many documents, your

15  Honor.

16          THE COURT:  Okay.  Since it is a J exhibit I assume

17  by definition the plaintiff has no objection to it.

18          MR. PRESS:  That would be safe, Judge.

19          THE COURT:  Okay.  J 294, which is also marked as D

20  410 in evidence.

21  Q.   We are finally up to the document.  Did you have a

22  chance to look it over?

23  A.   Just glancing at it.

24  Q.   What Mr. O'Leary is forwarding an email from the prior

25  day, March 23, that Captain John Darrah had sent to all of

 1    the American pilots, correct?

 2    A.   Okay.

 3    Q.   Do you agree with that?

 4    A.   That is what it looks like.

 5    Q.   J 294?

 6             THE COURT:   J 294.

 7             THE COURT:   There is a rule against driving a Judge

 8    off his rocker.

 9    Q.   All right.  So he is talking in the first couple of

10    paragraphs of the Darrah email is talking about the TWA deal

11    as announced by American, right?  He says in the first

12    paragraph, just to blow it up, on Sunday, January 7, I

13    received a phone call from AMR management informing me that

14    AMR was preparing to announce their intent to purchase the

15    assets of TWA.  And it also on --

16    A.   I see that.

17    Q.   What he proceeds to do in the email is to complain about

18    the way American is treating its own pilots.  Right.  Do you

19    see, turn to the third page, for example.  The second full

20    paragraph, beginning February 23.

21    Q.   On February 23 we began negotiations with AMR management

22    and anticipated a speedy conclusion to discussions, given the

23    timeframe with which management was able to negotiate the

24    entire TWA purchase transaction and the limited number of

25    items APA had identified as priorities.  He complains that we

 1    still don't have a deal.  If you remember getting this

 2    internal information about the complaint?

 3    A.   I remember getting information.  But I am just telling

 4    you I don't remember the specific doubt document.  I am sure

 5    I could have, certainly would have gotten it if I am on the

 6    list here.  But this is the first time I have seen it in over

 7    ten years, if that is the case.

 8    Q.   All right.  Let me ask you the general question, maybe

 9    avoid some of these other documents.  Do you remember

10    agreeing within the TWA MEC that it was important for the TWA

11    pilots to get as much internal information about what was

12    happening at the APA as possible?

13    A.   Well, sure.

14    Q.   Okay.  That was, that intelligence was important to your

15    committee in its negotiations with the APA, right?

16    A.   Yes.

17    Q.   And you expect that the people at ALPA to do the same to

18    the extent they had the ability to find out what was going on

19    internally at the APA, right?

20    A.   We would.   Awe had hoped they would, yes.

21    Q.   Are you aware or were you aware back then that a fellow

22    named Ron Rindfleisch of ALPA was receiving information from

23    a couple of pilots at American, that those pilots were

24    passing along internal information about how the APA pilots

25    felt?

1    A.   No, not at the time I wasn't.

2         MR. FRAM:  Your Honor, want to try to limit my

3    examination.  If I can have a very short break, maybe ten

4    minutes, that I should be able to do that.  And should be

5    able to wrap up with this witness today.

6         Do you mind taking a ten-minute break so I can try

7    to pare this down?

8         THE COURT:  Okay.

9         MR. FRAM:  Thank you.

10        THE COURT:  Remember it is almost 1:30.

11        MR. PRESS:  I would like to offer a little bit of

12   rebuttal or redirect.

13        THE COURT:  You will have, whenever that comes.

14        MR. PRESS:  I want to make sure we don't have to

15   have Captain Day come back up on Monday from Florida.

16        MR. FRAM:  What that is what I am trying to avoid.

17   I am not sure if we can or not.

18        THE COURT:  I can stay a few minutes later if I

19   have to ladies and gentlemen, let's take a ten-minute break

20   now.

21        Do not discuss the case among yourselves.  Do not

22   discuss the case until you have heard all the evidence.

23        (The jury leaves the courtroom.)

