```
1              IN THE UNITED STATES DISTRICT COURT.
                         FOR THE DISTRICT  OF NEW JERSEY
2                        CIVIL 02-2917  (JEI)

3         PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
4         AND MICHAEL FINUCAN, individually
          and on behalf of all others
5         similarly situated,
                              Plaintiffs,
6                                                VOLUME 11
              V.                                 TRIAL TRANSCRIPT
7
          AIR LINE PILOTS ASSOCIATION,
8
                              Defendant.
9
                                         CAMDEN, NEW JERSEY
10                                       JUNE  27, 2011

11        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                         A P P E A R A N C E S:
13
              TRUJILLO, RODRIGUEZ & RICHARD
14            BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                    AND
              GREEN JACOBSON, P.C.
16            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
              AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17            For the Plaintiffs.

18            ARCHER GREINER
              BY:  STEVEN FRAM, ESQ.
19                 AND
              KATZ & RANZMAN
20            BY:  DANIEL M. KATZ, ESQ.
              FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
              ELIZABETH  GINSBURG, ESQ.
22            IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
above-entitled proceedings.
3
                     S/   LYNNE JOHNSON
4
                   Lynne Johnson, CSR, CM, CRR
5                   Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
               LYNNE JOHNSON, CSR, CM, CRR
18           OFFICIAL COURT REPORTER
           UNITED STATES DISTRICT COURT
19           P.O. BOX 6822
           LAWRENCEVILLE, NJ  08648
20

21

22

23

24

25

```
 1                    (The jury enters the courtroom.)

 2              THE COURT:  Good morning, everybody.

 3              Please be seated.

 4              THE COURT:  Okay.  Just for the record, the Rule 50

 5    motion of the defendant, I understand, is going to be

 6    electronically filed some time this morning.  Did you say it

 7    was this morning.

 8              MR. FRAM:  By the end of the day, your Honor.

 9              THE COURT:  That is fine.  I just want to keep

10    track of that.

11              All right.  The plaintiff has rested.  Now I

12    recognize, is it Mr. Katz, are you going to present this?

13              MR. KATZ:  Yes, your Honor.

14              THE COURT:  I recognize Mr. Katz to present his

15    first witness.

16              MR. KATZ:  The Air Line Pilots Association calls

17    Duane Woerth as its first witness.

18              DUANE EDWARD WOERTH, sworn.

19              DIRECT EXAMINATION.

20              BY MR. KATZ:

21              THE COURT:  You may proceed.

22    Q.  Good morning, Mr. Woerth.

23    A.  Good morning.

24    Q.  Would you state your address for the record, please?

25    A.  I currently live at Rue Drummond in Montreal, Quebec.
```

1    Q.   And would you explain for the jury your educational

2    background, please?

3    A.   Educational background, I have a bachelor's degree in

4    business administration from the University of Nebraska, a

5    master's degree in public administration from the University

6    of Oklahoma.

7    Q.   And would you describe for the jury, please, your

8    military service?

9    A.   Yes.  I served six years on active duty in the United

10   States Air Force from 1970 to 1976, and 15 years in the

11   Kansas international guard where I retired as a lieutenant

12   colonel.

13   Q.   Were you a pilot during this period of time?

14   A.   Excuse me.

15   Q.   Were you a pilot with the United States Air Force?

16   A.   Yes, I was a pilot for the United States Air Force.

17   Q.   Did you serve any time in war zones or the Middle East?

18   A.   I was a pilot during the Vietnam war I was not ever

19   stationed in Vietnam.  I flew to Thailand.  I was called to

20   active duty again in Desert Shield.

21           I served in Saudi Arabia at that period in 1990

22   after Saddam Hussein invaded Kuwait.

23   Q.   And you worked for the airlines.  Would you describe

24   when you were first hired as a pilot by a major airline?

25   A.   My first piloting job in the airlines was with Braniff

1    Airlines in May of 1977.  I stayed there until bran I have

2    failed, and was liquidated really in 1982, and a few months

3    after that I was hired by northwest orient airlines, where

4    where I remained employed and retired from Northwest in 2008.

5    Q.   Being going go back to your employment at Braniff, how

6    was it that your service there ended, what happened with

7    Braniff?

8    A.   Braniff filed for bankruptcy in May of 1982, and

9    completely shut their doors, even though it was Chapter 11

10   they completely seized operation and everyone lost their job.

11   Q.   At Northwest, what positions did you hold as a pilot

12   there?

13   A.   I held, I started of course as a second officer on the

14   727, and flew the 727, became a captain, flew the 747 as well

15   as through all the positions.

16   Q.   Would you explain for the jury what your work was with

17   the Air Line Pilots Association, starting from the first

18   elective or appointed office?

19   A.   Yes.  I was, I first did some volunteer work for Braniff

20   Airlines in Kansas City's local Council, that is where I was

21   domiciled for a majority of the period of time with Braniff.

22        I was first elected to an elected position in 1981,

23   I believe, and I served in that position until our domicile

24   was closed earlier in 1982, and then of course we liquidated,

25   so I was an elected representative, secretary treasurer of

1    Braniff council 45.  When I got to Northwest airlines I got

2    on proceed got off probation and was eligible to serve again.

3              I did some volunteer work but my first elected

4    position I think was in 1986 I became a second officer

5    representative in New York, Council 116.

6              I was reelected to that position a couple of times.

7    I later became of the Master Executive Council, the secretary

8    treasurer of the Northwest Master Executive Council.

9    Q.   Was that also in 1986, Mr. Woerth?

10   A.   That was 1989 by the time I think I was that position.

11   In 1990, after the merger of Northwest and Republic Airlines,

12   I became the chairman of the MEC of the combined group of

13   Republic and Northwest.

14             Simultaneous to that I was also elected executive

15   vice president of the Air Line Pilots Association and served

16   on their executive council.

17   Q.   Let me ask you to pause there for a moment.  So the jury

18   can follow these various offices.  When you were elected to

19   be an executive vice president and served on the ALPA

20   Executive Council, was that what is considered a national

21   office?

22   A.   That is considered a national office, yes.

23   Q.   And when you are elected you explained you were elected

24   to be the second officer representative at Braniff and then

25   later on the Northwest Airlines.  What other offices

1  automatically come with that, in terms of the service on

2  other governing bodies of the Air Line Pilots Association?

3  A.   If, when you are elected to a local council

4  representative you are automatically part of what is known as

5  the Master Executive Council, the MEC, so you serve your

6  local pilots but you also get to vote on the MEC executive

7  council.

8          When I was an officer of both the secretary

9  treasurer of the MEC and MEC office chairman of Northwest I

10  had those responsibilities, but as an executive vice

11  president, the executive council is kind of like the

12  fiduciary body of the association, and make rulings on the

13  Constitution and bylaws and sets the budget.

14  Q.   Approximately how many members did the executive council

15  have at that time?

16  A.   When I first got on the council I think we only had nine

17  members of executive council, five executive vice presidents

18  and four national officers.  It has since been expanded to

19  about 13, is my understanding.

20  Q.   And you also, in this case, there have also been

21  references to the ALPA executive board, and the board of

22  directors.  Would you explain for the jury's benefit what the

23  composition of those bodies is?

24  A.   The ALP board of directors is composed of approximately

25  300 members, all the LEC members were directly elected by

1    their membership are automatically part of the overall board.

2    They are the highest governing body of the association.  Kind

3    of like the Congress of the union.

4    Q.    And the board of directors consists of all of the

5    council representatives?

6    A.    That's correct.

7    Q.    And what about the executive board?

8    A.    The executive board is the chairman, the master

9    executive council chairman of each individual airlines MEC.

10   So if we have 40 airlines there is 40 members of the

11   executive board.

12   Q.    When you were elected to be the Northwest airlines MEC

13   chairman, that automatically entitles you to serve on the

14   executive board?

15   A.    Yes.

16   Q.    All right.  And what role does it play in the governance

17   of the association?

18   A.    I guess in the hierarchy it is the second highest

19   governing body in terms of making policy for the overall

20   union.

21   Q.    All right.  And while we are on the subject, could you

22   explain to the jury, please, how decisions are made on a

23   regular day-to-day basis in connection with the pilots

24   working agreement and the negotiation and administration of

25   the working agreement?

1    A.   We have kind of a stage right approach to our union

2    that's correct each individual property, whether it be TWA,

3    Delta, whether it be United, that the members who are

4    directly elected by the pilots, they will select who their

5    officers are, their chairman, their secretary treasurer.

6    They also, those bodies also determine who is their

7    negotiating committee, who is on their merger committee.

8    They are the ones who have control of the ultimate processes

9    that leads to contracts and ratifying contracts, to give to

10   the membership.  They are the highest governing body at the

11   local level.

12   Q.   So they make the decisions?

13   A.   They make the decisions.

14   Q.   All right.  I think you were tracing your offices that

15   you had been elected to up to Northwest MEC chairman.  What

16   year was that?

17   A.   I was elected in May of 1990.

18   Q.   All right.  And that was for the combined Republic

19   Northwest airlines, I think you mentioned?

20   A.   That's correct.

21   Q.   And that was the product of an airline merger, was it

22   not?

23   A.   Yes.

24   Q.   All right.  And were you appointed to any special

25   committees or offices thereafter?

Woerth/direct                                                    10

1   A.    While I was serving in both those capacities, president

2   Henry Duffy at the time, of ALPA, appointed me to several

3   things including restructuring committee, a financial

4   restructuring committee, to review the entire restructuring

5   of the finances of the association.  And there probably were

6   some other smaller committees but I remember that one most

7   specifically.

8   Q.    All right.  And then were you elected to another

9   national office?

10  A.    In October of 1990 I was elected as first vice president

11  of the entire association.

12  Q.    And how long is the term of office for first vice

13  president?

14  A.    They are four-year terms.

15  Q.    And how many of those did you serve, Mr. Woerth?

16  A.    I served two terms, I served eight years as first vice

17  president.

18              THE COURT:  Is that a full time job?

19              THE WITNESS:  Yes, it is.

20              THE COURT:  You are not flying then when you are

21  first vice president, other than for fun,  you are not flying

22  for --

23              THE WITNESS:  That is a pretty accurate

24  characterization.  I maintain minimal currency for fun but my

25  full time job was with the union in Washington, D.C.

1    Q.    You kept a valid pilot's license by doing three bounces

2    a quarter?

3    A.    That is pretty much it.

4    Q.    But were devoting most of your time to union work?

5    A.    Yes.

6    Q.    When were you elected the president of the union?

7    A.    I was elected president in October of 1998.

8    Q.    And that was for a four-year term?

9    A.    Yes.

10   Q.    And how many terms did you serve there?

11   A.    I served two terms as president ending December 31,

12   2006.

13   Q.    So was this a continuous period of 16 years you were

14   first vice president and then president of the union?

15   A.    That's correct.

16   Q.    All right.   And the last term as president expired

17   when?

18   A.    December 31, 2006.

19   Q.    What did you do then?

20   A.    I returned to Northwest Airlines, worked briefly in the

21   government affairs department, and then simultaneously I was

22   starting, I co founded an internet advertising company with

23   two other partners.

24   Q.    And would you remind us of your retirement date from

25   Northwest Airlines, please?

1    A.    March of 2008.  -- no, February 28, 2008.

2              THE COURT:  From 2006 to 2008 you weren't flying

3    for Northwest.

4              THE WITNESS:  No.

5    Q.    And this internet firm that you helped set up, is that

6    still in business?

7    A.    Yes, it is.

8    Q.    Are you still involved in the ownership or operation of

9    that?

10   A.    I am involved in the ownership, but since my

11   presidential appointment, I had to leave the company.

12   Q.    Tell us about that.   What are you doing now, Mr.

13   Woerth?

14   A.    Right now I am a United States   Ambassador to the ICAO,

15   International Civil Aviation Organization.  ICAO is a united

16   Nations type organization.  I represent the United States to

17   that body.

18   Q.    Is that based in Montreal?

19   A.    Its headquarters is in Montreal, Canada, yes.

20   Q.    That is why you are residing there?

21   A.    That is why I reside there now.

22   Q.    Would you explain to the jury, please, what the

23   functions of ICAO are?

24   A.    Yes.  ICAO was formed in 1944, even prior to the United

25   Nations.  Its purpose is to set up international standards

1    with everything you could possibly conceive with civil

2    aviation, all standards for aircraft, airports, air traffic

3    control systems, manufacturing, carbon emissions, aviation

4    security.

5           If it says civil aviation, this body is the

6    controlling agency to set up standards so we can have a

7    global system so you can fly any where in the world and the

8    pilots and controller's and airlines can expect pretty much

9    the same thing.

10          So 190 nations belong, or have signed the

11   convention.  There is a special council, you could think of

12   the United Nations security council, much like the same

13   thing.  I serve on that council as well and represent the

14   United States there, which does most of the business for that

15   organization.

16   Q.   All right.  And the United States is one of the 36

17   members of the council?

18   A.   That's correct.

19   Q.   Can you give us an example of ICAO's work in an area

20   that people would understand?

21   A.   Our most recent general assembly in October, we for the

22   first time set up international aviation security standards

23   that are now binding on all nations with the type of security

24   they have to provide.  It took a long time to get the rest of

25   the world to agree to this.  A lot of the world thought it

 1   was just the United States problem or Israel's problem and

 2   Africa and South America and Asia didn't need to have the

 3   same security standards we have, but we got them to agree.

 4   Now we can audit them and enforce security around the world,

 5   like we do in the United States.

 6   Q.   What are the responsibilities of the United States

 7   ambassador to the International Civil Aviation Organization?

 8   A.   The organization is the democracy wherever nation has

 9   just one vote.  We supply about 25 percent of the operating

10   captain to run the organization, like a lot of things in this

11   world, but we have one vote.

12          So my job is to represent the United States

13   interest for our jobs, for our manufacturers, for airlines,

14   for our government's position from the Department of State

15   and transportation to, to ensure that the United States goals

16   are met in aviation safety and security, and with the

17   environment.

18   Q.   And what is your relationship with the other United

19   States cabinet offices, for example, in performing your job?

20   A.   Well, I work and coordinate with them, but I do work

21   directly for the president.  Ambassadors really report only

22   directly to him.

23          Actually, I have a letter from the President that

24   we all get to remind other cabinet members that I work for

25   him, and not them.  There is often competing interests from

1    the Department of State, Department of Transportation,

2    secretary of that Politan notice from security may have a

3    particular view on an issue.

4            But there is only one government, can only be one

5    vote, and one decision, and it is to remind them that I

6    report to the president, not to them.

7    Q.    Now, are the representatives from all of these 190

8    nations to the ICAO hold ambassadorial rank?

9    A.    No. Of the 36 members on the council who are there all

10   the time, the assembly, 190 nations only meets once every

11   three years for a couple of weeks.

12           For the most part, the 36 nations on the council

13   run the place.  Of the 36 representatives from other nations,

14   I think there is only only ten other representatives who have

15   the rank of ambassador granted by their government.

16   Q.    How did it come about that you were entrusted with this

17   position, sir?

18   A.    I was 0, well, I was nominated by President Obama in

19   July of last year.  I had a Senate confirmation hearing from

20   the Senate Foreign Relations Committee in August of last

21   year, and in September the full Senate voted on my

22   confirmation.

23   Q.    Thank you.  Now, turning your attention to the year

24   2000, and 2001, you were then serving as the president of the

25   Air Line Pilots Association, correct?

1    A.    Yes.

2    Q.    And how did you first learn of the proposed acquisition

3    of TWA's assets by American Airlines?

4    A.    The first two calls I remember, I can't remember the

5    exact sequence from Captain Bob Pastore, who was the MEC

6    chairman of TWA, and from the CEO and president of the

7    company, of TWA, Bill Compton.

8    Q.    Did you know Bill Compton before you received this call?

9    A.    Yes, I did.

10   Q.    How did you know Mr. Compton?

11   A.    Mr. Compton and I were more or less contemporaries

12   within the Air Line Pilots Association, beginning in the late

13   eighties, our career paths were fairly parallel.  I became

14   chairman of the Northwest pilots and later a board member of

15   the airline board of directors, of an airline, not of the

16   union.

17            Bill Compton became chairman of TWA pilots, and

18   also a member of the board of directors of TWA.  We were, we

19   kind of parallel tracked.  We served together on an executive

20   board of ALPA, and became friends, besides acquaintances,

21   during that process.

22   Q.    How could you describe your working relationship with

23   Mr. Compton at that time?

24   A.    Very professional.

25   Q.    All right.  And did you have conversations with him from

 1    time to time during that period?

 2    A.    Yes, after he became president and CEO of the company

 3    and I was president of the union we would engage like I did

 4    with a lot of the airline CEOs.

 5    Q.    And he called you to say that TWA's assets were being

 6    acquired by American Airlines?

 7    A.    Yes, in January.  By this time I think I might have

 8    already heard it through the media but he did call me right

 9    away.

10              THE COURT:  2001, January, 2001.

11              THE WITNESS:  That's correct, sir.

12    Q.    That would be January 9, 2001, approximately.  What was

13    your reaction to that news, Mr. Woerth?

14    A.    Well, first of all I was simply elated for the employees

15    of TWA, which I was very concerned were facing a dire,

16    probably a liquidation, so I was just thrilled for them.  And

17    I was probably surprised that American did that.  I didn't,

18    that wasn't what I was expecting to happen but I was thrilled

19    for them and kind of surprised at the same time and

20    congratulated Bill that he must be a tremendous CEO to be

21    able to rescue TWA and get it successfully transferred to a

22    successful carrier like American, so I was very happy, was my

23    most important emotion.

24    Q.    And why were you surprised?

25    A.    I had thought that, sadly, that the great airline of

1    Trans World, who had been an industry leader for decades, had

2    two previous bankruptcies and endured Howard Hughes, Carl

3    Icahn, leveraged buyouts.  Their assets had been stripped.

4    Their crown jewel of Europe had been sold to American

5    earlier.  They labored under a very onerous agreement from

6    Mr. Icahn called the Karabu agreement that stripped further

7    revenue from the airline.

8              I had felt that they had been surrounded and

9    weakened as a competitive carrier, to a very large degree,

10   and I actually thought they were so out of cash, frankly, I

11   didn't think anybody would actually purchase TWA at all.  I

12   thought if it got sold it would be in pieces, like Eastern

13   Airlines.  I feared that very much.

14   Q.   And what was that information based upon, that you just

15   recited?

16   A.   Well, in November of the previous year, that is November

17   of 2000, Mr. Compton, in his office as CEO, had called me for

18   my assistance in helping arrange meetings with Northwest, not

19   just the CEO but also their principal shareholders, Al

20   Checche and Gary Wilson.

21   Q.   Why would Mr. Compton call to you help with that?

22             MR. JACOBSON: I am going to object to asking for

23   Mr. Compton's inner thoughts, just what this witness

24   experienced.

25             THE COURT:  I will sustain the objection.

1   Q.   Would you just tell us what Mr. Compton said to you in

2   this telephone call of November of 2000?

3   A.   He told me how dire the situation was at TWA, that they

4   were running out of cash.  He was unable to secure additional

5   credit in any form.  He was actively knocking on every

6   airline door he could to try to find somebody to acquire

7   TWA's assets, and of course save the jobs of the employees.

8   He wasn't having much luck and he asked for my help in

9   getting a meeting with Northwest.

10  Q.   And what did you say in response to Mr. Compton's

11  comments?

12  A.   I told him of course I would help in that regard and

13  wished him every luck.  I wanted to add he also warned me in

14  that conversation that, he was mortified but he that he was

15  probably not going to be able to make pension contributions

16  any longer.  They were so far out of cash beginning in

17  December so he wanted to give me that heads up, to tell me in

18  advance that was probably going to happen.

19  Q.   And did he say he was mortified?

20  A.   Yes.  He was mortified.

21  Q.   And did you learn later that TWA did fail to make the

22  required pension contributions?

23  A.   I did learn that later, yes.

24  Q.   And what did you do with respect to his request with

25  regard to a possible transaction between Northwest Airlines

1    and TWA?

2    A.    I think I immediately hung up the phone and called John

3    Dasberg, who was president of Northwest, and asked him to

4    help arrange a meeting, but more importantly help ensure that

5    if possible to get Al Checche and Gary Wilson, the TWA

6    largest shareholders, which would be very important to any

7    decision to also be at the meeting so Mr. Compton could give

8    the full pitch to the most important members of the board.

9    Q.    And did you letter later learn that such a meeting was

10   held?

11   A.    Yes.

12   Q.    What were the results of that meeting?

13   A.    I heard, I am not sure who all the meetings participants

14   were.  I do know Mr. Dasberg attended and that they had

15   decided there wasn't a transaction possible.

16   Q.    All right.  So the possible deal between Northwest and

17   TWA led nowhere.  But you mentioned another conversation that

18   you learned about the transaction between American and TWA

19   from Bob Pastore, the MEC chairman, at TWA.  Was that also on

20   or about the 9th of January, 2001?

21   A.    Yes.

22   Q.    Would you describe for the jury, please, what Mr. Pastor

23   said to you and what you said to him in that conversation,

24   please?

25   A.    Well, he relayed what, again, I just had been -- what

 1   had been reportedd to me.  He was happy and he was excited.

 2   He was also, he also knew we had a lot of work ahead of us,

 3   all of us, to ensure that transaction actually closed.  He

 4   requested my assistance in, of course he would be given an

 5   audience of the executive council meeting which was going to

 6   be held in a couple weeks, to make a presentation to the

 7   executive council which of course obviously he was going to

 8   be granted, and it was a short conversation.  I just

 9   congratulated him and let's get this completely done, and we

10   both felt pretty good about it.

11   Q.   Did either Mr. Pastor or Mr. Compton describe to you on

12   or about the 9th of January, 2001, any of the terms of the

13   proposed asset purchase agreement?

14   A.   In rough in rough outline form, the most important

15   aspect was clear that, it was more a contingent offer in this

16   regard, the contingency was that all of the unions of TWA

17   would have to relinquish their job security or their labor

18   protective provisions for the transaction to go forward.

19            THE COURT:  Is that what we call the scope rights?

20            THE WITNESS:  That's correct, sir.

21   Q.   Refer to the scope or labor protective provisions, those

22   are interchangeable terms in this context?

23   A.   They are, yes.

24   Q.   What is the essential aspect of this provision that is

25   of interest to the pilots in a merger?

1   A.   The most important, there are two provisions:  One, that

2   the employees would go with the transaction, but the other

3   key element was we always tried to ensure that there would be

4   a right to an arbitration process, if you couldn't reach an

5   agreement on seniority integration, there would be some kind

6   of third-party arbitration.  That was a key element.

7   Q.   How would you evaluate this arbitration right?

8   A.   Well, we seek it.  Negotiating seniority is probably the

9   hardest thing that any employee groups do.  Seniority is

10  forever.  Contracts come and go.  And people, it is a

11  difficult decision to make, and very often people do not like

12  to make the decisions and have a third-party decide it.  It

13  is a very difficult decision to make.

14  Q.   So that is a way that the pilots involved can transfer

15  the ultimate decision to a third party?

16  A.   Yes.

17  Q.   All right.  And are there sometimes surprises when there

18  are arbitrations?

19  A.   I would say there is always surprises, and very rarely

20  are the parties satisfied.  Either side.  Both sides usually

21  feel they lost, which is remarkable, but that is how it

22  normally happens.

23  Q.   All right.  We will come back to that a little later.

24        And did you anticipate that this provision was

25  going to be a stumbling block in the acquisition?

```
 1   A.   I knew that it would be, the decision would have to be
 2   made but I always viewed it that I felt very certain that
 3   both APA and Don Carty, the CEO of American Airlines, this
 4   was not a ploy, it wasn't, well, maybe we will forget about
 5   it.  This was absolute irrevocable obstacle.  You either, the
 6   employees either agreed to it or they would walk away and not
 7   post the transaction, I was completely convinced of that.
 8   Q.   Why were you convinced of that?
 9   A.   The history probably beginning in 1997 with American
10   Airlines, how they got that provision into their contract
11   following a --
12             THE COURT:  You have to explain what provision you
13   are talking about in the APA contract.
14             THE WITNESS:  In the APA contract, in 1997 is when
15   Allied Pilots got that provision in their contract, that
16   the --
17             THE COURT:  What provision?
18   A.   The provision on any merger or seniority integration
19   that they could staple the other pilots to the bottom of
20   their list, if American was the acquiring character.
21   Q.   Okay.  So the American pilots negotiated that in 1997?
22   A.   Correct.
23   Q.   And then what happened?
24   A.   In 19 -- later, in February, 1999, American Airlines
25   acquired Reno Airlines.
```

```
 1              THE COURT:  Reno,  R E N O?

 2              THE WITNESS:  Yes, sir.

 3   Q.   Were the pilots of Reno represented by the Air Line

 4   Pilots Association?

 5   A.   Yes.

 6              THE COURT:  This is an ALPA-to-ALPA merger.

 7              THE WITNESS:  No.  This was American Airlines, APA,

 8   American Airlines acquired Reno Airlines in 1999.

 9              THE COURT:  Reno was represented by ALPA?

10   A.   Yes, sir.

11              THE COURT: APA represented American in 1999.

12              THE WITNESS:  Yes, sir.

13   Q.   What happened then?

14   A.   What happened is that almost immediately, this was near

15   Presidents Weekend, the pilots of American Airlines

16   represented by Allied, engage in an illegal job action, a

17   wildcat strike, if you will, in protest.  They didn't want

18   the merger.  They hadn't been told about it in advance.  And

19   that was their reaction.  That resulted -- that strike was

20   ended by the courts, and the Allied Pilots were ultimately

21   fined 45 million dollars for that illegal strike.

22              The other outcome was it really changed the

23   dynamics in a relationship between Don Carty, the CEO of the

24   airline and its union.  This was a crisis moment.  They had

25   had a very bad experience, and Mr. Carty had actually flew in
```

 1  from Dallas in February of 1999 to meet with me.  Even prior

 2  to the judge's decision.  And it is about a two-hour meeting,

 3  kind of venting, first he was angry at the pilots.

 4  Q.   Where did this meeting take place?

 5          THE COURT:  But you didn't represent those, ALPA

 6  didn't represent the American pilots who did the job action.

 7          THE WITNESS:  No, we did not.  He flew, we had

 8  known each other.  He was a member of the Air Transport

 9  Board, all the airlines were in the trade association.  We

10  testified together in Congress many times.  We knew each

11  other on that basis.  He was coming to Washington, and I

12  think he just wanted some counsel counsel about how to get

13  out of this mess.  It was more, I wasn't there as a union

14  representative or a representative of the pilots.  He kind of

15  was seeking my counsel and advice, what do I do now.

16  Q.   Where did the meeting take place, Mr. Woerth?

17  A.   It took place in my office there, Air Line Pilots

18  Association president's office in Washington, DC.

19  Q.   1625 Massachusetts Avenue?

20  A.   Yes.

21  Q.   Who else was present during this conversation?

22  A.   I believe Will Riss, who is the vice president of

23  government affairs for American Airlines, accompanied Mr.

24  Carty.

25  Q.   All right.  And tell us what Mr. Carty said to you at

 1  that time?

 2  A.    Mr. Carty, we spent some time on his anger at Allied and

 3  the fine was going to have to be imposed, onerous, whatever

 4  it was, he couldn't tolerate illegal strikes.  At the same

 5  time he knew he had to rebuild a relationship with his most

 6  important union, the pilots, and he was really kind of

 7  thinking about how do I go forward.

 8          What, I mean what lessons did I take from this

 9  debacle, and I advised him the first thing, he is always

10  going to have to keep his pilots informed with

11  confidentiality agreements or whatever.  You can't just

12  spring the news of a merger of any kind on them,  in the

13  media.  That was a big mistake.  They reacted badly, but he

14  should learn to keep them better informed.

15          THE COURT:  American had 11,000 pilots, something

16  like that.  Reno could not have had that many?

17          THE WITNESS:  It had less than 300, sir.

18          THE COURT:  Yeah.  I mean, what was it that got the

19  American pilots so exercised?

20          THE WITNESS:  Your Honor --

21          THE COURT:  It has got to be more than somebody

22  sprung a surprise on them.

23  A.    I honestly agree with you.  I have no rational

24  explanation for the tremendous over-reaction to this

25  transaction.  I cannot explain it.  I can't countenance it.

