```
 1                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                              Plaintiffs,
 6                                                VOLUME 12
                 V.                               TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                              Defendant.
 9
                                          CAMDEN, NEW JERSEY
10                                        JUNE  28, 2011

11        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                       A P P E A R A N C E S:
13
             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D. JACOBSON, ESQ.  (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:  STEVEN FRAM, ESQ.
19                AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH  GINSBURG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
   Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
   above-entitled proceedings.
3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                    LYNNE JOHNSON, CSR, CM, CRR
18                  OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
19                  P.O. BOX 6822
                    LAWRENCEVILLE, NJ  08648
20

21

22

23

24

25

1            DUANE WOERTH, previously sworn, resumes.

2            CONTINUED CROSS EXAMINATION.

3            BY MR. JACOBSON:

4            (The jury enters the courtroom.)

5            THE COURT:  Good morning, everybody.  Please be

6    seated.

7            THE COURT:  Mr. Jacobson, I recognize you to

8    continue your cross examination.

9            MR. JACOBSON: Thank you, your Honor.

10   Q.   Mr. Woerth, at ALPA's offics, among the 500 employees,

11   approximately, you have working for the union there is a

12   group devoted to communications.  Correct?

13   A.   Yes.

14   Q.   And they maintain, among other things, a website for

15   you?

16   A.   Yes.

17   Q.   And they help issue press releases that are issued out

18   to the public?

19   A.   Of course.

20   Q.   All right.  And the press releases in fact are recorded

21   on the website so nine who wants to can go back and see the

22   press releases you have issued over the years at least back

23   as far as the year 2000.  Correct?

24   A.   I would hope so.

25   Q.   And the intent of these press releases is to be

1    accurate, correct?

2    A.   Of course.

3    Q.   Truthful?

4    A.   Yes.

5    Q.   And you are frequently quoted in press release /-S from

6    the time that were issued during the time when you were

7    present.  Correct?

8    A.   I am sure I was.

9    Q.   And when you are quoted you want to make sure that the

10   quotes accurately reflect what you say?

11   A.   Sure.

12   Q.   All right.  Now, there has been testimony in this case

13   about what is called a called 1113 motion in bankruptcy

14   court.  Are you familiar with that, sir?

15   A.   Yes.

16   Q.   And 1113 motion is a motion filed under a particular

17   section of the Bankruptcy Code that deals with collective

18   bargaining agreements?

19   A.   That's correct.

20   Q.   All right.  And prior to 1113 being enacted, collective

21   bargaining agreements were treated like every other contract,

22   abrupt company might wish to get out of, correct?

23   A.   Yes.

24   Q.   And there was a very bad experience that pilots and

25   other unions had at the hands of Frank Lorenzo at Continental

  1    Airways, correct?

  2    A.   Yes.

  3    Q.   As a result you together with the AFL- CI O went to

  4    Congress and you got the 1113?

  5    A.   Actually that was President Duffy in the eighties but

  6    the union did, that's right.

  7    Q.   ALPA got the 1113 as additional protection for pilots

  8    and other union employees who had collective bargaining

  9    agreements?

 10    A.   That was our goal.

 11    Q.   All right.  Now, you know that in this case, a 1113 had

 12    been filed by TWA to try to abrogate the TWA pilots'

 13    contract, their collective bargaining agreement?

 14    A.   Yes.

 15    Q.   All right.  Now, isn't it a fact that as late as April

 16    10 of 2006, while you were still president of APA, that no

 17    bankruptcy court had ever abrogated a Railway Labor Act

 18    collective bargaining agreement.

 19          MR. KATZ:  I am going to object, your Honor.  It is

 20    irrelevant.  Anything that happened in 2006 is irrelevant to

 21    the facts of this case, as well, there is no foundation for

 22    this witness to be an expert on the legal aspects of 1113.

 23          THE COURT:  Well, I don't know you have to be a

 24    legal expert to answer the question but I think you are

 25    correct.  What happened in 2003, 4, 5 and 6 is really

 1  irrelevant.

 2              MR. JACOBSON: Your Honor, it is relevant to what

 3  the state of mind of ALPA's advisors are in 2001.

 4              THE COURT:  The state of mind in 2001 couldn't be

 5  influenced by what happened in 2004.

 6              MR. KATZ:  Precisely.

 7              MR. JACOBSON: But it could be influential if it

 8  never happened until 2006.

 9              THE COURT:  Why don't you ask the question, up to

10  April 6 of 2001.

11              MR. JACOBSON: All right.

12  Q.   As of April 6 of 2001, isn't it a fact that no 1113

13  motion filed to set aside or abrogate any collective

14  bargaining agreement under the Railway Labor Act had ever

15  been granted by a bankruptcy court?

16  A.   That may be true.  I don't know.  But there was almost

17  no bankruptcies, so I doubt if there were many opportunities

18  for it to be tested.

19  Q.   You don't know.

20  A.   I don't know.

21  Q.   You don't recall as of that date whether or not any had

22  ever been abrogated?

23  A.   I am going, I probably think there were not.  I think

24  there was only a couple of bankruptcies between the mid

25  eighties and 2001.  There were very few bankruptcies in the

 1    nineties, if any.  You are probably right but I do not know.

 2    Q.   Let me give you something which may refresh your

 3    recollection as to whether or not this is true, the statement

 4    I made to you.  I am marking this document as plaintiff's

 5    exhibit 441?   Do you have that document?

 6    A.   Yes.

 7    Q.   This is a press release issued by the union you headed

 8    at that time?

 9    A.   From April 10, 2006.

10    Q.   Correct.

11    A.   Yes.

12    Q.   And this is the press release from ALPA news?

13         MR. KATZ:  I object to any questioning using this

14    document for the same reasons.

15         THE COURT:  No, I am going to allow this.  Go

16    ahead.  First of all, are you offering it or not.

17         MR. JACOBSON: Not yet.  I haven't got him to

18    identify it.  He is the president at the time.  I want to

19    make sure he can identify items that look like his press

20    releases.

21    A.   This looks like a press release from ALPA.  I was

22    certainly president at the time.

23    Q.   Do you see the bottom, the url showing from the website

24    ALPA dot org?

25    A.   Yes.

1   Q.   That is the website for the union you headed?

2   A.   Yes.

3   Q.   Second-to-last paragraph, the one above the history of

4   ALPA paragraph?

5   A.   The second to last?

6   Q.   Yes, sir.

7   A.   Yes.

8   Q.   Read that?

9   A.   Since the adoption of Section 1113 legislation no

10  contract governed by the Railway Labor Act has been rejected

11  through bankruptcy.

12  Q.   Does that refresh your recollection that as of April 2,

13  or April 6 of 2001, that no Railway Labor Act contract had

14  been abrogated under Section 1113?

15  A.   I am hoping this is true because I said it so that must

16  have been right when the communications and legal guys

17  drafted it up so I am assuming that is right.

18  Q.   Thank you.

19       MR. JACOBSON: I would like to offer 441 in

20  evidence.

21       MR. KATZ:  I object.  Something from 2006 is

22  irrelevant, your Honor.  He can use it to try to refresh the

23  witness's recollection but I don't think it is admissible as

24  an exhibit in the case under Rule 803(5).

25       THE COURT:  I am going to let it in.

1              THE COURT:  It is an official document issued by

2     ALPA the defendant makes a statement, a very affirmative

3     factual statement concerning 1113.  I am going to let it in.

4              MR. JACOBSON: Thank you, your Honor.

5     Q.   Mr. Woerth, if you look at the first paragraph of this

6     press release, it is regarding a potential strike with the

7     Delta pilots.

8     A.   Yes.

9     Q.   And it states that ALPA has given final approval for a

10    $10 million grant from the major contingency fund to help

11    fund that strike if it should happen?

12    A.   Yes.

13    Q.   All right.  Thank you.

14    Q.   Now, we have talked a lot about the major contingency

15    fund and I want to ask you, is it a fact that the major

16    contingency fund is something that was established in roughly

17    1986 by ALPA.

18    A.   I think the, I think in '85 or '86, after the United

19    strike, yes.

20    Q.   And it was because of the United strike and the need to

21    be able to bring resources to bear in advance of an action

22    that you developed this particular fund, correct?

23    A.   Strikes are very expensive proposition.

24    Q.   And it is used not just for strikes.  It was also used

25    to help support contract negotiations that are extensive in

1  length?

2  A.   That is not an accurate statement.

3  Q.   That is not an accurate statement?

4  A.   The purposes of the major contingency fund cannot be

5  used for normal operations, and contract negotiations are

6  normal operations.  For just negotiating the contract you

7  don't get an MCF account.

8  Q.   If it is a contract that extends over an extended period

9  and goes into NMB mediation and the rest of it, isn't it a

10 fact that ALPA does give major contingency fund financing to

11 those type of negotiations?

12 A.   As we already testified and you asked me for special

13 projects relating to strike preparations, not negotiations.

14 If they are going to prepare for a strike they will probably

15 be granted an MCF.  It has to be a grant related to a strike.

16 Not normal contract negotiations or merger.

17 Q.   All right.  I understand your answer.

18 Q.   Now, with 1113 hearing, you had to go through a few of

19 those as president of ALPA in the 1990s -- in the 2000s,

20 correct?

21 A.   Well, the union did.  I never participated in any Court

22 proceeding.

23 Q.   You never participated in a court proceeding?

24 A.   Not for 1113.

25 Q.   Are you familiar with the process or not?

1    A.   From my vantage point of the president of a union but

2    not as an attorney.

3    Q.   From your vantage point as the president of the union,

4    do you understand that the date that is set for the hearing

5    is the date that everything happens, or that in fact you have

6    extended hearings where you present evidence over the course

7    sometimes of weeks or months?

8    A.   My understanding of the Court, it is in the hands of the

9    a Judge.  A lot things can happen when the Judge wants them

10   to happen.

11   Q.   You participated in the Mesaba 1113 motions and

12   arguments?

13   A.   I was never in a court, know.

14   Q.   You were outside the Court, you made speeches about it,

15   didn't you, sir?

16   A.   I made speeches to my pilots and to the press to

17   encourage the right outcome in the media.  In the community.

18   Q.   And the hearing took months, didn't it?

19   A.   Yes.

20   Q.   From the time it started until the time there was a

21   final decision?

22   A.   I sbelieve it did.

23   Q.   So it is not simply, for example, in the TWA case, April

24   6 is the date that the motion is joined, and you have to be

25   done by then because the Court will decide on that day?

1    A.   It seems like everything depends on the circumstances,

2    and the Judge.

3    Q.   All right.  That is a fair statement.

4         Now, in this particular situation, the TWA

5    situation, ALPA pledged to the TWA pilots its moral support,

6    and such financial resources as maybe reasonable under

7    various things, correct.

8    A.   I think the language says as was necessary.

9    Q.   As was necessary.  There are higher degrees of support

10   that ALPA gives to MECs and, from time to time, isn't there?

11   A.   I didn't hear your question.

12   Q.   I am sorry.  There are higher degrees of support,

13   support beyond simply moral support that ALPA gives to its

14   member units when needed?

15   A.   We meet the requests, we make evaluation upon requests

16   besides the normal budgets and evaluate them, sometimes they

17   are more, sometimes they are less.

18   Q.   All right.  In fact sometimes ALPA will pledge, quote,

19   all its resources, close quote, to an MEC that is facing a

20   situation.  Isn't that right?

21   A.   I don't think that happened under my watch.  I am sure

22   it happened sometimes.

23   Q.   But you were president of ALPA until when?

24   A.   2006.

25   Q.   What month, what year?

1    A.    December, 2006.

2    Q.    December, 2006.  I am going to give you a document I

3    have marked as exhibit 442.  This is another press release

4    from ALPA?

5              MR. KATZ:  Your Honor, I am going to object to any

6    questioning about this document.  It is July, 2006.  It

7    relates to event that occurred long after the events in this

8    case.

9              THE COURT:  Let me look at it.

10             MR. JACOBSON: Your Honor, I direct your attention

11   to the fifth paragraph in particular.

12             THE COURT:  What is this being offered for?

13             MR. JACOBSON: Your Honor, he just stated that he

14   had never pledged all its resources to a unit during the time

15   he was president and here they are pledge go all their

16   resources to the Mesaba pilots while he is present.

17             THE COURT:  You can question on that.

18   Q.    Mr. Woerth, I direct your attention to the fifth

19   paragraph of this letter.  Of the press release, excuse me?

20   A.    Yes.

21   Q.    This is a press release issued at the time you are

22   president?

23   A.    Yes.

24   Q.    Your six months  from the end of your term at this

25   point?

1    A.    Yes.

2    Q.    And what does the first line of paragraph 5 say?

3    A.    This line is not a pledge from ALPA, it is not a pledge

4    from a governing body.  It is not a statement.  It is, it is

5    not a resolution.  It is a press release that says, I will

6    read what it says, it has no governing body authority.  The

7    press release says ALPA's national leadership has pledged all

8    of its resources to support the Mesaba pilots in this

9    dispute.  But it is not backed up by a single resolution or

10   anything of authority of ALPA.

11   Q.    Did ALPA pass a resolution to that effect?

12   A.    No, it did not.

13   Q.    You are telling?

14   A.    The words all, we never passed a resolution with the

15   word all.

16   Q.    You have never passed a resolution saying all of your

17   resources?

18   A.    I am not aware of one.  I don't remember one.

19   Q.    All right.  Now, in the Mesaba case, was ALPA willing to

20   shut the airline down and all the jobs if they weren't able

21   to get a contract that would be acceptable to the union?

22            MR. KATZ:  Objection, your Honor.  The Mesaba case

23   is not what this lawsuit is about.  The present lawsuit is

24   about the TWA case.

25            THE COURT:  The Mesaba case, even according do the

1    press release, had tons of money.  They were subrogated to a

2    parent company.  TWA had no money.  It certainly was not in a

3    position to upstream anything to anybody.  This to me looks

4    like a different kettle of fish.  I let the you ask the

5    question on pledging all the resources.  But to start getting

6    into the facts of this bankruptcy that took place five years

7    later, and clearly is a different set of facts.  I am not

8    going to allow that.

9              MR. JACOBSON: Your Honor, may I approach sidebar on

10   this for a second?

11             THE COURT:  Sure.

12             (At sidebar)

13

14             MR. JACOBSON: Your Honor, the purpose of this --

15   you want the noise on?

16             THE COURT:  What?

17             THE COURT:  We have a white noise button.

18             MR. JACOBSON: Your Honor, the defendants in their

19   defense state that there are limits on their ability to apply

20   pressure in this case because of the fear that it would

21   somehow cause TWA to liquidate or be closed down or something

22   along those lines.  And what I would like to show on part of

23   my cross examination of this witness is that when an issue

24   deals with something that ALPA considers to be a fundamental

25   issue of the type of the contracts and rights to protect

```
 1   their pilots, they are in fact willing to, in the words of

 2   one ALPA present president, burn the airline down to get it.

 3           They did that with Eastern Airlines and they were

 4   going to do it with Mesaba I want to show that that is the

 5   kind of leverage and press that a tough union brings to the

 6   table when they need to.

 7           THE COURT:  Well, I don't, this is a 2006 event.

 8   The company is totally different, by their own press

 9   releases, apparently the charge here was they up streamed

10   tons of money so the notion that the airline, or its intent,

11   this to me is confusing to the jury.  When they come out,

12   about strikes generally, or policy before 2001, Eastern

13   occurred before 2001  Not the Mesaba.  That is a Mesaba

14   situation, it occurred five years later.

15           MR. JACOBSON: I understand, your Honor.

16           THE COURT:  Okay.

17           THE COURT:  Eastern may be a different story.

18           (In open court)

19           BY MR. JACOBSON:

20   Q.   Mr. Woerth, do you still have in front of you the

21   exhibits you were shown by your lawyer yesterday?

22   A.   No.

23   Q.   All right.  Then we will just project this on the

24   screen, if we could.  Will, exhibit D 159.   Go to the first

25   page, we will identify it.
```

Woerth-cross/Jacobson                                      17

1              Can you see that this is a resolution of the

2    executive board, May 22 through 24, 2001, of the Air Line

3    Pilots Association.

4    A.   Yes.

5    Q.   And this relates to support for the TWA MEC?

6    A.   Yes.

7    Q.   Let's go to the last page of this document.  Do you

8    recall that in your direct testimony, that you indicated that

9    this resolution dealt with a request by the TWA MEC for a

10   million dollars, and that ALPA gave them the million dollars.

11   Do you recall that, sir?

12   A.   I believe I do.

13   Q.   All right.  Can you look at this and tell me where in

14   this resolution, anywhere, the TWA MEC is given any money

15   whatsoever by ALPA?

16   A.   I was mistaken.  This is a different resolution and my

17   testimony now, it just refers to a million dollars that was,

18   it was not a request.  I was in error.

19   Q.   It refers to the fact that TWA had in their contract?

20   A.   Yes.

21   Q.   With TWA, a 9,000 hour flight loss bank that was at the

22   discretion of the TWA master chairman.  Right?

23   A.   That's correct.  I should have reviewed the resolution

24   more before my testimony.

25   Q.   So saying that they are having a somewhat financial

1    tough time now because they have lost approximately a million

2    dollars a year that they had available for their union

3    activities?

4    A.    That appears to be correct, yes.

5    Q.    And then therefore be resolved paragraph at the end,

6    there is where you pledge the full moral support of the

7    association, right, an along with necessary funding in

8    accordance with current ALPA policies and the ALPA

9    Constitution and bylaws.   Correct?

10   A.    That's correct.

11   Q.    And you testified yesterday, you agreed yesterday, that

12   neither in 2000, nor in 2001, nor in 2002, did TWA receive

13   any of the contingency fund money?

14   A.    It wasn't necessary.

15   Q.    All they received was a loan of approximately a quarter

16   million dollars from the operating contingency fund, correct?

17   A.    It was a grant from the operations fund.

18   Q.    Operating contingency fund money is supposed to be

19   repaid, right?

20   A.    It is supposed to be repaid.

21   Q.    This was repaid in fact out of the bankruptcy, wasn't

22   it?

23   A.    I don't know the outcome.   I hope it was.

24   Q.    Can we turn to exhibit D 160 which you were shown

25   yesterday as well.   Look at the top.   This is again another

Woerth-cross/Jacobson                                    19

 1   ALPA executive council resolution?

 2   A.   Yes.

 3   Q.   This is from September 24 through September 28?

 4   A.   Yes.

 5   Q.   And this is a resolution regarding the TWA MEC's desire

 6   to employ Roland Wilder in connection with grievance and

 7   possible litigation off of the grievance, correct?

 8   A.   Yes.

 9   Q.   You testified about this yesterday.

10   A.   Yes.

11   Q.   And yesterday you said that ALPA gave the TWA MEC money

12   in approving this resolution?

13   A.   I think the correct answer is they were going to use

14   their funds.

15   Q.   All right.   It wasn't any new money from ALPA?

16   A.   I don't think there was any new money.

17   Q.   It was TWA MEC's fund?

18   A.   Correct.

19   Q.   Okay.   Turn now if you would to exhibit D 158.   That is

20   another resolution of the ALPA Executive Council, correct?

21   A.   Yes.

22   Q.   This one is from May 21 of 2001?

23   A.   Yes.

24   Q.   And this is their request about engaging outside

25   negotiation consultant, Mr. Baehler?

1   A.    Yes.

2   Q.    You recall that yesterday you testified that ALPA gave

3   the TWA MEC permission to hire him and paid for Mr. Baehler.

4   Do you recall saying that?

5   A.    I recall saying that he was, permission to hire.

6   Q.    Do you recall saying you paid for it as well?

7   A.    I don't recall but I wouldn't be surprised.  I might

8   have made an error.

9   Q.    But in fact this is being paid out of TWA MEC's money?

10  A.    Yes, it is.

11  Q.    Not any new funds from ALPA?

12  A.    That's correct.

13  Q.    Turn if you would to exhibit D 50.  Turn to the second

14  page of it, if you would.  This is a letter addressed to Bob

15  Pastore, the TWA MEC chairman?

16  A.    Yes.

17  Q.    Do you see that, sir?

18  A.    I have to use the cheater here unless they can blow it

19  up a little bit.

20  Q.    That is August 29, 2001.

21  A.    Yes.

22  Q.    Somewhat late in the whole history of this transaction.

23  Correct, sir?

24  A.    Yes.

25  Q.    If you look at the third paragraph of this letter, it

1    says that executive council approved subject to the approval

2    of the executive board  $251,94040 in supplemental funding

3    from the operating contingency fund to bring your MEC's

4    account up to the required 90 level as of June 1, 2001.

5            Do you see that, sir?

6    A.   Yes.

7    Q.   Isn't it a fact that this roughly quarter of a million

8    dollars was the only additional funds provided to the TWA MEC

9    by ALPA throughout the entire TWA American merger

10   negotiations, and transition?

11   A.   I think that's correct.  Everything we requested they

12   had enough funds to pay for it in their budget.

13   Q.   You agree this is the only supplemental funds that ALPA

14   provided?

15   A.   I think that's right.

16   Q.   These are the funds that are supposed to be repaid?

17   A.   I believe so.

18   Q.   All right.

19   Q.   In fact, all the things that ALPA approved to TWA MEC to

20   do, to the extent that you approve things, if there were

21   costs involved the TWA MEC paid those costs?

22   A.   Yes.

23           MR. KATZ:  I am going to object to that

24   characterization, your Honor.

25           MR. JACOBSON: It is already answered.

1          THE COURT:  He didn't have a problem witness.  I am

2    going to let it stand.  If you want to clarify it, you can do

3    it on redirect.

4          MR. KATZ:  Thank you, your Honor.

5    Q.   Now, collective bargaining agreements are supposed to be

6    negotiated between, by the MEC, through its negotiating

7    committee or with the employee subject to your ultimate

8    approval.  Correct, sir?

9    A.   I think that is generally correct, yes.

10   Q.   And before you exercise your ultimate approval you have

11   lawyers and in-house negotiators review the documents to

12   ensure that it complies with ALPA policy and the goals that

13   the association has for the improvement of the statute and

14   status of pilots?

15   A.   Yes.

16   Q.   All right.  But the key thing, part of the Independence

17   Plus that you talked about yesterday, is that the local MEC

18   is the one that is supposed to be negotiating.  Correct?

19   A.   Well, sure.

20   Q.   All right.  And if they want to make a concession of

21   some sort, it has to originate from them, not from, it

22   shouldn't be forced upon them by someone else?

23   A.   Well, they will make the decision.  I am not sure of the

24   characterization of being forced.

25   Q.   Let me rephrase it.  Would you agree that it would not

Woerth-cross/Jacobson                                          23

1   be proper for an ALPA staff member to, on his own, negotiate

2   the terms of the collective bargaining agreement with the

3   employer without keeping the MEC or the MEC's negotiating

4   committee in the loop about what is being negotiated?

5   A.   I wouldn't approve of that.

6   Q.   That would be improper, wouldn't it?

7   A.   I can't imagine that happened, but I wouldn't approve of

8   it as it is.

9   Q.   All right.  Would that be inconsistent with ALPA's

10  Constitution and operating procedures, or staff, for a staff

11  member to go off on his own and negotiate concession Oz

12  behalf of the MEC?

13  A.   I don't think it is written in our Constitution or

14  anybody's Constitution, but normally, you involve the entire

15  negotiating committee, not just staff by itself, although

16  there are sidebars between, this happens very frequently when

17  the attorney from the company wants to meet with the attorney

18  or the lead, a staff negotiator on the side and have a

19  sidebar conversation.

20        That happens very frequently, but only, when only

21  attorneys are involved or advisors are involved, that happens

22  all the time.

23  Q.   Right.  But that is in the negotiation session while the

24  negotiators are there?

25  A.   The negotiators usually know what is happening, of

1    course.

2    Q.   Right.  You do it out of their sight and out of their

3    hearing and without their knowledge, that would not be at all

4    typical, right?

5    A.   Without their knowledge or reporting, I think I wouldn't

6    approve of that.

7    Q.   In fact, that would be so unusual that for an ALPA

8    employee to go off on his own and negotiate the terms of

9    collective bargaining agreement on behalf of an MEC without

10   involving MEC, that would be an arbitrary action, wouldn't

11   it, sir?

12           MR. KATZ:  I am going to object.  It calls for a

13   legal conclusion.  There is no evidence in the record that

14   anything like that ever happened.

15           THE COURT:  Did you understand the question?

16   A.   I understand the question.  I don't understand its

17   theoretical relevance, if nothing happened.

18           THE COURT:  Rephrase the question.  Reframe it.

19   Q.   All right.

20           Mr. Woerth, there has been testimony in this case

21   that between the point, the last point the negotiating

22   committee was involved, they had a two- or three-page term

23   sheet with some bullet points and then appeared later a full

24   blown collective bargaining agreement, many, many pages,

25   what, 72 pages, in length, with all sorts of provisions in

1   it, never before seen by negotiating committee, appeared in

2   the hands of the master chairman, Bob Pastore, for signature,

3   without the negotiating committee having been involved

4   anywhere between these two documents.  You weren't here for

5   it.

6           I am just telling you that is what the testimony

7   was.  You very well might disagree with that, sir.

8           THE COURT:  These are negotiations with TWA LLC.

9           MR. JACOBSON: Yes, your Honor.  This WAS the

10  negotiations that were testified to by Mr. Day, and Sean

11  Clarke.

12          MR. KATZ:  I am going to object to the question,

13  your Honor.  He is referring to a document that was signed

14  Byram Kiel, the chairman of the TWA pilots MEC negotiating

15  committee.

16          THE COURT:  I don't think that is his question, who

17  signed it.  I think the question is -- I am not --

18  Q.   The question is, the testimony is it went from a small,

19  a short set of bullet points to a full-flung document who

20  without involving the committee.  Would that kind of activity

21  be consistent in your view in how ALPA operates in

22  negotiating collective bargaining agreements with airlines?

23  A.   Sir, what you just ask described to me sounds normal.

24  You have bullet points, and what is going to happen, lawyers,

25  not the pilots, go back and draft up language.  So if lawyers

```
 1   and advisors drafted up language and finally presented it,

 2   you don't have to agree to it.  If you don't like it, you can

 3   amend it, can you discard it, you can vote against it but it

 4   is not unusual for attorneys to draft the language, not for

 5   pilots.  That is very normal, actually.

 6   Q.   Would it be normal to have a termination date rather

 7   than an amendable date without first discussing that with the

 8   pilots?

 9   A.   It is probably a thousand things you can put if in but

10   if they didn't like it, they could change it.  The attorneys

11   can't agree to anything or make a contract.  Only the pilots

12   can make a contract.

13   Q.   Do you remember the Comair pilots and their strike?

14   A.   Yes.

15   Q.   That was taking place at about the same time as the TWA

16   American merger negotiations, correct?

17   A.   It began in March of 2001, and I think ended in June.

18   Q.   And in fact you testified on direct examination that the

19   Comair strike was the most important thing happening in your

20   union world at that time period?

21   A.   That was the one that had the most risk and downside for

22   the pilots.

23   Q.   How many pilots were there at Comair?

24   A.   I am thinking about 1,500.  I am not sure.

25   Q.   All right.  So something about 60 or 70 percent of the
```

Woerth-cross/Jacobson                                              27

1   size of the TWA group.

2   A.   Yes.

3   Q.   Now, what are strike preparation costs?

4   A.   Well, they vary, of course, between the size of the

5   airline and --

6   Q.   I am sorry.  My question wasn't clear.  I am not talking

7   about a dollar amount.  What type of things are involved in

8   strike preparation that would be a cost that would be funded

9   by a major contingency fund grant?

10  A.   Normally the highest cost for strike preparation is

11  really flight pay loss which is usually the highest cost of

12  association other than employees of our employees for having

13  we do.  Strike preparation usually involves very large teams

14  of strike coordinators, you rent office facilities, you make

15  videos, you have strike coordinators.  There is an awful lot

16  of manpower so depending on how much the pilots are paid, is

17  how much flight loss pay loss, but it is a very large team,

18  sometimes hundreds of pilots are directly involved with with

19  the active strike leaders, if it came to pass.

20  Q.   Is that an appropriate major contingency fund

21  expenditure in your view?

22  A.   That is what our definition of major contingency fund

23  defines it as, so yes.

24  Q.   So let me show you what I have marked as exhibit 443.

25          This is another press release from your

1    association.  Mr. Woerth, do you recognize this as a March 7,

2    2001, press release of ALPA.

3    A.   Yes.

4    Q.   You are in fact quoted in this press release, third

5    paragraph.

6    A.   I see that.

7    Q.   Also quoted again in the fourth paragraph?

8    A.   Yes.

9    Q.   Is that true, sir?

10   A.   Give me a moment to read it.  Looks like it.

11   A.   Yes.

12        MR. JACOBSON: I will offer exhibit 443 in evidence,

13   your HOnor.

14        MR. KATZ:  No objection.

15        THE COURT:  Okay.  It is in evidence.

16   Q.   Now, looking at the first two paragraphs of the

17   document.  All right.  The association, ALPA, provided the

18   pilots at Comair approximately $2 million in major

19   contingency funds at that point in time for strike

20   preparation, correct?

21   A.   Yes.

22   Q.   And would it din to pay about $2 million per month in

23   strike benefits if the strike in fact took place?

24   A.   By our policies, yes.

25   Q.   By your policies.  And you in the third paragraph, you

```
 1    are quoted as saying, you say, we have pledged our full

 2    support to the Comair pilots to do our ultimate most for them

 3    in their efforts to a chief a fair and equitable contract.

 4    Is that right, sir?

 5    A.   Sure.

 6    Q.   And if you go down to the fourth paragraph, you are

 7    quoted as saying, and if a strike occurs I will ensure that

 8    additional funds from our more than 70 million dollars war

 9    chest will be available to support our Comair pilots.  Do you

10    see that, sir?

11    A.   Sure.

12    Q.   All right.  But you didn't provide any major contingency

13    funds to TWA pilots to help them in their battle for

14    seniority?

15    A.    Two completely different things.  If they were eligible

16    for major contingency fund, they could have applied and the

17    executive board would have made that determination.  The

18    mergers aren't normally a strike.

19    Q.   You agree that seniority is more important than any

20    particular term of a contract, you said yesterday seniority

21    is forever.

22    A.   And a strike can be forever, too.

23    Q.   In fact you joined the picket line for the Comair

24    strike, didn't you, sir?

