IN THE UNITED STATES DISTRICT COURT.
                    FOR THE DISTRICT OF NEW JERSEY
                    CIVIL 02-2917 (JEI)

        PATRICK BRADY, SALLY YOUNG,
        HOWARD HOLLANDER, THEODORE CASE,
        AND MICHAEL FINUCAN, individually
        and on behalf of all others
        similarly situated,
                    Plaintiffs,
                                            VOLUME 13
            V.                              TRIAL TRANSCRIPT

        AIR LINE PILOTS ASSOCIATION,

                    Defendant.

                                CAMDEN, NEW JERSEY
                                JUNE  29, 2011

        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE

                A P P E A R A N C E S:

            TRUJILLO, RODRIGUEZ & RICHARD
            BY:  NICOLE M. ACCHIONE, ESQ.
                AND: LISA J. RODRIGUEZ, ESQ.
                    AND
            GREEN JACOBSON, P.C.
            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
            AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
            For the Plaintiffs.

            ARCHER GREINER
            BY:  STEVEN FRAM, ESQ.
                    AND
            KATZ & RANZMAN
            BY:  DANIEL M. KATZ, ESQ.
            FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

            ELIZABETH  GINSBURG, ESQ.
            IN-HOUSE COUNSEL FOR ALPA.

1

2          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
3   accurate record as taken stenographically in the
above-entitled proceedings.
4
                          S/   LYNNE JOHNSON
5
                          Lynne Johnson, CSR, CM, CRR
6                         Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18
                     LYNNE JOHNSON, CSR, CM, CRR
19                   OFFICIAL COURT REPORTER
                     UNITED STATES DISTRICT COURT
20                   P.O. BOX 6822
                     LAWRENCEVILLE, NJ  08648.
21

22

23

24

25

 1                STEVEN RAUTENBERG, previously sworn, resumes.

 2                CONTINUED DIRECT EXAMINATION.

 3                BY MR. FRAM:

 4                (The jury enters the courtroom.)

 5                THE COURT:  Good morning, everybody.  Mr. Fram.

 6                MR. FRAM:  Thank you.  Rautenberg, please resume

 7    the stand.

 8                THE COURT:  You may continue, Mr. Fram.

 9                MR. FRAM:  Thank you.

10    Q.   Good morning, Mr. Rautenberg?

11    A.   Good morning.

12    Q.   You told us yesterday that you got involved with the MEC

13    level in late 2000.  Did you do anything in late 2000 to

14    familiarize yourself with the financial condition of TWA?

15    A.   Yes, I did.

16    Q.   What did you do?

17    A.   Because we had an assigned ALPA of directors

18    representative who was designated by the pilots union, we had

19    access to company financial records, and in order to get

20    access you had to sign a confidentiality agreement.  Very

21    shortly after I was elected I was briefed about the

22    confidentiality provisions by David Holtzman, and virtually,

23    immediately upon con crucial of that briefing I requested

24    access to the documents, because, at that point it was

25    already clear that there was financial issues but I wanted to

 1    find out promptly.

 2    Q.   What documents did you get access to?

 3    A.   I am sorry?

 4    Q.   What documents did you get access to?

 5    A.   There was monthly income statements in the form of an

 6    Excel spread sheet or a spread sheet of some nature, showed

 7    companies performance against the budget which was also

 8    shown.  Those were the documents that were available to us.

 9    Q.   What conclusions, if any, did you reach from reviewing

10    those documents about TWA's financial condition?

11    A.   This was in the latter part of September, very early

12    part of October, 2000, and the documents that I saw initially

13    were for, I believe July, perhaps August, but I believe the

14    initial documents were for July which is the heart of TWA's

15    historic peak travel season, and they --

16         MR. PRESS:  Your Honor, I am sorry.  I am objecting

17    to this.  He is testifying about a document that is not in

18    evidence.  I have never seen it before.  I don't think it is

19    proper and I object to it.

20         THE COURT:  I am going to allow it.  His perception

21    of TWA's financial condition is relevant, and how he got that

22    perception is relevant.

23         MR. FRAM:  Thank you, your Honor.

24    Q.   Will you continue, please?

25    A.   Yeah.  July was the heart, the peak financial season for

1    TWA and the documents showed that the company was missing its

2    expense targets substantially by blocks by approximately $20

3    million on the wrong side of expenses and they were missing

4    revenue targets on the wrong side of expenses by

5    approximately $20 million.  And the performance, it also

6    showed the performance to date for the year and the budgeted

7    performance to date through the year and the performance to

8    date through the year had been similar to that.

9    Q.   Did you continue to review similar financial documents

10   through the end of 2000?

11   A.   I did, as they became available, yes.

12   Q.   What did they tell you about the company's financial

13   circumstances?

14   A.   Similar results.  The situation was not improving.

15   Shortly after that the company initiated another

16   reorganization plan to try to save the company as an

17   independent entity.

18   Q.   Is that before the bankruptcy filing?

19   A.   Yes.

20   Q.   And what was the result of the attempt to reorganize the

21   company at that point?

22   A.   What was the result of -- the result of the attempt was

23   it failed.  The reorganization attempt failed, it is my

24   understanding that it failed due to lack of participation on

25   the part of the IAM, the machinists union.

1   Q.   After the bankruptcy filing did you continue to make

2   yourself aware of the company's financial condition?

3   A.   I did.  We were, the MEC was in Wilmington, on more than

4   one occasion, where we were present, and hearings before the

5   bankruptcy court, and that was really the source of

6   ascertaining the company's financial performance at that

7   time.

8   Q.   And what conclusions or assessments did you reach during

9   that timeframe after the bankruptcy about the company's

10  prospects for survival as a stand alone entity?

11  A.   I didn't believe that the company had any prospects,

12  post bankruptcy filing, had any prospects of surviving as a

13  stand alone entity, and I had concerns that the company's

14  failing performance in the bankruptcy process were going to

15  -- was going to dissuade some of the participants, i.e.,

16  American Airlines, from their continued interest.

17  Q.   Can you give us a little more detail about what you mean

18  when you refer to the company's failing financial performance

19  during the bankruptcy?

20  A.   Well, America had to pitch in more than their initial

21  DIP financing?

22          THE COURT:  DIP means debtor in possession?

23          THE WITNESS:  Yes, sir.

24  A.   There was additional requirements for financing to keep

25  the company operating during the period of time it was in

1   bankruptcy before the transaction closed.

2   Q.   All right.  I want to change subjects on you if I could.

3   Did you become aware at some point after the bankruptcy that

4   there was a possibility of a motion by TWA under Section 1113

5   of the Bankruptcy Code?

6   A.   Yes.  I was aware of the possibility of a motion of that

7   nature, as soon as I read the provisions of the asset

8   purchase agreement that required employee groups to waive

9   certain provisions of their contract.

10  Q.   All right.  So you are referring back now to January, at

11  some point in January you were aware of --

12  A.   I believe so, yes.  I was aware promptly due to the fact

13  that these provisions were not going to be readily available,

14  or they weren't going to be willingly given up, I should say.

15  Q.   Did you have some prior knowledge of Section 1113 of the

16  Bankruptcy Code?

17  A.   Well, I did.  TWA had been in bankruptcy twice before,

18  and the prospect of 1113 was always on the horizon.  I paid

19  attention during those occasions.  It was my career.  And so

20  I guess my, up to that point my education in 1113 in

21  bankruptcy was due to the company's transition through a

22  couple of those.

23  Q.   When it occurred to you shortly after the bankruptcy

24  that there might be a Section 1113 motion, what, if anything,

25  did you do to educate yourself more fully about Section 1113?

```
 1   A.   Well, I went to the internet and I found the statute.  I

 2   read over the statute.  Later on we were provided a copy of

 3   the statute in a memo I think from David Holtzman.  The

 4   company's 1113 filing was provided to us, I read through the

 5   1113 filing.

 6   Q.   You mean the --

 7            THE COURT:  The TWA, Inc., filing.

 8            THE WITNESS:  Yes, sir.

 9   Q.   So the formal motion that TWA filed in March you

10   actually got a copy of that?

11   A.   Yes.

12   Q.   You mentioned David Holtzman a couple of times.  Can you

13   just remind the jury of who Mr. Holtzman was?

14   A.   David Holtzman was the MEC's contract administrator.  He

15   was our council in the MEC office.

16   Q.   And did you mention a minute ago that he provided you

17   with a copy of Section 1113?

18   A.   Yes.

19   Q.   You just mentioned the actual motion that TWA filed.  Do

20   you recall how you obtained a copy of that?

21   A.   I believe I obtained a copy from David Holtzman.  I

22   believe a copy was provided to all of us.

23   Q.   When you say all of us?

24   A.   To the MEC, to the MEC and on the officers.

25   Q.   Do you recall a meeting of the MEC on March 21 and 22
```

1    wherein the Section 1113 issue and some other issues were

2    discussed?

3    A.   I do.

4    Q.   Let's walk ahead.  I want to refer you, I think it is

5    the second document in the file I gave you.  I am referring

6    to defendants 382 in evidence, your Honor.  This is the March

7    19, 2001, memo scheduling that meeting.  Do you have that in

8    front of you, Mr. Rautenberg?

9    A.   Yes.

10   Q.   Do you recall receiving that email?

11   A.   Yes.

12   Q.   And do you recall the agenda which listed, if you could

13   put that up so people can follow, D 382.

14   A.   Yes.

15   Q.   We have the email, then the agenda is the second page.

16   And it has got a transaction update shown for the negotiating

17   committee, a break, then a transaction update for the merger

18   committee.

19        Let's focus on the negotiating committee for a

20   minute.  The name listed there is Ron Kiel.  Do you see that?

21   A.   Yes.

22   Q.   Did you know Mr. Kiel?

23   A.   I do.

24   Q.   What was his position with respect to the negotiating

25   committee?

1    A.   He was the chairman of the negotiating committee at that

2    time.

3    Q.   Were there other TWA pilots working with them?

4    A.   Yes, there were.

5    Q.   About how many of them were there?

6    A.   I believe two or maybe three more, additional pilots.

7    Alan Altman was one of them.  Carry Bouchard I believe was

8    another one.  I don't recall the other participants at this

9    point in time.

10   Q.   And the merger committee is listed below that, Mike Day,

11   Sean Clarke, and some others?

12   A.   Yes.

13   Q.   Were those other pilots that you also knew?

14   A.   Yes.

15   Q.   In terms of these two committees, what degree of

16   confidence did you have in their ability to fulfill their

17   responsibilities as, let's start with the negotiating

18   committee, what degree of confidence did you have in the

19   abilities of the people on the negotiating committee?

20   A.   Well, I had high confidence in the ability of the

21   people, and of the abilities of the counsel they were

22   getting.  I didn't necessarily have high confidence in the

23   results they might achieve, but in the people I had high

24   confidence.  They were all dedicated to the task at hand,

25   committed to getting, you know, hopefully an agreement that

1    precluded us from having to go in and waive portions of our

2    contract.

3    Q.   How about the merger committee?  What degree of

4    confidence did you have in the people on the merger

5    committee?

6    A.   I had high confidence in the membership of the merger

7    committee at that time.

8    Q.   Okay.  All right.  So let's turn to the actual meeting

9    on March 21 and 22.  Do you recall attending that meeting of

10   the MEC?

11   A.   Yes, I was at this meeting.

12   Q.   I am going to refer you to defendant's exhibit 223 in

13   evidence.  Which I think you should have in front of you.

14   The minutes of those meetings.  You attended both days of

15   that meeting?

16   A.   Yes.

17   Q.   And what discussion, if any, do you recall about Section

18   1113?

19   A.   Well, I remember briefing by our bankruptcy counsel and

20   I remember --

21            THE COURT:  Who was?

22            THE WITNESS:  Richard Seltzer was one of them.

23   Steve Tumblin was another one of them.  I don't remember, I

24   mean, my recollection of this meeting is that they walked us

25   through the process of the 1113 and how it would proceed, how

1    we could expect it to proceed.

2    Q.   Let me ask you something.  Based upon your review of the

3    actual statutes and you review of the motion, did you reach

4    any conclusions in your mind before this meeting about how

5    likely it was that the Section 1113 motion would be granted?

6            MR. PRESS:  Judge, I object to that, calling for a

7    legal conclusion.

8            THE COURT:  It is not being offered for the

9    accuracy of the conclusion because this is a case about

10   perception.  I am going to allow it.

11           MR. FRAM:  Thank you.

12   Q.   My question, Mr. Rautenberg, was before this meeting on

13   the 21 and 22, did you, based upon your own independent

14   investigation and analysis, did you reach any conclusions in

15   your mind about how likely it was that the Section 1113

16   motion would be granted?

17   A.   Yes, I wouldn't necessarily call it a conclusion.  I

18   had, I was pessimistic.  I would say I was very pessimistic

19   about  the probability of our success on 1113.

20   Q.   And when you met with advisors and the other MEC members

21   on March 21 and 22, were you given any assessments by

22   advisors about how they felt the Section 1113 was likely to

23   come out?

24   A.   Yes.  In a nonquantitative way we were.  That meeting

25   served to enhance my prior assessment, I guess.  At best I

```
 1    would say I became more pessimistic as time went on about the

 2    prospects of prevailing, should we choose to try to prevail,

 3    against a 1113 motion.

 4    Q.   All right.  You say that, advisors talked in a

 5    nonquantitative way.  Can you give us some more detail?

 6    A.   Yes.  It was talking us through the 1113 motion, and

 7    basically, what would, you know, what the situation entailed,

 8    notice requirements, the negotiation requirements, the

 9    hearing, and so on.  It was that kind of a situation, and

10    yeah, there was -- you know, there was indication of what the

11    probabilities of success were, but it was not, I think the

12    probability was this or I think the probability was that.  It

13    was -- later on there was numbers that were mentioned by

14    counsel.

15    Q.   Let's come to that in a minute.  All right.  So the

16    bottom line in terms of what advisors were saying about the

17    likelihood that the motion would be granted, that TWA would

18    be able to reject the contract, was what?

19    A.   Not likely.

20    Q.   Would you repeat the question.  I think I heard the

21    question.  I may have?  The bottom line in terms of what

22    advisors were saying about the likelihood that TWA would win

23    the motion and be able to reject the contract?

24    A.   That was very likely.  Our probability of over coming

25    the motion was not likely.
```

Rautenberg-direct/Fram                                              14

```
 1   Q.   The other members of the MEC, do you recall which of

 2   them were present during the discussion you just referred to?

 3   A.   I really don't recall specifically who was there.

 4   Q.   If I were to refer you back to the minutes, defendant's

 5   exhibit 223.  Would the second line, March 21, it says

 6   secretary Treasurer Bob Stow called the roll.  Members

 7   present and accounted for.  Do you see that?

 8   A.   Yes.

 9   Q.   Would that have indicated that all of the voting members

10   and the officers were present?

11   A.   It would.

12   Q.   Do you recall the other members of the MEC, including

13   the other voting members, asking questions about Section

14   1113?

15   A.   There was a discussion, but 1113 was not a secret.  You

16   know, it was not something that just came up out of the blue.

17   It had been an ongoing issue.  An ongoing expectation, I

18   guess.

19   Q.   Okay.  Do you recall any of the other members of the MEC

20   on March 21 or 22 appearing to be confused or not

21   understanding what advisors were saying about Section 1113?

22   A.   No, I have no recollection of that.

23   Q.   What was your understanding as a result of the meetings

24   on March 21 and 22 about what would happen if the 1113 motion

25   was granted, meaning that TWA was able to have the collective
```

1   bargaining agreement rejected?

2   A.   My understanding was that we would have no contract,

3   that employees would be basically, you know, if they were, as

4   if they were hired, would be an engineer, like I was at one

5   time, that we wouldn't have a working agreement.  We wouldn't

6   have a grievance process.  We wouldn't -- we would be

7   basically without a contract.  Starting over.

8   Q.   Did you view that as a good prospect?

9   A.   No, certainly not, certainly not.

10  Q.   Do you recall any discussion at these meetings on March

11  21 and 22 about what might happen in the Section 1113 motion

12  was denied meaning that TWA was unsuccessful in getting the

13  bankruptcy court to reject the contract.

14  A.   I don't recall a whole lot of discussion about that at

15  the time, but we all knew that American had placed waiver of

16  certain provisions of our contract as a condition.  It was

17  not a secret.  It was absolutely an important issue through

18  that period of time.  So the prospect that American would

19  back away from a transaction or the possibility that they

20  would back away from a transaction as a result of that or

21  threaten us or, it was always present.

22  Q.   Was that possibility something you recall being

23  discussed at these meetings on March 21?

24  A.   Discussed at that particular meeting, you know, I don't

25  recall it being discussed right at that particular time but

1   there was a lot of discussions about those topics.

2   Q.   And did you view that as a good thing or a bad thing, if

3   American were to walk away from the transaction?

4   A.   I view Americans departure from the transaction to be

5   disastrous.

6   Q.   Explain to us why you felt that would be disastrous?

7   A.   I was confident that Americans departure from the

8   transaction would cause the liquidation of TWA and the loss

9   of jobs.

10   Q.   All right.  Let's move ahead to the meetings of the MEC

11   on April 1 and April 2.  Do you recall those meetings?

12   A.   I do.

13   Q.   Just to put in context, I refer you to defendant's

14   exhibit 210 in evidence.  It should be the next document

15   there.  Do you recall that as an email of Thursday, March 29,

16   scheduling a work session on Sunday, April 1, and a formal

17   meeting on Monday, April 2?

18   A.   Yes.

19   Q.   We projected that.  And then the next document, so you

20   have it in context, is defendant's exhibit 179 in evidence,

21   and that is the agenda for the April 2 meeting.  Pull that up

22   real quick.

23   A.   Yes.

24   Q.   All right.  Let's focus on the April 2 meeting, and I am

25   going to ask you to start by telling us who was present at

```
 1   this work session on Sunday, April 2.

 2   A.    I am confident that the entire MEC was present for the

 3   simple reason that, I had a habit of leaving the house early

 4   because I was local, sometimes there was traffic.  And I

 5   would tend to get to the meetings a bit early.  And upon

 6   arrival at this meeting on the second, after the work meeting

 7   on the first, I went in to the meeting room and Scott

 8   Shwartz, the vice chairman of the MEC, was in the room

 9   preparing, making sure the room was prepared for the outset

10   of the meeting.  And we entered into a brief discussion about

11   how he thought things would go.

12   Q.    Let's go back to April 1.

13   A.    Okay.

14   Q.    I want to first focus on who was present for the work

15   session.  Do you recall that the work session was on the

16   afternoon of April 1?

17   A.    Yes, I do.

18   Q.    Okay.  Do you recall who was present for that meeting on

19   Sunday, April 1?

20   A.    Well, I was trying to explain that I think that every

21   one was present at that meeting, because of what I did the

22   following day.

23   Q.    Go ahead.  I am sorry to interrupt you.

24   A.    That is quite all right.

25              At any rate, as Scott Shwartz and I greeted one
```

```
 1    another, we entered into a brief discussion about how we
 2    thought it would go and it was clear to both of us that that
 3    was about the contract, how would we waive scope, would we
 4    enter into this contract or not.
 5              And as a result of the fact that I thought that the
 6    situation was so clear cut, and as was discussed at a
 7    discussed the day prior, I offered to Scott Shwartz that I
 8    would bet him it would be unanimous, and he doubted that.  He
 9    thought it would be less than unanimous and we actually
10    entered into a bet of $20 that it would be unanimous.  It was
11    a bad bet on my part because I didn't get good odds.  But I
12    would not have made that bet had the entire MEC in my mind
13    not have been fully engaged in the process the day before.  I
14    mean it was something that was as a result of what transpired
15    the day before.
16    Q.   Let's go back to the day before.  Do us a favor, why
17    don't you name names.  Name the individuals who you recall
18    being present on Sunday, April 1, the MEC members?
19    A.   Scott Shwartz was there.  All the individual members of
20    the MEC were there.  Beyond that.
21    Q.   So just to look at the minutes, look at the minutes of
22    April 2 which are the next document, it is defendant's
23    exhibit 74 in evidence.  Do you have that handy?
24    A.   The minutes, yes, I have the minutes.
25    Q.   Walk us through the top of the document, and just tell
```

Rautenberg-direct/Fram                                          19

```
 1   us based upon your recollection which of the people listed
 2   there were present at the meeting on April 1 of 2001?
 3   A.   Howard Hollander, Dave Singer.  Ted Case.  Pablo Lewin,
 4   Allen Altman, Glenn Stieneke I am not sure about.  Myself.
 5   Sally Young.  Scott Shwartz, Bob Pastore, I couldn't vouch
 6   for where Bob Pastore was that day.  And Bob Stow, I couldn't
 7   vouch for where he was that day.
 8   Q.   Were some of the outside advisors also present at the
 9   work session on Sunday, April 1, of 2001?
10   A.   Yes, they were.
11   Q.   Do you recall which ones were there?
12   A.   There was a lot of advisors there.  I wrote a letter
13   about that, about the meeting, or about what transpired and I
14   listed advisors that were there.  David Holtzman was there.
15   Richard Seltzer was there.  Bill Roberts was there.
16             THE COURT:  Bill Roberts?
17             THE WITNESS:  Bill Roberts was an attorney from the
18   -- from ALPA.
19             THE COURT:  An in-house attorney at ALPA?
20             THE WITNESS:  Yes, sir.
21   A.   Bill Roberts was there.  Clay Warner was there.  Michael
22   Glanzer was there.  That is some of them.  I am not sure if I
23   got them at all.
24   Q.   Do you recall Roland Wilder being there?
25   A.   Yes, Roland Wilder was there.
```

1   Q.   We will come back to him in a minute.  What was the

2   discussion on Sunday, April 1, 2001?

3   A.   The discussion was about the impending 1113 hearing.

4   And what was likely to transpire, and what were the

5   alternatives.  Advisors, it was more of an open dialogue, it

6   was not a formal MEC meeting, per se.  It was a dialogue.  It

7   seemed that the basic format was the individual advisors took

8   turns, but on occasion, others would pipe in.  And

9   individually they just, they offered their thoughts about the

10  1113 and what the probabilities of prevailing in the 1113 and

11  what the implications of prevailing in the 1113 were.

12  Q.   When you say prevailing, prevailing in the sense of TWA

13  prevailing or prevailing from the sense of defeating it?

14  A.   Prevailing in the sense of potentially defeating TWA's

15  motion.

16  Q.   What do you recall advisors saying about the chances of

17  defeating the motion?

18  A.   Virtually nothing.  Virtually nil.  Advisors were

19  extremely pessimistic about the prospect of us prevailing and

20  defeating TWA's 1113 motion.

21  Q.   Were there was there any disagreement among advisors

22  about the prospect of defeating the motion?

23  A.   There was no disagreement about the prospects of

24  defeating the motion.  There was disagreement about other

25  issues, but not about the prospect of defeating the motion.

```
1   Q.   We will come to those other issues in a minute.  The

2   advice, the predictions about the prospects of defeating the

3   motion, was that different from the advice and the

4   predictions that you had heard from advisors during the

5   meetings on March 21 and 22 of 2001?

6   A.   Well, it was different in the sense of it was more

7   quantitative, you know, on March 21 and 22, in the prior

8   situation it was about the process, it was about generally,

9   you know, what the outlook was.  But it was more

10  quantitative.  I remember advisors getting up, and one or two

11  put numbers on the board.

12  Q.   What numbers, if any, do you recall?

13  A.   I remember 99.  Somebody might have put 99.9 on the

14  board.

15  Q.   As a percentage?

16  A.   Yes.  The odds that TWA would win its motion.  These

17  were accompanied by dialogue.  They were, they were trying to

18  share the view that it wasn't a likely scenario.

19  Q.   Were you surprised by any of the advice about Section

20  1113 that you just described and which you heard on April 1

21  of 2001?

22  A.   I was not surprised.  I was actually appreciative of the

23  fact that they were making it clear, that they were making

24  it, you know, they were making it clear, the situation was

25  clear.
```

1   Q.   Was there any discussion on April 1 about the

2   possibility or the advisability of a strike by the TWA

3   pilots?

4   A.   Yes.  There was a comment about the possibility of a

5   strike.

6   Q.   Tell us who made the comment and what the comment was?

7   A.   My notes reflect that Howard Hollander said, how about,

8   or what if all 24 of us, 2,400 of us, walked offer the job at

9   the same time.

10  Q.   You just referred to some notes.  Can you describe what

11  you are referring to, please?

12  A.   Yeah.  I was a sporadic note taker and a bad note taker,

13  but I made notes from time to time.

14  Q.   Okay.  Did you happen to make some notes about some of

15  the issues discussed at the meeting of April 1, 2001?

16  A.   Yes.  I expected that I would, that I was going to be

17  need to go communicate with the membership about what

18  transpired, and so I was, I think, taking notes at that time

19  to be able to do that in a better way.

20  Q.   I think you referred to a letter that you wrote shortly

21  after the meeting to report to Council 2?

22  A.   Yes.

23  Q.   We will come to that in a minute.  Let's go back to Mr.

24  Hollander's comment about the possibility of a strike.  Did

25  Hollander explain his thinking, did he explain why he thought

1   people should consider a strike?

2   A.   No. It was more in a sense a frustration, I think.

3   Q.   Did anybody else at the meeting speak in favor of this

4   the idea of a strike?

5   A.   I would hate to say that Howard Hollander was speaking

6   in favor of a strike.  I think he was throwing out the idea,

7   and, so I am not sure that anybody spoke in favor of a

8   strike.  It really just kind of fell on the floor like a

9   thud.

10  Q.   What was your reaction to the idea of a strike of the

11  TWA pilots?

12  A.   Well, my reaction was, we were trying to come out of

13  this with jobs, not without jobs.  And I thought that a

14  strike was a really good way to come out of it without a job.

15  Q.   All right.  Do you recall any discussion by Roland

16  Wilder at the meeting on April 1, 2001, about the possibility

17  of litigation?

18  A.   Yes.

19  Q.   Tell us what you recall about that?

20  A.   I recall the essential argument was that in our scope

21  language, we had provisions that prevented the company from

22  negotiating a transaction or a deal that didn't provide us

23  with Allegheny Mohawk labor protective provisions or

24  something like that.  And it was my -- in Wilder's litigation

25  initiative was to basically put pressure on American by

1    seeking to block the transaction.  And seeking to get

2    American to cough up whatever American would cough up to move

3    the transaction forward.

4    Q.   And when you said the company a minute ago, you are

5    referring to TWA?  You said the company had a collective

6    bargaining agreement that required scope protections?

7    A.   Yes.  Our collective bargaining agreement with TWA.

8    Q.   What was your reaction to Wilder's idea of maybe filing

9    a lawsuit to prevent the American transaction from going

10   forward?

11   A.   I was not -- I was very much opposed to Wilder's idea of

12   trying to block the transaction.

13   Q.   You were very much?

14   A.   I was very much opposed to the concept of blocking the

15   transaction.

16   Q.   Did any of the members of the MEC speak up in favor of

17   Roland Wilder's idea?

18   A.   I don't recall that they did, know.

19   Q.   Did any of the other advisors speak up in favor of

20   Wilder's idea?

21   A.   No.

22   Q.   How about Mr. Hollander, do you recall Mr. Hollander

23   saying anything to suggest that he supported the /OEUTD of a

24   lawsuit to prevent the transaction?

25   A.   No, I don't.

1    Q.    Did anybody suggest a motion or resolution to request

2    authorization to go ahead with Wilder's lawsuit idea?

3    A.    No, they did not.

4    Q.    Let me ask you some questions about the general tone of

5    the meeting on April 1.  Did any of advisors during the

6    meeting on April 1, 2001, threaten any of the members of the

7    MEC?

8    A.    No.

9    Q.    Did any of advisors tell any of the members of the MEC

10   that they had to vote a certain way?

11   A.    No. Advisors were talking about the prospects for the

12   1113 situation, and Roland Wilder was talking about an

13   alternative to that.  Nobody was telling us what to do or how

14   to vote.

15   Q.    Did any of advisors raise their voices or scream at

16   anybody, any members of the MEC or anybody else?

17   A.    I do remember one occasion when I think Michael Glanzer

18   spoke in a manner that was a little more assertive than

19   typical.  I mean it was kind of a minor blurt.  And it was

20   something to the effect that American won't follow through

21   with the transaction if you win this 1113 motion.  Something

22   to that effect.

