```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                          Plaintiffs,
 6                                          VOLUME 14
               V.                           TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                          Defendant.
 9
                                    CAMDEN, NEW JERSEY
10                                  JUNE  30, 2011

11        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                    A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                     AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:  STEVEN FRAM, ESQ.
19                   AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH  GINSBURG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3                              S/   LYNNE JOHNSON

4                              Lynne Johnson, CSR, CM, CRR
5                              Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17                    LYNNE JOHNSON, CSR, CM, CRR
18                    OFFICIAL COURT REPORTER
                     UNITED STATES DISTRICT COURT
19                    P.O. BOX 6822
                     LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

```
 1                  (The jury enters the courtroom.)

 2             THE COURT:  Good morning, everybody.

 3             Where in the United States of America is there a

 4   federal court that starts three minutes before 8:30.  I defy

 5   you to find any court anywhere.

 6             Mr. Fram.

 7             MR. FRAM:  Thank you.  On behalf of ALPA, we call

 8   David Holtzman to testify, please.

 9             DAVID HOLTZMAN, sworn.

10             DIRECT EXAMINATION.

11             BY MR. FRAM:

12             THE COURT:  Mr. Holtzman, try to keep as close to

13   the microphone as you can.

14             Okay.

15   Q.   Mr. HOltzman, good morning.

16   A.   Good morning.

17   Q.   Can you tell us, please, who you work for?

18   A.   I work for the Air Line Pilots Association.

19   Q.   Let's get some are some of your background.  How old are

20   you, please?

21   A.   I am 63.

22   Q.   Where did you grow up?

23   A.   Near St. Louis, Missouri.

24   Q.   Tell us about your education, please, starting with

25   college.
```

```
 1   A.    Sure.   I graduated from Washington University in St.

 2   Louis, with a bachelors in 1970, and with a master's degree

 3   from Washington University in 1982, in political science, and

 4   then with a law degree from St. Louis University School of

 5   Law in 1986.

 6   Q.    Did you practice law for a time?

 7   A.    Yes, I did.   With a labor law firm, Schuchhat, Cook &

 8   Werner in St. Louis.

 9   Q.    For how long did you do that?

10   A.    Five years as a practicing attorney.

11   Q.    And tell the jury a little bit what labor side law

12   involves?

13   A.    Well, in our particular practice, it involved

14   arbitrations, and we represented electrical workers and sheet

15   metal workers with various construction contractors.   We also

16   represented the Missouri National Education Association,

17   which is school teachers, and we represented unions and

18   individuals in court, before administrative agencies, and

19   before arbitrators.

20   Q.    You made a decision to move on from the practice of law

21   at some point?

22   A.    Well, I applied for a legal position in the

23   representation department in 1991.

24                THE COURT:   In ALPA?

25                THE WITNESS:  Yes.
```

1    Q.    Okay.  And I take it you were hired?

2    A.    Yes.

3    Q.    Did you at some point begin to assist the TWA pilots?

4    A.    Yes.  I was immediately assigned to the TWA MEC and the

5    TWA MEC office located then in Maryland Heights, Missouri.

6    Q.    And your position assisting the TWA MEC was what?

7    A.    Yes, my title was contract administrator.

8    Q.    Was this a full time position?

9    A.    Full time position, yes.

10   Q.    What were your responsibilities as a contract

11   administrator for the TWA MEC?

12   A.    A contract administrator is an on-site advisor to the

13   MEC, also to the MEC officers, and to the committees of the

14   MEC, including especially the negotiating committee, and the

15   grievance committee.

16   Q.    And for how long did you serve as a contract

17   administrator for the TWA MEC?

18   A.    Well, I served continuously until we closed the office

19   in 2002.

20   Q.    Give us a little bit more of a sense of what you do or

21   what you did on a day-to-day basis to work with the MEC.  For

22   example, the MEC had meetings?

23   A.    The MEC was, by Constitution and bylaws, required to

24   meet twice a year.  The TWA MEC usually had regular meetings

25   about four times a year, and ultimately had and also had

```
 1    special meetings sometimes two, three, four times a year.

 2    Q.   What role did you play in connection with the meetings

 3    of the members of the MEC?

 4    A.   Well, usually it was to appear with the committees that

 5    were giving reports that I had been working with, usually

 6    negotiating committee, the grievance committee, and the

 7    system board of adjustment which is the arbitration board

 8    under the Railway Labor Act, and air carrier collective

 9    bargaining agreement.

10    Q.   You started 1991, so you would have been working with

11    the MEC during the first two TWA bankruptcies?

12    A.   Yes.  The first bankruptcy was filed on January 30,

13    1992, and the second one on June 30, 1995 and those are

14    periods of more intense focus than in periods when the

15    carrier is not in bankruptcy so there are a day-to-day duties

16    that are different than the usual.

17    Q.   I want to focus you on the year 2000, the year leading

18    up to the third bankruptcy filing in January, 2001.  Can you

19    tell us what the TWA MEC was doing to be aware of TWA's

20    financial condition and to prepare for any potential

21    problems?

22    A.   When one committee was appointed, a new committee called

23    the scenarios committee, and it was chaired by Captain Ed

24    Johns.  And it had outside advisors and myself assigned to

25    it.
```

Holtzman-direct/Fram                                                  7

1              And the particular focus was to work with our

2    investment banker who we had retained, Michael Glanzer, and

3    the object really was to persuade TWA to do more than it had

4    been doing, or that we perceived it had been doing, to find a

5    merger partner.

6    Q.   You mentioned Michael Glanzer.  Do you recall when he

7    was retained?

8    A.   He was retained in the spring of 2000, March or April.

9    And we had had investment banker, a different investment

10   banker almost continuously throughout the nineties, and then

11   changed over to Michael Glanzer and his firm in 2000.

12   Q.   What specifically was Mr. Glanzer supposed to do to help

13   the TWA pilots?

14   A.   Well, the, it the investment bankers looked for

15   transactions.  That is their job.  Along the way they give

16   you financial advice in our case, financial advice about the

17   status of TWA, its financial condition, its month to month

18   performance, and various, explaining various financial

19   criteria that we should be concerned about.

20   Q.   Did you mention that there were other advisors who were

21   also assisting you and Mr. Glanzer to guide the TWA MEC?

22   A.   Yes.  Yes.  We also retained the firm of LeBouef, Lamb,

23   which had been chosen by the MEC back in about the same era

24   that I came to the MEC in 1991, and occasionally Ralph Mabey

25   would assist us.  He was a senior partner, a former

1    bankruptcy Judge in Utah, and at other times his partner,

2    Steve Tumblin, and it was Steve Tumblin who we worked with

3    most often with the scenarios committees.

4    Q.   What type of financial information about TWA were the

5    members of the MEC getting in 2000, either from Mr. Glanzer

6    or from Judge Mabey or from you?  Can you describe that for

7    us, please?

8    A.   I am sorry, I didn't understand the first part.  In

9    2000 you said?

10   Q.   Focusing on the period before the bankruptcy.  My voice

11   does not carry well.  Please speak up if you don't hear.  I

12   am going to try to stay close to the microphone.

13            I was asking you what type of financial information

14   were the  members of the TWA MEC getting before the

15   bankruptcy either from Mr. Glanzer or Judge Mabey in this

16   firm or from you.  Can you describe that in a little detail

17   for us?

18   A.   Yes, the MEC and myself and the advisors were all

19   signatory to confidentiality agreements with TWA.  We focused

20   on month-to-month data.  We had looked at month-to-month data

21   for ten years and you look at revenue, year over year, and

22   you look at revenue month to month and you look at cash.  You

23   look at what is happening on various expense categories,

24   importantly fuel, and you have a sense over time of how the

25   company is performing.

1    Q.   You just made a comment about the importance of fuel.

2    Can you explain to the jury why the cost of fuel is important

3    in the airline industry?

4    A.   Well, it is -- fuel is -- carriers buy fuel on a cash

5    basis.  So the headlines you see about the cost of oil

6    directly impact carriers bottom line on an immediate basis.

7    So short term rises in fuel are sometimes unforecastable.

8    Expense items that have a big impact on the company's bottom

9    line.

10   Q.   Did the MEC, before the bankruptcy filing in January,

11   2001, also getting information about what the board of TWA

12   was thinking?

13   A.   We did receive information through the ALPA appointed

14   board representative, Bob Pastore.  Steve Tumblin, the

15   outside counsel had been a -- had been our ALPA appointed

16   board member at a previous time.  He had contacts within

17   management and with the board.  He brought back information.

18   And we received reports from the CEO, Bill Compton also, from

19   the chief financial officer, Mike Palumbo.

20   Q.   You say we received reports.  Are you referring to the

21   TWA MEC?

22   A.   The MEC heard reports from Bill Compton from time to

23   time, the CFO reports from Mike Palumbo, and usually the

24   pilots and advisors with the scenarios committee.

25   Q.   Did those gentlemen, the CFO and Mr. Compton, did they

1   just send written reports up or did they come and sit with

2   the MEC face-to-face?

3   A.   Bill Compton would come to MEC meetings and meet

4   face-to-face.  With Mike Palumbo we would travel down town to

5   TWA headquarters and sit with him in his office and talk and

6   talk things over.

7   Q.   What kind of financial shape generally was TWA in in

8   late 2000?

9   A.   TWA was declining quickly in 2000.  Its share price had

10  dropped below a dollar a share.  The American stock exchange

11  had begun proceedings to de list TWA from the American

12  exchange.

13          October was a very poor month for revenue.  Fuel

14  was increasing, and the company was --

15          THE COURT:  This is October of 2000.

16          THE WITNESS:  October of 2000.

17  A.   The company was reaching out desperately for new

18  financing and to refinance or turn over loans with a

19  particular group of creditors and that was not going well.

20  And it was in extremely important condition.

21  Q.   Was TWA in compliance with all of its obligations,

22  financial obligations, to the TWA pilots?

23  A.   In December the company stopped paying contributions to

24  the pilots direct contribution plan called the directed

25  account plan or the  DAP.  And did not make -- TWA itself did

1    not make payments again.

2    Q.   Were there discussions within the MEC in late 2000 about

3    whether TWA had the ability to continue on a so-called

4    stand-alone basis, as a carrier that just operated without

5    getting taken over by somebody else?

6    A.   The evaluation that we received from Michael Glanzer was

7    that TWA could not be sustained as a stand-alone carrier,

8    overtime, and in fact, could not, or would not make it past

9    mid January due to cash shortfall.

10   Q.   Mid January of 2001?

11   A.   Of 2001.

12   Q.   At what point in time did you receive, did the MEC

13   receive that evaluation from Mr. Glanzer, do you recall?

14   A.   In November and throughout December.

15   Q.   And what was the sense, your sense, what did Mr. Glanzer

16   say about where things were going, what TWA's potential

17   future was?

18   A.   Michael Glanzer's view was that TWA needed a major cash

19   infusion via a transaction, in other words, a sale of TWA to

20   an air carrier immediately.  And that had been the object of

21   the scenarios committee, was to try and make that happen.

22   Q.   Tell us a little bit more about the scenarios committee.

23   Is this a committee made up of TWA pilots?

24   A.   Yes.

25   Q.   Do you recall who was on the committee?

 1   A.    Captain Ed Johns was the chairman.   I believe that Bill

 2   Kents, Captain Bill Kents was a member.   I believe that John

 3   Berlin was a member, also.   Those are the three pilots that I

 4   can recall right now.

 5   Q.    And what was this committee doing in terms of

 6   investigating potential transactions?

 7   A.    Well, the committee reviewed the work of previous pilot

 8   committees, and had a lot of knowledge and research about

 9   potential transactions.

10          The problem and the issue was to persuade

11   management to do something about it because the committee,

12   the MEC didn't think that Bill Compton was doing enough.   And

13   that really came to a head after the America West management

14   informed Compton and TWA that they were no longer in the game

15   for TWA, at least at that time, because they had some other

16   issues.

17          And America West had been a potential suitor and

18   there had been discussions including pilots over a couple of

19   years, so in September of 2000 we learned that America West

20   was no longer interested.   So that was kind of the last hope

21   that we knew about.

22          So the scenarios committee was trying to, really

23   trying to place Michael Glanzer in a position to shop the

24   airline to other carriers because again we did not believe

25   that management was doing enough.

1    Q.    Let's focus on who was involved in the MEC in late 2000,

2    who would have been getting the information and the parties

3    of the discussions.   You mentioned Captain Bob Pastore.   He

4    was the master chairman?

5    A.    He was at that time, yes.

6    Q.    Do you recall who the elected council representatives

7    were as of late 2000?

8    A.    You know, they change from time to time with elections.

9    At that time, Council 4, for example, a senior pilot Bill

10   Cliff was the captain representative and Pablo Lewin was the

11   first officer representative.

12          Council 3, which is St. Louis, Steve Rautenberg was

13   the captain representative.   Sally Young was the first

14   officer representative.

15          In New York, Council 2 was Howard Hollander and

16   captain rep and Dave singer as first officer representative.

17   Q.    When the bankruptcy was filed in January and the

18   American Airlines deal was announced, what was your reaction?

19   Were you surprised?

20   A.    I was very surprised, as were the pilots.

21   Q.    Why were people surprised about, were you surprised by

22   the bankruptcy?

23   A.    Well, the transaction came first, and then the

24   bankruptcy.   The transaction -- well, we --

25          THE COURT:   The transaction anticipated the

1   bankruptcy, a requirement of the transaction.

2               THE WITNESS:  In a sense a requirement.  I believe

3   they may have been separated by one day, I think January 9

4   and 10.  I could be open by a day.  But the asset purchase

5   agreement I think was January 9, and the bankruptcy would be

6   either January 9 or January 10, 2001.

7               But we had been having meetings about what to do

8   for pilots when they became unemployed by the shutdown of

9   TWA.

10  Q.   Sir, when were those meetings?

11  A.   Those were within the first week of January, 2001.  Bob

12  Pastore asked the group of people -- I think also in fact

13  including Captain Ed Johns, to see what could be done.  And

14  there wasn't much that we determined that you could really do

15  before the fact.

16              So we went from that kind of planning to the

17  announcement of a purchase by one of the strongest airlines

18  in the world.  So it was astounding.

19  Q.   Astounding in a good way?

20  A.   In a good way.

21  Q.   All right.  Let's focus on the period of January, did

22  you read, have an occasion to read the asset purchase

23  agreement to see what the terms of the transaction were?

24  A.   Yes.

25  Q.   Okay.  And what particular provisions did you think were

Holtzman-direct/Fram                                          15

 1  most, of most concern to the TWA pilots?

 2  A.   Well, there were two main provisions that were of

 3  concern initially.  One was a provision that said that the

 4  purchaser, American, would hire TWA pilots except those who

 5  had been terminated and there was also a phrase or a clause

 6  relating to general hiring practices.  And there were people

 7  who were afraid that they had left American without giving

 8  two weeks notice, they were afraid that they wouldn't be

 9  hired with this transaction so there was some nervousness

10  about that, which didn't prove out to be a problem.

11       But obviously, the big thing was there was a

12  requirement that TWA amend its collective bargaining

13  agreements so that scope, successorship, and the benefit

14  plans, would not carry over to American.

15  Q.   Did you have an understanding of why American made that

16  a condition of the deal, that scope and successorship be

17  waived?

18       MR. JACOBSON: I am going to object, your Honor, he

19  is being asked to read American's mind or intent.

20       THE COURT:  No.  I am going to let him answer the

21  question if he can.  If he knows.

22       MR. FRAM:  Just foundation, your Honor.

23  A.   You know, the one hot-button issue, of course, for

24  American was that it be able to satisfy its own pilot group

25  recognized by the Allied Pilots Association, and that was as

1    to the pilot group of employees or other employees, of

2    course.  But as to the pilots, that was a big concern to

3    American.

4    Q.   Was there something about the relationship, the

5    collective bargaining agreement between American Airlines and

6    its pilots that was important?

7    A.   Well, they had years of friction and problems between

8    management and the APA, and it was my perception that

9    American was trying to get along, make peace with its pilot

10   group.

11   Q.   Do you recall what the American Airlines contract said

12   about new pilots coming in?

13   A.   New pilots could be given seniority according to their

14   date of employment with American Airlines.

15   Q.   Is that what is referred to as being stapled?

16   A.   Stapled you generally go from one list to another.  This

17   is just you are hired and the date that you are hired

18   determines your seniority number.

19        THE COURT:  Here it is the date you were hired not

20   by the old airlines, but by American.

21   A.   Well, it would be any new pilot coming to American,

22   whether off the street --

23        THE COURT:  He would be treated, even if he had 30

24   years seniority, he would be treated as if he had just been

25   hired that day?

1    A.    That's correct.

2    Q.    Did the TWA MEC support the transaction, the American

3    purchase of TWA,  notwithstanding the requirement that scope

4    and successorship be waived?

5    A.    Yes, the MEC certainly did.

6    Q.    Okay.  Were they lukewarm about it, were they

7    enthusiastic about it, give us a sense?

8    A.    They were very enthusiastic about it and made press

9    statements to that fact, and later statements in bankruptcy

10   court supporting the transaction.

11   Q.    I wanted to show you one of those, D 294, which is not

12   in evidence.

13          I am handing you what has been marked as D 294 for

14   identification.  Do you recognize that as one of the

15   statements?

16   A.    Yes, I do.

17   Q.    This is a statement of the TWA Master Executive Council

18   submitted to, it looks like the commerce size and

19   transportation committee of the United States Senate?

20   A.    That's correct.

21          MR. FRAM:  I move D 294 into evidence, please.

22          MR. JACOBSON: No objection.

23          THE COURT:  D 294.  In evidence.

24   Q.    We are not going to spend a lot of time on this.  Were

25   statements similar to this one supporting the transaction

```
 1   issued to the press, issued to other governmental agency's

 2   and the like?

 3   A.   Yes.

 4   Q.   Bob Pastore, you mentioned before, was on the board of

 5   directors of TWA?

 6   A.   That's right.

 7   Q.   Did you recall him telling the TWA pilots that in his

 8   capacity as a board member that he had voted in favor of the

 9   transaction?

10   A.   Yes.

11   Q.   Any disagreement among the members of the TWA MEC, is

12   there anybody early on, let's say in January, who opposed the

13   transaction so, said this is a bad idea?

14   A.   I don't remember anyone, any pilot, saying we shouldn't

15   enter into the transaction at any time.

16   Q.   Tell us what the TWA MEC did internally to get organized

17   to move forward in terms of creation of committees and

18   communications, and all of that?

19   A.   Sure.  The immediate and first task was to appoint or

20   elect a merger committee to deal with the issue of seniority

21   integration with the Allied Pilots Association, merger and

22   acquisitions committee.

23        There were also other committees formed.  There was

24   a merger oversight committee formed, and the vice chairman,

25   Scott Shwartz, was named as chairman to that committee.
```

1          Bob Pastore made a delegation of responsibility on

2    the day-to-day basis, for bankruptcy matters he would count

3    on Bob Stow, the secretary treasurer to oversee ALPA's

4    involvement in the bankruptcy process and for the merger or

5    transaction more generally Scott Shwartz would be

6    responsible.

7    Q.   Was there also a negotiating committee that was

8    appointed?

9    A.   The negotiating committee is a standing committee and

10   had been in existence.

11   Q.   Okay.  I am going to walk you through a stack of

12   documents just so we have them out there.

13          THE COURT:  The negotiating committee was an MEC

14   committee.

15          THE WITNESS:  The MEC negotiating committee.  I am

16   sorry?

17          THE COURT:  It was a MEC committee.

18   A.   Yes.

19          THE COURT:  Their role is normally negotiating with

20   TWA.

21          THE WITNESS:  Correct.

22          THE COURT:  With management.

23          THE WITNESS:  Correct.

24          THE COURT:  That was their role.

25          THE WITNESS:  That part only changed slightly, but

1   you are correct.

2   Q.   Mr. Holtzman, I want to walk through some documents.  I

3   have handed you a stack.  I just want you to identify the

4   first one, please.  This is D 285 on top, your Honor.  None

5   of these are in evidence yet.

6          Do you recognize this as an emergency motion for

7   interim and fine relief that was filed by TWA at the

8   inception of the bankruptcy?

9   A.   Yes.

10         MR. JACOBSON: Objection, your Honor.  I would say

11  that is a leading question.  A little too leading.

12         MR. FRAM:  Your Honor, I will rephrase.

13         THE COURT:  I agree with you, but I am going to

14  allow it.  Okay.  Go ahead.

15  Q.   Mr. Holtzman, what is D 285, please?

16  A.   D 285 is TWA's emergency motion for interim and final

17  orders approving post-position financing.

18  Q.   And is this a document that came to your attention

19  shortly after the bankruptcy filing?

20  A.   Yes.

21         MR. FRAM:  Your Honor, I move D 285 in evidence.

22         MR. JACOBSON: No objection.

23         THE COURT:  D 285 in evidence.

24         Let me ask you one question.  The interim

25  financing, that is financing for TWA to keep flying while the

1    bankruptcy is going on?

2                THE WITNESS:  That's correct.

3                THE COURT:  And it was being provided or at least

4    the order sought to be provided was American Airlines was

5    going to provide the interim financing as lender pending the

6    closing of the deal.

7                THE WITNESS:  Correct.

8                MR. FRAM:  Thank you, your Honor.

9    Q.   Mr. Holtzman, did documents like this, filings, when

10   documents filed in the bankruptcy came to your attention, did

11   you have any responsibilities in terms of circulating them to

12   the members of the MEC?

13   A.   Yes.  I tried to circulate them at an appropriate time

14   either through the mail or at an MEC meeting.

15   Q.   Was there anything in this particular document that

16   jumped out at you in terms of TWA's ability potentially to

17   continue operating without a bankruptcy?

18   A.   Yes.  I had mentioned before a run, that TWA had been

19   trying to refinance with a particular group the creditors.

20   And on page 10 of this motion, paragraph 22 F, the accounts,

21   airline receivable asset-backed notes, the facility is

22   described, and this is an obligation of 100 million dollars

23   that TWA owed to this particular group of creditors.

24                And I believe it is on page 16, paragraph 39, it is

25   noted that the securitization facility matures on January 15,

 1   2001, after which all cash generated from sold receivables

 2   goes to pay down the securitization trust, a process which

 3   can take as much as 30 days.

 4          What that meant was that the main source of TWA's

 5   working capital, which was the receipt of accounts receivable

 6   on a daily basis, was going to be interrupted to the extent

 7   that this group of creditors were going to collect 100

 8   million dollars from TWA.

 9          So in effect they were taking TWA's working capital

10   for a month or more, to pay, capital to pay everything from

11   fuel to salaries and wages, and it was this particular

12   obligation that Mike Palumbo had described to us in October,

13   November, and December.

14   Q.   He was the CFO, Mike Palumbo was the CFO?

15   A.   He was the chief financial officer.  As a priority for

16   TWA to satisfy and hopefully to refinance this debt.  But

17   they were unsuccessful.  This group of creditors wanted their

18   money and it was going to be taken through this come reply

19   indicated process beginning January 15, 2001.

20   Q.   All right.  Let's talk for a couple minutes before we

21   move into these other documents about Section 1113.  Did you

22   know back in January what Section 1113 of the Bankruptcy Code

23   dealt with?

24   A.   Yes.

25   Q.   How did you know about Section 1113 before January of

1    2001?

2    A.   Well, as I said, I had been with a union side labor

3    firm.  I knew that 1113 grew out of I believe the Continental

4    bankruptcy in the mid eighties, and I knew, in the mid

5    eighties and I knew what it called for and how it had been

6    applied.

7    Q.   Any discussions about Section 1113 during the two prior

8    TWA bankruptcies that had taken place?

9    A.   No.  There -- during the two prior bankruptcies TWA

10   management needed the cooperation of its unions and there was

11   no discussion of 1113 during those two bankruptcies.

12           THE COURT:  Well, the pilots made concessions in

13   both of those bankruptcies, right?

14           THE WITNESS:  That's right.

15           THE COURT:  So there was no need to try to force

16   them, by rejecting their contract.  They voluntarily accepted

17   pay cuts.

18           THE WITNESS:  That is true --

19           THE COURT:  And work rule changes.

20   A.   And work rule changes.  That's correct.  My only

21   addition would be that management needed the ongoing

22   cooperation of the unions to make the airline run.

23   Q.   How soon after the third bankruptcy filing in January of

24   2001 did the possibility of a Section 1113 motion come up?

25   A.   It came up early on in our first meetings with Roland

```
 1   Wilder who was the merger counsel that the MEC chose, and we

 2   met in his offices in Washington, DC.  And --

 3   Q.   Tell us when was that meeting, please?

 4   A.    This was approximately January 21, 22, 23, 2001.

 5   Q.   And who was present at the meeting, please?

 6   A.   I was present with the merger committee, and the merger

 7   committee at that time was Bud Bensel, Gary Flor, Sean

 8   Clarke, John Swanson and John Hefley.

 9   Q.   What was said about the possibility of a Section 1113

10   motion at that meeting on January 21, 22, 23, of 2001?

11   A.   A lawyer in Roland Wilder's firm had signed his son,

12   Bill Wilder, mentioned that TWA might resort to a 1113 to

13   amend the collective bargaining agreement to take out the

14   scope, successorship and benefit obligations.

15            And it was his opinion that the union could defeat

16   such a motion.

17            THE COURT:  Could defeat?

18            THE WITNESS:  Could defeat the company's

19   application for such a motion if that occurred.

20   Q.   Did he explain at that time why he thought the union

21   could defeat such a motion?

