1              IN THE UNITED STATES DISTRICT COURT.
               FOR THE DISTRICT  OF NEW JERSEY
2              CIVIL 02-2917  (JEI)

3       PATRICK BRADY, SALLY YOUNG,
        HOWARD HOLLANDER, THEODORE CASE,
4       AND MICHAEL FINUCAN, individually
        and on behalf of all others
5       similarly situated,
                         Plaintiffs,
6                                          VOLUME 15
             V.                          TRIAL TRANSCRIPT
7
        AIR LINE PILOTS ASSOCIATION,
8
                         Defendant.
9
                                    CAMDEN, NEW JERSEY
10                                  JULY 5, 2011

11      B E F O R E:   HONORABLE JOSEPH E. IRENAS
                       UNITED STATES DISTRICT JUDGE
12
                    A P P E A R A N C E S:
13
             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:  STEVEN FRAM, ESQ.
19                AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH  GINSBURG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.

3
                          S/   LYNNE JOHNSON
4
                          Lynne Johnson, CSR, CM, CRR
5                         Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
              LYNNE JOHNSON, CSR, CM, CRR
18            OFFICIAL COURT REPORTER
              UNITED STATES DISTRICT COURT
19            P.O. BOX 6822
              LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

1          THE COURT:  While eating Chinese food  YaYa Noodles

2     on Saturday evening I checked my Blackberry and received a

3     motion from the plaintiffs to bar the testimony of Seth

4     Rosen.  The motion was signed, I think by Lisa Rodriguez.

5          It appears that Seth Rosen was not -- well, was a

6     30 (b)(6) witness rather than a specific fact witness.  Also,

7     it appears that in the initial, the Rule 26 disclosures he

8     was not listed an as a fact witness.  However, on pages 54

9     and 55 of the final pretrial order there is a very lengthy

10    description of Mr. Rosen's potential and what he is going to

11    testify to.

12         And so I am here -- here is the author of the

13    motion entering the courtroom.  Being the last one here

14    because she lives the closest.  That is the Irenas rule, the

15    farther away you live from the courthouse the later you are

16    likely to be there.

17         MS. RODRIGUEZ:  You have to leave earlier.

18         THE COURT:  I don't know where Mr. Fram lives.

19         MR. FRAM:  About the same as Ms. Rodriguez.

20         MS. RODRIGUEZ:  Around the corner from me.

21         THE COURT:  In Haddonfield.

22         MS. RODRIGUEZ: Yes.

23         THE COURT:  So I want to hear this one out, and

24    get rid of it.  Normally the place to have objected to that

25    would have been an objection to the final pretrial.  I don't

1    recall there is any objection to Seth Rosen being listed as a

2    fact witness in the final pretrial, pages 54 and 55.  So I

3    will let the plaintiff go first, it is their motion.

4                 MR. PRESS:  Mr. Jacobson will argue for us.

5                 THE COURT:  Yes, Mr. Jacobson.

6                 MR. JACOBSON: Your Honor, the Rule 26 disclosures

7    are mandatory.  They require owe on.

8                 THE COURT:  What?

9                 MR. JACOBSON: They are mandatory.  They require

10   disclosure of witnesses with fact acknowledge.  Mr. Rosen

11   wasn't disclosed in that way.  He was produced as you noted

12   as their rule, one of the Rule 30 (b)(6) designees but that

13   is no reflection on whether or not he has personal knowledge.

14   And the testimony is replete about what he was told by other

15   people within the organization.  It is totally appropriate

16   for a Rule 30 (b)(6) witness.

17                I understand that he was listed as having a number

18   of topics in the pretrial.  I did not participate in the

19   pretrial objection so I am not sure why that wasn't objected

20   to.

21                I would note that the Court has throughout the

22   trial allowed few objections to pretrial, particularly the

23   depositions and I think it is important to protect the jury

24   from evidence that is strictly hearsay that is not based on

25   the witness's acknowledge.

```
1              THE COURT:  I haven't made a ruling that he hs ie

2     allowed to give hearsay testimony.  At this point he is just

3     a potential witness.

4              MR. JACOBSON: Correct.

5              THE COURT:  I haven't made any determination as to

6     what is or is not going to be allowed to testify to.  I mean,

7     I look, Mr. Jacobson, this is the notice of deposition.

8              MR. JACOBSON: The 30 (b)(6) notice.

9              THE COURT:  The 30 (b)(6) notice.  I mean, I could

10    understand your objection if there was some very narrow area,

11    somebody was asked to testify and you don't didn't know who

12    in the company knew that area, some kind of bullet narrow

13    area.  The person produces, for that very narrow area.  And

14    then later on, it sort of -- at trial that witness pops up

15    with an area of knowledge that has never otherwise been

16    disclosed.  But that is not the case here.  The 30 (b) (6)

17    notice is not -- 31 paragraphs of areas of inquiry.  I mean

18    it is, it is about as broad as you can get and it is in the

19    final pretrial.  That is the whole purpose of the final

20    pretrial, is to flush out those objections, to flush out

21    those.

22             MR. JACOBSON as far as the 30 (b)(6) notice, the

23    rule is adopted in order to avoid the game of sort of whack

24    the mole, every time you think you have the person who is

25    going to have information on the part of the entity they
```

```
 1    point to someone else and say that is the person with

 2    information.

 3              THE COURT:  I agree with that.

 4              MR. JACOBSON: The rule doesn't require the

 5    deponents to bring forward all the people with knowledge.  It

 6    requires them to bring and wore more people who will do the

 7    internal investigation to find out what the company, in this

 8    case the union's submission --

 9              THE COURT:  You made the point.  It cases you cited

10    in the brief stood for the proposition that a 30 (b)(6)

11    witness is not limited to personal knowledge.

12              MR. JACOBSON: Correct.

13              THE COURT:  And if you say I want a witness on this

14    area.

15              MR. JACOBSON: The presentation of the witness is

16    also not an endorsement --

17              THE COURT:  He has a duty to investigate --

18              MR. JACOBSON: Absolutely.

19              THE COURT:  -- and dig up material.  And I agree

20    with that.

21              MR. JACOBSON: And the corresponding factor in this

22    case is that the production of a witness or the presentation

23    of the witness as a 30 (b)(6) is no endorsement that that

24    person actually himself has personal knowledge of events.

25              THE COURT:  Although the deposition should, or
```

1    shall, he does have knowledge, even if it is, if given the

2    opportunity, if he says look, I investigated and I was told

3    by so and so that such and such is a fact, you have an

4    opportunity to say who told you, who knows?  Who has the

5    actual person.

6            MR. JACOBSON: I believe we have taken the

7    depositions of many people with personal knowledge.  If he

8    had been disclosed as a person with knowledge we could have

9    taken his deposition for what he knew as opposed to what he

10   was reporting what the entity knew.

11           THE COURT:  Oh, no.  A 30 (b)(6) witness doesn't

12   exclude what the witness personally knows.  It is geared to

13   the topics that you identify, not geared to whether his not

14   geared to whether his knowledge is personal or otherwise.

15           Anything else?

16           MR. JACOBSON: On the last point I would note there

17   are a number of cases in which the party presenting the

18   witness would disavow at appoint, well, this person is now

19   talking about their personal knowledge, they are not

20   representing the company,  this is not binding on the

21   company.

22           THE COURT:  Well --

23           MR. JACOBSON: There are a fair number of witnesses

24   in which a witness is produced as 30 (b)(6) and then is asked

25   questions where they have personal knowledge, and at that

```
 1   point, it is that their testimony on those issues are not

 2   considered to be binding admissions on the part of the

 3   company because now they are talking from their personal

 4   knowledge, it is subject to other witnesses, it is, it could

 5   be considered an admission against interest but it is not a

 6   binding type of admission.  That happens frequently.

 7              THE COURT:  Anything Seth Rosen said, that he would

 8   offer testimony of, in rebuttal or anything, that is going to

 9   be a party admission.  I mean, he would have a rough time

10   getting out from under that.  Seth Rosen is a very senior

11   ALPA executive, and anything he said is otherwise evidential,

12   otherwise satisfies, would escape the hearsay.  I think it is

13   probably defined not under the Federal Rules it is defined as

14   not hearsay at all.

15              MR. FRAM:  Under 801, your Honor.

16              THE COURT:  State rules it is defined the same way,

17   but an exception to the hearsay rule.  Let me hear from

18   somebody who will speak for the defendant.

19              MR. FRAM:  Your Honor, thank you.  The argument

20   that is made in the motion was an argument that was raised as

21   part of the joint pretrial.  On page 64 of the joint final

22   pretrial.

23              THE COURT:  Let me turn to that.  I have it here.

24   I did have it a minute ago.  Here it is.

25              THE COURT:  Go ahead.
```

1              MR. FRAM:  Page 64, second numbered paragraphs,

2    plaintiffs objected to these, quote, undisclosed proposed

3    witnesses, and one of, wanted their testimony limited to that

4    given at the deposition and indicated that if necessary, they

5    would move in limine to limit the testimony.  We discussed

6    this issue, your Honor, at the final pretrial conference, in

7    chambers, on February 9, and your Honor directly addressed

8    this issue, and I will just quote you from my detailed notes

9    of that conference, you may recall, help your Honor recall

10   what was discussed, which you ruled, again not on the record,

11   that you would not bar the testimony by any ALPA witnesses

12   that went beyond the Rule 30 (b)(6) testimony given by the

13   ALPA designee.

14            This is my internal report.  I noted, your Honor,

15   that your Honor was unimpressed with Mr. Press's argument

16   that an organization should be limited to the testimony given

17   by its Rule 30 (b)(6) witnesses.  Your Honor noted that Rule

18   30 (b)(6) was a discovery rule and not a rule of limitation

19   for the purpose of trial testimony.

20            One of the other things your Honor said at the

21   final pretrial conference is that if people were concerned

22   that the full disclosure of witness testimony had not been

23   made they were free to take depositions.  And your Honor

24   commented that the deposition --

25            THE COURT:  That I remember very much.  That is one

1    of the ways I dealt with objections to witnesses who were

2    known but there were some argument that they hadn't been

3    fully discovered as to what they might testify to.  I know,

4    fine, tell me if there is somebody you want to take, go take

5    it.

6           MR. FRAM:  There are a couple of witnesses the

7    plaintiffs had not disclosed and we went to their

8    depositions.  Glasby, that was Comlish.  We had a later

9    skirmish where the plaintiffs made a formal motion of Steve

10   Rautenberg.

11          Your Honor advised them they that take his

12   deposition.  We deposed Altman and Singer.  There was a

13   flurry of depositions.  What is surprise to go me beyond the

14   fact that I think your Honor ruled on it at the pretrial

15   conference is here we are toward the end of trial and notice

16   effort was made by the plaintiffs to take Mr. Rosen's

17   deposition.

18          He could have been made available, they could have

19   taken the deposition and not only was he listed of course in

20   the final pretrial order as a witness but of course we

21   submitted on May 20 a finalized list of trial witnesses, your

22   Honor, and once again Mr. Rosen was prominently listed.  So

23   it seems to me if there was an objection to him, that, and if

24   the plaintiffs were going to make an in limine motion, as

25   they indicated in the final pretrial order, they should have

```
 1   made it, the motion is something, in limine motion is

 2   something that should be made before trial.

 3              THE COURT:  It is hard to envision him testifying

 4   in some area that wasn't listed in -- which I had not seen

 5   until today, the, his, the original 30 (b)(6) notice, to

 6   which he was produced pursuant to which he -- pursuant to

 7   which he was produced.  It is a very broad notice of 30

 8   (b)(6).

 9              MR. FRAM:  Of course he was not designated as I

10   understand it to address all of the issues in the 30 (b)(6).

11              THE COURT:  Is there a designation somewhere, some

12   piece of paper, that says they asked for 31 areas, I am

13   producing him on number 2, 4, 7.

14              MR. KATZ:  There was a piece of paper created like

15   that, your Honor.  Jalmer Johnson covered five of the

16   subjects listed, and Seth Rosen covered the rest.  And at his

17   deposition, as your Honor indicated --

18              THE COURT:  Do we have that?

19              MR. PRESS:  We made a record of that in the

20   beginning of the deposition.

21              MR. KATZ:  I think Mr. Press will confirm that is

22   what happened.

23              THE COURT:  Let me check.  I have it here.

24              MR. PRESS:  Pages 7 and 8, Judge.

25              THE COURT:  Pages 7 and 8?
```

```
 1              MR. PRESS:  Yes.

 2              MR. FRAM:  The other point I would make is beyond

 3     the fact if a motion to bar him is going to be made it should

 4     have been made months ago.  He is going to address topics,

 5     your Honor, that we had other witnesses who already testified

 6     who could have talked about.  We could have had Duane Woerth

 7     address some of the same topics, not at all.  We could have

 8     had Dave Holtzman spend more time on the stand and cover some

 9     topics.

10              We could have covered things that Rosen is going to

11     cover as a fact witness.  We are somewhat prejudiced by that.

12              THE COURT:  I would like to have it.

13              MR. JACOBSON: I will give that to Mr. Press.

14              THE COURT:  I don't care.

15              MR. PRESS:  Did he make an objection to undisclosed

16     witnesses in our pretrial order as Mr. Fram announced.  We

17     are presenting that now.  It is, the witness is about ready

18     to take the stand and we have an objection to him.  He was

19     not disclosed as a witness properly under the rules.  And we

20     ask you to strike him.

21              Judge, if you allow this testimony, it needs to be

22     very guarded because quite frankly, Mr. Rosen is a hearsay

23     witness.  He was prepared --

24              THE COURT:  Well, I mean to the extent, I want to

25     make it Cleary am not ruling that he had a license to give
```

```
 1    hearsay testimony.  I mean, his designation under a discovery

 2    rule in which one might inquiry into hearsay, indeed, I think

 3    he would be remiss in taking a discovery dep, if he didn't

 4    inquiry.

 5            But that can lead to discoverable evidence, even if

 6    it is not admissible at trial.  But, so I don't know, if you

 7    are worried about, that I am automatically going to let in

 8    everything he said at his deposition, the answer is I am not.

 9    That is not the issue here.  The issue is there is some kind

10    of surprise to the plaintiff, unfair surprise, and I don't

11    see that.  I think that even on the areas that he testified

12    to, very broad on deposition, I mean, tied to the notice, he

13    is listed in the final pretrial, and if there is anything I

14    made clear when I finally pretried this case, anything I made

15    clear on I think several other occasions, is that in a

16    complicated case like this, my hope, my strategy was not to

17    bar testimony, but to let the other party have a fair shot at

18    depositions.

19            And you know, I think I made it many times, in this

20    case.  I had experience with taking deposition, in the middle

21    of a trial.  I can remember a case I tried from June 6, 1986,

22    to September 14, 1986, I think I it is seared in my brain,

23    before Judge Landow, who was then trial, Superior Court

24    Judge.  And on several occasions I wound up taking

25    depositions in the middle of a trial.  We tried the case, in
```

1     the evening I would be taking depositions.

2            And I think I made that clear, not only did I make

3     it clear conceptually, I acted on it with specific requests,

4     when specific requests for depositions were made I allowed

5     them.  I don't think I ever turned one down, at lows I doubt

6     I did.  Maybe one.  But overwhelmingly I believe I allowed

7     every one requested.

8            And this witness has already been very extensively

9     deposed on a very wide range of issues identified by the

10    plaintiff on the 30 (b)(6) notice, and I am going to allow

11    the witness.  I am going to allow him.  I don't see any basis

12    at this point.  I would never bar a witness because he wasn't

13    disclosed under 26 B, maybe in a case where is there is no

14    proceeding and suddenly he shows up at trial and the only

15    disclosure has been a rule 26 disclosure, that is a different

16    thing.  This is a case where I think thousands and thousands

17    of pages of depositions were taken.

18            MR. FRAM:  Easily, your Honor.

19            THE COURT:  And where the person is conspicuously

20    listed in the final pretrial, and I thought if the plaintiff

21    had any doubt that their deposition somehow or other omitted

22    offering him for something that wasn't in the 25 categories

23    that he would be testifying to as the 30 (b)(6), it would

24    have been a simple matter to depose him.  I gave that

25    opportunity repeatedly.

```
 1              Now, I am denying the motion.  I am not going to --

 2    just pretextually.  Do we have that?

 3              THE CLERK:  I am not sure it has been filed on the

 4    docket.

 5              THE COURT:  Well, I think the motion should be

 6    filed on the docket.

 7              MS. RODRIGUEZ:  I will get it filed on the docket.

 8              THE COURT:  What?

 9              MS. RODRIGUEZ:  I will see that it gets filed on

10    the docket.

11              THE COURT:  You have done it already.

12              MS. RODRIGUEZ:  No, I have not.  I will see that it

13    gets filed.

14              THE COURT:  I just think in fairness to plaintiff

15    it should be filed on the docket.

16              Okay.  Can we get going?

17              MR. FRAM:  Yes.  We have a couple other

18    miscellaneous issues.  We should set them aside.

19              THE COURT:  Clay Warner is coming, right?  He is

20    here.

21              Let's get Mr. Warner on.

22              (The jury enters the courtroom.)

23

24              THE COURT:  Good morning, everybody.  I hope you

25    all had a good 4th of July.
```

```
1              In the category of, you should have known, Francis

2     Scott Key, who wrote the spar Star Spangled Banner, was a

3     lawyer.

4              So here you are you can call your next witness.

5              MR. FRAM:  Thank you, your Honor.  We call Clay

6     Warner to the stand, please.

7              GRANVILLE CLAY WARNER, sworn.

8              DIRECT EXAMINATION.

9              BY MR. FRAM:

10    Q.   Good morning, Mr. Warner.  You might want to pull the

11    microphone a little bit closer.  I think your voice, like

12    mine, does not carry that well.

13              Do you go by Clay Warner?

14    A.   Yes, I do, thank you.

15    Q.   And you are presently employed as an in-house attorney

16    at the Air Line Pilots Association international, commonly

17    referred to as ALPA?

18    A.   Yes.

19    Q.   Let's find out a little bit about your personal

20    background.  You are how old?

21    A.   I of 52.

22    Q.   And where did you grow up?

23    A.   Throughout the country.  I ended up in Virginia Beach.

24    Q.   And you are a college graduate?

25    A.   Yes.  I went to William and Mary, graduated in 81.
```

Warner-direct/Fram                                          17

1    Q.   And you are also an attorney?

2    A.   Yes.  I went to University of Virginia law school,

3    graduated in 1985.

4    Q.   What did you do after graduating from law school for

5    work?

6    A.   I worked for a large firm in the Washington, D.C. area

7    for a little over three years.  Doing, in a general

8    litigation practice I specialized in working for labor

9    unions.

10        Then in December of 1988 I took a position with Air

11   Line Pilots Association.

12   Q.   What what position was that?

13   A.   It was a staff attorney position within the legal

14   department.

15   Q.   Tell us, please, what your experience as a staff

16   attorney at ALPA was in the period leading up to early 2001?

17   A.   In the first ten to 12 years my career was primarily a

18   litigation practice.  Litigation being federal court

19   litigation, also arbitrations, and some administrative

20   proceedings before the Federal Aviation Administration.

21        In the years after that it began to shift to some

22   litigation but also some governance work which was advising

23   various governing bodies of ALPA with respect to the policies

24   and procedures of the association and the external law that

25   applies to governance of the labor unions.

Warner-direct/Fram                                          18

1   Q.   Tell us a little bit more about governance.  We are

2   going to focus on the TWA MEC.  Can you describe briefly the

3   structure of ALPA in terms of how it operates and how ALPA at

4   the national level interacts with the master executive

5   committee level?

6   A.   ALPA is a little different than most labor organizations

7   in that it is a unitary organization.  It is actually one

8   organization that is ALPA.  Most labor unions are divided

9   into locals which are separate labor organizations that then

10  are affiliated into some times regional groups and sometimes

11  directly into the international.

12          But that difference really doesn't make a whole lot

13  of difference because ALPA also has it's effective local

14  groups, which are organized at each airline.  So each airline

15  from that group elects the representatives to make decisions

16  concerning that airline.  The airline group is called the

17  Master Executive Councils.  And they are Master Executive

18  Councils are broken up into local executive councils or local

19  council's at each domicile.  ALPA also has several inter

20  National governing bodies which are elected from the entire

21  pilot group.

22  Q.   Are there documents within ALPA that define who is

23  responsible for what in terms of things that the local MEC's

24  do, as compared to what ALPA at the national level is

25  empowered to do or required to do?

Warner-direct/Fram                                    19

1    A.    Sure.   Primarily it is the ALPA Constitution and bylaws.

2    But there is also an administrative manual which is the

3    collected policies of the national governing bodies.   It runs

4    now a couple inches thick.   But those two documents govern

5    the international affairs.

6    Q.    And you said before that during this period leading up

7    to early 2001 that you become expert or experienced in these

8    types of issues, the governance issues as between ALPA

9    National and the local MEC's?

10   A.    Yeah, that would be true.   Starting I guess in about, it

11   has probably been more like in the '96, '97, timeframe, when

12   I started to get involved in that and by 2001 that was close

13   to 50 percent of my practice.

14   Q.    Is there something specific that happened in the 96

15   timeframe that led you to get more expert in these kinds of

16   governance issues?

17   A.    I was doing a lot of work with the U.S. Airways MEC and

18   they were struggling with a number of issues.   I happened to

19   be there.

20   Q.    Let's focus on the events after the TWA bankruptcy.   Do

21   you recall the bankruptcy and the announcement of the deal

22   with American Airlines in January, 2001?

23   A.    Yes, I do.

24   Q.    At what point were you asked to get involved in working

25   with the TWA MEC?

1    A.    Almost immediately after that.  I had been working

2    previously on a lawsuit that we had brought on behalf of TWA

3    pilots to try to block termination of their defined benefit

4    pension plan.  It was a complicated set of affairs because it

5    had arisen out of one of their prior bankruptcies so I was

6    already involved with the group and already involved somewhat

7    with the issues.

8    Q.    Is that defined benefit plan also referred to as the

9    DAP?

10   A.    No.

11   A.    No, that is a different one.  This is called the A plan.

12   Q.    The A plan.  What happened which led to the lawsuit with

13   respect to the A plan.  Do you recall?

14   A.    In the, one of the prior bankruptcies in the early

15   nineties, the pension benefit guarantee corporation which

16   guarantees pension benefits had had enough leverage because

17   of its position of having to take over this pension plan take

18   that it was able to effectively block any efforts to

19   reorganize TWA.  Through a complicated set of negotiations,

20   ALPA was able to get Carl Icahn, who was one of the prior

21   owners of TWA, to agree to take over sponsorship of the

22   pension plan.

23            And to keep it going, to get it out of that

24   bankruptcy so we could reargue TWA and keep it going for a

25   while.  But Icahn had the ability to terminate the pension

1    plan if one of a defined set of events occurred.

2              Termination of the plan would mean that the PBGC

3    has its own and when they take over a plan, generally

4    speaking, pilot benefits are going to be dramatically

5    decreased to a guarantee level which is much less than what

6    the plan would otherwise provide.  We would are were trying

7    to block that termination of that plan.

8    Q.   Who were some of the TWA pilots you worked with in that

9    endeavor, in the attempt to plaque?

10   A.   The officers of the MEC, Bob Pastore, Scott Schwartz and

11   Bob Stow.

12   Q.   So after the bankruptcy filing, what were you asked to

13   do to assist the TWA MEC in dealing with the issues that

14   arose??

15   A.   I was asked to be effectively the legal department

16   representative to deal with whatever issues arose.  Issues

17   arose from the very beginning, from negotiating contract for

18   the various advisors that the MEC wanted to hire until the

19   appointee to the creditors committee was concerned about

20   personal liability and wanted to make sure that ALPA

21   indemnified him for any liability he would have.  So we had

22   to work through a process to make sure that could happen.

23             They had various funds that we had to try to figure

24   out how to handle those funds and as they transitioned over

25   to the what we thought was immediately to be the American

Warner-direct/Fram                                                    22

1    pilots.

2    Q.   You mentioned you helped negotiate the contracts with

3    some of the advisors?

4    A.   Yes.

5    Q.   Can you identify advisors you helped to bring on board?

6    A.   There was a communications firm, Kupper Parker

7    Communications.

8    Q.   When were they engaged?

9    A.   In January of 2001.

10   Q.   They were engaged to do what to assist the TWA MEC?

11   A.   Communications work in support of the transaction which

12   the MEC wholeheartedly supported.  So Randy Babbitt, who was

13   brought in as a negotiations adviser beings he was a former

14   ALPA president and was.

15             And was brought in to assist.  Michael Glanzer,

16   now, I worked on Michaels contract earlier because he had

17   been working with the TWA MEC since the prior year.  And I

18   actually looked an agreement with Roland Wilder beings their

19   merger  counsel, but I did not negotiate with Roland over

20   that agreement.  The merger counsel generally worked with the

21   MEC.

22   Q.   Did you mention that you addressed some concerns as an

23   appointee to the creditors committee about personal

24   liability?

25   A.   Yes.

1    Q.    Who was that?

2    A.    He was concerned.

3              THE COURT:  Who is he?

4              THE COURT:  I believe his name was Jonathan

5    Goldstein.  But I don't remember exactly.

6    Q.    He was a pilot?

7    A.    He was a TWA pilot appointed to be ALPA's representative

8    on the creditors committee.  As he sat in the creditors

9    committee meetings he realized all of these other appointees

10   were being indemnified by the entity that appointed them.

11   He, does ALPA indemnify me.  And the answer was there isn't a

12   clear policy that says that they do.  And that was not

13   comfortable for him so we worked out something where we got

14   it guaranteed that ALPA would indemnify him from any personal

15   liability that might arise.

16   Q.    Did you also have occasion in the first couple of months

17   of 2001 to interact with the Department of Transportation?

18   A.    Yes.  In March of 2001, we arranged a meeting with an

19   assistant second, I believe, to -- it was one of many efforts

20   we were doing on behalf of the TWA pilots, but this one was

21   an effort to see what the DOT could do for us.  The DOT had

22   to approve the transfer of the operating certificates from

23   TWA, Inc., to American or as we knew at that time, TWA LLC,

24   the corporation they were setting up to operate the company.

25              Now, back in the days prior to 1978, that transfer

Warner-direct/Fram                                                    24

1    of a certificate was under a thoroughly regulated scheme.

2    And in the transfer, the DOT, or their predecessor, the civil

3    Aeronautics Board, would impose all kinds of employee

4    protective provisions on the transfer of those certificates.

5              The airline de regulation act of 1978 changed all

6    of that.  So we didn't have the statutory basis but we

7    figured, let's see what we can do.  Let's see if there is

8    anything they can do to lean on one side or another to try to

9    help us out with respect to the seniority integration with

10   the Allied Pilots Association.

11   Q.   By the way, the labor protective provisions imposed

12   before de regulation, did they include typically the

13   so-called Allegheny Mohawk provisions?

14   A.   That is exactly what they were, was the Allegheny Mohawk

15   provisions.

16   Q.   And that ended any attempt to impose them ended after

17   1978?

18   A.   Yes.

19   Q.   Okay.  But you were going back to the DOT in early 2001

20   to press for what, give us a sense of what you were trying to

21   get them to help you do?

22   A.   March, 2001, we were looking to see if we could do

23   anything to put any kind of pressure on American or the

24   Allied Pilots Association in a way that would not boomerang

25   back and hurt the TWA pilots.  We were looking around at

1    rocks everywhere and picking them up to see if there was

2    anything under any rock that might possibly help.

3              Randy Babbitt actually suggested this meeting, and

4    you know, there was absolutely no possibility for harm from

5    it.  We didn't know it would, if it would ever come to

6    anything.  And so we went, it was Scott Shwartz who was the

7    vice chairman of the MEC, Matt Comlish who was their

8    legislative affairs chairman, and I went and met with three

9    folks from DOT to see if there was anything they could

10   possibly do.  (And the answer was a very polite no, but we

11   checked.

12   Q.   Okay.  I want to move ahead and focus on the issue of

13   Section 1113.  Are you familiar with Section 1113 of the

14   Bankruptcy Code?

15   A.   Yes, I am.

16   Q.   Did there come a point in early 2001 where you became

17   aware of the possibility of a Section 1113 motion by TWA,

18   Inc.?

19   A.   Yes.

20   Q.   When do you first recall becoming aware that TWA might

21   have filed a motion to reject under Section 1113 of the

22   Bankruptcy Code?

23   A.   I made an appear immediately when we saw the asset

24   purchase agreement.

25   Q.   When you say the asset purchase agreement, you are

1   referring to the agreement by which American Airlines was

2   agreeing to purchase certain assets of TWA, Inc.?

3   A.   Yes.

4   Q.   Why was it apparent to you immediately when you saw that

5   agreement that Section 1113 motion might be in the making?

6   A.   One of the paragraphs of the agreement required TWA,

7   Inc., to eliminate certain provisions of the collective

8   bargaining agreement between TWA and its employee groups, in

9   this case, we are concerned about the pilots.

10          In a bankruptcy context there is two ways to

11  eliminate contract provisions in a collective bargaining

12  agreement.  One is you get rid of the whole agreement itself

13  through the 1113 and the second is you do a negotiation with

14  the employee agreement and reach an agreement.

15          So 1113 was immediately a possibility, as soon as

16  we saw the asset purchase agreement.

17  Q.   I want to work through some documents that I handed you

18  when you went up on the stand, a fairly good stack of

19  documents.  I would just like to work through some of them to

20  put things in context.  As part of your work assisting the

21  TWA MEC, were you receiving written reports from Richard

22  Seltzer, one of the lawyers representing ALPA, and the TWA

23  pilots in the bankruptcy?

24  A.   Yes.  The reports are written to the president, but I

25  was a copy recipient.

1    Q.   Do you have in front of you D 395 in evidence?

2    A.   Yes.

3    Q.   D 396 in evidence and D 397 in evidence?

4    A.   Yes.

5    Q.   Those are letters that you did receive and review?

6    A.   Yes.

7    Q.   The last one you have D 398 in front of you, March 21,

8    2001 letter?

9    A.   Yes.

10   Q.   All right.  And that is one that you received?

11   A.   Yes.

12            MR. FRAM:  Your Honor, D 398 is not yet in

13   evidence.  It may have been identified but I move it into

14   evidence at this time.

15            MR. JACOBSON: I would like to take a look at it if

16   I might.

17            THE COURT:  Yes, look at it.  398 was identified,

18   but not admitted.

19            MR. JACOBSON: No objection.

20            THE COURT:  No objection, I am going to put D 398

21   in evidence.

22            MR. FRAM:  Thank you, your Honor.

23   Q.   And I see, we will come back to one of those in a

24   minute.  And the next document you have is is D 379 in

25   evidence?

Warner-direct/Fram                                          28

1    A.    It is D 379, yes.

2    Q.    Let's pull that up and talk about it for a minute.  It

3    says confidential, March 1, 2001, conference call agenda.  Is

4    this an agenda for a conference call in which you

5    participated?

6    A.    Yes.

7    Q.    Do you recall who else participated in the conference

8    call?

9    A.    My recollection, it was the MEC officers, members or all

10   of the negotiating committee, members or all of the merger

11   committee, and various advisors, Michael Glanzer, Richard

12   Seltzer, Steve Tumblin.

13   Q.    Right.  Do us a favor so we have the names in mind.  Can

14   you name names in terms of the MEC officers and the members

15   of the negotiating merger committees that you recall?

