1                 IN THE UNITED STATES DISTRICT COURT.
                  FOR THE DISTRICT  OF NEW JERSEY
2                 CIVIL 02-2917  (JEI)

3        PATRICK BRADY, SALLY YOUNG,
         HOWARD HOLLANDER, THEODORE CASE,
4        AND MICHAEL FINUCAN, individually
         and on behalf of all others
5        similarly situated,
                          Plaintiffs,
6                                              VOLUME 16
            V.                                 TRIAL TRANSCRIPT
7
         AIR LINE PILOTS ASSOCIATION,
8
                          Defendant.
9
                                    CAMDEN, NEW JERSEY
10                                  JULY 6, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                     A P P E A R A N C E S:
13
            TRUJILLO, RODRIGUEZ & RICHARD
14          BY:  NICOLE M. ACCHIONE, ESQ.
                 AND: LISA J. RODRIGUEZ, ESQ.
15               AND
            GREEN JACOBSON, P.C.
16          BY:  ALLEN PRESS, ESQ.   (MO. BAR)
            AND:  JOE D. JACOBSON, ESQ.   (MO. BAR)
17          For the Plaintiffs.

18          ARCHER GREINER
            BY:  STEVEN FRAM, ESQ.
19               AND
            KATZ & RANZMAN
20          BY:  DANIEL M. KATZ, ESQ.
            FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
            ELIZABETH  GINSBURG, ESQ.
22          IN-HOUSE COUNSEL FOR ALPA.

23

24

25

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2     accurate record as taken stenographically in the
above-entitled proceedings.

3                            S/   LYNNE JOHNSON

4                         Lynne Johnson, CSR, CM, CRR
5                         Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17                    LYNNE JOHNSON, CSR, CM, CRR
18                    OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
19                    P.O. BOX 6822
                      LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

1                THE COURT:  Good morning.  Who is your first

2     witness, Mr. Fram.

3                MR. FRAM:  Seth Rosen.

4                MR. FRAM:  Was your Honor going to permit argument

5     this morning on the issue of the cut-off date or did you want

6     to defer that until later.

7                THE COURT:  I would rather defer that until

8     tomorrow.  Those are on exhibit 148?

9                MR. FRAM:  Yes, your Honor.

10               THE COURT:  Have you identified the ones?

11               MR. FRAM:  We put a tab in the notebook on the

12    document dated April 23, 2002 and our requests was to exclude

13    everything after that.

14               THE COURT:  Okay.

15               MR. FRAM:  We discussed that with plaintiffs

16    counsel and I believe that they do not agree with our

17    request.  We are still trying to work out the issue of

18    deposition designations, your Honor.  One issue that perhaps

19    you can provide --

20               THE COURT:  The only one I have so far is Babbitt.

21               MR. FRAM:  Yes, your Honor.  We provided to Mr.

22    Press what we propose to show and we will await his comments.

23    We did have designations, your Honor, on two other

24    transcripts only, not videos and I did receive very late

25    yesterday some counter designations.  We have an issue about

Rosen-direct/Fram                                                    4

1    the scope of the counter designations and I am wondering if

2    your Honor can provide some general guidance.

3           With respect to Bensel we designated just a couple

4    minor portions.  The designations that came back, your Honor,

5    the counter designations are very extensive.  I think, for

6    example, that we designated basically three chunks which came

7    back looks like about 15 or 20 chunks which I think would are

8    hours and hours.

9           My position on behalf of defendant, your Honor, is

10   that the plaintiffs counter designations should be limited to

11   completeness.  Their position is that it is as though the

12   witness was being cross examined and they could go much more

13   broadly.

14          If your Honor has any thoughts about that, that

15   might guide counsel, I think that would be appreciated.

16          THE COURT:  And the reason Bensel isn't being

17   brought in here.

18          MR. FRAM:  Unavailable.  We tried to subpoena him.

19   We were told when we tried to serve him he moved to Virginia.

20   We tried to serve him a couple of weeks before trial and to

21   our surprise was told that he had moved.

22          MR. PRESS:  We confirmed that yesterday with one of

23   our clients.  He did in fact move to Virginia.

24          MR. FRAM:  What we had hoped, your Honor, was to

25   read one small clip from his deposition which talks about his

Case 1:02-cv-02917-JEI    Document 438    Filed 09/05/11    Page 5 of 203 PageID: 14256

Rosen-direct/Fram                                                                        5

1    background, his role as merger chair and then about this

2    incident on March first where this other fellow, the pilot

3    tried to come across the pilot at him exhibiting hostility.

4    That was the limit of what we proposed.  Plaintiffs have come

5    back late yesterday and counter designate, is it looks, your

6    Honor, like another maybe 25 or 30 pages which obviously will

7    take much longer and goes beyond the scope of that one

8    incident.

9           So we would object to that and again if your Honor

10   is comfortable giving some general guidance about that we

11   might be able to work it out.  Otherwise I think we will have

12   to submit it to your Honor.

13          MR. JACOBSON: Your Honor, I made the counter

14   designations.  Alan and I spoke about that and he said, well,

15   let's try to cut it back to something between what they want

16   and what we want.  So I am going through that right now.  I

17   think there is more to be counter designated than simply

18   completion of the line.  Federal Rules provide that the

19   parties in the deposition, the other party can use it for any

20   purpose.  I am cutting it back.  Hopefully we will get it

21   worked out in the next break.

22          MR. FRAM:  Great.  We had the same issue on Glasby.

23   I would ask counsel to take another look at the counter

24   designation  of Glasby and we will try to work it out, your

25   Honor.  Thank you.

```
 1              THE COURT:  Okay.

 2              (Pause)

 3              THE COURT:  Do you know what exhibit number the

 4   actual acquisition agreement between American and TWA, the

 5   actual agreement in which they --

 6              MR. PRESS:  J 272 or P-272, 1 or the other.

 7              THE COURT:  Anybody have a copy of that laying

 8   around.

 9              MR. FRAM:  Yes.

10              THE COURT:  I am sure I have it here.

11              MR. FRAM:  I have one, your Honor.

12              (Jury enters the courtroom.)

13              THE COURT:  Good morning, everybody.  You are all

14   here bright and early.  I emphasize the word early.

15              Mr. Fram, you may call your first witness.

16              MR. FRAM:  Thank you, your Honor.  We call Seth

17   Rosen who has already taken the stand.

18              Seth Rosen, Sworn.  Direct by.

19              MR. FRAM:

20              SETH DAVID ROSEN.  Sworn.

21              DIRECT EXAMINATION.

22              BY MR. FRAM:

23              BY MR. FRAM:  If I may.

24              THE COURT:  Please.

25   Q.   Mr. Rosen, good morning.  You are a former employee of
```

1   the Air Line Pilots Association international, commonly

2   referred to as ALPA?

3   A.   Yes, I was.

4   Q.   Let's start with some background.  How old are you?

5   A.   I just turned 70.

6   Q.   Okay.  And tell us about your educational background to

7   start with?

8   A.   I went to undergraduate and law school at G W, and was

9   admitted.

10          THE COURT:  That is George Washington.

11          THE COURT:  George Washington University.  Excuse

12   me.  George Washington University.  Graduated law school in

13   1966.  Was admitted to the bar and then went to work for the

14   national labor relations board in Washington, DC.

15   Q.   And what does the National Labor Relations Board do?

16   A.   Well, it regulates labor relations in all industries

17   except air and rail.

18   Q.   And for how long did you work at the, referred to as the

19   NLRB?

20   A.   Yes, sir.

21   Q.   How long did you work at the NLRB?

22   A.   Just short of five years.

23   Q.   What type of work did you do there?

24   A.   I was litigation, I first was a lawyer in the advice

25   branch and then in the appellate court branch doing briefs,

1    and arguing cases before the Court of appeal -- courts of

2    appeal.  Did some District Court work then to.

3    Q.    This is all federal court work?

4    A.    All federal court work.

5    Q.    What did you do after working at the NLRB for five

6    years?

7    A.    I was hired by the Air Line Pilots Association in March

8    of 1971 as a lawyer in the legal department.

9    Q.    And for how long did you work as a lawyer in the legal

10   department at ALPA?

11   A.    I wags in the legal department for about three years.  I

12   was promoted to assistant director and then transferred after

13   a rere organization within ALPA to the representation

14   department where I became the manager of contract

15   administration slash legal.  It is a big title but I over saw

16   the grievance arbitration work, case handling by people in

17   the field, a whole variety of legal types of

18   responsibilities.

19   Q.    What year are we talking about when you got transferred

20   over?

21   A.    1974.

22   Q.    For how long did you do that type of work in ALPA?

23   A.    Pretty continuously then until I retired I was promoted

24   to director of representation department in 1984, a position

25   I held until I retired in 2003.

Rosen-direct/Fram                                                    9

1    Q.    Are you still working today?

2    A.    I am.

3    Q.    For whom did do you work?

4    A.    I work for a wholly owned subsidiary of the airline

5    pilots association called the Airline Pilots Services

6    Corporation.   I specialize in doing work with the

7    International Federation of Air Line Pilot Associations, and

8    pilot groups around the world at different carriers.   And I

9    also do on occasion work within the U.S., still.

10   Q.    I want to focus on your work within the representation

11   department of ALPA during the period leading up to 2001.   Did

12   you get involved in organizing other nonALPA pilots to try to

13   join ALPA?

14   A.    Yes.   Starting in 1982 I was involved in organizing

15   efforts.   1982 ALPA adopted a policy of really expanding the

16   membership and organizing, for example, all the regional

17   carrier pilots and I was directly involved in that operation,

18   both out on the line, actually doing the organizing, and

19   putting together plans.

20          During that period we organized at least 50, maybe

21   more carriers during the period from 1982 until about 2000,

22   during my period of time, over 50 carriers.

23   Q.    And those organizing campaigns, they were subject to the

24   requirements of the Railway Labor Act?

25   A.    Yes, they were.

Rosen-direct/Fram                                                    10

1    Q.   Tell us, how did you go about trying to organize other

2    pilot groups, what were the different approaches that were

3    used?

4    A.   President it depended upon the type of organizing drive.

5    There are two basic types of drives.  One, organizing

6    efforts, that is, and one is where a pilot group is

7    unorganized, and reaches out and we get a call from a core

8    group, and that is one type of drive.

9          The other type of drive is where the pilot group is

10   organized, and we have a different method of dealing with

11   that when we are dealing with a group that is already

12   organized.  We actually work out a merger agreement.  But

13   going back to the first one, the first one is a multi step

14   process in terms of organizing, unorganizing unorganized

15   carriers because you have to go out and you have to collect

16   representation cards that you would then file with the

17   government agency and have an election.  So you start off,

18   first step really is to form up a core group from within the

19   pilot group.  Then we designate a staff to assist them and

20   then we put together a plan in which we have communications,

21   you know, a lot of support, different resources used.  And

22   try to develop a strategy to collect cards.  And when we

23   reach a certain level of cards, which at that point we are

24   looking for maybe 70 to 80 percent showing of interest in

25   terms of cards.

1   Q.   Let's break that down.  Can you describe the kinds of

2   cards you are referring to?

3   A.   These are cards that authorize the holding of an

4   election and you go to a, you know, a pilot within the

5   bargaining unit and you solicit him to sign a card which you

6   would then file with the National Mediation Board, and if you

7   had the necessary showing of interest in the case of an

8   unorganized carrier, 35 percent, you could then trigger an

9   election.  You don't go with 35 percent.

10  Q.   Let's break the steps down.  Someone goes and prints

11  cards?

12  A.   We print the cards.

13  Q.   What is the next step?

14  A.   We print the cards, we distribute the cards.

15  Q.   What do the cards say.  Do they say something like I

16  hereby certify I am interested in being represented by a

17  particular union?

18  A.   Yes.  I, you have to sign the card.  The card is valid

19  for one one year.

20  Q.   The cards go to all of the pilots who work at a

21  particular airline?

22  A.   Yes.

23  Q.   And how many cards do you have to -- the significance of

24  the cards is what, if you get enough cards you can trigger a

25  vote on whether the union will represent the pilots?

```
 1   A.   Right.  You can then trigger a representation election

 2   that would be conducted by the National Mediation Board.

 3   They would do an investigation to determine whether or not

 4   you had the showing of interest.  If they found you had the

 5   showing of interest, they then would order an election,

 6   usually about a four-week period for balloting.  In the old

 7   days it was a mail ballot.

 8              Now it is done electronically that.  Would be the

 9   process.  If we were to win the election we would be

10   certified and became the bargaining representative for that

11   pilot group.

12   Q.   There is a specific percentage of cards you need to

13   trigger the election?

14   A.   Yes, 35 percent in an unorganized group.

15   Q.   35 percent of whom, of all the pilots?

16   A.   All the eligible voters within the bargaining unit.

17   Q.   You mentioned the phrase showing of interest.  Explain

18   what that means?

19   A.   The showing of interest is the actual support you have,

20   the 35 percent showing of interest.

21   Q.   And what type of investigation, what agency investigates

22   and decides --

23   A.   This was the National Mediation Board.

24   Q.   What type of investigation do they do once they receive

25   the cards?
```

Rosen-direct/Fram                                              13

```
 1   A.   They verify that the cards are actually valid.  They
 2   check it against the signatures on file with the employer.
 3   Q.   And if you meet that 35 percent threshold and there is a
 4   vote, what percentage of the pilots have to vote in favor for
 5   ALPA to be certified?
 6   A.   During that period of time, the rule has changed, but
 7   during the relevant period of time, it required 50 percent
 8   plus one of all the eligible voters within the bargaining
 9   unit had to vote.
10   Q.   Did you mention a couple minutes ago you were typically
11   looking for a higher percentage, 70 to 80 percent?
12   A.   That's correct.
13   Q.   Can you explain that for us?
14   A.   Well, the experience that I have had, you know, over
15   this period of time is that if you go in with a thin margin
16   you have a real problem.  One, you won't win the election
17   because there will be attrition, especially in an unorganized
18   carrier, the carrier is probably going to get involved in
19   this election and we have to dial with that issue.  So there
20   will be a significant attrition or fall off of the votes, so
21   if you start, let's say, with 55 percent, you are likely to
22   end up with somewhere around 40 percent voting for.  If you
23   start with any percent, it is a lot.  But you will win the
24   election.  If you have 70 percent, it is pretty sure that you
25   will win the election.
```

Rosen-direct/Fram                                              14

1          So I established a guideline during that period of

2    time of not filing, first of all, we would try and get to the

3    80 percent quickly if we could do that, great, we would file,

4    and that was pretty much a given that we would win the

5    election.

6          If after a while we saw that we weren't getting

7    there and it was dragging, then we would probably go with 70

8    percent and take a chance.  When we went with less we

9    generally were not successful.

10   Q.   So if you had fewer than 50 percent sign cards, what

11   would you have done in a situation like that?

12   A.   Would not file.

13   Q.   You wouldn't pursue representation?

14   A.   I would not pursue, I would not recommend pursuing

15   representation on the part of ALPA.

16   Q.   I think you mentioned that when you had pilots that were

17   already represented by another union, there was a typically a

18   different approach?

19   A.   Yes.

20   Q.   How did you learn to approach those groups of pilots

21   during the period after 1982 that we are discussing?

22   A.   Over a period of time there are a number of carriers out

23   there, a number of airlines that are organized into

24   independent unions, and when dealing with an organized

25   carrier, it was their policy not to raid other unions, and

Rosen-direct/Fram                                                     15

1   two, to work in a collaborative way, a cooperative way

2   torques bring those groups into ALPA through a merger

3   agreement.  So it was entirely a different process.  This was

4   a process we used, for example, at continental airlines.

5   Q.   Walk us through the process, are you saying this is a

6   process, an approach that you developed during the period in

7   which you were doing the campaign?

8   A.   Yes.

9   Q.   That period was from about 1982 up until when?

10  A.   2003.

11  Q.   And walk us through the process that you developed, the

12  approach you developed?

13  A.   I should say I developed it in conjunction with the

14  general manager and other people.  But essentially,

15  organizing was within the representation department

16  jurisdiction and we kind of over saw that and ran it.  So at

17  any rate, we developed, you know, a multi step process.  The

18  first thing we needed to really undertake the effort to even

19  begin was you needed a resolution from the independent that

20  they sought to merge with ALPA, that they would like to enter

21  into discussions to merge with ALPA, and then if we got that

22  kind of resolution from their board, from their executive

23  body, then we would trigger a joint merger committee, we put

24  together a committee made up of some of their people, our

25  people, and they would sit down and hammer out a merger

1    agreement.  If they were successful one of the essential

2    parts of that was within an independent union structure under

3    their Constitution, they would require a vote of their

4    membership, in order to authorize that kind of action.  And

5    so there would be an internal vote of the membership.  And if

6    they voted for it, then the ALPA executive board would then

7    pass a resolution supporting the merger, and then the next

8    step after that would be we would take all of that

9    information and file it with the National Mediation Board,

10   and request that they transfer the bargaining rights from the

11   independent to ALPA.  And at that point we would become the

12   bargaining agent.

13   Q.   This process you just described, did it involve any of

14   the kind of cards that you talked about before?

15   A.   No, it doesn't involve cards.  There is no election

16   conducted by the National Mediation Board.

17          They will approve internal election under those

18   circumstances.  And we have done this a number of times over

19   the past 25 years, 30 years.

20          THE COURT:  There is no legal bar, though, to

21   conducting a card campaign among that group of pilots that is

22   already organized.

23          THE WITNESS:  No, there is no legal bar.

24          THE COURT:  Maybe a matter of policy but as a

25   matter of law you could conduct --

Rosen-direct/Fram                                                    17

1   A.   There is a two-year bar.

2              THE COURT:  Two-year bar after --

3              THE WITNESS:  They first became organized and

4   certified, then they have two years to negotiate the first

5   contract.

6              THE COURT:  But after that.

7              THE WITNESS:  After that there is no bar.

8              THE COURT:  You could go the card route, even

9   though they were organized.

10             THE WITNESS:  Yes, you could.

11  Q.   So this approach you described, by what point in time

12  had you concluded that if the pilot group was already

13  represented by a union, an independent union, that a card

14  campaign would not be used?

15  A.   My approach was that would be failed strategy.  I never

16  went in in that route.  Again, we don't raid independents,

17  number 1, that has never been our policy.

18             Number 2, trying to organize a group without the

19  support, the internal support and the leadership of, you

20  know, the core, is extremely difficult, if not impossible.  I

21  just haven't seen it so we always look to have the core

22  support.

23  Q.   You said before you were involved in about 50 organizing

24  campaigns?

25  A.   Yes.

Rosen-direct/Fram

1    Q.    Was there ever an organizing effort where the other

2    pilot group was represented by independent independent unions

3    and ALPA tried to use a card campaign?

4    A.    Not that I remember.

5    Q.    Let me just focus you on late 2000.  Do you recall when

6    ALPA adopted the so-called unity resolution?

7    A.    Yes, I do.

8    Q.    Tell the jury your understanding of what the unity

9    resolution was?

10   A.    Once Duane came, Captain Woerth, came into office, we

11   initiated a strategy of, and a plan to expand membership and

12   we had some expressions of interest from some of the large

13   independent unions.

14            So by 2000, actually we started talking to

15   continental in I think 1999, maybe even 1998, but by 2000 it

16   was clear that we needed to really expand this and make this

17   more public, and so we came out with this unity resolution

18   which really said that we wanted to organize, go out, meet

19   and talk and in a collaborative way with independents,

20   bringing them into ALPA, and as soon and as much as possible.

21   Q.    When that resolution was adopted were there particular

22   pilot groups other than continental that ALPA's leadership

23   had in mind?

24   A.    Yes.

25   Q.    Trying to bring into ALPA?

Rosen-direct/Fram                                          19

```
 1    A.    Yes.

 2    Q.    Who were they?

 3    A.    Well, we have, I think in the resolution there were only

 4    four names, but in fact in our planning there were --

 5                    THE COURT:  Who were the four names?

 6    A.    The four names named were continental, Federal Express,

 7    American, and Air Canada.  Because we also represent pilots

 8    in Canada, your Honor.  We had about twelve pilot groups in

 9    can Canada currently.  And Air Canada was not a member of

10    ALPA.  They were an independent dependent and in fact they

11    had broken off from the Canadian airline.

12    Q.    Okay.  And within the planning process were there other

13    pilot groups?

14    A.    Southwest and UPS.

15    Q.    I think you named a total of 6.  Of those, which of

16    those were fully represented by independent unions and which

17    were not?

18    A.    All of them were represented by independent unions.

19    Q.    So was it contemplated when the unity resolution was

20    adopted and these six groups were identified, was it couldn't

21    plate D that a card campaign would be used to try to organize

22    at any of them?

23    A.    No.

24    Q.    For the reasons you described before?

25    A.    Yes.
```

Rosen-direct/Fram                                                          20

1    Q.   And was there an order of priority?

2    A.   Yes, there was.

3    Q.   When you came up with this list of pilot groups?

4    A.   Yes.

5    Q.   What was the order of priority?

6    A.   The order of every priority, clearly we were targeting

7    Continental as the first because we had already initiated

8    discussion was Continental over a year before and now we were

9    moving towards Reilly bringing that to conclusion so

10   Continental was the first.

11            Second favorite was Federal Express, which had also

12   started to stir and indicate an interest in rejoining ALPA.

13   They had left ALPA about five years previous and now because

14   of changes in conditions there, they desired to come back to

15   ALPA.

16   Q.   Okay.  How about the other, those are the first two.

17   How about the other ones that you mentioned?

18   A.   Well, in my sense, I was looking to see if we could get

19   mow meant momentum out of those first two.  Then the two that

20   I thought would be the most, well, the easiest to try and

21   work something through were Southwest and UPS.  And after

22   that, hopefully we could go after American and Air Canada.

23   Q.   You said something about momentum.  Would the plan in

24   late 2000 when the unity resolution was adopted to try to

25   bring all six of these groups into --

1    A.   We are not living in a land of unlimited resources so it

2    was impossible to do that from a resource standpoint.

3    Running a drive like Continental is an enormous undertaking.

4    It involves a huge amount of resources.  That was a group of

5    5,000.  I had two assistant directors working on that.  I had

6    other people on the staff.  We had people from communications

7    working on that.  We had people from, we had pilot

8    volunteers.  We had over 50 volunteers, I think much more

9    than that but I can't remember exactly how many, but we had a

10   whole plan and network, we had to get facilities.  It is a

11   very intense undertaking.  Very intense.

12   Q.   In terms of the order of priority you mentioned, why was

13   American and Air Canada at the bottom?

14   A.   Because I thought they were the least possible.

15   Q.   Explain why --

16   A.   Most unlikely to be able to organize because of past

17   history and their current status.  One, in the past history

18   of both they broke off from ALPA or CALPA, which is now

19   merged with ALPA, so we have a Canadian operation minus.

20   American had broken off in 1963.  Both were strong carriers

21   standing  on their own, did not really see the great benefit

22   in moving towards a national union at that particular point

23   in time.

24   Q.   As of the point in time, you recall the announcement of

25   the TWA bankruptcy and the proposed transaction American

1    would buy a TWA asset?

2    A.    Yes, I do.

3    Q.    January of 2001?

4    A.    Yes, I do.

5    Q.    As of that point in time, by the way, you were aware

6    that in October, 2000, Captain Woerth went and talked to the

7    board of American's union, the APA?

8    A.    Yes, I am.

9    Q.    Were you present when he spoke to the APA?

10   A.    No, I was not.

11   Q.    What was your sense about the likelihood of bringing the

12   American pilots back to ALPA?

13   A.    I thought it was highly unlikely.

14            MR. PRESS:  Objection.

15            THE COURT:  Sustained.

16   Q.    Did you have --

17   A.    Excuse me.

18   Q.    Did you have discussions with Captain Woerth in late

19   2000 about the chance of the likelihood that the American

20   pilots might come back to ALPA?

21   A.    I don't remember any specific conversation.

22   Q.    Okay.  As of the point in time when the TWA bankruptcy

23   and American transaction were announced, had even the first

24   step that you mentioned before, the merger resolution of some

25   kind from the independent union, had that happened with

1    respect to the American Airlines?

2    A.    No, it had not.

3    Q.    Had it happened with respect to Continental?

4    A.    Yes, it had.

5    Q.    Let's talk about the organizing campaign at Continental.

6    Continental add approximately how many pilots in late 2000?

7    A.    Approximately 5,000.  They had two divisions, they had

8    the big airline, Continenatl and Continental Express at that

9    point.  They were both part of the same unit though.

10   Q.    The union representing the Continental pilots was what?

11   A.    IACP, Independent -- well, IACP is the initials.

12   Q.    Did that union represent only Continental pilot or did

13   it represent pilots from other airlines?

14   A.    Only Continental and Continental Express.

15   Q.    Talk us through the steps that ALPA took to try to bring

16   the Continental pilots into ALPA?

17   A.    The first thing that had was that we had a meeting with

18   their president and vice president who told us that the board

19   wanted to discuss merging with ALPA, coming back to ALPA.

20   They had been in ALPA many years before.

21          The second step, after they indicated that

22   interest, was for us to analyze the situation and try and

23   determine whether or not we would have support within ALPA

24   because there were a lot of thorny issues that grew out of

25   the strike in 1983 to 1985.  So we internally then formed up

Rosen-direct/Fram                                              24

```
 1   a group that went out to the large MEC's, that is like

 2   American -- not American, I mean TWA, or United, or

 3   Northwest, and we discussed the possibility of merging with

 4   Continental.  And we got their approval and at that point we

 5   then formed up a joint merger committee.

 6   Q.   An a joint committee between who?

 7   A.   Between Continental and ALPA.

 8           THE COURT:  You went to other airline pilot groups?

 9           THE WITNESS:  Within ALPA.

10           THE COURT:  Within ALPA.

11           THE WITNESS:  Yes.  Because they needed to support

12   this.  There was a very difficult history going back to the

13   strike between 1983 to 1985.  So it was a very complicated

14   membership, there were complicated membership issues.  We had

15   to go and pretty much get everyone's blessing that we could

16   move forward, which we ultimately did and then we formed this

17   merger committee.

18   Q.   Just to go back, what was your understanding of why the

19   Continental pilots were interested in maybe coming back to

20   ALPA?

21   A.   I think they recognized the advantages of a national

22   union.  There were a lot of people within that unit that were

23   former members of ALPA and leaders of ALPA and a lot of them

24   had moved into leadership positions within IACP and they saw

25   the benefit, they saw the benefit of a lot of the advantages
```

Rosen-direct/Fram                                          25

1    we bring to the table in terms of representing pilots and

2    their interests plus they saw the advantage of being under

3    the ALPA merger policy so that in the event they would be

4    merged in the future with another ALPA carrier they would be

5    covered by the ALPA merger policy.

6    Q.   You mentioned that a joint committee of some type was

7    formed between Continental's union and ALPA to pursue merger

8    discussions?

9    A.   Yes.

10   Q.   What happened next in terms of the effort to bring the

11   Continental pilots into ALPA?

12   A.   The next thing that happened was we agreed upon a merger

13   agreement to merge the two in terms of all the business

14   points you would deal with, staff, money, things like that.

15   And an orderly transition.  That was the next step.  After

16   that we then had to start going out and holding a vote within

17   Continental pilot group.

18   Q.   What did that involve?

19   A.   Well, that involved a huge undertaking, a lot of pilots,

20   we had office's at all their domiciles.  We would go to crew

21   rooms.  We had as I said other 50 pilot volunteers who would

22   go around and talk to pilots.  We had a huge amount of staff

23   support to handle this undertaking because it was very

24   complicated and we had lawyers assigned because there were

25   legal issues.  Communications people assigned.  It was a full

Rosen-direct/Fram                                                    26

1    undertaking.

2    Q.    The leadership of the Continental pilots union had

3    agreed to merge, why was there any need to go and talk to the

4    individual pilots?

5              MR. PRESS:  Judge, I object to the relevance of

6    this.  You don't know why we are talking about the

7    Continental pilots.

8              THE COURT:  Yeah, I am beginning to --

9              MR. FRAM:  If you want me to explain, your Honor, I

10   am happy to.  We are talking about what you do to organize

11   pilots and we are going to compare it to what never happened

12   at American.  None of this  happened at American.

13             THE COURT:  You are wrong.  That is a misstatement

14   of facts.  There were cards out there.  Those cards didn't

15   come from the Tooth Fairy.  Those cards were being collected.

16   They were handed over to ALPA.  Your statement that none of

17   this happened in American is not a true statement.

18             MR. FRAM:  Sorry, your Honor.  None of this was

19   done by ALPA.  ALPA did not organize other unions as

20   explained by the witness.

21             THE COURT:  That is unclear.  That is your take.  I

22   am not sure the evidence doesn't support another inference on

23   that.

