```
 1                    IN THE UNITED STATES DISTRICT COURT.
                      FOR THE DISTRICT  OF NEW JERSEY
 2                    CIVIL 02-2917  (JEI)

 3          PATRICK BRADY, SALLY YOUNG,
            HOWARD HOLLANDER, THEODORE CASE,
 4          AND MICHAEL FINUCAN, individually
            and on behalf of all others
 5          similarly situated,
                              Plaintiffs,
 6                                                VOLUME 17
                   V.                             TRIAL TRANSCRIPT
 7
            AIR LINE PILOTS ASSOCIATION,
 8
                              Defendant.
 9
                                        CAMDEN, NEW JERSEY
10                                      JULY 7, 2011

11          B E F O R E:   HONORABLE JOSEPH E. IRENAS
                           UNITED STATES DISTRICT JUDGE
12
                         A P P E A R A N C E S:
13
                TRUJILLO, RODRIGUEZ & RICHARD
14              BY:  NICOLE M. ACCHIONE, ESQ.
                     AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
                GREEN JACOBSON, P.C.
16              BY:  ALLEN PRESS, ESQ.   (MO. BAR)
                AND:  JOE D. JACOBSON, ESQ.  (MO. BAR)
17              For the Plaintiffs.

18              ARCHER GREINER
                BY:  STEVEN FRAM, ESQ.
19                   AND
                KATZ & RANZMAN
20              BY:  DANIEL M. KATZ, ESQ.
                FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
                ELIZABETH  GINSBURG, ESQ.
22              IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
above-entitled proceedings.

3                         S/   LYNNE JOHNSON

4                         Lynne Johnson, CSR, CM, CRR
5                         Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                    LYNNE JOHNSON, CSR, CM, CRR
18                  OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
19                  P.O. BOX 6822
                    LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25          .

```
 1              THE COURT:  Good morning, everybody.

 2              MR. FRAM:  Good morning, your Honor.

 3              THE COURT:  Mr. Fram.

 4              MR. FRAM:  Your Honor, thank you.

 5          You heard mention yesterday I believe of Mike Abram

 6   who is a partner at the Cohen, Weiss firm yesterday.

 7              THE COURT:  Until this morning I haven't, the name

 8   hadn't stuck in my head.  But I now know that he is a partner

 9   at that law firm and he is here in court, through apparently

10   for the defense for ALPA.

11              MR. FRAM:  Yes, your Honor.

12          Mr. Abram was handed a subpoena this morning by

13   plaintiffs counsel.  We assume they are making an effort to

14   introduction into evidence P-264.  As your Honor may recall,

15   P-264, a premarked exhibit, part of the joint final pretrial,

16   an internal memo at the Cohen, Weiss firm that is analyzing

17   some legal issues and throwing out some hypotheticals that

18   relate to the 45 million dollars fine that Judge Kendall in

19   Texas had imposed.

20              THE COURT:  Let's be specific.  The memo was a

21   research memo done by an associate, I believe, at the Cohen,

22   Weiss firm.

23              MR. FRAM:  Yes, your Honor.

24              THE COURT:  It was addressed to four or five

25   people, not addressed to the witness who was on the stand at
```

```
 1    the time.

 2                MR. FRAM:  Not address to Mr. Seltzer.

 3                THE COURT:  Let me finish.  The point that the memo

 4    sailed /*R said that one of the ways to avoid, in effect

 5    said, it didn't say quite like this, but one of the ways to

 6    avoid potential liability on ALPA's part of the huge fine

 7    that had been levied against APA, based on the sick-out it

 8    had earlier, was instead of merging the two unions, was to

 9    conduct a traditional card campaign, and then have an

10    election and then presumably the American pilots would vote

11    to join ALPA, and they would join ALPA, but leaving behind

12    any liability that APA had.

13          That was the thrust of the memo, and plaintiffs

14    want it in because, at least a couple of witnesses have made

15    a big point that ALPA doesn't like to conduct card campaigns

16    against other unions.  In other words, incorporated pilots

17    who were already represented by another union, who are to

18    take from an unorganized, unrepresented group.  That is why

19    they want it in.

20                MR. FRAM:  Your Honor, I don't think the memo says

21    that.  Quite says that.  It sets out a number of

22    hypotheticals in terms of --

23                THE COURT:  Yeah, but it does, I mean, if somebody

24    had followed that advice, it does say use a card campaign

25    rather than merge the unions.  I think it does say that.
```

```
 1              MR. FRAM:  I am not sure I agree with that, your

 2   Honor.

 3              THE COURT:  It doesn't make any difference.  They

 4   think it says that and they want it in.

 5              MR. FRAM:  Okay.  That apparently is what they want

 6   to argue based upon the memo.  We have course dispute it.

 7              THE COURT:  Right.

 8              MR. FRAM:  My point, if I may, it is a premarked

 9   exhibit.  If they wanted it in, it was their obligation to

10   put it in as part of their case in chief.  They tried to get

11   it in through Duane Woerth, if you recall.  He hadn't seen

12   it.  They tried to raise it with David Holtzman as well,

13   again on cross examination, couldn't do it, and they tried

14   with Mr. Seltzer again.

15              And the problem we have, your Honor, of course, is

16   that this is part of their case in chief.  This is not

17   rebuttal.  This is not an issue that came up as part of our

18   case that we raised affirmatively.  It is an issue that --

19              THE COURT:  You did raise -- not that I want to get

20   into that, but you did raise affirmatively, very strongly, by

21   several of the witnesses, that you don't use card campaigns

22   when somebody you are trying to organize is already

23   represented by a union.  An it is a matter of policy of ALPA

24   not to be --

25              MR. FRAM:  That actually came out in the
```

1   plaintiff's case, your Honor.  They showed the videotape

2   testimony of Hunnibell and Clark who recited they were told

3   that.

4             THE COURT:  Duane Woerth said that.

5             MR. FRAM:  He did.

6             THE COURT:  That was your case, too.  Well, all

7   right.

8             MR. FRAM:  My point, your Honor, is this is not

9   proper rebuttal.  This is something that they have been

10  trying to prove since day one.  They could have tried to take

11  Mr. Abram's deposition and put him on the witness list.  He

12  wasn't there.  Indeed, when we talked about the wrap-up of

13  the case, they represented their sole rebuttal witness would

14  be Sherry Cooper.

15            THE COURT:  I am more concerned with, instead of

16  whether it is proper rebuttal or not, whether it is

17  admissible or not, whether rebuttal or otherwise.

18            MR. FRAM:  We don't think it is.

19            THE COURT:  Why don't you argue that.

20            MR. FRAM:  Even if it could be authenticated it is

21  just a thought piece to have an associate coming up with

22  hypotheticals.  The testimony we have, I think in the record

23  already, is Mr. Woerth never saw it.  No one is talking about

24  these issues.  He never saw the evidence.  Even if you

25  authenticate it and, to get it in evidence it is an internal

1    memo of the Cohen, Weiss firm that is a  thought piece.

2    There is no evidence it was ever communicated to anybody at

3    ALPA.

4              THE COURT:  I can't remember if it was Duane

5    Woerth.  At least one of the witnesses testified that, it

6    wasn't illegal to run a card campaign for a union that was

7    represented.  It was just a matter of policy of ALPA not to

8    do that.  I know one of the witnesses -- I think I asked the

9    question.

10              MR. FRAM:  Seth Rosen, your Honor.

11              THE COURT:  What?

12              MR. FRAM:  That was Seth Rosen.

13              THE COURT:  I think I was the one who asked that

14   question, is there anything, per se, illegal about running a

15   card campaign, when you are trying to organize a group that

16   is already organized and I think is answer was clearly no, it

17   was not illegal.  It was just sort of a matter, we don't raid

18   other unions, it is a matter of policy.

19              MR. FRAM:  The other reason why we are concerned

20   about the lack of a connection, and the confusion and

21   prejudice here is, if you recall, the APA fine, the testimony

22   we have, the APA fine gets resolved in April and May of 2001

23   and then the card campaign is not initiated by Clark and

24   Hunnibell until late May.

25              So to the extent there is any relevance or argument

```
1    to be based upon this, we are just going to be going around

2    in circles.  This advice, if ever given, became irrelevant as

3    soon as the APA fine got resolved in late April, early May of

4    2001.

5             But the more important point I think again is I

6    think as your Honor appreciates, lawyers think of

7    hypotheticals, and create issues and research them

8    internally.  And they don't necessarily --

9             THE COURT:  And bill for it, too.

10            MR. FRAM:  And bill for it.  Thank goodness for

11   that.  But they don't necessarily communicate advice, there

12   is no indication here that any particular advice was given

13   and the connection the plaintiffs want to make that this was

14   part of the conspiracy.  This doesn't fly.  And the facts

15   don't support it.  So.

16            THE COURT:  Well, this was dated before the

17   announcement of the acquisition.

18            MR. FRAM:  November 6, 2000.  So there is no --

19            THE COURT:  The acquisition wasn't announced until

20   January.

21            MR. FRAM:  Exactly.  So you can't argue, your

22   Honor, this was created at a point in time that it was

23   improper, that this is part of a backdoor way to include the

24   American pilots.  It was entirely proper.  It was entirely

25   proper for Duane Woerth to talk to the APA.
```

1       If you recall, he testified about the speech he

2   gave to the APA where they asked him about the $45 million

3   fine.  He said we have our lawyers looking at that to see if

4   we can resolve that.

5       There is nothing improper about this.  We are

6   concerned about plaintiffs arguing about a memo that was

7   written at a time when there was no impropriety somehow can

8   be used to argue later.  So under 403, under 401, we really

9   object to this going in, and for the rebuttal issues I

10  mentioned before, we object to Mr. Abram being called and

11  request that the Court quash the subpoena.

12      MR. KATZ:  May I add one point to that, your Honor?

13  If you look at the memo itself it is by an associate in the

14  firm, as you noted, your Honor.  And it attributes comments

15  to Robert Savelson, RSS, conversations that associates

16  thought he had with someone at ALPA.  However, that is double

17  and triple hearsay with regard to whether those statements

18  were ever made at all.  So it is unreliable in the extreme.

19  Because of that --

20      THE COURT:  Double hearsay.  If it was in the

21  report, it would be hearsay, if he took the stand.

22      MR. KATZ:  If he were to say it from the stand.

23  But it is triple hearsay because it is a memo.

24      THE COURT:  All right.  I get the point.

25      Mr. Jacobson.

```
 1              MR. JACOBSON: First I would like to correct what

 2     was stated about Mr. Woerth's testimony.  Mr. Woerth did not

 3     tell the APA board on that first meeting.

 4              THE COURT:  What board?

 5              MR. JACOBSON:.  He did not tell the APA board the

 6     first time he met he had lawyers researching 45 million

 7     dollars question to see if it would be a problem.  The

 8     testimony was he had lawyers research it and it was not a

 9     problem.  They wanted them now.  So.

10              THE COURT:  When was this?  This is a speech he

11     gave in November.

12              MR. JACOBSON: Yes.

13              THE COURT:  When he went to the APA board in

14     November.

15              MR. JACOBSON: Correct.  He didn't say we are

16     researching the issue.  He said I had it researched and it

17     is not a problem.  Your Honor, we believe that this is the

18     research to which he is referring.

19              The fact that RSS says he met with John Cohen and

20     Marcus Migliori and briefly Duane Woerth isn't, while there

21     is no statement here specifically attributed to them, that is

22     the context of the opinion saying here are issues to be

23     resolved.

24              So it is not being offered for the truth that they

25     said gee, what do we do --
```

1          THE COURT:  What is it being offered for?  Let's

2    start with that.  What disputed fact in this case?

3          MR. JACOBSON: This is rebuttal to defendant's --

4          THE COURT:  Forget the word rebuttal.

5          MR. JACOBSON: -- defendant's claim they never do a

6    card campaign at a work site that has already been organized

7    or is represented by the a union.  This explains reasons why

8    one would do so and the purpose being to avoid an existing

9    liability of 45 million dollars and to avoid a potential

10   liability in consumer class actions be brought against the

11   union that you would like to merge with.  And lays out, if

12   you do these things, your chances of avoiding these liability

13   ever the successor are improved.

14         And if, it gives a lie to their defense that we

15   don't do card campaigns at places that are unionized.  And it

16   is true rebuttal.

17         THE COURT:  There is nothing in there that says

18   that ALPA is going to conduct a card campaign.  This is a

19   lawyer who comes up with, which may well be an accurate

20   theory, I am not, you know, that you might be able to avoid

21   successor liability that would flow from a merger by

22   conducting a campaign directed to the individual pilots, a

23   card campaign.

24         MR. JACOBSON: You are correct --

25         THE COURT:  That is different from saying that

1    ALPA, as a matter of policy, was ready to conduct that kind

2    of card campaign.  There is no indication that they ever

3    adopted that theory, that it was communicated to them.  You

4    say Woerth says our lawyers tell us it is no problem, if you

5    are trying to tie it to that, well, I don't know that that

6    advice, how do I know that that advice, what witness will say

7    that advice was given to ALPA, or somebody in authority at

8    ALPA.

9           MR. JACOBSON: Your Honor, we have subpoenaed Mr.

10   Abrams and he is the lawyer who has a close relationship to

11   ALPA.  He was one of the recipients of this memo.  He may be

12   able to tell us that.  We don't know that.  We haven't

13   deposed him.  We don't know his testimony.  This memo doesn't

14   say ALPA will do this.  But it does lay out a road map, how

15   one could do a campaign at APA in light of --

16          THE COURT:  Nobody ever denied -- nobody ever

17   asserted from ALPA that as a matter of law you couldn't

18   conduct a card campaign if a union, if another union was

19   already representing the group you were targeting.

20          MR. JACOBSON: No, your Honor.  What they said is we

21   don't --

22          THE COURT:  As a matter a policy.  They said it is

23   a matter of policy that we will not raid, the word raid was

24   used, we will not raid another union.

25          MR. JACOBSON: As Mr. Seth Rosen said in his

1    testimony on cross examination, well, these policies are

2    things that are guidelines, they are suggestions, we are not

3    bound by them.   But we can do other things and this

4    suggestion, this document suggests that the activity that we

5    have shown all this evidence in our direct case about the

6    card campaign and the connections between the card campaign

7    and ALPA wasn't simply a bunch of American pilots off on

8    their own without any encouragement or support by ALPA, but

9    in fact --

10             THE COURT:   That is a contested issue that we have

11   to deal with.

12             MR. JACOBSON: Right.   And this supports the

13   conclusion that in fact ALPA had from their general counsel

14   who they have been dealing with, representing them since the

15   thirties --

16             THE COURT:   Is he here?

17             MR. FRAM:  Yes.

18             THE COURT:   I am going to hold a 104 hearing, right

19   now.  Mr. Abram, where are you?   That good looking guy

20   sitting.   I wondered who he was.   Swear him in.

21             THE COURT:   Can I have that document?   I am sure I

22   have it here.

23             M I C H A E L    A B R A M, Sworn.

24             THE COURT:   Did you receive this document which is

25   P-264 for identification.

```
 1   A.   Yes.

 2            THE COURT:  You received a copy of it.

 3            THE WITNESS:  Yes, I did.

 4            THE COURT:  Did you have any conversations with

 5   anybody at ALPA, either ALPA, and I include in that anybody

 6   at the MEC, you know, any pilot, did you have any

 7   conversations with anybody at TWA or ALPA about this memo.

 8            THE WITNESS:  TWA MEC or ALPA.

 9            THE COURT:  Or ALPA, yes, right.

10            THE WITNESS:  I don't recall, your Honor, any

11   conversation was anyone outside of the firm.  I haven't

12   checked anything on it for sure but I don't recall any.

13            THE COURT:  So sitting here now you don't recall

14   conveying anything about this subject matter, forget the

15   memo, the subject matter of the memo, did you have any

16   discussions with anybody at ALPA or anybody at the TWA MEC

17   about conducting a card campaign.

18            THE WITNESS:  No, your Honor.

19            THE COURT:  Did you have any discussions with

20   anybody at ALPA or TWA MEC about the problem of trying to

21   organize the APA pilots in light of the outstanding 45

22   million dollars contempt fine.

23   A.   I don't recall any.  I haven't reviewed anything to make

24   sure but I don't recall any conversation.

25            THE COURT:  Okay.  Where would you go from there?
```

1          MR. JACOBSON: Your Honor, would you ask him

2   whether --

3          THE COURT:  You can ask him.

4          BY MR. JACOBSON:

5   Q.   Had you had any conversation was any of the other

6   lawyers in your firm about advise they may have given ALPA in

7   connection with any desire to organize the American Airline

8   pilots?

9   A.   I had discussions with at least one other lawyer in the

10  firm about the subject matter of this memorandum.

11  Q.   Who was that, sir?

12  A.   Mr. Savelson.  That would be one of the person.

13         THE COURT:  Is that RSS?

14  A.   Robert Savelson, he is the RSS, your Honor.  I don't see

15  his name as a recipient of this memo, but I do know I

16  discussed this subject matter with him.

17         THE COURT:  Who is Mr. Savelson.

18  A.   He is one of my partners in the firm.

19         BY MR. JACOBSON:

20  Q.   Is he the individual whose initials appear in the first

21  paragraph, RSS met with John Cohen?

22  A.   Yes.

23  Q.   Was Mr. Savelson someone who had regular contact with

24  ALPA officers on these topics, or just contact with ALPA

25  officers?

1    A.   He is one of the lawyers in the firm who had regular

2    contact with ALPA officials at MEC's, and in the national

3    office on a lot of different things.

4              THE COURT:  What would you be your next question?

5              MR. JACOBSON: I wasn't prepared to do this

6    yesterday and I don't have my question yet.

7              THE COURT:  Okay.  You can step down.

8              THE WITNESS:  Thank you.

9                (Witness excused).

10             THE COURT:  Make your last argument.  I don't want

11   to keep the jury.

12             MR. FRAM:  The only reference in here to a card

13   campaign, we have five numbered questions.  If you look at

14   page 4, your Honor, the memo does not talk about ALPA running

15   a card campaign.  What it says in the fifth numbered

16   paragraph --

17             THE COURT:  What page are you on?

18             MR. FRAM:  Page 4, your Honor.  Paragraph number 5.

19   What if the APA BOD, APA key committee members, et cetera,

20   offered to distribute and collect ALPA cards.  So we are not

21   talking about ALPA running a card campaign.  I just want the

22   record to reflect that.  The other thing --

23             THE COURT:  Go back.  What were you just saying.

24             MR. FRAM:  Your Honor, I am trying to highlight the

25   fact that the memo doesn't talk about ALPA running the card

1    campaign.  The memo talks about, what if the APA BOD.

2         THE COURT:  It would be difficult to stand in the

3    way of getting assistance if ALPA wants to run a quick and

4    successful representation campaign.

5         MR. FRAM:  It says ALPA has to start off by

6    collecting close to 70,000 cards.

7         MS. RODRIGUEZ:  7,000.

8         MR. FRAM:  Sorry.  7,000, 70 percent, which I think

9    is consistent with the idea that you need a lot of cards,

10   from Mr.  Rosen's testimony.

11        THE COURT:  He says it is hard to do.

12        MR. FRAM:  Any way, I rest on my prior arguments,

13   your Honor.  Thank you.

14        MR. JACOBSON: With respect to the last point that

15   was made, if you see that paragraph five that he pointed to

16   is the fifth of five called dilemma questions that begin on

17   page 3.  And it says, you know, if we are trying to do a card

18   campaign, what is the result, what is the effect of APA

19   participating, how does that jeopardize us on successorship.

20        THE COURT:  All I know is what I get out of all of

21   this, we get out of Mr. Abram brief appearance at the 104

22   hearing, is that in November of 2000, ALPA was certainly

23   interested in absorbing, if you will, if that is the right

24   word, the American pilots into ALPA.

25        One of the problems they were worried about was

1    this very large contempt judgment against APA in favor of

2    America, and they were afraid that if somehow or other they

3    took over representation of the American pilots, that they

4    might find themselves stuck for 45 million, is that the

5    number?

6              MR. FRAM:  Yes, your Honor.

7              THE COURT:  For a 45 million dollars judgment.

8              An associate in the firm, Cohen, Weiss, was asked

9    to research the question.  He researches it, he gives both

10   legal and practical, in a way, practical, makes legal and

11   practical observations.  There is no question he considers

12   the possibility that you can avoid, possibly, possibly avoid

13   the liability by not merging with APA but rather by

14   conducting -- by having, I don't want to say who, but by

15   having somebody conduct a card campaign and collecting enough

16   cards to trigger an election and then the election, if things

17   work out the way ALPA wanted, would be in favor of having

18   ALPA representation.  But there is no indication that this

19   was, I mean, what evidence that this was what was conveyed to

20   ALPA or even that ALPA accept accepted this advice and

21   decided to act upon it?

22             I think, if nothing else, from a 403 perspective it

23   is very confusing to the jury, it raises all kinds of issues

24   that really have nothing to do with this case.  It doesn't

25   put the lie to Duane Woerth's testimony that it was their

```
1    policy to not conduct card campaigns for unions, for groups

2    of pilots already represented by an independent union, or a

3    different union.

4              I am going to quash the subpoena to Mr. Abram.  And

5    let's get the jury out here and proceed with the defendant's

6    case.

7              MR. FRAM:  Thank you, your Honor.

8              (The jury enters the courtroom.)

9              THE COURT:  Good morning, everybody.  I assure you,

10   while I am late getting you out, we have been working since

11   quarter after.

12             So sometimes matters take a little longer than we

13   expect.

14             Okay.  Mr. Fram.

15             MR. FRAM:  Your Honor, thank you.  At this time we

16   would like to play the videotape testimony of Randy Babbitt,

17   taken on August 28, 2008.

18             THE COURT:  I am sorry.  You can I have the date

19   get.

20             MR. FRAM:  August 28, 2008, your Honor.

21             THE COURT:  August eight?

22             MR. FRAM:  August 28.

23             THE COURT:  28.  August 28.

24             MR. FRAM:  2008.  I think we have heard mention of

25   Mr. Babbitt's name a few times.
```

1          THE COURT:  This testimony is under oath and it has

2     the same force and effect as if it were given in the Court.

3          MR. PRESS:  The jury will hear my voice.  Can you

4     explain the context of the deposition.

5          THE COURT:  Depositions are part of a process we

6     call discovery.  And it gives either party the right to

7     examine potential witnesses who have been identified as

8     people who might have knowledge of the case.  And so some of

9     the questioning you will hear was done by Mr. Press.  That

10    doesn't mean that it is his witness or he is deposing the

11    witness, it just means in the context of discovery, at that

12    moment he was doing the questioning.

13         There is going to be some questioning by the other

14    side.

15         MR. PRESS: No.

16         THE COURT:  It is all by you.  Okay.  But that just

17    means he was exercising his right to take discovery of the

18    witness negotiations with the American pilots the whole

19    process, the idea of a federal trial is not to have ambush

20    and surprise.  That is Perry Mason.  The idea is that each

21    side gets to know what the other sides case is, so there is

22    no ambush, no surprise.  As I said, Mr. Press was exercising

23    his right to do that.

24         But under certain circumstances, portions of the

25    discovery deposition may be played in court as evidence.  And

```
1    you are to treat it as if Mr. Babbitt is here in court under

2    oath testifying.  Even though you are hearing it as part of

3    the discovery deposition.  It is no different to evaluate it,

4    you are to evaluate the same way, it gets no more weight or

5    less weight just because it is presented this way.  Okay.

