```
 1                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3       PATRICK BRADY, SALLY YOUNG,
         HOWARD HOLLANDER, THEODORE CASE,
 4       AND MICHAEL FINUCAN, individually
         and on behalf of all others
 5       similarly situated,
                              Plaintiffs,
 6                                              VOLUME 18
              V.                                TRIAL TRANSCRIPT
 7
         AIR LINE PILOTS ASSOCIATION,
 8
                              Defendant.
 9
                                        CAMDEN, NEW JERSEY
10                                      JULY 11, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                      A P P E A R A N C E S:
13
             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                 AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:  STEVEN FRAM, ESQ.
19                AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH  GINSBURG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                    LYNNE JOHNSON, CSR, CM, CRR
18                  OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
19                  P.O. BOX 6822
                    LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

```
 1              THE COURT:  Good morning, everybody.  Please be

 2    seated.

 3              Number one, I was advised over the weekend that we

 4    are not going to have another witness today.  In other words,

 5    the taking of evidence is complete.  So other than the short

 6    colloquy we are going to have in a minute, we are going to go

 7    straight to closing arguments.  So that when we resume the

 8    trial when the jury comes in, we will begin with defendant's

 9    closing argument.

10              Number 2, over the weekend I received some further

11    reading materials from Mr. Fram concerning the jury charge.

12    And also, resumed our charge conference in the robing room

13    for about 20 minutes, just a few minutes ago.

14              I have made two changes, as a result of all of

15    that.  One, was the addition of a paragraph that relates to

16    the question of Roland Wilder -- the union's reaction to

17    Roland Wilder's various litigation suggestions.

18              And I have also combined two paragraphs to sort of

19    summarize the legal charge, and I told the parties where

20    those changes were made.  Now, the parties want to put on the

21    record their positions on some issues, and so I am going to

22    let -- well, first I will ask the plaintiffs.  Anything you

23    want to put on the record that you are unhappy with?

24              MR. RODRIGUEZ:  Yes, your Honor.

25              THE COURT:  I don't want you to be unhappy -- I
```

```
 1   want both sides to be unhappy.  Then I know I have done my

 2   job.

 3            MS. RODRIGUEZ:  I know we spoke in the robing room

 4   about the addition of the language regarding the litigation

 5   strategies.  I am not sure, flipping through I am not sure

 6   where it is in the jury instructions.

 7            I am not able to refer to it exactly.  But I will

 8   say, your Honor, that the language cited to you by the

 9   defendants  from the Eleventh Circuit, anticipated the filing

10   of a grievance, and they just took the grievance language

11   out, and plugged in litigation.  And I think the rationale

12   behind having --

13            THE COURT:  By the way, page 18, the large

14   paragraph that starts, on, a little before the middle of the

15   page.  You heard testimony, et cetera.  Page 18.

16            MS. RODRIGUEZ:  I think that --

17            THE COURT:  Do you see that?

18            MS. RODRIGUEZ:  I do see that, your Honor.  Again,

19   I just roar the record note that the language of the Eleventh

20   Circuit, and the cases cited by the defendants talk about

21   grievances, not litigation, and that there is a difference in

22   the distinction between filing a grievance against a company

23   employee and the situation before the Court in this case

24   where there is litigation against not the employer of the

25   pilots, but American and APA and I think that that
```

1   distinction warrants a different treatment.

2          THE COURT:  I agree with your comment, but I

3   thought it captured as well as could be done the concept of

4   how a union reacts to a request to litigate a particular

5   position.  And I thought it was balanced and I thought that

6   the first part, while called the defendant's position, set

7   forth, the second part of that charge I think is like a

8   plaintiff's position and it emphasizes here that to some

9   degree it is whether the union acted in good faith or bad

10  faith in making the decision.

11         I mean it is a very sticky area, I admit, when the

12  union or the plaintiff's position, the union refused on three

13  occasions to litigate.  I didn't want to turn the case into a

14  law school exercise as to what were the merits of the

15  proposed litigation.  I thought the issue was much more

16  subtle than that.  I thought this captured it.  But captured

17  it fairly.

18         Your objection is noted on the record.

19         MS. RODRIGUEZ:  Thank you, your Honor.

20         THE COURT:  Mr. Fram.

21         MR. FRAM:  Thank you, your Honor.

22         We requested a charge defining bad faith that is

23  included in Section 157.102 of O'Malley and of course that is

24  actually a paired-down version of the earlier charge

25  requested based upon Deboles which we think requires the

1    elements of fraud --

2             THE COURT:  Yeah, but we don't think, in fact, as I

3    said I would, would read all those cases, not just Deboles,

4    but a lot of other cases.  We are not convinced that the type

5    of charge there is called for by Deboles or any other case.

6             MR. FRAM:  I understand.  I am concerned about the

7    first full paragraph on the top of 18 where the charge

8    defines bad faith, including things like deliberating making

9    misleading statements to employees, not disclosing conflict

10   of interest, acting with hostility toward union members and

11   ignoring union policies and labor negotiations.

12            I think that is actually inconsistent with the law

13   summarized in O'Malley.  O'Malley defines bad faith in the

14   way I described:  Fraud, deceitful action, dishonest action,

15   and then says personal hostility alone is not enough and in

16   contrast to that the paragraph I referred to on 18 suggests

17   that hostility is enough.

18            So I think that is contrary to the law, and I think

19   your Honor should instruct the jury consistent with what is

20   earlier in the instruction that personal hostility is not

21   enough.

22            THE COURT:  It is not enough, but that doesn't mean

23   that it is not evidence of bad faith.  And you pointed that

24   out.  I am satisfied that we have it right.

25            MR. FRAM:  That is one objection.  Your Honor, I am

```
 1    concerned a little bit about causation in two respects.  One,

 2    we think the jury needs to understand that causation has to

 3    be proven by the plaintiffs, you say that in the charge.

 4         THE COURT:  I say it in the charge, now I will be

 5    saying it twice, with that paragraph.

 6         MR. FRAM:  But we also request, consistent with the

 7    charge we submitted yesterday, that they be instructed that

 8    they should not speculate about whether things might have

 9    been different.  We also request, given the instruction on

10    the verdict sheet that a separate section be included here

11    that focuses just on the issue of causation.

12         THE COURT:  I am satisfied that the charge covers

13    that point.  I mean more than happy.

14         MR. FRAM:  We stand on the objections we made last

15    week as well.

16         THE COURT:  Of course.  Okay.

17         MR. FRAM:  Thank you.

18         THE COURT:  I am going to mark what is now draft

19    number 4 of the charge, and draft number 3 of the jury

20    verdict, as C 3 and C 4.  And before we close I will mark the

21    exhibit, the final char charge.

22         MS. RODRIGUEZ:  The jury instructions are C 3  and

23    the charge is C 4.

24         THE COURT:  The other way around -- no, you are

25    right.  C 3 will be the charge, and C 4 will be the verdict
```

```
 1   sheet.  One is draft three and one is draft four.  Okay.  All
 2   right.  I know you have a little preparation.
 3              MR. FRAM:  I need to modify my Power Point and set
 4   up.  I am not sure where the best point to put the screen for
 5   the power point is.  Is that okay.  Against that wall,
 6   side-by-side.
 7              THE COURT:  Well, those are the folks that have to
 8   see what you want to do.  You have to make that decision.
 9   You can't use the screen and our, the screen we normally show
10   evidence, you can't use those.
11              MR. FRAM:  We will have evidence and documents
12   going up on the screen side-by-side with the Power Point.
13              THE COURT:  So it will appear on the big screen.
14              MR. FRAM:  The power point will be on the small
15   screen.  At the same time we will be showing evidence --
16              THE COURT:  If you are satisfied the jury can see
17   it.  It is your closing.
18              MR. FRAM:  I think we will move it up.  If we can
19   have a minute to modify the Power Point.  I will appreciate
20   it.
21              THE COURT:  We told the jury that that there would
22   be no more evidence and we are going right to closings, and I
23   will tell them without identifying who, we are saying the
24   parties are getting ready for the closing.
25              MR. PRESS:  There was much rejoicing when they
```

1    heard no more evidence.

2              THE COURT:  I wasn't there.  I can't testify as to

3    what their facial expressions were.

4              Okay.

5              MR. FRAM:  Thank you, your Honor.

6              THE COURT:  I will get off the bench and wait until

7    I am told you are ready.

8              (Recess)

9              (Jury enters the courtroom.)

10             THE COURT:  Good morning, everybody.  Ladies and

11   gentlemen, the parties have advised me that the taking of

12   evidence is complete.  You have now heard all the evidence

13   and we are proceeding to the part of the trial known as

14   closing arguments, or closing statements.

15             It is the chance for each of the lawyers to argue

16   to you, that is in a good sense of the word argue, argue to

17   you why the evidence supports his or her particular view of

18   the case.

19             However, I do want to instruct you that if a lawyer

20   recounts evidence to you that is not evidence itself, a

21   lawyer's statement as to what somebody said or what the

22   evidence was, is not in and of itself evidence.  If a

23   lawyer's statements of fact differs from your recollection of

24   what went down in the witness box, it is your recollection

25   that controls, not what the lawyer said.  However, it is a

