```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                            Plaintiffs,
 6                                          VOLUME  19
                 V.                         TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                            Defendant.
 9
                                     CAMDEN, NEW JERSEY
10                                   JULY 12, 2011

11        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                       A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                 AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.  (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.  (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:  STEVEN FRAM, ESQ.
19                  AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH  GINSBURG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
above-entitled proceedings.

3                          S/   LYNNE JOHNSON

4                          Lynne Johnson, CSR, CM, CRR
5                          Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                   LYNNE JOHNSON, CSR, CM, CRR
18                 OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
19                 P.O. BOX 6822
                   LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

```
 1              THE  COURT:  Good morning.

 2         MR. FRAM:  Good morning, your Honor.

 3         THE COURT:  Now, do we have Mr. Press?

 4         MR. PRESS:  Yes.

 5         THE COURT:  Okay.  We are going to go on the

 6  record.

 7         Mr. Fram raised three objections to aspects of the

 8  portion of the closing that Mr. Press gave at the end of

 9  yesterday's session.

10         Mr. Fram, why don't you briefly give us the first

11  one?

12         MR. FRAM:  Fine, your Honor.  The first one is that

13  Mr. Press argued in response to my pointing out that his

14  clients had claimed that Mr. Wilder was there on April 2nd

15  and in fact Mr. Wilder testified that he wasn't.

16         THE COURT:  Go right to the point.

17         MR. FRAM:  He claimed, your Honor, that his

18  witnesses were "serious, credible people," and you can't do

19  that under 3.4 D --

20         THE COURT:  Mr. Press, you can't vouch.

21         MR. JACOBSON: He asked me --

22         THE COURT:  You can't vouch for your clients, you

23  can't do that.

24         MR. JACOBSON:  He referred to them and said you saw

25  them on the stand.  He was referring to the testimony.
```

```
 1              THE COURT:  No, no, no.  He had to stand up in the

 2    courtroom, they are serious people.  There wasn't one single

 3    reference to the record.  All of Mr. Fram's comments about

 4    the credibility were tied to the record, tied to things that

 5    were said and that were in the record.  Not one comment about

 6    that.

 7              You can't express a personal opinion about the

 8    credibility of your clients.  Don't do it again.

 9              MR. PRESS:  I won't.

10              THE COURT:  And if you do it again -- I don't know

11    what I am going to do, but I am going to do something.  And

12    you can, part of you record, you know they are telling the

13    truth because, and you can make whatever references to the

14    record you want.  But having to stand up in the courtroom and

15    saying they are serious people, is not proper closing

16    argument.

17              All right.  Let's go to the second point.

18              MR. FRAM:  Thank you.

19              THE COURT:  1113.

20              MR. FRAM:  Your Honor, 1113, you cited the

21    testimony, we provided the statute.  The argument that they

22    could have gone and gotten an extension is just wrong, and

23    there is nothing in the --

24              THE COURT:  It is not complete, it is a little more

25    murky than that.  They filed the, some time early in March
```

```
1   irks don't know, they filed, TWA filed its 1113 motion.

2            MR. FRAM:  March 15, your Honor.

3            THE COURT:  Well, on the 21st, but on the 21st, and

4   there is no return date set on that motion.

5            MR. FRAM:  Yes, your Honor.

6            THE COURT:  On the 21st an amended motion was

7   filed, which may start the clock all over again.  If you

8   don't even consider that possibility, that the amended motion

9   would start the clock all over again.  And in that case, they

10  set the 6th as the date, and I don't know whether the Court

11  set that date, or it was in TWA's papers.

12           MR. JACOBSON: The testimony of Mr. Seltzer was that

13  that date had already been set by the court for other motions

14  so the motion war set for a date that was already set for

15  that case.

16           THE COURT:  I don't understand what you said.

17           MR. JACOBSON: Seltzer said that April 6 had been

18  set as a date for a hearing in bankruptcy before the 1113

19  motion was filed, and when they filed the amended motion they

20  set it for that already scheduled date.

21           THE COURT:  Yeah, but was it, TWA said in the

22  papers that is going to be the return date or was the it the

23  Court said it.

24           MR. JACOBSON:  That was the date they said, TWA set

25  in the papers.
```

```
 1            THE COURT:  That is what they thought.  It wasn't

 2   a date the Court said I am going to hear it.  There was a

 3   date scheduled for other matters.

 4            MR. JACOBSON: Correct.

 5            THE COURT:  But now, the 6th happened to be 16 days

 6   from March 21st.  I don't know with the weekend, how that

 7   falls or anything.

 8            So there may well be an additional period where you

 9   could get an extension, if you start the clock running from

10   the date the amended motion is filed.

11            MR. FRAM:  The testimony of Mr. Seltzer was that

12   that was the final date.

13            THE COURT:  Well, first of all, nobody made any

14   effort to extend it.

15            Mr. Press, your statement that they had an

16   automatic right to extension, even the statute doesn't say

17   that.  The Court has a right to grant the motion.  It is not

18   like our motion practice here where the clerk can give a two-

19   week extension are or something.

20            MR. FRAM:  For an answer, and a dispositive motion.

21            THE COURT:  The Judge doesn't have to get involved,

22   the Clerk's office will do it.  But in this statute, the

23   Court has to approve it.  In other words, it is not

24   automatic.

25            So quite candidly, it is a little bit murky.  What
```

1    do you propose I do about it?  I am not going to instruct the

2    jury on it.

3           You want me to put my thumb in, I am not.

4           But what do you suggest other than that?  Because

5    your argument is quite candidly less than rock solid.

6           MR. FRAM:  Well, if your Honor's view is that the

7    argument was fairly based upon the evidence, then I am

8    probably not be entitled to a remedy.  What I would like is

9    to be able to get up and give a rebuttal closing, that would

10   be very nice.  I don't know that your Honor is going to allow

11   that.

12          THE COURT:  Let me, I have been thinking about that

13   all night, about the question of rebuttal closing.  But let

14   me -- on that point.  But because what I see right now is

15   exactly what Mr. Jacobson said.  You had a date set.  The

16   date was used when the amended was filed, and that happened

17   in 16 days, not 14 days after afterward.  Right, March 21,

18   April 6?

19          MR. FRAM:  But you raise an important point, your

20   Honor.  The statute says --

21          THE COURT:  It is not automatic.

22          MR. FRAM:  The statute says it has got to be 14

23   days after it is filed.  So if it gets refiled on the 21st,

24   April 6 could not have been the correct date.  It would have

25   been more than 14 days later.  It is right in the statute.

```
 1            THE COURT:  Bankruptcy judges, all judges, district

 2   judges, we set our calendars, we change dates all the time.

 3            MR. FRAM:  In contradiction of the statute, your

 4   Honor?

 5            THE COURT:  What are you going to do, appeal to the

 6   Circuit?

 7            You know, but the statement there was an automatic

 8   right to an extension is not an accurate statement.  It is an

 9   inaccurate statement.

10            I am going to see what Mr. Press does with that

11   when he gets his closing.

12            I think the more relevant point from Mr. Press's

13   point of view is that nobody made any effort to get the Judge

14   to extend it.  That is supported by the record.  That nobody

15   made a motion, nobody asked the Judge, nobody said Judge, we

16   need a week or two to analyze this.

17            Nobody tried, or nobody even tried to use the

18   statute to get an extra number of days.

19            That is relevant.  And that is supported by the

20   record.  It is not supported by the record that it is an

21   automatic right.

22            But on the other hand, I think there is a very

23   credible argument that the filing started the clock going.

24            All right.  Third point.

25            MR. FRAM:  Your Honor, the third point is a little
```

```
 1    bit more involved, but it looks to the distinction between

 2    the conduct that is alleged was arbitrary and conduct that is

 3    in bad faith.

 4            The argument I heard yesterday is that ALPA made

 5    promises, again and again, to support to, do all these

 6    different things and it didn't fulfill them.  It also, I

 7    thought it sounded like a contract argument but of course

 8    there is no consideration, including a contract.  The idea

 9    that by making promises and not fulfilling them you are

10    acting arbitrarily is inconsistent with the law, as we read

11    it.

12            There are cases which say that if you make promises

13    or give opinions about future events or interpretations of

14    documents, that that can form the basis for violation of the

15    DFR if they are made in bad faith.  But the idea that simply

16    by making a promise and not fulfilling it there is in effect

17    strict liability I think is contrary to the statute, your

18    Honor.

19            THE COURT:  We haven't heard all of Mr. Press's

20    closing, but I thought that part of his closing was proper.

21    I thought his, I mean, part of his theory of this case is

22    that ALPA in its desire to unionize the American pilots,

23    basically took a dive in negotiations on seniority.  And the

24    fact that they were promised that we will do everything in

25    our power to help you, you need more money, we will leave no
```

1    stone unturned, or as I used to say to my clients, leave no

2    turn unstoned.

3            I thought that was proper closing.  The cases I

4    read, I have them here.  They deal with different sets of

5    facts and different situations.  In the context of this case,

6    I didn't find anything improper in pointing out that there

7    was a discrepancy between statements, we will do everything

8    in our power to help you, and doing, and at least as

9    argument, and argument, that they didn't do anything to help,

10   you have contrary arguments, of course, on that.  But that is

11   tied to the record and that I think is proper.

12           So I am not going to, on the third point, I didn't

13   find anything on that, along that line, the line of his

14   argument to be improper.

15           So as to the first point, Mr. Press has promised me

16   he won't do it again.

17           As to the second point, I want to see what he does

18   about that.

19           I think the point is that no effort was made.  I

20   don't think the point is to adjourn the hearing.  I think it

21   is a little murky.  I don't think there is an absolute right

22   to an extension.  I think that there was a right to appeal to

23   the Judge for an extension.  And I think the Judge had the

24   authority here for at least five days for an extension.

25   Quite candidly, I think it is based on whatever.  I am going

```
1    to see what Mr. Press does with that.  If I think rebuttal on

2    that point is required, I will do it.

3              MR. FRAM:  Thank you.  As to the first point you

4    are going to charge the jury as to credibility?

5              THE COURT:  You know what the charge is, you have

6    it.

7              MR. FRAM:  I am not sure I have this morning's

8    version.  It --

9              THE COURT:  I haven't changed that, though.

10             MR. FRAM:  I think what I may ask you to do is to

11   refer the jury back during the charge to Mr. Press's

12   assertion and ask them to disregard it.  Let me look at the

13   charge.

14             THE COURT:  All right.  I will let you look at

15   that.  If you are going to suggest something, I am not saying

16   I am going to grant it, but if you request something, write

17   it out.

18             MR. FRAM:  Yes, absolutely.  I may have somebody

19   with legible handwriting do it.

20             THE COURT:  I can read your handwriting.

21             MR. FRAM:  All right.

22             THE COURT:  Or you can have somebody do it.

23             MR. FRAM:  Thank you.

24             THE COURT:  Okay.  We will find out if the jury is

25   here.
```

1          Are you ready, Mr. Press.

2          MR. PRESS:  Yes.

3            (Pause)

4          THE COURT:  Mr. Press, Mr. Fram, this is the

5     up-to-date, it has no "draft" on it.

6          MR. FRAM:  Thank you, your Honor.

7          (Off-the-record discussion).

8          (Jury enters the courtroom.)

9          THE COURT:  What a handsome group of jurors.

10         You must have picked them for their good looks.

11         Good morning, everybody.  Please be seated.   Good

12    morning to you all.  Nice to see you.

13         Mr. Press, I recognize you to continue your closing

14    statement.

15         MR. PRESS:  Thank you, your Honor.

16         This is the end, I am confident we will conclude

17    this for you and you will get the case.  And you will go back

18    there, but I have more words before that happens.

19         Continuing with this list of ALPA tools, I am going

20    to follow up on this notion that all my clients lied about

21    what happened on April 2.

22         Do you remember the accusation that Roland Wilder

23    testified that he wasn't there on April 2, so how could my

24    clients be telling the truth?  They all concocted this

25    conspiracy and story and came in here and told it to you.

1    That is what they want you to believe.  Because Roland Wilder

2    testified he wasn't there on April 2.

3          Well, what is missing from that argument is the

4    fact that Roland Wilder flip-flopped three times on whether

5    he was there on April 1 or April 2.  And that was played to

6    you.  And what Mr. Fram played to you was his last testimony

7    where he flip-flopped back saying no, I wasn't there.  I was

8    there on the first, but not on the second.

9          So instead of coming in and trying to convince you

10   that all my clients lied, isn't it more reasonable to think

11   that Mr. Wilder was just confused on the date?  Isn't that

12   more reasonable?

13         You know what I think about it.  But you also have

14   something that was missing.  David Singer, their own witness,

15   testified that Roland Wilder was there on April 2.  Their

16   other pilot witnesses, Rautenberg, he conveniently couldn't

17   recall.  That was his testimony.  So every pilot witness that

18   hit that stand told you that Roland Wilder was there that

19   day.

20         And Roland Wilder, again he went back and forth

21   several times and then finally, the last time he testified it

22   was, no, Roland wasn't there.

23         So let's get back to this list of tools.  Where I

24   left off was funding.

25         The next one I want to talk about is lobbying.  The

1  evidence was lobbying.  The evidence was very clear ALPA is

2  proud of its legislation affairs department, it has a

3  department devoted to going to Capitol Hill and getting

4  things done.  Headed by this fellow Paul Hallisay, who

5  conveniently wasn't here to testify to you.

6          But we know that this is something that ALPA is

7  very proud of.  I want to refer to exhibit 10.  And this

8  again, this is the remarks, this is the script, or rather the

9  transcript of Duane Woerth's remarks to the American Airlines

10 pilots board of directors when he went down there and spoke

11 to them in the fall of 2000.

12         And he made some comments bragging about ALPA's

13 ability to lobby, at page 15.  Page 15.  I don't know where

14 it is.

15         Will, can you highlight that?

16         What does he say?  We are trying to get back to the

17 core, what works for all trade unions.  Most of it is pretty

18 simple.  The same thing that works with the trade union works

19 in business.  You consolidate power and money.  All the

20 political power you can concentrate.  All the economic power

21 you can concentrate.  And you kick as much ass as you can

22 with it.

23         That is Duane Woerth talking and that is pretty

24 tough talk.

25         At page 22 he makes some more remarks about ALPA's

1    lobbying prowess.

2              He is talking about President Clinton.  He had just

3    played, remember the video I played you, ALPA's 70th

4    anniversary video and there was a bunch of people that

5    talked, President Clinton talked on it, several other

6    politicians.  He is talking about that.  He had just played

7    the video.  Then he makes this comment.  Whether you are a

8    supporter of Clinton or not, it really doesn't matter.  It is

9    all about political power and justice is never blind.  Our

10   pack is huge, he says, continuing down,  and we are the most

11   bipartisan pack in the labor movement.  I go to the

12   Republican convention and we give money to John McCain.  We

13   give money to more Republicans than any labor union because

14   we are the most focused, as you are, the most focused special

15   interest group you can get to.

16             What does he say, continuing down.  It is all about

17   pilots, and that is the only thing we care about, and we will

18   do anything it takes to win a political arena.  Whether that

19   be with the White House, or whether that be with Congress.

20             So -- and Duane Woerth testified here similarly, I

21   mean he was very proud of the fact that he could get in the

22   White House whenever he wants.

23             So this union has the political power that it takes

24   to get something done in Washington.  They do.

25             And my clients asked for that power to be exercised

1   on their behalf when it came to this Bond bill.  Remember how

2   that started, it wasn't ALPA's idea.  It was Matt Comlish's

3   idea and Ted Case's idea.  By the way, I got a picture of

4   Ted, in case you forgot him.  He was the first witness to

5   testify.  He is on a trip and can't testify.  Ted and Matt

6   came up with that idea on their own.  They went to Senator

7   Bond and they drafted the legislation themselves, and Senator

8   Bond introduced this thing.

9            And they asked for ALPA support over and over

10  again.  They went to Duane Woerth's office and asked for

11  support.  Nothing happened.  Except one letter to Senator

12  Bond.

13           Writing a letter to the Senator that sponsored the

14  bill and saying we support this bill, that is silly.  Unless

15  you think the Senator is going to withdraw the bill.  I mean,

16  why would you write, it is the other 99 senators that you

17  should have been writing to, not the guy that sponsored the

18  bill.  But that is what Duane Woerth did and that is all he

19  did.

20           Remember, it went further than that.  Remember Matt

21  Comlish.  He testified that they had these daily meetings

22  when they were organizing all these big  groups of pilots to

23  go out on the Hill and knock on doors and talk to senators

24  and staffers.

25           Remember, they had these morning meetings, and Ted

1    and Matt would give orders out to everybody and they would

2    go, flight attendants and pilots.

3          And they were doing it at a hotel and they needed

4    better resources so they asked ALPA can we use your downtown

5    office, your DC office?  What was the answer?  No.  They had

6    to go to a different union, the IAM, the flight attendants'

7    union, let the pilots use their space for that purpose.  They

8    just wanted some space and a copy machine and even that was a

9    no.

10         There was some testimony, the bill gets passed or

11   gets introduced by Senator Bond on December 1st, I believe --

12   no, October 1st.

13         And then three weeks later there is this meeting in

14   DC where ALPA, or the merger committee of both pilot groups

15   are trying to negotiate a deal again.  Remember, there is a

16   lot of testimony about that meeting.  October 23.  And Paul

17   Hallisay, the legislative affairs director for ALPA, called

18   in to the meeting, and he was asked, what have you been

19   doing?  And he made a false statement, according to Howard

20   Hollander, he said I have been knocking on doors.  Howard

21   said that is a lie, because every office I go into, I ask

22   them have you heard from ALPA?  This is Howard's testimony.

23   And the answer he always got was no.  And he made a record of

24   that on the business card that he brought into court with

25   him.  He wanted to know what ALPA was doing, so he asked

1    people.  And the answer he got was, we haven't heard from

2    your union.  Mr. Hallisay wasn't doing any work.  That is the

3    evidence.

4           Mr. Fram told you yesterday that the bill was going

5    nowhere.  I guess it is some sort of excuse not to support

6    it.  It wasn't going anywhere?  What happened to it?  The

7    Senate unanimously approved that bill.  That was on December

8    8.

9           On their own, the TWA pilots got that bill through

10   the Senate.  Then it has to go to Congress -- yeah, it has to

11   go then to the House of Representatives.  What did ALPA do

12   then?  This is P 357.

13          Remember the timing of this.  December 8.  It gets

14   unanimously approved by the Senate.  Four days later,

15   December 12, we have this going on.  Go to the next page,

16   please, will.  This is this business about flight pay loss,

17   where pilots make claims, if they drop a trip, they are not

18   getting paid by their employer, doing union business, the

19   union will pay them for their lost pay.  This is flight pay

20   loss, that is what this is.

21          This is -- this is the flight pay loss claim form

22   submitted by Howard Hollander for legislative work in DC.

23   And that claim got denied.  This is Jalmer Johnson was the

24   testimony.  That is the general manager of ALPA.  Four days

25   after this bill passes the Senate, they start denying flight

1    pay loss claims for pilots that want to lobby.

2          Now we got to get through the House of

3    Representatives.  There is five times more representatives

4    than senators.  And they start denying flight pay loss.  Go

5    to the next page.  You can see another example.  Jim Arthur.

6    He is another MEC representative, legislative work in DC.

7    Denied.  Lisa Mauro, legislative work in DC.  Denied.  This

8    is four days after the thing gets passed by the Senate.  I

9    don't think it is a coincidence.

10          And what happened?  The bill died in the House.

11    That is what happened.  So lobbying.

12          What is another tool that ALPA has?  Litigation.

13    Litigation is another thing this union does.

14          They have a whole legal department.  It is headed

15    by a man named Jonathan Cohen.  I want to show you Mr.

16    Cohen's words in a previous example prior to the TWA's pilot

17    problems, this is exhibit 405.

18          Mike Day showed this to you.  This was a memo,

19    March 22, '01 that he sent to the MEC and the negotiating

20    committee and he attached a whole bunch of documents that he

21    had collected from ALPA, that related to past seniority

22    integration.  If you go to the next page, he is talking, here

23    at the bottom, Jonathan Cohen, director of legal.  This is

24    his memo, about the TWA Ozark transaction which was a merger

25    that occurred in mid eighties.  Ozark was a regional carrier

