UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, et al. | Civil Acton No. 02-2917 (JEI) |
| Plaintiffs, | |
| v. | **DECLARATION OF NICOLE M. ACCHIONE** |
| AIR LINE PILOTS ASSOCIATION. | |
| Defendant. | |

I, Nicole M. Acchione, declare under penalty of perjury as follows:

1. I am an attorney-at-law with the firm of Trujillo Rodriguez & Richards, LLC, and I submit this declaration upon personal knowledge in support of Plaintiffs' Motion for Sanctions Pursuant to Rule 11.

2. Attached as Exhibit A are true and correct copies of excerpts from the depositions of Clay Warner, Michael Glanzer, and Steve Tumblin.

3. Attached as Exhibit B is a true and correct copy of the Certification of Service reflecting service of Plaintiffs' Motion for Sanctions upon counsel for Defendant, as required by Rule 11 (c)(2), on August 16, 2011.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND ACCURATE.

September 6, 2011

*/s/ Nicole M. Acchione*

Nicole M. Acchione

# EXHIBIT A

## In The Matter Of:

*Bensel v.*
*Air Line Pilots Association*

---

## CLAY WARNER
### Vol. 1
### September 16, 2008

---

## REPORTING ASSOCIATES, LLC
*Certified & Registered Professional Reporters*
*Cherry Hill -- Philadelphia -- Trenton*
*(888) 795-2323*
*www.ReportingAssociates.com*



Original File 0916warn.txt
Min-U-Script® with Word Index

Page 17

1  Q  Okay. They went on strike after the 1113
2  motion was filed?
3     MR. KATZ: Objection, lack of foundation.
4     THE WITNESS: I don't think so.
5     BY MR. PRESS:
6  Q  What?
7  A  I don't think so.
8  Q  Well, who filed an 1113 motion and what did
9  it request in that case?
10     MR. KATZ: I'm going to object to this
11  whole line of questioning. There's no foundation that
12  this Witness would be aware of that.
13     BY MR. PRESS:
14  Q  Well, Mr. Warner, do you have any knowledge
15  of the 1113 motion that was filed in that Court and how
16  it was responded to resolved or -- other than the fact
17  it was filed can you tell me anything about it?
18  A  Twenty-one -- no, 19 years ago. No, I
19  can't tell you much about it.
20  Q  All right.
21     MR. KATZ: Why don't you ask Mr. Seltzer.
22  His deposition is later this week.
23     MR. PRESS: I understand that.
24     BY MR. PRESS:

Page 18

1  Q  And sitting here today the Eastern
2  bankruptcy is the only bankruptcy you can recall that
3  you had any involvement with in which there was an 1113
4  motion at issue?
5     MR. KATZ: I object, mischaracterizes the
6  record.
7     BY MR. PRESS:
8  Q  Well, sitting here today your best
9  testimony.
10  A  I said sitting here this minute that's the
11  one that I can come up with but I know there were
12  others. So -- and if -- well, let it go at that.
13  Q  You know there were others but you can't
14  name them for me?
15  A  At this moment that is correct.
16  Q  And you came here today anticipating I
17  would ask you questions about your prior section 1113
18  experience, didn't you?
19  A  No.
20  Q  You were advising the TWA MEC on how to
21  deal with an 1113 motion. That's one of the issues in
22  this case, right?
23  A  Did you ask me whether I was advising the
24  TWA MEC about 1113?

Page 19

1  Q  I am asking. Yes.
2  A  Well, if that was your question I didn't
3  hear that question. Do you want to ask me that
4  question?
5  Q  You gave advice to the TWA MEC regarding
6  the section 1113 motion that the TWA pilots were
7  facing --
8  A  No.
9  Q  -- correct?
10  A  That's not correct.
11  Q  You didn't given any advice?
12  A  I did not.
13  Q  Okay. That's because you weren't qualified
14  to give such advice, right?
15  A  It was because Mr. Seltzer was available.
16  And as I had previously testified, he was -- had more
17  experience in this area than almost anybody else in the
18  country.
19  Q  So it's your testimony -- well, first of
20  all, let's get some foundation. You remember being
21  present at a TWA MEC meeting on April 2nd, 2001, in
22  St. Louis, correct?
23  A  Can you give me the subject matter that was
24  discussed as opposed to the time? I just want to make

