## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| _____ ) | |
| PATRICK BRADY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 02-2917 (JEI) |
| ) | |
| AIR LINE PILOTS ASSOCIATION, ) | |
| INTERNATIONAL, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

---

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION
## TO DECERTIFY PLAINTIFFS' CLASS

---

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By:     Steven J. Fram, Esquire
        Kerri E. Chewning, Esquire

*Pro Hac Vice*:

Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Ave., N.W., Suite 250
Washington, DC 20016
(202) 659-4656

Attorneys for Defendant
        Air Line Pilots Association, International

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................ 1

PROCEDURAL HISTORY............................................................................................ 1

STATEMENT OF FACTS ............................................................................................. 2

I.      TRIAL EVIDENCE ....................................................................................... 3

II.     ARGUMENT OF PLAINTIFFS' COUNSEL................................................. 11

III.    JURY INSTRUCTIONS AND JURY VERDICT........................................... 12

ARGUMENT ............................................................................................................... 13

I.      DECERTIFICATION IS NECESSARY AS TO ALL ISSUES BECAUSE
        COMMON ISSUES DO NOT PREDOMINATE ........................................... 14

II.     DECERTIFICATION IS NECESSARY BECAUSE DAMAGES IS AN
        INDIVIDUAL ISSUE.................................................................................... 20

III.    DECERTIFICATION IS ALSO WARRANTED BECAUSE CLASS
        TREATMENT IS NOT SUPERIOR .............................................................. 27

CONCLUSION............................................................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

<u>Agostino v. Quest Diagnostics, Inc.,</u>
    256 F.R.D. 437 (D.N.J. 2009)................................................................................15

<u>Amchem Prod., Inc. v. Windsor,</u>
    521 U.S. 591 (1997)................................................................................27, 28

<u>Barnes v. Am. Tobacco Co.,</u>
    161 F.3d 127 (3d Cir. 1998)................................................................................13

<u>Bayshore Ford Truck v. Ford Motor Co.,</u>
    Civ. No. 99-741, 2010 WL 415329 (D.N.J. Jan. 29, 2010)........................................14, 23, 24

<u>Beattie v. CenturyTel, Inc.,</u>
    511 F.3d 554,567 (6th Cir. 2007) ................................................................................27, 28

<u>Bensel v. Allied Pilots Ass'n,</u>
    675 F. Supp. 2d 493 (D.N.J. 2009) ................................................................................19

<u>Biver v. Saginaw Township Cmty. Sch.,</u>
    1989 WL 74654 (6th Cir. July 10, 1989)................................................................................17

<u>Blum v. Witco Chem. Corp.,</u>
    829 F.2d 367 (3d Cir. 1987)................................................................................21, 25

<u>Bogosian v. Gulf Oil Corp.,</u>
    561 F.2d 434 (3d Cir. 1977)................................................................................26

<u>Bowen v. United States Postal Service,</u>
    459 U.S. 212 (1983)................................................................................21

<u>Broussard v. Meineke Disc. Muffler Shops,</u>
    155 F.3d 331 (4th Cir.1998) ................................................................................25, 26

<u>Crosby v. Social Sec. Admin. of U.S.,</u>
    796 F.2d 576 (1st Cir. 1986)................................................................................15

<u>Deboles v. Trans World Airlines,</u>
    552 F.2d 1005 (3d Cir. 1977)................................................................................19

<u>DeGidio v. Perpich,</u>
    612 F. Supp. 1383 (D. Minn. 1985)................................................................................22

Dopp v. HTP Cor.,
947 F.2d 506 (1st Cir. 1991)................................................................................17

Fleishman v. Albany Medical Center,
No. 06-CV-765, 2008 WL 2945993 (N.D.N.Y. July 28, 2008) ...............................................22

Forman v. Data Transfer, Inc.,
164 F.R.D. 400 (E.D. Pa. 1995)................................................................................15

Foust v. Int'l Bhd. of Electrical Workers,
572 F.2d 710 (10th Cir. 1978) ................................................................................21

Galindo v. Stoody Co.,
793 F.2d 1502 (9th Cir. 1986) ................................................................................25

Gates v. Rohm & Haas Co.,
265 F.R.D. 208 (E.D. Pa. 2010)................................................................................20, 28

Gates v. Rohm & Haas Co.,
__ F.3d __, 2011 WL 3715817 (3d Cir. Aug. 25, 2011) ...............................................19, 20, 28

Goss v. Exxon Office Systems Co.,
747 F.2d 885 (3d Cir. 1984)................................................................................25

Gunnells v. Healthplan Svcs, Inc.,
348 F.3d 417 (4th Cir. 2003) ................................................................................22

Gutierrez v. Johnson & Johnson,
523 F.3d 187 (3d Cir. 2008)................................................................................13

Hartnett v. Brown & Bigelow,
394 F.2d 438 (10th Cir. 1968) ................................................................................17

Hohinder v. U.S. Parcel Svcs.,
574 F.3d 169 (3d Cir. 2009)................................................................................13

In re Hydrogen Peroxide Antitrust Litig.,
552 F.3d 305 (3d Cir. 2008)................................................................................14, 18, 23

In re OSB Antitrust Litig.,
, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) ................................................................................22

In re Prudential Ins. Co.,
148 F.3d 283 (3d Cir. 1998)................................................................................27

Key v. Gillette Co.,
782 F.2d 5 (1st Cir. 1986)................................................................................22

Kinnel v. Mid-Atl. Mausoleums,
    850 F.2d 958 (3d Cir. 1988)........................................................................16, 17

Lazy Oil Co. v. Witco Corp.,
    95 F. Supp. 2d 290 (W.D. Pa. 1997).....................................................................26

McNamara v. Felderhof,
    410 F.3d 277 (5th Cir. 2005) ...............................................................................13

Miller v. Hygrade Food Prods. Corp.,
    198 F.R.D. 638 (E.D. Pa. 2001).............................................................................25

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    259 F.3d 154 (3d Cir. 2001)...................................................................................14

Pichler v. UNITE,
    228 F.R.D. 230 (E.D. Pa. 2005).............................................................................15

Prentice v. Platoff Zane's Admin.,
    49 U.S. 470 (1850).................................................................................................17

Reap v. Cont'l Casualty Co.,
    199 F.R.D. 536 (D.N.J. 2001)................................................................................22

Richmond v. Madison Mgmt. Group,
    918 F.2d 438 (4th Cir. 1990) ................................................................................17

Royal Netherlands v. Strachan Shipping Co.,
    362 F.2d 691 (5th Cir. 1966) ................................................................................17

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,
    No. 05 Civ. 1898, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ...........................15

Vaca v. Sipes,
    386 U.S. 171 (1967)...............................................................................................21

Wal-Mart Stores, Inc. v. Dukes,
    131 S. Ct. 2541 (2011)......................................................................................17, 25

Walsh v. Pittsburgh Press Co.,
    160 F.R.D. 527 (W.D. Pa. 1994) ...........................................................................22

Windham v. Am. Brands, Inc.,
    565 F.2d 59 (4th Cir. 1977) ..................................................................................22

## RULES

Fed. R. Civ. P. 23 ................................................................................................. passim

Fed. R. Civ. P. 50(b) .......................................................................................................2, 12, 13, 29

Fed. R. Civ. P. 59(a) .......................................................................................................................2

**TREATISES**

2 William B. Rubenstein, Alba Conte, & Herbert B. Newberg, <u>Newberg on Class Actions</u>
    §4:27 (4th ed. 2010)..............................................................................................................28

7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, <u>Federal Practice and</u>
    <u>Procedure</u> § 1779 (3d ed. 2010)...........................................................................................28

Defendant, Air Line Pilots Association, International ("ALPA"), submits this Brief in support of its motion to decertify this litigation as a class action.

