# Exhibit P



EXHIBIT
D021

#21

October 25, 2001

Fellow Council 3 Pilots:

Many of you have contacted me inquiring about the events of the past few days of meeting with the APA and American in Washington over the weekend.  Since the issues are important to all Council 3 pilots, I will provide a brief overview of what occurred and information regarding the seniority integration provisions offered by APA and American.

As you know, ALPA has been seeking a fair and equitable seniority integration since the American buyout of TWA was announced in January.  Those efforts reached a key milestone on Tuesday, October 23rd.  After many hours of negotiation over four days, the MEC ended negotiations by rejecting a resolution to offer conditional acceptance of the terms on the table.

Those terms included a number of elements that, in general terms, were a seniority list, conditions, restrictions, a protective cell in STL, and protective provisions offered by American Airlines.  The seniority list proposed by the APA was by any measure egregious.  The list was constructed from essentially an 8 to 1 ratio starting at approximately 2600.  That formula placed more than 1200 TWA pilots on the list after all AA pilots hired prior to April 10, 2001.  The proposal restricted TWA pilots from flying large wide body aircraft until the last AA pilot hired prior to April 10, 2001 would be able to do so.

Conditions of the proposal created a protective cell for TWA pilots to take advantage of TWA retirements for a number of years.  The duration of the narrow body cell was predicated on the Captain upgrade of the TWA pilot with seniority number 1729.  That was estimated to happen in 2008.  The cell would allow all TWA pilots senior to 1729 to upgrade at a rate determined by the number of TWA retirements and the STL staffing level.  The duration of the small wide body cell was predicated on the small wide body captain upgrade of the TWA pilot with seniority number 1351.  That was predicted to happen in 2014.

Essentially the cell would reserve STL narrow body flying for TWA pilots until approximately 2008 and small wide body flying until approximately 2014.  TWA pilots in STL would

ALPA 008055

advance in relative seniority by the TWA retirements until those dates. All TWA pilots senior to 1351 would have an opportunity to reach the small wide body, and all TWA pilots senior to 1729 would have an opportunity to reach captain based upon their relative TWA seniority. Other pilots would also advance in relative seniority until those dates.

The proposal also included minimum guaranteed system wide captain jobs for TWA pilots depending on the number of aircraft operated. Those guarantees topped out at 800 narrow body captains plus 260 small wide body captains.

American Airlines offered to provide a floor to the STL domicile. That floor was to be set at a level no less than 25% below the current staffing of STL as compared to ORD and DFW combined. The floor would have provided substance to backstop the protective cell from the arbitrary decisions of management relative to staffing in STL.

AA also offered furlough protection to the pilots placed on the list above the staple point. And AA and APA offered to set the recall position of furloughed TWA-LLC pilots at the staple point rather than at the bottom of the list at the time of recall.

In short form, the terms before the MEC were an egregious seniority list mitigated by a protective cell supported by an American staffing guarantee.

In the following paragraphs I'll address the three questions I contemplated in considering the terms before the MEC. (1) Is there anything left on the table to be negotiated? (2) Are the terms better than we would do in an AA-APA cram down? (3) Is there any recourse available to avoid a cram down?

1. Is there anything left on the table to be negotiated? The Merger Committee, Merger Chairman, and negotiating consultant, Jim Baehler, agreed that the APA had in front of the MEC, everything that was available. Amongst those engaged in the process there was virtually no dissent. The APA's position on the seniority list had been unwavering or moving backward. The congressional lobbying effort had created a level of uncertainty that should have caused the APA to move, if there was any room for movement left in their

ALPA 008056

position.  The severity of the situation in the
industry makes furloughs an expectation rather than a
possibility.  APA movement to a position that would
expose more American pilots and fewer TWA pilots to
furlough is highly improbable.  The APA had stated
publicly and in negotiations that they were done
negotiating.  American had stated that they had a
tentative agreement with the APA on a seniority
implementation.  All of these factors led me to the
conclusion that vis-à-vis the APA, there was nothing
more on the table.  However, it is possible that
American could have had some small incremental
participation available that would mitigate some of
the effects of the egregious integration.

2. Are the terms better than we would do in a cram-down?
American had unequivocally stated that in the absence
of settlement, there would be (1) no guarantees as to
the STL staffing level, (2) no furlough protection for
any TWA pilot and (3) placement of TWA-LLC furloughees
upon recall would be subject to agreement between APA
and AA.  Both parties had indicated that such
placement would be after <u>all</u> American pilots, not at
the staple point.  Further, although we have reason to
believe that the seniority list imposed would be
identical to that included in the terms, there is no
guarantee or assurance that the protective provisions
of the STL cell or system wide Captain guarantees
would be included.  American was also willing to set
limits on furloughs during the 4th quarter and 1st
quarter.  It was absolutely clear to me that the terms
under consideration were significantly superior to
that which we could expect in a cram down.

