# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

PATRICK BRADY, *et al.*,   )
                           )
    Plaintiffs,            )
                           )
vs.                        )   Civil Action No. 02-2917 (JEI)
                           )
AIR LINE PILOTS ASSOC., INT'L,  )
                           )
    Defendant.             )

**DECLARATION UNDER OATH
BY JOE D. JACOBSON**

Joe D. Jacobson, under penalty of perjury under the laws of the United States pursuant to 28 U.S.C. § 1746, states:

1. I am one of the lawyers for the TWA pilot plaintiffs and class. I was admitted *pro hac vice* in this case July 7, 2006.

2. My first involvement in the case was in November 2005. I had minimal involvement in the case until September 2010, and did not spend significant time on the case until the spring of 2011. I first met Howard Hollander in April 2011.

3. As I became more involved in the case, I learned there was a factual issue about whether Roland Wilder had been in attendance at an MEC meeting held with the ALPA advisors on April 2, 2001. I learned that the TWA pilots, our clients, had consistently stated that Wilder had been in attendance April 2, and that they had done so since well before our law firm first became involved in the case. I also learned that Wilder had flip-flopped between whether he was or was not present April 2, and that his then-current, and apparently ultimate, position was that he was not present.

1

4.  In my meetings with the TWA pilots I tested and challenged their assertions that Wilder was present at the April 2 meeting. Many hours were spent on this topic because we did not want to have a conflict between the TWA pilots and their former attorney, Wilder, on a factual issue of little consequence to the case, in that I did not believe that it would be material to the outcome of the case whether the meeting and discussions at issue took place April 1 or April 2. The TWA pilots were adamant, however, that the meeting and discussions took place April 2 and that Wilder was there on that day. Several of the pilots stated that the meeting and discussions could not have taken place April 1 as those pilots were not even in St. Louis until the evening of April 1, after the work session had ended.

5.  It is my firm belief that the TWA pilots who testified at trial that Wilder was present at the MEC meeting April 2 were testifying truthfully to the best of their knowledge and belief. I did not suggest to the TWA pilots that Wilder was present April 2, and did not coach or encourage the TWA pilots or any other witness to present false testimony at trial concerning the date of the meeting and discussions, Wilder's presence or absence, or any other issue whatsoever.

6.  Although not directly relevant to what I did or did not do, I would note that ALPA's own witness David Singer testified in his deposition that Wilder was present at the April 2 meeting. At trial, Singer testified that he no longer had any independent recollection of whether Wilder was present, but acknowledged his deposition testimony. *See* Transcript Vol. 13, p. 184 (quoting deposition: "I still think he [Wilder] came. He came in late, I believe.")

7. With respect to Howard Hollander's testimony concerning the April 23, 2001 meeting attended by Duane Woerth, I did not knowingly sponsor any inaccurate or untruthful testimony by Hollander. To the best of my recollection, I had not discussed the April 23 meeting with Hollander during our pretrial preparation. During his voir dire by defendant's counsel, Steven Fram, which included questioning by the Court, Transcript Vol. 6, pp. 66-72, Hollander or I became confused about which meeting he was being asked about. As a result, I therefore understood him to say that he was present at the April 23 meeting. Once the jury returned, I asked Hollander if he was at the April 23 meeting and he testified that he was, so I asked him follow up questions about the meeting. I did not realize that his participation in the meeting was only virtual, via continuous telephone communications with other MEC members. When asked about the meeting on cross-examination, at a distance from the confusion arising during his voir dire, Hollander directly and without hesitation testified that he was not at the April 23 meeting.

8. Contrary to Mr. Fram's suggestion in his brief in support of the motion to revoke pro hac vice admission, I did not have every meeting and every set of meeting minutes memorized so that I would know, without checking documents, whether the documents reflected that Hollander was not present at the April 23 meeting.

9. While any error in testimony is unfortunate, I do not believe that it is surprising that there be some miscommunications or misstatements during the course of a five-weeks-plus trial. Nevertheless, I did not knowingly sponsor any false testimony and I do not believe that Hollander knowingly offered false testimony at trial.

