UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATRICK BRADY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2917 (JEI) |
| | ) | |
| AIR LINE PILOTS ASSOCIATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT AS A MATTER OF LAW**

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez
Nicole M. Acchione
258 Kings Highway East
Haddonfield, NJ 08033
(856) 795-9002

**GREEN JACOBSON, P.C.**
Martin M. Green
Joe Jacobson
Allen P. Press
Jonathan Andres
7733 Forsyth Boulevard
Suite 700 Pierre Laclede Center
St. Louis, Missouri 63105
(314) 862-6800

Dated: September 12, 2011

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

LEGAL ARGUMENT...................................................................................................1

I.  A Reasonable Juror Could Have Found That ALPA
    Breached Its Duty Of Fair Representation............................................................1

    A.  ALPA's Conflict of Interest...........................................................2

    B.  The March 28 and 29, 2001 Merger
    Committee Meetings.........................................................................3

    C.  The April 2, 2001 MEC Vote. ..........................................................5

    D.  Wilder's First Injunction Theory. ...................................................6

    E.  Woerth's "Get Real" Comment. ......................................................7

    F.  The Request For A Jump Seat War....................................................7

    G.  The Bond Bill....................................................................................8

    H.  Wilder's Other Litigation Theories..................................................9

    I.  Other Promises And Assurances....................................................10

II.  A Reasonable Juror Could Have Found That ALPA's Breach
    Of Its Duty Of Fair Representation Caused Injury in Fact. ...............................11

    A.  ALPA Recasts Plaintiffs' Claims in Order to Advance
    Its Arguments..................................................................................11

    B.  ALPA Confuses Injury with Damages. .........................................11

    C.  ALPA's Argument that it was Incumbent upon
    Plaintiffs to put on Evidence is without Support ..........................13

CONCLUSION.............................................................................................................16

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Anderson v. United Paperworkers Intern.,*
   641 F.2d 574 (8th Cir. 1981) ...................................................................12

*Aguinaga v. United Food and Commercial Workers,*
   993 F.2d 1463, 1470-71 (10th Cir. 1993)....................................................14

*Barber v. CSX Distributing Services,*
   68 F.3d 694 (3d Cir. 1995)......................................................................1

*CGB Occupational Therapy, Inc. v. RHA Health Services Inc.,*
   357 F.3d 375 (3d Cir. 2004)....................................................................1

*Cox. V. U.S. Steel,*
   17 F.3d 1386 (11th Cir. 1994) ................................................................14

*Deboles v. ALPA,*
   552 F.2d 1005 (3d Cir. 1977)..................................................................12

*Eastman Kodack v. S. Photo Materials, Co.,*
   273 U.S. 359 (1927)..............................................................................14

*Eshelman v. Agere Systems, Inc.,*
   554 F.3d 426 (3d Cir. 2009)....................................................................1

*Hecht v. Commerce Clearing House, Inc.,*
   897 F. 2d 21, 23-24 (2d Cir. 1990) .........................................................15

*Lewis v. Tuscan Dairy Farmers,*
   25 F.3d 1138 (2d Cir. 1994)....................................................................14

*Porter v. American Optical,*
   641 F.2d 1128, 1142 (5th Cir. 1981)........................................................13

*Rutherford v. American Bank,*
   565 F.2d 1162, 1164 (10th Cir. 1977).......................................................13

### STATE CASES

*Viner v. Sweet,*
   70 P.3d 1046 (S. Ct. CA. 2003) ..............................................................15

## PRELIMINARY STATEMENT

The standards for ruling on a motion under Rule 50(b) are familiar:

> [W]hether viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.... [I]n performing this narrow inquiry, we must refrain from weighing the evidence, determining the credibility of witnesses, or substituting our own version of the facts for that of the jury." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)(citations and internal quotations omitted)

*Eshelman v. Agere Systems, Inc.,* 554 F.3d 426, 433 (3d Cir. 2009). The Court should ultimately

"'determine whether the evidence and justifiable inferences most favorable to [the non-movant]

afford any rational basis for the verdict.'" *CGB Occupational Therapy, Inc. v. RHA Health*

*Services Inc.,* 357 F.3d 375, 383 (3d Cir. 2004), quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d

694, 698 (3d Cir. 1995).

