# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

PATRICK BRADY, et al.,

                    Plaintiffs,

      v.

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,

                  Defendant.

Civil Action No. 02-2917 (JEI)

---

## BRIEF OF DEFENDANT IN RESPONSE TO
## PLAINTIFFS' MOTION FOR RULE 11 SANCTIONS

---

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By:    Steven J. Fram, Esquire
         John C. Connell, Esquire
         Kerri E. Chewning, Esquire

*Pro Hac Vice*:

    Daniel M. Katz, Esquire
    Katz & Ranzman, P.C.
    4530 Wisconsin Ave., N.W., Suite 250
    Washington, DC 20016
    (202) 659-4656

Attorneys for Defendant
    Air Line Pilots Association, International

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

PROCEDURAL AND FACTUAL BACKGROUND ......................................................... 2

A.  The Revocation Motion Establishes Serious Misconduct Both Before And During Trial With Respect to Four Issues ........................................................ 2

    1.  Plaintiffs' Counsel Improperly Relied Upon Wilder's False Testimony and Disregarded His Corrected Testimony ............................. 3

    2.  The Plaintiffs' Pilot Witnesses Gave False Testimony at Trial With Respect To Key Events Leading Up To April 2, 2001 .............................. 3

    3.  Hollander Also Gave False Testimony Concerning April 23, 2001 .......... 4

    4.  Press Engaged In Misconduct During His Closing .................................... 4

B.  The Facts Do Not Support the Arguments Contained In The Rule 11 Motion ................................................................................................................ 5

    1.  The Rule 11 Motion Does Not Dispute Most Of The Misconduct Documented In The Revocation Motion .................................................... 6

    2.  There Is No Basis For Asserting That The Jury Credited The False Testimony Of The Plaintiffs' Pilot Witnesses ............................................ 8

    3.  Plaintiffs Misstate The Evidence By Asserting That Wilder Remained "Confused." ................................................................................ 8

    4.  There is No Factual Basis for Plaintiffs' Argument That Wilder Doctored His Bills ..................................................................................... 9

    5.  The Rule 11 Motion Misrepresents The Testimony of Other Witnesses ................................................................................................. 11

ARGUMENT ..................................................................................................................... 17

CONCLUSION .................................................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Agacoili v. Gonzo,
  2010 WL 606697 (D.N.J. Feb. 18, 2010) ...............................................................22

Alberti v. Klevenhagen,
  896 F.2d 927 (5th Cir. 1990) ................................................................................11

Bensel v. Allied Pilots Ass'n,
  675 F. Supp. 21 493 ..............................................................................................18

Hawaiian Shippers, Inc. v. Midland W., Inc.,
  2011 WL 1832559 (D.N.J. May 13, 2011) ...........................................................17

Hensley v. Eckerhart,
  461 U.S. 424 (1983) ..............................................................................................10

Leroy v. City of Houston,
  831 F.2d 576 (5th Cir. 1987) ................................................................................11

Saizan v. Delta Concrete Products Co., Inc.,
  448 F.3d 795 (5th Cir. 2006) ................................................................................11

Sakhrani v. Escala,
  2006 WL 2376746 (D.N.J. Aug. 16, 2006) ...........................................................22

Teamsters Local Union No. 430 v. Cement Exp., Inc.,
  841 F.2d 66 (3d Cir. 1988) ...................................................................................17

Thomas v. Ford Motor Co.,
  137 F.Supp.2d 575 (D.N.J. 2001) .........................................................................22

United States v. American Investors of Pittsburgh, Inc.,
  879 F.2d 1087 (3d Cir.), cert. denied, 493 U.S. 955 (1989) ...................................6

United States v. Kapp,
  781 F.2d 1008 (3d Cir.), cert. denied, 479 U.S. 821 (1986) ....................................7

United States v. McGlory,
  968 F.2d 309 (3d Cir. 1992) ...................................................................................7

United States v. Wexler,
  838 F.2d 88 (3d Cir.1988) ......................................................................................6

Walker v. U.S. Dept. of Housing and Urban Development,
    99 F.3d (5th Cir. 1996) ...........................................................................................11

Winget v. Corporate Green, LLC,
    2011 WL 2173840 (M.D. La. May 31, 2011) ........................................................11

**STATE CASES**

Hawkins v. Harris,
    141 N.J. 207 (1995) .................................................................................................22

Loigman v. Twp. Comm. Of the Twp. of Middletown,
    185 N.J. 566 (2006) .................................................................................................22

**RULES**

L. Civ. R. 104.1(e) ...........................................................................................................20

Fed. R. Civ. P. 11...................................................................................................passim

Fed. R. Civ. P. 11(c)(2) ...............................................................................................1, 22

RPC 3.3............................................................................................................................19

RPC 3.4............................................................................................................................19

RPC 8.3.......................................................................................................................19, 20

RPC 8.4............................................................................................................................19

**OTHER AUTHORITIES**

Hazard & Hodes, The Law of Lawyering (Aspen Law & Business 2011)....................20

Joseph F. McSorley, A Portable Guide to Federal Conspiracy Law (ABA 2d ed. 2003)...............7

Defendant, Air Line Pilots Association, International ("ALPA"), and its counsel, Steven J. Fram, Esquire and Archer & Greiner, P.C., submit this Brief in opposition to the motion for Rule 11 sanctions that was filed by Plaintiffs' counsel on September 6, 2011.

## INTRODUCTION

Plaintiffs' Rule 11 Motion is an ill-considered and unsupportable reaction to ALPA's Motion to Revoke the *Pro Hac Vice* admissions of Allen Press and Joe Jacobson (the "Revocation Motion"). ALPA's Revocation Motion, which was filed on August 10, 2011, along with ALPA's post-trial motions for judgment notwithstanding the verdict or, in the alternative, for a new trial, demonstrated that Press and Jacobson presented false testimony concerning the events leading up to and on April 2, 2001, presented false testimony concerning the events of April 23, 2001, and engaged in misconduct during closing argument, including by misstating evidence and improperly "vouching" for Plaintiffs' witnesses.

