Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By:     Steven J. Fram, Esquire

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 02-2917 (JEI) |
| | ) |
| AIR LINE PILOTS ASSOCIATION, | ) |
| INTERNATIONAL, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF STEVEN J. FRAM

STEVEN J. FRAM hereby declares as follows:

1.      I am a member of the Bar of this Court and am a shareholder in the law firm of

Archer & Greiner, P.C., counsel for Defendant, the Air Line Pilots Association, International

("ALPA").

2.      I have firsthand knowledge of the facts and circumstances set forth in this

Declaration, which I am submitting in opposition to the Motion for Rule 11 sanctions that has

been filed by Plaintiffs in this litigation.

3.      I was lead trial counsel for ALPA during the six-week liability trial that took

place in June and July of this year.

4.      Well before that trial commenced, I was concerned about the conduct of certain of Plaintiffs' counsel with respect to the issue of whether Roland Wilder met with the TWA-MEC on April 2, 2001.  For the reasons discussed both during trial and in ALPA's post-trial motions, the issues of what was discussed on April 2, 2001, and whether Wilder was present at that meeting, were important both to the substantive claims asserted by the Plaintiffs and to the credibility of numerous witnesses.

5.      I first became concerned about the conduct of Plaintiffs' counsel with respect to Wilder's testimony about the events of April 1 and 2, 2001, earlier this year, when counsel exchanged drafts of their portions of the Joint Final Pretrial Order (the "JFPO") and met on January 4, 2011, to discuss the finalization of the JFPO.  In their proposed portions of the JFPO, Plaintiffs' counsel had designated portions of Wilder's deposition testimony of August 8, 2008, in which he indicated that he had been present in St. Louis with the TWA-MEC on April 2, 2001.  Subsequent to that deposition, Wilder had provided an Affidavit which corrected that testimony and which stated definitively that he had not been present with the TWA-MEC on April 2, 2001, but was instead in Louisville on that date meeting with other clients.

6.      When counsel for both parties met on January 4, 2011, to discuss the preparation of the JFPO, I noted this discrepancy to Plaintiffs' counsel and questioned the propriety of Plaintiffs' counsel relying upon deposition testimony of Wilder that was inaccurate – and therefore false.  When I proposed that counsel for Plaintiffs agree to a supplemental deposition of Wilder so that he could correct his earlier deposition testimony in a manner that would be admissible at trial – his Affidavit was inadmissible hearsay – counsel for Plaintiffs refused that proposal with no explanation.

7.      Over the opposition of Plaintiffs' counsel, the Court subsequently granted ALPA leave to take a supplemental deposition of Wilder limited to the issue of his whereabouts on April 1 and 2, 2001.  During that supplemental deposition, which was taken on March 21, 2011, Wilder confirmed the accuracy of the statements in his Affidavit, described the manner in which he contemporaneously recorded his billing narrative in his Day-Timer and described the manner in which his firm's bills were prepared.  Based upon those documents and his fully refreshed recollection, Wilder testified that he was "100% certain" that he left St. Louis on the afternoon of April 1, 2001, for Louisville and that he did not attend the meeting of the TWA-MEC in St. Louis on April 2, 2001.

8.      Allen Press, one of the St. Louis attorneys representing Plaintiffs, was present at Wilder's supplemental deposition and in fact had Wilder clarify, during cross-examination, that Wilder's testimony in his August 8, 2008 deposition about a meeting of the TWA-MEC that he had attended on April 2, 2001, in actuality referred to the meeting Wilder attended with the TWA-MEC on April 1, 2001.

9.      During the course of preparing for trial, I reviewed the transcripts of the deposition testimony that had been given by other witnesses in this case, including the pilot witnesses who were called to testify at trial by Plaintiffs.  I noted, in reading those transcripts, that a number of the pilots had given inconsistent testimony concerning the events of April 1 and 2, 2001.  After counsel for ALPA became aware from meeting with Plaintiffs' counsel on January 4, 2011, that Steve Rautenberg, a former member of the TWA-MEC, had opted out of the class and that counsel for ALPA could therefore speak to him, I interviewed Rautenberg telephonically with respect to a number of events, including the meetings on April 1 and 2, 2001.

Rautenberg confirmed, as he later testified at trial, that Wilder and the other members of the TWA-MEC were present on April 1 but that Wilder was not present on April 2.

10.    Plaintiffs' counsel later made a motion to bar Rautenberg from testifying at trial. The Court wisely denied that motion, advising counsel that the interests of justice were best served if the jury was permitted to hear testimony from everyone with knowledge of the matters at issue.  In denying that motion, the Court granted Plaintiffs' counsel leave to take the deposition of Rautenberg.

11.    My concerns about the approach being taken by Plaintiffs' counsel with respect to the events of April 1 and 2, 2001, were accentuated when Press spoke by phone to Rautenberg on April 18 and advised me, based upon that interview, that Rautenberg had "nothing to say" and that Plaintiffs had determined not to take Rautenberg's deposition.  I knew, from speaking to Rautenberg, that he had a great deal to say, much of its unfavorable to the positions being taken by Plaintiffs' counsel.

12.    Plaintiffs' counsel took the position that counsel for ALPA could not discuss the substance of any issues with David Singer, another former member of the TWA-MEC, because Singer was still a member of the class and was in effect "represented" by Plaintiffs' counsel.  As a consequence of that position, I was not able to speak with Singer about any substantive matters – I did speak to him about the scheduling of his deposition after my office served him with a subpoena – but was not able to attempt to refresh his recollection concerning any matters. Plaintiffs' counsel also attempted to prevent counsel for ALPA from taking Singer's deposition, but the Court again rejected that position.  As a consequence of Plaintiffs' position that counsel for ALPA could not interview Singer, Singer gave deposition testimony in this case without the benefit of having reviewed any documents relating to the events of 2001 that might have

refreshed his memory with respect to those events. Singer disclosed during his deposition that he had met with local counsel for Plaintiffs the day before his deposition but that no effort had been made, during that meeting, to provide him with any documents or otherwise to assist him in refreshing his memory. Excerpts from Singer's April 29, 2011 deposition in which he described his meeting with counsel for Plaintiffs are attached as Exhibit "A" to this Declaration.

13.     It became fairly obvious to me, as a consequence of what I have outlined above with respect to Wilder, Rautenberg and Singer, that Plaintiffs' counsel were attempting to prevent ALPA from presenting at trial the best, most accurate testimony available concerning the events leading up to and on April 2, 2001.

14.     During the course of preparing for trial, I also participated telephonically in the deposition of Alan Altman, who was belatedly identified as a trial witness by Plaintiffs. Altman testified in his deposition that he did not recall whether Wilder was present on April 2, 2001. Excerpts from Altman's April 28, 2011 deposition in which he testified concerning the events of April 1 and 2, 2001, are attached as Exhibit "B" to this Declaration.

15.     During the course of pre-trial preparation, I also interviewed numerous individuals with knowledge of the events leading up to and on April 2, 2001, including a number of individuals who testified at trial, as well as reviewed documentation concerning various issues, including that of whether Wilder was present on April 2, 2001. Those interviews and the documentation I obtained – including two agendas prepared by the TWA-MEC staff itself, which did not list Wilder as an anticipated attendee on April 2, 2001 – left no question in my mind that Wilder was <u>not</u> present on April 2, 2001.

16.     During trial, I cross-examined all of the witnesses presented by Plaintiffs, including the pilot witnesses who were present for the meeting on April 2, 2001, namely Ted

5

Case, Howard Hollander, Sally Young, Alan Altman and Sean Clarke.  I also cross-examined Mike Day, who claimed he saw Wilder in St. Louis on April 2, 2001.  I was astonished to hear those witnesses testify, uniformly and consistently, that Wilder was present on April 2, 2001; that they were not present for the work session on April 1, 2001 – their testimony directly contradicted not only that of the other advisors and Rautenberg, but also of Wilder himself; and that although they attended the important TWA-MEC meetings on March 21 and 22, 2001, they did not recall which advisors were present or what any of the advisors had said at those meetings.

17.     It was obvious to me, from this and other testimony, that the Plaintiffs' pilot witnesses had carefully conformed their story for the purposes of trial, in some cases by changing their testimony from their depositions and in other cases by for the first time providing vivid details of what allegedly happened on April 2, 2001, details that most of them had not recalled in their depositions.  If the Plaintiffs' pilot witnesses had testified consistently with their deposition testimony, if one or several of them had testified that they recalled being present on April 1, 2001, if one or several of them had testified that they simply did not recall whether Wilder was present on April 2, 2001, or even if some of them had remembered what was discussed on March 21 and 22, 2001, I would have been prepared to believe that they were testifying truthfully and had not deliberately and consciously coordinated their testimony.  But the degree of uniformity among their testimony was just too great.  Given that their testimony was contrary both to documents and to the testimony of Wilder and other witnesses who had no motive to testify untruthfully about what happened during the period leading up to April 2, 2001, the trial testimony given by the Plaintiffs' pilot witnesses left no doubt in my mind about the improper nature of their preparation to testify at trial.

18.     I have been practicing as a litigation attorney since 1983 and have tried many

complex cases, including trials that have lasted as long as thirteen weeks.  I have also read

widely about trial-related issues and have written and lectured about many trial-related issues,

including the ethics of witness preparation.  In my entire career as a lawyer I have never seen or

heard of a case in which a group of witnesses so obviously and brazenly coordinated their

testimony in a manner that so neatly fit with the themes their counsel wanted to present.

19.     There were many other instances during trial during which I became concerned

that the Plaintiffs' pilot witnesses were providing false testimony.  In perhaps the most striking

example, Howard Hollander testified under direct examination by Jacobson that he was

physically present at a meeting of the TWA-MEC in St. Louis on April 23, 2001, when Duane

Woerth, the former President of ALPA, spoke to the TWA-MEC about a number of matters,

including a meeting of the Board of Directors of the Allied Pilots Association that Woerth had

attended on April 5, 2001.  This testimony was presented immediately after the Court conducted

an *in limine* hearing and made clear that Hollander would be permitted to testify concerning

statements made by Woerth only if he personally heard them.  I knew, from a review of the

official Minutes of the TWA-MEC meeting on April 23, 2001, see D-78, that Hollander had not

been present at the meeting on April 23, 2001.  Despite this, Hollander gave explicit testimony

about what Captain Woerth said at the meeting on April 23, 2001, testimony that was intended to

damage ALPA.  A true and correct copy of D-78 is attached as Exhibit "C" to this Declaration.

20.     As surprised as I was to hear this testimony, knowing that it was untruthful, I was

completely astonished when, on cross-examination, Hollander readily admitted that he was not

present at the TWA-MEC meeting on April 23, 2001, and had not personally heard any

statements by Captain Woerth.  I did not believe Hollander's attempt to explain away this false

testimony by saying that he was "mistaken," after having testified only minutes earlier that he was present on April 23, 2001, particularly in light of other false testimony that he gave.

21.     The only explanation that occurred to me for Hollander's almost immediate correction of his false testimony concerning April 23, 2001, was that he knew I would cross-examine him with the minutes of the TWA MEC meeting marked as D-78, which clearly indicated that he was not present on April 23, 2001.  There is no question, in my mind, that if I had not asked Hollander about the events of April 23, 2001, that he would not have corrected his testimony and that the Court and the jury would have relied upon that testimony.

22.     There is also no question in my mind that Hollander testified falsely about a number of other issues during trial.  As another example, Hollander testified that he attended a meeting of the pilots of Council 2 in March of 2001, at which those pilots directed their representatives to vote against any waiver of scope.  I was able to determine, by requesting that my client check its internal records, that no meeting of the Council 2 pilots took place between January of 2001 and June 26, 2001, when the Council 2 pilots met and recalled Singer as their First Officer Representative.

