# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PATRICK BRADY, et al.,      ) | |
| ) | |
| Plaintiffs,      ) | |
| ) | Civil Action No. 02-2917 (JEI) |
| v.      ) | |
| ) | |
| AIR LINE PILOTS ASSOCIATION,      ) | |
| INTERNATIONAL,      ) | |
| ) | |
| Defendant.      ) | |
| ) | |

---

## REPLY BRIEF IN FURTHER SUPPORT OF THE MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b)

---

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By:    Steven J. Fram, Esquire
       John C. Connell, Esquire

*Pro Hac Vice*:

    Daniel M. Katz, Esquire
    Katz & Ranzman, P.C.
    4530 Wisconsin Ave., N.W., Suite 250
    Washington, DC  20016
    (202) 659-4656

Attorneys for Defendant
    Air Line Pilots Association, International

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

ARGUMENT........................................................................................................................ 3

     A.     There is no Evidence that ALPA's Alleged Conflict Had Any Impact.................3

     B.     The Events of March 28 and 29, 2001 Do Not Support the Verdict. .....................5

     C.     There Is No Evidence to Support the Verdict With Respect to the Events of April 2, 2001. ...................................................................................................6

     D.     There Is No Evidence to Support the Verdict With Respect to Causation............9

CONCLUSION ................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Aguinaga v. United Food and Commercial Workers Int'l Union,
    993 F.2d 1463 (10th Cir. 1993) ...................................................................15

Air Turbine Tech., Inc. v. Atlas Copco AB,
    410 F.3d 701 (Fed. Cir. 2005) .....................................................................9

Akley v. Western Conference of Teamsters,
    958 F.2d 1463 (9th Cir. 1992) .....................................................................2

Anderson v. United Paper Workers Int'l Union,
    641 F.2d 574 (8th Cir. 1981) ..................................................................2, 15

Cox v. Administrator United States Steel & Carnegie Pension Fund,
    17 F.3d 1386 (11th Cir. 1994) ................................................................11, 12

Deboles v. Trans World Airlines, Inc.,
    552 F.2d 1005 (3d Cir. 1977) .....................................................................2

Eastman Kodak Co. of New York v. Southern Photo Materials Co.,
    273 U.S. 359 (1927) ...............................................................................12

Lewis v. Tuscan Dairy Farms, Inc.,
    25 F.3d 1138 (2d Cir. 1994) ......................................................................15

Porter v. American Optical Corp.,
    641 F.2d 1128 (5th Cir. 1981) .....................................................................9

Rutherford v. American Bank of Commerce,
    565 F.2d 1162 (10th Cir. 1977) ................................................................9, 10

Steelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.,
    63 F.3d 1267 (3d Cir. 1995) .......................................................................9

**STATE CASES**

Ortega v. Kmart Corp.
    (2001) 26 Cal.4th 1200, 114 Cal.Rptr.2d 470, 36 P.3d 11 .......................................11

Viner v. Sweet,
    30 Cal. 4th 1232, 70 P.3d 1046 (2003) ........................................................10, 11

**RULES**

Fed. R. Civ. P. 50(b) ................................................................................................................. 1, 3

**OTHER AUTHORITIES**

Antitrust Law, <u>Proving Antitrust Damages: Legal and Economic Issues</u> (1996) at 31 ................ 12

## INTRODUCTION

Defendant, Air Line Pilots Association, International ("ALPA"), submits this Brief in further support of its Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b).

Plaintiffs' papers submitted in opposition to ALPA's Rule 50(b) motion are premised upon two assumptions, neither of which is supported by the law. The first is that it was up to the jury to decide which pilot group within the TWA-MEC was correct about how to proceed with respect to certain matters in 2001. The second is that everything ALPA did was tainted because of the "conflict" that allegedly existed by virtue of ALPA's long-term desire to represent the American pilots.

The first of these contentions is incorrect, because ALPA's conduct was required to be judged under the "highly deferential" standard that applies to claims for breach of the duty of fair representation. ALPA's conduct could only be found "arbitrary" under that standard if ALPA acted in a manner that was "irrational" and without "any rational basis or explanation." ALPA Rule 50(b) Br. at 3 (citing cases). That many of the pilots, including both former members of the MEC who testified at trial and pilots who were not called to testify, disagreed with Plaintiffs' position and articulated reasons why ALPA proceeded appropriately, to say nothing of the reasons provided by ALPA representatives themselves, demonstrates that ALPA did not act arbitrarily.

