Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By:    Steven J. Fram, Esquire
       John C. Connell, Esquire

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, et al.,      ) | |
|      ) | |
| Plaintiffs,      ) | |
|      ) | |
| v.      ) | Civil Action No. 02-2917 (JEI) |
|      ) | |
| AIR LINE PILOTS ASSOCIATION,      ) | |
| INTERNATIONAL,      ) | |
|      ) | |
| Defendant.      ) | |
|      ) | |

## DECLARATION OF STEVEN J. FRAM IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b) AND COMPANION MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59 OR FOR DISMISSAL

STEVEN J. FRAM hereby declares as follows:

1.      I am a member of the Bar of this Court and am a shareholder in the law firm of

Archer & Greiner, P.C., attorneys for Defendant, Air Line Pilots Association, International.

2.      I am submitting this Declaration in order to provide copies of certain deposition

and trial transcripts and other materials that are referred to in the reply briefs being filed by

Defendant on September 26, 2011, in further support of the Defendant's Motion for Judgment as

a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) and Companion Motion for New Trial

Pursuant to Fed. R. Civ. P. 59 or for Dismissal.

        3.      True and correct copies of excerpts of deposition and trial transcripts, trial

exhibits and other materials are attached as follows to this Declaration:

| Exhibit | Description |
| --- | --- |

**Deposition Transcripts**

| A | Deposition of Mark Hunnibell, October 24, 2006 |
| --- | --- |
| B | Deposition of John Clark, December 1, 2006 |

**Trial Transcripts**

| C | Trial Transcript, Volume 3, of June 9, 2011 |
| --- | --- |
| D | Trial Transcript, Volume 4, of June 13, 2011 |
| E | Trial Transcript, Volume 7, of June 16, 2011 |
| F | Trial Transcript, Volume 9, of June 22, 2011 |
| G | Trial Transcript, Volume 10, of June 23, 2011 |
| H | Trial Transcript, Volume 11, of June 27, 2011 |
| I | Trial Transcript, Volume 12, of June 28, 2011 |
| J | Trial Transcript, Volume 13, of June 29, 2011 |
| K | Trial Transcript, Volume 14, of June 30, 2011 |
| L | Trial Transcript, Volume 15, of July 5, 2011 |
| M | Trial Transcript, Volume 16, of July 6, 2011 |
| N | Trial Transcript, Volume 17, of July 7, 2011 |
| O | Trial Transcript, Volume 18, of July 11, 2011 |

**Trial Exhibits**

| | |
|---|---|
| P | P-3, Letter dated December 18, 2001, from Hunnibell to Rindfleisch |
| Q | P-236, Email dated May 24, 2001, from Holtzman to Christy, Roberts, Rosen and Wilder forwarding May 23, 2001 APA Hotline Message |
| R | P-343, Letter dated October 23, 2001, from Pastore to Darrah and Brundage |
| S | P-344, Letter dated October 23, 2001, from Darrah to Pastore |
| T | P-345, Letter dated October 24, 2001, from Brundage to Pastore |
| U | D-2, ALPA Board of Directors Pilot Unity Resolution |
| V | D-25, Council 3 Information Update dated May 8, 2001 |
| W | D-88, Minutes of TWA-MEC Special Meeting on October 20-23, 2001 |
| X | D-138, Letter dated October 25, 2001, from Rautenberg to Council 3 pilots |
| Y | D-365, Minutes of Council 4 Meeting on March 30, 2001 |
| Z | D-411, ALPA Jumpseat Policy |

**Other Materials**

| | |
|---|---|
| AA | Joint Proposed Final Jury Instructions |

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on September 26, 2011.

_/s/ Steven J. Fram_____
STEVEN J. FRAM, ESQUIRE

7154498v1

# Exhibit A

Bensel v. Air Line Pilots

10/24/2006                                    Mark Hunnibell

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

Cause No. 02-2917-JEI-AMD

-----------------------------------------x

LEROY "BUD" BENSEL, et al.,

          Plaintiffs,

     Vs.

AIRLINE PILOTS ASSOCIATION,

          Defendant.

-----------------------------------------x


               D E P O S I T I O N


     The deposition of CAPTAIN MARK HUNNIBELL,

taken on behalf of the Plaintiffs in the

hereinbefore entitled action, before Francine

Garb, a Certified Shorthand Reporter and Notary

Public within and for the State of Connecticut,

commencing at 10:00 a.m., on October 24, 2006,

at the offices of Brandon Smith Reporting,

Six Landmark Square, Stamford, Connecticut 06901.

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Bensel v. Air Line Pilots

10/24/2006                                          Mark Hunnibell

Page 50

MARK HUNNIBELL
1
2 about this deposition?
3     A   No.
4     Q   Earlier in the deposition you mentioned
5 that you had met with Mr. Rindfleisch?
6     A   Yes.
7     Q   And he's one of the organizers at ALPA,
8 right?
9     A   I believe so.
10    Q   When was the first time you met with him
11 in connection with trying to organize the American
12 Airline pilots to join ALPA?
13    A   That is a question I felt confident that
14 you would ask, and I can't say for sure.  I think
15 it's possible the way have met sometime late in
16 2001 or 2002.  I don't know.
17    Q   It's possible, certainly sitting here
18 today, your best memory, you are saying it's
19 possible you met him in the year 2001 in
20 connection with trying to organize the American
21 Airline pilots to join ALPA?
22    A   I would say it's possible.  I would be
23 more confident in saying it's the year 2002.
24    Q   And that would be the winter of 2002?
25    A   I think if I met with him, it was

Page 51

MARK HUNNIBELL
1
2 probably after we had run out of time on the
3 cards.
4     Q   What does that mean?
5     A   Well, the card campaign that we were
6 running timed out.  There is -- they are only good
7 for a year, and then you have got to go back and
8 resolicit signatures, and we didn't do that.  So,
9 we let the cards expire, and then we transitioned
10 to an effort to generate political support for a
11 merge.
12    Q   You said a whole bunch there.
13    A   I'm sorry.
14    Q   Don't apologize to me.
15        The 12-month limitation you are talking
16 about, what you are saying is that once these
17 campaign cards go out to the membership, you have
18 12 months to --
19    A   Twelve months from the date the
20 individual signed, it times out.  That is my
21 understanding.  My understanding is that the
22 National Mediation Board will not accept as valid
23 a card that was executed more than 12 months
24 earlier.
25    Q   For those of us in the room that aren't

Page 52

MARK HUNNIBELL
1
2 labor lawyers, explain what you mean by these
3 cards.  What's the purpose of the cards?
4     A   The cards were cards that I sent out in
5 conjunction with my campaign for Vice President,
6 actually, and they are cards that say -- we sent
7 them to every APA member, or that was the idea
8 anyway.  And the intent was that pilots would sign
9 and return these cards, and we would get enough of
10 them, which in this case, my understanding is we
11 would need 51 percent, because the pilots were
12 already represented.  And once we got enough of
13 them, that we would request an election.
14        What the cards themselves said was I
15 want to have a representation election on the
16 property at American, and I want ALPA to be my
17 representative, something like that.  And then the
18 people would fill it out and mail it back.
19    Q   And they are, physically, like little
20 postcards?
21    A   They are postcards, yes.
22    Q   When were they mailed out?
23    A   I mailed them at the end of my
24 campaign.  I think it was probably either the
25 beginning of May or middle of May, 2001.  It's

Page 53

MARK HUNNIBELL
1
2 possible that it was in June, but I don't think it
3 was.  I'm trying to remember the time line on that
4 election, and I don't think I went to run off in
5 that election, which would have meant it was
6 probably a May campaign.
7     Q   You said these cards, once signed, they
8 are good for 12 months, right?  That is your
9 understanding?
10    A   Yes.
11    Q   During what period were you receiving
12 signed cards back from American pilots?
13    A   Well, I never received them.
14    Q   Where did they go?
15    A   They went to the post office in
16 California.
17    Q   That would be John Clark's post office?
18    A   John got them, yes.
19    Q   How long was he receiving signed cards;
20 do you know?
21    A   I don't know.  It was over the course of
22 the year.  They came and trickled -- you get an
23 initial bunch, and then they kind of trickled out.
24    Q   I'm trying to understand.  I'm asking
25 these questions because you prefaced your

14 (Pages 50 to 53)

Brandon Smith Reporting

Bensel v. Air Line Pilots

10/24/2006                                          Mark Hunnibell

| Page 70 | Page 72 |
|---|---|

**Page 70**

MARK HUNNIBELL
1
2 on the 23rd of July, right?
3     A   The bill that you have here was I guess
4 arrival on the 22nd, check out on the 23rd.
5         And you say there is a Cafe Grille
6 thing?  Where is that?
7     Q   It's --
8     A   On the thing, and 10:48 in the morning.
9 Yeah, I think we had breakfast.
10     Q   You mentioned a dinner.  That would have
11 been on the evening --
12     A   I would say the 22nd, the night before.
13     Q   Who paid for the dinner?
14     A   I don't remember.  I really don't.
15     Q   You didn't pay for it, though?
16     A   I don't remember.  I don't know.  I may
17 have, I don't know.  We may have split the check,
18 I don't remember.
19     Q   The people that were at the dinner were
20 the same group that was at the hotel the next day?
21     A   No.  No.  I think the only person that I
22 have any recollection of having dinner with like
23 that is Ron Rindfleisch.  It was just him and John
24 and I.
25     Q   And you have a firm memory, sitting here

**Page 71**

MARK HUNNIBELL
1
2 today, that you had a dinner -- you had dinner
3 with Mr. Rindfleisch on July 22nd of 2001?
4     A   Not firm.  No.  That's wrong.  It's not.
5 Obviously, I don't have a firm reading of the
6 dates, so I sure don't have a firm reading of when
7 it was.
8     Q   But you do know for a fact that the
9 reason you were in Washington in July 2001 was to
10 meet with some ALPA folks, and there was talk
11 about organizing the American pilots to join ALPA;
12 is that right?
13     A   That was the genesis of it.
14     Q   Let me throw some names out at you and
15 see if it will draw some memory as to who might
16 have been at the meeting.
17     A   Okay.
18     Q   Do you remember Jalmer Johnson?
19     A   No, he was not there.
20     Q   He wasn't at the July 2001 meeting?
21     A   I shouldn't say that.  I don't recall
22 him being there.
23     Q   You know that gentleman?
24     A   I met him one time that I do recall.  I
25 don't recall meeting him prior to that.

**Page 72**

MARK HUNNIBELL
1
2     Q   Jerry Mugerditchian, was he at the
3 July 2001 meeting?
4     A   He may have been.  It's possible.
5     Q   So it's possible it could have been
6 Rindfleisch, it's possible it could have been
7 Mugerditchian.  Is it possible it could have been
8 anybody else that you know of?
9     A   The dinner thing?
10     Q   I'm talking about the hotel.
11     A   Like I said, I'm fairly certain that
12 Howard Attarian was there.
13     Q   You did mention him.
14     A   And beyond that, I don't know.
15     Q   And you told me that Mr. Worth, Duane
16 Worth, the President of ALPA, was supposed to be
17 at the meeting, but he didn't make it?
18     A   Something like that.  I don't know
19 whether he was supposed to be, but there was
20 something of the expectation that we would be
21 seeing him or something like that.  There was some
22 ambiguity as to whether he would be coming.
23     Q   At this point, July of '01, you had
24 already made your mailing to the APA membership,
25 right?

**Page 73**

MARK HUNNIBELL
1
2     A   Yes.
3     Q   What was the point of this meeting; to
4 report the status of how many cards you are
5 receiving, is that it?
6     A   Well, one of the things is that we
7 really -- the campaign itself, we happened to pick
8 an unfortunate name for it in the context of
9 what's being transpired here.  We really were not
10 doing anything at the direction or behest of ALPA.
11 So reporting the progress to them implies that
12 there is some kind of superior/subordinate
13 relationship that didn't exist.
14         We were informing them of how things
15 were going, and what we were facing and things
16 like that.  I suppose that that is accurate.  But
17 to the extent that you imply there is some kind of
18 reporting, that is not accurate.
19     Q   Well, do you, in fact, remember the ALPA
20 people asking you about the status of the campaign
21 in the July 2001 time frame there?
22     A   They may have asked how it was going,
23 something like that.
24     Q   What else did they ask you?
25     A   Well, I will tell you that I do

19 (Pages 70 to 73)

Brandon Smith Reporting

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Bensel v. Air Line Pilots

10/24/2006                                              Mark Hunnibell

Page 74

MARK HUNNIBELL
1
2   remember -- backing up just a little bit, I
3   remember that when I called Mr. Rindfleisch in
4   May, right after I had mailed my campaign mailer
5   with the cards, and -- because I hadn't discussed
6   this with him at all before I did it, and he -- it
7   was like an extended period of silence on the
8   phone, like you could have heard a pin drop. Like
9   he knew -- he said, what do the cards say, and he
10  asked me about the card, and what it looked like,
11  and what it said. And I told him, and he said,
12  "Well, how did you mail that out?" I said, "I
13  just used it in my campaign mailing for candidate
14  for office." And he sounded really bummed out
15  about it, that I had done this.
16          And so I was a little bit, I don't know,
17  taken aback. I was kind of upset with myself a
18  little bit, but also could tell they were a little
19  bit startled by it. But that was in May, and then
20  by July they said, okay, it's water over the dam,
21  how is it going kind of thing.
22      Q   They warmed up to the idea, it sounds
23  like?
24      A   I wouldn't say they warmed up. Cat
25  being out of the bag to the extent it was, they

Page 75

MARK HUNNIBELL
1
2   said, okay, what is the impact, where are we now,
3   what's going on, how is it going, that kind of
4   thing.
5       Q   Other than making inquiries of you as to
6   the status of things, what else was discussed
7   about your campaign that you can recall? I'm
8   limiting my question to this meeting here in July
9   '01.
10      A   I think they may have wanted to know how
11  broadly supported we were, what the network was
12  like, things like that. You know, what kind of --
13  what kind of group, for lack of a better word,
14  that we represented. They were probably perhaps
15  testing us to find out whether this was just a
16  couple of knuckleheads, or whether we actually had
17  broad base of support, or things like that.
18      Q   Well --
19      A   Like I said earlier, my sense of the
20  meeting was that they were kind of trying to find
21  out what we were about and who we were.
22      Q   What sort of assistance did they offer
23  you at that meeting?
24      A   None. None.
25      Q   What assistance did they provide you?

Page 76

MARK HUNNIBELL
1
2       A   None.
3       Q   We were talking about a meeting in
4   Vegas, and I asked that question. If you flip to
5   the very next page of this Exhibit 3 --
6       A   24611?
7       Q   Yes, exactly.
8           -- there is a cab receipt dated
9   December 5, '01, right?
10      A   Okay.
11      Q   That is correct, right?
12      A   The cab receipt, yes.
13      Q   This is in Mr. Clark's handwriting,
14  correct?
15      A   Yes. I don't know. I don't know his
16  handwriting.
17      Q   There is an invoice for a cab fare in
18  Las Vegas on or about December 5, '01. Were you
19  in Vegas that day?
20      A   No.
21      Q   Do you know why Mr.-- assume for me this
22  is Mr. Clark's handwriting.
23      A   Assuming that it is.
24      Q   Assuming that is the case, do you know
25  why he was there that day?

Page 77

MARK HUNNIBELL
1
2       A   No.
3       Q   He never told you about a meeting with
4   ALPA people at the Paris Hotel in December '01?
5       A   Well, I don't know that he did, no.
6       Q   So as of July '01, you have now had one
7   meeting with ALPA folks; is that your testimony?
8       A   Yes.
9       Q   That you can recall, or is that a fact,
10  just one meeting --
11      A   Since --
12      Q   -- as of July?
13      A   As of July '01, yes, I would say that.
14  Certainly nothing before then.
15      Q   When was your next meeting with ALPA
16  people relative to your campaign effort?
17      A   I think we met with them in May or
18  perhaps June 2003.
19      Q   You didn't meet with them again in the
20  year 2001?
21      A   I don't -- I shouldn't say that. Well,
22  in 2001, I don't think I did. I don't recall
23  doing it. And that may be -- maybe there was a
24  meeting, and it's completely escaped my mind. But
25  I think that we met that one time in 2001.

20  (Pages 74 to 77)

Brandon Smith Reporting

6f8f0429-1f87-4e2d-a97f-958e0e4b0327

Bensel v. Air Line Pilots

10/24/2006                                                          Mark Hunnibell

---

Page 226

## SIGNATURE SHEET

I, MARK HUNNIBELL, have read the foregoing transcript of the testimony taken at the deposition on the 24th day of October, 2006, and it is true and accurate to the best of my knowledge.

_____
MARK HUNNIBELL

Subscribed and sworn to before me this
    day of          , 2006.

_____
Notary Public

---

Page 228

OCTOBER 24, 2006
I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| MARK HUNNIBELL | Mr. Press | 5 |
| | Mr. Katz | 199 |
| | Mr. Press | 214 |
| | Mr. Katz | 223 |

E X H I B I T S

| FOR IDENTIFICATION | | PAGE |
|---|---|---|
| Plaintiffs' 1 | Group of invoices | 34 |
| Plaintiffs' 2 | Letter | 49 |
| Plaintiffs' 3 | Group of documents | 63 |
| Plaintiffs' 4 | Document bearing Bates No. ALPA 018562 | 82 |
| Plaintiffs' 5 | 10/14/01 e-mail | 103 |
| Plaintiffs' 6 | Document dated 4/3/02 | 128 |
| Plaintiffs' 7 | 2/11/02 receipt | 134 |
| Plaintiffs' 8 | Document bearing Bates Nos. ALPA 24561 through 587 | 142 |
| Plaintiffs' 9 | Document headed "Presentation by Captain Duane Woerth for President" | 154 |
| Plaintiffs' 10 | String of e-mails | 159 |
| Plaintiffs' 11 | Document headed "ALPA Exploratory Committee Report to the APA Board of Directors Winter 2001 Board Meeting" | 166 |

---

Page 227

STATE OF CONNECTICUT:
COUNTY OF FAIRFIELD:

I, Francine Garb, a Notary Public within and for the State of Connecticut, do hereby certify that the deposition of MARK HUNNIBELL was held before me on the 24th day of October, 2006, at the offices of Brandon Smith Reporting, Six Landmark Square, Stamford, Connecticut 06901.

I further certify that the witness was first sworn by me to tell the truth, the whole truth and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as hereinbefore appears.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the event of said cause.

Dated at Stamford, Connecticut this 2nd day of November, 2006.

ss/Francine Garb

---

Page 229

E X H I B I T S
(Continued)

| Plaintiffs' 12 | Document dated 1/31/01 | 174 |
|---|---|---|
| Plaintiffs' 13 | Document dated 4/5/01 | 180 |
| Plaintiffs' 14 | 4/14/01 memorandum | 187 |
| Plaintiffs' 15 | Document dated 6/1/01 | 190 |
| Plaintiffs' 16 | Excerpt from ALPA's website | 217 |

* * *

---

58  (Pages 226 to 229)

Brandon Smith Reporting

# Exhibit B

Major John B. Clark, JR. - December 1, 2006
Leroy "Bud" Bensel, et al. vs. Air Line Pilots Association

Page 1

Cause No. 02-2917-JEI-AMD

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW JERSEY

-oOo-

LEROY "BUD" BENSEL, et al.,

            Plaintiffs,

vs.

AIR LINE PILOTS ASSOCIATION,

            Defendants.

=========================================================

            VIDEOTAPED DEPOSITION OF
            MAJ. JOHN B. CLARK, JR.

            FRIDAY, DECEMBER 1, 2006

            INCLINE VILLAGE, NEVADA

Reported by:  KIMBERLY J. WALDIE, NV CCR #720, RPR
              CALIFORNIA CSR #8696

b5c99f65-a54b-4571-8b2b-2bfed7b52128

Major John B. Clark, JR. - December 1, 2006
Leroy "Bud" Bensel, et al. vs. Air Line Pilots Association

Page 70

1  Airlines. And if 50 percent plus one returned them, and
2  then they're submitted to the National Mediation Board
3  within a year's time frame of the first one being
4  signed, that triggers a representation election.
5      Q  Okay.
6      A  The members of the class at that point in time
7  then get to choose who they want to represent them. It
8  doesn't necessarily mean that they choose ALPA. They
9  could choose ALPA. They could choose the Teamsters.
10  They could choose APA. It just triggers a
11  representation election.
12      Q  Election. Very good. And that was your goal
13  in initiating this card campaign --
14      A  Yes.
15      Q  -- is to have an election?
16      A  That's correct. And we could have called it
17  the Ducks Unlimited Authorization --
18      Q  Right.
19      A  -- Campaign. But we chose to call it the ALPA
20  representation campaign because that's where Mark and I
21  wanted to go.
22      Q  Now, the cards that are used for a card
23  campaign, how did you get those cards?
24      A  We made them up.
25      Q  And you -- from scratch?

Page 71

1      A  Yes.
2      Q  There's no --
3      A  We designed them and made them up.
4      Q  There's no union form book you can go to and
5  here's a representation card or --
6      A  Yeah.
7      Q  Oh, there is?
8      A  Yeah. We did the research ourselves. We
9  formulated the format in which the card was going to be.
10  I got the post office box. I did the Business Reply
11  Mail paperwork with the Redondo Beach Post Office, and
12  we ran it all by ourselves. You bet.
13      Q  Okay. First you mentioned that you -- you
14  researched what you had to do. I mean going into this,
15  had you ever, I guess, organized a card campaign for --
16      A  No.
17      Q  -- union elections?
18      A  No.
19      Q  This is the first time you ever did it?
20      A  That's it.
21      Q  All right. What sources did you refer to to,
22  you know, figure out what you had to do?
23      A  I believe we looked at what's called the NMB
24  Representation Manual at a minimum. I can't remember if
25  we looked at anything else.

Page 72

1      Q  Who told you to go look at that manual?
2      A  I don't recall that anyone did.
3      Q  That was something that you learned on your
4  own?
5      A  Yes.
6      Q  Okay.
7      A  Mark and I learned that on our own.
8      Q  And then the cards themselves, I understand,
9  they're like the size of a postcard?
10      A  Uh-huh.
11      Q  Who was involved in -- well, let me ask -- did
12  anybody give you an exemplar of -- of a card like that
13  for you to work with?
14      A  No. I told you we designed it all on our own.
15      Q  From scratch?
16      A  Yes.
17      Q  Was there anybody at ALPA that helped you
18  research or format your -- your representation cards?
19      A  No.
20      Q  Nobody?
21      A  No.
22      Q  Besides Mr. Hunnibell, who helped you?
23      A  Helped us with what?
24      Q  With the researching and the creation of the
25  card.

Page 73

1      A  No one that I recall.
2      Q  Did you -- well, I was going to ask you if you
3  consulted a lawyer, but that would call for privileged
4  information. I won't ask.
5          Now, do you remember when the cards were mailed
6  about?
7      A  Yeah. Roughly May of '01.
8      Q  Okay.
9      A  May -- late May, early June.
10      Q  So you got basically mid-February at this --
11  this board meeting your resolution to continue the
12  Exploratory Committee. That failed. And then from that
13  time period through early May, you are in this
14  research-and-design, if you will, mode. Is that --
15  would that be accurate?
16      A  No. That didn't start until probably early
17  May.
18      Q  Oh, after you retired from the board?
19      A  Well, Mark was off the board. Mark's term
20  was -- preceded mine by -- by six months. So he -- he
21  left the board in November of 2000. And to the extent
22  that I recall, he -- he was doing a lot of this work,
23  because in the winter of 2001 into the spring of 2001,
24  there was about a two-month period where I really wasn't
25  doing much of any APA work at all because I was going

19 (Pages 70 to 73)

b5c99f65-a54b-4571-8b2b-2bfed7b52128

Major John B. Clark, JR. - December 1, 2006
Leroy "Bud" Bensel, et al. vs. Air Line Pilots Association

Page 94

1  document, it's got -- it says ALPA, and there's a
2  number. Do you see that?
3      A   Uh-huh.
4      Q   And that would signify that Mr. Katz's law firm
5  produced this. All right?
6      A   Okay.
7      Q   And this is the way the document came to me.
8      A   Okay.
9      Q   Did you forward this e-mail on to somebody at
10  ALPA? Did you do that?
11      A   I can't tell you that. I have no idea.
12      Q   Right. Okay.
13      A   I mean it -- since, you know, it looks to me
14  like whoever forwarded that information was redacted
15  from the top of this, I don't know.
16      Q   Fair enough.
17      A   My guess is if Dennis Petretti was running for
18  president, that this was sent to as many pilots at
19  American Airlines as possible. Probably above
20  90 percent of them. So I could have been a recipient of
21  this, but I don't know that I was, and I couldn't tell
22  you if I forwarded it.
23      Q   Fair enough. Now, if you look at the first
24  paragraph of his e-mail --
25      A   Okay.

Page 95

1      Q   -- Captain Petretti says, (Reading): I would
2  like to preface my comments with the understanding that
3  what I have -- should be "to say" -- what I have to say
4  has to do with the recent and ongoing activity by APA
5  leadership in rejoining ALPA.
6          And my question is, as far as you know, what
7  activity was ongoing by APA leadership to rejoin ALPA in
8  April of 2001?
9      A   The ALPA Exploratory Committee was probably
10  showing up in their mailboxes as he was sending this.
11  That's it.
12      Q   That -- that was the only thing that the
13  leadership was undertaking at that point?
14      A   That's it.
15      Q   All right. Other than you and Captain
16  Hunnibell's effort, your grass roots campaign, if you
17  will, was there anybody else at the APA that was working
18  to organize the American pilots to join ALPA?
19      A   There may have been.
20      Q   And I know that you got some support along the
21  way. But was there another, you know, significant
22  effort underway that you know of?
23      A   There may have been.
24      Q   Can you tell me anything about it?
25      A   No. I'm saying there is -- the possibility

Page 96

1  exists that there may have been.
2      Q   But sitting here today you are not aware of
3  any?
4      A   No.
5      Q   All right.
6      A   Nor was I back then.
7      Q   Now, you recall that there were two mailings
8  that you and/or Mr. Hunnibell were involved in of
9  campaign cards. Right?
10      A   Uh-huh.
11      Q   All right. And the first one was -- well, the
12  first one, did it go to all the pilots, all the American
13  Airline pilots?
14      A   It went to whatever distribution list Prima
15  Data had.
16      Q   Prima Data, what -- what's that?
17      A   That's the firm that APA uses to send campaign
18  mailers to. They provide the addresses of the pilots.
19      Q   That was your intention, to --
20      A   APA provides the list -- the distribution list
21  to Prima Data, and Prima Data sends it to that list.
22  You, as the candidate, don't get to see the list.
23      Q   Can anybody call Prima Data and get a copy of
24  that list?
25      A   Absolutely not.

Page 97

1      Q   That's proprietary to the union. Right?
2      A   Of course.
3      Q   Okay. And then there was a second mailing
4  then. Was it your intention to mail to the same group
5  of people at that time?
6      A   Yes.
7      Q   All right. Do you recall generally what the
8  time frame was between the two mailings?
9      A   No.
10      Q   Was it more than six months?
11      A   No, because the election cycle is not that
12  long.
13      Q   So it was less than six months?
14      A   I would say it was probably four to six weeks
15  at the most.
16      Q   Okay.
17      A   If I recall that the cards were sent in late
18  May or June, and you are showing me this saying that it
19  was sent in mid-April, there's your four to six weeks.
20      Q   So sitting here and looking at the record that
21  we have before us, you would -- you would draw the
22  inference or -- let me start over and ask a real
23  question.
24          From everything that you know and you've seen
25  today, you would believe that the first mailer went out

25  (Pages 94 to 97)

b5c99f65-a54b-4571-8b2b-2bfed7b52128

Major John B. Clark, JR. - December 1, 2006
Leroy "Bud" Bensel, et al. vs. Air Line Pilots Association

**Page 186**

1 and sign the deposition and make any corrections.
2  THE WITNESS: I'll make corrections if
3 they're -- if those are -- any need to be made and then
4 I will sign the corrected copy.
5  MR. PRESS: Right on. That's it.
6  THE WITNESS: Okay.
7  THE VIDEOGRAPHER: This concludes the
8 deposition of John Clark on December 1st, 2006. The
9 time going off record is 5:57 p.m.
10  (The proceedings concluded at 5:57 P.M.)
11
12
13
_____
MAJ. JOHN B. CLARK, JR.
14
15
16
17
18
19
20
21
22
23
24
25

**Page 188**

1
2
3 STATE OF _____)
                         ) ss.
4 COUNTY OF _____)
5
6  I, _____, a notary
7 public in and for the County of
   _____,
8
9 State of _____, do hereby certify:
10  That on the _____ day of
    _____,
11 2006 before me personally appeared MAJ. JOHN B. CLARK,
12 JR., whose deposition appears herein;
13  That any changes in form or substance desired
14 by the witness were entered upon the deposition by the
15 witness;
16  That the witness thereupon signed the
17 deposition under penalty of perjury.
18
19  Dated: At _____,
20 This _____ day of _____, 2006.
21
22  _____
23
24
25

**Page 187**

1  I, KIMBERLY J. WALDIE, a Certified Shorthand
2 Reporter licensed in the State of California and the
3 State of Nevada, do hereby certify:
4  That on FRIDAY, DECEMBER 1, 2006, at the Hyatt
5 Regency Lake Tahoe, 111 Country Club Drive, Incline
6 Village, Nevada, personally appeared MAJ. JOHN B. CLARK,
7 JR., who was duly sworn to testify and deposed in the
8 matter entitled herein;
9  That said deposition was taken in verbatim
10 stenotype notes by me, a Certified Shorthand Reporter,
11 and thereafter transcribed into typewriting as herein
12 appears;
13  That the foregoing transcript, consisting of
14 pages 1 through 186, is a full, true and correct
15 transcription of my stenotype notes of said deposition
16 to the best of my knowledge, skill and ability.
17  I further certify that I am not a relative or
18 employee of counsel of any of the parties, nor
19 a relative or employee of any party involved in said
20 action, nor financially interested in the action.
21  At the conclusion of the proceedings the
22 witness requested the transcript be e-mailed to him.
23  Dated at Reno, Nevada, this 11th day of
24 December, 2006.
25
_____
KIMBERLY J. WALDIE, CSR No. 8696
NV CCR #720, RPR

**Page 189**

1
2  OFFICER'S ACTIONS RE SIGNING OF DEPOSITION
3  PURSUANT TO NEVADA RULES OF CIVIL PROCEDURE
4
5 DATE
6 12-11-06  AT DIRECTION OF COUNSEL THE WITNESS WAS
      SENT AN E-MAIL OF THE TRANSCRIPT
7
8
9
10
11
12  WITNESS SIGNED DEPO
13
14  ORIGINAL SENT TO
15
16  OTHER ACTIONS
17  _____  _____
18  _____  _____
19  _____  _____
20  _____  _____
21  _____  _____
22  _____  _____
23  _____  _____
24  _____  _____
25  _____  _____

48 (Pages 186 to 189)

# Exhibit C

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3      THEODORE A. CASE, SALLY YOUNG,
        HOWARD HOLLANDER, PATRICK BRADY
 4      AND MICHAEL FINUCAN, individually
        and on behalf of all others
 5      similarly situated,
                       Plaintiffs,
 6                                      VOLUME 3
                V.                      TRIAL TRANSCRIPT
 7
        AIR LINE PILOTS ASSOCIATION,
 8
                       Defendant.
 9
                            CAMDEN, NEW JERSEY
10                          JUNE 9, 2011

11      B E F O R E:   HONORABLE JOSEPH E. IRENAS
                       UNITED STATES DISTRICT JUDGE
12
                  A P P E A R A N C E S:
13
            TRUJILLO, RODRIGUEZ & RICHARD
14          BY:  NICOLE M. ACCHIONE, ESQ.
                 AND: LISA J. RODRIGUEZ, ESQ.
15                  AND
            GREEN JACOBSON, P.C.
16          BY:  ALLEN PRESS, ESQ.   (MO. BAR)
            AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17          For the Plaintiffs.

18          ARCHER GREINER
            BY:   STEVEN FRAM, ESQ.
19               AND
            KATZ & RANZMAN
20          BY:  DANIEL M. KATZ, ESQ.
            FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
            ELIZABETH GINSBERG, ESQ.
22          IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1            Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.
3
                     S/   LYNNE JOHNSON
4
                     Lynne Johnson, CSR, CM, CRR
5                    Official Court Reporter

6

7

8

9

10            LYNNE JOHNSON, CSR, CM, CRR
              OFFICIAL COURT REPORTER
11            UNITED STATES DISTRICT COURT
              P.O. BOX 6822
12            LAWRENCEVILLE, NJ  08648
              PHONE:   609 896 1836
13

14

15

16

17

18

19

20

21

22

23

24

25

1   for the process to continue.  That was what the discussion

2   was about.  He said I didn't see, he he didn't think the

3   Court would grant in this case.

4   Q.   And again, that he was who?

5   A.   Bill Wilder.  Our merger attorney.

6   Q.   Did Mr. Holtzman or Warner or Christy make any

7   statements to the effect that they agreed with Mr. Wilder's

8   opinion?

9   A.   No. There was no agreement or disagreement at this

10  meeting.  People were just listening.

11  Q.   Now, at that point there hadn't been a 1113 motion

12  filed.  That came later?

13  A.   That came later.

14  Q.   Why were you even talking about that?

15  A.   It was one of the threats, I guess, coming, that if we

16  were told by TWA corporation that if you didn't do this, this

17  would be the next step that they would have to take and that

18  would be to file a 1113 motion.

19  Q.   So you just planned it?

20  A.   That is exactly what the meeting was for.  What are the

21  options, what are we phased with.  What could happen?

22  Q.   Mr. Altman, as an ALPA member, a MEC member, were you

23  aware of any efforts before the American TWA transaction was

24  announced, so now we are in the year 2000, were you aware of

25  any efforts by ALPA to get the American pilots to rejoin

Altman-direct                                                    63

1    ALPA?

2    A.    Yes, I was.

3    Q.    Can you tell us what you understood at the time?

4    Q.    Again, we are talking before the merger deal was

5    announced in January?

6    A.    There were a number of airlines that had split off from

7    ALPA in the past.  And for various reasons.  And ALPA was

8    making a concentrated effort, rightfully so, I believe, to

9    bring it back into one union.  The airlines in question were

10   Federal Express, Continental, and American.  So I had known

11   that -- well, Federal Express and Continental had rejoined

12   ALPA, knew that.  And we knew that, or I knew personally from

13   press reports and what I had read in ALPA magazine and other

14   publications that, you know, there is an effort, we would

15   like to get American back into the ALPA fold.

16   Q.    Okay.  Now, did that subject come come up at these

17   January, late January, meetings?

18   A.    Yes, it did.

19   Q.    Tell us how, the subject was raised?

20   A.    The merger committee chairman for our side, Mr. Bud

21   Bensel, asked the question.

22   Q.    Asked it of whom?

23   A.    He asked it of the ALPA advisors, Mr. Holtzman, Mr.

24   Christy and Mr. Warner, and it was phrased, what are you

25   doing with American, and the American pilots.

Altman-direct                                                    116

1   A.    Just what we were told, there is no need to waive scope.

2   You don't have to do it.

3   Q.    On April 2 he flip-flopped and his opinion was what?

4   A.    You have to do it, you have to do it now.  There is no

5   time.

6          I did raise the question, because it was such a

7   huge decision, and normally we would send things out of a

8   magnitude like this to the pilot group, hey, this is what is

9   facing us, how do you vote.  Yes or no.  We would like to get

10  a pilot ratification.  I was told specifically there is no

11  time.

12  Q.    Wait.  You asked for that to happen on April 2?

13  A.    I would like to have this go out.  That is a huge

14  decision to put on our shoulders.  And we need to put this

15  out to, this is a total change in, you know, a

16  recommendations coming from advisors.  So we should, in good

17  conscious, put this out to the pilot group and it had to be

18  done that day.  And no one ever told us why.

19  Q.    Other than waiving scope did they give you any

20  alternative strategy?

21  A.    There were no alternatives offered.

22  Q.    Did any of the MEC members suggest alternative

23  strategies?

24  A.    Yes.  The question was asked?

25  Q.    What was that?

Altman-direct                                    117

1  A.    Alternative strategies was raised by Mr.  Ted Case about

2  the ability, if they took the contract, of the right to

3  strike.

4        THE COURT:  In other words, if there was no labor

5  contract at all, if the 1113 was granted, the issue raised

6  was --

7  A.    Can you strike, without a labor contract.

8  Q.    Before getting into what the response was, this right to

9  strike, a pilot that has an existing, that is working under a

10  collective bargaining agreement does not have the right to

11  strike.  Is that correct?

12  A.    Yes.  That's correct.  Certain circumstances through the

13  process negotiating, whatever might happen, and it is a very

14  long, lengthy drawn-out process before you are given that

15  Wright to walk off the job.

16        THE COURT:  That is peculiar to the Railway Act as

17  distinct from the National Labor Relations general law

18  governing, right?

19  A.    That's correct.

20  Q.    The question was if the bankruptcy court rejects our

21  contract, and we don't have one, does that mean we have the

22  right to strike.  That was the question posed?

23  A.    That was the question.

24  Q.    And who responded and what was the response?

25  A.    The response was from Clay Warner and he said no.

Altman-direct                                                    118

1    Absolutely you do not have the right to strike.

2    Q.   Do you recall any other advisors responding to the

3    question?

4    A.   I don't recall the others.  I just remember Clay,

5    speaking to that.

6    Q.   P 136.

7              THE COURT:  J?

8              MR. PRESS:  P 136.

9              THE COURT:  J.

10             MR. PRESS:  It is J, I am sorry.

11             THE COURT:  I have J 136.

12             MR. PRESS:  J 136.  That's correct.

13   Q.   Do you have that in front of you?

14   A.   Yes, I do.

15   Q.   Mr. Seltzer was the bankruptcy lawyer.  He was there, on

16   April 2?

17   A.   That's correct.  One of the advisors present.

18   Q.   What did he say about your chances or prospects of

19   prevailing in the bankruptcy court on this 1113 motion?

20   A.   99 point 99 percent that you won't.

21   Q.   Is that a quote?

22   A.   That was a quote.

23   Q.   99.9 chance you will fail and the Court will take your

24   contract and reject it?

25   A.   That's correct.

# Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3      THEODORE A. CASE, SALLY YOUNG,
        HOWARD HOLLANDER, PATRICK BRADY
 4      AND MICHAEL FINUCAN, individually
        and on behalf of all others
 5      similarly situated,
                     Plaintiffs,
 6                                            VOLUME 4
            V.                           TRIAL TRANSCRIPT
 7
        AIR LINE PILOTS ASSOCIATION,
 8
                     Defendant.
 9
                                  CAMDEN, NEW JERSEY
10                                JUNE 13, 2011

11      B E F O R E:   HONORABLE JOSEPH E. IRENAS
                       UNITED STATES DISTRICT JUDGE
12
                  A P P E A R A N C E S:
13
           TRUJILLO, RODRIGUEZ & RICHARD
14         BY:  NICOLE M. ACCHIONE, ESQ.
               AND: LISA J. RODRIGUEZ, ESQ.
15               AND
           GREEN JACOBSON, P.C.
16         BY:  ALLEN PRESS, ESQ.   (MO. BAR)
           AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17         For the Plaintiffs.

18         ARCHER GREINER
           BY:   STEVEN FRAM, ESQ.
19               AND
           KATZ & RANZMAN
20         BY:  DANIEL M. KATZ, ESQ.
           FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
           ELIZABETH GINSBERG, ESQ.
22         IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

```
 1            Pursuant to Section 753 Title 28 United States
      Code,  the following transcript is certified to be an
 2    accurate record as taken stenographically in the
      above-entitled proceedings.
 3
                        S/   LYNNE JOHNSON
 4
                      Lynne Johnson, CSR, CM, CRR
 5                    Official Court Reporter

 6

 7

 8

 9

10            LYNNE JOHNSON, CSR, CM, CRR
              OFFICIAL COURT REPORTER
11            UNITED STATES DISTRICT COURT
              P.O. BOX 6822
12            LAWRENCEVILLE, NJ  08648
              PHONE:   609 896 1836
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    at the council meeting and they were the ones subject to

2    career tragedy if we didn't have a union.

3    Q.    Ms. Young, other than waiving scope, was there any other

4    option presented to the MEC that day?

5    A.    There was not.

6    Q.    We have got a group of six or seven lawyers and no one

7    has an idea other than surrender, is that right?

8    A.    They presented no other alternative than basically to,

9    comparison of waiving scope or not waiving scope.  They made

10   it, a very clear case for waiving scope.

11   Q.    Do you remember any discussion about, well, if the

12   bankruptcy court takes our contract, rejected our contract,

13   will we then have a right to strike.  Do you remember any

14   discussion about that.

15   A.    I do remember some discussion at the very end.  But I

16   don't remember exactly what was said., you know, the right to

17   strike is such a crucial element for an employee group

18   because it is the one bargaining behavior that they have to

19   keep the company from making unilateral changes to a

20   contract.  The threat of a strike, I should say.

21   Q.    Can you, without remembering specifics, can you remember

22   the gist of the conversation that day about whether or not

23   you would have a right to strike?

24   A.    They said we would not have a right to strike.

25   Q.    Who is they?

1   A.   Well, Bill Roberts and company.

2   Q.   Again, did Mr. Seltzer, who had filed a brief saying

3   there was a clear right to strike, did he correct Mr.

4   Roberts?

5   A.   He said nothing.  He said nothing about it.  He did not

6   mention that he had filed that in his brief.

7   Q.   If you had known that, had you known that striking would

8   have been an option for you even if you lose in the

9   bankruptcy court, would that have been something important to

10  you that day to know?

11  A.   Absolutely.

12  Q.   Did anyone -- did any of the ALPA advisors present that

13  day tell you, you know, you need to understand something,

14  that if you do waive scope, it is going to be game over with

15  respect to the seniority issue?

16  A.   No. In fact, Steve Tumblin told us we had a back stop in

17  the asset purchase agreement.  They, ALPA, ALPA had told us

18  that they were going to be supportive, that this was the only

19  way to go, we would still have a process, that the reasonable

20  best efforts grievance was real, that the asset purchase

21  agreement language was real, that those were elements of

22  leverage that would provide us a process that would be, that

23  went, that end in a fair integration and discussions for

24  integration.

25  Q.   Of course you still had the biggest pilot union in the

# Exhibit E

1

2                 IN THE UNITED STATES DISTRICT COURT.
                  FOR THE DISTRICT  OF NEW JERSEY
3                 CIVIL 02-2917  (JEI)

4        PATRICK BRADY, SALLY YOUNG,
         HOWARD HOLLANDER, THEODORE CASE,
5        AND MICHAEL FINUCAN, individually
         and on behalf of all others
6        similarly situated,
                             Plaintiffs,
7                                              VOLUME 7
              V.                               TRIAL TRANSCRIPT
8
         AIR LINE PILOTS ASSOCIATION,
9
                             Defendant.
10
                                     CAMDEN, NEW JERSEY
11                                   JUNE  16, 2011

12       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
13
                     A P P E A R A N C E S:
14
             TRUJILLO, RODRIGUEZ & RICHARD
15           BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
16                   AND
         GREEN JACOBSON, P.C.
17           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
18           For the Plaintiffs.

19           ARCHER GREINER
             BY:  STEVEN FRAM, ESQ.
20                   AND
         KATZ & RANZMAN
21           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
22
             ELIZABETH GINSBERG, ESQ.
23           IN-HOUSE COUNSEL FOR ALPA.

24

25

2

1

2          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
3     accurate record as taken stenographically in the
above-entitled proceedings.

4
                      S/   LYNNE JOHNSON
5
                      Lynne Johnson, CSR, CM, CRR
6                     Official Court Reporter

7

8

9

10

11          LYNNE JOHNSON, CSR, CM, CRR
            OFFICIAL COURT REPORTER
12          UNITED STATES DISTRICT COURT
            P.O. BOX 6822
13          LAWRENCEVILLE, NJ  08648

14

15

16

17

18

19

20

21

22

23

24

25

Clarke-direct/Press                                        32

1   out of your mind.  There is no way.  How can we as pilot

2   representatives, somebody that is supposed to be watching our

3   backs of the guys that we have flown with for these years and

4   just come in and say yeah, let's throw 825 of them on the

5   bottom of the list.  It is crazy.

6   Q.   How did Mr. Christie explain himself, what did he say?

7   A.   Basically he was, we were coming to the April 2nd, its

8   April 4 when we were going to be forced to make a decision on

9   the scope waiver.

10  Q.   Right.

11  A.   So everybody, in everybody's best interest, a deal would

12  be better than having to make that decision, if we could get

13  a deal that we could swallow.  That deal you can't swallow.

14          That is what I told them, I said we cannot go from

15  a date-of-hire proposal and the next day show up, and offer

16  to staple 825 of our own guys.

17          First of all, that is not very good negotiating to

18  come in and negotiate against yourself.

19          And second of all, how can you really do that?  How

20  can you do that to somebody?  How can I do that to my friends

21  and my co-workers.

22  Q.   So what happened?  How did the meeting end?

23  A.   Well, we stayed until probably about one or two in the

24  morning.  And eventually Bob Christy and the ALPA advisors

25  were able to convince the more senior members of our

1    committee that that obviously weren't going to be stapled

2    that there had to be some sort of a staple for the American

3    pilots to go with this.  And they wanted to get a deal.  So I

4    kept arguing and arguing and arguing, and trying to convince

5    them that this was not good, and eventually we ended up where

6    our proposal would be to staple 400 something pilots.  So I

7    got it down to half.

8    Q.    And that proposal was that made the next day, the next

9    morning?

10   A.    Yeah.

11         THE COURT:  Which is what, the end of March?

12   A.    March 29, the next day.

13         MR. PRESS:  This is J 301, Mr. Fram.

14   Q.    Mr. Clarke, I handed you exhibit J 301, right?

15   A.    Yes.

16   Q.    What is this?

17   A.    This is the proposal that we presented to the APA.

18   Q.    On?

19   A.    March 29.

20         MR. PRESS:  We move for the admission of exhibit J

21   301.

22         MR. FRAM:  No objection.

23         THE COURT:  Well, before, this was, was this

24   prepared by APA, this document?

25         MR. PRESS:  It says APA's understanding of TWA's

# Exhibit F

1

```
 1                 IN THE UNITED STATES DISTRICT COURT.
                   FOR THE DISTRICT  OF NEW JERSEY
 2                 CIVIL 02-2917  (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                         Plaintiffs,
 6                                             VOLUME 9
               V.                              TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                         Defendant.
 9
                               CAMDEN, NEW JERSEY
10                             JUNE  22, 2011

11        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                     A P P E A R A N C E S:
13
             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:   STEVEN FRAM, ESQ.
19               AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH  GINSBURG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1        Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
above-entitled proceedings.

3
                    S/   LYNNE JOHNSON
4
                    Lynne Johnson, CSR, CM, CRR
5                   Official Court Reporter

6

7

8

9

10            LYNNE JOHNSON, CSR, CM, CRR
           OFFICIAL COURT REPORTER
11         UNITED STATES DISTRICT COURT
           P.O. BOX 6822
12         LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  And of course, as you know, it becomes

2     the defendant's turn to put its case on.  So the attorneys

3     are moving along.  That is a good thing.

4           Have a very safe trip home and a safe in tomorrow

5     morning at 8:30.

6           (The jury leaves the courtroom.)

7           THE COURT:  Thank you, Captain.  You can step down.

8           Everyone please be seated.

9           Mr. Katz, you rise.

10          MR. KATZ:  Yes, your Honor.  In the spirit of

11    moving things along smartly, there are some videos that ALPA

12    would like to show as part of its case, and may arise as soon

13    as tomorrow.

14          We discussed it on Monday, to some extent, and with

15    regard to Jeffrey Brundage's video, this is a situation where

16    plaintiffs did not designate any portions of Mr. Brundage's

17    deposition to show as part of their case.  However, ALPA did

18    designate plaintiffs.  Plaintiffs had objection and counter

19    designations and we have color coded in the fashion to which

20    you have been accustomed the --

21          THE COURT:  Give it to me.

22          MR. KATZ:  -- the designations and counter

23    designations and the objections and I have a copy of the same

24    thing for opposing counsel.

25          We would like to, I think we will need to show that

1    tomorrow.

2            THE COURT:  Okay.  Mr. Press, Mr. Jacobson.

3            MR. PRESS:  Ms. Rodriguez will be handling this.

4            THE COURT:  I don't know who will do there, but I

5    would go over this if you can this afternoon and if you could

6    email me, if there is any objections that you have that are

7    not on here.  Okay.  So we will make sure, tonight I get as

8    many of the objections I know I don't want to see once

9    tomorrow morning I haven't seen.  It is not that long.

10           MR. KATZ:  No, I think it is use pages long.

11           THE COURT:  It looks like a rather short one.  It

12   should be, to check out the objections shouldn't be, he has

13   them marked here in yellow, the objections just make sure for

14   whatever reason, so nothing is lost in translation.

15           MR. PRESS:  We will do that.

16           MR. KATZ:  Your Honor, we talked about Mr. Babbitt,

17   and he is a case where plaintiffs did designate, we counter

18   designated and there are objections.

19           THE COURT:  Well, the key now, he is not offering

20   those.

21           MR. KATZ:  We are going to offer Babbitt.

22           THE COURT:  The question is whether you offer it

23   and what does he object to and what does he ask for.

24           MR. KATZ:  Precisely.  We are prepared to stick

25   with what is in the joint pretrial order unless the parties

# Exhibit G

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3      PATRICK BRADY, SALLY YOUNG,
        HOWARD HOLLANDER, THEODORE CASE,
 4      AND MICHAEL FINUCAN, individually
        and on behalf of all others
 5      similarly situated,
                     Plaintiffs,
 6                                        VOLUME 10
              V.                          TRIAL TRANSCRIPT
 7

 8      AIR LINE PILOTS ASSOCIATION,

 9                   Defendant.

10                             CAMDEN, NEW JERSEY
                               JUNE  23, 2011
11
        B E F O R E:   HONORABLE JOSEPH E. IRENAS
12                     UNITED STATES DISTRICT JUDGE

13              A P P E A R A N C E S:

14          TRUJILLO, RODRIGUEZ & RICHARD
            BY:  NICOLE M. ACCHIONE, ESQ.
15              AND: LISA J. RODRIGUEZ, ESQ.
                   AND
16          GREEN JACOBSON, P.C.
            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
17          AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
            For the Plaintiffs.
18
            ARCHER GREINER
19          BY:   STEVEN FRAM, ESQ.
                   AND
20          KATZ & RANZMAN
            BY:  DANIEL M. KATZ, ESQ.
21          FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.

22          ELIZABETH  GINSBURG, ESQ.
            IN-HOUSE COUNSEL FOR ALPA.
23

24

25
```

1             Pursuant to Section 753 Title 28 United States
      Code,  the following transcript is certified to be an
2     accurate record as taken stenographically in the
      above-entitled proceedings.

3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter

6

7

8

9

10            LYNNE JOHNSON, CSR, CM, CRR
          OFFICIAL COURT REPORTER
11        UNITED STATES DISTRICT COURT
          P.O. BOX 6822
12        LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  I just want to put on the record a

2  couple of things.  I had a conversation with counsel this

3  morning concerning the deposition of Jeffrey Brundage that

4  was proposed to be read into the record.  I was very unhappy

5  with this deposition.  Mr. Brundage was pretty much -- this

6  is not to question his sincerity or his honesty, but he was

7  very much an out of control witness, in the sense that you

8  ask a question, he would launch into a three- page answer.

9        He rarely gave an answer that was less than a full

10  paragraph and in many cases he gave answers that took up two

11  pages of transcript, that often, usually, launched into areas

12  that had nothing to do with the question that was being

13  asked.  And of course, this was a discovery dep but, it

14  wasn't a de bene esse dep, and so when Ms. Rodriguez would

15  ask leading questions, which is not an improper technique in

16  a discovery dep because you sometimes want the witness to

17  sort of go on and on.

18        Mr. Katz started questioning him, in in many cases

19  with leading questions but even when there was a leading

20  question the answer was, he wouldn't even respond to the

21  leading question, even when he was being led he would go off.

22  So we have, we talked about this, we did that, we did this.

23  You know, their position with this.  But you have no idea,

24  you know, who was talking to whom, where it was, who was

25  present, what was said.  And I would, as I say, at some point

1   the objections of plaintiff are just, toward the end it is

2   like 28 pages, just, of objections I added up the pages, I

3   think it was 28 pages.  But you know, that are objected to.

4           But in many cases, it is not, if not most cases, of

5   value.  I just feel like I could not let any of this in

6   unless it was cleaned up some way or Mr. Brundage came to

7   court and that I could control the questioning, you know,

8   have it done the right way.

9           Now, Mr. Katz said he was going to go back and look

10  at this and, you know, see if he can work something up,

11  narrow what is being offered, et cetera.  But right now I am

12  not going to let this be played in this form.

13          And the second point is on the issue of the

14  testimony of the TWA CEO, what was his name again?

15          MR. KATZ:  Bill Compton.

16          THE COURT:  Compton before the Senate when they

17  were investigating the acquisition of American -- not

18  investigating -- well, maybe investigating is the right word.

19  I don't know.  Looking into the American acquisition, there

20  is a tape that defendant wants to play of Compton's

21  testimony.  And there clearly was some kind of agreement

22  between the parties related to Compton, because his

23  deposition wasn't taken and the exchange keeps talking about

24  stipulations.

25          But for the life of me I couldn't figure out what

```
 1    was stipulated to.  I couldn't figure out what the actual
 2    contours of the agreement were.  I suspect at the time
 3    everybody knew, but sitting here today I don't know.  And
 4    right now plaintiff objects to it, and so what I am going to
 5    do is,  Mr. Katz kindly gave me a complete transcript, he
 6    gave  me both the transcript, complete transcript, and then a
 7    transcript of what he intends to play.  Is that correct?
 8              MR. KATZ:  That's correct, your Honor.
 9              THE COURT:  And I am going to review that at some
10    point.  But I want to make clear that at least today, if the
11    plaintiff has time to proceed we have to proceed with
12    something other than these two items.  They can't proceed
13    today with Brundage.
14              MR. PRESS:  Defendant.
15              THE COURT:  What?  Defendant, I mean.  Can't
16    proceed with Brundage and can't proceed with Compton's Senate
17    testimony.  I am not making a final ruling.  At the end of
18    the day some of this might get in, but it is not in a form
19    right now.
20              MR. KATZ:  We understand.
21              THE COURT:  It is not that I am uncomfortable.  I
22    haven't read it.  I can't be confident we have, I have any
23    feeling until I see it.
24              MR. KATZ:  We understand, your Honor.
25              THE COURT:  Brundage I unfortunately have read, on
```

1    several occasions and I am uncomfortable with that.  Okay, I

2    just want to get that on the record.

3              MR. KATZ:  One other loosened is the video

4    testimony of Randy Babbitt.  We have marked the transcript.

5              THE COURT:  I haven't looked at that.

6              MR. KATZ:  I haven't given it to you yet.

7              THE COURT:  That explains why I haven't looked at

8    it.

9              MR. KATZ:  I think that is a good excuse for not

10   looking at it.

11             MR. PRESS:  I sent you our objection, we had four.

12             THE COURT:  They came by email.  I opened up the

13   email, and in fact.

14             MR. PRESS:  I thought you had the transcript.

15             THE COURT:  You sent it to two different addresses

16   both of which my blackberry picks up so I had your memo

17   twice.

18             MR. KATZ:  Your Honor, I have written on the top

19   what the information is that was in Mr. Press's email.  The

20   objections that are noted on the top are the ones that he

21   described in the email.  The color coding, however, was put

22   on before we received that so there is more objections than

23   what plaintiff's are asserting now.

24             THE COURT:  As I say, I have his memo.

25             MR. KATZ:  You can ignore the color coding.

Day-direct/Press                                                27

```
 1    A.    Well, they told us that the 1113 was looming, and if the

 2    1113 motion was successful, that we would be working without

 3    a CBA.

 4              THE COURT:  Collective bargaining agreement.

 5              THE WITNESS:  Collective bargaining agreement.

 6    Q.    And so?

 7    A.    And so we had to get the deal done.  It was being

 8    impressed upon us to get the deal done, and we went back to

 9    the hotel and we had a huge argument among the committee, and

10    advisors.

11    Q.    Describe the argument, how that went?

12    A.    Well, especially the junior portion of the committee was

13    outraged.  And I felt it was too early to offer to staple

14    anybody.

15              We didn't know where Professor Tanen's proposal was

16    going to be at this point in time.  We actually called

17    Professor Tanen to see if he could give us some guidance.  He

18    gave us some general numbers, about where he thought he was

19    at, but nothing exact.

20              THE COURT:  What date is this now, the 28 of March?

21              THE WITNESS:  This was the evening of the 28th of

22    March.

23              THE COURT:  The 28th.

24              THE WITNESS:  Yes, sir.

25              THE COURT:  Did you know that the 1113 was
```

1   A.   It would show a sign of weakness, offering that type of

2   a staple that early into the game.  We suspected that there

3   was going to be some position that even Professor Tanen's

4   analysis was going to show that certain TWA pilots belonged

5   on on the bottom of the list but it was going to have a

6   basis, not just an arbitrary number pulled out and do this.

7   Soy I really wanted something concrete that I could use

8   rather than that.

9   Q.   You mentioned in response to a previous question that

10  this was something you regretted doing?

11  A.   I regretted it.  I have regretted it for ten years.

12  Q.   Why?

13  A.   Because it was the wrong thing to do.  And I made the

14  decision.

15  Q.   So, but that proposal was made, right?

16  A.   The proposal was made.

17  Q.   This is March 29, right?

18  A.   March 29, Gary Flor was one of our members of the

19  committee and he made a very elegant proposal.  I think they

20  understood it.  I expected some discussion on it.  There was

21  very little discussion.

22          In fact, that is when we were informed that, thank

23  you, we will take your proposal, and oh, by the way, we are

24  going to have to leave today and cut the meeting today and we

25  are canceling tomorrow because we have to go meet with the

1    A.    Mid April.

2    Q.    Now, this meeting, Captain Day, when did the actual

3    meeting start, the MEC meeting?

4    A.    I recall it starting in the afternoon.

5    Q.    All right.  And before the meeting, what did you do?

6    A.    We all went out to lunch together.

7    Q.    When you say we, who is the we?

8    A.    Well, the entire MEC and the merger committee and Duane

9    Woerth.

10   Q.    Okay.

11   A.    We went to the 94th air squadron and I made sure that I

12   was going to have the opportunity to sit next to Duane so

13   that I could discuss my concerns with him.

14   Q.    And did you?

15   A.    I did.

16   Q.    What did you discuss, what did you tell him and what did

17   he tell you?

18   A.    Well, I explained where we were at.  I explained the

19   position that we now found ourselves in.  We waived scope,

20   and I didn't feel we had a meaningful process agreement and

21   and I needed ALPA National to help create some leverage.  I

22   was goes go into the meetings without anything to bargain

23   with.

24          So Duane asked, what did I suggest and I said,

25   well, I have got one thought right off the top of my head.

Day-direct/Press                                                    49

1    Q.    And what was that?

2    A.    Well, I suggested that he telephone up and call the

3    president of APA, John Darrah, and tell him to treat us right

4    and stop this nonsense, or there wasn't going to be an

5    American pilot riding on an ALPA jumpseat in the future.

6    Q.    Describe, I don't think anybody has testified about this

7    jumpseat.  Can you tell us what you mean, what is a jumpseat,

8    first of all?

9    A.    A jumpseat  is the seat, any seat in the cockpit we

10   refer to as a jumpseat.  Some of them actually fold down.

11   And a great number of pilots commute to work.  They fly in to

12   work.

13          At this point in time one of the predominant ways

14   of getting to work was, we had this wonderful agreement,

15   reciprocity among virtually all the airlines where you could

16   show up, I could show up in Fort Lauderdale to go to JFK for

17   my trip and show my ID, and my pilots license, to the gate

18   agent, in Jet Blue, gate agent would go out and show it to

19   the captain, it was always the captain's discretion to

20   whether to take the jumpseat, but never seen a case where it

21   was refused.  I certainly never refused anybody.  And they

22   would accept you and if there was a seat in the back, you

23   would get that.  If not, you would get a seat in the cockpit.

24          As a matter of fact, even when the cockpit filled

25   out, Jet Blue was kind enough to Mike Day to put him in a

Day-direct/Press                                                50

1  flight jumpseat in the back.  We didn't have that authority

2  at TWA, but apparently Jet Blue did.

3  Q.   Captain Day, you live  in Cedar Key, Florida, how did

4  you get to work?

5  A.   That was when I was in Fort Lauderdale.

6  Q.   Okay.

7  A.   But I judged jumpseats.  And if you if your own airlines

8  was there you could use your own airlines passes, if you had

9  them.  The other alternative was of course to buy a ticket.

10 But the company does not provide you transportation to get to

11 work.  That is up to you.  So this was probably the

12 predominant means of pilots getting to work, is using that

13 jumpseat as their backup.

14 Q.   Can you recall what airlines other than TWA you used the

15 captains jumpseat to get to work?

16 A.   Well, I have flown on a lot of them depending on where I

17 was coming from, Delta, when national was in existence I flew

18 on National, Eastern.  Just about most of them.

19 Q.   All right.  From your experience as a tile lot for over

20 30 years, Captain Day, how prevalent was the use of jumpseat

21 access for pilots of airlines nationwide to get to work?

22 A.   It was an accepted practice.

23 Q.   Which meant what as far as its prevalence?

24 A.   It was very prevalent because as I said, an a great

25 number of pilots, I had originally done a study in New York,

Day-direct/Press                                                51

```
 1    at that time, over 50 percent of the pilots were flying in  a
 2    rather than driving.
 3    Q.   Can you recall ever letting an American pilot use your
 4    jumpseat?
 5    A.   Oh, yeah.
 6    Q.   Okay.  Now, getting back to this lunch with Duane
 7    Woerth, what were you asking him to do with respect to this
 8    jumpseat --
 9              THE COURT:  When was this, by the way.
10              THE WITNESS:  This was, I believe it was April 18.
11    It was mid April.
12              THE COURT:  It was after the waiver, after April 2.
13              THE WITNESS:  Yes, yes.
14    Q.   And what did you specifically ask Duane Woerth to do
15    with respect to this jumpseat privilege that captains had?
16    A.   I asked him to use this as a club, call it the
17    president of APA, and threaten to withdraw and have all the
18    ALPA carriers be notified that they had to support their TWA
19    pilots, because it completely changed the leverage.
20    Q.   Wait.  And do what?  Called the president of the APA and
21    tell him what?
22    A.   And tell him to tell his negotiating committee that they
23    had to negotiate with us in good faith.
24    Q.   And if they don't?
25    A.   And if they don't, there would not be an American pilot
```

Day-direct/Press                                          52

1   riding on an ALPA carrier.

2   Q.    Which --

3   A.    Since there was 11,000 of their pilots and 70,000 ALPA

4   pilots, it changed the entire leverage.

5   Q.    Well, it could have, had it be used?

6   A.    Right.

7   Q.    And what did Duane Woerth say in response to that?

8   A.    He looked at me and said, I can't start a jumpseat war.

9   Q.    Did you ask him why?

10  A.    I was just flabbergasted.  I tried to explain that this

11  was unionism.  He was representing TWA pilots, not American

12  pilots.  But that was his response and he wasn't going to

13  change it.

14  Q.    What did you say in response, if anything, Captain Day?

15  A.    I don't recall my exact words.  I was so angry, I just,

16  I was afraid to say anything.

17  Q.    Now, this was at lunch, right?

18  A.    This was at lunch.

19  Q.    Now, and then the Meg meeting followed that, the actual

20  meeting, right.  Back at the MEC office?

21  A.    Well, we went back as to the committee first, and I

22  explained to the committee what happened, and I was still

23  upset.  So we all decide to go in and listen to Duane speak

24  to the MEC and to the members.

25  Q.    And the minutes of that meeting are in evidence already.

Day-direct/Press                                                    71

```
 1              THE COURT:  As opposed to the full board.
 2              THE WITNESS:  Yes, sir.
 3   Q.    This is some sort of policy making council at ALPA?
 4   A.    This would be like Duane Woerth's boss, as I saw it.
 5              THE COURT:  This would be like going to the
 6   executive committee of a major corporation.
 7              THE WITNESS:  That's correct, Judge.
 8              THE COURT:  The board of a corporation.
 9              THE WITNESS:  Right.
10   Q.    Were you alowed to speak, first of all, when about was
11   this executive council meeting that you attended?
12   A.    Mid July.
13   Q.    Were you allowed to speak?
14   A.    I was.
15   Q.    What did you say?
16   A.    I made an impassioned plea.  I explained that Bensel and
17   Pastore and myself, between the three of us, we had 105 years
18   of seniority.
19              TWA was one of the original groups in ALPA and gave
20   them a run-down where we were at on this, their last offer
21   was two thirds stapled, and I said we mad already waived
22   scope, and now we got this denial of our latest proposal,
23   which I went in to in great detail with them, provided them
24   tapes so that they could see, DVDs, I guess, and I said we
25   needed some leverage.  We didn't have anything.  And I went
```

1    in to some suggestions, starting with the jumpseat one.  I

2    explained that one.  I went into several other ones.  I told

3    them these are only ones I had thought of, but you have got a

4    huge staff here that certainly can come up with better ideas

5    than I can.

6    Q.   Let me interrupt you, Captain Day.  You testified that

7    you asked Duane Woerth to authorize a jumpseat war, as you

8    call it, in April, three months prior.  Right?

9    A.   Right.

10   Q.   Now you are in front of the executive council.  Why

11   would you think a decision might be different?

12   A.   I thought they might persuade Duane --

13          THE COURT:  Duane Woerth was at this meeting, was

14   he not?

15   A.   He was at the meeting.

16          THE COURT:  The one in July, he was there?

17   A.   Yes, Judge.

18   Q.   When we were talking about this jumpseat war notion, I

19   don't think I asked you why you thought that this would

20   provide you any leverage.  Can you describe that?

21   A.   Well, it would call attention to what was happening, and

22   perhaps the individual American pilots then would go to their

23   representatives, and want to know what is going on.

24   Q.   Why in your thinking would an American pilot be

25   motivated to do that because of this jumpseat restriction?

1    A.    Because he is going to be having to pay money to get to

2    work, or start missing flights.

3    Q.    Describe that.

4    A.    Well, if he can't get on this airplane to assure that he

5    is going to be getting to work, he is probably going to have

6    to buy a ticket.  Most of the people that were doing the

7    jumpseat were doing them on other airlines.

8    Q.    And this plan of yours, how did you sort it out in your

9    head how this would actually do something beneficial for your

10   group?

11   A.    Well, I just started coming up with ideas.

12   Q.    No, no, what did you think this would do, as a practical

13   matter, if ALPA had done what you requested, in your mind,

14   what would have happened?

15   A.    As a practical matter, I felt that this would force the

16   APA merger and acquisition committee to come to the table and

17   help make a more reasonable, fair and equitable proposal.

18              THE COURT:   Instead of the word force, would the

19   word encourage be more accurate?

20   A.    Encourage, I would accept that, Judge.

21   Q.    And why did you hold that belief?

22   A.    Because it would have affected me in that manner, if I

23   couldn't jumpseat.

24   Q.    So you presented this executive council in July and you

25   asked for ALPA to engage in this jumpseat war, right?

Day-direct/Press                                    74

1   A.    Yes.

2   Q.    Did you have any other ideas that you expressed to the

3   executive owe on?

4           THE COURT:  Before you go off the jumpseat, if you

5   deny an American pilot a jumpseat, that is a pretty -- that

6   was then a pretty big airline, a fairly large number of

7   routes.

8           What if they started denying jumpseats to all the

9   other pilots, wouldn't that, I mean, wouldn't the pilots

10  think twice, wouldn't a union think twice about, yeah, you

11  will block American pilots but they are going to block our

12  entire membership from doing this, and that is a pretty big

13  airline.

14          Did anybody express that view?  I mean what is good

15  for the goose is good for the gander.

16          THE WITNESS:  Judge, there was certainly that

17  threat.  However, there were 70,000 National ALPA members

18  versus 11,000 APA members, so it reversed the leverage.

19          THE COURT:  Well, it is not just numbers of pilots,

20  it is number of routes that you had.  I mean the number of

21  people using jumpseats are not necessarily going to be

22  exactly proportional to the number of pilots.

23          THE WITNESS:  That is true, there is not an exact

24  correlation.

25          THE COURT:  Some Emery pilots or Fed Ex pilots or

Day-direct/Press                                    75

```
1    Alaska Airlines pilot might not be using jumpseats as much.
2    There is, you know, there is a difference there.  I am just
3    wondering, did anybody discuss that issue?
4    A.    No, we didn't get into that aspect of it, Judge.
5           THE COURT:  It could hurt ALPA.
6    A.    I knew there were going to be sacrifices and I explained
7    that, that, you know, that is what unionism was about, and
8    giving some examples of strikes and so on.  But that we would
9    have to pull together as a union, and who are we representing
10   here.
11          THE COURT:  Okay.
12   Q.    Staying with that same line the Judge had, what
13   carriers, what major carriers, did ALPA represent?
14   A.    United.  Delta.  Northwest.
15          THE COURT:  Continental?
16   A.    Continental came somewhere in there.  I don't know
17   whether they were back at that time yet.
18   Q.    And what carrier, or single carrier, did the APA
19   represent?
20   A.    Just American.
21   Q.    All right.  And this notion that, yeah, there could have
22   been a reciprocal reaction from the APA, they might deny
23   jumpseat privileges to ALPA pilots, right?
24   A.    I am I am sure they would.
25   Q.    In so why did you expect your union to go along with
```

1    something like that?

2    A.    Because that is what unionism is about, it is protecting

3    your members.

4    Q.    All right.  But why, why would a Delta pilot, let's say

5    he or she shows up for work or to jumpseat to get to Chicago

6    or wherever.  And that, and he wants to get on an American

7    flight.  Dent jumpseat.  Why would that pilot want to sign up

8    for something like that?

9    A.    Well, nobody would want to, but it is the same as an

10   assessment,  you do it because you are all in the same union

11   and you are all trying to protect one another.

12   Q.    At this meeting where you asked to engage a jumpseat

13   war, did you make a specific request for action?

14   A.    I threw out several ideas.  I suggested informational

15   picketing.  I suggested the threat of litigation.  I

16   suggested that they go to the AFL-CIO and have them put

17   pressure on the APA saying that they didn't, they would not

18   let them know that organization because ALPA was part of that

19   which was even bigger yet.  I suggested that they go back to

20   American and threaten American to put them on the "do not

21   buy, boycott list" that the AFL-CIO had.

22   Q.    What is the AFL-CIO and how is ALPA connected to it?

23   A.    That is a confederation of more unions, on a bigger

24   scale.  At that time it might have had, I would be

25   speculating, but it was in the millions of members.

```
 1   policy, section 15, of the ALPA administrative manual which
 2   provided --
 3              MR. PRESS:  Your Honor -- go ahead.
 4              MR. FRAM:  Can I ask the whole question first?
 5              MR. PRESS:  I am sorry.  I thought you with were
 6   finished.
 7   Q.   Did he tell you at that time that section 15  -- 115 of
 8   the ALPA Administrative Manual specifically prohibited the
 9   denial of jumpseat privileges as a means of punishing,
10   coercing or retaliating against other pilot groups or
11   individuals not supported by ALPA?
12              MR. PRESS:  Your Honor, I object.  He is asking the
13   same questions now five times.
14              THE COURT:  No, but I think, I mean I think that is
15   legitimate cross examination.  The answer may be no, in which
16   case that is the end of it.  But I think that is legitimate
17   cross, particularly if he has -- well, I will allow it.
18   A.   I am going to tell you.  Absolutely not.  That is the
19   first I heard of it, is you reading this.
20   Q.   Were you familiar with the ALPA administrative manual
21   back during the period in which you were a member of the TWA
22   MEC?
23   A.   Familiar with it?  I knew it existed.  Did I study it?
24   No.
25   Q.   Did you have a copy of it back in the nineties when you
```

1    were a member of the MEC?

2    A.   I believe they give a copy to each new LEC officer.

3    Q.   When you got appointed to the unsecured creditors

4    committee in February of 2001, did you have a copy of,

5    accessible to you then?

6    A.   There was one I am sure in the MEC office.

7    Q.   When you became chairman of the merger committee, did

8    you have a copy of the ALPA administrative manual accessible

9    to you then?

10   A.   Same answer.

11   Q.   Well, did you understand that when you were acting as

12   merger chairman, chairman of the merger committee, that you

13   were expected to act consistent with ALPA's Constitution,

14   bylaws, and other regulations?

15   A.   Yes.

16   Q.   Did you make reference to the Constitution, bylaws, and

17   other regulations to satisfy yourself that what you were

18   doing was consistent with them?

19   A.   No. It was a reference made.

20   Q.   When you weren't before the ALPA executive board, I

21   think you said it was some point in July or thereabouts and

22   made your plea for them to authorize a jumpseat war.  Do you

23   recall talking about that earlier today?

24   A.   You are are you talking about the executive board or the

25   executive council.

Day-cross/Fram                                                    123

1   Q.   Which did you say it was, did you say it was the

2   executive council?

3   A.   What I refer to as the executive council.

4   Q.   That is the group --

5        THE COURT:   That is the smaller group?

6   A.   Yes, sir.

7   Q.   That is the smaller group that has representatives of

8   all of the other pilot groups, all the other pilot groups

9   that were represented by ALPA, yes?

10  A.   Yes.

11  Q.   Tell  us how many people were there at that meeting

12  where you and been Bensel and Pastore, was he the third guy

13  there?

14  A.   Yes, he was.

15  Q.   How many other pilot representatives were there when you

16  and Bensel and Pastore made your plea?

17  A.   Are you talking about how many persons were on the

18  executive council or how many pilots were in the room.

19  A.   Well, let's find out how many other pilot were in the

20  room.  How many nonTWA pilots were in the room.

21  A.   I am guessing seven to ten.

22  Q.   How many other pilot groups, pilot airplane groups,

23  airline groups, did they represent?

24  A.   Well, the executive council represented all of ALPA's

25  carriers.

Day-cross/Fram                                                124

1   Q.   So dozens and dozens of other carriers, yes?

2   A.   Yes.

3   Q.   And they told you when you asked for a jumpseat war that

4   they would not agree to it, yes?

5   A.   No, they didn't tell me anything at that time.

6   Q.   So you got no reaction whatsoever to your request for a

7   jumpseat war?

8   A.   The reaction that I got was dealt take pilot telling me

9   I was there asking for money.  That was the reaction I got.

10  Q.   So did you get any explanation for why any of those

11  people felt, let me take a step back.  Did any of them

12  communicate to you that they thought a jumpseat war was a bad

13  idea?

14  A.   I do not remember that.  You are reading that to me for

15  the first time that I have heard that.

16  Q.   Well, during the entire period in which you were

17  pressing for a jumpseat war, are you telling us that no one

18  ever told you that ALPA had a policy which prohibited the use

19  of jumpseat wars?

20  A.   That is what I am telling you.

21  Q.   To get leverage over another pilot group?

22  A.   That is the best of my recollection.

23  Q.   You talked about some litigation ideas this that Mr.

24  Wilder had.  Do you recall that?

25  A.   Yes.

Day-cross/Fram                                                    147

1    that?

2    A.    I don't recall that.

3    Q.    So you don't recall that the pressure to meet late March

4    and try to reach an agreement was pressure that came from the

5    APA and American.   That is what you are telling us?

6    A.    I am telling you that the pressure was not coming from

7    APA.   The pressure was coming from ALP national.

8    Q.    So you don't recall anything from the APA side saying we

9    need to do this quickly because of these other issues.   That

10   is your testimony?

11   A.    That's correct.

12   Q.    In terms of the offer that was made by your committee,

13   the one I think it involved stapling about 425 pilots?

14   A.    Yes.

15   Q.    You agreed to make that offer, yes?

16   A.    I did.

17   Q.    You as the chairperson of the merger committee agreed to

18   make the offer, yes?

19   A.    I did.

20   Q.    Was there a division within the committee about whether

21   that was a good idea or a bad idea?

22   A.    We didn't have a vote, if that is what you mean.   But

23   there there was certainly discussion and arguments on it.

24   Q.    You claim that the people from ALPA who you identified

25   recommended that you offer to staple over 800 people?

Day-cross/Fram                                              148

```
 1    A.    Yes.

 2    Q.    What did they say about why they were recommending that,

 3    do you recall?

 4    A.    Not specifically.

 5    Q.    You have no recollection of why they swooped in,

 6    unannounced, and said, you have to agree or propose that 825

 7    people be stapled?

 8    A.    They told us this was what it was going to take to get

 9    the deal done.

10    Q.    Do you recall them saying anything else about why they

11    were making that recommendation?

12    A.    No, I don't.

13    Q.    Your committee disregarded the recommendation.  Right?

14    A.    Well, we disregarded 800, yes.

15    Q.    The recommendation was 800, and you disregarded it,

16    right?

17    A.    That's correct.

18    Q.    I think you told us yesterday about Carl Icahn showing

19    up at one of the bankrupt bankruptcy hearings and trying to

20    bull Lee people.  Do you remember that?

21    A.    Yes.

22    Q.    You weren't bullied by Carl Icahn, were you?

23    A.    Not at that upon one, no.

24    Q.    You weren't bullied by these ALPA advisors on the

25    evening of March 29, right?
```

Day-cross/Fram                                                 149

1   A.   I was pressured.

2   Q.   Pressured.  Pressured in the sense that they explained

3   to you why they thought their suggestion was a good idea?

4   A.   I was pressured in that they were conveying an urgency,

5   and that they knew something I didn't know.

6   Q.   Well, did you ask them whether they knew that you didn't

7   know?

8   A.   I don't recall if we got into those specifics or not.  I

9   am sure it came it up.  But I don't recall.

10  Q.   Within the committee, the most junior member of the

11  committee, Sean Clarke, was the one who was most upset about

12  the idea of stapling TWA pilots, right?

13  A.   Yes.

14  Q.   And the other members of the committee, what views, if

15  you recall, did they express about the idea of stapling as

16  many as 825 TWA pilots?

17  A.   I don't think anybody was in favor of it.

18  Q.   Who was in favor of stapling 425?

19  A.   Well, I don't think anybody was in favor of it.  I can't

20  recall who was adamantly against it and who wasn't.

21  Q.    If no one was in favor of it, how did it come that your

22  committee proposed that to the APA the next day?

23  A.    What I am saying here, Mr. Fram, is that we reluctantly

24  decided to do it.  Nobody was in favor of it.  We didn't

25  vote.

# Exhibit H

1

```
 1              IN THE UNITED STATES DISTRICT COURT.
                      FOR THE DISTRICT  OF NEW JERSEY
 2                    CIVIL 02-2917  (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                          Plaintiffs,
 6                                             VOLUME 11
               V.                              TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                          Defendant.
 9
                               CAMDEN, NEW JERSEY
10                             JUNE  27, 2011

11        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                    A P P E A R A N C E S:
13
              TRUJILLO, RODRIGUEZ & RICHARD
14            BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                     AND
              GREEN JACOBSON, P.C.
16            BY:  ALLEN PRESS, ESQ.   (MO. BAR)
              AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17            For the Plaintiffs.

18            ARCHER GREINER
              BY:   STEVEN FRAM, ESQ.
19                    AND
              KATZ & RANZMAN
20            BY:  DANIEL M. KATZ, ESQ.
              FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
              ELIZABETH  GINSBURG, ESQ.
22            IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1            Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.
3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                LYNNE JOHNSON, CSR, CM, CRR
18              OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
19              P.O. BOX 6822
                LAWRENCEVILLE, NJ  08648
20

21

22

23

24

25

1    A.    Oh, yeah.  But I assumed that was going to happen.  He

2    didn't have to warn me.  I knew it was going to happen.

3    Q.    And in addition to the arrangements for the request for

4    consultants to the executive council and arranging for

5    special bankruptcy counsel, what else did you do?

6    A.    I reached out to then President Darrah, I wanted to have

7    a conversation with him.  I wanted at some point to be able

8    to address the American pilots and ask, do my -- that they

9    would do much better, that they would not staple the American

10   -- the TWA pilots to their list, that we would have a process

11   that would be fair, and, but mostly just preparing the

12   council, my duties at ALPA and reaching out to Mr. Carty and

13   told him he wanted to make sure the transaction flows.

14   Q.    Did you talk to Mr. Carty at this time?

15   A.    I talked to himself times in the month of January of

16   that year.

17   Q.    Tell us what Mr. Carty said to you in those telephone

18   conversations and what you said back to him, please?

19   A.    He was emphasizing that he was, that he hoped it was

20   going to close, that he knew my opinion on stapling pilots to

21   the bottom.  I opposed that.  It was not ALPA's merger

22   policy.

23        He just reiterated that I needed to know that if

24   the pilots' joy at being acquired went away and was being

25   replaced by a feeling that they could somehow have the

1  transaction, that American would buy them and still permit an

2  arbitration, that I should disabuse myself them of the notion

3  that that was absolutely not going to happen.

4  Q.    That is what Mr. Carty told you?

5  A.    Mr. Carty told me that, and this was again, he learned

6  his lesson, a bloody lesson, in the Reno debacle, that even

7  if American pilots are unreasonable in this regard, that is

8  what they were, and he was not prepared to destroy further

9  his relationship with APA, and so this was the demand he was

10 willing to countenance, either the scope was waived or no

11 transaction.  He was very emphatic.

12 Q.    And you said you had several conversations with, was

13 this repeated in the other conversations you had as well?

14 A.    Probably only mentioned.  It was mostly the first

15 conversation, to make sure there was no doubt in my mind that

16 the transaction could only close under one set of

17 circumstances.

18 Q.    Can you tell us anything about your conversation with

19 Mr. Darrah, the president of the Allied Pilots Association?

20 A.    They were also briefed.  He was fairly new to his

21 position.  I think he had just gotten the job in November,

22 and  he said he worked for the board of directors and they

23 had a policy, and his duty was to the board,  but he would

24 try to work with me, but he was fairly noncommittal at that

25 time.

Woerth/direct                                              44

1               Do you recognize this document, Mr. Woerth?

2    A.    Yes.

3    Q.    Would you tell us what it is, please?

4    A.    It is a pilot unity resolution.  It is essentially the

5    resolution of our board of directors on the methodology to be

6    used in support for trying to organize and merge with

7    independent pilots associations that were identified in the

8    resolution.

9    Q.    And --

10              THE COURT:  Is this being offered?

11              MR. KATZ:  Yes, sir.

12              THE COURT:  Any objection?

13              MR. JACOBSON: No, your Honor.

14              THE COURT:  Okay.  D 2 in evidence.

15              MR. KATZ:  Thank you.

16              THE COURT:  ALPA wanted to have APA become part of

17   its union, didn't they?  You wanted to invite some by some

18   modality, get those 11,000 American pilots to be ALPA

19   members, didn't you?

20   A.    Our mission statement was everyone --

21              THE COURT:  You wanted them because they were a big

22   union, they were a dues paying -- You wanted them to be ALPA

23   members?

24   A.    Of course.  They were certified in 1963 and I think

25   every union president since would hope would to be the

Woerth/direct                                                    50

1    further resolved, and numbered paragraphs.  I would like to

2    get to the number 3 item.  Proposed merger agreements with

3    independent pilots associations will be subject to approval

4    by the executive council and ratification by the executive

5    board.

6              So did this resolution reflect the preferred method

7    that you just stated?

8    A.    Yes, it did.

9    Q.    Is this the method that you employed with the a, that

10   the association employed, with the Continental pilots?

11   A.    Yes.

12   Q.    So how did it start, was their action taken by the

13   governing body of the Continental pilots?

14   A.    Eventually it started with my approaching their

15   leadership, probably in 1999.  And it took a lot of months to

16   develop a bond and a trust that this is something we should

17   do together, so it is probably six months of spade work, if

18   you will, trying to nurture a relationship and then got them

19   very interested to the point I wanted to make sure that the

20   Airlines Pilot Association would approve the merger, and they

21   needed the confidence that the entire board of directors

22   would welcome Continental back.  That is really what the

23   principle focus of the whole reason to have this pilot unity

24   resolution, it was about Continental, it wasn't about Fed Ex

25   and it wasn't about American.

Woerth/direct                                           51

1    Q.   Did you give the Continental pilots that union, that
2    they would be welcomed back into the association?
3    A.   I did but they wanted the assurance from the entire
4    board of directors, not just from me.  That what is this do.
5    Q.   That is D 2, the unity resolution was a reflection of
6    the desire of the entire Air Line Pilots Association board to
7    welcome the Continental pilots back?
8    A.   Continental was the mission right in front of us and the
9    obstacle we were trying to clear.  We also included everyone
10   else, because why not?  We have a mission statement to
11   organize everyone, merge everyone, let's list everyone but
12   the reason we needed this unity resolution was we had stalled
13   at Continental.  Without it we were not going to be able to
14   get done.
15   Q.   Did you say there was a million and a half dollars
16   budgeted for organizing the Continental pilots?
17   A.   Yes.
18   Q.   That was to be spent in 2001?
19   A.   Spent from the end of 2000, we went right immediately
20   back to work when this was, resolution was done, and we
21   concluded the merger in April, Continental pilots voted in
22   mid April of 2001, and they became official members June 1st,
23   2001.  Then we went straight into the Fed Ex campaign.
24   Q.   All right.  That was done with cards or with a merger
25   agreement?

1    of the membership eventually.

2    Q.   By April of 2001?

3    A.   Yes.

4    Q.   Did you, from time to time, report to the ALPA Executive

5    Council about the progress that was being made under the

6    pilot unity resolution, exhibit D 2?

7    A.   Yes.

8    Q.   I am not sure whether 243 and 44 are in every?

9              THE COURT:  D or P.

10   Q.   243 and 244s.  They are in evidence.  I have copies for

11   the Court.

12             THE COURT:  They are both in evidence.

13   Q.   You are familiar with these documents?

14   A.   Yes.

15   Q.   Are these the minutes from the ALPA executive council

16   meetings in January and April, 2001, Mr. Woerth?

17   A.   Let me read it.  Yes.

18   Q.   All right.  Could we focus on the list of attendees for

19   the January meeting.  Exhibit D 243.

20       MR. KATZ:  I am sorry.  P-243.

21             MR. KATZ:  Your Honor, I misled you.  I think P-243

22   and P-244 are the documents I had in my hand.  Are they in

23   evidence?

24             THE COURT:  I don't know.  D 243 and, let me check

25   P 243 and 244.

Woerth/direct                                                    72

1    that road now.

2    Q.    And did you agree with that decision?

3    A.    Yes, I did.

4    Q.    Could you think of anything that you could have done or

5    that ALPA could have done to persuade the Allied Pilots

6    Association to go along with the seniority integration

7    process that ended up with arbitration?

8    A.    I do not.

9    Q.    All right.  After the MEC made this decision on April 2,

10   you made an appearance, did you not, at the Allied Pilots

11   Association board of directors meeting in April, 2001?

12   A.    Yes, I did.

13   Q.    Would you tell us how that came about, please?

14   A.    I requested a meeting and asked that president of APA,

15   John Darrah at the time, it was going to be in Texas, in

16   Dallas, to meet with American Eagle pilots and I wanted this

17   opportunity to talk to the board to advocate the position of

18   the TWA pilots in in this integration.

19   Q.    Did Mr. Darrah extend an invitation to you to appear

20   beer before the Allied Pilots Association board on April 5?

21   A.    Yes, he did.

22   Q.    You accepted that invitation and addressed the board?

23   A.    Yes, I did.

24   Q.    Tell us, what did you tell the board?

25   A.    I told the board that the TWA pilots had made a very

Woerth/direct                                                    77

1              MR. KATZ:  Yes, that came in through the Rachsford

2    video.

3              THE COURT:  That was already in.

4    Q.   This is the executive council meeting minutes of April 9

5    to 11, 2001.  Do you have that?  Can you put that up?

6    A.   I am trying to find it.  Executive council minutes.

7    Q.   Right.  You are familiar with this document, Mr. Woerth?

8    A.   Yes, I am.

9    Q.   Let's flip to page 12.  There is a briefing to the

10   board.  The executive council that is noted here under the

11   heading agenda item number 3, organizing slash pilot unity

12   campaign review.

13             Did you provide that?

14   A.   Yes.

15   Q.   And what was the purpose of this review?

16   A.   Well, we are required to update I think the executive

17   council at every meeting so we give them the review of the

18   status of where we were.

19   Q.   The second paragraph, Brian, can you blow that up,

20   please?

21             The minutes say the association has expanded its

22   activities with four major independent pilot unions, it names

23   them.  In an effort to achieve the associations goal of

24   unifying the pilots of the United States and Canada under the

25   ALPA banner.

Woerth/direct                                              83

1    listing things before April 2 and after April 2, you attended

2    the APA board of directors.  That was on April 5, right?

3    A.   Yes.

4    Q.   Then on April 23 you attended the TWA MEC meeting.  And

5    and met with the TWA pilots?

6    A.   Yes.

7    Q.   And do you remember taking part in any of the seniority

8    integration discussions after this point in time?

9    A.   It was later in the summer when the facilitation

10   started.  2, I took the opportunity twice to attend the

11   facilitation.

12   Q.   What city were those talks being held in?

13   A.   In Washington, D.C.

14   Q.   Who were the participants in those talks?

15   A.   There was merger committees of both of American pilots

16   and the TWA pilots.

17   Q.   Anyone else present?

18   A.   I think the facilitator was also present.

19   Q.   That was Rolf Dalton?

20   A.   That's correct.

21   Q.   And he is a nationally recognized arbitrator and

22   mediator?

23   A.   That's correct.

24   Q.   With experience in airline industry disputes?

25   A.   Yes.

Woerth/direct                                                    84

Q.   Were there also lawyers for the two sides there?

A.   On at least one occasion I believe both Roland Wilder

and Wes Kennedy were both present, I believe.

         THE COURT:   What is the second name?

A.   Wes Kennedy I believe is the attorney that the American

pilots were using.  Wes Kennedy.

Q.   He was their seniority lawyer?

A.   Yes.

Q.   Like Mr. Wilder was for the TWA pilots?

A.   That's correct.

Q.   And what was the subject being discussed at these

meetings?

A.   Well, they were having facilitated discussions to get to

a negotiated settlement of integration.  I came to support

the TWA pilots and also to encourage the importance of a

negotiated settlement, and the sooner they got one, the

better.

         So I was trying to encourage both parties, both

parties honestly to stretch and try to reach an agreement.

Q.   And how did it come about that you attended this

session?

A.   I asked the party, I think Bob Pastore asked if I could

show the support for the TWA pilots, my physical presence at

the meeting, so I complied with that.

Q.   What did you say when you were there?

Woerth/direct                                                    85

```
 1   A.   I encouraged to the Allied Pilots that they, of course

 2   were going to have to get off that stapling proposal.  They

 3   are going to have to stretch, I reminded them what I told

 4   them in Dallas, you shall going to have to get way past where

 5   you think you can have a comfortable, fair settlement that

 6   you can be proud of, and American employees as well as

 7   Allied.

 8            Everybody needs to get off their current positions

 9   because it was like trench warfare.  You weren't going to get

10   a deal with both sides staying exactly where  they were and

11   just staring at each other.  There hadn't been a lot of

12   movement.  That is what I told them.

13   Q.   Mr. Woerth, it has been suggested in these proceedings

14   earlier before today, that the TWA pilots might have

15   benefited if you had threatened litigation at the meeting you

16   are referring to.  Did you consider that?

17   A.   I didn't think litigation would be helpful.  In fact, it

18   would  be a total distraction, and might end the

19   negotiations.

20   Q.   Why did you think that?

21   A.   There was no legal foundation to compel American

22   Airlines pilots to even negotiate.  They had a contract that

23   said they could do what they were going to do.  Nobody

24   appreciated that.  I certainly didn't.  But I didn't see a

25   legal argument.  There was a morally persuasive argument to
```

1    do better, but not a legal argument to compel them to do

2    better.

3            So my experience is this:  You can't sue people

4    into liking you and making a deal.  If you sue somebody, they

5    go into defensive huddle and just prepare to win the lawsuit.

6    They stop bargaining.

7            So I thought litigation, while bargaining, in my

8    opinion, that is a terrible strategy.

9    Q.   All right.  So in the summer, we will call this

10   seniority list integration negotiations.  And you attended

11   one or two sessions?

12   A.   That's correct.

13           THE COURT:  You met with one or two?

14   A.   I am pretty sure it was back to back days, your Honor.

15           THE COURT:  Two-day meeting.

16   A.   I attended two days in a row.  I think they met longer

17   but I think I went two days in a row.  That is my

18   recollection.

19   Q.   Let me refer you to exhibit D 181 which is in evidence.

20   It is a summary of your comments to the April 23 MEC meeting.

21   A.   Okay.

22   Q.   With regard to this issue, what you said on the second

23   page at the top, the MEC reports that you said TWA MEC had

24   made a realistic assessment of their situation, made the hard

25   decision and now APA needs to get realistic and make a hard

Woerth/direct                                              87

1    decision.  Is that an accurate reflection of your comments at
2    the meeting?
3    A.    Yes, it is.
4    Q.    Thank you.  Did you meet with any TWA pilots separately
5    from the meeting at about that time while you were in St.
6    Louis?
7    A.    In a completely separate meeting, I don't recall that.
8    Q.    Like a lunch meeting, for instance?
9    A.    I think we probably had lunch with the officers.  That
10   seems plausible.  I don't have a specific recollection of it.
11   Q.    Do you recall a request by Captain Mike Day, the
12   chairman of the merger committee for the TWA pilots, to
13   initiate a jumpseat war?
14   A.    Yes.
15   Q.    Was that made at or about that time?
16   A.    I believe it was.
17   Q.    And what was your response?
18   A.    My response was that we had ALPA policy prohibiting that
19   and we had a national jumpseat policy, that we weren't going
20   to engage in a jumpseat war.  That would not help the TWA
21   pilots and inconvenience and anger everyone.  Again, I
22   thought this was another suggestion that was going to harm
23   the process, not help the process.  And not just at American
24   and TWA, it would have started involving all the other
25   airlines in a disruption of everybody's life.  But most

Woerth/direct                                                      90

 1              THE COURT:  It seems to go up only to section 75.

 2              MR. PRESS:  And it is not all inclusive through

 3      that section.

 4              THE COURT:  No.  They seem to be in numerical

 5      order.  And the jumpseat policy doesn't appear to be part of

 6      it.

 7              MR. KATZ:  Let me ask the witness a few questions

 8      about D 411 and maybe that will clear this up.

 9              THE COURT:  All right.

10      Q.   Mr. Woerth, do you recognize the pages that have been

11      marked as did 411?

12      A.   It has been removed from my screen.

13      Q.   You should have a copy of it on the stack of papers.

14      That I gave you at the break?

15      A.   All right.

16      Q.   Do you recognize this document?

17      A.   Yes.

18      Q.   Would you tell the Court what it is, please?

19      A.   The jumpseat policy as proposed and adopted by the

20      executive board.

21      Q.   Turning to the second page.  Can tell us when this

22      became effective?

23      A.   It is executive board, 1997, amended by the board in

24      2000.

25      Q.   And do you see the date in the upper right-hand corner?

Woerth/direct                                                    99

1   Q.   And how did it come up?

2   A.   It came up almost every dispute between pilot groups

3   could be for a merger, it could be with RJ issues, regional

4   issue, big airline, any dispute whatsoever, any dispute

5   whatsoever somebody usually wanted to start a jumpseat

6   campaign.   And so I would estimate at least three or four

7   times a year somebody from a different airline made the same

8   request that Captain Day did.

9   Q.   Done and did you have a standard employee or did you say

10  something different?

11  A.   Each time it is against ALPA policy and we are not going

12  to have a jumpseat war.

13  Q.   Is that what you told Captain Day?

14  A.   Yes.

15  Q.   And did you refer him specifically to the paragraph

16  marked with an X there.

17          MR. JACOBSON: Your Honor, I think this is very

18  leading at this point.

19  Q.   Would you read the paragraph that begins?

20          THE COURT:  I will allow it.

21  Q.   Would you read the paragraph that begins, the sentence

22  that begins denial of jumpseat privileges?

23  A.   Yes.   Denial of jumpseat privileges as a means of

24  punishing, coercing or retaliating against other pilot groups

25  or individuals is not supported by ALPA.   The jumpseat and/or

Woerth-cross/Jacobson                                    156

1   with the APA caused them to not staple all of the TWA pilots

2   to the bottom of the list.  Is that correct, sir?

3   A.    That wasn't the only consideration, but I think I helped

4   that.

5   Q.    All right.  When do you think did you that, sir?

6   A.    The first time I talked to John Darrah which was right

7   after the transaction was announced and then again in April.

8   Q.    When did you think that you persuaded them that they

9   shouldn't staple everyone?

10  A.    I am not sure if that was the only persuading person but

11  I made that argument.  I am not sure when they made their

12  decision.  I think it might might have been before that.

13  Q.    You don't know when that was?

14  A.    No, I don't know when it was.

15  Q.    He we talked about the major contingency fund.  That is

16  a pool of money roughly 70 million in cash, 20 million in

17  property, that ALPA tries to maintain for major contingencies

18  like strikes and the like, correct?

19  A.    Yes.

20  Q.    All right.  And you viewed that this proposed merger

21  between TWA and a nonALPA carrier, the acquisition of assets,

22  however you want to characterize it, that would be something

23  that would come within the major contingency, correct?

24  A.    I know TWA had been given multiple grants of the major

25  contingency fund dating back to 1988.

Woerth-cross/Jacobson                                          174

1   transcript, of your comments to the APA board of directors on

2   Friday, October 27, 2000 with a cover letter forwarded to you

3   for your review and correction, if needed.

4   A.    That is what it is, yes.

5            MR. JACOBSON:   At this time I offer P 10 in

6   evidence.

7            MR. KATZ:   No objection.

8            THE COURT:   Okay.   P 10 in evidence.

9   Q.    Let's look at the cover letter first.   It is addressed

10  to you and it is signed, "Fraternally, by  Captain John

11  Darrah, president of the APA?"   Right?

12  A.    Yes.

13  Q.    Addressed to you, Captain Woerth.   Could you -- oh, you

14  got it there.   All right.   Thank you.   Thanks you for coming

15  to their headquarters, right?

16  A.    Yes.

17  Q.    Thanks you for sharing your goals about the unity

18  campaign?

19  A.    Yes.

20  Q.    And that is the unity campaign that includes bringing

21  APA back into ALPA, correct?

22  A.    Yes.

23  Q.    He tells you that they, they, that is the APA, has now

24  formed an ALPA Exploratory Committee, correct?

25  A.    That's correct.

Woerth-cross/Jacobson                                    175

1   Q.    That is a committee that is going to explore what the

2   pluses and minuses are of APA reaffiliation with ALPA,

3   correct?

4   A.    Yeah.

5   Q.    They plan on working on that on the next three months,

6   to have that committee do its investigation.  Correct?

7   A.    That is what it says.

8   Q.    All right.  And you have apparently committed to provide

9   their committee chairman with materials and assistance and to

10  and pursues his investigation, correct?

11  A.    I believe when they were there they asked for certain

12  documents and I told them we would provide it to them, sure.

13  Q.    You did provide it to them, right?

14  A.    I would hope so.

15  Q.    Speaking of which, I have here a couple of books which I

16  just want you to identify first.  You are familiar with the

17  book, Flying the Line?

18  A.    Sure.

19  Q.    This is a history of the first 50 years of ALPA,

20  correct?

21  A.    Yes, it is.

22  Q.    It was written in cooperation with ALPA?

23  A.    I believe so, sure.

24  Q.    When it was first published it was serialized in ALPA's

25  magazine, Airline Pilot?

# Exhibit I

```
 1                    IN THE UNITED STATES DISTRICT COURT.
                      FOR THE DISTRICT OF NEW JERSEY
 2                    CIVIL 02-2917  (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                         Plaintiffs,
 6                                             VOLUME 12
               V.                              TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                         Defendant.
 9
                               CAMDEN, NEW JERSEY
10                             JUNE  28, 2011

11        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                         A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                    AND: LISA J. RODRIGUEZ, ESQ.
15                  AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:   STEVEN FRAM, ESQ.
19                   AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH  GINSBURG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

Woerth-cross/Jacobson                                              2

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.
3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                    LYNNE JOHNSON, CSR, CM, CRR
18                  OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
19                  P.O. BOX 6822
                    LAWRENCEVILLE, NJ  08648
20

21

22

23

24

25

Woerth-cross/Jacobson                                        150

1    Q.    ALPA remembers who the scabs are in their various job

2    actions, correct?

3    A.    Yes.

4    Q.    In fact, you keep lists of who the scabs are, to the

5    best you know, from every strike going back to 1931, Century

6    Airlines?

7    A.    We do not keep a list.

8    Q.    You do not keep a list?

9    A.    We do not keep a list.

10   Q.    You do not keep a list and provide them to your pilots

11   so they know who are scabs and who are not?

12             THE COURT:  Who is naughty and who is nice?

13             MR. JACOBSON: Yes, your Honor.

14             THE WITNESS:  Your Honor, you should know that that

15   has been determined to be illegal.  We do not do that.

16             THE COURT:  I would have thought so.

17             THE WITNESS: We do not, ALPA does not.

18             THE COURT:  Your answer to the question is you

19   don't keep such lists.

20             THE WITNESS:    That's right.

21             THE COURT:    All right.

22   Q.    Let me give you something that is not marked as an

23   exhibit because it won't be offered as an exhibit but perhaps

24   you will find it useful.

25             MR. KATZ:  Your Honor, I object to any examination

1            THE WITNESS:  No, your Honor, it does not.

2            THE COURT:  Okay.  Go on to the next subject.  You

3    can't use this document for any purpose.  All right.

4            MR. JACOBSON: Maybe I can use this document.  Mark

5    this as plaintiff's exhibit 449.

6            THE COURT:  44 what?

7            MR. JACOBSON: 449, your Honor.

8            MR. KATZ:  I object to any cross examination of the

9    witness with regard to this document.  This is totally beyond

10   the scope of the direct examination.  All this business about

11   scabs has nothing to do with this case.  No one has accused

12   American pilots or TWA pilots of being scabs.

13           THE COURT:  They didn't have a strike so we never

14   had the issue of anybody crossing a picket line.

15           MR. JACOBSON: This goes to the question of jumpseat

16   privilege.  This witness testified on direct examination that

17   it is improper to exclude, under ALPA policy, it is, as a

18   means of punishing, coercing or retaliating against other

19   pilots or groups or individuals.  It is not supported by

20   ALPA.  This is heading toward that.

21           MR. KATZ:  I object.  The jumpseat policy is in

22   evidence.  If he wants to ask Captain Woerth about jumpseat

23   policy, that is one thing.  This whole scab issue is a total

24   red herring.

25           THE COURT:  I see nothing that would permit

1    questioning on this document.

2            MR. JACOBSON: Look at the very bottom of the page,

3    your Honor, at the name of the document.

4            THE COURT:  Yeah?

5            MR. JACOBSON: I think I ask him whether he is

6    familiar with this document and some other questions on that

7    line.

8            THE COURT:  Let me see where you are going.  What

9    is your next question.

10   Q.   All right.  Mr. Woerth, is it not a fact that as a

11   matter of unwritten policy, the Air Line Pilots Association

12   encourages or directs its members to exclude from their

13   jumpseats pilots who are characterized as scabs?

14   A.   Are you saying is that ALPA's policy?

15   Q.   I said is that ALPA's policy or practice?

16   A.   No, it is not.

17   Q.   It is not at all?

18   A.   No.

19           MR. JACOBSON: That is his testimony.

20           THE COURT:  In our case there is no strike.  There

21   is no issue, the issue of the jumpseats wasn't to keep out

22   scabs.  It was to keep out everybody.  It was to keep --

23           MR. JACOBSON: No.

24           THE COURT:  It was to keep the 11,000 American

25   pilots from riding in the jumpseats.

Woerth-cross/Jacobson                                      154

```
1              MR. KATZ:  American pilots weren't scabs.  They
2    were working.
3              THE COURT:  They were working.  They weren't scabs.
4              MR. JACOBSON: The policy is denial of jumpseat
5    privileges as a means of punishing, coercing, retaliating
6    against other pilots, groups or individuals is not supported
7    by ALPA.  His contention was I didn't offer a jumpseat.
8              THE COURT:  Don't want to coerce the American
9    pilots because of this policy.  I am asking him whether they
10   were punishing pilots through groups or individuals,
11   notwithstanding the language because of strike breakers or
12   other scabs.
13             THE COURT:  He answered that question.
14             MR. KATZ:  He answered that question.
15             THE COURT:  He said no.
16             MR. JACOBSON: I understand.  I am ending that
17   question.
18             THE COURT:  All right.
19             MR. JACOBSON: I have no further questions for this
20   witness, your Honor.
21             THE COURT:  All right.  This will be in the area
22   now of redirect.
23             MR. KATZ:  Yes, you your Honor, I have a few
24   questions on redirect.
25
```

# Exhibit J

```
1

2                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
3                    CIVIL 02-2917  (JEI)

4         PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
5         AND MICHAEL FINUCAN, individually
          and on behalf of all others
6         similarly situated,
                              Plaintiffs,
7                                              VOLUME 13
                 V.                            TRIAL TRANSCRIPT
8
          AIR LINE PILOTS ASSOCIATION,
9
                     Defendant.
10
                              CAMDEN, NEW JERSEY
11                            JUNE  29, 2011

12        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
13
                     A P P E A R A N C E S:
14
               TRUJILLO, RODRIGUEZ & RICHARD
15             BY:  NICOLE M. ACCHIONE, ESQ.
                    AND: LISA J. RODRIGUEZ, ESQ.
16                      AND
               GREEN JACOBSON, P.C.
17             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
18             For the Plaintiffs.

19             ARCHER GREINER
               BY:  STEVEN FRAM, ESQ.
20                  AND
               KATZ & RANZMAN
21             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
22
               ELIZABETH  GINSBURG, ESQ.
23             IN-HOUSE COUNSEL FOR ALPA.

24

25
```

2

1

2          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
3    accurate record as taken stenographically in the
above-entitled proceedings.

4
                         S/   LYNNE JOHNSON
5
                    Lynne Johnson, CSR, CM, CRR
6                   Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18
                LYNNE JOHNSON, CSR, CM, CRR
19              OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
20              P.O. BOX 6822
                LAWRENCEVILLE, NJ  08648.
21

22

23

24

25

1   bargaining agreement rejected?

2   A.    My understanding was that we would have no contract,

3   that employees would be basically, you know, if they were, as

4   if they were hired, would be an engineer, like I was at one

5   time, that we wouldn't have a working agreement.  We wouldn't

6   have a grievance process.  We wouldn't -- we would be

7   basically without a contract.  Starting over.

8   Q.    Did you view that as a good prospect?

9   A.    No, certainly not, certainly not.

10  Q.    Do you recall any discussion at these meetings on March

11  21 and 22 about what might happen in the Section 1113 motion

12  was denied meaning that TWA was unsuccessful in getting the

13  bankruptcy court to reject the contract.

14  A.    I don't recall a whole lot of discussion about that at

15  the time, but we all knew that American had placed waiver of

16  certain provisions of our contract as a condition.  It was

17  not a secret.  It was absolutely an important issue through

18  that period of time.  So the prospect that American would

19  back away from a transaction or the possibility that they

20  would back away from a transaction as a result of that or

21  threaten us or, it was always present.

22  Q.    Was that possibility something you recall being

23  discussed at these meetings on March 21?

24  A.    Discussed at that particular meeting, you know, I don't

25  recall it being discussed right at that particular time but

Rautenberg-direct/Fram                                          22

1    Q.    Was there any discussion on April 1 about the

2    possibility or the advisability of a strike by the TWA

3    pilots?

4    A.    Yes.   There was a comment about the possibility of a

5    strike.

6    Q.    Tell us who made the comment and what the comment was?

7    A.    My notes reflect that Howard Hollander said, how about,

8    or what if all 24 of us, 2,400 of us, walked offer the job at

9    the same time.

10   Q.    You just referred to some notes.   Can you describe what

11   you are referring to, please?

12   A.    Yeah.   I was a sporadic note taker and a bad note taker,

13   but I made notes from time to time.

14   Q.    Okay.   Did you happen to make some notes about some of

15   the issues discussed at the meeting of April 1, 2001?

16   A.    Yes.   I expected that I would, that I was going to be

17   need to go communicate with the membership about what

18   transpired, and so I was, I think, taking notes at that time

19   to be able to do that in a better way.

20   Q.    I think you referred to a letter that you wrote shortly

21   after the meeting to report to Council 2?

22   A.    Yes.

23   Q.    We will come to that in a minute.   Let's go back to Mr.

24   Hollander's comment about the possibility of a strike.   Did

25   Hollander explain his thinking, did he explain why he thought

Rautenberg-direct/Fram                                           23

1    people should consider a strike?

2    A.   No. It was more in a sense a frustration, I think.

3    Q.   Did anybody else at the meeting speak in favor of this

4    the idea of a strike?

5    A.   I would hate to say that Howard Hollander was speaking

6    in favor of a strike.  I think he was throwing out the idea,

7    and, so I am not sure that anybody spoke in favor of a

8    strike.  It really just kind of fell on the floor like a

9    thud.

10   Q.   What was your reaction to the idea of a strike of the

11   TWA pilots?

12   A.   Well, my reaction was, we were trying to come out of

13   this with jobs, not without jobs.  And I thought that a

14   strike was a really good way to come out of it without a job.

15   Q.   All right.  Do you recall any discussion by Roland

16   Wilder at the meeting on April 1, 2001, about the possibility

17   of litigation?

18   A.   Yes.

19   Q.   Tell us what you recall about that?

20   A.   I recall the essential argument was that in our scope

21   language, we had provisions that prevented the company from

22   negotiating a transaction or a deal that didn't provide us

23   with Allegheny Mohawk labor protective provisions or

24   something like that.  And it was my -- in Wilder's litigation

25   initiative was to basically put pressure on American by

Singer-direct/Fram                                                  173

 1    manager didn't like him.  And if we didn't have that

 2    contract, we would.

 3              There was another as aspect to that as well and

 4    several people that were involved very closely with the TWA

 5    finances had, and some of them being very close to me, as

 6    friends, and as fellow pilots that I have flown with, that

 7    TWA was totally out of money.  That there is no way that they

 8    were going to continue to operate and that if the transaction

 9    with American didn't close, that every single pilot would be

10    out of work.

11              And my conclusion, by the time I voted this, was

12    that, A, we might lose our union representation, but the

13    other possibility was that American would just walk away from

14    the transaction since it was a requirement of the transaction

15    that we did waive our scope objections.

16    Q.    The information you referred to about TWA finances, did

17    you say you got that from some friends of yours?

18    A.    No. We had a finance committee, I believe, on, Scott

19    Shwartz may have been involved on that.  I know another pilot

20    named Jonathan Goldstein was on that, who has a MBA.

21    Q.    So it was pilots who were gathering the financial

22    information?

23    A.    They actually met with the company throughout going back

24    to probably the summer of 2000.

25    Q.    Do you recall any discussion on April 1 or 2 about

1   whether the TWA pilots should consider going on strike to try

2   to get more leverage or bet people's attention?

3   A.   I don't recall that specifically.  It was mentioned in

4   that article about labor groups taking individual action,

5   maybe even worse than a strike.

6   Q.   So do you recall Mr. Hollander -- let me ask the

7   specific question.  Do you have any recollection of Mr.

8   Hollander raising the possibility of a strike on April 1 or

9   April 2?

10  A.   I don't have any recollection of that.

11  Q.   Pardon me for a second? Do you recall when we took your

12  dep deposition at my office back on April 29 of this year?

13  A.   Yes.

14  Q.   I am sorry.

15          MR. FRAM:  Your Honor, I didn't bring copies.

16          MR. PRESS:  Impeaching his own witness.

17          MR. FRAM:  I am refreshing his recollection, your

18  Honor.  I am going to show counsel.

19          I want to show him this.

20          THE COURT:  It is his deposition?

21          MR. FRAM:  Yes, your Honor.

22  Q.   Mr. Singer, I want you to read to yourself on page 115,

23  line 20, the question down to about the middle and see if

24  that refreshes your memory about potential discussions of a

25  strike.

1    A.   It refreshes my recollection that there might have been

2    isolated discussion of it and there may have been some rumors

3    but nothing specific and nothing that I remember

4    specifically.

5    Q.   Do you recall what your reaction to the possibility of a

6    strike was, whether you thought it was a good idea or a bad

7    idea?

8    A.   I thought it was a very bad idea.  I knew that the

9    flight attendants had gone on strike about the time of the

10   merger between TWA and Ozark and that there was a lot of bad

11   feeling even in 2001 from something that happened I guess 15

12   years earlier.

13   Q.   Let me just ask you some questions about the atmosphere

14   of the meetings on April 1 and April 2.  Do you recall any of

15   advisors telling the members of the MEC that they had to vote

16   in a particular way?

17   A.   No.

18   Q.   Do you recall any of advisors threatening any of the

19   members of the MEC?

20   A.   Certainly not.

21   Q.   Do you recall any of advisors yelling or screaming at

22   anybody at the meetings?

23   A.   No.  It was very civil.

24   Q.   Do you recall any of advisors cutting off discussion,

25   saying we can't talk about these issues any more?

# Exhibit K

```
 1                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917   (JEI)

 3        PATRICK BRADY, SALLY YOUNG,
          HOWARD HOLLANDER, THEODORE CASE,
 4        AND MICHAEL FINUCAN, individually
          and on behalf of all others
 5        similarly situated,
                        Plaintiffs,
 6                                            VOLUME 14
             V.                               TRIAL TRANSCRIPT
 7
          AIR LINE PILOTS ASSOCIATION,
 8
                        Defendant.
 9
                                    CAMDEN, NEW JERSEY
10                                  JUNE  30, 2011

11        B E F O R E:   HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                        A P P E A R A N C E S:
13
             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:   STEVEN FRAM, ESQ.
19                   AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH  GINSBURG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.

3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                LYNNE JOHNSON, CSR, CM, CRR
18              OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
19              P.O. BOX 6822
                LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

1    CC?

2              THE WITNESS:  Yes.

3              THE COURT:  I will allow this.

4    A.    The document has a guarantee of a number of captain's

5    positions for the St. Louis cell.

6              The proposal that was on the table had a floor, I

7    think I described earlier, of 25 percent of the combined --

8    there could be no decrease in flying greater than 25 percent

9    of the combined domiciles of Chicago, Dallas and St. Louis.

10   And that is viewed as more favorable than what was agreed to

11   by APA and American and Supplement CC.

12   Q.    Are those the importance ways in which you recall

13   Supplement CC was less favorable than the deal that had been

14   on the table?

15   A.    Yes.

16             THE COURT:  In terms of the number of pilots

17   stapled, though, that didn't change.

18   A.    That did not change.

19   Q.    Throughout, and by the way, the advice that you gave to

20   the merger committee and the MEC that they should accept this

21   proposal and not have something in code.  That advice was

22   rejected, yes?

23   A.    That's right.

24   Q.    Throughout the course of 2001 when you were advising the

25   TWA MEC, did anybody from ALPA National tell you what advisor

1   direction to give to the TWA MEC?

2   A.   No, no one did that.

3   Q.   Were you aware as of late 2000 that ALPA had adopted the

4   so-called unity resolution, and had expressed an interest in

5   bringing some independent pilot unions into ALPA?

6   A.   I wasn't really aware of the resolution.  I was aware

7   that there was an interest in organizing the independent

8   union.

9   Q.   Were you aware as of late 2000 that there was an

10  interest on the part of ALPA National in trying to bring the

11  American pilots back?

12  A.   Yes.

13  Q.   Did that interest, that interest the part of ALPA

14  National, did that in any way, shape or form affect the

15  advice or guidance that you gave to the TWA MEC?

16  A.   No, it didn't affect my advice.

17           MR. FRAM:  I have nothing further on direct.

18           Thank you, your Honor.

19           THE COURT:  We will take a 15-minute break now.

20           Then we will resume with cross.  Mr. Jacobson, you

21  are going to do the cross?

22           MR. JACOBSON: Yes.

23           THE COURT:  We will pick up with your cross

24  examination at 10 of 12.

25           All rise when the jury leaves.

# Exhibit L

```
 1                    IN THE UNITED STATES DISTRICT COURT.
                      FOR THE DISTRICT  OF NEW JERSEY
 2                    CIVIL 02-2917  (JEI)

 3          PATRICK BRADY, SALLY YOUNG,
            HOWARD HOLLANDER, THEODORE CASE,
 4          AND MICHAEL FINUCAN, individually
            and on behalf of all others
 5          similarly situated,
                       Plaintiffs,
 6                                         VOLUME 15
                 V.                        TRIAL TRANSCRIPT
 7
            AIR LINE PILOTS ASSOCIATION,
 8
                       Defendant.
 9
                                    CAMDEN, NEW JERSEY
10                                  JULY 5, 2011

11          B E F O R E:   HONORABLE JOSEPH E. IRENAS
                           UNITED STATES DISTRICT JUDGE
12
                       A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                    AND: LISA J. RODRIGUEZ, ESQ.
15                    AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:   STEVEN FRAM, ESQ.
19                   AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH  GINSBURG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1              Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.
3
                        S/   LYNNE JOHNSON
4
                        Lynne Johnson, CSR, CM, CRR
5                       Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                   LYNNE JOHNSON, CSR, CM, CRR
18                 OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
19                 P.O. BOX 6822
                   LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25

Warner-direct/Fram                                          89

1   think.

2   Q.    Was there any motion by anybody at the MEC level, any

3   resolution offered, a motion made to send this new CBA out

4   for ratification by the members?

5   A.    No.

6   Q.    Focusing on the advice you gave and the things you did

7   on April 2, 2001, did anybody at ALPA National tell you what

8   advice to give or what guidance to provide to members of the

9   MEC?

10  A.    Absolutely not.

11  Q.    Were you aware during the period before April 2, 2001,

12  that ALPA National had adopted the so-called unity resolution

13  in late 2000?

14  A.    Yes.

15  Q.    And just remind us what was the unity resolution?

16  A.    It was, it directed the president to go out and try to

17  start discussions with other independent pilot groups to see

18  about merging into ALPA.

19  Q.    And one of the pilot, independent pilot groups that was

20  talked about as part of the unity resolution was the Allied

21  Pilots Association?

22  A.    Yes, it was.

23          THE COURT:  Well, it wasn't just one of them, it

24  was probably one of the most important ones, wasn't it, in

25  terms of the size and nature --

1    A.    There were four.  Fed Ex, Continental pilots, American

2    pilots and the UPS pilots.  So yeah, there were four of

3    consequence and that was one of them.

4    Q.    The fact that ALPA had this, and tried to bring the

5    American pilots into ALPA, did that in any way shape or form

6    influence the advice you provided to the TWA MEC?

7    A.    Absolutely not.

8    Q.    Did there come a point over the summer of 2001 when you

9    were asked to assess or analyze additional litigation

10   theories that were proposed by Roland Wilder?

11   A.    Yes.

12   Q.    Let's walk through those.  Do you have in front of you,

13   if you flip along the pile, skipping a bunch of documents to

14   move this along.  July 2, 2001, J 127 in evidence.  Your

15   Honor.  Do you have that in front of you, Mr. Warner?

16   A.    Yes, I do.

17   Q.    Is this a legal memorandum from Mr. Wilder's office that

18   came to your attention?

19   A.    Yes.

20   Q.    What, if anything, were you asked to do in terms of

21   assessing it?

22   A.    Well, I was asked to assess it.  Exactly that.  What had

23   preceded this is I had gone to Roland's office in June before

24   this was done with another lawyer in the legal department to

25   discuss and brainstorm over some legal ideas that Roland had.

Exhibit M

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3       PATRICK BRADY, SALLY YOUNG,
         HOWARD HOLLANDER, THEODORE CASE,
 4       AND MICHAEL FINUCAN, individually
         and on behalf of all others
 5       similarly situated,
                        Plaintiffs,
 6                                          VOLUME 16
              V.                            TRIAL TRANSCRIPT
 7
         AIR LINE PILOTS ASSOCIATION,
 8
                        Defendant.
 9
                             CAMDEN, NEW JERSEY
10                           JULY 6, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                   A P P E A R A N C E S:
13
            TRUJILLO, RODRIGUEZ & RICHARD
14          BY:  NICOLE M. ACCHIONE, ESQ.
                 AND: LISA J. RODRIGUEZ, ESQ.
15                 AND
            GREEN JACOBSON, P.C.
16          BY:  ALLEN PRESS, ESQ.   (MO. BAR)
            AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17          For the Plaintiffs.

18          ARCHER GREINER
            BY:   STEVEN FRAM, ESQ.
19               AND
            KATZ & RANZMAN
20          BY:  DANIEL M. KATZ, ESQ.
            FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
            ELIZABETH  GINSBURG, ESQ.
22          IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

                Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
accurate record as taken stenographically in the
above-entitled proceedings.

                          S/   LYNNE JOHNSON

                          Lynne Johnson, CSR, CM, CRR
                          Official Court Reporter

                    LYNNE JOHNSON, CSR, CM, CRR
                    OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    P.O. BOX 6822
                    LAWRENCEVILLE, NJ  08648.

Rosen-direct/Fram                                        18

1   Q.   Was there ever an organizing effort where the other

2   pilot group was represented by independent independent unions

3   and ALPA tried to use a card campaign?

4   A.   Not that I remember.

5   Q.   Let me just focus you on late 2000.  Do you recall when

6   ALPA adopted the so-called unity resolution?

7   A.   Yes, I do.

8   Q.   Tell the jury your understanding of what the unity

9   resolution was?

10  A.   Once Duane came, Captain Woerth, came into office, we

11  initiated a strategy of, and a plan to expand membership and

12  we had some expressions of interest from some of the large

13  independent unions.

14        So by 2000, actually we started talking to

15  continental in I think 1999, maybe even 1998, but by 2000 it

16  was clear that we needed to really expand this and make this

17  more public, and so we came out with this unity resolution

18  which really said that we wanted to organize, go out, meet

19  and talk and in a collaborative way with independents,

20  bringing them into ALPA, and as soon and as much as possible.

21  Q.   When that resolution was adopted were there particular

22  pilot groups other than continental that ALPA's leadership

23  had in mind?

24  A.   Yes.

25  Q.   Trying to bring into ALPA?

1    we bring to the table in terms of representing pilots and

2    their interests plus they saw the advantage of being under

3    the ALPA merger policy so that in the event they would be

4    merged in the future with another ALPA carrier they would be

5    covered by the ALPA merger policy.

6    Q.    You mentioned that a joint committee of some type was

7    formed between Continental's union and ALPA to pursue merger

8    discussions?

9    A.    Yes.

10   Q.    What happened next in terms of the effort to bring the

11   Continental pilots into ALPA?

12   A.    The next thing that happened was we agreed upon a merger

13   agreement to merge the two in terms of all the business

14   points you would deal with, staff, money, things like that.

15   And an orderly transition.  That was the next step.  After

16   that we then had to start going out and holding a vote within

17   Continental pilot group.

18   Q.    What did that involve?

19   A.    Well, that involved a huge undertaking, a lot of pilots,

20   we had office's at all their domiciles.  We would go to crew

21   rooms.  We had as I said other 50 pilot volunteers who would

22   go around and talk to pilots.  We had a huge amount of staff

23   support to handle this undertaking because it was very

24   complicated and we had lawyers assigned because there were

25   legal issues.  Communications people assigned.  It was a full

1    undertaking.

2    Q.    The leadership of the Continental pilots union had

3    agreed to merge, why was there any need to go and talk to the

4    individual pilots?

5              MR. PRESS:   Judge, I object to the relevance of

6    this.  You don't know why we are talking about the

7    Continental pilots.

8              THE COURT:   Yeah, I am beginning to --

9              MR. FRAM:   If you want me to explain, your Honor, I

10   am happy to.  We are talking about what you do to organize

11   pilots and we are going to compare it to what never happened

12   at American.  None of this  happened at American.

13             THE COURT:   You are wrong.  That is a misstatement

14   of facts.  There were cards out there.  Those cards didn't

15   come from the Tooth Fairy.  Those cards were being collected.

16   They were handed over to ALPA.  Your statement that none of

17   this happened in American is not a true statement.

18             MR. FRAM:   Sorry, your Honor.  None of this was

19   done by ALPA.  ALPA did not organize other unions as

20   explained by the witness.

21             THE COURT:   That is unclear.  That is your take.  I

22   am not sure the evidence doesn't support another inference on

23   that.

24             MR. FRAM:   Your Honor, I respectfully disagree with

25   that.

Rosen-direct/Fram                                                    27

1          THE COURT:  The jury will decide that.  That is
2    what we have them here for.
3          MR. PRESS:  Your Honor, I believe Mr. Fram's
4    statement to this jury but heard by this jury opened the door
5    to what happened after April 3rd, 2002.
6          THE  COURT:  Let's leave that for another day.
7          I think the jury has the drift of what you are
8    saying.  I don't think we need an explanation for why there
9    has to be a big campaign to generate votes among the pilot
10   groups itself in a merger.
11   Q.   Did ALPA in any way shape or form initiate a card
12   campaign at American Airlines?
13   A.   No, they did not.
14         THE COURT:  In the card campaign, where do the
15   cards come from?
16   A.   In a card campaign we generate the cards.
17         THE COURT:  That's right.
18   A.   We print cards.  When we do our own card campaign we
19   print the cards and distribute the cards.
20         THE COURT:  You are aware there was a card campaign
21   going on in a limited sense with American.
22   A.   I am aware.
23         THE COURT:  You are aware those cards were
24   delivered, in fact, to ALPA.
25   A.   Yes.

Rosen-direct/Fram                                                28

1              THE COURT:  Those cards then disappeared later on,

2       the physical cards.  You know that as well.

3              THE WITNESS:  Yes, that was in my deposition.

4              THE COURT:  You don't know what happened.

5              THE COURT:  That's correct.

6              THE COURT:  Do you know who printed the cards?

7       A.   No, I don't know.

8              THE COURT:  You don't know whether it was American

9       that printed the cards and provided them to Hunnibell and

10      Clark, the American pilots or they somehow or other got out

11      and got cards of their hone.

12      A.   They could have done that.

13             THE COURT:   They could have done that but you

14      don't know.

15      A.   I am not aware of providing any cards to them.

16             THE COURT:  You can't say, you don't simply know.

17      You are not even aware of where the cards are, that might

18      tell us, if we had the cards we might know who prepared them,

19      wouldn't we?  If we physically had the cards.

20      A.   I am not sure.

21             THE COURT:  Maybe.  It might give us a clue who the

22      printer was, was a printer used by --

23      A.   I understand what you are saying, but I am am not sure.

24             THE COURT:  There is a lot of things we could do if

25      we had the cards.

Rosen-direct/Fram                                              29

```
 1    A.    I understand what you are saying.

 2            THE COURT:   Go ahead.

 3    Q.   Mr. Rosen, did ALPA printed cards that were used to

 4    distribute to the American pilots?

 5    A.   No, I am not aware --

 6            THE COURT: No, no.  Don't say no.  You don't know,

 7    do you, where the cards came from?  You don't know where the

 8    cards came from.

 9    A.   I don't know where they came from.

10            THE COURT:  And you don't know where they are so we

11    can't do any forensics on them to figure it out, right?  Is

12    that correct?

13            THE WITNESS:  Yes.

14            THE COURT:  Don't try to get him to say that he

15    knows American didn't distribute them.  He is not aware that

16    they did, but he doesn't know where they got the cards.  I

17    you don't know where Clark and Hunnibell got the cards.

18    A.   All I know.

19            MR. FRAM:  We have testimony that --

20            THE COURT:  He doesn't know.  What other witnesses

21    say is one thing.  He doesn't know.

22    Q.   Mr. Rosen, did you direct anybody to print cards?

23    A.   No.

24    Q.   To send to the American Airline pilots?

25    A.   No.
```

1   Q.    Has anybody at ALPA ever told that you they printed

2   cards to send to American?

3   A.    No. No one of told me that.

4   Q.    Was any money ever budgeted by ALPA in 2001 to try to

5   organize the American pilots?

6           MR. PRESS:  He is leading the witness.

7           THE COURT:  Yeah, you are leading him.  By the way,

8   did ALPA ever indicate to Hunnibell and Clark that they would

9   reimburse them for expenses they incurred in their card

10  campaign.

11          THE WITNESS:  Did ALPA?

12          THE COURT:  Did ALPA ever indicate on ALPA

13  letterhead or ALPA, from ALPA official to say Clark and

14  Hunnibell that they would reimburse them for their expenses.

15  A.    I am not aware of any --

16          THE COURT:  You are not aware?

17          THE WITNESS:  No.

18          THE COURT:  So if somebody showed you a memo or a,

19  or something that said otherwise, you would be surprised.

20  A.    Yes, because I know --

21          THE COURT:  No, no, you didn't know.  You would be

22  surprised if such a document were shown.

23  A.    Why surprised?

24          THE COURT:  Well, because you are not aware of it.

25  So you would be surprised if somebody showed you an ALPA memo

Rosen-direct/Fram                                          31

1    and an ALPA documents that promised to reimburse.  You

2    indicator indicated there would are reimbursement.

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  Okay.  Next.

5    Q.   To your knowledge did ALPA ever actually reimburse any

6    expenses to Clark or Hunnibell?

7    A.   No, they did not.

8    Q.   Let's wrap up with the Continental campaign.  I think

9    you told us about some of the, have you told us about the

10   resources that ALPA devoted to trying to pursue the merger

11   with Continental?

12   A.   I think I did.  I explained that we had two assistant

13   directors, we had a whole bunch of people from

14   communications, legal department, a lot of pilot volunteers,

15   a lot of interim political officers who were assisting in the

16   campaign.  Very widespread support.

17   Q.   And what cost, can you tell us how much money ALPA

18   incurred during the course of trying to organize or merge

19   with the Continental pilots?

20             MR. PRESS:  Again, Judge, relevance.

21             THE COURT:  Are you objecting?

22             MR. PRESS:  Yes.

23             THE COURT:  Say I object.

24             MR. PRESS:  I object.

25             THE COURT:  Sustained.

Rosen-cross/Press                                              50

1    engage in a jumpseat war with American?

2    A.    I think as I explained in the deposition, it is an

3    apolitical policy.  We do not, and it is based on reciprocity

4    and the overall negative impact on everyone would far

5    outweigh any advantage or anything that would be gained by

6    doing that in some kind of retaliatory fashion, and I thought

7    it would make things worse, would be my reevaluation.

8    Q.    That policy is just a guideline, it is not a hard and

9    fast rule?

10   A.    That is the guideline we followed but it is not

11   mandatory.

12   Q.    In fact, Mr. Rosen, you know from your experience at

13   ALPA that ALPA has in fact used the jumpseat to punish pilots

14   it was upset with?

15   A.    I am not aware of that.

16   Q.    You are not aware of that?

17   A.    No.

18   Q.    Aren't you aware that the Eastern pilots went on strike

19   in 1989 for about a year?

20   A.    I am aware of that.

21          MR. FRAM:  I object.  That is before the policy.

22   This is misleading.

23          THE COURT:  I will allow it.  Go ahead.  What is

24   your next question?

25   Q.    You are aware that there were some Eastern pilots that

1   crossed the picket line, they were referred to as scabs,

2   right?

3   A.   That's correct.

4   Q.   You are aware that these scabs in fact were precluded

5   from ALPA jumpseats?

6   A.   I am aware of that.

7   Q.   Right.  And you are aware that in fact there was a list

8   of all these scabs that ALPA produced and distributed to all

9   of its members, right?

10  A.   No, I am not aware of that.

11  Q.   You are not aware of that?

12  A.   No.

13  Q.   Aren't you aware there was a lawsuit over that and you

14  provided testimony, I think?

15  A.   Yeah, that we didn't have a list.

16  Q.   You didn't have a list?

17  A.   We did not have the list.  That was the testimony.

18  Q.   Isn't it true, Mr. Rosen, that in 1991 ALPA produced and

19  distributed 50,000 copies of the scabs list, the final

20  publication was entitled the scabs of Eastern, of the strike

21  of 89.  Aren't you aware of that?

22  A.   I don't remember.

23  Q.   Can I show you?

24  A.   Sorry.

25  Q.   I want to show you.

1           MR. FRAM:  Your Honor, I object under 403.

2           THE COURT:  No, I will allow it.

3           MR. FRAM:  Can I see you at sidebar?

4           THE COURT:  I am going to allow it.  The jumpseat

5    issue is clearly in the case.  I will allow it.  Go ahead.

6    Q.   I am going to hand you something that I want you to look

7    at, first of all, what is it, are you familiar with this?

8           MR. FRAM:  May I have a copy?

9           MR. PRESS:  I am sorry.

10          THE COURT:  What is it marked?

11          MR. PRESS:  It is not marked, Judge.  It is just, I

12   am just using it to refresh memory for now.

13   A.   I what are you pointing me to?  I apologize --

14   Q.   Have you ever seen this case I have landed you?

15   A.   Yes.

16   Q.   Oh.  This is a published opinion of --

17   A.   I said yes.

18   Q.   Dun versus ALPA?

19   A.   Yes.

20   Q.   You are familiar with in lawsuit, right?

21   A.   Goes back a long time.  I don't recalling it.  I would

22   have to read it, your Honor.

23          THE COURT:  Well, if you want to read it, I am

24   certainly going to ask him to ask questions on it.

25          MR. PRESS:  I don't want to sit and have you read

1    in front of the jury.

2            THE COURT:   If you want to know about the list,

3    forget -- just stick with what he knows about the list.

4    Q.   You are denying that ALPA produced and distributed a

5    scab list?

6    A.   No, you have refreshed my recollection.  I would like an

7    opportunity to review it, and I appreciate your refreshing

8    it.  I apologize if I gave incorrect information on that.

9            THE COURT:   Okay.  Your recollection is refreshed.

10   Q.   In this is refresh refreshing your memory in fact ALPA

11   did produce and distribute a scab list?

12   A.   If that is what it says, that is what it says.  That is

13   why I wanted to review it.

14           THE COURT:   Let him look at it.

15   Q.   Please --

16           THE COURT:   Go ahead and a look at it.

17   Q.   I show you --

18           THE COURT:   Let him look at it.

19           MR. PRESS:   I am sorry, Judge.

20           (Pause)

21   A.   I see the paragraph you highlighted which clearly states

22   in 1991 ALPA produced and distributed 50,000 copies of the

23   scab list.  This final publication was entitled the scabs of

24   Eastern, of the strike of '89.

25           THE COURT:   The question is do you recall  that

1   now?

2   A.    I do recall it now.

3         THE COURT:   Okay.

4   Q.    So as a matter of fact, ALPA did produce and distribute

5   a scabs list of these Eastern pilots, right?

6   A.    I think you asked me that.  Yes.

7   Q.    And part of the intention of doing that was for that

8   list to be taken into cock pits by ALPA pilots so they on on

9   would know who the scabs were that might want to sit in the

10  jumpseat.   That was part of the reason?

11  A.    I can't speak to the intent.

12  Q.    That is fair enough.

13  Q.    Following up on some of the judge's questions about Mr.

14  Rindfleisch.   You were aware at the time, this is 2001, on

15  '02, that he was communicating directly with American pilots

16  about rejoining ALPA?

17  A.    He was communicating with American pilots.   Who were

18  expressing an interest in ALPA.

19  Q.    And two in particular had undertaken this card campaign,

20  Mr. Hunnibell and Mr. Clark, right?

21  A.    Yes.

22  Q.    You know for a fact Mr. Rindfleisch had regular

23  communication with those two men.

24  A.    There was frequent emails exchanged between the three of

25  them.

1    serious and prejudicial and if your Honor is concerned about

2    anything I say, that might suggest that, I request that you

3    call counsel to sidebar.  I really do.

4             THE COURT:  Okay.

5             MR. FRAM:  I am very upset about the Court's

6    comments on the record in front of the jury so.

7             THE COURT:  All right.

8             MR. FRAM:  I request that you not do that again,

9    please.

10            THE COURT:  All right.  I am going to give this

11   charge, this instruction.  When the jury comes in.

12            MR. FRAM:  Thank you, your Honor.

13            (Jury enters the courtroom (.

14            THE COURT:  Everyone please be seated.

15            Ladies and gentlemen, I want to give you an

16   instruction that relates to an interchange that took place

17   earlier in the day.

18            During the examination of Mr. Rosen I made a

19   comment to the effect that Mr. Fram had made an inaccurate

20   factual statement.

21            I instruct you to disregard that comment.  Certain

22   of the facts in this case are disputed by the parties, and my

23   comment referred to those disputed facts.  It is your role as

24   the jury to decide disputed facts.  Your role and your role

25   alone.

1   a pilot representative or two, and so I do remember talking

2   to people at ALPA about that, did they have a recommendation

3   on who might be a good retiree to serve on the committee.

4   But other than that, and sort of reporting that the motion

5   had been made, ALPA didn't -- none of the unions I think

6   represented there, retirees for those purposes, so it wasn't

7   that.

8   Q.   Did you give some kind of presentation at the meeting on

9   March 21 and 22 of 2001 about Section 1113, the likelihood of

10  it being granted and related issues?

11  A.   Yes.

12  Q.   As of March 21 and 22, did you have an understanding

13  about when the motion would be heard by the Judge, by Judge

14  Walsh and when ALPA would be required to file any responsive

15  papers?

16  A.   Yes.

17  Q.   What was your understanding of when the motion was going

18  to be heard by Judge Walsh are?

19  A.   I believe when the motion was filed, in fact, if I can

20  look at it for a second, it had down, hearing on the first

21  page, it had hearing date to be determined.  Objection date,

22  March 26.

23       So when it was filed we actually didn't know what

24  day it was going to be heard.

25       I believe right around the 21st, it may have been

1    the 21st, TWA filed an amended motion stating that the

2    hearing would be held on April 6, and that objections would

3    be due March 30 instead of March 26.

4    Q.   Okay.

5    A.   And I believe I reported at that meeting that at some

6    point during that meeting.

7    Q.   When you reported to the MEC -- by the way, just tell us

8    generally who was present at the meetings on March 21 and 22,

9    2001?

10   A.   It was an MEC meeting.  There were a series of these

11   meetings.  Members of the MEC would be there and the officers

12   and the chairs at least of the negotiating and merger

13   committees, and the creditors committee representatives, and

14   David Holtzman and me and Steve Tumblin and Michael Glanzer,

15   and I think at most of these meetings, if not all of them,

16   Clay Warner.

17   Q.   Did you talk at the meeting on March 21 and 22 about

18   whether the hearing date could be postponed, whether there is

19   a way to get the motion to be considered to be put off?

20   A.   I believe I did.

21   Q.   What did he say?

22   A.   The statute, this is a very unusual statute.  The

23   statute says that when the motion is filed, the hearing, the

24   Court will schedule the hearing no later than two weeks after

25   the motion is filed.  And the Court, for, it says something

1   like special circumstances or the circumstances of the case,

2   can extend it one week, and that is all.  The hearing has to

3   start 21 days after the motion is filed.  No later than that.

4   Unless the company agrees.

5           As I remember, April 6 was 21 days, maybe it was 20

6   days, but it was 21 days after March 15.  So that unless the

7   company agreed, the hearing was going on start on April 6.

8   The statute instructed the Judge not to extend the start of

9   the hearing unless the company agreed.

10  Q.   Did you have a sense on March 21 or 22 of how long the

11  hearing would take?

12  A.   Yes.  I had a general sense.

13  Q.   Did you talk to the people at the meeting about how long

14  you thought the hearing would take?

15  A.   At both this meeting and the meeting on, the last

16  meeting which was April 1, 2, my -- and we were focusing at

17  this point more on getting the objection done and filed.

18  That was the first thing we needed to do.  But that -- from

19  everything I knew in the negotiations, everything was

20  focusing now on scope and successorship.  And seniority

21  integration.   I sort of mean that too.

22          And so my view, I think I expressed at this point,

23  I know I expressed at the next meeting, was that we would

24  need a witness, the negotiating history was going to be

25  agreed to, I thought, what is in the contract is going to be

1          My conclusion from that is that the Judge was

2    reaching out to make some comments about the 1113

3    proceedings, even before they were scheduled to start.

4    Q.   So was the 1113 application, was it even before Judge

5    Walsh as part of the motions he was deciding?

6    A.   No. I think there were some objections by some Israeli

7    employees, or Israeli employees --

8               THE COURT:  Of whom?

9               THE WITNESS:  Of TWA, and I think the Israeli

10   operations were going to be closed and they were raising

11   objections, but what struck me was that this was very general

12   language that the Judge used about the 1113 process.

13   Q.   Mr. Seltzer, did you know during the timeframe that we

14   were discussing, early 2001, that the prior year late 2000,

15   ALPA had adopted the so-called unity resolution?

16   A.   No.

17   Q.   Did anybody tell you during the period which you were

18   representing the MEC and ALPA during the bankruptcy

19   proceeding that ALPA had a long term goal of trying to bring

20   the American pilots back to ALPA?

21   A.   No.

22   Q.   Did anybody tell you what advice you should give to the

23   TWA MEC or the TWA pilots?

24   A.   Absolutely not.

25   Q.   Did anyone try to influence the advice that you give to

1    TWA pilots or the TWA MEC?

2    A.    Absolutely not.

3          MR. FRAM:   Thank you thank you.  I have nothing

4    further on direct.

5          THE COURT:   Cross examine.

6          MR. JACOBSON: Thank you, your Honor.

7          CROSS EXAMINATION.

8          BY MR. JACOBSON:

9    Q.   Mr. Seltzer, I would like to ask you a few more

10   questions about your background first before I get into the

11   meat of the cross examination.  Okay, sir?

12   A.    Absolutely.

13   Q.    You are a lawyer at what law firm?

14   A.    Cohen, Weiss & Simon.

15   Q.    Cohen, Weiss and Simon represented ALPA since when?

16   A.    I think since the 1930s.

17   Q.    You or your law firm have been their general counsel

18   since then, correct?

19   A.    I think since then.  At some point we became general

20   counsel.  We have been general counsel for a long time.

21   Q.    For a long time and still are today?

22   A.    Yes.

23   Q.    All right.  And let's go to the bankruptcy.  You had

24   mentioned that you thought the debtor in possession financing

25   was unusual because the financing was by American Airlines

# Exhibit N

1

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3       PATRICK BRADY, SALLY YOUNG,
         HOWARD HOLLANDER, THEODORE CASE,
 4       AND MICHAEL FINUCAN, individually
         and on behalf of all others
 5       similarly situated,
                     Plaintiffs,
 6                                          VOLUME 17
             V.                          TRIAL TRANSCRIPT
 7
         AIR LINE PILOTS ASSOCIATION,
 8
                     Defendant.
 9
                             CAMDEN, NEW JERSEY
10                           JULY 7, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                     A P P E A R A N C E S:
13
             TRUJILLO, RODRIGUEZ & RICHARD
14           BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
             GREEN JACOBSON, P.C.
16           BY:  ALLEN PRESS, ESQ.   (MO. BAR)
             AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17           For the Plaintiffs.

18           ARCHER GREINER
             BY:   STEVEN FRAM, ESQ.
19                  AND
             KATZ & RANZMAN
20           BY:  DANIEL M. KATZ, ESQ.
             FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
             ELIZABETH  GINSBURG, ESQ.
22           IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

2

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2   accurate record as taken stenographically in the
above-entitled proceedings.
3
                    S/   LYNNE JOHNSON
4
                    Lynne Johnson, CSR, CM, CRR
5                    Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18          LYNNE JOHNSON, CSR, CM, CRR
          OFFICIAL COURT REPORTER
19          UNITED STATES DISTRICT COURT
          P.O. BOX 6822
20          LAWRENCEVILLE, NJ  08648.

21

22

23

24

25        .

1    MR. PRESS:  The last paragraph of instruction 15
2  has a reference to not filing grievances.
3           THE COURT:  Say again.
4           MR. PRESS:  There is a reference to not providing
5  represented employees proper forms for grievances.
6           THE COURT:  Where?
7           MR. PRESS:  Last paragraph.
8           THE COURT:  16.
9           MR. PRESS:  Of 15.
10          THE COURT:  15, I am sorry.
11          MR. PRESS:  First sentence talking about grievance
12  forms, Judge.  I didn't know what that was about.
13          THE COURT:  I agree.  That is far from relevant in
14  this case.
15          MR. PRESS:  I would suggest putting a period after
16  the word  "manner" and deleting the rest of that.
17          MR. FRAM:  No objection to that, your Honor.
18          THE COURT:  I don't see why anybody would want
19  that.
20           Probably move that sentence up as part of the
21  previous paragraph.  In other words, put a period after
22  "manner," then move that truncated sentence as part of the
23  previous paragraph.
24           Okay.  16.
25          MR. FRAM:  Your Honor, the beginning of 15, we

1    think it is important to quote from language from Lockridge

2    that we had in our proposed charge on charges 14 C, in the

3    language would be, also some language from Deboles, your

4    Honor, it would be to the effect that to establish bad faith

5    plaintiffs have the burden of presenting affirmative

6    substantial evidence of fraud, deceitful action or dishonest

7    conduct.

8            A showing of fraud, deceitful action, or dishonest

9    conduct would prove -- requires proof of all of the following

10   elements.  We have the four elements on page 29 of our

11   proposed charge that come from Deboles.  A misleading

12   statement or material omission in reliance, injury and

13   wrongful intent.  We didn't believe that those concepts, your

14   Honor, are sufficiently --

15           THE COURT:  I have your language right here.

16           MR. FRAM:  Thank you.

17           THE COURT:  It goes on.

18           MR. FRAM:  I think it is just the one paragraph I

19   am focused on.

20           THE COURT:  You have to establish bad faith, the

21   plaintiffs have the burden of burden of establishing fraud.

22   Deceitful action, dishonest conduct.  Showing of fraud,

23   deceitful action, requires proof of all the following

24   elements.

25           MR. FRAM:  Exactly, your Honor.

1      THE COURT:  You rise.

2      MR. PRESS:  It is an incomplete statement of the

3 law, is our primary objection, Judge.  You have given

4 examples of what bad faith are, and  their proposed

5 instruction would exclude some of those things.  It is an

6 incomplete statement of what may constitute bad faith.

7      THE COURT:  I mean I am sure in the context of the

8 way some duty of fair representation cases have arisen, fraud

9 is a meaningful concept.  But it is not too meaningful in the

10 way this case has arisen.  I know you would like to shoehorn

11 this into a fraud case.  But I am not sure, if it was a true

12 fraud case for one thing the burden of proof is different.

13 In a fraud case the burden of proof is clear and convincing,

14 not by a preponderance to start with.

15      MR. FRAM:  Your Honor, we researched that issue.

16 Under state law that is the case.  Under federal law it is

17 not.  We hoped to argue that.  Under the DFR law, even fraud

18 cases like Deboles are subject to the preponderance standard.

19 I think it is clear that major aspects of this case are fraud

20 cases, just like Deboles.

21      THE COURT:  In many cases they are fraud cases, in

22 the way they come down.  But in a conflict of interest

23 situation, hard to shoehorn that into, I mean you put it

24 anywhere you want, the core of the plaintiff's case in this

25 case, is that they had a conflict.  And because they had a

```
 1    conflict, they breached, their actions were inconsistent with
 2    the duty of fair representation.
 3              That is very simple terms.  Their case.  That
 4    doesn't fit well into the fraud paradigm.  I mean.
 5              MR. FRAM:  Your Honor, could I be heard on that?
 6              THE COURT:  Yes.
 7              MR. FRAM:  I think there is an important
 8    distinction.  They point to the conflict as evidence of bad
 9    faith, but they still have to prove that there was, they
10    still have to prove that there was substantial evidence of
11    fraud and deceitful action, dishonest conduct, reliance on
12    the other elements.  And if they don't prove the other
13    elements, then the fact that there was a conflict becomes
14    meaningless.  I think the Deboles case really punctuates that
15    point.  They are separate elements, your Honor, and I think
16    to the extent they are pushing a theory that, well, the
17    breach here was having a conflict, but failing to disclose
18    it, that goes nowhere.
19              There has to be action, or inaction, or some other
20    conduct, that harms the plaintiffs.  You can't have a
21    conflict that sits out in the vacuum, that does not result in
22    some action or inaction upon the plaintiffs.  That is why we
23    think the language here is so essential, and again, I am
24    taking it from O'Neill and from Deboles, I would submit, your
25    Honor, this case is just like Deboles, where the plaintiffs
```

1    are claiming that --

2              THE COURT:  Deboles?

3              MR. FRAM:  Deboles, we cited Deboles v.  TWA, the

4    Third Circuit cases, your Honor may recall, it was written by

5    Judge Gerry sitting by designation some years ago.  I think.

6              THE COURT:  It was some years ago, yes.

7              MR. FRAM:  I think it was '76.  If the theory here,

8    your Honor, is that the fact of the conflict goes anywhere, I

9    just don't get it.

10             We have already, your Honor mentioned this morning

11   and you are absolutely right, that it was entirely lawful and

12   not improper for Duane Woerth to go in and talk to the APA in

13   the fall of 2000.  One of the things we request is that you

14   instruct the jury to that effect.

15             THE COURT:  Let me ask you this.  Let's assume the

16   company has a conflict.  The one we have here in this case.

17   Alleged.

18             MR. FRAM:  Yes,  your Honor.

19             THE COURT:  And the union in effect doesn't use its

20   best efforts to represent their members because of this

21   conflict.  You are saying because the jury might have trouble

22   finding a misleading statement or representation the case

23   fails?

24             MR. FRAM:  No.  What we are saying, your Honor, is

25   two things.  One, we are saying that --

1          THE COURT:  You make it look like a false or

2    misleading statement is the heart of the case.

3          MR. FRAM:  Your Honor.

4          THE COURT:  That is not really the heart of this

5    case.

6          MR. FRAM:  Your Honor, I think it is, but to the

7    extent it is part of this case, we believe it is essential to

8    have that language so that they can evaluate that part of the

9    case.  We understand that --

10          THE COURT:  Why don't, does, if a party has a duty,

11    or it is infected by a desire to receive a benefit from some

12    other group, so it doesn't use its best efforts, because of

13    that conflict, to represent its members, why does there have

14    to be a misrepresentation?

15          MR. FRAM:  Your Honor --

16          THE COURT:  What makes their need for a

17    misrepresentation, that particular context.

18          MR. FRAM:  First of all, best efforts is not the

19    standard.

20          THE COURT:  Well, let's they are influenced by

21    their desire to benefit APA, and they take steps because of

22    that not to -- well, I will for the moment use best efforts,

23    use their best efforts to represent.  Specifically because of

24    their desire not to offend the American pilots who they hope

25    to bring into their fold.

```
 1              Why does -- why would I focus on misrepresentation
 2    as the heart of that cause of action?
 3              MR. FRAM:  Your Honor, if we are agreeing that
 4    there is no claim of misrepresentation and material --
 5    mission in the case I am fine with that.
 6              THE COURT:  I am saying they are not taking that
 7    position.   They are not taking the position  there is no
 8    misrepresentation.  I am saying why should I make that the
 9    focal point of the bad faith claim.
10              MR. FRAM:  This goes back to my suggestion before
11    that you be more specific in terms of the types of claims and
12    say some of the claims that certified the plaintiffs here is
13    there were omissions and misrepresentation, and those claims
14    are subject to this standard.  Other claims are based upon
15    the alleged failure of ALPA to, I don't want to agree with
16    you about best efforts, I think it is a concept that is not
17    recognized.
18              THE COURT:  I agree.
19              MR. FRAM:  It is highly deferential.  Other claims
20    of the plaintiff.
21              THE COURT:  I say here the fact a union is
22    negligent or careless doesn't give you a cause of action.
23    One thing I made very clear that is the intent, there has to
24    be intent.  They have to find intent.
25              MR. FRAM:  Your Honor, you can certainly instructed
```

1    that certain of the claims are not based upon

2    misrepresentations or omissions.

3          THE COURT:  I think you are trying to parse the

4    claims in little tiny bits that is not really justified.

5          MR. FRAM:  We want the jury to be guided clearly in

6    terms of the requirements of the law.  I don't think Deboles

7    could be any clearer about the need for misrepresentation,

8    omissions on the conduct, reliance by the plaintiffs.  These

9    are basic fraud elements, that are essential to an evaluation

10   of not only the --

11         THE COURT:  I don't think the conflict claimed in

12   this case fits very well with the fraud paradigm.  I don't

13   think it works.

14         MR. FRAM:  The conflict claim is element number 4.

15   That is the proof they have of wrongful intent.  Before you

16   get to consideration of whether there was wrongful intent,

17   whether it was meaningful, you first have to prove there was

18   dishonest conduct or some other problem.  If ALPA had made

19   correct representations, had been diligent, had done

20   everything it was supposed to do.

21         THE COURT:  That, by the way, to some degree, that

22   is the Achilles heel of their case.  I don't know what the

23   jury is going to do, I know what I am going to do.  On appeal

24   I agree with you they are going to have to prove that they

25   did something that they shouldn't have done.

1          MR. FRAM:  It is something they shouldn't have

2  done.

3          THE COURT:  What?

4          MR. FRAM:  Fraud, deceitful action or dishonest

5  conduct.  That is part of their case.

6          THE COURT:  All right.  I will look at Deboles.

7          MS. RODRIGUEZ:  Can I be heard on this?

8          THE COURT:  Of course.

9          MS. RODRIGUEZ:  This is not the standard.  It is

10  not a fraud case.  It is --

11          THE COURT:  No, I have taken that, indeed, I made

12  changes in the way I originally drafted the charge because I

13  ought at least in this case -- the fraud matrix just doesn't

14  apply.

15          MS. RODRIGUEZ:  It does not apply and it is not the

16  law, and as much as I respect Judge Gerry, a 1970 case pre

17  O'Neill by the way is not instructive.  And again, I ask --

18          THE COURT:  You better respect Judge Gerry.

19          MS. RODRIGUEZ: When I clerked for Judge Cohen,

20  going back, he was sick for a long period of my clerkship so

21  I actually ended up getting switched over to Judge Gerry for

22  that time.

23          THE COURT:  I sit in Judge Gerry's old chambers.

24          MS. RODRIGUEZ:  I know you do.  In Aguinaga, the

25  Court addresses these issues.  It says if --

```
 1                 THE COURT:  In what?

 2                 MS. RODRIGUEZ:  Aguinaga.

 3                 THE COURT:  Spell that.

 4                 MS. RODRIGUEZ:  A G U I N A G A.    It is a Second

 5       circuit Court of Appeals, 1993.

 6                 The Court says, if, as the union argues, O'Neill

 7       counsels that the union be accorded due deference in its

 8       decision to sacrifice  plaintiffs' rights, such deference

 9       would only be appropriate insofar as the union's motives have

10       been proper, i.e., to gain advantage with Morrell embarking

11       over other plants.  Here, however, plaintiffs presented

12       evidence that the union had other motives in sacrificing

13       plaintiffs' rights and concealing its activities.  The record

14       contains evidence that tended to show that the union was

15       motivated in part by its desire to obtain status as the

16       bargaining representative for three reopened plants.  As

17       neither of these motives are proper for a union which had the

18       duty to its members akin to the duty owned by other

19       fiduciaries to their beneficiaries, we hold that there is

20       evidence upon which the jury could probably find that the

21       union breached its duty of fair representation.

22                 There is no talk about a four-part test and parsing

23       here and parsing there.  It is one duty of fair

24       representation.

25                 THE COURT:  I told you I already made changes in
```

```
 1   this.  I actually had some fraud stuff in an earlier draft of
 2   this.  See draft number 2.  Draft number 1 actually had some
 3   fraud language in it which I took out.  And I took it out
 4   because I didn't believe that this case, you know, fit well
 5   within that paradigm, within that framework.  I will reread
 6   these cases.
 7           MR. KATZ:  Your Honor, we cited in many of the
 8   briefs that have been filed a number of cases that followed
 9   Deboles, that reaffirmed the principles that were laid out in
10   Deboles, and a few of them that are after, Anderson, Acri,
11   Cell in the Fourth Circuit.  These are six or seven different
12   circuit courts of appeal that make clear that Deboles is good
13   law throughout the country.  Aguinaga is a very unusual and
14   atypical case --
15           MS. RODRIGUEZ:  These are the two cases I cited.
16           MR. KATZ:  The point I wanted to make is that there
17   are allegations in this case of misstatements that the
18   plaintiffs are relying upon.  And while no one approves or
19   condones the idea of union representatives making
20   misstatements, there are a wide variety of cases that deal
21   with the issue in a duty of fair representation context,
22   including cases where a union representative basically is
23   accused of taking a dive, as the accusations are here, in
24   order to persuade employees to ratify a collective bargaining
25   agreement.
```

```
 1            And in those cases, the fact that there is a

 2   misstatement is far from enough to establish a duty of fair

 3   representation violation.  And even a bad motive of making a

 4   misrepresentation in order to make a deal when it is not in

 5   the best interest of the employees is not enough.

 6            As Mr. Fram has been pointing out, the cases in all

 7   these courts of appeals that I have mentioned that are cited

 8   in our motion to decertify the class, in our 1292 (b)

 9   application, and even in our summary judgment motion, those

10   cases show that it is vital in order to prove a DFR

11   violation, that --

12            THE COURT:  I am going to revisit the issue.  I

13   told you.

14            MR. KATZ:  All right.  I would just suggest that

15   you look at the other briefs that collect some of the cases

16   in other circuits.

17            THE COURT:  I am not going to make a change now.

18   But I have your point.  I will read it.

19            MR. KATZ:  Thank you.

20            MR. PRESS:  It dawned on me listening to Mr. Katz

21   the best guidance we have in this case is the Third Circuit's

22   decision in this case.  They held that if we prove that the

23   union failed to do anything for an improper purpose, we win,

24   or we can win.

25            MR. FRAM:  Your Honor, I have --
```

1          MR. PRESS:  That is black and white.  That was the

2     holding.

3          MR. FRAM:  Failed to do anything.  But what about

4     causation?  What about injury in fact?  What about Deboles,

5     your Honor, that says that there can be no liability in the

6     absence of injury, because, quote, "any remedy against the

7     union would necessarily be a 'punishment' for a harmless

8     lie."

9          Deboles, as you recall is a case where the District

10    Court found there were affirmative misrepresentations.  The

11    Third Circuit reverses.  A harmless lie.  A lie that wasn't

12    relied upon by the union members, and that didn't result in

13    any harm, is meaningless, there is no DFR violation.

14          THE COURT:  I have accepted that principle.

15          MR. FRAM:  Thank you.

16          THE COURT:  There has to be harm from the wrongful

17    conduct.  We have a verdict sheet and we have it in the

18    charge.

19          All right.  I will revisit that.  We will look at

20    that again.  I am not changing paragraphs 16 now.

21          Okay.  What about, anything for the rest of it?

22          MR. FRAM:  Your Honor, 16, I am looking at the

23    third line.

24          THE COURT:  Third line of the first paragraph.

25          MR. FRAM:  A phrase, "out of a desire to obtain an

1    undeserved benefit at the expense of the employees it

2    represents, A.  We are not certain that there is any law that

3    supports that; B.  It doesn't seem to have any application to

4    the case, your Honor.  We are concerned it will be confusing.

5             MS. RODRIGUEZ:  Where are you?

6             THE COURT:  The very first sentence of paragraph

7    16.

8             MR. FRAM:  We ask the Court to strike that.

9             (Pause)

10            MR. PRESS:  We don't have a problem removing that

11   sentence or clause.

12            THE COURT:  He wants the whole sentence removed.

13            MR. PRESS:  I forgot where we are.

14            THE COURT:  First paragraph, first sentence, first

15   paragraph of 16.

16            MS. RODRIGUEZ:  We don't have a problem with it.

17            MR. PRESS:  No, not the whole sentence, just the

18   last --

19            THE COURT:  I don't know.  What is it you asked to

20   be struck?

21            MR. FRAM:  Your Honor, we would strike "or out of a

22   desire to obtain an undeserved benefit at the expense of."

23            THE COURT:  Do you have an objection to that?

24            MR. PRESS:  No.

25            THE COURT:  It reads "A union's conduct is made in

```
 1    bad faith when it acts or fails to act out of ill will
 2    towards the employees it represents."
 3              MR. FRAM:  Yes.
 4              THE COURT:  There is no objection to that change.
 5    I will make it.
 6              THE COURT:  What else?
 7              MR. FRAM:  Next paragraph, examples of bad faith.
 8    Deliberately making misleading statements to employees, not
 9    disclosing conflicts of interest, acting with hostility
10    towards union members and ignoring union policies in labor
11    negotiation.  We are a little concerned about that language,
12    your Honor.
13              One, not disclosing conflicts of interest.  I am
14    not sure, we don't believe the law supports that.  Acting
15    with hostility towards union members.
16              Again, I alluded to this testimony, which I think
17    you know my view of it, by Comlish, that when Duane Woerth
18    scowled at him, I am concerned that the jury might think
19    someone might not, that someone allegedly raising their
20    voice,  that someone raising their voice is a violation.  It
21    doesn't.  It has to be meaningful.  Or ignoring the policy of
22    the labor negotiation.  I don't know that the law supports
23    that.
24              We think the jury is going to be confused, and I
25    don't believe there is any evidence, your Honor, in the case
```

1    that we ignored, that ALPA ignored union policy.  What I

2    would ask your Honor to do is strike that sentence and --

3              THE COURT:  That paragraph.

4              MR. FRAM:  That paragraph.

5              THE COURT:  It is one sentence.

6              MR. FRAM:  The one sentence paragraph which I know

7    your Honor disfavors, you said that before.  We have a one-

8    sentence paragraph and no page numbers.

9              THE COURT:  Bad news.

10             MR. FRAM:  That is my reference and let the jury

11   rely upon the more general discussion of the standard.

12             Of course, our concern is by giving specific

13   examples that arguably dovetail with the plaintiff's

14   arguments, that this becomes suggestive to the jury and

15   prejudicial to the defendant.

16             THE COURT:  I will wait to see.

17             MR. PRESS:  I don't have the cases in my

18   fingertips.  I know there is legal support for every

19   submission you included in here.  I think this is completely

20   proper.

21             THE COURT:  I am going to omit "ignoring union

22   policies and labor negotiations."  Because I don't think

23   there is anything in this case --

24             MR. PRESS:  There is.

25             THE COURT:  Well, tell me what there is.

1    MR. PRESS:  ALPA merger policy in an ALPA to non-

2 ALPA case requires the president to take reasonable steps to

3 insure that a fair process is entered into for a fair and

4 equitable integration.  There is no evidence Duane Woerth did

5 anything to comply with that policy.  All the evidence and

6 inferences would suggest that he didn't do anything.  That is

7 policy one.

8    Policy two, we got it yesterday from Seth Rosen,

9 the collective bargaining policy, the concessionary

10 negotiation requires that those negotiations be coordinated

11 through the president's office.  Again, there is no evidence

12 that Duane Woerth did anything.  And so that is two big ones

13 right there, Judge.

14    MR. FRAM:  Duane Woerth signed the transition

15 agreement.  Your Honor pointed that out.  It was negotiated

16 by the negotiating committee, approved by the entire MEC,

17 signed off on by Ron Kiel, negotiated --

18    THE COURT:  You are talking about the transition

19 agreement.

20    MR. FRAM:  Yes.  That is what I think Mr. Press is

21 alluding to.  I don't know how he can argue it wasn't

22 coordinated through the president's office.  That is not a

23 violation.  I think Mr. Rosen said as well that we are

24 dealing with guidelines, not policies.  How is that harmful

25 to anybody?  So yes --

```
 1            THE COURT:  I am sorry.  If you don't do it.

 2            MR. FRAM:  Well, the fact of the matter, your

 3   Honor, is that if there is a DFR violation in connection with

 4   the transition agreement, it is during the period leading up

 5   to the execution.  It is unable to -- your Honor, if I can

 6   make a note about the examples you had, you referred to

 7   deliberately making misleading statements to employees.  I

 8   think this goes back to the defendant really underscores the

 9   importance of the Deboles language that we talked about

10   before.

11            So we ask your Honor to consider that in

12   conjunction with that paragraph as well.

13            THE COURT:  I am going to leave it as it is, but

14   subject to my reviewing Deboles, and Aguinaga, and other

15   cases.  Find out whether Aguinaga was a support, and whether

16   it is a stand-alone case,  we will see.

17            MR. FRAM:  On the not disclosing conflicts issue --

18            THE COURT:  Where are you?

19            MR. FRAM:  Same sentence, that one-sentence

20   paragraph.  Did I request before the instruction that it was

21   not improper in any way for Duane Woerth to go and talk to

22   the APA in late 2000?  If I didn't, I would request that the

23   Court instruct the jury to that effect.

24            THE COURT:  It is not improper.

25            MR. FRAM:  It was not improper for ALPA as an
```

1  organization to adopt a unity resolution, or for Duane Woerth

2  in the wake of that to talk to APA --

3          THE COURT:  Nobody testified in this case that

4  passing the unity resolution was a wrong or bad thing.

5          Nobody suggested that.

6          MR. FRAM:  I think the jury is going to be confused

7  about that issue, your Honor.  Our request would be to

8  clarify it by instructing the jury that until the TWA pilots

9  and the American pilots became adverse, there was nothing

10  improper that the unity resolution or Duane Woerth's going

11  and speaking to the board of the APA about it.

12          MR. PRESS:  It is completely unnecessary, Judge.  I

13  don't know why we would have another instruction on things

14  that are legal.  Where are he going to stop?

15          MS. RODRIGUEZ:  That is not an issue in the case.

16  There is nothing contested about it.

17          THE COURT:  Well, I look at that differently.  I

18  think he could shoot himself in the foot with that.

19  Remember, there was, he went to the APA, I think in November,

20  2000.  But he went to the APA during a period they were

21  negotiating.  Indeed, it is very conflicting testimony about

22  what was said.  And the thing that says there is nothing

23  wrong prior to the acquisition by American and the TWA --

24  there is nothing wrong with the unity resolution or anyone

25  speaking to ALPA.

1    MR. PRESS:  I see the distinction you are drawing.

2    THE COURT:  Do you really want that?

3    MR. FRAM:  Can I think about it over night?

4    THE COURT:  Yes, think about it or, and tell me

5    Monday.  I won't be here tomorrow.  It seems to me you are

6    focusing with almost laser-like intensity a light on his

7    meeting about which there is some confusion, but he certainly

8    went to a meeting.

9    Now, his take on it, he went to the meeting to

10   encourage the pilots to be fair in their integration.  That

11   is his recount of it.  But you have a charge that any

12   visiting APA prior to January 9, whatever the date of the

13   announcement is, of the TWA acquisition, really, what does

14   that tell the jury?  Forget that one.  He went, why don't you

15   think about it.

16   MR. FRAM:  Thank you.

17   MR. KATZ:  Your Honor, may I make one comment about

18   this paragraph?

19   THE COURT:  YES.

20   MR. KATZ:  The union policies issue, Mr. Press

21   talked about the allegations in the case.  My comment goes to

22   whether it is an example of bad faith for a union to not

23   follow one of the policies that it has.  And the ALPA

24   administrative manual, like many union policies, is several

25   inches tall, and I respectfully submit, your Honor, that it

```
 1   not automatically a breach of the duty of fair representation

 2   violation, for a union to violate one of its policies.  The

 3   standard of the duty of fair representation is something else

 4   entirely.  And so, if it was automatically an example of bad

 5   faith to violate a union policy, union members would be in

 6   the federal courts all the time about a variety of  things

 7   that aren't truly justiciable -- That is even harder than

 8   Aguinaga -- justiciable under the duty of fair

 9   representation.

10           That was the point I wanted to make.

11           THE COURT:  You make a point that I find

12   interesting.

13           MR. KATZ:  Yes, sir.

14           THE COURT:  Examples of bad faith include things

15   like deliberately making misleading statements to employees,

16   not disclosing records -- ignoring union policies if such

17   actions are the result of a bad faith motive as described

18   above.

19           MR. KATZ:  If they result in harm --

20           THE COURT:  No.   No.  No.  Harm we will cover

21   later.  In other words, I take your point.  Not following a

22   particular policy for negotiation, or unions may have books,

23   you know, 100 pages long.  Absolutely.   It has to be

24   motivated or be the result of a bad faith motive, as I just

25   described in the previous paragraph.
```

```
1              MR. KATZ:  Thank you, your Honor.  I am sure you

2    know --

3              MR. PRESS:  No.  No problem with that.

4              THE COURT:  I have to add that to be fair.

5              MR. KATZ:  I am sure you know in a union meeting

6    there is  frequently rough and tumble.

7              THE COURT:  Rough and tumble?

8              MR. KATZ:  Loud noises,  scowls.

9              MS. RODRIGUEZ:  On, not these guys.

10             MR. KATZ:  Every time someone raised their voice in

11   a union meeting they could go to federal court we would have

12   a docket problem.

13             THE COURT:  Don't worry about our docket problem.

14   I am not worried about it.  Anything more?

15             MR. FRAM:  My last request with respect to the

16   section 16, and I think your Honor made clear before how you

17   will rule on this is we did request an instruction about the

18   responsibilities of lawyers in recommending or pursuing

19   litigation.  Those were our proposed charge 17.  We had an

20   alternative charge.

21             THE COURT:  Why.  Paragraph 17?

22             MR. FRAM:  No, it would be part of 16.  We had a

23   proposed charge of 17, page 39 through 42 of the joint --

24             THE COURT:  I think I have it.  You are charged

25   with an excellent closing argument.
```

# Exhibit O

```
1              IN THE UNITED STATES DISTRICT COURT.
               FOR THE DISTRICT  OF NEW JERSEY
2              CIVIL 02-2917   (JEI)

3      PATRICK BRADY, SALLY YOUNG,
       HOWARD HOLLANDER, THEODORE CASE,
4      AND MICHAEL FINUCAN, individually
       and on behalf of all others
5      similarly situated,
                      Plaintiffs,
6                                          VOLUME 18
            V.                             TRIAL TRANSCRIPT
7
       AIR LINE PILOTS ASSOCIATION,
8
                      Defendant.
9
                              CAMDEN, NEW JERSEY
10                            JULY 11, 2011

11     B E F O R E:   HONORABLE JOSEPH E. IRENAS
                      UNITED STATES DISTRICT JUDGE
12
                      A P P E A R A N C E S:
13
            TRUJILLO, RODRIGUEZ & RICHARD
14          BY:  NICOLE M. ACCHIONE, ESQ.
                 AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
            GREEN JACOBSON, P.C.
16          BY:  ALLEN PRESS, ESQ.   (MO. BAR)
            AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17          For the Plaintiffs.

18          ARCHER GREINER
            BY:   STEVEN FRAM, ESQ.
19                AND
            KATZ & RANZMAN
20          BY:  DANIEL M. KATZ, ESQ.
            FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
            ELIZABETH  GINSBURG, ESQ.
22          IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2    accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18          LYNNE JOHNSON, CSR, CM, CRR
            OFFICIAL COURT REPORTER
19          UNITED STATES DISTRICT COURT
            P.O. BOX 6822
20          LAWRENCEVILLE, NJ  08648.

21

22

23

24

25

1   concerned a little bit about causation in two respects.  One,

2   we think the jury needs to understand that causation has to

3   be proven by the plaintiffs, you say that in the charge.

4         THE COURT:  I say it in the charge, now I will be

5   saying it twice, with that paragraph.

6         MR. FRAM:  But we also request, consistent with the

7   charge we submitted yesterday, that they be instructed that

8   they should not speculate about whether things might have

9   been different.  We also request, given the instruction on

10  the verdict sheet that a separate section be included here

11  that focuses just on the issue of causation.

12        THE COURT:  I am satisfied that the charge covers

13  that point.  I mean more than happy.

14        MR. FRAM:  We stand on the objections we made last

15  week as well.

16        THE COURT:  Of course.  Okay.

17        MR. FRAM:  Thank you.

18        THE COURT:  I am going to mark what is now draft

19  number 4 of the charge, and draft number 3 of the jury

20  verdict, as C 3 and C 4.  And before we close I will mark the

21  exhibit, the final char charge.

22        MS. RODRIGUEZ:  The jury instructions are C 3  and

23  the charge is C 4.

24        THE COURT:  The other way around -- no, you are

25  right.  C 3 will be the charge, and C 4 will be the verdict

# Exhibit P



FIRST CLASS

FIRST CLASS

Hannibell 3

U.S. POSTAGE
MANHATTAN BEACH, C.
DEC 31 '00 01
$0.80
AMOUNT
0007600B8-15

ALPA 024593

Mark L. Hunnibell
2611 Long Hill Road
Guilford, CT 06437
Tel: 203-457-9872
Fax: 801-383-5030

December 18, 2001

Mr. Ron Rindfleisch
Air Line Pilots Association
535 Herndon Parkway
Herndon, VA 20170

Ron:

I have attached documents supporting the reimbursement request that I understand John Clark has filed. I cannot presently locate receipts for some of the smaller items that are reflected as incurred by me in the spreadsheet. Still, I have documentation for the "big ticket" items as attached:

1.  Copies from microfiche of my three payments to Primadata, Inc. (the printer/mailer who produced and mailed the cover letter and authorization cards). I do not get actual copies of cancelled checks and, if I was provided with a complete "PAID IN FULL" receipt, I cannot find it. These checks, and the accompanying invoice, are the best I have.

2.  5/15/2001 invoice from Primadata, Inc. for the handling and postage for the card mailing. Note that this does not include the amount for the actual printing the letters, envelopes, and authorization cards. That was billed separately for $1,276.94 and I cannot find that invoice, but I do have the cancelled check in that amount, (#6120, 5/22/2001) that includes my memo of the purpose of the check. The balance due on the 5/15/2001 Primadata invoice ($1,462.14) was also paid on 5/22/2001 with my check #6119. The $2,000 reflected on the invoice as "Deposit" was paid on 5/9/2001 with my check #6107.

3.  5/14/2001 USPS certificate of mailing. This was not paid directly by me. The amount was included in the invoice from Primadata, Inc.

4.  Copy of the room charges ($114.25) applied to my credit card on 7/23/2001. The total charge was actually split between John Clark and myself (which is why is still shows a balance due identical to what I had charged on my card). John will no doubt be submitting the other half of this expense.

5.  Ten (10) e-mail notices of setup and billing for the aa-alpa.org web site. These costs continue to be billed monthly to my personal credit card. The invoices may be a little hard to follow, but the charges I incurred were $84.44 for initial setup and the first 6 months, plus $10 per month after that ($50), plus $25 on 12/4/2001 to re-register the domain (Total: $159.44).

I believe the total expenses reflected above ($5,012.77) substantially exceed the amount for which I am seeking reimbursement. Please let me know if you need more information.

Sincerely,

Mark Hunnibell

ALPA 024594

MARK L. HUNNIBELL AND
LAURA S. HUNNIBELL
203-457-9872
2611 LONG HILL RD.
GUILFORD, CT  06437

ALLIED PILOTS ASSOCIATION
FEDERAL CREDIT UNION
387 SHUMAN BLVD., SUITE 383E
NAPERVILLE, IL  60563-8453

6119

70-9321/719

5/22/2001

PAY TO THE
ORDER OF   Primadata                                            $ **1,462.14

One Thousand Four Hundred Sixty-Two and 14/100*********************** DOLLARS

Primadata
1228 West Scyene Road
Suite 130
Mesquite, TX 75149-3127

MEMO   Mail Services & Postage 15/44

⑈006119⑈ ⑆071993214⑆      847202⑈      ⑈0000146214⑈

Acct: 847202    Check #: 6119
Amt: $1,462.14    Date: 05-31-2001

Sequence #: 2388630

ALPA 024595

MARK L. HUNNIBELL AND
LAURA S. HUNNIBELL
203-457-9872
2611 LONG HILL RD.
GUILFORD, CT 06437

ALLIED PILOTS ASSOCIATION
FEDERAL CREDIT UNION
367 SHUMAN BLVD., SUITE 360E
NAPERVILLE, IL 60563-8453

6120

70-9321/719

5/22/2001

PAY TO THE
ORDER OF ___ Primadata _____ $ **1,276.94

One Thousand Two Hundred Seventy-Six and 94/100************************ DOLLARS

Primadata
1228 West Scyene Road
Suite 130
Mesquite, TX 75149-3127

MEMO ___ Postcard/Env/Letter   15142 _____

⑈006120⑈ ⑆071993214⑆   847202⑈ ⑈000012...94⑈

## Acct: 847202    Check #: 6120
## Amt: $1,276.94    Date: 05-31-2001

0710-00........
050335738...............
050335738  05-31-01 ....
050335738 -1532-...........

071000013
PARK ONE
05/31/01
07301293

## Sequence #: 2388628

ALPA 024596

MARK L. HUNNIBELL AND
LAURA S. HUNNIBELL
203-457-9672
2611 LONG HILL RD.
GUILFORD, CT · 06437

ALLIED PILOTS·ASSOCIATION
FEDERAL CREDIT UNION
387 SHUMAN BLVD., SUITE 383E
NAPERVILLE, IL  60563-8453

6107

70-3321/719

5/9/2001

PAY TO THE
ORDER OF   Primadata

$ **2,000.00

Two Thousand and 00/100************************************************  DOLLARS

Primadata
1228 West Scyene Road
Suite 130
Mesquite, TX 75149-3127

MEMO   Mark Hunnibell for Vice Presiden

⑈006107⑈ ⑆071993214⑆     847202⑈     ⑈0000200000⑈

## Acct: 847202    Check #: 6107
## Amt: $2,000.00    Date: 05-14-2001

FOR DEPOSIT ONLY
PRIMADATA, INC.
9500006912

0002357512
05/14/2001

0710-0030-1
D60641632  0710-0030-1
D60641632  05-14-01
D60641632  1753  1293  04  06  110

071000013
05/13/01

07866302

## Sequence #: 2357512

ALPA 024597

# Primadata, Inc.

Invoice

1228 Scyene Road, Suite 134
Mesquite, Texas 75149-3128
(972) 216-9910

| | |
|---|---|
| Invoice Number: | 15144 |
| Invoice Date: | 05/15/01 |

Sold To:

Hunnibel For Vice President
2611 Long Hill Road
Guilford, CT 06437-3616

Attn:   Mark

Ship To:

Mesquite PO

| Delivered Via: | Mesquite PO | P.O. Number: | Mark |
|---|---|---|---|
| Delivery Date: | 05/14/01 | P.O. Date: | |
| Terms: | Net 10 | Salesperson: | PDI |

| Quantity | Description | Price |
|---|---|---|
| 11091 | **MAIL SERVICES** | 1332.56 |
| | **HUNNIBELL FOR VICE PRESIDENT** | |
| | (Data Conversion-E Mail, Data Hygiene, Address Corrections, De Dupe, Ink Jet Envelope, Fold Letter, Insert 2 Pieces, Seal, Zip Sort, Sleeve & Strap Trays, Deliver To Mesquite PO, UPS Overs To Mark) | |
| 11091 | **POSTAGE .   POSTAGE SAVINGS $643.98** | 2129.58 |
| | (Presorted STD--Automated) | |

| | | |
|---|---|---|
| | Subtotal: | 3462.14 |
| | Tax: | |
| Past 30 days subject to 1.50% interest (18% A.P.R.) | Deposit: | 2000.00 |
| *Thank You for your business!* | Total:    $ | 1462.14 |

ALPA 024598

```
05/24/2001  04:12   9722169904                                    PAGE  01
                                      PRIMADATA, INC.
              POSTAL SERVICE PERMIT SYSTEM   TRANS# 200113415200/0UM1
  3602       STATEMENT OF MAILING/3607 WEIGHING AND DISPATCH CERTIFICATE
```

| STATION OR UNIT: MESQUITE MAIN POST OFFICE | COMPANY PERMIT USED: Y |
|---|---|
| FINANCE NUMBER : 48-5860 | PERMIT NO: 00072 |

```
                PRIMADATA INC
                1228 W SCYENE RD STE 134
                MESQUITE  TX 75149-3128          DUPLICATE
```

| DATE OF MAILING | CLASS | PROC CAT | TYPE |
|---|---|---|---|
| 05/14/01 | STANDARD | LETTERS | BULK REGULAR |

| WEIGHT OF SINGLE PIECE (LBS) | TOTAL PIECES | TOTAL POUNDS |
|---|---|---|
| 0.0300 | 11,082 | 332.4600 |

```
MAILED: FOR
PERMIT NO. 80646
NAME: MARK HUNNIBEL

CONTAINERS
   64
                                              RECEIVED  JUN  1 5 2001
NBRVP:
     ERRORS:  0.00%
                              AFFIXED POSTAGE:
                              AMOUNT FROM TRUST:          $2,126.52
```

```
    I CERTIFY that this mailing has been inspected concerning:
  1)eligibility for the rate of postage claimed; 2)proper preparation
  (and presort where required); 3)proper completion of the statement of
  mailing; and 4)payment of the required annual fee.
```

```
     MESQUITE TX 75149
         MAY
          14
         2001
   ROUND STAMP REQUIRED             ROUND STAMP REQUIRED
   TIME____ AM / PM                 TIME____ AM / PM


   SIGNATURE OF WEIGHER             RECEIVED FOR PROCESSING BY
```

| COMMENTS: | REMAINING ON DEPOSIT: | $7.39 |
|---|---|---|
| | | CLK INIT: DJE |

ALPA 024599

**mark@hunnibell.net**

| | |
|---|---|
| **From:** | Minerva Technical Support [support@minerva.net] |
| **Sent:** | Saturday, January 27, 2001 12:19 PM |
| **To:** | mark@hunnibell.net |
| **Subject:** | New Domain Information |

Hello Mark,

Thank you for choosing Minerva Network Systems as your Internet Solutions
Provider.  We are pleased to inform you that your order has been processed.
The following information will grant access to your account:

Company Name: Alpa Now
Contact Name: Mark Hunnibell
Contact Phone Number: 203-457-9872

Domain Name: aa-alpa.org
IP Address: 206.239.54.14

FTP Username: alpanow
FTP Password: ######

Home Page or Start file: index.html

Please review the technical information above and let us know if any changes
are necessary.

If you require an email(s) account for your website (example:
yourname@yourdomain.com) or if you have any additional technical questions
or concerns, please contact support@minerva.net or reply to this email.

For all other inquiries or account changes, please contact the following:

Technical Support:
support@minerva.net
1.888.667.7231 ext. 1
703.263.3300

Sales Issues:
sales@minerva.net
1.888.667.7231 ext. 2
703.263.2200

Billing Issues:
billing@minerva.net
1.888.667.7231 ext. 3
703.263.0796 ext. 3

You may also visit our website for additional information at
www.minerva.net.  Thank you for choosing Minerva.

Geoffrey Watson
Minerva Technical Support

1

ALPA 024601

**mark@hunnibell.net**

| | |
|---|---|
| **From:** | billing@minerva.net |
| **Sent:** | Tuesday, January 30, 2001 7:49 PM |
| **Subject:** | Periodic Billing Order 1163-1 Submitted |

```
Periodic Billing Order
Order # 1163-1 Submitted

Amount: 10.00
Tax: 0.00
Shipping: 0.00
Customer: mark hunnibell
Company: Minerva Network Systems
Address: 2611 Long hill Rd

City:  Guilford
State: CT
Country: US
Zip: 06437
--------------------------------
   Periodic Billing Information
Startdate: 2001/07/03
Periodicity: m1
Installments: 99
Threshold: 3
Comments:
```

1

ALPA 024602

**mark@hunnibell.net**

| | |
|---|---|
| From: | MNS Accounts & Billing [billing@minerva.net] |
| Sent: | Wednesday, February 07, 2001 4:41 PM |
| To: | mark@hunnibell.net |
| Subject: | Bill 2/6/01 |

```
MINERVA NETWORK SYSTEMS, INC.


Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437


CUSTOMER ID              MNS-394

ACCOUNT STATUS

Previous Balance            $0.00
Payments                   $84.44 CR
Adjustments                 $0.00
Current Charges            $84.44

CURRENT BALANCE             $0.00

BILL NUMBER                   932
BILL DATE                Feb 6, 2001
DUE DATE                 Mar 8, 2001

Your account is current.  Do not send payment.
------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231.

------------------------------------------------------------------


PAYMENTS

Date    Description                                   Amount
------------------------------------------------------------------
Jan 30  Credit Card Payment MC
------------------------------------------------------------------
                                                     $84.44 CR
        TOTAL PAYMENTS                               $84.44 CR

CURRENT CHARGES

Date    Description                                   Amount
------------------------------------------------------------------
Jan 25  Set up fee
                                                     $35.00
        Set-Up Fees
        Additional Services  Domain Registration     $10.00
                                                     $25.00
------------------------------------------------------------------
Jan 30  Basic Account 6 month pre-pay: MNS-394-1  (Jan 25 - Jun 3 $49.44
------------------------------------------------------------------
        6 Month Fee with 5% discount: (86.74% of $57.00)   $49.44
        TOTAL CURRENT CHARGES                        $84.44
```

1

ALPA 024603

**mark@hunnibell.net**

| | |
|---|---|
| From: | billing@minerva.net |
| Sent: | Monday, July 02, 2001 10:32 AM |
| To: | mark@hunnibell.net |
| Subject: | Bill 07/02/2001 |

```
MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437

CUSTOMER ID              MNS-394

ACCOUNT STATUS

Previous Balance            $0.00
Payments                    $0.00
Adjustments                 $0.00
Current Charges            $44.13

TOTAL AMOUNT DUE           $44.13

BILL NUMBER                  2691
BILL DATE             Jul 2, 2001
DUE DATE              Aug 1, 2001

The total amount due will be automatically charged
to your credit card.  Do not send payment.

-----------------------------------------------------------------------

Thank you for your business!

For Customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

-----------------------------------------------------------------------

CURRENT CHARGES

Date   Description                                      Amount
-----------------------------------------------------------------------
Jul 2  Basic account 6 month pre pay: MNS-394-1  (Jul 1 - Jul 24  $44.13
       ----------------------------------------------------------
       Monthly Fee: (77.42% of 57)                      $44.13
-----------------------------------------------------------------------
       TOTAL CURRENT CHARGES                            $44.13
```

1

ALPA 024604

**mark@hunnibell.net**

| | |
|---|---|
| From: | billing@minerva.net |
| Sent: | Wednesday, August 01, 2001 3:27 PM |
| To: | mark@hunnibell.net |
| Subject: | Bill 08/01/2001 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437

CUSTOMER ID                MNS-394

ACCOUNT STATUS

Previous Balance           $10.00
Payments                    $0.00
Adjustments                 $0.00
Current Charges             $0.00

TOTAL AMOUNT DUE           $10.00

BILL NUMBER                  3032
BILL DATE            Aug 1, 2001
DUE DATE            Aug 31, 2001

The total amount due will be automatically charged
to your credit card.  Do not send payment.

--------------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

--------------------------------------------------------------------------

1

ALPA 024605

**mark@hunnibell.net**

From:          billing@minerva.net
Sent:          Friday, August 31, 2001 1:38 PM
To:            mark@hunnibell.net
Subject:       Bill 8/31/01

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437

CUSTOMER ID              MNS-394

ACCOUNT STATUS

Previous Balance         $10.00
Payments                 $10.00 CR
Adjustments              $0.00
Current Charges          $10.00

TOTAL AMOUNT DUE         $10.00

BILL NUMBER                    3351
BILL DATE                Aug 31, 2001
DUE DATE                 Sep 30, 2001

The total amount due will be automatically charged
to your credit card.  Do not send payment.

----------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

----------------------------------------------------------------------

PAYMENTS

| Date | Description | Amount |
|------|-------------|--------|
| Aug 3 | Credit Card Payment M | $10.00 CR |
| | TOTAL PAYMENTS | $10.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|------|-------------|--------|
| Aug 31 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 |
| | Monthly Fee | $10.00 |
| | TOTAL CURRENT CHARGES | $10.00 |

1

ALPA 024606

**mark@hunnibell.net**

From:           billing@minerva.net
Sent:           Monday, October 01, 2001 1:01 PM
To:             mark@hunnibell.net
Subject:        Bill 10/1/01

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT 06437

CUSTOMER ID                 MNS-394

ACCOUNT STATUS

Previous Balance            $10.00
Payments                    $10.00 CR
Adjustments                 $0.00
Current Charges             $10.00

TOTAL AMOUNT DUE            $10.00

BILL NUMBER                 3673
BILL DATE                   Oct 1, 2001
DUE DATE                    Oct 31, 2001

The total amount due will be automatically charged
to your credit card. Do not send payment.

-------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees: $15.00 on all over due balances of $20.00
or more.

-------------------------------------------------------------------

PAYMENTS

| Date | Description | Amount |
|------|-------------|--------|
| Sep 4 | Credit Card Payment | $10.00 CR |
| | TOTAL PAYMENTS | $10.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|------|-------------|--------|
| Oct 1 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 |
| | Monthly Fee | $10.00 |
| | TOTAL CURRENT CHARGES | $10.00 |

1

ALPA 024607

**mark@hunnibell.net**

| | |
|---|---|
| From: | billing@minerva.net |
| Sent: | Thursday, November 01, 2001 3:13 PM |
| To: | mark@hunnibell.net |
| Subject: | Bill 11/1/01 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437

CUSTOMER ID                MNS-394

ACCOUNT STATUS

| | | |
|---|---|---|
| Previous Balance | $10.00 | |
| Payments | $35.00 | CR |
| Adjustments | $0.00 | |
| Current Charges | $35.00 | |

TOTAL AMOUNT DUE           $10.00

| | |
|---|---|
| BILL NUMBER | 4005 |
| BILL DATE | Nov 1, 2001 |
| DUE DATE | Dec 1, 2001 |

The total amount due will be automatically charged
to your credit card.  Do not send payment.

------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

------------------------------------------------------------------

PAYMENTS

| Date | Description | Amount | |
|---|---|---|---|
| Oct 3 | Credit Card Payment m | $10.00 | CR |
| Oct 3 | Credit Card Payment M | $25.00 | CR |
| | TOTAL PAYMENTS | $35.00 | CR |

CURRENT CHARGES

| Date | Description | Amount | |
|---|---|---|---|
| Oct 3 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $0.00 | |
| | Monthly Fee: (93.55% of $10.00) | $9.35 | |
| | Discount: 100% | $9.35 | CR |
| Oct 3 | Set up Domain and Registration for 1 year: MNS-394-4 | $25.00 | |
| | Set up Domain and Registration for 1 year | $25.00 | |
| Oct 31 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 | |
| | Monthly Fee | $10.00 | |
| | TOTAL CURRENT CHARGES | $35.00 | |

1

ALPA 024608



# THE
# WASHINGTON COURT
# HOTEL
◆ ON CAPITOL HILL ◆

A Harbaugh Hotel

525 NEW JERSEY AVE., N.W., WASHINGTON, D.C. 20001   202-628-2100   FAX: 202-879-7918

CLARK, JOHN
AIR LINE PILOTS ASSN

| | |
|---|---|
| ARRIVAL | 7/22/01 |
| DEPARTURE | 7/23/01 |
| NO. IN PARTY | 2 |
| RATE | 169.00 |

CC#: ▓▓▓▓▓7029    Exp: 06/03

ACCOUNT NO.   403115    ROOM NO.   1008

| NO. | DATE | DESCRIPTION | | | AMOUNT |
|---|---|---|---|---|---|
| A-STANDARD | | | | | |
| | 7/22/01 | LOCAL PHONE | 1008 | 7220072001 23:55 | $1.00 |
| | 7/22/01 | ROOM CHARGE | 1008 | 12 | $169.00 |
| | 7/22/01 | ROOM TAX | 1008 | 13 | $24.51 |
| | 7/23/01 | LONG DISTANCE PHONE | 1008 | 7230139002 10:06 | $1.00 |
| | 7/23/01 | CAFE & GRILL | 1008 | 1538 10:48 | $32.99 |
| | 7/23/01 | MASTERCARD | 1008 | 5602824 | $114.25CR |

5470421
KINKOS
8003231470
7029  APA

* BALANCE DUE *    $114.25

7029    1008

MARK L HUNNIBELL

072201    5602824

CUSTOMER COPY
IMPORTANT:
RETAIN THIS COPY FOR YOUR RECORDS.

Regardless of charge instructions, I acknowledge the
above as personal indebtedness.

GUEST SIGNATURE _____

ALPA 024600

**mark@hunnibell.net**

| | |
|---|---|
| From: | billing@minerva.net |
| Sent: | Friday, November 30, 2001 12:42 PM |
| To: | mark@hunnibell.net |
| Subject: | Bill 11/30/01 |

MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437

CUSTOMER ID                 MNS-394

ACCOUNT STATUS

Previous Balance            $10.00
Payments                    $10.00 CR
Adjustments                 $0.00
Current Charges             $10.00

TOTAL AMOUNT DUE            $10.00

BILL NUMBER                     4344
BILL DATE                   Nov 30, 2001
DUE DATE                    Dec 30, 2001

The total amount due will be automatically charged
to your credit card.  Do not send payment.

-----------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.

-----------------------------------------------------------------------

PAYMENTS

| Date | Description | Amount |
|---|---|---|
| Nov 29 | Credit Card Payment mc | $10.00 CR |
| | TOTAL PAYMENTS | $10.00 CR |

CURRENT CHARGES

| Date | Description | Amount |
|---|---|---|
| Nov 30 | Basic Pkg - 10MB 1GB traffic/month 5 email accounts: MNS- | $10.00 |
| | Monthly Fee | $10.00 |
| | TOTAL CURRENT CHARGES | $10.00 |

1

ALPA 024609

**mark@hunnibell.net**

| | |
|---|---|
| **From:** | billing@minerva.net |
| **Sent:** | Tuesday, December 04, 2001 4:50 PM |
| **To:** | mark@hunnibell.net |
| **Subject:** | Bill 12/4/01 |

```
MINERVA NETWORK SYSTEMS, INC.

Mark Hunnibell
Alpha Now
2611 Long Hill Rd
Guilford, CT  06437


CUSTOMER ID               MNS-394

ACCOUNT STATUS

Previous Balance          $10.00
Payments                  $35.00 CR
Adjustments               $0.00
Current Charges           $25.00

CURRENT BALANCE           $0.00

BILL NUMBER               4475
BILL DATE                 Dec 4, 2001
DUE DATE                  Jan 3, 2002

Your account is current.  Do not send payment.
-------------------------------------------------------------------

Thank you for your business!

For customer assistance please call 1-888-MNS(667)-7231 or
1-703-263-0796.

Late fees:  $15.00 on all over due balances of $20.00
or more.
-------------------------------------------------------------------


PAYMENTS

Date   Description                                        Amount
-------------------------------------------------------------------
Dec 4  Credit Card Payment mc                          $10.00 CR
Dec 4  Credit Card Payment mc                          $25.00 CR
-------------------------------------------------------------------
       TOTAL PAYMENTS                                  $35.00 CR


CURRENT CHARGES

Date   Description                                        Amount
-------------------------------------------------------------------
Dec 4  Set up Domain and Registration for 1 year: MNS-394-5   $25.00
-------------------------------------------------------------------
       Set up Domain and Registration for 1 year      $25.00
-------------------------------------------------------------------
       TOTAL CURRENT CHARGES                           $25.00
```

1

ALPA 024610

to Paris Hotel

Truck to LAS on 12/05/01

LS TRANSPORTATION
CALL AHEAD
HRS FOR RESERVATION
702-740-4050

KET #
-TRP STRP    $7.50
AL              7.50
:PD          7.50
H            7.50
T RESPONSIBLE FOR
MISSED FLIGHTS
RK3      NO.605318
05.WED 13:14      #01-1

**YELLOW-CHECKER-STAR**
"THE" CAB COMPANIES
Las Vegas, Nevada
873-2227
COMPUTER RADIO DISPATCHED

DRIVER: _____  DATE 12/05/01
(CHARGE THE ACCT. OF)
(RECEIVED OF) _____
FOR TAXI FARE FROM Paris Hotel
TO LAS Airport
(X) DRIVER NAME _____
(X) PASSENGER SIGNATURE _____
AMOUNT $ 15.00

LAX-CPCS
EXIT 16  12-05-01 17:22
ID NO 118   FEE $ 15.00
LP# NU 0184   SEQ 2919

ALPA 024611

Corresponds to spread sheet

OFFICE DEPOT
1700 ROSECRANS AVE.
MANHATTAN BEACH, CA 90266
310-536-9769

Employee 210160          06/07/01 17:01
Store #0987        Reg #002  Tran #8889
SALE                    POS Version 4.07

787870442S  GUIDE,CARD,A        3.49
       MFG. LIST $ 5.80
716913B977  BX,SHOE,1.50        5.56
       4 @              1.39
       MFB. LIST $ 2.49
                        SUBTOTAL    9.05
                                     .72
       CA 8% SALES TAX   TOTAL    9.77

CASH                               10.77

CHANGE                              1.00

Try our COPY CENTER for
Printing and Copying Services

---

Visit our Web Site at: WWW.MBE.COM

Postal transactions may have received a
handling fee.

Change:           6.40
Cash:            20.00

Total Sale:      13.60
Tax:              0.00
Sub Total:       13.60

2 Stamps         6.80

Qty Description  Unit    Ext

Center #3260        17:10:54
ShiftE:0168 Drv:01 ID:1220 Clerk:Amy
6/14/01
****************  SME  *****************
************** Mail Boxes Etc. **************
Making Business Easier. Worldwide.
2110 ARTESIA BLVD #B
REDONDO BEACH, CA 90278
Phone 310 318 3000

---

EL SEGUNDO MAIN PO
EL SEGUNDO, California
902459998
(310)322-7238

07/18/2001    01:40:08 PM

Product      Sales Receipt   Final
Description  Sale  Unit      Price
             Qty   Price

$5.80 Statue
of Liberty
PSA Bk        1    $6.80     $6.80
$5.80 Apple &
Orange PSA Bk  1   $6.80     $6.80

Total:                      $13.60

Paid by:
Cash                        $13.60

For information on current postage
rates, visit our web site at
www.usps.com.
Bill#: 100040030017S
Clerk: 10
       Thank you for your business

---

Taxi Cab Receipts

DATE: 7/29/01   TIME: 11:00 PM

TRIP ORIGIN: Washington Court Hotel

DESTINATION: LaGuardia

FARE: $10.00   SIGNATURE

---

RECEIPT                    No. 241669

DATE 9/1/01

FROM Jerry B Clark Jr.

                              DOLLARS

FOR RENT  Box 215
FOR

ACCT.                 CASH    FROM 5/4/01 TO 9/4/01
AMT. PAID             CHECK
BAL.                          BY Mel
DUE                   MONEY ORDER

ALPA 024612

Corresponds to spread sheet

Kinko's                    (202) 547-8421
317 Pennsylvania Avenue Southeast
Washington, DC 20003

| QTY/LIST | DISC | PRICE | AMOUNT |
|---|---|---|---|
| 3 | Office Supplies | | |
| 0.67 | 0.00 | 0.69 | 2.07 |
| 39 | PC SS WRK STATION TIME/MIN | | |
| 0.20 | 0.00 | 0.20 | 7.80 |
| 19 | COMP RENT LTR.LGL., B&W PRNT | | |
| 0.49 | 0.00 | 0.49 | 9.31 |
| 13 | ES COLOR S/S LTR, LGL | | |
| 1.00 | 0.00 | 1.00 | 13.00 |

SUB    31.98  TX    1.84  TOT   33.82
                    MasterCard    33.82
                        CHG    0.00
XXXXXXXXXXXXX4654 08/02 AP005645
I agree to pay the above amount
cording to the card issuer agreement.
Sign Here: X

CW4718 7K   640118 RG 3A 07/23/01 01:20
Visit us @ http://www.kinkos.com

USPS, REDONDO BEACH MAIN
REDONDO BEACH, California
902779998
05/15/2001   (310)376-3252   04:31:35 PM

Sales Receipt
| Product Description | Sale Qty | Unit Price | Final Price |
|---|---|---|---|
| Business Reply Mail | | | |
| Account Number: | 25 | | |
| Customer Name: | ALPA REPRESENTATION CAMP | | |
| AIGN | JOHN | | |
| Address: | | | |
| Amount of Deposit: | | | $500.00 |
| Total: | | | $500.00 |
| Paid by: | | | |
| Check | 4146205 | | |
| | | | $500.00 |

ALPA 024613

Corresponds to spread sheet



```
                 MAIN OFFICE  USPS
               MANHATTAN BEACH, California
                     902669998
 06/02/2001      (310)937-9569         01:57:31 PM

 ─────────────── Sales Receipt ───────────────
 Product        Sale     Unit         Final
 Description     Qty     Price         Price

 INCLINE VILLAGE NV 89451              $0.76
 First-Class
                                     ─────────
                      Issue PVI:       $0.76

 INCLINE VILLAGE NV 89451              $0.76
 First-Class
                                     ─────────
                      Issue PVI:       $0.76

 INCLINE VILLAGE NV 89451              $0.76
 First-Class
                                     ─────────
                      Issue PVI:       $0.76

 TUSTIN CA 92780                       $0.76
 First-Class
   Return Receipt                      $1.50
   Certified                           $1.90
   Label Serial #:  70001530000283528118
                                     ─────────
                      Issue PVI:       $4.16

 $6.80 Flowers       1     $6.80       $6.80
 PSA Bk

 Total:                               $13.24

 Paid by:
 Cash                                 $15.00
 Change Due:                          -$1.76

 NetPost Mailing Online lets you send
 your mailings right from your computer!
 It's quick, easy and online at
 www.usps.com.
 Bill#: 1000600743131
 Clerk: 16

 ──── Thank you for your business ────
```

ALPA 024614



# THE
# WASHINGTON COURT
# HOTEL
◆ ON CAPITOL HILL ◆

A Harbaugh Hotel

525 NEW JERSEY AVE., N.W., WASHINGTON, D.C. 20001   202-628-2100   FAX: 202-879-7918

CLARK, JOHN
AIR LINE PILOTS ASSN

½ hotel stay in DCA

| | | |
|---|---|---|
| ARRIVAL | 7/22/01 | |
| DEPARTURE | 7/23/01 | |
| NO IN PARTY | 2 | |
| RATE | 169.00 | |

CC#:   5471211540017029        Exp: 06/03

ACCOUNT NO   403115        ROOM NO   1008



| NO. | DATE | DESCRIPTION | AMOUNT |
|---|---|---|---|



ALPA 024615

# Exhibit Q

From:            Holtzman, David, TWAMEC
Sent:            Thursday, May 24, 2001 05:32 PM
To:              Herndon, Christy, Bob,; Herndon, Roberts, William,; Herndon, Rosen, Seth,; Roland',
                 'Wilder,
Subject:         FW: APA Information Hotline - May 23, 2001
Attachments:     Header


-----Original Message-----
From: Warner, Clay, Herndon
Sent: Thursday, May 24, 2001 3:50 PM
To: 'sunshine.lawyer@att.net'
Cc: Holtzman, David, TWAMEC
Subject: FW: APA Information Hotline - May 23, 2001


Mike:
The attached email describes the results of the APA national officer
elections.  I have been told that both Gross and Petretti support
realignment with ALPA, and that Darrah does not.
The APA Constitution states that the two-year terms of local representatives
begin on November 1 and May 1.  (Apparently the terms are staggered.)  I
presume that the results of the May 1 elections have been completed, and
that the November 1 election round has not begun.
Call me if you have any questions.
Clay


-----Original Message-----
From: Rindfleisch, Ron, Herndon
Sent: Thursday, May 24, 2001 3:46 PM
To: Warner, Clay, Herndon
Subject: FW: APA Information Hotline - May 23, 2001


-----
     APA INFORMATION HOTLINE - May 23, 2001
This is Gregg Overman, APA Director of Communications, with the
APA Information Hotline for Wednesday, May 23.
The ballots have been tallied for the APA President, Vice
President, and Secretary-Treasurer elections. For President,
Captain John E. Darrah received 3,757 votes, Captain Jim Gross
received 320 votes, and Captain Dennis Petretti received 1,085;
therefore, Captain John Darrah is elected APA President. For Vice
President, First Officer Robert R. Ames received 3,681 votes and
Captain Mark Hunnibell received 1,335 votes; therefore, First
Officer Ames is elected Vice President. For Secretary-Treasurer,
First Officer John Bury received 2,834 votes, Captain David P.
Duquemin received 754 votes, and Captain Paul Renneisen received
1,130 votes; therefore, First Officer John Bury is elected
Secretary-Treasurer. The three-year term of office for APA's
National Officers begins on July 1, 2001. As reported previously,
APA will host a meeting of the Coalition of Airline Pilots
Associations, known as CAPA, at APA headquarters tomorrow and
Friday, May 24 and 25. Also tomorrow, the DFW Domicile is hosting
an invitation-only luncheon to recognize the medical team, family
members and others who helped Captain Jay Straub with the
life-threatening injuries he suffered in November 1999 when a jet
bridge at DFW collapsed. Please remember that both credit union
accounts will remain open until the end of the month for
contributions to the First Officer Rich Racsko reward fund. At



EXHIBIT
236

the APAFCU, the account number is 9020731, and at the AAFCU, the
account number is 999994183. That's it for now. Thanks for
calling.

DOMICILE MEETINGS
DFW-Thursday, May 24 -
        11:00 AM - 2:00 PM
        Straub luncheon
        D/FW Airport Marriott
        8440 Freeport Parkway
        972-929-8800.

LAX-Wednesday, June 6 -
        meeting from 10 AM - 2 PM
        lunch will be provided
        Shelter Point Hotel and Marina, 1551 Shelter Island Drive, San Diego,
CA
        tel. 800-566-2524 or 619-221-8000.

RETIREMENT PLANNING SEMINAR -

SFO-Wednesday, July 11 -
        Embassy Suites, 250 Gateway Blvd., San Francisco, CA
        tel. 650-589-3400.  To ensure your place, please call APA at
800-323-1470, ext. 2142 by July 2.  For hotel reservations, call the Embassy
Suites by June 25.  This program is for all American Airlines pilots and
spouses only.

DL0009128

# Exhibit R

**TWA MEC**
**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL**
500 NORTHWEST PLAZA, SUITE 1200 ☐ ST. ANN, MISSOURI 63074 ☐ 314-770-8500

October 23, 2001

*VIA FACSIMILE (817-302-2119) &*
*OVERNIGHT DELIVERY*

Captain John E. Darrah
President
Allied Pilots Association
14600 Trinity Boulevard, Suite 500
Fort Worth, Texas 76155-2512

*VIA FACSIMILE (817-967-1843) &*
*OVERNIGHT DELIVERY*

Captain Jeffrey Brundage
Vice President
American Airlines, Inc.
P.O. Box 619616, MD 5235
Dallas Ft. Worth Airport, TX 75261-9616

Gentlemen:

The TWA Pilots Master Executive Council, Air Line Pilots Association, International AFL-CIO, voted this afternoon to accept the seniority integration proposal made by the Allied Pilots Association on Saturday, October 20, 2001, supplemented by the written conditions and restrictions delivered to us on Sunday, October 21, 2001, with the following additional conditions:

1.     The Allied Pilots Association ("APA") mitigates the scheduled 409 furloughs of AA pilots.

2.     Upon completion of the AA-APA mitigation agreement mentioned above, AA will provide a written guarantee to the Air Line Pilots Association ("ALPA") that AA will furlough no pilots until the third quarter of 2002.

3.     American Airlines, Inc. shall enter into an agreement assuring that the number of pilots flying out of the St. Louis domicile as of November 1, 2001 shall decrease no more than identically timed decreases in the pilot population of the AA System (excluding STL) to a maximum of 20 percent, according to the formula described by AA Vice President Brundage on October 22, 2001.

**P-343**

ALPA 022075

Captain John E. Darrah
Captain Jeffrey Brundage
October 23, 2001
Page 2

4.      The following definitions applicable to the APA proposed conditions and restrictions shall be adopted.

   A. "Hardship transfer" shall have the same meaning as defined in relevant AA/APA agreements. These agreements shall be provided to ALPA. The TWA Pilots' understanding of "hardship transfer" is that the AA Pilots who, pursuant to the hardship transfer provision, transfer or are displaced into STL will bid behind the TWA Pilots.

   B. For purposes of B paragraphs 7, 8, 9, 11 and 12, the following shall apply:

     (i) The term "small widebody" shall replace "767."

     (ii) The term "narrowbody" shall replace "S80" and "717."

   C. For purposes of D, paragraph 1, the term "small widebody" shall replace "757/767" and "A300."

   D. For purposes of D, paragraph 2, the term "All STL narrowbody flying" shall replace "All STL S80/717 flying." The preceding generic aircraft descriptions shall be defined in terms of gross weights.

5.      APA Green Book pay rates effective 12/2/01.

6.      AMR agrees to satellite language provided to AMR & APA during merger discussions.

7.      This tentative agreement shall be reduced to writing and signed by the Presidents of the Organizations and the highest labor relations official of the Company.

If you agree with the foregoing description of our tentative agreement, please sign in the space indicated below and return a signed copy of the Agreement to me.

Very truly yours,

Captain Robert A. Pastore
Master Chairman
TWA MEC

ALPA 022076

Captain John E. Darrah
Captain Jeffrey Brundage
October 23, 2001
Page 3

---

_____          _____
Captain John E. Darrah                    Date
President
Allied Pilots Association

---

_____          _____
Captain Jeffrey Brundage                  Date
Vice President
American Airlines, Inc.

ALPA 022077

# Exhibit S

10/23/2001 18:25 FAX 8173022119          APA EXECUTIVE OFFICE

# FILE COPY

## ALLIED PILOTS ASSOCIATION

O'Connell Building  •  14600 Trinity Boulevard, Suite 500  •  Fort Worth, TX 76155-2512  •  817.302.2115  •  Fax 817.302.2119

Captain John E. Darrah
President

**VIA FAX 314-770-8510; 8571
and 202-223-0723**

October 23, 2001

Air Line Pilots Association (TWA-MEC)
Captain Robert A. Pastore, Chairman
500 N.W. Plaza, #1200
St. Ann, MO 63074

Dear Bob:

As you know, when our meetings in Washington, D.C. ended on the afternoon of October 22, we clearly reiterated that the APA Board of Directors was meeting beginning October 23 for the purpose of approving a seniority integration agreement between APA and American Airlines. We understand that AMR management subsequently advised you that, if the TWA MEC did not accept the seniority integration proposal pending at the conclusion of those meetings by 1300 CST on October 23, the Company would proceed to conclude an agreement with APA. We have now received your letter of October 23, which we received at approximately 1630 CST on this date. In your letter, you state that the TWA MEC has voted to accept the seniority integration proposal, but with additional conditions as stated in your letter.

Your letter arrived well after the deadline established by the Company and purports to place conditions on the MEC's acceptance of the proposal beyond those set forth in the proposal. We are gratified that the MEC has concluded that the pending seniority integration proposal is fundamentally acceptable. We made clear in our meetings, however, that we would proceed forward with American unless the proposal was accepted. In addition, as you know, the most significant conditions proposed in your letter would require the agreement of American Airlines management. However attractive some of those conditions might be to us, we understand that American has already advised you that they are unacceptable and that it will therefore not execute your letter.

O:\exepres\misc\102301 Pastore

ALPA 001857

P-344

Air Line Pilots Association (TWA-MEC)
Captain Robert A. Pastore, Chairman
October 23, 2001
Page 2


    Accordingly, it does not appear that your letter provides the basis for an
agreement among the two pilot groups and American.  Therefore, we intend to continue
on the course which we identified at the conclusion of our meetings in Washington,
D.C.


                         Sincerely,

                         *John E. Darrah*

                         Captain John E. Darrah
                         President


JED/sp

cc:  Jeffrey J. Brundage


O:\exepres\misc\102301 Pastore


                                        ALPA 001858

# Exhibit T

**American Airlines**

RECEIVED
NOV 0 6 2001
**FILE COPY**

Jeff Brundage
Vice President
Employee Relations

October 24, 2001

**Via Facsimile & FedEx**
Captain Robert A. Pastore
Master Chairman, TWA MEC
Air Line Pilots Association
500 Northwest Plaza, Suite 1200
St. Ann, MO 63074

Dear Bob:

While I'm happy to hear that the TWA Pilots MEC accepted the APA's seniority integration proposal, the conditions outlined in your letter for an integrated seniority agreement are unacceptable to the Company.

I'm disappointed that we were unable to conclude an agreement that is acceptable to American Airlines, the Allied Pilots Association and Air Line Pilots Association.

Respectfully yours,

Jeff Brundage
Vice President
Employee Policy & Relations

cc:    John E. Darrah – APA President

P. O. Box 619616, MD 5235, Dallas/Fort Worth Airport, Texas 75261-9616
Phone (817) 967-2266, Fax (817) 967-1843, Email Jeff.Brundage@aa.com

ALPA 001323

P-345

# Exhibit U

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
38TH REGULAR BOARD OF DIRECTORS MEETING
October 16-20, 2000



AI#33

SUBJECT
Pilot Unity

SOURCE
President Duane E. Woerth

BACKGROUND INFORMATION
See Proposed Resolution.

PROPOSED RESOLUTION
WHEREAS the Mission Statement of the Air Line Pilots Association calls on
ALPA "to represent, in both specific and general respects, the collective
interests of all pilots in commercial aviation," and

WHEREAS the interests of the members of ALPA, as well as all airline
pilots, will be materially advanced by the Association achieving its long-
standing goal of truly becoming the unified pilot representative for the
profession in the United States and Canada, and

WHEREAS political, policy and labor disputes of years past should not be
permitted to result in continuing separate organizations for pilots of present
and future generations, a situation which places the success of projects of the
utmost importance to the profession at risk and from which management,
industry governmental and global forces achieve real benefit, and

WHEREAS there have been discussions on ALPA representation with the
IACP, representing the Continental and Continental Express pilots; and
interest in ALPA representation has recently been expressed within other
independent pilots' associations, including APA, representing the pilots of
American Airlines, and FPA, representing the FedEx pilots; and the
Canadian Airlines/Air Canada merger will shortly result in a representation
vote, and

WHEREAS pilot unification within ALPA, bringing into ALPA the thousands
of members of independent pilots' associations, will be a true victory over the

ALPA 019798

corporate forces that have sought to perpetuate division within the profession against the background of union busting tactics that have arisen since deregulation, and

WHEREAS opportunities to truly unify the profession within ALPA should be pursued without delay in a diligent and constructive manner,

THEREFORE BE IT RESOLVED that the Board of Directors, as ALPA's highest governing body, reaffirms the Association's longstanding objective to provide representation for all members of the airline piloting profession in the United States and Canada, including through merger of independent pilots' associations with ALPA by agreement, and

BE IT FURTHER RESOLVED that the President continue to actively pursue fulfillment of this goal, taking into account the following principles:

1. Discussions with independent pilots' associations, i.e., ACPA, APA, FPA and IACP, will be conducted through the President or his specific designee(s).

2. Members in good standing of independent pilots' associations which merge with ALPA by agreement will be offered ALPA membership.

3. Proposed merger agreements with independent pilots' associations will be subject to approval by the Executive Council and ratification by the Executive Board, in accordance with Article I, Section 11 of the ALPA Constitution and By-Laws.

4. ALPA representation campaigns and elections will remain available as a vehicle to be used in appropriate situations.

FINAL RESOLUTION
WHEREAS the Mission Statement of the Air Line Pilots Association calls on ALPA "to represent, in both specific and general respects, the collective interests of all pilots in commercial aviation," and

WHEREAS the interests of the members of ALPA, as well as all airline pilots, will be materially advanced by the Association achieving its long-standing goal of truly becoming the unified pilot representative for the profession in the United States and Canada, and

**ALPA 019799**

WHEREAS political, policy and labor disputes of years past should not be permitted to result in continuing separate organizations for pilots of present and future generations, a situation which places the success of projects of the utmost importance to the profession at risk and from which management, industry, governmental and global forces achieve real benefit, and

WHEREAS there have been discussions on ALPA representation with the IACP, representing the Continental and Continental Express pilots; and interest in ALPA representation has recently been expressed within other independent pilots' associations, including APA, representing the pilots of American Airlines, and FPA, representing the FedEx pilots; and the Canadian Airlines/Air Canada merger will shortly result in a representation vote, and

WHEREAS pilot unification within ALPA, bringing into ALPA the thousands of members of independent pilots' associations, will be a true victory over the corporate forces that have sought to perpetuate division within the profession against the background of union busting tactics that have arisen since deregulation, and

WHEREAS opportunities to truly unify the profession within ALPA should be pursued without delay in a diligent and constructive manner,

THEREFORE BE IT RESOLVED that the Board of Directors, as ALPA's highest governing body, reaffirms the Association's longstanding objective to provide representation for all members of the airline piloting profession in the United States and Canada, including through merger of independent pilots' associations with ALPA by agreement, and

BE IT FURTHER RESOLVED that the President continue to actively pursue fulfillment of this goal, taking into account the following principles:

1.  Discussions with independent pilots' associations, i.e., ACPA, APA, FPA and IACP, will be conducted through the President or his specific designee(s).

2.  Members in good standing of independent pilots' associations which merge with ALPA by agreement will be offered ALPA membership.

3.  Proposed merger agreements with independent pilots' associations will be subject to approval by the Executive Council and ratification by the

**ALPA 019800**

Executive Board, in accordance with Article I, Section 11 of the ALPA Constitution and By-Laws.

4.   ALPA representation campaigns and elections will remain available as a vehicle to be used in appropriate situations.

**ALPA 019801**

# Exhibit V

#25



# STL COUNCIL 003

## INFORMATION UPDATE

### BRIEFING #: 2001-09,

### May 8, 2001



EXHIBIT
**D025**

**HELLO, THIS IS RON TAMACCIO, COUNCIL 003 COMMUNICATIONS CHAIRMAN WITH AN ALPA INFORMATION UPDATE.**

**TODAY IS TUESDAY, MAY 08, 2001.**

**IT'S 15:04 HOURS IN ST. LOUIS.**

**THERE ARE TEN ITEMS IN THIS BRIEFING.**

**1. AS ALWAYS, SAFETY FIRST!**

In our last Update, we cited a few examples of how some of our captains declare themselves experts in airworthiness requirements by not entering malfunctioning components or known deficiencies in the aircraft's logbook.

AS a follow on, we'd like to remind you that whenever you encounter any non-normal situation; be prudent and use all the resources available to you.

Don't proclaim yourself the on-site "expert," and start making decisions before you've had a chance to consult with the real experts.

Worse yet, don't ignore a bad situation hoping it will just go away.

The former is foolish, and the latter is just plain stupid!

1

Unfortunately, last week we had another in-flight engine failure.

The crew landed without incident, but, once again, failed to call anyone from ALPA's Safety Department.

We found out about it the next day.

Please remember, anytime you declare a flight segment *"non-routine"* per Chapter 6, Section VII, P., s., of the FOP; whatever happened to cause you to make that declaration is probably something ALPA needs to know about.

In some respects, our simulator training for these kinds of abnormal procedures sets us up for not following through with the necessary notifications.

In the sim, once we touch down, the event ends and we go on to the next one.

However, in the real world, when we experience one of these kinds of situations, the crew is put on Chief Pilot Hold (CHP) and the 21(A) inquiries begin immediately thereafter.

The first things you do or say are the very things that will have the greatest impact on the eventual outcome.

Don't start talking or writing until you talk to us!

Call 1-800-USE-ALPA.

## 2. INTEGRATION UPDATE.

Things aren't going well in our discussions with APA about how to integrate the TWA pilots into the American Airlines' Pilot Seniority List.

To date, both proposals from APA included a methodology whereby the most senior TWA pilot ends up somewhere below the middle of the current AA list, and more than half of the rest of the TWA group is stapled to the bottom.

Unlike Mr. Carty, the rest of AA's top managers, and many airline industry analysts, the APA's leadership still refuses to attribute any value to TWA's contributions to the transaction between the two airlines.

2

It's apparent to us that APA feels AA "saved" TWA from extinction, and absent that, we'd all be out of work.

So, from their perspective, we should be quite happy with APA's current offer.

Until their mindset changes, and APA's leadership recognizes how this transaction _enhances the career expectations of its members,_ it's unlikely their negotiating position will change.

Nevertheless, our team is preparing a very detailed counter-proposal; based on a concept that does reflect the substantial positive contribution the TWA assets bring to AA's system, the company's "bottom line," and the career expectations of all its pilots.

Also, there's another _sub-rosa_ aspect to this whole negotiation.

Since the pilots from Continental recently voted to rejoin ALPA, APA is now the only large, stand-alone pilots union in the US.

Its leadership just agreed to pay a $49.5 million claim to AA management resulting from

APA's illegal sick out in February 1999.

The former Reno Air pilots are suing them and there's a group of AA pilots in a shadow union on their property.

All things considered, perhaps APA's leadership feels they must appear "strong" to their members in order to maintain their independent status and their position as bargaining agent for the AA pilots. It's no secret that ALPA would like to have AA back in the Association. We'll keep you posted as events unfold.

Because of scheduling conflicts, the next meeting between the parties will not occur until sometime later this month.

## 3. STAFFING REPORT.

What follows is from Gary Tritt, Acting Chairman of the System Schedule Committee.

_The following information is for distribution to the pilot group._

_First item concerns the future wide body displacement message. **At this time there are no plans by**_

3

**the company to post another wide body displacement bid message.**

The current staffing of the wide body fleet is such that there is minimal overstaffing through the fall, 2001.

Second item concerns the 717 fleet. The company has created an aggressive June schedule for the 717 fleet that has resulted in excessive penalty time creating a situation whereby the crews available were not sufficient to fly the schedule. In an effort to reduce the crew requirements for June the result was a decrease in actual flying hours and very few 1 and 2 day trips for the fleet.

Third item again concerns the 717 fleet. Expect a bid message within the next month effective probably in August for 717 vacancies. We are requesting that all pilots, especially the DC9 pilots review their standing bids. If the company is unable to fill the 717 vacancies and there is an overstaffing of the DC9 fleet (a real probability due to DC9 aircraft being retired), then we can probably expect a displacement message for the DC9.

Fourth item. The company is in the process of completing their semi-annual review of the financial plan and will adjust the financial plan as required.

It is unknown at this time the specifics, however, considering the changes that have occurred in ownership and fleet size we expect to see changes, to what extent, we don't know. It is imperative that all pilots continue to review their standing bids.

Last item. When pilots have questions concerning their schedule, they should first contact crew scheduling. If your answer is not satisfactorily answered then you next step should be to contact your domicile for resolution.

If your problem is not answered satisfactorily, or you feel that this could be a problem to other pilots, please notify your Scheduling Committee representative, a Grievance Committee representative or your elected LEC representatives.

These representatives are listed on the MEC website. And again, have a question, just ask, we'll try our best to get an answer for you.

Gary Tritt

ALPA 000212

4

*SSC Chmn, Acting*

# 4. RETIREMENT PLAN OPTIONS.

Sometime last week, everyone should have gotten a letter confirming the amount of past-due company contributions, plus interest, made to your DAP account. The payments were made on April 19th.

These monies were the last contributions from any source, excluding rollovers, to the TWA DAP and 401(k) accounts.

All future TWA LLC retirement contributions and your personal 401(k) contributions will go to your new AA $uper $aver Account.

Also in the letter was important information about the future of the DAP and 401(k) Plan.

It appears that the DAP will continue, as is, with a new sponsor. However the 401(k) Plan will eventually be terminated.

Please pay close attention to the directions for requesting a

distribution or rollover from either your DAP or 401(k) account.

Errors could have substantial tax consequences.

# 5. NEW MEC OFFICER.

The MEC elected Keith O'Leary to replace Scott Schwartz as its Vice Chairman.

Keith is a STL MD-8 Captain. He lives in STL.

# 6. MORE CHANGES ON THE MERGER COMMITTEE.

The MEC chose Captain D.J. Glasby to replace Captain Gary Flor on the Merger Committee.

Captain Flor left the committee for personal reasons.

The Merger Committee member are:

Captain Mike Day
Captain D. J. Glasby
Captain John Swanson
F/O John Hefley
F/O Sean Clark

5

ALPA 000213

## 7. ALPA PRESIDENT SPEAKS TO APA ABOUT TWA PILOTS.

What follows is an excerpt from ALPA's President, Captain Duane Woerth's comments to the TWA MEC and ALPA members present at a Special MEC meeting on April 23, 2001.

*Addressing the current issues facing TWA pilots specifically, Captain Woerth said that as an ex-Braniff pilot he was happy that TWA pilots had hung on to get to the point we are. The Association's focus now is on obtaining a fair seniority integration for the TWA pilots, he said.*

*Captain Woerth reported that earlier this month he traveled to Dallas with the intention of speaking to the Allied Pilots Association Board of Directors about the TWA pilots' seniority integration. Although the APA did not guarantee that Captain Woerth would be allowed to speak to the APA BOD, he went with the hope of receiving an official invitation. That morning, APA President John Darrah contacted Captain Woerth with that invitation. This would be only the second time since APA was formed that a sitting ALPA*

*President had been able to officially address the APA BOD, according to Woerth.*

*During his discussion with the APA, Captain Woerth said that this transaction would mark the first time in the American pilots' careers that they would have to deal with integrating a large airline with a long history. He said this transaction is different than Reno or Air Cal and the APA must realize that and be fair in their negotiations.*

*He went on to tell the APA that the TWA MEC had recently made one of the hardest decisions he has ever seen any MEC make in reaching the transition agreement with TWA Airlines LLC. Captain Woerth said that the TWA MEC had made a realistic assessment of their situation and made the hard decision, and now the APA needs to get realistic and make a hard decision.*

*He told the APA that they have an even greater responsibility to be fair and realistic since they would not allow a third party to facilitate the negotiations. (NOTE: Subsequent to Captain Woerth's meeting with the APA, they agreed to the use of a facilitator if needed.)*

ALPA 000214

6

*Captain Woerth told the MEC then that he would send a letter to the TWA pilots and others to be sure they all know what his position is. Captain Woerth pledged the financial support of the entire Association for the TWA pilots. In light of losing the 9,000-hour flight pay loss bank previously negotiated with TWA, Inc., Captain Woerth assured the MEC and other members present that the TWA MEC will be provided the funds and other support necessary from ALPA to process MEC activities.*

*Capt. Woerth stated that they would look at the TWA MEC's financial needs quarter by quarter without micromanaging the MEC.*

*This is a unique situation - we are going to take care of business, he added.*

*Question and Answers (paraphrased and condensed):*

*Q: What is APA's status with regard to the AFL-CIO?*

*A: The APA has been trying to get into the AFL-CIO for a long time, and they have not been successful. They need to be true members of the labor movement if they want the political support and clout that goes along with a national union.*

*Q: What did you think of the APA's latest proposal?*

*A: I saw their first proposal, and when they said they had a better one I certainly thought it would be better than that. I found it highly unsatisfactory.*

*Q: Do we have your commitment to use the resources of ALPA, including litigation, to ensure TWA pilots are integrated fairly?*

*A: If we have any basis for litigation, we will do what is necessary, including litigation. We hold the bargaining rights-we don't need MCF for litigation.*

*Q: What is your assessment of the APA Board of Directors? How did they receive you?*

*A: When I was in front of them, it was a very controlled group. There are less than 20 members on the BOD, out of which maybe two are approaching 50 years old. Frankly, in that way they don't look all that different than any MEC. Their Vice President is an ex-Eastern pilot; however, since American growth has been mostly through internal expansion and*

7

ALPA 000215

the APA has never been through a large merger like the rest of ALPA's MECs, they are struggling with how to do this.

Q: Are you of the opinion that an integration that is not fair to the TWA pilots will have long-range consequences for the industry and American Airlines going forward?

A: I think that's obvious. This transaction results in the largest airline with the largest pilot group. What the rest of the world's pilots will be counting on is for this combined group to have the unification and strength to do their job in negotiating their next contract. We need leading edge companies with leading edge contracts. The biggest airlines can raise the bar for everyone. If one big airline does not, then it negatively impacts the rest of the pilots in the industry.

The consequences of not doing the right thing are serious. The APA can use the addition of the TWA pilots to strengthen their position. If not, with a hostile political environment and an aggressive management, they might stay a notch below where they need to be. They need to be aware of the long-term consequences of what they do.

Q: Is there anything that you can do to assist the five pilots who have not been offered employment by American Airlines in the TWA LLC?

A: Bob Pastore and I will talk to Don Carty before any decision is made to be sure he understands all the issues involved.

Q: What influence do you think Don Carty has with the APA? Is there any assistance we can get from him?

A: We have an open dialogue with him. How effective he will be, I'm not certain. He has a hard time reaching a deal with his own pilots. If he doesn't want to look like the dumbest CEO in the industry he's got to do this right.

Q: Why did ALPA not choose to sponsor the pilots' DAP?

A: If we agree to sponsor one, we would have to be prepared to take on more. We simply don't have the resources to take on that kind of liability.

Q: What's the status of the fine levied against the APA as a result of their sickout in 1998?

A: I don't think Don Carty is going to make them write a check for something when they don't have

8

ALPA 000216

*it. I don't know what he will tell the judge.*

*The members applauded Capt. Woerth at the conclusion of his remarks.*

## 8. AA EXECS MEET WITH TWA LINE PILOTS IN STL.

Captain Rick Crocker provided this summary of the "Meet & Greet" session with AA managers in STL on May 3ᵈ.

*The representative in attendance for AA were:*

*Capt. Bob Kudwa:  VP Flight Operations*

*Jeff Brundage:  VP employee relations*

*Capt. Eric Lewis:  Managing Director (I believe of Flt Ops)*

*Capt Kudwa opened up the session with a few comments:*

*The TWA/AA combination places AA ahead of UAL strategically and puts UAL in a position of trying to find a way to counter what AA has done.*

*TWA runs an outstanding airline.*

*He wants everybody's motto for this merger to be "treat everybody like you want to be treated."*

*They do most of their company communication over their website.*

*They have access to Sabre from the website (you will no longer have to maintain a CompuServe account).*

*There were a few more comments but they are the same things we have already heard a 100 times. The rest of the statements were from the question and answer portion.*

*Someone asked about the potential loss of 60 A/C. He said they plan to move A/C out of LLC only to match the retirements of LLC pilots. Most of the A/C transfers would happen to A/C whose leases run out.*

*The future of the B717 depends on Boeing. They were offered a deal to replace every F100 with a B717. The returned F100's would not be used in the states. The deal got a little cloudy when they were going to have to include the extra F100's coming from USAir.*

ALPA 000217

9

The drop dead last possible date to be LLC is 12/31/04, but the LLC could disappear sooner.

Part of the delay in figuring out fleet plans and training issues was that they couldn't look at everything until the bankruptcy judgment was final (antitrust laws prohibited it).

If at any point there is an excess of pilots in the LLC they will be able to move across the fence (instead of being furloughed) based on whatever is agreed upon for our seniority integration.

The first noticeable change to our A/C is going to be the seats -- were going back to comfort class.

There will not be disposal of TWA a/c. They do not plan to replace 180 a/c unlike the Reno acquisition were they are replacing all of the a/c.

His comment on seniority integration is that it's "like everyone showing up to the dance with two dates but you are still worried about losing your girlfriend."

AA will not accept a proposal from APA that creates large costs.

Management is neutral on the position of seniority integration.

They would like an integration process sooner rather than later.

NO ONE WILL BE DISPLACED. He said that they do not have a displacement program and that as long as no one bids out of their seat they should not be forced out.

On their upgrade or out policy he said it is not their intention to eliminate people, in fact he thought we had a stricter policy.

When do we train to AA procedures? It will be slow integration followed by some sort of FAA requirement. They have no idea at this time what is exactly going to be required.

Are we a pawn in the upcoming Section 6 negotiations? We don't plan to use LLC as a pawn either way in negotiations.

They want the integration done quickly. "This has got to be done right from the people side, people issues are very important."

Any plans to change our domiciles? No changes currently, they plan to keep things status quo at the co-located domiciles.

10                                    ALPA 000218

They do NOT want another integration like Reno. They were not happy with the way the labor portion of the Reno integration worked out.

They thought the Air Cal integration went smoothly and like the easy way that integration of work forces took place.

Based on current staffing if we went to AA work rules there would be a significant shortage of LLC pilots.

We will be on AA pay and benefits NO LATER than 1/1/02.

Pref bid will be dead 12/31/01.

The type of flights using STL will be focused on connecting traffic so they can utilize ORD for more O&D traffic. They do not see an immediate increase in our international flying out of STL, they are still trying to get landing slots in NRT for the route authorities they have so don't look for a STL-NRT route anytime soon.

LLC new hires will be hired by A/A and then allotted to LLC, as LLC needs new pilots. They are currently looking into the status of the pilots in our pilot pool.

When will we get new uniforms? They have not set a date yet but would like it sooner rather than later.

They are currently working on who is going to be our feeder in STL.

When will we be eligible for profit sharing? LLC pilots will not be eligible for a profit sharing check for the year 2001 but should be eligible after that.

What is the status of the LLC5? They are currently still reviewing their legal issues and hope to have it resolved soon. It is now the LLC4 because one pilot has already been returned to the list.

These above comments are only my perception from my notes of the meeting.

Hope this helps those that want more info.

Rick

## 9. A MESSAGE FROM OUR COUNCIL'S NEW SECRETARY/TREASURER

*Fellow Council 3 Pilots*

11

ALPA 000219

*I have just recently been able to obtain the email addresses of those pilots in Council 3, that have them on file with TWA ALPA. This was not an easy task with all the red tape involved.*

*As I have committed to a better line of communication with you, I will begin to give you EMAIL updates as to our progress with APA in the coming days, weeks and months.*

*You can also store my email address; so in the event you have any questions, feel free to email me. I will do my best to respond appropriately to those questions. In that, I will say that there may be times that I will not be able to be specific about sensitive issues that have to do with Strategic Planning Issues with the APA*

*This will be in your best interest in the long term. You may ask why? The answer is simple and to the point. Information that is often in the planning stage is not complete nor is it appropriate to communicate it if it may jeopardize the plan before it even gets started.*

*Often EMAILS and general postings have found themselves in the hands of the APA and being*

*counteracted to our Merger Committee, at their surprise. This is a tremendous problem that hurts the TWA pilots and your MEC's fight to seek a fair and equitable integration of the seniority list.*

*It is incumbent upon each one of us to understand this process. I ask that each of you take it upon yourself to limit your Internet and ALPA Board communication of items that may not already be released by ALPA.*

*I will also state, if ever in the future I feel that this process has a flaw or seems to be going down the wrong path, I will immediately communicate this to ALL C3 Pilots.*

*Those that represent you in ALPA are to be held accountable for their actions, this includes me. If you ever doubt their actions or their intent, it is perfectly within your right, to question their motives and their actions or lack thereof.*

*I am still committed to seeking (DOH) or it's equivalent for the TWA pilot's.*

*I will be putting a briefing together in the next 24 hours to bring as*

12

ALPA 000220

*much of you up to date as possible.*

*Again, please feel free to email me at anytime.*
*Fraternally,*
*Jim Arthur*
*C3 Secretary/Treasurer*
*STL MD80 Captain*
TWAC3JIMARTHUR@CS.COM

## 10.  A SPECIAL FRIEND APPROACHES RETIREMENT.

Our Chief Pilot will retire on May 24th.   Captain Magnuson has served us well during his tenure as our "boss."

He's an outstanding example of the true spirit of enlightened, customer-oriented management.

Lee's unique style and genuinely caring approach to his responsibilities has, on more than one occasion, resulted in preserving a fledgling pilot's flying career that was in serious jeopardy.

His successor will have a difficult time following such a fine manager.

Before he retires, please try to stop by or send him a note to wish him well.

## THAT'S ALL FOR NOW. LOOK FOR OUR NEXT UPDATE SOMETIME LATER THIS MONTH.

## THANKS FOR CALLING WATSON.

## GOOD BYE.

The preceding information is a verbatim transcript of a TWA ALPA Council 003 Code-A-Phone message.   The messages are updated frequently.   Each message is prepared by Captain Ron Tamaccio and is sequentially numbered to provide continuity.   The recording is available around-the-clock by calling WATSON at 314-426-1011.

ALPA maintains an office in the STL airport terminal.  It's located in room MTS-2267, on the lower level in the corridor behind the rental car counters between exits MT-14 and MT-15.

The office is open weekdays from 0800 to 1600.  The telephone number is (314)-426-1789.  The FAX number is (314)-426-7295.

The mailing address is:
Air Line Pilots Association,
P.O. Box 10277,
SAINT LOUIS, MISSOURI 63145

ALPA 000221

13

# HERE ARE SOME IMPORTANT TELEPHONE NUMBERS.

YOUR Captain Rep:
Steve Rautenberg,
(636) 561-4884

YOUR F/O Rep:
Sally Young,
(636) 561-1621

YOUR Secretary/Treasurer:
Jim Arthur
(314) 422-9518

MEC Safety Reporting Voice-Mail System:
(800) USE ALPA
(314) 770-8556

ALPA Worldwide Safety & Accident Investigation Hotline:
(202) 797-4180
CALL COLLECT!

MEC Code-a-Phone:
(800) 253-7919
MEC Office:
(314) 770-8500
MEC FAX:
(314) 770-8510/8597
MEC Benefits Specialist
Mary Ulett (314) 770-8500
DAP Office:
(314) 739-7373
DAP NAV Update:
http://resources.hewitt.com/4twadap.
DAP Information:
(877) 4TWADAP
CCS Hotline:
(800) 388-7665
TWA Info Line:

(800) TWA-1976
Council 002 CDP:
(800) 253-7928
Council 004 CDP:
LAX & SFO: (800) 887-1821
TWA Flight Information:
(800) 893-5436
TWA Non-Rev VRU System:
(800) 449-3833

American Airlines Info Line:
(800) 222-2789



14

ALPA 000222

Exhibit W

# TWA MEC Minutes 

Written, edited and published by your TWA Master Executive Council, these minutes provide a record of the business conducted during the representative body's last meeting. This document is not a verbatim transcript of the meeting's reports, discussions and actions. Rather, it is a comprehensive summary of those events. For more information on the issues influencing TWA pilots' careers, consult the TWA MEC's other various communications.

SPECIAL MEETING DATE: October 20-22, 2001 Washington, D.C.

**MASTER EXECUTIVE OFFICERS**
**Robert A. Pastore, Master Chairman**
**Keith J. O'Leary, Vice Chairman**

**EXHIBIT**
**D088**

**COUNCIL 2 - NY**
Howard B. Hollander, Captain Rep.
Theodore A. Case, First Officer Rep

**COUNCIL 4 - LAX/SFO**
Pablo Lewin, Captain Rep.
Alan Altman, First Officer Rep.
Glenn Stieneke, Secretary/Treasurer

**COUNCIL 3 - STL**
Steven P. Rautenberg, Captain Rep.
Sally D. Young, First Officer Rep.
Jim Arthur, Secretary/Treasurer

---

**Saturday, October 20, 2001**

1000 Captain Bob Pastore called the meeting to order.

Vice Chairman Keith O'Leary called the roll.

In attendance: Hollander, Case, Young, Arthur, Stieneke

Not In attendance: Rautenberg, Lewin, Altman

Proxies: None

Committee members: Ron Kiel, Keith Holcomb, Bud Bensel, Matt Comlish

Announcements

1001 Recess

Case for the read Article 1 Section 14 from ALPA's Constitution and By-Laws:

*Representation of all members of the Association at any duly called meeting of the Board of Directors, Executive Board and Master Executive Council is mandatory. Elected representatives may be considered as acting against the best interest of the Association if they fail to represent, or arrange for representation of their constituents.*

Case also requested that Pastore notify Woerth regarding members attempt to deny quorum.

Pastore stated he thought this was a postponed regular meeting. Holtzman stated that it would be a stretched to say this was a regular meeting. Additionally a 24-hour notice was given that this was a special meeting.

*Pastore Ex
88*

1014 Pastore adjourned meeting for lack of quorum.

Pastore called for Special MEC meeting for 10:30, Sunday, October 20.

_____

<u>Sunday, October 20, 2001</u>

1030 Master Chairman Bob Pastore called the meeting to order.

Vice Chairman Keith O'Leary called the roll.

In attendance: Hollander, Case, Rautenberg, Young, Arthur, Altman, Lewin and Stieneke

Committee Members: Bud Bensel, Matt Comlish, Ron Kiel, Keith Holcomb

Announcements

Pastore reviewed the agenda for the meeting. Also discussed Jeff Brundage's letter to Duane Woerth. Pastore said he spoke directly with Brundage to clear up some of the discrepancies in the letter.

Holtzman briefed the MEC regarding Dispute Resolution Committee grievances. These are handled by the DRC committee, the MEC is not involved.

Case for the record: "I have been made aware of at least two letters written by Duane Woerth, President of ALPA. One, intimating that this TWA MEC intends to depart from the TWA MEC Policy Manual with regard to the seniority integration discussions with the APA which began on October 20, 2001. For the record, this MEC member has no intention of taking any such action.
The other, concerns Special MEC meetings and a reiteration of intimations about the TWA MEC's conduct with respect to the seniority integration discussions with the APA. I am very concerned about the intimidating language of both letters. Because of the failure of this MEC to meet prior to the seniority integration engagement, this MEC has allowed non-Merger Committee members into the room for direct negotiations, which may be in violation of the TWA ALPA MEC Policy Manual. For the record, I object to this action. I am not quite sure how I am to continue representing my constituents with these letters in effect."

1045 <u>Briefing from Captain Howard Attarian, ALPA Executive Administrator (*via phone*)</u>
Captain Howard Attarian addressed the MEC regarding the recent seniority integration meetings between ALPA and APA. Also discussed several communication strategies.

Questions and Answers

1058 Briefing concluded.

1059 <u>Protocol Discussion for the Merger Committee</u>

Case/Altman moved to enter into Committee of the Whole
VOTE: **PASSED** unanimous voice vote.

1108 Recess
1125 Reconvened

_____

Hollander requested that the record reflect that Rautenberg, Lewin and O'Leary were not present.

1130 O'Leary and Lewin returned to the meeting.
1131 Rautenberg returned to the meeting.

**Legislative Committee Report: Matt Comlish**
Comlish briefed the MEC regarding the legislative efforts during the past few weeks. Grass roots campaign has been very successful, receiving a lot support on Capital Hill. Suggested that the MEC plan for the upcoming weeks. Comlish said that tomorrow would be the most critical juncture. Recommended developing public relations campaign and get something released with press today. He said he would like to see more of the rank and file getting involved. Comlish suggested that keeping the pressure on and asked the MEC to stay in DC to help with the campaign. Also need to educate the pilots so they participate and work together as a team. Expressed concerns that ALPA has not been supportive in either the political or public campaigns. If this fails, it is because of lack of support from ALPA National.

Questions and Answers

1206 Recess
1214 Reconvened.

Questions and Answers continued.

1222 Report concluded.

1223 Case/Hollander moved to come out of Committee of Whole.
VOTE: **PASSED** unanimous voice vote.

**AI# 0110-118 Case/Hollander**
**SUBJECT:** TWA ALPA legislative initiative.

WHEREAS the TWA ALPA Governmental Affairs Committee has experienced an extraordinary level of success, and been instrumental in placing a Bill on the floor of both the U.S. House of Representatives and U.S. Senate, and

WHEREAS those Bills, Senate (S.1479) and companion House (H.R.2989), are specifically designed to allow for 3rd party neutral arbitration, for a resolution to the TWA / ALPA, American / APATWA LLC's seniority integration, and

WHEREAS those Bills are a direct result of the work of the Governmental Affairs Committee as augmented by certain members of the MEC, now

THEREFORE BE IT RESOLVED that the TWA MEC augments the TWA ALPA Governmental Affairs Committee by placing the following members on the Governmental Affairs Committee to include the entire MEC: Howard Hollander, Ted Case, Sally Young and Jim Arthur.

Discussion

1228 Lewin/Case moved to POSTPONE until after the Merger Committee report and the conclusion of the legislative report.
VOTE: **PASSED** voice vote.

---

*PAGE - 3*
*Never Approved by the TWA MEC*

**ALPA 006388**

**Merger Committee Update:  Mike Day**
Briefed the MEC regarding ongoing meetings with APA.

1246 Report concluded.

MEC discussed whether to called a Special Meeting or move a late agenda item to deal with any merger proposals.

Arthur suggested that the MEC stay the course that we assured Senator Bond, the MEC would follow.

1255 Recess
1316 Reconvened

**Representational Structure Report:  Bill Kientz**
Kientz updated the MEC regarding representational structure.  Most likely TWA would fall under the American West concept.  The MEC would need to make a request to the Executive Council. Kientz suggested that the MEC make two requests, first dealing with the next four months, then to deal with the next election cycle.  The MEC could request to keep the current officers until the next election cycle.  Recommend whatever the MEC decides, it be unanimous.  Some MEC members have suggested seniority-based representation.  Under this structure there would seven status reps, with 300 pilots per rep. Kientz said the he talked to the American West Master Chairman and they were not happy with their setup.  It works, but doesn't work well.

Questions and Answers

1345 Report concluded.

1346 Recess
1408 Reconvened

Rautenberg/Young moved to consider any seniority integration proposal or tentative agreement submitted to the MEC by the TWA MEC Merger Committee.

Discussion

VOTE to consider any seniority integration proposal:  **PASSED** voice vote.

**Representational Structure Discussion**

Young/Hollander moved to into Committee of the Whole.
VOTE:  **PASSED** unanimous voice vote.

Per Pastore, no minutes were recorded during the Committee of the Whole.

1456 Recess
1516 Reconvened

Hollander moved to come out of Committee of Whole.
VOTE:  **PASSED** unanimous voice vote.

Representation Structure discussion continued.

MEC agreed that representation would be status quo but agreed to wait until the body heard from Salverson to see if the Executive Council would pass status quo.

**Communications Update:  Keith Holcomb**
Briefed the MEC regarding press conference and his discussions with Don Skiados, ALPA, Director Communications.

1647 Recess
1700 Reconvened

1701 Recess until 20:00pm

20:00 Reconvened
20:01 Recess

2020 **Communications Committee Report:  Keith Holcomb**
 Briefed the MEC regarding press conference and rally.  Rally has been delayed but press conference will go on as scheduled.  Skiados was ready to assist us.

**Negotiating Report:  Ron Kiel**
Kiel updated the MEC regarding meeting with Brundage.  Briefed the MEC on preliminary negotiations.

2039 Recess
2044 Reconvened

**Representation Structure:  Bill Kientz**
Updated the MEC with regarding conversation with Captain Jerry Mugerditchian, ALPA, Vice President Administration.  Mugerditchian said that anything was possible.   Kientz said that there was a possibility that TWA could keep the current reps with seniority block.   Recommend that the decision stay within the confines of the Constitution and By-Laws.

2055 Recess
2109 Reconvened

**Merger Committee Update:  Sean Clarke**
Updated the MEC on the latest proposal from APA.

Questions and Answers

2127 Updated concluded.

2128 AI# 0110-119 Case/Altman
**SUBJECT**: TWA ALPA Representational Structure

WHEREAS the tragic events in early September have caused unprecedented issues to be dealt with by the Air Line Pilots Association, and

WHEREAS the TWA ALPA representational structure has the proven ability to remain adaptable and innovative concerning union representational duties, and

**ALPA 006390**
D-088
Page 5 of 16

WHEREAS TWA LLC is caught in middle of the largest airline merger in history, and

WHEREAS the TWA MEC and ALPA is faced with the largest air carrier seniority integration in history, and

WHEREAS it is vitally important to maintain basic governing principles and stability for the purpose of adequately representing the interests of the TWA ALPA pilots, including representation for pay and working conditions, and

WHEREAS TWA LLC will collapse into a single Council airline with more than two thousand (2000) active members, which will tax the MEC beyond it's representational capacity, now

THEREFORE BE IT RESOLVED that to provide a organization structure for the continued governance and representation of TWA pilots the TWA MEC requests the Vice President – Administration/Secretary to coordinate with the ALPA Executive Council to adopt and administer the following requests:

1. Provide a temporary vehicle to maintain the current duly elected TWA MEC status representatives as the "status quo" for the purpose of adequately representing the TWA pilots. This vehicle shall expire upon the normal election cycle beginning March 01, 2002.

2. The MEC requests that the ALPA Vice President-Administration/Secretary coordinate with the ALPA Executive Council to provide a vehicle to maintain the TWA ALPA MEC Officers who are in place on October 31, 2001 until the normal election cycle.

Discussion

2237 Case/Altman moved to POSTPONE until after Kientz's briefing tomorrow.
VOTE:  **PASSED** voice vote.

**Captain Duane Woerth and Captain Howard Attarian (via phone)**
Discussion regarding APA's latest proposal.

2253 Recess.

**Monday, October 22, 2001**

0900 Master Chairman Bob Pastore called the meeting to order.

Vice Chairman Keith O'Leary called the roll.

In attendance: Hollander, Case, Rautenberg, Arthur, Lewin, and Altman

Not In attendance: Young and Stieneke

Proxies:  None

Committee members:  Ron Kiel, Keith Holcomb, Bud Bensel, Matt Comlish

**ALPA 006391**

D-088
Page 6 of 16

Announcements

0909 Recess

0918 Stieneke arrived at the meeting.

0920 Young arrived at the meeting

1015 Recess
1030 Reconvened

Lewin/Hollander moved to accept AI#0110-120 as a late agenda item.
VOTE:  PASSED voice vote.

AI#0110-120 Young/Rautenberg
SUBJECT:  Parker Dues Deferral

Discussion

Resolution #01-97 by S. Young/S. Rautenberg

**BE IT RESOLVED that the TWA MEC approves a two-month period for repayment of 1999 dues/service charge reconciliation for Charles Parker.**

<strong>PASSED</strong> voice vote

Case for the record: Abstained from voting because he did not have enough information to make a decision.

1040 Recess
1100 Reconvened

1103 Altman/Case moved to go into Committee of the Whole.
VOTE:  PASSED unanimous voice vote.

Pastore requested no minutes be recorded.

1132 Recess
1148 Reconvened

MEC discussed the agenda and representation structure.

1153 Working lunch that included briefing from the Merger Committee. No minutes recorded per Pastore's direction.

1315 MEC discussed the briefing from the Merger Committee and asked numerous questions of Roland Wilder.

1347 Recess
1349 Reconvened

**ALPA 006392**

D-088
Page 7 of 16

MEC discussion continued.

Tanner shared his opinion regarding the recent proposal; felt it was a step south.   The restrictions were not as favorable as the APA had offered earlier.

Lewin requested that the full details of the deal be given to the body for review before he could make a decision.

Rautenberg also requested the deal be reviewed in its entirety before he could reach a decision.  Felt he did not have enough information to even consider voting.  Rautenberg said he felt that the MEC was in no position to even contemplate this issue, need all the experts to advise us.

1420 **Government Affairs Update:  Matt Comlish**

Comlish updated the MEC regarding efforts on Capitol Hill.  Trevor Blackaan from Senator Kit Bond's office informed Comlish the reason no one from their office would be present during the negotiations was to avoid the appearance of interfering.  Comlish said he found it odd that Norma Kaehler, AMR Vice President, Government Affairs, was on site today.  He said that she had met with him and Bud Bensel and asked a few questions regarding how negotiations were going and how ALPA was being treated.  Comlish emphasized the tremendous importance of keeping the legislation effort going.

Questions and Answers

1435 Caucus

1438 Update concluded.

1439 **Merger Committee Update**
Day briefed the MEC regarding the meetings with APA.  Discussion focused on furloughs.

Day's briefing was set aside in order that the MEC receive a briefing from Paul Hallisay, ALPA Director, Government Affairs.

1443 **Briefing from Paul Hallisay, ALPA Director, Government Affairs** (via phone)
Hallisay discussed the MEC's recent legislative efforts.  Stated that he felt that even if the Bill passed in the Senate, it would not pass in the House.  Although efforts to this point have been somewhat successful the Bill would never come to the floor, this issue was very controversial.

Questions and Answers

1449 Briefing concluded.

1500 **Merger Committee Update: Mike Day (continued)**
Day suggested that the MEC hear from Jeff Brundage, AMR, Vice President Employee Relation regarding the recent proposal.

MEC agreed to hear from Brundage.

Kientz briefed the MEC on Brundage's background while he was at ALPA.

**1504 <u>Discussion with Jeff Brundage, Vice President Employee Relations, American Airlines (via phone)</u>**

Brundage stated that there were some options.  If there wasn't an agreement, things would remain status quo.  AMR has tentative language with APA and will file for single carrier status.  AMR has said from day one they want to be a single carrier.  The other option was arbitration.  Brundage stated Don Carty told Senator Bond if the Bill passed, he would shut down TWA LLC.  AMR made a commitment to its employees, right or wrong.  AMR employees cannot fathom an arbitrated seniority list.  AMR committed to its employees that AMR would not support arbitration for seniority.  If the Bill passed, AMR would shut down the TWA LCC, cannot afford to upset the apple cart.  Brundage said that Delta was going to be very aggressive, that was why we want to be in position to compete.  The other piece was litigation; certainly an option.  AMR doesn't share the same opinion with ALPA of what we signed up with back in Delaware.  We have done what was reasonable to facilitate the process and feel it will stand up in court.  Final option was to make a deal.  Brundage said he would not answer whether or not this was a fair deal.  There has been little success of fair integration among major carriers.  He has not seen and integration where all parties were happy in the end, understood that this was an emotional issue.  AMR will do everything it takes to become the number one airline. This was a lousy place to be, but that is where we are.

Questions and Answers

1620 Discussion concluded.

1621 Recess.
1639 Reconvened

Pastore announced that Day made a commitment to Ed White that nothing would be released to the press until close of business tomorrow.  Day said that he had no problem calling White and telling him the deal was off.

Day reviewed in detail the proposal.

Questions and Answers

1725 Recess.
1729 Reconvened.

Questions and Answers

1740 Hollander left the meeting, Hollander proxy to Case.

1744 Lewin left the meeting, Lewin proxy to Altman.

1757 Lewin arrived at the meeting.

1830 Recess
1842 Reconvened

**<u>TWA ALPA Representational Structure Discussion</u>**

Pastore announced that he gave his proxy to Kientz to attend the Executive Board.  He recommended that he would like to see the most Reps possible.

---

Kientz briefed the MEC regarding prospect of status quo. ALPA has stated that they are going to be flexible on this because of the current circumstances. He read from the ALPA Constitution and By-Laws regarding organizational structure. There were several options, but recommended block seniority representation for the interim. The MEC needs to be unanimous on this decision.

Questions and Answers

Rautenberg for the record requested the following be read to the Executive Council: *I understand that the Executive Council will be considering the request of the TWA MEC on representational structure at its meeting this week. I have abstained from voting on that recommendation in order to facilitate cooperation among the members of the MEC at this critical juncture. However, I do believe that the Executive Council should be aware of the most serious reservation that prevents me from outright support of our request.*

*I am writing to communicate my concern and ask that you share it with the Executive Council members as they consider our representational situation. A vacancy was created in the Council 2 First Officer Representative position on August 10, 2001. That vacancy was created by recall. The vacancy was filled on an interim basis soon after. However, to my knowledge, the election process for the secret ballot of the membership to elect the representative to serve the remainder of the term has not begun. I cannot endorse the failure of Council 2 to begin that process by scheduling and holding the nominating meeting. Subsequent to about September 28, when TWA announced its intentions to close the JFK domicile, the failure to hold nominations is understandable. However, the expiration of seven weeks between the recall on August 10 and the announcement of domicile closing at the end of September with no nominations being scheduled or conducted is in my opinion highly inappropriate. That is aggravated by the fact that Council 2 did in fact find it possible to conduct a meeting for the purpose of electing an interim representative. Nominations could have been held at that time.*

*The potential addition of four months to an interim representative's term that should already have ended is a circumstance that I cannot support.*

*Thank you in advance for communicating this to the Executive Council.*

Rautenberg for the record said that if the Council #2 election been conducted, he would have supported the status quo motion.

1924 Caucus

MEC reviewed press release.

Kientz recommended that MEC do a straw poll regard representation. He would take their decision to Bob Salverson and Jerry Mugerditchian to write the resolution.

1942 Recess.

**Tuesday, October 23, 2001**

0900 Master Chairman Bob Pastore called the meeting to order.

0901 Recess

0945 Reconvened

Vice Chairman Keith O'Leary called the roll.

In attendance: Case, Rautenberg, Young, Arthur, Lewin, Altman and Stieneke

Not In attendance: Hollander

Proxies: Hollander proxy to Case

Committee members: Sean Clarke, John Swanson, Matt Comlish, DJ Glasby, Bud Bensel, Mike Day

Guests: On file MEC office

Announcements

**Merger Committee Report: Mike Day**
Day stated that if there were better furlough protections, the Merger Committee would agree to the deal unanimously. Pilots that were now furloughed were definitely at risk. Day didn't believe there was a chance for litigation or the Bill passing, only leverage was to continue to delay. He said he was not trying to sell this, the Committee tried to get unanimous consensus. The Committee can only recommend this with certain conditions.

Swanson stated if that the captain upgrades were based on retirements rather than the economy. With the deal, recall rights would maintain April 10 seniority number, but if the pilot stayed in STL would maintain current seniority and would be able to move up to captain sooner than anywhere in the system. Recall could be anywhere there was an opening, but as soon as there was an opening in STL, the TWA pilot would get it before any AMR pilot.

Day reminded the body that quality of life is not an issue for APA pilots; they only care about the money.

Swanson stated that the MEC agrees not to take the deal; the TWA pilots would loose about 400 numbers in their seniority number. Doesn't' seem a lot right now, but later in their career it will. Also, TWA pilots would be recalled to the bottom of APA seniority list.

Questions and Answers

1022 Recess
1040 Reconvened

Glasby stated that the MEC must do what was the best for all the TWA pilots. He was opposed to the deal; this was not integration but isolation. This was the best deal the Committee could get; APA was not going to give anymore. The upside of voting this down was very small. The litigation was not going get us better seniority; the legislative option was dead. Glasby also felt that the airline was going to be shrunk considerably. If the MEC agreed to the deal, it would protect some 1000 pilots. If don't accept, all pilots would be at risk.

Clarke said if there was furlough protection, he would not be for the proposal but he would be neutral. He thought there was a miss conception that if we don't accept the deal that we will loose 400 numbers on seniority, there was a shot that this won't happen. Briefed the MEC on the mitigation package. The APA already believes that anyone hired by the April 10 date has furlough protection. Clarke said that the

TWA pilots were the mitigation package whether we take the deal or not.  Clarke hoped that this group would not sell out 1200 pilots to save their own butt.  We don't have to come to a deal, there would be some risks.  He couldn't believe anyone on the Merger Committee could sign a deal that was going to furlough 1200 pilots.  We are here to prevent furloughs, not to voluntarily sign up for furloughs, and that would be what you will be doing if you accept this deal.

Wilder stated he was here to advise the MEC on the law and to help them get were they decided to go.  Injunctions were being prepared against the single carrier filing.  In order to get to arbitration all the pieces have to fall in line.  First, the MEC must stop AMR from reaching an agreement with APA and then file injunction on the single carrier filing.  This would only be a short delay, but cannot stop them from doing this eventually.  ALPA needs to win the grievance with Richard Block, on fair and equitable process for integration.  If ALPA wins the grievance, need to get a specific remedy.  The next step if ALPA prevails would be to file suit to make sure the award was enforced.  Next ALPA would need to work on improving the deal.  During this period, ALPA would need to continue the legislative front with Senator Bond.  During this period, there was nothing to prevent furloughs.  Depending on the economy, if the traffic doesn't return, AMR would take it out of our hides.  Wilder didn't see any legal protection to prevent AMR from furloughing heavier on the TWA side.  He saw the fight going on through the first of the year.  If ALPA obtained arbitration, it would be about 120 days for the arbitration.  This would be a period of vulnerability.  As in any war, there would be causalities.  If ALPA doesn't take the deal, APA and AMR positions are that furloughed TWA Pilots would be recalled after all APA pilots.

1122 Recess
1142 Reconvened

MEC reviewed letter to APA to accept the proposal.

Rautenberg/Lewin moved that the letter to APA be issued as written.
Discussion

Case/Young moved to POSTPONE motion by Rautenberg/Lewin until 1230.
Discussion
VOTE:  **PASSED** voice vote.
Lewin requested recorded vote.
FOR:  Case, Hollander (*Proxy to Case*), Altman, Young
AGAINST:  Rautenberg, Lewin

MEC continued discussion on the APA proposal.

Tannen briefed the MEC with numbers of captain projections and potentials for TWA first officers to become captain.

1209 Case/Lewin moved to enter into Committee of Whole.
VOTE:  **PASSED** voice vote.
Rautenberg requested recorded vote.
FOR:  Case, Hollander (*Proxy to Case*), Lewin, Altman, Young
AGAINST:  Rautenberg

MEC continued discussion on APA's proposal.

Altman/Young moved to extend motion to POSTPONE until 1245.
VOTE: **FAILED** recorded vote.

**ALPA 006397**

Lewin requested recorded vote.
FOR: Young, Altman
AGAINST: Rautenberg, Lewin
ABSTAIN: Hollander (*Proxy to Case*), Case
Pastore voted against the motion to break to the tie vote.

Discussion continued.

Case for the record: "After much sole searching and deliberation, I speak against the motion for conditional acceptance of the seniority integration proposed by the APA representatives yesterday October 22, 2001.

Having been a principle in the effort to encourage the APA to return to the table, I find this offer an affront to those efforts. This offer cannot be considered fair and equitable by any reasonable standard. I represent a range of New York, First Officer constituents. This offer does not meet their needs or desires or the nearly 60% of pilots most directly affected by this offer. This offer places the whole of my constituents at risk of imminent furlough, and would devastate their careers. No reasonable standard would allow for 1241 TWA pilots, with years of service ranging from one year to twelve and a half years of service, to be placed below an American pilot who was hired on April 10, 2001. To rob those 1241 TWA pilots of their dedicated years of service and experience, and consider them newly hired at American Airlines as of April 10, 2001, is totally unacceptable.

Placing nearly 60% of the TWA pilots in immediate risk is deplorable. The only reasonable standard for furlough protection is a reasonable seniority number.

No reasonable standard of fair and equitable has been met with this offer.

After listening to American Airlines labor relations representative, Jeff Brundage, and quoting him: "American and the APA have a Tentative Agreement for an imposed seniority integration, which is essentially identical to the current offer on the floor," with two exceptions. I don't see the advantage of agreeing to this offer and thus denying the Association and TWA pilots due process.

I don't believe that American Airlines has exhausted their "reasonable best efforts" in this effort, and until that effort, and our grievance compelling that effort, has seen the light of day, we do not have the best deal available."

Young called the question that the letter to APA be issued as written.
VOTE: **FAILED** roll call vote.
Lewin requested roll call vote.
**FOR:** 803    **AGAINST:** 1128

| | | |
|---|---|---|
| FOR: | Hollander (*Proxy to Case*) Council#2- | 3 |
| | Case, Council #2- | 3 |
| | Rautenberg, Council #3- | 710 |
| | Young, Council #3- | 7 |
| | Lewin, Council #4- | 80 |
| AGAINST: | Hollander (*Proxy to Case*) Council#2- | 208 |
| | Case, Council #2- | 200 |
| | Rautenberg, Council #3- | 2 |
| | Young, Council #3- | 631 |
| | Lewin, Council #4- | 4 |
| | Altman, Council #4- | 83 |

---

*PAGE - 13*
*Never Approved by the TWA MEC*

**ALPA 006398**

Holtzman updated the MEC regarding conversation with Brundage regarding mitigation. Brundage suggested that ALPA condition its acceptance on APA's mitigation efforts. If APA does this there would be seniority integration as we now it, if don't do mitigation, there would be no deal. For first quarter, the next furloughs would be between 0-250. Brundage suggested that there be in three-way conference call this afternoon to get this done.

Pastore briefed the MEC regarding his conversation with Don Carty. Pastore asked for full furlough protection. Carty said he could not guarantee furlough protection. Covered the furloughs for this year. There would be up to 200 furloughs the fourth quarter. However AMR was only anticipating 133. For the first quarter of next year, furloughs could be 0-250. Although AMR could not guarantee that there would be no furloughs, Pastore recommended asking for AMR to at least guarantee the numbers.

MEC Discussion

Lewin/Young moved to go into Committee of the Whole.
VOTE: **PASSED** voice vote.

MEC in the Committee of the Whole

1355 MEC Caucus

1400 **Update from Trevor Blackaan of Senator Kit Bond's Office**
Updated the MEC about the legislation. Senator Bond was committed, but had some concerns that the Bill could be filibustered.

Questions and Answers

1430 Update concluded.

1431 **Discussion with Captain Duane Woerth** (via phone)
Woerth and the MEC discussed the recent proposal and other options available to the MEC if they decide not to accept the deal.

1435 Discussion concluded.

1453 Case/Altman moved to recess until Merger Counsel arrived.
VOTE: **PASSED** recorded vote.
Lewin requested recorded vote.
**FOR:** Case, Young, Altman, Hollander proxy to Case
**AGAINST:** Rautenberg, Lewin

1454 Recess
1514 Reconvened

Pastore updated Hollander via phone with the recent comments from Woerth.

1617 Staff was excused from the room.

MEC discussion with Roland Wilder and the Merger Committee.

---

1635 Staff returned.

Lewin/Rautenberg moved to accept APA proposal with conditions as recommended by the Merger Committee (Counter proposal to APA).

Discussion

1624 Caucus

1630 MEC back in regular session.

1631 VOTE to send Counter proposal: **PASSED** roll call vote.
Lewin requested roll call vote.

| **FOR:** 797 | **AGAINST:** 412 | **ABSTAIN:** 722 | |
|---|---|---|---|
| FOR: | Hollander (*Proxy to Case*) Council#2- | | 3 |
| | Case, Council #2- | | 3 |
| | Rautenberg, Council#3- | | 710 |
| | Lewin, Council #4- | | 81 |
| AGAINST: | Hollander (*Proxy to Case*) Council#2- | | 208 |
| | Case, Council #2- | | 200 |
| | Rautenberg, Council #3- | | 2 |
| | Lewin, Council #4- | | 2 |
| ABSTAIN: | Young, Council, Council #3 | | 638 |
| | Lewin, Council #4 | | 1 |
| | Altman, Council #4- | | 83 |

1635 Recess
1740 Reconvened

Pastore briefed the MEC regarding his phone conversation with Brundage.  Brundage stated TWA, LLC pilots would not get Greenbook pay prior to January 1, and no guarantees on furloughs.  Pastore said the Brundage did agree to provide in writing that furloughs would be no more than 200 in the 4th quarter of 2001 and and no more than 250 pilots in the first quarter of 2002.

## MEC Discussion with Captain Howard Attarian (*via phone*)

1758 Discussion concluded.

1759 Young called for the orders of the day.

Pastore asked for indulgence until Brundage responded to the Counter proposal.   MEC agreed.

## MEC Discussion with Captain Howard Attarian and Bob Christy.

Attarian stated that the counter proposal were not acceptable.  MEC questioned how they were getting this information.   Attarian stated that they just got off the phone with Brundage and he said the conditions were not acceptable.  Pastore said that was not his understanding with his phone conversation with Brundage.

1804 Discussion concluded.
1805 MEC Caucus

---

**ALPA 006400**

D-088
Page 15 of 16

**1812 MEC Discussion with Jeff Brundage.**
Brundage said that the counter proposal was not acceptable.

1818 Back in regular session

Holtzman outline terms of third proposal to send to APA.

1822 Rautenberg/Lewin moved to accept terms as described by David Holtzman.
VOTE: **FAILED** roll call vote.
Lewin requested roll call vote.

| | | |
|---|---|---|
| **FOR:** 807 | **AGAINST:** 1123   **ABSTAIN:** 1 | |
| FOR: | Hollander (Proxy to Case), Council #2 - | 3 |
| | Case, Council #2 - | 3 |
| | Rautenberg, Council #3 - | 710 |
| | Young, Council #3 - | 7 |
| | Lewin, Council #4 | 81 |
| | Altman, Council #4 | 3 |
| AGAINST: | Hollander (Proxy to Case), Council #2 - | 208 |
| | Case, Council #2 - | 200 |
| | Rautenberg, Council #3 - | 2 |
| | Young, Council #3 - | 631 |
| | Lewin, Council #4 | 2 |
| | Altman, Council #4 | 80 |
| ABSTAIN: | Lewin, Council #4 | 1 |

Case stated that the MEC had sent a conditional acceptance to the APA proposal.  The MEC is requesting a formal response.

Young asked if the MEC was requesting that Brundage state that he rejected the package?  Holtzman said Brundage made it clear that it was not acceptable.

1829 Young/Altman moved to adjourned meeting.
VOTE: **PASSED** voice vote.

1830 Meeting adjourned.

# Exhibit X



October 25, 2001

Fellow Council 3 Pilots:

Many of you have contacted me inquiring about the events of
the past few days of meeting with the APA and American in
Washington over the weekend.  Since the issues are
important to all Council 3 pilots, I will provide a brief
overview of what occurred and information regarding the
seniority integration provisions offered by APA and
American.

As you know, ALPA has been seeking a fair and equitable
seniority integration since the American buyout of TWA was
announced in January.  Those efforts reached a key
milestone on Tuesday, October 23rd.  After many hours of
negotiation over four days, the MEC ended negotiations by
rejecting a resolution to offer conditional acceptance of
the terms on the table.

Those terms included a number of elements that, in general
terms, were a seniority list, conditions, restrictions, a
protective cell in STL, and protective provisions offered
by American Airlines.  The seniority list proposed by the
APA was by any measure egregious.  The list was constructed
from essentially an 8 to 1 ratio starting at approximately
2600.  That formula placed more than 1200 TWA pilots on the
list after all AA pilots hired prior to April 10, 2001.
The proposal restricted TWA pilots from flying large wide
body aircraft until the last AA pilot hired prior to April
10, 2001 would be able to do so.

Conditions of the proposal created a protective cell for
TWA pilots to take advantage of TWA retirements for a
number of years.  The duration of the narrow body cell was
predicated on the Captain upgrade of the TWA pilot with
seniority number 1729.  That was estimated to happen in
2008.  The cell would allow all TWA pilots senior to 1729
to upgrade at a rate determined by the number of TWA
retirements and the STL staffing level.  The duration of
the small wide body cell was predicated on the small wide
body captain upgrade of the TWA pilot with seniority number
1351.  That was predicted to happen in 2014.

Essentially the cell would reserve STL narrow body flying
for TWA pilots until approximately 2008 and small wide body
flying until approximately 2014.  TWA pilots in STL would

ALPA 008055

October 25, 2001

Fellow Council 3 Pilots:

Many of you have contacted me inquiring about the events of
the past few days of meeting with the APA and American in
Washington over the weekend.  Since the issues are
important to all Council 3 pilots, I will provide a brief
overview of what occurred and information regarding the
seniority integration provisions offered by APA and
American.

As you know, ALPA has been seeking a fair and equitable
seniority integration since the American buyout of TWA was
announced in January.  Those efforts reached a key
milestone on Tuesday, October 23rd.  After many hours of
negotiation over four days, the MEC ended negotiations by
rejecting a resolution to offer conditional acceptance of
the terms on the table.

Those terms included a number of elements that, in general
terms, were a seniority list, conditions, restrictions, a
protective cell in STL, and protective provisions offered
by American Airlines.  The seniority list proposed by the
APA was by any measure egregious.  The list was constructed
from essentially an 8 to 1 ratio starting at approximately
2600.  That formula placed more than 1200 TWA pilots on the
list after all AA pilots hired prior to April 10, 2001.
The proposal restricted TWA pilots from flying large wide
body aircraft until the last AA pilot hired prior to April
10, 2001 would be able to do so.

Conditions of the proposal created a protective cell for
TWA pilots to take advantage of TWA retirements for a
number of years.  The duration of the narrow body cell was
predicated on the Captain upgrade of the TWA pilot with
seniority number 1729.  That was estimated to happen in
2008.  The cell would allow all TWA pilots senior to 1729
to upgrade at a rate determined by the number of TWA
retirements and the STL staffing level.  The duration of
the small wide body cell was predicated on the small wide
body captain upgrade of the TWA pilot with seniority number
1351.  That was predicted to happen in 2014.

Essentially the cell would reserve STL narrow body flying
for TWA pilots until approximately 2008 and small wide body
flying until approximately 2014.  TWA pilots in STL would

ALPA 008055

advance in relative seniority by the TWA retirements until
those dates.  All TWA pilots senior to 1351 would have an
opportunity to reach the small wide body, and all TWA
pilots senior to 1729 would have an opportunity to reach
captain based upon their relative TWA seniority.  Other
pilots would also advance in relative seniority until those
dates.

The proposal also included minimum guaranteed system wide
captain jobs for TWA pilots depending on the number of
aircraft operated.  Those guarantees topped out at 800
narrow body captains plus 260 small wide body captains.

American Airlines offered to provide a floor to the STL
domicile.  That floor was to be set at a level no less than
25% below the current staffing of STL as compared to ORD
and DFW combined.  The floor would have provided substance
to backstop the protective cell from the arbitrary
decisions of management relative to staffing in STL.

AA also offered furlough protection to the pilots placed on
the list above the staple point.  And AA and APA offered to
set the recall position of furloughed TWA-LLC pilots at the
staple point rather than at the bottom of the list at the
time of recall.

In short form, the terms before the MEC were an egregious
seniority list mitigated by a protective cell supported by
an American staffing guarantee.

In the following paragraphs I'll address the three
questions I contemplated in considering the terms before
the MEC.  (1)  Is there anything left on the table to be
negotiated?  (2) Are the terms better than we would do in
an AA-APA cram down?  (3) Is there any  recourse available
to avoid a cram down?

   1. Is there anything left on the table to be negotiated?
      The Merger Committee, Merger Chairman, and negotiating
      consultant, Jim Baehler, agreed that the APA had in
      front of the MEC, everything that was available.
      Amongst those engaged in the process there was
      virtually no dissent.  The APA's position on the
      seniority list had been unwavering or moving backward.
      The congressional lobbying effort had created a level
      of uncertainty that should have caused the APA to
      move, if there was any room for movement left in their

ALPA 008056

position.  The severity of the situation in the
industry makes furloughs an expectation rather than a
possibility.  APA movement to a position that would
expose more American pilots and fewer TWA pilots to
furlough is highly improbable.  The APA had stated
publicly and in negotiations that they were done
negotiating.  American had stated that they had a
tentative agreement with the APA on a seniority
implementation.  All of these factors led me to the
conclusion that vis-à-vis the APA, there was nothing
more on the table.  However, it is possible that
American could have had some small incremental
participation available that would mitigate some of
the effects of the egregious integration.

2. Are the terms better than we would do in a cram-down?
American had unequivocally stated that in the absence
of settlement, there would be (1) no guarantees as to
the STL staffing level, (2) no furlough protection for
any TWA pilot and (3) placement of TWA-LLC furloughees
upon recall would be subject to agreement between APA
and AA.  Both parties had indicated that such
placement would be after all American pilots, not at
the staple point.  Further, although we have reason to
believe that the seniority list imposed would be
identical to that included in the terms, there is no
guarantee or assurance that the protective provisions
of the STL cell or system wide Captain guarantees
would be included.  American was also willing to set
limits on furloughs during the 4th quarter and 1st
quarter.  It was absolutely clear to me that the terms
under consideration were significantly superior to
that which we could expect in a cram down.

3. Is there any  recourse available to avoid a cram-down?
I'll reserve detailed comment on this question for
later.  However, I will share at this time, that my
decision on this issue was based in part upon
consultation with and the advice of our merger
counsel; consultation with our own labor counsel; a
meeting with Paul Hallisay, ALPA's Director of
Government Affairs; telephone contacts with ALPA
President Duane Woerth and other ALPA officials; and
last but not least, a teleconference with Trevor
Blackann, a Director of Legislative Affairs in Senator
Bond's office.

The MEC had been in continuous session in Washington since
Sunday. I, along with two other members of the MEC declined

ALPA 008057

to attend Saturday's meeting when we learned that the first order of business was going to be making last minute changes in key personnel, including MEC Officers and the Merger Committee.  Once personnel changes were off the table, the MEC was able to concentrate on the very important business of seniority integration and representation.  After all day meetings on Sunday and Monday, the time for a decision arrived late Monday afternoon.

After a night of agonizing over the best course of action for the TWA pilots, on Tuesday morning I brought forward a motion reflecting the advice of counsel (Merger Counsel and our Contract Administrator) to accept the APA's terms with conditions that we had reason to believe would be acceptable to American.  Captain Pablo Lewin, Council 4 Captain Representative joined me in support of that motion. F/O Altman, Captain Young and F/O Case voted against.  F/O Case held Captain Hollander's proxy who was not present Monday night or Tuesday for reasons unknown to me.  F/O Case voted Captain Hollander's proxy against.  The motion failed.

Later in the afternoon, after an extremely traumatic process of assimilating additional information, the four members of the MEC that had rejected the prior motion, in caucus amongst themselves, decided that two of them, Captain Young and F/O Altman, were prepared to abstain from a vote on submitting acceptance of another conditional acceptance.  The conditions that they required be placed in the acceptance were conditions that American had already stated in unequivocal terms were unacceptable.

I should also point out that the seniority integration terms were identical to the terms that the MEC had rejected earlier.  One significant difference was a condition that American agree to not furlough anyone in the 4th quarter of 2001 and the 1st quarter of 2002.  Those conditions had already been discussed with American and had been summarily rejected as absolutely impossible.

Although it was my belief that the conditions would lead to a breakdown in negotiations, in order to preserve some slight chance that we might be able to reap the benefits that American "was" willing to put on the table, Captain Lewin and I agreed to take responsibility for passing the motion while two voted against and two abstained.  Although

ALPA 008058

the Master Chairman could have broken the resulting 2-2-2 tie (and he was prepared to do so), it was his desire that the MEC make the decision. So, with F/O Case (who had voted his vote and Hollander's proxy against the motion) encouraging him to do so, Captain Lewin invoked the roll call and since Captain Young and F/O Altman abstained all of their roll call votes, Captain Lewin and I had sufficient votes to actually offer something that at least had some potential to keep the negotiations ongoing.

I should point out that we were already well past the deadline that the parties had set for the negotiations, and that it had taken a significant degree of cajoling of Jeff Brundage of American to keep discussions alive.

After Jeff Brundage received our "conditions", which were the ones that he had already made clear were totally out of the question, we responded in two ways. One was a call between the Master Chairman and Brundage, in which he again rejected our conditions, and the second was a teleconference between those of us in the room, Brundage, Howard Attarian, Duane Woerth's Executive Assistant, and Bob Christy of ALPA Int'l. The only members of the MEC present in the room during that teleconference were Captain Lewin and myself, as the other four members of the MEC, which I will refer to as the DC caucus, had left to hold yet another caucus amongst themselves alone.

During that call, Attarian of ALPA Int'l made it absolutely clear that Brundage was at wit's end and that only minutes remained for acceptance of the offers that APA and American had made. Brundage personally made it clear that American was done negotiating, and that what American was willing to do to facilitate agreement between the APA and ALPA had already been made clear. In a final last effort to collect off the table those provisions that American was willing to provide to help alleviate the egregious nature of the seniority integration terms of the APA, Captain Lewin and I again brought forward a motion to communicate acceptance of the agreement conditioned on those additional provisions. In their own private meeting the DC caucus had apparently decided to reject anything further and that is what they did. Our motion failed again.

At that point the meeting was adjourned. The high fives and the celebration amongst the DC caucus began, and others who were not interested in celebrating including Captain

**ALPA 008059**

Lewin, myself, our two legal counselors, the MEC officers, a couple of members of the Merger Committee and a few others packed our stuff and departed the room.

That's the report on the final hours of the weekend.  I'll provide more information on the entirety of the process as events and time allows over the next couple of weeks.

Steven Rautenberg
Council 3 Chairman

ALPA 008060

# Exhibit Y



RECEIVED

MAR 2 1 2001

BY:



**EXHIBIT**

**D365**

## TWA COUNCIL 4 MEETING NOTICE

| | |
|---|---|
| **DATE:** | Friday, March 30, 2001 |
| **TIME:** | Noon |
| **PLACE:** | Furama Hotel |
| | 8601 Lincoln Boulevard |
| | Los Angeles, CA |
| | (310) 670-8111 |

**AGENDA:**
1. Local Council Business
2. Negotiating Committee Update
3. TWA/American Airlines Merger Update
4. Other Topics of Interest

**GUESTS:**
Bob Pastore, MEC Chairman
Scott Schwartz, MEC Vice Chairman

*Beverages will be served.*

Pablo Lewin, Chairman
TWA Council 4

ALPA 020998

# Council Minutes



**AIRLINE: TWA**      **Council: 004**      **CITY: Los Angeles, CA**      **DATE: March 30, 2001**

A regular meeting of TWA Council 4 was held at the Furama Hotel, in Los Angeles, CA, on March 30, 2001.

    **I.**      Meeting called to order at 1200 by Pablo Lewin, chairman, seconded by J. Buss.

    **II.**     Record of attendance:

| | | |
|---|---|---|
| LAX F/O Arthur W. De Wit | LAX Cap Court Mumford | LAX Cap Larry Balliet |
| LAX F/O James Buss | LAX F/O Keith Bounds | LAX Cap Bill Skinner |
| LAX Cap Tom Solomon | STL Cap Emmett Conrecode | LAX Cap Pat Brady |
| LAX Cap Jerry Reynolds | LAX Cap Marv Smith (ret.) | LAX Cap Gene Mihalka |
| LAX Cap Scott Willson | LAX Cap Ed Duenes | JFK Cap Gary Benson |
| LAX F/O Felton Walker | LAX Cap Brent Miller | LAX Cap Jim Sherk |
| LAX Cap Dick Hoyt | LAX Cap Larry Koch | SFO F/O Owen Smith |
| LAX F/O Alan Altman | LAX Captain Bob Pastore | SAN Cap Pablo Lewin |
| SAN Cap Jim Vanek | LAX Cap Tom Wiese (ret) | |

    **III.**    Motion to approve minutes from previous Council 4 LEC meeting, made by D. Hoyt, seconded by R. Pastore. Motion approved.

    **IV.**    **OFFICERS' REPORTS**

        **A.**  Captain Pablo Lewin provided background and introduced First Officer Rep Alan Altman. He then took many questions from and provided answers to the members present.

        **B.**  Captain Glenn Stieneke—not present due to recent death of mother.

        **C.**  Captain Scott Schwartz—not present due to personal business.

        **D.**  Representative Alan Altman, who acts as vice chairman of Council 4 as well as vice chairman of Negotiating Committee, gave extensive background and update on the current status of negotiations with the Company regarding the CBA. He also spoke on the significance of the upcoming Section 1113 motion to be heard a week from today in the Bankruptcy Court. He then took many questions from and provided answers to the members present.

        E. MEC Chairman and TWA ALPA Board of Directors Representative Bob Pastore provided his perspective and insight into the current negotiations under way with both TWA and AMR and APA. He then took many questions from and provided answers to the members present.

ALPA 020999

Pursuant to the aforementioned presentations, a motion was offered by K. Bounds directing members of the LEC to ensure our continued representation by ALPA after the closing date of the TWA/AMR deal. Furthermore, the LEC was directed to secure the TWA/ALPA CBA throughout the life of TWA Airlines, LLC. Seconded by J. Buss. Discussion held. Motion approved.

WHEREAS the TWA pilots currently employed by TWA, Inc. and represented by the Air Line Pilots Association may be subject to employment by an AMR subsidiary, TWA LLC concurrent with the closing of the TWA/AMR Asset Sale,

THEREFORE BE IT RESOLVED that the Council 4 pilots instruct the Council 4 LEC officers to vigorously pursue the representation of the TWA LLC pilots by the Air Line Pilots Association.

BE IT FURTHER RESOLVED that the Council 4 pilots instruct the Council 4 LEC officers to vigorously pursue the protections that at all times the current and future TWA LLC pilots and the retired pilots of TWA, Inc. shall be covered by a collective bargaining agreement.

Bounds/Buss. Passed unanimously.

---------------------------------------------------------------

Motion by Bob Pastore regarding ALPA's representation of retired pilots' interests. Seconded by P. Brady. Discussion occurred. Motion approved.

WHEREAS most ALPA pilots will retire from their respective airline, and

WHEREAS most Collective Bargaining Agreements contain language that affect pilot retiree benefits, and

WHEREAS the president of the Association has recently advised retired TWA pilots that ALPA does not represent them,

THEREFORE BE IT RESOLVED that the Council 4 pilots direct the Council 4 officers to introduce a resolution to the MEC that would require the ALPA Executive Board to address pilot retiree issues.

Pastore/Brady. Passed unanimously.

P. Lewin, Alan Altman, and Bob Pastore discussed the issue of seniority integration. However, they were unable to discuss the specific details of the plan so as not to jeopardize ALPA's negotiating position. Extensive discussions were held. The officers took many questions from and provided answers to the members present.

**ALPA 021000**

VII.      OLD BUSINESS

P. Lewin exhorted all members present to make sure their standing bids were in good order due to the upcoming displacement messages; then he informed the members that one of the first actions they should take when having an incident or accident is to make sure that an ALPA rep and CASC Chairman Captain Vince Cocca are informed immediately.

VIII.   NEW BUSINESS

P. Brady offered a motion to adopt a policy calling for two Council 4 meetings to cover both SF and LA. The motion was seconded by S. Willson. Discussion held. P. Lewin spoke in opposition to the motion. The motion was withdrawn by P. Brady and S. Willson. P. Lewin agreed to forward, in writing, to P. Brady, the reasons as to why bi-domicile meetings would cause an undue burden on the LEC.

IX.     ADJOURNMENT

At 1543, B. Pastore made a motion to adjourn the meeting. Seconded by P. Brady. Motion approved.

Respectfully submitted,
/s/
Pablo Lewin, Chairman
TWA Council 4

ALPA 021001

TWA COUNCIL 4
MEETING NOTICE

**DATE:**   Wednesday, July 18,200 I
TIME:      Noon–4:00 p.m.
PLACE:     Furama Hotel
           8601 Lincoln Boulevard
           Los Angeles, CA
           (310) 670-8111

AGENDA: 1. TWA and American
           Seniority Integration
           Issues
        2. Negotiating Committee
           Report
        3. Local Council 4 Issues
        4. Consideration of Recall of
           Council LEC 4 Chairman
           Captain Pablo Lewin

*Refreshments and snacks will be served.*

Pablo Lewin, Chairman
TWA Council 4

ALPA 021002

# Exhibit Z

D-4111

**TABLE OF CONTENTS**

**PART 1 - JUMPSEAT POLICY**................................................................................115-2

   A.  MEC Jumpseat Coordinator/Committee Chairperson..........................................115-2
   B.  Duties and Responsibilities of Jumpseat Coordinators/Committee Chairpersons.............115-2
   C.  Admission to Flight Deck...............................................................115-3
   D.  Cabin Seating ............................................................................115-3
   E.  Security/Identification ...............................................................115-3
   F.  Jumpseat Fraud and Abuse..............................................................115-4
   G.  Boarding Priority.......................................................................115-4
   H.  Other Jumpseat Requests................................................................115-4
   I.  National Jumpseat Registry.............................................................115-4

**INDEX**..............................................................................................115-5

**ALPA 034147**

## SECTION 115 - JUMPSEAT POLICY

### PART 1 - JUMPSEAT POLICY

SOURCE - Executive Board October 1997; AMENDED - Board 2000

The following policy provides guidelines that may be used by Master Executive Councils in establishing jumpseat policies and procedures with their respective airlines.

ALPA encourages participation by other pilot unions and officials of non-represented airlines in the industry-wide Jumpseat Task Force.

ALPA encourages all pilots to extend the use of their jumpseats to eligible cockpit crewmembers as a professional courtesy and as a resource to enhance the safety of flight. The Captain is, and shall always be, the final authority as to admission to the flight deck.

Denial of jumpseat privileges as a means of punishing, coercing or retaliating against other pilot groups or individuals is not supported by ALPA. The Jumpseat and/or Professional Standards Representative appointed by the respective Master Executive Council or governing body should resolve disputes that arise between pilots, airlines or other unions.

Master Executive Councils should appoint a Jumpseat Coordinator/Committee Chairperson and authorize him/her to work with their Company in establishing and administering jumpseat policy and procedures.

**A.  MEC JUMPSEAT COORDINATOR/COMMITTEE CHAIRPERSON**

    1.  Guidelines for selection of Jumpseat Coordinator/Committee Chairperson

        a.  Experience - must be knowledgeable of the applicable Federal Aviation Regulations, associated legal interpretations and specific company policies that affect jumpseat usage at their respective airline.

        b.  Appointment/Term of Office - per MEC policy.

    2.  Funding for MEC Jumpseat Coordinators/Committee Chairpersons

        a.  Necessary funding for the MEC Jumpseat Coordinator/Committee Chairperson should be arranged by the respective MEC. Funding considerations should include flight pay loss, as well as other related expenses, to adequately represent pilot issues.

**B.  DUTIES AND RESPONSIBILITIES OF JUMPSEAT COORDINATORS/COMMITTEE CHAIRPERSONS**

    1.  Establish appropriate communication with the MEC to insure proper administration and compliance with the respective airline's jumpseat program.

        a.  The Jumpseat Coordinator/Committee Chairperson should report directly to the MEC Chairperson or designated appointee. The Coordinator or Chairperson should be authorized to represent the MEC in dealings with Company Officers on jumpseat matters. Issues of a critical nature should immediately be addressed to the MEC Chairperson.

ALPA 034148

2.  Maintain an accurate file of company and industry-wide jumpseat policy and procedures.

    a.  When changes occur, the MEC Jumpseat Coordinator or Committee Chairperson should communicate them to the ALPA National Jumpseat Committee Chairperson for appropriate dissemination.  ALPA resources will be used to keep all members of the Jumpseat Task Force informed on specific airline policies and procedures.

    b.  Communicate company and industry-wide changes of jumpseat procedures and protocol to the pilot group and other affected company employees.  Appropriate union and/or company media sources should be incorporated to accomplish this.

3.  Address and resolve issues that may arise over jumpseat authority and usage in a timely manner.  Reciprocal airline and other off-line matters should be discussed with the associated Jumpseat Coordinator.  Discussions beyond ALPA represented carriers should include the ALPA National Jumpseat Chairperson.

4.  Submit a Jumpseat Coordinator/Committee report at all regularly scheduled meetings of the MEC, or as otherwise directed.

## C.  ADMISSION TO FLIGHT DECK

1.  Captains should be familiar with applicable Federal Air Regulations and their own Company policies concerning jumpseat use.

2.  ALPA supports the Captain's authority to manage the flight deck environment and resources in a manner that enhances safety.  Accordingly, ALPA supports the Captain's authority to exclude any person other than required crew from the flight deck if, in his opinion, that person's presence will compromise safety.

3.  If a jumpseat rider is to remain on the flight deck, the Captain will ensure that he/she is properly briefed on safety, communication and evacuation procedures.  This may be done verbally or by means of a printed aircraft specific briefing card.

4.  ALPA and most airlines consider a pilot jumpseat rider as an additional crewmember.  Pilot jumpseat riders must be prepared to exercise flight related tasks that the Captain may assign.

## D.  CABIN SEATING

1.  In accordance with company policy, if a cabin seat(s) is available, the Captain may offer it to a jumpseat rider(s) to accommodate additional jumpseat requests.  Appropriate procedures for such accommodations should be adopted and developed as Company policy.

2.  As representatives of their airline and profession, jumpseat riders must conduct themselves in a manner that is above reproach at all times.

3.  Although seated in the cabin, jumpseat riders may be asked to assist the cockpit or cabin crew in certain situations.

## E.  SECURITY/IDENTIFICATION

1.  Without exception, security is paramount in all aspects of aviation safety.  The Captain is responsible for ensuring that all jumpseat riders admitted to the flight deck have in their possession the proper documentation.  For pilots, this shall include airmen's certification and valid company ID.  Jumpseat riders should have this identification readily available for inspection.

2.  Host Captains should recognize that a union membership card is another means of identity verification, although not all pilots of represented airlines are union members.

3.  Under the Captain's authority, entry to the flight deck will not be permitted for individuals with whom the Captain or his flight deck crew is not entirely comfortable.

ALPA 034149

*ADMINISTRATIVE MANUAL*                                                        *5/31/01*

**F.   JUMPSEAT FRAUD AND ABUSE**

1.   A fraudulent jumpseat rider is an individual attempting to gain access to a flight deck by knowingly being deceptive.   Counterfeit IDs, failure of medical certificate standards or dismissal by the presented employer constitute fraudulent representation.

2.   An abuse of the jumpseat privilege includes, but is not limited to, individuals revenue positioning at company request for reasons other than commuting to or from work or on personal business.

**G.   BOARDING PRIORITY**

1.   It is understood that certain individuals, such as government or company officials in the performance of their duties, must be given free and unlimited access to the cockpit by FAR. Seniority, first-come, first-served or a reservation system may be used for company and off-line pilots.

2.   Extending preferential boarding to specific carriers shall be reviewed and amended when determined appropriate by the Coordinator/Chairperson, the MEC and the Company.

3.   Within boarding priority, most airlines accommodate off-line jumpseat riders on a first-come, first-served basis.   Due consideration should be given to union affiliation.   Any problems that arise should be quickly referred to the Captain for resolution.

4.   Company boarding priority for other individuals shall be mutually developed by the Jumpseat Coordinator/Committee Chairperson, the airline management and the MEC.

**H.   OTHER JUMPSEAT REQUESTS**

1.   The FAA has an established procedure whereby air traffic controllers are allowed access to the cockpit for familiarization flights.   ALPA supports these familiarization flights and encourages pilots to welcome controllers into their cockpits for this purpose.   ATC personnel must have in their possession FAA Form 3120-28 Parts A&B, FAA Form 3120-31 and their FAA identification card/badge.

2.   Foreign air carrier pilots, FAA licensed dispatchers and other individuals may be accommodated with authorization by the FAA and company flight management authorities.

**I.   NATIONAL JUMPSEAT REGISTRY**
SOURCE - Board 2000; AMENDED - Executive Board May 2001

The ALPA Jumpseat Committee shall produce and maintain a National Jumpseat Registry. The airlines listed will abide by ALPA Jumpseat Policy and shall have appointed Jumpseat Coordinators to work with the ALPA sponsored Industry Jumpseat Task Force.   The Registry will be disseminated within ALPA to Master Executive Councils and their appointed Jumpseat Coordinators to use as they see fit.

ALPA 034150

## INDEX

Admission to Flight Deck ..................................................................................................115-3
Boarding Priority ..............................................................................................................115-4
Cabin Seating ...................................................................................................................115-3
Duties and Responsibilities of Jumpseat Coordinators/Committee Chairpersons.......115-2
Jumpseat Fraud and Abuse..............................................................................................115-4
Jumpseat Requests, Other ...............................................................................................115-4
MEC Jumpseat Coordinator/Committee Chairperson ...................................................115-2
National Jumpseat Registry..............................................................................................115-4
Security/Identification ......................................................................................................115-3

ALPA 034151

AA

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| LEROY "BUD" BENSEL, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2917 (JEI) |
| | ) | |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, | ) | |
| | ) | |
| Defendant. | ) | |

**JOINT PROPOSED FINAL JURY INSTRUCTIONS**

## TABLE OF CONTENTS

Proposed Charge No. 1:  Introduction to the Final Charge - Province of the Court and of the Jury ..........................................................................................................................1

Proposed Charge No. 2:  Judging the Evidence ...................................................................4

Proposed Charge No. 3: Burden of Proof............................................................................5

Proposed Charge No. 4: Evidence Received in the Case ....................................................6

Proposed Charge No. 5: Questions are Not Evidence .........................................................8

Proposed Charge No. 6: Inferences From the Evidence......................................................9

Proposed Charge No. 7: Direct and Circumstantial Evidence..........................................10

Proposed Charge No. 8:  Jury's Recollection Controls......................................................11

Proposed Charge No. 9:  Juror Notes ................................................................................12

Proposed Charge No. 10:  Credibility ...............................................................................13

Proposed Charge No. 11: Number of Witnesses ...............................................................15

Proposed Charge No. 12:  Prior Inconsistent Statements .................................................16

Proposed Charge No. 13: Nature of the Claim  (alternative charges proposed) ..............17

    [Plaintiffs' Proposed Charge] .......................................................................................17

    [Defendant's Proposed Charge]....................................................................................19

Proposed Charges No. 14: Charges on DFR Claims  (alternative charges proposed)...................21

    Plaintiffs' Proposed DFR Charges ...............................................................................21

[Plaintiffs' Proposed Charge No. 14(a)- The Duty of Fair Representation – Generally]..........21

[Plaintiffs' Proposed Charge No. 14(b) - Breach of the Duty of Fair Representation – Arbitrary Conduct] .......................................................................................................................23

    [Plaintiffs' Proposed Charge No. 14(c) - Breach of Duty of Fair Representation - Bad Faith] 25

Defendant's Proposed DFR Charges .................................................................................26

[Defendant's Proposed Charge No. 14(a) - Elements of Plaintiff's Claim]............................26

[Defendant's Proposed Charge No. 14(b): Duty of Fair Representation] ...............................27

[Defendant's Proposed Charge No. 14(c): Bad Faith] ...........................................................29

[Defendant's Proposed Charge No. 14(d): Overall Agreement] ...............................................34

[Defendant's Proposed Charge No. 14(e): Causation/Proof of Injury]....................................35

Defendant's Proposed Charge No. 15: Fraud Not Presumed .........................................................37

Defendant's Proposed Charge No. 16: No Burden of Proof on ALPA .........................................38

Defendant's Proposed Charge No. 17:  Assertion of Legal Claims and Litigation.......................39

Defendant's Alternative Proposed Charge No. 17 ........................................................................40

Defendant's Proposed Charge No. 18: Damages -- Effect of Instructions....................................43

Plaintiffs' Proposed Charge No. 19: Read-Backs of Trial Testimony ..........................................44

Proposed Charge No. 20: Deliberations .......................................................................................45

Proposed Charge No. 21: Duty To Deliberate...............................................................................48

Proposed Charge No. 22: Conclusion............................................................................................49

The parties hereby jointly submit the following proposed Jury Instructions for use at the conclusion of evidence in this case.  Despite a meet and confer and the exercise of good faith efforts, counsel were not able to agree to charges with respect to the description of this case and the substantive charges on the duty of fair representation.  Accordingly, the parties have incorporated alternative requests for charges as indicated herein.  Each party respectfully reserves their right to propose additional charges or to modify the submitted charges to conform with the evidence and the Court's rulings on legal issues.

**LADIES AND GENTLEMEN OF THE JURY:**

**Proposed Charge No. 1:  Introduction to the Final Charge - Province of the Court and of the Jury**[1]

Now that you have heard all of the evidence to be received in this trial and the arguments of counsel it becomes my duty and privilege to give you the final instructions of the Court as to the law that will guide you in your decisions.

The Plaintiffs in this matter are several individuals, Howard Hollander, Sally Young, Patrick Brady, Ted Case and Michael Finucan.  They are former pilots for TWA and TWA, LLC. In this action, these individuals are pursuing this litigation not only on their own behalf, but they also represent a class of plaintiffs consisting of some of the approximately 2,300 individuals who were pilots of TWA as of April of 2002.

As you have heard, the defendant, the Air Line Pilots Association, International, which has been referred to as ALPA, is a union and represented the pilots of TWA up until April of 2002.

During the course of these instructions I will refer to the Plaintiffs as Plaintiffs or the Class and I will refer to the Defendant as ALPA.

All of the instructions of law given to you by the Court -- those given to you at the beginning of the trial, those given to you during the trial, and these final instructions -- must guide and govern your deliberations.  It is your duty as jurors to follow the law as stated in all of the instructions of the Court and to apply these rules of law to the facts as you find them from the evidence received during the trial.

---

[1] Proposed Jury Charges 1 to 10, 12, 25 and 26 are from the Court's Standard Jury Charges filed on CM/ECF on March 1, 2011 [Doc. #360-2].  Citations are provided with respect to all other charges.

You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole. You should construe each of the instructions in light of and in harmony with the other instructions, and you should apply the instructions as a whole to the evidence. The order in which the instructions are given has no significance and is no indication of their relative importance.

Counsel have quite properly referred to some of the applicable rules of law in their closing arguments to you. If any difference appears to you between the law as stated by counsel and that as stated by the Court in these instructions, you are to be governed by the instructions given to you by the Court.

You must not be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base any part of your verdict upon any view of the law other than that given in these instructions. It also would be a violation of your sworn duty, as the judges of the facts, to base your verdict upon anything but the evidence received in the case.

You were chosen as jurors for this trial in order to evaluate the evidence received and to decide the factual questions presented by the respective positions of Plaintiffs and ALPA. In deciding the issues presented to you for decision in this trial, you must not be swayed by bias, prejudice, or sympathy for or against any of the parties, nor influenced by public opinion.

Justice through trial by jury depends upon the willingness of each individual juror to evaluate the same evidence presented to all the jurors here in the courtroom and to arrive at a verdict by applying the same rules of law that I am giving you now in these instructions.

At times during the trial you saw lawyers make objections to questions asked by other lawyers, and to answers by witnesses. This simply meant that the lawyers were asking me to

make a decision on a rule of law. Do not draw any conclusion from such objections or from my rulings on them. These related only to the legal questions that I had to determine and should not influence your thinking. When I sustained an objection to a question, the witness was not allowed to answer it. Do not attempt to guess what answer might have been given had I allowed the question to be answered. Similarly, when I told you not to consider a particular statement, you were told to put that statement out of your mind, and you may not refer to that statement in your deliberations.

During the course of the trial we have from time to time held conferences with the attorneys at sidebar out of the hearing, hopefully, of the jury. These conferences were held to resolve legal issues which arose during the trial. Please do not speculate about what was said or decided at these sidebar conferences. Do not consider them in any way in reaching your verdict.

At times during trial, I asked questions of witnesses. These questions should not be taken as an indication that I have any opinion about the facts in the case. Indeed, if I have said or done anything during the trial, or in instructing you now, that leads you to believe that I am inclined to favor the case of the Plaintiffs or the Defendant, you must remove that impression from your minds and not permit yourselves to be influenced by it because none was intended to be created.

**<u>Proposed Charge No. 2:  Judging the Evidence</u>**

There is nothing particularly different in the way that a juror should consider the evidence in a trial from that in which any reasonable and careful person would treat any very important question that must be resolved by examining facts, opinions, and evidence.  You are expected to use your good sense in considering and evaluating the evidence in the case for only those purposes for which it has been received, and to give such evidence a reasonable and fair construction in the light of your common knowledge of human nature.

Keep in mind that it would be a violation of your sworn duty to base a verdict upon anything other than the evidence received in the case and the instructions of the Court.

**Proposed Charge No. 3: Burden of Proof**

The party with the burden of proof on any given issue has the burden of proving every disputed element of his or her claim to you by a preponderance of the evidence.  If you conclude that the party bearing the burden of proof has failed to establish any required element of that claim by a preponderance of the evidence, you must decide against that party on the issue you are considering.

What does "preponderance of evidence" mean?  To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the testimonial and documentary evidence, not to the number of exhibits or witnesses.

If you find that the credible evidence on a given issue is evenly divided between the parties, such that it is equally probable that one side is right as it is that the other side is right, then you must decide that issue against the party having the burden of proof.  That is because the party bearing this burden must prove more than simple equality of evidence; Plaintiffs must prove the issue by a preponderance of the evidence.  On the other hand, the party with the burden of proof need prove no more than a preponderance.  So long as you find that the scale tips, however slightly, in favor of the party with the burden of proof -- that what the party claims is more likely true than not true -- then that element will have been proved by a preponderance of the evidence.

**Proposed Charge No. 4: Evidence Received in the Case**

      The evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them, all exhibits received in evidence, regardless of who may have produced them, and all facts which may have been agreed to or stipulated.

      The parties have agreed that a number of facts that have been presented to you as stipulated facts are true.  Those stipulations have been read to you during this trial.  You must therefore treat the stipulated facts as having been proved for the purposes of this case.[2]

      You have also heard testimony in the form of depositions and interrogatories, which have been received into evidence.  A deposition is simply a procedure in which the attorneys for one side question a witness or an adversary party under oath before a court stenographer prior to trial.  An interrogatory is a written question to which a party or witness provides a written answer.  A video deposition is a procedure where attorneys question a witness under oath before a court stenographer prior to trial while the whole proceeding is simultaneously taped by a specially trained video operator.  Deposition and interrogatory testimony is entitled to the same weight as live testimony and should be evaluated by you in the same manner as you would evaluate any other testimony.

      During the trial several items were received into evidence as exhibits.  These exhibits will be sent into the jury room with you when you begin to deliberate.  Examine the exhibits if you think doing so will help your deliberations.  Any proposed testimony or proposed exhibit to which an objection was sustained by the Court and any testimony or exhibit ordered stricken by the Court must be entirely disregarded.

---

[2] Third Circuit Model Jury Charges, 2.4.

Likewise, anything you may have seen or heard outside the courtroom is not proper evidence and must be entirely disregarded.

**Proposed Charge No. 5: Questions are Not Evidence**

      Questions, objections, statements, and arguments of counsel are not evidence in the case. If a lawyer asks a question on cross examination which incorporates a statement which assumed certain facts to be true, the question is not evidence of those facts if the witness denies the truth of the statement in his or her answer. You may consider the facts incorporated into a question only if the answer of the witness recognizes their truth. In short, questions are not evidence, answers are.

**<u>Proposed Charge No. 6: Inferences From the Evidence</u>**

You are to base your verdict only on the evidence received in the case.  In your consideration of the evidence received, however, you are not limited to the bald statements of the witnesses or to the bald assertions in the exhibits.  In other words, you are not limited solely to what you see and hear as the witnesses testify or as the exhibits are admitted.  If you find a fact has been proven, you are permitted to draw from that fact such reasonable inferences as you feel are justified in the light of your experience and common sense.  Inferences are simply deductions or conclusions which reason and common sense lead the jury to draw from the facts proven in the case.

**<u>Proposed Charge No. 7: Direct and Circumstantial Evidence</u>**

There are two types of evidence which are generally presented during a trial -- direct evidence and circumstantial evidence.  Direct evidence is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness.  Circumstantial evidence is proof of a chain of facts and circumstances indicating the existence or non-existence of a fact. The law generally makes absolutely no distinction between the weight or value to be given to either direct or circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.  You should weigh all the evidence in the case.  After weighing all the evidence, you must decide if Plaintiffs have satisfied their burden of proving each element of the case by a preponderance of the evidence.

**Proposed Charge No. 8:  Jury's Recollection Controls**

If any reference by the Court or by counsel to matters of testimony or exhibits does not coincide with your own recollection of that evidence, it is your recollection which should control during your deliberations and not the statements of the Court or of counsel.  You are the sole judges of the evidence received in this case.

**Proposed Charge No. 9:  Juror Notes**

Any notes that you have taken during this trial are only aids to your memory.  If your memory differs from your notes, you should rely on your memory and not on the notes.  The notes are not evidence.  If you have not taken notes, you should rely on your independent recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

## Proposed Charge No. 10:  Credibility

There are times when you are asked to draw different inferences from the same facts.  It is for you, and you alone, to decide what reasonable inferences you choose to draw from the evidence in this case.

Now, I have said that you must consider all of the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.  You are the sole judges of the credibility or "believability" of each witness and the weight to be given to his or her testimony.

You are called upon to resolve various issues of fact concerning the respective allegations of the parties.  How do you determine where the truth lies?  Your determination of the credibility or believability of a witness depends largely upon the impression the witness made upon you as to whether or not he or she was giving an accurate and truthful version of what occurred.  In weighing the testimony of a witness you should consider his or her interest, if any, in the outcome of the case, his or her manner of testifying, and the extent to which he or she has been supported or contradicted by other credible evidence.  You may accept or reject the testimony of any witness in whole or in part.

You must use your common sense, your good judgment, and your experience.  In other words, what you must try to do is to size a person up, just as you would in any important matter where you are undertaking to determine whether or not a person is truthful, candid, and straightforward.

In passing upon the credibility of a witness, you may also take into account inconsistencies or contradictions as to material matters in his or her own testimony, the length of time which has passed since the events testified about, and any conflict between his or her

13

testimony and the testimony of another witness.  A witness may be inaccurate, contradictory, or even confused in some minor respects, and yet be entirely credible in the essentials of his or her testimony.

The ultimate question for you to decide in passing upon credibility is -- did the witness tell the truth?  It is for you to say whether his or her testimony at this trial is truthful in whole or in part in the light of the demeanor, the explanations, and all the evidence in the case.

If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness's testimony in other particulars; and you may reject all the testimony of that witness, or you may give it such credibility as you think it deserves.

**<u>Proposed Charge No. 11: Number of Witnesses</u>**

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.[3]

---

[3] Third Circuit Model Jury Charges, 3.2

**Proposed Charge No. 12:  Prior Inconsistent Statements**

During the course of the trial, the parties have sometimes challenged the testimony of certain witnesses by pointing to prior statements the witnesses made or allegedly made.  In considering this evidence, you must separate these prior statements into statements that were not made under oath and statements that were made under oath.

You may consider prior statements that were not made under oath solely for the purpose of impeachment; that is, you may consider them only to help you decide if you believe the witness's testimony.  For example, if the witness said something previously that conflicts with what he or she said here in court, there may be reason for you to doubt that witnesses' testimony.  That is for you to decide.  You are not permitted, however, to use these earlier statements as affirmative, substantive evidence in this case.

If, however, the witness is a party, that is, the witness is one of the Named Plaintiffs or is an officer, employee, or agent of ALPA, then even their unsworn prior statements may be treated by you as substantive evidence in this case.[4]

Prior statements that were made under oath -- for example at a deposition, or in an affidavit, an answer to a written interrogatory or a sworn certification -- should be treated just as if they were made here in court.  You may consider them for the purpose of impeachment, as above, but you may also consider them as affirmative, substantive evidence.  You may rely on these statements as much, or as little, as you think proper.

It is exclusively your duty to determine whether the prior statement was inconsistent, and, if so, the significance of the inconsistency and how much weight it should be given.

---

[4] ALPA objects to this paragraph only to the extent that the terms "employee" and "agent" must be more fully defined.

16

**Proposed Charge No. 13: Nature of the Claim**  (alternative charges proposed)

### [Plaintiffs' Proposed Charge]

In this case, the TWA Pilots claim that the ALPA, their former union, breached its duty of fair representation.  ALPA denies those claims.

I will give you detailed instructions on the law at the end of the case, and those instructions will control your deliberations and decision.  But in order to help you follow the evidence during the trial, I will now give you a brief summary of the TWA Pilots' claims and the elements that the TWA Pilots must prove to make their case.

ALPA, as the union and exclusive bargaining representative for the TWA Pilots, was required under the law to fairly represent the TWA Pilots.  This duty is known as the "duty of fair representation" and is similar to a fiduciary duty and a duty of undivided loyalty.   The TWA Pilots claim that ALPA breached its duty of fair representation by failing to protect the TWA Pilots' seniority as part of TWA's merger with American Airlines, and the subsequent merger of the two pilot groups.   Instead of fairly representing the TWA Pilots to ensure a fair integration between the TWA and American Pilot seniority list, Plaintiffs allege that ALPA sacrificed the interests of the approximately 2,300 TWA Pilots in an attempt to curry favor with the over 11,000 American Pilots who ALPA was attempting to acquire into its union.   Plaintiffs allege that ALPA proceeded with its efforts to court the American pilots while falsely assuring the TWA Pilots that these efforts had ceased.  Plaintiffs further claim that this created a conflict of interest that infected the entire seniority negotiation and ultimately resulted in a loss of seniority for the TWA pilots.

ALPA denies these allegations.

In order to prove their case, the TWA Pilots will have to establish by a preponderance of the evidence that ALPA's representation of the TWA Pilots was either arbitrary or motivated by bad faith. I will describe these terms to you in greater detail at the close of the evidence. If you decide that the TWA Pilots have proven their case, then you will have found that ALPA is liable to the TWA Pilots and your verdict must be for the Plaintiffs.

In that situation, it will be necessary to determine the amount of damages caused by that breach, but that determination will be made in a later phase of the case by another jury or the Court. In this trial, you are not going to be asked to determine the amount of money damages owed to the TWA Pilots. Rather, you are only being asked to determine whether ALPA breached its duty to the TWA Pilots.

---

Third Circuit Model Jury Charges, 1.2 (Modified)

18

**[Defendant's Proposed Charge]**

In early 2001, TWA, Inc. ("TWA") and American Airlines negotiated an asset purchase transaction. At the time, TWA was in dire financial straits and American Airlines appeared to be its only and last financial hope before it succumbed to liquidation and went completely out of business.[5] To save the jobs of the TWA pilots, in late winter and early spring of 2001, the TWA Master Executive Council, a representative of ALPA, negotiated an agreement which provided, among other things, that the TWA pilots would become employees of American and that American would use its reasonable best efforts to assure that its pilot union, the APA, would agree to a fair and equitable process for the seniority integration of the TWA pilots. The Bankruptcy Court approved this agreement and permitted American to purchase TWA's assets.

Representatives of the TWA MEC and of the APA, over several months, did not reach agreement on a seniority integration. On November 8, 2001, American and the APA adopted a document which ultimately controlled the unified seniority system, known as the Supplement CC. An arbitrator later determined that American fulfilled its obligation to the TWA pilots to use its reasonable best efforts to secure a fair and equitable process for seniority integration and that determination is not at issue in this case. Accordingly, you must take it as a given that American did use its reasonable best efforts with the APA to secure a fair and equitable seniority integration for the pilots of both airlines.

Plaintiffs claim that ALPA, a labor union representing pilots for TWA, violated its duty to fairly represent the TWA pilots in connection with the integration of the TWA pilots into American. I will provide you with some more detail about these claims shortly.

ALPA denies these claims and contends that it represented the TWA pilots appropriately under the difficult circumstances presented by TWA's financial situation and bankruptcy. ALPA

further contends that its members and, in particular, the members of the Master Executive Council, were fully apprised of all the relevant facts regarding their decisions.

As I mentioned earlier, this case is being pursued by the named Plaintiffs on behalf of a class of certain of the former TWA pilots. While the outcome of this case will affect these members of this class, this issue should not influence your decision making on whether the Plaintiffs here have proved all the elements of their case. The question of whether it is appropriate for these claims to be decided with respect to the whole class is a legal question which I have already resolved. You should not view the fact that this is a class action as making the Plaintiffs' claims any more true or likely. You must evaluate the proofs as they are presented to you without consideration of the class action question.

---

[5] *Bensel v. Allied Pilots Ass'n,* 675 F. Supp. 2d 493, 495 (D.N.J. 2009).

**Proposed Charges No. 14: Charges on DFR Claims**  (alternative charges proposed)

### Plaintiffs' Proposed DFR Charges

#### [Plaintiffs' Proposed Charge No. 14(a)- The Duty of Fair Representation – Generally]

When a union, as in this case, is the exclusive bargaining representative for a group of employees, the law requires that union to represent the interests of the employees in a proper manner. This requirement is known as the duty of fair representation. ALPA owed a duty of fair representation to the TWA Pilots.

The duty of fair representation is similar to the duty owed by other fiduciaries to their beneficiaries. Just as these fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith.

The duty of fair representation is similar to the duty of undivided loyalty. Just as a public official owes a duty of honest, faithful and disinterested service to the public, a union owes employees a duty of undivided loyalty and may not to engage in undisclosed, biased decision making for its own gain.

The primary concern that the duty of fair representation was designed to address is that individual employees not be deprived of all effective means of protecting their own interests.

In this case, you must decide whether ALPA breached its duty of fair representation.

A union breaches its duty of fair representation when its conduct toward a member or members of the bargaining unit it represents is arbitrary, in bad faith, or discriminatory.

---

*Bensel v. Allied Pilots Ass'n,* 675 F.Supp.2d 493 (2009)(Summary Judgment Opinion)

21

*Steele v. Louisville & Nashville Railroad*, 323 U.S. 192, 202--03 (1944) (Railway Labor Act "impose[s] on the bargaining representative . . . the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts").

*Breininger v. Sheet Metal Workers Int'l Ass'n Local Union 6*, 493 U.S. 67, 83 (1989)(A union's duty of fair representation is often described as the corollary of the worker's surrender of his right to bargain individually)

*Delcostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164 (1983) ("[I]f individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the [union]" to fairly represent them in good faith.)

*Masy v. New Jersey Transit Rail Operators, Inc.*, 790 F.2d 322, 328 (3d Cir. 1986) ("The rule is a counterbalance to the union's position as exclusive bargaining representative.")

*Airline Pilots Association v. O'Neill*, 499 U.S. 65, 74 (1991) (The union's duty of fair representation has thus been described as similar to a fiduciary duty)

*Vasile v. International Brotherhood of Teamsters*, 1981 U.S. Dist. LEXIS 17583, *14 (D.N.J. 1981) (unions afforded deference)

*Bellesfield v. RCA Communications, Inc.*, 675 F. Supp. 952, 955 (D.N.J. 1987)

*Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1243 (C.A.7 1997) ("whether the Union's conduct was discriminatory and whether it was in bad faith must be analyzed separately, the analyses are related.").

*Vaca v. Sipes*, 386 U.S. 171, 177 (1967) ("the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.").

*Lewis v. Tuscan Dairy Farms*, 25 F.3d 1138, 1142 (2d Cir. 1994)(deprived plaintiffs of all effective means to protect their interests); *Aquinaga*, 933 F.2d at 1471.

*Air Line Pilots Ass'n, Intern. v. O'Neill*, 499 U.S. 65, 75 (U.S. 1991) ("The fair representation duty also parallels the responsibilities of corporate officers and directors toward shareholders. Just as these fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith.") (citing Restatement (Second) of Trusts § 174 (1959); *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264,274 (2d Cir. 1986).

*United States v. Antico*, 275 F.3d 245, 262-63 (3d Cir. 2001) ("undisclosed, biased decision making for personal gain, whether or not tangible loss to the public is shown, constitutes a deprivation of honest services").

**[Plaintiffs' Proposed Charge No. 14(b) - Breach of the Duty of Fair Representation – Arbitrary Conduct]**

A union violates its duty of fair representation if it acts in an arbitrary manner in its representation of any employee.  Conduct is arbitrary if, looking at all the evidence presented, it is so far outside a wide range of reasonableness that it is irrational. A union acts arbitrarily when it makes decisions based on considerations that are not legitimate union objectives.

Examples of arbitrary conduct include things like:

(a)     Deciding not to pursue the rights or complaints of employees it represents in order to curry favor with employees represented by a competing union;

(b)     Violating union policy; or

(c)     Acting in a perfunctory or superficial manner.

If you find, looking at all of the evidence presented, that ALPA acted arbitrarily, you must find that it breached its duty of fair representation.

------------------------------

*International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 47 (1979) (perfunctory conduct may constitute arbitrary, discriminatory or bad faith conduct)

*Bennett v Local Union No. 66, Glass, Molders, Pottery, Plastics & Allied Workers lnt'l Union, Local Union* 66,958 F2d 1429, 1438 (C.A.7 1992) ("When a union deliberately turns its back on an employee and sacrifices that employee's contractual rights, it has acted improperly. Intentionally acting to deprive an employee of her rights under the collective bargaining agreement-whether ultimately out of personal antipathy, political differences or merely to avoid work-constitutes acting for an improper reason, and is thus a breach of the union's duty").

*Conkle v. Jeong,* 73 F.3d 909, 915-916 (C.A.9 1995) (holding that a union's decision is arbitrary if it lacks a rational basis).

*Johnson v. United States Postal Service,* 756 F.2d 1461, 1465 (9th Cir. 1985) (holding that reckless disregard may constitute arbitrary conduct).

*Tenorio v. NLRB*, 680 F.2d 598,601 (C.A.7 1982) (defining arbitrary as the "egregious disregard for the right of union members").

*Trinque v. Mount Wachusett Community College Faculty Assn.,* 437 N.E.2d 564, 568-569 (Mass. App. 1982) ("Although ordinary negligence may not amount to a denial of fair representation,

lack of a rational basis for a union decision and egregious unfairness or reckless omissions or disregard for an individual employee's rights may have that effect.").

*Addington v. US Airline Pilots Association,* 2009 U.S. Dist. LEXIS 61724, *remanded,* 606 F.3d 1174 (9th Cir. 2010) (D. Ariz. 2009)("Even if the union's conduct could be rationally related to a legitimate union objective, the union can be liable for violating its duty of fair representation if its actions are shown to be solely motivated by objectives that are not legitimate union objectives.").

**[Plaintiffs' Proposed Charge No. 14(c) - Breach of Duty of Fair Representation - Bad Faith]**

A union violates its duty of fair representation if it exhibits bad faith towards any employee it represents. A union exhibits bad faith when it acts, or fails to act, out of hostility or ill will towards, or out of desire to obtain an undeserved benefit at the expense of, employees it represents.

Examples of bad faith include things like:

(a)     Depriving employees of their right to the union's undivided loyalty,

(b)     Failing to disclose a conflict of interest,

(c)     Making decisions motivated by divided loyalty or undisclosed self—interest or bias,

(d)     Making intentionally misleading statements to employees,

(e)     Failing to provide adequate information necessary to make informed decisions, or

(f)     Making intimidating statements toward those who oppose the union

You must decide not whether ALPA's actions or decisions themselves were right or wrong, but rather whether, looking at all of the evidence presented, ALPA acted in bad faith in representing the TWA pilots.

If you find, based upon the evidence presented, that ALPA acted in bad faith, you must find that it breached its duty of fair representation.

———————————————

*Bensel v. Allied Pilots Association*, 387 F.3d 298, 311 (3d Cir. 2004).

*Bensel v. Allied Pilots Association*, 675 F.Supp.2d 493 (2009)(Summary Judgment Opinion)

*Black's Law Dictionary* 139 (6th ed. 1990) (bad faith defined as "the conscious doing of a wrong because of a dishonest purpose or moral obliquity . . . [I]t contemplates a state of mind affirmatively operating with furtive design or ill will."

### Defendant's Proposed DFR Charges

### [Defendant's Proposed Charge No. 14(a) - Elements of Plaintiff's Claim]

In order to prevail on their claim that ALPA breached its duty to fairly represent its union members in regard to their integration into American Airlines, Plaintiffs must prove by a preponderance of the evidence that:

1)  By way of actions or omissions, ALPA was motivated by bad faith toward the TWA pilots; and

2)  Plaintiffs suffered actual injury as a direct result of ALPA's bad faith conduct.[6]

I will provide you now with more detail about these elements of Plaintiffs' claim.

---

[6] *Bensel v. Allied Pilots Ass'n,* 675 F. Supp. 2d 493, 499 (D.N.J. 2009) (citing *Deboles v. Trans World Airlines,* 552 F.2d 1005, 1019 (3d Cir. 1977)). *See also Vaughn v. ALPA,* 604 F.3d 703, 709 (2d Cir. 2010) ("To prove that a union has breached its duty of fair representation, the challenging members must establish two elements. First, they must prove that the union's action or inactions 'are either "arbitrary, discriminatory, or in bad faith."' . . . Second, the challenging members must 'demonstrate a causal connection between the union's wrongful conduct and their injuries.'") (citations omitted).

**[Defendant's Proposed Charge No. 14(b): Duty of Fair Representation]**

ALPA is a labor organization and was the exclusive collective bargaining representative of the TWA pilots.  When a union or labor organization is the exclusive representative of employees, the law requires that the union fairly represent the interests of those employees.  This duty is known as the duty of fair representation.[7]

A union breaches its duty of fair representation only if in the course of negotiating, modifying, administering, or enforcing a collective bargaining agreement, the union's conduct toward a member of the bargaining unit it represents in the matter at issue was arbitrary, discriminatory, or in bad faith.[8]  A union owes its duty of fair representation to every employee within the bargaining unit that it represents.[9]

A cause of action for the breach of the duty of fair representation is a "purposefully limited check" on a union's discretion in its representation of its members.[10]  Therefore, any review of union actions in the context of litigation "must be highly deferential."[11]  This deferential review is designed to recognize "the wide latitude that negotiators need for the effective performance of their bargaining responsibility."[12]  Therefore, in evaluating whether Plaintiffs have demonstrated their claim of breach of the duty of fair representation, you may not rely on hindsight.  Instead, you must evaluate ALPA's decisions and actions only in light of the legal and factual information ALPA possessed at the time it made those decisions and took those actions.

---

[7] *Vaca v. Sipes,* 386 U.S. 171, 177 (1967).
[8] *Id.*
[9] O'Malley, 3A Fed. Jury Prac. & Instr. § 157.81 (5th ed.) (citing *Vaca v. Sipes,* 386 U.S. 171, 177 (1967); *see also Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 76-78 (1991).
[10] *Steelworkers v. Rawson,* 495 U.S. 362, 375 (1990).
[11] *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 78 (1991).
[12] *Id.*

Plaintiffs do not assert that ALPA's actions were arbitrary or discriminatory, only that ALPA was motivated by bad faith.[13]   Accordingly, in order to prevail on their claim that ALPA breached its duty of fair representation, Plaintiffs must prove that ALPA's conduct was motivated by bad faith toward them.

---

[13] *Bensel v. Allied Pilots Ass'n,* 675 F. Supp. 2d 493, 501 n.13 (D.N.J. 2009) ("The Plaintiffs do not allege ALPA was arbitrary or discriminatory.").

**[Defendant's Proposed Charge No. 14(c): Bad Faith]**

In order to prove "bad faith" on the part of ALPA, plaintiffs were required to prove that ALPA engaged in fraud, deceitful action, or dishonest conduct toward them in the matter at issue. Personal hostility alone is insufficient to establish unfair representation if the union's representation was adequate and there is no substantial evidence that personal hostility tainted the union's actions.[14]

To establish bad faith, plaintiffs have the burden of presenting affirmative "substantial evidence" of "fraud, deceitful action or dishonest conduct."[15] A showing of fraud, deceitful action or dishonest conduct requires proof of all of the following elements:

1. Proof of a false or misleading statement or material omission;

2. Reliance by union members on the misleading statement or material omission;

3. Injury caused by the wrongdoing; and

4. Wrongful intent on the part of the defendant against the Plaintiffs.[16]

---

[14] *Id.*

[15] *Amalgamated Ass'n of St. Elec. Ry. Employees v. Lockridge,* 403 U.S. 274, 299 (1971); *Humphrey v. Moore,* 375 U.S. 335, 348 (1964); *Moore v. Essex County Div. of Welfare,* Civ. No. 07-2504, 2009 WL 2581511, at *8 (D.N.J. Aug. 20, 2009).

[16] *Deboles v. Trans World Airlines, Inc.,* 552 F.2d 1005, 1017-18 (3d Cir. 1977). *See also Ackley v. W. Conference of Teamsters,* 958 F.2d 1463, 1472 (9th Cir. 1992) ("[T]o prevail in a misrepresentation case . . . plaintiffs must demonstrate 'a causal relationship between the alleged misrepresentations and their injury.'"); *Acri v. Int'l Ass'n of Machinists & Aerospace Workers,* 781 F.2d 1393, 1397 (9th Cir. 1986) (holding that plaintiffs were required to prove that the outcome of a union vote would have been different but for the misrepresentations of its union); *Anderson v. United Paperworkers Int'l. Union AFL-CIO,* 641 F.2d 574, 580 (8th Cir. 1981) (finding plaintiffs failed to prove that their votes regarding a severance package would have been different but for the union's alleged misrepresentations); *Petersen v. United Steel Workers of Am.,* No. Civ. 2004-0062, 2009 WL 3269311, at *10 (D.V.I. Oct. 8, 2009) (holding that plaintiffs were required to "individually establish that (1) the Union communicated inaccurate information in bad faith, (2) they relied on such information when they voted to strike or when they decided not to cross the picket line, (3) they would not have voted to strike or would have crossed the picket line if not for the misrepresentation, and (4) they sustained injuries from striking.").

29

In order for you to find that ALPA acted in bad faith, you must find that ALPA had a "bad faith motive"[17] in the manner in which it handled the integration of the TWA pilots into American Airlines.  Moreover, in order for the bad faith motive to constitute a breach of the duty of fair representation, you must determine that the "bad" motive was the sole motivating factor for ALPA's actions.[18]

I should emphasize to you that in order to prove their claim, Plaintiffs must prove "that ALPA did more than simply act negligently or without proper care in dealing with the TWA-American Airlines merger."[19]  They must establish that ALPA was motivated by bad faith as I have defined it for you.

The Plaintiffs allege that ALPA was motivated by bad faith in connection with two sets of issues.  First, Plaintiffs claim that ALPA, in bad faith, made material misrepresentations and failed to disclose material information in order to induce the TWA-MEC on April 2, 2001, to agree to a labor agreement that had been proposed by TWA and American and that did not give the TWA pilots the ability to arbitrate the issue of seniority integration provided, among other things, that the TWA pilots would waive the "scope" protections that were included in their labor agreement with TWA.  Second, Plaintiffs claim that ALPA in bad faith failed to support the efforts of the TWA-MEC later in 2001, in connection with seniority integration negotiations with the APA – the union that represented the American Airlines pilots.

---

[17] *Findley v. Jones Motor Freight,* 639 F.2d 953, 959 (3d Cir. 1981) (union must have "bad faith motive").
[18] *Addington v. US Airline Pilots Ass'n,* No. Civ. 08-1633, 2009 WL 2169164, at *14-15 (D. Az. July 17, 2009) *rev'd on other grounds,* 606 F.3d 1174 (9th Cir. 2010).
[19] *Bensel v. Allied Pilots Ass'n,* 675 F. Supp. 2d 493, 501 (D.N.J. 2009)

With respect to the decision to accept the labor agreement offered on April 2, 2001, Plaintiffs allege the ALPA made the following false misrepresentations and that ALPA was motivated to do so by bad faith towards them:

1.      That there was a high likelihood that TWA would win the Section 1113 motion, a motion filed in the bankruptcy court to reject the Collective Bargaining Agreement between TWA and its pilots, which would have resulted in the TWA pilots losing not only the seniority integration provisions but their grievance procedures and all other provisions of their CBA;

2.      That there was a high likelihood that if the TWA MEC did not agree to concede the seniority provisions in their Collective Bargaining Agreement, known as the LPPs, American would walk away from the proposed asset purchase and that the pilots would again lose everything including their jobs; and

3.      That if the TWA MEC did agree to the labor agreement on April 2, 2001, American Airlines would use its reasonable best efforts to assist the two unions (ALPA, representing TWA pilots, and APA, representing the American Airlines pilots) to arrive at a fair and equitable process for resolving the seniority and integration issues.[20]

Plaintiffs also contend that ALPA failed to disclose a number of material facts to the TWA pilots, including the asserted fact that ALPA was engaged in an active organizing campaign to bring the American Airline pilots into ALPA with the knowledge and approval of APA.[21]

With respect to the negotiations over seniority integration and other events that took place after April of 2001, Plaintiffs claim that ALPA's bad faith caused it to engage in the following:

1.      Failing to require American Airlines and TWA to negotiate the terms of seniority integration and the terms and conditions of the TWA Pilots' employment with ALPA while ALPA remained the certified exclusive collective bargaining agent for the Class;

2.      Permitting American and TWA-LLC to require the TWA-MEC to negotiate seniority integration with APA;

3.      Failing to seek representational rights of the combined pilots before the National Mediation Board;

---

[20] *Bensel v. Allied Pilots Ass'n.,* 675 F. Supp. 2d 493, 498 (D.N.J. 2009).
[21] *Id.*

31

    4.     Failing to challenge the certification of APA as the certified collective bargaining agent of the former TWA pilots as requested of them by the TWA-MEC; and

    5.     Failing to take action to challenge Supplement CC, though the agreement was entered into to control matters relating to rates of pay, rules and working conditions of the Class and was entered into with the ALPA as the Class' collective bargaining agent, in violation of the RLA.[22]

*(The following bracketed text is proposed for use in the event that the Court does not grant the Rule 50 motion providing the exclusion of evidence regarding Roland Wilder)*

[Plaintiffs also contend that ALPA's asserted bad faith towards them during this period caused it to reject two litigation strategies suggested by Roland Wilder. In July, 2001, Wilder proposed a litigation strategy which he claimed was designed to shake "the complacency of the American pilots to create a dilemma for APA whereby it could either accept ALPA participation at the bargaining table which Captain Pastore [head of the TWA-MEC] had requested or assume a fair representation duty to the TWA pilots."

Later, in mid-September 2001, when the facilitated negotiations between the TWA pilots and the American pilots ended without an agreement, Wilder also proposed fiing a lawsuit seeking to enjoin American Airlines and APA from entering into a seniority integration agreement without the agreement of the TWA pilots.

Plaintiffs claim that ALPA's refusal to authorize either of these lawsuits to be filed on its behalf was motivated by bad faith toward the Plaintiffs.]

In regard to each claim that ALPA was motivated by bad faith, the Plaintiffs must prove that ALPA engaged in conduct that was fraudulent, deceitful or dishonest and that ALPA acted with wrongful intent toward them. If you find that Plaintiffs have failed to establish that the advice or other conduct of ALPA was fraudulent, deceitful or dishonest and that ALPA acted with wrongful intent toward them, your verdict should be for ALPA. ALPA does not need to

---

[22] *Id.* at 499.

establish that it had any particular reason for any of the actions it took, or that it was motivated

by good faith, so long as Plaintiffs have not proven that ALPA was motivated by bad faith

towards them, causing ALPA to engage in misconduct which caused them injury.

## [Defendant's Proposed Charge No. 14(d): Overall Agreement][23]

In evaluating Plaintiffs' claim that ALPA's conduct was motivated by bad faith or that they suffered injury in the matter of their integration into American, you must consider not only the seniority integration but the overall contents of the agreement negotiated by ALPA through the TWA MEC, including all of the benefits of that agreement.

---

[23] Plaintiffs object to this Proposed Jury Instruction.

**[Defendant's Proposed Charge No. 14(e): Causation/Proof of Injury][24]**

If Plaintiffs prove that ALPA's conduct was motivated by bad faith as I have defined that term for you, they must then prove a tangible injury resulting from that bad faith conduct in order to prevail.  Even if a labor union engages in deceptive conduct with an improper motive, it can only be held liable if its breach directly causes injury to an individual or group to whom the duty is owed.[25]  "False statements may not create liability under the federal labor laws absent a showing of tangible injury proximately resulting from the falsehood."[26]  Liability for a labor union's deceptive conduct in breach of the fiduciary duty of fair representation arises only if the breach directly causes injury to an individual or group to whom the duty is owed.[27]  In the absence of such injury, any remedy against the union would necessarily be a "punishment" and not a redress for injury.[28]

In this case, proving injury means that Plaintiffs are required to demonstrate that the advice provided to the TWA MEC and the outcome of the TWA-MEC vote on April 2, 2001, would have been different and that the overall outcome of the integration of the TWA pilots into American would have been more favorable and the Plaintiffs would have received a better package of employment benefits if ALPA had not been motivated by bad faith toward the Plaintiffs in the circumstances that I have described to you.[29]  It is not enough for Plaintiffs to prove that the outcome of the negotiations and the other arrangements might have been

---

[24]   Plaintiffs object to this Proposed Jury Instruction.
[25] *Bensel v. Allied Pilots Ass'n,* 675 F. Supp. 2d 493, 499 (D.N.J. 2009) (quoting *Deboles v. Trans World Airlines,* 552 F.2d 1005, 1019 (3d Cir. 1977)).
[26] *Deboles v. Trans World Airlines*, 552 F.2d 1005, 1017 (3d Cir. 1977).
[27] *Id.*
[28] *Id.* at 1019.
[29] *Id.* at 1019-20; *Acri v. Int'l Assoc. of Machinists & Aerospace Workers,* 781 F.2d 1393, 1397 (9th Cir. 1986).

different.[30] They must prove that the only thing that prevented a <u>better</u> outcome on their integration into American was ALPA's allegedly bad faith conduct in breach of the duty of fair representation.[31]

If you conclude, for example, that the Plaintiffs have failed to prove that the advice to the TWA MEC and the outcome of the vote on April 2, 2001, would have been different, or if the vote had been different, if they have failed to prove that American Airlines would not have walked away from the transaction, your verdict on the issue of causation on the first set of claims should be for ALPA.  Likewise, if you conclude, after the vote on April 2, 2001, that Plaintiffs failed to prove that additional efforts by ALPA would have had a positive effect on the outcome of their integration into American, your verdict on the issue of causation with respect to the second set of claims should be for ALPA.

---

[30] *Anderson v. United Paperworkers Int'l Union,* 641 F.2d 574, 579 (8th Cir. 1981); *Barrett v. Thorofare Markets, Inc.,* 452 F. Supp. 880, 884 (W.D. Pa. 1978).
[31] *DeLong v. Int'l. Union,* 850 F. Supp. 614, 619 (S.D. Ohio 1993), *aff'd sub nom. NLRB v. United States Postal Serv.,* 17 F.3d 1434 (4th Cir. 1994).

36

**<u>Defendant's Proposed Charge No. 15: Fraud Not Presumed</u>**[32]

Fraud is never presumed, but must always be proved by a preponderance of the evidence. You should assume that persons are fair in their dealings until the contrary appears from the evidence. If a transaction is called into question and is equally capable of two interpretations, one honest and the other fraudulent, it should be found to be honest.[33]

---

[32] Plaintiffs object to this Proposed Jury Instruction.
[33] O'Malley 3A Fed. Jury Prac. & Instr. §123.10 (5th ed.)

37

**<u>Defendant's Proposed Charge No. 16: No Burden of Proof on ALPA</u>**[34]

It is the Plaintiffs' burden to prove bad faith.  ALPA is not obligated to produce evidence that it acted in good faith.[35]

---

[34] Plaintiffs object to this Proposed Jury Instruction.
[35] *Simo v. Union of Needletraders, Indus. & Textile Employees,* 322 F.3d 602, 618 (9th Cir. 2003).

**<u>Defendant's Proposed Charge No. 17:  Assertion of Legal Claims and Litigation</u>**[36]
*(Alternative charges proposed by Defendant)*

As I have told you, Plaintiffs contend that ALPA breached its duty of fair representation when it rejected certain recommendations by Roland Wilder that litigation be filed.  You heard testimony about the litigation strategies suggested by Roland Wilder.  Those strategies included: (1) a plan to file a lawsuit in federal district court to compel TWA to arbitrate the grievance regarding seniority and, in the meantime, to enjoin TWA from closing its transaction with American; (2) a plan to place American in the "Horns of a Dilemma" by attempting to compel ALPA's participation in negotiations regarding the TWA pilots by filing a lawsuit to enjoin American and APA from implementing any agreement that would affect the TWA pilots.  The second part of this plan was to file a lawsuit claiming a violation of the duty of fair representation against the American pilots union, the APA; and (3) a plan to file a lawsuit to enjoin the implementation of Supplement CC.  This third legal strategy required coordination of a number of legal maneuvers that I do not need to detail here.

I have determined as a matter of law that these litigation theories were deficient and would not have been appropriate to pursue.  Accordingly, I am instructing you as a matter of law that ALPA acted reasonably and appropriately in not approving the litigation tactics proposed by Roland Wilder.

---

[36] Plaintiffs object to this Proposed Jury Instruction.

**Defendant's Alternative Proposed Charge No. 17[37]**
*(proposed for use in the event that the Court does not grant the Rule 50 motion providing the above result)*

As I have told you, Plaintiffs contended that ALPA breached its duty of fair representation when it rejected certain recommendations by Roland Wilder that litigation be filed.  There are some basic elements of the rules and rules and regulations governing lawyers.  A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice.  As a representative of clients, a lawyer performs various functions.  As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications.  As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.  As negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements of honest dealings with others.  As an evaluator, a lawyer acts by examining a client's legal affairs and reporting about them to the client or to others.[38]

A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs.  A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others.  A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials.  While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.[39]

---

[37] Plaintiffs object to this Proposed Jury Instruction.
[38] ABA Model Rule of Prof'l Conduct, Preamble (2002).
[39] *Id.*

40

Many of a lawyer's professional responsibilities are prescribed in the Rules of Professional Conduct, as well as substantive and procedural law.[40]  One such Rule, RPC 3.1, governs a lawyer's use of legal process.

The Rule states:

A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.[41]

In addition to the Rules of Professional Conduct, lawyers are also governed by the requirements set forth in the relevant Rules of Court.  One such Rule is Federal Rule of Civil Procedure 11(b).  That Rule states:

By presenting to the court a pleading, written motion or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after the inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence, or if specifically so identified, are reasonably based on belief of a lack of information.[42]

The law also prohibits lawyers and litigants from making litigation and proceedings longer and more complicated than necessary.  The law states:

---

[40] *Id.*
[41] ABA Model Rule of Prof'l Conduct R. 3.1 (2002).
[42] Fed. R. Civ. P. 11(b).

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred by such conduct.[43]

Thus, if a lawyer proposes a course of action or litigation or proceeding that would violate any one of these provisions, that proposed course of action, litigation or proceeding would not be valid and would be a reasonable basis for rejecting any such recommended course.

If you find that Roland Wilder's proposals would have violated these Rules, then you must find in favor of ALPA on this issue.

---

[43] 28 U.S.C. §1927.

42

**Defendant's Proposed Charge No. 18: Damages -- Effect of Instructions[44]**

You may be familiar, either through your own experience or through some other means, that in the event a jury finds that a plaintiff has satisfied all elements of their claim, the jury will next deliberate on the question of damages, meaning dollars lost as a result of liability. You will not consider the question of damages in any way during your deliberations. You should not speculate about what damages might exist or what they might be because damages are not at issue in this action. This does not mean, however, that you will not consider the question of injury; as instructed, Plaintiffs must prove, as an element of their claims against ALPA, that ALPA's alleged bad faith motivation resulted in actual injury as described above.

---

[44]  Plaintiffs object to this Proposed Jury Instruction.

43

**Plaintiffs' Proposed Charge No. 19: Read-Backs of Trial Testimony**

At your request, I have decided to have [a transcript of ] [describe the testimony] read [provided] to you in order to assist you in your deliberations. I remind you that you must focus on all of the testimony and evidence presented at the trial. You may not give undue weight to the testimony that is read back to you [provided to you].

---

Third Circuit Model Jury Charges, 3.3

44

**Proposed Charge No. 20: Deliberations**

When you retire to the jury room to deliberate, you may take with you these instructions, your notes, and the exhibits that the Court has admitted into evidence. You should select one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, under the appropriate burden of proof, the TWA Pilots have established their claims. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

As jurors, you have a duty to consult with each other and to deliberate with the intention of reaching a verdict. Each of you must decide the case for yourself, but only after a full and impartial consideration of all of the evidence with your fellow jurors. Listen to each other carefully. In the course of your deliberations, you should feel free to re-examine your own views and to change your opinion based upon the evidence. But you should not give up your honest

convictions about the evidence just because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of obtaining enough votes for a verdict.

When you start deliberating, do not talk to the jury officer, to me or to anyone but each other about the case. During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a cell phone, smart phone [like Blackberries or iPhones], or computers of any kind; the internet, any internet service, or any text or instant messaging service [like Twitter]; or any internet chat room, blog, website, or social networking service [such as Facebook, MySpace, LinkedIn, or YouTube], to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

If you have any questions or messages for me, you must write them down on a piece of paper, have the foreperson sign them, and give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.

One more thing about messages. Never write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that a certain number is voting one way or another. Your votes should stay secret until you are finished.

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, each juror must agree to the verdict. Your verdict must be unanimous.

A form of verdict has been prepared for you. It has a series of questions for you to answer. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will fill it in, and have your foreperson date and sign the form. You will then return to the courtroom and your foreperson will give your verdict. Unless I direct

you otherwise, do not reveal your answers until you are discharged. After you have reached a verdict, you are not required to talk with anyone about the case unless I order you to do so.

Once again, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or manner what I think your verdict should be.  It is your sole and exclusive duty and responsibility to determine the verdict.[45]

---

[45] Third Circuit Model Jury Charges, 3.1.

47

## Proposed Charge No. 21: Duty To Deliberate

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous.

But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or merely for the purpose of returning a verdict. You are not partisans. You are judges -- impartial judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case. Under no circumstances should your deliberations be affected or diverted by any appeal to bias, passion or prejudice for or against any of the parties, nor influenced by any pity or sympathy in favor of them.  The law does not permit jurors to be governed by sympathy, prejudice or public opinion.  A corporation, or other association, including a labor union, and all other persons are equal before the law and must be treated as equals in a court of justice.[46]

---

[46] Plaintiffs object to the modification of this sentence in the charge.

48

**Proposed Charge No. 22: Conclusion**

(a) If any of you have served on a jury before, you must disregard the facts and law of that case and any verdict you may have returned, because they have no application to this case. All cases are unique and must be judged independently. You are not permitted to compare them to arrive at your verdict in this case. Your verdict here must be based solely on the law I give to you and the evidence you heard and saw in this courtroom.

(b) You are instructed once more that if I have asked any questions of any witness during the trial or if I have said or done anything during the trial, or in the course of instructing you now, that suggests to you that I am inclined to favor the case of the plaintiff or the defendant, you must remove that impression from your minds and not permit yourselves to be influenced it. Nothing in these instructions or in the verdict sheet prepared for your convenience is meant to suggest what verdict I think you should find. That is not my responsibility.

The determination of the verdict is the exclusive and essential duty of the jury.

(c) You will be provided with a written copy of these instructions should you desire to consult it during deliberations. The captions at the beginning of the various sections or subsections are not part of the instructions and are there only for your convenience. You must not consider any particular portion of these instructions in isolation, but rather, you must apply all the rules of law about which I have instructed you.

(d) May I commend counsel for their actions in this Court and for the respect which they have given to the Court. I wish also to compliment and thank the jurors for their patience and for the attention they have paid to the witnesses, to the parties and to this Court.

(e) If you have any questions for the Court, please write them on a piece of paper and have your foreperson give them to the United States Marshal for delivery to me. Never attempt

to communicate with the Court by any other means than a signed writing. You will be provided with paper and pencils. Bear in mind that you are not to reveal to the Court or to any person how the jury stands, numerically or otherwise, until you have reached a unanimous verdict.

(f) Now a word as to the form of your verdict. Your verdict must represent the considered judgment of each juror. In order to return a verdict it is necessary that each and every juror agree to it. Your verdict must be unanimous. In accordance with our custom in this Court, Juror Number One, *(COURT WILL ADD NAME)*, will act as your foreperson and *(COURT WILL ADD NAME)* must sign the verdict when it is reached.

(g) Jurors perform a very important function in deciding upon their verdict. You are an arm of government, here to do justice. There is nothing more sacred. Do your duty conscientiously, according to your oath, and according to these instructions, and justice will be done.

6710138v1

50