# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PATRICK BRADY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 02-2917 (JEI) |
| ) | |
| AIR LINE PILOTS ASSOCIATION, ) | |
| INTERNATIONAL, ) | |
| ) | |
| Defendant. ) | |
| ) | |

---

## REPLY BRIEF IN SUPPORT OF
## DEFENDANT'S COMPANION MOTION FOR NEW TRIAL
## PURSUANT TO FED. R. CIV. P. 59 OR FOR DISMISSAL

---

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By:    Steven J. Fram, Esquire
       John C. Connell, Esquire

*Pro Hac Vice*:

    Daniel M. Katz, Esquire
    Katz & Ranzman, P.C.
    4530 Wisconsin Ave., N.W., Suite 250
    Washington, DC 20016
    (202) 659-4656

Attorneys for Defendant
    Air Line Pilots Association, International

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

    I.      PREJUDICIAL ERRORS IN THE JURY INSTRUCTIONS ............................... 2

    II.    THE ERRONEOUS EXCLUSION OF JEFFREY BRUNDAGE'S DEPOSITION TESTIMONY ............................................................................... 7

    III.   MISCONDUCT BY PLAINTIFFS' COUNSEL ................................................... 11

    IV.   THE PREJUDICIAL AND ERRONEOUS CROSS-EXAMINATION OF SETH ROSEN CONCERNING AN ALPA "SCAB LIST" ............................... 11

    V.    THE COURT'S INTERJECTIONS DURING SETH ROSEN'S TESTIMONY ...................................................................................................... 14

    VI.   SEVENTH AMENDMENT ISSUES ................................................................. 17

CONCLUSION ................................................................................................................. 19

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Aguinaga v. United Food and Commercial Workers Int'l Union,*
993 F.2d 1463 (10th Cir. 1993) ................................................................................5, 6

*Air Line Pilots Ass'n, Int'l v. O'Neill,*
499 U.S. 65 (1991) ......................................................................................................2

*Bissell v. United States,*
321 Fed. App'x 549 (9th Cir. 2008) ...........................................................................8

*Champeau v. Fruehauf Corp.,*
814 F.2d 1271 (8th Cir. 1987) ..................................................................................15

*Collins v. Wayne Corp.,*
621 F.2d 777 (5th Cir. 1980), *superseded on other grounds as noted in Mathis v.*
*Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002) ...........................................................8, 9

*Considine v. Newspaper Agency Corp.,*
43 F.3d 1349 (10th Cir. 1994) ....................................................................................6

*Duckett v. Godinez,*
67 F.3d 734 (9th Cir. 1995) ......................................................................................16

*Hauf v. IRS,*
968 F. Supp. 78 (N.D.N.Y 1997)................................................................................1

*Lewis v. Tuscan Dairy Farms, Inc.,*
25 F.3d 1138 (2d Cir. 1994) ...................................................................................5, 6

*Morales v. P.F. Labs, Inc.,*
No. 00-150 (JCL), 2000 WL 33678049 (D.N.J. Aug. 3, 2000)..................................2

*Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.,*
174 F.3d 801 (6th Cir. 1999) ....................................................................................15

*Ne. Women's Center, Inc. v. McMonagle,*
689 F. Supp. 465 (E.D. Pa. 1988)...............................................................................1

*Perkins v. Silver Mountain Sports Club & Spa, LLC,*
557 F.3d 1141 (10th Cir. 2009) ..................................................................................8

*Quercia v. United States,*
289 U.S. 466 (1933) ............................................................................................16, 17

*Spellacy v. Airline Pilots Ass'n Int'l*,
   156 F.3d 120 (2d Cir. 1998) ................................................................................................5, 6

*Spina v. Forest Pres. Dist. of Cook Cnty.*,
   207 F. Supp. 2d 764 (N.D. Ill. 2002) ..................................................................................1

*United States v. Candelaria-Gonzalez*,
   547 F.2d 291 (5th Cir. 1977) .............................................................................................16

*United States v. Meinster*,
   488 F. Supp. 1342 (S.D. Fla. 1980) ..................................................................................16

*United States v. Scott*,
   243 F.3d 1103 (8th Cir. 2001) ...........................................................................................14

*W.V. Realty, Inc. v. N. Ins. Co.*,
   334 F.3d 306 (3d Cir. 2003) ..............................................................................................15

**RULES**

Fed. R. Civ. P. 50(b) ...................................................................................................................1

Fed. R. Civ. P. 59(a) ...................................................................................................................1

Federal Rule of Evidence 103(a)(2) ....................................................................................7,8, 9

Rule 11 .......................................................................................................................................11

Rule 50 .........................................................................................................................................6

Rule 103 .......................................................................................................................................8

Rule 103(a) ...................................................................................................................................7

**CONSTITUTIONAL PROVISIONS**

SEVENTH AMENDMENT .......................................................................................................17

## INTRODUCTION

Defendant Air Line Pilots Association, International ("ALPA") submits this Reply Brief in support of its motion for a new trial or dismissal pursuant to Fed. R. Civ. P. 59(a), which is submitted in the alternative to ALPA's pending motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b).  ALPA will address the issues in this reply brief in the same order as we did in our opening brief, which is the same order that Plaintiffs followed in their opposition.

