IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>AIR LINE PILOTS ASSOCIATION, )<br>INTERNATIONAL, )<br>)<br>Defendant. )<br>) | Civil Action No. 02-2917 (JEI) |

**REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT'S
MOTION TO DECERTIFY**

                                        Archer & Greiner
                                        A Professional Corporation
                                        One Centennial Square
                                        P.O. Box 3000
                                        Haddonfield, New Jersey 08033-0968
                                        (856) 795-2121
                                        By:    Steven J. Fram, Esquire
                                                   John C. Connell, Esquire
                                                   Kerri E. Chewning, Esquire

*Pro Hac Vice*:

    Daniel M. Katz, Esquire
    Katz & Ranzman, P.C.
    4530 Wisconsin Ave., N.W., Suite 250
    Washington, DC 20016
    (202) 659-4656

Attorneys for Defendant
    Air Line Pilots Association, International

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii
INTRODUCTION .................................................................................................................1
PROCEDURAL AND FACTUAL STATEMENT ................................................................2
ARGUMENT .........................................................................................................................6
    A.    The Verdict Does Not Permit Identification of the Pilots Who Were Injured .........6
    B.    Plaintiffs Cannot Establish Which Pilots Were Injured Through Expert Testimony ...8
    C.    Decertification Is Required With Respect To The Issue Of Damages ......................9
    D.    Decertification is Appropriate at this Time ...............................................................11
CONCLUSION .....................................................................................................................12

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Agostino v. Quest Diagnostics, Inc.,
   256 F.R.D. 437 (D.N.J. 2009) ......................................................................................... 6

Bayshore Ford Truck v. Ford Motor Co.,
   Civ. No. 99-741, 2010 WL 415329 (D.N.J. Jan. 29, 2010) ........................................ 12

Bensel v. Allied Pilots Ass'n.,
   675 F.Supp.2d 493 (D.N.J. 2009) ................................................................................. 6

Brown v. Pro Football, Inc.,
   146 F.R.D. 1 (D.D.C. 1992) ........................................................................................ 10

Brown v. Pro Football, Inc.,
   518 U.S. 231 (1996) .................................................................................................... 10

Elias v. Ungar's Food Products, Inc.,
   2009 WL 2581502 (D.N.J. Aug. 20, 2009) ................................................................ 11

Fedorczyk v. Caribbean Cruise Lines, Ltd.,
   82 F.3d 69 (3d Cir.1996) .............................................................................................. 9

Gen. Elec. Co. v. Joiner,
   522 U.S. 136 (1997) ...................................................................................................... 9

Holman Enterprises v. Fid. & Guar. Ins. Co.,
   563 F. Supp. 2d 467 (D.N.J. 2008) ............................................................................... 9

In re FleetBoston Financial Corp. Sec. Litig.,
   253 F.R.D. 315 (D.N.J. 2008) .................................................................................... 11

In re Hydrogen Peroxide Antitrust Litig.,
   552 F.3d 305 (3d Cir. 2008) ................................................................................. passim

Magistrini v. One Hour Martinizing Dry Cleaning,
   180 F. Supp.2d 584 (D.N.J. 2002) ................................................................................ 9

Pineda v. Ford Motor Co.,
   520 F.3d 237 (3d Cir. 2008) ......................................................................................... 9

Wal-Mart Stores v. Dukes,
   131 S. Ct. 2541 (2011) ............................................................................................ 7, 12

Yarchak v. Trek Bicycle Corp.,
    208 F. Supp. 2d 470 (D.N.J. 2002) .................................................................................. 9

**RULES**

Fed. R. Civ. P. 23 ............................................................................................................ passim

Fed. R. Evid. 702 ..................................................................................................................... 9

