Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121
By:    Steven J. Fram, Esquire
       John C. Connell, Esquire
       Kerri E. Chewning, Esquire

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 02-2917 (JEI) |
| ) | |
| AIR LINE PILOTS ASSOCIATION, ) | |
| INTERNATIONAL, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF STEVEN J. FRAM, ESQUIRE IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DECERTIFY

STEVEN J. FRAM hereby declares as follows:

1.      I am a member of the Bar of this Court and am a shareholder in the law firm of

Archer & Greiner, P.C., attorneys for Defendant, Air Line Pilots Association, International.

2.      I am submitting this Declaration in support of the Reply Brief filed in Further

Support of Defendant's Motion to Decertify.

3.      A true and correct copy of the Brief filed by ALPA on April 19, 2005, in support

of its Bifurcation Motion is attached as Exhibit A to this Declaration.

4.      A true and correct copy of the transcript of a portion of the charge conference held in this case on July 7, 2011, is attached as Exhibit B to this Declaration.

5.      The jury verdict sheet submitted by ALPA to the Court, and which was referred to at page 149 of the transcript attached as Exhibit B, is attached as Exhibit C to this Declaration.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 27, 2011.

*/s/ Steven J. Fram*
STEVEN J. FRAM, ESQUIRE

Exhibit "A"

JCC 1970

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| LEROY "BUD" BENSEL, ET AL.<br><br>Plaintiffs,<br><br>v.<br><br>ALLIED PILOTS ASSOCIATION,<br><br>AIR LINE PILOTS ASSOCIATION,<br><br>AMERICAN AIRLINES, INC.<br>AND TWA, LLC,<br><br>Defendants. | Civil Action No. 02-2917-JEI-AMD<br><br>DOCUMENT FILED<br>ELECTRONICALLY |

## DEFENDANT AIR LINE PILOTS ASSOCIATION'S BIFURCATION MOTION

### STATEMENT OF THE CASE

This case was brought by eleven former Trans World Airlines, Inc. (TWA) pilots against the Air Line Pilots Association (ALPA), their former collective bargaining representative, and others, for alleged violations of its duty of fair representation (DFR), breach of fiduciary duty and conspiracy. The Second Amended Restated Complaint is lengthy, but the essential facts with respect to ALPA are that (i) TWA, the Plaintiffs' former employer, went into bankruptcy and was on the verge of liquidation when American Airlines, Inc. (American) offered to purchase its assets and hire its employees; (ii) American refused to honor the seniority protections contained in the TWA pilots' collective bargaining agreement because those protections conflicted with American's agreement with its own pilots; and (iii) faced with the choice of waiving those seniority

protections and obtaining employment with American or losing their jobs in TWA's liquidation, the TWA pilot leaders (including several of the Plaintiffs) voted to sacrifice the negotiated protections in order to ensure the pilots' continued employment at American.

The Second Amended Restated Complaint contains three Counts directed at ALPA. In the initial proceedings, this Court concluded that the duty of fair representation claim in Count I was barred by the statute of limitations, and that the breach of fiduciary duty and conspiracy claims in Counts III and IX were preempted, and, on their face, failed to state a claim. *Bensel v. Allied Pilots Ass'n*, 217 F.Supp.2d 616 (D.N.J. 2003). The Court also dismissed the remaining Counts, which directed claims at American and the union representing its pilots, the Allied Pilots Association (APA). The Court of Appeals upheld this Court's rulings in all respects except with respect to Count I, and on that Count a divided panel reversed and remanded for discovery. *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298 (3d Cir. 2004). The appellate court denied ALPA's petition for rehearing and suggestion of rehearing *en banc*. Special counsel for the Plaintiffs have filed a petition for a writ of *certiorari* with respect to the dismissal of claims asserted against APA and American.

## STATEMENT OF THE FACTS

### I.      ALPA's Role at TWA

For decades, ALPA served as the collective bargaining representative for pilots at TWA. (Holtzman Dec. ¶ 2.)[1]  As a consequence, ALPA and TWA were parties to a

---

[1]  Record references are to the ALPA documents submitted to this Court in March 2003 in support of ALPA's Motion to Dismiss, or, in the Alternative For Summary Judgment in ALPA's Favor.

succession of collective bargaining agreements setting forth the terms and conditions of employment for TWA pilots. (Holtzman Dec. ¶ 3.) The most recent of these agreements was signed in 1998. (*Id.*)

## II.   TWA's Precarious Financial Circumstances and American's Offer to Purchase Assets

By the end of 2000, TWA was in dire financial circumstances, and found itself on the brink of bankruptcy and liquidation. (Holtzman Dec. ¶ 4.)  On January 9, 2001, TWA and American announced that American would purchase substantially all of the assets of TWA. (Restated Compl. ¶ 32.)  As part of its offer, American promised to hire nearly all of TWA's union-represented employees. (Holtzman Dec. ¶ 6; Ex. 2.) However, as a specific condition to the transaction itself, American required TWA to eliminate certain provisions from its collective bargaining agreements to ensure that the transaction did not conflict with American's collective bargaining agreements with its own employees. (Holtzman Dec. ¶ 7.)  TWA first attempted to comply with American's requirement by negotiating with ALPA for the removal of specific provisions in the collective bargaining agreement. (Holtzman Dec. ¶ 8.)  When ALPA failed to agree to the demands immediately, TWA prepared and filed a motion under Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113, to reject the ALPA-TWA collective bargaining agreement in its entirety. (Holtzman Dec. ¶ 8; Ex. 3.)