24

25        (Recess)

1              (The jury enters the courtroom.)

2              MICHAEL DAY, resumes.

3              THE COURT:  Mr. Fram.

4    Q.   The last thing I want to ask you about is the events of

5    October and November, 2001, relating to further efforts to

6    negotiate seniority integration.  I have given you a stack of

7    documents.  I want to try to work through them quickly.  The

8    first one is D 200, it is an October 12, 2001 letter, to

9    Duane Woerth from Jeff Brundage.  Do you recall seeing that

10   letter back in late October?

11   A.   I don't recall this letter.

12   Q.   Do you recall an incident where the MEC was supposed to

13   send a group to Dallas Fort Worth to negotiate and instead of

14   sending a group they just sent Bob Pastore and didn't give

15   him any authority to negotiate?

16   A.   Yes.

17   Q.   Do you recall the people at American being very upset

18   about it and Mr. Brundage writing a letter?  Do you recall

19   any of that?

20   A.   No.

21   Q.   The next document is D D 88.  Those are the minutes of

22   October 20 to 23?

23              THE COURT:  D 88.

24              MR. FRAM:  Which is in evidence, your Honor.

25              Do you recall attending this meeting of the TWA MEC

1    in October of 2001.

2    A.    If that was the same time that we were meeting with

3    them, I was in and out of the meeting, yes.

4    Q.    The same time you were meeting with who, with the

5    representatives of the APA?

6    A.    Yes.

7    Q.    Do you recall during that period that Duane Woerth and

8    Howard Atterian and Jeff Brundage were calling in to the

9    meeting of the MEC to give input into the negotiation

10   process?

11   A.    Yes.

12   Q.    Okay.  And you were still chairman of the negotiating

13   committee at that point in time, yes?

14   A.    Yes.

15   Q.    What recommendations were you making about trying to

16   reach agreement with the APA?

17   A.    Based on this?

18   Q.    Based on your recollection?

19   A.    Well, my recommendation was to accept it with

20   modifications.

21   Q.    Okay.  Do you recall a point in time when Jeff Brundage

22   called in to the meeting and made some statements about

23   Americans position?

24   A.    I vaguely remember that, yeah.

25   Q.    All right.  Let's turn to page 11 of the minutes.

1           THE COURT:  Of D 88?

2           MR. FRAM:  Yes, your Honor.  Just to put in to

3    context, go back to page 10 real quick.  The very bottom

4    shows this is now Tuesday, October 23, 2001.  Do you see

5    that.  And the top of the next page, the meeting reconvenes,

6    and then merger committee report, Mike Day.

7    A.   Yes.

8    Q.   The report here is day stated that if there were better

9    furlough protections the merger committee would agree to the

10   deal unanimously.  Pilots that were now furloughed were

11   definitely at risk.  Day didn't believe there was a chance

12   for litigation or the Bill passing.  Only leverage was to

13   continue to delay.

14           Does that accurately reflect remarks, statements

15   that you made to the TWA MEC on October 23 of 2001.

16   A.   It is a little bit out of context as far as litigation.

17   Q.   What did you say to the MEC about not believing there

18   was a chance for litigation?

19   A.   What I said, and I always maintained, was we did not

20   have -- the pilots themselves did not have an individual

21   cause of action against American, and APA.

22   Q.   Well, did anyone ever suggest that individual pilots

23   should file a lawsuit against American or the APA?

24   A.   There was a group effort in the background that the

25   pilots that were getting together to file lawsuits.

1    Q.   It also indicates here that you said you didn't believe

2    there was a chance for the Bill passing.  The Bill referred

3    to there was the Bond Bill, right?

4    A.   I will be happy to explain that, too.

5    Q.   Well, did you tell people at the meeting on October 23

6    that you didn't think there was any chance of the Bond bill

7    passing?

8    A.   With ALPA's support, yes.

9    Q.   ALPA supported the Bond bill, didn't they?

10   A.   They didn't support it initially, and the information I

11   was getting was they weren't real really in there supporting

12   it.