```
 1            THE COURT:  How were the pilots --

 2   A.   They had some negotiation, it ended very quickly.  I

 3   don't know --

 4            THE COURT: Negotiation between who and who.

 5   A.   Reno Pilots and APA.

 6   Q.   Do you know whether they were all stapled to the bottom

 7   of the list?

 8   A.   I believe that is what happened, but it all happened

 9   very quickly afterwards.

10   Q.   And then I think we got on the record there was this

11   contempt fine for 45 million dollars.

12   A.   Yes.

13   Q.   That resulted from the slow-down?

14   A.   Yes.

15   Q.   How did that relate to the provision of the asset

16   purchase agreement that you had referred to a few minutes

17   ago?

18   A.   Well, the end, that was what they thought was an

19   important provision or contract, and they were very intent on

20   enforcing that, for some reason, they had viewed that as a

21   high level within.

22   Q.   When you say they you are referring to the pilots?

23   A.   The American pilots thought that was very important to

24   their pilots to be able to absolutely control acquisition of

25   assets or a merger.
```

1   Q.   When you learned of this provision, did you also learn

2   of the reasons for it from either Mr. Compton, Mr. Pastor, or

3   someone else?

4   A.   You are talking about the provision of the acquisition?

5   Q.   The provision in the asset purchase agreement that

6   required removal of the union's scope or LLPs?

7   A.   I heard it from, first from Mr. Compton, Mr. Pastor

8   mentioned it briefly.  I also had a conversation later,

9   several days later, with Mr. Carty, who requested my

10  assistance and hoped this went well and he reminded me of

11  this provision that was there.

12  Q.   All right.  When you learned of the transaction, what

13  steps did you take to prepare for the associations

14  participation in this transaction?

15  A.   First of all, we made sure our merger -- rather,

16  bankruptcy counsel, because there was going to be an

17  immediate bankruptcy, that was for Cohen, Weiss and Simon and

18  Richard Seltzer, prepared the legal team and instructed them

19  to work with Captain Pastore and give him everything he

20  needed, prepared the executive council for their meeting.  I

21  knew that TWA pilots would be coming in with a long list of

22  immediate consultants, outside consultants, prepared that

23  agenda and prepared to support them in all their requests.

24  Q.   Mr. Pastor had warned you about that in previous

25  conversation?

1    A.    Oh, yeah.  But I assumed that was going to happen.  He

2    didn't have to warn me.  I knew it was going to happen.

3    Q.    And in addition to the arrangements for the request for

4    consultants to the executive council and arranging for

5    special bankruptcy counsel, what else did you do?

6    A.    I reached out to then President Darrah, I wanted to have

7    a conversation with him.  I wanted at some point to be able

8    to address the American pilots and ask, do my -- that they

9    would do much better, that they would not staple the American

10   -- the TWA pilots to their list, that we would have a process

11   that would be fair, and, but mostly just preparing the

12   council, my duties at ALPA and reaching out to Mr. Carty and

13   told him he wanted to make sure the transaction flows.

14   Q.    Did you talk to Mr. Carty at this time?

15   A.    I talked to himself times in the month of January of

16   that year.

17   Q.    Tell us what Mr. Carty said to you in those telephone

18   conversations and what you said back to him, please?

19   A.    He was emphasizing that he was, that he hoped it was

20   going to close, that he knew my opinion on stapling pilots to

21   the bottom.  I opposed that.  It was not ALPA's merger

22   policy.

23          He just reiterated that I needed to know that if

24   the pilots' joy at being acquired went away and was being

25   replaced by a feeling that they could somehow have the

1    transaction, that American would buy them and still permit an

2    arbitration, that I should disabuse myself them of the notion

3    that that was absolutely not going to happen.

4    Q.   That is what Mr. Carty told you?

5    A.   Mr. Carty told me that, and this was again, he learned

6    his lesson, a bloody lesson, in the Reno debacle, that even

7    if American pilots are unreasonable in this regard, that is

8    what they were, and he was not prepared to destroy further

9    his relationship with APA, and so this was the demand he was

10   willing to countenance, either the scope was waived or no

11   transaction.  He was very emphatic.

12   Q.   And you said you had several conversations with, was

13   this repeated in the other conversations you had as well?

14   A.   Probably only mentioned.  It was mostly the first

15   conversation, to make sure there was no doubt in my mind that

16   the transaction could only close under one set of

17   circumstances.

18   Q.   Can you tell us anything about your conversation with

19   Mr. Darrah, the president of the Allied Pilots Association?

20   A.   They were also briefed.  He was fairly new to his

21   position.  I think he had just gotten the job in November,

22   and  he said he worked for the board of directors and they

23   had a policy, and his duty was to the board,  but he would

24   try to work with me, but he was fairly noncommittal at that

25   time.

```
 1   Q.   All right.  You mentioned arrangements for a bankruptcy

 2   counsel for the bankruptcy procedure.  Was the, the

 3   bankruptcy, was your understanding was part of the

 4   transaction with American Airlines?

 5   A.   Oh, absolutely.

 6   Q.   And it was TWA that was in bankruptcy, not American,

 7   though?

 8   A.   Of course.

 9   Q.   And who were the bankruptcy specialists that you helped

10   to arrange for the TWA pilots in this case?

11   A.   Well, the principle firm was through Cohen, Weiss and

12   Simon of New York but the principal counsel was Richard

13   Seltzer had done many bankruptcies before.

14   Q.   Can you tell us about that law firm and Mr. Seltzer and

15   their experience in this areas?

16   A.   Cohen, Weiss and Simon had been our general counsel

17   since our union's founding in the thirties.  We had used in

18   bankruptcy for other unions, but our union sadly had a lot of

19   bankruptcy experience with Continental, Easter and other

20   airlines, so he was quite experienced in bankruptcy.

21   Q.   And are you aware of Mr. Seltzer's prior experience in

22   the area?

23   A.   I mostly, during my time as president, I learned a lot

24   about bankruptcy myself post 9-11, but he had considerable

25   experience prior to the TWA bankruptcy.
```

1   Q.   All right.  I have got a package of four exhibits that I

2   would like to have marked, and, marked for identification,

3   and introduced?

4              THE COURT:  They are?

5              MR. KATZ:  They are 395.

6              THE COURT:  D, P, J?

7              MR. KATZ:  D 395.  D 396, D 397, and P 137.  I have

8   got copies of those in paper that I would like to distribute

9   at this time.

10             THE COURT:  395, 396 and 397 are already marked for

11  identification and not introduced.  And P-137, that is being

12  marked for identification.

13  Q.   Can you identify these documents, Mr. Woerth?

14  A.   Yes, I can.

15  Q.   Would you tell us what they are, please?

16  A.   These are the updates and briefings I was receiving from

17  Cohen, Weiss and Simon and from Richard Seltzer as to the

18  progress of the bankruptcy proceedings with TWA.

19  Q.   And did you read them at the time?

20  A.   Yes, I did.

21             MR. KATZ:  I would ask that they be received in

22  evidence, your Honor.

23             MR. JACOBSON: No objection, your Honor.

24             THE COURT:  Okay.  D 395, 396, 397 in evidence.

25  And P-137 in evidence.

1              MR. KATZ:  Thank you, your Honor.

2    Q.   Would you tell us, please, what you learned from reading

3    these documents?

4    A.   Well, I what I learned was the bankruptcy was

5    proceeding.  Maybe a little more rapidly than some, but the

6    most important thing was to get the desperately needed cash,

7    that the debtor in possession financing, that is document

8    395, in place.

9    Q.   And 395, maybe we could put that up on the screen now.

10   Look at the first substantive paragraph.  If you could blow

11   that up, Brian.

12            Is this the debtor in possession financing that you

13   referred to?

14   A.   Yes.

15   Q.   So was this money that was going from American Airlines

16   to TWA?

17   A.   Yes.

18   Q.   Do you know what priority this funding received?

19            ?MR. JACOBSON: Objection, your Honor.  He is asking

20   questions of bankruptcy law, I think.

21            MR. KATZ:  It is just a general background question

22   if the witness knows?

23            THE COURT:  Repeat the question.

24   Q.   What priority does the debtor in possession receives in

25   connection with the bankruptcy?

1          THE COURT:  I will allow that if he knows.

2     A.   The term was actually a description of what happened.

3     Whoever does the financing now is in possession and in

4     control of this process.

5          THE COURT:  Have you ever heard the term super

6     priority?

7     A.   I have heard of the term but I am not going to try to be

8     a lawyer.

9     Q.   Let's not try to make Mr. Woerth into a lawyer then.

10    That would be a shame.

11         THE COURT:  Okay.

12    Q.   And then in 397, Mr. Woerth, there is a reference, that

13    is the March 16.  That deals with the Karabu agreement that

14    you mentioned earlier?

15    A.   Yes.

16    Q.   Do you know what was going on there?

17    A.   Yes.  That is left over from Carl Icahn to basically

18    skim money from TWA and American was rightly trying to get

19    rid of that provision.

20    Q.   And then in that same document, turning to the second

21    page, there is a reference to the Section 1113 motion.  Would

22    you explain what was going on there?

23    A.   An 1113 motion is a vehicle if it is successful where

24    the contracts can basically be eliminated, the contract

25    provisions of the union can be eliminated by the court.

1    Q.    And if you could blow up the indented portion of that

2    paragraph.   It describes the motion itself, failure to obtain

3    waivers would allow American to walk away from the

4    transaction, making TWA's liquidation a virtual certainty.

5              What was your reaction when you read this part of

6    Mr. Seltzer's report.

7    A.    Well, there was information I already new and believed

8    to be true, that this would happen.

9    Q.    That what would happen?

10   A.    If it, failures did not occur, failure, American would

11   walk away from the transaction and TWA would be liquidated.

12   Q.    Suppose somehow ALPA were able to defeat the 1113

13   motion, what was your understanding of what would happen at

14   that point?

15   A.    Well, it had the same result.   Any time the provisions

16   remained, American would walk away.   There was no way to

17   escape objection -- the provisions either, either is left or

18   TWA liquidated.   That is how I saw the world.

19   Q.    And did you have discussions with representatives of the

20   TWA pilots during the same period of time?

21   A.    Very limited, after a few with Bob Pastore, but very

22   limited.   They mastered their -- they kept in contact with

23   their own council, but I always told them that I assumed that

24   they were going to do this, that they would not risk of jobs

25   of all their pilots and all the rest of the employees by not

1    waiving these provisions.

2    Q.   Well, did Captain Pastore describe for you what the

3    goals and objectives of the TWA pilots were?

4            MR. JACOBSON: I am going to object to this one,

5    your Honor.  This is hearsay.  Captain Pastore is an

6    executive of ALPA.  And the master executive chairman.

7            THE COURT:  Say the question again.

8            MR. KATZ:  Can you describe what Mr. Pastor told

9    you about the goals and objections of the TWA pilots.

10           THE COURT:  Did you have such a conversation?

11           THE WITNESS:  Yes.

12           THE COURT:  When?

13           THE WITNESS: Well, the first conversation, the

14   longest one was at our executive council meeting in January,

15   and the last week of January of 2009 when he asked for

16   additional help, and he also asked me to insure that other

17   airlines did not interfere in the bankruptcy process, try to

18   stopped the transaction with DOT, he was concerned if any of

19   that happened, TWA might liquidate, and his goal was first to

20   survive, and he really didn't, he was trying to fight for the

21   survival of the TWA pilots.

22           THE COURT:  Now, what is question, what do you

23   consider unanswered?

24           MR. KATZ:  I think he has answered my question.

25           THE COURT:  All right.  Go ahead.  Next.

1    Q.    Was there something going on in the bankruptcy case in

2    terms of other airlines, as you discussed, that was prompting

3    Captain Pastore's comments to the ALPA executive council?

4    A.    At the time he feared one or more airlines would object

5    to the transaction or want spin office, if the Department of

6    Justice or DOT was going to approve it and in the end I think

7    Continental did file some complaint that was later rejected

8    but I think Continental did try to intervene.

9    Q.    Did you agree with that priority of preserving the jobs

10   for the TWA pilots?

11   A.    Absolutely.

12   Q.    Was there something about your experience as an airline

13   pilot or an ALPA representative that led you to conclude that

14   that was a sound goal?

15   A.    Well, I had lost my job previously at Braniff if 1982,

16   but had witnessed several airlines completely liquidate, not

17   just Eastern, but Midway Airlines, there was a, the thing was

18   most clear in my mind is a transaction that almost happened

19   but did not, Northwest almost bought Midway Airlines and the

20   last second withdrew their offer and changed their mind and

21   48 hours later Midway liquidated.

22   Q.    What did you learn from that experience?

23   A.    What I learned was that just because there is a proposal

24   for a deal doesn't mean the deal is going to close, and

25   unknown events happen, board of directors change their mind,

 1   and until a deal is completely done, and you are completely

 2   absolutely finished with everything, and are under contract,

 3   you are at risk, extreme risk.

 4   Q.   And vis a vis the TWA pilots, how did that experience

 5   relate?

 6   A.   Well, I was concerned that if the transaction did not

 7   close, I was convinced American would walk away.  They would

 8   not follow through with an asset acquisition, if the contract

 9   was not waived.  And I continued to have fears after that,

10   that even after all in occurred, some unknown event could

11   happen where the American Airlines board of directors might

12   have changed their mind about their decision to buy TWA.  I

13   was always worried about that.

14   Q.   When you say after that, what are you referring to,

15   after when?

16   A.   After the April final closing of the asset acquisition.

17   Q.   On April 10?

18   A.   Yes.

19   Q.   And you are still concerned about the survival of the

20   TWA pilots jobs?

21   A.   Yes.

22   Q.   All right.  Could we turn to exhibit D 13, which is in

23   evidence, I believe.

24            THE COURT:  I am sorry, to?

25            MR. KATZ:  D 13 in evidence.

```
 1   Q.   This is the resolution of April 2, 2001, adopted by the

 2   TWA MEC to accept the package of agreements that American and

 3   TWA put on the table.  You are familiar with that?

 4             THE COURT:  Don't have D 13 in evidence.

 5             MR. KATZ:  Let me if ask if there is an objection

 6   to it.  I believe it is in the minutes which are in evidence.

 7             THE COURT:  Maybe.

 8             MR. KATZ:  As a separate exhibit, you don't have a

 9   problem.

10             MR. JACOBSON: No objection to the separate exhibit.

11             THE COURT:  Okay.  Then I am going to mark D 13 in

12   evidence.

13   Q.   Now we can put that up.  And the third whereas, can you

14   blow that up, please?

15             We have already talked about the assistance you

16   provided to the TWA pilots in retaining expert bankruptcy

17   counsel for the 1113 motion.  Mr. Seltzer.  This whereas

18   clause remind you of any other things that you and ALPA did

19   to  assist the TWA pilots in connection with this

20   transaction?

21             MR. JACOBSON: Objection, your Honor, to the leading

22   form of the question.

23             THE COURT:  Rephrase it.

24   Q.   Can you tell us, Mr. Woerth, whether in addition to Mr.

25   Seltzer there are other things, if any, that you and the
```

1    association did to assist the TWA pilots?

2    A.   Well, this is, this list of counsel, we hired

3    additional, we had bankruptcy counsel, but we also wanted

4    investment bankers, Glanzer is there, I think there is a

5    communications specialist firm.  I forgot the name of the

6    firm.  There is at least two more consulting firms that I

7    think they wanted hired and I think we hired, everyone they

8    asked for I think we allowed them to be hired.  I don't think

9    we turned them down for anything.

10   Q.   So you mentioned Mr. Glanzer?

11   A.   Yes.

12   Q.   He is an investment banker?

13   A.   Investment banker.

14   Q.   Communications firm.  That was retained at the request

15   of the TWA MEC?

16   A.   Yes.

17   Q.   You mentioned, who else did you mention?

18   A.   Besides, well, the investment bankers, we had our own

19   in-house counsel, and there is an additional person that came

20   on later that they wanted to hire, I don't even remember his

21   name.

22   Q.   All right.  And Mr. Babbitt is mentioned.

23   A.   Yes.

24   Q.   Would you remind the jury who Mr. Babbitt is or was at

25   the time?

1    A.   Mr., Captain Babbitt was the former president of the Air

2    Line Pilots Association.  After he retired he set up his own

3    consulting firm called Eclat and he was also on some boards

4    in Washington Metropolitan airport board.  He was an

5    influntial player in Washington.

6    Q.   E C L A T is Eclat?

7    A.   Yes, sir.

8    Q.   And do you know what he is doing now?

9    A.   He is the FAA administrator of the United States.

10   Q.   So he is the top aviation safety official in the

11   country?

12   A.   That's correct.

13   Q.   And how did it come about that Mr. Babbitt was advising

14   the TWA pilot in this connection, do you know?

15   A.   I do not know.  I know they requested his, I think Bob

16   Pastore reached out to him, there may have been somebody

17   else.  But I was happy Randy was willing to agree to help

18   them.

19   Q.   So the MEC asked you for permission to retain his

20   services as adviser?

21   A.   Well, the request comes to me, but all outside counsel,

22   every time any outside consultants are hired, it requires

23   executive council to approve them.  Sometimes they don't, but

24   in TWA's case, they approved every one that they asked for.

25   Q.   All right.  Merger  counsel, was there a special lawyer

```
 1   for seniority integration issues?

 2   A.   Yes.  Roland Wilder was a merger counsel.

 3   Q.   Do you know who Steve Tumblin is?

 4   A.   I know Steve Tumblin.

 5   Q.   Would you tell us who he is?

 6   A.   He is an attorney, he lives in Salt Lake City.  He had

 7   been adviser to TWA, I think even briefly served as a board

 8   of directors member.

 9        THE COURT:  A union representative?

10   A.   A union representative, yes, sir, on the board of

11   directors of TWA.

12   Q.   Did that come about as a result of action by the TWA MEC

13   or by ALPA or in some other manner?

14   A.   I think that was the TWA MEC had the right and did

15   choose Steve Tumblin to be their board member at take time.

16   Q.   So did they also ask for Mr. Tumblin's services and

17   receive permission from you and ALPA to receive those

18   services?

19   A.   Yes, they did.

20   Q.   Let me ask you to digress for a moment.  We take we can

21   take that down.  And go back to the period before the

22   announcement of the acquisition of assets in the year 2000,

23   please.

24        And now I would like to focus for a minute on the Allied

25   Pilots Association.
```

Woerth/direct                                                      43

1          Did there come a time when you had the opportunity

2    to address the board of directors of the Allied Pilots

3    Association in the year 2000.

4          THE COURT:  That is American's union.

5          MR. KATZ:  Right.

6    A.   Yes.

7    Q.   How did that come about, Mr. Woerth?

8    A.   They requested me -- Rich Lavoy was the president.

9    Brian Mayhew was the vice president.  And I had a request of

10   them at the board of directors, the ALPA board of directors

11   meeting was concluded in Miami, if they were holding a

12   meeting, they asked me to come address them.

13         THE COURT:  When was this, what is the date of

14   this?

15   A.   I think it was in October 27, is the third week in

16   October, I believe.

17   Q.   That's correct.

18         THE COURT:  Of the year 2000?

19   A.   2000.

20         THE COURT:  Before the American deal was announced?

21   A.   Yes.

22   Q.   Right.  And at about this time I believe exhibit D 2 is

23   in evidence already.  Can we put that up?  No, it is not.  I

24   would likes to show it for identification to the witness

25   then.

```
 1              Do you recognize this document, Mr. Woerth?

 2   A.   Yes.

 3   Q.   Would you tell us what it is, please?

 4   A.   It is a pilot unity resolution.  It is essentially the

 5   resolution of our board of directors on the methodology to be

 6   used in support for trying to organize and merge with

 7   independent pilots associations that were identified in the

 8   resolution.

 9   Q.   And --

10              THE COURT:  Is this being offered?

11              MR. KATZ:  Yes, sir.

12              THE COURT:  Any objection?

13              MR. JACOBSON:  No, your Honor.

14              THE COURT:  Okay.  D 2 in evidence.

15              MR. KATZ:  Thank you.

16              THE COURT:  ALPA wanted to have APA become part of

17   its union, didn't they?  You wanted to invite some by some

18   modality, get those 11,000 American pilots to be ALPA

19   members, didn't you?

20   A.   Our mission statement was everyone --

21              THE COURT:  You wanted them because they were a big

22   union, they were a dues paying -- You wanted them to be ALPA

23   members?

24   A.   Of course.  They were certified in 1963 and I think

25   every union president since would hope would to be the
```

```
 1    president who brought them back into the union, absolutely.

 2    Q.    Why did you want the American pilots to rejoin the Air

 3    Line Pilots Association?

 4    A.    My belief was, the mission statement as identified in

 5    the first paragraph, was that we were supposed to try to have

 6    all pilots in our union, and this is how we were founded in

 7    1931, and so as an overall goal, it wasn't just for APA, it

 8    was Continental, Fec Ex, Air Tran, Southwest, it was everyone

 9    was the ultimate goal.

10              THE COURT:  Was there any other domestic carrier

11    larger than American that went a member of ALPA.

12    A.    No, they were the largest.

13              THE COURT:   American was the largest nonALPA pilot

14    group in the country?

15    A.    Absolutely.

16    Q.    Who would benefit from the American pilots rejoining

17    ALPA, in your view?

18    A.    I view American would benefit, but the Air Line Pilots

19    Association would benefit, and I think all the other pilots

20    in other companies would benefit by a stronger union with

21    more political clout, with more economic clout, with better,

22    what is known as pattern bargaining.  There are a number of

23    times that American I think had harmed as an independent,

24    they started the B scale, two-tier wage scale which was very

25    harmful.
```

1            There is a number of things that American had done.

2   Q.   In that started at American Airlines?

3   A.   Yes.  We thought being part of one year union we could

4   advance the cause of piloting better with everybody in the

5   same union.

6            THE COURT:  Two-tier system is when new hires go on

7   to a lower scale than existing pilot?

8            THE WITNESS:  That's correct.  American started a

9   system where all new hires were paid 50 percent less, and

10  originally forever, not just for four or five years, they

11  agreed to pay new pilots 50 percent pilots less forever.

12  Q.   And did you view that as a bad thing for the piloting

13  profession?

14  A.   I thought that was cataclysmic for the piloting

15  profession.

16  Q.   Did it spread from American to other airlines?

17  A.   It spread but nobody agreed to forever.  It got into

18  five years and ten years.  It took us 20 years to get rid of

19  that provision that American started.

20  Q.   This was one of the reasons for the goal of having all

21  pilots in one union?

22  A.   Absolutely.

23  Q.   All right.  And then when this opportunity arose on

24  October 27, 2000, what did you say in general to the pilots

25  of American?

```
1    A.    The pilots of American were aware of our resolution.

2    More importantly they are aware that we had an active

3    campaign to organize Continental underway, and they are aware

4    that I had an active plan that when we were finished with

5    Continental, that we were going to organize Fed Ex next.  And

6    so they are aware of that and they wanted -- they had an

7    active group, a small group, but active nonetheless,

8    enthusiastic, who were upset with APA over a number of

9    things, beginning with their 45 million dollars debacle,

10   illegal strike that they got fined for.

11         They are embarrassed that in 1997 they tried to go

12   on strike and the emergency board, President Clinton stopped

13   them in 13 seconds.  They tried to get a contract through

14   equal to United, but it wasn't equal to United and the pilots

15   rejected it.

16         There are a number of pilots that American were

17   very dissatisfied with APA and recent mystery.  They are

18   aware of United historic new contract, a successful pilots

19   strike by Northwest in 1998 and there was some level of

20   interest by at least some American pilots, and they had

21   prodded Captain Lavoy and -- Rich Lavoy and Brian Mayhew to

22   do the invitations.

23   Q.    Those were the officers of the Allied Pilots Association

24   at that time?

25   A.    That's correct, that's correct.
```

```
 1  Q.   How would you compare this appearance at the Allied

 2  Pilots Association board of directors on October 27, 2000, to

 3  the organizing efforts that were ongoing at Continental

 4  airlines amongst the pilots there?

 5  A.   At this point with Continental, the reason I chose

 6  Continental and Fed Ex is we had a large group including

 7  their board of directors who was already on board and willing

 8  to sign an agreement.  We had already, it was going to cost

 9  about a million and a half dollars for each campaign.  We had

10  almost 100 volunteers of ALPA volunteers who would need to go

11  out on the road and be willing to work for about 120 days, be

12  in the crew rooms, talk to the pilot, be present on videos,

13  make campaign literature.  It is a like a political campaign

14  that lasts intensely the last 120 days are very intense but

15  it takes about a year.

16  Q.   These are pilots from other airlines like Northwest and

17  United?

18  A.   Yes.

19  Q.   Who go to talk to Continental in the Continental crew

20  rooms?