25    A.   Of course I did.
```

Woerth-cross/Jacobson                                          30

1   Q.   And your issue with Comair was that the proposed

2   contract would in fact per perpetuate a system of two

3   distinct classes of pilots, pilots who are main line pilots,

4   who are relatively well paid and pilots who are regional

5   pilots who are always at the bottom of the pecking order,

6   correct?

7   A.   There are, you are correct in saying the strike was

8   important to more than Comair.  There is almost 25,000

9   regional pilots who barely make a living wage, and this was a

10  strike to affect more than Comair pilots, to raise regional

11  pilot pays past the living wage for 25,000 pilots.  This was

12  a very important strike to win.

13  Q.   I am not disputing the points of the strike.  If I

14  understand correctly, I think you agree with me is that the

15  issue there was to try to prevent, to roll back, in  a sense

16  the attempt to split the pilots between the haves  and the

17  have nots, those in the top who get reasonably decent pay and

18  reasonably good living conditions and those at the bottom,

19  the regional pilots, who get neither.  Is that a fair

20  statement?

21  A.   I think it is more simple than that.  We are trying to

22  get the pay rate up for Comair.  We weren't having a class

23  warfare.  We were trying to raise their pay which we hoped

24  raised up the pay of other pilots.

25  Q.   Right.  You are trying to eliminate the class warfare

Woerth-cross/Jacobson                                          31

 1   that management put in of trying to treat regional pilots as

 2   second class citizens in the aviation world.

 3   A.    We were trying to raise their pay and make them what

 4   they are worth, which is a lot more than they are getting

 5   paid, yes.

 6   Q.    You are trying to eliminate this thing from keeping them

 7   on the bottom?

 8   A.    What was keeping them on the bottom was poor contracts.

 9   We were trying to improve the contracts.

10   Q.    And similar to the TWA pilots are in a situation where

11   most of them are going to be kept on the bottom of the

12   seniority list, correct?

13   A.    They are going to be kept -- wherever seniority ended

14   up, but they were going to be some of the best paid pilots in

15   the country when they became American pilots.

16   Q.    The group that would be stapled would be on the bottom

17   of the seniority list, correct?  Is that correct?

18   A.    I thought you said that aren't be stapled to the

19   bottom..

20   Q.    The ones that would be stapled?

21   A.    They would be bottom.  Yeah, I guess that is where they

22   would be seniority list.

23   Q.    If they try to fly anywhere except from St. Louis, they

24   can only fly as reserve pilots because they are not senior

25   enough to do anything else, right?

Woerth-cross/Jacobson                                          32

```
 1              MR. KATZ:  I am going to object, Your HOnor.  He
 2    didn't testify about the provisions of Supplement CC.  This
 3    is way beyond the scope of direct.
 4              THE COURT:  I will sustain the objection.
 5              The Comair pilots, the question of the strike would
 6    be put to a vote.
 7    A.    The Comair pilots voted to strike.  They are the only
 8    ones who could put themselves on strike.
 9              THE COURT:  The union didn't say you are going on
10    strike?
11    A.    Oh, no, the Comair pilots were the only ones involved in
12    that, yes, sir.
13    Q.    I am going to give you now what I have marked as exhibit
14    444, plaintiff's 444.
15    Q.    Do recognize this as a press release from ALPA from May
16    31, 2001?
17    A.    Yes.
18    Q.    All right.  Now, you testified earlier that the major
19    contingency fund is only used for strike and strike
20    preparation, correct?
21    A.    Among other things.  Whatever the executive board, by
22    our policies, you can quote the policies if you want to see
23    what is authorized.
24    Q.    Don't put it up yet.  It hasn't been --
25    Q.    So it is exactly, it is beyond the strike and strike
```

Woerth-cross/Jacobson                                     33

```
 1   preparation that you spoke about before?
 2   A.   It can be under the guidelines whatever the major
 3   contingency fund, not for normal operations but the executive
 4   board can interpret it at its leisure what it wants to fund.
 5           MR. JACOBSON: I would like to offer exhibit 444 in
 6   evidence.
 7           MR. KATZ:  No objection.
 8           THE COURT:  P-444 in evidence.
 9           MR. JACOBSON: All right.  Now, under this time, May
10   31, 2001, which is, you know, kind of still in the art of the
11   TWA pilots struggle with American, the Ryan airline pilots
12   are receiving one million dollars in the major contingency
13   fund, correct?
14   A.   I think we should at this point clarify what the press
15   releases say and what a million dollars grant means.
16           A check is not written for one million dollars.
17   Its authorization, up to a million dollars, sometimes these,
18   no money was even spent, maybe it is a very small amount.  We
19   don't say here is a million dollars, here is your check.  Go
20   an about about your way.
21           This is an organization in the press release of how
22   much we would commit to this project.  We might not spend any
23   money out of it.  I want to make that clear.  This is not
24   writing someone anybody a collect.
25   Q.   But it is commiting out of the 70 million dollars war
```

```
 1    chest you have there these pilots can get up to a million

 2    dollars for the activities that are described in the press

 3    release and the resolution, correct?

 4    A.   That is correct.

 5    Q.   And here the item that is described is strategic

 6    planning and communication programs.  Correct?

 7    A.   Yes.

 8    Q.   Strategic planning is something that MECs do on a normal

 9    basis.  Correct?

10    A.   They normally do.

11    Q.   Communications programs is something they do on a normal

12    basis as well, isn't it, sir?

13    A.   That's correct.

14    Q.   All right.  And Ryan joined ALPA in August of 1998?

15    A.   I think that is true.

16    Q.   That is what it says in the second paragraph.  Right.

17    So here we are, move down further, how many pilots were there

18    at Ryan at that point?

19    A.   I don't remember, but it was an extremely small carrier.

20    I don't remember the number.

21    Q.   A very small carrier.  It joined ALPA in August of 1998.

22    So here we are less than three years later and they are

23    receiving up to a million dollars for strategic planning and

24    communications.  Correct?

25    A.   Yes.
```

```
1    Q.   And the article goes on to state what the issues, the

2    key issues, are in this contract dispute, doesn't it, sir, if

3    you look at the fifth paragraph?

4    A.   Yes.

5    Q.   And so it says there are two primary sticking points,

6    doesn't it?  That is what your association says?

7    A.   Including the use, and didn't recognize any seniority at

8    all.

9    Q.   One is you didn't give sick days, and the other is it

10   didn't recognize seniority, Ryan Air did not?

11   A.   That is what it says.

12   Q.   And of course, seniority is a basic tenant of unionism

13   that provides protection?

14   A.   That's correct.

15   Q.   All right.  The same thing that TWA pilots were fighting

16   for?

17   A.   All pilots fight for seniority.

18   Q.   Same thing the TWA pilots were fighting for, correct?

19   A.   Sure.

20   Q.   I move to another press release which I will mark as

21   plaintiff's exhibit 445.   Do you recognize this as a press

22   release from ALPA, September 6, 2001?

23   A.   Yes.

24   Q.   Printed on the ALPA dot org website?

25   A.   Yes.
```

1          MR. JACOBSON: I offer P-445 in evidence.

2          MR. KATZ:  No objection.

3          THE COURT:  Press release, P-445 in evidence.

4   Q.   Let look at the first paragraph.  This relate to the

5   America West pilots, correct?

6   A.   Yes.

7   Q.   And that is a reasonably large airline, what was it

8   about eight largest at the time in the U.S.?

9   A.   I don't remember their ranking.  I think they had a

10  little less than 2000 pilots.

11  Q.   Okay.  And they are, in this press release, receiving a

12  pledge, as you called it, of three million dollars from the

13  major contingency fund, correct?

14  A.   Yes.

15  Q.   And full support of their fellow ALPA members?

16  A.   Yes.

17  Q.   For contract negotiations.

18  A.   Yes.

19  Q.   Sir?

20  A.   Yes.

21  Q.   Okay.  So because of the extended length of the contract

22  negotiations, it was deemed something beyond the ordinary.

23  Is that right?

24  A.   Beyond the ordinary?

25  Q.   Beyond the ordinary MEC type expense?

1    A.   What is going on in all these press releases, and thank

2    you for bringing them all to my attention, the differences in

3    language and you allowed me to remember the differences and

4    why some languages speak of strikes and some do not.  If the

5    strike preparation is not in the press release, the only

6    reason for that is the MEC has requested this money but they

7    haven't yet taken a strike vote or there pilots, they are

8    willing to consider a strike.  So if they have already done

9    that the press release will reflect, it is for strike

10   preparations because they already got the vote of pilots to

11   proceed with strike preparations.

12         In the case of America West and Ryan Air and these

13   others, you probably have so I -- I don't know how many more

14   you have, if it doesn't say strike preparation, the only

15   difference is they haven't asked their pilots fully for the

16   support of a strike yet.  If they have, they talk about

17   strike preparation.  If they do not, the press release says

18   whatever it says.

19         But in all cases, the anticipation, frankly, the

20   only exception I knew was TWA who had long struggled with

21   Carl Icahn, which wasn't talking about strikes and we amended

22   the major contingency fund to an allow TWA access from '88,

23   to -- almost 13 years.  The reason strike preparation doesn't

24   appear, they haven't asked the pilots for a strike vote yet

25   or authorization to proceed.  So this is, all these were

1   anticipation, at some point, this may come to a strike.

2   Q.   Well, any dispute with an employer who is not willing to

3   agree to terms may at some point come to a strike, sir?

4   A.   It may.

5            THE COURT:  But in this case, the case we have is

6   not a negotiate with their employer.

7            MR. JACOBSON: That's correct.

8            THE COURT:  It is a negotiation with another union.

9            MR. JACOBSON: That's correct, your Honor.

10           THE COURT:  One does not normally strike another

11  union.  You strike the employer.

12           MR. JACOBSON: One can strike the employer or threat

13  tone strike the employer to bring pressure and leverage

14  against the other union.

15           THE COURT:  You are making an argument now.  That

16  is not a fact, and that is not a question.  If it brings

17  pressure or not.  But all these press releases are strikes

18  against the employer in the context of a labor negotiation

19  for a CBA, a collective bargaining agreement.  That is not

20  what was going on here.

21           Go ahead.  Ask your next question.

22  Q.   So we are not at a strike vote.  We are in negotiations

23  and they are getting three million dollars from the major

24  contingency fund, correct?

25  A.   They requested it and they were granted it, yes.

1    Q.    Thank you?

2    Q.    Mr. Woerth, I am going to give you another press

3    release, this is marked as plaintiff's exhibit P-446.  Sir,

4    do you recognize this as a June 18, 2002 press release?

5    A.    Yes, I do.

6    Q.    All right.  This one is talking about strike

7    preparation, correct?

8              MR. KATZ:  Your Honor, I am going to object to any

9    questioning about this.  It is not only repetitive but it is

10   after April, 2002, and is therefore irrelevant.  I would

11   remind the Court of the ruling made at the pretrial

12   conference about events occurring after April 3, 2002.

13             THE COURT:  Yeah, this is, this press release is in

14   in the context of a company negotiating a labor agreement

15   with its employer.  It is different than what is involved in

16   the negotiation that was involved in this case.  Not the same

17   thing.  I am going to sustain the objection.

18             MR. KATZ:  Thank you, your Honor.

19   Q.    Let's talk a little bit about the airline industry

20   economics during the period relevant to this case, all right,

21   sir?  We all know about September 11, 2001.  And the damage

22   that did to the air transport industry.  You talked about

23   that eloquently yesterday, sir.  Correct?

24   A.    I hope I was eloquent.

25   Q.    You were.  Prior to that date, however, and for a period

Woerth-cross/Jacobson                                        40

```
 1   of two to three years prior to that date there, the airline

 2   industry was doing well, wasn't it?

 3   A.   It was doing very well until the dot com bubble burst in

 4   '99, but it was still profitable.

 5   Q.   Still hiring pilots?

 6   A.   Yes.

 7   Q.   TWA was buying a new air airplane every day for the past

 8   two years.  Were you aware of that?

 9   A.   Sounds right.

10   Q.   Newest fleet of any of the major airlines, correct?

11   A.   I understand it was with the 757.

12   Q.   You know THAT the TWA pilots were stapled, were stapled

13   below approximately 400 new American airline pilot hires who

14   were hired between the date that the transaction was

15   announced and the date it closed, between January 9 and April

16   10, 2001?

17           THE COURT:  Not all TWA pilots.

18           MR. JACOBSON: The ones that were stapled, your

19   Honor.

20           THE COURT:  I was reading your question.  Your

21   question just said TWA pilots.

22           MR. JACOBSON:  I thought I said the TWA pilots that

23   were stapled.  I will rephrase it.

24   Q.   The TWA pilots that were stapled were stapled below some

25   400 new hires at American Airlines, people that were hired
```

1    between the announcement of the deal in January and its

2    closing in April of 2001, correct.

3            MR. KATZ:  Excuse me.  I am going to object as

4    before, he is questioning the witness about a subject that

5    the witness did not testify about on direct and that is the

6    composition of the merged seniority list and Supplement CC.

7    The witness did not testify about the provisions of

8    Supplement CC.

9            THE COURT:  I don't necessarily, I know that, we

10   limit cross to the subject on direct but this man was

11   president of the union.  I am going to allow a little broader

12   cross than for me to parse precisely where the direct was.

13   Ask the question again.

14   Q.   I am asking about the financial condition, the financial

15   realities of the aviation market in the period prior to 9-11.

16   All right, sir.  And some of the --

17           THE COURT:  He answered that question.  He said it

18   flattened a little bit with the dot com bust, and it was

19   still relatively prosperous until 9-11.

20   Q.   And one of the earmarks of this prosperity that I was

21   asking about to see whether he knew and could knowledge it

22   was that in fact American Airlines with its approximately

23   11,000 pilots had employed another 400 or so in the time

24   period, from from the point where the TWA acquisition was

25   announced until it closed and that those TWA pilots who were

Woerth-cross/Jacobson                                            42

```
 1  stapled were actually stapled below them, right?

 2  A.   That is what my understanding was.

 3  Q.   There was a big demand at that point in time until 9-11

 4  for experienced pilots.  Isn't that correct, sir?

 5  A.   If there is still hiring going on, yes, there was.

 6  Q.   Of course, that situation was different than the

 7  situation we had back during the time of the Eastern strike

 8  which you referred to in your direct testimony, right?  Do

 9  you remember the time when Eastern was on strike for about a

10  year?

11  A.   Well, I will never forget that.  Sure I remember the

12  strike.

13  Q.   And the economy at that time wasn't as good?

14          THE COURT:  Compared to when?

15          MR. JACOBSON: Compared to the period of time up to

16  9-11 there the aviation industry.

17  A.   I think the period of time in the late nineties was

18  better than the late eighties and early nineties, but again I

19  am not -- I  am not an economist.  That is my general

20  feeling.

21  Q.   You are working in the union as a vice president and

22  president, you are working at the level of the guts level of

23  the economy, you are dealing with employers whose relative

24  strength depends in part on how badly they need pilots,

25  doesn't it?
```

1           THE COURT:  You are opening a wide door to

2  testimony on the TWA financial condition.  I want you to know

3  that.  A wide, wide door.

4           MR. JACOBSON: All right.  Let me close the door for

5  a second, your Honor.

6           THE COURT:  I am just telling you.

7           Go right ahead.

8           MR. JACOBSON: Thank you, your Honor.

9  Q.   As a labor union, do you have more leverage with

10 employers when they need pilots or when they don't need

11 pilots?

12 A.   I think it is almost irrelevant.

13 Q.   Okay.

14           THE COURT:  The service may be more important when

15 the demands for pilots is low.

16 A.   My point, your Honor, was the pressures, is every

17 negotiation is all about the financial condition of the

18 company, they may be retiring pilots, they need to hire some,

19 maybe not, but that environment is also locally focused on

20 the condition of the company, the financials of the company

21 are the number one factor of any negotiation.

22 Q.   Let's move if we could to one of the exhibits you looked

23 at on your direct examination.  It is exhibit D 2.

24           THE COURT:  That is in evidence.

25           MR. JACOBSON: Yes, your Honor.

```
 1   Q.   And just to recognize from the screen, that is the board

 2   of directors resolution regarding pilot unity from the

 3   October 16 to 20, 2000 meeting, correct?

 4   A.   Yes.

 5   Q.   You were asked in your direct testimony to read

 6   paragraph 3 of the resolution.  I would like to just go

 7   through the whole, therefore, be it resolved portion of the

 8   final resolution.  Go to page 3.

 9            And from be it further resolved down to the bottom

10   there.  So we can see it.  All right.

11            This is the be it resolved portion of the pilots --

12            THE COURT:  This is October, 2000.

13            MR. JACOBSON: Yes, your Honor.

14            THE COURT:  This is before they announced the

15   American TWA deal.

16            MR. JACOBSON: Yes, your Honor.

17            THE COURT:  This.

18            THE COURT:  Just so the jury is oriented.

19            MR. JACOBSON: I appreciate that.  There is a lot of

20   dates.

21   Q.   Do you recognize this, sir?

22   A.   I do.

23   Q.   You you recall reading the paragraph 3, which continues

24   on the next page, to the jury.

25   A.   Point 3?
```

1    Q.    Point 3?

2    A.    Proposed merger agreements.

3    Q.    Proposed merger agreements with independent pilots

4    associations will be subject to approval by the executive

5    council and ratification by the executive board, in

6    accordance with article one, Section 11, of the ALPA

7    Constitution and bylaws.

8              Do you remember reading that?

9    A.    Yes.

10   Q.    Would you please read to the jury the fourth paragraph

11   of this resolution?

12   A.    ALPA representation campaigns and elections will remain

13   available as a vehicle to be used in appropriate situations.

14   Q.    All right.  And by representation campaigns, you are

15   referring to the representation cards that we talked about

16   extensively yesterday, correct?

17   A.    That is what you usually use to do a campaign, yes.

18   Q.    So this meeting, meaning it is available as a vehicle to

19   use in an appropriate situation?

20   A.    I remember why the language was put in by lawyers to

21   make sure we kept that available.  We weren't excluding that

22   possibility.

23   Q.    Very good.  Now, I was unclear in your testimony

24   yesterday whether your visiting the APA board in October was

25   at your instigation or their invitation.  Were you invited or

```
 1   did you ask to go?

 2   A.   I was asked do go.

 3   Q.   You were asked to go.  You didn't ask to go yourself?

 4   A.   I don't remember ever asking to go.

 5   Q.   I am going to give you a document I have marked as

 6   exhibit P-447.

 7            Take a moment to look at that document, sir.

 8   A.   Yes.

 9   Q.   This?

10   Q.   All right.  Does this document refresh your recollection

11   as to whether you asked to address the APA board at your

12   October meeting?

13   A.   I don't remember doing it.  But I will be glad if I did.

14   And if this substance corrected, I probably called.  But I

15   don't remember doing it.  I probably should have if I hadn't.

16   Q.   All right.  I am not sure I understood the last point?

17   A.   We are trying to organize pilots.  If I asked for the

18   meeting, I would be glad to have asked for it.  I don't

19   remember having done it ten years ago.  I am glad it

20   happened.

21   Q.   From reading this do you recall you were aware at that

22   point before you asked that APA had in fact, was going to

23   select an ALPA exploratory committee at that October meeting

24   you you were going to address?

25   A.   I don't remember they were going to do it then.  I do
```

1    remember, we had been in discussions for months, that if they

2    did not start something, I was going to terminate the

3    services agreement and not deal with them any more.  We had

4    been working with them in a dance for years, and either they

5    get serious or or I was going to cut them off.  I didn't know

6    when they were going to make the decision but I had thrown

7    down the gauntlet.

8                MR. JACOBSON: I think I would like to move as the

9    last answer be struck as not responsive.

10               THE COURT:  It is interesting.  No, I am going to

11   let it stand.

12               MR. JACOBSON: All right.

13               THE COURT:  It puts a slightly different flavor on

14   the relationship between ALPA and APA.

15   Q.   You knew you they were selecting an ALPA committee, a

16   commit to possibly explore rejoining ALPA?

17   A.   I knew I had made that insistent if they do, if they

18   wanted to continue our agreement.  I knew that much.

19   Q.   You asked to go to the meeting?

20               THE COURT:  This agreement, were you providing

21   services to APA at that point.

22   A.   At some point in the future --

23               THE COURT:  I am talking about 2000.

24               THE WITNESS:  I believe we were.

25               THE COURT:  Give me an idea what kind of services

Woerth-cross/Jacobson                                              48

1   you were providing to them.  When I say you, I mean ALPA was

2   providing to APA in this timeframe around October of 2000.

3   A.   Your Honor, to my best recollection, the services

4   normally involved our economic and financial analysis

5   department to evaluate work rules, we had software that could

6   evaluate different proposals and work rules.  It may have

7   been that they could attend our retirement insurance

8   seminars.  I don't remember all that was provided.

9           THE COURT:  You said there was an agreement.  Was

10  it committed to writing?

11  A.   I am not sure.  I believe it was but I can't testify

12  with certainty that it was.

13          THE COURT:  Okay.  And did APA pay you for these

14  services.

15  A.   It is my understanding that they did.

16          THE COURT:  Okay.

17  Q.   And to close the loop on the area that the Judge asked

18  about, they paid you for the services and among the things

19  you did is you provided them with advice on contracts and

20  contract terms as they were getting ready for the Section 6

21  negotiations with American Airlines.

22          MR. KATZ:  I am going to object to the question,

23  your Honor.  If there is a question about the terms of the

24  services agreement, the best evidence would be the service

25  agreement itself.

 1              THE COURT:  Well, it may be, but if he knows the

 2   answer to that question, I am going to let him -- were they

 3   getting this economic analysis in connection with their

 4   negotiations with American over the terms of the collective

 5   bargaining agreement?  That is the question.  I will allow

 6   him to answer that question.

 7              THE WITNESS:  Your Honor, I --

 8              THE COURT:  If he knows.  Did he doesn't know, he

 9   doesn't know.

10   A.   I  don't know for certain, but it only makes sense that

11   it was.  I am not sure why you are analyzing stuff if you

12   don't bargain.  I assume that I assume that is what it was

13   for.

14              MR. JACOBSON: Thank you.

15   Q.   So you asked, I guess I should offer that document in

16   evidence.  I will move exhibit P-447 in evidence, your Honor.

17              MR. KATZ:  I object, your Honor.  This is an

18   internal Allied Pilots Association document.

19              THE COURT:  Yes, this was used to refresh his

20   recollection.  He also, I am not going to admit 447.

21              MR. KATZ:  Thank you, your Honor.

22              THE COURT:  But the testimony stands about this

23   document.

24              Go ahead.

25              MR. JACOBSON: Thank you.

Woerth-cross/Jacobson                                              50

1   Q.   When you addressed the APA you talked to them for about

2   two hours, right?

3   A.   You are going back to October --

4   Q.   Yes, sir.  I know, you talked several times.  In October

5   of 2000.  It was fairly extensive comments, about two hours

6   worth?

7   A.   I was pretty tired so it must have been about two hours

8   by the time it was over.

9   Q.   And they provided a transcript which you looked at

10  yesterday?

11  A.   Sure.

12  Q.   They gave you an opportunity to prepare an executive

13  summary based on that transcript that you could have

14  distributed to the APA members.  Do you recall doing that,

15  sir?

16  A.   Repeat the question, please?

17  Q.   They gave you the opportunity to prepare an executive

18  summary based off of the transcript they gave you, that would

19  be included in the minutes they circulated to their members

20  at APA?

21  A.   I recall, I don't recall that being the purpose.  I

22  thought it was reviewed for accuracy.  I don't remember I was

23  going to do the executive summary.  That might have happened

24  but I don't remember that.

25  Q.   All right.  Let me show you a document and see if that

1    refreshes your recollection on this issue.

2              I am giving you what has been marked as plaintiff's

3    P-448, sir.  Does this refresh your recollection as to

4    whether or not you created an executive summary for inclusion

5    in their minutes.

6    A.   No, it does not refresh -- I remember reviewing the

7    minutes, rather, but I do not have a recollection of

8    preparing an executive summary.

9    Q.   All right.  This document is addressed to you?

10   A.   Yes.

11   Q.   Did you receive it, sir?

12   A.   Yes.

13             MR. JACOBSON: I would move for the admission of

14   exhibit P-448.

15             MR. KATZ:  No objection.

16             THE COURT:  448 in evidence.  That is October 30.

17             MR. JACOBSON: Yes, your Honor.  October 30, 2000.

18   Q.   Could you read to the jury the one paragraph of text

19   that is in that exhibit since we don't have it to blow up?

20   A.   Thank you.  That is.

21   Q.   Thank you.

22   A.   Thank you, Captain -- Thank you and Captain Atterian for

23   addressing our board of directors last week.  We will forward

24   a transcript including the questions and answers as soon as

25   it is available and request you provide an executive summary

```
 1    for inclusion in our minutes at your earliest convenience.

 2    You do not have to include the questions and answers in your

 3    summary unless there are some interesting -- unless there

 4    were some interesting enough to make into bullet points.

 5    That is up to you.

 6    Q.   This letter was from whom?

 7    A.   Captain Richard Lavoy, President of  Allied Pilots.

 8            THE COURT:  It it is a fax, not a letter.

 9            MR. JACOBSON: It is a fax letter.

10    A.   Yes.

11            THE COURT:  But the cover sheet was used to convey

12    the message.

13            MR. JACOBSON: Yes, your Honor.  It appears to have

14    been faxed although there is no fax line on the top.

15            THE COURT:  There is no data.

16    Q.   You in fact received the transcript which you reviewed

17    and we talked about yesterday so we wouldn't go into that in

18    any detail?

19            I would like to give you what is previously marked

20    as exhibit P 115.

21            That is a three-page document, sir, signed by you.

22    A.   I see three pages, and signed by me.  I haven't read it

23    in a while.

24    Q.   Take your time, sir.

25    A.   Okay.
```

Woerth-cross/Jacobson                                          53

1    Q.   Are you familiar with that document, sir?

2    A.   Yes.

3              MR. JACOBSON:   I move exhibit P 115 in evidence,

4    your Honor.

5              MR. KATZ:   No objection, your Honor.

6              THE COURT:   That is December l2.

7              MR. JACOBSON: Yes, your Honor.   December 12, 2000.

8              THE COURT:   I am going to admit by consent, P 115

9    into evidence.

10             MR. JACOBSON: Thank you.   Sorry to step on you

11   there.

12   Q.   This is a December l2, 2000, contract from, letter from

13   you to John Darrah, the president of the Allied Pilots

14   Association, correct

15   A.   Yes, it is.

16   Q.   And you just mentioned you thought you had asked to be

17   invited to their meeting and because of an issue relating to

18   a service contract that you had, that you, ALPA, had with

19   allied.   Correct?

20   A.   Yes.

21   Q.   And this is the service contract you had, that ALPA had

22   with Allied?

23   A.   Well, this is what, I can't testify as, it is the only

24   one or if we had other oral agreements, but this speaks to

25   what it was in December.   I do not remember what happened

1    prior to this.  I am looking at this now.

2    Q.    That is fair.  Could you read the first paragraph of the

3    letter?

4    A.    The Air Line Pilots Association, ALPA, has agreed to

5    provide certain services to the Allied Pilots Association in

6    order to assist your union with its preparation for contract

7    negotiations.  This letter sets forth the services that ALPA

8    will offer, and the terms and conditions pursuant to which

9    those services will be provided.

10   Q.    All right.  And you list number of services, turn to the

11   last page, it is signed by you as president of ALPA.

12   Correct?

13   A.    Yes.

14   Q.    Signed by John Darrah as president of the Allied Pilots

15   Association?

16   A.    Yes.

17   Q.    And your association, ALPA, performed this contract

18   properly, correct?  You performed the contract?

19   A.    I certainly hope so.

20   Q.    You provided services you said you provided?

21   A.    I would think we would.

22   Q.    Because they were heading into their Section 6 of the

23   Railway Act negotiations with American Airlines and they

24   needed your help.

25   A.    Looks like that is what is going on.

 1    Q.    Now I would like to show you what has been marked as
 2    exhibit P 111.
 3          Do you recognize that document, sir?
 4    A.    Just a moment, please.
 5    Q.    Sure.  Certainly.
 6    A.    Yes.
 7    Q.    And this is a letter to you, right?
 8    A.    Yes, it is.
 9    Q.    It is from the Allied Pilots Association, the American
10    Pilots Union?
11    A.    Yes.
12          MR. JACOBSON: I would like to offer exhibit P 111
13    in evidence, your Honor.
14          MR. KATZ:  No objection.
15          THE COURT:  P 111 in evidence.
16    Q.    Now, this letter is dated November 27, 2000.
17    A.    Yes.
18    Q.    So shortly before the service agreement we just looked
19    at but after your speech at the APA?
20    A.    Yes.
21    Q.    And they have appointed an ALPA Exploratory Committee,
22    the Allied Pilots have?
23    A.    Yes.
24    Q.    And they want to come to your offices to basically get
25    information?

1   A.   Yes.

2   Q.   All right.  And they list a number of topics that they

3   want to meet with you and your people about, correct?

4   A.   Yes.

5   Q.   And they want you to assign a point of contact to be the

6   person that they know they can reach so there is no confusion

7   in communications, correct?

8   A.   Yes.

9   Q.   And who did you appoint as that point of contact, sir?

10  A.   I don't remember if it was Howard Atterian or

11  Rindfleisch.  I don't exactly remember.  I would assume it

12  would be one of those two people.

13  Q.   It would either be Howard Atterian or Ron Rindfleisch?

14  A.   Most likely but I don't remember the point of contact.

15  I am sure I appointed somebody.  I just don't remember who.

16  Q.   Ron Rindfleisch, remind us, he is the person in charge

17  of bringing in new members?

18  A.   That is a gross exaggeration of Ron Rindfleisch's job.

19  Q.   And Howard Atterian, what was his job?

20  A.   He was my chief of staff.  He is executive

21  administrator.  He was my right-hand man.

22  Q.   Okay.

23          THE COURT:  MR.  Jacobson, you can pick a time.

24          MR. JACOBSON:  This is as good as any.  I am always

25  ready to wait.

 1              THE COURT:  I didn't mean to suggest that.  But

 2      this is a convenient time for a break.  We have been at it

 3      about an hour and 20 minutes, we will give the jury a little

 4      break.

 5              Do not discuss the case among yourselves.  Keep an

 6      open mind until you have heard all the evidence.  All rise.

 7      We will be back at ten o'clock.

 8              (The jury leaves the courtroom.)

 9              THE COURT:  I received this for the record this

10      morning the Rule 50 motion.

11              MR. KATZ:  Yes, your Honor.

12              THE COURT:  In this case.  Are the plaintiffs

13      intending to give a written response?

14              MR. JACOBSON: I haven't seen it yet, your Honor,

15      but I find it hard to believe that we wouldn't.

16              THE COURT:  You served it.

17              MS. RODRIGUEZ:  It appeared on ECF last night.  I

18      haven't had time to download it.

19              MR. FRAM:  We provided paper copies this morning,

20      your Honor.

21              MS. RODRIGUEZ:  I haven't seen those.

22              MR. JACOBSON: I haven't seep them either.

23              THE COURT:  When you get a chance to go through the

24      brief, it is, without prejudging it, it is a thorough job.

25      So I assume you may want to respond to it.  And just let me

```
 1    know so I can schedule argument.  Now, I would like to

 2    schedule the argument before I submit the case to the jury.

 3    But that is the crucial, that is, it is really the timeframe

 4    that matters, before the case goes to the jury.  So give me

 5    the time.

 6              MR. JACOBSON: We will talk among ourselves and get

 7    back to you.

 8              THE COURT:  Very good.

 9              (Recess).

10              (Jury enters the courtroom)

11              DUANE WOERTH, resumes.

12              CONTINUED CROSS EXAMINATION

13              BY MR. JACOBSON:.

14              THE COURT:  Mr. Jacobson.

15              MR. JACOBSON: Thank you, your Honor.

16    Q.   Now, Mr. Woerth, you testified yesterday about how you

17    went to speak to the APA board again on April 5, three days

18    after the TWA MEC waived their scope.  Do you recall that?

19    A.   Yes, I do.

20    Q.   All right.  And was it that you, if I recall, you said

21    that something along the lines I, of they have taken a hard

22    step, now you have to, something along those lines?