23   Q.    Did you think that the way he expressed himself was

24   intimidating or unprofessional?

25   A.    No.  It was just, I thought it was kind of a typical

1    partly emotional response to what was being said.

2    Q.   Did any of advisors cut-off discussion during the

3    meeting of April 1, 2001, and say that is enough, we are not

4    going to answer any more questions.  Anything like that?

5    A.   No.

6    Q.   Did any of advisors refuse to answer any of the

7    questions raised by the members of the MEC?

8    A.   No, not at all.

9    Q.   Did any than of the members of the MEC say they were

10   confused or didn't understand the issues in front of them?

11   A.   No.

12   Q.   Did any of the members of the MEC appear to you, based

13   upon your observation, did they appear to be confused about

14   the issues or not understanding things?

15   A.   No.

16   Q.   In your view did any of advisors put any pressure on the

17   MEC or any members of the MEC to do anything in particular?

18   A.   No.

19   Q.   And in your view did any of advisors act inappropriately

20   or unprofessionally during this meeting on April 1 of 2001?

21   A.   No. Quite the contrary.  I was very pleased with the

22   process and the advice that we were getting.

23   Q.   Did you hear any complaints from other members of the

24   MEC after the meeting about the way they felt advisors had

25   conducted themselves?

```
 1   A.   No.

 2   Q.   All right.  Let's turn to the meeting on April 2.  This

 3   is the formal meeting that is reflected in the minutes you

 4   have there?

 5   A.   Yes.

 6   Q.   Marked as defendant's exhibit 74 in evidence.  Do you

 7   recall who was there for that meeting?  Let's start with the

 8   members of the MEC?

 9   A.   Yeah.  I am certain the entire MEC was present.  The

10   entire voting members of the MEC were present.  I am certain

11   that Scott Shwartz was present.

12   Q.   You say that because of this conversation you had with

13   him about the wager?

14   A.   Yes.

15   Q.   Do you recall if Mr. Wilder was still there on Monday,

16   April 2, 2001?

17   A.   I don't recall which of the advisors were there on April

18   2.

19   Q.   What were the issues on the table on April 2, 2001, for

20   the MEC to consider?

21   A.   Well, there was, you know, the bankruptcy process was

22   the primary issue.  And there were other, you know, minor

23   issues.  System board of adjustment and so on.  But the

24   principal issue was the 1113 and the --

25              THE COURT:  Didn't you have to decide whether to
```

1    enter a labor contract, collective bargaining agreement, with

2    the new TWA LLC which was going to be controlled by American,

3    wasn't that an important issue on the table?

4    A.   Oh yes, absolutely.

5    Q.   In the minutes let's refer to the point where it looks

6    like you and Mr. Lewin made a motion, if you refer to the

7    bottom of page 5.

8    A.   Yes.

9    Q.   Do you see on the bottom, resolution 01-64, by S.

10   Rautenberg, P.  Lewin.  You recall that resolution, the one

11   that begins on the bottom of 5 and continues on the top of

12   page 6?

13   A.   I do.

14   Q.   Let's go back a little bit to talk about some things

15   that happened before that.  If you go to the bottom of page

16   4, just to pick up the flow, you see that there is a recess

17   at 14 31?

18   A.   I do.

19   Q.   Reconvened at 15:06.  Then the top of the next page it

20   looks lining the merger committee is given an up did it and

21   you and Mr. Singer moved to enter into into executive

22   session?

23   A.   Yes.

24   Q.   Passed by a voice vote.  There is an agenda item we will

25   come to, and you come out of executive session at 1728?

Rautenberg-direct/Fram                                        29

1    A.   Yes.

2    Q.   It looks like the MEC is in executive session for what,

3    about, almost two and a half hours?

4    A.   Yes.

5    Q.   Okay.  Describe for us, please, what happens in terms of

6    who is present or not present when the MEC goes into

7    executive session?

8    A.   The people who are not present would include any guests,

9    pilots who have come to the meeting to observe, staff members

10   are zip reply not present aside from typically our counsel.

11   The officers would be present, if they were on the scene.

12   The MEC members would be present, the Secretary Treasurers

13   would be present.  It was for situations where, what was

14   discussed or what came out, might be, if it were disclosed,

15   harmful to our group.

16   Q.   Okay.  On this particular occasion when the MEC went

17   into executive session did advisors remain or not, do you

18   recall?

19   A.   I don't recall specifically whether they were.  I

20   suspect they were.

21   Q.   Okay.  And do you see that there was an agenda item on

22   the top, we have that there, agenda item, 01-475 was moved

23   and failed in executive session and not for distribution.  Do

24   you recall what that agenda item was?

25   A.   I do.  I found a copy of it, in the materials that I had

1    left over and the agenda item was about the prospect of

2    sending a special committee of merger representatives to

3    Dallas for the specific purpose of getting an expedited

4    seniority integration agreement before the 1113 hearing took

5    place, or before the 1113 hearing came to a head.

6    Q.   What was the status of the merger committee's efforts as

7    of April 2 to reach agreement with the APA on seniority

8    integration, do you recall?

9    A.   They had been unsuccessful.

10   Q.   And the agenda items that was moved, would was that an

11   agenda item that was offered up by members of the MEC?

12   A.   My, the agenda item was prepared on the face of it by

13   the master chairman.  But it was probably prepared by Scott

14   Shwartz.

15   Q.   You say the master chairman, you are referring to Mr.

16   Pastor?

17   A.   Yes.  But Scott Shwartz was serving as his designee in

18   charge of seniority integration issues.

19   Q.   Did Mr. Pastor or Mr. Shwartz have the ability as

20   nonvoting members to move agenda items?

21   A.   No, they could not move an agenda item.  They could

22   prepare the an agenda and establish things for the MEC to

23   discuss, however.

24   Q.   Do you recall which voting members of the MEC moved in

25   or seconded the agenda item you referred to, the one

1    suggesting the merger committee go back and try to reach

2    agreement with the American pilots before the 1113 hearing?

3    A.   I don't recall.

4    Q.   Do you recall what your position on that was, whether

5    you voted in favor of it or not?

6    A.   I am not absolutely certain.  It is not something that

7    would have, I would have found objectionable.

8    Q.   Let me ask you this.  What was the thinking of the

9    people who advocated for another shot at working out

10   seniority integration?

11   A.   The thinking --

12           MR. PRESS:  I object to this.  Calling for

13   speculation.

14           The witness doesn't even know what his position

15   was, he doesn't know who made the motion, who second the

16   seconded it.  He seems to be speculating about what happened.

17           MR. FRAM:  I will rephrase, your Honor.

18   Q.   The people who were advocating this, what did they say

19   about why they thought it was a good idea?

20           MR. PRESS:  Judge, we don't even know yet who

21   advocated for it.  I object again.

22           THE COURT:  Well, were there people at the meeting

23   advocating for this resolution?

24           THE WITNESS:  Yes.

25           THE COURT:  Okay.  I am going to allow it.  Go

1   ahead.

2   A.   The notion was to get the seniority integration

3   agreement before we lost our contract, or before we lost our

4   scope provisions in the contract.  It was desirable to get it

5   resolved, to try to take advantage of what we had at that

6   time.

7   Q.   All right.  Just to try to wrap this up --

8            THE COURT:  The motion was defeated.

9            THE WITNESS:  Yes.

10  Q.   Would it refresh your memory of who made the motion and

11  who likely spoke in favor of it if I showed you the

12  resolution?

13  A.   I think it would.

14  Q.   Do you recognize that as a copy of --

15           THE COURT:  What is the number?

16           MR. FRAM:  I didn't even put an ID on it.  I wasn't

17  going to move it.

18           THE COURT:  All right.

19           MR. FRAM:  Is that okay?

20           THE COURT:  Yes.  Go ahead.

21           MR. FRAM:  Just to refresh recollection.

22  Q.   Do you have in front of you now a list of the different

23  items that were considered on April 2 and a copy of the

24  actual --

25           THE COURT:  You mean in executive session.

1              MR. FRAM:  Yes, your Honor.  I think the cover

2    sheet identifies everything that was addressed on April 2.

3    Executive session.

4    A.   It appears like it does, yes.

5    Q.   But the second page is the actual resolution we have

6    been discussing.  Is that correct?

7    A.   Yes.

8    Q.   All right.  Does that refresh your memory in terms of

9    who made this motion to go back and try to work out seniority

10   integration?

11   A.   Yes.

12   Q.   Who was it, please?

13   A.   Dave Singer moved the motion and Alan Altman seconded

14   it.

15   Q.   Okay.  I am sorry if the answered this before, but did

16   you give us your recollection of what they or anybody who

17   supported this would have said about why they thought this

18   was a good idea?

19   A.   Well, I think I mentioned that the idea was to get a

20   seniority integration before the 1113 came to a head.

21   Q.   Right.  After that motion was defeated, we are back to

22   the motion that, it looks like you and Mr. Lewin made at the

23   bottom of page, if you go back to the bottom of defendant's

24   exhibit 74 in evidence.

25   A.   Yes.

 1   Q.   Then we see on page 6 that there was a roll call that

 2   was taken, and I think everybody has heard quite a bit about

 3   how everybody voted and the like so I am not going to go over

 4   that with you again.

 5            Did advisors to your recollection on April 2, and I

 6   am going to ask you some of the same questions I asked you

 7   about April 1, but did advisors tell the members of the MEC

 8   how they should vote.

 9   A.   No.

10   Q.   Did advisors in your view put any pressures on the

11   members of the MEC to vote in any particular way?

12   A.   No.

13   Q.   Did advisors on April 2, 2001, raise their voices or

14   scream at anybody?

15   A.   No.

16   Q.   Were there any questions of members of the MEC on April

17   2, 2001, to advisors that advisors didn't answer?

18   A.   No.

19   Q.   Did any of the members of the MEC say that they were

20   confused or didn't understand on April 2 of 2001?

21   A.   Not to my recollection.

22   Q.   Did any of them to your recollection appear to be

23   confused or not to understand what was happening?

24   A.   No.

25   Q.   Do you feel that there was any pressure put on the

1    members of the MEC to vote in any particular way?

2    A.   It was a high pressure situation.  There was no pressure

3    put on members of the MEC from somebody else.  But it was a

4    high pressure situation.

5    Q.   And it was a high-pressure situation why?

6    A.   We were going to do something very, very substantial, to

7    our contract.  Should we initiate this new agreement.  And

8    waive those provisions of our existing contract.  It was a

9    big deal.

10   Q.   Why did you make the motion and vote in favor of

11   accepting the new collective bargaining agreement and waiving

12   scope and moving ahead in the direction that your resolution

13   suggested?

14   A.   I viewed the potential outcome or the potential future

15   for us as one of three things:  One was this contract without

16   the arbitration provisions, in other words, without the scope

17   clause.  Another was no contract at all and the third was

18   essentially no job.

19        And although, although it was a big deal, it was a

20   very difficult thing to do.  For me it was not a hard

21   decision to make.  I guess that is it in a nutshell.

22   Q.   Did you have a sense before you called the resolution

23   and the vote took place of how the other voting members of

24   the MEC were likely to vote?

25   A.   Well, I thought, I mean I lost 20 bucks because I

1    thought it was going to be unanimous.

2    Q.    Okay.  How about the two Council 4 reps, Lewin and

3    Altman, I see that Altman joined you in making the

4    resolution.  Did you have a sense before you voted April 2,

5    2001, of how they were likely to vote?

6    A.    I did.  I had been told by Pablo Lewin that they had had

7    a local council meeting in Council 4 within --

8              THE COURT:  What city is Council 4.

9    A.    Council 4 was Los Angeles, your Honor.

10             THE COURT:  All right.

11   A.    They had had a local council meeting in Council 4 and

12   the council had taken up the issue and initially they

13   discussed it and initially there had been some disagreement

14   but ultimately, he expressed it as virtually unanimous

15   agreement amongst the attendees at the meeting that the

16   appropriate thing to do was to have a contract, waive the

17   scope, move on.

18   Q.    Let's focus on Council 2 in New York.  Did anybody out

19   of Council 2 claim that they had been directed or told by

20   their members to vote against the contract and vote against

21   waiving scope?

22   A.    Not to my recollection.

23   Q.    In terms of the vet on April 2, did you learn any

24   information after the vote that you think would have changed

25   the way you voted on April 2?

1    A.    You mean subsequent?  No, I think to this day it was the

2    right thing to do, if that is what you are asking.

3    Q.    Yeah, that is fine.  And in terms of the support that

4    the MEC got from ALPA during the period leading up April 2,

5    is there anything that you can think of that ALPA didn't do

6    that you would have wanted ALPA to do?

7    A.    I can't think of anything, no.

8    Q.    I want to move forward to a meeting of the MEC on April

9    23, 2001.  But wait,  before I do that, the next document in

10   your pile to wrap this up, do you have defendant's exhibit 16

11   in evidence, the April 3, 2001, letter to Council 2 pilots?

12   A.    Yes.

13   Q.    That is the letter that was signed by you and Sally

14   Young?

15   A.    Yes.

16   Q.    The first officer rep?

17   A.    Yes.

18   Q.    Just tell us, please, why you took the time to prepare a

19   letter and sent it to the members of Council 3?

20   A.    We had just engaged in a restructuring of the contract

21   and made a dramatic decision relative to how things were

22   going to go moving forward.  They were entitled to have that

23   information promptly.

24   Q.    All right.  Let's move on to April 23 and 24.  Do you

25   have in front of you defendant's exhibit 78 in evidence,

 1   which is the minutes of the MEC meeting on April 23 and 24?

 2   A.   Yes.

 3   Q.   All right.  You were present at that meeting?

 4   A.   Yes.

 5   Q.   Do you recall Duane Woerth, the president of ALPA,

 6   coming and talking to the members of the MEC?

 7   A.   Yes.

 8   Q.   And do you recall Captain Woerth talking about a meeting

 9   that he previously had, I believe on April 5, 2001, with the

10   board of directors of the APA?

11   A.   Yes.

12   Q.   Of course the APA was the union, the independent union,

13   representing the American pilots?

14   A.   Yes.

15   Q.   When did you first become aware that Captain Woerth was

16   going to be meeting with the board of the APA?

17   A.   I believe that the first time I became aware of that was

18   on April 2.

19           THE COURT:  Before it happened.

20           THE WITNESS:  Yes, sir.

21   Q.   And how did you become aware of that on April 2?

22   A.   Well, at the conclusion of the meeting on April 2, Scott

23   Shwartz and I had a good working relationship, and we kind of

24   gravitated to one another to discuss what had transpired.

25   And at the end of the meeting as things were breaking up, I

1   went to pay him the 20 bucks.  And it was kind of a what now?

2   You know, my, I remember that being the gist of that

3   conversation, it was what now?  And his comment to me was,

4   well, we have Duane going to Dallas on the fifth.  And my

5   response was, well, maybe that will help.

6   Q.   Okay.  So did you think it was a good thing or a bad

7   thing that Duane word -- by the way, when you say we have

8   gain worth going to Dallas, did you understand that he would

9   be going to Dallas to meet with the board of the APA?

10  A.   Yes.

11  Q.   Did you think that was a good thing or a bad thing?

12  A.   I thought it was potentially a good thing.  I did not, I

13  mean, we were in a position where we needed to talk our way

14  into the best possible deal that we could get, and having the

15  president of the association go and, you know, do some of the

16  talking, was in my mind a good thing.

17  Q.   Describe what you mean when you say you were in a

18  position where you had to talk our way into a situation.

19  A.   We weren't going to be able to let an arbitrator decide

20  for us.  You know, we -- you know, I would say negotiate our

21  way into that, but you know, negotiate without leverage is

22  not really the right term.

23        So it was convince the APA to give us the best

24  possible seniority integrations is what we needed to do.

25  That is what I mean by it.

1   Q.   And just to move on to the next document.  Do you have D

2   25 for identification.  The STL Council 3 briefing.

3   A.   Yes.

4   Q.   Can you con /TPEURPBL for us that D 25 A's briefing that

5   was put together for Council 3 and circulated?

6           THE COURT:  That is, I, it has been identified but

7   it is not in evidence.

8           MR. FRAM:  Yes, I am going to move it in evidence.

9   Your Honor, I will move D 25 into evidence, if I could,

10  please.

11          MR. PRESS:  No objection.

12          THE COURT:  No objection.  Then D 25 is in

13  evidence.

14  Q.   I see that on page section of D 25, if we could pull

15  that up, please.

16  A.   Yes.

17  Q.   You have a whole, there is a whole discussion here about

18  Captain Woerth speaking to the, I guess to the TWA MEC on

19  April 23.  And as part of that discussion it notes that, I am

20  looking on the left-hand column, the third paragraph.  It

21  notes Captain Woerth reported that earlier this month he

22  traveled to Dallas with the intention of speaking to the

23  Allied Pilots board of directors about the TWA pilots

24  seniority integration.

25          Do you see that it goes on to talk about his

```
 1   discussion with the APA, and on the next page there is
 2   questions and answers, page 7, question:  What is APA's
 3   status with regard to the AFL-CIO.  It goes on for quite a
 4   few pages.
 5   A.   Yes.
 6   Q.   In your view was -- did you have a view about whether
 7   the pilots at large would be aware of the fact that Duane
 8   Woerth was talking to the board ever the APA?
 9   A.   You know, I think it is something that the pilots at
10   large are entitled to know.  But I didn't consider Duane
11   Woerth talking to the APA to be that big of a deal.  You
12   know, our MEC officers went and talked to the APA.  Our
13   merger committee goes and talks to the APA.  Duane Woerth
14   talking to the APA was just not that big of a deal to me and
15   it had the prospect of maybe being a positive.  That is the
16   way I viewed it.
17   Q.   All right.  Let's turn to a slightly different topic.
18   Are you familiar with, or back in '01 were you familiar with
19   jumpseat privileges?
20   A.   Yes, I am familiar with jumpseat privileges.
21   Q.   Do you recall any discussion within the MEC back in 2001
22   about the idea of the so-called jumpseat war where ALPA would
23   encourage pilots at ALPA carriers to deny jumpseat privileges
24   to American pilots?
25   A.   I don't recall that discussion taking place within the
```

```
 1   MEC.

 2   Q.   Okay.  Do you recall any discussion about the idea of a

 3   jumpseat war?

 4   A.   I do.

 5   Q.   Tell us what you recall, please.

 6   A.   The general issue during this period of time was

 7   leverage and the lack thereof, the lack of leverage.

 8   Everybody, well, I shouldn't say everybody.  Seeking traction

 9   or seeking leverage was a common theme throughout the MEC,

10   throughout the committees, and people began to grouse about

11   the fact that we didn't seem to be get go a lot of support

12   from ALPA Washington or ALPA international, and so because of

13   this grousing there was a meeting scheduled in Duane Worth's

14   office, and the specific purpose of the meeting was for

15   members of the MEC to grouse about ALPA's international

16   action or inaction relative to the seniority integration.

17   Q.   I am sorry to interrupt.  Just give us your best

18   recollection of when the meeting took place?

19   A.   My best recollection was in the summer.

20   Q.   Okay.

21   A.   Of 2000.

22   Q.   Who do you recall, this meeting was in Duane Worth's

23   office in Washington?

24   A.   Yes.

25   Q.   Who do you recall being present?
```

```
 1   A.    I was present.  I recall Jim Arthur being present.  I
 2   recall Sally Young being present and I recall Bob Pastore
 3   being present.  Beyond that, there may have been others.
 4   Those are people I remember being there.
 5   Q.    Okay.  And what do you recall being discussed during
 6   this meeting at Duane Worth's office in Washington?
 7   A.    Well, the initial, beyond kind of, "Can I get you guys a
 8   cup of coffee?"  The social aspects, Duane started the
 9   meeting with I am not going to start a jumpseat war.  We have
10   done it before.  It has not been proved effective.  Words to
11   that effect.  And then it was beyond that, what can I do for
12   you?
13              So that was the discussion of the jumpseat war that
14   I heard.  I thought a jumpseat war would have been a really
15   bad idea and I was really glad that it was off the table.
16   Q.    Do you recall anybody from the MEC who was present at
17   this meeting pushing Captain Woerth and saying, well, no, we
18   really need to do this, jumpseat war?
19   A.    No, no.
20   Q.    Why did you think it was really a bad idea?
21   A.    Well, as I said earlier, we were in a position where we
22   needed to talk our way into the best possible seniority
23   integration that we could get and the prospect of a jumpseat
24   war, it just held, you know, you are going to wind up
25   aggravating the very people with whom you are trying to
```

1    negotiate your way into something better.  And aggravating

2    them is in my mind not the way to go.  I don't think it would

3    be helpful.

4              I think it would be unhelpful I think that people

5    who got bumped off a jumpseat by TWA or by other ALPA

6    carriers because of the TWA integration would communicate

7    with their leadership that, you know, just staple them all.

8    Whatever.

9              It would result in retaliation, in my opinion.

10   Q.  The people who were grousing at this meeting in Duane

11   Woerth's office in the summer of 2001, did they have any

12   other suggestions, did they make any demands of Duane Woerth

13   in terms of what ALPA National could or should do to help the

14   TWA pilots?

15   A.  There were no specific requests made that ALPA National

16   should do X or Y.  I was at the meeting because, A, the

17   meeting was scheduled, I was a member of the MEC and I

18   considered it my job to be there, but B, I wanted to hear

19   what knuckle-headed ideas some of my fellow MEC members might

20   come up with and ask Duane Woerth in a meeting I wasn't in

21   attendance at, but I was frankly embarrassed to be there

22   because there just wasn't anything constructive asked for.

23             And part of the conversation was brought by me and

24   I wasn't the one that asked for the meeting.  But it was

25   basically, "Can you bluff?  Can you posture?"  Can you, you

1    know, that was the gist of what I heard.

2    Q.    Setting aside the issue of a possible jumpseat war, were

3    there any specific requests made by people there that Duane

4    Woerth turned down?

5    A.    No.  No.  Not to my recollection.  Like I said, beings

6    it was embarrassing to be there.

7    Q.    The next document in the pile in front of you is P-165.

8    Question is not which is not yet in evidence?

9                THE COURT:  Is that P or D?

10               MR. FRAM:  Plaintiff's, your Honor.  P.

11   Q.    Do you recognize P-165 as an email that you and others

12   received on or about May 7, 2001, attaching a confidential

13   memo?

14   A.    Yes.

15   Q.    Do you recall this?

16   A.    I recall the letter it is attached to more than I recall

17   the email.  But I got the letter from Roland Wilder.  And the

18   email, not so much.

19   Q.    All right.  Well.

20               MR. FRAM:  Your Honor, I move plaintiff's 165 into

21   evidence.

22               MR. PRESS:  No objection.  I thought it was

23   already.

24               THE COURT:  I am sorry.

25               MR. PRESS:  I thought it was already.

1          THE COURT:  It is not according to my record.

2          MR. PRESS:  There is no objection, Judge.

3          THE COURT:  P-165 in evidence.

4          MR. FRAM:  Thank you, your Honor.

5    Q.   Let's go to the second page of the document.  This is

6    the memo that you recall receiving from Roland Wilder?

7    A.   Yes.

8    Q.   Did you receive it directly from Mr. Wilder?

9    A.   How it physically came to me I don't recall, whether it

10   was in the mail.  But yes, it was addressed to the members of

11   the MEC and I received a copy of it.

12   Q.   Let me just refer you, please, to the second paragraph

13   of the memo.  Pilot dissatisfaction.  He wrote "Pilot

14   dissatisfaction with seniority integration often leads to

15   fair representation litigation."

16          Then he goes on and talks about it.  I want to

17   highlight two more aspects, the third paragraph, please, the

18   one that says litigation against APA and/or AA is certain to

19   fail if it is poorly conceived, inadequately financed, or

20   initiated too soon.  Also, efforts to prepare for such

21   litigation could divert needed resources from the MEC and

22   discourage ALPA from providing additional support.  These

23   considerations weigh heavily in favor of your maintaining

24   control over the litigation initiative.

25          And then just to highlight one other aspect of it,

 1    then I will ask you some questions.

 2            The fourth paragraph, beginning, in cooperation

 3    with ALPA legal.  The second sentence.  Please understand

 4    that any litigation contemplated against APA and AA will be

 5    novel and complex.

 6            You had discussions with Mr. Wilder and others in

 7    2001 about litigation ideas other than the one we talked

 8    about around the time of the meeting on April 1, 2001.

 9    A.   At the time I received this letter, I don't believe that

10    I had had knowledge of other litigation initiatives, other

11    than the one that had been discussed in the April 1

12    timeframe.

13    Q.   Did there come a point later in the year when Mr. Wilder

14    proposed some litigation and you had a discussion with him

15    about it?

16    A.   Yes.

17    Q.   Tell us about that, please?

18    A.   Well, that litigation was discussed in the context of

19    the culminating point, if you will, which was, you know, in

20    my view, the October 20 through 23 MEC meeting timeframe, or

21    21 through 23 timeframe, and Roland Wilder had prepared a

22    concept that involved blocking the cram-down from taking

23    place, and then by getting an injunction, by grieving a

24    reasonable best efforts letter, and trying to delay single

25    carrier filing by the NMB, and so on.

1   Q.   Okay.  And tell us what discussion you recall with Mr.

2   Wilder about that particular period?

3   A.   Well, he had briefed the MEC on it, before that period

4   of time, and I believe on October 21 or 22 he briefed it in

5   detail.  And he briefed the various steps and he presented

6   them as independent steps.  And on the evening of the 22, at

7   a time when I was trying to get some quiet time, I was

8   spending this agonizing evening trying to figure out what to

9   do the next day about whether or not to accept the terms that

10  were available to us, or not.

11       I was evaluating whether this litigation

12  alternative held promise for me.

13       And so I had assigned probabilities to each of the

14  various steps, and I was being very generous in assigning the

15  probabilities to the various steps because I, you know, I am

16  an armature, just assigning probabilities, and I didn't want

17  to under estimate our potential for success.  And I was

18  genuinely looking for an alternative.  I was looking for

19  something that held promise.

20       At any rate, the next day, in the morning, as the

21  day progressed, I caught up with Roland Wilder during a

22  period of time or a break in the meeting and I showed him

23  what I had done, and he looked at it and he said initially,

24  not only, if you fail at any one of these steps, you fail,

25  you have to be successful in all of these things.  And I

 1   said, no, I understand that.  You know, I am trying to

 2   calculate an overall probability of success using the

 3   statistical, you know, little minor statistical analysis.  He

 4   said, oh, okay.

 5          I said what do you think of the numbers I have

 6   assigned to the individual steps and he lowered a couple of

 7   them, and that was the nature of the discussion.

 8          And initially I, initially with the numbers that I

 9   had assigned to these various steps I came up with the

10   probability of success of 5.6.  And after my discussion with

11   Roland Wilder and he, you know, bumped two numbers down, I

12   came up with 3.6.  So.

13   Q.   In terms of the probability assignments, this is one of

14   those situations where if two things had to happen to be

15   successful, and there was a 50 percent chance of one

16   succeeding and a 50 percent chance of the second succeeding,

17   you multiply it, point five times point five.  The overall

18   success outcome will be point 25?

19   A.   That's correct.  That is the analysis I used, and it is

20   valid for variables that are independent.  And you know,

21   these aren't entirely independent, but they were independent

22   to the sense that they were presented by Roland Wilder as

23   being independent, and it is a fair -- I mean I realize that

24   this is not a -- I was looking for -- I am analytical.  And

25   you know, perhaps overly analytical.  I was looking for a way

 1   to get a grasp on this thing that looked like numbers instead

 2   of words.

 3   Q.   So --

 4   A.   So yes.  You multiply one times the other.  Independent

 5   variables, you multiply one times the other times the other,

 6   and you know, if you want to calculate the odds of tossing

 7   three dimes and them all coming up heads, it is point five

 8   times point five times point five.  That is essentially what

 9   we had to do.

10            We had to come up heads.  We had to come up

11   successful on each one of these steps in the Roland Wilder

12   initiative.  I should say part of the Roland Wilder package

13   was that in order to get to the point where you kind of won

14   the prize or the at least the way we view it of getting

15   arbitration, was not only did you have to be successful at

16   all of these steps that he laid out but you had to be

17   successful in the Congress in getting the law changed.