22   A.   Not really, no.

23   Q.   Did there come a point where a negotiated, where the

24   negotiating committee began to talk with TWA about trying to

25   amend the contract?
```

1   A.   Yes.   TWA management approached the MEC first with a

2   letter to Bob Pastore and then by setting up a meeting with

3   the negotiating committee.  I believe the first meeting was

4   February 28, 2001.

5              THE COURT:  It would have been the negotiating

6   committee, not the merger committee.

7   A.   Negotiating committee.

8   Q.   What role did you play in the negotiating committee?

9   A.   Well, I was adviser, as contract administrator, adviser

10  to the committee and that meant spending a lot of time with

11  the committee, including at the bargaining table.

12  Q.   All right.  I want you to flip, skip over the next

13  document in the pile because we already talked about it.  I

14  want you to turn to D 212.  Do you have that in front of you?

15  A.   Yes.

16  Q.   What is D 212 please?

17  A.   D 212 are the notes taken at that first meeting by our

18  paralegal, brook lance.

19  Q.   That is the first meeting of the negotiating the

20  negotiating committee with TWA?

21  A.   That's correct.

22             MR. FRAM:  I move D 212 into evidence.

23             MR. JACOBSON:  No objection.

24             THE COURT:  D 212 in evidence.

25  Q.   Let's bring it up and spend a minute on it.  On the top

1    of the document is giving us the date and location as well as

2    the people who participated?

3    A.    Yes.

4    Q.    And the company people on the left were who?

5    A.    Terry haze was vice president of labor relations for

6    TWA.  And Bernie Plum  was outside labor counsel hired by

7    TWA.

8    Q.    Then on the right side it lists you along with the

9    members of the negotiating committee?

10   A.    Ron Kiel and Alan Altman were members of the negotiating

11   committee.  Mary Ulett was a benefit specialist officer at

12   the headquarters.  Vince Lombardi was a pilot and a member of

13   the retirement and TWA MEC retirement and insurance company

14   me.  And of course Brook Lance was the paralegal taking the

15   notes.

16   Q.    Let's talk for a minute about your role with this

17   committee.  Was your role in working with the negotiating

18   committee to tell the pilots what did what to do?

19   A.    No, certainly not.

20   Q.    What was your role?  Describe it for us.

21   A.    Well, a contract administrator working with the

22   committee does make suggestions, does give advice, and does

23   talk about the history of a, for example, of a particular

24   contract provision, if the pilots are unaware of the history

25   many times the pilots are more aware of the history than the

1    contract administrator's are.  But generally to prepare, and

2    to be as well prepared as possible to meet face-to-face with

3    management.

4    Q.   Is there any ALPA rule or understanding that when a

5    contract administrator gives advise, that the pilots are

6    supposed to follow it?

7    A.   No.  No.  You, you know, the pilots are very independent

8    minded people.  They are well educated.  Many of them have

9    training and careers in other fields, the law, finance, and

10   they are well prepared to make their own decisions and they

11   do make their own decisions.

12   Q.   How about at the MEC level generally, is it your role as

13   the contract administrator to tell the MEC what kinds of

14   decisions to make?

15   A.   No. You just can't do it.  You know, it is not really

16   professional to do so.  But it is not something you can

17   succeed at, because the MEC makes the decisions and they take

18   that responsibility seriously and they, you know, for

19   example, they often have executive sessions.  Sometimes they

20   say pilots only, which means staff and advisors and everyone

21   who is not a TWA pilot leaves the room.  Other times it is an

22   executive session with named exceptions.  In other words, you

23   know, Holtzman and Steve Tumblin, you know, stay in the room

24   with us.

25            And they run the show, basically.

1   Q.   Were there occasions with the TWA MEC, we are going to

2   focus on the period leading up April 2 in a little bit, were

3   there occasions from after the bankruptcy up until April 2 of

4   2001 when you were excluded from the room?

5   A.   There were.

6   Q.   Well, the MEC went into executive session, yes?

7   A.   Well, often they excluded everyone but pilots from

8   discussions with the merge her committee, not always, but

9   usual.  (Merge her (.

10  Q.   The merger committee also had meetings with their

11  counterparts at American Airlines?

12  A.   Yes.

13  Q.   Did you play the same roll in working with the merger

14  committee that you did with the negotiating committee,

15  meaning being there and giving advice and the like?

16  A.   I did, except that it was secondary to the fact that we

17  had retained Roland Wilder as counsel for the merger

18  committee.

19  Q.   But when the pilots met, when the two pilot groups met

20  --

21  A.   Yeah, Roland Wilder and I were both excluded from the

22  meetings of the two groups at the insistence of the Allied

23  Pilots Association.  They didn't want to have lawyers.  They

24  didn't have lawyers present either but we were excluded from

25  that.

1  Q.   Was there ever a situation during the entire year of

2  2001 where you were present when the merger committee's of

3  the two pilot groups were meeting?

4  A.   No, there was not.

5  Q.   Let's look through a couple documents here.  The next is

6  D 3 79.  Looks like an agenda from March 1, 2001, conference

7  call?

8  A.   That's correct.

9  Q.   What role did you play in preparing this?

10 A.   It was an occasion to bring together the staff and

11 outside professionals that were working with the TWA MEC, and

12 from time to time we would either meet or have conference

13 calls, including pilots, whenever possible, to bring each

14 other up-to-date as to recent developments in the bankruptcy,

15 recent developments in the negotiations between the

16 negotiating committee and TWA and also of course between the

17 TWA MEC merger committee and the APA merger committee.

18            MR. FRAM:  Your Honor, I move D 379 into evidence,

19 please.

20            MR. JACOBSON: No objection.

21            THE COURT:  D 379 in evidence.

22 Q.   Mr. Holtzman, I have sort of jumped from the bankruptcy,

23 in one, 2001.  Were there meetings of the TWA MEC, formal or

24 special meetings, between, that took place between January,

25 2001 and the date of this memo?

1    A.    Yes.

2    Q.    Do you recall approximately how many?

3    A.    There was January 11, 2001 and January 17 and 19, 2001.

4    I think the next one might have been February 15 or 16, and

5    then these are and then either March first or second, 2001.

6    Q.    What is agreed between the meetings, are members of the

7    MEC communicating with each other and communicating with you?

8    A.    They communicate a lot with each other, which, you know,

9    frankly we were, the staff is generally not in the loop on,

10   but we did, Scott Shwartz, did initiate conference calls

11   usually on a Wednesday at 11:00 a.m., which also included

12   Keith O'Leary who was the communications committee chairman.

13   And the purpose was just on a weekly basis to keep every one

14   in the loop on recent developments, and including especially

15   the communications committee which would then, you know,

16   filter out and filter out to the pilot groups with

17   information.

18   Q.    Referring back to D 379, you see in the first paragraph

19   under pressure on unions from American, Holtzman's view, it

20   says American is putting pressure on its own unions with the

21   concept of TWA airlines LLC and on it was unions by talk of

22   Section 1113.

23         March 1 is before the Section 1113 motion is

24   actually filed.

25   A.    Correct, yes.

1    Q.   And I see there are some other discussion in there.

2    Then it says comments and questions.  The list of people

3    there, were those people on this call?

4    A.   The staff and professionals were on the call.  I am not

5    sure about Tim Walsh.  Tim Walsh was an attorney with LeBoeuf

6    Lamb in the New York office, and Ron Kiel I think was on this

7    occasion.  But we would attempt to bring the pilots in on the

8    calls, but pilot keep their own schedules, so sometimes they,

9    sometimes to a greater degree, sometimes to a lesser degree.

10   I am not exactly sure on this particular call.  I believe Ron

11   Kiel was on this particular call but beyond that I am not

12   sure.

13   Q.   Mr. Kiel was the chairman of the negotiating committee

14   at this point?

15   A.   Yes.

16   Q.   Let's see the top of the second page, possible

17   negotiating committee positions.  What should the negotiation

18   committee response to the demand for waivers mad -- I am

19   sorry -- what should be the negotiation committee's response

20   would have been for waivers made by TWA on 2/28.  What was

21   the demand for waivers referring to?

22   A.   That was the demand of waivers referred to in the asset

23   purchase agreement for waivers of scope, successorship,

24   benefit, on applicability.

25   Q.   Then it says,  it says, "Also, what are the 1113

```
 1    implications of the following possible responses?"

 2              Are those a list of issues that you outlined for

 3    consideration?

 4    A.   Yes.

 5    Q.   And why did you take the time to do that?  What

 6    possible, what potential importance did you see Section 1113

 7    having?

 8    A.   Well, 1113, at this time of course was not yet filed.

 9    But of course, 1113 takes the contract and rejects it.  And

10    the -- and so it is of great importance to understand the

11    implications of 1113 in different situations and different

12    contexts.

13    Q.   Let's walk through a couple of these documents quickly.

14    The next document you should have is D 350, and you have --

15              THE COURT:  I am sorry.  D 250?

16              MR. FRAM:  D 350.

17              I will do these en masse, if it okay.

18    Q.   Are D 350, D 352, D 217, and D 354, all minutes of

19    negotiating committee meetings with TWA that you attended.

20    A.   I would say no, because the paralegals aren't trained to

21    take verbatim minutes.  So if you accept notes, yes, they

22    are.

23              MR. FRAM:  Your Honor, I am going to move those

24    into evidence, D 350.  352 --

25              THE COURT:  D 350, D 352, D 217 and D 354.
```

```
 1                MR. FRAM:  Yes.  Thank you.

 2                MR. JACOBSON: No objection, your Honor.

 3                THE COURT:  Then those four exhibits are in

 4    evidence.

 5    Q.   Tell us generally, Mr. Holtzman, what is the negotiating

 6    committee trying to do in the meetings that are taking place

 7    as requested in these notes?

 8    A.   What we are trying to evaluate is how to respond, at

 9    this time, March first, to the demand as it was initially

10    presented to us.  And one of the main questions is do we ask

11    TWA, and through TWA to American, and to the management of

12    the new entity,  which was about to be created, TWA Airlines,

13    LLC, do we ask for a process agreement which would also

14    necessarily be something that the APA would need to agree to,

15    in lieu of the waiver of scope and successorship.

16                If we could have a process agreement that would

17    give us arbitration, we would have the equivalent of what we

18    would be giving up about with the labor protective provisions

19    or scope.

20    Q.   Tell us in a little more detail, what us a process

21    agreement?  Does a process agreement necessarily evolve or

22    potentially end with an arbitration?

23    A.   It doesn't have to.  A process agreement is just what is

24    suggested is some sort of process or procedure for the

25    parties to work through issues,  and come to an agreement on
```

```
 1   a --

 2            THE COURT:  This would be an agreement between the

 3   two unions?

 4            THE WITNESS:   It would be, it would need to have

 5   the agreement of the two years.  If the two unions agreed,

 6   the management would certainly agree.  But they would need to

 7   be -- at least American would meet with the signatories as

 8   well.

 9            THE COURT:  And why would American meet with the

10   signatories?

11   A.   Well, because they are the party that has the collective

12   bargaining agreement with the APA.

13            THE COURT:  If TWA LLC, that is American.  Right.

14   So you later have to approve it.

15   A.   Yes, yes, I agree.  Yes.  More correctly it would be the

16   LLC  that would be -- no,  it would be American, because

17   American and APA have the agreement that would put all new

18   hires at the bottom of the list.  So it would need to be

19   American, it would be perhaps a one-time amendment to the

20   green book, the agreement with American and the APA.

21            MR. FRAM:  Thank you, your Honor.

22   Q.   All right.  Just a couple more documents.  D 219.  What

23   is that, please?  Tell us.

24   A.   Do you have that one handy?  D 219, the first page is a

25   fax cover page, second page says ALPA response to TWA request
```

1    for transition sensitivities.

2    A.   I think I do.  Give me one moment.   I have it.

3    Q.   Just to move this along.  Is that a document that was

4    generated as part of the discussions between the negotiating

5    committee?

6    A.   Yes.

7            MR. FRAM:  Your Honor, I move D 219 into evidence,

8    please.

9            MR. JACOBSON: No objection.

10   Q.   D 220, is that the next one, another document generated

11   as part of these discussions back and forth?

12   Q.   ALPA's counter proposal with TWA revised proposal?

13   A.   I have it.

14           MR. FRAM:  I move D 220 into evidence, please.

15           MR. JACOBSON: No objection.

16           THE COURT:  Okay.  D 220.

17   Q.   Did there come a point where you went to bankruptcy

18   court in Wilmington, in early March, I guess the beginning of

19   the second week of March?

20   A.   Yes.

21   Q.   What was happening in the bankruptcy court with respect

22   to TWA at that point?

23   A.   The Court was considering the bids for the sale of TWA,

24   and the only qualifying bid was American Airlines, and a

25   final hearing on that was required and the TWA MEC was in

1  town in Wilmington, Delaware, to attend those meetings and to

2  have an MEC meeting.

3  Q.   Did you have occasion while you were in Wilmington at

4  that point to interact with representatives of TWA?

5  A.   Yes.  On the walk to the courthouse on, believe it was

6  the 9th, Ron Kiel, the negotiating committee chairman, was a

7  block ahead of me, and as he got in the elevator he said that

8  he spoke with Terry Hayes, vice president of labor relations,

9  of TWA, who handed him a document which was a proposal, and

10  it contained one paragraph which was, later came to be called

11  a regional best efforts letter.

12         And when I arrived at the courthouse Ron Kiel gave

13  the letter to me and I met up with Roland Wilder and we

14  reviewed it and decided that we should meet with Terry Hayes

15  and Bernie Plum actually in the courthouse that morning.

16  Q.   Did you in fact meet with them?

17  A.   Yes.  Roland Wilder and I and Alan Altman met with

18  Bernie Plum and Terry Hayes.  The clerk of the Court actually

19  let us sit in the courtroom to talk.

20  Q.   And what comments or what discussion was there involving

21  Mr. Wilder about that proposal?

22  A.   Well, Mr. Wilder told Terry Hayes and Bernie Plum

23  basically that the proposal, the regional best efforts

24  letter, was insufficient, that he needed to have a full

25  process agreement with an arbitration feature, and that also

1    that TWA -- that the -- yes, the TWA MEC had filed a

2    grievance to a violation of section one of the agreement, by

3    proposing that we waive scope and by making --

4              THE COURT:  Who was the grievance against, TWA,

5    Inc.?

6              THE WITNESS:  That's correct.

7              THE COURT:  By agreeing to the contract of sale

8    with the waiver in it, they were violating the labor

9    contract.

10             THE WITNESS:  That is exactly right.

11   A.   And further, that if necessary, that ALPA would be

12   willing to go to court to uphold the contractual provisions

13   which called for, what is called Allegheny Mohawk, and --

14             THE COURT:  Allegheny Mohawk is a provision that

15   provides for arbitration, basically.

16             THE WITNESS:  Correct.  And that we were willing,

17   Mr. Wilder said, to bring an action which would stay the

18   closing of the transaction.

19   Q.   So an action to enjoin the American purchase of TWA

20   assets?

21   A.   That's right.

22   Q.   What was your reaction?  This is March 9 of 2001?

23   A.   Yes.

24   Q.   What was your reaction when Mr. Wilder made these

25   statements to the representatives of TWA?

1            MR. JACOBSON: Objection, your Honor.  I think

2   reactions of that type aren't facts in evidence.

3            MR. FRAM:  Your Honor, I will rephrase.

4            THE COURT:  Good idea.

5   Q.   Had there been any prior discussions at the MEC level

6   about going to court and trying to enjoin the transaction?

7            MR. JACOBSON:  I am going to object to this one.

8   There is no foundation that this man was present at all MEC

9   discussions.

10           THE COURT:  Well, he obviously, limit your answer

11  to discussions where you were present.

12  Q.   Let's put a finer point on it.  Mr. Holtzman, was there

13  a single meeting of the TWA MEC between the bankruptcy filing

14  and March 9, 2001, that you did not attend?

15  A.   There was not a meeting that I did not attend at least

16  part of.

17  Q.   Okay.  And you said you didn't attend part of the

18  meeting.  What did you do to make sure you were up-to-date on

19  what had been discussed?

20  A.   I spoke to people who did attend the meeting.

21  Q.   To your knowledge had there been any discussions before

22  Mr. Wilder made this threat -- let me phrase differently.

23           Had there been any authorization of any kind from

24  the TWA MEC before Mr. Wilder made this threat for him to

25  make the threat or for the MEC to go to court.

1           THE COURT:  The threat, the threat would be made

2    not to your own client, it would be made to the other side.

3           MR. FRAM:  Yeah.

4           THE COURT:  So there is no testimony here that the

5    other side was threatened to sue.  We are talking about

6    advise he is giving to his own client.

7           MR. FRAM:  No.  Mr. Wilder made the threat to the

8    representatives of TWA on March 9.

9           THE COURT:  All right.

10          MR. JACOBSON: Your Honor, the objection would be

11   that he hasn't set a foundation that he is aware of any of

12   the activities within the MEC executive sessions.

13          THE COURT:  Well, if he was present when a threat

14   was made to TWA, that they are going to sue him or seek an

15   injunction of the transaction, I am going to let him testify

16   to that.

17   Q.   Focusing --

18          THE COURT:  Whether he was present at every MEC

19   executive session or not.

20   Q.   To your knowledge did Mr. Wilder have authorization from

21   the TWA MEC that threatened to file a lawsuit against TWA and

22   American to enjoin the entire transaction?

23   A.   To my knowledge, he did not.

24          THE COURT:  Did he do that?  Did he threaten TWA

25   with a suit?

1    A.    Yes.

2              THE COURT:   When?

3              THE WITNESS:   On March 9.

4              THE COURT:   You were present for that?

5    A.    Yes.

6    Q.    All right.   Now, did Mr. Wilder subsequently raise this

7    idea of a possible lawsuit with the MEC?  Do you recall that?

8    A.    He discussed a theory of filing such a suit.  It was not

9    in the context of asking for authorization.  It was in the

10   context of describing what action might be taken.

11   Q.    All right.   What happens at the bankruptcy hearing in in

12   connection with the judge's consideration of the transaction,

13   what was the end result?

14   A.    The Court approved the bid of American Airlines for TWA

15   assets.

16   Q.    And you recall the date when that was approved?

17   A.    It was either that Saturday, the 10th, or Monday, the

18   12th.

19   Q.    All right.  Let me hand you a document that may refresh

20   your memory, and I have a couple more issues here.

21              Do you recognize D 231 as the bankruptcy court's

22   order approving the American bid for assets?

23   A.    Yes,

24              MR. FRAM:   I move that into evidence.

25              MR. JACOBSON:  No objection.

```
 1              THE COURT:  D 231 in evidence.

 2   Q.   The next is D 381.  Do you recognize that as an agenda

 3   that you prepared and had circulated on March 12, 2001?

 4   A.   Yes, I do.

 5   Q.   I move D 381 in evidence.

 6              MR. JACOBSON: Did you give me D 381?

 7              MR. FRAM: Should be the next one.

 8              MR. JACOBSON: You bundled them together.  I am

 9   sorry.

10              MR. JACOBSON: No objection to that one.

11              THE COURT:  That was previously marked into

12   identification.  There was no objection.  That will be in

13   evidence.

14   Q.   Let's project that.  Mr. Holtzman, this is an email of

15   March 12, an agenda for what, meeting, phone conference on

16   March 15?

17   A.   This was an agenda for an in-person meeting at the ALPA

18   headquarters building in Herndon, Virginia.

19   Q.   And looks like the topic there is TWA scope, seniority

20   integration and Section 1113 issues?

21   A.   Correct.

22   Q.   Had the Section 1113 motion been filed yet?

23   A.   No.

24   Q.   Then why are you circulating agenda that is focused on

25   Section 1113?
```

1   A.   Well, it had become evident that this was a possibility.

2   Q.   Who attended the meeting actually took place --

3            THE COURT:  He said it was evident.  How did it

4   became evident?

5            THE WITNESS:  Well, Scott Shwartz was our MEC vice

6   chairman.  He had a conversation with Kate Soled, the general

7   counsel to TWA, and asked how is it going with the IAM.  She

8   said not well.  He asked what the company would be doing

9   about that, and she said we are thinking about filing a 1113

10  motion.

11           So I knew from that that if they were considering

12  it for the IAM, that they would be considering it for our

13  union as well.

14  Q.   Did this meeting take place on March 14?

15  A.   Yes.

16  Q.   In preparation for the meeting did you ask some of

17  advisors to do some research about Section 1113 and some

18  other issues?

19  A.   Well, the -- to be prepared to speak to these particular

20  issues.  These were people who had, many of them had

21  experience in labor issues.  And would be up-to-date on

22  recent developments.

23  Q.   And the next two documents in front of you.  D 378 and D

24  380, are those memos that you prepared and circulated

25  requesting some research on 1113 and Railway Labor Act

1    issues?

2    A.   Yes.

3            MR. FRAM:   Your Honor, I move D 378 and D 380 into

4    evidence, please.

5            MR. JACOBSON: No objection to those.

6            THE COURT:   Okay.  Give me a second.

7            D 378 was already marked for identification.  That,

8    without objection, is in evidence.  Same with D 380, that was

9    previously marked for identification and is now in evidence

10   without objection.

11   Q.   So we have the time line, I am going to put up where I

12   hope the people can see a blowup of some of the events from

13   late February and to early March.  Can you see that okay, Mr.

14   Holtzman?

15   A.   Yes.

16   Q.   All right.  So let's talk about these memos quickly.

17   The first memo, D 378 is from you to Richard Seltzer.  Tell

18   us, please, who Mr. Seltzer was and what involvement he had

19   with the TWA MEC?

20   A.   Richard Seltzer is an attorney with the firm of Cohen,

21   Weiss and Simon.  Cohen, Weiss and Simon is general counsel

22   to the Air Line Pilots Association.  Richard Seltzer had

23   worked with the TWA MEC in the 1992 bankruptcy, and he is

24   well known as an experienced advocate and expert on

25   bankruptcy issues, especially with regard to labor.

Holtzman-direct/Fram                                          44

1    Q.   Had he been involved in helping the TWA pilots before

2    the date of this memo?

3    A.   Yes.

4    Q.   And what had he been doing with respect to bankruptcy?

5    A.   He worked with the Utah office of the bankruptcy, of the

6    firm that I mentioned, LeBoeuf Lamb, and they had also,

7    again, LeBoeuf Lamb being principally Ralph Mabey and Steve

8    Tumblin, and Richard and Ralph Mabey and Steve Tumblin had

9    worked together in the 1992 bankruptcy and had arranged

10   communications so that they would be coordinated, that they

11   would be both the, our legal representatives in the current

12   TWA bankruptcy, and they would take on a take on different

13   parts of the representation, and consult with each other.

14   Q.   Focusing on this memo, you wrote, this is D 378.

15   Richard.  This is a restatement of the question I raised with

16   you at the courthouse on Saturday.

17         The courthouse you are referring to there was the

18   bankruptcy court in Delaware?

19   A.   Yes, in Wilmington, Delaware.

20   Q.   The first question was assuming that TWA would use the

21   available April 6 court hearing for Section 1113 hearing

22   against ALPA, and assuming also that no agreements or waivers

23   are concluded between ALPA and TWA slash LLC or American,

24   what is the latest date that TWA could file a motion to

25   reject the pilots CBA for hearing on April 6?

1          What was it about the April 6 date that was causing

2    you concern?

3    A.   Well, the bankruptcy court in Wilmington set aside a

4    certain number of days each month for the TWA case.  And

5    April 6 was one of those dates.  So it was, at this point, it

6    was a date that was soon going to be upon us.  So the

7    question here is will the 11 13 motion be filed in time to be

8    docketed for April 6.

9    Q.   The second question you raised in this memo, if American

10   continues to insist on scope waiver, ALPA refuses and no

11   substitute agreement is concluded, will TWA prevail against

12   ALPA on Section 1113.  Why was that important?

13   A.   Well, that is important because it, number 1, it would

14   accomplish the requirement of the asset purchase agreement to

15   strip away those provisions that American had required of TWA

16   for the transaction that follows.  And it would also, if

17   granted, would reject the entire collective bargaining

18   agreement between TWA and ALPA.

19   Q.   I am not going to spend time on the other questions, but

20   I see on the second page the bottom, you have got carbon

21   copies to quite a few people.   Am I correct that the first

22   five people list listed there are all pilots?

23   A.   Yes, that's correct.

24   Q.   And Mr. Day was the chairman of the merger committee.

25   Mr. Kiel at that point was the chair of the negotiating

1   committee?

2   A.   Yes.  Mike Day had recently assumed the position of

3   merger committee chairman from Bud Bensel.

4   Q.   And then the second memo we talked about is D 380 in

5   evidence.  That is a memo you sent to Clay Warner, also March

6   13?

7   A.   Yes.

8   Q.   And you had a series of questions for Mr. Warner that

9   dealt with various bankruptcy issues.  Correct?

10  A.   Yes.

11  Q.   If you would focus on the second page, Paragraph 2.  You

12  had a specific question for him under 2.  If the bankruptcy

13  court rejects the TWA ALPA CBA in whole or in part under

14  Section 1113, and assuming further that after closing the TWA

15  LLC employees, former TWA pilots, and operates the purchased

16  assets and given that American has stated that it will

17  recognize ALPA at closing, A, what will be the collective

18  bargaining obligations?  I am paraphrasing.  And B, assuming

19  that scope and successorship provisions of TWA ALPA CBA are

20  rejected, is there a statutory non-contractual argument under

21  the RLA that the LLC is a successor to TWA.  It goes on.  The

22  RLA refers to the Railway Labor Act?

23  A.   Yes.

24  Q.   That is the federal statute that governs not just

25  railway workers, but also pilots?

1    A.    Also air carriers.

2    Q.    And the third page of the document shows that you sent

3    carbon copies of the memo to the same people we discussed

4    before?

5    A.    Yes.

6    Q.    Did the TWA pilots, I am jumping ahead, but did the TWA

7    pilots get answers to and advice about the issues that you

8    outlined in these March 13 memos before they made a decision

9    on April 2 to accept the new collective bargaining agreement

10   and waive scope?

11   A.    Yes, they did.

12   Q.    This meeting that you had scheduled in the prior

13   document, the March 12 email scheduling the March 14 meeting.

14   Do you recall who was present at that meeting?   That  would

15   have been the day after the two memos we just talked about.

16   A.    The only pilot that I can be sure of at this time that

17   attended was Scott Shwartz.   I believe the other staff

18   members, and advisors did attend.

19   Q.    Okay.   Flip a long until you come to D 12.   I am going

20   to skip a couple of these documents.   Which is a motion by

21   TWA under Section 1113.   I want you to --

22              THE COURT:   Is that already in evidence?

23              MR. FRAM:   I am not sure it is.   I don't think it

24   is, your Honor.   Let me check.   It is not.   I am told it is

25   not.

```
 1              THE COURT:  It is not in evidence.  I have it.
 2              MR. FRAM:  I am going to move D 12, which is the
 3    motion and D 211 which is the declaration of Terry Hayes in
 4    support.  I will move those in evidence.
 5              THE COURT:  What is the other one?
 6              MR. FRAM:  D 211, your Honor.
 7              MR. JACOBSON: No objection to D 12.
 8              THE COURT:  What is the objection?
 9              MR. JACOBSON:  It has a lot of hearsay.  I am
10    trying to decide.  I may not.
11              THE COURT:  Let me know when you are ready.
12              MR. JACOBSON:  I will let it all in.
13              THE COURT:  D 211 is in evidence and of course D 12
14    is in evidence.
15    Q.   Thank you, your Honor.  So just to move this along.  You
16    received copies of these documents, the actual motion
17    supporting certification shortly after they were filed?
18    A.   Yes, I believe the company provided those to us
19    initially.
20    Q.   The company, the TWA negotiating committee?
21    A.   Yeah, the management team provided us with a copy, and
22    then we also received them from our own bankruptcy counsel
23    but I think, I am not sure which version this is.  But we
24    received them within a day or so of each other from a couple
25    of different sources.
```

1    Q.   What did you do to make the members of the MEC aware of

2    the motion and what the motion was asking for?

3    A.   I sent them around with a short cover memo which I

4    believe was with the Friday mailing, the MEC office, would

5    mail out, you know, documents of all sorts, to the MEC

6    members each Friday.

7              Now, as I recall, this was, my memo was dated March

8    17, which was a Saturday, 2001, so it may have held over to

9    the MEC meeting the next week, which I think is more likely

10   the case.  But I am not sure right at the moment.

11   Q.   D 3 85, is that the next document you have in front of

12   you?

13   A.   Yes.

14   Q.   That is a document you prepared?

15   A.   Yes.

16             THE COURT:  What is the number?

17             MR. FRAM:  It is D 385, your Honor.  It is headed

18   Major Advantages of the Proposed LLC ALPA CBA versus Section

19   1113 Rejection of the ALPA CBA."

20   A.   Yes.

21   Q.   Is that the cover memo you referred to?

22   A.   No.

23   Q.   This is something different.

24             MR. FRAM:  Let me move D 385 in evidence, your

25   Honor.

```
1                THE COURT:  Mr. Jacobson.  D 385?

2                MR. FRAM:  We actually have a couple other

3     documents attached to it, but they are already in evidence.