16   A.    I recall the officers who I mentioned previously were

17   still Bob Pastore as chairman, Scott Shwartz as vice chairman

18   and Bob Stow as secretary treasurer.  From the negotiating

19   committee I remember Ron Kiel, who was the chairman of the

20   committee.

21         I don't remember if there were others present.

22   Q.    How about the merger committee, do you recall who who

23   participated on behalf of the merger committee?

24   A.    I am not completely sure.  It may have been Captain Day

25   or it may have been Captain Bensel.

Warner-direct/Fram                                          29

1    Q.   Okay.  And I see just to focus on the first paragraph

2    below pressure on units from American, American is putting

3    pressure on its own unions with the concept of TWA airlines

4    LLC, and on TWA's unions by talk of Section 1113 it goes on

5    and talks about other issues.  Do you recall discussion about

6    that issue, that strategy that TWA, I am sorry, that American

7    was using?

8    A.   Yes.

9    Q.   I am going to flip along a little bit.  We have an

10   expected page where the heading is possible negotiating

11   committee.  You then get to the third page.  I want to focus

12   on the top heading, general 1113 advise for the negotiating

13   committee.  It says what is the likelihood of defeating a

14   1113 motion?

15          Now, had a 1113 motion been filed as of March 1 of

16   2001.

17   A.   No, it hadn't.

18   Q.   Why are people asking the question about the likelihood

19   of defeating a motion that has not even been filed yet?

20   A.   For the same reason I mentioned earlier, there were two

21   ways to get rid of these contract provisions.  One was to get

22   rid of the whole contract through 1113 and the other was

23   through negotiation.

24          So the MEC needed to know what the likelihood of

25   success was with respect to the 1113 to know whether or not

```
 1   it needed to push through negotiations.

 2   Q.   Now, do you see that there are I guess five people who

 3   are listed below that topic.  Roland Wilder who you

 4   identified as merger counsel counsel.  Mr. Seltzer, Steve

 5   Tumblin, and I see Tim Walsh.  Do you recall who Tim Walsh

 6   was?

 7   A.   He was an associate are a partner at LeBoeuf Lamb with

 8   Mr. Tumblin.

 9   Q.   A colleague of Mr. Tumblin?

10   A.   Yes.

11   Q.   And you.  Did any of the people listed there give views,

12   even if preliminary, about what the answer to that question

13   was about about the likelihood of defeating a 1113 motion in

14   it was filed?

15   A.   Yes.  Yes.  The views were preliminary but were

16   unanimous that the likelihood of defeating 1113 was very,

17   very, very slim.

18   Q.   What was explained about why it was unanimous view of

19   the people who addressed it that the likelihood of defeating

20   a 1113 motion, if filed, was slim?

21   A.   By that time we were already aware that the bankruptcy

22   court was strongly in favor of this transaction, this sale to

23   American Airlines, and in fact, you no, we were, too.  The

24   TWA MEC had indeed just hired Kupper Parker communications to

25   go out and do a communications campaign in support of this
```

1    transaction.

2             There were no other viable alternatives on the

3    horizon at that point and that is the only other possibility

4    other than liquidating, shutting down the company and laying

5    off 20,000 employees was the sale to American.  So the high

6    likelihood was that the bankruptcy court was going to run

7    over any possible opposition that might come through our

8    collective bargaining agreement, through 1113.

9    Q.   Let's walk ahead a little bit.  Do you recall that on or

10   about March 12 of 2001, Judge Walsh formally approved the

11   transaction whereby American Airlines was purchasing assets

12   of TWA, Inc.?

13   A.   Yes.

14   Q.   And I want to walk ahead to the next document which I

15   hope is D 378 in evidence?

16   A.   It is.

17   Q.   Do you recognize that as a memo that David Holtzman sent

18   to Richard Seltzer on March 13, 2001, or thereabouts, and you

19   were copied, you received a copy of that memo?

20   A.   I do recognize it.  I did receive a copy, yes.

21   Q.   The next one behind that should be D 380 in evidence

22   which is another memo from Mr. Holtzman also dated --

23             THE COURT:  D 380.

24             MR. FRAM:  D 380, your Honor, it should be in

25   evidence.

Warner-direct/Fram                                                      32

1              THE COURT:  Okay.  Go ahead.

2              MR. FRAM:  Thank you.

3    Q.   That is a similar memo from Mr. Holtzman, same date,

4    addressed to you with copies to other people?

5    A.   Correct, yes.

6    Q.   Do you recall receiving and review these memos back on

7    or about March 13 of 2001?

8    A.   Yes.

9    Q.   And just to jump ahead one more document to put them in

10   context, is the next document D 381 in evidence, which

11   includes an agenda for a meeting on March 14 of 2001?

12   A.   Yes.

13   Q.   Did you attend that meeting on March 14 of 2001?

14   A.   Yes, I did.

15   Q.   Why where did the meeting take place?

16   A.   In the Washington, D.C. area.

17   Q.   Who was present at that meeting?

18   A.   The only officer that was there was Scott Shwartz.

19   There were several negotiating committee members who were

20   there, Captain Kiel to be sure, and Mr. Altman, and I believe

21   a merger committee members were there but definitely Roland

22   Wilder, the merger committee counsel, as well as other

23   advisors including Mr. Seltzer, and Mr. Tumblin and Russ

24   Baily, who is a lawyer in the legal department who deals with

25   the Department of Transportation issues specifically.  I

1    believe Randy Babbitt hooked in by telephone.

2    Q.    You mentioned the merger committee.  Was Mike Day of the

3    merger committee also present at the meeting on --

4    A.    My notes indicate that Mike was there, yes.

5    Q.    All right.  So let's go back to the memos quickly and

6    work forward to the meeting.  So the memo to, let's start

7    with D 380, the memo to you.  Pull that up, please.

8              All right.  Mr. Holtzman wrote, as you know, TWA

9    has filed a petition under Chapter 11 in the bankruptcy court

10   in Wilmington, Delaware.  And then he ends up moving on to

11   three sets of questions.  Do you see question 1 A?  Given our

12   1 F 2 language, will there be jurisdiction in federal

13   district court to enjoin the closing of the TWA American

14   asset purchase in order to vindicate the TWA pilots section 1

15   rights, including the requirement to implement sections 3 and

16   13 of Allegheny Mohawk labor protective provisions for

17   seniority integration.  The question that Mr. Holtzman

18   proposed to you.

19   A.    Yes.

20   Q.    And then it looks like on the next page under D,

21   continuing, I am sorry, under B, if such an action is brought

22   in federal court, would ALPA prevail in rebutting the defense

23   that such an action proper only in the bankruptcy court?

24   A.    Yes.

25   Q.    There are other questions that we can talk about later.

1    In preparation for the meeting on March 14 did you give some

2    thought to those issues?

3    A.   I gave some thought but more importantly than giving

4    thought I had discussion with Richard Seltzer.  Both of them

5    are really questions arising out of bankruptcy law which was

6    Richards area of specialty.  So I, just to confirm that

7    someone is going to be able too answer those questions I

8    spoke with Richard and he was.

9    Q.   You also saw the other memo which is D 378, the one that

10   Mr. Holtzman had sent to Mr. Seltzer?

11   A.   Yes.

12   Q.   It appears just to highlight a couple aspects of that,

13   the second paragraph, second numbered paragraph, if Americans

14   continues to insist on a scope waiver ALPA refuses and no

15   substitute agreement is concluded, will TWA prevail against

16   ALPA on Section 1113?

17   A.   I see that.

18   Q.   Is that an issue you gave some thought to and you and I

19   talked about on the meeting of March 14 of 2001?

20   A.   Yes.

21   Q.   Just to flip to the last page of that memo, paragraph 4?

22   A.   378?

23   Q.   Yes.

24   A.   Okay.

25   Q.   Fourth numbered paragraph.  The one beginning, if the

Warner-direct/Fram                                          35

```
 1    bankruptcy court approves the rejection of the ALPA TWA CBA

 2    in whole or in part, and the TWA American transaction closes

 3    and thereafter the TWA LLC employees former TWA pilots and

 4    operates the purchased assets, will the former TWA pilots

 5    have self help rights after closing against, and then it

 6    lists, TWA, TWA LLC, and American.

 7            Now, just so we understand what this is saying, CBA

 8    refers to.

 9    A.   Collective bargaining agreement.

10    Q.   And can you describe what is what is understood within

11    the labor law communicate as a self help rights?

12    A.   It is a strike.

13    Q.   The right to strike?

14    A.   The right to strike, yes.

15    Q.   Did you give some thought to this issue of what the self

16    help or strike rights of the TWA pilots would be if that

17    scenario played out, if the bankruptcy court rejected the

18    collective bargaining agreement and the deal went ahead?

19    A.   Yes, I did.  I also spoke again with Richard about this

20    bus there was this question of whether the union has the

21    right to strike after its contract is taken away in Section

22    1113 is an area that is more within his range of expertise as

23    well.

24            THE COURT:  You don't have to have a contract to

25    strike, do you?  You can strike, unions strike all the time
```

1    when negotiating contract, they don't get a contract, they

2    strike.  They strike because they don't have a contract.

3    A.    Not under the Railway Act.  The National Labor

4    Relations Act contracts terminate and then you may strike

5    thereafter, under the Railway Labor Act there is a status quo

6    period that must, and the lengthy procedures that have to be

7    exhausted.

8              THE COURT:  Don't they have to be implemented or

9    triggered by somebody to be the stay put period?

10             THE WITNESS:  No.  The status quo period is

11   automatic.

12             THE COURT:  How long?

13   A.    It applies until, well, sometimes it seems forever but

14   until the process of negotiation, and then mediation through

15   the NMB and a 30-day cooling off period is exhausted.

16   Q.    So let's jump back now to the agenda for March 13 which

17   is D 381 in evidence.  Let's focus on Roman numeral VI.  The

18   one that says, Section 1113 and preliminary responses to

19   Holtzman March 12 bankruptcy memorandum and discussion.  And

20   did you understand the reference to March 12 bankruptcy memo

21   to be the memo, one of the memos you just referred to?

22   A.    I did.  In fact the memo to me originally came in a

23   March 12 version as well, and somehow the last version ended

24   up as March 13 so we understand that to be David's memo.

25   Q.    So what discussion do you recall at this meeting in the

Warner-direct/Fram                                              37

1    Washington area on March 14 about Section 1113?

2    A.   The discussion actually began not so much with the

3    lawyers but with the investment advice are, Michael Glanzer,

4    who the MEC had hired again during 2000.

5         And Michael was trying to make two points, and made

6    them aggressively and vociferously.  One was, point one was

7    that American was, the American management, was not

8    unanimously in favor of this transaction, that there were

9    faxex within its American management that had never been in

10   favor of them and were looking for ways to discover it.  So

11   based on that was trying to remind everybody Americans is a

12   voluntary, they can walk away.

13        In fact he had a number.  He said if they walk away

14   now they lose 90 million dollars.  And then the second point

15   he was trying to make is not so much from a legal

16   perspective, although Michael is a lawyer, but rather from a

17   perspective of observing the bankruptcy court Judge.  The

18   reality and the practicality of the situation was that this

19   bankruptcy judge was going to do what it took to make sure

20   that this transaction with American went through.  He had

21   written in his March 12 decision that without this

22   transaction with American, 20,000 employees were going to be

23   unemployed and he wasn't going to let that happen.  So

24   Michael was saying, look, you file 1113.  He is going to run

25   over it.

```
 1            But also, remember, you push this too hard,

 2    American is a volunteer.  They may walk away.

 3            What my notes also reflect, and what I recall very

 4    specifically is right after Michael taught, then Captain Day

 5    spoke, and my notes reflect first that Captain Day shade he

 6    was 100 percent in agreement with Michael.  The notes also

 7    reflect and I agree that he said 1113 will be pushed right

 8    through.

 9            So from that point further, Richard Seltzer and

10    Steve Tumblin were talking about some technical aspects of

11    1113 but those larger practical point were already on the

12    table.

13            THE COURT:  Go ahead, ask your next question.

14    Q.   The notes that you referred to, do you have them in

15    front of you marked as P-198?

16    A.   Yes.

17    Q.   Was it your practice in, when meetings, in meetings

18    where issues of consequence were discussed to take notes?

19    A.   When I had the opportunity.  If I was speaking it is

20    hard to take notes of myself but yes.

21    Q.   Did you maintain those notes in the ordinary course of

22    your work for ALPA.  Yes.

23            MR. FRAM:  Your Honor irks move P-198 into

24    evidence, the collection of handwritten notes from this and

25    other meeting.
```

1              MR. JACOBSON: No objection.

2              THE COURT:  P 198.

3              MR. FRAM:  Yes, premarked as P-198.

4              THE COURT:  That is in evidence.

5     Q.   Just to punctuate this point, let's pull up, if we can,

6     the page of your knots you just referred to.

7              047715.  Let's blow up the top half of that.

8     Q.   Did you never take a penmanship course?

9     A.   There was a point in time when I started printing so it

10    could be legible.  I don't know what is left.  I went through

11    cursive and I have gone through printing now.  I have to find

12    a third path.

13             THE COURT:  Called the computer.

14    Q.   So actually go back to the prior page.  Your notes talk

15    about Mr. Glanzer's remarks.

16             At the bottom it says Glanzer.  What you are doing

17    here is every time someone spoke you wrote notes.

18    A.   Yes.

19    Q.   Read to us or translate if you will what you wrote under

20    Glanzer?

21    Q.   If you can.

22    A.   I can mostly.

23             Judge prepared to run over Icahn, the prior

24    ownership group which was making a half-hearted play to, for

25    TWA.  And unsecured creditor.

1          MR. JACOBSON: Your Honor, I would like to object to

2    the editorializing that goes on in this.  Half hearted, every

3    stone.  A lot of editorializing.

4          THE COURT:  Yes.  Don't editorialize.  Just answer

5    the questions.  I agree.

6    Q.    So could you try to read it verbatim?

7    A.    Judge prepared to run over Icahn and unsecured

8    creditors.  Clear what he wants and how he would treat 1113.

9    Q.    And then the to be of the next page, please.

10   A.    Creditors committee proposal unreasonable.  AA, that is

11   American Airlines.  AA refused to respond.

12          Clear that AA management split on this issue.  And

13   that AA management near tolerance levels.

14          Cost is beginning to dawn on AA.

15          AA is a volunteer.  Can walk away.  DIP financing,

16   and, can I explain what DIP financing is.

17   Q.    Please.

18   A.    Debtor in possession financing that was provided by

19   American Airlines to keep TWA operating while when while the

20   transaction was pending.  DIP financing secured by accounts

21   receivable.  They would lose 90 million or so if they walked

22   away.

23   Q.    Okay.  And then just read for us Mr. Days, or Captain

24   Day's --

25   A.    Day:  100 percent agreement.  1113 will be pushed right

1    through.

2    Q.   Did you think at the time that Captain Day had

3    experience and background to be expressing opinions on these

4    kinds of issues?

5    A.   Sure.  Mike is a lawyer and he was a practicing lawyer

6    at the time.  Smart guy, too.

7    Q.   All right.  Did any of the other advisors disagree with

8    Mr. Glanzer's comments about the possibility of American

9    walking away, about likelihood that Judge Walsh would grant

10   the Section 1113 motion?

11   A.   No one disagreed with the likelihood that the 1113 would

12   be granted.  All advisors were unanimous that the 1113 was

13   going to be granted.  Roland Wilder disagreed to some, to

14   some extent with the possibility, or the likelihood that

15   American would walk away.

16   Q.   How about the other pilots who were present, did any of

17   them comment other than Captain Day about the likelihood that

18   the Section 1113 motion would be granted?

19   A.   I don't recall that and I don't have it in my notes.

20   Q.   One of the other topics going back to D 381, please,

21   which is the agenda --

22        THE COURT:  Before you do, you testified as to

23   American Americans attitude towards this and you talked about

24   the split in management.  What is your source of information

25   about that.

1          THE COURT:  About what managers at American were

2    thinking, or is this something somebody told me.

3          THE WITNESS:  It is from Mr. Glanzer primarily.

4          THE COURT:  Glanzer didn't work for American.  He

5    had American -- What was Glanzer's source of information or

6    don't you know?

7    A.   His sources of information were those people he was

8    interacting with in the bankruptcy court primarily in the

9    bankruptcy process.  Also, the other financial --

10         THE COURT:  But he wasn't a lawyer in the

11   bankruptcy, it is not like --

12   A.   No, but this bankruptcy was run by the investment

13   advisors as much as anything and I have forgotten the banking

14   firm that TWA had hired to run through this bankruptcy, and

15   that is where his primary contacts were, with the other

16   investment bankers who were working in the bankruptcy.

17         THE COURT:  Your testimony, whatever you know about

18   Americans attitude, it is not personal knowledge.

19         THE WITNESS:  That's correct.

20         THE COURT:  It is just something that Mr. Glanzer

21   or the union's investment adviser, told you.

22   A.   More important than me, he told the MEC officers and

23   members, yes.

24         THE COURT:  Well, he told anybody who would listen,

25   right?

1  A.   I don't, I hope he doesn't telling anybody but he was

2  telling his clients.

3           THE COURT:  Within the ALPA family?

4  A.   He was telling his client to be sure.

5           THE COURT:  Go ahead.

6           MR. FRAM:  Thank you, your Honor.

7  Q.   Pulling up that agenda, that March 4 agenda, D 381 in

8  evidence.  I see that Roman numeral VII.

9           Railway Labor Act issues and preliminary responses

10  to Holtzman March 12 RLA memorandum and discussion, and then

11  it lists your name.  RLA refers to?

12  A.   Railway Labor Act.

13  Q.   Okay.  One of the issues that is identified in one of

14  these memos, it actually is identified in a Holtzman memo to

15  Seltzer is this issue about self help.  Do you recall we

16  talked about that a couple minutes ago?

17  A.   Yes.

18  Q.   Is that one of the issues that you addressed at this

19  meeting?

20  A.   At this meeting, at the meeting on March 21, 22, at the

21  meetings on April 1 and 2, yes.

22  Q.   Let's start with what you recall saying about that issue

23  at this meeting on March 14 of 2001?

24  A.   Well, it is essentially the same thing.  Rather than get

25  involved in a debate about whether or not self help was

```
 1    available or a strike was available after 1113, and to be

 2    clear, at that point our position was that a union should be

 3    able to strike if its collective bargaining agreement was

 4    taken away in the bankruptcy court in 1113.  But getting away

 5    from the legal analysis, let's look at the practical

 6    analysis.

 7            The practical analysis was who do you get to strike

 8    against.  Who do you get the strike against is TWA, Inc..

 9    Not TWA LLC, not American Airlines, you get to withhold your

10    services from TWA, Inc..  So.

11            THE COURT:  That is the entity that was flying at

12    that point.

13            THE WITNESS:  Yeah, but it was the entity that

14    wasn't going to be flying a couple days after --

15            THE COURT:  No, it is the only, you can only strike

16    who you are providing services for.

17            THE WITNESS:  Absolutely right.

18            THE COURT:  At that point LLC hadn't started

19    operating go yes.

20            THE WITNESS:  That is true.  Look at it as a time

21    line.  Time line being at some point there was going to be a

22    1113 hearing, right?

23            And let's say we lost at that hearing and lost our

24    collective bargaining agreement.  Within days or probably

25    minutes thereafter, there was going to be another transaction
```

Warner-direct/Fram                                                45

1    where the assets were all sold to TWA LLC.  We couldn't

2    strike TWA LLC.  We couldn't only strike TWA, Inc. and by the

3    time our strike could do anything TWA Inc. would be a file

4    cabinet somewhere, it wouldn't be airlines.  It would be TWA

5    LLC.

6            So a strike would have no practical value at all.

7            THE COURT:  If the pilots stop flying, who is going

8    to fly the planes, whether they were LLC planes or Inc.

9    planes.

10   A.   That is a separate question.  I mean TWA LLC could say,

11   hmmm, we have these planes, right?   WE will offer you jobs

12   to comply.   They could in effect try to break our strike.

13   The bigger problem was this.  Strikes don't just happen

14   overnight.  They take time to gin up..  So while we are

15   ginning up our strike against TWA LLC, American Airlines is

16   doing what Michael Glanzer said they might do which is they

17   said this is now too costly for us. You have made this --

18           THE COURT:  But that is contrary to the premise you

19   just, the premise you just made in testimony under oath that

20   it takes away from the, the bankruptcy, if granted the 1113,

21   rejecting the contract, that there would be a closing with

22   LLC almost instantly.  You can't have it both ways, and your

23   testimony --

24           THE WITNESS:  Well, I don't mean to.  What I mean

25   to --

1           THE COURT:  But you did.  First you premised it

2      that it took place.  Then you premised it hadn't taken place.

3      A.   IF we were going to do a strike we were going to have to

4      prepare for that strike in advance of the 1113 hearing.  In

5      other words, we were going to have to show everybody that if

6      you take our contract and 1113 we are going to go on strike.

7           Now, if I am American Airlines, under your premise

8      that TWA LLC needs pilots to fly, I say to myself, wait, wait

9      a minute, these guys are not willing, they are not going to

10     come and fly these airplanes.  We have had enough of this.

11     We are going TO back away.  That is the point.

12          If we were to, if we were actually to strike there

13     may not be anybody to strike against but the bigger problem

14     would be American walking away.

15          THE COURT:  But if the 1113 was granted what was

16     the right to walk away based on?  In other words, they could

17     have walked away if the, if certain provisions weren't

18     waived, the labor protective, but the 1113 takes care of

19     that.  What gives them the right to walk away?

20     A.   I don't think they had a right to walk away.  I am

21     anticipating what is going to happen and what we all

22     anticipated was going to happen within a very short amount of

23     time after the 1113 there was going to be a transaction and

24     all that stuff was going to be done.

25          THE COURT:  That is a different premise.  If the

```
 1    1113 was granted the premise is going to be then the strike

 2    is against LLC.  American airplanes, American presumably

 3    would pay the purchase price, TWA, Inc., doesn't care any

 4    more and the strike would be against American.  You are

 5    mixing apples and oranges.  You are mixing your testimony

 6    with the premise that they would close, and then you mix with

 7    that the premise that they wouldn't close.

 8    A.   I am trying to show two different options.  I am trying

 9    if I am mixing it by going too quickly.  Let me break it down

10    slowly.

11          If we were to take the position, the hard over

12    position that we are going to fight the 1113, right, and that

13    if you take our contract and 1113 we are going to strike.

14    That position on would have certainly caused American

15    Airlines to question whether they wanted to continue with the

16    transaction.  So there was a risk --

17          THE COURT:  But where was your legal right to get

18    out.

19          THE WITNESS:  Before the 1113?

20          THE COURT:  Yes.

21    A.   Any point.  They hadn't delivered.

22          THE COURT:  Well, you will have to -- all right.

23          BY MR. FRAM:

24    Q.   Let's try to break it down in terms of what your thought

25    process was.
```

1            If the 1113 is granted, the TWA, the contract is

2   rejected, was the legal advice, setting aside the practical

3   aspects, was the legal advice that the TWA pilots had the

4   right to strike against TWA, Inc..

5   A.   That was our best view of the law, but there wasn't a

6   lot of support one way or the other.

7   Q.   And if that strike took place before the closing, before

8   American consummated the deal, paid the money for the assets,

9   are you saying that there was a concern that American might

10  say forget it, we are going to walk away?

11  A.   Yes.

12  Q.   If the 1113 was granted, meaning the contract is

13  rejected, the deal then closes, American pays the money, gets

14  the assets, LLC, TWA LLC starts to operate.  If the strike,

15  if a strike is called after the employees become -- the

16  pilots become employees of TWA LLC, was there a legal right

17  to strike in your view against TWA LLC?

18  A.   No.

19            MR. JACOBSON: I object to the extent he is asking

20  for his legal opinions now as opposed to what was discussed

21  at that meeting.

22            MR. FRAM:  I wasn't meaning to do that.  I am

23  trying to focus on the thought process and advise back at the

24  time.

25  A.   My understanding the law is different now any way.  At

1     that time it was clear there was no right to strike against

2     TWA LLC.

3              THE COURT:  And that was, was that view expressed?

4              THE WITNESS:  Yes.

5              THE COURT:  To the various participants at ALPA.

6     A.   Yes, the 14th, the 21st and 22nd and the first and

7     second.

8     Q.   And what concern, if any, did you express about whether,

9     in if the deal went ahead and the pilots become employees of

10    LLC if there was a strike, what was the concern about what

11    might happen there?

12    A.   Any or all of them could be terminated.  There was no

13    right to strike at that point.

14    Q.   All right.  Let's go back if we could to the agenda of

15    March 14.  I want to ask you about one other topic that is

16    listed.  D 381 in evidence, please.

17              All right.  Roman numeral II is "Recommended

18    strategy/discussion of Wilder memorandum.  60 minutes."

19              Do you recall a memo of Roland Wilder where he

20    outlined a theory for filing litigation to enjoin the

21    transaction.

22    A.   I have not seen that memo as of this meeting.  But I saw

23    it subsequent.

24    Q.   All right.  Just to go back to D 380, which was

25    Holtzman's memo to you, do you recall the first set of

Warner-direct/Fram                                                    50

```
 1    questions below where it is asking in A, will there be

 2    jurisdiction in federal district court to enjoin the closing

 3    of the TWA American asset purchase?

 4    A.    Yes.

 5    Q.    Do you recall that question arising from this idea that

 6    Mr. Wilder had put out there?

 7    A.    I realized that later when I saw Roland's memo, yeah.

 8    Q.    So what discussion do you recall jumping back to March

 9    14 about the Wilder strategy, the injunction strategy?

10    A.    The first thing I recall about it was Roland's

11    discussion -- statements that he had discussed litigation

12    with TWA's lawyers and with Americans lawyers.  And that he

13    had effectively gotten a rise out of them because it had

14    prompted a call from one of the upper level American

15    managers.

16          Why that got my attention is that as far as I knew,

17    the MEC had not approved any form of litigation.  It

18    certainly hadn't authorized their merger counsel to discuss

19    that litigation with the potential opposing parties so it was

20    quite a shock that he did that without authorization.  But

21    then he presented his proposals, and his theories, as a

22    potential way of getting some leverage to be used in the

23    seniority integration process.

24    Q.    Did other advisors give foreign language reactions to

25    this injunction concept, focusing on March 14, 2001, still?
```

Warner-direct/Fram                                                    51

1    A.   I think every one, well, I was a bit shocked by it, so I

2    don't recall responding to Roland's proposals at that point.

3    I recall responding to them on the 21st, and 22nd and then

4    the first and second.

5    Q.   We will come to that in a minute.  Do you recall anybody

6    else responding or reacting on March 14, 2001, to this

7    injunction idea?

8    A.   Not directly, no.

9    Q.   Okay.  Let's move ahead.  If you flip to the next

10   document, D 385 in evidence?

11   A.   Yes.

12   Q.   And major advantages of the proposed LLC ALPA CBA versus

13   Section 1113 rejection of the TWA ALPA CBA.  Do you recall

14   receiving this document some time mid March?

15   A.   Yes.

16   Q.   Can you just put it in context, please, where did this

17   document fall into the analysis of how to deal with the 1113

18   motion?

19   A.   This was, my recollection, was created by David, and my

20   note on the top reflects, it is cut off on the screen but I

21   got it on March 17.

22   Q.   When you say created by David?

23   A.   David Holtzman.

24   Q.   Okay.

25   A.   And the idea was to try to present to the MEC what you

```
 1   would get if you made an agreement versus what you would get

 2   if you fought in one respect or another, in this case he was

 3   talking about the 1113.

 4          Now, David was working with the negotiating

 5   committee in producing the agreement.  So he was producing

 6   the document that said here is the, here is what we have got

 7   in the agreement that is worth considering and weighing in

 8   this analysis.

 9   Q.   All right.  Let's move ahead to the meetings of March 21

10   and 22, 2001, that you referred to before.  You attended

11   meetings of the TWA MEC on those dates?

12   A.   Yes, I did.

13   Q.   Where were the meetings held, do you recall?

14   A.   St. Louis.

15   Q.   And which members of the MEC officers or voting members

16   do you recall being present?

17   A.   I recall all of them, definitely all the officers and

18   the voting members of the MEC being present at both meetings.

19   Q.   And which of advisors do you recall being present?

20   A.   There was some in and out of advisors.  March 21 I

21   recall just about everybody being there, and everybody would

22   be Michael Glanzer, Roland Wilder, Randy Babbitt perhaps by

23   phone, perhaps in person, I don't remember on that meeting

24   for sure.  I was there.  David Holtzman was there.  And

25   Richard Seltzer was there.  And on the April 1st and 2nd
```

Warner-direct/Fram                                                    53

1    meeting again there were some ins and outs.

2    Q.    Okay.  Had something of significance with respect to

3    Section 1113 happen since the meeting you talked about on

4    March 14?

5    A.    Right.  The motion was filed I believe on the 15th.

6    Q.    Okay.  And was there further discussion of Section 1113

7    and the motion on March 21 or 22?

8    A.    Extensive discussion.

9    Q.    Okay.  Tell us what you recall being discussed on

10   section, let's break it down this way.  Would you did you

11   give a presentation of some kind on March 21 or 22 about

12   Section 1113?

13   A.    Well, I give a presentation that tried to summarize the

14   advice from all of advisors, from the negotiating committee

15   and David, from Richard Seltzer, from Roland Wilder, Michael

16   Glanzer.  I tried to summarize that and I did it in a series

17   of sort of outlines on an easel with the advantages of this

18   versus the advantages of that.

19   Q.    Okay.  Do you have some notes that you created in

20   preparation for the meetings on March 21 and 22 where you

21   create some schematics of the analysis?

22   A.    Yes.

23   Q.    Are they included in your handwritten notes we marked as

24   P-198?

25   A.    Yes.

Warner-direct/Fram                                          54

1    Q.   Can you tell us which page they are?

2    A.   There are several versions beginning at 047722.  And

3    running through 047728.

4    Q.   Can you pull up 047722.   The top says agreement versus

5    no agreement.

6         Can you walk us through why you, walk us through

7    the analysis and give us a sense of what you were trying to

8    say here?

9    A.   The analysis was that there was a choice before the MEC

10   which in some iterations I called agreement versus no

11   agreement, and in other iterations it was agreement versus

12   two different ways of fighting, 1113 and Roland litigation.

13   Essentially the MEC had to decide do we take this agreement

14   with TWA LLC which our negotiating committee was brought

15   back.

16        So I laid out the pros, on the left, it came from

17   David's charts that I created and that you showed earlier.

18   Number one with a little asterisks and stars and fireworks is

19   jobs.  You get jobs with a stable airline.  Why that had

20   little asterisks was that in January these guys were within

21   days or weeks of losing their jobs, and the whole thing

22   shutting down.  So they had one great benefit.