24             MR. FRAM:  Your Honor, I respectfully disagree with

25   that.

```
 1              THE COURT:  The jury will decide that.  That is

 2    what we have them here for.

 3              MR. PRESS:  Your Honor, I believe Mr. Fram's

 4    statement to this jury but heard by this jury opened the door

 5    to what happened after April 3rd, 2002.

 6              THE  COURT:  Let's leave that for another day.

 7              I think the jury has the drift of what you are

 8    saying.  I don't think we need an explanation for why there

 9    has to be a big campaign to generate votes among the pilot

10    groups itself in a merger.

11    Q.   Did ALPA in any way shape or form initiate a card

12    campaign at American Airlines?

13    A.   No, they did not.

14              THE COURT:  In the card campaign, where do the

15    cards come from?

16    A.   In a card campaign we generate the cards.

17              THE COURT:  That's right.

18    A.   We print cards.  When we do our own card campaign we

19    print the cards and distribute the cards.

20              THE COURT:  You are aware there was a card campaign

21    going on in a limited sense with American.

22    A.   I am aware.

23              THE COURT:  You are aware those cards were

24    delivered, in fact, to ALPA.

25    A.   Yes.
```

```
1              THE COURT:  Those cards then disappeared later on,

2   the physical cards.  You know that as well.

3              THE WITNESS:  Yes, that was in my deposition.

4              THE COURT:  You don't know what happened.

5              THE COURT:  That's correct.

6              THE COURT:  Do you know who printed the cards?

7   A.   No, I don't know.

8              THE COURT:  You don't know whether it was American

9   that printed the cards and provided them to Hunnibell and

10  Clark, the American pilots or they somehow or other got out

11  and got cards of their hone.

12  A.   They could have done that.

13             THE COURT:   They could have done that but you

14  don't know.

15  A.   I am not aware of providing any cards to them.

16             THE COURT:  You can't say, you don't simply know.

17  You are not even aware of where the cards are, that might

18  tell us, if we had the cards we might know who prepared them,

19  wouldn't we?  If we physically had the cards.

20  A.   I am not sure.

21             THE COURT:  Maybe.  It might give us a clue who the

22  printer was, was a printer used by --

23  A.   I understand what you are saying, but I am am not sure.

24             THE COURT:  There is a lot of things we could do if

25  we had the cards.
```

1    A.   I understand what you are saying.

2              THE COURT:   Go ahead.

3    Q.   Mr. Rosen, did ALPA printed cards that were used to

4    distribute to the American pilots?

5    A.   No, I am not aware --

6              THE COURT:   No, no.  Don't say no.  You don't know,

7    do you, where the cards came from?  You don't know where the

8    cards came from.

9    A.   I don't know where they came from.

10             THE COURT:   And you don't know where they are so we

11   can't do any forensics on them to figure it out, right?  Is

12   that correct?

13             THE WITNESS:   Yes.

14             THE COURT:   Don't try to get him to say that he

15   knows American didn't distribute them.  He is not aware that

16   they did, but he doesn't know where they got the cards.  I

17   you don't know where Clark and Hunnibell got the cards.

18   A.   All I know.

19             MR. FRAM:   We have testimony that --

20             THE COURT:   He doesn't know.  What other witnesses

21   say is one thing.  He doesn't know.

22   Q.   Mr. Rosen, did you direct anybody to print cards?

23   A.   No.

24   Q.   To send to the American Airline pilots?

25   A.   No.

1    Q.   Has anybody at ALPA ever told that you they printed

2    cards to send to American?

3    A.   No. No one of told me that.

4    Q.   Was any money ever budgeted by ALPA in 2001 to try to

5    organize the American pilots?

6              MR. PRESS:  He is leading the witness.

7              THE COURT:  Yeah, you are leading him.  By the way,

8    did ALPA ever indicate to Hunnibell and Clark that they would

9    reimburse them for expenses they incurred in their card

10   campaign.

11             THE WITNESS:  Did ALPA?

12             THE COURT:  Did ALPA ever indicate on ALPA

13   letterhead or ALPA, from ALPA official to say Clark and

14   Hunnibell that they would reimburse them for their expenses.

15   A.   I am not aware of any --

16             THE COURT:  You are not aware?

17             THE WITNESS:  No.

18             THE COURT:  So if somebody showed you a memo or a,

19   or something that said otherwise, you would be surprised.

20   A.   Yes, because I know --

21             THE COURT:  No, no, you didn't know.  You would be

22   surprised if such a document were shown.

23   A.   Why surprised?

24             THE COURT:  Well, because you are not aware of it.

25   So you would be surprised if somebody showed you an ALPA memo

1    and an ALPA documents that promised to reimburse.  You

2    indicator indicated there would are reimbursement.

3               THE WITNESS:  Yes, your Honor.

4               THE COURT:  Okay.  Next.

5    Q.   To your knowledge did ALPA ever actually reimburse any

6    expenses to Clark or Hunnibell?

7    A.   No, they did not.

8    Q.   Let's wrap up with the Continental campaign.  I think

9    you told us about some of the, have you told us about the

10   resources that ALPA devoted to trying to pursue the merger

11   with Continental?

12   A.   I think I did.  I explained that we had two assistant

13   directors, we had a whole bunch of people from

14   communications, legal department, a lot of pilot volunteers,

15   a lot of interim political officers who were assisting in the

16   campaign.  Very widespread support.

17   Q.   And what cost, can you tell us how much money ALPA

18   incurred during the course of trying to organize or merge

19   with the Continental pilots?

20              MR. PRESS:  Again, Judge, relevance.

21              THE COURT:  Are you objecting?

22              MR. PRESS:  Yes.

23              THE COURT:  Say I object.

24              MR. PRESS:  I object.

25              THE COURT:  Sustained.

```
1              MR. FRAM:  Would it be helpful for me to know the

2    basis of the objection.  Could we approach at sidebar for a

3    moment.

4              THE COURT:  No.  Relevance.  Let's assume they paid

5    $10 million.  It is not relevant to the issue in this case.

6    Q.  How much time did it take, Mr. Rosen, to pursue the

7    organizing campaign with Continental.

8              MR. PRESS:  Same objection.

9              THE COURT:  Sustained.

10   Q.  All right.  Just focusing on American for a moment,

11   after the TWA bankruptcy was announced, with American, did

12   you authorize any steps with ALPA to try to have ALPA

13   represent the American pilots?

14   A.  No, I did not.

15   Q.  To your knowledge were any affirmative steps taken by Al

16   ALPA to organize the American pilots?

17   A.  None were taken.

18        MR. PRESS I object.

19             THE COURT:  I will overrule that objection.

20             THE COURT:  No steps were taken.  Okay.

21   Q.  Ron Rindfleish was an employee at ALPA back in 2001.  Do

22   you recall him?

23   A.  Yes, I do.

24   Q.  Was he within, you were at that point heading up the

25   representation department?
```

Rosen-direct/Fram                                              33

1    A.    Correct.  Yes.

2    Q.    Did he also work in that department?

3    A.    Yes, he was.

4    Q.    Can you tell us what his job responsibilities were?

5    A.    He was responsible for receiving input as to inquiries

6    and information concerning pilots and pilot groups that

7    wanted to be organized.  So he was the contact point, for

8    those kinds of phone calls.

9    Q.    Okay.  And you have a sense from how many pilot groups

10   did he get those kind of contacts?

11   A.    Will he would get calls from all sorts of pilot groups.

12   It is hard for me to know at any given time but many that we

13   organized would first start off by having a phone call, a

14   conversation with Ron.

15   Q.    And to what degree did he circulate within ALPA

16   information about the contacts he would get?

17   A.    He would, based on the information, whoa pass it on and

18   we would assess whether or not it was something we wanted to

19   do, we wanted to go after.  And it would depend upon

20   circumstances, it would depend upon what he heard.

21   Q.    Okay.  Did you become aware at at some point that he was

22   getting some communication, some emails and/or phone calls

23   from a couple pilots at American, Clark and Hunnibell?

24   A.    Yes, I was aware of that.

25   Q.    Was it inappropriate from your perspective as the head

1    of the representation department for Mr. Rindfleisch to be

2    communicating with those pilots, Clark and Hunnibell?

3    A.    That was part of his job.

4    Q.    Okay.  Designations, your Honor there come a point where

5    the National Mediation Board issued a single carrier

6    determination.  Do you recall that?

7    A.    Yes, I do.

8    Q.    Can you remind the jury quickly what a single carrier

9    determination was in the context of the purchase by American

10   of TWA assets?

11   A.    At some point when two companies, one is acquired or

12   merged into another company, and there is a filing for a

13   single carrier determination with the board, up until that

14   point you have two bargaining units, and once the board

15   determines that it is a single carrier and they merge the

16   bargaining units, and that is their single carrier

17   determination.

18   Q.    Okay.  And in conjunction with that determination was

19   ALPA given the opportunity by the National Mediation Board to

20   try to pursue representation of the American pilots?

21   A.    Yes.

22   Q.    Okay.  And were you part of the group making the

23   decision about whether ALPA should pursue the right to

24   represent the American pilots?

25   A.    Yes, I was.

1    Q.   Tell us what the discussions were, what the thought

2    process was in that regard?

3    A.   The thought process really involved assessing the

4    situation and determining whether it made any sense at all to

5    pursue it because it was clear, at least to me, that pursuing

6    it what would not lead to us being successful.  Anyway, if we

7    made the showing of interest.  First consideration was, you

8    know, did we make the showing of interest.  We evaluated the

9    situation, we counted up, you know, different types of ballot

10   -- not ballots.

11        We had the seniority list of TWA, so we had a

12   certain number there plus a certain number of cards, and that

13   tabulation together did not amount to the 35 percent

14   necessary to go forward.  So you know, at that point, that

15   was one of the issues.

16        The second issue is even if we got to 35 percent,

17   even if we had had a minimal showing of interest, it was

18   highly unlikely, if not impossible, for us to prevail in that

19   kind of election under those circumstances.

20   Q.   Why do you say that?  Why do you say it was highly

21   unlikely for ALPA --

22   A.   People tend to stay with their, in a situation like this

23   that is very fluid, it is unlikely  --

24        MR. PRESS:  He is going to speculate about the

25   motive.  I object.

1

2              MR. FRAM:  He is explaining the thought process.

3              THE COURT:   No, he can't talk about the APA.

4    There is all kind of evidence on that.

5    A.   Based on my experience.  Can I speak to that, your

6    Honor?

7              THE COURT:  No, I sustained the objection.

8    A.   Thank you, your Honor.

9    Q.   We are focusing on the thought process at ALPA, why not

10   to pursue.  Can you explain that to us?

11   A.   One of the things that we were concerned about that even

12   if we were successful, and there was no showing of interest

13   so to start off, there was no showing of interest, so that

14   pretty much was the end of the analysis.  But even if we were

15   successful, we would have a very divided group and our

16   experience in that type of situation is that it is very -- it

17   doesn't really help, it doesn't really help the pilots to

18   have that kind of divisiveness, it is not something we would

19   pursue.

20   Q.   You said there was no showing of interest.  Weren't

21   there 1,500 or so cards that had been signed by American

22   pilots?

23   A.   Even if you added those 1,500 to the 2,300, there were

24   approximately 13,500 American pilots and that still was less

25   than 30 percent.

1    Q.   Do you recall becoming aware in early 2002 that some of

2    the pilots at American domiciles were expressing an interest

3    in a potential merger with ALPA?

4    A.   I am aware of that.

5    Q.   Did that information in early 2002, didn't that

6    information seem so suggest that maybe there was enough

7    interest?

8    A.   Not to satisfy the legal requirement of, you know, a

9    showing of interest.  You still needed either, you know, the

10   status as the bargaining representative of TWA to bring that

11   number over plus cards.  Physical evidence.

12            THE COURT:  But you had 30 days in which to got

13   they are evidence, didn't you?

14   A.   Yeah, but 30 days would not be adequate to glean any

15   cards like that.  We would have needed almost a thousand

16   cards, your Honor.  And there is no way we could collect a

17   thousand cards in that period of time.

18            THE COURT:  How do you get the number a thousand,

19   where does that come from?

20   A.   Well, if we are running to 35 percent, to get 35 percent

21   of 13,500, that is roughly 4,000 something, I am not running

22   the numbers in my head.

23            THE COURT:  The TWA pilots, plus 1,500 cards is

24   what?

25            THE WITNESS:  38.

```
 1              THE COURT:  And a thousand more.

 2   A.   It is 28 percent of 13,000.

 3              THE COURT:  It would  be a thousand, the number is

 4   smaller than that.

 5   A.   Seven -- I won't argue with your Honor.

 6   Q.   Mr. Rosen, based on upon your experience since 19 --

 7   1998, in organizing, if you got 36 percent, would that have

 8   been enough for ALPA to try to proceed with a representation

 9   of the American pilots?

10   A.   No, it would not.  Even if we had 36 percent we would

11   still have to gain another 15 percent in a total vote of the

12   combined units to get to the, to be the winner of the

13   election.

14              THE COURT:  Have you told us all the factors that

15   were considered in the decision not to go after American, all

16   of them?  Have you told us all of them?

17              THE WITNESS:  Yes.

18              THE COURT:  Okay.

19   Q.   What percentage of interest, based upon cards and the

20   TWA pilots would you have wanted to see in 2002 to pursue

21   representation of American pilots?

22   A.   To actually do a filing?  We would have to have a

23   majority.

24   Q.   You said you would need 50 percent plus one.  How much

25   of an expression of interest would you want to see to move
```

1    down that road to try to get 50 percent?

2    A.   You mean additional cards from American, you are saying?

3    Q.   Yes?

4    A.   A substantial number.  Substantial number.

5    Q.   Can you give us a sense of what that substantial number

6    would be?

7    A.   Well, I think that our chances of winning would be based

8    on having almost 70 percent of the combined total between TWA

9    and cards from American.  So I, whatever that number is, if

10   we had about that much, then we would have a really good shot

11   at winning.

12   Q.   Okay.

13        MR. FRAM:  Thank you, I have no further questions

14   on direct, your Honor.

15        THE COURT:  Cross examine.

16        MR. PRESS:  Thank you, your Honor.

17        THE COURT:  Mr. Press.

18        CROSS EXAMINATION.

19        BY MR. PRESS:

20   Q.   Mr. Rosen, as part of your job responsibilities,

21   collective bargaining, or when you were with ALPA -- I am

22   sorry.  Collective bargaining came within your department's

23   gambit, right?

24   A.   That's correct.

25   Q.   And you were the head the department, the representation

1    department, for how many years?

2    A.    From 1984 to 2003.

3    Q.    And that is when you retired from ALPA?

4    A.    That's correct.

5    Q.    And after that you went for some, you worked for a

6    consulting firm today?

7    A.    We formed up an international pilots services

8    corporation some time in the nineties, and I became the

9    director of the International Pilot Services Corporation, a

10   subsidiary of ALPA.

11   Q.    And that is a company you work for today?

12   A.    That is.

13   Q.    A subsidiary of ALPA?

14   A.    That's correct.

15   Q.    The company you worked for is owned by ALPA?

16   A.    The union I work for.

17   Q.    Okay.

18   A.    It is a union.

19   Q.    And currently you are involved in a project, not sitting

20   here today obviously, but there is a project underway where

21   you are negotiating a contract on behalf of the American

22   pilots, aren't you?

23   A.    That's correct.

24   Q.    Now, getting back to this matter here, are you familiar

25   with ALPA's written policies on collective bargaining?

1   A.    Somewhat.  I would have to review them again.  I haven't

2   looked at them.

3   Q.    I asked asked you the question, collective bargaining is

4   what you do?

5   A.    Yes, I realize that.  I still would like to look at them

6   and refresh my memory.

7              THE COURT:  What is the number?

8   Q.    J 249.  The J, Mr. Rosen, means a joint exhibit.  Do you

9   recognize it?

10  A.    Yes, I do.

11  Q.    What is it?

12  A.    This is section 40 of our administrative manual I think

13  is the document that it comes from.  And it is entitled

14  collective bargaining.

15             MR. PRESS:  I move for the admission of J 249,

16  Judge.

17             MR. FRAM:  No objection, Judge.

18             THE COURT:  Okay.  J 249 in evidence.

19             MR. PRESS:  Can we pull up the first page.  Can you

20  highlight the top line?

21  Q.    This says what, section 40, right.  Collective

22  bargaining.  It is section 40 of this administrative manual,

23  right?

24  A.    That's correct.

25  Q.    Which is, ALPA's policy manual is big, isn't it?

Rosen-cross/Press                                                        42

1    A.   I don't know how big it is.

2    Q.   Well, let's stick with this, this is what you know,

3    right?  I want to refer you to page 8 on ratification.   When

4    you get there let me know.

5    A.   Page 48?

6    Q.   40 - 8.  I am sorry.  I said eight.  And just to lay

7    some ground work here, the policy on collective bargaining,

8    this is ALPA's policy on negotiating for a collective

9    bargaining agreement with an employer?

10   A.   Yes.

11   Q.   And you are aware that the TWA pilots did that in April,

12   2001, as part of the whole bankruptcy process?

13   A.   Yes.

14   Q.   And they entered into a new collective bargaining

15   agreement with their new employer, TWA LLC.

16             MR. FRAM:  I object.  This is well beyond the scope

17   of the direct.

18             THE COURT:  I am going to allow it.

19   Q.   You are aware that happened?

20   A.   Yes.

21   Q.   Now, referring to page eight on ratification.  Can you

22   real ALPA policy on ratification?

23   Q.   Can you read it out loud?

24   A.   The conclusion of an agreement shall, at the discretion

25   of the individual Master Executive Council, be subject to MEC

1    or membership ratification.

2    Q.    And that means that if the MEC wants to put the

3    collective bargaining agreement out to vote amongst all the

4    members, the MEC can do that?

5    A.    That's correct.

6    Q.    If they want to?

7    A.    Yes.

8    Q.    And aren't you aware that the TWA MEC in fact asked to

9    do that for this new collective bargaining agreement?

10   A.    No.

11   Q.    You weren't aware of that?

12   A.    No, I am not aware of that.

13   Q.    Sticking on that same page, section E talks about

14   professional negotiators.  And are you there?

15   A.    Yes, I am.

16   Q.    ALPA has a whole team in Washington, D.C. or Herndon,

17   there is a whole team of professional negotiators, isn't

18   there?

19   A.    No.

20   Q.    There isn't?

21   A.    No.  Let me explain.

22   Q.    I didn't ask for an explanation.

23   A.    What?

24   Q.    I didn't ask for one.  Mr. Rosen, I thought there was a

25   team of like 40 professional negotiators?

1    A.    You said located in Herndon or Washington.    That is not

2    where they were.    I wanted to clarify how it works.

3    Q.    I want to be fair.    Where are they?

4          MR. FRAM:    Pardon me.    Counsel is talking over the

5    witness.    I object.

6          THE COURT:    Where are they?

7    A.    We have a staff that is distributed around the country.

8    Most of the professional negotiators are actually located

9    where the Master Executive Council offices are.    For example,

10   in TWA's case, they had a St. Louis office.    David Holtzman

11   was the resident contract administrator located there.    So

12   there are a handful of negotiators or staff members of the

13   representation department in Herndon.    Only a handful.    Most

14   of them are out so that they could directly represent and

15   work with the MEC's, the officers, and the negotiating

16   committees.

17   Q.    So Mr. Holtzman was my client's professional negotiator?

18   A.    That's correct.

19   Q.    All right.    If you go to the next page, page 9 at

20   Vermont top there is a section about what are called first

21   contracts, right?

22   A.    This is 49?

23   Q.    Page 9 at the top, 6 I, on first contracts.

24   A.    I see it.

25   Q.    Can you --

Rosen-cross/Press                                                45

```
 1   A.   The president's department shall monitor all aspects of

 2   preparation for and negotiation of first contracts for a

 3   pilot group to assure that this is accomplished in an

 4   efficient and expeditious manner.

 5   Q.   And that was ALPA's policy at the time, right?

 6   A.   That's correct.

 7   Q.   Now, you know for a fact that the TWA pilots, their

 8   contract with this new company, TWA LLC, was in fact a first

 9   contract, wasn't it?

10   A.   I don't consider it a first contract.

11   Q.   Well, this is a brand new airline?

12   A.   Even so it was a transition agreement from an old

13   contract to whatever the American contract to be.  So I would

14   not categorize that as a first contract.

15   Q.   How about this, was it a concessionary -- were the TWA

16   pilots involved in a concessionary negotiation concerning

17   their scope?

18   A.   Concerning there scope, yes, the company was requesting

19   relief from their scope.  So that would be concessionary in

20   that regard.

21   Q.   Are you aware what ALPA's policy was when it came to

22   concessionary negotiations?

23   A.   I have to review it again.

24   Q.   Go to page 21.  You will come to part six, crisis and

25   concessionary negotiations.  Are you there?
```

1    A.    Yes, I am.

2    Q.    Okay.  I want, if you could look at that and get

3    yourself comfortable with the fact that yes, this was ALPA

4    policy on that subject.  Then I will have some questions.

5    A.    Go ahead.  I read it quickly.

6    Q.    I want you to get comfortable with it.  Yes, we are

7    looking at the right document.

8    A.    What?

9    Q.    On concessionary negotiations?

10   A.    These are the guidelines that are provided for proofs,

11   they are guidelines, they are not guarantees or anything like

12   that.  But they are guidelines.  They are not mandatory.

13   Q.    If you go to page 22?

14   A.    Yes.

15   Q.    Paragraph 2, there is a list of three things that ALPA

16   shall provide to the MEC.  Are you there?

17   A.    Yes, I am.

18   Q.    A, coordination directly through the president's office.

19   Right?

20   A.    Yes.

21   Q.    Which means that the TWA pilot concessionary negotiation

22   concerning their scope should have been coordinated through

23   Duane Worth's office.  Right?

24   A.    Well, I don't agree with your interpretation of that.  I

25   am part of that process of coordination with the president's

1    office.  I don't want to quibble with you over that.

2    Q.   Okay.  B.  ALPA shall provide staff support for costing

3    the financial impact of various concessions.  Right?  That

4    didn't happen here either, did it?

5    A.   They had they had financial support.  They had an

6    outside financial adviser that we retained for their benefit

7    plus we had people from the economic and financial analysis

8    department assigned to it.

9    Q.   Can you point to one piece of paper in this courtroom

10   that shows any work by anybody at ALPA to come up with

11   financial impact of a scope waiver.

12         MR. FRAM:  Your Honor, I object.  That is not a

13   fair question.  We have lots of paper.  The witness, we are

14   beyond the scope of direct.  It would take the witness I am

15   sure time to find the document.

16         THE COURT:  I am going to sustain the objection.

17   The words, a piece of paper in this courtroom, is somewhat

18   vague.

19   Q.   Mr. Rosen, you are not aware of any actual work done by

20   anybody to assess the financial impact?

21   A.   I am not aware of anyone doing it in any in any case.

22   That is something that is, I don't know how you would do

23   that.

24   Q.   And the last thing that ALPA is supposed to provide the

25   MEC is staff support for determining the financial condition

```
 1   of the concerned carrier, in this case it would have been

 2   TWA?

 3   A.   That's correct.

 4   Q.   You are not aware of any work done along those lines

 5   either, are you?

 6   A.   They had outside financial adviser.  Michael Glanzer.

 7   Q.   You are not aware of anything Mr. Glanzer did?

 8   A.   Am I personally aware?  I am sure he was involved in

 9   doing exactly that.

10   Q.   Mr. Rosen, this says staff support, not an outside

11   consultant?

12   A.   As I said these are guidelines.  The fact that we

13   retained some very prominent outside analysts to provide the

14   support was above and beyond what was provided by economic

15   and financial analysis.  Bob Christie was working with these

16   people.

17   Q.   Mr. Rosen, you mentioned that these, this administrative

18   manual is more along the lines of a guideline?

19   A.   Not it is more a long.  It is a guideline.  It is not

20   mandatory policy.

21   Q.   It is not mandatory?

22   A.   That's correct.

23   Q.   It is discretionary?

24   A.   That's correct.

25   Q.   And that would apply to every section in it?
```

Rosen-cross/Press                                                    49

1    A.    I would have to read the whole thing.  I think yes, it

2    is guidelines for the whole thing.

3    Q.    All right.  And one section of the administrative manual

4    deals with jumpseat privileges, right?

5    A.    You want to point me to it, please?

6    Q.    No, can you sit here, can you just recall?

7    A.    I don't remember whether it was in the administrative

8    manual or not.  I know there is a jumpseat policy.

9    Q.    There is some evidence of it.  Actually your lawyers

10   brought it out.  I don't want to say something that you are

11   not comfortable agreeing with.  You are aware that there was

12   a jumpseat policy at ALPA?

13   A.    Yes.

14   Q.    And I think you told me in the deposition we took of you

15   several years ago that that policy was the reason that the

16   TWA pilots could not engage in the jumpseat war with American

17   pilots?

18   A.    Well, I don't know how -- you are wording it differently

19   than I think I stated in my deposition.

20   Q.    Tell me then.

21   A.    If you want to quote from my deposition, that is fine.

22   Q.    I would rather just do this smoothly in the way we are

23   both communicating well?

24   A.    Sure.

25   Q.    Tell me why then ALPA denied the TWA pilots request to

1    engage in a jumpseat war with American?

2    A.    I think as I explained in the deposition, it is an

3    apolitical policy.  We do not, and it is based on reciprocity

4    and the overall negative impact on everyone would far

5    outweigh any advantage or anything that would be gained by

6    doing that in some kind of retaliatory fashion, and I thought

7    it would make things worse, would be my reevaluation.

8    Q.    That policy is just a guideline, it is not a hard and

9    fast rule?

10   A.    That is the guideline we followed but it is not

11   mandatory.

12   Q.    In fact, Mr. Rosen, you know from your experience at

13   ALPA that ALPA has in fact used the jumpseat to punish pilots

14   it was upset with?

15   A.    I am not aware of that.

16   Q.    You are not aware of that?

17   A.    No.

18   Q.    Aren't you aware that the Eastern pilots went on strike

19   in 1989 for about a year?

20   A.    I am aware of that.

21          MR. FRAM:  I object.  That is before the policy.

22   This is misleading.

23          THE COURT:  I will allow it.  Go ahead.  What is

24   your next question?

25   Q.    You are aware that there were some Eastern pilots that

Rosen-cross/Press                                           51

```
1    crossed the picket line, they were referred to as scabs,

2    right?

3    A.   That's correct.

4    Q.   You are aware that these scabs in fact were precluded

5    from ALPA jumpseats?

6    A.   I am aware of that.

7    Q.   Right.  And you are aware that in fact there was a list

8    of all these scabs that ALPA produced and distributed to all

9    of its members, right?

10   A.   No, I am not aware of that.

11   Q.   You are not aware of that?

12   A.   No.

13   Q.   Aren't you aware there was a lawsuit over that and you

14   provided testimony, I think?

15   A.   Yeah, that we didn't have a list.

16   Q.   You didn't have a list?

17   A.   We did not have the list.  That was the testimony.

18   Q.   Isn't it true, Mr. Rosen, that in 1991 ALPA produced and

19   distributed 50,000 copies of the scabs list, the final

20   publication was entitled the scabs of Eastern, of the strike

21   of 89.  Aren't you aware of that?

22   A.   I don't remember.

23   Q.   Can I show you?

24   A.   Sorry.

25   Q.   I want to show you.
```

```
 1                MR. FRAM:  Your Honor, I object under 403.

 2                THE COURT:  No, I will allow it.

 3                MR. FRAM:  Can I see you at sidebar?

 4                THE COURT:  I am going to allow it.  The jumpseat

 5   issue is clearly in the case.  I will allow it.  Go ahead.

 6   Q.   I am going to hand you something that I want you to look

 7   at, first of all, what is it, are you familiar with this?

 8                MR. FRAM:  May I have a copy?

 9                MR. PRESS:  I am sorry.

10                THE COURT:  What is it marked?

11                MR. PRESS:  It is not marked, Judge.  It is just, I

12   am just using it to refresh memory for now.

13   A.   I what are you pointing me to?  I apologize --

14   Q.   Have you ever seen this case I have landed you?

15   A.   Yes.

16   Q.   Oh.  This is a published opinion of --

17   A.   I said yes.

18   Q.   Dun versus ALPA?

19   A.   Yes.

20   Q.   You are familiar with in lawsuit, right?

21   A.   Goes back a long time.  I don't recalling it.  I would

22   have to read it, your Honor.

23                THE COURT:  Well, if you want to read it, I am

24   certainly going to ask him to ask questions on it.

25                MR. PRESS:  I don't want to sit and have you read
```

1    in front of the jury.

2              THE COURT:   If you want to know about the list,

3    forget -- just stick with what he knows about the list.