6              Is that satisfactory?

7              MR. PRESS:  Thank you, Judge.  Yes.

8              MR. FRAM:  Thank you, your Honor.

9              (Videotape deposition of Randy Babbitt commences).

10             THE COURT:  Hold on.  I can't believe the jury is

11   following this.

12             MR. PRESS:  It started on page 18.  When what I was

13   handed by defendant's counsel starts on page 4.  There is a

14   lot missing.

15             MR. FRAM:  Your Honor, I thought we worked this out

16   yesterday.

17             THE COURT:  That is what I was advised.

18             MR. FRAM:  Can I confer with Mr. Press for a

19   moment, please?

20             JUROR:  Can we turn it up, too?

21             THE COURT:  Part of it I didn't hear either.

22             MR. PRESS:  I never got this, this is part --

23             THE COURT:  Whoa.  Whoa.  Even though the jury just

24   got comfortable.  I am going to send them back out.  I don't

25   want them to see this.  Please keep an open mind.  Do not
```

```
 1    discuss the case among yourselves until, very soon.  See you,

 2    it could be three minutes, four minutes.  I don't know.

 3              (The jury leaves the courtroom.)

 4              THE COURT:  Mr. Fram, what I heard so far was

 5    garbled.  I had trouble following what was going on and I am

 6    sure the jury did.

 7              MR. FRAM:  I don't disagree, your Honor.  I am

 8    trying to figure out what happened.  We emailed to Mr. Press

 9    late yesterday the final, final of this.  Apparently we

10    didn't connect in the way we thought we did.  If I could take

11    a moment with him I am sure we can work this out.

12              MR. PRESS:  Your transmission was never received.

13    I never got this.

14              (Off-the-record discussion)

15              MR. FRAM:  I apologize, your Honor.  I think we are

16    ready.

17              THE COURT:  Okay.  Try again.  If at first you

18    don't succeed.

19              (Jury enters the courtroom.)

20              THE COURT:  Okay.  The lawyers report that they

21    have worked out the glitches in the playback of Mr. Babbitt's

22    testimony.  So.

23              MR. FRAM:  Yes.  We a we apologize for the

24    confusion, your Honor.  We are ready to proceed.

25              THE COURT:  Okay.
```

```
 1                    (Videotape of Randy Babbitt is played).

 2              MR. FRAM:  Your Honor, I asked to pause.  I

 3      thought this might be a good time for a break.

 4              THE COURT:  Okay.

 5              MR. FRAM:  Is that okay?

 6              THE COURT:  Do not discuss the case amongst

 7      yourselves.  Keep an open mind until you have heard all the

 8      evidence.  All rise.  We will come back at quarter to 11.

 9                    (Jury leaves the courtroom)

10              THE COURT:  Mr Fram, can you do a favor for me?  I

11      was never presented with a list of what was going to be

12      played.  I want to put on the record what was played from the

13      August 28, 2008 deposition.  And it will take a few minutes.

14      Can you read off those pages, lines and pages.

15              MR. FRAM:  Yes.

16              THE COURT:  So we will all know what to use as part

17      of the record.

18              MR. FRAM:  Would you like me to read that now?

19              THE COURT:  Now.

20              MR. FRAM:  Sure.  I would ask Mr. Press to spot me,

21      to make sure I get it right.

22              THE COURT:  Mr. Press, this is a heavy burden on

23      you.

24              MR. PRESS:  I am up to the task.

25              THE COURT:  I am sure you are.
```

```
 1                 MR. FRAM:  Page 4, line 2 to page 16, line 6.

 2                 Page 18, line 22, to page 19, line 4.

 3                 THE COURT:  18, line 4.

 4                 MR. FRAM:  19, 4.  Page 19, line 10, to page 20,

 5     line 17.

 6                 Page 20, line 21, to page 21, line 7.

 7                 Page 21, line 24, to page 23, line 15.

 8                 Page 31, line 6, to page 32, line 19.

 9                 Page 41, line 5, to page 42, line 16.

10                 Page 42, line 17, to page 43, line 20.

11                 Page 44, line 17, to page 57, line 11.

12                 Page 57, line 12, to page 74, line 15.

13                 Page 75, line 21 to page 78, line 22.

14                 Page 79, line 14 to page 82, line 5.

15                 Page 82, line 15 to page 88, line 11.

16                 Page 89, line 7, to page 91, 17.

17                 That is where we have broken, your Honor.

18                 THE COURT:  Okay.  See you in 15 minutes.

19                 (Recess)

20                 (Jury enters the courtroom.)

21                 THE COURT:  Mr. Fram, you may proceed with Mr.

22     Babbitt.

23                 MR. FRAM:  Thank you, your Honor.

24                  (Videotape of Randy Babbitt continues).

25                 MR. FRAM:  That concludes the testimony of Mr.
```

1    Babbitt, your Honor.

2            THE COURT:  What is next?

3            MR. FRAM:  We have exhibits that go along with it

4    that we would like to introduce.

5            THE COURT:  Did you give me the two minutes, to

6    give me page and line.

7            MR. FRAM:  We did 91, 17.   We picked up with page

8    91, line 18 to page 92, line 10.  Page 95, line 5 to 95, line

9    20.

10            Page 95, line 21, to page 96, 15.

11            THE COURT:  Slow down a bit.  Go ahead.

12            MR. FRAM:  Page 96, 16 through 101, line 9.

13            THE COURT:  101 what?

14            MR. FRAM:  Line 9, your Honor.  Testimony page 103,

15    8, to 104, 22.

16            Page 116, line 1, to page 1 17, line 2.

17            Page 117, line 3, to page 119, line 21.

18            Page 119, 3, to line 8.  Page 119, 22, to --

19            THE COURT:  119, 22?

20            MR. FRAM:  119, 22, to page 120, line 19.

21            Page 123, line 9, to page 124, line 7.

22            Page 128, line 5, to page 129, line 15.

23            Page 132, line 13, to page 133, line 17.

24            Page 133, line 22, to page 135, line 5.

25            Page 137, line 16, to page 140, line 16.

1          Page 141, line 4, to page 141, line 23.

2          Page 142, line 14, to 142, line 15.  Page 143, line

3    13, to page 146, line 10.

4          Page 147, line 20, to 148, line 3.

5          Page 160, line 1, to page 162, line 8.

6          Page 162, line 9, to page 163, line 3.

7          Page 163, line 4, to page 166, line 4.

8          THE COURT:  Okay.

9          Now let's go to the exhibits.

10          MR. FRAM:  I will identify them for the record.

11          THE COURT:  Right.

12          MR. FRAM:  P-151.

13          THE COURT:  P.

14          MR. FRAM:  P-151, which is the Eclat consulting

15    letter agreement as of February 1, 2001.

16          J 152, a fax from Mr. Babbitt to Mr. Wilder dated

17    January 16, 2001.  P-153 is another fax from Mr. Babbitt to

18    Mr. Wilder dated February 26, 2001.

19          P-154 is a March 5, 2001 letter from Mr. Babbitt to

20    captain Robert Stow.

21          P-155 is another letter from Mr. Babbitt to Mr.

22    Stow dated March 31, 2001.

23          With his statement.

24          P-156 is a statement of Eclat, dated May 9, 2001.

25          P-158 is a fax from Mr. Babbitt to Mr. Wilder dated

1    February 28, 2001.

2              J 160 is a fax from Mr. Babbitt to clay Warner

3    dated March 27, 2001.

4              J 163 is a fax from Mr. Babbitt to Captain Stow,

5    dated April 24, 2001.  And finally, P-164 is an email, the

6    top message is an email from Mr. Babbitt to Keith O'Leary,

7    Robert Stow, Robert pastor, dated April 24, 2001, your Honor.

8              THE COURT:  That attaches resolutions.

9              MR. FRAM:  It did.  This copy of the exhibit itself

10   does not have the attachment.  I assume it is not intended to

11   be part of the exhibit.

12             THE COURT:  On your list of exhibits does have it

13   as part of the exhibit.

14             MR. FRAM:  Let me confer.

15             THE COURT:  The in the description in the exhibit

16   list in the, says email from Babbitt to O'Leary, attaching

17   draft resolution --

18             MR. FRAM:  Pardon me for a moment, your Honor..

19             (Off-the-record discussion).

20             MR. FRAM:  Your Honor, neither counsel seems to

21   have the attachment.

22             THE COURT:  You will find it somewhere.

23             MR. FRAM:  We will do that, your Honor.

24             THE COURT:  Are you offering all these into

25   evidence?

```
 1              MR. FRAM:  Yes, your Honor.

 2              THE COURT:  Any objection?

 3              MR. PRESS:  No.

 4              THE COURT:  Okay.  Then P-151, J 152, P-153, P-1

 5    54, P-155, P-156, P-158, J 160, J 163, P-164 will be in

 6    evidence.

 7              MR. FRAM:  Your Honor, we have two other exhibits

 8    to offer that have been stipulated to by counsel.

 9              THE COURT:  Which are?

10              MR. FRAM:  D 137.

11              THE COURT:  D 137.

12              MR. FRAM:  And D 136.

13              THE COURT:  136.  Any objection, Mr. Press?

14              MR. PRESS:  No, your Honor.

15              THE COURT:  They are in evidence.

16              What do you have planned next?

17              MR. FRAM:  With that, ALPA now rests its case.

18              THE COURT:  Ladies and gentlemen, let's take a

19    brief break.

20              I want to discuss with counsel where we are going.

21    I believe, I believe rebuttal you have just one witness?

22              MR. PRESS:  That is true.

23              THE COURT:  That witness would have been here today

24    but had a funeral so won't be here until Monday.

25              MR. PRESS:  Yes.
```

```
 1              THE COURT:  That witness we anticipate will take a

 2    couple of hours, if that.

 3              MR. PRESS:  Yes.

 4              THE COURT:  That is done, and that is the end of

 5    your case.

 6              MR. PRESS:  Yes.

 7              THE COURT:  In rebuttal.

 8              MR. PRESS:  Yes.

 9              THE COURT:  Then we go to closing arguments.  And

10    my charge.

11              So you will have the case, I can't tell you whether

12    it is Tuesday or, Tuesday morning, Tuesday afternoon.  But

13    what we have left is again one witness that was going to be

14    here today, and she is in Florida.

15              MS. RODRIGUEZ:  In Florida.

16              THE COURT:  She was going to be here today, but a

17    sudden death occurred and the funeral is today.

18              So we show sympathy and kindness and we will have

19    her Monday morning.

20              Then I say, I am repeating myself we are going to

21    have the closing arguments that each counsel gets to argue,

22    in a good sense of argue, to argue why you should view the

23    case in their light.  Then I will read the instructions to

24    the law which are very, I would say 45 or 50 minutes.  And by

25    the way, you will have a copy of that with you in the jury
```

```
 1   room.  You don't have to memorize it.  You should pay

 2   attention.

 3            And then the case is yours.

 4            So since the witness we were going to have is no

 5   longer here, we would have filled up the rest of today.  I am

 6   going to send you home and see you Monday morning.  To wrap

 7   up the case.

 8            So have a safe trip home, safe trip in, have a nice

 9   weekend.  And also, not only will we wrap up this case next

10   week, my birthday is next week.  So we will have two reasons

11   to celebrate.

12            JUROR NO. 12:  My birthday is next week, too.  Make

13   it three.

14            THE COURT:  What, what?

15            What day?

16            JUROR NO. 12:  The 12th.

17            THE COURT:  I am the 13th.  My college roommate is

18   the 12th.  I am July 13th.  My sister is August 13th.  The

19   thirteenth was a popular day for my mother.

20            Well, okay.  Have a great weekend.  Do not discuss

21   the case among yourselves.  Keep an open mind.  Do not

22   discuss the case with friends or loved ones.  It is only now

23   a couple of days and the case will be in your hands.  Keep an

24   open mind until you have heard everything.

25            (The jury leaves the courtroom.)
```

1          THE COURT:  All right.  We had a 2:30 time for

2    arguing the motion.  You want to push that up a little bit?

3          MR. FRAM:  We have one open evidentiary issue we

4    had deferred.  That was our request to strike from evidence

5    parts of P 148, the documents after April 18, 2001.  If you

6    recall.

7          THE COURT:  Yeah, you were going to get together

8    and tell what it is you wanted in and what he objected to.

9          MR. FRAM:  We did.  We put a tab in the notebook.

10   We are objecting to everything that has a date after April

11   18.

12         THE COURT:  That was ten documents.

13         MR. FRAM:  Yes.

14         THE COURT:  You want to do that now.

15         MR. FRAM:  If it is convenient for the Court.

16         THE COURT:  All right.  Let me take five minutes.

17   I want, I got to make some entries on the list of exhibits.

18   Go and have a comfort break and let me fill in what I have to

19   fill in on my charts.  Okay.

20         MR. FRAM:  Yes, your Honor.

21         (Recess)

22         THE COURT:  All right, everybody.

23         We are dealing with now exhibit 148, which is a,

24   which at some point without objection I might add was

25   introduced in evidence in bulk.  However, the defendant has

1    now raised a question as to whether documents dated after

2    April 18, 2002, should be admissible because as of that time

3    ALPA no longer represented the TWA pilots, therefore, it

4    certainly owed them no duty of fair representation and indeed

5    there would be nothing untoward about this them seeking to

6    carry out their unity policy, to go after independent unions,

7    go after the pilots in independent June's, to have them join

8    ALPA.

9            I don't take an absolute rule that just because

10   something is after April 18 it couldn't be relevant.  But I

11   look at most of this stuff and most of it would be highly

12   confusing to the jury.  Quite candidly there is a whole big

13   exchange about a letter Woerth wrote or an email he sent in

14   June, something like that, all kinds of things back and

15   forth.  So the first one I haven't objected, I have that

16   isn't objected to is P 148, PPPPP, ALPA Bates number 039188.

17           THE COURT:  Are you there?

18           MR. FRAM:  Yes.

19           THE COURT:  Mr. Press.

20           MR. PRESS:  Yes.

21           First of all, the first email here dated, is dated

22   April 23 and it is sent by Terry M, who is Terry M?

23           MR. PRESS:  Terry McCullough, American pilot.

24           THE COURT:  To Ron Rindfleisch.  It says, is this

25   email authenticity.  Then he attaches the email which I guess

1    has to do with money spent by ALPA earlier in the campaign

2    top organize the APA pilots.  I am not sure I understand it.

3    But there is no particular response to the question, that I

4    can see.

5              First it says, after the letter is purportedly

6    signed by Duane Woerth.  P S.  On a personal note could you

7    send me an updated seniority list.  We had hoped to implement

8    this if you had been in charge of the TWA APA buyout.  And S

9    S, if the list had gone the way you wished, what the its

10   status seniority, would your brother have gotten versus what

11   he actually -- I don't know what that means.

12             MR. PRESS:  Your Honor, I can short circuit this.

13             THE COURT:  I can't figure this out.

14             MR. PRESS:  We have no problem removing this from

15   the exhibit.

16             THE COURT:  Let's start with that.  148 PPPPP is

17   not in evidence.  I am not going to personally take it out

18   148 5 P's.

19             MR. FRAM:  Your Honor, could I make one comment in

20   terms of the, your Honor knows it went into evidence without

21   objection.  We did raise this cut-off --

22             THE COURT:  The general cut-off point you did

23   raise, you raised it several times.  I am going to hear your

24   argument.

25             MR. FRAM:  I appreciate that.

```
 1              THE COURT:  If something shouldn't go in evidence,

 2    the fact that it went in evidence even without objection at

 3    the time.  The way this went in, talking about one or two

 4    documents in a book of hundreds of documents, clearly, maybe

 5    I should be more vigilant.

 6              MR. FRAM:  I am not suggesting that at all, your

 7    Honor.

 8              THE COURT:  What?

 9              MR. FRAM:  I am not suggesting that at all.

10              THE COURT:  The answer is I am going to hear you.

11              MR. FRAM:  Thank you, we appreciate that.

12              THE COURT:  Now, the next document which is QQQ, is

13    actually dated 2/11/'02.

14              MR. PRESS:  The first page is dated April 30, '02,

15    Judge.

16              THE COURT:  Well, you are right.  The handwritten

17    note is dated April 30.  But it is attached to a receipt, or

18    a xerox of a receipt for Mailboxes, Inc.  And if I am not

19    mistaken, the position of plaintiff is that mailbox was being

20    used by Clark as part, in connection with his card campaign.

21              MR. PRESS:  That was his testimony.

22              THE COURT:  Right.  People could send their cards

23    to that box.  And this is a, I guess it is a submission, a

24    reimbursement for the cost.

25              MR. PRESS:  Ron.  Add this to the reimbursement
```

1    request, please.

2              THE COURT:  Attached to it which I think is still

3    part of QQQ is the renewal, a notice about the renewal of the

4    box, starting on March 4.  Right?

5              MR. PRESS:  Correct.

6              MR. FRAM:  Your Honor, I can --

7              THE COURT:  And then attached to that still part of

8    the same exhibit is again another renewal notice.

9              MR. FRAM:  Your Honor, I can simplify this.  We

10   believe that that document with the April date on it is a

11   duplicate of the same document with a February date that is

12   earlier in the notebook, five E's, I am told.  We don't

13   really care if --

14             THE COURT:  Well, I was not going to take these out

15   because although you are right they are dated afterwards,

16   they are continuations of a set of facts that occurred prior

17   to April.  The box clearly was in existence for many, many

18   months prior to April.  So as to Q, I am not taking it out.

19   I am not removing it from evidence.

20             MR. JACOBSON: Your Honor, for the record could

21   reflect it is five Q's.

22             THE COURT:  Everything I say is five.  The PI

23   removed is five P's.  5 Q's, I am not taking out.  The next

24   document is P 148 5 R's.

25             MR. PRESS:  I have no problem removing that.

```
 1                THE COURT:  Okay.  Let me make a note.  148 5 R's

 2    is not in evidence.  Okay.

 3                The next one is a memo to Seth Rosen from Ron

 4    Rindfleisch, with copies to Ken Cooper, Bill Roberts, York,

 5    Cradle Bill Sharp,, dated June 5, 2002.

 6                Reorganizing update --

 7                Who is Cooper, Roberts, York and Cradel?

 8                MR. PRESS:  Mr. Cooper and Mr. York I believe were

 9    in Mr. Rosen's department.  Mr. Katz would be better --

10                THE COURT:  They are all employees of the union.

11                MR. PRESS:  Yes.

12                THE COURT:  Roberts and Cradel.

13                MR. PRESS:  All four of those men are ALPA

14    employees, Judge.

15                THE COURT:  Okay.  And it says that American, pilot

16    contact advised passed resolution at each domicile to form

17    committee to merge with ALPA.  Please advise what actions are

18    necessary.  That is a two-page document.  That is SSSSS.

19    What is your position on that?

20                MR. PRESS:  This is a continuation of what we saw

21    in April, where one of these resolutions gets passed, Miami

22    first, and if you recall mid March and on April 3rd a

23    resolution gets passed in Dallas.  And this memo says that

24    that is going on all over the country.  So this is just a

25    continuation of the story, Judge.  This goes to --
```

```
 1              THE COURT:  We are now three months later, though.
 2    This is June.  April, May, June.  Two and a half months
 3    later.
 4              MR. PRESS:  Remember  Mr. Rosen told us how all
 5    this work that has to be done to accomplish these goals.
 6    This is it.  And Judge, I think this goes directly to ALPA's
 7    real motivation and their conflict of interest while they
 8    were representing the TWA pilots.  That is what it is offered
 9    for.
10              THE COURT:  Let me tell you where I am hung up
11    their is no doubt that ALPA, in November of 2000, passed a
12    unity resolution.  But basically embarked on a plan or a
13    goal, in other words, a goal, uniting or reuniting, as the
14    case may be, with independent pilot groups.  Nobody denied
15    that.  I think that is clear from the record.
16              January, American announces the acquisition of TWA.
17    Certainly fairly soon seniority became a big interest.  The
18    contract permitted for waiver of scope, and from some of the
19    things Babbitt said, although that wasn't his field, by March
20    he was talking about that.  It became clear fairly on, it
21    became clear that would be a big issue.  Certainly ALPA
22    should have cut-off, you know, negotiating with American.
23    They should have not participated in any way in any
24    organizing campaign.  If they did not would be an issue of
25    fact for the jury.
```

1          But come April 18, when they are declared a single

2   carrier, LLC and American, a single carrier, APA now

3   represents the former TWA pilots and the subject of the

4   collective bargaining agreement, including Supplement CC of

5   the APA collective bargaining agreement, and ALPA says I want

6   to bring them back in the fold.  I want to do what I have to

7   do to get American -- what is wrong with that?

8          MR. PRESS:  This is part of the story.  They were

9   conflicted going in and they were conflicted coming out and

10  what do they do?  They went right back to their real agenda

11  the whole time.

12         The timing of this is not coincidental, Judge.

13  April 3rd is when, that is the day that ALPA lost its

14  bargaining rights.  On that day these resolutions get

15  forwarded up to ALPA.  And then the ball really gets rolling

16  as we see in June, in the memo you are looking at.

17         THE COURT:  I think the April 3rd resolution is in.

18  They are already in.

19         MR. PRESS:  They are absolutely in.

20         THE COURT:  They are in, and I understand that.

21  But now we are getting further a field concerning activity

22  that is perfectly legal.

23         MR. PRESS:  We are not questioning its legality.

24  We are offering this and we think it is evidence of ALPA's

25  conflict of interest, Judge.

1          MR. JACOBSON: May I add something?

2          THE COURT:  Yes.

3          MR. JACOBSON: Mr. Rosen in his testimony on the

4    stand on direct testimony testified to the huge amount of

5    work, the huge amount of time, the huge amount of money

6    required over many, many months to get to the point where you

7    start getting resolutions for unity.  So the fact that we

8    have resolutions here in June are suggestive that there was

9    before this many months of work with many volunteers and much

10   money spent.

11          And so it is like an ocean liner rather than a race

12   car.  You didn't just start and stop an on a dime.  It takes

13   time to get this thing underway.

14          THE COURT:  You shove it in reverse in Jamaica and

15   you pull to a stop in the Bahamas.

16          MR. JACOBSON: Something like that, your Honor.

17          MR. FRAM:  Couple points if I can.

18          THE COURT:  I am not sure Mr. Jacobson is finished.

19          MR. JACOBSON: Given that this is just two months

20   roughly after the end of the representation and given Mr.

21   Rosen's testimony about the many months required to get to

22   this point, and the work and the money required to get to

23   this point it is reasonable for a jury to say, okay, in June

24   they have got resolutions coming up in all of these

25   domiciles, that reflects many months of preparation including

```
 1   preparation at the time when ALPA was still the exclusive

 2   bargaining agent for the TWA pilots.  I think that is a

 3   reasonable inference.