```
 1   very important part of the case because it is the only time
 2   the lawyer gets to really draw all the threads together into
 3   a cohesive whole.   I urge you to pay strict attention to
 4   what the lawyers have to say, and with that I recognize Mr.
 5   Fram to give the closing argument for the defendant.
 6              MR. FRAM:  Thank you, your Honor.  Good morning.
 7              You have all listened patiently for quite a few
 8   weeks now since June 6 to what the witnesses have to say.
 9   You have heard about documents and seen some of them, and you
10   are probably wondering at this point, well, there is a lot of
11   information out there.  What are we supposed to do in terms
12   of evaluating that?
13              You have heard about litigation theories, for
14   example.  Was ALPA required, if a couple union members
15   thought it made sense to go file a lawsuit, was ALPA somehow
16   required to do that.  And you don't have a framework yet and
17   you really haven't had a framework for evaluating the
18   information you have been given.
19              What is going to happen at the end of the closing
20   argument, I will speak and then one of the lawyers on behalf
21   of the plaintiffs will speak, then Judge Irenas is going to
22   read you the law.  He is going to give you what is known as
23   the jury charge.
24              In that jury charge he is going to tell you what
25   the standards are.  He is going to give you a framework to
```

1    evaluate the conduct of ALPA, and you will measure the

2    evidence, the testimony, the exhibits, against that framework

3    and decide whether or not there is merit to the claims that

4    were made here.

5            So that you understand my argument, understand the

6    reasons why I am going to try to persuade you that the

7    plaintiffs had not met that standard, that there has been no

8    breach.  I want to start by taking a couple of minutes to

9    give you a preview of what the Judge is going to tell you and

10   of course, the precise words that he uses, the actual

11   language of the  charge is what you should follow.  I am

12   going to give you my best understanding of what it is, so

13   that you can follow along my argument and evaluate the

14   evidence.

15           Judge Irenas will tell you that there are two

16   things the plaintiffs need to prove.  The first is that there

17   has been a breach of the duty of fair representation.  What

18   does that mean?  It means that the plaintiffs have to show

19   either that ALPA's conduct was arbitrary, or that ALPA  acted

20   in bad faith.  What does arbitrary mean?  It means more than

21   negligent, it means conduct that is not reasonable, that is

22   irrational, that makes no sense.  Pretty high standard.

23           What is bad faith?  Bad faith goes a step even

24   beyond that.  Bad faith is hostility or ill will.  An example

25   would be deliberately making misleading statements to the

1    union members.

2          You have heard a lot during the case about

3    litigation proposals that were made.  You recall there was a

4    fellow, Roland Wilder, who is merger counsel, kept coming up

5    with ideas for lawsuits he wanted to file.  The standard is

6    the same in terms of evaluating those litigation ideas.

7          The standard is one of reasonableness.  And the

8    Judge will tell you that that individual members cannot

9    insist that lawsuits had to be filed.  I will talk more about

10   the way the MEC works, but simply because a couple members of

11   the MEC or some union members thought that a lawsuit was a

12   good idea, and ALPA didn't pursue it, that is not a breach of

13   the duty of fair representation.

14         So that is the first thing the plaintiffs have to

15   prove is that there has been a breach.  Again, either

16   arbitrary conduct or bad faith.

17         They then have to prove that that breach had an

18   impact, that it made a difference.  They have to show that

19   the breach caused harm.  Tangible injury is one of the

20   phrases that the Judge will use, and what they have to prove

21   is that the overall outcome of the integration of the TWA

22   pilots into American would have been more favorable, not

23   different.

24         You have heard, I think, a lot of evidence about

25   what might have happened if certain things were done.  If one

1  of Wilder's lawsuits were filed in the beginning, for

2  example.

3          There was a concern that the whole deal would blow

4  up.  It is not enough to prove that if that lawsuit had been

5  filed they would have different, that they would have been

6  worse.  They have to prove to you that the overall

7  integration would have are better, more favorable.  I want

8  you to keep those standards in mind, those two requirements,

9  either arbitrary or bad faith in an impact, that it made a

10  difference, as you listen to the arguments to consider the

11  evidence in the case.

12          And a point I want you to keep in mind as well is

13  that when you Judge the conduct of ALPA and listen to the

14  plaintiff's arguments, you don't do so from this vantage

15  point.  You don't do so with the benefit of hindsight, or

16  gee, we found out something later that if we had known about

17  in April of 2001 we might have decided differently.  No

18  Monday morning quarterbacking.  No second-guessing.  You need

19  to put yourself in the mind frame of the people who are

20  making decisions at the time, and decide did they do things

21  that were unreasonable, given what they knew and given what

22  the circumstances were.

23          I want to break up the factual information you have

24  heard in the case roughly into three sets of issues.  You

25  heard a lot.  You heard about things that led up April 2, you

1   heard about complaints over the summer.  You heard about

2   things that happen in the fall of 2001.  And just for the

3   purposes of talking about the issues, I want to talk about

4   the events leading up April 2 of 2001, when the decision is

5   made to accept the collective bargaining agreement with TWA

6   LLC, and talking about the facts and the evidence there.  I

7   then want to talk a little bit about what happened over the

8   summer in terms of the negotiations back and forth.  And then

9   I want to talk finally about the events after 9-11, and the

10  events leading up to the imposition of Supplement CC, all the

11  back and forth there.

12          And I am doing that in part because when you think

13  about the evidence in each of those periods, Mr. Wilder

14  stepped up and said I think we should file a lawsuit.  And I

15  think you are going to hear from the plaintiffs' side that

16  they are going to argue that each of those points, that the

17  lawsuit should have been pursued.

18          The decision on April 2, I think the claim you are

19  going to hear from the plaintiffs is that the members of the

20  MEC who voted on April 2 to accept a new collective

21  bargaining agreement, to waive their labor protected rights,

22  to move forward, they were somehow coerced, they were

23  bamboozled, they were either misled or bullied by ALPA into

24  taking action.  We will address that.

25          The events over the summer of 2001, I think the

1    claim there is that ALPA didn't properly support them.  It

2    didn't provide resources.  And I will talk about that.  I

3    won't spend as much time on that.

4         And finally the decision that is made, or really

5    the nondecision, that is made in the October and November

6    timeframe, by the MEC.  I think the claim there is that ALPA

7    did not provide sufficient support.  It didn't push for the

8    Bond Amendment, it didn't threaten to do things that some

9    people wanted.  But again, the common theme in all of these

10   is we need to be more aggressive, we should go and file a

11   lawsuit.

12        The theory I think the plaintiffs have as to why

13   ALPA allegedly didn't do the things it was supposed to do is

14   a conspiracy theory.  And their theory I think is that ALPA

15   announced as an organization in October of 2000 its so-called

16   unity campaign.  And we have unity resolution, it is in

17   evidence.  It is adopted by ALPA with the concurrence of all

18   the different MEC's, everybody knows about it.  And as you

19   have heard, the resolution says that we want ALPA to

20   represent as many airline pilots in the United States, and

21   Canada, as it can.  We think that benefits everybody.  All

22   the pilots, to have a bigger group.  It benefits everybody in

23   terms of ALPA's ability to negotiate better contracts with

24   individual airlines, it benefits everybody in terms of having

25   that kind of base line.

1            And there were specific pilot groups, as you heard,

2    that ALPA was focused on in late 2000, the one at the top of

3    the list, as you heard from Captain Woerth, and also Seth

4    Rosen who was the Continental pilots.  There have been

5    discussions ongoing already, and ALPA did in fact proceed

6    with its organizing campaign, the campaign to merge with the

7    union, the independent union representing Continental,

8    Federal Express was another independent union that

9    represented those pilots and was there as well.

10           But certainly the American pilots represented by

11    the Allied Pilots Association, they were one of the groups

12    that ALPA was interested in, and Captain Woerth went and

13    talked, as you have heard, to the leadership of the APA, in

14    October of 2000 and said, hey, we would like to have you guys

15    come back.  We know you split off back in the early sixties.

16    We think it makes sense.  We think it makes sense for us.  We

17    think it makes sense for you to come back.

18           No question about that.  No question everybody knew

19    about that.  And of course one of the things that the

20    American pilots union is dealing with at that point is this

21    $45 million fine you heard about.  They had the sick-out in

22    February of 1999, American had to cancel hundreds of flights,

23    lost all kinds of money.  They went to court and a federal

24    judge down in Texas imposed this fine.  That was unresolved,

25    as of late 2000.  It was a concern to some degree to the

1   American pilots.  That became an issue of discussion.

2          So the conspiracy theory, as we understand it, is

3   that because ALPA was interested in attracting the American

4   pilots, bringing them back in to ALPA, during 2001, when ALPA

5   was assisting the TWA pilots, it tried to undercut them.  It

6   tried to undercut them in a way so that they got less

7   favorable seniority integration and the American pilots did

8   better.

9          And I think you heard throughout trial this some of

10  the plaintiffs' witnesses complain about the fact that ALPA

11  didn't do certain things.  Obviously there were other

12  witnesses and I will come to that, who we call and said, no,

13  that is not the case and of course you will recall Steve

14  Rautenberg who was there from day one, had a very different

15  perspective  than some of the plaintiffs' witnesses, you

16  heard David Singer, the fellow who got pushed out of Council

17  2 because he did not agree with Ted Case, and Howard

18  Hollander.

19          But that is the theme.  That is the theory that, A,

20  ALPA did things that it shouldn't have done, or failed to do

21  things it should have done; and B, it did that because it was

22  really more interested in the American pilots.  And what I

23  think the evidence proves and what I am going to argue to you

24  is that ALPA did everything it should have done.  It acted

25  reasonably and certainly not unreasonably or irrationally,

1    and that this long term interest of bringing the American

2    pilots back had nothing to do with anything.

3         So let me walk ahead and give you some very

4    important background, you probably heard it but I want to

5    summarize a couple points about how ALPA works so that you

6    understand how far-fetched this theory is and why it makes no

7    cents.

8         The first thing I ask you to recall is that the way

9    ALPA is structured is that the pilots at an individual

10   airline, such as TWA, they make all the major decisions.

11   What happens is you have the three councils which you have

12   heard about, Council 2 in New York, Council 3 in St. Louis

13   and Council 4 in California, Los Angeles, they represent

14   elect representatives.

15        At least early in 2001, up until November 1, you

16   have six representatives, one captain rep and one first

17   officer rep from each of the so-called domiciles.  Those

18   elected representatives get together and they elect officers

19   to help them organize things and run things, and they make

20   the decisions.  This is a Democratic system where the pilots,

21   through elections, in effect, are having their

22   representatives make decisions, including the decisions about

23   what gets put out to the membership for ratification, so that

24   the six people who are voting on a particular issue think,

25   gee, we want to make sure the members are really comfortable

what with what they are doing, they have the option of
sending that issue out and in effect getting a referendum on
it, not taking responsibility for making the decision and
saying we are going to leave it up to you.

Are there limits on what an MEC can do?  Yes.  They
are supposed to operate and conduct themselves in accordance
with the Constitution and the bylaws, and the policies of
ALPA.  Otherwise, there would be no point in having them be
part of the bigger organization.

And ALPA gets to approve litigation.  ALPA does not
permit individual unions to go off and file lawsuits.  And
indeed, it couldn't, because the unions are part of ALPA.  If
a law lawsuit is going to get filed on behalf of the
authorized collective bargaining representative of the
employee, it has got to be ALPA that files the lawsuit.

As you can imagine over the years and given the
number of unions that number of airline groups, rather,
pilots that ALPA represents, you would want to have some
degree of consistency, some institutional knowledge about
what kinds of lawsuits work or don't work, and that is why
ALPA reserves the right to make that decision.

And then within ALPA you have these MEC's, they
together form the ALPA board of directors, the MEC chairman,
the master chairman form an executive board, and then
officers and executive vice presidents from the MECs form an

1    executive council.  So you have all this coordination within

2    ALPA, and all of this discussion and interaction back and

3    forth with the MEC members, not only of TWA, but all of the

4    other airlines whose pilots are represented by ALPA.

5            And one of the things I want you to keep in mind as

6    we talk through the issues in the case, and you hear about

7    some of the complaints you heard from the plaintiffs, like

8    the litigation complaint.  We didn't go off, ALPA didn't

9    authorize to go off and file a lawsuit to enjoin or conduct a

10   transaction.

11           Again, the TWA pilots act through the MEC.  How

12   does the MEC act?  They have votes, they make decisions.  If

13   a resolution does not come out or a directive does not come

14   out of the MEC there is nothing for ALPA to do or not do.

15   Again, that is the process.  The process is referred to, you

16   may have heard as Independence Plus.  The pilots are

17   independently entitled to make their own decisions.  The plus

18   is ALPA has these resources, and this guidance and the

19   institutional knowledge and the like to back them up.

20           All right.  So let's focus on this first set of

21   issues that I mentioned to you before, the one leading up

22   April 2, and I will give you a little background just so we

23   have it all in mind, and you have heard this for weeks and

24   weeks.

25           I am sorry if I am repeating stuff you know well.

1   I will try to move through this quickly.  January of 2001 is

2   TWA's third bankruptcy filing.  It had filed back in 1992 and

3   again in 1995.  There had been concessions, millions and

4   millions of dollars of concessions by the pilots, lots of

5   concessions from the flight attendants and the other workers

6   as well.

7         The good news about the American deal is that

8   American is promising jobs to all of the TWA employees, all

9   20,000 of them, obviously including the pilots.  American is

10  at that point the largest airline in the country.  It is

11  financially secure.  It is stable.  It has a bright future.

12  The hitch, of course, as you heard, is that the asset

13  purchase agreement between American and TWA requires that the

14  TWA pilots waive their labor protective provisions, the one

15  that is most important, as you have heard, is the right to go

16  to arbitration if  the pilot groups do not agree on

17  seniority.  I will come back to that.

18        Why does American require that as a condition of

19  the deal?  Because American has a labor agreement, a

20  collective bargaining agreement with its own union, the APA,

21  that entitles the APA to have any new pilots who come in be

22  stapled, meaning being put at the bottom of the seniority

23  list.  American has no leverage over the APA to speak of.  I

24  will come back and talk about how incidental that becomes but

25  the fact of the matter is American is legally required to

respect the contract that it signed with the APA and with its

own pilots, and there is no reason in the world why American

is going to disrupt that or try to attack that or try to

change that.

You have heard a lot in the case from some of the

TWA pilots.  I think really all of them to be fair about how

important seniority is in the pilot industry.  We don't

disagree with that.  But think about the American pilots.

Seniority is just as important to the American pilots as it

is to the TWA pilots.

So when the deal gets announced their position very

much is, hey, we have a contract that entitles us to

seniority over the TWA pilots, and it is important.  We are

not going to give that up unless something significant

happens.

ALPA, of course, has no leverage over American or

the APA.  It doesn't have contracts with them.  It really

doesn't have leverage.  And we will talk, despite the absence

of that leverage, about things that ALPA tried to do to

persuade the American pilots, and to persuade American to

treat the TWA pilots with some compassion.

But American makes clear, as you have heard during

the entire process, and certainly after April 2, that it is

not fooling around here, when it says that the TWA pilots

have to waive scope, it is serious.  And you have heard the

1    testimony about its threats to walk away from the deal if

2    that aspect, that condition is not met.

3          And of course, the Section 1113 motion which you

4    have heard about again and again and again is the device, the

5    vehicle that American acting really behind the scenes, or not

6    even really behind the scenes, with TWA, that is the vehicle

7    that they use to bring this issue ahead.  Because as you have

8    heard, in early 2001, TWA is in terrible condition.  The

9    bankruptcy is public.  People aren't buying as many tickets.

10   American is putting in this so-called DIP, debtor in

11   possession financing, and this is costing American a lot of

12   money.  They want to move this deal along and not have it be

13   out there, and the way they do that is by filing a motion

14   under Section 1113.

15          Pardon me one second.

16          All right.  So what does the MEC supported by ALPA

17   do to get ready for what everything else is coming?

18   Everybody knows this decision is coming in terms of do we

19   waive scope, do we not?

20          And again, you heard about the different committees

21   that the MEC had, the committees of course, they are all

22   persons, I don't want to say man, because you have some women

23   involved, but they are all persons, pilots.

24          You have the negotiation committee out there,

25   chaired by Ron Kiel.  You have a merger committee that is

1    appointed.  You have Bud Bensel, he does it for a while,

2    early March, he steps down, and then Mike Day comes in as

3    chair of that committee.  He has a group of pilots.  You

4    heard Mr. Day testify.  You heard about a merger oversight

5    committee.  You heard about a bankruptcy committee.  So there

6    are many, many pilots beyond the ones who are elected and

7    beyond the ones who are directly part of the MEC who are part

8    of the process.

9         During this period, the MEC and the different

10   committees also engaged in different advisors.  I will talk

11   about that in a little bit, and you also heard that a public

12   relations firm is engaged.  That firm is engaged to get out

13   to the public, and to get out to Congress the position of the

14   TWA pilots, with respect to the deal.  And the position of

15   the pilots, unambiguously, without any question, is we

16   support the deal.  We want the American deal to go ahead.  We

17   want Carl Icahn to disappear.  We don't want TWA to liquidate

18   and loose our jobs, and that is a sensible position.

19        It is really the only position that you could take

20   that makes sense under the circumstances.  What are some of

21   the key events you heard about during the period leading up

22   April 2?  Well, you have got to figure out do you want to

23   accept this collective bargaining agreement, you have got to

24   determine to waive seniority.  This is the decision, I

25   project I had for you what the decision ultimately is.  I am

1    going to walk back a little bit and talk to you about some of

2    the events leading up to it.

3             But if you recall, all the different back and forth

4    that went into this, if you recall the resolution that is

5    adopted on April 2, it is not a resolution as a couple of

6    plaintiffs' witnesses said to waive scope, it is a resolution

7    to accept the new collective bargaining agreement, subject to

8    some tweaks and loose ends, to waive scope and resolve the

9    1113 motion and move ahead.

10            Obviously,  the resolution of that motion means

11   that you avoid a lot of downside that you heard about.  And

12   you certainly avoid the risk of American walking away from

13   the deal.  I will talk about that in a little more detail.

14            What  is the new collective bargaining with TWA

15   LLC?  Well, it secures jobs with the largest, most

16   financially secure airline in the industry.  You got higher

17   hourly rates.  You heard some of those numbers.  The 767

18   captains from American are making $66 per hour more than the

19   TWA captains.  So that is obviously a positive.

20            I think you also heard that the hour limitations

21   are a little bit different in American, but the fact of the

22   matter is very significant benefit.  You heard about the

23   contributions to $12 million plus interest in contributions

24   that are made as part of this deal by TWA LLC to the fund,

25   that is a big benefit.  And you heard as well about the

1    flight pay loss that ALPA picks up.  I want to just dwell on

2    that for a second, because I think it says a lot about the

3    case that the plaintiffs have presented.

4         If you recall under the collective bargaining

5    agreement  with TWA, Inc., the company goes into bankruptcy,

6    there is this bank that set-aside for flight pay loss.  And

7    that is money that is available for people involved in union

8    activities.  Members of the TWA MEC, they go to meetings,

9    they are involved in grievances, if they miss a flight and

10   can't make money as a result of that, well, the bank is out

11   there and TWA pays.

12        Well, what happens when this deal is negotiated is

13   that that disappears, and you may have heard some testimony,

14   you may recall testimony about the joint petition, remember

15   the fee petition that is put into bankruptcy?  I think with

16   Mr. Jacobson, who was talking to Mr. Holtzman, well, Mr.

17   Holtzman, isn't it a fact that one of the things that the TWA

18   pilots gave up when this agreement was struck is they gave up

19   their right to flight pay loss payment?

20        Well, Yeah, they did.  They give it up in terms of

21   TWA, Inc., a company in bankruptcy and about to disappear, so

22   they didn't really give anything up P.  Who stepped in and

23   paid the flight pay loss?  ALPA did.  And you heard the

24   testimony about the millions of dollars that ALPA paid

25   through 2001 and 2002 to the pilots who were doing the union

1    work.

2           You heard about the $180,000, for example, in

3    flight pay loss that was paid to Robert Pastore, who was the

4    master chairman of the MEC.  What happens here, I want to

5    highlight this for you with respect to the collective

6    bargaining agreement, is that ALPA steps in.   ALPA could

7    have said listen, we don't want to be responsible for flight

8    pay loss.  Let's have TWA LLC pay $2 million less for the

9    outstanding pension contributions.  We will set that aside.

10          Did it do that?  No.  It made a direct

11   contribution, a direct benefit to the union members by

12   stepping up and saying we will take care of the flight pay

13   loss.  We will support you going forward in your union

14   activities and your efforts to protect the rights of the TWA

15   pilots.

16          Now, let's focus for a minute on what the TWA

17   pilots gave up when they agreed to this new collective

18   bargaining agreement on April 2, because this becomes a big

19   issue going forward.  We are going to focus on that, you are

20   going to hear a lot about.  They gave up the right to

21   seniority arbitration, and of course I think you heard that

22   there was essentially no choice.  The section 1113 motion was

23   there.  They were advised by the advisors that it would

24   likely be granted.  I will show you in a couple of minutes

25   the statements that the plaintiffs themselves made, where

1   they acknowledged that, yeah, this particular bankruptcy

2   judge was going to run this through.  The motion was going to

3   be granted.  We really didn't have much of a choice.  Of

4   course, you will recall Mr. Warner's testimony, he is the

5   lawyer from ALPA who did this analysis.  Recall his notes, he

6   has agreement, no agreement, pros, cons, he walks through

7   and analyzes the pilots and they come to appreciate and

8   understand it is really a no-win situation.  I think the

9   phrase Mr. Warner used was lose/lose.  You don't have much of

10  a choice?  But to give it up and to take the jobs and be

11  happy that you now have positions with the largest, most

12  financially secure airline in the country.

13          But I just want you to keep in mind as we talk

14  about the later negotiations, seniority negotiations, is that

15  the plaintiffs' mantra, what they keep saying is we gave up

16  scope, we gave up the right to seniority arbitration.  What

17  does that mean?  What does it mean to give up the right to go

18  to arbitration?

19          It doesn't  mean giving up a particular position on

20  the seniority list.  It doesn't mean you would get date of

21  hire.  You heard what date of hire is.  Date of hire means

22  you look at the dates when the two groups were hired at the

23  respective airlines and you put them together.  That would be

24  the most equal way.  It doesn't mean ratioing, where if you

25  have 11,000 pilots here and 2,300 here.  It doesn't mean you

1    take five pilots from American and one pilot from TWA.  It

2    doesn't mean anything.

3           It means I have the right to go to an independent

4    third party, and you have no idea who that person is.  And

5    make your case.  Make your argument for why you think you are

6    entitled to something in particular.  So the right that is

7    given up is something that is very indefinite and very

8    unclear.  That is all the TWA pilots ever claimed that they

9    were entitled to, the right to go to arbitration, with no

10   idea of how an arbitrator might view this, with no idea

11   whether an arbitrator would look at this and look at the

12   arguments made by American pilots and say yeah, you guys were

13   right.

14          So when you think, as you will be asked to, about

15   this issue of causation, remember I said to you before, that

16   the plaintiffs have to prove that there was a breach of the

17   duty, and they have to prove it mattered, they have to prove

18   that the outcome would have been more favorable.  I don't

19   know how they could possibly do it because if you got what

20   you claim you didn't get, if you had gotten the seniority

21   arbitration, who knows what the arbitrator's perspective

22   would have been?  And I will come back to that point in just

23   a little bit.  But keep that in mind.

24          Now, you are probably wondering, well, Mr. Fram, if

25   this is all so clear, if the decision on April 2 was so

1   clear, really there is no choice, the 1113 was going to be

2   granted, this was the right thing, the pilots on the MEC did

3   the responsible thing, they protected jobs, they avoided

4   risk, they didn't assume, as I think you heard one of the

5   plaintiffs' witnesses testify, they didn't think Don Carty

6   was bluffing.  Think about that.

7          Here is a guy who is the CEO of one of the largest

8   companies in the country, and he publicly states at different

9   points that if certain things don't happen, if scope is not

10  waived, that the deal is off, we are not going to go through.

11  And you have individual pilots saying, oh, the guy is

12  bluffing.  I don't believe him.

13         Here is a guy who took on his own union and got a

14  $45 million fine, and you are prepared to call his bluff?

15  You are a smaller pilot group.  He owes no obligation to you

16  whatsoever and you are going to call his bluff.

17         Anyway, what is the plaintiff's version?  What do

18  they say about why ALPA either acted arbitrarily, it acted

19  irrationally or that it acted in bad faith with respect to

20  this decision we have been talking about on April 2 of 2001.

21         Well, here is the story.  We are going back a weeks

22  and weeks now.  You may not recall this that clearly because

23  you have heard other testimony but I want to remind you of

24  what Ted Case and Alan Altman and Sally Young and Howard

25  Hollander told you when they testified about what happened

1    and why they felt that they were mistreated.  The story they

2    told that was a consistent story, and I will show you that in

3    a couple minutes, is that April 2 was the first time that we

4    were told that we had to waive scope.

5         They claim that Roland Wilder was there at the

6    meeting on April 2, and that he was shouted down.  He tried

7    to speak up and articulate his litigation theory, but the

8    other advisors shouted him down, principally Michael Glanzer.

9    They claimed that they had received advice about the Section

10   1113 motion prior April 2, to the effect you don't need to

11   worry about it.

12        Remember Hollander testified, Oh,  I had a

13   conversation with Clay Warner, a 45-minute conversation, at

14   some point in late March, where he told me don't worry about

15   the 1113 motion, it is likely to be denied.  I will come back

16   to Mr. Hollander in a couple of minutes.

17        And what they say as a result of all of this is

18   that we were pressured and coerced.  Voices were raised.  The

19   phrase they use is the train is leaving the station.

20        And what I want to do is I want to show you some of

21   the testimony, obviously it wasn't videotaped, but we have

22   transcripts.  I think you understand that Ms. Johnson has

23   been sitting here through this whole trial typing away and

24   the result of her efforts, is that we get a transcript every

25   day what the testimony was, and I want to show you some

1    excerpts from those transcripts, we are going to put them up

2    on the big screen, and what I would like to do is start with

3    Altman, Young.

4            All right.  So this is Alan Altman talking on April

5    2.  I don't know if people can see that.  The other screen is

6    not going to light up.  We will work with this one.  What he

7    says is, on April 2, instead of what we had been told, don't

8    waive scope, there is no reason to.  We were told you have to

9    waive scope, you have to do it now.  If you don't waive

10   scope, and it was, there were emotions involved.

11           Comments were made that the train had left the

12   station.  Kind of apropos, we are dealing with Railway Labor

13   Act issues.   What he is trying to suggest is not an allusion

14   to the Railway Labor Act.  He is trying to suggest we were

15   railroaded.  The train has left the session.  We heard that a

16   number of times.  There was a sense of urgency.  There had

17   been no urgency, it had been fairly relax the you don't have

18   to do it.  It is not going to succeed.

19           Let's go to the bottom.  He says, well, did all

20   advisors on April 2 ultimately agree that the Section 1113

21   motion was likely to be granted?

22           That is what they told us.  I don't know why they

23   changed their mind.  Roland Wilder did not agree.

24           We will come back to Roland Wilder.  It says, he is

25   referred  there, remember that April 3, there are a couple

communications that went out on April 3, explaining what
happened.  He says, it says, not one of our advisors believed
that we would be successful against 1113.  The Court has
sided with TWA and American on virtually every important
issue.

Does that refresh your memory that all the
advisors, including Mr. Wilder, agreed a the 1113 was likely
to be granted?  No, Roland did not.  Like I said, Roland
walked out of the room.  He was upset and he just  turned
around and I don't consider this agreeing.  As he is walking
out the door, he says, I guess some contract is better than
no contract.  I can tell you, I remember Roland being abused,
actually quite heavily, by the other advisors.  It was not a
pleasant sight.  He describes Roland as a defeated person as
he walks out of the room oh April 2.  This is the meeting on
April 2.  He says, voices were raised.  Actually, we were all
being yelled at.  This was not professional.

Very dramatic.

Let's talk for a minute about what Hollander said.
Mr. Hollander.  Right.

Can you recall what the individual advisors said to
you, and if you can't recall, can you recall what any of them
said?  Then he says, you know, it is an interesting
statement.  I can tell you what was said that day as if it
were yesterday.  He recalls it vividly.  The little bit vague

1    as to who said what.  Clay Warner was an active speaker.

2    Michael Glanzer did speak.  Bob Christie did speak.  Roland

3    Wilder attempted to speak.  April 2, Roland Wilder attempted

4    to speak.  Let me phrase it as this.  I am from New York.  To

5    me, it almost looked like a Broadway play.  That is how I

6    look at it today.  Everybody was singing the same song and

7    dancing to the same step, with one exception, which was

8    Roland Wilder.  Singing the same song.  I will come back to

9    that.  He says, I highlighted this.

10            At least once or twice he tried to offer

11   suggestions he was interrupted in his speaking.  He was not

12   like, I am not saying like allowed, but he was cut off.  Mr.

13   Wilder, we will get to that.  Mr. Wilder, we don't share your

14   opinion on that.

15            Then, in the final sentence, he says the quote of

16   the day that is engrained in my head is the train is leaving

17   the station.

18            We were railroaded.  The train is leaving the

19   station.

20            All right.  Let's turn and look for a minute at Ms.

21   Young, what does she have to say about this.  Sally Young.

22   We are talking about at the meeting on April 2.  You have

23   seen evidence about a litigation strategy that Mr. Wilder had

24   come up with to try to hold the deal hostage basically.  Was

25   that discussed at the meeting on April 2?  She says she never

saw it.  She didn't even know about the litigation strategy.
The first time she saw it was part of the litigation.
Skipping down where it says, "Roland had made his
presentation."

         This is her version of what happened on April 2,
2001.  "Roland had made his presentation and had argued
somewhat differently than the rest of the advisors, and at
that point in time after his presentation he sat down and
Michael Glanzer, the investment banker, who had been advising
about potential mergers got very angry and in fact stood up
and went over to Roland and again was screaming, American is
not going to do the deal if you don't waive scope.  They are
going to walk."  This is Mr. Press questioning.

         "Again, screaming?

         "ANSWER:  Screaming."

         They are trying to paint a picture.  Or trying to.
What does she say about how Mr. Wilder reacted?  Again, we
are on April 2, 2001.  He capitulated, he looked defeated.
His body language was, he ended his presentation by saying,
you know, a contract is better than no contract.  A phrase
that we saw before.

         So this is the story, it is dramatic.  It was
orchestrated, advisors were all singing the same song, they
had all gotten together with the exception of our champion,
Mr. Wilder, to take a common position.  They beat this guy

1    up.  They shouted him down, they physically intimidated him.

2    You get the image of Mr. Glanzer walking up and standing over

3    him.  This is the allegation the plaintiffs have made.

4         All right.  Well, let's talk for a couple minutes

5    about what Mr. Wilder says about the meeting on April 2,

6    2001.  You may recall this.  Let's start with the first

7    Wilder video, please.

8         What we are talking about --

9         MR. PRESS:  Your Honor, I don't know if it is

10   proper to replay testimony.

11        THE COURT:  I am going to allow it.

12        MR. PRESS:  All right.

13        MR. FRAM:  What we are talking about is Mr. Wilder

14   had a bill like all lawyers, who bill by the hour, he kept

15   time records.  You recall his day timer he wrote in the book,

16   where he was on what days.  So we are showing him his bill,

17   the one that he sent to Mr. Pastore and that the MEC paid as,

18   to see what it says about what he was doing on April 1 and

19   April 2.  You just heard or saw or remembered testimony from

20   the plaintiffs about Mr. Wilder being there on April 2 and

21   all this drama.  What does Mr. Wilder say about what is

22   happening on April 2 of 2001.

23        (Videotape deposition of March 21, 2011, at 15:09

24   commences)

25        MR. FRAM:  All right.  Then, there is a second

1   clip.

2          (Clip March 21, 2011, commencing at 14:15

3   commences)

4          MR. FRAM:   100 percent certain he was in Louisville

5   on April 2, 2001, and obviously could not have been at the

6   meeting with the MEC.  Well, how can Young and Hollander and

7   Case, who said the same thing, and Altman come in and say he

8   was there and he got beat up on April 2?  It never happened.

9   They are making it up.  And in terms of trying to dramatize

10  the decision on April 2.

11         I will show you something else.  Let's move, jump

12  to clip three of the video, which Is where in the same

13  deposition, Mr. Press was there, asked Mr. Wilder about some

14  prior testimony given about different events.  Let's skip to

15  three, please.

16         (Videotape of Roland Wilder commences, videotape

17  of March 21, 2011 commencing at 14:21:40 played)

18         MR. FRAM:   Whatever I said before happened on April

19  1, not on April 2.  Let's show the final Wilder clip where he

20  talks about things that he thought happened on April 2.

21         Go ahead.

22         (Videotape of Roland Wilder dated August 8, 2008,

23  commencing at 2:55:25, commences).

24         MR. FRAM:   I was asked that by Captain young.

25  Sally Young.  And he has now clarified this is April 1.

1   Well, what did the plaintiffs say about what happened on

2   April 1?  Do you recall this?

3          They all told the same story.  They said that they

4   didn't understand that the members of the MEC were invited

5   April 1.  You may recall me showing them that email, the

6   March 29 email, where it refers to the scheduling the

7   meeting.  Let's pull that up real quick.  Brian, that is D

8   210.  If you blow the top part, this is the announcement sent

9   to all the pilots who testified.  It is announcing that the

10  master chairman is holding a special meeting on April 2.

11  There will be a work session  beginning on Monday -- I am

12  sorry, work session beginning Sunday, April 1.  There is no

13  indication that they are not invited and yet all of them,

14  Case, and Altman, and Young and  Hollander, they all

15  testified on the stand in the courtroom that they were there

16  on April 1.  They didn't think they were invited.  They were

17  busy with other stuff.  They didn't attend.  They insinuated,

18  they suggested this was a meeting for the organizers to get

19  organized.

20          This goes back to the conspiracy theory.  The

21  advisors are sitting down, trying to coordinate.  Well, wait

22  a minute.   You just heard Mr. Wilder testify everything he

23  thought happened on April 2, including the dialogue with

24  Sally Young, happened on the  first.  So Mr. Wilder is now

25  confident that he recalls here being there on April 1 and

1    that Sally Young came in and testified as did the other pilot

2    plaintiffs, they weren't even there.

3            Mr. Rautenberg and Mr. Singer were here and

4    testified.  They were other pilots on the MEC.  They said

5    everybody was there.  We were there.  Everybody was there.

6    Mr. Holtzman was there and testified about it.  Mr. Warner

7    was there and testified about it.  Mr. Seltzer was there, and

8    testified about it.

9            By the way, Mr. Rautenberg and Mr. Singer, you

10   think they are popular among the former TWA pilots for coming

11   in here and testifying and contradicting what Altman and

12   Young and Hollander and Case said.  Did you notice how they

13   got glared at by some of the pilots when they left the stand?

14   I don't know if you noticed that or not.  They are not

15   popular for not agreeing with the plaintiffs' position in

16   this case.

17           I want you to think when you judge credibility,

18   that is a big issues in the case, I want you to think about

19   what incentive does Steve Rautenberg have to come from St.

20   Louis  and get on the stand and talk about these issues.  Is

21   he going because he is going to benefit in some fashion?  No,

22   he is doing it because it is the truth.  Same with David

23   Singer.

24           So the story that the plaintiffs are trying to tell

25   you about being bullied, and coerced on April 2, never

```
 1   happened.  If you look at the minutes of April 2, and I

 2   encourage you did do that, D 74 in evidence, you will see

 3   that they begin the meeting with the discussions by Randy

 4   Babbitt.  They go through all routine business and then the

 5   issues gets called late in the afternoon.  There is no

 6   indication of presentations.  There is no suggestion of

 7   bullying.

 8           Look at the documents that were prepared and sent

 9   out on April 3rd.  You recall Captain Pastore sends out an

10   announcement to all TWA pilots on April 3rd.  Let's pull a

11   couple up quickly.  There are a handful of document by the

12   way that I really encourage you to sit and review carefully.

13   You are going to get a mountain of documents.  You may not be

14   able  to see it.  It is a lot of material.  If  every one of

15   you took the time to go through every document, you would be

16   here for weeks trying to figure this out.  You can certainly

17   do that.  That is up to you.  But there are a handful of

18   documents I want to encourage you to review.  One is D 15.

19   This is the report of Captain Pastore.  Pull that up real

20   quick.