```
 1    based out of St. Louis and TWA bought them and there were

 2    seniority issues going on.

 3          TWA took some harsh actions to the Ozark pilots,

 4    not the pilots, but the carrier itself.  The carrier

 5    considered that it was not bound by ALPA merger policy in

 6    this transaction.  It took action that was harmful to the

 7    Ozark pilots, transferred certain aircraft and what not.

 8    They threatened to take further actions against the Ozark

 9    pilots.  They were ALPA pilots.  They want to sue TWA.  The

10    Ozark pilots representatives and their chosen counsel

11    concluded that the chances of -- oh, wait.  Yeah, the chances

12    of prevailing in litigation challenging TWA's actions were

13    slim.  Nevertheless, ALPA offered to pursue litigation and

14    grievances and to take whatever action the Ozark pilots

15    desired.

16          That is the standard that ALPA sets forth.  You

17    want to sue, even if it is slim, we will let you do it.

18          At least for the Ozark pilots back then.  You can

19    take that down.

20          But what happened in our case?  We heard the ALPA

21    lawyers testify on the witness stand that Roland's ideas were

22    no good, meaning I guess they had a slim chance of

23    prevailing.  And they denied every request.  The first one

24    came in March, the next one came in July.  I want to put up

25    the July 1, P-127.  Roland prepared a detailed memo of a
```

 1    strategy that he wanted to, a litigation that he wanted to

 2    bring in July.  This is right in the middle of the seniority

 3    discussions between the two pilot groups, and the TWA pilots

 4    are getting nowhere.  Remember that America guy said we are

 5    going to staple two thirds of you, that is it, they are never

 6    budged off that position until the very end.

 7              And we will talk about that later.

 8              So this is right in the middle of this.  A very

 9    difficult negotiation is going on and Roland Wilder comes up

10    with this strategy and he prepares a multi-page memo that he

11    submits up to the ALPA legal department.  And if you go I

12    think it is to the last page, he makes a conclusory statement

13    that this is an opportunity to generate much-needed leverage

14    for the TWA merger representatives.  That is what they

15    needed.  That is what they were looking for.  Leverage.  You

16    heard it from Mike Day over and over and over again, how

17    completely frustrated he was that he had no leverage against

18    there other pilot group he is negotiating with.

19              And Roland Wilder saw an opportunity, and he sought

20    saw it, and ALPA said no.

21              And we heard Clay Warner testify that, well,

22    Roland's strategy was, what were his words?  Oh.

23    Fundamentally flawed, he said.  Fundamentally flawed.

24              Well, I don't know.  It is probably hard for you to

25    remember this, but I had Mr. Warner's testimony or his legal

1    memorandum when I took Roland's deposition, this

2    fundamentally flawed thing.  I asked Roland point blank, I

3    said here is Clay Warner saying your strategy is

4    fundamentally flawed.  Do you agree with that?  Roland of

5    course said no.  And he was quite solid about that.

6             So who are you supposed to believe?  That is for

7    you to do.

8             But Roland Wilder thought this was an opportunity

9    to get some leverage, and it wasn't used.

10            His last strategy came in October.  This was right

11   when the cram-down is coming, and he had a strategy to stop

12   the cram-down.  Stop American and the American pilots from

13   imposing their own will on the TWA pilots.

14            This strategy I think is probably the most

15   egregious because, well, rather the denial, because ALPA had

16   promised that this one could be done.  There was a meeting

17   with Roland, Mike Day, and Duane Woerth, in which they

18   discussed this, and Duane Woerth approved it.  He said when

19   the time comes, I am going to let you do that.  This, I think

20   the meeting was in August.

21            Well, the time came in October.  The cram-down was

22   imminent.  Roland Wilder was dispatched to complete the

23   paperwork to file the lawsuit.  And what happened?  Duane

24   Woerth called in to the MEC meeting, this is again in DC,

25   late October.  And he reneged on his promise.  He reneged and

1    and said no, I don't sue other unions.  That was it.

2            What kind of excuse is that?  You represent the TWA

3    pilots.  You had approved this litigation strategy.  And now

4    when I need to do it, you are saying no.  It infuriated them,

5    and you heard their testimony.  It was a very emotional day.

6    But that left them completely, just kick the legs under them,

7    they were done at that point.  They were powerless to stop

8    the cram-down, and it came.

9            Then of course there was one final request for

10   litigation.  One final one.  Remember the TWA pilots, other

11   than Mr. Rautenberg, did not want to sign off on the

12   seniority plan that American and their pilots came up with,

13   this Supplement CC.  TWA pilots generally did not want to

14   agree to that.

15           Mr. Rautenberg, for whatever reason, he did.  But

16   there was a reason the TWA pilots didn't want to agree to it.

17   If you agree to it you can't complain about it in court.  If

18   you sign a contract, you can't challenge that contract.  And

19   so the TWA pilots, they had a reason for not agreeing, and

20   the reason was they wanted to leave an option open, a

21   litigation option open, to challenge Supplement CC when the

22   time was right.

23           And that time came.  And Ted Case, he went to ALPA,

24   David Holtzman, and asked for permission to challenge

25   Supplement CC.  He wanted to sue APA and have this thing

declared invalid, and he had a reason that he gave you.  He
said listen, once it came out, they had names,  every TWA
pilot was named and put on the seniority list.  I can show it
to you.  But he said wait.  You are negotiating for me.  You
are interfering with my union, with ALPA.  ALPA has my
bargaining rights and you can't put me on a seniority list.

        And so he thought that Americans interference with
ALPA's bargaining right provided a basis to challenge
Supplement CC and he asked to bring that lawsuit and he was
told, of course, no.  But what you need to remember is that
none of the four ALPA lawyers that testified in this case
said one word about that.

        They were quick to criticize Roland Wilder and tell
you that his ideas were no good, but none of them said that
Ted Case's idea wasn't any good.  Not one.

        I think that sounds pretty arbitrary.  No, no,
Roland, no, Roland, no, Roland, no Ted.  And of course they
didn't come up with one strategy of their own, not one.  So
that is litigation.

        Another tool that this union has is its affiliation
with the AFL-CIO which is an organization of labor unions,
and it is the biggest one in the world.  At the time there
were 14 million affiliated members in the AFL-CIO, and this
again is something that ALPA was very proud of and quick to
tout to people as one of our strengths.

1           And we will look again at that speech that Duane

2      Woerth gave to the APA in October, 2000.  That is exhibit 10.

3      This time, Will, I think the quote is at page 16.

4           He is talking about, ALPA's affiliation with the

5      AFL-CIO, and I think he says, I think, by consolidating our

6      power and money, you will add so much to our organization, he

7      is talking about the American pilots.  You have such talent

8      in your organization and I think where it belongs, and I am

9      just, is where you can get the most leverage from it.

10           You need to leverage the rest of us.  We need your

11      strength and you need to leverage ALPA.  You need to leverage

12      what should be 70 to 90,000 pilots within a couple of years.

13      You need to leverage the 14 million members of the AFL-CIO,

14      and the 50 million dollars they put in every single year into

15      the political campaigns.

16           Then he talks some more about this affiliation with

17      the AFL-CIO on the next page, page 17.  The second down here.

18      But that is where the power is.  That is where the power is.

19      Right there.  The president and staff are functionaries.  We

20      are the Executive Branch as well, the Congress makes rules.

21      They have the local power and we try to carry out their will

22      in Washington, try to enforce, whether it be in Congress,

23      through the administration, any place we can enforce our

24      will.  Try it and through the AFL I am the vice president of

25      the AFL-CIO, elected to the member of the executive council,

1    which is some of the larger union presidents of the AFL  and

2    I think we just try to leverage all that power for our

3    benefit.

4           We leverage all that power for our benefit.

5           And he was right.  I mean, that is power.

6           And remember on the video that he played and I

7    played for you, their 70th anniversary video, they had the

8    president of the AFL-CIO give a little presentation and he

9    talked, he thanked ALPA for resurrecting the strike as a tool

10   for labor and he referenced the Northwest strike in the

11   eighties, and the United strike.  As to the United strike, I

12   don't expect you to remember this, he said, ALPA, you brought

13   labor to new heights in its effort for the United pilots.

14          So this is unionism at its core here we are talking

15   about, AFL-CIO, strikes.  This is unionism.  This is

16   brotherhood.  And my clients all told you that is what they

17   expected.  That is what they wanted.  And it just wasn't

18   delivered here.

19          But it wasn't asked for specifically as to the

20   AFL-CIO.  Mike Day, if you remember, this is again in that

21   July timeframe, the summer, when the negotiation with the

22   American pilots is going very, very rough.  And he was very

23   concerned so he went to ALPA, presented at their executive

24   council, this is the same meeting where Bud Bensel was there

25   and Captain Pastore was there.  Captain Pastore, I told you

1   he was asking to hire the lawyer and he got the "no, hell

2   no."  Mike Day was there asking for something different.  He

3   wanted some leverage in his negotiation.  And he asked, he

4   said I want you to go to the AFL-CIO and ask them to organize

5   a boycott of American.  And he explained that to you, what

6   that means.  There is this boycott list.  It gets distributed

7   to all 14 million of these AFL-CIO members.  And that boycott

8   list says don't do business with that company.  They are

9   unfair to labor.  And this is something that union members

10  take seriously.  Mike Day said so any way.  And he showed you

11  an example of one of these boycott lists.  It gets

12  distributed to ALPA members ever month in its magazine.  This

13  is exhibit 440.

14        And he brought in the magazine, remember, he

15  brought in, this it was from October, 2001.  Don't buy these

16  products.  National boycotts.  He wanted to see American be

17  put on that list.  So that all 14 million members of the

18  AFL-CIO and their families would stop flying American

19  Airlines.  What was the intent?  Put some pressure on

20  American to go over to their pilot union and say, hey, you

21  need to soften up.

22        You need to lighten up a little bit.  He wanted to

23  exert pressure on American to pressure its union.  That is

24  all he was asking for.  That wouldn't have cost ALPA a nickel

25  to ask the AFL-CIO to put American on that list.  But what

 1   did he get?  No.

 2          Now, this is a very interesting coincidence.  If

 3   you go to the next page, this is from October, 2001, this is

 4   the ALPA magazine.  No, we are not going to put American on

 5   the boycott list but we will let them advertise in our

 6   magazine.

 7          You can take that down, will.

 8          Another tool available to ALPA or at least one that

 9   had exercised in the past, is this jumpseat thing.

10          As part of the same meeting when make day is

11   presenting to the executive council asking for a boycott of

12   American he asked for ALPA to threaten a jumpseat war.  And I

13   think you all understand what we are talking about there.

14   Restricting American pilots from the jumpseat so they can't

15   fly for free on ALPA carriers.  You got to remember there are

16   50, 60,000 ALPA members.  11,000 American.  So if American

17   reciprocates and says, okay, you guys can't get in our

18   jumpseats.  Who is going to win that war?  That is easy.  Who

19   is going to win?  60,000 versus 11,000?  We know the answer

20   was no, we are not going to do that.  ALPA came in here and

21   gave you a reason, it is against our policy.  We have a

22   written policy on that.

23          But what were the facts?  They do.  Steve

24   Rautenberg testified that Duane Woerth told him that they had

25   done a jumpseat war in the past.  If there was any specifics

```
1   about what it was, but they had done it and we know for a

2   fact they keep scabs out of the jumpseat.  Their policy says

3   we don't use the jumpseat for political purposes.  Yes, they

4   do.  That is the fact.  Keeping a scab out of a jumpseat,

5   that is punishing somebody because of something they did.

6   Well, that is what we wanted here.  That is what the TWA

7   pilots wanted.  These guys aren't scabs, these American

8   pilots but they are completely unfair to us, and were your

9   members.

10          But the answer was no.

11          This isn't so much a tool.  But a policy of theirs

12  that I want to talk about.  Independence Plus.

13          You heard Mr. Fram talk about this concept in his

14  closing, and Duane Woerth testified about it.  This is the

15  notion at ALPA, this is how ALPA says it does business.

16  Independence Plus, what does it mean?  It means the MECs are

17  to act independently.  They make their own decisions.  The

18  plus is, plus they get ALPA's support.  So this is a really

19  good thing.  You act independently plus you get all the

20  national support you need.  Independence Plus.  Well, what

21  happened here?

22          On April 2, the MEC is meeting to decide whether or

23  not to waive scope, and they are confronted with a gaggle of

24  advisors.  And we know except for Mr. Rautenberg, everybody

25  else came to the meeting, five members, came to the meeting
```

```
 1    not knowing how they are going to vote.  We know Hollander

 2    testified he was not going to waive scope.  The others didn't

 3    know what they were going to do.  They had all been

 4    previously advised not to waive scope.  All three testified

 5    to that.  Howard, Sally, Ted -- four, and Alan.

 6            The ALPA advisors up April 2 had always told them

 7    we can beat the 1113, and you shouldn't waive your scope.

 8            Now, ALPA of course disputes this.

 9            They say no, no, we had meetings on March 14, where

10    we told, we fully advised everybody and we did the same thing

11    on March 21.  Remember, they were very, very deliberate in

12    this testimony.  By Warner, David Holtzman, Richard Seltzer.