Page 20

1  sure I'm at the right meeting.
2  Q  The subject matter would have been ALPA's
3  request that the TWA MEC waive its scope provisions.
4  A  ALPA never requested that the TWA MEC waive
5  its scope provisions.
6  Q  So you were never at such a meeting?
7  A  Well, that never happened.
8  Q  You remember an April 2nd, 2001, meeting in
9  St. Louis, Mr. Warner?
10  A  What was the subject matter being discussed
11  by the TWA MEC and I can tell you whether or not I
12  remember it?
13  Q  Some resolution to waive its scope.
14  A  That I remember. Yes, I was there.
15  Q  Right.
16     And you were there that day?
17  A  That is correct.
18  Q  And you gave advice to the TWA MEC that
19  day?
20  A  Yes, I did.
21  Q  And your advice was that they should waive
22  their scope, right?
23  A  My advice and my recommendation were to
24  list alternatives and the results from those

### Page 21

1  alternatives. 1113 played into the alternatives but
2  the advice with respect to 1113 came from Mr. Seltzer.
3  Q   Your advice ultimately to the MEC that day
4  was that they should waive scope, right?
5      MR. KATZ: I'm going to object. That was
6  asked and answered. The Witness said he listed
7  alternatives and gave the likely consequences of those
8  alternatives.
9      BY MR. PRESS:
10 Q   You had no recommendation that day?
11 A   My role and my discussion with the MEC was
12 to go down alternatives, following paths, summarizing
13 the advice that they were getting from their other
14 advisors, and pointing out the results of various
15 alternatives.
16 Q   Point out what?
17     MR. KATZ: The results of various
18 alternatives.
19     BY MR. PRESS:
20 Q   Who invited you to that meeting?
21 A   I do not recall.
22 Q   You can state definitively you know it
23 wasn't a TWA pilot that invited you, right?
24 A   Of course not. Why would I state that

### Page 22

1  definitively?
2  Q   No. Of course not it wasn't the TWA MEC
3  that invited you.
4  A   Well, that would be far and away the most
5  likely source of the invitation, but I don't recall.
6  Q   Right. Okay.
7      Which is to say you can't refute the
8  testimony of anybody on the MEC who would say that you
9  were not invited by them?
10     MR. KATZ: I'm going to object. You are
11 just arguing with the Witness. He's answered the
12 question.
13     BY MR. PRESS:
14 Q   I want to know if you are going to come
15 into Court and testify that Bob Pastore or somebody
16 else associated with the MEC invited me to that
17 meeting. Can you testify to that or not?
18 A   Staff members appear at MEC meetings and I
19 had previously appeared at TWA MEC meetings on other
20 issues at the invitation generally of one of the
21 officers of the MEC who would have been billed for my
22 expenses for attending.
23     So it is very likely that one of the
24 officers of the MEC invited me to attend, but I don't

### Page 23

1  have a recollection of that conversation.
2  Q   All right. And that's as most as you can
3  say about how you got invited?
4  A   Yep. That's it.
5  Q   Now, the alternatives that you presented to
6  the MEC that day, Mr. Warner, can you recall what they
7  were?
8  A   The issue presented to the MEC for decision
9  was whether or not -- well, let me step back. There
10 was a whole series of negotiating issues being
11 presented to the MEC in the form of a proposed
12 agreement with TWA-LLC. The details of those proposals
13 were discussed by the negotiating chairman Ron Kiel and
14 Mr. Holtzman, not me. And there were decisions to be
15 made there. I was involved in that.
16     The decisions that I was involved -- the
17 decision that I was involved with was whether or not
18 the MEC should agree to waive section one of its
19 collective bargaining agreement and associated
20 provisions that had been identified by TWA previously.
21 Q   And the shorthand phrase for the provisions
22 in section one what would that be, if there is one? I
23 was talking about waiving scope. Isn't that what you
24 are talking about?