**INTRODUCTION**

This litigation cannot be permitted to continue as a class action. As a result of the liability trial that concluded on July 13, 2011, the jury rendered a verdict that is meaningless for the purposes of further proceedings in this case. With the factual record now complete, and the verdict applying only to "some" members of the class, the evidence and the verdict clearly show that the requirements for class certification were never met in this case. Further, because Plaintiffs pursued a "kitchen sink" approach to the issue of liability, it is impossible to determine, from the jury's general verdict, what violations of the duty of fair representation ("DFR") the jurors found or if the jurors even agreed on the same alleged violations. Moreover, because the jury was permitted to find in favor of Plaintiffs if only <u>some</u> of the members of the class suffered injury, there is no way to know which members of the class the jurors found to be injured – or even if the jurors agreed on who was injured – or the nature of the injury the jurors had in mind – or if they agreed on what that injury was. Regardless of whether this case proceeds to a new trial on all issues or only to a damages trial, the class must be decertified.

**PROCEDURAL HISTORY**[1]

ALPA hereby repeats and incorporates as if set forth at length herein the Procedural History contained in both (1) ALPA's February 22, 2011 brief in support of its Motion to

---

[1]    The relevant excerpts from trial transcripts and trial exhibits referred to in this brief are attached to the accompanying Declaration of ALPA's counsel. In this brief, ALPA's trial exhibits are referred to as "D-__," Plaintiffs' trial exhibits are denoted as "P-__," and Joint exhibits are referred to as "J-__."

1

Decertify Plaintiffs' Class pursuant to Fed. R. Civ. P. 23(c)(1)(C), and (2) ALPA's May 20, 2011 Trial Brief. The following facts addressed at trial are added by way of supplementation.

The trial of the liability phase of this bifurcated class action commenced on June 6, 2011, and concluded on July 13, 2011, when the jury returned a verdict of liability against ALPA. The verdict was based upon the jury's affirmative answer to the following question on the jury verdict sheet concerning injury:

> Did Defendant Airline Pilots Association's violation of its duty of fair representation directly cause injury to *some* of the TWA pilots?

Doc. 413 (emphasis added). On August 10, 2011, ALPA filed post-trial motions for Judgment as a Matter of Law pursuant to Fed. R. Civ. P. 50(b), for a New Trial or Dismissal pursuant to Fed. R. Civ. P. 59(a), and for Revocation of the *Pro Hac Vice* Admission of certain of the attorneys who represented Plaintiffs at the liability trial.

## STATEMENT OF FACTS

ALPA hereby repeats and incorporates as if set forth at length herein the Statement of Facts contained in both (1) ALPA's February 22, 2011 brief in support of its Motion to Decertify Plaintiffs' Class pursuant to Fed. R. Civ. P. 23(c)(1)(C), and (2) ALPA's May 20, 2011 Trial Brief. The following is added by way of supplementation.

The testimony presented at the liability trial established three facts that compel the decertification of this action if it is permitted to proceed, whether to a new trial or a bifurcated damages trial. Those facts are: (1) serious conflicts exist among the members of the class; (2) it is impossible to know from either the evidence presented at trial or from the liability verdict which members of the class suffered injury in fact or the nature of that injury - indeed it is relatively clear, from the proofs presented, that many TWA pilots did <u>not</u> suffer any injury; and (3) even if (by supposition only) it could be determined who was injured, the issue of damages

with respect to the "some" members of the class who were harmed is an individual question that will require separate damage trials.

I. **Trial Evidence**

The evidence presented at trial established that Duane Woerth and others from ALPA encouraged the TWA-MEC to accept enhanced furlough protection and other benefits that American Airlines offered in October and November of 2001 in what was referred to as the three-party term sheet. See D-139.  The three-party term sheet would have included a number of benefits that were not included in Supplement CC, including: (1) a no-furlough guarantee to the former TWA pilots senior to Ray Camus, the most senior stapled TWA pilot (seniority number 1085); (2) a limitation on American's ability to shrink its operations at St. Louis that was tied to its operations at Chicago O'Hare and Dallas-Fort Worth; by no more than 25%; and (3) furlough limits which restricted the maximum number of former TWA pilots furloughed to 200 in the fourth quarter of 2001 and to 250 in the first quarter of 2002. Id. at 3. In addition, because the TWA pilots, through ALPA, would have been a party to the three-party term sheet, American's offer, if accepted, would have protected the TWA pilots from adverse changes in Supplement CC imposed by American and the APA. Id.

A number of TWA pilots, including TWA-MEC members Steve Rautenberg and Pablo Lewin and Merger Committee Chairman Mike Day, recognized that the idea of pursuing litigation against American and the APA was futile, and repeatedly pressed the other TWA pilots to accept the three-party term sheet. Rautenberg's letter to the Council 3 pilots dated October 25, 2001, detailed the considerable efforts that he and Lewin made in an attempt to convince their fellow MEC members to vote in favor of the term sheet; negotiations occurred over the course of four days, and Rautenberg and Lewin moved to bring the term sheet up for a vote on three separate occasions. See D-21. In both this letter and his trial testimony, Rautenberg expressed

3

disgust at a group of MEC members including Hollander, Young, Case and Altman, who had engaged in "silly celebration," "high five'ing" and "congratulating each other … as if they had accomplished something," after the three-party term sheet was ultimately rejected and the meeting was adjourned. See Tr. of June 29, 2011 at 81:14-24. Day also testified that he advised the MEC to accept the deal that was on the table during the October 20-23 meeting, because he did not feel portions of the agreement could be changed later due to the three-party nature of the agreement. See Tr. of June 23, 2011 at 99:17-19.

The undisputed testimony at trial established that Supplement CC, as imposed by American and the APA, was less favorable in the respects noted above than the seniority integration that American and the APA had offered in the three-party term sheet. In other words, the former TWA pilots who have pressed this litigation, including Howard Hollander, Sally Young, Ted Case and Alan Altman, themselves caused harm to at least some of the TWA pilots by rejecting ALPA's advice, by rebuffing American's proposal, and by opting to pursue litigation.

Supplement CC, as implemented, nevertheless included important protections for many TWA pilots. To begin with, it interspersed 46% of the TWA pilots among the pre-acquisition American pilots on an approximately 8-to-1 ratio and placed the other 54% of the TWA pilots immediately junior to the last American pilot hired on April 9, 2001 (but senior to 475 American pilots hired after that date). It also contained protective cell provisions that allowed TWA pilots to bid for positions and flying and vacation schedules in St. Louis without competing against American pilots for those spots.

Supplement CC also guaranteed that captain positions in American's St. Louis pilot base were awarded only to former TWA pilots (and not to American pilots). See J-352 at 5-6.