3. Is there any  recourse available to avoid a cram-down?
I'll reserve detailed comment on this question for
later.  However, I will share at this time, that my
decision on this issue was based in part upon
consultation with and the advice of our merger
counsel; consultation with our own labor counsel; a
meeting with Paul Hallisay, ALPA's Director of
Government Affairs; telephone contacts with ALPA
President Duane Woerth and other ALPA officials; and
last but not least, a teleconference with Trevor
Blackann, a Director of Legislative Affairs in Senator
Bond's office.

The MEC had been in continuous session in Washington since
Sunday. I, along with two other members of the MEC declined

ALPA 008057

to attend Saturday's meeting when we learned that the first order of business was going to be making last minute changes in key personnel, including MEC Officers and the Merger Committee.  Once personnel changes were off the table, the MEC was able to concentrate on the very important business of seniority integration and representation.  After all day meetings on Sunday and Monday, the time for a decision arrived late Monday afternoon.

After a night of agonizing over the best course of action for the TWA pilots, on Tuesday morning I brought forward a motion reflecting the advice of counsel (Merger Counsel and our Contract Administrator) to accept the APA's terms with conditions that we had reason to believe would be acceptable to American.  Captain Pablo Lewin, Council 4 Captain Representative joined me in support of that motion. F/O Altman, Captain Young and F/O Case voted against.  F/O Case held Captain Hollander's proxy who was not present Monday night or Tuesday for reasons unknown to me.  F/O Case voted Captain Hollander's proxy against.  The motion failed.

Later in the afternoon, after an extremely traumatic process of assimilating additional information, the four members of the MEC that had rejected the prior motion, in caucus amongst themselves, decided that two of them, Captain Young and F/O Altman, were prepared to abstain from a vote on submitting acceptance of another conditional acceptance.  The conditions that they required be placed in the acceptance were conditions that American had already stated in unequivocal terms were unacceptable.

I should also point out that the seniority integration terms were identical to the terms that the MEC had rejected earlier.  One significant difference was a condition that American agree to not furlough anyone in the 4th quarter of 2001 and the 1st quarter of 2002.  Those conditions had already been discussed with American and had been summarily rejected as absolutely impossible.

Although it was my belief that the conditions would lead to a breakdown in negotiations, in order to preserve some slight chance that we might be able to reap the benefits that American "was" willing to put on the table, Captain Lewin and I agreed to take responsibility for passing the motion while two voted against and two abstained.  Although

ALPA 008058

the Master Chairman could have broken the resulting 2-2-2 tie (and he was prepared to do so), it was his desire that the MEC make the decision. So, with F/O Case (who had voted his vote and Hollander's proxy against the motion) encouraging him to do so, Captain Lewin invoked the roll call and since Captain Young and F/O Altman abstained all of their roll call votes, Captain Lewin and I had sufficient votes to actually offer something that at least had some potential to keep the negotiations ongoing.

I should point out that we were already well past the deadline that the parties had set for the negotiations, and that it had taken a significant degree of cajoling of Jeff Brundage of American to keep discussions alive.

After Jeff Brundage received our "conditions", which were the ones that he had already made clear were totally out of the question, we responded in two ways. One was a call between the Master Chairman and Brundage, in which he again rejected our conditions, and the second was a teleconference between those of us in the room, Brundage, Howard Attarian, Duane Woerth's Executive Assistant, and Bob Christy of ALPA Int'l. The only members of the MEC present in the room during that teleconference were Captain Lewin and myself, as the other four members of the MEC, which I will refer to as the DC caucus, had left to hold yet another caucus amongst themselves alone.

During that call, Attarian of ALPA Int'l made it absolutely clear that Brundage was at wit's end and that only minutes remained for acceptance of the offers that APA and American had made. Brundage personally made it clear that American was done negotiating, and that what American was willing to do to facilitate agreement between the APA and ALPA had already been made clear. In a final last effort to collect off the table those provisions that American was willing to provide to help alleviate the egregious nature of the seniority integration terms of the APA, Captain Lewin and I again brought forward a motion to communicate acceptance of the agreement conditioned on those additional provisions. In their own private meeting the DC caucus had apparently decided to reject anything further and that is what they did. Our motion failed again.