Moreover, given Hollander's prompt correction of his inaccurate testimony upon being asked about the meeting in cross-examination, I do not believe that Hollander's misstatement had any material impact on the result of the trial. I assume that Mr. Fram shared my belief at the time, given that he did not ask to have any portion of Hollander's testimony stricken and did not ask for any other relief from the Court. I also do not agree with Mr. Fram's assertion in his brief in support of the motion that the Court erred by not *sua sponte* taking some kind of unspecified "corrective action." *See Brief* at 20.

10. In summary, I have not taken any action to mislead this Court or the jury, but have at all times done my very best to present the Court and jury with honest testimony and other evidence. I believe I remain worthy of continued pro hac vice admission to this Court in this case.

11. I request that the Court rule on the motion to revoke pro hace vice admission at the earliest possible moment, without waiting for hearing or other additional argument. While normally I would patiently await the Court's decision, even in a matter as personally painful as the accusations made by Mr. Fram, I find myself in a special situation prompting me to ask for special consideration: I have been nominated by the Missouri Appellate Judicial Commission as one of three nominees for an open seat on the Missouri Supreme Court, and the pendency of this motion, which has been widely publicized throughout Missouri, may potentially jeopardize my chances of being appointed by our Governor to fill this seat.

4

12. The system we use in Missouri to appoint our appellate judges, and the trial judges in metropolitan circuits, is based on merit rather than partisan or other political considerations. An Appellate Judicial Commission, comprised of three lawyers (elected by the Bar) and three laypersons (appointed by the Governor), one from each of the three appellate districts of the State, along with the Chief Justice of the Supreme Court, selects from among the qualified applicants three nominees. The nominees are then presented to the Governor, who then has 60 days in which to fill the post.

13. I have attached as an exhibit to my declaration a true and complete copy of an article published on the front page of *Missouri Lawyer's Weekly*, "High court panel: Draper, Jacobson, Manners" (September 5, 2011), reflecting my nomination for the Missouri Supreme Court.

14. I have also attached as an exhibit to my declaration a true and complete copy of an article published on the front page of the current issue of *Missouri Lawyer's Weekly*, "Allegations leveled at high court nominee" (September 12, 2011), reporting on the allegations made against me by Mr. Fram in his brief in support of his motion to revoke pro hac vice.

15. The Governor of Missouri has up to 60 days from the date the nominations are made to select his choice as the new Supreme Court judge. Historically, governors have not used the full 60 days. The Appellate Judicial Commission made its nominations September 1, 2011. Leaving Mr. Fram's allegations unresolved may place me in a disadvantage to be appointed, as our Governor has made it clear in past appointment statements that both the ability and the good character of the nominee is important

5

to his decision. Consequently, I request that the Court rule on the motion as soon as possible to lift this blot from my reputation before the opportunity for my appointment to this position, which I greatly desire, passes me by.

I, Joe D. Jacobson, hereby declare under penalty of perjury that the foregoing is true and correct. Executed on September 12, 2011.

_____
Joe D. Jacobson

Case 1:02-cv-02917-JEI   Document 445-2   Filed 09/12/11   Page 8 of 11 PageID: 15231

■ VOLUME 25 NUMBER 36   WWW.MOLAWYERSMEDIA.COM   SEPTEMBER 5, 2011 ■ $8.50

# MissouriLawyers WEEKLY

Expertly focused. Widely acclaimed. 2010 WINNER OF THE MISSOURI PRESS GOLD CUP FOR BEST WEEKLY NEWSPAPER

## High court panel: Draper, Jacobson, Manners

By Scott Lauck
scott.lauck@molawyersmedia.com

A circuit court judge from Independence, an appellate judge from the Eastern District and an attorney from St. Louis are finalists to become the next judge of the Missouri Supreme Court.

After two days of interviews and more than four hours of debate, the Appellate Judicial Commission selected Michael W. Manners, George W. Draper III and Joe D.


George W. Draper III


Joe Jacobson

Michael Manners

Jacobson. Gov. Jay Nixon will have 60 days to choose one of the three to replace Judge Michael Wolff, who retired on Aug. 11.

The judicial panel is the first announced for the Supreme Court under new, more open selection rules unveiled last year. On Wednesday and Thursday, 13 applicants were publicly interviewed in Jefferson City. Sitting just a few feet from the bench they hoped to obtain, the hopefuls fielded questions from the commission's seven members and tried to make the case for their selection.