ALPA cites this law, but makes no attempt to follow it. Its motion relies almost entirely

on its own evidence. Plaintiffs' evidence is simply disregarded. ALPA, in essence, asks the

Court to weigh the evidence, or rather ALPA's evidence, and substitute its judgment for that of

the jury. For this reason alone, the motion for judgment should be denied.

ALPA's motion is devoid of substantive merit. There was substantial evidence from

which the jury could reasonably find that ALPA breached its duty of fair representation to the

TWA pilots, and that its breach caused injury to TWA pilots. There is no basis to conclude the

jury did not have a rational basis for its verdict.

## LEGAL ARGUMENT

I.    **A Reasonable Juror Could Have Found That ALPA Breached Its Duty Of Fair Representation.**

ALPA argues there was no evidence from which the jury could have reasonably

-1-

concluded that ALPA acted arbitrarily or in bad faith. ALPA, minces Plaintiffs' evidence into nine supposedly discrete issues, and attempts to characterize these issues as separate "claims." This is not Plaintiffs' case.

Plaintiffs took a merger process that lasted 15 months, and presented evidence of all the misconduct ALPA engaged in during that process. That evidence provided a clearly rational basis for the jury to find that ALPA acted arbitrarily or in bad faith in defending the TWA pilots' seniority. ALPA, however, ignores Plaintiffs' evidence. This fundamental flaw in ALPA's motion is apparent starting with its introductory discussion of the liability issues. It references to the testimony of one of its witnesses, Steve Rautenberg, and states: "[t]hat Rautenberg – and others – agreed with the manner in which ALPA approached matters is ***conclusive proof*** that ALPA acted reasonably and responsibly and did not breach its duties to the TWA pilots." *ALPA's Mem.*, Doc. No. 419, p. 21 (emphasis added).

The statement is absurd on its face. It is as if Steve Rautenberg and the un-named "others" were the only witnesses who testified in the case. And neither Rautenberg's nor anyone else's opinions are conclusively binding on the jury. ALPA then presents a twenty-one page discussion of its evidence that improperly omits any of Plaintiffs' evidence. ALPA's refusal to apply the proper standard of review of Plaintiffs' evidence, is eloquent proof of the legal inadequacy of its motion.

### A.    ALPA's Conflict of Interest.

ALPA contends "it is undisputed that ALPA did not take any concrete steps to pursue the American pilots during the seniority integration dispute." *ALPA's Mem.*, at 23. Later, ALPA states that "the only evidence in Plaintiffs' case of on-going active interest on the part of ALPA

in the American pilots is the January 25, 2001 letter of Jalmer Johnson to the APA." *ALPA's Mem.*, at 32. These are inaccurate statements and a mischaracterization of the evidence and testimony introduced at trial.

The evidence showed that ALPA officials communicated regularly with the American campaign organizers, and that top ALPA executives met with those organizers. President Woerth received the campaign cards from American pilot John Clark in Las Vegas, and then treated him to a lavish dinner. An ALPA official then promised in writing to reimburse the American pilot organizers for the expenses they had incurred. That message was approved in advance by ALPA's legal and finance departments.

ALPA's witnesses admitted to these events[1], all of which took place while the TWA pilots were in the midst of their struggle with the American pilots, and none of which were disclosed to the TWA pilots at the time. The jury could have easily found that ALPA had a conflict of interest.