The Rule 11 Motion asserts that ALPA's counsel made factual contentions that lack proper evidentiary support and submitted the Revocation Motion for an improper purpose. As discussed below, the Rule 11 motion focuses on testimony concerning the events of April 1 and April 2 but makes no effort to address – much less contest – the other misconduct identified in the Revocation Motion.

Because the Rule 11 Motion fails to identify a single fact in the Revocation Motion that is not accurate and fails even to suggest that counsel for ALPA did not undertake a proper investigation, and because there is no basis for asserting that ALPA's counsel acted with an improper motive, the Rule 11 Motion must be denied. Indeed, because the Rule 11 Motion misstates numerous facts and was itself apparently filed in undue haste and for improper purposes, the Court should exercise its discretion, pursuant to Fed. R. Civ. P. 11(c)(2), to award

1

ALPA its reasonable expenses, including attorney's fees, incurred in responding to the Rule 11 Motion.

## PROCEDURAL AND FACTUAL BACKGROUND

ALPA hereby repeats and incorporates as if set forth at length herein the procedural history, facts and arguments set forth in the Revocation Motion. That motion summarized extensive evidence of misconduct by lead trial counsel for Plaintiffs, Press and Jacobson, both before and during the liability trial of this action.

**A.     The Revocation Motion Establishes Serious Misconduct Both Before And During Trial With Respect to Four Issues.**

The Revocation Motion demonstrated that Roland Wilder, former merger counsel for the TWA-MEC, gave inaccurate testimony when his deposition was taken by Press in this case on August 8, 2008. Wilder had previously testified in a deposition in Missouri state court litigation brought against certain members of the TWA-MEC that he did not meet with the TWA-MEC and other advisors on April 2, 2001, and in fact was in Louisville on that date. Despite that testimony, during his deposition in this case on August 8, 2008, Wilder testified, while being examined by Press, that he was in St. Louis and met with the TWA-MEC and other advisors on April 2, 2001. The Revocation Motion pointed out that both Wilder and Press, who had in their possession the invoice sent by Wilder's firm to the TWA-MEC for April 2001 by virtue of their involvement in the Missouri litigation, should have known, at the time of Wilder's deposition in this case, that Wilder did <u>not</u> meet with the TWA-MEC in St. Louis on April 2, 2001. Revocation Br. at 6-7 [Docket # 417].

The Revocation Motion noted that Wilder corrected his deposition testimony in an Affidavit dated February 20, 2009. That Affidavit definitively confirmed that Wilder was in

Louisville, not St. Louis, on April 2.  The supporting documents attached to Wilder's Affidavit included portions of his Day-Timer and travel records.  Revocation Br. at 6-9.

> **1.      Plaintiffs' Counsel Improperly Relied Upon Wilder's False Testimony and Disregarded His Corrected Testimony.**

The Revocation Motion noted that despite this incontrovertible evidence, Plaintiffs' counsel not only persisted in relying upon Wilder's false testimony in his August 8, 2008 deposition, both in opposing ALPA's motion for summary judgment and in Plaintiffs' portions of the Joint Final Pre-Trial Order, but also actively obstructed ALPA's efforts to take a supplemental deposition of Wilder so that accurate testimony could be presented at trial concerning the events leading up to April 2, 2001.  Revocation Br. at 10-11.  Even after the Court granted ALPA's counsel leave to take a supplemental deposition and Wilder confirmed, during that deposition on March 21, 2011, that he was "100% certain" that he was not in St. Louis on April 2, 2001, counsel for Plaintiffs insisted on presenting Wilder's false testimony to the jury during trial.  Revocation Br. at 11.  Plaintiffs' counsel also misleadingly argued, throughout trial, and in disregard of Wilder's Affidavit and March 21, 2011 deposition, that Wilder continued to be confused or mistaken concerning his whereabouts on April 2, 2001. Revocation Br. at 21.

> **2.      The Plaintiffs' Pilot Witnesses Gave False Testimony at Trial With Respect To Key Events Leading Up To April 2, 2001.**

The Revocation Motion also demonstrated that a number of the pilot witnesses presented by Plaintiffs gave different testimony at trial than they had during their depositions concerning the events of April 2, 2001, including concerning the issue of whether Wilder was present.  At trial, all of the pilot witnesses called by Plaintiffs gave lockstep testimony to the effect that Wilder was definitely present on April 2.  Moreover, a number of those pilot witnesses claimed to have vivid recollections of specific aspects of the meeting on April 2 that they had not recalled

during their depositions, recollections that happened to conform closely to the testimony of the other Plaintiffs' pilot witnesses. Revocation Br. at 12-15.

The Revocation Motion also pointed out that the Plaintiffs' pilot witnesses testified uniformly that none of them attended the work session on April 1, 2001, and that this testimony directly contradicted the testimony not only of ALPA's witnesses, including pilot Steve Rautenberg, but also of Wilder himself. The Revocation Motion further demonstrated that the efforts of the Plaintiffs' pilot witnesses to coordinate their testimony extended to the TWA-MEC meetings that took place on March 21 and 22, 2001. The Plaintiffs' pilot witnesses all conceded that they were present at those meetings but testified uniformly that they did not recall which advisors were present or the specifics of any of the advice provided. The Revocation Motion noted the extraordinary nature of this collective amnesia concerning the critically important events leading up to April 2, 2001. Revocation Br. at 15-16.