23.     As another example of false testimony at trial, Matthew Comlish gave dramatic testimony on behalf of Plaintiffs during trial about an incident on Capitol Hill in the summer of 2001 when Captain Woerth allegedly "scowled" at him and told Comlish that the TWA pilots had to "get off the Hill."  Comlish was impeached with the deposition testimony he gave in this case on January 14, 2011, during which Mr. Katz had asked him directly whether he had any communications with Captain Woerth about Comlish's lobbying efforts.  After attempting to avoid the question that Mr. Katz was asking during his deposition, Comlish unequivocally stated that he had never had a direct conversation with Captain Woerth in which Captain Woerth had

indicated that he opposed the lobbying efforts of the TWA pilots. When Comlish was confronted at trial with this deposition testimony, which was completely contrary to his trial testimony, he – and plaintiffs' counsel – did not even attempt to have him explain the inconsistency. See transcript excerpts attached as Exhibit "D" to this Declaration. The only conclusion I could reach from this incident is that Comlish had given false testimony – either in his deposition or at trial – and that Plaintiffs' counsel was likely aware of that.

24.     In addition to the false testimony that was given by the Plaintiffs' pilot witnesses during trial, there were many other incidents during trial when counsel for Plaintiffs, principally Press, misstated or distorted the testimony that witnesses had given. These incidents are summarized in the motion to revoke. In addition, Press improperly attempted to vouch for the veracity of the pilot witnesses during his closing, an issue that I raised with the Court and with respect to which the Court admonished him.

25.     During the trial of this action, as I observed the false testimony and misconduct of counsel noted above, I began to become concerned that I would have a responsibility, under Rule 8.3(a) of the New Jersey Rules of Professional Conduct, to report Plaintiffs' counsel to the "appropriate authorities" within the meaning of that rule. I take my ethical responsibilities seriously and was concerned, based upon what I have described above, that Plaintiffs' counsel had presented false testimony and had otherwise attempted to mislead the Court and the jury.

26.     As a consequence, after the conclusion of trial, and in connection with the preparation of ALPA's motions for JNOV and new trial, I reflected further on the testimony presented at trial, the role that counsel for Plaintiffs played in that testimony, and the other misconduct that I personally observed. As a consequence of that further consideration, I concluded that it was unclear whether Plaintiffs' counsel had knowingly presented certain of the

9

false testimony given by Plaintiffs' pilot witnesses at trial. For example, I concluded that Hollander's false testimony about attending a meeting of the Council 2 pilots in March of 2001 was sufficiently complex and unimportant that Plaintiffs' counsel might not have known that it was false. I reached a similar conclusion with respect to Comlish's false testimony about his alleged run-in with Captain Woerth. Because no documents existed with respect to that incident, I concluded that Comlish, if pressed further on the issue, might simply say that he had forgotten the incident at the time of his deposition and that it would be difficult to prove that counsel for Plaintiffs knowingly presented false testimony with respect to this issue.

27.    I reached a different conclusion with respect to the false testimony of Wilder relied upon by Plaintiffs' counsel, counsel's mischaracterization of Wilder's corrected testimony as confused or mistaken, and the obviously coordinated and orchestrated testimony of the Plaintiffs' pilot witnesses. It was obvious to me, from the fact that all of the Plaintiffs' pilot witnesses met with counsel and that their stories became both completely consistent, not only with respect to the events of April 2, 2001, but also with respect to the meetings on March 21, 22 and April 1, 2001, and that their testimony became much more detailed with respect to the events of April 2, 2001, in ways that were helpful to Plaintiffs' case, that there had been improper witness "coaching" and that the pilot witnesses who testified for Plaintiffs at trial were selected based upon their willingness to tell a consistent "story" about mistreatment at the hands of ALPA.

28.    I recognized, as I considered the misconduct that occurred during the trial, that the claims set forth in the Motion to Revoke the Pro Hac Vic Admission of Press and Jacobson (the "Revocation Motion") would be serious claims and that they would likely elicit a strong reaction from Plaintiffs' counsel. As a consequence, I not only re-reviewed the deposition and trial

transcripts in this case, but also reviewed the transcripts of the deposition and trial testimony given in the Missouri litigation referred to in the Revocation Motion and reviewed all of the exhibits and other documentation that might bear on the issues that had concerned me. I cannot think of a single document relevant to any of the issues raised in the Revocation Motion that I did not review on multiple occasions. I note that the Rule 11 Motion fails to identify a single such document.

29.     As I reviewed transcripts and documents, I also thoroughly researched both the ethical rules that were implicated by counsel's conduct and various materials that interpret and discuss those rules, including numerous cases, treatises, practice manuals and law review articles, as reflected to some degree in the brief filed in support of the Revocation Motion.

30.     My exhaustive review of the facts and law left no question in my mind concerning the propriety of the Revocation Motion.

31.     I had two primary purposes in filing the Revocation Motion. First, I reluctantly reached the conclusion, after a detailed assessment of the facts and the law, over an extended period of time, that I was ethically obligated, under RPC 8.3(a), to report Press and Jacobson to the appropriate authorities. I believe that the filing of the Revocation Motion complies with my ethical obligation in that regard. Second, there is no question in my mind that ALPA has suffered severe prejudice and significant financial harm as a consequence of the misconduct outlined in the Revocation Motion. I believe those motion papers, which are cross-referenced in and relied upon ALPA's Motion for a New Trial, justify the granting of a new trial in the event that the Court does not grant the JNOV motion. I have a fiduciary responsibility to my client, as its attorney, both to attempt to correct the unjust result of the trial and to protect my client from future misconduct and prejudice.

32. On August 12, 2011, I received a letter from local counsel for Plaintiffs which requested that I withdraw the Revocation Motion within 48 hours. A true and correct copy of that letter is attached as Exhibit "E" to this Declaration. Nothing in that letter gave me pause in terms of need to pursue the Revocation Motion.

33. I have reviewed in detail the brief filed in support of Plaintiffs' Rule 11 Motion as well as the Declarations of Allen Press and Joe Jacobson filed by Plaintiffs with that Brief on September 12, 2011.

34. The Rule 11 Motion's assertion that the jury agreed with the testimony of the Plaintiffs' pilot witnesses and "rejected" ALPA's position concerning the events of April 1 and 2, 2001, is completely incorrect. The jury was never even given the opportunity to express its views about ALPA's conduct with respect to the event leading up to April 2, 2001. My personal view – and I speak here for myself and not for my client – is that many of the jurors probably understood that the Plaintiffs' pilot witnesses were not being truthful about a number of issues and that, if the jury had been permitted to do so, it would have rejected any claim against ALPA with respect to the events leading up to April 2, 2001. To the extent any jurors believed the Plaintiffs' witnesses or were misled by Plaintiffs' counsel, it simply proves the prejudice that ALPA suffered as a consequence of that misconduct.

35. The Rule 11 Brief also suggests that Wilder's invoice to the TWA-MEC might have been inaccurate in failing to mention that he met with the TWA-MEC on April 2 in St. Louis, because Wilder edited that invoice in an exercise of "billing judgment." This idea never occurred to me before I filed the Revocation Motion, because it is completely contrary to Wilder's testimony about how he maintained his records and prepared his bills. Excerpts from Wilder's March 21, 2011 deposition in which he testified about his billing practices are attached

12

as Exhibit "F" to this Declaration.  It is also completely contrary to the manner in which lawyers exercise "billing judgment," as noted in the accompanying brief.

36.     The Declaration of Jacobson filed as part of Plaintiffs' opposition to the Revocation Motion concedes that Jacobson presented false testimony by Hollander with respect to the events of April 23, 2001, but attempts to suggest that he did not "knowingly" present false testimony because he was unprepared and confused.  I did not consider this explanation before I filed the Revocation Motion because it is completely incredible.  Jacobson was actively involved in the trial of this action and knew, both from prior proceedings and from Press' opening, that the issue of what Captain Woerth told the TWA-MEC on April 23 was considered by Plaintiffs to be a critical issue.  Relevant portions of the transcript of Press' opening concerning Woerth's comments to the TWA-MEC on April 23, 2001, are attached as Exhibit "G" to this Declaration.

37.     Given the importance of what was allegedly discussed on April 23, 2001, I find it difficult to believe that Jacobson put Hollander on the stand and had him testify about the important events of April 23, 2001, without first discussing that issue with Hollander.  Jacobson had to have known, from the Minutes of the meeting on April 23, 2001, that Case made a specific statement, which appears on the first page of those Minutes, that Hollander was not present at the meeting.

I hereby declare under penalty of perjury that the foregoing is true and correct.  Executed on September 19, 2011.

  _/s/ Steven J. Fram_____
STEVEN J. FRAM, ESQUIRE

7124037v1

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

LEROY "BUD" BENSEL, et al.,  :
      Plaintiffs,  :
                     :
  - vs -           :   DOCKET NO. 02-2917(JEI)
                     :
ALLIED PILOTS ASSOCIATION,  :
et al.,  :
      Defendants.  :

# ORIGINAL

- - -

Videotaped deposition of DAVID B.

SINGER, taken at the law offices of Archer

& Greiner, One Centennial Square, 33 East

Euclid Avenue, Haddonfield, New Jersey, on

Friday, April 29, 2011, beginning at 9:38

a.m., before Michele R. Musick, Certified

Court Reporter-Notary Public and Gregory

A. Gottlob, Videotape Operator, there

being present.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, NJ  08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

**DAVID B. SINGER**

1    was not giving -- giving a deposition.

2        Q.    Okay.  By the way, when -- and I think

3    it's Ms. Acchione who contacted you.  When she spoke

4    to you over the phone, did she tell you that you

5    should maintain in confidence the conversation she

6    was having with you?

7                    MS. RODRIGUEZ:  Objection.

8            Direct you not to answer.

9                    MR. FRAM:  Mark this part of the

10           transcript, please.

11   BY MR. FRAM:

12       Q.    All right.  So what do you recall

13   discussing with Captain Rautenberg?

14       A.    Simply that he had been asked to give a

15   deposition, that the judge had -- had approved it,

16   and that he expected that he would be giving a

17   deposition.

18       Q.    Did he mention to you that Mr. Altman

19   would also be giving a deposition?

20       A.    No.

21       Q.    Are you aware that Mr. Altman gave a

22   deposition yesterday?

23       A.    Yes.

24       Q.    How did you become aware of that?

25       A.    I became aware of that in counsel's office

**DAVID B. SINGER**

1    yesterday.

2        Q.   Did you meet with Ms. Rodriguez yesterday?

3                 MS. RODRIGUEZ:  You can answer

4            yes or no.

5                 THE WITNESS:  Yes.

6    BY MR. FRAM:

7        Q.   For about how long, please?

8        A.   I think about an hour.

9        Q.   Anyone else present?

10       A.   This other attorney (indicating).  I'm

11   sorry, I can't remember your name.

12                MS. RODRIGUEZ:  It's Acchione.

13                MR. FRAM:  Okay.

14                THE WITNESS:  She was not

15           present at the meeting, but she was

16           present in the office, coming in and out.

17   BY MR. FRAM:

18       Q.   Did you review any documents in your

19   meeting with Ms. Rodriguez?

20       A.   Yes.

21       Q.   What -- what was your purpose in reviewing

22   those documents?

23       A.   To, simply, see if the -- if those

24   documents were related to the subpoena.

25       Q.   The documents you reviewed, were they

**DAVID B. SINGER**

1    documents that you had in your possession?