ALPA does not contend, as suggested in Plaintiffs' brief, that the only evidence that the Court can consider in assessing ALPA's conduct is that of the pilots who agreed with the manner in which ALPA proceeded. See Pls' Br. at 2. Its point is that other pilots, including Steve Rautenberg, testified that ALPA proceeded entirely appropriately in light of all of the facts presented by Plaintiffs at trial and relied upon by them in their post-trial briefs. The jury's role in this case, under the standard that governs DFR claims, was not to judge which pilot group had

1

the better arguments at the time but rather only to determine whether there was a reasonable basis for ALPA's conduct and judgments. That Rautenberg and Singer – and other pilots who did not testify, but whose positions were reflected in others' testimony and documents – agreed with ALPA, and explained in detail their basis for agreeing with ALPA and disagreeing with the risks that the Plaintiffs' pilot witnesses proposed be taken, demonstrates conclusively that ALPA's conduct was not arbitrary or irrational.

With respect to Plaintiffs' claims that ALPA acted in bad faith, it cannot be contested that Plaintiffs were required to prove three things: (1) that representatives of ALPA made misrepresentations of fact or omitted to disclose material information; (2) that union members detrimentally relied upon those statements or omissions; and (3) if the TWA-MEC had acted differently, that the overall outcome would have been different, meaning that the APA and American would have agreed to a different seniority integration process. See, e.g., Deboles v. Trans World Airlines, Inc., 552 F.2d 1005 (3d Cir. 1977); Anderson v. United Paper Workers Int'l Union, 641 F.2d 574 (8th Cir. 1981); Akley v. Western Conference of Teamsters, 958 F.2d 1463 (9th Cir. 1992).

Thus, although Plaintiffs are certainly entitled to have the Court view the evidence presented at trial in the light most favorable to them, as the verdict winners, that evidence must nevertheless be viewed through the lens of the very demanding legal standard that applies to DFR claims. Because no reasonable jury, considering the evidence in light of that standard, could have found in favor of Plaintiffs, the liability verdict entered against ALPA in this case must be vacated and judgment should be entered in its favor.

## **ARGUMENT**

**A.      There is no Evidence that ALPA's Alleged Conflict Had Any Impact.**

Plaintiffs begin their opposition brief by trumpeting the argument that they have pressed

from the inception of this case:  that because certain representatives of ALPA communicated

with two American pilots, John Clark and Mark Hunnibell, everything that ALPA did in

connection with its representation of the TWA pilots was somehow infected.  Pls' Br. at 3.  It is

undisputed that no representative of ALPA communicated with Clark and Hunnibell until after

May 2001, after Hunnibell had lost his campaign to be elected as Vice-President of the APA, and

that neither Clark nor Hunnibell was ever a representative of ALPA.  ALPA's Br. in Support of

New Trial Motion at 42-43.  They were nothing more than individual American pilots who

hoped, at some point, that other American pilots would agree with their view that ALPA could

more effectively represent all of the American pilots than the APA.  Despite this, Plaintiffs

persist in arguing that because ALPA had communications with Clark and Hunnibell, it is strictly

liable for a breach of the duty of fair representation, without regard to any proof that the alleged

conflict in any way impacted ALPA's representation of the TWA pilots.  Pls' Br. at 2-3.

In discussing the events leading up to the vote on April 2, 2001, Plaintiffs' Brief ignores

undisputed evidence, summarized in ALPA's Opening Brief, that key advisors to the TWA-MEC

were not aware of and were not affected by ALPA's interest in merging with the APA and that

Clark and Hunnibell did not even begin their pro-ALPA campaign until May 2001, well after the

vote on April 2, 2001. See ALPA Rule 50(b) Br. at 31-32.

Moreover, there is no basis for claiming that ALPA had an undisclosed conflict.  As

ALPA demonstrated at trial, all of the TWA pilots knew, by virtue of the Unity Resolution, that

ALPA had a long-term interest in merging with the APA and representing the American pilots.

It is clear that many of the TWA pilots, all of whom expected to become members of the APA in

3

connection with the purchase by American of TWA's assets and the merger of the pilot groups, saw the desire of some American pilots to join ALPA as a positive during the merger negotiations.  See D-25 at 3.