Plaintiffs have inaccurately described the testimony of witnesses and failed to provide citations to the transcript, as in *Spina v. Forest Pres. Dist. of Cook Cnty.*, 207 F. Supp. 2d 764, 769 (N.D. Ill. 2002), where the defendant filed a motion for a new trial that "contain[ed] only scant citation to legal authority, and citation to the record or trial transcripts [was] nonexistent." The court there held: "A litigant who fails to press a point by supporting it with pertinent authority . . . forfeits the point." *Id.* at 770 (omission in original) (quoting *United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990)).  Plaintiffs' inattention to the trial record deserves the same treatment here.  *See Hauf v. IRS*, 968 F. Supp. 78, 82 (N.D.N.Y 1997) ("In the absence of specific citations to the testimony relied upon, such arguments must fail."); *Ne. Women's Center, Inc. v. McMonagle*, 689 F. Supp. 465, 470 (E.D. Pa. 1988) (reminding a litigant who failed to include citations in its argument that "the lengthy review necessary to respond to [the party's] contention is not this court's responsibility").

Moreover, in many instances Plaintiffs' response to ALPA's contentions has been to ignore them, and we submit that the Court should likewise treat such omissions by Plaintiffs as concessions.  We demonstrate below that the motion for a new trial has merit and should be granted if the Court does not determine that judgment should be entered in ALPA's favor.

## I.       PREJUDICIAL ERRORS IN THE JURY INSTRUCTIONS

Plaintiffs seek to justify what is essentially a strict liability standard for the duty of fair representation ("DFR") whenever union members allege a breach based on what they claim are bad faith acts by their union.  Pls. Opp'n Br. 4.  Such an approach conflicts with well-established labor law principles, as do the jury instructions given in the case at bar.  ALPA submits that the jury instructions improperly failed to inform the jury that ALPA's multiple interests were lawful unless those interests adversely affected the conduct or advice of an ALPA officer, staffer or advisor in connection with the services provided or advice given to the TWA MEC and its Merger and Negotiating Committees.  The jury instructions were thus fatally defective in that they failed to advise the jury appropriately that its determination of whether ALPA's actions and counsel with respect to the TWA pilots' seniority integration were reasonable must be evaluated in the "highly deferential" manner owed to the strategic choices facing unions in such circumstances. *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991).  The instructions should have made clear that *any* rational choice of strategic options by ALPA was permitted under DFR law, which allows unions great leeway in choosing the proper approach to negotiations because "'[m]ere disagreements over tactics and strategy' will not support a claim for breach of the duty of fair representation." *Morales v. P.F. Labs, Inc.*, No. 00-150 (JCL), 2000 WL 33678049, at *2 (D.N.J. Aug. 3, 2000) (quoting *De Fillippes v. Star Ledger*, 872 F. Supp. 138, 141 (D.N.J. 1994)).

The jury instructions also improperly failed to explain that the jurors should not speculate in determining whether the TWA pilots were harmed by conduct or advice of an ALPA officer, staffer or advisor.  Plaintiffs contend that ALPA failed to object to the Court's causation instruction, Pls' Opp'n Br. 10, but they have overlooked ALPA's numerous submissions on this subject, including Steven Fram's letter to the Court on July 10, 2011, while the Court was in the

2

process of formulating and revising the jury instructions.  Doc. 405.  In addition to the letter's discussion of the "bad faith" portion of the jury instructions, ALPA addressed the causation issue and asked the Court to instruct the jury: "In determining the question of causation, you may not guess or speculate about whether any claimed breach of duty resulted in a direct, tangible injury to the Plaintiffs."  *Id.* at 3.  The requested instruction would have also stated: "Rather, Plaintiffs must prove that actual harm was caused by conduct that constituted a breach of the duty of fair representation and must do so by a preponderance of the evidence."  *Id.*  ALPA raised the issue at the charge conference, but the Court specifically rejected ALPA's request.  Tr. 7/11/11 at 7.

Plaintiffs argue that the jury may have relied on the testimony of Mike Day and Roland Wilder that a better seniority deal could have been achieved if ALPA had provided more support.  Pls' Opp'n Br. 11.  But substituting the speculation of these interested witnesses for admissible evidence of actual harm does not make it any less speculative and does not provide a lawful basis for establishing liability.  *See* ALPA's New Trial Br. 17-23.  For example, if the jury found that ALPA breached its duty of fair representation in connection with the advice provided to the TWA MEC on April 1-2, 2001, as Plaintiffs contended at trial, it would have been pure conjecture to find that the jobs outcome for the TWA pilots would have improved in the event that ALPA implemented Wilder's litigation scheme and sued American and TWA in federal district court to enjoin the consummation of the acquisition of assets.  In the absence of an instruction such as that requested by ALPA, however, the jury was improperly left to speculate on this subject, as Plaintiffs' counsel encouraged it to do in his closing argument.  *Id.* at 17-18.