# INTRODUCTION

Plaintiffs argue in their Brief opposing the decertification motion of Defendant, the Air Line Pilots Association, International ("ALPA"), that ALPA somehow conceded, when it moved for bifurcation of liability and damages in early 2005, that treatment of this case as a class action was warranted both with respect to liability and with respect to damages. Plaintiffs are incorrect. Instead, as discussed below, at the time of bifurcation, class treatment of the issue of liability appeared to be warranted based upon the seniority arbitration waiver theory of liability that Plaintiffs were pressing at that point. After it later became clear that Plaintiffs were pressing a second theory, that the TWA pilots' ability to negotiate a more favorable seniority integration in the summer and fall of 2001 was undermined by ALPA's alleged lack of aggressiveness, ALPA pointed out that class certification was no longer appropriate and that a liability verdict in favor of Plaintiffs would not provide the parties with the information necessary to proceed to the issue of damages if Plaintiffs prevailed. The full record of the trial, considered in light of current law, amply demonstrates that the issue of injury in fact was not a common issue, that class treatment of the issue of liability was unwarranted and that the liability verdict does not provide the information necessary for further proceedings.

Moreover, even if the liability verdict had identified which members of the class suffered injury and were therefore entitled to participate in damage proceedings, Plaintiffs themselves concede, in their opposition Brief, that no consideration was given, at the time of the bifurcation motion or thereafter, to whether the issue of damages could be addressed on a class-wide basis. Indeed, Plaintiffs' opposition Brief essentially argues that it is premature even to consider the issue of whether damages can be addressed on a class-wide basis because Plaintiffs have not yet had an opportunity to take discovery and submit expert reports on the issue of damages. ALPA

submits that consideration of the "rigorous analysis" required by In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008), including the formulation of a trial plan and consideration of proposed expert testimony, makes clear that class treatment of the issue of damages is not warranted.

For these reasons, if the Court does not grant ALPA's motion for judgment as a matter of law, decertification is necessary with respect to all issues in this case.

## PROCEDURAL AND FACTUAL STATEMENT

At the time ALPA moved for bifurcation on April 19, 2005, the primary theory of Plaintiffs' case was that the TWA pilots had been deprived of their right to have a neutral arbitrator determine a "fair and equitable" seniority intergration under Allegheny-Mohawk principles because the TWA-MEC was induced by ALPA to waive the pilots' "scope" protections on April 2, 2001. This theory was set forth in Plaintiffs' Second Amended Restated Complaint (the "SAC"), which they filed on January 27, 2003 [Docket # 45]. In the SAC, Plaintiffs alleged that the injury suffered by the class was the loss of the right of the TWA pilots to arbitrate the issue of seniority integration. See SAC at ¶¶ 100-02; 104-05; 108. The SAC specifically requested, as among the relief sought, that the TWA pilots be granted "a fair and equitable integration" under the Allegheny-Mohawk protective provisions.

When the bifurcation motion was filed over two years later, that motion was premised on the understanding that Plaintiffs were claiming that the DFR violation was the waiver of scope on April 2, 2001, and that Plaintiffs would attempt to prove damages based a "fair and equitable" seniority integration that would have resulted from arbitration. Thus, the bifurcation motion summarized Plaintiffs' claims as being based upon the waiver of the labor protection provisions on April 2, 2001:

2

>To prove the proper amount of damages, Plaintiffs would need to show what the seniority list would have looked like had ALPA not, as Plaintiffs allege, "coerced and forced" the TWA Master Executive Council (TWA MEC) to waive the seniority protective provisions of the TWA-ALPA Collective Bargaining Agreement (CBA) in response to American's demands and TWA's filing of a Section 1113 motion in Bankruptcy Court seeking to reject the CBA. See Complaint at ¶¶ 42-45.

Bifurcation Br. [Docket # 112] at 8-9.

The bifurcation motion noted that determining a "fair and equitable" seniority list under Allegheny-Mohawk would be "an extraordinarily difficult task," Bifurcation Br. at 9, and would probably require expert testimony, but that establishing such a seniority list would still leave, as an individual issue, the nature and amount of the damages suffered by individual pilots:

>Establishing what the consolidated seniority list would have looked like had negotiations turned out differently in this case would be, in short, an exceedingly complex and resource-intense endeavor, requiring extensive discovery and expert witness testimony.
>
>Moreover, simply establishing a version of a "fair" seniority list, would not in itself answer the question of damages. Passing over the issue of how many "fair" merged lists exist in a single merger, in theory, one can easily see that merely calculating each pilot's difference in seniority numbers between the actual list and a "fair" list would not in itself lead to a dollar figure for actual damages. Instead, <u>Plaintiffs would need to show exactly what the difference in seniority numbers would have provided, in terms of Plaintiffs' alternative careers, in order to calculate the differences in salary and benefits the pilots would have received under the different conditions.</u>

Bifurcation Br. at 10 (emphasis added).