Since American was willing to guarantee wage and benefit levels for pilots hired in accordance with the Asset Purchase Agreement, the most significant demand was for the elimination of TWA collective bargaining provisions addressing seniority integration. (*Id.* ¶ 9.)  The ALPA-TWA collective bargaining agreement contained specific protections regarding seniority integration in the event TWA was purchased or merged

with another airline.  (*Id.* ¶ 10.)  In general terms, those provisions required TWA to

ensure that any purchaser agree to a set of procedures, including arbitration, to achieve a

fair and equitable seniority integration for the pilots of the merging airlines.  (*Id.*)

American demanded that those and related provisions be eliminated from the agreement.

(*Id.*)  If ALPA agreed to that demand, the transaction would go forward but the seniority

list integration would be governed by the collective bargaining agreement between

American and the Allied Pilots Association, which was the union representing pilots

employed by American.  (*Id.*)  That agreement required American to treat the pilots of

any acquired carrier like new hires by placing them at the bottom of the American

seniority list.  (*Id.*)

III.    **ALPA's Options**

On April 2, 2001, after consulting at length with bankruptcy counsel, labor

counsel, an investment banking firm, and an aviation consulting firm, ALPA (acting

through its elected representatives at TWA, the TWA MEC) adopted a resolution

agreeing to eliminate the collective bargaining agreement provisions identified by

American. (Holtzman Dec. ¶ 11; Ex. 4.)  In return, American agreed to provide ALPA

with a collective bargaining agreement that would cover the employment of TWA pilots

with TWA Airlines-LLC (TWA-LLC), which was the subsidiary that American

established to acquire the assets and conduct the operations of TWA until such time as

those assets and operations could be merged with those of American. (Holtzman Dec.

¶ 3.)  All six voting members of the TWA MEC voted at least some portion of their roll

call votes in favor of the resolution, and the resolution passed by a roll call majority of

1501 to 450. (Holtzman Dec. ¶ 11; Ex. 4.)

The following day, Plaintiff Robert Pastore, Chairman of the TWA MEC, sent a communication to all TWA pilots explaining that no other reasonable alternatives existed. (Holtzman Dec. ¶ 12; Ex. 5.)  Plaintiff Pastore explained that, if ALPA had refused American's demands to modify the collective bargaining agreement, TWA would have pressed forward with its Section 1113 motion to reject the entire agreement.  (*Id.*)  In that circumstance, Capt. Pastore explained, all of the TWA MEC's advisors—including the independent advisors chosen by the MEC—believed the Section 1113 motion would succeed, which would result in a complete loss of contractual protections for the TWA pilots.  (*Id.*)  In addition, Capt. Pastore noted that, by agreeing to waive the collective bargaining agreement provisions identified by American, ALPA achieved additional commitments from American, including pay increases and the payment of past due pension contributions.  (*Id.*)

## IV.      Seniority Integration Negotiations

American's purchase of TWA's assets closed on April 10, 2001, and at that point almost all TWA pilots became employees of TWA-LLC.  (Holtzman Dec. ¶ 15.)  Once the transaction was announced, the TWA pilots, through the TWA MEC, and the American pilots, through their union, the Allied Pilots Association (APA), had begun negotiations regarding the integration of the American and TWA-LLC pilot seniority lists.  (*Id.*)  Those negotiations occurred against the backdrop of the APA-American collective bargaining agreement, which, as noted above, required American to treat the pilots of any acquired carrier like new hires by placing them at the bottom of the American seniority list, and ALPA's waiver of the seniority protective provisions in its contract with TWA.  (Holtzman Dec. ¶ 10.)

5

APA and the TWA MEC never reached agreement on seniority integration. (Restated Compl. ¶¶ 58-60.)  On November 8, 2001, APA and American executed an agreement (known as "Supplement CC") that imposed a seniority integration formula on the TWA-LLC pilots.  (Restated Compl. ¶ 61.)  That agreement modified the APA-American collective bargaining agreement to allow some TWA-LLC pilots to be integrated into the American pilots' seniority list, but most were placed at the bottom of that list.  (Restated Compl. ¶¶ 61, 63.)  Supplement CC was to become effective when the National Mediation Board (NMB) determined that the operations of American and TWA-LLC were sufficiently integrated to constitute a single employer for the purposes of collective bargaining.

When the negotiations over seniority integration failed, ALPA attempted to attack Supplement CC by pursuing a grievance against American, alleging that American had failed to meet a written commitment to ALPA that it had made at the time of the asset purchase.  Specifically, American had committed to use its "reasonable best efforts" to convince APA "to secure a fair and equitable process for the integration of seniority." (Restated Compl. ¶¶ 48, 66.)  In an arbitration award issued April 18, 2002, the TWA-ALPA System Board of Adjustment sitting with a neutral arbitrator rejected ALPA's claim, holding that American had met its commitment.

## V.      APA Takes Over at TWA-LLC

On March 5, 2002, the NMB held that American and TWA-LLC were a single carrier for RLA purposes.  (Restated Compl. ¶ 65.)  The NMB extended APA's certification as the exclusive bargaining agent to cover all American and TWA-LLC pilots on April 3, 2002, and terminated ALPA's certification as the collective bargaining

6

agent for the TWA-LLC pilots on that date, at which time Supplement CC took effect.

(*Id.*)

## ARGUMENT

I.       **The Decision to Bifurcate a Case into Liability and Damages Phases Is a Matter for the Sound Discretion of This Court, and All of the Relevant Considerations Support Bifurcation.**

The decision to bifurcate this case into separate liability and damages phases is a

matter for the sound discretion of this Court. *See, e.g.*, *Lis v. Robert Packer Hospital*,

579 F.2d 819, 824 (3d Cir.1978) ("the decision to bifurcate vel non is a matter to be

decided on a case-by-case basis and must be subject to an informed discretion by the trial

judge in each instance."); *Idzojtic v. Pennsylvania R.R. Co.*, 456 F.2d 1228, 1230 (3d

Cir.1972) ("The district court is given broad discretion in reaching its decision whether to

separate the issues of liability and damages.").