13   Q.   There are some other remarks below that.  Do you see

14   where it says Swanson stated that the MEC agrees not to take

15   the deal, the TWA pilots would lose, it should say "lose" --

16   about 400 numbers in their seniority.  It doesn't seem a lot

17   right now but later in their career it will.  Also TWA pilots

18   would be recalled from the bottom of the APA seniority list.

19   Do you recall those comments?

20   A.   I don't, I don't recall John's comments specifically,

21   no.

22   Q.   Do you recall Swanson saying that he thought that the

23   merger committee and the MEC should accept the deal that was

24   on the table because it provided some furlough protection

25   that might disappear?

1    A.    I believe that was John's position, yes.

2    Q.    Do you see that after a short recess that Mr. Glasby

3    made some comments?

4    A.    Yes.

5    Q.    Glasby was on the merger committee as well?

6    A.    Yes.

7    Q.    Glasby stated the MEC must do what was best for all the

8    TWA pilots.  He was opposed to the deal, this was not

9    integration but isolation.  This was the best deal the

10   committee could get.  APA was not going to give any more.

11   The upside of voting this down was very small.  The

12   litigation was not going to get us better seniority.  The

13   legislative option was dead.  So his recommendation was that

14   the MEC should accept the deal on the table, right.  Yes?

15   A.    No. He was opposed to the deal.  DJ never was in favor

16   of the deal.

17   Q.    He said if the MEC agreed do the deal it would protect

18   1,000 pilots, if don't accept all pilots would be at risk.

19   That doesn't --

20   A.    I am sorry.  DJ was against the deal.  It says here he

21   was opposed to the deal.  He was not in favor of it.  I was

22   surprised at DJ's position I but I can tell you emphatically

23   that is what it was.  DJ kind of had a tendency to flip flop

24   around a little bit, too.

25   Q.    You are saying his bottom line was not, I think it is a

Day-cross/Fram                                                        183

```
 1   lousy deal, but it is the best we are going to do, we should
 2   accept it?
 3   A.   No, that is not what I am saying.  I am saying he said
 4   do not accept it.  Do not, he would not vote for it.
 5   Q.   All right.  Then Clarke made comments here.  If you flip
 6   to the top of the next page, to go through this quickly.
 7   Clarke said, Clarke hoped that this group would not sell out
 8   1,200 pilots to save their own butt.  We don't have to come
 9   to a deal.  There would be some risks.  He couldn't believe
10   anyone on the merger committee could sign a deal that was
11   going to furlough 1,200 pilots.  We are here to prevent
12   furloughs, not to voluntarily sign up for furloughs, and that
13   would be what you will be doing if you accept this deal.  So
14   he opposed it, yes?
15   A.   Sean opposed it, yes.
16   Q.   Mr. Wilder made some comments.  Mr. Wilder recommended
17   that the deal be accepted.  Yes? Do you recall that?
18   A.   No, I don't recall that.  I am looking at these notes.
19   Q.   Do you see?
20   A.   Where does it say that.
21   Q.   Well, he says, if you go to six lines up from the
22   bottom.  During this period there was nothing to prevent
23   furloughs, depending on the economy, if the traffic doesn't
24   return AMR would take it out of our hide.  Wilder didn't see
25   any legal protection to prevent AMR from furloughing heavier
```

```
 1   on the TWA side.  He saw the fight going on through the first
 2   of the year.  If ALPA obtained arbitration, it would be about
 3   120 days for the arbitration.  This would be a period of
 4   vulnerability.  As in any war, there would be casualties.  If
 5   ALPA doesn't take the deal, APA and AMR positions are that
 6   afurloughed TWA pilots would be recalled after all APA
 7   pilots.
 8              Does that refresh your memory that he recommended
 9   the deal?
10   A.   No.  He didn't recommend the deal.
11   Q.   Do you recall Mr. Wilder saying that he thought a deal,
12   that the TWA pilots signed on to was better than a deal that
13   was imposed upon them?
14   A.   Not this, not this deal.  He was prepared to go back and
15   start instituting litigation.
16   Q.   Was there ever a point where he recommended that the
17   pilots accept the deal that was on the table?
18   A.   I can't ever recall him recommending that.
19   Q.   All right.  Let's work through, work with P 343.
20              THE COURT:  P?
21   Q.   343?
22              THE COURT:  In evidence.
23              MR. FRAM:  No, I don't think it is.
24   Q.   343, 344 and 345 are related, your Honor?
25              THE COURT:  D 343, 344 and 345.
```