21  A.   Right.  Plus we had Continental pilots, most important

22  in the effort because their board of directors, the ICE

23  board, wanted to merge with ALPA and so it is going to be a

24  joint campaign.  And we were going to get, I had enough

25  contact with Fed Ex that we were going to have a similar
```

1    experience with Fed Ex because we had a large majority of the

2    board and their leadership actually wanted to merge.  I

3    wasn't having to convince them.

4              THE COURT:  By the way, there is two ways you can

5    take a nonALPA union, one, can you merge the two unions.

6              THE WITNESS:  Yes, sir

7              THE COURT:  You don't get cards, you don't do a

8    campaign there?

9    A.   That's correct.

10             THE COURT:  Or you can use a card campaign which is

11   in effect you certify the existing union and then certify

12   ALPA as the bargaining agent, or have an election which then

13   certified ALPA.

14             THE WITNESS:  Those are the two methodologies, sir.

15             I rejected the card campaign.  I was, I thought it

16   was a terrible strategy, and I was the principal advocate of

17   this strategy only by merger.  If it couldn't co-opt the

18   leadership, if they didn't agree with you, I didn't want a

19   hostile takeover.

20             It is either a friendly takeover where both

21   leadership teams wanted it, or it wasn't worth pursuing it.

22   It was going to be a costly failed endeavor.  So I was

23   committed to one strategy, a strategy by merger, not by card

24   count.

25   Q.   If we go to the third page of this document, be it

1    further resolved, and numbered paragraphs.  I would like to

2    get to the number 3 item.  Proposed merger agreements with

3    independent pilots associations will be subject to approval

4    by the executive council and ratification by the executive

5    board.

6                 So did this resolution reflect the preferred method

7    that you just stated?

8    A.   Yes, it did.

9    Q.   Is this the method that you employed with the a, that

10   the association employed, with the Continental pilots?

11   A.   Yes.

12   Q.   So how did it start, was their action taken by the

13   governing body of the Continental pilots?

14   A.   Eventually it started with my approaching their

15   leadership, probably in 1999.  And it took a lot of months to

16   develop a bond and a trust that this is something we should

17   do together, so it is probably six months of spade work, if

18   you will, trying to nurture a relationship and then got them

19   very interested to the point I wanted to make sure that the

20   Airlines Pilot Association would approve the merger, and they

21   needed the confidence that the entire board of directors

22   would welcome Continental back.  That is really what the

23   principle focus of the whole reason to have this pilot unity

24   resolution, it was about Continental, it wasn't about Fed Ex

25   and it wasn't about American.

1    Q.   Did you give the Continental pilots that union, that

2    they would be welcomed back into the association?

3    A.   I did but they wanted the assurance from the entire

4    board of directors, not just from me.  That what is this do.

5    Q.   That is D 2, the unity resolution was a reflection of

6    the desire of the entire Air Line Pilots Association board to

7    welcome the Continental pilots back?

8    A.   Continental was the mission right in front of us and the

9    obstacle we were trying to clear.  We also included everyone

10   else, because why not?  We have a mission statement to

11   organize everyone, merge everyone, let's list everyone but

12   the reason we needed this unity resolution was we had stalled

13   at Continental.  Without it we were not going to be able to

14   get done.

15   Q.   Did you say there was a million and a half dollars

16   budgeted for organizing the Continental pilots?

17   A.   Yes.

18   Q.   That was to be spent in 2001?

19   A.   Spent from the end of 2000, we went right immediately

20   back to work when this was, resolution was done, and we

21   concluded the merger in April, Continental pilots voted in

22   mid April of 2001, and they became official members June 1st,

23   2001.  Then we went straight into the Fed Ex campaign.

24   Q.   All right.  That was done with cards or with a merger

25   agreement?

1    A.   They were both with merger agreements.

2    Q.   In compliance with exhibit D 2?

3    A.   Of course.

4    Q.   Can you tell the jury, please, what was the budgeted

5    amount for organizing an American for the year 2001?

6    A.   Zero.

7    Q.   There was nothing budgeted to organize the American

8    pilots?

9    A.   No.

10   Q.   All right.  But you did give a speech on October 27,

11   2000?

12   A.   Yes.

13   Q.   And as a result of that speech did anything happen?

14   A.   Well, actually there was really no follow-up.  I give it

15   my best shot.  I was invited to talk by Captain Lavoy, I mean

16   American leadership.  I think at the instigation of a couple

17   of members of his board of directors who were ALPA

18   enthusiasts, but nothing ever came of it.

19   Q.   Can you describe on a scale of zero to 100, with 100

20   being the highest, what the level of interest among the

21   representatives in the American pilots was in rejoining ALPA

22   in the year 2000 when you went to address them?

23   A.   I would assess it at about five percent.

24   Q.   How would you compare that to Continental?

25   A.   Continental was about 60 to 70 and we had got 98 percent

1    of the membership eventually.

2    Q.   By April of 2001?

3    A.   Yes.

4    Q.   Did you, from time to time, report to the ALPA Executive

5    Council about the progress that was being made under the

6    pilot unity resolution, exhibit D 2?

7    A.   Yes.

8    Q.   I am not sure whether 243 and 44 are in every?

9            THE COURT:  D or P.

10   Q.   243 and 244s.  They are in evidence.  I have copies for

11   the Court.

12           THE COURT:  They are both in evidence.

13   Q.   You are familiar with these documents?

14   A.   Yes.

15   Q.   Are these the minutes from the ALPA executive council

16   meetings in January and April, 2001, Mr. Woerth?

17   A.   Let me read it.  Yes.

18   Q.   All right.  Could we focus on the list of attendees for

19   the January meeting.  Exhibit D 243.

20     MR. KATZ:  I am sorry.  P-243.

21           MR. KATZ:  Your Honor, I misled you.  I think P-243

22   and P-244 are the documents I had in my hand.  Are they in

23   evidence?

24           THE COURT:  I don't know.  D 243 and, let me check

25   P 243 and 244.

1              MR. KATZ:  I apologize.  I ask for these to be

2     admitted into evidence.

3              MR. PRESS:  Your Honor, P  243 and P-244 are in

4     evidence.  They are admitted with Captain Rachsford.

5              MR. KATZ:  Fine, thank you, Allen.

6              THE COURT:  They were admitted on June 20.  243 and

7     244, P, are already in evidence.

8     Q.   Mr. Woerth, looking at the list of attendees at the

9     January 23, 2001, ALPA Executive Council meeting, I see the

10    national officers are there, including you, as the president?

11    A.   Yes.

12    Q.   And who are all these various executive vice presidents,

13    sir?

14    A.   They are executive vice president David Morrow was from

15    U S. Airways.  Robert Morris is from Delta.  Steve Soller is

16    from Northwest.  Kevin Dillon is from United.  They had

17    individual seats, each airline of that size was entitled to

18    its own seat.

19    Q.   Let me ask you this  question, Mr. Woerth.  Was there

20    any of these executive vice presidents who had the

21    responsibility of representing the interests of the TWA

22    pilots?

23    A.   Yes.

24    Q.   Who was that?

25    A.   That was G Cress Bernard, who was from Alaska.

1  Q.    TWA, because it was a smaller airline, was part of a

2  group represented by Captain Bernard?

3  A.    Yes.

4  Q.    The first item on the first page are officer reports.

5  Could we blow up the third paragraph that refers to the pilot

6  unity campaign.

7         Do you see that language there, Mr. Woerth?

8  A.    Yes.

9  Q.    What was your report, that is reflected by this entry in

10  the official minutes of the executive council meeting, can

11  you remember what you said?

12  A.    Well, I don't remember all of what I said because I

13  think I talked about 20 minutes about Continental which we

14  were very deep into, and had a lot of detail about all the

15  activities at all the different bases.  My prediction for

16  success, and what we were going to have to do.  I spent about

17  20 minutes on Continental which is the majority, because that

18  was the only active campaign.

19         I talked -- at Fed Ex I addressed that their

20  current officers were very interested but we were going to

21  have to wait with Fed Ex until we were completely done with

22  Continental.  We simply couldn't do two at the same time.  We

23  might have had the financial resources, we don't have the

24  human resources.  It takes about a hundred volunteers plus

25  the staff.

 1            You can only organize one group at a time.  It is

 2      like fighting a two-front war.  You are better off getting

 3      one objective done and then go on to the next objective.  So

 4      most of this briefing, almost all of it, was about

 5      Continental.  I touched on Fed Ex, we might do them next, I

 6      hoped we could.  And that the the effort, I, this was

 7      probably my first meeting with them since our board in

 8      October that I had gone to Dallas, I met with APA, and

 9      nothing had happened, of course, now nothing  would happen,

10      we have a merger going in place with TWA, and that is the

11      only thing we are going to to do.

12            THE COURT:  Well, Mr. Woerth, the second officer

13      report, I gather it is P 243, do you see that, January 23 to

14      25 meeting?

15            THE WITNESS:  Yes.

16            THE COURT:  The second paragraph, officer reports,

17      which is the first substantive paragraph, Captain Woerth

18      reported that the Bilateral Scope Impact Committee

19      established by October, 2000, board of directors, quote, for

20      the purpose of developing as necessary a new amended

21      established ALPA policies and procedures, including but not

22      limited to the impact of the scope provisions on ALPA pilots

23      to the airlines had been appointed.

24            So the very first thing is some kind of committee

25      that is dealing with scope issues.  And some discussion of

1    the impact.  What is that all about?

2            That is the first thing you discuss.  The word

3    Continental isn't even mentioned.  That is the very first

4    thing in the minutes.

5    A.   Actually, your Honor, this by Bilateral Scope Impact

6    Committee had really nothing to do with the classic job

7    security provisions and scope of acquisitions.  This was

8    purely focused on the relationship between regional airlines

9    and main line carriers so this was all about how do we deal

10   with limitations on scopes for regional jets and for the

11   regional jet operators had an interest in lifting scope so

12   they could fly more of them, the main line was trying to

13   restrict RJ flying, so this really had nothing to do with the

14   classic scope provisions, this was more how do do we deal

15   with regional jets, the whole purpose of the bilateral scope

16   impact committee.

17   Q.   To follow up on that, Mr. Woerth.  A scope usually

18   appears in the section 1 of ALPA contracts, doesn't it?

19   A.   Yes, it does.

20   Q.   And would, within section 1 there are a variety of

21   protections for pilots?

22   A.   Yes.

23   Q.   And did ALPA at that time represent the main line

24   carriers like Delta, as well as their regional or feeder

25   carriers,  like Conair and ASA?

```
 1    A.   Of course, yes.

 2    Q.   And did the Delta pilots scope provisions have an

 3    alleged impact upon the ASA and Conair pilots flying?

 4    A.   Yes.

 5    Q.   Would you describe for the Court and jury what that

 6    issue was?

 7    A.   Yes.  As regional jets were introduced into the industry

 8    beginning in 19, mid 1990s, it became evident that they were

 9    going to be paid only a tiny fraction of main line fare,

10    sometimes way less than half, maybe two thirds less, and that

11    carriers like United and U.S. Air and American, and others,

12    everyone was concerned that they were going to go very

13    rapidly and replace the job of some smaller jet flying by the

14    main line carriers, it is going to be job transfer away from

15    main lines like Delta and United into Conair, Pinnacle,

16    airlines you never heard of, who are going to get this out

17    source flying.

18         So there was a lot of tension between the

19    limitations on that flying into the contract that main line

20    carriers got their owners to agree to, and that aspirations

21    of some regional pilots who wanted those removed so they

22    could fly bigger equipment and get more flying for

23    themselves.

24         THE COURT:  Mr. Woerth, in terms of scope, isn't

25    there a difference in attitude for the pilots of an airline
```

1    that was likely to be acquirer, American was likely not to be

2    taken over, they were likely to be the ones, historically I

3    think who were buying airlines.  Their pilots would have one

4    viewpoint, which would be not to have these newly acquired

5    pilots take their jobs away.

6            Then you have other airlines who are more likely to

7    be targets of a takeover by the TWA.  Their concern is the

8    reverse.  Their concern is that when they are taken over they

9    don't get stapled to the bottom and that they maintain some

10   seniority.  Is that right?

11           THE WITNESS:  That is correct.  And --

12           THE COURT:  How did that play out in your role as

13   president of the union, that tension between the airline who

14   was likely to be a taker-over, as opposed to one who is

15   likely to be taken over?

16           THE WITNESS:  Your Honor, that is why we had ALPA

17   merger policy, that if there was an acquisition, the

18   governing policy, ALPA-to-ALPA, would are merger policy and

19   notwithstanding all these other provisions.  In the end, the

20   merger and integration would be governed by our policy.

21           THE COURT: That is within ALPA and ALPA.

22   A.   That's correct.  When you don't have an ALPA carrier, it

23   becomes very difficult.  Most U.S. carriers, your Honor, if

24   you will permit me, actually wrote scope provisions covering

25   both directions because they didn't know what was going to

1   happen.

2             American, if I may say, was a little unique in

3   their arrogance in presuming there would only be one way, it

4   would always be the acquirer, but in the unlikely event they

5   are acquired, the very provisions that they denied anyone

6   else they insisted upon for themselves.  It was the ultimate

7   hippocracy, but that was the contract of American Airlines.

8   Q.   So the contract at American said if American were

9   acquired by some other airline, they would have the right to

10  a seniority arbitration to put the list together?

11  A.   That's correct.

12  Q.   But they denied that same right to the pilots of an

13  acquired airlines?

14  A.   Yes, they did.

15  Q.   All right.  If two ALPA carriers merged, and the ALPA

16  merger policy applies, what happens with the seniority

17  integration in that circumstance?

18  A.   When it us two ALPA carriers emerging, they have a

19  period of time when they are supposed to try to negotiate an

20  agreement.  We don't want this to drag out forever so let's

21  try to be the prescription, try to get it done within I think

22  six months.  And failing a successful negotiation of good

23  faith of both parties, they are able to submit the seniority

24  integration to a third party, an arbitrator, and that happens

25  a great deal of the time.

Woerth/direct                                                    61

1    Q.    You are saying frequently it does take an arbitrator to

2    resolve a seniority integration dispute?

3    A.    Yes, it does.

4    Q.    Do you have an opinion why that is?

5    A.    Yes, I do.

6    Q.    Would you state it, please?

7    A.    I believe that seniority integration is the most

8    difficult political thing a member of a committee or an MEC

9    can do, and it is unlike even contracts where we do contracts

10   and side letters all the time, contracts are constantly

11   amended, and there is always a point where we gave up too

12   much or we didn't get enough but a contract is short term.

13   It may last a couple of years.

14            For pilot seniority, the seniority numbers last

15   forever, so the emotion and the responsibility is usually

16   overwhelming.

17            It is very common that a pilot, MEC or a merger

18   committee, pilot sees where a deal could be but they just

19   can't be the one who forever tells their pilots, I agree to

20   your seniority number for the rest of your life.  Especially

21   knowing full well that every pilot wants more seniority.

22   There is no way to make it happen.  It is human nature.  If

23   there is a way to punt it to a third party, it is natural

24   that usually that is what happens.  They give it to an

25   arbitrator and let him decide.

```
 1              MR. KATZ:  Your Honor, I have a couple more

 2   questions and I would like to take a break.

 3              THE COURT:  I was going to tug.

 4   Q.   Let me follow-up with this one issue and one other.  It

 5   won't take a second.

 6              What impact, if any, do these provisions of ALPA

 7   merger policy, did these provisions of ALPA merger policy,

 8   have upon the American, the prospect of the American pilots

 9   joining ALPA after January 9, 2 2001?

10   A.   Well, they have always been the principle obstacle.

11   American pilots, as evidenced by their contracts, do not want

12   to -- want to totally be in control in a situation.  When

13   they acquired somebody they wanted the right to have total

14   control and domination of the outcome and they put that in

15   their contract.

16              One of the principle obstacles to ever getting

17   American back is the attitude of the American pilots who do

18   not want to be subject to arbitration.  And so while, to try

19   to get American to join us, which would be subject them to

20   arbitration was completely nonsensical.  The whole reason

21   they stayed out, I mean, they insisted on no seniority

22   integration for American as an absolute principal they wanted

23   to have, and if they joined ALPA they would have to buy our

24   bylaws submit to arbitration.  So it was a non-starter for

25   American pilots.
```

```
 1              MR. KATZ:  I think this would be a good time for a

 2     break.

 3              THE COURT:  Okay.  Ladies and gentlemen, we will

 4     take a break until 20 after ten.  Do not discuss the case

 5     among yourselves.

 6              Keep an open mind until you have heard all the

 7     evidence.  All rise when the jury leaves.

 8              (Jury leaves the courtroom.)

 9              THE COURT:  I will see you at 20 after ten.

10              (Recess).

11              (Jury enters the courtroom.)

12              DUANE WOERTH, Resumes.

13              THE COURT:  Mr. Katz, you can continue with your

14     direction examination.

15              MR. KATZ:  Thank you, your Honor.

16              CONTINUED DIRECT EXAMINATION

17              By MR. KATZ:

18              MR. KATZ:  In order to expedite the process I would

19     like to distribute the exhibits that I plan to go through

20     with this witness, to the Court, the witness and opposing

21     counsel.

22              THE COURT:  Okay.

23              MR. KATZ:  They are in the order I plan to address

24     them.

25              THE COURT:  Okay.
```

```
 1              THE COURT:  You have a document here called
 2   jumpseat policy but there is no marking on it.
 3              MR. KATZ:  I will explain that when we get to it.
 4   If you like I would address it now.  I would rather start
 5   with the April 2 MEC meeting.  I think we had the resolution
 6   up on the projection screen a few minutes ago.
 7              THE COURT:  J 124?
 8              MR. KATZ:  No, it is one of the earlier ones, that
 9   we looked at.
10              THE COURT:  What are you beginning with?
11              MR. KATZ:  It might be D 74.  Is that the
12   resolution.  Let's start with the resolution.
13   Q.   This is D 13?
14              THE COURT:  D 74 is already in evidence.
15   Q.   D 13 is in evidence now.  You are familiar with this
16   resolution of the TWA MEC, Mr. Woerth?
17   A.   Yes, I am.
18   Q.   And looking at the, do you know what the voting was,
19   without looking at the document?
20   A.   Yes, I do.
21   Q.   Would you describe that, please?
22   A.   I think everyone except Hollander ended up voting for.
23   Q.   And it does recite, as we looked before at the
24   whereas's, extensive advice from various advisors.  Did you
25   have any role in telling these advisors what advice to give?
```

Woerth/direct                                              65

1    A.    No.

2    Q.    Did you appear at the April 2 MEC meeting?

3    A.    No.

4    Q.    Why not?

5    A.    I wasn't invited.

6    Q.    And how does that work under ALPA's practice?

7    A.    ALPA's practice is, I am like the president.  We have 41

8    airlines.  And I work in Washington, and I don't impose

9    myself on the govenors, I don't just show up at their

10   meetings.  I am the president.  I want to talk to you, if

11   they want my advice they can invite me to meetings which I am

12   happy to attend.  They can see me in Washington.  But I had

13   60,000 pilots, of which -- to represent.  I am not ensure

14   where I was April 2, but I wasn't with them, I know that.

15   Q.    Were you invited to that meeting?

16   A.    No, I was not.

17   Q.    And do you have other responsibilities as the president

18   of the union?

19   A.    Many additional responsibilities.  Yes.  60,000 pilots,

20   40 airlines.

21   Q.    Is there a staff of the Air Line Pilots Association

22   responsible for directing the activities?

23   A.    Yes, we have nearly 500 employees and lots of directors

24   and lawyers who do the work.

25   Q.    And are there areas that you focus on aside from local

Woerth/direct                                           66

 1  issues affecting particular airlines?

 2  A.   Well, I am principally responsible for all the finances

 3  of the association and its governing policies and Washington

 4  politics.

 5        I deal with the administration and Congress, and at

 6  this particular time we were in the middle of an organizing

 7  drive with Continental.  I was dealing with the Conair air

 8  strike, the biggest thing going on in April, we had a strike

 9  of the Conair pilots, regional pilots had just gone on strike

10  so I was dealing with that.

11  Q.   When you say dealing with the administration what you

12  are you referring to?

13  A.   I am dealing with the Department of Transportation,

14  Federal Aviation Administration, National Mediation Board.

15  Anything that might interface and affect our pilots contracts

16  or their companies.

17  Q.   All right.  And did you agree with the decision that the

18  MEC made on April 2?

19  A.   Absolutely.

20  Q.   Why did you think they made the correct decision, Mr.

21  Woerth?

22  A.   Any other decision would have resulted in a liquidation

23  of TWA and loss of all their jobs.  It seemed obvious it was

24  the only decision.

25        THE COURT:  Mr. Woerth, they still had the four

```
 1   days later, the 1113 hearing, the bankruptcy court which

 2   could have achieved the same thing.

 3            THE WITNESS:   It could have achieved the same

 4   thing, potentially.

 5            THE COURT:   If that had been granted they wouldn't

 6   have walked away.

 7   A.   I am sorry, your Honor?

 8            THE COURT:   American wouldn't have walked away?

 9   A.   They probably might have waited until until the end of

10   1113.

11            THE COURT:   That was four days off, April 6 it was

12   scheduled, the hearing on that.

13            THE WITNESS:   I accept your point, your Honor.

14   Q.   How would you compare the results for the TWA pilots of

15   the deal that they accepted on April 2, versus what would

16   have happened if the 1113 motion had been granted?

17            MR. JACOBSON: Your Honor, I think this is getting

18   too far into legal opinion.

19            THE COURT:   Yeah, that is getting pretty subtle.

20            MR. KATZ:   To compare the results of the 1113 --

21            THE COURT:   We don't know what the results of the

22   1113 were going to be.  Not on April 2.  I don't know what

23   you are getting at.  I am just not sure what you are getting

24   to.

25   Q.   Let me ask the witness to turn to exhibit J 124, which
```

 1  is in evidence.

 2              THE COURT:  J 124?

 3              MR. KATZ:  Yes, your Honor.

 4              THE COURT:  Is in evidence.  You are correct.

 5  Q.   This is a letter to you dated March 26, 2001, from

 6  Roland Wilder, who is seniority lawyer for the TWA pilots,

 7  correct?

 8  A.   I am looking at J 124 now, yes.

 9  Q.   Did I describe what it is correctly?

10  A.   Yes.

11  Q.   All right.  And did you receive this letter on or about

12  March 26, 2001?

13  A.   Yes, I did.

14  Q.   And did this present an alternative that was available

15  to the TWA MEC?

16  A.   I referred this document, I didn't try to render a legal

17  opinion on what advice it takes.  I turned this letter after

18  reading it over to our counsel for advice.

19  Q.   The first paragraph of the letter, maybe we can blow

20  that up, says, Mr. Wilder is advising you that the MEC will

21  decide as early as March 30, that is a few days later,

22  whether suit should be instituted against TWA and A and

23  American to compel arbitration of the minor dispute created

24  by the carriers violation of the successorship provisions of

25  the TWA/ALPA collective bargaining contract.  In preparation

1    for this eventuality, the master chairman instructed me to

2    seek your authorization under the ALPA Constitution to sue

3    the carriers for the reasons set forth below.

4              So  what consideration did you give to that

5    request?

6    A.   Well, two things:  First, I turned the entire letter

7    over to my attorneys for advice.

8              But the second question was, I normally get letters

9    like this not from an attorney, The master chairman makes a

10   request to me, not an attorney directed by a master chairman

11   so I was waiting to hear from Bob Pastore.

12   Q.   Did you get a request from Captain Pastore or a lawsuit

13   at this time?

14   A.   No, I did not.

15   Q.   To your knowledge, was there a resolution adopted by the

16   TWA MEC seeking this kind of lawsuit?

17   A.   I don't remember any resolution.

18   Q.   And who were the lawyers to whom you referred the

19   letter?

20   A.   I would refer this first to our in-house counsel,

21   Jonathan Cohen, ALPA's own internal counsel, and I assumed he

22   would get the advice of our general counsel, Cohen, Weiss and

23   Simon.

24             The lawyers would get together to try to give me

25   their advice and recommendations as to this procedure.

Woerth/direct                                                          70

1   Q.   All right.   In the middle paragraph that is up on the

2   screen, it says Mr. Wilder is seeking to institute litigation

3   in the United States District Court for the district of

4   Delaware.   And acknowledge other things he is seeking

5   injunctive relief.   At the very end, in order to preserve the

6   -- sorry.   -- enjoining -- an injunction enjoining the

7   completion of the TWA American transaction.   Without getting

8   into the legalistic aspects of it, did you have a view as to

9   the desirability or undesirability of that proposed course

10  much action?

11          MR. JACOBSON: Objection, your Honor.   I think this

12  requires some foundation.   He just said he doesn't apply a

13  legal and he handed it off to the lawyers.

14          THE COURT:   I agree with that.

15  Q.   Did you read the letter?

16  A.   Yes.

17  Q.   And did I understand what Mr. Wilder was proposing to

18  do?

19  A.   Yes.

20  Q.   What was your understanding based on this letter?

21  A.   My understanding -- I understood that he was asking me

22  to sue to keep the ability to arbitrate, even though the

23  motion, knowing that the TWA agreement may fail, or collapse,

24  unless their ability to arbitrate was eliminated.   So it  a

25  seemed, we were debating two things.   Negotiate it and maybe

1    it will go away, and to have a court to keep it under the

2    threat that American may walk from the transaction.  We

3    didn't know that.  With absolute certainty that was my

4    belief.

5              So it seemed to be at cross purposes with the

6    survival, in my judgment.  But I was waiting to get advice

7    from my attorney.

8    Q.   All right.  And did something happen before the

9    attorneys responded?

10   A.   Well, they got this agreement in April 2, the MEC agreed

11   to their deal on April 2.

12   Q.   Okay.  Do we have D 74 in evidence?

13             We looked at the resolution of the TWA MEC a minute

14   ago.  What impact, if any, did the TWA resolution on April 2

15   have on the request for the initiation of a lawsuit?

16   A.   I didn't hear any more about it at that time.

17   Q.   What was your assessment of the MEC's decision on April

18   2?

19   A.   My understanding was that they had taken a course of

20   action to eliminate additional risk under 1113.  At least

21   they knew what they agreed to in this case, and with the

22   hopes that the transaction would ultimately be completed.

23             The asset acquisition and TWA LLC, and leading to

24   what we knew would take about another year to the final

25   integration becoming American pilot.  I thought we were on

1    that road now.

2    Q.   And did you agree with that decision?

3    A.   Yes, I did.

4    Q.   Could you think of anything that you could have done or

5    that ALPA could have done to persuade the Allied Pilots

6    Association to go along with the seniority integration

7    process that ended up with arbitration?

8    A.   I do not.

9    Q.   All right.  After the MEC made this decision on April 2,

10   you made an appearance, did you not, at the Allied Pilots

11   Association board of directors meeting in April, 2001?

12   A.   Yes, I did.

13   Q.   Would you tell us how that came about, please?

14   A.   I requested a meeting and asked that president of APA,

15   John Darrah at the time, it was going to be in Texas, in

16   Dallas, to meet with American Eagle pilots and I wanted this

17   opportunity to talk to the board to advocate the position of

18   the TWA pilots in in this integration.

19   Q.   Did Mr. Darrah extend an invitation to you to appear

20   beer before the Allied Pilots Association board on April 5?

21   A.   Yes, he did.

22   Q.   You accepted that invitation and addressed the board?

23   A.   Yes, I did.

24   Q.   Tell us, what did you tell the board?

25   A.   I told the board that the TWA pilots had made a very

 1   difficult decision, it is hard to give up scope protection,

 2   and a right you believe you have, and, but they had done that

 3   now.

 4           I was really trying to get them convinced that most

 5   importantly, that the provision in the contract about just

 6   stapling to the bottom 100 percent of the TWA pilots was

 7   totally unacceptable, it was morally reprehensible.  They

 8   would live to regret the day in this regard.  They wanted,

 9   they were very jealous of the Northwest contract, the United

10   contract, the Delta contract, the ability to have pilot

11   unity, and as a reminder to them they had done small things

12   before, the great American Airlines had a couple of small,

13   they bought Trans Caribbean in the sixties, they bought Air

14   California.  They bought Reno, those were tiny small

15   transactions.  11,000 pilots absorbing two or three hundred.

16           And this was very different.  TWA was almost 2,500

17   pilots with an established carrier, very seasoned, and if

18   they wanted unity they were going to have for their combined

19   future at American, they are going to have to have a fair

20   process, even if it didn't include arbitration, their

21   negotiation was going to have to really stretch beyond what

22   they purportedly had right in their contract.  So I was

23   encouraging them to use all their efforts to go way beyond to

24   what they thought they were going to do to think of the long

25   term future of American, which included TWA, that they would

```
 1   would be better off having a fair integration through

 2   negotiation and that I would do everything I can to help that

 3   process.

 4        I suggested we get facilitation, if you won't have an

 5   arbitrator, at least get some outside help to try to get the

 6   parties to get to a deal, but they could not approach this

 7   like they did with Reno Air or Trans Caribbean or Air

 8   California.  This was a big transaction, the TWA pilots

 9   deserved a better integration that their contract was

10   providing.

11   Q.   Did you  tell the Allied Pilots board of direct

12   directors that you told the TWA pilots that they needed to

13   get real?

14   A.   No. I told American pilots that they needed to get real.

15   It was all in reference to this idea that they could staple

16   absolutely to the bottom of single pilot.  That was

17   completely unreasonable.  And I reminded them of their

18   hippocracy, quite frankly.  If you are acquiring somebody,

19   you want to be stapled.   If you are being acquired by

20   somebody else, you want to be integrated, I told them that.

21   I called them on that.  They didn't seem to blink, but I

22   think they got my message.