23    A.   Something along those lines.

24    Q.   All right.  Let me ask you, isn't it a fact what you

25    did talk about was the political climate in Washington, DC,
```

1    you talked to them about that?

2    A.   I think I talked to them about quite a few things.

3    Q.   Quite a few things.  How long a conversation do you

4    think it was to talk?

5    A.   I don't really have a, I couldn't make an accurate

6    estimate.

7    Q.   You wouldn't dispute someone who would describe it as a

8    brief comment?

9    A.   A brief comment I would dispute.

10   Q.   All right.  What is PEBs?

11          THE COURT:  I am sorry?

12   Q.   PEBs?

13          THE COURT:  PEB?

14   Q.   Letter P, letter E, letter B?

15   A.   Presidential Emergency Board.

16   Q.   That is mechanism by which the President can prevent a

17   strike?

18   A.   Yes.

19   Q.   Did you talk to the American pilots about these

20   presidential emergency boards?

21   A.   I might have.  I don't remember all of what I talked

22   about that day.

23   Q.   Did you talk about reserved rests?

24   A.   If I was given an update on what is going on that day,

25   that might have, but like I said, I do not remember having I

1   talked about.

2   Q.   And age 60 issues?

3   A.   Most likely.  Don't remember.

4   Q.   From?

5   Q.   Those are things that you and they would all have in

6   common as far as interest, right?

7   A.   Could have happened, I don't remember.

8   Q.   Did you also information them about the current status

9   of negotiations on the Comair strike?

10  A.   Comair strike.

11  Q.   Yes?

12  A.   As I already testified, I don't remember having talked

13  about it.

14  Q.   Let me give you something to see if it refreshes your

15  recollection about what you talked about.  This is exhibit P

16  13?

17          THE COURT:  In evidence already?

18          MR. JACOBSON: I don't think it is, your Honor.

19          THE COURT:  P 13 is not in evidence.

20  Q.   Would you look at this and see if it refreshes your

21  recollection regarding your comments to the APA board on

22  Thursday, April 5, 2001?

23  A.   That is their characterization of some of the things I

24  talked about.

25  Q.   Their being APA?

1    A.    Apparently.  I think this is -- is this their document?

2    Q.    It would be their minutes?

3    A.    It would be their minutes then.

4    Q.    All right.  Had you seen these minutes or had a chance

5    to comment on them at any point?

6    A.    I don't ever remember seeing this.  They might have sent

7    me a different copy but I don't remember this.

8    Q.    All right.  Well, this one has large white areas of

9    material that was removed in discovery in the case.  So it

10   would look unfamiliar, probably.  Reading the comments here,

11   does this refresh your recollection about the topics you

12   addressed with the APA on April 5?

13   A.    It really doesn't, it does not.

14          THE COURT:  Okay.

15   Q.    All right.

16          THE COURT:  You are not offering it.

17          MR. JACOBSON: I am not.  He doesn't recognize it.

18   It doesn't refresh.

19          THE COURT:  Okay.  I have marked it for

20   identification only.

21          MR. JACOBSON: Yes, your Honor.

22   Q.    Mr. Woerth, I would like to give you what has been

23   marked as exhibit P-339?

24          THE COURT:  P?

25          MR. JACOBSON: Yes, sir.

Woerth-cross/Jacobson                                          62

1    Q.   This will be a little hard to recognize as well because

2    it is a large redacted document.  But if you look at the

3    first page you see it is addressed to you.

4    A.   Yes.

5    Q.   All right.  And it is from Ron Rindfleisch?

6    A.   His name says from Ron Rindfleisch, yes.

7    Q.   Do you recognize this as a heavily redacted version of a

8    memo sent to you?

9    A.   Since it is 95 percent redacted I don't recognize much.

10   Usually when I get a memo, the person usually initials it or

11   science their name.  I am curious why there is no name or

12   signature behind Rindfleisch's name if it is from him.

13   Q.   Looking at the lower right-hand corner of the document

14   do you see a stamp on the first page, ALPA, 039344.  And the

15   following page, 445?

16   A.   Yes.

17   Q.   Do you recognize as indicating there is a document that

18   comes from ALPA's files?

19   A.   That is what you say.  I mean, I haven't been dealing

20   with these documents before.

21          MR. JACOBSON: This time I would like to offer P-339

22   in evidence.

23          MR. KATZ:  I object.  It contains hearsay and

24   double hearsay, and there is no proper foundation that has

25   been laid.  The witness doesn't remember seeing it.

```
 1              THE COURT:  Well, I am going to let it in.  This is
 2   a communication from the, one fairly high ranking ALPA
 3   officer to, or committee head, to the president of ALPA.  I
 4   am going to allow it.
 5   Q.   All right.  Could you enlarge this part here?  The date
 6   of this memo is what, sir?
 7   A.   October 18, 2001.
 8   Q.   It is addressed to you.
 9   A.   Yes.
10   Q.   Copies to whom?
11   A.   Howard Attarian, Jalmer Johnson, Seth Rosen and Ken
12   Cooper.
13   Q.   And Howard Attarian you just testified was your
14   right-hand man at ALPA?
15   A.   That's correct.
16   Q.   Jalmer Johnson was the highest staff person?
17   A.   Yes.
18   Q.   Seth Rosen is head of the representation department?
19              THE COURT:  No.  Wasn't he --
20   A.   No.  Set.
21              THE COURT:  He was the legal department? Wasn't he?
22   A.   No, your Honor.
23              THE COURT:  That was Cohen.
24              THE WITNESS:  Correct, your Honor.
25   Q.   Seth Rosen is head of the representation department?
```

1    A.   That's correct.

2    Q.   And therefore, Ron Rindfleisch's boss, whether immediate

3    or on the chain of command?

4    A.   I think Ron worked in, I am not exactly sure who Ron

5    Rindfleisch's boss was.

6    Q.   Ken Cooper, who is that?

7    A.   He is assistant director of representation.  He worked

8    for set he worked for Seth.

9    Q.   The text that is not redacted on this first page, it

10   says what, sir?

11   A.   American:  Pilot contact, Americans are quite angry --

12   Q.   Sir, on the first page.  Before we get to that page.

13   What is the one piece of unredacted text on that page?

14   A.   The following is a list of carriers with an interest in

15   ALPA representation.

16   Q.   All right.  And so other carriers who might be there,

17   that is what has been removed, is that right?

18   A.   I have no idea what was removed.

19   Q.   The second page, it is talking about American.  So

20   American is in this list of carriers, interested in ALPA

21   representation.  Correct, sir?

22   A.   If that is hit, yes.

23   Q.   Mr. What does it say about American, what does Mr.

24   Rindfleisch tell you and the other top ALPA executives?

25   A.   It says American:  Pilot contacts are very concerned,

1    actually quite angry, that ALPA continues to represent the

2    TWA pilots.  I always tell them we must.  And that we are

3    even supporting legislation, the Bond bill, et cetera, that

4    could damage the seniority integration process as well as the

5    card campaign."

6    Q.   All right.  So here in October of 2001, you are

7    receiving a memo from one of the people working for you and

8    the organization you are to head, talking about a card

9    campaign for American, correct?

10   A.   It doesn't say it is ALPA's card campaign because it is

11   not.

12   Q.   I didn't say that.  I said it is talking about a card

13   campaign, correct?

14   A.   That is what it says.

15   Q.   It is saying that the legislation could be damaging to

16   the card campaign.  Correct?

17   A.   That is what it says.

18   Q.   By that you understand that the legislation might cause

19   American pilots --

20          THE COURT:  Are you asking him to read

21   Rindfleisch's mind?

22          MR. JACOBSON: No.  I am asking him for his

23   understanding as the president of the organization.

24          THE COURT:  Then ask him what his understanding

25   was.

```
 1              MR. JACOBSON: All right, your Honor.

 2   Q.   And what do you understand the phrase, "damage the

 3   seniority integration process" to mean?

 4   A.   First of all, I don't remember this document at all.

 5   This is the first time I have seen it.  I don't know what Mr.

 6   Rindfleisch means.  Apparently, whoever he is talking to, I

 7   don't know who he is talking to.  I have no idea.

 8              THE COURT:  He is talking to you.  I mean the memo

 9   is addressed to you.

10              THE WITNESS:  It is, your Honor.  But I don't, I am

11   not grasping what he is trying to tell me.

12              THE COURT:  Oh, okay.

13   Q.   That is fair.  If you are not grasping it, then we will

14   move on.

15              THE COURT:  Okay.

16   Q.   I would like to show you what has been marked as exhibit

17   P-356.  Have you had a chance to review the document?

18   A.   Yes.

19   Q.   This is a letter to you from Bob Pastore forwarding four

20   resolutions from the special MEC meeting, the TWA MEC.

21   Correct?

22   A.   I am sorry.  I didn't see the last one, I only reviewed

23   three out of four.

24   Q.   Okay.

25
```

Woerth-cross/Jacobson                                    67

1              (Pause)

2    Q.    This is a document you received on or about December 6

3    of 2001, sir?

4    A.    It was mailed December, so I probably received it very

5    shortly thereafter.

6              MR. JACOBSON: You move exhibit 356 in evidence.

7              MR. KATZ:  No objection.

8              THE COURT:  There being no objection, P-356 in

9    evidence.

10             THE COURT:  P-356.

11   Q.    In this is a December 6, 2001 letter from Bob Pastore,

12   TWA MEC master chairman?

13             THE COURT:  Including four TWA MEC resolutions.

14             MR. JACOBSON:  Yes.

15   Q.    Do you see that?

16   A.    Yes.

17   Q.    You received this?

18   A.    Yes.

19   Q.    Did you review the resolutions?

20   A.    Yes, I have.

21   Q.    Excuse me?

22   A.    Yes.

23   Q.    At the time, back in December of 2001, did you review

24   the resolutions?

25   A.    Yes.

Woerth-cross/Jacobson                                    68

1   Q.   Did you take any action on these resolutions?

2   A.   I think we were going to forward things to the next

3   executive council meeting, if I recall.  But I don't remember

4   exactly what we did, but that is what I think we did.

5   Q.   All right.  And let's turn to the second resolution, the

6   resolution 01-118.  Are you there, sir?

7   A.   Yes.

8   Q.   And this is a formal request for money, from the MEC for

9   three million dollars from either the major contingency fund

10  or other ALPA budgets for their use, for the extraordinary

11  bankruptcy legal fees and continuing seniority integration

12  issues.  Do you see that?

13  A.   Yes.

14  Q.   Did you take any action to attempt to have the ALPA

15  National resolve to grant the three million dollars being

16  asked for here?

17  A.   This was a request that would go to the executive

18  council first, or for executive board approval, so it was

19  processed in that manner, I believe.

20  Q.   You believe you sent it down the line?

21  A.   I believe I did.

22  Q.   Did did you take any steps to advocate for this motion,

23  sir?

24  A.   No.

25  Q.   All right.  And did the TWA MEC receive three million

Woerth-cross/Jacobson                                        69

1   dollars from ALPA as requested here?

2   A.   I don't believe they did.

3   Q.   Did they receive $30 from this motion?

4   A.   I don't believe any money was granted from the major

5   contingency fund for anything on this regard.

6   Q.   Or from the national budgets, or any other source?

7   A.   They continued to have their own budget but there was no

8   special allocation of any money, no.

9   Q.   Turn to the next resolution, 01-119.

10  A.   Yes.

11  Q.   You are familiar with this resolution?

12  A.   Yes.

13  Q.   All right.  And this is a resolution with whereases,

14  including statements regarding ALPA National receiving

15  representation pledge cards from pilots of American Airlines

16  look at the fourth whereas.  Pilots at American?

17  A.   That is what they say.  But I don't believe that to be

18  true.

19  Q.   The prior paragraph they say ALPA's National's legal

20  staff has stated they have no interest in taking any further

21  action to enforce the ALPA fair and equitable treatment of

22  the pilots?

23  A.   That is what the says.

24  Q.   Did you have an opinion that was a true belief, whether

25  the belief of the MEC expressed here was accurate?

1   A.   I believe by December 4 most people believed that the

2   matter of seniority integration at TWA and American was

3   final.  They had imposed their terms, APA and American, I

4   think most people believed it was now over.

5   Q.   Did you believe it was over?

6        THE COURT:  It wasn't effective until single

7   carrier status was implemented, the so-called Supplement CC,

8   the cram-down.

9   A.   It violated the  --

10       THE COURT:  That wouldn't have any actual on-the-

11  ground effect until the National Mediation Board declared

12  them a single carrier, it would end ALPA's representation and

13  commence APA's representation.

14       MR. JACOBSON: Correct.

15       THE COURT:  I think I have that right.

16  Q.   Mr. Woerth, do you recall when ALPA seized to be the

17  exclusive bargaining agents for the pilots previously

18  employed at TWA?

19  A.   I believe it was in April but I am not sure.

20       THE COURT:  April of 2002.

21  A.   2002, I believe.

22  Q.   April, 2002?

23  A.   Yeah.

24  Q.   That is when the period of time for ALPA to make a run

25  at becoming the collective bargaining agent for the combined

```
 1   group expired, approximately a month after single carrier was

 2   announced?

 3   A.   You are asking me a question?

 4   Q.   Let me rephrase it.  Do you recall the National

 5   Mediation Board made a single carrier finding?

 6   A.   Eventually, of course they did.

 7   Q.   They invited ALPA to submit, if they wanted to, for an

 8   election to see whether ALPA or APA would be the exclusive

 9   bargaining agent for the newly enlarged group of American

10   Airline pilots, correct?

11   A.   That?

12   A.   Would be the normal process.

13   Q.   And when that time period expired, then you were done at

14   that property, correct?

15   A.   I guess that's correct.

16   Q.   Look at the last page of this, the resolution portion of

17   this resolution 01-123.  Last page.

18   A.   Yes.

19            THE COURT:  What are you asking the witness to look

20   at?

21            MR. JACOBSON: I am trying to get him to put it on.

22   Here it is.

23   Q.   Do you recall this resolution?

24   A.   This is a continuation, yes.

25   Q.   The things that they asked that you do, that ALPA do?
```

1   A.   Yes.

2   Q.   And that one of the things was to condition any re

3   affiliation of the American pilots in ALPA with integration

4   of the TWA pilots per ALPA policy?

5   A.   Yes.

6   Q.   Did you take any steps to advocate this resolution

7   within ALPA?

8   A.   No.

9   Q.   And ALPA didn't enact a resolution with terms similar to

10  this at all?

11  A.   No.

12  Q.   Is that correct, sir, did not?

13  A.   Did not.

14          THE COURT:  Was there any opposition to the, to

15  Americans application for single carrier status before the

16  National Mediation Board, by anybody, and if so, by whom?

17  A.   I don't know, your Honor.  Somebody else would have to

18  provide that answer.  I don't know.

19          THE COURT:  Did ALPA itself oppose single carrier

20  status?

21          MR. KATZ:  Your HOnor, we we will have a witness to

22  address that.

23          THE COURT:  He is chairman of the union.  He might

24  know.  If he doesn't know, he doesn't know.

25  A.   I do not know.

 1              THE COURT:  That was one of these resolutions, in

 2   fact the first resolution.

 3   A.    That if that was their request, I don't know how we

 4   responded.  I would be kind of surprised if we opposed it,

 5   but I don't remember, sir.

 6              MR. JACOBSON: Thank you, your Honor.

 7              THE COURT:  Okay.

 8   Q.    Who is John Feldvary?

 9   A.    John Feldvary was a U.S. Airways captain who was vice

10   president of finance and treasurer.

11   Q.    So he was one?

12              THE COURT:  Vice president and finance and

13   treasurer of what.

14   A.    Airline Pilots Association.  He was a national officer.

15              THE COURT:  Of ALPA.

16   A.    Yes.

17   Q.    He was one of four national officers of of the /PAOERD

18   of 2001, 2002, along with you?

19   A.    Yes.

20   Q.    And you recall an AFL-CIO convention that you attended

21   in Las Vegas in December of 2001?

22   A.    Sure.

23   Q.    All right.  And there was, at that convention you said

24   you first met the American pilot, John Clark?

25   A.    That wasn't my first, I saw him before at board

Woerth-cross/Jacobson                                          74

 1    meetings.

 2    Q.   Oh, that is true.  I am sorry.  I stand corrected.  I

 3    apologize.  You had met him previously at the APA board

 4    meeting, in fact, he was one of the people who asked the

 5    question that you responded to.

 6    A.   Yes.

 7    Q.   And he introduced himself as the person who had no, made

 8    the motion for the ALPA Exploratory Committee?

 9    A.   I don't remember him saying that.  But I mean I know

10    that is what ultimately happened but I wasn't aware, I don't

11    believe I knew that at the time.

12    Q.   Okay.  That is fair.  But you met Mr. Clark again here

13    at Las Vegas?

14    A.   Yes.

15    Q.   And you went to lunch with him?

16    A.   Yes.

17    Q.   And you went to dinner with him?

18    A.   No, I don't believe I did.

19    Q.   You don't recalling to go dinner with him?

20    A.   I do not recalling to go dinner with him.

21              MR. KATZ:  Your Honor, I am going to ask for a

22    sidebar conference.

23              THE COURT:  Okay.

24

25

1          (At sidebar)

2          MR. KATZ:  Your Honor, I didn't have an objection

3     to him asking whether Clark went to dinner.

4          THE COURT:  Yes.  I didn't see anything

5     objectionable with that.

6          MR. KATZ:  But where he is going is there is a

7     document that was also submitted in the summary judgment

8     papers.  And there was an affidavit that was submitted with

9     the reply brief in the summary judgment process.  Feldvary

10    had a expense reimbursement request.  And he listed on the

11    expense reimbursement request that Clark was at the dinner

12    with worth that night.  However, that is a hearsay statement

13    as to whether Clark was there or not.

14         THE COURT:  Business record.

15         MR. KATZ:  The record is a business record as to

16    what the expense was.  And as to the fact that it was paid.

17    But as to whether Clark was there or not, it is a hearsay as

18    to whether Clark was there.

19         THE COURT:  Is he going to deny Clark was there.

20    Is that the idea.

21         MR. KATZ:  He did deny that.  Feldvary denied Clark

22    was there in an affidavit submitted with our summary judgment

23    reply brief.  The receipts that are in evidence that were

24    submitted by Hunnibell and Clark show that Clark was back in

25    Los Angeles at four o'clock that afternoon, he took his car

```
 1   out of the parking lot at four o'clock that afternoon and

 2   Clark denied at his deposition that he was there for more

 3   than a couple of owe he for the, past two o'clock in the

 4   afternoon.  So they know that this is false.  That.

 5              THE COURT:  Is it?

 6              MR. JACOBSON:  No, your Honor.  Let's, remember,

 7   Clark is an individual who.

 8              THE COURT:  I know who he is.

 9              MR. JACOBSON:  He didn't bring any cards or cards

10   from Las Vegas.

11              Next we have Jerry Mugerditchian, I got the card

12   from him and I mailed them to ALPA I got the cards.  Clark

13   said I didn't have a date today because of cards.  I heard

14   the deposition, that they got the database from him.  We have

15   a lot of people here who claim they weren't in places they

16   were.  It doesn't suit them to be here.  This is a business

17   record and the names of the people there are part of record

18   because it is what they commit in order to get reimbursed for

19   this.  I showed it did him.  He didn't say he denied it.  He

20   said he didn't recall it which is quite different.  I will

21   show to it him and see if it reps him recall whether he was

22   there.

23              THE COURT:  Well, it could be conflicting

24   testimony.  I think it is a business record.  I think it is a

25   record people rely on, company relies on it in, you know, in
```

1  making its reimbursement.  I had a huge fraud case involving

2  chits for reimbursement, and the guy was putting dinners and

3  lunches with people, to find out one of them was in Australia

4  for the month, that he was putting them in for.

5           MR. KATZ:  Judge, this was a reimbursement expense,

6  whether Clark was there or not.

7           MR. FRAM:  If I may.

8           THE COURT:  The validity of the reimbursement may

9  depend on who was present.

10          MR. KATZ:  They were there for ALPA business at an

11  AFL- CO I business.

12          THE COURT:  No.  I am.

13          MR. FRAM:  Your Honor, if I may, doesn't think this

14  witness can authenticate.  To authenticate, state a business

15  record you need the custodian of records.  They have to have

16  firsthand knowledge of how the records are kept.

17          MR. PRESS:  We have a stipulation that these are

18  business records.

19          MR. KATZ:  I never stipulated.

20          MR. PRESS:  There was a request to admit.

21          MR. FRAM:  Wait a minute.  This witness can't do

22  it.

23          MS. RODRIGUEZ:  He did it.  In a stipulation.

24          THE COURT:  It is in, if it is in a request for

25  stipulation.

1          MR. FRAM:  Produce them.  If you are not going to

2     get this witness to say he has seen it.

3          MS. RODRIGUEZ:  You stipulated to the authenticity

4     of the documents in.

5          MR. FRAM:  Authenticity doesn't mean admissibility.

6          THE COURT:  They have a stipulation, he is going to

7     get in somehow.

8          MR. KATZ:  We bring Feldvary in and he says it is a

9     mistake.

10         THE COURT:  That is different.  That is conflicting

11    testimony.  That is what a trial is for.  You don't get to

12    keep something out because you side is totally  different

13    than the other side.

14         MR. JACOBSON:  That would be convenient.

15         THE COURT:  That would be convenient but it is not

16    the rule.  But I am troubled by having this witness testify

17    as to a document that he knows nothing about.

18         MR. JACOBSON:  I don't know that he knows nothing

19    about.

20         THE COURT:  Ask him.  Before you put what is in it.

21         MR. JACOBSON I would like to ask whether it

22    refreshes his recollection.  He said he didn't recall.

23         THE COURT:  You can ask.  You haven't even asked.

24    I will let you go forward with it.  If, this doesn't get in

25    through him.  That is all.

1              MR. PRESS:  Your Honor, the foundation for the

2    document, and its authenticity, has already been admitted to

3    by the union.

4              THE COURT:  But, I don't know what he knows about

5    it.

6              MR. PRESS:  I mean there is no other objection

7    left.  It is relevant, it is nonhearsay and it is authentic.

8              MR. JACOBSON: Authenticated by the stipulation.

9              THE COURT:  Yes.

10             MR. PRESS:  So what is left.

11             MR. JACOBSON:  I  can use it, admit into evidence

12   with any witness.

13             THE COURT:  Do you agree this was admitted as a,

14   through either a request for admission or a stipulation?

15             MR. KATZ:  I would have to check.  I don't

16   remember.

17             MR. PRESS:  Oh, Dan, you know.

18             THE COURT:  I am going to accept it, his

19   representation.  God help you if it is not.

20             But I am going to accept it.  And so you can

21   proceed.

22

23

24

25

```
 1
 2                    (In open court)
 3                    BY MR. JACOBSON:
 4     Q.   I am going to give you what has been marked?
 5                    THE COURT:  First of all, he never asked the
 6     question you asked originally.
 7                    THE COURT:  I forgot the question, your Honor.
 8                    THE COURT:  Whether he had dinner with Mr. Clark.
 9                    MR. JACOBSON: He said I don't recall having dinner
10     with him.
11                    THE COURT:  All right.  I thought that was the
12     question you asked before the sidebar.
13
14                    (Off-the-record discussion) record read open court.
15                    THE COURT:  Go ahead.
16     Q.   I would like to give you what is marked exhibit P-362,
17     sir.
18                    THE COURT:  P-362.
19                    MR. JACOBSON:  Yes, your Honor.  I understand this
20     document is not in evidence now.
21                    THE COURT:  No.
22                    MR. JACOBSON: I am offering P-362 in evidence.
23                    MR. KATZ:  I object under Federal Rules of evidence
24     403 and 602, lack of foundation.
25                    THE COURT:  I think this is a very classic business
```

1   record and I am going to let it in.

2            MR. JACOBSON: Thank you, your Honor.

3   Q.   Mr. Woerth, you are familiar with expense reimbursement

4   reports that were used at ALPA when you were president?

5   A.   Yes.

6   Q.   And some reports were in use the an ALPA when you were

7   vice president before that?

8   A.   I believe so, yes.

9   Q.   Under ALPA policy, individuals who worked for ALPA and

10  incur expenses on its behalf can get reimbursed for the

11  expenses if they provide the reports plus documentation that

12  receipts and so on, showing what they expended it on,  with

13  explanations of what the ALPA business purpose is.  Correct?

14  A.   Of course, yes.

15  Q.   And that is the rule that you used and all of the

16  executives at ALPA had to follow, correct?

17  A.   Yes.

18  Q.   You recognize this document, P-362, as one such expense

19  reported?

20  A.   Looks like an ALPA expense report.

21  Q.   It has a cover which, as has a summary, showing the

22  amounts that were spent and signed by the person submitting

23  the report, correct?

24  A.   Yes.

25  Q.   There is an authorization line, right?

1    A.    Yes.

2    Q.    That means that somebody else has to review it and say

3    it is okay to pay?

4    A.    Of course.

5    Q.    And  then following it are a number of receipts,

6    correct?

7    A.    Yes.

8    Q.    Small reports, and then also receipts as well, correct?

9    A.    Yes.

10   Q.    And this is the type of document that ALPA relies on

11   from its employees before it reimbursed them for expenses

12   they claim to have had for the company, right, for the union?

13   A.    Yes.

14   Q.    So this is a expense report dated January 8, 2002, the

15   statement date is December 29, 2001.  You see that on the top

16   of the first page?

17   A.    Yes.

18   Q.    Now, let's look at the second page of this document.  In

19   is a credit card item expense report.  Do you see that?  That

20   is what the caption on top is?

21   A.    Okay.

22   Q.    There is a list of type of expenses, explanation of

23   charges and totals.  Do you see that on top?

24   A.    Yes.

25   Q.    Then underneath that there is a section to fill out

Woerth-cross/Jacobson                                          83

```
 1   below for group meal expenses, do you see that?

 2   A.   Yes.

 3   Q.   Then you are supposed to list the persons in the group?

 4   A.   Yes.

 5   Q.   The airline, their last name, first name.  And then if

 6   there is an outsider, there is some type of information to be

 7   provided?

 8   A.   Yes.

 9   Q.   So in this particular page, in the type of expense under

10   group meals, it references two lunches.  See attached.  Do

11   you see that?

12   A.   Yes.

13   Q.   And if you look in the date of the meal, it says 12/4

14   and 5..  Because there are two meals being reported?

15            THE COURT:  Before that, it says breakfast, lunch,

16   dinner, lunch is circled.

17   Q.   I meant to point that out.  The one circled is lunch,

18   correct?

19   A.   That is what it is.

20   Q.   In fact on the line above it says two different lunches,

21   one on the 4th and one on the fifth?

22   A.   Yes.

23   Q.   And it shows a list of names.  And the first one is you.

24   Correct?  Duane Woerth?

25   A.   Yes.
```

1    Q.    The next one is Dennis Dolan?

2    A.    Yes.

3    Q.    And who is Dennis Dolan?

4    A.    He was the he was the first vice president of the

5    Airlines Pilot Association.

6    Q.    So in the ire arc key he is the person immediately after

7    you?

8    A.    He is the second highest-ranking elected person.

9    Q.    Next person is Jerome Mugerditchian?

10   A.    Yes.

11   Q.    We have talked about him before.  What is his title

12   again?

13   A.    Vice president of administration.

14   Q.    Does that make him the third ranking person of the four

15   elected officers?

16   A.    I believe that is correct.

17   Q.    All right.  And then the last one is John Feldvary, who

18   is, if I recall correctly, the fourth ranking person of the

19   four elected --

20   A.    That's correct.

21   Q.    So 1, 2, 3 and 4 of the top elected officials are all at

22   this lunch?

23   A.    They are all at the convention.

24   Q.    Right.  It shows that you are both there for 12/4, and

25   12/5, both days, your lunches, right?

1    A.    That is what that says.  I only remember being at one

2    lunch.  That is what it says.

3    Q.    You only had one lunch at the convention?

4    A.    I only remember one lunch with these people.  I was at

5    the convention a long time with a lot of people.

6              THE COURT:  You remember having lunch with Clark?

7    A.    Oh, yes.

8              THE COURT: So this is reimbursement for that lunch.

9    A.    It has two lunches.

10             THE COURT:  It has Clark, one lunch only.

11   A.    I see that.

12   Q.    You the second lunch, John Clark?

13   A.    Yes.

14   Q.    12/ 5 only.  American Airlines?

15   A.    Yes.

16   Q.    You testified you had lunch with Mr. Clark at that

17   convention?

18   A.    Sure.

19   Q.    Now, let's turn to the next page.  The next page is

20   receipt for the Paris, Las Vegas.  Do you see that?

21   A.    Yes.

22   Q.    And it shows on December 4, the same day that one of the

23   lunches as reflected on the day before, it shows something at

24   the St. Louis Cafe.  It has four names there for names, three

25   names for lunch.

1    A.    Yes.

2    Q.    Can't tell if that is 4 or 3.

3          THE COURT:  What are you -- if I am looking at the

4    receipt, these are both for lunches.

5          MR. JACOBSON:  Yes.  There is more receipts, your

6    Honor.  I am working my way down to it.

7          THE COURT:  All right.

8    Q.    And so there is a list of names there, and then on the

9    second day there is a list of five names for lunch.  And one,

10   the second list, name on that list is John Clark.  All right.

11   So this is the receipt backup, page 3 is the receipt backup

12   for the itemization on page 2, correct?

13   A.    Yeah.

14   Q.    All right.  The next page has been redacted.  Now, let's

15   go to the page, the American Express card page.

16         THE COURT:  Feldvarie's page.

17         MR. JACOBSON:  Yes, John Feldvarie's American

18   presents.

19   Q.    You see there is one expense item that is not redacted

20   out.  Can you expand that one, please.  Thank you.  Do you

21   see that?

22   A.    Yes.

23   Q.    For Smith and Wollenski, Las Vegas?

24   A.    Yes.

25   Q.    What is Smith and Wollenski?

1    A.    A steak house.

2    Q.    That is a December 6, 2001, charge?

3    A.    That is what it shows, yeah.

4    Q.    There for $996.36.

5    A.    Yes.

6    Q.    Turn to the next one?

7              THE COURT:  Was its food extra?

8              MR. JACOBSON: Extra bread sticks, your Honor.

9    Q.    Next page.  That is a copy of the one of the receipts on

10   the American Express page, everything else redacted out,

11   right?

12   A.    Yes.

13   Q.    Mr. Turn to the next page after that.  On the left we

14   see the receipt, the number matching the number we just saw

15   before, the $996.36.  Correct?

16   A.    Yes.

17   Q.    And on the right it says dinner, 12/5/01.

18   A.    Yeah.

19   Q.    And it lists four names there, right?

20   A.    Yes.

21   Q.    Can you tell the jury what those names are?

22   A.    My name, Duane Woerth, Dennis Dolan, Jerry Mugerditchian

23   and John Clark.

24   Q.    John Clark had AAL after him?

25   A.    Yes.

Woerth-cross/Jacobson                                      88

1    Q.    That is the code used for American Airlines?

2    A.    Yes.

3    Q.    Turn to the next page.

4          THE COURT:  Before you go off that page.

5          MR. JACOBSON: Yes, your Honor.

6          THE COURT:  The cards that fall on the 6th, on 12/,

7    6/01- this says on top here 12/5/01-

8    Q.    Let me ask  the question I think that will clear that

9    up?

10         THE COURT:  I would ask it.  But right now it is

11   not clear that the handwritten notes are dealing with the

12   same thing as the charge, because the charge is apparently

13   made the next day.

14   Q.    Mr. Woerth, did you ever have a dinner in Las Vegas that

15   goes out past midnight?

16   A.    Have I?

17   Q.    Yeah.

18   A.    I probably guess I have.

19   Q.    You think this is one of those dinners?

20   A.    It might have been, but I don't remember.  I thought we

21   had an early dinner but I don't remember.

22   Q.    Someone is feeling that it is still December 5 but it is

23   after midnight when the card was run, the card will show the

24   six, although people think it is still being the fifth.  Is

25   that correct, sir?

1    A.    That?

2    A.    Could happen, but like I said, my dinner of this memory

3    is much earlier, but that is my memory.

4    Q.    Turn to the next page which is a expense, item expense

5    report similar to the one that was page 2 of this exhibit,

6    sir?

7    A.    Yes.

8    Q.    Notice on the first one we had the Judge pointed out

9    that the word lunch was circled?

10   A.    Yes.

11   Q.    You see here the word dinner is circled?

12   A.    Yeah.

13   Q.    It says the date of the meal is 12/6/01.

14   A.    Yes.

15   Q.    And it shows the same dollar amount as all the prior

16   numbers of that dinner?

17   A.    Yes.

18   Q.    It shows the list of attendance, right?

19   A.    Yes.

20   Q.    Again, it is you, Dennis Dolan, Jerry Mugerditchian,

21   John Feldvary, and John Clark of American Airlines.

22   A.    Yes.

23   Q.    All right.  And do you recall whether the envelope of

24   authorization cards were given to Jerry Mugerditchian at the

25   lunch or at the dinner?

```
 1    A.   My recollection, it was at, in, and my only recollection

 2    of John Clark at all, was at the lunch.  That is the only

 3    recollection I have of John Clark.

 4    Q.   Your recollection of a dinner could be faded by this

 5    time, you think?

 6    A.   Not any worse than lunch.

 7    Q.   All right.

 8    Q.   I am going to show you a document that has been marked

 9    as exhibit P-373.

10              THE COURT:  P-373?

11              MR. JACOBSON: Yes, your Honor.

12    Q.   Did you have a chance to glance at this?

13    A.   I did.

14    Q.   Turn to the third page, there is a list of cc's to this

15    letter?