18   Q.   You are referring now to the Bond bill that would have

19   imposed seniority  arbitration?

20   A.   Right.  The Roland Wilder litigation strategy did not

21   result in arbitration.

22   Q.   Okay.  Let's come back to the events of late October in

23   a couple minutes.  I want to go backwards in time for a

24   couple of minutes and ask you about a couple other things.

25            The next document you should have in the pile there

1    is P, plaintiff's 318 in evidence, which is the Rightful

2    Place -- [I] say that again, the Rightful Place proposal.

3              MR. FRAM:  Yes.  Plaintiff's P-318 in evidence,

4    your Honor.

5    Q.   Do you have that in front of you?

6    A.   I have a document that has the same cover page on it,

7    only it is marked exhibit D 142.

8    Q.   Oh, great.  All right.  Let's make sure they are the

9    same.  I am going to give you what is marked as P-318.  I

10   think they are the same?

11             THE COURT:  D 142 is the June 14 Rightful Place

12   proposal.  It is not in evidence.

13             MR. FRAM:  I think we ended up marking some of the

14   same documents on both sides.

15             THE COURT:  What is the P designation?  I want to

16   make a note here.

17   Q.   You have it?

18   A.   P 318.

19             MR. FRAM:  I thought P 318 was in evidence, your

20   Honor.

21             THE COURT:  Let me check that.

22             (Pause).

23             THE COURT:  318 is in evidence.

24   Q.   Let's spend a couple minutes on this.  Do you recall the

25   Rightful Place proposal?

1    A.    Yes.

2    Q.    And did you have some involvement and some input into

3    what the proposal was?

4    A.    Yes.  A minimum minimal amount of input into the

5    proposal.  It was principally prepared by our merger

6    committee in conjunction with a consultant.

7    Q.    Okay.  And then I want to also have you look at J 323 in

8    evidence.  It should be the next document, the July 18, 2001

9    letter of Ed White of the Allied Pilots Association.  Do you

10   have that that one in front of you?

11   A.    Yes.  J 323.  And P-323, it is marked.

12   Q.    Okay.  We do this to confuse everybody, multiple

13   designations on the document?

14        THE COURT:  And you are succeeding.

15   Q.    All right.  So you recall receiving and reviewing that

16   document?

17   A.    Yes.  We received the document.

18   Q.    Do you see a the bottom of the second page, to go

19   through this quickly.  The heading, ALPA's Rightful Place

20   proposal?

21   A.    The bottom of the second page of ALPA's, of the letter.

22   Okay.

23   Q.    Of the letter?

24   A.    Yes.

25   Q.    Paragraph beginning in an earlier letter to your

1    predecessor as TWA merger committee chairman, I noted that

2    fairness is largely in the eye of the beholder.  The same is

3    true of the label your committee has created to attach to its

4    proposal, the Rightful Place.

5              Then skipping down to the fifth line from the

6    bottom.  Thus, though never explicitly stated, your proposal

7    defines Rightful Place as if this transaction was a full

8    blown corporate merger between equal carriers and pilot

9    groups, without any material differences in the nature of the

10   carriers, pay and working conditions, or financial condition,

11   and as if every aircraft, gate, slot, and other asset of the

12   acquired carrier was going to be deployed to the consolidated

13   operation.

14             Then the next page continues to talk about --.

15             MR. PRESS:  Is there a future anywhere in the

16   future, Judge?

17             THE COURT:  That is a good question.

18             MR. FRAM:  There is.

19             THE COURT:  That is a good question.  The answer is

20   I don't know.

21             MR. PRESS:  I object to the lawyer reading the

22   document.

23             THE COURT:  Yes.

24   Q.   Does this document refresh your memory that the American

25   pilots were pretty aggressive and also articulate in

1    disagreeing with the Rightful Place proposal, and the TWA

2    pilots position about what they were entitled to, as part of

3    the seniority integration?

4    A.   Yes.  It refreshes my recollection about that.  I don't

5    think my recollection needed refreshing about that.  But it

6    does.  Yes.

7    Q.   In terms of the factual statements that the letter

8    contains, the facts that are recited about TWA's financial

9    condition, prospects for survival, were you able to take

10   issue or disagree with any of the factual statements about

11   TWA, where it was, that were contained in this letter?

12   A.   You know, when you are talking about, when you are

13   talking about employees of airlines, they tend to be long-

14   term employees.  And you know, I think it is natural that we,

15   you know, we start to attach some identity to our employer.

16   And it is difficult to get to where, you know, you would not

17   argue with these statements, that, you know, hey, we work for

18   a great company.  It had a promising future, and so on and so

19   forth.  You know, and it is painful.  When you attach your

20   identity to your employment, to say we didn't work for a

21   great company.

22             That is the reality.

23             If that is responsive to the question, so be it.

24   Q.   It is.  Thank you.  I think you said yesterday when we

25   first started to talk that you felt some of the TWA pilots

1   had unrealistic expectations about the seniority integration

2   process?

3   A.    Yes.

4   Q.    Can you explain in a little detail what you meant by

5   that comment?

6   A.    Yes.  Pilots tend to use things like date of hire, or

7   the date that you began, as a benchmark for what they think a

8   fair seniority integration is, and there are other bench

9   marks that are out there used.

10          But the most popular one was date of hire.  And

11  pilots, we had applicants come to the MEC for positions on

12  the merger committee, and they had this conception that if

13  they came in and said that they were in favor of date of

14  hire, that that was going to make them an attractive

15  applicant.

16          To some of the members of the MEC it perhaps did.

17  I was looking for people who understood the nature of the

18  circumstances that we were in, which were very difficult.  I

19  mean at the time we were staffing the merger committee we

20  were looking at this condition that scope be waived, and we

21  were not in a good situation.

22          We were in bankruptcy.  We were looking at losing

23  our contract or moving forward without scope.  And to be

24  expecting, or even reasonably thinking that you were going to

25  come out of this with something like date of hire is just

1    irrational.  And there was a lot of that.

2    Q.   Thank you.

3            MR. FRAM:  Your Honor, this is good point for me to

4    break.  I have a different topic.

5            THE COURT:  Okay.  Ladies and gentlemen, we have

6    been at it about an hour 25 minutes now.  It is 10 of.  Let's

7    go to six or seven after ten.  Do not discuss the case among

8    yourselves.  Keep an and mind until you have heard all the

9    evidence.  All rise.

10           (The jury leaves the courtroom.)

11           THE COURT:  I made a note to myself.  The note says

12   that the testimony as to TWA's financial position by this

13   witness opened the door, either in rebuttal or on cross, for

14   Ms. Cooper's testimony.

15           MR. JACOBSON: Judge, I made the same note.

16           THE COURT:  Then mine is probably wrong.  But

17   whether you made the same note or not, that is my note.  See

18   you in 15 minutes.

19           (Recess)

20           (Jury enters the courtroom.)

21           THE COURT:  Mr. Fram.

22   Q.   I would like to talk to you for a couple minutes about

23   the events of October and November of 2001, in particular, to

24   the MEC discussions about seniority integration.  Let's start

25   for some context by having you refer to defendant's exhibit

Rautenberg-direct/Fram                                                    57

1    88 in evidence.  Which should be in front of you.  Minutes of

2    the October 20 to 22, 2001, MEC meeting?

3    A.   Yes.

4              THE COURT:  What is that number again?

5              MR. FRAM:  Defendant's 88, your Honor.  It is in

6    evidence.

7              THE COURT:  Oh, yes.  88.

8    Q.   Do you recall attending that meeting?

9    A.   Yes, I do.

10   Q.   And just to give you a little context.  If you turn to

11   the second page of the minutes, under, it says Sunday,

12   October 20 -- looks like it is corrected to be 21, 2001.

13   Under announcements it says pastor viewed the agenda for the

14   meeting, also discussed Jeff Brundage's letter to Duane

15   Woerth.  Pastore said he spoke directly with Brundage to

16   clear up some of the discrepancies in the letter.  Pastore

17   viewed the agenda.  I think the next exhibit behind that is D

18   200 which is a letter of Jeff Brundage to Duane Woerth dated

19   October 12, 2001?

20   A.   Yes.

21   Q.   You have seen that letter before?

22   A.   I have.

23   Q.   Can you, just to put this in context, can you tell us,

24   please, what was happening with respect to seniority

25   integration negotiations between the TWA pilots and the

Rautenberg-direct/Fram                                          58

1    American pilots as of this meeting on October 20 and 21,

2    2001?

3    A.   As of the time of the meeting.

4    Q.   Yes, sir.

5    A.   There hadn't, there hadn't really been discussions in

6    quite some time between the two committees at the time of the

7    meeting.

8    Q.   Okay.  And had there been an effort on the part of the

9    TWA pilots to get legislation passed in Congress?

10   A.   There had, yes.

11   Q.   What was the status of that, do you recall, as of late

12   October?

13   A.   As of late October, the legislative initiative was still

14   ongoing, but I think it had already passed its critical

15   point.  In my opinion, the critical point was when the

16   aviation security bill that Senator Bond was threatening to

17   attach his legislation to came before the Senate and that was

18   earlier in October and he did not.

19   Q.   Okay.  Just to focus on the Bond bill for a couple of

20   minutes.  Did you have personal views about whether, about

21   what the chances of the Bond bill being enacted were?

22   A.   I had personal views and I sought advice about what the

23   probability was of the Bond bill passing.  I thought it was

24   very unlikely that we were going to obtain legislation.  We

25   were asking the Congress to change the terms of a commercial

Rautenberg-direct/Fram                                                    59

1    transaction that had already taken place.

2              And you know, I suppose weirder things have

3    happened.  I am certainly not an expert in legislation but it

4    seemed really unlikely.

5              There was a period of time when the legislative

6    initiative was being carried on exclusively by TWA pilots, in

7    the quiet, if you will, and American and the APA hadn't

8    caught on to it yet, that it was ongoing.  But after American

9    and the APA caught on to it, we were faced with the prospect

10   of being 20,000 employees seeking legislation that 100,000 or

11   80,000 American employees were going to be opposed to.  And

12   you know, money and votes, in my view, are what kind of drove

13   that.

14             So that made it more unlikely.  It was

15   controversial in the sense that here you have these American

16   employees that aren't going to want it.  Anyway, I did not

17   believe that the legislation had much of a probability of

18   success at all.

19   Q.   Did you have views about whether pushing the legislation

20   was helpful or not helpful in terms of ongoing seniority

21   negotiations?

22   A.   Well, I thought that, initially, I thought that the idea

23   of legislation, and the fact that we had the APA kind of in

24   the dark on it, and then they found out about it, I thought

25   it had the potential to create uncertainty on the part of the

1    APA, as they caught up, as they got wind of it, got spun up

2    to go oppose this, I thought it provided an advantage in the

3    sense of providing us some uncertainty.

4    Q.   Did your view in that regard change or did you continue

5    to believe through the fall that it was helpful or

6    potentially helpful to keep pushing on the Bond legislation?

7    A.   I thought reliance on the legislation, on the part of

8    the MEC was a bad mistake.  I thought some members of the MEC

9    were relying on the legislation perhaps because they had an

10   unrealistic expectation.  That I thought was a bad mistake.

11   I didn't think that pursuing the legislation was a problem,

12   and it was potentially, potentially helpful, but relying on

13   it was not helpful.

14   Q.   Let's focus on these minutes, and the meetings that it

15   looks like the meeting began on Saturday, October 20.  If you

16   flip to page 10 of the minutes, it looks like the meeting

17   continued until Tuesday, October 23, of 2001?

18   A.   Yes.

19   Q.   It is a meeting that goes on for four days.  You were

20   there the entire time?

21   A.   Yes.  Well, at the outset of the meeting, I was there in

22   Washington but several of us elected not to attend.

23   Q.   Not to attend any part of the meeting or not to attend

24   the --

25   A.   Not to attend the first day.

1    Q.    Can you explain, you are one of the people who elected

2    not to attend?

3    A.    Yes, that's correct.

4    Q.    Why was that?

5    A.    Well, we had gotten wind, heard, that members of the MEC

6    were prepared to recall the vice chairman, Scott Shwartz, at

7    this meeting.  We had gotten wind or suspected that the MEC,

8    or other members of the MEC were intending to put Bud Bensel

9    back in the negotiating room with the merger committee and

10   myself and Pablo Lewin and Alan Altman felt that those things

11   were mistakes.

12   Q.    Let's focus on Bud Bensel.  Why did you and others think

13   it was a mistake to put Bensel back in the negotiation

14   process?

15   A.    I thought it was a mistake to put Bud Bensel back in a

16   room because he had become enamored, I would say, with the

17   idea of a lawsuit, and early on in the, in Bud Bensel's

18   tenure as the merger committee chairman, I think that he had

19   misread the response of the APA, and he had misread it to

20   conclude that the APA was somehow afraid of being sued, and

21   that subsequent to that, he reported that to the MEC.

22   Subsequent to that.

23          He became enamored of this idea of pursuing a

24   lawsuit and the notion was get Bud Bensel back in the room

25   and he makes the threat of filing a lawsuit and the APA is

```
 1   going to suddenly throw caution to the wind and give us what

 2   we want.

 3          That is perhaps an over statement, but that is I

 4   think what their planning entailed.

 5   Q.   And did you think that was a good approach or not a good

 6   approach?

 7   A.   No, it was not a good approach.

 8   Q.   Just for context, is Bensel the fellow who had been the

 9   chair of the merger committee up until early March?

10   A.   Yes.

11   Q.   Then got replaced by Mike Day?

12   A.   Yes.

13   Q.   All right.  Just to put a little more context here.  You

14   have the Brundage letter of October 12 in front of you?

15   A.   Yes.

16   Q.   Do you recall what led to Mr. Brundage writing this

17   letter?

18   A.   Yes.

19   Q.   Tell us, please.

20   A.   The two committees had.

21   Q.   The two merger committees?

22   A.   The two merger committees had been having a recess, if

23   you will.  They were not meeting for a period of time because

24   American and the APA merger committee were discussing what

25   American might be willing to do in the way of a, ensuring the
```

 1    existence of a protective cell that was under consideration

 2    in St. Louis.  The APA did not want us in these meetings and

 3    so they were meeting with their own company to discuss those

 4    things.

 5            As those meetings wrapped up the APA and our

 6    committee were interested in getting back together to

 7    finalize the agreement.  At that time, this was post 9-11

 8    now, our legislative affairs committee had gotten the

 9    legislative initiative cranked up.  And we were we were using

10    the legislative initiative to try to create this uncertainty,

11    create some kind of potential leverage, and we were holding

12    off on meeting with the APA.

13            There came a time in that first or second week of

14    November, the 8th or 9th, when the pressure from American and

15    the APA --

16    Q.   Of November?

17    A.   I am sorry.  Of October.  I am sorry.  Where the

18    pressure from the APA and American increased.  The MEC was

19    holding routine conference calls in the evening.  A number of

20    the MEC were actually present in Washington participating in

21    the lobbying effort and really the only contact with them was

22    on these conference calls.

23            And during the conference call that I participated

24    in, just prior to this, it was discussed that we were going

25    to have to meet with the APA soon, that the pressure was

Rautenberg-direct/Fram                                          64

 1    increasing, and we were going to have to probably do it this

 2    week.

 3                And ultimately, I think the next day, which was

 4    October 9, the vice chairman of the MEC, Scott Shwartz, in

 5    collaboration with Mike Day and Bob Pastore and Roland

 6    Wilder, final set a meeting to meet with the APA and with

 7    American  to find out the results of what American and the

 8    APA had been discussing and also to find out the APA's

 9    position.

10                And that meeting was set for October 10.  The day

11    before this aviation security bill was scheduled to come

12    before the Senate floor.  It really was in my opinion an

13    opportune time to take advantage of whatever leverage had

14    been created by the legislative initiative.  And on a

15    conference call that night, the decision was made, it was not

16    an MEC meeting, it was simply an informational conference

17    call.

18                I was not on the call.  But because I had spoken

19    with Keith O'Leary during the day and I was aware of what was

20    going on --.

21                MR. PRESS:  Judge, I am going to object to the

22    hearsay.  He just said he wasn't part of the call.

23                MR. FRAM:  Your Honor, he was told by others, I am

24    sure we can establish he was told by others who are party

25    plaintiffs what was happening.  So.

```
 1            THE COURT:  I will allow it.
 2   Q.    Keith O'Leary so we can follow, what was his involvement
 3   in the MEC?
 4   A.    Keith O'Leary was the vice chairman of the MEC and
 5   similarly to Scott Shwartz, he had been delegated authority
 6   to deal with the seniority integration issues on behalf of
 7   the master chairman.
 8            So this meeting had been scheduled for October 10,
 9   and during the call the members of the MEC induced, I guess,
10   or convinced the master chairman to call off the meeting that
11   had been scheduled and to go down to Dallas himself to, not
12   to meet with the APA, but to pick up whatever American had to
13   give us, and to obtain a nondisclosure agreement, I guess
14   concealing the fact that the meeting ever took place.
15   Q.    And is that what happened, to your knowledge?
16   A.    Yes.  The master chairman reported that he went to this
17   meeting, that he entered the room, and found leadership of
18   the APA and Jeff Brundage, and I believe there may have been
19   another American, but Jeff Brundage was certainly there and
20   the leadership of the APA and master chairman invited the APA
21   out of the room, and then requested that Jeff Brundage sign
22   the nondisclosure agreement, which he declined because, well,
23   he declined.
24            And then the master chairman indicated that he
25   wanted to just pick up from Brundage what they had to say,
```

```
 1   what they had to offer us at that point, and Jeff Brundage's

 2   response was  words to the  effect of you are going to have

 3   to get that from the guys who were just invited out of the

 4   room.

 5   Q.   In the letter that Brundage wrote, October 12, that came

 6   to your attention?

 7   A.   Yes.

 8   Q.   To your knowledge was the it circulated to all the

 9   members of the MEC?

10   A.   As far as I know, it was.

11          MR. FRAM:  I will move D 200 in evidence.  I don't

12   recall that it is in.

13          MR. PRESS:  No objection.

14          THE COURT:  There being no objection, D 200 in

15   evidence.

16   Q.   Let's pull it up.  So is it fair to say, let's focus on

17   the first paragraph of the letter where he wrote, the event

18   of the last week surrounding American Airlines continuing

19   efforts to facilitate a seniority --

20          THE COURT:  Folks, D 200 is in evidence.

21          MR. FRAM:  Okay.

22          THE COURT:  It was identified on the 13th of June

23   and put in evidence on the 27th.

24          MR. FRAM:  Thank you, your Honor.

25   Q.   So that first sentence.  He talks about how the event of
```

Rautenberg-direct/Fram                                              67

1    the last week lead me, to say the least, perplexed and

2    aggravated.  He goes on to talk about some of the specifics

3    that you discussed.  Yes?

4    A.    Yes.

5    Q.    Do you think that the events he described with Captain

6    Pastore going down there by himself and asking for a

7    confidentiality agreement, and asking for a proposal, did

8    that help or not help the process of trying to negotiate

9    seniority integration with American and the APA?

10   A.    I thought this was an abominable mistake.

11   Q.    Why did you feel that.

12   A.    Well, for one, we had the Aviation Security Bill was

13   coming before the Senate floor the next day.  The opportunity

14   to take advantage of whatever uncertainty that we had created

15   existed the day before, because, you know, this legislation

16   was, in my opinion, just not going to happen.

17        In my opinion, there is always an a conflict, I

18   guess, is not the right word but it is the best word I can

19   come up with at the moment, between moderates and radicals in

20   an MEC, and I think that, or I believe that the APA had their

21   own conflict between the moderates and the radicals and I

22   think that our act of failing to follow through on a meeting

23   that we had scheduled, failed to continue the process of

24   negotiating, convinced the APA that a deal with us was not

25   possible.  That the radical viewpoint that they should not,

1    you know, make, continue to make good-faith efforts or at

2    least what they considered to be good0faith efforts to reach

3    a deal, it was no longer possible.

4              I think it was a culminating point, vis a vis the

5    APA, if you will.

6    Q.   So let's go back now to the meeting that began on

7    October 20.

8              Let's go back if we could to D 88 in evidence.  And

9    part with the first page, and try to walk through this a

10   little bit.  I think you mentioned before that you and a

11   couple other members of the MEC decide not to attend this

12   meeting because you were concerned about some agenda items?

13   A.   Yes.

14   Q.   Is that first page, Saturday, October 20, it says not in

15   attendance, Rautenberg, Lewin and Altman.  Does that reflect

16   what you just discussed?

17   A.   Yes.

18   Q.   It looks like the meeting continues if we turn to the

19   second page on Sunday, October 21, 2001.  Called to order at

20   10:30.  Tell us, please, what efforts, if any, were made over

21   the next several days to get the seniority integration

22   process back on track.  Tell us the efforts that were made,

23   who was involved -- let me break it down for you.

24             Were efforts made beginning on October 21, 2001, to

25   get the seniority integration process back on track?

 1   A.   Yes, I think so.  Our merger committee was in extensive

 2   meetings with leadership of the APA.  It was no longer really

 3   the APA's merger and acquisitions committee they were meeting

 4   with, but with their chairman, and their union president, and

 5   so they were meeting with them.  They reported to us that

 6   these meetings were not, you know, negotiations, you know,

 7   even as a stretch any more, but merely the APA explaining to

 8   them the way it was going to be.  And explaining to them what

 9   the integration was going to look like.

10   Q.   Just logistically these minutes refer to the meeting

11   being in Washington, D.C.?

12   A.   Yes.

13   Q.   Are you saying the merger committee was also meeting at

14   the same time, were they also meeting in Washington?

15   A.   Yes.

16   Q.   How far apart were the two meetings taking place?

17   A.   Well.

18   Q.   Do you recall?

19           THE COURT:  You mean physically?

20           MR. FRAM:  Physically, your Honor, yeah.

21   A.   My recollection is that that we were in the same hotel,

22   they were meeting in the same hotel.  I never saw where they

23   were meeting so I couldn't be sure of that.

24   Q.   In addition to the people who were at the meeting, the

25   MEC meeting, and participating in the negotiations, were

1   other people calling in from time to time?

2   A.   Oh, there was a lot of calls.

3   Q.   Tell us, give us a sense, who was calling in as this

4   discussion continued?

5   A.   We had calls from Duane Woerth, we had calls from Howard

6   Atterian, we had calls from Senator Bond's office, a

7   gentleman by the name of Trevor LeCann.  We had a conference

8   calls with Jeff Brundage, from American.  There was a lot of

9   stuff going on, a lot of interactions going on.

10  Q.   The different people who were calling in, what position

11  were they taking with respect to seniority integration?

12  A.   Jeff Brundage was taking the position that, you know, he

13  realized that this offer was, I won't use the terms he used,

14  but it was a tough pill to swallow.  It wasn't exactly what

15  he said.

16        But that is the essence of it, in more crude

17  language.  But we should swallow it.  And that it was the

18  best we were going to do.  And that if we did not, that

19  American would not follow through on the commitments that it

20  had made as part of the offer.

21        THE COURT:  You mean the best efforts?

22        THE WITNESS:  No.  I mean American had made a

23  commitment to provide a minimum floor to the domicile in St.

24  Louis which was to be restricted to former TWA pilots.  And

25  that they would not comply with that.  They also made a

```
 1    commitment --

 2              THE COURT:  You mean they were going to put a fence

 3    around it?

 4    A.   Yes, there was going to be a fence around St. Louis and

 5    the APA agreed there would be a fence around St. Louis but

 6    American had indicated a willingness to ensure that there

 7    actually was a St. Louis domicile with St. Louis flying.

 8    That is the commitment that he indicated they would withdraw,

 9    that they would not comply with.  It was part of the offer --

10              THE COURT:  In simple terms, they were going to

11    eliminate St. Louis as a hub for the combined airline?

12    A.   No, the situation wasn't there yet.  But there was

13    planned a restriction that the flying in St. Louis would be

14    reserved for TWA pilots.

15              THE COURT:  That is the so-called fence.

16              THE WITNESS:  Right.  Our view was a fence in St.

17    Louis was not of value to us unless there was flying that was

18    based in St. Louis.

19              THE COURT:  In other words, unless St. Louis was

20    still a hub.

21    A.   Yes.  Well, there is a connection between the hub and

22    whether there is flying or not.  There isn't necessarily

23    flying that is conducted out of St. Louis by pilots based in

24    St. Louis, and the commitment American was making was to

25    pilots being based in St. Louis.  That was the flying that
```

```
1   was to be researched for us.

2           THE COURT:  Okay.

3   Q.   So as of the meeting we have been talking about there

4   was a proposal on the table from American and the APA?

5   A.   Yes.

6   Q.   Did the members, are we still at the point where there

7   are six voting members of the MEC, two from Council 2, two

8   from Council 3, and two from Council 4?

9   A.   Yes.

10  Q.   Were the members of the MEC able to agree on whether to

11  accept or not accept the proposal that American had put on

12  the table, American and the APA?

13          THE COURT:  That proposal provided for stapling

14  some of the TWA pilots.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  What number?

17          THE WITNESS:  About 1,200, is my recollection.

18          THE COURT:  The total you are talking about

19  including stapling its 1,200 junior pilots to the bottom of

20  the American list.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Go ahead.

23  Q.   The six vote were the six voting members able to agree

24  on how to respond to this proposal?

25  A.   Not with unanimity.  We made a decision.  The proposal
```

1    was not approved.

2    Q.   Okay.

3    A.   Actually, I don't think it was a proposal at that time.

4    I believe it was a proposal to us that we were accepting with

5    conditions, or considering accepting with conditions.

6    Q.   There were some actual votes did taken by the members of

7    the MEC during these meetings?

8    A.   Yes, there were several.

9    Q.   Let's walk through them quickly if we can.  I want to

10   refer, please, to the bottom of page 13.

11           You see there is a discussion that continues,

12   actually at the top, case was directed after much sole

13   searching and deliberation I speak against the motion for

14   conditional acceptance of the seniority integration proposed

15   by the APA representatives yesterday, October 22, 2001.

16           At the bottom it lies like there is an actual roll

17   call vote, and 803 for, 1123 against.  If I am reading it

18   correctly, it looks like you and Lewin were the ones who

19   voted most of your votes in favor, and you got out-voted by

20   the other members.

21   A.   That's correct.

22   Q.   And what, if you can tell us, if you recall, what

23   proposal were you voting to accept which the group could not

24   agree on?

25   A.   We had as a result of the merger committees, the

1    meetings with the APA, we had a two-page set of notes that

2    explained what the seniority list would look like, it

3    explained what the fence around St. Louis would look like.

4           We had an understanding of commitments that

5    American was prepared to make relative to furloughs, they

6    were willing to restrict furloughs in the fourth quarter of

7    2001, and in the first quarter of 2002 to certain numbers.

8           There was language about the prospect for future

9    furloughs, and there was Americans guarantee that they would

10   limit the reduction in flying available to TWA pilots in St.

11   Louis.

12   Q.   Was there then some further discussion after that

13   resolution failed?

14   A.   Yes, after that resolution failed, one of the calls we

15   got, will, after that resolution failed, the discussion

16   centered on pursuing the litigation strategy that had been

17   outlined by Roland Wilder, and so the MEC sought that, you

18   know, that outcome to go pursue this litigation strategy.

19          We then got a call I believe directly from Duane

20   Woerth and he indicated that the executive council had

21   decided that ALPA was not going to pursue this injunction.

22   And after some nashing of teeth and so on, the members of the

23   MEC who were engaging in a caucus amongst themselves, there

24   was essentially four of the voting members of the MEC who

25   would routinely caucus amongst themselves in one of the hotel

1    rooms, they left the room.  And they went to caucus Americans

2    themselves.

3    Q.   Right.

4    A.   When they came out of that room, I was having Diet Coke

5    in the lobby of this meeting room, just waiting to find out

6    what the majority of the MEC who had disappeared was going to

7    do, what are we doing next.  We are not going to have this

8    litigation.

9         And it was passed to me that Sally Young and Alan

10   Altman were going to abstain.  And I was kind of perplexed.

11   What does that mean, Sally Young and Alan Altman are going to

12   abstain?  But okay.