4                MR. JACOBSON: No objection.

5                THE COURT:  Okay.  D 385 in evidence.

6     Q.   There was reference to an April 6 date in your memo I

7     think to Mr. Seltzer.  Did you have an understanding when TWA

8     filed the formal motion on March 15 of when it was scheduled

9     to be heard by the bankruptcy court?

10    A.   I think Richard Seltzer let us know perhaps on March 19

11    or 20 that it was scheduled for April 6.

12    Q.   All right.  Tell us what steps, given the fact that the

13    motion has now been filed, or scheduled for April.  6, what

14    steps did you take to assist the TWA MEC to make decisions

15    about what to do?

16    A.   We had an MEC, an MEC meeting had been scheduled by the

17    decision of the MEC at the meeting in Wilmington, Delaware,

18    so we brought in the staff and advisors to speak to the MEC.

19    Q.   When was that meeting?

20    A.   March 21, March 21, 22, 2001.

21    Q.   I handed you a series of documents that are in evidence.

22                THE COURT:  They are already in evidence?

23                MR. FRAM:  Yes, your Honor.

24    Q.   D 382 in evidence, you recognize that as a March 19,

25    2001, email scheduling a special MEC meeting for March 21 and
```

1    March 22, 2001?

2    A.   Yes.

3    Q.   Then do you recognize the agenda that is attached to

4    that?

5    A.   Yes.

6    Q.   Pull those up quickly.  Everybody has seen them at least

7    five times now.

8    Q.   This is the agenda.  Part of this meeting is going to be

9    updates from the negotiating committee and the transaction,

10   of the merger committee, correct?

11   A.   Yes.

12   Q.   Tell us who is present at this meeting in terms of

13   outside advisors?

14   A.   I believe all of advisors and staff listed here under

15   transaction update, were present.  That includes myself,

16   Steve Tumblin, Michael Glanzer, Richard Seltzer, Clay Warner,

17   row than land Wilder and Bob Christy.

18   Q.   All right.  Did any of advisors at the meeting give

19   their views about whether the Section 1113 motion was likely

20   to be granted?

21   A.   Richard Seltzer gave his view that the 1113 motion was

22   likely to be granted.

23   Q.   Do you recall the specifics of what he said in that

24   regard?

25   A.   Well, he basically said that his judgment that this

 1   bankruptcy, this Judge in this context of a failing airline

 2   with a white knight purchaser, was very likely to grant the

 3   1113 so as to permit the transaction to close, and bar the

 4   St. Louis community and the passenger public generally could

 5   benefit from the transaction.

 6   Q.   Did he at that meeting give any percentage predictions

 7   about how likely it was that the motion would be granted?

 8   A.   I believe it was at this meeting that he said that it

 9   was 99 percent.

10   Q.   Did other advisors  give opinions or express  views

11   about the likelihood that the Section 1113 motion would be

12   granted?

13   A.   I think Steve Tumblin said that he would say 98 percent.

14   Q.   And did he explain his reasoning?

15   A.   His reasoning was similar to Richard Seltzer's, that

16   this is a transaction that needs to happen and the Judge was

17   going to remove obstacles, essentially in the way it would

18   happen.

19   Q.   Did any of the other advisors present disagree with the

20   assessment of Mr. Seltzer and Mr. Tumblin that the bankruptcy

21   Judge, that this particular bankruptcy Judge, was highly

22   likely to grant the 1113 motion?

23   A.   I don't recall any other adviser disagreeing.

24           THE COURT:  Was the decision made to oppose the

25   motion, for the union to oppose the motion.

1           THE WITNESS:  I don't think there was a decision

2    made, but we would be opposing it, there would be --

3           THE COURT:  Well, it had, was the law firm

4    authorized to oppose the motion?

5    A.   The law firm, to my understanding, was authorized to

6    oppose it.

7           THE COURT:  What law firm?

8    A.   Richard Seltzer's firm, Cohen, Weiss and Simon.

9           THE COURT:  Did they oppose the motion?  Did they

10   file papers giving you a reason as to why they opposed the

11   motion?

12          THE WITNESS:  Yes, sir.

13   Q.   Did members of the MEC present at the meeting ask

14   questions about Section 1113 issues?

15   A.   Yeah, there were a lot of questions.

16          Ted Case raised the issue of whether, if the

17   collective bargaining agreement were rejected, whether the

18   TWA pilots could lawfully strike, and Richard Seltzer

19   responded to that, saying that yes, that a strike would be

20   level, pointing out, however, that it would be a strike

21   against the old company, Trans World Airlines, Inc., not the

22   new company, and presumably if the --

23          THE COURT:  You couldn't strike the new company,

24   they weren't the employer yet.

25   A.   Well, we questioned whether they could strike the new

 1    company at all.

 2            THE COURT:  They weren't the employer.

 3            THE WITNESS:  That's right.

 4            THE COURT:  They didn't run the terminal, they

 5    didn't run the hub.  It was still TWA, Inc., the original

 6    employer who was the employer at this point in March, prior

 7    to April 6.

 8            THE WITNESS:  Right.

 9            THE COURT:  TWA LLC, the deal hadn't closed.

10    A.   Right.  So presumably if it was rejected on the 6th and

11    it closed as it did on the 9th, potentially you would have a

12    two day strike against the old company.  That would be the

13    scenario.

14            THE COURT:  The discussion that, in rejecting a

15    contract, is not necessarily rejecting the union as

16    representative of the workers.  That is not the same thing.

17    Was there any discussion about that.

18    A.   There was discussion about that more at the April 1

19    meeting than at this particular meeting?

20    Q.    Were there other questions that MEC members asked about

21    Section 1113 issues?

22    A.   There were questions about the appeal process and

23    Richard responded to those.  Steve Tumblin may have also

24    responded.

25    Q.    When you say the appeal process?

1   A.   Well, your right to appeal a 1113 order.

2   Q.   So the question was if the bankruptcy Judge grants the

3   1113 motion, and rejects the contract, what right do you have

4   to appeal?

5   A.   That is the question.  And you do have, of course, a

6   right to appeal.

7   Q.   Okay.  Was there a discussion about what the status of

8   the TWA pilots would be if the Section 1113 motion were

9   granted and the contract were rejected?

10  A.   Yes.

11  Q.   What was what was discussed about that?

12  A.   If the TWA ALPA pilots were rejected, and the

13  transaction closed, the pilots would not have a collective

14  bargaining agreement between ALPA and the new entity, TWA

15  airlines LLC.

16  Q.   And --

17        THE COURT:  Even if it even if there was no 1113

18  motion, would there be a contract with the new employer or

19  would it be considered a successor and that is why the

20  contract would continue on.

21        THE WITNESS:  Well, you could not have, you could

22  not have contractual successorship because that was one of

23  the provisions that was, it had to be waived or be rejected

24  by 1113.  So there be would be no contractual right to have

25  the contracting over to --

1              THE COURT:  But if the 1113 were denied, and

2    American closed notwithstanding the absence of the waiver,

3    then you could have successorship.

4    A.   Well, the thinking there was if it were denied, that it

5    would not close and American Airlines would walk away from

6    the transaction all together.

7    Q.   Was there discussion about what might happen if the

8    Section 1113 motion was denied, if the contract wasn't

9    rejected?

10   A.   Clay Warner was there, and he gave something close to a

11   formal presentation, and one of the issues that he addressed

12   was the lose/lose character of the 1113 motion.  In other

13   words, if you lose the motion, the contract is rejected.  The

14   transaction closes, you don't have Allegheny Mohawk, you

15   don't have a right to seniority integration arbitration and

16   you don't have a collective bargaining agreement.  So you

17   have jobs but you don't have a contract.      And you don't

18   have arbitration and seniority.

19              If you win the 1113 motion, the purchaser,

20   American, is not going to go against the APA, not to mention

21   the other unions on their property, and they are going to

22   walk away from the deal.

23   Q.   And who, that was expressed by Mr. Warner as the likely

24   outcome.

25   A.   Yes.

```
 1              THE COURT:  He is an ALPA lawyer?

 2   A.   He is an ALPA lawyer.  Also significantly I think

 3   Michael Glanzer, and Steve Tumblin, who have the contacts

 4   within the corporate community, within the bankruptcy

 5   communicate, who have some thinking on those issues.

 6   Q.   Did any of advisors present on March 21 and 22 disagree

 7   with the concept that opposing the Section 1113 motion to the

 8   hearing, going all the way, was a lose/lose proposition?

 9   A.   No.  In particular, I think Roland Wilder agreed with

10   the proposition that it was lose/lose.  The question had

11   been, I think originally raised by Ted Case.  He was raising

12   most of the questions about 1113, about the strikes, about

13   the appeal process.  And you know, what the sequence of

14   events could be.

15   Q.   Did Mr. Case say that he was in favor of a strike or was

16   he just asking the question --

17   A.   He was just asking the question.

18   Q.   Did anybody at that meeting, any member of the MEC at

19   that meeting express the idea that the pilots should consider

20   striking?

21   A.   No.  No one did.

22   Q.   Did any of the members of the MEC at this meeting, March

23   21 and 22, say that they were confused about the issues that

24   were being discussed?

25   A.   No. It was a two-and-a-half to three-hour discussion,
```

```
 1    and it was very informative.  It was very informative to me,

 2    and I think to everybody there.

 3    Q.   And did any of the members of the MEC appear to be

 4    confused?

 5    A.   No.

 6    Q.   Just in terms of your personal observation?

 7    A.   No.

 8    Q.   What was the next step in term of moving this whole

 9    process forward?

10    A.   The next step was, you know, in light of the pendency of

11    the 1113 motion, a group of advisors had talked about the

12    importance of the next scheduled meeting between the two

13    merger committees.  I am not sure when it had been, when the

14    date had been fixed, but there was a meeting scheduled for

15    the next week in the Dallas Fort Worth area.  And Michael

16    Glanzer --

17              THE COURT:  That was April 2.

18              THE WITNESS:  No.  I think it was March 28, 29.

19    Q.   Okay.  Did that meeting -- was there a discussion on

20    March 21 or 22 about this next meeting of the merger

21    committee?

22    A.   Yes.  On March 22 Michael Glanzer came to me and he said

23    he had been talking with the other advisors, and they were

24    stressing the importance of this next meeting and of the

25    possibility of the two committees reaching an agreement, and
```

1   of the urgency of at least making the attempt to reach an

2   agreement, and Michael Glanzer thought it would be beneficial

3   for some of advisors to meet with the merger committee prior

4   to meeting with the APA merger committee.

5           So I went to Scott Shwartz and I explained this to

6   him and asked if he could put such a meeting together.  He

7   said he would --

8           MR. JACOBSON: Objection.  I think he is getting

9   into hearsay.

10          THE COURT:  I will allow it.  Go ahead.

11  A.   He  then spoke to Mike Day who was chairman of the

12  merger committee, and arranged, and we agreed that we would

13  meet at a restaurant near the Dallas Fort Worth airport, and

14  we did.

15          MR. FRAM:  Your Honor, is this a good time for a

16  break?

17          THE COURT:  I think the jury wants that.  We have

18  been at it about an hour 40 minutes.  We will take a 15-

19  minute break until about 20 after ten.

20             (Jury leaves the courtroom)

21          THE COURT:  I am holding my finger up.  I am not

22  saying anything.  You know what it means.

23             (The jury leaves the courtroom.)

24             (Recess)

25             (Jury even enters the courtroom)

```
 1                DAVID HOLTZMAN, resumes.

 2                CONTINUED DIRECT EXAMINATION

 3                By MR. FRAM:

 4                THE COURT:  Mr. Fram.

 5  Q.   Mr. Holtzman, we were talking before the break about

 6  discussions you had I think you said with Scott Shwartz who

 7  would have been the MEC vice chairman on March 22 about

 8  scheduling a meeting of the merger committees for the

 9  following week.  Do you recall that?

10  A.   Yes.

11  Q.   At what point in time was that meeting scheduled?  When

12  was the meeting scheduled for, do you recall?

13  A.   The meeting of the advice advisors with the MEC merger

14  committee was put together in the two days after the end of

15  the MEC meeting, that would have been March 23, March 24,

16  arrangements were made to meet with the committee whose

17  meeting had already been scheduled for the next week.

18  Q.   Okay.  I want to show you J 299 and J 301 which are both

19  in evidence.

20                MR. JACOBSON:  299, and?

21                MR. FRAM:  301.

22  Q.   Do you recognize those as documents that were generated

23  during the course of the merger committee meetings on March

24  29, 2001, and -- March 28 and March 29, 2001?

25  A.   Yes, I do.
```

```
 1   Q.   Okay.  And did you and some of the other advisors have a

 2   meeting with the members of the merger committee on the

 3   evening of March 28?

 4   A.   Yes, we did.

 5   Q.   Okay.  And that meeting was where?

 6   A.   Well, we first had a dinner meeting, and then we met

 7   that evening at the Hilton Arlington in Arlington, Texas.

 8   Q.   Who were advisors present for the dinner and the

 9   meeting?

10   A.   I was.  Clay Warner.  Steve Tumblin.  And Bob Christy.

11   Q.   All right.  So Clay Warner you told us before was an

12   in-house labor attorney at ALPA, correct?

13   A.   Yes.

14   Q.   Steve Tumblin was one of the bankruptcy attorneys from

15   the LeBoeuf Lamb firm?

16   A.   Yes.

17   Q.   Tell us, please, who was Bob Christy?

18   A.   Bob Christy is a, excuse me, at that time, was a staff

19   member of ALPA in the economic and financial analysis

20   department.

21   Q.   And who were the members of the merger committee whom

22   you had dinner with and then met with later on the evening of

23   March 28 of 2001?

24   A.   The chairman, Mike Day, John Swanson, Gary Flor, John

25   Hefley, and Sean Clarke.
```

```
1    Q.   Now, did the members of the merger committee you have

2    just described, were they aware before advisors met with them

3    that you all were coming?

4              MR. JACOBSON: Object to the form of the question.

5    It is asking for his knowledge of someone else's state of

6    mind.

7              THE COURT:  Well, he has a basis for knowing it?

8    A.   They knew we were coming to meet them.

9    Q.   Did any of them act surprised when you met them for

10   dinner?

11   A.   No.

12   Q.   What was discussed during dinner and thereafter between

13   advisors and the members of the merger committee.

14   A.   What was discussed was the, in the part of the room

15   where I was, was just the importance to the overall process

16   of reaching an agreement with the APA, if that was at all

17   possible.

18   Q.   And why was that important as of late March to the

19   overall process?

20   A.   Because the Section 1113 motion to reject the collective

21   bargaining agreement was scheduled.  I don't know, eight or

22   ten days after.

23   Q.   And what impact would an agreement between the pilot

24   groups on seniority integration have on the Section 1113

25   motion?
```

1    A.   Well, the whole object of the process was to reach an

2    acceptable agreement.  So if a waiver was still necessary, it

3    would be a painless waiver, at least in terms of seniority

4    integration.

5    Q.   Do you recall the specifics of what was discussed

6    between advisors and the members of the merger committee

7    during dinner and later that evening about the kinds of

8    proposals, or the type of proposals that were going back and

9    forth?

10   A.   It was, there was a discussion of whether a proposal

11   could be made to bring the parties closer together.  There

12   may have been numbers discussed, but that was not something

13   that I was involved in.  But the chairman, Mike Day, was

14   interested in making some movement, making an attempt at some

15   movement between the two committees.

16   Q.   Do you recall some discussion about whether some TWA

17   pilots should be stapled as part of these discussions?

18   A.   That was an issue, yes.

19   Q.   Let's talk about kind of the tone of the meeting.  Were

20   any of the ALPA advisors putting pressure on the members of

21   the merger committee to make any particular kinds of

22   proposal?

23   A.   Not for any particular proposal.  And as I said before,

24   you can't, you can't really cause a pilot to do something in

25   a leadership position that they don't want to do.  You know,

1    they talked about different ideas for proposals, but you

2    know, I don't think anything would be characterized as other

3    than a suggestion.

4    Q.   Do you recall any disagreements among the members of the

5    merger committee, among the pilots, about how they should

6    proceed?

7    A.   No, I don't.

8    Q.   And how late into the evening did the meeting go, do you

9    recall?

10   A.   Well, the meeting went very late.  But Bob Christy and I

11   and I think Clay Warner got on an elevator at about the same

12   time, eleven or 11:30 and we were headed to our rooms to get

13   some sleep, and the committee continued, I think Steve

14   Tumblin, stayed and worked with the committee rather late.

15   Q.   Was an agreement on seniority integration reached the

16   next day between the pilot groups?

17   A.   No.

18   Q.   What happened next in terms of preparing the deal with

19   the Section 1113 motion that had been filed and was set for a

20   hearing on April 6?

21   A.   Well, it was Thursday, the 29, I think, when I returned

22   to St. Louis, and we were then in the process of finally

23   collecting a proposal from TWA, and through TWA from TWA

24   Airlines, LLC, and in a couple of particulars from American

25   Airlines.  So.

1    Q.    I am sorry.  Proposal for what?

2    A.    A proposal for a collective bargaining -- both for the

3    waivers between TWA and ALPA, and also for a collective

4    bargaining agreement between ALPA and the new airline, TWA

5    airlines, LLC, which would go into effect if approved by the

6    MEC when the transaction closed.

7    Q.    TWA LLC was the entity that was set up by American as

8    its wholly owned subsidiary?

9    A.    Yes.

10   Q.    Do you have in front of you D 210 which is in evidence.

11   It is a Thursday March 29, 2001, email, from Robert Stow

12   scheduling the meetings on April 1 and April 2?  You should

13   have it there.

14   A.    It may take me a moment to find it.

15   Q.    I will give it to you.

16   A.    Thank you.

17   Q.    Whose suggestion was it, if you recall, to send this

18   email and schedule a work session on April 1 and a meeting to

19   begin on April 2 of 2001?

20   A.    I suggested to Scott Shwartz that a meeting be

21   scheduled, as you say, with a work session on Sunday, April

22   1, and a meeting starting April 2 and Bob Stow initiated

23   that.

24   Q.    As of -- by the way, why did you suggest a work session

25   on a Sunday on April 1, 2001?

1    A.   Well, there were two factors.  One is we wanted to

2    schedule it as soon as possible so that there was sufficient

3    time in advance of the April 6 hearing.

4           But more importantly on a Sunday, in a work session

5    would be less pressure filled and intense for the MEC.  There

6    was the MEC is not in session, they can't reach a decision,

7    thus, there should be less -- they should feel less pressure

8    afternoon it should be more informal and hopefully useful for

9    the MEC members.

10   Q.   When this email went out on March 29 scheduling the work

11   session and the start of and to start a meeting, had you

12   received the proposal from TWA LLC that you referred to

13   before?

14   A.   I had not received it yet.

15   Q.   Okay.  At what point in time did you receive it, do you

16   recall?

17   A.   I received it on Saturday, March 31.

18   Q.   I want to show you what has been marked as D 115, which

19   is in evidence.  Otherwise that the email which forwarded the

20   proposal from TWA LLC?

21   A.   Yes.

22   Q.   And it looks like it came in at 8:40 p.m. on Saturday,

23   March 31, of 2001?

24   A.   That's right.

25   Q.   What did you do afternoon receiving this to advise the

Holtzman-direct/Fram                                    67

 1   members of the MEC and advisors of its content?

 2   A.   The MEC knew to expect it and we had wanted it earlier,

 3   but on Saturday evening I forwarded this proposal to the

 4   members of the MEC.

 5   Q.   There is Saturday night, March 31.  People were coming

 6   to St. Louis for a work session the next day.  Did it occur

 7   to you that they may not be checking their emails between

 8   Saturday evening and Sunday morning?

 9   A.   Well, I did, the next day I did ask and people said that

10   they had picked it up.

11   Q.   Did you have any copies of it available for people who

12   wanted to look at it?

13   A.   I asked if people needed copies when we got together,

14   and some had their lap tops open in front of them and I

15   didn't hear any requests, so we went forward with the review

16   of the proposal.

17   Q.   All right.  Let's talk about the work session on Sunday,

18   April 1, 2001.  Tell us please who was present at the work

19   session?

20   A.   The MEC officers, Bob Pastore, Scott Shwartz, Bob Stow,

21   Council 3 representatives Steve Rautenberg, Sally Young, the

22   Council 2 representative Howard Hollander, Dave Singer, and

23   the Council 4 representatives, Pablo Lewin, and I am not sure

24   if Allen Altman was present or not.

25   Q.   With the possible exception of Altman all of the voting

1    members of the MEC were there for the work session on Sunday,

2    April 1, 2001?

3    A.    That's correct.

4    Q.    Which advisors were there?

5    A.    On Sunday there was Roland Wilder, Michael Glanzer, Clay

6    Warner, Steve Tumblin.  Staff -- Clay Warner of course was

7    staff.  Bob Christy, also staff.  Let me think to make sure I

8    am not leaving nine out.

9    Q.    Was Richard Seltzer there?

10   A.    Richard Seltzer was there.

11   Q.    How about Randy Babbitt, was he there on Sunday?

12   A.    Randy Babbitt was not there on Sunday.

13            THE COURT:  You were there?

14            THE WITNESS:  I was there.

15   Q.    Were there presentations made on April 1 by the

16   different advisors?

17   A.    Well, it started with, Roland Wilder and I were at the

18   front table, and it began with my review of the proposed

19   collective bargaining agreement.   And then it moved on to

20   where I made a presentation -- recommendation, including the

21   recommendation that we accept the offer,  and that we make

22   the waivers that had been requested, and enter into an

23   agreement.

24            At that point, or shortly thereafter, after I gave

25   some reasons for that, there were a lot of questions which

1    were mainly directed to advisors.

2    Q.   When you say you made some recommendations, did you

3    prepare a document that you handed out?

4    A.   Yes.  I prepared a five-point list of recommendations.

5    Q.   All right.  Let me hand to you what has been premarked

6    as J 215.  Just tell us, please, if the second page of that

7    is the list of recommendations that you prepared and handed

8    out at the work session on Sunday, April 1, of 2001?

9    A.   Yes, it is.

10   Q.   Okay.

11          MR. FRAM:  Your Honor, I move J 215 into evidence,

12   please.

13          MR. JACOBSON: No objection.

14          THE COURT:  There okay.  Without objection, J 215

15   in evidence.

16   Q.   The first page is extraneous.  Put the second page up,

17   please.  You see there is handwriting on the upper right-hand

18   corner.  Presented to MEC 4/1/01.  Is that your handwriting?

19   A.   It is not mine.  I think it was one of the paralegals

20   who I asked to help me keep track of documents.

21   Q.   All right.  It is dated I guess a couple days before the

22   meeting.  Is that correct?

23   A.   Yes.

24   Q.   And you had five recommendations?

25   A.   Yes.

1    Q.   And the first one was to continue all current efforts

2    for seniority integration?

3    A.   Yes.

4    Q.   Second was seek CBA clarifications on a limited number

5    of issues, five or fewer.

6            Can you explain what you are referring to there in

7    terms of CBA clarifications?

8    A.   It is common that when you approach an agreement, and to

9    have issues that the decision makers want to have resolved.

10   This was uncommon in that it was not a tentative agreement.

11   In other words, it was, in other words, the negotiating

12   committee had not signed off on the company's offer as

13   something that we were proposing as an agreement.   It was an

14   offer.

15           But if there were things that could be improved, it

16   would be worth worthwhile to go back and ask for either

17   clarifications or for items that were meaningful but would

18   not be deal killers.

19   Q.   All right.  And the third point recommendation was

20   authorize bankruptcy counsel to open negotiations with TWA/

21   American counsel to incorporate CBA agreements in bankruptcy

22   court order resolving Section 1113 motion.  Why did you make

23   that recommendation?

24   A.   Well, if we were, first of all, if we were making the

25   waivers, there would be no longer any reason for TWA to move

1    against us for a rejection of the collective bargaining

2    agreement.

3              Secondly, it was just a way of, in we filed the

4    agreement with the Court, in the Court file, it would just be

5    one more way of solidifying what had been agreed to, so that

6    to try to cut down on a number of disputes over what the

7    agreement actually is, and says.

8    Q.   And then the fourth point, authorize master chairman to

9    sign agreements, including waiver, when CBA negotiation is

10   complete.  Resolve by Wednesday or early Thursday.

11             Why did you make that recommendation?

12   A.   Well, that is the key recommendation, is the waiver,

13   and it is not going to be, it is not going to be effective

14   without the master chairman agreeing to it, or the MEC

15   agreeing to it as signified by the master chairman's

16   signature.

17   Q.   And why did you indicate their resolve by Wednesday or

18   early Thursday?

19   A.   Well, we would be in court on Friday, April 6.  So the

20   company's offer of a collective bargaining agreement to apply

21   when the deal closed was, would drop dead on April 6 at the

22   beginning of the Section 1113 hearing.

23   Q.   The fifth point was begin planning for post closing

24   actions to support merger committee.  What was that about?

25   A.   Well, it was a reaffirmation, really, that we are going

1    to continue all of our efforts to reach an agreement with the

2    APA.

3    Q.   All right.  So you gave a presentation and provided

4    these recommendations in writing on April 1, 2001?

5    A.   Yes.

6    Q.   Did other advisors talk to the members of the MEC to

7    provide their thoughts?

8    A.   Well, it was really initiated by the MEC.  Advisors were

9    towards the back of the room, and the MEC members just

10   swiveled their chairs away from the front towards advisors

11   and I think almost every MEC member had a question for almost

12   every advisor.

13        So there was a lot of questions.  It was orderly.

14   But there was a give-and-take exchange for hour and a half,

15   probably.

16   Q.   You told us earlier that there was discussion about the

17   1113 motion, the likelihood it would be granted, back at the

18   MEC meetings on March 21 and 22.  Did that topic, the

19   likelihood that the Section 1113 motion would be granted, did

20   that come up on April 1 of 2001?

21   A.   Yes.

22   Q.   Tell us what you recall of that discussion.

23   A.   Well, it was a very similar discussion to the March 21

24   discussion, with the MEC.  And I think Richard Seltzer

25   amplified on his reasoning, and it wasn't new at that point,

Holtzman-direct/Fram                                         73