23        MR. JACOBSON: I object to the last comment and ask

24   that it be stricken.  There is no personal knowledge on the

25   part of this witness as to the two statements about the

```
 1    condition of TWA.  He is not nothing about his personal

 2    knowledge.

 3    A.   I am reciting from the bankruptcy court.

 4          THE COURT:  So your knowledge is limited to what

 5    the bankruptcy court said.

 6    A.   I have it from other sources but that seemed the most

 7    reliable.

 8          THE COURT:  Doesn't have personal knowledge.

 9    A.   I did not look at their books, no.

10          THE COURT:  Go ahead.

11    Q.   So you described why you put the stars around jobs?

12    A.   Right.

13    Q.   What what were the other pros that you listed in your

14    analysis if there was an agreement?

15    A.   The second was union representation.  They would

16    continue to have union representation with an agreement.

17    There are some other things that we wrote down.

18          THE COURT:  Union representation by whom?

19    A.   It would be by ALPA initially but then eventually by the

20    Allied Pilots Association as they rolled into American.

21          THE COURT:  It was always anticipated, was it not,

22    there was going to be an application of single carrier

23    status.

24    A.   Absolutely.

25          THE COURT:  When that happened, ALPA was out and
```

1   APA was in.

2             THE WITNESS:  Absolutely.

3   Q.   So union representation, three, you wrote grievance?

4   A.   Grievance.  A lot of these guys had worked only at union

5   entities, only at union carriers, and we thought that they

6   may not have the idea that the average schmo on the street

7   doesn't get a grievance right to the right to file a

8   grievance and challenge discipline under a just cause

9   standard.  It is employment at will for most of us.

10  Q.   Just for those who may not know, give us an explanation

11  of what employment at will means as opposed to the phrase you

12  used just cause?

13  A.   Employment at will is that your employer may discipline

14  or terminate you for any reason, good, bad, or no reason at

15  all.  And in a union context, the most contracts, and the

16  contract here, say that discipline could only be imposed for

17  something called just cause which is the law that has been

18  developed through arbitration decisions over many decades but

19  it protects employees who are from essentially whimsical

20  action by their employers.

21  Q.   I think you are up to number 4 on the list?

22  A.   That says DAP, that is the plan you asked about earlier,

23  but American was going to, had agreed to make a contribution

24  to the pilots directed account plan, that TWA had not made.

25  And I, ten or twelve million dollars that was owed to the

Warner-direct/Fram                                           57

1    plan, American had agreed to pay that.

2    Q.   You say American had agreed to pay that?

3    A.   Yes.

4    Q.   Was that TWA LLC?

5    A.   I don't know.

6    Q.   Okay.

7    A.   One way or the other the money was coming in to the

8    directed account plan.  It may have been filtered through

9    TWA, Inc., for all I know.

10   Q.   Next item?

11   A.   Next item is pay increases.  Now, TWA collective

12   bargaining agreement had some pay increases into it in the

13   future, but the pay increases we are talking about here were

14   substantial.  They were going to get up to a much higher pay

15   raise that American Airline pilots made.  The next one was

16   mirror benefits.

17          There was a promise that American had made to TWA

18   LLC, to provide benefits that were no worse than what they

19   had at TWA, Inc., and could in fact be better to bring them

20   up to the standards at American.  And the last was the

21   process agreement for seniority, and I put process in

22   quotation marks.  In this this is the reasonable best efforts

23   agreement that American had offered.

24   Q.   Now, I think we have heard some about that.  You also

25   identified some cons to the agreement.

Warner-direct/Fram                                              58

```
 1   A.   Yes.
 2           2 cons we talked about in great detail, because on.
 3   Q.   By the way, you say we talked about.  Are we still
 4   talking to?
 5   A.   The March 21, 22 meeting.
 6   Q.   2001?
 7   A.   Correct.
 8   Q.   Thank you.
 9   A.   The first one was furlough.  And I put furlough/ asset
10   transfer.  The idea was this:  They were going to go to TWA
11   LLC, but nothing was going to protected them from being
12   furloughed out of TWA LLC.  If something bad happened and TWA
13   LLC reduced its operation, nobody anticipated September 11 at
14   that point, but clearly, we didn't want, we wanted to make
15   sure they didn't think they had, everybody had a guarantee of
16   jobs at TWA LLC.  So there was a possibility they could get
17   furloughed.
18           Then the next was poor seniority integration.
19   Another interest version of this I put Crummy seniority
20   integration.  I wanted to make it clear they were not going
21   to get the seniority integration they wanted if they accepted
22   an agreement with TWA LLC.
23   Q.   We will come back to that.  Let's work quickly through
24   the right side of that particular chart, where it says no
25   agreement.  Can you try to walk us through the pros and cons
```

 1    that you identified there?

 2    A.    Yeah, I apologize for all the arrows.  I didn't irks did

 3    not write these on the board.  This was my own way of looking

 4    at it.

 5          Okay.  There was essentially two ways to go, if we

 6    decided to reject the collective bargaining agreement.  We

 7    could fight against the rejection of the collective

 8    bargaining agreement and Section 1113 or we could adopt a

 9    litigation strategy that Roland Wilder had put out there.

10          This chart doesn't actually go through the cons of

11    each one in quite as much detail as the other ones, but the,

12    with the 1113 filing, the idea is this, is, I did note the

13    possibility of self help if we lose the 1113 as a discussion

14    point.  But the point was if we fight the 1113 filing, all of

15    advisors, including roam land Wilder, who favored litigation

16    but not even he favored fighting 1113.  We were going to

17    lose.

18          And so with a loss at 1113, you weren't going to

19    have any of those benefits that were over on the left side of

20    that chart.  You with weren't going to have a collective

21    bargaining agreement.  You weren't going to have union

22    representation.  You weren't going to have a grievance

23    process.  You didn't even know what your wages would be.  You

24    didn't know what your work rules would be.  All those could

25    be changed by the employer at any point.  And also you still

```
 1    weren't going to get a seniority integration that you liked.

 2    Because you had no leverage for that at all.

 3              The odd thing about the 1113, though, is even if

 4    all advisors were wrong and even if you were to win, you one

 5    the 1113, if you win you really lose, right?  Because if you

 6    win the 1113, what you have done, your Honor, you pointed

 7    this out, you prevented American from taking away those

 8    clauses of your collective bargaining agreement, TWA,

 9    prevented TWA from taking away those clauses of your

10    collective bargaining agreement that American had said had to

11    be removed before American would go through with the

12    purchase.

13              So you win 1113, and TWA can't meet the conditions

14    of this contract.

15              THE COURT:  Unless the pilots agree, and then --

16    A.    That was alternate strategy.  We have already not

17    agreed.

18              THE COURT:  Well, if the APA give them what they

19    wanted.

20              THE WITNESS:  If magic happened, that would be,

21    yeah, it would happen.  Our point is that even if you 1113,

22    you lost.  And the odd thing about 1113 also is it didn't

23    give you leverage against the one party you needed leverage

24    again against and that was the APA.  APA was against this

25    transaction from the beginning.  So we were going to do
```

1    something that was going to try to kill the transaction, they

2    would say great.  We support that.

3    Q.   So just to go back to this chart, on no agreement you

4    have strategies, like one, two, three.  An arrow at the

5    bottom, legal success.  Is that arrow down to legal success,

6    is that coming down from number 1, fight for 1113 filing, the

7    self help?

8    A.   The legal success, says dispute on 1113.  Success

9    chances.  That were my notes.  We thought Roland would say

10   1113, we could beat it.  In fact Roland consistently said

11   from that point forward, no, you are going to lose the 1113.

12   Q.   Looks like that one arrow ends up at the bottom of the

13   page.  Did your analysis about the agreement continue on the

14   next page of your notes?

15   A.   It probably did.

16   Q.   You want to check and tell us?

17   A.   But I think the -- actually, the way this ends up in my

18   notes, it is hard to tell what is the next page.  These pages

19   were shoved back into the folder as I went through.  But I

20   mean, if you are talking about what the analysis was of the

21   chances of success of the litigation alternative, they were,

22   the analysis of that was a little more complicated on a legal

23   basis, but just as simple on a strategic basis.

24          The legal analysis was complicated for this reason,

25   that Roland had an idea that we could file a lawsuit to

Warner-direct/Fram                                                    62

```
 1    enjoin this transaction, to stop this transaction from going
 2    forward.
 3              The other advisors, including the bankruptcy
 4    specialists, thought that that couldn't be done, it would not
 5    and allowed by the bankruptcy law.  And that even if it were
 6    done it would just push the 1113 faster so that the 1113
 7    would overwhelm it and overcome it.
 8              But without getting into the legal debate which we
 9    did, we got into the debate a little bit, but then we tried
10    to pull the pilot back to the practical alternative, the
11    practical result and the practical result was going to be the
12    same as with the 1113.  Even if you win, you lose.
13              The idea was this:  We liked this transaction.
14    Again, we were testifying in Congress in favor of it.  We
15    were testifying before the Court.
16              THE COURT:  We meaning ALPA?
17    A.   We meaning ALPA, yes.
18    Q.   And we including the TWA pilots?
19              MR. JACOBSON:  Objection.  Leading.
20    A.   Well, Scott Shwartz, the vice chairman of the TWA MEC
21    testified, yes.  And Kupper Parker Communications wrote
22    testimony to be submitted in writing to the Senate committee.
23    Q.   Was there anybody within the TWA MEC before April 2 who
24    do in the support the American transaction purchase of TWA
25    assets?
```

1    A.    I am not aware if they didn't.

2    Q.    All right.  So I think you are describing your analysis?

3    A.    Yes.

4    Q.    About what the practical realities of trying to enjoin

5    the transaction?

6    A.    Right.  So just thinking about it for a second, what you

7    are doing is you are trying to stop a transaction that you

8    support.  And that at least the bankruptcy court had said was

9    your only chance of continued employment.  That is an

10   extraordinarily risky thing do.  It is really foolhardy.  So

11   again if even if you win you are going to lose, because

12   American is going to walk away.  And leave you immediately

13   unemployed.  That was the litigation analysis.

14   Q.    All right.  Flip to the next page of the notes.  You

15   have got a list of pros and cons.

16         Are those pros and cons associated with the no

17   agreement analysis from the prior page.

18   A.    It was likely to be associated with the 1113 slash

19   litigation analysis.

20   Q.    And without getting into all of the details about, you

21   have got one pro listed, what is that?

22   A.    Haven't chance of better seniority integration.

23   Q.    And then you have how many cons listed?

24   A.    I guess there are eight.

25   Q.    And just we will do this quickly, but let's flip to the

1    next page and project that.  You have another diagram.  TWA

2    slash ALPA.  And is this a refinement of some kind of your

3    agreement, no agreement analysis?

4    A.   Yes.

5    Q.   The next page after that looks like another list of

6    sorts?

7    A.   This next three pages further refinement of the

8    analysis.

9    Q.   And --

10   A.   Which was broken down instead of agreement, no

11   agreement, agreement is one, 1113 fight is two.  And

12   litigation is three.

13   Q.   All right.  And in terms of walking the attendees at the

14   March 21st and 22nd meetings through your analysis, how did

15   you do it?  How physically did you do it?  Did you just talk

16   them through it or what??

17   A.   I stood at an easel with large white piece of paper, and

18   I wrote this stuff out on the easel.  Talking as we went.

19   Interrupted by questions.  Interrupted by other advisors

20   making comments.  Then after the interruptions we would go

21   back and restate, make sure we were all on the same page and

22   go forward but it was done by standing in front of the room

23   and writing it out.

24   Q.   The MEC officers and voting members who were present,

25   did some of them ask questions?

1    A.    Yes.

2    Q.    Are there any questions, were there any questions asked

3    that you refused to answer?

4    A.    Oh, no.

5    Q.    Did any of them say that they were confused by your

6    analysis?

7    A.    No.

8    Q.    Did any of the MEC officers or voting members say they

9    disagreed with your analysis, they thought you were wrong?

10   A.    Some of them were reluctant to give up the litigation

11   alternative.

12            THE COURT:  Some of them.

13            THE WITNESS:  Some of the voting members much the

14   MEC were reluctant to give up on the litigation alternative

15   until we had gone over it, and over it, and over it.  That is

16   really Judge I have at least three versions of of this

17   presentation because we went over it and over it and over it

18   until they were completely satisfied.

19   Q.    Okay.  And at the end of the day at the end of these

20   meetings on March 21 and 22, were any of the members of the

21   MEC, either officers or voting members, was anybody

22   disagreeing with your analysis?

23   A.    No.

24   Q.    To what degree, if any, did the other advisors disagree

25   with your analysis?

1    A.    Roland alone thought that the risk of litigation was

2    worth it, to give leverage on the seniority integration.

3    Q.    All right.  Let's talk about what happened after the end

4    of these meetings on March 21 and 22.  At the end of the

5    meetings was any direction given by the MEC to the merger

6    committee merger committee?

7    A.    Yes.

8    Q.    What direction was given to the merger committee when

9    this meeting broke up?

10   A.    Randy Babbitt had suggested that in addition in advance

11   of the 1113 hearing, and in advance of making a decision on

12   whether or not to accept the agreement with LLC, the merger

13   committee should meet again with the merger committee at APA.

14   And present essentially the worst possible offer that they

15   could stomach, to see if there was any possible way of

16   getting a deal, in advance of making in decision of agreement

17   versus no agreement.

18   Q.    You mentioned that the merger committee was given

19   direction to try this in advance of the hearing.  Had a

20   hearing be scheduled at that point on the 1113 motion?

21   A.    I believe so.  But actually it was really less the

22   hearing than the decision point for the MEC.  I know the

23   decision point for the MEC was actually going to be triggered

24   off of that hearing but I don't recall exactly whether it was

25   scheduled at that point.

Warner-direct/Fram                                    67

1    Q.   I think you said the merger committee was directed to

2    make the worst possible offer they could stomach.  Can you

3    explain that more?

4    A.   Instead of negotiating, making little increment mal

5    movements from side to side to see if you could eventually

6    get to an agreement, they were told go make the best thing

7    you can.  Jump to where you think you can get an agreement

8    and you can still stomach it.  Put it on the table and see if

9    you can get a response and an agreement.

10   Q.   And what was explained at the MEC level about why they

11   wanted the merger committee to do that, to try and resolve

12   this issue of seniority integration?

13   A.   If to see if there is any possible way to resolve that

14   issue before the decisions had to be made by the MEC.

15            Everything hinged on those merger discussions.  If

16   we could reach an agreement with the Allied Pilots

17   Association on seniority integration, the rest was really,

18   really easy.

19   Q.   Now, this direction you have been describing, did that

20   direction come from advisors?

21   A.   No.

22   Q.   Who did it come from?

23   A.   It was a suggestion by adviser, Randy Babbitt, but the

24   direction came from the MEC.

25   Q.   And at the end of the meetings on March 22 was any

1    direction given to the negotiating committee in terms of what

2    it should do or not do?

3    A.    Yes.  It was an a continuation of the direction they had

4    had all along which was to get an agreement with, at least

5    since early March, to get an agreement with TWA, LLC, nail

6    down every possible issue, but avoid the successorship clause

7    issues in section 1.

8    Q.    Okay.  And how about the lawyers who were dealing with

9    the 1113 motion, what direction, if any, was given to them at

10   the end of the meeting on March 22, 2001?

11   A.    They understood, because Richard was going to be working

12   on it at that point, that we were to prepare, Richard was to

13   prepare and file an objection to the 1113.

14   Q.    Well, if you had told the attendees at the meeting, the

15   MEC members, that, and if Glanzer had told them all that the

16   Section 1113 motion was going to be granted, this was a lost

17   cause, why did the MEC direct the lawyers to prepare

18   opposition?

19   A.    Well, it is sort of a literal answer.  I will work up

20   from there.

21        The literal answer was if we didn't file an

22   opposition, then it was going to be conceded and we were

23   definitely going to lose, by giving up.  So if we were going

24   to keep a toe in that at all, we had to file an objection.

25        And the MEC hadn't made a decision yet on whether

1   it wanted to fight 1113 or whether it wanted an agreement or

2   whether it wanted to go on this litigation strategy, so the

3   lawyers had to prepare the objection.

4   Q.   All right.   At the time the directions were given to the

5   merger committee, to the negotiation committee, and the

6   lawyers, was there any discussion about having the MEC

7   advisors get together again to take stock of where they are

8   and make some decisions?

9   A.   Yes.   There was an understanding that there was going to

10  have to be a subsequent meeting of the MEC to make this

11  decision about whether to accept the agreement, whether to

12  fight through 1113 or litigation.

13  Q.   Okay.   Did you attend a meeting with the members of the

14  merger committee and some of the other advisors on the

15  evening of March 28, 2001, in Dallas Fort Worth?

16  A.   Yes.

17  Q.   How did that meeting come about?

18  A.   I don't know how the meeting was scheduled between the

19  two merger committees.   I mean I know there was a direction

20  to schedule this meeting, a meeting was scheduled.   And I was

21  ask and I was asked to attend.

22  Q.   Did you and the other advisors show up unannounced in

23  Dallas Fort Worth?

24  A.   No.

25  Q.   Do you recall any discussion at the conclusion of the

Warner-direct/Fram                                              70

 1   meeting on March 22 about advisors getting together with the

 2   merger committee when the merger committee was meeting with

 3   their counterparts at TWA.

 4            MR. JACOBSON: I am going to object to the very

 5   leading nature of the question.

 6            MR. FRAM:  It is a yes or no question.

 7            MR. JACOBSON: Which is by definition leading.

 8            THE COURT:  No, no.  No.  Any question that calls

 9   for yes or no would not be leading.

10            MR. JACOBSON: That is true.  I overstated it.

11            THE COURT:  Sometimes it hints it is leading.  I

12   agree with that.  I will allow the question.

13            MR. FRAM:  I can rephrase it.

14            THE COURT:  Go ahead.

15   A.   Can I just answer no.  At end of that meeting I was not

16   directed to go to Dallas.  The request came subsequently.  I

17   believe from vice chairman Scott Shwartz.

18   Q.   Thank you.  What discussion do you recall with the

19   members of the merger committee on the evening of March 28,

20   2001?

21   A.   The discussion that we had with the merger committee

22   members was about the suggestion by Randy Babbitt that turned

23   into a direction from the MEC to come up with the seniority

24   integration presentation that was the worst that they could

25   stomach, and really was just a bouncing around of ideas based

1    on various concepts that they were very facile with at that

2    point, about how many do you put here, what airplanes do you

3    protect, that sort of thing.

4    Q.   Who were the other advisors present at this meeting on

5    the evening of March 28, 2001?

6    A.   I recall Bob Christy, I recall Michael Glanzer, David

7    Holtzman.

8    Q.   Did any of advisors tell --

9         THE COURT:  Roland Wilder was not there?

10   A.   I am pretty confident that he was but I don't exactly

11   recall it.

12        THE COURT:  Oh.  He was there also.

13        THE WITNESS:  I think he was.

14   Q.   All right.  So did any of advisors tell the merger

15   committee what type of proposal to make to the APA?

16   A.   No. Well, other than reminding them of what the MEC

17   directs was which they knew any way.  So.

18   Q.   Do you recall any of advisors telling the merger

19   committee that they should offer to staple over 800 of the

20   TWA pilots to the bottom of the American Airlines seniority

21   list?

22   A.   No.  I mean I recall discussion of some number of pilots

23   that would be at the bottom.

24   Q.   Did any of advisors in your view put pressure on the

25   members of the merger committee to make any particular offer?

1   A.    No.

2   Q.    There has been some testimony that the members of the

3   merger committee bid against themselves at the meetings with

4   the APA, they made a proposal on the 28th, and then without

5   hearing back from American with a counter proposal they made

6   another proposal, less favorable, on the 29th.

7         Did you think it was bad thing or in some way

8   terrible in undermining the negotiating position of the

9   merger committee to in effect bid against themselves in that

10  fashion.

11  A.    The direction that was given by the MEC to go in and

12  make essentially your final offer, isn't the best way to

13  negotiate.  It never is.  If you have time and you have

14  leverage, you never want to go in and make your best offer

15  again.

16        The problem is they had neither time nor leverage.

17  And that is why the MEC gave them that direction, go make

18  your worst offer.  So yeah, it is not the ideal way to

19  negotiate, but these guys had no leverage at this point.

20        MR. FRAM:  Your Honor, I am about to move to a

21  different topics.  Is this a good time to break?

22        THE COURT:  Yes.  We will take a break until 10:15.

23  Do not discuss the case among yourselves.  Keep an open mind

24  until you have heard all the evidence.  All rise.

25        (Recess)

```
 1                   (The jury enters the courtroom.)

 2                   GRANVILLE CLAY WARNER, resumes.

 3                   THE COURT:  Mr. Fram.

 4                   MR. FRAM:  Thank you, your Honor.

 5    Q.   Let's pick up about the meeting on April 1 of 2001.  Did

 6    you attend that meeting in St. Louis?

 7    A.   Yes.

 8    Q.   Who else was present, please?

 9    A.   The officers and voting members of the MEC, negotiating

10    committee, merger committee, and all of advisors except Randy

11    Babbitt.

12    Q.   And there has been some testimony in this case that a

13    number of these voting members of the MEC MEC were not

14    present on April 1, 2001, namely Alan Altman, Howard

15    Hollander and Sally Young.  Is that testimony consistent or

16    inconsistent with your recollection of the meeting on April 1

17    of 2001?

18    A.   Inconsistent.

19    Q.   Your recollect is that they were there?

20    A.   They were all there.

21    Q.   Who gave presentations at the meeting on April 1 of

22    2001?

23    A.   The negotiating committee with David Holtzman.  The

24    merger committee.

25                   THE COURT:  This is on April 1?
```

 1              MR. FRAM:  April 1 of 2001.

 2              THE COURT:  That's a Sunday.

 3              THE WITNESS:  Yes, sir.

 4     A.   The negotiating committee with David Holtzman, the

 5     merger committee, and each of advisors, Roland Wilder,

 6     Richard Seltzer, Michael Glanzer.  And I did another of the

 7     charts that we saw.

 8     Q.   All right.  Let's talk quickly about the merger

 9     committee.  What type of presentation do you recall from the

10     merger committee?

11     A.   Their presentation was to reflect that they had done

12     what the MEC told them to do, and they had gotten no where

13     with the Allied Pilots Association merger committee.  They

14     had no agreement.

15     Q.   How about the negotiating committee, who gave comments

16     on behalf of the negotiating committee, do you recall?

17     A.   The negotiating committee, was David Holtzman and I

18     believe Ron Kiel as well, kind of a tag team.  Their was a

19     relatively technical presentation because they were

20     explaining the technical aspects of the contract and some

21     technical issues that were still open and had been resolved

22     since the 21st, 22nd meeting.  And actually, a couple of

23     other issues that still were hanging out there that needed to

24     be clarified.  So that was a technical relative lengthy

25     discussion.

1   Q.   You mentioned I think that there was a presentation by

2   Richard Seltzer?

3   A.   Yes.

4   Q.   What do you recall Mr. Seltzer discussing at this

5   meeting on April 1, 2001?

6   A.   Very similar things to what he had discussed the 21 and

7   22, in the meantime he had filed the objections to the 1113

8   motion.

9   Q.   And what do you recall him saying about the objection

10  that he had filed to the Section 1113 motion?

11  A.   The same things he had said on the 21 and 22, which is

12  now it has been filed but we are still going to lose.

13  Q.   Did you mention Mr. Glanzer made some comments.  Let's

14  start with Mr. Wilder,  I think you mentioned Mr. Wilder made

15  comments at the meeting of April 1, 2001?

16  A.   Right.

17  A.   Roland's comments were addressed to his litigation

18  theory that we should file an injunction to enjoin the

19  transaction.

20  Q.   What did Mr. Glanzer say,  to your recollection?

21  A.   Very similar to what he had said on the 14th, the 21st,

22  the 22nd and again here which is the two points that he had

23  been making, one was that American was a volunteer, and could

24  walk away at any point.  And would walk away in the face of

25  too much in the way of litigation or if there was going to be

1    too many problems.   And the second was that the 1113 motion

2    would be granted quickly.

3    Q.    Did any of the other advisors difficulties disagree with

4    the idea that the Section 1113 motion would be granted

5    quickly?

6    A.    No. No.   In fact, Roland at that meeting specifically

7    agreed that the 1113 motion would be granted.

8    Q.    And what comments did you have at the work session on

9    April 1 of 2001?

10   A.    Again, it was another of those charts that there are

11   three versions of, three or four versions of in my notes.   We

12   went through again going through all of the issues and

13   addressing the good and the bad of each alternative.

14   Q.    Was there any discussion at the meeting on April 1,

15   2001, about the right to exercise self help remedies, about

16   the right to strike?

17   A.    Yes.

18   Q.    What do you recall being discussed about the right to

19   strike?

20   A.    Richards position was that his best view is that we did

21   have a right to strike if we were to lose this 1113 motion,

22   have our collective bargaining agreement taken away.   That

23   wasn't certain by any stretch of the imagination, but the

24   best judgment at that point was that that was the case.

25   Turned out there is some case law to the contrary in the

```
 1    intervening years but we thought that they had a right to

 2    strike.

 3            The question then came down to a practical one, the

 4    one that we discussed earlier which is what good is it to

 5    strike against TWA Inc. which is about to shut down

 6    operations.

 7    Q.   Okay.  The advice that you described with the various

 8    advisors was that advice on April 1, 2001, any different than

 9    the advice you had been given on March 21st or 22nd with

10    respect to the issues we have been discussing, the Section

11    1113 motion, the possibility that American would walk away,

12    all the things we talked about?

13    A.   No.  The details had been filled in as the negotiating

14    committee could report on more of the details of the contract

15    and the merger committee could reported, we made a last try

16    and we failed.  But the outline of the analysis was, with the

17    good and the bad was still exactly the same.

18    Q.   Was there any support from the members of the MEC, the

19    voting members of the MEC, let's start with them, for the

20    idea of a strike?

21    A.   No.

22    Q.   Was there any support from any of the members of the MEC

23    including the nonvoting members on April 1 for the idea of a

24    strike?

25    A.   No.
```

1   Q.   How about for Roland Wilder's idea to enjoin the

2   transaction, was there any support from anybody involving the

3   MEC for running to court and trying to stop the transaction?

4   A.   On April 1, no.  Ted Case came on the two.  He was a

5   nonvoting secretary treasurer, he arrived on the 2nd.  He

6   didn't hear Roland's presentation and stuff but he indicated

7   he would be in support of litigation.  Of course he didn't

8   have a vote but that was his position.

9   Q.   Do you recall Howard Hollander, one of the Council 2

10  members?

11  A.   Yes.

12  Q.   There has been some testimony in this case that you had

13  a phone conversation of about 45 minutes with Hollander in

14  late March where you told him that in your view the Section

15  1113 motion was likely to be denied.  Do you recall such a

16  conversation with Hollander?

17  A.   It didn't happen.

18  Q.   The April 2 meeting --

19          THE COURT:  Well, there was no conversation or you

20  didn't say that.

21          THE WITNESS:  I did not say that.  There were many

22  conversations with Howard.  But I never told him the 1113

23  motion would be granted.

24  Q.   I am sorry.  You never told him?

25  A.   That the 1113 motion would be granted.

Warner-direct/Fram                                           79

 1   Q.   You never told I am it would be granted or you never

 2   told him it would be denied?

 3   A.   I am sorry.  I never told him it would be denied.  I am

 4   getting our motion and, I mean, our opposition and their

 5   motion confused.

 6          But the position of advisors from early March on

 7   was that the 1113 motion would succeed and our objection

 8   would fail.

 9   Q.   All right.  Did you ever have a conversation with

10   Hollander where you gave him advice that was inconsistent

11   with that position?

12   A.   No.

13   Q.   April 2, let's talk about the April 2 meeting.  Do you

14   recall who was present at the April 2, 2001 meeting with TWA

15   MEC?

16   A.   Well, all of the same people that were there on April 1

17   with three exceptions.  Ted came on the second, he was not.

18   Q.   Ted?

19   A.   Ted Case.  Randy Babbitt cage on the second, and he was

20   not there on the first, and Roland had left the night before

21   on the first, he was not there on the second.

22   Q.   Do you recall Roland said about why he would not be

23   there on the second?

24   A.   He worked with another pilot group, the UPS pilots, and

25   he had meetings with them on the first Louisville, I think,

1    eastern Kentucky.  And he left me phone numbers that are in

2    my notes to contact him in case there are any questions that

3    came up and I did.  I mean I called him at the end of the day

4    to tell him what had happened.

5    Q.   Did you call him at the end of April 2, 2001?

6    A.   Yes.

7    Q.   All right.  Did Randy Babbitt who had not been there on

8    April 1, give any kind of presentation on April 2, 2001?

9    A.   Yes.

10   Q.   Do you recall the gist of his presentation?

11   A.   The gist of his presentation was you tried everything

12   there is to try.  You have you have gone as far as you can

13   go, and now it is time to accept the agreement.

14   Q.   Okay.  Was there any advice given on April 2 about the

15   issues we  have been discussing, Section 1113, the

16   possibility American would walk from the deal, any advice

17   given on April 2, 2001, that was inconsistent from or

18   different from the advice given on April 1 and on March 21st

19   and 22nd?

20   A.   No.

21   Q.   Now, you and the other advisors were present at the

22   meeting on April 2 of 2001 to tell the members of the MEC how

23   they had to vote.  Isn't that so?

24   A.   No.

25   Q.   What were you doing there?

1    A.    We were advisors.  The MEC made decisions.  Advisors

2    gave advise.  And did analysis as requested.  But we

3    certainly didn't tell them how to vote.

4    Q.    Did you tell the members of the MEC on April 2 that the

5    quote train was about to leave the station?

6    A.    No.

7    Q.    Do you recall saying that?

8    A.    Not at all.

9    Q.    Did any of advisors tell the members of the MEC that

10   they had to vote a certain way, that it would be

11   irresponsible to do anything other than to follow the advice

12   of the order vice advisors?

13   A.    No.

14   Q.    Did any of advisors yell or raise their voices in

15   talking to the members of the MEC or other advisors, either

16   on April 2, 2001, or at the meeting on April 1 of 2001?

17   A.    Or ever.  No.  Absolutely not.  I mean, look, these are

18   pilots you are dealing with who are educated, sophisticated,

19   smart, and almost by definition are leaders, because in every

20   cockpit somebody is the leader.  It is silly for us to tell

21   them what to do one particular way or another.  And it is

22   also going to be counter productive.  They are going to push

23   back.

24         So no, we didn't tell them what to do.  We never

25   told them what to do.

1    Q.    Under ALPA's Constitution and bylaws, the governance

2    documents referred to before, did advisors have the right to

3    tell the members of the MEC what to do?

4    A.    No.

5    Q.    Who had the right to make decisions on behalf of the TWA

6    pilots under ALPA's Constitution and bylaws?

7    A.    Pilots, TWA pilot's elected by TWA pilots had the right

8    and the responsibility to make decisions affecting TWA

9    pilots.

10   Q.    And there was some degree of oversight by ALPA with

11   respect to decisions that they made?

12   A.    With respect to collective bargaining agreements, the

13   only possible oversight, if you want to call it that, at the

14   national level was the eventual agreement has to be signed by

15   the president.  But in my experience there is also once when

16   a president has refused to sign a collective bargaining

17   agreement.  Every other circumstance the MEC makes all those

18   decisions about what is in an agreement.

19   Q.    How about decisions to file litigation, to proceed with

20   lawsuits?  Did the TWA memorandum MEC have the ability to

21   decide, to go ahead and file the lawsuit?

22   A.    Not on their own.  They had to get approval of the

23   president.  But if you look at it from the opposite

24   perspective, without the TWA MEC recommendation the president

25   was never going to pursue litigation.  The president did act

1    as a final check with respect to litigation.