4    Q.   You are denying that ALPA produced and distributed a

5    scab list?

6    A.   No, you have refreshed my recollection.  I would like an

7    opportunity to review it, and I appreciate your refreshing

8    it.  I apologize if I gave incorrect information on that.

9              THE COURT:   Okay.  Your recollection is refreshed.

10   Q.   In this is refresh refreshing your memory in fact ALPA

11   did produce and distribute a scab list?

12   A.   If that is what it says, that is what it says.  That is

13   why I wanted to review it.

14             THE COURT:   Let him look at it.

15   Q.   Please --

16             THE COURT:   Go ahead and a look at it.

17   Q.   I show you --

18             THE COURT:   Let him look at it.

19             MR. PRESS:   I am sorry, Judge.

20             (Pause)

21   A.   I see the paragraph you highlighted which clearly states

22   in 1991 ALPA produced and distributed 50,000 copies of the

23   scab list.  This final publication was entitled the scabs of

24   Eastern, of the strike of '89.

25             THE COURT:   The question is do you recall  that

1    now?

2    A.   I do recall it now.

3         THE COURT:   Okay.

4    Q.   So as a matter of fact, ALPA did produce and distribute

5    a scabs list of these Eastern pilots, right?

6    A.   I think you asked me that.  Yes.

7    Q.   And part of the intention of doing that was for that

8    list to be taken into cock pits by ALPA pilots so they on on

9    would know who the scabs were that might want to sit in the

10   jumpseat.  That was part of the reason?

11   A.   I can't speak to the intent.

12   Q.   That is fair enough.

13   Q.   Following up on some of the judge's questions about Mr.

14   Rindfleisch.  You were aware at the time, this is 2001, on

15   '02, that he was communicating directly with American pilots

16   about rejoining ALPA?

17   A.   He was communicating with American pilots.   Who were

18   expressing an interest in ALPA.

19   Q.   And two in particular had undertaken this card campaign,

20   Mr. Hunnibell and Mr. Clark, right?

21   A.   Yes.

22   Q.   You know for a fact Mr. Rindfleisch had regular

23   communication with those two men.

24   A.   There was frequent emails exchanged between the three of

25   them.

Rosen-cross/Press                                                55

```
 1    Q.    He copied you on many of those emails, didn't he?

 2    A.    He did.

 3    Q.    I want to show you 147 VV.

 4          THE COURT:  Did you say BB?

 5          MR. PRESS:  VV.

 6          MS. RODRIGUEZ:  Vivian, Vivian.

 7          THE COURT:  VV.

 8          MR. PRESS:  Victor Victor.

 9          THE COURT:  Victor Victor, okay.

10    Q.    Mr. Rosen, before we look at that email?

11    A.    Yes.

12    Q.    Have you, these are emails from Mr. Rindfleisch, have

13    you reviewed these binders of emails?

14    A.    I have reviewed them.

15    Q.    Okay.  And this thing that I have got on the monitor

16    here is part of this?

17    A.    I guess you would say I am not sure I read every single

18    one of them but there are many, many emails.

19          THE COURT:  By the way.  P-147 in its entirety, I

20    have marked in evidence.

21          MR. PRESS:  It is.

22    Q.    This email we are looking at, first of all the date is

23    what?

24    A.    July 26, 2001.

25    Q.    It is Mr. Rindfleisch forwarding an email to you and
```

1   many ALPA officials, right?

2   A.   Yes.

3   Q.   And the forwarding information, where Mr. Rindfleisch

4   got this from, that has been deleted from the email, right?

5   A.   I am not following you.

6   Q.   Look at the subject line, it says FW, AA to ALPA

7   stickers.  Right.  That means this email was forwarded to Mr.

8   Rindfleisch by somebody else.

9   A.   Yes.  I see the FW.

10  Q.   We don't know who forwarded it from looking at this

11  email, do we?

12  A.   I don't know.

13  Q.   But you can read the context of it, Mr. Rosen, and agree

14  it came from an American pilot?

15  A.   The signature is an American pilot.  The name.

16  Q.   Okay.  And he is talking about some stickers, and his

17  last, well, it sure would be nice if we could highlight that.

18  Can you read that, Mr. Rosen?

19  A.   It sure would be nice of ALPA to produce some of these

20  by a professional outfit.  After all our cause is their

21  cause.

22  Q.   This is some American pilot asking ALPA to produce

23  stickers that would be used in conjunction with their card

24  campaign, right?

25  A.   It is asking for help in producing some stickers.

Rosen-cross/Press                                                      57

1    Q.   And when you received this, that is what you understood

2    back in July of 2001, right?

3    A.   Well, I am not sure exactly when I read this email.  I

4    just don't know.  But in any event, it says what it says.

5    Q.   You will agree with me that it would have been highly

6    inappropriate for ALPA to have produced the stickers

7    requested in this email?

8    A.   It would have been inappropriate, yes.

9    Q.   Why?

10   A.   Because we weren't engaged in any campaign, and we had

11   no budget to do anything for any campaign relative to

12   American Airlines.

13   Q.   Did, are you aware of any follow-up from Mr. Rindfleisch

14   to these pilots to say we can't do that, it would be

15   inappropriate?

16   A.   I am not aware of it.

17   Q.   Now, you are aware this July 26 date, that came three

18   days after John Clark and Mark Hunnibell were actually in

19   Washington for meetings with ALPA, right?

20   A.   I don't know when they were in Washington.

21   Q.   You weren't part of those meetings in July, 2001?

22   A.   I don't recall.

23             MR. PRESS:  147, AAA.

24             THE COURT:  A's?

25             MR. PRESS:  A's.

Rosen-cross/Press                                              58

1    Q.   This is an email, Mr. Rosen, next day, July 27, 2001.

2    Do you see that?

3    A.   Yes, I do.

4    Q.   This again is an email that Mr. Rindfleisch received

5    from an American pilot that he has forwarded to you and the

6    same group of ALPA officials, right?

7    A.   How do we know it is from an American pilot?  I don't

8    know.

9    Q.   I can give you that evidence if you want?

10   A.   Okay.  It doesn't show on it.  I see what it is.  But I

11   don't know where it came from.

12   Q.   If you go to 147 EEE?

13           MR. PRESS:  Is there a way to put both on the

14   screen?

15   Q.   147 EEE is an email from Terry M to Ron Rindfleisch,

16   right?

17   A.   Yes, that is what it says.

18   Q.   He has attached what is called endorsement update on the

19   second page, right?

20   A.   Yes.

21   Q.   And that endorse meant update is from Mark Hunnibell to

22   ALPA support list, right?

23   A.   I am not following you.  I am sorry.

24   Q.   Oh.

25           MR. PRESS:  We need the second page of EEE.

1              That is why I couldn't follow you.

2    Q.   Yeah, you don't have the hard volume.  Page 2.

3    Q.   See that.  Mark Hunnibell to ALPA support list with an

4    endorse minute up indict.

5    A.   I see that, yes.

6    Q.   I just want you to compare that page to this other one

7    we looked at before, AAA, and you can confirm that that is

8    the same message that was forwarded -- that Mr. Rindfleisch

9    forwarded to you?

10   A.   Looks the same to me.

11   Q.   Right.  So what this endorsement update is, it is update

12   of 10 new American pilots who are on board with the campaign,

13   right?

14   A.   Yes.

15   Q.   So this is just an example of Mr. Rindfleisch giving you

16   a blow-by-blow account of how the campaign is going?

17   A.   He is giving me information about what is going on

18   there, yes.

19              THE COURT:  Well, it is a campaign.

20              THE WITNESS:  The campaign --

21              THE COURT:  There is some, obviously the pilots and

22   American are engaging in some kind of effort.

23              THE WITNESS:  You are right.

24              THE COURT:  On behalf of ALPA.

25   A.   Yes.

1    Q.   And this email.  I am sorry?

2         THE COURT:  Go ahead.

3    Q.   This email I have shown you with this update from July,

4    this wasn't the only up did it you received?  You received

5    regular updates about the campaign from Mr. Rindfleisch?

6    A.   I received updates from Mr. Rindfleisch.

7         THE COURT:  What was the relationship between you

8    and Rindfleisch, were you his boss?

9    A.   Ultimately, yes.

10        THE COURT:  You were his boss?

11   A.   He was within my department, yes.

12   Q.   Go to 148 FF.  I have jumped forward now to November 30,

13   '01.

14   Q.   Mr. Rosen, would you prefer to have hard copies?

15   A.   No, I can see.  My eyes are a little --

16   Q.   This is an email dated November 30, '01, from Mr.

17   Rindfleisch to you and the same group of officials at ALPA,

18   right?

19   A.   Yes.

20   Q.   And this you are aware of the timing of things, this is

21   after the APA had imposed this cram-down on the TWA pilots,

22   right?

23        THE COURT:  Wasn't the cram-down November 8,

24   supplement CC, November 8.

25        THE WITNESS:  It is what it is.

```
 1                THE COURT:  I am asking you when is the cram-down.

 2                THE WITNESS:  Wouldn't refer to it as a cram-down.

 3                THE COURT:  Supplement CC, the agreement between.

 4    A.   It was early November, you are right.

 5                THE COURT:  November 8.

 6                THE WITNESS:  Right.

 7                THE COURT:  I don't think there is any dispute on

 8    that.

 9    Q.   I wanted him to get comfortable, this email we are

10    looking at was after that, right?

11    A.   Yes.

12    Q.   And this again is an email forwarded to Mr. Rindfleisch

13    by somebody named John.  Do you see that?

14    A.   John.  Yeah, I see the John, yeah.

15    Q.   And you know from talking with Mr. Rindfleisch that this

16    John was John Clark, right?

17    A.   No, I do not know that.

18    Q.   Anyway, this John, he says what at the top, the first

19    sentence?

20    Q.   Can you read that?

21    A.   Note the fun that seems to be going on at the TWA MEC.

22    Q.   Did you instruct Mr. Rindfleisch in any way to take some

23    sort of action concerning this sarcastic email when it comes

24    to the TWA pilots?

25    A.   No, I didn't take any action with regard to this email.
```

1    Q.   Can we look at one --

2            THE COURT:  On this email what do you think is

3    being said here, with this "guys".  What did you, this, you

4    were a recipient of this.  A lot of people.  In fact, the

5    whole executive staff of ALPA is a recipient of this.

6    A.   The staff is, yes.

7            THE COURT:  What did you think Rindfleisch was

8    saying here?

9    A.   I think he was referring to the fact that TWA internally

10   had political skirmishes and they were involved in yet

11   another one of those --

12           MR. FRAM:  Pardon me.  I think the email is from

13   John, not from Mr. Rindfleisch.  I think he just forwarded

14   it.

15           THE COURT:  He is forwarding it.

16           THE WITNESS:  Yes.  That's right.

17           MR. PRESS:  Your Honor.

18           THE COURT:  Yes.

19           MR. PRESS:  148, P P.  That is another email.

20   Q.   This one is dated December 10 from Mr. Rindfleisch to

21   you and the same group of ALPA officials, right?

22   A.   Yes.

23   Q.   What is being forwarded is an update from the American

24   pilots union concerning the Bond Amendment.  Do you see that

25   in the middle?

1    A.    I do.

2    Q.    Bond Amendment finally takes.  What is the first word of

3    the message from the American pilots?

4    A.    Ugh.

5    Q.    So here we have American pilots reacting negatively to

6    something quite positive for the TWA pilots?

7    A.    That would be positive for the TWA pilots.

8    Q.    You didn't give Mr. Rindfleisch any directions on how to

9    respond to these American pilots and their attitude, did you?

10   A.    This comes from who?

11   A.    This from Denny Breslin.

12   Q.    To your employer, Mr. Rindfleisch?

13   A.    The last update.  No, I did not give him any

14   instruction.  .

15   Q.    The Judge asked you questions about the pilot, the

16   American pilot organizers expenses, and whether or not they

17   were reimbursed.   I want to look at what is already, well,

18   it is 148 D.

19        148 D.  Is this an email you are familiar with?

20   A.    Yes.

21   Q.    Dated October 14, Mr. Mugerditchian and Mr. Rindfleisch,

22   right?

23   A.    Yes.

24   Q.    He says, "As we discussed several months ago in person

25   and again on the phone more recently, Mark and I are filing

Rosen-cross/Press                                                      64

 1   this reimbursement request."  Do you see that?

 2   A.   Yes, I do.

 3   Q.   Mr. Rindfleisch as we saw with these other emails, he

 4   forwarded this email to you and the same ALPA officials.  Do

 5   you recall that?

 6   A.   I am sure you have it.  I mean.

 7   Q.   I don't, actually?

 8   A.   I don't remember seeing this.

 9   Q.   All right.

10   A.   That is why I asked you for it.

11   Q.   Well, do you remember Mr. Rindfleisch shortly after he

12   received this message going to you and seeking your advice on

13   how to respond?

14   A.   No, I don't recall.

15   Q.   Is that to say it didn't happen, or it might have

16   happened?

17   A.   No, I just, I don't have recollection of that.  That is

18   what it is saying.

19   Q.   Now, if we go to 148 H.  That is another email, 148 H.

20   This email is dated October 31, '01, at the top, that is its

21   date.  But in the middle, underneath that you will see the

22   message from Mr. Rindfleisch to you and the ALPA officials

23   again, right?

24   A.   Yes.

25   Q.   It is dated October 30, '01?

Rosen-cross/Press                                                    65

```
 1   A.   Yes.

 2   Q.   He is forwarding an email from this John again,

 3   anonymous John?

 4   A.   John.  Yes.

 5   Q.   And are you comfortable now looking at this saying yes,

 6   that is John Clark.  That is the John?

 7   A.   I am.

 8   Q.   You are comfortable agreeing with that?

 9   A.   Yes.

10   Q.   Mr. Clark, he is talking about things up up there in the

11   first paragraph.  In the second paragraph he concludes it by

12   saying what?

13   Q.   Can you read that?

14   A.   Also?

15   Q.   Yes?

16   A.   Also, I would still like some help --

17   Q.   No, the last sentence, I am sorry.

18   A.   I also look forward to our reimbursement.

19   Q.   That message was forwarded to you in late October of

20   '01.  And you understood at that time that he was talking

21   about getting his expenses reimbursed by ALPA?

22   A.   Yes.

23   Q.   And you gave, are you telling this jury you gave no

24   directions to Mr. Rindfleisch on how to respond to this?

25   A.   That's correct.
```

Rosen-cross/Press                                                    66

```
 1   Q.   You will agree with me it would have been, providing

 2   stick, if providing stickers would have been inappropriate,

 3   providing cash would have been really inappropriate?

 4   A.   It would it would have been.

 5   Q.   Can we go to 148 KK.

 6            Now we have jumped ahead in time to December 5,

 7   right?

 8   A.   Yes.

 9   Q.   Mr. Rindfleisch is sending in an original message of his

10   own to John Clark and Mark Hunnibell concerning their

11   expenses.  Do you see that?

12   A.   Yes.

13   Q.   And are you aware, because again I don't have it in the

14   binder, if I did I would show it to you, but do you know, can

15   you agree that this message was forwarded to you?

16   A.   I don't recall.

17   Q.   Well, what does Mr. Rindfleisch, your employee, say.

18   Guys, can you read that?

19   A.   Yes, I can.

20   Q.   Please do.

21   A.   Guys, please forward to me the original receipts.  You

22   may want to make a copy for yourself, of your expenses that

23   you emailed to me on October 14.  I apologize for the delay.

24   But as soon as we can get the receipts we can get checks cut.

25   Also include your three current addresses, including Dan
```

Rosen-cross/Press                                                    67

 1  Hall, that we will mail the checks to.

 2  Q.   Okay.  And you were aware because Mr. Rindfleisch and

 3  you talked about it that he was going to send this message,

 4  right?

 5  A.   No. I didn't say we talked about it.  I never said that.

 6  Q.   I think in answer to one of the judge's questions you

 7  said you would be surprised  if there was communications

 8  about reimbursing  expenses, right?  Are you surprised to see

 9  this?

10  A.   I don't remember seeing this.

11  Q.   Now, this date, December 5.  The date that Mr.

12  Rindfleisch, your employee, promised to pay these guys.  You

13  know for a fact that is the same day that John Clark

14  delivered his cards in Las Vegas to Duane Woerth and Jerry

15  Mugerditchian.  You know that?

16  A.   I do not know that, whether it was the same day or not.

17  Q.   Now, if you go to email 148 U U, are you there?

18  A.   Yes, I am.

19  Q.   This is nine days later, December 14.  Ron Rindfleisch

20  forwards on to you and the other ALPA officials there, you a

21  message from John Clark, correct?

22  A.   Yes.

23  Q.   And Mr. Clark and his message to Ron says I will get the

24  receipts to you when I get to that on my to-do list.  Do you

25  see that?

1    A.    Yes, I do.

2    Q.    And you understood right then that day you received this

3    or when ever you read it that he was talking about receipts

4    for the reimbursement request that had been promised to be

5    met nine days earlier.  You understood that is what this was

6    in reference to?

7    A.    I understand that that is what it is.

8    Q.    And then you didn't take any action to stop that, did

9    you?

10   A.    No, I did not.

11   Q.    Can he we go to exhibit 148 XX.  Actually, let's move

12   on.  148 GGG.  Are you there, Mr. Rosen?

13   A.    Yes, I am.

14   Q.    This is an email from Mr. Rindfleisch to Mark Hunnibell

15   and John Clark dated December 21, '01.  Correct?

16   A.    Yes, it is.

17   Q.    Was this email forwarded to you?

18   A.    I don't recall.  It may have been.

19   Q.    Before he says, Go Packers.  Mr. Rindfleisch writes

20   what, again?

21   Q.    Can you read that?

22   A.    Before?  Have a great holiday and healthy new year and

23   go Packers.  Rino.

24   Q.    Before that?

25   A.    Again, I must admit to you three guys that we will

1    reimburse you for the expenses you already incurred when we

2    re receive them.

3    Q.   And you knew at the time that Mr. Rindfleisch was

4    communicating a long those lines to these American pilots,

5    didn't you?

6    A.   Yes.

7    Q.   And you didn't do anything to stop him, did you?

8    A.   No.

9    Q.   Now, what happened, you testified I think in response to

10   Mr. Fram's question that these expenses, although there was a

11   promise to pay, they weren't paid, right?

12   A.   Yes.  That's correct.

13   Q.   That was your testimony.  Isn't it a fact that at around

14   this time you became aware that some TWA pilots, you became

15   aware some TWA pilots had found out about ALPA's involvement

16   with the card campaign and had made a public complaint about

17   that, right at this time, right?

18   A.   What are you referring to.

19   Q.   The AWRF?

20   A.   I am aware of that.

21   Q.   They made a public complaint about what they perceived

22   to be ALPA's conflict of interest, right?

23   A.   Yes.

24   Q.   And that complaint, ALPA found out about that the same

25   time this was going on, late December, '01, right?

```
 1   A.   I don't know exactly when ALPA found out about the

 2   filing.  There was a letter filed, written to the National

 3   Mediation Board, I think you are referring to.  So what is

 4   the date of the letter.

 5   Q.   I don't have it.  That is okay.  Now, I want to talk

 6   about, we can take that down.

 7              These campaign cards that got delivered to ALPA,

 8   the Judge asked you some questions about them.  You saw them

 9   at some point, right.

10   A.   No, I did not.

11   Q.   Well, you just testified there was 1,500 of them or

12   something like that?

13   A.   That doesn't mean I saw them.

14   Q.   Well, what do you rely on for that information?

15   A.   Someone else told me the number.

16   Q.   Who was that?

17   A.   I don't recall.  It may have been clay.  Clay Warner.

18   Q.   Clay Warner.  And he testified yesterday.  Did he say

19   that he had the cards with him?

20   A.   No, he did not.

21   Q.   Have you talked to anybody at that union that every said

22   I have the cards, or gave you some impression that they knew

23   where the cards were?

24   A.   No.

25   Q.   But Mr. Warner's conversation with you concerning the
```

```
 1    number of cards, that was in conjunction with this decision

 2    about whether or not to seek an election, right?

 3    A.   That's correct.

 4    Q.   That was in the March, '02, timeframe?

 5    A.   Yes.

 6    Q.   So at that point in time ALPA still had the cards,

 7    right?

 8    A.   I don't know whether we had the cards or not at that

 9    point in time.

10    Q.   But Mr. Warner --

11    A.   I am not sure we had the cards as that point.  We may

12    have had some cards.  We may have had not all those cards.  I

13    don't know what we had or didn't have.

14    Q.   But Mr. Warner was representing to you that there were

15    1,500 cards?

16    A.   Yes, he was.

17    Q.   You knew for a fact from your communication was Mr.

18    Rindfleisch that cards were continuing to come in from the

19    American pilots?

20    A.   Come in to the American pilots, not come to us, but come

21    in to the American pilots.

22    Q.   That was my question?

23    A.   What.

24    Q.   They that they were still collecting cards?

25    A.   I don't know exactly when they stopped coming, when they
```

```
 1    reached that number.  I really can't tell you that.

 2    Q.   But a decision was made by ALPA not to seek an election,

 3    correct?

 4    A.   Yes.

 5    Q.   That decision was made that we looked at a letter, March

 6    18, '01, or '02?

 7              THE COURT:   '02.

 8    Q.   That sound about right?

 9    A.   Do you have it?

10    Q.   We can, I can -- yeah, we do.  I don't want to spend the

11    time on it.  It is in evidence.  Can we go to P 31.  This is

12    an email dated March 18, '02, from Mr. Rindfleisch to you and

13    the same group of ALPA officials, right?

14    A.   Yes.

15    Q.   And he is forwarding something called ALPA merger MIA

16    document.  Right?

17    A.   Yes, he is.

18    Q.   And you know -- the attachment is not there.  If I had

19    it I would show it to you.  But you are familiar enough with

20    these facts, Mr. Rosen, to tell this jury what that was was a

21    merger resolution passed at APA's Miami base.

22    A.   Was it passed?

23    Q.   Or introduced.

24    A.   I don't think it was passed.  And it is only out on the

25    base.  So.
```

1    Q.   Let me start --

2    A.   It was some resolution that was introduced at the Miami

3    meeting that I am aware of.  That is it.  And this is on

4    what, March 18.

5    Q.   Right.  As of March 18 ALPA had in its possession a

6    motion, what did you call it?

7    A.   A resolution.

8    Q.   A resolution to do what?

9    A.   To, looks like to form up some kind of merger process, I

10   think is what they were looking toward doing, was to then

11   take that to their board and have some, they would need to

12   take that to their board, and represent more than a

13   resolution that wasn't passed.

14   Q.   But this was a merger between the American pilots union,

15   this APA and ALPA?

16   A.   Yeah, but only from the Miami domicile on a resolution

17   that wasn't passed.  So what does it amount to?

18   Q.   I am just what it was.  No witness before you could say

19   what it was.  Now we know what it is.

20   A.   Right.

21        MR. FRAM:  Your Honor, I object.  I really object

22   to counsel's comment.  That wasn't the testimony.

23        THE COURT:  Ignore his comment on what the prior

24   testimony was.  This witness says he remembers it.  That is

25   his testimony.

Rosen-cross/Press                                              74

1    A.    Thank you.

2    Q.    Mr. Rosen, this merger between APA and ALPA, that is

3    what ALPA wanted?

4    A.    I don't know what you are talking about.  In this

5    context ultimately yeah, in the long range, in the scheme of

6    things, of course, that would have been nice to do in the

7    future.  But this had no bearing on that at this point.  Nor

8    did it go in any way towards the showing of interest.  I

9    don't understand the point you are trying to make.  I am

10   sorry, counsel.

11   Q.    Can we look at exhibit 148, 5 O's?

12            THE COURT:  I am sorry.

13            MR. PRESS:  148, OOOOO.

14            THE COURT:  That is in evidence.

15            MR. PRESS:  It is.

16   Q.    This is just the first page.  It is a multi-page

17   document, Mr. Rosen, which I am going to give you?

18   A.    Yes.

19   Q.    So you have the whole thing?

20   A.    Thank you.

21   Q.    Mr. Rosen, this is an email from Ron Rindfleisch to you

22   and the same group of ALPA officials, this one is dated April

23   4, 2002, correct?

24   A.    Yes.

25   Q.    He is forwarding to you an email from Mark Hunnibell

Rosen-cross/Press                                                      75

 1   that he received on April 3rd.  Right?

 2   A.   Yes.

 3   Q.   And April 3rd you know is the day that ALPA lost its

 4   bargaining rights over the TWA pilots, right?

 5   A.   Yes.

 6   Q.   And what Mr. Hunnibell has attached to his email are the

 7   pages following the first page that I have given you?

 8   A.   Yes.

 9   Q.   And those are, well, the first collection of paperwork

10   that is a resolution sim already to this Miami thing you

11   talked about except it is a resolution from the American

12   Dallas base?

13   A.   Yes.

14   Q.   Again, it is a resolution that is, to merge the two

15   unions?

16   A.   Well, to form up a merger committee to look at exploring

17   merging the two unions.

18   Q.   Are you familiar enough with American Airlines to agree

19   with me that the American pilots Dallas base was the largest

20   base as far as number of pilots?

21   A.   Yes, it is.

22   Q.   How does Mr. Hunibell end his message to Mr.

23   Rindfleisch.  Do you see that, cheers?

24   A.   You mean the cheers or above the cheers?

25   Q.   Yes.

1    A.    Above the cheers?

2    Q.    No, the cheers.  Do you see that?

3    A.    Yes.

4    Q.    And here you are at the end being rewarded by Mr.

5    Rindfleisch's efforts, aren't you?

6    A.    I don't accept that.

7              MR. FRAM:  I object.

8    A.    I don't accept that characterization.

9              MR. FRAM:  That is argumentative.

10             THE COURT:  I will sustain the objection.

11             MR. PRESS:  That is all the questions I have.

12             THE COURT:  Redirect?

13             MR. FRAM:  Thank you, your Honor.

14             REDIRECT EXAMINATION.

15             BY MR. FRAM:

16             MR. FRAM:  Can I have D 411 in evidence.

17   Q.    I am handing you D 411 in evidence.  Do you recognize

18   that as the jumpseat policy that ALPA adopted?

19   A.    Yes.  I do recognize it.

20   Q.    Can you tell us from the document when the policy was

21   adopted?

22   A.    The most recent change was the board 2000.

23             THE COURT:  That is most recent change.  Adopted

24   source was executive board, October, 1997.  Amended board

25   2000.

Rosen-redirect/Fram                                          77

1   Q.    Mr. Press asked you questions about the Eastern strike

2   and a list, scab list.  Do you recall that?

3   A.    Yes.

4   Q.    The Eastern strike was in 1991?

5   A.    1989, March of 1989, to about January of 91.

6   Q.    So was the jumpseat policy in effect during the Eastern

7   strike?

8   A.    No, it was not.

9   Q.    The American Airlines pilot, give us your definition of

10  a scab, what does that mean in the labor context?

11  A.    The normal definition is a person that crosses a lawful

12  picket line.

13  Q.    Is it a union member?

14          THE WITNESS:  A union member who could go to work.

15          THE COURT:  Couldn't it be both a union member or a

16  nonunion member.

17  A.    Could be both.  Any member of a bargaining unit who

18  crosses the picket line, a lawful picket line of a union.

19  Q.    The Eastern pilots who were an excused of being scabs,

20  were they members of ALPA?

21  A.    They were members of ALPA prior to their action.

22  Q.    Okay.

23  A.    Many of them were.  Some may not have been, most were.

24  Q.    The American Airlines pilots in 2002, were they members

25  of ALPA?

1   A.   No, they were not.

2   Q.   Could they be classified as scabs?

3   A.   No, they could not.

4   Q.   So all right.  So the last document you asked about, 148

5   OOOOO.  Do you have that handy?   Did Mr. Press give you a

6   copy.  Resolution from Dallas Fort Worth?

7   A.   Yes.

8   Q.   Do you have any idea how many American pilots showed up

9   at the meeting that is referred to in this forwarded email?

10  A.   No, it is a huge base and I would be surprised if there

11  were more than 100 or so pilots.  Generally it is less than

12  that that come to the council meetings.

13  Q.   Based upon your experience at council meetings, can you

14  give us a sense of what percentage of the pilots at a

15  domicile show up at at meeting?

16        MR. PRESS:  There is no foundation that he attended

17  any American pilot meetings.

18        THE COURT:  Have you ever attended an American MEC

19  meeting?

20  A.   Not an MEC meeting.  Council meeting.

21        THE COURT:  Or council meeting.

22  A.   I attended many others, but not an American.

23        THE COURT:  I am going to, he can't testify to the

24  experience at Fort Worth, Dallas Fort Worth.

25        MR. FRAM:  I understand.

1              THE COURT:   I will sustain the objection.

2    Q.   Do you have any idea from the email whether this

3    resolution even came to a vote?