 4            MR. FRAM:  A couple things.

 5            THE COURT:  Yes.

 6            MR. FRAM:  I think Mr. Press mentioned on April 3 a

 7   resolution was passed.  That wasn't the case.

 8            THE COURT:  Well, as I recall, there was a little

 9   bit of ambiguity as to whether it was passed.  The evidence

10   was it was introduced.  It wasn't clear it was even seconded.

11   I am not sure.

12            MR. FRAM:  Exactly.

13            THE COURT:  But it was discussed at that, at the

14   Dallas Fort Worth.

15            MR. FRAM:  Yes.

16            THE COURT:  It was discussed but the record was

17   unclear as to whether it had actually been seconded or

18   passed.

19            MR. FRAM:  Yes, your Honor.

20            THE COURT:  One of the pilots who was introduced

21   had to leave to go fly some.

22            MR. PRESS: I don't mean to make a misstatement

23   there.

24            THE COURT:  I am sure you didn't.

25            MR. FRAM:  I wasn't suggest he was.  In terms of
```

```
 1    the document you have in front of you much you it is

 2    reporting American pilots were trying to pass resolutions.  I

 3    think what is important here is two things --

 4              THE COURT:  No, no.  I think what may be more

 5    important than the fact that a bunch of pilots are trying to

 6    pass resolutions, American pilots, is that Rindfleisch and

 7    Rosen were involved with them.  I think that is more to the

 8    point.  It is just a question of, you know, that is more the

 9    issue.

10              MR. FRAM:  Your Honor, I don't believe the

11    documents suggest that they were involved with encouraging or

12    and obviously they have no direct control over what American

13    pilots do and of course now that the TWA pilots, the former

14    TWA pilots are part of American, for all we know they are the

15    ones out there saying we want to continue being members of

16    ALPA the fact that we are past.

17              THE COURT:  Please advise what actions are

18    necessary.  In talking about actions of ALPA, not action of

19    APA.

20              MR. FRAM:  That's correct, your Honor.  As you

21    pointed out once a single carrier determination us finalized

22    on April 5, certainly after April 18 when the best efforts

23    arbitration is over there is no legal prohibition on ALPA

24    doing this.  Our concern in terms of confusion is

25    considerable.
```

```
 1              And if any of this does come in, your Honor, we

 2     would have to request the Court specifically instruct the

 3     jury that ALPA was fully permitted after April 5 to go out

 4     and try to organize American.  And I don't think we need to

 5     get into that.  I don't think there is a reason to put in

 6     irrelevant evidence and then have to tell the jury that it is

 7     relevant and that it is irrelevant and don't be confused by

 8     it.  We believe there needs to be a firm cut-off based upon

 9     the DFR law that the Court has already articulated.

10              THE COURT:  Anything you want to add, Mr. Press?

11              MR. PRESS:  Here is June 5.  We have got evidence

12     of these resolutions or efforts to pass the resolutions and

13     you are going to see and documents coming up that a month

14     later Duane Woerth is in Dallas --

15              THE COURT:  I saw that.

16              MR. PRESS:  And his remarks made there have

17     evidentiary value themselves, some of them.

18              So we would ask that these documents that came in

19     without objection be allowed to go to the jury.

20              THE COURT:  This is a very difficult issue.

21              MR. FRAM:  Your Honor, if I may, I would suggest

22     unless any of the marks are backward looking.  Duane Woerth

23     made a statement in September about something he had done in

24     mid 2001, there might be an argument that it would be

25     evidential.  But unless he is talking about events that are
```

```
 1   relevant to the case, this is simply going to confuse and is

 2   going to, and will prejudice ALPA.

 3           THE COURT:  I am not going to I am not going to

 4   allow in SSSSS, five S's.

 5           The next document is five T's.  148.  That is a

 6   very lengthy report.  I mean, this would be fully confusing

 7   to the jury.  There are all kinds of issues in this reported,

 8   all kinds of discussions, that have nothing.  The report is

 9   an ALPA Exploratory Committee report to the APA board of

10   directors in 2001, so it is not a date issue.

11           MR. PRESS:  Your Honor, I don't know how these got

12   messed up.  But 148 4 L's, or maybe five L's is the same

13   document.

14           THE COURT:  148 5 T's is a memo from Rindfleisch to

15   Rindfleisch.

16           MR. PRESS:  Right.  D April 1.

17           THE COURT:  I don't know why he is communicating

18   with himself.

19           MR. PRESS:  It is dated April 1, Judge.

20           THE COURT:  April 1, 2002.  That is the memo.  But

21   what he attaches.

22           MR. PRESS:  Is the ALPA.

23           THE COURT:  Of January, 001.  Talking about looking

24   back.  This looks back a full year.

25           MR. PRESS:  This is, the report he attaches is
```

1  APA's, ALPA Exploratory Committee report, which is in

2  evidence itself as a different number.

3          THE COURT:  What is it?  I am really confused.  It

4  is not really a time issue, because he is sending something

5  to himself which is, the jury will get nothing out of the

6  email.  If they are going to get anything out of it, they are

7  going to get out of it the report, not the email.  So it is

8  really, what is really at issue is the admissibility of the

9  exploratory report of the APA board of directors in 2001.

10          MR. PRESS:  Which came in evidence through John

11  Clark already.

12          MR. KATZ:  Then they don't need it.

13          MR. PRESS:  Why is --

14          THE COURT:  Tell me where it is in evidence with

15  John Clark.  Show me.  Give me a citation.  148, 4 L's?

16          MR. PRESS:  No.

17          I don't think so I think that is something totally

18  different.

19          MR. FRAM:  Five L's, your Honor.

20          THE COURT:  That may be.  I don't know.

21          (Pause) Yes, I think you are right.  I think it is

22  5 L's.

23          MR. PRESS:  I don't know why the dupe /PHREUBG

24  indication is made.  I have no problem removing the five T's,

25  a copy of that same exhibit.

45

```
 1              THE COURT:  Here it is.  5 L's.  It is either the

 2   same, it is even the same cover memo, Rindfleisch to

 3   Rindfleisch.

 4              MR. PRESS:  That was an error.

 5              THE COURT:  Looks like a complete duplicate.

 6              MR. PRESS:  It is, it is the precise same document.

 7              THE COURT:  I will let that in.  Why Rindfleisch

 8   choose tows send that document to himself in April, 2002, I

 9   have no idea.  But maybe he wanted it to go from one computer

10   to another computer.  But it is already in evidence.  It

11   clearly relates to something that was a year earlier.

12              Okay.  I am going to omit, I am going to remove

13   148, 5 T's.  But not because it is not admissible, just

14   because it is a duplicate.

15              Okay.

16              MR. PRESS:  Judge, we have the same problem with

17   UUUUU.

18              THE COURT:  I got UUUUU.

19              MR. FRAM:  Your Honor, I am told that U is a

20   /PHRAOUP /TKPWEUBGT of five M's.

21              MR. PRESS:  It is.

22              THE COURT:  So we can probably remove that.

23              Do you agree to that?

24              MR. PRESS:  Yes, it is.

25              THE COURT:  I am going to take 148 UUUUU out.
```

```
 1              MS. RODRIGUEZ:  As a duplicate also, right.

 2              THE COURT:  Yes, right.  As a duplicate.  I am

 3      going to make it clear, I am going to put it is not in

 4      evidence.  /KHRAOEURLT M wasn't even contested.

 5              MR. PRESS:  The five V's and the five W's which are

 6      the next two are also duplicative.

 7              THE COURT:  I have W.  I am looking for V.   Do you

 8      agree that V and W are duplicates?  Tell me what the

 9      duplicates of.

10              MR. PRESS:  They are duplicates of five N and 5 O.

11              THE COURT:  1 N and one O?

12              MR. PRESS:  Five N /-S and 5 O's.

13              THE COURT:  Five N /-S and 5 O's.  Do you agree to

14      that?

15              MR. FRAM:  Yes, your Honor.

16              THE COURT:  So I am going to leave in five N and 5

17      O which are already in evidence and take out P-148 VVVVV,

18      take that out, and take out 148 5 W's.  Okay.

19              THE COURT:  That brings us to the tab of June,

20      2002.  X.  P-148 XX X.

21              MR. PRESS:  I don't have a problem removing that.

22              THE COURT:  I am going to tell you right now a lot

23      of the material from here to the end deals with the Dallas

24      lawsuit.  And I really think that gets, talk about potential

25      for confusing the jury.  So you agree that XXX can come out.
```

```
 1   5 X's, I mean.

 2              MR. PRESS:  Yes.

 3              THE COURT:  XXXXX is not in evidence.

 4              MR. PRESS:  I believe the five Y's.

 5              THE COURT:  Let me find it first.  The next one is

 6   YYY.

 7              MR. PRESS:  No problem removing that.

 8              THE COURT:  Okay.  148 YYYYY, five Y's, not in

 9   evidence.

10              Let me go to Z.

11              Then we are going to get to 6 A's.

12              What about Z.

13              MR. PRESS:  This is Mr. Rindfleisch's monthly

14   update on the organizing activities at the union and he is

15   supplementing what is going on in American.

16              THE COURT:  I am not going to let ZZZ in.  I

17   already kept out a similar one that was much earlier.

18              MR. PRESS:  The June 1.

19              THE COURT:  P-148 Z's for the same reason.  5 Z's,

20   out.

21              MR. PRESS:  Judge, we could short-circuit this and

22   just take everything else out.

23              THE COURT:  Might as well do it right and look at

24   it.  6 A's.  This really is confusing.  Because it deals with

25   some kind of conflict between Woerth and Darrah.  I mean
```

```
 1   there is a lot of stuff in here that the jury has no idea

 2   what this is about.

 3           MR. PRESS:  I have no problem removing it, Judge.

 4           THE COURT:  Okay.  Then 148, 6 A's.

 5           I would, would this be confusing.

 6           Okay.  I can't find it yet but what about BBB.

 7           MR. PRESS:  It refers to the fact that Duane will

 8   be speaking in Dallas  BBB, next Friday, July 28.  We want

 9   this to go back to the jury..

10           What is your position on this.

11           MR. FRAM:  Same thing.

12           THE COURT:  I am going to strike 148, 6 B's.

13           MR. FRAM:   Thank you, your Honor.

14           THE COURT:  Then there is  C's.  You don't really

15   try to get that in.

16           MR. PRESS:  I don't have a problem removing that.

17           THE COURT:  That is really far afield.

18           C's are out.

19           Hudson County prosecutor wants decided to help the

20   disadvantaged by hiring them to do filing in the prosecutor's

21   office.  And they found out they had to post the alphabet

22   over the filing cabinets because if they didn't post the

23   alphabet, nothing would get filed in the right order.

24           That is the way I feel.  I have to post the

25   alphabet so I can see it and make sure C comes before D.  Do
```

```
 1   you have a problem with taking D out?

 2              MR. PRESS:  No, your Honor.

 3              THE COURT:  Okay.  D is not in evidence.

 4              Believe it or not, I can't find E, I got F as the

 5   next one.

 6              MR. PRESS:  They are out of order.  I think E is

 7   the last one, Judge.

 8              THE COURT:  Yeah, you are right.  These are too far

 9   afield.

10              MR. PRESS:  I am sorry.

11              THE COURT:  They are too far afield.

12              MR. PRESS:  I understand your ruling, Judge.

13              THE COURT:  I am going to take E and F out as well.

14              MR. PRESS:  This is one that we would offer.

15              THE COURT:  Which one, E or F.

16              MR. PRESS:  Five E's.

17              THE COURT:  Five E's.

18              MR. PRESS:  Can't we read the word where Duane

19   Woerth says he is Wyatt Earp and Sky King in the same body.

20              THE COURT:  Show me.

21              MR. PRESS:  First page of the remarks on 5 E's.

22   Second paragraph.

23              THE COURT:  I am Duane Woerth, Wyatt Earp, Sky

24   King, all in the same body.

25              MR. PRESS:  And the jury is not going to get to
```

```
 1    hear that.

 2              MR. FRAM:  They are not going to get to hear Bud

 3    Bensel.

 4              THE COURT:  He is obviously the perfect man for a

 5    diplomatic post.

 6              He is Wyatt Earp and Sky King and Duane Woerth all

 7    wrapped into one person.

 8              No, I am not going to allow this.  I admit there is

 9    some appeal to letting the jury hear that and reading that

10    but I think his speech goes so far afield from what this case

11    is about that even if I could conjure up a minor bit of

12    relevance under 401, under 403, it is ultimately confusing.

13    I am sticking with what I said on 6 E's, and 6 F's.

14              Okay.  That takes care of this issue.

15              That leaves to the lawyers to make the physical, as

16    I say, I haven't taken anything out of the binder.  Will

17    somebody come and take this.  Maryland Rodriguez is the only

18    one, five strong men here, the only person that gets up is

19    Ms. Rodriguez.

20              THE COURT:  What time do you want to have the

21    argument.  Two o'clock.

22              MR. FRAM:  When is it convenient for your Honor.

23              THE COURT:  It is not me, it is the people, the

24    court reporter needs arrest.  You guys.

25              MR. JACOBSON: May I recommend we take a ten- or 15-
```

```
 1    minute break so the staff can rest and go right to it and get

 2    it done.

 3              THE COURT:  Okay with me.  I got a chance to read

 4    your brief this morning.  I already read your brief.  So I

 5    got a chance to read the one that was mailed last night.

 6              All right.  Let's do this.  Let's do it at one

 7    o'clock.  It is 20 of 1 now, according to my watch.  We will

 8    resume at one.  Then why don't we plan to meet in my chambers

 9    around three o'clock.

10              MS. RODRIGUEZ:  Today.

11              THE COURT:  Three, 3:30  3:15  or the charge.

12              MR. FRAM:  Yes, your Honor.

13              THE COURT:  That will give you time to do some more

14    reading.

15              MR. JACOBSON:  Your Honor, I can tell you from the

16    plaintiffs side we read the charge, we have very few

17    comments.

18              THE COURT:  What are whatever they are.  I want to

19    get them on the record.  I am not, I don't, I hope there are

20    not a lot of comments obviously.  We prepared it in the hope,

21    with that hope in mind.  Let's see, you saw the verdict

22    sheet, too.  I did give you all the verdict sheets.

23              MS. RODRIGUEZ:  Yes.

24              MR. FRAM:  As a miscellaneous matter.  I am told

25    the version of 137 that was in evidence is slightly different
```

1    from what I handed up today.

2              THE COURT:  Well, the 137 was just one page, then

3    there is a big attachment to the other version.

4              MR. FRAM:  Yes.

5              THE COURT:  I am assuming that is the one with the

6    attachment is the one in evidence.

7              MR. FRAM:  If we could substitute the one.

8              MS. RODRIGUEZ:  The one with the attachment was not

9    the one that was in evidence.  We don't have an objection to

10   that.

11             THE COURT:  All right.  There being no objection we

12   are going to substitute the one, that is what I asked my

13   courtroom deputy to do without asking you.  To do it.  But

14   you have agreed to do it.  We will do it.

15             MR. FRAM:  Thank you, your Honor.

16             THE COURT:  Okay.  All right.  I will see you at

17   one o'clock.

18             (Recess.)

19             THE COURT:  Good afternoon.

20             We are going to hear the Rule 50 motion filed by

21   defendants and responded to by plaintiff.

22             So whoever is going to handle it for the defendant,

23   Mr. Fram, is that you.

24             MR. FRAM:  Yes, your Honor.

25             THE COURT:  Go ahead.

```
1              MR. FRAM:  May I stand at the lectern, your Honor?

2              THE COURT:  You may stand wherever you want.

3              MR. FRAM:  Thank you.

4              THE COURT:  Go ahead.

5         MR. FRAM:  Your Honor, I think the crux of this

6    case really focuses on what happened on April 2 of 2001 and

7    the event leading up to that.  And the law is --

8              THE COURT:  Let me stop you right there.  I know

9    that that is your position in your brief.  But the fact that

10   they waived scope on April 2, remember, the integration issue

11   wasn't resolved by that.  All that did was waive scope.  I

12   mean, which, as I understand it, all it did is waive

13   independent arbitration as a remedy for deadlock.  But it

14   didn't, these parties were negotiating continuously.  In

15   fact, they had merger committees, each side, had a merger

16   committee, so it wasn't like the issue of integration was

17   over you.

18             THE COURT:  That is what you want me to rule, once

19   they waive scope it was over.

20        MR. FRAM:  No, your Honor.

21             THE COURT:  It was not over.

22        MR. FRAM:  I agree, your Honor.  We are not

23   arguing, your Honor, that the case is over after --

24             THE COURT:  Not the case, but that the issue of

25   whether a, whether ALPA was infected with a conflict of
```

```
 1   interest which dictated their actions in some fashion.  That

 2   doesn't go away because on April 2 they waive the scope.

 3            MR. FRAM:  I agree with that, your Honor.  But I

 4   think we have to look at the specific allegations made by the

 5   plaintiff with respect to the specific decision points.  And

 6   the idea that there was a conflict of interest, your Honor,

 7   is out there, and if this were a case where based upon the

 8   conflict of interest ALPA did something to help the APA, at

 9   the expense of the TWA pilots, that would be one thing but it

10   is not.

11            That is their evidence of bad faith.  We know, that

12   bad faith has to result in three things.  One, it has to

13   result in conduct that is fraudulent or dishonest in some

14   fashion on the part of ALPA two, that conduct has to be

15   relied upon in some fashion by the union members.  This is

16   why I focus on April 2, and 3, that reliance, and whatever

17   decision is made by the union members, has to result in a

18   different outcome.  It has to result in injury.

19            THE COURT:  I have accepted that as a premise.  For

20   this trial, you have to prove there is injury in fact.

21            MR. FRAM:  Exactly.  You have to prove there was

22   some outcome that was different.