21           This is where if we go to the next page he talks

22   about what happened at the meeting.  Summarizes what the

23   issue was on April 3rd.  The alternative facing our MEC was

24   to fight the 1113 motion in court.  Not one of our advisors

25   believed that we would be successful against the 1113.  The
```

 1   Court, referring to the bankruptcy Judge you heard about,

 2   Judge Peter Walsh in Wilmington, thus far has sided with TWA

 3   and American on virtually every important issue.  If we did

 4   not agree to the new CBA with TWA Airlines LLC and the Court

 5   granted TWA's 1113 motion, as expected, we would lose all of

 6   our contractual rights, including our scope.  Pretty succinct

 7   summary of what happened.

 8          When you read this document, see if there is any

 9   indication in there of last-minute coercion, of people not

10   being prepared, he says by the way, contrary to what Young

11   and Altman and Case and Hollander said that Wilder agreed.  I

12   showed you some testimony a couple minutes ago from Altman

13   where he said, Wilder didn't agree.  He didn't say he, the

14   1113 would be granted.  That is one example, and I ask you to

15   review that.

16          D 16, pull that up.  That is the letter that goes

17   out from the two Council 3 representatives, Mr. Rautenberg

18   and Ms. Young.

19          At this point in time, the day after the decision

20   on April 3, they are on the same page literally.  They both

21   signed the letter.  When they got up on the stand they were

22   miles apart in terms their recollection.  But look what they

23   said collectively in a letter sent the day after the meeting.

24   "The MEC has consulted extensively with a large group of

25   professional advisors on the CBA negotiations, the merger

1    negotiations, and the bankruptcy process."

2            And then it identifies all advisors that you heard

3    mentioned, a few of whom testified in court.  The unanimous

4    opinion of our advisors, including Richard Seltzer, the

5    motion experienced Section 1113 attorney available, the

6    likelihood of ALPA's prevailing in an attempt to defeat TWA's

7    CBA rejection application was virtually nil.  Next page.

8            Attorneys advised the Bankruptcy Code does not

9    provide the Court the authority to modify the contract.  In

10   effect, the contract would have to be rejected or retained in

11   its entirety.  This aspect of the situation created a high

12   probability that the representational status of ALPA would

13   also be affected.

14           Any suggestion of coercion or railroading in that

15   letter?  No.  There is none.

16           The third document I am going to mention it, you

17   recall it, I won't bother projecting it, the April 10 letter,

18   D 35, that goes out from Council 2, that is the letter signed

19   by case and by Hollander and Singer.  There is no suggestion

20   of coercion or last minute rush or anything to that effect.

21   What the letters do is they explain the very thorough,

22   deliberate process that the elected members of the MEC went

23   through in making the difficult but clear decision that they

24   should accept the new collective bargaining agreement as part

25   of that process, or scope.

1          Let me just, let me dwell for a minute on one other

2     aspect of this.  The plaintiffs also have a version of what

3     happened at the meeting on March 21 and 22.  Okay.  You may

4     recall that very important meeting.  What has happened

5     leading up to March 21 and 22 is on March 15, the bankruptcy

6     Judge approves the American transaction, March 12, a Monday,

7     couple days later,  March 15, American again on behalf,

8     really TWA, on behalf of American, goes ahead and files a

9     Section 1113 motion.  That brings this whole issue ahead.

10          The motion, as you heard many times, is scheduled

11     for a hearing in the bankruptcy court on April 6.  A day or

12     so after they file the motion they put this proposed

13     collective bargaining agreement out there.  Remember it has a

14     time line that says this is going to be withdrawn.  On the

15     date of the 1113 hearing so it is this carrot and stick

16     approach.  The carrot is here is a new collective bargaining

17     agreement but you have to accept it before April 6.  The

18     stick is the 1113 motion.  If you don't accept that, then you

19     have no contractual rights.

20          So these are pretty important events, pretty

21     significant events.  And what does the MEC, the leadership of

22     the MEC, okay, remember the leadership of the MEC, Robert

23     Pastore, here is a guy who was a former board member of TWA,

24     Inc., went to the board meetings, understood the financial

25     condition, was there when the board voted to approve the deal

1    with American, the deal that provides for waiving scope.  He

2    knew from having been through the wars, as did many TWA

3    pilots like Steve Rautenberg and Dave Singer, they have been

4    through the prior bankruptcies.  They knew what could happen.

5         He was willing very sensibly to move ahead with the

6    whole process.

7         So what happens is they schedule a meeting on March

8    21 and 22.  What is the purpose of the meeting?  The purpose

9    of the meeting is to have advisors come in.  Than indeed

10   advisors come in, and they analyzed the 1113 motions,

11   remember those memos we talked about?  We got the agenda for

12   March, 14.  We got the memos Mr. Holtzman sends out to Mr.

13   Warner and to Richard Seltzer, what about the 1113 motion?

14   What about the contract rights?  What about the right to

15   strike?  You remember those.  You  heard those just within

16   the last week or so.  Advisors go out and research the issues

17   and figure out as best they can what is going to happen and

18   everybody gets together on March 21 and 22 to try to figure

19   out what do we do in response to the carrot that is being

20   dangled in front of us and the stick that American is ready

21   to bring down on their heads.  What is the plaintiffs'

22   version?  What is the version of Altman and Young and

23   Hollander and Ted Case, we admit we were there and we admit,

24   you may recall me doing this, we admit that there were two

25   executive sessions.  One on the 21st, for over three hours

1   with advisors, and a second one on the 22nd.  Also longer

2   than three hours with the advisors.  We don't recall which

3   advisors were there, and we don't recall what was discussed.

4   No recollection whatsoever.

5        Here is the key meeting to figure out what to do

6   and they don't recall anything.  Okay.  So that is the story

7   that the plaintiffs' witnesses have told you, that we don't

8   recall anything of consequence on the 21st and the 22nd.  We

9   weren't there on April 1.  We don't think we were invited.

10  We showed up on the 2nd and we were railroaded.  None of that

11  is true.

12       None of it is true.  And I ask you to go back and

13  think about the comment that Mr. Hollander made about this

14  was like a Broadway play.  Everybody was singing to the same

15  tune.  Is that what happened here in terms of the plaintiffs'

16  story.  He is accusing the ALPA advisors of organizing and

17  conspiring to try to railroad the plaintiffs.  But what he

18  accused them of is exactly what the plaintiffs have done in

19  this case.  Hollander and Young and Case and Altman did on

20  that stand, under oath, in front of you.

21       Now, I want to mention a couple other aspects of

22  their testimony that I would like you to think about it.

23  Remember Mr. Altman came in and said that he attended a

24  meeting of Council 4 on March 30, and if we pull that meeting

25  materials up, that is D 365.

1          What is happening here, as we discussed, is the six

2     people who get to vote on the second.  They are the elected

3     representatives of all the pilots, the whole 2,300 pilots.

4     They know that they are responsible for the pilots and have

5     to keep the pilots up-to-date in terms of what is happening.

6     So what happens in anticipation of a decision on the 1113

7     motion is that on March 21 a meeting is scheduled out of

8     Council 4 of the local council people, and it is pretty

9     obviously for the purposes of getting some updates and

10    negotiating committee update, and a TWA American Airlines

11    merger update.  That is the notice of the meeting to take

12    place on March 30.

13         What happens at that meeting?  Let's look at the

14    minutes, the official minutes.  First page of the minutes.

15    Mr. Altman.  What does he do?  He acts as vice chairman of

16    Council 4 as well as vice chairman of the negotiating

17    committee.  He is in the know.  He knows what is going on.

18    Gave extensive background and update on the current status of

19    negotiations with the company regarding the CBA.  He also

20    spoke on the significance of the upcoming Section 1113

21    motion to be heard a week from today in the bankruptcy court.

22         He took many questions from, and provided answers

23    to the members present.  Now, you think a meeting on March 30

24    is an about a week after the meeting on March 21 and March

25    22.  Do you think he showed up at Council 4 and told the

1   people who elected him, who entrusted him with the ability to

2   make decisions, do you think he said yeah, I was at the

3   meeting on the 21 and 22 but I don't recall which advisors

4   were there and I don't recall what advice they gave?  Are you

5   kidding?

6           Okay.   He knew exactly what was going on, and he

7   had a little bit of amnesia problem, as did Young, and Case

8   and Hollander.  What is the result of the meetings on March

9   30?

10          Mr. Altman tried to tell us that the direction

11  given by the pilots on March 30 was don't waive scope.  Okay.

12  Let's look at the resolutions that got passed and I ask you

13  is there anything in there that in any way shape or form

14  suggests that the direction is don't waive scope.

15          Go to the second page.

16          Let's look at the top.  The direction given is, the

17  LEC was directed to secure the TWA/ ALPA CBA throughout the

18  life of TWA Airlines, LLC.  Seconded.  Discussion held.  Here

19  is the direction.  Get the LLC contract.  Okay.

20          Well, getting the LLC contract means what in terms

21  of waiving scope?  It means you are waiving scope.  Okay.

22  And again, I encourage you to read through the minutes and

23  satisfy yourself that there is nothing in there that is

24  consistent with what Mr. Altman got up on the stand under

25  oath and told you his direction was.  He was told don't fool

 1    around.  Make sure you get a contract.  We want jobs.

 2            And if you think back to the vote that takes place

 3    on April 2, remember that roll call vote that you saw

 4    probably more times than you would like to, some of the

 5    people are splitting their votes.  What do Altman and Pablo

 6    Lewin out of Council 4 do.  Every single vote they have, 90

 7    for Altman, 90 for Lewin, in favor of the new contract.  And

 8    of course that means waiving scope.  So they did exactly what

 9    they were directed to do Council 4.

10            Council meetings, let's go back to Mr. Hollander.

11    Mr. Hollander testified that he attended a meeting of Council

12    2 at some point in March.  He was uncertain of when he claims

13    that happened and that the overwhelming direction given out

14    at Council 2 at this meeting was don't waive scope.  Well,

15    did you talk to him about the 1113 motion?  I don't recall.

16    Did you talk to them about the collective bargaining

17    agreement that had been offered by TWA LLC?  I don't recall.

18    But I know the direction was don't waive scope.

19            Do you think that meeting really happened?  Do we

20    ever see any minutes of that meeting?

21            Mr. Singer is out of Council 2 and if you recall

22    one of the questions that I asked him when he got up on the

23    stand was do you recall a meeting in March of 2001 out of

24    Council 2 where any of these discussions were discussed.  He

25    said no, absolutely not.  And look, I think we have the blow

1   up of it somewhere.  But if you remember back to the roll

2   call vote, the roll call vote on April 2 is Mr. Hollander

3   splits his vote, some in favor, some against, and of course

4   the overwhelming direction out of Council 2 was don't waive

5   scope.  He would have voted all and all against.

6           What is Mr. Singer?  Mr. Singer votes the large

7   majority of his votes in favor of the collective bargaining

8   agreement, CBA.  That is inconsistent with the idea that

9   there was direction out of Council 2.  If you go and if you

10  have time, you can look, remember Mr. Case and Hollander get

11  Mr. Singer recalled.  There was this big debate in Council 2

12  at a meeting of June 26 of 2001, and we have those minutes.

13  There is no suggestion in those minutes that Mr. Singer

14  disregarded any direction from a prior meeting.  You would

15  expect if a meeting really happened in March of 2001, as

16  claimed by Mr. Hollander, you would expect there to be some

17  indication during the recall debate that Mr. Singer, Captain

18  Singer, we told you to do something on April 2 and you

19  disregarded us, and there is nothing in there to suggest

20  that.

21          So here is another situation where Mr. Hollander is

22  just making stuff up to try to dramatize what he claims

23  happened on April 2.

24          I asked you to make reference to the reports of

25  April 3 and 10 of 2001 to satisfy yourself that there is no

suggestion of last minute advisor coercion.  You will see

that those reports, I think, outline, and you will decide for

yourself, they outline in a very comprehensive and reasoned

way  what the decision was.

You can also look at the minutes of April 2, D 74,

to see if there is a suggestion that people were pressured.

Of course they are not.  These are official MEC minutes

prepared by who?  By the MEC.  It is not the advisors.  No

one is scrubbing these things and telling them what to say.

But I want you to think for a minute about the bigger issue

of whether the pilots who are making decisions on behalf of

the rest of the pilots, these elected members, whether they

are really the kinds of individuals who are likely to be

bullied by anybody.

Start with Sally Young.  She told us she had been a

pilot, had been a school teacher and got burned out and went

and got a career counselor who told her she should either be

a racecar driver or a pilot.  We know she became a pilot.

Sally Young, who is a person at a meeting in March of 2001

with dozens of TWA pilots and Jeff Brundage, remember Jeff

Brundage, ,he is the vice president for employment relations

at American, one of the top managers of the company, she

calls him out at a meeting and says you are being

disingenuous.  Remember I questioned her?  You called out a

high ranking American official in front of TWA pilots?  You

1    embarrassed him by calling him insincere.  She did it.  Is

2    she the kind of person that is going to get bullied by, how

3    about a guy like David Holtzman?  There is a really

4    intimidating guy.  Can you imagine Holtzman intimidating

5    Sally Young?  Sally Young is the one at the November 7

6    meeting, if you recall that is the meeting that was secretly

7    recorded by some people, they wanted a record of what

8    happened.  That is the meeting and we have the transcript, it

9    is marked as D 399, what is the meeting where the meeting

10   begins with Sally Young interrogating Clay Warner.  She is

11   like cross examining Clay Warner about what happened earlier

12   the in are in the year.  Clay Warner, you saw him.  He is a

13   smart guy.  He is not a guy who doesn't know what he is

14   talking about.  Was she intimidated by Clay Warner?

15   Absolutely not.  Read the transcript.  That is the same

16   meeting when Sally Young doesn't get her way, remember, Steve

17   Rautenberg wants to push ahead and accept the deal on the

18   table and we have this parliamentary  maneuvering which Sally

19   Young doesn't want to second the motion and the advice from

20   ALPA, based upon their Constitution and bylaws, is that she

21   can't prevent the MEC from operating by refusing to second

22   the motion.  In effect she would be vetoing any activity.

23   You will see in the transcript, I think I may have asked her

24   about it.  You can read the transcript.  She doesn't like the

25   result, so she says at one point for the record, this is

1    bullshit.  It is absolute bullshit.

2         Here is a woman who stands up for herself.  You

3    think she is the kind of person who could have been bullied

4    or coerced on April 2?

5         If what the plaintiffs say happened had really

6    happened on April 2, Sally Young would have stood up for

7    herself.  How about Howard Hollander?  Howard Hollander is a

8    guy who told you when he began to testify that one of the

9    early things that happened to him as a junior pilot, remember

10   his story about this trans Atlantic flight where one of the

11   engines goes out and they are concerned about whether you are

12   going to have fuel, okay? He goes to the captain and says we

13   can't do this by the book.  Okay.  When we ought to do is run

14   out the fuel in this one engine and then I can determine what

15   the problem is.

16        Here is a guy who is fast on his feet, who doesn't

17   necessarily follow the rules, if he thinks that it is

18   inappropriate to do so.  Do you think he is the kind of guy

19   who would bully any of the people we are talking about?

20   Absolutely not.

21        How about Rautenberg and Singer?  They came in and

22   talked.  Did they testify that they, or anybody else was

23   bullied at the meeting on April 2 or before that?  Remember

24   all the questions?  Was anybody told that they had to vote

25   that day?  Was anybody yelled at?  Was anybody, did anybody

 1  ask questions that they couldn't -- that weren't answered by

 2  advisors?  Remember the litany  of questions I asked them and

 3  I asked the same questions of advisors.  No, absolutely not.

 4  Rautenberg told you that the decision to be made on April 2,

 5  it was made, and the decision that was well thought out, that

 6  was thorough answer that was the right decision.

 7          Remember, just to amplify on that point, how

 8  independent these pilots are, and how responsible they are in

 9  terms of the decision.  Rautenberg is the one who testified

10  that he went on the internet and got a copy of Section 1113.

11  He wanted to look at the statute itself.  When the 1113

12  motion was filed, he got a copy of the motion from David

13  Holtzman, and he read it.  He sat and read it.  You can do

14  the same, it is in evidence, and made up his own decision and

15  he made his decision based in part on his observations of

16  this bankruptcy Judge, Peter Walsh, who was very much adamant

17  that the only way to go in the TWA bankruptcy was with the

18  American deal, and in the context of all of the creditors,

19  the unsecured increased torts, the 20,000 employees,

20  everybody understood, as reflected in the April 3, and April

21  10 documents I referred you to, everybody had understood that

22  Judge Walsh was not going to let a group of 2,300 pilot stand

23  in the way of a deal that made sense for everybody else.

24          So Steve Rautenberg was not going to be bullied and

25  wasn't bullied, and Made up his mind.  Here is a guy, just to

remind you, who was a Navy pilot and who took a job in a

commercial, as a commercial pilot of TWA.  He got furloughed

for five and a half years.  And during his time off he

actually went and got an MBA, and was probably pretty well

qualified to look at information about TWA's financial

circumstances.

He thought this through independently, he did his

job, and he understood from having been furloughed and having

lived through the prior bankruptcies that it didn't make

sense, and it wasn't responsible to roll the dice with the

jobs of 2,300 pilot by rejecting the collective bargaining

agreement and taking the chance that American would walk

away, it didn't make sense to try to stop the whole

transaction, I mean you want jobs at American, why would you

stop the transaction from going down.  How does that make

sense?

More on that in a couple minutes.

Same with David Singer.  David Singer, like

Rautenberg, is an older fellow.  Even though he wasn't that

senior as a pilot.  If you will recall he made the mistake of

going to law school and practicing as a lawyer for a couple

of years, and then got into what he really enjoyed doing.

But Singer sat there and thought this through and made the

responsible decision that you can't fight this.  This is the

way to go.

```
 1            Just to give you a sense of how, I think thorough,

 2    a guy like Singer was in making his decision.  Let's pull up

 3    if we could D 384.  If you recall during the period of,

 4    leading up to the meeting on, the meetings on April 1 and 2,

 5    Singer found an article that had to do with the issue of

 6    seniority integration in a book.  I think he said he was a

 7    Cornell grad.  He was up at Cornell and somehow came across

 8    this book that had been written and published by Cornell

 9    Press.  It talked about seniority integration.

10            The particular chapter that caught his interest was

11    a chapter that had been written by two people, one of them

12    was Wes Kennedy.  You may recall mention, Wes Kennedy was the

13    lawyer representing the APA, the Allied Pilots in the merger

14    integration.  So if you turn to -- I am sorry, go back to the

15    first page.  Here is a guy who goes out independently, he

16    goes out, finds the article that might be of interest..  This

17    is Suzi Manoni, one of the support people who works at TWA

18    MEC and is responsible to set up meetings and the like.

19    Suzi, please copy this article by APA's merger attorney,

20    Wesley Kennedy and distribute to the MEC, the officers and

21    the MOC, ASAP.

22            I believe the MOC is a reference to the merger

23    oversight committee.  This is March 30.  Let's look at a

24    couple aspect of the article that are important.  Go to the

25    next page.  Blow up the yellow stuff.
```

 1          What the article does, you can take the time to

 2  read itself, it talks about the history and the evolution of

 3  merger integration in the airline industry.  And the

 4  conclusion of the article is that the process that now

 5  prevails in the industry, and that has replaced the orderly

 6  procedures of section 3 and 13 is the law of the jungle under

 7  which the stronger pre-merger employee group, particularly

 8  when it is supported by management at the merged carrier, is

 9  able to impose its will on the smaller pre-merger group.

10          That is exactly the situation the TWA pilots were

11  faced by.  American pilots were much bigger, 11,000, and they

12  are supported by American Airlines, to say nothing of the

13  fact that they are supported by a collective bargaining

14  agreement which gives them the right to staple.  So the two

15  points I think you can draw is,  one, Singer is out there

16  reading on his own.  No one is telling him what to do.   He

17  is an independent thinker.  He is being responsible and

18  thorough so he can make the best decision for the TWA pilots,

19  and, two, he goes into this decision, as do all of the

20  members of the MEC with their eyes wide open about what is in

21  store when they have to sit down and deal with the American

22  pilots.  What is in store is the law of the jungle.  There is

23  not a whole lot that you can do about that.

24          Let's talk about some of the other people who were

25  involved in this process and who were at these meetings and

```
 1    were getting the documents who you didn't hear from on the

 2    plaintiffs' side.

 3              I will do this quickly.   We mentioned Robert

 4    Pastore before.   He is the master chairman, the guy who was

 5    on the board of TWA.   He is in the thick of this.   Okay.   Did

 6    you hear him come in and testify that there was coercion or

 7    bullying or bad things happen to the people involved in the

 8    MEC leading up April 2?   Of course not.

 9              Scott Shwartz, he was the master vice chairman.

10    You see his names all over the documents, he is at every

11    meeting, he is on the list.

12              I am not going to walk through every document, but

13    if you will recall the reports Richard Seltzer sent about the

14    bankruptcy, the long list of cc's, if you recall the memos

15    that David Holtzman put together to Clay Warner and to

16    Richard Seltzer.   We need research on this issue.   What

17    happens?   Is there a right to strike?   There is a long list

18    of cc's.   Pastore and Shwartz are on the list.   Robert Stow

19    is secretary treasurer.   He is at every meeting, part of the

20    discussions.   Keith O'Leary, the communications committee

21    chair.   Where was he?