13    They all came in here and said we fully briefed the MEC, two

14    prior occasions, March 14 and March 21, on the fact that you

15    are going to lose the 1113 and you are probably going to have

16    to give up your scope ultimately.  That was their testimony.

17    It doesn't make sense.

18            Not if there is Independence Plus it doesn't make

19    any sense.

20            If you fully advice the MEC twice, and remember Mr.

21    Fram, he asked all his witnesses the same questions and they

22    understood, yes.  They were able to ask all their questions?

23    Yes.  And we answered all their questions?  Yes.  Did they

24    appear confused?  No.  He did that with all three of them.

25    And on both days, March 14 and March 21, so here is the
```

1   question.  If they are smart, intelligent people, and you

2   fully advised them, why do you need to do it a third time on

3   April 2.  It doesn't make sense.  If you fully advised them

4   and they understood why do you feed to do it again, a third

5   time?

6           The answer is because it didn't happen the two

7   prior times.

8           The testimony makes no sense.  The most reasonable

9   conclusion is that the advisors came on April 2 and advised

10  them to waive scope because they were all changing their

11  opinions, as my clients testified.  They needed to secure

12  that scope waiver.

13          My clients all testified that there was strenuous

14  pressure exerted by the ALPA advisors that day in securing

15  the scope waiver.  And it was only a result of that pressure

16  that led to their decision.  Independence Plus?  No.  What

17  did that scope waiver do?  It disarmed them of their best

18  leverage.

19          Now, we are not here to say what was the right

20  decision.  We don't know.  But we do know this, there was no

21  Independence Plus there.  ALPA stripped them of their best

22  leverage and re-armed them with nothing.  That is the truth.

23          So these are their tools.  Contract, we provide

24  contract negotiating assistance.  But not to TWA pilots.  We

25  provide seniority negotiation assistance in the form the

president, going to the other group and trying to secure a

fair process.  That is their policy, but no, not for the TWA

pilots.  To provide funding in several ways through this

major contingency fund, and others.  But no, not for the TWA

pilots.

We have this great lobbying department at your

service.  But no, not for the TWA pilots.

We have this legal department and we litigate even

when the chances are slim.  But no, not for the TWA pilots.

We have this affiliation with the 14 million member

AFL-CIO which provides much power.  That is at your disposal,

but no, not for the TWA pilots.

We have a practice in the past and currently as to

scabs to keep people we don't like off our jumpseats.  But

no, you can't do that, you TWA pilots can't.  And we have

this policy of Independence Plus that you are going to make

your own decisions.  But no, not for the TWA pilots.

That is what we had.  Did ALPA act arbitrarily?  At

the end, what we have here is we know that ALPA is very good

at supporting a scope waiver.  They are very good at

supporting surrender, but they are not so good at -- I

shouldn't say that.  But they provided no support for the TWA

pilots in the struggle that really mattered.  The struggle

for their seniority.  There was no support there.  And that

is why we are here.

1          Now, Mr. Fram told you a few things that ALPA did

2    after the scope waiver, that I guess they are trying to

3    convince you would somebody given leverage to the TWA pilots.

4    I tried to be careful and note them all.  If your memory is

5    that I missed one, I am not doing it intentionally.  I am

6    going to list them up here, what I remember Mr. Fram, I made

7    a list, things Mr. Fram says ALPA did.  The first thing was

8    that they paid flight pay loss.  Remember this issue?  In the

9    pilots contract with TWA, Inc., before the bankruptcy, they

10   had this 9,000 hour flight pay loss bank which was worth one

11   and a half million dollars, which meant that the company

12   would pay the pilots when they were out doing union work, the

13   company would pay for it.  That is a good thing.

14          And you remember as part of the scope waiver and

15   this new contract that the pilots entered into, that flight

16   pay loss bank wasn't in there, it got removed for whatever

17   reason.  No one explained it.  All the pilots had to do going

18   in to that bankruptcy was remove their scope.  Well, they

19   removed this $1.5 million bank as well for some unknown

20   reason.  Mr. Holtzman negotiated the deal.  But he didn't

21   explain to you why that got taken out.

22          So what did ALPA do?  Yes.  ALPA stepped in and

23   filled that void and paid some flight pay loss, except for

24   lobbying at the end, which we know.  But this was just for

25   the MEC to conduct its business, to have its meetings, pay

1    its rent, yeah, have its meetings and for the various MEC

2    officers and committee members did do their work.

3              So ALPA allows TWA to strip the pilots of their

4    flight pay loss bank and then they replenish it.  Did that

5    provide any leverage to Mike Day's committee, negotiating for

6    seniority?  No.  That is not leverage.

7              The next thing, I don't know about the order, but

8    another one, he said, that Duane Woerth appeared before the

9    American Airline pilot union's board on April 5 and had a

10   discussion with them.  Woerth, 4/5, at APA.

11             Okay.  What else did he say?  Oh.  Yeah.  Mr. Fram

12   told you that Duane Woerth went down there to Dallas and told

13   the American pilots that they had to be fair to the TWA

14   pilots.  That is what he supposedly did.

15             And what is the proof of that?  Duane Woerth's

16   testimony.  There is not one substantiating piece of evidence

17   in the record.  Yeah, the TWA pilots reported in their memos

18   afterward what Duane Woerth had told them he said.  That is

19   not evidence of what Duane Woerth actually said.  That is

20   just them parroting what he said,  what he told them.

21             We showed you, we read you a deposition, very short

22   one we took of an American pilot who was actually at the

23   meeting.  Do you remember we had to read it?  I had, we had

24   Joe Jacobson sit in the witness stand and be the witness, I

25   think.  And his name was Reifsnyder.  This guy was at the

1    meeting, this April 5 meeting.  He made a note

2    contemporaneous with that saying Duane Woerth told us that

3    the TWA pilots need to get real.  The TWA pilots need to get

4    real.  That is what this American pilot reported Duane Woerth

5    said on April 5.

6              And we read that deposition to you.

7              And remember, word of that "get real" comment when

8    it got out, it set off an uprising.  People were upset and we

9    showed you a complaint that was made to the ALPA legal

10   department, that was P-144.  I want to show that.  This was a

11   complaint from the TWA pilot.  He finds out about this.  Down

12   here at the bottom.  ALPA legal, April 10, five days after.

13   He has something, he got off a website.  It is reporting on

14   the get real comment.  He says, if this is true I am very,

15   very, very upset.  And if he did, does it not leave ALPA

16   National open to a representational lawsuit.

17             This is sent to ALPA legal.  If you go up, in the

18   email.  It gets routed to Clay Warner ultimately.  Remember,

19   and I showed you a little video clip from Clay Warner when I

20   took his deposition.  It is sent to him for a response.  What

21   does he say?  I don't think a response is necessary or

22   appropriate.  And you remember the question I asked him at

23   his deposition?  I said, why wouldn't you think a response

24   was appropriate or necessary?  The TWA pilot was very upset.

25   What was his answer?

1          What would I say to that pilot that wouldn't make

2   him even more angry.  That was his answer.

3          You can take whatever implication you want from

4   that.  But my follow-up question to Mr. Warner if you

5   remember from that deposition is what would you say to him?

6   I said, well, how about the truth.

7          So Duane Woerth attended one meeting at April 5th,

8   and is that providing leverage?  No.  No leverage TWA pilots

9   anything, it was a complete stab in the TWA's pilots' back if

10  you believe he actually told the American pilot union, his

11  guys need to get real.  If he said that, that is treachery of

12  the highest order.

13         He is just telling the other side, we are not going

14  to put up any fight at all.  Do what you want.

15         Mr. Fram mentioned that Duane Woerth attended a

16  meeting.  And he did.  Woerth meeting with the merger

17  committee.  The merger committee had extensive sessions with

18  the American pilot negotiating group, that they went on

19  throughout the summer of 2000, and even into the fall.  Duane

20  Woerth attended one meeting.  Jim Baehler, remember him, the

21  older man that set up here, he was part of the TWA

22  negotiating group.  He testified the meeting was on August 27

23  that Mr. Woerth attended.  Mike Day testified about Woerth's

24  appearance, so does Sean Clarke, they didn't provide a

25  precise day.  Mr. Baehler remembered the exact date.

1          And those three gentleman's testimony was

2     completely consistent.  In fact they were excited Duane

3     Woerth was finally showing up, they viewed this as something

4     that could be very positive.

5          Finally the other side is going to get to hear from

6     our union boss that we can't be slapped around like this.

7     That is precisely what Duane Woerth told them in their

8     private pre-meeting meeting.  The meeting with just the TWA

9     group.  Duane Woerth was advised what was going on. He said

10    they are not going to do that to you.  I am not going to let

11    that happen.

12         What happened when he got to the session with the

13    American group?  He sat there meekly and said nothing other

14    than a parting comment, you guys need to work this out.  What

15    did Mike Day, Sean Clarke and Jim Baehler tell you?  They

16    were completely let down and disappointed by Duane Woerth's

17    performance and his failure to take this opportunity to show

18    some muscle and try to shove these guys around and let them

19    know that they can't be doing what they are doing.

20         So Duane Woerth's appearance at one meeting.  Did

21    that get any leverage?  If anything else, it was negative.

22    It again let the other side no, like the get real excellent,

23    let the other side know I am not going to put up any fight

24    here.

25         That was the third thing.  What is the fourth thing

1    here.  Mr. Fram suggested in his closing yesterday that this

2    Ron Rindfleisch, the ALPA organizer, that was dealing with

3    Mr. Clark and Mr. Hunnibell, he suggested that Rindfleisch

4    was doing that, he was some sort of mole to collect intel.

5    That is what he suggested to you, that that is what the guy

6    was doing.  Of course, Mr. Rindfleisch don't say that, and no

7    witness said that.  That is just something that Mr. Fram came

8    up with.  Rino, that is his nickname, Rino is a mole.  Rino,

9    the mole, that is a ridiculous suggestion.

10           He wasn't operating as some mole to collect

11   intelligence that could be helpful to TWA pilots.  He was

12   trying to organize the American pilots.

13           Certainly didn't provide any leverage.  No

14   leverage.

15           I am getting tired of writing that.

16           Fifth thing.  Oh, this was big.   Tannen.  Mr. Fram

17   said, well, ALPA authorized the TWA MEC to hire Professor

18   Tannen to come up with this proposal, this seniority plan

19   that he had, that was offered to the American pilots.  It was

20   called the Rightful Place proposal and Mike Day testified

21   about it.  But they say we let you hire Tannen.  Yeah, but

22   who paid for it?  The TWA MEC paid for Professor Tannen.  I

23   mean saying, you can go hire somebody, that is not leverage.

24   No.  I am going to write no.

25           And then he said, oh, and we authorize you to hire

1    Roland Wilder.   Yeah.   But who paid for him?   The TWA MEC.

2    And every strategy he came up with ALPA said no to.   So

3    authorizing the MEC to hire Roland Wilder, that is not

4    leverage.   If they would have left Wilder do his work, maybe

5    we could say that that was helpful.

6            They authorized Jim Baehler to be hired.   But again

7    who paid for him?   The TWA MEC.   Giving somebody permission

8    to hire somebody, that is not creating leverage in a

9    negotiation.

10           Getting back to this right Rightful Place proposal.

11   Eight.   And we played this.   Duane Woerth made an

12   introductory remark to the proposal.   Remember the video clip

13   I played you?   Woerth video.   And in it, by the way, that

14   video was proposed for publication to the TWA pilots.   A copy

15   of that video went to all 2,300 of them.   And that was done

16   so that they could understand what the seniority proposal was

17   all about.   That wasn't done for the American pilots.   But

18   what did Duane Woerth say in that video.   You remember how he

19   concluded his remarks I don't want to play it.   He said we

20   will be at your side.

21           Did that create leverage?   No.

22           They point to Duane Woerth's letter to Bond as

23   something supportive that they did.   I already talked about

24   that.   That didn't create any leverage.   Then they had

25   another letter, they mentioned on the Bond bill that was sent

1    to a representative Jerry Lewis, I think was his name.  We

2    didn't have any context for this Louis I know he is a

3    Congress person.  But we don't know.

4              Anyway, we had this Lewis letter.  Did that create

5    any leverage?  No.  The last thing on the list I got from Mr.

6    Fram yesterday, oh, yeah.  This was after the MEC on October

7    23, rejected Supplement CC, remember they had that vote and

8    they turned it down.

9              Mr. Fram told you yesterday that Duane Woerth

10   wanted to help these hot heads out that rejected the proposal

11   and try to see if we could reinvigorate our -- revisit, that

12   is what I want to say, if we could revisit Supplement CC and

13   Mr. Fram said that he called my clients hot heads, for

14   rejecting Supplement CC, and so Woerth, he said Woerth called

15   the APA to see if the issue could be revisited before

16   cram-down.

17             I don't remember Duane Woerth saying that.  But if

18   he did, is that leverage?  No.  That is not leverage.

19             How long have I been talking?

20             THE COURT:  There are many answers I could give to

21   that.

22             MR. PRESS:  Some, that is some pathetic list of

23   support, I think.  Nothing he said his client did in the

24   seniority dispute provided any leverage to Mike Day and his

25   committee, not one.

```
 1              THE COURT:  Mr. Press, any time you feel you need a

 2    break, you just tell me, I am going to let you control that.

 3              MR. PRESS:  Okay.

 4              THE COURT:  Within limits, I will let you do it.

 5              MR. PRESS:  This is a perfect time for a break, as

 6    I turn the a page.

 7              THE COURT:  Okay.  Ladies and gentlemen.  I can

 8    assure you, giving a closing argument is strenuous, and so,

 9    we will take, it is a little past quarter after nine, we will

10    take a 15-minute break now.

11              Do not discuss the case among yourselves.  We are

12    close to the end.  You will get the case very shortly.

13              (Jury leaves the courtroom.)

14              (The jury enters the courtroom.)

15              THE COURT:  You may continue, Mr. Press.

16              MR. PRESS:  Thank you, Judge.

17              So that was the arbitrary aspect.  Again, we prove

18    our case if we show ALPA acted arbitrarily or in bad faith,

19    one or the other.

20               So did ALPA act arbitrarily to my clients, to the

21    TWA pilots?  That is of course up to you to decide.  I think

22    the evidence shows, would support a finding that they did.