### Page 24

1  A   Yes. There was more than that. I mean,
2  there were other benefits provisions and things that
3  also had to be changed, but it -- but there was a
4  discussion. They did shorthand it as waiving scope.
5  Q   Okay. So how was the issue presented then
6  as to that proposed waiver?
7  A   Present at that meeting in the form of
8  advisors were TWA MEC's corporate and bankruptcy
9  counsel Steve Tumblin which the MEC retained. There's
10 also the MEC's labor advisor Randy Babbitt that the MEC
11 obtained -- retained. There was, from the
12 representation department, Mr. Holtzman and
13 Mr. Roberts, Bill Roberts. I was there. The MEC's
14 investment banker Michael Glanzer was there and the
15 MEC's merger counsel Roland Wilder was there.
16     So there was a lot of presentation and a
17 lot of talking and a lot of discussing and a lot of
18 framing issues. There may have been other people
19 there, but that's what I recall right now.
20 Q   And the issue that you talked about was
21 whether or not the MEC should waive section one of its
22 collective bargaining agreement?
23 A   That's the issue they were presented with
24 and I helped to try -- I hoped to try to help them

## In The Matter Of:

*Bensel v.*
*Air Line Pilots Association*

---

MICHAEL GLANZER
*Vol. 1*
*September 18, 2008*

---

REPORTING ASSOCIATES, LLC
*Certified & Registered Professional Reporters*
*Cherry Hill -- Philadelphia -- Trenton*
(888) 795-2323
*www.ReportingAssociates.com*



Original File 0918glan.txt
Min-U-Script® with Word Index

Page 85

1  A. Uh-huh.
2  Q. Is this a document that you think you
3  probably received in the scope of your engagement
4  with the TWA MEC?
5  A. Probably.
6  Q. If you go to -- there's document numbers
7  at the bottom of the pages --
8  A. Uh-huh.
9  Q. -- ALPA, if you go to 53130.
10  A. Okay.
11  Q. It talks about American's agreement with
12  United as part of this American/TWA deal.
13  A. Uh-huh.
14  Q. And it says in the second bullet point,
15  "Subject to the APA's consent, American will make
16  offers to 500 US Airways B757 captains and first
17  officers, and integrate them subject to Allegheny
18  Mohawk labor provisions."
19      You recognize the reference to APA is to
20  the American Airline Pilots Union?
21  A. Yes.
22  Q. And this was -- this notion of some 500
23  U.S. Airway pilots being integrated under the
24  Allegheny Mohawk provisions, that was something that
25  you knew about at the time. Right?

Page 86

1  A. I may have. I don't know with certainty
2  that I did, but possibly.
3  Q. And you know for a fact that that was
4  something that ALPA insisted upon for the US Airways
5  pilots. Right?
6  A. No, I do not know that.
7  Q. Weren't you personally involved in those
8  negotiations, sir?
9  A. Not as between US Airways and United on
10  this issue, no.
11  Q. And how do you understand this notion of
12  U.S. Airway pilots being offered Allegheny Mohawk
13  came up?
14      MR. KATZ: Objection. Lack of
15  foundation.
16      MR. AMINI: I'm going to object, too.
17  Go on.
18  A. Could you restate the question again?
19  Q. Yeah. You told me you were aware of
20  this generally at the time, and I want to know, how
21  were you made aware of it?
22  A. I -- I don't recollect. I mean, there
23  was a -- some deal between United and US Air, and
24  there may have been a deal between -- what is the
25  date of this? I just don't recollect this in

Page 87

1  particular. So...
2  Q. Well, your firm was working with the US
3  Airways MEC at the time.
4  A. It was.
5  Q. And had been for years.
6  A. That is true.
7  Q. And you were aware that the US Airways
8  MEC filed a grievance as a result of this part of the
9  transaction that we're looking at right here.
10      MR. AMINI: Objection.
11  A. I -- they may have. I don't know that.
12  It was asked as the deal that I would have focused
13  on.
14  Q. That wasn't --
15  A. No.
16  Q. -- something you knew at the time?
17  A. I may have, but my charge is on
18  financial matters, not prospective seniority
19  integration issues.
20  Q. With the US Air pilots?
21  A. With the US Air pilots.
22  Q. So are you aware of how that grievance
23  was resolved?
24  A. No.
25  Q. No?

Page 88

1      Or the timing of the resolution of the
2  grievance?
3  A. No.
4  Q. Were you aware of the fact that the APA
5  filed a grievance as a result of these US Airway
6  pilots being offered Allegheny Mohawk?
7  A. No.
8  Q. All right.
9      Do you remember -- going back to this
10  TWA MEC meeting where the scope waiver came up.
11  Mr. Glanzer, do you remember that you
12  weren't the only person advising MEC that day. There
13  were other folks there --
14  A. That's --
15  Q. -- who made presentations.
16  A. That's my recollection, yes.
17  Q. And do you remember that, at some point
18  in the meeting, those -- those presenters or
19  advisors, whatever you want to call them, those
20  people were asked to vote and give their opinion as
21  to whether or not the pilots should waive scope or
22  not?
23  A. I don't recollect that, no.
24  Q. Do you remember a call for a show of
25  hands?