4

American pilots were entirely fenced out of St. Louis altogether with respect to captain positions, which were reserved exclusively for the former TWA pilots. Consequently, when a former TWA MD-80 captain in St. Louis bid for his flight schedule each month, he had no American pilots bidding against him for that schedule. He bid for his schedule only against other pre-acquisition TWA pilots and was junior to exactly the same pilots and senior to exactly the same pilots for schedule bidding as he was in 2001. The same was true for the B-757/767 Captains in St. Louis. The quality of their working conditions remained unaffected by the fact that thousands of American pilots held slots senior to them on the combined American-TWA seniority list, because they did not bid against those American pilots for their flight schedules, vacation schedules or anything else that affected the MD-80 and B-757/767 Captains based in St. Louis. See id. at 6-7.

The same was true for the former TWA pilots holding First Officer positions in St. Louis. Under the terms of Supplement CC, they had super-seniority as against pre-acquisition American pilots and outbid them for schedules, vacations and everything else determined by seniority. See id. Again, these pilots' relative positions on the integrated seniority list were irrelevant because Supplement CC guaranteed that the former TWA pilots received their flying and vacation schedule preferences as against all other American pilots in the St. Louis domicile. Id.

Circumstances beyond ALPA's control affected the pilots' working conditions.  For example, many American pilots, including former TWA pilots, were furloughed after the 9/11 terrorist attacks. But these furloughs were not the result of anything for which ALPA bore responsibility.

In short, the evidence presented at trial established that the TWA pilots strongly disagreed among themselves about what course of action to take and, ultimately, whether to

accept or reject American's last offer. Duane Woerth and others from ALPA encouraged the TWA-MEC to accept the enhanced furlough protections and other improvements that American offered in October 2001 in the three-party term sheet. See D-139. Although Rautenberg and Lewin favored accepting American's last offer, other pilots, including Hollander, Young, Case and Altman, disagreed and apparently determined that it was better not to reach an agreement and to reserve the right to file litigation against American, the APA and ALPA.

Indeed, the eight former TWA pilots who testified at trial took dramatically different positions on the issue of how ALPA should have proceeded. Those pilots had significantly different levels of seniority and were also impacted in very different ways by Supplement CC. Those pilots, from most senior to most junior, according to their TWA seniority numbers as noted in J-313, were as follows:

(1)     Michael Day (TWA #133), the most senior of the pilots who testified at the trial, expressed frustration that ALPA did not start a jumpseat war and pursue tactics that other pilots felt were "knuckle-headed" ideas. See Tr. Of June 29, 2011 at 125:15-17. At the end of the negotiation process, in October of 2001, however, Day supported ALPA's recommendation that the TWA-MEC accept the three- party term sheet and freely admitted that he suffered no injury at all as a result of the acquisition and integration process. See Tr. of June 23, 2011 at 117:13-16. Day's date of hire at TWA was December 9, 1966, and, by January 2001, he had been employed by TWA for thirty-five years and was a 767 captain flying out of New York. See Tr. of June 22, 2011 at 31:20-23 and 49:12-13. Day's TWA seniority number was 133 and his seniority number on the combined list was 3890. See Tr. of June 23, 2011 at 117; J-313. After the lists were combined, Day continued to fly at American as a captain on the 757 and 767, and received an hourly pay rate increase from approximately $130 to $200 per hour. See Tr. of June 23, 2011 at

117:25 to 118:4; J-365. Day retired from American in 2005 at the then-mandatory retirement age of 60. See Tr. of June 22, 2011 at 30:18-19. Day admitted that many pilots who, like him, were integrated above the staple point, were not harmed by the imposition of Supplement CC. See Tr. of June 23, 2011 at 117:17-21.

(2)      Steve Rautenberg (TWA #596), who was called during ALPA's case, testified that in 2001 he was a 767 captain based in St. Louis with twenty-two years of experience at TWA. See Tr. of June 28, 2011 at 183:3-24. Rautenberg's date of hire was April 20, 1979 and his TWA seniority number in July 2001 was 596, which placed him well above the staple point. See J-313. Rautenberg, who opted out of the class, testified that he disagreed with the members of the TWA-MEC who wanted to start a jump seat war and file litigation. Rautenberg strongly believed that the TWA pilots were better as a group if they reached an agreement with American and the APA in the fall of 2001 and he was not willing to risk the job security of the more senior pilots by rejecting American's final offer.

Rautenberg testified that he did not suffer any harm in connection with seniority integration with the American pilots; he was never furloughed and retained his position as a captain. See Tr. of June 29, 2011 at 98:22-25. Although he was displaced from flying as a 767 captain in 2001, his reassignment occurred well before Supplement CC became effective. See id. at 102:17-20. In 2002, after he became a captain with American, Rautenberg made "substantially more money" than he had made as a captain at TWA. See id. at 99:4-6. Rautenberg is currently an MD-80 captain at American. See Tr. of June 28, 2011 at 182:22.

(3)      Howard Hollander (TWA# 905) was a TWA captain domiciled in New York. See Tr. of June 14, 2011 at 70:6-8. He had been hired by TWA on September 30, 1988, which placed him above the staple point in Supplement CC, see id. at 52:16; J-313. Hollander was assigned a

seniority number on the integrated list of 11,158. See J-365. He was the only member of the

TWA MEC to vote a majority of his roll call votes against accepting the new CBA with TWA,

LLC on April 2, 2001, and he persisted in pressing for ALPA to file lawsuits through the end of

the year. He consistently voted to reject any agreement with American and the APA.

Hollander testified that he was furloughed, along with some American pilots, due to the

financial difficulties that affected the entire airline industry after September 11. See Tr. of June

15, 2011 at 122:20 to 123:22. It is ironic to note that, if the TWA-MEC had accepted American's

three-party agreement in October 2001, Hollander would not have been furloughed. American

did recall Hollander and he remains employed as a pilot with American today. See id. at 124:6-

10. Hollander was recently promoted and recommenced flying as a captain in July 2011 from St.

Louis because of the protective cell provisions in Supplement CC. See id. Hollander

acknowledged that some pilots were so junior on TWA's seniority list that they could not have

been saved from furlough after September 11, 2001, even absent American's acquisition of

TWA or even if fewer TWA pilots were stapled. See id. at 122:20 to 123:22.

(4)     Sally Young (TWA# 1184) was hired at TWA on July 7, 1989 which positioned

her roughly midway through the TWA seniority list. See J-313. Young's seniority number on the

integrated list was 12,761. See J-365. In 2000, she was awarded a captain bid on a Boeing 717 in

St. Louis, and she completed captain's training in 2001. See Tr. of June 13, 2011 at 9:10-13.

Young agreed with the litigation approach advocated by Hollander and joined him and others in

rejecting the three-party term sheet and forcing American to impose Supplement CC.

Young testified that almost immediately after the American transaction, she was bumped

back to first officer on the B-767 and was ultimately furloughed in 2003. See id. at 9:20-25.

Three months later, she was again demoted to a first officer on the B-757, and she was ultimately

8

furloughed in 2003. See id. Young was recalled by American in March 2008, but rather than return to work, she opted to stay home for another year to spend time with her children. See id. at 10:5-11. Young did not testify about whether she sought employment during the time she was furloughed. She resumed employment with American in March 2009, where she remains employed today as a first officer. See id. at 10:10-16.