At that point the meeting was adjourned. The high fives and the celebration amongst the DC caucus began, and others who were not interested in celebrating including Captain

ALPA 008059

Lewin, myself, our two legal counselors, the MEC officers, a couple of members of the Merger Committee and a few others packed our stuff and departed the room.

That's the report on the final hours of the weekend.  I'll provide more information on the entirety of the process as events and time allows over the next couple of weeks.

Steven Rautenberg
Council 3 Chairman

ALPA 008060

# Exhibit Q



With Brundage
    Changes 11-7-01
 Presented to MEC
            November 6, 2001

### Three Party Term Sheet

**Background:**  Items 1., 2., and 3., below, including the Clarifications to item 1., represent ALPA's understanding of the Allied Pilots Association's proposal as of October 22, 2001. Item 4. represents ALPA's conditions as of October 23 for accepting the APA proposal.  ALPA understands that American Airlines will accept ALPA's conditions.  Item 5 represents ALPA's understanding of a proposal offered by American Airlines to ALPA on October 23, 2001.


1.   **The Integrated List.**

     The modified System Seniority List will be constructed by integrating the April 10, 2001 AA Pilot Seniority List (i.e., adjusted for hiring and attrition through April 10, 2001) and the TWA Pilot Seniority List as of April 10, 2001 (i.e., adjusted for hiring and attrition through April 10, 2001) in the following manner:

     A.   TWA Pilots J.G. Upp, DOH 12/2/63 through Raymond Camus, DOH 3/20/89 will be inserted in the AA Pilot Seniority List on a ratio of approximately one TWA Pilot to 8.1762556 AA Pilots, commencing immediately following AA Pilot W.H. Elder, DOH 10/8/85 and ending immediately following AA Pilot B.D. White, DOH 4/9/01.

     B.   The remaining TWA Pilots commencing with TWA Pilot Theron Clark, DOH 3/23/89, will be placed in seniority order immediately following TWA Pilot Raymond Camus, DOH 3/20/89.

     C.   All pilots hired by American after April 10, 2001 who had been assigned to air line flying duty as of October 1, 2001 will be placed on the modified System Seniority List following pilots referred to in [1.B.] above in accordance with their length of service as flight deck crew members at American, in accordance with Section 13 of the Green Book.

ALPA 030234

Clarifications:  (i) All TWA-LLC pilots currently on furlough and all TWA-LLC pilots who may be furloughed prior to the application of the Green Book to TWA-LLC pilots (i.e. simultaneously with the NMB single transportation system determination) will have seniority numbers in accordance with 1.B. above.  (ii) All recalls will be in combined seniority list order following the application of the Green Book to TWA-LLC pilots.

(Source:  ALPA/APA table discussions and APA Draft Language, not including II.D., which is a matter exclusively between American Airlines and APA).

2.  <u>The St. Louis Cell</u>.  As per the APA proposal dated October 21, 2001 (attached), subject to the following:

A.  "Hardship transfer" shall have the same meaning as under the relevant AA/APA agreements. As applied to the instant case, the TWA MEC Merger Committee understand that any American pilot (i.e. not a former TWA pilot) bidding or displacing to St. Louis would be junior to all former TWA pilots in the respective status, for monthly bidding.

B.  For purposes of B paragraphs 7, 8, 9, 11 and 12, the following shall apply:

(i)  The term "small widebody" shall replace "767."

(ii) The term "narrowbody" shall replace "S80" and "717."

C.  For purposes of D, paragraph 1, the term "small widebody" shall replace "757/767" and "A300."

D.  For purposes of D, paragraph 2, the term "All STL narrowbody flying" shall replace "All STL S80/717 flying."  The preceding generic aircraft descriptions shall be defined in terms of gross weights.

E.  The 409,000 pounds MGTOW limitation of paragraphs B.1. and B.5. are modified to include the following: "except 767 iterations."

(Source:  ALPA-APA-American Airlines table discussions.  Items 2.A.-D. inclusive were stated as conditions to APA and American Airlines in October 23rd correspondence.)

ALPA 030235

3.   "No furlough" protection.   The TWA pilots covered by 1.A.
     above will be covered by the "no furlough" provisions of
     the July 10, 2001 APA-AA Transition Agreement when the
     Green Book becomes effective for TWA-LLC pilots (i.e.
     simultaneously with the NMB single transportation system
     determination).   (TWA pilots covered by 1.B. above will not
     be covered by the "no furlough" provisions of the July 10,
     2001 APA-APA Transition Agreement).   (Source:  ALPA-APA-
     American Airlines table discussions.)