Manners, who was appointed to the bench in 2000 during Gov. Roger Wilson's brief tenure following Gov. Mel Carnahan's death, was the only circuit judge who applied for the Supreme Court opening. As he told the commission, "I've been in the trenches."

[SEE PANEL ON PAGE 11]



Chief Justice Richard Teitelman

## The judge who wasn't supposed to make it

Chief Justice of the Missouri Supreme Court Richard Teitelman. Photo by Karen Elshout

By Scott Lauck
And Donna Walter
scott.lauck@molawyersmedia.com
donna.walter@molawyersmedia.com

Widely regarded as an incurable liberal, a frequent dissenter, the only appellate judge in recent memory to face a serious retention challenge, Richard B. Teitelman is the Missouri Supreme Court's most controversial judge — on paper.

In person, he is perhaps the court's most beloved member. An unerring presence at parties, an inveterate glad-hander, he's the judge who wanders through the courtroom before a hearing to say hello, then compliments the lawyers after their arguments.

That charm has proved to be a powerful weapon.

"Frankly, there are a lot of people who may not be Teitelman fans, but they're not enemies, and that's a big distinction," said Chip Robertson, a former Supreme Court judge. "Rick doesn't have any enemies that I know of. Even the people who think he's on the wrong end of things like him personally, and that means a lot."

In July, Teitelman, 63, began a two-year term as chief justice of the Missouri Supreme Court, a position that makes him both the face of the court system and the chairman of the committee that selects finalists for judicial openings. Last week, in his first major pub-

[SEE TEITELMAN ON PAGE 12]

SEARCH FOR VERDICTS AND SETTLEMENTS ONLINE AT WWW.MOLAWYERSMEDIA.COM

THE DOLAN COMPANY
To subscribe call 800-451-9998 or e-mail subscriptions@dolanmedia.com.

**********CAR-RT LOT**C-081
0343724  10/08/2012  7
JOE D JACOBSON
GREEN JACOBSON & BUTSCH
7733 FORSYTH BLVD STE 700
SAINT LOUIS  MO 63105-1882



### Silence in the art world

Fear of lawsuits is keeping the world's art experts from speaking up about frauds.
■ Page 14

### Verdicts & Settlements

Find out how one car dealer's ad campaign netted his brother a $19 million jury verdict.
■ Page 8

# Better Courts for Missouri head calls panel 'awful'

[PANEL FROM PAGE 1]

Manners is also the only one of the three who has previously made a Supreme Court panel. He was one of three finalists for the opening that Wolff ultimately won in 1998, as well as the one in 2002 from which Chief Justice Richard Teitelman, who chairs the Appellate Judicial Commission, was chosen.

Being a circuit judge, Manners told the commission, is like being the "rawhide tip of the whip."

"We've got to make decisions very, very rapidly, and we don't always have the benefit of hindsight," he said.

But he pointed to numerous appellate cases he'd handled in private practice. Manners admitted that appellate work could be a bit "cloistered," but said the Supreme Court's work has compensating virtues.

"You really have an opportunity to make decisions that will have a long-term effect on how we do business," he said.

Manners also pointed to his not having been selected for the court on prior panels as an example of a "failure" in his life through which he persevered. He received reassurance from Teitelman.

"I would never call any of this stuff failure," Teitelman said, adding that the appointment was up to the governor. "It's not a reflection on you."

Manners earned his law degree in 1976 from the University of Missouri-Kansas City School of Law. Before his appointment to the bench, Manners was also the prosecuting attorney for the city of Smithville.

## A legal lineage

Draper, one of five appellate judges who applied, was named to the Court of Appeals Eastern District in 2000 by Carnahan. He previously had served as an associate circuit judge and a circuit judge in St. Louis County, and his background also includes a 10-year stint in the Office of Circuit Attorney for the city of St. Louis.

Commissioner John Gentry, of Springfield, noted that Draper had "worked up through the ranks" and asked why he wanted to be on the Supreme Court.

"Anything you give your life to, you'd like to get a chance to lead," Draper responded. He added that while the case-load of the Supreme Court is less than that of the intermediate appellate courts, "the work they do can't be measured just by cases."