### B.      The March 28 and 29, 2001 Merger Committee Meetings.

The TWA MEC Merger Committee met with its American counter-part in Dallas on March 28 and made a seniority proposal. Two members of that committee, Captain Mike Day and Sean Clarke, testified to what happened when they returned to their hotel that evening. Day and Clarke testified that they were confronted by three ALPA officials who had arrived uninvited and who told them they had to make a new proposal the following morning to staple 825 TWA

---

[1] Ron Rinfleash finally admitted the fact that he had communications with American organizers too numerous to recount and that he agreed to pay them. His admissions, however, came during a second deposition after ALPA was compelled to produce the email traffic between ALPA and American organizers. During the first deposition he remembered nothing. His total lack of recall that was apparently subsequently refreshed and raised real issues as to his credibility.

pilots to the bottom of the American seniority list. They said this would get a deal done. Day and Clarke testified that a heated exchange ensued between the TWA Merger Committee members and the ALPA officials, and that the pilots yielded to their union. The following morning, the TWA Committee made a new proposal which offered to staple 400 TWA pilots. They offered this huge concession before the American pilots had even responded to the proposal made the previous day. The American pilots did not respond to the new proposal either. Day testified that he still regrets the fact that they yielded to the ALPA officials, and bid against themselves in this fashion.

Plaintiffs pointed to these facts as evidence of ALPA's hostility to the TWA pilots. These facts were also evidence of ALPA's violation of its policy of so-called "Independence Plus," a policy whereby the individual pilot groups are left to make their own decisions without ALPA's interference, but with its support. This was evidence of ALPA's arbitrariness and bad faith.

ALPA claims the evidence of what happened on March 28 does not show arbitrariness or bad faith because two of the three ALPA officials who were present at the meeting, David Holtzman and Clay Warner, "both denied that the Merger Committee was pressured." *ALPA's Mem.*, Doc. No. 419, p. 25. All this means is that Plaintiffs' evidence was disputed and thus presented an issue for the jury. The jury weighed the evidence and appropriately found ALPA's evidence not credible.

ALPA also argues that the evidence surrounding the March 28 meeting can not be evidence of bad faith because the Supplement CC merger terms ultimately imposed on the TWA pilots were worse than ALPA's demand to concede 825 pilots to the bottom of the list. This

conclusion does not follow logically from the evidence. The fact that 1,200 TWA pilots were ultimately stapled as a result of Supplement CC in November does not negate ALPA's bad faith breach of its duty of fair representation seven months earlier, in March, when the seniority negotiations had just begun.

### C.    The April 2, 2001 MEC Vote.

On April 2, 2001, the MEC voted to waive the scope provisions in ALPA's collective bargaining agreement with TWA. ALPA argues "there can be no claim that the advice given [that day] by the advisors other than Wilder ... was irrational or given in bad faith." *ALPA's Mem.*, Doc. No. 419, p. 29. Contrary to ALPA's declaration however, there was such a claim, and there was substantial evidence to support it.

Plaintiffs' introduced evidence that the MEC made its decision under enormous pressure from various ALPA officials and advisors to waive scope on April 2nd. This was a further violation of ALPA's policy of Independence Plus. But the unreasonable pressure imposed was not the only problem: the advisors' pressure included various false and misleading statements.

ALPA nevertheless claims "the ***undisputed*** facts refute any contention that any of the advisors, including any representatives of ALPA, made any misrepresentations or concealed material information during the course of providing advice" to the MEC. *ALPA's Mem.*, Doc. No. 419, at 27 (emphasis added). To say the facts were "undisputed" is fantasy. The facts were disputed. There was substantial evidence in this regard. Two examples suffice.

Plaintiffs' witnesses testified that the ALPA advisors told the MEC that the TWA pilots would have no right to strike if the bankruptcy court rejected ALPA's collective bargaining agreement. In opposing the 1113 motion, however, ALPA stated that the right to strike was

-5-

"clear." In applying for its legal fees in the bankruptcy court, ALPA justified its request for fees by contending as fact that it had helped avoid a strike by securing the scope waiver.