### 3. Hollander Also Gave False Testimony Concerning April 23, 2001.

The Revocation Motion further established that Howard Hollander testified falsely at trial that he was present at a meeting of the TWA-MEC on April 23, 2001. Both Hollander and Jacobson, who presented him as a witness, plainly knew, from the official minutes of that meeting, that Hollander was <u>not</u> present at the MEC meeting on April 23 and that his testimony was false. Revocation Br. at 17-20.

### 4. Press Engaged In Misconduct During His Closing.

The Revocation Motion further documented that Press relied upon false testimony during his closing, that he misstated other testimony and evidence during trial, including testimony given by Richard Seltzer, that he mischaracterized Wilder's testimony concerning the events of April 1 and 2, 2001, and that he improperly expressed his personal opinion concerning the credibility of the Plaintiffs' pilot witnesses.

The Revocation Motion was electronically filed on August 10, 2011, at 8:24 P.M., along with an extensive Declaration that included all of the transcripts and other documents it cited. On Friday, August 12, 2011, less than two days later, Nicole M. Acchione, one of the attorneys representing Plaintiffs, sent a letter to ALPA's lead trial counsel, Mr. Fram, in which she demanded that the Revocation Motion be withdrawn within forty-eight hours. See Fram Declaration at ¶ 31 and Exh. C thereto.

The following Tuesday, August 16, 2011, counsel for Plaintiffs served ALPA's counsel with their Rule 11 Motion. After counsel for ALPA declined to withdraw the Revocation Motion, Plaintiffs' counsel filed their Rule 11 Motion on September 6, 2011. [Docket # 442].

**B.     The Facts Do Not Support the Arguments Contained In The Rule 11 Motion.**

The Rule 11 Motion asserts that ALPA's counsel violated Rule 11 in two respects by filing the Revocation Motion. First, the motion accuses ALPA's counsel of submitting a motion that lacks proper factual support in violation of Rule 11(b)(3), which requires that "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Second, the motion asserts that counsel for ALPA filed the Revocation Motion for an improper purpose in violation of Rule 11(b)(1), which gives as examples of improper purposes, "to harass, cause unnecessary delay, or needlessly increase the cost of litigation." The Rule 11 Motion does not argue that the Revocation Motion is not supported by proper legal authority. As discussed below, the Rule 11 Motion itself fails to cite any cases or other authorities with respect to the substantive issues raised by the Revocation Motion.

### 1.    The Rule 11 Motion Does Not Dispute Most Of The Misconduct Documented In The Revocation Motion.

Although the Revocation Motion outlined a broad range of misconduct on the part of Plaintiffs' counsel before and during trial, the Rule 11 Motion only takes issue with ALPA's contention that counsel for Plaintiffs presented false testimony concerning a single issue: whether Wilder was present on April 2, 2001. In arguing with respect to the events of April 2, 2001, the Rule 11 Motion does not contest the accuracy of any of the transcripts or other evidence relied upon by the Revocation Motion. What the motion seems to argue instead, is that the conclusion drawn by ALPA and its counsel – that the carefully coordinated testimony of the Plaintiffs' pilot witnesses resulted from improper witness coaching – is unwarranted. When witnesses who testified differently during deposition are (1) all prepared to testify by the same attorneys; (2) all suddenly recall a wide range of things the same way at trial and likewise all have the same lapse of memory concerning important events; (3) change their deposition testimony so that it is consistent; (4) give testimony that is contradicted by undisputed documents; and (5) contradict the testimony of other witnesses who have no incentive to be untruthful, it is difficult to avoid the conclusion that they have agreed to tell the same story. Any attempt to argue that these witnesses did not conform their testimony in an effort to overcome Wilder's 100% certain testimony and his supporting documents – and therefore give false testimony – cannot be accepted.

The law of conspiratorial agreements is instructive. The elements of proof of a conspiracy are "a 'unity of purpose,' intent to achieve a common goal, and an agreement to work together toward that goal." United States v. Wexler, 838 F.2d 88, 90–91 (3d Cir.1988); see also United States v. American Investors of Pittsburgh, Inc., 879 F.2d 1087, 1100 (3d Cir.), cert. denied, 493 U.S. 955 (1989). It is well settled that all of these elements may be established

6

entirely by circumstantial evidence.  United States v. McGlory, 968 F.2d 309, 321-22 (3d Cir.

1992).  See also United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir.), cert. denied, 479 U.S. 821

(1986) ("[T]he existence of a conspiracy can be inferred 'from evidence of related facts and

circumstances from which it appears as a reasonable inference, that the activities of the

participants ... could not have been carried on except as the result of a preconceived scheme or

common understanding'") (quoting United States v. Ellis, 595 F.2d 154, 160 (3d Cir.), cert.

denied, 444 U.S. 838 (1979)).

     Indeed, unlawful agreements are almost never proven through explicit agreements but

instead are invariably proven circumstantially.  As one commentator has noted:

> Formal documents that prove the existence of an agreement to engage in
> criminal conduct are rarely found.  Since a conspiracy is characterized by secrecy
> in origin and execution, it is usually difficult to prove except by inferences drawn
> from the conduct of the parties.  Thus the law does not require an agreement be
> formal, explicit, or written.  How does one prove an "agreement"?  An agreement
> is almost always proven by circumstantial evidence and may be inferred from
> evidence of concert of action from persons working together with a common
> design, purpose, and understanding. . . .
>
> An agreement may be inferred from "the working relationship between the
> parties that has never been articulated but nevertheless amounts to a joint criminal
> enterprise." . . . Evidence that shows that alleged conspirators committed acts
> "that are unlikely to have been undertaken without an agreement" permits an
> inference that there was a meeting of the minds.

Joseph F. McSorley, A Portable Guide to Federal Conspiracy Law (ABA 2d ed. 2003) at 12-13

(numerous citations omitted).