2        A.    They are the documents that I gave you

3    today.   The -- the computer file -- although we did

4    not review it specifically -- and the two membership

5    cards.

6        Q.    Did Ms. Rodriguez show you any documents

7    that you had not seen?

8        A.    No.

9        Q.    Since becoming aware that you might be a

10   witness in the case, has anybody else contacted you

11   other than Mr. Hollander?

12       A.    He did not contact me after I was told

13   that I -- that I might be a witness or give a

14   deposition.   And nobody else has contacted me.

15       Q.    Okay.   Have you talked to any other former

16   TWA pilots about the fact that you might be a

17   witness?

18       A.    Yes.

19       Q.    Can you tell me who you spoke to, please?

20       A.    I would prefer not to.

21       Q.    Okay.   Well then, I will -- I'll withdraw

22   the question.   All right.   So let's go back and fill

23   in some of the details.

24       A.    Let -- let me -- let me rephrase what I

25   said, I would prefer not to without getting their

**DAVID B. SINGER**

1                          CERTIFICATION

2                              - - -

3

4          I hereby certify that the testimony and the

5     proceedings in the aforegoing matter are contained fully and

6     accurately in the stenographic notes taken by me, and that

7     the copy is a true and correct transcript of the same.

8

9

10    _____
      MICHELE R. MUSICK
      Certified Court Reporter

11

12

13          The foregoing certification does not apply to any

14    reproduction of the same by any means unless under the

15    direct control and/or supervision of the certifying

16    shorthand reporter.

17

18

19

20

21

22

23

24

25

# Exhibit B

Bensel, et al., v. Allied Pilots Association, et al.      ALAN ALTMAN, 4/28/11

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

- - -

LEROY "BUD" BENSEL, et al.  :

  Plaintiffs,  :
                :
    v.  :  Civil Action No.
           :  02-2917-JEI
ALLIED PILOTS ASSOCIATES,  :
AIRLINE PILOTS ASSOCIATIONS,  :
INT'L, AMERICAN AIRLINES, INC.:
and TWA, LLC,  :
             :
  Defendants.  :
            :

- - -

Oral videotaped deposition of ALAN ALTMAN, held
at the Offices of Sousa Court Reporters, 1013 Garces
Avenue, Las Vegas, Nevada, on Thursday, April 28, 2011,
commencing at 8:26 a.m., taken by and before
Lisa C. Puettmann-Hawton, Certified Court Reporter.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

**Page 2**

1  APPEARANCES:
2  GREEN JACOBSON & BUTSCH, P.C.
   BY: ALLEN P. PRESS, ESQUIRE
3  Pierre LaClede Center
   7733 Forsyth Boulevard
4  Suite 700
   Clayton, Missouri  63105
5  (314) 862-6800
   REPRESENTING THE PLAINTIFF
6
7  KATZ & RANZMAN, P.C.
   BY: DANIEL M. KATZ, ESQUIRE
8  (Pro Hac Vice)
   4530 Wisconsin Avenue, N.W.
9  Suite 250
   Washington, DC  20016
10  (202) 659-4656
   REPRESENTING THE DEFENDANTS
11
12  GEOFFREY KLIMAS, SR.
   LEGAL VIDEOGRAPHER
13
14  Also Present Telephonically:
15  Steve Fram
   Marta Wagner
16
          - - -
17
18
19
20
21
22
23
24
25

**Page 3**

I N D E X

WITNESS            PAGE
ALAN ALTMAN
  Mr. Katz           5

- - -

E X H I B I T S

Number           Marked/Ref
ALTMAN 345  Resume of Alan Altman    11
ALTMAN 346  Certification by the ALPA    15
             Election and Ballot
             Certification Board
ALTMAN 347  TWA Bankruptcy/AA Buyout    67
             Benefit Issues to be Addressed
             Updated as of 2/28/01

ALTMAN 348  Handwritten notes dated 2/28/01    68

ALTMAN 349  Handwritten notes    72

ALTMAN 350  Meeting with Company March 2,    86
             2001 TWA Training Center (Joan
             Baker notes)

ALTMAN 351  Letter dated March 5, 2001 from    89
             TWA to Mr. Terry Hayes regarding
             ALPA Waiver Proposal

ALTMAN 352  Meeting with Company March 5,    100
             2001 (Joan Baker notes)
ALTMAN 353  American Airlines letter dated    103
             March 6, 2001 to Mr. William
             Compton
ALTMAN 354  Meeting with Company March 6,    108
             2001 - B. Lance's Notes

**Page 4**

E X H I B I T S
(Continued)

Number           Marked/Ref

ALTMAN 355  TWA's Revised Proposal for    118
             Changes to the TWA-ALPA
             Collective Bargaining
             Agreement dated March 8, 2001
ALTMAN 356  ALPA's Counter Proposal to    120
             TWA's Revised Proposal dated
             March 8, 2001
ALTMAN 357  Handwritten notes    127
ALTMAN 358  Agenda dated March 14, 2001 -    137
             Confidential

ALTMAN 359  ALPA Comprehensive Proposal    139
             dated March 15, 2001
ALTMAN 360  Meeting with Company dated    141
             March 15, 2001 (Joan Baker
             notes)
ALTMAN 361  Letter dated March 17, 2001    145
             from TWA to Mr. Robert Pastore

ALTMAN 362  Letter dated March 26, 2001    150
             from TWA to Captain Robert
             Pastore

ALTMAN 363  Letter dated March 27, 2001    152
             to John from Bob Kudwa
ALTMAN 364  Proposed Talking Points dated    154
             March 28, 2001

ALTMAN 365  TWA Council 4 Meeting Notice    157
             and Council Minutes dated
             March 30, 2001

ALTMAN 366  Memorandum of Understanding for    184
             Changes to the TWA-ALPA
             Collective Bargaining Agreement
             dated March 31, 2001
             - - -

1  (Pages 1 to 4)

**Bensel, et al., v. Allied Pilots Association, et al.**                    **ALAN ALTMAN, 4/28/11**

---

Page 165

1  Q.  It doesn't say that in the Resolution.
2  A.  It doesn't say otherwise either.  All it says is
3  that do your best efforts and vigorously pursue the
4  protections.
5      In other words, if you go out there and get what
6  you can, go out there and do your best for us and we
7  always bring it back.  It always goes back to the pilots
8  or used to -- would go back to the pilots.
9      So all they're saying is, hey, guys we're
10  supporting you, go forward.  This is what we want to see
11  and that's what we did.  We went forward and we're going
12  to try to get the best deal according to what the pilots
13  wanted.
14  Q.  Aren't the pilots saying don't take this to the
15  Bankruptcy Judge and let him invalidate your contract?
16  A.  It doesn't say that anywhere in there.
17  Q.  You wouldn't have a contract if the Judge --
18  A.  How do we know?  How do we know the Jude is going
19  to do that?
20      See, everyone is making these assumptions that
21  this is what this says and this is what the Judge was
22  going to do.  And that's where I believe we started to
23  get bad advice, because we don't know what was going to
24  happen.
25      All it says here is vigorously pursue the

Page 166

1  protections, that is at all times current and future TWA
2  pilots and retired pilots protected by Collective
3  Bargaining.  It doesn't say anything else.  It just says
4  vigorously pursue which we did and then we did exactly
5  what the pilots told us to do, go out there and fight
6  for us.
7  Q.  In fact, you did what the pilots asked by voting
8  in favor of the Agreement proposed March 31, the very
9  next day, didn't you?
10  A.  I don't remember.  Show it to me.
11  Q.  This is Exhibit D13, which is the April 2nd
12  Resolution -- April 2nd compilation of actions from the
13  MEC meeting.
14      It shows that you cast all 90 of your Council 4
15  votes in favor of accepting the package of Agreements
16  that had been proposed by management on March 31.
17      Isn't that correct?
18  A.  That was a Resolution so I just took what the
19  Resolution -- it wasn't very particular but that's what
20  the pilots said on the Resolution, so you vote that way.
21  We didn't stop fighting.
22      I mean, this doesn't mean anything.  This is a
23  Resolution.
24  Q.  This Resolution was in accordance with the
25  Resolution adopted by the Council 4 pilots on March 30,

Page 167

1  wasn't it?
2  A.  Council 4, my guys, passed that Resolution.  In
3  fact, I don't know what the other bases did.  I would
4  like to know what the other bases did when they went on
5  the road shows and see what the votes were or the
6  Resolutions were.
7  Q.  Do you know whether there were discussions about a
8  Resolution at Council 2, for instance?
9  A.  I don't remember.  I'm sure there had to be.  If
10  we were holding a Resolution or meeting in LA, there had
11  to be something going on at the other bases too.
12  Q.  Do you remember whether there was a discussion
13  like that and a Resolution from the St. Louis --
14  A.  I don't know.  I would have to see some notes.
15  Q.  But you do remember this meeting on April 2, I
16  take it.
17  A.  April 2nd, I remember the meeting.  That's when I
18  lost my trust and my faith in our union.
19  Q.  Well, you cast -- you and Pablo Lewin cast all 90
20  of the votes that each of you have in favor of accepting
21  the Agreement that was on the table; correct?
22  A.  Uh-huh.
23  Q.  And why don't you explain why you did that.
24  A.  We went into this meeting on April 2nd, none of us
25  were going to waive scope.

Page 168

1      Throughout the previous two months, we were going
2  back and forth with these negotiations both on the
3  Merger Committee level and on the negotiating level for
4  Transition Agreement that there was a scope waiver.
5      And this meeting on April 2nd, all a sudden ALPA
6  comes in saying you have to waive your scope now.
7  That's it.  You have to do it now immediately.  You're
8  going to be -- if you don't waive -- and literally, it
9  was a panic mode.
10  Q.  Let me cut you off there and take it in smaller
11  bite size pieces.
12      What did Richard Seltzer say at the April 2nd
13  meeting?
14  A.  I don't recall who said what to us on an
15  individual basis.
16  Q.  Do you recall anything that Richard Seltzer said
17  at the meeting.
18  A.  No.  I remember what was told to us.
19  Q.  What did Richard Seltzer say to you in particular?
20  A.  I don't remember.  I know what was told to us by
21  our advisors.
22  Q.  I want to hear one by one.  Do you remember
23  anything that Richard Seltzer said on April 2nd?
24  A.  You know what, they probably all said the same
25  thing because they were all saying the same thing.

42  (Pages 165 to 168)

**Bensel, et al., v. Allied Pilots Association, et al.**                    **ALAN ALTMAN, 4/28/11**

---

Page 169

1    Q.   Do you remember anything Richard Seltzer said on
2    April 2nd at the MEC meeting?
3    A.   No.  Does he remember what I said at the meeting,
4    probably not.
5        I remember what was told to us.
6    Q.   Do you remember anything that Randy Babbitt said
7    at the April 2 meeting?
8    A.   Yeah.  I don't know why -- well, this is something
9    that upset me.  Why was Babbitt there?  Why wasn't Duane
10   Woerth there?
11       This is a pretty important meeting and Duane was
12   too busy to attend so he sent Randy Babbitt.  I do
13   remember that at that point, that was the explanation
14   for why he was there.
15   Q.   Who gave you that explanation?
16   A.   It was Randy that said it.  He said Duane is too
17   busy to be here.  He's got something else going on so he
18   sent me because I'm the special advisor to the
19   President.
20   Q.   What did Randy Babbitt say to the MEC about the
21   Agreement that was proposed by management?
22   A.   It wasn't about the Agreement.  It was talking
23   about why we had to waive our scope and successorship
24   that day.
25   Q.   What did Babbitt say?