Nor is there any basis for Plaintiffs' assertion that it was somehow improper for representatives of ALPA to be communicating with American pilots.  There was constant communication with representatives of the APA throughout 2001 and everyone knew it.  Duane Woerth met with the APA Board of Directors on April 5, 2001, and was literally applauded by the TWA-MEC when he reported on that meeting at the April 23, 2001 meeting of the TWA-MEC.  Id. at 9 ("The members [of the TWA MEC] applauded Capt. Woerth at the conclusion of his remarks.")

From that point forward, and with the knowledge and encouragement of the TWA-MEC, Woerth kept an open line of communication with John Darrah, the President of the APA, and lobbied Darrah on behalf of the TWA pilots.  See Tr. of June 27, 2011 at 29-30, 72 and 156.  At the request of the TWA-MEC, Woerth also met directly with representatives of the APA during one of the merger integration negotiation sessions.  See id. at 83-86.  Other ALPA representatives, including Clay Warner, received emails concerning the internal politics of the APA and distributed those emails to the TWA pilots during the course of merger negotiations.  See P-236.  Moreover, members of the TWA Merger Committee themselves met face-to-face with the American pilots on dozens of occasions.

In short, the idea that it was somehow improper for ALPA representatives to meet with individual American pilots – who were not part of the APA negotiating team and who were not reporting back to anyone on the APA side who was involved in the seniority integration process – is not supportable.  Certain representatives of ALPA met with Clark and Hunnibell – who were

not representatives of the APA and had no power to negotiate or speak on its behalf – for the limited purpose of obtaining information about the number of cards they had gathered; that they did so does not establish bad faith and certainly does not demonstrate that ALPA acted arbitrarily or in bad faith in respect to the actions or inactions that it took in connection with the seniority integration negotiations.  In order to establish bad faith, Plaintiffs were still required to demonstrate material misrepresentations or omissions, detrimental reliance by the TWA-MEC as a whole (not by individual pilots) and a different outcome with respect to seniority negotiations. To allow liability to be imposed on ALPA simply because there was an alleged conflict would be to impose strict liability on it.

**B.**     **The Events of March 28 and 29, 2001 Do Not Support the Verdict.**

Although Plaintiffs' opposition brief attempts to suggest detrimental reliance with respect to a number of specific incidents, a review of the evidence referred to in their brief, which fails to provide record citations for many of the statements it makes, establishes that Plaintiffs have not accurately recounted the evidence presented at trial with respect to numerous issues. In discussing the Merger Committee meetings on March 28 and 29, 2001, Plaintiffs' brief claims that, at trial, Mike Day and Sean Clarke testified that they were "confronted" by three "uninvited" ALPA officials on the evening of March 28, 2001, and that "Day and Clarke testified that a heated exchange ensued between the TWA Merger Committee members and the ALPA officials and that the pilots yielded to their union." Pls' Br. at 4 (emphasis added).  The testimony was otherwise.  While Day testified that he felt "pressured" by the recommendation the ALPA officials had made, he testified the argument that took place on March 28 was between the members of the Merger Committee, with junior pilots pitted against senior pilots, not between members of the Merger Committee and the ALPA officials. See Tr. of June 23, 2011 at 27, 149.  Day also acknowledged during his testimony that the decision on how to

5

proceed was one for the Merger Committee to make and that he made his decision independently. Id. at 30, 148. For his part, Clarke testified that he "kept arguing and arguing and arguing" with other Merger Committee members but never once asserted that ALPA officials were involved in the argument or put any pressure on him or the other pilots to proceed in any particular way. See Tr. of June 16, 2011 at 32-33.

So the idea that representatives of ALPA pressured or coerced the Merger Committee is not supported by the record. Everyone knew that the decision about how to proceed was for the pilots to make and that the pilots were the only ones who would be meeting with the representatives of the APA. The ALPA representatives made a recommendation; the members of the Merger Committee disagreed among themselves, discounted the advice provided and rejected the recommendation and otherwise proceeded as they deemed appropriate.

C.    **There Is No Evidence to Support the Verdict With Respect to the Events of April 2, 2001.**

Plaintiffs' arguments concerning the vote on April 2, 2001, are also unavailing. Plaintiffs assert that the advice provided by the ALPA advisors on April 2 "included various false and misleading statements." Pls' Br. at 5. The only two aspects of the advice referred to are the alleged statements that the TWA pilots would not have a right to strike if the Bankruptcy Court granted TWA's 1113 Motion and rejected the CBA between the TWA pilots and TWA Inc. and that Richard Seltzer, the bankruptcy attorney representing ALPA and the pilots, failed to disclose that a request could be made for the Bankruptcy Court to postpone the hearing of the Section 1113 Motion.