Plaintiffs failed to respond at all to ALPA's complaint with respect to the omission from the jury instructions of the Supreme Court's guidance that proving a "bad faith" DFR claim requires that "a plaintiff must adduce 'substantial evidence of fraud, deceitful action or dishonest

3

conduct.'" ALPA's New Trial Br. 8 (quoting cases). This too was a point raised in Steven Fram's letter to the Court on July 10, 2011, Doc. 405, and Plaintiffs' failure even to address the issue should be taken as conceding. ALPA respectfully submits, as discussed at the charge conference, that the examples of bad faith conduct provided in the jury instructions do not meet this stringent standard.

Plaintiffs further argue that ALPA waived its "objection to the lack of guidance offered" by the Court's jury instruction on bad faith "as it was not an issue raised during the charge conference." Pls.' Opp'n Br. 6. That is incorrect. The parties discussed this question at length during the charge conference. Tr. 7/7/11 at 122-43. Indeed, ALPA's counsel specifically made this point during the charge conference: "MR. FRAM: *We want the jury to be guided clearly in terms of the requirements of the law.* I don't think *Deboles* could be any clearer about the need for misrepresentation, omissions on the conduct, reliance by the plaintiffs. These are basic fraud elements . . . ." *Id.* at 129 (emphasis added).

Plaintiffs also incorrectly contend that ALPA waived its objection to the part of the jury instructions that listed, as an example of bad faith, "ignoring union policies," on the theory that ALPA's only objection during the charge conference was "that the instruction *was not supported by the evidence.*" Pls.' Opp'n Br. 8 (emphasis added). However, ALPA's counsel argued *both* that (1) the law did not support that example, and that (2) the evidence did not support that part of the instruction: "Mr. FRAM: [I]gnoring the policy of the labor negotiation. I don't know that the law supports that. We think the jury is going to be confused, and I don't believe there is any evidence, your Honor, in the case . . . that ALPA ignored union policy." Tr. 7/7/11 at 136-37. ALPA's co-counsel also pointed out that the use of "ignoring union policies" as an example of bad faith conflicted with DFR law:

> MR. KATZ: The union policies issue, Mr. Press talked about the allegations in the case. My comment goes to whether it is an example of bad faith for a union to not follow one of the policies that it has. And the ALPA administrative manual, like many union policies, is several inches tall, and I respectfully submit, your Honor, that it not automatically a breach of the duty of fair representation ... for a union to violate one of its policies. The standard of the duty of fair representation is something else entirely. And so, if it was automatically an example of bad faith to violate a union policy, union members would be in the federal courts all the time about a variety of things that aren't truly justiciable . . . under the duty of fair representation.

*Id.* at 141-42.

In arguing that the Court properly instructed the jury on the law related to arbitrary conduct and on bad faith, Plaintiffs place undue reliance on two decisions: *Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1142 (2d Cir. 1994); and *Aguinaga v. United Food and Commercial Workers Int'l Union*, 993 F.2d 1463, 1471 (10th Cir. 1993). Pls.' Opp'n Br. 3-5. However, neither *Lewis* nor *Aguinaga* is applicable to the case at bar.

In *Lewis*, the president of the union entered into a secret oral agreement with the employer that forfeited the employees' seniority rights if the business was acquired, but then lied to the union members by assuring them that they still had those seniority rights. *Lewis*, 25 F.3d at 1142-43. The Second Circuit subsequently limited *Lewis* to its facts:

> In *Lewis* . . . the union[] entered into [a] secret side-agreement[] with the employer that vitiated clear contractual rights of the employees. . . . Moreover, the employees in *Lewis* . . . were tricked into believing that their rights were preserved until it was too late to protest the employer's action. In contrast, . . . [t]he pilots here knew ALPA's position in time to challenge its decision . . . . Under these facts, we cannot say that ALPA or the MEC acted in bad faith.

*Spellacy v. Airline Pilots Ass'n Int'l*, 156 F.3d 120, 129 (2d Cir. 1998) (internal citation omitted).

Likewise, in *Aguinaga*, 993 F.2d 1468-71, the union entered into a secret side agreement with the employer to reopen a closed meat packing plant, but the plant was reopened as a nonunion operation, and the union's agreement waived all claims that its members would have

5

had against the employer.  However, in *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1358-62 (10th Cir. 1994), the Tenth Circuit narrowed *Aguinaga* to its facts:

> In *Aguinaga,* the employer announced its plans to close a meat packing plant at which the plaintiffs worked. Without informing its members, the union entered into the secret agreement described above. . . . Unlike the institutional self-protectionist motives of the union in *Aguinaga,* the unions in the instant case . . . attempted to negotiate on behalf of all its members, filed a formal grievance, and pursued arbitration. . . . These claims, considered individually and collectively, do not establish bad faith and are not supported by the appellate record.