If this case had been tried based upon the claims set forth in the SAC, a liability verdict in favor of Plaintiffs on their arbitration theory -- that DFR violations by ALPA during the period leading up to April 2, 2001, deprived the TWA pilots of their right to achieve a fair and equitable list through arbitration -- would have enabled this case to proceed to consideration of what an arbitrated seniority list would have been under Allegheny-Mohawk principles. The issue of the damages suffered by individual pilots based upon the differences between that hypothetical list

3

and Supplement CC, however, would still have required individual hearings, as noted in the bifurcation motion, and, would not have been appropriate for class treatment.

What happened, instead, is that Plaintiffs' changed counsel, changed class representatives and added a new theory of liability that was not anticipated at the time of the bifurcation motion. That new theory was that the alleged failure of ALPA to act more aggressively during the summer and fall of 2001, by failing to do such things as authorize litigation by Roland Wilder, start a jump-seat war and press more aggressively for the Bond legislation, impaired the ability of the TWA pilots to negotiate a more favorable seniority list with American Airlines and the APA. These three allegations, which played a prominent role at trial, were never mentioned in the SAC. Plaintiffs also never articulated these issues or their negotiation theory focusing on the events leading up to the implementation of Supplement CC when substitute counsel for Plaintiffs filed their motion to amend the nature of class certification on September 21, 2006, to allow this action to proceed as a class action for damages under Fed. R. Civ. P. 23(b)(3). Indeed, even after the Court granted that motion on March 19, 2007, the SAC remained as the operative pleading and Plaintiffs made no attempt to amend that complaint. Instead, Plaintiffs' arguments about litigation theories, jump-seat wars and the Bond legislation only emerged during discovery that began after the bifurcation motion was granted.

After the Court denied ALPA's summary judgment motion, ALPA realized, in preparing the Joint Final Pretrial Order (the "JFPO"), that Plaintiffs' new theory of injury – that ALPA's alleged DFR violations <u>after</u> April 2, 2001, undermined the ability of the TWA pilots to put pressure on American and the APA to negotiate a more favorable seniority list than Supplement CC – was not susceptible to proof of injury on a common basis and that the issue of class certification had not been considered with the "rigorous analysis" required by <u>Hydrogen Peroxide</u>.

As a consequence, in its portions of the JFPO, ALPA objected that injury in fact could not be proven on a class-wide basis and advised the Court that decertification was necessary. See JFPO at Page 70. In its first Motion to Decertify filed on February 22, 2011 [Docket # 354], ALPA argued that decertification was necessary under Hydrogen Peroxide and expressed concern that if this case proceeded to a liability trial on a class basis, a verdict in favor of Plaintiffs on the issue of liability would "not be meaningful for the purposes of further proceedings on the issue of damages . . .." Decertification Br. at 1.

During trial, ALPA again argued that it was important to know, for the purposes of further proceedings, which of Plaintiffs' theories was the basis for liability. Thus, ALPA submitted a proposed verdict sheet that would have had the jury address separate liability and causation questions for each of (1) the loss of the right to arbitrate theory resulting from the events leading up to April 2, 2001; and (2) the less favorable negotiation theory based upon the alleged failure of ALPA to act more aggressively toward American and the APA in the summer and fall of 2001. Plaintiffs objected to this verdict sheet and the Court, over ALPA's objection, declined to allow the jury to consider these theories separately. See Tr. of 7/7/11 at 148-49. Instead, the Court only permitted the jury to answer two general questions, one each for liability and causation.