The Federal Rules of Civil Procedure give the Court broad discretion to bifurcate

a case "in furtherance of convenience or to avoid prejudice, or when separate trials will

be conducive to expedition and economy," provided only that doing so does not interfere

with "the right of trial by jury as declared by the Seventh Amendment to the Constitution

or as given by a statute of the United States." Fed R. Civ. P. 42(b).  Although the

language of Fed. R. Civ. P. 42(b) is disjunctive, authorizing the court to bifurcate for any

of the several possible reasons it enumerates, courts typically consider the range of

effects bifurcation would likely have. *See Emerick v. U.S. Suzuki Motor Corp.*, 750 F.2d

19, 22 (3d Cir. 1984) (citing *Lis*, 579 F.2d at 824) ("before a decision to bifurcate may be

made, the trial court, in the exercise of its discretion, must weigh the various

7

considerations of convenience, prejudice to the parties, expedition, and economy of resources").

Weighing these considerations in the present case, it is clear that bifurcation will greatly serve the interests of convenience, expedition, and judicial economy (Part A), will prevent possible prejudice to ALPA while not prejudicing Plaintiffs (Part B), and will not interfere in any way with the Plaintiffs' Seventh Amendment jury trial rights (Part C). *See In re Paoli RR Yard PCB Litigation*, 113 F.3d 44, 452 n5 (3d Cir. 1997) ("[s]everance of the question of liability from other issues can 'reduce the length of trial, particularly if the severed issue[s] [are] dispositive of the case, and can also improve comprehension of the issues and evidence'").

> **A.   Given the Complex Damages Issues in the Case, and the Unlikelihood that the Plaintiffs Will Prevail on the Issue of Liability, Bifurcating the Case Will Promote the Interests of Judicial Economy, Convenience, and Expedition.**

Plaintiffs allege that ALPA's supposed breach of the duty of fair representation led to disadvantageous seniority integration with the American pilots. But because ALPA no longer represents the former TWA pilots and has no control over their seniority or other aspects of their working life, they cannot benefit from injunctive relief against ALPA. And because all claims against American and APA – the only parties in a position to provide injunctive relief – have been dismissed pending a decision by the Supreme Court on the writ of *certiorari*, Plaintiffs' only remedy in this action, should they prevail, would be money damages.

Given the nature of the transactions involved, calculation of those damages would be an extremely complex undertaking. To prove the proper amount of damages, Plaintiffs would need to show what the seniority list would have looked like had ALPA

8

not, as Plaintiffs allege, "coerced and forced" the TWA Master Executive Council (TWA MEC) to waive the seniority protective provisions of the TWA-ALPA Collective Bargaining Agreement (CBA) in response to American's demands and TWA's filing of a Section 1113 motion in Bankruptcy Court seeking to reject the CBA. *See* Complaint at ¶¶42-45.

Determining what an appropriate seniority list would look like would be an extraordinarily difficult task. Prior to the passage of the Airline Deregulation Act of 1978, the Civil Aeronautics Board generally required merging airlines to follow a process intended to provide for "fair and equitable" integration of employee seniority lists. *See Allegheny-Mohawk Merger Case*, 59 C.A.B. 22 (1972). When that regulatory framework was dismantled, ALPA carried the process forward as a matter of contract in its agreements with TWA and other airlines, and it was the waiver of that contract provision that forms the basis of Plaintiffs' claim against ALPA.

That seniority integration process proceeded from negotiation into arbitration and frequently became enormously complicated. The "fair and equitable" standard allowed introduction of a wide variety of evidence, such as the type of aircraft and routes each carrier operated, the relative financial strength of each carrier, and the impact of external economic factors. Through that evidence, each carrier's employees would argue that they brought promotional expectations and economic advantages to the merger, and therefore should obtain a superior seniority position in relation to the other carrier's employees to reflect those relative promotional expectations and economic advantages. Arbitrators established principles based on that evidence to guide the integration of the seniority lists, and then applied those principles to each individual on the two pre-merger seniority lists

9

to create a merged list.  For good reason, preparation for such proceedings consumed months, and the arbitration hearings themselves regularly lasted for weeks, or longer.

Arbitral outcomes were also notoriously difficult to predict under the CAB regime and its contract-based replacement.  Arbitrators given the task of sorting through the mounds of information had complete freedom to structure results that they believed were "fair and equitable."  Often those results contained conditions regarding matters such as which pilots could operate from certain bases and who could fly certain aircraft, and those conditions often extended many years into the future.  For example, the conditions imposed as a result of the 1986 merger of Northwest Airlines and Republic Airlines are not scheduled to expire until January 1, 2006.

Establishing what the consolidated seniority list would have looked like had negotiations turned out differently in this case would be, in short, an exceedingly complex and resource-intensive endeavor, requiring extensive discovery and expert witness testimony.