1   Q.   Do you recognize P-374 as an October 23, 2001 letter,

2   sent by Captain Pastore to John Darrah and Jeff Brundage?

3   A.   Yes.

4   Q.   And this was a letter sent at the recommendation of the

5   MEC saying we accept the offer that is on the table, but with

6   additional conditions and restrictions, yes?

7   A.   Yes.

8   Q.   Those conditional, let's blow this up.   P-343.

9           THE COURT:   Are these being offered in evidence?

10          MR. FRAM:   Yes, I am going to offer them.

11          THE COURT:   Does plaintiff have an objection?

12          MR. PRESS:   I don't know about the other ones.   Not

13   to this one.

14          THE COURT:   P 343 in evidence.

15   Q.   So what happens is the APA and American set a deadline

16   for the TWA pilots to accept or not accept the deal they put

17   on the table, correct?

18   A.   A short deadline, that's correct.

19   Q.   And this letter is writing back after the deadline and

20   saying, we accept your proposal with a whole bunch of

21   additional terms.   Correct?

22   A.   Yes.

23   Q.   And what happened is you got two letters back, one on

24   the 23rd, one on the 24th, those are P-343 and P-344, right?

25   Did I give those to you?

1    A.   I do have them.  I have got 44 and 45.

2    Q.   Those are the letters that came back, one from the

3    Allied Pilots and one from Jeff Brundage?

4    A.   Yes.

5    Q.   The letter said no thanks, we reject your additional

6    conditions.  There is no deal.  Right?

7    A.   Essentially, that is correct.

8    Q.   Now, there was --

9             THE COURT:  Now, again. Do you have any objection

10   to 344 and 345?

11            MR. PRESS:  No, your Honor.

12            THE COURT:  I am sorry?

13            MR. PRESS:  No.

14            THE COURT:  I will put 344 in evidence and P 345 in

15   evidence.

16   Q.   There was an effort in the couple days after this to

17   accept the proposal that American had put on the table,

18   right?

19   A.   That was what the MEC was doing.  I really was pretty

20   much out of the loop at that point in time.

21   Q.   Did you resign from the merger committee around the time

22   of these letters we just discussed?

23   A.   No. I don't remember resigning.  But I believe I left

24   town, once, once we got to this point.

25   Q.   Weren't there people in the MEC who were pushing for the

1    MEC to accept the deal on the table because they thought it

2    was the best deal they could get?

3    A.    Yes.

4    Q.    1 those people was Steve Rautenberg, right, do you

5    remember him?

6    A.    Yes.

7    Q.    Do you remember Mr. Rautenberg's letter, D 21, remember

8    the long letter, October 25, 2001, he sent to the Council 3

9    pilots?

10   A.    I don't remember specifically.  No.

11          THE COURT:  It is in evidence.  D 21 is in

12   evidence.

13   Q.    You don't recall that evidence.  All right.  Do you

14   recall, we talked about the meeting on October 31, where the

15   minutes reflect that you were, you had voted in favor of the

16   APA's proposal.  Do you recall that?  Back to D 257.  Page 2,

17   questions and answers.  We read this before.

18   A.    Okay.

19   Q.    And your claim here today is that you were misquoted in

20   those minutes and you never were in favor of accepting the

21   APA's proposal?

22   A.    No.

23   Q.    All right.

24   A.    Let me take a look at this for a second and see what it

25   is we are talking about here.