23   Q.   Did you compare this transaction to the Reno deal?

24   A.   Yes.

25   Q.   What did you say about that?
```

1    A.    There was nothing to compare.   Reno was a brand new

2    airline with junior pilots.   There was only a couple hundred

3    of them.   And TWA had been around for 70 years, and some of

4    these pilots had been flying for 30 years.   And they had an

5    important international network and domestic network, their

6    company thought it was important enough to buy them, for

7    their future they ought to do a fair integration.

8    Q.   Did you say anything to the Allied Pilots Association

9    board of directors with regard to the age and experience of

10   the TWA pilots in terms of how that might impact the American

11   pilots?

12   A.   Well, I tried to remind them that TWA was also a very

13   senior pilot group.   They had a lot of senior pilots and

14   within five to ten years, I thought a large, I didn't have

15   precise numbers, but 30 to 40 percent of the TWA pilots would

16   retire, in other words, the benefit of that American pilots

17   were all going to to get promoted inside to those jobs, so

18   that again, my focus was trying to think of the long term.

19         This is a merger that is going to happen now.

20   American will benefit and you will inherent a lot of good

21   jobs from TWA because their senior pilot force will retire,

22   so bottom line, think long term.   Don't think about tomorrow.

23   Think ten years from now.

24   Q.   Mr. Woerth, do you think that your appearance before the

25   APA board of directors was a help or a hindrance to the TWA

1   pilots in their seniority integration?

2           MR. JACOBSON:  I  am going to object, your Honor.

3   I think that is total speculation.

4           THE COURT: Ask that a different way.  I am

5   sustaining the objection to that question.

6   Q.   Mr. Woerth, what if any impact do you feel your

7   appearance had?

8   A.   I do know that unlike in previous acquisitions by

9   American, that APA ultimately did agree to enter in

10  facilitated negotiations, negotiations that ultimately took

11  place from, well, the deal was in April.  They continued to

12  negotiate all the way through mid September which was very

13  uncharacteristic of American, and that they did come off

14  their staple everybody to the bottom of the lies, it was

15  still in my view a harsh integration but 46 percent of TWA

16  got integrated.  Not as well as I would have liked.  And so I

17  hope there was some impact.  I can't take credit for this.  I

18  tried my best.

19  Q.   All right.  Returning to exhibit P-244.  Which has been

20  now I think received in evidence?

21          THE COURT:  Which one?

22          MR. KATZ:  P-244.  I distributed that before.

23          THE COURT:  That is in evidence.

24          MR. KATZ:  Before the break.

25          THE COURT:  That was already in evidence.

    1            MR. KATZ:  Yes, that came in through the Rachsford

    2    video.

    3            THE COURT:  That was already in.

    4    Q.   This is the executive council meeting minutes of April 9

    5    to 11, 2001.  Do you have that?  Can you put that up?

    6    A.   I am trying to find it.  Executive council minutes.

    7    Q.   Right.  You are familiar with this document, Mr. Woerth?

    8    A.   Yes, I am.

    9    Q.   Let's flip to page 12.  There is a briefing to the

   10    board.  The executive council that is noted here under the

   11    heading agenda item number 3, organizing slash pilot unity

   12    campaign review.

   13            Did you provide that?

   14    A.   Yes.

   15    Q.   And what was the purpose of this review?

   16    A.   Well, we are required to update I think the executive

   17    council at every meeting so we give them the review of the

   18    status of where we were.

   19    Q.   The second paragraph, Brian, can you blow that up,

   20    please?

   21            The minutes say the association has expanded its

   22    activities with four major independent pilot unions, it names

   23    them.  In an effort to achieve the associations goal of

   24    unifying the pilots of the United States and Canada under the

   25    ALPA banner.

1          What did you say to the ALPA executive council in

2    April on this subject, Mr. Woerth?

3    A.   Well, like, this pretty much in the same vein as our

4    January meeting, I spent about 20 minutes on Continental,

5    because that was coming to a close.  We were going to have

6    the vote, or almost immediately, and wanted to update them on

7    what I thought was going to happen.  Fed Ex we had already

8    started an active campaign there beyond grass roots now, we

9    had engaged in a very serious way the Fed Ex board of

10   directors, MEC, if you want to call it that, and we are

11   prepared immediately upon the success of Continental which I

12   anticipated to happen almost immediately, that we would,

13   before the dust was settled, we would have a very active

14   campaign at Federal Express.

15          At Allied, I was reporting that I had actually gone

16   to just a few days earlier to the Allied Pilots Association

17   and, to advocate on behalf of TWA pilots and there was

18   nothing going on at American.  There was no chance, or even

19   way to contemplate a merger.  We are in the middle of the

20   merger with the seniority integration, Allied Pilots hadn't

21   gotten back to us at all.  I didn't expect anything with the

22   obvious reason --

23          THE COURT:  Mr. Woerth, that is not what this says.

24   This says you were expanding your activities with four major

25   independent unions.  You name the four.  The third one you

1    name is Allied.  That is what it says.

2                 THE WITNESS:  That is what it says.

3                 THE COURT:  That is not the answer you were given.

4    You were describing something other than what that says.

5    That said you, my question is what did you do, what expansion

6    did you do with the Allied Pilots Association, like that says

7    there.

8    A.   We did nothing, your Honor.  My --

9                 THE COURT:  Then why did that say that?

10   A.   This was a heading typed up by our secretary, that, it

11   was a 20-minute speech, that is how she captured it.  It was

12   my briefing from all four items from my pilot resolution, I

13   gave them an update on each one.  Two of them had very active

14   activities, your Honor.  Allied had nothing.  We had some

15   minor outreach from Air Canada Pilots Association, ACPA, and

16   that was my report, your Honor.

17   Q.   Following the meeting of the ALPA executive council, did

18   you attend a meeting of the TWA MEC in or around April of

19   2001?

20   A.   Yes, I did.

21   Q.   Would you describe how that came about?

22   A.   I was invited by Captain Pastore to come to the meeting.

23                 THE COURT:  Date of the meeting again?

24   A.   I believe it was towards the end of April.  The precise

25   date I am not sure.

1             MR. KATZ:  Your Honor, I would offer for it

2    indication exhibit J 426, which is the minutes.

3             THE COURT:  Is there any objection to that being in

4    evidence?  J exhibit?  The very last J exhibit.

5             MS. RODRIGUEZ:  No, your Honor.

6             THE COURT:  What?

7             MR. JACOBSON: No, that was a P, wasn't it.

8             THE COURT:  No, he is saying J 426.

9             MR. JACOBSON: We have no objection to J 426.

10            MR. KATZ:  Thank you.

11            THE COURT:  Mr. Katz, do I have it right?

12            MR. KATZ:  Do, you do, sir.  You have it absolutely

13   right.

14            THE COURT:  Okay.

15   Q.  In Mr. Woerth, that may give --

16            THE COURT:  That is in evidence.  I am putting that

17   in evidence without objection.

18            MR. KATZ:  Thank you, Judge Irenas.

19   Q.  Does this tell you the precise date of the meeting you

20   attended of the TWA meeting?

21   A.  It was April 23.

22   Q.  All right.  And the minutes do reflect on the second

23   page that you briefed the MEC regarding a variety of matters?

24   A.  That's correct.

25   Q.  Was there also a discussion, do you recall briefing the

1    MEC on these items that are mentioned here?

2    A.   Yes, I do.

3    Q.   And then it says that you briefed them on your presence

4    at an APA board meeting in Dallas.  Was that part of your

5    address?

6    A.   Yes, it was.

7    Q.   And did the question arise as to what you had said to

8    the Allied Pilots Association board?

9    A.   Most certainly it did.

10   Q.   What did you tell the members of the TWA MEC at that

11   time?

12   A.   I recounted accurately what I told the members of the

13   Allied board, American pilots, how to treat, you ought to

14   treat the TWA pilots fairly and give them a much better

15   integration than stapled to the bottom, and basically

16   repeated what I just gave in testimony, that you ought to

17   think long term, the TWA pilots were senior.  There is a lot

18   of reasons to, for Allied to stretch way beyond what they

19   were currently offering, prepared to offer the TWA pilots.

20   That is what I told them.

21   Q.   Did they have questions about your participation in this

22   board meeting?

23   A.   Well, they did because it had been erroneously reported

24   by an American pilot that I had told them that TWA should get

25   real, when in fact I had told Allied that they needed to get

1   real, and of course, that should be cleared up and it was.

2   Q.   How was it cleared up?

3   A.   I told them what actually happened, and they were

4   satisfied.

5   Q.   All right.  You see below the questions and answers,

6   there is a reference to Ted Case.  And a statement he made.

7   A.   Yes.

8   Q.   And it says he asked you, the TWA pilots, had your

9   commitment as the president of ALPA to use the full resources

10  of the association, including litigation, if possible or

11  necessary.  Do you remember him raising that point?

12  A.   Yes.

13  Q.   What did you tell him at that time?

14  A.   I believe I told him he would have our full support and

15  we would use litigation, if it was warranted.  In other

16  words, if there was a legal basis or American or Allied had

17  violated laws, we would proceed.  But it had to be a

18  plausible lawsuit.

19  Q.   The minutes say that you told Mr. Case and the MEC that

20  ALPA would not leave any stone unturned to protect the TWA

21  pilots.  Do you remember saying that?

22  A.   Yes.

23  Q.   And do you feel that you fulfilled that commitment?

24  A.   Yes, I do.

25  Q.   In terms of the actions of the association you were

1    listing things before April 2 and after April 2, you attended

2    the APA board of directors.  That was on April 5, right?

3    A.   Yes.

4    Q.   Then on April 23 you attended the TWA MEC meeting.  And

5    and met with the TWA pilots?

6    A.   Yes.

7    Q.   And do you remember taking part in any of the seniority

8    integration discussions after this point in time?

9    A.   It was later in the summer when the facilitation

10   started.  2, I took the opportunity twice to attend the

11   facilitation.

12   Q.   What city were those talks being held in?

13   A.   In Washington, D.C.

14   Q.   Who were the participants in those talks?

15   A.   There was merger committees of both of American pilots

16   and the TWA pilots.

17   Q.   Anyone else present?

18   A.   I think the facilitator was also present.

19   Q.   That was Rolf Dalton?

20   A.   That's correct.

21   Q.   And he is a nationally recognized arbitrator and

22   mediator?

23   A.   That's correct.

24   Q.   With experience in airline industry disputes?

25   A.   Yes.

1    Q.   Were there also lawyers for the two sides there?

2    A.   On at least one occasion I believe both Roland Wilder

3    and Wes Kennedy were both present, I believe.

4             THE COURT:  What is the second name?

5    A.   Wes Kennedy I believe is the attorney that the American

6    pilots were using.  Wes Kennedy.

7    Q.   He was their seniority lawyer?

8    A.   Yes.

9    Q.   Like Mr. Wilder was for the TWA pilots?

10   A.   That's correct.

11   Q.   And what was the subject being discussed at these

12   meetings?

13   A.   Well, they were having facilitated discussions to get to

14   a negotiated settlement of integration.  I came to support

15   the TWA pilots and also to encourage the importance of a

16   negotiated settlement, and the sooner they got one, the

17   better.

18             So I was trying to encourage both parties, both

19   parties honestly to stretch and try to reach an agreement.

20   Q.   And how did it come about that you attended this

21   session?

22   A.   I asked the party, I think Bob Pastore asked if I could

23   show the support for the TWA pilots, my physical presence at

24   the meeting, so I complied with that.

25   Q.   What did you say when you were there?

1   A.   I encouraged to the Allied Pilots that they, of course

2   were going to have to get off that stapling proposal.  They

3   are going to have to stretch, I reminded them what I told

4   them in Dallas, you shall going to have to get way past where

5   you think you can have a comfortable, fair settlement that

6   you can be proud of, and American employees as well as

7   Allied.

8        Everybody needs to get off their current positions

9   because it was like trench warfare.  You weren't going to get

10  a deal with both sides staying exactly where  they were and

11  just staring at each other.  There hadn't been a lot of

12  movement.  That is what I told them.

13  Q.   Mr. Woerth, it has been suggested in these proceedings

14  earlier before today, that the TWA pilots might have

15  benefited if you had threatened litigation at the meeting you

16  are referring to.  Did you consider that?

17  A.   I didn't think litigation would be helpful.  In fact, it

18  would  be a total distraction, and might end the

19  negotiations.

20  Q.   Why did you think that?

21  A.   There was no legal foundation to compel American

22  Airlines pilots to even negotiate.  They had a contract that

23  said they could do what they were going to do.  Nobody

24  appreciated that.  I certainly didn't.  But I didn't see a

25  legal argument.  There was a morally persuasive argument to

1   do better, but not a legal argument to compel them to do

2   better.

3           So my experience is this:  You can't sue people

4   into liking you and making a deal.  If you sue somebody, they

5   go into defensive huddle and just prepare to win the lawsuit.

6   They stop bargaining.

7           So I thought litigation, while bargaining, in my

8   opinion, that is a terrible strategy.

9   Q.   All right.  So in the summer, we will call this

10  seniority list integration negotiations.  And you attended

11  one or two sessions?

12  A.   That's correct.

13          THE COURT:  You met with one or two?

14  A.   I am pretty sure it was back to back days, your Honor.

15          THE COURT:  Two-day meeting.

16  A.   I attended two days in a row.  I think they met longer

17  but I think I went two days in a row.  That is my

18  recollection.

19  Q.   Let me refer you to exhibit D 181 which is in evidence.

20  It is a summary of your comments to the April 23 MEC meeting.

21  A.   Okay.

22  Q.   With regard to this issue, what you said on the second

23  page at the top, the MEC reports that you said TWA MEC had

24  made a realistic assessment of their situation, made the hard

25  decision and now APA needs to get realistic and make a hard

1    decision.  Is that an accurate reflection of your comments at

2    the meeting?

3    A.    Yes, it is.

4    Q.    Thank you.  Did you meet with any TWA pilots separately

5    from the meeting at about that time while you were in St.

6    Louis?

7    A.    In a completely separate meeting, I don't recall that.

8    Q.    Like a lunch meeting, for instance?

9    A.    I think we probably had lunch with the officers.  That

10   seems plausible.  I don't have a specific recollection of it.

11   Q.    Do you recall a request by Captain Mike Day, the

12   chairman of the merger committee for the TWA pilots, to

13   initiate a jumpseat war?

14   A.    Yes.

15   Q.    Was that made at or about that time?

16   A.    I believe it was.

17   Q.    And what was your response?

18   A.    My response was that we had ALPA policy prohibiting that

19   and we had a national jumpseat policy, that we weren't going

20   to engage in a jumpseat war.  That would not help the TWA

21   pilots and inconvenience and anger everyone.  Again, I

22   thought this was another suggestion that was going to harm

23   the process, not help the process.  And not just at American

24   and TWA, it would have started involving all the other

25   airlines in a disruption of everybody's life.  But most

```
 1    importantly, ALPA specifically has a policy that says we are

 2    not going to do those things.

 3            MR. KATZ:  Your Honor, I would like to mark for

 4    identification the document that I have distributed which is

 5    actually a part of exhibit P 18.  For some reason when the

 6    plaintiffs copied P 18, which is the ALPA administrative

 7    manual in effect at the time, these pages were not part of

 8    what they copied.  They were part of the deposition.

 9            MR. JACOBSON: Your Honor, they were not, this was

10    not produced to us as part of P 18.

11            MR. KATZ:  This was actually used by the plaintiffs

12    at the deposition of Gary Mugerditchian.  These pages were in

13    the document at that time.

14            THE COURT:  I am trying to find it.

15            MR. KATZ:  It says jumpseat policy.

16            THE COURT:  I know what it says.  I saw it.  I

17    can't find it now.

18            MR. KATZ:  Here is another copy of it, your Honor.

19            THE COURT:  I don't know where it went.  I know I

20    had it.  Let's start, you want this marked as a D exhibit,

21    right?  What number would that be?  Would that be D 411?

22            MR. KATZ:  Yes, sir.

23            THE COURT:  Okay.  D 411 is marked as the jumpseat,

24    ALPA's jumpseat policy.

25    Q.   Let me ask the witness a couple questions about it?
```

1          THE COURT:  Now, you say it is included in what?

2          MR. KATZ:  It is included in P 18, when it was a

3     deposition exhibit in the deposition of Jerry Mugerditchian.

4     But for some reason --

5          MR. PRESS:  Your Honor, can I intervene here.  He

6     is testifying about an exhibit that omits lots of sections

7     from the Admin manual and he is trying to suggest this was

8     done selectively and I object to it.

9          MR. KATZ:  I am saying it was there when it was a

10    deposition exhibit.  It is not there as a trial exhibit.  I

11    will ask the witness about the document.  I think he can

12    establish foundation for it.  As a separate item.

13         THE COURT:  All you have on P 18 here, the only

14    description I have, is, it is not in evidence, that is not

15    even marked, it is marked for identification.  Is excerpts

16    from ALPA Administrative Manual.  Do you have P 18, the one

17    that you jointly marked, that is marked in the pretrial?  Do

18    you actually have it?  Does somebody have a copy of P 18.

19         MR. PRESS:  I have it right here, Judge.  You will

20    see that it omits many, many, many, sections from the Admin

21    manual.

22         THE COURT:  It already says it does.

23         MR. PRESS:   The Admin manual is probably this at

24    all.  This is just a subset of it that we marked as an

25    exhibit.

1            THE COURT:  It seems to go up only to section 75.

2            MR. PRESS:  And it is not all inclusive through

3    that section.

4            THE COURT:  No.  They seem to be in numerical

5    order.  And the jumpseat policy doesn't appear to be part of

6    it.

7            MR. KATZ:  Let me ask the witness a few questions

8    about D 411 and maybe that will clear this up.

9            THE COURT:  All right.

10   Q.   Mr. Woerth, do you recognize the pages that have been

11   marked as did 411?

12   A.   It has been removed from my screen.

13   Q.   You should have a copy of it on the stack of papers.

14   That I gave you at the break?

15   A.   All right.

16   Q.   Do you recognize this document?

17   A.   Yes.

18   Q.   Would you tell the Court what it is, please?

19   A.   The jumpseat policy as proposed and adopted by the

20   executive board.

21   Q.   Turning to the second page.  Can tell us when this

22   became effective?

23   A.   It is executive board, 1997, amended by the board in

24   2000.

25   Q.   And do you see the date in the upper right-hand corner?

1   A.   It says May 31, '01.

2   Q.   So is this to the best of your knowledge an accurate de

3   depiction of the association jumpseat policy as of the spring

4   of 2001?

5   A.   Yes.

6   Q.   All right.

7            MR. KATZ:  I would ask for its admission into

8   evidence, your Honor.

9            MR. JACOBSON: Objection, your Honor, this is not

10  designated by them as an exhibit in their pretrial

11  compliance.  This was not part of the exhibit P 18 as

12  asserted.

13           THE COURT:  Is there any question, though, that

14  this is genuine?  Do you challenge that it is genuine in any

15  way?

16           MR. JACOBSON:  We don't know anything about this

17  document.  It showed up last week for the first time.

18           MR. KATZ:  This is not true.  This was produced in

19  discovery, your Honor.

20           THE COURT:  Can you show me where it was produced?

21           MR. KATZ:  It was produced --

22           THE COURT:  Show me.  Show me a deposition

23  reference where it is produced.  I am happy to look at it.

24           (Pause)

25           THE COURT:  I am going to send the jury out.  We

1   will do this outside the hearing of the jury.  I don't want

2   them sitting around.

3           Don't discuss the case among yourselves.  Keep an

4   open mind until you have heard all the evidence.

5           (Jury leaves the courtroom)

6           THE COURT:  One of the reasons I am a little jumpy

7   about this is the issue of the jumpseat retaliation policy

8   has been in this case, I heard it before.  It is not

9   something that, the idea of that, I heard it before in this

10  very trial, and I have heard it enduring discovery I was

11  aware that something like that had been suggested.  I think

12  it my have even been Wilder that suggested it at some point.

13  Was it Wilder?

14          MR. JACOBSON:  I think it was suggested at least

15  twice by two different people.

16          THE COURT:  But I knew about it.  It was clearly a

17  tactic that had been discussed.  And one would think that if

18  there is an ALPA policy against it, squarely against it, that

19  that is almost something that would have puffed up very

20  early.  It is short sort of a natural response.  To be

21  sitting here now, when I have 100 pages of marked exhibits,

22  and this isn't one of them, somebody take this back.  I don't

23  want this.  This is P 18.  Whoever it belongs to.  So that is

24  my -- the case, the case has had basically almost six years

25  of discovery, let's say four, four years of discovery.  And

```
 1    to have an issue that clearly was, you you know, one of

 2    really only a handful of strategies, that was one of a fairly

 3    small handful of strategies that surfaced at some point.

 4            To have something that appears to be what he says

 5    it is, what captain word says it is, is an ALPA ban on

 6    participating in a jumpseat war, why am I seeing it for the

 7    first time.

 8            MR. KATZ:  Your Honor, let me make two points about

 9    that.  This is not the first time this has arisen in the

10    case.

11            THE COURT:  I am asking you to show me that.

12            MR. KATZ:  ALPA Bates number 34147 was part of the

13    initial production of documents in the summer of 2005.  In

14    addition, your Honor, it was attached -- this policy was

15    attached as an exhibit.

16            THE COURT:  That is the Bates number , ALPA

17    034317.

18            MR. KATZ:  Correct.  And we attached it to our

19    reply brief in summary judgment proceedings.  In 2009.  When

20    the matter was briefed.  And they raised the jumpseat policy

21    as an issue in their opposition to our summary judgment

22    motion and we attached this policy --

23            THE COURT:  Do you have that, do you have your, the

24    brief, can you physically hand me the brief that says that?

25            MR. KATZ:  I am afraid I don't have the brief with
```

1  me.

2          I really did not anticipate that they would say

3  that they had never seen this before.  My recollection is

4  that it was part of the deposition exhibit P 18 when they

5  deposed Mugerditchian, there were excerpts and this was one

6  of them.

7          Putting that aside --

8          THE COURT:  I was handed something I was told was P

9  18 and it is not there.

10          MR. KATZ:  That is what they produced at trial as P

11  18.

12          THE COURT:  ALPA 34317.

13          MR. PRESS:  Out of candor, this document was

14  produced to us.  It has their Bates number on it.  It was

15  produced to us.  That is not the issue.

16          THE COURT:  The Bates number for the jumpseat?

17          MR. PRESS:  The document on the screen has their

18  document number on it, indicating it was produced.  We don't

19  question that.

20          THE COURT:  I think what the Bates number you have

21  to see that it was produced at some point, the document, it

22  is going on.

23          MR. KATZ:  It was part of the summary judgment

24  briefing.  They raised the jumpseat policy in opposition to

25  our summary judgment motion.

 1              THE COURT:  What is the position, someone

 2     articulate the plaintiff's position?

 3              MR. JACOBSON: For one thing it is not listed in the

 4     pretrial disclosure of exhibits that they will be using.  I

 5     know there has been a fair amount of looseness on their part

 6     as far as complying with the pretrial, but we prepared for

 7     exhibits that are listed there in the direct portion of their

 8     case.

 9              THE COURT:  Somebody just took P 18 from me.  Let

10     me have it back.  My fault.  I am sorry.  I was going to

11     compare the Bates number on this to the numbers on this but

12     there are none on here.

13              MR. PRESS:  That came from our client's file, what

14     you are looking at.

15              THE COURT:  I thought there might be Bates numbers

16     on that.

17              I hate to keep out evidence that is directly

18     probative, as genuine, not, you know, there is -- there

19     doesn't appear to be any question of authenticity here.  Mr.

20     Katz, how come it didn't wind up on your exhibit list?

21              MR. KATZ:  We thought it was part of, we thought P

22     18 was the administrative manual and we assumed it was part

23     of that.  I apologize for the oversight.

24              THE COURT:  So when they produced their version of

25     P 18, and it does say excerpts, it doesn't say the whole

 1    thing.

 2              MR. KATZ:  Yes, your Honor.  It is hundreds of

 3    pages long and we just assumed that this portion of the

 4    administrative manual as of 2001 was part of it.

 5              THE COURT:  You assumed.

 6              MR. KATZ:  Yes, sir.

 7              THE COURT:  Make an ass of you and me.

 8              MR. KATZ:  In this case, me alone.

 9              MR. PRESS:  Judge, I can tell you that excerpts

10    from that manual were used at various depositions throughout

11    the discovery phase and never once was there ever a reference

12    to this jumpseat policy.  I want that clear.

13              THE COURT:  He is referring to the summary judgment

14    brief.

15              MR. PRESS:  Right.

16              THE COURT:  You say there is no reference --

17              MR. PRESS:  No, in discovery there was no reference

18    to it.

19              THE COURT:  I tell you what I am going to do.  I am

20    going to admit it.  If I find out, and I will go back through

21    my record and try to find, in the summary judgment, was it in

22    the original summary judgment.

23              MR. KATZ:  My recollection is the jumpseat arose in

24    the opposition, so we put it in with the reply brief.

25              THE COURT:  So it would be in the reply brief.

```
 1              MR. KATZ:  Yes, sir.

 2              THE COURT:  That was 09.

 3              MR. KATZ:  Yes.

 4              THE COURT:  2009.

 5              MR. KATZ:  That's correct.

 6              THE COURT:  Well, I am going to double check to

 7    make sure it is in there.  If it is in there and I am

 8    assuming now it is, I am going to let it in.

 9              MR. KATZ:  Thank you, your Honor.

10              THE COURT:  If it turns out it is not, I will have

11    to instruct the jury and do something, mistry the case.  I

12    don't know.  I will do something to take care of it.  Right

13    now, I am not going to keep out a piece of evidence that to

14    me is very significant, I won't say very significant, is

15    significant.

16              There is no, I don't see any dispute as to its

17    authenticity.  So D 411, which has just been marked, it was

18    not premarked, it goes from Bates number ALPA O 34147, to

19    034151.  And which I guess is four or five pages.  And it is

20    captioned section 1 15 jumpseat policy.

21              Okay.

22              MR. KATZ:  Yes, sir.

23              THE COURT:  I am going to, at least subject to

24    confirmation that you did cite it in your brief, and just put

25    down its absense is something due to some confusion as to
```

1    what was in P 18.

2              MR. KATZ:  Thank you, your Honor

3              THE COURT:  I will, at the next break, try to get

4    my law clerk to explore the electronic filing to see if I can

5    find the reply brief.  In that summary judgment motion.

6              Okay.  Are we ready for the jury back.

7              MR. KATZ:  Yes, sir.

8              (The jury enters the courtroom.)

9              THE COURT:  Welcome back.

10             THE COURT:   Mr. Katz, you may continue your direct

11   examination.

12             By MR. KATZ: Is  exhibit D 411 in evidence, your

13   Honor?

14             THE COURT:  Yes, it is in evidence.

15             MR. KATZ:  Could we display that to the jury.

16             BY MR. KATZ:

17   Q.   Let's focus on the pages here, the two big paragraphs in

18   the middle there.

19             Mr. Woerth, were you familiar with this ALPA policy

20   at the time you had a conversation with with Captain Day in

21   the spring of 2001?

22   A.   Yes, I was.

23   Q.   And had you had experience in pilot groups raising this

24   issue prior to that time?

25   A.   Yes, I did.  Frequently, actually.

Woerth/direct                                                          99

1    Q.    And how did it come up?

2    A.    It came up almost every dispute between pilot groups

3    could be for a merger, it could be with RJ issues, regional

4    issue, big airline, any dispute whatsoever, any dispute

5    whatsoever somebody usually wanted to start a jumpseat

6    campaign.  And so I would estimate at least three or four

7    times a year somebody from a different airline made the same

8    request that Captain Day did.

9    Q.    Done and did you have a standard employee or did you say

10   something different?

11   A.    Each time it is against ALPA policy and we are not going

12   to have a jumpseat war.

13   Q.    Is that what you told Captain Day?

14   A.    Yes.

15   Q.    And did you refer him specifically to the paragraph

16   marked with an X there.

17          MR. JACOBSON: Your Honor, I think this is very

18   leading at this point.

19   Q.    Would you read the paragraph that begins?

20          THE COURT:  I will allow it.

21   Q.    Would you read the paragraph that begins, the sentence

22   that begins denial of jumpseat privileges?

23   A.    Yes.  Denial of jumpseat privileges as a means of

24   punishing, coercing or retaliating against other pilot groups

25   or individuals is not supported by ALPA.  The jumpseat and/or

1   professional standards representative appointed by the

2   representative Master Executive Council governing body should

3   resolve disputes that arise between pilots, airlines, or

4   other unions.

5   Q.   And your conversation with Captain Day, was there

6   reference to this agreement?

7   A.   I didn't quote the manual.  It is simply, it is not ALPA

8   policy on a jumpseat policy.  That is all I said.

9   Q.   In did this issue arise later in dealings with the

10  representatives and the TWA pilot groups?

11  A.   I don't remember specifically, but I wouldn't be

12  surprised if it came up again.

13  Q.   If it came up again, what was your response?

14  A.   My response would always be the same, it is against ALPA

15  policy.  We don't do that.

16  Q.   Did you also think that it was, it would have been, what

17  was your view as to how effective that would have been in

18  terms of the seniority integration talks?

19  A.   It would probably be unhelpful, might even be harmful.

20  I didn't see the benefit at all of engaging in a jumpseat

21  war.

22  Q.   Thank you, Mr. Woerth.

23          Would you turn to exhibit D 158, which is not in

24  evidence.  I would ask you to mark it for identification and

25  identify it if you can.

1          THE COURT:   Okay.   You are correct.

2    Q.   Can you identify this document?

3    A.   Yes.

4    Q.   What is it, please?

5    A.   It is a request to hire James Baehler to provide

6    negotiating training, consultant services to the merger

7    committee of the TWA MEC.

8    Q.   Is this an executive council, ALPA executive council

9    resolution dated May 21, 2001?

10   A.   Yes, it is.

11          MR. KATZ:   Can this be admitted into evidence,

12   your Honor?

13          THE COURT:   Any objection.

14          MR. JACOBSON: No objection,  your Honor.

15          THE COURT:   D 158 in evidence.

16   Q.   And can you tell us how did did this issue arise of

17   hiring Baehler?

18   A.   It was a request of the TWA MEC.

19   Q.   Was it, do you know who Baehler was?

20   A.   Yes, I do now.   I don't think I knew him at the time.

21   Q.   And how would -- who was he?

22   A.   He was a consultant to provide training for negotiations

23   to lots of different types of companies.

24   Q.   All right.   And did the ALPA Executive Council grant or

25   deny the request of the MEC?

 1   A.   They granted it.

 2   Q.   This was May 21?

 3   A.   Yes, sir.

 4   Q.   159, please, for identification.

 5             THE COURT:  D 159.

 6             MR. KATZ:  Yes, sir.

 7   Q.   This is just a day or two later the ALPA executive board

 8   is meeting.  That is a different body from the executive

 9   council, right?

10   A.   That's correct.

11   Q.   We went over that before.  This is the master chairman

12   of each airline comprised the executive board.  Did it not?

13   A.   That's correct.

14   Q.   And do you recognize exhibit D 159 as a resolution

15   adopted by the executive board at its May 22 to 24, 2001,

16   regular meeting?

17   A.   Yes, I did I do.  Can can I ask that it be admit

18   understood evidence, your Honor.

19             THE COURT:  Any objection.

20             MR. JACOBSON: No objection.

21             THE COURT:  D 159 in evidence.

22   Q.   All right.  Tell us, Mr. Woerth, what what the TWA

23   pilots were seeking here?

24   A.   It is a long resolution.  I am going to need a moment.

25

Woerth/direct                                              103

```
 1            Additional funding to enable  -- to properly

 2    represent the TWA pilots through their crisis and properly

 3    complete the task before them.  They wanted another one

 4    million dollars, I think.  They they already had a million

 5    dollars.