16    A.   Yes.

17    Q.   You he will see the third name listed is your name?

18    A.   Yes.

19    Q.   And did you receive this letter, sir, in or around the

20    time it was sent, a copy of this letter?

21    A.   I must have.  I don't remember it, though, but I am sure

22    I did.

23              THE COURT:  This would be pretty important.

24              THE WITNESS:  Yes.

25              THE COURT:  This is a pretty important thing?
```

1    A.    I would think so.

2              MR. JACOBSON: I would move exhibit P-373 in

3    evidence, your Honor.

4              MR. KATZ:  No objection.

5    Q.    Let's look at the first page of this.  This is a letter

6    on the TWA MEC letterhead?

7    A.    Yes.

8    Q.    Dated March 20, 2002?

9    A.    Yes.

10   Q.    It is addressed to the chairman of the National

11   Mediation Board?

12   A.    Yes.

13   Q.    The National Mediation Board is the entity we talked

14   about here at trial that is responsible for essentially

15   managing collective bargaining and union representation,

16   under the Railway Labor Act.  Correct?

17   A.    Yes.

18   Q.    Let's look at the first paragraph.  Can you read that

19   paragraph to the jury?

20   A.    "As the duly elected union representative of

21   representatives of the TWA airlines LLC pilots as represented

22   by the TWA Master Executive Council, MEC of the Air Line

23   Pilots Association.   We hereby submit our formal request for

24   an investigation into possible interferences by American

25   Airlines, Inc., management with a representational

```
 1   certification.  This request is made pursuant to the

 2   representative election process ordered in 29 NMB number 36,

 3   American Airlines, Inc., Trans World Airlines, Inc./ APA/,

 4   ALPA, case number R 6867, file number C R 6736.

 5   Q.   Now, this complaint, you didn't help prepare this

 6   complaint, did you, sir?

 7   A.   I don't believe so.

 8   Q.   And people at your ALPA National office didn't prepare

 9   this complaint, correct?

10   A.   I don't believe so.

11   Q.   As prepared by the TWA MEC and whoever was helping them,

12   right?

13   A.   Yes.

14   Q.   Turn to the second page, you can see it is signed boy

15   all of the officers and an elected representative of the MEC?

16   A.   Yes.

17   Q.   Eight people.

18          MR. KATZ:  I object.  That mischaracterizes the

19   record.

20          THE COURT:  What mischaracterizes?

21          MR. KATZ:  It wasn't signed by all of the members

22   of the MEC, your Honor.

23          MR. JACOBSON: I believe that is all that were left

24   of the MEC at this point, but I will ask you.

25   Q.   Do you recognize those names as being the elected
```

1    officers and captains and first officer reps for TWA?

2              THE COURT:  And the secretary treasurer, who I

3    don't think is elected.

4              MR. JACOBSON: It is an elected office, it has no

5    vote.

6              THE COURT: It has no vote but it is elected.

7              MR. JACOBSON: Both the chairman and vice chairman

8    and secretary are elected but have no vote.

9    A.   Your Honor, I must admit I am confused here because my

10   understanding was by November of the previous year, the MEC

11   members themselves was only Mr. Rautenberg and Sally Young.

12   All, the others were no longer on the MEC.

13   Q.   That was true for a period of two to three weeks,

14   correct, sir?  Then they moved to two first officer, two

15   captain structure?

16   A.   My time line of all the comings and goings, I don't

17   remember.

18             THE COURT:  In any case, this letter is submitted

19   on behalf of the TWA airline LLC, MEC.

20   Q.   Yes?

21   A.   Yes.  Yes.

22   Q.   And the gist of the letter is that American Airlines

23   management, by entering into Supplement CC, with AMA, is

24   essentially interfering with ALPA's ability to run an

25   election to represent the AA pilots, would that be a fair

1   summary of it?

2   A.   That seems to be their objective.

3   Q.   Right.  And the notion being that supplemental cc

4   provides such a windfall to the American pilots who had been

5   represented by APA, that it would put ALPA at a tremendous

6   disadvantage in becoming the representatives of the American

7   pilots in the future?

8   A.   That seems to be their theory.

9   Q.   All right.  Did you take any action in response to this

10  request to the NMB?

11  A.   I don't remember any action.

12  Q.   All right, thank you.

13          MR. JACOBSON: Your Honor, I think I moved this in,

14  did I.

15          THE COURT:  Yes, I have it marked in evidence.

16          MR. JACOBSON: Thank you very much.

17          THE COURT:  Yes.

18  Q.   I want to show you now a document that has been marked

19  as exhibit P-374.

20  Q.   Do you recall receiving this letter?

21  A.   Yes.

22  Q.   Did you take any action in response to this?

23  A.   I don't believe I did.

24          MR. JACOBSON:I offer this P374in evidence.

25          MR. KATZ:  I object.  It is hearsay.  It is filled

1    with /SEFPL serving statement statements that are not

2    factual.  They are purely argumentative.  Not admissible.

3                MR. JACOBSON: Can I can ask for questions in a

4    foundation, if you would like.

5                THE COURT:  Before using this document ask him if

6    he knows anything about it.  I mean, on the ground that he

7    received it -- do you remember receiving this letter?

8    A.   If not this letter specifically, I remember him raising

9    the issue of him wanting all counsel.  All I remember is he

10   wanted additional counsel.  I don't remember this

11   specifically.

12               MR. JACOBSON: I will ask for foundational

13   questions.

14               THE COURT:  Yes.  This is all speculation,

15   theories, issues of conflicts which, you know, really, under

16   403 would be very confusing.

17               MR. KATZ:  Yes, your Honor.

18               THE COURT:  And not very relevant to this point.

19               MR. KATZ:  I believe the Court addressed this at

20   the pretrial conference and the in limine motion.

21               THE COURT:  I am not sure you couldn't ask about

22   the litigation, if he knows anything about it.  But to use

23   him as a framework for sticking this in evidence, I am not

24   going to allow it, at least on the current basis.

25               MR. JACOBSON: I will ask more questions, your

 1  Honor.

 2              THE COURT:  Go ahead.

 3  Q.   Mr. Woerth, do you recall that a pilot named Bud Bensel,

 4  Leroy Bud Bensel?

 5  A.   Yes.

 6  Q.   And he was a TWA pilot?

 7  A.   Yes.

 8  Q.   A little bit older than you but somewhat your

 9  contemporary?

10  A.   Yes.

11              THE COURT:  Taller than you.

12              THE WITNESS:  Everyone is better looking, so we can

13  establish all that.

14  Q.   I don't know if he is taller.  I think they are both

15  very tall pilots.

16              And you recall that that he was a vocal opponent of

17  the supplemental cc, do you recall that, sir?

18  A.   I actually recall that later rather than at the time.

19  Q.   All right.  Do you recall a situation in which he was

20  sued by the Allied Pilots Association?

21  A.   I don't remember him being sued, no.

22  Q.   No, you don't remember that?

23  A.   No.

24  Q.   Do you remember a lawsuit regarding the enforceability

25  of Supplement CC?

1    A.   I don't remember a lawsuit.

2    Q.   All right.

3         MR. JACOBSON: He doesn't remember a lawsuit.

4         THE COURT:  Do you remember a lawsuit brought by

5    APA as the plaintiff against Bud Bensel and a class of TWA

6    pilots as defendants.

7    A.   I do not, sir.

8    Q.   All right.  Do you recall any requests by the TWA pilots

9    to have ALPA help defend them in a suit?

10        MR. KATZ:  I object to that, your Honor.

11        THE COURT:  If he doesn't remember the lawsuit, how

12   can he --

13        MR. JACOBSON: I thought he might have a request for

14   defense.

15        THE COURT:  Do you remember a request for defense?

16        THE WITNESS:  No.

17        MR. JACOBSON: I am done with those questions of

18   this witness on this issue.

19   Q.   You recall that ALPA's role as the exclusive bargaining

20   agent for the former TWA pilots expired, right?

21   A.   Sure.

22   Q.   And you recall that that was on or about April 3rd of

23   2002?

24   A.   Sounds about right.

25   Q.   All right.

1          THE COURT:  When that happened, then ALPA's

2    contract with TWA LLC expired by its own terms.  Is that

3    correct?

4          THE WITNESS:  That is my understanding, your Honor.

5          THE COURT:  And who represented the former TWA

6    pilots.

7          THE WITNESS:  After April 3rd.

8          THE COURT:  After April 3rd.

9          THE WITNESS:  Then the pilot, Allied Pilots

10   Association, represented their employment at American

11   Airlines.

12   Q.   Now, on April 3rd of 2002, did you receive, excuse me.

13   Did the APA domiciles, any of the APA domiciles, pass

14   resolutions asking that the American pilots join ALPA, do you

15   recall that?

16         MR. KATZ:  Objection, your Honor.  This was

17   discussed at the pretrial conference, prior to the start of

18   the trial.  All of these issues are irrelevant --

19         THE COURT:  Come to sidebar.

20         (At sidebar)

21         THE COURT:  Mr. Jacobson.

22         MR. JACOBSON: Yes, your Honor.

23         THE COURT:  Assuming for the moment, I must admit I

24   don't have a specific recollection, but assuming for the

25   moment that one of the local, or some group of APA pilots,

```
 1   passed a resolution expressing a desire to affiliate with

 2   ALPA.

 3              MR. JACOBSON: Yes.

 4              THE COURT:  And this was after April 3rd, 2002,

 5   what relevance to this case.

 6              MR. JACOBSON: Actually it is on April 3rd, 2002.

 7              THE COURT:  Let's assume, if that is the day that

 8   the National Mediation Board ruled single carrier status,

 9   isn't it?  Do I have that?

10              MR. KATZ:  You have that right --

11              MR. JACOBSON: Your Honor, it is highly relevant

12   because one  person, a reasonable person, a reasonable juror

13   looking at the evidence would say, gee, on the first day that

14   they are free to now sign up because their formal obligation

15   to TWA is over, they would see that, resolutions were passed

16   by two of the five main domiciles and then he begins a visit,

17   a road show to all --

18              THE COURT:  Who?

19              MR. JACOBSON Mr. Woerth, goes to all of the main

20   domiciles that, together are the homes for 95 plus percent of

21   the pilots, over the next several months.  This would be a

22   reasonable inference from this, that this is not something

23   that --

24              THE COURT:  What is the reasonable inference?

25              MR. JACOBSON: The reasonable inference is that they
```

```
 1   are working the on he will Howard Attarian whole time.

 2              THE COURT:  What makes that inference reasonable?

 3              MR. JACOBSON:  Because prompts to have unions

 4   added, to come on to your property don't pop up like

 5   mushrooms after the rain.  There is something there ahead of

 6   time.  It is a reasonable inference and I think more

 7   reasonable to the contrary that the that the reason why these

 8   resolutions are passed the day that ALPA is off the property

 9   is because the authorization campaign and the other work ALPA

10   had been doing up to this point to bring them on board are

11   now continuing out in the open.

12              They were working at it quietly, behind the scenes,

13   because they weren't allowed to legitimately, now they can

14   legitimately so it comes out.

15              It is like, I mean, any reasonable person, you

16   know, you see a couple on the street one day being

17   passionate, you can assume it is reasonable to assume that

18   the day before they were as well.

19              THE COURT:  The issue of the affiliation with, of

20   ALPA with APA precedes the point in time when the two unions

21   become adverse.  They became adverse as a result of the

22   American acquisition.  They weren't adverse before, they were

23   just two different union.  They didn't have any dealings with

24   each other.  And prior did that time, indeed you brought a

25   lot of it out, was that ALPA, and the APA saw, at least some
```

1   of the pilots, let me put it that way, saw a benefit of being

2   represented by ALPA, ALPA is a large organization, their

3   financial strength, there clout on the Hill, you know, the

4   resources that they could bring to bear on that issue.

5          Then you have TWA comes along, the American

6   agreement, that kind of thrusts them, in a semi adversary

7   role.  In some sense, a direct adversary role.

8          And that goes along, and that adversary role

9   continues on the 3rd of April.

10         You try to get the jury to conclude that it is

11  proof that ALPA went into the tank during that period,

12  because they are now resuming what had been a policy before

13  the TWA acquisition was ever announced.

14         MR. JACOBSON: What we are trying to get the, than

15  /KOUGS, inference we are trying to get the jury to reach is

16  while they may have, for there public phase, stopped pursuing

17  it, the TWA American merger discussions, seniority list

18  merger discussions, that in fact they were continuing --

19         THE COURT:  You ought to have a good --

20         MR. JACOBSON: I don't.

21         THE COURT:  You have a good appeal issues.

22         MR. JACOBSON: I think it is an issue owe on.

23         THE COURT:  The Court of Appeals like to slap me

24  around ever now and then, makes them feel good.

25         MR. JACOBSON:  I think it is highly persuasive

```
1    evidence.  You see a man running at one end of the building

2    behind the building.  You look at the other end, he is

3    running again, you can assuming he is coming out the other

4    side.

5            THE COURT:  ALPA and APA are thrown into

6    adversarial positions by the American announcement.  It is

7    not something ALPA planned or APA planned.  It is just, ones

8    American decided to buy TWA, that took what was a budding

9    friendly relationship, preceding that, only by a couple of

10   amonths, budding friendly relationship, and a relationship

11   that the union itself was fostering to some degree.  I mean

12   the APA was fostering.  Now suddenly this comes, and they are

13   adversaries.

14           How they dealt with that is the issue in this

15   lawsuit.  But to say that they went back on April 3rd, to a

16   policy they had had all along.

17           MR. FRAM:  Your Honor, the conduct he is pointing

18   to is not ALPA's conduct.  He is talking about the APA's.

19           THE COURT:  The APA people now feel, reverting to

20   what they had felt before.

21           MR. JACOBSON: Your Honor, these are lengthy

22   resolutions, not just on one of the ALPA domiciles, APA

23   domiciles, but several.  It is clearly in the hopper waiting

24   for the day that they can launch it.  They launch it the

25   first day that ALPA is on the property, is no longer on the
```

 1   property.

 2              THE COURT:  That is APA.

 3              MR. JACOBSON: One can infer from that that they are

 4   doing it because they had a coordination with ALPA.

 5              THE COURT:  No, no.  That is the leap you make.

 6   The reason that APA acted in a sense unlike most unions when

 7   they were willing to consider affiliating with ALPA before

 8   the -- was they saw some advantage, and there is another, an

 9   earlier resolution that outlined what the advantages are.  I

10   can't remember the date of it, but there was.

11              MR. KATZ:  Back in 2000.

12              THE COURT:  Yeah, back in 2000.  Okay.  That, those

13   advantages didn't go away, being part of the AFL-CIO, having

14   60,000 members, having 500, whatever the hell they had,

15   whatever think had, employees, and, you know, and the staff

16   of experts and things of that sort.  That didn't go away.

17   Circumstances thrust them into adversity, not adversary,

18   adversariness with each other and indeed that is why we are

19   having this trial.

20              It is how ALPA dealt with that situation that is

21   relevant.  And your cross brought out some very interesting

22   stuff on that as to what was going on while.

23              But to say that once the adversarial nature was

24   relieved because ALPA was an expression, off the property,

25   APA now wants to go back and do what it always wanted to do,

1    and to say that that is proof, they can draw an inference

2    that ALPA breached its duty of fair representation, went into

3    the tank.

4           MR. JACOBSON: That is too many steps, your Honor.

5    The only inference I want to get from this is that the reason

6    why APA domiciles are doing this is because they have been in

7    continuing contact.

8           THE COURT:  Yeah, but where?  They have been in

9    contact, introduce evidence this that they have been in

10   continuing contact.

11          But to say that there was no longer an adversarial

12   relationship, and they now gone back to take the position to

13   do what they what always wanted to do or at least many of

14   them wanted to do prior to --

15          MR. JACOBSON:  Your Honor, the reference has been

16   that John Clark and Hunibell were collecting ALPA cards.  He

17   has denied --

18          THE COURT:  I let all that in.

19          MR. JACOBSON: He denied that that was an ALPA

20   thing, there private thing.  The letter, according to the

21   resolution.

22          THE COURT:  I thought your cross on that was very

23   important.  I think the question of the card campaign going

24   on while the parties are in adversarial -- whether to what

25   extent, if any, ALPA sort of cooperated, or winked an eye at

1    it, is very directly relevant.

2              But once ALPA is off the property, and APA goes

3    back to doing what it has legitimate reasons to do and always

4    had legitimate reasons to do --

5              MR. JACOBSON: The resolution, though, is sent a to

6    ALPA directly from Mark Hunnibell, the same person who is

7    doing the card campaign seeking as you saw the evidence

8    seeking to be re I am buzzed by ALPA.

9              THE COURT:  Mark Hunnibell always, from what I

10   gather, was in favor of ALPA.

11             MR. JACOBSON: Strongly so.

12             THE COURT:  Clark was also in favor of ALPA.  And

13   anything they did during, prior to April 3rd, 2002, I have

14   not in any way limited you.  In any interaction they had,

15   even lunch, dinner, any interaction they had with Al, an ALPA

16   officials, I think is fair fodder.

17             MR. JACOBSON: The resolution --

18             THE COURT:  For the --

19             MR. FRAM:  It was mixed, your Honor.

20             THE COURT:  For this case.

21             MR. KATZ:  Mr. Jacobson.

22             THE COURT:  This is a big leap.  Even if it occurs

23   -- once the conflict, let's call it, is removed, the

24   adversarial nature is removed, because ALPA basically is

25   bounced off the American property, the fact that there are

```
 1    pilots who wanted to do what they always wanted to do.  I

 2    mean, not always.  But they wanted to do, there is a

 3    movement, it started prior to American putting its --

 4             MR. PRESS:  Joe, were you intending to owe he.

 5             MR. KATZ:  Let me say --

 6             MR. PRESS: I want to --

 7             MR. KATZ:   I haven't been able to say one word.

 8             THE COURT:  I have been dominating the

 9    conversation.

10             MR. KATZ:  I want to mention for the record that

11    the Court has reaffirmed its rulings on February 8, and on

12    June 2, when this issue was discussed in detail.

13             MS. RODRIGUEZ:  That is not what the ruling was.

14    The ruling gave latitude through the month of April, there

15    was another document that came out post this document that

16    the Judge said came in.  You are wrong there.

17             MR. KATZ:  No, you are wrong.

18             MS. RODRIGUEZ:  The date is not April 2.  I forget

19    the date of the document, but it was a document post --

20             THE COURT:  I am not relying on some prior ruling I

21    made.  I am relying, I am analyzing what is right here before

22    me, it is affecting the jury.  I think you are trying to make

23    an inference that it is, that is, that is not fair and is

24    misleading to the jury and goes to the concept of unfair

25    prejudice.
```

1              MR. KATZ:  Thank you.

2              MR. PRESS:  Can I make a point?  One of these

3      resolutions was sent to ALPA on March 18, the my Al American

4      me resolution.  We have the email.  It was forwarded to

5      Captain Woerth.  I don't know if you were intending to use

6      that.  This provides context for that.  It provides context

7      for why ALPA decided not to seek an election, which that

8      happened on the same day.

9              THE COURT:  That is different.  Nobody mentioned to

10     me you were talking about a draft resolution being forwarded

11     to ALPA on March 18.

12             MR. KATZ:  If you want to ask him why ALPA didn't

13     seek an election, that is allowable.

14             THE COURT:  I would allow that.

15             MR. JACOBSON: I am not asking your questions on

16     cross examination.

17             THE COURT:  There was a period of time until they

18     were ruled a single carrier beings even though everybody

19     anticipated that was going to happen, until it was done, and

20     until the complaint of the TWA MEC committee about that's

21     correct which was just introduced, the explanation, why they

22     were objecting to it, I think they are adverse and to the

23     extent that the two unions are talking to each other or that,

24     he can bring out.

25             So the March 18, saying that they prepared, they

1    sent it to him in draft form, that is a fact.  I don't know

2    that it is a fact.

3            MR. PRESS:  Well, this will provide context for

4    that email.

5            THE COURT:  No, no.  Don't give me context.

6            MR. PRESS:  I need to explain myself.  Attachment

7    to that email is not there.  It was produced to us in a

8    faulty state.

9            But the resolution is attached to this email.

10           THE COURT:  In a faulty --

11           MR. PRESS:  The attachment didn't accompany the

12    email ALPA produced to us.  We got it later in this thing.

13           MR. JACOBSON: Just the cover sheet.

14           MR. PRESS:  We got the email saying attached is a

15    merger resolution.

16           THE COURT:  But that was March 18.

17           MR. PRESS:  But the resolution itself is not an

18    attached.

19           THE COURT:  Is there any doubt as to what that

20    resolution was?  Do we have a doubt as to what was found?

21           MR. FRAM:  An email to Duane Woerth.

22           MR. PRESS:  No, to Rindfleisch and he forwarded it

23    to Duane.

24           MR. JACOBSON: It is in evidence through

25    Rindfleisch.  The resolution wasn't attached it.  It says

1    ALPA merger dot MIA.

2            THE COURT:  How do you know what resolution was

3    attached?

4            MR. JACOBSON: We don't.  It says ALPA merger.

5            MR. KATZ:  ALPA produced whatever it had.

6            THE COURT:  That is in evidence.

7            MR. KATZ:  It was a very thorough search of ALPA's

8    electronic files.

9            MS. RODRIGUEZ:  We know how thorough the search

10   was.

11           MR. KATZ:  We produced everything that was there.

12           MS. RODRIGUEZ:  Let's not go there.

13           THE COURT:  Well, I am sticking to my ruling.  At

14   the March 18 stuff, I think the merger of the two unions, it

15   was being sent when the matter was still open before the

16   National Mediation Board, possibly, things could have been

17   filed, things might have been done before the mediation board

18   acted.

19           MR. JACOBSON: I was planning on going into the next

20   letter which is where Mr. Woerth got the resolutions for

21   Miami and Dallas which were the following day, and then his

22   trip, visit goes these places.

23           THE COURT:  No.  No.  That, to me.

24           MR. JACOBSON my question is are you going to rule

25   the same way on all of those.

```
 1              THE COURT:  Yes.  Again, the date to me is

 2   extremely important.  Once the adversarial nature is removed,

 3   and, I don't know whether, they are not there yet, they are

 4   not part of ALPA's --

 5              MR. KATZ:  No.

 6              MR. JACOBSON: Why don't we excuse the jury for five

 7   or ten minutes.  I will make an offer.

 8              THE COURT:  I will do that.  .

 9              (In open court.)

10              THE COURT:  The lawyers would like to talk to me.

11   Can you blame them?

12              We have probably ten more minutes of legal matters

13   we have to go over.  Rather than make you sit here and try to

14   over here us through the white sound noise, I will give you a

15   break now.

16              Please, do not discuss the case among yourselves.

17   Keep an open mind until you have heard all the evidence.

18              (Jury leaves the courtroom:

19              MR. JACOBSON: Your Honor, the documents we would be

20   offering a long this line of testimony, which you have

21   excluded at sidebar, would be plaintiff's exhibit P 148

22   UUUUU, that is five U's.

23              THE COURT:  148, 5 U's, there is a document with

24   that?

25              MR. JACOBSON: If you recall the huge binders of the
```

1    Rindfleisch emails by your clerk, those two huge binders, the

2    individual documents in that were separated out.

3              THE COURT:  From A to 6 FFFFFF.

4              MR. JACOBSON: Yes.

5              THE COURT:  That is like 26 by six.  All right.

6              MR. JACOBSON: We pulled them out to make them

7    easier to handle.

8              THE COURT:  148, what is that again, four U's?

9              MR. JACOBSON: Five.

10             THE COURT:  That is not a female sheep, is it?

11             MR. JACOBSON: It is the start of a herd.

12             MR. JACOBSON: There was an email from Mark

13   Hunnibell to Ron Rindfleisch, and a copy to John Clark.

14   Subject line was ALPA merger resolution under consideration

15   in Dallas, Fort Worth.

16             THE COURT:  That is March 18.

17             MR. JACOBSON: April 3, 2002.  March 18 document is

18   already in evidence, your Honor, through Mr. Rindfleisch's

19   deposition.

20             THE COURT:  Go ahead.

21             MR. JACOBSON: This forwards a copy of the

22   resolution of the local -- the domicile, and, of why they

23   want to join ALPA and they include in their resolution a set

24   of conditions relating to TWA pilots.  That the merger

25   agreements include that there be no attempts to alter

Woerth-cross/Jacobson                                      112

1    seniority integration agreements relate relating to TWA or

2    any other prior acquisitions slash merger.  And then there is

3    other conditions, but that is the -- oh, and the defense

4    against litigation with intent or effect of altering any

5    prior seniority integrations.

6              Those are some of the conditions that the Dallas

7    Fort Worth group want.

8              THE COURT:  We know why.  They didn't want to lose

9    the benefit of Supplement CC.

10             MR. JACOBSON: I didn't suggest the Dallas pilots

11   were stupid in any way, your Honor.

12             The next document in the set would be a follow-up

13   email, dated April 4, 2002, at 8:38 in the morning, and that

14   is from.

15             THE COURT:  April 4.  How many X's after this.

16             MR. JACOBSON:  P 148, five W's.  And this is the

17   same document that was the prior exhibit but it is being

18   forwarded by Mr. Rindfleisch at 8:38 in the morning to people

19   including Ana McAhlen Schultz, Bob Christy, Clay Warner,

20   Duane Woerth, Howard Atterian, Jalmer Johnson, Ken Cooper,

21   Jonathan Cohen, Seth Rosen, Bill Roberts, and several others.

22             THE COURT:  Forwarded by Rindfleisch.

23             MR. JACOBSON: Yes, forwarded by Rindfleisch.

24             THE COURT:  Is that what he got on the 3rd.

25             MR. JACOBSON: Yes, same document.

1              THE COURT:  Now he is in turn forwarding it to.

2              MR. JACOBSON: All the people up the ladder.

3              THE COURT:  Up the chain.

4              MR. JACOBSON: Correction.  This one has the Dallas

5    Fort Worth motion and also he attached to as well a similar

6    resolution by the Miami domicile, of APA.

7              And has the same, almost exactly the same language,

8    has the same conditions in it the Miami one does.

9              THE COURT:  You mean Miami has the same condition

10   as Dallas Fort Worth.

11             MR. JACOBSON: Yes, your Honor.  They they are very,

12   very similar.

13             THE COURT:  Not surprising.

14             MR. JACOBSON: They appear coordinated.

15             The next document in this set is listed as P-148,

16   followed by six B's.

17             THE COURT:  Do you understand that P 148 is in

18   evidence?

19             MR. JACOBSON: Yes, your Honor.  But I think for

20   making the purpose of this record I think it is important to,

21   the specific pages, it is a huge exhibit.  I hope when you

22   hear the recitation you may consider your decision.

23             THE COURT:  P 148 was admitted on the 22.

24             MR. JACOBSON: Yes, your Honor.  Without objection.

25             THE COURT:  That is what I am checking.  Nothing.

1              MR. PRESS:  Your Honor.

2              MR. JACOBSON: Your Honor, these documents are

3    already in the case.

4              MR. KATZ:  We will object now to anything after

5    April 3rd, on or after April 3rd, 2002.  I thought that the

6    documents were limited to the period up to April 3rd, 2002.

7    But we object to any of these emails in 148.  Following that

8    point in time.

9              MR. JACOBSON: Your Honor.

10             THE COURT:  I have it right here.  This was in

11   connection, I think, with the video of Ron Rindfleisch.

12             MR. JACOBSON: Yes, your Honor.

13             THE COURT:  And I have that P, without objection,

14   P-146, 147, 148, and 149.

15             MR. JACOBSON: Yes, your Honor.

16             THE COURT:  Were all admitted into evidence on my

17   master list I keep as well as my notes.

18             MR. PRESS:  It is sitting right there.

19             MR. JACOBSON: The big stack next to the binders.

20             THE COURT:  I have it in evidence.

21             MR. JACOBSON: The documents are in evidence.  The

22   question is whether I can make inquiry of this witness

23   regarding these exhibits.

24             MR. FRAM:  Your Honor, if I may, we had --  we

25   submitted our trial brief, we recalled this issue on June 2

1    in chambers.

2            Your Honor reaffirmed the previous ruling at the

3    pretrial conference that relevance for the purposes of this

4    case would end on April 3rd.  So we had, we relied upon that.

5    I think we were surprised to hear that notwithstanding the

6    court's ruling in response to our trial brief, that portions

7    of the document are going into evidence.  So we would move to

8    strike them and we would certainly object to any questions or

9    argument with respect to these issues, your Honor.

10           MR. JACOBSON: First of all the recitation of the

11   Court's order made by opposing counsel does not correspond

12   with our recollection of it.  But in any case, the train has

13   left the station as far as the admissibility of this

14   document.

15           THE COURT:  Well, one can always correct error

16   before it gets in too deep.

17           I think at this point the burden is on the defense

18   here to identify a document that they now say shouldn't be in

19   evidence.  I think it is justified at this point.   They are

20   in evidence.  There was no objection.  This is a very well,

21   thoroughly, this case, the discovery was very thorough so

22   when somebody doesn't object, I don't have the feeling that

23   it is ignorance, it is a position by counsel who know the

24   case inside out.

25           I am still, for questioning this witness, I believe

 1    that actions by the APA, or for that matter, ALPA, with

 2    respect to a possible merger of the two unions, even after

 3    April 3rd, doesn't answer the question as to whether ALPA

 4    went into the tank when it was representing the TWA pilots

 5    from January of 2001 all the way into I think there was a,

 6    some kind of arbitration decided at the end of April of 2002,

 7    April --

 8              MR. FRAM:  Best efforts.

 9              THE COURT:  What?

10              MR. FRAM:  It was the so-called best efforts

11    arbitration.

12              THE COURT:  Best efforts.  Yes.  Until, once the

13    National Mediation Board ruled that ALPA was no longer the

14    carrier, which was April 3rd, 2002, we know that, was no

15    longer the union for the TWA pilots or for any pilots in the

16    TWA, American mix, the fact that the two unions started

17    talking merger again, and ALPA and I say that was a position

18    ALPA was taking long before anybody heard of American taking

19    over TWA.  We had all the testimony about October, the

20    captains visit to address APA pilots, and I think that that

21    created some, to try to get the jury to draw the inference

22    that somehow or other the APA pilots doing what they always

23    wanted to do, at least what some of them wanted to do, some

24    of them wanted to do, is proof that ALPA went into the tank.

25              Now, I am told there was a, and it is in evidence,

1    that on March 18, APA and ALPA had communication about a

2    resolution, that should be in evidence.  APA and ALPA were

3    talking to each other in March before they were single

4    carrier status.  I think the jury should hear that.  That may

5    be something as well, but I am sticking with my overall

6    ruling as to questioning this witness.

7               As to admissibility to rule on whether I should

8    allow or revoke the admission of P 148, you have to identify,

9    I am not going to go through 300 documents to try to figure

10   out what you are objecting to.  If you object en masse, on

11   the theory if I object to everything if you object to

12   everything,  what I don't want, I won't listen to that

13   either.

14              MR. FRAM:  We understand.

15              THE COURT:  You got to come up, you don't object

16   the first time.  You got to come up, and I am not, that

17   doesn't say that I will agree with you, but you at least have

18   to be specific.

19              I don't want you to say we made a mistake on 123rd

20   documents, you know.  You have got to show me why.

21              MR. FRAM:   We will be specific.

22              THE COURT:  I will read the documents, and --

23              MR. FRAM:  Your Honor, I hope we understand your

24   ruling to also preclude any argument by counsel that event

25   after April 3rd or on April 3rd are relevant to their claims.

```
 1    There was some questions asked before that about Mr. Bensel

 2    and money he wanted to defend a lawsuit, that is not in this

 3    case.

 4              THE COURT:  The lawsuit, if I am not mistaken, was

 5    in February.

 6              MR. FRAM:  It was --

 7              THE COURT:  2002.  But the suit against Bud Bensel,

 8    and it was a purported, I think it was supposedly a, they

 9    were seeking a defendant class, I think, in that suit, were

10    they not?