13        We went back in to the meeting room, and when it

14   became apparent to all of the parties present, in the meeting

15   room, what was going to happen, and that because Sally Young

16   and Alan Altman were planning on abstaining, that Lewin and

17   myself had sufficient roll call votes to pass a resolution,

18   and that since we had already favored the passage of this

19   resolution that we would probably pass it with roll call.

20        I mean, that I think became the general consensus,

21   and one of the members of the merger committee had what I

22   would term a sustained emotional outburst.  I believe, the

23   minutes reflect that the staff was invited out of the room,

24   and I am, I believe that that was the point where Bob Pastore

25   asked the staff to leave the room because it was -- you know,

```
1    it was better for the situation while this, while this

2    situation was going on.

3    Q.    Let's come back to that in a minute.  I want to list the

4    votes that happened.  The first one you talked about was 803

5    for, 1128 against.  And it was you and Lewin.  Then the four

6    others were against.  It would have been Hollander, it would

7    have been case Case.  It would have been Young.  And Altman.

8              We will come back to the emotional outburst in a

9    minute.

10        There was a second vote taken with respect to the

11   proposal that was on the table where some people abstained?

12   A.    Yes.

13   Q.    That is reflected in the minutes at page 15.  Is that

14   correct?

15   A.    Yes.

16   Q.    Let's list that up here so we can see how things were

17   shifting around.  So vote number 2, I am I correct it was 797

18   for?

19   A.    Yes.

20   Q.    It was --

21   A.    That is what the minutes reflect.

22   Q.    412 against.  And it was 722 abstain.  And the 797 for

23   is still you, and Lewin, two people voted against, Hollander

24   and Case.

25   A.    Well, Hollander, Hollander was not present.  I don't
```

Rautenberg-direct/Fram                                    77

 1    believe that Hollander was present for any of these meetings

 2    but he had left his proxy with Ted Case.

 3    Q.   And is that reflected in the vote there where it says

 4    Hollander, proxy to case.

 5    A.   Yes.

 6    Q.   We will put a P next to that.  The two who voted to

 7    abstain were Young and Altman?

 8    A.   Right.  And you are referring to the majority of the

 9    vote with the names because some people split their votes but

10    the majority of the votes were as you indicated.

11    Q.   There were minor splits.  Looks like you voted 710 in

12    favor and two against?

13    A.   Yes.

14    Q.   All right.  So did that mean that the resolution passed

15    because there were 797 in favor and 412 against?

16    A.   That resolution did bass.  It was not an identical

17    offer, and I don't believe it was even an offer at that

18    point.

19         THE COURT:  It refers to a counter proposal.  What

20    are you referring to.  It says vote to send counter proposal.

21    What does that mean?

22    A.   As a result of this emotional outburst, the letter that

23    had been prepared that was being considered at the time of

24    the first vote had been revised.

25         THE COURT:  In what way?

1            THE WITNESS:  In a number of ways.  The letter had

2     been revised to increase the support that American would have

3     to provide to the St. Louis flying.  It revised the furlough

4     provisions substantially.  Those were the essential changes.

5     So it wasn't an offer made to us any longer, it had been

6     revised.

7            THE COURT:  The first time you were voting on

8     accepting an offer that was made to you?

9            THE WITNESS:  Yes, sir.

10           THE COURT:  Now you are voting on a counter

11    proposal.

12           THE WITNESS:  Yes, your Honor.

13           THE COURT:  Go ahead.

14    Q.   Do you have in front of you P-343 in evidence it is

15    October 23, 2001 letter?

16    A.   343, yes.

17    Q.   Is that the letter with the counter proposal that was

18    prepared and sent as a result of the vote you have just been

19    talking about?

20    A.   As a result of the second vote, yes, that's correct.

21    Q.   As a result of the vote that had people abstaining?

22    A.   Yes.

23    Q.   Okay.  And how was that letter sent to American and the

24    APA?

25    A.   I am not sure.  The staff, Bob Pastore and the staff

Rautenberg-direct/Fram                                          79

1    took care of sending it.  I am sure it was sent promptly.

2    Q.   Was there a reaction from Mr. Brundage to the sending of

3    that letter during the meeting that we have been discussing

4    on October 23?

5    A.   There was.  Mr. Brundage was extremely unhappy.  The

6    minutes reflect I think that Mr. Brundage said it wasn't

7    acceptable.   That is a gross under-statement of his

8    response.

9    Q.   Let's go back to the minutes if we could, D 88.  Page 16

10   at the top, let's go back to that.

11   A.   Yes.

12   Q.   Can you blow up 812, MEC discussion of Brundage.

13   Brundage said the counter proposal was not acceptable.  Was

14   he referring, as you understood it, to the October 23 mention

15   we just talked about?

16   A.   Yes.  As I understand it, he was referring to this P 343

17   letter.

18   Q.   So you made a counter proposal.  Brundage says it is

19   unacceptable.  What happens next at the meeting?

20   A.   The group of MEC members who had been routinely

21   caucusing in another room left to caucus in another room.

22   And they were gone for some time, and they came back, and I

23   don't know -- I don't know.

24   Q.   Let's go back to the minutes.  Staying on that same page

25   below that.  It says that at 1818, you are back in regular

1    session.   Holtzman outlined Holtzman outline terms of third

2    proposal to send to APA.   Then you and Mr. Lewin made a

3    motion.

4    A.   Yes.

5    Q.   Can you describe what the motion was?

6    A.   Well, this was the original motion.   This was the same

7    terms that had been rejected in the first vote.   Was

8    considered again in the third vote.

9    Q.   All right.   So we are back --

10              THE COURT:   This time you were going to send it to

11   them?

12              THE WITNESS:   Yes, sir.

13              THE COURT:   First time they sent it to you.

14              THE WITNESS:   Yes, your Honor.

15   Q.   The third vote is back pretty much to the same issue as

16   vote number 1.   We are back to 807.   You actually have a

17   couple more.   Then all the people who had abstained on the

18   second vote, they are back in the opposition camp.   They vote

19   against it.

20   A.   Yes.

21   Q.   So the upshot of all of this is no agreement on

22   seniority integration?

23   A.   That's correct.

24   Q.   Did the members of this opposition group, the four who

25   voted against the proposal on the table twice, did they

1    articulate what they saw as the next step in terms of how to

2    resolve the issue of seniority integration?

3    A.    I don't recall them articulating that at that time.  The

4    subject had been discussed extensively over the course of

5    this meeting, this long meeting.

6    Q.    Okay.  Can you tell us if you recall what was their

7    theory or their idea for how to resolve the issue, if it

8    wasn't by reaching some kind of an agreement?

9    A.    Well, my belief was that they were intending to pursue

10   litigation.

11   Q.    Okay.  Now, when you walked away from this meeting with

12   no agreement on seniority integration, were you happy or

13   unhappy?

14   A.    Well, some of us were very dissatisfied, and unhappy,

15   but the crowd who had voted against it and carried the day

16   engaged in what I thought was a kind of a silly celebration.

17   You know, they began to celebrate.

18   Q.    Describe what you mean when you say they began to

19   celebrate?

20   A.    High five'ing, congratulating each other, it was as if

21   they had accomplished something.  You know.  And I don't know

22   how they -- I mean literally it was as if they had

23   accomplished something and how they got to the conclusion

24   that they had accomplished something was beyond me.

25   Q.    Do you think that it was a, let me come at it this way.

1    You wrote a letter?

2    A.   Yes.

3    Q.   After this?

4    A.   Yes.

5    Q.   Do you have that in front of you, it is D 21 in

6    evidence.  October 25, 2001.

7    A.   Yes.

8    Q.   This letter, it looks like it is five and a half pages

9    single spaced?

10   A.   Okay.

11   Q.   And --

12   A.   Almost, yes.

13   Q.   This is a letter you prepared and sent to the Council 3

14   pilots?

15   A.   Yes.

16   Q.   Is it fair to say?

17            THE COURT:  It is in evidence.

18            MR. FRAM:  Yes, thank you, your Honor.

19   Q.   It is fair to say you recounted a lot of the specifics

20   of what we just talked about in the letter for the Council 3

21   pilots?

22   A.   I tried to, yes.

23   Q.   Why did you report to them, why did you send this letter

24   to the Council 3 pilots?

25   A.   Well, I thought that the seniority integration process

1    was over except to find out from the APA what it was going to

2    be or find out from American what it was going to look like.

3    And I was telling the pilots, they are entitled to know how

4    it went down.  I was telling the pilots how it went down.  I

5    was unhappy about it.  I was expressing that.  I was doing

6    part of my job of communicating.

7    Q.   It looks like on the second page of the letter that you

8    set up three questions.  Looking at the bottom of that first

9    page.  Is there anything left on the table to be negotiated.

10   You talked about that.  And then you concluded, at the top of

11   the next page, that there was nothing more on the table.

12   A.   Yes.

13   Q.   That was the conclusion you reached.

14   A.   Right.

15   Q.   Then the second question asked are the terms better than

16   we would do in the cram-down.  What conclusion did you reach

17   about whether the proposal on the table would be better than

18   the terms that might be imposed by American and the APA in

19   the cram-down?

20   A.   I reached the conclusion that what was available to us

21   was superior substantially to a cram-down, to what we could

22   look forward to without our participation.

23   Q.   Why did you feel that?  Can you explain that for the

24   jury, please?

25   A.   Well, Jeff Brundage had indicated unequivocally that

```
 1    there would be no guarantee to the size of the, of this fence

 2    or this protective cell in St. Louis and without a guarantee,

 3    the industry was in turmoil.  9-11 had started a tremendous

 4    downturn.

 5              American had a track record of abandoning places

 6    where it had made an investment, San Jose, Nashville,

 7    Raleigh, St. Louis now.  Their track record continues.  So

 8    without some guarantee as to what the flying was going to be

 9    in St. Louis, the protective cell had much less value and

10    this protective cell was essentially the only good thing

11    about what was coming Our way.

12    Q.   Okay. Let's move on.  Did the issue of seniority come up

13    at the next meek of the MEC on October 21, 2001.  Do you

14    recall that?

15    A.   No, I don't.  But you know, the issue may have come up,

16    but there was no resolution or, there was no action offered

17    relative to the seniority integration.

18    Q.   All right.  Let's turn to the minutes of that meeting

19    which  are defendant's 257 in evidence.  Do you have those

20    handy, I hope?

21    A.   I do.

22    Q.   There was some type of, you agree that there was some

23    discussion at the meeting about seniority integration as

24    reflected in the questions and answers on the second page?

25    A.   Yes.  I am sure it was discussed.
```

 1   Q.   Okay.  And was there some expectation on October 31

 2   about the collapse of the MEC and Council 3, do you recall

 3   that?

 4   A.   Yes.  American had already announced that they would be

 5   closing the domicile in Los Angeles and in New York, and as a

 6   result of the closing of those domiciles, the pilot structure

 7   of ALPA dictated that the representatives close out as well.

 8   Q.   Okay.  What did that mean in terms of the voting power

 9   of the two Council 3 members, at least for a short period of

10   time?

11   A.   Well, absent some action to change the structure of our

12   MEC, it was going to leave two representatives.  Ms. Young

13   and myself.

14   Q.   And as between you and Ms. Young, when that happened,

15   between you and Ms. Young, who had more votes?

16   A.   I did.

17   Q.   If you turn to page 6 of the MEC meetings on October 31,

18   there is a resolution there.  Resolution 01-101 by HOllander

19   and Altman, do you see that?

20   A.   125 at 1616?

21   Q.   No.

22   A.   Oh I see what you are referring to.  At the top of the

23   page.

24   Q.   Do you recall this resolution being made? It looks like

25   it is a resolution, looking at the first "Therefore", clause.

1   Any proposed integrated seniority list agreed to between the

2   TWA ALPA elected representatives and AMR APA representatives

3   shall be unanimously agreed to by each and every individual

4   TWA MEC member and the TWA MEC chairman.

5   A.   I remember this, yes.

6   Q.   You do.  Okay.  It says it was passed by a voice vote.

7   Did you vote in favor of this?

8   A.   Certainly not.

9   Q.   What was your view of what -- so the resolution passed

10  by less than unanimous?

11  A.   It was less than unanimous, yes.

12  Q.   So what was the point of this resolution, as you

13  understood it?

14  A.   The point I think was to try to stipulate or require

15  that any future consideration of seniority integration be

16  approved unanimously by the MEC, and I should point out they

17  also included the master chairman.

18        They gave the chairman a vote in this resolution as

19  well, ostensibly.

20  Q.   To the extent you were in favor of negotiating seniority

21  integration, what effect would this resolution, if it

22  operated, have on your ability to move ahead?

23  A.   Oh, if it was a valid resolution which, you know, I

24  assure you it was not, it would restrict me from exercising,

25  you know, the votes that I had available to me.

1   Q.   Why do you say in your view it was not a valid

2   resolution?

3   A.   Well, you can't, as an MEC, go and change the

4   Constitution and bylaws of the Air Line Pilots Association.

5   It doesn't happen that way.   The Constitution and bylaws are

6   what provides for who votes and how things pass.  So it was

7   kind of a ridiculous attempt to do that.

8   Q.   The next document in front of you was an email you sent

9   on November 1 of 2001 to your Council 2 pilots.  That is D

10  22?

11  A.   Yes.

12        MR. FRAM:  Your Honor, I move defendant's exhibit

13  22 into evidence, please.

14        MR. PRESS:  No objection, Judge.

15        THE COURT:  Okay.  D 22 in evidence.

16  Q.   Is this another report you were sending to the Council 3

17  pilots?

18  A.   Yes.

19  Q.   You are bringing them up-to-date on what had happened

20  including what had happened at the meeting on October 31 of

21  2001?

22  A.   Yes.  And I am reminding them that there is a meeting

23  scheduled to have a vote in less than two weeks.

24  Q.   Without going through all the details were you in this

25  email summarizing for them your views of why they negotiated

1    seniority integration was better than not?

2    A.   You are looking at the November one email.  Yeah.  I

3    was, I think summarizing that, but I was giving them some

4    advance warning of what was to take place, and there was also

5    this meeting that was scheduled for November 12, ALPA

6    National had decided that we would follow the America West

7    model for representation and that there would be four

8    representatives for the domicile or for the council, and so I

9    was advising the council of the issues and taking a position

10   on how they ought to view these issues as they thought about,

11   you know, coming to this meeting or preparing to vote.

12   Q.   Did you make any secret in your October 25, 2001,

13   November 1, 2001 communications, of your views about what you

14   thought should happen with seniority integration?

15   A.   No. I did not make any secret of that.

16   Q.   Did you get any criticism or negative feedback from the

17   Council 2 pilots?

18   A.   From Council 3 pilots.

19   Q.   Council 3.  I am sorry?

20   A.   Throughout the course of the year I got occasional phone

21   call from pilots who were unhappy, but it was not extensive,

22   and I don't recall specifically in this timeframe the kind of

23   feedback that I got.

24   Q.   All right.  Let's move ahead to D 139 which I think you

25   have in front of you?

1    A.    Yes.

2    Q.    Do you recognize that as a document that was presented

3    by American to the MEC on or about I guess November 7, 2001?

4    A.    Well, I don't know that this document was presented by

5    American.

6              I believe this document originated as an effort

7    in-house to find out, or to establish what was really truly

8    available, and it was coordinated with American.  But yeah, I

9    don't, yes.  I recognize the document.

10   Q.    All right.  So you think the document, are you saying

11   you think the document might have been prepared by the TWA

12   MEC side?

13   A.    Yes.  I think, I believe this document was prepared by

14   David Holtzman, if I am not mistaken, and in consultation

15   with a member of the merger committee to establish what was

16   really available, and, that is my understanding where it came

17   from.

18   Q.    There was a meeting of the MEC on November 7 of 2001, do

19   you recall that?

20   A.    There was.

21   Q.    And you recall that meeting?

22   A.    I do.

23   Q.    Okay.  The jury has heard a fair amount about what

24   happened at the meeting so I don't want to go into a lot of

25   the details.

1          But I would like you to tell us, please, what you

2     tried to accomplish at the meeting on November 7 of 2001?

3     A.   Well, I tried to get the seniority integration situation

4     revisited.  I tried to get to a position where we could

5     debate the issue.

6          I tried to get some light shed on the legal

7     initiative that I believed was behind the rejection of the

8     terms that were available to us, and to try to shed some

9     light on whether or not that legal initiative held any

10    promise.

11         That effort was denied.  My effort to get the

12    motion to the, to be considered or debated was denied.  That

13    is what I was frying to accomplish.

14    Q.   When you say you tried to shed some light on the

15    litigation initiative approach, that effort was denied.  Can

16    you be more specific about any questions you might have asked

17    to find out what the strategy was from those who disagreed

18    with you?

19    A.   Yes, there wasn't a litigation strategy I was privy to.

20    I had heard about it.  I heard about AWRF, I think, and I

21    didn't know what they were telling members of the MEC.  I

22    didn't know what advice they were getting.  I was trying to

23    ask questions, we had Roland Wilder available.  I wanted to

24    ask questions of Roland Wilder as to what he thought the

25    probability of success of whatever it was they were

1    considering was.  Because it was affecting the pilot group.

2    This is the questions I was trying to get at.

3    Q.    Were you able to get the answers from Mr. Wilder?

4    A.    No. The master chairman, you know, he --

5    Q.    This is Mr. Pastore?

6    A.    Yes.  Mr. Pastore, he indicated the question was out of

7    order.  I don't know how the question of counsel can be out

8    of order.  But.

9    Q.    All right.  Just to wrap this up in terms of November 7.

10   At some point you made a motion and were prepared to vote the

11   majority of the available votes in favor of accepting the

12   deal that was on the table?

13   A.    Well, you know, I came to the meeting prepared to do

14   that, and I believed that I would have done that.  I was

15   really trying to get the motion on the table to get it

16   considered.

17          My view of this meeting, it was kind of a surprise

18   to me, as to this meeting being called.  I mean it wasn't an

19   unhappy surprise, but I was pleased about the opportunity to

20   maybe revisit this thing.  But my view was that Sally Young

21   had maybe changed her mind, and that we would be able to go

22   forward on this, and I didn't know if she and I didn't know

23   if she changed her mind back into a position where she was

24   going to be willing to abstain to allow it to move forward as

25   happened on October 23, or what.  But yeah, I was prepared, I

1    was not looking forward because this was going to be very

2    unpopular.  And I was not anxious to become the target of

3    everybody's -- not everybody's, but I was not anxious to be

4    the target of people's dissatisfaction with the ultimate

5    outcome.

6    Q.   You say this was going to be unpopular.  Can you just

7    specify for us what you are referring to?

8    A.   Well, the  seniority integration was egregious.  A lot

9    of people were being stapled.  A lot of people were going to

10   be furloughed.  And those people were not going to be happy

11   with the idea that their union executed something that was

12   going to result in that.  So I think that is what I mean by

13   that.

14           You know, in my view there was distinct advantages

15   to doing this, as I indicated earlier.  But there were going

16   to be people who were going to be unhappy.  And quite a few

17   of them.

18   Q.   But even though you knew people would be unhappy you

19   were prepared to go ahead and see this proposal accepted why?

20   Why were you willing to put yourself in that position for you

21   to be the target of unhappy pilots?

22   A.   Well, again.  I had -- American had promised,

23   threatened, committed that they were not going to support the

24   fence, by putting a floor under the fence if we didn't make a

25   deal.  That was significant.  I mean, that would have been

1    disastrous.

2            That was the principal issue.  We had been getting

3    some excerpts from the APA's website bulletin board, if you

4    will, called Challenge and Response.

5            How we were getting them I got they are was

6    confidential but somebody was delivering these excerpts to

7    Keith O'Leary, who was the vice chairman of the MEC, and he

8    was delivering them to me, and in these excerpts a member of

9    the APA merger and acquisitions committee was discussing the

10   integration.

11           And it appeared from reading the excerpts, nowhere

12   was there outlined exactly what the integration was going to

13   look like, but reading the excerpts, it appeared that there

14   was going to be know floor.  And instead of a floor there was

15   going to be a limit on the maximum size of the St. Louis

16   domicile and so on.  So.

17   Q.   You are familiar with Supplement CC as implemented by

18   American in the APA on November 8 of 2001?

19   A.   I am fairly familiar.  I am not an expert in it.

20   Q.   How did the terms of that so-called cram-down compare to

21   the deal that was on the table.  Are they better or are they

22   worse?

23   A.   The terms of Supplement CC are slightly worse than what

24   was available to us.

25   Q.   Can you give us some of the details of how the deal that

1    was imposed was worse than the deal that was on the table

2    that you wanted to accept?

3    A.    Yes.  Principally by the size of the floor under the St.

4    Louis flying.  The Supplement CC imposed a floor of 30

5    percent of the total of the Dallas and Chicago flying, that

6    there would be at least that many captains in the St. Louis

7    domicile.

8              The terms that were available to us were expressed

9    in a different way.

10             American had indicated that what they were would

11   guarantee is that the ratio of the St. Louis pilots, as

12   compared to the Dallas and Chicago pilots combined, would not

13   decrease from a snapshot more than 25 percent.

14             And so the terms used to describe the floor were

15   different, and when I received Supplement CC, which was very

16   soon after it was executed, I immediately reviewed the

17   document, looked at what -- whether or not this floor was

18   present in it, and then I took a snapshot using American

19   Airlines' website as to what the flying, applicable flying

20   was in Dallas, Chicago and St. Louis, by flying, I mean the

21   number of pilots in Dallas, Chicago and St. Louis and I

22   calculated the ratio, and the ratio I calculated using

23   Americans terms was slightly better than what Supplement CC

24   called for.

25   Q.   How about furlough protection, do you recall any aspect

1    of Supplement CC that were not as favorable as the deal that

2    had been on the table?

3    A.   American had committed that the pilots who were not

4    end-tailed, or who were not stapled to the end of the

5    seniority list, would enjoy furlough protection.  That

6    furlough protection was not inherent.  There was furlough

7    protection in Supplement CC that would accrue much later, but

8    that furlough protection was not inherent.

9           The furlough restrictions that American had

10   committed to in the fourth quarter of 2001 and the first

11   quarter of 2002, those were not inherent.

12   Q.   You say the furlough protections American had committed

13   to, you are referring to what American had committed to in

14   this last offer that was on the table?

15   A.   Yes, that's correct.

16          THE COURT:  What about the number of pilots

17   stapled, was it any difference was there any difference?

18          THE WITNESS:  No, your Honor.

19          THE COURT:  Same number?

20          THE WITNESS:  Yes.

21   Q.   In terms of the events we have been talking about,

22   October, November, is there anything that you asked ALPA as a

23   union to do to assist in this process that ALPA did not do?

24   A.   No.  There is nothing that I asked ALPA to do.

25   Q.   Can you think of anything that ALPA should have done, in

 1  your view, to help this process along that they didn't do?

 2  A.   There  was always, the issue of leverage or traction or

 3  getting some advantage or some way to get going on getting a

 4  fair, or better seniority integration, was on the front

 5  burner all the time, with essentially everybody.  And you

 6  know, we just, we didn't have any good ideas coming from

 7  ALPA.  We didn't have any ideas coming out of our own shop,

 8  you know.  Everyone was looking for that answer.  And nobody

 9  had it.

10  Q.   Did you terminate your service as a member of the MEC at

11  some point after the events we have been discussing?

12  A.   I did.

13  Q.   When did that happen?

14  A.   I believe the effective date was December 14 or 15.

15  Q.   And why did your service end?

16             THE COURT:  2001.

17             THE WITNESS:  2001.  Yes, your Honor.

18             MR. FRAM:  Thank you.

19  A.   Well, at this meeting that we meld on November 12 to

20  elect two more representatives, representatives were elected

21  that were not in the position that I favored.  In other

22  words, they were not going to in any way, shape or form,

23  attempt to move forward on getting seniority integration.

24  And in addition, the council passed a resolution asking for

25  plea to add my recall to a -- actually, asking me to schedule

1    a local council meeting in two weeks, is what they wanted.

2    They wanted, the resolution was to require me to schedule a

3    local council meeting for the purpose of my recall in two

4    weeks.

5           And that resolution was out of order ut the council

6    passed a resolution any way.

7           And so at that point it was clear that a recall

8    issue was going to come up again.  It had come up before.  I

9    didn't see, I didn't see any point in fighting a recall

10   again, that didn't have to do with just me.  For me to fight

11   this recall wouldn't have been about whether I stayed in

12   office.  It would not have been about what was good for the

13   TWA pilots, because that was done.  That was, as far as I

14   could tell, behind us.

15          The members that had been elected weren't going to

16   take what I considered to be any constructive action.  We

17   were going to get a cram-down, and something like this was

18   going to ensue, and there was no point for in me fighting a

19   recall.

20          So I tendered my resignation effective on the day

21   that we elected my replacement.

22   Q.   Can you give us an estimate of the number of days or

23   partial days that you devoted to your responsibilities as an

24   MEC member during the period we have been discussing, during

25   the year 2001?

Rautenberg-direct/Fram                                    98

```
1    A.   Days or partial days?

2    Q.   Yes.

3    A.   I thought about it every day.  Does that count?

4              It would be all of them.

5    Q.   In terms of actually being in meetings, phone

6    conferences, that kind of stuff, can you give us a sense of

7    how many days or partial days that that happened.

8    A.   60, 70, 80, something like that.

9    Q.   Did you have to put in for flight pay loss because of

10   that?

11   A.   Yes, on occasion I did.

12   Q.   Did you have any difficulty getting reimbursed for your

13   flight time?

14   A.   No.

15   Q.   Let's, as a final topic, let's talk about the impact of

16   Supplement CC on you.  You continue to fly as a pilot at

17   American?

18   A.   I do.

19   Q.   Okay.  Ever furloughed?

20   A.   I was furloughed in the late seventies, through '85.  I

21   have not been furloughed since then.

22   Q.   So from early 2001 on, you have not been furloughed?

23   A.   No. I did not get furloughed.  I was very fortunate.

24   Q.   Were you fortunate to continue flying as a captain?

25   A.   Yes.
```

1    Q.   And in terms of your, how much money you made, did you

2    make more money or less money in 2001 than you had in 2000?

3    A.   In 2001, probably a little bit more.

4    Q.   How about in 2002, when you formally become a captain in

5    American, did you make more money in 2002 than in 2001?

6    A.   In 2002 I made substantially more money than in 2001.

7    Q.   And just so we are clear.  Where were you on the TWA

8    seniority list before the merger of the pilot groups?

9    A.   The 2001 seniority list shows me at 672 out of 2,341.

10   Q.   And to your knowledge, did anybody above you on the TWA

11   seniority list ever get furloughed by American?

12   A.   Not without their own voluntary submission to it, no.

13   Q.   All right.

14             MR. FRAM:  Thank you very much, thank you, your

15   Honor.

16             THE COURT:  Okay.

17             MR. FRAM:  I have no more questions.

18             THE COURT:  I think we should take a break now

19   rather than let you go for ten minutes.

20             So we will take a 15-minute break until 11:30, and

21   do not discuss the case among yourselves.  Keep an open mind

22   until you have heard all the evidence.

23             (The jury leaves the courtroom.)

24             (Recess)

25             (Jury enters the courtroom.)

1               STEVEN RAUTENBERG, Resumes.

2               THE COURT:  Mr. Press, are you going to do the

3    cross?

4               MR. PRESS:  Yes, I am.

5               THE COURT:  I recognize you for that purpose.

6               CROSS EXAMINATION.

7               BY MR. PRESS:

8    Q.   Mr. Rautenberg, do you have the Supplement CC document

9    in front of you?

10   A.   I don't have it in front of me.  It is in the packet.

11   Q.   You probably don't need it for this question.  The

12   Supplement CC I am showing to the jury.  It is a multi-pate

13   document, right?  It goes on for 15 pages.  This is the

14   document that is the seniority plan that was imposed on the

15   TWA pilots, right?

16   A.   Yes.

17   Q.   And that is what was called the cram-down?

18   A.   Yes.

19   Q.   Supplement CC is the cram-down, right?

20   A.   Right.

21   Q.   And you were, you were testifying about how you -- you

22   testified about how Jeff Brundage characterized the

23   cram-down, and you were a little bashful to use the man's

24   real words.  He referred to it to a sandwich.  Do you

25   remember?