```
 1   but it was very focused, because now there was a decision to
 2   be made.
 3   Q.   How about the issue of what might happen if the 1113
 4   motion was denied, did that come up again on April 1 of 2001?
 5   A.   Yes, it did.
 6   Q.   And tell us what you recall about that topic, what
 7   people said?
 8   A.   Well, Michael Glanzer and perhaps also Steve Tumblin,
 9   mentioned that they had,  I guess Michael Glanzer had
10   attended a creditors committee meeting and I think the, I
11   think the chief financial officer, someone very high up in
12   finance at American Airlines, appeared, and Michael Glanzer
13   gleaned from that that management was lukewarm, at best,
14   about the TWA purchase.  And he mentioned that you have a
15   very significant risk, I can't remember his exact words, but
16   a very -- a very large and significance chance that American
17   could still walk away from the transaction.
18   Q.   Was there any discussion on April 1 about the fact that
19   ALPA's lawyers had filed opposition to the Section 1113
20   motion several days earlier?
21   A.   Yes.
22   Q.   Who do you recall discussing that fact?
23   A.   Richard Seltzer.
24   Q.   Did members of the MEC have questions about the
25   opposition papers that had been filed?
```

1   A.   They may have.  It was, you know, it was a flurry of

2   questions in, I just can't recall about the opposition of

3   papers.

4   Q.   Was there discussion on April 1 about what the MEC

5   should do if the decision was made to not accept the

6   collective bargaining agreement and to go to the hearing, to

7   go to the bankruptcy hearing on April 6 to oppose the motion.

8   A.   Discussion about what?

9   Q.   About how to prepare if the decision was made to oppose

10  the motion?

11  A.   Sure.  We were meeting on, then the second, in St.

12  Louis, so Richard Seltzer was in town.

13         So obviously, if we either chose to simply oppose

14  the motion, or if we also chose to bring the lawsuit that

15  Roland Wilder was advocating, we would need that week to

16  prepare for the hearing.

17  Q.   So was there any discussion on April 1, 2001, about who

18  might  testify at the hearing or what the evidence would be

19  if the decision was made to oppose the Section 1113 motion?

20  A.   Richard had, Richard Seltzer had mentioned to me that I

21  would likely be a witness, and again I can't recall whether,

22  there were specific discussions about the preparation

23  process.

24  Q.   You mentioned Ted Case had raised the issue of a

25  possible strike on March 21 or 22.  Did the issue of whether

Holtzman-direct/Fram                                          75

1    the pilots should consider a strike come up on April 1 of

2    2001, to your recollection?

3    A.    I don't think so.

4    Q.    You I think made reference before to Roland Wilder's

5    litigation theory.  Was that discussed on, at the work

6    session on April 1 of 2001?

7    A.    Yes.

8    Q.    Tell us what you recall Mr. Wilder saying about his

9    litigation idea?

10   A.    Well, it was separated from the previous discussion

11   because I had mentioned, I had mentioned that Roland Wilder

12   would have to leave.  He had a meeting with a client, the UPS

13   pilots in Louisville, Kentucky, and he would need to leave

14   the meeting and I also mentioned that he had a different

15   view.  So we.

16   Q.    You mentioned this to whom?

17   A.    To the MEC.

18   Q.    You mentioned this to the group at large on April 1 of

19   2001?

20   A.    Yes.  At a certain point I, you know, took the

21   opportunity when there was some -- when there was a lag in

22   the questions to say to people, Roland, Roland Wilder needs

23   to leave and he has a different view.  And so then Roland

24   spoke.

25   Q.    What do you recall Roland saying about his different

1   view?

2   A.    Well, he explained his theory once again, which was

3   based on what we call a minor dispute doctrine.  We had the

4   grievance filed regarding the violation of section one of the

5   collective bargaining agreement, so the minor dispute

6   doctrine says to a court, enjoin this action, in this case

7   the closing of the transaction, so that this dispute can be

8   heard by the arbitration board, the systems board of

9   adjustment.

10            So that was the basic theory.  Of course in this

11  case it was very much complicated by the fact that TWA was in

12  bankruptcy, and there was an automatic stay which prohibits

13  certain actions from going forward except in bankruptcy

14  court.

15            So he was saying that this particular action, being

16  an action for an injunction, was not barred, is not an action

17  for money damages, and he felt that it could go forward in

18  Federal District Court, and that a Federal District Court

19  would have exclusive jurisdiction over the action, and that

20  it would not be subjected to basically being removed to

21  bankruptcy court.

22  Q.    Did Mr. Wilder talk about any of the risks that were

23  associated with running to Court, the Federal District Court,

24  and try to enjoin a major corporate transaction of the nature

25  proposed by American while -- after that transaction had been

 1   approved by a federal bankruptcy Judge?

 2   A.   Well, he always felt, and he still felt then, that

 3   American was so invested in the action and that it had

 4   advantages for American Airlines that American would not walk

 5   away.  He acknowledged that there was some risk, but he

 6   tended to minimize it.

 7   Q.   Focusing on the merits, setting aside what American

 8   might do, did he talk about the likelihood that this lawsuit,

 9   if filed, would be allowed to proceed?

10   A.   He thought it would be allowed to proceed and that he

11   thought that the Section 1113 would -- could not go forward.

12   Q.   Did he talk about the downside of what might happen if a

13   federal district Judge decided that an injunction was not

14   appropriate?

15   A.   No, he did not.

16   Q.   Did other advisors comment on Mr. Wilder's proposed

17   lawsuit to enjoin the entire transaction?

18   A.   Yes.  Richard Seltzer responded to it.

19   Q.   And tell us, please, what did Richard Seltzer say he

20   thought of Roland Wilder's litigation theory?

21   A.   I can't quote him exactly, but he had experience in the

22   Eastern Airlines bankruptcy, a case called Ionosphere Clubs,

23   I believe, it was a case I believe that he worked on, and he

24   recounted the holding of that case, which as I understand it

25   is that --

 1              MR. JACOBSON:  I object, your Honor.  Now he is

 2    getting into some case law told by some other lawyer.

 3              THE COURT:  I will sustain the objection.

 4              MR. FRAM:  Your Honor, I think we need to hear the

 5    advice Mr. Seltzer gave to the MEC.

 6              THE COURT:  He is, not the advice, clarify the

 7    holding.

 8    Q.   Did Mr. Seltzer explain the holding of the Ionosphere

 9    case to the MEC on April 1?

10              MR. JACOBSON:  I think that is the same question.

11              THE COURT:  Ask about the advice, not what the

12    holding of the case was.

13    Q.   Without giving us all the details, can you tell us, what

14    was Mr. Seltzer's bottom line in terms of whether he agreed

15    or disagreed with this litigation idea of Mr. Wilder?

16    A.   He disagreed.

17    Q.   And give us the sense of how strongly he disagreed, was

18    it lukewarm or was it, you got to be out of your mind

19    disagreement?

20              MR. JACOBSON: Your Honor, I think these type of

21    emotional things, I object to that throughout.  Just what the

22    man said, what the facts are.

23              THE COURT:  Just describe what Seltzer's reaction

24    was.  What he said.

25    A.   He very strongly disagreed, and also felt that the

 1    bankruptcy judge would in effect take offense to attempting

 2    to go around the bankruptcy court.

 3    Q.    Did other advisors, including other advisors who were

 4    lawyers, express views about the advisability of Wilder's

 5    litigation advice?

 6    A.    I know other advisors had views.  I can't recite what

 7    they may have said.

 8    Q.    Did you have views about whether you thought this

 9    litigation theory was a good thing or not a good thing?

10    A.    I did have views.

11    Q.    What views did you have on April 1 of 2001?

12    A.    My view was that the automatic stay provisions of the

13    Bankruptcy Code are very powerful, and I did not agree that

14    we could be successful, that we could successfully go around

15    that.

16    Q.    Okay.  And did you see some downside, potential

17    downside, of the litigation proposed, if the litigation

18    proposed by Mr. Wilder was pursued?

19    A.    The downside would be the disfavor of the bankruptcy

20    Judge towards whatever ALPA might be asking the Court.

21    Q.    Did any of advisors present other than Mr. Wilder speak

22    up in favor of his litigation idea?

23    A.    No.

24    Q.    Did any of the members of the MEC who were present

25    express interest in pursuing his litigation idea?

1    A.    No.

2    Q.    Do you recall any comments by members of the MEC about

3    his litigation proposal?

4    A.    After his presentation and before Richard Seltzer's

5    response there were no questions, no comments.

6    Q.    Okay.  Let's just talk about the tone of the meeting.

7    Did any advisors tell the members of the MEC how they had to

8    proceed, what they had to do?

9    A.    No.  Absolutely not.

10   Q.    Did any of advisors raise their voices or scream at any

11   of the members of the MEC during the meeting?

12   A.    No, nothing like that.

13   Q.    Did anybody scream at Mr. Wilder in terms of anything he

14   said?

15   A.    No.  It was very gentlemanly, and respectful, between

16   Richard Seltzer and Roland Wilder.

17   Q.    Were there any questions from members of the MEC that

18   were not answered by the advisors?

19   A.    I think the advisors gave it their best shot in each

20   case.

21   Q.    Did anybody cut off discussion or say we spent enough

22   time on it?

23   A.    No.

24   Q.    Did any of the members of the MEC say that they were

25   confused or didn't understand what the advice was?

1    A.    No.

2    Q.    Did any of them appear to you just by observing them,

3    did people appear by their facial expressions appear to be

4    confused or not to understand?

5    A.    They did not appear confused to me.

6    Q.    Okay.  All right.  So let's move ahead now April 2 which

7    is the beginning of the actual meeting.  You were present

8    again?

9    A.    Yes.

10   Q.    Was everybody who was there on April 1 present at the

11   meeting on April 2?

12   A.    Well, Roland Wilder had left town.  Bob Christy left

13   also.  He may have been there briefly in the morning of April

14   2.  I can't recall when he left.  But he did leave.

15   Q.    Okay.  And did anybody new who wasn't there on April 1,

16   2001, arrive on April 2?

17   A.    Among the MEC Ted Case was there on April 2, and Alan

18   Altman definitely was there on the second.

19         Among advisors, Randy Babbitt was there.  Also

20   Katherine Powers, from the ALPA retirement and insurance

21   department staff was there.

22         Later in the meeting we had kind of a surprise

23   arrival from a former pilot named Joe Montenaro.  He was not

24   on the agenda, but he came about ten o'clock and made a

25   presentation to the MEC.

1  Q.   Did I hand you a copy of D 74 in every which is the

2  minutes of the April 2, 2001 meeting?

3            THE COURT:  D 74?

4            MR. FRAM:  D 74, your Honor.

5            THE COURT:  In evidence.

6  A.   I don't think you did.

7            (Pause)

8  Q.   All right.  Do you recognize that as the minutes, the

9  official minutes of the meeting on April 2 of 2001?

10 A.   Yes.

11 Q.   And you mentioned that a Joe /PHOPBT he narrow appeared

12 at the meeting, sort of unannounced?

13 A.   Yes.

14 Q.   Is that reflected on the third page of the minutes in

15 the middle?

16 A.   Yes.

17 Q.   Just as a matter of, a general matter, tell us how do

18 these minutes and this get prepared.

19 A.   Well, they are prepared by administrative staff, usually

20 by a lady named Michelle Wayne, who would sit at a computer

21 station, and make notes as the meeting progressed, and then

22 they would later be collated with all the official actions

23 that had occurred, and then they would be reviewed often by

24 the officers, and then submitted to the MEC at the following,

25 at the next MEC meeting, usually, for approval, sometimes for

1    edits.  But finally for approval.

2    Q.   So those are steps to make sure the minutes of the

3    meeting are accurate in terms of what was discussed?

4    A.   Yes.

5    Q.   Was that the practice throughout the year 2001?

6    A.   Yes.

7    Q.   All right.  Let's  walk through a couple aspects of the

8    minutes.  Going back to the first page the meeting begins at

9    9 oh 4, with master chairman Bob Pastore calling the meeting

10   to order.  And then on the bottom of that first page

11   bankruptcies/ transaction update, Randy Babbitt, Eclat

12   Consulting.

13           It says he addressed the decision-making process

14   regarding the 1113 bankruptcy hearing and discussed different

15   scenarios that could result from the bankruptcy.

16           Do you recall what Mr. Babbitt said when he gave

17   that presentation?

18   A.   The main thing that I recall was his recommendation.

19   And what he recommended was that the MEC merger committee

20   make another effort to meet with the APA merger committee to

21   reach an agreement prior to the 1113 hearing scheduled for

22   April 6.

23   Q.   And was that recommendation taken up and considered by

24   the MEC?

25   A.   It was considered later that day in executive session by

1    the MEC.

2    Q.    And what was the result of the MEC's consideration of

3    that recommendation?

4    A.    It was -- there was a motion made to act on it, to send

5    the merger committee back down to Dallas, and the motion

6    failed.

7    Q.    All right.  And then just to move through this because

8    people have heard about it a couple of times.  There was a

9    motion made later in the afternoon, a resolution on the

10   bottom of page 5.  Do you have that handy?  A resolution 01-

11   64 by Rautenberg and Lewin, five parts, and then there was a

12   roll call vote, and the resolution passed?

13   A.    Yes.

14   Q.    I want to ask you some questions I asked before about

15   the tone, the tenor of the meeting.  Did any advisors,

16   including yourself, tell the members of the MEC how they had

17   to vote?

18   A.    No.

19   Q.    Did any of advisors make any threats about what might

20   happen at if the MEC did not vote to waive scope and accept

21   the collective bargaining agreement?

22   A.    No, nothing like that.

23   Q.    Any advisors raise their voices or get physically

24   address aggressive with any of the members of the MEC?

25   A.    No.

1   Q.   Did any members of the MEC -- I am sorry.  Did anybody

2   cut off discussion about any of these issues?

3   A.   Well, the discussion was among the members of the MEC.

4   There was very little input from advisors.  There were a few

5   questions.  There was one question to me but it was not the

6   free- flowing kind of discussion of the Sunday, April 1

7   meeting.  It was a day of adherence to Roberts Rules of

8   Order, and the MEC considered things as it always does in

9   session.

10  Q.   Did anybody did anybody tell the MEC that it had to

11  decide this issue, any of these issues, on April 5?

12  A.   Not that anything had to be decided on April 2, no.

13  Q.   Is there any meeting that the meeting could not have

14  continued for a couple more days if people needed more time

15  to consider these issues?

16  A.   It could have continued, yes.

17  Q.   Did any of the members of the MEC appear to be confused

18  or not to understand what the issues were?

19  A.   No, I think they understood.

20  Q.   Did you perceive that any pressure was being put on

21  advisors, any pressure being put by advisors on the members

22  of the MEC to do anything in particular?

23  A.   I don't, I didn't observe it.  I don't know of any

24  pressure applied.

25  Q.   Did any members of the MEC complain  to you after the

1    meeting that they felt pressured or coerced by anything said

2    by advisors?

3    A.    No, no one complained to me.

4    Q.    What happened after this meeting on April 2 in terms of

5    moving the process forward, in the sense that a, well, the

6    first part of the resolution at the top there on that second

7    page, page 6, directs the negotiating committee to, quote,

8    "seek clarification immediately on all outstanding issues

9    arising from the proposed agreement covering the operation of

10   TWA LLC."

11              What happened as a result of the adoption of that

12   resolution?

13   A.    We scheduled a conference call meeting with TWA for the

14   following day; actually, it was in the evening on the 3rd.

15   Q.    Was that a conference call of the negotiating committees

16   of the pilots and of TWA?

17   A.    That's correct.

18   Q.    Okay.  And I want to show you what has been premarked as

19   D 194.  Can you tell us what D 194 is?

20   A.    This exhibit is an agenda for the April 3rd conference

21   call.

22   Q.    Who prepared the agenda, do you know?

23   A.    I prepared it with the help of the negotiating

24   committee, Ron Kiel and Alan Altman.

25   Q.    And did the conference call actually take place in

 1   accordance with the agenda?

 2   A.   Yes, it did.

 3   Q.   Did Mr. Altman participate?

 4   A.   Yes, he did.

 5   Q.   Who else, on behalf of the negotiating committee,

 6   participated?

 7   A.   Well, it was, of the pilots negotiating committee, it

 8   was only Ron Kiel and Alan Altman.

 9             MR. FRAM:  I move D 194 into evidence, please.

10             MR. JACOBSON: No objection.

11             THE COURT:  D 194 in evidence.

12   Q.   And were the negotiating committees able to resolve the

13   issues outlined on D 194?

14   A.   They were either resolved or we obtained the information

15   that we were looking for, and in some cases were

16   disappointed, but we had taken it as far as we could.

17   Q.   I want to hand you what has been marked --

18             THE COURT:  Before you go off D 194, a lot of the

19   subjects are identified by a section number, section 3,

20   section 4 F.   Do those section numbers relate to the

21   proposed contract between LLC and ALPA?

22   A.   They do.  But they are the same section numbers that

23   were in existence for the old contract.

24   Q.   All right.  So I am going to hand you what has been

25   marked as P-139.  It is in evidence.  And I would ask if you

1   recognize that as the agreement that was ultimately signed as

2   a result of the vote on April 2, 2001, and the negotiating

3   committee meeting on April 3rd, that you just mentioned?

4   A.   This is the transition agreement that applied beginning

5   with the closing of the transaction on April -- it actually

6   closed on April 10.  We were told that it closed on April 9,

7   so it carries the April 9, 2001 date.

8   Q.   You see in the upper right-hand corner --

9           THE COURT:  You call this transition agreement but

10  it is really the collective bargaining agreement between ALPA

11  and TWA LLC, which is American.

12  A.   Well, its sole purpose, though, is to transition --

13          THE COURT:  To a single carrier status.

14  A.   But not only that, your Honor, but to the American

15  pilots' CBA.

16  Q.   You see in the upper right-hand corner of each page of

17  the document it says March 31, 2001.

18  A.   Yes.

19  Q.   What relationship does this document have to the

20  document that was emailed to you on the evening of March 31,

21  2001, the day before the work session on April 1?

22  A.   It is the same document except that there were, as a

23  result of the April 3rd changes, there were a couple of

24  modifications.

25  Q.   And this document is actually signed, if we turn to

1    page, after page 73, the signature page.

2    A.   Yes.

3    Q.   And it is signed by Mr. Kiel, chairman of the

4    negotiating committee, by Mr. Pastore, the chairman of the

5    MEC, and by Duane Woerth?

6    A.   Yes.

7    Q.   Did you have any role in getting the document signed?

8    A.   Yes.  We went, took the document first to Duane Worth's

9    office and of course in the Washington, D.C., and then it was

10   sent to us in Wilmington, Delaware, because we traveled to

11   Wilmington, Delaware, for those final hearings.  And then we

12   did a lot of signing for a day or so.

13   Q.   Okay.  Did you spend some time with Mr. Pastore when you

14   went to Wilmington and Mr. Kiel when you went to Wilmington

15   do get their signatures on the document?

16   A.   I did.

17   Q.   What was the mood in Wilmington when you were in Mr.

18   Pastore's company with respect to the document?

19   A.   Well, it was very festive.  He had a big suite at the

20   hotel, and several of the MEC members were there and they

21   were going to have a brief meeting, but very soon the music

22   was turned up, and it was a celebration, really.

23   Q.   How many pilots were there for the celebration, sir?

24   A.   Probably 30 or 40.

25   Q.   And for how long did the celebration go?

1    A.   Well, I didn't stay but I think it was a good part of

2    that first evening, which was Wednesday, which would have

3    been the --

4              THE COURT:  The 4th.

5              THE WITNESS:  The 4th.

6    Q.   What were they celebrating, what we were they happy

7    about?

8    A.   They were happy about becoming American pilots, about

9    being able to transition to the higher pay at American,

10   greater job security.  A company that made profits, was not

11   in danger of being liquidated, and of generally having

12   succeeded.

13   Q.   All right.  Let's jump now to events later in the year.

14   You want to focus you on events of October and November of

15   2001, in particular, discussions about the issue of seniority

16   integration.  Do you recall those events fairly clearly?

17   A.   Yes.

18   Q.   And if you need me to show you an MEC minutes or other

19   documents that will help you remember things, you will let me

20   know.

21             But do you remember some discussions in October

22   leading up to a meeting of the MEC on October 21 and 22, and

23   continuing on the 23, about whether a particular seniority

24   integration proposal should be adopted?

25   A.   There were -- I do recall that.  I am not sure what the

 1   question is.

 2   Q.   Do you recall, let's take it a step at the time.  You

 3   recall a proposal being put on the table by American and the

 4   APA over seniority integration?

 5   A.   The first I heard of it was from Keith O'Leary who had

 6   succeeded Scott Shwartz as the vice chairman.  And Keith

 7   O'Leary told me that he and Bob Pastore had met with Bill

 8   Compton the previous day, the previous day being the Thursday

 9   before Columbus Day observed.  And that Keith O'Leary said it

10   appeared to him that there was a deal available --

11            MR. JACOBSON: Objection, your Honor.  I think he is

12   get to go hearsay at this point.

13            MR. FRAM:  Your Honor, I am trying to lay some

14   foundation for some advice he gave.

15            THE COURT:  I will allow it.  Go ahead.

16   A.   So Keith O'Leary thought that there was a deal

17   available.  He told me that on the Friday before the Columbus

18   Day observed, and there was a, I believe an MEC meeting I

19   think the Tuesday after Columbus Day, and the issue was

20   whether the merger committee and Roland Wilder should travel

21   to American headquarters to meet first with American and then

22   possibly with the APA.

23   Q.   Okay.  And the upshot of that is that Mr. Pastore went

24   by himself and no agreement was reached?

25   A.   That's correct.

1    Q.   This do you recall the October 12 letter from Mr.

2    Brundage expressing frustration about what had happened?

3    A.   I do.

4    Q.   All right.  Do you recall the meeting on October 21, 22,

5    and 23, where efforts were made by the pilots, the TWA

6    pilots, to reach agreement on what should be done in response

7    to a proposal, a seniority integration proposal??

8    A.   Yes.

9    Q.   Okay.  Focusing just on the merger committee, to your

10   recollection, were the members of the merger committee able

11   to agree among them?  Selves about what to do in response to

12   the new proposal?

13   A.   No, they were not.

14   Q.   Tell us about the disagreements that you observed.

15   A.   The members, merger committee members present were Mike

16   Day, John Swanson, Sean Clarke, and DJ Glasby.  And Mr.

17   Glasby I think was, came on the negotiating go -- excuse me

18   on the merger committee after Gary Flor left the merger

19   committee.  John Hefley was not present.  Bud Bensel I think

20   was still a member of the merger committee, but he really, I

21   don't see him participate in it.

22        But it was basically Mike Day and John Swanson

23   being open to what was on the table and favoring what was on

24   the table.  DJ Glasby was a bit torn.  And Sean Clarke was

25   very much against accepting the proposal.

1    Q.   And what --

2             THE COURT:   The proposal had radically different

3    effects, depending on the seniority, right?

4    A.   That's correct.

5             THE COURT:   I mean senior TWA pilots came out okay.

6    Maybe not as well as they could have, but they came out

7    pretty well, while the junior pilots, the younger, really

8    which was Clarke --

9    A.   Sean Clarke was a junior, yes.

10            THE COURT:   And he was the most junior of any?

11            THE WITNESS:   That's right.

12            THE COURT:   And he gets no benefit from it.

13            THE WITNESS:   Right.   In his view there was -- in

14   his view, every member should vote with him because he was

15   hurt.

16   Q.   All right.   So there seemed to be a correlation between

17   level of seniority and the position people were taking on the

18   merger committee?

19   A.   Yes.

20   Q.   The proposal at this point of course involves stapling a

21   significant number of the TWA pilots?

22   A.   Yes.

23   Q.   And how about the TWA MEC as a whole?   Were they

24   involved in discussions about the proposal that was on the

25   table?

Holtzman-direct/Fram                                            94

1    A.   They had several days of discussions, yes.

2    Q.   Okay.   There were disagreements among the members of the

3    TWA MEC about whether it was a good idea to accept this

4    proposal?

5    A.   Yes, there was disagreement.

6    Q.   Can you describe briefly for us who the players were,

7    what their positions were, about whether this was the deal

8    you would get stuck with?

9    A.   Well, Steve Rautenberg, and Pablo Lewin were in favor of

10   accepting the offer, and most of the others were opposed.

11   There may have been some nuances in their positions, but they

12   were generally opposed.   That would conclude Sally Young, Ted

13   Case and Howard Hollander.

14   Q.   Tell us what, the people both on the merger committee

15   and on the MEC level who were in favor of accepting the

16   proposal, what were their argument, what were they saying

17   about why this was a good idea, if that sense?

18   A.   Well, the arguments in favor related to items that were

19   not the integration, per se.   In other words, not the actual

20   combining of the list, that other agreements that would go

21   with the seniority agreement.   One of the items on the table

22   would be a promise by American that the St. Louis domicile,

23   where most of the TWA pilots would fly out of, would not be

24   -- that flying there would not be decreased by more than 25

25   percent of their combined flying of St. Louis, Chicago, and

1  Dallas.

2          And the proponents of making the deal saw value

3  there.  And there were other parts of what was on the table,

4  but they also saw value to.

5  Q.   How about the opponents, the people not in favor of

6  accepting the deal, what were their arguments about why the

7  deal should not be accepted, and how it was accepted, the

8  issue of seniority integration would be resolved?

9  A.   Well, they would still, the opponent thought that it

10  should be resolved by Congress acting on what was called the

11  Bond Amendment, which was a proposal by Senator Kit Bond,

12  that initially would have a retroactive effect to provide

13  arbitration between the dispute between the APA and the TWA

14  MEC.

15  Q.   Did they have a backup plan, if Congress did not adopt

16  the Bond bill and solve this problem for them?

17  A.   I really didn't hear any backup plan.

18  Q.   Did you have views about whether the Bond bill was

19  likely to be adopted?

20          MR. JACOBSON: Objection, your Honor.  Calls for an

21  opinion from a witness.

22          THE COURT:  I will sustain that.

23  Q.   Did you express your views to the members of the merger

24  committee and the members of the members of the MEC about

25  what they should do in terms of accepting or not accepting

1    the proposal that was on the table?

2    A.   I, at the same time that Roland Wilder made his

3    recommendation, I also was recommending that the MEC accept

4    the proposal that was on the table, which had components of

5    the merger integration, and also consideration that American

6    Airlines would provide.

7    Q.   What was your thinking in making that recommendation?

8    A.   Well, my thinking was that the, there was unlikely to be

9    relief from Congress, and that American Airlines was going an

10   extra mile to try to bring the parties together, and that you

11   can only, you can only push so far and so long before things

12   are going to start getting worse instead of better.

13          So that this was the time to make the best deal

14   that they could.

15   Q.   What about, guys like Sean Clarke who were junior, what

16   did you think, if anything, could you done for the most

17   junior pilots?

18   A.   There really wasn't a lot, there really wasn't a lot on

19   the table for the people who were the most junior.  Except

20   that American was willing to say that in the fourth quarter

21   of 2001 and the first quarter of 2002 the number of

22   furloughs, because of course this was after 9-11, the number

23   of furloughs I think would be 200 in the fourth quarter and

24   250 in the first quarter, if I have it correctly, or it could

25   be reversed, but I believe I have it correctly.

1    Q.   I think you mentioned a moment ago that Roland Wilder

2    had a recommendation with respect to the proposal as well?

3    A.   Yes.

4    Q.   Tell us what that was?

5    A.   Well, his recommendation was also to accept the deal.

6    Q.   Do you recall him suggesting that a lawsuit be filed at

7    some point?

8    A.   He had suggested that a lawsuit be filed earlier, yes.

9    Q.   And was there interest -- well, what was your reaction

10   to the idea of the lawsuit?

11   A.   Well, this particular lawsuit I thought had less merit

12   than the others.

13   Q.   And do you recall what the lawsuit proposal was, who he

14   would be suing, what the claims would be?

15   A.   Well, he would be suing to enjoin either the adoption of

16   an agreement of the merger list between American and the APA,

17   or possibly attempting to foreclose the National Mediation

18   Board from acting on a single carrier application.

19         I heard both versions of that.  I am not sure which

20   version was Roland Wilder's actual proposal.

21   Q.   And what was your, why did you believe that either

22   version was not something that you would be that you would

23   pursue?

24   A.   There was, the fact that these events would be fairly

25   far off in the future and there was the fact that under the

 1    law there might not be irreparable harm to meet the standard

 2    for injunctive relief.

 3    Q.   When discussing these issues with TWA pilots and merger

 4    committee, and the MEC, did you see any virtue to having

 5    assigned agreement that the TWA pilots had signed as opposed

 6    to having an agreement just imposed by American and the APA?

 7    A.   Yes.  There was a virtue in a signing agreement, there

 8    was a virtue in the negotiation of it, that if our merger

 9    committee, the TWA MEC merger committee could have used their

10    willingness to agree for a little bit more, probably not very

11    much, but for a little bit more, and there was what I said

12    before, which was if you don't have a signed agreement,

13    things could get worse instead of better.

14    Q.   Explain what you mean by things getting worse?

15    A.   Well, as we said before, the agreement between American

16    and, and, between American and the APA allowed that the

17    seniority date of a new pilot would be date that that pilot

18    is hired by American.

19         So theoretically, and I emphasize theoretically,,

20    even TWA pilot could be put at the end of the list.  But in

21    any case, even if not so drastic, it could be worse than what

22    was offered.

23    Q.   All right.  Did you become familiar with Supplement CC

24    when it when it was ultimately adopted by American and the

25    APA?

1    A.    Somewhat, yes.

2    Q.    Let me show you what is in evidence as J 352.

3          What I would like you to do is just to talk to us a

4    little bit about some of the benefits of the document, other

5    than the fact that pilots did not get, all the pilots, did

6    not get stapled.  Do you recall the protective cell aspect of

7    Supplement CC?

8          MR. JACOBSON:  Your Honor, I am going to object to

9    the leading nature of the question.   The witness already

10   said he had some vague passing familiarity with Supplement

11   CC.

12         THE COURT:  I will sustain the objection.

13         MR. FRAM:  I will do there with a different

14   witness.  That is fine.

15         THE COURT:  It is in evidence.  You can make

16   closing argument.

17         MR. FRAM:  That is fine.

18         THE COURT:  I don't know that he fully knows the

19   comparison between that document and what was offered, the

20   offer that was turned down.

21         MR. FRAM:  I think he does.

22   Q.   Mr. Holtzman --

23         THE COURT:  Ask him that question.

24   Q.   Are you familiar with the differences between the

25   proposal that was on the table before Supplement CC was

1    adopted and Supplement CC itself?

2    A.   In a couple of particulars that are, that I think are

3    important, yes.

4    Q.   Do why don't you tell us about those, differences and

5    why they are important and we will wrap up.

6    A.   The provision that was on the table from American would

7    have given furlough protection for the, for those TWA pilots

8    on the American list who were integrated into the list, not

9    to, not the stapled portion but the upper portion.  They

10   would have had no furlough protections as offered by

11   American.  American didn't offer that in CC.

12          THE COURT:  Did it ever make a difference?

13          THE WITNESS:  Yeah.  Unfortunately.

14   Q.   You said American didn't offer that.  You mean it didn't

15   impose that in Supplement CC?

16   A.   Well, it would have and welcome imposition, but it was

17   not in CC.

18   Q.   Okay.  There are were there other ways which in your

19   view in which Supplement CC was less favorable to the TWA

20   pilots than what had been offered?

21   A.   The CC has, as I understand it, a guarantee --

22          MR. JACOBSON:  Objection, your Honor.  From his

23   phrasing, it is clear that he is relying on hearsay, not

24   personal knowledge.

25          THE COURT:  You reviewed the document, didn't you,

1  CC?

2              THE WITNESS:  Yes.

3              THE COURT:  I will allow this.

4  A.   The document has a guarantee of a number of captain's

5  positions for the St. Louis cell.

6              The proposal that was on the table had a floor, I

7  think I described earlier, of 25 percent of the combined --

8  there could be no decrease in flying greater than 25 percent

9  of the combined domiciles of Chicago, Dallas and St. Louis.

10 And that is viewed as more favorable than what was agreed to

11 by APA and American and Supplement CC.

12 Q.   Are those the importance ways in which you recall

13 Supplement CC was less favorable than the deal that had been

14 on the table?

15 A.   Yes.

16             THE COURT:  In terms of the number of pilots

17 stapled, though, that didn't change.

18 A.   That did not change.

19 Q.   Throughout, and by the way, the advice that you gave to

20 the merger committee and the MEC that they should accept this

21 proposal and not have something in code.  That advice was

22 rejected, yes?

23 A.   That's right.

24 Q.   Throughout the course of 2001 when you were advising the

25 TWA MEC, did anybody from ALPA National tell you what advisor

 1   direction to give to the TWA MEC?

 2   A.   No, no one did that.

 3   Q.   Were you aware as of late 2000 that ALPA had adopted the

 4   so-called unity resolution, and had expressed an interest in

 5   bringing some independent pilot unions into ALPA?

 6   A.   I wasn't really aware of the resolution.  I was aware

 7   that there was an interest in organizing the independent

 8   union.

 9   Q.   Were you aware as of late 2000 that there was an

10   interest on the part of ALPA National in trying to bring the

11   American pilots back?

12   A.   Yes.

13   Q.   Did that interest, that interest the part of ALPA

14   National, did that in any way, shape or form affect the

15   advice or guidance that you gave to the TWA MEC?

16   A.   No, it didn't affect my advice.

17           MR. FRAM:  I have nothing further on direct.

18           Thank you, your Honor.

19           THE COURT:  We will take a 15-minute break now.

20           Then we will resume with cross.  Mr. Jacobson, you

21   are going to do the cross?

22           MR. JACOBSON: Yes.

23           THE COURT:  We will pick up with your cross

24   examination at 10 of 12.

25           All rise when the jury leaves.