2    Q.    Is there any motion made or resolution offered on April

3    2, 2001, to proceed with the injunction lawsuit that Roland

4    Wilder had talked about?

5    A.    I believe something was prepared but it was never put on

6    the floor, never voted on.

7    Q.    Was any support articulated by the members of the MEC

8    for pursuing Roland Wilder's lawsuit on the second.  Do you

9    recall?

10   A.    My recollection is that Ted Case who was not a voting

11   member of the MEC, again, he had no vote, but he expressed

12   support for the litigation theory.

13   Q.    Did any of advisors on April 2 refuse to answer any

14   questions that were posed by members of the MEC?

15   A.    No.

16   Q.    Did any of the members of the MEC say that they were

17   confused or did not understand what they are being asked to

18   decide?

19   A.    No.

20   Q.    Did any of the members of the MEC appear to you to be

21   confused in terms of their facial questioning of the

22   questions?

23   A.    Not at all.

24   Q.    In your view did any of the advisers pressure any of the

25   members of the MEC to vote in a particular way?

1    A.    No.

2    Q.    Did, in your view, did any of the advisors act

3    inappropriately and unprofessionally?

4    A.    No.

5    Q.    On April 1, 2001 or April 2, 2001?

6    A.    No, not tall.

7    Q.    Now, was there some discussion during the period leading

8    up April 2, 2001, about a 45 million dollars fine that had

9    been imposed against the Allied Pilots Association, the union

10   representing the American pilots?

11   A.    Yes.

12   Q.    Tell us what you know and then I will ask you what was

13   discussed about that fine.  What do you know about events

14   that led to that 45 million dollars fine?

15   A.    American had purchased a small airline, or purchased the

16   assets, or actually in that case they purchased stock of a

17   small airline, Reno Airways.  They were operating it

18   separately from the larger company.  The American pilots

19   objected to that.  They have a clause in their collective

20   bargaining agreement which I think they are correct when they

21   say all of the flying that American or any of its affiliates

22   do has to be done by pilots on the American seniority list

23   with American work rules and American wages.

24         What ended up happening, though, is instead of

25   pursuing that through the grievance mechanism, as the Railway

Warner-direct/Fram                                          85

1    Labor Act requires, they began a sick-out.  They started

2    calling in sick in huge numbers.  American went to court in

3    Texas and a Judge in Texas ordered Allied Pilots Association

4    to stop the sick-out.

5            A couple days later the sick-out hadn't stopped and

6    there was some indication that Allied Pilots Association

7    officials had, through a wink and a nod, actually encouraged

8    it to continue.

9    Q.   I am sorry.  What effect did the sick-out have on

10   American flights?

11   A.    Hundreds and hundreds of flights were cancelled.  So

12   American went back into court and the Judge ordered, found

13   the American, the Allied Pilots Association and several

14   pilots in contempt of his ruling.  And in a later decision

15   found that -- imposed a fine of 45 million dollars on the

16   Allied Pilots Association.

17           Now, we thought when we saw the reasonable best

18   efforts letter which we mentioned but not discussed, it was a

19   letter that American offered that said they would use their

20   reasonable best efforts with their union, the Allied Pilots

21   Association, to get them to agree to a process for seniority

22   integration.

23           We thought, well, you know, it is not much but

24   maybe they can use this 45 million dollars fine.  It is still

25   out there in 2001, to wrestle the Allied Pilots Association

1    into agreeing to some sort of process that would be

2    beneficial to TWA pilots.

3            What happened instead is they actually just agreed

4    on a payment plan with the Allied pilots.

5            THE COURT:  Who is they?

6    A.   I amso rry.  American agreed.

7            THE COURT:  Was this money going to American

8    A.   Yes, it was going straight to American.  There was a $25

9    million in the Court registry.  That went straight to

10   American.  Then there was a payment plan over ten or 15 years

11   to pay out the rest at the statutory interest rate.

12           So this was puzzling, why they had just accepted

13   the money rather than trying to use it as leverage.  And it

14   came very clear later on why that had happened.  And in the

15   proceeding that we did, a trial that we did to try to enforce

16   this reasonable best efforts letter later on, a couple of

17   witnesses for American testified, look, the Allied Pilots

18   Association has 11,000 and change members.

19           MR. JACOBSON: Your Honor.  I hate to object in the

20   middle of a narrative but it is a long narrative that appears

21   to be going into hearsay now and not to be connected to the

22   question.

23           THE COURT:  I think they are both valid points.

24           MR. FRAM:  I will break it up.

25   Q.   Let's not get to the best efforts arbitration yet.  We

Warner-direct/Fram                                              87

1    will talk about that in a little bit.

2              As of March of 2001, was the fine still

3    outstanding.

4    A.   It was resolved in March or April.

5    Q.   Okay.  And what was the feeling, what was your view in

6    view of the MEC about whether this 45 million dollars fine

7    was going to give American the kind of leverage that you

8    hoped for, to bludgeon the APA into something that was

9    reasonable?

10   A.   Well, and I am sorry I skipped ahead.

11             The point was clear.  Everybody could do the math.

12   11,000 pilots.  45 million dollars fine.  It is less than

13   $5,000 a head.

14             Now, $5,000 is real money, don't get me wrong, but

15   the average American pilot at that point is probably making

16   120, to 125, that is the average, and the idea they were

17   going to give up some of their seniority for $5,000 was

18   really a stretch, the reason being that seniority will get

19   you, I mean if it is the difference between a first officers

20   seat or a captain's seat or a seat on a smaller airplane or a

21   larger airplane, you can earn that $5,000 in one year if your

22   seniority is just a little bit different, so there was no way

23   that the Allied Pilots were going to say, oh, well, you

24   forgive our fine, then we will give them a seniority

25   integration.  Just wasn't going to work.

1   Q.   All right.  Focusing on the decision that was made on

2   April 2, 2001, by the MEC, was there any requirement that the

3   decision to accept a new collective bargaining agreement and

4   to waive scope on April 2, 2001, had to be ratified by all of

5   the TWA pilots?

6   A.   No.  ALPA's Constitution work the opposite.  The default

7   mechanism is ratified by the MEC, by the elected

8   representatives.

9   Q.   And was there any discussion at the meeting on April 2,

10  2001, about trying to put this decision out, this new

11  collective bargaining agreement out, for ratification by the

12  members?

13  A.   I recall a question about whether that was possible.

14  Q.   And were you the one who responded to the question?

15  A.   I was one of the ones who responded to the question.  We

16  had changed our vote procedures just recently and I had

17  worked on that process.  In order to get the information out

18  to the pilots, and conduct a ballot of any length of time

19  would have taken weeks, probably as much as a month to do.

20  Q.   Okay.  Why was that a problem?  Why didn't it make sense

21  given the importance of these issues to put the new CBA and

22  the scope waiver issue out so that all the TWA pilots could

23  vote on it?

24  A.   It was a question of timing.  There was a hearing on the

25  1113 motion just a few days down the road, on the 6th, I

 1    think.

 2    Q.    Was there any motion by anybody at the MEC level, any

 3    resolution offered, a motion made to send this new CBA out

 4    for ratification by the members?

 5    A.    No.

 6    Q.    Focusing on the advice you gave and the things you did

 7    on April 2, 2001, did anybody at ALPA National tell you what

 8    advice to give or what guidance to provide to members of the

 9    MEC?

10    A.    Absolutely not.

11    Q.    Were you aware during the period before April 2, 2001,

12    that ALPA National had adopted the so-called unity resolution

13    in late 2000?

14    A.    Yes.

15    Q.    And just remind us what was the unity resolution?

16    A.    It was, it directed the president to go out and try to

17    start discussions with other independent pilot groups to see

18    about merging into ALPA.

19    Q.    And one of the pilot, independent pilot groups that was

20    talked about as part of the unity resolution was the Allied

21    Pilots Association?

22    A.    Yes, it was.

23            THE COURT:  Well, it wasn't just one of them, it

24    was probably one of the most important ones, wasn't it, in

25    terms of the size and nature --

Warner-direct/Fram                                        90

1    A.   There were four.  Fed Ex, Continental pilots, American

2    pilots and the UPS pilots.  So yeah, there were four of

3    consequence and that was one of them.

4    Q.   The fact that ALPA had this, and tried to bring the

5    American pilots into ALPA, did that in any way shape or form

6    influence the advice you provided to the TWA MEC?

7    A.   Absolutely not.

8    Q.   Did there come a point over the summer of 2001 when you

9    were asked to assess or analyze additional litigation

10   theories that were proposed by Roland Wilder?

11   A.   Yes.

12   Q.   Let's walk through those.  Do you have in front of you,

13   if you flip along the pile, skipping a bunch of documents to

14   move this along.  July 2, 2001, J 127 in evidence.  Your

15   Honor.  Do you have that in front of you, Mr. Warner?

16   A.   Yes, I do.

17   Q.   Is this a legal memorandum from Mr. Wilder's office that

18   came to your attention?

19   A.   Yes.

20   Q.   What, if anything, were you asked to do in terms of

21   assessing it?

22   A.   Well, I was asked to assess it.  Exactly that.  What had

23   preceded this is I had gone to Roland's office in June before

24   this was done with another lawyer in the legal department to

25   discuss and brainstorm over some legal ideas that Roland had.

```
 1    He had given us a list of case citations that supported
 2    various propositions and we had been looking at those.  But
 3    this  was a memo he produced that sort of solidified the
 4    idea.
 5    Q.   Without having us read through the memo, what was the
 6    theory or litigation proposal Mr. Wilder was putting forth?
 7    A.   The idea was this:  That American and APA were
 8    bargaining over issues that affected the TWA pilots.  And
 9    Roland's theory was that American had an obligation under the
10    Railway Labor Act to bring TWA, and TWA MEC into those
11    discussions, because the issues affected TWA pilots and he
12    had sort of a parallel theory that the Allied Pilots
13    Association was also violating the collective -- the Railway
14    Labor Act by negotiating over things that affected the TWA
15    pilots.
16            So it would, trying to capture both the Allied
17    Pilots Association and American, in this concept that
18    discussions about issues that affect TWA pilots had to
19    involve the TWA MEC and ALPA.
20    Q.   And what was Mr. Wilder proposing be done about that?
21    What was the recommendation that was made to him based upon
22    that theory, that there were these obligation that's flowed
23    from American and the American pilots to the TWA pilots?
24    A.   A lawsuit, I think he was proposing one but you could
25    have done two that brought TWA MEC and ALPA into those
```

1    discussions.  It forced them to talk with us about those

2    things.  And actually, what he wanted to do was stop the

3    discussions in order to put pressure on both pilot groups, I

4    mean, but the pilot group and the airline to talk to us more

5    seriously about seniority integration.

6    Q.    All right.  And what did you do to assess the viability,

7    the merit, if you will, of this theory?

8    A.    Again we had been talking to Roland and to Bill Wilder

9    prior and gotten their cases, and we had read those already.

10   We went back with the specific words and went through

11   everything again to try to see what we could do, whether

12   there was any merit to this at all.

13   Q.    Do you during the course of this process make notes on a

14   copy of this memo?

15   A.    Well, I first red it, yeah, I made notes.

16   Q.    Do you have J 202 in front of you?

17   A.    Yes.

18          MR. FRAM:  Your Honor, J 202 is not yet in

19   evidence.  I will hand it up.

20          THE COURT:  Okay.

21   Q.    Is that your hand writing that appears on J 202 which is

22   which is a copy of Mr. Wilder's July 2, 2001 memo?

23   A.    Yes.

24          MR. JACOBSON:  No objection.

25          THE COURT:  202 in evidence.

Warner-direct/Fram                                              93

1    Q.    Let project it.  Do you agree your handwriting has not

2    improved?

3    A.    Yes.

4    Q.    You made some notes.  What else did you do to analyze

5    the litigation?

6    A.    We read the cases and actually read other cases to try

7    to see if there was another angle off of some of these

8    theories that might work.  Essentially explored them, and as

9    far as he we could.  When I say we it was another lawyer in

10   the legal department and we discussed it with others in the

11   legal department as well to see if there were ideas that we

12   were missing.

13   Q.    Did you prepare a memorandum of your own?

14   A.    Yes, I did.

15   Q.    Is that J 130?

16   A.    Yes, it is.

17   Q.    And that is in evidence.  Do you have a copy handy?

18   A.    I do.

19   Q.    Tell us without, project the first page.  Looks like the

20   memo has anyone pages.  Is that correct?

21   A.    Yes.

22   Q.    All right.  And without giving us all the details, what

23   conclusion did you reach about this litigation idea that that

24   Mr. Wilder had come up with?

25   A.     It was based on a fundamentally flawed premise.  Again,

Warner-direct/Fram                                                    94

1    I said the premise it was based on was that while American

2    and the APA were talking about issues that affected TWA

3    pilots, that ALPA and TWA MEC had to be involved in those

4    discussions and that premise just isn't true.

5            All of the time, unions negotiate with employers

6    over things that are going to affect other people, either way

7    down the road or in other circumstances that aren't

8    represented by that particular union.  And the Allied Pilots

9    Association is made very clear what they were doing here, and

10   what they were doing was negotiating for the changes to their

11   agreement that were necessary to allow TWA LLC to operate.

12           And what they were most interested in was making

13   sure that American didn't start to shovel all of its work to

14   this lower cost airway because the TWA LLC pilots were make

15   go less money, had work rules that were more favorable in

16   most respects, lower benefit cost, so the Allied Pilots were

17   afraid that their work was going to be shoveled to TWA LLC.

18   So what they were negotiating was essentially a bunch of

19   conditions that would stop that from happening.  Yes, it

20   affected the TWA pilots but it was fundamentally negotiation

21   that the Allied Pilots Association was entitled to do.

22   Q.  Mr. Wilder had cited some cases, some judicial decisions

23   in his memo.  And you read those decisions?

24   A.  Yes.

25   Q.  What conclusions did you reach about whether the cases

1  he cited supported the argument you wanted to make?

2  A.   They did not support the argument he want the argument

3  he wanted to make.

4  Q.   Did you receive a subsequent memo from Mr. Wilder's

5  office proposing another lawsuit?

6  A.   Yes, we did.

7  Q.   Is that P 131 in evidence, which I hope you have in

8  front of you, August 16, 2001?

9  A.   I have a version of that memo.  It doesn't have the P

10  131 stamp on it.

11  Q.   Lower right-hand corner?

12  A.   Oh, yeah.  I am sorry.  I see it.

13  Q.   It is in evidence.  Let's project it real quickly.

14  August 16, 2001.  Tell us withoug walking us through in

15  detail, if you can, what was the proposal being made by Mr.

16  Wilder in this memo?

17  A.   This was another lawsuit but on a different theory.  And

18  this theory came up out of the reasonable best efforts letter

19  that was talked about previously.  American and TWA LLC had

20  given us an agreement, given the TWA MEC an agreement at the

21  end of the negotiations before, in March of 2001, that said

22  that American would use its reasonable best efforts if with

23  its union, representing its pilots, to get them, the APA, to

24  agree to some process for seniority integration and Roland

25  asserted that they hadn't used those reasonable best efforts.

```
 1    And he further asserted that we should file a lawsuit, we
 2    should file a grievance, claiming they hadn't met that, and
 3    when and when American refused to process that grievance we
 4    should file a lawsuit to compel them to do it and to stop
 5    them from negotiating any further over seniority integration
 6    with the Allied Pilots.  So that was the nature of the
 7    litigation theory.
 8    Q.    Describe for the jury, please, what you mean when you
 9    say processed agreements, the idea that a written document of
10    some kind would be filed complaining about Americans failure
11    to live up to the best efforts obligation.  What would happen
12    as a result of that --
13    A.    Sorry, I didn't lay that out.
14    A.    A grievance process in ALPA collective bargaining
15    agreement and I think it is similar in all union agreements,
16    is that an employee or group of employees can petition the
17    employer in some way and say, look, we think you violated the
18    contract, A B and C ways.  It is usually levels at which you
19    process these.  You start in a pilot world with the chief
20    pilot, the first level supervisor.  Then maybe you go up to a
21    vice president level.
22          But eventually, if the company doesn't get relief
23    and the employees aren't happy, it can be pushed to a neutral
24    arbitrator in which there is a trial in front of the
25    arbitrator about whether or not the company has fulfilled the
```

1    collective bargaining agreement.

2    Q.    You say a trial.  With witnesses testifying under oath

3    and documents marked and moved into evidence in the way we do

4    in this courtroom?

5    A.    With court reporters, yes, the whole thing.

6    Q.    And what was your assessment, were you asked to assess

7    the litigation theory outlined in Mr. Wilder's memo of August

8    16, 2001?

9    A.    Yes.  We were.  The legal department was.  I was on

10   vacation for a portion of this time.  I came in at the end of

11   the assessment.

12   Q.    What was the assessment of the theory?

13   A.    This one might have some merit, if in fact the factual

14   predicate occurred.  If we filed a grievance and American

15   refused to process it, then we might actually be able to get

16   an injunction.  It wasn't a sure thing, but it was worth

17   looking at.  Worth, definitely filing the grievance.

18   Q.    Did you go ahead and file the grievance?

19   A.    Yeah, actually David Holtzman physically filed the

20   grievance in late September, yes.

21   Q.    What was American's reaction?  The hope, am I correct

22   the hope was that American would refuse to process the

23   agreement to process the grievance so that ALPA could do

24   what?

25   A.    So we could try to seek an injunction to stop them from

1    talking with the Allied Pilots Association about seniority

2    integration.  Claiming that they had not exhausted their

3    obligation to use reasonable best efforts to get Allied

4    Pilots Association to talk with us.

5    Q.   What did American Airlines do in response to the filing

6    of this grievance in late September of 2001?

7    A.   They immediately agreed to process it.

8    Q.   Okay.  What impact did their agreement to process the

9    grievance have on the idea of going to court and trying to

10   enjoin or stop American and the American pilots from

11   negotiating about seniority integration?

12   A.   There was no basis for going to court.

13   Q.   I want to focus on what you were doing as of about mid

14   October of 2001, to assist the TWA MEC and the TWA pilots.

15   What issues or promises were you involved in as of mid

16   October?

17   A.   Well, the grievance had been filed, this reasonable best

18   efforts grievance, and I was assigned to handle it.  So that

19   was one project I was working on.

20           Another was the governance issue that was arising.

21   The ALPA structure, we have local councils at most pilot

22   domiciles or bases, and the TWA MEC had three local councils,

23   one in Los Angeles, one in New York, one in St. Louis.  And

24   we had discovered late September, early October, that Los

25   Angeles, and New York domiciles were going to be closed.  So

```
 1    those under the ALPA Constitution, those local councils would

 2    immediately disappear.

 3    Q.   Closed by whom?

 4    A.   By TWA LLC.

 5    Q.   And what was the effect in terms of governance on the

 6    closing of the New York and Los Angeles domiciles?

 7    A.   Literally the Master Executive Council would then shrink

 8    to one council, consisting of two people, the captain and

 9    first officer representative in St. Louis and likely it would

10    literally be the case that the officers of the MEC would also

11    lose their authority and jurisdiction.  It would just really

12    be two people at that point.

13            There were some other options, two other options

14    under ALPA Constitution for representing the TWA pilots.  And

15    both depended on the MEC making a decision, making a

16    recommendation to the ALPA executive council, a national

17    governing body, so working together on putting together

18    options for the TWA MEC to consider about how they wished to

19    see themselves represented after November 1.

20    Q.   And did a recommendation come forward from the TWA MEC?

21    A.   No.

22    Q.   Were there discussions, were you involved in discussions

23    with members of the MEC about what they wanted to do?

24    A.   My discussions were primarily with a guy named Kientz

25    who was assigned by the MEC to come up with options.  I don't
```

```
 1   recall that I discussed it with any MEC members directly.

 2   Q.   In the absence of the making a recommendation, what

 3   happened to the governance structure of the MEC after the

 4   closure of the New York and Los Angeles domiciles?

 5   A.   The ALPA executive council had to make a decision about

 6   what to do and what they decided to do was to leave the MEC

 7   officers in place, the current officers, rather than having

 8   them disappear and loose their jurisdiction for stability's

 9   sake and then to order a meeting of the new larger loss,

10   sorry, St. Louis council to elect two more representatives,

11   which was one of the options.  So they would have an MEC

12   consisting of four representatives, four first officers, two

13   captains and the existing officers.  That was done by the

14   counsel at some point in October.

15   Q.   Did you become aware of some actions taken, well, as of

16   October 31, 2001, had the New York and Los Angeles domiciles

17   collapsed yet?

18   A.   I believe it was to happen on November 1.

19   Q.   Did you become aware that certain actions were taken by

20   the --

21            THE COURT:  By collapse, what do you mean?

22            THE WITNESS:  They were to go out of exist

23   existence and all the pilots would be assigned to St. Louis

24   as their domiciles.

25            THE COURT:  Everyone.
```

```
 1   A.   All the TWA pilots would be assigned.

 2           THE COURT:  All the TWA LLC pilots.

 3   A.   Yes, TWA LLC pilots would all be assigned to St. Louis

 4   as their domicile.

 5   Q.   Did you become aware that some action was taken by the

 6   MEC at a meeting on October 31 of 2001?

 7   A.   I did become aware of that later, yes.

 8   Q.   Do you have in front of you what is in evidence as D

 9   257, the minutes of the meeting on October 31, 2001?

10   A.   Yes, I do.

11   Q.   Did you become aware, I will refer you to page 6,

12   please, top of page 6.  There is a resolution there which

13   provides that acceptance of any integrated seniority list is

14   subject to unanimous approval by every TWA MEC member and the

15   TWA MEC chairman and also that any such group had to be

16   submitted to the membership for membership ratification?

17   A.   I became aware of that after the meeting.

18   Q.   What involvement if anything did you have in addressing

19   that resolution?

20   A.   I received the call from the national vice president of

21   administration, Jerry Mugerditchian.

22           Jerry had received a call and I think subsequently

23   a letter from one of the representatives of the TWA MEC

24   asking whether this was a lawful resolution.  And Jerry's

25   view, which I shared, and was shared by general counsel, was
```

```
 1    that that was inconsistent with the ALPA Constitution which
 2    says all matters other than a very small handful are decided
 3    by a majority vote of the master executive member.
 4    Q.   The member of the MEC who raised this issue, who
 5    expressed concern about it, do you recall who that was?
 6    A.   Steve Rautenberg.
 7    Q.   Do you recall Mr. Rautenberg wrote a letter when he
 8    raised that issue?
 9    A.   I saw that letter subsequent to the conversation with
10    Jerry about it.  But yes.
11    Q.   I put in front of you two documents that are not
12    premarked, D 450 and D 451 for it indication.  Do you have
13    those?
14    A.   I don't.  I don't see them.
15              THE COURT:  450.
16              MR. FRAM:  450 and 451 for identification.  They
17    were not premarked.
18    Q.   Right.  D 450 is that November 1, 2001 letter from Mr.
19    Rautenberg that came to your attention?
20    A.   Yes.
21    Q.   And is D 451 a response that you assisted in
22    Mugerditchian in preparing, that responded to Mr.
23    Rautenberg's concern?
24    A.   Yes.
25    Q.   And the bottom line in terms of this resolution that
```

Warner-direct/Fram                                              103

```
 1    reported to require unanimous MEC action and agreement by the

 2    master chairman, what advice did you assist in giving about

 3    the validity of that resolution?

 4    A.   That it was plainly invalid under the ALPA Constitution.

 5    Q.   Did you subsequently attend a meeting of the TWA MEC on

 6    November 7, 2001?

 7    A.   Yes, I did.

 8    Q.   Why were you asked to attend that meeting, do you

 9    recall?

10    A.   There were, I was asked by my supervisor, the director

11    of the legal department, Jonathan Cohen, there were a number

12    of issues swirling around with the change in structure of the

13    MEC.  And there were likely to be parly meant tree questions

14    that came up because we were dealing now with a two-person

15    MEC.

16    Q.   By the way, these letters you just referred to where Mr.

17    Mugerditchian indicated that this resolution was in doubt,

18    the one that reported to require unanimous action.  Were you

19    involved in any discussions about that advice to the MEC

20    shortly after November 1 of 2001?  Do you recall a phone

21    conference?

22    A.   Well, I recall a phone conference with the officers of

23    the MEC, some of the members, and Captain Woerth.  And at the

24    beginning of the, my notes reflect and my memory is this way,

25    is that at the very beginning of that conversation, the first
```

Warner-direct/Fram                                        104

1   things that Duane said was that resolution that requires

2   unanimity, it has no force and effect.  I don't know whether

3   Steve had gotten the letter from Jerry Mugerditchian by that

4   same.

5   Q.   Steve Rautenberg?

6   A.   Yeah, I don't know know whether that information had

7   been passed along but indeed it was, that is the first thing

8   out of the box that Duane told him.

9   Q.   When was that phone conference?

10  A.   November 2.

11  Q.   Try to be specific in terms of who was on the call other

12  than you and Captain Duane Woerth?

13  A.   My notes reflect Keith O'Leary, Bob Pastore, Sally

14  Young, Ted Case, Steve Rautenberg, as well as Howard

15  Atterian.  Marta Wagner, John Cohen, Mike Abrahm and Bill

16  Roberts.

17  Q.   A lont list.  Who is Howard Atterian?

18  A.   He was the executive administrator.  He is an assistant

19  to the president.

20  Q.   John Cohen, who is that?

21  A.   My boss, the director of the legal department.

22  Q.   Mike Abrahm?

23  A.   Outside general counsel.  And parliamentarian  for

24  ALPA's larger groups.

25  Q.   Marta Wagner?

1   A.   A member of the legal department.

2   Q.   Is there any push-back in this call from Ms. Young or

3   Mr. Pastor or any of the MEC members saying no, we disagree

4   with ALPA's assessment of this resolution?

5   A.   No.

6   Q.   Before we move on to the November 7 meeting, I meant to

7   ask you about another thing at the October 31 meeting.   Do

8   you have those notes handy:   This is D 257 in evidence.

9   A.   Yes.

10  Q.   Go back to page 6, let's go to the bottom of that page

11  6.  Looks like resolution at 6/16.   Resolution A I  01-

12  10125, Hollander and Altman, and it is for the purposes of

13  requesting authorization, approval to pursue federal court

14  injunctive relief, to prevent an AMR/APA imposed seniority

15  list integration.

16  A.   Yes, I see it.

17  Q.   Were you asked to assess whether a lawsuit of the nature

18  proposed in this resolution should be or could be  ---

19  A.   This was the lawsuit that Roland had proposed back in

20  August.  We already advised the president that there could be

21  some basis for this litigation if the facts turned out

22  correctly.  But what happened was of course American agreed

23  to process the grievance and we were trying to decide on

24  dates at that point for the trial.

25  Q.   So what point, if any, would there have been to running

Warner-direct/Fram                                                    106

1    to court to file a lawsuit?

2    A.   None.

3    Q.   Okay.  And did you ever get an explanation from any of

4    the MEC officers about why they thought it was in it would in

5    any way advance the cause to file a lawsuit if the lawsuit

6    wouldn't have any effect on the ongoing grievance?

7    A.   No.

8    Q.   So back to November 7, you attended a meeting, on

9    November 7, 2001?

10   A.   I did.

11   Q.   Were there any parliamentary controversies at the

12   meeting that you got involved in?

13   A.   Yes.

14   Q.   Tell us what they were, please?

15   A.   There may have been others, but I recall two.  One

16   involved Sally Young's threat to get up and leave during the

17   course of the meeting.

18        And the ALPA Constitution is pretty clear that you

19   need to have a majority of the members of an MEC present in

20   order to have a quorum for a meeting.  There are only two

21   members of the MEC.  She left, only 50 percent remaining.

22   That is not a majority.  So the meeting under ALPA rules has

23   to stop at that point.

24        So first thing was to advise her that the

25   consequence of her leaving the meeting was that the meeting

1    couldn't happen, and whatever business was proposed for the

2    meeting couldn't happen.

3    Q.   Did she say why she wanted to leave the meeting, was

4    there something she was trying to prevent from happening?

5    A.   Well, she did not want to have a vote on whether to

6    accept a -- or, let's be really clear.  What it was was, to

7    make an offer back to American and APA that ALPA would accept

8    a certain seniority integration with certain conditions.  The

9    MEC had previously rejected that.  And Captain Rautenberg

10   wanted to revisit that issue.

11            Under ALPA's structure, I should explain this, the

12   voting is normally done by each member of the MEC as one vote

13   has one vote.  But any member of the MEC at any time, except

14   on a very few issues, can request what is called a roll call

15   vote, in which case the MEC member then votes all, for all of

16   the active members that he or she represents.  Just happened

17   there were more captains than first officers, Captain

18   Rautenberg represented the captains, Ms. Young represented

19   the first officers.

20            So when any vote came up in that two person MEC it

21   could be one to one, and Captain Rautenberg could say I would

22   like a roll call vote and he could win.

23            So Ms. Young knew that.  And did not want to be

24   involved in a vote in which she would lose.  And that vote

25   was going to be on whether or not to make an offer back to

Warner-direct/Fram                                                   108

1    APA and American on a seniority integration.

2    Q.    What advice, if any, did you give to Ms. Young about the

3    properness or propriety of her getting up and walking out and

4    ending the meeting.

5    A.    I told her what the consequence of her getting up would

6    be and leaving, the meeting would end.  And then I said that

7    the responsibility for whatever happened or doesn't happen as

8    a result is yours.  I mean, if what you have done is you have

9    blocked consideration of agreement, of an agreement, that if

10   passed would be good for the TWA pilots, then you could under

11   some readings of the Labor Management Reporting and

12   Disclosure Act, you could have personal liability for that

13   misuse of procedure.

14   Q.    When you give that advice to Ms. Young, did you raise

15   your voice?

16   A.    No.

17   Q.    Did you yell at her  or threaten her?

18   A.    No.

19   Q.    Did she leave the meeting?

20   A.    No.

21   Q.    The vote that Captain Pastore wanted to have to make

22   this proposal happen, did that vote proceed?

23   A.    No.

24   Q.    No?

25   A.    It did not.

Warner-direct/Fram                                                      109

```
 1   Q.   What happened?

 2   A.   There was a second parliamentary issue.  Captain

 3   Rautenberg, after receiving presentations from the

 4   negotiating committee, asked to vote on whether or not to --

 5          THE COURT:  He made a motion.

 6          THE WITNESS:  Thank you.  That is correct.  He made

 7   a motion to accept or to make an offer back to American and

 8   TWA.

 9          THE COURT:  And what happened?

10   A.   What happened was --

11          THE COURT:  Nothing.

12   A.   There was no second for that motion.  Correct?

13          THE COURT:  Don't ask me.  You were there or you

14   know about it.

15   A.   You seem to know more than I do.  But there was no

16   second for the motion.  And so what happened was the ruling

17   went to the chairman, Captain Pastore, whether a second was

18   necessary.

19          We anticipated that as a possibility and I

20   discussed it with Jerry Mugerditchian and with general

21   counsel in advance of coming, and  Jerry decided it didn't

22   make sense to require a second in that case because then what

23   you are doing is you are requiring unanimity on all issues,

24   which is contrary to ALPA policy.

25          THE COURT:  So it was Justice Roberts Rules of
```

Warner-direct/Fram                                            110

```
 1   Order, not Roberts Rules of Order.
 2   A.   I am not quick enough to catch that reference.
 3            So the fact remains what Bob Pastore said is I
 4   think a second is required and I advised them I had talked
 5   with Jerry Mugerditchian about in issue and with general
 6   counsel and they had a different view.
 7            Bob then stopped the meeting, we had a private
 8   conversation, he told Captain Mugerditchian.  He then asked
 9   for Captain Mugerditchian's ruling in writing and all of this
10   struck out over huge amounts of time.
11            THE COURT:  Was Sally Young still there?
12   A.   Yes, she stayed through the entire process.  Definitely
13   got Captain Mugerditchian's ruling in writing and then still
14   refused to follow it.
15            So he ruled that the motion died for lack of a
16   second and it was never considered.
17   Q.   So the meeting ended?
18   A.   They literally went on the next day to have what they
19   called membership and guest power so they could listen to
20   pilots, but the purpose of the meeting which was that, that
21   one resolution, that item of business was done.
22   Q.   Were you aware during this meeting of the MEC on
23   November 7, 2001, that the meeting was being recorded, audio
24   recorded?
25   A.   I was not.
```

Warner-direct/Fram                                               111

1    Q.    When did you find that out?

2    A.    During this case at some point.

3    Q.    Was the recording of that meeting consistent or

4    inconsistent with ALPA policy?