4    A.   It don't look like it did.  It doesn't doesn't look like

5    it was passed or even came to a vote.

6              MR. FRAM:  That is all I have.

7              THE COURT:  Anything?

8              MR. PRESS:  No, thank you.

9              THE COURT:  Thank you very much.  Let's take a

10   recess, we have been at it a little more than an hour and a

11   half.  Be back about 20 after.

12             (Recess)

13             MR. FRAM:  During my examination of Mr. Rosen, I

14   hood made a proffer about the relevance of his testimony

15   about Continental, and in overruling my proffer, your Honor,

16   stated that I had made a misstatement of fact and that I had

17   said was not a true statement.  And I am concerned about

18   that, because I think it may have suggested to the jury that

19   in fact that ALPA was running a card campaign at American.

20   Our position is --

21             THE COURT:  You are.  You are trying to, A,

22   testify, in an area that is up to the jury and now you are

23   trying to get me to put my thumb on the scale.

24             The simple matter was there was a card campaign

25   going on at American.  There was, there were numerous emails

1    about it between officials at ALPA, and the American pilots

2    who were conducting the campaign.  And I think it is up to

3    the jury to decide what ALPA's involvement was.  I mean you

4    have a guy who, on the one hand, testifies that he, that it

5    would be massively improper for ALPA to pay expenses and yet

6    you have many emails in which, oh, yeah, we will pay you.

7            Now, they changed their mind and there happened to

8    be a coincidence of when they changed their mind and the

9    timing of the Rights Foundation sort of blowing the whistle,

10   and when the decision not to pay, you know repeatedly they

11   said they would pay, even solicited, said send me your

12   receipt.

13           His testimony, and your statement about it, oh,

14   maybe that is one inference that could be drawn, but you

15   shouldn't be testifying as to what other evidence shows,

16   number 1, you shouldn't be saying other evidence, other

17   witnesses say that.  That is never proper during an

18   examination of a witness for a lawyer to get up and say,

19   well, other witnesses have said this.  That is just never

20   proper.

21           MR. FRAM:  I didn't do that, your HOnor.  I simply

22   explained,  I explained to the Court that I was going to ask

23   the witness to compare what happened at Continental with what

24   didn't happen at American.  I didn't make a special

25   statement.  I didn't testify.  I am concerned based upon the

1    Court's comment --

2              THE COURT:  You are are concerned.  Take me up.

3              MR. FRAM:  No, your Honor.

4              THE COURT:  What do you want me to do?

5              MR. FRAM:  I would ask you to provide the jury with

6    a curative instruction that the issue of whether ALPA was

7    supporting in some improper way this campaign is an issue of

8    fact that is in dispute, and for them to decide, and that

9    they should disregard the Court's comments that I made a

10   misstatement of fact, and that what I said was not a true

11   statement.

12             That is what you said.  And I was surprised and

13   taken aback by it, your Honor.  I think it was inappropriate.

14   I have never seen your Honor make a statement like that about

15   a lawyer in front of a jury.  I think it is highly

16   prejudicial for your Honor to accuse me of making a factual

17   misstatement in front of a jury.

18             If you felt that way, I think you should have

19   called counsel to sidebar.

20             So I request an instruction and in the absence of

21   an instruction, I will file a written motion, your Honor, for

22   a mistrial.

23             MR. PRESS:  I am not inclined to think that any

24   instruction is warranted or proper.  I quite frankly don't

25   remember the colloquy being so severe as Mr. Fram does.  I

```
 1    don't remember it being severe at all in what he did, he was

 2    testifying in front of the jury.  So I guess that is our

 3    position, Judge.

 4              THE COURT:  Yes.

 5              MR. FRAM:  I wasn't testifying and I asked Ms.

 6    Johnson at the break to pull up the transcript.

 7              THE COURT:  I was going to ask.  Can she get back

 8    to that series? ?

 9              MR. FRAM:  Yes.  I would ask her to do so.

10              (REFERRING TO PAGE 26 OF THE TRANSCRIPT).

11              (Off-the-record discussion)

12              THE COURT:  Let me look at it now.

13              MR. PRESS:  Your Honor, if they want that

14    instruction, I would just as soon get the issue out of the

15    case if that is what they want.

16              THE COURT:  Would you write it out?  Write out the

17    instruction, what you want.  Do it in hand.

18              MR. FRAM:  Yes.

19              THE COURT:  While you with are doing that I want to

20    look at it.

21              (Pause)

22              THE COURT:  What never happened at American.  If

23    that isn't testimony, I don't know what is.

24              None of it.  You follow it up with the next

25    sentence which is, "none of this happened at American."
```

 1              MR. FRAM:  Talking about Continental.  That was not

 2     a card campaign.  We are talking about a merger.  I wasn't

 3     making any reference to a card campaign.

 4              THE COURT:  None of this happened at American.

 5              MR. FRAM:   Compared to what never happened at

 6     American.

 7              MR. FRAM:  Yes, your Honor.  Referring to

 8     Continental.  No card campaign, it was a merger resolution,

 9     it was the entire process.

10              THE COURT:  You were making a comparison that may

11     or may not be justified.  Maybe it was a different kind of

12     campaign, but you are implying, you didn't say there was no

13     merger resolution or anything like that.  You said, "This

14     never happened at American."

15              Then I said, "You are wrong.  That is a

16     misstatement of fact.  There are cards out there.  Those

17     cards didn't come from the Tooth Fairy.  These cards were

18     being collected.  They were handed over to ALPA.  Your

19     statement that none of this happened in American is not a

20     true statement.

21              "Sorry, your Honor, none of this was done by ALPA.

22     ALPA did not organize other unions as explained by the

23     witness."  Again, you are testifying, even after I call you

24     on it.  You persist in it.

25              "Sorry, your Honor.  None of this was done by ALPA.

1    ALPA did not organize other unions as explained by the

2    witness."

3              MR. FRAM:  Your Honor, I am talking about

4    Continental.

5              THE COURT:  I said that is unclear.  That is your

6    take.  I am not sure the evidence doesn't support another

7    inference on that.

8              MR. FRAM:  Your Honor, I made a proffer without

9    attempting to testify or state facts and you accused me of

10   misstating facts.  It is right there in the record.  I tried

11   to explain further that Continental was not a card campaign.

12             THE COURT:  You are making a fine point.  You say,

13   they did not organize other unions, as explained by the

14   witness.  You have been trying not only with this witness,

15   but other witness, to take, we don't go after other unions by

16   card campaigns.  That is the point you have been making.  You

17   have had witnesses testify to this.  You had this witness

18   testify, and prior witnesses testify.  Look, if you want to

19   write it out.

20             MR. FRAM:  I was halfway through it.

21             THE COURT:  Why don't you finish it.  If there is

22   no objection, I will give it.  On the basis of, in the face

23   of no objection.

24             (Off-the-record discussion)

25             THE COURT:  Throughout the trial, you have been

```
 1    trying to make the point that, oh, we just never go after a
 2    union, dealing with a card campaign.  I think Woerth
 3    testified to that.  I think there were several witnesses who
 4    testified to that.
 5              Well, the witness's testified to that.  That is
 6    fine.  The jury can consider that testimony.  But for a
 7    lawyer to say that, that is a different story.  That is
 8    commenting on -- I will give it, if there is no objection to
 9    the instruction.
10              MS. RODRIGUEZ:  I don't know if there will be an
11    objection or not.
12              THE COURT:  Let me see it.
13              MR. FRAM:  Let me finish it, your Honor.
14              (Off-the-record discussion.
15              THE COURT:  Let me see it.
16              THE COURT:  Let me read the requested charge.  I
17    think I can read it.
18              During the examination of Mr. Rosen I made a
19    comment to the effect that Mr. Fram had made an inaccurate
20    factual statement.  I instruct you to disregard that comment.
21    Certain of the facts in this case are disputed by the
22    parties, and my comment referred to disputed fact.  It is
23    your role as the jury to decide disputed fact.  Is that
24    right?
25              MR. FRAM:  Yes.
```

```
 1            THE COURT:  Have I read that correctly?

 2            MR. FRAM:  Yes, your Honor.

 3            MS. RODRIGUEZ:  Your Honor, again, I don't think

 4    there was anything inappropriate about your Honor's comments

 5    but to take an issue out of the case and put it aside.  We

 6    have no objection to that.

 7            THE COURT:  Right.  Now, let me, Mr. Fram, what I

 8    said was a blip in the three-week trial.  This is going to

 9    highlight the comment.  Even if I tell them to disregard it,

10    it is like disregard the white elephant in the room, or

11    disregard the rhinoceros banging on the door.  I will do it.

12    But I want to give you another 20 seconds to consider if that

13    is what you want.

14            MR. FRAM:  Thank you, your Honor.  I don't need the

15    20 seconds.

16            I request the instruction and I also request your

17    Honor if other issues come up that counsel be permitted to

18    come to sidebar.  I don't want to be accused by anybody of

19    making factual statement.  That wasn't my intent.  I hope

20    your Honor appreciates that.  I was simply --

21            THE COURT:  I am imputing no evil intent of any

22    kind, in the least.

23            But I thought you did you did make factual

24    statements, in the very strong, in the context of all this

25    repeated testimony that if it is organized, we don't use card
```

```
 1    campaigns, we only use merger negotiations, you were very

 2    clearly referring to that testimony.  And I stand by what I

 3    said.

 4            But I will give this instruction because there is

 5    no objection to it.  And I agree with the statement that with

 6    disputed fact it is the jury who decides that.

 7            MR. FRAM:  I hope your Honor appreciates that part

 8    of our defense here is in fact that this is not how we

 9    organize.  You heard that a number of times because it is

10    important to the case.

11            THE COURT:  You are entitled to have witnesses say

12    that.  You are not entitled to say it.

13            MR. FRAM:  Well, I respectfully suggest, your

14    Honor, I don't think the record suggests that I did say that.

15            THE COURT:  Well, the record is the record.  We

16    know it is there.  And we have to live with it.  That is the

17    record.

18            MR. FRAM:  I do request, it is a long trial.  We

19    have all worked very hard.  If your Honor has concerns, that

20    would lead to --

21            THE COURT:  I had no concerns.  I mean this is not

22    some, you know, lurking idea I had that suddenly popped out.

23    I had no complaints about about any counsel in this case.

24            MR. FRAM:  But your Honor, for a Judge to accuse a

25    lawyer in front of a jury of making a factual misstatement is
```

```
 1   serious and prejudicial and if your Honor is concerned about

 2   anything I say, that might suggest that, I request that you

 3   call counsel to sidebar.  I really do.

 4           THE COURT:  Okay.

 5           MR. FRAM:  I am very upset about the Court's

 6   comments on the record in front of the jury so.

 7           THE COURT:  All right.

 8           MR. FRAM:  I request that you not do that again,

 9   please.

10           THE COURT:  All right.  I am going to give this

11   charge, this instruction.  When the jury comes in.

12           MR. FRAM:  Thank you, your Honor.

13           (Jury enters the courtroom (.

14           THE COURT:  Everyone please be seated.

15           Ladies and gentlemen, I want to give you an

16   instruction that relates to an interchange that took place

17   earlier in the day.

18           During the examination of Mr. Rosen I made a

19   comment to the effect that Mr. Fram had made an inaccurate

20   factual statement.

21           I instruct you to disregard that comment.  Certain

22   of the facts in this case are disputed by the parties, and my

23   comment referred to those disputed facts.  It is your role as

24   the jury to decide disputed facts.  Your role and your role

25   alone.
```

Setlzer-direct/Fram                                          89

1              I also want to make it clear that I have been very

2     proud of all the lawyers in this case.  I believe all the

3     lawyers in this case, every one of them, have acted in the

4     highest traditions of the profession, and honorably in every

5     respect.

6              And I don't want anything I ever say to make you

7     think that I disrespect or am critical of anything, given the

8     difficulty of this case and the emotions involved.  All the

9     lawyers on both sides have performed admirably.

10             Okay.

11             MR. FRAM:  Thank you, your Honor.  ALPA calls

12    Richard Seltzer to testify, please.

13             THE COURT:  Richard Seltzer?

14             MR. FRAM:  Yes, your Honor.

15             RICHARD SELTZER, sworn.

16             DIRECT EXAMINATION

17             BY MR. FRAM:

18             THE COURT:  You may proceed.

19    Q.   Good morning, Mr. Seltzer.  You are a lawyer at the

20    Cohen, Weiss law firm in New York?

21    A.   Yes.

22    Q.   Is that correct?

23    A.   Yes.

24    Q.   That law firm has represented ALPA in certain legal

25    matters over the years?

1   A.   Yes.

2   Q.   Let me start with a little background about you, please.

3   You are how old?

4   A.   I am 61.

5   Q.   Tell us about your formal educational background,

6   please?

7   A.   I went to secondary school in Verona, New Jersey.  I

8   attended the University of Pennsylvania.  I graduated with a

9   BA and MA in 1972, and I attended Colombia Law School and I

10  graduated in 1975.

11  Q.   Where did you begin your law practice after you

12  graduated from Colombia in 1975?

13  A.   I was hired by Robert Morganthau when he first became

14  District Attorney as an assistant District Attorney in New

15  York County and I served there for six years, three years in

16  the appeals bureau and three years in the trial bureau.

17  Q.   At some point did you begin doing labor law related

18  work?

19  A.   Yes.  In 1981 I joined Cohen, Weiss and Simon as an

20  associate.

21  Q.   And you have remained at Cohen Weiss and Simon

22  continuous continuously since then?

23  A.   Yes.

24  Q.   Give us a sense of your legal practice up until 2001

25  which is the period I want to focus on.

Setlzer-direct/Fram                                              91

1   A.   When I first came to Cohen, Weiss and Simon I did a fair

2   amount of what I would call ordinary labor law work.  I did

3   labor arbitrations, I did labor board proceedings.  I worked

4   on some litigation.

5        But within the first year or two after I got there

6   I began to be assigned to some bankruptcy work that the firm

7   did for unions.

8   Q.   Describe the work you did representing unions in

9   bankruptcies, generally, please.

10  A.   I think initially I appeared at some hearings and some

11  cases where we represented a Teamsters negotiating committee,

12  and some trucking company cases.  I did a small piece of the

13  very last part of the first Braniff bankruptcy.  In 1984

14  Congress passed new legislation involving collective

15  bargaining agreements, called Section 1113, and after that

16  there were a large number of airline and steel industry and

17  other bankruptcies where unions were involved, and I became

18  involved in them.

19  Q.   Okay.  Tell us, if you could, what some of those

20  bankruptcies were?   Let's start with the ones involving

21  airlines.

22  A.   Okay.  Not, I think in 1985 or 1986, there was a filing

23  by a small airline called Right Airlines in Cleveland.  There

24  was what is called a 1113 E proceeding which is a company

25  seeking emergency relief from its collective bargaining

Setlzer-direct/Fram                                            92

 1   agreement.

 2        I think it was the first one or two cases under

 3   that section.  I litigated that.

 4        Eastern Airlines filed for bankruptcy in I believe

 5   1989, and a number of us from the firm were involved in that

 6   case, and a tremendous amount of litigation that resulted

 7   from that case.

 8   Q.   By the way, was there a Section 1113 motion litigated in

 9   Eastern bankruptcy?

10   A.   Yes.  Eastern first filed a 1113 and then withdrew it.

11   And then it filed another 1113 that was settled.  And then it

12   filed a 1113 E, which I litigated, and so yes, there was a

13   lot of 1113 litigation.

14        There was a small airline in Alaska called Mark

15   Air, where there was a 1113 E settlement, without there

16   actually being a filing, there was a settlement right away,

17   not right away but after some negotiations and then I believe

18   there was a later 1113, there a second Mark Air bankruptcy.

19        There are also numerous small airlines that filed

20   for bankruptcy before 2001, in which I believe some of them

21   there are concessionary negotiations, there was never a 1113

22   as such because the airlines in most cases liquidated shortly

23   after the filing or a couple months after the filing, within

24   the first year of the filing.

25   Q.   All right.  Have you been involved in other bankruptcies

1  representing unions, not airlines, where Section 1113 motions

2  were litigated?

3  A.   Yes.

4  Q.   Without giving us the names and the details, give us an

5  approximate number of other bankruptcies where you litigated

6  1113 issues?

7  A.   Is this before 2001.

8  Q.   Before 2001, yes?

9  A.   I think that there were probably approximately ten cases

10 in which I was involved one way or another, either litigating

11 it or writing the brief or helping to supervise other people

12 who were working on the case.

13 Q.   All right.  Were there other bankruptcies involving

14 where you represented unions, where 1113s were not made?

15 A.   Yes.

16 Q.   Give us a rough estimate of the number of those.

17 A.   I think probably half of them, half of them there was

18 either a 1113 or a threatened 1113, and half of them, a lot

19 of the cases that liquidated right it away where there wasn't

20 one.

21 Q.   Just to wrap this up, as of early 2001 what percentage

22 of your practice as a lawyer after you left the DA's office

23 had been devoted to representing unions in bankruptcy

24 matters?

25 A.   I would say after 1984, close to half.  And actually, I

Setlzer-direct/Fram                                          94

```
 1    just realized there was another major ALPA bankruptcy where

 2    there was a 1113 before 2001.  That was the Pan Am case.

 3    Q.   Tell us briefly what happened in Pan Am?

 4    A.   In Pan Am, which was suffering from real liquidity

 5    problem at the beginning of the case, Delta Airlines, there

 6    was an auction.  Delta Airlines purchased the European routes

 7    and the shuttle that is now the Delta Shuttle, and they are

 8    now the European flights that Delta flies, and it also agreed

 9    to fund, and a reorganized Pan Am that would fly to South

10    America.

11          Pan Am's situation deteriorated, finances

12    deteriorated.  Delta was making more and more loans to Pan

13    Am, it was suffering.  There was a requirement for the

14    union's to reach a new collective bargaining agreement with

15    Pan Am and at the end of the day, Delta withdrew in effect

16    its dispute about who withdrew first but Delta withdrew from

17    the transaction, and I was present on the day the company

18    announced it was liquidating and all the planes were coming

19    back to New York and that was the end of the company.

20    Q.   What year was that?

21    A.   1991.

22    Q.   Let's walk ahead and talk about the TWA bankruptcy, the

23    third bankruptcy in January of 2001, and the American

24    Airlines transaction.  Were you asked to get involved in that

25    bankruptcy, the third TWA bankruptcy?
```

1    A.    Yes.

2    Q.    And  what role were you asked to play in that

3    bankruptcy?

4    A.    I was contacted early in the bankruptcy by various

5    individuals at ALPA, and there was another firm, it was a

6    corporate firm, Leboeuf lamb, that had represented the ALPA

7    and ALPA and TWA in bankruptcy matters in the past.  But I, I

8    had conversations with various people at ALPA who said it was

9    likely that the labor contracts might become a focus of the

10   bankruptcy and people would like my assistance.  So I agreed

11   to do it.

12   Q.    At what point in time are you talking about?

13   A.    There were some phone calls in January, after the filing

14   I didn't spend a lot of time in January on the case but there

15   were a couple calls and I started reviewing the filings that

16   had been made in the case.

17   Q.    What did you do to familiarize yourself with TWA's

18   bankruptcy proceedings and TWA's financial condition?

19   A.    There were a number of bankruptcy filings very early in

20   the case by TWA.  It immediately sought for authority to

21   borrow money from American, called debtor in possession, DIP

22   financing.  It was unusual.  And usually that kind of

23   financing is provided by banks.  And financial institutions.

24   In this case there was apparently nobody else to do the

25   financing except for American.

Setlzer-direct/Fram                                        96

1            MR. JACOBSON: Objection to the speculative nature

2    of the last answer.  It may be unusual, but the motivation

3    for it.

4            THE COURT:  No, I am going to allow it.

5            Go ahead.

6    A.   So I saw from the papers that when they filed they had

7    20 to $30 million in cash, which from my past experience in

8    major airline bankruptcies I knew was an extremely small

9    amount of cash.

10           The papers reflected, and I think the testimony at

11   the early hearings reflected that they had a need for $40

12   million the next day, and if the financing by American had

13   not been approved, they would not have had the money the

14   second day of the case to make payments that were due.  And

15   that there was an asset purchase agreement with American, and

16   that the Judge, and it was temporarily a district court Judge

17   who was hearing the case the beginning of the case, scheduled

18   a hearing on proposed bidding procedures.  I think in late

19   January.

20   Q.   Tell us what bidding procedures are, why were they an

21   issue?

22   A.   In bankruptcy when there is going to be a sale, a sale

23   of assets, usually there is an attempt made to find out if

24   there are other potential parties who would be interested in

25   bidding on the assets.  And so the Judge approved a series of

1    procedures when bids were due, what they had it before, the

2    bidders had to show they had enough cash to do it, they had

3    to show how the company is going to get from A to B, and so

4    those bidding procedures were approved I believe the end of

5    January, something like January 27.

6    Q.    What is the goal of setting bidding procedures like

7    that?

8    A.    It is to see if there was an alternative transaction to

9    American that would provide more money that would be a better

10   transaction for the bankruptcy estate.

11   Q.    What was the outcome of that bidding process?

12         THE COURT:  First of all, did it go out to bid?

13   A.    Yes, it did.  The bidding procedures were approved which

14   meant that there were notices sent to the world that if you

15   wanted to make a bid, it was due by a certain date.  Here are

16   the various parts of the bid you had to submit.  And I

17   believe those were due some time in late February.  At the

18   same time there was a motion on, there was a motion filed to

19   approve the sale of assets to American, and if the auction

20   had resulted in a different buyer than the motion would sort

21   have been transformed into a motion to sell to that other

22   entity.

23   Q.    Were there any offers that complied with the requirement

24   of the bidding procedures that the bankruptcy court set?

25   A.    No.  There was a kind of offer from Carl Icahn, and some

Setlzer-direct/Fram                                                    98

 1    individuals associated with him, and there was an auction on

 2    March 5, and, in New York City at the law firm of the

 3    debtors, called that company in bankruptcy a debtor, the

 4    debtor's attorneys.

 5              THE COURT:  That is TWA,

 6    A.   TWA's attorneys.  I am sorry.

 7              THE COURT:  Okay.

 8    A.   And this bid, as I remember, came in late.  It did not

 9    comply with the bidding procedures.  They adjourned the

10    auction for a day or two until I think the 7th to try to see

11    if they, if TWA tried to see if it could make it a real offer

12    and whether, and it was not able to.

13              I attended the auction on the 7th.  And TWA

14    announced that it did not believe this alternative suggestion

15    was a real -- complied with the bidding procedures order, and

16    that it was choosing the American bid, which had been

17    enhanced, American had offered more money as this bidding

18    procedures went along and as the auction went along, had

19    offered more money, and that it had chosen American as the

20    only complying bid and the winning bid.

21    Q.   So did the American bid meet the requirements of, set by

22    the bankruptcy court forbid?

23    A.   Yes.

24    Q.   You walked up to the stand with a stack of documents.  I

25    just want to make reference to a couple of them.

1    A.   Okay.

2    Q.   The first document D 395 in evidence?

3              THE COURT:  D 395?

4              MR. FRAM:  Yes, your Honor.

5    Q.   That is a letter?

6    A.   I have it.

7    Q.   That is a letter you prepared and sent on or about

8    February 26, 2001?

9    A.   That's correct.

10   Q.   And this is a letter in which you are report to go

11   Captain Duane Woerth and others on what is happening in the

12   bankruptcy?

13   A.   Yes.  It was my practice and it was in TWA as well, from

14   time to time to send a report letter to the president of

15   ALPA, copied to the MEC chairman of the -- I also sent to the

16   vice chairman I see here and other officials at ALPA in

17   Washington and other officials of the TWA MEC.

18   Q.   All right.  And you are referring to the carbon copy

19   shown on the fifth page of the letter?

20   A.   Yes.

21   Q.   Okay.  What position, what position was the TWA MEC

22   taking in the bankruptcy with respect to the Icahn sort of

23   bid that you described an and with respect to the American

24   proposal?

25   A.   The, it was prepared by -- TWA -- ALPA filed a pleading,

Setlzer-direct/Fram                                         100

1   a piece of paper, a legal document in the bankruptcy.  And it

2   was called a limited objection.  And it said that ALPA fully

3   supported the American transaction, but that it reserved its

4   rights under its scope clause, and under its successorship

5   clause, and that it wanted any order that approved the sale

6   to American to have a proviso that in effect it was without

7   prejudice to ALPA's rights under -- all the union's rights,

8   actually, under their collective bargaining agreement.

9           In addition, at the hearing, at the hearing in

10  Delaware on the 9th.

11  Q.   The 9th of March?

12  A.   The 9th of March to approve the sale to American, ALPA,

13  one of its other counsels from this corporate firm, Ralph

14  Mabey, who was a former bankruptcy judge, put on the vice

15  chairman of the MEC, Captain Shwartz, to testify at the

16  hearing in favor of the transaction -- in favor of the sale

17  to American, and to report to the Court that the night before

18  at an MEC meeting that took place in Wilmington the MEC had

19  voted to oppose in the strongest possible terms any

20  transaction of any kind whatsoever involving Carl Icahn.

21  Q.   Did you have occasion during the period leading up to

22  this hearing on March 8 to talk to the members of the MEC,

23  the TWA MEC, about their perspective on the TWA bankruptcy?

24  A.   Yes.

25  Q.   Okay.  And what did they say to you about whether they

Setlzer-direct/Fram                                    101

```
 1  approved or agreed with the American transaction or not?
 2  A.   I believe I attended part of the MEC meeting in
 3  Wilmington the week of the fifth.
 4            THE COURT:  Fifth of what month?
 5            THE WITNESS:   Fifth of March.  I am sorry, your
 6  Honor.
 7  A.   I also was on a conference call with the MEC officers
 8  and advisors I think March 1st, February 28, and at a meeting
 9  on March 2.  At every meeting that I attended members of the
10  MEC made clear that their goal, the seniority integration
11  goal, was to have the American transaction go through.  And
12  to oppose the only other transaction, if you call it that,
13  that was deposed, which was the transaction by Carl Icahn,
14  and it was -- at every meeting, you know, MEC would say,
15  let's not forget our goal, that we want the American
16  transaction to go through.
17  Q.   Did they explain why they wanted the American
18  transaction to go through?
19  A.   The company was -- yes, they did.
20  Q.   What did they say?
21  A.   The company was on the verge of liquidation.  American
22  was offering to hire all employees to assume all retiree
23  medical benefits, both for retired employees, and that
24  included retired pilots, and for active pilots, and it was
25  considered a much stronger, viable airline.  The American,
```

```
 1   they also, the American transaction was going to, in effect,
 2   save them from a liquidation of their company and they were
 3   going to go to a stronger company.  They were going to be
 4   hired.  The retiree insurance was going to be assumed, and as
 5   events went by there were additional things that were
 6   offered, contractual provisions, that were offered that were
 7   also attractive to the pilots as they expressed at these
 8   meetings.
 9   Q.   Did you hear anybody within the TWA MEC in January or
10   February before the hearing that you described, did you hear
11   any of them oppose the American transaction or say no, we
12   don't think that this should go through?
13   A.   No, I didn't.  In fact, in reviewing the filings early
14   in the case, the time of the bidding procedure motion, ALPA
15   filed a statement of position in the bankruptcy court.  This
16   was quite early, January.  Saying that it supported the
17   adoption of the procedures, and in fact, saying that everyone
18   should remember that American, I remember this language, that
19   American was a voluntary participant in the bankruptcy.  And
20   while the bidding procedure should be approved, nothing
21   should be done to dissuade American from continuing with its
22   offer, that it was a voluntary, I remember those words, a
23   voluntary participant in the bankruptcy.
24   Q.   You mentioned I think a conference call on March 1 of
25   2001?
```

Setlzer-direct/Fram                                              103

1   A.   Yes.

2   Q.   Do you have in front of you as the next exhibit D 379 in

3   evidence.  Is that the agenda for that phone call?

4   A.   Yes.

5   Q.   Did you participate in the call?

6   A.   Yes, I did.

7   Q.   Who else to your recollection participated in that phone

8   conference?

9   A.   As I remember it was not a full MEC conference call.  It

10  was the MEC officers.  I believe the major committee chairs,

11  the negotiating committee, the merger committee was on, and a

12  number of lawyers and advisors.

13  Q.   Do you see as the last item on that document, flipping

14  through the third page, actually it is Roman numeral IV.

15  General 1113 advise?

16  A.   Yes.

17  Q.   To the negotiating committee.  What is the likelihood of

18  defeating a 1113 motion.  Had a 1113 motion been filed by TWA

19  as of March 1, 2001?

20  A.   No.  No.

21  Q.   When did you first and anticipate that a 1113 motion

22  might be filed?