23            We submit when you start by looking at the event

24   leading up April 2 and I will come to events after that in a

25   moment that's correct there is no evidence of fraudulent
```

1    conduct, material misrepresentation, or omissions, or

2    anything of the like.

3            And I was interested to read in the opposition

4    brief to see what are the plaintiffs pointing to when they

5    try to argue that there is such misconduct and they refer to

6    three things.  One, they claim that misinformation was

7    provided.  Bad advice about the right to strike.  And I think

8    you know from the full evidence that there is a distinction

9    between the right to strike against TWA, Inc., and the right

10   to strike against LLC.

11           THE COURT:  Say that again.

12           MR. FRAM:  You may recall, your Honor, that the

13   testimony  of Warner and Seltzer is that there clearly is a

14   right to strike against TWA, Inc., if the Section 1113 motion

15   is granted.

16           But that if the motion is granted and the

17   employees, the pilots then became employees of TWA, LLC, what

18   Seltzer told us is that it is very unclear, it is a very

19   different issue.

20           THE COURT:  Let's assume whether they have a right

21   to strike is unclear, and maybe that depends on whether they

22   are deemed a successor or not which he said in his mind it

23   was unclear issue.  Let's assume that is correct.

24           Are you telling me that where the right to strike

25   is a debatable issue, unions haven't struck.

1              MR. FRAM:  No, your Honor.  What I am saying is

2     that the plaintiff has not produced any evidence that the

3     extent they claim they were misled about the right to strike,

4     their claim I think is that they were told that you have no

5     right to strike when in fact they did.

6              And the point on that, your Honor, is that they had

7     no testimony, there is no evidence that they would have

8     struck if they were told they had the right to do it and

9     there is no evidence if they had gone on strike that that

10    would have gotten them into a better position, that they

11    could prove an outcome that was better.  All we have is

12    speculation about what might have happened and I think based

13    upon the evidence your Honor appreciation that the idea of

14    striking, even if you have a right to do it, is potentially

15    disastrous, in light of what people knew, leading up to April

16    2.

17             So that alleged omission or misrepresentation about

18    the right to strike we submit is not one that any reasonable

19    jury could rely upon.

20             The second thing they point to, your Honor, is this

21    allegation that the union, the members of the MEC were

22    somehow misled into thinking that they couldn't put the

23    contract out for membership ratification.

24             Well, that is an entirely, and I am just referring

25    your Honor to the plaintiff's brief.  That is an entirely

1    procedural matter.  And the idea that the MEC voted to accept

2    a new collective bargaining agreement to waive scope, the

3    idea that they should have or could have been overruled by

4    the membership, again, that is not something that goes

5    anywhere in terms of DFR violation, your Honor.

6            The third thing they allude to and they don't

7    really discuss it is the idea that they could avoid more time

8    to negotiate by filing the lawsuit that Roland Wilder

9    recommended.  Go in and enjoin the entire transaction.

10           I believe your Honor will recall from our trial

11   brief, and we have incorporated some of the same arguments

12   that the issue of whether that lawsuit had any merit is a

13   legal issue for the Court and we ask the Court to rule as a

14   matter of law that it was not a misrepresentation or bad

15   advice on the part of the ALPA advisors to tell the members

16   of the MEC that this was a bad idea, it was something they

17   shouldn't do.

18           And I submit that there is no evidence from the

19   plaintiff's side --

20           THE COURT:  Well, if something is a bad idea, is

21   illusive, that is a different question, isn't it?

22           MR. FRAM:  Perhaps more precise, I think the point

23   we make, your Honor, is that there was no legal merit to the

24   lawsuit and moreover, as a practical matter, even if there

25   was, it would not have --

1              THE COURT:  Which lawsuit?  Which one?  There are

2       three lawsuits.

3              MR. FRAM:  The lawsuit to enjoin the entire

4       transaction between American and TWA, until the grievance

5       filed against TWA for agreeing away scope --

6              THE COURT:  The agreement itself was a violation of

7       the contract.

8              MR. FRAM:  Yes, your Honor.  You heard Mr. Seltzer

9       talk about how even if you could get an injunction issued,

10      there would have to be a bond, the practical issues, the

11      legal issues.

12             And again, we submit that the Court should rule as

13      a matter of law that there was no legal basis to file a

14      lawsuit, it would have violated the automatic stay under

15      section 352, it would have rejected, but even if this if

16      there was a basis, there is no evidence that it was bad

17      advice to not pursue that lawsuit because even if you are

18      going to join the whole transaction, what have you done, you

19      have blown up the whole deal.  What is telling is I read

20      through the opposition brief, there is no argument advanced

21      that advice given with respect to the Section 1113 motion

22      itself and the likely outcome is made here.  And I think that

23      is important.

24             So when we go through, your Honor, and look at what

25      the plaintiffs are saying, we submit that there are no

1    misrepresentations, or material omissions.  There is no

2    evidence in the record that the plaintiffs, the TWA MEC in

3    making their decision on the second was in any way misled,

4    that they would have done things differently.  Different

5    advisor predictions had been made and even if they had, even

6    if they had gone on strike, or had tried to go down the road

7    that Mr. Wilder was recommending, there is no evidence in the

8    record that the outcome would have been better.  The outcome,

9    in all likelihood, would have been different, but we submit

10   that it would have been worse and there is nothing to suggest

11   that, to the contrary.

12          So our request, your Honor, is to dismiss any claim

13   of the plaintiffs for lack of proof a reasonable jury can

14   rely upon to find a DFR violation leading up April 2, 2001 or

15   in connection with that decision.  It was a good decision.

16   It was the right decision.  Get a new collective bargaining

17   agreement, protect the jobs of the pilots, and deal with

18   seniority integration later on.

19          And if the Court is not prepared to make that

20   ruling now, we do request that any claim based upon the

21   argument that Mr. Wilder's advice to file this lawsuit should

22   have been followed be excluded from the case, and that the

23   jury be instructed accordingly, that they cannot find a DFR

24   violation based upon advice to not go to court and try to

25   upset the entire apple cart, your Honor.

1        I would note with respect April 2 that the advice,

2   the statements being made, to the TWA MEC are statements that

3   are not all been being made, your Honor, on behalf of ALPA.

4   You recall there are independent advisors who have been

5   engaged directly by the MEC, you have not just Wilder but you

6   have Glanzer, you have Steve Tumblin, an outside lawyer, and

7   you have Randy Babbitt, who as we heard today, is directly

8   engaged by the MEC.

9        I think what is very important here from the

10  perspective of reliance and causations that those advisors,

11  with the exception of Wilder, in terms of the tactical issue,

12  those advisors are not ALPA.  Any statements they make cannot

13  be attributed to ALPA.  But their advice --

14       THE COURT:  Let me ask you this:  If Babbitt, what

15  do you think Babbitt would have said if he was told that

16  people at ALPA were working with pilots at American to

17  conduct a card campaign for representation?  What do you

18  think, if somebody told him that, what do you think he would

19  have said?

20       MR. FRAM:  I hesitate to speculate.

21       THE COURT:  Why is it speculation?

22       MR. FRAM:  Well --

23       THE COURT:  You don't think you know what he would

24  have said?

25       MR. FRAM:  If he was told, your Honor, that

1   American pilots independently --

2          THE COURT:  Not if he told your version of the

3   facts, let's assume he is told a version the jury might find.

4          MR. FRAM:  I think my version is American pilots

5   independently began a card campaign.

6          THE COURT:  You want that word, "independently."

7   But it would have been very easy to ALPA to say to Hunnibell

8   or Clark, don't talk to me, don't write to me, don't email to

9   me, I can have nothing to do with this.  Rather, what you

10  have are innumerable, many emails, I don't know if we have

11  them all, but a tremendous number of emails, meetings where

12  they are meeting, I guess in Las Vegas that they met.

13         MR. JACOBSON: Washington, D.C.

14         THE COURT:  Meetings where the cards are turned

15  over.  I mean it is very easy to say don't give me any cards,

16  don't give me cards.  What are you giving them to me for?  I

17  mean you want me to find that it was independent.  But I am

18  not going to do that.  Whether the efforts of Hunnibell and

19  Clark were independent or not independent.  It is for the

20  jury to decide.

21         MR. FRAM:  I  agree, but with respect April 2 the

22  card campaign didn't exist.  It didn't start until May.

23  Those are the undisputed facts.  And the undisputed facts

24  also are that none of advisors --

25         THE COURT:  Let's assume you are right.  I don't

1    know right now sitting here in my head I don't have the

2    dates.  Let's assume you are right it didn't start until May.

3    Remember, the integration negotiations were going on, and

4    obviously, although because of the waiver of scope, the TWA

5    pilots had lost leverage.  They were not without zero

6    leverage.

7            I mean, I don't think APA ever took the position we

8    are going to staple 2,300 pilots to the bottom of the list.

9    There may have been back and forth, 800, 1,200, 700.  But the

10   notion that -- so APA, there were some, even if it was just a

11   moral high ground, ALPA was not without some leverage in that

12   negotiation.  The negotiations went on, there were proposals,

13   counter proposals.  And so that was ongoing, after April 2.

14   April 2 took away one possible leverage, the possibility of

15   an independent arbitrator.  Although that could have been

16   agreed to.  Even though they waived it, it is possible it

17   could have been agreed to between the parties.  But --

18           MR. FRAM:  Your Honor, my point with respect to the

19   timing of the card campaign and these independent advisors,

20   A, that nobody could have known about the card campaign

21   during the period leading up April 2, and there is no

22   evidence that any of the independent advisors were even some

23   of the ALPA advisors knew about -- well, they couldn't have

24   known about the card campaign, so my point is how could they

25   be motivated by bad faith if it didn't exist.

```
 1              THE COURT:  Well, you in your life as litigator and

 2    mine in my distant life as far, far away, a long time ago,

 3    life as a litigator, we have dealt with experts before.  And

 4    experts can often be influenced by what they sense they want

 5    their clients to say.  The attitude of the clients, an

 6    expert's reaction to a situation, you know, if he is talking

 7    to people who are pushing one way, that may affect the way

 8    they approach their case, if they are pushing -- if the

 9    client is pushing another way, that may also influence him.

10              MR. FRAM:  Two points, your Honor.  One, I think we

11    need to distinguish between who is ALPA and who is not.

12    Tumblin is not ALPA.  Glanzer is not ALPA.  Wilder is not

13    ALPA.

14              THE COURT:  No, but they are people hired.

15              MR. FRAM:  These are people hired by the MEC.  They

16    are not ALPA.  So you can't, even if you could somehow impute

17    in the absence of any evidence bad faith to them, there is no

18    basis for it.  Seltzer, Seltzer is an outside lawyer.  He

19    happens to represent ALPA.

20              THE COURT:  Let's assume you are right, that as of

21    April 2 there was no, nothing had happened.  Why does that

22    MEC --

23              MR. FRAM:  There is no evidence of bad faith.

24    There has to be, in addition to misrepresentation, dishonest

25    conduct, reliance and causation, there has got to be bad
```

 1    faith.

 2              THE COURT:  You don't think it is dishonest conduct

 3    to conduct a card campaign, to participate in a card campaign

 4    with American pilots at the same time and not reveal that

 5    fact fully and openly to the MEC?

 6              MR. FRAM:  Your Honor --

 7              THE COURT:  Even in July, August, September?  I

 8    don't think -- Supplement CC was what?  November 8 or

 9    something like that?  Do I have the date right?

10              MR. PRESS:  Yes, you do.

11              MR. FRAM:  First of all, the card campaign was

12    known to everybody.  The APA pilots were out there.

13    Everybody knew there was a card campaign.  I think the

14    argument after it began in May --

15              THE COURT:  No, I don't know if the evidence

16    supports that.  The issue is not so much whether, was there a

17    card campaign is what was the role of ALPA in that card

18    campaign.  Did they know that Ron Rindfleisch was having

19    continue flow of emails.  Did they know that the cards were

20    being given to ALPA.

21              MR. FRAM:  Your Honor, they knew that people at

22    ALPA were communicating with American pilots and you recall

23    Mike Day.

24              MR. PRESS:  There is no evidence of that.  Not one.

25              THE COURT:  No, don't interrupt.

1          MR. PRESS I am sorry.

2          THE COURT:  You will get your chance.

3          MR. FRAM:  I asked Mike Day didn't you expect

4    people at ALPA National to be in communication with American

5    to find out what their positions were.  Yeah, of course.  We

6    know Duane Woerth was talking directly to John Darrah,

7    immediate of APA.  We know he was talking to card I.  There

8    were lots of communications back and forth.  In addition to

9    the direct communications that were taking place between the

10   merger committee teas and the like.

11         THE COURT:  You don't think the jury could say

12   given the clear conflicts between the APA pilots and the TWA

13   -- and the ALPA pilots, the TWA pilots and the American

14   pilots, that ALPA's position could be we are not going to

15   talk to you about the cards, don't send us any emails, we are

16   not going to send you any emails.  For God's sake don't

17   submit any request for reimbursement for your expenses.

18   Don't you think, you know, I mean, does the MEC, the American

19   pilots -- the TWA pilots know that somebody at ALPA is

20   promising to reimburse the APA Pilots for their expenses?

21   Where is that in the record?

22         MR. FRAM:  Your Honor, you already ruled on,

23   denying summary judgment, that that evidence could be

24   evidence of bad faith.  I am not trying to reargue that.

25              What I am pointing out is that didn't exist as of

1    April 2.

2            THE COURT:  Why do I have to cut everything off?

3    You take April 2.  I admit when they waived their scope, that

4    reduced their leverage.  But that didn't reduce the fact that

5    there was still ongoing negotiations.  There were two

6    committees that were formed for that very purpose.

7            MR. FRAM:  I agree that the --

8            THE COURT:  The whole process was ongoing and there

9    was hope of getting some kind of agreement, almost up to the

10   last moment.

11           MR. FRAM:  Your Honor --

12           THE COURT:  The last moment being November 8 when

13   the Supplement CC was executed by American and APA.

14           MR. FRAM:  Focusing on the actions of advisors up

15   April 2.  You can't presume that they knew a card campaign

16   would happen later.  You can't presume they were acting on

17   behalf of ALPA to further the interest of the American

18   pilots.  There has got to be evidence of that.  There is

19   none.  There is no evidence that Tumblin or Wilder or

20   Glanzer, for example, were motivated by anything but to do

21   the best job.

22           This is not the pleadings phase, your Honor, of a

23   case, where you can make allegations of wrongful intent, and

24   the like, and have a chance to flush it out in discovery.  We

25   have been through a long trial, and the fact of the matter is

1    there is no evidence whatsoever that those advisors knew

2    about the unity campaign or any of the other stuff and when

3    we go back to the issue of reliance and causation they gave

4    the same advice with the exception of the wrinkle with Wilder

5    who wants to file a lawsuit that has no legal merit, they

6    gave the same advice.

7              THE COURT:  But remember, Tumblin I think was a

8    bankruptcy attorney.

9              MR. FRAM:  Yes.

10             THE COURT:  With Leboeuf Lamb.

11             MR. FRAM:  Outside counsel.

12             THE COURT:  Outside counsel, in the Salt Lake City

13   office.

14             MR. FRAM:  With Judge Mabey as well.

15             THE COURT:  Judge Mabey, right.  The one person who

16   approached this task from a labor lawyer's point of view was

17   Roland Wilder.

18             MR. FRAM:  The point is they are all giving the

19   same advice.  What the plaintiffs were required to do as part

20   of their case certainly was to provide evidence, to adduce

21   every that these advisors were somehow acting in bad faith.

22   And there is nothing there.  They didn't even call them.

23   They played a clip of testimony from, if you recall, from

24   Tumblin.  They didn't present anything from Glanzer.  The

25   material they presented from wild are Wilder didn't suggest

1    he was trying to curry favor with American.

2            THE COURT:  Wilder testified that through a video

3    that he thought they would have had a better deal, they could

4    have gotten a better deal.  Didn't he testify to that?

5            MR. FRAM:  He testified that if he was able to

6    pursue his litigation theory, your Honor.

7            THE COURT:  Yes.  That his advice was followed.

8    His advice to members -- well, he had three litigation

9    strategies, two of them -- one was before April 2, the other

10   two were after April 2.

11           MR. FRAM:  I will come to those in a minute.

12           THE COURT:  Only the first one was before April 2.

13           MR. FRAM:  I will come to those in a minute.  My

14   point, your Honor, is that any claim of breach of the duty of

15   fair -- of the duty of fair representation as of April 2 is

16   not supported by the evidence.  There is nothing to show

17   misrepresentations, nothing, even if we assumed bad faith in

18   some general sense, no misrepresentation, no evidence from

19   the plaintiffs of detrimental reliance as required by

20   Deboles, and no evidence --

21           THE COURT:  Part of the problem is that a lot of

22   bad faith, it is not almost all bad faith, not 100 percent,

23   the great majority of bad faith cases oh rise out of

24   negotiation between management and the union.  And you know,

25   we have all heard from, about sweetheart contracts, and

1    unions going into the tank because they are getting paid off

2    by some company in the tank in some way.

3            This is really a little different.  This is a case

4    of union versus union.  And two unions, not of their own

5    making, suddenly find themselves in very direct adversary

6    positions.

7            And.  When there is a lawyer in the conflict the

8    lawyer would probably be barred from representing either

9    party.  The lawyer would lose two clients probably in that

10   situation.  He certainly won't be able to, you know, try to

11   solicit one side or the other side.  I mean, for instance, on

12   the -- I am the grand jury Judge right now in Camden.  I have

13   cases being prosecuted from Washington.  They come running

14   in, a guy representing two targets.  The next week or two he

15   pops up representing the key potential witnesses against him.

16   And he didn't see a problem:  Then at some point he

17   represents the spouses.

18           I assure you, now he is representing nobody.  I

19   mean could a jury find that given the very direct conflict

20   that there was here, that there was just a lot of things that

21   they should have, that ALPA should have done to make clear

22   that it was going to have no trust, not deal with ALPA -- not

23   deal with APA at all.

24           MR. FRAM:  Your Honor.

25           THE COURT:  And they didn't do that.  They simply

1    didn't do that.  So the jury could find.

2         MR. FRAM:  Well, your Honor, I think what could be

3    argued from the plaintiff's side is that what ALPA should

4    have done is told, card I we won't have contact you with.

5         THE COURT:  That is easy.

6         MR. FRAM:  Yes, but what they did instead was to

7    tell them we don't do card campaigns but we are going to

8    listen to you.

9         THE COURT:  You don't do card campaign but submit

10   all your expenses from the card campaigns and we will pay

11   them.

12        MR. FRAM:  The lower level guy who didn't

13   understand the law said that.  When others found out it was

14   ultimately decided we can't reimburse the expenses.  Your

15   Honor, the evidence --

16        THE COURT:  It was pretty late in the game before

17   Hunnibell and Clark new they weren't going to get their

18   money.

19        MR. FRAM:  Hunnibell and Clark testified they

20   incurred their expenses, did everything they did before there

21   was discussion about reimbursement.  It is not as though they

22   are out there incurring expenses and doing things based upon

23   a promise by ALPA to be reimbursed.

24        THE COURT:   A conflict is a mindset.  That is what

25   makes a case.  It may be your salvation some day in the

1    Circuit or before the jury.  I mean negotiations are very

2    subtle matters.  How one negotiates.  It is very, very

3    subtle.  The strength of an employment negotiation.

4            Some clearly misguided sole described my technique

5    of negotiation as being massively unreasonable and forcing

6    everybody else to try to bring them back to rationality.  And

7    you know you how one negotiates, the strength with which one

8    negotiates, can be influenced by one's perception of where

9    one's duties lie, or where one's obligations lie.  I mean

10   conflicts are very tricky.  On it is easy, some employer is

11   paying off a union official, to do a sweetheart contract.

12   Yeah.  That fits very neatly into the duty of fair

13   representation.

14           I admit the plaintiff has a tough burden when you

15   are dealing with a conflict because unlike lawyers, you can

16   remove the lawyer from the case.  That is not really feasible

17   in the labor context.  You can't say that, to the TWA pilots

18   we are removing ALPA as your bargaining representative.  Go

19   out and pick another,  hire the Teamsters to bargain for you.

20   They can't do that.

21           MR. FRAM:  Your Honor, I guess my point is that

22   before you even get to the issue of conflict, the plaintiffs

23   first must prove that there were misrepresentations, material

24   omissions, other misconduct, that they relied upon and that

25   there was an injury in fact.  None of that is here.  And then

```
 1    with respect to --
 2              THE COURT:  Well, I mean could ALPA have come to
 3    the MEC and said look, folks.  We are not going to be
 4    representing you, this is all over, when this is all over you
 5    are going to be bound from us, we want to go after the
 6    American pilots, the APA pilots at American.  So we plan not
 7    to bargain too hard.  We don't want to upset them.  We want
 8    you to know that.  We want you to know that that is what we
 9    are going to do.  We are going to take it easy in the
10    negotiations with them.  We are not going to push too hard.
11    We don't want to get them angry.  We may wind up in their
12    fold, when you try to bring the whole fold back into our
13    pasture.  Could they have said that?
14              MR. FRAM:  They couldn't, and they didn't, and they
15    wouldn't have, because they were not negotiating on behalf of
16    the TWA pilot.  The TWA pilots, as you know, through the TWA
17    MEC did their own negotiations, they hired their own
18    consultants, and their own advisors, and those advisors
19    answered to them.  You heard, your Honor, the testimony of
20    Mr. Baeler, the negotiations fellow they hired.  They hired
21    Mr. Tanner.  They hired other people directly and engaged in
22    negotiations directly and ALPA didn't do anything.
23              THE COURT:  Well, as I understood we had one of
24    them testimony, Babbitt.
25              MR. FRAM:  Baehler.
```

1          THE COURT:  They are all experts, all experts have

2     to be approved by the president.

3          MR. FRAM:  There wasn't a single expert or advisors

4     that they asked to retain that ALPA didn't approve and pay

5     for.  ALPA was not negotiating and could never have been in a

6     position where they said we are not going to be with us.  It

7     would have been the MEC.

8          As you know, we get into the fall of 2001, what

9     happens is that the members of the MEC, and the members of

10    the merger committee, they can't agree among themselves about

11    what to do.  They can't agree and ultimately President Woerth

12    gets a little more actively involved and tries to get them

13    additional chances.

14         THE COURT:  That is a problem which may in a sense

15    be a defense-oriented argument.  It is very clear that the

16    TWA had a pretty senior pilot group because, which would be

17    characteristic of a shrinking airline, that they tend to have

18    more people, a lot of people at the senior level.  And less

19    at the junior level.  So the more senior TWA pilots, it was

20    very clear from the testimony, were not as worried about the

21    integration.  They were going to come out fairly okay.  No

22    matter what happens, the most senior, 400, 500, that group

23    was going to come out okay.  Maybe not perfect, maybe not as

24    good as the date of hire type of integration.  But they were

25    going to pretty much stay as captains, the captains would be

1    captains, the type of aircraft would probably not change,

2    particularly with some kind of protective fence around St.

3    Louis.

4            But 1,500 pilots, the loss of seniority is a senior

5    matter.  I think it is fairly clear from the testimony we

6    heard today, the senior pilots were more anxious to see the

7    deal go through as well as the junior pilots, they stood to

8    lose a lot, were probably more willing to take risks.  That

9    is a fact.

10           MR. FRAM:  That is absolutely correct.  It was

11   their responsibility under ALPA's Constitution and bylaws to

12   make a deal or not make a deal on behalf of the TWA pilots.

13   And any claim by the plaintiff that ALPA violated its duty of

14   fair representation has to look to what ALPA did or did not

15   do to support them.  We know that ALPA hired or approved the

16   hiring of, and paid for every consultant they asked for.  We

17   know that ALPA did a lot to support them including getting

18   the extra chance to talk to American.  Mr. Woerth got on the

19   phone, talked to Compton, talked to Carty.

20           THE COURT:  Compton is TWA.

21           MR. FRAM:  Correct.  A lot of effort was put into

22   positioning them.  I think the only claim, the only real

23   claim that the plaintiffs have pursued with respect to the

24   events of the fall relates to the Bond Amendment.  I don't

25   think it is a serious argument to say that ALPA breached its

1   duty of fair representation because Duane Woerth scowled.

2          THE COURT:  It was lukewarm support.  He wrote a

3   letter to Bond at the very end, right before it was passed,

4   he wrote a letter to Bond if I am not mistaken.  I think it

5   is in evidence.  But there is no indication, it would be a

6   fair argument of the fact that ALPA hardly unleashed its

7   allegedly potent public affairs capability, lobbying

8   capability, to go after this --

9          MR. FRAM:  Your Honor, I am sure you recall this,

10  when the conference in the case on June 2 --

11         THE COURT:  You are assuming I recall the

12  conference on June 2.

13         MR. FRAM:  I am going to try to refresh your

14  recollection.  One, in response to our trial brief we moved

15  if you recall to dismiss any claim based upon the failure of

16  the Bond Amendment to be enacted citing nor Pennington and

17  other law.  Your Honor ruled that the plaintiffs could not

18  argue that if ALPA had done something different that the Bond

19  Amendment would have been enacted, that that would have been

20  speculative.

21         THE COURT:  No, I am not saying they can say to a

22  jury it would have passed if something more mad be done.  But

23  their attitude, I think they said that, what they, whether

24  they were supportive or not supportive, I mean, they had

25  gotten an expert to give an opinion, somebody, but the last

1    paragraph of the guy's letter was very revealing, said look,

2    anybody who tells you they can predict whether a particular

3    amendment will pass or not pass in Congress needs to have his

4    head examined.  That was pretty much the thrust of that

5    letter.

6              MR. FRAM:  Your Honor did indicate that ALPA's

7    alleged failure --

8              THE COURT:  ALPA didn't jump in with both feet to,

9    you know, support that effort.

10             MR. FRAM:  Yes, your Honor --

11             THE COURT:  Which was started by a group of pilots

12   who were kind of amateurs at the whole lobbying business.  I

13   mean I literally looked up an address in a book and went to

14   see what they could do.  They were not people who I think who

15   knew much about the ins and outs of lobbying, and they, well,

16   they got as far as getting the --

17             MR. FRAM:  Your Honor ruled pretrial that evidence

18   about less than enthusiastic reported could be evidence of

19   bad faith.  The question then becomes what action did ALPA

20   take that were harmful or what actions did it fail to take

21   that were based upon bad faith.

22             And we submit that there is nothing there.  We

23   heard an argument that in December, that ALPA failed to

24   continue approving flight pay loss for certain individual

25   pilots.  That is not a DFR obligation, a DFR violation, your

1    Honor.  Other pilots continued to get flight pay loss and the

2    handful of pilots who didn't, how many months was ALPA going

3    go to subsidize pilots on Capitol Hill to push a bill --

4              THE COURT:  We weren't talking about a huge

5    expense, an intensive lobbying effort even in the house which

6    is where the bill moved to after the Senate.  It lasted a few

7    weeks, a month, it didn't last very long.  They were going to

8    conference the bill right away.  It was attached to a defense

9    spending bill.  So they were going to conference that bill

10   within weeks, I assume.  I mean we aren't talking about

11   pilots running around Washington for a year living off the

12   fat of the land.  It was effort that would be measured in

13   weeks rather than months, or if months, just a couple of

14   months, not a huge period of time.

15             MR. FRAM:  Your Honor, this was after, if you

16   recall, it was after Supplement CC and after it was reported

17   that Don Carty --

18             THE COURT:  Yeah, it definitely was after CC.

19             MR. FRAM:  Don Carty was reported as indicating if

20   the bill passed that he would close TWA LLC and all the TWA

21   pilots --

22             THE COURT:  So he is lobbying with both feet.  That

23   is for sure.  He jumped in to the fray with both feet.  I

24   would expect him to.

25             MR. FRAM:  Would it have been responsible for ALPA

1    to push for that bill and get it enacted and then have all

2    the TWA pilots lose their jobs.  I think, it is a rhetorical

3    question.

4         THE COURT:  Well, if your argument, and it is one I

5    think you are probably permitted to make, then you are

6    arguing that you didn't want the bill passed.  I mean you are

7    carrying water on both shoulders.  On one hand you are saying

8    we did what we could, we wrote a letters supporting it.  But

9    we really didn't want it to pass.  Which is it?  You did not

10   want it to pass because you thought it was a bad idea and

11   American would tank the whole TWA operation.  Or did you

12   think it was a good idea, and it should pass?

13        MR. FRAM:  Your Honor, we are --

14        THE COURT:  You can't argue both side of that.

15        MR. FRAM:  What we are arguing is when it became

16   clear that the bill would not pass and when Don Carty said

17   cut it out.

18        THE COURT:  When did it became clear.  I must

19   admit, it -- all I could get out of the evidence is, to flip,

20   it slipped through the Senate relatively easily.  I don't

21   know if you know, it was a roll call vote.  I don't know if

22   it went on the executive calendar.  It slipped through

23   basically unopposed through the Senate.  I don't know if it

24   got on the executive calendar or how it got through.  That is

25   how most of those things get through, on the executive

```
1    calendar.  But so be it.  However it does through it got

2    through.  It now goes to conference committee.  All I can

3    gather, it sort of disappeared, it would make -- -- maybe it

4    was the Texas delegation.  I don't know.  There is nothing in

5    evidence on that.