22              I will show you what his view of some of these

23    issues was.   If you pull up D 18, please.   D 18, Ms. Young

24    talked about this, a confidential strategic planning

25    development that the testimony is this was put together by
```

1    Mr. O'Leary.

2            Just to focus on this idea that the MEC was

3    railroaded on April 2 to waive scope but they had no idea

4    because of prior advise it was going to happen, if you turn

5    to the second page, please.  We highlighted before.  What

6    does he say?  He says a loss of scope seems to be a foregone

7    conclusion.  Our MEC needs to again leverage and engage in

8    tactics to accomplish our objectives without scope.

9            If we flip along to the next page.  The TWA pilots

10   are going to lose their scope  one way or another.

11           None of this popped out of the sky on April 2.  You

12   heard this in the testimony of Mr. Seltzer and Mr. Warner and

13   Mr. Holtzman that it was being analyzed and discussed.

14           Just let me focus on one other aspect of this.

15   There are a couple others that are important.  Where we get

16   into the next phases.  I am still talking about April 2.

17   Flip to page 4 of 8 .  Strategic action.  The proposal here,

18   make it difficult public relations wise for the APA or AMR to

19   treat us extremely unreasonably or fail to keep their

20   promises.  Action objectives.  He positioned the TWA pilots

21   as reasonable and the good guys.  Continually speak publicly

22   in a constructive but frank manner.  Maintain good media

23   relations, et cetera.  Anything in there about we need to

24   engage in dirty tricks?  We need to filed meritless lawsuits?

25   Any of that stuff in there?  No.

1        Again, I go back to the point as we will in a

2   moment, when we get to litigation.  Whenever you have a big

3   group of people, people will disagree.  They will disagree

4   based upon their experience and their seniority.  I think you

5   understand from the testimony that a guy like Steve

6   Rautenberg, who had been through the wars, who understood the

7   problems, he didn't want to take chances.  He wanted to get a

8   deal.

9        One of the things he said, if you recall, is when

10  they were selecting people for the merger committee, he

11  wanted people on the committee to have reasonable

12  expectations.  What do you mean by reasonable expectations?

13  He thought not people who thought date of hire was even a

14  possibility in seniority integration.

15       What does Sean Clarke say?  Remember Sean Clarke?

16  He is the guy who is 30 years old, he had the landscaping

17  business on the side for a period of time.  He was on the

18  merger committee.  30 years old, had been flying at TWA since

19  1996.  He gets up and the first thing he says, we talked

20  about his expectations, is I expected date of hire.  How in

21  the world do you expect date of hire integration in this

22  transaction?

23       Didn't you read the announcement of the deal in

24  January which said that waiver of scope was a condition of

25  the deal?  Didn't you understand that the American pilots had

1    a contract that required them to staple?

2            And just to amplify that point because I think it

3    is important.  Let's go to D 7, please.  I want to show you

4    how publicly known and how widely known it was, that scope

5    had to go, and that there were issues.

6            This is a Council 3 information update.  I think

7    you heard described as the way the MEC and the council, the

8    LEC, communicated was they had these code-a-phones.  People

9    could call in and get the message and there.

10           Written versions are of them.  Here is one January

11   18, 2001, about a week after the transaction.  If you flip to

12   the second page, it is going through and summarizing what the

13   American deal is.  In black and white what, the scope clause

14   in our current contract will not apply to this action.

15           Flip to the next one, issues of pilot seniority

16   will be negotiated between ALPA and the pilot union.  It

17   talks at the bottom about this, so it is no secret that

18   seniority integration is not going to be date of hire, and to

19   the extent you have more junior pilots or less experienced

20   pilots taking positions, they are separated really from

21   reality and they are certainly not positions that are adopted

22   by seasoned, intelligent people on the MEC, people like Steve

23   Rautenberg, and at the time, Sally Young who voted in favor,

24   Alan Altman who voted in favor.  And certainly they are not

25   positions that anybody is suggesting who was adopted by these

1    other senior people.

2          But I have shown you Keith O'Leary's document on

3    April 1 where he talks about the fact that scope is history,

4    it is a foregone conclusion.  Then the last person who you

5    didn't hear from on the plaintiffs' side is Ron Kiel.  He is

6    the chairman of the negotiating committee.  He is the guy who

7    spends all the time, you have some of the minutes, you will

8    see some of the, the almost verbatim minutes, he helps

9    negotiate the 80-page document dated March 31, the document

10   sent to the MEC a day or so before, and that is the document

11   that gets further negotiated, there is a meeting of the

12   negotiating committee by phone on April 3rd.  When the

13   document gets finalized and signed, it is signed by Captain

14   Woerth, by Robert Pastore, the master chairman and by Ronald

15   Kiel.

16         Again, if you go back to the idea these guys were

17   experienced, they take their responsibility seriously.  Do

18   you think even if there was bullying or coercion on April 2

19   that they would have felt bullied or coerced the rest of the

20   week before they signed the document?  Absolutely not.

21         So think about that.  I think one of the arguments

22   you may hear from the plaintiffs' side is well, this should

23   have been put out for ratification.  Again, the testimony you

24   heard it is that up to the MEC to decide if they want to put

25   something out for ratification and the decision was made in

 1   this circumstance that there probably wasn't time.  Could you

 2   accepted around a document, an 80-page document, to 2,300

 3   pilots on April 2 and give them a chance to read it and vote

 4   on it before April 6?  Maybe you could.  Is it possible?

 5   Perhaps.  But are you going to get intelligent feedback?  Do

 6   you really have time to have the meetings and to discuss what

 7   happened?

 8           And  when you think about this issue, this

 9   argument, that you may hear, I don't know, that it should

10   have been put out for ratification, remember, the pilots

11   rule.  The MEC makes decisions.  Do we see a resolution, do

12   we even see a motion, much less a resolution, that this

13   contract should be put out for a vote?  No.  That is a

14   decision that the members of the MEC, don't they need advice

15   from Richard Seltzer or Clay Warner or David Holtzman or

16   Michael Glanzer about whether to put something out for

17   ratification.  That is something that is purely within the

18   expertise of the members of the MEC.  They didn't do it.

19   That is not something anybody can blame ALPA for.

20           Let's talk for a minute about Wilder's injunction

21   theory, because you did hear some of the plaintiffs'

22   witnesses say, well, you know, Wilder had this idea, we

23   should go to court and if we weren't going to go to court we

24   should at least hold off until courthouse steps.  Wait until

25   the last minute.

1          Let me talk for a moment about the last idea, that

2     there was more time that we could have waited a little bit

3     more.  Look, the vote is on April 2.  The deadline, the

4     hearing date for the 1113 motion, is, it is April 6.  You got

5     four days.  And between April 2 and April 6, the agenda, if

6     you recall, is you got to go back and negotiate some further

7     points and resolve some further points and wrap up some other

8     loose ends.

9          So what do you mean, go to the courthouse steps.

10    You mean show up at the Court house on April 6 and if

11    American hasn't backed off try at the courthouse to negotiate

12    the last couple of points.  There is no time to do that if

13    you are to go proceed in an orderly fashion to do that.

14         How about the injunction theory?  Couple problems.

15    One, Wilder put it out there and he had a fair opportunity,

16    as you heard from advisors, to talk about the lawsuit and try

17    to persuade the MEC it made sense.  The MEC never voted to go

18    in that direction.

19         I talked to you at the very beginning about

20    litigation, and Judge Irenas will instruct you about

21    litigation, members of the union don't have the right to

22    force a national union to file a lawsuit.  We have a process

23    here.  The members of the MEC discuss and debate and vote and

24    if they thought on April 2 that a lawsuit was the way to go,

25    some somebody would have made a motion, it would have been

1    debated and it would have been resolved.  Never happened.

2    Why?  Because it, it didn't happen because the lawsuit had no

3    legal merit.

4              I want to dwell on that for a moment.  So there are

5    no questions about that in your mind.

6              What had happened if you recall from Richard

7    Seltzer's testimony is that Wilder had written a memo dated

8    March 13, and that memo was out there along with the two

9    memos that David Holtzman wrote, also March 13.  The memos

10   were out there when this meeting takes place on March 14.

11   Just so you have it fresh in your mind, the meeting on March

12   14 is reflected in the agenda, if we can pull that up, D 381.

13   This is where the discussion points are, number one.

14   Recommended strategy, discussion, of Wilder memo.  This memo

15   suggesting a lawsuit is out there, 60 minutes.  Wilder gets a

16   forum to discuss.  Then if you go down to Roman numeral VI,

17   you recall.  Holtzman, March 12 bankruptcy memo, there will

18   be discussion about it again.

19             This gives you a sense of how thorough and well

20   prepared advisors and the MEC, the Section 1113 motion hasn't

21   been filed yet.  If you recall, it was debated and discussed

22   to some degree on March first.  Here we are on March 14,

23   people are strategizing and preparing.  Under Roman numeral

24   VII you also have a discussion about the separate memo

25   Holtzman sent to Clay Warner.

1          So what does Richard Seltzer say at the meeting on

2     the 14th about Wilder's idea?  And I am just going to quote

3     to you from his testimony.  You will recall it I am sure.  We

4     can project it.  He says the idea that some district judge is

5     going to issue injunctions without sort of taking into

6     consideration what is happening in the bankruptcy, just

7     struck me as completely misleading and incorrect, and really

8     without any basis in the law.

9          Question:  How did you express your view at this

10    meeting with respect to Mr. Wilder's injunction theory.

11    Answer.  Well, to the extent of, again, we were or sort of,

12    we would move forward at this point.  The Judge had approved

13    the American transaction.  The 1113 hadn't been filed.

14          What Wilder did of course is that after this

15    meeting where Seltzer is discouraging and said this is not

16    the way to go he, he goes ahead without any vote or without

17    any resolution of the MEC, he writes a letter to Duane Woerth

18    on March 27.  That letter is J 41.

19          Remember this.  He writes and says, we would like

20    authorization to file suit.  And you recall the testimony,

21    that Woerth didn't respond, making an argument from the

22    plaintiffs' side, Duane Woerth ignored this.  Duane Woerth

23    didn't ignore anything.  What he acts on is resolutions from

24    the MEC, and it never came.

25          So what does Mr. Seltzer say happened at the

meeting on April 1.  When Mr. Wilder was present, and I am
just going to paraphrase what he said.  What he said is that
he was surprised that this issue came up again.  He was
surprised Wilder was pushing it, and he said the same thing.
He said that it was a terrible idea.  And it was not
something that should be pushed.  He talked, as you recall,
about his prior experience, he litigated this issue,
remember, he talked about a Second Circuit case, In Re
Ionosphere.

       He said Wilder was just wrong and this was really
in his view irresponsible.

       The other thing he pointed out was that Mr. Glanzer
at this meeting was concerned about what American might do,
if this lawsuit was filed.  And he said Glanzer reported to
the MEC on April 1 and he may have said the same thing on
March 21 or 22, that Glanzer had had a meeting with the chief
financial officer of American Airlines, and the chief
financial officer told Glanzer that the chief financial
officer opposed the transaction.  He opposed the TWA deal and
that there was a faction within American that didn't think
the transaction was a good idea.

       So American is divided internally about whether to
go ahead with the deal, and all the CFO and the people who
opposed the transaction were waiting for is somebody to go
out and upset the apple cart.  Why would you, why would you

 1   encourage that?  Why would you risk a deal and all the jobs

 2   by doing that?

 3           Mr. Seltzer recalled again at the meeting on April

 4   1, Mr. Glanzer was pretty adamant that Wilder's litigation

 5   idea was not a good idea.

 6           Mr. Rautenberg said the same thing on the stand in

 7   the case.  I asked him what was your reaction to Wilder's

 8   idea of maybe filing a lawsuit to prevent the American

 9   transaction from going forward?  I was opposed to his idea of

10   blocking the transaction.  Why would you do it?

11           If  there is any doubt about what the other

12   advisors felt  Mr.  Wilder's litigation idea, I will refer

13   you to J 130, this is in evidence, this is a memo that Mr.

14   Warner wrote over the summer when Wilder came up with the

15   second litigation theory.  What he does in the memo, let's go

16   to page 4.  Footnote 2.

17           We will come to the other part of the memo, but he

18   is referring back to Wilder's initial litigation theory.

19   Wilder initially advocated litigation against American to

20   enjoin the transaction unless American agreed to follow the

21   procedures for seniority integration set forth in section one

22   of the original ALPA- TWA collective bargaining agreement.

23   All other parties providing advice to the TWA MEC, including

24   attorneys from the legal and representation departments,

25   bankruptcy counsel from LeBoeuf Lamb Green and MacRae,

1    remember that is Steve Tumblin and Cohen, Weiss and Simon,

2    that is Richard Seltzer, viewed Wilder's advice as misguided.

3    Among other reasons, one, strategy had no legal support, two,

4    halting the transaction would have had horrible consequences

5    for TWA pilots, since TWA would have ceased operations

6    immediately.  Three.  American could easily have used Section

7    1113 of the Bankruptcy Code to eliminate the entire TWA- ALPA

8    collective bargaining agreement including the provisions that

9    Wilder wanted to use as the basis for injunction, so no

10   merit, no strategic benefit, and no support for Roland

11   Wilder's litigation theory.

12           His first litigation theory.  We will come to his

13   other theories.

14           Let's pause and just think about what the

15   plaintiffs have not proven in the case with respect April 2.

16   When we go back to arbitrary action, something in bad faith.

17   Have you heard anything in what we discussed here to suggest

18   that ALPA's actions were irrational or didn't make sense?

19   No.  Anything to suggest bad faith?

20           The conspiracy theory, let's just talk about

21   whether it makes sense.  Everybody knew at this point that

22   ALPA wanted the American pilots back.  That is out there.

23   The TWA pilots and the MEC know as a result of the unity

24   resolution that ALPA in the long run wants the American

25   pilots back.  So to the extent that there is a concern about

```
1    the advice you are getting from people like Holtzman and

2    Warner, you discount that.  Right.  You say I am concerned

3    this guy may have a bias, so I may not interested.

4              Everybody also knew at this point in time from the

5    history that the American pilots were not interested in

6    coming back to ALPA so it is not something that is realistic.

7    Everybody knew the APA would represent the TWA pilots after

8    the integration.

9              So the question is this whole idea of bad faith,

10   this motive, if you will, this conflict of interest I think

11   is what is going to be alleged, think about this.  ALPA is a

12   national organization.  They represent pilots across the

13   country and Canada.  Is it really going to try to market

14   itself to the American pilots or anybody else by doing a

15   lousy job for the TWA pilots?

16             Here is a great way to want people to join your

17   union, is to not do your job.  And by the way, advisors, we

18   talked about advisors, let's just keep in mind that most of

19   advisors who are speaking up and giving advice here, most of

20   advisors, they are not ALPA advisors.

21             If you just go back quickly, Tumblin, LeBoeuf Lamb,

22   an independent outside lawyer from Salt Lake City, recall he

23   has been representing the TWA MEC since 1991.  Since the

24   first bankruptcy.  He in fact was the MEC's representative on

25   the TWA board before Pastore.  So ALPA is going to try to
```

1    tell him what to do, what advice to give?

2         Michael Glanzer, he is the investment adviser who

3    investigated, talked to the CFO of American.  He is going to

4    listen to what ALPA wants him to do, and take direction from

5    them.  Roland Wilder.  Clearly not.  He is going to do his

6    own thing.

7         Randy Babbitt.  Randy Babbitt has his own

8    consulting firm.  He is going to do a great job in marketing

9    his consulting services, if he  misleads, or doesn't do his

10   job for the TWA pilots.  I mean ALPA is not going to tell

11   this guy what to do.

12        And Richard Seltzer.  You saw Mr. Seltzer.  He is

13   an independent outside attorney at the Cohen, Weiss firm in

14   New York.  Where is there a basis, where is there any basis

15   for even suggesting that these non-ALPA advisors are going to

16   do its bidding and because of some long-term interest ALPA

17   might have in wooing American pilots that they are going to

18   give tainted advice.  It just makes no sense.

19        Now, on this conflict of interest issue, you may

20   hear an argument, I don't know, that ALPA somehow, the people

21   somehow didn't know about ALPA's interest in the American

22   pilots.

23        I just want to show you one document that I think

24   is pretty clear in that regard.  D 25, please, Council 3

25   communications this is another one of those Council 3

 1   communications.  This one goes out in May.  This is a month

 2   or so after, May 8.

 3            If you look on the second page, you will see there

 4   is a discussion here an integration update.  A report that

 5   inks aren't going well in discussions with the APA.  And one

 6   of the things that is a problem there as you can see on the

 7   bottom is unlike Mr. Carty, the rest of AA's top managers,

 8   and many airline industry analysts, the APA's leadership

 9   still refuses to attribute any value to TWA's contributions

10   to the transaction between the two airlines.  Which means of

11   course that these negotiations the APA is saying you don't

12   really bring any value as a consequence or you are not

13   entitled to any significant seniority here.

14            But turn to the next page because I want you to

15   understand just how out in the open this interest, this long

16   term interest of ALPA in the APA is.

17            If you look  on the left side you see it says, also

18   there is another sub rosa aspect to this hole negotiation..

19   Since the pilots from Continental recently voted to rejoin

20   ALPA, APA is now the only large stand-alone pilots union in

21   the U.S.  Talks about the fine.  Then look to that column on

22   the right side.  The paragraph, "All things considered,

23   perhaps APA's leadership feels they must appear strong to

24   their members in order to maintain their independent status

25   and their position as bargaining agents for the AA pilots."

```
1              It is no secret that ALPA would like to have AA

2    back in the association.  Everybody knew about this alleged

3    conflict, this alleged interest on behalf of ALPA.  And to

4    the extent there was any concern that the ALPA advice, forget

5    about the independent advisors, to the extent there was any

6    concern that Mr. Holtzman or Mr. Warner or even Captain

7    Woerth, was somehow biased because of that, it was discounted

8    by the members of the MEC, they either discounted the advice

9    or simply ignored it.

10             Your Honor, I am going to move to a different

11   topic.  Is this a good place to take a break?

12             THE COURT:  Yes.  We will take a 15-minute break.

13   About 20 after eleven we will come back.  Again, don't

14   discuss the case.  Don't discuss the case, wait until you

15   hear my charge on the law before you start to deliberate.

16             All rise.

17             (Jury leaves the courtroom.)

18             (Recess)

19             (The jury enters the courtroom.)

20             THE COURT:  Mr. Fram, you may continue.

21             MR. FRAM:  Thank you, your Honor.

22             All right.  We are now past April 2 of 2001.  One

23   of the claims, I think are going to hear from the plaintiffs

24   side is that Duane Woerth did something terrible a couple

25   days after that, that soured the ability of the TWA pilots to
```

1    negotiate seniority.  And that was to go before the board of

2    the APA an on April 5 and make a comment to them that the TWA

3    pilots had to get real.  I think you recall some testimony

4    and some back and forth about that.

5              What I want to show you because I think it is very

6    well go, I want to show you the testimony Mr. Hollander gave

7    about this issue.  With respect to the meeting on April 23.

8    If you recall, Woerth went to the meeting before the APA

9    board on April 5.  He then was invited for the first time to

10   go meet with the board of the MEC and he did so on April 23,

11   and when he went to the meeting on April 23, 2001, he was

12   asked about, how did it go, what happened, what did you say

13   at the meeting oh April 5.

14             Here is what Mr. Hollander  said.  Let's start with

15   his direct testimony, and you may recall there was a little

16   argument back and forth about whether he could testify about

17   what was said on the 23rd, was he there.  So the question I

18   think it was Mr. Press questioning, were you present at that

19   April 23 meeting?  Yes.

20             Was Captain Woerth asked about his visit to the

21   Allied Pilots, that is the American Airline Union, board of

22   directors?

23             He was.  He was questioned about not only going

24   there but his comment.

25             Did Captain Woerth deny having made the statement?

1          ANSWER:   He did not deny having made the

2    statement.  Okay.  He did not.  Then the Judge made a

3    comment, "Let him finish his answer."

4          The answer was he did not deny making this

5    statement, but his complete answer was that he believed he

6    was misquoted.

7          Mr. Hollander is saying that Captain Woerth didn't

8    deny it, which would suggest that he made the statement.

9          Well, when I got up to cross examine him later that

10   day, the first question, one of the questions I asked him,

11   blow up the cross examination, were you there when Mr. Woerth

12   addressed the MEC on April 23 and 24.  Correct?

13         "ANSWER:  No, I was not."

14         Well, you can see what he just said.  These are

15   verbatim transcripts.

16         "QUESTION:  You weren't even at the meeting where

17   he was asked about whether he had made the statement?

18         "ANSWER:  Duane Worth's appearance was the first

19   day of the meeting.  My recollection is I was not there on

20   the first day of the meeting.  So how do you know he did not

21   deny making the statement but believed it had been taken out

22   of context.

23         "ANSWER:  I was getting phone calls."

24         Judge Irenas made a comment.  I am sorry.  I

25   thought when, I asked some questions about this and one of

1    the reasons he explored it, I understood that you were there.

2    That is, you recall enough about the hearsay rule to know

3    unless you hear something directly, there are certain

4    circumstances in which you can't talk about what other people

5    have discussed.  It is considered under the law a rule of

6    evidence unreliable.  So there is back and forth.  You can

7    read it for yourself.

8           At the bottom, at the end of the line, on the next

9    page we have Mr. Hollander saying, he corrects himself.  He

10   says, I will yield and say I was mistaken.  I was not there

11   for Duane Worth's personal appearance on the first day of

12   that meeting.

13          Well, why would he get up there when questioned on

14   direct and say I was there?  And then try to tell you that

15   Woerth didn't deny it, and then when I stood up on cross

16   examination and said Mr. Hollander, were you at that meeting

17   on the 23rd?  Immediately changed his testimony.  Why would

18   you do that?  I will show you why.

19          Let's pull up and project the April 23 minutes.  D

20   78.  This let's blow up what we highlighted.  Announcement.

21   It says at the beginning of the meeting on April 23 Case read

22   for the record the following statement written by HOllander

23   to the master chairman.  Quote.

24          "Due to personal reason which we have spoken about

25   last week I am unfortunately unable to attend the TWA MEC

1   special meeting on April 23, 24.  It is, however, my intent

2   to attend the second day of the special meeting, if

3   possible."

4           So his buddy, Case, announces at the beginning of

5   the meeting that he is not there and can't be there.  So why

6   did he change his testimony when I stood up to cross examine

7   him?  Because he knew I read all the documents.  And he knew

8   that I was going to confront him with this.  And he knew that

9   he couldn't get away with that lie.  If I hadn't asked him,

10  Mr. Hollander, were you there on April 23?  He never would

11  have corrected that.  He would have tried to mislead you

12  about the fact that he was there, and mislead you into

13  believing that Captain Woerth made a statement which the

14  plaintiffs think show is somehow harmful.  It shows bad

15  faith.  Captain Woerth was trying to undermine their

16  position.

17          One of the instructions that Judge Irenas is going

18  to give you at the end of the case, has to do with the

19  credibility of witnesses.  And we certainly have some

20  credibility issues in the case.  One of the instructions he

21  is going to give to you will tell you that if you find that

22  any witness has deliberately lied, has deliberately given

23  false testimony, that you have the right to disregard other

24  testimony given by that witness.  That is just common sense.

25  If people don't tell the truth and you are convinced, it is

1    one thing to make a mistake.  It is one thing to not remember

2    something.

3          But if somebody gets up and really makes a false

4    statement that they know is false, it is common sense that

5    you can't necessarily trust what they say about other things.

6    That instruction is, and I won't try the Latin, but the

7    translation is "false in one, false in all."  And something,

8    it is something you ought to think about when you think about

9    the testimony he gave about April 2, when you talk about the

10   testimony he gave in which he claimed there was a meeting of

11   the Council 2 MEC at some point in March.  Think about it

12   when you evaluate the testimony, remember he claimed he had a

13   45-minute conversation with Clay Warner where Clay told him

14   the Section 1113 motion will not be granted.  Don't worry

15   about it.  Remember Clay Warner's response when I asked him

16   did you ever have such a conversation?  He said it never

17   happened.  Never happened.

18         Just think about that as you think about the case.

19         What about the idea that Duane Woerth was attending

20   a meeting of the APA, and talking about these issues.  Is

21   that considered a good thing or a bad thing from the

22   perspective of the pilots.

23         Well, I will show you.  If you go back to the

24   minutes, I am sorry, the Council 3, May 8 communication, D

25   25, where this  whole issue was discussed, and we talked

```
 1   before about the portions of it where it said it is no secret

 2   that ALPA would like to have the AA back.  If we turn to page

 3   6 of that, item 7, ALPA president speaks to APA about the TWA

 4   pilots.  It recites an excerpt.  It talks and summarizes it,

 5   and again, I try to identify documents you should look at.

 6   This is one of them.  D 25 is one that I think is worth your

 7   time.  What this reports on the right hand column, what he

 8   tells them of course is that the transaction is different

 9   from Reno  or AirCal, that the APA must realize that and be

10   fair in their negotiations.  The next paragraph it is

11   reported, Captain Woerth said the TWA MEC had made a

12   realistic assessment of their situation and made the hard

13   decision and now the APA needs to get realistic and make a

14   hard decision.