23    But again, that is up to you, completely.

24              Let's talk about the bad faith thing.  The Judge

25    will instruct you that a union violates its duty of fair
```

1   representation when it acts in bad faith.  The Judge will

2   instruct you that you can find that faith in several ways and

3   one of them is when a union acts with hostility towards its

4   members.  Hostility.  If you find that ALPA acted with

5   hostility to the TWA pilots, that can support a finding it

6   breached its duty.

7           Now, was there any evidence of hostility presented

8   to you of ALPA officials acting in a hostile manner towards

9   the TWA pilots?  Well, let's look what happened on March 28.

10  This was a meeting in Dallas, Mike Day's first meeting with

11  the American pilots.  And negotiating seniority.  The

12  negotiations had just begun.  And remember what happened on

13  March 28.  The TWA side made a proposal.  It was basically a

14  modified, I call it modified date of hire.  That was the

15  proposal made on 3/28.  And this was scheduled series of

16  meetings, there was going to be a follow-up meeting the next

17  day, remember?  And what happened?  The TWA pilots went back

18  to their hotel in Dallas after they make their proposal, and

19  they are met with, by Clay Warner, and Bob Christy.  David

20  Holtzman said he was there as well.

21          These guys were not invited.  That was the

22  testimony, of Mike Day.  They were not invited.  They show

23  up.  What did Mike say?  He said I was kind of happy to see

24  them.

25          I knew I would get a good meal, he said.  They did.

1    They went out to eat.  But what happened after the dinner?

2    After the dinner they met back at the hotel and what did Clay

3    Warner and Bob Christie say?  They said you have to make an

4    offer, you got to make an offer that is going to get a deal

5    done and you need to did it now and you need to offer up 825

6    TWA pilots to be stapled.  Remember that?  That is some

7    Independence Plus there.  They are telling them how to

8    negotiate.

9            And they are asking that the TWA pilots make a

10   huge, huge, compromise, right off the bat.  I mean, they made

11   a proposal the other day that had -- -that day, that had not

12   been responded to.  There was already an offer on the table,

13   and these guys come in and say you need to offer up 825.

14           Do you remember what the testimony was from Mike

15   Day and Sean Clarke?  They were outraged.  And this resulted

16   in quite an argument.  They all, Sean and Mike both testified

17   that it was heated.  Very heated.  And lots of yelling.  From

18   Mr. Warner and Mr. Christy.  So is that hostility?  That is

19   again for you to decide.

20           But it didn't end there, the yelling, any way.  By

21   the way, what happened the next day?  The merger committee

22   went in and made an offer, not to staple 825, but 434.

23   Remember that?  And Mike Day testified that that was a

24   horrible, horrible decision that he made, and something that

25   he has regretted ten years later.  That is what he told you.

 1   And he explained to you why.  And he said because all we did

 2   was bid against ourselves and show a huge sign of weakness.

 3   And what happened?

 4           They make the proposal and it wasn't even responded

 5   to, the 434.  The American guys just left.  But this

 6   hostility, we see it again on 4/2.  Or at least we see

 7   yelling.  This was the MEC meeting to waive scope.  And all

 8   of the pilot witnesses that we presented told you that,

 9   again, it was very heated.  Much yelling.  Roland Wilder got

10   beat up.  Mike Day told you that.

11           Remember he was, with his own committee, he wasn't

12   part of the MEC.  He was with the merger committee and Roland

13   was meeting with the merger committee and he went to go find

14   Roland because he had left their office and he found Roland

15   in the library being beat on, and verbally abused by the ALPA

16   advisors, Warner and Christy.  That was Mike Day's testimony.

17   And of course the MEC members, Howard Hollander, Sally Young,

18   Alan Altman, Ted Case, they all told you in their meeting it

19   was more of the same, lots of yelling from Mr. Christie and

20   Mr. Warner.  We see it again.  And another critical juncture.

21   November 7, this time Sally Young that is again getting the

22   abuse.  What happened on that day?

23           The full MEC on 10/23, in DC, had rejected

24   Supplement CC, they were not going to agree to that.  And you

25   remember what happened?  TWA closed the New York and Los

1    Angeles basis which meant that the MEC representative from

2    those basis were removed from the MEC.  Everything was

3    collapsed into St. Louis and we were left with two MEC

4    members, Mr. Rautenberg and Ms. Young.

5            What happened?  That was going to be temporary,

6    though.  There was going to be an election on November 14 to

7    name two more MEC members.  Sean Clarke I think was elected.

8    That was the week after this.  What happened on this day?

9    Mr. Rautenberg, or somebody called a meeting.  And on 24

10   hours notice, and the only agenda item was Mr. Rautenberg's

11   motion to approve Supplement CC.  And Sally thought that this

12   was ridiculous.  We had just, the full MEC two weeks prior

13   had rejected that.  She was very uncomfortable with what was

14   going on.

15           Remember Mr. Rautenberg, he had more votes.  He

16   represented more pilots than Ms. Young at the time, so if you

17   had one of these roll call votes he could do business on his

18   own.  He could conduct business on his own.  Sally said this

19   is not Democratic.  The first officers at this airline are

20   not being represented, she said.  And she refused to second

21   Mr. Rautenberg's motion and the motion died.

22           That was very upsetting to Clay Warner.  And

23   remember, Sally's testimony that he was yelling at her,

24   threatening her, saying that if you get sued we are not going

25   to defend you.  It was very abusive, according to Sally.  Mr.

1  Warner, Mr. Warner of course denies all this.  He denies he

2  was abusive to the merger committee in March.  He denies he

3  was abusive to, or yelling at the MEC on April 2.  He denies

4  he was yelling at Sally Young.

5       Well, each time he was accompanied by Bob Christy.

6  We never got to see him and really gauge his personality.

7  But you did get to see Mr. Warner.  And my partner was asking

8  him some questions and Mr. Warner was getting annoyed, and

9  what did he do?  He grabbed his head, oh, you are making my

10 head hurt, he yells.

11      I mean, if he is yelling at my partner in front of

12 you, this, is it a stretch to think that he was yelling at my

13 clients ten years ago when they are not doing what he wants

14 them to do?

15      There is also hostility, evidence of hostility from

16 Mr. Woerth.  This relates to Matt Comlish when he was down in

17 DC trying to get the bill passed on Capitol Hill, he saw

18 Duane there one day, Duane Woerth, and he went to go talk to

19 Mr. Woerth, and Mr. Woerth very angrily told him to what?

20 Get off the Hill.  That was Matt's testimony.  So again, you

21 can consider that, if you find that that is more evidence of

22 hostility.

23      Now, the Judge will also instruct you on this bad

24 faith that you can find bad faith when a union deliberately

25 misleads its members, if a union deliberately misleads its

 1   members.

 2          Is there any evidence of that here?  One big

 3   example gets back to this March 28.  Warner and Christy were

 4   telling the merger committee that you have to do this.  This

 5   will get a deal done.

 6          Well, the American side wasn't even prepared to

 7   negotiate.  We don't know what the source of the information

 8   was, for these gentleman to make that statement, that these

 9   guys are ready to deal.  But the American side was not ready

10   to deal.  They received the next day, they received the

11   merger committee proposal and walked out of the room without

12   countering it.

13          April 2.  The MEC was told, according to our

14   witnesses, "The train is leaving the station."  You have to

15   make this decision today.  "The train is leaving the

16   station."

17          Was that true?  We know from the documents that the

18   offer that was on the table, that got accepted, was to remain

19   open until the bankruptcy hearing on 4/6.  And if you could

20   look at this, this is, there is a document that says this.

21   Exhibit 386.  P.  Okay.  This is March 17.  This Terry Hayes,

22   that was the American -- that was the TWA official who was

23   responsible for negotiating the bargaining agreement and he

24   sends this to the MEC.  If you go to the next page, proposal

25   of TWA to ALPA.  This proposal will be deemed withdrawn --

1    wait.  This proposal to enter into a transition agreement

2    will remain in effect to the commencement of the hearing on

3    TWA's motion to reject the ALPA collective bargaining

4    agreement.

5              This will remain open until the hearing on the 1113

6    motion, which was when?  It was set on 4/6.  These guys, they

7    all come to the MEC on April 2 and say you got to do this and

8    you got to do it now, the train is leaving the station.  But

9    they could have accepted the deal on the courthouse steps.

10             According to TWA's own offer.

11             Remember the testimony of Randy Babbitt?  He was,

12   his video deposition was played.  And one of the excerpts he

13   testified to this.  If there was more time on April 2, you

14   don't need to make a decision that day.  I asked him that

15   question, and that was his answer.  So apparently he was

16   misled as well by what the -- he testified he thought a

17   decision had to be made by close of business on April 2.

18   Well, no.  It wasn't until four days later.

19             If you are going to concede, you can always wait to

20   do that.  Until the end, until the end.

21             So why was it the MEC was told you have to do it on

22   April 2.  What happened on April 5?  One day before the real

23   deadline, you got Woerth going to the APA board, for a

24   historic second appearance, this is the real deadline.  The

25   MEC is told you got to do this today and you have Duane

1   Woerth planning this at the APA three days later.  Is that a

2   coincidence?

3         The bankruptcy filings are revealing on whether or

4   not there were misleading statements.  If you to go exhibit

5   136, plaintiff's 136, ladies and gentlemen, this was the

6   brief that Mr. Seltzer had filed in the bankruptcy court

7   opposing TWA's 1113 motion.  All right.

8         This is the brief he filed.  And if you go to the

9   first highlighted segment, Will, this is paragraph 7 of the

10  brief, five pages into it, subsection A of section 1 provides

11  for recognition -- he is referring to ALPA's collective

12  bargaining agreement with TWA, that section provides for

13  recognition of ALPA as the representative of TWA's pilots.

14  And that is the one subsection of section 1 that TWA does not

15  seek to reject.

16        What is he saying there?  He is saying TWA's 1113

17  motion is asking the Court to strip section 1 which is the

18  scope language from the TWA pilots contract, except that part

19  that says that ALPA is recognized as their representative.

20  TWA was not seek to go have ALPA removed as the TWA pilots

21  union, that was not part of what they were asking, but what

22  did the ALPA advisors tell the MEC on April 2.  If the 1113

23  is granted, you are going to lose union representation.

24        The complete contrary statement to what Mr. Seltzer

25  put in his brief.

1          There is another statement in his brief, if you go

2   to the next clip, Will, he is talking about a union's right

3   to strike.  What does he say?  A union's right to strike

4   after a bankruptcy court approves rejection of the collective

5   bargaining agreement is clear.  What do they tell the MEC

6   three days later.  Again that's correct brief is filed

7   Friday, March 30.  Three days later tell the MEC, the MEC

8   asked questions.

9          What happens if this 1113 is granted and we don't

10  have a contract, can we strike?  And the answer was no, the

11  testimony was a little all over the place.  But they did not

12  say yes, you clearly have a right to strike.  It was muddled,

13  as to whether or not you would have that right wasn't clear.

14  But that is not what Mr. Seltzer put in his brief to the

15  bankruptcy Judge.

16          And this right to strike was important.  They were,

17  they asked these questions because they wanted to know.  And

18  the situation would have gone down like this.  The bankruptcy

19  Judge grants the 1113 and abrogates ALPA's contract with TWA

20  so they, the pilots don't have a labor agreement.  Then

21  American goes ahead and completes the transaction with TWA,

22  buys all of its planes, hires all of its employees as it

23  promised to do.

24          Then what happens?  The thought process was the TWA

25  pilots would not show up for work some day.  They would go on

1    strike.  And what would that have done?  Grounded the airline

2    is what it would have done.  And that of course would create

3    some leverage.

4          But they were told you don't have that right.  At

5    the MEC meeting.  Even though they clearly did, according to

6    Mr. Seltzer's brief.

7          Now, another aspect of bad faith that you are going

8    to get in the judge's instruction is that you can find bad

9    faith if the union did not disclose a conflict of interest.

10   Mr. Fram talked about this, and there was an abundance of

11   evidence that, that would allow you to find that ALPA was

12   attempting to organize the American pilots, while the TWA

13   pilots, TWA pilots were engaged in their seniority dispute at

14   the same time.

15         And is that a conflict of interest?  That again is

16   up to you to decide.  But we do know this.  That ALPA's

17   organizing activities at American Airlines, that was never

18   disclosed to the TWA pilots at the time of these events.

19   During the seniority struggle, it was never disclosed.

20         Now, the Judge will, again, on the bad faith,

21   instruct you that an additional example is ignoring union

22   policies.   We looked at that when I was talking about

23   arbitrariness.  That is something you will be instructed to

24   find bad faith as well.  The Judge will instruct you as to

25   bad faith that you have to find that ALPA had a bad faith

1    motive for its actions.  What was motivating ALPA here?  The

2    suggestion we made is the conflict of interest was motivating

3    ALPA.  It had no stomach to fight the American pilots.  Its

4    goal was to have those pilots join ALPA.

5            And what was the evidence of that?

6            First of all, with he had Tom Rachsford, we played

7    you part of his deposition.  He said that he thought, I mean

8    from what he saw of Duane Woerth, he said bringing in the

9    American pilots was his legacy.  That was Tom Rachford's

10   testimony.

11           And where did all this begin?  In October,

12   September, October, 2000, ALPA passes this resolution, we

13   heard about the unity resolution, where Duane Woerth was told

14   to go out and bring back the Continental pilots, bring back

15   the American pilots.  Oh, shoot -- and one other group.  I

16   can't recall.  But we will get to it.

17           So that was the union resolution, Duane Woerth set

18   out to do that.  And he met with the APA board.  He was

19   invited there for a meeting in the fall of 2000.  This was

20   the first time the sitting ALPA president had done that, that

21   we are aware of, since the American pilots broke away in

22   1961.  First time.

23           He met there and he spoke and what happened next?

24   The APA set up this committee, ALPA Exploratory Committee.

25   That committee that was charged with going out and finding

1    everything they could about ALPA and report back to the

2    American pilots.

3            And that process got underway.  The American pilot

4    committee went to Washington, ALPA sent people to Dallas for

5    meetings.  And that work was underway in the fall and winter

6    of 2000.  And then what happened?

7            Early January, American announces it is buying TWA.

8    This created a problem for ALPA.  It knew that there would be

9    a seniority dispute, that seniority was going to be an issue.

10   And that there could potentially be a fight.  And so what did

11   it do?  It took its effort underground.  They knew they

12   couldn't openly organize or seek to organize the American

13   pilots.  That would be too obvious.  But we know that the

14   effort didn't stop.  We know that from a mound of documents

15   that we have shown you.

16           The first one was P-243.

17           P-243, these were minutes from an ALPA Executive

18   Council meeting, January 23, through the 25th, of '01.  This

19   is approximately what, two, three weeks after the deal is

20   announced?  Duane Woerth is there and all of the executive

21   vice president.  And there is a report on the unity campaign

22   on this first page.  Right here.  The pilot unity campaign is

23   continuing and Captain Woerth updated the counsel on the

24   effort that American Airlines and Federal Express.  That was

25   the one I forgot.  Updating the council on the effort at

1    American.   That was January.

2            And then it is followed, there is a, that same,

3    part of the same meeting I should say, P 113, P 113.   This is

4    a letter from ALPA's general manager, Jalmer Johnson, the

5    25th.   He is writing to Captain Darrah, president of the

6    American pilot unit.   And what does he say?   I understand

7    your board is considering taking action to continue looking

8    at affiliation between ALPA and APA.   In connection with any

9    communications efforts in which ALPA provides information to

10   your membership about our union and the benefits of ALPA

11   membership, we are willing to pay for the cost of

12   distributing such information, as well as any polling of your

13   members that may accompany this campaign.

14           This campaign.   It is continuing.   And they are

15   offering to pay for it.   This is in January of 2001.

16           That same time the merger committee, TWA merger

17   committee, TWA negotiating committee, were in Washington,

18   D.C. for meetings to get ramped up on how do we do this.   We

19   have never gone through a merger before.   Same time period.

20           Okay.   The next one I want did show you is P-244.

21           This is three months later.   ALPA executive council

22   till meeting, April 9, 2001.   Same participants there.

23           Ladies and gentlemen, you got to remember the

24   timing of these things.   April 2, the ALPA advisors browbeat

25   the MEC into waiving scope.   April 5, this is our evidence.

1    April 5, Duane Woerth told the APA board that the TWA pilots

2    need to get real.  April 2, surrender.  April 5, my guys need

3    to get real.

4         April 9, if you could go to the clip.  Organizing,

5    there is an update on the organizing activities.  What does

6    he say?  The minutes say, the association has expanded its

7    activity with, among other things, the Allied Pilots

8    Association.  As of April, seven days after the scope waiver,

9    President Woerth is reporting to the executive council of

10   this union that ALPA has expanded its activities to organize

11   the American pilots.

12        What do we see, five days later, if you look at

13   exhibit 147 P.

14        This is five days later.  April 14.  From an

15   American pilot Terry M to Ron Rindfleisch and actually Mr.

16   Fram showed you this.  This is telling ALPA about the fact

17   that there is an American pilot running for president of that

18   union on an ALPA platform.  That was the platform.  We don't

19   need to look at it because it was shown to you yesterday.

20   This is five days after the presentation of executive council

21   that we are expanding our effort.

22        Now we got American pilot running on an ALPA

23   platform.  And it just goes on from there.

24        I am going to show you some more email with this

25   Mr. Rindfleisch.

1          Before I do that, though, I want to play some video

2    clips from his deposition.  Remember Mr. Rindfleisch, I

3    tormented you with two of his depositions by video.  I did

4    not, I expected the man to be here and I wanted you to have

5    some foundation for his testimony before he got here so you

6    could see what he told me.

7          And so I want to remind you of some of his

8    testimony.  And Will, if we could buzz through the clips.  I

9    don't have it scrolled up to audio.  He is asked that

10   question.

11         You were aware they, that is the American pilots,

12   initiated a card campaign in May of 2001, right?

13         "ANSWER:  I don't remember the year.

14         "Okay.  Okay.  Mr. Rindfleisch, do you recall how

15   it is that you came to become aware that there was a card

16   campaign underway on the American property in the year 2001.

17   Do you recall how you learned that?

18         "ANSWER:  I don't recall.

19         "QUESTION:  All right.  And when you discovered

20   this card campaign underway at American who did you speak

21   with at ALPA concerning that campaign.

22         "ANSWER:  I don't remember.

23         "Well, I want to limit my questions for the time

24   period right now to the year 2001.  Sitting here right now,

25   your best memory under oath, did you speak with John Clark on

```
 1    the phone in the year '01?

 2              "ANSWER:   I don't remember.

 3              "QUESTION:  How did the year '02, did you speak

 4    with John Clark on the phone that year?

 5              "ANSWER:  I just don't remember.

 6              "QUESTION:  Did you exchange emails with him in the

 7    year '01, referring to John Clark?

 8              "ANSWER.  Don't remember.

 9              "QUESTION.  Did you change emails with Mr. Clark

10    any time in the year '02?

11              "ANSWER:  I don't remember."

12              Then I asked the question.

13              "When they were running their card campaign you

14    were having frequent contact with those gentlemen on that

15    subject?

16              "ANSWER:  I don't think that is true," he says.