Bensel v.  
Air Line Pilots Association

MICHAEL GLANZER - Vol. 1  
September 18, 2008

**Page 89**

1   A.   No.
2   Q.   Do you remember Roland Wilder dissenting
3   and disagreeing --
4         MR. PRESS: Roland Wilder.  Roland.
5   Q.   Do you remember him disagreeing with
6   your advice, in particular?
7   A.   I recollect that Roland Wilder, who was
8   charged with focusing on, and doing the best that
9   the -- the TWA pilots could in a seniority
10  integration was -- took a different position and --
11  with respect to the waiver issue, yes.
12  Q.   Okay.
13       And do you remember yourself, your -- as
14  part of your presentation at MEC, that your -- your
15  tone and demeanor was quite forceful.  Do you
16  remember that?
17  A.   No, I don't remember that.
18  Q.   Well, okay.  That's not your
19  recollection.
20  A.   I don't have a recollection of my -- I
21  don't play videos of myself in my own head about
22  meetings eight or nine years ago, no.
23  Q.   That's fine.
24       Do you remember, during a -- a break in
25  the proceedings, that the presenters, including

**Page 90**

1   yourself, caucused in a separate room and kind of
2   laid it on Roland Wilder pretty good, trying to get
3   him to change his vote.  Do you remember that?
4   A.   No.
5   Q.   Which is to say it might have happened,
6   you just don't remember it?
7   A.   That's correct.  It might have happened.
8   I just don't remember it.
9         MR. PRESS: Okay.  Thank you.  That's --
10  that's all I have.
11        MR. KATZ: I have no questions.
12        THE VIDEOGRAPHER: This will conclude
13  the deposition of Michael Glanzer at approximately
14  3:12 p.m.
15        Going off the video record.
16        (Testimony concluded.)

**Page 91**

1                    CERTIFICATE
2
3        I, MARY G. VAN DINA a Certified
4   Shorthand Reporter and Notary Public of the State of
5   New Jersey, do hereby certify that prior to the
6   commencement of the examination, MICHAEL GLANZER was
7   duly sworn by me to testify the truth, the whole
8   truth and nothing but the truth.
9        I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony as
11  taken stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13       I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any
15  of the parties to this action, and that I am neither
16  a relative nor employee of such attorney or counsel,
17  and that I am not financially interested in the
18  action.
19
20       Notary Public of the State of New Jersey
21       My Commission expires August 31, 2010
         License No. XI01903
22
23       Dated:  9/25/08

**Page 92**

1                    JURAT
         I, MICHAEL GLANZER, do hereby certify
2   that I have read the foregoing transcript of my
    testimony taken on September 18, 2008, and have
3   signed it subject to the following changes:
4   PAGE    LINE           CORRECTION

20                    WITNESS NAME
21  DATE _____
22  Sworn and subscribed to before me this
23  _____ day of _____, 2008.
24
    NOTARY PUBLIC

## In The Matter Of:

*Bensel v.*
*Air Line Pilots Association*

*STEVE TUMBLIN*
*Vol. 1*
*September 22, 2008*

*REPORTING ASSOCIATES, LLC*
*Certified & Registered Professional Reporters*
*Cherry Hill -- Philadelphia -- Trenton*
*(888) 795-2323*
*www.ReportingAssociates.com*



Original File 0922tumb.txt
Min-U-Script® with Word Index

Page 81

1  Q.   Okay.
2  A.   Or what qualifications they may have put
3  on their advice.
4  Q.   And maybe a better question is can you
5  testify as to what advice was generally given to the
6  MEC before April 2, 2001?
7       MR. CONNELL: Objection to the form.
8       THE WITNESS: Generally given. I think
9  the advice that was generally given was that there
10 were -- there was a significant risk if they did not
11 waive their scope, or whatever else the American had
12 asked them with respect to the integration. That
13 there was a possibility that American could withdraw
14 from the transaction and that some -- some of those
15 people believed there was a likelihood that American
16 withdraw from the transaction.
17      And I can't -- I cannot specifically say
18 this person said this and this person said this. Just
19 my general sense that -- that from all the advisors
20 who made presentations with respect to, I don't know
21 if it was that meeting or prior meetings, that it was
22 a difficult issue, integration was a difficult issue,
23 there were other difficult issues to deal with, and
24 that they received -- the MEC received probably, if I
25 had to put a number on it, at least the majority of