(5)   Ted Case (TWA #1282) testified that by January 2001, he had been employed by TWA for about thirteen years. See Tr. of June 8, 2011 at 107:16. He was a first officer on a 767 and flew internationally. See Tr. of June 7, 2011 at 128:1-3. Case's date of hire at TWA was Mach 9, 1990, his seniority number at American after Supplement CC was 12,860. See J-313, Tr. of June 8, 2011 at 107:12. Case joined Hollander and Young in rejecting the three-party term sheet. Case was furloughed from approximately June 2003 to December 2004. See Tr. of June 7, 2011 at 129:1-14. Case testified that he resumed his employment with American in April 2008. See id. at 130:7-10. He did not testify about his employment during the time period between December 2004 and April 2008. Case is currently employed by American as a first officer on the MD-80 aircraft based in St. Louis. See id. at 118:2-6.

(6)   David Singer (TWA# 1422), who was called during ALPA's case, had a February 1, 1996, date of hire at TWA. See J-313. In 2001, Singer was a first officer based in New York with five years of experience as a pilot at TWA. See Tr. of June 29, 2011 at 157:16-17. His number on the combined seniority list was 13,001. See J-365. Singer voted to accept the new CBA with TWA, LLC on April 2, 2001, and stood by his decision at trial. Singer was furloughed by TWA LLC in 2003 and was hired in 2004 by Trans Meridian Airlines, where he worked until that company ceased operations in 2005. See Tr. of June 29, 2011 at 157:20-25; J-365. One month later, he began working as a first officer for a start-up airline called Maximum Jet, where

he worked until he reached the then-mandatory retirement age of 60 in July 2006. See id. at 157:25 to 158:3.

(7)      Sean Clarke (TWA # 1577) was the most junior member of the TWA Merger Committee in 2001. See Tr. of June 16, 2011 at 13:20-22. Clarke's TWA date of hire was September 5, 1996, and was below the staple point. See J-365; J-313. His seniority number on the combined list was 13,157. See J-365. Clarke testified that he initially expected a "date of hire" seniority integration and became frustrated when it became clear that he would be among the TWA pilots who would be stapled. See Tr. of June 16, 2011 at 16:12 to 23:23. Clarke had little to lose following the events of 9/11, and he behaved accordingly by insisting on aggressive positions that endangered a larger number of TWA pilots. After Clarke was furloughed in 2003, he continued a landscape and pool installation business, which he currently owns and operates. See id. at 9:14-15 and 67:3-21.

(8)      Alan Altman (TWA #1656) was a first officer domiciled in Los Angeles at the time of the third TWA bankruptcy. See Tr. of June 9, 2011 at 53:9-13. Altman had a TWA date of hire of January 15, 1997, see J-313, and after integration with the American pilots, Altman's seniority number on the integrated list was 13,236. See J-365. Altman voted all of his votes in favor of the CBA offered by TWA, LLC on April 2, 2001, in accordance with a resolution passed by the Los Angeles domicile on March 31, 2001. See Tr. of June 9, 2011 at 106:21 to 110:12. He later joined the Hollander faction in opposing the three-party term sheet and in advocating that the TWA pilots file litigation against American and the American pilots. Altman was furloughed by TWA LLC in January 2003 and was never recalled. See id. at 48:8-9 and 128:3-6. He testified that he has been employed by Jet Blue since approximately 2005 and that he flies an Airbus A-320 and is based in Long Beach, California. See id. at 43:14-19.

10

In summary, the evidence at trial established that many of the TWA pilots who were integrated above the staple point, such as Day and Rautenberg, were not harmed and in fact did better financially at American that they had done at TWA. See Tr. of June 23, 2011 at 117:17-21 (Day). Others, such as Hollander and Young, were senior enough on the combined list that they would not have been furloughed if the events of 9/11 had not so adversely impacted the entire industry and if the TWA-MEC had accepted the three-party term sheet and its furlough protections. See Tr. Of June 15, 2011 at 122:20 to 123:22. Other pilots, probably including Clarke and Altman, were so junior on the TWA seniority list that they could not have been saved from being furloughed after the events of 9/11, no matter what ALPA allegedly did or did not do for the TWA pilots. See Tr. June 15, 2011 at 122:20 to 123:22 (Hollander). Indeed, furloughs after 9/11 eventually even reached pilots who were above the staple point in Supplement CC.

## II.    Argument of Plaintiffs' Counsel

Counsel for Plaintiffs conceded during trial that not all of former TWA pilots were harmed by ALPA's alleged failure to represent pilots more aggressively. Indeed, they more than conceded the point: counsel used it as a way of encouraging the jury to find in favor of the Plaintiffs. Thus, in closing, counsel for Plaintiffs argued that the jury could find injury in fact, and award a verdict for Plaintiffs as to the entire class, if it found that if ALPA had acted differently even "one pilot" less would have been "stapled." See Tr. of July 12, 2011 at 72 to 75. At the conclusion of trial, the jury was instructed that it could find injury if it determined that the "overall outcome of the integration of the TWA Pilots into American would have been more favorable" and that ALPA's conduct "caused injury to some or all of the TWA pilots..." Tr. of July 12, 2011 at 97:5-7 and 101:7-8. The verdict form, which the jury answered in the affirmative, found that unspecified violations by ALPA of its DFR caused injury to "*some* [not "some or all"] of the TWA pilots." Final Verdict Form [(Doc. 413)] (emphasis added).

11

### III.   Jury Instructions and Jury Verdict

The Court's instructions and the jury's verdict provide no guidance in terms of which pilots were harmed by ALPA's alleged breach of its DFR or how they were harmed. Indeed, there is no way of knowing if the jurors even agreed on the same violation or violations. That the jurors deliberated for only approximately five hours after a five-week trial certainly suggests that they did not take the time to agree on any specific violation, but that they only agreed that there must have been some violation. Thus, it is possible that some jurors might have concluded that ALPA breached its DFR in connection with the events leading up to April 2, 2001. Other individual jurors might have agreed with ALPA that it acted reasonably and responsibly in advising the TWA-MEC during the period leading up to April 2, 2001, but that ALPA did not adequately support the TWA-MEC by failing to start a jumpseat war during the summer of 2001. Still other jurors might have disagreed with both of these positions and concluded that ALPA committed a DFR violation solely by failing to lobby more aggressively for the Bond Bill.[2]

Likewise, the verdict, by its express terms, did not find injury in fact applicable to the entire class or even as to the named Plaintiffs and is inconclusive as to how many or which TWA pilots were actually injured. Even if the jurors did all agree on the specifics of how the "overall outcome" of the integration would have been more favorable, what did they decide? Did they conclude that the ratio used to integrate the TWA pilots into the American list started too low and that the pilots who were ratioed in should have been given better seniority slots? Did they decide that the protective cell could have been more protective? Or that better furlough

---

[2] By suggesting these possibilities, ALPA in no way concedes that the evidence concerning these issues was adequate for a reasonable juror to find a DFR violation. To the contrary, ALPA submits that no reasonable juror – and certainly no reasonable jury – could have found that it violated its duty of fair representation to any of the TWA pilots, as discussed in more detail in the pending Rule 50(b) motion.

protection could have been achieved for some pilots? Or that a handful of additional pilots, or even one pilot, could have been placed above the staple point, as suggested by counsel for Plaintiffs in closing arguments? It is impossible to know.

As discussed below, in the event the Court denies ALPA's Rule 50(b) motion, this action should be decertified as a class action because the liability trial established that injury in fact was not a common issue, because the jury's verdict provides no basis for proceeding and because the issue of damages is an individual issue. In the alternative, and even if the Court denies ALPA's Rule 50(b) and new trial motions, this action cannot proceed as a class action with respect to the issue of damages because, even if it could be determined which pilots were harmed and how they were harmed, individual issues will predominate with respect to damages and continued class treatment would not be a superior method of treatment for this action.