4.   Conditions as of October 23, 2001.

     A.   APA mitigates the scheduled 409 furloughs of AA
          pilots.

     B.   Upon completion of the AA-APA mitigation agreement
          mentioned above, AA will provide a written guarantee
          to the Air Line Pilots Association that AA will
          furlough no more than 200 pilots in the fourth quarter
          of 2001 and no more than 250 pilots in the first
          quarter of 2002.

     C.   American Airlines, Inc., shall enter into an agreement
          assuring that the number of pilots flying out of the
          St. Louis domiciles shall decrease no more than
          identically timed decreases in the pilot populations
          at the Chicago and Dallas – Ft. Worth domicile, to a
          maximum of 25 percent, according to the formula
          described by AA Vice President Brundage on October 22,
          2001.

          Clarifications:  (i) There will be no growth ceiling
          at the St. Louis domicile.  (ii) The agreement shall
          include the following concepts:  (a) there will be
          separate guarantees for Captains and First Officers
          and (b) separate guarantees for pilots flying small
          widebody and narrowbody aircraft.

     D.   This tentative agreement (i.e. 1., 2., 3., and 4. of
          this Three Party Term Sheet) shall be reduced to
          writing and signed by the President of the
          Organizations and the highest labor relations official
          of the Company.

ALPA 030236

(Source: October 23 draft Letter from Captain Robert A. Pastore to Captain John E. Darrah and Captain Jeffrey Brundage [attached], based upon October 23 telephone conversations).

5.   Satellites.

American Airlines will provide a "meet and confer" letter to ALPA with respect to ALPA's interest in creating TWA-LLC satellites to the St. Louis domicile at New York, Los Angeles and San Francisco.  (Source:  October 23 telephone conversation with Captain Jeff Brundage).

ALPA 030237

October 21, 2001

A. Furlough

1. Furlough in seniority order
2. Recall in seniority order
3. Furlough protections for TWA LLC pilots placed on the combined seniority list as acceptable by management.

B. Proffer of Vacancies

1. No TWA pilot may fly F/O on 777, A300 or any new bid equipment greater than 409,000 pounds prior to AA pilot BD White bids or has the opportunity to bid F/O on the 777. No TWA pilot may hold a bid line as F/O on the 777, A300, or any new bid equipment greater than 409,000 until BD White can hold a bid line.
2. No TWA pilot may fly CA on the 777 until AA pilot BD White bids or has the opportunity to bid CA on the 777. No TWA pilot may hold a bid line as CA on the 777 until BD White can hold a bid line.
3. No TWA pilot may fly CA on the MD-11 until AA pilot BD White bids or has the opportunity to bid CA on the MD-11. No TWA pilot may hold a bid line as CA on the MD-11 until BD White can hold a bid line.
4. No TWA pilot may fly CA on the A300 until BD White bids or has the opportunity to bid CA on the A300. No TWA pilot may hold a line as CA on the A300 until BD White can hold a bid line.
5. No TWA pilot may fly CA on the new bid equipment greater than 409,000 pounds MGTOW until BD White bids or has the opportunity to bid CA on such equipment. No TWA pilot may hold a line as CA on such equipment until BD White can hold a bid line.
6. No Protected TWA CA can be displaced by an AA Pilot.
7. No AA pilot can displace into STL 767, S80, or 717 bid status.
8. During a furlough, the junior most pilot in the AA system being displaced may proffer/be assigned as F/O in the STL 767, S80, or 717 F/O bid status' (from the preference list first, then the displacement list).
9. AA Pilots in STL 767, S80 or 717 F/O bid status' will bid monthly bid preferences as if they were on a hardship transfer during the period of the protected cell.
10. TWA Pilots have right of first refusal for all STL vacancies. F/O positions that are not bid by TWA pilots may be bid by any pilot in system seniority order.
11. No AA pilot may proffer B757/767 CA bid status in STL until Morgan Fischer upgrades or has the opportunity to upgrade to CA on the B757/767.
12. No AA pilot may proffer S80 or B717 CA bid status in STL until Magnus Alehult upgrades or has the opportunity to upgrade to CA anywhere in the system.
13. TWA pilots may proffer CA positions at bases other than STL based on D below.
14. TWA pilots bid TWA CA retirements subject to D below.
15. During the period of time that there is an operational fence, no TWA pilot may proffer outside of STL. However, at the discretion of the Company, a TWA pilot

ALPA 030238

may proffer outside of STL, provided that no AA pilot is assigned to cover any vacancy created by the TWA pilot leaving the status.