Draper comes from a distinguished legal lineage: his father, George Draper Jr., was one of the first black prosecutors in the St. Louis Circuit Attorney's Office and was later a judge on the Washington, D.C., Superior Court. The elder Draper died in 1976, his son's junior year of college. His father's legacy, Draper said, "caused me to hesitate quite a bit to go into the law."

Draper is married to Judy P. Draper, an associate circuit judge in St. Louis County. Responding to questions about his lack of private practice experience, Draper noted that his wife had been a lawyer in the private sector, "so my own finances have been involved."

"I'm aware that business is looking for a level playing field, just like everybody else," he said.

Draper holds a law degree from Howard University in Washington.

Jacobson is a shareholder in Green Jacobson, a 12-lawyer complex-litigation firm in Clayton.

He, too, did not apply for a recent opening on the intermediate appellate court. Jacobson said he was more interested in a position that dealt with the "philosophy of law."

"I'm more interested in bigger-picture issues," he said.

Jacobson said a partner at a firm he worked at as a young lawyer taught him to write briefs with "the voice of God," devoid of asides and excess passion.

Teitelman cited Aristotle: "The law is reason free from passion."

"I think it has to have passion, too," Jacobson responded.

Jacobson grew up in New Jersey and attended Washington University in St. Louis for his undergraduate degree. His law degree is from Boston University. He put himself through school in a variety of ways, including creating a legal newspaper in law school and moving back in with his mother, whom he described as a bit of a "wandering Jew" who had survived Nazi Europe.

"It was not good for my social life, but good for my academic life," he said of his unusual roommate situation.

Jacobson said he has handled about 80 appellate cases and tried 60, primarily on the civil side. He admitted to little experience with criminal law but pointed out that he's taken on patent cases, though his previous experience with such law had been limited to a single class.

"I will work my butt off to do the best job I can do," Jacobson promised the commission.

According to a news release from the judicial commission late Thursday, the panel was chosen over seven rounds of balloting. Manners got seven votes, Draper got five votes and Jacobson got four votes.

The voting process is held behind closed doors, but the interviews, which were previously private as well, were conducted with an audience. Then-Chief Justice William Ray Price Jr. announced the change at last year's Missouri Bar meeting.

The commission still appeared to be adjusting to the public nature of the process and instituted several rules designed to minimize disruptions. No one was permitted to come and go while the applicants were speaking, and the commission barred photography and video recording during the short breaks between interviews, even though nothing substantive was discussed.

## Modest interest

The interviews attracted about 15 or so viewers over the two days — many of them court clerks or staff at the Attorney General's Office, which is housed in the same building.

Among the outside observers was Vivian Eveloff, executive director of the Sue Shear Institute for Women in Public Life, who attended Wednesday's session. She said that in contrast to some circuit court-level interviews where questions were submitted to the applicants in advance, the wide-ranging, individually tailored questions gave viewers a good sense of the Supreme Court applicants' backgrounds.

Nonetheless, Eveloff was disappointed that no female candidates were chosen.

"There were certainly women in that group who were as impressive as the people who were chosen," she said by phone after the panel was announced.

The interviews also drew a handful of reporters, as well as representatives of Better Courts for Missouri, a group pushing for changes to the Nonpartisan Court Plan. The group videotaped all the proceedings and intends to post them on the Web.

James Harris, the group's director, attended some of the interviews and said they offered a "good dialogue." But, he said, it also appeared that many of the questions stemmed from earlier private conversations between the applicants and the commissioners. He said the commission should disclose the extent of such meetings and the identities of those who support the candidates.

Harris called the panel "awful," focusing particularly on the two judges. He faulted Manners for having been president of the Missouri Association of Trial Attorneys during his private practice career. Harris has repeatedly accused the organization of having too much influence on the selection process, which the group denies.

Harris also faulted Draper, whose opinions he characterized as "activist."

The other candidates who applied were Appeals Court Judges Lisa White Hardwick, Karen King Mitchell, Glenn A. Norton and Mark D. Pfeiffer, Solicitor General James R. Layton, and attorneys Timothy R. Cisar, Gretchen Garrison, Richard A. Gartner, Paul G. Lane and Erwin O. Switzer.



Judge George W. Draper III gets up to leave after being interviewed by the Appellate Judicial Commission. He must have made a favorable impression. He was one of three selected as finalists for the governor to consider.