Plaintiffs' witnesses also testified that the MEC was told that a decision on waiver had to be made that day – that the "train was leaving the station." TWA's so-called "offer," however, was to remain open for several days, until April 6, when the 1113 hearing was scheduled to begin. ALPA's own witness, Randy Babbitt, testified that there would be no need to waive scope on April 2 if the MEC had more time. And ALPA's bankruptcy lawyer, Richard Seltzer, testified that one could ask the bankruptcy court to postpone the hearing. This option was not disclosed to the MEC.

The jury could have easily found that the ALPA advisors misrepresented and concealed material facts about the right strike and the need for an immediate decision in their statements to the TWA MEC.

### D.    Wilder's First Injunction Theory.

The MEC's Merger Counsel, Roland Wilder, was retained to, among other things, bring legal action to protect the TWA pilots. The first litigation he sought to pursue was an equitable action to enjoin the closing of the American-TWA transaction until after the TWA pilots' then-pending grievance against TWA was heard. He sought ALPA's authorization to file suit. That authorization never came, and ALPA argues that "no reasonable jury could have found that ALPA acted irrationally in declining to pursue" Wilder's strategy. *ALPA's Mem.*, Doc. No. 419, at 30. This argument misses the point.

Plaintiffs' evidence showed that ALPA historically was willing to engage in uncertain litigation to advance its members' goals. A memo from the head of ALPA's legal department

-6-

noted that ALPA had offered to sue TWA on behalf of the Ozark pilots even though the likelihood of success was "slim."

Plaintiffs' also showed the commitments from President Woerth made to the TWA pilots to pursue "legal venues for support," and that ALPA would bring litigation "if there were any basis for litigation." Wilder testified that ALPA's rejection of his strategies was a "singular" experience in his lengthy career representing the union.

These facts of ALPA's custom and usual practice, and its stated commitment to the TWA pilots, stood in stark contrast to ALPA's actions in rejecting all of Wilder's strategies, and were thus competent evidence of its arbitrary conduct.

### E.   Woerth's "Get Real" Comment.

ALPA argues, "the record is devoid of any *credible* evidence that Woerth made the alleged 'get real' comment." *ALPA's Mem.*, Doc. No. 419, at 34 (emphasis added). Here again, ALPA turns Rule 50 on its head. The question is whether there was evidence of such a statement made by Woerth. An American pilot, Robert Reifsnyder, who attended the meeting reported on Woerth's statement shortly after it was made. He testified by deposition that he did not recall Woerth's statement, but that if he reported on it at the time, then the statement must have been made. The jury was free to believe this testimony, or to discredit it, but in either case it presented a question of fact for the jury to decide.

### F.   The Request For A Jump Seat War.

ALPA argues that no "reasonable jury could have found that ALPA acted irrationally or in bad faith in failing to begin a 'jump seat war.'" *ALPA's Mem.*, Doc. No. 419, at 34. Day, however, testified that he asked ALPA to merely threaten a jump seat war, not "begin" one as

-7-

ALPA claims. He testified that the threat alone would have created leverage his Merger
Committee sorely needed, but ALPA refused to do even that. Further, although ALPA went to
great lengths to show that a jump seat war was a "knuckle-headed" idea, its evidence was
impeached and refuted in dramatic fashion that called into question the credibility of ALPA
witnesses, including Woerth.

ALPA's proffered excuse for rejecting the idea of a jump seat war was that it does not use
the cockpit jump seat for "political" reasons. Plaintiffs' evidence showed that this was not true.
ALPA engaged in a jump seat war with another pilot group in the past, and ALPA kept scabs out
of the jump seat. Woerth was asked about this on cross examination. In the course of that
questioning, Woerth adamantly denied that ALPA ever had a scab list. He said it would be
"illegal" to have a scab list. Seth Rosen, however, later admitted that ALPA in fact distributed a
scab list to all of its members. Rosen's contradiction of Woerth on this important point called
into question everything ALPA's witnesses said about the jump seat. A jury could have easily
found it was irrational and in bad faith to reject the TWA pilots' request to threaten, and if
necessary engage in, a jump seat war.