     The only reasonable inference that can be drawn in this case, not just from the Plaintiffs'

pilots' testimony concerning the events of April 1 and 2, 2001, but also from their coordinated

loss of memory concerning the meetings of March 21 and 22, 2001, is that an agreement was

reached to tell a story at trial rather than the truth.

    **2.**    **There Is No Basis For Asserting That The Jury Credited The False Testimony Of The Plaintiffs' Pilot Witnesses.**

The Rule 11 Motion relies heavily on a truly extraordinary assertion:  that the liability jury "heard . . . and rejected the contention that Plaintiffs' witnesses were all liars."  Rule 11 Br. at 2.  This statement is absurd.  To begin with, the jury was never asked to address the issue of whether the Plaintiffs' witnesses were liars.  Nor was it permitted to address the issue of whether ALPA breached its duty of fair representation in connection with the vote on April 2, 2001, as ALPA had requested.  Instead, the verdict sheet only gave the jury the opportunity to address two discrete issues:  whether ALPA breached its duty of fair representation, and whether that breach caused injury to "some of" the TWA pilots.

There is no basis for asserting that the jury decided that Wilder was present on April 2, 2001, much less that it agreed with the false testimony relied upon by Plaintiffs' counsel and "rejected" ALPA's position.  To the extent any jurors did credit the testimony of the Plaintiffs' pilot witnesses on the issue of April 2, 2001, that simply confirms that ALPA was severely prejudiced by the presentation of false testimony at the time of trial.

    **3.**    **Plaintiffs Misstate The Evidence By Asserting That Wilder Remained "Confused."**

Equally devoid of any factual basis is the Rule 11 Motion's continuing attempt to suggest that Wilder remained confused about whether he was present on April 2, 2001, and that "Wilder was simply forgetful or mistaken" in stating that he was in Louisville and not St. Louis on April 2, 2001.  Rule 11 Br. at 6.  See also id. at 4 (referring to the "illogical and unreasonable premise that the Court is required to accept Wilder's final word on the subject as incontestably accurate").  Indeed, this argument does nothing more than repeat one of the instances of misconduct.

8

Plaintiffs' continued reliance upon Wilder's inaccurate testimony on August 8, 2008, and their characterization of his correcting affidavit and his definitive testimony on March 21, 2011, as a "subsequent flip-flop" cannot be justified. Both Wilder and Press knew, when Wilder was deposed on August 8, 2008, that Wilder's prior testimony in the Missouri litigation concerning his whereabouts on April 2 was inconsistent to the extent that he had testified in his deposition in that litigation that he was not present on April 2, 2001, but had testified at trial that he was. Both also knew that Wilder's bill to the TWA-MEC, which both had in their possession, would have fully and definitely resolved this inconsistency. Despite this, Wilder apparently did not take the time to review his Day-Timer or his bill, and Press apparently did not show him the bill or request that Wilder review it. When Wilder subsequently went back, at the insistence of ALPA's counsel, and reviewed his Day-Timer and other relevant records, he established, with "100% certainty," that he was not present on April 2, 2001. Once Wilder definitively corrected his August 8, 2008 deposition testimony (and his trial testimony in Missouri), it was improper – and a violation of R.P.C. 3.3 – for Plaintiffs' counsel to rely upon that false testimony for its truth and to argue, as they did, that Wilder remained confused about the issue. Wilder was forgetful and mistaken in his testimony of August 8, 2008. He was not forgetful or mistaken in his Affidavit or supplemental deposition when he had documented facts at hand.

### 4. There is No Factual Basis for Plaintiffs' Argument That Wilder Doctored His Bills.

The Rule 11 Motion also suggests that Wilder's time entry for April 2, 2001, which refers only to phone conferences and which shows his time as 1.6 hours, may have excluded narrative indicating that he attended the TWA-MEC meeting on that date and that his office may have billed the MEC for less time than he spent because Wilder exercised "billing judgment" and did not bill the MEC for all of his time. Rule 11 Br. at 5. There are two basic problems with this

suggestion.  First, it is directly contrary to Wilder's testimony about how he prepared his bills. Wilder testified that he tracked his time and described his services by making contemporaneous entries in his Day-Timer.  Upon returning to his office, he then transferred the narratives and time amounts from his Day-Timer into his firm's billing system.  See Fram Declaration at ¶ 34 and Exh. F thereto.  A review of Wilder's Day-Timer as compared to his bill to the TWA-MEC establishes that they are identical.  Any suggestion that Wilder may have failed to record in his bill that he was attending a meeting of the TWA-MEC in St. Louis on April 2 is also directly contrary to his testimony that he was meeting with other clients in Louisville on April 2, 2001. As a consequence, Plaintiffs' speculation that Wilder may have doctored his bills to the MEC is not merely baseless; it is directly contrary to the facts.

Second, Plaintiffs' suggestion that Wilder's bill may have been inaccurate because he was exercising "billing judgment" evinces a complete lack of familiarity with how attorneys reduce fees when they exercise "billing judgment."  When an attorney who bills by the hour decides to reduce the amount of a bill, she nevertheless provides an accurate narrative of the services performed and an accurate summary of the amount of time spent.  She then generally provides an explanation, usually in the bill and often also in a cover letter, about why she has reduced the charges.