---

Page 170

1    A.   You had to waive your scope and successorship.
2    Q.   Was that his exact words?
3    A.   All of them said that.  In fact, what was said --
4    Q.   I just asked you about Randy Babbitt.  What did
5    Randy Babbitt say?
6    A.   They all said the same thing.  Every advisor --
7    and I'm not going to quote them exactly because I don't
8    remember the exact quote.
9    Q.   What did Steve Tumblin say?
10   A.   You have to waive your scope.
11   Q.   What did Michael Glanzer say?
12   A.   You have to waive your scope.
13   Q.   What did Clay Warner say?
14   A.   You have to waive your scope.
15   Q.   What did David Holtzman say?
16   A.   You have to waive your scope.
17   Q.   What did Bob Christy say?
18   A.   You have to waive your scope.
19   Q.   Are you quoting them?
20   A.   I'll tell you what was said.  You have to waive
21   your scope -- I will paraphrase.  If you don't, that --
22   the threats came real hard and heavy that you're going
23   to --
24   Q.   Who are you quoting now?
25   A.   The ALPA advisors.  Our advisors were in there

---

Page 171

1    telling us that we had to waive scope.
2    Q.   You're saying that there was a script that each of
3    these people said the same thing?
4    A.   They were all on the same page because they
5    obviously discussed this before.
6    Q.   Are you saying they each said the same thing?
7    A.   Yes, exactly the same thing.
8    Q.   So Tumblin, Glanzer, Babbitt, Holtzman, Christy,
9    Roberts, Warner, Seltzer, every one of them said word
10   for word the same thing?
11   A.   Yes, it was very frustrating.
12   Q.   What did Roland Wilder say on April 2nd?
13   A.   Roland did not want us to waive our scope.
14   Q.   What did he say?
15   A.   I don't remember what he said.  I know he was
16   against it.
17   Q.   Are you sure he was there on April 2nd?
18   A.   I don't remember exactly who was there on
19   April 2nd.
20       Actually, no, Roland I don't know if he was there
21   or not.  He was there with us on April 1st.
22   Q.   Would he have said on April 1st don't waive your
23   scope?
24   A.   He did not want to waive scope.  Roland had a plan
25   of action.

---

Page 172

1        Roland had an entire plan of action.
2    Q.   Tell me what he said.
3    A.   He said don't waive scope, not hard to understand,
4    don't waive your scope.
5        That was the gist of our merger attorney telling
6    us what his recommendation was.  Roland also had a plan
7    of taking this to a District Court in New York to fight
8    this.
9    Q.   Did he explain about his plan?
10   A.   Yes, he did and Duane Woerth said I'm not funding
11   it but that came after the fact, I'm not authorizing it
12   because Duane had to do that.
13   Q.   You talked to Duane Woerth about --
14   A.   No, it was on the phone.
15   Q.   Duane Woerth called into the April 2nd meeting?
16   Is that your testimony?
17   A.   I don't remember if it was the April 2nd meeting,
18   but it was a meeting just after we had done this and
19   Roland had a plan of action and Duane says as the ALPA
20   President, I'm not authorizing that.
21       And I remember just looking over at Roland and he
22   had this look of kind of like huh?  Kind of shocked.
23       Roland's idea was that he had a plan and what that
24   plan would do would just delay.  And the idea was as
25   everyone knows, the longer you can wait in a situation

---

43  (Pages 169 to 172)

**Bensel, et al., v. Allied Pilots Association, et al.**                    **ALAN ALTMAN, 4/28/11**

---

Page 173

1   and delay something, the better off a lot of times you
2   will end up being.
3   Q.   Is that what Roland Wilder told you?
4   A.   Yeah.  He said I can probably delay this for six
5   months.  Six months is a lifetime.
6   Q.   That was on April 1, 2001; right?
7   A.   Yeah, I think it was.
8   Q.   He was proposing to delay the closing of the
9   transaction?
10  A.   No.
11  Q.   What was he proposing to do?
12  A.   He had a plan and I don't remember what it was
13  exactly.
14     I would have to go look at what Roland's notes
15  was.  He just said I can file injunctions in Court that
16  could at least slow this up for six months and time is
17  time and time helps you.
18     It's just that when we came into this meeting on
19  April 2nd, everybody's attitude changed and it was
20  quickly.  You got to waive your scope now, now, now.  It
21  was a sense of urgency to it which didn't make any
22  sense.
23  Q.   Are you saying you remember Roland Wilder was
24  talking to the MEC on April 1st?
25  A.   I don't remember the date exactly but Roland did

Page 174

1   have this briefing.
2   Q.   Did you ask any questions?
3   A.   No, I was listening.
4   Q.   Did you make any comments?
5   A.   I actually liked Roland Wilder's plan.  I thought
6   he knew what he was doing.
7   Q.   I'm not asking whether you liked him.  I'm asking
8   whether --
9   A.   No, I agreed with it.  I liked it.
10  Q.   Did you say you agreed with it?
11  A.   I probably did.  I agreed with everything.  I did
12  not disagree with Roland.  I thought Roland knew what he
13  was doing.
14     We hired Roland.  I trusted Roland.  We're using
15  him as our expert.  I'm going to trust the guy.
16  Q.   What was Roland's plan on April the 1st?
17  A.   Injunctions.
18  Q.   He had planned to file an injunction to delay the
19  closing to the acquisition?
20  A.   I don't remember exactly how it worked but Roland
21  had some ideas.
22     Again, we come into this meeting and there's this
23  immediate you have to waive your scope now.
24  Q.   Did any other members of the MEC aside from you
25  say that they supported the idea of filing a lawsuit

Page 175

1   instead of accepting the package of Agreements proposed
2   by management?
3   A.   No, no, no.  This was not something that was
4   done -- these were options we were talking about.
5     We were -- I was -- we were all threatened that if
6   you didn't waive your scope, you're going to be the
7   cause of everybody losing their job and that kind of
8   caused everybody to stop for a second and have to think
9   about this and this is coming from our advisors.  Which
10  one said it first I don't remember, but the conversation
11  and the gist of this conversation was you have to waive
12  your scope and you have to do it now.  And if you don't
13  do it, again, here comes a threat that American is going
14  to walk away and you guys are going out of business and
15  you're done.  You're all be out on the street.
16  Q.   And Wilder disagreed with that on April 1st,
17  didn't he?
18  A.   He didn't agree that that's what was going to
19  happen.  He didn't think that the -- first off, the
20  1113 is -- our advisor was telling us, Roland Wilder and
21  Bill, that the Judge isn't going to grant it.
22     Up until this point, up until that day basically
23  even David Holtzman was saying don't waive your scope,
24  the Judge won't do it.  Then he had a total change of
25  heart.

Page 176

1     MR. KATZ:  I think we're going to have to break
2   now.
3     THE VIDEOGRAPHER:  This is the end of Tape 4 of
4   the video deposition of Alan Altman.
5     The time is approximately 12:49 p.m.  We're
6   going off the record.
7     (Short lunch break taken.)
8     THE VIDEOGRAPHER:  This is the beginning of
9   tape Number 5 of the video deposition of Alan Altman.
10  The time is approximately 1:34 p.m. Pacific time.
11     We are now on the record.
12  BY MR. KATZ:
13  Q.   Thank you.  Mr. Altman, as we go forward from
14  here, it will make a better record if you let me
15  complete my questions and then start your answer.  That
16  will be easier to follow in the transcript as well as
17  the videotape.
18  A.   Okay.
19  Q.   So we were talking about the April 1st and 2nd
20  meeting and the March 30th meeting of Council 4 and I
21  think there were discussions going back and forth about
22  all of those subjects.
23     So let me go back and just to confirm a couple of
24  things because there were some back and forths that may
25  have been unclear about it.

44  (Pages 173 to 176)

**Bensel, et al., v. Allied Pilots Association, et al.**          **ALAN ALTMAN, 4/28/11**

Page 177

1    What was your testimony about Roland Wilder's
2  statements to the MEC on April 1, the first day of the
3  meeting, I believe that was a Sunday.
4    A.   I'm not sure of the date.  All that Roland had
5  said was that he had numerous ideas and plans for going
6  forward.
7    A lot of it just had to do with Court filings that
8  would at least delay whatever was being forced upon us
9  or whatever was happening with the understanding that
10  time is your friend.  The longer you can usually wait
11  something out or delay something, the better it will be
12  for you.
13    Roland felt that he would be, you know, successful
14  in his plans and for different scenarios and different
15  ideas but nothing concrete had been this is what I'm
16  going to do on this day but he had ideas and this was
17  just informal, you know.  On the first in wasn't an
18  official MEC meeting.  It was just informal because we
19  just had dinner, a couple of us.  We were gathering for
20  the April 2nd meeting.
21    But Roland had been discussed this entire process.
22    Q.   Did he say he had drafted papers to file in Court?
23    A.   I don't remember him saying he had papers drafted.
24  Again, he was talking concepts, ideas.
25    Q.   Did he say that he thought the Judge would deny

Page 178

1  the 1113 Motion?
2    A.   Roland felt that we would not -- yeah, the Judge
3  would deny TWA's LLC 1113 Motion.  He didn't think they
4  would prevail on that.
5    Q.   Did he also say that he did not think American
6  would walk away from the deal on April 1?
7    A.   I never heard Roland say that.  The only people
8  that had said that to that point was the TWA, LLC, and
9  specifically Terry Hayes was the one who usually said
10  they would walk if you didn't do this.
11    Q.   What did Roland say about that?
12    A.   I don't remember Roland -- I don't think he ever
13  listened to that.  I mean, I never heard him say
14  anything directly up to that point.
15    Q.   One way or the other.
16    A.   Yeah.
17    Q.   And you didn't believe that American would walk
18  away from the deal.
19    Is that right?
20    A.   That's correct.  That is a negotiating ploy.
21    Q.   That's what you said at the April 1 meeting?
22    A.   Yes.
23    Q.   Or was that on April 2?
24    A.   April 2, I think.
25    Q.   Going back over your testimony before lunch, I

Page 179

1  think you said you don't remember what Richard Seltzer
2  said at the April 1 or 2 meeting.
3    MR. PRESS:  Object to the form of the question.
4  BY MR. KATZ:
5    Q.   What did Richard Seltzer say?
6    A.   I don't remember what anyone in general said.
7  What I remember was a general common theme and a common
8  strategy.
9    I don't know what you want to call it but
10  everybody was -- and I'm not saying it was done word for
11  word verbatim, but everybody was saying the same thing
12  as if they went and spoke beforehand and said this is
13  what we have to present, which is not any different than
14  if the MEC had gotten into a meeting.  We agreed on
15  something.  We all say the say thing to our constituents
16  so I'm not going to say anything word for word.  I don't
17  remember what any individual person said.
18    It was a general this is what you have to do and
19  why.
20    Q.   What did you say to the MEC that you recall?  Did
21  you say that Roland Wilder's theories sounded good to
22  you?
23    A.   We never got to discuss that point.  We were
24  discussing the -- again, April 1st was not an MEC
25  meeting.  It was just an informal -- we were coming into

Page 180

1  town.  A couple went to dinner.
2    On April 2nd, we didn't have a chance to discuss
3  that because the negotiation or the gist of the meeting
4  changed.
5    Q.   You're saying there was a dinner of some of the
6  MEC members on April 1?
7    A.   Yeah.  We came into town earlier.  Both of us live
8  far away.  We came in on the night before.
9    Q.   That would have been on March 31st then.
10    A.   No, April 1st --
11    Q.   Wasn't the meeting --
12    A.   No, the meeting was April 2nd.
13    Q.   Wasn't there also a meeting on April 1st?
14    A.   I don't remember the dates.  I thought it was
15  April 1st we came in for the April 2nd meeting.
16    Q.   You don't remember if it was a one-day or two-day
17  session?
18    A.   No.  I remember the 2nd because that's the day
19  that stood out in my mind.
20    Q.   You don't remember a meeting at all on the 1st?
21    A.   No.  I remember talking and I don't remember if it
22  was the 30th to the 31st of the month or the 1st day.
23    The 2nd was the meeting that I remember.
24    Q.   Do you remember if it was a one-day session or a
25  two-day session?