With respect to whether the pilots had a right to strike, even if all credibility determinations are resolved in favor of the Plaintiffs, the testimony of the Plaintiffs' pilot witnesses does not support the contention that any of the pilots detrimentally relied upon

inaccurate advice about the right to strike. Alan Altman, the Council 4 First Officer Representative, testified that one of the other pilots – Ted Case – inquired as to whether the TWA pilots could strike if the 1113 Motion were granted and was told that there was no right to strike. See Tr. of June 9, 2011 at 116 to 118. But Altman was never asked and never testified that he would have voted differently on April 2 or that the issue was even important. Given that Altman had been instructed by the Council 4 pilots to secure a new CBA during a meeting on March 30, 2001, see D-365, it could not have been.

Likewise, Sally Young testified that the ALPA advisors told the TWA-MEC on April 2 that the TWA pilots would not have the right to strike if the 1113 Motion were granted. See Tr. of June 13, 2011 at 40-41. While Young asserted that she felt it would have been important for the TWA pilots to know they might have the option to strike if they lost the Section 1113 Motion, she never testified that she would have voted differently if given different advice about the right to strike. Id. Howard Hollander, the third voting member of the MEC called at trial by Plaintiffs, also failed to testify that he would have voted differently if the advisors had told the MEC that the pilots had a right to strike.[1]

Plaintiffs also claim that the TWA MEC should have been told, on April 2, 2001, that ALPA had the ability to obtain a postponement of the hearing date for the Section 1113 Motion. This contention is also contradicted by the undisputed evidence. As ALPA has pointed out in other post-trial submissions, Richard Seltzer testified that the Section 1113 Motion had already been carried for the additional seven days allowed under the statute and that there was no way to postpone it further. See Tr. of July 6, 2011 at 119-21.

---

[1] Steve Rautenberg and David Singer, the two members of the TWA-MEC who testified on behalf of ALPA, both testified that the idea of striking was a terrible idea and that they fully supported the vote on April 2, 2001. See Tr. of June 29, 2011 at 22-23, 174-75.

Plaintiffs' opposition brief also argues, for the first time, that certain of the TWA pilots wanted ALPA to "threaten" a jump seat war. Pls' Br. at 7. Plaintiffs contend that Mike Day testified at trial that "the threat alone [of a jump seat war] would have created the leverage his Merger Committee sorely needed, but ALPA refused to do even that." Pls' Br. at 7 to 8. This assertion, which is not supported by any citation to the record, misstates Day's testimony. Day made clear, in his direct testimony, that the TWA pilots wanted ALPA to <u>start</u> a jump seat war, not merely to <u>threaten</u> one, and that he was upset when Woerth responded by saying ALPA would not do so. <u>See</u> Tr. of June 23, 2011 at 48-52. Indeed, even on cross-examination, and when the Court asked a series of questions about potential adverse effects to the TWA pilots if the APA engaged in a reciprocal jump seat war, Day made no effort to suggest that he wanted ALPA only to threaten a jump seat war. <u>See</u> Tr. of June 23, 2011 at 48-52; 71-76; 121-24.

Moreover, it should be noted that the TWA-MEC as a whole never voted in favor of either threatening or starting a jump seat war. As noted in ALPA's opening brief, a number of TWA pilots, including Rautenberg, thought that a jump seat war was a "knucklehead" idea; Rautenberg was embarrassed that it was even being suggested. ALPA's Br. at 34-35. That a single pilot or a group of pilots was pressing for a jump seat war does not support a finding that ALPA breached its duty of fair representation for failing to comply with their demand. Plaintiffs were not entitled, at the time of trial, to fault ALPA for failing to do something advocated by a group of pilots rather than the entire TWA-MEC, which was the representative body of the TWA pilots.