*Lewis* and *Aguinaga* are thus inapplicable to the instant case since, as in *Spellacy* and *Considine*, the TWA pilots knew of ALPA's long-term goal to merge with all independent pilots' unions, including the APA, through ALPA's Pilot Unity Resolution, which was adopted by acclamation by the Board of Directors in October 2000.  Tr. 6/9/11 at 62-63; *see* D-2.  The undisputed evidence at trial demonstrated that ALPA's goal was never concealed from the TWA pilots and did not affect the actions or advice given by ALPA officers, employees and staffers.  Tr. 6/27/11 at 44, 50-51, 53, 77, 174-75; Tr. 6/30/11 at 101-02; Tr. 7/5/11 at 89-90; Tr. 7/6/11 at 18, 158-59. *See also Spellacy*, 156 F.3d at 129; *Considine*, 43 F.3d at 1358-59.

Moreover, *Lewis* and *Aguinaga* conflict with the overwhelming weight of authority.  As shown in ALPA's New Trial Br. at 19-24, many DFR cases involve allegations of bad faith, but those cases all treat the union's decisions with a high degree of deference and require hard evidence of injury to plaintiffs, not speculation, in order to prove bad faith.

ALPA has reiterated its position on the law – which the jury instructions should have applied – in its summary judgment briefs (Doc. 295; Doc. 309), its briefs in support of its motion for leave to pursue an interlocutory appeal from the denial of summary judgment (Doc. 314; Doc. 316), its trial brief served on Plaintiffs and the Court on May 20, 2011, its proposed jury instructions and its briefs in support of its initial (Doc. 395) and renewed motions for judgment

pursuant to Rule 50 (Doc. 415).  Rather than repeating that position again in this submission, we respectfully refer the Court to those prior submissions, which we hereby incorporate by reference.

## II.    THE ERRONEOUS EXCLUSION OF JEFFREY BRUNDAGE'S DEPOSITION TESTIMONY

Plaintiffs seek to evade the consequences of their successful effort to exclude the deposition testimony of Jeffrey Brundage by arguing that Federal Rule of Evidence 103(a)(2) required ALPA to make a formal offer of proof with regard to his testimony.  Pls.' Opp'n Br. 12.  However, the Court and Plaintiffs' counsel understood that ALPA was requesting to play the portions of the Brundage videotaped deposition designated in the Joint Final Pre-Trial Order, which comprised the color-coded transcript given to them and to the Court.  Tr. 6/22/11 at 65-66.  On June 23, the Court definitively denied ALPA's request during a lengthy, off-the-record conference in the Courtroom, which the Court subsequently confirmed on the record.  Tr. 6/23/11 at 3-6.  Rule 103(a)(2) requires no further formalities.

Contrary to Plaintiffs' contention that ALPA should have made a formal offer of proof as to Brundage's deposition testimony, Rule 103(a)(2) merely requires that "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."  Fed. R. Evid. 103(a)(2).  The color-coded transcript accomplished that.  Moreover, the second sentence of Rule 103(a)(2) contradicts Plaintiffs' argument: "Once the court makes a definitive ruling on the record . . . excluding evidence, . . . a party need not renew an objection or offer of proof to preserve a claim of error for appeal."  *Id.*  The accompanying Advisory Committee notes to Rule 103(a) further clarify that when the court makes a definitive

ruling, "a renewed . . . offer of proof at the time the evidence is to be offered is *more a formalism than a necessity*." *Id.* at Advisory Committee notes on 2000 Amendments (emphasis added).[1]

"Rule 103 does not require any specific form for offers of proof.  Instead the trial judge has discretion to shape the manner and form of the offer of proof." *Perkins v. Silver Mountain Sports Club & Spa, LLC*, 557 F.3d 1141, 1147 (10th Cir. 2009) (citing *United States v. Adams*, 271 F.3d 1236, 1241 (10th Cir. 2001)).  Rule 103(a)(2) requires only that the court be "given enough information to determine admissibility of the evidence, to resolve other evidentiary questions . . . , and to determine the existence of a question of fact for the jury." *Id.* at 1148.

For example, in *Collins v. Wayne Corp.*, plaintiffs appealed an adverse jury verdict claiming that the district court erred in, among other things, refusing to allow certain deposition testimony into evidence.  *Collins v. Wayne Corp.*, 621 F.2d 777, 780 (5th Cir. 1980), *superseded on other grounds as noted in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002).  In *Collins*, the dispute hinged on whether deposition testimony could be offered as an admission of a party opponent.  *Id.*  "The district court took the motions and briefs filed by the plaintiffs and [defendant] under advisement and withheld any ruling on the admissibility of [the] deposition testimony until plaintiffs prepared to offer it as part of their trial evidence." *Id.*  The court ultimately held that plaintiffs could offer the deposition, but limited the manner in which plaintiffs could use the testimony.  *Id.*  "After the district court's ruling, the plaintiff[s] decided not to offer [the] deposition into evidence." *Id.* at 781.