The parties and the Court now face two major problems in proceeding forward as a consequence of Plaintiffs' shift in theories and the general verdict form. The first is that there is no way of knowing what violations the jury found – or even if the jurors agreed on the same violations – and therefore there is no way of knowing which members of the class suffered injury and to what extent (i.e., because of a failure to maintain the right to arbitrate or the failure to do better in negotiations), so there is no way of knowing which members of the class are entitled to pursue claims for damages. The second problem is that, even if it could be ascertained which

5

pilots suffered injury, and to what extent, if at all, their seniority would have been different, the issue of their specific damages would still be individual in nature and not suitable for treatment on a class basis.

## ARGUMENT

### A. The Verdict Does Not Permit Identification of the Pilots Who Were Injured.

At this point, there are no objective criteria that can be applied to determine which TWA pilots are still legitimate members of the class because we do not know which pilots suffered injury. Plaintiffs themselves concede that some members of the former TWA pilot class did not experience any injury in fact and will not be entitled to damages. Pl. Br. at 6.

Class certification is inappropriate when the class members cannot be identified absent an inquiry into the merits of their claims. See Agostino v. Quest Diagnostics, Inc., 256 F.R.D. 437, 478 (D.N.J. 2009). Plaintiffs attempt to distinguish Agostino by arguing that, in light of the liability verdict, the "actions of ALPA had a common impact" and that liability would not have been different for different pilots. Pl. Br. at 6. This argument ignores Plaintiffs' express acknowledgment that some pilots "did not suffer lost income damages." Pl. Br. at 1. The absence of injury in fact from ALPA's actions precludes liability for a DFR violation. See Bensel v. Allied Pilots Ass'n., 675 F.Supp.2d 493, 499 (D.N.J. 2009).

Plaintiffs are themselves responsible for this lack of clarity. As explained in detail in ALPA's opening Brief, Plaintiffs argued that if the jury found that the number of pilots stapled below the American pilots on the integrated list was reduced by just "one pilot," then it could find in favor of Plaintiffs. Df. Br. at 11. The verdict sheet, which was significantly pared down from the verdict sheet proposed by ALPA, similarly invited the jury to find in favor of the Plaintiffs if it found that only "some" of the pilots suffered injury as a result of ALPA's actions. See id.

That there were some common issues in this case, including the question of how ALPA's conduct impacted the overall seniority integration process, Pl. Br. at 2, was not sufficient to establish the essential element of commonality for class certification. In Wal-Mart Stores v. Dukes, 131 S. Ct. 2541 (2011), the Supreme Court dispelled the misunderstanding that commonality under Rule 23(a)(2) is a readily established element in class certification and clarified that commonality requires "the Plaintiff to demonstrate that the class members 'have suffered the same injury.'" Id. at 2551. Dukes also emphasized that what matters to class certification "is not the raising of common 'questions' – even in droves – but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (quoting Nagarata, "Class Certification in the Age of Aggregate Proof," 84 N.Y.U.L. Rev. 97, 132 (2009)) (emphasis in original).

In other words, that ALPA acted in a common manner toward the TWA pilots would not be sufficient to establish that all of the TWA pilots suffered a common injury and does not establish the basis for class certification. Indeed, the proofs at trial made clear that the TWA pilots, when confronted with TWA's third bankruptcy filing in early 2001, had divergent views about how to approach the issue of seniority integration, and that many pilots, particularly the more senior pilots, benefitted from the measured approach taken by ALPA in dealing with American Airlines and the APA.[1]

---

[1] A number of pilots who testified at trial - or whose positions were presented at trial - believed that ALPA acted entirely appropriately in assisting the TWA-MEC and that ALPA properly declined to take certain risks that might have led American to abandon the transaction or the APA to take harder line positions. These pilots included TWA-MEC members Steve Rautenberg, Pablo Lewin, and David Singer. Other pilots favored taking more aggressive positions and were willing to risk the adverse consequences that might be visited on all of the pilots. These pilots included Howard Hollander, Ted Case and Sally Young.