Moreover, simply establishing a version of a "fair" seniority list, would not in itself answer the question of damages.  Passing over the issue of how many "fair" merged lists might exist in a single merger, in theory, one can easily see that merely calculating each pilot's difference in seniority numbers between the actual list and a "fair" list would not in itself lead to a dollar figure for actual damages.  Instead, Plaintiffs would need to show exactly what the difference in seniority numbers would have provided, in terms of Plaintiffs' alternative careers, in order to calculate the differences in salary and benefits the pilots would have received under the different conditions.  This question would in turn involve any number of divergent inquiries.  Plaintiffs would need to undertake a

month-by-month salary and benefits comparison corresponding to the two lists, beginning in April 2002. This comparative analysis – under the actual list and the "fair" list – would need to take into account many complex factors – the aircraft, cockpit position and routes flown, whether a pilot held a line of flying or was on reserve, whether a pilot was furloughed – each of which affect each individual pilot's monthly salary and benefits, above and beyond that pilot's seniority number. A pilot's pay can vary widely from month to month and year to year, even under the terms of the same collective bargaining agreement. And a more senior pilot does not necessarily earn more than a less senior pilot. For these reasons, individualized calculations would be necessary to fix monetary damages in this case.

To complicate matters further, any calculation of the financial harm to the Plaintiffs would also have to take into account the vicissitudes of life as a pilot for American in the period since the TWA acquisition. In particular, American itself underwent a major reorganization in 2003, in the course of which it compelled the airline's pilots to make significant concessions. Thus, even if the Plaintiffs could prove that a better seniority list should have emerged in 2001, and even if they could prove what the resulting difference in salary and benefits would have been at that time, they would still need to take into account the effect of subsequent pilot concessions and other events at American. If, for example, they were able to demonstrate that fewer former TWA pilots would have been furloughed in 2002 under a "fair" seniority list than under the list that actually emerged, they would still need to establish the continuing status of those pilots in the wake of the subsequent corporate restructuring and operational contractions. Yet another layer of complexity lies in the need to take into account

opportunities to avoid furlough by accepting work at American's subsidiary, American Eagle – an opportunity which several of the Plaintiffs have apparently accepted.

Finally, the parties would also need to reckon with other likely financial implications had events transpired differently. For example, had the TWA pilots not waived the CBA provisions they now claim to have been coerced into waiving, they would not have received in return American's commitment to pay increases and the payment of past due pension contributions. Plaintiffs' accounting of damages would need to offset from their claimed losses any gains achieved by the course of negotiations that actually unfolded. Any attempt to answer these and related questions would again require extensive discovery and substantial expert testimony, thus lengthening the pre-trial and trial processes and burdening the parties and the Court.

This enormous effort will be rendered entirely moot if Plaintiffs fail to establish liability, and on that score they face a number of insurmountable obstacles. For example, to establish liability Plaintiffs need to prove that, absent the alleged "coercion," the TWA MEC would not have agreed to waive the seniority protective provisions of the CBA in response to American's demands and TWA's filing of a Section 1113 motion. *See* Complaint at ¶¶42-45. In addition, they need to demonstrate that TWA's pending Section 1113 motion would not have been granted by the Bankruptcy Court (which would have left the Plaintiffs with no CBA protections at all). Then, they need to show that, if neither the waiver nor the rejection occurred, American would not have abandoned the acquisition (leaving TWA to liquidate, and the Plaintiffs with no pilot jobs at all). Also, they need to prove that—despite the System Board of Adjustment's determination that American had used its best efforts to provide a fair seniority

integration (TWA-LLC/ALPA System Board of Adjustment arbitration decision, April 18, 2002)—the seniority process would have somehow yielded a better seniority list for Plaintiffs if the acquisition had gone through under different circumstances. Finally, to meet the duty of fair representation standard, Plaintiffs need to show that ALPA's actions were arbitrary, discriminatory, or in bad faith. *Air Line Pilots Association v. O'Neill*, 499 U.S. 65, 67 (1991) (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)).

Since a finding in ALPA's favor on liability would be dispositive of the case, by postponing discovery and evidence on damages until the unlikely eventuality that Plaintiffs should prevail on the issue of liability, the length of the trial, if any—and the resources the Court and the parties must devote to it—are likely to be greatly reduced. *See, e.g., Paoli R.R.*, 113 F.3d at 452 n.5 (approving bifurcation where "[r]esolution of the [liability] issues obviated the need for a trial on the issues of the defendants' liability, which undoubtedly would have . . . involved issues more complicated than the [liability] trial, all at additional cost to the parties."); *Bates v. United Parcel Serv.*, 240 F.R.D. 440, 449 ("Judicial economy would be further promoted because bifurcation might eliminate the need to consider evidence of damages. If the first phase results in no finding of liability to the class by [defendant], then the second phase to determine individual and class damages would become irrelevant."). ALPA is confident that it will prevail on the question of liability, most likely on summary judgment, but, in any event, certainly at trial on that issue, thus obviating the need for the extensive inquiry that would be required to establish damages.

B.     **The Issues of Liability and Damages in This Case Are Completely Separate, and Bifurcation Will Create No Prejudice or Burden on Plaintiffs, nor Present Any Seventh Amendment Concerns.**

The Court would clearly serve the interests of judicial economy and convenience by bifurcating this case into separate liability and damages phases, and, because the two issues in this case are completely separate, bifurcation presents no countervailing concerns for the Court to weigh against these benefits. Indeed, this case presents the kind of separable liability and damages issues that make bifurcation the norm in certain categories of actions. For example, "most courts adjudicating civil rights class actions in the employment discrimination context opt to bifurcate the liability and damages phases of the trial." *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 458-59 (N.D. Cal. 1994) (citing 5 H. Newberg, CLASS ACTIONS § 24.123, at 24-414-416 (3d ed. 1992)). In such cases, as here, the liability and damages issues present distinct burdens for the plaintiff to meet: in the former, to establish that the behavior of the defendant was deficient; and in the latter, to establish the actual harm caused by that deficient behavior to the individual plaintiffs. *See, e.g.*, *Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324, 360-62 (1977) (discussing the differing nature of the burdens on the issues of liability and damages in a bifurcated employment discrimination case).