1   Q.   You see the paragraph --

2           THE COURT:   What document.

3   Q.   257?

4           THE COURT:   In he.

5           MR. FRAM:   In evidence.   It is the second page.

6           THE COURT:   D 247.

7           MR. FRAM:   Yes, your Honor.

8   Q.   The paragraph that says Mike Day, Council 2, addressed

9   the MEC?

10  A.   Yes.   What I believe I said was that I -- I probably

11  said the Judge could have waived it for us.   That is what, I

12  am not sure.   Is that what you are referring to?   Or are you

13  referring to something else?

14  Q.   Let's  take the first couple of lines.   Addressed the

15  MEC regarding seniority integration.   He echoed what Swanson

16  just stated.   He voted in favor of the APA proposal.   He also

17  believed that this was the best deal ALPA was going to get.

18  Yes?   Is that accurate in terms of reporting what you said?

19  A.   Yes.

20  Q.   And ALPA, the ALPA advisors at that point, including

21  Duane Woerth, they were also recommending that the MEC accept

22  the proposal that you were referring to, yes?

23  A.   Yes.

24  Q.   Did the members of the MEC as a whole, did they agree to

25  accept the proposal that was on the table?

1    A.   Not without changes.

2    Q.   Okay.  So in terms of the proposal on the table that

3    said we reject that, yes?

4    A.   That's correct.

5    Q.   So they disregarded your recommendation as the chair of

6    the merger committee and they also disregarded the

7    recommendation of the ALPA people, right?

8    A.   No, wait a minute.  At that meeting I said I recommended

9    accepting it with changes.  But at the time when I said that,

10   I still thought we had this litigation strategy with Roland

11   in place.

12           Shortly thereafter is when we had this telephone

13   conversation and Duane pulled the rug out from underneath us.

14   That was the end of the game.  Once that was done we were

15   finished.  And then end game.  Accept what you got.  Don't

16   leave anything on the table.  That is when I recommended

17   accepting.

18   Q.   The minutes say he voted in favor of the APA proposal.

19   He also believed that this was the best deal ALPA was going

20   to get.  So were you recommending on October 31, 2001, that

21   the deal on the table be accepted as it was?

22   A.   Yes.

23   Q.   And that was also what ALPA was recommending, yes?

24   A.   I believe so.

25   Q.   And that recommendation, which you made and ALPA made,

 1  was rejected by the MEC.  Correct?

 2  A.   On October 31, it had become a moot point.  But yes.  I

 3  don't, as far as I know, the MEC has never agreed to accept

 4  the deal.

 5  Q.   There were some TWA pilots were pretty upset that the

 6  MEC was not going to accept the APA's proposal.  Right?

 7  A.   Well, there were pilots upset on both sides, yes.

 8  Q.   Well, what was the strategy, what did the people who

 9  were opposing the deal on October 31 think was going to

10  happen if the deal got turned out?  How were they, what were

11  they going to do or recommend to get a better deal for the

12  TWA pilots?

13  A.   I don't know.

14  Q.   Well, were they recommending some kind of lawsuit, was

15  that the strategy or was it just --

16  A.   I think the pilots, there was a group of pilots out

17  there that always felt that they had some basis for a lawsuit

18  against American and APA.

19  Q.   And --

20  A.   I was not part of that group.  I don't know what they

21  were thinking.

22  Q.   Look quickly at the next block, it says Jim Martin,

23  Council 2?

24  A.   Yes.

25  Q.   Addressed his concerns regarding the behavior of the

1    current MEC.  More afraid what ALPA was doing and this MEC.

2    Believed we received the best offer and there will not be any

3    more offers.  Life wasn't fair, but should try to make it as

4    fair as possible.  Addressed his concerns to Hollander about

5    his position.  Hollander stated that the legislation was an

6    illusion for the APA, it was to put pressure on the APA.