 6    Q.   So were they looking for additional support from the

 7    union?

 8    A.   Yes.

 9    Q.   And under the "Therefore, be it resolved," would you

10    read what the executive board did?

11    A.   It says the executive board pledges the full moral

12    support of the association along with the necessary funding

13    in accordance with current ALPA policies and ALPA

14    constitutional bylaws to enable the TWA MEC to properly

15    represent the TWA pilots through this crisis and to properly

16    complete the tasks before them.

17    Q.   So they asked for support and they got it?

18    A.   Yes.

19    Q.   Let me put that up on the board here, too.

20            With regard to the funding, are you aware of any

21    project that was denied to the TWA pilots because of a

22    shortage of funds?

23    A.   I am not aware of a single project that was denied TWA.

24    Q.   All right.  Exhibit P 316 is in evidence.   It is an

25    ALPA  --
```

```
 1              THE COURT:  Say again?

 2              MR. KATZ:  P 316.  May 31, 2001 letter, from Mr.

 3   Woerth to all TWA pilots.

 4   Q.   Do you recognize this letter, Mr. Woerth?

 5   A.   Yes, I do.

 6   Q.   Can you tell us why you wrote this?

 7   A.   I wanted to write directly to ever TWA pilot and

 8   reiterated the  support that the entire executive board is

 9   giving them, and to make it from me personally with my career

10   started in Kansas City with TWA, wo that Is how I

11   personalized it.

12   A.   You started with Braniff?

13   A.   With Braniff but that is where TWA headquarters were.

14   We shared the same crew bus.  My National Guard partners were

15   TWA.  I had a lot of TWA pilots friends.

16   Q.   Do you identify with the TWA pilots?

17   A.   Sure.

18   Q.   And you explained what had happened at the recent

19   executive board meeting?

20   A.   Yes.

21   Q.   And at the end, or last paragraph, blow that up.  You

22   said you would continue to coordinate with the TWA MEC and

23   merger committee.  Is it your view that you did that?

24   A.   Yes, it is.

25   Q.   Thank you.  Exhibit 233.  This is not in evidence yet.
```

1              THE COURT:  P-2.

2              MR. KATZ:  D 233.

3              THE COURT:  Okay.

4    Q.   Can you identify this document, Mr. Woerth?

5    A.   Yes.

6    Q.   What is it?

7    A.   It is a letter from Captain Pastore to me.

8    Q.   And can you even capsule encapsulate what he was seeking

9    here.  Well, what is significant about the  aletter, in your

10   view?

11   A.   It appears with him thanking me for our support of the

12   pilot group of the executive board.

13   Q.   Let me ask you to slow down for a second.  I?

14             MR. KATZ:  I would ask that this be received in

15   evidence, your Honor.

16             THE COURT:  Any objection?

17             MR. JACOBSON: No objection on this one.

18             THE COURT:  Okay.  D 233 in evidence.

19   Q.   Blow up the first paragraph, please.   You were saying,

20   Mr. Woerth, before I asked you to identify the document, what

21   was Mr. Pastore saying in the letter?

22   A.   He was thanking me for my support and getting the

23   support of the executive board and opening and closing

24   paragraphs.  He also enclosed a copy of a video presentation

25   along with this letter.

1    Q.   He says, in the next-to-last paragraph, where he says

2    enclosed is a copy of a video presentation that was produced

3    with your assistance and the assistance of the ALPA

4    Communications Department.

5              What is he talking about there?

6    A.   I believe he is probably talking about the video

7    presentation on seniority integration, that I kind of gave

8    the introduction to a presentation for fair integration,

9    Rightful Place, I believe it was called.

10   Q.   Correct.  The plaintiffs actually showed the jury part

11   of your video in that document.  So June 14 was the video.

12   Did you participate in making the video?

13   A.   Yes, I did.

14   Q.   And do you know what was, what resources were used to

15   make the video?

16   A.   I know our ALPA communications facility, I believe as

17   well as a communications specialist, helped in producing that

18   video.

19   Q.   Was it unusual for the president of the association to

20   take part in the seniority integration materials like in?

21   A.   Yes, it was.

22   Q.   Why is that?

23   A.   Most pilot seniority integrations want to keep the

24   president and executive council and everybody else out of, in

25   other words, go to your neutral corners, we don't support

1    either side, and don't make any statements that will look

2    like it is contrary or, to ALPA policy.  So there was, to

3    speak on a specific seniority integration proposal was a

4    little unusual.

5    Q.   Are you aware of any instance of the president of ALPA

6    participating in the seniority integration talks in this

7    manner?

8    A.   I am not aware of any.

9    Q.   And was this video widely disseminated?

10   A.   I believe it was.

11   Q.   Exhibit 299 for identification, please.  This is a July

12   18 letter from Captain Pastore to you, Mr. Woerth.  Did you

13   receive this on or about that date?

14   A.   Yes.

15        MR. KATZ:  I would ask it be received in evidence,

16   your Honor.

17        THE COURT:  Any objection to D 299?

18        MR. JACOBSON: No, your Honor.

19        THE COURT:  Okay.  D 299 is in evidence.

20        MR. KATZ:  Thank you.

21   Q.   The first paragraph, Captain Pastore refers to his vice

22   chairman appearing in front of the executive council.  Do you

23   recall that event?

24   A.   Yes, I do.

25   Q.   And what do you remember about it?

1   A.    Well, from the earliest beginnings they did believe this

2   would be a difficult process with APA and we, and he

3   acknowledged it is even more difficult than he thought.  And

4   from the very first meeting that they were still extremely

5   concerned, that not only for the process, but the ultimate

6   conclusion that they would get a successful transaction

7   completed in a successful integration.

8   Q.    He is talking about the seniority integration as well as

9   the transaction?

10   A.    I believe so, yes.

11   Q.    The last sentence of the second paragraph, blow that up.

12   He makes reference to the fact that as of July, 2001, this is

13   strictly an ALPA versus nonALPA integration, and asked for

14   direct financial support for the legal fees for the firm of

15   Baptiste and Wilder.  That is Roland Wilder's firm, isn't it?

16   A.    Yes, it is.

17   Q.    And would you tell us what ALPA's process is for

18   seniority integration lawyers and the funding of their fees?

19   A.    ALPA's process is, everyone funds their own merger

20   attorney.  It is not from the general pool of money, or even

21   from your normal dues.  Merger attorneys are funded by

22   special assessment on their own pilot groups.  That is how it

23   is is handled.  That is everyone funds their own.

24          THE COURT:  That is an ALPA-to-ALPA, wouldn't it?

25   It wouldn't be used for 22 ALPA groups negotiating, it won't

1    be fair to pay for one side out of the general pool.  But

2    athat rule about each side paying for itself, is that true in

3    an ALPA to nonALPA merger.

4              THE WITNESS:  Your Honor, it is true that an

5    ALPA-to-ALPA is strict and ALPA to nonALPA, it is possible at

6    a request to get additional funding, if necessary.  Not the

7    immediate funding or up-front funding but it was important

8    that they did not run out of money.

9              THE COURT:  These are both ALPA, you can say we are

10   neutral, go to the corners and work it out.  But that

11   wouldn't be so in an ALPA to nonALP merger, would it?

12   A.   As I said, your Honor, if there was an ability to

13   request, which this is additional assistance, and that is

14   what they are making here.

15             THE COURT:  Okay.

16   Q.   Focusing your attention back in January of 2001, was the

17   proposed transaction with American Airlines an ALPA to

18   nonALPA merger at that time?

19   A.   At that time it was, but we had a complication because

20   of a U.S. Airways potential spin-off.  We had a U.S. Airways

21   ALPA carrier potential involvement.

22   A.   Was there a potential for U.S. Airways pilots to

23   transfer to American as well as TWA pilots?

24   A.   Yes.

25   Q.   Did that invoke the provisions on requiring assessments?

1    A.    Yes.

2    Q.    Do you know whether the TWA pilots floated an assessment

3    at that time, in January, 2001, to pay for Mr. Wilder's fees?

4    A.    I don't know how soon they formed, I believe they had

5    $600,000, I am not sure when they raised the money.

6    Q.    But what was the position of the Air Line Pilots

7    Association in connection with the request in July 18, 2001

8    letter that is received as exhibit D 299?

9    A.    Up until that time with U.S. Airways involvement we

10   didn't believe we could assist, but we are willing to

11   reconsider now that U.S. Airways in which Captain Pastore is

12   now that they are gone, we could consider additional help.

13   Q.    Thank you.  I would like to show the witness exhibit D

14   136 for identification.

15              THE COURT:  Okay.

16   Q.    Can you identify this document?

17   A.    Yes.

18   Q.    What is it, please?

19   A.    It is a request for economic financial analysis of a

20   great many things, the differences between TWA and American

21   contract.

22   Q.    Let me start --

23   A.    Almost a dozen.

24              THE COURT:  P-136, is this that a memo from Ana

25   McAlhren Schulz.

1   A.   Yes.

2   Q.   Ms. McAlren-Schwarts was at the time, what position did

3   she told?

4   A.   She was the director of our economic and financial

5   analysis department.

6   Q.   And the memo is dated August 3, 2001?

7   A.   Yes.

8   Q.   And is she reporting on a meeting she had with a

9   representative or representative of the TWA pilots?

10  A.   Yes.

11  Q.   And did you receive this memo and talk to Mc. McAhlren

12  Schultz at or about that time?

13  A.   I  received the memo and I believe I also talked to her.

14          MR. KATZ:  Your Honor, I would ask that D 136 be

15  received in evidence.

16          THE COURT:  Any objection?

17          MR. JACOBSON: I don't believe so, your Honor.

18          THE COURT:  You want time to check?

19          MR. JACOBSON: I don't believe so.

20          THE COURT:  Okay.  There is no objection.

21          MR. JACOBSON: No, your Honor.

22          THE COURT:  All right.

23          THE COURT:  D 136 is in evidence.

24  Q.   There are a great many items on this list, Mr. Woerth.

25  Is that what you were saying?

1   A.   Yes.

2   Q.   Does it say the timeframe or are you aware of the

3   timeframe in which these requests for asked for?

4   A.   A little more than two weeks, I think they wanted it by

5   August 20.

6   Q.   Do you know whether the economic and financial analysis

7   department at ALPA was able to fulfill any of these requests

8   during this period of same?

9   A.   I believe they fulfilled everything they could get done.

10  I can't certify that every one was, I doubt very much that it

11  was possible but I think they did all they could.

12  Q.   D 137, for identification, please.  Do you recognize

13  this as an email from an ALPA employee, Troy Eklert, dated

14  August 15, providing a contract comparison, TWA pilots?

15  A.   Yes, I do.

16  Q.   Did you, were you aware that they, E and FA department

17  had prepared that in the summer?

18  A.   Yes, I was.

19  Q.   I ask that D 137 be received in evidence, your Honor.

20       MR. JACOBSON: I don't think there is any evidence

21  that this was ever given to the TWA MEC.

22       THE COURT:  Say again.

23       MR. JACOBSON: I don't believe there is any evidence

24  this was given to the TWA MEC.  I am looking at the

25  documents.

1            MR. KATZ:  Your Honor, DJ Glasby is the recipient

2      of the email and the attachment, he was deposed on January

3      14, 2011, and he admitted that he received --

4            MR. JACOBSON: Let me see what Mr. Glasby may or may

5      not have said.

6            THE COURT:  Are you objecting to its admission?

7            MR. JACOBSON: Just a second to look at it.

8            THE COURT: It doesn't say anything that is really

9      not, it is really not basically conceded.

10           MR. JACOBSON: I agree.

11           THE COURT:  As to the difference in the two

12     contracts.

13           MR. JACOBSON: I agree with you.

14           THE COURT:  Okay.  I will admit that exhibit.  D

15     136 in evidence.

16           MR. KATZ:  Thank you, your Honor.

17     Q.   This document reflects --

18            THE COURT: Everybody at the MEC understood the

19     difference between the APA contract and the ALPA contract?

20     A.   I am pretty sure.

21           THE COURT:  That was not a secret any more.

22           THE WITNESS:  No.

23     Q.   It was understood whose pay rates were higher, right?

24     A.   Yes.

25     Q.   And that was?

1    A.   That was American, of course.

2              THE COURT:  My question was specifically as to the

3    seniority provisions, the scope provisions of the two

4    contracts.  It was understood that Allegheny Mohawk rights

5    that TWA had in its ALPA contract were not in the American

6    APA contract, at least when American was the acquirer.

7    A.   That's correct.

8              THE COURT:  That was understood.

9    Q.   So I have written up there the contract comparison that

10   was compared by the economic and financial analysis

11   department.  Could we turn to exhibit D 160 for

12   identification, please:  Do you have that document?

13   A.   Yes, I do.

14   Q.   Can you identify what the document is?

15   A.   It is another outside counsel request by the TWA MEC

16   Q.   This is an ALPA executive council resolution dated

17   September 24, 2001?

18   A.   Yes.

19             MR. KATZ:  I would ask for its receipt in evidence,

20   Judge Irenas.

21             MR. JACOBSON: No objection, your Honor.

22             THE COURT:  D 160 in evidence.  Go ahead.

23   Q.   Let's just flip down to the bottom paragraph where it

24   says the final resolution?

25   A.   Yes.

1    Q.    The MEC has requested that the association retain Roland

2    Wilder to provide legal services related to an alleged

3    violation by TWA and American of the contractual obligations

4    in connection with seniority integration.  Do you know what

5    that refers to?

6    A.    Yes, I do.

7    Q.    Would you tell the jury, please?

8    A.    I think we were preparing a grievance as to the best

9    efforts clause of an American agreement with, to use their

10   best efforts in seniority integration, we were filing a

11   grievance and this was a request to have -- to pay Roland

12   Wilder for those services.

13   Q.    Turning to the therefore, therefore be it resolved and

14   further resolved clauses on the second page.

15   A.    Yes.

16   A.    We, the executive council authorized, we gave them what

17   they asked for.

18   Q.    Okay.  This is different from the seniority integration

19   fees, this is work on something else?

20   A.    Yes.

21   Q.    Kind of grievance litigation?

22   A.    Correct.

23   Q.    Let me continue my list here.  I have run out of room on

24   this page.  Let me start a new page.  There was September 24.

25   Wilder fees.

Woerth/direct                                                    116

1              Do you know whether action was taken on this issue

2    to pursue this legal concept.

3    A.   Yes, we did pursue the grievance.

4    Q.   All right.  Except D 305 for identification.  Do you

5    have that, Mr. Woerth?

6    A.   Yes, I do.

7    Q.   Is this the submission made under your name of the

8    grievance to the system board of adjustment?

9    A.   Yes, it is.

10             MR. KATZ:  Your Honor, I would ask that 305, D 305,

11   been received in evidence.

12             MR. JACOBSON: No objection.

13             THE COURT:  D 305 in evidence.

14   Q.   The document has several parts, the first page is dated

15   October 26, 2001.  Is that signature on your behalf on page

16   3, Mr. Woerth?

17   A.   Yes, it is.

18   Q.   And is that the submission by the Air Line Pilots

19   Association of this grievance to this system board of

20   adjustment?

21   A.   Yes, it is.

22   Q.   And is that an arbitration panel?

23   A.   Yes, it is.

24   Q.   What is the question that was presented, looking back to

25   the bottom of page 1?

Woerth/direct                                                    117

1    A.    The question was, has TWA LLC/ American Airlines

2    violated section 29 of the transition agreement and the

3    letters dated March 17 and March 30, related to the

4    agreements by failing to use its reasonable best efforts with

5    the Allied Pilots Association to secure a fair and equitable

6    process for seniority integration, and if so, what is the

7    remedy.

8    Q.    So is this what we referred to as the reasonable best

9    efforts case?

10   A.    Yes, it is.

11   Q.    It says that American and TWA didn't use their

12   reasonable best efforts?

13   A.    That's correct.

14   Q.    And the grievance itself, if you turn back to page 4,

15   was filed on September 24, was it not?

16   A.    Yes, it was.

17   Q.    Can we go to that page?  And that is the grievance there

18   from September 24?

19   A.    Yes.

20   Q.    Flipping two more pages to page 6, there is an October

21   18 letter from Captain Arnie Kellen

22            THE COURT:  What document is this?

23            MR. KATZ:  Same document.  Last two pages.  Pages 6

24   and 7.

25            THE COURT:  Of 160?

1           MR. KATZ:  Exhibit 305, D 305, pages 6 to 7.

2           THE COURT:  That is the grievance.

3  Q.   Last two pages are the company's denial of the

4  grievance, correct?

5  A.   That's right.

6  Q.   And then this was submitted within about a week more to

7  the system board?

8  A.   That's correct.

9  Q.   How would you characterize the speed with which this

10 grievance was processed?

11 A.   This was exceedingly rapid compared to most grievances.

12 This was very expeditious.

13 Q.   Do you know what the result of this grievance process

14 was?

15 A.   The final result was that the grievance was denied, the

16 American Airlines and TWA were found not to have violated the

17 agreement.

18 Q.   That was a ruling by a neutral arbitrator?

19 A.   Neutral arbitrator, yes.

20 Q.   Let me put that up?

21          THE COURT:  That arbitration was under the TWA LLC

22 labor contract, not under the TWA, Inc., labor contract.

23          THE WITNESS:  That's correct, your Honor.

24 Q.   I will call that the reasonable best efforts case:  That

25 was power are purchase side by the Air Line Pilots

1    Association using ALPA resources?

2    A.   ALPA did pursue that using our resources, yes.

3    Q.   Exhibit 50 for identification, please.  Tell us what

4    this document is?

5    A.   This is a letter from our Chairman Dillon, executive

6    vice president, United pilot, and from Jalmer Johnson, and

7    let me review it a little bit, please.

8    Q.   All right.  While you are doing it, it is to Bob

9    Pastore, dated August 29, 2001.  Is that correct?

10   A.   Yes, it is.

11            MR. KATZ:    I would ask for this to be admitted,

12   your Honor.

13            MR. JACOBSON: No objection, your Honor.

14            THE COURT:  Okay.  D 50 in evidence.

15            MR. KATZ:  Thank you.

16   Q.   Turning to the bottom paragraph on the page that is

17   showing here.  Would you explain what Captain Dillon and Mr.

18   Johnson are telling Mr. Pastore in this paragraph that is on

19   the screen now, Mr. Woerth?

20   A.   Yes.  They are explaining the processes that besides,

21   may have been continuously funded in a separate bucket of

22   money that was granted and had been continuously since 1988,

23   to TWA, an now an additional block of money from what we call

24   the operational contingency fund, a quarter of a million

25   dollars was granted for use of the TWA.

1    Q.    Did you say a quarter of a million dollars?

2    A.    Yes.  $251,940.

3    Q.    Does it say whether the TWA MEC was over or under budget

4    at that time?

5    A.    The way you access this money is when you already spent

6    it, you are being replenished.  And so with that comes some

7    rules.

8            And what Kevin Dillon and Jalmer Johnson are

9    reminding them of, what the flight loss rules are, and that

10   approval of flight pay loss going forward while they are

11   using this money under our policy, this applies to everyone

12   who uses that, this is not unusual for TWA, everyone who has

13   access to this kind of money has to go through these

14   processes of getting their flight pay loss approved and Kevin

15   Dillon and Jalmer Johnson are the two who would be over-

16   seeing that.

17   Q.    Was this a mechanism to see that the TWA MEC got the

18   financial resources necessary?

19           MR. JACOBSON: Object to the leading form of the

20   question, your Honor.

21           THE COURT:  Say again?

22           MR. JACOBSON:  I object to the leading form of the

23   question.

24           THE COURT:  I will sustain that.

25           MR. KATZ:  I will rephrase it.

Woerth/direct                                              121

1    Q.    What was the purpose of this letter?

2    A.    It is two things, I guess, to, they already knew they

3    had the money but this was, this letter was really required

4    and we send it to every MEC who ends up with additional

5    funding under the operations contingency fund to tell them

6    about the processes, particularly about needing additional

7    layers of approval.

8              This is a requirement put on everyone who has

9    access to this additional funding.

10   Q.    At this point in time were the TWA pilots cut off from

11   financial resources by the association?

12   A.    No. They had an access to financial resources, these are

13   just the rules of engagement that apply to everyone, but this

14   particular type of money, operation contingency fund, they

15   had other money, major contingency fund money, but this was

16   separate rules.

17   Q.    We are at the end of August now and I think people are

18   aware that September 11 is around the corner.  We understand

19   the tragedy for the people who were killed and injured as as

20   a result of the attack.  What was the impact, in addition to

21   that tragedy, on the airline industry?

22   A.    Well, the airline industry was catastrophically

23   affected.  Billions of dollars in losses.  Thousands upon

24   thousands of airline employees lost their jobs, many

25   permanently.  Over 20 airlines went into bankruptcy, within a

1    couple of days of 9-11, two of them liquidated right away,

2    Canada, 3,000, the third larger airline in Canada which we

3    represented, Midway liquidated within a few days.  The

4    pension plans were lost at the majority of ALPA carriers.

5    United lost their pension, Delta lost their pension, US

6    Airways lost their pension.  Northwest and Continental had

7    their pension frozen and modified.  Again they are

8    catastrophic layoffs, a lot of people haven't been recalled

9    to this day.

10   Q.   Specifically with regard to the 22 pilots and the

11   American pilots, what was the impact on the negotiations that

12   were then nearing their conclusion, on seniority?

13   A.   The normal understanding was that about September 1st

14   was supposed to be the end of negotiating process, that would

15   have that had been kind of discussed.  It appeared some

16   progress had been made and they were willing to reschedule

17   some negotiations for the 13th and 14th of September.

18   Obviously with September 11, those negotiations were

19   cancelled but nonetheless with everything else that was going

20   on, they did make another attempt to negotiate seniority

21   integration on September 17.  I think it was the 17th of

22   September.

23          And that failed.  But obviously there was

24   tremendous a lot of activity across the industry, every

25   airline was terribly impacted by this event.

```
 1   Q.   And what activities were you engaged in yourself?

 2   A.   Well, at the beginning right away, the secretary to the

 3   President Bush, secretary Norm Mineta asked me to be on a

 4   rapid response team for aircraft, there was two rapid

 5   response teams to respond to the crisis.  The airline

 6   industry was shut down, as you remember, completely for five

 7   days.

 8        So I was on that team with Boeing and some FAA

 9   people, Herb Deleher from Southwest had the other team.  I

10   was involved with that.  I was involved with trying to get

11   the airline stabilization act passed.  We had proposals to

12   Congress to get relief for all the airlines, five billion

13   dollars in cash and ten billion dollars in loan guarantees.

14        But of course I had over 60,000 pilots who were all

15   afraid for their jobs.  We had to wonder how many layoffs

16   were going to be, we had to redo ALPA's budget, we had our

17   own employees, I was a pretty busy guy right after 9-11 for

18   several months.

19   Q.   Were there financial implications for the association?

20   A.   Well, certainly as pilots were laid off, we would lose

21   dues income, and we had  dwe fixed costs, employee costs,

22   pension costs, we had to start deciding what we were going to

23   do as an association with all these losses.  I was pretty

24   sure pay cuts or on their way with this much financial

25   losses, pay cuts aren't far behind.
```

Woerth/direct                                                    124

```
 1   Q.   The jury may not appreciate that ALPA's dues, how are

 2   ALPA's dues calculated?

 3   A.   ALPA's dues are calculated, it is like, I forgot the

 4   exact number, I think about 1.7 or 1.8 percent of your gross

 5   income is what you pay in dues.  So it is not, everybody

 6   doesn't pay the same.  The more you make, the more dues you

 7   pay.  So about 1.6, 1.7 percent of your gross income.

 8   Q.   So those people are being furloughed and downgraded and

 9   having downgraded and having their pay reduced what is the

10   impact on ALPA's dues income?

11   A.   It immediately goes down in direct proportion.

12   Q.   I would like to turn your attention to exhibit D 51 for

13   identification, a September 21 letter from I, which is ten

14   days after the attacks, to all ALPA members and their

15   families.  Can you identify this as a letter you sent on or

16   about September 21, 2001?

17   A.   Yes, I recognize it, yes.

18           MR. KATZ:  I ask that it be received in evidence,

19   your Honor.

20           THE COURT:  Any objection, Mr. Jacobson?

21           MR. JACOBSON: No, your Honor.

22           THE COURT:  In evidence.  D 51.

23           MR. KATZ:  Thank you.

24   Q.   After the preface you talk about the security task

25   force, the bottom of the first page?
```

1    A.    Yes.

2    Q.    That is an ALPA security task force?

3    A.    Yes.

4    Q.    And so was that an issue that you were involved in?

5    A.    I was involved in an ALPA, as well as the other

6    governmental process, rapid response team, I was involved in

7    both.

8    Q.    On the bottom of the second page there is a reference to

9    legislative activities.  There is a subheading.  What was

10   going on with the ALPA government affairs department in

11   September, 2001?

12   A.    Many things, including particularly trying to get the

13   Airlines Stabilization Act actually passed and funded and

14   getting the money to the airlines and hopefully making money

15   available through loan guarantees to keep us going until the

16   airline industry could recover.

17   Q.    Turning to the next page, there is a heading of

18   collective bargaining and ASSOCIATION, administrative and

19   financial matters.  Let's look at the bottom paragraph of

20   page 3, please.

21   A.    The bottom paragraph?

22   Q.    Yes, where there is a reference to a third ALPA task

23   force, examining belt tightening measures.  Was that on --

24   how  would you describe that effort at that point in time?

25   A.    Well, it was just beginning, but it was, we took every

```
 1    method possible, we were trying to come to terms with what

 2    was going to happen to our employees.

 3              We had 500 employees.  Would we be able to make our

 4    payroll?  What, are we go to go have to lay off people?  What

 5    other cuts could we take?  Were we go to go have -- we were

 6    looking at every possible thing we might have to do to

 7    preserve the financial credibility and stability of the whole

 8    association.  We just really didn't know how bad this was

 9    going to get.

10    Q.   At the bottom you say I will also be asking each ALPA

11    MEC to implement strategies to contain costs, including

12    seeking company paid flight pay loss, to cover current

13    negotiating expenses.

14              So was flight pay loss a financial issue for ALPA

15    at that time?

16    A.   Flight pay loss, next to direct employee costs, was our

17    next highest expense.  Flight pay loss is the second highest

18    expense with the association.

19    Q.   So that was a big item?

20    A.   That is a big item.

21    Q.   The last page, Mr. Woerth, talks about jumpseat.  Did

22    the FAA implement any new restrictions or limitations on

23    transporting people in the cockpit of airplanes?