11              MR. FRAM:  They were.

12              THE COURT:  They were seeking a defendant class of

13    TWA pilots or ex- TWA pilots.

14              MR. PRESS:  True.

15              THE COURT:  That was in February.

16              MR. PRESS:  It was.

17              THE COURT:  So how that was dealt with is within

18    the timeframe, clearly within the timeframe of this case.

19              MR. FRAM:  It is, but the concern there, your

20    Honor, is that that is not a claim.  There is no DFR claim in

21    this case alleging that ALPA breached its duty by failing to

22    support them.

23              THE COURT:  You know you can't have it that

24    tightly.  Their attitude towards -- by ALPA, ALPA for

25    assistance might bear on the issues.
```

```
 1              MR. FRAM:  Your Honor, we have very detailed

 2     proposed findings of fact for both sides.

 3              THE COURT:  There is a jury here.  I don't make

 4     findings of fact.

 5              MR. FRAM:  No, your Honor.

 6              THE COURT:  That is why the jury is here.

 7              MR. FRAM:  The contested facts in the joint final

 8     pretrial, your Honor, are supposed to limit the proofs at

 9     trial and there is nothing in those to suggest that there was

10     bad faith or misconduct with respect to the failure of ALPA

11     to defend Bensel.  Of course  Ben Bensel to the extent he

12     incurred fees individualsly is not --

13              THE COURT:  So far I haven't heard anything about

14     that suit that I thought should be in this.  And whether it

15     is in this, the detailed, Fred Lacey's gift to the District

16     of New Jersey, the --

17              MR. FRAM:  The final pretrial.

18              THE COURT:  -- the monstrous final pretrial with

19     300 contested facts is no surprise to anybody.  I assume it

20     is no surprise to anybody.  Everybody knows all about it.

21     And I would allow the testimony of what ALPA's reaction is,

22     which I did, I do.  The testimony is they, I think Captain

23     Woerth said that.  Didn't he say they never, he said he never

24     even heard of the suit.

25              MR. JACOBSON:  He did not recall the suit.
```

1            THE COURT:  That ends that.

2            MR. JACOBSON: I stopped asking questions about

3      that.

4            Your Honor, on the offer of proof, what I would

5      anticipate eliciting his testimony if I were permitted to do

6      so, was that the day after ALPA was off the property, Mr.

7      Woerth, along with other top officials at ALPA, received the

8      resolutions of the Miami and Dallas Fort Worth domiciles of

9      American Airlines.

10            THE COURT:  The inference you want to draw from

11      that is because the it happened the next day or four days

12      later or twelve days later was that ALPA went into the tank,

13      which is the issue in this case.

14            MR. JACOBSON: And the additional evidence I would

15      solicit from him is  that over the course of succeeding

16      months he in fact personally visited the five main domiciles

17      owe on.

18            THE COURT:  That was the policy before American

19      ever appeared.

20            MR. JACOBSON: I am making my offer of proof of what

21      the evidence would show.

22            THE COURT:  They can slap me around again.  That is

23      what we have the Third Circuit for.

24            MR. JACOBSON: He visited the domiciles to, in his

25      words, document the road show to sell ALPA to the members.

1          THE COURT:  I have no doubt that.

2          THE COURT:  I have no doubt that, at least for a

3    while, after they became a single carrier, that ALPA was

4    trying to get APA, into --

5          MR. JACOBSON: The evidence will show that, yes.

6          THE COURT:  I don't doubt that.  I don't doubt that

7    the evidence will show that.  But to make that, to say that a

8    policy was in place before American ever appeared on the

9    scene, when there was no American -- there was an American

10   but they weren't buying TWA, and then the acquisition thrust

11   the two unions into conflict, but when the conflict was

12   removed, when single carrier status was ruled upon on April

13   3rd by the National Mediation Board.

14         Now, for instance, any testimony about how ALPA,

15   whether ALPA list resisted that application, I think that is

16   all admissible.  I think how they reacted to it, single

17   carrier application was pending for quite some time.  It was

18   pending.

19         MR. KATZ:  Yes, your Honor, from November 9 --

20         THE COURT:  Four months, whatever it was.  Whatever

21   ALPA did during that period with respect to that application

22   I think is relevant.  And I think arguments might be made

23   from that.  But once the conflict is removed, the conflict

24   between the two unions is removed, the fact that Alpha goes

25   back to doing what it wanted to do before American ever

1   showed up on the scene, you know.  Now, I will look at, right

2   now, where we stand, is those documents are in evidence.  We

3   will see what the defendant does.  And I am not going to let

4   you question this witness.

5            MR. JACOBSON: There are two other documents that I

6   would offer along this line.

7            THE COURT:  Sure.

8            MR. JACOBSON: One was --

9            THE COURT:  You don't mean offer.  You mean that

10  you want.

11           MR. JACOBSON:  In my offer of proof.

12           THE COURT:  Right.

13           MR. JACOBSON: One was P-253.

14           THE COURT:  253.  What is that?

15           MR. JACOBSON: That is the address by ALPA president

16  Duane Woerth at the Dallas Fort Worth domicile meeting on

17  Friday, August 2, 2002.

18           THE COURT:  That is not, that is not in evidence.

19           MR. JACOBSON: That is not in evidence.  But there

20  is a portion of his statement that I would like to ask him

21  about, even notwithstanding your ruling, and that is on the

22  third page of this document, he talks about how ALPA handles

23  difficult negotiations.  He says, I will read the quote.

24  This is the thing I was going to go into.  Quote, we are

25  going to probably have over 500 staff members by end of this

1   year, and they are probably our greatest strength.  They are

2   the depth of the organization.  They are transportable.  That

3   is to say they are interchangeable.  When we have a crisis as

4   a big negotiation that is going on, whether it be American or

5   Delta, we bring in the A team.  We don't leave anything

6   behind.  We bring in the top guns, and John Malone can attest

7   to this as he has Seth Rosen at his time.  He is our number 1

8   contract negotiator over 30 years, negotiated more contracts

9   with pilots than any other person in history.

10              And I would read him that and I would ask him why

11  didn't we get the A team.  Why didn't TWA get the A team?  I

12  would like permission to read that portion?

13              THE COURT:  You said he didn't get the A team?

14              MR. JACOBSON: We didn't get Seth Rosen.  We got

15  Holtzman.

16              MR. KATZ:  From this --

17              THE COURT:  Holtzman ain't going to like to hear

18  this.

19              MR. KATZ:  This is from an August 2, 2002,

20  document.

21              THE COURT:  Okay.  You are offering it.  I am

22  sticking to my ruling.

23              MR. JACOBSON:   But that --

24              THE COURT:  For a couple of reasons.  First of all

25  the passage of time, he is trying to sell ALPA to APA.  Who

```
 1    is the A team, and who isn't the A team.  Why didn't we get

 2    the A team?  There were a lot of advisors floating around,

 3    some of them were pretty strong.

 4              MR. JACOBSON: The other exhibit, your Honor, would

 5    be P-254.

 6              THE COURT:  What?

 7              MR. JACOBSON: The other exhibit on that line.

 8              THE COURT:  254?

 9              MR. JACOBSON: Yes.

10              MR. KATZ:  What is the date on that?

11              MR. JACOBSON: That is the notes from owe on.

12              THE COURT:  It is December 9, '02.

13              MR. JACOBSON: That's correct.

14              MR. KATZ:  Thank you.

15              MR. JACOBSON: Mr. Woerth's comments to the APA

16    domiciled at LaGuardia that day.

17              THE COURT:  Right.  They are actually meeting

18    notes.

19              MR. JACOBSON: Yes.  They include his comments.

20              THE COURT:  Yes.  I am sticking --

21              MR. JACOBSON: I understand.

22              THE COURT:  I am sticking to my ruling.

23              MR. JACOBSON: I wanted to complete my offer of

24    proof and I have --

25              THE COURT:  That is fair.  And I want to also say
```

Woerth-cross/Jacobson                                              125

1    that until I, because 148 was in without objection, I am

2    going to have to review those documents very carefully.  I

3    don't know if that will change my view.

4            MR. KATZ:  Yes, your Honor.  We will file a motion

5    to strike or raise a motion to strike.  They are in

6    chronological order so at the point in time --

7            THE COURT:  I want to tell you this.  I want to

8    make it clear, before I do, I want your commitment that if

9    Captain Woerth has to come back because I do something based

10   on my review of the document, that you have to bring him back

11   and make him available for further cross examination.  I am

12   not going to let him leave this courtroom when the issue of

13   those things are still, and I don't have them.

14           MR. KATZ:  Yes, your Honor.  We will take that.

15           THE COURT:  Captain Woerth, do you understand that?

16   A.   Yes, your Honor.

17           THE COURT:  You might have to come back in five

18   days or something.

19           THE WITNESS:  I want to just tell the Court, I need

20   to vote tomorrow.  I can't do it tomorrow but I will come

21   back any time  --

22           THE COURT:  I don't know if it will be tomorrow.

23   A.   I am not available tomorrow, your Honor.

24           THE COURT:  Vote on what?

25           THE WITNESS:  About 15 items of interest to the

```
 1   United States.

 2           THE COURT:  Oh.  Is tomorrow election day?

 3   A.   I represent the United States at the ICAO.

 4           THE COURT:  You mean in Montreal?

 5           THE WITNESS:   The voting in Montreal.

 6           THE COURT:  At the international -- right.  Oh,

 7   that is an important.  You should be there.

 8           THE WITNESS:  Thank  you..

 9           THE COURT:  We will accommodate your schedule.  I

10   just pant to make it clear that at some point, next week or

11   so, we will get his answer, that I may decide that some of it

12   will stay in.

13           MR. KATZ:  That is understood, your Honor.

14           THE COURT:  Okay.  Now, can we resume cross

15   examination.

16           MR. JACOBSON: I have more questions.  Can we take a

17   three or four minute break?

18           THE COURT:  Let's do this.  I have roughly 20 to

19   12.  Let's go to ten of 12.  12 minutes.

20           MR. JACOBSON: Thank you.

21           (Recess)

22

23

24

25
```

```
 1              (Jury enters the courtroom.)

 2              DUANE WOERTH, resumes.

 3              CONTINUED CROSS EXAMINATION.

 4              BY MR. JACOBSON:

 5              THE COURT:  Mr. Jacobson, you can continue.

 6              MR. JACOBSON: Thank you, your Honor.

 7   Q.   Now, Mr. Woerth, your secretary back in 2002 was Ursula

 8   Reichstein, is that correct.

 9   A.   Yes.

10   Q.   Do I pronounce that correctly?

11   A.   No.

12   Q.   How do you pronounce it?

13   A.   Ursula Reichstein.

14              THE COURT:  You asked.

15   A.   Ursula Reichstein.

16   Q.   And when you would get emails she would print them out

17   for you?

18   A.   Typically.

19   Q.   All right.  Did you print out your own emails, relied on

20   the secretary?

21   A.   No,  I relied on them to send them out.

22   Q.   I would like to direct attention to March 18 of 2002,

23   and to make it a little bit easier for you, this is a while

24   ago, I want to give you exhibit P 31?

25   Q.   You have before you P 31?
```

```
 1    A.    I am there.

 2    Q.    It is an email that is forwarding a document.  Correct?

 3    A.    That is what it purports to do.

 4    Q.    It is from Ron Rindfleisch?

 5    A.    Yes.

 6    Q.    It is addressed to a number of people at ALPA National

 7    headquarters.  Correct?

 8    A.    Yes.

 9    Q.    And that would include Ana McAhren Schultz who was your

10    head research person, correct?

11    A.    She was the Director of Economics and Financial

12    Analysis.

13    Q.    Bob Christie.  Clay Warner.  You.  Howard Atterian.

14    Jalmer Johnson, Jonathan Cohen.  Ken Cooper.  Seth Rosen.

15    Fill Roberts and other people who I haven't haven't

16    mentioned, correct?

17    A.    Yes.

18    Q.    And the subject is ALPA merger MIA document.  Correct?

19    A.    That is what it says.

20    Q.    Now, in the pilot lingo, MIA doesn't refer to missing in

21    action.  It refers to Miami.  Correct?

22    A.    That identifier for Miami.

23    Q.    And you know that the Allied Pilots, American Airline,

24    has a large domicile in Miami?

25    A.    Yes.
```

1    Q.   You have been there?

2    A.   Of course.

3    Q.   All right.  And the importance of this document is high?

4    A.   Yes.

5    Q.   The sensitivity is confidential?

6    A.   Yes.

7    Q.   And the attachment is ALPA merger, MIA documents.  Do

8    you see that?

9    A.   I see that.

10   Q.   All right.  And you received that document?

11   A.   I don't remember this document.

12   Q.   All right.  The name on top showing who printed it.

13   That Ursula?

14   A.   Yes.

15           THE COURT:  Herndon is the location.

16   Q.   Herndon is where the ALPA main offices are in Virginia,

17   Herndon?

18   A.   We have offices, I usually work downtown, but we have

19   offices in Herndon.

20   Q.   That is where most of the staff is?

21   A.   That's correct.

22           MR. JACOBSON I would like to offer exhibit P 31 in

23   evidence, your Honor.

24           MR. KATZ:  Your Honor, I object.  He doesn't

25   remember receiving the document.

1          THE COURT:  He is addressed in it and it is printed

2    out by his secretary.  There is no indication of lack of

3    genuineness.  I think the jury should be allowed to hear that

4    an ALPA merger document was received.  I am going to allow

5    it.

6    Q.   And Mr. Woerth, in fact, back there on March 18 of 2002,

7    at 8:56  in the morning or so, Ron Rindfleisch forwarded to

8    you and the other ALPA executives a document he receives from

9    the American airline pilots based out of the Miami domicile,

10   a resolution to merge with ALPA.  Correct?

11   A.   That is what this document is.

12   Q.   And on March 18 of 2002, ALPA was still the certified

13   exclusive bargaining agent for the TWA LLC pilots?

14   A.   Yes, we were, for two more weeks.

15   Q.   All right.

16          THE COURT:  You I you didn't know then --

17   A.   No, I didn't.

18          THE COURT:  Turned out it was.

19   A.   Correct.

20   Q.   Turned out it was two more weeks?

21          THE COURT:  You didn't know that then.

22          THE WITNESS:  That's correct, your Honor, no.

23   Q.   Did you know Sean Clarke, a different first name, not

24   John Clark, but Sean Clarke?

25   A.   I am not putting it, in context, I don't remember Sean

1   Clarke.

2   Q.   Did you ever go out to dinner with Sean Clarke that you

3   can recall?

4   A.   I can't remember who Sean Clarke you are talking about

5   is.  I am not associating the name or place or person with

6   Sean Clarke.

7   Q.   All right, thank you.  Now, the master executive you

8   chairman of an MEC, and ALPA, is referred to sometimes as

9   being ALPA on the property.  Is that a phrase that is used?

10  A.   I completely don't, I don't, I didn't understand --

11  Q.   I think I garbled it up.  I am sorry.  Have you ever

12  heard the phrase ALPA on the property, or ALPA on the ground,

13  to refer to the role of the master executive chairman of the

14  MEC?

15  A.   I haven't heard that phraseology, no.

16  Q.   All right.  Is the master executive chairman is a member

17  by virtue of being that office, of one of the three main ALPA

18  National boards, right?

19  A.   He is a member of the executive board.  All MEC chairman

20  are members of the executive board, yes.

21  Q.   And the executive board are the ones who sort of are the

22  first revisers of policy, they suggest the policy that have

23  been adopted by the board of directors?

24  A.   The counsel normally suggests policy.  The executive

25  boards can adopt certain kinds of policies and at a certain

```
 1   level they have to send it to the full board of directors.

 2   They are our second highest-ranking governing body, yes.

 3   Q.   All right.  So with you been being the president, Bob

 4   Pastore and those like him would be sort of equivalent of

 5   senators or Congress men, correct?

 6   A.   I don't -- well, I guess the board of directors I

 7   referred to as Congress, so maybe we could call the execute

 8   difference board the Senate.  I am not sure if it is a

 9   perfect fit but I get your point.  They are a legislative

10   body.

11   Q.   They are important legislative officials within the

12   structure of ALPA?

13   A.   Yes, as individuals and as a collective body.  Very.

14   Q.   Thank you.  And communication between the members on the

15   local level at MEC, and National ALPA, is normally supposed

16   to be directed through the MEC chairman.  Correct?

17   A.   Well, members are free to communicate with whoever they

18   want to communicate with.

19   Q.   I should rephrase it.  Communication from ALPA National

20   down through the MEC, is normally directed through the MEC

21   chairman?

22   A.   I think very many communications go through the master

23   chairman, but a president is free to communicate with any

24   member or any body or any group of bodies that he wishes to.

25   Q.   Very good.  Thank you.  All right.
```

Woerth-cross/Jacobson                                    133

1              Now, in your direct examination you said that ALPA,

2    APA's merger policy had always been an impediment to APA

3    rejoining ALPA because of the no arbitration provision and,

4    that, and things like that.  Do you recall that testimony?

5    A.   Yes.

6    Q.   All right.  How long was always in that context?

7    A.   My understanding, I became, left the airport in 76, got

8    hired in 1977 and as long as I can remember even thinking

9    about these sorts of questions, that was, my entire life in

10   the airline industry, that was my understanding, why APA was

11   gone and one of the reasons why they weren't coming back.

12   Q.   Isn't it fact you also testified that the no arbitration

13   provision was not added with the APA's contract with American

14   until 1997?

15   A.   No arbitration clause but ALPA's merger policy

16   notwithstanding, even if they didn't have a contract, they

17   didn't  like, my understanding was they didn't really see

18   them selves as being willing to split to arbitration.  That

19   was my understanding, of the attitude of the average American

20   pilot.

21   Q.   But you you agree that the no arbitration provision was

22   not added in your contract until 1997?

23   A.   And that is what I believe to be true.  I can't verify

24   that.

25   Q.   So no arbitration provision would could not have itself

1    be an impediment to rejoining prior to that, could it?

2    A.   I don't understand the question.

3    Q.   The no arbitration clause wasn't added to their contract

4    until 1997, then it could not have been an impediment to

5    having APA rejoin ALPA as you said earlier?

6    A.   The impediment wasn't APA's policy.  The impediment was

7    ALPA's policies which did provide for arbitration.  They

8    weren't worried about their policies.  To join ALPA they

9    would be subject to our policies which did have an

10   arbitration.

11   Q.   I see.  You said did you not respond to Roland Wilder's

12   written request for a lawsuit because it was made by him and

13   not bypass tore.  Do you recall that?

14   A.   Yes.

15   Q.   You never told Wilder or Pastore that you needed a

16   letter signed bypass tore before you respond, do you?

17   A.   I don't remember what the response was.

18   Q.   You didn't respond at all?

19   A.   It became moot, as I understand it understood it.

20   Q.   You didn't tell Mr. Wilder thank you for your letter.

21   Could you please have Bob Pastore sign it and send it back

22   in.  Did you?

23   A.   Why would I?

24   Q.   You didn't call Pastore and say I got this letter from

25   your lawyer who said I have been asked by you, Pastore, to

```
 1    have ALPA authorize the lawsuit, but I have to get the letter

 2    from you directly.

 3              You didn't tell Mr. Pastore that either?

 4    A.   I don't believe I did.

 5    Q.   All right.  Now, you told the APA board you say on April

 6    5 of 2001 that a stapling was unacceptable and morally

 7    reprehensible?

 8    A.   Yes.

 9    Q.   Do you still believe that today?

10    A.   The whole staple of the entire seniority list, yes.

11    Q.   Now, you also said that the October 2 thousand one time

12    frame after you got a letter from Mr. Brundage which your

13    lawyer put in evidence that you called Bill Compton, the TWA

14    CEO to talk about the situation.  Do you recall that?

15    A.   Refresh me on the timeframe.

16    Q.   October, 2001?

17    A.   Yes.

18    Q.   That is your testimony?

19    A.   That I talk to Thompson in 2001.

20    Q.   Right.  And he is a CEO of TWA?

21    A.   I believe I he was.

22    Q.   Do you know the name Bob  Baker?

23              THE COURT:  Baker?  What?

24    Q.   Baker as in making bread.

25              THE COURT:  As in making bread.  Okay.
```

1    A.    Bob Baker, I knew, was an executive at American

2    Airlines.  I am not sure if that is the same Bob Baker.

3    Q.    Was he the vice chairman of AMR and CEO.  TWA LLC?

4    A.    I knew I was vice chairman of American.  I didn't know

5    what his role was at the TWA LLC.

6    Q.    You didn't realize that he, Baker, not Compton was the

7    CEO at that point.

8              MR. KATZ:  What point of time are you talking

9    about?

10             MR. JACOBSON: October, 2001.

11   A.    I am not sure what difference it made, what his job was.

12   Q.    Because you indicated you called him because he was the

13   CEO.  That is why I was asking you?

14             THE COURT:  After April 10, 2001, TWA was operating

15   as a subsidiary of American, right TWA, LLC.

16   A.    It was, your Honor.  I think what counsel is trying to

17   ask me, when I called Bill Compton, I am calling Bill

18   Compton.  If I incorrectly referred to his title as President

19   and CEO of TWA LLC, I didn't care what his title was.  I was

20   talking to Bill Compton, who I thought knew something that

21   was going on about the negotiations.  I wasn't trying to call

22   a CEO.  I was trying to call Bill Compton.

23             THE COURT:  What interest did Compton have after

24   LLC was operating and clearly American people were designees

25   were running it, whoever they were, what interest did Compton

 1    have in the ongoing integration dispute?

 2                 THE WITNESS:  My belief  --

 3                 THE COURT:  He was an officer in what was now a

 4    bankrupt company in Chapter 11.

 5    A.   I wasn't calling, your Honor, like in an official

 6    capacity addressing someone who is representing -- I was

 7    trying to understand what was going on in October, and I

 8    thought Bill Compton was the type of individual that still

 9    had contact with the pilots, who had a lot of influence

10    around there, who might shed some light on to me, what,

11    meetings were happening, meetings were not happening.

12                 THE COURT:  He really wasn't in the loop at that

13    time.  If TWA LLC is operating under Americans umbrella,

14    TWA, Inc., the original TWA is, presumably in the process of

15    winding up its bankruptcy, distributing its assets out of

16    bankruptcy, in fact, liquidating, and I am trying to figure

17    out what, why he would even been in the loop as to what is

18    going on on the pilot integration front.  I can see why

19    American is concerned, I can see why the APA is concerned, I

20    can see why ALPA is concerned.  But I can't see where TWA,

21    Inc., is concerned.  Maybe I am wrong.

22    A.   Your Honor, I was, I placed a call, I might be

23    completely wrong in all of my assumptions.  Maybe he would

24    know nothing and contribute nothing.  I testified that I did

25    reach out to him to talk to him in the hope of getting

1    information.  I am not sure if I learned anything from the

2    call or not.  I am just testifying yes, I did talk to the

3    man.  That is all I am saying.

4              THE COURT:  Okay.

5    Q.   Now, you also said in October, 2001, you believed that

6    the CEO of American, Mr. Carty, could still walk away from

7    the deal somehow.  Do you recall testifying to that?

8    A.   I believed he could terminate TWA LLC if he chose to.

9    Q.   And he?

10             THE COURT:  I am sorry.  What do you mean by

11   terminate?

12             THE WITNESS:  I mean if he, if the whole thing

13   didn't turn out under the process that they thought they had

14   agreed to, that is without an arbitration, and if Congress or

15   litigation or by any means an arbitration was imposed upon

16   them, I believed Mr. Carty believed he had the right, and had

17   promised APA they would never submit themselves to that, so

18   there is some risk that he may decide I am not going to do

19   TWA LLC any more.  I will try to sell the assets at some

20   point.

21             What I thought, what I believed was important to

22   him, was preserve the relationship with APA, no matter how

23   ill founded, I didn't like what they were agreeing to, but he

24   would not proceed and conclude and integrate into American

25   Airlines the pilots of TWA if there was an arbitration.  That

 1   is what I concluded.

 2           THE COURT:   Okay.

 3   Q.   All right.  Now, in fact, you know that American

 4   Airlines, AMR, had spent approximately 750 million dollars on

 5   TWA.  Acquiring it.  Correct?

 6   A.   I didn't know the exact number.  I knew they had to put

 7   many levels of money in because it was losing so much money.

 8   Q.   They paid money for those assets, right?

 9   A.   Yes.

10   Q.   The assets included something like 170 airplanes, most

11   of them knew, right?

12   A.   I don't remember the numbers.  I know whatever TWA was,

13   they got it all.

14   Q.   They got it all.  The slot restricted gates in the

15   airports that everybody was trying to get, right?

16   A.   They got everything.  Yes.

17   Q.   And you know they also assumed about two billion dollars

18   from debt, right?

19   A.   Yes.

20   Q.   And they also were well in the way of process of

21   spending another 750 million dollars in integration costs to

22   interest grace the TWA operations into the American Airline

23   operations?

24   A.   If you say so.  I don't know what the numbers were.

25   Q.   Well --  all right.  Well, you have whole research

1    group, you are always keeping on top of what all the airlines

2    are doing financially, right, at ALPA?

3    A.   Ten years ago I had a pretty good grip on what the

4    numbers were.  I don't know if I have a grip today.

5    Q.   If you add those numbers up, that is about three and a

6    half billion dollars.  Are you seriously saying that if

7    Congress passed a law requiring arbitration among seniority

8    groups, that couldn't resolve it through negotiation, that

9    Mr. Carty, who was taking a great deal of personal

10   responsibility for this transaction, would shut it down and

11   walk away from all of that?

12   A.   I know what Mr. Carty, sir, said to Senator Kit Bond.  I

13   know what was reported he said.  I know what was reported he

14   said to Senator -- to the secretary of transportation, Norm

15   Mineta, what Norm Mineta reported to me.  And that

16   conversation said he would.  So either he lied to Senator

17   Mineta or, Department of Transportation Mineta or Mineta lied

18   to me, but that is what he said.

19   Q.   You found that to be a credible threat then that wasn't

20   worth testing?

21   A.   Worth testing?  He said it.  I think there was a risk

22   that should be considered.

23   Q.   Now, you talked about the participation at the Mayflower

24   hotel meeting of act 20 to 22.  Do you recall that?

25   A.   Yes.

1           THE COURT:  I am sorry, the date.

2    Q.   October 20 to 22 of 2001, your Honor.  In fact, there

3    was an exhibit that you put in evidence through your lawyer,

4    exhibit D 88, which I believe are the minutes of that

5    meeting.

6           Now, in your testimony you stated that there was a

7    better deal offered by APA that day, correct?

8    A.   I was aware what I thought was a better offer.

9    Q.   And you said that in particular that that better offer,

10   that better deal, offered furlough protection for TWA pilots?

11   A.   It is my understanding that the offer included furlough

12   protection, a St. Louis cell, a number of items.  I don't

13   remember all of them.  Whatever it was it was better than the

14   other offer.

15   Q.   I am asking you about the furlough protection in

16   particular?

17   A.   I thought there was furlough protection.

18   Q.   Of course furlough protection isn't something that the

19   APA's, the union, can grant.  That is only something the

20   employer, American Airlines, can grant?

21   A.   Correct.

22   Q.   I want to address briefly, I hope briefly, the Eastern

23   Airlines situation that you mention order direct examination.

24   All right, sir?  Would you agree with the statement that in

25   the 1980s and 1990s that Frank Lorenzo was probably the

1   biggest enemy of pilots in the pilot union?

2   A.   Yes.

3   Q.   He was the person who owned Texas Air, then he bought

4   Continental Air, then he bought Eastern Airlines, correct?

5   A.   He had two strikes, pilot strikes, with Frank Lorenzo,

6   Continental and Eastern.

7   Q.   He was very anti union and attempted to bust the union

8   in both places, right?

9   A.   Yes, he was.

10  Q.   In connection with Eastern airline, the original strike

11  actually did not involve the pilots, it involved the

12  mechanics, the IAM, correct?

13  A.   The machinists went on strike, yes.

14  Q.   And the key to whether or not Lorenzo could, actually he

15  locked them out, didn't he?

16  A.   I don't recollect if he locked them out as a strike.

17  Q.   But whichever way, the Eastern pilots decided to strike

18  in sympathy with the mechanics?

19  A.   That was their decision, yes.

20  Q.   And in fact, the Eastern pilots and ALPA as a whole was

21  willing to shut down Eastern, if necessary, put it out of

22  business, if necessary, to stop Lorenzo's union rampage?

23  A.   We supported the strike.  We supported Eastern pilots.

24  Q.   Right.  Were you willing to support them to the point of

25  the airline shutting down if necessary?

Woerth-cross/Jacobson                                        143

1    A.   That would be the Eastern pilots' decision, not the rest

2    of the pilots' decision.

3    Q.   But you were supportive of that?

4    A.   We would support the Eastern pilots with their object.

5    Q.   All right.  Sometimes the pilots refer to it as burning

6    the airline down, if they needed to.  Do you recall that

7    phrase being and?

8    A.   Phrase of that or similar.

9    Q.   In fact, Eastern went out of business as a result of the

10   strike, right?

11   A.   Yes, they did.

12   Q.   Okay.  And although many pilots were hurt by that,

13   losing their jobs, ALPA celebrates the event as being a key

14   step of showing the reassertion of their power and their

15   ability to assert themselves against management?

16   A.   I think that is a gross mischaracterization.  You don't

17   celebrate the disaster of losing Eastern Airlines.  That is

18   never celebrated, sir.

19   Q.   Maybe that is the wrong word.  You hold that as showing

20   something we are able to, if need be, take it to the end in

21   order to preserve the interest of all the pilots?

22   A.   I don't think that was the message of Eastern strike,

23   which, and the shutdown of Eastern Airlines was a tragedy,

24   and we think we view it that way.  I think it did show what

25   the Eastern, what the Eastern strike showed, the Continental,

1    united and Eastern strikes, when we created major contingency

2    fund we were showing that we will put resources, we will

3    assess ourselves.  We will make pilots pay special an

4    assessments.  We will fight an aggressive union busting

5    effort.

6             And unfortunately, Lorenzo took it to the end and

7    destroyed an airline rather than negotiate.

8    Q.   ALPA stood strong, in fact, all the members were

9    assessed based on the percentage of their respective income

10   to provide a strike fund for the Eastern pilots?

11   A.   For strike benefits.

12   Q.   They were on strike for a year, a little bit more?

13   A.   A very long time.

14   Q.   Once Eastern went under, there was a question what to do

15   with all the pilots who were now out of work, right?  Do you

16   recall that situation?

17   A.   The pilots were out of work, it is a question for

18   everyone, I am not sure what you mean by ALPA.

19   Q.    All right.  But isn't it a fact that under ALPA's,

20   fragmentation policy,  ALPA made efforts to bring these

21   pilots on board at various ALPA affiliated carriers, carriers

22   where union property, with their seniority, do you recall

23   that?

24   A.   There were efforts made to get Eastern pilots hired.  I

25   don't remember any effort anywhere to get them with their

Woerth-cross/Jacobson                                          145

 1    seniority.

 2    Q.    Isn't it a fact United Airlines hired 600 former Eastern

 3    pilots with full seniority, about 300 in the training center

 4    in Denver and the other 300 scattered throughout the airline?

 5    A.    I didn't realize they were integrated.  I thought they

 6    were hired as new hires.

 7    Q.    Do you recall this quote from the ALPA president, Hank

 8    Duffy.  Quote.  "A willingness to share seniority is not only

 9    the moral way to operate, even though it may impinge upon

10    one's own advancement.  It is also an important check of our

11    association's character."  Close quote.

12          Do you remember that?

13    A.    I  don't remember that but that sounds like  Hank Duffy

14    to me.

15    Q.    Flying in line 2, page 249.

16    A.    Sure.

17    Q.    You agree with that sentiment?

18    A.    Sure.

19    Q.    All right.  And in fact, Jerry Mugerditchian, who we

20    talked about, that time he was the MEC chairman of Midway

21    Airlines?

22    A.    That's right.

23    Q.    Ahe attempted to get midway to hire 400 of the Eastern

24    strikers with full seniority?

25    A.    Yes.

1   Q.   But they got hired with reduced seniority.  Do you

2   recall that happening?

3   A.   I remember quite a few carriers including northwest,

4   about five or six carriers hired Eastern pilots.

5   Q.   And do you recall that a fair number of them were hired

6   with full or at least partial seniority?

7   A.   I don't remember.  My recollection is everyone was new

8   hire.  I don't remember anyone being integrated.  If that is

9   incorrect, you can show me.  My recollection is everyone was

10  a new hire.

11  Q.   All right.  Now, let's look at the TWA acquisition, as

12  we talked earlier today, the year 2001 prior to 9/14, was a

13  pretty good period of time for the airline industry.

14  A.   Yes.

15  Q.   People needed air -- airlines needed experienced pilots?

16  A.   Yes.

17  Q.   All right.  When Eastern went under there wasn't a whole

18  lot of hiring going on.  That is one of the reasons why Frank

19  Lorenzo thought he would get scabs in to fly his planes for

20  him, right?

21          MR. KATZ:  I am going to object.  There is no basis

22  for this witness to know what is what was going on in

23  Lorenzo's mind.

24          THE COURT:  Yes.

25  Q.   I will rephrase it.  As part of the four senior

1    executives, were you one of the four senior executives  at

2    that time?

3    A.    Where?

4    Q.    At Eastern strike?

5    A.    I was at Northwest Airlines, I was not a national

6    officer.  I was master chairman of Northwest to Minneapolis

7    and I wasn't elected until October and didn't take office

8    until 91.

9    Q.    All right.  So I erred as far as where you lay there

10   time wise.  I apologize.

11            Isn't it a fact that there was another item of

12   Leverage, you could have used in the first part, the first

13   two thirds of 2001 on behalf of the TWApilots.  Couldn't you

14   have gone to the CEO of American Airlines, Carty, and tell

15   him if you don't put pressure on your union to treat these

16   TWA pilots fairly, then we are going to go to our ALPA

17   carriers who need experienced pilots, and ask them to hire

18   the staple people on, with seniority.  Wasn't that a credible

19   threat?

20   A.    No one asked me at TWA to hire their, jobs for our

21   pilots.  Nobody ever approached me with that proposal.

22   Q.    I am not asking you if they approached you.  You are the

23   president of the union, right?  You are the president of the

24   union.  You are the person who you said that you went in and

25   you made some calls to people to reduce the stapling from

1    full.  I am asking, did you ever suggest to anyone saying,

2    look, we can apply more pressure here.  They need the pilots

3    to fly the planes.  If we can get the pilots jobs somewhere

4    else with  seniority under the fragmentation policy we can

5    put a lot of pressure on American Airlines.

6              MR. KATZ:  I am going to object, your Honor.  I

7    think this proposition is first of all incoherent.

8              THE COURT:  I am going to sustain the objection to

9    that question.

10             MR. JACOBSON: To the question or the chain of

11   questions?

12             THE COURT:  Just the one that has been objected to.

13             MR. JACOBSON: All right, thank you.

14   Q.  Did you ever consider ways of putting pressure on

15   American Airlines so that they would put pressure on APA?

16             THE COURT:  Did you ever consider trying to get the

17   TWA pilots job for them?

18             MR. JACOBSON: Different question now, your Honor.

19   The question now is whether he ever considered trying to

20   apply pressure --

21             THE COURT:  The answer to my first question was no,

22   right?  You never tried to get the TWA pilots employed at

23   other airlines.

24   A.  I was unaware that they wanted to work at any other

25   airlines.

Woerth-cross/Jacobson                                            149

1            THE COURT:  Now, the next question.

2   Q.   The question is did you ever consider how you might

3   apply pressure to American Airlines so that they would put

4   pressure on their union to treat your union members better?

5   A.   I think that was the best efforts agreement that

6   resulted in the TWA LLC.  That best efforts is what we got

7   from American, which they agreed to use best efforts.

8   Q.   Right.  You understand best efforts in their mind meant

9   they hire a facilitator, a mediator with no power to cause

10  anyone to make a decision and that was the extent of their

11  responsibility?

12  A.   You can interpret best efforts.  There was a grievance

13  over best efforts.

14  Q.   That, the grievance, that is the position American took,

15  right?

16  A.   I don't know what their position was.

17  Q.   It is in evidence so the jury will know.

18           Now, I mentioned a moment ago the phrase scab.

19  Right?  That is a phrase that is used in union work

20  sometimes.

21  A.   Yes.

22  Q.   And a scab is someone, for example, who crosses a picket

23  line or violates a strike to go to work for an employer who

24  is the subject of a job action?

25  A.   That's correct.

Woerth-cross/Jacobson                                    150

1    Q.    ALPA remembers who the scabs are in their various job

2    actions, correct?

3    A.    Yes.

4    Q.    In fact, you keep lists of who the scabs are, to the

5    best you know, from every strike going back to 1931, Century

6    Airlines?

7    A.    We do not keep a list.

8    Q.    You do not keep a list?

9    A.    We do not keep a list.

10   Q.    You do not keep a list and provide them to your pilots

11   so they know who are scabs and who are not?

12              THE COURT:  Who is naughty and who is nice?

13              MR. JACOBSON: Yes, your Honor.

14              THE WITNESS:  Your Honor, you should know that that

15   has been determined to be illegal.  We do not do that.

16              THE COURT:  I would have thought so.

17              THE WITNESS: We do not, ALPA does not.

18              THE COURT:  Your answer to the question is you

19   don't keep such lists.

20              THE WITNESS:   That's right.

21              THE COURT:   All right.

22   Q.    Let me give you something that is not marked as an

23   exhibit because it won't be offered as an exhibit but perhaps

24   you will find it useful.

25              MR. KATZ:  Your Honor, I object to any examination

Woerth-cross/Jacobson                                        151

1    of the witness with this document.  This is really far afield

2    from the facts of this case.  It is a decision, 1999, from

3    the Eleventh Circuit, relating to one of the aspects of the

4    Eastern Airlines strike apparently.

5            THE COURT:  Yes.  I am not going to let you

6    question him on a legal opinion.

7            MR. JACOBSON: There is a factual portion in it I

8    would like to direct your attention to see if it refreshes

9    his recollection about a scab list.

10           THE COURT:  Go ahead.  You are just going to point

11   to him and ask if it refreshes recollection.  What page?

12   Q.   Page 1190, sir.  Left-hand column.  Bottom paragraph.

13   Continues on to the right-hand column.

14   A.   Beginning where?

15   Q.   Page 1190?

16           THE COURT:  During, the word during.

17   Q.   During the sympathy strike.

18           MR. KATZ:  Your Honor, I really object to this.

19           THE COURT:  You asked if it refreshed his

20   recollection.

21           MR. KATZ:  He already testified he wasn't involved

22   in any of the national activities of the union.  It is way

23   off the of the issues in the case.  It is a total

24   distraction.

25           THE COURT:  Does it refresh your recollection.

1           THE WITNESS:  No, your Honor, it does not.

2           THE COURT:  Okay.  Go on to the next subject.  You

3     can't use this document for any purpose.  All right.

4           MR. JACOBSON: Maybe I can use this document.  Mark

5     this as plaintiff's exhibit 449.

6           THE COURT:  44 what?

7           MR. JACOBSON: 449, your Honor.

8           MR. KATZ:  I object to any cross examination of the

9     witness with regard to this document.  This is totally beyond

10    the scope of the direct examination.  All this business about

11    scabs has nothing to do with this case.  No one has accused

12    American pilots or TWA pilots of being scabs.

13          THE COURT:  They didn't have a strike so we never

14    had the issue of anybody crossing a picket line.

15          MR. JACOBSON: This goes to the question of jumpseat

16    privilege.  This witness testified on direct examination that

17    it is improper to exclude, under ALPA policy, it is, as a

18    means of punishing, coercing or retaliating against other

19    pilots or groups or individuals.  It is not supported by

20    ALPA.  This is heading toward that.

21          MR. KATZ:  I object.  The jumpseat policy is in

22    evidence.  If he wants to ask Captain Woerth about jumpseat

23    policy, that is one thing.  This whole scab issue is a total

24    red herring.

25          THE COURT:  I see nothing that would permit

Woerth-cross/Jacobson                                            153

1   questioning on this document.

2              MR. JACOBSON: Look at the very bottom of the page,

3   your Honor, at the name of the document.

4              THE COURT:  Yeah?

5              MR. JACOBSON: I think I ask him whether he is

6   familiar with this document and some other questions on that

7   line.

8              THE COURT:  Let me see where you are going.  What

9   is your next question.

10  Q.   All right.  Mr. Woerth, is it not a fact that as a

11  matter of unwritten policy, the Air Line Pilots Association

12  encourages or directs its members to exclude from their

13  jumpseats pilots who are characterized as scabs?

14  A.   Are you saying is that ALPA's policy?

15  Q.   I said is that ALPA's policy or practice?

16  A.   No, it is not.

17  Q.   It is not at all?

18  A.   No.

19             MR. JACOBSON: That is his testimony.

20             THE COURT:  In our case there is no strike.  There

21  is no issue, the issue of the jumpseats wasn't to keep out

22  scabs.  It was to keep out everybody.  It was to keep --

23             MR. JACOBSON: No.

24             THE COURT:  It was to keep the 11,000 American

25  pilots from riding in the jumpseats.