1    A.   Yes.

2    Q.   A poop sandwich, although he didn't say poop?

3    A.   That's correct.

4    Q.   And you said you guys are going to have to eat that poop

5    sandwich, didn't he?

6    A.   I don't know if he said we were going to have to eat it.

7    Q.   Okay.  If you don't remember you don't remember.  All

8    right.  That is what Supplement CC is.  And you testified

9    that you made more money in 2002 than you did in 2001.  I

10   just want it clear that that had nothing to do with

11   Supplement CC C, right?  That had to do with the fact that

12   you got a raise in 2002?

13   A.   That's correct.  I got a raise and I didn't get --

14        THE COURT:  And you weren't stapled.

15   Q.   And you weren't furloughed?

16        THE COURT:  And he wasn't stapled.

17   A.   Correct.

18        THE COURT:  You were above the staple point.

19   A.   Yes.

20   Q.   Captain Rautenberg, you retained your captain seat

21   throughout this whole last ten years when other guys were

22   furloughed and some of them lost their captain seats?

23   A.   That's correct., I was very fortunate.

24   Q.   Captain Hollendar lost his captain seat in '02 and just

25   got it back.  You knew that, right?

```
 1    A.   I am not sure of what Captain Hollander's exact

 2    circumstances are.

 3    Q.   Fair enough.  But you were fortunate enough, because of

 4    your high seniority, to not have lost your captain's seat?

 5    A.   I was fortunate enough because of my seniority to not

 6    have lost it.

 7    Q.   And this corral or fence or jail in St. Louis, however

 8    you want to refer to it, that doesn't affect you because you

 9    live in St. Louis, right?

10    A.   It doesn't affect me.  It does affect me -- yes, it does

11    affect me.  It doesn't affect me negatively, but it affects

12    me.

13    Q.   It doesn't affect you negatively.  You don't have, your

14    commute to work didn't change because all TWA pilots were put

15    in St. Louis?

16    A.   No. I elected years ago to move to my domicile.

17    Q.   Okay.  So you weren't hurt by this deal at all, were

18    you, Supplement CC, personally?

19    A.   I was not hurt by Supplement CC, no.  I did get

20    displaced from the 767 in early 2001.

21    Q.   Okay.  Now, this notion that that there was a better

22    deal, better than Supplement CC, you mentioned it was two

23    categories.  There would be a minimum number of pilots in St.

24    Louis, right?

25    A.   Yes.  As compared to Chicago and Dallas combined.
```

1    Q.   But it is a fact that Supplement CC contains minimums on

2    the number of captains in St. Louis?

3    A.   Yes.  Supplement CC does contain minimums.  I don't

4    believe that the minimums are quite as advantageous as what

5    was available to us.

6    Q.   And here is the question.  And we will  look at the,

7    what was on the table in October, November, and compare that

8    to Supplement CC.  We will do that.

9             But for right now I just want to you agree with me

10   that this supposed better deal, the staple point was exactly

11   the same as Supplement CC?

12   A.   Yes.

13   Q.   Yes?

14   A.   I would agree with that.

15   Q.   There were 1,200, about 1,200 pilots stapled?

16             THE COURT:  He already testified to that.

17   Q.   The remaining 1100 pilots, they were integrated in the

18   list in exact same way as happened in Supplement CC?

19   A.   Yes, I agree with that.

20   Q.   The integration started from the very bottom of the

21   American list, right?  Well, as of April 10, 2001?

22   A.   Well, I believe that the language of Supplement CC

23   starts the integration with the first TWA pilot and enters

24   him in adjacent or following an American pilot, and then

25   proceeds downward rather than from the bottom upward.

Rautenberg-cross/Press                                          104

1    Q.   Okay.  I think we are mincing words but I understand

2    what you are saying.  The most senior TWA pilot at that time

3    was Captain Upp, right?  He is mentioned in this supplement.

4    Do you remember that?

5              THE COURT:  Captain Upp?

6              MR. PRESS:  Upp, U-P-P, right?

7              THE COURT:  Good name for a pilot.

8              MR. PRESS:  Beats Down.

9              THE COURT:  We don't like down.  We like up.

10   Q.   It says here in the Supplement CC that Captain Upp, TWA

11   pilot up, list date of hire was December 2, 1963.  Would you

12   agree with me?

13   A.   Yes.  If you are reading the document, I would have to

14   agree with you.

15   Q.   Yes.  And then he gets put on to the integrated

16   seniority list with the American pilots with a guy named

17   Elder whose date of hire was October 8, 1985.  Right.  So he

18   lost 22 years seniority right there.

19   A.   Okay.

20   Q.   Then what happened is after Captain Upp, the next 1100

21   TWA pilots are put in that list going downward, right?

22             THE COURT:  At a fixed ratio.

23   Q.   At a fixed D ratio which was the same, Supplement CC

24   didn't change that ratio, it was about eight to one, right?

25   A.   No, it did not.

1    Q.   Which is to say I am correct that the ratio was eight to

2    one, that is what was offered in October and that is what

3    Supplement CC provides?

4    A.   Well, no, it did not was an answer to the question I

5    thought you asked.  That didn't change.

6    Q.   Correct?

7    A.   The ratio was a little more than eight.  It was eight

8    and a fraction.

9    Q.   8.14  and some more decimals?

10   A.   Yes.

11   Q.   Okay.  This supposed better deal, Captain Rautenberg, it

12   wouldn't have saved one pilot from being furloughed who

13   ultimately was furloughed, would it have?

14   A.   Probably not.

15   Q.   Right.  And we know that recently American started

16   recalling some furloughed TWA pilots, haven't they?

17   A.   Yes, they have.

18   Q.   In the last couple of years, maybe 300.

19        MR. FRAM:  Your Honor, I question the relevance of

20   what happened in the last couple of years to decisions made

21   in 2001.

22        THE COURT:  No, I think that you put at issue the

23   comparison between what is on the table, what was on the

24   table and Supplement CC, as to whether it was better or

25   worse.  And I am going to allow him to explore that.

1    Q.

2            MR. PRESS:  I will be real brief.

3    Q.   You are aware that American has started recalling some

4    of the furloughed TWA pilots recently?

5    A.   I am aware of that.

6    Q.   And my question to you is, this supposed better deal,

7    had it be accepted, would not have brought about those

8    recalls any faster than they actually have taken place?

9    A.   No, it would not have.

10   Q.   Right.  So no, number of guys furloughed would have been

11   the same --

12           THE COURT:  Don't make a closing statement.  Ask

13   questions.

14           MR. PRESS:  All right.

15   Q.   You said the supposed better deal would have limited the

16   number of furloughs that would have occurred in the last

17   quarter of '01 and the first quarter of '02, correct?

18   A.   Yes.

19   Q.   If we need to look at documents I will show them to you

20   but do you recall that the limitation was expressly this.  We

21   won't furlough more than 200 TWA pilots in the last quarter

22   of '01 and we won't furlough more than 250 TWA pilots in the

23   first quarter of '02.  Those were the specific numbers?

24           THE COURT:  In the regional office.

25           MR. PRESS:  Yes.  In the supposed better deal,

Rautenberg-cross/Press                                    107

1    yeah.

2    A.    I don't know, those are the numbers, whether they match

3    up to the proper quarters, I would have to look at the

4    document to confirm.

5    Q.    It is reflected in the minutes from one of those

6    meetings.  When we get to it?

7    A.    200 and 250 are the numbers.  I agree with the number.

8    I don't know whether it was first quarter one or first

9    quarter the other.

10   Q.    Are you familiar enough with the furlough history at TWA

11   to know that those limitations weren't reached, they didn't

12   furlough more than 200 pilots in that first period and they

13   didn't furlough more than 250 in the second period?

14   A.    That is news to me.  It was my understanding that the

15   furloughs exceeded one of those limitations.  I could be

16   replies taken.  But it was my understanding that that was the

17   case.

18   Q.    Okay.  I want to jump way back to the beginning of your

19   testimony.  You were talking about, this is before the

20   American acquisition, and you were asked some questions about

21   TWA's ability to stand alone as a carrier.  Right?  And you

22   testified, sir, that you, it was your understanding that the

23   machinists union, the IAM, were the ones that, they failed to

24   participate in that process and that is why it failed.  Was

25   that your testimony?

```
 1    A.   It is my understanding that the IAM did not participate

 2    to the level required by the company and the stand alone plan

 3    did not work because of that.  Yes.

 4    Q.   Now, the stand alone plan, first of all -- TWA's

 5    corporate governance, it is owned by a bunch of shareholders,

 6    right, people go out and buy stock.  Maybe you had some stock

 7    in the company?

 8    A.   Not any more.

 9    Q.   I know that.  Back then you did.

10    A.   At the time of the third bankruptcy, I didn't.  I sold

11    it for a profit.

12    Q.   But the company was owned by its stockholders, yes?

13              THE COURT:  Give me a point in time for that.

14              MR. PRESS:  Late 2000, before the bankruptcy.

15    A.   Yes.

16    Q.   And the shareholders, what they do, is that they elect a

17    board of directors to oversee the company.  Right?

18    A.   Right.

19    Q.   And then the board of directors, they nominate officers

20    like president and so on, right?

21    A.   Yes.

22    Q.   You were not a board of director member, were you?

23    A.   No, I wasn't.

24    Q.   But the TWA pilots were represented on TWA board?

25    A.   Yes.
```

1   Q.   That was by Bob Pastore?

2   A.   Yes.

3   Q.   And the IAM, this machinists union, that you thought

4   didn't participate, they had at least two members on the

5   board of directors, didn't they?

6   A.   I believe they did, yes.

7   Q.   Flight attendant representative named Sherry Cooper.  Do

8   you remember her?  Sherry Cooper?

9   A.   Yes.  I remember the name Sherry Cooper.

10  Q.   And then there was another fellow, I can't remember his

11  name.

12  A.   Driscoll.

13  Q.   Driscoll.  So  -- weren't you informed by your own

14  representative, Bob Pastore on the board, that the stand-

15  alone plan, was being pursued vigilantly by by the board of

16  directors before the American acquisition took place?

17          THE COURT:  Again, the timeframe.

18          MR. PRESS:  As late as January 7, 2001.

19  Q.   This plan was being pursued vigilantly.  Weren't you

20  informed of that?

21  A.   That the stand-alone plan was being vigilantly pursued?

22  Q.   Yes.

23          THE COURT:  Vigilantly was not the word.

24  Vigorously.

25  Q.   Still being pursued.

 1              THE COURT:  Vigorously pursued.

 2              MR. PRESS.   Vigorously pursued, yes.

 3   A.   I was aware the stand-alone plan was still being

 4   pursued.

 5   Q.   In fact, there was an agreement in principal with

 6   Boeing, one of the largest creditors of TWA, and the two

 7   major unions --

 8              THE COURT:  What?

 9   Q.   Weren't you aware that there was an agreement in

10   principal between Boeing, the IAM, and ALPA, to make certain

11   concessions to keep TWA alive, weren't you aware of that?

12   A.   I was aware that the company was seeking an agreement

13   with Boeing to reduce costs.  I was aware that, certainly of

14   the agreement that the company had with ALPA.  I was not

15   aware of the agreement that they, that the company had with

16   the IAM.

17   Q.   You weren't aware of that?

18   A.   No.

19   Q.   Were you aware --

20              THE COURT:  Did the IAM also represent the flight

21   attendants?

22   A.   Yes.

23              THE COURT:  So IAM was representing both machinists

24   and flight attendants?

25   A.   Yes, your Honor.  And ramp workers as well.

1              THE COURT:  You mean like baggage handlers, things

2       like that?

3       A.   Yes.

4       Q.   Were you aware that as part of these negotiations what

5       was going to happen is TWA was going to hire a restructuring

6       firm named Jay Alex in New York, a Wall Street investment

7       banking firm, were you aware of that?

8       A.   I was aware of the possibility that they would bring in

9       a restructuring firm.

10      Q.   Okay.  Were you aware that one of the conditions of the

11      restructuring firm was that the president of TWA, Bill

12      Compton, would have to be replaced as CEO with one of the

13      investment banking firms people?

14      A.   I was aware of that as well.

15      Q.   All right.  So having talked about this some more, your

16      testimony that the IAM didn't participate in a stand-alone

17      plan, that wasn't quite accurate, was it?

18      A.   Well, I don't think I said that the IAM didn't

19      participate.  I think I said that the IAM didn't participate

20      to the extent required by the company.

21      Q.   Okay.  Would you defer to Sherry Cooper on that matter

22      if she were to testify?

23              MR. FRAM:  I object.

24              THE COURT:  Yeah, I will object to that.  I will

25      sustain the objection to that.

1    Q.   You didn't have any conversations with Sherry Cooper,

2    the IAM representative on the board of directors about any of

3    this, did you?

4              THE COURT:  You can answer that question.  Did you

5    have any conversation with Sherry Cooper?

6    A.   No.

7              THE COURT:  About the stand-alone plan?

8              THE WITNESS:  No, your Honor.

9              THE COURT:  That ends that subject.

10   Q.   Jumping to a new subject.  Your meetings with ALPA

11   advisors leading up to the scope waiver on April 2.  That is

12   what I want to talk about.

13   A.   Yes.

14   Q.   You mentioned that Mr. Seltzer briefed you on this

15   bankruptcy motion issue, the 1113, right?

16   A.   Yes.

17   Q.   Here is my question:  In any of these briefings  --

18   foundation first.

19              You understood that the bankruptcy court was going

20   to have a hearing on this bankruptcy motion on April 6,

21   right?

22   A.   Correct.

23   Q.   And do you remember April 2 your MEC meeting was a

24   Monday?

25   A.   Yes.

1    Q.   If so it was that same Friday, April 6, is when the

2    hearing is going to be, right?

3    A.   Yes.

4    Q.   That is if you guys don't waive scope.  If you waive

5    scope that motion becomes irrelevant or moot, right?

6    A.   Yes.  It was an omnibus hearing.  The hearing would

7    still take place, presumably.  Part of it would be --

8    Q.   But if you guys didn't, if you hadn't waived scope, this

9    hearing is going to start on April 6, right?

10   A.   Yes.

11   Q.   Here is my question.  Did any of the bankruptcy lawyers

12   that advised you, did any of them talk about their strategy

13   for dealing with the hearing itself had you not waived scope?

14   A.   I remember discussion about the hearing.  I don't recall

15   them sharing with us here is our strategy.

16        THE COURT:  Do you know who the lawyers

17   representing the union were, I mean ALPA, were in that

18   hearing.

19   A.   That were to represent ALPA in the hearing.  No, I don't

20   know.

21        THE COURT:  Somebody had to represent ALPA.  Do you

22   know who?

23   A.   I do not know who ALPA would have.

24        THE COURT:  Did Seltzer file papers or appear at

25   that hearing?

```
 1    A.    That is a possibility.  I am not sure.

 2    Q.    Wait.  If you guys hadn't waived scope, there is going

 3    to be this hearing and you don't know what lawyer was going

 4    to be in the courtroom advocating on your behalf?  You didn't

 5    even know that?  Is that true?

 6    A.    I think that is true.

 7    Q.    So then I guess certainly you didn't know this unknown

 8    lawyers strategy, if he or she had one, would you?

 9    A.    Probably not, no.

10    Q.    Were you advised that at this hearing, if you hadn't

11    waived scope, that you would have had the right to present

12    evidence?  Were you told that?

13    A.    Present evidence?

14    Q.    Yes.  Put up a defense?

15    A.    I didn't need to be told that we would have the right to

16    present evidence.

17    Q.    Because that was just something you knew?

18    A.    Yes.

19    Q.    Okay.  Did anybody say what this evidence might look

20    like if we are going to have a real hearing.

21    A.    No, I don't think so.

22    Q.    Did anybody tells you that TWA pilots, maybe yourself

23    included, would have the right to testify if it was

24    necessary?

25    A.    I expected that the 1113 hearing would involve the
```

 1    testimony of pilots.  We had been at hearings in the

 2    bankruptcy court with where a pilot had testified, so, I

 3    expected that.  Why I don't know.

 4    Q.   Okay.

 5              THE COURT:  Did you get, did anybody advise you as

 6    to the timeframes, how it would play out, in other words, how

 7    long the hearing would take, how long it would take to for

 8    the judge to make a decision, whether there were appeals from

 9    the judge's decision, kind of a time line?

10              I mean it was going to start on the 6th.  We know

11    that.  But whenever we talk about a legal matter you talk

12    about a time line, you think this is going to happen, it will

13    take so many days, and if you lose or if you win, either way,

14    win or lose in the field, you appeal.  If you win, the other

15    side appeals.  And that takes a certain amount of time and

16    the bankruptcy is somewhat unusual provisions for appeals.

17    It is different than other types of courts.

18              I wonder if anybody discussed a time line with you,

19    how much time you really had until a final resolution on the

20    1113 issue.

21    A.   The time line of the 1113 process was discussed, at the

22    March 21, 22, meeting.  The time line of the hearing itself,

23    and the post hearing time line wasn't, I don't recall that

24    being discussed.

25    Q.   Well, did any of these advisors advise you that this,

1    the hearing itself, provided an opportunity to create some

2    delay.  You know, we could try to drag this out and that will

3    by you more time to negotiate a better deal.  Did anybody say

4    anything like that?

5    A.   Well, Roland Wilder's strategy involved delay.  Whether

6    that was --

7    Q.   I am sorry, his strategy was to hold up the sale.  I.

8    Just talking about the bankruptcy --

9            MR. FRAM:  I object to counsel cutting the witness

10   off.  He asked a question.  The witness is entitled to

11   respond to it.

12           THE COURT:  Ask your next question.

13   Q.   I am limiting myself to the 1113 motion.  Okay.  Not the

14   overall transaction.  Mr. Wilder's strategy to hold it

15   hostage, just the 1113 hearing.  Okay.  I forgot my question.

16           Did anybody telling you that we could drag this

17   out, that hearing out, and that delay itself could give you

18   more time to negotiate a better deal?  Did anybody suggest

19   that?

20   A.   I don't recall talking about the 1113 hearing itself

21   being used as a mechanism to delay.

22   Q.   All right.

23           THE COURT:  Well, even, let's leave aside, what

24   trial judges don't like to hear about a delay.  But the

25   question of  time lines themselves, how long, even assuming

1    it was fought, I can't call that delay, you have a right to

2    put in a case, did anybody talk just about how long does it

3    take, one day, two days, will the Judge make a decision from

4    the bench, will he write an opinion three weeks later?  What

5    is the appeal time?  He would appeal to district court

6    actually.

7              All this stuff that, how long it is going to be

8    until there is kind of a final and binding decision.  One way

9    or the other.

10   A.   Your Honor, I am reluctant to say those things were not

11   discussed.  I don't recall them being discussed, but by the

12   same token, I was not interested in delay.  So it is not

13   necessarily something that I would recall if it was

14   discussed.  It wasn't, delay was not an attractive

15   alternative to me.

16             THE COURT:  I will let you follow up on that.

17   Q.   Delay, without American walking from the deal, would

18   have given you more time to negotiate.  That is always a good

19   thing in a labor negotiation, isn't it?

20   A.   I don't think it is always a good thing in a labor

21   negotiation.

22   Q.   Okay.  You disagree with Mr. Wilder about that, by the

23   way.  Is that correct?

24   A.   I disagreed with Mr. Wilder about a number of things.

25   Q.   All right.  Now, what was discussed at the April 2

```
 1   meeting about the bankruptcy hearing is that, they didn't

 2   tell you about their evidence, they didn't tell you about

 3   potentials for delay but they did tell you the train is

 4   leaving the station, didn't they?

 5             MR. FRAM:  I object.  That wasn't the testimony.

 6   He said he didn't recall.

 7             MR. PRESS:  Okay.

 8             THE COURT:  Well, Captain, were you told that the

 9   train was leaving the station, words to that effect, and if

10   so, by whom?  Who was it that told you that.

11             THE WITNESS:  I do not recall those words being

12   said.  It is possible that they were.

13   Q.   But you, it was your understanding that a decision had

14   to be made that day, April 2, you had to make a decision that

15   day?

16   A.   That was not my understanding, no.

17   Q.   Okay.  This chart, Mr. Fram, agenda chart, is this part

18   of what is loaded up in your computer that I could show the

19   jury?

20             THE COURT:  Does it have a number?

21             MR. PRESS:  No, it doesn't.

22             MR. FRAM:  No, it was just for refreshing

23   recollection purposes.  It wasn't premarked.

24             MR. PRESS:  I would like to show it to you again.

25             THE COURT:  Let's mark that and give it some
```

```
 1   identification THE COURT:  Don't like documents unmarked.

 2             MR. PRESS:  Here is a sticker right here, Judge.

 3             THE COURT:  Makes me anxious.

 4             MR. PRESS:  I marked it plaintiff's exhibit 450.  I

 5   don't have a copy, though.

 6             THE COURT:  Give me a summary, some mutual

 7   description of it.

 8             MR. PRESS:  I don't know.  MEC meeting agenda

 9   chart.

10             THE COURT:  I will call it that.

11             MR. PRESS:  Agenda index.

12             MR. FRAM:  Here is a copy, your Honor.

13             THE COURT:  MEC agenda chart, I will call it.

14   There is no doubt I can associate with that.

15             MR. PRESS:  I don't have a copy.

16             MR. FRAM:  I think it is April 2, your Honor.

17             MS. RODRIGUEZ:  April 3.

18             MR. FRAM:  April 3.

19             THE COURT:  There is a date.  April 2.  April 2,

20   '01.  I am marking that for ID only.  Go ahead.

21   Q.   It is exhibit P-450 I handed you, right?

22   A.   Yes.  It last like it is.

23   Q.   And tell the jury what it is?

24   A.   Well, it looks like a table listing agenda items,

25   resolutions, that were considered, subjects of the
```

Rautenberg-cross/Press                                         120

```
 1   resolution, the mover in the second and the status of the

 2   resolution.

 3   Q.   And you talk about one of them when Mr. Fram was asking

 4   you questions.  I want to talk about the fourth agenda item.

 5   What is that listed there?

 6   A.   It is listed as 0104 - 74,  is the agenda item number.

 7   Resolution number is 01-64.  The subject is CBA for TWA LLC.

 8   The mover --

 9   Q.   I referred you to the wrong line.

10            THE COURT:  That is the fourth one.  He answered

11   the question correctly.

12   Q.   Okay.

13            THE COURT:  I have a question on that while we are

14   at it.   That, the subject of the resolution you just

15   referred to was CBA for TWA LLC.

16            THE WITNESS:  Yes.

17            THE COURT:  And that is where they agreed to a

18   labor agreement on behalf of TWA, LLC, which was American.

19            THE WITNESS:  Yes.

20            THE COURT:  And the waiver of scope is in that

21   agreement.

22            THE WITNESS:  Yes.

23            THE COURT:  That is the resolution where scope is

24   waived, right?

25            THE WITNESS:  Yes.
```

```
 1              THE COURT:  Now, you, looks like you were the

 2   moving party, Lewin seconded it, and it says on this chart it

 3   passed, which is true.  It passed?

 4   A.   Yes.

 5   Q.   I am sorry, I wanted to direct your attention to the

 6   third line.  I stole it from you there.

 7   A.   Okay.

 8   Q.   Can you read that line?

 9   A.   Yes.  0104 - 73.  Resolution number blank.  Subject

10   membership ratification/changes, CBA.  Mover, second, blank.

11   Status, no action taken.

12   Q.   Now, isn't that a reference to the fact that at least

13   somebody put as an agenda idea, some MEC member, that is,

14   that this notion of a scope waiver should be put to a

15   ratification vote of all of the TWA pilots.  Isn't that what

16   that is a reference to?

17   A.   It appears that that is what that us, a reference to

18   that.  I don't have the actual resolution unless this is it

19   behind this document.

20   Q.   But you remember that subject came up during the MEC

21   meeting, the, somebody asked to put this up for membership

22   ratification, didn't they?

23   A.   It is possible, but I would question why the mover and

24   the second is blank.

25   Q.   Okay.
```

1          THE COURT:  First of all, leave that aside.

2          Is the subject of putting the new collective

3   bargaining agreement, TWA, LLC, did that come up for

4   discussion, whether that question, i.e., the next resolution,

5   should also be subject to membership -- you know, broad

6   membership ratification.

7   A.   The question of membership ratification, I don't recall

8   at the moment whether it was brought up or not.

9   Q.   Okay.  Do you recall -- you took your seat on the MEC in

10  September, 2000, right?

11  A.   Yes, I believe that's correct.

12  Q.   Just seven months before you are being faced with this

13  monumental decision, right?  I mean you were only an MEC

14  member for seven months before all of this is going down.

15  A.   It was September, I believe, and if it is seven months,

16  yes.  I take your word for it.

17  Q.   And do you remember that in November, 2000, the MEC

18  passed a resolution that any motion to change our collective

19  bargaining agreement has to be put up to membership

20  ratification.  Do you remember that that happened?

21          MR. FRAM:  I object.  That mischaracterizes the

22  document, your Honor.

23          THE COURT:  I am going to let him try to, if he can

24  answer that question.  This was not a change in the CBA.

25  This was a new CBA with a different employer.  The one

1    ratified in April was with American, it says TWA LLC but it

2    is really a new labor agreement with American Airlines, not

3    TWA.

4             THE WITNESS:  Right.

5             THE COURT:  But answer his question.

6    A.   There was under consideration during that timeframe a

7    concessionary agreement with TWA, as part of the stand alone

8    plan, if you will.  And I do recollect that the issue of

9    membership ratification was raised during that period of

10   time.

11   Q.   Okay?

12            THE COURT:  And was it adopted?  Was there a

13   resolution?

14   A.   I believe the resolution was adopted in reference to the

15   stand alone plan that was under consideration.

16            THE COURT:  Okay.

17   Q.   And this is in evidence, it is exhibit D 3.  I will just

18   hand it to you, Rautenberg.  See if you --

19            THE COURT:  I am sorry.  D 3.

20            MR. PRESS:  D 3.

21            THE COURT:  That is already in evidence.

22   Q.   And that is the resolution that we have been talking

23   about, right?

24   A.   Yes, it appears to be.

25   Q.   Can you read the last, be it resolved, can you read that

1    out loud?

2    A.    Be it further resolved that any changes to the CBA will

3    be ratified by the entire pilot group.

4    Q.    Okay.  And that resolution was in effect when you guys

5    made your scope waiver, right?

6    A.    This resolution, in my view, specifically addresses the

7    issue of the potentially concessionary agreement with TWA.

8    That is what it deals with.  I don't, I would not consider

9    this resolution to be effective other than to that particular

10   circumstance.

11   Q.    Okay.  So I gave you the wrong document.

12            THE COURT:  Excuse me?

13            MR. PRESS:  He testified it is not applicable.  So

14   I am moving on.

15            THE COURT:  Okay.

16            MR. PRESS:  I want to jump to a new topic.

17   Jumpseat.

18            THE COURT:  You want to jump to the jumpseat.

19   Q.    You testified about a meeting you attended in

20   Washington, D.C. with President Woerth and you were

21   accompanied by Sally Young, Bob Pastore and Jim Arthur?

22   A.    That is my recollection, yes.

23   Q.    The subject of a jumpseat war came up briefly, I guess?

24   A.    Yes.

25   Q.    And you told us that President Woerth told you that we

1    have done that before.  Right?

2    A.   Words to that, effect, yes.

3    Q.   You remember that clearly, he said we have done it

4    before.

5    A.   I think so, yes.

6    Q.   Now, in your testimony on that subject, Captain

7    Rautenberg, you made a comment about knuckle-headedness.  I

8    don't know who you were referring to.  But were you aware of

9    the fact that Captain Mike Day was the first TWA pilot to

10   suggest that ALPA should engage in a jumpseat war with the

11   American pilots, were you aware of that?

12   A.   No, I was not.

13   Q.   Would you ever in a million years characterize Mike Day

14   as a knucklehead?

15   A.   I would not call Mike Day a knucklehead.  I might

16   consider some ideas that Mike Day would come up with as

17   knuckle-headed.

18   Q.   Now, to the Bond bill.  We are getting into October,

19   correct, of 2001?

20         THE COURT:  October of '01

21   Q.   '01.  Is it a fact that you did not personally lobby on

22   Capitol Hill in support of the Bond bill?

23   A.   That is correct.

24   Q.   Now, you mentioned that you sought some advice on the

25   prospects of the Bond bill passing.  You did?