```
 1                (The jury leaves the courtroom.)

 2          THE COURT:  Counsel, the jury, one of the jurors

 3     inquired of Mr. Bruey as to how much more, what the future of

 4     this lawsuit is.  Do you have any sense after, this is the

 5     most, I don't want to be, I think we will finish him today.

 6     What comes after that?

 7          MR. FRAM:  Your Honor, we have Mr. Warner.  We have

 8     Mr. Rosen.

 9          THE COURT:  Seth Rosen.

10          MR. FRAM:  Seth Rosen.

11          THE COURT:  Seth Rosen is going to be live.

12          MR. FRAM:  Seth Rosen live.

13          THE COURT:  I don't have to worry about the

14     deposition.

15          MR. FRAM:  Richard Seltzer, and that is it.

16          THE COURT:  You have three more witnesses.

17          MR. FRAM:  Yes, your Honor.  We are hoping to

18     finish them if not on Tuesday, probably unlikely, more likely

19     Wednesday.  We hope to be done with the testimony by

20     Wednesday.

21          MR. KATZ:  Possibly some video.

22          MR. FRAM:  Possibly a video.  Your Honor gave us

23     some preliminary rulings.

24          THE COURT:  No, I am not prepared, notwithstanding

25     my concern with the stipulation, such as it was.  I find
```

1    that, I am reluctant to let either of the two depositions,

2    Babbitt and the TWA chairman.

3              MR. KATZ:  Compton.

4              THE COURT:  Compton.  Which was before the Senate.

5    All right.

6              MR. FRAM:  We are inclined not to pursue Compton at

7    all.  But there are some portions of Babbitt that were not

8    objected to that we may play.

9              THE COURT:  It was sort of offered in gross.  What

10   I had, what I was reviewing was large segments, and then

11   large objections to those segments.  You know.

12             MR. FRAM:  That is our goal, your Honor.  I think

13   in terms of prediction, I think we are reasonably expecting

14   to be done with our case by the end of the day on Wednesday.

15   Of course we are off Monday.

16             THE COURT:  July 6.

17             MR. FRAM:  July 6, your Honor.

18             THE COURT:  Okay.

19             MR. JACOBSON: All three witnesses you think you can

20   get done in one day.

21             MR. FRAM:  No, two days.  Tuesday and Wednesday.

22             THE COURT:  In terms of rebuttal, what do you --

23             MR. JACOBSON: We are going to revisit the Sherry

24   Cooper deposition as rebuttal.

25             THE COURT:  I would love in a way to have her.  But

1    I would like to have her here.  The absence of cross

2    examination very much troubles me on Cooper.

3              MR. PRESS:  I thought she was crossed.

4              MR. JACOBSON: She was crossed in deposition.

5              THE COURT:  That is a discovery deposition.  You

6    don't cross examine your own witness.

7              MS. RODRIGUEZ:  We can try calling her again.  I

8    don't think that the result is going to be different.  We can

9    try to see if somebody can reach out to her again.

10             THE COURT:  Try that.  Normally, in a discovery

11   deposition, you don't cross examine your own witnesses, the

12   person is taking the other side's deposition, the other

13   side's witness.  You don't cross examine your own witness.

14             MR. JACOBSON: Your Honor, that is not the

15   circumstance here.  If I am not mistaken, we took the

16   deposition, didn't we, for Sherry Cooper.

17             MS. RODRIGUEZ:  She was never a defendant's

18   witness.

19             MR. JACOBSON: They had an opportunity to cross her

20   at that time.

21             THE COURT:  It was --

22             MS. RODRIGUEZ:  She was never on their disclosure

23   list as a potential witness.

24             THE COURT:  I know.  That is why I take issue with

25   the great minds of the Rules Committee about the de bene esse

 1  deps and the discovery deps.

 2            All right.  I will let, we will go back over it.

 3            MR. FRAM:  Your Honor.

 4            THE COURT:  Looking at it from the other point of

 5  view, there has been a fair amount of testimony as to the bad

 6  condition of TWA.

 7            I am not inclined to foreclose you, the testimony

 8  is not the kind that has the additional reliability, because

 9  it is not subject to cross.  Let me think about it.  See if

10  you can reach out and get her here.

11            MR. JACOBSON:  We will.

12            MS. RODRIGUEZ:  I will try.

13            MR. JACOBSON:  She will be as charming as she can

14  be.

15            THE COURT:  That is considerable.

16            But other than Ms. Cooper's testimony, what,

17  whether live or by deposition or otherwise.

18            MR. JACOBSON:  We need to talk about it.  We need

19  to talk.

20            THE COURT:  Okay.  At the moment, all you know

21  about is Cooper.  You may come up with something.

22            MS. RODRIGUEZ:  That is the only one we can

23  identify for certain today.

24            MR. PRESS:  I can tell you right now a concern of

25  mine is you struck our expert witness.  We talked about this

1    at the pretrial, Judge, we may, depending how the defendant's

2    case come in, we may want to offer as rebuttal witness.  If

3    we keep getting legal opinions from lawyers from the witness

4    stand, we are going to want to bring our labor expert in.

5              THE COURT:  To testify to what?

6              MR. PRESS:  To testify that what they are saying is

7    wrong.  Or at least questionable.  I don't know.  We have to

8    talk.

9              THE COURT:  Well, there is a difference between a

10   lawyer getting on and giving legal advice from the stand, and

11   a statement as to what advice was given to members of the

12   MEC.  The advice they were receiving or the merger committee

13   and the negotiating committee, three different groups there,

14   the advice they were receiving is relevant, whether it is

15   wrong or right or, it is relevant to --

16             MR. PRESS:  If I may, I heard Mr. Holtzman give two

17   legal opinions.  I agree with what you said, but despite

18   that, he said the automatic stay would have precluded the

19   March litigation strategy and he said the October strategy

20   had less merit than the March strategy.  He said both of

21   those things.

22             Again, they got three more lawyers that are going

23   to testify.

24             THE COURT:  Well, maybe it will go -- I am not

25   convinced that we have a problem that we have a problem that

1   the jury might be confused at the moment.  Maybe with three

2   more lawyers.

3           MR. PRESS:  Or if we control their testimony in a

4   way that prevents them from giving legal opinions.

5           MR. FRAM:  We are not trying a legal malpractice

6   case here, where they want to say it is not adequate advice.

7   Unless they can show the advice was so far beyond the pale, I

8   don't know why we get into this.

9           MS. RODRIGUEZ:  Your Honor --

10          MR. FRAM:  If I may, Lisa.  The advisors gave

11  advice based upon their legal acknowledgement, we all know

12  from pretrial and the prior proceedings that they are going

13  to explain the basis for their opinion to show that they

14  acted in good faith.

15          I don't know how having a lawyer come in who wasn't

16  involved is going to help.  I think your Honor has previously

17  commented, at least, that there are legal issues here that

18  some of them are ones that the Court should be deciding.  I

19  know you have written opinions before, your Honor, that have

20  held that expert testimony on issues of law is not

21  appropriate.  That is well settled.

22          THE COURT:  In most cases.  There are exceptions.

23          MS. RODRIGUEZ:  Your Honor, this is a different

24  issue, however.  You have got witnesses, lawyers, who have

25  gotten up and opined, for instance and I think the most

1    compelling argument is people getting up and saying Roland

2    Wilder's litigation strategy is, one after another, Roland

3    Wilder's litigation strategies were meritless.

4         THE COURT:  Yeah, but look, first, there is no

5    question in my mind as a legal matter that the first of his

6    strategies was to have the district court bypass the

7    bankruptcy court on a minor dispute doctrine.  At the very

8    aleast, he has a rough road to hoe in that one.  Certainly.

9    I don't know how it would come out.  I don't know how a Judge

10   would have dealt with it.  But it is a tough issue.  But that

11   doesn't, that is not proof of, that they went in attack --

12        MS. RODRIGUEZ:  There is a difference, your Honor,

13   between a rough row to hoe and what the suggestion has been

14   from several of the witnesses, that it bordered on the

15   frivolous.  They have gotten up there and opined continuously

16   about, of the total lack of merit of any of Roland Wilder, a

17   respected, one of the most long term labor lawyers in this

18   country, they have gotten up there and opined that it was

19   bordering on the frivolous, people said, and that is not

20   questioning the legal advice that Richard Seltzer gave.  That

21   is just having some redirect on, you know what, it really

22   wasn't as clearcut as they would have you believe, sitting

23   here today, when the pilots were in this fight for trying to

24   get some leverage, to get the ball rolling.

25        MR. FRAM:  Your Honor, if I may.  We briefed this

1    issue as you recall, our  trial brief outlines our legal

2    basis for arguing that Roland Wilder was dead wrong, and

3    again we would ask the Court to rule on that as a matter of

4    law.  I don't know how having an outside lawyer who wasn't

5    involved come in and try to argue that is admissible or

6    helpful.  If there was a reasonable disagreement among

7    advisors --

8              THE COURT:  Nobody is calling Roland Wilder.  Is he

9    alive?

10             MS. RODRIGUEZ:  He is alive.

11             THE COURT:  No one is calling Roland Wilder.

12             MS. RODRIGUEZ:  He had his video.

13             MR. PRESS:  He wants to remain neutral.  He wants

14   to maintain his neutrality.  He is not testifying for either

15   party.

16             MS. RODRIGUEZ:  We had his video deposition, your

17   Honor, hours of the video deposition where he went through

18   his strategies.   He is not willing to commit to one side or

19   the other.

20             THE COURT:  Okay.

21             MR. FRAM:  Your Honor, our point is that the fact

22   that there was a dispute between lawyers about what to do

23   doesn't help them prove bad faith.  Wilder had an idea, our

24   people disagreed.  We happened to think we were right and it

25   was frivolous but the fact of the matter is --

 1              THE COURT:  No, but when you start opining, I guess

 2     the problem is, hasn't been, it wasn't too bad, maybe it was

 3     neutral -- not neutral.  He wasn't flamboyant.  But if you

 4     go, if you get into the record that Wilder's ideas were hair-

 5     brained, and they are denied the opportunity to do that, the

 6     next bunch of lawyers -- Warner is a lawyer.

 7              MR. FRAM:  Rosen.

 8              MR. JACOBSON: Rosen, and Seltzer is a lawyer.

 9              MR. FRAM:  Seltzer, your Honor, I tell you right

10     now, Seltzer, in the deposition he, they know this,

11     characterized Wilder's litigation theory as irresponsible and

12     as a misreading of the Ionosphere case.  And that will be his

13     testimony.  They know that.

14              This case is not about trying to save Roland

15     Wilder's reputation and prove that he was not off the wall.

16     The fact of the matter is that even if there had been a

17     reasonable basis for his theory, the advice was don't take

18     the chance.  Don't take the chance with this bankruptcy

19     Judge.  Don't take the chance with the American, and there is

20     no basis, I think we have argued this already in the Rule 50

21     motion, even if there was a basis for disagreement among

22     reasonable people, there is no basis for arguing bad faith.

23     That is the issue in the case.

24              MS. RODRIGUEZ:  Your Honor, it is a multi -- you

25     don't go from A to B.  It is a multi step, it is a

1    progression.

2              But you have got, and the basis of your Honor's

3    decision barring our expert reports was that legal analysis

4    was not the province for an expert.

5              THE COURT:  It isn't.

6              MS. RODRIGUEZ:  And I agree.  Except when you have

7    got, for instance, now Seltzer, a bankruptcy lawyer, going on

8    the stand and saying, as Mr. Fram just said, bordered on the

9    frivolous.

10             THE COURT:  If Wilder wanted to defend his own

11   advice, really, that is one thing.  If he wants to come to

12   court and defend it.  But to have just a, they are not

13   offering expert for their advice, they are just having a

14   witness review the, say the advice I gave.

15             MR. JACOBSON:  But each comes in and goes beyond

16   that.  They take on their expert hat here.

17             THE COURT:  No, none of them said I think the

18   advice I gave is wrong.  They say this is the advice I gave

19   and obviously they think it was right.

20             MR. FRAM:  And they will explain why it was right,

21   they will explain the due diligence and the everything they

22   do you expect lawyers to do when you have a high stakes

23   issue.  They should be permitted to do that so we can rebut

24   the suggestion that they acted in bad faith, that they didn't

25   do their jobs as responsible professionals.

Holtzman-direct/Fram                                              113

 1              These people, your Honor, as you might imagine,

 2     they were offended by the idea that their legal advice was

 3     somehow skewed because of this bigger long-term goal on

 4     behalf of ALPA.

 5              And Mr. Seltzer and Mr. Warner, they will walk you

 6     through the memos, they will walk through the notes.  They

 7     absolutely are entitled to explain to the jury why they

 8     thought they were right and why their advice was right and

 9     why they thought Wilder was wrong.

10              THE COURT:  And Wilder would be entitled to that

11     same --

12              MR. FRAM:  Bring them on.  We wish they could put

13     Wilder on the stand and I would relish the opportunity to

14     cross examine him.

15              They had that opportunity to make that record in

16     his videotape deposition.  If you recall, they didn't ask

17     Wilder to try to justify his litigation theories.  Indeed,

18     one of them, your Honor, one of the theories going and suing

19     the APA and American.

20              THE COURT:  One of his points also that he could

21     defend is that maybe it was a weak case, and it only had a 30

22     percent chance of success, but it would create delay and put

23     pressure, a lot of his talk, indeed a lot of Wilder's own

24     discussion was to get leverage, you have to get leverage,

25     something that they are afraid of, even if there is a 20

1    percent chance or 30 percent chance of success, that could

2    create leverage.  It would have to 100 percent, I mean 100

3    percent or 90 percent.  Even if it is 20 percent likely.  But

4    he could say that.

5              MR. FRAM:  Yes.

6              THE COURT:  Not some expert.

7              MR. FRAM:  Precisely.

8              THE COURT:  I mean, in a sense, I have already made

9    the ruling that his litigation, but that his litigation, not

10   one of them, was such assure, slam bang winner, that, or even

11   a 50 percent winner, that, you know, irresponsible, you know,

12   not to follow it.

13             On the other hand, that is different.  Let's face

14   the real world of litigation.  People bring multi million

15   dollars class actions with probably a 15 percent chance of

16   winning them, and it costs a lot of money.  Don't they, Ms.

17   Rodriguez?

18             MS. RODRIGUEZ:  Sometimes, your Honor.

19             THE COURT:  And you know, I wish it were that no

20   lawyer brought a suit unless there was a 50 percent chance of

21   winning it.  But let's face it.  That just isn't the face.

22   Lawyers bring suit for lots of tactical reasons.  But Wilder

23   is the one who has to explain that.  He could explain it.

24   And even things like his views of timing.  Nobody has really

25   gotten into very much what the effect of a lawsuit, even a

1     lawsuit that is relatively weak, as long as it is one that

2     can pass the Rule 11 threshold.

3            You know, what effect that would have on the file

4     timing, whether that would -- well, that is a reason I would

5     like Ms. Cooper.

6            Ms. Cooper very definitely inserts the trophy, a

7     trophy testimony.  She does it very deftly but we don't know,

8     we have no idea who said it, was it American, was or the

9     circumstances, was it sarcastic, was it mocking TWA's

10    inflated sense of its own importance.  I don't know.  That is

11    why I would love to have her here, because I think she could

12    give some testimony that, not just American says it was

13    trophy, she every even refers to it as the trophy issue and

14    it is not relevant to her testimony, so she is very at

15    putting it in, but then, you know, it is like hearsay on

16    hearsay.

17           I don't know where she heard that, from somebody at

18    American, who at American, whether she heard it from American

19    TWA person who said he heard it or she heard it from

20    somebody.  I have no idea.  And yet if she really does have

21    some testimony about American's attitude towards the

22    acquisition, that is relevant.

23           MR. FRAM:  Your Honor, if I may?

24           THE COURT:  I was offended by the deftness with

25    which she threw it in.  I think she knew exactly what she was

1    doing when she did it.

2         MR. JACOBSON: My recollection, it is unclear right

3    now, was in her deposition she said that that was a phrase

4    that Compton said at the initial -- when he introduced them,

5    that is what American was calling it.  It was via Compton.

6    That is my recollection.  I am not 100 percent on that.

7         THE COURT:  I didn't read that.  I don't remember

8    that.  I know she used the phrase, she even used it when it

9    wasn't relevant to what the answer was she was giving.  So I

10   mean she knew what she was doing.  It was very deftly put in

11   to make it -- but that doesn't mean it is not relevant.  In

12   some fashion.

13        That is why I would really like her here where she

14   could testify to that.

15        MR. FRAM:  If plaintiffs are going to request your

16   Honor reconsider the issue of expert testimony, we would ask

17   for a Rule 104 hearing, if they are going to try to bring

18   somebody in.

19        THE COURT:  I haven't said I would consider that.

20        MR. FRAM:  That is what they are requesting in

21   terms of this issue --

22        THE COURT:  They will have to make a formal motion

23   for that.

24        MR. FRAM:  Okay.

25        THE COURT:  The testimony by an expert that

 1   Wilder's theories were good, I don't think is proper expert

 2   testimony.

 3              MR. FRAM:  Thank you, your Honor.

 4              THE COURT:  But I would let Wilder defend, because

 5   I think there is a lot more to the question of a fine lawsuit

 6   than just is it a good lawsuit or a bad lawsuit, is it a 30

 7   percent or 70 percent, and he could testify as to that.

 8              MR. FRAM:  There would be no objection, your Honor,

 9   to Mr. Wilder coming in and testifying.

10              THE COURT:  But just having, ditching the guy, not

11   using the guy who gave the testimony and then calling in some

12   expert to give an abstract opinion as to whether the minor

13   dispute doctrine, I don't think is proper testimony.

14              All right.  Let's take five minutes.

15              (Recess)

16              (Jury enters the courtroom.)

17              DAVID HOLTZMAN, resumes.

18              THE COURT:   Ladies and gentlemen, I am sorry for

19   the longer break this time.  I was making some inquiry as to

20   how long things are going to, what the future is, because I

21   know there are some jurors who are concerned with that.  And

22   I will report to you at end of the day before you leave where

23   I think we stand.

24              Okay.  But that is what I was doing for most of the

25   quote break, it wasn't a break out here.  For most of your

 1    break.

 2              Okay.  Mr. Jacobson, I understand you are going to

 3    conduct the cross.

 4              MR. JACOBSON: Yes, your Honor.

 5              THE COURT:  Okay.

 6              MR. JACOBSON: For the benefit of the court reporter

 7    I will try to speak more slowly.

 8              THE COURT:  By the way, I don't know that you have

 9    any idea what a phenomenal job this court reporter has done

10    by herself.  Usually in a trial this long we have two or

11    three reporters.   And she has done it by herself, and she

12    has done an absolutely marvelous job quietly, efficiently,

13    and I want to recognize that.

14              Mr. Jacobson.

15              MR. JACOBSON: Thank you, your Honor.

16    Q.   Mr. Holtzman, I would like to start if I could at the

17    end of your relationship with the TWA pilots, the former TWA

18    pilots at that point.  Do you recall when the National

19    Mediation Board issued its single carrier ruling?

20    A.   Yes.

21    Q.   What day was that, sir?

22    A.   It was the first week in April.

23    Q.   The first week in April??

24    A.   Of 2002.

25    Q.   Of 2002.

1    Q.   All right.  And at that time?

2            THE COURT:  Actually that isn't the date.  I think

3    it is March.  I think it is March 5, 2002.  2002 is the date

4    that the NMB declared that they had single carrier status.

5            THE WITNESS:  That's correct.

6            MR. JACOBSON: Your Honor, I agree.  I was just

7    asking Mr. Holtzman --

8            THE COURT:  I don't want to testify, but I think

9    that is the date that really isn't in dispute.

10            MR. JACOBSON: That's correct, your Honor.

11            I was asking Mr. Holtzman because he seems to have

12    such a remarkable memory.

13    Q.   Now, on that day, when you stopped being, you being

14    ALPA, stopped being the exclusive bargaining agent for the

15    former TWA pilots, do you recall that?   That is what

16    happens?

17    A.   I recall that, yes.

18    Q.   All right.  And that means that there is no longer a TWA

19    MEC, correct?

20    A.   Well, that is a union bylaw question.  It makes sense,

21    but I don't know that for certainty.

22    Q.   Well, you do know for certainty that all the locks on

23    the office at Westport were changed, correct?

24    A.   Yes.

25    Q.   So that the various MEC officers and representatives

1   couldn't get into the space any more?

2   A.   Well, they were able to get in to get their things.

3   Q.   Isn't it a fact they were not allowed in to get their

4   things?

5   A.   No, that is not a fact.

6   Q.   That is not a fact.  All right.  Isn't it a fact that

7   all of their records and notes and personal possessions were

8   still in the office?

9          MR. FRAM:  Your Honor, I object.  First of  all, we

10  are beyond the scope.

11         THE COURT:  Well, I don't -- I am going to allow --

12  I will overrule that objection.

13         MR. FRAM:  What is the relevance?  What control

14  does this witness have over any of that?

15         THE COURT:  I don't know where it is.  The fact

16  that they became a nonrepresentative, that, the union with

17  the exclusive bargaining agent changed, and was now allied

18  with APA rather than ALPA, is relevant.  I am going to allow

19  to it agree.  I an not --

20         MR. JACOBSON:  I am not going to spend a lot of time

21  on it, your Honor.

22  Q.   You are basically the top person in the office of the

23  staff, correct?

24  A.   I wasn't the, I wasn't the top person by supervision.  I

25  was the top person by the seniority of the position in terms

1    of it being a professional position.

2    Q.   You had the corner office in the suite, correct?

3    A.   That's right.

4    Q.   And you supervised and organized the packing up of all

5    the things that had been the TWA MEC?

6    A.   I did not supervise, no.

7    Q.   You directed the office manager under your direction to

8    pack up boxes of all the documents, all the notes, everything

9    else, right?

10   A.   No, she did not work under my direction.

11   Q.   All right.  Do you know that hundreds of boxes of

12   documents were packed up in that location, correct?

13   A.   Many boxes were boxed up.

14   Q.   Were hundreds of boxes of documents packed up?

15   A.   If I said hundreds before, I am not sure if I was

16   correct.  But it was many, many boxes.

17   Q.   All right.  And they are all shipped to a place called

18   Iron Mountain, right?

19              MR. FRAM:  Your Honor, I object.

20              THE COURT:  Yes.

21              MR. FRAM:  May we see your Honor at sidebar.  Or

22   that is fine.

23              THE COURT:  Where is this going?

24              MR. JACOBSON: I am going to explain why there is an

25   absence of certain documents here.  I am not casting blame

1   for it.

2            THE COURT:  No.  Go to another area.  Go to another

3   area.  Jack.

4            MR. JACOBSON: All right.  Your Honor.  I

5   understand.

6   Q.   Let's move now to the beginning of this situation, a

7   little before the American Airlines proposal was mentioned.

8   And there was something called a stand-alone plan, correct?

9   That was being worked on?

10  A.   The company had --

11  Q.   That could be a yes or no, sir?

12  A.   Yes, the company had a stand-alone.

13  Q.    You were involved with the negotiating committee on

14  working out the terms of that stand-alone?

15  A.   No.

16  Q.   You were not involved with the negotiating committee in

17  negotiating with TWA, Inc., regarding how ALPA would

18  participate in the stand-alone plan?

19  A.    Amy problem is with the stand-alone plan, we did

20  negotiate with the company.

21  Q.   Say that again.  I didn't understand what you said.

22  A.   We were not involved in what was called the stand-alone

23  plan.  However, we did negotiate with the company during that

24  period.

25  Q.   All right.  Let me give you what has been marked --

1            THE COURT:  The stand-alone plan involves the

2    potential  of unions making concessions to create, in effect,

3    to create money, capital, for operating expenses for the

4    airlines, right that was, in fact, that was not the only

5    factor but it was one of the factors.

6    A.   The company did not come to us and say this is a

7    stand-alone plan.  They came to us far our concessions for

8    short term survival.

9            THE COURT:  And you --

10   A.   And we engaged them.

11           THE COURT:  And you engaged them in discussions in

12   which you were involved in over how much of a concession the

13   pilots would make.

14           THE WITNESS:  Yes.

15   Q.   And the company came to you and said they wanted to get

16   savings of approximately 100 million dollars per year.

17   Correct?

18   A.   No.

19   Q.   And they said they wanted to get savings from the TWA

20   pilots  of approximately 16 million dollars per year,

21   correct?

22   A.   The 16 million figure is correct.

23   Q.   Let me show you what has been marked as exhibit P-166.

24   Do you have that before you, sir.

25   A.   Yes.

1   Q.   And that is a memo from you that covers an email from

2   you?

3   A.   Yes.  An email from me, yes.

4   Q.   And your email is forwarding to Barbara Flynn an email

5   you got from stand Henderson, correct?

6   A.   Yes.

7   Q.   Stand Henderson is executive at TWA, Inc.?

8   A.   Yes.

9   Q.   All right.  He was the point man on the stand-alone plan

10   negotiations?

11   A.   He was a point person from these negotiations, correct.

12   Q.   And he is forwarding you a document, I will offer

13   exhibit, is this P-166?

14          MR. FRAM:  No objection, your Honor.

15          THE COURT:  No objection, P-166 in evidence.

16   Q.   Now, you recall that at this point, and this email is

17   December 5, 2000, sir?

18   A.   Yes.

19   Q.   You recall at this point you had been in discussions and

20   negotiations regarding the concessions that TWA wanted from

21   ALPA for several weeks?

22   A.   Yes.

23   Q.   And in fact, there were a document known as a term sheet

24   that was being exchanged back and forth between ALPA and TWA?

25   A.   Yes.

1    Q.   And this letter from Mr. Henderson was forwarding you

2    the 11 version of the term sheet, correct?

3    Q.   You can see in the middle of that page it says term

4    sheet 11 dot DOC is attached?

5    A.   I see that.

6    Q.   As each new version came along the number was

7    incremented up, correct?

8    A.   I believe so, yes.

9    Q.   Now, you had phone conversations with Mr. Henderson

10   regarding this stand-alone plan as well, correct?

11   A.   Yes.

12   Q.   Up to this point, up to December 5, one of the main

13   concerns, difficulties in putting the plan together was the

14   reluctance of the IAM, the International Association of

15   Machinists, to participate in the plan, correct?

16   A.   It was one of TWA's problems, yes.

17   Q.   And now if we turn to the second paragraph of the

18   incorporated email.  Mr. Henderson tells you in the email

19   from him to you that quote, I am told that the IAM is now

20   actively engaged in discussions which might make it possible

21   for some of the limited language Al ALPA now deserves to

22   protect against what is unknown to be less necessary.

23          That is an awkward phrase.  You understand that to

24   mean that in the term sheets that you were negotiating with

25   negotiating committee, with TWA corporate, there was language

1    that would cause the concessions you were giving, ALPA was

2    giving, not to kick in unless IAM and the other participants

3    all made their concessions as well, correct.

4    A.    That was a concern.  I am not clear that that is what

5    this language means, but what you said before, it was a

6    concern to ALPA.

7    Q.    All right.  And if we turn to the next page we have the

8    beginning of this term sheet version number 11.  Correct?

9    A.    Yes.

10   Q.    All right.  And in fact, if I understand correctly, ALPA

11   actually drafted the first version of the term sheet.  Isn't

12   that right?

13   A.    If memory serves, that's correct.

14   Q.    And so among the term sheet items under 1 B there is a

15   provision there for TWA agrees to have its investment bankers

16   meet with ALPA's investment bankers to discuss various terms

17   and conditions of possible deals.  Right?

18   A.    You are in 1B on page 1?

19   Q.    Page 1 of the term sheet, sir.

20   A.    Let me look at it.

21   Q.    Certainly.

22   A.    Yes.

23   Q.    And if we turn to the second page of this, the top in

24   paragraph 3, there is a reference to a business plan.  Do you

25   see that?

1    A.    Yes, I do.

2    Q.    And the business plan referred to there is also what is

3    often referred to as the stand-alone plan?  Correct?

4    A.    Subject to the fact that we weren't calling them a

5    stand-alone plan, yes.

6    Q.    When I say, let me not use this phrase since it causes

7    you trouble.  This business plan was a plan for how TWA could

8    go forward without either merging with someone or being

9    acquired by somebody.

10   A.    On a short-term basis.

11   Q.    And they had a very large accounting firm, and advisory

12   firm, Price Waterhouse Cooper LLP review that plan?

13   A.    Yes, that's right.

14   Q.    And you, you being ALPA, you didn't want to make, you

15   and the pilots you are representing, didn't want to make the

16   large financial concessions being asked for by TWA unless you

17   had a reason to believe that the plan had a reasonable chance

18   of success.

19   A.    Yes, that's right.

20   Q.    So they were letting you meet directly with Price

21   Waterhouse Cooper and to get a copy of the Price Waterhouse

22   Cooper analysis so that ALPA, and its large economic

23   investigation branch, we have heard so much back in DC could

24   analyze it and see whether the plan for TWA to go forward

25   without merger had a reasonable chance of success.  Correct?

 1   A.   I am agreeing with what the language says, yes.

 2   Q.   That is what you were negotiating for, you wanted the

 3   right to get a copy of Price Waterhouse Coopers analysis and

 4   to speak to them so that you could assure yourself, right?

 5   A.   That's right.

 6   Q.   And TWA was willing to give that to you?

 7   A.   Yes.

 8   Q.   All right.  And there is also an investment company,

 9   investment bank, Rothschild, right?

10   A.   That's right.

11   Q.   They were going to share with you the confidential

12   Rothschild retainer letter so you would know what the terms

13   of their involvement were?

14   A.   I don't remember that part.

15   Q.   Ask just look down third line from the bottom in this

16   paragraph.

17   A.   It says that ALPA will be provided a copy, yes.

18   Q.   And you know, you see the reference all to the Bain

19   report there.

20   A.   Yes, I see that.

21   Q.   Do you recall what, who Bain was, right?

22   A.   I am sorry, I don't call Bain being report.  I know who

23   Bain is.  I don't recall them being record.

24   Q.   Who do you recall Bain being?

25   A.   A consulting firm.

1    Q.   1 of the very large business consulting firms in the

2    United States?

3    A.   Yes.

4    Q.   So you were going to get copies of all of this

5    information, you being ALPA, so that you can decide whether

6    or not to make concessions necessary to let this dealing

7    forward, correct?

8    A.   That is true.

9    Q.   And you are agreeing, even though your amendable date

10   hadn't arrived yet as part of this deal ALPA would agree to

11   enter into amendments, or negotiations for amendments, to the

12   collective bargaining agreement?

13   A.   Yes, that's right.

14   Q.   So they are asking you to agree specially since they had

15   no right to begin those negotiations unless both parties

16   agreed?

17   A.   That's right.

18   Q.   Okay.  And then you go to paragraph 3 which is a little

19   lower on the page.  It is called limitations of amendments.

20   Do you see that there, sir?

21   A.   Yes.  I did.

22   Q.   All right.  And could you, these limitations on

23   amendments were conditions that either had to be  satisfied,

24   that is, they actually had to come true or ALPA had to waive

25   them before the concessions ALPA was going to make in the

1    agreement, concessions in its collective bargaining

2    agreement, would take effect?

3    A.   Let me review that.

4    Q.   Certainly, certainly.

5         (Pause)

6    A.   Yes.

7    Q.   So you are going to agree, you, I keep saying you, you

8    don't mean you personally, you understand by that I mean ALPA

9    on behalf of the TWA pilots?

10   A.   Yes.

11   Q.   That you are going to agree to certain changes,

12   collective bargaining agreement, that will include

13   concessions of some substantial financial value but none of

14   those are going to take place unless all these conditions

15   that are listed here either actually happen or ALPA decides

16   to waive them, right?

17   A.   Correct.

18   Q.   And one of those is that the savings from the amendments

19   to the TWA collective bargaining agreement won't exceed the

20   sum of 17.6 million per year, excluding benefits?

21   A.   Correct.

22   Q.   Those are wage givebacks, right?

23   A.   They would be in effect wages, they would be the result

24   of work rule changes  which translate to wages.

25   Q.   Right.  And then in addition the pilots would give back

1    ten percent of the current medical and dental benefit costs.

2    So the first set of ones are limits on how much the pilots,

3    TWA pilots, are giving back, right?

4    A.   Correct.

5    Q.   If you swing down to the next set of limitations called

6    "Further Limitations," there is a paragraph relating to the

7    IAM, correct?

8    A.   There is a paragraph relating to the IAM.

9    Q.   All right.  Essentially the first part of that, C, says

10   that on a percentage basis the pilots aren't going to give up

11   more in effective salary and wages than the IAM members give

12   up, right?

13   A.   Correct.

14   Q.   Sort of a one for all, all for one, you don't want to be

15   the guys carrying the whole load.  Is that right?

16   A.   Yes.

17   Q.   Okay.  And on the next paragraph is that the amendments,

18   these cost give-aways, or salary give-aways, work rule

19   changes and all that, they don't become effective unless the

20   total savings that TWA is going to have on a annual basis is

21   at least 100 million dollars.

22   A.   That is what the term sheet says.

23   Q.   That is what you all were negotiating and agreeing to?

24   A.   We weren't agreeing to it but we were negotiating.

25   Q.   All right.  And that of course relates to the 100