5    A.    The fact of recording it?

6    Q.    Yes.

7    A.    It was inconsistent with ALPA policy.

8    Q.    What was ALPA policy about the recording of the audio

9    recording of MEC meetings?

10   A.    Our policy does not allow the recording of meetings.  It

11   is something that has been an addressed over the years in

12   several contexts by several different committees.  But the

13   basic idea is this:  Pilots get disciplined for things they

14   say in public.  If management finds out.  You just simply

15   can't record what goes on at these meetings without putting

16   pilots at risk and their jobs at  risk, and so the recording

17   is not permitted of local council and MEC counsel meetings.

18   Q.    You mentioned the best efforts arbitration before.  Tell

19   us what role you played in pursuing the grievance that was

20   filed against American on on its best efforts letter?

21   A.    I was primarily responsible for the a grievance, the

22   assistance of Marta Wagner from the legal department.

23   Q.    Did it go to an arbitration hearing?

24   A.    Yes.

25   Q.    Do you recall when that happened?

Warner-direct/Fram                                                112

```
 1    A.   It was mid December, 12, 13, 2001.

 2              THE COURT:  Were there witnesses?

 3              THE WITNESS:   Oh, yes.

 4    Q.   So who did you call as the witnesses?

 5    A.   Captain Day.  Sean Clarke.  Ron Kiel.  John Hefley, and

 6    David Holtzman.  Were our witnesses.

 7    Q.   All right.  And were they presented, you gave, you

 8    offered direct testimony, they were cross examined, just like

 9    we are doing in court?

10    A.   Yes.

11    Q.   You marked exhibits and moved them into evidence?

12    A.   Yes.  We had, normally we prepare a notebook of exhibits

13    so we had to prepare notebooks of exhibits in advance.

14    Q.   And did American and, did American participate in the

15    proceeding?

16    A.   American and TWA LLC both participated, through separate

17    counsel, and presented separate witnesses.

18    Q.   Okay.

19              THE COURT:  Who was hearing the matter.

20              THE WITNESS:  Richard Bloch.

21              THE COURT:  He is an arbitrator.

22    A.   He is a private labor arbitrator, does a lot of work for

23    us, a lot of sports work as well for athletes.

24    Q.   All right.  And at the conclusion of the arbitration

25    hearing, did arbitrator Bloch issue a written decision?
```

1    A.    Yes.  After the transcript came in we filed briefs, all

2    three parties filed briefs, and yes, he issued a decision.

3    Q.    Do you have, I think it may be at the bottom of the

4    pile?

5              THE COURT:  Do you know when he issued it?

6              THE WITNESS:  He issued a draft decision in March,

7    and then the final.

8              THE COURT:  Of 2002.

9              THE WITNESS:  20002, and the final was April 18,

10   2002.

11   Q.    Do you have D 316.  I think it is in that pile?

12   A.    I do.

13   Q.    Is that the final decision that Arbitrator Bloch issued

14   on April 18 of 2002?

15   A.    Yes.

16             MR. FRAM:  I move D 316 into evidence, please.

17             MR. JACOBSON: No objection.

18             THE COURT:  Okay.  Without objection, D 316 is in

19   evidence.

20   Q.    And just tell us briefly what did arbitrator Bloch find

21   in terms of whether American had or had not fulfilled its

22   responsibility to use its best efforts to ensure fair and

23   equitable seniority process?

24   A.    It found that, well, he first found that they did indeed

25   have a serious obligation to use best efforts.  He went to

```
 1    some length to say that he was taking this seriously, this
 2    wasn't something that he could just make a wave at.  Then he
 3    found that on the facts they had indeed exercised their best
 4    efforts to get us a process with the Allied Pilots
 5    Association.
 6    Q.   Okay.  Once he came up with this decision finding that
 7    American had fulfilled its duties was there anything further
 8    recourse, anything else TWA pilots could do to pursue
 9    American?
10    A.   Well, there is a, these decisions of Railway Labor Act
11    arbitrators are final and binding.  In fact, the grounds for
12    reviewing these in court, there is a famous case that says
13    the grounds for overturning an arbitrator's decision under
14    the Railway Labor Act are among the narrowest known to law.
15    So basically the answer is no.  This decision was it.  We
16    were done.
17    Q.   Did you mention before that American filed for a
18    so-called single carrier determination at hat some point?
19    A.   Literally, the Allied Pilots Association did.  The
20    carrier is not permitted to.  But the Allied Pilots
21    Association filed for claiming that there was a single
22    carrier between American and TWA LLC.
23    Q.   Thank you.  Tell us, just walk us through what a single
24    carrier determination is?
25    A.   The question to be decided is are the employees of
```

Warner-direct/Fram                                                    115

1    whatever group is identified, in this case, are the employees

2    of American and TWA LLC, should they be represented by one

3    union.

4              The National Mediation Board makes these decisions

5    and they have a whole list of factors about whether or not

6    the two companies are, have a, you know, the people wear the

7    same uniforms, do they report to the same labor relations

8    structure, do they of this the same work rules, things like

9    that.  But literally what they were saying, the Allied Pilots

10   Association, was we think that as of now which was a point in

11   November, I think, 2001, American and TWA LLC are so closely

12   allied that their pilots ought to be represented by one

13   union.

14   Q.   Did the TWA pilots agree or disagree with the idea that

15   everybody should be, it should be considered a single

16   carrier?

17   A.   At that, they disagreed that it was a single carrier at

18   that point.

19   Q.   And what role, if any, did you play in opposing the

20   APA's single carrier filing with the National Mediation

21   Board?

22   A.   Let me be clear on the circumstances.  It was absolutely

23   certain that at some point in time TWA LLC was going to be

24   smashed into American Airlines and there was going to be a

25   single carrier and one union representing all the pilot.  We

1    had known that from the beginning.  American had said they

2    weren't going to operate this separately.  Their agreement

3    with APA required them to smash the two entities together.

4             So the question wasn't will there always be two.

5    It was, our goal was to delay single carrier as long as

6    possible, very pragmatic reason for that.  The pragmatic

7    reason was that we could delay some furloughs on the TWA side

8    until that single carrier determination was made, several

9    hundred pilots.

10            It happened through a complex formula and I won't

11   go into, but the bottom line is our goal with the single

12   carrier was to delay it as long as possible to keep those TWA

13   LLC pilots from being furloughed for as long as possible.  So

14   we opposed it but our goal again was delay.

15   Q.   How did you go about opposing it?

16   A.   It is an evidentiary process, again, with a whole series

17   of factors.

18            And I was assigned to work with several members of

19   the MEC, Ted Case was the primary point person.  And we sent

20   Ted out to find facts on as many issues as possible.  We also

21   collected whatever evidence people would send to us to see if

22   we could sort it out and make something of it.  Honestly we

23   did something else which was simply to ask for an extension

24   as a way of delaying.  We had a justification for an

25   extension because of the filing of our brief and the

1  reasonable best efforts case and the, and American had

2  previously asked for an extension to get evidence so they

3  couldn't object so we used the good old extension to keep

4  those guys employed for another month and a half.

5  Q.   Did this processing to a hearing, was testimony and

6  evidence before the National Mediation Board?

7  A.   No, there are submissions by the interested parties.  We

8  submitted a declaration of Ted Case with lots of exhibits.

9  But there isn't a hearing.

10 Q.   I want to show you what is marked P-369 and a couple of

11 later documents.

12        I think you have that in front of you.

13 A.   Yes.

14 Q.   Do you recognize P-369 as the findings upon

15 investigation of the National Mediation Board with respect to

16 single carrier proceeding we have been discussing?

17 A.   I do.  But it is not up on the screen.

18 Q.   It is not supposed to be?

19 A.   I apologize.

20 Q.   Do you have the paper copy?

21 A.   Yes.

22        MR. FRAM:  I offer P-3 P-369 in I have.

23        THE COURT:  P-369 was not premarked.

24        MR. JACOBSON: I believe it is J 369 and it is in

25 evidence already.

1              MR. FRAM:  I am sorry.

2              MR. JACOBSON: It is J 369.

3              THE COURT:  There is no P-369 at all.  J 369 is

4    the findings of the National Mediation Board.  It is not in

5    evidence, but it is a joint exhibit.  I assume there is no

6    objection to putting it in evidence.

7              MR. JACOBSON: No objection.

8              THE COURT:  Okay.  Marked this, Larry, as J 369,

9    not P-369.  Okay.  I am going to put it in evidence.

10   Without objection.

11             MR. FRAM:  Thank you, your Honor.

12             THE COURT:  J 369.

13   Q.   There it is.  All right.  So?

14             THE COURT:  Okay.

15   Q.   Thank you, your Honor.  So Mr. Warner, what did the

16   National Mediation Board find with respect to the argument by

17   the APA that American Airlines and TWA LLC were a single

18   carrier as of November, 2001?

19   A.   Well, they literally rejected the claim that they were a

20   single carrier as of November, but they found that they were

21   a single carrier as of, at this point, in March.

22   Q.   Okay.  Now, did that determination trigger the act of

23   ALPA to try to represent all of the American and TWA LLC

24   pilots at that point?

25   A.   Well, the NMB gave us the opportunity to try to trigger

```
 1    an election among all of the pilots of American Airlines,

 2    both the former TWA LLC and the former American pilots.  What

 3    we had to do was make a showing that we represented at least

 4    35 percent of them.  And we could do that.

 5              THE COURT:  35 percent wanted you.

 6              THE COURT:  Or that 35 percent wanted you to

 7    represent them.

 8              THE WITNESS:  Yes, thank you.  That's right.

 9    A.   We could do that in various ways.  One of them would be

10    that there would be a presumption that the TWA LLC pilots

11    still wanted us to represent them.  But that was like 2,300

12    out of the total of maybe 13,000.  So that wasn't close to 35

13    percent.

14    Q.   Okay.  Just so, if you look to the second to last page

15    of J 369 there evidence, the very last line, ALPA has, and

16    then it continues on the top of the next page.

17              THE COURT:  What page are you referring to?

18              THE WITNESS:  212, 213.

19              MR. FRAM:  212, the very bottom and the sentence

20    continues on the top of 213.  I am going by the page numbers

21    in the decision.

22              THE COURT:  I am looking at it.  Conclusion.

23              MR. FRAM:  Last line on that page.

24    A.   Last two words.

25              MR. FRAM:  Yes.
```

Warner-direct/Fram                                          120

1    Q.    ALPA has 30 days from the date of this determination to

2    file an application supported by a showing of interest of at

3    least 35 percent of single transportation system, or to

4    supplement the showing of interest in accordance with manual

5    section 19.601.

6            Tell us again what a showing of interest, what kind

7    of showing of interest are they referring to here.

8    A.    There are various forms.  But again, we could argue that

9    the current TWA pilots were interested in us representing

10   them.  Another way you can do it is to gather cards which

11   indicate that the signer of the cards would be interested in,

12   or would support you, ALPA, in this case, as the

13   representative.

14   Q.   Were you part of the decision about whether ALPA should

15   or should not pursue representation of single carrier?

16   A.    I provided some information to the president, it is the

17   president's decision to make.

18   Q.    Okay.

19            THE COURT:  You mean Woerth.

20   A.    Yes.

21            THE COURT:  You advised him.

22   A.    I merely provided him information about the numbers at

23   TWA, and plus the numbers that this independent group had, of

24   cards that they had collected which may or may not have still

25   been valid, but we thought we would look and see how many

1    were out there.

2    Q.   The independent group you are referring to, are you

3    recalling that as Captain John Clark and Mark Hunnibell, the

4    two American pilots would --

5    A.   Much the two American pilots who had been operating

6    their ALPA card campaign.

7    Q.   Okay.  Do you have P-217 in front of you?

8    A.   I do.

9    Q.   Is that an exchange of emails that you had with Mr. Ron

10   Rindfleisch, looks like March 7, 2002, or thereabouts?

11            THE COURT:  P-217.

12            MR. FRAM:  Yes, your Honor.

13            THE COURT:  That is not in evidence.

14            MR. FRAM:  Correct.  That should have been one of

15   the documents I handed up a moment ago.

16   A.   Okay.

17   Q.   Do you have that?

18   A.   I do.  This is an email exchange between me and Mr.

19   Rindfleisch.

20            MR. FRAM:  I move P-217 into evidence, please.

21            MR. JACOBSON: No objection, your Honor.

22            THE COURT:  Okay.  P-217, the email from

23   Rindfleisch to Warner.  What is the date of that email?

24            MR. FRAM:  March 7, 2002, your Honor.

25            THE COURT:  March 7, '02?

```
1              MR. FRAM:  Yes, your Honor.

2              THE COURT:  That is in evidence.

3              MR. FRAM:  Thank you.

4    Q.   Mr. Warner, what did you conclude about the numbers of

5    cards that Clark and Hunnibell had gathered from American

6    pilots with respect to their interest in being represented by

7    ALPA?

8    A.   There were 1,548.  Some of which might be outdated, some

9    of the individuals might have been retired as well.  So the

10   maximum of 1,548.

11   Q.   What did that number along with the number of TWA LLC

12   pilots tell you about whether ALPA had a shot at representing

13   all the American pilots?

14   A.   Well, ignore the shot at actually representing them.  We

15   couldn't even make a 35 percent showing to trigger an

16   election.  I mean, you know, obviously it is a long shot from

17   that to getting 50 percent plus one to represent them.  But

18   we couldn't trigger 35 percent.

19   Q.   All right.  So what decision was made within ALPA about

20   whether to pursue any attempt at representing the American

21   pilots?

22   A.   Captain Woerth decided not to pursue representation.

23   Q.   Is March, I am sorry, is D 320 in front of you, that

24   March 18, 2002 letter?

25   A.   Yes.
```

1    Q.   That is a letter Captain Woerth sent to --

2              THE COURT:  What number is this.

3              MR. FRAM:  D 320, it is not in evidence.

4              THE COURT:  P-220.

5              MR. FRAM:  D 320.

6    Q.   Do you have D 320 in front of you?

7    A.   I do.

8    Q.   Is this a March 18, 2002 letter which Captain Woerth

9    sent to the chief of staff of the National Mediation Board,

10   yes?

11             MR. FRAM:  I move D 320 into evidence, please.

12             MR. JACOBSON: No objection, your Honor.

13             THE COURT:  Okay.  D 320 is in evidence.

14             MR. FRAM:  Thank you, your Honor.

15   Q.   All right.  So this is the letter conveying that ALPA

16   was would not purchase pursue any effort to represent the

17   American pilots?

18   A.   That's correct.

19   Q.   Just to close the loop, do you have in front of you

20   P-379, which may be J 379.  The April 3, 2003 findings of the

21   National Mediation Board?

22   A.   It is April 3, 2002.

23   Q.   Thank you.

24   A.   Yes.  I have that.

25             MR. FRAM:  I move P, it got changed to J.  379 into

1    evidence.

2              MR. JACOBSON: It is a J.

3              THE COURT:  There is a J 379.

4              MR. FRAM:  That is what I move.

5              THE COURT:  National Mediation Board findings upon

6    investigation to determination terminating certification.

7              MR. JACOBSON:  No objection, your Honor.

8              THE COURT:  D -- no, J 379 will be in evidence.

9    Q.   Thank you, your Honor.

10   Q.   So does this close the loop and confirm that from this

11   point forward, April 3, 2002, ALPA no longer is representing

12   any of the TWA LLC pilots?

13   A.   Yes.

14   Q.   Okay.  All right.  I want to talk to you very briefly

15   about the issue of flight pay loss.  Are you familiar with

16   what flight pay loss is?

17   A.   I am.

18   Q.   I want to do that by showing you or having you refer,

19   please, to the fee petition that was filed in the bankruptcy

20   in November, 2001, it is marked as P-226 in evidence.  Do you

21   have that, it is in the notebook?

22   A.   I have the binder.

23   Q.   You are familiar with that, with that fee petition?

24   A.   Yes.

25   Q.   Did you play some role in reviewing it before it was

1    filed with the bankruptcy court?

2    A.   I review drafts, yes.

3    Q.   And do you recall that, I will refer you to page 10, I

4    am sorry, page 4, paragraph 10.  That paragraph is noting

5    that in addition to some waivers and modifications required

6    by the asset purchase agreement, that TWA and American they

7    requested other changes to the ALPA CBA  in order to provide

8    TWA and American with additional flexibility in integrating

9    the two carriers operations, and then it says these include

10   among other changes a relinquishment by TWA pilots of, talks

11   about pay increases in A.

12        Let's focus on that by the way.  What impact on the

13   TWA pilots was there of them giving up pay increases from

14   TWA, Inc., of $20 million in 2001?

15   A.   None, because they got higher pay increases through TWA

16   LLC.

17   Q.   B refers to more than $1,500,000 actually in flight pay

18   reimbursement for pilots working on ALPA committees and

19   performing overwork for ALPA.  Do you see that?

20   A.   Yes.

21   Q.   Did the TWA pilots involved in the MEC continue to get

22   flight pay reimbursement after they gave up their right to

23   flight pay reimbursement under the TWA, Inc., collective

24   bargaining agreement?

25   A.   Absolutely.

1   Q.   Who paid?  Who reimbursed them for the flight pay losses

2   and expenses?

3   A.   Came through the ALPA budget.

4        THE COURT:  They were still ALPA representatives at

5   the time..

6   A.   Correct, correct.

7        THE COURT:  Even though it was owned by American.

8        THE WITNESS:  Correct.

9   Q.   All right.  So did you --

10       THE COURT:  Didn't they have a bank of certain

11  amount of money that they, for flight pay loss, like $9

12  million or something?

13  A.   What this is talking about is in the TWA, Inc.,

14  collective bargaining agreement, there was a 9,000 hour

15  flight pay loss bank.

16       THE COURT:  That was not included in the LLC

17  transition agreement, let's call it.

18       THE WITNESS:  That's correct.  And what ended up

19  happening then was that ALPA funds paid for the flight pay

20  loss rather than it being paid for by TWA.

21  Q.   Do you know for the year 2001 how much ALPA paid to TWA

22  MEC members and those assisting them in flight pay losses and

23  expenses?

24  A.   Actually, I have a number that it would also include the

25  amount paid for their advisors and to run the MEC office and

1    all of that.  But the total, oddly, it doesn't include my

2    time or the --

3              THE COURT:  Just the flight pay loss, not the other

4    expenses, just the flight pay loss was the question.

5    A.   I don't have a number, a total flight pay loss number

6    for all of the individuals.  No.

7    Q.   Do you have flight pay loss numbers for individual

8    members of the MEC who are doing this?

9    A.   I do.

10   Q.   What was the number for the MEC master chairman, Robert

11   Pastore?

12   A.   Absolute flight pay loss, or flight pay loss and

13   expenses?

14   Q.   Let's distinguish what they are.  What kind of expenses

15   are we talking about?

16   A.   Hotels, meals.

17             THE COURT:  Travel.

18             THE WITNESS:  Travel.  But travel for pilots,

19   normally they travel on their travel passes, mostly.  So that

20   is not there.  But it is hotels and meals and things like

21   that.

22   Q.   Put it all together, flight pay loss and expenses, what

23   was the number paid to Captain Pastore by ALPA in 2001, do

24   you have that?

25   A.   I have the number for 2001 was $129,000.

Warner-direct/Fram                                              128

1    Q.   Okay.  Was he paid additional flight pay loss and

2    expenses in '02?

3    A.   Yes.  Another $54,000 in 2002.

4    Q.   Okay.  How about the voting members of the MEC, how

5    about Sally Young?

6    A.   Sally Young received 28,000 in 2001, and 14,000 in 2002,

7    for a total of almost 43,000.

8    Q.   Alan Altman?

9    A.   His total for the two years is 58,000, 38,700, in 2001

10   and almost 20,000 in 2002.

11   Q.   Howard Hollander?

12   A.   Howard Hollander's total for the two years was 68,600

13   For 2001, and 30,000 for 2002.

14          THE COURT:  Sean Clarke.

15          THE WITNESS:  Sean Clarke was 38,000 in 2001, 8,000

16   in 2002 for a total of about 46,000500.

17   Q.   Mike Day, do you have his numbers?

18   A.   64,000 in 2001, and just 855 in 2002.  He wasn't

19   involved any more.

20   Q.   To round it out, Steve Rautenberg, do you have his

21   number?

22   A.   I do.  31,000 in 2001 and nothing in 2002.

23   Q.   So to the best of your knowledge did any of these pilots

24   who were volunteering to advance the interest of the pilots

25   at large, did any of them suffer any out of pocket losses

 1    based upon the efforts they were making on behalf of the TWA

 2    pilots?

 3    A.   Not at all.

 4              MR. JACOBSON: I object to that.

 5              THE COURT:  I am going to sustain that objection.

 6    First of all, was anybody ever turned down for flight pay

 7    loss in 2001, of that group that you just went through one by

 8    one by one.  Any of them turned down?

 9    A.   I am not aware that anybody on this group would have

10    been turned down.  There was a period at the end of 2001 when

11    the MEC was drawing substantial amounts from one of the

12    contingency funds and there was a review process.

13              THE COURT:  Were they ever told that, any of these

14    people told that lobbying for the Bond bill, time they spent

15    doing that would be not reimbursed for flight pay loss?

16    A.   The MEC members and officers I think the answer is no.

17    I think by December when the Bond bill was effectively dead

18    and some other none representatives were told that those

19    couldn't be reimbursed.  That was at a point when the MEC --

20              THE COURT:  So there were people who were told no

21    in 2001.

22              THE WITNESS:   Not the representatives.

23              THE COURT:  Who are you talking about there?

24    A.   . Pilots who didn't have a representative position, is

25    my recollection, who were seeking to, instead of showing up

1    in Washington on their own time, wanted ALPA to buy a trip

2    for them to show up and lobby Congress.  There was no problem

3    with them showing up and actually getting their expenses

4    paid.

5            The question was is ALPA going to pay TWA for their

6    four-day trip that they had to cancel in order to do it.

7            MR. FRAM:  Thank you.  I have no further questions

8    on direct.

9            THE COURT:  Okay.  I don't know who is going to

10   undertake, Mr. Press.

11           MR. PRESS:  Mr. Jacobson.

12           THE COURT:  Mr. Jacobson?

13           MR. JACOBSON: Yes.

14           THE COURT:  Your witness.

15           CROSS EXAMINATION.

16           BY MR. JACOBSON:.

17           THE COURT:  At 11:39 a.m., it is your witness.

18           MR. JACOBSON: I think I will move to the podium

19   because I have a lot of documents.

20           CROSS EXAMINATION.

21           BY

22           MR. JACOBSON:

23   Q.   I would like to start if I could with the March 21,

24   2001, MEC meeting about which you testified.  All right.  Do

25   you recall that?

Warner-cross/Jacobson                                    131

1   A.   I do.

2   Q.   Okay.  Now, you say that is the that the meeting ended

3   with the TWA MEC giving certain directions to the merger

4   committee and the negotiating committee?

5   A.   That is my recollection, yes.

6   Q.   All right.  And you said that the directions given to

7   the merger committee was to make the worst offer they could

8   stomach to the American pilots to see if they could get a

9   deal at their bottom line?

10  A.   Yes.

11  Q.   And that would have been on March 21?

12          THE COURT:  You say their bottom line.  You mean

13  APA's bottom line.

14          MR. JACOBSON: New York the American TWA, MEC's

15  bottom line.

16          THE COURT:  The least they would be willing to go

17  accept..

18  A.   Yes.

19  Q.   You know how they work, they have resolutions, correct?

20  A.   On many subjects, yes.

21  Q.   In something important they have a resolution?

22  A.   Not always.

23  Q.   Resolutions are in writing, sir?

24  A.   Yes, they are.

25  Q.   And there are minutes kept of these meetings?

1    A.    Should be, yes.

2    Q.    There is an ALPA staff person who works out of the MEC

3    office who is supposed to take down notes and write minutes,

4    correct?

5    A.    That is varied by MEC.

6            THE COURT:  Well, on March 21, was it two days,

7    March, what days were they, the 21st and 22nd.

8    A.    Yes U U were there minutes kept of those meetings.

9    A.    My understanding is there were.

10           THE COURT:  Okay.  That is the ones we are

11   concerned with.

12           MR. JACOBSON that is the ones we are concerned

13   with, your Honor.

14           THE COURT:  Whatever the policy for Reno airlines,

15   for that, for those two, for TWA MEC there were minutes kept.

16           THE WITNESS:  Yes.

17           THE COURT:  Okay.

18   Q.    And you described Mike Day, the chairman of the merger

19   committee, as being intelligent?

20   A.    That is my recollection, yes.

21   Q.    A practicing lawyer?

22   A.    Yes.

23   Q.    Understanding in simple instructions like make the worst

24   offer you can make.  He understands those instructions?

25           THE COURT:  Not the worst you could make, the worst

1    you could make and  stomach.

2            MR. JACOBSON: Correct, your Honor.  Thank you.

3    Q.   He would understand those instructions, correct, sir?

4    A.   That would be my understanding, yes.

5    Q.   And they then went on November 6, was it?

6            THE COURT:  November?

7            MR. JACOBSON: Excuse me.  I meant March 28.

8            THE COURT:  March.

9    A.   March 28.

10   Q.   March 28.  I have November 6 written down and it popped

11   in my mouth when I saw the date?

12   Q.   March 28 they have this meeting with their counterparts

13   in American Airlines, right, the APA?

14   A.   Correct.

15   Q.   And you understand that they are there supposedly with

16   these instructions from the MEC that you have just testified

17   about that they make the worst offer they can stomach to see

18   if they can get a deal?

19   A.   Correct.

20   Q.   And that, those instructions of course you don't have a

21   written resolution to reflect those instructions, do you,

22   sir?

23   A.   I do not.

24   Q.   You don't have any written minutes from that meeting

25   that would reflect that instruction, sir?

1    A.    That's correct.

2    Q.    In fact on March 28 the MEC merger committee headed by

3    Mark Day, Captain Mark Day?

4    A.    Mike.

5    Q.    Mike.  Excuse me.  Mike Day, experienced, intelligent

6    captain, the offer that they put on the table is a modified

7    date of hire with certain fences and restrictions, correct?

8    A.    On the 28th or the 29th?

9    Q.    On the 28th when they show --

10         THE COURT:  Start with the 28th.

11   A.    It is an exhibit in here as to which, what, but their

12   first offer on the 28th was substantially different from

13   their offer on the 29th.

14         THE COURT:  Was it a modified date of hire?

15   A.    Without looking at it, I can't tell you off the top of

16   my head, sorry.

17   Q.    You don't recall that it is a modified date of hire with

18   certain fences and restrictions?

19   A.    Without looking at it I can't tell you what it says.

20   Q.    You agree that the offer you made that day wasn't the

21   worst agreement they could stomach, don't you?

22   A.    On the 28th?

23   Q.    Yes, sir.  The day, the first offer they make after

24   getting these supposed instructions?

25         THE COURT:  Unless their stomachs change.

1           THE WITNESS:  That is not my recollection.

2     Q.    It is not your recollection.  Is it your recollection

3     that the 28th they went and gave an offer that was a hard to

4     swallow, worse offer they could stomach, per the directions

5     you claim the MEC gave them?

6     A.    I don't remember.  I wasn't there on the morning of the

7     28th when they gave that offer.  I arrived in the evening of

8     the 28th.  But they, certainly by the next day didn't, the

9     offer they gave was my recollection was the worst they could

10    possibly stomach, which was consistent with the MEC's

11    direction.

12          THE COURT:  That is on the 29th.

13    A.    Yes.

14    Q.    After you and the other advisors showed up?

15    A.    After they thought about it over the course of the

16    evening.

17    Q.    After you and the other advisors showed up, sir?

18    A.    That would be true, yes.

19    Q.    And you all went out to dinner that evening, the evening

20    of the 28th?

21    A.    I think so.

22    Q.    And the next day their stomachs had changed?

23    A.    It was that evening, actually, when most of the work was

24    done by that committee.

25    Q.    One of the things you said at the very beginning of your

1    direct examination that one difference between ALPA and most

2    unions is that ALPA is a unitary union, everybody is a member

3    of the same union, but for most trades and crafts, there is a

4    local union which is affiliated with a National or

5    international union.  Do you recall that testimony?

6    A.   Yes.

7    Q.   All right.  And you went on to say that well, this is a

8    difference in structure but doesn't make a lot of difference.

9    Do you remember that testimony?

10   A.   Yes.

11   Q.   All right.  But isn't it a fact that because the pilots

12   are part of a large union and not simply operating on their

13   own local union that they are in fact, they require the

14   president of the international unions permission to enter the

15   collective bargaining agreement?

16   A.   That is true for ALPA, but I don't know that that is a

17   different for other unions.  There are other unions that

18   require either a regional or international signature on the.

19          THE COURT:  But there are a lot of unions that, the

20   local can sign a labor contract.

21   A.   I am not sure I agree with that.

22          THE COURT:  Teamsters.

23   A.   The Teamsters do master agreements.

24          THE COURT:  They do some but they have locals.

25   A.   You have more knowledge than I do.

1

2             THE COURT:  Construction unions.

3   A.   Again I believe in most of the unions either regional or

4   presidential signature is necessary to institute collective

5   bargaining.  But I in that is true for ALPA.

6   Q.   All right.  And litigation also, in ALPA the union has

7   to get the permission of the president to sue?

8   A.   That is true.

9   Q.   That you not true of an independent local that is

10  affiliated with lots of other unions?

11  A.   I am not in a position to say that.  I am not sure that

12  is the case.

13  Q.   All right.  So you don't know whether or not at local

14  unions that have a local structure , whether the local in

15  fact has the ability to enter into contracts or file suits

16  without the permission of someone outside the local.  You

17  don't know?

18  A.   I don't know for every local that exists.  And as I am

19  standing by the original proposition that my estimation, in

20  my view, ALPA's structure may be different but it doesn't

21  make a practical difference for the guy on the ground.

22  Q.   All right.

23  Q.   Do you have in front of you exhibit 217?

24             THE COURT:  Already in evidence.

25             MR. JACOBSON: Yes.

1           THE COURT:  P, D, J.

2           MR. JACOBSON: I believe it is P-217.

3           THE COURT:  Okay.

4    A.   Yes.

5    Q.   You indicated this document was somehow related to your

6    determination of whether there were enough signed

7    authorization cards in ALPA's position to adding up with the

8    TWA pilots to reach that 35 percent threshold to ask for

9    representational election.  Is that correct?