23  A.   I think I anticipated the possibility as soon as I

24  became involved in the case.  Once I saw that a pre condition

25  to the closing of the American transaction was that all the

Setlzer-direct/Fram                                            104

1    collective bargaining agreements have to be amended to delete

2    various successorship and seniority provisions:  So I knew at

3    that point unless American changed its mind or the parties

4    reached an agreement it was likely at some point we might

5    well see a 1113 motion.

6    Q.   You just referred to a direct question that is in that

7    agenda for March 1 of 2001.  You are one of the people listed

8    there under that agenda item?

9    A.   That's correct.

10   Q.   Did you have any comments during this conference call in

11   response to that question?

12   A.   Yes.

13   Q.   What did you do, what were your comments, what did you

14   say?

15   A.   Well, we, as you said, there wasn't a 1113 motion yet.

16   The Judge had not approved, had not -- the auction, March

17   first -- yeah, the auction had not yet taken place.  The

18   Judge hadn't approved the transaction with American yet.  And

19   the negotiations had sort of just began I think they started

20   in late February.  And so this was --

21   Q.   When you say negotiations can you been more specific?

22   A.   I think in late February American -- excuse me.  TWA

23   wrote to ALPA and said, there is no agreement between ALPA

24   and the American pilots.  I think we should, we need to sit

25   down and start negotiating.

1    Q.    The negotiations between whom?

2    A.    TWA, the company in bankruptcy and ALPA.

3    Q.    Okay.

4    A.    And so reviewed the fact that we were at a preliminary

5    stage, but my preliminary advice was that if this came down

6    to a question of American being the only game in town, the

7    only offer, and still insisting on a chain to this provision

8    to go forward, that there was an an excellent chance that the

9    motion would win and there was a very poor chance of ALPA

10   defeating it.

11   Q.    When did you first start to draft the, to physically

12   prepare a written response, to a 1113 motion.  Do you recall?

13   A.    In early March.  Before the motion was filed.

14   Q.    Do you recall the specific date?

15   A.    I doubt, I know I think I prepared an outline of

16   possibilities for for things to consider for this call.  I

17   know I did an early March, I don't remember the date.  I

18   would be guessing.

19   Q.    The next document you have is D 396 in evidence.  Do you

20   recognize that as one of your other report letters to Captain

21   Woerth and others about the status of the bankruptcy? March

22   8?

23   A.    I am not sure I have that document.

24              I do.  I am sorry.  It is attached.  It got stuck.

25              I do.

Setlzer-direct/Fram                                        106

1   Q.   And what happened in the bankruptcy court on March 8,

2   2001?

3   A.   I think as I testified earlier, the initial auction took

4   place on the fifth which was a Monday.  The auction continued

5   on the 7th and the hearing to approve the sale to American

6   took place, was scheduled to take place on Friday, the 9th.

7   Q.   Okay.  Did there come a point when you attended a

8   meeting in Washington to talk about Section 1113 issues and

9   other issues?

10  A.   Yes.

11  Q.   Okay.

12  A.   I think it was in Herndon, actually.

13  Q.   Do you have D 381 in evidence in front of you, the

14  agenda.

15  A.   Yes.

16  Q.   For the March 14 meeting?

17  A.   Yes.

18  Q.   I see the email is dated March 12, 2001?

19  A.   That's correct.

20  Q.   Pull that up, please.  And do you see an in item 2 there

21  is recommended strategy/ discussion of Wilder memorandum.

22  You see items 6 and 7, references to Holtzman March 12

23  bankruptcy memo.  Holtzman March 12 RLA memo?

24  A.   Yes.

25  Q.   Do you have behind that document as the next three

```
 1   documents, three memos all dated March 13, 2001.  The first

 2   being J 119, the second D 380 and the third D 378?

 3   A.   Yes, I do.

 4   Q.   Are those the three memos referred to in this agenda for

 5   March14?

 6   A.   Are you including item 97 on the list.  Yes, that's

 7   correct.

 8   Q.   The memo is dated March 13, 2001, is that correct?

 9   A.   That's correct.

10   Q.   The an agenda was circulated on March 12, 2001?  The

11   reference in the agenda, two of them are March 12 memos?

12   A.   Yeah.  Actually, the date on the memos from David

13   Holtzman that I have in front of me are March 13, but I have

14   a copy that I received, that I produced, actually, and that

15   are dated March 12, as I remember.

16   Q.   Is that copy dated March 12 identical to the March 13

17   paper copy, what we are working with?

18   A.   Yes,

19   Q.   I just want to clarify, you attended the meeting on

20   March 14 in Herndon?

21   A.   Yes.

22   Q.   Who else was present?

23   A.   Again I believe it was a meeting with the MEC officers,

24   the committee heads, and various legal and financial

25   advisors.
```

Setlzer-direct/Fram                                         108

1    Q.   Let's take the three sets of issues.   Recommended

2    strategy/discussion of Wilder memorandum.   Tell us without

3    getting into a great amount of detail, what was the strategy,

4    the recommended strategy outlined in the Wilder memorandum?

5    A.   The Wilder memorandum, it there was a later letter, too,

6    but I think essentially the advice was was the same in both,

7    was that ALPA had a grievance that Northwest -- excuse me --

8    that TWA had violated the successorship and scope provisions

9    of the contract, that ALPA should proceed with those

10   grievances.   The company was likely not to grieve them now.

11   And that a lawsuit should be filed in the District Court, and

12   Mr. Wilder said that that is that is where, that is where

13   there was jurisdiction.

14   Q.   You mean in the district court as opposed to the

15   bankruptcy court?

16   A.   That's correct.   For bankruptcy there are sort of three

17   levels of courts.   There is the bankruptcy court that

18   presides over bankruptcy cases.   There is a District Court

19   like this one, which is the next level up, and then there is

20   a Court of Appeals.

21         And so Mr. Wilder said that a loss would be

22   required to force TWA to grieve these -- to proceed with the

23   arbitration, that it could be brought in the District Court,

24   the District Court had jurisdiction and the District Court

25   would hear it, and that also that if the District Court could

Setlzer-direct/Fram                                      109

 1    be asked to issue an injunction against the transaction, and

 2    to hold the entire transaction in abeyance just sort of let

 3    it sit there for a while while this arbitration took place

 4    over ALPA's contractual rights.

 5    Q.    The whole transaction being what?

 6    A.    The whole sale to the American.

 7    Q.    You said the transaction to hold the transaction in

 8    abeyance.  Is there a different word Mr. Wilder  used to

 9    describe the goal of the theory?

10    A.    At a later meeting he called it ransom.

11    Q.    What was the context in which he used the word ransom?

12    A.    That his litigation strategy would delay everything and

13    put a lot of leverage on American and in effect, the only way

14    for American to proceed would be to ransom the transaction by

15    doing what ALPA wanted.

16    Q.    Did, the discussion that took place about this theory on

17    March 14, did you have any comments  in response to this

18    theory that Mr. Roland Wilder was offering up?

19    A.    Yes.  I mean, I had just heard about this theory.  I

20    think he sent a memo to the MEC officers.  I wasn't copied on

21    it.  But at some point either at this meeting, or it was

22    described to me at this meeting, in, I think one thing I just

23    need to say in explain what I said, March 14 was after March

24    12.  And March 12, the bankruptcy court had issued a very

25    strong decision approving the transaction to sell the TWA

Setlzer-direct/Fram                                                    110

1    assets to American.

2    Q.   What do you mean by a strong decision?

3    A.   He said  --

4               THE COURT:  This is Judge Walsh.

5               THE WITNESS:  This is Judge Walsh, yes, your Honor.

6    A.   He said there was a very, very strong likelihood, let me

7    use the word, a very, very strong likelihood, if not

8    certainty, that TWA would liquidate if this transaction did

9    not gone through.  And he used words like collapse in a free

10   fall bankruptcy if this transaction didn't go through.  My

11   experience in bankruptcy, those were pretty strong words for

12   a Judge to use.

13   Q.   What impact if any did those words have on your

14   assessment of Mr. Wilder's injunction theory?

15   A.   Well, I first thought as a legal matter that the lawsuit

16   would not be heard in District Court.  When I was

17   representing ALPA in Eastern bankruptcy, Eastern Airlines,

18   ALPA filed that kind of lawsuit in the District Court.  And

19   the bankruptcy Judge enjoined it.  And said, if a lawsuit was

20   going to be brought it had to be brought before the

21   bankruptcy court.

22               The bankruptcy court also enjoined an arbitration.

23   There were two parts of the case.  It went up to the Second

24   Circuit.  I argued it, I was the lead attorney on it.  And

25   the Second Circuit held that as long as the bankruptcy court

1    had a basis to hear a lawsuit involving the bankruptcy

2    activities of a company, that the lawsuit had to be heard in

3    the bankruptcy court.  That was the holding of the case.  It

4    also held that arbitrations were not stopped by a bankruptcy.

5    There were two pieces.  One about arbitration and one about

6    lawsuits.

7             And so I thought that Mr. Wilder didn't discuss

8    this case.

9    Q.   What was the name of the case?

10   A.   In re Ionosphere club because that was, I think it was a

11   travel agency or something that Eastern Airlines ran.  So the

12   name that was used in all the Eastern Airlines decisions was

13   Ionosphere clubs but it was the Eastern Airlines case.  It

14   was a pretty well known case.  It is an issue I think in the

15   early 90s and American's the people who dealt with unions in

16   bankruptcy, it was a very, very well known case.  I

17   particularly was aware of it because it was my case.

18            So I thought his suggestion that this injunction

19   action was going to be heard in the District Court, just was

20   incorrect.

21            I also, I don't know whether I said it at in

22   meeting or another meeting, but because of a shortage of

23   bankruptcy judges in Delaware, the District Court judges had

24   sat as bankruptcy court judges in many cases.  And so they

25   were used to sort of being bankruptcy judges.  And the

Setlzer-direct/Fram                                           112

1    impression of the bankruptcy bar, and my impression, was that

2    they, more than the usual District Court Judge, they tended

3    to see things in bankruptcy terms in bankruptcy cases.

4            So the idea that some District Court Judge is just

5    going to issue injunctions without sort of a, taking into

6    consideration what was happening in the bankruptcy, just

7    struck me as completely misleading and incorrect and without

8    really any basis in the law.

9    Q.   And how did you express your view at this meeting with

10   respect to Mr. Wilder's injunction theory?

11   A.   Well, to the extent of -- again, we were sort of, we

12   would move forward at this point.  The Judge had approved the

13   American transaction.  The 1113 hadn't been filed yet,

14   although by the 14 we were pretty sure it was coming and

15   coming soon.

16           So I thought the idea that the District Court would

17   hear this case was wrong.  I expressed that.  And he also had

18   theories about how it would delay the 1113, and it was

19   amplified as he went along and another memo later on, and at

20   least my preliminary review of that was that that was not

21   going to happen either.

22   Q.   Let's take it a meeting at a time.  Have you told us

23   everything you recall saying at this meeting on March 14

24   about your view of Wilder's injunction theory?

25   A.   Yes, I think generally I have.

1  Q.   Okay.  Do you recall some discussion at this meeting

2  about the likelihood that a Section 1113 motion, if filed,

3  would be granted?

4  A.   Yes.

5  Q.   What do you recall saying about that?

6  A.   What I recall saying is that, again, that the likelihood

7  of it being granted in respect to this scope issue, was very

8  high.  That was the only issue out there.

9         But as I remember in the middle of March there were

10  still a number of negotiations going on between ALPA and TWA

11  about the contract that would be in effect between ALPA, TWA

12  LLC, the new company, the new part of American, and that

13  there were a bunch of issues out there.  And and those

14  negotiations were continuing, and so I said if TWA and

15  American stop negotiating, or don't offer anything, or don't

16  provide information you want, I still didn't think our

17  chances were that good but that if they were not negotiating

18  and making proposals about the new contract, that perhaps we

19  would have -- there was a possibility at least of, it wasn't

20  quite as dire, but in terms of the scope, I think my view all

21  along was that we didn't have owe on I didn't -- I didn't see

22  that ALPA had much of a chance.

23  Q.   Why were issues of offers and negotiations, why were

24  they relevant to Section 1113?

25  A.   Well, under Section 1113 there are requirements that the

1    company in bankruptcy and the union meet at reasonable times,

2    that they negotiate in good faith, that the Court's have

3    said, you know, that they make proposals, and so March 14

4    wasn't the end of the negotiation.

5             So I remember saying in terms of these other

6    matters, you know, we have to sort of see what happens in

7    terms of them but that ultimately in terms of the scope

8    clause, that is what the 1113 came down to, I did not think,

9    again, we could see what developments happen, we hadn't seen

10   the motion, we were still tort of -- the day ended up being

11   the day before the motion was filed but my general view was

12   it was going to be very, very hard to defeat a 1113 that was

13   focused on just the scope and successorship clause.

14   Q.   Were there other advisors to the TWA MEC present at this

15   meeting on March 14, 2001?

16   A.   My recollection is that at all of these meetings David

17   Holtzman was there, Steve Tumblin was there who was a lawyer

18   from LeBoeuf Lamb, the corporate law firm that ALPA had used,

19   the TWA MEC had used in the past.  Roland Wilder may have

20   been there.  I think he was there actually, and Michael

21   Glanzer who was the financial advisor, attended I think every

22   one of these meetings.

23   Q.   Do you recall what any of the other advisors said if

24   they said anything about the likelihood that a Section 1113

25   motion, if filed, would be granted?

Setlzer-direct/Fram                                    115

1    A.   Take again, take into consideration that it was still

2    sort of premature, the motion hadn't been filed.

3    Negotiations were still going on.  I don't think anyone

4    differed with my view, with my general view.

5    Q.   Did the issue come up as this March 14, 2001 meeting,

6    about whether, if the 1113 motion was granted the TWA pilots

7    would have a right to strike.  Do you recall that coming up

8    at this meeting?

9    A.   I know it came up at the next two meetings after this.

10   It may well have come up at this meeting.  You don't know

11   whether I remember whether it specifically came up with this

12   meeting.

13   Q.   Let's move ahead to the next meeting then.  I think you

14   mentioned a couple minutes ago that the actual 1113 motion

15   was filed a day or so later?

16   A.   It was filed on the 15th.

17   Q.   Do you have in front of you just for reference if you

18   need it D 12 in evidence, which is the motion and D 211 in

19   evidence, which is the supporting declaration  of Terry

20   Hayes.

21   A.   Yes, there was a motion, there was a memorandum of law

22   which is attached to the proceedings and then there was a

23   Terry Hayes declaration and a bunch of exhibits to that.

24   Q.   Is D 397 in evidence, your March 16, 2001 document, the

25   next document?

Setlzer-direct/Fram                                        116

1    A.    Yes.

2    Q.    What was your purpose in preparing and circulating this

3    letter?.

4    A.    There were a number of developments in the bankruptcy.

5    One of them was the filing of the 1113 motion which I

6    regarded as a very important development.  I thought it was

7    -- the Judge had also, since my last report letter, had

8    approved the sale to American.  There was a contract, it was

9    a Carl Icahn, who used to be the owner of TWA, a Carl Icahn

10   entity called Karabu which had this special arrangement with

11   TWA to sell ticket.

12          That contract had been rejected by the bankruptcy

13   court, and the 1113 motion had been filed.  So I was

14   reporting on all those things in this letter.

15   Q.    I see on the second page of the letter a heading,

16   Section 1113 motion?

17   A.    Yes.

18   Q.    The motion papers were collectively about how many

19   pages, how long?

20   A.    The Terry Hayes declaration of exhibits was a couple of

21   inches thick.  The motion and the memo, I don't know, were

22   40, 30, 40 pages, something like that.  It was a big stack of

23   documents.

24   Q.    Can you summarize the motion it looks like in a page or

25   so?

1    A.    Yes.

2    Q.    Just looking at this second full paragraph, the one

3    beginning the motion relates to the asset purchase agreement?

4    A.    Yes.

5    Q.    Skipping ahead.  The second line on that paragraph.  The

6    motion and supporting papers include the following statements

7    about the consequences of the failure to reach agreement or

8    or reject the CBA.  You quoted, it looks like four block

9    quotes in the motion papers?

10   A.    Yes.

11   Q.    Why did you choose to highly those four aspects of the

12   motion in this report letter to Captain Woerth and others?

13   A.    TWA was saying in very strong terms, and Mr. Hayes was

14   saying in a declaration under oath, that if the -- if ALPA

15   did not agree, and it was the IAM, the machinists union, and

16   ALPA did not agree to these changes, or if the contracts were

17   not rejected, that it was TWA believed that it would have to

18   liquidate, and that it would have no other option.  And Mr.

19   Hayes said that it was TWA's view that American was concerned

20   not only about closing but any delay in closing as it stays

21   on there on the board, it was TWA's understanding that the

22   sale was delayed, American might walk away from the deal.

23          I thought that these were very significant

24   statements, that they represented a -- TWA's statements, but

25   TWA statements were stating that there was a major risk to

Setlzer-direct/Fram                                          118

1    TWA liquidating, or the American transaction going through,

2    if  an agreement was not reached or there was not a

3    rejection.

4           I thought, again, these were very strong

5    statements.  They represented a potential very big risk, and

6    I thought everybody at ALPA, from the president, the MEC

7    chair, through the MEC vice chair, to the two representatives

8    on the creditors committee, needed to focus on these risks,

9    that, you you know, they were in the documents.  They said

10   what they said.

11   Q.   All right.  What is the next meeting you recall where

12   Section 1113 and related issues were discussed?

13   A.   There was a meeting in St. Louis.  I believe on March 21

14   and 22.  And it was called, I think to discuss the status of

15   the 1113.  It was also, there was also what is called a 1114,

16   it is another provision of the code dealing with retiree

17   medical benefits, and there was a separate committee diagnose

18   that, reviewing that but that was also going on.  We were

19   discussing that as well.

20   Q.   Was there a separate motion that had been filed under

21   Section 1114?

22   A.   Yes.  I believe so.

23   Q.   To what degree were you involved in assessing that?

24   A.   I wasn't, but there was -- at a certain point the Court

25   or the U.S. trustee had to appoint a committee.  They wanted

1    a pilot representative or two, and so I do remember talking

2    to people at ALPA about that, did they have a recommendation

3    on who might be a good retiree to serve on the committee.

4    But other than that, and sort of reporting that the motion

5    had been made, ALPA didn't -- none of the unions I think

6    represented there, retirees for those purposes, so it wasn't

7    that.

8    Q.   Did you give some kind of presentation at the meeting on

9    March 21 and 22 of 2001 about Section 1113, the likelihood of

10   it being granted and related issues?

11   A.   Yes.

12   Q.   As of March 21 and 22, did you have an understanding

13   about when the motion would be heard by the Judge, by Judge

14   Walsh and when ALPA would be required to file any responsive

15   papers?

16   A.   Yes.

17   Q.   What was your understanding of when the motion was going

18   to be heard by Judge Walsh are?

19   A.   I believe when the motion was filed, in fact, if I can

20   look at it for a second, it had down, hearing on the first

21   page, it had hearing date to be determined.  Objection date,

22   March 26.

23          So when it was filed we actually didn't know what

24   day it was going to be heard.

25          I believe right around the 21st, it may have been

Setlzer-direct/Fram                                           120

1    the 21st, TWA filed an amended motion stating that the

2    hearing would be held on April 6, and that objections would

3    be due March 30 instead of March 26.

4    Q.   Okay.

5    A.   And I believe I reported at that meeting that at some

6    point during that meeting.

7    Q.   When you reported to the MEC -- by the way, just tell us

8    generally who was present at the meetings on March 21 and 22,

9    2001?

10   A.   It was an MEC meeting.  There were a series of these

11   meetings.  Members of the MEC would be there and the officers

12   and the chairs at least of the negotiating and merger

13   committees, and the creditors committee representatives, and

14   David Holtzman and me and Steve Tumblin and Michael Glanzer,

15   and I think at most of these meetings, if not all of them,

16   Clay Warner.

17   Q.   Did you talk at the meeting on March 21 and 22 about

18   whether the hearing date could be postponed, whether there is

19   a way to get the motion to be considered to be put off?

20   A.   I believe I did.

21   Q.   What did he say?

22   A.   The statute, this is a very unusual statute.  The

23   statute says that when the motion is filed, the hearing, the

24   Court will schedule the hearing no later than two weeks after

25   the motion is filed.  And the Court, for, it says something

Setlzer-direct/Fram                                                121

1    like special circumstances or the circumstances of the case,

2    can extend it one week, and that is all.  The hearing has to

3    start 21 days after the motion is filed.  No later than that.

4    Unless the company agrees.

5              As I remember, April 6 was 21 days, maybe it was 20

6    days, but it was 21 days after March 15.  So that unless the

7    company agreed, the hearing was going on start on April 6.

8    The statute instructed the Judge not to extend the start of

9    the hearing unless the company agreed.

10   Q.   Did you have a sense on March 21 or 22 of how long the

11   hearing would take?

12   A.   Yes.  I had a general sense.

13   Q.   Did you talk to the people at the meeting about how long

14   you thought the hearing would take?

15   A.   At both this meeting and the meeting on, the last

16   meeting which was April 1, 2, my -- and we were focusing at

17   this point more on getting the objection done and filed.

18   That was the first thing we needed to do.  But that -- from

19   everything I knew in the negotiations, everything was

20   focusing now on scope and successorship.  And seniority

21   integration.  I sort of mean that too.

22              And so my view, I think I expressed at this point,

23   I know I expressed at the next meeting, was that we would

24   need a witness, the negotiating history was going to be

25   agreed to, I thought, what is in the contract is going to be

Setlzer-direct/Fram                                       122

```
 1   agreed to.  We were going to need a witness to explain why

 2   seniority integration was important to ALPA, what proposals

 3   it had made and why it believed that its proposal should be

 4   adopted.  And that that was going to be the focus of what --

 5   there were documents we could present.  There were certain

 6   more technical objections we could make.  But that the focus

 7   of the hearing is going to to be on a witness explaining to

 8   the Court why seniority was important, how it affected a

 9   pilot's life, and why it was important to ALPA to have this

10   proposal.

11   Q.   Hadn't there been Section 1113 hearings in other cases

12   that had taken weeks, testimony and evidence put in over

13   weeks?

14   A.   Yes.

15   Q.   Okay.  Did you think that the hearing that might take

16   place here would take weeks?

17   A.   Not at all.

18   Q.   How long, if you can recall in days, did you tell people

19   you thought the hearing would take?

20   A.   A day or two.  The hearing on the entire sale to

21   American Airlines took a day and a half.

22   Q.   Is that unusually fast in your experience?

23   A.   Not in a -- not in a case where the company was losing

24   three million dollars a day and was only operating because it

25   had received financing from American Airlines, and where the
```

Setlzer-direct/Fram                                    123

1    reports that were being received were that it was American

2    Airlines presence that was keeping passengers flying TWA.

3    And so in all these other cases -- not all these other cases

4    -- but in many 1113 -- most 1113 proceedings the issue isn't

5    scope or successorship or seniority integration.  If the

6    company says you are making so many dollars an hour, and we

7    want to cut it by half, and the union comes back and says no,

8    we only want to cut it by a dollar, and there are economic

9    experts get on the stand and say here is the company's

10   balance sheet and here is the company's cash flow and we

11   think that this much cash flow is enough.

12        The other side says no, we think this much cash is

13   enough.  And there can be a lot of testimony about that, and

14   about the meaning of proposals.  As we are getting towards

15   the end of March, the entire process is focused on the

16   seniority integration issue.  That is, seniority integration

17   issue and the fact that this, only the American transaction

18   out there, that is going to save the airline and jobs.  That

19   what is the hearing is going to come down to.

20   Q.   Did you have any views at the meeting on March 21 and 22

21   about how long after the hearing was concluded Judge Walsh

22   would likely rule on the motion?

23   A.   Yes.

24   Q.   Judges sometimes take months and months to decide

25   complex matters?

Setlzer-direct/Fram                                          124

```
 1              THE COURT:  Sometimes years.
 2   Q.   Okay.  You understand from your experience that
 3   sometimes judges need time to work through difficult issues
 4   and render their decisions, yes?
 5   A.   Yes.
 6   Q.   Did you have a sense from your knowledge of Judge Walsh
 7   of how long it was likely to take him to rule on the 1113
 8   motion if it went to a hearing?
 9   A.   Very, very quickly.  He finished the hearing on the sale
10   motion on a Saturday.  He continued the hearing on a
11   Saturday.  Somewhat unusual.  And he issued the decision on a
12   Monday.
13              Judge Walsh, as many bankruptcy judges do, often
14   instead of writing a full decision, will come out on the
15   bench and read his decision into the record.  And that is
16   what he did with the sale hearing.  That is what I have seen
17   bankruptcy judges do many times.  Sometimes they will issue
18   formal decisions, but very often because bankruptcy tends to
19   be  a very expedited process, they will read the decision
20   into the record.  And that is what he had been doing in the
21   case.
22   Q.   Sometimes motions get settled, they get worked out with
23   the assistance of judges?
24   A.   Sometimes, yes.
25   Q.   Had you had decisions in bankruptcy where the Judge
```

Setlzer-direct/Fram                                                    125

```
 1   talked to a lot of lawyers, maybe back in chambers or a
 2   conference room, to try to broker a deal?
 3   A.    In a 1113 proceeding it happened to me once and it
 4   happened ten years after that.
 5   Q.    I guess my question is wasn't there a chance in your
 6   mind that instead of proceeding with the 1113 hearing that
 7   Judge Walsh might try to sit down with the lawyers and broker
 8   a deal that would be better for the TWA pilots than what TWA
 9   LLC was offering?
10   A.    I had one or two cases, it was a 1114 case that actually
11   the motion was, it it was a very complex, difficult retiree
12   insurance matter before Judge Walsh, where we represented the
13   steel workers.
14         And there was another actual proceeding where
15   people in the office were handling with Judge Walsh.  We had
16   been before Judge Walsh in one way or another many times.
17         My experience has been that Judge Walsh does not
18   hold chambers conferences.  Judge Walsh comes out on the
19   bench and he asks the attorney to speak and he proceeds.
20   Some judges and there are some bankruptcy judges who will
21   pull people know chamber --- not full people, whoosh -- ask
22   lawyers to come into, who will ask people to -- ask lawyers
23   to come into chambers and talk about sort of where the case
24   is going,  and there are some judges who don't do that at
25   all.
```

1          Judge Walsh, I was before Judge Walsh last week in

2    a different case, and I actually asked a local Wilmington

3    lawyer, they said they never heard of Judge Walsh ever having

4    a chambers conference, in 20, 30 years on the bench.

5    Q.   So going back to March of 2001, if Judge Walsh granted

6    the TWA motion after a hearing, wouldn't there have been a

7    right to appeal that rejection of the TWA contract up to

8    District Court?

9    A.   In was a potential right to do that.

10   Q.   Tell us what the potential right was?

11   A.   There have been cases, and this is a, sort of a

12   technical aspect of bankruptcy, where in bankruptcy because

13   things move very quickly, and events and sales get done, that

14   a lot of times when you when you try to appeal something from

15   a bankruptcy court, the appeals court will say, it is too

16   late.  The sale took place.  The plan or reorganization was

17   confirmed.

18          THE COURT:  That is more when the sale, when you

19   are trying to stop a sale that has already taken place, the

20   doctrine of mootness --

21          THE WITNESS:  That's correct.

22          THE COURT:  You just say it is too late, you try to

23   undo something that has already happened.

24          THE WITNESS:  That's right.

25          THE COURT:  It wouldn't normally apply in a 1113.

1    A.   I wouldn't but --

2         THE COURT:  Unless it was followed by --

3    A.   In this case, the sale was approved.  The report was

4    that American was anxious to close as quickly as possible.

5    So one possibility was, while we were appealing from the

6    1113, if the sale closed, we might be faced with a mootness

7    problem.

8         THE COURT:  Wouldn't the reaction at that point,

9    the person, unhappy with the decision to grant the 1113,

10   wouldn't they at least, in fact they would have to apply for

11   a temporary stay of the sale to keep that that from

12   happening, to keep the whole thing from becoming moot?

13   A.   Yes, your Honor.

14        THE COURT:  Then they would take that up to the

15   District Court and maybe after that the Circuit.

16        THE WITNESS:  Right.  And already in the case, I

17   don't remember which party sought to stay the bidding

18   procedures order.  And Judge Walsh had issued again a pretty

19   strong opinion saying that the expedited nature, the

20   expedited schedule for the bid procedures was necessary, and

21   that he was not going to, he was not going to stay it.  It

22   was not stayed on appeal.