6              MR. FRAM:  The point, your Honor, is ALPA did

7    support it to a point and made a judgment after a point that

8    it was, A, unlikely to be enacted, and B, that it was

9    detrimental potentially to the TWA pilots to keep pushing.  I

10   don't think there is any basis in the record for to you find

11   that those judgments about complex matters such as lobbying

12   were made in bad faith or had any effect.

13             The other argument I think that the plaintiffs

14   meaningful argument, other than --

15             THE COURT:  Sorry.  Other, what word.

16             MR. FRAM:  The other argument, your Honor, that I

17   think the plaintiffs are still pressing with respect to the

18   fall is that ALPA should have approved Mr. Wilder's

19   litigation theories.

20             THE COURT:  Which one?

21             MR. FRAM:  Well, one theory, your Honor, was to sue

22   the APA and American Airlines.  Arguing that American

23   Airlines -- that the APA has duties to the TWA pilots in

24   terms of negotiating with American about what might happen.

25             And the other is, as I recall, is to enjoin the
```

1    implementation of Supplement CC.  And then I guess the

2    related one, your Honor, was to sue American for alleged

3    violation of its best efforts letter.  And we know with

4    respect to that --

5              THE COURT:  That did go to arbitration.

6              MR. FRAM:  It went to arbitration.

7              THE COURT:  I believe that went to the National

8    Mediation Board, went to the board of adjustment, went to

9    some --

10             MR. FRAM:  System board of adjustment.  As you

11   heard from Mr. Warner ALPA pursued that, he submitted briefs,

12   he presented testimony.  It was a two-day hearing.  We have

13   an April 18, 2002 decision from Arbitrator Bloch which says

14   no, American fulfilled that responsibility.  So filing a

15   lawsuit with respect to that would have been meaningless, and

16   really ways full, and in terms of a lawsuit.

17             THE COURT:  I think the original premise of the

18   lawsuit was going to be that American wouldn't process the

19   grievance.

20             MR. FRAM:  And many agreed to do that.

21             THE COURT:  American to some degree took the,

22   knocked the studs out of that theory by agreeing to process

23   the grievance.

24             MR. FRAM:  The other theory was the APA, the union

25   representing the American pilots, owed responsibilities to

1    the TWA pilots because of their negotiations with American.

2    And as your Honor ruled in this litigation, not a viable

3    legal theory.

4              So how can the plaintiffs possibly be permitted to

5    argue to the jury that ALPA should have pursued that?  You

6    can't be accused it seems to me, your Honor, of violating the

7    duty of fair representation by declining to pursue a lawsuit

8    that has no merit.  The APA represented the American pilots,

9    it owed a fiduciary duty to them and solely to them.  This

10   idea that there was a legal basis for that lawsuit never

11   supported by the plaintiff, and this, your Honor, I note is

12   an area where no testimony, no evidence from the plaintiffs'

13   side, if you recall their witnesses almost without exception,

14   your Honor, were pilot witnesses.  They didn't bring Mr.

15   Wilder in.  They showed his videotape.  But other than to

16   throw out the concept of, they really didn't justify it.  If

17   you recall, the ALPA legal staff took these proposals

18   seriously, you heard Mr. Warner testify about reviewing the

19   cases, writing up an extensive memo in conclusion with this

20   idea was fundamentally flawed.

21             The point, your Honor, with respect to those

22   proposed lawsuits in the fall is that ALPA cannot,  no

23   reasonable jury can find that ALPA fell down in its duties to

24   the TWA pilots by not pursuing them.  And we would ask the

25   Court to dismiss any claim based upon that, and to instruct

```
 1    the jury that it can't consider that argument in terms of

 2    deciding with respect to any other issues that there was a

 3    DFR violation.

 4            The final point I would make, your Honor, and you

 5    have indicated you would, you read our brief, and we

 6    certainly appreciate that.  The final point I would make is

 7    that the seniority integration ultimately imposed beyond

 8    being imposed because of actions of the MEC, you recall they

 9    were given a chance to agree do it, they were divided, they

10    couldn't agree, you got the senior versus the junior, the

11    evidence --

12            THE COURT:  Hiring a professor to come up with a,

13    quote, fair integration proposal, which they did I guess in

14    the late spring, early summer of, some, should have had their

15    heads examined that.  Was one of the screwy ideas of all

16    times.

17            MR. FRAM:  ALPA said for that.  ALPA didn't say we

18    will support you.  They said if you think it is helpful we

19    will support it.  They even had Duane Woerth make the video

20    to support the Rightful Place proposal.  Duane Woerth

21    attended a session where he supported that further.  You

22    could argue I suppose that that was a waste of time, but ALPA

23    didn't.  Duane Woerth was out there supporting these people.

24            My point with respect to Supplement CC is the

25    undisputed evidence in the record --
```

1              THE COURT:  How could he be criticized, that is ice

2      in the winter time, supporting that proposal.

3              MR. FRAM:  But part of what the plaintiffs are

4      arguing, and I think you heard from, your Honor, is that

5      Duane Woerth didn't have enough of a presence, he wasn't

6      involved, I think you heard somebody criticize him at the

7      facilitation meeting because he wasn't aggressive enough.  He

8      didn't threaten to break anyone's knees or slash tires, that

9      kind of thing.

10              THE COURT:  Oh, I don't --

11              MR. FRAM:  That kind of flavor.  But the point is,

12      you saw the gentleman testify.  He is a smart guy.  He tried

13      to use the bully pulpit, the power of persuasion, and we all

14      know that there are different negotiation techniques.  Some

15      are of the nature that I think your Honor described before,

16      that you were accused.

17              THE COURT:  I am sorry.

18              MR. FRAM:  Some are like the negotiation techniques

19      your Honor described before, where someone accused you or

20      complemented you for being very aggressive.  That can be

21      effective.  But we all know that more low-key persuasive

22      techniques can also be very effective.

23              THE COURT:  I was very smart, when because when I

24      had a losing case you couldn't stop me from settling it.

25              MR. FRAM:  That is what happened here.  The people

```
 1    at ALPA recommended an agreement of settlement.  It had other

 2    people in the MEC who wanted to go to court to file a lawsuit

 3    and they did it and those lawsuits were dismissed, your Honor

 4    dismissed them.

 5              And my point, your Honor, is that the undisputed

 6    evidence in the record here --

 7              THE COURT:  You mean in the three counts in this

 8    very case that I dismissed.

 9              MR. FRAM:  Exactly.  They wanted to file a lawsuit,

10    they filed a lawsuit against American, they filed a lawsuit

11    against the APA and they were dismissed.  So how can you

12    argue that --

13              THE COURT:  You got strung up on the ray of hope

14    doctrine.

15              MR. FRAM:  Judge Fisher was right, yes, your Honor,

16    we did.

17              But in any event, the point going back to this

18    issue of misconduct, dishonesty, things that were done, there

19    has to be some reliance, the people making the decision in

20    this case, the MEC, had to have relied upon something ALPA

21    did and they didn't.  The people pushing the case, rejected

22    ALPA's recommendation, that it takes that last agreement

23    offered by American and the undisputed evidence, and you

24    heard it from Steve Rautenberg, one of the pilots, you heard

25    it from David Holtzman, is that the deal imposed with
```

```
1   Supplement CC was worse in a couple respects.  ALPA did its

2   best to save this MEC from itself.  It was unsuccessful

3   because the MEC was internally divided.   How did those

4   efforts to counsel the MEC to get them more opportunities to

5   interact and talk to American, and the APA, where is the

6   evidence that that was in bad faith or harmful?  Maybe the

7   hard campaign something in the background and that is fine.

8   Go back to the Deboles, that is not enough to have bad faith.

9   There has to be dishonest conduct and misrepresentation

10  relevant to the decision to be made, there has to be reliance

11  of some kind and there has to be an outcome that is worse and

12  we have none of that.

13          THE COURT:  Thank you very much.

14          MR. FRAM:  Thank you, Mr.  Fram.  I don't know who

15  is going, Mr. Press.

16          MR. PRESS:  Your Honor, we just heard defense

17  closing argument.  They are taking Rule 50 and turning it on

18  its head.  You are to view --

19          THE COURT:  Did a good job, though, didn't he?

20          MR. PRESS:  I wasn't persuaded.

21          THE COURT:  You weren't?

22          MR. PRESS:  No.

23          THE COURT:  We are going to kick you off the jury

24  then.

25          MR. PRESS:  Your Honor, as you know, the evidence
```

1    and all reasonable inferences from that evidence is to be

2    viewed in a light most favorable to our clients, and when you

3    do that you will find --

4              THE COURT:  You even said that in a brief.

5              MR. PRESS:  You will find there is substantial

6    evidence in this record to support findings of yes on both of

7    the questions that you had proposed to send to the jury.  And

8    you should deny this motion, Judge.

9              THE COURT:  Okay.  Anything else by anybody?

10             MR. FRAM:  No, thank you, your Honor.

11             MR. PRESS:  No, your Honor.

12             THE COURT:  I am going to deny the motion for

13   directed verdict, the Rule 50 directed verdict at this time.

14   I think there are, admittedly there are fragments, but there

15   are fragments of evidence flowing through this record, and I

16   guess I am most troubled by, but I think that it is not a

17   very subtle point that ALPA had a potential for conflict of

18   interest, a serious conflict of interest here.  I mean there

19   was only two months before the American acquisition was

20   announced that they, that there was a unity resolution, I

21   think I have that right, the unity resolution was passed and

22   Woerth I think went down to speak to APA, and clearly, by the

23   way I find nothing wrong in any of that.  It was done in

24   November, 2000, or earlier, to try and bring in American, you

25   know, and Fed Ex and UPS, and Continental, and anybody else

1    into the ALPA fold.

2           It was perfectly lawful, proper conduct.  And

3    American would I think at that time may have been one of the

4    most prosperous American passenger carriers.  And certainly

5    try to bring them into the ALPA fold.  Perfectly proper.  We

6    need to decide how one goes about doing that as a goal, under

7    the circumstances.  It is perfectly legitimate.

8           But ones American announced its acquisition, and

9    required the waiver of the scope provisions in the ALPA

10   contract as a condition for the acquisition of a clearly a

11   failing airline, ALPA was very much in a conflict of interest

12   situation.  And I simply don't believe, I mean I think a jury

13   could conclude they were certainly well aware there was a

14   conflict of interest inherent in that situation and the

15   question is how did they deal with it.  I agree it is not

16   like a lawyer, you kick the lawyer off the case, and hire two

17   new lawyers.

18          You can't do that, you can't say I am going to fire

19   this union and say, well, bring the Teamsters in to negotiate

20   for us.  You can't do that.  I mean, the pilots, the TWA

21   pilots couldn't do that.

22          So I think it behooved ALPA, you know, to be like

23   Calpernia, Caesar's wife, and you know, be above and beyond

24   all reproach.

25          Again we have all the snippets of evidence relating

1    to the card campaign that was going on.  We have

2    representations that it was going to be paid for.  I mean the

3    expenses, whether it was going to be paid.  That appears not

4    just once.  But a couple of times.  And I, as I recall, I

5    think it was when Clay Warner was on the stand and he had

6    proofread a letter where it said submitted.  And he changed

7    the word to incurred.  Which the net effect would be accurate

8    to expand the possible scope of reimbursement.  He tried to

9    get around that by saying I was worried about fraudulent --

10   but nowhere was there -- Clay Warner is a pretty smart guy,

11   looks to me to be a pretty smart buy, nowhere does he say we

12   can't reimburse you for anything. While the integration

13   negotiations were still going on.

14          I think there are other bits of evidence

15   throughout, you know, even the, although here you talked

16   about it, the fee petition for fees in bankruptcy.  What was

17   our contribution?  Our contribution was keeping the union

18   out.  Our contribution was seeing that they didn't make any

19   trouble.   That is a contribution of some kind, but the

20   question is to whom.

21          I think I may have to revisit this issue.  I think

22   the rule says when I deny a motion and submit it to a jury I

23   can reconsider this when the jury verdict comes back,

24   depending on what the verdict is.

25          But I am going to let it to go to the jury.  I

1   think there is enough here, giving all inferences favorable

2   to the plaintiff.  And the plaintiff ought to be thanked for

3   his very short argument.  Not too many lawyers have the guts

4   to get up and do that.  After hearing as talented an argument

5   as Mr. Fram made.  When the juices start flowing and they go

6   argument for argument, case for case, evidence for evidence,

7   but Mr. Press had the courage just to say basically I get, I

8   got all the evidence I need, that is enough for me and I

9   think it is enough in this case.  Again, the reaction of

10  ALPA, their dealings with Hunnibell and Clark, I found very

11  troubling.

12          I found the conflict would be readily apparent.

13  Warner seemed to me like a very bright, cautious, fellow.  We

14  didn't hear from the top dog, the top lawyer, Jonathan Cohen,

15  we didn't hear from him.  We heard from Holtzman who wasn't

16  technically in the legal department.  He was in the

17  representation department.  But he was a lawyer for all

18  intents and purposes, looks like a good lawyer.  I just, it

19  is inconceivable that a jury could conclude that they were

20  well aware of the potential for conflict here.  And instead

21  of taking the relatively simple steps they could have taken

22  to make it clear to the APA, it, they have nothing to do with

23  any organizational effort, that was cut off, and whatever the

24  reason they chose not to do that.  And so I am going to deny

25  the motion.

 1           I am going to submit the case to the jury and see

 2    what happens after that.

 3           MR. FRAM:  Your Honor, will you permit the jury to

 4    make decisions about whether Roland Wilder's theories had

 5    merit?

 6           THE COURT:  I am not going to instruct them that

 7    the theory had merit or doesn't have merit.  We don't have

 8    enough in this record, I am not even going to ask the jury to

 9    consider that.

10           If it is suddenly an opinion -- the jury shouldn't

11    be deciding, you know, whether the theory, I am not so sure

12    that I have enough.  I mean, you know, we have Roland Wilder

13    saying one thing, other people saying other things.  You said

14    they have no merit.  But if I had a dollar for every

15    meritless suit that is filed in this Court, I guess I would

16    be a wealthy man.  I mean litigation has a time component.

17    Let's take even the issue, for instance, as to whether APA

18    had a duty of fair representation to the TWA pilots after

19    they became the bargaining agent for the combined group April

20    3rd.

21           When the National Board certified the results of

22    this, the 30 days had passed and they certified the result of

23    the single carrier determination.

24           The question is do they have a duty of fair

25    representation at an earlier time, maybe back in November.

```
 1    On the surface you can right a slam bang brief that says they

 2    have no duty, the only duty of owe fair representation -- I

 3    am not so sure that isn't a trickier issue than it appears.

 4            I can imagine some district judge finding that

 5    there is some breaches of duty there, that arose even before

 6    they were the certified bargaining agent, but you know, those

 7    are issues that would take steps of exploration.  That hadn't

 8    been done.  I am not going to tell the jury one way or the

 9    other.  I mean they have heard the testimony.  They will make

10    a decision.  You can argue as to the merits, you can argue

11    all advisors said the suits were of no merit.  I will let you

12    say that.

13            MR. FRAM:  Your Honor, we did brief those issues

14    fairly extensively in our trial brief.

15            THE COURT:  Yes.

16            MR. FRAM:  We would ask the Court to, if you are

17    denying --

18            THE COURT:  I tell you right now I am not going to

19    give you a ruling that the suit has no merits, so the answer

20    is no.

21            And the issue is, were they five percent meritless,

22    ten percent meritless, 15 percent, do they pass the Rule 11

23    test or not, which is a completely different standard,

24    whether they pass a Rule 11 test.  I am not ready to say

25    that.
```

1          You wrote a brief.  You wrote a brief saying the

2    suit had no merit.  Somebody else might write a brief saying

3    the suit had some merit.  Roland Wilder, by all the

4    testimony, was a very successful, very honorable -- I have

5    heard nothing, he was a very honorable practitioner, did a

6    lot of work in this area.  I am not going -- you are not

7    going to get a ruling out of me to the jury that the suits

8    are meritless.  If that is error on my part.  I think the

9    issue is far more subtle of that, the issue of whether the

10   suit should be brought or not brought, it is far more subtle

11   than an evaluation of the merits.  Certainly there is no

12   testimony in this case that the suits didn't pass a Rule 11

13   test.  I am not going to allow it.

14          I will allow you to rely on whatever testimony

15   their was, if somebody said the suit had no merit, you can

16   say that.  If it is in the record I allow it.  I am not going

17   to weigh in and -- telling the jury that the suits, filing

18   either of those, or three suits was meritless is tantamount

19   to directing a verdict.  I am not going to do it.  That is

20   what it is tantamount to a directed verdict.

21          MR. FRAM:  That is what we requested consistently,

22   your Honor.

23          THE COURT:  I know.

24          MR. FRAM:  We are concerned the jury is going to be

25   able to address legal issues, to the extent there is a

```
 1    dispute about what a reasonable lawyer would have done, the

 2    plaintiffs are required to present expert testimony.  They

 3    didn't present any that was admissible.  We understand the

 4    Court's ruling.

 5          THE COURT:  Again, I recognize that that is, that

 6    the question of bringing litigation really creates a very,

 7    very difficult issue.  But I don't think that just based on

 8    the evidence before me there is really enough in the position

 9    to say this suit was meritless.  Somebody, I think the issues

10    are far more complicated.

11          We have -- I won't say this has never happened.  I

12    think there are one or two cases around where duty of fir

13    representation was related to seniority integration.  But it

14    is a very unusual case.  Very, very unusual.  This is not

15    just a case of where -- this is an issue of two unions in the

16    same field, and one, possibly wanting to take over the other

17    one, and a union in a position of lose-lose, I think it is a

18    very unusual situation.  I think courts, had they been

19    facing, you know, Roland Wilder's suit, you might have gotten

20    some unusual results.

21          All the law is against it.  Every bit of it.  I

22    couldn't find anything favorable, but I was 100 percent sure

23    I was going to win the case.  Guess what?  I won it.  There

24    was something about the case that told me, you can read all

25    the cases you want.  Usually it is the other way around.  And
```

```
 1   I still managed to lose.  But this was the reverse.  This was

 2   a very unusual case.  It was a very unusual duty of fair

 3   representation case.  And I think that to predict how a court

 4   will react in three different Wilder lawsuits would be very

 5   difficult composition.  And I am going to let the jury deal

 6   with the record as of now.

 7              All right.

 8              You want to come up at three o'clock to discuss

 9   the.

10              MR. PRESS:  We can do it as early as you would like

11   to start.

12              (Off-the-record discussion)

13              MR. JACOBSON:  The staff is agreeable.  I talked to

14   them.

15              MR. FRAM:  If we want to continue into it --

16              (Off-the-record discussion).

17              MR. FRAM:  Your Honor, can we take five minutes?  I

18   want to confer with my co-counsel.

19              THE COURT:  Sure.  I will give you all the time you

20   want.  You tell me.  Tell me what you want.

21              MR. FRAM:  15 minutes.  Then we will be ready to

22   go.

23              THE COURT:  Fine.  Thank you.

24              (Recess)

25              THE COURT:  Okay.  This is a charge conference.
```

1   Mandated by the rules.  For the record I have distributed to

2   counsel earlier, I guess around 8:15 this morning, a copy of

3   a draft jury charge.  It is marked draft number 2 with the

4   date seven, 6, 2011.  I also distributed a jury, proposed

5   jury verdict sheet, which is likewise marked draft number 2,

6   7/6/2011.

7           I am going to mark those as exhibits C1 and C 2.

8           Since I understand from comments that were made on

9   the record just before we took a short break today, that the

10  major objections, that the plaintiff had minor objections but

11  nothing too serious.  But that the defendant did have real

12  objections and so I think just to save time, I will get right

13  to defendant's positions.  So starting with page 1, and by

14  the way, I apologize because I am a fanatic on having

15  numbered pages and I wound up giving you a document with

16  unnumbered pages.  I have no excuse for that.  It is

17  inexcusable.  But.

18          MS. RODRIGUEZ:  We can number them.

19          THE COURT:  You can number them.  That doesn't mean

20  that I shouldn't have numbered them.   Mr. Fram, you can

21  start about page 1.

22          MR. FRAM:  Thank you, un.

23          THE COURT:  Plunge ahead.

24          MR. FRAM:  I have minor comments until we get to

25  the substantive charges.