15          And Captain Woerth came in here, he came down from

16   Montreal, from his responsibility as U.S. ambassador to this

17   international aviation organization, he took the time to come

18   down here and confront these issues directly.  You heard his

19   testimony.  He never made a statement to the APA board that

20   the TWA pilots had to get real.  He never admitted that he

21   said that, as Mr. Hollander tried to suggest to you when he

22   met with the MEC on April 23.

23          I will point out something else here if you turn to

24   the next page, I mentioned this issue before where it was

25   suggested to you at one point in time that the TWA pilots
```

 1     lost something.  Because they gave up their flight pay loss

 2     bank, in the collective bargaining agreement.  Look at the

 3     left column here where it is reported that in losing, in

 4     light of losing the 9,000 hour flight pay loss bank

 5     previously negotiated with TWA, Inc., Captain Woerth assured

 6     the MEC and other members present that the TWA MEC will be

 7     provided the funds and other support necessary from ALPA to

 8     process MEC activities.

 9            In fact, that is what happened.  ALPA stepped in

10     and supported the pilots, and said, do your job, do your best

11     work for the TWA pilots and don't worry about the fact that

12     there are flight pay losses.  We are going to pay that.  We

13     are will go to underwrite that.

14            And it goes on.  And give you another example then

15     I will move on.  Page 8.  Left-hand column.  There is some

16     question and answer.  Here is what he tells the American

17     pilots.  The consequences of not doing the right thing are

18     serious.  The APA can use the addition of the TWA pilots to

19     strengthen their position.  If not, with a hostile political

20     environment and an aggressive management they may stay a

21     notch below where they need to be.

22            He is appealing to their self interest saying don't

23     be jerks.  Bring the TWA pilots in, and join forces with them

24     to get a better job, get a better situation, better

25     conditions for everybody.

1          What is the reaction according to this report of

2    the MEC?  To this presentation on April 23?  Are people angry

3    at Captain Woerth for talking to the APA?  Are they upset

4    about  it?  Turn to the top of the next page.  I will show

5    you what the reaction of the TWA MEC at the time is.

6          "The members applauded Captain Woerth at the

7    conclusion of his remarks."

8          So that is the get real issue, and we summarize it

9    here.

10          I don't think the evidence is contrary.

11          All right.  What is the other big argument that you

12   may have heard alluded to for why ALPA acted in bad faith or

13   didn't do its job.  I think you have heard a fair amount

14   about the so-called card campaign.  I want you to understand

15   the facts with respect to that issue.  Because it is very

16   important.

17          I am sure you are going to hear about it when

18   plaintiffs' counsel argues.  What is the card campaign?

19   There is an American pilot.  His name is Mark Hunnibell.  You

20   saw some of his video testimony.  He decides to run for vice

21   president of the APA.  And what is his platform?  Well, his

22   platform is that he wants the APA to follow through what had

23   been discussed to some degree in late 2000, which is to re-

24   affiliate with ALPA.

25          And there had been, I will show you quickly there

1    had been some back and forth, some communications between the

2    American pilots and this fellow, Ron Rindfleisch, who is

3    referred to as Rino, even before the deal is announced.  So

4    if you pull up, please, P 147 E.  The background here, you

5    have 11,000 American pilots.  And obviously a group that

6    large you are going to get people with different opinions,

7    some of them strong.

8            Here is an example, this is an email one of the

9    American pilots sends to Rino on January 4, where he says,

10   ALPA, strength in numbers.  I do not know if anyone noticed

11   that the federal courts did not intervene in the Delta

12   Airlines ALPA contract dispute or the United Airlines

13   mechanics dispute.  They respect AFL-CIO.  We are a speck on

14   the map.  We need to become ALPA before openers in June,

15   2001.  Times have changed.  Openers are of course contract

16   negotiations between the American pilots, and American.

17   Furthermore with Bush in office we need all the national

18   power base we can get.

19           So he is forwarding this along to Mr. Rindfleish,

20   to Rino.

21           Another example and then I will move on.  P-147 H.

22   Pull that up, please.  This is another email from, looks like

23   another American pilot talking about these issues.  I thought

24   we highlighted part of it.  Let's move on.

25           In any event, let's jump ahead to P-147 P, April

1    14.  The ALPA card.  The second page.  This is again, stuff

2    that gets forwarded to Rino because people know he is out

3    there.  If you can blow this up, the heading on this is

4    Petretti for President.  If you read through this, this is a

5    fellow, an American pilot, who is running for president of

6    the APA, and his platform is he wants to take the

7    organization back to ALPA.  It is a long email.  I am not

8    going to talk you through the details but this is his

9    campaign statement to the American pilots about why he thinks

10   it is a good idea.  April 14.

11        The next document I want you to see is P-147 Q.

12   This is being forwarded again, you see in the name Terry M

13   727.  He is one of the American pilots, April 15, forwarding

14   to Rindfleisch, what is best for our future?  ALPA or

15   isolation?

16        If you look at the next page of this what you will

17   see, this is Hunnibell for vice president.  Mark Hunnibell is

18   running for vice president in that election in, he says,

19   fellow ALPA members.  The first paragraph.

20        As a 1989 hire, like many of you I came to American

21   with no personal bias over what happened in the early 1960's

22   when APA split from ALPA.  I worked diligently within APA.

23        He goes on and on and he makes his pitch for why

24   the American pilots should elect him and let him follow

25   through and pursue reaffiliation with ALPA.

1        Now, what happened is that as he continues this

2   campaign, this is, you see April 15, later in April

3   apparently, and then in May, he sends out campaign materials.

4   And this campaign materials include some kind of a flyer.

5   They also include a representation card.  He gets the idea

6   that a representation card expressing interest in ALPA

7   representation should go out.

8        I think you heard from Mr. Rosen and from Mr.

9   Woerth about what representation cards are, how many you need

10  to do a so-called card campaign.  If you recall, there are a

11  couple of ways to bring union members in.  One is by

12  negotiating with the leadership of an independent union, and

13  Mr. Rosen talked to you about how that was ALPA's approach.

14  If other pilots were represented by a union, you would get a

15  resolution from the other board.  You would then go through

16  the steps of going out and trying to persuade the other

17  pilots that they should go along, full time, I think the

18  testimony was that in the Continental case, it was about $1.5

19  million spent to try to bring Continental back.

20       So that is how ALPA would, and the other way of

21  course is to do a card campaign.  You could do a card

22  campaign.  ALPA could send cards to another union.  What we

23  have here is we have Hunnibell as part of his campaign for

24  office, within the APA, sending out cards..

25       Let's pull up P-3, please.

1          P-3 is some materials that he later sends to ALPA.

2     But what happens, I am going to show you that he sends out

3     the cards, and has to pay this company called Primadata to

4     print the notices and print his cards and then later on there

5     is a discussion can I get reimbursed by ALPA.  The second

6     page of this letter is Hunnibell writing to Rindfleisch in

7     December, December 18, 2001, and what he is talking about in

8     the first paragraph, copies from microfiche and my three

9     payments to Primadata increase.  The printer produced and

10    mailed the cover letter and authorization cards.  He talks

11    about the other ones.  Paragraph 2, 5/15/01 invoice from

12    Primadata, for the handling and postage for the card mailing.

13         So if you flip along, if we flip through you see

14    the cancelled checks, these are checks from May 22, and then

15    if we get along to the invoice, in the right-hand corner,

16    invoice number 15144.  Let's blow up mail services.  So the

17    mail services, Hunnibell for vice president, he is running

18    for office.  Data conversion, email.  Data hygiene, addressed

19    corrections, gold letter.  Insert two pieces.   Seal, zip,

20    sort, sleeve, and strap, etc.  $1332.56..  Below that a

21    separate charge for postage.

22         So what this is, if you flip to the next page you

23    see that you have the, it looks like the invoice  from

24    Primadata for the postage.  They mailed a total of 11,082

25    pieces, you see that about 40 percent down.

1           This is his mailing.  Who is Primadata.  Is

2    Primadata some mailing service that is used by ALPA that he

3    is referred to go to?  No, they are not.  Let's play the clip

4    of the Clark testimony on that, please.

5                (Videotape of Clark, deposition 12/1/06,

6    commencing at 3:59 p.m. is played).

7           MR. FRAM:  Now we know who is Primadata.  They are

8    the mailing service that the APA uses, and they don't even

9    give that information out.  You want to send something out to

10   the American pilots, they have the addresses, they have the

11   information, go to them.  Nothing to do with ALPA.

12          Well, what happens to this campaign, Mr. Hunnibell

13   for office.  I will show you.  If you pull up P-147 T.  Go to

14   the bottom.  APA information hotline.  May 23, 2001.

15          So here is the communication director for APA.  The

16   ballots have been tallied for the APA president, vice

17   president, and secretary treasurer.  For president, Captain

18   John E Darrah received 3757 votes.  Captain Jim Gross

19   received 320 votes, and Captain Dennis Petretti received

20   1,085.  Therefore, Captain John Darrah is elected APA

21   president.  Petretti you recall is the fellow running for

22   president on an ALPA campaign, how about vice president.  For

23   vice president, flip to the next page.

24          First Officer Robert Ames received 3,681 votes, and

25   Captain Mark Hunnibell received 1335 votes.  Therefore, Ames

1    is  elected, so this card campaign begins at some point in

2    late April.  You heard the testimony from Clark that they

3    tried to send stuff out, it got mangled, they sent it again.

4    You saw the invoices from Primadata that Mr. Hunnibell talked

5    about showing they went out in mid May.  The whole thing is

6    done, over and done with, the election.  This is May 23.  And

7    that is the only time the cards get sent out.  They get sent

8    out in this window when Hunnibell is running for office.

9    They go out and come back, the evidence you have heard is

10   ultimately about 1,550 cards come back, expressing interest

11   in ALPA.  That, as you know, is I think the numbers are about

12   13 or 14 percent of the 11,000 American pilots.

13           What is significant about that?  Well, I think one

14   of the conflict of interest allegations that the plaintiffs

15   have made is that the advice of the ALPA people was somehow

16   skewed or biased during the period leading up April 2, 2001,

17   because of the card campaign you have heard so much about.

18   The card campaign didn't exist until late April when

19   Hunnibell and Petretti announced their candidacy for office.

20   It didn't even exist and it couldn't have therefore

21   influenced anybody.  It was over and done with in terms of

22   their push at some point in late May.

23           Did Hunnibell and Clark continue to talk to people

24   at ALPA?  They did.  There is no question about it.  They

25   sent Rino emails, with information about what was happening

1   inside of the APA.  There was a meeting in July where they

2   could, they for the first time raised the issue about perhaps

3   getting reimbursement, and I think it is pretty clear that

4   ALPA didn't offer to reimburse them initially.  Let's play

5   the second clip of Clark and pin down this issue.

6            (Clip of Clark dated 2/01/06, commencing at

7   4:51:45, p.m. played)

8            There is no question you of have seen the documents

9   that in fact Hunnibell and Clark did submit their expenses

10  after this meeting in July, they submitted it a couple of

11  times, and there is no question that there are emails and

12  other communications within ALPA about reimbursing those

13  expenses.  These are past expenses going back, but that

14  ultimately doesn't happen because at some point the people in

15  ALPA start to pay attention and realize, well, this is

16  something that is not appropriate for us to do.  You may

17  recall the testimony from Hunnibell about how he realized

18  that, and when he realized that.

19           But the fact of the matter is it wasn't ALPA's card

20  campaign.  These guys were out there.  And there is

21  absolutely nothing wrong with hearing from them and

22  communicating with them.  In fact there is a benefit to the

23  TWA pilots, and I want to go back to P-147 P and talk to you

24  about that a little bit.

25           One of the things that is happening after April 2,

1    even before April 2, is people on the ALPA side, on behalf of

2    the TWA pilots are communicating with people at the APA.  The

3    merger committees are meeting.  Duane Woerth testified that

4    he met with the board and continued to lobby John Darrah.  I

5    think you recall him testifying that Darrah was a fairly

6    young guy, as the president of the AMA.  APA.  He said John,

7    look at the long term.  If you want to be the president who

8    presides over seniority integration that causes dissension

9    and bad feelings going forward.  Look at the bigger issue.

10   Those communications are going back and forth.  Part of what

11   is happening is Rino is getting, I think you have seen

12   circulating information about what is happening internally at

13   the APA.  You saw the long list of emails, email recipients

14   and some of those people like David Holtzman are actively

15   working with the TWA pilots.

16           I will give you a good example of one situation in

17   which the information that comes from the APA side gets

18   circulated.  This, we looked at the bottom part of this.

19   This is the APA information hotline reporting on the

20   elections.  Look what happens.  It gets forwarded by

21   Rindfleisch.

22           Rindfleisch sends it to Clay Warner.  What does

23   Warner do?  Warner sends it to Sunshinelawyer@ ATT.net.

24   Remember who Sunshine Lawyer is?  Mike Day.  Mike Day, who is

25   the chairman of the merger committee.  And he says Mike.  The

```
 1   attached email describes the results of the APA national

 2   officer elections.  I have been told that both Gross and

 3   Petretti support realignment with ALPA and that Darrah does

 4   not.

 5           Then it gets forwarded on apparently from there.

 6   So he -- it is inside information.  There is nothing improper

 7   about getting this information and in fact we know from other

 8   documents that members of the MEC are getting this type of

 9   information directly.  I will give you an example.  Let's

10   pull up J 294, please.

11           Let's go to the resigned so people can see where it

12   is.  It is, this is an email, that is, March 24, 2001, from

13   Keith O'Leary.  Reading, important information from APA

14   website.  Confidential.  What follows is a lengthy report.