17              "QUESTION:  Did you have a file set up for the

18    American Airline campaign, on your computer?

19              "ANSWER:  I don't remember.  I may have kept some

20    emails.  I didn't have a real file.

21              "QUESTION:  Did you ever talk with either Clark or

22    Hunnibell about their expenses?

23              "ANSWER:  I don't remember.

24              "QUESTION:  And you applied that policy for this

25    scope -- in fact, you told Clark and Hunnibell they needed to
```

1    supply the backup, referring to their expenses.

2            "ANSWER:  I don't remember that."

3            And then, that was his first deposition.  After

4    that, the documents that are in these two binders that will

5    be available to you if you want to peruse them, after all the

6    I don't remember, I don't remember, I don't remember, I don't

7    recall, we get this.  And we go and take his deposition

8    again.  And this is a clip from that second one.  I say:

9            "All right.  When you were asked that, what did you

10   do to go find American Airline pilot email traffic?

11           "ANSWER:  I believe I had a folder, a giant

12   folder."

13           Here it is, or some of it.

14           What is in that giant folder?

15           Will, 147 Q, this is part of this binder.  This is

16   Terry M again writing to Mr. Rindfleisch, April 16.  Listen

17   to this suggestion.  "Maybe we should pledge our membership

18   to ALPA in exchange for their agreeing to staple the TWA

19   pilots.  We get the seniority and they get 12,000 members

20   instead of losing 2,300."

21           What a suggestion.  What did Mr. Rindfleisch do in

22   response to that?  Nothing.

23           I am going to skip through a lot of what I -- let's

24   to P-147 S.  In is May 20.  Terry M again to Mr. Rindfleisch.

25   I recently received -- he is forwarding some email from

another unknown American pilot.  It says I recently received,
as I am sure most of you will, a representation election
authorization card along with a campaign letter from Captain
Mark Hunnibell, candidate for APA vice president.

        This reference to a representation election
authorization card.  That is what we have been refer
referring to as this card campaign.  That is what was mailed
out.  Remember they played John Clark's testimony yesterday.
This is a reference to that.  If you go down, Captain
Hunnibell states that as vice president of APA he will lead
the charge to reaffiliate with ALPA and has included an
included a card to make it easier for us to make the change
whether elected or not.

        And if elected, make sure this is no impropriety, a
select group led by former LAX vice chairman John Clark will
independently control the card until a sufficient number can
be collected and then turned over to ALPA for proper NMB
disposition.  NMB I think is a reference to the National
Mediation Board.  This was the plan all along.  To have Clark
collect them, and then when you get enough, send them to
ALPA, and ALPA was told that plan, at least we know by May
20.  And was told of that plan, what did Mr. Rindfleisch do
about that?  It is all in here.

        If you go to P-147, this is an email, 147.  Oh, D,
I am sorry.  June 6, '01 Terry M, well, to Terry M.  Somehow

1   ALPA got it.  It was printed up.  Ms. Toone's computer.  This

2   talks about quite a few things.  Hello.  This is first

3   officer Randy Leruth with the hotline message for the LA

4   domicile on Friday, June 1.   He starts off with "This

5   message will cover the following topics."  Number 2 is TWA

6   seniority integration status.

7          If you go, next page, there is a rather lengthy

8   email.  But the update does talk about the TWA seniority

9   integration.  In here it says what?  We want to avoid having

10  an arbitrator or judge decide the seniority integration by

11  date of hire.

12         You can stop right there.

13         Remember Mr. Fram telling you arbitration, you

14  don't know who, we don't know what an arbitrator would do,

15  and of course that is true.  But we do know this, that we

16  know what the American pilots, or at least this American

17  pilot, thought.  We got to avoid that because then there will

18  be date of hire.  We also need to avoid a Judge, a

19  litigation, because we can end up with the same thing.  Mr.

20  Case's litigation that got rejected.  Maybe.  But that is

21  their fear.  Litigation is something that they fear.  At

22  least this pilot did.

23         Go to 147 BB.

24         Okay.  This is Mark Hunnibell writing to Ron

25  Rindfleisch, June 13.  It is a rather, I do want you to read

1    this.

2              John Clark has relayed to me that you would be

3    interested in watching the ongoing discussion on APA's

4    challenge and response electronic bulletin board.  What that

5    is, that is a place where for American pilots go to blog and

6    check on one another.

7              Please understand that distribution of messages

8    sent to this open forum is limited to APA members.  I am

9    violating the acceptable use policy in setting you up to get

10   a copy, and risk theoretical union discipline in doing so.

11   Skip the middle.  I want to go to Paragraph 2.

12             I have set up a daily digest subscription to this

13   challenge and response that goes to a special email address I

14   set up just for this purpose.  Each morning at 4 all messages

15   posted in the prior 24 hours are compiled into the digest and

16   mailed out automatically.  I have configured my special email

17   address to auto forward to your address so that means you

18   will get the digest each day until you tell me to make it

19   stop.

20             So what is going on here?  Mr. Hunnibell has set it

21   up, against his own union policies, set it up for Mr.

22   Rindfleisch to see a blow-by-blow account of what the

23   American pilots are saying about this campaign.  He gets, he

24   is going to get a daily digest of every communication on this

25   American pilot bulletin board on that subject.

1          The emails just go on from there and cover a wide

2    variety of subjects.

3          Then we get to the issue of the money and his

4    reimbursement request.  And I want to start with exhibit 148

5    D.  This is John Clark now, we see, writing to Mr.

6    Mugerditchian, and Mr. Rindfleisch, Mr. Rindfleisch said I

7    don't remember seeing a, any emails from Clark.  But this one

8    was sent, October 14.  Jerry, referring to Mr. Mugerditchian,

9    as we discussed several months ago in person, we know from

10   the testimony that was a reference to the July 23 meeting

11   where Clark and Hunnibell were invited to ALPA and they

12   toured and visited with Duane Woerth and others.  As we

13   discussed at that meeting and on the phone more recently,

14   mark and you are filing this reimbursement request.  At this

15   point we are only filing for what we have spent.  And

16   attached to the email is a chart with the expenses broken

17   down and what not.  So that is October 14.

18          Before I go any further, I want to remind you of

19   the testimony of Seth Rosen and Clay Warner on this subject.

20   Both of them told you it would be inappropriate for ALPA to

21   pay the expenses of this card campaign, this American

22   campaign.  That would be inappropriate.  One of them said he

23   was shocked it could happen, the other said surprised.  I

24   don't remember which.  That was, it would be inappropriate,

25   shocked and surprised if it happened.  Let's look at what

1    happened next.  October 31.  148, H.  I am sorry.

2           This is an email, if you go to the middle you can

3    see it originated from Mr. Rindfleisch, and he is forwarding

4    a message from John.  No one wanted to admit that that is

5    John Clark.  But again, use your own thinking on that.  But

6    it is to Ron.  And he is saying, he is referring first all to

7    some post, but I want you to look at the last sentence.  The

8    very last sentence of his email.  "I also look forward to our

9    reimbursement."

10          And his message, this message, Mr. Rindfleisch

11   forwarded to Bob Christy, I am just referring to the people

12   that we heard about in this courtroom, Warner, Woerth,

13   Atterian, Johnson, Jonathan Cohen, Seth Rosen and Bill

14   Roberts.  All those people were mentioned in this courtroom

15   as ALPA executives and officials.  This email about this

16   reimbursement was forwarded to all of them that day.

17          What happened next on this reimbursement.  Let's go

18   to 148 J.

19          148 J is a string of emails.  But you got to start

20   at the bottom to make sense of it.  This is Clark to

21   Rindfleisch.  Thanks, John.  That is how he signs.  Who was

22   the John in the last one?  Ron, what is going on with our

23   reimbursement?  I thought I would hear from you.

24          How does Rindfleisch respond?  You got to go up.

25   His response is November 6.  "John, I am hoping to have an

1   answer and check very soon. I think I have Hunnibell's

2   address in our system but can you give me you and Dan Hall's

3   address."

4          Another American pilot.

5          So right there he is promising, I am hoping to

6   after an answer and check very soon.

7          Then you go up, Clark finishing the string.  Ron,

8   the address to send the checks for me and Dan Hall is, that

9   address.  That was a PO box that he had set up to collect the

10   cards.

11          I will get his check to him.  To Mr. Hall.

12          Okay.  The next document we have about this

13   reimbursement deal is 148 KK.  So a month, this is December

14   5, a month previous we saw that Rindfleisch hoped to have an

15   answer and check very soon.  What does he say here?

16          "Guys, please forward to me the original receipts

17   of your expenses that you emailed to me on October 14.  I

18   apologize for the delay, but as soon as we can get the

19   receipts we can get checks cut."

20          December 5.

21          What else happened on that day?  That was the day

22   John Clark went to Las Vegas and delivered the cards to Duane

23   Woerth and Jerry Mugerditchian.  That very same day.

24          Do we have blurbs of Clark?  I want to play this.

25   Oh, it comes later.  I am sorry.

1          So December 5, the cards get delivered in Vegas and

2    on that same day Rindfleisch sends this out.  We are going to

3    pay you.  As soon as we get your receipts we are going to pay

4    you.

5          What else happened that day back in Vegas, big

6    party.  P-362.  Remember this?  We showed you this was the

7    expense report of this guy John Feldvary, who is director of

8    ALPA Finance, I think, or treasurer.  December 29, he is

9    submitting an expense report, wants to get reimbursed for

10   some stuff.

11         Go to the next page.  What is the biggest part of

12   that?  Well, the receipt for this dinner.  December 5, '01 in

13   Vegas, Smith and Wolinski, a steak house there, $996.  And

14   who was at the dinner?  He writes it down on the back side of

15   the receipt.  Dinner, 12/5/01.  Woerth, Dennis Dolan, an ALPA

16   executive vice president.  Mugerditchian, John Clark.

17         That is some dinner.  So John Clark delivers the

18   cards, he gets promised to pay and taken out to dinner all on

19   the same date. And they want you to believe that ALPA wasn't

20   involved in the campaign.

21         Let's go to 148 XX.  This is John Clark writing

22   again to Mr. Rindfleisch, December 18.

23         What does he say?  Since you and Jerry have

24   inquired about the contents of the card database, I provided

25   in disk form with the cards.  I have attached a spread sheet

 1   that is drawn from previously developed databases

 2            Now, what is he talking about there?  Let's look at

 3   his testimony on these issues first.

 4            This is John Clark.  I asked him in deposition, and

 5   he took them from you.  Referring to the cards.  Remember he

 6   testified, he bought a sample of the card.  ALPA was curious

 7   about the format.  He brought a sample and put them in his

 8   shirt.  That was his testimony.  I asked him, referring to

 9   Mugerditchian, took them from you.  No.  You took them back?

10            "ANSWER:  You mean did I leave them with him when I

11   left Las Vegas?

12            "QUESTION:  Yes, sir.

13            "ANSWER:  Absolutely not.  Okay.  Proprietary.

14   Absolutely wouldn't do that.

15            "QUESTION:  Now, what you brought was simply a

16   small representative sample so that they could look at the

17   cards?

18            "ANSWER:  Right.

19            "QUESTION:  Did you ever at some point after that

20   send to ALPA all of your campaign cards?

21            "ANSWER:  No.

22            "QUESTION:  That never happened?

23            "ANSWER:  No."

24            That was his sworn testimony.  Then there is more.

25   About the database.  I showed him, this is what the exhibit

1    we were referring to.  This file marked APA cards, if Ron

2    Rindfleisch told you that, that is my handwriting.  APA

3    cards.  There it  follows, a post it, APA cards, 1,549.

4    Rindfleisch says I don't know if that is my handwriting.

5    Then what follows is a chart, a database of numbers and

6    dates.  And then redacted.  That means, that is a lawyer word

7    for we deleted it, whatever else is there.  And this was

8    shown Mr. Clark at the deposition and here is what his

9    testimony was.

10            "QUESTION:  And you don't know anything about that

11   chart, do you?

12            "ANSWER:  No, I think it is a fabrication.

13            "QUESTION:  A fabrication of what?

14            "ANSWER:  I think it is a fabrication of whatever

15   somebody wanted it to be."

16            Mr. Clark under oath testified that this document,

17   this database, is a fabrication.  Didn't know what it was.

18            Now, go back to the email, 148 XX.  Since you and

19   Jerry have inquired about the contents of the card database I

20   provided in disk form with the cards, I have attached a

21   spread sheet.

22            Mr. Clark's testimony is completely contrary to all

23   the evidence in the record.  And you had to ask yourselves

24   why?  Who was he trying to protect?

25            Back to reimbursement, December 19.  Oh, 148 Z Z.

1    This is December 19.  Right here, Rindfleisch writing to

2    Clark.  John, I have been told there is nothing in the ALPA

3    budget for organizing the APA pilots.  But I have to be

4    honest with you and say we are going to reimburse you three

5    guys on the expenses you turned in as soon as we get your

6    receipts.  But that is confidential.  Rino.

7         Remember the deposition I asked Mr. Rindfleisch,

8    didn't you ask those pilots to turn in their expenses?  No.

9    No, I don't remember, was his testimony.  When now we see he

10   did.  What happened the next day, 148, EEE.  This is the next

11   day, December 20, Clark to Rindfleisch.  I dropped the

12   receipts and some other info about the BRM account and PO box

13   in the mail today.  So the receipts are on the way.  One day

14   after Rindfleisch asked for them.

15        Something else happened that day.  That is P-218.

16   Mr. Rindfleisch is writing to two people at the bottom:

17   Right down here at the bottom.  December 20 he is writing to

18   Clay Warner and Kevin Barnhurst, who is in ALPA finance

19   department.  What does he say?  Please review this before I

20   send it to the APA ALPA pilots, John Clark and Mark

21   Hunnibell.

22        And what follows is a proposed, or a draft message

23   that email that Mr. Rindfleisch wants to send to Clark and

24   Hunnibell, and the last sentence before "I hope again," what

25   does he say.  This is going to be part of the message,

1    "Again, I must add admit that we will reimburse you three

2    guys for the expenses you already submitted when we receive

3    them."

4           So he is asking for ALPA legal and ALPA finance to

5    review this message before it goes out.  And what does Mr.

6    Warner do?  He responds to it that same day up at the top.

7    "I made a few changes.  Clay."

8           And then the next page of the document is his

9    marked-up version of the proposed email.

10          Mr. Warner, he edits all three paragraphs including

11   the reimbursement one.  Again, I must admit that we will

12   reimburse you three guys for the expenses, not submitted, but

13   the expenses incurred when we receive them.  So he is saying

14   whatever you spent, we will pay for it.  That is Clay Warner.

15   That is ALPA legal.

16          Now, Mark Hunnibell was another video I played you.

17   He lives in Connecticut.  And in his testimony he said under

18   oath that he came to learn after the fact that if ALPA had

19   paid those expenses, it would have violated the law.  That

20   was the pilots' testimony.  He came to learn that.  He

21   claimed he didn't know it at the time, but he came to know it

22   later.  Here is ALPA legal.

23          Mr. Warner, setting up a document where ALPA is

24   pledging to do just that.  If the American pilots are

25   correct, he is pledging to violate the law.

1          Next document, 148 FFF.  This is, remember

2     Rindfleisch send his email to Warner and Barnhurst.  Here is

3     Barnhurst's edit.  Correction.  It is the IACP, not CALPA.

4     That is a reference to the Continental pilot union.  He is

5     just saying you got the acronym wrong.  So this was reviewed

6     by legal and finance and no one had a problem with Mr.

7     Rindfleisch telling those pilots you are going to get paid.

8          And that is exactly what happened, if you look at

9     148 GGG.

10          This is the end of the road on this story.

11     December 21.  This is the full email that went to Hunnibell

12     and Clark and Rindfleisch.  And you see at the end there that

13     Mr. Warner's edit on the reimbursement was made.  Again, I

14     must admit to you guys, we will reimburse you for the

15     expenses you already incurred when we receive them.

16          And we know from the March 19 email preceding that

17     they were on their way, the receipts were on their way.

18          I want to move forward now to 148 XXX.  This is

19     another email from Mr. Clark to Mr. Rindfleisch dated January

20     15.  What does he say?  Ron, I received several cards since

21     producing the majority I had to ALPA late last year.  I will

22     extend them to you if that is acceptable and Mark will

23     provide an updated database.  Please advise.

24          He has got more cards he has collected and he asked

25     ALPA, what did you want me to do with them?  Don't know what

1  the response was, but we do know this, the cards, however

2  many there were, they are not here any more.  Remember Mr.

3  Rosen testified, we asked him what happened to the cards?  I

4  don't know.  Looked everywhere, can't find them.  That was

5  his answer.  Can't find them.  Rindfleisch denied he ever had

6  it in his deposition.  And here is an email that says, hey,

7  those cards I give you last year, I got some more.  Do you

8  want them?

9          Okay.  And then going to 148, I think it is 4 E's,

10 or is it five, 5 E's, 148, 5 E's.  This is the last on this

11 subject here.  This is April 30 of '02.  John:  Thanks, John.

12 John Clark.  To Ron.  Add this to the reimbursement request,

13 please.  He has another receipt.  So he updated ALPA on his

14 receipts and the cards, they are not here.

15          The evidence, there is evidence in this case that

16 ALPA had its hands all over this campaign.

17          And promises go to pay for it.  They are updating

18 on it daily, the American pilots are emailing with John Clark

19 and Mark Hunnibell and others.  ALPA had its hands all over

20 it.

21          Was there a bad faith motive for what ALPA did and

22 didn't do to protect the TWA pilots seniority?  That is again

23 for you to decide.

24          So we talk about arbitrariness, we talked about bad

25 faith.

1              There is one other issue I need to talk to you

2    about and that is the issue of injury.  The Judge will

3    instruct you that you should find that ALPA caused injury to

4    TWA pilots if you believe that but for ALPA's breach, the

5    overall outcome of the seniority integration would have been

6    more favorable to the TWA pilots.  But for ALPA's breach, the

7    integration would have been more favorable.

8              Now, before I get into the evidence on that, I want

9    to talk to you about the burden of proof just a bit.  You

10   will be instructed that should you find a fact that -- that

11   you should -- you will be instructed that you should find a

12   fact as true if you believe it is more likely true than not.

13   No matter how slightly the scale tips in favor on that fact.

14   No matter how slightly, if you believe it is more likely true

15   you need to find it a fact.  That is that instruction.

16             You will also be instructed to use your common

17   sense.  You don't believe that out here.  You take it in with

18   you.

19             So on this injury question, after applying your

20   common sense, you need to determine whether or not plaintiffs

21   proved some injuries.  Well, we proved that the 1,200 TWA

22   pilots got furloughed.  Everyone that got stapled got

23   furloughed.

24             We have to show that ALPA, TWA pilots would have

25   gotten a more favorable integration had ALPA not breached its

1    duty of fair representation.

2          Now, what is the evidence of that?  What is the

3    evidence that there could have been a more favorable

4    integration?  There was direct testimony from Mr. Day about

5    that.  He said I would have expected, I think his testimony,

6    his answer was it would have been reasonable to believe that

7    we would have got a better deal closer to the Tannen proposal

8    had ALPA done the things we asked for and gave us the

9    leverage we needed.

10         Mike Day told you that.  He was the only one in the

11   room with the American side.  ALPA produced nobody in that

12   position.  They give you four witnesses, four lawyers that

13   were completely uninvolved.  Mike Day told you we could have

14   got a better deal.

15         And what is the evidence to support that

16   conclusion?  What is the evidence of it?  It is in the, the

17   proof is in the pudding.  It really is.  The first offer made

18   by the APA was on March 1st and they offered up staple 1,500.

19   About.  Two thirds.

20         They didn't come off that until April 18.  They

21   lowered the staple by 50.  But at least that is movement in

22   the right direction.  They do that every month, we will,

23   after a year we will have a fair deal.  So this is curious,

24   this is after the scope waiver, pilots give up their best

25   leverage and they come back with a better proposal.  It is

1    still obnoxious from the TWA pilots' side, but that is what

2    they did.

3              Now, what happened after that?  They go into this

4    facilitated negotiation process, all throughout the summer,

5    meeting after meeting after meeting.  I don't know how many

6    meetings.  I know it was more than ten, Mike Day testified

7    to.  And throughout that the APA does nothing.  They don't

8    come off this position one iota to out that whole process in

9    the summer.

10             And then after 9-11, a week after 9-11, they write

11   a letter to Mike Day saying we are done.  We are done talking

12   to you, we are going to go to our board, and we are going to

13   do what we want.  At that point, 14, 15, was still the offer.

14   What happened next?  The TWA pilots got involved.  They went

15   to Senator Bond, got him involved.  And Bond announces this

16   bill that would give arbitration to the TWA pilots, had it

17   passed.  That was on October first that that announcement was

18   made.

19             This is just some Senator saying hey, I got this

20   bill, I put on the floor.

21             What happened next?  American pilots come back to

22   the table on their own and say hey, we got a better deal, you

23   are going to love it.  And that better deal, it was better,

24   was Supplement CC.   The staple lowered to 1,200.  And it

25   included in this notion of fencing all the TWA pilots in St.

1    Louis, which not only kept them all in St. Louis corralled

2    there but it kept American pilots out of St. Louis, which

3    meant they couldn't bid there which was some sort of benefit

4    for the TWA guys.

5          So on the strength of the TWA pilots doing nothing

6    other than get Senator Bond to introduce some legislation,

7    the American pilots lower the staple by 250, and offer this

8    notion of a fence in St. Louis.  That was done with just the

9    leverage of maybe the senator's bill might get passed some

10   day.  That was the only leverage.  That was all that had

11   changed.   What if ALPA had gotten involved and done any of

12   the things, or all of the things, that were requested of it?

13   Litigate, boycott.  All of it.  Would there have been a

14   better deal?  A more favorable deal?  Again, that is up to

15   you to decide.  But again, you must use your common sense and

16   look at what happened.

17         If you lower that staple by one pilot, that is

18   injury.

19         Folks, I am finished.  Okay.  I am sure you have

20   heard enough.  And I am going to sit down now, and the Judge

21   is going to read some instructions to you and we will see you

22   when you get back.

23         THE COURT:  Thank you, Mr. Press.  We will take a

24   short break now.  About 15 minutes.  It is 25 of 11.  About

25   ten of 11.  Then I will read my charge of the law to you.