Page 82

1  advisors said there was a very significant risk of a
2  liquidation if American were to pull out of the
3  transaction.
4  Q.   BY MR. PRESS: What you've just recounted
5  for us, is that your memory of what was said by -- by
6  folks at the April 2nd meeting?
7  A.   I don't remember which meeting it was at.
8  I remember we met and we had the MEC, you know,
9  basically asked all of the advisors who were present
10 just to, you know, sort of lay out what they thought
11 the options were and give us their, you know, to give
12 their advice on what they thought the possibilities
13 were, what the risks were of various transactions and,
14 you know, give the MEC all the options so that the MEC
15 could make an informed decision in the -- in the best
16 interest of the TWA pilots.
17 Q.   And that -- the meeting you're referring
18 to, was that in St. Louis?
19 A.   I don't recall where it was.
20 Q.   Do you remember, are you referring to a
21 meeting where I think eight advisors came, including
22 yourself?
23 A.   If you named them I --
24      MR. CONNELL: Objection as to form.
25      THE WITNESS: If you named them I could

Page 83

1  tell you.
2  Q.   BY MR. PRESS: Sure. Bob Christy, Clay
3  Warner, Randy Babbitt, Michael Glanzer, Richard
4  Seltzer, yourself, Bill Roberts, and Rolland Wilder?
5  A.   Yeah, I think you're right.
6  Q.   That's eight.
7  A.   Yeah, I wouldn't have remembered some of
8  those if you hadn't said them, but I think that's
9  right. I mean, I think they were all there.
10 Q.   That's the meeting you're referring to?
11 A.   Yeah, that's the meeting I'm referring
12 to.
13 Q.   Okay. Did you make a presentation that
14 day?
15 A.   I'm sure I did.
16 Q.   Do you remember what advice, if any, you
17 gave?
18 A.   I don't recall specifically what advice
19 we were -- we gave. Based on my recollection of my
20 feelings with respect to the transaction at the time I
21 think what advice we probably gave was that it -- that
22 after listening to the financial advisor's analysis,
23 after listening to the analysis of those who were
24 strictly labor counsel and merger counsel, and
25 examining the bankruptcy options, and based on the

Page 84

1  feedback that, as I said, not directly but we were --
2  I was -- was coming back to me what I understood
3  American's -- the likelihood that they would move away
4  from -- from what they had required, that I think I
5  advised them that there was a very high risk in -- in
6  pursuing a strategy to try to go on the standalone
7  basis. To try to upset the American deal either --
8  either in the effort to do a standalone with some
9  other -- do a deal with some other entity or try to
10 renegotiate with American, those were basically, I
11 think, probably the three possibilities.
12 Q.   And that's what you can recall the advice
13 you gave?
14 A.   That's what I can recall the advice I
15 gave, although I don't specifically say -- remember
16 what I said.
17 Q.   Were you involved in the drafting of --
18 well, let me back up and lay some foundation.
19      TWA filed its motion under Section 1113
20 on February 5th -- not February -- March 15th, okay?
21 And do you recall that an objection to that motion was
22 filed by ALPA?
23 A.   I don't recall whether -- right now
24 whether -- do you have ...
25 Q.   I do have the brief with me, and my

# EXHIBIT B

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez
Nicole M. Acchione
258 Kings Highway East
Haddonfield, NJ 08033
Telephone: 856-795-9002
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> AIR LINE PILOTS ASSOCIATION, <br><br> Defendant. | Civil Action No. 02-2917 (JEI) |

## CERTIFICATION OF SERVICE

I hereby certify that a copy of Plaintiffs' Notice of Motion for Sanctions Pursuant to Rule 11, Brief in Support, Proposed Order and Declaration of Nicole M. Acchione has been served on Defense Counsel.

**VIA HAND DELIVERY:**
Steve Fram
Archer & Greiner P.C.
One Centennial Square
Haddonfield, NJ 08033

**VIA OVERNIGHT MAIL:**
Daniel M. Katz
Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Suite 250
Washington, D.C. 20016

Dated: August 16, 2011

By: s/ Lisa J. Rodriguez
Lisa J. Rodriguez