## ARGUMENT

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Thus, an application to modify or amend a class certification order may be made at any time before a final judgment is entered. Gutierrez v. Johnson & Johnson, 523 F.3d 187, 199 n.12 (3d Cir. 2008) ("Indeed ... a district court is free to reconsider its class certification ruling as often as necessary before judgment") (quoting McNamara v. Felderhof, 410 F.3d 277, 280-81 (5th Cir. 2005)); see also Hohider v. U.S. Parcel Svcs., 574 F.3d 169, 202 (3d Cir. 2009) ("Rule 23(c)(1)(C) allows for amendment at any time before final judgment").

The Third Circuit has observed that there is a continuing obligation on the part of a trial court to ensure that class certification is appropriate and that the standards for such relief are met. See Barnes v. Am. Tobacco Co., 161 F.3d 127, 140 (3d Cir. 1998). Examining the appropriateness of continued class certification requires the application of the exacting standards

set forth in In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008). See Bayshore

Ford Truck v. Ford Motor Co., Civ. No. 99-741, 2010 WL 415329, at *7 (D.N.J. Jan. 29, 2010)

("once this Court undertakes a re-evaluation, it must apply the standard as it is currently

understood").

## I.  Decertification is Necessary as to All Issues Because Common Issues Do Not Predominate.

Rule 23 requires a finding "that the questions of law or fact common to the class

members predominate over any questions affecting only individual members." Fed. R. Civ. P.

23(b)(3) (emphasis added); Hydrogen Peroxide, 552 F.3d at 310. "Because the nature of the

evidence that will suffice to resolve a question determines whether the question is common or

individual, a district court must formulate some prediction as to how specific issues will play out

[at trial] in order to determine whether common or individual issues predominate in a given

case." Hydrogen Peroxide, 552 F.3d at 311 (citations and quotations omitted). "If proof of the

essential elements of the cause of action requires individual treatment, then class certification is

unsuitable." Id. (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154,

172 (3d Cir. 2001)).

ALPA previously argued that the Court should decertify this action as a class action

because the issue of injury in fact was not common to the class. The proofs at trial, as discussed

above, established conclusively that the members of the class did not all suffer injury. Instead,

the liability verdict in this case is incompetent to establish liability for injury in fact to the

plaintiff-class. The verdict, by its express terms, does not address whether the finding of injury in

fact is applicable to the entire class. The verdict is also inconclusive as to which TWA pilots still

belong in the class. Indeed, the only finding that is clear from the verdict is that there is no

common injury in fact, but rather only injury to "some" pilots. The result is that there is no objective means of ascertaining which pilots remain members of the class.

"It has long been held that Rule 23 implicitly requires that prospective plaintiffs propose a class definition that is readily ascertainable based on objective criteria." Agostino v. Quest Diagnostics, Inc., 256 F.R.D. 437, 478 (D.N.J. 2009) (citing Crosby v. Social Sec. Admin. of U.S., 796 F.2d 576, 580 (1st Cir. 1986)); Simer v. Rios, 661 F.2d 655, 669 (7th Cir. 1981); Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., No. 05 Civ. 1898, 2006 WL 2161887, at *3 (S.D.N.Y. Aug. 1, 2006), aff'd, 546 F.3d 196 (2d Cir. 2008). Class certification is inappropriate when "[d]etermining membership in the class would essentially require a mini-hearing on the merits of each case." Forman v. Data Transfer, Inc., 164 F.R.D. 400, 403 (E.D. Pa. 1995). Thus, a "court must reject a proposed class or subclass definition that 'inextricably intertwines identification of class members with liability determinations.'" Agostino, 256 F.R.D. at 479 (quoting Pichler v. UNITE, 228 F.R.D. 230, 247 (E.D. Pa. 2005), aff'd, 542 F.3d 380 (3d Cir. 2008)).

In Agostino, the plaintiffs proposed a very broad ranging class with four subclasses to pursue RICO and ERISA claims, as well as breach of contract and various consumer fraud claims against Quest Diagnostics for unfair billing practices. See id. at 446. The Court denied the plaintiffs' motion for class certification in its entirety. See id. at 479. The Court specifically rejected a proposed subclass of individuals who were allegedly subjected to "demands for payment from Quest or its outside debt collectors … for FDCPA violations, which demands for payment" violated the statute or its regulations. See id. at 478. Judge Chesler determined that the class definition was improper because "membership in the Debtor Subclass necessarily depends upon the Defendants' liability." Id. (emphasis added). The Court rejected the proposed subclass

on the basis that membership was not "readily ascertainable based on objective criteria," because determining membership in the class required establishing whether the subject payment demands on certain debt were "not authorized" or for debt that Quest did not intend to pursue. Id. at 479. The Court determined that such inquiries would be "impermissible" and thus it denied class certification of the proposed subclass. See id.

Similarly, here, continued membership in the class that was certified by this Court is not readily ascertainable based on objective criteria. At the conclusion of trial, the jury was instructed that it could find injury if it determined that "overall outcome of the integration of the TWA Pilots into American would have been more favorable" and that ALPA's conduct "caused injury to some or all of the TWA pilots...." Tr. of July 12, 2011 at 97, 101. The jury verdict sheet erroneously allowed a finding of a DFR breach upon the jury's finding that only "some" of the TWA pilots experienced injury in fact due to ALPA's actions.

Because the jury verdict at the liability phase was so seriously flawed, there is no basis for proceeding to the damages phase for the class of TWA pilots. See Kinnel v. Mid-Atl. Mausoleums, 850 F.2d 958 (3d Cir. 1988). In Kinnel, the plaintiff sued two defendants, a company and its president, and the district court bifurcated the trial. See id. at 959. During the liability phase, the jury "was not specifically asked" in the jury form whether the company president was liable (although the jury charge referred to the "defendants"). Id. at 959, 961. The Third Circuit ruled that because this "flawed" jury verdict liability form did not identify the company president as liable, the case could not proceed to the damages phase against him because liability "must be resolved before damages are considered." Id. at 967, 969 & n.12 (citation omitted).

The jury liability determination here similarly precludes this case from proceeding to the damages stage. Contrary to the requirement of proving injury in fact as a necessary element of establishing DFR liability, as discussed below, the jury verdict found that ALPA was liable only to "<u>some</u>" members of the class. Consistent with <u>Kinnel</u>, there cannot be a damages trial on behalf of any class member as to whom liability was not found. Further, given that the "injured" class members cannot be identified – the jury verdict form failed to "specifically ask[]" the jury to identify which TWA pilots were injured by ALPA's challenged conduct – there can be no damages trial at all. <u>Kinnel</u>, 850 F.2d at 961, 967 & n.12.[3] Indeed, this jury verdict – stating that only "some" TWA pilots were injured – shows that Plaintiffs no longer have the sufficient common "glue holding" this case together as a class action. <u>See Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2552 (2011). The jury verdict – as well as the evidence presented at trial – now lays bare the absence of an injury in fact common to all class members.