C. TDY – TDY into STL will be done in accordance with the Basic Agreement.

D. The combination of STL and other base CA positions for the TWA pilots will be capped by the following.

1. B757/767 Captain Positions

The combination of STL 757/767 and other bases 757/767 CA jobs for TWA pilots are capped at the following during the time of the protected cell.

| Number of B757/767 and A300 in Operation | Number of TWA Protected Captains |
|---|---|
| 276 or greater | 260 |
| Greater than 270 but less than 276 | 238 |
| Greater than 265 but less than 270 | 200 |
| Greater than 260 but less than 265 | 167 |
| Greater than 255 but less than 260 | 132 |
| Less than or equal to 255 | All STL 757/767 Captain flying |

2. The combination of STL NB and other bases NB CA for TWA pilots are capped by the following during the period of the protected cell.

| Total number of aircraft operated by AA and TWA LLC | Number of protected Narrow Body Captains |
|---|---|
| Equal to or greater than 900 | 800 |
| Greater than 890 but less than or equal to 900 | 770 |
| Greater than 880 but less than or equal to 890 | 710 |
| Greater than 870 but less than or equal to 880 | 650 |
| Greater than 860 but less than or equal to 870 | 590 |
| Greater than 850 but less than or equal to 860 | 530 |
| Less than or equal to 850 | All STL S80/717 flying |

For TWA protected NB CA, in those months when there is not enough NB CA's to fulfill the guarantees specified above, 1 out of 6 narrow body CA proffers will be set aside for TWA pilots to proffer. If no TWA pilots proffers the Captains bids, AA pilots shall fill the bids.

ALPA 030239

E.  STL Captain and F/O guarantees until the protected cell ends as acceptable to management.

ALPA 030240

18:20



October 23, 2001

Captain John E. Darrah
President
Allied Pilots Association
14600 Trinity Boulevard, Suite 500
Fort Worth, Texas 76155-2512

Captain Jeffrey Brundage
Vice President
American Airlines, Inc.
P.O. Box 619616, MD 5235
Dallas Ft. Worth Airport, TX 75261-9616
(817-967-1843)

Gentlemen:

The TWA Pilots Master Executive Council, Air Line Pilots Association, International AFL-CIO, voted this morning to accept the seniority integration proposal made by the Allied Pilots Association on Saturday, October 20, 2001, supplemented by the written conditions and restrictions delivered to us on Sunday, October 21, 2001, with the following conditions:

1.      The Allied Pilots Association ("APA") mitigates the scheduled 409 furloughs of AA pilots.

2.      Upon completion of the AA-APA mitigation agreement mentioned above, AA will provide a written guarantee to the Air Line Pilots Association ("ALPA") that AA will furlough no more than 200 pilots in the fourth quarter of 2001 and no more than 250 pilots in the first quarter of 2002.

3.      American Airlines, Inc. shall enter into an agreement assuring that the number of pilots flying out of the St. Louis domiciles shall decrease no more than identically timed decreases in the pilot populations at the Chicago and Dallas – Ft. Worth

ALPA 030241

Captain John E. Darrah
Captain Jeffrey Brundage
October 23, 2001
Page 2

domiciles, to a maximum of 25 percent, according to the formula described by AA Vice President Brundage on October 22, 2001.

      4.    The following definitions applicable to the APA proposed conditions and restrictions shall be adopted.

      A.    "Hardship transfer" shall have the same meaning as defined in relevant AA/APA agreements. These agreements shall be provided to ALPA.

      B.    For purposes of B paragraphs 7, 8, 9, 11 and 12, the following shall apply:

        (i)    The term "small widebody" shall replace "767."

        (ii)    The term "narrowbody" shall replace "S80" and "717."

      C.    For purposes of D, paragraph 1, the term "small widebody" shall replace "757/767" and "A300."

      D.    For purposes of D, paragraph 2, the term "All STL narrowbody flying" shall replace "All STL S80/717 flying." The preceding generic aircraft descriptions shall be defined in terms of gross weights.

      5.    This tentative agreement shall be reduced to writing and signed by the Presidents of the Organizations and the highest labor relations official of the Company.

      If you agree with the foregoing description of our tentative agreement, please sign in the space indicated below and return a signed copy of the Agreement to me. Thank you for your consideration of this matter.

                  Very truly yours,

                  Robert A. Pastore, Master Chairman
                  TWA Master Executive Council

ALPA 030242

Captain John E. Darrah
Captain Jeffrey Brundage
October 23, 2001
Page 3

_____          Date _____
Captain John E. Darrah
President
Allied Pilots Association

_____          Date _____
Captain Jeffrey Brundage
Vice President
American Airlines, Inc.

**ALPA 030243**