Finalist Joe Jacobson is a shareholder in Green Jacobson, a 12-lawyer complex-litigation firm in Clayton.
Photos by Karen Elshout

■ VOLUME 25  NUMBER 37       WWW.MOLAWYERSMEDIA.COM       SEPTEMBER 12, 2011  ■ $8.50

# MissouriLawyers WEEKLY

**Expertly focused. Widely acclaimed.** 2010 WINNER OF THE MISSOURI PRESS GOLD CUP FOR BEST WEEKLY NEWSPAPER

## UP COMING 2011

Honoring the best and brightest of Missouri's young lawyers

**INSIDE**

Find a special 12-page pullout section introducing this year's honorees

## Allegations leveled at high court nominee

**By Heather Cole**
*heather.cole@molawyersmedia.com*

Green Jacobson lawyers let unflattering adjectives fly when asked about an opponent's allegation that they coached five witnesses to lie on the stand in a high stakes class action case.

The allegation is just one in a series of "slimy" tricks played by the defense throughout the case, said Joe Jacobson, a Missouri Supreme Court finalist and one of the attorneys representing the former TWA pilots who are plaintiffs in the case. Allen Press, who is the lead plaintiffs' attorney, said the motion containing the allegation was "a desperate move."

Their adversary, defense attorney Steven Fram, says in an Aug. 10 court filing that Press and Jacobson "lost their moral compass" in pursuing their successful trial. Fram heads up the commercial litigation practice of New Jersey firm Archer & Greiner.

The witnesses were former TWA pilots. They are among the 2,300 pilots in the class suing their former union after they lost seniority in the 2001 American Airlines purchase of the bankrupt TWA. A unanimous jury sided with the plaintiffs in July. They now await a second hearing on damages, which could be substantial; Press has put a figure of more than $1 billion on actual damages.

Meanwhile, attorneys for the two sides are lobbing mud at a particularly bad time for Jacobson to be spattered. He's one of three contenders for a vacancy on the Missouri Supreme Court.

Fram asked in the Aug. 10 filing for Press and Jacobson to be kicked off the case, which is in federal court in New Jersey.

St. Louis-based Green Jacobson fired back with a Sept. 6 motion for sanctions and attorneys' fees, saying defense support for the allegation against the lawyers "rests simply on its counsel's wild imagination."

"It is said that a desperate party unable to win his case on the merits, will sometimes resort to an attack on the lawyer," the motion said. "Defendant's Motion to Revoke the *Pro Hac Vice* Admissions of

[SEE JACOBSON ON PAGE 14]

---

SEARCH FOR VERDICTS AND SETTLEMENTS ONLINE AT WWW.MOLAWYERSMEDIA.COM

THE DOLAN COMPANY
To subscribe call 800-451-9998 or e-mail subscriptions@dolanmedia.com

*******CAR-RT LOT**C-081
343724 10/08/2012 11
JE D JACOBSON
REEN JACOBSON & BUTSCH
733 FORSYTH BLVD STE 700
AINT LOUIS MO 63105-1882

**SIF**
Court sets date for Second Injury Fund lawsuit.
■ Page 2

**IRS**
The clock is ticking on estate tax exemptions.
■ Page 5

**V&S**
Wheel problems continue to yield plaintiff wins.
■ Page 6

# Can John Edwards resist becoming a 'fool client'?

*He has hired a top-notch legal team, but it'll be hard for him not to second-guess strategy*

**BY NED BARNETT**
*Dolan Media Newswires*

Following his indictment in June, former U.S. Senator John Edwards stood and listened as the judge explained his rights. But as the judge went on, Edwards interrupted, saying he was an attorney and the explanation wasn't necessary.

That exchange in the federal courthouse in Winston-Salem, N.C., may have been the first flicker of the legal tension that will run through Edwards' upcoming trial on charges of violating campaign finance laws. It's a case in which the defendant is also an attorney, and a very good one. What will be the dynamic between Edwards and his defense team? How much will he steer the case and how much will he defer?

Richard Myers, a former federal prosecutor who teaches at the University of North Carolina School of Law, says Edwards will likely be fighting an instinct to manage his own defense.

"For any competent and successful attorney, it would be incredibly difficult to be a defendant," Myers says.