     **G.    The Bond Bill.**

Plaintiffs presented evidence of ALPA's political and lobbying might, and that none of its
power was employed to support the Bond Bill. Plaintiffs' witnesses testified to their grass roots
efforts to get the Bill passed. The pilots who spear-headed that effort asked for ALPA's help, but
received none. In fact, the Chairman of the MEC's Legislative Affairs Committee was treated
with hostility by Woerth on Capitol Hill. And when the Bill passed the Senate in early
December, ALPA began denying the TWA pilots' claims for flight pay loss associated with their

continuing lobbying efforts.

ALPA had a schizophrenic response to this evidence. ALPA first claimed at trial that it did support the Bond Bill; it then chastised the Bill as "special legislation" and minimized the Bill's importance in light of the event of 9/11. It even attempted to show that the Bill would hurt the TWA pilots if passed. ALPA now recognizes that it did not support the Bill, and argues in its motion that "it was eminently reasonable for ALPA to conclude, in early December of 2001, that further efforts to push the Bond Bill might harm the TWA pilots and to discourage further lobbying efforts. No reasonable jury could conclude otherwise." *ALPA's Mem.*, Doc. No. 419, at 37. Twelve jurors did.

The only evidence to suggest the Bond Bill might harm the TWA pilots was ALPA's evidence that Jeff Brundage told the MEC that American would shut down TWA if the Bill passed. No TWA pilot believed that threat was real, and the jury was free to disbelieve it as well.

### H.   Wilder's Other Litigation Theories.

Roland Wilder proposed two separate litigation strategies after the scope waiver: one in July 2001, and another in September. As ALPA points out, Wilder recognized that each strategy was a long-shot. But again, this misses the point. ALPA's custom, and its stated commitment to the TWA pilots, to use litigation even if success was unlikely, stood in stark contrast to ALPA's actions in rejecting all of Wilder's strategies. Thus this was competent evidence of its arbitrary conduct.

The evidence concerning Wilder's strategy devised in September, however, went further. That strategy was to enjoin the cram down. ALPA would pursue a grievance against American for having breached its agreement to use its "reasonable best efforts," and Wilder would seek an

-9-

injunction to prevent American and APA from imposing any cram down in order to preserve the status quo while that grievance was pending.

This strategy was discussed with ALPA legal and President Woerth. Wilder and the MEC were told that the litigation could be pursued when the time was right, *i.e.* when the cram down was imminent. That day came October 23, 2001, when seniority negotiations finally broke down. On that day, Woerth reneged, and said he would not authorize the injunction action. The jury was free to believe this was an act of betrayal – just as the TWA pilots did.

ALPA ignores this evidence, and argues that the suit proposed was moot. It states, "despite all the talk and all the emotion about that lawsuit, it was moot and *filing* it would have been an act of bad faith." *ALPA's Mem.*, Doc. No. 419, at 39 (emphasis in original). This is false. On October 23, 2001, a suit to enjoin the cram down was as ripe as any case could be. Woerth did not renege because the case was moot. He reneged because the suit did not fulfill ALPA's "agenda," as Roland Wilder testified.

ALPA's rejection of Wilder's litigation strategies was competent evidence that ALPA acted arbitrarily and in bad faith.

### I.    Other Promises And Assurances.

Plaintiffs' evidence showed that ALPA broke its promise to the TWA pilots to "leave no stone unturned," and many other promises to support the TWA pilots. ALPA nevertheless argues "there is no question that ALPA provided substantial support to the TWA pilots." *ALPA's Mem.*, Doc. No. 419, at 42.

ALPA made the same argument at trial, but there was scant evidence of any actual support from the union. Plaintiffs' evidence was that ALPA provided nothing but "lip service."

-10-

It did nothing which provided any leverage for the TWA pilots in their seniority dispute with the American pilots, and instead, arbitrarily rejected every attempt made by the TWA pilots to create any leverage.  This is not "substantial support."

## II.    A Reasonable Juror Could Have Found That ALPA's Breach Of Its Duty Of Fair Representation Caused Injury in Fact.