The issue of "billing judgment" is a frequent topic in litigation involving fee requests, because attorneys who submit fee requests are required to exercise billing judgment by not charging for time that is unproductive, excessive, or duplicative.  See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) ("The applicant should exercise 'billing judgment' with respect to hours worked . . . and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.").  Establishing the exercise of billing judgment, the

courts have consistently held, "requires documentation of the hours charged <u>and</u> of the hours written off as unproductive, excessive or redundant." <u>Saizan v. Delta Concrete Products Co., Inc.</u>, 448 F.3d 795, 799 (5th Cir. 2006) (emphasis added).  Indeed, the courts have expressly rejected claims that attorneys exercised billing judgment where they failed to document the hours that were written off.  <u>See, e.g.</u>, <u>Winget v. Corporate Green, LLC</u>, 2011 WL 2173840 (M.D. La. May 31, 2011) ("Those statements, coupled with the absence of any documentation that hours were written off, support a conclusion that plaintiff's counsel did not write off any hours in the exercise of billing judgment."); <u>Walker v. U.S. Dept. of Housing and Urban Development</u>, 99 F.3d at 769 (5th Cir. 1996) ("there is no record of any such billing judgment, as the plaintiffs allege that they wrote off hours before recording them."); <u>Alberti v. Klevenhagen</u>, 896 F.2d 927, 930 (5th Cir. 1990) ("Ideally, billing judgment is reflected in the fee application, showing not only hours claimed, but also hours written off."); <u>Leroy v. City of Houston</u>, 831 F.2d 576, 585 n. 15 (5th Cir. 1987) ("[T]he billing records are completely devoid of any hours written off.").

In other words, the point of exercising billing judgment is to make clear that time was spent but is not being billed.  Only by making the reduction explicit does the attorney get "credit" for being sensitive to inefficiencies in the provision of legal services or other circumstances that would warrant writing-down a bill.  An attorney who bills by the hour and who decides to write-down the bill would <u>never</u> provide an inaccurate narrative and an inaccurate amount of time and fail to advise the client.

### 5.      The Rule 11 Motion Misrepresents The Testimony of Other Witnesses.

In a final effort to suggest that Wilder may have been in St. Louis with the TWA-MEC on April 2, 2001, Plaintiffs assert that former TWA pilot David Singer, who was called during trial by ALPA's counsel, testified that Wilder was in St. Louis on April 2 and that three other witnesses, namely Clay Warner, Michael Glanzer and Steve Tumblin, gave deposition testimony

to the effect that Wilder attended the April 2 meeting.  To support their claim that Singer testified

that Wilder was in St. Louis on April 2, Plaintiffs cite trial transcript volume 13, page 149, lines

8 through 14.  Needless to say, a review of that transcript reveals that it contains no discussion of

the issue of whether Wilder was present on April 2, 2001.  This mis-citation to the record no

doubt reflects the haste with which Plaintiffs rushed to file their motion, contrary – ironically –

to the requirements of Rule 11.[1]

Even more disturbing, Singer's trial testimony about the events of April 2, 2001, refutes

the representation made in Plaintiffs' brief.  During his direct testimony, Singer stated that he did

not recall which advisors were present on April 2:

> Q.  Do you recall if Mr. Wilder was still there on Monday,
> April 2, 2001?
> A.  I don't recall which of the advisors were there on April 2.

Tr. of June 29, 2011 at 27:15-18.  When Press cross-examined Singer concerning this issue,

Singer maintained that he did not have an independent recollection of whether Wilder was

present on April 2:

> Q.  Okay.  And you know that Roland Wilder had always advised
> the MEC not to waive scope up [to] April 2, any way?
> A.  I don't recall.
> Q.  Do you recall that on April 2 Mr. Wilder initially took
> the position that you all should not waive scope?
> A.  I do not recall that.
> Q.  So do you recall that he was confronted verbally by Bob
> Christy regarding his opinion, you remember that?
> A.  No, if that happened, I wasn't aware of it.
> Q.  Do you remember that Roland Wilder left the meeting in
> disgust?  Do you remember that?

---

[1] That Plaintiffs' Rule 11 Motion was filed precipitously is reflected by other inaccuracies and
deficiencies.  For example, the brief claims that ALPA's Revocation Motion concluded by
claiming that Press and Jacobson have "lost their moral compass." Rule 11 Br. at 6.  In fact,
ALPA's brief concluded that Press and Jacobson had "lost their ethical compass." See
Revocation Br. at 29.

> A.  No, I don't.  It seems to me I saw some documents that showed
> that he wasn't there at all. But I didn't have any recollection.
> Q.  I mean --
> THE COURT:  He said he doesn't have any independent
> recollection.
> Q.  <u>You independently recall Mr. Wilder was there, however, don't
> you?</u>
> A.  <u>I do not</u>.
> Q.  Do you still have your deposition transcript in front of
> you or was that removed from you?
> A.  I still have it.
> Q.  If you go to page 99.  Are you at page 99?
> A.  Yes.
> Q.  Well, actually there is a question better on 102.  At
> the beginning there.
> MR. FRAM:  What line, please?
> Q.  Line 5.  You are with asked a question regarding Mr. Wilder's
> presence at the meeting on April 2, right? You are
> shown a document.  Does that refresh your memory that he was
> not there on April 2 and your answer was there?
> A.  "I still think he came. He came in late, I believe."
> Q.  So he was there on April 2, that is your best memory
> sitting here today?
> A.  Yes. If he was there he came in late.

Tr. of June 29, 2011 at 83:10 to 84:20.

Also inaccurate is Plaintiffs' assertion that Warner, Glanzer and Tumblin all testified that

Wilder was present on April 2, 2001.  In his deposition on September 22, 2008, Tumblin was

asked generally about the advice that was given to the members of the TWA-MEC "before April

2, 2001."  After he summarized the advice given, he was asked directly by Press whether the

advice he recalled was what was "said by . . . folks at the April 2nd meeting."  Tumblin

responded that he did not recall either the date of the meeting or where the meeting took place:

> Q.  BY MR. PRESS:  What you've just recounted for us, is that
> your memory of what was said by -- folks at the April 2 meeting?
> A.  <u>I don't remember which meeting it was at</u>.  I remember we met
> and we had the MEC, you know, basically asked all of the advisors
> who were present just to, you know, sort of lay out what they
> thought the options were and give us their . . . advice on what they
> thought the possibilities were, what the risks were of various
> transactions and . . . give the MEC all of the options so that the

> MEC could make an informed decision in the . . . best interests of
> the TWA pilots.
> Q. And that -- the meeting you're referring to, was that in St.
> Louis?
> A. <u>I don't recall where it was.</u>

Tumblin Dep. of September 22, 2008 at 82:4-19 [excerpt attached as Exhibit A to Acchione Dec.] (emphasis added).  Tumblin could not have made it clearer that he did not recall the specifics of who was present, when various meetings took place or the details of the advice provided.  There is simply no way to read his deposition testimony to suggest that he recalled Wilder being present on April 2, 2001.