45  (Pages 177 to 180)

Case 1:02-cv-02917-JEI   Document 448-1   Filed 09/19/11   Page 26 of 61 PageID: 15338

Bensel, et al., v. Allied Pilots Association, et al.                    ALAN ALTMAN, 4/28/11

Page 181

1  A.   Don't remember.
2  Q.   Do you remember whether you came into town on a
3  Saturday night?
4  A.   I don't remember what night it was.
5  Q.   Who did you have dinner with before the MEC
6  meeting?
7  A.   I don't remember who was all there. I just know
8  whoever would have come in would have been there.
9      I just knew there was a couple of people there.
10  Nothing unusual, I mean, it's just a plain old dinner.
11  Q.   You said everyone said they were going to vote
12  against the deal.
13  A.   That had been our standing from day one, that
14  nobody wanted to waive scope.
15      The MEC never changed from the day of the Asset
16  Purchase was announced with American up to this point.
17  The MEC was saying we're not waiving our scope. It
18  never changed.
19  Q.   So you don't remember who was at the dinner the
20  night before the MEC meeting?
21  A.   No, it was just a dinner.
22  Q.   So you don't remember who said they were going to
23  vote against the deal the night before the MEC
24  meeting.
25  A.   It didn't matter. No one had changed their minds.
   We were unanimous up to that point. Up until April 2nd,

Page 182

1  we were unanimous in sticking to our guns. We didn't
2  want to waive scope.
3  Q.   Did you talk to Pablo Lewin, your Captain rep and
4  Chairman of Council 4 the night before the MEC meeting?
5  A.   I may have. I don't remember.
6  Q.   Do you remember whether he told you he was going
7  to vote for or against this package of Agreements?
8  A.   Pablo was going to not waive scope and, in fact,
9  he had given in a previous meeting -- I don't remember
10  the date -- but it was a fairly impassioned speech about
11  why he wouldn't waive scope. He wasn't going to do it.
12      Again, I don't remember when or where this was --
13  it was just one of the daily meetings that had been
14  leading up to this point and Pablo up to that point
15  was -- every voting member was unanimous that we were
16  not going to waive scope.
17  Q.   So you had a discussion with Pablo Lewin or he was
18  speaking at an MEC meeting?
19  A.   It was an MEC meeting.
20  Q.   What about Steve Rautenberg? Did he say -- did
21  you talk to him?
22      Did he have dinner with you the night before?
23  A.   Didn't talk to him. I would see Steve in the
24  meetings. I didn't have conversations with him on the
25  side.

Page 183

1      Again, he was also of the same I'm not waiving
2  scope. At the point throughout this entire process,
3  there was no reason to waive our scope and successorship
4  provisions. No one had given us any valid, viable
5  reason to do so other than the fact that American put it
6  in the Asset Purchase Agreement.
7      It was still no reason to do it. That is why the
8  MEC continued down the path of we want -- if we waive
9  scope and successorship, we still want the process as I
10  said before of Arbitration, which defeated the whole
11  purpose of waiving your scope and successorship in the
12  first place.
13      That was the MEC's standing. It was -- the
14  consensus was unanimous up until we met on April 2nd.
15  Q.   So you're saying that the meeting at March 21 and
16  22, we've gone through those Minutes, and you're saying
17  as of that point in time Rautenberg and Lewin were still
18  saying that they wouldn't accept any package of
19  Agreements that didn't have an Arbitration process to
20  merge seniority lists.
21      Is that correct?
22  A.   That is correct. Everybody at least publicly told
23  us when we were in the meetings, no one changed their
24  tunes. I don't know if they were talking privately. I
25  don't know if they were doing something without other

Page 184

1  members knowing or they were just saying it to say it.
2  I'm not going to speak for somebody else.
3      What was said publicly among the members of the
4  MEC was everybody was unanimous. There really was no
5  reason to waive scope. There was no logical, viable
6  reason given other than the fact that it was put in the
7  Asset Purchase Agreement because American didn't want to
8  deal with the APA.
9      That's not really a reason. The MEC was also
10  pursuing the Process Agreement that would end in
11  Arbitration.
12  Q.   Here's a document which I'll mark as 366. This is
13  a Memorandum of Understanding for Changes to the TWA
14  ALPA Collective Bargaining Agreement dated March 31,
15  2001.
16  A.   Thank you.
17      (Defendant's Exhibit 366 was marked for
18      identification by the court reporter.)
19  BY MR. KATZ:
20  Q.   Did you see this?
21  A.   This is just another one of the back and forth
22  changes that were going during the negotiations for this
23  if it was to happen.
24      This wasn't a negotiation to have it happen. This
25  was in case the MEC did vote on it, the Negotiating

46  (Pages 181 to 184)

**ALAN ALTMAN**

REPORTER'S DECLARATION

1

2

3    STATE OF NEVADA        )
                                            )   SS.
4    COUNTY OF CLARK        )

5

6           I, Lisa C. Puettmann-Hawton, Certified Court
Reporter No. 521, declare as follows:

7    That I reported the taking of the deposition of the
witness, ALAN ALTMAN, commencing on Thursday, April 28,

8    2011 at the hour of 8:26 a.m.
     That prior to being examined, the witness was by me

9    duly sworn to testify to the truth, the whole truth, and
nothing but the truth.

10   During the deposition, the deponent was advised of
the opportunity to read and sign the deposition

11   transcript under Rule 30, the original signature page is
being forwarded to Allen Press, Esq. to obtain the

12   deponent's signature.
     That I thereafter transcribed said shorthand notes

13   into typewriting and that the typewritten transcript of
said deposition is a complete, true and accurate

14   transcription of said shorthand notes taken down at said
time.

15   I further declare that I am not a relative or
employee of counsel or any party involved in said

16   action, nor a relative or employee of the parties
involved in said action, nor a person financially

17   interested in the action.
     Dated at Las Vegas, Nevada this 11th day of May,

18   2011.

19

20                          Lisa C. Puettmann-Hawton, CCR 521

21

22

23

24

25

# Exhibit C

# TWA MEC Minutes

Written, edited and published by your TWA Master Executive Council, these minutes provide a record of the business conducted during the representative body's last meeting. This document is not a verbatim transcript of the meeting's reports, discussions and actions. Rather, it is a comprehensive summary of those events. For more information on the issues influencing TWA pilots' careers, consult the TWA MEC's other various communications.

SPECIAL MEETING DATE: April 23-24, 2001 St. Louis, Missouri

### MASTER EXECUTIVE OFFICERS
**Robert A. Pastore, Master Chairman**
**Scott A. Schwartz, Vice Chairman**
**Robert C. Stow, Sr., Secretary/Treasurer**

**EXHIBIT**
**D078**

**COUNCIL 2 - NY**
Howard B. Hollander, Captain Rep.
David B Singer, First Officer Rep.
Theodore A. Case, Secretary/Treasurer

**COUNCIL 4 - LAX/SFO**
Pablo Lewin, Captain Rep.
Alan Altman, First Officer Rep.
Glenn Stieneke, Secretary/Treasurer

**COUNCIL 3 - STL**
Steven P. Rautenberg, Captain Rep.
Sally D. Young, First Officer Rep.
Jim Arthur, Secretary/Treasurer

---

### Monday, April 23, 2001

1335 Master Chairman Bob Pastore called the meeting to order.

Secretary/Treasurer Bob Stow called the roll, members present or accounted for with the exception of Howard Hollander and Glenn Stieneke. Hollander proxy to Case. Stieneke was not present due prior family obligations.

Committee Members: Keith O'Leary, Ron Kiel, Cary Bouchard, John Swanson, Sean Clarke, John Hefley, Keith Holcomb, Mike Day, Steve Parrella, Rick Crocker, Bill Kientz, Kim Pearson, Vince Lombardi

Guests: On File MEC office

Steering Committee: Case, Rautenberg, Lewin

Sergeant at Arms: Ron Kiel

Announcements

Case read for the record the following statement written by Hollander to the Master Chairman:
"Due to personal reason, which we have spoken about last week, I am unfortunately unable to attend the TWA MEC Special Meeting on April 23-24. It is however my intent to attend the second day of the Special Meeting if at all possible. So that there is no confusion or misunderstanding, I have sent F/O Ted Case a valid proxy to vote on all issues in my place. We have spoken at length on all the published agenda items and he has a clear understanding on how the Council 002 pilots wish to be represented. I have asked F/O Ted Case to read this into the record at the start of the meeting and hand you this for your record."

**Duane Woerth, President ALPA**
Captain Duane Woerth briefed the MEC regarding the Delta's tentative agreement, the Comair strike, the legislative progress on the Age-60 rule and his presence at an APA Board meeting in Dallas. Captain Woerth discussed the current situation of the TWA pilots and stated the TWA MEC made one of the most difficult decisions any MEC could be faced with – waiving their scope protection. Captain Woerth stated the MEC's decision although tough, was the right decision and that he was extremely proud of the courage displayed by the TWA MEC.

At the conclusion of Captain Woerth's statements, there was a question and answer session with members of the MEC and pilots in attendance.

Questions and Answers

Case for the record stated that the TWA pilots have been loyal, dedicated ALPA members for more than 50 years. They have the distinct honor of holding ALPA post's, Council 2, Council 3 and Council 4. During fifty plus years as ALPA union members, the TWA ALPA pilots have contributed millions of dollars to the Association. Along with their monetary contributions, TWA ALPA pilots have also contributed countless hours of service within the Association furthering ALPA's Safety, Union, Political and Labor causes. He asked Captain Woerth if the TWA pilots had his commitment as the President of ALPA to use the full resources of the Association, including litigation if possible or necessary, against the APA, AMR, and TWA LLC to ensure that the TWA pilots were integrated into the American Airlines pilots seniority list, in a manner other than a staple job.

Captain Woerth responded if there were any basis for litigation, ALPA would do what was necessary to protect the pilots. ALPA would not leave any stone unturned to protect the TWA pilots.

1448 Presentation concluded.

1449 Recess
1505 Reconvened

**Membership and Guest Hour**

Dean Seward, Council #3:  Addressed the MEC regarding his concerns that flying time was going away.

Questions and Answers

Dee J Glasby, Council #2:  Addressed the MEC regarding a position on Merger Committee.

Questions and Answers

Russ Hazelton, Retired TWA Pilot:  Addressed the MEC regarding retired pilots issues. Requested the MEC to continue their support of the retired pilots causes. ALPA cannot walk away from the retired pilots. He detailed his efforts to help both active and retired participants in the terminated A Plan.

Questions and Answers

John Fuerhmeyer, Council #3:  Thanked the MEC for the great job they have been doing on behalf of the TWA pilots.

1524 Membership and Guest Hour concluded.

Pastore welcomed Jim Arthur, newly elected Council #3 Secretary/Treasurer, to the MEC and presented him with his pewter ALPA pin.

## Master Chairman Report:  Bob Pastore
Pastore gave brief overview of the work undertaken since he became chairman last August. Stressed that in seniority integration discussion with APA, all were professionals and should treat each other with the respect that each group deserves.  Also stressed that unity among the TWA pilots was critical to moving forward.   Pastore thanked the Merger Committee for all the work they have done.  Concluding his report, Pastore announced that Scott Schwartz was stepping down as Vice Chairman and an election was scheduled during the second of the meeting.