Although ALPA submits that the evidence fails to support the jury's liability verdict with respect to the other specific incidents referred to in Plaintiffs' brief, including their claim that ALPA should have approved Wilder's various litigation theories, that Duane Woerth made a "get

8

real" comment with respect to the TWA pilots, or that ALPA failed to support the Bond legislation, the fact remains that there is no evidence to support the conclusion that the TWA pilots in any way detrimentally relied on statements of ALPA, including its general promises, or that, if ALPA or the TWA pilots had behaved more aggressively, that the APA or American would have agreed to a more favorable seniority integration.

**D.      There Is No Evidence to Support the Verdict With Respect to Causation.**

With respect to the issue of causation, Plaintiffs' Brief makes no effort to discuss, much less distinguish, the cases cited by ALPA which demonstrate that evidence from American Airlines and APA was essential for Plaintiffs to establish causation, namely Steelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267 (3d Cir. 1995) and Air Turbine Tech., Inc. v. Atlas Copco AB, 410 F.3d 701 (Fed. Cir. 2005). These cases establish the basic principle that the hearsay rule bars any attempt by Plaintiffs to speculate about the reasons why American and the APA took the positions they took.

The cases cited by Plaintiffs for the propositions that causation can always be proven by circumstantial evidence and that direct evidence is not necessary if it must come from an "adverse" party, see Pls Br. at 13-14, do not support these positions. For example, Porter v. American Optical Corp., 641 F.2d 1128 (5th Cir. 1981), does not hold, as suggested by Plaintiffs, that under the federal standard for sufficiency of evidence, causation can "always" be inferred from circumstantial evidence. Porter was a product liability case that relied upon the law of Louisiana, not federal law. It dealt with the issue of physical causation, not that of human motivations.

The decision in Rutherford v. American Bank of Commerce, 565 F.2d 1162 (10th Cir. 1977), is equally inapposite. Rutherford was an employment discrimination case in which a bank employee claimed that, after she made a complaint of sex discrimination, she was unable to

9

obtain employment at a different bank, Citizens Bank. The case was tried to a judge, who found

in favor of the plaintiff and who specifically found that Citizens Bank determined not to make an

offer of employment to the plaintiff because of interference from her employer. Officials from

Citizens Bank testified at that trial and confirmed that Citizens Bank was sufficiently interested

in hiring the plaintiff that it contacted her employer's vice president about her. These and other

circumstances led the trial court to discount testimony by representatives of Citizens Bank that

they determined not to hire the plaintiff for reasons unrelated to the fact that she had filed sex

discrimination charges against her employer. In affirming, the Tenth Circuit noted that it was

not improper for the trial court to discount the "self-serving statements" of officials from

Citizens Bank and that "inferences from circumstantial facts may frequently amount to 'full

proof' of a given theory, and may on occasion even be strong enough to overcome the effect of

direct testimony to the contrary." 565 F.2d at 1164.

     The difference between Rutherford and this case is stark. In Rutherford, representatives

of Citizens Bank testified at trial, were cross-examined and made statements that, the trial court

found, were sufficient to establish causation. The court relied upon evidence that Citizens Bank

was poised to hire the plaintiff but backed off after a call with a representative of her former

employer.

     Plaintiffs also rely upon the decision in Viner v. Sweet, 30 Cal. 4th 1232, 1241, 70 P.3d

1046, 1052 (2003), a legal malpractice action under California law. It too fails to support their

position. In Viner, the California Supreme Court reversed a jury verdict in a case involving

alleged malpractice in a transaction, because the trial court had failed to require the plaintiffs to

establish that the outcome would have been more favorable. The court held that the requirement

of causation in cases involving litigation malpractice applies with full force to all malpractice

cases and summarized that requirement as follows:

> In a litigation malpractice action, the plaintiff must establish that *but for* the
> alleged negligence of the defendant attorney; the plaintiff <u>would</u> have obtained a
> more favorable judgment or settlement in the action in which the malpractice
> allegedly occurred. The purpose of this requirement, which has been in use for
> more than 120 years, is to safeguard against speculative and conjectural claims. .
> . . It serves the essential purpose of ensuring that damages awarded for the
> attorney's malpractice actually have been caused by the malpractice.

70 P.3d at 1053 (citations omitted) (emphasis added).  In discussing the proofs necessary to

establish causation, the court noted that while the plaintiffs need not extract an "express

concession by the other parties to the negotiation that they would have accepted" the plaintiffs'

terms and commented that the plaintiffs need not prove causation with "absolute certainty," the

plaintiff must nevertheless "introduce evidence which affords a reasonable basis for the

conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of

the result." <u>Id</u>. (quoting <u>Ortega v. Kmart Corp.</u>, 26 Cal.4th 1200, 1205, 114 Cal.Rptr.2d 470, 36

P.3d 11 (2001)).  The court further emphasized that "difficulties of proof cannot justify

imposing liability for injuries that the attorney could not have prevented by performing

according to the required standard of care." <u>Id</u>.