---

[1]  Plaintiffs cite *Bissell v. United States*, an unpublished Ninth Circuit decision, to support the proposition that "the offering party is required to offer the [deposition] testimony 'as evidence during trial.'" Pls.' Opp'n Br. 12.  However, in *Bissell*, unlike in the case at bar, the plaintiffs "did not attempt to offer the deposition testimony . . . as evidence during trial and therefore did not preserve their right to raise on appeal their argument that the deposition testimony should have been admitted." *Bissell v. United States*, 321 Fed. App'x 549, 552 (9th Cir. 2008).

8

The defendant in *Collins* argued that "plaintiffs failed to preserve the error, if any, of the district court in limiting the use of [the] deposition testimony. [Defendant argued] that the plaintiffs made no offer of proof . . . and that the deposition was not filed in the district court either before or after trial." *Id.* However, the court rejected the defendant's argument:

> The function of an offer of proof is to inform the court what counsel expects to show by the excluded evidence. Here, the district court was fully aware of what the plaintiffs intended to show with [the] deposition. . . . Plaintiffs preserved error . . . by making the substance of the deposition known to the district court.

*Id.* (internal citations omitted).

Here, ALPA made the substance of its evidence known on June 22, when it informed the Court that ALPA planned to play portions of Brundage's videotaped deposition for the jury and provided the Court and opposing counsel with a color-coded copy of the deposition transcript, which showed ALPA's designations and Plaintiffs' objections and counter-designations. Tr. 6/22/11 at 65. Then, on June 23, 2011, the Court definitively ruled that "right now I am not going to let this be played in this form." Tr. 6/23/11 at 4.

The fact that ALPA was given the opportunity to revise its designations to respond to the Court's determination does not make the Court's ruling any less definitive. Under Rule 103(a)(2), ALPA had already adequately preserved its position and did not need to make a formal offer of proof later. As in *Collins*, the Court in this case was "fully aware" of what Brundage's deposition testimony would show once ALPA provided the Court with the color-coded deposition transcript and the matter was discussed at length with the parties in an off-the-record conference. Tr. 6/22/11 at 65; Tr. 6/23/11 at 5-6. *See also Collins*, 621 F.2d at 781.

Plaintiffs argue for the exclusion of Brundage's deposition testimony, *in toto*, on the grounds of "hearsay, speculation, improper narrative and non-responsive." Pls.' Opp'n Br. 13. However, most of their objections to Brundage's testimony did not include hearsay, and their

remaining objections are unmeritorious, especially on the wholesale scale in which Plaintiffs

seek to apply them here.  *See* Doc. 348, exh. E at 2-3 (listing Plaintiffs' objections to ALPA's

designations of Brundage's deposition).  During ALPA's cross-examination of Brundage, for

instance, he was asked whether "American was [] bluffing about walking away from this

transaction unless the scope provisions of the union contracts at TWA were waived or eliminated

by the bankruptcy court."  Brundage Dep. Tr. at 57.  As discussed in the June 23 off-the-record

conference, Brundage's response was succinct and well within the scope of his responsibilities as

American's chief labor relations executive for this project: "Not only was it not a bluff, it wasn't

even open for negotiation."  *Id.*

Significantly, Brundage was next asked about conversations he had had with Randy

Babbitt and whether "in any of [those] conversations with Captain Babbitt [the witness] [gave]

him any indication that American was negotiable about the elimination of the TWA union's

merger protections."  *Id.* at 58.  Again, his response was direct:

> Quite to the contrary, [I] was absolutely clear with Randy that those pilots in all
> likelihood would be unemployed if those conditions weren't removed from the
> agreement because we fully expected that TWA would liquidate and there would
> be no jobs.  And my conversations with Randy were, you know, if you're going to
> try to help these guys, you better get them to understand that the only way they're
> going to be flying as pilots is if they figure out how to get rid of these provisions.

*Id.* at 58-59.  Plaintiffs' attack on the advice that Babbitt and others gave to the MEC at its

meetings on April 1 and 2 rendered Brundage's foregoing testimony critical to ALPA's defense

because Brundage's comments provided part of the foundation for Babbitt's advice that the MEC

should accept the package of agreements that management was offering.  *See* Babbitt Dep. Tr. at

81-83, 123-24.  The Court improperly sustained Plaintiffs' objections to this testimony and the

many other portions of Brundage's deposition that ALPA designated in the Joint Final Pre-Trial

Order, which were only objected to on the grounds of speculation, non-responsiveness and

improper narrative.  Doc. 348, exh. E at 2-3.  These rulings unduly prejudiced ALPA and the outcome of the trial.

## III.   MISCONDUCT BY PLAINTIFFS' COUNSEL

In light of the Court's disposition on September 22, 2011, on ALPA's motion to revoke and Plaintiffs' Rule 11 Motion, ALPA does not rely upon any argument that Plaintiffs' counsel engaged in ethical violations in support of its motion for a new trial. ALPA does not waive its contentions that the conduct of Plaintiffs' counsel and the erroneous testimony of Plaintiffs' witnesses at trial do constitute grounds for a new trial.