Under ALPA's democratic structure, the decision on how to proceed ultimately fell to the TWA-MEC, exclusively. An overwhelming majority of the TWA-MEC voted to waive scope and accept

7

B.     **Plaintiffs Cannot Establish Which Pilots Were Injured Through Expert Testimony.**

Plaintiffs suggest that they intend to present "a damage model to approximate a fair and reasonable seniority list." Pl. Br. at 5.[2] If the jury had found in favor of the Plaintiffs based upon their arbitration waiver theory, then it might have been possible for this case to proceed to consideration of what a "fair and equitable" seniority list would have been under <u>Allegheny-Mohawk</u> principles, as suggested in the bifurcation motion. Expert testimony, perhaps from a labor arbitrator about how those principles would have been applied if there had been no waiver, might be admissible. (As discussed below, however, decertification would still be required with respect to the issue of the damages of individual pilots.)

The problem we face, however, is that the jury never found that ALPA committed a DFR violation with respect to the events leading up to April 2, 2001, or that any members of the class suffered injury from the waiver of scope. Because of the general nature of the verdict, it is impossible to know whether the jury found liability based upon the arbitration waiver theory or the negotiation theory – or even if the jurors agreed on the nature of the violation.

If the jury found DFR violations and injury to the pilots based upon the negotiation theory, as Plaintiffs appeared to argue at trial, expert testimony would <u>not</u> be admissible to establish what the seniority list would have been. This is because factual testimony from representatives of American Airlines and the APA would be the only basis for determining what they would have agreed to had ALPA done one or more of the things that Plaintiffs claim ALPA should have done.

---

the new Collective Bargaining Agreement with TWA, LLC and to protect the jobs and other benefits that American was offering to the TWA pilots. Regarding the decision about whether to accept the seniority integration proposal made by the APA and American in the Fall of 2001, a different majority of the TWA-MEC, over the dissent of Rautenberg and Lewin, voted to reject the last and final offer made by the APA and American. As a result, the APA and American imposed seniority integration in the form of Supplement CC, which was less favorable, on an overall basis, to the TWA pilots than the last offer made by the APA and American.

[2] ALPA assumes that Plaintiffs meant to refer to a "fair and equitable" list.

8

Rule 702 requires that proffered expert testimony must "fit" within the facts of the case. See, e.g., Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008); Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 496 (D.N.J. 2002). "'Fit' requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case." Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp.2d 584, 595 (D.N.J. 2002). Here testimony concerning what American Airlines and the APA might have done if ALPA had proceeded differently is simply not an issue where expert testimony would be helpful. The issue is strictly a fact issue that is not beyond the ken of the ordinary juror.

Moreover, it would be improper to allow an expert to speculate about what American or the APA might have done. "An expert opinion is not admissible if the court concludes that an opinion based upon particular facts cannot be grounded upon those facts." Holman Enterprises v. Fid. & Guar. Ins. Co., 563 F. Supp. 2d 467, 471-72 (D.N.J. 2008) (quoting Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 75 (3d Cir.1996)). It is well settled that "if an expert opinion is based on speculation or conjecture, it may be stricken." Id.; see also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Speculation by an expert about what American Airlines or the APA would have done is no more admissible than speculation by individual pilots about that topic. For this reason, expert testimony would not be admissible to attempt to establish what the seniority list would have been based upon Plaintiffs' impaired negotiation theory.

C. **Decertification Is Required With Respect To The Issue Of Damages.**

Even if the liability verdict provided a foundation for proceeding to the issue of damages, Plaintiffs' bare assertion in their opposition brief that they will produce an expert with a damage

9

model that will apply to the entire class is insufficient. Hydrogen Peroxide requires the Court to determine if the expert testimony that will be offered in support of the damages in this case will be admissible and will allow the parties to address the question of damages on a class-wide basis. Because Plaintiffs have failed to articulate how damages can be proven other than through individual hearings, and because the law outlined in ALPA's opening brief establishes that damages cannot be addressed on a class-wide basis, decertification on the issue of damages should be ordered.

Plaintiffs rely on Brown v. Pro Football, Inc., 146 F.R.D. 1 (D.D.C. 1992), to argue that damages among the TWA pilots do not need to be "identical" to qualify for continued treatment as a certified class. That case -- a 19 year old antitrust matter decided long before the significant developments in more recent class action law -- offers no authority to excuse Plaintiffs from presenting a cogent method of computing damages as to the class as a whole.