The analogy to the present case is clear. The liability issue in this case is whether ALPA breached its duty of fair representation to the former TWA pilots. The question is one that solely concerns the actions of ALPA in the 2001 negotiations that resulted in the seniority arrangements that ultimately emerged. In the unlikely event that Plaintiffs were to prove a breach of this duty, calculation of damages would involve a completely separate set of facts, focusing instead on the question of how the individual pilots would

14

have fared in 2002 and thereafter had the seniority arrangements proved more favorable.
The underlying facts, the evidence necessary to establish those facts, and the witnesses
who would testify to that evidence, are entirely distinct on the two issues. *See. e.g.,*
*Bates*, 204 F.R.D. at 449 (noting that the question of liability concerned the behavior of
the defendant, while the question of damages "depends on individualized questions"
regarding the effect on individual employees, and that "[e]ach phase would therefore
require the parties to present different types of evidence.").

　　Such clear separability of issues makes bifurcation in this trial convenient. *See id.*
at 449 ("Because the issues of liability and damages are separable, it would be convenient
to bifurcate.").  Moreover, given the complexity of the damages issues in this case,
bifurcation will reduce the potential confusion this case might present to a jury by
carefully compartmentalizing the separate issues. *See, e.g., Barr Laboratories, Inc. v.*
*Abbot Laboratories*, 978 F.2d 98, 115 (3d Cir. 1992) (approving trial court's
determination "that bifurcation would prove beneficial by enhancing juror
comprehension of the complex issues presented . . . ."); *Arnold*, 158 F.R.D. at 459
(concluding, where issues are complex, "that a unitary trial in which fact issues
pertaining to both liability and class damages were combined would be substantially
more complicated than a bifurcated trial, and would consequently increase the risk of jury
misunderstanding.").

　　Furthermore, the separability of issues ensures that bifurcating the trial would
result in no prejudice to Plaintiffs, who would have a full and fair opportunity to present
all relevant evidence on the distinct issues in their respective phases. *See, e.g., Krocka v.*
*City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000) (observing that there can be no

prejudice to plaintiff when bifurcation "had the result of excluding evidence that was not relevant to the issue presented during the first phase of the trial"). Conversely, an unbifurcated trial would present a strong likelihood of prejudice to ALPA. Plaintiffs have alleged damages at the hands not only of ALPA, but also by the Allied Pilots Association and American Airlines, both of which are no longer parties to this action. Furthermore, whatever economic harms Plaintiffs have suffered are doubtless attributable in part to the deterioration of the airline industry in the wake of the 9/11 disaster and the general economic downturn in this sector over the last several years. Presenting evidence on damages to the jury before a determination of liability has been made runs a strong risk of confusion as to the responsibility for those damages, and thus a concomitant risk of prejudice to ALPA on the question of liability itself. This prejudice can be easily avoided by bifurcation. If Plaintiffs' case survives ALPA's summary judgment motion (which we doubt), bifurcation would have the effect of focusing the jury's attention on the actual behavior of ALPA during the events in question to determine liability, rather than on the accumulated economic harm Plaintiffs may have suffered from a variety of sources outside of ALPA's control. *See, e.g., Emerick*, 750 F.2d at 22 (noting the possibility of confusion and unfair prejudice to defendant inherent in introducing damages evidence before a finding of liability).

Finally, bifurcating this case into liability and damages phases presents none of the Seventh Amendment concerns mentioned by Fed. R. Civ. P. 42(b). "The Seventh Amendment requires that, when a court bifurcates a case, it must 'divide issues between separate trials in such a way that the same issue is not reexamined by different juries.'" *Paoli*, 113 F. 444 at 452 n5 (quoting *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293,

16

1303 (7th Cir.)).  In the present case, there is no possibility of this right being violated.
First, if ALPA prevails on the question of liability, either on summary judgment or at the
first phase of a bifurcated trial, no further issues will need to be examined, rendering any
possible Seventh Amendment concerns moot. *Id.*  In the unlikely event that Plaintiffs
should establish liability, the complete separability of the issues in this case, discussed
above, eliminates any concern that the second jury would revisit issues decided by the
first.  *Id.*; *see also Blihovde v. St. Croix County, Wisconsin*, 219 F.R.D. 607, 621 (W.D.
Wis. 2003) (finding no Seventh Amendment concerns if action proceeded to separate
damages phase, because "no issue litigated in the first phase will be revisited in the
second phase."); *Arnold*, 158 F.R.D. at 459 (finding no Seventh Amendment issue where
different juries decide distinct issues).  Even if we assume for the sake of argument a
degree of evidentiary overlap between the two phases, bifurcation in such circumstances
presents no Seventh Amendment problems, "for the Seventh Amendment 'prohibition is
not against having two juries review the same evidence, but rather against having two
juries decide the same essential issues.'"  *Paoli*, 113 F.3d at 452 n5 (quoting *In re
Innotron Diagnostics*, 800 F.2d 1077, 1086 (Fed.Cir.1986)).

## CONCLUSION

For the forgoing reasons, ALPA urges the Court to bifurcate this case into separate liability and damages phases, and to order separate discovery proceedings accordingly.