7              Do you recall Hollander making that comment?

8    A.   I recall that comment being made.

9    Q.   Yeah, you recall Hollander conceding there was no way

10   the Bond bill was ever going to get enacted, right?

11   A.   No, I don't recall that.

12   Q.   It then says Hollander also stated that Case was in the

13   extreme and would not be in a position to vote on anything.

14   However, Hollander gave his to Case, this was irresponsible.

15   Martin asked that Hollander, Case, Arthur and Alman, do not

16   come back in power.  Do you see that?

17   A.   Yes.

18   Q.   They were a group of people that were taking the

19   position that the MEC should not agree to anything that

20   American and the APA offered.  Is that so?

21   A.   I don't know if it was that extreme.  As I said, I, at

22   this point, I was pretty well getting out of the loop.

23   Q.   So you don't recall what Mr. Martin or others may have

24   said about why they were upset with the way that Hollander,,

25   Case, Arthur and Altman had behaved?

1    A.   No.

2              MR. FRAM:   Thank you, I have no no further

3    questions.

4              THE COURT:   Redirect.

5              REDIRECT EXAMINATION

6              BY MR. PRESS:

7    Q.   Mr., Captain Day, Mr. Fram mentioned a fellow named Ron

8    Rindfleisch.   Until yesterday, when his video was presented,

9    had you ever heard of that guy?

10   A.   No. Never.

11   Q.   And Mr. Fram suggested that Ron Rindfleisch was

12   collecting intel for you guys from these two American pilots,

13   John Clark and Mark Hunnibell.   You heard him make that

14   suggestion.

15             MR. FRAM:   I object.   That is not the question I

16   asked.

17   Q.   Well, he was asked --

18             THE COURT:   Why don't you just him a question

19   rather than trying to -- just ask him whether he was getting

20   intelligence from them.

21   Q.   Did Ron Rindfleisch or anybody else at ALPA National

22   collect intel from these two American pilots, John Clark, and

23   Mark Hunnibell, for you, that was provided to you?

24   A.   No.

25   Q.   Were you aware that the same two American pilots, John

1    Clark, and Mark Hunnibell,  were collecting cards,

2    authorization cards for ALPA at the same time?

3    A.   No.

4              THE COURT:  I am sorry?

5              MR. FRAM:  It is all right,  your Honor.

6              THE COURT:  I am going to allow that question.

7    Q.   Were you aware that the same two American pilots, John

8    Clark and Mark Hunnibell, were invited and attended meetings

9    at ALPA National on July 23, the same time you were in front

10   of the executive council being turned down, were you aware of

11   that?

12   A.   No. Sure wasn't.

13   Q.   You were asked if Duane Woerth had been lobbying the APA

14   board on your behalf.  Did Duane Woerth ever report to you

15   any lobbying he did on your behalf?

16   A.   No.

17   Q.   And lobbying, I meant to APA, not on the Capitol Hill

18   somewhere?

19   A.   No.

20   Q.   When he came to you for that one meeting he attended did

21   he sit you down and give you the status of his negotiations,

22   his private negotiations?