24    A.   Yes, the FAA put in new rules, more stringent rules.

25    Q.   How would that affect an American pilot who wanted to
```

1   fly in the cockpit of a Delta airplane to get to work?

2   A.   Their initial proposal was that you could no longer ride

3   in the cockpit if you are not employed by that airline.

4   There had to be a seat for you in the back.  And at first it

5   is not mentioned in here they were actually trying to

6   eliminate all cockpit jumpseats, riding all together.  I was

7   able to stop that when I was on that task force but this was

8   the new procedures.

9   Q.   And I have another letter on a similar line, D 24 for

10  identification:  October 4, 2001 letter you sent to all ALPA

11  MEC officers?

12  A.   Yes.

13          MR. KATZ:  I ask it be received in evidence.

14          MR. JACOBSON: No objection.

15          THE COURT:  D 24 in evidence.

16          MR. KATZ:  Thank you.

17  Q.   And does this letter deal with some of the financial

18  applications of the crisis hitting the airline industry at

19  that time?

20  A.   Yes, it does.

21  Q.   I am not going to ask you to go through it all.  In the

22  middle of the pairs page there are reductions of over $10

23  million in ALPA MEC budgets that is listed?

24  A.   That's correct.

25  Q.   What is A and S budget where there is a reduction of

 1   17.4 million?

 2   A.    Administrative and support account.  That is shorthand

 3   for that, that is the national account.  That is the national

 4   budget as compared to the local MEC budgets.

 5   Q.    Returning to page 3, there is a reference to the major

 6   contingency fund?

 7   A.    Yes.  In the first paragraph it talks about the purposes

 8   for which this war chest is to be used.

 9   A.    Yes.

10   Q.    Are you familiar with these policies?

11   A.    Yes, I am.

12   Q.    What purpose is the major contingency fund to be used

13   for?

14   A.    Non-normal, war chest type savings account for

15   negotiations, strike preparations, family awareness.  Pilot

16   to pilot projects.

17   Q.    Communications activities.  Would that be generic?

18   A.    In line with negotiations, strike preparation, family

19   awareness, yes.

20   Q.    Would you blow up the recent events paragraph, please?

21   In the middle of that paragraph it says the executive council

22   at its meeting this week directed Captain Feldvary and Mr.

23   Johnson to review and wind down all spending activities

24   currently being funded by the MCF.  Was that your

25   recollection that that happened?

1   A.   Yes.

2   Q.   That was an effort to preserve ALPA's financial

3   condition?

4   A.   That's correct.

5   Q.   All right.  In particular reference to the seniority

6   integration negotiations between the TWA and the American

7   pilots, what additional implications were there for those

8   talks?

9   A.   My understanding by October 4, is that the time line you

10  are referencing?

11  Q.   Yes, sir.

12  A.   That those talks had concluded.  I was unaware of any

13  more talks attempted to be scheduled, but I was aware that

14  Jeff Brundage was, was vice president of American Airlines

15  labor relations, was directed to try to get something done.

16  So he was reaching out.  I didn't know at that point, on

17  October 4, what was happening, but I knew he was attempting

18  to.

19  Q.   All right.  I would likes to show you for identification

20  exhibit D 200 which is a letter from Mr. Brundage dated

21  October 12, 2001.  Did you receive that letter on or about

22  that date?

23  A.   Yes, I did.

24        MR. KATZ:  I would ask that exhibit D 200 be

25  received in evidence, your Honor.

1              MR. JACOBSON: Your Honor, I believe this is

2       hearsay.

3              THE COURT:  Let me look at it.

4              THE COURT:  What is your basis, Mr. Katz, for

5       admitting this?

6              MR. KATZ:  Your Honor, we are not asking for it to

7       be admitted for the truth of the matters asserted by Mr.

8       Brundage in the letter.

9              THE COURT:  You really are, though.

10             MR. KATZ:  No, we are asking it to be admitted for

11      Mr. Woerth's response.

12             THE COURT:  He is telling Captain Woerth, Brundage

13      is, who is an American, now an AA executive, American

14      airlines executive, to put pressure on the TWA merger

15      committee to meet.  He is alleging time is running sort.  It

16      is offered for that.

17             MR. KATZ:  The witness's communications with

18      executives at TWA and American as well as the TWA MEC

19      affected how he responded to events during the month of

20      October.  That is why we are offering it, your Honor.

21             THE COURT:  Well --

22             MR. JACOBSON:  Your Honor, I add that it is hearsay

23      within hearsay.  He is reporting what supposedly is told to

24      him by other third parties, what was told to them by fourth

25      parties.

1          MR. KATZ:  It nevertheless formed the basis for

2     this witness's actions later in the month.

3          THE COURT:  Ladies and gentlemen of the jury, I am

4     going to admit exhibit 200.

5          But I want to emphasize to you, I am not letting it

6     in for the truth of what the writer of this letter says, Mr.

7     Brundage.  He says a lot of things about the TWA MEC.  I want

8     to make it clear I am not offering -- I am not accepting it,

9     excuse me, because anything he says is true.  I am accepting

10    it only because it is what Captain Woerth was told, and he

11    can testify as to how he reacted to it, or whether he

12    believed it.

13         But I am not offering it, I am not accepting it,

14    what is in here from American Airlines as to the truth.

15         Do you understand what I am getting at, only to

16    show what reaction he might have had?  I will let it in on

17    that basis.

18         MR. KATZ:  Thank you, your Honor.

19    Q.   Mr. Woerth, you read this letter when you received it?

20    A.   Yes.

21    Q.   Did you take any related actions to communicate with

22    officials of American Airlines, TWA, or the TWA MEC to learn

23    what was going on in October with regard to the seniority

24    negotiations?

25    A.   Yes, I did.

Woerth/direct                                                  132

1    Q.   Would you describe those efforts, please?

2    A.   After October 12, letter, I had already been told by the

3    phone call or something that the meetings were trying to be

4    held, but were cancelled.  I was all fairly confused by what

5    the truth of the matter was.  I got Brundage's letter which

6    he says, that he had had meetings on October 8, with the

7    understanding that there would be an agreement, and they

8    would come to Dallas the next day to do that.  Instead, they

9    did not come.

10   Q.   Who did not come?

11   A.   The TWA MEC, or merger committee did not come, but Bob

12   Pastore came instead.  And that is all a matter of

13   confidentiality and they were not going to meet with

14   American, and I was, so after that call I tried to ask Bob

15   Pastore what was going on and he gave me some explanation.

16   Q.   What did he say?

17   A.   He said that yes, there had been meetings, but he had

18   gone to Dallas and the MEC wasn't able or willing to meet

19   with Brundage on this matter.  So I didn't get a clear

20   explanation, but it was an acknowledgement that there had

21   been meetings, the meeting in Dallas was attended by Bob

22   Pastore but not by anybody else, and that is about all I

23   actually gleaned from that initial investigation.

24   Q.   Did you talk to any executives at TWA?

25   A.   I had called, at this time I asked, you called Bill

 1    Compton who was the CEO, and asked if he was aware what was

 2    going on.

 3            He said he was, that he had assisted Brundage in

 4    some regard trying to save, in his words, save this deal so

 5    we could get a negotiated settlement rather than a contract

 6    of seniority imposition by American, and APA which they

 7    reported to me that it was imminent, that sometime within the

 8    next ten or 20 days APA and American were just going to

 9    impose their will and that would be the end of it.  They are

10    hoping to get a three-party agreement that they could reach

11    an agreement that the TWA MEC would agree to, that we could

12    have, be a part of the agreement, to provide extra protection

13    for the TWA pilots.

14    Q.   What was your view of the best course of action to

15    protection the TWA pilots?

16    A.   My view was to try to entice the best possible offer you

17    could from American and to re-engage in negotiations, and to,

18    in this letter they also talk about efforts to have

19    legislation that Mr. Carty had found out about and was very

20    angry about and actually threatened to walk away from the

21    transaction.

22            That had been confirmed to me, Norm Mineta, the

23    Secretary of Transportation, this is all happening at the

24    same time, Mr. Carty was very angry about an attempt for

25    legislation and that I wanted the TWA MEC to re-engage and I

Woerth/direct                                              134

 1    talked to Brundage and through our attorney to sweeten their

 2    offer, to put more on the table, give some extra protection

 3    for seniority for TWA pilots, protect the St. Louis domicile

 4    specifically.  This was kind of a last-ditch effort to try to

 5    get a negotiated settlement.

 6    Q.    Did you say that you improved, you asked the other side

 7    to improve their offer?

 8    A.    Yes, I did.

 9    Q.    Did you say you talked to the secretary of

10    transportation, Norman Mineta?

11    A.    Yes, I did.

12    Q.    When was that conversation?

13    A.    Well, there were several conversations.  I was in

14    constant contact with the Secretary of Transportation because

15    of the events of 9-11 but on this specifically, the last one

16    was really, near the end of October, the 21st or 22nd of

17    October, but I talked to him probably every two or three

18    times a week in the weeks leading up to this.

19    Q.    What did you say to him about the TWA pilots?

20    A.    I told him, he was mostly a one-way conversation, that

21    he was totally aware, he is the Secretary of Transportation,

22    I was completely interested.  His son was a TWA pilot.  He

23    was not unaware of what was going on.  The Secretary of

24    Transportation had a son at TWA.  Rob Brantner I think was

25    his name.

1            And, but he was afraid that American was about to

2    just do what they wanted to do with APA and just move on to

3    other subjects, that the events of 9-11, it was time to just

4    end the negotiation, not walk away from the transaction, but

5    impose their seniority list and just be done.

6            THE COURT:  They couldn't walk away from the

7    transaction, it was already closed.

8    A.   No, he wasn't talking about walking away from the

9    transportation.  He is you talking about just giving an

10   imposed seniority list, reaching an agreement with APA and

11   American and just be done.  That was the advice I got from

12   the Secretary of Transportation.  And that the government was

13   not going to intervene or stop the transaction, or put

14   pressure on Mr. Carty.  We were done now.

15   Q.   That is what Mr., Secretary Mineta told you?

16   A.   Secretary Mineta.

17   Q.   Why did you view the imposition of an agreement between

18   APA and American as less desirable for the TWA pilots?

19   A.   The way American, this is a common par gaining practice,

20   they had suite end the offer, but only with agreement, in

21   other words, they added additional things, additional

22   seniority protection, they created a special, what they call

23   it the St. Louis cell, that the St. Louis, where the TWA

24   pilots were domiciled would be given extra protection,

25   special seniority about that.

Woerth/direct                                               136

1              But the most important one was that even in its

2      environment after post 9-11 when the whole world was

3      collapsing and shrinking and nobody knew where the bottom

4      was, that the St. Louis domicile did not shrink more than 25

5      percent in proportion to the greatly domiciles of any of the

6      rest of them, Chicago and Dallas, so that give a special

7      protection for the TWA pilots who were domiciled in St.

8      Louis.

9              So that, and a few other things, and furlough

10     protection were only available if they agreed.  If they did

11     not agree, they were going to withdraw those and impose a

12     worse deal.

13             So I was focusing on attempting to get the maximum

14     deal, and my judgment was the maximum deal was that deal.

15     The sweetened deal.

16     Q.   I would like to show exhibit D 88 which is in evidence.

17     These are minutes from the TWA MEC meeting dated October 20

18     to 22, 2001.

19             MR. JACOBSON: I am sorry.  Which exhibit number?

20             MR. KATZ:  D 88 in evidence.

21             Are you familiar with the special MEC minutes

22     October 20 to 22 at Washington, D.C.

23     A.   Yes.

24     Q.   That is the one at the Mayflower Hotel?

25     A.   Yes.

1    Q.   Is this the meeting at which the protections you were

2    referring to in your last answer were offered by the

3    representatives of American Airlines and the APA?

4    A.   They may have been offered earlier but they were

5    certainly being discussed here.

6    Q.   Turning to the end of this exhibit.  On the last page

7    there was an MEC discussion with Jeff Brundage.  Counter

8    proposal was not acceptable.  Rautenberg and Lewin moved to

9    accept the terms as described by David Holtzman and it

10   failed.  Is this something that was referenced in your last

11   answer?

12   A.   Yes.

13   Q.   Would you explain the specifics of that, please?

14   A.   The better offer with increased protection was

15   available, but only if they agreed to it.  They are about to,

16   at least they alleged they were about to reach an agreement

17   with American, with all those sweeteners missing.  In other

18   words, a worse seniority integration, no special cell for St.

19   Louis, no restrictions on the sweetener of St. Louis.  And

20   that was the terms.  And they voted that down.

21   Q.   So there were protections that were offered by American

22   Airlines in the area of furloughs.  Is that what you are

23   saying?

24   A.   Yes.

25   Q.   In the area of the size of the St. Louis protective

1   cell?

2   A.   Yes.

3   Q.   And how would you rate those on a scale of zero to 100

4   as of October, 2001?

5   A.   Well, especially in that context, within six or eight

6   weeks of 9-11, when there were furlough notices everywhere,

7   nobody knew where the bottom of the industry was going to be,

8   I thought on a scale of one to a hundred that had to be at

9   least an 85, trying to get special protections for your

10  pilots in St. Louis where they were all domiciled.

11  Q.   So you thought those protections were important?

12  A.   I thought they would prove to be very important.

13  Q.   What was your reaction to the TWA MEC's failure to

14  accept them?

15  A.   I was disappointed for the TWA pilots.  I thought the

16  best course of action was not selected.   I disagreed with

17  the decision.

18  Q.   Turning back in this exhibit, two pages, to page 14, I

19  would like you to blow up the portion at 14:31, 2:31  in the

20  afternoon?

21          THE COURT:  What document is this?

22          MR. KATZ:  D 88.

23          THE COURT:  Still on D 88.

24  Q.   On page 14, at the time, 1431, it says discussion with

25  Duane Woerth via phone.  It looks like it only lasted four

1    minutes, Mr. Woerth.  Is that your recollection of it being a

2    short conversation?

3    A.    It was a pretty short conversation, yes.

4    Q.    They noted that you discussed the recent proposal, and

5    other options available to the MEC if they decide not to

6    accept the deal.

7            And would you tell us what you can recall of that

8    discussion.

9    A.    Again, it was a very short discussion, and I gave them

10   my honest opinion that I thought in my view American, and the

11   APA would not sweeten their offer further and instead would

12   impose a worse deal and they would do it fairly soon, if not

13   that day, within a very short period of time.  They expressed

14   that they would rather, they wanted me to sue, to enter into

15   litigation, and I told them that I had no basis for a

16   lawsuit.

17           We had filed a grievance.  That was the legal

18   remedy under the Railway Labor Act, when you have a

19   contractual problem with the Railway Act, you file a

20   grievance.  That is what we did and it had lost.

21   Q.    Is that referring to the recently best efforts

22   grievance?

23   A.    Yes.

24   Q.    That was still pending at that time?

25   A.    It was pending, but we were doing the strategy we could

1    do and should do.

2    Q.   Did you explain anything about why you felt the proposed

3    litigation was a poor choice?

4    A.   There are a lot of reasons.  First of all, I didn't see

5    a basis for litigation.  I take litigation very seriously.  I

6    was never convinced there was a legal basis in this venue,

7    another court, to sue.

8    Q.   You told that to the --

9    A.   I told that to TWA.  I reminded them that we were suing

10   another union which I didn't have a problem with if if we had

11   a legal hook, but that APA had the exclusive bargaining

12   rights with American.  And I didn't, I couldn't intervene on

13   that any more than I could with the firefighters, a

14   construction union, a teachers union.  It wasn't my union.

15   And it wasn't the company I represented.  They were

16   exercising their rights to enter their contract the same way

17   we were.  They were about to do just that.

18          And I saw, I was never convinced there was a legal

19   strategy that would work and exactly might back fire at this

20   moment.  Again, I want to keep in context six or seven or

21   eight weeks after 9-11.  Both a legislative strategy, what

22   became known as the Bond bill, trying to get back in

23   arbitration what they agreed to waive, and trying to sue to

24   get an arbitration they agreed to waive, they may have not

25   taken Mr. Carty's threat that he would sell the assets and

1    liquidate TWA LLC.  I took it seriously.  And I thought it

2    was a risk not worth taking.  That was my risk reward

3    judgment.  And I gave them the benefit of my judgment.

4           They disagreed with that.

5    Q.  And what did you say at the bottom line with regard to

6    the proposal that you initiate litigation on behalf of the

7    Air Line Pilots Association?

8    A.  I reiterated I didn't have a basis to do that.  They had

9    their rights, even though I disagreed with what they were

10   doing, I didn't see a legal remedy and I would not institute

11   litigation.  I was very clear I would not.  They were going

12   to be faced with a judgment to either accept it or not

13   judgment, but I was not going to sue.

14           MR. KATZ:  Thank you, Mr. Woerth.  We have been

15   going quite a while now.  I have a little bit left.  I would

16   like to suggest a break at this point.

17           THE COURT:  Ladies and gentlemen, we will take a

18   15-minute break, until 20 of 1.  20 of 1.

19           (The jury leaves the courtroom.)

20           (Recess)

21           (Jury enters the courtroom.) (.

22           DUANE WOERTH, resumes.

23           CONTINUED DIRECT EXAMINATION.

24           BY MR. KATZ:

25           THE COURT:  Mr. Katz, you may continue.

Woerth/direct                                                    142

1    Q.   Mr. Woerth, I have written on this board I have been

2    keeping track of some of the highlights of the assistance

3    ALPA provided and you provided to the TWA pilots.  I have

4    written October 23 advice to the MEC, which you just

5    described in your last testimony before we took a break.

6              What I would like to ask you about now is since the

7    transaction had been consummated, that is American had

8    acquired these assets of TWA and made the TWA pilots

9    employees of TWA LLC, what was the fear that you expressed,

10   what was the concern that you expressed to the TWA MEC?  What

11   was the downside?

12   A.   The downside still in October?

13   Q.   Yes, sir.

14   A.   The downside is that TWA LLC was still their employment

15   vehicle.  They are not integrated at this time.  They were

16   not American employees.  Single carrier status had not

17   occurred, that there was still, September 11 and all the

18   implosion of the airline industry, that I thought they were

19   still at risk from some second doubts from the board of

20   directors of American, from Carty himself, and their primary

21   concern to preserve their relationship with APA and their own

22   union, not so much with the TWA employees.  I felt they still

23   had a certain amount of risk, a measurable risk at that time

24   to getting the ultimate goal, getting all the way into

25   American and be an American employee which with was not

 1    complete.

 2              THE COURT:  However, in LLC they were getting

 3    American wages, weren't they?

 4              THE WITNESS:  I don't think they were at that time

 5    yet.

 6              THE COURT:  They had single carrier status?

 7    A.    I don't know when that occurred.  I know it was later, I

 8    am not sure of the date.

 9              MR. KATZ:  We will have a witness on that, your

10    Honor.

11              THE COURT:  Okay.

12    Q.    Have you seen in the past situations where one holding

13    company owned more than one airline?

14    A.    Yes, I have.

15    Q.    What have the risks been associated with that condition?

16    A.    They often take work from one operation and move it to

17    another operation.  That appeared at Eastern, Continental, it

18    happened before, it is still happening.

19    Q.    In in October, 2001, was that a fear that you expressed

20    to the TWA MEC?

21    A.    Yes.

22    Q.    All right.  I have also written on the board Bond bill

23    support.  You mentioned in your last testimony about the

24    legislation.  Would you tell us what was going on with that,

25    please?

Woerth/direct                                                         144

1    A.   Yes.  In October, early October, I was advised by our

2    government affairs officer, ahead of our government affairs,

3    that the TWA pilots would like and had met with Senator Kit

4    Bond and other Missouri representatives in the house to

5    introduce legislation that kind of attaches to a defense

6    appropriations bill, as I recall, and if it got through that

7    way, it would become law.  So they are attaching a special

8    provision to a defense appropriation.

9           And although I thought there was some risk with

10   this, and I was supportive and sent letters to both Senator

11   Bond and I think his equal in the House of Representatives on

12   this committee to support it.

13   Q.   I would show you for identification exhibits D 94, and D

14   165.

15           THE COURT:  D 94, and D 165.

16           MR. KATZ:  Yes, sir.

17           THE COURT:  Okay.

18   Q.   Are these the letters to which you just referred?

19   A.   Yes.  The letter to Senator Kit Bond and a letter to

20   Congressman Jerry Lewis.

21   Q.   They are dated October 3, 2001 and December 10, 2001?

22   A.   Yes.

23           MR. KATZ:  I ask that they be received in evidence.

24           MR. JACOBSON: I haven't received a copy of the

25   Lewis letter.

 1              MR. KATZ:  It is part of the package I gave you

 2    earlier.

 3              THE COURT:  Let's take D 94 first.  Any problem

 4    with that?

 5              MR. JACOBSON: No, no problem with D 94, your Honor.

 6              THE COURT:  Okay.  So now D 94 is in evidence.

 7              MR. KATZ:  Thank you, your Honor.

 8              THE COURT:  Let's see the other one.  D 165.

 9              MR. JACOBSON:  Did he testify he sent this letter?

10    I missed that.

11              MR. KATZ:  Yes, he did.

12              MR. JACOBSON:  Then no objection.

13              THE COURT:  Okay.  Then D 165, which is a letter to

14    representative Jerry Lewis.  You have to be my age to get a

15    chuckle out of that.  But that is in evidence as well.

16    Q.   And are these the letters in support for the legislation

17    that you mentioned?

18    A.   Yes, they are.

19    Q.   And what was your view of the legislation?  Let me ask

20    you this way:  What was your view of having prospects of

21    having this enacted?

22    A.   My view of the prospects were that, I might characterize

23    it as a Hail Mary pass a little bit because of the technique,

24    but it has worked before.  This technique has worked before

25    when you, you slip a provision in a bill, that most people

1    don't know it is there, I thought the way it was going to

2    pass if Senator Bond got it in and with all the other

3    activity in the Senate, a lot of his fellow senators didn't

4    realize it was there and did not object, and as I knew for

5    certain that if the Texas delegation, American's delegation

6    in Texas found out about it, they would take it out.

7              If it wasn't introduced in the house yet, that you

8    would have to assume that the conferees, when they got

9    together, the House bill and Senate bill, they would not

10   object and somehow get it through a conference and get it to

11   the President.  I understood why TWA wanted to take a shot,

12   as remote as it was, and I supported them in their effort.

13   Q.   Did you advise representatives of the TWA pilots of this

14   stealth strategy?

15   A.   They were, I only really talked to Bob Pastore and I

16   told -- he understood what we were trying to do.  But it had

17   to be, it would only be successful in my view, my judgment

18   and the judgment of the people advising me on government

19   affairs, that it really had to be a quiet strategy.  The more

20   it was known, the least likely it would be successful.

21   Q.   And what actually happened?

22   A.   Well, what actually happened, I think understandably the

23   very enthusiastic TWA pilots took it upon themselves to go on

24   the Hill and it was pretty well known and put out a lot of

25   publication, actually, for what was going on and solicited

1    additional support.

2    Q.    And what was the reaction of American and the Allied

3    Pilots Association?

4    A.    They were apoplectic.  They were extremely angry, and I

5    heard more from Mr. Carty who saw Mr. Bond on I believe on

6    October 11.  He was exceedingly angry, and I guess you would

7    say, the report I got from, was that he threatened that if

8    this happens, he would --

9              MR. JACOBSON: Objection, your Honor, I believe he

10   is going to hearsay now.

11             THE COURT:  Yeah, I am going to sustain that

12   objection.

13   Q.    Did you have a conversation with Mr. Carty yourself, Mr.

14   Woerth?

15   A.    No, I did not.

16   Q.    All right.  What was the progress of the bill?  I think

17   there has been testimony about it already.  But do you recall

18   how the bill progressed through the Congress?

19   A.    My recall, my recollection is that it moved along, it

20   took a long time to try to progress all the way through the

21   end of the year, but that, as I suspected --

22             THE COURT:  First, it passed the Senate almost

23   without objection, didn't it?  It passed.  It actually was

24   adopted.

25   A.    It was adopted by the Senate.

```
 1              THE COURT:  When they adopted the defense bill they

 2    picked up the tag-along, right?

 3              THE WITNESS:  I absolutely don't have a clear

 4    recollection how it was finally disposed of, your Honor.

 5    Q.   Let me show you exhibit D 172 for identification.  Is in

 6    a TWA --

 7              THE COURT:  I am sorry, what is it?

 8              MR. KATZ:  D 172, your Honor.

 9              THE COURT:  D 172.  Okay.  Go ahead.

10    Q.   Is this a TWA MEC information update dated December 19,

11    2001?

12    A.   Yes.

13    Q.   From a pilot at TWA named Glenn Stieneke.

14    A.   Yes.

15    Q.   And he was the chairman of the TWA pilots communication

16    committee?

17    A.   Yes.

18              MR. KATZ:  I ask that it be received in evidence,

19    your Honor.