```
 1              MR. KATZ:  American pilots weren't scabs.  They

 2   were working.

 3              THE COURT:  They were working.  They weren't scabs.

 4              MR. JACOBSON: The policy is denial of jumpseat

 5   privileges as a means of punishing, coercing, retaliating

 6   against other pilots, groups or individuals is not supported

 7   by ALPA.  His contention was I didn't offer a jumpseat.

 8              THE COURT:  Don't want to coerce the American

 9   pilots because of this policy.  I am asking him whether they

10   were punishing pilots through groups or individuals,

11   notwithstanding the language because of strike breakers or

12   other scabs.

13              THE COURT:  He answered that question.

14              MR. KATZ:  He answered that question.

15              THE COURT:  He said no.

16              MR. JACOBSON: I understand.  I am ending that

17   question.

18              THE COURT:  All right.

19              MR. JACOBSON: I have no further questions for this

20   witness, your Honor.

21              THE COURT:  All right.  This will be in the area

22   now of redirect.

23              MR. KATZ:  Yes, you your Honor, I have a few

24   questions on redirect.

25
```

1              REDIRECT EXAMINATION.

2              BY MR. KATZ:

3    Q.   Mr. Woerth, if you can remember back to yesterday

4    afternoon when the cross examination began, there were some

5    questions regarding the talk you gave at the Allied Pilots

6    Association board of directors on October 27, 2000.  Do you

7    recall that questioning, sir?

8    A.   Yes, I do.

9    Q.   Would you refresh the jury's recollection as to where,

10   what point in time that was with regard to the announcement

11   of Americans proposed acquisition of the assets of TWA?

12   A.   I think, October, 2000, right after our board of

13   directors unity resolution, and the TWA announcement of a

14   willing to acquire, I mean, American will to go acquire TWA

15   assets didn't occur until the following January, 2001, so

16   this is 90 days, approximately, somewhere around three months

17   prior to that.

18   Q.   Thank you, Mr. Woerth.  And there was in connection with

19   the cross examination some discussion of a services agreement

20   that was entered into between ALPA and the Allied Pilots

21   Association.  Do you recall that?

22   A.   Yes, I do.

23   Q.   And there was in fact an exhibit that was put into

24   evidence that was the services agreement itself?

25   A.   I remember that.

1    Q.    And do you remember when the services under that

2    agreement were performed?

3    A.    In a very short period of time frame after the signature

4    of both John Darrah and myself.  I don't remember the exact

5    dates.

6    Q.    I would like to show you for identification the,

7    something to confirm the exact date, it is exhibit P-271 for

8    identification.  Let me give you a copy, of that document.

9            Mr. Woerth, does this appear to be an invoice dated

10   January 5, 2001, from the Air Line Pilots Association for

11   services performed under the ALPA APA service contract.

12   A.    Yes, it does.

13           MR. KATZ:  Your Honor, I ask that this be received

14   in evidence.

15           MR. JACOBSON: No objection.

16           THE COURT:  Okay.  P-271 in evidence.

17           MR. KATZ:  Thank you, your Honor.

18   Q.    Does this refresh your recollection as to the exact

19   period of time when the services were performed under this

20   contract?

21   A.    Well, we sent a billing January 5, so it must have been

22   mostly in December, I would estimate.

23   Q.    Would you say the services had been completed by January

24   5 when the invoice was sent?

25   A.    Yes.

1    Q.   Then the second page of the document shows that the

2    Allied Pilots Association paid $5,000 that was, it was

3    invoice D?

4    A.   Yes, it does.

5    Q.   And the actual services agreement is plaintiff's exhibit

6    1 15 which is in evidence.  P 115.  It has been received.

7    P-271 has been received?

8              THE COURT:  Which one?

9              MR. KATZ:  P-271 is received.

10             THE COURT:  That is in evidence without objection.

11   Q.   Let's go to P 115 which is also in evidence.  And

12   pointing to the part under paragraph 1, where it says ALPA

13   will provide to APA the following in services.  What were the

14   services that were to be performed under this contract with

15   APA?

16   A.   Can you blow that up a little more for me?

17   Q.   What was being done here?

18   A.   Whatever is on that sheet is what we asked them to do.

19   Q.   APA asked ALPA to do some analytical and clerical work

20   to create, collect did it take, and analyze a membership

21   contract survey.  Could you describe for the jury what a

22   membership contract survey is?

23   A.   A survey, if we are really trying to ascertain the

24   priorities of what the membership finds most important.  Do

25   they find increased pay more important, maybe improved health

```
 1    benefits more important, are there work rules they want to

 2    change are more important.  More days off, it is kind of a

 3    ranking of all the, how the membership feels about all the

 4    various issues in front of them and it was a way to gauge how

 5    to prepare for contract negotiations to emphasize the

 6    priorities of the membership.

 7              So it is a fairly boilerplate thing.  We do it all

 8    the time.  It is very simple for us to do.  It is software.

 9    We pretty much use what we have off the shelf, that is what

10    we use.

11              We do the same thing for all our airlines.  We

12    survey our members before any contract negotiations begin.

13    Q.   What department within the Air Line Pilots Association

14    handles these surveys?

15    A.   I believe it is Economic, Financial Analysis.  Something

16    likd that

17    Q.   Sometimes referred to as EF and A?

18    A.   That's correct.

19    Q.   Do they do those surveys for other airlines?

20    A.   We do them for other airlines.  Everyone in ALPA we have

21    routinely provided these services for other independent

22    unions.  We actually did a lot of work for a foreign

23    airlines.  Many foreign airlines even created an independent

24    pilots services corporation so we could do services for other

25    airlines, including a foreign airlines.  We had a big staff,
```

 1   and we had a lot of requests so we did services for other

 2   airlines on a fee, on a per fee basis.  It was fairly

 3   routine.

 4   Q.    And so you had contracts with other pilots unions,

 5   independent unions, and foreign pilot unions to do this kind

 6   of work?

 7   A.    That's correct.

 8   Q.    And beyond the membership survey, are you aware of any

 9   work that was covered by this contract?

10   A.    I believe the only work was specified by this agreement.

11   Q.    All right.  And they were, the work was done prior to

12   the announcement of the TWA asset acquisition?

13   A.    I believe all the work was concluded in December, is my

14   recollection.

15   Q.    Thank you, Mr. Woerth.

16             Mr. Woerth, yesterday afternoon you were cross

17   examined about comments that were made at this AMA board

18   meeting in October, 2000, regarding the 45 million dollars

19   contempt fine that had been assessed against the Allied

20   Pilots Association.  Do you remember that discussion?

21   A.    Yes, I do.

22   Q.    Do you know when American Airlines and the Allied Pilots

23   Association resolved that issue?

24   A.    I believe it was in April and maybe finally blessed by

25   the Judge  in May, Judge Kendeall from Texas, that is my

1    understanding.

2    Q.    Of what year, sir?

3    A.    Of 2001.

4    Q.    And do you have any notion as to how it was resolved?

5    A.    There was a negotiation between American management and

6    the Allied Pilots Association.  And they worked out that they

7    would basically spread this 45 million dollars over 20 years,

8    they wouldn't have to pay it back except, an installment

9    plan, a  20-year period.

10              THE COURT:  With no interest.

11   A.    I don't, I am unaware, I don't have that knowledge, your

12   Honor.  I do know it is 20 years.  That is all I know.

13   Q.    How would you characterize the level of interest of the

14   American pilots in rejoining ALPA in the fall of 2000, the

15   year 2000?

16   A.    Fall of 2000?  I think in the fall of 2000, I think I

17   have already testified, I thought about five percent maybe.

18   I knew there was some interest, a few very, very interested

19   people but I didn't have a sense there was much -- those who

20   had interest were very intense, but I am afraid there weren't

21   very many of them.

22   Q.    And when the acquisition of TWA's assets was announced

23   by American Airlines, did that level of interest go up or

24   down or stay about the same?

25   A.    Basically, I think it went down.  I don't think anybody

1    was interested in ALPA as long as the seniority integration

2    was a work in progress.

3    Q.   And was that in in part because of the ALPA merger

4    Colorado policy?

5    A.   Well, of course the joint ALPA you would get in

6    arbitration, which was their goal, to prevent an arbitration.

7    Q.   There was some questioning there morning about Ron

8    Rindfleisch.  Can you describe what his duties were at ALPA?

9    A.   Ron was in, I believe worked for Seth Rosen.  I would

10   describe him as a mid management type person.  He wasn't a

11   director, he wasn't an assistant director.  He performed

12   various functions for us, kind of a utility man, under my

13   administration, he did a lot of different things for us but

14   he didn't have management responsibility.   He was not a

15   responsibility.

16   Q.   Did he have the ability to set policy for ALPA?

17   A.   Of course not.

18   Q.   Did he have any budget authority for ALPA?

19   A.   No, he did not.

20   Q.   Do you know whether he supervised any other ALPA

21   employees?

22   A.   I don't believe any employees reported to him.

23   Q.   Would you consider him a high-ranking executive?

24   A.   No, I would not.

25   Q.   You received a letter from Mr. Wilder, seniority lawyer

```
 1    for the TWA pilots on March 26, you testified about that

 2    today and yesterday?

 3    A.   Yes.

 4    Q.   And at one point you said that it was made moot, I

 5    believe, your phrase, in your testimony.  Would you explain

 6    what you meant by that?

 7    A.   I would have to refresh myself what Mr. Wilder was

 8    asking.

 9    Q.   All right.  Make we we can put that up on the screen.

10    A.   I believe events over ran and I think we got an

11    agreement with American Airlines is I think what happened.

12    Q.   That is what I was asking about.  On April 2 the MEC

13    adopted a resolution that had something to do with the same

14    issues, didn't I?

15    A.   That's correct.

16    Q.   And at that point the MEC did not request that you

17    pursue the litigation.

18              MR. JACOBSON: Objection, your Honor, leading.

19              THE COURT:  Sustained.

20    Q.   What if anything did you hear from the MEC after the

21    March 26 letter?

22    A.   I  heard nothing on the subject at all.

23    Q.   They didn't complain about the absence of any

24    litigation?

25    A.   There was no communication on the subject whatsoever.
```

1   Q.   On cross examination Mr. Jacobson asked you about some

2   items where you had testified earlier on direct that the ALPA

3   executive council approved the retention of certain advisors

4   like Mr. Baehler.  Do you recall that testimony?

5   A.   Yes, I do.

6   Q.   And he was inquiring specifically, did the money come

7   for that purpose from the MCF, the major contingency fund, or

8   the OCF, the operating contingency fund, or the normal

9   budget.

10              THE COURT:  What would be the MEC's own money.

11              MR. KATZ:  That is what I wanted to ask about.

12              THE COURT:  What is your question, what is your

13   non-leading question.

14   Q.   How does the money work at ALPA in terms of the

15   treatment of money coming in?  You are familiar with that,

16   aren't you, Mr. Woerth?

17   A.   Yes.

18   Q.   Would you describe that process, please?

19              MR. JACOBSON: I object, your Honor.  This is a

20   question that calls for a narrative.  How do I even know what

21   is going to happen here?

22   Q.   With regard to the retention of an outside consultant

23   like Mr. Baehler --

24              THE COURT:  Before you, let me -- every MEC gets a

25   budget from the collective pot of dues that are collected.

1    Right?

2                    THE WITNESS:  Yes, your Honor.

3                    THE COURT:  Then you have your contingency fund.

4                    THE WITNESS:    Yes, your Honor.

5                    THE COURT:  Presumably you keep some money to pay

6    your own expenses for those 500 employees.

7                    THE WITNESS:  That's correct, your Honor.  I think

8    I can answer the question in 30 seconds.

9                    THE COURT:  What do you perceive the question to

10   be?

11                   THE WITNESS:  I perceive the question he is trying

12   to ask, how is the budget, what is the formula or the

13   rationale besides the budget.

14                   THE COURT:  Why is that relevant to this case?

15                   MR. KATZ:  We are talking about whether it was the

16   MEC's own money under ALPA's financial processes.

17                   THE COURT:  Well, the MEC is, am I correct, Mr.

18   Woerth, is given an amount of money which they then control,

19   what is taken from the overall dues of the organization.

20                   THE WITNESS:  Yes, your Honor.  It is a formula.

21   It is not political.  People don't make political judgments.

22   It is a formula that we have all agreed upon and they got

23   what the formula produced.

24                   THE COURT:  And the expenses that we talked about

25   were paid out of that money?

1           THE WITNESS:  That's correct.

2  Q.   Now, what I am getting to, Mr. Woerth, are there

3  limitations when you are talking about outside consultants

4  like Mr. Baehler, that affect any MEC's ability to access its

5  budgeted funds to spend in that fashion?

6  A.   The requirement for any outside consultant is to get

7  permission, and the point is we are trying to control

8  expenses.

9           They have, you have your own in-house counsel and

10  we hope our own resources are good enough, so to help control

11  the cost of MECs and not just hire everybody's uncle and

12  cousin, there is some control of outside consultants.  If

13  they feel they are needed, they are approved but they are

14  charged, accounted for --

15           THE COURT:  They pay for it out of their own

16  budget.

17  A.   Yes.  They need permission to hire an outside

18  consultant.

19           THE COURT:  I think he has testified to this

20  before.  Go ahead.

21  Q.   Mr. Woerth, do you know whether on April 10, 2001, when

22  TWA and its assets became TWA LLC, a subsidiary of American

23  Airlines, whether Mr. Compton and some of the other TWA

24  executives were asked by American Airlines to leave or stay

25  on or something else?

```
 1              MR. JACOBSON:  I object to the form of this
 2    question, your Honor.  I think it calls for hearsay and there
 3    is no foundation.
 4              THE COURT:  No.
 5    A.   I honestly don't know the answer to that question.
 6              MR. KATZ:  Hang on, there is an objection.
 7              THE COURT:  He answered the question, he doesn't
 8    know.  But there is no doubt when TWA LLC started American
 9    was running the show.
10              THE WITNESS:  Oh, yes.
11              THE COURT:  Surely they kept a lot of employees.
12    Of course, most of them.
13    A.   Think normally make sure the operation runs.
14              THE COURT:  They kept the pilots, they kept the
15    ground crews, they kept the gate staff.  They kept all those
16    people.
17    Q.   Do you know whether Bill Compton stayed on as an
18    executive for a while?
19    A.   He stayed on.  I am not sure in what capacity.  I know
20    he was compensated.  I don't know what his authority was
21    after that.
22              THE COURT:  Do you know whether he was compensated
23    by TWA, Inc. Or  TWA LLC, do you really know that?
24    A.   I don't know that.
25              THE COURT:  He doesn't know that.
```

1   Q.    Exhibit D 88.

2            THE COURT:  I want to take the last break now.

3            MR. KATZ:  I just have one more question.

4            THE COURT:  All right.  Then ask it.  Then you can

5   resume.

6   Q.   D 88 is the minutes from this meeting, October 20 to 22,

7   that Mr. Jacobson asked you about on cross examination.  And

8   with regard to the furlough protection issue, he asked you on

9   cross wouldn't it require the agreement of American Airlines

10  to give any extent of furlough protection to the TWA pilots.

11           And my question to you is do you know whether there

12  were any representatives of American Airlines who were

13  participating in the discussions at the Mayflower Hotel

14  October 20 to 23, 2001?

15  A.   It was my understanding that the vice president of human

16  resources or labor relations, Jeff Brundage, was very engaged

17  in these discussions and he was having authority to make

18  proposals and what was possible.  I think they were dealing

19  directly with Jeff Brundage and American management is my

20  understanding.

21  Q.   Could we go to page 9, the top of the page?

22           THE COURT:  Is this in evidence?

23           MR. KATZ:  Yes, sir.

24  Q.   Would you blow up the top paragraph, 1504?

25           THE COURT:  What number is this?

```
 1            MR. KATZ:  D 88.

 2   Q.   Discussion with Jeff Brundage, vice president employee

 3   relations.  American Airlines.

 4            MR. JACOBSON:  Via phone.

 5            MR. KATZ:  Sorry?

 6            MR. JACOBSON:  Never mind.

 7   Q.   Does this reconfirm your recollection --

 8            THE COURT:  That is not redirect.  That is picking

 9   and choosing something you think is in evidence and repeating

10   it.

11            MR. KATZ:  We have nothing further at this time.

12            THE COURT:  By the way, we are going to take a

13   break for 15 or 20 minutes now.  DO not discuss the case

14   among yourselves.  Keep an open mind until you have heard all

15   the evidence.

16            All rise.

17            (The jury leaves the courtroom.)

18            THE COURT:  Be seated.  Mr. Katz.

19            MR. KATZ:  Yes, your Honor.

20            THE COURT:  You know the sound of a door opening,

21   you know the sound when you hear it?

22            MR. KATZ:  I hear it.

23            THE COURT:  Well, you tried to get this witness to

24   basically say that prior to April 10, or April 3rd, 2002,

25   there really was only a very small group of people at
```

```
 1    American who were interested -- pilots, who were interested

 2    in merging, because of the ALPA merger policy, or integration

 3    policy.  There really was only a small number of pilots who

 4    were interested.

 5            Do you realize that that may open the door to the

 6    very thing you are trying to keep out post April 3rd things,

 7    because that -- if two major hubs vote merger issues just

 8    days after, that puts to lie somewhat, or calls into question

 9    testimony, well, there was a little interest but there really

10    wasn't very much.

11            MR. KATZ:  My question, your Honor, my question was

12    prior to January 9, 2001 --

13            THE COURT:  Yeah, but the inference, there is no

14    inference that changed.  Certainly it didn't increase after

15    the announcement when the --

16            MR. PRESS:  The testimony was contrary..

17            THE COURT:  What?

18            MR. PRESS:  Before the TWA transaction it was less

19    than five percent and it gotten less after that.

20            THE COURT:  The fact before January, even less.  So

21    I mean the thrust of that testimony is yeah, there were a

22    couple of zealots that were interested, but nobody else was,

23    and the merger policy was, ALPA's merger policy, integration

24    policy, was no problem.