Rautenberg-cross/Press                                      126

1   A.   Yes.

2   Q.   I want to show you a letter.

3            THE COURT:  P-340?

4            MR. PRESS:  Yes.

5   Q.   Exhibit 340, Mr. Rautenberg, is a letter from Estes

6   Associates to Matt Comlish dated October 18, '01.  Do you see

7   that?

8   A.   Yes.

9   Q.   At the bottom it has ALPA document number on the bottom

10  right?

11  A.   Yes.

12  Q.   You understand that means it came from ALPA's files,

13  right?

14  A.   Okay.  If you tell me that.  I accept that.

15  Q.   In is a letter you have seen before, right?

16  A.   No, it is not.

17  Q.   Is this the first time you have ever seen this letter?

18  A.   I believe so, yes.

19  Q.   Well, in it this fellow reports on the prospect --

20           MR. FRAM:  I object to any questions about the

21  letter.

22           THE COURT:  If he has never seen it before, I don't

23  think it is fair.  You are just introducing it in evidence

24  without any basis for it to be in evidence.  Maybe a

25  rebuttal, you would, you could find a witness who can deal

 1    with it.

 2    Q.    This firm, Estes and Associates, have you ever heard of

 3    that firm?

 4            THE COURT:  It is just Estes Associates.

 5    A.    Can't say that I have.

 6            THE COURT:  Full name is Estes associates,

 7    Washington Strategies.

 8            THE COURT:  Ever heard of them?

 9    A.    No, I have not.

10    Q.    Did you solicit to get a written opinion from any

11    lobbying organization in Washington D.C.  about the prospect

12    of the Bond bill passing?

13    A.    No.

14    Q.    You testified in connection with the Bond bill that once

15    the potential legislation caught the eye of the APA, that the

16    chances of it passing were even further reduced?

17    A.    I believe so, yes.

18    Q.    All right.  When did the Bond bill catch the eye of the

19    APA, so far as you know?

20    A.    As far as I know, that would have been in early October.

21    That is my best sense of when it got the eye of the APA.

22    Q.    How early in October?

23    A.    I don't think that I could, you know, before October 10.

24            THE COURT:  It would have gotten American's eye

25    then at the same time?

Rautenberg-cross/Press                                        128

```
 1    A.   Yes, approximately the same time.  Some time before
 2    October 10.
 3    Q.   You talked about Captain Pastore being dispatched to
 4    Dallas around October, the October 10 time period, right?
 5    A.   Yes.
 6    Q.   And we saw some letter from Jeff Brundage at American
 7    Airlines being critical of Captain Pastore's actions, I
 8    think, right?
 9    A.   Yes.
10    Q.   Okay.  And as a factual matter, you know that Captain
11    Pastore disputes much of what is written in Jeff Brundage's
12    letter.  You heard Captain Pastore dispute it?
13    A.   I have not heard Captain Pastore dispute Brundage's
14    letter.  Much of what I understand about what transpired in
15    Dallas that day came from a report by Captain Pastore.
16    Q.   Do you have the October minutes in front of you, October
17    20 minutes?
18              THE COURT:  Give me a number.
19              MR. PRESS:  Exhibit D 88.  It is the long --
20              THE COURT:  The famed D 88.  You should have that.
21    A.   I believe I have it.  If I can lay my hands on it.
22    Q.   I will give you my copy.
23    A.   Here it is.
24    Q.   These are the minutes, Sunday, October 21, page 2.  Can
25    you go there.
```

1    A.   I am with you.

2    Q.   After the announcements.  There is a report from Captain

3    Pastore, correct.  Do you see that?  Pastore viewed?

4    A.   Yes.

5    Q.   And he states, also discussed Jeff Brundage's letter to

6    Duane Woerth, right?

7    A.   Yes.

8    Q.   Pastore said he spoke directly with Brundage to clear up

9    some of the discrepancies in the letter.  Right?

10   A.   Yes.

11   Q.   So my statement that you heard Captain Pastore dispute

12   some of the things in Mr. Brundage's letter, that happened.

13   Right?

14   A.   It says that Pastore said he spoke directly with

15   Brundage to clear up some of the discrepancies in the letter.

16   Did he do that?  Probably.  Did he actually describe to the

17   MEC what the discrepancies in the letter were?  I don't

18   recall that.

19   Q.   That is fair.

20        THE COURT:  But Pastore did give a report to the

21   MEC about his meeting with Brundage.

22        THE WITNESS:  Yes.

23        THE COURT:  You were present for that?

24        THE WITNESS:  Yes.

25   Q.   Now, what happened, leading up to that the APA had

1    contacted the MEC, maybe it was just the merger committee,

2    and said, hey, we got a deal you are going to love, right?

3    Words to that effect were used?

4    A.   I don't think that the APA said that.  It is my

5    understanding that words to that effect were used by Mr.

6    Brundage.

7    Q.   All right.  And the invitation was to come down to

8    Dallas and pick up the proposal.  Right?

9    A.   I wasn't party to what the conversation was, what the

10   invitation was or how it was characterized.  I know that the

11   meeting that was scheduled was to include merger committee

12   chairman Mike Day and Roland Wilder.

13   Q.   And they didn't go?

14   A.   They did not go.

15   Q.   Bob Pastore went, Captain Pastore.  When he showed up

16   there was no proposal there for him, was there?

17   A.   The report that I received is there was no proposal for

18   him because he because he had invited the party that had the

19   proposal out of the room.

20   Q.   Well, that is what that was what was reported to you.

21   By who?

22   A.   By Mr. Pastore.

23   Q.   All right.  Now, this October meeting.  You want to stay

24   in this October timeframe for a while.  The meeting started

25   on Saturday, October 20.  Right?

1    A.    Yes.

2    Q.    And you didn't go to the meeting on the 20th?

3    A.    I was not present in the meeting room on the 20th.  I

4    was present in Washington.

5    Q.    Right.  You were sightseeing that day, right?

6    A.    Sightseeing?  We were at a book store.

7    Q.    And by your failure to be at the meeting, at this book

8    store instead, you denied a quorum at the meeting, didn't

9    you?

10   A.    That's correct.  Myself and Captain Lewin and First

11   Officer Altman did that, yes.

12   Q.    And you were there for union business.  Did you collect

13   your flight pay loss for that day that you denied a quorum?

14   A.    We got flight pay loss only on those occasions when

15   union work conflicted with a trip.  And I am not sure if I

16   was scheduled to be on a trip at that time or not.

17   Q.    At some point the meeting stretched all the way into

18   October 23, right?

19   A.    Yes.

20   Q.    And on the 22nd you guys received --

21              THE COURT:  Is that the Sunday?  The 22nd?

22              MR. PRESS:  Can you recall?

23   Q.    Can you recall, Mr. Rautenberg, what day of the week the

24   22nd was?

25   A.    I don't.

```
 1              THE COURT:  Go ahead.

 2    Q.   Sunday was 21st, so that would be Monday.

 3              THE COURT:  All right.

 4    Q.   At some point in the day on the 22nd you get this bullet

 5    point a presentation of what is on the table as far as

 6    seniority goes.  Right?

 7    A.   Yes.

 8              THE COURT:  What was on the table, put on the table

 9    by APA.

10              MR. PRESS:  By APA.

11    Q.   I am going to refer to P-197.

12              I have given you P-197, Mr. Rautenberg.  Can you

13    just identify this and tell us what it is.

14    A.   Well, can you say that again.

15    Q.   Can you tell us what this exhibit is?

16    A.   It is a letter.  Apparently from David Holtzman, our

17    contract administrator, to Jeff Brundage.

18    Q.   And this is something you are familiar with, right?  You

19    have seen this letter?

20    A.   I don't know if I have actually seen the letter.  I have

21    seen the three party term sheet that appears to follow.

22    Q.   And then after that there are two pages of single spaced

23    small typed words.  Right?

24    A.   Yeah, it goes on to a third page.  But yes.

25    Q.   That is dated October 23, '01
```

1    A.    Yes.

2    Q.    Those three page is with single spacing there, is that

3    the proposal that was on the table in Washington, DC?

4    A.    These are the notes of our committee's understanding of

5    what the proposal was, it is my recollection.

6    Q.    So you didn't get anything in fact in writing from the

7    APA?

8    A.    We got a summary of our understanding of what the

9    proposal was.

10   Q.    And I want to be clear about this.  These three pages,

11   is that the summary that you just talked about?

12   A.    It looks like it, yes.

13            MR. PRESS:  Your Honor, what I would like to do is

14   tear this exhibit a part and mark those three pages as a

15   separate exhibit.

16            THE COURT:  The last three pages?

17            MR. PRESS:  No.  The middle portion that starts

18   October 21, right here, Judge.

19            THE COURT:  Four pages.

20            MR. PRESS:  It is actually three, I think.

21            MR. FRAM:  Bates 36721 to --

22            THE COURT:  No.  I think it is 36717.

23            MR. PRESS:  No.

24            THE COURT:  I am sorry.  Then I am confused.

25            MR. PRESS:  It is this one.  Starts here.  Yes.

```
1            THE COURT:  That is not in the middle.  That is the
2   end.  All right.
3   Q.  Mr. Rautenberg, I would like for you to take those three
4   pages --
5            THE COURT:  Why does he have to tear it off.
6            MR. PRESS:  I think it will be easier.
7            THE COURT:  No.  Let's keep the exhibit together.
8   You see the numbers in the lower right-hand corner
9   /EUFRPBLGTS.
10  A.  Yes.
11           THE COURT:  Turn to 36721.
12           THE WITNESS:  I am in.
13           THE COURT:  Now, you want to question him on that,
14  on those three pages, go ahead.  This is not in evidence,
15  though.  Are you offering it.
16           MR. PRESS:  I was going to tear it up and then
17  move.  Exhibit P-197 into evidence.
18           MR. FRAM:  No objection, your Honor.
19           THE COURT:  There is no objection so it is in
20  evidence.  P-197.  The whole document is in evidence.
21           MR. PRESS:  Okay.  I think there is a good reason
22  to keep the document together.
23  Q.  Now, when you received this, you know, we keep saying it
24  is three pages, but the third page only has one sentence,
25  right?
```

1    A.   Yeah.  Very little on it.

2    Q.   You got this on October 22, correct?

3    A.   Yes.  We had been in discussions with the merger

4    committee during that time.  Extensively.

5    Q.   And when you got this, when you received it -- When you

6    received this little bullet point proposal on October 22, you

7    viewed this as inadequate for you to make a decision, didn't

8    you?  You did not have enough information about what this

9    really means?

10   A.   If this is what I had received, alone, without the

11   supporting discussion, with the merger committee, I would

12   absolutely agree.  It is inadequate to make a decision.

13   Q.   And I think if you look in the minutes you make a

14   statement about that.  So I guess you got some more

15   information the next day.  Would that be fair?

16   A.   About what?

17   Q.   About what this bullet point presentation means.

18   A.   We had a number of conversations with the merger

19   committee during this period of time.  The merger committee

20   was meeting with the leadership of the APA, getting

21   information, and then they would report back to the MEC

22   routinely on what they had.

23            So we were getting routine contact during this

24   period of time with the merger committee.

25   Q.   So you received the proposal, and that night you did

```
 1   your mathematical calculations of risks, or chances of

 2   success, I think is what you called it, and the next day, the

 3   23rd, you had an MEC meeting where you voted whether or not

 4   to accept this thing, right?

 5   A.   I think that's correct.

 6   Q.   And you voted up.

 7   A.   Yes.

 8   Q.   You will accept this?

 9   A.   Yes.

10   Q.   But you were out-voted?

11   A.   Well, let me clarify "accepted."

12            The offer that was made to us that we voted was

13   conditioned on the negotiation of acceptable language.  So it

14   wasn't a document that would become a contract absent the

15   negotiation of acceptable language.  I didn't think.

16   Q.   What was the motion?  I don't remember that being part

17   of the testimony.  What was the motion?  Mr. Rautenberg?

18   A.   The motion, my recollection is, and I will look at the

19   minutes to confirm, that the motion was about the execution

20   of the letter.

21   Q.   A letter that would have accepted what was on the

22   table?

23   A.   A letter that accompanied this summary.  There was a

24   letter that was being exchanged between the parties that was

25   accompanying this summary.  The letter contained conditions
```

1   in it.  And the conditions included things like the furlough

2   protections that were to be provided by American, things like

3   American's commitment to maintain the size of the St. Louis

4   fenced in protective cell.

5           Those conditions were in the letter and not in this

6   note.  Additional conditions in the letter, in my

7   recollection, was that these things be put to language, and

8   agreed to by the parties.

9   Q.   And I think that letter is here.  I think it is the last

10  two pages of exhibit, or last three pages of exhibit 197.

11  Tell me if I am right or wrong.

12          THE COURT:  Beginning with 036724.

13          MR. PRESS:  Yes, your Honor.

14          THE COURT:  Do you have that, Captain?

15  A.   I have 036724, yes, your Honor.

16  Q.   There is a handwritten note on the first page.  Proposal

17  offer moved by council three captain rep.  That would be you,

18  right?

19  A.   That was me, yes.

20  Q.   And defeated by MEC vote.  Right?

21  A.   Yes.

22  Q.   This is a letter you are talking about?

23          THE WITNESS:  It appears to be, yes.

24  Q.   This is what you wanted to have sent to APA to accept

25  the deal.  Right?

1    A.   Yes.  I think so.

2              THE COURT:  But this letter was never sent.

3              THE WITNESS:   This one was not agreed to, yes,

4    your Honor.

5              THE COURT:  This was a proposed letter.

6              THE WITNESS:  Yes, that's correct.

7              THE COURT:  And when they voted not to accept it,

8    the letter was never mailed?

9              THE WITNESS:  Correct.

10             THE COURT:  Okay.

11   Q.   So the full MEC had voted to not accept APA's offer to

12   the table by way of this letter that you had prepared?

13             THE COURT:  Even as modified.

14             MR. PRESS:  Yes.

15             THE WITNESS:  This one, if it matches up to the

16   resolution, was not approved.

17   Q.   Correct.  Now, at the same meeting there was some talk

18   about what was going on with the American bases, or the TWA

19   base, rather, in Los Angeles and the TWA base in New York

20   were closing very soon?

21   A.   That's correct.

22   Q.   They were going to be closed by October 31?

23   A.   Correct.  Well, or November, yes.  Something like that.

24   Q.   And as a result of that, you were going to lose Captain

25   Lewin as an MEC member, right?

Rautenberg-cross/Press                                    139

```
 1   A.    Yes.

 2   Q.    Because he was the captain rep in LA?

 3   A.    Yes.

 4   Q.    You were going to lose First Officer Alan Altman as an

 5   MEC member because he was the first rep in LA.

 6   A.    Yes.

 7   Q.    You were going to lose Howard Hollander as an MEC

 8   member?

 9   A.    Yes.

10   Q.    And you were going to lose David Singer as an MEC?

11   A.    David Singer was no longer a member.

12   Q.    Oh, Ted Case had replaced him?

13   A.    Yes.

14   Q.    The MEC was going to consist of you and Sally Young?

15   A.    Yes.

16   Q.    From the time period November 1 through whenever you

17   could get two more folks elected?

18   A.    I don't believe that ALPA had yesterday made the

19   decision as to what structure would be in place, in Council

20   3, at that point.

21   Q.    Okay.  That the decision to add two more MEC folks and

22   make you like the America West group, that decision came

23   later, you think?

24   A.    I believe so, yes.

25   Q.    All right.  But when you are still in Washington,
```

1   though, you knew that at least for a short period of time the

2   MEC was going to consist of you and Sally Young?

3   A.   Yes.

4   Q.   And that prospect was unsettling to the MEC members who

5   had disagreed with you about accepting the APA's proposal,

6   wasn't it?

7   A.   I think it was, yes.

8   Q.   They were concerned specifically that you could, on your

9   own, conduct MEC business and accept the proposal.  Right?

10  A.   From the conversations, I would presume that was true.

11  I would hate to say that I knew what was in their heads but I

12  suspect that is true.

13  Q.   Right.  You were basing it on what was said to you.

14  They were concerned that you would go out and do this on your

15  own, right?

16  A.   It appeared like that, yes.

17  Q.   An and so the first thing they did to prevent that was

18  they wanted to write to ALPA and get permission from ALPA

19  that the MEC structure, the six people in place, the status

20  quo, would remain, right, even after the base closures, the

21  status quo would remain the same, that is all six would still

22  be on the MEC?

23  A.   That is what they desired.  I don't know that they wrote

24  to ALPA to express that..

25  Q.   No, you know they didn't in fact because you blocked it.

1        THE COURT:  He blocked them writing a letter?

2   Q.   Yes.  ALPA made it for that to happen it needs to be

3   unanimous.  All six have to agree and isn't it true, Captain

4   Rautenberg, you did not agree?

5   A.   I think you are mischaracterizing what happened at that

6   point in time.

7   Q.   I think it is in the minutes.

8        THE COURT:  Let's not argue.

9   Q.   Isn't it?  Aren't you aware?

10        THE COURT:  If you want to show him a document,

11   show him the document.

12   Q.   Go to exhibit D 88, if you would?

13        THE COURT:  D 88 again.

14   A.   Going to the minutes, okay.

15   Q.   If you go to page 10?

16   A.   I am on page 10.

17   Q.   There is a statement attributed to you, quote, for the

18   record, unquote.  Right?

19   A.   Yes.

20   Q.   And without reading all of that, what, you made a

21   statement for the record that you do not agree to keep the

22   status quo representation on the MEC.  Right?

23   A.   I made that statement.  Yes.

24   Q.   Okay.

25   A.   I made the statement that is printed here.

1   Q.   So that -- any way.   Do you remember the MEC's last

2   meeting as a group of six which was October 31?

3   A.   Yes.

4   Q.   There was some discussion about this already.   But the

5   MEC made this resolution that you didn't say much, think too

6   much of apparently, that there needs to be unanimity to

7   approve a seniority plan, right?

8   A.   Yes.

9   Q.   That happened on October 31?

10  A.   Yes.

11  Q.   And you understand that that again was another effort on

12  the MEC to prevent you from unilaterally agreeing to

13  something the full MEC disagreed with.   Right?   That was

14  another attempt to check your power, right?

15  A.   Well, you asked me if the full MEC disagreed with it,

16  and the answer to that is no.   Two members of the MEC did not

17  disagree with the notion of concluding a deal.

18  Q.   I did, I put something in there, because, Captain Lewin

19  voted with you.

20  A.   Yes.

21  Q.   But you are going to be the sole member, the sole

22  captain rep on the MEC the next day, November 1, right?

23  A.   That's correct.

24  Q.   This resolution on October 31 to require unanimity, that

25  was a check on you to prevent you from accepting a seniority

1    plan that the majority of the MEC had rejected?

2              THE COURT:  Of the old MEC.

3              MR. PRESS:  Correct.

4              THE COURT:  Not the new one.

5    A.   I would say it was a silly attempt to put a check on me.

6    It certainly did not bind the MEC that existed on November 1

7    to something that the MEC decided on October 31.  And it

8    certainly didn't change the Constitution and bylaws of the

9    association.

10   Q.   I understand that that is your view of how to interpret

11   the document.

12             My question was very simple.  You understood at the

13   time there was an attempt, maybe futile, but it was an

14   attempt to curb your power?

15   A.   Yes.

16             THE COURT:  That is because you had more votes than

17   Sally Young?

18             THE WITNESS:  Yes, your Honor.

19             THE COURT:  Of the two of you, you had more voting

20   power than she had?

21             THE WITNESS:  Yes.

22   Q.   And on November 7 you vote again on what had been

23   rejected just two weeks earlier, in Washington, DC, right?

24   A.   No.

25   Q.   Or you tried to vote.  You made a motion.

1          MR. FRAM:  Your Honor, counsel is talking over the

2   witness.  I really think he should wait until we have a

3   complete answer.

4          THE COURT:  Ask your next question.

5   Q.   On November 7 there was an MEC meeting at which you made

6   a motion to approve the seniority plan that two weeks earlier

7   the six member MEC had rejected?

8   A.   Yes.  That's correct.

9   Q.   You made that motion.  And it was your intent going into

10  that meeting, well, let me ask a foundation.  You had more

11  roll call votes than Sally Young did, right?

12  A.   Yes.

13  Q.   And so it was your intention to bring the motion and

14  pass it via a roll call vote?

15  A.   It was my intention to bring the motion and debate the

16  motion, and to pursue the motion as far as I could.

17  Q.   And ultimately it was your goal, though, to have the

18  motion succeed?

19  A.   When I left the house for the meeting, I was under the

20  belief that the Constitution or the rules of how meetings are

21  to be conducted required a second.  That the second would be

22  necessary and it was my belief that the motion, if it did not

23  get a second, would die for lack of a second.

24  Q.   Oh.

25  A.   And so it was my curiosity as to whether or not Ms.

1    Young would second the motion and allow the motion to carry

2    forward.

3           If Ms. Young had seconded the motion, then I was

4    prepared to assume the responsibility for passing this

5    resolution because Ms. Young had done something similar of

6    promoting the passage of a resolution, without taking

7    responsibility for voting for it.  At the MEC meeting on

8    October 23.

9           So yes, I was prepared to press the motion forward

10   if it was allowed to move forward, but I expected that a

11   second would be required.

12   Q.   And if First Officer Young, Sally Young, had seconded

13   the thing, your motion, and had it be voted on, and she voted

14   all of her votes against, you were going to do what?

15   A.   I hadn't -- I would have probably passed the motion but

16   I had not made any preconceived decision about how I would

17   pursue that.

18   Q.   You testified on direct yesterday, very early on in your

19   testimony, that you were not a big fan of the roll call vote.

20   You like one man, one vote.  That was your motto that you

21   testified to, right?

22   A.   I testified that I didn't like the roll call vote.  I am

23   not sure -- yeah, one man, one vote, I would much prefer to

24   have a properly sized group, a properly sized MEC, that was

25   representative and so that one man, one vote, could work

1    effectively.  That would be my preference.

2    Q.   But in this case you were willing to throw that

3    preference a side and push this agenda through via roll call

4    vote, weren't you?

5    A.   I think so, yes.

6    Q.   Yes.  Your agenda, at this point.  You knew --

7    A.   I didn't create.

8    Q.   You knew it was a very unpopular decision, right?

9    A.   Yes.  I knew that there was a lot of unpopularity.  The

10   agenda was provided by the chairman.  I didn't create the

11   agenda.  I didn't call the meeting.

12   Q.   I meant your personal agenda to use the power of your

13   role call position to pass a motion on your own, that had

14   been rejected two weeks earlier?

15   A.   You characterize it as my personal agenda.

16           I had no agenda between November 1 and November 6

17   at ten o'clock in the morning when I got this, when I got

18   this meeting notice.

19           I had the power to call an MEC meeting at any time

20   I chose because of, because I was 50 percent of the MEC.  I

21   could request that the master chairman call an MEC meeting.

22   I did not do so.

23           The master chairman called the meeting.  I did not

24   ask for the meeting.  It wasn't my agenda.  My position, from

25   November 1, to November 6, is that, is that the only

```
 1   opportunity to pursue the situation again was going to be,

 2   was going to come after the election on November 12.

 3   Q.   Okay.  I am going to interrupt myself?

 4           THE COURT:  You are?

 5   Q.   Exhibit D 21 was I think one of the letters you wrote to

 6   the --

 7           THE COURT:  D?

 8           MR. PRESS:  D, a letter to the Council 3 pilots you

 9   brother in October.

10   A.   Okay.  October 25.

11   Q.   There it is.  I want you to look at that.

12           First of all, you wrote that letter intending to

13   communicate what happened --

14           THE COURT:  That is in evidence.

15   Q.   Intending to accurately communicate what happened in

16   Washington, D.C., right?

17   A.   Yes.  That was one of the reasons, yes.

18   Q.   Now, nowhere in your letter, by the way, it is four

19   pages long, right?

20   A.   Well, it looks like five and a little bit.

21   Q.   5 and a little bit pages.  Nowhere in those five and a

22   little bit pages do you tell the Council 3 pilots that Duane

23   Woerth had reneged on his promise to let you guys bring the

24   cram-down injunction lawsuit.  Did you?

25   A.   Can I read it before I answer that?
```

Rautenberg-cross/Press                                    148

1    Q.   Sure.

2         (Pause)

3    A.   I didn't say that explicitly, but I was referring to

4    that on page 4, on the 3rd paragraph, where I stated, later

5    in the afternoon after an extremely traumatic process of

6    assimilating additional information, that additional

7    information that I was referring to was the fact that the

8    litigation strategy had been denied by Duane Woerth.  I did

9    not say it explicitly.

10   Q.   Right.  You didn't information your members that

11   according to the other MEC members, the legs had been cut out

12   from under you guys, by the president.  You didn't report

13   that, did you?

14   A.   Not in those words, no.

15   Q.   Now, after November 7 there was a meeting on November 12

16   where you testified, well, you were there, right?

17   A.   Yes.

18   Q.   At this meeting, do you remember where it was held?

19   A.   I think so.

20   Q.   Where?

21   A.   I think it was at the airport Marriott.

22   Q.   That's right.  Not in the MEC office, in that office

23   building.  It was held at a banquet room in a hotel, right?

24   A.   Well, what kind of room it was, it was a large room.

25   Q.   A very large room that accommodated 600 pilots, right?

1    A.   There were a lot of pilots there, yes.

2    Q.   In fact, it was several hundred pilots?

3    A.   Yes.  I don't disagree.  There was a lot of pilots

4    there.

5    Q.   It was the largest attended MEC meeting ever, in TWA

6    history, wasn't it?

7    A.    Well, it was a local council meeting, and I wouldn't

8    doubt it if it was, if records had been kept.  But I doubt

9    that anybody ever kept any records.  I didn't.

10   Q.   And do you remember a New York pilot named Joe Anello?

11   A.   I know the name.  I am not sure I could recognize his

12   face.

13   Q.   Okay.  Some pilot in that group made a motion to have

14   you recalled.  It was out of order because it wasn't

15   procedurally done right, but that motion was made.  Right?

16   A.   The motion that was made was to direct me to call a

17   local council meeting in two weeks with my recall on the

18   agenda.

19   Q.   And instead of facing that you just resigned.  Right?

20   A.   I wouldn't character characterize it that way.  But I

21   did resign, yes.

22   Q.   You resigned knowing you would have been recalled.

23   There was no question in your mind?

24   A.   No, it is not clear to me I would have been recalled.

25   It was not worth the fight, whether I stayed in office would

1    have been exclusively about whether I stayed in office.  And

2    it would not have been about whether anything productive was

3    going to happen on behalf of the TWA pilots.

4              So it was not worth me going through that, it was

5    not putting the council through that.  The majority of the

6    MEC had an agenda, as you put it, that was different from

7    mine, and I made the decision to allow them to carry on their

8    agenda, absent my involvement.  Had I chosen to fight, I am

9    not sure what would have happened.

10   Q.   That opportunity was taken away.  Well, any lay, the

11   MEC's agenda was different than yours, clearly, wasn't it?

12   A.   Well, the majority of the MEC's agenda, yes.

13   Q.   They wanted to keep their options open and they thought

14   if we sign this cram-down, this poop sandwich, our options

15   will be limited in challenging it in a court down the road,

16   right?  That was an option they wanted to keep open?

17   A.   It looked like that was the case.  It looked like they

18   were relying on some kind of litigation, yes.

19   Q.   Now? Now, this meeting in St. Louis where the notion of

20   recalling you was brought up.  You recall that when that

21   motion was brought, it drew huge applause from the crowd?

22   A.   There was a good amount of support for it, yeah.  The

23   motion passed.