```
1    million dollars in receivables income that are supporting a

2    note to a group called  Constellation, correct.

3    A.    No.

4    Q.    The 100 million dollars is not related to the other 100

5    million dollars.  It is that what you are telling us.

6    A.    It would not collect 100 million dollars in cost savings

7    in time to pay the group of creditors.

8    Q.    But you knew that Constellation wanted to see that there

9    is going to be 100 million dollars a year in savings in order

10   to work out their deal?

11   A.    That was not represented to us, no.

12   Q.    Let's turn to the next page of this agreement?

13            THE COURT:  Draft agreement.

14   Q.    Of this draft agreement.  Conditions subsequent.  Do you

15   see that?

16   A.    What page?

17   Q.    The bottom of page 2, it says "Conditions Subsequent".

18   The conditions appear on the following day.  Page 3.

19   A.    Okay.

20   Q.    All right.  And you know what conditions subsequent I

21   is, sir, right?

22   A.    Yes.

23   Q.    It is something that after a deal comes into place, it

24   has a, it has to happen to keep the deal in force, correct?

25   A.    That's right.
```

1    Q.   And a condition subsequent here including that they have

2    agreements with the aircraft lessors.  Do you see that, sir?

3    A.   Give me a moment.

4    Q.   Slur.  Don't mean to rush you?

5    A.   Okay.

6    Q.   And you knew that one of the largest items that TWA has

7    are the leases they have on their airplanes, right?

8    A.   It is a large item, yes.

9    Q.   How many airplanes do they have at this point in time?

10   A.   185 to 190.

11   Q.   And about 17 of them are owned outright by the airline,

12   correct?

13   A.   I am not sure.

14   Q.   Okay.  And then the vast majority of the rest were being

15   leased from Boeing, the manufacturer?

16   A.   There were many leased from Boeing, yes.

17   Q.   And then there were also a handful leased from capital

18   lease companies, people in the business of buying airplanes

19   and leasing them to airlines?

20   A.   Yes.

21   Q.   We are talking primarily Boeing when we talk about the

22   leases and then a handful of planes from other people,

23   correct?

24   A.   In terms of their total fleet, is that what you are --

25   Q.   Total dollars of outstanding liability the airline has.

1    Is that correct, sir?

2    A.    That Boeing is the largest of those?

3    Q.    Yes.

4    A.    Yes.

5    Q.    And by far the largest?

6    A.    I can't say that.

7    Q.    If you remember?

8    A.    I can't say that right now.

9    Q.    That is fine.  And also another condition, subsequent

10   condition is that there are in fact amendments made to the

11   collective bargaining agreements between TWA and IAM, right?

12   A.    Correct.

13   Q.    That you, ALPA, finds satisfactory?

14   A.    If we made such an agreement, yes.

15   Q.    Right.  Okay.  Now, let's move down a little lower to

16   confidentiality here.  I am sorry.  Higher, to paragraph 4,

17   termination of amendments.  One of the things that you on

18   behalf of the TWA pilots want to make sure ha was that if the

19   pilots made these concessions and other people made the

20   concessions, the lessors and the IAM, that they wouldn't get

21   snap backs where they get the concessions back and you were

22   still stuck with your concessions, correct?

23   A.    Yes.  That's right.

24   Q.    That is what this provision deals with?

25   A.    Okay.  I am going to read it.

1   Q.   Sure, please.

2   A.   Okay.

3   Q.   That is an accurate statement, sir?

4   A.   It is a fair statement, yes.

5   Q.   All right.  Now we go down to confidentiality

6   agreements, a little bit lower on that page.  The last line

7   is ALPA's acknowledgement that the terms of this agreement,

8   although confidential in some sense, have to be shown to both

9   the aircraft lessors and the IAM as part of getting them to

10  do their deal?

11  A.   If they were in agreement, yes.

12  Q.   That is a correct statement then?

13  A.   Yes.

14  Q.   Paragraph 7 is another paragraph with some importance,

15  correct, sir.  Professional fees?

16  A.   Yes.

17  Q.   And that is TWA's agreement that if an agreement is

18  signed, that they will pay ALPA for its fees for its lawyers,

19  and investment bankers and so on.  Correct?

20  A.   It was TWA's proposal, yes.

21  Q.   Right.  So if you entered an agreement, they will pay

22  you, turn to the top of the next page, they will pay ALPA an

23  amount not to exceed $120,000 to cover the legal fees and

24  investment banker fees you sustained in reaching this

25  agreement.  Right?

1    A.    Yes.

2    Q.    All right.  Now, these negotiations continued over the

3    following days and weeks, correct, sir?

4    A.    Until the end of December.

5    Q.    Now, let's go to exhibit 167, if we could.  P-167, your

6    Honor.  I am sorry?

7              THE COURT:  P?

8              MR. JACOBSON: Yes, sir.

9    Q.    Take a chance to look at that if you need to, sir.

10             MR. JACOBSON: Your Honor, I don't think I offered

11   P-167 in evidence.

12             THE COURT:  166 I have marked in evidence without

13   objection.

14             MR. FRAM:  Thank you.

15             MR. JACOBSON: Thank you.  I forgot whether I did.

16   I wouldn't want to leave it out.

17             THE COURT:  You did it.

18             (Pause)

19   Q.    Have you had a chance to review that now?

20   A.    What is the question?

21   Q.    There is no question yet.  Have you had a chance to

22   review that?  I wanted to give you a chance to look at it.

23             By the way, this term sheet we have been looking at

24   and went through part of it.  You were involved in working on

25   that document, revising it and drafting it, correct?

1    A.    I was.

2    Q.    And Steve Tumblin was?

3    A.    Correct.

4    Q.    And Michael Glanzer was?

5    A.    Yes.

6    Q.    All three of you were involved in drafting this document

7    for the concessions that were being asked from ALPA for TWA?

8    A.    And obviously TWA.

9    Q.    I am talking about just your side of the table?

10   A.    Correct.

11   Q.    You recognize this document, exhibit P-167, as being a

12   series of emails between you and Stan Henderson of TWA

13   concerning further drafts, et cetera, of this term sheet?

14   A.    Yes.

15           MR. JACOBSON: I move exhibit P-167 in evidence.

16           MR. FRAM:  No objection.

17           THE COURT:  P-167 in evidence.

18   Q.    Conveniently these are in chronological order from the

19   first to the last.  Front to back, unlike so many documents.

20   Let's look at the first page if we could.  We had been

21   looking on December 5 at term sheet eleven, now we are

22   looking at term sheet 16, here on December 14.  Correct?

23   A.    We are on the top page?

24   Q.    Yes, sir.

25   A.    Okay.  Go ahead.

1    Q.    Did I get that right?

2    A.    This is the first page, right.

3    Q.    Yes, sir.  Yes, sir.

4    A.    Okay.

5    Q.    This was an email you received approximately 7:00 p.m.

6    from Stan Henderson, correct?

7    A.    Correct.

8    Q.    He is forwarding you term sheet 16 dot DOC.  Can you

9    read to the jury what Mr. Henderson wrote to you in this

10   email.

11   A.    As discussed in our phone conversation as it relates to

12   term eleven, the language is acceptable to TWA unless advised

13   of possible RLA implications that we might not be aware of.

14   We have been advised that we will have this issue clarified

15   in the morning.

16   Q.    All right.  So the document is getting closer to a final

17   form?

18   A.    Yes, it was.

19   Q.    Turn to the next page.  This is December 15, the next

20   day, 955 in the morning, from Mr. Henderson to you, correct?

21   A.    Yes.

22   Q.    And it is a term sheet 16 and tell the jury what this

23   says?

24   A.    Final version with all agreed changes in place including

25   those sent last night without any additional change.

1    Q.    All right.   Final version.   So at this point we have a

2    document between the two of you, TWA and ALPA, which both

3    sides appear to be satisfied with.   Is that correct?

4    A.    At that date, yes.

5    Q.    That date being December 15, 2000?

6    A.    Correct.

7    Q.    All right.   Then the next email that is just no text,

8    just forwarding you a document called term sheet 16 clean.

9    Do you see that?

10   A.    Yes.

11   Q.    By "clean" you understand that that means the document

12   has had all the marks showings, insertions and deletions

13   removed from it?

14   A.    Yes.

15   Q.    That is a document ready for signing if parties want to

16   sign it?

17   A.    I think that is going a step too far.   But I agree with

18   you, by what clean means.

19   Q.    It is in the form that one would expect to see a

20   document if you are ready to sign it?

21   A.    Correct.

22   Q.    Without all the strike-outs and insertions, correct?

23   A.    Correct.

24   Q.    Let's turn to the next email.   This is email December

25   26, 2000.   Day after Christmas.   Right?

1    A.    Right.

2    Q.    From Mr. Henderson, to you.   Correct?

3    A.    I am included.

4    Q.    Yes.   And the other people included include Steve

5    Tumblin?

6    A.    Correct.

7    Q.    And R Roach of the International Association of

8    Machinists?

9    A.    Correct.

10   Q.    And S Sleigh of the International Association of

11   Machinists? ?

12   A.    Yes.

13   Q.    Do you know R Roach?

14   A.    I met him and talked to him.

15   Q.    Who is R Roach, what is first name?

16   A.    Haven't Robert.

17   Q.    Who is Robert Roach?

18   A.    He was the head of the transportation division of the

19   IAM at that time.

20   Q.    In fact his office in Washington, D.C., correct?

21   A.    I think that's right..

22   Q.    S Sleigh?

23   A.    I think I knew that name at the time, but I don't have a

24   recollection today.

25   Q.    Was S Sleigh your counterpart at the local IAM office?

1    A.    I didn't know of a local office.

2    Q.    Okay, all right.  Then it is you.  And then finally Mike

3    Lichty?

4    A.    Mike Lichty.

5    Q.    He is a person at TWA?

6    A.    Yes.

7    Q.    It is called  Intention of Restructuring Professionals

8    is the caption.  It is a new document?

9    A.    Yes.  I am not sure what your question is.

10   Q.    Let me rephrase it.  This is a different document than

11   term sheets.  This is a document that is contemplated as part

12   of the overall transaction, but it is a different one is a

13   term sheet?

14   A.    Yes.

15   Q.    This is a document relating to the retention of

16   restructuring professionals who will operate or at least

17   manage -- I guess operate is the right word, TWA Inc. once

18   all the documents are signed in place, correct?

19   A.    Yes.

20   Q.    There is a company, a restructuring firm called J. Alix

21   and company, correct?

22   A.    Correct.

23   Q.    J. Alix was the company that recently completed the

24   restructuring of America West airlines.  Do you recall that?

25   A.    I wasn't aware of that at the time.

1    Q.   And you know J. Alix was a restructuring company that

2    was being recommended to deal by Boeing?

3    A.   It was being recommended to TWA.

4    Q.   Yes, to TWA.   You were in that loop, weren't you?

5    A.   I didn't know that they were recommended by Boeing.

6    Q.   Did you have an idea where J. Alix came in?

7    A.   I, my understanding at the time is that they were a firm

8    that the IAM was interested in, and were pushing.

9    Q.   All right.   Okay.   Now, Steve Tumblin had drafted the

10   retention agreement initially and this is an email forwarding

11   to you and him and the others we just described TWA's mark-up

12   of the documents retained, the professionals, correct?

13   A.   Correct.

14   Q.   There are changes,  things they think are a little

15   confusing need to be changed.  Is that a fair statement?  Go

16   to the hex page.  There is a document called TWA restructure.

17   This is December 26 also.  Do you see that?

18   A.   Yes.

19   Q.   Apparently a document that had been circulated

20   previously still had some mark-ups on it so they eliminated

21   that because that is not supposed to be there on this clean

22   version.  Is that a fair statement?

23   A.   Are you looking at the last page?

24   Q.   Yes.  These two go together, correct?

25   A.   Right.

1   Q.   Yes.  Is that a fair statement?

2   A.   Yes.

3   Q.   They are trying to get a document finalized, changes

4   have been made, to get it ready so if the parties wish to go

5   forward they can sign it, correct?

6   A.   Yes.

7            THE COURT:  Was it ever signed?

8            THE WITNESS:   No.

9            MR. JACOBSON: I was going to get to that question.

10  Q.   Now, you know --

11           THE COURT:  I am sitting here, I had nothing to do,

12  so I  --  go ahead.

13  Q.   Now, you are aware that this document, these documents

14  were initially set to be signed at a meeting of the board of

15  directors of TWA, approved, signed by the TWA side, in the

16  first week of January of 2000?

17  A.   I was not aware of that, no.

18  Q.   All right.  Were you aware that that they were postponed

19  to be brought up again at the, was it January 8 or January 9?

20  What was the date of the American Airline asset purchase

21  agreement was signed, sir?

22  A.   I think it was the 9th.

23  Q.   At a regularly scheduled meeting of the board of

24  directors of TWA?

25  A.   It was at a board of directors meeting.

1    Q.   That was a the board of directors meeting where the J

2    Alix restructuring agreement was to be brought up?

3    A.   As I said, I wasn't aware of that.

4    Q.   Oh, you weren't aware of that.

5         Now, we talk about Bob Christy before.  Right?  And

6    he is the head of economic and financial analysis at ALPA.

7    A.   Yeah, he wasn't the head but he was, I think he had a

8    management title.

9    Q.   Was his title director, something like that?

10   A.   No, it wasn't director.

11   Q.   Who was his director?

12   A.   Ana McAhren Schultz.

13   Q.   Okay.  And he came to that first MEC meeting after the

14   TWA American Airline deal was announced, correct?

15   A.   Yes.

16   Q.   And he total, well attended meeting, over 100 pilots

17   there?

18   A.   Yes.

19   Q.   He told the pilots, Christy told the pilots, quote,

20   "We are not going to waive scope."  Do you recall that?

21   A.   He said something very close to that.

22   Q.   All right.  You might still have, I will come to this

23   one later.

24        How closely did you work with the people at Cohen,

25   Weiss and Seltzer during the period say from January of 2001

1    through April of 2001?

2    A.    Fairly closely.

3    Q.    Were you on the circulation lists for memos from them?

4    Legal memos?

5    A.    No.

6    Q.    What is your middle initial, sir?

7    A.    C.

8    Q.    C?   All right.   You already testified to some extent

9    about the asset purchase agreement.   And section -- article

10   10.   And article 10 had some very specific provisions of the

11   CBA that American Airlines want to have removed.   Correct?

12   A.    It was scope successorship and a phrase relating to

13   benefit plan.

14   Q.    Right.   Scope, successorship and benefit plans?

15   A.    Correct.

16   Q.    American Airlines had no desire or made no questions in

17   the asset purchase agreement for any other provisions to be

18   rere moved?

19   A.    Correct.

20   Q.    But ultimately, the collective bargaining agreement that

21   you worked on and that you had signed by the MEC waived more

22   than the items that American Airlines had asked for?

23             THE COURT:   That is the agreement with TWA LLC.

24             MR. JACOBSON: Yes, sir.

25   A.    Yes, that's right.

1    Q.   In fact, you prepared a memorandum detailing the things

2    that we waived that weren't required from the asset purchase

3    agreement?

4    A.   That's right.

5    Q.   Let me give you what I believe is already in evidence

6    but may not be.  J 403, your Honor.

7          THE COURT:  I have up to J 402 is all I have.  I

8    don't have J 403.

9    Q.   I don't have a stickered one here.  Let me give you J

10   403.

11         THE COURT:  J?

12         MR. JACOBSON: Yes.

13         THE COURT:  You are familiar with this document.

14         MR. FRAM:  Yes, your Honor, there is no objection

15   to it going in evidence.

16         THE COURT:  Okay.  I will add it.  Is that going to

17   be in evidence?

18         MR. JACOBSON: I am intending to do it, your Honor.

19         THE COURT:  Any objection?

20         MR. FRAM:  No objection, your Honor.

21         THE COURT:  Okay.

22   Q.   This is a memorandum, the first two pages are a

23   memorandum that you prepared, sir?

24   A.   Yes.

25   Q.   And what you had done is collected a number of filings

1    in the TWA bankruptcy?

2    A.    I think it was one filing with attachment.

3    Q.    Okay.  The subject line of your memo is "Icahn objection

4    to the Rejection of the Karabu Ticket Program?"

5    A.    Yes.

6    Q.    This is his objection and the various exhibits that he

7    had attached to, or his lawyers attached to.  Is that right?

8    A.    Apparently so, yes.

9    Q.    You remembered that at the time.  When you put it

10   together you knew what it was, right?

11   A.    Yes.

12   Q.    And you quote a portion of the objection.  Correct?

13   A.    Yes.

14   Q.    All right.  And you quoted that, or you sent this to the

15   TWA MEC.  Is that right?

16   A.    Yes.

17   Q.    And to the TWA MEC's bankruptcy committee?

18   A.    Yup.

19   Q.    And to the TWA MEC's merger committee?

20   A.    Yes.

21   Q.    And their negotiating committee as well?

22   A.    That's correct.

23   Q.    You thought it was an important document for them to

24   know about, right?

25   A.    That would have been interesting information.

1    Q.   And you quoted a portion of the motion that you thought

2    was of particular importance so you would highlight it for

3    the readers, is that right?

4    A.   Apparently so, yes.

5    Q.   Do you recall doing that, sir?

6    A.   I don't.

7    Q.   All right.  And this is what they say backed up with all

8    these documents that they are citing, correct?

9    A.   Correct.

10   Q.   And what they say is that as the evidence -- why don't

11   you read that paragraph that you chose to the jury so they

12   are aware what you thought was important for these various

13   MEC committees to know.

14   A.   This whole paragraph?

15   Q.   Yes, sir.  I know it is a little long.

16   A.   Okay.  As the evidence already adduced in this case

17   shows, motivating the proposed --

18   Q.   I can't hear you.

19   A.   As the evidence already adduced in this case shows,

20   motivating the proposed American acquisition transaction is

21   the desire of TWA's senior management to retain their jobs,

22   avoid being replaced by a crisis management team from J, Alix

23   and Associates, and receive lucrative bonuses.  As discover

24   in connection --

25   Q.   That is probably "discovery," right?