10   A.   I think what I said was I gathered data to report to the

11   president to make a decision on that.  This was data that I

12   gathered from Rindfleisch to you on March 7, 2002.

13          THE WITNESS:  That is correct.

14   Q.   March 7, 2002.  This is a document that was shown to you

15   as part of your testimony about the fact that there were,

16   what was it, 1,50048 cards, some which may no longer be good?

17   A.   That's correct.

18   Q.   Do you recall that testimony?

19   A.   Yes.

20   Q.   And that was, this email is referring to a database

21   created concerning the American pilot cards, American, the

22   cards for ALPA representation signed by American pilots,

23   correct?

24   A.   I was focused on the first line.

25   Q.   Did you not read the entire document you are referring

```
 1    to in trying to decide this important question about whether

 2    or not --

 3    A.   No.

 4    Q.   You did not read the entire document?

 5    A.   Because the number at the top, even if that number, all

 6    of those cards are valid, were still not close, we are still

 7    not close to 35.  I mean if that number were four times that,

 8    then yeah, you are going to find out the validity of the

 9    cards but the number itself, assuming they are all valid,

10    doesn't get us anywhere in the ballpark.

11    Q.   Did you not have any curiosity as to where this database

12    came in?

13    A.   No.

14    Q.   You don't see that as reflective that the database was

15    created by John Clark, the American pilots?

16    A.   I was aware of that.

17    Q.   In you knew John Clark wags the person who provided the

18    database of all of these cards?

19    A.   I was aware that John Clark and Mark Hunnibell were

20    collecting cards.  So I am not surprised that John Clark

21    created a database.  But again, my focus was on the number on

22    the top of the letter.

23    Q.   Let's look.  Did you at least read the first paragraph

24    of the email?

25    A.   No.
```

1    Q.    So when you had this in front of you trying to decide

2    whether or not to go, you didn't look to see where it says

3    Ron, Ron Rindfleisch, right.  You know that?

4    A.    I assume.

5    Q.    And you see it says you and Jerry.  Jerry would be Jerry

6    Mugerditchian.  Right?

7    A.    I don't know.

8    Q.    The document is in evidence.  I guess the jury can read

9    it?

10   Q.    Did you have any involvement at this point in time with

11   the card campaign that was going on?

12   A.    No.

13   Q.    Were you asked to review any documents or letters or

14   anything else like that involving this card campaign?

15   A.    No.

16          THE COURT:  Were you ever consulted by anybody at

17   ALPA about the card campaign, say any time from October,

18   2001, through March of 2002.

19          THE WITNESS:  There is one email which I am sure I

20   am going to be shown which I was consulted on whether or not,

21   there was a question about expenses that could be reimbursed

22   for these guys.

23          I did not get involved in that decision at all.  I

24   had nothing to do with the card --

25          THE COURT:  Other than that you never were

1    consulted by anybody, did they ever ask you any questions

2    about the card campaign.

3              THE WITNESS:  Not a thing.

4    Q.   Let's see if we can find that particular document you

5    just referenced.  I believe this document is already in

6    evidence.  As exhibit P-218, is it.  Did you give me a copy

7    of it?

8              MR. JACOBSON: I am sorry, your Honor.  I thought I

9    had the folder.

10             THE COURT:  Looks like it is being produced as we

11   speak.

12             MR. JACOBSON:  It is being produced as we speak,

13   your Honor.

14   Q.   Let me give you a document that has been marked as

15   exhibit P-218, Mr. Warner.  Do you have that there, sir?

16   A.   Yes.

17   Q.   And do you recognize this as the document that you were

18   just talking about?

19   A.   Yes.

20   Q.   All right.  And this is an email, initially to you, and

21   then a response from you making certain editing changes?

22   A.   Yes.

23   Q.   Look at attachments which reflect your editing changes?

24   A.   Yes.

25             MR. JACOBSON: I would like to offer exhibit P-218

1    into evidence, your Honor.

2              MR. FRAM:  No objection, your Honor.

3              THE COURT:  Okay.  There being no objection, it is

4    in evidence.

5    Q.   Let's look at the incorporated email first, the one from

6    Ron Rindfleisch to you.  Do you have that there in front of

7    you.  Now, this is addressed to you and someone named Kevin

8    Barnhurst, correct?

9    A.   Correct.

10   Q.   That is a fellow employee of ALPA who works with you in

11   the Herndon office, correct?

12   A.   He is the director of the finance department.

13   Q.   Director ever the finance department.  And the email

14   from Ron Rindfleisch to you asks you to review this before he

15   sends it to the APA slash ALPA pilots, John Clark and Mark

16   Hunnibell.  Do you see that?

17   A.   Yes.

18   Q.   Had you heard of John Clark or Mark Hunnibell at any

19   time before receiving this letter, this email?

20   A.   Yes.

21   Q.   All right.  When had you first heard of them?

22   A.   I have no idea.

23   Q.   All right.

24   A.   Ron had likely mentioned it to me, but that is it.

25   Q.   Was it in connection with this card campaign?

Warner-cross/Jacobson                                        143

1    A.    No.

2    Q.    What was it in connection with?

3    A.    I don't recall.

4    Q.    Were you involved in any of the discussions relating to

5    the card campaign in the context of the 45 million dollars

6    contempt fine against APA?

7    A.    I think I answered the judge's question that I had no

8    dealings with the card campaign at all.

9    Q.    All right.  Before the card campaign started were you

10   involved in with any discussions about possible merger

11   between APA and ALPA?

12   A.    None.

13   Q.    None at all?

14   A.    None.

15   Q.    Now, in this email from Mr. Rindfleish, Rino is his

16   nickname?

17   A.    That's correct.

18   Q.    He has forwarded to you an email he sent to Mark

19   Hunnibell?

20   A.    I believe he was proposing to send it.

21   Q.    This is a draft that he is doing for your review, and?

22         THE COURT:  If this is your comment, the second

23   page is the edits you made.

24   A.    Yes.

25   Q.    I have a purple blocker.

1        You read the text, right?

2   A.   Yes.

3   Q.   So you knew that there was in the year 2000 about 55,000

4   possible merger costs between ALPA and APA, correct?

5   A.   Again, that is what Ron was writing but he was sending

6   it to the director of finance for review of those numbers.

7   Q.   Right?

8   A.   So no, I didn't did know that, other than I knew Ron was

9   writing that and sending it to someone for review.

10  Q.   Do you find this made you aware or took your notice that

11  those amounts were spent, you didn't think Ron was making it

12  up, did you?

13  A.   I think he was writing Dun a number and sending it to

14  somebody who should know for confirmation.

15       THE COURT:  You don't think he picked the number

16  out of the air?

17  A.   I have no idea.  Honestly, I have no idea.

18  Q.   All right.  Then the third paragraph of that letter, the

19  proposed email says, quote, "Again, I must admit that we will

20  reimburse you three guys the expenses you already submitted

21  when we receive them."  Close quote.

22       Do you see that?

23  A.   Yeah.

24  Q.   Again, understanding from this that ALPA was reimbursing

25  the American Airline pilots for expenses they had incurred in

1    this card campaign?

2    A.   I find that pretty shocking.   But that was really

3    directed to Kevin for his review.

4    Q.   Let me step aside from your reaction and, I will get

5    back to your reaction in a minute.   You read that line,

6    correct, because you are supposed to be editing this

7    document?

8    A.   I was focused on paragraph 1 which was about single

9    carrier proceeding which is why it was sent to me.

10            THE COURT:   In the third one you brought end it

11   rather than narrowed it.

12   Q.   Did you edit this third line, didn't you?

13            THE COURT:   You edited in a way which gave them

14   more reimbursement, not let, you changed the word submitted

15   which meant they would have had to submit them to inincur

16   which means it would include both those submitted and those

17   not submitted.   You broadened it.   You made it bigger.

18   A.   I did.   But again, I did not know, and I did not think

19   it was appropriate for us to be reimbursing people costs that

20   were not ALPA related costs.

21            THE COURT:   You certainly don't indicate that here.

22   A.   It was going to the director of finance, your Honor, for

23   his review and analysis.

24            THE COURT:   No --

25   Q.   Mr. Warner, you are an in-house lawyer, correct?

Warner-cross/Jacobson                                          146

1   A.    That is true.

2   Q.    The primary portion of the litigation portion of your

3   practice is defending ALPA against lawsuits?

4   A.    That's correct.

5   Q.    You are one of the lawyers on the defense side rather

6   than the prosecution side primarily?

7   A.    Mostly what we do is defense but I do prosecution also,

8   yes.

9   Q.    Well, you said there were other lawyers there who focus

10  more on the prosecution side.  Your focus is more on the

11  defense side?

12  A.    On duty of fair representation cases, yes.

13  Q.    Right.  Duty of fair representation case is.  And so,

14  and you are sensitive when reading documents or hearing about

15  events to things that might open up ALPA to lawsuit suits,

16  correct?

17  A.    That is true.

18  Q.    You expressed earlier that when you read this line and

19  understands that ALPA is reimbursing authorization card

20  expenses to a nonALPA person, that you found that shocking?

21  A.    I understood that somebody was proposing that to the

22  director of finance.

23         THE COURT:  But the director of finance is not a

24  lawyer, is he?  I mean, this press a legal issue.  The

25  appropriateness or inappropriateness of this reimbursement is

Warner-cross/Jacobson                                      147

```
 1    in the a financial issue --
 2          THE WITNESS:   Your Honor, I disagree.  It is a
 3    policy issue, that is right squarely in the policy that the
 4    director of finance was responsible.
 5          THE COURT:  You don't think it is a legal issue
 6    whether something doing, whether it becomes evidential
 7    against you at a future proceeding, you don't think that is a
 8    legal issue?  I mean I am saying it could be a policy issue,
 9    too.
10    A.   I your Honor, in retrospect, everyone sends dozens of
11    emails every day, it goes across their desk and to sit back
12    and everyone, could everyone be evidential, I mean the answer
13    is I suppose so.  Everything you do is that way.
14          THE COURT:  The world would be better off I guess
15    if we composed emails, if we paid a little attention to the
16    significance of them.
17    A.   You are absolutely right.  But the bottom line is that
18    in this context, for me, the director of finance was
19    addressing these financial questions and I am confident that
20    he did.
21          THE COURT:  Pick up , Mr. Jacobson.
22          MR. JACOBSON: Okay, your Honor.
23    Q.   But you are the lawyer who is --
24          THE COURT:  My eyelids are closing.  Quick, keep me
25    awake.
```

Warner-cross/Jacobson                                                    148

1    Q.    You are the lawyer who is receiving this, right?  You

2    are being asked to review it?

3    A.    For the first paragraph, yes.

4    Q.    Let's go to the top of this page, where you say I made a

5    few changes to allow you to see my changes I attached to the

6    work document and highlighted differences.  Do you see that?

7    A.    Yes.

8    Q.    So let's turn to the second page then.  These are the

9    changes you made, correct?

10   A.    Correct.

11   Q.    And the first paragraph you changed the word American,

12   to APA because in fact as you told us earlier it was APA that

13   filed single carrier motion, correct?

14   A.    Correct.

15   Q.    And then the second paragraph --

16          THE COURT:  Either American or APA could have

17   filed?.

18   A.    I think that is not true.

19          THE COURT:  You think it had to be APA?

20   A.    I think the union had to.

21          THE COURT:  There isn't cases where single carrier

22   applications aren't filed by the airline?.

23   A.    I believe the NMB rules require them to be filed by the

24   union.

25   Q.    Now, in the second paragraph which is a paragraph you

1    weren't reading or editing, you changed a number.  Quite a

2    few more words than you did in the first paragraph, correct?

3    A.    In an effort to make it more clear.  Yes.

4    Q.    Then in the third paragraph, the paragraph I had you

5    read a moment ago, the one, that was not a paragraph you were

6    reading, you changed the word submitted to incurred.

7    Correct?

8    A.    Correct.

9    Q.    You will agree with the Judge that that in fact

10   increased the amount that ALPA was admitting that it would

11   reimburse to these three guys?

12   A.    That was not my intent.  But I can see his argument

13   that it does increase the potential world that is out there,

14   yeah.

15            THE COURT:  I can't go into people's minds.  So I

16   can't say what anybody had in mind when they wrote it.  But

17   as a matter of the English language, the expenses incurred

18   are braoder than, the diagram, where you have a small circle

19   --

20   A.    You are right.

21            THE COURT:    A small circle and a larger circle

22   around it would be incurred.

23   Q.    With the exception that if somebody submitted expenses

24   that weren't incurred, that would be a problems where they

25   would be submitted that weren't incurred, right?

1    A.   He is right.  You can submit expenses that are

2    fraudulent that you hadn't incurred.

3            THE COURT:  I have litigated those cases.

4    A.   You put his finger on what I was concerned with..

5    Q.   And you say that this document, this exhibit, P-2218,

6    that is the one bit of correspondence you are involved with

7    in connection with this card campaign.  Is that correct, sir?

8    A.   Correct.

9    Q.   I believe exhibit P 27 is already in evidence.  Can you

10   put P 27 up?

11           THE COURT:  P 27.

12           MR. JACOBSON: Yes.  I don't have additional

13   photocopies for you.

14           THE COURT:  I want to make sure you have my notes

15   correctly.

16   Q.   Now, this is an email that the top level of it, thaws

17   you forward going it to Marta Wagner.  You are forwarding the

18   email below?

19   A.   Yes.

20   Q.   We go down to the next level, that is an email from Ron

21   Rindfleisch to a series of people including yourself.

22   Correct.  The first list?

23   A.   Yes, I am on there.

24   Q.   This is October 30, 2001.  Now let's go down to, in is

25   the enclosed email is to Ron from John.   Did you see that?

Warner-cross/Jacobson                                    151

1    A.    Yes.

2    Q.    Let's look at the second paragraph to begin with.    A

3    second sentence.  I appreciate the time you took to hear me

4    out, where mark and you are with our campaign at this point

5    and where ALPA may go in the near future.  I also look

6    forward to our reimbursement.

7               Do you see that?

8    A.    I do.

9    Q.    And that is referring again, this is from John Clark to

10   Ron Rindfleisch?

11   A.    I don't know.  The part I can see doesn't, just reflects

12   the name John.

13   Q.    So it is talking about looking forward to reimbursement,

14   do you have any idea what it it?

15   A.    I didn't understand you.

16   Q.    At the time did you have any idea what any of this was

17   about?

18   A.    What any of which?

19   Q.    Well, this talk about our campaign.

20   A.    I was aware there was a card campaign, yeah.

21               THE COURT:  Well, you understood the campaign

22   referred to the card campaign?

23   A.    Correct.

24   Q.    When you sawed our reimbursement, you understood our

25   reimbursement referred to our campaign, the card campaign,

1    correct?

2    A.   I did not.

3    Q.   All right.  You didn't connect the two portions of the

4    same paragraph as being related to each other?

5    A.   Could I see the whole document?

6    Q.   Sure.

7    A.   But there is the, we only got one page?  Is this it or

8    do you have another page?

9            MR. JACOBSON: I don't know.  There are many, many

10   pages produced.

11           THE COURT:  This was produced by ALPA.

12           MR. FRAM:  I think the question is whether the

13   exhibit has one page or more.

14           THE WITNESS:  There there is a second page to the

15   exhibit.

16           MR. JACOBSON: The exhibit has one page.  Whether

17   there were emails in another exhibit that might be part of

18   the same chain I can't tell you.

19   A.   Could you say your question again, please?

20   Q.   Yes.  When you got this from Rino, who was the person in

21   charge of the card campaigns at ALPA, and you see --

22   A.   I don't necessarily agree with that.

23   Q.   All the cards go to him eventually, right?

24   A.   No.  They were going to, my understanding is Mr. Clark

25   and Mr. Hunnibell were correcting the cards.  Isn't that

1   correct?

2   Q.   They were the ones?

3   A.   Why did you say they were collecting to Ron.

4   Q.   When cards come to ALPA they go to Ron Rindfleish, he is

5   the person at ALPA that the cards come to?

6   A.   Depending on what organizing strategy is being used, but

7   if there is a  strategy of card collection and organizing Ron

8   often ear sees it but he don't always collect the cards.

9          THE COURT:  Weren't the cards delivered in fact to

10  ALPA?

11         THE WITNESS:  Don't know.

12         THE COURT:  You don't know.

13         THE WITNESS:  Don't know.  I don't know.

14         MR. JACOBSON: He doesn't know.

15  Q.   Did you see in the first paragraph of the email from

16  John to Ron referring to the ALPA, the APA board of directors

17  meeting.  Do you see that there.  It says, so you can see how

18  the seniority integration has been put off and how a NMB

19  filing will now follow shortly after the implementation takes

20  place.  This is all supposed to happen the week of November

21  5.  Do you see that?

22  A.   I do.

23  Q.   Now, did that relate in any way to the work you say you

24  were doing in connection with an NMB single carrier and so

25  on?

1    A.   Only in that there is a prediction of when a NMB filing

2    will take place.

3            THE COURT:  More significantly than the date, this

4    creates a relationship between the NMB filing and the

5    resolution of the seniority issue, doesn't it?

6    A.   Well, that was, everybody knew that was going to happen.

7    I mean the APA was going to wait until they resolved the

8    seniority issue.  And then seek a single carrier.

9            THE COURT:  In fact, they did the next day?

10           THE WITNESS:  Right.  That was to protect

11   themselves to make sure that they would not possibly have any

12   obligations to the TWA pilots.  That wasn't new.  We knew

13   that structure was going to happen.  We had known that all

14   along.

15   Q.   In fact, the opposite happened, if there is a single

16   carrier and seniority interest Griggs wasn't resolved, once

17   single carrier, APA has the recognized collective bargaining,

18   exclusive bargaining agent for those employees, would then

19   have a duty of fair representation to the new members of its

20   group, the TWA pilots?

21   A.   Correct.

22   Q.   And if the collective bargaining agreement between the

23   TWA pilots and TWA LLC had an amendable date, rather than a

24   termination date, then once that group of pilots were merged

25   in, their collective bargaining agreement terms and

1    conditions would continue as a status quo until a new

2    agreement some place, correct?

3    A.   You are giving me a headache.  That is a series of just

4    wild speculation.

5    Q.   Let me shorten it down.  All right.

6         Labor contracts and the Railway Labor Act normally

7    have a date that by which you can start renegotiating,

8    correct.

9    A.   Yes, that is true.

10   Q.   And those are called amendable dates?

11   A.   Correct.

12   Q.   And when the amendable date comes by, the employees

13   aren't suddenly without a contract?

14   A.   That is correct.  The contract stays in effect until

15   replacement terms and conditions are negotiated and, or until

16   self help is authorized.

17   Q.   Right.  They continue under the same terms and

18   conditions?

19   A.   Correct.

20   Q.   And if its pilots at TWA, Inc., were moved into TWA LLC

21   without any change to their collective bargaining agreement,

22   there was no 1113, there was no waiver, there there was no

23   amend, this he would be employed by TWA LLC under the same

24   terms and conditions that they had under TWA, Inc..  Correct?

25   A.   Right.  That is where you are giving me a headache.

1    There is no way that was going to happen.

2    Q.    But that is a true statement of what what would happen

3    if those circumstances came to play?

4    A.    And if I were six eight I would have a great basketball

5    career.  I mean it is just, it is just things that don't

6    happen.

7    Q.    Right.  I understand.

8    A.    It is silly to talk about.

9    Q.    No, it is not silly to talk about.

10              Isn't it a fact that the reason for a termination

11   date in the LLC collective bargaining agreement was to ensure

12   that there would be no risk that an American airlines, excuse

13   me, that APA, would have -- it would make sure that the

14   collective bargaining terms and conditions under LLC had no

15   way of continuing on for that group of employees if, once

16   they were folded back in to American Airlines property.

17              MR. FRAM:  I object.  I think this is

18   argumentative.

19              THE COURT:  I am going to sustain the objection to

20   that.

21              MR. FRAM:  Thank you, your Honor.

22              THE COURT:  Go ahead.

23   Q.    You talked in respect to exhibit P 131 regarding the

24   proposals Mr. Wilder made in connection with the reasonable

25   best efforts.  Do you recall that, sir?

Warner-cross/Jacobson                                           157

 1   A.    Yes.

 2   Q.    All  right.  And you said that, you know, this theory

 3   had some merit until American Airlines agreed to arbitrate

 4   with us?

 5   A.    Yes.

 6   Q.    Do you recall that testimony?

 7   A.    Yes.

 8   Q.    And it isn't it a fact that Wilder's theory was that you

 9   needed to stop American Airlines and the APA from entering

10   into a seniority integration agreement before the arbitration

11   process was completed, not before the -- you are saying that

12   the starting of the arbitration process mooted what he was

13   doing, but isn't it a fact what he was saying is we need to

14   stop them from entering into this integration before the

15   arbitration is completed?  Otherwise, their action will moot

16   whatever happens in the arbitration grievance?

17   A.    I don't recall exactly what Roland said.  But if you say

18   that is what he said --

19   Q.    Let's go to page 3 on this document.  There is a

20   paragraph that says analysis.  2.  Analysis.  Compelling

21   representation can be obtained through Federal District

22   Court.  Quote.  More significant, however, is the danger

23   presented by an agreement between AA, and APA, prior to a

24   decision by the adjustment board on an ALPA grievance.  Do

25   you see that?

1    A.    Yes.

2    Q.    It continues, if AA and APA were to enter a seniority

3    integration agreement prior to the adjustment boards

4    decision, then the board process would be rendered moot.  Do

5    you see that?

6    A.    Yes.

7    Q.    And by moot you mean you understand that to mean that

8    you have got a decision but it doesn't make any changes

9    because the things you are trying to deal with have already

10   happened and can't be undone?

11   A.    His language here is a bit lose.  What really he was

12   trying to, the point he was really trying to make is that

13   you, if you have to -- you have to stop the process that

14   could make your arbitration irrelevant.

15   Q.    Yes.

16   A.    And what APA and American had done is they entered into

17   an agreement but they made it not to be effective.  Until

18   single carrier determination was made, which was, turns out

19   to be months hence.  So I think even Roland would agree, and

20   he did agree, that in that circumstance, the arbitration to

21   be continued because the agreement was not effective and the

22   arbitration could be completed before the effective day of

23   the agreements.

24          THE COURT:  But the effective date of the single

25   carrier determination is the condition.

1              THE WITNESS:  Correct.

2              THE COURT:  So if that happened it was going did

3    moot --

4              THE WITNESS:  Correct.

5    Q.    I understood that you testified that as of March 14, if

6    American Airline had walked away, they would be losing about

7    90 million dollars, according to Mr. Glanzer?

8    A.    That was Mr. Glanzer's statement in my notes, yes.

9    Q.    That would be a sum that would increase over time, the

10   longer the transaction was there, the larger the potential

11   loss for American Airlines if they walked away?

12   A.    That is not completely true because again, the phrase

13   was before that, that the financing was secured on the

14   accounts receivable.  So I don't, it depended on ticket sales

15   and how the operation of TWA was going.  So that it may be

16   the case that TWA, that the operation without the icon

17   burdens that had been removed by the bankruptcy court was

18   actually making money so the 90 million could have been

19   getting lower over time.

20   Q.    You talked about your notes, P-198.  We are not going to

21   look at them.

22            Did you make notes you say of what happened at all

23   of these various meetings you testified about?

24   A.    I believe the answer is yes.  But again, I didn't make

25   notes of every meeting.  It is my practice to make notes

Warner-cross/Jacobson                                        160

1    where I can.  If I am doing something else or I am speaking,

2    I can't really make notes of the meeting.

3    Q.   But if other people are speaking you can, right?

4    A.   Usually I can.  Usually I do.  But that is not always

5    the case.

6    Q.   You also talked about the strike option and why you said

7    the strike option wasn't any good, because if you prepared

8    and told American Airlines that hey, we are going to strike,

9    if you don't help you get the kind of terms they want, that

10   they could just walk away, right?

11   A.   That is one reason.

12   Q.   And they would not close the transaction and walk away?

13   A.   That is one reason.

14   Q.   And once they close the transaction, then they can't

15   walk away, right?

16   A.   Right, but then we can't strike against TWA LLC either.

17   Q.   You are saying that the people are going to be compelled

18   to involuntary servitude to work for a company with whom they

19   have no contract with whom they have never signed a deal?

20   A.   Oh, come on.  That is silly.

21        THE COURT:  Whoa, whoa, the facts are when they

22   closed as LLC they had a contract, the transition agreement.

23   Q.   This is the 1113.

24   A.   I am not saying --

25   Q.   He says on the 1113?

Warner-cross/Jacobson                                                161

1    A.   I am not saying that any TWA pilot ever had to go work

2    for TWA LLC.  That was the fundamental notion.  If these guys

3    did not want to work for American or TWA LLC under these

4    conditions, any  single or groups of them could walk away.

5           The MEC's job was to make sure that there were jobs

6    available for those who wished to take them, not that they

7    could sit there and say, well, you know, let's just decide

8    that none of these jobs are good enough for think any of the

9    2,300 TWA pilots and therefore, we are going to refuse, we

10   are just going to let all these jobs disappear.

11          Is that what you are trying to say?

12   Q.   No.  I am trying to say that the leverage of the strike

13   can  be greater once American has closed and now has

14   committed to --

15   A.   But they have no ability to strike against TWA LLC.

16   There is no strike against TWA LLC.

17          THE COURT:  After closing, when they are flying for

18   TWA LLC?

19          THE WITNESS:  There is no ability -the 1113

20   removesontract with TWA Inc.  We may strike against TWA, Inc.

21          But after closing, they are going to fly all those

22   planes through TWA LLC.  We have no right to strike against

23   TWA LLC.  An individual pilot could, if they chose,  decide,

24   no, I don't really want to work for TWA LLC.  I would rather

25   stay home or work for some other airline.  That is always

 1    available to them.  Our concern was to get jobs available for

 2    the 2,300 people who make that choice.

 3    Q.   I want to understand.  You are saying these pilots, if

 4    they say no, we are going to fight it.  The 1113 is granted,

 5    TWA LLC acquires all of these planes, pilots will fly them,

 6    that they cannot strike against TWA LLC because of the, some

 7    agreement to put them on the tail?

 8    A.   Nobody is forcing them to go to work.  When they don't

 9    show up for work, TWA LLC may legally fire them.  That is my

10    point.  Nobody forces anybody to work for TWA LLC.

11              THE COURT:  If there is a  labor agreement with TWA

12    LLC.

13    A.   Not under his scenario.  His scenario is we they have

14    taken our agreement  away with 1113, and they have no

15    agreement with LLC.  Any pilot can choose not to show up and

16    any pilot can get fired for that.

17              Is that what you want?

18              THE COURT:  There are airlines that don't have

19    representation.

20              THE WITNESS:  Yes.

21              THE COURT:  And don't have a contract.

22    A.   And the employees are mostly employees at will, can be

23    fired like that.

24              THE COURT:  No, but they can strike.  It may well

25    be that one of the things they can do is fire them..

Warner-cross/Jacobson                                                    163

```
 1    A.   They can be fired for striking, yes.  They can strike

 2    and be fired for it.  TWA, the TWA pilots could withhold

 3    their services from LLC and all be fired for it.  That was

 4    always an option.  Nobody was seriously considering that

 5    option.

 6              THE COURT:  Just like the National Football League.

 7    A.   Except they get paid a lot better.

 8    Q.   If you have 187 planes going to TWA LLC and acquire the

 9    2,300 pilots who are flying them to be there and fly them and

10    everyone goes on strike, isn't that leverage against the

11    airline?

12    A.   No.

13    A.   You know, this question comes up all the time with pilot

14    groups.  If we all do it, they can't hurt us.  And the fact

15    is what they do, again and again, whether it is sick-out or

16    slow down, whatever, they pick open a few, fire a few,

17    everybody else thinks, I got a mortgage, I got kids.  And so

18    yeah, maybe I am not the one that gets picked off, but I

19    might be next so I go back to work.

20              You got no protection in that circumstance.  No

21    pilot does.

22              MR. FRAM:  Your Honor, is this a good time for a

23    break?  I think we have been going over two hours.

24              THE COURT:  All right.  We will take a break.

25    Thank you.
```

1          I have been so excited by the questions and

2     answers.  I lose track of time.  Time flies when you are

3     having fun.

4          We will break until quarter to one.  Don't discuss

5     the case among yourselves.  Keep an open mind until you have

6     heard all the evidence.

7          (Recess))

8           (Jury enters the courtroom.

9          CLAY WARNER, Resumes.

10         CONTINUED CROSS EXAMINATION.

11         BY MR. JACOBSON:

12         THE COURT:  Mr. Warner, before we start I have a

13    couple of questions.  Had the 1113 motion been granted by the

14    Judge, that would have eliminated the collective bargaining

15    agreement between ALPA and TWA pilots, right?

16         THE WITNESS:  And TWA, Inc., yes.

17         THE COURT:  And TWA, Inc., and its union.

18         THE WITNESS:  Correct.

19         THE COURT:  ALPA?

20    A.   Yes.

21         THE COURT:  That would not, however, have

22    eliminated ALPA as their representative.  ALPA would still be

23    the lawful bargaining representative for the TWA pilots.

24    A.   I want to be clear, for the TWA, Inc., pilots, correct?

25         THE COURT:  For TWA, Inc..

1              THE WITNESS:  Correct.

2              THE COURT:  If TWA had, American had closed

3       thereafter, the 1113 was granted, had closed, they had hired

4       all American hired all the TWA pilots, they would have been a

5       continuing entity, wouldn't they?

6       A.   That was discussed.

7              THE COURT:  At least until they were single carrier

8       status, they would be a single carrier.

9       A.   No, the conclusion is different.  There are arguments

10      in favor that TWA LLC is on a statutory basis, not a contract

11      basis, but by function after statute is a successor of TWA,

12      Inc., and there is an argument for that.

13             THE COURT:  Right.  But it --

14      A.   It is not a strong argument but it is there.

15             THE COURT:  If the argument was such that they were

16      a successor, until single carrier status, ALPA would have

17      been the bargaining representative for those pilots.

18      A.   Correct, without --

19             THE COURT:  Without a contract, because the

20      contract was wiped out.  But their status as a bargaining --

21      only the bankruptcy court didn't purport to wipe out their

22      status.

23      A.   The bankruptcy court didn't wipe out their status as

24      bargaining agent for TWA, Inc., clearly.  The question then

25      is did we have status with TWA LLC.

1            THE COURT:  Or would you have.

2            THE WITNESS:  Maybe.

3            THE COURT:  Because we don't know.  It never

4   happened.

5   A.    Maybe, maybe is the argument.  And maybe even if we had

6   been pushed on that, which we probably would have been by

7   American TWA LLC, we could have gone through the NMB

8   processes of an election and things to get elected within

9   some months of time.

10           THE COURT:  Go ahead.

11           MR. JACOBSON: Thank you, your Honor.

12           By MR. JACOBSON:

13  Q.    Now, on the April 2nd meeting you talked about the TWA

14  pilot were told they were going to use their union

15  representation if the 1113 was granted.  You testified about

16  that earlier, correct?