23        If you are not the government, there is always a

24   problem in these cases if a bond is requested because in this

25   case the transaction was worth millions and millions of

Setlzer-direct/Fram                                      128

1    dollars.  The Judge, the bankruptcy Judge was saying the

2    alternative was liquidation.  So in, and my conclusion was

3    also that it was not only that Judge Walsh was likely to

4    grant 1113.

5           My conclusion was that it was likely an appeal that

6    that kind of odd would be affirmed.

7    Q.   In terms of the potential for a stay, you mentioned the

8    bond.

9           Can you just explain to the jury what the roll of

10   the bond is in the appeal process as it relates to a stay?

11   A.   Okay.  When you get a decision from a trial court, like

12   this court or a bankruptcy court, and then you appeal, and

13   you want whatever was done by the court not to take place

14   while you are appealing, in other words, you wanting just to

15   stay the same even though you lost, you want everything to

16   stay the same while you are appealing, what the judges will

17   often do is say if you want that you have to put up a whole

18   bunch of money with the Court, a bond, so that if you are

19   wrong and you appeal and you have delayed everything and

20   people have lost out because we delayed it, there is a big

21   sum of money available to compensate the people who were hurt

22   by the delay.

23          And so, and in most cases when you lose, and then

24   you want to go on appeal and you want the decision stopped

25   while you are appealing, if it is that kind of case, then

Setlzer-direct/Fram                                         129

```
 1   courts usually say, well, you have to put up some money.  If
 2   it is a small case, the bond could be 5,000 or 50,000.  If it
 3   was a case like this, my thought was that TWA and/or American
 4   would say, and then it happened in other cases where other,
 5   what other parties have tried to stay, you know, put up a
 6   bond of whatever amount.  And I thought once we got to April
 7   1, once the motion was filed, again, there were developments
 8   and contract negotiations were getting closer.
 9           American transaction has been approved.  Everything
10   was sort of narrowing down.  I thought it was very likely
11   that this 1113, the 1113 would be approved and that that
12   would be affirmed on appeal, and as it happens, ultimately
13   there was an appeal and it was -- and the decision to sell
14   was affirmed on appeal.
15   Q.   Still focusing on March 21 and 22 of 2001, do you recall
16   any discussion at that meeting about the right to strike,
17   self help remedies about the TWA pilot might have if the 1113
18   motion was granted and the contract went by the wayside.
19   A.   Yes.
20   Q.   Tell us what you recall of that discussion?
21   A.   Well, the issue had been raised in one of the memos from
22   Mr. Holtzman, one of the March 12 memos, so it was discussed,
23   I know, I believe at the March 14 meeting, and the last, my
24   memory is the last two meetings, the last two meetings to me
25   were April 1 and March 21, 22, that the issue of the strike
```

Setlzer-direct/Fram                                            130

```
 1    was discussed.  I know it was at least one of them.  I

 2    believe it was at both meetings.

 3    Q.   We are still focusing on March 21 and 22?

 4    A.   Right.

 5    Q.   Do you recall it being discussed at that meeting?

 6    A.   I believe it was discussed because we were discussing --

 7    the meeting was really called to discuss the 1113.  The

 8    filing, the response, the implications of a 1113.

 9    Q.   Do you recall what was said about the potential right to

10    strike with the 11th, if the 1113 were granted?

11    A.   Yes.

12    Q.   Tell us, please.

13    A.   I was very careful, the other advisors were very careful

14    to sort of divide up this issue.  And Mr. Holtzman's memo had

15    divided up the issue for us.  The first issue was could, if

16    the 1113 were granted, could the pilots strike against the

17    company in bankruptcy.  TWA, Inc., the debtor, I think of it

18    as the debtor.  And the answer to that was yes.  We could

19    strike against this company that was on the verge of

20    liquidation, they could strike against that company.  And

21    there --

22              THE COURT:  It was a company that was still flying

23    the aircraft.

24    A.   I it was the company still flying the aircraft, although

25    one could wonder if the 1113 were granted whether, how much
```

Setlzer-direct/Fram                                        131

1    longer they would be flying the aircraft.

2             THE COURT:  I know.

3    A.   The second question that was posed to us at this meeting

4    and the March 12 memos, March 14 meeting, was under various

5    circumstances, if the pilots went -- if the pilots ended up

6    despite the 1113 being hired by the new company, I think of

7    it as the new company, TWA LLC, could they strike against TWA

8    LLC.

9             THE COURT:  You are assuming the closing took

10   place.

11   A.   Yes.  That is how the question was usually posed to us.

12   The closing took place, there was no contract.  But the

13   employees got hired any way.  The pilots got hired any way.

14   And that answer was very different.  That answer was we could

15   give no assurance that they would be able to strike.  That it

16   was sort of a -- we received a number of questions about it,

17   because the pilots were looking to see, was there some

18   assurance that if the contract were rejected and they were

19   hired any way, it sort of wanted to know, well, what would

20   take place with the new airline, would we be protected?

21   Could we strike?  Would we have a contract?  They asked all

22   these questions together.  What would happen?

23             And on the strike we explained, and I had had some

24   research done before this meeting on the 21st, and I had, and

25   I had research done twice because my, I had it done.

Setlzer-direct/Fram                                    132

1    Q.    Research done by whom?

2    A.    Research done by other people in my office, and in fact

3    I held a meeting with several, I do some Railway Labor Act

4    work but I primarily do bankruptcy work involving ALPA.

5           I held a meeting with other individuals in my

6    office who do more Railway Labor Act work, and Clay or

7    somebody may have brought it to my attention.

8    Q.    Clay Warner?

9    A.    After those meetings it was brought to my attention.

10   Q.    Clay Warner?

11   A.    Yes, I am sorry.  Clay Warner.  That there was a Second

12   Circuit case, that, from the point of view the union, a

13   terrible case, but sometimes there are terrible cases, that

14   said, if a company was a new company, and a new employer, and

15   there was no contract, between the company and the union,

16   under the Railway Labor Act which is what governed the

17   airlines, the union couldn't strike because it was contrary

18   to an obligation of the Railway Labor Act, but the company,

19   after it set terms and conditions of employment, could change

20   it.

21           It is the worst of all possible words.  The union

22   couldn't strike and the company could lower salaries, change

23   working conditions.  And at the end of the decision, the

24   Second Circuit said, you know, the union says this sounds

25   very unfair.  It is very unfair.  It sounds very unfair but

1    that is the law, and that is the law for a new company.

2            We had tremendous concern that that is the law that

3    would be applied to TWA LLC, the new company, if there was no

4    contract, and it was just a transfer of employees.  And that

5    a court would say that is a new company, there is no contract

6    in effect and there were other theories that somehow it was a

7    successor under labor law although I am not sure that would

8    have done anything other than a bargaining obligation.  What

9    we said is we can give you no assurance that you can strike

10   and there is a good possibility, or a larger probability,

11   that you will not be able to strike.  There is this awful

12   decision out there.

13   Q.   Could not strike against?

14   A.   TWA LLC.  So again, we said you can strike against your

15   company, your current company.  But then the next question is

16   can we strike against the new company.  And we said, we think

17   there is an excellent chance you cannot strike against the

18   new company.

19   Q.   All right.

20   A.   And I will say that in response to the first point,

21   members of the MEC sort of said, at various meetings, why

22   would we want to strike against TWA, which is in bankruptcy

23   and to the err go on the verge of collapse.  That was their

24   question.

25           THE COURT:  By the way, assuming they struck TWA

```
 1   struck TWA Inc., they walked out the day of the decision and
 2   the closing hadn't taken place, wouldn't that have entitled
 3   American not to close under the terms of the acquisition
 4   agreement.
 5   A.   I think so.
 6        THE COURT:  Isn't there a general provision in the
 7   acquisition agreement that if there is a change in
 8   circumstance.
 9   A.   A material change.
10        THE COURT:  A material adverse change, they don't
11   have to close.
12   A.   I think that is absolutely right, your Honor.
13         ATHE COURT:  I think that is in.
14   A.   I think it is in the asset purchase agreement.
15   Q.   Still focusing on the March 21, 22, 2001 meeting, did
16   any members of the MEC or any of the negotiating committee or
17   merger committee people speak in favor of the idea of a
18   strike?
19   A.   A strike against either company.
20        THE COURT:  Generally, a strike against anybody.
21        THE WITNESS:  I don't remember any MEC owe on I
22   remember a lot of questions about strike, want to go
23   understand it.  I don't remember any MEC member saying we
24   want -- I think they wanted to know.  Nobody said let's
25   strike, we want to strike.  I think they wanted to know if
```

Setlzer-direct/Fram                                             135

1    they went to LLC and they didn't have a contract and things

2    didn't work out well there, would they have the strike as a

3    weapon.  And we told them there is an excellent chance you do

4    not have the right to strike.

5    Q.   Did any of advisors say the idea of a strike would be a

6    good idea against either company, TWA Inc., or TWA LLC?

7    A.   I don't think anybody offered an opinion about LLC, the

8    new company.  I think advisors sort of slugged our shoulders

9    and said, as the MEC was, you know, it is an interesting

10   question why you would want to strike against a company that

11   is maybe on the verge of liquidation.

12   Q.   Let's move on head, unless, does your Honor want a

13   break.  I think we have been going an hour and a half.  I

14   want to ask about the April 1 meeting now?

15              THE COURT:  Let's take a break until a few minutes

16   after twelve, 12: 02 or 12:03

17              MR. FRAM:  Thank you, your Honor.

18              THE COURT:  Do not discuss the case amongst

19   yourselves.  Keep an open mind until you have heard all the

20   evidence.  All rise.

21              (Recess.)

22              THE COURT:  You noticed I added a few lines about

23   the attorneys generally.  Anybody have any objection did

24   that?

25              MR. PRESS:  No.

Setlzer-direct/Fram                                     136

1            THE COURT:  You want me to tell the jury I didn't

2    mean it?

3            MR. FRAM:  Thank you.

4            THE COURT:  Everyone satisfied with my ad lib?  I

5    thought that, as I was reading it, it was just, it would have

6    its intended -- it would not have an unintended effect of

7    emphasizing something in the way that it shouldn't.  I

8    thought those comments in the instruction would mollify or

9    abate any consequence, the law of unintended consequences.  I

10   thought we could avoid the law of unintended consequences.

11   As to making the statement as to all employers.

12           MR. FRAM:  It was appreciated.  Thank you.

13           THE COURT:  Plaintiff is satisfied.

14           MR. PRESS:  No problem, Judge.

15           THE COURT:  Okay.  See you a little after noon.

16           (Recess)

17           (The jury enters the courtroom.)

18           RICHARD SELTZER, resumes.

19           CONTINUED DIRECT EXAMINATION.

20           BY MR. FRAM:

21           THE COURT:  Mr. Fram, you may continue.

22   Q.   Mr. Seltzer, we are up to the meeting on April 1, 2001.

23   Do you recall the meeting?

24   A.   Yes, there were meetings on April 1 and 2.

25   Q.   Let's start with April 1.  Where was was the meeting?

Setlzer-direct/Fram                                    137

1   A.   St. Louis.  I believe it was at the MEC office.

2   Q.   Who else was present?

3   A.   There were a number of advisors, again, I believe

4   Michael Glanzer, David Holtzman, I know Clay Warner.  And I

5   believe, Steve Tumblin.  And I believe Bill Roberts was

6   another ALPA representative who was there.

7   Q.   How did the meeting start, do you recall?

8   A.   I got there very early.  I think advisors sort of came

9   in one by one during the morning.  And I think MEC members

10  came in later in the morning and the early afternoon and then

11  I think we started, in the afternoon, as I remember this was

12  not an MEC meeting to take action, this was an MEC, I don't

13  know, informational meeting or a meeting for them to go over

14  issues with advisors.

15  Q.   And do you recall the first presentation or the first

16  people who spoke?

17  A.   I think there was an update by the negotiating

18  committee.  Ron Kiel was the chairman.  About where the

19  negotiations with TWA were.

20  Q.   Okay.  Did you give any type of report or update on the

21  status of the Section 1113 motion at this meeting?

22  A.   Yes.  I reported that the 1113 -- that an objection to

23  the 1113 motion had been filed.  This was Sunday, late on

24  Friday afternoon.

25  Q.   What, if anything, did you say about the objection that

Setlzer-direct/Fram                                        138

1    had been filed?

2              THE COURT:  Who prepared the objection.

3              THE WITNESS:  I prepared it, and then a draft of

4    drafts of it were circulated to Mr. Holtzman and Mr. Warner

5    and Mr. Tumblin, and I got comments back and, we got comments

6    back and I know Mr. Holtzman reported that Mr. Kiel had

7    suggested that some other things be added to it, so this was

8    sort of a group of people who were looking at it.

9              THE COURT:  Then you incorporated those comments

10   and you were the one that filed it.

11   A.   Actually, the local counsel in Delaware.  I think it was

12   Saul Ewing filed it.

13             THE COURT:  You were the point man.

14   A.   I was the point man.  It was before electronic file

15   filing, your Honor.

16             THE COURT:  Now you press a button and it is filed

17   wherever you are.

18   A.   Right.

19   Q.   Did you mention Mr. Kiel had some input into the written

20   objections that were filed?

21   A.   I remember that there was some port part of either the

22   negotiation or pass concession or something that he thought

23   was missing from a draft.  Mr. Holtzman reported Ron thinks

24   we should add such and such at some point.

25   Q.   At at the meeting on April 1 can you describe the

Setlzer-direct/Fram                                            139

```
 1    argument that had been made in the objection.
 2    A.   I think I advised there were a number of, what I think
 3    of as technical arguments.  We also raised the argument that
 4    was in the -- that related to the grievance, that you know,
 5    it was ALPA's position that the company shouldn't have
 6    entered into the asset purchase agreement without getting
 7    ALPA's agreement.  And that generally, now, it took the
 8    position that ALPA thought that its seniority -- it shouldn't
 9    have to waive these various provisions of the contract, along
10    with some technical, what I thought of as largely technical
11    objections.
12    Q.   Did you talk to the members of the MEC on April 1, 2001,
13    about your view of, at that point, of how the 1113 motion was
14    likely to be decided?
15    A.   Yes.
16    Q.   What did you say?
17    A.   I said in the strongest possible terms that it was my
18    belief the motion was going to be granted.   I think someone
19    asked can you give a percentage and I and I said is there a
20    number higher than 99, that in light of the judge's decision
21    on the 12th that --
22              THE COURT:  March 12.
23              THE WITNESS:  March 12.  I am sorry, your Honor.
24    A.   -- that he had concluded that there was a very, very
25    strong likelihood, if not certainty, on liquidation if this
```

1    as asset purchase agreement with American didn't go through,

2    and with the fact that although American had not -- American,

3    and the new company, had not gone as far -- had -- and TWA,

4    had not agreed to the ALPA position on scope and

5    successorship, that there was this negotiation about the new

6    contract with the LLC.  And that as I remember the

7    negotiating committee reported that they had finally gotten

8    all of TWA's, and TWA LLC's current position in writing, that

9    they that there were raises, there were contributions to a

10   pension fund at TWA, that there were a number of improvements

11   and sort of bringing the TWA pilots up at a certain point to

12   the level where the American pilots were.

13          And a grievance procedure.  And a whole slew of

14   things that others who were involved in the negotiations

15   reported on more than I did.  But ALPA had achieved in that

16   part of the negotiation, and the company and LLC had moved a

17   tremendous amount.

18          And based on that, and my view of where the

19   bankruptcy court was going to go in this transaction, and you

20   know, that the 1113 was going to be approved, and I made a

21   point at this meeting and other meetings to say, the

22   creditors have argued in opposing the approval of the sale,

23   that the employees were getting too much, that the creditors

24   were going to likely get nothing and the employees were going

25   the retiree benefits assumed, they were going to -- that they

 1   were all going to be hired, that in effect it was an unfair

 2   an unfair transaction.

 3          And the Judge dealt with this in his decision.  It

 4   was an unfair transaction because the employees were getting

 5   too much and the creditors were getting too little, and that

 6   was an unfair treatment of creditors.  The Judge rejected

 7   that argument.

 8          But I remember saying to them the Judge, who is

 9   here arguments that you are getting too much, is not going to

10   put the transaction from jeopardy because you didn't get

11   everything that you want.

12          And that you had to sort of consider what he was

13   hearing from other parties in the case, and I remember saying

14   this, too, he is not a mediator, he is not a good guy who is

15   just out to help everybody.  He is a bankruptcy Judge

16   following the bankruptcy law, and --

17          THE COURT:  You don't want to use "good guy" and

18   "Judge" in the same sentence.

19          THE WITNESS:  Not just a good guy, your Honor.

20   A.   And that he had a major interest in avoiding a

21   liquidation, for a bankruptcy Judge, aside from -- and the

22   bankruptcy law is geared towards trying to reorganize and

23   trying to avoid liquidation and for any bankruptcy Judge to

24   have a huge company collapse, sort of on his watch, that is,

25   you know, that is not what what the law, what the bankruptcy

Setlzer-direct/Fram                                           142

1    law is geared towards and that is not what I thought Judge

2    Walsh wanted to happen in a case in front of him.  For all

3    those reasons I thought ALPA was going to lose the 1113.

4    Q.   Did any of the other advisors disagree with your

5    assessment of the likely outcome of the Section 1113 motion?

6    A.   No.  I specifically remember Roland Wilder saying I had

7    a tremendous amount of 1113 experience and if I said they

8    were going to lose, they were going to lose.

9    Q.   Did any of the pilots ask questions about the Section

10   1113 process and the likelihood that the motion would be

11   granted?

12   A.   No. I remember that there were some comments but I don't

13   remember about the process, or whether they, anyone differing

14   with -- at this meeting or a prior meeting, I can't identify

15   which member of the MEC, either the MEC or the committee,

16   somebody who was in court agreed that their view of Judge

17   Walsh is that this transaction was going to take place.  And

18   I remember either a committee chair or a member of the MEC

19   saying just from watching the Judge in court and what he did

20   that this transaction was going to take place.

21   Q.   Was that comment made in the context of a discussion of

22   the Section 1113 motion?

23   A.   Yes, that he agreed, whoever -- that he agreed that the

24   11 -- ALPA was going to lose the 1113 because this Judge was

25   not going to let there be a major threat to the American

Setlzer-direct/Fram                                    143

1  transaction.

2  Q.   All right.  Let's talk a little bit about the Wilder

3  litigation theory.  Do you recall receiving at some point

4  before the meeting on April 1 a copy of Mr. Wilder's letter

5  of March 26, 2001?

6  A.   Yes.

7  Q.   Okay.

8  A.   Letter to Captain Woerth.

9  Q.   Yes.  You have that in in front of you.  It is in

10 evidence as J 41.  I hope it is in the pile I gave you?

11 A.   J 41 D.

12 Q.   Yes.

13 A.   I have it.

14 Q.   And you have had an opportunity to review that meeting

15 before the meeting on April 1?

16 A.   Yes, I did.

17 Q.   What did you do to prepare for the meeting on April 1

18 with respect to that letter?

19 A.   This letter was again raising the suggestion of a

20 litigation that I had concluded earlier was meritless, and

21 that the legal positions in here were incorrect, and

22 misleading.   And I was surprised on to see it.  And I

23 talked --

24 Q.   I am sorry.  Why were you surprised to see it?

25 A.   I had never heard Mr. Wilder respond to the points I and

Setlzer-direct/Fram                                          144

1    others had raised about which court this would be heard in,

2    and whether this lawsuit which was any leverage at all.  In

3    my view, a meritless lawsuit that goes nowhere isn't

4    leverage.  And I discussed, I think I had a phone

5    conversation with either Clay Warner or Dave Holtzman or both

6    at some point, again, before the meeting, again telling them

7    that --

8    Q.  Before the meeting on April 1, 2001?

9    A.  Yes, again telling them that I thought this was a

10   meritless proposal.  It was the same meritless proposal

11   except now it was being proposed to the head of ALPA.  And I

12   reviewed again with them from a bankruptcy point of view why

13   I thought it was meritless.

14          And they asked if I would prepare talking points

15   because I had mentioned some cases, and my analysis of those

16   cases, and they asked if I would prepare talking points that

17   they could review as well, and that would sort of, we have

18   now seen this two or three times, that would sort of

19   summarize my views of this.

20   Q.  Did you in fact prepare some written talking points?

21   A.  I did.

22   Q.  I am going to show you what has been marked for

23   identification purposes as D 453.

24          THE COURT:  D?

25          MR. FRAM:  D, your Honor, it is newly marked.  Just

Setlzer-direct/Fram                                              145

1     for identification.

2              THE COURT:  D 453.

3              MR. FRAM:  Yes, your Honor.

4              THE COURT:  I don't have a 452, by the way.  Fram

5     /STPR-PL I thought I used it.  I have another document that

6     is marked for identification only.  That is.

7              THE COURT:  This is 453.

8              MR. FRAM:  Yes.

9     Q.   Are these the written talking points you prepared?

10    A.   Yes, they are.

11    Q.   At what point had you completed preparing them?

12    A.   Well, they are marked at the bottom the way documents

13    sort of reflect, on March 29, but I believe in reviewing my

14    billing for this period, that I began this on the 28th or 27.

15    Q.   You say your billing.  Can you describe what you mean by

16    your billing?

17    A.   We submit monthly bills to ALPA and they separate by

18    each day what we did on that day and how many hours.  So I

19    saw that a reference to talking points I think on the 28th.

20    Or the 28th or the 27 or both.

21    Q.   All right.  And did you circulate this document to

22    anybody else before before the meeting on April 1?

23    A.   Yes.  Actually next to this is a, the last page of this

24    is a --

25              MR. JACOBSON: Your Honor, I object to him talking

Setlzer-direct/Fram                                                  146

1   about the substance of this document until it has been

2   offered.

3           THE COURT:  Yes, I think that is a fair statement.

4   Q.   Without looking at the document do you recall

5   circulating to anybody?

6   A.   Yes.

7   Q.   Who did you send it to?

8   A.   Clay Warner.

9   Q.   So back to the meeting on April 1.  Did Mr. Wilder get

10  some kind of presentation in support of his injunction

11  theory?

12  A.   The only thing I remember Mr. Wilder saying, other than

13  that, if I said they were going to lose the 1113, then he

14  agreed they were going to lose the 1113, was that his

15  strategy had risk, but that he thought that, you know, that

16  American would not walk away from the transaction.  He didn't

17  think there was any evidence, or anything that pointed to

18  American, ever walking away from the transaction --.

19          THE COURT:  That is what Roland Wilder said.

20          THE WITNESS:  Yes.

21  A.   But I don't remember him responding to, for example, my

22  pointing out the case that said that if this kind of

23  injunction action would be in the bankruptcy court, and why I

24  didn't think, I thought the 1113 would take precedence over

25  an attempt at an injunction.

Setlzer-direct/Fram                                        147

 1   Q.   Well, what was the downside of filing a lawsuit?  You

 2   file a law cite, it doesn't succeed.  What is the big deal?

 3              THE COURT:  You are not offering 453?

 4              MR. FRAM:  It wasn't premarked.  I can offer it.

 5   There may be an objection because it wasn't marked as part of

 6   the pretrial, your Honor.

 7              Sure, I will offer it.

 8              MR. JACOBSON: We object.  It is not marked as part

 9   of the pretrial.

10              MR. FRAM:  Okay.

11              THE COURT:  At least everybody is predictable.

12   That is good.

13              THE COURT:  I am going to sustain the objection.  I

14   am going to allow the testimony.

15              MR. FRAM:  Thank you, your Honor.

16   Q.   All right.  So what is the big deal?  You file a

17   lawsuit.  It doesn't succeed.  Why is there any downside to

18   it?

19   A.   It -- because, one, Michael Glanzer who was the

20   financial advisor to the pilots, reported at this meeting and

21   I think he may have reported at a prior meeting as well, that

22   he had been in a meeting with American's --

23              MR. JACOBSON: Your Honor, I object at this point.

24   Sounds like he is asking for a current opinion as opposed to

25   what happened then and therefore this testimony is hearsay.

Setlzer-direct/Fram                                              148

```
 1              MR. FRAM:  I am asking about what was discussed at

 2    the meeting on April 1 of 2001.

 3              THE COURT:  Do you understand, Mr. Seltzer, that

 4    the objection is to some modern thought or something?  The

 5    question is limited.

 6    A.   To what was said.

 7              THE COURT:  To things that were actually said by

 8    somebody at the meeting at which, you know, various people

 9    you have identified as being there.

10    A.   It was said.  It was said, your Honor.

11              THE COURT:  To the extent that it is understood

12    that we are talking about what was said at the meeting.  I am

13    going to allow it.

14    Q.   That was the intent of the question.  Please.

15    A.   Mr. Glanzer said at this meeting, and he may have said

16    it the 21 or 22 meeting, too, and he reported this to the

17    MEC, that I had had a meeting but the status of the case with

18    the chief financial officer of American Airlines, who

19    reported that the chief financial officer told Michael that

20    he, the chief financial officer, opposed this transaction,

21    that there was a fax within American that did not think this

22    was a very good idea.

23              THE COURT:  This being the --

24    A.   The acquisition.  And Mr. Glanzer, and Mr. Glanzer

25    reported that in light of that and the continuing losses at
```

Setlzer-direct/Fram                                    149

```
 1    TWA, that if the pilots wanted the American transaction to

 2    take place, that they should do everything they could to move

 3    it forward quickly and get to a closing so American could not

 4    change its mind.  And that filing frivolous lawsuits that are

 5    aimed at delaying things and that could potentially give

 6    ammunition to the people at American who were opposed to the

 7    transaction was not a good idea.

 8    Q.   Did any of the members of the MEC comment on this

 9    exchange where Wilder said, I don't think American will walk

10    away and Glanzer responded that he had information to suggest

11    otherwise?

12    A.   I don't remember a particular reaction to that.

13    Q.   Do you recall Sally Young making some comments about the

14    risks that American might walk away?

15    A.   I remember her making comments about risks involving

16    American.

17    Q.   What do you recall her saying at the meeting on April 1

18    of 2001?

19    A.   Specifically remember her saying that it was important,

20    as ALPA went forward, for -- to try to keep, however you want

21    to put it, the good opinion, a positive view of Don Cardy,

22    who was the head of American Airlines, towards the TWA

23    pilots, and as a positive, constructive part of the new

24    airline, and that she didn't think that, I don't know whether

25    it was in particular relation to the lawsuit idea, but that
```

Setlzer-direct/Fram                                              150

1    she didn't think ALPA should do anything that would endanger,

2    or that the positive view that she thought Don Cardy had of

3    the TWA pilots.

4    Q.   Did any of advisors support Mr. Wilder's idea of trying

5    to enjoin the entire transaction?

6    A.   No.

7    Q.   Did any of the members of the TWA MEC on April 1 support

8    the idea of trying to enjoin the entire transaction?

9    A.   No.

10   Q.   April 2.  Were you present at the formal meeting of the

11   MEC on April 2, 2001?

12   A.   Yes.

13   Q.   Was there any further discussion about the likely

14   outcome of the Section 1113 motion and the other topics that

15   had been discussed on April 1 of 2001?

16   A.   There may have been but that, I don't have a clear

17   memory of that.  There just may have been a general sort of

18   summarizing but I don't have a particular memory of it.

19   Q.   If the MEC had voted on April 2, 2001, to pursue the

20   Section 1113 hearing, would you have been prepared to go

21   ahead on April 6?

22   A.   Absolutely.

23   Q.   What preparations, if any, had you made prior to April

24   one to get ready for that hearing?

25   A.   We obviously had prepared the objection and filed the

Setlzer-direct/Fram                                           151

 1   objection.  Which preserved ALPA's rights to oppose it at a

 2   hearing.

 3            I had discussed with Mr. Holtzman, I think the week

 4   before and possibly before that, that at if the MEC wanted to

 5   go ahead with the 1113 hearing that as soon as the meeting

 6   was over, on the second, I guess, all the MEC members were

 7   there, the committee chairs were there, Mr. Shwartz was

 8   there, the vice chairman,  that we would sit down and focus

 9   on choosing either one or two witnesses to be the key

10   witnesses at the hearing.

11            We would make that determination, and we would

12   begin prepping the witness for the hearing.

13            And I remember commenting that my view is that

14   Captain Shwartz had, he had testified before this Judge,

15   originally in support of the American transaction, that he

16   had the experience of testifying in the bankruptcy court, the

17   Judge had seen him before, that he might be the correct key

18   witness.

19            I think there was some discussion of whether Mr.

20   Singer would be a good witness or an alternative witness or

21   an additional witness.

22   Q.   Is that David Singer, one of the Council 2 reps?

23   A.   Right.  And we sort have had determined that as soon as

24   the MEC meeting was over and if they decided to go forward we

25   would immediately go into trial preparation mode.