```
 1              THE COURT:  Give me anything.

 2              MR. FRAM:  Your Honor, on page.

 3              THE COURT:  You can refer to the paragraph number.

 4              MR. FRAM:  Let me do that, your Honor.

 5              THE COURT:  Let's do it this way.  Paragraph 1,

 6    anything?

 7              MR. FRAM:  No.

 8              THE COURT:  Paragraph 2, judging the evidence,

 9    anything on that.

10              MR. FRAM:  No issues with that.

11              THE COURT:  Three, burden of proof.

12              MR. FRAM:  No issue there.

13              THE COURT:  Four, evidence received in the case.

14              MR. FRAM:  Second paragraph, we had some stipulated

15    facts.  You don't think we ever read them to the jury.

16              THE COURT:  I don't recall them.

17              MR. PRESS:  No.

18              THE COURT:  I know you did in the final pretrial

19    there is a six right in the beginning of the final pretrial

20    where the facts, not very much many but there were four or

21    five facts stipulated.  But they never went to the jury.

22              MR. FRAM:  They didn't.  So my suggestion would be

23    to -- -

24              THE COURT:  We still have Monday.

25              MR. PRESS:  I would suggest delete that paragraph
```

1    in its entirety, wouldn't you?

2           MR. FRAM:  I would be fine with that.  I don't want

3    to confuse them and have them here about stipulated facts.

4           THE COURT:  All right.  We will eliminate the

5    paragraph on stipulated facts.

6           I said it is clear, you didn't stipulate very much.

7           Okay.  Paragraph 5.

8           MR. PRESS:  Wait.  On the next page I had some

9    issues there, Judge.

10          THE COURT:  Tell me what you have.

11          MR. PRESS:  You heard testimony in the form of

12   depositions and interrogatories.  There weren't any

13   interrogatories read to the jury.

14          THE COURT:  I will eliminate reference to

15   interrogatories.

16          MR. PRESS:  There are two more references in that

17   same paragraph.

18          THE COURT:  We will take out any preferences to

19   that.

20          MR. FRAM:  Your Honor, I had the same comment.  On

21   that same page the next paragraph, referencing evidence of

22   exhibits.  Reference any proposed testimony and proposed

23   exhibit.  Will your Honor permit the jury to request

24   transcripts or read backs of testimony?

25          THE COURT:  That is interesting.  Let me have your

```
 1    take on that.  It is a very discretionary area.  We do have

 2    transcripts.

 3              MR. FRAM:  We do.

 4              THE COURT:  Because Lynne has prepared them for

 5    every day.  So we do have them.  Of course, before you give

 6    them in you have to go back through them, they have to be

 7    edited to take out colloquy, and, it isn't quite as simple as

 8    handing them.  We have to make sure there isn't anything the

 9    jury didn't hear in that.

10              MS. RODRIGUEZ:  Right.

11              THE COURT:  What is your take on this?

12              MR. FRAM:  My reference, your Honor, would be to

13    permit the jury to read some of the transcripts or witness

14    testimony if it is helpful to them.   I don't think you want

15    to encourage them to ask for a lot, but if there is something

16    in --

17              THE COURT:  I am definitely not going to encourage

18    then to ask for it.  You can count on that.

19              MR. FRAM:  I would anticipate, your Honor, both

20    counsel referring to certain testimony particularly as

21    important.

22              THE COURT:  That you are allowed to do.

23              MR. FRAM:   The jury doesn't recall that or

24    disagree about what it is, I think they should have the

25    opportunity to --
```

```
 1              THE COURT:  But that sort of plays itself out when

 2    the questions get asked.  I mean, you know, we hear Clay

 3    Warner's testimony.

 4              MR. FRAM:  I guess the question, your Honor, is do

 5    you want to put something in the charge on to indicate that

 6    they can have testimony provided, or are you okay if during

 7    argument --

 8              THE COURT:  I would rather -- I have, by the way,

 9    almost, maybe close to 100 percent of the time but when I

10    have had a transcript available because it was daily copy

11    being made, I have allowed it to be, I have allowed it to go

12    into the jury room and they can read it there or have it read

13    out here.  Q and A.  My preference has been to allow it.

14    Almost universally.

15              I have not, however, normally put an encouragement

16    to do it.  What happens is they, I think the jury has picked

17    up that I have a transcript coming right in front of me.  I

18    think the jury knows that already.  I think if they want it.

19    But I have no objection whatever to you reading testimony.  I

20    have no objection to you holding a transcript, you know, and

21    saying, you know, on June 8, whatever date, June 17, you

22    remember that so and so testified and he said the following.

23    I don't mind that.  I think that is legitimate.

24              MR. FRAM:  How do you feel about proceed projecting

25    a transcript page, if there is something of particular.
```

```
1              THE COURT:  If it doesn't slow things down to the

2   end, oh, no, I allow that.

3              MR. FRAM:  Very good.

4              THE COURT:  I have seen some, I think in one case

5   where it was so effective I had to set the verdict aside.

6   Where they did a, on a computer, like a power point

7   presentation.

8              MR. FRAM:  Yes.

9              THE COURT:  Where they, you know, would quote

10  segments of testimony and it was deadly effective.  It was

11  really effective.  And I mean, if it doesn't get out of hand.

12  If you have snippets or you are asking for pages, that are

13  dynamite, I would let either of you do so, put them on.

14             MR. FRAM:  Okay, great.  Then in terms.

15             THE COURT:  I have always allowed computers, Power

16  Point.  Although the Power Point only, if it is other just

17  showing the transcript, that you don't have to do in advance.

18  But if it is something else, I mean where you are actually

19  creating charts or creating things, I request that you show

20  it to the other side.  Do you follow me?

21             MR. FRAM:  Yes, your Honor.

22             THE COURT:  You have a chart or making bullet

23  points.  And you are going to show it through a power point

24  presentation.  Then I require you pass it by the other side.

25             MR. FRAM:  Yes, your Honor.  All right.  Then I
```

1    don't think there has to be any change to the paragraph that

2    led to this discussion.

3            THE COURT:  Okay.  I will eliminate reference to

4    stipulated facts and I will eliminate references to

5    interrogatories.  Five is questions are not evidence.

6            MR. FRAM:  No issue there.

7            THE COURT:  Inferences from evidence.

8            MR. PRESS:  Fine.

9            MR. FRAM:  Can I go back to five.  I hope your

10   Honor doesn't take offense to this but there were a couple of

11   points where your Honor asked questions of witnesses.

12           THE COURT:  I think I say in this charge multiple

13   times, multiple times, from the very beginning to the very

14   end, that I, that I may have asked questions but it is not to

15   express any opinion.  I think I say that more than once in

16   here.

17           MS. RODRIGUEZ:  You say it in eight.

18           MR. FRAM:  I was thinking that questions, you say

19   questions, objections, statements, questions from counsel or

20   the Court.

21           THE COURT:  Oh, I will add that.

22           MR. FRAM:  Then the rest flows from that.

23           THE COURT:  I will add that.

24           MR. FRAM:  Thank you, your Honor.

25           THE COURT:  You will find it elsewhere in here.  In

1    fact more than once.  I think you will find it at least

2    twice.  At the beginning and end.  No problem.  6, nothing.

3              MR. FRAM:  That is fine.

4              THE COURT:  Direct and circumstantial E.

5              MR. FRAM:  That looks standard, your Honor.

6              THE COURT:  That is copied right out of the charge

7    book.  Jury recollection controls.  Paragraph 8.

8              MR. FRAM:  Fine.

9              THE COURT:  Juror notes.  Paragraph 9.

10             MR. FRAM:  Fine.

11             THE COURT:  10, credibility.  I think this is

12   pretty much taken out of the standard charge, the circuit

13   standard charge.

14             MR. FRAM:  Looks fine, your Honor.

15             THE COURT:  Okay.  Next is 11.

16             MR. FRAM:  That is fine, your Honor.

17             THE COURT:  11.  Number of witnesses.  12.  Prior

18   inconsistent statements.

19             MR. FRAM:  Looks standard, your Honor.

20             THE COURT:  I think it is taken right out of--

21             MR. PRESS:  Third paragraph on page 13, makes a

22   reference to affidavits and answers to.

23             THE COURT:  Where?

24             MR. PRESS:  Third paragraph of instruction number

25   12.

```
 1                THE COURT:  Tell me.

 2                MR. PRESS:  Refers to affidavits and interrogatory

 3   answers.

 4                THE COURT:  You only used depositions.

 5                MR. FRAM:  We actually did have an affidavit, your

 6   Honor.  We had an affidavit from Mr. Wilder that went into

 7   evidence.  We would like that to stay in.  I agree with

 8   counsel that any reference to interrogatories.

 9                THE COURT:  Interrogatories.

10                MR. PRESS:  Fine.

11                THE COURT:  All right.  I will take that out.  I

12   will remove any reference to interrogatories.

13                MR. KATZ:  Affidavit or declarations.

14                MR. FRAM:  It may have been couched as a

15   declaration.

16                MR. KATZ:  There was a declaration from Terry Hayes

17   that was a declaration.

18                MR. FRAM:  That's right.  The declaration to

19   support the 1113 motion.

20                MR. KATZ:  There is no sworn certification which is

21   in --

22                THE COURT:  Point to me where you want to make a

23   change.

24                MR. FRAM:  Prior statements that were made under

25   oath, for example, at a deposition or in an affidavit or
```

```
 1   declaration:  Technically a declaration is not made under
 2   oath but it is made subject to the penalties of perjury.
 3           THE COURT:  You have, for example, in a deposition
 4   in an affidavit or declaration.
 5           MR. FRAM:  Yes.
 6           THE COURT:  All right.  You have no objection to
 7   that?
 8           MR. PRESS:  No, Judge.
 9           THE COURT:  After the word affidavit.
10           THE COURT:  13.
11           MR. FRAM:  The second paragraph of 13, second line,
12   second sentence, this duty is known as the duty of fair
13   representation and is similar to fiduciary duty and the duty
14   of undivided loyalty.  We would ask your Honor to strike and
15   the duty of undivided loyalty.  Of course the duty of
16   undivided loyalty is a kind of fiduciary duty, but it is not
17   one that is recognized in the duty of fair representation
18   law.
19           And I think, we think it is contrary to O'Neill.
20   O'Neill contains the statements that a duty of fair
21   representation is akin to fiduciary duty.  We are concerned
22   that injecting the idea of undivided loyalty and then also,
23   your Honor, there is an allusion, a reference two pages on --
24           THE COURT:  Let's stick with this one for the
25   moment.
```

1          MR. FRAM:  We are concerned about trying to

2    analogize or incorporate  the more general fiduciary

3    responsibilities into the charge that are not specific to the

4    duty of fair representation.  We all know, to paraphrase

5    Justice Cardozo, to say that something is fiduciary is only

6    the beginning of the inquiry.

7          There are many different types of fiduciary duties

8    from the highest trustee, undivided loyalty, must act in the

9    best interest, all the way down to the fiduciary duties of

10   corporate officers and directors which is to act within the

11   ambit of the business judgment rule.  And the duty of fair

12   representation is specific, and we are concerned about

13   injecting context that don't apply and that are going to

14   confuse the jurors.  And undivided loyalty is one of those.

15         Obviously, ALPA, as your Honor knows, represents

16   many, many different pilot groups, and there are probably --

17         THE COURT:  60.

18         MR. FRAM:  60.  And there are points at which the

19   interest of those groups may have conflicted.  ALPA is not

20   like a lawyer, as your Honor acknowledged earlier today.

21         THE COURT:  Yeah.  For a lot of very practical

22   reasons, is not like a lawyer.

23         MR. FRAM:  We don't want to get people thinking

24   about trusteeship or fiduciary responsibilities of lawyers.

25         THE COURT:  Let me first hear what Mr. Press has to

 1    say.

 2              I have a suggestion I am going to make.  I want to

 3    hear from Mr. Press.

 4              MR. PRESS:  There is, the case law has defined or

 5    likened the duty to a fiduciary one, but the undivided

 6    loyalty, Judge, I assume that you read some case where you

 7    found that because it was not in the materials that we gave

 8    you in support of our --

 9              THE COURT:  I think we found it.  Interestingly

10    enough, I have a little problem with fiduciary duty only

11    because, even though I put it in, I had a problem, I have, as

12    I was reading it, I was having a little problem with it.

13    Even though it is in that, that phrase is in the case law.  I

14    worry about a jury understanding what that really means.  I

15    mean I could, I suppose I could write a book on what

16    fiduciary duty means.

17              I could go to Blacks Law Dictionary and, you know,

18    and whip out a definition of fiduciary duty.  I am sure I

19    could find case law in all kinds of contexts.  That is what

20    we normally get a lot of stuff about the duty of a

21    fiduciaries and guardianships, things like that.

22              MR. PRESS:  The plaintiffs will not object if you

23    remove the second sentence from that paragraph.

24              MR. FRAM:  We request that as well, and we request

25    that the other sentence, two pages on --

1          THE COURT:  I was going to make a different

2   suggestion.  This duty is known as the -- this is the second

3   sentence of the second paragraph.  Right.  This duty is known

4   as the duty of fair representation, and requires a union to

5   act in the best interests of its members.

6          MR. PRESS:  That is great.

7          THE COURT:  That is something, A, a jury will

8   understands.  It won't get them involved in what is a

9   fiduciary, what is not a fiduciary, it won't get them

10  involved in what is an undivided loyal -- what is a divided

11  duty of law or undivided duty of law.

12         MR. FRAM:  The only concern I have about that is

13  that the duty of, courts have held is subject to a highly

14  deferential standard.

15         THE COURT:  That comes up later.

16         MR. FRAM:  Perhaps you could say the best interests

17  in the way that I will describe that for you in this

18  instruction.

19         THE COURT:  I don't mind that either.

20         MR. FRAM:  Thank you.

21         THE COURT:  Give me time to come up with that.

22         MR. FRAM:  Of course.

23         THE COURT:  Here is what I propose.

24         This duty is known as the duty of fair

25  representation and requires you to act in the a union to act

1    in the best interests of its members in the manner I will

2    describe to you hereafter.

3              MR. FRAM:  Thank you, your Honor.  That is great.

4              THE COURT:  Is that okay with you, Mr. Press?

5              MR. PRESS:  It is, Judge.

6              THE COURT:  Anything else in paragraph 13?

7              MR. FRAM:  Your Honor, at the end.  Just before the

8    last paragraph.

9              THE COURT:  Just a minute.  The last paragraph

10   appears alone on the page.  You are talking about the

11   penultimate paragraph.

12             MR. FRAM:  It says as I mentioned earlier.

13             THE COURT:  Oh, yes.  That is the last paragraph.

14             MR. FRAM:  Your Honor, we think it is important in

15   the instruction to identify to the jury that there are

16   different sets of issues here, and I think you know we

17   conceptualize the case event leading up April 2 which really

18   seems to be a fraud, misrepresentation kind of a theory and

19   events afterwards.

20             I think it is very helpful to them in considering

21   the evidence in the charge to be advised that there are sets

22   of issues.  As opposed to not outlining that for them.  We

23   have proposed --

24             THE COURT:  This paragraph is a whole different

25   issue.  The paragraph I am reading here, just to tell the

```
 1   jury that they shouldn't be influenced by the fact that it is
 2   a class action.  Isn't that all that case.
 3             MR. FRAM:  We are asking before that paragraph that
 4   something be inserted.
 5             THE COURT:  I see.  You don't want to change that
 6   paragraph.  You want something in before it.
 7             MR. FRAM:  I am fine with that paragraph.  But we
 8   think they need a little bit more guidance.
 9             THE COURT:  By the way, I already told them that.
10   This is something I something I told them almost
11   word-for-word at the beginning of the case if I am not
12   mistaken.
13             MR. FRAM:  Yes.
14             THE COURT:  I said this almost word-for-word in the
15   opening charge that very statement.
16             MR. FRAM:  Yes, your Honor.
17             THE COURT:  Give me some notion, I am still a
18   little in the air what you are looking for.
19             MR. FRAM:  Does your Honor have close at hand --
20             THE COURT:  I have the earlier -- I have something
21   that I created out of your two drafts to me.  So if you have
22   some language that you used previously, I have it here.
23             MR. FRAM:  It would have been, your Honor, on the
24   joint draft at page 30.
25             THE COURT:  I don't have page numbers. Just give me
```

```
1    the paragraph number.

2              MS. RODRIGUEZ:  We don't have it either.  If he

3    could read it.

4              THE COURT:  13 was nature of the claim.

5              MR. FRAM:  What I am referring to, your Honor, is

6    our proposed charge 14, it is part of 14 C.

7              THE COURT:  I may have that.  Hold on.

8              14 C.  A union violates its duty of fair

9    representation.

10             MR. FRAM:  No, your Honor.  The one, I don't see

11   that in what I am looking at.

12             THE COURT:  Read what you are looking at.

13             MR. FRAM:  I will read it.  The paragraph we would

14   ask the Court to include.  The plaintiffs allege that ALPA

15   was motivated by bad faith in connection with two sets of

16   issues.  First, plaintiffs claim that ALPA --

17             THE COURT:  Wait.

18             MR. FRAM:  In bad faith.

19             THE COURT:  Let me see if I can find that in the

20   other draft.

21             MS. RODRIGUEZ:  We don't have the joint draft.

22             THE COURT:  This is something I created myself.

23   This is not anything you have.

24             MS. RODRIGUEZ:  I know.

25             MR. FRAM:  I am quoting from the joint document
```

1    that counsel submitted on May 20.  As part of what we had

2    proposed.

3              THE COURT:  How does it begin?

4              MR. FRAM:  Plaintiffs allege ALPA was motivated by

5    bad faith in connection with two sets of issues.

6              THE COURT:  I am having trouble finding it.

7              MR. FRAM:  Shall I just hand up the page?

8              THE COURT:  Yes.  Let me look at it.

9              (Pause) Did you see this.  Practices.

10             MR. PRESS:  I looked at it.  I am familiar with it.

11   We of course object to that.  It mischaracterizes what our

12   claim is all about.

13             THE COURT:  Yeah.  I mean what you are trying to do

14   is claim that the conflict, basically you want me to tell the

15   jury that the conflict of interest issue didn't arise until

16   after April 2 and therefore the claim for duty of breach of

17   the duty of fair representation up April 2 can only be based

18   on misrepresentation.

19             Isn't that what you are trying to do?

20             MR. FRAM:  I am not trying to do that.  What we are

21   trying to do is help them understand that the claim leading

22   up April 2 is part of the admission claim and the claim later

23   on is different in nature, that it is based I think upon the

24   alleged failure of ALPA to do certain things.    We are not

25   trying to advocate and I would agree to modification of that.

1  We are just trying to help them conceptualize the issues a

2  little bit.

3          THE COURT:  See, I don't accept that the material

4  representation issue is sort of, only goes up April 2.  I

5  don't accept that.

6          MS. RODRIGUEZ:  Nor did our case.

7          THE COURT:  Well, I am just going by what the

8  evidence is that I heard.  I think you can make a case that,

9  I think a jury could find in effect misrepresentation later

10 than that.  So you are trying to sort of really bifurcate the

11 case, before and after April 2.  And I am not going to do

12 that.

13         MR. FRAM:  I understand, your Honor.  I am not

14 aware of any claim of misrepresentation after April 2.

15         MR. PRESS:  It continues.  There was a continuous

16 fraud on the TWA pilots.  You stated the claim, the nature of

17 our claim accurately, Judge.  And I would ask that you reject

18 the proffered instruction from the defendant.

19         THE COURT:  I mean, I think there, I mean, to the

20 extent that you are implying, I mean for instance, where it

21 says various kinds, I am going to do everything humanly

22 possible to help the TWA pilots, I think you said that on

23 more than one occasion, but meanwhile he is busy trying to

24 cozy up to the APA pilots.  That is a misrepresentation. It

25 is selfless misrepresentation.   And it may well be here that

1    the biggest misrepresentation from beginning to end in this

2    case is failure to tell the MEC, the TWA pilots, that hey,

3    look, you guys are going to be history soon.  And we are

4    going to conduct ourselves in a way that doesn't create any

5    animosity with the APA pilots because we are anxious to bring

6    them into our fold when you leave us and join them.  We are

7    anxious to bring you back with the other 11,000 of them.  And

8    I just can't see, I know you want to do it, divide April 2 as

9    something, that is one case up to April 2, it is another case

10   afterwards.

11            I just went through the charge that I had, and I

12   think that is accurate.  So I am going to give you this --

13            MR. FRAM:  I understand, your Honor, thank you.

14            THE COURT:  I am going to give you this back.  Do

15   you want me to mark this for appellate purposes?

16            MR. FRAM:  No, it has been submitted.

17            THE COURT:  I want to make sure you preserve that.

18            MR. FRAM:  Thank you, your Honor.  I appreciate it.

19            MR. PRESS:  Judge, I have one slight --

20            THE COURT:  Go ahead.  What paragraph?

21            MR. PRESS:  Last paragraph of instruction 13.  You

22   are talking about this is a class action, and.

23            THE COURT:  Yes.  As I mentioned earlier.

24            MR. PRESS:  You shouldn't view that fact as making

25   plaintiffs claims any more true or likely.  Can we add after

```
 1    the word "more", "or less?"

 2              THE COURT:  I didn't say that?  I think it should

 3    be "more or less."

 4              MR. PRESS:  Thank you.

 5              MS. RODRIGUEZ:  Probably, your Honor, should it be

 6    class action issue.

 7              THE COURT:  Say again?

 8              MS. RODRIGUEZ:  The last sentence, you must

 9    evaluate the proofs as they are presented to you without

10    consideration of the class action.  Issue.  There is not

11    really a question before the jury with regard to the class

12    nature of it.

13              MR. PRESS:  Status.

14              MS. RODRIGUEZ:  Class action status.

15              THE COURT:  All right.  I will change the way it is

16    worded to status.

17              Okay.  14.  Paragraph 14 is next.

18              MR. FRAM:  Your Honor, the second paragraph of 14

19    we would ask your Honor to strike that first sentence.

20    Again, referring to fiduciary duties, and beneficiaries.  We

21    think for the reasons discussed before it is confusing.