15   Look who he is sending it to.  He is sending it to everybody

16   on the MEC.  Altman, Babbitt, all advisors.  Case, Day,

17   Hollander, Holtzman, Kiel.  Look at all the people who get

18   this.  And what follows is a detailed report which I am not

19   going to go through, a detailed report basically about John

20   Darrah complaining about how American is beating up the

21   American pilots in negotiations.

22           And as you can imagine, when you are negotiating

23   with another party, it is helpful to know what their other

24   issues and what their problems are.  So when stuff like this

25   comes in, it is being evaluated, and what we submit to you on
```

1    behalf of ALPA is that any suggestion that contacts on,

2    ongoing contacts by Hunnibell and Clark, to ALPA are

3    improper, is just wrong.  Nothing wrong with it and this

4    potentially is useful information that can be used to assist

5    the TWA pilots.

6            And the idea that, again, that people, even the TWA

7    pilots, didn't know that there was long term interest, and

8    thought this was improper, is just wrong.  I want to show you

9    a resolution that the MEC passed in December, December 7 of

10   2001.

11           Pull up, please, P-356.

12           This is a letter, actually December 6, I misspoke.

13   It is a letter from master chairman Pastore to Duane Woerth

14   forwarding a bunch of resolutions.  I just want to talk for a

15   moment about the fifth page of the document.  Compilation of

16   actions.  December 4, 2001.  Go down to the second paragraph.

17   It refers to the fact that ALPA pledge cards are being

18   collected by, at the address of ALPA representation campaign,

19   Redondo Beach, California.

20           You can look at P-3, materials from Clark and

21   Hunnibell.  That is a post office box Clark set up in

22   California.  That is what they are referring to.  Go down

23   to the fifth paragraph.  Where as the TWA pilots fully

24   endorse ALPA's short-term goal of recruiting the pilots of

25   American Airlines back into our international pilot union,

1   and the larger goal of extending the benefits and

2   responsibilities of ALPA membership with fairness and equity

3   to all professional pilot groups, this is part of a

4   resolution that is passed.

5          Look at the top to see who sponsored the

6   resolution:  Howard Hollander and Sally Young.

7          So what is happening, if you recall, is that single

8   carrier determination, I think you recall that there is this

9   mechanism for the National Mediation Board to decide that

10  American and TWA are really one company now, that the TWA

11  operations have been sufficiently integrated on a day-to-day

12  basis so it is one airline and the APA has filed for a single

13  carrier determination at this point, and the TWA MEC wants to

14  delay that because that is the trigger for the effectiveness

15  of Supplement CC.

16         And they are obviously aware that ALPA will have

17  the opportunity, as part of that single carrier

18  determination, to try to represent all of the American

19  pilots.  The American pilots plus the TWA pilots.  And they

20  are lobbying out to do that.  They say we want you to run and

21  try to represent the American pilots.  As you heard from Mr.

22  Rosen, and to some degree from Woerth, they looked at the

23  number of cards that had come in, 1,548 or so, and realized

24  this they couldn't even hit that 35 percent level that you

25  had to have to have some kind of election.  You needed 50

1    percent plus and they looked at it, Mr. Rosen said look, I

2    knew in 2000 that American was a long shot.  It was at the

3    bottom of the list in terms of pilot groups who were

4    interested.  That is why I went to Continental and spent 1.5

5    million  there, and that is why I went to Federal Express.

6    His judgment  after 20 years of organizing it wasn't

7    worthwhile to pursue the representation of the American

8    pilots.  He was right.  That is why he came back did in 2002.

9

10           Who were upset about this it?  Hollendar and Young

11   were upset about it.  They were part of ALPA and thought if

12   ALPA came in and was able to organized APA, it would be good,

13   to have them part of it.  The idea that there was something

14   improper about the card campaign, that ALPA was somehow

15   behind it, it, that it was improper for ALPA to be

16   communicating with the American pilots, that is wrong.

17   Absolutely wrong and no basis for it.

18           Let's move on, I will try to do this as quickly as

19   I can.

20           I think you heard more recent about some of these

21   issues.

22           The summer of 2001, what happens as you know is

23   that the TWA pilots put together the so-called Rightful Place

24   proposal, the June 14 document, they send to American pilots

25   where they try to advocate for why they should get something

1   other than stapling.  There is a long list of things ALPA

2   does to support that.  They authorized the hiring of Michael

3   Tannen.  In fact, there is a resolution that is passed by the

4   ALPA executive board that authorizes that.

5           There is a separate resolution that is passed

6   around the same time.

7           Pull up, please, D 158.  It is a resolution of the

8   executive council, this is ALPA, as you can see, the TWA MEC

9   has requested authorization to engage the services of an

10  outside consultant to provide negotiation, training and

11  consulting services.  Mr. Baeler came in and testified, you

12  recall the older gentleman from New York who came in and

13  talked.  The TWA MEC wants some more support for their

14  negotiations.

15          Does ALPA turn him down and say no, you are on your

16  own?  No, a resolution gets passed.  The fellow is engaged.

17  He goes and helps him.  Michael Tannen.  Is also hired.

18  Professor Tannen as you recall is the fellow who helps put

19  together the Rightful Place proposal.  He does this very

20  complicated economic analysis.  There is another resolution,

21  D 159, let's pull that one up, please.  A separate

22  resolution.  It talks about the fact that the TWA pilots are

23  now facing extraordinary expenses and incurred, with American

24  Airlines which occurred without prior proceeding.  They are

25  forced to abandon primary protection and scope.  It goes on

1    in a sympathetic and supportive way, it authorizes funding.

2            There is another resolution in September, D 160.

3    This is a little bit later, but the MEC came back and they

4    wanted to have Roland Wilder continue to work with them.  So

5    they passed a resolution submitted to the executive council.

6    Do they get turned down?  Do people say we think Wilder is a

7    little bit off in terms of the theories?  You know, we want

8    somebody who is not so reckless?  No.  They authorize it and

9    authorize the funding.

10            And as you have heard, and I will talk about it in

11    a little bit more, Wilder continues to work with them into

12    the fall.  So in terms of financial support, in terms of

13    other support, is ALPA supporting the pilots over the summer

14    in their effort to negotiate?  Absolutely.  He absolutely

15    did.

16            And do the people at the MEC recognize that?  Well,

17    they do.  D 233, please.

18            This is a letter that Captain -- 233.  The first

19    paragraph, from master chairman Pastore who you didn't hear

20    from during the trial.  Thanking Captain Woerth.  I am

21    writing to thank you for your support of our pilot group at

22    the last executive board meeting.  With your support the

23    agenda item pledging the full moral support and the necessary

24    funding to enable our MEC to properly represent our pilots

25    passed by acclamation.  Support.  You can read the letter.

1   July 18 is another letter.  D 299.  You can read all these

2   letters.  I just highlight the one point where master

3   chairman Pastore says that you and the council have offered

4   and delivered significant support to the TWA pilots and we

5   collectively appreciate it.

6          Then he talks about some other official action.

7   Look, you understand from the letters and from the testimony

8   that this is not Duane Woerth making decisions on his own.

9   The plaintiffs want to portray Captain Woerth as some kind of

10  a villain in the case but the fact of the matter is at the

11  national level, ALPA had lots of people involved, and things

12  are done by group vote so that representatives of the other

13  pilot group, work with the other airlines, are involved with

14  the process and they are making judgments about what is

15  necessary or not.

16         Now, what is the result of this?  Well, the result

17  of this is the APA doesn't get much ground.   I think perhaps

18  the most important document in the whole case that I really

19  encourage you to sit and spend some time looking at is the

20  APA's response.  What happens as you have heard is the

21  Rightful Place proposal is put out there.  Captain Woerth is

22  front and center, I think you saw part of the video where he

23  introduces the proposal.  That was played for you.  He is

24  fully supportive.

25         He goes to a facilitation meeting where he tries to

1  advocate on behalf of the pilots.  The APA comes back with

2  their position, and that is in the form of a letter dated

3  July 18, 2001, J 323.  It is a long letter, and I won't read

4  you the whole thing, but if you read nothing else from cover

5  to cover, I encourage you to sit and read this letter because

6  it will I think help you understand why the APA took such a

7  hard line and why the APA was so unimpressed with the

8  arguments that the TWA pilots were trying to put forward for

9  better seniority integration.

10         And if you turn to the second page of the letter, I

11  will quote just a little bit of it.  It talks on the second

12  page, you can see in the middle of the page it talks about

13  the flaws in the APA, the ALPA proposal have led us again to

14  conclude that the structure of our seniority integration

15  proposal is the basis for a fair resolution which gives

16  respect to the Rightful Place of the AA pilots and does as

17  much, if not more, for the TWA pilots.  Their proposal, as

18  you will read, is stapling a very significant amount of the

19  TWA pilots.

20         But I want to point you to the bottom of the

21  letter, and walk you through some of the facts that are the

22  basis for the APA's position.  I want you to think as you

23  read this about how an arbitrator, remember, we talked before

24  about the fact that what the TWA pilots have given up and

25  what they keep complaining they had given up is not the right

1    to any particular seniority integration.  They have given up

2    the right to go before an arbitrator without knowing who he

3    or she would then, and to make arguments about what, quote,

4    "fair and equitable integration" would be.  Look at the last

5    paragraph.

6         Needless to say, based on the fact, and our

7    analysis, we disagree.  This is not a merger with a complete

8    air carrier.  Nor is it a transaction between equals.  It is

9    a purchase by one of the largest and most financially stable

10   global airlines, of most, but not all, of the assets of a

11   much smaller, largely regional carrier that was within hours

12   of going out of business.

13        That view of the TWA pilots Rightful Place was

14   certainly shared by your own CEO and former MEC chairman

15   William Compton when he said, at the time the transaction was

16   announced, it has actually been since 1971 that people have

17   worried about their jobs.  You think about all these years

18   that TWA employees had to go to bed wondering about their

19   jobs.  You think by TWA's management, when it represented to

20   the bankruptcy court that this transaction was the best

21   option, indeed, the only realistic option, that would allow

22   TWA to avoid seizing operations.  And again by CEO Compton

23   when he told the bankruptcy court that this transaction was

24   the equivalent of catching the Hail Mary pass.

25        That view was certainly shared by the bankruptcy

1    court when it agreed that this transaction was the only way

2    to avoid the liquidation of TWA and that given this debtor's

3    history, if this Court were to deny the sale of assets there

4    would be an immediate and precipitous decline in the affairs

5    of the debtor with a very high probability, if not certainty,

6    of liquidation.

7              Remember Mr. Seltzer on the stand talking about how

8    struck he was by that very language when he read Judge

9    Walsh's opinion approving the American transaction.  And how

10   similar language showed up in Judge Walsh's opinion on April

11   2, denying the stay, a bunch of creditors and other parties

12   had opposed the American transaction, and they were trying to

13   get a stay from Judge Walsh so they could take it up on

14   appeal.

15             If you read that opinion, that is another document

16   I encourage you to look at, it is D 288.  If you read that

17   opinion, I think you will understand clearly what the dire

18   financial circumstances were.  Just to read one more sentence

19   of this so that you appreciate the perspective of the

20   American pilots.  It finally says, and this was certainly the

21   view of your own MEC when it stated at the time the

22   transaction was announced that we believe the American

23   acquisition represents the best opportunity for our pilots

24   and for all TWA employees.  "If for some reason this deal

25   does not close, then we face the possibility that all 20,000

 1   jobs at TWA will be lost and the traveling public will suffer

 2   from less competition."

 3            If you read nothing else, read this July letter

 4   from start to finish and it will help you to understand why

 5   the TWA pilots had no leverage.  They had no contractual

 6   leverage, they had no leverage in terms of appealing to the

 7   economics of the situation.  It was a very difficult

 8   situation.

 9            And we submit that ALPA National did the best it

10   could to support them under very difficult circumstances.

11   But the fact of the matter remains that the American pilots

12   feel strongly about seniority and they are backed by a

13   collective bargaining agreement, contract, and they are

14   backed by American.  So what are you going to do?

15            Well, a couple suggestions came out from the

16   plaintiffs in this case.  And I want to walk through what

17   they are now claiming, that ALPA should have done to rattle

18   the APA.

19            And the ones that we have been able to identify the

20   complaints are, one, no jumpseat war.  Well, talk about that.

21   First of all, ALPA has a jumpseat policy, D 411 in evidence,

22   and the policy says you can't use the policy for political

23   purposes.  So the idea that ALPA would engage in a jumpseat

24   war, you recall what it is, the ability of pilots to

25   basically commute to work by going on the planes of other

1    carriers.  So you got 2,200, 2,300 pilots who want to disrupt

2    air transportation across the entire country by having ALPA

3    carriers denied jumpseat privileges to American, realizing

4    that American pilots are going to probably do the same.  And

5    everything becomes a mess.

6            And you can imagine that if that were to happen,

7    that people would be very upset, maybe the government gets

8    involved, maybe the government ends up doing away with the

9    whole idea of jumpseat privileges for everybody.  And indeed,

10   as I think you heard after 9-11, the whole issue of jumpseat

11   privileges gets paired back.  So you have a policy, and think

12   about that, by the way.  One of the complaints I think you

13   are going to hear from the plaintiffs is ALPA didn't comply

14   with some of its own policies.

15           Well, here is a situation where some, not

16   everybody, not the TWA MEC because, again, it acts as a

17   group.  There is no resolution that ever comes out of the MEC

18   that says start a jumpseat war, but you have a handful of

19   pilots, saying just ignore the policy, and let's shake up the

20   industry because we are not getting our way.

21           Duane Worth's response is we are not going to do

22   that.  We know it doesn't work from the past and indeed that

23   is probably why the policy gets adopted in 1997.

24           You recall Mr. Rautenberg's testimony.  He recalled

25   being in a meeting in Duane Worth's office over the summer

1    where somebody raised the idea of a jumpseat war.  What was

2    the reaction?

3            The reaction was he thought it was a dumb idea and

4    it would probably hurt the pilots.  And he described being at

5    the meeting with people were coming up with these knucklehead

6    ideas.  Remember him using that phrase?  He described being

7    at the meeting as embarrassing.  It was embarrassing to be on

8    the TWA MEC and have people raise some of these arguments and

9    issues.

10           Was it unreasonable or irrational for ALPA not to

11   start a jumpseat war?  I think you know the answer.  How

12   about the AFL-CIO boycott that, let's have the AFL-CIO

13   boycott, start a boycott against American because they are

14   not treating us fairly.  Let's think about that.  The

15   American pilots, their union, APA, has a collective

16   bargaining agreement with their employer that gives them

17   certain rights, and they are standing on those rights and

18   insisting that those rights be respected.

19           Well, why would a confederation of other labor

20   unions criticize another union for wanting the respect of

21   their collective bargaining agreement.  This is not a dispute

22   between the American pilots and American, with their being

23   abused.  They have a contract.  So the idea that a labor

24   organization would criticize a union who wanted to enforce

25   the terms of its contract, is that irrational?  Is that

1    unreasonable?

2           What about litigation?  Mr. Wilder, as you know,

3    comes up with another litigation idea over the summer.  This

4    is the second one.  His idea now is we should go and sue

5    American and the APA because they are engaging in

6    negotiations and those negotiations have an impact on the TWA

7    pilots, therefore, we can argue that three are really

8    representing and have obligation under the law to the TWA

9    pilots.

10          I want to walk you through the lead up to this.  D

11   42, if you could pull that up, please.

12          D 42 is a memo that Mr. Wilder writes back in May,

13   and I just want you to -- all right, this is a memo and we

14   highlighted a couple aspects.  This is in the aftermath of

15   course of the decision to waive scope and he says a couple

16   things in the memo that I think are pretty telling in terms

17   of his argument.

18          All right.  He says that I recognize that the

19   threat of such litigation is considered -- he is referring to

20   litigation against the APA, American, and perhaps ALPA.

21          "The threat of such litigation is considered by

22   many to provide leverage that could strengthen our position

23   in merger negotiations with APA.  Nonetheless, I believe that

24   concerted pilot efforts to organize and finance fair

25   representation actions are contrary to the pilot groups

 1   interests and should not be encouraged by MEC officials or

 2   committee members."

 3        He then says, in that third paragraph, the one

 4   beginning, "In cooperation with ALPA legal."

 5        "In cooperation with ALPA legal, but independently

 6   if necessary, this firm will evaluate the availability of a

 7   litigation option and present it for your consideration.

 8   Please understand that any litigation contemplated against

 9   APA and AA will be novel and complex.  Necessarily, then, our

10   evaluation will remain a work in progress until the merger

11   committees seniority plan has been launched and the

12   facilitated negotiations are underway."

13        Novel and complex.  As a general matter is the

14   unreasonable to shy away from litigation that is novel and

15   complex.  I don't think so.  But he does come up with a

16   specific litigation proposal.  It is in D 202 is one version

17   of it.  You heard Mr. Warner testify about it.  Pull that up,

18   please.

19        It had to happen at least once.  I had to mix up

20   the designation.  J 202, please.

21        Here is the memo, he outlined the theory.  What

22   does ALPA do?  Does ALPA say forget it, we already admitted

23   litigation would be novel and complex, we are not going to

24   consider it.  No.

25        Mr. Warner testified he took the cases, he did the

1    research.  Ms. Wagner helped him and he wrote a memo and that

2    memo is J 130.  August 6, 2001.

3           All right.  And what he does in the memo, and you

4    can read it if I am allowed, just go to page 4.  It gives

5    background, and then on page 4 he refers to the Wilder

6    memorandum.  Let me read it to you quickly.

7           He says, TWA merger counsel Roland Wilder has been

8    openly frustrated by the lack of, quote, "leverage" held by

9    the TWA LLC pilots and its seniority integration process.  He

10   has consistently attempted to find anything that will

11   increase that leverage.  The Wilder memorandum outlined the

12   most recent theory.

13          And then later in the memo, throughout the memo, he

14   talks about the law.  He talks about the Railway Labor Act.

15   He talks about the cases.  And what he says is similar to

16   what people said when Wilder came up with this first

17   litigation theory.  He says Wilder's claim that APA would

18   violate a fair representation duty to TWA LLC pilots whose

19   negotiations with American ignores a fundamental proposition.

20   A union does not owe a fair representation duty to pilots

21   that it does not represent.

22          APA does not represent the TWA LLC pilots, and it

23   will not represent them until the NMB determines that TWA

24   LLC, an American, constitute a single carrier.

25          What he is saying here is that the APA represents

 1    the American pilots and it is doing its job to act in their

 2    best interest and make sure that the seniority integration is

 3    best for them, just in the way ALPA represents the TWA

 4    pilots.  It is as basic as it gets under the law.  He goes on

 5    to talk about the cases and to discuss the fact that the

 6    couple of cases cited by Mr. Wilder in his memo have nothing

 7    to do with this issue.  They are inapposite, to quote the

 8    phrase that lawyers and judges sometimes use.

 9           And the bottom line, on the first page of the memo,

10    again I encourage you to look at this document if you have

11    time.  His summary is that the legal analysis contained in

12    Wilder's memo is fundamentally flawed.  Wilder is wrong,

13    again.  Let's go back.  Is it unreasonable, irrational, not

14    to pursue a lawsuit that has no basis?  Is venting by suing

15    the TWA -- by suing the American pilots, is that going to do

16    something for you in seniority integration negotiations?  I

17    don't think so.

18           So I think I have covered the main claims that you

19    have heard or will hear with respect to ALPA's alleged lack

20    of support, lack of aggressiveness, during the summer.

21           All right.  Let's move ahead and talk about this

22    third period where there seems to be some claims that ALPA

23    didn't sufficiently support the pilots.

24           All right.  Obviously, you heard a lot about the

25    crisis in the airline industry after 9-11, the planes stopped

1   flying because of security reasons for a week or so, and then

2   people are uncertain, they are not traveling, and because

3   airlines are so dependent upon passengers, all of the

4   airlines end up in dire financial circumstances.  A bunch of

5   them file for bankruptcy.

6           You heard discussion about the Air Transportation

7   Safety and System Stabilization Act.  5 billion dollars.

8   This is less than two weeks after 9-11.  The crisis in the

9   airline industry is so severe that Congress has to allocate

10  five billion in compensation for lost revenues and make

11  available another ten billion in loan guarantees.

12          If you recall the fall of 2001, President Bush

13  declares the war on terror and aerial bombings in Afghanistan

14  begin.  October 7 the Patriot Act was enacted.  A lot is

15  happening, the country is in crisis.

16          So you can only imagine the atmosphere on Capitol

17  Hill, and if you recall the atmosphere around the country, it

18  is pretty dire.  So what is happening in the midst of that?

19  In the midst of that the TWA pilots are pushing for the Bond

20  Amendment, and one of their complaints in this case is that

21  ALPA did not support the Bond Amendment enthusiastically

22  enough.  They didn't get the AFL-CIO to support it.

23          You may recall this claim by Matt Comlish that he

24  ran into Duane Woerth and that Woerth told him that the TWA

25  pilots have to get off the hill.  This is another one of

1    those alleged conversations that are put forward, just like

2    Mr. Hollander's claim that you get a conversation with Mr.

3    Warner.  And I just want to focus on that because I think

4    again it tells a lot about the flavor of the plaintiff's

5    case.

6         If you recall Mr. Comlish testified about this

7    claim, he tried to make it sound like a confrontation and he

8    remembered the date.  October 16 of 2001.  Captain Woerth was

9    there, he was in his uniform.  I saw him from afar.  Remember

10   what he said?  He scowled at me.  Captain Woerth scowled at

11   him.  Wow, what a terrible thing.

12        Then when I got closer to him and tried to engage

13   him, he said the pilots have to get off the hill.  I think we

14   scanned it.  I want to pull up, when I cross examined him

15   about that.  I want you to see this.  Again, I think it is

16   important.

17        This is a blowup, the second part of it, do you

18   claim that you had a conversation on Capitol Hill with Duane

19   Woerth about the legislation you are pushing for?

20        That's correct.

21        Tell us exactly what you claim Mr. Woerth said to

22   you when you went up to him at this gathering with respect to

23   the legislation you were pushing?

24        He said you need to get off the hill.

25        You understood that to be him directing you to

1    become off from the legislation.  Right?   That was the point

2    of what you said before.   Yes?

3              What I said was he told me, me and my pilots, to

4    get off the hill.  That was the gist of the conversation.

5              So he is resisting me in terms of giving the

6    interpretation he give on direct.

7              Go to the next page.  The Judge then asked him

8    directly, "But you understood that, or you, I will ask the

9    question, did you understand he was telling you to stop

10   lobbying for the Bond bill?

11             "Yes".

12             We finally get a direct answer.

13             I then referred him back to sworn deposition

14   testimony he gave in January of this year, when Mr. Katz took

15   his deposition in preparation for the trial.  Let's go down

16   to the bottom.  He quoted from the deposition.  Did Woerth

17   ever say anything to you directly about being opposed to your

18   lobbying efforts?

19             How do you define directly?

20             I mean you are face-to-face with him, or you are in

21   a telephone conversation with him.

22             Says Comlish, "I am opposed to your legislative

23   efforts.  Something like that."

24             He avoids answering the question.

25             "ANSWER:  Counsel, we had a chain of command and I

1    wanted to honor that chain of command so many of these

2    communications went through the chain of command back and

3    forth to Duane Woerth."

4           Mr. Katz persists:

5           "Question:  Well, I am just asking you a simple

6    question.  Did you have a conversation directly with Duane

7    Woerth on the phone or in person in which he told you that he

8    was opposed to what you were doing?."

9           His answer was no.

10          This is so important.  This confrontation on

11   October 16, 2001, it is so important and it is so

12   demonstrative of Mr. Woerth's lack of support of the Bond

13   bill and ALPA's lack of support, how come he didn't remember

14   this conversation in January of this year.  He asked the

15   question directly.  So do you believe the conversation really

16   happened?  I leave that for you to decide.

17          Now, let's talk about what ALPA did do with respect

18   to the Bond bill.  I think when you look at the facts you

19   will understand that the suggestion here that ALPA didn't

20   appropriately support the Bond bill is just wrong.  Pull up D

21   94.

22          October 3 letter, Duane Woerth.  Do we have that

23   up?

24          This is a couple days, two days after the special

25   interest legislation gets introduced.  Here is Captain Woerth

1    writing to Senator Bond.  On behalf of the Airline Pilots

2    Association, I want to advise you of our strong support for

3    the Bond bill.

4            All right.  December 10, D 165.  Another letter he

5    wrote.  Representative Lewis.  This is December 10, after

6    Supplement CC has been implemented and as I will remind you

7    in a minute after Don Carty told the TWA pilots that the

8    Bond Amendment, if it passes, will lead him to close TWA LLC.

9            But some of the pilots are still pushing.  What

10   does Duane Woerth do.  He writes and says we support the Bond

11   Amendment.

12           And do the TWA pilots dispute that?  Let's pull up

13   the -- pardon me for a second.  I will see if I can find it.

14   Otherwise I will move on.

15           I will move on.  There is a letter in December, I

16   think it is December 19 -- pardon me for one second.

17           (Pause)

18           MR. FRAM:  I think it is D 206.  Oh good.  All

19   right.  Blow up the second paragraph from the bottom, with

20   the help.

21           Talking about Senator Bond and others, the TWA

22   pilots came very close to enacting arbitration legislation

23   during this session of Congress.  We wish to thank Senators

24   Bond, Carnahan and others for their efforts.  Furthermore, we

25   would like to express our gratitude to our own legislative

1   affairs committee and ALPA governmental affairs for their

2   support and guidance in pushing this proposed legislation

3   forward.

4           So this is an official communication.  If you go

5   back to the top of it you will see it is Mr. Glenn Stieneke

6   who sending this out on behalf of TWA LLC.  He is the

7   communications guy.  Does the MEC as a whole believe back in

8   2001 that ALPA did not appropriately support the Bond

9   legislation?  I don't think so.

10          Let's focus on the Bond legislation.  I want to

11  refer to the minutes of October 21 to 23.  I said to you a

12  couple times there are a handful of documents that I think

13  are truly important that you might want to take the time to

14  review.  Certainly the APA response of July 18 is important.

15  One of the other documents is D 88.  These are the minutes of

16  this meeting on October 20 to 22.  Pull those up, please.

17          I want to call to your attention a couple aspects

18  of this in case there is any thought that the Bond bill had

19  actually a chance of passing.  Refer to page 8 of the

20  minutes.

21          What you see is Paul Hallisay who you heard

22  identified by Mr. Comlish, at 14:43 gives a briefing.  He

23  talks about the MEC's recent legislative efforts.  Stated

24  that he felt that even if the bill passed in the Senate it

25  would not pass in the House.  Although efforts to this point

 1   have been somewhat successful, the bill would never come to

 2   the floor.

 3          This issue is very controversial.  You can imagine,

 4   A, that American and the American pilots are vigorously

 5   opposing it.  I think you recall that American is based in

 6   Texas.  We have a president from Texas.  We have a large and

 7   very powerful Congressional delegation from Texas.  We have a

 8   very difficult environment at this point in the aftermath of

 9   9-11, that is an environment that has got to be hostile to

10   the special interest side.  The TWA pilots agreed to waive

11   scope so there is an argument they are trying to do an end-

12   run around the agreement they reached on April 2.  As you can

13   imagine, there is not necessarily a lot of sympathy  for

14   them.

15          Let's turn to page 8 and get an assessment of the

16   merger committee chairman, by the merger committee chairman

17   about whether the bill had any chance of passing.  This is

18   Mike Day.  So Mr. Day is at the meeting and he has some

19   comments.  And one of the things he says is that he didn't

20   believe there was a chance for litigation or the bill

21   passing.  Only leverage was to continue to delay.

22          So he agrees this is an exercise in futility to try

23   to get this thing to pass.

24          What about Senator Bond's office?  What do they

25   think about this?  Turn to page 14.  There is a fellow from

1    Senator Bond's office who apparently attended the meeting.

2    Senator Bond was committed, but had some concerns that the

3    bill could be filibustered.  Not a rosy picture.  If you go

4    back to page 9 we have Mr. Brundage calling him and I think

5    you heard this quoted a couple times.  Where Don Carty told

6    Senator Bond if the bill passes, he will shut down TWA LLC.

7    And just recall Carty's position.

8            AMR, American, made a commitment to its employees,

9    right or wrong.  AMR employees cannot fathom an arbitrated

10   seniority list.  AMR committed to its employers that AMR

11   would not support arbitration for seniority.  If the bill

12   passed, AMR would shut down TWA LLC.  Cannot afford to upset

13   the apple cart.  He is unwavering in his position.  Even if

14   he gets this bill passed, you will wish that you didn't.

15           So think about that in terms of this argument that

16   ALPA should have pushed harder for the Bond bill.  It was

17   going nowhere.  It really wasn't.

18           What about litigation?  We are up to the point now

19   where Wilder comes up with a third litigation theory.  What

20   is his theory?  He wants to sue to force arbitration against

21   American because it has failed to use its best efforts to

22   help.

23           There is a discussion in these minutes about the

24   litigation theory and I would ask you to turn to page 10,

25   please.

1          Page 12 it is.  So Wilder is talking about this

2     issue.  He says, it says, Wilder stated he was here to advise

3     the MEC on the law and to help them get where they decided to

4     go.  Injunctions were being prepared against a single carrier

5     filing.  In order to get to arbitration, all the pieces have

6     to fall in line.  First, the MEC must stop AMR from reaching

7     an agreement with APA, and then file injunction on the single

8     carrier filing.

9          Let's talk about that.  How do you stop American

10    from reaching agreement with the APA on something that they

11    are going to negotiate?  It Doesn't say.

12         This would only be a short delay but cannot stop

13    them from doing this eventually.  He acknowledges that.  ALPA

14    needs to win the grievance with Richard Bloch on fair and

15    equitable process for integration.  Goes on and talks about

16    all the things that have to happen for his litigation theory

17    to have any chance of succeeding, any traction.

18         He also says in that same paragraph, he says if you

19    go down this road, there is nothing to prevent furloughs.

20         He says in the same paragraph, he says AMR would

21    take it out of our hides.  Wilder didn't see any local

22    protection to prevent AMR from furloughing heavier on the TWA

23    side.  He saw the fight going on through the first of the

24    year.  If ALPA came to arbitration, it would be about 120

25    days for the arbitration.  This would be a period of

1    vulnerability, as in any war.  There would be casualties.

2            So this litigation theory is not one that he is

3    really pushing as a solution.  You recall Mr. Rautenberg's

4    testimony, Mr. Rautenberg testified when Wilder put this

5    theory out there and assigned percentages, to all the things

6    that had to happen to succeed, that he did some math, and the

7    chances of success were about 5.6  percent.  Rautenberg then

8    went back and reassessed the percentages, the likelihood of

9    the different independent events, and then talked to Wilder

10   the next day and Wilder agreed that Rautenberg's percentages

11   were more accurate percentages.  Do you recall what number

12   Rautenberg came up with for the chance of success?  3.6

13   percent.

14           All the things had to fall into place for that to

15   happen.

16           One of the things that it says in here that had to

17   happen was that the arbitrator, this fellow, Richard Bloch,

18   had been assigned to hear the best efforts arbitration had to

19   rule in favor.  We had that arbitration decision.  In an

20   April 18, April 18 of 2002, it is D 316.  Pull it up.  I will

21   show you something that is interesting about it.

22           All right.  So you heard Mr. Warner testify about

23   representing the TWA pilots in this arbitration over two days

24   in December, he called Hefley and Swanson, Holtzman and Mike

25   Day, and even Sean Clarke to testify, the American people put

1   their witnesses on, they made arguments.  They had a mini

2   trial.  Just like the trial we are having here.  And

3   arbitrator Bloch found against them, and I just want to

4   highlight a couple aspects.  If you go to the very last page

5   of the document, I am sorry.  Page before the signature page.

6   Page 7.

7           What he says about the efforts that American made

8   in the process.  He says, but whatever its flaws, the process

9   itself was one that was negotiated, endorsed by the ALPA

10  representatives.  This is not to somehow attribute blame in

11  that process.  Given the respective bargaining position as

12  dated above it is unlikely that a better deal could have been

13  achieved.  Indeed, bringing the APA pilots to the table at

14  all, under the circumstances, could have been considered a

15  major victory.

16          This is after Supplement CC, this is after all the

17  efforts that you heard about, and I will talk about them in a

18  couple minutes.  So Bloch is looking at the evidence as an

19  independent arbitrator, and saying you guys got the best deal

20  that was out there to be had under the circumstances.

21          He makes comments on the prior page about a couple

22  other issues that have come up.  I think they are important

23  comments for you to keep in mind.

24          They give you a sense, I think they will help you

25  understand that some of the arguments that the TWA pilots,

1  the plaintiff group are pushing in this case are arguments

2  that, about a dry run before the arbitrator.  Top of page 6

3  of 8.

4        ALPA says, in summarizing the argument, that

5  American could have, for example, exercised leverage with

6  respect to the $45 million contempt fine incurred by the APA

7  following the Reno strike.  The suggestion is that American

8  could have somehow modified the repayment terms in exchange

9  for APA flexibility on the seniority issue.  But the

10  company's rejoinder on this point is persuasive.  The cost of

11  the fine amounted to some $5,000 per pilot.  Hardly the price

12  for which a pilot could forfeit seniority placement.

13        The fact of that fine really didn't mean that much

14  to the APA.  As you heard during the trial the fine was

15  resolved during the April or May timeframe of 2001.

16        Next paragraph, he talks about the claim that

17  American, a claim was made in the arbitration that American

18  should not have opposed the Bond Amendment.  ALPA directs the

19  Board's attention to the company's vigorous opposition to

20  legislation proposed by Missouri Representative Christopher

21  Bond, who attached an amendment to the appropriations bill

22  that would have guaranteed arbitration of the merger dispute.

23  American weighed in heavily against this amendment which was

24  ultimately dropped from the final bill.

25        He notes at the bottom, all this placed -- he

1    talked about the company's responsibility to the APA

2    contract.  All this placed the American pilots in a virtually

3    unassailable bargaining position in the upcoming seniority

4    discussions.  For this to have been overturned by legislative

5    fiat, while American remained silent, would have been viewed,

6    properly so, as a remarkable and profound abandonment of the

7    company's responsibility for this existing work force.

8           American had a responsibility to the pilots and an

9    obligation he felt to defend the terms of the collective

10   bargaining agreement, and to oppose the Bond Amendment.  So

11   nowhere, that is going nowhere.  One other thing I want you

12   to, I think it is important for you to note, a lot of

13   plaintiff's case favor, Duane Woerth scowled.  People raised

14   their voices.

15          I want to highlight one other aspect of the October

16   21, 23 minutes that I think is important.  If you turn,

17   please, to page, again, I encourage you to review these

18   minutes in full.  But if you turn page 7 of the minutes.

19   When you read through the minutes they are minutes of a

20   multiple day meeting, the meeting goes on, it breaks late, it

21   starts and picks up.

22          I want to point out to you that there are a number

23   of occasions where Captain Woerth is on the phone calling in,

24   Howard Atterian, Jeff Brundage, everybody is calling in and

25   catering to the TWA pilots, trying to get them as you heard

1    to move forward and reach an agreement.

2              And what is happening here is this is on Sunday

3    evening, October 21, 2001.  After ten o'clock at night,

4    actually after 10:30 at night you have got Captain Woerth and

5    Captain Atterian participating by telephone.  So Duane

6    Woerth, who the plaintiffs want to portray as uninvolved and

7    uninterested and unsupportive, Sunday night at 10:30 he is on

8    the phone with the MEC answering questions, giving guidance,

9    trying to help them move forward.

10             I think that speaks volumes about the kind of guy

11   Captain Woerth and the extra mile that he went to try to help

12   the TWA pilots.

13             Now, what about the events that result in

14   Supplement CC.  I am going to go through this quickly.  I

15   think you heard there is an effort at this meeting on the

16   22nd and 23rd to accept the proposal that is out there from

17   American but they try to make changes.  You may recall these

18   letters on the letter that goes out on the 23rd.  And then

19   American and the APA write back and say thanks for accepting

20   our proposal, but all of the additional conditions, that we

21   try to attach are unacceptable.

22             And if you read through these minutes, again, I

23   encourage you, you recall that this is a meeting where

24   Rautenberg and Altman are trying to get the MEC to vote to

25   accept a proposal.  And that motion is rejected.  They then