```
 1   And then the case is yours.  Don't discuss the case among

 2   yourselves until you have heard my charge.  All rise.

 3              (Jury leaves the courtroom)

 4              THE COURT:  Mr. Fram.

 5              MR. FRAM:  Two things.  One, I did write out a

 6   proposed insert to deal with this with this issue of witness

 7   vouching, if I can hand it up.  I indicated, your Honor,

 8   where I would request that the Court include it.  It would be

 9   on page 10, is where I was suggesting.

10              THE COURT:  Have they seen it?

11              MR. FRAM:  No, they haven't, your Honor.

12              THE COURT:  While they are looking at it, you have

13   a second point.

14              MR. FRAM:  I did, your Honor.  I thought we talked

15   about the advice in the charge that if you find by a

16   preponderance of the evidence that ALPA breached, then you

17   must.  And the converse.  I am looking, your Honor, at the

18   bottom of page 18 of the charge.

19              THE COURT:  Yes.

20              MR. FRAM:  I thought that paragraph was going to

21   move and be part of what you of this --

22              THE COURT:  Page 19, not 18.

23              MR. FRAM:  I am looking at the bottom of 18.

24              THE COURT:  Look at 19.

25              MR. FRAM:  19 is what we discussed.  I guess my
```

```
 1   concern, is if you look at the bottom of 18 you have the

 2   first half of what was still, what was there before.  I

 3   thought that last sentence on the bottom of 18 was going to

 4   come out.  That is what was being consolidated into section

 5   18.

 6              MS. RODRIGUEZ:  As jurors you have the duty to

 7   consult with each other?

 8              MR. FRAM:  No.  This is what I am looking at.  Do

 9   you have the same draft?

10              MS. RODRIGUEZ:  You have an old draft.

11              MR. FRAM:  No, I have what the Judge give me this

12   morning.

13              MS. RODRIGUEZ:  I have an old draft.

14              MR. FRAM:  The one that says final.  Pardon us for

15   a minute.

16              (Off-the-record discussion).

17              THE COURT:  I think he is right.  I am taking that

18   out, the bottom of 18, the first two lines of 19.

19              MR. FRAM:  Yes.  Thank you very much, your Honor.

20              THE COURT:  Now, let me have your comment on the

21   proposed addition to the charge on page 10 that Mr. Fram

22   wrote out which I will mark as an exhibit.

23              MR. FRAM:  Thank you, your Honor.

24              THE COURT:  Your writing is pretty legible.

25              (Off the record discussion)
```

1           THE COURT:  I will read it from Mr. Press's

2   summation, the part you objected to.

3           "And my clients, he called them all liars.  I want

4   you to remember some of them are here.  Alan, Sean Clarke,

5   please stand up.  Sally Young.  Alan Altman.  Matt Comlish.

6   They are all liars.  That is what he just told you.  You

7   remember these people.  They sat there, right in your chair

8   and looked you all in the eyes and told you what they

9   believed.  They told you what they remembered, to the best of

10  their ability, stuff that happened ten years ago.

11          " Their story was completely consistent, unlike

12  some of the ALPA witnesses that we will get into.  That is

13  who they are calling liars to you today.  And then this

14  charming fellow, remember him?  This was Howard.  Howard

15  Hollander.  He is a liar, too.  He is the fellow that,

16  remember, that fateful date, April 2, he followed advisors

17  out of the conference room.  They went in to have a

18  conference call and he put his ear on the wall, the room next

19  door, and he overheard what they were saying, which wasn't

20  very nice.  But that is who they are now trying to portray as

21  just completely dishonest people.  And I hope you don't

22  believe it.  These people are serious, credible people.  They

23  came in here today and told you the truth to the best that

24  they could, and they are no faction.

25              "Who is the faction?  I mean, come on.  Steve

1    Rautenberg is the faction.  He is the one that got run right

2    out of his office because of the things he did there at the

3    end trying to get Supplement CC passed.  After the full MEC

4    had just rejected it two weeks earlier.  Remember all of

5    that.  Steve Rautenberg is the faction.  He is entitled to

6    his opinion.  And no one could quarrel with somebody wanting

7    to have their own opinion.  But don't come in here, Mr. Fram,

8    and recreate facts.  Mr. Rautenberg was the faction.  And his

9    decision was so unpopular, remember what happened?  There was

10   that recall vote in St. Louis.  It was the most attended two-

11   day meeting --"

12           Basically, it was the part about these are serious

13   people.

14           MS. RODRIGUEZ:  Serious people.

15           MR. JACOBSON: In the context of you have seen them

16   on the stand.  He is referring back to the testimony.  I

17   don't think the rules require that every moment you refer to

18   the evidence to say the phrase, "the evidence shows."  In

19   testing them he is not saying I have personal knowledge that

20   these people are honest, that these people are truthful.  I

21   think that he is trying to make a mountain out of a mole

22   hill.  One line where he doesn't refer back to the evidence?

23           THE COURT:  But I can put a ski lift on it.  If we

24   make it a mountain.

25           MR. JACOBSON: It is one line out of, in an entire

1  opening, which was referring properly to the evidence, he is

2  not personally vouching for them.   There is no requirement

3  that a person preface every question with, "the evidence will

4  show you."

5       I think that the proposed instruction is trying to

6  get a fly with a shotgun.   It is totally out of line.

7       THE COURT:   Can I have it back, please?

8       MR. FRAM:   Your Honor, what does --

9       THE COURT:   Mark this as a C exhibit.   This is, for

10  the record, C 5 is the proposed additional charge that Mr.

11  Fram wants as a follow-up to the letter of yesterday and his

12  comments of Mr. Press that he considers from Mr. Press to be

13  vouching.

14       MR. FRAM:   Your Honor, just to respond to counsel's

15  comment.   What does RPC 3.40 mean?   It specifically provides

16  that a lawyer cannot say his personal opinions, and that is

17  what happened.   The comment after --

18       THE COURT:   Well, he did reference, for instance, I

19  referred to the consistency of all the testimony.   And one of

20  the things I tell the jury earlier on is that you should

21  analyze for the one witness, whether one witness is

22  consistent with other witnesses, or inconsistent with other

23  witnesses, in assessing credibility.   I say that in my

24  general comments, in section 10.

25       Anything else you want to add?

1          MR. FRAM:  No.  I think your Honor understands the

2     issue.

3          THE COURT:  No, I understand it.  Everyone

4     understands it.  As lawyers, we all understand the issue.

5          All right.

6          I think Mr. Press came close to the line of

7     vouching, in other words, talking credibility, without -- but

8     I think in the overall context of his comments, it was not

9     serious enough for me to put my thumb in there and finger

10     another lawyer as having broken the rules.  That puts my

11     thumb on the scale.

12          MR. PRESS:  Thank you, your Honor.

13          THE COURT:  Too much, I think much too heavily to

14     do that.

15          I am not going to give the suggested charge.  There

16     was reference to the record in there.  There was reference

17     particularly to the consistency and the contrast of the

18     consistency of the pilots' testimony with the inconsistency

19     that he said would be the defendant's position.  And Mr.

20     Press certainly today didn't even get close to the line.  He

21     did everything he was supposed to do.  And to say, somebody

22     must have circled it, it wasn't me.

23          MS. RODRIGUEZ:  It was me.

24          THE COURT:  Okay.  It wasn't me that did that on

25     the exhibit.  It says I instruct you that it is improper for

1    an attorney to state his personal opinion, et cetera.

2           As I say, when I have two attorneys and I

3    specifically criticize one attorney for improper behavior,

4    however minor the point may be, or however major it may be,

5    it is putting my thumb on the scale more than is necessary

6    here.  You know what I mean.  We went through it and we heard

7    about Duane Woerth -- not Duane Woerth, Roland's Wilder's

8    presence or absence on April 2, and that was all tied to the

9    record.

10           I am satisfied that this will not, that Mr. Press's

11    comments will not improperly influence the jury beyond what

12    is legitimate argument.  So I am going to deny the request.

13           We have it on the record.

14           Anything else by anybody?

15           MR. PRESS:  Not from the plaintiffs, Judge.

16           MR. FRAM:  Your Honor, I express concern as well

17    about the issue of the extension.  I think your Honor has

18    addressed it already.

19           THE COURT:  Say it again.

20           MR. FRAM:  The issue of Mr. Press's statements

21    yesterday about an extension.  I think your Honor ruled on

22    that before.

23           THE COURT:  Yeah, I did rule on it before.  As I

24    say, I think, the best I can divine out of it, because the

25    facts are a little murky, is that the judge probably could

```
1    have extended it some time, but not as of right.  So I think

2    Mr. Press was wrong, when he said they have a right.

3               MR. PRESS:  Honestly, that is the way I remember

4    the testimony coming, Judge, honestly.

5               THE COURT:  It may be there was testimony about

6    that.  I don't recall that.  I don't want to say that that

7    wasn't in the testimony.

8               MR. PRESS:  And I am not saying it was.  That is

9    honestly the way I remember it.

10              THE COURT:  I don't remember one way or the other.

11              MR. PRESS:  When the testimony came in, I wrote on

12   my notes, so there was time to have a vote.

13              THE COURT:  There may have been testimony.  I

14   simply don't remember.  But reading the rule, I think the

15   Judge did have four or five days that they could have

16   extended it.  It is murky enough, also in the context of this

17   closing, it is a pretty minor point.  I mean, the notion that

18   somehow or other that is going to sway the scale, that they

19   could have gotten an extension on the 1113.  In the context

20   of this case it is not going to rise or fall on that.  So I

21   did rule on that.