The trial evidence also showed that Plaintiffs could not establish that <u>all</u> TWA pilots were injured by ALPA's conduct, even if the jury had been asked to determine whether the class was injured. As a result, as the case law shows, the class here should be decertified. <u>See</u> <u>Dukes</u>, 131 S.Ct. at 2552 n.6 (discussing causes of action where Rule 23(b)(3)'s requirement that questions common to class members predominate over questions affecting individual members "would often be an insuperable barrier to class certification" because each class member "would have to

---

[3] <u>See</u> <u>also</u> <u>Dopp v. HTP Cor.</u>, 947 F.2d 506, 516 (1st Cir. 1991) (court may not enter a verdict that is "utterly ambiguous in a salient respect"); <u>Richmond v. Madison Mgmt. Group</u>, 918 F.2d 438, 459-62 (4th Cir. 1990) (remanding case because there was an ambiguous verdict as to the allocation of damages among multiple defendants); <u>Biver v. Saginaw Township Cmty. Sch.</u>, 1989 WL 74654, at *4 (6th Cir. July 10, 1989) (when "confronted by an ambiguous verdict, a court has no alternative but to vacate the verdict"); <u>Hartnett v. Brown & Bigelow</u>, 394 F.2d 438, 442 (10th Cir. 1968) (verdict left important issues "in a nebulous condition"); <u>Royal Netherlands v. Strachan Shipping Co.</u>, 362 F.2d 691, 694 (5th Cir. 1966) (ambiguous and confusing verdict "will not support judgment"); <u>see also</u> <u>Prentice v. Platoff Zane's Admin.</u>, 49 U.S. 470, 484 (1850) (a "verdict ... finding matter uncertainly and ambiguously, is insufficient").

prove reliance on the alleged misrepresentation"); <u>Hydrogen Peroxide</u>, 552 F.3d at 311 ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable").

Moreover, a subclass or class of a reduced scope – including only those "some" TWA pilots who were purportedly injured by ALPA conduct – would also be impossible to formulate. The verdict form did not allow for identification in any way of those "injured" pilots. As a result, there is no practical means for divining which TWA pilots suffered an injury in fact (as determined by the jury) and should be included in any "reduced scope" class.

The question that the jury really needed to answer was whether there were some pilots who would have been placed higher on the integrated seniority list <u>if</u> ALPA had fulfilled its duty of fair representation to the TWA pilots, whether they were furloughed as a direct result of that differential placement on the merged seniority list or whether they would have received some other protections that they did not obtain.

Once those questions were answered, the jury then should have been asked to identify which pilots were in that category. Instead, the parties and the Court have been left with a verdict that is totally meaningless because of its failure to provide any direction as to damages. This is especially true in light of the significant protections the TWA pilots were afforded by Supplement CC; namely, the St. Louis protective cell which prevented the seniority placement of the TWA pilots from injuring them unless it resulted in their furlough. American pilots could not and did not bid into St. Louis, downgrade TWA Captains from wide-body to narrow body aircraft, or from Captain to First Officer. And they did not push them from line-holder to reserve or even outbid them for desirable trips or schedules. The St. Louis protective cell left the TWA pilots exactly as they were before the acquisition with respect to all of these considerations.

18

Relying upon the closing arguments of Plaintiffs' counsel, an interpretation of the jury's verdict that would be generous to Plaintiffs is that the seniority integration was less favorable to "some of" the pilots in the sense that they were stapled when they might not have been otherwise. But because of the ambiguous language contained in the verdict, there is no way to know how many pilots might have been higher on the seniority list. In fact, because the jury was not required to decide that issue, there is nothing to suggest that the jurors even considered it.

There is no question that "'liability for a labor union's deceptive conduct in breach of the fiduciary duty of fair representation arises <u>only if the breach directly causes damages</u> to an individual or group to whom the duty is owed.'" <u>Bensel v. Allied Pilots Ass'n</u>, 675 F. Supp. 2d 493, 499 (D.N.J. 2009) (emphasis supplied) (<u>quoting</u> <u>Deboles v. Trans World Airlines</u>, 552 F.2d 1005, 1019 (3d Cir. 1977)). But that determination is reflected nowhere in the liability verdict. Instead, the question of injury has now become a <u>post hoc</u> inquiry reserved for the damages phase as to each member of the class, whoever they may be. Since continued membership in the class at this point <u>necessarily depends upon ALPA's liability</u> as to each member of the class, the verdict is meaningless because it does not identify, through any objective means, which TWA pilots actually suffered an injury in fact to qualify for class membership and potential damages.

As discussed below, there is also no question that the issue of damages is one that must be proven on an individual basis. Where, as here, both causation and damages are individual issues, the fact that there may be common issues concerning whether there was a breach is not adequate to establish predominance and continued class treatment is unwarranted. This deficiency is well illustrated by the Third Circuit's recent decision in <u>Gates v. Rohm & Haas Co.</u>, __ F.3d __, 2011 WL 3715817 (3d Cir. Aug. 25, 2011), in which the proposed class sought both medical monitoring and damages as the result of contamination to their properties caused by the

defendant. Although the trial court held that common issues existed concerning the defendant's conduct and the nature and extent of the contamination, the court concluded that individual issues existed with respect to both the fact and amount of damages and thus predominance had not been established. See Gates v. Rohm & Haas Co., 265 F.R.D. 208, 233 (E.D. Pa. 2010). The Third Circuit agreed and held that the District Court did not abuse its discretion in declining to certify an "issue only" class on liability:

> Alternatively, plaintiffs contend that, even if common issues do not predominate, the court should have certified an "issue only" class on liability. The court found an issue class was not feasible and would not advance the resolution of class members' claims. The court noted both the fact of damages and the amount of damages "would remain following the class-wide determination of any common issues," and further that causation and extent of contamination would need to be determined at follow-up proceedings. Due to the numerous individual issues that would remain, the court declined to certify a liability-only class.

Gates, 2011 WL 3715817, at *14.

The same circumstances exist in this case. Even if it could be argued that the issue of whether ALPA committed a DFR breach was a common issue to the TWA pilots – and ALPA makes no such concession – the intertwined issues of the fact of damages (injury in fact) and the amount of damages are unquestionably individual issues which predominate over any common issues. It was therefore improper for the Court to certify this action as a class action for any purposes. The Court should therefore decertify this action for all purposes.

## II.   **Decertification Is Necessary Because Damages is an Individual Issue**

Even if it could somehow be divined from the jury's verdict which TWA pilots were injured and how they were injured, this case cannot proceed to a damages trial as a class action because the issue of the amount of damages is clearly individual in nature; instead, decertification is necessary.

Although there are some cases in which the issue of damages can be considered on a class-wide basis, such as where there are methods to calculate damages based on records provided by the defendant, this is not such a case. In this case, instead, a detailed assessment of the individual work history of each pilot who seeks to pursue a claim for damages will be required and most of the information will have to come from third parties.

The only damages available in a DFR claim are compensatory damages designed to make the plaintiff "whole" and a union can only be responsible for compensatory damages "flowing from its breach" of its duty. See Bowen v. United States Postal Service, 459 U.S. 212, 224-31 (1983); Vaca v. Sipes, 386 U.S. 171, 196-98 (1967). DFR damages may include lost wages and fringe benefits. See Foust v. Int'l Bhd. of Electrical Workers, 572 F.2d 710, 718-19 (10th Cir. 1978), rev'd in part on other grounds, 442 U.S. 42 (1979). The lost wages component has been applied to include back pay and front pay awards for salary and wages, overtime pay, vacation pay, insurance, seniority and fringe benefits. See Foust, 572 F.2d at 718. Thus, the damages awarded for a DFR violation closely mirror the damages that are generally available to plaintiffs in employment discrimination cases. See, e.g., Blum v. Witco Chem. Corp., 829 F.2d 367, 373 (3d Cir. 1987) (holding that an ADEA plaintiff is entitled to a front pay award because such an award will effectuate the purpose of the statute – to make the plaintiff whole). Accordingly, compensatory awards may be limited or unavailable where such an award would make a plaintiff "more than whole, such as where a plaintiff has found subsequent employment at a greatly increased salary that would offset any loss." Id.