Yet for all his success as one of North Carolina's top plaintiffs' attorneys, Edwards doesn't want to over-manage his own defense and become the proverbial "fool for a client." He has assembled a team of high profile legal advisers to prepare for his trial, tentatively set for October.

The defense team includes Wade Smith, known as the dean of North Carolina defense attorneys and an early mentor to Edwards; James P. Cooney III, a Charlotte attorney who is rated one of the state's best civil and criminal attorneys; and Gregory Craig, President Obama's former White House counsel and a personal attorney to former President Bill Clinton.

Smith declined to discuss how the team will be organized by role, but he says Edwards' legal expertise will be a help, not a hindrance. "He is one of the easiest people I've ever represented because he knows the issues, he knows the law and he understands the case," Smith says. "Because he's so aware of all that, it makes your job much easier."

While Edwards is knowledgeable about the task before his lawyers, he also understands his role as a client, Smith says.

"He's not more interested than other people would be. All clients are interested," Smith says, but added, "I've found him to be patient."

Efforts to reach Cooney and Craig were not successful.

Some wonder why Edwards would put himself and his children through a trial after he was publicly disgraced for having an affair and a baby with his mistress, Rielle Hunter, while his wife was dying of cancer. But taking his chances with a jury wouldn't be unusual for a man known to push his luck whether the situation is personal, professional or political.

Gary Pearce, a former press secretary to Gov. Jim Hunt and a political advisor to Edwards when he won his U.S. Senate seat in 1998, says Edwards "is a risk taker."

Pearce notes that Edwards turned down major settlement offers in 1996 when he decided to go to trial for a 5-year-old girl who was disemboweled by a faulty swimming pool drain. He won a $25 million award. In politics, Pearce says, Edwards also gambled in running for the Senate with no experience and then president in 2004 after only one term in the Senate. Edwards secured the 2004 Democratic nomination for vice president and sought the presidency again in 2008.

"You look at his whole career back to the swimming pool case. He was offered an enormous settlement. He turned it down and got more," Pearce says. "It was a gutsy thing to run for Senate. It was a gutsy thing to run for president."

And it will be a gutsy thing to decline a plea bargain and go to trial. A trial will bring back all the sordid details of Edwards' affair. It also will focus on his efforts to cover it up with more than $1 million in gifts from benefactors, gifts the government says he failed to report as campaign contributions. A felony conviction on any of the six felony counts Edwards faces could send him to prison and strip him of his license to practice law. (It's already been more than a decade since Edwards worked as a lawyer. According to the North Carolina State Bar, his license has been inactive since 2000.)

Pearce thinks Edwards made a shrewd move by turning to Smith, a lawyer who likely will concede his client's flaws, but argue that he did not break the law.

"I don't think there anybody better than Wade to draw that bright line," he says.

Even if Edwards the lawyer is willing to stay in the background, Edwards the defendant will still have to make major decisions about the case.

Myers, at the UNC-CH law school, notes that defendants often make the final decision about accepting a plea agreement, whether to testify and even whether to strike prospective jurors.

Those decisions could be complicated by the expertise Edwards brings to them. Myers says, "It creates more chances for disagreement between counsel and the client."

Myers has been on the other side in cases against Smith and says he's "a terrific lawyer," but when the case comes down to key strategic calls, Myers thinks he knows who will make the decision.

He says, "I think it's probably going to be the client."

# Attorney switched on attendance at crucial meeting

[JACOBSON FROM PAGE 1]

Allen Press and Joe Jacobson is a disgraceful example of that adage at work."

"The filings can be very hurtful to us and especially to Joe," said Martin Green, Green Jacobson's president and legal adviser, said in an interview last week. "It's very unfair. He hasn't done anything wrong.... I'm not going to sit back and tolerate false accusations against my partners."

Jacobson, for his part, said he doesn't think the allegations will hurt his chances for the Supreme Court position. He is up against Jackson County Circuit Judge Michael Manners of Independence and Missouri Court of Appeals Eastern District Judge George Draper III.

All kinds of allegations are made in court filings, Jacobson said. As an example, he pointed to Manners' application for the position. In answer to a question about whether he had faced litigation, Manners refers to several lawsuits filed against him as a lawyer and a judge.

"The bottom line is there are people in the world who are jerks, and anyone can file anything," Jacobson said. "It should not diminish one bit Michael Manners' reputation, which is stellar. In a short period of time [Fram's motion in the TWA case] will be in the dustbin of history."