### A.    ALPA Recasts Plaintiffs' Claims in Order to Advance Its Arguments.

As with much of its post-trial briefing ALPA attempts to mischaracterize Plaintiffs' claims in order to attack them.  One such example is the statement:

> In this case, all of Plaintiffs' claims were premised on the assertion that American Airlines and the APA might have acted differently if the TWA MEC or if ALPA had been more aggressive.

That statement does not describe Plaintiffs claims or the evidence introduced at trial.  Plaintiffs claimed that ALPA failed to disclose that it was courting the American pilots to join ALPA at the very time the TWA pilots were engaged in the biggest career challenge they had ever faced.  While ALPA was providing lip service, claiming that it was doing everything with in its power to assist the TWA pilots in the seniority integration efforts, its actions and its words to the American pilots was directly contrary.  ALPA's actions so infected the seniority process that it was impossible for the TWA pilots to achieve a fair seniority integration.

The jury heard all the evidence and found that ALPA's actions violated its duty to the TWA pilots and that the breach caused injury to TWA pilots.  That was all that was required in the liability phase of this bifurcated action.

### B.    ALPA Confuses Injury with Damages.

ALPA's causation argument merges the issue of injury with that of damages.  Having

-11-

initially sought bifurcation of the liability and the damages phases of the litigation, ALPA attempts to use the lack of proof of actual damages, or a damage theory, as a shield against finding ALPA liable for a DFR. ALPA relies on an inaccurate reading of *Deboles v. ALPA*, 552 F. 2d 1005 (3d Cir. 1977), to support its argument.

In *Deboles* the employees alleged that the collective bargaining agreements provided the TWA Kennedy Space Center employees with seniority rights inferior to those enjoyed by employees else where in the TWA system, and that this violated the duty of fair representation. After a nonjury trial the court found that the seniority provisions of the collective bargaining agreement were not discriminatory and did not violate the union's duty of fair representation. The court, however, found that the union breached its duty of fair representation when it made misstatements about the efforts to achieve a more equitable seniority system. The court imposed DFR liability simply on the fact of the union misstatement alone. This finding came after determining there was no issue with the two tier seniority system. *Deboles*, did not create a detrimental reliance standard in its DFR analysis as urged by ALPA.

*Anderson v. United Paperworkers Intern.*, 641 F. 2d 574 (8th Cir. 1981), likewise does not support ALPA's position. *Anderson,* blurs the issues of injury and damages as it tries to craft a "but for" requirement to proving damages for a DFR. The issue before the court in *Anderson,* was a misrepresentation by the Union that an employer had specific reserves set aside for severance pay. The employer went bankrupt and the employees received only portion of the severance pay to which they were entitled. The court made specific factual findings, including a finding that during the contract negotiations the employees did not appear to be specifically concerned about the existence of a severance pay fund to justify their contention at trial that they

-12-

would have gone on strike if they knew the employer did not have an adequate severance benefit fund. The court found that the union could not be liable for the company's failure to make severance payments when it filed for bankruptcy. The actual damages resulted because the company failed to meet its obligation, not because the union made general representations about the fund. 641 F. 2d at 580.

ALPA next tries to boot strap its causation arguments by analogizing this case to one arising under the Robinson-Patman Act, for price discrimination. There is no proper analogy to be made to cases arising out of the antitrust laws. But ALPA's novel attempt to find one again confuses the issue of injury of fact with that of damages. It also ignores established case law that in a "but for" test, causation can always be inferred from circumstantial evidence. *See Porter v. American Optical,* 641 F.2d 1128, 1142 (5th Cir. 1981)(under federal standard for sufficiency of the evidence, plaintiff may prove causation by circumstantial evidence); *Rutherford v. American Bank*, 565 F.2d 1162, 1164 (10th Cir. 1977)("[I]nferences from circumstantial facts may frequently amount to 'full proof' of a given theory and may …be strong enough to overcome … direct testimony to the contrary.").