The excerpts from the Glanzer deposition testimony attached as part of the Rule 11 Motion also fail to support the assertion that he testified that Wilder was present on April 2.  Glanzer made clear, in his testimony, that he recalled very few specifics of his meetings with the TWA-MEC and made <u>no</u> mention of the meeting on April 2, 2001:

> Q. . . . Do you remember -- going back to this TWA-MEC
> meeting where the scope waiver came up.  Mr. Glanzer, do you
> remember that you weren't the only person advising MEC that
> day.  There were other folks there . . . who made presentations.
> A. That's my recollection, yes.
> Q. And do you remember that, at some point in the meeting, those
> . . . presenters or advisors, whatever you want to call them, those
> people were asked to vote and give their opinion as to whether or
> not the pilots should waive scope or not?
> A. <u>I don't recollect that, no.</u>
> Q. Do you remember a call for a show of hands?
> A. No.
> Q. Do you recall Roland Wilder dissenting and disagreeing . . .
> with your advice in particular?
> A. I recollect that Roland Wilder, who was charged with focusing
> on, and doing the best that the -- the TWA pilots could in a
> seniority integration was -- took a different position and -- with
> respect to the waiver issue, yes.
> Q. . . . and do you remember yourself -- as part of your
> presentation at MEC, that your -- your tone and demeanor was
> quite forceful.  Do you remember that?
> A. No, I don't remember that.

Glanzer Dep. of 9/18/08 at 88:9 to 89:17 [attached to Acchione Declaration] (emphasis added).[2]

Finally, the record also fails to support the Rule 11 Motion's assertion that Warner testified that Wilder was present on April 2, 2001.  At trial, Warner testified unequivocally that Wilder was <u>not</u> present on April 2, and that he specifically recalled that Wilder left on the evening of April 1 to travel to Louisville to meet with the UPS pilots:

> Q. April 2, let's talk about the April 2 meeting. Do you
> recall who was present at the April 2, 2001 meeting with TWA
> MEC?
> A. Well, all of the same people that were there on April 1
> with three exceptions. Ted came on the second, he was not.
> Q. Ted?
> A. Ted Case. Randy Babbitt came on the second, and he was
> not there on the first, and Roland had left the night before
> on the first, he was not there on the second.
> Q. Do you recall Roland said about why he would not be
> there on the second?
> A. He worked with another pilot group, the UPS pilots, and
> he had meetings with them on the first [in] Louisville, I think,
> eastern Kentucky. And he left me phone numbers that are in
> my notes to contact him in case there are any questions that
> came up and I did. I mean I called him at the end of the day
> to tell him what had happened.
> Q. Did you call him at the end of April 2, 2001?
> A. Yes.

Tr. of July 5, 2011 at 79:13 to 80:6.

On cross, Jacobson attempted to suggest that Warner had testified during his deposition that Wilder was present on April 2, 2001.  Warner pointed out, in response, that he had not understood a question in his deposition about advice given by Wilder to be referring to April 2, 2001.  <u>See</u> Tr. of July 5, 2001 at 169:12 to 171:8.

---

[2] Press, who took this deposition, questioned Glanzer about the TWA-MEC meeting "where the scope waiver came up." As the testimony at trial made clear, the issue of the scope waiver came up at a number of meetings, including those on March 21, March 22 and April 1, 2001.  So Glanzer could have had any number of meetings in mind when he testified that he recalled the issue of the scope waiver being addressed.

15

Regardless of what other witnesses remembered – or did not remember – about the events of April 2, 2001, the fact remains that Wilder was <u>not</u> present in St. Louis on that date and, after giving inaccurate – and therefore false – testimony about this issue on August 8, 2008, definitively corrected his testimony and provided documents which established conclusively that he was in Louisville on April 2, 2001.  As a consequence, it was ethically improper for counsel to repeatedly rely upon Wilder's false testimony from his deposition of August 8, 2008. Plaintiffs' counsel did this on four occasions:  in opposing ALPA's motion for summary judgment; in submitting Wilder's false testimony as part of the Joint Final Pre-Trial Order; in playing Wilder's false testimony during trial; and, in closing argument, by relying upon the substance of that testimony and misleadingly suggesting that Wilder remained confused or uncertain about whether he attended the meeting on April 2, 2001.  As a consequence of Wilder's certainty about where he was on April 2, 2001, there is simply no basis for Plaintiffs' continued assertion, in their Rule 11 brief, of "the alternate possibility that Wilder was simply forgetful or mistaken . . ."  Rule 11 Br. at 6.  Wilder was only forgetful and mistaken during his testimony on August 8, 2008, which was the testimony relied upon by Plaintiffs' counsel.  He was clear and certain during his corrected testimony on March 21, 2011.

In summary, what Plaintiffs' Rule 11 Motion attempts to do is to suggest possible excuses for the false testimony presented and relied upon by Press and Jacobson concerning only one of four sets of issues raised by the Revocation Motion.  That attempt to justify their misconduct, which flies in the face of Wilder's testimony and misstates the testimony of other witnesses, is woefully deficient.