1540 Report concluded.

## Secretary/Treasurer Report:  Bob Stow
Stow reported due to contractual changes under TWA LLC, ALPA would no longer have the 9000-hour flight pay loss bank. This translated into approximately a 40% reduction in funding for union work.  He also updated the MEC on Merger Assessment delinquent payments.  Only 13 members currently have not paid their Merger Assessment.  In accordance with ALPA Constitution and Bylaws, Article VIII charges would be taken against those members.  Stow said that a detailed update of expenses paid by the Merger Assessment would be posted on the TWA MEC website.

Questions and Answers

1545 AI#0104-77 Lewin/Rautenberg
Approval to Reimburse LEC Rep David Singer

Discussion

## Resolution #01-66 by P. Lewin/S. Rautenberg

WHEREAS Council #2 F/O Representative David Singer tried to get to this meeting today by all possible means, and

WHREAS there was no other opportunity but to purchase a full fare ticket on USAir, now

**THEREFORE BE IT RESOLVED that the TWA MEC directs Secretary/Treasurer Bob Stow to reimburse Council #2 F/O Representative Singer for the ticket.**

**PASSED** voice vote

1549 Reports concluded.

## Merger Committee Report/Strategic Planning
Day updated the MEC regarding recent committee activities and meetings with the APA.  He indicated that full support of all of ALPA would be necessary going forward.  Day also addressed some administrative issues relating to Merger Committee work the MEC would need to address.

Questions and Answers

1601 Rautenberg/Singer moved to enter into Executive Session.
VOTE: **PASSED** unanimous voice vote.

1755 Rautenberg/Lewin moved to come out of Executive Session.
VOTE: **PASSED** unanimous voice vote.

1800 Recess

---

**Tuesday, April 24, 2001**

0900 Master Chairman Bob Pastore called the meeting to order.

Committee Members: Cary Bouchard, John Swanson, Mike Day, John Hefley

Guests: On File MEC office

0903 Altman/Lewin moved to enter back into Executive Session to conclude Merger Committee Report. Note: Stow called the rolled during Executive Session, members present or accounted for with the exception of Hollander and Young. Hollander proxy to Case and Young called the office and reported she would be arriving in approximately 30 minutes.

0928 Young arrived at the meeting.

1000 Case *(Proxy for Hollander)*/Altman moved to come out of Executive Session.
VOTE: **PASSED** unanimous voice vote.

1004 Recess

Pastore briefed the MEC regarding phone conversation with Captain Duane Woerth.

1012 Stow called the roll, members present or accounted for.

Stow updated the MEC regarding various advisors fees.

1015 Case, for the record, stated that he was in receipt of a mailing from T. O. Richardson Company. He didn't know how they got his address or knew that he was a TWA pilot. Also, didn't know how this company knew the details concerning the DAP and its termination. T. O. Richardson had informed him that two active TWA pilots were in their employment. One was currently a high-ranking ALPA Union official; the other was a former high-ranking ALPA union official.

**Grievance Committee Report: Sean Clarke**
.Clarke updated the MEC regarding recent committee activities. Discussed the five pilots who were not offered employment by American Airlines under the TWA LLC. He indicated that AMR could make a decision on these five individuals later this week. He added that ALPA would continue to support these pilots. Clark announced that Jim Arthur was stepping down as Grievance Committee Vice Chairman due to his recent election on the MEC. He recommended Buzz Erickson as his replacement.

Pastore appointed Arthur (Buzz) Erickson.

---

**ALPA 006470**

1017 Lewin/Rautenberg moved that the TWA MEC approve the appointment of Arthur (Buzz) Erickson as Vice Chairman of the Grievance Committee.
VOTE: **PASSED** unanimous voice vote.

Questions and Answers

1034 Report concluded.

### Negotiating Committee Report:  Ron Kiel and Cary Bouchard
Bouchard briefed the MEC regarding his conversation with Rick Cannon on displacements.  Kiel discussed issues relating to the agreement with TWA Airlines LLC.  He stated that all documents comprising the agreement had been posted on the MEC website earlier this month.

Stow requested that the Negotiating Committee report be interrupted and continue after the DAP/401K Report.

### 1051 DAP/401k Report:  Marty Zygmund (via teleconference)
Zygmund updated the MEC regarding events that occurred since last MEC meeting.  Discussed meeting with Community America Credit Union regarding outstanding loans and possible source for the loans and Plan sponsor.  They were receptive to being Plan sponsor and would be contacting their legal advisors.  Discussed meeting with TWA Benefits as well to discuss possible change in the Plan sponsor.

Zygmund highlighted the Plan under Community America. The Credit Union has done due diligence and he was anticipating a letter of intent in the near future.

1054 Hollander arrived at the meeting.

Questions and Answers

1109 Report concluded.

### Negotiating Committee Report (continued)

Kiel discussed the training program differences between TWA and AMR and briefly discussed benefit transition issues.  Hoped to have remaining unanswered benefit questions resolved later in the week.  TWA Benefits Specialist Mary Ulett stated Larry Cleveland was hoping to have these answers by the end of the week.  Class 9 passes were still an ongoing issue and the committee was waiting to hear from Labor Relations.

Questions And Answers

1131 Report concluded.

### Schedule Committee Report:  Gary Tritt (via teleconference)
Tritt updated the MEC on schedule and equipment changes that had occurred recently and reminded the MEC that pilots would be more than likely be subject to balancing due to these changes.  Updated the MEC regarding satellites, AMR satellites were different from TWA.  Satellites would continue under LLC because of their cost savings but anticipated them going away as the integration of the operation was closer to completion.

Questions and Answers

1144 Report concluded.

1145 Recess

## 1150 STL Airport Expansion Committee: Bud Bensel (via teleconference)
Bensel spoke to the MEC about the status of Air Traffic control upgrades in St. Louis. He reported the progress continues and a meeting on the issue with ALPA National Safety representatives would be held in May.

Questions and Answers

1214 Report concluded.

1215 Recess

1300 Stow called the roll, all members present or accounted for.

## Membership & Guest Hour
Bill Kientz, Council #3:  Addressed the MEC regarding his willingness to serve a MEC Vice Chairman. Discussed his background and prior ALPA experience.

Questions and Answers

Keith O'Leary, Council #3:  Addressed the MEC regarding his willingness to serve a MEC Vice Chairman.  Discussed his background and prior ALPA experience.

Questions and Answers

1315 Membership & Guest Hour concluded.

## Non-Payment of Merger Assessment/Article VIII Charges:  Don Knight
Knight updated the MEC regarding progress of collecting delinquent assessment payments. Discussed the procedure of filing Article VIII charges against pilots who have not paid their assessment and gave overview of the hearing that would be held to hear the charges.

Questions and Answers

The MEC agreed that the pilots who retired in January pay the full $300.00.   They also agreed to file charges in small claims court for those pilots who were now employed by non-ALPA carriers and had not paid their assessment.

1349 Report concluded.

Steering Committee Report

1359 Lewin/Rautenberg moved to accept AI#0104-78, AI#0104-79 and AI#0104-80 as late agenda items. VOTE:  **PASSED** unanimous voice vote.

Lewin/Singer moved to enter into Executive Session.
VOTE: **PASSED** voice vote.

## RESOLUTION #01-67 WAS PASSED IN EXECUTIVE SESSION, NOT FOR DISTRIBUTION

1400 Lewin/Singer moved to come out of Executive Session.
VOTE: **PASSED** voice vote.

1401 MEC Caucus

1551 **Election – MEC Vice Chairman**

Singer/Hollander moved to open the floor for nominations.
VOTE: **PASSED** unanimous voice vote.

Young nominated Bill Kientz
Hollander nominated Keith O'Leary

Singer/Altman moved to close the floor for nominations.
VOTE: **PASSED** unanimous voice vote.

Ballot Certification Committee: Don Knight, Cary Bouchard

1558 O'Leary was elected Vice Chairman

Pastore announced that Ed Johns was willing to serve on the Merger Committee.   MEC questioned whether or not Ed Johns had the time to devote to the committee.   Pastore stated that Ed Johns would have the time necessary to devote to the committee.

1604 Young/Hollander moved to RECONSIDER the election of the Vice Chairman.
Discussion

Lewin requested a ruling from ALPA National.

Stow reported that per Clay Warner, ALPA Legal, the motion was out of order.

Motion was withdrawn.

1607 Young requested MEC Caucus

1625 Rautenberg/Singer moved to extend the meeting 15 minutes.
VOTE: **PASSED** unanimous voice vote.

## Merger Committee Member Election

Lewin/Hollander moved to open the floor for nominations.
VOTE: **PASSED** unanimous voice vote.

Hollander nominated Ed Johns
Altman nominated Dee J. Glasby

**ALPA 006473**

Singer/Lewin moved to close the floor for nominations
VOTE:  **PASSED** unanimous voice vote.

Glasby was elected (Lewin requested recorded vote).
**FOR Glasby:**
Hollander, Council #2
Singer, Council #2
Rautenberg, Council #3
Young, Council #3
Altman, Council #4

**FOR Johns:**
Lewin, Council #4

1635  AI#0104-78 Lewin/Altman
**SUBJECT:**   Approval of request(s) for Council affiliation transfers.

**Resolution #01-68 by P. Lewin/A. Altman**

WHEREAS the following pilots have requested their council affiliation be changed and/or frozen and,

WHEREAS the pilots' eligibility has been verified by the ALPA Membership department, now

**THEREFORE BE IT RESOLVED that the following pilots have their council affiliation changed
and/or frozen as indicated in accordance with Article III, Sect. 10(a) of the ALPA Constitution and
By- Laws and the TWA MEC Policy Manual Section VII para 17:**

| Name | ALPA # | From | To | State |
|------|--------|------|-----|-------|
| Rights, Theresa | 1197235 | 3 | 4 | CA |

PASSED recorded vote
(Lewin requested recorded vote)
**FOR:**
   Singer, Council #2
   Rautenberg, Council #2
   Lewin, Council #4
   Altman, Council #4
**AGAINST:**
   Hollander, Council #2
   Young, Council #3

1640  AI#0104-79 Rautenberg/Altman
**SUBJECT:**   Level of Support for Retired Pilots.

Discussion

**Resolution #01-69 by S. Rautenberg/A. Altman**

**BE IT RESOLVED the TWA MEC directs the TWA MEC Chairman to submit the attached
resolution as an agenda item for the next regularly scheduled ALPA Executive Board meeting.**

    (4) To carry out other strategic initiatives when specifically tasked by the TWA MEC Master Chairman or the TWA MEC, by resolution.

  2. Personnel

    a) Strategic Planning Committee Chairman

      (1) The Chairman shall be appointed by the TWA Master Chairman and approved by the TWA MEC in accordance with Section VIII.B of this TWA MEC Policy Manual.

      (2) Qualifications:

        (a) Shall be knowledgeable in all areas of committee activities.

        (b) Shall be a member of TWA ALPA in good standing.

    b) Strategic Planning Committee Members

      (1) The Chairman of the Strategic Planning Committee may appoint up to three committee members who shall all be TWA ALPA members in good standing.

Discussion

Altman/Rautenberg moved to **POSTPONE** until next MEC meeting.
VOTE: **PASSED** unanimous voice vote.

1643 Lewin/Rautenberg moved to **ACCEPT** AI#0104-81 and #0104-82 as late agenda items.
VOTE: **PASSED** unanimous voice vote.