The decision in <u>Cox v. Administrator United States Steel & Carnegie Pension Fund</u>, 17

F.3d 1386 (11th Cir. 1994), also fails to support Plaintiffs' contention that causation can

"always" be inferred by circumstantial evidence.  Indeed, a review of the court's extensive

decision in <u>Cox</u> establishes that there was significant direct evidence, including testimony at a

criminal trial, that union officials demanded personal concessions as a condition of their

agreement to any settlement with the company.  In summarizing that evidence, the Eleventh

Circuit noted:

> The subject of a personal pension for Rich and Phillips [the two union officials] was always discussed between them and U.S.X negotiators in secret. Rich first raised the issue by slipping Miller a hand-written note after a negotiating session. Phillips testified that thereafter, when the U.S.X negotiations discussed the subject, they never did so in the hotel conference room where the formal negotiations were being held, but only in a small room across the hall or in the hallway or lobby.

> After the concessions were negotiated, Rich and Phillips refused to sign the agreement until they received assurances that their pension requests would be considered favorably. Miller testified in a deposition that Rich and Phillips refused to sign the Fairfield Agreement until they had received an answer to their request for pension credit, and that as far as U.S.X. was concerned, "their signatures were essential." Only after he told them that he thought their pension requests "would be considered favorably" did they sign, Miller testified.

17 F.3d at 1401. In reversing a grant of summary judgment to the defendants, the court found that this evidence was sufficient to establish that the misconduct of the union officials caused the company to negotiate a contract with the union that was less favorable to the union-represented employees than it might have been:

> Instead of receiving personal pension benefits for themselves and their friends, Rich and Phillips could have demanded and obtained from U.S.X. a reduction in the union's concessions of an amount equal to the cost of the pensions. That conclusion follows as a matter of economics from the nature of the collective bargaining process.

Id. at 1402.[2] In other words, causation was obvious based upon the "economics" of collective bargaining, because money that the company was willing to pay to corrupt union officials was

---

[2] The decision in Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359 (1927), an anti-trust case, has nothing to do with the issue of causation. It considered a claim by the defendant that the plaintiff's damages were "purely speculative." In rejecting this argument, the Supreme Court noted the damages "are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." Id. at 379 (quoting the Court of Appeals decision). It is well settled that the standard for proving injury in fact – reasonable certainty – is significantly higher than the standard for proving the amount of damages. ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues (1996) at 31 ("The standards for proving the *fact* that the plaintiff was injured are more stringent than those for proving the *amount* of that injury.") (emphasis in original).

presumably money that it would have been willing to pay to the workers represented by the union.

None of these cases holds that evidence from an adverse party is inadmissible or unnecessary. Indeed, the three of these cases that involved transactions all appear to have required consideration of such testimony. So these cases in fact support ALPA's position that testimony from representatives of American with respect to the events of April 2, 2001, and from representatives of the APA – and probably also American – with respect to the seniority negotiations later in the year was necessary.

Moreover, although these non-DFR cases comment that circumstantial evidence can sometimes be sufficient to prove causation, they also make clear that such evidence, if admissible, must still demonstrate that the outcome would have been different. As a consequence, in some cases, circumstantial evidence will be inadequate and will impermissibly invite the trier of fact to engage in conjecture or speculation.

This is such a case. There is no basis in the record to support an argument that if ALPA had given different advice or had been more aggressive, that the outcome would have led to a more favorable seniority integration process. Indeed, the direct evidence is to the contrary. For example, American consistently took the position, throughout negotiations leading up to the execution of the new CBA on April 2, 2001, that if the Section 1113 motion were denied, it would walk away from the deal, unless all of the unions – including ALPA – waived the scope and successorship provisions of their CBAs with TWA, Inc. Although some of the Plaintiffs attempted to claim, at trial, that they believed American was "bluffing," they presented no testimony from American that it was indeed bluffing and no circumstantial evidence to suggest that it was. The testimony of Jeffrey Brundage, which ALPA offered at the time of trial, would

have established that American was not bluffing and would have explained its reasons.  Even beyond this, in light of the high likelihood that the Section 1113 motion would be granted in any event, allowing the Bankruptcy Court to rule on that motion would have significantly prejudiced the TWA pilots.  They – and ALPA – simply could not take the chance that American was bluffing and risk the loss of jobs and other benefits.