## IV.   THE PREJUDICIAL AND ERRONEOUS CROSS-EXAMINATION OF SETH ROSEN CONCERNING AN ALPA "SCAB LIST"

Plaintiffs do not accurately characterize the trial record in attempting to defend their cross-examination of Seth Rosen about a list of scabs of Eastern of the strike of 1989.  Tr. 7/6/11 at 50-54.  In an effort to connect the Eastern scabs of 1989 to the case at bar, Plaintiffs incorrectly state that Mike Day testified that "Duane Woerth told him that ALPA never engaged in suspending jump seat privileges."  Pls.' Opp'n Br. 19 (emphasis in original).  Day's actual testimony was: "He looked at me and said, I can't start a jumpseat war."  Tr. 6/23/11 at 52.

Plaintiffs also erroneously assert that during cross-examination Woerth "proclaim[ed] that to engage in a 'jump seat war' was against ALPA policy and never done."  Pls.' Opp'n Br. 19.  The trial transcript shows that Woerth said something quite different:

> Q.   All right.  Mr. Woerth, is it not a fact that as a matter of unwritten policy, the Air Line Pilots Association encourages or directs its members to exclude from their jumpseats pilots who are characterized as scabs?
>
> A.   Are you saying is that ALPA's policy?
>
> Q.   I said is that ALPA's policy or practice?
>
> A.   No, it is not.

11

Q.    It is not at all?

A.    No.

Tr. 6/28/11 at 153.  Woerth thus did not say that ALPA maintained a policy of excluding scabs from jump seats, nor did he testify that ALPA had never attempted a jump seat war.  On direct, Woerth was emphatic in explaining that in 1997 ALPA adopted a "national jumpseat policy" stating that it would not "engage in a jumpseat war."  Tr. 6/27/11 at 87.  Woerth testified that he had experience dealing with requests to start jump seat wars because "at least three or four times a year somebody from a different airline made the same request that Captain Day did." *Id.* at 99. Woerth explained that his response was always the same: "[I]t is against ALPA policy and we are not going to have a jumpseat war." *Id.*

Plaintiffs counter ALPA's request for a new trial based on their cross-examination of Rosen about the scab list by contending that "ALPA did not object to any of those questions." Pls.' Opp'n Br. 19.  In fact, ALPA's counsel objected twice to this line of questioning, and requested a side bar to discuss the subject.  Tr. 7/6/11 at 50, 52.  The Court not only overruled ALPA's objections, but also denied the side bar request. *Id.* at 52.  By contrast, when Plaintiffs earlier tried to cross-examine Woerth about the scab list using the same document, the Court stated: "I see nothing that would permit questioning on this document." Tr. 6/28/11 at 152-53. The Court observed during Plaintiffs' attempted cross-examination of Woerth about the scab list that the subject was far afield from the proposal to initiate a jump seat war against the American pilots in 2001:  "In our case there is no strike.  There is no issue, the issue of the jumpseats wasn't to keep out scabs.  It was to keep out everybody." *Id.* at 153.  As further noted by the Court, Day's request to start a jump seat war was a request "to keep the 11,000 American pilots from riding in the jumpseats." *Id.*  But the Court added that the two scenarios were very

12

different: "[The American pilots] were working. They weren't scabs." *Id.* at 154.  It is also

significant that the jump seat policy was adopted in 1997, many years after the Eastern strike of

1989.  Tr. 6/27/11 at 90; D-411.

There are additional inaccuracies in Plaintiffs' argument on this issue.  They claim that

"the scab list was prepared and distributed to all ALPA members to identify these unwelcomed

pilots." Pls.' Opp'n Br. 19.  Rosen's testimony does not support Plaintiffs' claim:

> Q.    So as a matter of fact, ALPA did produce and distribute a scabs list of these Eastern pilots, right?
>
> A.    I think you asked me that.  Yes.
>
> Q.    And part of the intention of doing that was for that list to be taken into cock pits [sic] by ALPA pilots so they . . .would know who the scabs were that might want to sit in the jumpseat.  That was part of the reason?
>
> A.    I can't speak to the intent.
>
> Q.    That is fair enough.

Tr. 7/6/11 at 54.  There is no other testimony in the trial record to support Plaintiffs' contention

as to the purpose for preparing and distributing the 1989 Eastern scab list.

Plaintiffs argue that cross-examining Rosen on this subject "was appropriate in judging

Duane Woerth's credibility on the issue of the denial of jump seat privileges to generate leverage

for the TWA pilots." Pls.' Opp'n Br. 19.  The argument is flawed on several grounds.