Plaintiffs' reliance on Brown is also unavailing with respect to the calculation of damages.[3] The court in Brown declined to decertify the Plaintiffs' class because a simple formula -- "the subtraction of the former $1000 from the pro rata share of the latter salary" -- existed for the calculation of damages. Brown, 146 F.R.D. at 5. In this case there is no such "simple" formula that would apply to the damages of the eligible class members and Plaintiffs do not even attempt o articulate one. Plaintiffs do not dispute that, to calculate damages for individual pilots, a jury would be required to consider the myriad individual issues identified in ALPA's opening brief

---

[3] While the Brown case does not support Plaintiffs' arguments, it does illustrate the importance of a thorough review of class-wide proof to sustain the merits of Plaintiffs' claims. It is telling that, after years of litigation as a class action including more than 200 individuals as class members, the United States Supreme Court affirmed the circuit court's dismissal of that case on its merits, Brown v. Pro Football, Inc., 518 U.S. 231 (1996). The Brown decision is an example of the problems fostered by continued class treatment, and is at best dubious authority, rendered so by recent controlling caselaw setting more exacting standards for class certification. Hydrogen Peroxide, 552 F.3d at 311.

relating to damages. Pl. Br. at 2. These issues include, among others, individual evaluation of back pay and fringe benefits in the context of each pilot's mitigation of damages.

The individual issues in ascertaining membership in the class and in assessing the proper measure of damages for each remaining class member will overwhelm the damages phase of this litigation. The Court should therefore decertify this class.

### D.  Decertification is Appropriate at this Time.

Plaintiffs contend that it is inappropriate for the Court to evaluate continued class certification through the damages phase because the facts have not changed. Not so. The trial evidence, Plaintiffs' closing argument and the jury's verdict that only "some" of the pilots suffered injury all demonstrate that review of the issue of certification is warranted. As Chief Judge Brown observed in In re FleetBoston Financial Corp. Sec. Litig., 253 F.R.D. 315 (D.N.J. 2008), "the accumulation of a full factual record and the simultaneous accretion of zero evidence that the class actually exists is ... a 'factual development' within the meaning of Rule 23(c)(1)(C) triggering the Court's duty of review." Id. at 338. The Court should therefore re-evaluate the propriety of class treatment at this time.

The case cited by Plaintiffs on this point does not support their position. The Court in Elias v. Ungar's Food Products, Inc., 2009 WL 2581502 (D.N.J. Aug. 20, 2009), declined an invitation to re-examine the class certification because there had not been any change in the facts as they had been presented to the Court from the time of the initial certification to the time the defendant requested decertification. Elias does not apply here because this Court has had the benefit of a five-week jury trial. The facts and theories here are markedly different from the facts and theories presented at the time the parties earlier encountered the question of class certification.

Decertification, especially after a ruling on liability, is not a novel concept. As discussed in ALPA's opening Brief, decertification is appropriate when it becomes apparent that there is

11

insufficient commonality among the class members to assess damages on a class-wide basis. See, e.g., Bayshore Ford Truck v. Ford Motor Co., Civ. No. 99-741, 2010 WL 415329, at *13 (D.N.J. Jan. 29, 2010) (class decertified for damages after class-verdict). Rather than attempt to manage an improperly certified class action, the Court should do as Judge Linares did in the Bayshore case and decertify this case, provide notice to the class members and require them to submit individual proof of their injuries to determine whether they would be entitled to pursue damages. Any attempt to simplify these individual, pilot-specific issues into one damages trial under the rubric of a class action would not only create an unmanageable trial but it would also directly impact ALPA's ability to litigate its defenses as to damages relating to the individual parties. See Dukes, 131 S. Ct. at 2561.

## CONCLUSION

For the foregoing reasons, ALPA respectfully submits that if the Court does not grant its motion for judgment as a matter of law, that it should decertify this action.

Respectfully submitted,

Archer & Greiner, P.C.

By: __/s/ Steven J. Fram__
   STEVEN J. FRAM, ESQUIRE
   JOHN C. CONNELL, ESQUIRE
   KERRI E. CHEWNING, ESQUIRE

*Pro Hac Vice:*
  Daniel M. Katz, Esquire
  Katz & Ranzman, P.C.

Dated: October 27, 2011.

7260628v1