<div style="margin-left: 40%">

Respectfully submitted,

Archer & Greiner
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
(856) 795-2121


By:___s/Alexander Nemiroff_____
     John C. Connell, Esquire
     Alexander Nemiroff, Esquire

</div>

*Pro Hac Vice*:
    Daniel M. Katz, Esquire
    Katz & Ranzman, P.C.
    1015 18th Street, N.W., Suite 801
    Washington, DC  20036
    (202) 659-4656

    Counsel for Defendant Air Line Pilots Association, International

Dated:  April 19, 2005

1462520v1

Exhibit "B"

1

1               IN THE UNITED STATES DISTRICT COURT.
              FOR THE DISTRICT  OF NEW JERSEY
2              CIVIL 02-2917  (JEI)

3     PATRICK BRADY, SALLY YOUNG,
     HOWARD HOLLANDER, THEODORE CASE,
4     AND MICHAEL FINUCAN, individually
     and on behalf of all others
5     similarly situated,
              Plaintiffs,
6                                   VOLUME 17
        V.                    TRIAL TRANSCRIPT
7

AIR LINE PILOTS ASSOCIATION,
8
              Defendant.
9
                     CAMDEN, NEW JERSEY
10                  JULY 7, 2011

11    B E F O R E:  HONORABLE JOSEPH E. IRENAS
                  UNITED STATES DISTRICT JUDGE
12
              A P P E A R A N C E S:
13
        TRUJILLO, RODRIGUEZ & RICHARD
14        BY:  NICOLE M. ACCHIONE, ESQ.
           AND: LISA J. RODRIGUEZ, ESQ.
15           AND
        GREEN JACOBSON, P.C.
16        BY:  ALLEN PRESS, ESQ.   (MO. BAR)
        AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17        For the Plaintiffs.

18        ARCHER GREINER
        BY:   STEVEN FRAM, ESQ.
19           AND
        KATZ & RANZMAN
20        BY:  DANIEL M. KATZ, ESQ.
        FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
        ELIZABETH  GINSBURG, ESQ.
22        IN-HOUSE COUNSEL FOR ALPA.

23

24

25

2

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON

4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17
                    LYNNE JOHNSON, CSR, CM, CRR
18                  OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
19                  P.O. BOX 6822
                    LAWRENCEVILLE, NJ  08648.
20

21

22

23

24

25          .

1   organization to adopt a unity resolution, or for Duane Woerth

2   in the wake of that to talk to APA --

3          THE COURT:  Nobody testified in this case that

4   passing the unity resolution was a wrong or bad thing.

5          Nobody suggested that.

6          MR. FRAM:  I think the jury is going to be confused

7   about that issue, your Honor.  Our request would be to

8   clarify it by instructing the jury that until the TWA pilots

9   and the American pilots became adverse, there was nothing

10  improper that the unity resolution or Duane Woerth's going

11  and speaking to the board of the APA about it.

12         MR. PRESS:  It is completely unnecessary, Judge.  I

13  don't know why we would have another instruction on things

14  that are legal.  Where are he going to stop?

15         MS. RODRIGUEZ:  That is not an issue in the case.

16  There is nothing contested about it.

17         THE COURT:  Well, I look at that differently.  I

18  think he could shoot himself in the foot with that.

19  Remember, there was, he went to the APA, I think in November,

20  2000.  But he went to the APA during a period they were

21  negotiating.  Indeed, it is very conflicting testimony about

22  what was said.  And the thing that says there is nothing

23  wrong prior to the acquisition by American and the TWA --

24  there is nothing wrong with the unity resolution or anyone

25  speaking to ALPA.

```
 1              MR. PRESS:  I see the distinction you are drawing.

 2              THE COURT:  Do you really want that?

 3              MR. FRAM:  Can I think about it over night?

 4              THE COURT:  Yes, think about it or, and tell me

 5    Monday.  I won't be here tomorrow.  It seems to me you are

 6    focusing with almost laser-like intensity a light on his

 7    meeting about which there is some confusion, but he certainly

 8    went to a meeting.

 9              Now, his take on it, he went to the meeting to

10    encourage the pilots to be fair in their integration.  That

11    is his recount of it.  But you have a charge that any

12    visiting APA prior to January 9, whatever the date of the

13    announcement is, of the TWA acquisition, really, what does

14    that tell the jury?  Forget that one.  He went, why don't you

15    think about it.

16              MR. FRAM:  Thank you.

17              MR. KATZ:  Your Honor, may I make one comment about

18    this paragraph?

19              THE COURT:  YES.

20              MR. KATZ:  The union policies issue, Mr. Press

21    talked about the allegations in the case.  My comment goes to

22    whether it is an example of bad faith for a union to not

23    follow one of the policies that it has.  And the ALPA

24    administrative manual, like many union policies, is several

25    inches tall, and I respectfully submit, your Honor, that it
```

1   not automatically a breach of the duty of fair representation

2   violation, for a union to violate one of its policies.  The

3   standard of the duty of fair representation is something else

4   entirely.  And so, if it was automatically an example of bad

5   faith to violate a union policy, union members would be in

6   the federal courts all the time about a variety of  things

7   that aren't truly justiciable -- That is even harder than

8   Aguinaga -- justiciable under the duty of fair

9   representation.

10          That was the point I wanted to make.

11          THE COURT:  You make a point that I find

12   interesting.

13          MR. KATZ:  Yes, sir.

14          THE COURT:  Examples of bad faith include things

15   like deliberately making misleading statements to employees,

16   not disclosing records -- ignoring union policies if such

17   actions are the result of a bad faith motive as described

18   above.