23   A.   No, absolutely not.

24   Q.   You were asked about Roland Wilder, whether or not his

25   lawsuit strategies were frivolous.  Setting aside the legal

```
 1   aspects of that question, you spent a lot of time with Roland

 2   Wilder, didn't you?

 3   A.   Oh, lots of time.

 4   Q.   Is there a way for you to quantify how much time you

 5   spent with the man?

 6   A.   Days on end.  Numerous telephone conversations.

 7   Q.   Did you find anything frivolous in Mr. Wilder?

 8           MR. FRAM:  I object.  There is no foundation.

 9           THE COURT:  I will allow it.  Did you think

10   anything he told you was frivolous?  The answer is going to

11   clearly be no, right?

12           THE WITNESS:  That's correct.

13           THE COURT:  I will allow that question.  Next.

14   Q.   You were asked about the jumpseat deal.  This

15   administrative manual that Mr. Fram talked about, did you,

16   you put it in, and stacked it up on a table, how big a stack

17   of paper do you think it would be?

18   A.   Well, originally, it is a manual like so.  As I said.

19           THE COURT:  Like so.

20   Q.   Show the jury if you would?

21   A.   Three or four inches.

22   Q.   All right.

23   A.   It was provided to MEC representatives, initially.  And

24   I am sure I scanned through it.  At that point in time.

25   However, that document is not easy reading and it is
```

```
 1    constantly changing.  I used it as a resource, if I ever had

 2    to look something up.

 3    Q.   It is kind of a manual on how to do ALPA business.  Is

 4    that --

 5    A.   That's correct.

 6    Q.   And you mentioned that it is constantly changing.

 7    A.   It is constantly changing being updated.

 8    Q.   Who changes it?

 9    A.   I believe it is the executive committee.  Or executive

10    board but I think it is the executive committee.

11    Q.   You were read some portion of this big manual on

12    jumpseats and whether or not they could be used as a weapon,

13    and my question to you, Captain Day, is in your career as an

14    ALPA pilot, was the jumpseat ever used in an offensive way?

15              THE COURT:  By ALPA?

16              MR. PRESS:  Yes, as authorized by ALPA, as directed

17    by ALPA?

18    A.   Yes.  I never had to do it, but it was pretty widely

19    understood among the pilots that ALPA had a policy of, they

20    did not want Continental scabs riding in the jumpseat.

21    Q.   What do you bean my Continental scabs?

22    A.   I mean people that had crossed the picket line and gone

23    back to work for Continental when they were on strike.

24    Q.   That is what a scab is?

25    A.   That is what a scab is.
```

1    Q.   An if a Continental scab showed up in your cockpit, what

2    was ALPA's direction?

3    A.   Don't let him ride in the jumpseat.

4    Q.   You were asked about Supplement CC's impact on you

5    personally.

6             You were not hurt by the seniority integration?

7    A.   No, this isn't about me.

8    Q.   Why are you here?

9    A.   Because --

10            THE COURT:  That is, I am -- there is no objection

11   but I am going to sustain it.

12            MR. FRAM:  Objection.

13            MR. PRESS:  Sustained?  I will sit down.

14            Thank you, Captain Day.

15            THE COURT:  Thank you, Mr. Press.  Do you have any

16   recross?

17            MR. FRAM:  Very quickly.

18            RECROSS EXAMINATION.

19            BY MR. FRAM:

20   Q.   Are you claiming there was a some type of ALPA directive

21   to suspend jumpseat privileges to pilots at some point?

22   A.   Unwritten rule.

23   Q.   Okay.

24   A.   One of these things that gets circulated around, Mr.

25   Fram, by word of mouth.  Yes.

Day-recross                                                      197

1   Q.   Okay.  ALPA communicates with its pilots in writing for

2   the most part, yes?

3   A.   Yes.

4   Q.   And was there ever a written ALPA directive that any

5   pilot --

6            THE COURT:  That he knows of.

7   Q.   That you know of, that any pilots, let's get the

8   question, any written directive from ALPA that any pilots

9   should be deprived of jumpseat privileges?

10  A.   I never saw a written directive.

11  Q.   Did you ever hear from an ALPA official that ALPA was

12  orally directing pilots to deprive other pilots of jumpseat

13  privileges.

14           MR. PRESS:  Could heI be specific as to what he

15  means by official?-

16           THE COURT:  Anybody acting, I think that is clear,

17  as distinct from another pilot.

18  A.   How about an EVP representative?  Executive vice

19  president.  Bill Kents, a close friend of mine.

20  Q.   Bill Kents is who?

21  A.   He was former executive vice president of ALPA.  Yes.

22  Q.   And when do you claim that he made some oral statement

23  to you about jumpseat privileges?

24  A.   We were close friends, and --

25  Q.   When?

1   A.   I cannot give you a specific date.

2   Q.   Can you give me a decade?

3   A.   I would have to remember when I first met Bill.  So I

4   would have to say back in the late eighties, early 90s.