20              MR. JACOBSON: No objection.

21              THE COURT:  There being no objection, go ahead.

22    Q.   If you look at the second paragraph on Tuesday, December

23    18, the joint conference committee passed the finalizing the

24    language for the House and SENATE version.  Met for a very

25    short session.  The bill was removed.  Does this refresh your
```

1    recollection that the --

2    A.   I always knew that, the ultimate outcome that it was

3    removed.  I didn't know the timeframe.  Now you are

4    refreshing my memory of what time that actually happened, in

5    December.

6              THE COURT:  That happened in the joint conference

7    meeting between the House and the Senate, didn't happen in

8    the, in the Senate it passed --

9              THE WITNESS:  That's correct.

10   Q.   The next paragraph in the middle  of the paragraph,

11   Captain Stieneke says, blow up the middle paragraph, Brian.

12   We wish to thank Senator Bond, Carnahan and others for their

13   efforts to date.  Furthermore, we would like to express our

14   gratitude to our own Legislative Affairs Committee, and ALPA

15   Government Affairs for their support and guidance in pushing

16   this proposed legislation forward.

17             Did you see that at the time?

18   A.   Yes.

19   Q.   And you agree with this appreciative comment of Captain

20   Stieneke?

21   A.   I appreciate it, we tried, and it didn't work.

22   Q.   Was there, despite the proposed legislation, was there

23   nevertheless another opportunity for consideration of

24   agreement?

25   A.   After the October MEC meeting?

Woerth/direct                                                     150

1   Q.   Right, right.

2   A.   Yes.  I had implored through Jeff Brundage, American and

3   APA pilots, not to reach an agreement, and try at least one

4   more time to give us another chance to vote on a superior

5   agreement, the one that was rejected previously in October by

6   the TWA MEC.

7   Q.   And can you tell us what happened with regard to that

8   effort?

9   A.   A meeting was called for December 7.  By that time there

10  was only two representatives left --

11  Q.   You said December 7.

12  A.   I said November 7, I meant to say November 7.

13  Q.   Thank you.

14  A.   I apologize.  November 7 of 2001.  And by that time, the

15  MEC, which used to have six members, was down to two.  The

16  West Coast base and the East Coast base were closed, so now

17  all the votes were consolidated into two people.

18  Q.   All the pilots were placed in St. Louis?

19  A.   All the pilots were based in St. Louis.  Capital Steve

20  Rautenberg and First Officer Young were the only two

21  representatives who represented all the pilots.  So now if

22  there is another vote, two people would make the decision.

23  So the meeting was called, and for November 7, by Captain

24  Pastore.

25

Woerth/direct                                        151

1    Q.   And what happened at the meeting?

2    A.   At the meeting, Captain Rautenberg, who wanted to agree

3    to take the sweetened deal and make a deal with American for

4    the enhanced protection, moved to do just that.  At that

5    Sally Young would not second the motion, and so they called

6    the SECRETARY of the association, Jerry Mugerditchian and our

7    legal counsel, for an interpretation of the rules.

8              Could Sally Young object and simply prevent a vote,

9    and the advice they got through our secretary who was in

10   charge of this, vice president of administration, Captain

11   Mugerditchian along with advice of counsel, was that they

12   could not.  You could not stop a vote just because you don't

13   agree.

14             You would have to at least second the most of what

15   and a vote would occur.  That is what they were advised.

16   Captain Pastore, who was the chairman of the meeting,

17   discarded that advice and did not allow a vote and the

18   meeting adjourned without a vote.

19   Q.   I would like to show you J 24 for identification.

20             THE COURT:  Before do you that, it is sort of

21   academic, because the vote would have been one, one.

22             THE WITNESS:  No, your Honor.  It was not academic.

23   If it had been a roll call vote and Steve Rautenberg had more

24   votes.  Steve Rautenberg would have won.  There would have

25   been a contract.

1   Q.   J 24?

2              THE COURT:   J 24.

3              MR. KATZ:   Yes, sir.

4              THE COURT:   I assume there is no objection to J 24.

5              MR. JACOBSON:  No, I am just looking for it.

6              THE COURT:   Excuse me.

7              MR. JACOBSON:  I found it.   There is no objection.

8              THE COURT:   The first page.

9   Q.   It is a one pager.

10             THE COURT:   It is a letter from Mugerditchian to

11  Pastore.

12             MR. JACOBSON:  Yes, your Honor.

13             THE COURT:   Okay.   That is in evidence.

14             MR. KATZ:   Thank you, your Honor.

15  Q.   Mr. Woerth, is this the letter that was sent by Captain

16  Mugerditchian to Captain Pastore during the MEC meeting that

17  captain pastor called for November 7, 2001?

18  A.   Yes, it is.

19  Q.   And Captain Mugerditchian advises that you don't need a

20  second if there are only two members of the MEC?

21  A.   That's correct.

22  Q.   What would happen if you required a second if there were

23  only two members on the MEC?

24  A.   You could conduct no business.   If somebody decided they

25  wanted to have a discussion, they could stop it individually

1    all the time.

2    Q.   So the minorty could block --

3    A.   The minority could block the role of the majority at

4    every moment.   The basis of that is that they didn't have

5    equal votes.

6              THE WITNESS:   That's correct.

7              THE COURT:   It was based on the number of pilots

8    they represented.

9    A.   Yes.

10             THE COURT:   Go ahead.

11   Q.   When that effort failed, what happened with American

12   Airlines and the Allied Pilots Association with regard to the

13   seniority integration?

14   A.   I think in a very short period of time after that, I am

15   not sure how many days, but they entered into their own

16   agreement without the special protections so as as they said

17   they would, they would not give them special protections.

18   They did not get additional furlough protection.   They did

19   not get a St. Louis cell.   They lost significant protection

20   with TWA pilots and that is what they imposed.

21   Q.   You said they didn't get a St. Louis cell.   They had a

22   cell but it wasn't as strong as it could have been?

23   A.   That's correct.

24   Q.   Did you in fact view the seniority integration agreement

25   with the TWA pile, that the TWA pilots ultimately got as the

Woerth/direct                                                 154

1    best that was potentially there?

2    A.   No, I did not.  I thought the deal that was available

3    that they re directed with enhanced protections of the St.

4    Louis cell, additional furlough protection, was a better deal

5    for TWA pilots.  So the better deal was not achieved.

6    Q.   So the TWA MEC members, some of them walked away from

7    significant job protections?

8    A.   Yes.

9             MR. JACOBSON: I think that is leading.

10            THE COURT:  That is a leading question, if that is

11   your objection, and I am going to sustain it.

12   Q.   Was there anything that you could have done, Mr. Woerth,

13   or anything that ALPA could have done, that would have gotten

14   a better deal for the TWA pilots?

15   A.   I do not believe so.  They had the final decision.

16   Their elected leaders had to had the final decision and they

17   made it.

18            MR. KATZ:  Thank you.  That completes our

19   examination.

20            THE COURT:  Mr. Jacobson, Ms. Rodriguez, who will

21   do it?

22            MR. JACOBSON: I will do it.

23            THE COURT:  Mr. Jacobson, you are on for cross

24   examination.

25            MR. JACOBSON: Thank you, your Honor.

1              CROSS EXAMINATION

2              BY MR. JACOBSON:

3  Q.   Mr. Woerth, I want to go through some of the things you

4  said and some additional items as well.

5              You indicated that your interactions with the

6  American company or the American pilots helped bring about a

7  facilitation agreement.  That is correct?

8  A.   I believe I helped.  I know I wasn't the only one who

9  suggested this.

10  Q.   And when do you think you did that, sir?

11  A.   First it was in an April fifth meeting with the American

12  pilots was the first time I suggested a facilitator.

13  Q.   You suggest that on April 5 that they get a facilitator

14  and you believed that helped give rise to facilitation?

15  A.   I do.

16  Q.   Were you aware that American Airlines had promised, in

17  the best efforts, reasonable best efforts letter, that was

18  the basis for the April 2 waiver of scope, that it would

19  exercise its reasonable best efforts, including hiring a

20  facilitator?

21  A.   I was aware but I wasn't sure if they got around to

22  doing it at this point.

23  Q.   That was before the comments you made at the APA?

24  A.   Right.

25  Q.   You also indicated that you believe that your efforts

1    with the APA caused them to not staple all of the TWA pilots

2    to the bottom of the list.  Is that correct, sir?

3    A.   That wasn't the only consideration, but I think I helped

4    that.

5    Q.   All right.  When do you think did you that, sir?

6    A.   The first time I talked to John Darrah which was right

7    after the transaction was announced and then again in April.

8    Q.   When did you think that you persuaded them that they

9    shouldn't staple everyone?

10   A.   I am not sure if that was the only persuading person but

11   I made that argument.  I am not sure when they made their

12   decision.  I think it might might have been before that.

13   Q.   You don't know when that was?

14   A.   No, I don't know when it was.

15   Q.   He we talked about the major contingency fund.  That is

16   a pool of money roughly 70 million in cash, 20 million in

17   property, that ALPA tries to maintain for major contingencies

18   like strikes and the like, correct?

19   A.   Yes.

20   Q.   All right.  And you viewed that this proposed merger

21   between TWA and a nonALPA carrier, the acquisition of assets,

22   however you want to characterize it, that would be something

23   that would come within the major contingency, correct?

24   A.   I know TWA had been given multiple grants of the major

25   contingency fund dating back to 1988.

1   Q.   My question is, is it your view, are you telling the

2   jury here, that the proposed acquisition of the TWA assets by

3   American was the type of contingency that would allow the TWA

4   pilots to receive an award of major contingency funds?

5   A.   I think I would have to see what what the executive

6   board decided.  If there was a resolution, if the executive

7   board passed it, that was a decision of ALPA I don't have

8   control of the major contingency fund.

9   Q.   The reason why I am asking is you said numerous times

10  today during your testimony that TWA pilots, their MEC, had

11  been given substantial moneys from the major contingency fund

12  in connection with this, with their negotiations with the

13  APA.  Do you recall saying that, sir?

14  A.   They do.

15  Q.   All right.  And there is a process in place before major

16  contingency fund money can be awarded to an MEC.  Correct?

17  A.   That's correct.

18  Q.   And that process includes a resolution being passed by

19  oh governing board?

20  A.   That's correct.

21  Q.   And that is the executive council?

22  A.   Executive council recommends to the executive board.

23  Q.   So the executive council has to recommend that, and that

24  is in writing, correct, sir?

25  A.   That would always be in writing.

1    Q.    Then the executive board has to pass that, right?

2    A.    That would be true.

3    Q.    And that resolution is also reflected in writing?

4    A.    If it passes in writing, of course.

5    Q.    Now, you have said here many times that the TWA pilots

6    were receiving this major contingency fund money in

7    connection with the American Airlines pilots?

8    A.    I did not say it was in connection with the American

9    airline pilots.  It had been continually in the major

10   contingency fund since 1988.

11   Q.    Did they receive any award of major contingency money in

12   2001?

13   A.    I don't believe they did.

14   Q.    Did they receive any major contingency funds in 2002?

15   A.    I don't think any were requested until we were are

16   almost done with the entire process.

17   Q.    Is your answer no, they did not receive any in 2002?

18   A.    That's correct, the answer is no.

19   Q.    So when you saying how they are receiving this major

20   contingency fund money, you are talking about money that may

21   have been paid to them before the American deal came up on

22   the screen?

23   A.    Yes.

24   Q.    All right  and that money is supposed to be spent on

25   whatever that particular project is, right?

Woerth-cross/Jacobson                                          159

1    A.    That's correct.

2    Q.    It is not a slush of money, here is money, spend it on

3    whatever you want?

4    A.    That's correct.

5    Q.    So any major contingency fund money they may have been

6    awarded in connection with the second bankruptcy, that money

7    could not be applied to the American Airlines negotiations?

8    A.    That's correct.

9    Q.    Now, you talked, you began your testimony talking about

10   the phone call you received from Mr. Compton, roughly around

11   the time that the American Airlines acquisition was

12   announced.  Correct?  Do you remember that?.

13   A.    Yes, sir, I do.

14   Q.    And you said that Mr. Compton told you that he was very

15   excited that he had negotiated this deal, and that he was

16   mortified that he could not make pension contributions?

17   A.    Mortification would have been  in the November phone

18   call when he alerted me what he was seeking, it was not in

19   January.

20   Q.    Focus on the first conversation at that time.  Now, Mr.

21   Compton, you said, had been your contemporary, he was an MEC

22   chairman while you were an MEC chairman?

23   A.    That's correct.

24   Q.    He went into the company, became vice president of

25   operations of TWA?

1    A.    Yes.

2    Q.    And then board of directors?

3    A.    Yes.

4    Q.    And CEO?

5    A.    Correct.

6    Q.    In your conversations with Mr. Compton, did he tell you

7    anything about the work that the TWA board of directors were

8    doing on a stand alone plan for the company?

9    A.    He advised me that they advised, that, at every single

10   opportunity, looked at every opportunity, he saw no other

11   viable opportunity except for sale.  They had all been

12   investigated and none found viable.

13   Q.    All right.  Did he tell you at or around the time that

14   the TWA acquisition of American, that the board of directors

15   were ready --

16         THE COURT:  You mean the other way around.

17   American's acquisition of TWA.

18   Q.    If I said it backwards, then I am sorry?

19         THE COURT:  You said it backwards.

20   Q.    I am sorry.  In that early January timeframe, January 9,

21   January 10, whenever it was you had that conversation, did he

22   tell you that the board of directors of TWA had to prepare to

23   remove him as TWA's direct CEO and replace him with a turn-

24   around firm and they had financing in place with Boeing to do

25   stand alone?

1    A.    No, they did not.

2    Q.    They didn't disclose that to you?

3              THE COURT:   The answer is no?

4    A.    The answer is no.

5    Q.    Now, we talked about, the Reno acquisition and the APA

6    wildcat strike as you called it?

7    A.    Yes.

8    Q.    And the 45 million dollars that they were required to

9    pay.

10   A.    Yes.

11             THE COURT:   They meaning APA, Allied Pilots

12   Association.

13   Q.    To American Airlines?

14   A.    Yes.

15   Q.    And certainly having a 45 million dollars obligation

16   over your head puts you in a position where you are not as

17   strong vis a vis the person who has that right, correct?

18   A.    I wouldn't want to have to pay 45 million dollars.

19   Q.    American Airlines has some leverage with APA as a result

20   of this 45 million dollars fine, correct?

21   A.    You would presume so.

22   Q.    All right.  And as a union president you are familiar

23   with leverage, right?

24   A.    I think I am.

25   Q.    And leverage is how you try to get an advantage, vis a

1    vis whoever you are negotiating with, so that you can compel

2    within the range of possible outcomes, an outcome that is

3    more to your liking, correct?

4    A.   That is the common definition.

5    Q.   All right.  And did you not have frequent conversations

6    -- strike that.  Did anyone from TWA ever come to you and say

7    we need your help to get more leverage in dealing with the

8    APA?

9    A.   Yes, they wanted leverage.

10   Q.   Did they suggest to you certain forms of leverage that

11   they might be able to get if you would agree to that?

12   A.   They suggested litigation would be leverage.

13   Q.   Litigation would be leverage and you agree litigation

14   can be leverage, correct?

15   A.   If there is a basis for the litigation.

16   Q.   All right.  Isn't litigation, does it have to be a slam

17   damn winner to have leverage or can it be a low percentage

18   and still provide leverage?

19   A.   I think the other side has to feel it is a credible

20   threat and not frivolous.  If they are not worried about it,

21   it is not leverage.

22   Q.   If they are not worried about it, it is not leverage.

23   Leverage is something that the other side is worried about,

24   correct?

25   A.   Correct.

Woerth-cross/Jacobson                                    163

1    Q.    Now, I jump around a little bit here.  There are a lot

2    of documents offered to you and I have my own documents.  I

3    am going to go through the documents Mr. Katz used first.

4              THE COURT:  The ones you are using now are already

5    in evidence.

6              MR. JACOBSON: Yes, the ones done with Mr. Katz.  We

7    will replow some of the ground a little later, all right,

8    sir.

9    A.    Okay.

10   Q.    You talked about the pilot unity campaign.  Is it fair

11   to say you are a trade unionist.  That is your personal

12   philosophy?

13   A.    Yes, it is.

14   Q.    By a trade unionist we mean you are someone who believes

15   that everyone involved in a particular craft or a particular

16   skill should all been in the same union?

17   A.    I believe that.

18   Q.    So it is your belief that all the flight crew, the

19   captains, and the first officers, and to the extent that

20   there are still any second officers or flight engineers

21   around, they should all be in the same union?

22   A.    I think that would be best for the profession, yes.

23   Q.    Best for the profession?

24   A.    Yeah.

25   Q.    And you are opposed to the notion of company unions?

1    A.   I would prefer, as I said before, I prefer everybody to

2    be in the same union, if possible.   I do.

3    Q.   And that is not something that is a unique belief to

4    you, that has been a founding principle of ALPA since the

5    beginning, correct?

6    A.   I think that is absolutely correct.

7    Q.   ALPA has always attempted to bring in all the different

8    pilot groups everywhere into their union?

9    A.   We had a lot of organizing campaigns, some successful,

10   some not.

11   Q.   Right.  But you are always attempting to bring the whole

12   world of pilots together?

13   A.   Because together you are stronger than.

14   A.   That is always the goal, we take reasonable efforts, we

15   don't just throw spaghetti against the wall.  If there is not

16   a reasonable chance we don't spend the money.  We have to

17   have a reasonable chance of success.

18   Q.   Let's go to April 9 through 11.  You talked about

19   earlier, Mr. Katz.  This was your exhibit P-244.  And page 12

20   was something you were being asked about earlier.  Do you

21   recall that, sir?

22   A.   I remember being asked questions about this, yes.

23   Q.   All right.  And this is April 9 through 11?

24          THE COURT:  What is the number on this?

25          MR. JACOBSON:  P-244.

```
 1              THE COURT:  P-244.

 2   Q.   Is that correct, sir?

 3   A.   I am reviewing it.  Just a second.  Yes.

 4   Q.   And to set it in time, do you recall that the TWA pilots

 5   waived their scope, scope protections in their contract on

 6   April 2?

 7   A.   That's correct.

 8   Q.   And you visited and spoke to the APA board of directors,

 9   was that April 7, sir or April 9?

10   A.   I thought it was April 5.

11   Q.   April 5.  I knew it was an odd prime number.  On April

12   5.  This is April 9, a couple days later?

13   A.   Right.

14   Q.   And as the Judge noted, you are talking about expanding

15   your activities.  The associates expanding its activities

16   with four major independent pilots union.  Correct?

17   A.   That is what the leading paragraph says, yes.

18   Q.   And these notes are kept by your office staff?

19   A.   They are made by, Jan Redden, who was our secretary who

20   listened to our debate and encapsulated all into, that is an

21   hour's worth of discussion captured in four paragraphs, yes.

22   Q.   Was Jan at that time, not Ursula?

23   A.   My personal secretary did not do this.  It was Jan

24   Redden who worked for Jerry Mugerditchian who was in charge

25   of the governing bodies.
```

1    Q.    All right.  And one of the organizations of course that

2    as the Judge pointed out earlier was the Allied Pilot

3    Association, APA?

4    A.    Yes, sir.

5    Q.    And which according to the official minutes, that is one

6    of the entities with whom you are expanding your activities?

7    A.    We are not expanding -- I gave a briefing of all four.

8    Two were expanding, two of them were doing nothing with the

9    report.

10   Q.    That is not reflected here, is it, sir?

11   A.    That is not reflected there, but that is what I did.

12   Q.    Right.  And you had the opportunity to review all of

13   your minutes?

14   A.    Of course.

15   Q.    The others, you have other people on your staff, you

16   said almost 500 people, there are other people who are

17   assigned to review it to make sure they are accurate?

18   A.    Of course.

19   Q.    After that review process, this is what the minutes

20   resulted with, correct?

21   A.    Yes.

22   Q.    All right.  It also indicates, the next paragraph,

23   ALPA's 2001 budget includes $600,000 for organizing

24   activities?

25   A.    Yes.

1    Q.   All right.  And that doesn't indicate any particular

2    airline, correct?

3    A.   Not in this budget, but we allocated when we had

4    something to do.  Right now we were only spending money at

5    this point in time on Continental.

6    Q.   You did start spending money on Allied later in the

7    year, correct?

8    A.   We did not expend any money on Allied other than an

9    investigation on whether we would have to absorb their fine.

10   We had a legal investigation on that.  That was the only

11   money we expended.

12   Q.   And  that is that 45 million dollars fine we were

13   talking about a moment ago?

14   A.   That's correct.

15   Q.   And you asked the Cohen, Weiss firm to research it and

16   see whether or not, if you combined with the APA, whether

17   ALPA would somehow be liable for that 45 million dollars?

18   A.   I did.

19   Q.   You don't want to be liable for that 45 million dollars.

20   Correct?

21   A.   Of course not.

22   Q.   Isn't it a fact that the memorandum they prepared for

23   you, the legal advice they gave you, said that if the two

24   unions combined through a merger, there was a risk in fact

25   that you would be liable for 45 million?

1    A.   Yes.

2    Q.   But they also told you that if you used an alternate

3    process of putting out authorization cards, so that American

4    pilots would sign those cards and of this a National

5    Mediation Board election, then it was highly unlikely that

6    ALPA would be liable for 45 million because they wouldn't be

7    a successor to the APA?

8    A.   I don't remember that, but I probably believe that is

9    true.

10   Q.   All right.  Do you recall that is the advice they gave

11   you.  I have some memos.

12   A.   It was more focused on, since I was not prepared to do a

13   card campaign.

14            THE COURT:  The question is did you get that

15   advice.

16            THE WITNESS:  I think I got the advice, I remember,

17   your Honor, only the part about the merger.  Because that was

18   the only --

19            THE COURT:  You don't remember receiving advice

20   that the card campaign would avoid that problem.

21   A.   I honestly don't remember.

22            THE COURT:  All right.  The answer is he doesn't

23   remember.

24            MR. JACOBSON: All right.

25   Q.   Let's work our way there a little bit.  Exhibit P 264?

1          THE COURT:  264?

2          MR. JACOBSON: Yes, your Honor.

3          MR. KATZ:  Do you have a copy of that for me?

4          MR. JACOBSON: I do, sir.  I will bring it right to

5    you.

6          THE COURT:  That is not in evidence.

7          MR. KATZ:  It is not in evidence and I am going to

8    object to it H it is an internal memorandum of Cohen, Weiss

9    and Simon.  There is no evidence that it was ever distributed

10   beyond the walls of that law firm.

11         THE COURT:  Can I --

12         MR. JACOBSON: Yes, your Honor.  I am sorry.  I only

13   had two copies.  I thought I had three.

14         THE COURT:  I will give it back to you.  Doesn't

15   this memo show, isn't it reporting on a meeting with John

16   Cohen, who is the in-house general counsel of ALPA.

17         MR. JACOBSON:  Yes, your Honor.

18         THE COURT:  The very first sentence.

19         MR. KATZ:  It is an internal memo from Michael

20   Dialo, talking about RSS, that is Robert saddleson, meeting

21   with John Cohen.  It is an internal memorandum.  There is no

22   evidence, in fact there is an affidavit on file in this case

23   stating that this was only an internal memo that was never

24   given to anyone outside of the law firm.

25         THE COURT:  What are you going to do?  You use it

1  to refresh recollection?

2         MR. JACOBSON: I am going to direct his attention to

3  page 3.

4         THE COURT:  Are you going to refresh recollection?

5         MR. JACOBSON: I will use it that way initially.

6         THE COURT:  You can use the Subway Reporter to

7  refresh recollection.  It doesn't have to be in evidence.  I

8  will avoid that issue for the moment and use it any way you

9  want.

10         MR. JACOBSON: All right.

11         THE COURT:  I mean to refresh recollection, you

12  don't need, it doesn't have to be in evidence.

13  Q.   All right.  Mr. Woerth, would you please look at page 3

14  of in  his document.  Three bullet points near the top.

15  A.   Okay.

16  Q.   Read those bullet points and see if it refreshes your

17  recollection regarding the approach to be taken to bring APA

18  into the ALPA fold.

19  A.   The paragraph, I am trying to focus where you want me to

20  read.

21  Q.   It says, right underneath where it says work product.

22  Those three bullet points.

23  A.   Oh.  I am reading it.  I am trying to make sense of it.

24         MR. KATZ:  Is the question whether it refreshes his

25  recollection?

1              MR. JACOBSON:  I am waiting to see if he read it.

2    A.   I read it.

3    Q.   Now, you mentioned earlier that you recalled that the

4    advice you got was that if there was a merger, that would

5    likely lead to ALPA being liable for 45 million dollars.   Do

6    you remember saying that?

7    A.   Yes.

8    Q.   And do you now recall whether you were told that the

9    combination was not by merger, but through, but through the

10   issuance of authorization cards?

11             THE COURT:  Followed by an election.

12   Q.   Following by an MB election that would dramatically

13   reduce the possibility of any liability?

14   A.   It does not refresh my memory.  It may be my fault.  I

15   only really wanted the answer to one question.  I asked the

16   lawyer a question.  He gave me the answer to a question I

17   didn't ask.  I only cared about the merger.  I was never

18   going to do a card campaign.  So whatever they advised me on

19   a card campaign, I don't remember it because I was completely

20   disinterested.   I would never do a card campaign on

21   American.  I wanted to know what about a merger, and I

22   stopped reading or listening after that.  That is probably

23   why I don't remember.  I didn't care about it.

24             THE COURT:  Even if it would get you 11,000

25   American pilots?  I mean that is the jewel, at that time,

 1    supposed to be the jewel of the domestic airline industry.

 2              THE WITNESS:  Your Honor, I would respectfully

 3    disagree.

 4              I never, the point of the union is to have a strong

 5    union.  You can win an election by one tenth of one percent

 6    and you have won, and now you have got a boat load of

 7    trouble.

 8              We did that with Federal Express, and we won.  And

 9    two years later they decertified it.  We lost millions of

10    dollars, big fight, took us six years to get them back.  I

11    was committed to only one way, not a card campaign which

12    would be viewed as hostile.

13              My judgment was the only way to have a long-term

14    success, not even an election success, was by a merger.  That

15    is what I was committed to.

16              THE COURT:  Does the card campaign have to be

17    hostile?

18    A.    I viewed it -- with independence -- when you are not

19    organized, you are not fighting another union.  When you are

20    already organized, I believe they were viewed as hostile.  If

21    they hadn't agreed to it, if the board wasn't on board like

22    we did with Continental and Fed Ex, it would be competing

23    campaigns.   I just saw that as failure.  That was my

24    judgment, long-term failure.  Even if you won the election

25    you wouldn't win much.

Woerth-cross/Jacobson                                    173

1   Q.   Right.  But if the APA board, if the people who were in

2   charge of APA, really wanted to merge with you, and they

3   wanted to accommodate your interest in avoiding picking up

4   this 45 million dollars fine, sir, wouldn't it be appropriate

5   then to say you have our blessings, go forward with the card

6   campaign, we don't consider it hostile?  We understand we

7   need to cooperate with you this way in order to avoid this

8   fine flowing through to ALPA?

9   A.   That question never occurred to me or anybody else that

10  I was aware of.

11  Q.   And you don't recall receiving advice that as long as

12  you minimized ALPA's, APA's official involvement in the card

13  campaign and did it with ALPA money, that that would further

14  immunize ALPA from any liability for the 45 million dollars?

15  A.   I think I already testified I wasn't listening to

16  anything about a card campaign.  I was determined to only do

17  a merger.

18  Q.   Let me give you a document, keep that one up there.  Let

19  me give you a document marked as P 10.

20          THE COURT:  P 10.

21          MR. JACOBSON: Yes.

22          THE COURT:  All right.

23  Q.   Do you have that document, sir?

24  A.   Yes.

25  Q.   And that document is a transcript of sorts, a rough

1    transcript, of your comments to the APA board of directors on

2    Friday, October 27, 2000 with a cover letter forwarded to you

3    for your review and correction, if needed.

4    A.    That is what it is, yes.

5             MR. JACOBSON:  At this time I offer P 10 in

6    evidence.

7             MR. KATZ:  No objection.

8             THE COURT:  Okay.  P 10 in evidence.

9    Q.    Let's look at the cover letter first.  It is addressed

10   to you and it is signed, "Fraternally, by  Captain John

11   Darrah, president of the APA?"   Right?

12   A.    Yes.

13   Q.    Addressed to you, Captain Woerth.  Could you -- oh, you

14   got it there.  All right.  Thank you.  Thanks you for coming

15   to their headquarters, right?

16   A.    Yes.

17   Q.    Thanks you for sharing your goals about the unity

18   campaign?

19   A.    Yes.

20   Q.    And that is the unity campaign that includes bringing

21   APA back into ALPA, correct?

22   A.    Yes.

23   Q.    He tells you that they, they, that is the APA, has now

24   formed an ALPA Exploratory Committee, correct?

25   A.    That's correct.

1   Q.   That is a committee that is going to explore what the

2   pluses and minuses are of APA reaffiliation with ALPA,

3   correct?

4   A.   Yeah.

5   Q.   They plan on working on that on the next three months,

6   to have that committee do its investigation.  Correct?

7   A.   That is what it says.

8   Q.   All right.  And you have apparently committed to provide

9   their committee chairman with materials and assistance and to

10  and pursues his investigation, correct?

11  A.   I believe when they were there they asked for certain

12  documents and I told them we would provide it to them, sure.

13  Q.   You did provide it to them, right?

14  A.   I would hope so.

15  Q.   Speaking of which, I have here a couple of books which I

16  just want you to identify first.  You are familiar with the

17  book, Flying the Line?

18  A.   Sure.

19  Q.   This is a history of the first 50 years of ALPA,

20  correct?

21  A.   Yes, it is.

22  Q.   It was written in cooperation with ALPA?

23  A.   I believe so, sure.

24  Q.   When it was first published it was serialized in ALPA's

25  magazine, Airline Pilot?

1    A.    Yes.

2    Q.    It is given to every new ALPA member when they join?

3    A.    Yes.

4    Q.    You delivered it to APA although you suggested they were

5    familiar with it?

6    A.    Yes.

7    Q.    They were?

8    A.    This are in it.

9    Q.    They are in it.  Then there is a second book, Flying the

10   Line, Volume 2?

11   A.    Yes.

12   Q.    And that is an additional history from the point where

13   the first one let off?

14   A.    Same author, yes.

15   Q.    Same author, full cooperation of ALPA.

16   A.    Sure.

17   Q.    Also given to new ALPA members as they come on board,

18   let them know what they are joining?

19   A.    Yes.

20   Q.    I direct your attention if I could, we are back to

21   exhibit P 10.  Page 16 of 35.

22          THE COURT:  Upper left-hand corner.

23          MR. JACOBSON: Thank you, your Honor.

24   Q.    You see near the bottom of that page there is a question

25   buy Capital Jeffrey Sheets.

1    A.    Let me look on this.

2    Q.    You see.  Captain Jeffrey Sheets asks a question?

3    A.    Yes.

4    Q.    He says, some individuals feel that ALPA would not want

5    this right now due to our legal problems and the fine.  Do

6    you see that?

7    A.    Yes.

8    Q.    And in addition to the 45 million dollars fine, wasn't

9    the APA at that time the subject of a litigation filed on

10   behalf of American airline pilots claiming that the wildcat

11   strike had injured them?  Do you recall that, sir?

12   A.    I real you don't recall.  It is probably true, but it

13   escapes me.

14   Q.    It has been a long time.  That is all right.

15             Let's turn right to the bottom of that line you

16   start off, there is a sentence that goes on to -- let's read

17   the whole paragraph there.  You told them we want you right

18   now.  Correct.

19   A.    Absolutely.

20   Q.    "I am not worried about your fine."  You told them that

21   as well?

22   A.    Yes, I did.

23   Q.    And you are probably already in some discussions on that

24   fine.  We have some concerns about the state claims.

25             That is referring to the lawsuit I was mentioning.

1          We have a plan with our attorneys to try to find a

2    way to, someone couldn't figure out what your word was, that,

3    or blunt it.  Do you see that?

4    A.   Yes.

5    Q.   You continue at the bottom, at any point in time there

6    is going to be a lawsuit everywhere.  Correct?

7    A.   That has been proven to be true.

8    Q.   Turn to the next page.  Top of the paragraph there.  In

9    fact, you were in the process of trying to bring Continental

10   on board.  You testified that already?

11   A.   Yes.

12   Q.   They had some duty of fair representation lawsuits

13   pending against their union at that time?

14   A.   Yes.

15   Q.   That wasn't stopping you with Continental?

16   A.   No.

17   Q.   And then you conclude, starting in the middle there, we

18   want you.  We will deal with the financial issues around it

19   and we will deal with the legal parameters to protect

20   ourselves, but there are ways to do so.  I am not concerned

21   about your current legal situation or your fines.  I am sure

22   we can deal with that.  Correct?

23   A.   That is what I said.

24   Q.   And that is what you told the APA board of directors as

25   you are sitting there addressing this question from the

1   American pilot?

2   A.   Yes.

3   Q.   You intended that to be a truthful statement to them?

4   A.   Sure.

5   Q.   To express your strong interest in having the APA come

6   on board?

7   A.   Absolutely.

8   Q.   And the fact that the 45 million dollars fine wasn't

9   going to be an issue because you already had the lawyers

10  working on that?

11  A.   I wanted American in my union, absolutely.  As did the

12  whole board of directors.

13  Q.   Right.  And in fact you had gotten the advice from your

14  lawyers before you went to that meeting with American

15  Airlines.  APA?

16  A.   I don't remember the exact sequence.  It wouldn't have

17  mattered.  I alwasy wanted American in my union.

18          THE COURT:  Hold it.  You told them here that you

19  had spoken to your lawyers.

20  A.   Yes.

21          THE COURT:  You were telling the truth, weren't

22  you?

23  A.   Absolutely I was telling the truth.

24          THE COURT: You had consulted with your lawyers

25  about getting around the fine issue and the other litigation

1    before you addressed the American union.

2

3    A.    That's correct.

4    Q.    That is because you wanted to know whether the fine

5    would prevent you from going forward.  Correct?

6    A.    I wanted to know the full ramifications of the issue,

7    yes.

8    Q.    And in fact your lawyers told you, you said this

9    earlier, that if there was a merger between APA and ALPA,

10   that the fine would be a problem?

11   A.    Yes.

12   Q.    You would have liability for that?

13   A.    Yes.

14   Q.    Does that help you recall that they told you also that

15   if you did a card authorization instead, that it would be a

16   problem, that is why you are telling the pilots that it is

17   not a problem?

18   A.    That doesn't refresh my recollection at all or change

19   what I call about the card.  As I said before.  I am only

20   interested in a merger.  Maybe I have tunnel vision, but that

21   is my testimony.

22        THE COURT:  Other than the card campaign, how were

23   you going to get around the 45 million dollars fine, other

24   than by the rather established route of the card campaign

25   which is a very standard union way of organizing.

 1   A.   Your Honor, probably going to do it the same way the

 2   American pilots final did, through negotiation with American

 3   Airlines to get it reduced.  That was my strategy.

 4   Q.   You didn't say anything in this statement here that

 5   don't worry, we will negotiate with the airline and get the

 6   fine reduced?

 7   A.   No.

 8   Q.   You said we talked to our lawyers?

 9   A.   Sure.

10   Q.   Okay.   The two Flying the Line books, you mentioned

11   those on page 2 of this transcript, 235, right?

12            THE COURT:  Right in the beginning.

13   Q.   In the beginning?

14   A.   All right.

15            THE COURT:  Did you see that, page 2 of 35?

16   A.   Yes, I do.

17   Q.   And you tell the American, this is the beginning of your

18   statement to the American pilots, you tell them we want to

19   get back to the core, what works for all trade unions and the

20   same thing that works for business.  You consolidate power or

21   money.  Right?

22   A.   Yes.

23   Q.   Correct, sir?

24   A.   Sounds like me.

25   Q.   And you want to get all the political power concentrated

1    in one place?

2    A.    I believe in that.

3    Q.    All right.  And in fact, ALPA, because of its charter

4    would be AFL-CIO, has -- issues important to it, has the

5    backing at that time of 13 million unionized employees?

6    A.    That's correct.

7    Q.    And one of the largest political players in Washington?

8    A.    Yes.

9    Q.    And that was an advantage you were bringing to the table

10   that the American pilot didn't have?

11   A.    I  believe that to be true.

12   Q.    You told them that as well?

13   A.    Of course I did.

14   Q.    Let's go to the beginning of next paragraph, if we

15   could.  First five or six lines.  You told the American

16   pilots one of the things you want to emphasize, what about

17   unity campaign is a real drive to try to reunite.  And that

18   is what it is, to reunite the Air Line Pilots Association.

19   Correct?

20   A.    Yes.

21   Q.    You tell them your Constitution, policy manuals, none of

22   that is written in stone?

23   A.    That is true.

24   Q.    And you are willing to change those to a reasonable

25   degree in order to get the APA on board?

1   A.   Not just APA.  We had to change it with Continental, we

2   had to change it with Fed Ex.  That was part of the

3   negotiating process, yes.

4   Q.   You are willing, if necessary, to change not just your

5   policy manuals, but your Constitution, if necessary, in order

6   to help bring about the reunification of all the pilots in

7   one union?

8   A.   Let's clarify that.  I don't change the Constitution.  I

9   was willing to advocate change to the rest of ALPA to

10  accommodate these mergers.  I would be the strong advocate if

11  I agreed it was necessary.  Absolutely I would.

12  Q.   And you understand your boards.  You know the people on

13  your boards, you work with them, you know what their goals

14  are?

15  A.   I know I had to fight for the unity campaign.

16  Q.   Let's move to page 3.  I am pulling out some of the

17  things you told them.  It is too long to share with all.

18  Replied ill paragraph on page 3 of 35.  You tell them that

19  they have a lot of talent in their organization, correct?

20  A.   Yes.

21  Q.   You want to get the most leverage from it?

22  A.   Of course.

23  Q.   And that you are offering to have them, you are saying

24  if you join us, then you can leverage us in your fights with

25  American?

 1   A.    Sure.

 2   Q.    And not only that, they can leverage the 70 to 90,000

 3   pilots that ALPA has or will have?

 4   A.    Sure.

 5   Q.    And the 14 million members, I said 13 million earlier,

 6   of the AFL-CIO?

 7   A.    Right.

 8   Q.    There is a concept in your union called Independence

 9   Plus, right?

10   A.    Yes.

11   Q.    And if I understand the concept correctly, correct me if

12   I am wrong, Independence Plus means that the local MEC is the

13   one that is supposed to be making the decisions on behalf of

14   the pilots in that MEC.  And as long as they don't try, for

15   example, to bring in a B rate wage or do something else that

16   s, totally against, anathema, to the main purposes of ALPA

17   has, they have free rein to do that.

18   A.    That is, that captures it pretty closely, yeah.

19   Q.    For example, when the American Eagle pilots came to ALPA

20   and they wanted to have all the different companies under

21   AMR, that together were branded as American Eagle, and

22   American said you can have that, but you got to give us a 16-

23   year contract, you recommended against it, it was ultimately

24   their choice on whether to do that?

25   A.    That was Captain Babbitt, but I agreed with Captain

1    Babbitt, it was their choice and that is what happened, then.

2    Q.    You were the vice president, then, number 2 guy?

3    A.    Right.

4    Q.    And do you believe that the Independence Plus theory is

5    consistent with putting a great deal of pressure on the MEC

6    to make a decision to, the way ALPA National wants them to do

7    it?

8    A.    I feel it was actually maybe the other way around.  The

9    point of Independence Plus is pilots will not accept anything

10   else.  It is like the pilots believe an argument had to be

11   staged right to the federal system, but they wanted their

12   independence to make decisions as much as they could by

13   themselves.  They understood the benefit of a collective

14   union,pooling the money, pooling political power, when it

15   came to their contract, their life, their seniority, that was

16   their state right.  That is how we survived as a union for

17   now nearly 80 years.  Because that is how pilots beleive.

18   They believe in collectivism until it gets to the door step,

19   until it is all about them.  I agree with that.

20   Q.    I think you are agreeing with me that Independence Plus,

21   that principle would be violated if, for example, the

22   national union could put huge pressure on MEC to decide

23   something in a way contrary to what the pilots in that MEC

24   want.

25   A.    I think you are characterizing that in a way I would not

1    agree with, sir.  I think our union and advisors give their

2    best advice, and if somebody doesn't like that advice,

3    sometimes they call it pressure because they are not hearing

4    what they want to hear.

5           But I believe arguing that all advisors give their

6    best advice, whether people like it or whether they accept it

7    or not, they are always going to get their best advice.  That

8    what is we do.

9    Q.   All right.  And again, I don't know if you have answered

10   my question directly, sir.  Would you, I understand the

11   notion of giving advice and letting the pilots decide for

12   themselves.  But do you agree that if the pressure is put

13   upon the pilots to such an extent that it overwhelms their

14   will so that they are acting, they vote in a way they are

15   directed to by ALPA rather than have they been directed to by

16   their pilots, that would be contrary to the Independence Plus

17   that ALPA prides itself on?

18   A.   That is a theoretical question I have never seen happen

19   in 30 years of union business.

20   Q.   Have you heard about the testimony about what happened

21   April 2, 2001 here, when the ALPA employee advisors persuaded

22   the MEC members to vote in favor of waiver of scope.  Have

23   you heard did about that, sir?

24   A.   I have heard a lot about that testimony, yes.

25   Q.   And would it be fair to characterize what the TWA pilots

1    who were members of the MEC at the time, that they all said

2    they were put under such pressure that it overwhelmed their

3    independent view of what they wanted to do, what their pilots

4    who they were representing had told them to do?

5    A.   I have heard that and I found it absolutely astounding,

6    to hear that.

7    Q.   Now, you may not believe that, sir, correct?

8    A.   I don't believe it for a second.

9    Q.   Whether or not you believe that sir, would you agree

10   that if that happened, if that happened, as described by the

11   TWA pilots, that that would be contrary to your view of

12   Independence Plus?

13   A.   I don't see its correlation.  They had, our Constitution

14   sets up our relationships with Independence Plus.  Our

15   Constitution wouldn't change because of a pressure situation.

16   Our Constitution would survive afterwards.  I don't see the

17   correlation.

18   Q.   Let me rephrase it.  I must have phrased the question

19   improperly.  Would you agree that if what the TWA pilots

20   described as being what happened to them, at the hands of the

21   ALPA employees and ALPA advisors on April 2, if that were in

22   fact an accurate description of what happened, that that

23   conduct by the ALPA advisors and the ALPA retained -- the

24   ALPA employees, would in fact violate ALPA's constitutional

25   set up of Independence Plus.

1          MR. KATZ:  Your Honor, I rise to object.  I don't

2    think there is any foundation that the witness news all of

3    the testimony by the TWA -- by the plaintiffs.

4          THE COURT:  I don't know if he knows all the

5    testimony but he already said he knows a lot about what went

6    on April 2.  He just gave an answer that said that.

7          MR. KATZ:  I think counsel is just arguing with the

8    witness at this point.  I  object.

9          THE COURT:  I will not stop him now.  Ask the

10   question again.  Get an answer, let's go on.

11   Q.    My question is simple, sir.  Based on what you have

12   heard, the reports you have heard of what the TWA MEC members

13   and the other TWA pilots present there April 2, 2001, what

14   they describe as the pressure brought on them, by the ALPA

15   employees, and advisors retained by ALPA, would you agree

16   that if the description, if true, I know you don't believe it

17   is true, that that would be contrary to ALPA's Constitution

18   provisions relating to Independence Plus?

19   A.    First of all, I would like to correct, your Honor, that

20   I have heard a lot about the testimony and also heard it

21   immediately after April 2.  What I heard about the events

22   after April 2 do not reflect what I am hearing --

23          THE COURT:  No.  He understands you don't agree

24   that is what happened.  His question was if it did happen

25   that way, would it be a violation of the Independence Plus

1    provisions of the ALPA Constitution.  He is not asking you to

2    agree that it happened.  He is only asking you that if it did

3    happen that way, would it violate the Constitution.  Do I

4    have that right?

5              MR. JACOBSON: Yes, your Honor.

6              THE COURT: He is not asking you to agree with it.

7    A.   I understand.  I don't think it would violate our

8    Constitution.  I think it would be bad professional conduct

9    and I wouldn't appreciate it, but I don't know about a

10   constitutional violation.

11   Q.   I understand.  Turn to page 4.  About the fourth line

12   down.  There are, the next three lines.  Do you see, fourth

13   line down, your statements to the Allied Pilots say, talking

14   about members of your MEC's.  Quote.  They make all the

15   decisions on their own property.  Nobody tells them what to

16   put in their opener, what to take off the table.  Close

17   quote.  Do you see that?

18   A.   Yes.

19   Q.   Are you aware that according to the TWA MEC's

20   negotiating committee, merger committee, thank you, merger

21   committee, that they were directed by ALPA employees who came

22   to the first negotiation session with the APA, that they

23   would need to offer to staple some 800 plus TWA pilots, in

24   their opening offer.

25             MR. KATZ:  Objection, it is contrary to the record.