25            I am going to deal with that when you I get your
```

 1   objection to strike, and, but that testimony bothered me.  It

 2   bothered me because it is inconsistent with, you know, two

 3   days later, suddenly to have two major hubs, one in Miami and

 4   one in Fort Worth, Dallas, Fort Worth.  Suddenly passing

 5   refuse suddenly passing a resolution to merge.

 6          Anyway.  I will see you all at 10 after one.

 7          (Recess).

 8          DUANE WOERTH, resumes.

 9          THE COURT:  Mr. Jacobson.

10          MR. JACOBSON: I would like to walk through that

11   door now with exhibit P 148, five W's, which are the two

12   resolutions, Miami and Dallas Fort Worth that were received,

13   by this witness the day after exclusive --

14          THE COURT:  These are things that were passed like

15   on the 3rd or the 4th or the tenth.

16          MR. JACOBSON: Yes.

17          THE COURT:  I know you had one of the documents

18   relating to October.  That is a different kettle of fish.

19          MR. JACOBSON: Yes, that was the actual

20   presentation.

21          THE COURT:  I think that is different.

22          MR. JACOBSON: I am just looking for the actual

23   resolutions at this point.

24          THE COURT:  These are the resolutions passed in

25   Dallas Fort Worth.

1              MR. JACOBSON:  And Miami.

2              THE COURT:  What are the dates they were passed.

3              MR. JACOBSON: April 3rd 2002.

4              THE COURT:  Both of them?

5              MR. JACOBSON: It appears to be.  They were

6    forwarded by a --

7              THE COURT:  Mr. Jacobson, leave argument for

8    argument.

9              MR. JACOBSON: I shall.  I will ask these if these

10   are what they were.

11             THE COURT:  They are already in evidence at this

12   point.

13             THE COURT:  If it is April 3rd I will allow it.

14             MR. JACOBSON: Yes.

15             THE COURT:  I am not going to allow it for October.

16   October is --

17             MR. JACOBSON: I understood your ruling, your Honor.

18             MR. FRAM:  Your Honor, we are we clear, if counsel

19   is permitted to do this, that Captain Woerth will not have to

20   return?

21             THE COURT:  Say again?

22             MR. FRAM:  The question of him returning --

23             I think this reduces significantly the chance.  I

24   don't know what you are going to do.  You have a big, thick,

25   exhibit.  148.  Www www, so, if I multiply 26 times six there

 1    is more than 100 emails.  I don't know what you will object

 2    to.

 3              MR. FRAM:  Everything after April 3.  They are

 4    organized chronologically.

 5              THE COURT:  At this point, I don't want to make an

 6    absolute commitment.  Look, I don't want him, he is doing

 7    important work for our government at the moment and I don't

 8    want to interfere with his doing his important work, but in

 9    fairness to everybody involved, I have to leave it open the

10    chance that there may be some further examination.  But this

11    will reduce it.

12              Because this point, these resolutions go right to

13    the heart of the matter, and again, it is not that it is

14    exaggerated, it shows, to try to minimize the interest of the

15    ALPSA and APA pilots in doing it, in doing the merger, and I

16    think that resolutions passed on the same day they became a

17    single carrier could be used to at least challenge that

18    assumption.

19              MR. JACOBSON: Your Honor, one further question.

20    Does your ruling permit me to ask him the question, did you

21    then attend any meetings at any of these domiciles.  In

22    regard to these motions.  Am I allowed to ask that or not,

23    your Honor?

24              THE COURT:  Well, can you ask him did he follow-up

25    on these resolutions.  I will let you ask that question.

 1    That is it.

 2              MR. KATZ:  The first meeting was in October, your

 3    Honor.

 4              MR. PRESS:  No, it was in August.

 5              MR. KATZ:  The first meeting he attended --.

 6              MR. FRAM:  Your Honor.

 7              THE COURT:  I am going to ask that he follow-up.

 8              MR. JACOBSON:  I object.

 9              MR. FRAM:  That is limited to a yes or no.

10              THE COURT:  Not a date, just a yes or no answer.

11              MR. JACOBSON: I understand, your Honor.

12              MR. FRAM:  Thank you.

13              THE COURT:  Okay.  Can she bring the jury in?

14              MR. JACOBSON: Yes, your Honor.

15              THE COURT:  Okay.

16              (Jury enters the courtroom.)

17              DUANE WOERTH, resumes.

18              RECROSS examination

19              MR. JACOBSON:  Mr. Jacobson, I recognize you to

20    continue your brief cross.

21              MR. JACOBSON: Thank you, your Honor.

22    Q.   Mr. Woerth, on redirect examination, you were shown an

23    invoice and check marked as exhibit P-271, that was for

24    services provided to APA by ALPA.  Do you recall that, sir?

25    A.   Yes.

1    Q.   And you testified that this was the full extent of the

2    work and the full payment.  Is that what you testified, sir?

3    A.   That agreement, that was my understanding.

4    Q.   If we could look at P 115.

5            THE COURT:  This is in evidence.

6            MR. JACOBSON:  That is in evidence, your Honor.

7    Q.   You were shown just the paragraph numbered 2.  Highlight

8    the one, down to three.

9            You were just shown the one that is number two here

10   in the middle which is regarding survey information.  Do you

11   see that?

12   A.   Yes.

13   Q.   All right.  You see that there is the next paragraph

14   which talks about hourly charges for additional work.

15   A.   Yes.

16   Q.   So this invoice and the work that was completed as of

17   January 5, 2001, that just related to the Paragraph 2 work,

18   correct, the initial survey?

19   A.   Apparently.

20   Q.   And not the analytical and clerical work preference

21   referenced in paragraph 3 which is additional?

22   A.   I am not sure there was additional work done.  I don't

23   know if it was.

24   Q.   You don't know one way or the other?

25   A.   No.

1    Q.    You also said you provide these kind of services to a

2    large number of airlines, other airlines that, unions from

3    airlines that are unaffiliated with ALPA, correct?

4    A.    Yes.

5    Q.    And you mentioned in addition foreign airlines?

6    A.    Yes.

7    Q.    You testified at one point in your testimony yesterday,

8    I believe, it may have been today, that you went to that

9    meeting in October of 2000 with APA because you were kind of

10   mad that you were providing services for APA and yet they

11   weren't making any movement towards rejoining ALPA.  Do you

12   recall that?

13   A.    Yes.

14   Q.    Did you also go to meetings in a state of anger with

15   these various foreign carriers and the other independent

16   unions for whom you were doing services?

17   A.    No. For a very different reason.

18   Q.    My question was did you also go see them and say hey, we

19   are providing you services, why aren't you joining up?

20   A.    To the foreign airlines?

21   Q.    Yes.

22   A.    No.

23   Q.    You got Canadian Airlines on board?

24   A.    We organized Canadian Airlines.

25   Q.    You have affiliations with British Airlines.

1    A.    We an affiliation with --

2    Q.    The Constitution, references at the top an affiliation

3    you set up with the British Airline pilots, do you recall

4    that?

5    A.    You are educating the president about an affiliation I

6    am unaware of.

7    Q.    All right.   My question is the other independent

8    airlines in the United States for whom you are performing

9    these services, you didn't go to any of those and say wait a

10   second, we are doing services for you, you need to come on

11   board?

12   A.    We weren't ever going to attempt to organize people

13   outside of our country and Europe, we got Canada, we weren't

14   attempting to go organize them.

15   Q.    I am focusing, you said other independent airlines in

16   the U.S. you provide services.   You didn't go to those people

17   and say hey, we are providing you with services, we are tired

18   of doing that, you need to come on board?

19   A.    We didn't have a relationship, ongoing failed

20   relationship with anyone other than APA that was frustrating

21   me to that degree.

22   Q.    Now, you also said that as of the time of that meeting

23   in October you thought that the interest level among the

24   American pilots in joining ALPA was something like five

25   percent, roughly.   Do you recall that?

1    A.    Yes.

2    Q.    And you said that after the TWA acquisition was

3    announced that that interest level went down from there?

4    A.    Yes.

5    Q.    I would like to show you a document that has been

6    marked, actually it is in evidence already as part of P-148,

7    1 of those big binders over there.   This particular set of

8    pages are marked as P-148 followed by five W's.

9              MR. KATZ:   Your Honor, for the record, ALPA would

10   like to reserve its objection to examination based upon this

11   line of questioning?

12             THE COURT:   Okay.

13   Q.    All right.

14             (Pause)

15   Q.    Have you had ha chance to review that?

16   A.    Yeah.

17   Q.    The first page is an email that was forwarded to you

18   from Ron Rindfleisch, correct?

19   A.    That is what it says, yeah.

20   Q.    It is dated April 4?

21   A.    Yes.

22   Q.    And it has to you and also that long list of people I

23   mentioned earlier in connection with exhibit P 31 which you

24   saw earlier, right?

25   A.    Yes.

1    Q.   And it is the subject is ALPA merger resolution under

2    consideration in DFW.  Subject line?

3    A.   That is what it says.

4    Q.   Now, the date of this is April, the email to you is

5    April 4, 2002, correct?

6    A.   Yes.

7    Q.   It is forwarding an original email below that, doesn't

8    it, sir?

9    A.   That is what appears to be, yes.

10   Q.   And that email was from Mark Hunnibell to Ron

11   Rindfleisch, correct?

12   A.   Yes.

13   Q.   And with a copy to John Clark?

14   A.   Yes.

15   Q.   And you knew Rindfleisch and Hunnibell were the people

16   doing the card, authorization card over at American?

17   A.   Rindfleisch was not doing the card.

18   Q.   Not Rindfleisch, Clark and Hunnibell?

19   A.   That was my understanding, yes.

20   Q.   All right.  And the email from Mark Hunnibell is

21   forwarding you a resolution as introduced at the DFW

22   domicile?

23   A.   That is what it purports to be, yes.

24   Q.   You know that the Dallas Fort Worth, that is what DFW

25   stands for, sir?

1   A.   Yes.

2   Q.   That is the largest base for the American pilots?

3   A.   Yes.

4   Q.   If you turn to two pages in, you see a resolution or a

5   draft resolution, correct?

6   A.   Yes.

7   Q.   All right.  And it is a resolution, proposed resolution,

8   for American Airlines to become part of ALPA, correct?

9   A.   Yes.

10  Q.   Let's turn if we could to the third page of this

11  resolution and there is, be it further resolved, a number of

12  bullet points.

13  A.   Yes.

14  Q.   All right.  Could you highlight the first three bullet

15  points there, please?

16  A.   Line 113.

17  Q.   Yes.  Could you tell the jury what the first three

18  provisos  of this proposed resolution were?

19       MR. KATZ:  Your Honor, I am going to object to the

20  detailed examination of the witness about it, an APA

21  resolution.

22       THE COURT:  Let me, this resolution was to promote

23  the merger of ALPA and APA, correct?  That was the intent of

24  this resolution.

25  A.   Their resolution, it looked like that was what their

1    goal was of the people who offered it.

2            THE COURT:  All right.

3    Q.   And the dates that this was sent to Mr. Rindfleisch from

4    Mr. Hunnibell was April 3rd.  Correct?

5    A.   Yes.

6    Q.   That is the same day that your union lost its

7    representational rights for the former TWA pilots, correct?

8    A.   That's correct.

9    Q.   And and one of the provisos that they have in their

10   resolution is that if they are merged that there will be no

11   attempts to alter the seniority integration agreements

12   relating to TWA, correct?

13   A.   That is what they wanted.

14   Q.   Then if you turn, one, 2, three pages later you will see

15   a resolution from the Miami.  MIA, Miami.

16   A.   Yes.

17   Q.   Would you agree that that is essentially the same

18   resolution as they did in Dallas, Fort Worth?

19   A.   I haven't done a forensic analysis but it looks pretty

20   much the same to me.

21   Q.   If you turn to the second page of that they have the

22   same series or similar series of provisos about what they

23   want, if there is a reunification between the two unions?

24   A.   Yes.

25   Q.   That would include no attempts to alter seniority

1    integration relative to TWA?

2    A.    Yes.

3    Q.    And I would like you to look for a minute on the screen

4    at plaintiffs P 31 which was previously in evidence.  That

5    was the March 18, 2002 email, to all of you forwarding the,

6    supposedly an ALPA merger MIA dock, right?

7    A.    That is what those words say.

8    Q.    Looking at the second resolution attached to this

9    exhibit, P-148, WWWWW, does that appear to you to be the

10   Miami resolution referenced in the March 18, 2002 email?

11   A.    How would I possibly know that.

12           THE COURT:  How could he know?

13   Q.    I asked if he knows?

14           THE COURT:  You don't know that.

15   A.    Of course I don't know that.

16           MR. JACOBSON:  No further questions of this

17   witness, your Honor.

18           MR. KATZ:  Nothing further, your Honor.

19           THE COURT:  Okay.  Thank you very much, Captain.

20   You may step down.

21           THE WITNESS:  Thank you, your Honor.

22           (Witness excused.)

23           THE COURT:  Mr. Katz, call your next witness.

24           MR. KATZ:  Mr. Fram is going to call the next

25   witness, your Honor.

```
 1              THE COURT:  I am sorry?

 2              MR. KATZ:  Mr. Fram is going to call the next

 3    witness.

 4              MR. FRAM:  Thank you, your Honor.  I am going to

 5    call Steven Rautenberg.

 6              THE COURT:  Say the last name.

 7              MR. FRAM:  Steven Rautenberg.

 8              S T E V E N   P A U L   R A U T E N B E R G,

 9    Sworn.

10              DIRECT EXAMINATION.

11              BY MR. FRAM:

12              MR. FRAM:  If I may, your Honor.

13              THE COURT:  Yes, you may.

14              MR. FRAM:  I will stand by the podium.

15              THE COURT:  However is comfortable for you.

16              MR. FRAM:  Thank you.

17    Q.   Mr. Rautenberg, can you tell us where you live, please?

18    A.   I live in lake St. Louis, Missouri.

19    Q.   How old are you?

20    A.   59.

21    Q.   And what do you do today for a living?

22    A.   I am an MD 80 captain for American Airlines.

23    Q.   Get some background.  Where do you grow up, please?

24    A.   Most of it I grew up in Edmonds, Washington.  My dad was

25    a Navy man.  We moved around a lot, but I graduated from high
```

1    school in Edmonds.

2    Q.   Are you a college grad?

3    A.   I am.

4    Q.   Where did you go and what degree did you receive,

5    please?

6    A.   Excuse me.  I went to the University of Washington.  I

7    have a bachelor of science in electrical engineering, and I

8    attended California Lutheran College, where I received a MBA.

9    Q.   What year did you get your undergrad degree, please?

10   A.   1973.

11   Q.   How about your MBA?

12   A.   I  believe it was 1985.

13   Q.   There was a little bit of a gap between those years.

14   Can you tell us what you were doing between when you

15   graduated college and when you got the MBA, please?

16   A.   After college graduation I went to active duty in the

17   navy, served as a naval aviator and officer from 1973 to '79.

18   And in the spring of 1979 I was hired by TWA.

19   Q.   Did you continue your military service after your

20   activity duty?

21   A.   I  continued in the Reserves from 1979 through 1993, I

22   retired from the Reserves in 1993.

23   Q.   What were the highest ranks that you attained while on

24   active duty in the reserves?

25   A.   On active duty, the highest rank I attained was

1    lieutenant, 03, and the REserves I retired as a commander,

2    05.

3    Q.   When you began at TWA in 1979 what position did you

4    have?

5    A.   My first position was 727 flight engineer.

6    Q.   Okay.  Did you work continuously for TWA from 1979 up

7    until early 2001?

8    A.   No.  I did not.  I was furloughed in, I believe the

9    first of October of 1979.  I was furloughed almost

10   immediately after being hired at TWA.

11   Q.   For how long were you out on furlough at that point?

12   A.   I was out on furlough approximately five and a half

13   years.

14   Q.   What did do you during that timeframe?

15   A.   I went to work for an aerospace firm by the name of

16   Teledyne Electronics.  I served as a staff engineer and a

17   program manager.

18   Q.   Nor how long did you do that?

19   A.   The entirety of the furlough, five and a half years.

20   Q.   So you were recalled to TWA in approximately when, 85?

21   A.   I was recalled in April of 1985.

22   Q.   Okay.  Did you have other furloughs during the remainder

23   of your career with TWA?

24   A.   No, I did not.

25   Q.   And as of early 2001 what was your position with TWA?

1   A.   I was a 767 captain.

2   Q.   Okay.  And I am not sure I asked you about of this, how

3   old are you today?

4   A.   59.

5   Q.   About ten years ago you would have been 49?

6   A.   Correct.

7   Q.   Did you at some point become involved in the Air Line

8   Pilots Association, which we are referring to as ALPA?

9   A.   That's correct.

10  Q.   When did that start, please?

11  A.   I started in, unofficial capacity more as a activist

12  probably in about 1993.  I became interested in issues and

13  began contacting representatives and so on and so forth.  I

14  didn't attain an official position in ALPA until about

15  September of 2000.

16  Q.   What about 1993, or the events of 1993 led you to become

17  involved in an unofficial capacity?

18  A.   Principally, I think it was the risk to my career caused

19  by TWA's financial struggles.

20  Q.   Can you give us a little detail about what those

21  financial struggles were and how, why they raised the

22  concern?

23  A.   The financial struggles I think began when Carl Icahn

24  bought in to TWA in the 1986 timeframe.  But the company

25  entered bankruptcy, I believe the first time was in 1992, and

 1   you know, it was the company's inability to escape from Icahn

 2   to make a profit consistently to demonstrate that it was

 3   going to be around for the long term.

 4   Q.   What type of work did you do unofficially beginning in

 5   1993 to address that?

 6   A.   I wouldn't call it, I wouldn't call it work necessarily.

 7   It was letter writing, talking to representatives, and so on.

 8   Q.   And I think you mentioned that in September of 2000 you

 9   got more officially involved?

10   A.   In September of 2000 I was elected the local council

11   captain representative and then subsequently the local

12   council chairman.  That was Council 3 in St. Louis.

13   Q.   About how many pilots were represented out of Council 3

14   at that point?

15   A.   I am going to have to estimate about 1,400, I believe.

16   Q.   And were those 1,400 divided between captains and first

17   officers?

18   A.   Yes.

19   Q.   Do you recall the proportion?

20   A.   Approximately 50-50 but not quite.  There was probably

21   more captains than there were first officers.

22   Q.   And what proportion of the total number of TWA pilots in

23   late 2000 was that 1,400?

24   A.   Well, in the beginning of 2001, the active seniority

25   list had I believe 2,30041 pilots on it so it was a little

1    bit more than 50 percent.

2    Q.   And what led you to run for elected position at some

3    point before September, 2000?

4    A.   I was unhappy with the direction the union was going.

5    Q.   And can you give us a little detail about what you were

6    unhappy about?

7    A.   I think so.  There were individuals who were in a

8    position of authority, who were, I thought, exceeding the

9    bounds of what was appropriate.  One in particular was, was

10   serving as one of the MEC officers as well as one of the

11   local council representatives, and I didn't believe that this

12   particular individual in both of those positions was serving

13   our interests.

14   Q.   We will be talking a bit about TWA's bankruptcy and its

15   financial condition.  Was there anything about TWA's

16   financial circumstances in late 2000 that led you to get more

17   active?

18   A.   Well, my concern with TWA's financial concern was pretty

19   much active throughout that timeframe, from, you know, 1986

20   when Carl Icahn came on the scene until the ultimate

21   dissolution of the company, 2001.

22   Q.   Okay.  Do you recall when you first heard about the

23   third bankruptcy filing, the one in January of 2001, and the

24   proposed deal with American Airlines?

25   A.   I do.

1    Q.    Tell us how you heard about that?

2    A.    I heard about it on the radio.  As I was preparing to

3    get up and I think go to an MEC meeting if I am not mistaken.

4    Or to work.  I don't recall.

5    Q.    What was the reaction to news of the bankruptcy and the

6    propo ased deal with American?

7    A.    Astonishment.  I was astonished.  I was happy.  I was

8    curious.  I think all of those things.

9    Q.    Was there a lot of emotions.  Tell us why you were

10   astonished?

11   A.    Well, my expectation as the time was that I would hear

12   on the radio that TWA had ceased to operate.  And I think

13   astonishment was  that it looked like there might be a

14   future.

15   Q.    And how about the happiness?

16   A.    Same, same thing.

17   Q.    That there might be a future?

18   A.    Right.

19   Q.    And I think you mentioned you were curious as well?

20   A.    Yes.  Yes.  I was curious as to what it all would bring.

21   Uncertain about the future, but yet happy about the prospect

22   that things would be turning up.

23   Q.    Did there come a point after you heard about the

24   bankruptcy and the proposed deal on the radio that you got

25   more specific information about what was happening?

1    A.    Yes.  There was an MEC meeting within the next day or

2    so, and we got information there.  We received a copy of the

3    asset purchase agreement that had been executed between TWA

4    and American.

5    Q.    When you say we received, can you describe who you are

6    referring to, please?

7    A.    By "we" I mean the members of the MEC.  The MEC

8    officers, staff, members of the MEC received it.

9    Q.    What I what I am going to do, if I might approach the

10   witness, I am going to give him a stack of documents that I

11   would like to work through, most of which are in evidence.

12   There are a handful that are not and I will hand those out.

13            Just to fix some of the specifics.  I placed in

14   front of you, I think the document on top is D 242 in

15   evidence.

16            THE COURT:  P?

17            MR. FRAM:  D 242 in evidence.  Which is the minutes

18   of the -- the MEC meeting on January 11, 2001.

19   A.    Yes, I have that.

20   Q.    Do you recognize that document?

21   A.    Yes.

22            THE COURT:  It is in evidence.

23            MR. FRAM:  Yes, thank you, your Honor.

24   Q.    Is that the meeting just referred to a couple moments

25   ago?

1    A.    Yes, it is.

2    Q.    You referred to a "we" and I asked you who was involved.

3    At the top of those minutes, the top of those minutes, does

4    that list the people or at least the elected local council

5    members and officers that were present at the meeting?

6    A.    Yes, it does.

7    Q.    I think you mentioned a minute ago that you received a

8    copy of the asset purchase agreement between American and TWA

9    at this meeting?

10   A.    Yes.  Early on we received a copy of the asset purchase

11   agreement.  I don't recall the exact date but early on we

12   did.

13   Q.    You think it would have been as of the date of this

14   meeting?

15   A.    I believe so.

16   Q.    Did you take the time to review the asset purchase

17   agreement?

18   A.    I did.

19   Q.    And did you notice any provisions that were of

20   particular interest to you?

21   A.    Well, I immediately turned to what we already understood

22   to be the section detailing the employee provisions which my

23   recollection is was section 10, and I immediately read

24   through section 10, and on reading it, my happiness, elation,

25   about the announcement of the deal started to wane pretty

1    drastically.  My heart sank.

2    Q.    What did you see in that section of the agreement that

3    led your heart to start to sink?

4    A.    Well, the document detailed the condition that the

5    employee groups would have to waive their scope provisions,

6    and other provisions of their existing contracts.

7    Q.    Just so we are all on the same page, can you describe

8    what the scope provisions meant to you?

9    A.    The scope provisions meant to me that we had available

10   to us the eventuality of an arbitrator taking a look at the

11   seniority integration that would ensue.

12   Q.    And did you come to understand why American made the

13   waiver of scope a condition of the deal with TWA?

14   A.    I am not sure at what point I became, you know,

15   completely familiar with that.  But early on I did become

16   quite familiar with that.  There was a, relative to the

17   pilots, there was a provision in the American pilots contract

18   that was going to be in conflict with the scope provisions in

19   our contract.

20   Q.    And what understanding, if you recall, did you have of

21   the provision in the American pilots contract that would have

22   affected the TWA pilots?

23   A.    I am sorry.  I didn't hear the question.

24   Q.    What understanding did you have of the contract

25   provision, the American pilots contract, that was of concern

1    to you?

2    A.    Well, the American pilots contract, it appeared to

3    indicate that pilots who came to work at American would go in

4    order of the date they began line flying, and it really made

5    no exception for acquisition or mergers or otherwise.  So

6    that is what it looked like to me, the American pilots

7    contract required.

8    Q.    You just mentioned the term line flying.  Can you

9    describe for the jury what that is?

10   A.    When you are hired at an airline, you initially go

11   through a process of training, and not until you complete

12   that training, be it ground school or simulated training, and

13   actually reach the line, reach the cockpit, that is the point

14   at which the American pilots contract stipulated that pilots

15   would be added to the seniority list, in that order.

16   Q.    So line flying is actually a day after the date of

17   official hire?

18   A.    That's correct.

19   Q.    Do you recall at this first meeting of the MEC after the

20   announcement on January 11 that some outside professional

21   were there to advise the members of the MEC?

22   A.    I believe there were, yes.

23   Q.    Sir, would you please turn to the second page of the

24   minutes.  Do you see about 40 percent down, Judge Mabey,

25   LeBoeuf, Lamb, Green and MacRae?

1    A.    Yes.

2    Q.    Do you recall this fellow, he is listed there as a

3    Judge, do you recall he was a retired federal bankruptcy

4    judge?

5    A.    Yes.

6    Q.    Do you recall comments he made at the meeting about the

7    terms of the agreement and its implication?

8    A.    Yes.

9    Q.    Do you recall other professional, other outside advisors

10   being brought on board to help the TWA MEC?

11   A.    Over the period of time there was a lot of outside

12   advisors and proves always who appeared before the MEC.

13   Q.    Before we get into some of the detail, I would like to

14   ask you about the way that you understood your role as a

15   member of the MEC.  As somebody elected out of Council 3, you

16   had the right did vote on things?

17   A.    Yes.

18   Q.    Just describe for us quickly what that right, what that

19   right to vote meant, and who within the MEC had that right?

20   A.    There were six members of the MEC who had that right.

21   Although, at this, at the time of this meeting I believe

22   there was actually seven.  There was a captain rep for each

23   domicile that had captains, first officer rep that had each

24   domicile that had first officers and there was a flight

25   engineer rep for the domicile that had flight engineers.

1            And Council 2 and Council 4 which was New York and

2      Los Angeles respectively did not have any flight engineers so

3      they did not have a flight engineer rep.  In St. Louis we did

4      have one flight engineer whose main job was to ferry the

5      remaining 727s that TWA still had, and he was essentially

6      representing himself.  So there were seven members of the MEC

7      who had a vote.  There were also a couple of other secretary

8      treasurers who had been elected to positions and had the

9      right to attend MEC meetings, but they did not have a vote.

10     Q.   And in terms of how you viewed your goal as a voting

11     member, describe for us the way in which you felt you should

12     be casting your vote when different issues came up?

13     A.   I viewed my job, when I ran for office, to be as open

14     and as transparent as I possibly could about who I was.  And

15     to try to ensure that people knew me as best as possible, as

16     a candidate.  And once I was elected I considered my job to

17     be to evaluate the things that were in front of me, and make

18     a decision about what I would do.

19           And I didn't necessarily concern myself with trying

20     to figure out what somebody else was going to do.  It was

21     hard enough at times to figure out what the right thing to do

22     for yourself was.

23           So I considered the MEC to be a representative body

24     analogous to the Congress, where we were elected to consider

25     the information that was available, and to make the best

1  decision we possibly could.

2  Q.   Did you consider it your responsibility to talk to the

3  pilots in your council and find out how they would have voted

4  if they were in your seat, and allocate your votes

5  accordingly?

6  A.   No. I did not -- you may be referring to the roll call

7  vote, and I was not a fan of the roll call vote.  The roll

8  call enabled representatives to cast a vote that was

9  quantified by however many pilots were in their status that

10  they represented, so they there were in excess of 700 pilots

11  in the status that I represented, so when the roll call vote

12  was initiated, I could essentially cast in excess of 700

13  volts.

14        I didn't like it.  I didn't believe that I was

15  capable really of establishing what other people would do.  I

16  I didn't believe that I was capable nor was it my job to try

17  to figure out 40 percent would do this, 60 percent would do

18  something else.

19  Q.   Did anybody ever criticize you for suggesting that your

20  role was to figure out how different pilots would want to

21  vote?

22  A.   I don't recall that.  No.

23  Q.   We will come back to that.  While we are on the topic,

24  can you tell us about the different kinds of votes.  You

25  mentioned roll call vote.  Were there other ways where issues

1   had to be voted on by the MEC that the vote was taken?

2   A.   Normally a vote was taken where each representative had

3   one vote, and the majority ruled.  At the election or the

4   request of any of the particular representatives, the roll

5   call could be implemented where then the roll call would be

6   used in and pilots would vote the number of votes on the

7   pilots and their status.  Then it was majority rules again

8   although it was not necessarily the majority of the members.

9   But it was the majority of the votes cast.

10  Q.   First type of vote, what was that referred to as where

11  people each just get a vote?

12  A.   I guess when we talked about it, we talked about one

13  man, one vote.  I don't recall a particular official name for

14  that.  It was the standard voting methodology and the roll

15  call had to be asked for.

16  Q.   Was it sometimes referred to as a voice vote?

17  A.   Well, I don't think so.  You could have a voice vote or

18  a hand vote, or I am not sure a voice vote, or one man one

19  vote matched up exactly.

20  Q.   All right.  During the period after the bankruptcy as

21  the MEC is getting organized, what effort, if any, did the

22  MEC or the local counsel make to educate the TWA pilots at

23  large about what was happening?

24  A.   Well, there were a number of of emails sent out, an

25  email list, we communicated by email, and Council 3 we had a

1  code-a-phone as well as postings on a message board.  At one

2  point there was a resolution directing the officers to

3  conduct road shows, and I frankly don't recall how that went

4  down, but there was ramp office visits that were made, where

5  we went to the ramp office to meet pilots as they came

6  through the base on their trips.

7  Q.    Turn for a minute to D 7 which is not in yet in

8  evidence.

9          You you should have a copy in front of you, the

10 second document.

11 A.    I do.

12 Q.    Can you describe for us what D 7 is, please?

13 A.     This is an information update in our local council, we

14 had a communications chairman whose primary responsibility

15 was to communicate with the members of the domicile.   This

16 was typically puts on a code-a-phone where pilots could call

17 in and listen to it by voice.  There was also posted on an

18 enclosed bulletin board in our pilots mail room, and it was

19 emailed to pilots as well.

20 Q.    Now, you just?

21        MR. FRAM:  Your Honor, I am going to move D 7 in

22 evidence, please.

23        MR. PRESS:  No objection, your Honor.

24        THE COURT:  D 7 in evidence.

25 Q.    Let's walk through a couple aspects of it.  It looks

1  like it says hello, this is Ron Tamaccio, Council 3

2  communications chairman.  What were his responsibilities as

3  of January of 2001?

4  A.   He was the chairman of our local council communications

5  committee.

6  Q.   Okay.  And what degree did the elect members of local

7  Council 3 communicate with him or interact with him to make

8  sure he had up-to-date information?

9  A.   He would gather information from other chairman in the

10  local counsel, he would talk to me about what what was going

11  on.

12        I would give him information about what to

13  communicate.  He would talk to chairman of MEC committees to

14  gather information about what was going on.  He had a

15  collection of contacts that he would bring together, and put

16  into these information updates.

17  Q.   You just mentioned the MEC committees.  What were the

18  primary MEC committees that existed in January, '01 or that

19  came into existence?

20  A.   The primary committees of interest to us at that time,

21  the merger committee, came in to interest, the negotiating

22  committee, the MEC had a communications committee which was

23  important, the MEC had a scenarios committee which was of

24  lesser importance since the acquisition had already begun.

25  Those I think are the primary committees.

1    Q.   And it appears as though, it is like he is reading, it

2    says, "Hello, this is Ron Tamaccio."

3            Is this a printout of something that would have

4    been posted on the code-a-phone?

5    A.   Yes.

6    Q.   Let's turn to the second page.  I see that in that

7    left-hand column, third paragraph down, it says for us, the

8    most important term of the asset purchase agreement is an

9    offer of  employment by AAL to all of TWA's unionized

10   workers.

11   A.   Can you aim me at it again?

12   Q.   Turn to the second page of the document.  Left column.

13   Third paragraph down.

14   A.   Okay.

15   Q.   For us?

16   A.   Yes.

17   Q.   The reference there to AAL was referring to what?

18   A.   American Airlines.

19   Q.   Did you agree with the sentiment expressed there with

20   respect to the most important term?

21   A.   Yes.

22   Q.   Then I see if you go to the right column at the very

23   bottom it refers to the scope, it says the scope the scope

24   clause in our current CBA will not apply to this current

25   transaction.

Rautenberg-direct/Fram                                          200

1    A.    Yes.

2    Q.    Next page, left column, third arrow.  Issues of pilot

3    seniority will be negotiated between ALPA and the pilots

4    union at AAL.  Those particular issues were once that were of

5    concern to you and the other pilots and in Council 3?

6    A.    Absolutely.

7    Q.    Just to move along quickly to D 243 which is in

8    evidence.  There those are the minutes of an MEC meeting on

9    January 17 to 19 of 2001.  I am not going to ask you about.

10   Of this but do you have that handy?

11   A.    Yes.

12   Q.    Turn to page 18?

13         THE COURT:  What document is that?

14         MR. FRAM:  D 243 in evidence.

15   Q.    Turn to page 18.  You talked a little bit before about

16   the process of roll call vote.  And I see that at the top

17   that there was a resolution.  If we go back to the prior

18   page, we can put it in context, resolution, 01-21 by W Cliff,

19   D Singer, amended by D Singer/slash S Rautenberg.  Then the

20   resolution deals with the rights and privileges of the

21   nonstatus secretary treasurer?

22   A.    Yes.

23   Q.    And then you mentioned before that with respect to roll

24   call votes, your perspective is generally not to --

25   A.    I  didn't hear the question.

1    Q.   I think you said before when it came to roll call votes

2    that your position, let's go back to page 18, you see the

3    tally  of the roll call vote there?

4    A.   Yes.

5    Q.   It shows that you cast 724 votes in favor of the

6    resolution but none against?

7    A.   Yes.

8    Q.   And when roll call vote came up, on other occasions, was

9    that your practice to cast your votes as a whole?

10   A.   That was my general practice.  There was a couple of

11   exceptions.

12   Q.   I see that some of the others, voting members, split

13   their votes.  For example, looks like Mr. Singer cast 209 in

14   favor but one against?

15   A.   Yes.

16   Q.   And then it looks like Ms. Young cast 32 in favor and

17   and 600 against?

18   A.   Yes.

19   Q.   Did these other members explain when they split their

20   votes what their thinking was as a general matter?

21   A.   No, there was no requirement for them to do that.  I

22   don't recall it happening routinely and I really don't recall

23   it happening at all.

24   Q.   Okay.  All right.  The next document in front of you the

25   next document in front of you is D 244 in evidence.  I want

1   to ask you a couple of questions about this in terms of how

2   the MEC organized itself when it communities.  I see that on

3   the top of page 9 that a resolution, 01-44, appears to have

4   been passed in executive session.  Do you recall without me

5   showing you that resolution what it was?

6   A.   No, I don't.

7   Q.   So let's show it to you.  In fact if you turn to the

8   next document in your pile it should be there.  D 81.

9   A.   No, I don't have that.

10  Q.   I am going to give that to you in one second.  I am just

11  using the second, third and fourth pages of it.

12          Do you recognize D 81 as a memo from Robert

13  Pastore, the master chairman, to MEC and LEC officers and

14  others dated 2/8/01 to which is attached a compilation of

15  actions from February 15 and 16 of 2001.

16  A.   Yes.

17  Q.   Okay.  And the compilation action is what I want to

18  refer to quickly.  Does that refresh your memory that

19  resolution 01-44 referred to in the minutes was a way in

20  which the MEC organized itself in terms of communications and

21  other things going forward?

22          THE WITNESS:  Yes, it was.

23  Q.   Pull up D 81, the third page.

24          THE COURT:  Are you offering that?

25          MR. FRAM:  Yes, I will offer that.  I object D 81

1    in evidence.

2              THE COURT:  Any objection?

3              MR. PRESS:  No.

4              THE COURT:  I will be in evidence.  D 81.  Go

5    ahead.

6    Q.   It appears that a merger committee is formed, and

7    without reading through all the details at the top of the

8    next page, it then indicates indeed that direct access  to

9    the merger committee chairman shall be afforded to the MEC

10   chairman and MEC officers.  That would have included you,

11   yes.

12   A.   Yes.

13   Q.   Did you go forward and avail yourself of the right to

14   have direct access to the merger committee chairman?

15   A.   I did not.  Not that I can recall.

16   Q.   Okay.  Let's turn back to the first page of D 81.  Which

17   is 2/8/01.  2/8/01, that memo says access -- second page.

18   That says access to the merger committee is limited to the

19   MEC officers, David Holtzman and our merger counsel Roland

20   Wilder.  LEC officers and committee chairman who wish to

21   contact the merger committee may do so through merger

22   oversight chairman Scott Shwartz.  Is that why you didn't

23   have direct access?

24   A.   I may have misheard the question.  I believe I had

25   access to the merger committee chairman.  I did not, I did

```
 1   not avail myself of that.  I had plenty of contact with the
 2   merger committee chairman through the briefings that we had
 3   on a regular basis from the merger committee.  And contact
 4   with the merger committee was a highly sensitive issue.  That
 5   is why I think the memo was created, was to cut down on MEC
 6   members just directly contacting the merger committee, and
 7   the resolution was in the same vein, was to try to cut down
 8   the ex- train just input to the merger committee what wasn't
 9   guided by the entire MEC.
10   Q.   Ask request you just explain this a little, why there
11   was a concern about too much contact with the merger
12   committee chairperson?
13   A.   Well, I think the concern was that that individuals
14   might be pressing their own agenda and they might press their
15   own agenda in the absence of the other members of the MEC.
16   Now, that was the issue.  And so the desire was to create a
17   situation where that was limited.
18   Q.   What different agendas did you or others perceive there
19   were?
20   A.   Oh, there is always a seniority agenda.  You know, what
21   is the merger committee going to do, where is the merger
22   committee going to aim its efforts?  Is it going to represent
23   the junior guy, the senior guy, who exactly is going to be
24   adequately represented by the merger committee.
25   Q.   So were there disagreements among the TWA pilots about
```

1    whether particular seniority integration was good or bad?

2    A.   I am sorry.  I again, I am having difficult hearing you.

3    Q.   Were there disagreements among the TWA pilots as early

4    as February and March of 2001 about whether a particular

5    seniority integration was good or bad?

6    A.   I am sure there was.  The general, my general sense of

7    the situation is that pilots had wildly optimistic

8    expectations about what the seniority integration was going

9    to turn out to be.

10   Q.   We will come back to that.  Just to go back to the

11   minutes of February 15, 16, for a moment.  Going back to page

12   10.

13            THE COURT:  Which document is that?

14            MR. FRAM:  Your Honor, we are back to D 244 in in

15   evidence.

16            THE COURT:  243 or 244.

17            MR. FRAM:  44, your Honor.

18   Q.   If we look at, it looks like the second paragraph down,

19   bee row nine 47, Hollander defendant.  Pastore stated merger

20   oversight committee had been established to support the

21   merger committee.  Shwartz was assigned to make sure everyone

22   was in the loop.  Shwartz stated that a conference call was

23   scheduled every Wednesday with all those supporting the

24   merger committee included on the call.  Do you recall that?

25   Pastore stated that a merger oversight committee had been

1   established to support the merger committee?

2   A.   I am not with you on the document.  I remember the

3   establishment of a merger oversight committee, yes.

4   Q.   How about the scheduling of a conference call every

5   Wednesday?

6   A.   That was a call that MEC members were not on.

7            MR. FRAM:  Your Honor, I am going to move into some

8   detail at this point.  I see it is two o'clock.  Shall I

9   continue or would you like to break?

10           THE COURT:  No.  I think we will stick to our

11  schedule and resume tomorrow morning at 8:30, maybe even 25

12  after eight like we did today.

13           Ladies and gentlemen, let me continue to thank you

14  for your attention, for your participation.  And don't

15  discuss the case among yourselves.  Keep an open mind.  Do

16  not discuss the case with family, friends or loved ones.

17  Keep an open mind until you have heard all of the evidence.

18  Have a safe trip home and a safe trip in tomorrow morning.

19  That is what is really important.  I will see you tomorrow

20  morning at 8:30.

21           (The jury leaves the courtroom.)

22           THE COURT:  Everyone please be seated.   You can

23  step down.

24           (Witness excused.)

25           THE COURT:  I note that there were two homework

```
 1    assignments outstanding.  One is for the plaintiff to tell me

 2    when, what the timeframe they want for the response brief to

 3    the Rule 50 motion that was filed last night, actually, and

 4    then Katz's application to strike parts of the exhibit,

 5    rather than the come pills, 148.