24              MR. PRESS:  That is all the questions I have, your

25   Honor.

```
 1                    THE COURT:  Okay.  How long is your, is it time to

 2       take the last break?

 3                    MR. FRAM:  It will be fairly short but why don't we

 4       break now.

 5                    THE COURT:  We will take a break now until one

 6       o'clock.

 7                    Ladies and gentlemen, do not discuss the case

 8       amongst yourselves.  Keep an open mind until you have heard

 9       all the evidence.  All rise.

10                    (Jury leaves the courtroom.)

11                    (Recess).

12

13                    (Jury enters the courtroom)

14                    THE COURT:  Mr. Fram.

15                    REDIRECT EXAMINATION.

16                    BY MR. FRAM:

17       Q.   Captain Rautenberg, I want to clarify one issue with

18       respect to letters that were drafted on October 23, 2001.  Do

19       you have in front of you P-197 the cover page of which is a

20       November 6, 2001 letter, to Jeff Brundage?

21       A.   Yes.

22       Q.   Can you turn to the draft letter you talked about

23       before, which is the last couple of pages of that?

24       A.   Yes.

25       Q.   Do you also have in front you P-343 which is October 23,
```

1    2001, another letter that is actually signed?

2    A.   Yes.

3    Q.   Can you just help us understand the in terms of the

4    votes that took place on October 23, when the different

5    letters were generated.  You told us before that there was a

6    vote, the initial vote was you and Lewin in favor.  It

7    failed.  There was then the abstention vote.  A letter went

8    out at the abstention vote.

9        Can you put these letters in order for us?  Pull up the

10   letter, P-197.

11            THE COURT:  That is not on the screen.  That is in

12   evidence already.

13   Q.   At what point, if you recall, was this letter being

14   discussed?

15   A.   This is the first letter that was, the proposal was

16   rejected by the MEC.  This is vote number 1.

17   Q.   Okay.  And then the second letter which is P-343, is

18   what was agreed to in the second vote where a couple people

19   abstained?

20   A.   Correct.  This is the result of vote number 2.

21   Q.   Okay.  Can you describe for us, quickly, what the

22   differences are between the letters?  Do you see, for

23   example, that the first letter, the one, the draft one that

24   wasn't sent, it looks like it has five numbered paragraphs.

25   The second letter is the one that was sent, show the second

Rautenberg-redirect/Fram                                    153

1   page of that, please.  The second page of that letter?

2   A.   It has seven numbered paragraphs and a signature.  Over

3   Captain Pastore's name.

4   Q.   So what were the differences, if you can tell us quickly

5   between the letters?

6   A.   The differences were in the size of the minimum floor

7   that American was to guarantee, and furlough protection.  And

8   there was also a difference on satellite flying language.

9   Those are the ones that I am familiar with at the present.

10  Q.   Thank you.Mr. Press asked you some questions about your

11  agenda, your personal agenda for the things that I were doing

12  in October and November.  My question for you is this:  Did

13  you, Captain Steve Rautenberg, did you have a personal

14  agenda, an  agenda that was personal to you in terms of the

15  things you were trying to do?

16  A.   Certainly not.  Certainly not.  I was, I was doing what

17  I thought was the best for the pilots that I represented and

18  I was, I was fully aware that what was going to transpire was

19  going to be not advantageous to a lot of people, and that a

20  lot of people were going to be upset about it.  But at the

21  same time, there was a lot of advantages that were on the

22  table, and those were the advantages we were trying to take

23  advantage of.

24          And subsequently, some of those things did accrue

25  to the TWA pilots, but it certainly was not our doing that

1   did that.  It was American and the APA that put together

2   Supplement  CC.

3   Q.   Can you think of anything today that you could have done

4   back then to get an overall deal that was better for the TWA

5   pilots?

6   A.   That I could have done?

7   Q.   Yes, sir, that you could have done.

8   A.   I could have been more persuasive.  I could have made

9   some different decisions about personnel, perhaps.

10          I made some mistakes, but I don't look back at

11  decisions I made about the issues.  I look back at decisions

12  I made about personnel, and my inability to persuade people

13  that the course we were on wasn't the right course to be on.

14          MR. FRAM:  Thank you.  No further questions, your

15  Honor.

16          MR. PRESS:  Nothing further, Judge.

17          THE COURT:  Thank you very much, Captain

18  Rautenberg.

19          THE WITNESS:  Thank you, your Honor.

20          MR. FRAM:  Your Honor, if I may, I am going to walk

21  Captain Rautenberg out and bring my next witness in.

22          THE COURT:  All right.  Two birds with one stone.

23          MR. FRAM:  Your Honor, we will call David Singer,

24  please.

25          DAVID SINGER, sworn.

```
 1              DIRECT EXAMINATION.

 2              BY MR. FRAM:

 3              MR. FRAM:  If I may, your Honor?

 4              THE COURT:  You may proceed.

 5   Q.   Thank you.

 6              THE COURT:  Get as close to the microphone, sir, as

 7   you can.  You can pull it down.

 8   A.   Sure.

 9   Q.   Mr. Singer, good afternoon, sir.  You are a former TWA

10   pilot?

11   A.   Yes, I am.

12   Q.   And you were a first officer rep out of Council 3 back

13   in 2001?

14   A.   For part of 2001, yes.

15   Q.   Let me get a little background if I could.  How old are

16   you, please?

17   A.   I am 64.  I will be 65 next Wednesday.

18   Q.   Tell us where did you grow up?

19   A.   I was born in Amsterdam, New York.  Upstate New York.

20   Q.   You graduate from college?

21   A.   Yes, I did.

22   Q.   Where did you graduate from and what year, please?

23   A.   Cornell University in 1968.

24   Q.   And any form further formal education?

25   A.   Yes.
```

Singer-direct/Fram                                                156

1    Q.   What was that, please?

2    A.   I went to law school for three years, and got a JD

3    degree from Washington College of Law at American University

4    in Washington, D.C.

5    Q.   In what year, please?

6    A.   1971.

7    Q.   What did you do for work after getting your law degree,

8    please?

9    A.   I was admitted to the bar in 1972, and I worked for two

10   years as an attorney in a small firm in upstate New York.

11   Q.   At some point did you decide you wanted to pursue a

12   career as a pilot?

13   A.   Yes.

14   Q.   When was that, please?

15   A.   I took my first lessons in 1974.

16   Q.   And did there come a point where you got a job as a

17   commercial pilot?

18   A.   Yes.

19   Q.   When was that, please?

20   A.   In 1990 was my first airline.

21   Q.   Which airline was that?

22   A.   That was Jet Stream airlines, working for U.S. Air

23   Express.

24   Q.   What type of job were you able to get as a pilot?

25   A.   I was a first officer on a Jet Stream.

1   Q.   Can you walk us through your career as a commercial

2   pilot from that point up until early 2001, please?

3   A.   Okay.  Later in 1990 I got a job for Pan Am Express.

4   And I was with Pan Am Express as a pilot until I believe

5   August of 1991 when I received a furlough notice, just as I

6   was about to relocate to the Philadelphia area.  Two days

7   later they hired me as a crew scheduler and I stayed as a

8   crew scheduler for that airline through the Pan Am bankruptcy

9   and liquidation and the takeover by TWA.

10          At that point it was Trans World Express, and I was

11  recalled as a pilot in March of 1992.

12  Q.   Recalled as a pilot by what company?

13  A.   Trans World Express, the same company I was working for

14  at that point as a crew scheduler.

15  Q.   What was your next job as a commercial pilot?

16  A.   I started with TWA in February of 1996, a few months

17  after Trans World Express went out of business.

18  Q.   And for what period of time did you continue as a pilot

19  for TWA?

20  A.   I was with TWA from 1996, and I was furloughed in 2003.

21  At that point it was TWA LLC.

22  Q.   Did you work as a pilot after you were furloughed in

23  2003?

24  A.   Yes.  2004 I was hired by Trans Meridian airlines.  I

25  worked with them until they shut down in 2005.  And a month

```
 1    later went to work for maximum jet, a start up airline and

 2    worked for them until two days before my 60th birthday when I

 3    was required to retire.

 4    Q.   And is that because at that point in time the mandatory

 5    retirement age for pilots was 60 years old?

 6    A.   That's correct.

 7            THE COURT:  For commercial pilots.

 8    Q.   Commercial pilots, yeah.  What have you done since in

 9    terms of work?

10    A.   I have done some sales jobs with a manufactures

11    representative for Sony.  Off and on.  And last year I worked

12    as an interviewer and then a crew leader for the U.S. Census.

13    Q.   Are you currently working today, sir?

14    A.   No, I am not.

15    Q.   Are you taking some classes, I understand?

16    A.   I am taking classes and I just started a business as an

17    energy consultant.

18    Q.   Do you live locally, is that correct?

19    A.   I live in Mount Laurel, New Jersey.

20    Q.   Tell us about when you first became involved in union

21    work after you started a TWA in February of 1996?

22    A.   Almost immediately I went on the safety committee as I

23    had been at Trans World Express and Pan Am Express.

24    Q.   And did you have other union involvement that led up to

25    your becoming a Council 2 rep?
```

Singer-direct/Fram                                          159

```
 1    A.    Yes.

 2    Q.    Tell us briefly about that.

 3    A.    Shortly after the TWA contract was approved, I believe

 4    that was 1998, I went on the grievance committee.  And I was

 5    subsequently elected to the system board of adjustment.  I

 6    couldn't give you the exact date of that.

 7    Q.    All right.  Let's jump ahead.  When were you elected out

 8    of Council 2 to be the first officer representative on the

 9    TWA MEC?

10    A.    I am trying to figure out exactly when that was.  I know

11    I went through two election cycles.  So it had to be, and the

12    last one was in the fall of -- it may have been a special

13    election.  I think it was a special election.  The first

14    time.  Because it must have been around 1999, I would guess.

15    Q.    And were you a Council 2 rep on the MEC when you learned

16    about the TWA bankruptcy and the proposed transaction with

17    American Airlines?

18    A.    Yes, I was.

19    Q.    What is your recollection of when that happened?

20    A.    I believe January 8, 2001.

21    Q.    And for how long did you serve as a Council 2 rep on the

22    TWA MEC?

23    A.    Until August of 2001.

24    Q.    And during that period did you attend meetings of the

25    MEC?
```

1    A.    Yes.

2    Q.    Did you participate in phone conferences and in other

3    communications relating to MEC business?

4    A.    Yes, I did.

5    Q.    How seriously did you take your responsibilities as a

6    member of the MEC?

7    A.    Extremely seriously.  In fact, I was looking at my log

8    book in the spring of 2001, and there was a long stretch of

9    time when I did not have the opportunity to fly because I was

10   going to meetings with the MEC.

11   Q.    When you say usual log book, can you describe for the

12   jury what a log book is?

13   A.    Yes.  In fact I have it with me.  I have a log, I may be

14   an unusual pilot but I believe I have a log of every single

15   flight I ever took in my airline career, and as a private

16   pilot.

17   Q.    Okay.

18   A.    I have a series of books.  Because it went over 35

19   years.

20   Q.    Tell us, please, when you became a voting member of the

21   MEC, how did you view your role?  Did you view your role, for

22   example, as one where you would poll the pilots in Council 2

23   to find out what they wanted you to do and then do that, or

24   split your votes in a way that you thought the pilots would

25   vote?  Tell us what your philosophy towards your role as an

 1    MEC member was.

 2    A.    In my experience in union work, I don't know of any of

 3    the representatives that took scientific polls.  We would

 4    normally spend some periods of time when we weren't at

 5    meetings in the ramp office, which is where the pilots would

 6    start their flights, both in New York and in St. Louis, even

 7    if a lot of the New York pilots even went through St. Louis.

 8    So we would get opinions from the pilots, according to

 9    everything that I was -- that I learned to do, and was

10    trained to do as an MEC member.

11          I took my role very similarly to legislators in our

12    state and federal government who don't poll every

13    constituent.  They do get opinions from their constituents on

14    a regular basis and make the best judgment that they can on

15    issues that that come before them.  That is the way I viewed

16    my role in the MEC.

17    Q.    I want to focus you on events in early 2001, in

18    particular, a motion under Section 1113 of the bankruptcy

19    code that was filed by TWA.  Do you recall becoming aware at

20    some point in 2001 of the possibility of such a motion?

21    A.    Yes.

22    Q.    Do you recall roughly when you first became aware of

23    that?

24    A.    Roughly I believe some time in March of 2001.

25    Q.    And do you recall becoming aware at some point that the

1    motion had actually been filed?

2    A.    Yes.

3    Q.    Just by way of background, we covered this so I will do

4    it quickly.

5           Were you familiar with the terms of the asset

6    purchase agreement between American Airlines and TWA,

7    generally familiar with that deal?

8    A.    I was quite familiar, and in fact, I spent many days

9    when I wasn't at meetings and didn't have flying

10   responsibilities in bankruptcy court in Wilmington, since I

11   lived so close it was easy for me to get down there.

12   Q.    What do you recall that agreement saying with respect to

13   the scope and successorship clauses of the TWA pilots

14   collective bargaining agreement?

15   A.    What I call is that the, in order for the transaction

16   between TWA and American to consummate, that the, all the

17   unions would have to give up any proceed protective

18   provisions that they had in their contracts, labor protective

19   provisions.

20   Q.    And a motion under Section 1113, what do you understand

21   TWA's motion was intended to do?  What were they trying to

22   achieve?

23   A.    I came to learn over the period of time after they filed

24   it and before it was due to be heard by the court, that the

25   Court could strip us of our contract, and of course, the

1    question was asked several times, could they strip part of

2    the contract and not the rest.  And the answer to that, the

3    answer that I received that I believe was true was that if

4    they succeeded in the 1113 motion, our contract would be null

5    and void.

6    Q.   The entire contract?

7    A.   The entire contract would be null and void at that point

8    as well as the union representation.

9    Q.   All right.  Just to put a little more structure around

10   this.  I want to hand you a small stack of documents and walk

11   you through them.  I am giving them to you in the order in

12   which I am going to try to ask you about them.

13              I am going to take these other two away from you.

14   You don't need them.

15              All right.  Do you recognize --

16   A.   Excuse me.

17   Q.   Yeah, of course.

18   Q.   Do you recognize the first document, which is

19   defendant's 382 in evidence, as a March 19, 2001, email, from

20   Robert Stow to you and the other MEC members scheduling a

21   special MEC meeting for Wednesday, March 21, and Thursday,

22   March 22, of 2001?

23   A.   I can't say I have an independent recollection of

24   receiving this.  But I know that I was part of the TWA MEC at

25   that time and I did receive these notices and I am sure I

1    received this one.

2    Q.    The next document in the pile I have handed you is D 223

3    in evidence.  Do you recognize those as the meeting minutes,

4    the official MEC minutes of the meeting that took place on

5    March 21, 22 --

6            THE COURT:  Give me the number again.

7    Q.    Defendants 223.  Your Honor.  In evidence?

8            THE COURT:  That is already in evidence.

9            MR. FRAM:  Yes.

10   Q.    Do you recognize those minutes?

11   A.    Yes.

12   Q.    Does it refresh your memory that you did attend a

13   meeting of the MEC on March 21 and 22?

14   A.    Yes, it does.

15   Q.    And the, going back to the email with the agenda, does

16   the agenda that is part of the March 192001 email, does that

17   help you remember that there were some reports of the

18   negotiating and merger committees and that there was some

19   outside advisors there?

20   A.    Yes.

21   Q.    And do you recall discussion at that meeting about the

22   Section 1113 motion?

23   A.    I don't have an independent recollection of that

24   meeting.  But I have reviewed these minutes and that did

25   refresh my recollection that there was such a discussion.

Singer-direct/Fram                                                        165

1    Q.   Okay.  Do you recall any of the specifics of what was

2    discussed with respect to Section 1113 at that particular

3    meeting?

4    A.   Not at that particular meeting, no.

5    Q.   Let's walk ahead to the next document in the pile which

6    is D 210 in evidence.  Defendants 210.  Do you recognize that

7    as a March 29, 2001, email, again from Mr. Stow to you and

8    the other members of the MEC scheduling a work session for

9    April 2, I am sorry, for April 1, 2001, and a meeting on

10   Monday, April 2 of 2001?

11   A.   Yes.

12   Q.   And then do you see the next document, the agenda for

13   the April 2 meeting, D 179 in evidence?

14   A.   Yes, I did do.

15   Q.   Is that consistent -- do you recall being present at

16   meetings on April 1 and/or April 2 of 2001?

17   A.   I certainly recall April 2.  On April 1 I don't have an

18   independent recollection of that, but it has been refreshed

19   and I recall some informal meetings on April 1.

20   Q.   Okay.  All right.  What I want to do is I want to focus

21   a little bit, do you recall the meeting on April 2 of 2001

22   and what was discussed there?

23   A.   Yes, I do.

24   Q.   And did you have a chance before we asked you to come in

25   today to look over D 74 which should be in that pile, D 74 in

Singer-direct/Fram                                            166

1    evidence, being the minutes of the April 2, 2001 meeting?

2    A.   Yes, I did.

3    Q.   All right.  Tell us what you recall of the discussion on

4    April 1, and April 2, if you can't distinguish them, about

5    the Section 1113 motion, in particular, the likelihood that

6    the motion was going to be granted, that the bankruptcy court

7    was going to reject the TWA collective bargaining agreement?

8    A.   Well, I recall a lot of discussion about that.

9    Certainly going into those meetings I didn't have an

10   independent opinion about whether or not it was going to be

11   rejected or not.  And I remember a lot of discussion about

12   that in the evening of April 1, the MEC, when they had these

13   meetings would normally have the hospitality room in the

14   hotel where we were staying.  The members, sometimes would

15   visit us there, and we would have informal discussions among

16   ourselves, about the issues in front of us.

17   Q.   Handing you what has been marked as defendant's exhibit

18   3 84.  I would just like you to take a minute to review that

19   and tell me if you recall faxing that document on or about,

20   looks like March 29, 2001.

21   A.   Yes, I do recall that.

22   Q.   All right.

23            MR. FRAM:  Your Honor, I move D 384 into evidence.

24            MR. PRESS:  That is not what you gave me, Mr. Fram.

25            MR. FRAM:  Excuse me, your Honor.

1              THE COURT:   384 on top and it says P 406 on the

2    bottom.

3              MR. FRAM:   I am moving it as D 384.

4              MR. PRESS:   No objection, Judge.

5              THE COURT:   Okay.   D 384 is in evidence.

6    Q.   Thank you.   Mr. Singer, you wrote a note to Susie

7    Minomi.   Tell us who she is?

8    A.   I believe she is one of the secretaries in the MEC

9    office.

10   Q.   Can you read, pull that up, please.   Read for us the

11   note you wrote to Susie?

12   A.   Yes.   To Susie Minomi from David Singer.   Susie, please

13   copy this article by APA merger attorney WEsley Kennedy and

14   distribute to the MEC, the officers, and the MOC, ASAP.

15   Thanks.   DBS.

16   Q.   You sent this from your personal fax back on March 29,

17   2001?

18   A.   Yes, I believe so.

19   Q.   So we are clear you referred to the officers of the MOC.

20   Can you tell us what that substance for?

21   A.   I was referring to the officers of the MEC, and the MOC,

22   I believe that was the, possibly the merger committee.

23   Q.   Was the MOC the merger oversight committee?

24   A.   That would be correct.

25   Q.   Was that separate from the merger committee itself?

1    A.    I believe so.

2    Q.    What do you recall about the status of seniority

3    integration negotiations back on March 29, 2001?

4    A.    That our committee had met with the Allied Pilots

5    Association, and American, had several meetings with them.

6    We had made a great deal of progress, and the question was

7    what leverage might we have to make progress with them.

8    Q.    And why did you ask, first of all, how did this article

9    come for this, I guess it is a chapter from a book, how did

10   this come to your attention?

11   A.    I believe this came from, could have been one of the

12   schools at Cornell, could have been industrial labor

13   relations or the law school.  I did get a lot of information

14   there.

15            And I have been thinking about that, I think I was

16   at Cornell for something at Ithaca and I was at the

17   industrial labor relations building.  And I believe that is

18   where I found this article.  It seemed to be very important

19   to our work at TWA at the time.

20   Q.    And why did it occur to you or seem to you to be very

21   important to your work at TWA?

22   A.    Well, two reasons:  First, I saw the title, which is

23   "Seniority Integration in the Absence of Mandatory Labor

24   Protective Provisions".

25            Secondly, one of the authors, Wesley Kennedy, as I

1    mentioned here, was the merger attorney for the Allied Pilots

2    Association.  And reading into it I saw there was a lot of

3    discussion of different mergers at the airlines since they

4    were deregulated, in 1978, and even some discussion about the

5    deregulation.

6    Q.    And what did the article tell you about the way

7    seniority integrations in the absence of labor protective

8    provisions,  in the absence of Allegheny Mohawk had gone

9    down?

10   A.    The conclusions I took from this was that in any case,

11   the stronger airline, or in some cases, the larger airline,

12   or the airline that had more political clout, or the airline

13   that was stronger financially, was in much stronger position

14   than the airline, the airline that was being acquired.

15   Q.    Do you recall the article Mr. Kennedy and Mr. Nichols

16   referring to the process that prevailed as one akin to the

17   law of the  jungle?  Do you recall that phrase?

18   A.    I recall very well, because I do a lot of value and

19   deregulation from the other airlines I was with and also from

20   the fact that the Professor Alfred Khan, who was the father

21   of airline deregulation was my Economics 101 Professor at

22   Cornell, in 1974  -- 1964.

23   Q.    All right.  So in the context of the American

24   acquisition of TWA, and the integration of the pilot groups,

25   what did the article lead you to believe or expect in terms

1    of how the TWA pilots were going to get integrated in?

2    A.   I expected that we would not have a great deal of

3    leverage in any case, no matter what we did, and that seemed

4    to be the case about this point in time, that there wasn't

5    very much movement on behalf of the Allied Pilots.

6    Q.   Going back to the meetings on April 1 and 2 and focusing

7    on the Section 1113 motion, what do you recall being

8    discussed at those meetings about the likelihood that the

9    motion would be granted, and that TWA would be successful in

10   rejecting the collective bargaining agreements?

11   A.   Again, I don't have an independent recollection of April

12   1.  But I do recall the discussions we were having that

13   evening.

14        I don't believe anybody in the MEC really had a

15   clear handle of what the likelihood was then.  There were a

16   few, one or two maybe, that had made up their minds, but

17   certainly the majority of us really had not decided what

18   those issues were and what those likelihoods were at that

19   point, on April 1.

20   Q.   The discussions you recall on April 1, who was there,

21   who do you recall being involved?

22   A.   I recall every member of the MEC being there, as well as

23   Bob Pastore, the MEC chairman.  And several of our advisors,

24   including some of the people on the finance committee that we

25   had, and other people who were involved in the bankruptcy,

Singer-direct/Fram                                          171

1   pilots that were involved in the bankruptcy.

2   Q.   Do you recall any outside consultants or advisors

3   meeting with them on April 1?

4   A.   I do not recall.  I have had some, my recollection

5   refreshed by documents.  But I don't recall any of them being

6   involved in the discussions that evening.

7   Q.   How about on April 2, do you recall any discussion among

8   the MEC members or with advisors about the likelihood that

9   the Section 1113 motion would be granted?

10  A.   Yes.

11  Q.   Tell us what you recall.

12  A.   I recall that all advisors that are listed in these

13  minutes that were there believed that there was 100 percent

14  chance that the 1113 motion would be granted, with the

15  exception of one of the advisors, Steve Tumblin, who said,

16  well, it might be a 98 or 99 percent chance because nothing

17  in the in the law is absolutely certain.

18  Q.   Was that advice, that it was highly likely, 100 percent,

19  98, 99, was that advice, to your recollection, different from

20  advice that you had gotten, or the MEC had gotten from

21  advisors before April 2?

22  A.   No, I don't believe so.

23  Q.   Do you recall an issue coming up for a vote on April 2,

24  the issue of whether to accept the collective bargaining

25  agreement and waive scope?

Singer-direct/Fram                                          172

1   A.   Yes.  I do.

2   Q.   You have had a chance to go through these minute of

3   April 2.  Let's pull these up real quick so we are on the

4   same page.  I think it is D 74 in evidence, is in front of

5   you.  We will pull that up and go to page 6, please.

6   A.   All right.

7   Q.   Do you recall that resolution just above the roll call

8   vote?

9   A.   Yes, I do.

10  Q.   And am I seeing correctly that you voted 142 in favor of

11  the resolution and 65 against?

12  A.   Yes.

13  Q.   Can you explain for us, please, the extent you recall,

14  what your thinking was in terms of why you voted for the

15  resolution?

16  A.   The reason I cast most of my votes for the resolution

17  was because I came to the conclusion that one of two things

18  was likely to happen or possibly both, that either we would,

19  the 1113 motion would be granted by the Court and we would

20  lose our collective bargaining agreement and our union

21  representation, and to me the most important part of that,

22  having been on the grievance committee, having been on the

23  system board deciding grievances along with the company

24  representatives and the neutral, that we would have no

25  protections, that a pilot could be fired just because a

1    manager didn't like him.  And if we didn't have that

2    contract, we would.

3            There was another as aspect to that as well and

4    several people that were involved very closely with the TWA

5    finances had, and some of them being very close to me, as

6    friends, and as fellow pilots that I have flown with, that

7    TWA was totally out of money.  That there is no way that they

8    were going to continue to operate and that if the transaction

9    with American didn't close, that every single pilot would be

10   out of work.

11           And my conclusion, by the time I voted this, was

12   that, A, we might lose our union representation, but the

13   other possibility was that American would just walk away from

14   the transaction since it was a requirement of the transaction

15   that we did waive our scope objections.

16   Q.   The information you referred to about TWA finances, did

17   you say you got that from some friends of yours?

18   A.   No. We had a finance committee, I believe, on, Scott

19   Shwartz may have been involved on that.  I know another pilot

20   named Jonathan Goldstein was on that, who has a MBA.

21   Q.   So it was pilots who were gathering the financial

22   information?

23   A.   They actually met with the company throughout going back

24   to probably the summer of 2000.

25   Q.   Do you recall any discussion on April 1 or 2 about

1    whether the TWA pilots should consider going on strike to try

2    to get more leverage or bet people's attention?

3    A.   I don't recall that specifically.  It was mentioned in

4    that article about labor groups taking individual action,

5    maybe even worse than a strike.

6    Q.   So do you recall Mr. Hollander -- let me ask the

7    specific question.  Do you have any recollection of Mr.

8    Hollander raising the possibility of a strike on April 1 or

9    April 2?

10   A.   I don't have any recollection of that.

11   Q.   Pardon me for a second? Do you recall when we took your

12   dep deposition at my office back on April 29 of this year?

13   A.   Yes.

14   Q.   I am sorry.

15           MR. FRAM:  Your Honor, I didn't bring copies.

16           MR. PRESS:  Impeaching his own witness.

17           MR. FRAM:  I am refreshing his recollection, your

18   Honor.  I am going to show counsel.

19           I want to show him this.

20           THE COURT:  It is his deposition?

21           MR. FRAM:  Yes, your Honor.

22   Q.   Mr. Singer, I want you to read to yourself on page 115,

23   line 20, the question down to about the middle and see if

24   that refreshes your memory about potential discussions of a

25   strike.

1    A.   It refreshes my recollection that there might have been

2    isolated discussion of it and there may have been some rumors

3    but nothing specific and nothing that I remember

4    specifically.

5    Q.   Do you recall what your reaction to the possibility of a

6    strike was, whether you thought it was a good idea or a bad

7    idea?

8    A.   I thought it was a very bad idea.  I knew that the

9    flight attendants had gone on strike about the time of the

10   merger between TWA and Ozark and that there was a lot of bad

11   feeling even in 2001 from something that happened I guess 15

12   years earlier.

13   Q.   Let me just ask you some questions about the atmosphere

14   of the meetings on April 1 and April 2.  Do you recall any of

15   advisors telling the members of the MEC that they had to vote

16   in a particular way?

17   A.   No.

18   Q.   Do you recall any of advisors threatening any of the

19   members of the MEC?

20   A.   Certainly not.

21   Q.   Do you recall any of advisors yelling or screaming at

22   anybody at the meetings?

23   A.   No.  It was very civil.

24   Q.   Do you recall any of advisors cutting off discussion,

25   saying we can't talk about these issues any more?

1   A.   No.  They were very open with us.

2   Q.   Do you recall advisors setting any deadlines for a vote

3   on any particular issues?

4   A.   The only deadline we had was the fact that the 1113 was

5   due to be brought before the bankruptcy court on April 6, and

6   that, I believe there was a weekend in between, so clearly

7   April 2 was the last day for our decision.

8   Q.   April 2, you recall it as a Monday?

9   A.   I don't.

10   Q.   Do you recall advisors telling anybody that that they

11   had to make a decision on April 2?