```
 1   A.    Probably.   In connection with the employee retention and

 2   bidding procedures motions heard by Judge Robinson on January

 3   26 and 27 revealed, TWA had been pursuing what it termed the

 4   self help plan, which involved a restructuring of TWA's debts

 5   through a combination of new and replacement financing  and

 6   concessions from its aircraft lessors and unions.   A

 7   condition to certain union concessions was the replacement of

 8   top management with a team from Jay Alex.

 9   Q.    You don't have to read the citations.

10   A.    Okay.

11   Q.    Despite the fact that TWA was on the verge of

12   successfully implementing the self help plan, senior

13   management chose to shift its focus to the purchase offer

14   from American which had agreed to retain senior management on

15   at least an interim basis, and was willing to support a 15

16   million dollars management bonus program, of which one-third

17   would flow to the debtor's three most senior managers?   All

18   right.   And the one-third of 15 million is five million.

19   Correct?

20   A.    Yes.

21   Q.    And the most senior of those managers would be Bill

22   Compton, CEO?

23   A.    Senior by title, yes.

24   Q.    CEO, CFO, and General Counsel were three who were going

25   to share the bonus plan?
```

1    A.    I don't know that.  But could be.  I don't know.

2    Q.    You don't recall or didn't check it out?

3    A.    Those three people I think were the three most senior.

4    Q.    All right.  And is it typically when three senior

5    manages split a pie like that, that they split it all equal

6    shares or does someone tend to get a bigger piece of pie?

7              MR. FRAM:  Objection, no foundation.  Calls for

8    speculation.  How would he know what typically happens when

9    the bonus pie gets split up.

10             THE COURT:  Rephrase it.  I will sustain that

11   objection.

12             MR. JACOBSON: I understand, your Honor.

13   Q.    Would you expect that under this retention plan that

14   American Airlines is offering the senior management of TWA,

15   that Mr. Compton should expect to receive at least a third of

16   the $5 million bonus.

17   A.    I don't know.

18   Q.    All right.  I think this is defendant's 379.  I will

19   skip over it.  I want to get done this afternoon.

20             (Pause)

21             THE COURT:  To the court reporter, silence is not

22   golden.  She gets paid by the word.

23             MR. JACOBSON: I am trying to skip ones.

24   Q.    I believe we had a version of this document earlier.

25   This would be plaintiff's 138.  Let me give this?

```
 1              THE COURT:  P-138.

 2              MR. JACOBSON: Yes, your Honor.

 3              THE COURT:  P-138 is not in evidence.

 4   Q.   Sir, you have in front of you P-138?

 5   A.   Yes.

 6   Q.   All right.  And is this a copy of your March 12, 2001,

 7   memo to Richard Seltzer, a version of which was previously

 8   entered in evidence on your direct examination?

 9   A.   Yes.

10   Q.   And there are certain handwritten notes on this.

11   Correct?

12   A.   Yes.

13   Q.   And that handwriting is not your handwriting, is it,

14   sir?

15   A.   No, it is not.

16   Q.   And you have since heard that that handwriting belongs

17   to Mr. Seltzer.  Is that correct?

18   A.   I haven't learned that, no.

19   Q.   All right.  Do you recall that it --

20              THE COURT:  Have you seen this document with those

21   handwritten notes on it before.

22   A.   I think I was asked to say something about it in my

23   deposition.

24              THE COURT:  This came from ALPA's file, not from

25   Seltzer's file.
```

```
 1              MR. JACOBSON:  Correct.

 2              THE COURT:  This was in ALPA's file.

 3              THE WITNESS:  But I don't, you know, I only know

 4   what I know.

 5              THE COURT:  I have to agree with that.  I know a

 6   few things I don't know.

 7              THE WITNESS:  Sorry to be flippant, I just don't

 8   know about the handwriting.

 9              THE COURT:  Go ahead.

10   Q.   So you had a telephone conversation with, with Mr.

11   Seltzer the day or day after you sent him this memo, either

12   March 12 or March 13.  Do you recall that, sir?

13   A.   Well, we met on March 14.  Which may have had a

14   telephone conversation on the 13.  I don't recall.

15   Q.   You don't recall one way or the other.

16   A.   No, I don't.

17   Q.   So you don't recall whether or not you had an exchange

18   with him about what his views were and in in connection with

19   your questions prior to that meeting?

20   A.   It is certainly possible but I don't have a

21   recollection.

22              THE COURT:  Mr. Holtzman, in the category of

23   knowing what you know, did Mr. Seltzer answer your question.

24   Forget whether, this handwriting or any other way, in some

25   fashion did he convey to you answers to your questions.  Four
```

```
1    questions.  We have seen them before.

2              MR. JACOBSON: We have seen the questions.

3              THE COURT:  P-138 I think.  Did Mr. Seltzer convey

4    answers to those questions?

5    A.   He certainly answered number 1.

6              THE COURT:  By the way, is there any objection, Mr.

7    Fram, to admitting P-138?

8              MR. FRAM:  There is, your Honor, it is not his

9    handwriting.

10             THE COURT:  No, no.  The document itself.

11             MR. FRAM:  Your Honor, that is already in evidence.

12   The memo.

13             THE COURT:  It is?

14             MR. JACOBSON: Not the handwritten version.

15             MR. FRAM:  I don't think he should be questioned

16   about the handwriting.  It is not his.

17             THE COURT:  All right.  But the document, I thought

18   I have seen the document before.

19             MR. FRAM:  The document is in evidence, your Honor.

20             Give me a moment.

21             THE WITNESS:  Your Honor, he asked me questions.

22             THE COURT:  In some fashion, not by his handwriting

23   because you don't recognize the handwriting, but in some

24   fashion, he answered the question.

25             THE WITNESS:  He did.
```

1          THE COURT:  Well, it is up to you.  I will allow

2   testimony as to what Seltzer conveyed, whether orally or

3   otherwise.  Of the answers.

4   Q.   Your first question to him --

5          THE COURT:  I am not going to admit, since the

6   document is already in evidence, as probably a D exhibit.

7          MR. JACOBSON: Since I understand Mr. Seltzer is

8   going to be here, we can ask him about the handwriting.

9          THE COURT:  That's right.  It may get in at that

10  point.

11         MR. FRAM:  This is D 378.

12         THE COURT:  D 378.  Okay.  Thank you.

13  Q.   The second question there, was quote, if American

14  continues to insist on a scope waiver, ALPA refuses and no

15  substitute agreement is concluded, will TWA prevail against

16  ALPA on Section 1113?  Do you see that question?

17  A.   Yes.

18  Q.   Don't put it up on the screen.  -- oh, that is in

19  evidence.

20         THE COURT:  Yes.   P 378 version.

21  Q.   All right.  Did Mr. Seltzer in or around March 12, 2001,

22  give the answer, no, no way, no way that TWA is going to

23  prevail?

24  A.   When I said he answered, I am thinking of the later MEC

25  meetings.  I think in this period --

1          THE COURT:  Mr. Holtzman, that is a pretty

2    straightforward question.  You asked him will TWA prevail a

3    against ALPA on the Section 1113.  Did he tell you at any

4    point what his opinion was on that subject.

5    A.   Yes, at any point.

6          THE COURT:  What was his opinion?

7          THE WITNESS:  That TWA would prevail.

8          THE COURT:  That TWA what?

9          THE WITNESS:  That their motion would be granted,

10   their application of 1113 would are granted.

11         THE COURT:  His advice to you was the 1113 was

12   going to be granted?

13         THE WITNESS:  Right.

14         THE COURT:  When did he give you that advice?

15         THE WITNESS:  That is what I was getting to.  I

16   think in still a discussion, obviously the answer is on March

17   21.

18   Q.   Isn't it a fact that in or around March 12, March 13,

19   that timeframe, that Mr. Seltzer in fact TOLD you that there

20   was no way that TWA was going to succeed on this motion, 1113

21   motion?

22   A.   No.

23   Q.   Didn't you in fact get a phone call from Howard

24   Hollander in mid March asking you about your views about the

25   1113?

1    A.   It is possible, but I don't have a recollection.

2    Q.   All right.  And did he ask you what you thought the

3    outcome would be.  Do you have any recollection of that at

4    all, sir?

5    A.   I don't.

6              THE COURT:  The question was will TWA prevail.

7    Against ALPA.  And you said, you are saying his advice was

8    remember, TWA wants the rejection of the collective

9    bargaining agreement.

10   A.   Right.  TWA files an application asking the Court to

11   reject --

12             THE COURT:  He said will TWA prevail against ALPA.

13   Will they?  What did he tell you.

14   A.   As I said on direct, he said that they will prevail.

15   Q.   Okay.  You said that on April 2, he said that on?

16   A.   He said it on April 2 and he also said it on March 21,

17   in my recollection, yes.

18   Q.   Now, when you spoke to Howard Hollander you told Howard

19   that in fact you had consulted with some of the top

20   bankruptcy lawyers in the country on this issue and their

21   opinion was that TWA would not prevail.

22             MR. FRAM:  I object.  There is no foundation he

23   spoke to Hollander about this.  He said in response to the

24   prior question he --

25             THE COURT:  I will let him answer this question.

1    A.   No, I didn't.  He didn't have to.

2    Q.   And did you refer him on to Clay Warner for more

3    questions?

4    A.   I don't recall that.

5    Q.   Let me give you what has been marked as exhibit J 169?

6         This is one of the memos you circulated before,

7    March 12.

8    A.   Yes.

9    Q.   This is a memo from you to, you move J 169 I think it

10   may already be in evidence under a different number.

11        THE COURT:  I don't know.

12        MR. FRAM:  It is.  We put it in this morning, your

13   Honor.

14        MR. JACOBSON: You put it in as D something.

15        MR. FRAM:  We put it in as D 380.

16        THE COURT:  It is already in evidence.  It is in

17   evidence as 380.

18        MR. FRAM:  Yes, your Honor.

19   Q.   Wasn't this memo your effort to present to Clay Warner

20   some  questions relating to the litigation theory that Roland

21   Wilder had presented to you?

22   A.   Relevant to that theory.

23   Q.   I am sorry.

24   A.   Yes, it is relevant to that theory.

25   Q.   Because you want to find out from Clay what his thoughts

1    were about these questions you had relating to Roland's

2    theory and how various things might workout?

3    A.   Yes.

4    Q.   And Clay's reaction was favorable at that point,

5    correct?

6    A.   I don't think so.

7          THE COURT:  You asked fairly complex questions of

8    Clay Warner who works for you and is an ALPA attorney.  Did

9    you perceive him as having special expertise in this area?.

10   A.   Well, he has the time to do the research.  And he is in

11   the legal department, and I value the legal departments

12   expertise.

13         THE COURT:  You didn't consider yourself as being

14   in the legal department.

15   A.   No, I was in the representation.

16   Q.   Let me give awe copy of a document already in evidence

17   as P-119.  J 119.  I am sorry.

18         THE COURT:  Yeah, that is in evidence.

19   Q.   Are you familiar with this document, sir?

20   A.   Yes.

21   Q.   All right.  And this is one of a number of legal

22   memorandums that Roland Wilder prepared during the course of

23   his representation of the merger committee.  Correct?

24   A.   Yes.

25   Q.   And he shared these with you?

1   A.   Yes.

2   Q.   Because you are the lawyer on the spot that at the MEC

3   headquarters?

4   A.   Yes.

5   Q.   And you are working with the merger committee and the

6   negotiating committee?

7   A.   That's right.

8   Q.   And was this memo, did you say that meeting was on the

9   14th, 13th, what day did you say the meeting was?

10  A.   The 14th.

11  Q.   So you had this memo the day before.

12  A.   I am not sure when I received it.  I think we did

13  discuss these issues on the 14th.

14  Q.   All right.  He gives very detailed explanation of every

15  step of his analysis, doesn't he?

16  A.   Yes.

17  Q.   Yes?

18  A.   It is detailed, yes.

19  Q.   And he lays out what the goals are, right?

20  A.   Yes.

21  Q.   What the risks are?

22  A.   Yes.

23  Q.   All right.  He cites the statutes.  Correct?

24  A.   He includes cites.

25  Q.   All right.

1    Q.    He says, what the object is, the goal and the object of

2    the negotiations is to get a fair and equitable integration?

3    A.    Yes.

4    Q.    And you agree with those goals?

5    A.    Yes.

6    Q.    All right.  And he talks about what means might be

7    available to that, the limited means that are available?  Is

8    that right?

9    A.    That's right.

10    Q.    And so he says that essentially says what we need to do

11    here in some way to slow down the process a little bit so

12    that the negotiation process has time to work.

13    A.    Yes.

14    Q.    Now, you have been involved in contract negotiations in

15    the past, right?

16    A.    Yes.

17    Q.    All right.  And for example, you were involved in the,

18    what is called contract 98 for TWA MEC?

19    A.    That's correct.

20    Q.    How many years was that contract under negotiation?

21    A.    Two.

22    Q.    Two years.  And the prior agreement between TWA and

23    ALPA, what year was that in?

24    A.    '94.

25    Q.    How many years did that one take to negotiate?

1   A.   That was one of the quick deals.  That was three or four

2   months.

3   Q.   Three or four months.  Not a big change from the prior

4   contract, is that right?

5   A.   Well, it was a big change.  It was a concessionary

6   environment and you can do a lot in a hurry if you need to.

7   Q.   There all right.  But typically if you are negotiating

8   big things you need some time to do it, right?

9   A.   Often times.

10  Q.   Now, we talked about establishing leverage a little

11  earlier, and that being the goal of Roland Wilder.  If you

12  turn to the third page of this document, it has a whole

13  section about establishing leverage, right?

14  A.   That's right.

15  Q.   And if you go to the third paragraph there, he is

16  talking about what is called minor disputes.  And whether or

17  not bankruptcy court has jurisdiction over minor disputes.

18  A.   Yes.

19  Q.   And you understand a major dispute is whether or not

20  there a is a contract in place or who is bargaining

21  representative of the employees, right?

22  A.   It can be, that can be an issue.

23  Q.   And a minor dispute is essentially an argument over what

24  does a particular provision in a contract mean, and whether

25  it has been breached or not?

1    A.    That is an example.

2    Q.    As a normal matter of your years doing this stuff if you

3    have a minor dispute over a labor contract you don't just sue

4    the other side, right?

5    A.    You cannot bring suit.

6    Q.    Right.  You cannot bring suit as a doctrine that says

7    that you have got to go through an administrative process,

8    right?

9    A.    Well, your remedy is the systems board of adjustment.

10   Q.    First you file a grievance, correct?

11   A.    Yes.

12   Q.    That gives the company a chance to correct their

13   misconduct on their own by being, saying hey you did this

14   wrong, right?

15   A.    Yes.

16   Q.    And if they don't agree with the grievance then you can

17   go to the system board of adjustment?  Correct?

18   A.    Yes.

19   Q.    The system board of adjustment can have hearings, you

20   can present evidence, they make a decision?

21   A.    Correct.

22   Q.    That is a form of arbitration and that decision is

23   binding on the parties?

24   A.    Correct.

25   Q.    All right.  And so what Mr. Wilder is saying in his

163

1   memorandum addressed to you and the other advisors of the MEC

2   was that we have a provision in our CBA here that says you

3   can't enter into a successorship arrangement unless the

4   successor gross to keep this contract in place.  Correct?

5   A.   Yes.

6   Q.   They said since they are entering into an asset purchase

7   agreement that doesn't have that provision, they, we can say

8   they violated that provision of our contract.

9   A.   Yes.

10  Q.   And so that would be a minor dispute under the contract,

11  under the labor law?

12  A.   Yes, that's right.

13  Q.   And therefore, that goes to a grievance?

14  A.   That's right.

15  Q.   You can file a grievance for that.  If the company

16  disallows the grievance you can go to the system board of

17  adjustment?

18  A.   Again correct.

19  Q.   You can't sue them over it because under your labor

20  contract, under the collective bargaining agreement, the

21  labor law, you have to go through the administrative process.

22  A.   The you have to employ the grievance machinery, yes.

23  Q.   I will call it a grievance machinery.  You have to use

24  the grievance machinery.  Right?

25  A.   Yes.  Correct.

1    Q.   So Roland Wilder's proposal was that because you have to

2    use the grievance mechanism and because the courts don't have

3    jurisdiction, this claim, that assigning the asset agreement,

4    they violated our contract, is something outside the

5    jurisdiction of the Court system.--

6              THE COURT:   Are you asking him to agree to that?

7              MR. JACOBSON: I am asking if that is the theory.

8              THE COURT:   There will be a follow-up question by

9    me.

10             MR. JACOBSON: I got two more questions before your

11   follow-up question.

12             THE COURT:  Because the contract didn't say it

13   would have to be, it only said that the union would go, that

14   American would only go forward with the transaction if the

15   pilots agreed to that.

16             It wasn't a case where -- am I correct?  It wasn't

17   a case where American and TWA agreed to abrogate those

18   provisions.  They would have said the conditions of the deal

19   is the pilots themselves.

20             THE WITNESS:  That's right.

21   Q.   The contract, the CBA said they can't enter an agreement

22   to do that, though?

23             THE COURT:  To do what?

24             MR. JACOBSON: An agreement to have the pilots waive

25   their conditions.

1        THE COURT:  Where does it say that?  Where does it

2   say the pilots can't waive --

3        MR. JACOBSON: It doesn't say the pilots can't

4   waive.  It says the employer can't make that a term of their

5   successorship contract.

6        THE COURT:  Wouldn't need to.  American would have

7   two choices, either go ahead with the deal without the

8   waiver, or back out of the deal, in which case there would be

9   no deal.

10       MR. JACOBSON: Those are the choices.

11       THE COURT:  It is never a situation where anybody

12  is made to accept that deal.  All right.

13       Go ahead.

14  Q.   And wasn't part of Mr. Wilder's litigation theory that

15  in order to allow the system board of adjustment to go

16  through the grievance process, that an action could be filed

17  in federal court --

18       THE COURT:  You are asking if that was his theory?

19       MR. JACOBSON: Yes, if that was his theory.

20       THE COURT:  You are asking him to read backwards

21  what is already in evidence.  That is his theory.  That is in

22  evidence already.

23       MR. JACOBSON: One more thing.

24       THE COURT:  No, you can't use him as a foil to try

25  to prove the right necessary of that opinion.

1          If you want to say that is the opinion you gave,

2     that is already in evidence.

3     Q.   Didn't the collective bargaining agreement include a

4     provision prohibiting TWA if it filed bankruptcy from filing

5     a 1113 motion?

6     A.   Yeah, I believe it did.

7     Q.   That was something that TWA agreed to, in return for the

8     concessions that the pilots made in the second bankruptcy?

9     A.   Either the first or second.

10    Q.   One of the two bankruptcies?

11    A.   Yes.

12    Q.   And that was a bargained for consideration.

13    A.   We wanted that provision and we object obtained that

14    provision.

15    Q.   Wasn't another one of his theories that once TWA filed

16    the 1113 motion, they were again in breach and there was

17    another minor dispute?

18          THE COURT:  No.  Hold it.  You can show what advice

19    they got.  You can't use him as a foil to get to the

20    rightness of that opinion.  You know what I am saying.  If

21    you want to say was that the advice you got from somebody,

22    tell him what advice was given by -- but not that it is

23    correct advice.  Only that it is the advice that was given.

24    Q.   Wasn't part of the advice that Roland Wilder gave the

25    MEC that you were present for, and you saw his memos, that

1    was by filing the 1113 motion itself, TWA would be creating a

2    minor dispute that would be subject to the system board of

3    adjustment?

4    A.   The merits of any of the --

5              THE COURT:  No, did you get that?  Was that advice

6    that Roland Wilder gave?

7    A.   That --

8              THE COURT:  That the filing, the mere filing of a

9    1113 motion, was a breach of the CBA, the collective

10   bargaining agreement, which would trigger the right to the

11   grievance procedure as a minor dispute.

12   A.   That was part of the Roland Wilder's theory.

13             THE COURT:  Okay.

14   Q.   I am trying to throw as many overboard as I can, your

15   Honor, to get to the end?

16             THE COURT:  Okay.

17   Q.   I believe this is a document that was not yet in

18   evidence.  I would lake to give you what has been marked as

19   exhibit P 235.  We are stepping forward in time now, Mr.

20   Holtzman, to May of 2001.

21   A.   Okay.

22   Q.   Do you recall getting this email prepared by Clay

23   Warner?

24   A.   I received it.  I don't have a recollection at the

25   moment.  But I know I received it, yes.

1   Q.   It is an email from Clay Warner to you, to Robert

2   Seltzer, to Michael Glazer.

3        THE COURT:  Glanzer.  G L A N Z E R.

4   Q.   Timothy Walsh,, do you know who Timothy Walsh is?

5   A.   I believe he is Leboeuf Lamb, New York, I think.

6   Q.   Steve Tumblin another LeBoeuf Lamb lawyer.  Correct?  He

7   is also recipient?

8   A.   Yes.

9   Q.   I would like to offer P 235 in evidence.

10        MR. FRAM:  I have to object.  First of all, it is

11  beyond the scope of direct.  I don't see how it has relevance

12  to any issues in the case.

13        THE COURT:  Why is this relevant to the case?

14        MR. JACOBSON: Sidebar?

15

16

17

18

19

20

21

22

23

24

25

```
 1              (At sidebar).

 2         THE COURT:  This appears to be somebody, somebody

 3    circulated a draft of the position, I assume it was the

 4    union's petition for its work in opposing the 1113.

 5         MR. JACOBSON: I wouldn't say opposing.

 6         THE COURT:  What?

 7         MR. JACOBSON: I would not say opposing.  It is

 8    their fee application saying that we should get paid various

 9    moneys because we got the TWA pilots to waive their

10    protective scope, and that we prevent prevented a strike and

11    labor unrest.

12         THE COURT:  We haven't seen that.

13         MR. JACOBSON:  This document leads up to the filing

14    to get to it.

15         THE COURT:  Well, you have got to lay more of a

16    foundation than just to stick this in evidence.  All I know

17    is that it is an email.  You can ask him, did you, are you

18    familiar with the fee petition.  The basis of the fee

19    petition was, and the position ALPA took.  I think that is

20    relevant.

21         MR. JACOBSON: I will go that way.

22         THE COURT:  Just to hand this in.  Maybe it will

23    become relevant.  I don't know.  Right now it is way more

24    than a foundation.

25         MR. JACOBSON: I understand.
```

```
 1                    (In open court)

 2            THE COURT:  I am going to sit over here for a few

 3   minutes so I can empathize with the jury.

 4            Okay.

 5            MR. JACOBSON: Thank you, your Honor.

 6            THE COURT:   This is too much empathy.

 7            I like the elevation.

 8            BY MR. JACOBSON:

 9   Q.   Let me hand you this somewhat larger document, exhibit

10   P-226.  This is already in evidence.

11            THE COURT:  226 is in evidence.

12            MR. JACOBSON: Yes.

13            THE COURT:  All right.

14   Q.   Mr. Holtzman, I would like to direct your attention if I

15   could to the point in time when the bankruptcy is winding

16   down.  Do you recall that, sir?

17   A.   Yes.

18   Q.   And ALPA filed an application in bankruptcy court to be

19   awarded certain fees and dollars and all.  Correct?

20   A.   Correct.

21   Q.   All right.  And this document, with all these exhibits,

22   was what was filed in support of that?