17  A.    If I said that I misspoke.

18  Q.    All right.

19  A.    They would have their union representation in TWA, Inc..

20  They wouldn't have it necessarily in TWA LLC for the reasons

21  I was just talking about.

22           THE COURT:  But at the moment, the motion was

23  granted they hadn't closed yesterday so clearly three were

24  still flying as TWA, Inc..

25  A.    With TWA, Inc., they were still the bargaining

1    representative.  This they didn't have a collective

2    bargaining representative.

3    Q.    Co you recall a point during the April meeting irks

4    won't say which day, I guess you will tell us, where the MEC

5    asked advisors how they would vote?

6    A.    I do.

7    Q.    All right.  And they asked advisors, raise their hands

8    as to whether or not they would, if they were the ones making

9    the decision whether they would waive scope or not?

10   A.    I do.

11   Q.    All right.  And you thought that was a highly unusual

12   event, normally the MEC doesn't take polls of the advisers in

13   that way, correct?

14   A.    I don't recall that I testified that it was, that that

15   it would have been unusual.

16   Q.    Wasn't it really quite extraordinary for MEC to ask

17   advisors that question, what would you do?

18   A.    It was not the way things normally worked.  And usually

19   advisors, my estimation, and my experience, pushed back and

20   said, look, we give you advice.  You guys have to make the

21   decision.

22   Q.    Well, isn't that in fact?

23   A.    In this case I do recall that they did ask, however.

24   Q.    Any add, and advisors in fact raised their hands to

25   express their view?

```
 1    A.    With some reluctance.  I don't recall that everybody

 2    participated in it, but why yeah, there were some of advisors

 3    that did.

 4    Q.    All right.  Wasn't the vote of advisors eight to one in

 5    favor of waiving scope?

 6    A.    That I don't remember.  What I do remember is that

 7    Roland was the voice that continued to want to pursue the

 8    litigation openings.  Whether there were eight on the other

 9    side, I don't recall that.

10    Q.    Let me give you your deposition and see if that helps

11    refresh your recollection about this.

12    Q.    I would like to direct your attention, if I could, to

13    page 115 of your deposition of September 6, 2008 have you

14    read that?

15    A.    You want me to read the whole page.

16    Q.    Just to your several to refresh your recollection.

17          (Pause).

18    Q.    Have you had a chance to read that?

19    A.    Yes.

20    Q.    Do you agree that it was really quite extraordinary for

21    -- step back.  Did the MEC or members of the MEC ask you and

22    other advisors to the show by, by a show of hands, whether or

23    not you would waive scope?

24    A.    I think I remember that.  Yes.

25    Q.    All right.  And whatever hesitation there might have
```

Warner-cross/Jacobson                                      169

1    been to putting your hands up as you described, advisors in

2    fact did raise their hands?

3    A.   Again, my recollection is some participated in it and

4    some did not.  I just don't remember how that went.

5    Q.   And you thought that was quite an extraordinary event

6    for the MEC to ask for this type of advice, correct?

7    A.   I thought it was quite extraordinary for advisors

8    actually to participate in it without pushing back further.

9    Usually advisors are reluctant to tell somebody what they

10   would do as opposed to just giving the facts and legal

11   advice.

12   Q.   Isn't it a fact that the question and answer here, a

13   response to the question,  "QUESTION:"

14            Were you asked this question and did you give this

15   answer?

16       "QUESTION:  And do you remember that the show of hands

17   was eight to one in favor of waiving, the sole dissent being

18   Roland  Wilder and one other?"

19            "ANSWER:  I remember Roland had a different view.

20   That is probably how it would have come out.  I am confused

21   as to whether that was the issue or whether it was a

22   subsidiary issue, but I seem to recall that there was an

23   occasion because it is really quite extraordinary for the MEC

24   to ask advisors what would you do and they were told what we

25   were do.

1        It may have been about waiving or it may have been about

2   a subsidiary issue.  I don't know.  Is that the question and

3   answer you were given.  The question you were asked and

4   answer you have gave?

5   A.    You accurately read the transcript.

6   Q.    Isn't it a fact that show of hands, this vote, took

7   place on April 2 of 2001?

8   A.    It couldn't have because Roland wasn't there, if Roland

9   had participated.

10  Q.    Let's look if you would at page 114 of your deposition.

11  Starting at line 24.  Question:  Now, on the day of the vote,

12  on April 2, do you remember that the MEC maybe just one

13  member more, but it could have been officer, any way, an MEC,

14  an officer member asked the people in front of the room that

15  came from Washington, D.C. including yourself and others,

16  advisors, if you will, they were asked to vote, to show their

17  hands as to who they think we should waive and who doesn't.

18  Do you remember that happening?  Answer.  I think I do.  I

19  think I do.

20        Was that the question you asked and the answer you

21  gave?

22  A.    You read the transcript accurately.

23  Q.    That question was about April 2, wasn't it, sir?  That

24  is a yes or no, sir.

25  A.    I did not take the question to be about April 2.  I took

1    the question to be about the meeting.

2    Q.    Was the question now on the day of the vote, on April 2,

3    is that how the question started?

4    A.    It did, nine lines prior to the time I got a chance to

5    answer.

6    Q.    Those nine lines you forgot you were talking about April

7    2, true?

8    A.    That is true.

9    Q.    Now, we looked at little while at an exhibit you were

10   shown on direct, we looked at in on cross examination,

11   exhibit P-2 17.  That is the card catalog or rather the data

12   base of the cards, right?

13   A.    It is an email on March 7, 2002.

14   Q.    Right.  You are looking to see if you had 35 percent.

15   Whether there would be 35 percent so you could at least make

16   a run at the vote for the new enlarged American pilot group?

17   A.    I was gathering information to report to the president

18   so he could make a decision on what to do.

19   Q.    Okay.  How many pilots were in this new body?

20          MR. FRAM:  Your Honor, can I object?  We covered

21   this before the break.

22          THE COURT:  No, go ahead.

23   Q.    How many pilots in the new, enlarged group?

24          THE COURT:  13,300.

25   A.    I don't remember the exact number.  It was in excess of

1   10,000.  11 to 12, but I don't.

2            THE COURT:  11,000 American pilots, right?

3   A.   I am sorry.

4   A.   I  think you are right, your Honor.  I.

5            THE COURT:  And 2,300 TWA pilots.

6            THE WITNESS:  That is my recollection.  But I am

7   sorry, I am not real solid.

8            THE COURT:  If I take off my shoes I can count to

9   13 and 3.

10  Q.   So approximately 13,300 pilots, right?

11  A.   That sounds like a good number.

12  Q.   And what was the 35 percent figure that you needed to

13  reach to get to that?

14  A.   Public math is not a strength.

15  Q.   All right.  Do you know what a third of 13,300 is?

16           THE COURT:  Let's take a look.  A third of 12,000

17  is 4,000, right?

18           THE WITNESS:  Yes.

19           THE COURT:  A third of 1300 is what?

20           THE WITNESS:  About 4400, right.

21           THE COURT:  See.

22  Q.   Let's round it up to 4,500.  We don't want to under

23  estimate the burden you have to do.  Okay?  Is that

24  reasonable.  About 4,500 in favor to have this vote?

25  A.   I will take that based on the numbers we talked about.

Warner-cross/Jacobson                                              173

1   Q.   All right.  And you know you have the rest, you are

2   assuming you have 2,200 TWA pilots for your initial run

3   through?

4   A.   Yes.

5   Q.   If we take the 2,300 off the 4,500 we are left with

6   2,300 that we need to get, right.  In order to be able to get

7   a vote?

8   A.   23 -- 45 minus 23 is 22, right.

9   Q.   22.  Thank you.  You are better at public math.  All

10  right.

11         Now, let's look at this database.  The line, Clay,

12  looks like.  Clay.  Looks like there may have been 1,548

13  cards.  Right?

14  A.   Correct.

15  Q.   So if you take that, round it up, call it -- should we

16  round it down?

17         THE COURT:  Just do it.

18  Q.   Let's take off 1,548.  So we are looking at about 650

19  additional.  Right that you need to make over this margin?

20  A.   Okay.

21  Q.   Now, did you have --

22  A.   You need to make a 35 percent showing.

23  Q.   To make the 35 percent showing?

24         THE COURT:  But the National Board gave you time to

25  do that, did it not?

Warner-cross/Jacobson                                          174

```
 1            THE WITNESS:  30 days is my recollection.
 2    Q.   So we are looking at 30 days to get another 652maybe.
 3    Let's look at a couple of things that we looked at here just
 4    to get the timing down right.  I think the timing here is
 5    important.
 6            This email is the March 7 email.  Next email I want
 7    to look at you just had in evidence in your case as D 320.
 8    That is the letter from, sorry.  I am out of order.  Let me
 9    go to P 31 which is already in evidence.  This is an email
10    which you are on the distribution list for, correct?  Do you
11    see the name there in the first line?
12    A.   I do.
13    Q.   All right.  856 in the morning email from Ron
14    Rindfleisch?
15    A.   Yes.
16    Q.   The subject is ALPA merger, MIA document?
17    A.   Correct.
18    Q.   All right.  You know MIA is the shorthand used for Miami
19    in flying, correct?
20    A.   That is one use of the acronym.  But I don't know what
21    use was being made here.
22    Q.   All right.  It is ALPA merger, right, MIA document is
23    the subject line?
24    A.   Yes.
25    Q.   Attachment, ALPA merger MIA dot DOC?
```

Warner-cross/Jacobson                                              175

1   A.   Yes.

2   Q.   That morning of March 18, 2002, Ron Rindfleisch

3   circulated to the people on this list, including yourself, a

4   resolution that was drafted for the Miami domicile of

5   American Airlines, ALPA's Miami domicile, asking to merge the

6   ALPA with certain conditions.  You received that, correct,

7   sir?

8   A.   I have no idea.

9        MR. FRAM:  I object.  There is no foundation that

10  is what the document says or the witness saw it.

11       THE COURT:  His name is listed in the received.

12       MR. FRAM:  There is no foundation that he saw the

13  attachment or that the document says what it says.

14       THE COURT:  Ask him.

15  Q.   Did you receive a copy of the attachment which was a

16  resolution from the Miami domicile of APA directing APA to

17  proceed with a merger with ALPA so long ascertain conditions

18  were satisfied, the chief of which was that there be no re-

19  negotiation of the seniority list.  Did you receive that at

20  that time?

21  A.   I have no recollection of that at all.

22  Q.   All right.  So this is March 8, 8:50 in the morning?

23  A.   March 18.

24  Q.   You are right.  Let's look to the next document which is

25  D 320 which was put in evidence earlier.  That is the March

Warner-cross/Jacobson                                    176

```
 1    18, same day, letter from Duane word to the NMB, declining to

 2    participate in an election?

 3    A.    Correct.

 4    Q.    Let's look at the next document that you just put in

 5    evidence, P-279.  This is the April 3rd order, finding of the

 6    NMB, determining that ALPA is no longer the certified

 7    bargaining agent for the former TWA pilots, correct?

 8    A.    Yes.

 9    Q.    Let's move now to exhibit P-148, I believe it is --

10          THE COURT:  P-148.

11          MR. JACOBSON: Yes, your Honor.

12    Q.    Followed by five as.  This is from Ron Rindfleisch to

13    top officials of ALPA, including yourself, correct?

14    A.    I am on the two line of the email.  That's correct.

15    Q.    Is it April 4, 8:38 in the morning?

16    A.    Yes.

17    Q.    It is forwarding, go down to forwarding --

18    A.    Could you make this larger.

19    Q.    It takes a minute to get to the large part after we get

20    to the small part?

21    A.    I appreciate that.

22    Q.    Isnt the email that is being forwarded to you and the

23    others between Duane Woerth --

24    A.    I am sorry.  Could I see the whole document?  UU by the

25    way, the only two sheets of that in evidence, the whole
```

Warner-cross/Jacobson                                                    177

1    thing, is P-148, I think it is UUUUU, five U's, and then

2    P-148, WWWWW.  I think those are the only two pages that we

3    have admitted into evidence.

4          MR. JACOBSON: Your Honor, I believe 148 OOOOO was

5    in evidence as well.

6          MR. FRAM:  Your Honor, I think your Honor allowed

7    this particular document into evidence.  There is no

8    objection to this.  We have an open issue about some other

9    documents.

10         THE COURT:  You have documents dated after 4/3/'02?

11         MR. FRAM:  May we approach to discuss this at

12   sidebar?

13

14         (At sidebar)

15         THE COURT:  Let me tell you what my notes say.  D

16   had objected to anything that was after 4/3/02.  Then I have

17   another note.  Plaintiff offers P-148.  UUUUU, five U's.  And

18   P-148 WWWWW.  That is what I admitted according to my notes.

19   If you want to offer more of it and there is no objection,

20   that is fine with me.

21         MR. FRAM:  My recollection is that we objected to

22   that and you permitted counsel to question Mr. Woerth about

23   some of the documents on April 4, including this one.

24         THE COURT:  But there was various, one thing to

25   permit questioning about a document.  But admission into

1    evidence, is a different story.

2                 MR. FRAM:  I agree.

3                 MR. JACOBSON: Your Honor, this document came

4    without objection.  The objections were made later.  And.

5                 THE COURT:  What document?

6                 MR. JACOBSON: This is the one we are talking about,

7    the five O's.

8                 MS. RODRIGUEZ:  The whole binder was in evidence.

9                 THE COURT:  No, that is not what I have.

10                MS. RODRIGUEZ:  It came in during Rindfleisch's

11   deposition.  They were going to present your Honor with

12   something additional to say why they hadn't previously

13   objected to a document that had been premarked and had been

14   admitted into evidence but we have never received that.

15                THE CLERK:  I have the whole thing in.

16                MR. FRAM:  Let me cut to the chase on this.

17                THE COURT:  You agree the whole thing is in

18   evidence.

19                MR. FRAM:  No.  No.

20                MR. JACOBSON: If they followed up.  They want to

21   object from this point down.  We haven't argued that yet.

22                MR. FRAM:  This point being April 23 on we we have

23   gone on the line, as a consequence we are not going to object

24   to April three and 4.  Just to simplify this.  This is one of

25   the loose ends I was going to raise with your Honor when we

1    had a break which is asking to exclude from evidence April

2    23, on, 2002 and on.

3            THE COURT:  What is your argument on this?

4            MR. JACOBSON: Your Honor, they have drawn the line

5    after this document, so they are not even objecting to it.

6    The document was already in evidence as a whole.  You said

7    that they should come and say what they are objecting to.  We

8    are will argue about the objection later.  The document I am

9    offering is not within the scope of what they are now

10   objecting to.

11           THE COURT:  Doesn't make any difference.  I don't

12   accept the notion automatically that the document dated after

13   the 18 was the cut-off date in the, I think.

14           MR. FRAM:  Yes.

15           THE COURT:  When the cause of action accrued.  The

16   fact that something may have happened after that casts light

17   on what was going on before, it may be admissible.  Notwith-

18   standing, it doesn't push forward the circa stacked date for

19   the reaction but it may cast light.  It may be evidential.

20   At least this one I guess it is PPP.

21           MR. JACOBSON: Your Honor, we are not offering this

22   one at this time individually.  We are offering this one

23   which they have indicated that they have no objection to, in

24   this binder.  They are not seeking to strike this item that

25   was admitted during Rindfleisch.

```
 1              THE COURT:  Well, I have an objection to having

 2    after April 3.  I am going to assume the whole thing is,

 3    April 3rd, I will assume everything is in except for things

 4    after April 3rd.

 5              MR. FRAM:  I think you initially sustained that.

 6    I, this is evidence on April 4.

 7              THE COURT:  Now, you put this massive documents in

 8    evidence.  Okay.

 9              THE COURT:  Right now, anything dated before April

10    3rd is already in.  If it is after April 3rd, if you offer it

11    and he objects I will rule.  As to PPP, he is not objecting

12    to OOO, right?

13              MR. JACOBSON: Right.  That is it is the one I am

14    working on, OOOOO, five O's.

15              THE COURT:  And PPP.

16              MR. JACOBSON: I am not referring to PPP, right now.

17              THE COURT:   I am noticing.

18              THE COURT:  That is the one you showed me.

19              MR. JACOBSON: That is the one he objected to.

20              THE COURT:  I am going to allow OOOOO in.

21              MR. FRAM:  Based on your Honor's prior ruling there

22    is no objection to OOO.

23              THE COURT:  All right.  OOO is in, and if you offer

24    others I will deal with them.

25              MR. FRAM:  We will object to others, your Honor..
```

 1              (Open court).

 2              THE COURT:  P 148 is a huge booklet, a huge binder

 3    of emails.  I now believe that except for emails of documents

 4    dated after April 3rd, 2002, they are already admitted.

 5              I also believe that WWWWW, UUU, and WWWWW are

 6    already in.  I don't know when they are dated, the specific

 7    points to put them in.

 8              I have now been asked to rule on OOOOO

 9     148.  I read that and I am admitting it.  My general

10    principle is that just because a document is dated after the

11    a cruel date of the cause of action doesn't mean it can't be

12    evidential to what happened before.  And cast light on that

13    subject.

14              MR. JACOBSON: I understand, your Honor.  So P 148

15    OOOOO is in evidence.

16              THE COURT:  Yes.

17    Q.   To put it back in context, let's go back to the prior

18    document.  I think the dates are what I am showing you now.

19    Exhibits P-379 we looked at.  That is the order of the

20    National Mediation Board that says after that date ALPA is no

21    longer on the property as an exclusive bargaining agreement

22    and APA is exclusive bargaining agent for all of the pilot,

23    both former American and TWA all together as a single

24    carrier, correct?

25    A.   More or less.

Warner-cross/Jacobson                                      182

 1   Q.    That is April 3rd, 2002.  Now, let's turn back to the

 2   document we were just looking at before we went to sidebar,

 3   P-148, followed by OOOO five 5 O's, and I think what we have

 4   established so far, can you see that okay, Mr. Warner?

 5   A.    Yes.

 6   Q.    So there is an email dated April 3rd, 2002, from Mark

 7   Hunnibell to Ron Rindfleisch, correct?

 8   A.    Correct.

 9   Q.    That is copied to John Clark.

10   A.    Yes.

11   Q.    And that email is forwarded to you and these other

12   people at ALPA, including gain worth and Bob Christie and

13   Seth Rosen and so on, and you are both, Jonathan Cohen,

14   correct?

15   A.    Correct.

16   Q.    And the email from Mr. Hunnibell to Mr. Ron Rindfleisch

17   dated April 3rd, the same day, that the NMB has removed ALPA

18   from the property, forwarding two resolutions from two ALPA

19   domiciles, correct?

20   A.    I am only going by reading this, because, I don't see

21   one reference to a resolution.  Am I missing something?

22   Q.    Well, it is odd that it refers just one.  But as you may

23   recall, we just looked at exhibit P 31, and we don't control

24   how the documents came to us.  These are together.  So let's

25   look first at the ones referenced DWF?

Warner-cross/Jacobson                                    183

```
 1    A.    Would you do me a favor and put this back?  I am having
 2    a hard time.  The thing is flipping around to different
 3    views.  Thank you.
 4    Q.    All right.
 5              MR. FRAM:  Can we give the witness a paper copy?
 6    A.    I am sorry.  I am not used to the bifocals yet.  I can't
 7    see you and this at the same time.
 8    Q.    That is disorienting, I am sorry about that.
 9    A.    If you could stop me from getting old.
10    Q.    You now have a large binder for exhibit P 148?
11    A.    I do.
12    Q.    Focusing on this particular document?
13    A.    Yes.
14    Q.    Is that easier to work with, sir?
15    A.    Much.  Thank you.
16    Q.    So let's look at the email text from Mark Hunnibell to
17    Ron Rindfleisch.  It says the attached resolution was
18    introduced at twelve o'clock noon central standard time today
19    at the APA, DFW domicile.  Do you see that?
20    A.    Yes.
21    Q.    Now DFW stands for Dallas Fort Worth?
22    A.    That is my understanding.
23    Q.    That is a where American Airlines is headquartered?
24    A.    I believe so.  They certainly have a council there.
25    Q.    It is a large group of pilot there, isn't it?
```

Warner-cross/Jacobson                                    184

1    A.   That I don't know.  I don't know how their bases line

2    up.  I know they have a base in Dallas.

3    Q.   You would assume that there is probable more than say

4    650 pilots total at the Dallas Fort Worth's base, wouldn't

5    you?

6    A.   I don't know that.

7    Q.   And then the second page of this document is a copy of

8    the same page.  And then if we turn to the third page there

9    is a resolution, right?  DFW 2002?

10   A.   Yes.

11   Q.   All right.  And that is a resolution and if you look

12   through it you will see it refers to the National Mediation

13   Board determination of a single carrier, correct?

14   Q.   First paragraph, first where as?

15   A.   Yes.

16   Q.   And it talks about the effect of that is to allow the

17   seniority integration between TWA LLC and American Airlines

18   to proceed, Supplement CC.

19   A.   Right.  That turns out not to be true.  That is what the

20   where as says.

21   Q.   This is what the people who passed this resolution are

22   saying?

23   A.   Yeah.  Well, people who are offering this resolution.  I

24   don't know that it was passed.  In fact, I think the

25   implication is it wasn't passed but that is, I am just

1    reading from the email.

2    Q.   The resolution discusses the payment of the what, $20

3    million balance, or 25.

4            MR. FRAM:  I object.  The document is in evidence.

5    The witness has no knowledge of the document other other than

6    what it says.  Counsel is asking him to read what the

7    document says.  There is no evidence the resolution was

8    adopted.  No evidence about how many pilots voted.

9            MR. JACOBSON: I will move on.

10           THE COURT:  The point is well taken.  You can use

11   is use it in closing argument.  You can't ask him if he

12   doesn't know about it.

13   Q.   As a person who is trying to see if there is enough

14   numbers here to add up to a sufficient basis to make an an

15   election run at being the collective bargaining agent for the

16   enlarged group of American pilots, would the fact that there

17   was resolutions proposed or passed in the Miami domicile, and

18   the Dallas Fort Worth domicile added to the 2,300 TWA pilots,

19   added to the 1,50045 cards, add up to more than 35 percent

20   you think you need.

21           MR. FRAM:  I object.  There is no foundation that

22   either resolution passed.  The foundation for the question is

23   factually unsupported.

24           MR. JACOBSON: The question isn't whether it passed.

25   It is whether in fact these resolutions are there for, would

1    that tend to cause you to think that there is a shot of

2    getting this passed.

3          THE COURT:  I will allow that question.  So it is

4    clear he is not arguing that it passed.

5    A.   There is still a lot that is wrong with the question.

6    It starts with the proposition that I was the guy who was

7    making a determination of whether it was appropriate for ALPA

8    to go for an election.  I have tried to be clear every time I

9    answered the question, I am not that guy.  That guy was the

10   president.  Captain Woerth.  What I was doing was reporting

11   to him on some basic information that was -- that I could put

12   my hands on or report.

13          But as far as whether or not it was an appropriate

14   for ALPA to go for an election, by the way, not based on 35

15   percent, but whether they can actually win.

16   Q.   Correct?

17   A.   That was Duane's call.  It was Duane's call.  It was his

18   decision to make.  I mean he made the decision, made a whole

19   lot of sense to me, but I didn't advise him on it.  And I

20   certainly wasn't surveying these documents to see if there

21   was additional support among the Allied Pilots group for

22   resolutions introduced.

23   Q.   So you were receiving these documents but you really

24   weren't reading them in order to give advice to your boss?

25          THE COURT:  He has answered he wasn't providing

1    advice.  He was providing information.  That is his answer.

2    A.   And someone else was providing this information to him

3    directly, not through me.

4    Q.   One of the documents we looked at in Mr. Holtzman's

5    deposition, we saw part of it, exhibit in evidence, joint

6    215.  Let's turn to the second page of 215 for a second.

7    Now, this is a document that is dated March 30, 2001.  Do you

8    see that?

9    A.   Yes, I do.

10   Q.   All right.  It has five points.  I believe you

11   referenced this document as saying one of the things you

12   considered in putting together your summary for your

13   presentation to the pilots?

14   A.   No, that is not true.

15   Q.   Okay.  I misunderstood.  I thought you were referring to

16   this document.

17          This is a document that, well, I won't say Mr.

18   Holtzman said, the jury will recall that.

19          Turn to the first page of it.  Do you see that this is a

20   document that was emailed to you on April 19, 2002?

21   A.   That is what the date says.

22   Q.   And that was at the point when ALPA was no longer the

23   recognized collective bargaining agent.  Correct?

24   A.   That is correct.

25   Q.   And that is the point when you are if not anticipating,

Warner-cross/Jacobson                                                188

1    at least being cautiously anticipatory of a possible lawsuit

2    against ALPA, correct?

3              THE COURT:  Before we get to that.  This is dated

4    April 19, 2002, right?

5              MR. JACOBSON: Right.

6              THE COURT:  It refers, for your records attached to

7    my handwritten --

8              MR. JACOBSON: I will get to that.

9              THE COURT:  More than a year earlier.

10             MR. JACOBSON: Correct.

11             THE COURT:  Okay.

12   Q.   So this is a document sent to you by Mr. Holtzman after

13   you are no longer, ALPA is no longer on the property as the

14   collective bargaining agent, correct?

15   A.   Correct.

16   Q.   It is a document that is being sent to you to help you

17   got they are things in case there is some sort of duty of

18   fair representation --

19   A.   No, I didn't say that.

20             THE COURT:  Hold it.  Hold it.  On April 19, 2002,

21   was ALPA the bargaining agent for the TWA pilots?

22             THE WITNESS:  No, April 3rd, 2002, was the date

23   that the NMB determined that there was a single carrier.  So

24   we --

25             THE COURT:  So by that time APA was not, was no

1    longer its lawful bargaining agent?

2    A.   Yes.

3    Q.   Isn't it a fact that you are gathering documents from

4    various people so you have documents available to you, in

5    case of litigation.

6             MR. FRAM:  I object.  I don't know how this is

7    evidential.

8             THE COURT:  I am going to allow it.

9             THE WITNESS:  No.

10            THE COURT:  The answer is no.  Next question.

11   Q.   You had identified two new documents that weren't in the

12   prior disclosure during your testimony.  I would like to

13   offer them in evidence.

14            MR. FRAM:  Your Honor, I object.

15            MR. JACOBSON: Defendant's exhibit 450 and 451.

16            MR. FRAM:  I object to counsel's comments.  I will

17   certainly look at the documents.

18            THE COURT:  450 and 451 were the ones not

19   premarked.

20            MR. FRAM:  I have no objection to their going into

21   evidence.  That is fine.

22            THE COURT:  Okay.  Are you moving them?

23            MR. JACOBSON: Yes, I am, your Honor.

24            THE COURT:  Okay.

25   Q.   You have them there in front of you, sir?

Warner-cross/Jacobson                                        190

1    A.   Give me a moment.

2    Q.   They look like this,

3    A.   I can see them from here, it is when they are here.

4         I found them.

5    Q.   Each of these has fax lines above them.  The jury can't

6    see them because I don't have them on my system yet.  I would

7    like to ask you first about the letter from Steve Rautenberg

8    who was chairman of Council 3 at the time of the signature

9    line, November 1, 2001, right?

10   A.   Okay.

11   Q.   That is the day after that resolution that you talked

12   about where the MEC was attempting to require materials to be

13   done unanimously and with the consent of the chairman

14   relating to seniority integration, right?

15   A.   Yes.

16   Q.   All right.  And looking at this email, can you tell when

17   Mr. Rautenberg faxed it to Captain Jerry Mugerditchian at

18   ALPA?

19   A.   No.

20   Q.   Do you see the fax line at the top?

21   A.   I do.  But I mean, I see a fax line at the top.  I don't

22   know whether Captain Rautenberg faxed it from the MEC office

23   or from home.  There is too much in that question.

24   Q.   Let me break it down.

25   A.   If you want to read the fax line.

Warner-cross/Jacobson                                191

1    Q.    There are two fax lines, right?

2    A.    Yes.

3    Q.    The top one says the source of ALPA legal.

4    A.    Right.

5    Q.    And that is the known number there, do you recognize

6    that phone number?

7    A.    I do.

8    Q.    Is that the fax machine in your office?

9    A.    No.

10   Q.    Your suite?

11   A.    No.

12   Q.    Whose fax number is it?

13   A.    It is our down town office in down town DC.

14   Q.    In Washington, D.C..  It indicates a date and time,

15   right?

16   A.    Yeah.

17   Q.    That would be November 1, 2001?

18   A.    Right.

19   Q.    14:48?

20   A.    Yes.

21   Q.    Which is 2:48 p.m.?

22   A.    Correct.

23   Q.    Using military time.  Correct?

24   A.    That is my understanding, yes.

25   Q.    And the line below that is a fax from ALPA/ TWA MEC?

Warner-cross/Jacobson                                      192

1    A.    Right.

2    Q.    And the phone number there, is that a phone number you

3    know or knew?

4    A.    The 314 area code, St. Louis and and 770 was our St.

5    Louis office exchange.  But.

6    Q.    That is fair.  And it shows also November 1, 2001?

7    A.    Yes.

8    Q.    And it shows the time being 14:36, is that, or 14:38?

9    A.    It is cut off but that appears to be right.

10   Q.    Okay.  So does it appear from the fax lines that this

11   document was faxed from St. Louis to ALPA approximately 2:46

12   in the afternoon, and then faxed on from ALPA legal within

13   two or three minutes?

14   A.    Certainly the fax came first from the MEC office because

15   the legal department fax line cuts over it.  But, you know.

16   Beyond that I can't say much.

17   Q.    Then the next document, the responsive email, excuse me,

18   fax, so use to emails now, the responsive fax from Jerry

19   Mugerditchian to Bob Pastore, that is also a November 1,

20   2001, right?

21   A.    Yes.

22   Q.    And what does the fax line on that one say?

23   A.    This copy appears to have been sent from the MEC office

24   on November 30.

25   Q.    All right.  You are right.  That is November 30.  Thank

Warner-cross/Jacobson                                            193

```
 1   you, sir.  I have a few more documents to show you on some

 2   different topics.

 3           Let me give you a document that is previously

 4   marked as P-235.

 5           Judge, it was marked and not identified earlier.

 6   You have a copy up there in your papers.

 7           THE COURT:  What is the number now?

 8           MR. JACOBSON: P-235.

 9           THE COURT:  It was identified but not entered into

10   evidence.

11           MR. JACOBSON: Yes.

12   Q.   Mr. Warner, do you recognize this as an email you wrote?

13   A.   Yes.

14   Q.   All right.  And dated May 16, 2001?

15   A.   Yes.

16   Q.   And you said there are a, and you sent it to a number of

17   people including David Holtzman, Mr. Seltzer, Mr. Glanzer,

18   Timothy wall be shall and Steve Tumblin?

19   A.   Yes.

20           MR. JACOBSON: Your Honor, I offer exhibit P-235 in

21   evidence.

22           MR. FRAM:  No objection, your Honor.

23           THE COURT:  Okay.  P-235 in evidence.

24   Q.   Now, sir, this is a document reflecting comments to

25   proposed changes you had with respect to a fee application
```

1    that was, a fee reimbursement application that ALPA was going

2    to file with the bankruptcy court?

3    A.   Yes.

4    Q.   And I am not going to go through all of the portions of

5    it.  There is a list of -- let's go to paragraph 5.  Were you

6    referring to paragraph 10 of the document?