Setlzer-direct/Fram                                            152

1   Q.   Let's  talk about the tone of the meetings on April 1

2   and April 2, 2001.  Did any of advisors refuse to answer any

3   aof the questions that were posed by the members of the TWA

4   MEC?

5   A.   No.

6   Q.   Did any of advisors tell the members of the MEC how they

7   had to vote?

8   A.   No.

9   Q.   Did any of advisors threaten any of the members of the

10  MEC?

11  A.   No.

12  Q.   In your view did any advisors put any pressure on any

13  members of the MEC to decide any issues in any particular

14  way?

15  A.   No.

16  Q.   Did any of the members of the MEC say they felt pressure

17  to follow any particular advice that was given?

18  A.   No.

19  Q.   Did any of the members of the MEC say that they didn't

20  understand the advice that was being given?

21  A.   No.

22  Q.   Based upon your observations of people, the body

23  language and the like, did any of the members of the MEC

24  appear to you to be confused or not to understand the advice

25  that was being given?

Setlzer-direct/Fram                                              153

1    A.    No.

2    Q.    The outcome of the vote on April 2, 2001, was to do what

3    with respect to the proposed collective bargaining agreement

4    that had been put out there by TWA LLC?

5    A.    I think it was to attempt, I think it was a negotiating

6    committee that was sent to finalize the agreement, to make

7    sure that every single -- I think most of the documentation

8    of it was done, but to make sure that every last aspect was

9    done, fully documented and was what the MEC had been told was

10   available.

11          They authorized the MEC chair to sign it, if and

12   when everything was completed, and I think counsel is

13   authorized to begin talking to TWA and I think American, I

14   don't remember if it was just TWA and/or, to enter into a

15   stipulation that in effect recognized the agreements that had

16   been reached, recognized that the waiver was taking place and

17   recognized that the pre conditions to the sale had been met.

18   There was no longer a collective bargaining agreement basis

19   for American not to go forward.

20   Q.    Did you learn anything between April 2 and April 6 that

21   you thought was relevant to the advice you had given to the

22   MEC about the likelihood that Judge Walsh was going to grant

23   the Section 1113 motion?

24   A.    Yes.

25   Q.    What did you learn?

```
 1   A.   On April 2 Judge Walsh issued a long decision denying, I
 2   believe it was the committee, it may have been, it was other
 3   entities, too, request for a stay of his approval of the sale
 4   to American.  And unlike his usual practice of reading
 5   opinions into the record, he sort of did it in an informal
 6   way because I think he started the opinion with dear counsel,
 7   like it was a letter, but he issued a written decision, an
 8   extensive decision, denying the stay and reviewing the entire
 9   history of the bankruptcy, from the first day, reviewing the
10   precarious shape that TWA --
11            MR. JACOBSON: I am going to object to this.  I
12   believe it is not relevant.  As I understand this is
13   something he  didn't learn until after the April 2 meeting
14   and vote was taken, if I understood the question correctly.
15            MR. FRAM:  Your Honor, it is before the collective
16   bargaining agreement was finalized, the question was did he
17   learn anything that I am backed on the advice that he was on
18   the advice that was given.
19            THE COURT:  Friday to reframe it.  I think that is
20   too broad, the sources of information.
21            MR. FRAM:  I will try to do this without leading,
22   your Honor.
23            THE COURT:  I understand the problem.
24   Q.   Did you learn anything before the collective bargaining
25   agreement was finalized, and the 1113 motion was formally
```

Setlzer-direct/Fram                                              155

1    resolved, that verified in your mind the soundness of the

2    advice you had given?

3    A.   Yes.

4    Q.   Let me hand up what had been premarked as D 288.  I

5    think it may have been marked for identification before?

6           THE COURT:  288.

7           MR. FRAM:  288, your Honor.

8    Q.   And is this the opinion of Judge Walsh that you referred

9    to?

10   A.   Yes.

11   Q.   What about this opinion verified in your mind the

12   soundness of your advice that the 1113 motion should not be

13   fought, should not be contested.

14          MR. JACOBSON:  I object, your Honor.  This is post

15   advice verifications aren't relevant to anything in this

16   case.

17          THE COURT:  I am going to allow it.  Go ahead.

18   A.   It confirms my view as to the judge's serious concern

19   with the likely liquidation of the company if this didn't go

20   through, and it did so extensively.  Many, many page opinion,

21   reviewing everything that happened in the case.

22          I also found directly on the 1113 point.

23   Q.   Pardon me.

24          MR. FRAM:  Your Honor, I am going to move D 288

25   into evidence, please.

Setlzer-direct/Fram                                                156

1              MR. JACOBSON: I object to the admission of a court

2    opinion in evidence, your Honor.

3              MR. FRAM:  I would like to know the basis of the

4    objection.

5              MR. JACOBSON: It is hearsay.  It is a bankruptcy in

6    which both the buyer and seller were in agreement on what

7    would happen.

8              THE COURT:  Well, this was part of the, it is a,

9    the background or the reality of the advisors, you know,

10   before the Judge is scheduled to start the hearing, which was

11   April 6 on the 1113.  This is --

12             MR. JACOBSON: April 2, your Honor.

13             THE COURT:  His job is specifically to advice on

14   the 1113 motion.  I think anything that he relies on in

15   giving the advice he did -- did you discuss this with this

16   opinion on others involved, with other advisors or other MEC

17   members, or other committee members.

18   A.   I discussed it with other advisors.

19             THE COURT:  What?

20   A.   I discussed it with other advisors.  In fact, while, it

21   was while the MEC meeting going on or after, but I remember

22   being in St. Louis on the second and somebody getting word,

23   it may have been the company calling somebody at the MEC but

24   somebody reported to me that the Judge has issued, has denied

25   the request for a stay.  I didn't get the opinion itself

1   until the next day or the day before but I remember hearing

2   while I was still in St. Louis that the Judge had issued a --

3           THE COURT:  I am going to let 288 in.

4           MR. FRAM:  Thank you.

5   Q.  Were you saying, Mr. Seltzer, that there was some

6   comments by Judge Judge Walsh in this April 2 opinion about

7   the sending Section 1113 motion?

8   A.  Yes.  I guess it is page 11 of the copy that I have in

9   front of me.  At the bottom of the page, can I read a little

10  bit of it.

11  Q.  Go ahead, it is in evidence?

12  A.  There is absolutely no evidence that TWA is attempting

13  to bypass the requirements of Section 1113.  As I found

14  before, the simple fact is that TWA is a failing enterprise.

15  Its likely end, in my opinion, will be either a partial

16  survival as part of American or a liquidation resulting in no

17  enterprise value, and a consequent material loss to all

18  nonpriority general unsecured creditor classes.

19       Then he said this, which is what I found particularly

20  significant.

21           "The end result of what will happen during TWA's

22  1113 negotiations is dictated by TWA's inability to survive

23  as a stand-alone enterprise.  There is simply no evidence to

24  suggest that TWA is proceeding in bad faith regarding its

25  1113 negotiations."

Setlzer-direct/Fram                                          158

1              My conclusion from that is that the Judge was

2    reaching out to make some comments about the 1113

3    proceedings, even before they were scheduled to start.

4    Q.   So was the 1113 application, was it even before Judge

5    Walsh as part of the motions he was deciding?

6    A.   No. I think there were some objections by some Israeli

7    employees, or Israeli employees --

8              THE COURT:  Of whom?

9              THE WITNESS:  Of TWA, and I think the Israeli

10   operations were going to be closed and they were raising

11   objections, but what struck me was that this was very general

12   language that the Judge used about the 1113 process.

13   Q.   Mr. Seltzer, did you know during the timeframe that we

14   were discussing, early 2001, that the prior year late 2000,

15   ALPA had adopted the so-called unity resolution?

16   A.   No.

17   Q.   Did anybody tell you during the period which you were

18   representing the MEC and ALPA during the bankruptcy

19   proceeding that ALPA had a long term goal of trying to bring

20   the American pilots back to ALPA?

21   A.   No.

22   Q.   Did anybody tell you what advice you should give to the

23   TWA MEC or the TWA pilots?

24   A.   Absolutely not.

25   Q.   Did anyone try to influence the advice that you give to

Seltzer-cross/Jacobson                                    159

1    TWA pilots or the TWA MEC?

2    A.   Absolutely not.

3         MR. FRAM:  Thank you thank you.  I have nothing

4    further on direct.

5         THE COURT:  Cross examine.

6         MR. JACOBSON: Thank you, your Honor.

7         CROSS EXAMINATION.

8         BY MR. JACOBSON:

9    Q.   Mr. Seltzer, I would like to ask you a few more

10   questions about your background first before I get into the

11   meat of the cross examination.  Okay, sir?

12   A.   Absolutely.

13   Q.   You are a lawyer at what law firm?

14   A.   Cohen, Weiss & Simon.

15   Q.   Cohen, Weiss and Simon represented ALPA since when?

16   A.   I think since the 1930s.

17   Q.   You or your law firm have been their general counsel

18   since then, correct?

19   A.   I think since then.  At some point we became general

20   counsel.  We have been general counsel for a long time.

21   Q.   For a long time and still are today?

22   A.   Yes.

23   Q.   All right.  And let's go to the bankruptcy.  You had

24   mentioned that you thought the debtor in possession financing

25   was unusual because the financing was by American Airlines

Seltzer-cross/Jacobson                                          160

1   and not a bank or other financial institution, correct?

2   A.   Yes.

3   Q.   All right.  Now, you understood, correct, that TWA and

4   American Airlines had entered into an asset purchase

5   agreement, for which situation by American of all of TWA's

6   assets and part of that agreement required this bankruptcy be

7   filed?

8   A.   Yes.

9   Q.   And so it was part of an agreement, the bankruptcy was

10  part of an agreement between TWA and American Airlines?

11  A.   Yes.

12  Q.   All right.

13  A.   It wasn't surprising in light of the agreement.  It was

14  surprising in light of how that kind of financing is

15  generally provided in bankruptcy.

16  Q.   Right.  But where a bankruptcy is filed as an agreement

17  as part of a seller and a buyer's agreement to do a

18  transaction, is not unusual in those cases for the buyer to

19  finance the bankruptcy?

20  A.   Those kind of agreements right before filing are

21  unusual.  And I don't know that, I can't name any others,

22  frankly, that, where the financing, there may well have been

23  but it was an unusual, in my bankruptcy practice it was very

24  unusual to see one company providing the DIP financing to

25  another.

Seltzer-cross/Jacobson                                        161

```
1   Q.   That is the company that is going to be buying all the

2   assets?

3   A.   In light of the transaction, it was not unusual.   In

4   light of what generally happens in bankruptcy, it was

5   unusual.

6   Q.   In light of the transaction, we are talking about this

7   transaction, not about the whole universe of bankruptcies,

8   correct?

9   A.   Correct, but there are many transactions where a sale

10  takes place and the DIP financing has been provided by a

11  bank.

12  Q.   That is when the buyer wants to get finance to go do the

13  purchase, correct?  If the buyer is able to buy without doing

14  that, they want to use their cash they can do so, right?

15  A.   I am not sure I understand your question.

16        When there isn't a bank willing to provide

17  financing, then a debtor has to try to find somebody else who

18  will provide financing.

19  Q.   Not all buyers want to borrow to buy, correct?

20  A.   Some --

21  Q.   Some buyers want to buy for cash?

22  A.   You mean by providing cash.

23  Q.   Yes, some people want to buy for cash.   Correct?

24  A.   Some people pay cash.   That's correct.

25  Q.   Thank you.  All right.  Now, you talked a little bit
```

Seltzer-cross/Jacobson                                      162

```
1    about the bidding procedure that was set up in the bankruptcy

2    court for the bidding on these assets.

3    A.   Correct.

4    Q.   And you know the bidding procedure was set up, isn't it

5    a fact that when there is a preferred buyer as there is here,

6    the bidding procedures are often crafted so that the

7    preferred buyer has a much better ability to satisfy the

8    terms than anyone else out in the world?

9    Q.   You have been involved with bankruptcies.  You know the

10   that is the reality?

11   A.   I have, I have.  There is some advantage but I will say

12   that there was extensive negotiations with the creditors

13   committee in this case and the chief District Court Judge of

14   Delaware found that these bidding procedures were completely

15   fair.

16   Q.   They may be fair but they were structured to give

17   American Airlines an edge in the bidding because they were

18   the preferred buyer, correct?

19   A.   I would have to go back and look at the document to see

20   whether I thought they provided an edge.

21   Q.   Well, when Icahn and his group came in and made their

22   bed, American upped its bid by about $250 million, correct?

23   A.   That's correct.

24   Q.   There was a lot of interest on the part of American to

25   buy t ahis?
```

Seltzer-cross/Jacobson                                           163

1    A.    There was.

2    Q.    Now, you talked about things that happened at different

3    meetings.  But isn't it a fact, sir, that you don't, you

4    can't particularize what happened at one meeting as opposed

5    to what happened at another meeting?

6    A.    I can, I know generally what I spoke about.  I also

7    looking at the agendas of each meeting which I looked at in

8    the last month in reviewing the agendas and my billing notes

9    for each day and the timing of the meetings, I can remember,

10   I remember that at some point, in my deposition, I wasn't

11   sure if there was a meeting between the 15th and the first.

12         When I look back and look at the agendas and my

13   billing notes I realize, and I remembered that there was a

14   meeting on the 21 and 22, and that the topic of that meeting

15   was the 1113 filing.

16   Q.    All right.  Isn't it a fact that you had no independent

17   memory of what you said at each of these meetings but you

18   reconstructed that memory by looking at the agendas and your

19   billing records for those meetings and trying to figure out

20   what would have been reasonable?

21   A.    No.   Looking at those records beings I now remember

22   what happened, not every detail, but I remember what happened

23   at those meetings.

24   Q.    Do you recall your deposition, right?

25   A.    I do.

Seltzer-cross/Jacobson                                    164

1    Q.    Back in September of 2008?

2    A.    I do.

3    Q.    September 19, in particular?

4    A.    I don't remember it was the 19.  I remember that was the

5    general time.

6    Q.    Let me give you a copy of it so you have it there, all

7    right, sir?

8    A.    Sure.

9    Q.    Let me ask you this  question.  Do you recall about how

10   many times you attended all meetings of the MEC?

11   A.    You are asking me now.

12   Q.    Yes, sir, how many times have you attend the formal

13   meetings of the MEC?

14   A.    Of the TWA MEC.

15   Q.    Yes?

16   A.    Does that include calls or in person.

17   Q.    What do you consider a formal meeting?

18   A.    I consider a meeting to be a meeting in person.

19   Q.    All right then.  How many times do you think you

20   attended formal in-person meetings of the MEC?

21   A.    I attended three of the full MEC, and then I attended on

22   the 14th a meeting of the committee as an MEC advisors, and

23   the MEC officers and committee chair.

24   Q.    Now, let's set aside for a second the April 2 meeting

25   where the scope waiver was voted on.  At any of the prior

1    meetings that you talked about, did anyone advise the MEC

2    that they ought to waive their scope in their contract?

3    A.   No. I don't -- I am sorry.  Before April 1?

4    Q.   Before April 2, before the meeting when they voted?

5    A.   I know David Holtzman had a written  set of

6    recommendations.  My best recollection is that they were made

7    at the April 1, 2, meeting.  They could have been made at an

8    earlier meeting but my memory is that they were made at the

9    April 1, 2 meeting.

10   Q.   You blur those two meetings together in your testimony?

11   A.   No.   There was a meeting on April 1 of advisors, and

12   the MEC, but it was not a formal meeting.  I thought of it

13   was the April first/second meeting.  When I looked at the

14   agenda and the invitation it refreshed my recollection that

15   we were asked to come there to talk to the MEC officers and I

16   specifically remember getting there very early in the morning

17   before anybody else, advisors coming in in the morning, and

18   the MEC coming in in the late morning and early afternoon.

19   Q.   All right.  You said you reviewed these agendas and your

20   time records what, a month ago or two months ago?

21   A.   Within the last six weeks.

22   Q.   Within the last six weeks.  So if we were sitting here

23   eight weeks, if you were here eight weeks ago without that

24   you weren't be able to tell us who was at that April 1

25   meeting or who was at the April 2nd meeting, correct?

Seltzer-cross/Jacobson                                          166

1    A.   I think I would have said that the MEC members were at

2    both.  I am not sure I would have remembered that the first

3    meeting was more an informational meeting and the second one

4    was a more formal one.

5    Q.   You wouldn't be able to tell us if you were sitting here

6    eight weeks ago what was discussed at each of those days,

7    could you, sir?

8    A.   No. But what I remembered as I testified at my

9    deposition --

10   Q.   That was a no, correct?

11   A.   That was a no.

12   Q.   All right, thank you.

13        Before you made your filing in opposition to the

14   1113 motion, had you expressed any views at the MEC about the

15   chances of success on the 1113 process.

16   A.   I expressed general views that we were -- I expressed

17   general views that we were not likely to win on the scope

18   provision, but that we didn't have the actual motion yet.  We

19   didn't have the judge's decision on the transaction until the

20   twelve.  So that what I said was tentative because we didn't

21   even know until the 12th.

22        THE COURT:  Of March.

23        THE WITNESS:  Of March.  I am sorry, your Honor.

24   A.   That the Judge, we thought it was very extremely likely

25   he was going to approve the American transaction, he had not

Seltzer-cross/Jacobson                                        167

1    approved the American transaction yet.

2    Q.   I would like you to look at page 56 of your deposition,

3    sir.

4    A.   Yes.

5    Q.   I would like to direct your attention on page 56, the

6    question asked on line 6.

7    A.   Yes.

8    Q.    I asl you whether you were asked this question in your

9    deposition and gave this?

10            "ANSWER:  Question:  Did you, do you remember

11   before a filing was made expressing any views on the

12   likelihood of success on the 1113 process?"

13            Did you give this answer?

14            "I know I did at the April 2 meeting.  I believe

15   that there were earlier discussions at 1113, and I believe

16   that there were discussions of difficulties succeeding in

17   1113.  I can't specify a meeting that was particularly said

18   at a particular meeting."

19            Is that the question you were asked and answer you

20   gave?

21   A.   Yes.

22   Q.   All right.  Now, did you express to your clients the

23   difficulty, now we are talking about difficult at 1113

24   filing, did you discuss with them the difficulties they would

25   face in the 1113, when do you first make that clear to them?

Seltzer-cross/Jacobson                                            168

1    A.   Could you repeat the question?

2    Q.   When did you first make that clear to them, the

3    difficulties they would face in the 1113?

4    A.   I believe the first time it was raised and the first

5    time I remember seeing it raised was in the conference call

6    with advisors on March first, I believe, and then the first

7    time at a meeting, again a meeting with advisors of March

8    14th.

9    Q.   Let me direct your attention to page 68 of your

10   deposition, line 9, sir.  And ask if you were asked this

11   question and gave this answer?

12          All right.  The question is "Well, we went through

13   all of those bankruptcies and well, no, that is just pilot

14   bankruptcies.  Okay.

15          "So you would have expressed to your clients the

16   TWA MEC the difficulties they would be faced if there was

17   1113 filing, and you believe you made that clear to them?"

18          And you gave the answer, "As I said, I know I did

19   at the April 2 meeting."

20          Was that the question and answer, sir?

21   A.   Yes.  And the next question and answer is "Right, and I

22   believe I did it at earlier meetings."

23   Q.   But you did it at the April 2 meeting?

24   A.   Right.  And then I said it I did it at earlier meetings

25   as well.   That is the next question and answer.

1        .

2              MR. FRAM:  Could we read a couple more lines.

3              THE COURT:  Well, I think he has --

4    Q.   He has taken care of it.

5              THE COURT:  We call that self help.  As long as he

6    doesn't try to go on strike.

7    Q.   You talk a little bit about some research that you had

8    people do for you in connection with the 1113 and Roland

9    Wilder's theory and the rest of it, right?

10   A.   It was less the 1113 -- it wasn't with the 1113, it was

11   less with 1113 than it was with the questions that were being

12   posed about various legal situations, if the assets were

13   transferred to TWA LLC.  And there wasn't a contract in

14   effect.

15   Q.   All right.

16             THE COURT:  You mean if the 1113 had been granted,

17   the supposition, if the 1113 was granted --

18   A.   Right, right.

19   Q.   Now, the brief that you filed on the Friday before the

20   April 2 meeting, March 30?

21   A.   Correct.

22   Q.   In that brief you expressly told the Court, the

23   bankruptcy court, that the TWA pilots would have the right to

24   strike if 1113 was granted.  Is that correct, sir?

25   A.   That's correct, and that is what I am saying today.

Seltzer-cross/Jacobson                                        170

1    Q.   Now, you were involved in part in a discussion at your

2    law firm just as you had people assisting you and you

3    following me in discussions, you yourself got involved in

4    other discussions on legal issues relating to ALPA and TWA

5    MEC.  TWA LLC, correct?

6    A.   Yes.

7    Q.   In fact your firm because you do a lot of work for ALPA,

8    which is a significant client of your firm, correct?

9    A.   Yes.

10   Q.   You often have discussions on legal issues facing ALPA,

11   correct?

12   A.   When you say you, you mean me?

13   Q.   You personally participate?

14   A.   I don't.

15   Q.   You don't?

16   A.   I participate generally on the bankruptcy cases that I

17   am involved with, and if I am doing a litigation and there is

18   a bankruptcy question.  I am not the person who has -- I am

19   not the person who has day-to-day contact with ALPA or

20   reviews ALPA matters generally.

21         I have specific assignments.

22   Q.   All right.  But you were part of a discussion within

23   your law firm about the risk ALPA would face if it merged

24   with the Allied Pilots Association with respect to a 45

25   million dollars fine that was outstanding against the APA.

1    Correct?

2    A.   I had discussion based on my bankruptcy experience.

3    Q.   Right.  You were bringing the bankruptcy part of the

4    discussion, the information to the discussion?

5    A.   Yes.  And I do not remember, I remember it had to do

6    with some sort of transaction involving a, or potential

7    transaction involving ALPA and the APA.  I don't remember

8    whether it was a merger or what it was.  I was asked a

9    question about the survival of liability.

10   Q.   Take a look at your deposition, page 35.  Perhaps that

11   will refresh your recollection as to what that particular

12   transaction you are discussing was.

13              THE COURT:  Line?

14              MR. JACOBSON: Look at line 6 of page 35.

15              THE WITNESS:  Yes.

16   Q.   Does that refresh your recollection as to what type of

17   combination or interaction with the APA that ALPA was

18   concerned about at that time?

19   A.   Yes.  I said an affiliation merger or whatever with APA.

20   Q.   All right.  And you are focusing --

21   A.   That refresh is my recollection of what I just said.

22   Q.   And your view was that it would be very difficult to

23   eliminate that 45 million dollars liability through the

24   bankruptcy process, correct?

25   A.   I said based on bankruptcy cases where unions had

Seltzer-cross/Jacobson                                             172

```
 1   attempted to transfer liabilities, that it appeared that
 2   there were cases out there that would make it very difficult
 3   to transfer a liability, to evade a liability of one union
 4   when there was some sort of affiliation or transfer of
 5   membership or whatever.  That is really how it came up in the
 6   bankruptcy context.
 7   Q.   I am going to hand you a document that is previously
 8   marked as exhibit P-264.
 9            THE COURT:  P-264.
10            MR. JACOBSON: I have a copy.
11            THE COURT:  That has been marked for
12   identification.
13            MR. JACOBSON: It is not in evidence yet, your
14   Honor.
15            THE COURT:  Right.
16   Q.   Do you have that document.  Have you had a chance to
17   look through it?
18   A.   Yes.
19   Q.   Is this the fortunately that looks like a typical form
20   for a Cohen, Weiss, internal memorandum on legal analysis?
21   A.   It looks like the form for a memo, yes.
22   Q.   And in fact if you look at the bottom there is a, I
23   guess a document number, it has your firm initials beginning
24   on it.  CWS?
25   A.   Yes.
```

Seltzer-cross/Jacobson                                              173

1    Q.   Above that there is a line which has a date on the right

2    and an internal document number on the left?

3    A.   Yes.

4    Q.   All right.  Now, this document is addressed to a number

5    of initials.  I want to see who these people are at your firm

6    and see if they are at your firm.  The first initial is BHS?

7    A.   Bruce Simon.

8    Q.   Bruce Simon.  Is that the Simon in the name?

9    A.   Yes.

10   Q.   Next  SBM?

11   A.   Stephen Maldoff.

12   Q.   Couldn't hear you?

13   A.   Stephen Maldoff.

14   Q.   Who is he?

15   A.   A partner.

16   Q.   MEA?

17   A.   Michael Abrahm, who is a partner in the firm.

18   Q.   Where is Michael Abrams?

19   A.   I am sorry?

20   Q.   Where is he now?

21   A.   Sitting in the courtroom.

22   Q.   That gentleman over there?

23   A.   Yes.

24   Q.   Thank you.

25   A.   It is Abrahm, not Abrams.

1   Q.   Singular?

2   A.   Right.

3   Q.   Next initial, SD, who is that?

4   A.   Susan Davis.

5   Q.   Last one is DEH?

6   A.   It is an associate who has left and her first name was

7   Didi, and I am having trouble remembering her last name.

8              THE COURT:  It was all lawyers in your firm?

9   A.   Yes, sir.

10             THE COURT:  Whatever the status is, they are all

11  lawyers in your firm.

12             THE WITNESS:  Yes, your Honor.

13  Q.   Turn if you would to page 6.  I want to see if this is

14  material that you supplied information on regarding

15  bankruptcy.

16             MR. FRAM:  Your Honor.  Can we approach on this

17  one?

18             THE COURT:  Excuse me?

19             MR. FRAM:  I object to questions about the memo.

20  It is not in evidence.  I object to it going in evidence on a

21  number of grounds.  I object.

22             THE COURT:  Want to go to sidebar?

23             MR. FRAM:  Yes.  Do you mind?

24             THE COURT:  No.

25

1

2              (Sidebar).

3              MR. FRAM:  May I, your Honor.

4              THE COURT:  All right.  Yes.

5              MR. FRAM:  It is my objection.  First of all there

6    is no indication he received the memo.  Mr. Jacobson objects.

7              THE COURT:  I was going to -- it is funny, I

8    withheld asking that question.  I was surprised that he

9    himself is not a recipient.

10             MR. KATZ:  No, he is not.

11             THE COURT:  Since he clearly was playing a major

12   role for the firm in the issues.

13             MR. FRAM:  The memorandum is dated November 6 which

14   is before there is any issue about --

15             THE COURT:  2000.

16             MR. KATZ:  He wasn't playing a major or role.

17             MR. JACOBSON:  I am trying to lay a foundation.

18             THE COURT:  I went to page 5 to ask if this is

19   material he contributed to the memo.

20             THE COURT:  What do you get from that?

21             THE COURT:  Being if I ask him if he got to see the

22   material after it incorporated his material.  If it did --

23             MR. FRAM:  What is the relevance of any of that?

24   He already testified about the fact that some research was

25   done to see whether the liability would follow the merger,

Seltzer-cross/Jacobson                                    176

 1    but that was in late 2000.  So how does he add anything to

 2    that?

 3              THE COURT:  I mean --

 4              MR. JACOBSON: Your Honor, I can try to see if he

 5    has seen the memo, if not, I will lay the function for it

 6    being a business record.  I think it is important and I would

 7    like it in evidence.

 8              THE COURT:  Why is it important?  I am trying to

 9    figure out, if there was a conflict, the conflict arose the

10    day the American signed to acquire TWA Inc. assets, which was

11    January 6, I something like that.  This is two months earlier

12    at a time when there is no dispute, the testimony who had the

13    unity resolution.  And they actually spoke to him.

14              MR. JACOBSON: Your Honor, the reason why this is

15    important is that this memo, particularly at page 3 of the

16    memo, lays out exactly the method that they used in approach

17    goes this APA merger.  Getting American into ALPA.  It says

18    the merger agreement is not going to work because of

19    liability.