22              THE COURT:  Did you agree to that?

23              MR. PRESS:  Yes.

24              THE COURT:  Okay.

25              MR. FRAM:  We would ask your Honor --
```

1          THE COURT:  Just a minute.

2          MR. FRAM:  I am sorry.

3          THE COURT:   Okay.

4          MR. FRAM:  This is the point where we ask for more

5    detailed description of the limits of the duty.  We have

6    proposed in our charge, in proposed charge 14 B, some

7    language that comes from Airline Pilots versus O'Neill, the

8    Supreme Court case and Stillworth versus Lawson, to the

9    effect that the breach of the duty of fair representation

10   claim is a, quote, "purposefully limited check," close quote,

11   on union's discretion and its representation of its members.

12          The language of the case goes on to indicate that a

13   review of union actions in the context of litigation must be

14   highly deferential.  The deferential nature of review

15   recognizes, quote, "the wide latitude that negotiators need

16   for the effective performance of their bargaining

17   responsibility."

18          We have an entire paragraph from our proposed

19   charge that we think is essential so that the jury

20   understands in a more concrete way what the specifics of the

21   duty are and that, as indicates, dealing with some, with

22   other, with certain other fiduciary duties like those subject

23   to the business judgment rule that there is a fair amount of

24   latitude.

25          THE COURT:  You are covering, in a different, in a

```
1    stronger way, I guess, from your point of view, the language
2    in the last paragraph of 14 that I have.
3              MR. FRAM:  I think not only more strongly but in a
4    different way.  We think that is essential language for the
5    standard.  We would ask your Honor to add it, and perhaps --
6              THE COURT:  I am trying to find it here.
7              MR. FRAM:  We didn't see it, your Honor.
8              THE COURT:  What?
9              MR. FRAM:  We didn't see that language.
10             THE COURT:  I am trying to find it in yours.
11             MR. FRAM:  Do you have mine handy or should I hand
12   it up again?
13             THE COURT:  Here.  The cause of action is for the
14   breach of the duty of fair representation, is the
15   purposefully limited check.
16             MR. FRAM:  Yes, that paragraph.
17             THE COURT:  On a union's discretion and its
18   representative members.  Therefore, any review of union
19   action within the context of litigation must be highly
20   deferential.  This deferential review is designed to
21   recognize the wide latitude, et cetera.
22             MR. FRAM:  That paragraph, your Honor.
23             THE COURT:  I found it.
24             MR. FRAM:  We request that that be inserted in
25   paragraph 14.
```

1              THE COURT:  It would go either as a separate

2    paragraph or rewriting of the last paragraph.  The last

3    paragraph, granted is a different way, the thought is pretty

4    much the same.

5              MR. FRAM:  It might actually go, your Honor, before

6    that last paragraph, the one beginning I should emphasize.

7              THE COURT:  Right.

8              MR. PRESS:  May I speak on that?

9              THE COURT:  Of course.

10             MR. PRESS:  The proposed instruction that they are

11   offering provides no guidance on how to apply these standards

12   that they have articulated and as a result the instruction is

13   a roving commission and we ask it be rejected.

14             THE COURT:  Is what?

15             MR. PRESS:  Is a roving commission.  It doesn't

16   provide guidance to the jury on how to reach its verdict.

17             MS. RODRIGUEZ:  There is another problem with the

18   language as well.  I think, that is why we cited to your

19   Honor the cases of Lewis and Aguinaga, which both talk about

20   when it is not in the context of a collective bargaining

21   agreement, they both distinguish ALPA versus O'Neill, when

22   the cases are not in connection with the collective

23   bargaining agreement.

24             So I don't think that the O'Neill language is even

25   relevant in this context.

```
 1              THE COURT:  Is this language that comes from

 2    O'Neill?

 3              MS. RODRIGUEZ:  The language Mr. Fram read is from

 4    O'Neill.

 5              THE COURT:  Mr. Fram, is that from O'Neill?

 6              MR. FRAM:  It is, your Honor, and of covers this is

 7    a collective bargaining negotiation, that is their whole

 8    claim, their primary claim in our view is in the context of

 9    negotiating a new collective bargaining agreement, to give up

10    the old one with TWA, and enter the new one with TWA LLC

11    things happen that hunt of happened.

12              MS. RODRIGUEZ:  Again, that is Mr. Fram's take on

13    our case, but that is not the plaintiff's case, your Honor.

14              THE COURT:  What is your argument about why the

15    O'Neill language shouldn't be used?

16              MS. RODRIGUEZ:  I think if you look at Lewis, and

17    United Food and Commercial Workers, they talk about the

18    context of the case being different but when you are talking

19    about an instance where the union infects the process, the

20    standard is different, and the O'Neill standard doesn't

21    apply.

22              MR. KATZ:  Your Honor, it is not just the O'Neill

23    case that we are being talking about.  Throughout the law of

24    duty of fair representation the courts have made clear that

25    it is not the province of the Court or the jury to put
```

```
 1    themselves in the place of the union and make a judgment

 2    about who whether the union made a good decision or a bad

 3    decision.  That is the whole notion of giving a wide degree

 4    of latitude to the union, is that it is like the relationship

 5    between the courts and the Legislature, the union is entitled

 6    to make all the strategic and tactical calls, and it is only

 7    in exceptional circumstances, extraordinary circumstances,

 8    where somebody should be coming in and reviewing that, not to

 9    second-guess them because the jury would make a different

10    decision, were it in that situation themselves.

11            THE COURT:  I am going to go back and look at some

12    of those cases.  Let me tell you what my tentative decision

13    on that is now.

14            But I, if you go to where, what is the penultimate

15    paragraph of 14, which says you must evaluate ALPA's decision

16    and legal, you must evaluate ALPA's decisions and actions,

17    only in light of the legal and factual informational

18    Pennsylvania possessed at the time it made those decisions,

19    and took those actions.

20            Therefore, any review of union actions in the

21    context of litigation must be deferential.  Taking the word

22    highly out, I am not putting quotes around it.  Then pick up,

23    this deferential review is designed to recognize the wide

24    latitude that negotiations need for effective performance of

25    their bargaining responsibilities.
```

```
 1              And then evaluating whether, the rest of that

 2    paragraph.

 3              MR. FRAM:  Yes, your Honor.

 4              THE COURT:  I am going to, that is my tentative

 5    conclusion.

 6              I am going to revisit the cases.  If you want to,

 7    tomorrow morning, give me a two-page thing on it, you can.  I

 8    didn't like highly deferential, I think the word highly --

 9    but I think the concept that they need wide latitude, et

10    cetera, is a proper concept.

11              Okay.  So let me take notes.

12              MR. FRAM:  Thank you, your Honor.

13              THE COURT:  Okay.  What is next?

14              MR. FRAM:  Still in paragraph 14 I think perhaps

15    just above that, the draft charge reads:  In this case you

16    must decide whether ALPA breached its duty of fair

17    representation, and go on.  We would request a charge that

18    clarifies who ALPA is and who it is not.  We argued an hour

19    or so ago that the MEC was getting advice from Michael

20    Glanzer, and Stephen Tumblin and some of these other outside

21    advisors they engaged directly.  We are concerned, your

22    Honor, that the jury be clear on who they are looking to in

23    terms of ALPA.  So I haven't thought of --

24              THE COURT:  You can argue who retained them and

25    what the roll is.  I am not going to try to make a
```

1    distinction between, you know, that the union is the union

2    and the MEC is something totally different.  Not going to do

3    that.

4              MR. FRAM:  Okay, thank you.

5              THE COURT:  But you can, you know, the fact that

6    you can argue that they were selected by the MEC, you know,

7    and reported to the MEC, or paid for by the union.  I am not

8    going to allow it.  Next.  Finished with 14 out of 15.

9              MR. FRAM:  Yes.  15, I think, on 15, your Honor,

10   you didn't like "highly."  But I will note any way that at

11   the very top of the next page, it refers to reasonableness

12   that is irrational.

13             THE COURT:  Sorry.

14             MR. FRAM:  The first sentence of 15, union's

15   conduct is arbitrary if looking at all the evidence

16   presented, it is so far outside the range of reasonableness

17   that it is irrational.

18             I just note O'Neill uses the phrase "wholly

19   irrational."  So we would ask the Court to consider that.

20             THE COURT:  I personally think the word "wholly"

21   confuses rather than, if the plaintiff accepts it, I will put

22   it in.

23             MR. PRESS:  No.  I like your instruction, Judge.

24             MR. FRAM:  I have nothing else on 15, your Honor.

25             THE COURT:  16.

1          MR. PRESS:  The last paragraph of instruction 15

2    has a reference to not filing grievances.

3          THE COURT:  Say again.

4          MR. PRESS:  There is a reference to not providing

5    represented employees proper forms for grievances.

6          THE COURT:  Where?

7          MR. PRESS:  Last paragraph.

8          THE COURT:  16.

9          MR. PRESS:  Of 15.

10         THE COURT:  15, I am sorry.

11         MR. PRESS:  First sentence talking about grievance

12   forms, Judge.  I didn't know what that was about.

13         THE COURT:  I agree.  That is far from relevant in

14   this case.

15         MR. PRESS:  I would suggest putting a period after

16   the word  "manner" and deleting the rest of that.

17         MR. FRAM:  No objection to that, your Honor.

18         THE COURT:  I don't see why anybody would want

19   that.

20          Probably move that sentence up as part of the

21   previous paragraph.  In other words, put a period after

22   "manner," then move that truncated sentence as part of the

23   previous paragraph.

24         Okay.  16.

25         MR. FRAM:  Your Honor, the beginning of 15, we

```
 1    think it is important to quote from language from Lockridge

 2    that we had in our proposed charge on charges 14 C, in the

 3    language would be, also some language from Deboles, your

 4    Honor, it would be to the effect that to establish bad faith

 5    plaintiffs have the burden of presenting affirmative

 6    substantial evidence of fraud, deceitful action or dishonest

 7    conduct.

 8             A showing of fraud, deceitful action, or dishonest

 9    conduct would prove -- requires proof of all of the following

10    elements.  We have the four elements on page 29 of our

11    proposed charge that come from Deboles.  A misleading

12    statement or material omission in reliance, injury and

13    wrongful intent.  We didn't believe that those concepts, your

14    Honor, are sufficiently --

15             THE COURT:  I have your language right here.

16             MR. FRAM:  Thank you.

17             THE COURT:  It goes on.

18             MR. FRAM:  I think it is just the one paragraph I

19    am focused on.

20             THE COURT:  You have to establish bad faith, the

21    plaintiffs have the burden of burden of establishing fraud.

22    Deceitful action, dishonest conduct.  Showing of fraud,

23    deceitful action, requires proof of all the following

24    elements.

25             MR. FRAM:  Exactly, your Honor.
```

1          THE COURT:  You rise.

2          MR. PRESS:  It is an incomplete statement of the

3   law, is our primary objection, Judge.  You have given

4   examples of what bad faith are, and  their proposed

5   instruction would exclude some of those things.  It is an

6   incomplete statement of what may constitute bad faith.

7          THE COURT:  I mean I am sure in the context of the

8   way some duty of fair representation cases have arisen, fraud

9   is a meaningful concept.  But it is not too meaningful in the

10  way this case has arisen.  I know you would like to shoehorn

11  this into a fraud case.  But I am not sure, if it was a true

12  fraud case for one thing the burden of proof is different.

13  In a fraud case the burden of proof is clear and convincing,

14  not by a preponderance to start with.

15         MR. FRAM:  Your Honor, we researched that issue.

16  Under state law that is the case.  Under federal law it is

17  not.  We hoped to argue that.  Under the DFR law, even fraud

18  cases like Deboles are subject to the preponderance standard.

19  I think it is clear that major aspects of this case are fraud

20  cases, just like Deboles.

21         THE COURT:  In many cases they are fraud cases, in

22  the way they come down.  But in a conflict of interest

23  situation, hard to shoehorn that into, I mean you put it

24  anywhere you want, the core of the plaintiff's case in this

25  case, is that they had a conflict.  And because they had a

1    conflict, they breached, their actions were inconsistent with

2    the duty of fair representation.

3            That is very simple terms.  Their case.  That

4    doesn't fit well into the fraud paradigm.  I mean.

5            MR. FRAM:  Your Honor, could I be heard on that?

6            THE COURT:  Yes.

7            MR. FRAM:  I think there is an important

8    distinction.  They point to the conflict as evidence of bad

9    faith, but they still have to prove that there was, they

10   still have to prove that there was substantial evidence of

11   fraud and deceitful action, dishonest conduct, reliance on

12   the other elements.  And if they don't prove the other

13   elements, then the fact that there was a conflict becomes

14   meaningless.  I think the Deboles case really punctuates that

15   point.  They are separate elements, your Honor, and I think

16   to the extent they are pushing a theory that, well, the

17   breach here was having a conflict, but failing to disclose

18   it, that goes nowhere.

19           There has to be action, or inaction, or some other

20   conduct, that harms the plaintiffs.  You can't have a

21   conflict that sits out in the vacuum, that does not result in

22   some action or inaction upon the plaintiffs.  That is why we

23   think the language here is so essential, and again, I am

24   taking it from O'Neill and from Deboles, I would submit, your

25   Honor, this case is just like Deboles, where the plaintiffs

1    are claiming that --

2             THE COURT:  Deboles?

3             MR. FRAM:  Deboles, we cited Deboles v.  TWA, the

4    Third Circuit cases, your Honor may recall, it was written by

5    Judge Gerry sitting by designation some years ago.  I think.

6             THE COURT:  It was some years ago, yes.

7             MR. FRAM:  I think it was '76.  If the theory here,

8    your Honor, is that the fact of the conflict goes anywhere, I

9    just don't get it.

10            We have already, your Honor mentioned this morning

11   and you are absolutely right, that it was entirely lawful and

12   not improper for Duane Woerth to go in and talk to the APA in

13   the fall of 2000.  One of the things we request is that you

14   instruct the jury to that effect.

15            THE COURT:  Let me ask you this.  Let's assume the

16   company has a conflict.  The one we have here in this case.

17   Alleged.

18            MR. FRAM:  Yes,  your Honor.

19            THE COURT:  And the union in effect doesn't use its

20   best efforts to represent their members because of this

21   conflict.  You are saying because the jury might have trouble

22   finding a misleading statement or representation the case

23   fails?

24            MR. FRAM:  No.  What we are saying, your Honor, is

25   two things.  One, we are saying that --

```
 1              THE COURT:  You make it look like a false or
 2   misleading statement is the heart of the case.
 3              MR. FRAM:  Your Honor.
 4              THE COURT:  That is not really the heart of this
 5   case.
 6              MR. FRAM:  Your Honor, I think it is, but to the
 7   extent it is part of this case, we believe it is essential to
 8   have that language so that they can evaluate that part of the
 9   case.  We understand that --
10              THE COURT:  Why don't, does, if a party has a duty,
11   or it is infected by a desire to receive a benefit from some
12   other group, so it doesn't use its best efforts, because of
13   that conflict, to represent its members, why does there have
14   to be a misrepresentation?
15              MR. FRAM:  Your Honor --
16              THE COURT:  What makes their need for a
17   misrepresentation, that particular context.
18              MR. FRAM:  First of all, best efforts is not the
19   standard.
20              THE COURT:  Well, let's they are influenced by
21   their desire to benefit APA, and they take steps because of
22   that not to -- well, I will for the moment use best efforts,
23   use their best efforts to represent.  Specifically because of
24   their desire not to offend the American pilots who they hope
25   to bring into their fold.
```

1          Why does -- why would I focus on misrepresentation

2     as the heart of that cause of action?

3          MR. FRAM:  Your Honor, if we are agreeing that

4     there is no claim of misrepresentation and material --

5     mission in the case I am fine with that.

6          THE COURT:  I am saying they are not taking that

7     position.  They are not taking the position  there is no

8     misrepresentation.  I am saying why should I make that the

9     focal point of the bad faith claim.

10          MR. FRAM:  This goes back to my suggestion before

11     that you be more specific in terms of the types of claims and

12     say some of the claims that certified the plaintiffs here is

13     there were omissions and misrepresentation, and those claims

14     are subject to this standard.  Other claims are based upon

15     the alleged failure of ALPA to, I don't want to agree with

16     you about best efforts, I think it is a concept that is not

17     recognized.

18          THE COURT:  I agree.

19          MR. FRAM:  It is highly deferential.  Other claims

20     of the plaintiff.

21          THE COURT:  I say here the fact a union is

22     negligent or careless doesn't give you a cause of action.

23     One thing I made very clear that is the intent, there has to

24     be intent.  They have to find intent.

25          MR. FRAM:  Your Honor, you can certainly instructed

```
1    that certain of the claims are not based upon

2    misrepresentations or omissions.

3              THE COURT:  I think you are trying to parse the

4    claims in little tiny bits that is not really justified.

5              MR. FRAM:  We want the jury to be guided clearly in

6    terms of the requirements of the law.  I don't think Deboles

7    could be any clearer about the need for misrepresentation,

8    omissions on the conduct, reliance by the plaintiffs.  These

9    are basic fraud elements, that are essential to an evaluation

10   of not only the --

11             THE COURT:  I don't think the conflict claimed in

12   this case fits very well with the fraud paradigm.  I don't

13   think it works.

14             MR. FRAM:  The conflict claim is element number 4.

15   That is the proof they have of wrongful intent.  Before you

16   get to consideration of whether there was wrongful intent,

17   whether it was meaningful, you first have to prove there was

18   dishonest conduct or some other problem.  If ALPA had made

19   correct representations, had been diligent, had done

20   everything it was supposed to do.

21             THE COURT:  That, by the way, to some degree, that

22   is the Achilles heel of their case.  I don't know what the

23   jury is going to do, I know what I am going to do.  On appeal

24   I agree with you they are going to have to prove that they

25   did something that they shouldn't have done.
```

1          MR. FRAM:  It is something they shouldn't have

2     done.

3          THE COURT:  What?

4          MR. FRAM:  Fraud, deceitful action or dishonest

5     conduct.  That is part of their case.

6          THE COURT:  All right.  I will look at Deboles.

7          MS. RODRIGUEZ:  Can I be heard on this?

8          THE COURT:  Of course.

9          MS. RODRIGUEZ:  This is not the standard.  It is

10    not a fraud case.  It is --

11         THE COURT:  No, I have taken that, indeed, I made

12    changes in the way I originally drafted the charge because I

13    ought at least in this case -- the fraud matrix just doesn't

14    apply.

15         MS. RODRIGUEZ:  It does not apply and it is not the

16    law, and as much as I respect Judge Gerry, a 1970 case pre

17    O'Neill by the way is not instructive.  And again, I ask --

18         THE COURT:  You better respect Judge Gerry.

19         MS. RODRIGUEZ: When I clerked for Judge Cohen,

20    going back, he was sick for a long period of my clerkship so

21    I actually ended up getting switched over to Judge Gerry for

22    that time.

23         THE COURT:  I sit in Judge Gerry's old chambers.

24         MS. RODRIGUEZ:  I know you do.  In Aguinaga, the

25    Court addresses these issues.  It says if --

```
 1              THE COURT:  In what?

 2              MS. RODRIGUEZ:  Aguinaga.

 3              THE COURT:  Spell that.

 4              MS. RODRIGUEZ:  A G U I N A G A.   It is a Second

 5    circuit Court of Appeals, 1993.

 6              The Court says, if, as the union argues, O'Neill

 7    counsels that the union be accorded due deference in its

 8    decision to sacrifice  plaintiffs' rights, such deference

 9    would only be appropriate insofar as the union's motives have

10    been proper, i.e., to gain advantage with Morrell embarking

11    over other plants.  Here, however, plaintiffs presented

12    evidence that the union had other motives in sacrificing

13    plaintiffs' rights and concealing its activities.  The record

14    contains evidence that tended to show that the union was

15    motivated in part by its desire to obtain status as the

16    bargaining representative for three reopened plants.  As

17    neither of these motives are proper for a union which had the

18    duty to its members akin to the duty owned by other

19    fiduciaries to their beneficiaries, we hold that there is

20    evidence upon which the jury could probably find that the

21    union breached its duty of fair representation.

22              There is no talk about a four-part test and parsing

23    here and parsing there.  It is one duty of fair

24    representation.

25              THE COURT:  I told you I already made changes in
```

1    this.  I actually had some fraud stuff in an earlier draft of

2    this.  See draft number 2.  Draft number 1 actually had some

3    fraud language in it which I took out.  And I took it out

4    because I didn't believe that this case, you know, fit well

5    within that paradigm, within that framework.  I will reread

6    these cases.

7            MR. KATZ:  Your Honor, we cited in many of the

8    briefs that have been filed a number of cases that followed

9    Deboles, that reaffirmed the principles that were laid out in

10   Deboles, and a few of them that are after, Anderson, Acri,

11   Cell in the Fourth Circuit.  These are six or seven different

12   circuit courts of appeal that make clear that Deboles is good

13   law throughout the country.  Aguinaga is a very unusual and

14   atypical case --

15           MS. RODRIGUEZ:  These are the two cases I cited.

16           MR. KATZ:  The point I wanted to make is that there

17   are allegations in this case of misstatements that the

18   plaintiffs are relying upon.  And while no one approves or

19   condones the idea of union representatives making

20   misstatements, there are a wide variety of cases that deal

21   with the issue in a duty of fair representation context,

22   including cases where a union representative basically is

23   accused of taking a dive, as the accusations are here, in

24   order to persuade employees to ratify a collective bargaining

25   agreement.

1              And in those cases, the fact that there is a

2    misstatement is far from enough to establish a duty of fair

3    representation violation.  And even a bad motive of making a

4    misrepresentation in order to make a deal when it is not in

5    the best interest of the employees is not enough.

6              As Mr. Fram has been pointing out, the cases in all

7    these courts of appeals that I have mentioned that are cited

8    in our motion to decertify the class, in our 1292 (b)

9    application, and even in our summary judgment motion, those

10   cases show that it is vital in order to prove a DFR

11   violation, that --

12             THE COURT:  I am going to revisit the issue.  I

13   told you.

14             MR. KATZ:  All right.  I would just suggest that

15   you look at the other briefs that collect some of the cases

16   in other circuits.

17             THE COURT:  I am not going to make a change now.

18   But I have your point.  I will read it.

19             MR. KATZ:  Thank you.

20             MR. PRESS:  It dawned on me listening to Mr. Katz

21   the best guidance we have in this case is the Third Circuit's

22   decision in this case.  They held that if we prove that the

23   union failed to do anything for an improper purpose, we win,

24   or we can win.

25             MR. FRAM:  Your Honor, I have --

```
 1              MR. PRESS:  That is black and white.  That was the

 2    holding.