```
 1   go back the second time and there is a vote where a modified

 2   letter is agreed to, where Rautenberg and Lewin voting in

 3   favor.  Two people abstain.  And two people oppose.

 4          They send the letter, it is rejected by Brundage.

 5   And you read through the minutes, Brundage calls up and he is

 6   pretty darn angry about it.  Brundage is the one who had

 7   written a letter on October 12 which is D 200, another letter

 8   you might look at, where he is upset and complains to Duane

 9   Woerth because basically he got stood up.  They invited the

10   TWA MEC members to Dallas Fort Worth to talk about seniority

11   integration, and instead of sending the merger committee or

12   delegation, they send Bob Pastore and Pastore shows up with a

13   confidentiality agreement and says I will talk to you guys

14   but I have no authority and you have to sign this

15   confidentiality agreement.

16          That nothing happened to that.  Brundage wrote this

17   angry letter.  Here we are on October 21st and 22nd and 23rd,

18   and on the 23rd, they are sending this letter that they know

19   ahead of time that Brundage is going to reject.  He calls up

20   after he gets the letter and says it is rejected.  It is not

21   acceptable.  That is on page 16 of the minutes.

22          The result of this back and forth is there is no

23   agreement.

24          And what happens next is that Rautenberg, was here

25   to testify, he is upset.  The ALPA National people are
```

```
 1    advising you are going to get a worse deal if you reject the
 2    proposal out there, and they impose something.  I heard him
 3    say something.  You heard David Holtzman say that and indeed
 4    Supplement CC they told you as ultimately implemented is a
 5    worse deal than the deal that was on the table.  So
 6    Rautenberg is pushing, and he writes a letter on October 25,
 7    that I want to spend a couple minutes on because I think it
 8    is just a key letter that speaks volumes about what is
 9    happening.  D 21.
10              Pull that up, please.
11              What is happening in this letter is he is writing
12    back to the pilots in Council 3 trying to explain to them all
13    of what is happened in, and explain why the issue of
14    seniority integration has not been resolved.  And one of the
15    things he explains to them is all the politicking back and
16    forth.  You go to the second page of the letter, where he
17    talks about -- The third page, this is the back and forth
18    reflected in the minutes.  He goes to the fifth page.  He
19    picks up and says, Brundage called in, he received our
20    conditions, which were the ones that he had already made
21    clear were totally out of the question.
22              We responded in two ways.  One was a call between
23    the master chairman and Brundage in which he again rejected
24    our conditions.  The second was a teleconference between
25    those of us in the room, Brundage, Howard Attarian, Duane
```

```
 1   Woerth's executive assistant, and Bob Christy of ALPA

 2   International.  The only members of the MEC present in the

 3   room during that teleconference were Captain Lewin and myself

 4   and the other four members of the MEC, which I will refer to

 5   as the DC caucus, had left to hold yet another caucus amongst

 6   themselves alone.

 7          Who is he referring to?  Hollander, Young, Case,

 8   and Altman.  The fewer pilots that came in and testified.

 9   Remember I told you in the opening that they were a faction

10   within the MEC, that they were in the minority, Hollander was

11   in the minority on April 2 and other the summer Singer, they

12   took things over.  Their position in October is they don't

13   want to agree to anything.

14          We want APA and American to impose something so we

15   can go file a lawsuit against them.  He refers to them as the

16   DC caucus.  It is not me identifying them as a faction.  It

17   is Rautenberg based on upon what happened.  He talks in the

18   next paragraph about Atterian and ALPA made it absolutely

19   clear that Brundage was with them, that only minutes were

20   made to acceptance of the offers that APA and American had

21   made.  Brundage made  it clear American was done negotiating

22   and what American was willing to do to facilitate agreement

23   between APA and ALPA had been made clear.