22              All right.  Let's take another five minutes.  Note

23   for the record that I am, the bottom of page 18, the top of

24   page 19, that paragraph I am taking out, it is repeated just

25   a few lines later, in section 18.  See you shortly
```

 1          (Recess)

 2          (The jury enters the courtroom.)

 3          THE COURT:  I have had a secret request to speak

 4    into the microphone.

 5          Ladies and gentlemen of the jury, now that you have

 6    heard all the evidence to be received in this trial, and the

 7    arguments of counsel, it becomes my duty and privilege to

 8    give you the final instructions of the Court as to the law

 9    that will guide you in your decisions.

10          The plaintiffs in this matter are several

11    individuals, Howard Hollander, Sally Young, Patrick Brady,

12    Ted Case, and Michael Finucan.

13          They are former pilots for TWA and TWA, LLC.  In

14    this action, these individuals are pursuing this litigation

15    not only on their own behalf, but they also represent a class

16    of plaintiffs consisting of some of the approximately 2,300

17    individuals who were pilots of TWA as of April of 2002.  As

18    you have heard, the defendant, Air Line Pilots Association

19    International,  which has been referred to as ALPA, is a

20    union and represented the pilots of TWA up until April of

21    2002.

22          During the course of these instructions I will

23    refer to the plaintiffs as plaintiffs, or the class, and I

24    will refer to the defendant as ALPA.

25          All of the instructions of law given to you by the

1   court, those given to you at the beginning of the trial,

2   those given to you during the trial, and these final

3   instructions, must guide and govern your deliberations.

4          It is your duty as jurors to follow the law as

5   stated in all of the instructions of the Court and to apply

6   these rules of law to the fact as you find them from the

7   evidence received during the trial.

8          You are not to single out one instruction alone as

9   stating the law, but must consider the instructions as a

10  whole.  You should construe each of the instructions in light

11  of and in harmony with the other instructions and you should

12  apply the instructions as a whole to the evidence.  The order

13  in which the instructions are given has no significance, and

14  is no indication of their relative importance.

15         Counsel have quite properly referred to some of the

16  applicable rules of law in their closing arguments to you.

17  If any difference appears to you between the law as stated by

18  counsel and that as stated by the Court in these

19  instructions, you are to be governed by the instructions

20  given to you by the Court.

21         You must not be concerned with the wisdom of any

22  rule of law stated by the Court.  Regardless of any opinion

23  you may have as to what the law ought to be, it would be a

24  violation of your sworn duty to base any part of your verdict

25  upon any view of the law other than that given in these

1    instructions.  It also would be a violation of your sworn

2    duty as the judges of the facts to base your verdict upon

3    anything but the evidence received in the case.  You were

4    chosen as jurors for this trial in order to evaluate the

5    evidence received and to decide the factual questions

6    presented by the respective positions of the plaintiffs and

7    ALPA.

8            In deciding the issues presented to you for

9    decision in this trial, you must not be swayed by bias,

10   prejudice, or sympathy for or against any of the parties, and

11   not influenced by public opinion.

12           Justice through trial by jury depends upon the

13   willingness of each individual juror to evaluate the same

14   evidence presented to all the jurors here in the courtroom,

15   and to arrive at a verdict by applying the same rules of law

16   that I am giving you now in these instructions.

17           At times during the trial you saw lawyers make

18   objections to questions asked by other lawyers, and to

19   answers by witnesses.  This simply meant that the lawyers

20   were asking me to make a decision on a rule of law.  Do not

21   draw any conclusion from such objections or from my rulings

22   on them.  These related only to the legal questions that I

23   had to determine and should not influence your thinking.

24           When I sustained an objection to a question, the

25   witness was not allowed to answer it.  Do not attempt to

1    guess what answer might have been given had I allowed the

2    question to be answered.  Similarly, when I told you not to

3    consider a particular statement, you were told to put that

4    statement out of your mind and you may not refer to that

5    statement in your deliberations.

6            During the course of the trial we have from time to

7    time held conferences with the attorneys at sidebar out of

8    the hearing, hopefully, of the jury.  These conferences were

9    held to resolve legal issues which arose during the trial.

10   Please do not speculate about what was said or decided at

11   these sidebar conferences.  Do not consider them in any way

12   in reaching your verdict.

13           At times during trial I asked questions of

14   witnesses.  These questions should not be taken as an

15   indication that I have any opinion about the facts in this

16   case.  Indeed, if I have said or done anything during the

17   trial, or in instructing you now, that leads you to believe

18   that I am inclined to favor the case of the plaintiffs or the

19   defendant, you must remove that impression from your minds

20   and not permit yourselves to be influenced by it because none

21   was intended to be created.  There is nothing particularly

22   different in the way that a juror should consider the

23   evidence in a trial from that in which any reasonable and

24   careful person would treat any very important question that

25   must be resolved by examining facts, opinions, and evidence.

1          You are expected to use your good sense in

2     considering and evaluating the evidence in the case for only

3     those purposes for which it has been received, and to give

4     such evidence a reasonable and fair construction in the light

5     of your common knowledge of human nature.

6          Keep in mind that it would be a violation of your

7     sworn duty to base a verdict upon anything other than the

8     evidence received in the case and the instructions of the

9     Court.

10          The party with the burden of proof on any given

11     issue has the burden of proving every disputed element of his

12     or her claim to you by a preponderance of the evidence.  If

13     you conclude that the party bearing the burden of proof has

14     failed to establish any required element of that claim by a

15     preponderance of the evidence, you must decide against that

16     party on the issue you are considering.

17          What does preponderance of evidence mean?  To

18     establish a fact by a preponderance of the evidence means to

19     prove that a fact is more likely true than not.  A

20     preponderance of the evidence means the greater weight of the

21     evidence.  It refers to the quality and persuasiveness of the

22     testimonial and documentary evidence, not to the number of

23     exhibits or witnesses.

24          If you find that the credible evidence on a given

25     issue is evenly divided between the parties, such that it is

1    equally probable that one side is right and that the other

2    side is right, then you must decide that issue against the

3    party having the burden of proof.

4          That is because the party bearing this burden must

5    prove more than a simple equality of evidence.  Plaintiffs

6    must prove the issue by a preponderance of the evidence.

7          On the other hand, the party with the burden of

8    proof need prove no more than a preponderance.  So long as

9    you find the scale tips, however slightly, in favor of the

10   party with the burden of proof, that what the party claims is

11   more likely true than not true, then the element will have

12   been proved by a preponderance of the evidence.

13         The evidence in this case consists of the sworn

14   testimony of the witnesses, regardless of who may have called

15   them, and all exhibits received in evidence, regardless of

16   who may have produced them.

17         You have also heard testimony in the form of

18   depositions which have been received into evidence.  A

19   deposition is simply a procedure in which the attorneys for

20   one side question a witness or an adversary party under oath

21   before a court stenographer prior to trial.

22         A video deposition is a procedure where attorneys

23   question a witness under oath before a court stenographer

24   prior to trial while the whole proceeding is simultaneously

25   taped by a specially trained video operator.

1          Deposition testimony is entitled to the same weight

2     as live testimony, and should be evaluated by you in the same

3     manner as you would evaluate any other testimony.

4          During the trial several items were received into

5     evidence as exhibits.  These exhibits will be sent into the

6     jury room with you when you begin to deliberate.

7          Examine the exhibits if you think doing so will

8     help your deliberations.  Any proposed testimony or proposed

9     exhibit to which an objection was sustained by the Court and

10    any testimony or exhibit ordered stricken by the Court must

11    be entirely disregarded.

12         Likewise, anything you may have seen or heard

13    outside the courtroom is not proper evidence and must be

14    entirely disregarded.

15         Questions and statements of the Court or counsel,

16    and objections and arguments of counsel, are not evidence in

17    the case.  If the Court or a lawyer asks a question on cross

18    examination which incorporates a statement which assumed

19    certain facts to be true, the question is not evidence of

20    those facts if the witness denies the truth of the statement

21    in his or her answer.

22         You may consider the facts incorporated into a

23    question only if the answer of the witness recognizes their

24    truth.  In short, questions are not evidence, answers are.

25         You are to base your verdict only on the evidence

received in the case.  In your consideration of the evidence

received, however, you are not limited to the bald statements

of the witnesses or the bald assertions in the exhibits.  In

other words, you are not limited solely to what you see or

hear as the witnesses testify or as the exhibits are

admitted.

   If you find a fact has been proven, you are

permitted to draw from that fact such reasonable inferences

as you feel are justified in the light of your experience and

common sense.  Inferences are simply deductions or

conclusions which reason or common sense lead the jury to

draw from the facts proven in the case.

   There are two types of evidence which are generally

presented during trial.  Direct evidence and circumstantial

evidence.

   Direct evidence is the testimony of a person who

asserts or claims to have actual knowledge of a fact such as

an eyewitness.  Circumstantial evidence is proof of a chain

of facts and circumstances indicating the existence or

nonexistence of a fact.  The law generally makes absolutely

no distinction between the weight or value to be given either

to direct or circumstantial evidence, but simply requires

that you find the facts from a preponderance of all the

evidence, both direct and circumstantial.

   You should weigh all the evidence in the case.

1    After weighing all the evidence you must decide if plaintiffs

2    have satisfied their burden of proving each element of the

3    case by a preponderance of the evidence.

4          If any reference by the Court or by counsel to

5    matters of testimony or exhibits does not coincide with your

6    own recollection of that evidence, it is your recollection

7    which should control during your deliberations.  And not the

8    statements of the Court or of counsel.  You are the sole

9    judges of the evidence received in this case.

10         Any notes you have taken during this trial are only

11   aids to your memory.  If your memory differs from your notes

12   you should rely on your memory and not on the notes.  The

13   notes are not evidence.  If you have not taken notes you

14   should rely on your independent recollection of the evidence

15   and should not be unduly influenced by the notes of other

16   jurors.  Notes are not entitled to any greater weight than

17   the recollection or impression of each juror about the

18   testimony.

19         There are times when you are asked to draw

20   different inferences from the same facts.  It is for you and

21   you alone to decide what reasonable inferences you choose to

22   draw from the evidence in this case.

23         Now, I have said that you must consider all of the

24   evidence.  That does not mean, however, that you must accept

25   all of the evidence as true or accurate.  You are the sole

1    judges of the credibility or believability of each of each

2    witness, and the weight to be given to his or her testimony.

3         You are called upon to resolve various issues of

4    fact concerning the respective allegations of the parties.

5    How do you determine where the truth lies?  Your

6    determination of the credibility or believability of a

7    witness depends largely upon the impression the witness made

8    upon you as to whether or not he or she was giving an

9    accurate and truthful version of what occurred.  In weighing

10   the testimony of a witness you should consider his or her

11   interest, if any, in the outcome of the case, his or her

12   manner of testifying, and the extent to which he or she has

13   been supported or contradicted by other credible evidence.

14        You may accept or reject the testimony of any

15   witness in whole or in part.

16        You must use your common sense, your good judgment,

17   and your experience.  In other words, what you must try to do

18   is size a person up, just as you would do in any important

19   matter where you are undertaking to determine whether or not

20   a person is truthful, candid, and straightforward.

21        In passing upon the credibility of a witness, you

22   may also take into account inconsistencies or contradictions

23   as to material matters in his or her own testimony, the

24   length of time which has passed since the event testified

25   about, and any conflict between his or her testimony and the

testimony of another witness.

A witness may be inaccurate, contradictory, or even confused in some minor respects, and yet be entirely credible in the essentials of his or her testimony.  The ultimate question for you to decide in passing upon credibility is did the witness tell the truth?  It is for you to say whether his or her testimony at this trial is truthful in whole or in part, in light of the demeanor, the explanation, and all of the evidence in the case.  If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness's testimony and other particulars, and you may reject all of the testimony of that witness, you may give it such credibility as you think it deserves.

The  weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify.  What is more important is how believable the witnesses were and how much weight you think their testimony deserves.

During the course of the trial the parties have sometimes challenged the testimony of certain witnesses by pointing to prior statements the witnesses made or allegedly made.  In considering this evidence you must separate those prior statements into statements that were not made under oath and statements that were made under oath.

1          You may consider prior statements that were not

2    made under oath solely for the purpose of impeachment.  That

3    is, you may consider them only to help you decide if you

4    believe the witness's testimony.

5          For example, if a witness said something previously

6    that conflicts with what he or she said here in court, there

7    may be reason for you to doubt that witness's testimony.

8    That is for you to decide.

9          You are not permitted, however, to use those

10   earlier statements as affirmative substantive evidence in

11   this case.

12         If, however, the witness is a party, that is the

13   witness is one of the main plaintiffs, or is an officer,

14   employee, or agent of ALPA, then even their unsworn prior

15   tested statements may be treated by you as substantive

16   evidence in this case.  Prior statements that were made under

17   oath, for example, at a deposition or at an affidavit or a

18   declaration, should be treated just as if they were made here

19   in court.  You may consider them for the purposes of

20   impeachment, as above, but you may also consider them as

21   affirmative substantive evidence.

22         You may rely on these statements as much or as

23   little as you think proper.  It is exclusively your duty to

24   determine whether the prior statement was inconsistent, and

25   if so, the significance of the inconsistency and how much

1    weight it should be given.

2            In this case, the TWA pilots claim that ALPA, their

3    former union, breached its duty of fair representation.  ALPA

4    denies these claims.  ALPA has the union and exclusive

5    bargaining representative to the TWA pilots was required

6    under the law to fairly represent the TWA pilots.  This duty

7    is known as the duty of fair representation, and requires a

8    union to act in the best interest of its members in a manner

9    I will describe to you hereafter.

10           The TWA pilots claim that ALPA breached its duty of

11   fair representation by failing to protect the TWA pilot

12   seniority as part of TWA's merger with American Airlines, and

13   the subsequent merger of the two pilot groups.  ALPA denies

14   these claims and contends that it represented the TWA pilots

15   appropriately under the difficult circumstances presented by

16   TWA's poor financial situation.

17           In order to prove their case the TWA pilots will

18   have to establish by a preponderance of the evidence that

19   ALPA's representation of the TWA pilots was either arbitrary

20   or motivated by bad faith.

21           If plaintiffs prove that ALPA's conduct was

22   arbitrary or motivated by bad faith, they must then prove a

23   tangible injury resulting from that conduct in order to

24   prevail.  A labor union can only be held liable for a breach

25   of its duty of fair representation if its breach directly

1    causes injury to an individual or group of whom, to whom the

2    duty is owed.

3              In this case, proving injury means that plaintiffs

4    are required to demonstrate that but for ALPA's breach of its

5    duty of fair representation, the overall outcome of the

6    integration of the TWA pilots into American would have been

7    more favorable.

8              As I mentioned earlier, this case is being pursued

9    by the named plaintiffs on behalf of a class of certain of

10   the former TWA pilots.  While the outcome of this case will

11   affect these members of this class, this issue should not

12   influence your decision-making on whether the plaintiffs have

13   proved all the elements of their case.  You should not view

14   the fact that this is a class action as making the

15   plaintiffs' claims any more or less true or likely.  You must

16   evaluate the proofs as they are presented to you without

17   consideration of the class action status.

18             When a union is the exclusive bargaining

19   representative for a group of employees, the law requires

20   that that the law requires that union to represent the

21   interests of the employees in a proper manner.  This

22   requirement is known as the duty of fair representation.

23   ALPA owed a duty of fair representation to the TWA pilots.

24             The primary concern that the duty of fair

25   representation was designed to address is that individual

employees not be deprived of all effective means of
protecting their own interests.  A union owes its duty of
fair representation to every employee within the bargaining
unit that it represents.

Personal hostility alone is insufficient to
establish unfair representation if the union's representation
was adequate, and there is no substantial evidence that
personal hostility tainted the union's actions.  In this
case, you must decide whether ALPA breached its duty of fair
representation.  A union breaches its duty of fair
representation when its conduct towards a member or members
of the bargaining unit it represents is arbitrary, in bad
faith, or discriminatory.

There is no contention that ALPA acted in a
discriminatory manner towards the TWA pilots.  You must
evaluate ALPA's decisions and actions only in light of the
legal and factual informational ALPA possessed at the time it
made those decisions and took those actions.  Therefore, any
review of the union actions in the context of litigation must
be deferential.

This deferential review is designed to recognize
the wide latitude that negotiators need for the effective
performance of their bargaining responsibility.  Therefore,
in evaluating whether plaintiffs have demonstrated their
claim for breach of the duty of fair representation, you must

1    not rely on hindsight.

2           I should emphasize to you that in order to prove

3    that ALPA violated its duty of fair representation to the TWA

4    pilots, plaintiffs must prove that ALPA did more than simply

5    act negligently or without proper care in dealing with the

6    TWA American Airlines merger.  ALPA does not need to

7    establish that it had any particular reason for any of the

8    actions it took, or that it was motivated by good faith.  It

9    is the plaintiff's burden to prove that ALPA acted

10   arbitrarily, or was motivated by bad faith toward the TWA

11   pilots it represented.