Numerous courts have denied class certification or have ordered decertification when the issue of damages would require such individual assessments. See, e.g., Danvers, 543 F.3d 141, 149 (3d Cir. 2008) ("The multitude of individualized issues presented in plaintiffs' claims would

21

entail complicated mini-litigations within the class action itself. On these facts, it would be neither more fair nor more efficient to proceed with this matter as a class action"); Key v. Gillette Co., 782 F.2d 5, 7 (1st Cir. 1986) (decertifying after liability trial for manageability problems). There are, of course, cases where the damage assessment for a large group of plaintiffs does not preclude class treatment. But those are cases where damages can be determined based upon a common body of data, such as information uniquely in the possession of the defendant.[4] Only in cases where the fact of injury and damages breaks down to what may be characterized as "virtually a mechanical task" that is "capable of mathematical or formula calculation," does the existence of individualized claims for damages offer no barrier to class certification on the grounds of manageability. Windham v. Am. Brands, Inc., 565 F.2d 59, 66-67 (4th Cir. 1977). On the other hand, where the issue of damages does not lend itself to such a mechanical calculation, but requires "separate "mini-trials," class certification is inappropriate. See Fleishman v. Albany Medical Center, No. 06-CV-765, 2008 WL 2945993, at *7 (N.D.N.Y. July 28, 2008) (denying class certification to proposed class of nurses and rejecting plaintiffs' proposed aggregate damages calculation); Reap v. Cont'l Casualty Co., 199 F.R.D. 536, 549 (D.N.J. 2001) (denying class certification in employment discrimination claim because subjective standards would be necessary to determine the extent of damages to each plaintiff); DeGidio v. Perpich, 612 F. Supp. 1383, 1386-87 (D. Minn. 1985) (individual class members "required to present evidence of causation and their particular damages separately").

---

[4] See, e.g., Gunnells v. Healthplan Svcs., Inc., 348 F.3d 417, 429 (4th Cir. 2003) (affirming grant of class certification on plaintiffs' ERISA and fraud claims based on medical billing because damages could be ascertained by examining defendant's billing computer program); In re OSB Antitrust Litig., Master File No. 06-826, 2007 WL 2253425, at *13 (E.D. Pa. Aug. 3, 2007) (accepting plaintiffs' expert's proposed regression analysis for calculating damages because the data was readily available); Walsh v. Pittsburgh Press Co., 160 F.R.D. 527, 531 (W.D. Pa. 1994) (certifying class of former employees seeking to recover ERISA benefits because individual damages were a matter of mathematical calculation based on an across-the-board formula).

The decision in <u>Bayshore Ford Truck v. Ford Motor Co.</u>, Civ. No. 99-741, 2010 WL 415329 (D.N.J. Jan. 29, 2010), is directly on point. There, Judge Linares decertified a class of Ford dealerships after a summary judgment liability determination based on facts developed during discovery. The class in <u>Bayshore</u> consisted of 136 Ford heavy duty truck dealerships. The plaintiffs alleged that Ford Motor Company breached its dealer agreements with the dealerships when it sold the heavy duty business to Freightliner. <u>See id.</u> at *1. The District Court initially granted class certification based, in part, upon the plaintiffs' experts' claim that a formula could be devised to ascertain the damages on a class-wide basis. <u>See id.</u> After the Court granted the plaintiffs' class certification motion, the parties engaged in discovery and plaintiffs produced an expert report regarding the issue of damages. <u>See id.</u> at *2. On November 16, 2009, the Court granted summary judgment in favor of 100 members of the plaintiffs' class solely on the question of liability. <u>See id.</u> at *2 n.1. Upon completion of additional limited discovery and based upon the "vigorous analysis" required by the Third Circuit's decision in <u>Hydrogen Peroxide</u>, Ford moved to decertify the plaintiffs' class.

In granting the motion, the Court acknowledged that "if there is any doubt as to whether the Rule 23 requirements have been met, class certification is <u>not</u> appropriate." <u>Id.</u> at *7 (citing <u>Hydrogen Peroxide</u>, 552 F.3d at 321). One of the critical elements considered by Judge Linares in decertifying the class was the fact that some plaintiffs did not suffer any damages and, indeed, that some of the plaintiffs experienced better than predicted sales after Ford's sale of the business. <u>See id.</u> at *9. Based upon this divergence of interests between the named plaintiffs and the absent class members, the Court determined that typicality was lacking with respect to the damages aspect of the plaintiffs' claims. <u>See id.</u>

Here, the jury was never required to specify what harm it found. Indeed, because the jurors were never even required to confirm that they all agreed on the nature of the harm, it is impossible to know which members of the class are entitled to damages and what baseline should be used in order to attempt to assess their damages. Moreover, as in Bayshore, even if the jury had been required to agree on what DFR violations occurred, the nature of the injury suffered and the identities of the pilots who suffered injury, decertification would still be required because the issue of damages depends entirely on issues that are individual to each pilot.

Some pilots were furloughed and some were not. Those who were furloughed were out of work for different periods of times. Some of those who were furloughed ultimately obtained jobs at American, others found work at other airlines, and still others obtained other employment. There is simply no uniform method for determining what amount of damages would reasonably compensate some individual pilots but not others. Thus, even if a baseline could be determined for each of the pilots, discovery and testimony at trial will be necessary concerning the work histories, earnings, personal choices and mitigation efforts of each pilot. Discovery and testimony may also be necessary from representatives of American and the other entities for which individual pilots have worked since 2001, depending on the period for which individual pilots will be permitted to seek damages.

Because ALPA was not the employer of any of the TWA pilots, or even their union during their employment with American, ALPA does not have information concerning their employment histories, earnings or other relevant circumstances. Any attempt to assess damages for individual pilots will have to be based upon information not only in the possession of the individual pilots but also in the possession of third parties, presumably including American and certainly including the other employers for whom individual pilots worked. Given the number of

24

pilots, these other employers could number in the hundreds. Because the nearly 2400 former

TWA pilots live all over the country, it will be necessary to obtain information concerning job

prospects and economic conditions in numerous geographic areas. Moreover, the efforts of each

pilot to find other work, and the reasonableness of those efforts, will also be at issue. For

example, trial testimony established that Sally Young opted to stay home for a year after being

recalled to work by American because she wanted to spend time with her children. See Tr. of

June 13, 2011 at 10:5-11. ALPA is not financially responsible for the consequences of such

lifestyle choices by Young or other pilots.[5]

Discovery and trial evidence from individual pilots, from American and from numerous

other sources will be required at any on damages trial because DFR damage awards must be

supported by evidence of "actual expenses" and evidence of any "lost seniority pay, vacation

pay, or any other fringe benefit that [a plaintiff] would have actually received." See Galindo v.