Fram did not return two phone calls seeking comment by press time. The media department for his client, the Air Line Pilots Association International, also did not respond to a request for comment by press time.

Press said the filing was disturbing.

"You don't lose a case and get to accuse everyone of perjuring themselves and the lawyers of coordinating it without a shred of evidence," Press said. "Of course there's no evidence. It didn't happen."



> "The bottom line is there are people in the world who are jerks, and anyone can file anything."
> — *Attorney Joe Jacobson*

## Unusual move

Fram's motion was one of three filed by the defense on Aug. 10. The other two were expected and conventional: a motion for a new trial and a motion for a judgment "as a matter of law" to overturn the jury's verdict.

The motion to revoke permission for Press and Jacobson to represent the pilots in the U.S. District Court in New Jersey was unusual and unexpected. Press and Green said they'd never seen anything like it in their decades of practice.

The 34-page motion centers mostly on the question of whether an attorney hired to represent the local master executive council of the union was present at a critical meeting on April 2, 2001, in St. Louis. The attorney, Roland Wilder Jr. of Washington, D.C.-based Baptiste & Wilder, varied on the question the four times he was asked about it in testimony and depositions for the TWA lawsuit and a separate unrelated case in St. Louis County Circuit Court over unpaid legal bills.

The last time he testified in a video deposition for the TWA case, Wilder said he hadn't been at the meeting of the council, referred to as TWA-MEC. Wilder's April 1 plane ticket for Louisville, an invoice and meeting agendas back up that version of events, Fram says in his motion.

Admitting that Wilder wasn't at the meeting "would undermine the entire foundation of the Plaintiffs' case," the motion says. The plaintiffs' case centered on their claim that Wilder and the members of the TWA-MEC were ambushed by the other advisors at the meeting on April 2 and were bullied and coerced into waiving scope," the motion says. By waiving scope, TWA-MEC gave up the pilots' rights to require that American submit TWA pilots' seniority to arbitration.

Six pilot members of the committee said in court that Wilder was at the April 2 meeting, according to Fram's motion. At least four of them said Wilder, who had advocated against waiving scope, capitulated and left after he was beset by the other advisers.

"What happened in this case is obvious," the motion said. "The pilot witnesses called by Plaintiffs concocted a story of last-minute coercion on April 2. That was only plausible if Wilder was present then as opposed to the day before."

## 'Squabble between the lawyers'

There is a simpler explanation, according to the 11-page sanctions motion filed by Press, Jacobson and local New Jersey counsel Lisa Rodriguez of Trujillo Rodriguez & Richards.

Wilder may have chosen not to bill for his time on April 2 because "responsible lawyers frequently will not bill clients for time spent that did not benefit the client's interests," the motion says. That would explain the lack of a note about the meeting on the invoice.

"Certainly, it can not be denied that it is more reasonable to believe that one lawyer decided not to bill for his time (and then forgot about it) than to believe that two lawyers and five witnesses entered into a conspiracy to present false testimony," the motion said.

Plaintiffs' attorneys also had their clients examine the document for Wilder's Louisville ticket, Jacobson said in a phone interview. They said the document was actually a receipt for a ticket returned for credit, and they couldn't tell from it when Wilder left, he said.

Reached by phone, Wilder said he didn't understand why there was any doubt about where he was. His testimony and affidavit show he was at an April 1 meeting but left afterward to meet another client in Louisville and was in that city April 2, he said.

"I'm not anxious to get involved in another squabble between the lawyers," he said.

Wilder's final word on his whereabouts April 2 is the linchpin of the defense attorney's contention "that everyone else is a liar," but the jury was free to disbelieve that account, especially after his earlier inconsistent testimony, Green Jacobson's motion says.

The jury's verdict is proof that Fram's claims are unreasonable; the defense attorney's closing argument was dominated by his attacks on the credibility of the plaintiffs' witnesses, the motion said.

"The jury heard all this and rejected the contention that plaintiffs' witnesses were all liars," the motion said.

The pilots did not lie, and the plaintiffs' attorneys did not coach them to lie, Jacobson said. He summed up his sentiments with a quote from his favorite lawyer movie: "My Cousin Vinny."

"Everything that guy said is bullsh--."