### C.     ALPA's Argument that it was Incumbent upon Plaintiffs Present Evidence from American and APA Mistates Relevant Law.

ALPA advances an argument, again without support, that if accepted would serve to provide a level of insulation for a defendant not contemplated by any reasonable analysis of causation. ALPA claims that the only way Plaintiffs could prove damages was by calling American and APA as witnesses to testify about what they would have done if ALPA had been more aggressive. The argument fails for at least two reasons.

-13-

First, ALPA tainted the process on so many levels and on so many occasions that it is unclear what the process would have been if not infected. That is why cases like *Lewis v. Tuscan Dairy Farmers*, 25 F.3d 1138 (2d Cir. 1994) and *Aguinaga v. United Food and Commercial Workers*, 993 F.2d 1463, 1470-71 (10th Cir. 1993) are instructive.[2] Here   we are not speaking about one union misstatement and trying to determine the impact that statement had. Rather, Plaintiffs were unable to achieve a fair seniority integration because of ALPA's conflict of interest which infected the entire process.

Second, American and APA are parties with interests adverse to the TWA pilots. They were initially Defendants in this litigation. One need look no further than to the testimony of Brundage, which ALPA claims to have been excluded in error, to see that it was not in American's interest to aid the TWA pilots.

This issue of seeking causation testimony from an adverse party was recognized by the Court in *Eastman Kodack v. S. Photo Materials, Co.,* 273 U.S. 359 (1927) in which the Court held:

> A defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by plaintiffs, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.

*Id.* at 379.

The issue of causation in circumstances analogous to this case arose in *Cox. v. U.S. Steel*, 17 F. 3d 1386, (11th Cir. 1994). There, union negotiators told a company negotiator that they would only sign an agreement if they were granted personal concessions. These concessions were agreed to but not disclosed. Plaintiffs sued claiming that the agreement that was finally

---

[2]    For a more detailed discussion on these cases, please see Plaintiffs' Memorandum in

-14-

signed was less favorable to them as a result of the private concessions, causing them to be damaged. The court began its analysis by noting that the plaintiffs need not prove that the actions of the union members caused all the concessions in the agreement, or that economic condition had no impact on the negotiations. 17 F. 3d at 1399. Plaintiffs need only show that the factor complained of was a "substantial factor in the sequence of responsible causation" *Id.* (citing *Hecht v. Commerce Clearing House, Inc.*, 897 F. 2d 21, 23-24 (2d Cir. 1990)).

> The court went on to hold:
>
> Here, although there may be no direct evidence that the union negotiators made concessions to obtain personal pension benefits, there is a great deal of circumstantial evidence that could lead a reasonable jury to that conclusion.

17 F. 3d at 1400.

Thus, the court recognized that it is appropriate for the jury to consider the circumstantial evidence offered at trial and to infer causation.

The specific issue of relying on an adverse party for proof of causation was before the court in *Viner v. Sweet*, 70 P. 3d 1046 (S. Ct. CA. 2003), an attorney malpractice action. There the court considered the plaintiffs difficulty in proving causation if required to obtain testimony from other parties to the transaction, who have since become their adversaries, to show that they would have granted more favorable terms "but for" the attorney's malpractice. The court found the plaintiff may use circumstantial evidence, and that it was unnecessary for an express concession, by other parties to the negotiation, that they would have accepted other terms. *Id.* at 1053.

## CONCLUSION

For the forgoing reasons, Defendant's Motion for Judgment as a Matter of Law should be

denied.

Dated:  September 12, 2011          Respectfully submitted,

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**

By:   s/ Lisa J. Rodriguez
      Lisa J. Rodriguez
      Nicole M. Acchione
      258 Kings Highway East
      Haddonfield, NJ  08033
      (856) 795-9002

**GREEN JACOBSON, P.C**
Martin M. Green
Joe Jacobson
Allen P. Press
Jonathan Andres
Pierre Laclede Center, Suite 700
7733 Forsyth Boulevard
St. Louis, Missouri 63105
(314) 862-6800

-16-