## ARGUMENT

What is perhaps most striking about Plaintiffs' Rule 11 Motion is what it does not attempt to do.  In order to justify Rule 11 sanctions for failing to conduct a proper factual investigation, the moving party must generally establish that the facts relied upon by other counsel were incorrect and that a more thorough investigation would have uncovered contrary information.  Thus, Rule 11 has been characterized as "impos[ing] on counsel a duty to look before leaping" or as a "litigation version of the familiar railroad crossing admonition to 'stop, look, and listen.'"  Hawaiian Shippers, Inc. v. Midland W., Inc., 2011 WL 1832559 (D.N.J. May 13, 2011) (quoting Lieb v. Topstone Indus., Inc., 788 F.2d 151, 157 (3d Cir. 1986)).  The purpose of Rule 11 is to discourage the filing of frivolous, unsupported or unreasonable lawsuits.  Rule 11 sanctions, the Third Circuit has held, are only appropriate "if the filing of the . . . [paper] constituted abusive litigation or misuse of the court's process."  Teamsters Local Union No. 430 v. Cement Exp., Inc., 841 F.2d 66, 68 (3d Cir. 1988).

What is conspicuously absent from Plaintiffs' Rule 11 Motion is any contention, much less proof, that any of the facts relied upon in ALPA's Revocation Motion were inaccurate or that further investigation by ALPA's counsel would have uncovered additional facts or information to suggest that the Revocation Motion was not warranted.  Counsel for ALPA was not required to anticipate the contention that the jury believed Plaintiffs' version of what happened on April 2, 2001.  Nor was counsel required to consider arguments that are directly contrary to the facts, including the assertion that Wilder was present in St. Louis on April 2, 2001 but remained "confused" or "mistaken" after taking his affidavit and giving his supplemental deposition.  After reviewing his records and refreshing his memory, Wilder testified that he was "100% certain" he was not in St. Louis on April 2, 2001.  No responsible attorney could simply disregard such testimony.

Nor was ALPA's counsel required to think up the completely unsupportable idea that Wilder doctored his billing records and testified falsely when, after reviewing his Day-Timer, bill and other records, he confirmed that he was 100% certain that he did not attend the meeting of the TWA MEC on April 2, 2001. Put simply, the Rule 11 Motion is devoid of <u>any</u> basis for suggesting that the facts relied upon in the Revocation Motion, with respect to whether Wilder was in St. Louis on April 2, 2001, were not accurate or that ALPA's counsel did not thoroughly investigate those facts. To the contrary, the Declaration submitted by Mr. Fram demonstrates that he was careful, thorough and responsible in preparing and filing the Revocation Motion.

Moreover, the Rule 11 Motion makes no effort to address most of the misconduct relied upon in the Revocation Motion. That motion pointed out, for example, that Hollander testified falsely that he was present at the TWA-MEC meeting on April 23, 2001, and that Jacobson must have known that this testimony was false because he had, in his possession, and showed to Hollander during his direct examination, the official minutes of the MEC meeting on that date, which established that Hollander was not present.

Jacobson has now claimed, in a Declaration filed on September 12, 2011, that "to the best of his recollection," he did not discuss the April 23 meeting with Hollander during pretrial preparation and that he became confused during Hollander's testimony. It is difficult to believe Jacobson did not speak to Hollander, before Hollander's testimony, about an issue that was important enough for the Court to discuss at some length in a published opinion in this case, <u>see</u> <u>Bensel v. Allied Pilots Ass'n</u>, 675 F. Supp. 21 493, 504 & n.19 (D.N.J. 2009), and that Press

raised in his opening.[3]  It is equally implausible that Jacobson was unfamiliar with the contents

of the TWA MEC minutes that Jacobson used in his direct examination of Hollander.

In any event, counsel for ALPA was not required, in preparing the Revocation Motion, to

anticipate these completely far-fetched explanations. Hollander gave false testimony at trial,

admitted it on cross and gave no credible explanation for having done so.  No competent

attorney, acting in good faith, could have been unaware of what Hollander was doing,

particularly in light of the emphasis the Court placed on this issue during the *in limine* hearing

that preceded Hollander's testimony.

Plaintiffs' Rule 11 Motion also asserts that ALPA's counsel filed its Revocation Motion

for some unspecified improper purpose, thereby violating Rule 11(b)(1).  This assertion is also

baseless.  Both the rules of ethics and counsel's fiduciary responsibilities to his client mandated

the filing by Mr. Fram of the Revocation Motion.  New Jersey RPC 8.3(a), relating to Reporting

Professional Conduct, imposes a mandatory duty on counsel to report serious ethical violations

of the nature committed by Press and Jacobson:

> A lawyer who knows that another lawyer has committed a
> violation of the Rules of Professional Conduct that raises a
> substantial question as to that lawyers' honesty, trustworthiness or
> fitness as a lawyer in other respects, shall inform the appropriate
> professional authority.

New Jersey RPC 8.3(a).  The facts outlined in the Revocation Motion left no doubt, in the mind

of ALPA's counsel, that Press and Jacobson had knowingly and brazenly violated numerous

Rules of Professional Conduct, including RPC 3.3, RPC 3.4 and RPC 8.4.  This triggered an

---

[3] See Tr. of June 7, 2011 at 46 (Opening Statement of Press) [Fram Declaration at ¶ 35 and Exh. G thereto] ("They called President Woerth to a meeting of the MEC.  On April 23.  He flew into St. Louis and there was a meet[ing].  President Woerth was confronted about his comment, his get real [comment]. . . . He didn't really deny it.  He didn't admit it.  What he did was just kind of dance around it.  Ted Case was at that meeting. . . . [H]e will testify that he was upset about where the TWA pilots were at this position.")

obligation on the part of ALPA's counsel to inform the "appropriate professional authority" under RPC 8.3.