1645 Hollander left the meeting *(Proxy to Case)*.

<u>AI#0104-82 Singer/Case (Proxy for Hollander)</u>
**SUBJECT:** U.S. Bankruptcy Code changes.

Discussion

**<u>Resolution #01-70 by D. Singer/T. Case</u>** *(Proxy for H. Hollander)*

**BE IT RESOLVED the TWA MEC directs the TWA MEC Chairman to submit the attached resolution as an agenda item for the next regularly scheduled ALPA Executive Board meeting.**

WHEREAS it has been one of the primary tenets of ALPA to insure the integrity of each and every pilot groups' Collective Bargaining Agreement, and

WHEREAS in the past the tactic of utilizing the U.S. Bankruptcy Code to circumvent traditional labor laws and unilaterally abrogate proper agreements was engaged by Francisco Lorenzo and others, and

WHEREAS ALPA lobbied effectively to demonstrate that the anti-labor behavior and practice was so egregious and potentially devastating to collective bargaining agreements, and

WHEREAS ALPA sought and achieved appropriate legislative changes so as to no longer permit such unilateral changes without due process and a proper hearing and arguments of cause in the applicable Bankruptcy Court, and

WHEREAS most pilots retire from their respective airlines, and

WHEREAS once retired ALPA cannot, under its Charter, represent a retired pilot, now

THEREFORE BE IT RESOLVED that the ALPA Executive Board determines what level of support is to be afforded retired pilots.

<strong>PASSED</strong> voice vote

1640 <u>AI#0104-80 Hollander/Singer</u>
**SUBJECT:**   Amend MEC Policy Manual, Section XXVI, Strategic Planning Committee.

WHEREAS The TWA MEC has passed a resolution establishing a Strategic Planning Committee and

WHEREAS the TWA MEC now wishes to establish policy for the authority, objectives and staffing of the Strategic Planning Committee, now

THEREFORE BE IT RESOLVED the TWA MEC Policy Manual Section XXVI. H. be changed to read as follows:

"H.     STRATEGIC PLANNING COMMITTEE
   1.      AUTHORITY
      a)     The TWA MEC shall have a continuing committee to carry-out the following objectives:
         (1)     In coordination with the MEC Officers, to interface with and lobby the ALPA National Officers, the members of the ALPA Executive Council and the members of the ALPA Executive Board to insure the utmost strategic and financial support to the TWA pilots.
         (2)     To participate in a regular conference call on at least two days each week (unless the MEC is in session during a given week, then the conference call schedule shall be amended by the Master Chairman).  The conference call will be conducted by an MEC Officer, or the Chairman of the Strategic Planning Committee if an MEC Officer is not available.  The conference call is to insure up to date communications between TWA MEC Officers, committee chairmen (including, but not limited to the following as needed: Negotiating Committee Chairman, Merger Committee Chairman, Government Affairs Chairman, Grievance Committee Chairman and Communications Committee Chairman) and MEC Advisors on issues concerning the integration of the TWA LLC operations and pilot seniority integration. The MEC members shall be informed of these conferences and shall be informed of these conferences and shall have the right to ask questions of the participants at the conclusion of each conference.
         (3)     In conjunction with strategic plans adapted by the MEC, to co-ordinate with the TWA MEC officers and the TWA MEC members, when in session, to develop strategic planning initiatives on the whole range to issues facing the TWA pilots.

---

<strong>PAGE - 9</strong>
<em>Approved MEC Resolution #01-88</em>

<strong>ALPA 006475</strong>

WHEREAS in today's legal environment, the TWA pilots along with tens of thousands of other ALPA and non-ALPA pilots have relied upon the hard-fought language of their Scope and Successor clauses, and

WHEREAS the TWA pilots received a great deal of protection form those past changes to the Bankruptcy Code, they nevertheless were forced, under the provisions of Section 1113 of the U.S. Bankruptcy Code, to abandon the primary protection of the Scope Clause section of the Collective Bargaining Agreement in order to avoid Chapter 7 liquidation of their carrier and affect the transition to TWA LLC, and

WHEREAS it is conceivable that any carrier could utilize such tactics while operating and seeking shelter under the protection of Chapter 11 of the U.S. Bankruptcy Code, and

WHEREAS the sanctity of every pilots' Collective Bargaining Agreement is of paramount importance and concern to ALPA, now

THEREFORE BE IT RESOLVED that ALPA shall adopt, as one of our highest legislative priorities, the goal of bringing the appropriate changes to the U.S. Bankruptcy Code to provide specific protections and legal immunity for seniority, employment and Scope and Successor clauses that contractually provide for the specific protections of seniority and fair and equitable merger integration.

**PASSED** unanimously voice vote

AI#0104-81 by Singer/Case (Proxy for Hollander)
**SUBJECT:** ALPA National Support

Discussion

**Resolution #01-71 by D. Singer/T. Case (*Proxy for H. Hollander*)**

**BE IT RESOLVED the TWA MEC directs the TWA MEC Chairman to submit the attached resolution as an agenda item for the next regularly scheduled ALPA Executive Board meeting.**

WHEREAS the TWA pilots have faced incredible challenges for more than a decade and a half, living through three changes in corporate ownership, a corporate raider and three bankruptcies, and;

WHEREAS the TWA pilots have been loyal members of ALPA from ALPA's inception, currently representing Councils Two, Three and Four, and;

WHEREAS the TWA pilots have contributed millions of dollars into the MCF to support their brother and sisters and to protect the piloting profession, and;

WHEREAS the TWA pilots are now facing extraordinary expenses in their current merger with American Airlines, which occurred, without precedent, during a Chapter 11 proceeding, and;

WHEREAS the TWA pilots have also been forced to abandon the primary protection of the Scope Clause section of their Collective Bargaining Agreement in order to avoid Chapter 7 liquidation of their carrier and affect the transition to TWA LLC, and;

WHEREAS the TWA MEC has enormous obstacles remaining before them in order to protect their loyal ALPA members and affect a successful transition to American Airlines, obstacles including ongoing negotiations, the continuing need for Bankruptcy counsel, extraordinary communications needs both

**ALPA 006477**

internally and externally, a yet to be defined merger integration process, the need for Merger counsel and Pension plan termination litigation, and;

WHEREAS the long-term goal of ALPA of "one Union for all pilots" could be realized with the return of the pilots of American Airlines and the best ambassadors to lead that charge would be the post-merger TWA pilots who truly appreciated the value of having proper support both morally and financially of a National Union, and;

WHEREAS the plethora of problems before the TWA MEC are only compounded by a dramatic reduction in available funding, coupled with enormous expenses to properly represent their constituents, including the loss of previously contractually provided Flight Pay Loss of over one million dollars ($1,000,000) annually, and;

WHEREAS the future of U.S. airline consolidation will be clearly affected by the outcome of the current acquisition of TWA by American Airlines and thus the very future of our profession and our careers would be impacted by a negative outcome, now

THEREFORE BE IT RESOLVED that the Executive Board pledges the full moral and financial support of the Association to enable the TWA MEC to properly represent the TWA pilots through this crisis and to properly complete the tasks before them.

**PASSED** unanimously voice vote

1648 Lewin/Altman moved to adjourn.
VOTE:  **PASSED** unanimous voice vote.

1650 All business concluded; the meeting was adjourned.

*Robert C. Stow Sr.*

Robert C. Stow, Sr.
TWA MEC Secretary/Treasurer

# Exhibit D

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT  OF NEW JERSEY
CIVIL 02-2917  (JEI)

PATRICK BRADY, SALLY YOUNG,
HOWARD HOLLANDER, THEODORE CASE,
AND MICHAEL FINUCAN, individually
and on behalf of all others
similarly situated,
                        Plaintiffs,
                                        VOLUME 7
         V.                             TRIAL TRANSCRIPT

AIR LINE PILOTS ASSOCIATION,

                        Defendant.

                        CAMDEN, NEW JERSEY
                        JUNE  16, 2011

B E F O R E:   HONORABLE JOSEPH E. IRENAS
               UNITED STATES DISTRICT JUDGE

               A P P E A R A N C E S:

         TRUJILLO, RODRIGUEZ & RICHARD
         BY:  NICOLE M. ACCHIONE, ESQ.
              AND: LISA J. RODRIGUEZ, ESQ.
                   AND
         GREEN JACOBSON, P.C.
         BY:  ALLEN PRESS, ESQ.   (MO. BAR)
         AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
         For the Plaintiffs.

         ARCHER GREINER
         BY:  STEVEN FRAM, ESQ.
              AND
         KATZ & RANZMAN
         BY:  DANIEL M. KATZ, ESQ.
         FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

         ELIZABETH GINSBERG, ESQ.
         IN-HOUSE COUNSEL FOR ALPA.

2

1

2         Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
3   accurate record as taken stenographically in the
above-entitled proceedings.

4
                      S/   LYNNE JOHNSON
5
                      Lynne Johnson, CSR, CM, CRR
6                      Official Court Reporter

7

8

9

10

11              LYNNE JOHNSON, CSR, CM, CRR
                OFFICIAL COURT REPORTER
12              UNITED STATES DISTRICT COURT
                P.O. BOX 6822
13              LAWRENCEVILLE, NJ  08648

14

15

16

17

18

19

20

21

22

23

24

25

Comlish-cross/Fram                                          193

1   Q.   Do you have any legal background or training?

2   A.   No, I don't.

3   Q.   Do you have any training in contract negotiations?

4   A.   I am an airline pilot.  Airline pilots fly airlines,

5   sir.

6   Q.   That is great.  Can you answer my question?  Do you have

7   any training in contract negotiations?

8   A.   No, I don't.

9   A.   ALPA National does.

10          MR. FRAM:  I move to strike that comment, your

11   Honor.

12          THE COURT:  I will strike it.

13   Q.   Do you claim that you had a conversation on Capitol Hill

14   with Duane Woerth about the legislation that you were pushing

15   for on Capitol Hill?

16   A.   That's correct.

17   Q.   And tell us exactly what you claim Mr. Woerth said to

18   you when you went up to him at this gathering with respect to

19   the legislation you were pushing?

20   A.   He said you need to get off the Hill.

21   Q.   And you understood that to be him directing you to back

22   off from the legislation.  Right?  That was the point of what

23   you said before.  Yes?

24   A.   What I said was, he told me, me and my pilots to get off

25   the Hill.  That was the gist of the conversation.

Comlish-cross/Fram                                                   194

1              THE COURT:  But you understood that, or you, I will

2    ask the question, did you understand he was telling you to

3    stop lobbying for the Bond bill?

4    A.    Yes.

5    Q.    That is the conversation where you said he had scowled

6    at you when you motioned to him before, right?

7    A.    That's correct.

8    Q.    Do you remember when Mr. Katz took your deposition in

9    January of this year?

10   A.    Yes, I do.

11   Q.    And you were sworn to tell the truth, the whole truth,

12   and nothing but the truth?

13   A.    Yes.

14   Q.    You understood that it was testimony subject to the

15   penalties of perjury?

16   A.    Yes, I do.

17   Q.    You understood it was important for the purposes of

18   presenting the facts in this case?

19   A.    Yes, I do.

20   Q.    Do you recall being asked in that deposition --

21              THE COURT:  Give us all a page and --

22              MR. FRAM:  Yes, your Honor.  Let me find it real

23   quick.

24              THE COURT:  Did you have a copy, plaintiffs?

25              MS. RODRIGUEZ:  No, I don't.

1          MR. FRAM:  They do now, your Honor.

2          THE COURT:  Okay.

3     Q.   So page 100, sir.  Let's talk about what you said in

4     your sworn testimony in January of this year.  Page 100, line

5     3.