Likewise, although Plaintiffs have tried to suggest that the threat of enactment of the Bond legislation caused American and the APA to give further ground in negotiations and that more support from ALPA for the Bond legislation would have led to more concessions, once again there is no testimony from representatives of American or the APA to support that contention, and no evidence was presented at the time of trial to suggest that was the case. Indeed, documents and testimony reporting on the firm positions being taken by American and the APA are directly contrary to the idea that they would have given more ground.  See Tr. of June 29, 2011 at 15 (Rautenberg); id. at 173 (Singer); D-088; P-343; P-344; P-345.  Indeed, that American and the APA imposed Supplement CC on November 7, 2001, while the Bond legislation was still being lobbied for, leaves little question that, from the perspective of American and the APA, the time for further discussion, much less more concessions, had passed.

To summarize, although there may be some cases where circumstantial evidence is adequate to establish causation, those cases nevertheless require both admissible evidence (which was not presented here) and a quantum of circumstantial facts which meet the evidentiary burden of establishing causation by reasonable certainty.  Because that evidence and those facts were absent in this case, and indeed, the circumstances undercut any such argument, Plaintiffs' argument for causation was nothing more than speculation and is not adequate to justify the jury's verdict on that issue.

14

Instead, this case falls squarely within the scope of such cases as <u>Anderson v. United Paperworkers Int'l Union, AFL-CIO</u>, 641 F.2d 574 (8th Cir. 1981), where the plaintiffs alleged that statements made by a union representative induced union members to ratify a bargaining agreement regarding severance pay. <u>See</u> 641 F.2d at 576. The employees had significant concern about financial viability of the employer and its ability to meet its severance pay obligations. <u>See id.</u> at 579. At the ratification meeting, the union representative made misrepresentations about the existence of a security fund for the severance pay. <u>Id.</u> The union member plaintiffs alleged that they would not have ratified the agreement and further would have gone out on strike or found other jobs had they known the truth that the security fund did not exist. <u>See id.</u> These allegations are strikingly similar to those made in this case.

The Eighth Circuit reversed the District Court's ruling that there was sufficient evidence in the record to support a claim that the union representative's misrepresentations caused the plaintiffs' injuries:

> Even crediting this self-serving testimony, it is <u>mere speculation</u> that an employer which had continually resisted the severance pay provision as written, had refused to establish a security fund, and was only a few months from filing for bankruptcy, would have been willing and able to establish a security fund and contribute the necessary funds to do it. ... The plaintiffs have not proved that but for Gear's misrepresentations in 1974 they would have obtained their severance pay.

<u>Id.</u> at 580 (emphasis added).[3]

In this case American and the APA had "continually resisted" the demands of the TWA pilots and, in the wake of 9/11 and its devastating impact on the American pilots and the entire

---

[3] ALPA has discussed, in its Reply Brief in further support of its New Trial Motion, which is being filed concurrently, why the two DFR cases relied upon by Plaintiffs, namely <u>Lewis v. Tuscan Dairy Farms, Inc.</u>, 25 F.3d 1138, 1142 (2d Cir. 1994); and <u>Aguinaga v. United Food and Commercial Workers Int'l Union</u>, 993 F.2d 1463, 1471 (10th Cir. 1993), are not applicable. It relies upon that discussion for the purposes of this Reply Brief as well.

airline industry, had no motivation to back away from their hard-line position. Any argument to the contrary is nothing more than speculation.

## CONCLUSION

For all of the foregoing reasons, defendant ALPA respectfully requests that the Court grant its renewed Motion for Judgment as a Matter of Law, and dismiss this action in its entirety with prejudice.

Respectfully submitted,

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121


By:   _/s/ Steven J. Fram_____
STEVEN J. FRAM, ESQUIRE
JOHN C. CONNELL, ESQUIRE

*Pro Hac Vice*:
Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Ave., N.W., Suite 250
Washington, DC 20016
(202) 659-4656

Counsel for Defendant Air Line Pilots Association, International

Dated:  September 26, 2011
7154255v1