For one thing, Rosen did not contradict Woerth.  As quoted above, Rosen admitted that

ALPA prepared and distributed a list of Eastern pilots who worked during the 1989 strike, but he

did not testify that the list was intended to bar strikebreakers from jumpseating.  *See* Tr. 7/6/11 at

54.  Rosen's testimony thus did not reflect on Woerth's credibility; Woerth responded in the

negative to the question: "In fact, you keep lists of who the scabs are, to the best you know, from

every strike going back to 1931, Century Airlines?" Tr. 6/28/11 at 150.  As quoted above,

13

moreover, Woerth denied that ALPA had a policy of excluding scabs from jumpseats and Rosen

did not disagree.  Tr. 6/28/11 at 153; Tr. 7/6/11 at 54.  Neither witness testified to a nexus

between the Eastern scab list and ALPA's policy on jumpseating; indeed, the scab list pre-dated

ALPA's jump seat policy by several years.  Tr. 7/6/11 at 53-54; D-411.

     Furthermore, it is improper to cross-examine one witness in order to impeach another

witness on a collateral subject.  As the appellate court explained in *United States v. Scott*, 243

F.3d 1103, 1107 (8th Cir. 2001) (quoting *United States v. Kozinski*, 16 F.3d 795, 806 (7th Cir.

1994)), "'one may not contradict for the sake of contradiction' by proferring testimony that

relates only to collateral matters."  Here, the entire subject of the 1989 Eastern scab list was

irrelevant to any issue at trial since it occurred prior to ALPA's adoption of its jump seat policy

and, as the Court noted during Woerth's cross-examination:

> In our case there is no strike. . . . [T]he issue of the jumpseats wasn't to keep out
> scabs.  It was to keep out everybody. . . . It was to keep the 11,000 American
> pilots from riding in the jumpseats. . . . [The American pilots] were working.
> They weren't scabs.

Tr. 6/28/11 at 153-54.  Plaintiffs' cross-examination of Rosen on the subject was unduly

prejudicial and improper.

## V.  <u>THE COURT'S INTERJECTIONS DURING SETH ROSEN'S TESTIMONY</u>

     Plaintiffs argue that ALPA "unjustifiably charge[d] the Court with misconduct," that the

standard for a new trial based on such an allegation is "extremely high," and that ALPA cannot

meet its burden.  Pls.' Opp'n Br. 20.  Plaintiffs misstate ALPA's point.  ALPA is not arguing that

the Court showed actual bias or consistently advocated on behalf of the Plaintiffs, but that the

Court's interjections during the direct examination of Seth Rosen unfairly prejudiced ALPA.

     The Court interjected the issue of spoliation into the case even though the Court had ruled

before trial that ALPA had not engaged in any spoliation of evidence.  *See* ALPA's New Trial

14

Br. at 43-46 (discussing the Court's pre-trial rulings on this issue).  The issue of spoliation

should have been out of the case.  *See Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174

F.3d 801, 803-04 (6th Cir. 1999) (granting a new trial where the district court erred in excluding

expert testimony and then "compounded the error when [the court] violated its own order by not

allowing [the expert] to testify as to matters to which the court had already agreed [the expert]

could testify").  Up to that point, ALPA's counsel had been asking Rosen about the

organizational campaign at Continental.  Tr. 7/6/11 at 25-26.  However, the Court, still focused

on the card campaign, launched into its own tangential examination of Rosen.  *Id.* at 26-31.  The

Court asked Rosen if he was aware that some cards were delivered to ALPA and that "*[t]hose*

*cards then disappeared later on, the physical cards*."  *Id.* at 27-28 (emphasis added).  The Court

continued: "You are not even aware of where the cards are . . . *if we had the cards we might*

*know who prepared them, wouldn't we? If we physically had the cards*."  *Id.* at 28 (emphasis

added).  The Court reiterated: "*And you don't know where they are so we can't do any forensics*

*on them to figure it out, right*?"  *Id.* at 29 (emphasis added).  The Court's examination of Rosen

thus suggested to the jury that ALPA was involved in the destruction of the cards and that it is

impossible to prove or disprove whether ALPA was involved because the cards were gone.

　　The Third Circuit has held that a new trial is appropriate when irrelevant and unfairly

prejudicial information is introduced in front of the jury.  *See W.V. Realty, Inc. v. N. Ins. Co.*, 334

F.3d 306, 314-15 (3d Cir. 2003).  The court there ordered a new trial when the jury was

permitted to hear testimony about a discovery violation that was not probative of bad faith and

thus was irrelevant.  *Id.*  That is akin to what occurred here, where the Court itself introduced the

issue of spoliation into the trial.  *See* Tr. 7/6/11 at 26-29; *see also Champeau v. Fruehauf Corp.*,

814 F.2d 1271, 1276 (8th Cir. 1987) (granting a new trial where the trial judge allowed "factual

and legal arguments . . . in the presence of the jury . . . . involv[ing] matters not in evidence").