19          MR. KATZ:  If they result in harm --

20          THE COURT:  No.   No.  No.  Harm we will cover

21   later.  In other words, I take your point.  Not following a

22   particular policy for negotiation, or unions may have books,

23   you know, 100 pages long.  Absolutely.   It has to be

24   motivated or be the result of a bad faith motive, as I just

25   described in the previous paragraph.

```
 1              MR. KATZ:  Thank you, your Honor.  I am sure you

 2    know --

 3              MR. PRESS:  No.  No problem with that.

 4              THE COURT:  I have to add that to be fair.

 5              MR. KATZ:  I am sure you know in a union meeting

 6    there is  frequently rough and tumble.

 7              THE COURT:  Rough and tumble?

 8              MR. KATZ:  Loud noises,  scowls.

 9              MS. RODRIGUEZ:  On, not these guys.

10              MR. KATZ:  Every time someone raised their voice in

11    a union meeting they could go to federal court we would have

12    a docket problem.

13              THE COURT:  Don't worry about our docket problem.

14    I am not worried about it.  Anything more?

15              MR. FRAM:  My last request with respect to the

16    section 16, and I think your Honor made clear before how you

17    will rule on this is we did request an instruction about the

18    responsibilities of lawyers in recommending or pursuing

19    litigation.  Those were our proposed charge 17.  We had an

20    alternative charge.

21              THE COURT:  Why.  Paragraph 17?

22              MR. FRAM:  No, it would be part of 16.  We had a

23    proposed charge of 17, page 39 through 42 of the joint --

24              THE COURT:  I think I have it.  You are charged

25    with an excellent closing argument.
```

```
 1              MR. FRAM:  Your Honor, we thought that some law
 2    would assist the eleven non-lawyers on the jury.
 3              THE COURT:  Assertion of legal claims in
 4    litigation.
 5              MR. FRAM:  Yes, your Honor.
 6              THE COURT:  I have it.
 7              MR. FRAM:  Obviously, law is helpful in helping
 8    them understand what was appropriate or not.
 9              We had an alternative, your Honor.
10              THE COURT:  These are four pages long.  I reject
11    that totally.
12              What is the alternative.
13              MR. FRAM:  Judge, just the one alternative, the
14    first was to instruct the jury that they should disregard any
15    claim based upon the litigation tactics.  The alternative
16    behind it, which I think you are also rejecting, is to give
17    them some guidance about the professional and other
18    responsibilities.
19              THE COURT:  No, I am not doing either of those.
20              MR. FRAM:  The only other issue I think I have is
21    we did raise in our trial brief a request that the Court
22    instruct the jury with respect to the Bond bill, and I think
23    you talked about it this morning, your Honor did rule in
24    chambers on June 2 that the plaintiffs couldn't claim a DFR
25    violation based upon the failure of Congress to enact the
```

```
 1    Bond bill.  We think it is important that it be somehow be

 2    put into the charge, and they be instructed consistent with

 3    your Honor's ruling --

 4              THE COURT:  I understand.

 5              MS. RODRIGUEZ:  Your Honor, we were abiding by your

 6    Honor's ruling on the 2nd.  There is nothing in evidence to

 7    suggest that we are maintaining, that it was a union's

 8    responsibility to see that the Bond bill got passed.  The

 9    evidence is what the evidence is, and to give it --

10              THE COURT:  I admit, you did not try to make an

11    argument in the course of presenting your case or in the

12    course of cross examination the witnesses that somehow or

13    other the failure of the Bond bill to pass was proof of

14    breach of the duty of fair representation.  But I think their

15    point is, you have a fair amount of testimony about the Bond

16    bill, and we certainly, the jury knows, that it is in the

17    jury knows it didn't pass.  And the jury knows that the

18    position of the plaintiffs is that, you know, the ALPA didn't

19    jump in with both feet to support that.

20              What I had ruled is that the failure to pass is not

21    proof of anything.  But that the attitude toward it, how one

22    responds to it, might be evidential.

23              He is asking for a charge to tell the jury that the

24    failure to pass, that they can't conclude that the Bond bill

25    failed to pass that, that they can consider efforts made by
```

```
 1    ALPA with respect to the Bond bill, but that the failure,

 2    they cannot consider it as a failure, failure, its -- they

 3    can consider efforts or lack of efforts, but not its failure

 4    to pass.

 5             MS. RODRIGUEZ:  I think it gives unnecessary weight

 6    to the whole --

 7             MR. PRESS:  What you are proposing might be an

 8    acceptable instruction.  But I don't know what we are

 9    debating.

10             THE COURT:  I am going to try to, I accept the

11    point that counsel is making.  I certainly don't want the

12    jury to think that because of, because it didn't pass, that

13    it proves that somebody didn't lobby strongly enough.  As

14    their own expert said, somebody, maybe it is the MEC's expert

15    that said it, anybody who tried to predict whether a bill

16    will be passed by Congress, somebody should consult the Tooth

17    Fairy.  Pretty much that is what it said.  You know what I am

18    talking about?

19             MS. RODRIGUEZ:  I think it is in the --

20             MR. KATZ:  Mr. Estes' letter, Estes and Associates.

21             THE COURT:  His last paragraph, are you kidding me,

22    nobody can tell what Congress is going to do.

23             THE COURT:  I am going to consider a subparagraph

24    on the Bond bill.  You can both look at it.

25             MR. FRAM:  Thank you,  your Honor.
```

```
 1              THE COURT:  Let's go to -- is there anything on the
 2   rest of it?
 3              MR. FRAM:  I didn't see anything.
 4              THE COURT:  The rest of it is boilerplate.  If the
 5   word boilerplate has any meaning.  This is it.
 6              MR. FRAM:  Looks fine.  I didn't see any one-
 7   sentence paragraphs either.
 8              THE COURT:  I only made that mistake once.  Mr.
 9   Katz is weighing in.
10              MR. FRAM:  I will let him speaking for himself.
11              MR. KATZ:  At the bottom of the page.
12              THE COURT:  What page?
13              MR. KATZ:  Page 17.
14              THE COURT:  Paragraph 17.
15              MR. KATZ:  Section 16 on page 17.  It ends saying
16   if you find looking at all the evidence presented and that
17   ALPA acted in bad faith, you must find it breached its duty
18   of fair representation.  It seems to me that --
19              THE COURT:  You want the reverse.  You want the
20   converse of that?
21              MR. FRAM:  We do.
22              MR. KATZ:  We want that, but I think it would be
23   appropriate to circle back to the causation element which is,
24   which you said earlier is a requirement to establish a DFR
25   violation.  Without that it may lead someone to conclude that
```

```
 1    it doesn't apply in this situation.

 2              MR. PRESS:  Your Honor, your verdict form is very

 3    clear in that distinction.

 4              THE COURT:  Nobody has objected to the verdict

 5    form.

 6              MR. PRESS:  I have a problem with it.

 7              THE COURT:  What.

 8              MR. PRESS:  I have a slight problem.  One word

 9    problem.

10              THE COURT:  I will listen to you.

11              MR. PRESS:  I don't think we need to load up 16

12    with that when you made the distinction clear in the verdict

13    sheet.  I don't think it is necessary.

14              THE COURT:  I may add it.  I may not.  I will look

15    at that.  If I add it, I will tell you and you can object.

16              What about 17?  To the end.

17              MR. FRAM:  17 to the end is fine.

18              MR. PRESS:  We have no problem.

19              THE COURT:  Okay.  I will prepare a new version of

20    this.  And it will be called draft three.  And I will

21    probably get it to you Monday morning.  You will have it

22    before you close.

23              MR. FRAM:  Thank you, your Honor.

24              THE COURT:  Yes.

25    →         MR. FRAM:  Will your Honor entertain comments on
```