5   Q.   All right.  So for all you know it was before ALPA

6   adopted a formal policy that jumpseat privileges would not be

7   used for economic or political purposes, right?

8   A.   When did that policy come --

9          THE COURT:  No, you don't ask questions.  You

10  answer them.

11  A.   I am sorry.

12  Q.   For all you know?

13  A.   The question again, please?

14         THE COURT:  Hold it.  Let's not waste time.  You

15  don't know when the policy was adopted by --

16         THE WITNESS:  No, sir.

17         THE COURT:  So you have no knowledge of whether

18  your conversations with him preceded or followed the adoption

19  of the particular policy that Mr. Fram is asking about.  Yes

20  or no?  You just don't know.

21  A.   That's correct, Judge.

22         THE COURT:  Okay.

23         MR. FRAM:  No further questions.  Thank you.

24         THE COURT:  Mr. Press.

25         MR. PRESS:  The plaintiffs have no further

```
1   questions of Captain Day and the plaintiffs rest their case.

2            THE COURT:  Okay.  And we will thank Captain Day

3   for his time and you are excused.

4   A.    Thank you, Judge.

5            THE COURT:  Okay.  Ladies and gentlemen, we will

6   end for today.

7            Thank you for staying a few extra minutes.  It is a

8   service to Captain Day that he doesn't have to come back on

9   Monday for further questioning.

10           You have heard the words the plaintiff rests.  We

11  will resume Monday morning at 8:30.  Again, and of course, it

12  will be now the defendants turn to put in their case.  So

13  thank you very, very much.

14           One, do not discuss the case among yourselves.  Do

15  not discuss the case with family, friends or loved ones.

16  Keep an open mind until you have heard all the evidence.  All

17  rise as the jury leaves.  Have a safe trip home, have a safe

18  trip back in Monday and my continuing thanks for your

19  participation.

20           (Jury leaves the courtroom)

21           THE COURT:  Mr. Fram, Mr. Katz, you are going did

22  start with a live witness.

23           MR. FRAM:  We will have Duane Woerth first thing

24  Monday morning, your Honor.

25           THE COURT:  Okay.
```

```
 1              MR. FRAM:  Then.

 2              THE COURT:  I don't think we need too much more.

 3    That should take care of Monday, won't it?

 4              MR. FRAM:  It should take care of Monday.

 5              THE COURT:  At least a fair hunk of Monday.

 6              MR. PRESS:  Is David Singer not coming?

 7              MR. FRAM:  Singer was here as the backup.  I don't

 8    think we will have him as a backup on Monday.  I think if we

 9    finish early Monday we will start with David's Holtzman and

10    so you can plan, I think the first witness Tuesday morning

11    would be Steve Rautenberg who is flying in, and if we are in

12    the middle of Holtzman, if we start Holtzman late Monday we

13    will probably ask for permission to interrupt his testimony

14    to get Rautenberg on first thing Tuesday and get him out of

15    here.

16              THE COURT:  Okay.

17              MR. FRAM:  I am happy to talk to counsel.

18              THE COURT:  Over the weekend I am going to read

19    Randy Babbitt's deposition.

20              MR. KATZ:  Thank you.

21              THE COURT:  I will read the transcript of what

22    transpired before Congress in the case of Mr. Compton.

23              MR. KATZ:  That runs 18 minutes.

24              THE COURT:  I will read it.  I am not going to look

25    at tape, I am just going to read the transcript.
```

1                    (Off-the-record discussion).

2              THE COURT:  Have a great weekend.  See you Monday

3      morning.

4                    (Adjourned at 2:15 p.m).

1                         I N D E X.

2

3

4          MICHAEL DAY, RESUMES.

5

6                 DIRECT EXAMINATION.

7                 CROSS EXAMINATION              P. 105.

8                 REDIRECT EXAMINATION.          P. 192

9                 RECROSS EXAMINATION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25