```
 1              THE COURT:  I am not sure.  I am going to let the
 2    question go.
 3    Q.   In their offer in order to be able to get a deal done
 4    with the American pilots?
 5    A.   I am unaware of that.
 6              THE COURT:  Next question.
 7    Q.   If the jury were to find that the ALPA employees in fact
 8    told the merger committee what to put in their opening offer,
 9    that would be contrary to what you are telling me the
10    American pilots here?
11    A.   I don't believe anybody would tell them what, they might
12    advise them what they thought would help, if they thought
13    there was a limited timeframe.  But I don't think any ALPA
14    employee every  thought they could direct any pilot to do
15    anything.  Any pilot, any airline.
16    Q.   Could you agree for an ALPA employee or adviser to do
17    that, to direct the merger committee or any other body of the
18    MEC, what to do, what to put in their offer, that that would
19    be the kind of arbitrary conduct that you would not permit in
20    your union?
21    A.   I would agree with that.
22    Q.   All right.
23    Q.   Now, one of the things that you told the American pilots
24    and I think it is reflected throughout your literature is
25    about the political power that ALPA has in Washington, D.C.
```

Woerth-cross/Jacobson                                            191

1    Do you agree ALPA has political power?

2    A.   I do agree with that.

3    Q.   Is that one of the selling points ALPA presents to the

4    pilots and pilot groups who are considering coming to ALPA??

5    A.   I am sure it is.

6    Q.   You yourself extoll it in your communications, correct?

7    A.   Absolutely I do.

8    Q.   When you talk to the Continental pilots you told them,

9    you know, you are better off with us representing your

10   interests in Washington, D.C.?

11   A.   Of course.

12   Q.   Said the same thing to the American pilots, right?

13   A.   Absolutely.

14   Q.   Same thing to Fed Ex pilots?

15   A.   Sure.

16   Q.   Every time  you talk to the pilot group one of the

17   things you extoll is the fact that ALPA has strong political

18   range?

19   A.   Sure.

20   Q.   You brag short of the President and Vice President on

21   something that is important, you get a meeting on that issue

22   with someone in government the same day?

23   A.   You have to refresh me what we are talking about.

24   Q.   If there is a political issue of concern to ALPA, if you

25   want a meeting with somebody, short of the President or Vice

1   President, you don't advertise an ability to get to them.

2   A.   Right.

3   Q.   You can get to a meeting with someone you need to that

4   day?

5   A.   That is generally true.

6           THE COURT:   The question is not only is it

7   generally true, but that you extoll that when you are

8   speaking.

9   A.   I do.   It is generally true.   I say it all the time.

10  Q.   And in fact, when ALPA was being formed, the decision

11  that the founders made was before we have a power to start

12  doing collective bargaining, let's work on power in

13  Washington, D.C. to get the laws we want that protected our

14  interest, and that was the focus?

15  A.   The focus for the whole profession, mostly safety,

16  that's correct.

17  Q.   All right.   And in fact, no, those legislation efforts

18  were referred to as being so special interest legislation

19  back then.   Special, for the special benefit of pilots?

20  A.   And the public, flying public was benefiting by a safe

21  system.

22  Q.   Correct.   And you don't have any problem personally with

23  the notion of pilots pursuing special interest litigation to

24  benefit pilots?

25  A.   No.

1    Q.    That is part of what you do?

2    A.    Part of the whole profession, absolutely.

3    Q.    That is part of your strength, to get the special

4    interest litigation that your constituents need?

5    A.    Yes.

6              MR. JACOBSON: I am trying to skip over things.

7              THE COURT:  I am not bothering you.

8              MR. JACOBSON: I know.  We all have places to go

9    here, your Honor.

10   Q.    Do you know a man named John Clark?

11   A.    Yes.

12   Q.    How do you know Mr. Clark?

13   A.    Mr. Clark used to be on the board of APA board, and he

14   was an extremely interested person in APA joining the Air

15   Line Pilots Association.

16   Q.    All right.  In fact, he was the person who filed the

17   motion for the -- for APA's ALPA Exploratory Committee?

18   A.    Probably so.

19   Q.    All right.  And he was the person who took the lead in

20   collecting the vote authorization cards?

21   A.    He did it on his own volition for his own campaign.

22   ALPA had nothing to do with what he was doing, but he did do

23   that, as I understand.

24   Q.    Okay.  So the answer is yes, he is the person who helped

25   lead the authorization card campaign to bring ALPA on to the

1    property at American Airlines?

2    A.    Within American.   American campaign.

3    Q.    I understand.   The answer is yes, that is the person,

4    John Clark?

5    A.    That is the person.

6    Q.    And in fact you met Mr. Clark in Las Vegas, Nevada, at

7    the AFL-CIO convention?

8    A.    I did.

9    Q.    At that point he delivered a large quantity of

10   authorization cards to you and Mr. Mugerditchian?

11   A.    Delivered a package.   I have no idea how many cards were

12   in there busy didn't care but he give us some cards.   He gave

13   them to Mugerditchian, yes.

14   Q.    Over a thousand cards, right?

15   A.    I haven't a clue how many cards were there.

16   Q.    And a disk with the index of all the cards, database of

17   the cards, correct?

18   A.    I don't know anything about that.

19          THE COURT:   Nobody opened the envelope, you just

20   burned it.

21   A.    I, we had lunch, your Honor.   At that luncheon meeting.

22   He had it in a suitcase.   I had to leave.   I said leave

23   whatever you have with Mr. Mugerditchian, but I was also

24   clear, thank you for your interest but I was not going to do

25   a card campaign.   He left the meeting highly disappointed

```
 1    that we had nothing to discuss hear.  Thank you for are

 2    efforts.  I know you love ALPA, but sorry, we can't help you.

 3    Q.   So does the fact that Mr. John Clark, a member of the

 4    board of directors of APA, is collecting these authorization

 5    cards for you,  does that in any way refresh your

 6    recollection  --

 7              MR. KATZ:  I object to that question.  That

 8    misrepresents the record.

 9              THE COURT:  At that time words "for you" out.

10              MR. JACOBSON: I am sorry.

11              MR. KATZ:  ALPA, he was not a member of the board

12    when he was doing his card campaign.

13              THE COURT:  That I don't know.

14              MR. KATZ:  We saw his testimony on video.  Amended

15    on May 1st.

16              THE COURT:  He was conducting a card campaign.

17    Let's do that.  He was an APA pilot, at least at one time he

18    had been on the APA board.

19              MR. JACOBSON:  I will try rephrasing it, your

20    Honor.

21    Q.   Do you recall Mr. John Clark who was an APA pilot who

22    had been on the board of directors of APA at the time you

23    came to speak to them in October of 2000?

24    A.   Yes.

25    Q.   And you understood that he was the individual who had
```

```
 1    moved the motion for the ALPA Exploratory Committee, correct?

 2    A.   Yes.

 3    Q.   All right.  And you understood that he left his seat on

 4    the APA board, and  began on his own collecting authorization

 5    cards to have the American property join ALPA?

 6    A.   Absolutely, that is what I understood he did.

 7    Q.   And he brought these cards to you and Mr. Mugerditchian

 8    in Las Vegas, Nevada?

 9    A.   Yes.

10         THE COURT:  Do you know where he got the blank

11    cards, before anybody signed them, do you know where he got

12    them?

13    A.   I don't, I have no idea.

14         THE COURT:  You don't know.  Okay.

15    Q.   You don't know whether or not they came from ALPA?

16    A.   I never looked at the cards.  I wasn't interested in the

17    cards.

18         THE COURT:  But that is not the question.  The

19    question is, that I asked is do you know where they came

20    from.  That is a lot of cards.

21         MR. JACOBSON: That is a lot of cards.

22    A.   No, I do not, your Honor.

23         THE COURT: All right.  That is all.

24    Q.   And had you had any conversations with anyone within

25    ALPA about the fact that Mr. Clark had left the ALPA, excuse
```

1    me, the APA board, so that it wouldn't be a direct APA board

2    working on the authorization card campaign?

3    A.   I never discussed Clark's politics on board with anyone.

4            THE COURT:  No.  The question more precisely, do

5    you know why he left the board.

6            THE WITNESS:  No, I do not.

7    Q.   You didn't discuss whether he left the board for

8    purposes of collecting the cards?

9    A.   I have no idea why he left the board.

10           THE COURT:  Okay.

11   Q.   Do you know a man named Mark Hunnibell?

12   A.   Yes.

13   Q.   How do you know Mr. Hunnibell?

14   A.   I was, I would say, a colleague of Mr. Clark and other

15   ALPA enthusiast who wanted APA to join ALPA.

16           THE COURT:  He is an American pilot.

17           THE WITNESS:  Correct.

18           THE COURT:  As Clark  was.

19   A.   Yes, your Honor..

20   Q.   And in your, I think we are getting pretty close to the

21   time?

22           THE COURT:  Six minutes.

23           MR. JACOBSON: I am trying to end at a reasonable

24   point not to keep them over.

25           THE COURT:  Go ahead.

1   Q.   Did you tell the American pilots that you thought that

2   as an administrative process, their integration, this is back

3   at that October meeting at the board of directors, that as an

4   administrative process integrating APA into ALPA would be

5   very, very simple?

6   A.   I described the methodology where we were doing with

7   Continental and what I anticipated with Fed Ex, and that was

8   my anticipation, we would use the same process and I

9   understood it and I didn't think it to be that complex.

10  Q.   In fact you described it as sort of a turnkey operation,

11  simply chain the sign on the door to MEC, essentially the

12  same, their employees would now be employed by ALPA, being

13  the same employees doing the same work, correct?

14  A.   I think what you are characterizing is they are going to

15  keep their independence, after the vote was done, they would

16  be ALPA, the dues structure would change, but in the end how

17  they operated every day in Dallas the way Delta operated in

18  Atlanta would not change.  Yes.

19  Q.   Okay.

20  Q.   Let me direct your attention if I could to page 31 of

21  35.  You see that you are responding to a question from

22  captain Jeffrey Sheets down there at the bottom.  Sheets

23  tells you that, my question is premature because we haven't

24  even yet named our guys to the ALPA Exploratory Committee,

25  but if we were to pursue this, would it be a board decision

Woerth-cross/Jacobson                                          199

1    or a membership vote?  Do you know how this proceeds at this

2    point?  Did you see that question?

3    A.    Yes.

4    Q.    All right.  And you told him that, on their side, that

5    is totally a matter for APA, how they want to do it, correct?

6    A.    Correct.

7    Q.    Looking a little lower you say, "What we have decided,"

8    and so the work committed to this process, and we had our

9    board of directors to do it on the ALPA side, so we are

10   already committed to doing it, so that I am putting the ball

11   in your court.  Do you see that?

12   A.    Yes.

13   Q.    And continuing on that paragraph, this is the top third

14   of that.  All we have to do, and we being ALPA, correct?

15   A.    Yes.

16   Q.    Is agree with 13 guys around the table, the executive

17   council and financial terms, and have the executive board

18   which is the master chairman, that is 55 guys.  We are

19   already going to say yes.  They have already unanimously

20   supported it.  Do you see that?

21   A.    Yes.

22   Q.    What you are telling the American pilots here and you

23   are trying to be honest about it is is your executive council

24   and your executive board have already unanimously approved

25   the notion of having the APA come on board?

 1   A.   What I am telling them, they already know the pilots the

 2   union, the highest governing body said to go out and pursue

 3   things by merger.  I think they already knew this but I am

 4   pretty enthusiastic about trying to get them to tell them to

 5   do it, yes.

 6   Q.   You tell them they are not going to get a document sent

 7   out to 58,000 pilots to vote on, correct?

 8   A.   Absolutely not.

 9   Q.   All right.  Now you said the technical question was

10   raised out there.  See that?  About Six, seven lines down.

11   You say, a technical question was raised out there.  There is

12   another way to do  things, and that is just to run cards at

13   the National Mediation Board.  Unless there is an overriding

14   reason that might be a legal reason, that might be a devoid a

15   state claim or something, that would only be done with

16   concurrence.  In other words, I am not going to raid anybody.

17   Do you see that?

18   A.   Yes.

19   Q.   Aren't you telling them there that you are willing to do

20   a card, authorization card program, through the National

21   Mediation Board, that is the way to do it but you are not

22   going to raid them.

23   A.   I am telling them I am not going to raid them, but also

24   I am not going to do a card campaign.  I didn't mention some

25   caveat about a state claim.  I said what I said.

Woerth-cross/Jacobson                                             201

 1   Q.   Didn't you just tell them here that another way to do

 2   this is to just run cards at the National Mediation Board?

 3   A.   I don't view that as giving them a strategy.  I told

 4   them what I wanted to do.  I was addressing probably a legal

 5   concern they had with state claims.

 6            MR. JACOBSON: Your Honor, it is two minutes of two.

 7   I would be moving on to another document.

 8            THE COURT:  Is this a convenient time for you, too?

 9            MR. JACOBSON: Yes.

10            MR. KATZ:  Your Honor, if there is any way to

11   finish the witness up today, we would certainly like to do

12   that.

13            MR. JACOBSON: There is no way.

14            THE COURT:  My sense is we got an hour or more.

15   Maybe two hours.

16            MR. JACOBSON something in that range.

17            THE COURT:  I am, just guessing.  Captain Woerth

18   has to return tomorrow.  Tuesday.  So we got 200 pages of

19   transcript today.  I know the jury remembers every word of

20   it.  They can probably recite it back to me.  But it has been

21   a long, hard day.  So I am going to adjourn for the day.  And

22   we will finish the cross examination and then the redirect

23   examination and then redirect of Captain Woerth tomorrow

24   morning, starting at 8:30.

25            Ladies and gentlemen, do not discuss the case among

```
 1    yourselves.  Keep an open mind.  Do not discuss the case with

 2    your family, friends, loved ones, bus drivers, anybody.  Keep

 3    an open mind until you have heard all the evidence.  Have a

 4    safe trip home and a safe trip in tomorrow.

 5              (Jury leaves the courtroom)

 6              THE COURT:  Okay.  Everybody.

 7              MR. KATZ:  Can I put something on the record, your

 8    Honor.

 9              THE COURT:  Yes.

10              THE COURT:  You can remain standing, Mr. Katz.

11              MR. KATZ:  Thank you.

12              THE COURT:  Okay.

13              MR. KATZ:  I want to correct the record about the

14    jumpseat policy.  It was attachment 48.

15              THE COURT:  Say that again.

16              MR. KATZ:  Attachment 48.

17              THE COURT:  48.

18              MR. KATZ:  48 to our opening brief on summary

19    judgment which was filed on March 12, 2009.  I had said

20    earlier it was attached to the reply brief.  It was not.  It

21    was attached to the opening brief that was filed in court on

22    March 12, 2009.

23              THE COURT:  And it was attachment 48.

24              MR. KATZ:  Yes, sir.

25              THE COURT:  Okay.
```

 1              MR. KATZ:  All right.

 2              THE COURT:  I am going to have one of my law clerks

 3    hit the computer because we have electronic filing.

 4              MR. KATZ:  Yes, sir.

 5              MR. PRESS:   Your Honor, I can tell you.

 6              THE COURT:  Even if if I couldn't find it on my

 7    desk, I will find it.

 8              MR. KATZ:  It will show up.

 9              THE COURT:  It will be in the computer.

10              MR. PRESS:  We can save your clerk the effort.  I

11    can confirm what Mr. Katz said is true.

12              THE COURT:  Oh, you will definitely save me the

13    effort.  Then the condition I put on the admission of the

14    document has been satisfied.  And so it is now in without

15    condition.

16              MR. KATZ:  Thank you, Judge Irenas.

17              THE COURT:  Thank you both.  I will see you

18    tomorrow.  Who is the next witness, by the way, after the

19    captain?

20              MR. KATZ:  Steve Rautenberg.

21              THE COURT:  All right.  See you tomorrow.

22              (Adjourned at 2:05 p.m.)

23

24

25

1

2                        I N D E X.

3

4          DUANE WOERTH, SWORN.

5              DIRECT EXAMINATION              P. 3.

6              CROSS EXAMINATION               P. 155

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25