 6              MR. KATZ:  Yes, your Honor.

 7              THE COURT:  To strike certain parts of that

 8    compilation.  So you have those two homework assignments

 9              MR. KATZ:  Your Honor, there is one issue that is

10    still pending before the Court.  I would like to remind you

11    of.

12              THE COURT:  Remind me?  Okay.  Remind me.

13              MR. KATZ:  Bill Compton's video.

14              THE COURT:  Yes.

15               AMR. KATZ:  We gave you and opposing counsel a

16    transcript of the portions of the Senate testimony on

17    February -- in February, 2001, of Mr. Compton that we wish to

18    show as part of ALPA's case.  I am not sure whether we are --

19              THE COURT:  What is the plaintiff's position?  They

20    want none of it.

21              MR. PRESS:  That's right.  It has no relevance to

22    the issues.

23              MR. JACOBSON: It has all these evidentiary flaws.

24              MR. PRESS:  Hearsay, inadmissible opinion

25    testimony, what not, lack of foundation.
```

1          MR. JACOBSON: Not the product of cross examination,

2   not subject to cross examination.

3          THE COURT:  Something was stipulated.  In that

4   series of emails.  Do we know what it was that was

5   stipulated.

6          MR. PRESS:  I don't want to make a representation

7   without reading it which I haven't done.

8          MS. RODRIGUEZ:  Again, my sense of what was

9   stipulated to and again it is not, the documents --

10          THE COURT:  You went ahead, they did not take the

11   deposition.

12          MS. RODRIGUEZ:  The issue, as I recall it, was that

13   there was a representation made that this is the area that he

14   will testify to, not to exceed what he has testified to at

15   Congress, and we reserved our right to all objections that we

16   would have to any testimony that they intended to put on.  So

17   you know, it was not, it wasn't our deposition.  We just

18   wanted to know if he is going to testify, what is he going to

19   testify to.  No surprises, it is all the stuff that was

20   before Congress.

21   A.   So we didn't need to take his deposition but we weren't

22   stipulating to the --

23          THE COURT:  Well, I did read some of that stuff

24   that he testified at Congress.  It is hard for me to say that

25   you wouldn't want a deposition on something.  Speaking to

1    Congress is not like giving a deposition.

2            MS. RODRIGUEZ:  But we reserved our right to object

3    to any portions of the transcript.  Quite frankly, it was --

4            THE COURT:  Oliver North took Arthur Lyman to the

5    cleaners when he testified before Congress.  Lyman was

6    questioning him, took him to the cleaners.  I don't, Lyman

7    didn't even know where he was.  And testifying before a

8    Senate is a lot different than taking a deposition with rules

9    and --

10           MS. RODRIGUEZ:  For purposes of discovery, what he

11   is being offered for, but the stipulation, the document that

12   Mr. Katz presented to you makes clear that we reserved our

13   right to object, reserved all objection to say that

14   testimony.

15           MR. KATZ:  Your Honor, I saw it a little

16   differently than what Ms. Rodriguez has described.  Let me

17   just briefly outline what I remember.  And that is that the

18   plaintiffs actually were the ones who noticed the deposition

19   of Bill Compton, and --

20           THE COURT:  Yeah, they were the ones, that I got

21   from the exchange because they were the ones that were in

22   effect giving up their right to depose him.

23           MR. KATZ:  Correct.  In response to their noticing

24   the deposition of Mr. Compton I said, in this exchange with

25   lawyers for the plaintiffs, that we would limit what we

```
1    relied on in our summary summary judgment motion and in trial

2    to Mr. Compton's testimony in the bankruptcy court and in the

3    Senate in February, 2001.

4         THE COURT:  He testified in the bankruptcy court.

5    Then you would have at least more controlled testimony.  I

6    haven't read it.  But by its very nature it would be subject

7    the rules of evidence, and cross examination.  It would look

8    a lot more like testimony given here in a courtroom.  I mean

9    in a District Court.  You can't say it is the same as a

10   testimony before a Senate committee.

11        MR. PRESS:  It was a sales pitch, Judge.

12        THE COURT:  No question about that.  He wanted them

13   to approve the disappearance of another American airlines.  I

14   say American, I mean an airline, a domestic airline.  And he

15   wanted to convince them they should back it.  That is

16   transparent.  It doesn't take a genius to figure that out.

17        MR. KATZ: What I offered, your Honor, in the email,

18   and in discussions with counsel for the plaintiffs, was that

19   we would limit our evidence from Mr. Compton to those two

20   pieces of evidence, the bankruptcy core testimony, the

21   Congressional testimony, if --

22        THE COURT:  But you put it it as a limitation, not

23   much of a limitation.  Especially if the Senate.

24        MR. KATZ:  The alternative is we get an affidavit

25   or we call him at trial.
```

```
 1            THE COURT:  This is the same thing with Brundage,

 2   and with the other one.

 3            MR. KATZ:  Randy Babbitt.

 4            THE COURT:  Randy Babbitt, where I have, you

 5   instead of putting on your witness, you know, carefully

 6   putting what you are going to prove, how you are going to

 7   cross examine, and getting those two cases, you get a

 8   discovery deposition, they are wild questions but in a

 9   discovery deposition they are okay.  You get a person to

10   babble on.

11            It becomes admissible by the party whose weakness

12   it really is.  Here I have the same thing.  I have a salesman

13   getting on.  The question what the financial future of the

14   company is a highly complex issue.  And I have no doubt that

15   he is competent to testify as a witness.  I think as the CEO

16   of the company he can testify to that or in that area.  But

17   that is a lot different than just giving, you know, an

18   open-ended statement, you know, to Congress.

19            MR. KATZ:  Your Honor, what we were dropping was

20   our ability to call him as a live witness at trial or dismiss

21   the affidavit --

22            THE COURT:  Why is this better than calling him as

23   a live witness?

24            MR. KATZ:  We thought it was better.  The exchange

25   was --
```

```
 1              THE COURT:  No, that much I see.

 2              MR. KATZ:  The exchange was that they would agree

 3    that either he would be, they would stipulate that either he

 4    would testify the same as he had in Congress in court, or the

 5    testimony was admissible subject only to the question of

 6    relevance.

 7              THE COURT:  I could think of all kinds of cross

 8    examination that the chief CEO of TWA concerning the

 9    financial condition of the company, not that I have any doubt

10    that it was a bad financial condition.  At some level that is

11    true.

12              But to say that a company is in bad condition,

13    there is bad condition and there is bad condition and there

14    is bad condition.  I mean, you know.  He is subject to cross

15    examination.  He asked about gate rights they had, the get

16    rights they had previously, of course.  Maybe you could ask

17    about the high skill level of the pilot force.  They had a

18    very senior pilot force.  Skilled pilots capable of flying

19    the big aircraft.  But he just gives a sales pitch to the

20    Senate.

21              MR. KATZ:  He had some very hard facts in there,

22    your Honor, like the fact that the day they filed for

23    bankruptcy they didn't have enough cash to operate the next

24    day.  Like the fact that he went to all the other major

25    airlines --
```

```
 1              THE COURT:  But even that, even that, that is a

 2    hard fact.  But believe you me, I watched good bankruptcy

 3    lawyers operate in cross examination and I guarantee you that

 4    that statement, we could be subject to two hours of cross

 5    examination alone.

 6              I had a hot shot bankruptcy lawyer who was fully

 7    up-to-date on, what all the financials were, had before him,

 8    what does the jury hear?  Well, man, he says we only had

 9    money for, you know, what that really means and do I think

10    this if they operated another day they were going to close up

11    shop.

12              The answer is no, of course not.  They had the

13    right to file Chapter 11, it stops them from closing up.  And

14    order number 1 in the Chapter 11 is to is to give them

15    authority to continue to operate and only have to pay new

16    debts, they don't have any of the old debts, at least for the

17    moment.  That is how they keep operating.  And had the built

18    to get financing which would be, I am using a term I like to

19    use when I was practicing, proof of priority.

20              MR. JACOBSON: Administrative expense, your Honor.

21              THE COURT:  What?

22              MR.  JACOBSON:  It is called administrative

23    expense.

24              THE COURT:  I know it is administrative expense,

25    but you can get even among administrative expenses you can
```

```
 1    get a super priority, even above the administrator expense.

 2              MR. JACOBSON: Sort of like a purchase money order

 3    lean.

 4              THE COURT:  I guess.  Not quite accurate.  So I

 5    don't know.  There is all kinds of things.  But what I am, in

 6    the series of emails, it says something is stipulated to.  I

 7    don't know what is stipulated to.

 8              MS. RODRIGUEZ:  Let me add one more level, your

 9    Honor.  When the discussions were being had, there was no

10    videotape.  The videotape came, timeframe wise, within the

11    last couple of months.

12              THE COURT:  The transcript was available.

13              MS. RODRIGUEZ: We were talking about the

14    transcript, C Span.  But that, and the stipulation, whatever

15    it is, it is certainly unclear, but what is clear is that the

16    plaintiffs maintain their right to all objections to the

17    testimony.  If Mr. Katz can point --

18              THE COURT:  We won't take the deposition, you can

19    use this, but we reserve all our objections now you come and

20    tell me I object to all of them.  That is a hell of a

21    stipulation.

22              MR. JACOBSON: The stipulation, this is a

23    stipulation that this testimony is not going to go outside

24    the bounds of what he said in the bankruptcy court and did

25    what I had I said in the Senate.
```

1              THE COURT:  What he stated to the Senate is from

2      the defendant's point of view, it is kind of a very favorable

3      bombshell.  I mean to the extent that, you know, the jury

4      believes that this is a company that was ten minutes, you

5      know, they are shutting down operations, actions of one kind

6      by ALPA can be put in one light, you know, it always, one's

7      perception with the financial condition of TWA and its worth

8      to American, they paid a lot lot of money for it, when I say

9      a lot, who knows in the context, but they pay hundreds of

10     millions of dollars, according to some examination if you

11     include  the assumption of debt they paid billions of

12     dollars,

13             So it is real important stuff.  From his point of

14     view, not from your point of view.

15             MS. RODRIGUEZ:  And certainly not, it was at a time

16     in the proceedings when the defendants were complaining about

17     all the depositions that we were taking and it was an attempt

18     to limit the scope of Mr. Compton's --

19             THE COURT:  You cared that they complained?

20             MS. RODRIGUEZ:  They were complaining to you, your

21     Honor.

22             THE COURT:  No, I didn't stop, when did I ever stop

23     a deposition?

24             MS. RODRIGUEZ:  Not a deposition.

25             THE COURT:  I never once stopped a deposition of

1     anybody.

2            In fact, I allowed depositions even after the final

3     pretrial order when I thought there were witnesses that might

4     have something to say.  Don't hang that one on me.  I

5     probably made lots of mistakes, but one of them is not

6     blocking discovery.  I am a big believer, if there is a

7     witness who knows something, even if if it comes later, hell,

8     when I was trying cases I would take depositions during the

9     course of the trial in the evening.

10           MR. PRESS: Mr. Katz and I were looking for ways to

11    streamline discovery.  We had a stipulation on Steve

12    Rautenberg that he wouldn't testify.  We made the stipulation

13    on Compton that is highly favorable to us.  He will not be in

14    that chair and the only thing they will offer is his

15    transcript, but we reserve our objections to it.

16           THE COURT:  It is illusory.  If the stipulation is

17    that --

18           MR. PRESS:  No, it is not.  You have the right to

19    rule on our objections.

20           THE COURT:  But your objection is the whole thing.

21           MR. PRESS:  That is true.

22           THE COURT:  It is not like you take a line here and

23    there or a page here and a page there and I read it.  When

24    there is left, there is something there.  You haven't taken

25    a line by line approach to say this section is okay, this is

```
 1    not.  You you said it is all -- what.

 2              MR. PRESS:  Your Honor.

 3              THE COURT:  What kind of a stipulation is that?

 4              MR. PRESS:  That is, the whole stands of what it is

 5    we will be arguing about, if we argue it in court which we

 6    are doing now.

 7              But your Honor, this issue came up with Sherry

 8    Cooper, the board member.  And I thought --

 9              THE COURT:  I had a different problem with Sherry

10    Cooper.  Sherry Cooper, she was the labor representative, she

11    was a labor representative, she was the flight attendants

12    representative, I think.  Flight attendants union

13    representative on the board.

14              MR. JACOBSON: That's right, your Honor.

15              THE COURT:  Basically what she said, I can

16    negotiate savings with lots of unions, she gave some

17    confusing and highly generalized statments about outside

18    investors, and there was not a slightest bit of indication

19    that any of that was lined of up or we had the slightest idea

20    of what the connection was.

21              This is a guy who is the CEO of the company.  I

22    think by definition --

23              MR. PRESS:  You also made the point, Judge, her

24    testimony doesn't go to whether or not the union breached its

25    duty of fair representation.
```

```
 1              THE COURT:  That's right.

 2              MR. PRESS:  We talked about this afterwards.  We

 3    ended up, we agree with you.  It isn't relevant to that.  And

 4    neither is the opposite position from the same coin.  It

 5    doesn't prove that ALPA didn't violate, whether or not TWA

 6    was going out of business the next day or the next month or

 7    the next year has nothing to do with --

 8              THE COURT:  But you had a lot of testimony about

 9    various strategies that were, with Wilder at various points

10    and other people, were suggested, and cross examination by

11    Mr. Jacobson, he went through a litany of  what unions might

12    do to put pressure on mostly the management, but might use to

13    put pressure on somebody.  Say this case is different because

14    you went pressure by pressure, but, it is the union, not

15    management.

16              MR. JACOBSON: Mr. Woerth was allowed to testify

17    about his impressions about the financial position of TWA.

18    He is the person whose mental state is important here, if

19    anyone's mental state is important.  So the evidence to the

20    extent that it is relevant is in.  To bring in a video of

21    something trying to do a sales job on the Senate who is not

22    the decision maker on how hard the union is going to fight,

23    you indicated so many things come in because they go to state

24    of mind of the participants.  Mr. Compton wasn't a

25    participant.
```

```
 1              THE COURT:  I have to think, if I was just offered

 2     this disk of Compton's testimony before the Senate, I would

 3     even consider it, even for a second, he is testifying on what

 4     I consider a highly technical subject.  He is not subject to

 5     cross examination.

 6              MR. KATZ:  He was under oath.

 7              THE COURT:  But he is not subject to cross

 8     examination.  Also it was not an adjudicatory proceeding in

 9     the real sense of the word.  It wasn't in the context of a

10     deposition or the context of a bankruptcy court.  I find it

11     hard to imagine that I would, even consider it briefly

12     letting it in, and had the potential to say, well, this

13     company is such a wreck, such a wreck from Georgia Tech, that

14     I am, you know, ALPA was smart to do nothing that could even

15     slightly risk tipping the balance, and tipping American

16     Airlines had to go through with it.  On the other hand.  One

17     of the value of assets is a fairly complicated question.

18     Especially this case is changed radically by events that had

19     nothing to do with the parties.  Probable the value of the

20     deal was changed radically on September 11.  9-11 to deal

21     with was a lot different than it looked in January.

22              MR. JACOBSON: 9-11 they received a substantial sum

23     of money from the government.

24              THE COURT:  When 9-11 happened it wasn't just the

25     money.  I know they had, it was billions of dollars, the
```

```
 1   airline industry took a banging.

 2            MR. JACOBSON:  That is true.

 3            THE COURT:  American Airlines would have still

 4   collected a lot of their business without even purchasing

 5   TWA.  That is neither here nor there.  It is a fairly

 6   complicated question and yet here I have a, I have some kind

 7   thing which resulted in the CEO of TWA's deposition not being

 8   taken.

 9            MS. RODRIGUEZ:  But we are the ones.

10            THE COURT:  You took dozens and dozens --

11            MS. RODRIGUEZ:  It was our decision not to, talk

12   about an illusory stipulation.  If you give their --

13            THE COURT:  But he has, as you know from the two

14   depositions you took of Brundage and what other one?

15            MS. RODRIGUEZ:  Babbitt.

16            THE COURT:  You took one of them, you took the

17   other one.  In one of them plaintiff -- the defendants

18   questioned at all, I don't think it was a simple question.

19            MR. KATZ:  We didn't ask Mr. Babbitt any questions.

20            THE COURT:  Brundage there was some questions.

21   There was some.

22            MR. KATZ:  A few.

23            THE COURT:  In either case, I take Babbitt, if I

24   were in Mr. Katz's position I would have confidence and even

25   under the laser like questioning we will see from the
```

1    plaintiff, he put himself in a way that was favorable to the

2    defendants.  The defendants would perceive as favorable to

3    them.  So that doesn't, to say you were the one taking the

4    deposition --

5           MS. RODRIGUEZ:  But the defendants didn't, they

6    didn't change the -- they didn't seek to take his deposition.

7    It wasn't --

8           THE COURT:  But there is this reference in this

9    correspondence to this testimony before the Senate.  It is

10   not like something that came up later on.

11          MS. RODRIGUEZ:  Ho, but why would we waive our

12   right to take a deposition to allow them to put something

13   that is wholly unobjectionable into the record?

14          THE COURT:  Maybe you thought it was a form of

15   limitation on what he could could say.

16          MR. KATZ:  Precisely.

17          MS. RODRIGUEZ:  No.

18          MR. PRESS:  We reserved our evidentiary objections

19   in this trial.  We did it, to be completely unfair --

20          MR. KATZ:  Not so.

21          THE COURT:  The emails are here.  Let me just take

22   a second.

23          (Off the record discussion.

24          THE COURT:  I am never going to forget Babbitt's

25   name again.  He is too important a man.  Maybe he can

```
 1    reactivate my students pilots license.

 2              MS. RODRIGUEZ:  Do you have an extra copy?

 3              MR. KATZ:  No, one copy.  I gave out copies the

 4    other day.

 5              MS. RODRIGUEZ:  They are in my car.

 6              THE COURT:  The first email in date is October 13.

 7    I think it is from Mr. Katz to Nicole  Acchione.

 8              MR. KATZ:  There is one below that.  From Nicole to

 9    me.  She says can you clarify what your proposed stipulation.

10              THE COURT:  I want to know the date.

11              MR. KATZ:  No date on that one.  It was probably

12    the same date, October 13.  I was responding.

13              THE COURT:  I don't see a date on it.  Can you

14    clarify what your proposed stipulation concerning Compton

15    will be?  Are you agreeing not to call him at trial or just

16    to rely on his prior testimony?  I don't know what she means

17    by testimony.  Or are you agreeing that he can be brought to

18    trial but his trial testimony will be limited to the subject

19    areas covered in his earlier testimony.

20              MR. KATZ:  I think the same day I responded to the

21    one above that.

22              THE COURT:  You respond.  Nicole, the concept is

23    that we'll agree to dispense with the deposition of Bill

24    Compton and ALPA will stipulate that we will rely on his

25    prior testimony before Congress and the bankruptcy court.  I
```

1    don't know, you haven't offered that, I don't think.

2            MR. KATZ:  No, it is similar to what he said in

3    Congress.

4            THE COURT:  Given what the bankruptcy Judge

5    decided, it probably was.  Instead of calling him as a

6    witness at trial, using his declaration to support our

7    dispositive motion.  We could stipulate that he would say

8    what he said before or we could stipulate that is is his

9    prior testimony is admissible subject to any objections

10   plaintiffs might assert as to relevance.

11           MR. KATZ:  That is the only one.

12           THE COURT:  As to relevance.

13           MR. KATZ:  That is the only one.

14           THE COURT:  Either of these approaches works for

15   me.

16           Then Ms. Rodriguez comes back, I think, Dan, I

17   tried to reach you today by telephone.

18           MR. KATZ:  This is October 23, your Honor.

19           THE COURT:  5:15:08.  Dan, I tried to reach you by

20   telephone today.  We will agree to the stipulation you

21   proposed concerning the use of transcripts rather than

22   calling Compton to testify at trial.  In light of the

23   stipulation we will not proceed with Compton's deposition on

24   Monday.  We are still waiting to hear back from you, however,

25   concerning -- I don't know what this is about.

1          MR. KATZ:  The March 15 letter is a letter that

2     Compton wrote to TWA employees and that Nicole had wanted us

3     to agree to the admissibility of that letter.  And I got --

4          THE COURT:  Is that letter in evidence?

5          MR. KATZ:  No, I did not agree to it and it is not

6     in evidence.

7          THE COURT:  He might offer it.

8          MR. KATZ:  It has not been offered and we did not

9     stipulate to its admissibility.  The voice mail that Lisa,

10    Ms. Rodriguez left me, was pretty much like her email.

11    Saying she agreed to the proposed stipulation that I had sent

12    on October 13.

13         THE COURT:  I can understand reserving the

14    objections to relevance because in a sense that is almost

15    always, almost automatically reserved.  Evidence is not

16    admissible if it is not relevant.

17         MR. KATZ:  It would be presumptuous of us to insist

18    that the Court allow it and we didn't insist on that.  We

19    said they could preserve their objection.

20         THE COURT:  But it is not preserved, not preserved

21    on hearsay, on authenticity.

22         MR. KATZ:  That's correct.  That was the deal I

23    offered and that is what Ms. Rodriguez accepted in her voice

24    mail and in her email reply.

25         THE COURT:  What sayeth thou?

```
 1              MR. PRESS:  Is there more to that chain?

 2              THE COURT:  What?

 3              MR. PRESS:  Is there more correspondence on that

 4    issue?

 5              THE COURT:  That is what I have.  If you want to

 6    show me more.  That is all I have.  Both sides gave me.

 7              MR. KATZ:  That is what I distributed the other

 8    day.

 9              MS. RODRIGUEZ:  We didn't give you anything.

10              THE COURT:  I am not limiting you.

11              MR. PRESS:  I don't have anything on me.

12              THE COURT:  Hang you by your heels and see what

13    comes out.

14              MR. PRESS:  On the stip as it exists on the record

15    now it shouldn't come in.  This is not relevant to any of the

16    issues raised in this courtroom.

17              MS. RODRIGUEZ: There is another page.

18              MR. PRESS:  You talked about, Judge, that people's

19    perceptions of TWA's financial position could be relevant but

20    this plan is testifying to supposed fact.

21              THE COURT:  But I am troubled when you make a

22    stipulation, a deposition is cancelled, and I am asserting

23    the right to say I object to all of it.

24              MR. PRESS:  Mr. Katz is the one that suggested the

25    relevance objection be preserved.
```

1          MS. RODRIGUEZ:  Do you have another page?  I

2     thought Mr. Katz handed up two pieces of paper.

3          THE COURT:  My second page has nothing on it.

4          MR. KATZ:  There is a third page.  This is the next

5     day, there is an email.

6          THE COURT:  From you.

7          MR. KATZ:  From me to Ms. Rodriguez, and the

8     lawyers for the plaintiffs.  With copies to the lawyers for

9     American Airlines.

10          THE COURT:  All he says is I agree to the

11     stipulations  but opens the question as to what the

12     stipulation is.

13          MR. KATZ:  I do not agree to the admissibility of

14     the Compton letter, that is the May 15 letter.

15          MS. RODRIGUEZ:  We would permit plaintiffs to

16     retain their potential objections to Compton's sworn

17     testimony.

18          MR. KATZ:  The relevance objections I mentioned in

19     the --

20          THE COURT:  Mail the day before.  On the 13th.

21          MS. RODRIGUEZ:  I can go back and see whatever

22     emails re we retained on that.

23          THE COURT:  All right.

24          MR. KATZ:  Let me make a situation.  We have had an

25     informative discussion about the Court's views on this.  I

 1    think everybody --

 2              THE COURT:  You know, you don't know what my views

 3    are.  My views are if this had just come up, if somebody

 4    showed up at trial and said I want to put this in evidence,

 5    we don't have to worry about relevance grounds, some of it

 6    may be relevant but it would just be blatant hearsay

 7    testimony, sales pitch at a Congressional hearing, it is not

 8    evidence.  Maybe in his deposition, maybe the sworn testimony

 9    of bankruptcy, maybe personally.  But when I see the

10    stipulation and I see a deposition was not taken --

11              MR. KATZ:  My suggestion is going to be that

12    everybody return to their neutral corners, consider their

13    position and we reconvene and discussion it again at a later

14    date.

15              THE COURT:  All right.  I will reserve on it.  You

16    folks want to talk about it.

17              MR. KATZ:  Thank you.

18              THE COURT:  Where is Compton now?

19              MR. KATZ:  He lives in Florida.

20              THE COURT:  You want to take a trip there to depose

21    him?

22              MR. KATZ:  Will we be permitted to discuss that

23    with our co-counsel?

24              THE COURT:  You are the one who wants to introduce

25    him.  They didn't offer Compton.

1          MR. KATZ:  We offered his Senate testimony.  If you

2   are suggesting that the Court would permit a deposition, we

3   would --

4          THE COURT:  I can't say, I don't really know what

5   he is going to testify to.  But I can't say that he doesn't

6   have relevant testimony.  Even though he wasn't essential, he

7   wasn't really a party to the dispute.

8          But if you really think he has something that is

9   relevant in the sense that I would understand, go down and

10  take his deposition, and maybe you can do it over some kind

11  of telephone, video hook up.  You don't even have to go down

12  there, it can be done through Kinko's or some sort of service

13  so you didn't have to physically go.

14         MR. KATZ:  We would appreciate the opportunity to

15  consider that option, your Honor.

16         THE COURT:  But right now, although I say this

17  stipulation troubles me.  I don't care what anybody says.  It

18  troubles me.  I say the stipulation.  The nature of what he

19  is about to say has troubled me, there may be more.  And so I

20  am being offered two very bad alternatives.  One is to ignore

21  a stipulation made by attorneys.   In good faith.

22         MR. PRESS:  On the stip, the stip was proposed by

23  the defendant.  All we said was we agreed.

24         THE COURT:  Those are the words that count.  It is

25  like proposing, like the good faith integration of the

1    pilots.  The ALPA proposed it, you know, and they hired a

2    professor who spent two months preparing it.  But until APA

3    said I agree, it was a piece of paper.  And it turned out at

4    least the testimony I heard so far remained a piece of paper.

5              MR. PRESS:  And the video.

6              THE COURT:  I say a piece of paper.  Probably 60 or

7    70 pages.  The key words are I agree.

8              You don't know how many people have gotten in

9    trouble by saying those words.

10             Right now my inclination is not to let this in.  I

11   think it is a sales pitch to Congress.  It it is not evidence

12   of a financial condition but I am not ready to rule that his

13   testimony about the financial condition an and what he

14   conveyed to various people about it is not relevant.  That

15   might be relevant.  But in a situation where you can cross

16   examine, you can, you will know what you have to face.

17   Rebuttal.  Something.  For instance, maybe he will say

18   something which will wind up opening up Ms. Cooper's

19   testimony.  You don't know.  On rebuttal.  Could be.  But I

20   am not inclined right now, notwithstanding the so-called

21   stipulation, to let Compton's sales pitch in, do what you

22   will.  Anything else?

23             MR. PRESS:  Yes.  We would like to know the order

24   the witnesses from the defendant.

25             THE COURT:  You can ask your next witness.

```
 1              MR. FRAM:  Your Honor, it will be Mr. Holtzman.

 2              THE COURT:  Who?

 3              MR. FRAM:  Mr. Holtzman.  Probably Mr. Singer.

 4    Depending upon we might call Mr. Singer tomorrow.

 5              THE COURT:  It is just a question of which is

 6    which.

 7              MR. FRAM:  I need to make a phone call and I will

 8    be happy to make that call to let Mr. Press know.

 9              MR. PRESS:  The next two witnesses are Dave Singer

10    and David Holtzman.

11              MR. FRAM:  Yes.

12              MS. RODRIGUEZ:  Somebody may not be available.  You

13    said you would make a phone call.  If somebody is not

14    available is there somebody else.

15              MR. FRAM:  It is one or the other, Singer or

16    Holtzman, one or the other.  I need to check with Mr. Singer.

17              THE COURT:  All right.

18              MR. PRESS:  I am satisfied.

19              THE COURT:  All right.  Thank you all very much.

20              (Adjourned at 2:45  p.m.)

21

22

23

24

25
```

1

2                          I N D E X.

3

4            DUANE WOERTH, RESUMES.

5                    CROSS EXAMINATION              P. 3.

6                    REDIRECT EXAMINATION           P. 155.

7                    RECROSS EXAMINATION            P. 173.

8

9            STEVEN PAUL RAUTENBERG, SWORN.

10                   DIRECT EXAMINATION             P. 182

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25