12   A.   They didn't tell us that but we knew we had to make a

13   decision before the 1113 was brought before the bankruptcy

14   court.

15   Q.   Do you recall?

16   A.   Otherwise it would be moot.

17   Q.   Do you recall any advisor refusing to answer any

18   questions?

19   A.   No, I don't.

20   Q.   That the MEC members had?

21   A.   No.

22   Q.   Did any of the other members of the MEC say that they

23   were confused about any of the issues and that they didn't

24   understand issues?

25   A.   There certainly was discussion about that the night of

1    April 1.  As I say, with very few exceptions, most of us on

2    the MEC had not decided at that point, which way we were

3    going to vote.  I know I had not decided when I went in the

4    meeting on April 2.

5    Q.   Were Pablo Lewin and Alan Altman out of Council 4, were

6    they present at the meeting you recall on the evening of

7    April 1?

8    A.   Yes.

9    Q.   Do you recall either of them talking about a Council 4

10   meeting that had taken place on March 30?

11   A.   I don't recall.

12   Q.   In your view did any of advisors on April 1 or April 2

13   pressure any of the members of the MEC to vote in any

14   particular way?

15   A.   I  can only speak for myself.  I didn't feel any

16   pressure.  I felt plenty of pressure from the situation.  I

17   didn't feel pressure from any individuals.

18   Q.   To your recollection did any of advisors act

19   inappropriately or unprofessionally on April 1 or April 2,

20   2001?

21   A.   In my opinion they did not.

22   Q.   Did any other members of the MEC in your presence of

23   complain that the advisors had acted inappropriately or

24   unprofessionally on April 1 or April 2?

25   A.   I don't know whether they ever did subsequently.  But

1    not at that time.

2    Q.   Limit it to 2001.  Did anybody complain about the

3    conduct of advisors, in the year, on April 1 and 2, during

4    the year, 2001?

5    A.   Not on April 1 or 2.

6    Q.   The Council 2 which elected you has local council

7    meetings from time to time?

8    A.   Yes.

9    Q.   To your recollection, was there a local council meeting

10   in March of 2001 where the membership overwhelmingly directed

11   you and Mr. Hollander to vote against waiving scope?

12   A.   I don't have an independent recollection of that.

13   Q.   All right.  Do you have any regrets about the way you

14   voted on April 2 in light of things, in light of anything you

15   learned about?

16   A.   I don't, I have to say that was probably the hardest

17   decision I have ever made in my entire life.

18           As I say, I did not, I had not made the decision

19   when I walked in there, and my decision was not necessarily

20   based on what advisors gave, because as I say, the biggest

21   thing was that if we lost our contract, that all of our

22   grievance mechanisms, all of our pay proceed protections,

23   everything would be gone, and that I felt there was a good

24   likelihood that the transaction would not proceed at all.

25   Q.   So do you stand by the decision you made on April 2 or

Singer-direct/Fram                                               179

1    do you think you, you wish you had done it differently?

2    A.    Ten years later, it didn't make any difference to me at

3    that time because I was 55 years old, due to retire in five

4    years, and a very junior pilot.  So whatever happened would

5    not have affected me personally.  And certainly doesn't ten

6    years later.

7    Q.    Was there any information that you wish you had had on

8    April 2 of 2001 that you found out later that, that was

9    available on April 2, that you wish you had had on April 2?

10   A.    I can't say that there was.

11   Q.    All right.  And just a couple more documents, to wrap

12   this up.

13            Shortly after this meeting there was a recall

14   campaign within Council 2 to have you removed as the first

15   officer representative.  Do you recall that?

16   A.    Yes.

17   Q.    The next document that you have here, or one of the next

18   once should be D 389.  Do you have that, June 20 letter that

19   you sent to Council 2 pilots?

20   A.    Yes.

21   Q.    Okay.  Tell us why you sent this letter.

22   A.    Because I was, well, first of all, I sent this to try

23   and give the pilot more information as to the situation.

24   Mass there be another letter sent out with my name over it,

25   which I did not approve.

1    Q.    Explain that, please.   Are you saying that someone else

2    prepared a letter and put your name on it without your

3    approval?

4    A.    Yes.  I have seen that letter recently.  I knew there

5    was such a letter, and I believe I even mentioned that in my

6    deposition.  I was unsure whether the letter that I was given

7    was that letter, and since then I reviewed it more closely,

8    and also compared it with the letter that went out shortly

9    after April 2 from the Council 3 pilots.  I realize that this

10   in fact is the letter that I did not approve.  It still had

11   my signature on it.

12   Q.    Is that the April 10 later, do you have that land I?

13   A.    Yes, I do.

14   Q.    What is the exhibit number on that, please?

15   A.    I believe it is D 35.

16   Q.    D 35.   You are saying D 35 is a letter that went out

17   with your signature but which you didn't an approve?

18   A.    Yes.

19   Q.    Who sent that letter out?

20   A.    I believe either Howard Hollander, Ted Case, or both of

21   them.

22   Q.    Was there a separate letter or communication of some

23   kind you sent out that you did approve?

24   A.    I had sent a draft to them which is very similar to the

25   one that Council 3 sent out, and reviewing this letter from

```
 1    Council 2, there is a lot of information in there that

 2    speculates -- that talks about the speculation of the

 3    advisors.

 4    Q.   All right.  Can you tell us quickly the key aspects of

 5    that letter?

 6            THE COURT:  First off, 389 is not in evidence.

 7            MR. FRAM:  I am sorry, your Honor.  I would like to

 8    move D 389 in evidence, please.

 9            MR. PRESS:  No objection.

10            THE COURT:  What?

11            MR. PRESS:  No objection.

12            THE COURT:  Okay.  D 389 in evidence.

13    Q.   All right.  Go back to D 35, which we can pull up, that

14    is in evidence, the April 10 letter.  Can you tell us quickly

15    what aspects of this letter that you did not think were

16    entirely accurate?

17    A.   In large part it was the tone of the letter, but I do

18    see --

19            THE COURT:  D 39?

20            MR. FRAM:  D 35, your Honor.

21            THE COURT:  Oh, 35.  That is in evidence.

22    A.   I do see comments about speculation of advisors.  I

23    didn't believe that it was speculation.  I believed it was

24    solid legal opinion, from those that were lawyers and

25    professional opinion from the others.
```

1    Q.   The recall efforts against Council 2, who led the charge

2    against you?

3    A.   My belief is that it was Ted Case and Howard Hollander.

4    There were certainly pilots of Council 2 that were very much

5    involved as well.

6    Q.   And after you were recalled, who took your position at

7    first officer rep out of Council 2?

8    A.   Ted Case took the position as interim case.  There never

9    was an election for a permanent representative before Council

10   2 was dissolved.

11            MR. FRAM:  Those are all the questions I have of

12   this witness.

13            Thank you, Mr. Singer.

14            THE COURT:  Okay.

15            MR. PRESS:  Should I use up the last 13 minutes or

16   shall should we break for the day?

17            THE COURT:  Use up the last 13 minutes.  It is 13

18   minutes, you can go home earlier a couple days from now.

19            CROSS EXAMINATION.

20            BY MR. PRESS:

21   Q.   Mr. Singer,   I am Allen Press by the way.  We have

22   never met?

23   A.   No, we haven't.

24   Q.   Staying with April 2.  Up to the MEC meeting where you

25   all decided to waive scope, who was the principal advisor

1    that you had talked with, which of advisors that were there

2    that day had you talked with the most before then?

3    A.   I don't recall.  I know we had a long meeting with Randy

4    Babbitt.

5    Q.   Wasn't Roland Wilder the one that had advised you the

6    most up to that point in time?

7    A.   Roland Wilder was the advisor to the merger committee,

8    of which I was not a member, but did have meetings, we did

9    have meetings, updates from them and Roland Wilder.

10   Q.   Okay.  And you know that Roland Wilder had always

11   advised the MEC not to waive scope up April 2, any way?

12   A.   I don't recall.

13   Q.   Do you recall that on April 2 Mr. Wilder initially took

14   the position that you all should not waive scope?

15   A.   I do not recall that.

16   Q.   So do you recall that he was confronted verbally by Bob

17   Christy regarding his opinion, you remember that?

18   A.   No, if that happened, I wasn't aware of it.

19   Q.   Do you remember that Roland Wilder left the meeting in

20   disgust?  Do you remember that?

21   A.   No, I don't.  It seems to me I saw some documents that

22   showed that he wasn't there at all.  But I didn't have any

23   recollection.

24   Q.   I mean --

25                THE COURT:  He said he doesn't have any independent

1    recollection.

2    Q.   You independently recall Mr. Wilder was there, however,

3    don't you?

4    A.   I do not.

5    Q.   Do you still have your deposition transcript in front of

6    you or was that removed from you?

7    A.   I still have it.

8    Q.   If you go to page 99.  Are you at page 99?

9    A.   Yes.

10   Q.   Well, actually there is a question better on 102.  At

11   the beginning there.

12            MR. FRAM:  What line, please?

13   Q.   Line 5.  You are with asked a question regarding Mr.

14   Wilder's presence at the meeting on April 2, right?  You are

15   shown a document.  Does that refresh your memory that he was

16   not there on April 2 and your answer was there?

17   A.   "I still think he came.  He came in late, I believe."

18   Q.   So he was there on April 2, that is your best memory

19   sitting here today?

20   A.   Yes.  If he was there he came in late.

21   Q.   At the same meeting, the April 2 meeting, that is, Mr.

22   Singer, there was a request made to put up the matter for

23   membership ratification vote.  Do you remember that?

24   A.   Yes.

25   Q.   And do you remember that, I don't know which adviser it

```
 1   was, but one of the ALPA advisors said that there is no time

 2   for that?

 3   A.   I don't recall that.

 4   Q.   Do you recall whether or not anybody said, well, you

 5   didn't recall, I will move on.  Your testimony is you don't

 6   know what anybody said in response to that request?

 7   A.   That's correct.

 8   Q.   You mentioned Mr. Seltzer saying there is 100 percent

 9   chance of losing the bankruptcy motion.  Right?

10   A.   I believe all advisors that were there said that except

11   for Steve Tumblin.

12   Q.   Mr. Seltzer, did he, were you aware that the Friday

13   before your MEC meeting he had filed in the bankruptcy court

14   a rather lengthy brief opposing the 1113 motion?

15   A.   I do have a slight recollection of that.

16   Q.   Did he provide a copy of that brief to you at any time?

17   A.   I believe he did.

18   Q.   Did he take it -- was it there available to you during

19   the April 2 meeting?

20   A.   I don't recall.

21   Q.   Going in to the meeting, well, at the meeting did Mr.

22   Seltzer share with you any of the legal arguments that he had

23   taken and advanced before the bankruptcy court that he set

24   forth in his brief?

25   A.   I don't recall whether he said that at the meeting or it
```

1    was just in the documentation that I saw.

2    Q.   Mr. Singer, you are aware that this 1113, that that

3    special code, or special part of the Bankruptcy Code, sets

4    forth a number of factors that the bankruptcy court is

5    supposed to go through and make findings on, right?

6    A.   Yes.

7    Q.   I think it is a list of maybe nine things that the

8    bankruptcy Judge is supposed to consider.  Did Mr. Seltzer,

9    from making his presentation to you, outline what each of

10   those factors was, what it meant, and how he intended to

11   respond?

12   A.   Are you asking me specifics about a document that I

13   haven't seen in ten years?

14   Q.   I am sorry.  We got disconnected.  Did he make a

15   presentation in which he outlined to you what the law is and

16   when, what he had argued in his brief about the law?

17   A.   I don't recall.

18   Q.   You mentioned in response to Mr. Fram's question that

19   you were advised that had TWA one the bankruptcy motion, that

20   the bankruptcy judge would remove your entire contract,

21   right?

22   A.   Yes.

23   Q.   Including your union representation?

24   A.   That was a possibility.

25   Q.   You were told that if the Judge grants the motion, ALPA

1   won't be your union any more?

2   A.   That there would either have to be a voluntary

3   recognition by the TWA LLC, obviously with the permission of

4   American, or that they would have to have an election.

5   Q.   Okay.  I want to be clear on what it is you were told.

6   You were told that if the motion is granted that day, you

7   won't have a union?

8   A.   That is what I recall.

9   Q.   Okay.  All right.  A document already in evidence was

10  marked joint exhibit 136.  Okay.  Can we bring that up.  This

11  is the first page of?

12            THE COURT:  Has this already been marked?

13            MR. PRESS:  Yes, it was admitted.

14            THE COURT:  136.

15            MR. PRESS:  The first day of trial.

16            THE COURT:  J 136, okay.

17  Q.   This, Mr. Singer, this is the brief that Mr. Seltzer

18  filed in the bankruptcy court.  This is just the first page

19  of it.  Do you recognize it?

20  A.   I recognize it from what I am seeing right now.  I don't

21  have an independent  recollection of it.

22  Q.   Can we go to page 5, please.  I want to refer you to

23  paragraph 7 of this page.  Are you there?

24  A.   Yes, I am.

25  Q.   Can you read that?

Singer-cross/Press                                              188

1   A.    Subsection A of section 1 provides for recognition of

2   ALPA as the representative of TWA's pilots, and is the one

3   subsection of section 1 that TWA does not seek to reject.

4   Q.    This is the statement that Mr. Seltzer made to the

5   bankruptcy court.  TWA is not seek to go reject ALPA as your

6   union.  But he said something totally different to you that

7   difficult on April 2, didn't he?

8   A.    I do not recall.

9   Q.    I thought you just said that you were told that you will

10  lose ALPA, too?

11  A.    That is the impression that I had but I don't recall

12  that he made that statement, or that anybody else made it,

13  and it wasn't the basis of my decision that day.

14  Q.    I was going to ask you if that was important to you.  Do

15  you remember that as part of the scope waiver you have got

16  this letter from American Airlines and TWA that, well, from

17  American Airlines, that it would use its reasonable best

18  efforts to obtain a fair process.  Do you remember that?

19  A.    I do remember that.

20  Q.    And they were going to hire a facilitator to do that,

21  right?

22  A.    Yes.

23  Q.    Do you remember being told by the ALPA advisors that day

24  that that letter had teeth to it?

25  A.    I don't recall.

1    Q.   Do you recall them saying this letter is something that

2    would hold up in court and give you some protections, do you

3    remember that?

4    A.   No. No, I don't.

5    Q.   Well, were you told it is completely meaningless and

6    worthless?

7    A.   I doesn't recall.

8    Q.   You don't recall what was said about it, anything that

9    was said about it?

10   A.   At that specific meeting, no.

11   Q.   All right.  Can you tell me, independently, your own

12   opinion of that letter, do you hold, have the opinion that it

13   was a meaningless promise on American's part to hire a

14   facilitator?

15   A.   At that point in time --

16           THE COURT:  Excuse me.  Higher or use its best

17   efforts.  That is two different, are you asking just about

18   hiring a facilitator?

19   Q.   I will ask about the letter in its entirety.  Do you

20   have the opinion sitting there now that that was a wholly

21   meaningless promise on American's part as far as something

22   that would help you get a better seniority deal?

23   A.   You are asking me sitting here now?

24   Q.   Yes, sir.

25   A.   I already stated that seniority had no effect on me

1    personally.  And I believed that at that time and I believe

2    that at this time.

3    Q.  Well, let's then consider it not for you personally, but

4    for the TWA class of pilots that I represent?

5           THE COURT:  No -- oh, oh, yeah.

6    Q.  In Mr. Singer, looking back on it and sitting there

7    today, do you have the opinion that this reasonable best

8    efforts letter that you all got was a completely meaningless

9    promise as far as getting a better seniority deal.

10          MR. FRAM:  I object.  Is he asking about what the

11   witness thought then or asking with the benefit of hindsight

12   looking back today.

13          THE COURT:  Which is it?

14          MR. PRESS:  I asked today, sitting there now.

15          THE COURT:  I will let him answer.

16          THE WITNESS:

17   A.  Today I have no opinion.  I am no longer a pilot, as I

18   said at the time, it didn't affect me personally.  I can tell

19   you how I felt about it then.

20   Q.  How did you feel about it then?

21   A.  While I was still on the MEC, I felt that that that that

22   was part of the contract that we were accepting, that was the

23   best that we were going to get.

24   Q.  But you found some solace in that letter, that it was

25   going to give you some sort of protection?  Is that what you

```
 1    thought?

 2              THE COURT:  He said it was a class  --

 3    Q.   Can you answer the question?

 4    A.   Would you repeat it, please?

 5    Q.   Did you think that that letter, this reasonable best

 6    efforts letter, give protection to the TWA pilots?

 7              THE COURT:  On the seniority integration issue.

 8              MR. PRESS:  Yes.

 9    A.   I believed it was the best we could get from American

10    Airlines.  My decision was not based on that.  It was based

11    on the contract as a whole, and the circumstances surrounding

12    us that day.

13    Q.   Mr. Singer, when you, as part of the scope waiver

14    decision, you authorized Bob Pastore to enter into this

15    transition agreement.  Do you remember that?

16    A.   Yes.

17    Q.   Which was a collective bargaining agreement between ALPA

18    and the new TWA LLC?

19    A.   Correct.

20              THE COURT:  Which was really an American company.

21    TWA LLC was really American.

22              THE WITNESS:  Correct.

23    Q.   When you voted that way, by the way, you approved the

24    resolution, you were in favor of it, right?

25    A.   Which resolution.
```

1    Q.   The resolution to waive scope and sign this new

2    transition deal?

3    A.   The resolution that approved the new contract.

4            THE COURT:   The way you waived scope was you would

5    sign a new LLC, signed a new labor agreement that didn't have

6    any scope protection in it.

7    A.   That's correct.

8            THE COURT:   That is how you waived it.

9    Q.   That is not what you wanted, you wanted the asset

10   purchase agreement.  Under the asset purchase agreement all

11   you had to do was modify your existing collective bargaining

12   agreement to remove those provisions on scope?

13   A.   That is my understanding of the asset purchase

14   agreement.

15   Q.   And then somehow this whole thing morphed into a new

16   collective bargaining agreement which was not necessary under

17   the deal, was it?

18   A.   Well, it became necessary when the 1113 motion was

19   filed.  If we believed that they were going to remove our old

20   contract and we certainly wanted a new contract, whether or

21   not we were going to have union recognition or not.

22   Q.   Well, I am not following that logic.  You entered into a

23   new collective bargaining agreement to defeat the 1113

24   motion?

25   A.   Not to defeat it specifically.  But to, the negotiating

1    committee spent a grit deal of time developing a new

2    collective bargaining agreement.  There were many other

3    issues.  Our pension, our drugs and account plan which is the

4    equivalent of the pension, had not been funded for some time.

5    There was a lot of money on the table that we weren't going

6    to receive.

7              There was the issue of whether we were going to

8    receive --

9              THE COURT:  Did you receive it under the new

10   contract?

11   A.   We yes, we did.  It was an issue of whether or not we

12   would receive the pay raises that were under the old

13   contract.  We didn't have a contract, those pay raises, there

14   would be no reason for the company to give them to us as well

15   as how we would transition to American's work rules.   All

16   these were covered in the new contract with TWA LLC.

17   Q.   My question was a little different.  To defeat the 1113

18   motion or make it moot, all you had to do was modify your

19   existing agreement to remove the scope language, right?

20   A.   Yes.  But if we had done that, we wouldn't have had

21   these other protections.

22   Q.   Let's be specific what you are talking about.  What

23   protections?

24   A.   The pay raise.

25   Q.   Can we break them down one by one?

1          THE COURT:  He is giving them to you one by one

2    just a minute ago.

3    Q.   That is the pay raise?

4          THE COURT:  The pension.

5    Q.   What else?

6    A.   Back payments to the directed account plan.

7          Pay rates, the American pay rates which were higher

8    than the TWA pay rates.  And a mechanism for transitioning to

9    American's work rules.  Some of which were better than ours,

10   some of which were not.

11   Q.   The back payments on, to fund these retirement account.

12   Those were obligations under your old collective bargaining

13   agreement?

14   A.   I don't know whether they were obligations or not, but

15   they aren't being done by TWA.

16   Q.   Right.  There was no new obligation created by the new

17   collective were gaining agreement.  That is my point.

18   A.   There was a new company formed.

19         THE COURT:  The new company took over that

20   obligation.

21         MR. PRESS:  That's right.

22         THE COURT:  TWA LLC took over that obligation,

23   right.

24   A.   They did when we signed the contract.

25         THE COURT:  Right.  When the contract was signed.

```
 1    Q.   The pay rates, Mr. Singer, don't you remember in the

 2    asset purchase agreement it said that you will go to American

 3    pay or comparable pay on the day of the closing, which would

 4    have been April 10.  Do you remember that?

 5    A.   I don't remember that specifically.

 6    Q.   But what happened was under this new collective --

 7              THE COURT:  No, no, you can't testify.

 8    Q.   Under the new collective bargaining agreement you

 9    remember you didn't go to American pay rates until January,

10    '02?

11    A.   I remember that.

12    Q.   Do you also remember that under this new collective

13    bargaining agreement, you waived your 9,000 hour flight pay

14    loss bank?

15    A.   I remember that.

16    Q.   That was worth over a million dollars, wasn't it?

17    A.   I don't know how much that was worth.

18    Q.   That was not required by the asset purchase agreement,

19    was it?

20    A.   I don't know.

21    Q.   Well, you read it.  You really don't know?  The only

22    condition was you waived scope, not waiver your flight pay

23    loss benefit?

24    A.   At that point there was no reason for us to have a new

25    contract because we didn't know there was going to be a TWA
```

```
 1   LLC before we fully transitioned to American.  That came
 2   later.
 3   Q.   That's right.  I used the phrase morphed into that.
 4   When you voted on April 2 this new transition agreement, the
 5   new collective bargaining agreement, that was not in the room
 6   you with, you had never seen it, had you?
 7   A.   I believe I did.
 8   Q.   You believe so?
 9   A.   I believe so.
10   Q.   Who presented it to you?
11   A.   I believe the negotiating committee.
12   Q.   Are you just guessing about that?
13   A.   No.  I read some documents here that refresh my
14   recollection.  In fact, I read some documents that
15   specifically refer to the new contract.
16             THE COURT:  Mr. Press.
17             MR. PRESS:  Yes, Judge.
18             THE COURT:  How much more do you have?
19             MR. PRESS:  Not very much.
20             THE COURT:  Five minutes or so I have to go.  See
21   if you can finish it.
22   Q.   Were you told that your new collective bargaining
23   agreement would have no -- well, the old collective
24   bargaining agreement had an amendable date, it would be
25   amendable not until September, '03, correct?
```

Singer-cross/Press                                             197

```
 1   A.    I don't remember the date but I know it did.

 2   Q.    It was entered into in '98.  If I tell you it had a

 3   five-year deal, five-year term, does that sound about right?

 4   A.    That sounds about right.

 5   Q.    Which means that having this five-year, until it can be

 6   amendable, that means that no one can mess with your

 7   collective bargaining unless you agree to it, right?

 8   A.    That's correct.

 9   Q.    Now, were you aware that this new collective bargaining

10   agreement that you guys signed had a termination date, you

11   waived your amendable date and replaced it with a termination

12   date.  Do you remember that?

13   A.    I do not remember that independently.

14   Q.    Okay.  Now, had you not done that, and I say you, had

15   the MEC not done that and entered into a new collective

16   bargaining agreement and simply just modified your old deal

17   to remove the scope --

18           THE COURT:  That is a misleading question.  It is a

19   new employer.  The old employer, the old agreement doesn't

20   deal with the new employer.

21   Q.    Will you agree with me your old contract would have

22   applied to TWA LLC, leaving everything else alone?

23   A.    I don't believe so.

24   Q.    You don't believe that?

25   A.    No.
```

1   Q.   That is fine.

2          THE COURT:  You agree, Mr. Singer, you could have

3   waived your rights under the existing contract and left open

4   the issue of the contract for the time being, for the new

5   contract.  They weren't necessarily tied together.

6   A.   No, but of course there was the issue of the 1113,

7   still.

8          THE COURT:  Nevertheless, but as a conceptual

9   matter you could have just waived your scope rights under the

10  existing agreement and left for another day the negotiation

11  of the contract with LLC.

12         THE WITNESS:  Yes.

13  Q.   When you walked into the MEC, I am sorry, April 2 when

14  you walked into the MEC office that day you were not decide

15  order how you were going to vote?

16  A.   That's correct.

17  Q.   It was your understanding that that was the same for

18  most of the other MEC members?

19  A.   That's correct.

20  Q.   All right.  You certainly weren't aware of anybody going

21  to Steve Rautenberg and telling Mr. Rautenberg that you are

22  all going to vote to waive scope?

23  A.   No. When we left the hospitality room that night, I

24  believe it was only two members that I knew how they were

25  going to vote.

1   Q.   And that would be Rautenberg and Lewin?

2   A.   Rautenberg and Hollander.

3   Q.   Okay.  Do you remember David Holtzman?

4   A.   Of course.

5   Q.   He was the ALPA lawyer in your MEC office who worked

6   there full time, right?

7   A.   Contract administrator.

8   Q.   And he was a lawyer?

9   A.   Yes.

10  Q.   And it is your opinion that he did not do a good job,

11  correct?

12  A.   I never said he didn't do a good job.  I believe what I

13  said was I don't have an extremely high opinion of him as an

14  attorney.

15  Q.   Okay.  Wasn't it your testimony that he was not good at

16  his job?

17  A.   I don't believe I specifically said he wasn't good at

18  his job.

19  Q.   If you go to page 55 of your deposition, line 14.  Let

20  me know when you are there, Mr. Singer?

21            THE COURT:  Mr. Press, I have to go soon.

22            MR. PRESS:  This is my last question.

23            THE COURT:  Okay.

24  Q.   Mr. Singer?

25  A.   Yes.

1    Q.   And Mr. Fram actually asked you this question.  What was

2    your assessment of David in terms of his abilities as a

3    contract administrator, do you think, did you think he was

4    pretty good at his job?  And your answer was what?

5    A.   No.  And I further said I didn't think he was that

6    thorough.

7              MR. PRESS:  Correct.  That is all the questions I

8    do have.

9              THE COURT:  Okay.  Do you have redirect?

10             MR. FRAM:  No, there will be no redirect.

11             THE COURT:  Okay.  Captain Singer, you are free to

12   go.

13             THE WITNESS:  Thank you.

14             (Witness excused)

15             THE COURT:  And ladies and gentlemen, we will see

16   you tomorrow at 8:30.  Maybe even at 8:25.

17             THE CLERK:  I am not here tomorrow. So I doubt

18   that.

19             THE COURT:  But somebody will be here.  At 8:25  So

20   have a safe trip in, have a safe trip home.

21             Thank you once again for your participation, and do

22   not discuss this case among yourselves.  Do not discuss the

23   case with family, friend or loved ones.  Keep an open mind

24   until you have heard all the evidence.

25             All rise.

```
 1                    (Jury leaves the courtroom)

 2              THE COURT:  Who do you have tomorrow?

 3              MR. FRAM:  We will start with David Holtzman.

 4              THE COURT:  Start with David Holtzman.  Start with

 5   a high note.

 6              MR. FRAM:  If we get through him, our backup

 7   witness is Clay Warner.  Mr. Warner will be here if we need

 8   him.

 9              THE COURT:  In other words, your plan is Holtzman

10   first, and then Warner.

11              MR. FRAM:  If we get to him.

12              THE COURT:  Holtzman may be all day.  If for some

13   reason he is done at one o'clock, you are ready to go.

14              MR. FRAM:  Yes.

15              THE COURT:  Okay.  See you tomorrow.

16              Thank you very much.

17              (Adjourned at 2:15)

18

19

20

21

22

23

24

25
```

1

2                              I N D E X.

3

4            STEVEN RAUTENBERG, RESUMES.

5                  DIRECT EXAMINATION            P. 3.

6                  CROSS EXAMINATION             P. 100.

7                  REDIRECT EXAMINATION          P. 151.

8

9

10           DAVID SINGER, SWORN.

11                 DIRECT EXAMINATION            P. 155.

12                 CROSS EXAMINATION             P. 183

13

14

15

16

17

18

19

20

21

22

23

24

25