23   A.   It is a joint motion of TWA and ALPA.

24   Q.   So TWA actually joined the bankrupt -- the bankrupt

25   actually joins with its union, the employee joined with the
```

```
 1  union to support the union's application for these fees?
 2  A.   Apparently so.
 3            THE COURT:  What?  Is the answer to that question
 4  yes?
 5            THE WITNESS:  Yes.
 6            MR. JACOBSON:  I didn't hear it.  Thank you, your
 7  Honor.
 8  Q.   And among the reasons that ALPA gave for why it would be
 9  entitled to these fees is that it persuaded the TWA pilots to
10  enter into a modified collective bargaining agreement as
11  required by the asset purchase agreement.
12            MR. FRAM:  I object.  The document is in evidence.
13  It speaks for itself.
14            THE COURT:  No, I am going to ask him, I am going
15  to allow that question:
16  Q.   Isn't that correct, sir?
17  A.   Yes.
18  Q.   Didn't ALPA say that when the post petition
19  negotiations, that is the negotiations after the bankruptcy
20  is filed, correct, were ongoing, that TWA filed its 1113
21  motion, correct?  And that there was, it was ALPA's view that
22  if the 1113 motion went forward and was granted, that that
23  could have resulted in significant labor unrest, including a
24  strike.  Was that part of this, you worked on this motion,
25  right?
```

1    A.   No, I didn't.

2    Q.   Didn't you, weren't you involved in correspondence with

3    the --

4    A.   I, I did some backup research in terms of some facts

5    that Steve Tumblin was looking for.  But the motion itself I

6    didn't, I did not work on.

7    Q.   Who is the person at ALPA who was most responsible for

8    working on this motion, in your view?

9    A.   I believe it was Steve Tumblin.

10   Q.   I said at ALPA, as opposed to outside?

11   A.   Oh, I am sorry.

12   A.   It would be someone other than me.  I am not sure who.

13   Q.   All right.  But you still have exhibit 235 in front of

14   you, right?

15   A.   Yes.

16   Q.   All right.  You are involved in the set of emails of,

17   including yourself and Clay Warner, and the various outside

18   the lawyers, and working on the drafts of the motion.

19   Correct?

20   A.   I received copies of emails of drafts of the motion.

21   Q.   All right.  And this exhibit, P-235, is one of the

22   emails you got involving the draft, and with Warner's

23   comments about how things should be changed or certain,

24   asking questions about whether certain things can be changed

25   in certain ways, right?

1    A.    Yes.

2    Q.    And you of course responded to him?

3    A.    I think this is going to Steve Tumblin, I believe.

4    Q.    You are the first recipient there listed, aren't you?

5    A.    I am the first recipient listed.

6    Q.    Okay.

7    A.    I think this is from Clay Warner to Steve Tumblin.

8    Q.    Well, if the two lines, the first name is Holtzman,

9    David, right.  That is you?

10   A.    Yes.

11   Q.    Next one is emailing to himself at work because this

12   email comes from his home account, I believe.  Next one is

13   Warner at ALPA dot org?

14   A.    Yes.

15   Q.    The next one is R Seltzer at his law firm address?

16   A.    Yes.

17   Q.    Then M Glanzer at his law firm?

18   A.    Correct.

19   Q.    Then Timothy Walsh, you said that is a partner of Steve

20   Tumblin from his office.  Yes?

21   Q.    And Tumblin is the last name?

22   A.    Yes.

23   Q.    And aren't you in fact receiving the various drafts of

24   the fee application and the various requests made by Mr.

25   Warner for information and Mr. Tumblin for information in

1   reviewing those?

2   A.   I -- I didn't say that I wasn't.  I did receive the

3   drafts and did read them.

4   Q.   You did receive the drafts, right?

5   A.   Yes.

6   Q.   And you did read them?

7   A.   Right.

8   Q.   And you did make suggestions of changes when there are

9   things that are factually stated that you felt were

10  inaccurate?

11  A.   I don't recall that I do that I did, that I did find

12  things that were factually inaccurate.

13  Q.   I thought you said a few moments  ago you were asked by

14  Mr. Tumblin to review certain facts and to investigate

15  certain factual items for him that he was unclear about?

16  A.   What I did do was prepare this list of things that

17  exceeded the requested waivers in the asset purchase

18  agreement.

19  Q.   This is the document that lists the things that were

20  given up by the TWA pilots beyond what American Airlines had

21  asked for?

22  A.   That's correct.

23  Q.   You prepared that list.  And isn't it a fact that this

24  application asks for money for the expenses that Randy

25  Babbitt incurred on behalf of the TWA MEC?

1  A.   I would have to read it again to know the answer.

2  Q.   All right.  Isn't it fact this document says one of the

3  things that ALPA brought of value to this was avoiding a

4  strike?

5        MR. FRAM:  Your Honor, I thought that was asked and

6  answered.

7        MR. JACOBSON: It wasn't answered.  We had an

8  objection and went to sidebar.

9        MR. FRAM: Maybe counsel can refer the witness to a

10  specific section or sentence so we can move along, if that is

11  the point of this.

12        THE COURT:  Do you have, by the way, a copy of 226

13  in your hand.

14        MR. JACOBSON: He does.

15        MS. RODRIGUEZ:  He has it.

16        THE COURT:  Go ahead.

17  Q.   Since this is in evidence, let me look at post certain

18  parts up so the witness can see them.  Page 4?

19        THE COURT:  Of this, 226.

20        MR. JACOBSON: Yes.

21        THE COURT:  I will give it back to him.

22        MR. FRAM:  Your Honor, you can have my copy.

23        THE COURT:  No.  We have it here.  Okay.

24        Go ahead.

25  Q.   Let's go to page 4, paragraph 10.  This is a list of

1    some of the things that the TWA pilots gave up.  Correct pay

2    increases, more than one and a half million dollars actual

3    annually in flight pay reimbursement.  Do you see that?

4    A.    I  see that.

5    Q.    That is called the flight pay loss amount?

6    A.    Flight pay reimbursement, that would be flight pay loss,

7    yes.

8    Q.    They gave up their contractual provisions against

9    furlough?

10   A.    There was a provision that was not carried over, yes.

11   Q.    Also gave up their right to participate in certain

12   management decisions?

13   A.    Yes.

14   Q.    You were citing all these things in support of your

15   application for fees and costs in the bankruptcy court.

16   A.    I think so, yes.

17   Q.    Next page, paragraph 15 on that.  This is talking about

18   the 1113 motion, correct?

19   A.    Yes.

20   Q.    And this is essentially says that if the 1113 motion

21   went to a decision, it could either result in American

22   terminating the asset purchase agreement, right?

23   A.    We are still on 15?

24   Q.    Still on 15?

25   A.    Let me catch up with you.

1    Q.   Sure.

2                 (Pause)

3    Q.   Is that correct?

4    A.   Yes.

5    Q.   And also to, it could have resulted in significant labor

6    unrest including a strike?

7    A.   That is what it says.

8    Q.   That would have been a problem for the debtor going

9    forward.

10   A.   If they had pilots employed and a strike it would be a

11   problem.

12   Q.   Part of what this says, this is value we brought to the

13   building to the ability of TWA or its successor to go forward

14   as an operating airline, right?

15   A.   I am not sure it is talking about the successor.

16   Q.   No, TWA?

17   A.   Yes.

18   Q.   Go to the next page.   There is a paragraph 18.   ALPA is

19   saying that TWA's agreement to support the payment of ALPA's

20   legal fees was a critical element to ALPA's agreement to

21   enter into expedited negotiations.   Correct?

22   A.   That is what it says, yes.

23   Q.   And these are things that are being filed with the

24   bankruptcy court or intended to be true, right?

25   A.   Yes.

1    Q.    And the agreement to support the payment of ALPA's legal

2    fees, that was in that document we were looking at the

3    beginning of your cross examination, correct, relating to the

4    business plan?

5    A.    I am sorry.  Could you --

6    Q.    Remember we looked at documents early on, your

7    correspondence back and forth in December?

8    A.    Correct.

9    Q.    That is where they made the promise that they would pay

10   your attorneys' fees?

11   A.    Oh, that was an agreement that was not executed.   I am

12   not sure they are relevant.  I mean I am not sure what the

13   question is.

14   Q.    Wasn't that where they made the promise to pay ALPA's

15   legal fees if there is an asset purchase?

16   A.    No, I don't think so.

17   Q.    Okay.  Now, you look a little lower on the same page,

18   page 6, there is relief that is requested, right?

19   A.    Yes.

20   Q.    This is the money you are asking the Court to award ALPA

21   out of the bankruptcy estate for the goods that they brought

22   to the ability of TWA to continue operating as an airline,

23   right?

24   A.    I can't say that this is for TWA to continue operating.

25   Q.    Well, for the operation not to be liquidated, to be able

1   to be sold as assets to TWA LLC?

2   A.   Yes.

3   Q.   And so this is the money you are asking be paid as

4   administrative expense, correct?

5   A.   Just one minute, please.

6   Q.   Sure.   Last line on page 6 refers to as administrative

7   expenses.

8   A.   It is characterized as administrative expense, yes.

9   Q.   Administrative expense is something that is paid ahead

10  of all the unsecured creditors of the company, right?

11  A.   Yes.

12  Q.   It is paid ahead of anything, if there is anything left

13  over, it gets paid to the shareholders?

14  A.   Yes.

15  Q.   It is a high priority item?

16  A.   High provide priority.

17  Q.   ALPA is asking for $525,563 for legal fees.

18  A.   Yes.

19  Q.   And would that include the bills of all the various

20  lawyers who are assisting TWA MEC in connection with the

21  bankruptcy?

22  A.   I don't have the backup on what the fee dollar amount

23  for --

24  Q.   We are talking about the fees for someone like Steve

25  Tumblin, correct?

1    A.    You know, I presume so.

2    Q.    And Seltzer?  Is that right?

3    A.    I don't know that.

4    Q.    How about Wilder?

5              MR. FRAM:  Your Honor, I really object to this.

6              THE COURT:  He doesn't know.

7              MR. JACOBSON: I am asking a different person.

8    A.    I don't know.

9    Q.    Okay.  Now, the next page, the additional amounts being

10   asked for here are $56,776 for actual and necessary expenses

11   in rendering legal services during the period, right?

12   A.    Yes.

13             MR. FRAM:  I object.  Is there an argument here

14   that it was improper for ALPA to seek reimbursement?  This

15   has nothing to do with the issues in the case.  I really

16   object to it consuming time, your Honor.

17             THE COURT:  Yes.  I think it does have something to

18   do with the case but I --

19             MR. JACOBSON: I am going to try to keep moving

20   along.

21             THE COURT:  You are just testifying now.  You are

22   using him as a foil for your own testimony.  That is not

23   testimony.

24             The jury doesn't want to hear your testimony.  They

25   want to hear the witness.

1   Q.   Let's turn to page 9.   There is a paragraph 26 there on

2   the main part.

3            You see filing says that ALPA and its lawyers have

4   benefited all parties, and benefitted --

5   A.   I see that.

6   Q.   And if you look at subpart C which continues on to the

7   next page, can you just tell the jury what the things that

8   benefited all the parties that ALPA did, what this one was?

9            THE COURT:   I don't want to sit here and have him

10  read the agreement.

11           MR. JACOBSON:  All right.

12           THE COURT:   Let me ask you a question.   Is it

13  correct that fees were being sought by ALPA for negotiating a

14  collective bargaining agreement with TWA LLC which reduced in

15  many, many ways, the benefits of pilots, looking for

16  compensation?

17  A.   I don't think that is a true statement.

18           THE COURT:   Isn't that what this says?

19           THE WITNESS:   Well, it would appear to say that,

20  but I --

21           THE COURT:   But it is filed by ALPA?

22           THE WITNESS:   Well --

23           THE COURT:   Doesn't it say what we are seeking

24  legal fees because we helped negotiate a CBA that took away a

25  wide variety of benefits the pilots had?   Isn't that what

1    this whole document says?

2              THE WITNESS:  It appears to say that, but I don't

3    know how that could be.

4              THE COURT:  What is your next question?

5              MR. JACOBSON: Two more lines in this document and

6    that is it for this document.

7              THE COURT:  All right.

8    Q.   In paragraph C we have here, doesn't it say ALPA

9    believes that it would have been entitled to exercise its

10   self help remedies, it continues on the next page, under the

11   Railway Labor Act?

12             THE COURT:  Which page are you on?

13   Q.   Page 9, continuing on to page 10.

14             THE COURT:  Which paragraph?

15             MR. JACOBSON: Paragraph 26 C, your Honor.

16   A.   It says that.

17   Q.   By self help we mean things like --

18             THE COURT:  Striking.

19   Q.   -- slowdowns, strikes, and so on?

20   A.   Yes.

21   Q.   The last line, the last paragraph of this document I

22   would like to turn to is page 12, paragraph 29.  The first

23   three lines of the first sentence of that paragraph, doesn't

24   it say one of the reasons why ALPA believes it is entitled to

25   all this money it is asking for is because without the work

1    of ALPA's council, ALPA and the TWA pilots would have been

2    unable to evaluate or agree to make the requested changes to

3    the ALPA CBA, changes which resulted in a major contribution

4    to the American transaction?

5    A.   Yes, that is what it says.

6    Q.   And in fact, you agree that without the input that they

7    were getting from -- the input they were getting from Mr.

8    Seltzer, Mr. Tumblin, you, Mr. Warner, and the rest of them,

9    that these pilots would not have been able to have decided to

10   waive their scope and accept the new collective bargaining

11   agreement?

12   A.   I don't think you can --

13   Q.   You don't think so?

14   A.   It is --

15   Q.   I can't hear you.

16   A.   I am sorry.  It is impossible, I think, to know what

17   people would have decided under different circumstances.

18   Q.   I will accept that statement.  That is a fair statement.

19          MR. JACOBSON: Your Honor, ten minutes.  I will see

20   how fast I can go.

21   Q.   During the presentations that you claim took place on

22   April 1 and April 2, you weren't present for all of that?

23   A.   I think I was out of the room for about ten minutes.

24   Q.   Ten minutes.  I will go with that.

25          When Woerth went  to the APA meeting, the Allied

1   Pilots Association meeting on April 5, 2001, do you recall

2   that?

3   A.   I recall hearing about it afterwards.

4   Q.   Yeah, you didn't know about it have beforehand, right?

5   A.   No.

6   Q.   I am sorry?

7   A.   I did not know.

8   Q.   Correct.  The meeting was in Washington, D.C. at the

9   Mayflower Hotel?

10  A.   Yes.

11  Q.   Those were put together by Senator Bond?

12  A.   Yes.

13  Q.   The meeting in St. Louis, when there was just a two-

14  member, remember there was a period of time for a couple of

15  weeks where there was just a two-member MEC?

16  A.   Yes.

17  Q.   All right.  That meeting was called by Duane Woerth,

18  correct?

19  A.   I thought so at the beginning, but it turned out that it

20  was called by Bob Pastore.

21  Q.   In fact, you testified at your deposition it was culled

22  by Duane Woerth, didn't you?

23  A.   I understood initially that it was.  But I was

24  incorrect.

25  Q.   Someone told you otherwise?

1   A.   No, I saw an email where the, one of the administrative

2   assistance writing about that put out the notice for the

3   meeting.

4   Q.   You knew that the Allied Pilots Association board was

5   meeting the very same day that this special meeting was

6   called on 24-hour notice?

7   A.   I learned it during the meeting, that it was, that the

8   APA was meeting at the same time.

9   Q.   All right.  And let's talk briefly about amendable dates

10  versus termination dates?

11  A.   Okay.

12  Q.   Most collective bargaining agreements have what is

13  called an amendable date, right?

14  A.   Most air carrier pilot agreements have amendable dates.

15  Q.   Under the Railway Labor Act?

16  A.   Yes.

17  Q.   The notion is there is a date that comes where the

18  parties now start negotiating any changes they want but the

19  contract in place continues status quo forward, right?

20  A.   Yes.

21  Q.   And the TWA collective bargaining agreements you worked

22  with up until this transitional agreement all had amendable

23  dates?

24  A.   Yes.

25  Q.   If you have an amendable date and you have a change in

1   representation, different union coming in, the contract still

2   in place, it doesn't go away with the union, correct?

3   A.   Usually that --

4   Q.   Right.  Because it is the contract between the

5   collective group of employees and their employer.  The union

6   is the agent, exclusive bargaining agent and you can change

7   agents, correct?

8   A.   Yes.

9   Q.   All right.  So under the TWA LLC, if TWA LLC's contract

10  had an amendable date, then the terms of that contract

11  between those employees and their employer would continue in

12  place even if ALPA left the property, right?

13          THE COURT:  You are asking him for a legal opinion

14  on that?

15          MR. JACOBSON: He is the representation contract --

16          THE COURT:  No.

17          MR. JACOBSON:  -- guy --

18          THE COURT:  That is a tricky question.

19          MR. JACOBSON:  That is what he does for his living,

20  your Honor.

21          THE COURT:  No, no.  This is a one time, you know,

22  this is a very unusual situation.  I don't think he is in a

23  position to advise the jury of what would happen to the

24  amendable date.  This was a contract that everyone thought

25  was going to come to an end, it was going to be for a brief

```
1    period until there was a single carrier.  Amendable date

2    makes sense for the wrong, you know --

3    Q.   Isn't it a fact that the original idea was that the TWA

4    LLC and this contract would remain in place for three to five

5    years from the date of the transaction?

6    A.   No, not at all.

7    Q.   Not at all.

8             Isn't it a fact that the purpose of having a

9    termination  date rather than an amendable date, and that

10   this purpose was discussed, the conversations in which you

11   were involved, was so that there would be no duty of fair

12   representation imposed upon APA at the end of the day when

13   the companies, the two airlines, were made a single carrier?

14   A.   The, if someone had a motivation, it was not ALPA that

15   had a motivation and took action.  It would have been

16   American Airlines, and I don't know all of their all of their

17   motivations.

18             MR. JACOBSON: Thank you.  No further cross.

19             MR. FRAM:  Your Honor, I have no redirect.

20             THE COURT:  No redirect.

21             MR. FRAM:  No redirect.

22             THE COURT:  You may step down.

23             (Witness excused.)

24

25             THE COURT:  Ladies and gentlemen, here is where I
```

1    think we stand.

2              I think the defendants have two more witnesses.

3    Three, three more witnesses.

4              MR. FRAM:  That's correct, your Honor.

5              THE COURT:  I think they have three.  I think they

6    believe that those two witnesses, or three witnesses, can be

7    taken care of on Tuesday and Wednesday of next week.

8              MR. FRAM:  We may have a little videotape as well,

9    your Honor.

10             THE COURT:  I don't know.

11             MR. FRAM:  There may be a couple minutes of a

12   deposition as well, but very short, your Honor.  Two live

13   witnesses.

14             THE COURT:  You agree that there is a chance that

15   will be done Tuesday or Wednesday.

16             MR. FRAM:  That is our hope.

17             THE COURT:  Now, there may be a day or so of

18   rebuttal.  We don't really know at this point, a day or two

19   rebuttal by the plaintiffs.  The plaintiffs don't have to

20   tell me that until they finish their case, which rebuttal

21   depends to some degree on what they hear in their case.  So

22   it seems to me that with some effort we can finish all

23   evidence, not next week, but the beginning of the week after

24   that.

25             The week of July 11 I may ask you to sit a little

1    longer on, I think I am going to be ready for twelve or 15

2    hour days on Tuesday.

3           Again,, ladies and gentlemen, I think we have to

4    have some sympathy for counsel.  I don't think counsel has

5    been dragging out the case.  Both sides are very competent

6    lawyers.  I just think, it is an important case to the

7    defendant and it is an important case to the plaintiff.  And

8    I don't want I don't want you to get angry at anybody or

9    upset.  I think we are trying to move the case as fast as we

10   can.  I don't think there is, I don't think you think there

11   is time wasted.  I hope you don't.

12          But that is, you know, right now my best guess is

13   not next week, but that the case will go to jury verdict the

14   week after next.

15          Does anybody disagree, any counsel disagree with

16   that?

17          MR. FRAM:  No disagreement here, your Honor.

18          THE COURT:  All right.  So is it going to be

19   Monday, Tuesday, Wednesday, of the week of the 11th, I can't

20   say.  The closing arguments, my guess is, and the charge to

21   the jury, we can do in one day.  And then I can't even begin

22   to think what the, how long the jury will take.  That is up

23   to you and actually your province.

24          With my love, my thanks, my appreciation, you are

25   looking at a Judge who has great faith in juries.  I really

1    do.

2              And by the way, today completes my 19th year on the

3    bench.  Today.  I was sworn in on June 30.

4              July 1st, Saturday, but technically I was on the

5    job July 1st, 1992, is when I started.  So today completes my

6    19 years.  And in 19 years I have had a wonderful experiences

7    with juries.  Never really a bad one.

8              And then my continued thanks.  I know it is

9    disrupting your lives and I appreciate it.  I really do.  So

10   please have a wonderful 4th of July.  And it is appropriate,

11   you know, the 4th of July and the jury system are related to

12   each other.  It is very important protection that not

13   everyone has.  The 4th of July to some degree ties in to what

14   we are doing here.  Whether it ties in to what we are doing

15   here, or it means big slabs of meat on the barbecue, either

16   way, enjoy it.

17             Have a wonderful fourth of July.  Remember, we will

18   see you Tuesday.

19             The 4th of July of course is Monday.  Everything is

20   closed.  So we will see you Tuesday morning at 8:25.  Okay.

21   Again, do not discuss the case among yourselves.  Keep an

22   open mind until you have heard all the evidence.  Do not

23   discuss the case with your family friends or loved ones.

24             Wait until you have heard everything.  We are

25   getting close to the end.  And I will see you on Tuesday.

```
 1              (The jury leaves the courtroom.)

 2              THE COURT:  Okay.  Anything you want, that I need

 3    over the weekend?

 4              MR. FRAM:  I don't think so, except our wishes for

 5    a nice holiday.

 6              THE COURT:  I appreciate that.  I am sure all

 7    counsel feel that.

 8              (Off the record discussion.)

 9              MR. PRESS:  I have something to discuss.

10              THE COURT:  First of all, if  there is proposal to

11    do radical surgery on Babbitt's deposition, I would like to

12    have it, I would like them to have it.  And then I would like

13    to have it as well.  All right.

14              Mr. Press.

15              MR. PRESS:  The directed verdict motion that got

16    filed.

17              THE COURT:  Yes.  You were going to tell me what

18    you want to do.

19              MR. PRESS:  What we would like to do is tell the

20    other side  that they can reserve whatever they want to

21    reserve and we will brief it after verdict if necessary.  We

22    would, if we would prevail there is going to be a notion J

23    NOV and another round of briefing.  So that is our

24    suggestion, to think it makes the most sense.

25              THE COURT:  Well, I mean I have a right but not an
```

```
 1    obligation to defer a decision I believe on Rule 50 motion

 2    until after the jury verdict.  I think the rule covers that.

 3    I don't have to do that.  I can also decide it.  And I think

 4    he has a right to make me decide it.  I don't want to -- by

 5    the way, you can all sit down.

 6              Now, if he agrees to have it submitted, you know,

 7    then I can defer decision on that until after the verdict,

 8    and then decide it, you are right, I only have to decide it

 9    if it is an NOV, if it goes his way, is better off with a

10    jury verdict than just my decision.  I don't know what he

11    wants to do.

12              MR. FRAM:  Your Honor, we would want the Court to

13    rule on the motion.  We of course would hope that the Court

14    would grant the motion in full, but we appreciate the

15    possibility that the Court may grant it in part.  You may

16    dismiss certain claims --

17              THE COURT:  Well, I find it a difficult motion only

18    in -- but for not the reason you might think.  I find it a

19    difficult motion because most of the cases involving duty of

20    fair representation involve a union's relationship with

21    management.  In other words, you know, negotiating with the

22    management.

23              You have read newspapers in the last 50 years.  You

24    know about a sweetheart deal, with unions that side with

25    companies for various favors.  That is usually the context.
```

1   A context where the fair representation is not interest, is

2   not a representation to deal with management.  But with

3   another union.  Negotiations with another union.  Kind of

4   taking all the black letter law, and applying it to this

5   situation is difficult.

6          My, if you want me to decide it, I will decide it.

7   I will let them decide where they get in a brief or not.

8          It also makes the what also makes the case

9   difficult is that you will not find too many cases where,

10  particularly in the context where the argument is you have a

11  duty, you have a duty of fair representation is compromised

12  because, A, you knew you were going to lose this union and

13  you weren't going to have it any more in the foreseeable

14  future, a single entity, and B, you wanted to represent the

15  very large American union, or American pilots, obviously in

16  their own APA union.

17         How one deals, what type of proof one requires to

18  prove that kind of context is a little difficult.  I don't

19  know that you get a lot of guidance from the black letter law

20  cases.  And then if you try to give guidance from law, you

21  know, it is all conflict of interest.  So far there, it is

22  only to translate the two.

23         My reaction is to try to let the jury have it, so I

24  have the jury verdict, whatever it, and then I have to decide

25  it because plaintiff has lost, in effect, NOV, that if, that

1   that is the way to go.

2           But if you want me to decide it, I will set a date

3   down for argument.  Some Tuesday or --

4           MR. PRESS:  We prefer you defer it, Judge.

5           THE COURT:  I don't think you can compel him.

6           MR. PRESS:  I am not suggesting I can.

7           THE COURT:  If he consented to it, I would defer

8   it.  I tell you that right now.  But if he asks for a

9   decision, I think I have to give it to him.  Now, my decision

10  may be to defer it.  And, but that is different.  Then I have

11  made a decision which is subject to review  by the appellate

12  court.  There are a couple of judges who are bankruptcy

13  experts and labor law experts.  Judge Sloviter certainly a

14  legal expert.  Well, there are a lot of judges up there who

15  may well have their own strong views.

16          The simple answer is if he asks me to decide it, I

17  am going to decide it, even if my decision is to defer it.

18  That is different from you agreeing to defer it.  That puts

19  it in a different posture.  I can make error, if my denial of

20  the motion, if you don't agree.  It could be error.  Couldn't

21  be error if both of you agree.

22          MR. FRAM:  We do request the Court decide the

23  motion.  We understand you may determine to defer it.  We do

24  want to see the opposition papers.  We think there are --

25          THE COURT:  I am not requiring opposition papers.

```
1    It is up to them, whatever he wants to do.  I mean this is a

2    case that I have a fair amount of work on.  It is up to him.

3    I have already read your papers.  A few times.  But the, and

4    the attachments.  I am going to leave it to plaintiff's

5    counsel if they want to do a brief or not.  If you want to do

6    one, you got it put it together so I can hear this on

7    Tuesday.

8              I can also here it Thursday afternoon, too.  Would

9    you rather do it Thursday?

10             MS. RODRIGUEZ:  I would ask that we at least have

11   that.

12             THE COURT:  That will given you a couple extra days

13   to put something together.

14             MR. PRESS:  Okay.

15             MR. JACOBSON: Thursday of next week?

16             THE COURT:  Yes.  The quality of your legal work

17   will be in direct proportion to the shortness of time I allow

18   for.  The less time you have to do it, the higher the quality

19   of the work.  You know that.  Don't you?

20             MS. RODRIGUEZ:  The less time you have to do it?

21             THE COURT:  The less time you have to do it, the

22   higher the quality.  Shorter, more comprehensible.  More time

23   you have,  the more you write.

24

25             (Off-the-record discussion)
```

1              THE COURT:  Anything else?

2              MR. FRAM:  We will confer with counsel on remaining

3      deposition issues and let you know Tuesday.

4              THE COURT:  Still in a sense hanging out there is

5      Sherry Cooper.

6              I know, I am very uninclined to let the deposition

7      in as it is now done.  But I would be inclined to let her

8      testify, even about some of the same areas.

9              MR. PRESS:  You have given us plenty of guidance on

10     what you find problematic.  We will endeavor to shorten it.

11             THE COURT:  Okay.  I mean I just find troublesome

12     the absence without the ability to cross examine.  I do not

13     accept the notion that because it is a discovery deposition

14     he had the opportunity to cross examine:  People generally

15     cross examination unless it is de bene esse.

16             We have doctors who don't want to come to court.

17     They want to get their six grand fees by sitting in the

18     office on a tape.  I call it a de bene esse deposition.

19     Whoever is calling the doctor, objections are made just as

20     they would be in the courtroom, and then there is cross

21     examination just the way it is in a courtroom.  When we play

22     it, the jury hears proper testimony.  Particularly in the

23     area here where there is so many much hearsay.  That is just

24     not the way this deposition is taken.

25             An adversary's deposition, it is not for anybody.

1          MR. FRAM:  I think it is in Rule 32, your Honor.

2          THE COURT:  Any purpose.  She is not a party to

3     this case.  TWA is not a party to this case.

4          I find it very troublesome.  Not that I am un-

5     sympathetic to having her come in and testify, which I am not

6     unsympathetic to that.

7          MR. PRESS:  We are going to try, but it is not

8     happening.

9          MS. RODRIGUEZ:  I will give it a shot.

10         THE COURT:  Yeah.  And again, there is the

11    possibility you have to work fast but taking it as a de bene

12    esse where you ask the questions, you know, taking it

13    wherever she is.

14         MS. RODRIGUEZ:  She was in Florida.  I haven't

15    heard that she is not.

16         THE COURT:  Anything else?

17         Have a very good 4th of July weekend.  And God

18    willing, I will see you Tuesday morning.

19              (Adjourned at 2:30).

20

21

22

23

24

25

1                        I N D E X.

2

3        David Holtzman, Sworn.

4              Direct Examination        P. 3.

5              CROSS EXAMINATION         P. 118

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25