7    A.   Yes.

8    Q.   Subsection B, or subparagraph B I guess.  And you are

9    talking that this is in relationship to the 1113 being

10   granted.  Is that correct, do you recall?

11   A.   Just a minute.

12   Q.   Do you recall any issues of concerns as far as how the

13   TWA MEC might react to the application that was being filed

14   on behalf of ALPA in the bankruptcy?

15   A.   No.

16   Q.   Do you recall any issues concerning whether TWA MEC

17   would see a, would receive a dollar amount that it requested

18   for, for example, Mr. Glanzer and why they weren't getting

19   any application for their lost flight pay.  Do you remember

20   that being an issue?

21   A.   I remember issues with Mr. Glanzer and his fee.  The

22   contract at the MEC had signed required us to use our best

23   efforts to obtain for him a success fee or an investment

24   banking fee, as it was called.  So we were obligated to do

25   that.  The MEC members were not in the mood to help Mr.

1   Glanzer at all, but we had the obligation so we kept pushing,

2   to try to get him some money.

3   Q.   And the success fee was based on point one percent of

4   the transaction value, correct?

5   A.   Not anywhere close.

6   Q.   Well, we will look at that in a second.  With you agree

7   that the transaction had a final value to American Airlines

8   of 2.8  billion dollars?

9   A.   I have no recollection.

10  Q.   Let me give you what has been marked as exhibit exhibit

11  P-239.

12          Do you recognize this document, sir.

13  A.   It appears to be an email exchange between me, David

14  Holtzman and Steve Tumblin.

15  Q.   The top email is one written by you, correct?

16  A.   I think so.

17  Q.   It forwards email from David Holtzman?

18  A.   It is a reply.

19  Q.   Reply all?

20  A.   Reply all.

21  Q.   Your email is dated June 11, 2001?

22  A.   Yes.

23          MR. JACOBSON: I would like to offer P-239 in

24  evidence.

25          MR. FRAM:  No objection, your Honor.

Warner-cross/Jacobson                                          196

```
 1              THE COURT:  Okay.  P-239 in evidence without
 2   objection.
 3   Q.   Since this is your reply to all why don't you first read
 4   the jury the email you are replying to since it is quite
 5   short.
 6   A.   Also, is the joint stipulation in good enough shape to
 7   show the MEC?  If so, are you each available by telephone to
 8   explain to the MEC why Michael gets 2.5 M, for million, but
 9   they don't get the balance of their flight pay loss bank?
10   Always fun here.
11   Q.   And what did you reply?
12   A.   Someone should explain the situation with Michael to the
13   MEC, and I guess that someone would be me.  I was hoping this
14   issue wouldn't come before the MEC until we had a sum of
15   money to divide between ourselves as reimbursement for people
16   we have already paid, and Michael.  How do you think it will
17   come up?  How can we, I, prepare?
18   Q.   Thank you, sir.
19   Q.   I would like you to see, I don't have an extra copy, a
20   document already in evidence, exhibit P-228.  Do you
21   recognize that email, sir?
22   A.   Yes.
23   Q.   The one, you are a recipient?
24   A.   Yes.
25   Q.   This is related to the same topic we were talking about,
```

1    the success fee?

2    A.    It is relating to the application for fees for Glanzer.

3    Q.    And who is David Seligman?

4    A.    My recollection is he is a lawyer who was representing

5    either the creditors committee or the estate, TWA, Inc.

6    Q.    All right.  So it would be someone who would want to

7    know why two point, or possibly be opposed to the notion of

8    money coming out of the estate in the sum of two point

9    million.  Is that right?

10   A.    Yeah, the recollection I have is that we had agreed that

11   our application for fee reimbursement would be a joint

12   application with TWA, Inc..  And so in effect we were in

13   negotiations with TWA, Inc., to see what they would support.

14   Among they did not support anything close to 2.8 million

15   dollars.

16   Q.    I am going to show you another document that is already

17   in evidence, sir, exhibit P-225, on the same topic, the fee

18   application?

19              THE COURT:  225?

20              MR. JACOBSON: Yes, your Honor.

21   Q.    Steve Tumblin is also involved in drafting this?

22   A.    It is an email from Steve Tumblin.

23   Q.    The fee application on the ALPA side, who are the people

24   primarily involved in drafting that document?

25   A.    Steve Tumblin and his firm.

1    Q.   What role do you play in that?

2    A.   With respect to the application for fees for the

3    advisors, I read it, and offered comments.  In this case, I

4    was trying very hard to broker a deal with Michael Glanzer to

5    make sure that we fulfilled our obligation, our reasonable

6    best efforts obligation to get him a fee, and at the same

7    time could get something from the estate for him.

8    Q.   All right.  Now, this document, if you turn to page -- I

9    don't know the number.  You will see it in a moment.

10            This is a page which is page 6 of the second

11   document, I believe, part of the attachments.

12            MR. FRAM:  What is the exhibit number, please?

13            MR. JACOBSON: Exhibit P-225.

14            THE WITNESS:  Could I possibly see the whole

15   document?  Is that available?

16            MR. JACOBSON: Yes, sir.  I know it is hard to

17   follow on the screen.

18   A.   There were lots of drafts of this.  And no offense but

19   for all I know you are showing me an early draft.  What

20   document is that?

21            MR. JACOBSON: 225.

22            THE COURT:  We haven't moved off that?

23            MR. JACOBSON: No.

24            THE COURT:  I wrote P-225, and I went to sleep.

25   A.   The document I am given is different than the one I am

1    shown on the screen.

2    Q.   It is?

3    A.   Page 6 doesn't have this on it.

4    Q.   The second document in there, there are two documents

5    that are part of this exhibit.  There is a brief and a

6    motion, I believe?

7    A.   Oh.

8    A.   Okay.

9    Q.   Is this an early or late motion, is this language agreed

10   to by TWA at this point.   My recollection is TWA never

11   really agreed to do anything in this nature at all.  But what

12   my recollection is that eventually they agreed to reimburse

13   Glanzer for his, the retainer fee amount.  And then to create

14   essentially some sort of a bonus success fee, Leboeuf Lamb

15   kicked in some of their fees that they received and ALPA

16   kicked in some more so we could create a pool for Glanzer to

17   get I think $180,000.

18           So yeah, these, we never got -- this was, a debate

19   we kept going on for a long time but Steve Tumblin finally

20   resolve it at fractions of this.

21           THE COURT:  Are you still on 225??

22           MR. JACOBSON: No, your Honor.

23   Q.   I would like to show you what is marked P-205?

24           THE COURT:  205.

25           MR. Jacobson:  There is a digit difference there,

1    your Honor.

2             THE COURT:   205.   That is not in evidence.   Do you

3    recall?

4    Q.   Do you recall this document, sir?

5    A.   Yes.

6    Q.   This is an email that you wrote on November 4 of 2001,

7    sir.

8    A.   November 6.   But yes.

9    Q.   You are right.   That is a 6.   And it has an attached

10   proposed letter for Bob Pastore to sign?

11   A.   Yes.

12   Q.   That you drafted that letter?

13   A.   I did, yeah.

14            MR. JACOBSON:   I would like to offer exhibit P-205

15   in evidence.

16            MR. FRAM:   No objection, your Honor.

17            THE COURT:   P-205 in evidence.

18   Q.   This is November 6, 12:10 p.m., could you read the first

19   paragraph in evidence, please.

20   A.   Duane has agreed to call Darrah to advise him in person

21   of the MEC meeting.   He called Sally a few minutes ago.

22   Sally was concerned with making sure the proposal was

23   available in written form for review, and Duane advised her

24   that folks were working on that.

25   Q.   Thank you very much.

Warner-cross/Jacobson                                        201

1   Q.   You talked a little bit about approaching the Department

2   of Transportation.  Do you recall that?

3   A.   Yes.

4   Q.   And towards that end, I would like to show you a

5   document that has been marked as P-161.

6            THE COURT:  Not in evidence.

7            MR. JACOBSON: Not in evidence, your Honor.

8   Q.   Do you recognize that document, sir?

9   A.   Yes, I do.

10  Q.   Is it an email that was sent by Mr. Babbitt to you with

11  an attached draft letter?

12  A.   Yes.

13  Q.   And are those your handwritten notes on there, on that

14  first page?

15  A.    Yes.

16  Q.   And on an on the later pages, the lines and the one or

17  two words that are written, are those your handwriting as

18  well?

19  A.   I don't know.

20  Q.   All right.

21  A.   I know my handwriting is poor but it is uniquely poor.

22  I am not sure that is mine.

23  Q.   I don't know the fine details of your handwriting.  So I

24  can mistake others for it.  I would like to offer exhibit

25  P-161 in evidence.

```
 1              MR. FRAM:  I object to the extent there is

 2    handwriting on it that the witness is not familiar with.

 3              THE COURT:  Well, the first page.

 4    A.   That is my handwriting on the first page.

 5              THE COURT:  The first page is all your handwriting,

 6    sir?

 7              MR. FRAM:  I am sorry?

 8              THE WITNESS:  Second and third pages.

 9              THE COURT:  The second page there is no

10    handwriting, it has a squiqqle and a circle so I don't think

11    that is testimony in any fashion unless he can answer it.

12    And the third line, the third page, has the word no.  Is that

13    your handwriting there?

14              THE WITNESS:  Actually, I don't think it is, but I

15    can't tell you for sure one way or the other.

16              MR. FRAM:  Your Honor, I misunderstood about the --

17              THE COURT:  Look at the word "no" on the first

18    page, then look at the one on the third page, aren't they the

19    same handwriting?  I will ask you again.  Does the word "no"

20    happens to be on the first page, too.

21    A.   And I could write it out for you here as well.  I am not

22    confident that that is the way I would write the O.

23              THE COURT:  They look almost identical.  Are you

24    really trying to tell me you won't admit that the "no" on the

25    third page is yours?
```

1    A.   I am not trying to admit one way or the other.

2             THE COURT:  I am going to let it in any way.  I

3    think that they are close enough that the jury could look at

4    it and reach the conclusion it is the same person, which is

5    him, that they are the same exact word "no" is on the first

6    page which he admits is his.

7             So I am going to admit it in.  To the extent we can

8    identify anything I think there is a strong inference it is

9    his handwriting.  Certainly on the first page.

10   Q.   So this is the cover is an email from Randy Babbitt, E

11   /KHRAT consulting, to you.  Right and you had worked with him

12   back he when he was president of ALPA, correct?

13   A.   Yes.

14            THE COURT:  Who is Duane Worth's predecessor?

15            THE WITNESS:  Yes, sir.

16   Q.   You worked together for a number of years?

17   A.   While he was president, yes.

18   Q.   All right.  And he says attached is my draft of the

19   letter we discussed yesterday.  Do you recall that

20   discussion?

21   A.   Yes.  I do recall the discussion.  I thought he

22   discussed the letter prior to the meeting.  The meeting, my

23   recollection was the 27.  And we talked about a strategy and

24   he suggested a letter, actually before the meeting.  But

25   whatever the case.

Warner-cross/Jacobson                                          204

1    Q.   All right.  And it is a draft letter, one is from him,

2    that is, you suggest one from him and one from Duane Woerth

3    as being two potential letters?

4    A.   Correct.

5    Q.   And the idea is to send these to the Department of

6    Transportation, the secretary of the Department of

7    Transportation as see if that can help out  the TWA pilots,

8    right?

9    A.   Correct.

10   Q.   And your handwritten message on the one hand, 3/30.

11   Called Paul H.  Who is Paul H?

12   A.   The same Paul that Randy is referring to in his email,

13   Paul Hallasay.

14   Q.   He is the director of governmental affairs lobbying for

15   ALPA?

16   A.   Director of government affairs I think was his title.

17   Q.   Part of his responsibilities is in charge of lobbying

18   and so on?

19   A.   Yeah, I think so.

20   Q.   What does Paul tell you that Duane says about doing this

21   letter?

22   A.   Duane says no.  But then the note is Paul will check

23   again.

24   Q.   You asked Paul.  Paul says Duane says No, will not,

25   about sending the letter, but he will check again.

1    A.   Correct.

2              THE COURT:  Mr. Jacobson.

3              MR. JACOBSON: Yes, your Honor.

4              THE COURT:  It would seem so far as we can tell

5    there are only three people who have seen this email.  You,

6    Babbitt, who is the author of it, and maybe Paul was sent a

7    copy.  I don't know.

8    A.   I know I sent it to Paul.

9              THE COURT:  But it is within the ALPA family.

10             THE WITNESS:  Correct.

11             THE COURT:  In other words, this wasn't sent to

12   anybody outside the ALPA family.  There is no apparent reason

13   for anybody to be making notes on here from outside ALPA.

14             THE WITNESS:  No.  This is my.

15             THE COURT:  Look on page 3.

16             THE WITNESS:  Your Honor, let me be clear.  This

17   was our file, my file copy and a legal department file.  The

18   only other people that could have made it is somebody when

19   had access to the ALPA legal files.

20             THE COURT:  Fine.  That is what I said, only ALPA

21   people had access to this.  There is a sentence in the

22   penultimate paragraph on page 3, that is a fancy word for

23   next to last, there is, it says, I would suggest the final

24   DOT approval of this transaction should include language

25   requiring American to take appropriate steps to meet the

1   minimum fairness standards always required in the past by DOT

2   with regard to having provisions to ensure the fair and

3   equitable integration of employees from TWA into the combined

4   work force of American.  Then there is the word, no, and

5   bracketed that exact sentence.  Why would anybody at ALPA,

6   whether it is you or, Babbitt certainly wrote this so he is

7   not opposed to it.  He is the former president of ALPA.

8           THE WITNESS:  It is an accurate statement of the

9   fact and the law, your Honor.  It was hopeful on Randy's

10  part.

11          THE COURT:  It says I would suggest that the final

12  DOT approval should include language, requiring --

13  A.   Always required in the past.

14          THE COURT:  Assume you took the words "always

15  required in the past" out.  I would suggest the final DOT

16  approval of this transaction should include language

17  requiring American to take appropriate steps to meet the

18  minimum fairness standards with regards to having provisions

19  to insure the fair and equitable integration of employees

20  from TWA into the combined work force of American.

21  A.   That was exactly the pitch we made on March 27 to DOT.

22  We couldn't tell them because it wasn't true that they had to

23  do it because they always done it in the past because they

24  had not.

25          THE COURT:  Does this letter say that?

1    A.   No my understanding, no.

2              THE COURT:  Go ahead.

3              THE COURT:  Mr. Jacobson, the only thing that is

4    keeping me awake is the hope that will be some ice cream when

5    I get back to my chambers by quarter after two.  I sent an

6    email to my staff telling them to get it.  That is keeping me

7    awake.

8              P-415.

9              MR. JACOBSON: Yes, your Honor.

10             THE COURT:  Go ahead.

11   Q.   Do you recognize this set of emails, Mr. Warner?

12   A.   Yes.

13   Q.   All right.  And?

14             THE COURT:  This is not in evidence.

15             MR. JACOBSON: This is not in evidence yet.  Some of

16   the emails in the chain are written by you, some are written

17   by other people in the legal department at ALPA, correct?

18   A.   Yes.

19   Q.   All right.

20             MR. JACOBSON: I would offer exhibit P-414 in

21   evidence.

22             MR. FRAM:  I object.  May I we see your Honor at

23   sidebar?

24

25

Warner-cross/Jacobson                                              208

```
 1              (AT sidebar)

 2              THE COURT:  What are you proffering this for, Mr.

 3   Jacobson?

 4              MR. JACOBSON:  Well, chiefly for Mr. Cohen's

 5   comments.

 6              THE COURT:  Which are what?

 7              MR. JACOBSON: Which are that the draft letter --

 8              THE COURT:  What draft letter?

 9              MR. JACOBSON:  That is attached, the draft letter

10   to Bud Bensel telling them why they are not going to defend

11   him on the CC, Supplement CC.

12              THE COURT:  This is the suit that was brought

13   against him in Texas?

14              MR. JACOBSON: Yes, which I believe ultimately --

15              THE COURT:  Do I have the right suit?

16              MR. KATZ:  Yes.

17              MR. JACOBSON:  Which ultimately becomes this suit.

18              MS. RODRIGUEZ:  They reformed it for forum non

19   conviens.

20              MR. KATZ:  I think it got dismissed and refiled.

21              THE COURT:   Do you know how it worked?  You are

22   both right.

23              MR. KATZ:  There was no personal jurisdiction in

24   Texas.

25              THE COURT:  I mean the jury doesn't know anything
```

 1    about that lawsuit.

 2              MR. KATZ:  No.

 3              THE COURT:  I can't believe that that lawsuit, they

 4    don't even a know anything about Bud Bensel, for a guy who

 5    was the dominent figure in this, characters now tried for

 6    over three years and nobody heard his name.

 7              MR. JACOBSON: His name has been mentioned.

 8              THE COURT:  It has been mentioned almost in

 9    passing, but remember, I spent four or five years when he was

10    the dominent figure in this matter, dominent non-lawyer

11    figure.  And now --

12              MS. RODRIGUEZ:  Defendants are going to read, have

13    deposition testimony proffered, to read into the record from

14    Mr. Bensel.

15              MR. FRAM:  About ten minutes worth is our proposal.

16    In any event, this is --

17              THE COURT:  He is listed as a witness by them.

18              MR. FRAM:  He was.  We just found out I moved

19    several months ago from New Jersey.

20              THE COURT:  He is no longer in Mount Laurel?

21              MS. RODRIGUEZ:  I think he is, your Honor.

22              MR. FRAM:  Well, if necessary, we will prove he

23    moved to Virginia.

24              But in any event, I don't see how this  is

25    relevant.  I think it is confusing.  It is certainly beyond

```
 1    the scope.

 2              THE COURT:  Notorious union busting law.  You are

 3    talking about an organization, the American Workers Rights

 4    Foundation, that nobody has heard anything about, AWRF.  I am

 5    not saying one couldn't cobblel together some theory of

 6    relevance, but under 403 the potential for confusion let

 7    alone prejudice, unfair prejudice, seems to me to be

 8    staggering.

 9              MR. JACOBSON: I understand your ruling.

10              THE COURT:  What?

11              MR. JACOBSON: I understand your ruling.

12              THE COURT:  It is interesting to me, but I want to

13    say I am not interested in this.  As an academic matter in

14    this case.  But I am not going to allow it.

15              (Open court.)

16              MR. JACOBSON: Your Honor, that is all I have.

17              THE COURT:  Do you have any redirect?

18              MR. FRAM:  Yes.

19

20    Q.   You were asked questions about the 35 percent threshold

21    that  is imposed by the National Mediation Board.  Do you

22    recall that?

23    A.   Yes.

24    Q.   What, if ALPA can meet that 35 percent threshold, pilot

25    interest, what does it give ALPA the right to do, what would
```

1    it have given ALPA the right to do?

2    A.   Participate in an election among the employees --

3             THE COURT:  Pilots.

4    A.   I am sorry.  The pilots, yes.  The pilot election among

5    the entire group of American Airlines pilots.

6    Q.   What would have had to happen in that election for ALPA

7    to actually represent the now consolidated group of American

8    Airlines pilots?

9    A.   We would have had to get a majority of support.

10   Q.   So over 50 percent?

11   A.   Yes.

12            THE COURT:  Mr. Warner, the decision was made not

13   to represent the American pilots when you wrote the letter on

14   March 18.  Basically they said we are not interested.  Go

15   right ahead and let APA represent them.

16   A.   Correct.

17            THE COURT:  Right?

18            THE WITNESS:  Correct.

19            THE COURT:  You did that, that was the same day

20   that you were forwarded some sort of basic information.  Your

21   email is dated March 8.

22            THE WITNESS:  That was Mr. Rindfleisch was

23   forwarding the information.

24            THE COURT:  Did you have any discussions with Duane

25   Woerth why he didn't choose to seek to represent the American

1    pilots at that point in time, on March 8, 2002.

2    A.   I heard him make the comment that it just was not

3    productive to participate in an election where we knew we

4    were going to lose.  So he was not focused on 35 percent.  He

5    as focused on 50 percent.

6              THE COURT:  Did you and Duane have any discussions

7    at any time when you were talking to each other about whether

8    to seek the representation or not?

9              THE WITNESS:  No.

10             THE COURT:  Where did you overhear this?

11             THE COURT:  In a group of five or six people.

12             THE COURT:  Did he ever express any other reasons

13   for not -- for not seeking to go after the American pilots.

14   A.   No.  He was just emphatic that it was unproductive, and

15   to pursue an election where you knew you were going to lose.

16             THE COURT:  Go ahead.

17   Q.   What was the timeframe of that comment that you just

18   referred to?

19   A.   It was between March, it was in that timeframe after we

20   got the decision from the NMB in March, whatever it was, 5,

21   2002, and the time of the letter on March 18, 2002.

22   Q.   You were asked questions about the, your testimony about

23   the direction of the TWA MEC on March 22, to the merger

24   committee?

25             THE COURT:  That is 2001.

1    Q.    Thank you, your Honor.

2    A.    Correct.

3    Q.    I want to refer you, do you have the minutes of that, D

4    223 in evidence.  Here.

5    A.    I got it.

6    Q.    Let me just refer you, please, to page 3.

7              MR. JACOBSON: What is the number.

8              MR. FRAM:  Defendant's 223.

9              THE COURT:  223.

10             MR. FRAM:  Yes, your Honor.

11   Q.    On page 3, do you see their are two points about 40

12   percent down.  There is a transaction update.  A motion to

13   enter executive session, 14:46 and you come out at 17:55.

14   Below that on Thursday, March 22, another motion at 9:15,

15   goes to executive session.  Then a couple resolutions are

16   passed and you come out with 12:30.  How come there is no

17   discussion in these minutes about the specifics of what was

18   discussed in executive session on those two occasions?

19   A.    That is the nature of what an executive session is.  It

20   is a private session which is not recorded in the minutes,

21   and which isn't publicly available, or even --

22             THE COURT:  What are the minutes you are referring

23   to?

24             MR. FRAM:  Your Honor, it is defendant's D 223.

25             THE COURT:  Can't be.  223 is an email 46789.

1            MR. FRAM:  If I may, your Honor.  This is what I am

2     reading off of.

3            Referring you are referring to P-223.  I am

4     referring to D.

5            THE COURT:  Oh, D.

6            MR. FRAM:  I am sorry, your Honor.

7     Q.   Do the minutes reflect the extent the direction to the

8     negotiating committee and the negotiating committee and the

9     lawyers were discussed in executive session, would that have

10    been summarized in the minutes?

11    A.   No, it shouldn't  be because those are confidential

12    positions of, for your negotiators to go and take on the

13    other side.  If you are going to put them in minutes and make

14    them available then they are going to end up in the hands of

15    the other side.  So it would -- certainly no minutes taken,

16    and no resolutions passed that would have substantive

17    bargaining positions in them.

18    Q.   Okay.

19           MR. FRAM:  Thank you.  Thank you, your Honor.  I

20    have in nothing further.

21           THE COURT:  Any recross on that?

22           MR. JACOBSON: Yes, your Honor.

23           THE COURT:  Go ahead.

24

25

1              RECROSS EXAMINATION.

2              BY MR. JACOBSON.

3    Q.    You agree that the minutes from March 21 through March

4    22 don't reflect these instructions that you say were given

5    by the MEC to the merger committee to make the worst offer

6    they could swallow, they could stomach, correct?

7    A.    That's correct.

8    Q.    And you are suggesting that that is because it was done

9    in executive session and therefore, you want to keep that

10   confidential, inside?

11   A.    It is not suggesting.  It was done with negotiations

12   with the American pilots in executive session.

13   Q.    You are saying because it was negotiation construction,

14   you don't want the public to know what it is?

15   A.    You don't want anybody to know what it is, other than

16   the MEC and your committee.  But it is negotiating or a

17   merger committee.

18   Q.    Isn't it a fact that if you are in fact instructing your

19   negotiators to go with your bottom line, absolute bottom

20   line, which below which you can't go, don't you want the

21   other side to know that that is what that offer is so it is

22   credibly the bottom line?

23              MR. FRAM:  I object.  That is argumentative, your

24   Honor.  It doesn't go to what the direction was.

25              THE COURT:  I will let it, if he if he can answer

```
 1   it, he can.  If he can't, he can't.

 2   A.    That won't be my view.  I still think you need the

 3   negotiating positions to remain confidential.  More

 4   important, it was ALPA's practice and always ALPA practice

 5   that negotiating positions and instructions and reports from

 6   the negotiating and merger committees were always done in

 7   executive session.  And all of that was maintained

 8   confidentially.

 9              MR. JACOBSON: I have no further recross.

10              MR. FRAM:  Nothing further, thank you.

11              THE COURT:  Thank you very much, Mr. Warner.  You

12   may step down.

13              Welcome to Camden.

14              THE WITNESS:  It has been a pleasure.

15              THE COURT:  Okay, ladies and gentlemen.  This may

16   surprise you, but I have three more hearings today.   So I

17   will see you tomorrow at 8:30.

18              Have a safe trip home.  That is job one.  Safe trip

19   in tomorrow, that is job one.  Do not the discuss the case

20   among yourselves.  Do not discuss the case among your family,

21   friends or loved ones or anybody else for that matter, even

22   if they nor the loved ones.

23              Keep an open mind until you have heard all the

24   evidence.

25              (Jury leaves the courtroom)
```

```
 1

 2          THE COURT:  Those sitting in the front row, I am

 3   advised two of my matters have to be held in this courtroom

 4   because they involve defendants in custody which is what we

 5   normally use this courtroom for, criminal matters.

 6          (Off-the-record discussion)

 7          THE COURT:  Anything else?

 8          MR. FRAM:  A couple of issues to address tomorrow.

 9          THE COURT:  What are they?

10          MR. FRAM:  One is the cut-off in P 148 we have

11   argued to some degree.

12          THE COURT:  Right now where it stands is having

13   dated before April 3rd, 2002 is in.  5 W's, five U's are in.

14   I don't know what the dates are but I know we made a special

15   point of admitting those two.  Five O's is in.  Nothing else

16   has been tendered.  I don't consider any of it in evidence.

17   We will have to make clear until somebody tenders the rest of

18   it.

19          MR. FRAM:  I think the plaintiff's position is they

20   moved the entire document --

21          THE COURT:  I am not accepting, giving me five

22   punches for two lines from a deposition.

23          MS. RODRIGUEZ:  Your Honor, they were moved in as

24   part of the joint final pretrial order and not objected to,

25   and they were moved in during the deposition.  I think that
```

1    is the --

2              THE COURT:  P 148.

3              MS. RODRIGUEZ:  P 148 in its entirety was presented

4    in the joint pretrial.

5              THE COURT:  I will give you the chance to move

6    anything you want in.  But I am not going to do it in bulk.

7    I am not going to admit 100 pages, in this case admit stuff

8    that I haven't even read or looked at?  Not a chance.

9              MS. RODRIGUEZ:  Your Honor, the last time the

10   issue was raised you put the burden on the defendants to say

11   why it should not be admitted since it was one already

12   admitted and two, not objected to in the joint final pretrial

13   issue.

14             THE COURT:  That is a different story, the person

15   who has the burden of staffing satisfying it.  Somebody has

16   to go through these.

17             How many documents are we talking about dated after

18   April 3?

19             MR. PRESS:  Less than ten.

20             MR. KATZ:  About ten.

21             MR. FRAM:  It goes into late in the year.

22             THE COURT:  All right.

23             MR. FRAM:  August, December.

24             THE COURT:  I will switch the burden to the

25   defendants.  If it is more than that, if it is only ten we

1    are talking about and one I already let in, what is the other

2    ones?

3              MR. JACOBSON: W and --

4              THE COURT:  Those I know I let in, my notes are

5    clear I let those in.  So OOOOO  is in.  That should leave

6    seven or eight documents.

7              MR. FRAM:  Perhaps first thing we will have an

8    opportunity to argue that.

9              THE COURT:  Well, I will be here tomorrow morning

10   early.

11             MR. FRAM:  One other thing issue I think we can

12   frame is your Honor gave us the benefit of your preliminary

13   views about the Babbitt testimony.  We have gone back did

14   pair that down and with the point, your Honor, where we asked

15   you to reconsider your preliminary views with respect to just

16   these limited clips.  They were emailed to them yesterday but

17   I have a paper copy.

18             Maybe we can talk about this in the morning.  It is

19   just a couple of pages.

20             THE COURT:  This is Babbitt.  This is what you

21   tendered.

22             MR. FRAM:  These are the portions.

23             THE COURT:  You want to read in.

24             MR. FRAM:  We would play along with what was not

25   disputed.   There is a bigger group that is not in dispute.

1    We excerpted out what they objected to and what you

2    preliminary advised us you would not permit in.  We are

3    asking to you reconsider your preliminary ruling on that.

4            THE COURT:  Can I be comfortable in not having to

5    look at the stuff that is not disputed?

6            MR. FRAM:  I hope so.  Counsel will confer to make

7    sure nothing else is in dispute.

8            THE COURT:  Give them the complete picture of what

9    you are going to read in so I can satisfy myself that these

10   are the only disputed sections.

11           MR. FRAM:  We will do that.

12           THE COURT:  You I didn't want you to start reading

13   and he jumps up and says I don't agree with that.  I want it

14   to be undisputed.  What else?

15           MR. FRAM:  The only other thing that I think is

16   open is that we do want to read some short excerpts from two

17   depositions, three things.   One is we want to read excerpts

18   from Bensel.  We are waiting to go back if they have an

19   objection.

20           THE COURT:  Bensel, I don't know what they object

21   to.

22           MR. FRAM:  We don't know.

23           MR. PRESS:  We got it last night at 10.  You will

24   look at.

25           MR. FRAM:  There are excerpts from Glasby, from the

```
 1    deposition of DJ Glasby.   We will hear back from then.   Then

 2    we asked to stipulate to the admissibility of two exhibits so

 3    we don't have to bring a woman up from Washington to spend

 4    five minutes on the stand to authenticate it.

 5              MR. PRESS:  We conferred and we can do that.

 6              MR. FRAM:  That covers it.

 7              THE COURT:  All right.  I have Babbitt in my hand.

 8    Get the others did me and I will do it.

 9              MR. FRAM:  We will try to work them out N.

10              THE COURT:  Okay.

11              MS. RODRIGUEZ:  Your Honor, I had had the

12    opportunity to talk to Sherry Cooper over the weekend.  I

13    talked to her twice, as a matter of fact, on Saturday, she

14    was willing to be here on Thursday.  In the interim, she

15    found out that her good friend had committed suicide.  She

16    has a funeral to attend Wednesday and Thursday.  She will be

17    here Monday.

18              THE COURT:  Monday should be sufficient.  Good.

19    That solves that problem.  Okay.

20              MR. FRAM:  Does counsel anticipate anything by way

21    bee rebuttal other than Ms. Cooper?

22              THE COURT:  I don't know.

23              MS. RODRIGUEZ:  We are not in a position to address

24    that right now.

25              MR. FRAM:  They will let us know.
```

1              Thank you.

2              THE COURT:  Okay.  I will be back here.

3               (Adjourned at 215 p.m.)

1

2

3                        I N D E X.

4

5          GRANVILLE CLAY WARNER, SWORN.

6                DIRECT EXAMINATION          P. 3.

7                CROSS EXAMINATION           P. 130.

8                REDIRECT EXAMINATION        P. 210.

9                RECROSS EXAMINATION         P. 215

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25