20              They need to go with collection of authorization

21    cards and in order to avoid successorship issues --

22              THE COURT:  What are you reading?

23              MR. JACOBSON: Page 3.

24              THE COURT:  Three.

25              MR. JACOBSON: Three bullet points, top of the page,

Seltzer-cross/Jacobson                                          177

```
 1    layout the method.  That was in fact followed.  I want to
 2    show that they keep saying that these 2:00 a.m. pilots or
 3    group of American pilots are operating on their own.  This
 4    says the method you have to use is to make sure you have
 5    individual American pilots operating on their own.  Don't
 6    have the officials of the APA doing it.
 7              THE COURT:  I understand the point.
 8              MR. JACOBSON: I am laying a foundation.
 9              MR. KATZ:  It is an internal Cohen, Weiss memo and
10    nothing more than that.
11              MR. JACOBSON:  They are the general counsel of the
12    union.  They call themselves that, have been for years, maybe
13    not to 1931 but for years and years.
14              THE COURT:  This isn't conveyed to the union in any
15    way, the answer is so what.
16              MR. JACOBSON: It is responding to questions
17    directed to them by the union, particularly by Duane Woerth
18    and John Cohen, and this is their analysis.  And I think a
19    reasonable inference is that when you ask your lawyer to
20    solve the problem, and they work on a memo to solve the
21    problem and, that gives the solution that that solution is
22    likely passed on to the client, particularly here when the
23    client engages in activity consistent with the solution.
24              THE COURT:  Let's find out if it was passed on to
25    the client.
```

Seltzer-cross/Jacobson                                          178

```
 1              MR. JACOBSON: I am trying to get a foundation about

 2    his knowledge.

 3              THE COURT:  This is to me such a huge point has

 4    been made by the defense, that got me into trouble, a huge

 5    point has been made by the defense that only mergers is the

 6    right way, they wouldn't consider a card campaign.  And here

 7    you have general counsel saying no, the only way to go is a

 8    card campaign.

 9              I am going to let you explore it a little further.

10    Again, he can't say what he doesn't know.

11              MR. JACOBSON: I understand.

12              THE COURT:  If you want to subpoena another witness

13    or call another witness.

14              MR. FRAM:  Your Honor, could I add to that, if you

15    recall, the fine gets resolved in April of 2001.  We have

16    testimony.  It gets resolved and is taken care of.  The card

17    campaign doesn't begin until after that.

18              THE COURT:  I don't know when the card campaign.

19              MR. FRAM:  We have Clark and Hunnibell, the card

20    campaign does not begin.

21              MR. KATZ:  From the middle of May.

22              MR. FRAM:  I think the connection he wants to make

23    is --

24              THE COURT:  That is argument.

25              MS. RODRIGUEZ:  When it is final, the fine is
```

Seltzer-cross/Jacobson                                              179

1    resolved is not clearly in the record.  You may know when it

2    is resolved.

3              MR. FRAM:  Oh, it is.

4              THE COURT:  I am going to let you explore it..

5                (In open court)

6              MR. JACOBSON:.

7    Q.   Mr. Seltzer, there came a day that your law firm

8    received a subpoena for documents relating to this case?

9    A.   That's correct.

10   Q.   And you were the person who, at least one of the

11   partners who took responsible for responding to that

12   subpoena?

13   A.   That's correct.

14   Q.   And you, did you personally search through the files of

15   your law firm for the documents?

16   A.   Yes.

17   Q.   And you then had the documents that you produced stamped

18   and marked?

19   A.   Yes.

20   Q.   All right.  And is in document here one of the documents

21   that you found in the file of Cohen, Weiss and produced to us

22   in discovery in this case?

23   A.   Yes.

24   Q.   And are you one of the, to use the legal phrase,

25   custodian of records at Cohen, Weiss, a person who has access

Seltzer-cross/Jacobson                                        180

1    and ability to retrieve and store documents there?

2    A.   Yeah, I guess so.  I never heard that phrase used in

3    that way, but yes.

4    Q.   And tell the jury the usual process at Cohen, Weiss for

5    preparing and storing legal memoranda like the documents

6    here, exhibit P-264?

7    A.   It was generally put into a red folder, of some type in

8    connection with the case, in connection with whatever matter

9    it was involved.

10   Q.   Are these documents important to Cohen, Weiss in the

11   operation of his law firm and law business?

12   A.   Yes.

13   Q.   And do you maintain copies of these in your files so

14   that you refer to them in order to properly serve your

15   clients and their point of views?

16   A.   Could you repeat the question?

17   Q.   I will try.  Try to rephrase it.

18        Do you keep, does Cohen, Weiss keep documents like

19   this document in its files for, in the regular operation of

20   its business as a law firm so that it can properly serve its

21   clients.

22   A.   Yes.

23        MR. JACOBSON: Your Honor, I would like to offer

24   this document now as a business record of Cohen, Weiss law

25   firm.

Seltzer-cross/Jacobson                                  181

```
 1              MR. FRAM:  Same objection we discussed at sidebar.

 2   That doesn't mean it is admissible.

 3              THE COURT:  Who is  RSS?

 4   A.  Robert Saddleson, another partner at Cohen, Weiss, it is

 5   not me.

 6              THE COURT:  I notice his name is on two lists, even

 7   though the first word in the memo are his initials.

 8   A.  I don't know.  I didn't draft this and I wasn't a

 9   recipient of it.

10              MR. FRAM:  The hearsay issues beyond the 1113, your

11   Honor.

12              THE COURT:  Do you know whether the substance of

13   this memo was conveyed to ALPA, or ALPA officials.

14   A.  I don't.

15              THE COURT:  I am not saying that there won't be a

16   way to get this in.  But this witness is not the recipient of

17   it.  I don't think he is referred to in here.  He doesn't

18   know what was done with this.  Whether this is even the last

19   word.  Sometimes -- who is Michael Downey?

20   A.  He was an associate.

21              THE COURT:  Sometimes an associate, the advice

22   changes:

23              I know the argument is it is a business record.

24   But this doesn't have the earmarks of reliability, or the

25   hallmark that a business record has, and something maintained
```

Seltzer-cross/Jacobson                                         182

```
 1    as a business record.  I am going to deny its admission.

 2              MR. JACOBSON: May I ask a couple more foundational

 3    questions?

 4              THE COURT:  Go ahead.

 5    Q.   Turn to page 5 if you would, sir?

 6    A.   Yes.

 7    Q.   There is some handwriting on this document?

 8    A.   Yes.

 9    Q.   Is that handwriting yours?

10    A.   No.

11    Q.   There is discussion here?

12              THE COURT:  Do you recognize the handwriting?

13    A.   It may be Babette Sacoti, that is what it looks like but

14    I am not sure.

15    Q.   Looking at, without reading it to the jury or anything,

16    looking at the information stated on page 5, can you

17    determine whether or not you were the source of that

18    information?

19              MR. FRAM:  I object.  If it is being used to

20    refresh recollection we need a foundational question first.

21              THE COURT:  Well, he says he knew nothing about the

22    memo.  But I will let him look at that, if he can say he was

23    the source of that or not the source of that, I will let him

24    say that.

25    A.   No.
```

Seltzer-cross/Jacobson                                      183

1    Q.   All right.

2              MR. JACOBSON: Then I will come at this a different

3    way and a different time.

4              THE COURT:  Okay.

5    Q.   Now, on your direct examination you read two paragraphs

6    from the bankruptcy decision of April 2.  Do you recall that,

7    sir?

8    A.   Yes.

9    Q.   On page 11 of the document?

10   A.   I don't remember the page but I remember reading two

11   paragraphs.

12   Q.   And in particular, you read the following language.  The

13   end result of what will happen during TWA's Section 1113

14   negotiation is dictated by TWA's inability to survive as a

15   stand-alone enterprise.  There simply is no evidence to

16   suggest that TWA is proceeding in bad faith regarding Section

17   1113 obligation.

18             Do you see that?

19   A.   Yes, I see it.

20   Q.   Now, isn't it a fact that the point in time when the

21   Judge wrote this, he hadn't yet seen your evidence about what

22   TWA's bad faith approach to the negotiations, correct?

23   A.   He, our brief had been filed but the hearing had not

24   been held.

25   Q.   Your brief had been filed late the Friday before this

Seltzer-cross/Jacobson                                      184

```
 1   lengthy twelve-page, two-column small type printed, the
 2   opinion was issued on the Monday following.
 3   A.   That's correct.
 4   Q.   And your brief outlines what you believe showed TWA's
 5   bad faith in its a broach to its negotiations with the
 6   pilots.  Correct?
 7   A.   It made an argument about that, yes.
 8   Q.   All right.  It suggested certain facts that would, if
 9   accepted, indicate that TWA was negotiating in bad faith?
10   A.   It made an argument.
11   Q.   You don't want to agree that you mentioned certain facts
12   in your brief, sir?
13   A.   No, but I don't, I was making an argument.  You are
14   asking me to make a conclusion whether that showed bad faith.
15   I made an argument.
16   Q.   I am the no I am not asking you to do that.  I am asking
17   in your brief whether you are representing facts that your
18   brief said showed bad faith on the part of TWA?
19   A.   Yes.
20          THE COURT:  You may.
21   A.   Yes, yes, I did.
22          THE COURT:  You said that.
23   A.   Yes.
24   Q.   And if you were to go and fight on it that following
25   Friday at the hearing on the 6th you would be putting up
```

Seltzer-cross/Jacobson                                    185

 1   witnesses who you would expect their testimony in part to be

 2   evidence of the bad faith?

 3   A.   We would makes that argument, yeah.  Based on this

 4   evidence.

 5   Q.   And you would present that evidence?

 6   A.   Yes.

 7   Q.   So when the Judge is saying that there is simply no

 8   evidence to suggest, that is because he hasn't heard your

 9   evidence yet, correct?

10   A.   Yes.  Yes.  But I found it significant that he reached

11   out to make that statement before the hearing even began.  I

12   found that unusual.

13   Q.   Well, you believe that judges, like other humans, are

14   swayed by evidence, don't you?

15   A.   Yes, but --

16   Q.   That is a yes or no.

17           THE COURT:  Thank you.

18           MR. JACOBSON: You are welcome.

19   Q.   Now, you were asked a little bit about the memos of

20   March 12 or March 13, in advance of the March 14 meeting, do

21   you recall that?

22   A.   Yes.

23   Q.   Let me hand you --

24           THE COURT:  We are talking '01 again.

25           MR. JACOBSON: Yes, we covered more of a year, I

Seltzer-cross/Jacobson                                    186

1   should say the year.

2           THE COURT:  There were a few things that happened

3   in March of '02 that were significant in this case.

4           MR. JACOBSON: You are right, your Honor.

5   Q.  Let me hand you an exhibit marked as D 378.

6           THE COURT:  D?

7           MR. JACOBSON: D as in defendant, your Honor.  It is

8   already in evidence.  I thought it is helpful for people to

9   have paper.

10  Q.  Do you recognize this as a memo to you from Mr. Holtzman

11  that you testified about on direct examination?

12  A.  Yes.

13  Q.  This is where he asks you certain questions or rather is

14  restating questions he claims he asked you on the Saturday

15  before?

16  A.  Yes.

17  Q.  And could you go through this memo in an attempt to

18  answer these questions?

19  A.  Yes.

20  Q.  Did you write down your answers by hand on the memo?

21  A.  I wrote it down about three or four different times.

22  Q.  All right.  Let me show you what has been marked for

23  identification, I don't know if it is in evidence yet?

24          THE COURT:  What is the number?

25          MR. JACOBSON: P-138, your Honor.

1          THE COURT:  P-138 which is also D 378 has been

2   marked for identification but not in evidence.

3          MR. JACOBSON: All right.

4   Q.   Mr. Seltzer, is that your handwriting on this document?

5   A.   Yes, it is.

6   Q.   These are your handwritten notes preparing your answers

7   to Mr. Holtzman's questions?

8   A.   Yes.

9          MR. JACOBSON: I would like to offer P-138 in

10  evidence.

11         MR. FRAM:  No objection, your Honor.

12         THE COURT:  Okay.  Then P-138, and I guess D 378,

13  wind up in evidence.

14  Q.   All right.  Your handwriting is not as bad as some we

15  have seen in this trial?

16  A.   It is pretty bad.

17  Q.   It is not the equivalent of a newspaper printing.  Let's

18  see if we can read portions of this to the jury so they can

19  understand what is on the first -- can you focus on the upper

20  right corner?

21  A.   Notes re D Holtzman question.

22  Q.   So this is reflecting that this document are your notes

23  regarding Mr. Holtzman's questions?

24  A.   Right.  As I said I think there are several cones,

25  several times I wrote notes on it.

Seltzer-cross/Jacobson                                          188

1    Q.   I understand you are saying that.  Lower left-hand

2    corner.  What does that say?

3    A.   Almost no case on meeting of rejection.  Better view is

4    that TWA may only implement last proposal as terms and

5    conditions of employment.  That's TWA.

6    Q.   All right.  By that you meant that if negotiation breaks

7    down between TWA and the pilots, and the Court rejects the

8    contract on 1113, then TWA can't impose on the pilots

9    something worse than their last offer?

10   A.   That is correct.  And I add "that's TWA" because I was

11   referring to the company in bankruptcy.

12   Q.   I understand.  Turn to the second page.  Upper

13   right-hand corner there is some language?

14   Q.   What does that say?

15   A.   No CBA.

16   Q.   Did that means collective were beginning agreement?

17   A.   Right.  RLA matter.

18   Q.   Railway Labor Act matter?

19   A.   Correct.  Terms and conditions subject to change.  I

20   think APA statement.

21   Q.   APA is the Allied Pilots?

22   A.   It is also the asset purchase agreement.  I think I may

23   have been referring to the as pet purchase agreement.

24   Q.   Fine.

25   A.   And I, see if it is any better here.

Seltzer-cross/Jacobson                                    189

```
 1              THE COURT:  Can't read my own handwriting.
 2   Q.    That is fine.  Let's go to the first page now.  Would
 3   you please block the second question and the answer.  The
 4   question reads what, sir?
 5   A.    If American continues to insist on a scope waiver.
 6   Q.    Slow down?
 7   A.    If American continues to insist on a scope waiver, ALPA
 8   refuses and no substitute agreement is concluded, will TWA
 9   prevail against ALPA on Section 1113.
10   Q.    What was your handwritten answer?
11   A.    No, no way.
12              MR. JACOBSON: Thank you.  No further cross
13   examination, your Honor.
14              THE COURT:  I am sorry.  You have concluded your
15   cross.
16              MR. JACOBSON: That is it.  It is no, no way.
17              THE COURT:  Redirect.
18              REDIRECT EXAMINATION.
19              BY MR. FRAM:
20   Q.    Why did you write no, no way?
21   A.    I am not usually dyslexic, but the question was often
22   posed is will ALPA prevail.  Will ALPA win?  In fact there
23   are two other versions of this where I say yes.  Absolutely
24   yes.
25              And I remember looking at this after I wrote it,
```

Seltzer-cross/Jacobson                                          190

1    and thinking that I had really been dyslexic dyslexic, that I

2    was answering the absolute opposite question and I have seen

3    since other versions of this where I wrote yes.  I simply was

4    answering the wrong question.  And that is --

5    Q.   Did you ever tell any of the members of the MEC in

6    response to the question of whether TWA prevailed against

7    ALPA, "No, no way?"

8    A.   I did not.

9              MR. FRAM:  Thank you.  That is all I have, your

10   Honor.

11             MR. JACOBSON: I think the document and the

12   testimony stands.

13             THE COURT:  The document is the document.

14             MR. JACOBSON: Yes.

15             THE COURT:  Okay.  That is it then.  No further

16   questions.  You may step down.

17             THE WITNESS:  Thank you, your Honor.

18              (Witness excused)

19             MR. FRAM:  We have no further live testimony.  We

20   have some video issues, we have not resolve all the issues on

21   that.  We have in depositions and reading we have not been

22   able to resolve.

23             THE COURT:  I reviewed them, Babbitt, that is the

24   only one I had, I was going to allow the very, the few lines

25   that were listed, that were contested.

```
 1                 MR. FRAM:  The ones we submitted yesterday.

 2                 THE COURT:  Yes.  I didn't know you were supposed

 3      to reach agreement as to the uncontested parts.

 4                 MR. PRESS:  Yesterday afternoon before we broke you

 5      ordered the defendant to provide us the comprehensive list of

 6      what it is they intended to play.  We didn't get that until

 7      first thing this morning.  I asked for it yesterday.  So I

 8      haven't had a chance to review.  Remember you wanted to be

 9      clear that we had no problem.

10                 THE COURT:  I just want to be clear that what was

11      supposed to be uncontested was truly uncontested.  So there

12      wasn't such --

13                 MR. PRESS:  If I had gotten this list I would have

14      been prepared.

15                 THE COURT:  Let's give the jury a break now.  Look

16      at it now.  My understanding is the Babbitt section is pretty

17      short.

18                 MR. FRAM:  I am told it is over an hour, your

19      Honor.  We probably can't finish it today.

20                 THE COURT:  Anything else that is short?

21                 MR. FRAM:  We don't, your Honor.

22                 THE COURT:  Are you done with your live witnesses

23      period?

24                 MR. FRAM:  We are, your Honor.

25                 THE COURT:  All right.  So that all that is left
```

```
 1    for your case are various readings and play goes of prior

 2    depositions.

 3              MR. FRAM:  Yes.  And we need a short conversation

 4    with counsel to work out issues.  Yeah, very few --

 5              THE COURT:  Okay.  So you anticipate that you could

 6    be completed tomorrow?

 7              MR. FRAM:  Oh, absolutely, your Honor.

 8              THE COURT:  And then for rebuttal, have you made

 9    decisions yesterday?

10              MR. PRESS:  We have, your Honor.  Sherry Cooper, we

11    intend to call.

12              THE COURT:  Okay.

13              MR. PRESS:  That should be a short-ish witness.

14              THE COURT:  I don't know how you are going to

15    present it.  Is that it?

16              MR. PRESS:  Beyond that, I think that is it.  I

17    don't think there is anything beyond that.

18              THE COURT:  Okay.  Then I think what I am going to

19    do is try to work for the next few minutes on resolving what

20    I can the issues on the playback feedback, and, so ladies and

21    gentlemen of the jury, we will let you go a few minutes early

22    today.

23              You have heard where we are.  That this portion of

24    the case, on the presentation of evidence may well be

25    finished tomorrow or the next day.  So after that we will
```

1    have closing arguments by the parties.  My instructions as to

2    the law.  And your deliberations.  Then we will have a

3    better sense of where we are.  So I am going to send you

4    home.  Don't discuss the case acknowledge yourselves.  Keep

5    an open mind.  Until you have heard all the evidence.  We are

6    very close to the end of the case.  I will see you tomorrow

7    morning at 8:30.  Again, job one, safe trip home and a safe

8    trip in tomorrow.

9            (The jury leaves the courtroom.)

10           THE COURT:  All right.  I will be here until 2 30.

11   Anything you can get to me by then on the issues, as I said,

12   I read the, it was only a few pages.  It was very short

13   Babbitt extract and I was going to permit those in.  They

14   were limited pretty much to what he told members of the MEC

15   or the MEC officers of ALPA.  But I don't know what is in the

16   other stuff.

17           Anything else you can get me to look at.  What is

18   the other piece you want to play, Babbitt.

19           MR. FRAM:  Other than Babbitt it was going to be

20   possibly a short reading of some of Bensel and a short

21   reading --

22           THE COURT:  That is a pretty testy issue right now.

23           MR. FRAM:  We need to talk about it to see how

24   testy it is.  If we can work it out, great.  If we can't, we

25   may just withdraw it.

1          THE COURT:  Yeah.  I have to say it is a little

2     troublesome to have somebody who was at the eye of the

3     hurricane for six or seven or eight years in this case and

4     then have him suddenly pop off in the form of small extract

5     from his deposition.

6          But any way, I will wait to see what you come up

7     with on that issue, if it is presented.   If you want to

8     offer it, I will evaluate what Mr. Press wants.

9          MR. PRESS:  We will meet and confer and try to get

10    everything resolved.

11         THE COURT:  Okay.  Now, is Ms. Cooper, is she going

12    to be here tomorrow?

13         MS. RODRIGUEZ:  No, she can't be here until Monday.

14    She has a funeral tomorrow.

15         THE COURT:  Tomorrow is Thursday.  Well, that is

16    probably okay.

17         MR. PRESS:  Should we be prepared to argue jury

18    instructions tomorrow?

19         THE COURT:  Yeah, I already have a draft of them.

20    I want to look at it again, I am ready to give to you.

21         Have you given any thought, I mean, if the jury

22    comes in with no cause, that is the the end of the case until

23    some higher, if the jury comes in for the plaintiff, then in

24    a sense that is not a final judgment.   Anybody given any

25    thought as to how we plan to proceed.  I take it nobody is

```
 1   really ready to proceed.
 2             MR. JACOBSON: I have a thought, your Honor.
 3             THE COURT:  What is that?
 4             MR. JACOBSON: We go into rapid discovery on
 5   damages.
 6             THE COURT:  It won't be the same jury.  It will be
 7   a different jury.
 8             MR. JACOBSON: Yes.
 9             THE COURT:  We are not going to try to hold this
10   jury.  Rapid discovery, I am all in favor of that.  But we
11   all accept that I am not going to try to hold this jury here
12   for something -- whatever familiarity they have with the
13   case, plaintiff really isn't ready to go to the damage phase.
14             MR. PRESS:  That is true.
15             THE COURT:  I am not trying to tell tales out of
16   school.  That is the sense I get.  Okay.  All right.
17             MR. FRAM:  Your Honor, I think you mentioned
18   earlier in the week that you would be inclined to hear
19   argument on the Rule 50 motion tomorrow.
20             THE COURT:  I scheduled it.  I think it is on my
21   calendar for tomorrow.
22             MS. RODRIGUEZ:  Yes.
23             THE COURT:  3:30  tomorrow.
24             MR. FRAM:  We haven't seen opposition papers yet.
25             THE COURT:  Nor have I.
```

1          MR. FRAM:  I wonder if they are expected.

2          THE COURT:  I don't know.  I have scheduled it for

3    argument.

4          MS. RODRIGUEZ:  We anticipate them when filing them

5    when we get back to the office this afternoon.  They are

6    short.

7          THE COURT:  What?

8          MS. RODRIGUEZ:  They are short.

9          THE COURT:  All right.  I will do the best I can to

10   read it and be prepared with it.  Okay.  3:30  it is on my

11   calendar for 3:30  argument.

12         MR. JACOBSON: Your Honor, if we finish with the

13   evidence earlier, because it sounds like there is not a whole

14   lot left, can we go right into the argument?

15         THE COURT:  I mean I think you should all be, I

16   think you all, I know we have a couple of snippets of tape,

17   and a possibility of Sherry Cooper testifying.

18         MR. JACOBSON: Not tomorrow.

19         THE COURT:  I am not going to have argument before,

20   I can't have a witness after her.

21         MS. RODRIGUEZ:  He is talking about argument on the

22   motion I think, your Honor.

23         MR. JACOBSON: The Rule 50 motion, your Honor.

24         THE COURT: Well, we want to do it.  We have to do

25   it before it is submitted to the jury.  That is the linchpin

```
 1    point.

 2            MR. FRAM:  We can do it before.

 3            THE COURT:  Right.

 4            MR. FRAM:  We did do it before Sherry Cooper

 5    testifies.

 6            THE COURT:  Well, as a practical matter we can do

 7    it Tuesday, I suppose.  She is going to be here Monday.  What

 8    is left is Thursday.  Friday I hadn't planned to be here

 9    actually.  But --

10            MS. RODRIGUEZ:  I think Mr. Jacobson's point was if

11    they get done their testimony at noon, instead of waiting

12    until 3:30  for the motion, can we do it at 12:30?

13            MR. JACOBSON: That is what I was asking.

14            THE COURT:  Oh, oh, oh, I am sorry.  The answer to

15    that is yes.  You tell me you want to do it at noon or an

16    earlier time and we don't have any testimony to interfere

17    with that.  Oh, yes.  Absolutely.

18            MR. JACOBSON: I think all the lawyers prefer that

19    if it is possible.

20            THE COURT:  You won't get my resistance from me.  I

21    just put it at 3:30  because that was the available time we

22    had tomorrow but if it turns out things break earlier and the

23    case is done.  We will do it earlier, I will do it earlier.

24            MS. RODRIGUEZ:  Thank you.

25            THE COURT:  No problem at all.
```

1          MR. FRAM:  Your Honor, in terms of other

2    scheduling, after Sherry Cooper Monday, would your Honor want

3    to move into a charge conference at that point?

4          THE COURT:  I want to give you the draft first so

5    you can read it.  Then have a charge conference.  We can pass

6    over the points of dispute.  You did have significant

7    differences, most of the, most of it us agreed on, there is a

8    small part of the charge that is actually contested.

9          MR. JACOBSON: Only the important parts.

10         THE COURT:  Well, that is not always the case for

11   the charge.  There may be a sentence or two.

12         MR. PRESS:  The verdict directing instructions were

13   where we had the difference.

14         THE COURT:  I think starting at paragraph 13, 14,

15   15.  Anyway, we drafted something to try to accommodate.  I

16   want you to have it and read it before we have the charge

17   conference.

18         MR. PRESS:  Sounds good.

19         MR. FRAM:  Thank you, your Honor.

20         THE COURT:  Okay.  See you tomorrow at 8:30.

21         MR. PRESS:  Your Honor, we will not have closing

22   arguments on Monday.  Is that true?  They would be Tuesday at

23   the earliest?

24         THE COURT:  Well, I don't know.  I mean, if the

25   only order of business we have is Sherry Cooper on Monday,

1     she might only take an hour.  I mean, an hour and a half.  I

2     don't know exactly, but I mean she is making a few bullet

3     points.  Cross on those points, she doesn't, I mean the whole

4     area of MEC consideration, she really is, there is nothing to

5     it.

6              She is going to try to testify on the stand-alone

7     plan.  I believe.  And maybe the trophy testimony, let's call

8     it that, what we mean by that.  But that doesn't strike me as

9     long.

10             There may be some issues, but it is not long

11    testimony.  So that could be done in an hour, hour and a

12    half.  Why couldn't we have the closing.

13             What is the reason?

14             MR. JACOBSON: There is no reason not to.

15             MR. PRESS:  No reason.  For planning purposes and

16    letting my clients know.

17             THE COURT:  Again.  If we use you up tomorrow

18    working out whatever is left of Mr. Fram's case, whatever

19    arguments we have on the Rule 50 motion, and then Monday we

20    have an hour of Ms. Cooper, an hour and a half, two hours,

21    that would leave four hours.  We could certainly get in one

22    closing.

23             I don't have a real sense, it has to do as much

24    with the personal style of the lawyers as it does with the

25    inherent -- I don't know how -- I will permit you to divide

```
 1    up the closings if you want to cover different topics.  Same
 2    for you if you want to have one person cover one topic and
 3    another person cover another, I will allow that but I don't
 4    have a real sense, as I say, it really depends on personal
 5    style as much as it does on the intrinsic nature of the case.
 6    So.
 7              MR. PRESS:  I asked the question because I remember
 8    the openings you wanted to start fresh with the opening
 9    statement.  I didn't know if you had the same view with the
10    closing.
11              THE COURT:  No.   I hate to waste a whole day.  Ms.
12    Cooper takes an hour, an hour and a half.  And we have six or
13    five hours left, my instinct would be that a reasonably
14    efficient closing would be two, two and a half hours, and
15    that is it.  You may think that is way too short, way two
16    long.
17              MR. PRESS:  Just right.
18              THE COURT:  I think we can get going on it.  And
19    start.
20              MR. PRESS:  Good.
21              THE COURT:  Defendant closes first in a civil case.
22              MR. PRESS:  Okay.  Really?.
23              MS. RODRIGUEZ:  We adopted the state court
24    practice.
25              THE COURT:  We used to call it the state court
```

1    practice. It  was the state who started.   We used to talk

2    about following the state court practice.   The way it works,

3    the party with the burden of proof goes last.   And in other

4    words, gets the last shot at the jury so the defendant

5    closes, and then, we don't use, in criminal case cases we

6    have a different procedure,  because the rebuttal closes.

7    The government goes first, then the defendant, then the

8    government gets a rebuttal.  But that is used only in

9    criminal procedures.

10            With us it is, I don't believe there is any Judge,

11   at least in this courthouse, that.

12            MR. PRESS:  Does the defendant get to break up his

13   time so he has to come back?

14            THE COURT:  No.

15            MR. PRESS:  He gives his entire closing and I stand

16   up and give mine?

17            THE COURT:  Yes.

18            MR. PRESS:  I never heard of it.

19            MR. JACOBSON: It is no different than what we do in

20   the midwest.  In Missouri, Illinois, Kansas, all those

21   places, the party with the burden of proof goes first, then

22   the defendant goes.  Then first party.

23

24            (Off-the-record discussion)

25            MR. PRESS:  Can we refer to the charges.

```
 1              THE COURT:  Yes, you can read from the charge.
 2   Both sides can use the charge.
 3              Try to get here at eight tomorrow.
 4              (Off-the-record discussion)
 5              (Adjourned at 1:45  p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2                          I N D E X.

3

4          SETH ROSEN, SWORN.

5                  DIRECT EXAMINATION          P. 3.

6                  CROSS EXAMINATION           P. 39.

7                  REDIRECT EXAMINATION        P. 76.

8

9          RICHARD SELTZER, SWORN.

10                 DIRECT EXAMINATION          P. 89.

11                 CROSS EXAMINATION           P. 159

12

13

14

15

16

17

18

19

20

21

22

23

24

25