 3              MR. FRAM:  Failed to do anything.  But what about

 4    causation?  What about injury in fact?  What about Deboles,

 5    your Honor, that says that there can be no liability in the

 6    absence of injury, because, quote, "any remedy against the

 7    union would necessarily be a 'punishment' for a harmless

 8    lie."

 9              Deboles, as you recall is a case where the District

10    Court found there were affirmative misrepresentations.  The

11    Third Circuit reverses.  A harmless lie.  A lie that wasn't

12    relied upon by the union members, and that didn't result in

13    any harm, is meaningless, there is no DFR violation.

14              THE COURT:  I have accepted that principle.

15              MR. FRAM:  Thank you.

16              THE COURT:  There has to be harm from the wrongful

17    conduct.  We have a verdict sheet and we have it in the

18    charge.

19              All right.  I will revisit that.  We will look at

20    that again.  I am not changing paragraphs 16 now.

21              Okay.  What about, anything for the rest of it?

22              MR. FRAM:  Your Honor, 16, I am looking at the

23    third line.

24              THE COURT:  Third line of the first paragraph.

25              MR. FRAM:  A phrase, "out of a desire to obtain an
```

```
 1   undeserved benefit at the expense of the employees it

 2   represents, A.  We are not certain that there is any law that

 3   supports that; B.  It doesn't seem to have any application to

 4   the case, your Honor.  We are concerned it will be confusing.

 5           MS. RODRIGUEZ:  Where are you?

 6           THE COURT:  The very first sentence of paragraph

 7   16.

 8           MR. FRAM:  We ask the Court to strike that.

 9           (Pause)

10           MR. PRESS:  We don't have a problem removing that

11   sentence or clause.

12           THE COURT:  He wants the whole sentence removed.

13           MR. PRESS:  I forgot where we are.

14           THE COURT:  First paragraph, first sentence, first

15   paragraph of 16.

16           MS. RODRIGUEZ:  We don't have a problem with it.

17           MR. PRESS:  No, not the whole sentence, just the

18   last --

19           THE COURT:  I don't know.  What is it you asked to

20   be struck?

21           MR. FRAM:  Your Honor, we would strike "or out of a

22   desire to obtain an undeserved benefit at the expense of."

23           THE COURT:  Do you have an objection to that?

24           MR. PRESS:  No.

25           THE COURT:  It reads "A union's conduct is made in
```

1   bad faith when it acts or fails to act out of ill will

2   towards the employees it represents."

3           MR. FRAM:  Yes.

4           THE COURT:  There is no objection to that change.

5   I will make it.

6           THE COURT:  What else?

7           MR. FRAM:  Next paragraph, examples of bad faith.

8   Deliberately making misleading statements to employees, not

9   disclosing conflicts of interest, acting with hostility

10  towards union members and ignoring union policies in labor

11  negotiation.  We are a little concerned about that language,

12  your Honor.

13          One, not disclosing conflicts of interest.  I am

14  not sure, we don't believe the law supports that.  Acting

15  with hostility towards union members.

16          Again, I alluded to this testimony, which I think

17  you know my view of it, by Comlish, that when Duane Woerth

18  scowled at him, I am concerned that the jury might think

19  someone might not, that someone allegedly raising their

20  voice,  that someone raising their voice is a violation.  It

21  doesn't.  It has to be meaningful.  Or ignoring the policy of

22  the labor negotiation.  I don't know that the law supports

23  that.

24          We think the jury is going to be confused, and I

25  don't believe there is any evidence, your Honor, in the case

1    that we ignored, that ALPA ignored union policy.  What I

2    would ask your Honor to do is strike that sentence and --

3              THE COURT:  That paragraph.

4              MR. FRAM:  That paragraph.

5              THE COURT:  It is one sentence.

6              MR. FRAM:  The one sentence paragraph which I know

7    your Honor disfavors, you said that before.  We have a one-

8    sentence paragraph and no page numbers.

9              THE COURT:  Bad news.

10             MR. FRAM:  That is my reference and let the jury

11   rely upon the more general discussion of the standard.

12             Of course, our concern is by giving specific

13   examples that arguably dovetail with the plaintiff's

14   arguments, that this becomes suggestive to the jury and

15   prejudicial to the defendant.

16             THE COURT:  I will wait to see.

17             MR. PRESS:  I don't have the cases in my

18   fingertips.  I know there is legal support for every

19   submission you included in here.  I think this is completely

20   proper.

21             THE COURT:  I am going to omit "ignoring union

22   policies and labor negotiations."  Because I don't think

23   there is anything in this case --

24             MR. PRESS:  There is.

25             THE COURT:  Well, tell me what there is.

1          MR. PRESS:  ALPA merger policy in an ALPA to non-

2     ALPA case requires the president to take reasonable steps to

3     insure that a fair process is entered into for a fair and

4     equitable integration.  There is no evidence Duane Woerth did

5     anything to comply with that policy.  All the evidence and

6     inferences would suggest that he didn't do anything.  That is

7     policy one.

8          Policy two, we got it yesterday from Seth Rosen,

9     the collective bargaining policy, the concessionary

10    negotiation requires that those negotiations be coordinated

11    through the president's office.  Again, there is no evidence

12    that Duane Woerth did anything.  And so that is two big ones

13    right there, Judge.

14         MR. FRAM:  Duane Woerth signed the transition

15    agreement.  Your Honor pointed that out.  It was negotiated

16    by the negotiating committee, approved by the entire MEC,

17    signed off on by Ron Kiel, negotiated --

18         THE COURT:  You are talking about the transition

19    agreement.

20         MR. FRAM:  Yes.  That is what I think Mr. Press is

21    alluding to.  I don't know how he can argue it wasn't

22    coordinated through the president's office.  That is not a

23    violation.  I think Mr. Rosen said as well that we are

24    dealing with guidelines, not policies.  How is that harmful

25    to anybody?  So yes --

1          THE COURT:  I am sorry.  If you don't do it.

2          MR. FRAM:  Well, the fact of the matter, your

3    Honor, is that if there is a DFR violation in connection with

4    the transition agreement, it is during the period leading up

5    to the execution.  It is unable to -- your Honor, if I can

6    make a note about the examples you had, you referred to

7    deliberately making misleading statements to employees.  I

8    think this goes back to the defendant really underscores the

9    importance of the Deboles language that we talked about

10   before.

11         So we ask your Honor to consider that in

12   conjunction with that paragraph as well.

13         THE COURT:  I am going to leave it as it is, but

14   subject to my reviewing Deboles, and Aguinaga, and other

15   cases.  Find out whether Aguinaga was a support, and whether

16   it is a stand-alone case,  we will see.

17         MR. FRAM:  On the not disclosing conflicts issue --

18         THE COURT:  Where are you?

19         MR. FRAM:  Same sentence, that one-sentence

20   paragraph.  Did I request before the instruction that it was

21   not improper in any way for Duane Woerth to go and talk to

22   the APA in late 2000?  If I didn't, I would request that the

23   Court instruct the jury to that effect.

24         THE COURT:  It is not improper.

25         MR. FRAM:  It was not improper for ALPA as an

```
1    organization to adopt a unity resolution, or for Duane Woerth

2    in the wake of that to talk to APA --

3            THE COURT:  Nobody testified in this case that

4    passing the unity resolution was a wrong or bad thing.

5            Nobody suggested that.

6            MR. FRAM:  I think the jury is going to be confused

7    about that issue, your Honor.  Our request would be to

8    clarify it by instructing the jury that until the TWA pilots

9    and the American pilots became adverse, there was nothing

10   improper that the unity resolution or Duane Woerth's going

11   and speaking to the board of the APA about it.

12           MR. PRESS:  It is completely unnecessary, Judge.  I

13   don't know why we would have another instruction on things

14   that are legal.  Where are he going to stop?

15           MS. RODRIGUEZ:  That is not an issue in the case.

16   There is nothing contested about it.

17           THE COURT:  Well, I look at that differently.  I

18   think he could shoot himself in the foot with that.

19   Remember, there was, he went to the APA, I think in November,

20   2000.  But he went to the APA during a period they were

21   negotiating.  Indeed, it is very conflicting testimony about

22   what was said.  And the thing that says there is nothing

23   wrong prior to the acquisition by American and the TWA --

24   there is nothing wrong with the unity resolution or anyone

25   speaking to ALPA.
```

1          MR. PRESS:  I see the distinction you are drawing.

2          THE COURT:  Do you really want that?

3          MR. FRAM:  Can I think about it over night?

4          THE COURT:  Yes, think about it or, and tell me

5    Monday.  I won't be here tomorrow.  It seems to me you are

6    focusing with almost laser-like intensity a light on his

7    meeting about which there is some confusion, but he certainly

8    went to a meeting.

9          Now, his take on it, he went to the meeting to

10   encourage the pilots to be fair in their integration.  That

11   is his recount of it.  But you have a charge that any

12   visiting APA prior to January 9, whatever the date of the

13   announcement is, of the TWA acquisition, really, what does

14   that tell the jury?  Forget that one.  He went, why don't you

15   think about it.

16         MR. FRAM:  Thank you.

17         MR. KATZ:  Your Honor, may I make one comment about

18   this paragraph?

19         THE COURT:  YES.

20         MR. KATZ:  The union policies issue, Mr. Press

21   talked about the allegations in the case.  My comment goes to

22   whether it is an example of bad faith for a union to not

23   follow one of the policies that it has.  And the ALPA

24   administrative manual, like many union policies, is several

25   inches tall, and I respectfully submit, your Honor, that it

1    not automatically a breach of the duty of fair representation

2    violation, for a union to violate one of its policies.  The

3    standard of the duty of fair representation is something else

4    entirely.  And so, if it was automatically an example of bad

5    faith to violate a union policy, union members would be in

6    the federal courts all the time about a variety of  things

7    that aren't truly justiciable -- That is even harder than

8    Aguinaga -- justiciable under the duty of fair

9    representation.

10             That was the point I wanted to make.

11             THE COURT:  You make a point that I find

12   interesting.

13             MR. KATZ:  Yes, sir.

14             THE COURT:  Examples of bad faith include things

15   like deliberately making misleading statements to employees,

16   not disclosing records -- ignoring union policies if such

17   actions are the result of a bad faith motive as described

18   above.

19             MR. KATZ:  If they result in harm --

20             THE COURT:  No.   No.  No.  Harm we will cover

21   later.  In other words, I take your point.  Not following a

22   particular policy for negotiation, or unions may have books,

23   you know, 100 pages long.  Absolutely.   It has to be

24   motivated or be the result of a bad faith motive, as I just

25   described in the previous paragraph.

```
 1              MR. KATZ:  Thank you, your Honor.  I am sure you
 2    know --
 3              MR. PRESS:  No.  No problem with that.
 4              THE COURT:  I have to add that to be fair.
 5              MR. KATZ:  I am sure you know in a union meeting
 6    there is  frequently rough and tumble.
 7              THE COURT:  Rough and tumble?
 8              MR. KATZ:  Loud noises,  scowls.
 9              MS. RODRIGUEZ:  On, not these guys.
10              MR. KATZ:  Every time someone raised their voice in
11    a union meeting they could go to federal court we would have
12    a docket problem.
13              THE COURT:  Don't worry about our docket problem.
14    I am not worried about it.  Anything more?
15              MR. FRAM:  My last request with respect to the
16    section 16, and I think your Honor made clear before how you
17    will rule on this is we did request an instruction about the
18    responsibilities of lawyers in recommending or pursuing
19    litigation.  Those were our proposed charge 17.  We had an
20    alternative charge.
21              THE COURT:  Why.  Paragraph 17?
22              MR. FRAM:  No, it would be part of 16.  We had a
23    proposed charge of 17, page 39 through 42 of the joint --
24              THE COURT:  I think I have it.  You are charged
25    with an excellent closing argument.
```

1          MR. FRAM:  Your Honor, we thought that some law

2    would assist the eleven non-lawyers on the jury.

3          THE COURT:  Assertion of legal claims in

4    litigation.

5          MR. FRAM:  Yes, your Honor.

6          THE COURT:  I have it.

7          MR. FRAM:  Obviously, law is helpful in helping

8    them understand what was appropriate or not.

9          We had an alternative, your Honor.

10          THE COURT:  These are four pages long.  I reject

11    that totally.

12          What is the alternative.

13          MR. FRAM:  Judge, just the one alternative, the

14    first was to instruct the jury that they should disregard any

15    claim based upon the litigation tactics.  The alternative

16    behind it, which I think you are also rejecting, is to give

17    them some guidance about the professional and other

18    responsibilities.

19          THE COURT:  No, I am not doing either of those.

20          MR. FRAM:  The only other issue I think I have is

21    we did raise in our trial brief a request that the Court

22    instruct the jury with respect to the Bond bill, and I think

23    you talked about it this morning, your Honor did rule in

24    chambers on June 2 that the plaintiffs couldn't claim a DFR

25    violation based upon the failure of Congress to enact the

1  Bond bill.  We think it is important that it be somehow be

2  put into the charge, and they be instructed consistent with

3  your Honor's ruling --

4          THE COURT:  I understand.

5          MS. RODRIGUEZ:  Your Honor, we were abiding by your

6  Honor's ruling on the 2nd.  There is nothing in evidence to

7  suggest that we are maintaining, that it was a union's

8  responsibility to see that the Bond bill got passed.  The

9  evidence is what the evidence is, and to give it --

10         THE COURT:  I admit, you did not try to make an

11 argument in the course of presenting your case or in the

12 course of cross examination the witnesses that somehow or

13 other the failure of the Bond bill to pass was proof of

14 breach of the duty of fair representation.  But I think their

15 point is, you have a fair amount of testimony about the Bond

16 bill, and we certainly, the jury knows, that it is in the

17 jury knows it didn't pass.  And the jury knows that the

18 position of the plaintiffs is that, you know, the ALPA didn't

19 jump in with both feet to support that.

20         What I had ruled is that the failure to pass is not

21 proof of anything.  But that the attitude toward it, how one

22 responds to it, might be evidential.

23         He is asking for a charge to tell the jury that the

24 failure to pass, that they can't conclude that the Bond bill

25 failed to pass that, that they can consider efforts made by

1    ALPA with respect to the Bond bill, but that the failure,

2    they cannot consider it as a failure, failure, its -- they

3    can consider efforts or lack of efforts, but not its failure

4    to pass.

5            MS. RODRIGUEZ:  I think it gives unnecessary weight

6    to the whole --

7            MR. PRESS:  What you are proposing might be an

8    acceptable instruction.  But I don't know what we are

9    debating.

10           THE COURT:  I am going to try to, I accept the

11   point that counsel is making.  I certainly don't want the

12   jury to think that because of, because it didn't pass, that

13   it proves that somebody didn't lobby strongly enough.  As

14   their own expert said, somebody, maybe it is the MEC's expert

15   that said it, anybody who tried to predict whether a bill

16   will be passed by Congress, somebody should consult the Tooth

17   Fairy.  Pretty much that is what it said.  You know what I am

18   talking about?

19           MS. RODRIGUEZ:  I think it is in the --

20           MR. KATZ:  Mr. Estes' letter, Estes and Associates.

21           THE COURT:  His last paragraph, are you kidding me,

22   nobody can tell what Congress is going to do.

23           THE COURT:  I am going to consider a subparagraph

24   on the Bond bill.  You can both look at it.

25           MR. FRAM:  Thank you,  your Honor.

```
 1              THE COURT:  Let's go to -- is there anything on the
 2   rest of it?
 3              MR. FRAM:  I didn't see anything.
 4              THE COURT:  The rest of it is boilerplate.  If the
 5   word boilerplate has any meaning.  This is it.
 6              MR. FRAM:  Looks fine.  I didn't see any one-
 7   sentence paragraphs either.
 8              THE COURT:  I only made that mistake once.  Mr.
 9   Katz is weighing in.
10              MR. FRAM:  I will let him speaking for himself.
11              MR. KATZ:  At the bottom of the page.
12              THE COURT:  What page?
13              MR. KATZ:  Page 17.
14              THE COURT:  Paragraph 17.
15              MR. KATZ:  Section 16 on page 17.  It ends saying
16   if you find looking at all the evidence presented and that
17   ALPA acted in bad faith, you must find it breached its duty
18   of fair representation.  It seems to me that --
19              THE COURT:  You want the reverse.  You want the
20   converse of that?
21              MR. FRAM:  We do.
22              MR. KATZ:  We want that, but I think it would be
23   appropriate to circle back to the causation element which is,
24   which you said earlier is a requirement to establish a DFR
25   violation.  Without that it may lead someone to conclude that
```

```
 1   it doesn't apply in this situation.

 2              MR. PRESS:  Your Honor, your verdict form is very

 3   clear in that distinction.

 4              THE COURT:  Nobody has objected to the verdict

 5   form.

 6              MR. PRESS:  I have a problem with it.

 7              THE COURT:  What.

 8              MR. PRESS:  I have a slight problem.  One word

 9   problem.

10              THE COURT:  I will listen to you.

11              MR. PRESS:  I don't think we need to load up 16

12   with that when you made the distinction clear in the verdict

13   sheet.  I don't think it is necessary.

14              THE COURT:  I may add it.  I may not.  I will look

15   at that.  If I add it, I will tell you and you can object.

16              What about 17?  To the end.

17              MR. FRAM:  17 to the end is fine.

18              MR. PRESS:  We have no problem.

19              THE COURT:  Okay.  I will prepare a new version of

20   this.  And it will be called draft three.  And I will

21   probably get it to you Monday morning.  You will have it

22   before you close.

23              MR. FRAM:  Thank you, your Honor.

24              THE COURT:  Yes.

25              MR. FRAM:  Will your Honor entertain comments on
```

```
 1    the verdict sheet?

 2              THE COURT:  Yes.

 3              MR. FRAM:  I have one request.  I think I know how

 4    you are going to rule.  We submitted a verdict sheet.

 5              THE COURT:  Let me find it.

 6              MR. FRAM:  Your Honor, we think it is important to

 7    separate issues out to avoid confusion.  We request separate

 8    questions relating to the vote on April 2 and events

 9    thereafter, both with respect to each breach of the duty and

10    causation.

11              THE COURT:  No.  No.  I don't think, I know you

12    wanted from day one to separate the case that way.  If you

13    want to argue that there was no card campaign, the evidence

14    doesn't show there was any conflict up April 2.  Fine, you

15    can argue that to the jury.  But I am not going to split the

16    case.

17              MR. FRAM:  Thank you, your Honor.

18              THE COURT:  What is your comment?

19              MR. PRESS:  Interrogatory two, the causation

20    question.  Did ALPA's violation of its DFR directly cause

21    injury to the TWA pilots?

22              I would suggest removing the word "the" and leaving

23    it, because that would suggest all.  And the jury has heard

24    from Mike Day that he wasn't hurt by Supplement CC.  And that

25    fact alone would preclude us from a yes answer to that
```

```
1    question.
2              MR. FRAM:  I am thinking, your Honor.
3              THE COURT:  He wants the word "some of the."
4              MR. PRESS:  That would be fine.
5              MR. FRAM:  This goes back to the concerns we had
6    about certification of the class, your Honor.  Can I think
7    about that overnight as well?
8              THE COURT:  Sure.
9              MR. FRAM:  I am not sure.
10             THE COURT:  Absolutely.
11             MR. FRAM:  I think our position is they do have to
12   show injury to the entire class.
13             THE COURT:  Every member of the class?
14             MR. FRAM:  Yeah, I think so.  Let me think about
15   it, your Honor.
16             THE COURT:  Okay,
17             MR. FRAM:  Let me note as well if I could, if we
18   are going to water this down to the extent that they only
19   have to show injury to Sean Clarke or a handful of pilots, I
20   am not sure that we have accomplished very much if we have to
21   proceed with the damages phase.  But I do want to think about
22   that.
23             I can address that, if it is okay, on Monday
24   morning.
25             THE COURT:  Okay.
```

1          MR. PRESS:  In closing, and I know you are going to

2    do more work on this.  On the verdict directing instructions,

3    Judge, I don't think it is appropriate to load them up with

4    too much more language.

5          THE COURT:  Who is loading up language?

6          MR. PRESS:  I know you are going to go back and

7    visit 14, 15 and 16.  We can't have a treatise for the jury

8    on the law of DFR.

9          THE COURT:  You are talking about the verdict

10   sheet.

11         MR. PRESS:  The verdict directing instructions.

12         THE COURT:  Paragraphs 13, 14 and 15, 16.

13         MR. PRESS:  The law on how to instructed in this

14   kind of case is probably unsettled, if nonexistent.

15         THE COURT:  I don't think, did either have you ever

16   find canned instructions in this case of case.

17         MR. PRESS:  No.

18         MR. FRAM:  We found instructions in what they call

19   a hybrid case, some out of the Ninth Circuit, a couple

20   circuits had them on DFR cases.  There was a hybrid type

21   case.

22         THE COURT:  What do you mean by that?

23         MR. FRAM:  The union is accused of not pursuing a

24   grievance with the employer.  The union member ends up suing

25   both the employer and the union.  And they are more

```
 1   complicated than this.  But there are some out there.  I

 2   don't think there are any in the Third Circuit.

 3            THE COURT:  I think failure to pursue a grievance,

 4   I am not saying it is not a DFR case.  It is really totally

 5   different.

 6            MR. PRESS:  The point I was going to make, Judge,

 7   is if you are instructions are to be a fair statement of the

 8   law so the jury can return a fair verdict.  And I think you

 9   have done that.  And I know you are going to revisit these

10   things.  I wanted to --

11            THE COURT:  A lot of the ones you asked, you agree

12   to.  But I think in fairness, we ought to look at Deboles,

13   and, if I pronounce that directly.  Aguinaga.

14            MS. RODRIGUEZ:  Now you see why I had to look at it

15   before I could say it.

16            THE COURT:  No, I understand.  All right.  I won't

17   be here tomorrow.  But we will have this done for you Monday.

18   Monday, the order of March is you are going to call in

19   rebuttal Sherry Cooper.

20            MS. RODRIGUEZ:  Yes.

21            THE COURT:  And then closings start.

22            MR. PRESS:  Your Honor, will you be leaving the

23   bench Monday at 2:00  or thereabouts?

24            THE COURT:  2:30.  I mean it is no secret, I get

25   dialysis three times a week and I start about 3:30  I am on
```

153

```
 1    the machine for four hours.   Dialysis is Monday, Wednesday

 2    and Friday.  Although my early start, my eight o'clock  start

 3    I was doing long before dialysis.  I have always done that.

 4    I get a full day in, but I can't sit in the afternoon.

 5    Sorry.  That is all I can do.

 6             MR. PRESS:  Thank you.

 7             MR. FRAM:  Thank you.

 8             THE COURT:  Thank you very much.

 9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```