24          He talks about the motion that was made to accept

25   the deal on the table.  And not to get stuck with Supplement
```

1    CC, and then he writes at that point the meeting was

2    adjourned.  The high fives, and the celebration amongst the

3    DC caucus, the pilots who testified as part of the

4    plaintiffs' case, began and others who were not interested in

5    celebrating, including Captain Lewin, myself, our two legal

6    counselors, the MEC officers, remember the officers, it is

7    Pastore, it Shwartz, we talked about them before.  The MEC

8    officer, a couple of members of the merger committee and a

9    few others packed our stuff and departed the room.

10           Celebration over blocking an agreement that as we

11   now know would have benefited the pilots more than Supplement

12   CC.

13           What happens, you recall the rest of the story.

14   There is a meeting on October 31 just before the domiciles on

15   the east and west coast collapse.  There is a resolution

16   passed to try  to  block Rautenberg from pushing ahead.

17   There is a November 1 letters where ALPA National says you

18   can't pass a resolution that requires unanimous approval and

19   the master chairman's approval.  That is against the bylaws.

20           So again, when the plaintiffs want to argue to you

21   that ALPA violated its policies and procedures, here is a

22   second example, where they are trying to violate the

23   procedures and get their way.  We had the meeting on November

24   7, where Rautenberg makes a last effort to accept the deal

25   what that is on the table.

 1          You saw from this summary that Brundage was at

 2  wit's end on okay 23.  How do you think it came that Brundage

 3  and the American people were still talking, that they didn't

 4  impose Supplement CC on October 24.  How that happened, Duane

 5  Woerth picked up the phone and called Brundage who had worked

 6  it out and made the communications that only Duane Woerth

 7  could make and said, look, we got some pilots here who are a

 8  little bit hot-headed.  Give us a chance.  Give us a chance

 9  to regroup and let's get some more time here.  And they did

10  that.

11          They did that because of the personal

12  relationships, they did that because of who Duane Woerth was.

13          Another thing, among many things, that Duane Woerth

14  did to try to help the pilots and to save them from the

15  faction who had this other strategy.

16          November 7, as you have heard, Rautenberg tried to

17  get a motion passed except Sally Young wouldn't second it,

18  and again, the policies and procedures that ALPA National was

19  saying are in effect, that you cannot second it, they are

20  disregarded, so we have another situation where policies and

21  procedures are disregarded because of an agenda, because of

22  an agenda to try to block a deal that would have been better

23  for the pilots.

24          So Supplement CC, as you heard, involves ratioing

25  1050 pilots in.  The other 1,250 pilots get stapled, they

1   don't get stapled as of the effective date of employment at

2   American.  You recall that the American pilots' contract

3   which you saw entitled new employees at American, entitled to

4   have then new employees stapled when they became American

5   employees.  They are still employees of TWA LLC, but despite

6   that it is made retroactive.  They are going to get stapled

7   as of April 10, 01.  They are ahead of 480 American pilots

8   who were hired.

9           You heard about the protected cells in St. Louis.

10  You heard the testimony I referred to before from Holtzman,

11  and from Rautenberg about some of the things that were lost.

12  There was no furlough guarantee for former pilots, senior, to

13  Ray Cano, the most senior staple pilot.  There were different

14  limits, less favorable limits on how much the protective cell

15  in St. Louis could shrink, and there were limits that were

16  lost on the number of pilots, TWA pilots, who could be

17  subject to furlough.

18          And the other thing that were lost, you may recall

19  Wilder pointed this out, Wilder pointed out, that look, if

20  you sign on to a three-party agreement, you recall the three-

21  party term sheet that was out there, dated November 6, if you

22  sign on to that American and the APA can't come back and

23  change it because you are a party to that contract.  If you

24  don't sign on and they impose Supplement CC, they could come

25  black in two months, if something else happens and say, oh,

1    we are changing it, we are going to make it less favorable to

2    the TWA pilots.

3            And no one knew of course at that time what the

4    future might hold.  These are all benefits that the Hollander

5    faction, they snubbed their collective noses at.  And who is

6    the worst for it?  The TWA pilots.  So think about that when

7    you listen to  an argument that it was ALPA, that it was

8    Duane Woerth, or ALPA National, that did wrong by the TWA

9    pilots.

10           They went the extra mile to try to get the best

11   possible deal.  But again, because of the way these MEC's

12   work, because of this whole Independence Plus procedure, this

13   structure, the pilots decide, the pilots decide by majority,

14   whether right or wrong.  ALPA National does not make any

15   decisions for them.

16           I think I have addressed the issues raised by the

17   plaintiffs, as I understand them.  I think you understand

18   what happened here in terms of the difficult situation.  But

19   a clear decision that had to be made on April 2.  I think you

20   understand, and I hope you do, from the evidence, and the

21   documents that the American pilots felt just as strongly

22   about seniority as the TWA pilots did.  But they had the

23   legal right, they had a contract, they had the leverage, they

24   had the ability to quote the article that Mr. Singer found

25   back on March think 30, they had the ability to impose the

1    law of the jungle, which meant they got the better deal.  Did

2    they insist on stapling?  No.

3           What happened here was much better than stapling.

4    Was it as good for the TWA pilots as Sean Clarke would have

5    liked?  As some of the other pilots would have liked?

6    Absolutely not.  It wasn't as good as anybody wanted.  But

7    the mature,  experienced pilots like Steve Rautenberg who was

8    pushing ahead to try to get a deal understood that you can't

9    always control the destiny, sometimes you have to take the

10   best deal possible under the circumstances.

11          And that one of the things you most certainly have

12   to do is you have to avoid risk.  You have to avoid rolling

13   the dice, and taking chances, that can really, really hurt

14   you.

15          And that is why you we submit to you that the

16   decision made on April 2 of 2001 was unquestionably, not a

17   shadow of a doubt, the right decision.  Waiving scope was

18   essential.  Waiving scope was giving up something that was

19   indefinite and uncertain, and as I think we have outlined for

20   you that ALPA National did everything that was within reason

21   during the rest of the year to try to support the MEC, to

22   give it extra chances, to position it, so that it could get

23   the best possible deal for the TWA pilots.

24          And the sad thing about this case is that that

25   didn't happen.  You had this group that felt they could win

1    the seniority, the best efforts arbitration and they could do

2    something.  It didn't happen.  They were not being realistic.

3    And they lost out, the TWA pilots lost out.  And what is

4    unfortunate about this case, as I think you have heard from

5    the evidence, what is unfortunate about this case is that the

6    people pushing this litigation are suffering from amnesia.

7            They are trying to rewrite history, what happened

8    here, to justify what happened.  Instead of taking

9    responsibility for decisions they made, instead of saying

10   yeah, I was at the meeting on March 21 or 22, yeah, I read

11   the documents, yeah, I did my job and prepared to make

12   decisions, to come in here and just made a mess of the fact

13   in terms of what happened, pretending they don't recall being

14   there, they don't recall the advice, pretending that they

15   weren't there on April 1, when even Mr. Wilder said they

16   were, and everybody else who has taken the time to prepare

17   and trying to give you the story.

18           This Broadway play, choreographed by Mr. Hollander

19   to the effect they were bullied and coerced on April 2.

20           Now, as I think Judge Irenas explained to you when

21   I began, I go first in terms of my presentation here.  The

22   plaintiffs' lawyers get the last word.  I don't get a chance

23   to come back and respond.  If they say something I don't

24   agree with or I can think of some reason why I think what

25   they said is wrong, that is it.  You have heard enough from

1    me is the way the system works.

2         So what I would like you to do as you hear their

3    presentation is to just keep in mind the framework that we

4    talked about at the very beginning.  And the framework is,

5    you are supposed to consider what is in evidence, not

6    questioned by the lawyers, where the answers might be no, I

7    don't recall, documents and testimony.  And then you are

8    supposed to evaluate that evidence and the arguments in light

9    of the standard.

10        Again, the standard, we don't have to prove that

11   ALPA left no stone unturned, or used what we refer to as

12   heroic efforts to help the MEC.  The plaintiffs have to prove

13   something.  What they have to prove is that ALPA acted

14   unreasonably, or irrationally, that it acted with ill will or

15   they have to prove that we did things like make deliberately

16   misleading statements.  That is a pretty high bar.  And we

17   ask you when they make arguments that I haven't anticipated,

18   maybe haven't thought about, we ask you to hold them to that

19   standard, and they, make them prove their case.  We ask you

20   to also think about the issue of causation.

21        It is real easy to see ALPA could have done X, Y

22   and Z.  But if it wouldn't have mattered given the fact that

23   the APA was an immovable object, it had its agenda and the

24   American pilots wanted to move, unless they can persuade you

25   that it made a difference we submit under the law, as the

1    Judge will describe to you, you should reject that argument.

2              Keep that framework in mind as you consider the

3    arguments and certainly as you consider the evidence.

4              You have been enormously patient.  You have sat

5    through weeks and weeks of testimony .  You listened to me go

6    on for hours today.  I probably repeated things you knew and

7    already understood, and I am sorry if I did that.  But the

8    case is enormously important to ALPA.  I think you understand

9    that.  And I want to thank you for your patience, and your

10   attention.

11             Thank you.

12             Your Honor, thank you.

13             THE COURT:  Thank you very much, Mr. Fram.

14             I think we will take a brief break now.  And I will

15   decide where we go from here today.

16             I am leaning towards adjourning today.  I don't

17   want the plaintiff to be in a position of  having his

18   closing --

19             MR. PRESS:  I don't mind doing it.  Just to

20   consolidate and use the jury's time.

21             THE COURT:  If you don't mind.  You told me

22   earlier --

23             MR. PRESS:  Let's just proceed.

24             THE COURT:  Let me ask you this.  Do you need a

25   break?

 1          You have been listening for three hours of closing

 2   arguments.  That is intense.  We will take a ten-minute break

 3   now.

 4          Then Mr. Press will start.

 5          (Recess)

 6          (The jury enters the courtroom.)

 7          THE COURT:  I now recognize Mr. Press to make his

 8   closing argument on behalf of the plaintiffs.  Mr. Press, we

 9   are breaking around two, so you know when would be a

10   convenient time, convenient breaking point.

11          MR. PRESS:  Okay.

12          THE COURT:  We will continue the rest of your

13   closing tomorrow morning.

14          MR. PRESS:  Okay.  You know I am not going to

15   finish in 45 minutes.  You know that.

16          Good afternoon, folks.  I want to thank you for the

17   hard work that you all put in.  If you remember in my opening

18   statement I promised you this would be hard.  I prompted you

19   lot of things.  That was one promise I know I kept.  And we

20   do thank you on behalf of the 2,300 pilots that we represent,

21   we do thank you.

22          And on that point, this class action, Mr. Fram told

23   you just a few minutes ago that this is being pursued by a

24   faction of the TWA pilots.  He said in his opening, and he

25   said it again today.  I couldn't believe it.  This is no

1    faction.  Look at this room.  And my clients, he called them

2    all liars.  I want you to remember, some of them are here.

3    Alan, Sean Clarke.  Please stand up.  Sally Young.  Alan

4    Altman.  Matt Comlish.

5         They are all liars.  That is what he just told you.

6    You remember these people.  They sat there, right in that

7    chair and looked you all in the eyes and told you what they

8    believed.

9         They told you what they remembered.  To the best of

10   their ability, stuff that happened ten years ago.  Their

11   story was completely consistent, unlike some of the ALPA

12   witnesses that we will get into.  That is who they are

13   calling liars to you today.

14        And then this charming fellow, remember him.  This

15   was Howard.  Howard Hollander.  He is a liar, too.  He is the

16   fellow that remember, that fateful day, April 2, he followed

17   advisors out of the conference room, they went in and  have a

18   conference call and he put his ear on the wall, the room next

19   door and he overheard what they were saying, which wasn't

20   very nice.

21        But that is who they are now trying to portray as

22   just completely dishonest people.  And I hope you don't

23   believe it.  These people are serious, credible people.  They

24   came in here and told you the truth to the best they could,

25   and they are no faction.

1          Who is the faction?  I mean, come on.  Steve

2   Rautenberg is the faction.  He is the one that got run right

3   out of his office because of the things he did there at the

4   end trying to get Supplement CC passed, after the full MEC

5   had just rejected it two weeks earlier.  Remember all of

6   that.  Steve Rautenberg is the faction.  He is entitled to

7   his opinion.  And no one could quarrel with somebody wanting

8   to have their own opinion.  But don't come in here, Mr. Fram,

9   and recreate facts.

10          Mr. Rautenberg was the faction.  And his decision

11  was so unpopular, remember what happened?  There was that

12  recall vote in St. Louis, it was the most attended two-day

13  pilot meeting ever in the history of TWA, it was about 600

14  people showed up for this.  So no.  Again, Mr. Rautenberg is

15  entitled to his opinion, but it wasn't very popular.

16          So that was part of who we brought in.  Who else

17  did we bring in here?  We brought in Roland Wilder, by video,

18  remember Roland?  Will, can you put his picture up there real

19  quick?  Roland Wilder.

20          This was not the way I would have wanted to present

21  this testimony to you.  You got to believe me on that.

22  Playing a video, I would never want to do that in any case

23  of, especially in this one, not of this man in particular.

24          He lives in Washington, D.C..  It is outside the

25  subpoena power of the Court.  I can't put a subpoena on him

1   and get him here.  Couldn't do it.  This was the only way I

2   could present his testimony to you.

3           And I know they are throwing Roland right under the

4   bus here all morning and afternoon.  But do you believe that?

5   This is an experienced, serious, highly qualified man.  He is

6   a guru in this industry.  He testified that he is one of a

7   handful of lawyers in the country that practice in this area

8   of the law, and that is seniority disputes.

9           He is the expert.  And we are supposed to believe

10  Clay Warner over Roland Wilder as to what is a good legal

11  strategy.  Come on.  Come on.

12          So we brought you Roland Wilder.  And here is what

13  is important.  There is a lot of things important.  But

14  Roland testified, he testified that good things happen to

15  employees that fight.  Good things happen to employees that

16  fight in a labor struggle.  And he said, if you are going to

17  get in a fight it is better to fight than to lie down.  That

18  was, that is his advice to every group that he represents.

19          And that is sound advice.  But what happened here?

20  What did ALPA do?

21          They insisted that the TWA pilots surrender their

22  best leverage, the scope.  That is the first thing they did.

23  You got to surrender that.  And then we go into the

24  negotiations and everything that the TWA pilots asked to do,

25  to garner some leverage, what did ALPA say.  No.  No.  No.

No.  No.  No.  That is all they ever said to the TWA pilots.
And they never had an idea of their own, no, that is not a
good idea, but let's try this.  No, they didn't do anything
to supply the TWA pilots with any leverage after they
stripped them or advised them to surrender their best
leverage.  That is what happened here.

        And we brought you the people that wanted to fight.
Who did they bring in?  They brought you four lawyers, not
that there is anything wrong with that.  They brought you
four lawyers, none of whom told you anything that they did to
help in the seniority debate.  None of them.  Not one of
them.  And they brought you two disgruntled former TWA
pilots, Rautenberg and Singer, and they brought you a
completely discredited former president, Duane Woerth.  And
why do I say that he is discredited?

        Mr. Fram called my clients liars.  I am not going
to do that to Ambassador Woerth, but what he said on the
witness stand wasn't entirely truthful about some of the
important things.  You remember the testimony, my partner,
Joe, was cross examining him about the scab list.  Remember
the testimony, there was this business about the TWA pilots
wanted to have a jumpseat war against the American pilots.
And there was, there was some evidence, Duane Woerth was
asked the question, isn't it true that ALPA has a list of
scabs, and that scab list is distributed to members?  And the

1    idea is that ALPA members are not to allow scabs to use the

2    jumpseat.  Do you remember that?  And I should give you some

3    more framework before I go on.

4         ALPA has told you that we don't do jumpseat wars

5    because we don't use the jumpseat to punish another pilot.

6    We don't use it for political reasons.  Well, that is

7    hogwash.  They do it.  With this scab list.

8         Duane Woerth denied it.  Oh, we have never had a

9    scab list.  Remember how, he was very calm in his testimony.

10   But when it came to that scab list he perked right up.  And

11   he said very defiantly, no, we have never had a scab list.

12   Remember what he said next?  That would be illegal.  Okay.

13   Joe sat down.

14        Then what happened a week later?  Seth Rosen is on

15   the witness stand, and he tells you the truth.  They did have

16   a scab list.  It took them a while to get there to remember

17   that.  Remember I had to show him a copy of a court opinion

18   that he actually participated in and once he read that, he

19   said, he had to admit then, yes, Mr. Press, we did have a

20   scab list and we did distribute it to all of our members.

21        So Duane Woerth was not exactly truthful with you.

22   And as Mr. Fram told you, I mean, come on, that is black and

23   white.

24        Did you have a scab list, Captain Woerth?

25        No, that would be illegal.

1        We know it is not true.  They did have one.  But he

2   just didn't want to tell you that.  And what did Mr. Fram say

3   about somebody that doesn't tell you the truth in the witness

4   stand?  You can believe what you want to believe and what you

5   don't want to believe.  And I suggest that everything he said

6   should be clouded, you should judge very seriously whether or

7   not you believe that from this man.  All right.

8        So that is what they brought you.  We brought you

9   all the people who wanted to fight and they brought you a

10  bunch of people that told you nothing about any fight that

11  they put up.  All they brought to you was excuses.

12       And I am sitting here listening to Mr. Fram, and

13  excuses, everyone has got an excuse, excuses are like noses,

14  my mother told me.  Everybody has got one.  That is not what

15  the TWA pilots wanted.  They wanted a fight.  They wanted

16  real support.  They needed leverage against the American

17  pilots.  Yes.

18       What Mr. Fram said is true, the American pilots did

19  have the leverage.  But they didn't have the most powerful

20  pilot union in the world backing them up.

21       And that is what our clients expected.  They

22  expected real support.

23       Now, let's get to the instructions you are going to

24  get.  The Judge is going to instruct you that ALPA violated

25  its duty of fair representation to the TWA pilots if it did

1    one of two things.  If it acted arbitrarily, or it acted in

2    bad faith.

3           Now, let's begin with arbitrary, okay.  You will be

4    instructed that examples of arbitrary conduct include acting

5    in a perfunctory or superficial manner.  Perfunctory or

6    superficial manner.  If a union does that, a union has acted

7    arbitrarily and has violated its duty to its members.

8           So did ALPA act perfunctorily, superficially?  You

9    bet.  I mean, my goodness, they did nothing but give lip

10   service.

11          I am going to break things down into things that

12   made sense in my mind any way.  Let's talk about the broken

13   promises first.  I think it is completely legitimate and fair

14   to conclude that a union act arbitrarily when it doesn't do

15   what it promises to do.

16          It seems fair.  If you promise one thing and you

17   don't deliver, you do just the opposite, then that is

18   arbitrary conduct.  And so let's look at what ALPA promised

19   my clients, while all of this was going on.  They are real

20   words.  D 243.

21          Now I need to be able  to see it.

22          D 243.  What did they promise here?  Can you go to

23   the highlighted section?

24          What is the date on this?  I need to go over here

25   so I can see.  This is an MEC meeting from January, 2001,

1    right.  And Captain Shwartz, where is he at?  He is the vice

2    chairman there, the second line.  He reports on some

3    conversation he had with Duane Woerth.  What does he report?

4    If you go to the next clip.  Shwartz briefed the MEC on his

5    conversation with ALPA president Duane Woerth.  He said

6    President Woerth indicated he would be extremely supportive

7    of the MEC's efforts in the coming months.

8            So that was promise one.  Woerth is going to be

9    extremely supportive.

10           What is promise two?  March 2, D 245.  This is

11   again an MEC meeting, March 2, in St. Louis.  And there is

12   another report on what Duane Woerth says he is going to do,

13   if we can go to that.  Vice chairman Scott Shwartz stated

14   that Captain Woerth was committed in assisting this pilot

15   group to facilitate fair seniority integration.  Good.  That

16   is what we want.  Assured the body that all resources would

17   be utilized to obtain fair seniority integration.

18           All resources would be used.

19           That is what was promised that date.

20           What is the next one?  March 21, D 223.  Another

21   MEC meeting.  March 21.  What is the promise and commitment

22   delivered that day?  Again from Scott Shwartz.  He again

23   briefed the MEC regarding teleconference with Duane Woerth

24   who promised to ramp up ALPA support and utilize other legal

25   venues for support. Other legal venues.   That would be

1    what?  A lawsuit.

2             And by the way, the timing of that, March 21, the

3    first time TWA pilots asked to bring a lawsuit was five days

4    later when Roland Wilder that letter to Duane Woerth

5    suggesting he should try to hold up this deal to buy times

6    for my guys.  That was written five days after Woerth

7    promised other legal venues of support.  And of course, we

8    know what happened to that litigation strategy.  It was

9    rejected.  Woerth didn't even bother to respond to Roland

10   Wilder on that one.

11            Okay.  So the next promise, this one  we don't have

12   a document of, but we have Mike Day's testimony.  Remember

13   Captain Day, the distinguished man who was head of the merger

14   committee, in charge of negotiating the seniority?  Do you

15   remember him?  And Mike Day told you that after he got done

16   with his first round of, if you want to call them

17   negotiations, at the end of March with the American

18   negotiators, he was very distraught, and he said he had a

19   conversation with Randy Babbitt, and Babbitt told him, said,

20   Mike, don't worry about it.  Duane Woerth has told me that as

21   soon as we get all the bankruptcy issues put aside, the

22   gloves are coming off.  That was promised at the end of

23   March.  As soon as we get the bankruptcy issues resolved, the

24   gloves are coming off.  Okay.  That sounds good.

25            So that was the promise that day.

1          Then let's go to the next one, which is April 23, D

2     78.  This is April 23, another MEC meeting in St. Louis.

3     This is the one where Duane Woerth attended, and what did he

4     report to the MEC?  What did he report?  First we have Ted

5     Case over here.  He is making a statement for the record, and

6     he wants Captain Woerth on the record this time.  He says,

7     Captain Woerth, if the TWA pilots -- Oh, he asked Captain

8     Woerth if the TWA pilots had his commitment as the president

9     of ALPA to use the full resources of the association,

10    including litigation, if possible or necessary, against the

11    APA, American, and TWA.

12         What does Captain Woerth, how does he respond?

13    Captain Woerth responded what?  If there was any basis for

14    litigation, it will be pursued.

15         That no stone will be unturned to protect the TWA

16    pilots.

17         Now, maybe there is no legal duty to turn over any

18    stone on behalf  of the guys you represent, but if you

19    promise it to them, shouldn't you deliver it?  Of course you

20    should.

21         So that was April 23.  What is the next one?  It is

22    May 31, P 316.  P 316.  This is the May 31 letter that Duane

23    Woerth sent to every TWA pilot.  All 2,300 of them got this

24    letter.  And what does he say here?  How does he conclude?

25              As president, I will continue to coordinate with

1    your MEC and your merger committee to ensure TWA pilots are

2    fairly and equitably integrated into the American pilots

3    seniority list.

4           Okay.  And we had every MEC member testify and

5    every merger committee member testify, up to that point, sir,

6    and Ms. Young, was there any coordination between MEC and

7    Duane Woerth?  And the answer was no.  Was there any

8    coordination thereafter?  No.  And the same question was

9    asked of Sean Clarke and Mike Day and they both testified no.

10          So, but this is what the ALPA president is

11   promising.  This is what they were promising.  And that is

12   what my clients expected.  That is what they expected.  The

13   full resources of their union applied against the American

14   pilots.  So that they could in fact get the best seniority

15   integration possible.  That is what they expected.  That is

16   clearly not what they got.  What they got was a whole gaggle

17   of advisors  that show up on April 2 to persuade them to

18   waive scope.  We know that happened.  Then they all

19   disappear, all these advisors, meeting after meeting in

20   March, and early April.  And then poof, they are gone.  Never

21   to come back.

22          It is all the pilots ever got from ALPA was lip

23   service and the word no.  That is all they ever got.  They

24   even said no to writing a letter, remember, this one?  It is

25   D, no, P-161.  P-161.  This is, I mean this is really

1    amazing.

2         This is Randy Babbitt, he was the last witness to

3    testify by that video deposition that they played.  And he

4    wants to write a letter to the secretary, or the -- yeah, the

5    head of the Department of Transportation, Norm Mineta and he

6    wants to write this letter saying Secretary Mineta, you

7    should hold up this American deal until the seniority issues

8    are played out and worked out and there is going to be some

9    assurance of fairness.  That is what the attached letter

10   says.

11        And what happened?  He sends this up to Clay Warner

12   on March 28.  Warner testified that he spoke with Paul

13   Hallisay, this ALPA lobbyist about it.  And Paul said, Duane

14   says no.  Okay.  You can't even send a letter.

15        Go to the next page, or the last page, there is

16   another no in here.  Remember Clay Warner wouldn't even agree

17   when the Judge was trying to get him to agree that that is

18   his handwriting?  The suggested proposed letter says that I

19   would suggest that the final DOT approval should include

20   language requiring American to take appropriate steps to meet

21   the minimum fairness standards on seniority integration.

22   Okay.  And Warner -- that is proposing DOT assure fairness in

23   the transaction.  And Warner writes, no.

24        You are going to be instructed on this

25   arbitrariness element, that a union acts arbitrarily if it

1    acts irrationally.

2           Irrational behavior from a union is arbitrary

3    conduct.

4           Now, like broken promises, shouldn't we conclude

5    that it is irrational for a union to persistently violate its

6    own practices and policies?  If a union persistently does

7    that in representing its members, wouldn't you consider that

8    to be irrational?  Well, there was plenty of that here.

9    Plenty of it.  We saw that ALPA has many, many tools

10   available to itself to help its members.

11          Many tools.  And I am going to list them one by

12   one.  And the fact is, and why we are here is that none of

13   those tools were given to the TWA pilots.  The first one I

14   want to talk about is contract negotiation assistance.

15          These TWA pilots as part of the scope surrender,

16   they get this new collective bargaining agreement, right?

17   Mr. Fram wants you to believe this is some great thing.  I

18   will get into that.  But let's just talk about how it was

19   negotiating and compare that to ALPA policy.

20          ALPA first of all has a written policy on how to

21   negotiate a contract with your employer.  And that was

22   exhibit 249.  P-249.  Or J, I am being told there is the

23   first page of it.  We had Mr. Rosen talk about some of this

24   stuff.  And on the first highlighted clip, what is the policy

25   there?  D.  Ratification.  That means you have to have all

1    the members vote on it.  Ratification.  The conclusion of an

2    agreement shall, at the discretion of the MEC, be subject to

3    MEC or membership ratification.

4           So if the MEC wants, it can put out a contract for

5    membership ratification.

6           What happened here?  On April 2 when the advisors

7    are all there telling them the train is leaving the station,

8    they may say that comment wasn't made, but you know it was,

9    they all say it.  But when that conversation was taking place

10   the MEC said they were reluctant to do this.  They didn't

11   want to.  They said can't we put this out for vote?  Can't we

12   have membership ratification?  And what was the response?

13   No.  There is not enough time.  There is not enough time to

14   do that.

15          Well, what was driving that issue?  The bankruptcy

16   hearing which was set to be heard four days later.  Okay.

17   The meeting was on Monday and then the bankruptcy hearing was

18   on a Friday, and they are saying, well, there is not enough

19   time to put it up for ratification.  But there was.  Mr.

20   Seltzer supplied the proof.  He told you that there is an

21   automatic right to an extension of the 1113 hearing.  All

22   they had to do is go into court and say Judge, we would like

23   an extension of this hearing so that we can put this issue

24   out to vote to the members, the union local representatives

25   have asked for it, and that is what we want to do.

1        And that would have been done.  Then ALPA has

2    procedures for telephonic balloting.  In can be done very

3    quickly.  So when they told the MEC there is not enough time,

4    that wasn't true.  There was time.  They just wanted a

5    decision that day.  And I will explain to you why that was

6    important to them.  But not now.

7        The next highlighted page, again, how to negotiate

8    a contract policy.  This one is "Crisis and concessionary

9    Negotiations."

10        The TWA pilots were clearly involved in a

11    concessionary negotiation.  They were being asked to give up

12    their scope.  Nothing could be more important to them.

13        So this policy applies.  And what does it say on

14    the next page?  If you are involved in that kind of

15    negotiation, ALPA shall provide to the MEC, can you highlight

16    that?  Shall provide three things.  First one is probably the

17    most important one:  Coordination directly through the

18    president's office.  So under ALPA's written policy, if an

19    MEC is involved in a concessionary negotiation, that

20    negotiation has to be coordinated through the president's

21    office.

22        That didn't happen here.  Woerth didn't tell you

23    one thing that he did coordinating any of this negotiation of

24    this new contract.  He wasn't involved.  They violated the

25    policy.

1          Now, there are remarks in the record that Captain

2     Woerth made when he is speaking to the American pilots.  A

3     copy of his speech is in evidence, it is exhibit 10, P 10.

4     And in his speech he makes some remarks about, additional

5     remarks on what ALPA does when negotiating a contract, and if

6     you go to page 26 of this document, it is number 26, now,

7     this is what is going on here.

8          You got this fellow, Captain Dan Hall, that is an

9     American pilot, he is asking a question.  And his question to

10    Captain Woerth is about how they structure negotiations.

11    Then Captain Woerth responds.  Here is his response.

12          "We have employees, we have three directors, a

13    director and three assistant directors that are in

14    Washington.  We farm them out kind of on what I call the

15    crisis patrol.  Like Seth" --  presumably referring to Seth

16    Rosen.  "Seth is the director of that entire department.  But

17    since the Delta contract is so important now on top of

18    Northwest, we have three negotiators down at Delta, plus Seth

19    Rosen on the team."

20          Our number one guy is assigned to the number one

21    project.  And that is how we use our top four or five most

22    senior guys.  The bigger the stakes, the more experienced

23    person we have, the more seasoned veteran on the team.  That

24    is what ALPA represents to the world what it does when its

25    members are involved in an important negotiation.

1         Weren't my clients involved in an important

2    negotiation?  David.  David Holtzman, the same lawyer Dave

3    Singer said wasn't so good, wasn't very thorough.  That is

4    all the TWA pilots got.  We didn't get Seth Rosen.  We didn't

5    get these directors, or any assistance.

6         So they violate their written policy, and they

7    violate their, what they tell the representations to the

8    world on what they do.  And that is just on contract

9    negotiation.

10         Then, let's talk about seniority, seniority

11    negotiations.

12         What is the policy there?  Again, this one is in

13    writing.  It is P 20.  P 20.  This is ALPA's merger and

14    fragmentation policy.  This is the how-to manual on when you

15    are trying to negotiate two seniority lists together, this is

16    the manual on how to do it and achieve a fair result.

17         Most of it deals with the context of two carriers,

18    two pilot groups both represented by ALPA, and that is the

19    typical situation of what we had here is atypical, because

20    ALPA didn't represent the other side.  What I said is because

21    ALPA represents so many pilots that usually it is two ALPA

22    represented groups going at one another and in those cases

23    ALPA just backs off.  They say go hire your own lawyer.  Go

24    raise as much money as you want and have it out.  And ALPA,

25    you know, steps aside.

1          That wasn't our case.  ALPA didn't represent the

2    other side.  This is a case that they get to take the gloves

3    off, as it were.  And about but what is the policy, what does

4    it say on page 15?  NonALPA or unorganized airlines.  Right

5    there.  When the circumstances surrounding a merger preclude

6    adherence to this policy, i.e., where a nonALPA or

7    unorganized group is involved, reasonable steps shall be

8    taken by the president to seek acceptance of a procedure that

9    will enable the parties to proceed to a fair and equitable

10   resolution.

11          The president is required to take reasonable steps

12   to seek acceptance of a procedure that will enable a fair

13   result.

14          Duane Woerth worth didn't tell you any step he took

15   to comply with this policy, and that is because he didn't

16   take any.  This is another example of ALPA violating its own

17   policy.

18          Duane Woerth was supposed to get involved here.  He

19   was supposed to direct these concessionary negotiations and

20   he was supposed to beat on the American pilots to agree to a

21   procedure for a fair integration.  And he did neither one of

22   those.

23          Now, what is another tool that ALPA has.  Funding.

24          Staying with exhibit 20, if you go back four pages

25   to page this is a whole thing on funding an MEC faced with

 1    merging with a nonALPA carrier.

 2              See, beginning on the sentence.  Statement of

 3    intent.  This is ALPA's intent.  Written policy.  It is of

 4    particular concern that there is the potential that one of

 5    our smaller or less financially able MECs could face a merger

 6    with a nonALPA carrier without sufficient means to provide

 7    adequate representation for their membership.  As provided by

 8    ALPA policy, nothing in this policy restricts the MEC

 9    chairman of such a group from petitioning the president for

10    supplemental funding to allow proper representation.

11              ALPA policy anticipates that in the situation my

12    clients were faced with, that they get a request for more

13    money.  That is the statement of intent.  And every time my

14    guys asked ALPA for money.  What was the answer?  No.

15              In fact, if you remember there was a meeting in

16    July of '01 at the executive council, this is ALPA's board --

17    or not the board, but another layer below the board, the

18    executive council.  And the TWA pilot had a group there Bob

19    Pastore, Mike Day and Bud Bensel and they presented to the

20    executive council and they asked for permission to hire a

21    lawyer.  They weren't even asking for money.  All they wanted

22    was money to hire an independent lawyer because Roland wasn't

23    working for ALPA.  Every time Roland asked for something they

24    said no, so they said let's hire a new lawyer.  What was the

25    response?  Remember, we had Tom Rachsford, he was a member of

1    the executive council, he set on the council, this is ALPA

2    talking to you now, not a TWA pilot.  And Tom  Rachsford,

3    what did he say  the response of Duane Woerth was?  Not only

4    no.  "Hell no."

5           Can we show that?  Remember Captain Rachsford.

6    That was taken in Phoenix, and I asked him, can you recall

7    what the response was to the TWA pilots' request?  And he

8    give a long answer.  Can we highlight that?

9           It says.  I can remember that on -- that Duane

10   listened -- Duane was rather -- I can't read that.  -- here

11   it is, line 20.

12          And I remember it specifically, it was no and hell

13   no.  We have got resources within the association and we have

14   got a myriad, those are my words, we have a myriad of

15   attorneys.  Okay.

16          And Captain Rachsford told me that that that was a

17   strange response from Duane Woerth because he is typically a

18   calm man and he reacted violently that day --  not violently,

19   but angrily -- and it led Tom Rachsford to think that there

20   is something else going on here.  That was his testimony.

21   There is something else going on here.  And of course there

22   was.

23          On that day, that very day, that was when Clark and

24   Hunnibell got invited to ALPA's headquarters.  Got taken out

25   to dinner, a tour of the facilities, all that, so there was

1    something going on that day.

2         Now, on this funding issue, you have also got this

3    thing called a major contingency fund, which we heard some

4    testimony about.  This was ALPA's war chest that it doles out

5    to pilot groups that need supplemental funding and they had

6    75 million dollars in it at this time.  But of course the TWA

7    pilots restricted completely from any major contingency

8    funding.  Any time they asked for it, answer, no.

9         But let's compare that to other pilot groups.  And

10   my partner, Joe Jacobson, he was questioning Duane Woerth

11   about this, he showed one press release after another where

12   pilot groups are getting big sums of money, the Delta pilots,

13   ten million I think it was, everybody seemingly who asked for

14   money out of the major contingency fund gets it except the

15   TWA pilots.  And even while this was going on, there was a

16   small, tiny group of pilots, from Ryan Airlines, and they are

17   involved with some sort of seniority issue, and they asked

18   for a million dollars and they got a million dollars.  This

19   was in May of 2001.  Same time, Duane Woerth is promising all

20   the support for the TWA pilots.  Ryan Airlines pilots get a

21   million.

22        This is a good time to break.

23        THE COURT:  Okay.  Ladies and gentlemen, first of

24   all, of course, job one, have a safe trip home and a safe

25   trip in tomorrow.

```
 1              Let me give you a brief rundown for tomorrow.  I
 2    don't think we will have the administrative stuff we had to
 3    do today that caused the hour delay this morning.  Tomorrow,
 4    I don't think that will be necessary.  So I certainly hope we
 5    can start at 8:30 tomorrow rather than 9:30 like we did
 6    today.
 7              We were working for that hour, but there are things
 8    we have to get ready for the closing.  Remember we thought we
 9    were going to have a witness and it turned out we didn't.  So
10    we had to use that time for some other things.
11              My anticipation is that Mr. Press will be finished,
12    I can't predict, but ten or eleven o'clock in the morning.
13    My charge to you will be less than an hour.  Probably more
14    like 45 minutes.
15              Then we will buy you lunch when you are
16    deliberating, we actually buy lunch for you.  We come and
17    take your order.  Filet mignon, lobster, good things like
18    that.
19              Then the case is yours to deliberate.  Tomorrow I
20    will leave it to you.  If you want to stay past 2:30, up
21    until five, to continue your deliberations, that is fine with
22    me.  But I won't force you to did that.  It is up to you.  We
23    will, you will vote and discuss it among yourselves and you
24    will let us know if you want to stay past two or not.  That
25    will be up to you.  That will be true on any day you
```

1 deliberate, if you want to stay past two, we will make

2 arrangements so you can do that.  But again, it will be up to

3 you.  We won't force it on you.  To keep our promise, we go

4 eight to two.

5    But sometimes, a lot of times juries like to

6 deliberate as long as they can.

7    It will be up to you.  We will see.

8    So you won't hear this very much longer.  Don't

9 discuss the case among yourselves.  Don't discuss the case

10 with friends or loved ones.  Keep an open mind until Mr.

11 Press as finished his closing argument, and you have heard my

12 instruction as to the law which will all be tomorrow morning.

13 And then have a safe trip home.  Have a safe trip in

14 tomorrow.

15    (Jury leaves the courtroom).

16   THE COURT:  Counsel, if you want to pick up a final

17 copy of the charge that reflect the changes we discussed this

18 morning, send somebody to my chambers.

19    MR. PRESS:  I have got enough information on that.

20    THE COURT:  Yes.  There isn't much.  But those

21 changes have been, I am advised, completed.  If you want

22 them, if you don't want, them I will just bring them here

23 with me in the morning.

24    MR. PRESS:  That is fine.

25    THE COURT:  I will bring them down tomorrow.  Other

1    than that, I will see you tomorrow.

2              Mr. Press, you will be ready to go at 8:30.

3              MR. PRESS:  I will be.

4              THE COURT:  Thank you, all of you, very, very much.

5              MS. RODRIGUEZ:  Thank you, your Honor.

6              MR. FRAM:  Thank you, your Honor.

7              (Adjourned at 2:00 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25