12          A union's conduct is arbitrary if, looking at all

13   the evidence presented, it is so far outside a wide range of

14   reasonableness that it is irrational.  A union acts

15   arbitrarily when it makes decisions based on considerations

16   that are not legitimate union objectives.  Examples of

17   arbitrary conduct include things like acting in a perfunctory

18   or superficial manner.

19          A union's conduct is made in bad faith when it acts

20   or fails to act out of hostility or ill will towards the

21   employees its represents.  The intent of the union is

22   critical in determining whether it acted in bad faith.  In

23   order for to you find that ALPA acted in bad faith, you must

24   find that ALPA had a bad faith motive.  Examples of bad faith

25   include things like deliberately making misleading statements

to employees, not disclosing conflicts of interest, acting
with hostility towards union members, and ignoring union
policies and labor negotiations, if such actions are the
result of a bad-faith motive described above.

You have heard testimony that ALPA refused to
institute litigation suggested by the attorneys for the TWA
MEC, Roland Wilder.  Individual union members do not have the
right to insist that a union file litigation.  The basic test
is one of reasonableness.  So long as the union acts in good
faith, the law permits the union to exercise broad discretion
in determining whether litigation should be instituted.  The
union may consider, among other factors, the cost of
proceeding, the likelihood of success, and the potential
adverse consequences of pursuing litigation, even if
meritorious.  Thus, even if a properly proposed legal action
has merit, mere negligence or existence of poor judgment on
the part of a union does not constitute a breach of its duty
of fair representation.

On the other hand, when a union acts arbitrarily or
in bad faith in refusing to pursue properly proposed legal
action, it violates a duty it has to represent fairly the
union members.

The fact that the Bond bill was not enacted into
law is not proof that ALPA breached its duty of fair
representation.  Nonetheless, when deciding whether ALPA

1  breached its duty of fair representation you can consider

2  what actions ALPA took or did not take in support of a Bond

3  bill, and its motivations for such action, or inaction.

4  If you find by a preponderance of the evidence,

5  looking at all of the evidence presented, that ALPA breached

6  its duty of fair representation by acting arbitrarily or in

7  bad faith, and that ALPA's conduct caused injury to some or

8  all of the TWA pilots, you must find for the plaintiffs.

9  If you find that plaintiffs have failed to meet

10  this burden of proof, you must find for ALPA.

11  When you retire to the jury room to deliberate, you

12  may take with you these instructions.  I will make three or

13  four copies and send them in to you.  When you retire to the

14  jury room to deliberate you may take with you these

15  instructions, your notes, and the exhibits that the Court has

16  admitted into evidence.  You should select one member of the

17  jury as your foreperson.  That person will preside over the

18  deliberations and speak for you here in open court.

19  You have two main duties as jurors.  The first one

20  is to decide what the facts are from the evidence that you

21  saw and heard here in court.  Deciding what the facts are is

22  your job, not mine.  And nothing that I have said or done

23  during this trial was meant to influence your decision about

24  the facts in any way.

25  Your second duty is to take the law that I give

1   you, apply it to the facts, and decide if, under the

2   appropriate burden of proof, the TWA pilots have established

3   their claim.  It is my job to instruct you about the law and

4   you are bound by the oath you took at the beginning of the

5   trial to follow the instructions that I give you, even if you

6   personally disagree with them.  This includes the

7   instructions I gave you before and during the trial and these

8   instructions.

9          All the instructions are important, and you should

10  consider them together as a whole.  Perform these duties

11  fairly, do not let bias, sympathy or prejudice that you may

12  feel towards one side or the other influence your decision in

13  any way.  Jurors have a duty to consult with each other and

14  to deliberate with the intention of reaching a verdict.  Each

15  of you must decide the case for yourself, but only after a

16  full and impartial consideration of all the evidence with

17  your fellow jurors.

18         Listen to each carefully.  In the course of your

19  deliberations you should feel free to reexamine your own

20  views, and to change your opinion based on the evidence.  But

21  you should not give up your honest convictions about the

22  evidence just because of the opinions of your fellow jurors.

23  Nor should you change your mind just for the purpose of

24  obtaining enough votes for a verdict.  You are not partisans.

25  You are judges, impartial judges of the fact.  Your sole

1    interest is to ascertain the truth from the evidence in the

2    case.

3          Under no circumstances should your deliberations be

4    affected or diverted by any appeal to bias, passion or

5    prejudice for or against any of the parties, or influenced by

6    any pity or sympathy in favor of them.  The law does not

7    permit jurors to be governed by sympathy, prejudice or public

8    opinion.  A corporation or other association, including a

9    labor union, and all other persons, are equal before the law,

10   and must be treated as equals in a court of justice.

11         When you start deliberations do not talk to the

12   jury officer, or to me, or to anyone but each other about the

13   case.  During deliberations you must not communicate with or

14   provide any information to anyone by any means about this

15   case.  You may not use any electronic device or media, such

16   as a cell phone, smart phone, or computers of any kind.

17         I am going to ad lib here.

18         If anyone is caught twittering or Googling, I will

19   put an earphone in their ear for the rest of their lives and

20   they will have to listen to Twitter nonstop 24 hours a day.

21   Okay.

22         The internet, do not use the internet, and any

23   internet services or text or instant messaging services or

24   internet chat room, blog, website, social networking services

25   to communicate to anyone any information about this case, or

1  to conduct research about this case, until I accept your

2  verdict.

3          If you have any questions or messages for me you

4  must write them on a piece of paper, have the foreperson sign

5  them, and give them to the jury officer.  The officer will

6  give them to me, and I will respond as soon as I can.  I may

7  have to talk to the lawyers about what you have asked, so it

8  may take some time to get back to you.

9          One more thing about messages.  Never -- listen,

10 never write down or tell anyone how you stand on your votes.

11 For example, do not write down or tell anyone that a certain

12 number is voting one way or another.  Your vote should stay

13 secret until you are finished.

14         Your verdict must represent the considered judgment

15 of each juror.  In order for you as a jury to return a

16 verdict, each juror must agree to the verdict.  Your verdict

17 must be unanimous.

18         A verdict form has been prepared for you.  It has,

19 I say, it has a series of questions, it has only two

20 questions for you to answer.  You will take this form to the

21 jury room and when you have reached a unanimous verdict --

22 when you reached unanimous agreement as to your verdict, you

23 will fill it out and have your foreperson date and sign the

24 form.

25         Unless I direct you otherwise, do not reveal your

1    answers until you are discharged.  After you have reached a

2    verdict you are not required to talk with anyone about the

3    case, unless I order you to.  Once again, I want to remind

4    you that nothing about my instructions, or nothing about the

5    form of the verdict, is intended to suggest or convey in any

6    way or manner what I think your verdict should be.  It is

7    your sole and exclusive duty and responsibility to determine

8    the verdict.

9              Now, I just for a minute want to go over the

10   verdict sheet with you.  We will send in six or seven copies

11   of it.  Use some of them as scrap paper.

12             It says jury verdict here.  It is two questions.

13             The first question is:

14             1:  Did defendant Air Line Pilots Association

15   violate its duty of fair representation to the TWA pilots?

16             ANSWER:  Yes, no.

17             Then there is an instruction that you must read.

18   If you answered yes to question 1, proceed to question 2.

19             If you answered no to question 1, please stop.

20   Your deliberations are over.

21             The jury foreperson must sign the last page of the

22   verdict form.

23             Again, if you answered yes, then you go to the

24   second question.

25             Did defendant Air Line Pilots Association violation

1   of its duty of fair representation directly cause injury to

2   some of the TWA pilots?

3            "ANSWER:  Yes, no.

4            Yes.  No.  Please stop.  Your deliberations are

5   over.  The jury foreperson will sign the last page of the

6   verdict form.  Then you date it and the foreperson signs it.

7            If any of you have served on a jury before you must

8   disregard the facts and law of that case, and any verdict you

9   may have returned, because they have no application to this

10  case.

11           All cases are unique, and must be judged

12  independently.  You are not permitted to compare them to

13  arrive at your verdict in this case.  Your verdict here must

14  be based solely on the law I give to you and the evidence you

15  saw and heard in this courtroom.

16           You are instructed once more, if I have asked any

17  questions of any witness during the trial, or if I have said

18  or done anything during the trial or in the course of

19  instructing you now that suggests to you that I am inclined

20  to favor the case of the plaintiffs, or the defendant, you

21  must remove that impression from your minds, and not permit

22  yourselves to be influenced by it.

23           Nothing in these instructions or in the verdict

24  sheet prepared for your convenience is meant to suggest what

25  verdict I think you should find.  That is not my

1    responsibility.

2          The determination of the verdict is the exclusive,

3    and essential duty of the jury.

4          You will be provided with a written copy of these

5    instructions, in fact, several written copies of these

6    instructions.  Should you desire to consult the jury

7    deliberations.

8          The captions at the beginning of the various

9    sections or subsections are not part of the instructions.

10   And I didn't read them to you.  And are not -- they are there

11   only for your convenience.  You must not consider any

12   particular.

13         You must not consider any particular portion of

14   these instructions in isolation.  Rather, you must apply all

15   the rules of law about which I have instructed you.

16         May I commend counsel for their actions in this

17   Court and for the respect which they have given the Court.  I

18   wish also to complement and thank the jurors for their

19   patience and for their attention they have paid to the

20   witnesses, to the parties, and to this Court.

21         Again, if you have any questions for the Court,

22   please write them on a piece of paper and have your

23   foreperson give them to the United States marshals for

24   delivery to me.

25         Never attempt to communicate with the Court by any

1    other means than a signed writing.  We are very generous.  We

2    will provide you with pencils and paper.  Bear in mind that

3    you are not to reveal to the Court or to any person how the

4    jury stands numerically or otherwise until you have reached a

5    unanimous verdict, I think I said this already, but can't

6    hurt to say it again.  The form of your verdict, your verdict

7    must represent the considered judgment of each juror.  In

8    order to return a verdict, it is necessary that each and

9    every juror agree.  The verdict must be unanimous.

10           Jurors perform a very important financial in

11   deciding on your verdict.  You are an arm of the government

12   here to do justice.  There is nothing more sacred.  Do your

13   duty conscientiously, according to your oath and according to

14   these instructions, and justice will be done.

15           And remember, that is first thing you do when you

16   get into the jury room, you have to elect a foreman, a

17   foreperson, I should say.

18           Now, I ask the parties to come to sidebar for the

19   last  time.

20           (At sidebar).

21           THE COURT:  Two things.  I want to put on the

22   record that all your prior objections and positions about the

23   charges, your objections are preserve.  Technically you have

24   to do it at the end of the charge.  I want to make clear I

25   consider them all preserved.

1          Now, I also give, sometimes you hear things, you

2     hear things you didn't think of before.  I don't want you to

3     repeat objections, but if any new objections occurred to you

4     in the course of, as I was reading, sometimes you hear things

5     aurally, through the ears, you react differently to them.  I

6     give everybody a chance to focus on something they might not

7     have focused on when we had our charge conference.

8          MR. PRESS:  We don't have any new objection.

9          MR. FRAM:  We, on behalf of ALPA we have nothing

10    further.

11         Did I see your Honor cross off the foreperson

12    selections?

13         THE COURT:  There is an ongoing battle among judges

14    as to whether number one is a foreperson.  I decided to let

15    them elect their own.  This is a complicated case.  I had

16    both concepts here.  I am taking this out.  I didn't read it.

17         MR. FRAM:  I noticed that.  So they will get a

18    revised version of this?

19         THE COURT:  Yes.  I will take this up.  I have two,

20    the thing you pointed out.  I will take that out.  And I am

21    going to take this out.

22         MR. FRAM:  Thank you, your Honor.

23         THE COURT:  Okay.

24         (Open court).

25         THE COURT:  The next thing we have to do is swear

1    in the Court officer.

2              THE CLERK:  Please come forward.

3              THE COURT:  We are ready to give you one of our

4    finest court officers.

5              BRAD ASHFIELD, SWORN AS COURT SECURITY OFFICER.

6              THE COURT:  Mr. Ashfield, it is a very amazing.

7    Sometimes you look out, he is going to look taller, shorter,

8    fatter, thinner, more hair, less hair.  More neatly pressed

9    suit.  Less neatly pressed suit.  It is just amazing how his

10   looks keep changing.  But it is just the way he is.

11             Sometimes he will look like a woman.  I never can

12   tell when you see your officers just sitting out in the hall

13   in front of your door.  He is very amazing.

14             Ladies and gentlemen, the case is yours.  We will

15   send in within, I don't know, ten minutes or something, the

16   exhibits.  We will ship them in to you.  And in about ten

17   minutes or so, or 15 minutes, I will ship in to you three or

18   four copies of the charge that I read to you as well as

19   probably six or seven copies of the verdict sheet so you can

20   use it for scrap paper.

21             So do your duty.  Justice will be done.

22             (Jury leaves the courtroom at 11:47 a.m.)

23             THE COURT:  Counsel, you don't have to sit in the

24   courtroom, because one has no idea obviously how long this

25   will take, but be where I can get you.

1            Larry asked the jury if they wanted to leave at two

2     today.  I told him I would be prepared to stay until five or

3     something.  They said?

4            THE CLERK:  They want to leave at two.

5            THE COURT:  They want to leave at two.  I will

6     offer them every day the chance to stay later, if they want

7     to.  On the days that I am here late I will just stay as long

8     as necessary.  If not, I will arrange for another judge to be

9     here and I will be accessible by phone if something comes up.

10    But I don't know what, whether they are going to stick to the

11    two o'clock, or their desire to get it done with is going to

12    motivate them to do longer days.  I don't know.

13           MR. FRAM:  You will bring them back in at two

14    o'clock before you let them go home.

15           THE COURT:  I will, on the first or second day, I

16    will today certainly.  Because I want to give them some

17    further instructions that I haven't given this them.  I am

18    going to instruct them, for instance, that, you know, remind

19    them not to talk to their family and friends, loved ones.

20           I am also going to say when they come in in the

21    morning, frequently jurors come in in groups, three, two,

22    they shouldn't be discussing the case in small groups.  In

23    other words, they should discuss the case only when they are

24    all twelve of them are together.  And they might not realize

25    that.  They may not think they are doing anything wrong if

1    three of them are discussing something as they are coming in,

2    it may not occur to them so I instruct them as to that.

3            And subsequent days I may not.  I may just let them

4    go home unless you want me to.  But today I am definitely

5    going to.

6            MR. FRAM:  Will you inquire as to their selection

7    of a foreperson at the end of today?

8            THE COURT:  I told them, that is the first thing

9    they have to do.

10           MR. FRAM:  I think we will be curious to know who

11   gets chosen.  I guess if you ask them to identify the person.

12           THE COURT:  Do both sides want that?

13           MR. PRESS:  Doesn't matter to me at all.

14           THE COURT:  If you have no objection to my doing

15   that, I will.

16           MR. PRESS:  I don't have an objection.

17           THE COURT:  I will have Larry make an inquiry.

18           MR. FRAM:  We are just curious.

19           THE COURT:  The name of the foreperson.  You can

20   all been seated.  I am sorry.  Let me stand.

21           I have both picked juror number 1, whoever the seat

22   would be, as foreperson, and other occasions I have had the

23   jury elect their foreperson.  I can't say that I have had bad

24   results in any event.  I have -- both have worked out.  But I

25   thought, this is a fairly long case.  However, I thought it

1   might be a good idea for them to pick their leader.  They may

2   have a sense of who is, of who will be best for that task.

3   So I chose here to do that.  We will see.  But I will, after,

4   you know, this afternoon, later, I will inquire as to, I will

5   have Larry inquire as to who has been elected the foreperson.

6   Okay.

7          So I don't think it is necessary today.  I don't

8   think they will have a verdict, that would be fairly fast.

9   Make sure I know where you are and where I can get at you

10  should there be a question.

11         We will get the exhibits in.  I am going to go up

12  and have new copies of this made.

13         (Recess)

14         (The jury enters the courtroom at 2:00 p.m.)

15         THE COURT:  Okay.  Ladies and gentlemen, I

16  understand you are on the way home.  Job one is to have a

17  safe trip home, and a safe trip in tomorrow.  We will see you

18  at 8:30.

19         Just a few instructions.  One, continue not to

20  discuss the case with family, friends, loved ones, co-

21  employees, or anybody.

22         Number 2, remember my instruction on use of

23  computers, cell phones, social media, you know, web sites,

24  research.  Stay off that.  Don't do any research on the case.

25  And don't discuss it over the internet with anybody.

1          The third point, as you leave and you come in in

2    the morning you may be in small groups, two or three.  Do not

3    discuss the case until all twelve of you have assembled

4    tomorrow morning.  In other words, it is important that

5    everybody hear everything.  And so we don't want to -- it

6    would be inadvertent.

7          I am not suggesting you would be doing anything

8    with a malicious motive, but you might as you are walking in,

9    three of you might start discussing it.  Don't do that.

10   Don't discuss the case until everybody is here.  All twelve

11   of you are in the jury room and have at it again.

12         I will see you tomorrow morning.  Again, I will

13   make you the same offer tomorrow.  If you want to stay beyond

14   two, let me know.  If you want to leave at two, let me know.

15   Your choice.  Whatever you choose to do is fine with me.

16         So it is your decision.  So again, with my

17   continuing thanks, I will see you tomorrow.

18         (Jury leaves the courtroom)

19         I don't know if Larry told you, apparently juror

20   number 1 was elected foreperson.  Now you know.

21         So my changing way of doing it didn't change the

22   result.

23         I am not going to call them out in the morning.  I

24   will just have, but I will come here just to check at 8:30,

25   make sure they are all here.  And I will check, so I will be

1   here a few minutes before 8:30 just to make sure they are all

2   here properly.  I don't see a purpose in calling them out

3   here.  I have nothing to tell them.

4          So with that, have a good night, everybody.  And

5   resist the urge to send me an email.  As your hand is

6   hovering over the computer key, like a dying Dr.

7   Strangelove.  Grab your hand and keep it from punching the

8   keyboard.

9          I will see you all tomorrow.

10         MR. FRAM:  Thank you, your Honor.

11         (Adjourned at 2:00 p.m.)