Stoody Co., 793 F.2d 1502, 1517-18 (9th Cir. 1986); see also Goss v. Exxon Office Systems Co.,

747 F.2d 885, 890 (3d Cir. 1984) (refusing to award front pay for the amount of time sought by

plaintiff based solely on plaintiff's conclusory statements).[6]

---

[5] ALPA does not lose its right to obtain the information it needs for full evaluation of damages
for each plaintiff simply because this litigation is proceeding as a class action. "[T]he procedural
device of Rule 23 cannot be allowed to expand the substance of the claims of class members."
Broussard v. Meineke Disc. Muffler Shops, 155 F.3d 331, 345 (4th Cir.1998). To the contrary,
ALPA is entitled to "individualized determinations of each [union member's] eligibility for back
pay," front pay and other monetary damages. Dukes, 131 S. Ct. at 2560. In addition, pilots who
would have been furloughed regardless of ALPA's actions are not entitled to a back pay award.
See NLRB v. Master Slack and/or Master Trousers, 773 F.2d 77, 83 (6th Cir. 1985).

[6] Front pay is an award "for a reasonable future period required for the victim to reestablish [his
or] her rightful place in the job market. Goss, 747 F.2d at 889. The award of front pay is given in
lieu of the alternative to the equitable remedy of reinstatement. See id. at 890. Back pay
compensates the plaintiff for loss of past wages. Blum, 829 F.2d at 373. The relevant time period
for calculating an award of back pay begins with the wrongful action, such as termination,
affecting employment and ends at the time of trial. See id. Front and back pay awards are highly
individualized inquiries that cannot be determined by objective standards. See Miller v. Hygrade

After this information has been gathered and assessed, fact and expert testimony will be necessary to determine the degree to which significant events over the past ten years, including the events of 9/11 and the recession since 2008, have affected the duration and quality of each pilot's employment. It will undoubtedly be the case that many pilots lost jobs or were demoted for reasons completely unrelated to ALPA's actions. Attempting to assess damages will involve determining the period for which damages are recoverable and considering various intervening and superseding events that have impacted individual members of the class.

Moreover, after the parties conduct the discovery relative on individual damages, any trial on the issue of damages will be unwieldy and unmanageable. Even if the identity of the injured pilots could be objectively ascertained, which it cannot, each pilot desiring and eligible to pursue a claim for damages will be required to appear in New Jersey and testify at trial. Even if further proceedings eliminate half of the members of the class because they concede they were not damaged, that would still leave approximately 1,200 pilots. If it takes one-half of a day to present testimony for each pilot, that would be 600 trial days. A damages trial that proceeded for four trial days per week, forty-eight weeks per year, would take nearly three years to complete.

---

Food Prods. Corp., 198 F.R.D. 638, 643-44 (E.D. Pa. 2001) (holding that in a Title VII case, "calculating compensatory and punitive damages cannot be completed by applying objective standards and would require individual examinations").

The problems in assessing individual front and back pay issues in this case are akin to the difficulties that preclude class treatment of lost-profit cases. Courts have long held that to calculate lost profits, the particular facts of the plaintiff's business must be considered. See Danvers, 543 F.3d at 148 (affirming denial of class certification because of individual issues related to car dealerships' claims for lost profits); Bogosian v. Gulf Oil Corp., 561 F.2d 434, 455 (3d Cir. 1977) (when a plaintiff elects to prove damages on the basis of lost profits, his proof "necessarily would focus on the operation of his business"). Courts have found that the class action vehicle is ill-suited to lost-profits damages claims for this very reason. See id.; Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 342-343 (4th Cir. 1998); Lazy Oil Co. v. Witco Corp., 95 F. Supp. 2d 290, 303 (W.D. Pa. 1997).

There is no basis for such drawn-out and complicated proceedings under the rubric of a class action.

In short, the task of attempting to assess the damages allegedly suffered by individual pilots will be daunting and the time required to try the damages claims will be overwhelming. The necessary individual inquiries are unworkable on a class-wide basis.

## III.   **Decertification Is Also Warranted Because Class Treatment Is Not Superior**

Decertification is also appropriate because a certified class is not the superior method of attempting to adjudicate the claims asserted in this case. Certification of a class under Rule 23(b)(3) is only appropriate if a court determines that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Several factors are relevant to the superiority inquiry:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Id. In effect, "[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." In re Prudential Ins. Co., 148 F.3d 283, 316 (3d Cir. 1998) (internal quotation marks omitted). The rule is designed to "'achieve economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 615 (1997).

To determine whether a class action is the superior method for fair and efficient adjudication, a court should consider the difficulties of managing a class action. Beattie v. CenturyTel, Inc., 511 F.3d 554,567 (6th Cir. 2007). The district court should also compare other

means of disposing of the suit to determine if a class action "is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1779 (3d ed. 2010); see also 2 William B. Rubenstein, Alba Conte, & Herbert B. Newberg, Newberg on Class Actions §4:27 (4th ed. 2010) (identifying possible alternatives to the class action device such as "joinder, intervention, consolidation, a test case, and an administrative proceeding"). Additionally, the court should consider the value of individual damage awards, as small awards weigh in favor of class suits. Beattie, 511 F.3d at 567; see also Amchem, 521 U.S. at 616 (explaining that, when individual class members have large stakes in the outcome and the ability to pursue a remedy alone, their individual interests weigh against a Rule 23(b)(3) action).

In this case, the evidence presented at the liability trial establishes that a class action was not the superior method of adjudicating the claims of TWA pilots and that the pilots who believe they were injured should have been required to pursue individual actions. Indeed, in that regard the facts of this case are remarkably similar to those of Gates, where the District Court determined that the issues of causation and damages were so closely intertwined that, even if the court were to certify the common issue of whether the defendant had caused contamination, "the subsequent separate proceedings necessary for each plaintiff would undo whatever efficiencies such a class proceeding would have been intended to promote." The court explained:

> Even more problematic, because a jury may be called upon to weigh the potential impact from Rohm and Haas's actions on a particular property against those of another source of contamination, the "second" jury could well wind up re-considering the evidence of Rohm and Haas's actions presented in the class proceeding. Because it appears that a class proceeding would not promote much efficiency, if any, the Court finds that it is not superior to individual proceedings.

Gates v. Rohm & Haas Co., 265 F.R.D. at 234.

The same circumstances exist in this case. Although the jury has found liability against ALPA, it is impossible to know from its verdict either the nature of the violations found or the pilots who were injured. Thus, before there can be any consideration of the issue of damages, further proceedings before another jury will be necessary to determine what violations caused what harm to what plaintiffs. In effect, virtually all of the evidence presented in the trial that just concluded will have to be presented again with respect to the claims of individual plaintiffs. For these reasons, class treatment of this case is clearly not the superior method of proceeding.

## CONCLUSION

For the foregoing reasons, if the Court does not grant judgment in favor of ALPA as a matter of law, as requested in ALPA's motion filed pursuant to Fed. R. Civ. P. 50(b), the Court should order decertification of this action regardless of how it rules on ALPA's motion for a new trial.

Respectfully submitted,

Archer & Greiner
A Professional Corporation

By:    */s/ Kerri E. Chewning*
       STEVEN J. FRAM, ESQUIRE
       KERRI E. CHEWNING, ESQUIRE

*Pro Hac Vice*:
     Daniel M. Katz, Esquire
     Katz & Ranzman, P.C.
     4530 Wisconsin Ave., N.W., Suite 250
     Washington, DC 20016

Counsel for Defendant Air Line Pilots Association, International

Dated: September 9, 2011.
7106419v1

29