Where, as here, a federal court maintains its own disciplinary process, see L. Civ. R. 104.1(e), an attorney complies with the mandatory reporting obligation of RPC 8.3(a) by reporting the conduct to the tribunal itself. See Hazard & Hodes, The Law of Lawyering (Aspen Law & Business 2011) § 64.5 (noting that the approach of complying with R.P.C. 8.3(a) by reporting professional misconduct to the tribunal itself "is often sound. In litigation-related matters, the Court is not only the best forum for resolving what actually occurred in fashioning a sanction to fit the situation, but also has its own incentives to do so. The Court may choose to refer the misbehaving lawyer to other authorities after the case is concluded, or if the misconduct involves criminal behavior, the matter may be referred to the prosecutor").

Beyond the ethical obligation of ALPA's counsel to report the professional misconduct of Press and Jacobson under RPC 8.3(a), ALPA's counsel had a fiduciary obligation to his client both to attempt to remedy the impact on ALPA of their improper conduct and to protect his client from future misconduct by attorneys who unquestionably view the trial process as a game and who feel unconstrained by the most basic professional responsibilities.

Having established that the Revocation Motion was filed after a thorough investigation, that all the facts upon which it relied are accurate and no contrary information could have been found, and that ALPA's counsel was required to file the Revocation Motion and certainly had proper purposes in doing so, the question arises as to why Plaintiffs' counsel filed their Rule 11 Motion at all, much less in such a hurry. As noted above, ALPA's Revocation Motion was filed on the evening of August 10, 2011; Plaintiffs' counsel shot off a Rule 11 letter less than two (2) days later and served their Rule 11 Motion only six (6) days later, on August 16, 2011. While

Plaintiffs' counsel were waiting to file the Rule 11 Motion, they obtained two extensions to respond to the Revocation Motion so that their response to that motion would not be filed until the week after the Rule 11 Motion was filed <u>and</u> publicized in Missouri.

The Declarations filed by Press and Jacobson in this case on September 12, 2011, and the articles from Missouri newspapers attached to Jacobson's Declaration, appear to explain Plaintiffs' undue haste and establish that their Rule 11 Motion, in addition to having been filed in disregard of the facts and the law, was filed for improper purposes, namely to attempt to advance the candidacy of Jacobson for judicial office and to provide Press and Jacobson with a vehicle for disparaging ALPA and its counsel in the Missouri press. Given that purpose, it did not matter that the assertions contained in the Rule 11 Motion were baseless and/or completely contradicted by the facts. The local papers in Missouri could be relied upon to publicize the highly charged and indignant Rule 11 Motion before ALPA's filings could respond and set the record straight.

It also appears that Plaintiffs' motion was filed for the improper purpose of attempting to intimidate ALPA's counsel into not pursuing meritorious claims. This is suggested by the repeated accusation, in Plaintiffs' brief, that ALPA's counsel has "defamed" both the Plaintiffs' pilot witnesses and Plaintiffs' counsel, the implication being that some type of defamation action might be pursued against ALPA's counsel. <u>See</u> Rule 11 Br. at 5 (asserting that defendant "defames these pilots by name: Young, Hollander, Altman, Case and Day"); <u>id.</u> at 7 (asserting that defendants' claims were made "without any concern for the truth, or concern for the reputations of those that defendant has recklessly defamed").

These threats appear to have been made without regard to the fact that all of counsel's filings on behalf of ALPA – in addition to being completely true – are protected by the absolute

litigation privilege that has been recognized by both the New Jersey courts and the federal courts. "[T]he litigation privilege applies to 'any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.'" Thomas v. Ford Motor Co., 137 F.Supp.2d 575, 582 (D.N.J. 2001); Hawkins v. Harris, 141 N.J. 207, 216 (1995). For the litigation privilege to apply, the statements at issue need only have "some connection or logical relation to the litigation[;] the relationship required is one of 'a general frame of reference and relationship to the subject matter of the action.'" Id. at 586. The privilege is broad and bars not only defamation claims, but also from a host of other tort-related claims. Agacoili v. Gonzo, 2010 WL 606697 (D.N.J. Feb. 18, 2010).

The absolute immunity provided by the litigation privilege has been described as "indispensable to the due administration of justice," because lawyers and litigants must "be permitted to speak and write freely without the restraint of fear of an ensuing action." Loigman v. Twp. Comm. Of the Twp. of Middletown, 185 N.J. 566, 580 (2006). As Judge Sheridan recently noted: "Given the importance to our justice system of ensuring truthful testimony, encouraging zealous advocacy, giving finality to judgments, and avoiding unending litigation, it is not surprising that the litigation privilege has been referred to as 'the backbone to an effective and smoothly operating judicial system.'" Sakhrani v. Escala, 2006 WL 2376746 (D.N.J. Aug. 16, 2006) (quoting Hawkins v. Harris, 141 N.J. 207 (N.J.1995)).

Rule 11(c) (2) provides that, if warranted, the Court may award to the party that prevails in a Rule 11 Motion its reasonable expenses, including attorney's fees. Because there was no basis for Plaintiffs' Rule 11 Motion and that motion itself disregarded and misstated the facts and

22

was filed for an improper purpose, the Court should deny Plaintiffs' motion and award ALPA its attorney's fees and other expenses incurred in responding to the motion.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Rule 11 Motion should be denied and the Court should award ALPA its fees and expenses.

<div style="margin-left:40%">

Respectfully submitted,

Archer & Greiner
A Professional Corporation


By:___/s/ Steven J. Fram_____
    STEVEN J. FRAM, ESQUIRE
    JOHN C. CONNELL, ESQUIRE
    KERRI E. CHEWNING, ESQUIRE

</div>

*Pro Hac Vice*:
    Daniel M. Katz, Esquire
    Katz & Ranzman, P.C.
    4530 Wisconsin Ave., N.W., Suite 250
    Washington, DC 20016

      Counsel for Defendant Air Line Pilots Association, International

Dated: September 19, 2011.

7122665v1