6          Do you see where Mr. Katz asked you:

7          "QUESTION:  Did Woerth ever say anything to you

8     directly about being opposed to your lobbying efforts?

9          "ANSWER:  How do you define directly?

10         "QUESTION:  I mean, you are face-to-face with him,

11    or you are in a telephone conversation with him.  Says

12    Comlish, I am opposed to your legislative efforts.  Something

13    like that.

14         "ANSWER:  Counsel, we had a chain of command and I

15    wanted to honor that chain of command, so many of these

16    communications went through the chain of command back and

17    forth to Duane Woerth.

18         "QUESTION:  Well, I am just asking you a simple

19    question.  Did you have a conversation directly with Duane

20    Woerth on the phone or in person in which he told you that he

21    was opposed to what you were doing?"

22         And what was your answer, sir?

23    A.   My answer was no.

24    Q.   Thank you.

25         MR. FRAM:  I have nothing further, your Honor.

# Exhibit E

**Fram, Steven**

| | |
|---|---|
| **From:** | Nicole Acchione [nacchione@trrlaw.com] |
| **Sent:** | Friday, August 12, 2011 1:52 PM |
| **To:** | Fram, Steven; Dan Katz |
| **Cc:** | Allen Press; Lisa Rodriguez; Nicole Acchione; Joe Jacobson |
| **Subject:** | Brady, et al. v. ALPA |
| **Attachments:** | 20110812_124326.pdf |

Dear Counsel,
Please see attached letter.
Thank you, Nicole



TRUJILLO
RODRIGUEZ &
RICHARDS, LLC
A PENNSYLVANIA LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

258 Kings Highway East
Haddonfield, NJ 08033
856-795-9002
856-795-9887 Fax

Lisa J. Rodriguez
New Jersey Responsible Attorney

1717 Arch Street
Suite 3838
Philadelphia, PA 19103
215-731-9004
215-731-9044 Fax

August 12, 2011

**VIA EMAIL AND REGULAR MAIL**
Steve Fram, Esquire
Archer & Greiner
One Centennial Square
Haddonfield, NJ 08033

Re:   *Brady, et al. v. ALPA*
      Civil Action No. 02-2917

Dear Mr. Fram:

I have your Motion to Revoke the *Pro Hac Vice* Admissions of Allen Press and Joe Jacobson, filed August 10, 2011. *See* PACER No. 417.

Rule 11 of the Federal Rules of Civil Procedure prohibits a party from filing a pleading "for any improper purpose, such as to harass, cause unnecessary delay, or to needlessly increase the costs of litigation." Rule 11(b)(2). Rule 11 requires that factual contentions made by counsel have evidentiary support. Rule 11(b)(4).

Your motion violates both of these requirements. The motion is not supported by evidence. Rather, it contains a series of inflammatory, self-serving statements that, were they not included in a court filing, would be actionable as defamatory. Your motion obviously was not filed for any legitimate purpose, but instead was designed to harass the Plaintiffs and their counsel and to serve ALPA's political interests in denigrating the jury's verdict to help ALPA in the pending JetBlue representational campaign and the Delta pilots' potential separation from the union.

We hereby demand you withdraw your motion within 48 hours. In our view, through your filing of this motion, you and your clients are in violation of Rule 11 of the Federal Rules of Civil

Procedure.  If the motion is not immediately withdrawn, we will ask the Court to impose appropriate sanctions, including but not limited to striking your pleadings and taxing you with the costs associated with our having to respond to the motion.

Very truly yours,

Nicole M. Acchione

cc:  Dan Katz, Esquire (via email and regular mail)

# Exhibit F

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

```
----------------------------x
LEROY "BUD" BENSEL, ET AL.,  :
                             :
        Plaintiffs,          :
                             :
     v.                      :   Civil Action
                             :   No. 02-2917 (JEI)
ALLIED PILOTS ASSOCIATION,   :
ET AL.,                      :
                             :
        Defendants.          :
----------------------------x
```

Washington, D.C.

Monday, March 21, 2011

Videotape Deposition of:

ROLAND WILDER

called for examination by counsel for Defendant Air

Line Pilots Association, International, pursuant to

notice, commencing at 2:00 p.m., at Baptiste & Wilder,

P.C., 1150 Connecticut Avenue, N.W., Suite 500,

Washington, D.C., before Delores M. Green, a Court

Reporter and Notary Public in and for the District of

Columbia, when were present on behalf of the

respective parties:

9

1   negotiations; meet with negotiating committee; review

2   and revise proposals."

3        Q.   And then below that, do you have another

4   reference there to the TWA-MEC representation?

5        A.   That's correct.

6        Q.   Can you read the narrative for us there,

7   please?

8        A.   Yes.   "Phone conference with John Hefley,

9   Clay Warner, WRW" -- that's William Wilder, a partner

10  in this firm -- "and respond to messages."

11       Q.   When did you make the entries that you've

12  just read for us in your daytimer?

13       A.   When?

14       Q.   Yeah.   About when?

15       A.   On November 2nd.  I'm sorry.  On April 2nd.

16       Q.   And what was your purpose in making those

17  entries, please?

18       A.   This is the foundation for the time records

19  that the firm maintains for me, and also we use this

20  for the billing.

21       Q.   Okay.   What I'm showing you now is D-176.

22            Can you please confirm that D-176 is a copy

1    of the billing statement that your firm sent to

2    Captain Robert Pestor (phonetic) of the TWA-MEC for

3    the month of April of 2001?

4         A.    It appears to consist of the firm's billing

5    to the TWA-MEC for the month of April, the bill being

6    dated May 9, 2001, and attached to the billing are the

7    various expense records evidencing the expenses I

8    incurred representing the TWA-MEC in April.

9         Q.    And the first page of D-176 is your

10   transmittal letter --

11        A.    That's correct.

12        Q.    -- the letter that forward the bill.   And

13   then the first page of the bill has an entry on 4-1-01

14   which shows 7.5 hours.   Do you see that?

15        A.    I see that.

16        Q.    And the description there is precisely the

17   same description as you read from April 1 on the

18   daytimer, correct?

19        A.    Correct.

20        Q.    So your practice in having your firm prepare

21   bills was to take the narrative you wrote in the

22   daytimer, around the time you performed the services,

1   and then have that narrative put into your billing

2   system so that the client got billed for the time?

3       A.   That is correct.

4       Q.   Now, can you tell us after you spent the

5   time shown on April 1 of 2001 representing the MEC,

6   did you leave town later that day?

7       A.   Yes.  I had a meeting with another client in

8   Louisville, Kentucky.  I left the MEC offices in St.

9   Louis somewhere between 4:30 and 5:00 on the afternoon

10  of April 1 and went to the airport, flew to

11  Louisville; and I believe I met with the client in

12  Louisville on April 1, yes.

13      Q.   Okay.  You just refreshed your memory about

14  meeting with the client in Louisville by referring to

15  the daytimer?

16      A.   I just did, yes.

17      Q.   Okay.  And if you turn back to the bill, it

18  looks like you have an attachment, and this is page 6

19  of 20 if you look in the center in the bottom.  It

20  says D-176, 6 of 20.

21      A.   I have it.

22      Q.   Is that a copy, at the top, of the plane

25

1       CERTIFICATE OF NOTARY PUBLIC

2

3          I, DELORES M. GREEN, a Notary Public in and

4   for the District of Columbia, before whom the

5   foregoing deposition was taken, do hereby certify that

6   the witness whose testimony appears in the foregoing

7   pages was duly sworn by me; that the testimony of said

8   witness was taken by me in shorthand at the time and

9   place mentioned in the caption hereof and thereafter

10  reduced to typewriting under my supervision; that said

11  deposition is a true record of the testimony given by

12  said witness; that I am neither counsel for, related

13  to, nor employed by any of the parties to the action

14  in which this deposition is taken; and, further, that

15  I am not a relative or employee of any attorney or

16  counsel employed by the parties thereto, nor

17  financially or otherwise interested in the outcome of

18  this action.

19

20                          _____
                            Delores M. Green
                            Notary Public in and for
21                          THE DISTRICT OF COLUMBIA

22  My commission expires:

# Exhibit G

1

```
 1                IN THE UNITED STATES DISTRICT COURT.
                 FOR THE DISTRICT OF NEW JERSEY
 2               CIVIL 02-2917  (JEI)

 3       THEODORE A. CASE, SALLY YOUNG,
         HOWARD HOLLANDER, PATRICK BRADY
 4       AND MICHAEL FINUCAN, individually
         and on behalf of all others
 5       similarly situated,
                         Plaintiffs,
 6
             V.                          TRIAL TRANSCRIPT
 7                                       VOL. 1
         AIR LINE PILOTS ASSOCIATION,
 8
                         Defendant.
 9
                               CAMDEN, NEW JERSEY
10                             JUNE 7, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                 A P P E A R A N C E S:
13
             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                 AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.  (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.  (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:  STEVEN FRAM, ESQ.
19                 AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH GINSBERG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1        Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10                LYNNE JOHNSON, CSR, CM, CRR
                  OFFICIAL COURT REPORTER
11                UNITED STATES DISTRICT COURT
                  P.O. BOX 6822
12                LAWRENCEVILLE, NJ  08648
                  PHONE:   609 896 1836
13

14

15

16

17

18

19

20

21

22

23

24

25

1    10 minutes, and resume with your opening statement.

2              MR. PRESS:  Thank you, your Honor.

3              (Jury leaves the courtroom).

4              (Recess)

5              (Jury enters the courtroom.)

6              THE COURT:  Mr. Press, you may continue.

7              MR. PRESS:  Thank you, Judge.

8              Before I plow on, hopefully it will be the last

9    break we take while I am speaking.  I said hopefully,

10   remember.

11             Before I go on with the chronology I of things I

12   want to take a step backwards.  Remember at the meeting I

13   told but the right to strike and how they put in their brief

14   that they filed with the Court that the right to strike was

15   clear and three days later they come and tell the MEC, the

16   pilots leaders, that no, you probably don't have a right to

17   strike.

18             Remember, I told you about that.  Six months later

19   ALPA is filing a motion in the bankruptcy court to get their

20   legal fees paid, over $700,000 in legal fees.  And in that

21   motion they say, Judge, you should award us all in this money

22   because we averted a strike.  We got the MEC to capitulate

23   and we avoided a strike.  Just another odd little wrinkle in

24   this case and you are going to hear lots of them.

25             Moving forward you have the president of the union,

```
1   down in front of the American pilots saying my guys need to

2   get real.  Word of that comment got out quickly.  To the TWA

3   pilots.  And they were not too happy to hear that their

4   president had said words that would just clearly embolden the

5   other side, and they were upset.  They called President

6   Woerth to a meeting of the MEC.  On April 23.  He flew in to

7   St. Louis and they, and there was a meet.

8            President Woerth was confronted about his comment,

9   his get real excellent.  He didn't really deny it.  He didn't

10  admit it.  What he did was just kind of dance around it.  Ted

11  Case was at that meeting.  And he was, he will testify that

12  he was upset about where the TWA pilots were at this

13  position.  They had given up their best leverage, the

14  negotiations were not going well with the American pilots,

15  and he was upset with his union and he pressed Captain

16  Woerth, President Woerth, for a commitment.  He pressed him

17  for a commitment to use the full resources of the union, and

18  to bring any litigation that would be necessary and

19  appropriate.  He pressed the president before that

20  commitment, and President Woerth gave it.  It was lip

21  service.

22           You are going to hear two more litigations that

23  were come up with that were not authorized.  But

24  face-to-face, that that is what the president told the

25  pilots, the TWA pilots.  He assured them appropriate
```