A motion for a new trial based on intervention by the presiding judge will be granted if

such an event "undermined the defendant's right to a fair trial by improperly influencing the

jury." *United States v. Meinster*, 488 F. Supp. 1342, 1345 n.1 (S.D. Fla. 1980) (internal citation

omitted). To be sure, a federal judge is more than "a mere moderator, but is the governor of the

trial for the purpose of assuring its proper conduct and of determining questions of law."

*Quercia v. United States*, 289 U.S. 466, 469 (1933) (citing *Herron v. S. Pac. Co.*, 283 U.S. 91,

95 (1931)). However, the judge's role is not without restraints:

> This privilege of the judge to comment on the facts has its inherent limitations.
> His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in
> conformity with the standards governing the judicial office. In commenting upon
> testimony he may not assume the role of a witness. He may analyze and dissect
> the evidence, but he may not either distort it or add to it. . . . The influence of the
> trial judge on the jury is necessarily and properly of great weight and his lightest
> word or intimation is received with deference, and may prove controlling.

*Id.* at 470 (internal quotations omitted). Judicial impartiality before the jury is most important in

cases such as the present one, in which the jury's verdict is heavily based on credibility

determinations. *United States v. Candelaria-Gonzalez*, 547 F.2d 291, 297 (5th Cir. 1977).[2]

The Court's interjections during Rosen's direct examination accused ALPA's counsel of

misstating the facts and misleading the jury: "*You are wrong. That is a misstatement of facts.*

There were cards out there. *Those cards didn't come from the Tooth Fairy.* Those cards were

being collected. They were handed over to ALPA. Your statement that none of this happened in

---

[2] Plaintiffs misstate the law on this point. Plaintiffs' opposition brief relies on *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995), in which the court stated that "the standard for reversing a verdict because of general judicial misconduct during trial is rather stringent." *See* Pls.' Opp'n Br. 20. But *Duckett* is inapplicable because it involved a habeas appeal where the issue was whether "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett*, 67 F.3d at 740.

American is not a true statement." Tr. 7/6/11 at 26 (emphasis added). However, the Court apparently misunderstood the proposed line of questioning and never gave ALPA's counsel the opportunity to clarify that misunderstanding. *See id.* at 26-31. The Court thereby implied that ALPA was involved in printing the cards, that ALPA's witnesses were lying, and that ALPA's counsel was incorrectly representing the true facts.

Taken as a whole, as more fully discussed in ALPA's Motion for a New Trial at 35-46, the Court's comments during the examination of Rosen undermined the credibility of Rosen and ALPA's counsel, and unfairly prejudiced ALPA. The Court inaccurately implied that ALPA might have been involved in initiating Clark and Hunnibell's card campaign, even though Clark and Hunnibell testified in their depositions, without contradiction from any source, that they printed the cards through a company called Primadata and did not communicate with ALPA until after the cards had been mailed. *See* Tr. 7/6/11 at 28-31; *cf.* P-3; Clark Dep. Tr. at 70-73, 96-97; Hunnibell Dep. Tr. at 50-53, 73-74.

Although the Court gave a curative instruction to the jury, Tr. 7/6/11 at 88, the damage was already done. As the Supreme Court has recognized, a judge cannot unring the bell simply by giving a limiting instruction:

> Nor do we think that the error was cured by the statement of the trial judge that his opinion of the evidence was not binding on the jury . . . . His characterization . . . was of a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence.

*Quercia*, 289 U.S. at 472 (internal citation omitted).

## VI.   SEVENTH AMENDMENT ISSUES

In its opening brief, ALPA argued that the verdict rendered in the liability trial was incompetent to determine liability and thus violated ALPA's Seventh Amendment rights. ALPA's New Trial Br. 46-48. Plaintiffs argue that a second jury in a damages trial will not need

17

to redecide issues that were resolved by the first jury. Pls.' Opp'n Br. 23.  However, the second jury can only determine which TWA pilots were injured if it starts from the premise that some conduct of ALPA's caused harm to the seniority integration and to the TWA pilots' jobs situation—something as to which the first jury could only have speculated.  Nor can a second jury remotely figure out which of the "some" pilots were injured without a new decision on liability – one in which a jury decides in what way those pilots were injured.  Indeed, Plaintiffs concede that not all of the TWA pilots were injured, a concession that supports the necessity for a new trial of liability to determine who was injured and in what way they were injured, but that also supports ALPA's position that the class should be decertified if the case moves forward to the damages phase. *See* ALPA's Motion to Decertify the Class (Doc. 444).

## CONCLUSION

For the foregoing reasons, as well as those set forth in our opening brief, ALPA respectfully requests that, as an alternative to ALPA's renewed motion for judgment, the Court grant its motion for a new trial on the issue of liability.

Respectfully submitted,

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121

By: ___*/s/ Steven J. Fram*_____
STEVEN J. FRAM, ESQUIRE
JOHN C. CONNELL, ESQUIRE

*Pro Hac Vice*:
Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Ave., N.W., Suite 250
Washington, DC 20016
(202) 659-4656

Counsel for Defendant Air Line Pilots Association, International

Dated: September 26, 2011.

7152177v1

19