1    the verdict sheet?

2            THE COURT:  Yes.

3            MR. FRAM:  I have one request.  I think I know how

4    you are going to rule.  We submitted a verdict sheet.

5            THE COURT:  Let me find it.

6            MR. FRAM:  Your Honor, we think it is important to

7    separate issues out to avoid confusion.  We request separate

8    questions relating to the vote on April 2 and events

9    thereafter, both with respect to each breach of the duty and

10   causation.

11           THE COURT:  No.  No.  I don't think, I know you

12   wanted from day one to separate the case that way.  If you

13   want to argue that there was no card campaign, the evidence

14   doesn't show there was any conflict up April 2.  Fine, you

15   can argue that to the jury.  But I am not going to split the

16   case.

17           MR. FRAM:  Thank you, your Honor.

18           THE COURT:  What is your comment?

19           MR. PRESS:  Interrogatory two, the causation

20   question.  Did ALPA's violation of its DFR directly cause

21   injury to the TWA pilots?

22           I would suggest removing the word "the" and leaving

23   it, because that would suggest all.  And the jury has heard

24   from Mike Day that he wasn't hurt by Supplement CC.  And that

25   fact alone would preclude us from a yes answer to that

1    question.

2              MR. FRAM:  I am thinking, your Honor.

3              THE COURT:  He wants the word "some of the."

4              MR. PRESS:  That would be fine.

5              MR. FRAM:  This goes back to the concerns we had

6    about certification of the class, your Honor.  Can I think

7    about that overnight as well?

8              THE COURT:  Sure.

9              MR. FRAM:  I am not sure.

10             THE COURT:  Absolutely.

11             MR. FRAM:  I think our position is they do have to

12   show injury to the entire class.

13             THE COURT:  Every member of the class?

14             MR. FRAM:  Yeah, I think so.  Let me think about

15   it, your Honor.

16             THE COURT:  Okay,

17             MR. FRAM:  Let me note as well if I could, if we

18   are going to water this down to the extent that they only

19   have to show injury to Sean Clarke or a handful of pilots, I

20   am not sure that we have accomplished very much if we have to

21   proceed with the damages phase.  But I do want to think about

22   that.

23             I can address that, if it is okay, on Monday

24   morning.

25             THE COURT:  Okay.

Exhibit "C"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| LEROY "BUD" BENSEL, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2917 (JEI) |
| | ) | |
| AIR LINE PILOTS ASSOCIATION, | ) | |
| INTERNATIONAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## JURY VERDICT SHEET

Please answer the following questions:

1.      With respect to the decision of the TWA-MEC on April 2, 2001, to accept a collective bargaining agreement with TWA LLC that did not include provisions giving the TWA pilots the right to arbitrate the integration of the TWA and American Airlines pilot seniority lists, have Plaintiffs proven, by a preponderance of the evidence, that ALPA acted in bad faith in regard to the advice that its employees and representatives gave to the MEC as I have defined that term for you?

Yes ☐      No ☐

If you answered "Yes" to Question 1, please answer Question 2.

If you answered "No" to Question 1, please move to Question 3.

2.     Have Plaintiffs proven by a preponderance of the evidence that bad faith conduct on the part of employees and representatives of ALPA caused injury to the TWA pilots in their conditions of employment?

Yes   ☐     No   ☐

3.     With respect to the negotiations over seniority integration and other events that took place _after_ the decision on April 2, 2001, have Plaintiffs proven, by a preponderance of the evidence, that ALPA's conduct was motivated by bad faith as I have defined that term for you?

Yes   ☐     No   ☐

If you answered "Yes" to Question 3, please answer Question 4.

If you answered "No" to Question 3, please stop, your deliberations are complete.

4.     Have Plaintiffs proven by a preponderance of the evidence that bad faith conduct on the part of ALPA during the period after April 2, 2001 caused injury to the TWA pilots in their conditions of employment?

Yes   ☐     No   ☐

Dated:                          _____

                                        Foreperson

6736853v1