1          UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
2

3    _____

     PATRICK BRADY, ET AL,
4
              Plaintiffs,              CIVIL ACTION NUMBER:
5
              -vs-                      02-2917(JEI)
6
     AIR LINE PILOTS ASSOCIATION
7    INTERNATIONAL,

8             Defendant.
     _____
9        Mitchell H. Cohen United States Courthouse
         One John F. Gerry Plaza
10       Camden, New Jersey 08101
         May 4, 2012
11
     B E F O R E:        THE HONORABLE JOSEPH E. IRENAS
12                        UNITED STATES DISTRICT JUDGE

13
     A P P E A R A N C E S:
14

15   TRUJILLO RODRIGUEZ & RICHARDS, LLC

16   BY:  LISA  J. RODRIGUEZ, ESQUIRE

17   ATTORNEYS FOR PLAINTIFFS

18

19   GREEN JACOBSON, P.C.

20   BY:  JOE D. JACOBSON, ESQUIRE

21       ALLEN P. PRESS, ESQUIRE

22   ATTORNEYS FOR PLAINTIFFS

23

24

25

```
 1
 2  KATZ & RANZMAN, P.C.
 3  BY:  DANIEL M. KATZ, ESQUIRE
 4  ATTORNEYS FOR DEFENDANT
 5
 6  ARCHER & GREINER
 7  BY:  STEVEN J. FRAM, ESQUIRE
 8  ATTORNEYS FOR DEFENDANT
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  Certified as true and correct as required by Title 28,
25  U.S.C., Section 753.
```

1      /S/ Carl J. Nami

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (open court)

2               THE DEPUTY COURT CLERK:  All rise.

3               THE COURT:  Please be seated, everyone.  Good

4    morning.

00:13    5          Okay.  This is the matter of Pilots versus ALPA.  Can I

6    please have appearances of counsel?

7               MS. RODRIGUEZ:  Good morning, your Honor.  Lisa

8    Rodriguez from Trujillo, Rodriguez and Richards for the

9    plaintiffs.

00:13   10          MR. PRESS:  Allen Press for the plaintiffs.

11               MR. JACOBSON:  Joe Jacobson for the plaintiffs.

12               MR. KATZ:  Good morning, your Honor.  Daniel Katz of

13    the law firm of Katz and Ranzman for the defendant, ALPA.

14               MR. FRAM:  Good morning, your Honor.  Steven Fram of

00:13   15    Archer Greiner also for ALPA.

16               THE COURT:  Okay.  We have three motions today.

17    Okay.  In no particular order.  One motion is for what I call

18    a Judgment NOV.  One motion is for a new trial, and the third

19    motion is a motion to De-Certify the Class.

00:13   20          I'm going to allow 20 minutes argument max on each side

21    for each motion.  So -- because I have to go for a certain

22    medical treatment at 2:30.  So I'm trying to get it all in

23    today.  Be 20 minutes on each side, five minutes for rebuttal.

24    Okay.  For each of the three months.

00:14   25          Now, Mr. Fram, they're all your motions or you did

1   split them up.  I notice there were the different people on

2   them but you had one motion I think.

3           MR. KATZ:  Yes, Judge Irenas --

4           THE COURT:  One was yours.  I think two were yours.

5   Is that --

6           MR. FRAM:  We're not being proprietary.  They were

7   joint motions.

8           THE COURT:  No, no.  But the names on the briefs you

9   could tell they were different like your name was not -- at

10  least one set of briefs your name was not on them.  Archer

11  Greiner was on the general thing but in the area on the left,

12  lower who wrote the brief.  You were not on, at least one of

13  them.

14          MR. KATZ:  Your Honor, we collaborated on all the

15  briefs.  If it please the court, we would, ALPA would prefer

16  to start with the JNLV motion and the new trial motion would

17  be following that.

18          THE COURT:  Okay.

19          MR. KATZ:  The Class de-certification motion would be

20  last.

21          THE COURT:  Okay.

22          MR. KATZ:  And I'm gong to be presenting the argument

23  for ALPA on the motion for a JNLV and a new trial.

24          THE COURT:  Okay.

25          MR. KATZ:  So if you're ready.

1          THE COURT:  Which one are you going to do first, NLV?

2          MR. KATZ:  JNLV, please.

3          THE COURT:  Okay.

4          MR. KATZ:  We thought it made sense to go in this

5  order first with if the JNLV motion is granted, the others

6  become moot.

7          THE COURT:  Okay.

8          MR. KATZ:  And I'm sure as always, Judge Irenas,

9  you're familiar with the papers.  I'm not going to repeat what

10 we said in the papers.  But I would like to put it in context

11 and in terms of the motion for a JNLV, I'd like to make three

12 points.

13          Number one, nothing, there's no evidence in the trial

14 record to support a jury verdict that ALPA acted in an

15 arbitrary manner.  Secondly, that there's no evidence

16 sufficient to support a reasonable jury verdict that ALPA had

17 acted in bad feign.  And, third, and importantly, in any

18 event, an integral and key part of the DFR elements, ALPA did

19 not engage in anything that caused any injury to any of the

20 plaintiffs.

21          Let me tackle those in reverse order.  And with regard

22 to causation, your Honor, it is important to keep in mind that

23 the plaintiffs do not accuse ALPA of directly doing anything

24 to the plaintiff class.  This is not a case where a union

25 refused to send a person out for a job in a shape up that as

1    long shoremen do.

2          THE COURT:  Shape up.  I guess we don't have to shape

3    up.  It's for pilots, the last I heard.

4          MR. KATZ:  The company does the hiring.  The company

5    does the firing.  ALPA did not take any action to injure any

6    plaintiff whatsoever.  The plaintiffs contend that what the

7    Allied Pilots Association, the American Pilots Union American

8    Airlines did in terms of supplement CC, injured the

9    plaintiffs.  And it is their contention that ALPA had it done

10   certain things or omitted to do certain other things could

11   have influenced the Allied Pilots Association or American to

12   impose a seniority integration.  That was better for the

13   plaintiffs, the TWA pilots than what they got.

14         THE COURT:  Mr. Katz, let me -- let's try to put in

15   context what the plaintiffs' position was or at least what I

16   understood the plaintiffs' position.

17         You have American taking over the shell, if you will,

18   the carcass of TWA in some fashion integrate their pilots into

19   their seniority system, into the American seniority system.

20   They, ALPA, at this point, is about to lose I don't know what

21   the number of TWA pilots was.

22         MR. KATZ:  Twenty-three hundred the number we're

23   using --

24         THE COURT:  To go into a much larger employer.

25   American being at that time one of the few large airlines that

1    was not already an ALPA airline.  So they're going to lose 23

2    hundred pilots into a union that they don't represent.  So

3    there's the, there's the immediate loss of whatever, the dues

4    pay is from those pilots and at the same time, their desire at

00:19    5    least arguably to bring the American which was APA I think

6    that was called the APA back into ALPA.  Conflict of interest

7    and the theory of the case is there was a conflict that their

8    desire not to offend the American pilots because they wanted

9    them to become part of ALPA was what infected the entire

00:19    10    process which how ever it lasted with this conflict of

11    interest.  And the conflict of interests are the toughest in

12    many respects to prove.  But their position is there was proof

13    that there was a conflict of interest.  I mean I don't want to

14    waste your time but call into it with the cards, the American

00:20    15    pilot cards from the American pilots who had indicated where

16    the cards came from, the relationship between Woerth and the

17    representative of the American pilots how they interacted.

18    What happened to the cards altogether was an issue.  And

19    that's really the gravamen of the case.  And don't you think a

00:20    20    jury if it finds that this infected ALPA's representation of

21    the TWA pilots, that a jury could infer from everything that

22    -- could infer from all the evidence, all the evidence that

23    they got a worse integration deal than they would have gotten

24    if ALPA was in their swinging with both fists to try to get a

00:21    25    better deal?

1           MR. KATZ:  I do not think so, your Honor, for a

2    variety of reasons.  Let me start, there is no conflict of

3    interest.  There is no evidence that anything that had

4    anything to do with the Hunnibell and Clark Card Campaign

00:21    5    influenced any of the people who were providing advice to the

6    TWA pilots or making any decisions with regard to the TWA

7    pilots.  There is no evidence that that was -- that anything

8    that they said made a difference to the MEC vote on April 2nd

9    or otherwise.  And there is no evidence from which a

00:21    10   reasonable jury could infer that any of this business with the

11   Hunnibell and Clark Card Campaign had a worse impact on the

12   seniority integration.  That it adversely affected the

13   seniority integration.

14        Let me give you an example.  There was testimony from

00:22    15   Randy Babbitt played at the trial that it was from his

16   deposition because he was unavailable for the trial.  Mr.

17   Babbitt testified that he was giving his best advice about

18   what was in the interest of the TWA pilots to the TWA MEC on

19   April 2.  He testified that there was a binary choice and that

00:22    20   it was up to the MEC to decide did they want to accept the

21   package of agreements that had been presented by management a

22   day or two before MEC --

23           THE COURT:  You're talking about in April.

24           MR. KATZ:  April.  I'm talking about April 2.  And if

00:22    25   they didn't want to accept it, they could reject it and they

1    could decide to take a chance on Roll and Wide Litigation

2    Theory or beating the Section 1113 motion that was then

3    pending in the Bankruptcy Court scheduled to begin on April

4    the 6th.  And there is absolutely not a shred of evidence from

00:23    5    which a jury could infer that any of the advice that Mr.

6    Babbitt gave to the TWA MEC was influenced by the Hunnibell

7    and Clark Card Campaign or otherwise.  For one thing, your

8    Honor, the Hunnibell and Card Campaign hadn't even started at

9    that point.  Hunnibell sent out the cards in connection with

00:23    10    his run for Vice President of the APA in late April or early

11    May.  The cards started coming in, and we have a list of the

12    cards from the Hunnibell and Clark people.  They started

13    coming in in the middle of May.  So there wasn't any Hunnibell

14    Clark Card Campaign.  There wasn't any card campaign.  There

00:23    15    wasn't anything adverse by ALPA at that point in time to do

16    anything to bring the Allied Pilots Association in.  Everyone

17    knew that it would be desirable for the Association and for

18    the TWA pilots if the American pilots came in to ALPA.  The

19    TWA pilots were part of the group that by acclamation back in

00:24    20    November of 2000 declared a policy in favor of organizing all

21    of the independent unions in bringing them in to ALPA,

22    including the many American pilots.  But not a thing was done

23    on that after the announcement of the merger on January 9,

24    2001.  So, nothing could have affected Mr. Babbitt because

00:24    25    there wasn't anything happening.  And there was nothing from

1    for the jury to infer, there were no facts from what the

2    reasonable jury could infer that Babbitt changed his advice

3    and told people you should go and take this package of

4    agreements because that's the better course for the TWA

00:24    5    pilots.  It's a safer course.

6         Now, the other people are in the same situation.

7    Michael Glasner was an investment banker and like Babbitt the

8    TWA MEC sought him out and decided to hire him and brought him

9    in to advise him about financial issues back early in 2000.

00:25    10    And he had been advising them.  And it's alleged that he gave

11    them emphatic advice that American Airlines would pull out of

12    the deal if they stalled this around.  That was good advice.

13    But doesn't have to be good advice.  The point is that there's

14    no evidence that a jury could infer that Glasner or Babbitt or

00:25    15    any of the other advisers to the MEC was influenced by

16    anything going on in terms of efforts to bring the American

17    pilots into ALPA.

18         In the original complaint, the second amended re-stated

19    complaint, your Honor.  The earlier lawyers for the

00:25    20    plaintiffs, the other set, the ones who started the case out,

21    they allege that ALPA should have pushed harder to bring the

22    American pilots in.  One of the complaints that they had that

23    was before the Third Circuit when it was there on the statute

24    of limitations case, it was that ALPA had violated its duty of

00:25    25    fair representation by not seeking the representation rights

1    for the American pilots, and obviously they couldn't.  They

2    couldn't get the representation right because of the numbers

3    that you referred to.  Hunnibell and Clark collected 1,549

4    cards according the spread sheet that Clark sent.  There were

00:26    5    11,500 American pilots and 2300 TWA pilots.  The numbers just

6    didn't work.  And once it became clear this was a merger going

7    on, the American pilots wanted to control the seniority

8    integration.  That was their number one priority.  So they

9    didn't want to become subject to ALPA's merger policy which

00:26    10    required the arbitration of the integration seniority list.

11    They want to control the outcome of the seniority integration.

12    The company said you could do that.  The contract said you

13    could do that.  And there wasn't any chance at all that they

14    were to be coming into ALPA.

00:26    15        So what evidence is there for a jury to find that

16    Babbitt or Glasner or any other advisers changed his advice to

17    make it more appealing to the American pilots.  There's

18    nothing in the record, nothing in the trial record, nothing in

19    the depositions or the transcripts of deposition or anywhere

00:27    20    else in this case that would support the idea that any of

21    these advisers changed their advice on account of that.  Nor

22    is there anything in the record to say that the vote would

23    have come out any different had there been different advisers.

24    Hollander had all but 55 of his votes against the package of

00:27    25    agreements that management had presented a couple of days

1    before.   There weren't enough votes to change.   He explained

2    that he was trying to mirror the wishes of his constituents.

3    That was why he voted.   Sally Young likewise voted.   Only 200

4    of her votes against the package and four hundred for it.

00:27    5    Even if you combine all of the Young's votes and Hollanger's

6    votes, that's not enough to have a different outcome in the

7    April 2nd election, the ratification vote.   And, clearly, it

8    is pure speculation.   Nothing but conjecture, Judge Irenas,

9    that would support the notion that if this resolution had gone

00:28    10   the other way and someone had said let's try rolling ******

11   lawsuit, what basis is there for a jury to infer from that

12   that the TWA pilots would have been better off.   Either they

13   would have gotten -- I mean it's very likely they would have

14   gotten wiped out by the bankruptcy judge and had no contract

00:28    15   at all.   And if they gotten -- taken jobs at TWA LLC, they

16   would have taken jobs as employees at will without the

17   objections of any collective bargaining agreement at all.   For

18   Americans walk away from the transaction, there's no TWA jobs

19   at all.   Why should we assume, what is there in the record for

00:28    20   a jury to base a reasonable conclusion that the TWA pilots

21   would have gotten a right to arbitrate.   The Allied Pilots

22   Association wasn't interested in arbitrating.   They had made

23   it very clear that they refused to arbitrate.   The company

24   wasn't going to lean on the 11,500 pilot group and say you

00:29    25   must arbitrate when they had a contractural right under their

1   collective bargaining agreement to refuse to do so.  They had

2   the contractual right to put all the TWA pilots at the very

3   bottom of the list.  There's nothing but speculation,

4   conjecture and peoples' vivid imaginations to support the

5   notion that things would you have worked out better for the

6   TWA pilots had people voted differently on April 2nd.  And

7   look at the other things that plaintiffs are complaining about

8   in terms of causation.  Plaintiffs say that ALPA should have

9   accepted Mike Day's suggestion and started a jump seat war.

10  Can you imagine how that was going to persuade the Allied

11  Pilots Association to provide the TWA pilots with a better

12  seniority list?  It's possible.  But there's no evidence that

13  we have speculation about Mike Day of a general nature that

14  maybe things would have gotten better if his idea had been

15  followed.  We have speculation by Roland Wilder in a vague way

16  that good things happen if unions would fight.  I can give you

17  a long list, your Honor, of bad things that have happened to

18  unions that have fought.

19          THE COURT:  Well, that's only when they fight you.

20          MR. KATZ:  They fight Braniff, they fight Eastern.

21          THE COURT:  When they fight you, it's a disaster all

22  the way around.  Sometimes -- you're not in every case.  Maybe

23  in 80 percent of them but there's always the other 20 percent

24  for the rest of the bar.

25          MR. KATZ:  Try to accommodate the entire bar.

1          THE COURT:  I know you're a public servant.

2          MR. KATZ:  Your Honor, the precedent clearly

3    establishes virtually in every Circuit that this kind of vague

4    speculation about what would happen is not enough to sustain

00:31    5    causation, which is part and parcel of the duty of fair

6    representation.  We can look at the Deboles case in the

7    Circuit.  I'm sure you're familiar with that.  The Cree and

8    Anderson cases in the Eighth and Ninth Circuits both involve

9    severance pay arrangements.  And the union officials were

00:31    10   accused of misrepresenting to the membership in a ratification

11   vote what the terms of the deal were.  In one case, they said

12   there was a severance pay fund that had been established.  So

13   don't worry about the employer going out of business.  The

14   severance pay is established by the fund.  And in another they

00:31    15   represented the severance pay limit had been removed.  In both

16   cases the Courts of Appeals assumed that those were

17   intentional misrepresentations of what the agreements actually

18   said.  The Courts of Appeals overruled duty of fair

19   representation finding and said this is not a sufficient basis

00:32    20   for a jury to find a DFR violation because there's no

21   causation.  You can't prove that their application vote would

22   have been different to the plaintiffs and you can't prove the

23   employer would have exceeded to these demands had the

24   employees voted to go on strike or voted to continue their

00:32    25   strike having Cree and Anderson.  In Spellacy there were

1    alleged misrepresentations by ALPA about the terms of training

2    that were being offered when Pan Am pilots were going to the

3    -- towards Delta under portions of Delta's, portions of Pan Am

4    sold to Delta.  The Second Circuit said in that case ALPA

00:32    5    there may have been a misrepresentation.  They assumed that

6    there might have been a misrepresentation.  They said it

7    didn't matter.  Pan Am was going out of business.  It wasn't

8    going to accept the kind of training arrangements that the

9    minority members of Pan Am MEC wanted, in any event.  And

00:33    10    without that essential causation, there was no violation.

11         With regard to the alleged conflict of interest, your

12    Honor, the Supreme Court and the Courts of Appeals have made

13    clear that it's substantial evidence is necessary.  A fraud,

14    deceitful action or dishonest conduct.  Nothing the plaintiffs

00:33    15    have alleged amounts to substantial evidence, nor does it

16    arise to the level of fraud, deceitful action or dishonest

17    conduct.  On the contrary.  We have accusations that Richard

18    Seltzer who is a lawyer who testified during the trial should

19    have told the TWA MEC very clearly that they had a right to

00:33    20    strike.  And that made a difference.  Well, number one, it

21    wasn't really so clear that they had a right to strike.  As it

22    turns out, the law has evolved and airline unions don't have a

23    right to strike according to the Second Circuit and I think

24    the Sixth Circuit.  And there's no Court of Appeals that said

00:34    25    you do have a right to strike just because your contract has

1  been annuled under Section 1113 of the Bankruptcy Code.

2        THE COURT:  What would bar them from striking?

3  Assuming the contract was nul and void for whatever reason.

4  What would bar them?

00:34   5        MR. KATZ:  The Railway Labor Act Section Two First

6  requires that every airline, every carrier and the unions and

7  the employees make every reasonable effort to make or

8  maintain agreements.  And Section 6 of the Railway Labor Act

9  requires that the status quo be maintained and no work

00:34   10  stoppages be allowed until all of the procedures of the

11  Railway Labor Act have been exhausted, including bargaining,

12  mediation by the National Mediation Board, a 30 day cooling

13  off period and the rejection by one side or the other of

14  interest arbitration under Section 5 of the Railway Labor Act.

00:35   15  Claim one explains these procedures.  That Richard Seltzer did

16  too during the trial.  So, I think the advice that Richard

17  Seltzer said he gave was that they could, that the employees

18  could strike against TWA, Inc. the carrier that was going to

19  be liquidated, but they would have to go to work for TWA LLC.

00:35   20  If they chose to work for TWA LLC, they would not be allowed

21  to strike.  They wouldn't be forced to go to work for TWA LLC

22  but if they did, they would be required to strike on penalty

23  of losing their jobs.  But the accusation by the testimony

24  from the plaintiffs was either we didn't hear it or we thought

00:35   25  it was confusing.  And what Allen Press argued in his closing

1    argument was that there should have been clear advice that

2    there was a right to strike.  And that was a

3    misrepresentation.

4         Now it wasn't a misrepresentation and Mr. Seltzer has

00:36    5    -- there's no evidence that Mr. Seltzer changed his advice

6    because there was some conflict of interest that he was

7    suffering from.  He gave his honest opinion of what the law

8    was.  And there's no proof, no evidence at all that one could

9    infer from this record that Mr. Seltzer changed his advice and

00:36    10    made it, changed in some manner that adversely affected the

11    results.  Now nobody said it made any difference either.  Of

12    all the four people who testified from the MEC on behalf of

13    the plaintiffs, none of them said that if they had a right to

14    strike, they wanted to go on strike.  None of them said if we

00:36    15    had a right to strike, we would have changed our vote and

16    voted to reject the Collective Bargaining --

17         THE COURT:  One minute warning.

18         MR. KATZ:  The other thing that plaintiffs rely on is

19    an alleged misrepresentation about possible delay that was

00:37    20    available in the April 6th, 1113 hearing.  And the court at a

21    conference towards the end of the trial in the middle of Mr.

22    Press's closing argument, Mr. Fram raised in a letter with you

23    that Mr. Press had misrepresented or the record showed and

24    said that Seltzer testified that there was an automatic right

00:37    25    to an extension of time and that they should have offered that

1   to the TWA MEC.  That's not what the record showed.  It was

2   clear that Mr. Press misstated what Mr. Seltzer's testimony

3   was.  The Court came up with a theory that maybe an extension

4   was possible under the theory that the motion was re-filed,

5   the 1113 motion was re-filed.  But the point is there's no

6   evidence that Mr. Seltzer was operating under a conflict.  He

7   gave his reasonable best efforts.  He gave his best opinion,

8   his honest opinion of what the law was because they were out

9   of time.  That's a reasonable reading of the statute.  The

10  21 days the statute allows were up.  No one said I move to

11  continue the meeting until tomorrow.  It would have been very

12  simple for TWA and a MEC member say I move that the meeting be

13  adjourned until tomorrow.  We'll talk about it tomorrow, or I

14  move that we have a ratification by the membership.  No one

15  said I move to have a ratification vote.  If they had, and if

16  there was a second, there would have been a vote by the MEC on

17  what to do.  But the MEC made its decision throughout.  The

18  MEC made its decision and should be required to live with it.

19  We don't, under the law of Duty and Fair Representation,

20  permit juries or courts to go in and reverse decisions that

21  were made by unions in the proper exercise of their

22  discretion.  In this case there is no evidence of any

23  arbitrary conduct, any bad faith conduct.  There's no evidence

24  of any causation, and for that reason, there's not sufficient

25  evidence in the record to support a jury verdict of ALPA

1    liability under the Duty and Fair representation.  I know my

2    time is up.

3         THE COURT:  Thank you, Mr. Katz.

4         MR. KATZ:  If you have any questions, I'd be happy to

5    respond.

6         THE COURT:  Thank you.  I don't know who's going to

7    handle it.  Are you going to handle it?

8         MR. PRESS:  Thank you, Judge.  A group of 12 men and

9    women as you know came in here every morning at 8:30 and heard

10   evidence for almost five weeks, Judge.

11        THE COURT:  You're emphasizing the 8:30 part?

12        MR. PRESS:  They were here on time every day is what

13   really struck me after reflecting on the case, and they

14   delivered their unanimous verdict in seven hours.  To set that

15   aside is a serious thing, and there's a standard for doing

16   that under Rule 50.  And Mr. Katz has not described that

17   standard but it's set forth in our brief.  It's a very

18   deferential standard to the verdict.  That is the evidence has

19   to be viewed in the light most favorable to the plaintiffs in

20   this case.  Giving the plaintiffs the advantage of every fair

21   and reasonable inference there is in the evidence, and when

22   you do that, Judge, as you did in ruling on the motion for a

23   directed verdict, you will find that there was substantial

24   evidence to support the verdict.  Our evidence by and large

25   was to fit into the framework that the Third Circuit provided

1   in this case.  The Third Circuit held in remanding the case

2   that plaintiffs proved their allegations that ALPA failed to

3   take specific actions -- I'm sorry.  Plaintiffs may recover if

4   they quote:  Prove their allegations that ALPA failed to take

00:40   5   specific actions on behalf of its members for an improper

6   purpose unquote.  That's at page 311 of the opinion.

7          All of our evidence fits right into that framework,

8   Judge.  We produced witness after witness who testified that

9   things that were requested of the union to do.  To provide

00:41   10   some leverage for this group of pilots and every time they

11   were told no.  No, no, no.  Nothing was done.  No action was

12   taken to help these pilots.  And it was for improper purpose

13   and it's the conflict of interest which you hit on, Judge.

14          All the evidence, all of plaintiffs' evidence which the

00:41   15   defendant would ignore, all of our evidence fits within that

16   framework that the Third Circuit has given us.  And when you

17   look at that evidence and the inferences supplied by that

18   evidence, Judge, you must conclude that there was sufficient

19   evidence for the jury verdict.  And I really don't want to

00:41   20   belabor this argument and even take up my whole 20 minutes.  I

21   would like to answer any of your questions, Judge, however if

22   you have any.  If you have any lingering doubt about this

23   verdict, I would like to address any such doubt that you may

24   have.

00:42   25          On the tissue of causation, Judge.  Mr. Katz referred

1   to Mr. Day's testimony, Mr. Wilder's testimony.  But what he

2   did not refer to was the inference supplied from what the

3   adversary union do did in this case, which is the biggest

4   piece of circumstantial evidence to support the causation

5   finding in this case, and that is this.  The APA's position

6   was always we are going to staple two thirds of the TWA

7   pilots.  That was their position from the beginning of the

8   process all the way up until close to the end.  And they did

9   soften their position substantially.  It was only in the face

10  of the leverage created by the TWA pilots themselves in

11  petitioning Senator Bond.  If you'll recall --

12          THE COURT:  The Bond Bill.

13          MR. PRESS:  That's right.  That was the only thing

14  that changed that softened up the adversary union.  Nothing

15  that ALPA did softened them up.  It was the TWA pilots

16  creating their own leverage.  And this was after 9/11.  You

17  would think that the adversary union would even have a -- they

18  did, they had even more of an incentive to batter the TWA

19  pilots after 9/11 because everybody knew there was a purpose.

20  But, no.  What they do is they soften their position

21  substantially.  And, so, it is no leap of logic for that jury

22  to have inferred what it did which was some leverage supplied

23  by ALPA would have even gone further to improve the plight of

24  the TWA pilots.  And that was our case, and the jury found in

25  our favor, Judge.  And we just simply ask you to leave that

 1    verdict alone and deny this motion for JNLV.  And, again, if

 2    you have any questions, I would like to address them.  But

 3    hearing none, I'm going to sit down, Judge.

 4            THE COURT:  Mr. Katz, I'll give you five minutes.

 5            MR. KATZ:  Your Honor, in terms of the point I was

 6    making earlier this morning.

 7            THE COURT:  What did ALPA do to help the Bond Bill?

 8            MR. KATZ:  Helped to support the Bond Bill.  The Bond

 9    Bill was not going anywhere, but ALPA supported it.  This is

10    Mr. Press's speculation.

11            THE COURT:  Fairly considering you as a bunch of

12    amateur pilots who were -- they went pretty far with that.  I

13    mean they made some progress.

14            MR. KATZ:  Your Honor, Mr. Press's speculation about

15    the impact --

16            THE COURT:  Didn't you even, the union refused to

17    give them their expenses?  At the beginning I think they --

18            MR. KATZ:  Your Honor, there were loads of the pilots

19    who got expenses.  Flight pay loss.  There were two or three

20    pilots on December 12th who were non-members of the MEC.  They

21    were not members of the Electorate Affairs Committee and their

22    request for flight pay loss was denied.  They were not

23    prevented from going and lobbying.  All they had to do was

24    drop a trip and they could go and lobby.  What Jalmer Johnson

25    said in the denying that, that request of flight pay loss is

1   the union wasn't going to reimburse them out the union's funds
2   much for the trips they wanted to drop.  But that was on
3   December 12th after Supplement CC had already been entered
4   into by American APA.  It is pure speculation by Mr. Press and
00:45   5   by the jury to say that the efforts on the Bond Bill actually
6   resulted in a better seniority integration, and it is even
7   more speculative to say that more aggressive lobbying for the
8   Bond Bill would have resulted in a still better seniority
9   integration.  There's no testimony from any one of the Allied
00:46   10   Pilots Association about that.  There's no testimony from
11   anybody in American about that.  What we have is testimony
12   that Brundage said that the company was going to ditch the TWA
13   operation if the Bond Bill passed.  What Duane Woerth
14   recommended and he testified about this, your Honor, is that
00:46   15   the TWA pilots would be better off taking the deal that was on
16   the table.  That was a reasonable call.  The idea that TWA
17   pilots would be immune from changes would only happen if they
18   agreed to sign the deal.  If they didn't, as they didn't,
19   American and Allied Pilots Association could make the deal
00:46   20   worse for the TWA pilots.  And they might have done that.
21   That was what Roland Wilder recommended.  That was a concern
22   of his.  The standard if your Honor is imposing with this
23   conflict of interest theory is strict liability.  If there
24   isn't any evidence and there isn't any in the record that ALPA
00:47   25   was motivated to make things worse for the TWA pilots to do

1   something that adversely affected the TWA pilots on account of

2   its desire to bring the American pilots into ALPA, then there

3   is automatic liability as soon as a conflict of interest is

4   presumed.  And what we are saying is that the case law on the

5   Duty of Fair Representation clearly requires that there be

6   substantial evidence that ALPA did something as a result of

7   this supposed conflict of interest that made things worse for

8   the TWA pilots.  There isn't any evidence of that.  All of the

9   calls that were made by ALPA throughout these requests by the

10  TWA pilots for jump seat wars for litigation, those were

11  reasonable calls.  Steve Rautenberg testified that he thought

12  they were knuckle head ideas that his colleagues on the MEC

13  were proposing.  What that establishes, your Honor, is that it

14  was not arbitrary.  It was not -- there's no evidence of bad

15  faith.  There's no evidence that ALPA did anything on account

16  of this allegedly improper motive that caused any injury.

17        So, I think that the speculation is insufficient.

18  There's no evidence that's sufficient to support the jury

19  verdict on causation, on arbitrariness, on bad faith.  Thank

20  you.

21        THE COURT:  All right.  Anything?

22        MR. PRESS:  No, Your Honor.

23        THE COURT:  Okay.  Well, I'm going to deny the

24  motion.  I believe that there was clearly evidence that there

25  was a conflict of interest, and I think there was evidence

1  from which a jury could infer that ALPA was not taking the

2  kinds of actions or even considering fully the kinds of

3  actions which might have put pressure on American or the

4  American pilots to agree to a let's call it more generous

00:49  5  integration scheme.  You know, I guess the answer it comes

6  down to several points, where is the staple point.  How high

7  up or down in seniority is the point of staple which, of

8  course, has a big effect on the pilots, depending -- the TWA

9  pilots.  At every point at where the union was asked to take

00:49  10  let's call it a hostile position toward American or the

11  American pilots for the effort to get TWA a better deal, they

12  rejected it at every turn.  Their support for the Bond Bill

13  was, to put it mildly, they wanted to show on the record that

14  they supported it, but that support was tepid at the very

00:50  15  least.  And there was much other evidence at various points

16  where the Union just seemed to be more interested in having a

17  good relationship with the American pilots than in protecting

18  the TWA pilots.  And I think the jury had sufficient evidence

19  under the very deferential standard for a new trial -- or

00:50  20  excuse me.  For an NLV that -- well, it was deferential for

21  both of them.  But there's a very deferential standard for the

22  NLV and I'm going to deny the motion.

23       Okay.  What's the next motion that's going to be

24  argued?

00:50  25       MR. KATZ:  The motion for a new trial, your Honor.

1          THE COURT:  And are you going to do that one, too?

2          MR. KATZ:  Yes, your Honor.

3          THE COURT:  Okay.

4               (Brief pause)

00:51  5          MR. KATZ:  Bear with me one minute.

6          THE COURT:  Okay.

7               (Brief pause)

8          MR. KATZ:  Your Honor, again I'm sure that you're

9     familiar with the materials in our new trial brief.  I'm not

00:52  10    going to attempt to repeat what's in the new trial brief but

11    --

12          THE COURT:  You'll be here until the Fourth of July.

13          MR. KATZ:  We don't want to do that.  We respectfully

14    submit that the information there, the precedent there

00:52  15    establishes sufficient grounds for a new trial.

16         Let me just start with one example.  The testimony of

17    Jeff Brundage was critical.  He was the only representative of

18    either APA or American whose testimony was offered in any way,

19    shape or form.  And his testimony, if it had been allowed,

00:53  20    would have shown that American told people like Randy Babbitt

21    who are advising the MEC that it wasn't going to back off of

22    the requirement that American had inserted in the acquisition

23    of assets agreement that the TWA pilots waived.

24          THE COURT:  Scope.

00:53  25          MR. KATZ:  Or modified their right to an arbitration

1    on seniority integration.  In fact, when I asked Brundage at

2    his deposition was American --

3            THE COURT:  Whatever you -- whenever anybody asks

4    Brundage, he answered a different question.

00:53    5            MR. KATZ:  When I asked him whether -- asked

6    Brundage, he said absolutely not.

7            THE COURT:  That deposition was as mess.

8            MR. KATZ:  Your Honor.

9            THE COURT:  It was a mess.

00:54   10            MR. KATZ:  The testimony was clear it was from a

11    representative of American Airlines.  In fact, the

12    representative who was in charge of the labor relations

13    aspects of this acquisition of assets.

14            THE COURT:  Who refused to answer a question

00:54   15    squarely.  He just refused.

16            MR. KATZ:  Your Honor, I think we've quoted in our

17    new trial brief some places where he very clearly and directly

18    answered questions about his conversations with Randy Babbitt

19    about the consideration by American of alternatives.  There

00:54   20    was no consideration of alternatives to the removal of this

21    provision from the TWA pilots' contract.  There was absolutely

22    no consideration of it because American was insisting on it

23    from the get go.  And the testimony was appropriate and we

24    submit was critical to ALPA's position that the advice that

00:54   25    was given to the MEC was based on a reasonable review of the

1    facts and the legal landscape as ALPA knew it at the time.

2    So, from that standpoint, it was important evidence.  We've

3    shown in our brief that, indeed, it was the only evidence from

4    American and APA.

5              THE COURT:  Evidence of what?

6              MR. KATZ:  Evidence of their insistence upon this

7    position that the TWA pilots --

8              THE COURT:  That there be no arbitration?

9              MR. KATZ:  That they're not going to go through with

10   the acquisition of the assets without the removal of this

11   provision from the TWA pilots' contract and --

12             THE COURT:  Removal of what, the scope?

13             MR. KATZ:  Yes, the provision requiring the

14   arbitration of seniority integration.  It's referred to as

15   scope.  It's sometimes referred to as protective provisions.

16   Ultimately requires arbitration of the integration seniority

17   list.

18             THE COURT:  But the vote that was I think the

19   April 2nd vote.

20             MR. KATZ:  The April 2nd vote.

21             THE COURT:  The vote on April 2nd to waive, I'll call

22   it waive scope, waive that provision, or to agree to waive it,

23   didn't end the negotiation.  That was almost like the start of

24   the negotiations for where the integration would be.

25             MR. KATZ:  It changed the legal structure.

1          THE COURT:  But both sides from the evidence

2     understood there was ongoing negotiations.  They had a

3     committee I think and American had a committee, the pilots had

4     a committee.  It was understood they were continue to

5     negotiate.  It's not like that ended all discussion and they

6     were going to staple the TWA pilot to the very bottom of the

7     American, uh --

8          MR. KATZ:  They had the negotiations before that and

9     there were negotiations --

10         THE COURT:  No, no.  But it was understood even after

11    April 2nd the negotiations were just beginning.  It was not

12    going to be arbitration granted.  Weren't going to turn it

13    over to an arbitrator to decide it.

14         MR. KATZ:  The testimony from Brundage was critical

15    to the way the negotiations were conducted to the legal

16    structure on which the negotiations were conducted, and there

17    was plenty of solid testimony --

18         THE COURT:  But you just said that Brundage said that

19    there was going to be -- they weren't go to permit

20    arbitration.  That's never been the Plaintiffs' position, I

21    don't think.

22         MR. KATZ:  The Plaintiffs --

23         THE COURT:  That they would have gotten arbitration.

24         MR. KATZ:  The plaintiffs have been coy about that,

25    your Honor.  They haven't said whether arbitration was a

1  result or not.  One of the rulings that you make today, one of

2  the rulings that is made by the court today is that the right

3  to arbitration is out of the case.  That would be an important

4  item.  The plaintiffs have not conceded that, to my knowledge,

00:57   5  up until this day.  And so the April 2nd meeting is important.

6          THE COURT:  They haven't conceded anything.  Nothing

7  I've said today is conceded or in their briefs for that

8  matter.

9          MR. KATZ:  Let me talk for a moment about the Seth

00:58   10  Rosen testimony because that was an important part of our new

11  trial motion.

12          THE COURT:  Okay.

13          MR. KATZ:  There were two things that we raised.  One

14  is that the court permitted Rosen to be examined on this scab

00:58   15  list, the scabs of Eastern's strike.

16          THE COURT:  Well, the scab list had to do with the

17  jump seat issue.

18          MR. KATZ:  Correct.

19          THE COURT:  The issue of the scab list was tied into

00:58   20  the jump seat issue.

21          MR. KATZ:  That's correct, your Honor.

22          THE COURT:  Because there was, it finally came out

23  that there was, A there was such thing as a scab list and that

24  it was used at some -- in some prior labor fights to bar jump

00:58   25  seat privileges to people on that list.

1          MR. KATZ:  Well, there was no evidence of that.

2    There was a scab list of the Eastern pilots from 1986 and when

3    the plaintiffs attempted to cross examine Duane Woerth with

4    that list, I objected and you sustained the objection and

00:59    5    would not allow the document into evidence and would not allow

6    the testimony.  And Duane Woerth testified that there was not

7    a scab list that ALPA maintained from every strike going back

8    to the Century Airline strike in 1930 or something like that,

9    is what Mr. Jacobson asked.

00:59    10          THE COURT:  I remember that list.

11          MR. KATZ:  You remember the Century Airlines strike?

12          THE COURT:  Yeah, I remember it well.

13          MR. KATZ:  You're one of the few who still remember

14    that strike, your Honor.

00:59    15          THE COURT:  Yeah.

16          MR. KATZ:  But the scab list was inflammatory.  It

17    was used to -- it was irrelevant to the subjects in this

18    lawsuit.  But people who have relations with unions have

19    strong feelings about the word scab and about being a scab and

00:59    20    about what happens to scabs.  And to permit this issue to be

21    raised during Rosen's cross-examination was to introduce

22    unfairly prejudicial and confusing information.  It didn't

23    have anything to do with Rosen's testimony.

24          THE COURT:  But doesn't it come down to --

01:00    25          MR. KATZ:  It was used to contradict something that

1    Dwayne Worth said.  The cross-examination --

2           THE COURT:  Duane Woerth takes the position, well, we

3    never start a jump seat war.  We just never do.

4           MR. KATZ:  That was not his testimony, your Honor.

01:00    5           THE COURT:  Well --

6           MR. KATZ:  His testimony --

7           THE COURT:  His testimony was something like that.

8    And I can't, sitting here now, do I remember the order of

9    verbs, adjectives and nouns, no.  But there was testimony --

01:00    10           MR. KATZ:  He testified that there was a policy that

11   ALPA maintained.

12           THE COURT:  Not to use jump seat privileges as a tool

13   in a labor fight.

14           MR. KATZ:  Right.

01:00    15           THE COURT:  Again, I'm re-casting it, but I think the

16   jury could you have inferred that that's what he was trying to

17   get across.  And the cross-examination was designed.  So

18   that's not really true.  It has been used in labor wars if you

19   quote labor wars.

01:00    20           MR. KATZ:  The policy that Mr. Woerth mentioned was

21   in evidence.  The document itself was in evidence.  The policy

22   was adopted after the scab list that the plaintiffs introduced

23   as an exhibit.  It showed nothing.  It did not show a

24   contradiction between Rosen and Woerth in their testimony.

01:01    25   It's simply brought in as an inflammatory issue in a confusing

1    manner in a way that was designed to inflame the jury.

2         We submit that it was improper to allow that

3    examination and allow that exhibit into evidence.

4         THE COURT:  The examination of Seth Rosen.

5         MR. KATZ:  Yes.  That part of Rosen's examination.

6         THE COURT:  Well, yeah.

7         MR. KATZ:  And when similar topics came in with

8    Woerth, you wouldn't permit it.  You made the point quite --

9         THE COURT:  Well, I wouldn't -- I didn't permit it

10    but you didn't -- that was at your request.

11        MR. KATZ:  That's right.  I objected to that.

12        THE COURT:  You can't complain what I did then.

13        MR. KATZ:  I'm not complaining about it.  I think

14    that your Honor was correct in that point.  I coherently and

15    articulately pointed out that the American pilots were not

16    scabs.  The American pilots had not crossed the picket line

17    during the strike.  But the plaintiffs were suggesting a

18    retaliation against 11,500 American pilots who had done

19    nothing like that, and it was simply going to generate an

20    antagonism and harder feelings.

21        THE COURT:  All right.  Antagonism toward ALPA trying

22    to get them into the fold.

23        MR. KATZ:  And antagonism toward the TWA pilots about

24    sparking the dispute.  It doesn't -- if it was a reasonable

25    call by Duane Woerth not to allow a jump seat war, it would

1  have been counter-productive.  The plaintiffs haven't

2  established that it would have advanced their cause in any

3  way, shape or form.

4      And, finally, in addition to the materials that are in

01:02    5  the brief, I have to remind the court with all --

6          THE COURT:  With all due respect.

7          MR. KATZ:  With all due respect.

8          THE COURT:  And you know what that phrase always

9  means.  I'll give you all the respect you're due, but it's

01:03   10  very little.

11          MR. KATZ:  We have great respect for your Honor.

12          THE COURT:  Well, we have with all due respect, your

13  Honor, and I try to figure out what that means.  The best I

14  can determine it means, I'll give you what you're due, your

01:03   15  Honor, but believe me, it ain't much.

16          MR. KATZ:  We have great respect for the court and

17  for you, Judge Irenas.  However, during the cross-examination,

18  the examination of Mr. Rosen, the issue of spoliation was

19  introduced by the court in a way --

01:03   20          THE COURT:  Are we talking about the cards?

21          MR. KATZ:  Talking about the tooth ferry didn't drop

22  these cards into --

23          THE COURT:  We're talking about the cards.

24          MR. KATZ:  Talking about the authorization cards.  It

01:03   25  was not something --

1           THE COURT:  The American authorization cards.

2           MR. KATZ:  The cards --

3           THE COURT:  The cards signed by the American pilots.

4           MR. KATZ:  The Clark and Hunnibell cards.

01:03   5           THE COURT:  Right.

6           MR. KATZ:  The cards --

7           THE COURT:  I know.  The ones that were given in

8   what, Las Vegas or something were handed to Woerth I think.

9           MR. KATZ:  On December the 5th in Las Vegas at the

01:04  10   Paris Hotel.

11           THE COURT:  Right.  Given by --

12           MR. KATZ:  Clark gave cards to --

13           THE COURT:  To Duane Woerth.

14           MR. KATZ:  Either to Woerth or Mugerditchian.

01:04  15           THE COURT:  I think the testimony was given to Woerth

16   I thought.

17           MR. KATZ:  Woerth is W-o-e-r-t-h.  Mugerditchian is

18   just the way it sounds like it sounds.

19   M-u-g-e-r-d-i-t-c-h-i-a-n.  And the cards, some cards were

01:04  20   given by Clark on December 5th again after supplement CC was

21   done.  After the card campaign was over and done with.  If you

22   look at the dates on the cards which are in I think it's

23   exhibit --

24           THE COURT:  Well, it's your position that once

01:04  25   Supplement CC was implemented, the Union could go back and

1   start soliciting American to come back in the fold?  The ALPA

2   fold?

3          MR. KATZ:  Yes, I think that it was proper for

4   American --

5          THE COURT:  All negotiation was over at that point?

6          MR. KATZ:  It was implemented on April 3rd, 2002,

7   your Honor.  You asked about its implementation.

8          THE COURT:  Yeah.

9          MR. KATZ:  And I think once it was implemented, ALPA

10  was no longer a bargaining representative for the TWA pilots

11  and it was certainly proper to try to organize the American

12  pilots.  There was nothing -- the case really is about the

13  negotiations up until the point when American and the Allied

14  Pilots Association executed Supplement CC on November 8th,

15  2001.  It was a done deal at that point.  The next day, the

16  Allied Pilots Association filed at the National Mediation

17  Board for a single carrier determination and then on April 3rd

18  --

19         THE COURT:  That didn't come until March I don't

20  think.

21         MR. KATZ:  That came on March 5th and then the

22  certification was transferred on April 3rd, 2002.  At this

23  point ALPA was no longer the bargaining agent for the TWA

24  pilots.  It didn't start out organizing campaign at American

25  at that point for ever.  The Allied Pilots Association still

1    represents the American pilots, and there hasn't been --

2           THE COURT:  You mean to this day.

3           MR. KATZ:  To this day.

4           THE COURT:  Yeah.

01:06    5           MR. FRAM:  There hasn't been the kind of organizing

6    campaign that Seth Rosen was testifying about at Continental.

7           THE COURT:  Well, American isn't--

8           MR. KATZ:  American ever.

9           THE COURT:  American isn't as mighty today as it was

01:06   10    then.

11           MR. KATZ:  But Rosen was correct to testify about

12    what happened to Continental.  Tremendous resources devoted by

13    ALPA bringing the Continental pilots into ALPA in the year

14    2001.  Millions of dollars were expended.  There was a zero

01:06   15    budget for organizing the American pilots.  But millions of

16    dollars were spent on organizing the Continental pilots.

17    There were hundreds of volunteers and people, staff people

18    assigned to work on the organization of the Continental pilots

19    during the year 2001.  There was no one from ALPA who was

01:07   20    assigned to do anything to organize the American pilots.  And

21    the notion that because Clark and Hunnibell had created these

22    cards and there's no dispute that they created them, the

23    testimony from their deposition was supplied to the jury.

24           THE COURT:  What is the word -- what do you mean

01:07   25    created them?

1          MR. KATZ:  They came out with the wording.  They

2    wrote them up.  The plaintiffs produced one of the cards in

3    discovery.  They had them printed by the Allied Pilots

4    Association printer, Primadata.  They were sent out by

5    Primadata as part of Hunnibell's election campaign to become

6    the vice president of the Allied Pilots Association.

7          THE COURT:  APA, yeah.

8          MR. KATZ:  ALPA had nothing to do with that.  In

9    fact, the undisputed testimony is that Rindfleisch who was an

10   organizer at ALPA among other duties was first informed of the

11   cards after they had been sent out.  They were sent out in

12   late April or early May and that he disapproved of it.  He --

13   Clark and Hunnibell had this home grown campaign of their own.

14   And what Rosen was testifying about, that's not the way ALPA

15   organizes independent pilots.

16         THE COURT:  Weren't Clark and Hunnibell told they

17   would be reimbursed for their expenses?  Wasn't there

18   testimony to --

19         MR. KATZ:  There was an e-mail from Rhino who had no

20   authority to send it on December 18th, your Honor, 2001 saying

21   that send us the receipts and you'll be reimbursed.  They sent

22   the receipts in.  There was never any reimbursement.  There

23   was never a penny.  Never a penny paid to either of them.

24         THE COURT:  I thought it was promised on more than

25   one occasion.

1          MR. KATZ:  There were, there were one or two e-mails

2     from --

3          THE COURT:  More than one.  I remember that.

4          MR. KATZ:  Rindfleisch.

01:09    5          THE COURT:  There was three or two.

6          MR. KATZ:  There was one the middle of October and

7     one in December from Rindfleisch which he had no authority to

8     send and which was disapproved of by the general manager as

9     soon as it was raised, and not a penny was ever paid to either

01:09   10   of directly or indirectly.  That has nothing to do with

11    anything involved in the case and that does not make the

12    Hunnibell and Clark card campaign something of ALPA.  But the

13    court in its examination of Rosen not only suggested that ALPA

14    had created these cards, had printed the cards and if it was

01:09   15   in some kind of forensic examination it might reveal that, but

16    suggested that Mr. Fram and Mr. Rosen and ALPA were all lying.

17    Said they were saying things that weren't factually true and

18    brought in front of a jury the whole idea that they, ALPA

19    shouldn't be believed.  That ALPA's lawyers shouldn't be

01:10   20   believed.  That ALPA's witness shouldn't be believed.  And

21    this was just days before the case went to the jury.  It was

22    the last scheduled day of testimony and the whole introduction

23    of the spoliation notion and the accusation that they were not

24    telling the truth was truly damaging to ALPA's position and

01:10   25   had to be confusing to the jury.

1          THE COURT:  Where were the cards?  They weren't even

2    produced.

3          MR. KATZ:  No one knows where the cards are.

4          THE COURT:  No one knows.  They just disappeared.

5          MR. KATZ:  But the court has ruled, this court

6    Special Magistrate Hedges and Magistrate Judge Donio ruled on

7    four occasions that all the information that the plaintiffs

8    needed about the cards was in their hands.  We had a spread

9    sheet that was supplied by Clark.  That was given in redacted

10   form to the plaintiffs.  The plaintiffs had the cards

11   themselves.  They produced the cards at discovery.  So the

12   language of the cards was known.  If there had been some need

13   for a forensic examination, they could have done it on the

14   card they had.  The dates that people signed were known

15   because that was on the spread sheet.  And the number of

16   cards, 1,549 were known.  So there were rulings from the court

17   on four occasions that they were not prejudiced in any way,

18   shape or form by the absence of the cards.  The cards could

19   have been sent back to Clark.  They could have been lost.

20   They could have been accidentally destroyed.  No one knows.

21   ALPA knows what's happened to them.  But the court did rule on

22   the spoliation motion on four occasions likewise that ALPA was

23   not guilty of the spoliation, and it was not fair game for

24   this case.  And even though Mr. Jacobson sought to introduce

25   it by asking the question during his cross-examination of one

1   of the ALPA witnesses about the hundreds of boxes that went

2   off to Iron Mountain, you sustained an objection to that

3   question because you had ruled at the pretrial conference and

4   then in denying their third motion for reconsideration on the

01:12   5   spoliation issue in April right before the trial started, you

6   ruled that spoliation was out of bounds for the case.  And yet

7   when you suggested during the examination of Mr. Rosen that a

8   forensic examination of the cards might reveal something, and

9   you yourself raised the issue of the loss of the cards as

01:12   10   being significant, that contradicted the ruling that the court

11   made on several occasions, on four occasions that spoliation

12   was not to be brought in.  It's a horrible accusation to make

13   in front of a jury that someone has destroyed evidence

14   intentionally, but you had ruled there was no bad faith on

01:12   15   ALPA's part in connection with the handling of the evidence in

16   this case.  And that plaintiffs had everything that they

17   needed with regard to the cards.  We just didn't have the

18   cards.  And that the fact is that the cards were unimportant.

19   ALPA never used the cards for anything.

01:13   20         THE COURT:  Well, to create the spread sheet.

21         MR. KATZ:  No.

22         THE COURT:  What?

23         MR. KATZ:  The spread sheet was created by Clark who

24   e-mailed it to Grinslahand on December 18th or 19th 2001.

01:13   25         THE COURT:  No, no.  The cards were used to create

1  the spread sheet.

2        MR. KATZ:  By John Clark.  ALPA didn't create a

3  spread sheet.  ALPA didn't care about the cards.  Was it wrong

4  on December 5th at the Paris Hotel, the ALPA Officers Woerth

5  and Mugerditchian to accept the cards?  Maybe they should have

6  said we don't want your cards.  Maybe they were just being

7  provided to this guy who would come in to have lunch with them

8  and was offering him something?  He was an ALPA supporter.  He

9  was an American pilot.  Why should they be rude to him?  Why

10 does that make any difference to the case that they accepted

11 the cards if there was nothing ever done with the cards.  So I

12 think that the cards are a total red herring.  That the --

13        THE COURT:  Two minutes.

14        MR. KATZ:  -- issue of spoliation was improperly

15 raised.  If it had come into the -- from the plaintiffs, it

16 would have justified a new trial.  The fact that it came in

17 from the court's own questioning made it more serious because

18 the jury clearly liked you, Judge Irenas.  They respected you

19 and the fact that you raised these questions I think

20 undeniably made a big difference to them.

21        Thank you for your attention.

22        THE COURT:  Thank you, Mr. Katz.  Mr. Press.

23        MR. PRESS:  The issue of the destruction, the loss of

24 the cards came in through Seth Rosen in our case in chief,

25 Judge.  We played a snippet from the video deposition where he

1   testified that we looked for the cards and couldn't find them.

2   When Mr. Rosen testified live and you did question him, you

3   were simply following up on the fact already in evidence that

4   the cards were not in existence today.

01:15    5          THE COURT:  Well, the cards hadn't been found.

6          MR. PRESS:  Right.

7          THE COURT:  Whether they were in existence or not who

8   knows, but they hadn't been located and produced in discovery.

9          MR. PRESS:  That's correct.  And the point that you

01:15   10   were making, Judge, was that these cards may have reflected

11   some important information that we just simply don't know.

12   Mr. Rosen was attempting to testify that ALPA had nothing to

13   do with the cards.

14          THE COURT:  Nothing to do with the printing or the

01:15   15   preparation of the cards.

16          MR. PRESS:  Right.  And Mr. Katz relies on the

17   testimony of John Clark for the notion that ALPA had nothing

18   to do with the printing of the cards.  Mr. Clark testified

19   under oath that I did not deliver those cards in Las Vegas.

01:15   20   He testified under oath that the database that he supposedly

21   created, his testimony was it's a fabrication.  This was the

22   evidence presented to the jury.  Mr. Clark was, his

23   credibility was completely destroyed by the evidence.  So,

24   there was absolutely nothing wrong with your questioning of

01:16   25   Mr. Rosen, Judge.

1        THE COURT:  There are 14 Third Circuit judges who

2   will weigh in on that issue.

3        MR. PRESS:  And the record will be clear for them as

4   well, Judge.  The questioning of Mr. Rosen that is complained

01:16    5   of that I made related to this scab list issue and defendant

6   has not specified what question it was that they object to.

7   But if you look at the record, you have Mr. Fram's -- I

8   attempted to refresh -- I did refresh Mr. Rosen's memory of

9   the existence of a scab list.  I refreshed that memory through

01:16   10   the use of an Appellate decision, a published decision.  I

11   think it was out of the Second Circuit of a case involving

12   ALPA scab list.  And Mr. Rosen was a witness in that case.

13   And I showed him to refresh his memory, I showed him that

14   published opinion and Mr. Fram got up and objected to my use

01:17   15   of the document in that fashion.  You overruled that

16   objection.

17        THE COURT:  I think the law is you can use a laundry

18   list.  There's no limit on what you're allowed to use to

19   refresh recollection.

01:17   20        MR. PRESS:  Right.

21        THE COURT:  Because the witness you show him, you

22   know, the menu at your local Chinese restaurant, you say no

23   that doesn't refresh my recollection.  I don't think there's a

24   limit on what you can show.

01:17   25        MR. PRESS:  And, so, the document was presented to

1    Mr. Rosen.  He reviewed it and indeed refreshed his memory

2    that ALPA, in fact, that it distributed to its 50,000 members.

3    And when I asked them that question, there was no objection to

4    that.

5            So, there was nothing -- first of all, the testimony

6    was relevant, admissible and procedurally there was no

7    objection to the question at issue.

8            As to Mr. Brundage and his deposition, Judge, your

9    recollection is correct.  He was all over the place.  And you

10   stated on the record and this is what happened.  Mr. Katz said

11   he was going to go back and look at this and, you know, see if

12   he can work something up, narrowed what is being offered, et

13   cetera.  But right now I am not going to let this be played in

14   this form.  That was your comment on the record after we were

15   in your conference room discussing this off the record.  Mr.

16   Katz had made a promise that he was going to go back and try

17   to, you know, cut this down a little bit and address your

18   problems.

19           THE COURT:  Yeah, because what was offered I found to

20   be incomprehensibly confusing.

21           MR. PRESS:  Right.  And you made those comments.

22           THE COURT:  I'm sure I made those comments and this

23   was a guy who couldn't answer a question.  I mean directly and

24   squarely.

25           MR. PRESS:  And so what happened was and as you

1  stated on the record, defendant was going to go back and try

2  to cut this thing down, and they never did, Judge.  They never

3  came back with anything.  And I was saying that you should

4  just sua sponte read the deposition at some point in the

01:19    5  trial.  They never re-offered anything.  So your ruling was

6  correct as it is.  Again procedurally this claim of error has

7  not been preserved.  That's all the time that I would spend on

8  the issue Mr. Katz presented.  I don't think there's a reason

9  to.

01:19   10          MR. JACOBSON:  I just want to make one last comment.

11          MR. PRESS:  Okay.  A ahead.

12          MR. JACOBSON:  I would just add one last thing to

13  what Mr. Press said which was in connection with your

14  questions and comments during the deposition, during the

01:19   15  testimony of Mr. Rosen.  They made an objection.  The relief

16  they asked for was that you read an instruction to the jury

17  saying that they, the jury should not take any negative

18  inference from this.  That there's no dishonesty, et cetera.

19  You read the instruction they tendered.  They made no request

01:20   20  for relief.  They did not request a mistrial and it's not

21  appropriate for them now to after the fact having gotten the

22  relief they requested for the court's questions and comments

23  to now come in and say in addition to relief we asked for and

24  the court granted us, now that the trial is over, we're also

01:20   25  entitled to a new trial.

1          THE COURT:  In effect they asked for a mistrial now

2     rather than --

3          MR. JACOBSON:  Rather than at that point in time.

4          THE COURT:  Yes.  Mr. Katz.

5          MR. KATZ:  A couple of points.

6          THE COURT:  Sure.

7          MR. KATZ:  With regard to the authorization cards,

8     Mr. Press references the testimony of John Clark.  That was

9     played to the jury.  In addition, there was testimony from

10    Mark Hunnibell that the plaintiffs showed to the jury from his

11    deposition.  In his deposition in the portion that we -- that

12    was shown at trial, he clearly said that the cards were

13    printed by Primadata Inc in connection with his candidacy for

14    a position within the APA and --

15         THE COURT:  Is the jury required to believe that?

16         MR. KATZ:  There was no -- the plaintiffs never

17    contended that ALPA printed the cards, researched the language

18    of the cards, prepared the cards, distributed the cards.  It

19    has been undisputed from the time that Clark and Hunnibell

20    gave their depositions back --

21         THE COURT:  Well, not from Clark's deposition.

22         MR. KATZ:  -- 2006.  Yeah, it was in the complaint,

23    the second amended re-stated complaint alleged that there was

24    an agreement between APA and ALPA to organize the American

25    pilots into ALPA.  That was abandoned by the original set of

01:21

01:22

01:22

01:22

01:22

01:23

1  plaintiffs and has never been resurrected again.  It's clearly

2  untrue.  Clark and Hunnibell were not at the time of their

3  card campaign officers of APA.  APA was officially against

4  their card campaign and encouraged pilots at American to not

5  sign the cards and if they had signed them, to ask them that

6  they be rescinded.

7          THE COURT:  Revoked.

8          MR. KATZ:  Revoked, yes.  With regard to the Brundage

9  testimony the court, and I remember talking in the courtroom,

10 not the chambers, but in the courtroom.

11         THE COURT:  On the record.

12         MR. KATZ:  Before the trial started for about a half

13 hour about Brundage.  Miss Rodriguez, Mr. Jacobson, Mr. Press

14 were all arguing vigorously that Brundage's testimony

15 shouldn't be allowed.  The court was asked today, as the court

16 is today, emphatically against any testimony from Brundage

17 coming into the record.  There was a definitive ruling and the

18 definitive ruling was one that we decided to live with.  And

19 it was, it was no withdrawal of our proposed designations of

20 the Brundage deposition.  That was part of the pretrial order.

21 We designated portions of the Brundage deposition that we

22 thought was appropriate to play.  The plaintiffs

23 counter-designated and objected to virtually everything.  And

24 the court made its ruling off the record and put the ruling on

25 the record after a lengthy discussion.  I think we did

1  everything necessary to preserve the record on that point.

2  That's really all I have to say in rebuttal, your Honor.

3            THE COURT:  All right.  Okay.  Anything you want to

4  add?

01:23   5            MR. PRESS:  No, Your Honor.

6            THE COURT:  All right.  Okay.  Most of this motion is

7  really geared to the testimony of Seth Rosen, what happened

8  during the testimony of Seth Rosen and what happened regarding

9  the non-testimony, if you will, of Mr. Brundage or the

01:23  10  non-admission of his deposition.

11        I'm going to deny the motion for a new trial or for

12  dismissal under Rule 59.  I think my handling of both Brundage

13  and Seth Rosen was proper.  And as pointed out when there was

14  a question of a curative instruction for the benefit of the

01:24  15  plaintiff or excuse me the benefit of the defendant, I gave

16  it.  And I think that reading the entirety of Seth Rosen's

17  testimony and reading the entirety of what there is with

18  discussions that were about Brundage, that I was correct.

19  That my rulings then were all correct.  I mean I can even

01:25  20  today after all that's gone by remember what a hodge-podge and

21  disorderly mess Brundage's deposition testimony was.  I think

22  I can remember the discussions we had on it.  I mean I'm not

23  one who likes to keep evidence out.  I like to get evidence in

24  and let the fact finder deal with it.  But Brundage was just

01:25  25  in a form, at least that was tendered, was in a form that I

1    thought would lead to confusion.  It was just no rational way

2    to present it.  But as the parties pointed out, I did open up

3    the door, notwithstanding the final pretrial, to have him, to

4    have the defendants modify what they were offering from

5    Brundage in a way that I might let it in.  And that's clear on

6    the record that I did not totally foreclose some possibility.

7    I wasn't saying, well, you said this in the final pretrial.

8    I'm not going to let you change that.  Quite to the contrary.

9    If you can narrow it down in some way that I can present it

10   that makes sense, I'll do it.  But that just never happened.

11   I mean maybe it was a tactical decision to leave it that way.

12   That would be legitimate, too.  But I don't know.  But I

13   didn't foreclose it.  And as to Seth Rosen, I think the

14   entirety of his testimony was fairly presented.  My actions

15   were fair and not prejudicial.  And I'm going to deny the

16   motion.

17           Okay.  Let's handle Decertifying the Class now.

18           Let me ask Carl, do you want a break?  Anybody would

19   like a break for five or ten minutes?  It's up to you.  I'm

20   ready to stay here, you know.  I go to dialysis at three

21   o'clock this afternoon.  You know, take care of that.

22           MR. FRAM:  Your Honor, we're fine to proceed.

23           THE COURT:  Okay.  And, look, I just want to make

24   sure Carl is the only guy really working hard here and I want

25   to make sure he's okay.  Carl, any time you want a break, you

         1   just signal and you got it.

         2          THE COURT REPORTER:  Okay, Judge.  Thank you.

         3          MR. FRAM:  Thank you, Your Honor.

         4          THE COURT:  Yes.

01:27    5          MR. FRAM:  We believe that the trial evidence

         6   demonstrated two things that warrants decertification of this

         7   case in its entirety, or if not would in its entirety with

         8   respect to the issue of damages.

         9          One, we learned that the TWA pilots were impacted in

01:27   10   very different ways by Supplement CC and the events that

        11   followed.  The senior most pilots, as the testimony

        12   demonstrated, were never furloughed and, indeed, they made

        13   significantly more in at least one case than they had at TWA.

        14   You may recall Mr. Roberts' testimony.  The evidence was that

01:28   15   the pilots at --

        16          THE COURT:  You don't have to convince me of that.

        17   There's no question that some pilots when all is said and done

        18   would wind up of having done better.  Having sustained no loss

        19   for whatever the reason.  I agree with that.  I don't think,

01:28   20   and I don't think the plaintiffs deny that.  That even if we

        21   had done the staple for instance, you know, 2000 places higher

        22   on the list, you know, that everybody would have sustained a

        23   loss, I don't think that was ever their position in this case

        24   that a hundred percent of the pilots sustained some kind of

01:29   25   loss.  That was never from day one, even from the prior, the

1    prior attorney I don't think that was ever their position.

2         MR. FRAM:  By the same token I think we can all agree

3    or hope we can that the most junior pilots were not impacted

4    by the integration because they, many of them were furloughed

5    even before Supplement CC was adopted, and indeed more of them

6    were furloughed before it became effective in April of 2002.

7    So you have two groups of pilots, senior and junior, who were

8    not impacted by any arguable breach on the part of ALPA.  You

9    have pilots in the middle who were furloughed for a different

10   amount of times, for different amounts of time.  Some probably

11   got jobs.  Some maybe out for a while.  We don't know.

12   There's a huge amount of detail in many different things that

13   they could have done, your Honor.  So, and, of course, on top

14   of that we know from the trial evidence as well that there

15   were disagreements among pilots about how to proceed.  Some

16   want to be aggressive, some did not.  Rautenberg talked in a

17   lot of detail about he thought it made sense to accept the

18   three part term sheets that was offered in October for 2001,

19   indeed, by rejecting that.  The evidence showed that the TWA

20   would concede got a worse deal.  And one he respected

21   obviously got a worse deal is that one aspect of the

22   three-part term sheet is that there would be no furloughs of

23   TWA pilots above the staple point.  In fact there were.

24        THE COURT:  Repeat what you just said.

25        MR. FRAM:  One aspect, your Honor, the three-part

1    term sheet is that no TWA pilots above the staple point.

2         THE COURT:  Above the staple point.

3         MR. FRAM:  Would be furloughed.  And as a matter of

4    fact, you heard testimony at trial the pilots above the staple

5    point were furloughed.  So my point is that different pilots

6    took very different positions about what was the most

7    effective way to try to negotiate with the American pilots.

8         THE COURT:  That's true.

9         MR. FRAM:  And, of course, there were disputes among

10   the senior pilots and the junior pilots.  Again senior pilots

11   had the most to lose.  They had the most job security.  They

12   tended to take more conservative positions.  And the junior

13   pilots as you may recall were to be more, more aggressive.  So

14   we learned that the outcome was different for different pilot

15   groups.  What we didn't learn and what the jury verdict did

16   not tell us is which pilots were harmed.  We know some were

17   not.  But we don't know who was.  We don't know how they were

18   harmed.  We don't know who they are.  We don't have any

19   information we need to move forward to the next stage of the

20   case.  And I hope your Honor had an opportunity to read the

21   Blyth versus Mancuzzi case out of the Second Circuit dealing

22   with the Attica riots back in 1971.

23        THE COURT:  The -- say that again.  The?

24        MR. FRAM:  Prison riots.  Attica.  Where a very

25   similar verdict sheet the jury was asked in that case to

1  determine, the liability jury whether the plaintiffs or any of

2  them had suffered harm.

3         THE COURT:  Wouldn't that have required a scienter

4  determination one by one?

5         MR. FRAM:  In this case, your Honor?

6         THE COURT:  No.  In the Attica case.

7         MR. FRAM:  I'm not recalling.  I think as part of the

8  1983 claim it probably would have.

9         THE COURT:  But it seems to me when they -- we don't

10  know yet the theory of liability that's -- I mean the damages

11  that's going to be put forth.  At least I don't know it yet.

12  Maybe they know, but I don't know how they're going to prove

13  that aspect of their case.  But it's clearly going to be on a

14  -- it's going to be determinative for the whole class even if

15  it's, the determination is that some pilots won't get

16  anything.  It's going to be clearly a class-wide type of

17  determination.  I mean in its simplest form it could be

18  wherever the staple point would have been.  You know, let's

19  assume it's done in that sense.  The staple point would have

20  been here rather than here.  Now it's true it will affect,

21  some people will get more, some will get less.  Some will get

22  none.  But it's clearly a class-wide determination.

23         MR. FRAM:  Your Honor, there are two problems with

24  that.  One is that it's going to require a damages jury to go

25  back and hear the allegations of it would, DFR breaches by

1   ALPA.

2          THE COURT:  Say what?

3          MR. FRAM:  The allegations, here a damages jury is

4   going to have to consider the claim that ALPA breached the DFR

01:33   5   and that that had an impact on the negotiation process.  And

6   they're going to have to hear much of the same evidence.  So I

7   think we pointed out --

8          THE COURT:  Well, that I don't know.

9          MR. FRAM:  Well -- but, your Honor, there's a problem

01:33   10   here when we say we don't know.  Because hydrogen peroxide and

11   Gates versus Rohm and Haas and the Supreme Court in Wal-Mart

12   versus Dukes all say that we have to engage in what they refer

13   to repeatedly is a rigorous analysis.  We have to have a trial

14   plan.  For the court to continue with the case as a class

01:34   15   action, we have to understand exactly what the issues are,

16   exactly how the plaintiffs intend to prove them.  They can't

17   come back, as they have, in response to a decertification

18   motion and say we are going to do it through an expert, but we

19   don't know who he or she is.  We don't know what he or she

01:34   20   will say.  And, indeed --

21          THE COURT:  But she will know before the trial

22   starts.  It's not as, I mean we're just now -- we're almost

23   like now at the complaint stage in a sense of the case, you

24   know.  You're not going to be forced to go to trial not

01:34   25   knowing who -- what their expert is going to say and what the

1    expert is going to be able to backup the opinion with.

2            MR. FRAM:  Your Honor, we don't even know the members

3    of the class they think are entitled to recover damages.  And

4    the problem, one of the many problems we have is that the

01:34    5    damages the jury is not going to know either.

6            THE COURT:  I mean you're asserting a proposition

7    that in a class action if you define a class and as here a

8    class definition, that if some of the people get different

9    damages or no damages at all, that somehow or other the class

01:35   10    is no longer a valid class.  I don't know where you get that

11    from.  I mean there's a lot of class actions where you define

12    a class, but when you ultimately get into it, some people in

13    the class recover, some don't or some get more or less than

14    others do.

01:35   15            MR. FRAM:  When we get that from Hydrogen Peroxide,

16    you're in the Third Circuit, you tell them that injury in fact

17    has to be common issues, you can't --

18            THE COURT:  It's a common issue but that doesn't mean

19    the result has to be the same for everyone.

01:35   20            MR. FRAM:  Well, we read Hydrogen Peroxide, in other

21    words, we don't think you can certify a class and then find

22    out after trial which members of the class had injuries and

23    are entitled to pursue claims.

24            THE COURT:  Well, I disagree with that.

01:35   25            MR. FRAM:  Your Honor --

1            THE COURT:  You mean -- you're proposing to make the

2    case totally, a difficult case totally untriable.  That's what

3    you -- you want me to make it so it can never in effect be

4    tried.  And it's so obvious that it's -- that the claims can

5    much more efficiently be handled on a class basis than a

6    non-class basis.

7            MR. FRAM:  Your Honor, there is one issue that does

8    encompass the entire class and that's the issue of what the

9    seniority list would have been but for ALPA's alleged

10   breaches.  And again there are two problems with that.  One

11   problem is in order for the damages jury to determine that,

12   they're going to have to hear much of the same evidence.

13           THE COURT:  Why?

14           MR. FRAM:  Why?

15           THE COURT:  Why?

16           MR. FRAM:  How do they prove it otherwise?  Where is

17   the trial going to --

18           THE COURT:  I don't know.  Let's see.  I mean maybe

19   that motion will have some legs at some time but right now I

20   don't know how they're going to prove it.

21           MR. FRAM:  Well, are they going to have an expert

22   come in and say in my opinion?

23           THE COURT:  I don't know.

24           MR. FRAM:  Well, your Honor, how can we pursue this

25   as a class action without doing that with a risk analysis and

Case 1:02-cv-02917-JEI   Document 480   Filed 05/31/12   Page 59 of 102 PageID: 15968

*59*

1      understanding that?  That's our concern.

2           On the issue of damages, your Honor, once a jury

3      decides what the seniority list should have been and you have

4      a baseline, you still have the fact that only then can you

01:37   5      determine which members of the class were harmed, and then you

6      have to look at the individual circumstances of each and every

7      one of them.  Were they furloughed.  Were they recalled.  Did

8      they decline to come back.  What did they do on the furloughs.

9      Did they get a job some place else.  All of those issues are

01:37   10     individual and they're a required discovery from every member

11     of the class who want to pursue a claim for damages, and

12     that's just the type of individual damage assessment which the

13     courts have repeatedly held is not amenable to class

14     treatment, your Honor.  And I think, you know, you'll sense

01:37   15     from our briefs of how long this process could probably take.

16     We've cited Judge Linares' opinion in the <u>Bayshore</u> case, which

17     we think is very similar.  The court actually granted Summary

18     Judgment on liability.  And then when it got to the issue of

19     damages, it was determined just as here, that some members of

01:38   20     the class were not harmed.  And that some arguably were but in

21     many different ways.  And the Judge decertified the class and

22     permitted the plaintiffs who wanted to come in to try to

23     pursue it.  We're a step away from that.  We're a step away

24     from that, your Honor, because we don't really know who is in

01:38   25     the class for the purposes of injury in fact.  And we need to

*United States District Court*
*Camden, New Jersey*

1   know that obviously before we can proceed.  We don't know from

2   the defense perspective, your Honor, for example.  We don't

3   know which members of the class we should be asking for

4   damages information from because we don't know who the

01:38   5   plaintiffs are that have been injured.  We just don't think in

6   terms of moving forward that there's a feasible way to

7   structure a damages trial.  I think the biggest problem, the

8   bigger hurdle we face, your Honor, is that what will the

9   damages be, what will the damages the jury be told about the

01:39   10   liability verdict to give them any guidance in terms of the

11   type of injury, which pilots were hurt.  And again we submit

12   that this case is just like <u>Bliden versus Mancuzzi</u> where the

13   case simply cannot go forward.  Setting aside the Seventh

14   Amendment issues.  Setting aside all the other issues.  And

01:39   15   the only way, your Honor, to try to proceed with the case is

16   to go backwards and to have a new liability trial where we go

17   through the rigorous analysis and figure out how to get what

18   the Supreme Court identifies in <u>Wal-Mart versus Dukes</u> as a

19   common issue that advances the case because we didn't get

01:39   20   that, your Honor, as result of the liability trial in this

21   case.  And I would note, your Honor, that the plaintiffs'

22   opposition briefs, they come back and say what we're going to

23   do with an expert.  We have a ten year old case.  We know

24   they're anxious to move ahead with discovery on the damage

01:40   25   issue, your Honor.  We need to know what the theory is and

1    it's not enough for --

2           THE COURT:  Well, no.  And I intended to discuss

3    before we all depart, discovery.  But you make what I think

4    may be, I don't want to say now but I think may be a valid

5    point which is that until we have their expert's report, and

6    the expert has been deposed, discovery isn't really too

7    meaningful, which I think is your point and that you -- the

8    normal, in a normal litigation we do fact discovery and the

9    last very end of the case is the experts, expert, you know, in

10   the timing of the discovery usually experts are at the end.

11   Right?  I mean just a typical case, I mean not a class action

12   case, just a regular case.  You know, fact discovery, then we

13   do expert reports, then we do expert discovery and then the

14   case is ready for trial.  And that's the normal order.  And

15   here the order may have to be reversed.

16           MR. FRAM:  Well --

17           THE COURT:  In that we have to get a much clearer

18   picture of what the theory is, and then fact discovery might

19   follow that which is what you're saying, and I agree with you.

20           MR. FRAM:  Well, but I'm not quite there in the sense

21   that we don't think the plaintiffs, given the nature of the

22   damages available for a DFR violation can prove damages on

23   behalf of the type class or even whichever sub group the TWA

24   pilots are going to pursue damage claims without getting into

25   these individual hearings, and that's a problem.  If -- you

1    know, we were expecting, your Honor, in their opposition brief

2    or at some point for their expert as they represented to come

3    up with a formula or an approach to try to project how you can

4    do that on a class-side basis.  But we know that in Wal-Mart

5    versus Dukes the Supreme Court has rejected a whole line of

6    authority which permitted in the past what the Supreme Court

7    refers as trial by formula.  So we have an environment now in

8    the class action area where you can't do representative

9    sampling of a class group, get information about this number

10   of pilots, and try to extrapolate from that.  The testimony

11   has to be based upon the specifics of each pilot.  I see your

12   Honor is nodding.  So I assume you're agreeing with that.

13   That's very problematic in this case, your Honor.

14        So we submit that decertification with respect to the

15   issue of damages is important and that there are more

16   efficient and more manageable ways for the court to try to

17   proceed.  But we have these two hurdles, the two steps.  The

18   one is we still don't know which pilots were harmed.  We may

19   have agreement that certain pilot groups were not harmed, and

20   if we can get to that point, we haven't been there yet.  That

21   would be helpful.  But we still have a big question mark and

22   we don't believe that the plaintiffs' expert is entitled to

23   come in and say, well, based upon the jury's verdict which

24   didn't identify a specific DFR violation which didn't tell us

25   what the violation should have been, we don't think an expert

1    can come in and try and interpret the jury's verdict in a way

2    that came about.  We need to understand how the plaintiffs

3    plan to do that.  And we do submit, your Honor, based upon the

4    evidence that will be necessary to try to prove that, it will

01:43    5    necessarily involve testimony, your Honor, from the American

6    pilots, the APA representatives.  We anticipate based upon

7    what you heard at the liability trial, that they'll come in

8    and say well, no.  A jump seat war would have had no impact on

9    us.  This particular --

01:43    10    THE COURT:  Who's going to say that?  Who's going to

11    offer that testimony?

12    MR. FRAM:  I anticipate that, what I'm saying, your

13    Honor, that the American pilots' testimony is essential to try

14    to figure out if the plaintiffs want to try to prove how

01:43    15    things would have been different.  And based upon what we

16    heard at trial, that's our expectation.  We think the American

17    pilots, we think Jeffrey Brundage, if we have to take his

18    deposition again and prepare his testimony, is going to rebut

19    any claim on the part of the plaintiffs that things would have

01:44    20    been different.

21    THE COURT:  You think he's going to become a more

22    controllable witness now than he was then?

23    MR. FRAM:  Your Honor, with the court's ruling, that

24    --

01:44    25    THE COURT:  You mean you think that somebody will ask

1    him a question, he'll just answer it?

2              MR. FRAM:  Your Honor, I can only hope.

3              THE COURT:  You can only hope.  Right.

4              MR. FRAM:  But my point is that there's a lot of

5    groundwork that has to be done, and again that necessarily is

6    going to cover some of the same issues that we've had.

7         So, we submit that rather than proceed based upon a

8    jury verdict, that really provides no information of

9    consequence.  The better thing to do is to go backwards as

10   opposed to trying to pursue damage issues in a way that is

11   going to be confusing and difficult.  I appreciate your

12   Honor's concern that the plaintiffs may not yet have had an

13   opportunity to submit an expert report, that's fine, but we do

14   --

15             THE COURT:  No.  As I say, I do think, although you

16   don't argue it quite that way but you ultimately make a good

17   point.  That until you know the theory of i.e. what would have

18   happened, you know, well what a damage expert said.  You

19   either take factual discovery is very difficult.

20             MR. FRAM:  Your Honor, there are two parts of this

21   and one is not really damages.  The first part of it is trying

22   to establish how the seniority integration might have been

23   different, and it might not have been --

24             THE COURT:  That's at the end of the day, I think, I

25   don't want to -- I'm not trying to limit them in any way, but

1    I think at the end of the day they have to come up with a

2    theory that this, I'll all it the staple point.  The staple

3    point would have been different and more favorable to the TWA

4    pilots had, you know, the union been more, you know, not

5    breached its duty of fair representation.  But until we get to

6    what that theory is, factual discovery as to who gets what is

7    going to be very difficult, if not impossible.

8         MR. FRAM:  Your Honor, we don't believe that that

9    issue is one that's amenable to expert testimony at all.

10   That's a fact --

11        THE COURT:  Well, how do I know until they give it?

12        MR. FRAM:  Well, your Honor, I think we're agreeing

13   that we don't have a trial plan and we don't have enough

14   information from plaintiffs on any of these issues that have

15   the rigorous analysis that we need to move forward.  So if

16   your Honor's inclination is to deny this motion without

17   prejudice and to defer these issues, that's fine.

18        THE COURT:  Well, I think on a class certification

19   issue in a sense it's always without prejudice to change any

20   kind of changed circumstances.  I mean, you know, it's with

21   prejudice, I guess you just make the motion a week later.  You

22   know, nothing has changed.  But if there's been some change, I

23   think the motion can be made again.  I mean it's inherent in

24   that.

25        MR. FRAM:  Well, your Honor, the major change here,

1    of course, is that the record seems to establish that many of

2    these pilots were not harmed at all and we --

3            THE COURT:  But I think that was always true.  I

4    think that was true from day one in the case.  I don't think

5    there was ever an argument that every single TWA pilot was

6    hurt.

7            MR. FRAM:  But the problem --

8            THE COURT:  But that was never the position.

9            MR. FRAM:  Your Honor, an expert cannot come in and

10   testify about which were hurt.  Those are fact issues.

11           THE COURT:  What is a fact issue?

12           MR. FRAM:  The fact issue of how -- you have two

13   issues.  One is how the seniority integration have been

14   different and it could have been different, your Honor, in

15   more ways than simply the staple point being a different

16   point.  It could have been different in terms of did St. Louis

17   protect themselves.  It could have been different in terms of

18   the offenses.  It's a very complex issue as your Honor may

19   recall.  So, we don't believe that an expert --

20           THE COURT:  Yeah, but when the breach of the duty of

21   fair representation is based on a conflict of interest where

22   the root of it is a conflict of interest, you have what we

23   used to call in the <u>Robinson</u> patent field.  I mean you may

24   have to modify your damage theory.  Be less precise in your

25   damage theory than you might be in other kinds of cases where

1    you can actually make a hard and fast calculation.  I'm not --

2    I just think this is all premature.  I just think until I know

3    what their theory is.

4            MR. FRAM:  I understand.  Your Honor.

01:48    5            THE COURT:  Making the, you know, decertifying a

6    class to me doesn't make sense until I know what they're

7    doing.  And I admit it sort of puts things backwards because

8    as I said, usually the expert comes at the end of the process,

9    not at the beginning.  But their statement has been they're

01:49    10   going to prove their damages to an expert.  Isn't that what

11   you've said?

12           MR. PRESS:  True.

13           THE COURT:  Yeah.  I mean that's what the plaintiffs

14   have said.  Okay.  I think they should have to put forth their

01:49    15   theory of, if you will, of damages, and then that will, to

16   some agree, dictate what further discovery is needed, factual

17   discovery.  And for all I know it may provoke another

18   decertification motion.

19           MR. FRAM:  Your Honor, they've said that they intend

01:49    20   to do that through expert testimony on a class-wide basis.

21   Our point is that Wal-Mart --

22           THE COURT:  Well, that's going to be inherently a

23   class-wide decision.  I mean they're going to say in some

24   fashion how the integration would have taken place had there

01:49    25   been no -- they're going to have a theory, the expert is going

1   to say this is how we should say how the integration would

2   have taken place had there been no conflict of interest.

3   Okay.  We'll have a report.  Maybe that will provoke another

4   motion on decertification.  I don't know.

01:50   5          MR. FRAM:  Well, your Honor --

6          THE COURT:  But it will dictate what further

7   discovery is needed, fact discovery.

8          MR. FRAM:  Your Honor, once we have a determination,

9   of course, we'll need it ultimately from the jury of how the

01:50   10  integration would have been different, then we still have to

11  accept the figuring out which pilots were harmed, how they're

12  injured and that does require us to look at furlough dates and

13  recall dates and what --

14         THE COURT:  Yeah, but that's all -- I mean that's a

01:50   15  computer program.

16         MR. FRAM:  Oh, your Honor --

17         THE COURT:  I mean that's --

18         MR. FRAM:  No.

19         THE COURT:  That's, that's not individualized like

01:50   20  determining scienter or taking a Wal-Mart employee from a

21  store in North Dakota and determining whether a particular

22  woman was hurt or not hurt.  You know, we're really getting

23  into a deep set of separate facts for each person.  This is

24  quintessentially a class-wide determination.

01:51   25         MR. FRAM:  Your Honor --

```
 1          THE COURT:  And, yeah, and finally we have to get
 2    some of the facts, when you were hired, when you were
 3    furloughed, you know.  Were you lowered from a Captain to a
 4    First Officer.  Was your aircraft lowered -- I mean the type
 5    of -- were you flying a 767 or were you flying an MD8 you know
 6    or some lesser aircraft.  I mean, yeah, that will probably
 7    have to be built into it, but I don't think that makes it an
 8    improper class action.  I think that's really a lot simpler
 9    than you think say it is.
10          MR. FRAM:  Your Honor, we believe that Wal-Mart makes
11    clear that in a case where individual circumstances when
12    you're furloughed, when you came back, what you did.  What if
13    a pilot was furloughed, went off and got into investment
14    banking or became a doctor or did something, a career change.
15          THE COURT:  Or a landscaper.
16          MR. FRAM:  Landscaper?  What about pilots who passed
17    away?  What about pilots who retired?  There is a myriad of
18    individual information about pilots that are going to have to
19    be examined and about which individual pilots who are going to
20    have to testify.
21          THE COURT:  You know Prudential had a class action
22    involving trade practices of some kind.  It was a huge class
23    action here in New Jersey.  Maybe you were in it.  I don't
24    know.  And the class members had vastly different stories and
25    vastly different factual, and the son of my college roommate
```

1  was hired to do the computer work as an independent contractor

2  to create the computer program to analyze what each person was

3  going to get.  Boy did he make a ton of money.  Instead of

4  hiring him for $40 an hour, they wound up hiring him for $300

01:52   5  an hour and paying all his expenses as well.  He made a ton of

6  money.  But he developed the program that in effect determined

7  where people -- what individual class members were going to

8  get.  And I don't see it -- I mean it's a lot of data.

9  Twenty-three hundred pilots?  Is that what you said?

01:53  10          MR. FRAM:  Well, that's the whole group of TWA

11  pilots.

12          THE COURT:  That's what I mean, the whole --

13          MR. FRAM:  Each agreed that --

14          THE COURT:  The whole defined original class is 2300.

01:53  15          MR. FRAM:  I agree that many were not injured but we

16  --

17          THE COURT:  I understand that.  But you're dealing in

18  gross with 2300 pilots.  All right, that's, that's duck soup

19  for a computer.  That's just entry of info coming up with an

01:53  20  algorithm and enter, you know, writing some program and then,

21  you know, plugging data entry.  Just entering the data into

22  the program.

23          MR. FRAM:  Your Honor, I think that type of approach

24  might be permissible in a settlement context where people are

01:53  25  submitting claims.  But if we're going to have to try the

1    damage issue, those pilots are going to have to come in and

2    testify about what they did or didn't do.  So we respectfully

3    disagree with the court's thought that there is a way to do

4    this through a formula.  Duke versus Wal-Mart specifically

1:54    5    says no trial by formula.  This proves a line of cases that

6    allow that kind of approach.

7           THE COURT:  But this is not a formula designed to

8    generalize and say here's a formula that you fit into this.

9    This is looking at each one individually.

1:54    10          MR. FRAM:  Your Honor, you --

11          THE COURT:  And the Rules of Evidence do allow

12   summary, I think it's Rule one thousand something.  It allows

13   summary -- I tried a case for nine and a half months involving

14   probably millions of individual transactions in the oil field,

1:54    15   in the -- and we had 18,500 pages of transcript in that case.

16   But even Carl probably got a little piece of that case.

17   Everybody did.  But a lot of the evidence was submitted in

18   tabular, you know, summary form and but --

19          MR. FRAM:  Well, your Honor --

1:55    20          THE COURT:  I think it's premature.

21          MR. FRAM:  I understand we're raising issues again at

22   the appropriate time.

23          THE COURT:  Yeah.

24          MR. FRAM:  Thank you, your Honor.

1:55    25          THE COURT:  Okay.  Thank you.  Are you going to do

1    this?

2            MS. RODRIGUEZ:  Yes.

3            THE COURT:  Okay.  Sure.

4            MS. RODRIGUEZ:  Thank you, Your Honor.  Just

5    following up on your last comment about the evidence coming in

6    in tabular form.  I think it's telling.

7            THE COURT:  Summary may be a better word, is a

8    summary form, yeah.

9            MS. RODRIGUEZ:  A 1897 quote from Oliver Wendell

10   Holmes said:  "To the rational study of the law, the black

11   letter man may be the man of the present, but the man of the

12   future is the man of statistics and the master of economics".

13   And I just -- that was a quote from --

14           THE COURT:  What was he, was he on the Supreme Court

15   of Massachusetts then?

16           MS. RODRIGUEZ:  No.  Actually this was -- it was a

17   Law Review article he wrote for the Harvard Law Review.  It

18   was quoted by the Third Circuit in the Bellran versus Comcast

19   case where they make clear that it's appropriate to prove

20   damages using -- when you have a common injury, which we do

21   here, caused by a common source, which we do here.  It's a

22   appropriate to have a common methodology.  And it's

23   interesting as I sat here I heard not once --

24           THE COURT:  And by the way, that to me is different

25   than the Dukes versus the Wal-Mart case because there the idea

1  is we'll find damages for a particular person not based on

2  what that particular person did or suffered or sustained, but

3  on some generalized statistical theory.  That may not be

4  proper.  But that's different here because we're talking just

01:57  5  the opposite of that.  We're talking about the precise damages

6  to a particular person which is the very opposite of what they

7  were talking about in Dukes.  Is Dukes the right word is it?

8  Dukes Wal-Mart.

9          MS. RODRIGUEZ:  Yes.

01:57  10          THE COURT:  So I don't see any analogy between those

11  two arguments at all.

12          MS. RODRIGUEZ:  Your Honor, just quickly.

13          THE COURT:  Well, to me it's just an evidence issue.

14  Is how to effectively get that mass of evidence before the

01:57  15  court -- before the jury.

16          MS. RODRIGUEZ:  And just two months ago Judge

17  Simandle in the Hayes versus Wal-Mart case recognized again

18  that not every class member has to have suffered an injury.

19          THE COURT:  I think there's tons of law on that.

01:57  20          MS. RODRIGUEZ:  Yes, there's tons of law on --

21          THE COURT:  I don't understand that argument at all.

22          MS. RODRIGUEZ:  Sullivan versus DeBeers case just

23  came down from the Third Circuit talks about when proving

24  common damages using a common methodology and how that

01:58  25  satisfies the predominance requirement of Rule 23.  We've

1    heard nothing today about the change of circumstances that

2    would warrant a decertification.  And as a matter of fact,

3    we're here precisely because defendants initially moved to

4    bifurcate the liability from the damages and as part of the

01:58    5    bifurcation motion they said the reason is because proving a

6    reconstituted seniority list that the damage phase would be

7    expensive and time-consuming and they didn't want to engage in

8    that exercise until there was a liability determination.  So

9    we have the liability determination.  We have a common course

01:58    10    of action that impacted the defendants.  Commonly their

11    damages will be different.  Some may not be damaged but it's

12    all caused by their breach, and class certification is,

13    therefore, appropriate.  Thank you.

14            MR. FRAM:  Briefly, your Honor.

01:59    15            THE COURT:  Yes, Mr. Fram.

16            MR. FRAM:  The bifurcation motion that your Honor had

17    a chance to look at it and contemplate it, that if we got to

18    the point of damages, there would have to be an individual

19    increase in each pilot.  So I don't think we're inconsistent.

01:59    20    And that motion, of course, was made at a time the when

21    plaintiffs' theories were very very different than they are

22    today.

23            THE COURT:  That's not particularly relevant.  Why do

24    you say that?

01:59    25            MR. FRAM:  The plaintiffs' theory --

1          THE COURT:  My understanding of that, their basic

2     theory of the case has been the same even before these folks

3     got in.  I mean maybe some of the details were different, but

4     the theory has always been that they were about to lose 2300

5     pilots as union members and they made the decision to go after

6     the American pilots and APA to bring back 10,000 pilots to

7     replace the 2,300 they were losing and it was a conflict of

8     interest, and because of that conflict, they went and they

9     basically went into the tank.  I mean they did not use their

10    best efforts to get the best possible deal for the TWA pilots.

11    But that was always the theory.

12          MR. FRAM:  The theory --

13          THE COURT:  That was always the theory of liability.

14          MR. FRAM:  The theory that --

15          THE COURT:  Even way before Mr. Press or Mr. Jacobson

16    got into the case that was the theory.

17          MR. FRAM:  Your Honor, the theory, the facts they

18    relied upon for that theory that ALPA did not properly support

19    or advise the TWA for a second.  There was nothing in the

20    second amended restated complaint or in the case at the time

21    of bifurcation about failure to support the Bond Bill without

22    jump seat wars, about losses that were filed.

23          THE COURT:  Or failure to follow the various

24    litigation strategy.  There was more than one I think.

25          MR. FRAM:  That's very significant for the purposes

1    of the damage inquiry.  The thinking at the time of the

2    bifurcation motion is that the plaintiffs prevail on their

3    argument that waiver of scope would not have happened and that

4    there would have been a senior integration.

5              THE COURT:  But by the time of the motion, the new

6    counsel are already in the case and you now knew what their

7    position was.

8              MR. FRAM:  No, Your Honor.  In fact, the bifurcation

9    motion, if you recall and Mr. Katz will correct me, but the

10   bifurcation motion was made before the case was even converted

11   from that 23(b)(2) case to a 23(b)(3) case.  So we have a very

12   odd set of circumstances that happens here and the theory that

13   there would have been an arbitration of the issue of seniority

14   integration is a very different damage theory and damage

15   approach than the theory that if part of the negotiation had

16   taken place in the fall, then maybe the outcome would have

17   been slightly different.  And we don't know because of a major

18   problem with the verdict sheet.  We don't know, your Honor,

19   what the jury was thinking.  If you recall we submitted two

20   sets of questions.  One question was, was there a breach with

21   respect to April 2.  If so, was it causation.  And then the

22   second set was, was there a breach with respect to the

23   negotiations in the fall.  If so, was there a causation.  That

24   would have given us information that would allow us to move

25   forward.  But as a consequence of the court's rulings, those

1    got condensed into two general questions.  So we don't know

2    and certainly don't agree necessarily with what the plaintiffs

3    are going to argue what that means.  And that's why I go back

4    to what I think is really the crux of the Bliden case.  Not

02:02    5    the Seventh Amendment examination issue, but the fact that we

6    have a jury verdict that doesn't give us any information to go

7    forward.  And we don't agree with the proposition that the

8    plaintiffs through expert testimony or otherwise, to try to

9    fill in the blanks.  Thank you, your Honor.

02:03    10         THE COURT:  Thank you, Mr. Fram.  Anything?

11         MS. RODRIGUEZ:  No.

12         MR. PRESS:  No.

13         THE COURT:  Okay.  Well, I'm going to deny the motion

14    to decertify the Class.  I still don't think there's any

02:03    15    relation to the Wal-Mart case, the Dukes versus Wal-Mart case.

16    I think the notion that a defined Class, that every member of

17    the class has to have sustained damages to make it a valid

18    class action.  I don't find that.  I think it's

19    quintessentially appropriate for a class action determination

02:03    20    as to what the integration would have been had the Union not

21    breached the duty of fair representation.

22         Again maybe when the theory of damages comes forward,

23    there will be something about that that may cause us have to

24    revisit the decertification issue.  But right now I consider

02:04    25    it a quintessentially appropriate class action.  I don't think

1  the jury verdict has done anything to impair that, and I'm

2  going to deny the motion.

3       I want to talk to you a little bit about how we proceed

4  from here.  Let me ask the plaintiff.  How do you perceive

02:04  5  that you would want to proceed from this point?

6       MR. PRESS:  Well, we're going to need to disclose an

7  expert, at least one.  And we've talked about this internally

8  how much time we would need, Judge and I would say between

9  four and six months to get that done.  We've already done some

02:04  10  preliminary work.  That number is not what you wanted to hear,

11  I'm assuming by your reaction.  We'll do our best to expedite

12  this process.  But it's not --

13       THE COURT:  It's not just identifying.  Name me an

14  expert.  Getting an expert's report.

02:05  15       MR. PRESS:  Yes.

16       THE COURT:  And even giving them time to depose the

17  expert.

18       MR. PRESS:  And it's further ruled by the Bank of

19  America bankruptcy now and some of the data, I think the best

02:05  20  data we have to get from American on furlough dates and things

21  like that.

22       THE COURT:  But American is still functioning.

23       MR. PRESS:  Oh, absolutely.

24       THE COURT:  It's still flying.  I mean it's, granted

02:05  25  it's in Chapter Eleven, but it's --

1        MR. PRESS:  I just don't know if the Trustee is going

2    to give us some slack when we send subpoenas up there.  But

3    the best data would come from American on some of the key

4    elements of any damage formula, or model rather.

02:05    5        So, that estimate of time I think is realistic, Judge.

6    I too would like to have this case tried this year.  There's

7    no question about it.  That would be our goal.

8        THE COURT:  What's the defendant's position on going

9    --

02:06   10        MR. KATZ:  Well, your Honor, one point that I need to

11    disclose for the record is that we, ALPA, will be requesting

12    your permission to apply to the Third Circuit for a 1292(b)

13    appeal of the ruling on the JNOV motion.  We think that the

14    standard for review of the Union's actions, a duty of fair

02:06   15    representation context, is an issue that warrants review and

16    we'll be preparing papers and submitting them.

17        THE COURT:  All right.  That doesn't mean I'll grant

18    it but --

19        MR. KATZ:  No, it doesn't mean you'll grant it.  It

02:06   20    doesn't mean it won't slow anything up because we'll do that

21    on a parallel track with anything else that's going on.  But

22    we will do that in a timely manner.

23        THE COURT:  Yeah, that to me doesn't affect the

24    discovery side of it until such time as --

02:07   25        MR. KATZ:  What I understood Mr. Press saying about

1  the expert is that it will take four to six months to present

2  not with his name but with the report.

3         THE COURT:  Oh, yeah.  What good does the name do

4  you.

5         MR. KATZ:  The report will justify analysis and we --

6  depending on the expert's, subject matter that the expert is

7  opining on, we may need to retain our own expert.

8         THE COURT:  Oh, yeah.  Absolutely.

9         MR. KATZ:  In order to do an adequate job on a

10  deposition.

11         THE COURT:  Absolutely.

12         MR. KATZ:  And so that is something that we'll need

13  time to do.  Mr. Fram, did you have additional comments on the

14  schedule?

15         MR. FRAM:  Your Honor, we're, of course, we do not

16  necessarily accept that the facts relied upon their expert are

17  the only relevant facts.

18         THE COURT:  Oh, no, not at all.  Why should you have

19  to accept that.

20         MR. FRAM:  So in terms of our being attended if the

21  case would have been in the direction of damages to serve

22  interrogatories and serve document requests asking for

23  information so we can test whatever they put out there, I

24  suppose we could hold off in doing that until we know who they

25  claim was injured and what the damage theory is.  But I just

1    hope we understand that once we get the report, there's a lot

2    of work that's going to have to happen.

3            THE COURT:  Oh, I don't think the report ends the --

4    I think it starts it, starts the discovery process to some

02:08    5    degree.

6            MR. FRAM:  And I guess my question is, should we hold

7    off in serving interrogatories, document requests and doing

8    things like, taking depositions perhaps of select pilots until

9    we get the report or should we start that process?

02:08    10           THE COURT:  What's your position on that?

11           MR. PRESS:  I think it would be premature for them to

12   start taking depositions of pilots on a theory that hasn't

13   been articulated yet.

14           THE COURT:  That's my reaction.

02:08    15           MR. FRAM:  Your Honor, as long as we understand that

16   we're going to have ample time to analyze the report and take

17   the discovery we need, then we're fine.  But we don't want to

18   be in the position where they serve the report and then try to

19   foreclose us from taking whatever discovery we think is

02:08    20   necessary.

21           THE COURT:  I agree with you.

22           MR. FRAM:  Thank you, Your Honor.

23           MS. RODRIGUEZ:  We agree as well and have no comment.

24           THE COURT:  That's good.  I'll have to re-think my

02:09    25   position.  You should have said I disagree.

1          MS. RODRIGUEZ:  Sorry.

2          THE COURT:  But -- all right.  All right, I'll give

3    you three months.  What's today?  Today is May 4th.

4    September 4th which is around Labor Day.  Whatever the first

02:09    5    day after Labor Day is.  No.  No.  August.  August 4th.

6          All right, it will be August 6th.

7          MR. FRAM:  Your Honor, just to expedite our analysis.

8    Could we get, in addition to the report, the backup

9    information.  Obviously if there are transcript of prior

02:10   10    testimony, all the typical information that you'd want to take

11    the deposition of an expert.  I think it's helpful if they

12    produce not only the report, but if they produce that backup

13    information at the same time?

14          THE COURT:  What backup information?

02:10   15          MR. FRAM:  Well, again things like transcripts from

16    prior expert testimony.  If there are documents the expert has

17    relied upon.  The typical report as your Honor knows that you

18    receive as the document.

19          THE COURT:  Well, I guess when I said there would be

02:10   20    three months for the report, I think that you should identify

21    the expert way before that.

22          MR. FRAM:  Okay.

23          THE COURT:  So they know who the expert is and the

24    type of material that, I can't remember is it Rule 26 that

02:10   25    provides that you have to give -- that that be -- you don't

1   have to await the report to get that kind of information.

2           MR. FRAM:  That would be helpful, your Honor.  Get a

3   head start on that.

4           THE COURT:  Won't you have that in about a month?

02:11   5           MR. PRESS:  I don't know, Judge.  I would like to

6   tell you yes and that would be a truthful answer, but I have

7   had cases where, you know, you don't disclose an expert.  I've

8   never disclosed an expert until I understood what the expert's

9   opinion is going to be and the basis thereof so that I can

02:11   10  test that expert's credibility as to what he or she is saying.

11  And so until I have a concrete opinion or we have a concrete

12  opinion from an expert, I don't see how we can disclose one.

13  We will make every effort, Judge, to expedite this.  It's in

14  our interest and we clearly want to move this as quickly as we

02:11   15  can.  But I'm just trying to be --

16          THE COURT:  You don't want to wait until they change

17  the name of American to use Uzbekistan Airlines, do you?

18          MR. FRAM:  Your Honor, so can we have a date for

19  identification of expert?  Maybe --

02:11   20          MR. PRESS:  That's what I'm saying, I don't know --

21          THE COURT:  No, his point is until he knows what the

22  expert is going to opine, but you don't wait until the final

23  report for that.

24          MR. PRESS:  Well, I'm sure we can get pretty good

02:12   25  preliminary opinions from an expert and have a feel that this

1   is the right person for us to testify in this case.  But

2   before we have a full-blown report.  I'm confident we can do

3   that.  But I don't know when in the process I can.

4            THE COURT:  But you have to begin speeding things up.

02:12   5   Did somebody say this is a ten year old --

6            MS. RODRIGUEZ:  Eleven.

7            MR. FRAM:  Ten years in June I think, your Honor.

8            MR. KATZ:  Ten years September 3rd.

9            MR. PRESS:  How about two months --

02:12   10           THE COURT:  June 30th is my twentieth year on the

11   bench.  So this case has taken up about half of it.

12           MR. PRESS:  Judge, how about a July Fourth or July --

13           THE COURT:  I was going to say June 30th.

14           MR. PRESS:  Okay.

02:12   15           THE COURT:  By June 30th you should be able to

16   identify the expert and give the type of information about the

17   expert that Rule 26 requires other than the report itself.

18           MR. PRESS:  Very good.  That would be a Saturday.

19   Should we go to Monday?

02:13   20           THE COURT:  Yeah, what's that?  July 2nd?

21           MR. PRESS:  Monday, July 2nd.

22           THE COURT:  July 2nd.  Okay.  Bring in the July

23   Fourth holiday with a bang.

24           MR. PRESS:  We were here last July 4th.  So --

02:13   25           THE COURT:  That's also the month of my birthday.

```
 1              MS. RODRIGUEZ:  July 7th?

 2              THE COURT:  No.  My mother was July 8th, but I was

 3   July 13th.

 4              MS. RODRIGUEZ:  I remember we were here.

 5              THE COURT:  My 49th birthday right around the corner.

 6   Okay?

 7              MR. PRESS:  I'm assuming that the defendant will want

 8   to designate a rebuttal expert.  Should we make provision for

 9   that today while we're here?

10              THE COURT:  Well, but I don't know that until I see

11   the report.

12              MR. FRAM:  Your Honor, we can until we know what the

13   theories are.

14              THE COURT:  And the theory -- I mean I'm not making

15   disclose by June or July 2nd what your theory is.  What the

16   substance of the report is.  It's only who he or she is.  And

17   the kind of, you know, prior opinion.  Whatever Rule 26

18   requires to tell about the expert.

19              MR. JACOBSON:  Judge, even though, we don't know

20   exactly what the report is.  Everyone knows it's going to be

21   an alternative theory of integration.

22              THE COURT:  Yes, I agree with that.

23              MR. JACOBSON:  And since we know that our full report

24   will be out the first business day after Labor Day, we could

25   save some period of time within that for them to take his
```

1   deposition.  You know, whether it's 30 days or 40 days.

2          THE COURT:  No, but they got to take the deposition

3   after they see the report.

4          MR. JACOBSON:  Right.  So after the report.

02:14

5          THE COURT:  And also get some of the backup material

6   that he's referring to in his report.  I'm assuming he's going

7   to refer to something.

8          MR. FRAM:  Why don't we take it a step at a time.

9   Let's get their report and then counsel can communicate and

02:15

10   try to --

11          THE COURT:  No, I'm going to stick with it.  See if

12   you can by July 2nd identify who the expert is, get some of

13   the, as I say, Rule 26 material about that expert to the

14   defendants.  September, what was the date we came up with?

02:15

15          MS. RODRIGUEZ:  August 6th.

16          THE COURT:  August 6th.  Excuse me.  August 6th for

17   the final report.  We'll then probably -- actually it might be

18   a good idea if we could set the depositions before Labor Day.

19   Have the deposition taken in that frame -- in that time.  I'm

02:15

20   not sure that I want to force you to do a counter-expert until

21   all that's done.

22          MR. FRAM:  We may need to retain experts, depending

23   on who their expert is, what the subject is of the report.  We

24   may need to retain experts at that point to analyze the report

02:15

25   to help depose the man or woman.

         1        August may be a challenging month for us to be able to

         2   do that, your Honor.  I think we can try but --

         3        THE COURT:  I'm going to leave what I've done now.

         4   Okay.  July 2nd for the name and the Rule 26 material.

)2:16    5   August 6th for the report itself.

         6        MR. FRAM:  Thank you, your Honor.

         7        THE COURT:  When you get the report, we'll then talk

         8   about what we need, if anything, for, you know, depositions

         9   counter -- you know, give what timing you would need to

)2:16   10   analyze, etcetera.  Let's take it, and in fact I'm going to

        11   set up a conference right in the Order, you know, a date here.

        12   Couple days later so we can begin to discuss those issues.

        13   Okay?  We'll put that in the Order.  There be a conference, in

        14   person conference here to discuss that.  Okay?

)2:17   15        MR. PRESS:  Perfect.

        16        MR. FRAM:  Thank you, your Honor.

        17        THE COURT:  All right.  Now off the record.

        18      (Off the record discussion took place)

        19        THE COURT:  Okay.  All right.

)2:20   20        MR. FRAM:  Thank you, Judge, take care.

        21        THE COURT:  Have a good weekend, everybody.  Thank

        22   you for coming.

        23        MS. RODRIGUEZ:  Thank you, your Honor.

        24        THE DEPUTY COURT CLERK:  All rise.

)2:20   25      (The matter was then concluded)

**$**

**$300** [1] - 70:4
**$40** [1] - 70:4

**/**

**/S** [1] - 3:1

**0**

**02-2917(JEI** [1] - 1:5
**08101** [1] - 1:10

**1**

**1,549** [2] - 12:3, 41:16
**10,000** [1] - 75:6
**11,500** [3] - 12:5, 13:24, 34:18
**1113** [4] - 10:2, 17:1, 18:20, 19:5
**12** [1] - 20:8
**1292(b** [1] - 79:12
**12th** [2] - 23:20, 24:3
**13th** [1] - 85:3
**14** [1] - 45:1
**18,500** [1] - 71:15
**1897** [1] - 72:9
**18th** [2] - 39:20, 42:24
**1930** [1] - 32:8
**1971** [1] - 54:22
**1983** [1] - 55:8
**1986** [1] - 32:2
**19th** [1] - 42:24

**2**

**2** [3] - 9:19, 9:24, 76:21
**2,300** [1] - 75:7
**20** [4] - 4:20, 4:23, 14:23, 21:20
**200** [1] - 13:3
**2000** [3] - 10:20, 11:9, 52:21
**2001** [7] - 10:24, 37:15, 38:14, 38:19, 39:20, 42:24, 53:18
**2002** [3] - 37:6, 37:22, 53:6
**2006** [1] - 48:22
**2012** [1] - 1:10
**21** [1] - 19:10

**23** [2] - 8:1, 73:25
**23(b)(2** [1] - 76:11
**23(b)(3** [1] - 76:11
**2300** [4] - 12:5, 70:14, 70:18, 75:4
**26** [5] - 82:24, 84:17, 85:17, 86:13, 87:4
**28** [1] - 2:24
**2:30** [1] - 4:22
**2nd** [14] - 9:8, 13:7, 14:6, 29:19, 29:20, 29:21, 30:11, 31:5, 84:20, 84:21, 84:22, 85:15, 86:12, 87:4

**3**

**30** [2] - 17:12, 86:1
**30th** [3] - 84:10, 84:13, 84:15
**311** [1] - 21:6
**3rd** [4] - 37:6, 37:17, 37:22, 84:8

**4**

**4** [1] - 1:10
**40** [1] - 86:1
**49th** [1] - 85:5
**4th** [4] - 82:3, 82:4, 82:5, 84:24

**5**

**5** [1] - 17:14
**50** [1] - 20:16
**50,000** [1] - 46:2
**55** [1] - 12:24
**59** [1] - 50:12
**5th** [4] - 36:9, 36:20, 37:21, 43:4

**6**

**6** [1] - 17:8
**6th** [7] - 10:4, 18:20, 82:6, 86:15, 86:16, 87:5

**7**

**753** [1] - 2:25
**767** [1] - 69:5
**7th** [1] - 85:1

**8**

**80** [1] - 14:23
**8:30** [2] - 20:9, 20:11
**8th** [2] - 37:14, 85:2

**9**

**9** [1] - 10:23
**9/11** [2] - 22:16, 22:19

**A**

**abandoned** [1] - 48:25
**able** [3] - 57:1, 84:15, 87:1
**absence** [1] - 41:18
**absolutely** [7] - 10:4, 28:6, 28:21, 44:24, 78:23, 80:8, 80:11
**accept** [8] - 9:20, 9:25, 16:8, 43:5, 53:17, 68:11, 80:16, 80:19
**accepted** [2] - 14:9, 43:10
**accidentally** [1] - 41:20
**acclamation** [1] - 10:19
**accommodate** [1] - 14:25
**according** [2] - 12:4, 16:23
**account** [2] - 12:21, 25:1, 25:15
**accusation** [3] - 17:23, 40:23, 42:12
**accusations** [1] - 16:17
**accuse** [1] - 6:23
**accused** [1] - 15:10
**acquisition** [3] - 27:22, 28:13, 29:10
**Act** [4] - 17:5, 17:8, 17:11, 17:14
**acted** [2] - 6:14, 6:17
**ACTION** [1] - 1:4
**action** [16] - 7:5, 16:14, 16:16, 21:11, 56:15, 57:7, 58:25, 61:11, 62:8, 69:8, 69:21, 69:23, 74:10, 77:18, 77:19, 77:25
**actions** [7] - 21:3, 21:5, 26:2, 26:3,

51:14, 57:11, 79:14
**add** [2] - 47:12, 50:4
**addition** [4] - 35:4, 47:23, 48:9, 82:8
**additional** [1] - 80:13
**address** [3] - 21:23, 23:2, 46:17
**adequate** [1] - 80:9
**adjectives** [1] - 33:9
**adjourned** [1] - 19:13
**admissible** [1] - 46:6
**admission** [1] - 50:10
**admit** [1] - 67:7
**adopted** [2] - 33:22, 53:5
**advanced** [1] - 35:2
**advances** [1] - 60:19
**advantage** [1] - 20:20
**adversary** [3] - 22:3, 22:14, 22:17
**adverse** [1] - 10:15
**adversely** [3] - 9:12, 18:10, 25:1
**advice** [14] - 9:5, 9:17, 10:5, 11:2, 11:11, 11:12, 11:13, 12:16, 12:21, 17:16, 18:1, 18:5, 18:9, 28:24
**advise** [2] - 11:9, 75:19
**advisers** [4] - 11:15, 12:16, 12:21, 12:23
**advising** [2] - 11:10, 27:21
**Affairs** [1] - 23:21
**affect** [2] - 55:20, 79:23
**affected** [4] - 9:12, 10:24, 18:10, 25:1
**afternoon** [1] - 51:21
**agent** [1] - 37:23
**aggressive** [3] - 24:7, 53:16, 54:13
**ago** [1] - 73:16
**agree** [12] - 26:4, 29:22, 52:19, 53:2, 61:19, 67:16, 70:15, 77:2, 77:7, 81:21, 81:23, 85:22
**agreed** [2] - 24:18, 70:13
**agreeing** [2] - 62:12, 65:12
**agreement** [5] - 13:17, 14:1, 27:23, 48:24, 62:19

**agreements** [5] - 9:21, 11:4, 12:25, 15:17, 17:8
**ahead** [2] - 47:11, 60:24
**ain't** [1] - 35:15
**AIR** [1] - 1:6
**aircraft** [2] - 69:4, 69:6
**Airline** [1] - 32:8
**airline** [3] - 8:1, 16:22, 17:6
**Airlines** [5] - 7:8, 11:11, 28:11, 32:11, 83:17
**airlines** [1] - 7:25
**AL** [1] - 1:3
**algorithm** [1] - 70:20
**allegations** [4] - 21:2, 21:4, 55:25, 56:3
**allege** [1] - 11:21
**alleged** [7] - 11:10, 16:1, 16:11, 16:15, 18:19, 48:23, 58:9
**allegedly** [1] - 25:16
**Allen** [2] - 4:10, 17:25
**ALLEN** [1] - 1:21
**Allied** [12] - 7:7, 7:11, 10:16, 13:21, 14:10, 24:9, 24:19, 37:13, 37:16, 37:25, 39:3, 39:6
**allow** [9] - 4:20, 32:5, 34:2, 34:3, 34:25, 71:6, 71:11, 76:24
**allowed** [5] - 17:10, 17:20, 27:19, 45:18, 49:15
**allows** [2] - 19:10, 71:12
**almost** [3] - 20:10, 29:23, 56:22
**alone** [1] - 23:1
**ALPA** [76] - 4:5, 4:13, 4:15, 5:15, 5:23, 6:14, 6:16, 6:18, 6:23, 7:5, 7:9, 7:20, 8:1, 8:6, 8:9, 8:24, 10:15, 10:18, 10:21, 11:17, 11:21, 11:24, 12:14, 14:8, 16:1, 16:4, 19:25, 21:2, 21:4, 22:15, 22:23, 23:7, 23:9, 24:24, 25:2, 25:6, 25:9, 25:15, 26:1, 29:1, 32:7, 33:11, 34:21, 37:1, 37:9, 37:23, 38:13,

38:19, 39:8, 39:10, 39:14, 40:12, 40:13, 40:16, 40:18, 41:21, 41:22, 42:1, 42:19, 43:2, 43:3, 43:4, 43:8, 44:12, 44:17, 45:12, 46:2, 48:17, 48:24, 48:25, 53:8, 56:1, 56:4, 75:18, 79:11

**ALPA's** [8] - 8:20, 12:9, 28:24, 40:19, 40:20, 40:24, 42:15, 58:9

**alternative** [1] - 85:21

**alternatives** [2] - 28:19, 28:20

**altogether** [1] - 8:18

**amateur** [1] - 23:12

**amenable** [2] - 59:13, 65:9

**amended** [3] - 11:18, 48:23, 75:20

**Amendment** [2] - 60:14, 77:5

**America** [1] - 78:19

**American** [67] - 7:7, 7:11, 7:17, 7:19, 7:25, 8:5, 8:8, 8:14, 8:15, 8:17, 10:18, 10:22, 11:11, 11:16, 11:22, 12:1, 12:5, 12:7, 12:17, 24:4, 24:11, 24:19, 25:2, 26:3, 26:4, 26:10, 26:11, 26:17, 27:18, 27:20, 27:22, 28:2, 28:11, 28:19, 28:22, 29:4, 30:3, 30:7, 34:15, 34:16, 34:18, 36:1, 36:3, 37:1, 37:4, 37:11, 37:13, 37:24, 38:1, 38:7, 38:8, 38:9, 38:15, 38:20, 43:9, 48:24, 49:4, 54:7, 63:5, 63:13, 63:16, 75:6, 78:20, 78:22, 79:3, 83:17

**Americans** [1] - 13:18

**amount** [2] - 53:10, 53:12

**amounts** [2] - 16:15, 53:10

**ample** [1] - 81:16

**analogy** [1] - 73:10

**analysis** [6] - 56:13, 58:25, 60:17, 65:15, 80:5, 82:7

**analyze** [4] - 70:2,

81:16, 86:24, 87:10

**Anderson** [2] - 15:8, 15:25

**announcement** [1] - 10:23

**annuled** [1] - 17:1

**answer** [6] - 21:21, 26:5, 28:14, 46:23, 64:1, 83:6

**answered** [2] - 28:4, 28:18

**antagonism** [3] - 34:20, 34:21, 34:23

**anticipate** [2] - 63:6, 63:12

**anxious** [1] - 60:24

**APA** [13] - 8:5, 8:6, 10:10, 24:4, 27:18, 29:4, 39:7, 48:14, 48:24, 49:3, 63:6, 75:6

**APA's** [1] - 22:5

**appeal** [1] - 79:13

**appealing** [1] - 12:17

**Appeals** [4] - 15:16, 15:18, 16:12, 16:24

**appearances** [1] - 4:6

**Appellate** [1] - 45:10

**application** [1] - 15:21

**apply** [1] - 79:12

**appreciate** [1] - 64:11

**approach** [4] - 62:3, 70:23, 71:6, 76:15

**appropriate** [9] - 28:23, 47:21, 49:22, 71:22, 72:19, 72:22, 74:13, 77:19, 77:25

**April** [22] - 9:8, 9:19, 9:23, 9:24, 10:3, 10:10, 13:7, 14:6, 18:20, 29:19, 29:20, 29:21, 30:11, 31:5, 37:6, 37:17, 37:22, 39:12, 42:5, 53:6, 76:21

**arbitrariness** [1] - 25:19

**arbitrary** [3] - 6:15, 19:23, 25:14

**arbitrate** [3] - 13:21, 13:23, 13:25

**arbitrating** [1] - 13:22

**arbitration** [12] - 12:10, 17:14, 27:25, 29:8, 29:14, 29:16, 30:12, 30:20, 30:23,

30:25, 31:3, 76:13

**arbitrator** [1] - 30:13

**Archer** [2] - 4:15, 5:10

**ARCHER** [1] - 2:6

**area** [2] - 5:11, 62:8

**arguable** [1] - 53:8

**arguably** [2] - 8:5, 59:20

**argue** [2] - 64:16, 77:3

**argued** [2] - 17:25, 26:24

**arguing** [1] - 49:14

**argument** [8] - 4:20, 5:22, 18:1, 18:22, 21:20, 66:5, 73:21, 76:3

**arguments** [1] - 73:11

**arise** [1] - 16:16

**arrangements** [2] - 15:9, 16:8

**article** [1] - 72:17

**articulated** [1] - 81:13

**articulately** [1] - 34:15

**aside** [3] - 20:15, 60:13, 60:14

**aspect** [3] - 53:21, 53:25, 55:13

**aspects** [1] - 28:13

**asserting** [1] - 57:6

**assessment** [1] - 59:12

**assets** [3] - 27:23, 28:13, 29:10

**assigned** [2] - 38:18, 38:20

**Association** [13] - 7:7, 7:11, 10:16, 10:17, 13:22, 14:11, 24:10, 24:19, 37:14, 37:16, 37:25, 39:4, 39:6

**ASSOCIATION** [1] - 1:6

**assume** [3] - 13:19, 55:19, 62:12

**assumed** [2] - 15:16, 16:5

**assuming** [4] - 17:3, 78:11, 85:7, 86:6

**attempt** [1] - 27:10

**attempted** [2] - 32:3, 45:8

**attempting** [1] - 44:12

**attended** [1] - 80:20

**attention** [1] - 43:21

**Attica** [3] - 54:22, 54:24, 55:6

**attorney** [1] - 53:1

**ATTORNEYS** [4] - 1:17, 1:22, 2:4, 2:8

**August** [6] - 82:5, 82:6, 86:15, 86:16, 87:1, 87:5

**authority** [3] - 39:20, 40:7, 62:6

**authorization** [3] - 35:24, 36:1, 48:7

**automatic** [2] - 18:24, 25:3

**available** [2] - 18:20, 61:22

**await** [1] - 83:1

## B

**Babbitt** [10] - 9:15, 9:17, 10:6, 10:24, 11:2, 11:7, 11:14, 12:16, 27:20, 28:18

**backup** [5] - 57:1, 82:8, 82:12, 82:14, 86:5

**backwards** [3] - 60:16, 64:9, 67:7

**bad** [6] - 6:17, 14:17, 19:23, 25:14, 25:19, 42:14

**bang** [1] - 84:23

**Bank** [1] - 78:18

**banker** [1] - 11:7

**banking** [1] - 69:14

**bankruptcy** [2] - 13:14, 78:19

**Bankruptcy** [2] - 10:3, 17:1

**bar** [5] - 14:24, 14:25, 17:2, 17:4, 31:24

**Bargaining** [1] - 18:16

**bargaining** [5] - 13:17, 14:1, 17:11, 37:10, 37:23

**base** [1] - 13:20

**based** [9] - 28:25, 62:11, 62:23, 63:3, 63:6, 63:15, 64:7, 66:21, 73:1

**baseline** [1] - 59:4

**basic** [1] - 75:1

**basis** [7] - 13:11, 15:19, 58:5, 58:6, 62:4, 67:20, 83:9

**batter** [1] - 22:18

**Bayshore** [1] - 59:16

**bear** [1] - 27:5

**beating** [1] - 10:2

**became** [3] - 12:6, 53:6, 69:14

**become** [5] - 6:6, 8:9, 12:9, 39:5, 63:21

**begin** [3] - 10:3, 84:4, 87:12

**beginning** [4] - 22:7, 23:17, 30:11, 67:9

**behalf** [5] - 18:12, 21:5, 61:23

**belabor** [1] - 21:20

**Bellran** [1] - 72:18

**bench** [1] - 84:11

**benefit** [2] - 50:14, 50:15

**best** [9] - 9:17, 19:7, 35:13, 75:10, 78:11, 78:19, 79:3

**better** [14] - 7:12, 8:25, 11:4, 13:12, 14:5, 14:11, 14:14, 24:6, 24:8, 24:5, 26:11, 52:18, 64:9, 72:7

**between** [5] - 8:16, 33:24, 48:24, 73:10, 78:8

**bifurcate** [1] - 74:4

**bifurcation** [6] - 74:5, 74:16, 75:21, 76:2, 76:8, 76:10

**big** [3] - 26:8, 43:20, 62:21

**bigger** [1] - 60:8

**biggest** [2] - 22:3, 60:7

**Bill** [9] - 22:12, 23:7, 23:8, 23:9, 24:5, 24:8, 24:13, 26:12, 75:21

**binary** [1] - 9:19

**birthday** [2] - 84:25, 85:5

**bit** [2] - 46:17, 78:3

**black** [1] - 72:10

**blanks** [1] - 77:9

**Bliden** [2] - 60:12, 77:4

**blown** [1] - 84:2

**Blyth** [1] - 54:21

**Board** [2] - 17:12, 37:17

**Bond** [10] - 22:11, 22:12, 23:7, 23:8, 24:5, 24:8, 24:13, 26:12, 75:21

**bottom** [2] - 14:3,

30:6
**bounds** [1] - 42:6
**boxes** [1] - 42:1
**boy** [1] - 70:3
**BRADY** [1] - 1:3
**Braniff** [1] - 14:20
**breach** [5] - 53:8,
66:20, 74:12, 76:20,
76:22
**breached** [3] - 56:4,
65:5, 77:21
**breaches** [2] - 55:25,
58:10
**break** [3] - 51:18,
51:19, 51:25
**brief** [10] - 5:12,
20:17, 27:4, 27:7,
27:9, 27:10, 28:17,
29:3, 35:5, 62:1
**briefly** [1] - 74:14
**briefs** [6] - 5:8, 5:10,
5:15, 31:7, 59:15,
60:22
**bring** [7] - 8:5, 10:16,
11:16, 11:21, 25:2,
75:6, 84:22
**bringing** [2] - 10:21,
38:13
**brought** [4] - 11:8,
33:25, 40:18, 42:12
**Brundage** [19] -
24:12, 27:17, 28:1,
28:4, 28:6, 30:14,
30:18, 46:8, 49:8,
49:13, 49:16, 49:20,
49:21, 50:9, 50:12,
50:18, 50:24, 51:5,
63:17
**Brundage's** [2] -
49:14, 50:21
**budget** [1] - 38:15
**built** [1] - 69:7
**bunch** [1] - 23:11
**business** [4] - 9:10,
15:13, 16:7, 85:24
**BY** [4] - 1:16, 1:20,
2:3, 2:7

**C**

**calculation** [1] - 67:1
**Camden** [1] - 1:10
**Campaign** [5] - 9:4,
9:11, 10:7, 10:8,
10:14
**campaign** [9] -
10:14, 36:21, 37:24,
38:6, 39:5, 39:13,
40:12, 49:3, 49:4

**candidacy** [1] -
48:13
**cannot** [2] - 60:13,
66:9
**Captain** [1] - 69:3
**carcass** [1] - 7:18
**Card** [5] - 9:4, 9:11,
10:7, 10:8, 10:14
**card** [6] - 10:14,
36:21, 40:12, 41:14,
49:3, 49:4
**cards** [64] - 8:14,
8:15, 8:16, 8:18, 10:9,
10:11, 10:12, 12:4,
35:20, 35:22, 35:23,
35:24, 36:1, 36:2,
36:3, 36:4, 36:6,
36:12, 36:19, 36:22,
38:22, 39:2, 39:11,
40:14, 41:1, 41:3,
41:8, 41:10, 41:11,
41:12, 41:16, 41:18,
42:8, 42:9, 42:17,
42:18, 42:19, 42:25,
43:3, 43:5, 43:6,
43:11, 43:12, 43:24,
44:1, 44:4, 44:5,
44:10, 44:13, 44:15,
44:18, 44:19, 48:7,
48:12, 48:17, 48:18,
49:5
**care** [3] - 43:3,
51:21, 87:20
**career** [1] - 69:14
**Carl** [5] - 3:1, 51:18,
51:24, 51:25, 71:16
**carrier** [3] - 17:6,
17:18, 37:17
**case** [79] - 6:24, 8:7,
8:19, 11:20, 11:24,
12:20, 14:22, 15:6,
15:11, 16:4, 19:22,
20:13, 20:20, 21:1,
22:3, 22:5, 22:24,
25:4, 31:3, 37:12,
40:11, 40:21, 41:24,
42:6, 42:16, 43:10,
43:24, 45:11, 45:12,
52:7, 52:13, 52:23,
54:20, 54:21, 54:25,
55:5, 55:6, 55:13,
56:14, 56:23, 58:2,
58:6, 60:12, 60:13,
60:15, 60:19, 60:21,
60:23, 61:9, 61:11,
61:12, 61:14, 62:13,
66:4, 69:11, 71:13,
71:15, 71:16, 72:19,
72:25, 73:17, 73:22,
75:2, 75:16, 75:20,

76:6, 76:10, 76:11,
77:4, 77:15, 79:6,
80:21, 84:1, 84:11
**cases** [5] - 15:8,
15:16, 66:25, 71:5,
83:7
**casting** [1] - 33:15
**causation** [11] -
6:22, 14:8, 15:5,
15:21, 16:10, 19:24,
21:25, 22:4, 25:19,
76:21, 76:23
**caused** [4] - 6:19,
25:16, 72:21, 74:12
**CC** [7] - 7:8, 24:3,
36:20, 36:25, 37:14,
52:10, 53:5
**Century** [2] - 32:8,
32:11
**certain** [4] - 4:21,
7:10, 62:19
**certainly** [2] - 37:11,
77:2
**certification** [4] -
5:19, 37:22, 65:18,
74:12
**Certified** [1] - 2:24
**Certify** [1] - 4:19
**certify** [1] - 57:21
**cetera** [2] - 46:13,
47:18
**challenging** [1] -
87:1
**chambers** [1] - 49:10
**chance** [3] - 10:1,
12:13, 74:17
**change** [8] - 13:1,
51:8, 65:19, 65:22,
65:25, 69:14, 74:1,
83:16
**changed** [11] - 11:2,
12:16, 12:21, 18:5,
18:9, 18:10, 18:15,
22:14, 29:25, 65:20,
65:22
**changes** [1] - 24:17
**Chapter** [1] - 78:25
**charge** [1] - 28:12
**chief** [1] - 43:24
**Chinese** [1] - 45:22
**choice** [1] - 9:19
**chose** [1] - 17:20
**Circuit** [16] - 11:23,
15:3, 15:7, 16:4,
16:23, 16:24, 20:25,
21:1, 21:16, 45:1,
45:11, 54:21, 57:16,
72:18, 73:23, 79:12
**Circuits** [1] - 15:8
**circumstances** [5] -

59:6, 65:20, 69:11,
74:1, 76:12
**circumstantial** [1] -
22:4
**cited** [1] - 59:16
**CIVIL** [1] - 1:4
**claim** [7] - 17:15,
47:6, 55:8, 56:4,
59:11, 63:19, 80:25
**claims** [4] - 57:23,
58:4, 61:24, 70:25
**Clark** [24] - 9:4, 9:11,
10:7, 10:12, 10:14,
12:3, 12:4, 36:4,
36:12, 36:20, 38:21,
39:13, 39:16, 40:12,
41:9, 41:19, 42:23,
43:2, 44:17, 44:18,
44:22, 48:8, 48:19,
49:2
**Clark's** [1] - 48:21
**Class** [5] - 4:19,
5:19, 51:17, 77:14,
77:16
**class** [49] - 6:24,
55:14, 55:16, 55:22,
56:14, 57:3, 57:7,
57:8, 57:9, 57:10,
57:11, 57:12, 57:13,
57:21, 57:22, 58:5,
58:6, 58:8, 58:25,
59:5, 59:11, 59:13,
59:20, 59:21, 59:25,
60:3, 61:11, 61:23,
62:4, 62:8, 62:9,
65:18, 67:6, 67:20,
67:23, 68:24, 69:8,
69:21, 69:22, 69:24,
70:7, 70:14, 73:18,
74:12, 77:17, 77:18,
77:19, 77:25
**class-side** [1] - 62:4
**class-wide** [5] -
55:16, 55:22, 67:20,
67:23, 68:24
**clear** [11] - 12:6,
13:23, 16:13, 16:21,
18:1, 19:2, 28:10,
45:3, 51:5, 69:11,
72:19
**clearer** [1] - 61:17
**clearly** [13] - 13:7,
15:2, 16:19, 25:5,
25:24, 28:17, 43:18,
48:12, 49:1, 55:13,
55:16, 55:22, 83:14
**CLERK** [2] - 4:2,
87:24
**close** [1] - 22:8
**closing** [2] - 17:25,

18:22
**Code** [1] - 17:1
**Cohen** [1] - 1:9
**coherently** [1] -
34:14
**collaborated** [1] -
5:14
**colleagues** [1] -
25:12
**collected** [1] - 12:3
**Collective** [1] - 18:16
**collective** [2] -
13:17, 14:1
**college** [1] - 69:25
**combine** [1] - 13:5
**Comcast** [1] - 72:18
**coming** [7] - 10:11,
10:13, 12:14, 49:17,
70:19, 72:5, 87:22
**comment** [4] - 46:14,
47:10, 72:5, 81:23
**comments** [5] -
46:21, 46:22, 47:14,
47:22, 80:13
**committee** [3] - 30:3,
30:4
**Committee** [1] -
23:21
**common** [9] - 57:17,
57:18, 60:19, 72:20,
72:21, 72:22, 73:24,
74:9
**commonly** [1] -
74:10
**communicate** [1] -
86:9
**company** [5] - 7:4,
12:12, 13:23, 24:12
**complain** [1] - 34:12
**complained** [1] -
45:4
**complaining** [2] -
14:7, 34:13
**complaint** [6] -
11:18, 11:19, 48:22,
48:23, 56:23, 75:20
**complaints** [1] -
11:22
**completely** [1] -
44:23
**complex** [1] - 66:18
**computer** [4] -
68:15, 70:1, 70:2,
70:19
**concede** [1] - 53:20
**conceded** [3] - 31:4,
31:6, 31:7
**concern** [3] - 24:21,
59:1, 64:12
**conclude** [1] - 21:18

**concluded** [1] - 87:25
**conclusion** [1] - 13:20
**concrete** [2] - 83:11
**condensed** [1] - 77:1
**conduct** [4] - 16:14, 16:17, 19:23
**conducted** [2] - 30:15, 30:16
**conference** [6] - 18:21, 42:3, 46:15, 87:11, 87:13, 87:14
**confident** [1] - 84:2
**conflict** [19] - 8:6, 8:7, 8:10, 8:11, 8:13, 9:2, 16:11, 18:6, 19:6, 21:13, 24:23, 25:3, 25:7, 25:25, 66:21, 66:22, 68:2, 75:7, 75:8
**confusing** [6] - 17:25, 32:22, 33:25, 40:25, 46:20, 64:11
**confusion** [1] - 51:1
**conjecture** [2] - 13:8, 14:4
**connection** [4] - 10:9, 42:15, 47:13, 48:13
**consequence** [2] - 64:9, 76:25
**conservative** [1] - 54:12
**consider** [2] - 56:4, 77:24
**consideration** [3] - 28:19, 28:20, 28:22
**considering** [2] - 23:11, 26:2
**constituents** [1] - 13:2
**consuming** [1] - 74:7
**contemplate** [1] - 74:17
**contend** [1] - 7:6
**contended** [1] - 48:17
**contention** [1] - 7:9
**context** [4] - 6:10, 7:15, 70:24, 79:15
**Continental** [5] - 38:6, 38:12, 38:13, 38:16, 38:18
**continue** [4] - 15:24, 19:11, 30:4, 56:14
**contract** [6] - 12:12, 13:14, 16:25, 17:3, 28:21, 29:11
**contractor** [1] - 70:1

**contractual** [1] - 14:2
**contractural** [1] - 13:25
**contradict** [1] - 32:25
**contradicted** [1] - 42:10
**contradiction** [1] - 33:24
**contrary** [2] - 16:17, 51:8
**control** [2] - 12:7, 12:11
**controllable** [1] - 63:22
**conversations** [1] - 28:18
**converted** [1] - 76:10
**convince** [1] - 52:16
**cooling** [1] - 17:12
**corner** [1] - 85:5
**correct** [11] - 2:24, 31:18, 31:21, 34:14, 38:11, 44:9, 46:9, 47:6, 50:18, 50:19, 76:9
**counsel** [3] - 4:6, 76:6, 86:9
**counter** [4] - 35:1, 49:23, 86:20, 87:9
**counter-designated** [1] - 49:23
**counter-expert** [1] - 86:20
**counter-productive** [1] - 35:1
**couple** [3] - 12:25, 48:5, 87:12
**course** [10] - 11:4, 11:5, 26:8, 53:13, 54:9, 66:1, 68:9, 74:9, 74:20, 80:15
**COURT** [234] - 1:1, 4:2, 4:3, 4:16, 5:4, 5:8, 5:18, 5:21, 5:24, 6:1, 6:3, 6:7, 7:2, 7:14, 7:24, 9:23, 14:19, 14:21, 15:1, 17:2, 18:17, 20:3, 20:6, 20:11, 22:12, 23:4, 23:7, 23:11, 23:16, 25:21, 25:23, 27:1, 27:3, 27:6, 27:12, 27:24, 28:3, 28:7, 28:9, 28:14, 29:5, 29:8, 29:12, 29:18, 29:21, 30:1, 30:10, 30:18, 30:23, 31:6, 31:12, 31:16,

31:19, 31:22, 32:10, 32:12, 32:15, 32:24, 33:2, 33:5, 33:7, 33:12, 33:15, 34:4, 34:6, 34:9, 34:12, 34:21, 35:6, 35:8, 35:12, 35:20, 35:23, 36:1, 36:3, 36:5, 36:7, 36:11, 36:13, 36:15, 36:24, 37:5, 37:8, 37:19, 38:2, 38:4, 38:7, 38:9, 38:24, 39:7, 39:16, 39:24, 40:3, 40:5, 41:1, 41:4, 42:20, 42:22, 42:25, 43:13, 43:22, 44:5, 44:7, 44:14, 45:1, 45:17, 45:21, 46:19, 46:22, 48:1, 48:4, 48:6, 48:15, 48:21, 49:7, 49:11, 50:3, 50:6, 51:23, 52:2, 52:4, 52:16, 53:24, 54:2, 54:8, 54:23, 55:3, 55:6, 55:9, 56:2, 56:8, 56:21, 57:6, 57:18, 57:24, 58:1, 58:13, 58:15, 58:18, 58:23, 61:2, 61:17, 63:10, 63:21, 63:25, 64:3, 64:15, 64:24, 65:11, 65:18, 66:3, 66:8, 66:11, 66:20, 67:5, 67:13, 67:22, 68:6, 68:14, 68:17, 68:19, 69:1, 69:15, 69:21, 70:12, 70:14, 70:17, 71:7, 71:11, 71:20, 71:23, 71:25, 72:3, 72:7, 72:14, 72:24, 73:10, 73:13, 73:19, 73:21, 74:15, 74:23, 75:1, 75:13, 75:15, 75:23, 76:5, 77:10, 77:13, 78:13, 78:16, 78:22, 78:24, 79:8, 79:17, 79:23, 80:3, 80:8, 80:11, 80:18, 81:3, 81:10, 81:14, 81:21, 81:24, 82:2, 82:14, 82:19, 82:23, 83:4, 83:16, 83:21, 84:4, 84:10, 84:13, 84:15, 84:20, 84:22, 84:25, 85:2, 85:5, 85:10, 85:14, 85:22, 86:2, 86:5, 86:11, 86:16, 87:3, 87:7, 87:17, 87:19, 87:21, 87:24
**court** [23] - 4:1, 5:15,

18:20, 31:2, 31:14, 35:5, 35:16, 35:19, 40:13, 41:5, 41:16, 41:21, 42:10, 47:24, 49:9, 49:15, 49:24, 56:14, 59:17, 62:16, 73:15
**Court** [9] - 10:3, 16:12, 16:24, 19:3, 56:11, 60:18, 62:5, 62:6, 72:14
**court's** [5] - 43:17, 47:22, 63:23, 71:3, 76:25
**Courthouse** [1] - 1:9
**courtroom** [2] - 49:9, 49:10
**Courts** [2] - 15:16, 15:18, 16:12
**courts** [2] - 19:20, 59:13
**cover** [1] - 64:6
**coy** [1] - 30:24
**create** [4] - 42:20, 42:25, 43:2, 70:2
**created** [7] - 22:10, 38:21, 38:22, 38:25, 40:14, 42:23, 44:21
**creating** [1] - 22:16
**credibility** [2] - 44:23, 83:10
**Cree** [2] - 15:7, 15:25
**critical** [3] - 27:17, 28:24, 30:14
**cross** [6] - 32:3, 32:21, 33:1, 33:17, 35:17, 41:25
**cross-examination** [5] - 32:21, 33:1, 33:17, 35:17, 41:25
**crossed** [1] - 34:16
**crux** [1] - 77:4
**curative** [1] - 50:14
**cut** [2] - 46:17, 47:2

# D

**Dakota** [1] - 68:21
**damage** [14] - 59:12, 60:24, 61:24, 64:10, 64:18, 66:24, 66:25, 71:1, 74:6, 76:1, 76:14, 79:4, 80:25
**damaged** [1] - 74:11
**damages** [32] - 52:8, 55:10, 55:24, 56:3, 57:3, 57:5, 57:9, 58:11, 59:2, 59:11, 59:19, 60:4, 60:7,

60:9, 61:22, 62:15, 64:21, 67:10, 67:15, 72:20, 73:1, 73:5, 73:24, 74:4, 74:11, 74:18, 77:17, 77:22, 80:21
**damaging** [1] - 40:24
**DANIEL** [1] - 2:3
**Daniel** [1] - 4:12
**data** [6] - 70:8, 70:21, 78:19, 78:20, 79:3
**database** [1] - 44:20
**date** [3] - 83:18, 86:14, 87:11
**dates** [5] - 36:22, 41:14, 68:12, 68:13, 78:20
**Day's** [1] - 14:9
**day's** [1] - 22:1
**days** [6] - 12:25, 19:10, 40:21, 86:1, 87:12
**de** [1] - 5:19
**De** [1] - 4:19
**de-certification** [1] - 5:19
**De-Certify** [1] - 4:19
**deal** [13] - 8:23, 8:25, 11:12, 15:11, 24:15, 24:18, 24:19, 26:11, 37:15, 50:24, 53:20, 53:21, 75:10
**dealing** [2] - 54:21, 70:17
**DeBeers** [1] - 73:22
**Deboles** [1] - 15:6
**deceitful** [2] - 16:14, 16:16
**December** [8] - 23:20, 24:3, 36:9, 36:20, 39:20, 40:7, 42:24, 43:4
**decertification** [7] - 52:6, 56:17, 62:14, 67:18, 68:4, 74:2, 77:24
**decertified** [1] - 59:21
**decertify** [1] - 77:14
**decertifying** [1] - 67:5
**Decertifying** [1] - 51:17
**decide** [3] - 9:20, 10:1, 30:13
**decided** [2] - 11:8, 49:18
**decides** [1] - 59:3
**decision** [7] - 19:17,

19:18, 45:10, 51:11,
67:23, 75:5
**decisions** [2] - 9:6,
19:20
**declared** [1] - 10:20
**decline** [1] - 59:8
**deep** [1] - 68:23
**defendant** [6] - 4:13,
21:15, 45:5, 47:1,
50:15, 85:7
**Defendant** [1] - 1:8
**DEFENDANT** [2] -
2:4, 2:8
**defendant's** [1] -
79:8
**defendants** [4] -
51:4, 74:3, 74:10,
86:14
**defense** [1] - 60:2
**defer** [1] - 65:17
**deferential** [4] -
20:18, 26:19, 26:20,
26:21
**define** [2] - 57:7,
57:11
**defined** [2] - 70:14,
77:16
**definition** [1] - 57:8
**definitive** [2] - 49:17,
49:18
**degree** [1] - 81:5
**delay** [1] - 18:19
**deliver** [1] - 44:19
**delivered** [1] - 20:14
**Delta** [2] - 16:3, 16:4
**Delta's** [1] - 16:3
**demands** [1] - 15:23
**demonstrated** [2] -
52:6, 52:12
**denied** [1] - 23:22
**deny** [9] - 23:1,
25:23, 26:22, 50:11,
51:15, 52:20, 65:16,
77:13, 78:2
**denying** [2] - 23:25,
42:4
**depart** [1] - 61:3
**depose** [2] - 78:16,
86:25
**deposed** [1] - 61:6
**deposition** [22] -
9:16, 12:19, 28:2,
28:7, 38:23, 43:25,
46:8, 47:4, 47:14,
48:11, 48:21, 49:20,
49:21, 50:10, 50:21,
63:18, 80:10, 82:11,
86:1, 86:2, 86:19
**depositions** [6] -
12:19, 48:20, 81:8,

81:12, 86:18, 87:8
**DEPUTY** [2] - 4:2,
87:24
**described** [1] - 20:16
**designate** [1] - 85:8
**designated** [2] -
49:21, 49:23
**designations** [1] -
49:19
**designed** [3] - 33:17,
34:1, 71:7
**desirable** [1] - 10:17
**desire** [3] - 8:4, 8:8,
25:2
**destroyed** [3] -
41:20, 42:13, 44:23
**destruction** [1] -
43:23
**detail** [2] - 53:12,
53:17
**details** [1] - 75:3
**determination** [10] -
37:17, 55:4, 55:15,
55:17, 55:22, 68:8,
68:24, 74:8, 74:9,
77:19
**determinative** [1] -
55:14
**determine** [4] -
35:14, 55:1, 58:11,
59:5
**determined** [2] -
59:19, 70:6
**determining** [2] -
68:20, 68:21
**developed** [1] - 70:6
**devoted** [1] - 38:12
**DFR** [6] - 6:18,
15:20, 55:25, 56:4,
61:22, 62:24
**dialysis** [1] - 51:20
**dictate** [2] - 67:16,
68:6
**difference** [5] - 9:8,
16:20, 18:11, 43:10,
43:20
**different** [36] - 5:1,
5:9, 12:23, 13:6,
15:22, 28:4, 52:10,
53:9, 53:10, 53:12,
54:5, 54:6, 54:14,
57:8, 59:21, 63:15,
63:20, 64:23, 65:3,
66:14, 66:15, 66:16,
66:17, 68:10, 69:24,
69:25, 72:24, 73:4,
74:11, 74:21, 75:3,
76:14, 76:17
**differently** [1] - 14:6
**difficult** [4] - 58:2,

64:11, 64:19, 65:7
**directed** [1] - 20:23
**direction** [1] - 80:21
**directly** [4] - 6:23,
28:17, 40:10, 46:23
**disagree** [3] - 57:24,
71:3, 81:25
**disagreements** [1] -
53:15
**disappeared** [1] -
41:4
**disapproved** [2] -
39:12, 40:8
**disaster** [1] - 14:21
**disclose** [5] - 78:6,
79:11, 83:7, 83:12,
85:15
**disclosed** [1] - 83:8
**discovery** [22] - 39:3,
41:11, 44:8, 59:10,
60:24, 61:3, 61:6,
61:8, 61:10, 61:12,
61:13, 61:18, 64:19,
65:6, 67:16, 67:17,
68:7, 79:24, 81:4,
81:17, 81:19
**discretion** [1] - 19:22
**discuss** [3] - 61:2,
87:12, 87:14
**discussing** [1] -
46:15
**discussion** [3] -
30:5, 49:25, 87:18
**discussions** [2] -
50:18, 50:22
**dishonest** [2] -
16:14, 16:16
**dishonesty** [1] -
47:18
**dismissal** [1] - 50:12
**disorderly** [1] -
50:21
**dispute** [2] - 34:24,
38:22
**disputes** [1] - 54:9
**distributed** [2] -
46:2, 48:18
**DISTRICT** [3] - 1:1,
1:1, 1:12
**ditch** [1] - 24:12
**doctor** [1] - 69:14
**document** [7] - 32:5,
33:21, 45:15, 45:25,
80:22, 81:7, 82:18
**documents** [1] -
82:16
**dollars** [2] - 38:14,
38:16
**done** [21] - 7:9,
10:22, 21:11, 24:20,

34:18, 36:21, 37:15,
41:13, 43:11, 52:17,
52:18, 52:21, 53:13,
55:19, 64:5, 78:1,
78:9, 86:21, 87:3
**Donio** [1] - 41:6
**door** [1] - 51:3
**doubt** [2] - 21:22,
21:23
**down** [8] - 23:3,
26:6, 26:7, 32:24,
46:17, 47:2, 51:9,
73:23
**drop** [3] - 23:24,
24:2, 35:21
**Duane** [6] - 24:13,
32:3, 32:6, 33:2,
34:25, 36:13
**duck** [1] - 70:18
**due** [5] - 35:6, 35:7,
35:9, 35:12, 35:14
**dues** [1] - 8:3
**Duke** [1] - 71:4
**Dukes** [6] - 56:12,
60:18, 62:5, 72:25,
73:7, 73:8, 77:15
**during** [11] - 16:18,
17:16, 32:21, 34:17,
35:17, 38:19, 41:25,
42:7, 47:14, 50:8
**duties** [1] - 39:10
**Duty** [3] - 19:19,
20:1, 25:5
**duty** [7] - 11:24,
15:5, 15:18, 65:5,
66:20, 77:21, 79:14
**Dwayne** [1] - 33:1

**E**

**e-mail** [1] - 39:19
**e-mailed** [1] - 42:24
**e-mails** [1] - 40:1
**early** [3] - 10:10,
11:9, 39:12
**Eastern** [2] - 14:20,
32:2
**Eastern's** [1] - 31:15
**economics"** [1] -
72:12
**effect** [4] - 26:8,
48:1, 58:3, 70:6
**effective** [2] - 53:6,
54:7
**effectively** [1] -
73:14
**efficient** [1] - 62:16
**efficiently** [1] - 58:5
**effort** [3] - 17:7,

26:11, 83:13
**efforts** [4] - 11:16,
19:7, 24:5, 75:10
**Eighth** [1] - 15:8
**either** [9] - 13:12,
17:24, 18:11, 27:18,
36:14, 39:23, 40:9,
57:5, 64:19
**election** [2] - 13:7,
39:5
**Electorate** [1] -
23:21
**elements** [2] - 6:18,
79:4
**Eleven** [1] - 78:25
**eleven** [1] - 84:6
**emphasizing** [1] -
20:11
**emphatic** [1] - 11:11
**emphatically** [1] -
49:16
**employee** [1] - 68:20
**employees** [4] -
13:16, 15:24, 17:7,
17:17
**employer** [3] - 7:24,
15:13, 15:23
**encompass** [1] -
58:8
**encouraged** [1] -
49:4
**end** [8] - 18:21, 22:8,
29:23, 61:9, 61:10,
64:24, 65:1, 67:8
**ended** [1] - 30:5
**ends** [1] - 81:3
**engage** [3] - 6:19,
56:12, 74:7
**enter** [1] - 70:20
**entered** [1] - 24:3
**entering** [1] - 70:21
**entire** [3] - 8:9,
14:25, 58:8
**entirety** [5] - 50:16,
50:17, 51:14, 52:7
**entitled** [4] - 47:25,
57:3, 57:23, 62:22
**entry** [2] - 70:19,
70:21
**environment** [1] -
62:7
**error** [1] - 47:6
**ESQUIRE** [5] - 1:16,
1:20, 1:21, 2:3, 2:7
**essential** [2] - 16:10,
63:13
**establish** [2] - 64:22,
66:1
**established** [3] -
15:12, 15:14, 35:2

establishes [3] -
15:3, 25:13, 27:15
estimate [1] - 79:5
ET [1] - 1:3
et [2] - 46:12, 47:18
etcetera [1] - 87:10
event [2] - 6:18, 16:9
events [1] - 52:10
Evidence [1] - 71:11
evidence [70] - 6:13,
6:15, 8:22, 9:3, 9:7,
9:9, 10:4, 11:14,
12:15, 14:12, 16:13,
16:15, 18:5, 18:8,
19:6, 19:22, 19:23,
19:25, 20:10, 20:18,
20:21, 20:24, 21:7,
21:14, 21:15, 21:17,
21:18, 21:19, 22:4,
24:24, 25:6, 25:8,
25:14, 25:15, 25:18,
25:24, 25:25, 26:15,
26:18, 29:2, 29:3,
29:5, 29:6, 30:1, 32:1,
32:5, 33:21, 34:3,
42:13, 42:15, 44:3,
44:22, 44:23, 50:23,
52:5, 52:14, 53:14,
53:19, 56:6, 58:12,
63:4, 71:17, 72:5,
73:13, 73:14
evolved [1] - 16:22
exactly [3] - 56:15,
56:16, 85:20
examination [15] -
32:21, 33:1, 33:17,
34:3, 34:4, 34:5,
35:17, 35:18, 40:13,
40:15, 41:13, 41:25,
42:7, 42:8, 77:5
examine [1] - 32:3
examined [2] -
31:14, 69:19
example [3] - 9:14,
27:16, 60:2
exceeded [1] - 15:23
excuse [3] - 26:20,
50:15, 86:16
executed [1] - 37:14
exercise [2] - 19:21,
74:8
exhausted [1] -
17:11
exhibit [3] - 33:23,
34:3, 36:23
existence [3] - 44:4,
44:7, 45:9
expectation [1] -
63:16
expecting [1] - 62:1

expedite [3] - 78:11,
82:7, 83:13
expended [1] - 38:14
expenses [4] -
23:17, 23:19, 39:17,
70:5
expensive [1] - 74:7
expert [48] - 56:18,
56:25, 57:1, 58:21,
60:23, 61:6, 61:9,
61:13, 62:2, 62:22,
62:25, 64:13, 64:18,
65:9, 66:9, 66:19,
67:8, 67:10, 67:20,
67:25, 77:8, 78:7,
78:14, 78:17, 80:1,
80:6, 80:7, 80:16,
82:11, 82:16, 82:21,
82:23, 83:7, 83:8,
83:12, 83:19, 83:22,
83:25, 84:16, 84:17,
85:8, 85:18, 86:12,
86:13, 86:20, 86:23
expert's [5] - 61:5,
78:14, 80:6, 83:8,
83:10
experts [4] - 61:9,
61:10, 86:22, 86:24
explained [1] - 13:1
explains [1] - 17:15
extension [2] -
18:25, 19:3
extrapolate [1] -
62:10

F

fabrication [1] -
44:21
face [2] - 22:9, 60:8
fact [27] - 28:1,
28:11, 39:9, 42:18,
43:16, 43:19, 44:3,
46:2, 47:21, 50:24,
53:23, 54:4, 57:16,
59:4, 59:25, 61:8,
61:12, 61:18, 65:10,
66:10, 66:11, 66:12,
68:7, 74:2, 76:8, 77:5,
87:10
facts [7] - 11:1, 29:1,
68:23, 69:2, 75:17,
80:16, 80:17
factual [4] - 64:19,
65:6, 67:16, 69:25
factually [1] - 40:17
failed [2] - 21:2, 21:4
failure [2] - 75:21,
75:23

fair [10] - 11:25, 15:5,
15:18, 20:20, 41:23,
51:15, 65:5, 66:21,
77:21, 79:14
Fair [3] - 19:19, 20:1,
25:5
fairly [2] - 23:11,
51:14
faith [4] - 19:23,
25:15, 25:19, 42:14
fall [2] - 76:16, 76:23
familiar [2] - 6:9,
15:7, 27:9
far [1] - 23:12
fashion [3] - 7:18,
45:15, 67:24
fast [1] - 67:1
favor [2] - 10:20,
22:25
favorable [2] - 20:19,
65:3
feasible [1] - 60:6
feelings [2] - 32:19,
34:20
feign [1] - 6:17
ferry [1] - 35:21
few [2] - 7:25, 32:13
field [2] - 66:23,
71:14
fight [6] - 14:16,
14:19, 14:20, 14:21,
33:13
fights [1] - 31:24
figure [3] - 35:13,
60:17, 63:14
figuring [1] - 68:11
filed [4] - 19:4, 19:5,
37:16, 75:22
fill [1] - 77:9
final [4] - 51:3, 51:7,
83:22, 86:17
finally [3] - 31:22,
35:4, 69:1
financial [1] - 11:9
finder [1] - 50:24
fine [4] - 51:22,
64:13, 65:17, 81:17
firing [1] - 7:5
firm [1] - 4:13
First [2] - 17:5, 69:4
first [7] - 6:1, 6:5,
39:10, 46:5, 64:21,
82:4, 85:24
fists [1] - 8:24
fit [2] - 20:25, 71:8
fits [2] - 21:7, 21:15
five [4] - 4:23, 20:10,
23:4, 51:19
flight [3] - 23:19,
23:22, 23:25

flying [2] - 69:5,
78:24
fold [3] - 34:22, 37:1,
37:2
folks [1] - 75:2
follow [2] - 61:19,
75:23
followed [2] - 14:15,
52:11
following [3] - 5:17,
44:3, 72:5
FOR [5] - 1:1, 1:17,
1:22, 2:4, 2:8
force [1] - 86:20
forced [2] - 17:21,
56:24
foreclose [3] - 51:6,
51:13, 81:19
forensic [3] - 40:15,
41:13, 42:8
form [11] - 27:19,
35:3, 41:10, 41:18,
46:14, 50:25, 55:17,
71:18, 72:6, 72:8
formula [7] - 62:3,
62:7, 71:4, 71:5, 71:7,
71:8, 79:4
forth [3] - 20:17,
55:11, 67:14
forward [7] - 54:19,
60:6, 60:13, 65:15,
76:25, 77:7, 77:22
fought [1] - 14:18
four [8] - 13:4, 18:12,
41:7, 41:17, 41:22,
42:11, 78:9, 80:1
Fourth [3] - 27:12,
84:12, 84:23
FRAM [81] - 2:7,
4:14, 5:6, 38:5, 51:22,
52:3, 52:5, 53:2,
53:25, 54:3, 54:9,
54:24, 55:5, 55:7,
55:23, 56:3, 56:9,
57:2, 57:15, 57:20,
57:25, 58:7, 58:14,
58:16, 58:21, 58:24,
61:16, 61:20, 63:12,
63:23, 64:2, 64:4,
64:20, 65:8, 65:12,
65:25, 66:7, 66:9,
66:12, 67:4, 67:19,
68:4, 68:8, 68:16,
68:18, 68:25, 69:10,
69:16, 70:10, 70:13,
70:15, 70:23, 71:10,
71:19, 71:21, 71:24,
74:14, 74:16, 74:25,
75:12, 75:14, 75:17,
75:25, 76:8, 80:15,

80:20, 81:6, 81:15,
81:22, 82:7, 82:15,
82:22, 83:2, 83:18,
84:7, 85:12, 86:8,
86:22, 87:6, 87:16,
87:20
Fram [8] - 4:14, 4:25,
18:22, 40:16, 45:14,
74:15, 77:10, 80:13
Fram's [1] - 45:7
frame [1] - 86:19
framework [3] -
20:25, 21:7, 21:16
fraud [2] - 16:13,
16:16
front [2] - 40:18,
42:13
full [2] - 84:2, 85:23
full-blown [1] - 84:2
fully [1] - 26:2
functioning [1] -
78:22
fund [2] - 15:12,
15:14
funds [1] - 24:1
furlough [2] - 68:12,
78:20
furloughed [10] -
52:12, 53:4, 53:6,
53:9, 54:3, 54:5, 59:7,
69:3, 69:12, 69:13
furloughs [2] -
53:22, 59:8
future [1] - 72:12

G

game [1] - 41:23
Gates [1] - 56:11
geared [1] - 50:7
general [4] - 5:11,
14:13, 40:8, 77:1
generalize [1] - 71:8
generalized [1] -
73:3
generate [1] - 34:19
generous [1] - 26:4
Gerry [1] - 1:9
given [9] - 21:16,
28:25, 36:7, 36:11,
36:15, 36:20, 41:9,
61:21, 76:24
Glasner [3] - 11:7,
11:14, 12:16
goal [1] - 79:7
gong [1] - 5:22
grant [2] - 79:17,
79:19
granted [5] - 6:5,

30:12, 47:24, 59:17, 78:24

**gravamen** [1] - 8:19
**great** [2] - 35:11, 35:16
**GREEN** [1] - 1:19
**GREINER** [1] - 2:6
**Greiner** [2] - 4:15, 5:11
**Grinslahand** [1] - 42:24
**gross** [1] - 70:18
**grounds** [1] - 27:15
**groundwork** [1] - 64:5
**group** [7] - 10:19, 13:24, 20:8, 21:10, 61:23, 62:9, 70:10
**groups** [3] - 53:7, 54:15, 62:19
**grown** [1] - 39:13
**guess** [5] - 7:2, 26:5, 65:21, 81:6, 82:19
**guidance** [1] - 60:10
**guilty** [1] - 41:23
**guy** [3] - 43:7, 46:23, 51:24

**H**

**Haas** [1] - 56:11
**half** [3] - 49:12, 71:13, 84:11
**handed** [1] - 36:8
**handle** [3] - 20:7, 51:17
**handled** [1] - 58:5
**handling** [2] - 42:15, 50:12
**hands** [1] - 41:8
**happy** [1] - 20:4
**hard** [2] - 51:24, 67:1
**harder** [2] - 11:21, 34:20
**harm** [1] - 55:2
**harmed** [8] - 54:16, 54:18, 59:5, 59:20, 62:18, 62:19, 66:2, 68:11
**Harvard** [1] - 72:17
**Hayes** [1] - 73:17
**head** [2] - 25:12, 83:3
**hear** [5] - 17:24, 55:25, 56:6, 58:12, 78:10
**heard** [7] - 7:3, 20:9, 54:4, 63:7, 63:16, 72:23, 74:1

**hearing** [2] - 18:20, 23:3
**hearings** [1] - 61:25
**Hedges** [1] - 41:6
**held** [2] - 21:1, 59:13
**help** [3] - 21:12, 23:7, 86:25
**helped** [1] - 23:8
**helpful** [3] - 62:21, 82:11, 83:2
**herring** [1] - 43:12
**high** [1] - 26:6
**higher** [1] - 52:21
**hire** [1] - 11:8
**hired** [2] - 69:2, 70:1
**hiring** [3] - 7:4, 70:4
**hit** [1] - 21:13
**hodge** [1] - 50:20
**hodge-podge** [1] - 50:20
**hold** [2] - 80:24, 81:6
**holiday** [1] - 84:23
**Hollander** [1] - 12:24
**Hollanger's** [1] - 13:5
**Holmes** [1] - 72:10
**home** [1] - 39:13
**honest** [2] - 18:7, 19:8
**Honor** [104] - 4:7, 4:12, 4:14, 5:14, 6:22, 9:1, 10:8, 11:19, 14:17, 15:2, 16:12, 23:5, 23:14, 23:18, 24:14, 24:22, 25:13, 25:22, 26:25, 27:2, 27:8, 28:8, 28:16, 30:25, 31:21, 32:14, 33:4, 34:14, 35:11, 35:13, 35:15, 37:7, 39:20, 50:2, 50:5, 51:22, 52:3, 53:13, 53:25, 54:20, 55:5, 55:23, 56:9, 57:2, 57:25, 58:7, 58:24, 59:2, 59:14, 59:24, 60:2, 60:8, 60:15, 60:20, 60:21, 60:25, 62:1, 62:12, 62:13, 63:3, 63:5, 63:13, 63:23, 64:2, 64:20, 65:8, 65:12, 65:25, 66:9, 66:14, 66:18, 67:4, 67:19, 68:5, 68:8, 68:16, 68:25, 69:10, 70:23, 71:10, 71:19, 71:24, 72:4, 72:12, 74:14, 74:16, 75:17, 76:8, 76:18, 77:9, 79:10, 80:15,

81:15, 81:22, 82:7, 82:17, 83:2, 83:18, 84:7, 85:12, 87:2, 87:6, 87:16, 87:23
**Honor's** [2] - 64:12, 65:16
**HONORABLE** [1] - 1:11
**hope** [5] - 53:3, 54:20, 64:2, 64:3, 81:1
**horrible** [1] - 42:12
**hostile** [1] - 26:10
**Hotel** [2] - 36:10, 43:4
**hour** [3] - 49:13, 70:4, 70:5
**hours** [1] - 20:14
**huge** [2] - 53:12, 69:22
**hundred** [5] - 7:22, 8:2, 13:4, 52:24, 70:9
**hundreds** [2] - 38:17, 42:1
**Hunnibell** [16] - 9:4, 9:11, 10:6, 10:8, 10:9, 10:12, 10:13, 12:3, 36:4, 38:21, 39:13, 39:16, 40:12, 48:10, 48:19, 49:2
**Hunnibell's** [1] - 39:5
**hurdle** [1] - 60:8
**hurdles** [1] - 62:17
**hurt** [5] - 60:11, 66:6, 66:10, 68:22
**hydrogen** [1] - 56:10
**Hydrogen** [2] - 57:15, 57:20

**I**

**i.e** [1] - 64:17
**idea** [6] - 12:20, 14:14, 24:16, 40:18, 72:25, 86:18
**ideas** [1] - 25:12
**identification** [1] - 83:19
**identifies** [1] - 60:18
**identify** [4] - 62:24, 82:20, 84:16, 86:12
**identifying** [1] - 78:13
**ignore** [1] - 21:15
**imaginations** [1] - 14:4
**imagine** [1] - 14:10
**immediate** [1] - 8:3

**immune** [1] - 24:17
**impact** [4] - 9:11, 23:15, 56:5, 63:8
**impacted** [4] - 52:9, 53:3, 53:8, 74:10
**impair** [1] - 78:1
**implementation** [1] - 37:7
**implemented** [3] - 36:25, 37:6, 37:9
**important** [7] - 6:22, 29:2, 31:3, 31:5, 31:10, 44:11, 62:15
**importantly** [1] - 6:17
**impose** [1] - 7:12
**imposing** [1] - 44:22
**impossible** [1] - 65:7
**improper** [5] - 21:5, 21:12, 25:16, 34:2, 69:8
**improperly** [1] - 43:14
**improve** [1] - 22:23
**Inc** [2] - 17:18, 48:13
**incentive** [1] - 22:18
**inclination** [1] - 65:16
**including** [2] - 10:22, 17:11
**incomprehensibly** [1] - 46:20
**inconsistent** [1] - 74:19
**increase** [1] - 74:19
**indeed** [6] - 29:3, 46:1, 52:12, 53:5, 53:19, 56:20
**independent** [3] - 10:21, 39:15, 70:1
**indicated** [1] - 8:15
**indirectly** [1] - 40:10
**individual** [10] - 59:6, 59:10, 59:12, 61:25, 69:11, 69:18, 69:19, 70:7, 71:14, 74:18
**individualized** [1] - 68:19
**individually** [1] - 71:9
**infected** [2] - 8:9, 8:20
**infer** [10] - 8:21, 8:22, 9:10, 10:5, 11:1, 11:2, 11:14, 13:11, 18:9, 26:1
**inference** [3] - 20:21, 22:2, 47:18
**inferences** [1] -

21:17
**inferred** [2] - 22:22, 33:16
**inflame** [1] - 34:1
**inflammatory** [2] - 32:16, 33:25
**influenced** [4] - 7:11, 9:5, 10:6, 11:15
**info** [1] - 70:19
**information** [19] - 27:14, 32:22, 41:7, 44:11, 54:19, 60:4, 62:9, 64:8, 65:14, 69:18, 76:24, 77:6, 80:23, 82:9, 82:10, 82:13, 82:14, 83:1, 84:16
**informed** [1] - 39:10
**inherent** [1] - 65:23
**inherently** [1] - 67:22
**injure** [1] - 7:5
**injured** [5] - 7:8, 60:5, 68:12, 70:15, 80:25
**injuries** [1] - 57:22
**injury** [7] - 6:19, 25:16, 57:16, 59:25, 60:11, 72:20, 73:18
**inquiry** [1] - 76:1
**inserted** [1] - 27:22
**insistence** [1] - 29:6
**insisting** [1] - 28:22
**instance** [1] - 52:21
**instead** [1] - 70:3
**instruction** [3] - 47:16, 47:19, 50:14
**insufficient** [1] - 25:17
**integral** [1] - 6:18
**integrate** [1] - 7:18
**integration** [24] - 7:12, 8:23, 9:12, 9:13, 12:8, 12:10, 12:11, 24:6, 24:9, 26:5, 28:1, 29:14, 29:16, 29:24, 53:4, 64:22, 66:13, 67:24, 68:1, 68:10, 76:4, 76:14, 77:20, 85:21
**intend** [2] - 56:16, 67:19
**intended** [1] - 61:2
**intentional** [1] - 15:17
**intentionally** [1] - 42:14
**interacted** [1] - 8:17
**interest** [18] - 8:6, 8:11, 8:13, 9:3, 9:18, 16:11, 17:14, 18:6,

21:13, 24:23, 25:3, 25:7, 25:25, 66:21, 66:22, 68:2, 75:8, 83:14
  **interested** [2] - 13:22, 26:16
  **interesting** [1] - 72:23
  **interests** [1] - 8:11
  **internally** [1] - 78:7
  **INTERNATIONAL** [1] - 1:7
  **interpret** [1] - 63:1
  **interrogatories** [2] - 80:22, 81:7
  **introduce** [2] - 32:21, 41:24
  **introduced** [2] - 33:22, 35:19
  **introduction** [1] - 40:22
  **investment** [2] - 11:7, 69:13
  **involve** [2] - 15:8, 63:5
  **involved** [1] - 40:11
  **involving** [3] - 45:11, 69:22, 71:13
  **IRENAS** [1] - 1:11
  **Irenas** [5] - 5:3, 6:8, 13:8, 35:17, 43:18
  **Iron** [1] - 42:2
  **irrelevant** [1] - 32:17
  **issue** [35] - 8:18, 31:17, 31:19, 31:20, 32:20, 33:25, 35:18, 42:5, 42:9, 43:14, 43:23, 45:2, 45:5, 46:7, 47:8, 52:8, 57:18, 58:7, 58:8, 59:2, 59:18, 60:19, 60:25, 62:15, 65:9, 65:19, 66:11, 66:12, 66:18, 71:1, 73:13, 76:13, 77:5, 77:24, 79:15
  **issues** [14] - 11:9, 56:15, 57:17, 59:9, 60:14, 64:6, 64:10, 65:14, 65:17, 66:10, 66:13, 71:21, 87:12
  **item** [1] - 31:4
  **itself** [3] - 33:21, 84:17, 87:5

## J

  **Jacobson** [5] - 4:11, 32:9, 41:24, 49:13,

75:15
  **JACOBSON** [9] - 1:19, 1:20, 4:11, 47:10, 47:12, 48:3, 85:19, 85:23, 86:4
  **Jalmer** [1] - 23:24
  **January** [1] - 10:23
  **Jeff** [1] - 27:17
  **Jeffrey** [1] - 63:17
  **JERSEY** [1] - 1:1
  **Jersey** [2] - 1:10, 69:23
  **JNLV** [6] - 5:16, 5:23, 6:2, 6:5, 6:11, 23:1
  **JNOV** [1] - 79:13
  **job** [4] - 6:25, 54:11, 59:9, 80:9
  **jobs** [3] - 13:15, 13:16, 13:18, 17:23, 53:11
  **JOE** [1] - 1:20
  **Joe** [1] - 4:11
  **John** [4] - 1:9, 43:2, 44:17, 44:8
  **Johnson** [1] - 23:24
  **joint** [1] - 5:7
  **JOSEPH** [1] - 1:11
  **judge** [2] - 13:14, 85:19
  **Judge** [32] - 5:3, 6:8, 13:8, 20:8, 20:10, 20:22, 21:8, 21:13, 21:18, 21:21, 21:25, 22:25, 23:3, 35:17, 41:6, 43:18, 43:25, 44:10, 44:25, 45:4, 46:8, 47:2, 52:2, 59:16, 59:21, 73:16, 78:8, 79:5, 83:5, 83:13, 84:12, 87:20
  **JUDGE** [1] - 1:12
  **judges** [1] - 45:1
  **Judgment** [2] - 4:18, 59:18
  **July** [14] - 27:12, 84:12, 84:20, 84:21, 84:22, 84:24, 85:1, 85:2, 85:3, 85:15, 86:12, 87:4
  **jump** [10] - 14:9, 25:10, 31:17, 31:20, 31:24, 33:3, 33:12, 34:25, 63:8, 75:22
  **June** [5] - 84:7, 84:10, 84:13, 84:15, 85:15
  **junior** [4] - 53:3, 53:7, 54:10, 54:12
  **juries** [1] - 19:20
  **jury** [50] - 6:14, 6:16,

8:20, 8:21, 9:10, 10:5, 11:1, 11:2, 11:14, 12:15, 13:11, 13:20, 15:20, 19:25, 21:19, 22:21, 22:24, 24:5, 25:18, 26:1, 26:18, 33:16, 34:1, 38:23, 40:18, 40:21, 40:25, 42:13, 43:18, 44:22, 47:16, 47:17, 48:9, 48:10, 48:15, 54:15, 54:25, 55:1, 55:24, 56:3, 57:5, 58:11, 59:2, 60:9, 64:8, 68:9, 73:15, 76:19, 77:6, 78:1
  **jury's** [2] - 62:23, 63:1
  **justified** [1] - 43:16
  **justify** [1] - 80:5

## K

  **Katz** [14] - 4:12, 4:13, 7:14, 20:3, 20:16, 21:25, 23:4, 43:22, 44:16, 46:10, 46:16, 47:8, 48:4, 76:9
  **KATZ** [107] - 2:2, 2:3, 4:12, 5:3, 5:14, 5:19, 5:22, 5:25, 6:2, 6:4, 6:8, 7:4, 7:22, 9:1, 9:24, 14:20, 14:25, 15:2, 17:5, 18:18, 20:4, 23:5, 23:8, 23:14, 23:18, 26:25, 27:2, 27:5, 27:8, 27:13, 27:25, 28:5, 28:8, 28:10, 28:16, 29:6, 29:9, 29:13, 29:20, 29:25, 30:8, 30:14, 30:22, 30:24, 31:9, 31:13, 31:18, 31:21, 32:1, 32:11, 32:13, 32:16, 32:25, 33:4, 33:6, 33:10, 33:14, 33:20, 34:5, 34:7, 34:11, 34:13, 34:23, 35:7, 35:11, 35:16, 35:21, 35:24, 36:2, 36:4, 36:6, 36:9, 36:12, 36:14, 36:17, 37:3, 37:6, 37:9, 37:21, 38:3, 38:8, 38:11, 39:1, 39:8, 39:19, 40:1, 40:4, 40:6, 41:3, 41:5, 42:21, 42:23, 43:2, 43:14, 48:5, 48:7, 48:16, 48:22, 49:8,

49:12, 79:10, 79:19, 79:25, 80:5, 80:9, 80:12, 84:8
  **keep** [2] - 6:22, 50:23
  **key** [2] - 6:18, 79:3
  **kind** [10] - 15:3, 16:8, 38:5, 40:15, 52:24, 65:20, 69:22, 71:6, 83:1, 85:17
  **kinds** [3] - 26:2, 66:25
  **knowing** [1] - 56:25
  **knowledge** [1] - 31:4
  **known** [3] - 41:12, 41:14, 41:16
  **knows** [8] - 41:3, 41:4, 41:20, 41:21, 44:8, 82:17, 83:21, 85:20
  **knuckle** [1] - 25:12

## L

  **Labor** [8] - 17:5, 17:8, 17:11, 17:14, 82:4, 82:5, 85:24, 86:18
  **labor** [5] - 28:12, 31:24, 33:13, 33:18, 33:19
  **landscape** [1] - 29:1
  **landscaper** [1] - 69:15
  **Landscaper** [1] - 69:16
  **language** [2] - 41:12, 48:17
  **large** [2] - 7:25, 20:24
  **larger** [1] - 7:24
  **Las** [3] - 36:8, 36:9, 44:19
  **last** [8] - 5:20, 7:3, 40:22, 47:10, 47:12, 61:9, 72:5, 84:24
  **lasted** [1] - 8:10
  **late** [2] - 10:10, 39:12
  **laundry** [1] - 45:17
  **law** [10] - 4:13, 16:22, 18:7, 19:8, 19:19, 25:4, 45:17, 72:10, 73:19, 73:20
  **Law** [2] - 72:17
  **lawsuit** [2] - 13:11, 32:18
  **lawyer** [1] - 16:18
  **lawyers** [2] - 11:19, 40:19
  **lead** [1] - 51:1

  **lean** [1] - 13:24
  **leap** [1] - 22:21
  **learn** [1] - 54:15
  **learned** [2] - 52:9, 54:14
  **least** [9] - 5:10, 5:12, 7:15, 8:5, 26:15, 50:25, 52:13, 55:11, 78:7
  **leave** [3] - 22:25, 51:11, 87:3
  **left** [1] - 5:11
  **legal** [3] - 29:1, 29:25, 30:15
  **legitimate** [1] - 51:12
  **legs** [1] - 58:19
  **lengthy** [1] - 49:25
  **less** [3] - 55:21, 57:13, 66:24
  **lesser** [1] - 69:6
  **letter** [2] - 18:22, 72:11
  **level** [1] - 16:16
  **leverage** [4] - 21:10, 22:10, 22:16, 22:22
  **liability** [14] - 20:1, 24:23, 25:3, 55:1, 55:10, 59:18, 60:10, 60:16, 60:20, 63:7, 74:4, 74:8, 74:9, 75:13
  **light** [1] - 20:19
  **likely** [1] - 13:13
  **likewise** [2] - 13:3, 41:22
  **limit** [4] - 15:15, 45:18, 45:24, 64:25
  **limitations** [1] - 11:24
  **Linares'** [1] - 59:16
  **line** [3] - 34:16, 62:5, 71:5
  **LINE** [1] - 1:6
  **lingering** [1] - 21:22
  **liquidated** [1] - 17:19
  **LISA** [1] - 1:16
  **Lisa** [1] - 4:7
  **list** [25] - 10:11, 12:10, 14:3, 14:12, 14:17, 29:17, 31:15, 31:16, 31:19, 31:23, 31:25, 32:2, 32:4, 32:7, 32:10, 32:16, 33:22, 45:5, 45:9, 45:12, 45:18, 52:22, 58:9, 59:3, 74:6
  **litigation** [3] - 25:10, 61:8, 75:24
  **Litigation** [1] - 10:1
  **live** [3] - 19:18, 44:2,

49:18
LLC [5] - 1:15, 13:15, 17:19, 17:20, 17:21
loads [1] - 23:18
lobby [1] - 23:24
lobbying [2] - 23:23, 24:7
local [1] - 45:22
located [1] - 44:8
logic [1] - 22:21
look [1] - 14:7, 15:6, 21:17, 36:22, 45:7, 46:11, 51:23, 59:6, 68:12, 74:17
looked [1] - 44:1
looking [1] - 71:9
lose [4] - 7:20, 8:1, 54:11, 75:4
losing [2] - 17:23, 75:7
loss [9] - 8:3, 23:19, 23:22, 23:25, 42:9, 43:23, 52:18, 52:23, 52:25
losses [1] - 75:22
lost [1] - 41:19
Louis [1] - 66:16
lower [1] - 5:12
lowered [2] - 69:3, 69:4
lunch [1] - 43:7
lying [1] - 40:16

**M**

M-u-g-e-r-d-i-t-c-h-i-a-n [1] - 36:19
Magistrate [2] - 41:6
mail [1] - 39:19
mailed [1] - 42:24
mails [1] - 40:1
maintain [1] - 17:8
maintained [3] - 17:9, 32:7, 33:11
major [2] - 65:25, 76:17
man [5] - 72:11, 72:12, 86:25
manageable [1] - 62:16
management [2] - 9:21, 12:25
manager [1] - 40:8
Mancuzzi [2] - 54:21, 60:12
manner [4] - 6:15, 18:10, 34:1, 79:22
March [2] - 37:19, 37:21

Mark [1] - 48:10
mark [1] - 62:21
Mart [12] - 56:11, 60:18, 62:4, 67:21, 68:20, 69:10, 71:4, 72:25, 73:8, 73:17, 77:15
mass [1] - 73:14
Massachusetts [1] - 72:15
master [1] - 72:12
material [4] - 82:24, 86:5, 86:13, 87:4
materials [2] - 27:9, 35:4
matter [7] - 4:5, 16:7, 31:8, 54:3, 74:2, 80:6, 87:25
max [1] - 4:20
MD8 [1] - 69:5
mean [38] - 8:13, 13:13, 23:13, 38:2, 38:24, 46:23, 50:19, 50:22, 51:11, 55:10, 55:17, 56:22, 57:6, 57:11, 57:18, 58:1, 58:18, 61:11, 63:25, 65:20, 65:23, 66:23, 67:13, 67:23, 68:14, 68:17, 69:4, 69:6, 70:8, 70:12, 75:3, 75:9, 78:24, 79:17, 79:19, 79:20, 85:14
meaningful [1] - 61:7
means [4] - 35:9, 35:13, 35:14, 77:3
MEC [19] - 9:8, 9:18, 9:20, 9:22, 10:6, 11:8, 11:15, 16:9, 16:19, 18:12, 19:1, 19:12, 19:16, 19:17, 19:18, 23:20, 25:12, 27:21, 28:25
mediation [1] - 17:12
Mediation [2] - 17:12, 37:16
medical [1] - 4:22
meeting [3] - 19:11, 19:12, 31:5
member [4] - 19:12, 59:10, 73:18, 77:16
members [13] - 16:9, 21:5, 23:20, 23:21, 46:2, 57:2, 57:22, 59:5, 59:19, 60:3, 69:24, 70:7, 75:5
membership [2] - 15:10, 19:14
memory [4] - 45:8, 45:9, 45:13, 46:1

men [1] - 20:8
mentioned [1] - 33:20
menu [1] - 45:22
merger [3] - 10:23, 12:6, 12:9
mess [3] - 28:7, 28:9, 50:21
methodology [2] - 72:22, 73:24
Michael [1] - 11:7
middle [4] - 10:13, 18:21, 40:6, 53:9
might [12] - 16:6, 24:20, 26:3, 40:15, 42:8, 51:5, 61:18, 64:22, 64:23, 66:25, 70:24, 86:17
mighty [1] - 38:9
Mike [2] - 14:9, 14:13
mildly [1] - 26:13
millions [3] - 38:14, 38:15, 71:14
mind [1] - 6:22
minority [1] - 16:9
minute [2] - 18:17, 27:5
minutes [7] - 4:20, 4:23, 21:20, 23:4, 43:13, 51:19
mirror [1] - 13:2
misrepresentation [5] - 16:5, 16:6, 18:3, 18:4, 18:19
misrepresentations [2] - 15:17, 16:1
misrepresented [1] - 18:23
misrepresenting [1] - 15:10
Miss [1] - 49:13
misstated [1] - 19:2
mistrial [2] - 47:20, 48:1
Mitchell [1] - 1:9
model [1] - 79:4
modified [1] - 27:25
modify [2] - 51:4, 66:24
moment [1] - 31:9
Monday [2] - 84:19, 84:21
money [2] - 70:3, 70:6
month [3] - 83:4, 84:25, 87:1
months [8] - 4:24, 71:13, 73:16, 78:9, 80:1, 82:3, 82:20, 84:9

moot [1] - 6:6
morning [6] - 4:4, 4:7, 4:12, 4:14, 20:9, 23:6
most [7] - 20:19, 50:6, 52:11, 53:3, 54:6, 54:11
mother [1] - 85:2
motion [44] - 4:17, 4:18, 4:19, 4:21, 5:2, 5:16, 5:19, 5:23, 6:5, 6:11, 10:2, 19:4, 19:5, 20:22, 23:1, 25:24, 26:22, 26:23, 26:25, 31:11, 41:22, 42:4, 50:6, 50:11, 51:16, 56:18, 58:19, 65:16, 65:21, 65:23, 67:18, 68:4, 74:5, 74:16, 74:20, 76:2, 76:5, 76:9, 76:10, 77:13, 78:2, 79:13
motions [3] - 4:16, 4:25, 5:7
motivated [1] - 24:25
motive [1] - 25:16
Mountain [1] - 42:2
move [9] - 19:10, 19:12, 19:14, 19:15, 54:19, 60:24, 65:15, 76:24, 83:14
moved [1] - 74:3
moving [1] - 60:6
MR [227] - 4:10, 4:11, 4:12, 4:14, 5:3, 5:6, 5:14, 5:19, 5:22, 5:25, 6:2, 6:4, 6:8, 7:4, 7:22, 9:1, 9:24, 14:20, 14:25, 15:2, 17:5, 18:18, 20:4, 20:8, 20:12, 22:13, 23:5, 23:8, 23:14, 23:18, 25:22, 26:25, 27:2, 27:5, 27:8, 27:13, 27:25, 28:5, 28:8, 28:10, 28:16, 29:6, 29:9, 29:13, 29:20, 29:25, 30:8, 30:14, 30:22, 30:24, 31:9, 31:13, 31:18, 31:21, 32:1, 32:11, 32:13, 32:16, 32:25, 33:4, 33:6, 33:10, 33:14, 33:20, 34:5, 34:7, 34:11, 34:13, 34:23, 35:7, 35:11, 35:16, 35:21, 35:24, 36:2, 36:4, 36:6, 36:9, 36:12, 36:14, 36:17, 37:3, 37:6, 37:9,

37:21, 38:3, 38:5, 38:8, 38:11, 39:1, 39:8, 39:19, 40:1, 40:4, 40:6, 41:3, 41:5, 42:21, 42:23, 43:2, 43:14, 43:23, 44:6, 44:9, 44:16, 45:3, 45:20, 45:25, 46:21, 46:25, 47:10, 47:11, 47:12, 48:3, 48:5, 48:7, 48:16, 48:22, 49:8, 49:12, 50:5, 51:22, 52:3, 52:5, 53:2, 53:25, 54:3, 54:9, 54:24, 55:5, 55:7, 55:23, 56:3, 56:9, 57:2, 57:15, 57:20, 57:25, 58:7, 58:14, 58:16, 58:21, 58:24, 61:16, 61:20, 63:12, 63:23, 64:2, 64:4, 64:20, 65:8, 65:12, 65:25, 66:7, 66:9, 66:12, 67:4, 67:12, 67:19, 68:5, 68:8, 68:16, 68:18, 68:25, 69:10, 69:16, 70:10, 70:13, 70:15, 70:23, 71:10, 71:19, 71:21, 71:24, 74:14, 74:16, 74:25, 75:12, 75:14, 75:17, 75:25, 76:8, 77:12, 78:6, 78:15, 78:18, 78:23, 79:1, 79:10, 79:19, 79:25, 80:5, 80:9, 80:12, 80:15, 80:20, 81:6, 81:11, 81:15, 81:22, 82:7, 82:15, 82:22, 83:2, 83:5, 83:18, 83:20, 83:24, 84:7, 84:8, 84:9, 84:12, 84:14, 84:18, 84:21, 84:24, 85:7, 85:12, 85:19, 85:23, 86:4, 86:8, 86:22, 87:6, 87:15, 87:16, 87:20
MS [18] - 4:7, 72:2, 72:4, 72:9, 72:16, 73:9, 73:12, 73:16, 73:20, 73:22, 77:11, 81:23, 82:1, 84:6, 85:1, 85:4, 86:15, 87:23
Mugerditchian [3] - 36:14, 36:17, 43:5
must [2] - 13:25, 21:18
myriad [1] - 69:17

# N

**name** [7] - 5:9, 5:10, 78:13, 80:2, 80:3, 83:17, 87:4
**names** [1] - 5:8
**Nami** [1] - 3:1
**narrow** [1] - 51:9
**narrowed** [1] - 46:12
**National** [2] - 17:12, 37:16
**nature** [2] - 14:13, 61:21
**necessarily** [4] - 63:5, 64:5, 77:2, 80:16
**necessary** [4] - 16:13, 50:1, 63:4, 81:20
**need** [17] - 41:12, 54:19, 59:25, 60:25, 63:2, 65:15, 68:9, 78:6, 78:8, 79:10, 80:7, 80:12, 81:17, 86:22, 86:24, 87:8, 87:9
**needed** [4] - 41:8, 42:17, 67:16, 68:7
**negative** [1] - 47:17
**negotiate** [2] - 30:5, 54:7
**negotiation** [4] - 29:23, 37:5, 56:5, 76:15
**negotiations** [9] - 29:24, 30:2, 30:8, 30:9, 30:11, 30:15, 30:16, 37:13, 76:23
**never** [18] - 30:20, 33:3, 39:22, 39:23, 42:19, 47:2, 47:5, 48:16, 49:1, 51:10, 52:12, 52:25, 58:3, 66:8, 83:8
**new** [15] - 4:18, 5:16, 5:23, 26:19, 26:25, 27:9, 27:10, 27:15, 28:17, 31:10, 43:16, 47:25, 50:11, 60:16, 76:5
**NEW** [1] - 1:1
**New** [2] - 1:10, 69:23
**next** [3] - 26:23, 37:15, 54:19
**nine** [1] - 71:13
**Ninth** [1] - 15:8
**NLV** [3] - 6:1, 26:20, 26:22
**nobody** [1] - 18:11

**non** [4] - 23:20, 50:9, 50:10, 58:6
**non-admission** [1] - 50:10
**non-class** [1] - 58:6
**non-members** [1] - 23:20
**non-testimony** [1] - 50:9
**none** [4] - 18:13, 18:14, 23:15, 50:9
**normal** [3] - 61:8, 61:14
**North** [1] - 68:21
**note** [1] - 60:21
**nothing** [26] - 6:13, 10:24, 10:25, 12:18, 13:8, 14:3, 16:14, 21:11, 22:14, 31:6, 33:23, 34:19, 37:12, 39:8, 40:10, 43:11, 44:12, 44:14, 44:17, 44:24, 46:5, 65:22, 74:1, 75:19
**notice** [1] - 5:1
**notion** [6] - 13:9, 14:5, 38:21, 40:23, 44:17, 77:16
**notwithstanding** [1] - 51:3
**nouns** [1] - 33:9
**NOV** [1] - 4:18
**November** [2] - 10:20, 37:14
**nul** [1] - 17:3
**number** [8] - 6:13, 7:21, 7:22, 12:8, 16:20, 41:15, 62:9, 78:10
**NUMBER** [1] - 1:4
**numbers** [2] - 12:2, 12:5

# O

**o'clock** [1] - 51:21
**oath** [2] - 44:19, 44:20
**object** [1] - 45:6
**objected** [4] - 32:4, 34:11, 45:14, 49:23
**objection** [6] - 32:4, 42:2, 45:16, 46:3, 46:7, 47:15
**objections** [1] - 13:17
**obvious** [1] - 58:4
**obviously** [4] - 12:1, 53:21, 60:1, 82:9

**occasion** [1] - 39:25
**occasions** [5] - 41:7, 41:17, 41:22, 42:11
**October** [2] - 40:6, 53:18
**odd** [1] - 76:12
**OF** [1] - 1:1
**offend** [1] - 8:8
**offenses** [1] - 66:18
**offer** [1] - 63:11
**offered** [7] - 16:2, 18:25, 27:18, 46:12, 46:19, 47:5, 53:18
**offering** [2] - 43:8, 51:4
**Officer** [1] - 69:4
**officers** [1] - 49:3
**Officers** [1] - 43:4
**officially** [1] - 49:3
**officials** [1] - 15:9
**oil** [1] - 71:14
**old** [2] - 60:23, 84:5
**Oliver** [1] - 72:9
**omitted** [1] - 7:10
**once** [7] - 12:6, 36:24, 37:9, 59:2, 68:8, 72:23, 81:1
**One** [1] - 1:9
**one** [68] - 4:17, 4:18, 5:2, 5:4, 5:10, 5:12, 6:1, 6:13, 7:25, 10:7, 11:22, 12:8, 15:11, 16:20, 17:13, 17:15, 18:8, 18:17, 19:10, 19:14, 24:9, 27:1, 27:5, 27:16, 31:1, 31:13, 32:13, 38:19, 39:2, 39:25, 40:1, 40:3, 40:6, 40:7, 41:3, 41:4, 41:20, 41:25, 47:10, 47:12, 49:18, 50:23, 52:9, 52:13, 52:25, 53:20, 53:21, 53:25, 55:4, 55:24, 57:4, 58:7, 58:10, 59:7, 62:18, 64:21, 65:9, 66:4, 66:13, 71:9, 71:12, 75:24, 76:20, 78:7, 79:10, 83:12
**ones** [2] - 11:20, 36:7
**ongoing** [1] - 30:2
**open** [2] - 4:1, 51:2
**operating** [1] - 19:6
**operation** [1] - 24:13
**opine** [1] - 83:22
**opining** [1] - 80:7
**opinion** [12] - 18:7, 19:7, 19:8, 21:6,

45:14, 57:1, 58:22, 59:16, 83:9, 83:11, 83:12, 85:17
**opinions** [1] - 83:25
**opportunity** [2] - 54:20, 64:13
**opposed** [1] - 64:10
**opposite** [2] - 73:5, 73:6
**opposition** [2] - 60:22, 62:1
**Order** [2] - 87:11, 87:13
**order** [9] - 4:17, 6:5, 6:21, 33:8, 49:20, 58:11, 61:14, 61:15, 80:9
**organization** [1] - 38:18
**organize** [3] - 37:11, 38:20, 48:24
**organizer** [1] - 39:10
**organizes** [1] - 39:15
**organizing** [5] - 10:20, 37:24, 38:5, 38:15, 38:16
**original** [3] - 11:18, 48:25, 70:14
**otherwise** [4] - 9:9, 10:7, 58:16, 77:8
**outcome** [4] - 12:11, 13:6, 54:14, 76:16
**overruled** [2] - 15:18, 45:15
**own** [4] - 22:16, 39:13, 43:17, 80:7

# P

**P.C** [2] - 1:19, 2:2
**package** [4] - 9:21, 11:3, 12:24, 13:4
**page** [1] - 21:6
**pages** [1] - 71:15
**paid** [2] - 39:23, 40:9
**Pan** [4] - 16:2, 16:3, 16:7, 16:9
**papers** [3] - 6:9, 6:10, 79:16
**parallel** [1] - 79:21
**parcel** [1] - 15:5
**Paris** [2] - 36:10, 43:4
**part** [19] - 6:18, 8:9, 10:19, 15:5, 20:11, 31:10, 34:5, 39:5, 42:15, 49:20, 53:8, 53:18, 53:22, 53:25, 55:7, 63:19, 64:21,

74:4, 76:15
**particular** [6] - 4:17, 63:9, 68:21, 73:1, 73:2, 73:6
**particularly** [1] - 74:23
**parties** [1] - 51:2
**parts** [1] - 64:20
**passed** [2] - 24:13, 69:16
**past** [1] - 62:6
**patent** [1] - 66:23
**PATRICK** [1] - 1:3
**pause** [2] - 27:4, 27:7
**pay** [8] - 8:4, 15:9, 15:12, 15:14, 15:15, 23:19, 23:22, 23:25
**paying** [1] - 70:5
**penalty** [1] - 17:22
**pending** [1] - 10:3
**penny** [2] - 39:23, 40:9
**people** [18] - 5:1, 9:5, 10:12, 11:3, 11:6, 14:6, 18:12, 27:20, 31:25, 32:18, 38:17, 41:14, 55:21, 57:8, 57:12, 70:7, 70:24
**peoples'** [1] - 14:4
**perceive** [1] - 26:24
**percent** [3] - 14:23, 52:24
**perfect** [1] - 87:15
**perhaps** [1] - 81:8
**period** [2] - 17:13, 85:25
**permissible** [1] - 70:24
**permission** [1] - 79:12
**permit** [5] - 19:20, 30:19, 32:20, 34:8, 34:9
**permitted** [3] - 31:14, 59:22, 62:6
**peroxide** [1] - 56:10
**Peroxide** [2] - 57:15, 57:20
**person** [8] - 6:25, 68:23, 70:2, 73:1, 73:2, 73:6, 84:1, 87:14
**perspective** [1] - 60:2
**persuade** [1] - 14:10
**petitioning** [1] - 22:11
**phase** [1] - 74:6
**phrase** [1] - 35:8

**picket** [1] - 34:16
**picture** [1] - 61:18
**piece** [2] - 22:4, 71:16
**pilot** [10] - 8:15, 13:24, 30:6, 43:9, 54:14, 62:11, 62:19, 66:5, 69:13, 74:19
**PILOTS** [1] - 1:6
**Pilots** [14] - 4:5, 7:7, 7:11, 10:16, 13:21, 14:11, 24:10, 24:19, 37:14, 37:16, 37:25, 39:3, 39:6
**pilots** [119] - 7:3, 7:13, 7:18, 7:21, 8:2, 8:4, 8:8, 8:15, 8:17, 8:21, 9:6, 9:7, 9:18, 10:18, 10:19, 10:22, 11:5, 11:17, 11:22, 12:1, 12:5, 12:7, 12:17, 13:12, 13:20, 14:2, 14:6, 14:11, 16:2, 21:10, 21:12, 22:7, 22:10, 22:15, 22:19, 22:24, 23:12, 23:18, 23:20, 24:15, 24:17, 24:20, 24:25, 25:1, 25:2, 25:8, 25:10, 26:4, 26:8, 26:9, 26:11, 26:17, 26:18, 27:23, 29:7, 30:3, 32:2, 34:15, 34:16, 34:18, 34:23, 36:3, 37:10, 37:12, 37:24, 38:1, 38:13, 38:15, 38:16, 38:18, 38:20, 39:15, 48:25, 49:4, 52:9, 52:11, 52:15, 52:17, 52:24, 53:3, 53:7, 53:9, 53:15, 53:23, 54:1, 54:4, 54:5, 54:7, 54:10, 54:13, 54:16, 55:15, 60:11, 61:24, 62:10, 62:18, 63:6, 63:17, 65:4, 66:2, 68:11, 69:16, 69:17, 69:18, 69:19, 70:9, 70:11, 70:18, 71:1, 75:5, 75:6, 75:10, 81:8, 81:12
**pilots'** [3] - 28:21, 29:11, 63:13
**place** [6] - 46:9, 59:9, 67:24, 68:2, 76:16, 87:18
**places** [2] - 28:17, 52:21
**plaintiff** [4] - 6:24,

7:6, 50:15, 78:4
**plaintiffs** [51] - 4:9, 4:10, 4:11, 6:20, 6:23, 7:6, 7:9, 7:13, 11:20, 14:7, 14:8, 15:22, 16:14, 17:24, 18:13, 18:18, 20:19, 20:20, 21:2, 21:3, 30:24, 31:4, 32:3, 33:22, 34:17, 35:1, 39:2, 41:7, 41:10, 42:16, 43:15, 48:10, 48:16, 49:1, 49:22, 52:20, 55:1, 56:16, 59:22, 60:5, 61:21, 63:2, 63:14, 63:19, 64:12, 65:14, 67:13, 76:2, 77:2, 77:8
**Plaintiffs** [2] - 1:4, 30:22
**PLAINTIFFS** [2] - 1:17, 1:22
**plaintiffs'** [7] - 7:15, 7:16, 21:14, 60:21, 62:22, 74:21, 74:25
**Plaintiffs'** [1] - 30:20
**plan** [3] - 56:14, 63:3, 65:13
**play** [1] - 49:22
**played** [4] - 9:15, 43:25, 46:13, 48:9
**Plaza** [1] - 1:9
**plenty** [1] - 30:17
**plight** [1] - 22:23
**plugging** [1] - 70:21
**podge** [1] - 50:20
**point** [43] - 7:20, 10:9, 10:15, 11:13, 19:5, 23:5, 26:6, 26:7, 26:9, 34:8, 34:14, 37:5, 37:13, 37:15, 37:23, 37:25, 44:9, 47:4, 48:3, 50:1, 53:23, 54:1, 54:2, 54:5, 55:18, 55:19, 61:5, 61:7, 62:2, 62:20, 64:4, 64:17, 65:2, 65:3, 66:15, 66:16, 67:21, 74:18, 78:5, 79:10, 83:21, 86:24
**pointed** [4] - 34:15, 50:13, 51:2, 56:7
**points** [4] - 6:12, 26:6, 26:15, 48:5
**policy** [5] - 10:20, 12:9, 33:10, 33:20, 33:21
**portion** [1] - 48:11
**portions** [3] - 16:3,

49:21
**position** [23] - 7:15, 7:16, 8:12, 22:5, 22:7, 22:9, 22:20, 26:10, 28:24, 29:7, 30:20, 33:2, 36:24, 40:24, 48:14, 52:23, 53:1, 66:8, 76:7, 79:8, 81:10, 81:18, 81:25
**positions** [2] - 54:6, 54:12
**possibility** [1] - 51:6
**possible** [4] - 14:12, 18:19, 19:4, 75:10
**practices** [1] - 69:22
**precedent** [2] - 15:2, 27:14
**precise** [2] - 66:24, 73:5
**precisely** [1] - 74:3
**predominance** [1] - 73:25
**prefer** [1] - 5:15
**prejudice** [3] - 65:17, 65:19, 65:21
**prejudiced** [1] - 41:17
**prejudicial** [2] - 32:22, 51:15
**preliminary** [2] - 78:10, 83:25
**premature** [3] - 67:2, 71:20, 81:11
**preparation** [1] - 44:15
**prepare** [1] - 63:18
**prepared** [1] - 48:18
**preparing** [1] - 79:16
**present** [4] - 51:2, 51:9, 72:11, 80:1
**presented** [6] - 9:21, 12:25, 44:22, 45:25, 47:8, 51:14
**presenting** [1] - 5:22
**preserve** [1] - 50:1
**preserved** [1] - 47:7
**president** [1] - 39:6
**President** [1] - 10:10
**PRESS** [36] - 1:21, 4:10, 20:8, 20:12, 22:15, 25:22, 43:23, 44:6, 44:9, 44:16, 45:3, 45:20, 45:25, 46:21, 46:25, 47:11, 50:5, 67:12, 77:12, 78:6, 78:15, 78:18, 78:23, 79:1, 81:11, 83:5, 83:20, 83:24, 84:9, 84:12, 84:14, 84:18, 84:21, 84:24,

85:7, 87:15
**Press** [6] - 4:10, 17:25, 47:13, 48:8, 49:13, 79:25
**press** [5] - 18:23, 19:2, 24:4, 43:22, 75:15
**Press's** [1] - 23:10
**press's** [2] - 18:22, 23:14
**pressure** [1] - 26:3
**presumed** [1] - 25:4
**pretrial** [4] - 42:3, 49:20, 51:3, 51:7
**pretty** [2] - 23:12, 83:24
**prevail** [1] - 76:2
**prevented** [1] - 23:23
**Primadata** [3] - 39:4, 39:5, 48:13
**printed** [4] - 39:3, 40:14, 48:13, 48:17
**printer** [1] - 39:4
**printing** [4] - 44:14, 44:18
**priority** [1] - 12:8
**Prison** [1] - 54:24
**privileges** [2] - 31:25, 33:12
**problem** [7] - 56:9, 57:4, 58:11, 60:7, 61:25, 66:7, 76:18
**problematic** [1] - 62:13
**problems** [4] - 46:18, 55:23, 57:4, 58:10
**procedurally** [2] - 46:6, 47:6
**procedures** [2] - 17:10, 17:15
**proceed** [8] - 51:22, 53:15, 60:1, 60:15, 62:17, 64:7, 78:3, 78:5
**process** [9] - 8:10, 22:8, 56:5, 59:15, 67:8, 78:12, 81:4, 81:9, 84:3
**produce** [2] - 82:12
**produced** [5] - 21:8, 39:2, 41:2, 41:11, 44:8
**productive** [1] - 35:1
**program** [5] - 68:15, 70:2, 70:6, 70:20, 70:22
**progress** [1] - 23:13
**project** [1] - 62:3
**promise** [1] - 46:16
**promised** [1] - 39:24

**proof** [2] - 8:12, 18:8
**proper** [5] - 19:21, 37:3, 37:11, 50:13, 73:4
**properly** [1] - 75:18
**proposed** [1] - 49:19
**proposing** [2] - 25:13, 58:1
**proposition** [2] - 57:6, 77:7
**proprietary** [1] - 5:6
**protect** [1] - 66:17
**protecting** [1] - 26:17
**protective** [1] - 29:15
**prove** [13] - 8:12, 15:21, 15:22, 21:4, 55:12, 56:16, 58:16, 58:20, 61:22, 63:4, 63:14, 67:10, 72:19
**proved** [1] - 21:2
**proves** [1] - 71:5
**provide** [2] - 14:11, 21:9
**provided** [2] - 20:25, 43:7
**provides** [2] - 64:8, 82:25
**providing** [1] - 9:5
**proving** [2] - 73:23, 74:5
**provision** [5] - 28:21, 29:11, 29:13, 29:22, 85:8
**provisions** [1] - 29:15
**provoke** [2] - 67:17, 68:3
**Prudential** [1] - 69:21
**public** [1] - 15:1
**published** [2] - 45:10, 45:14
**pull** [1] - 11:11
**pure** [2] - 13:8, 24:4
**purpose** [3] - 21:6, 21:12, 22:19
**purposes** [2] - 59:25, 75:25
**pursue** [6] - 57:23, 58:24, 59:11, 59:23, 61:24, 64:10
**pushed** [1] - 11:21
**put** [10] - 6:10, 7:14, 14:2, 26:3, 26:13, 49:24, 55:11, 67:14, 80:23, 87:13
**puts** [1] - 67:7

## Q

**questioning** [3] - 43:17, 44:24, 45:4
**questions** [9] - 20:4, 21:21, 23:2, 28:18, 43:19, 47:14, 47:22, 76:20, 77:1
**quickly** [2] - 73:12, 83:14
**quintessentially** [3] - 68:24, 77:19, 77:25
**quite** [4] - 34:8, 51:8, 61:20, 64:16
**quo** [1] - 17:9
**quote** [4] - 21:4, 33:19, 72:9, 72:13
**quoted** [2] - 28:16, 72:18

## R

**Railway** [4] - 17:5, 17:8, 17:11, 17:14
**raised** [7] - 18:22, 31:13, 32:21, 40:9, 42:9, 43:15, 43:19
**raising** [1] - 71:21
**Randy** [3] - 9:15, 27:20, 28:18
**Ranzman** [1] - 4:13
**RANZMAN** [1] - 2:2
**rather** [5] - 48:2, 48:3, 55:20, 64:7, 79:4
**ratification** [4] - 13:7, 15:10, 19:14, 19:15
**rational** [2] - 51:1, 72:10
**Rautenberg** [2] - 25:11, 53:16
**re** [7] - 11:18, 19:4, 19:5, 33:15, 47:5, 48:23, 81:24
**re-casting** [1] - 33:15
**re-filed** [2] - 19:4, 19:5
**re-offered** [1] - 47:5
**re-stated** [2] - 11:18, 48:23
**re-think** [1] - 81:24
**reaction** [2] - 78:11, 81:14
**read** [5] - 47:4, 47:16, 47:19, 54:20, 57:20
**reading** [3] - 19:9,

50:16, 50:17
**ready** [3] - 5:25, 51:20, 61:14
**realistic** [1] - 79:5
**really** [16] - 8:19, 16:21, 20:13, 21:19, 33:18, 37:12, 50:2, 50:7, 51:24, 59:24, 61:6, 64:8, 64:21, 68:22, 69:8, 77:4
**reason** [5] - 17:3, 19:24, 47:8, 52:19, 74:5
**reasonable** [12] - 6:16, 9:10, 11:2, 13:20, 17:7, 19:7, 19:9, 20:21, 24:16, 25:11, 28:25, 34:24
**reasons** [1] - 9:2
**rebut** [1] - 63:18
**rebuttal** [3] - 4:23, 50:2, 85:8
**recalled** [1] - 59:7
**recalling** [1] - 55:7
**receipts** [2] - 39:21, 39:22
**receive** [1] - 82:18
**recognized** [1] - 73:17
**recollection** [3] - 45:19, 45:23, 46:9
**recommended** [2] - 24:14, 24:21
**reconsideration** [1] - 42:4
**reconstituted** [1] - 74:6
**record** [27] - 6:14, 12:18, 12:22, 13:19, 18:9, 18:23, 19:1, 19:25, 24:24, 26:13, 45:3, 45:7, 46:10, 46:14, 46:15, 47:1, 49:11, 49:17, 49:24, 49:25, 50:1, 51:6, 56:11, 79:11, 87:17, 87:18
**recover** [3] - 21:3, 57:3, 57:13
**red** [1] - 43:12
**redacted** [1] - 41:9
**refer** [3] - 22:2, 56:12, 86:7
**references** [1] - 48:8
**referred** [4] - 12:3, 21:25, 29:14, 29:15
**referring** [1] - 86:6
**refers** [1] - 62:7
**reflected** [1] - 44:10
**reflecting** [1] - 20:13

**refresh** [5] - 45:8, 45:13, 45:19, 45:23
**refreshed** [2] - 45:9, 46:1
**refuse** [1] - 14:1
**refused** [5] - 6:25, 15:23, 23:16, 28:14, 28:15
**regard** [6] - 6:21, 9:6, 16:11, 42:17, 48:7, 49:8
**regarding** [1] - 50:8
**regular** [1] - 61:12
**reimburse** [1] - 24:1
**reimbursed** [2] - 39:17, 39:21
**reimbursement** [1] - 39:22
**reject** [2] - 9:25, 18:16
**rejected** [2] - 26:12, 62:5
**rejecting** [1] - 53:19
**rejection** [1] - 17:13
**related** [1] - 45:5
**relation** [1] - 77:15
**relations** [2] - 28:12, 32:18
**relationship** [2] - 8:16, 26:17
**relevant** [4] - 46:6, 74:23, 80:17
**relied** [3] - 75:18, 80:16, 82:17
**relief** [4] - 47:15, 47:20, 47:22, 47:23
**relies** [1] - 44:16
**rely** [1] - 18:18
**remanding** [1] - 21:1
**remember** [11] - 32:10, 32:11, 32:12, 32:13, 33:8, 40:3, 49:9, 50:20, 50:22, 82:24, 85:4
**remind** [1] - 35:5
**removal** [3] - 28:20, 29:10, 29:12
**removed** [1] - 15:15
**repeat** [3] - 6:9, 27:10, 53:24
**repeatedly** [2] - 56:13, 59:13
**replace** [1] - 75:7
**report** [32] - 61:5, 64:13, 68:3, 78:14, 80:2, 80:5, 81:1, 81:3, 81:9, 81:16, 81:18, 82:8, 82:12, 82:17, 82:20, 83:1, 83:23, 84:2, 84:17, 85:11,

85:16, 85:20, 85:23, 86:3, 86:4, 86:6, 86:9, 86:17, 86:23, 86:24, 87:5, 87:7
**REPORTER** [1] - 52:2
**reports** [1] - 61:13
**represent** [1] - 8:2
**Representation** [2] - 19:19, 25:5
**representation** [11] - 8:20, 11:25, 12:2, 15:6, 15:19, 20:1, 65:5, 66:21, 77:21, 79:15
**representative** [6] - 8:17, 27:17, 28:11, 28:12, 37:10, 62:8
**representatives** [1] - 63:6
**represented** [2] - 15:15, 62:2
**represents** [1] - 38:1
**request** [5] - 23:22, 23:25, 34:10, 47:19, 47:20
**requested** [2] - 21:9, 47:22
**requesting** [1] - 79:11
**requests** [3] - 25:9, 80:22, 81:7
**require** [2] - 55:24, 68:12
**required** [7] - 2:24, 12:10, 17:22, 19:18, 48:15, 55:3, 59:10
**requirement** [2] - 27:22, 73:25
**requires** [6] - 17:6, 17:9, 25:5, 29:16, 84:17, 85:18
**requiring** [1] - 29:13
**rescinded** [1] - 49:6
**researched** [1] - 48:17
**resolution** [1] - 13:9
**resources** [1] - 38:12
**respect** [10] - 35:6, 35:7, 35:9, 35:11, 35:12, 35:16, 52:8, 62:14, 76:21, 76:22
**respected** [2] - 43:18, 53:20
**respectfully** [2] - 27:13, 71:2
**respects** [1] - 8:12
**respond** [1] - 20:5
**response** [1] - 56:17
**rest** [1] - 14:24

**restated** [1] - 75:20
**restaurant** [1] - 45:22
**result** [4] - 25:6, 31:1, 57:19, 60:20
**resulted** [2] - 24:6, 24:8
**results** [1] - 18:11
**resurrected** [1] - 49:1
**retain** [3] - 80:7, 86:22, 86:24
**retaliation** [1] - 34:18
**retired** [1] - 69:17
**reveal** [2] - 40:15, 42:8
**reverse** [2] - 6:21, 19:20
**reversed** [1] - 61:15
**review** [3] - 28:25, 79:14, 79:15
**Review** [1] - 72:17
**reviewed** [1] - 46:1
**revisit** [1] - 77:24
**revoked** [2] - 49:7, 49:8
**Rhino** [1] - 39:19
**Richard** [3] - 16:17, 17:15, 17:16
**RICHARDS** [1] - 1:15
**Richards** [1] - 4:8
**rights** [1] - 11:25
**rigorous** [3] - 56:13, 60:17, 65:15
**Rindfleisch** [3] - 39:9, 40:4, 40:7
**riots** [2] - 54:22, 54:24
**rise** [2] - 4:2, 87:24
**risk** [1] - 58:25
**Roberts** [1] - 52:14
**Robinson** [1] - 66:23
**Rodriguez** [2] - 4:8, 49:13
**RODRIGUEZ** [20] - 1:15, 1:16, 4:7, 72:2, 72:4, 72:9, 72:16, 73:9, 73:12, 73:16, 73:20, 73:22, 77:11, 81:23, 82:1, 84:6, 85:1, 85:4, 86:15, 87:23
**Rohm** [1] - 56:11
**Roland** [2] - 14:15, 24:21
**Roll** [1] - 10:1
**rolling** [1] - 13:10
**room** [1] - 46:15
**roommate** [1] - 69:25

root [1] - 66:22
Rosen [23] - 31:10, 31:14, 33:24, 34:4, 35:18, 38:6, 38:11, 39:14, 40:13, 40:16, 42:7, 43:24, 44:2, 44:12, 44:25, 45:4, 45:12, 46:1, 47:15, 50:7, 50:8, 50:13, 51:13
Rosen's [5] - 32:21, 32:23, 34:5, 45:8, 50:16
rude [1] - 43:9
Rule [9] - 20:16, 50:12, 71:12, 73:25, 82:24, 84:17, 85:17, 86:13, 87:4
rule [1] - 41:21
ruled [6] - 41:5, 41:6, 42:3, 42:6, 42:14, 78:18
Rules [1] - 71:11
ruling [9] - 20:22, 42:10, 47:5, 49:17, 49:18, 49:24, 63:23, 79:13
rulings [5] - 31:1, 31:2, 41:16, 50:19, 76:25
run [1] - 10:10

## S

safer [1] - 11:5
Sally [1] - 13:3
sampling [1] - 62:9
sat [1] - 72:23
satisfies [1] - 73:25
Saturday [1] - 84:18
save [1] - 85:25
scab [13] - 31:14, 31:16, 31:19, 31:23, 32:2, 32:7, 32:16, 32:19, 33:22, 45:5, 45:9, 45:12
scabs [3] - 31:15, 32:20, 34:16
schedule [1] - 80:14
scheduled [2] - 10:3, 40:22
scheme [1] - 26:5
scienter [2] - 55:3, 68:20
scope [5] - 27:24, 29:12, 29:15, 29:22, 76:3
seat [10] - 14:9, 25:10, 31:17, 31:20,

31:25, 33:3, 33:12, 34:25, 63:8, 75:22
seated [1] - 4:3
Second [4] - 16:4, 16:23, 45:11, 54:21
second [6] - 11:18, 19:16, 48:23, 75:19, 75:20, 76:22
secondly [1] - 6:15
Section [6] - 2:25, 10:2, 17:1, 17:5, 17:8, 17:14
security [1] - 54:11
see [9] - 46:11, 58:18, 62:11, 70:8, 73:10, 83:12, 85:10, 86:3, 86:11
seeking [1] - 11:25
select [1] - 81:8
Seltzer [8] - 16:18, 17:15, 17:17, 18:4, 18:5, 18:9, 18:24, 19:6
Seltzer's [1] - 19:2
Senator [1] - 22:11
send [5] - 6:25, 39:20, 39:21, 40:8, 79:2
senior [5] - 52:11, 53:7, 54:10, 76:4
seniority [21] - 7:12, 7:19, 9:12, 9:13, 12:7, 12:10, 12:11, 14:12, 24:6, 24:8, 26:7, 28:1, 29:14, 29:16, 58:9, 59:3, 64:22, 66:13, 74:6, 76:13
sense [9] - 6:4, 51:10, 53:17, 55:19, 56:23, 59:14, 61:20, 65:19, 67:6
sent [7] - 10:9, 12:4, 39:4, 39:11, 39:21, 41:19
separate [1] - 68:23
September [3] - 82:4, 84:8, 86:14
serious [2] - 20:15, 43:17
servant [1] - 15:1
serve [3] - 80:21, 80:22, 81:18
serving [1] - 81:7
set [10] - 5:10, 11:20, 20:14, 20:17, 48:25, 68:23, 76:12, 76:22, 86:18, 87:11
Seth [9] - 31:9, 34:4, 38:6, 43:24, 50:7, 50:8, 50:13, 50:16,

51:13
sets [1] - 76:20
setting [2] - 60:13, 60:14
settlement [1] - 70:24
seven [1] - 20:14
Seventh [2] - 60:13, 77:5
several [2] - 26:6, 42:11
severance [4] - 15:9, 15:12, 15:14, 15:15
shape [6] - 6:25, 7:2, 27:19, 35:3, 41:18
sheet [11] - 12:4, 41:9, 41:15, 42:20, 42:23, 43:1, 43:3, 53:22, 54:1, 54:25, 76:18
sheets [1] - 53:18
shell [1] - 7:17
shoremen [1] - 7:1
show [4] - 26:13, 33:23, 45:21, 45:24
showed [7] - 18:23, 19:1, 33:23, 45:13, 48:10, 53:19
shown [3] - 27:20, 29:3, 48:12
shred [1] - 10:4
side [5] - 4:20, 4:23, 17:13, 62:4, 79:24
sides [1] - 30:1
sign [2] - 24:18, 49:5
signal [1] - 53:5
signed [2] - 36:3, 41:14, 49:5
significant [2] - 42:10, 75:25
significantly [1] - 52:13
Simandle [1] - 73:17
similar [3] - 34:7, 54:25, 59:17
simple [1] - 19:12
simpler [1] - 69:8
simplest [1] - 55:17
simply [7] - 22:25, 33:25, 34:19, 44:3, 44:11, 60:13, 66:15
single [2] - 37:17, 66:5
sit [1] - 23:3
sitting [1] - 33:8
situation [1] - 11:6
six [2] - 78:9, 80:1
Sixth [1] - 16:24
slack [1] - 79:2
slightly [1] - 76:17

slow [1] - 79:20
snippet [1] - 43:25
soften [2] - 22:9, 22:20
softened [2] - 22:14, 22:15
sold [1] - 16:4
soliciting [1] - 37:1
solid [1] - 30:17
someone [2] - 13:10, 42:13
sometimes [2] - 14:22, 29:15
son [1] - 69:25
soon [2] - 25:3, 40:9
sorry [2] - 21:3, 82:1
sort [1] - 67:7
sought [2] - 11:8, 41:24
sounds [2] - 36:18
soup [1] - 70:18
source [1] - 72:21
sparking [1] - 34:24
Special [1] - 41:6
specific [3] - 21:3, 21:5, 62:24
specifically [1] - 71:4
specifics [1] - 62:11
specified [1] - 45:6
speculation [9] - 13:8, 14:3, 14:13, 14:15, 15:4, 23:10, 23:14, 24:4, 25:17
speculative [1] - 24:7
speeding [1] - 84:4
Spellacy [1] - 15:25
spend [1] - 47:7
spent [1] - 38:16
split [1] - 5:1
spoliation [8] - 35:18, 40:23, 41:22, 41:23, 42:5, 42:6, 42:11, 43:14
sponte [1] - 47:4
spread [7] - 12:4, 41:8, 41:15, 42:20, 42:23, 43:1, 43:3
squarely [2] - 28:15, 46:24
St [1] - 66:16
staff [1] - 38:17
stage [2] - 54:19, 56:23
stalled [1] - 11:12
standard [7] - 20:15, 20:17, 20:18, 24:22, 26:19, 26:21, 79:14
standpoint [1] - 29:2

staple [14] - 22:6, 26:6, 26:7, 30:6, 52:21, 53:23, 54:1, 54:2, 54:4, 55:18, 55:19, 65:2, 66:15
start [10] - 5:16, 9:2, 27:16, 29:23, 33:3, 37:1, 37:24, 81:9, 81:12, 83:3
started [7] - 10:8, 10:11, 10:12, 11:20, 14:9, 42:5, 49:12
starts [3] - 56:22, 81:4
statement [1] - 67:9
STATES [2] - 1:1, 1:12
States [1] - 1:9
statistical [1] - 73:3
statistics [1] - 72:12
status [1] - 17:9
statute [3] - 11:23, 19:9, 19:10
stay [1] - 51:20
step [3] - 59:23, 86:8
steps [1] - 62:17
Steve [1] - 25:11
STEVEN [1] - 2:7
Steven [1] - 4:14
stick [1] - 86:11
still [10] - 24:8, 32:13, 37:25, 59:4, 62:18, 62:21, 68:10, 77:14, 78:22, 78:24
stoppages [1] - 17:10
store [1] - 68:21
stories [1] - 69:24
strategy [1] - 75:24
strict [1] - 24:23
strike [19] - 15:24, 15:25, 16:20, 16:21, 16:23, 16:25, 17:18, 17:21, 17:22, 18:2, 18:14, 18:15, 31:15, 32:7, 32:8, 32:11, 32:14, 34:17
striking [1] - 17:2
strong [1] - 32:19
struck [1] - 20:13
structure [3] - 29:25, 30:16, 60:7
study [1] - 72:10
sua [1] - 47:4
sub [1] - 61:23
subject [3] - 12:9, 80:6, 86:23
subjects [3] - 32:17
submit [8] - 27:14, 28:24, 34:2, 60:11,

62:14, 63:3, 64:7, 64:13

**submitted** [2] - 71:17, 76:19

**submitting** [2] - 70:25, 79:16

**subpoenas** [1] - 79:2

**substance** [1] - 85:16

**substantial** [4] - 16:13, 16:15, 20:23, 25:6

**substantially** [2] - 22:9, 22:21

**suffered** [3] - 55:2, 73:2, 73:18

**suffering** [1] - 18:7

**sufficient** [7] - 6:16, 15:19, 19:24, 21:18, 25:18, 26:18, 27:15

**suggested** [3] - 40:13, 40:16, 42:7

**suggesting** [1] - 34:17

**suggestion** [1] - 14:9

**Sullivan** [1] - 73:22

**summary** [5] - 71:12, 71:13, 71:18, 72:7, 72:8

**Summary** [1] - 59:17

**Supplement** [5] - 24:3, 36:25, 37:14, 52:10, 53:5

**supplement** [2] - 7:8, 36:20

**supplied** [5] - 21:17, 22:2, 22:22, 38:23, 41:9

**support** [14] - 6:14, 6:16, 12:20, 13:9, 14:4, 19:25, 20:24, 22:4, 23:8, 25:18, 26:12, 26:14, 75:18, 75:21

**supported** [2] - 23:9, 26:14

**supporter** [1] - 43:8

**suppose** [1] - 80:24

**supposed** [1] - 25:7

**supposedly** [1] - 44:20

**Supreme** [6] - 16:12, 56:11, 60:18, 62:5, 62:6, 72:14

**sustain** [1] - 15:4

**sustained** [7] - 32:4, 42:2, 52:18, 52:22, 52:24, 73:2, 77:17

**swinging** [1] - 8:24

**system** [2] - 7:19

# T

**table** [1] - 24:16

**tabular** [2] - 71:18, 72:6

**tackle** [1] - 6:21

**tactical** [1] - 51:11

**talks** [1] - 73:23

**tank** [1] - 75:9

**ten** [5] - 51:19, 60:23, 84:5, 84:7, 84:8

**tended** [1] - 54:12

**tendered** [2] - 47:19, 50:25

**tepid** [1] - 26:14

**term** [7] - 53:18, 53:22, 54:1

**terms** [12] - 6:11, 7:8, 11:16, 14:8, 15:11, 16:1, 23:5, 60:6, 60:10, 66:16, 66:17, 80:20

**test** [2] - 80:23, 83:10

**testified** [14] - 9:17, 9:19, 16:18, 18:12, 18:24, 21:8, 24:14, 25:11, 32:6, 33:10, 44:1, 44:2, 44:18, 44:20

**testify** [6] - 38:11, 44:12, 66:10, 69:20, 71:2, 84:1

**testifying** [2] - 38:6, 39:14

**testimony** [56] - 9:14, 17:23, 19:2, 22:1, 24:9, 24:10, 24:11, 27:16, 27:18, 27:19, 28:10, 28:23, 30:14, 30:17, 31:10, 32:6, 32:23, 33:4, 33:6, 33:7, 33:9, 33:24, 36:15, 38:23, 39:9, 39:18, 40:22, 44:17, 44:21, 46:5, 47:15, 48:8, 48:9, 49:9, 49:14, 49:16, 50:7, 50:8, 50:9, 50:17, 50:21, 51:14, 52:11, 52:14, 54:4, 62:10, 63:5, 63:11, 63:13, 63:18, 65:9, 67:20, 77:8, 82:10, 82:16

**THE** [235] - 1:1, 1:11, 4:2, 4:3, 4:16, 5:4, 5:8, 5:18, 5:21, 5:24,

6:1, 6:3, 6:7, 7:2, 7:14, 7:24, 9:23, 14:19, 14:21, 15:1, 17:2, 18:17, 20:3, 20:6, 20:11, 22:12, 23:4, 23:7, 23:11, 23:16, 25:21, 25:23, 27:1, 27:3, 27:6, 27:12, 27:24, 28:3, 28:7, 28:9, 28:14, 29:5, 29:8, 29:12, 29:18, 29:21, 30:1, 30:10, 30:18, 30:23, 31:6, 31:12, 31:16, 31:19, 31:22, 32:10, 32:12, 32:15, 32:24, 33:2, 33:5, 33:7, 33:12, 33:15, 34:4, 34:6, 34:9, 34:12, 34:21, 35:6, 35:8, 35:12, 35:20, 35:23, 36:1, 36:3, 36:5, 36:7, 36:11, 36:13, 36:15, 36:24, 37:5, 37:8, 37:19, 38:2, 38:4, 38:7, 38:9, 38:24, 39:7, 39:16, 39:24, 40:3, 40:5, 41:1, 41:4, 42:20, 42:22, 42:25, 43:13, 43:22, 44:5, 44:7, 44:14, 45:1, 45:17, 45:21, 46:19, 46:22, 48:1, 48:4, 48:8, 48:15, 48:21, 49:7, 49:11, 50:3, 50:6, 51:23, 52:2, 52:4, 52:16, 53:24, 54:2, 54:8, 54:23, 55:3, 55:6, 55:9, 56:2, 56:8, 56:21, 57:6, 57:18, 57:24, 58:1, 58:13, 58:15, 58:18, 58:23, 61:2, 61:17, 63:10, 63:21, 63:25, 64:3, 64:15, 64:24, 65:11, 65:18, 66:3, 66:8, 66:11, 66:20, 67:5, 67:13, 67:22, 68:6, 68:14, 68:17, 68:19, 69:1, 69:15, 69:21, 70:12, 70:14, 70:17, 71:7, 71:11, 71:20, 71:23, 71:25, 72:3, 72:7, 72:14, 72:24, 73:10, 73:13, 73:19, 73:21, 74:15, 74:23, 75:1, 75:13, 75:15, 75:23, 76:5, 77:10, 77:13, 78:13, 78:16, 78:22, 78:24, 79:8, 79:17, 79:23,

80:3, 80:8, 80:11, 80:18, 81:3, 81:10, 81:14, 81:21, 81:24, 82:2, 82:14, 82:19, 82:23, 83:4, 83:16, 83:21, 84:4, 84:10, 84:13, 84:15, 84:20, 84:22, 84:25, 85:2, 85:5, 85:10, 85:14, 85:22, 86:2, 86:5, 86:11, 86:16, 87:3, 87:7, 87:17, 87:19, 87:21, 87:24

**themselves** [3] - 22:10, 41:11, 66:17

**theories** [2] - 74:21, 85:13

**Theory** [1] - 10:2

**theory** [35] - 8:7, 19:3, 19:4, 24:23, 55:10, 60:25, 61:18, 64:17, 65:2, 65:6, 66:24, 66:25, 67:3, 67:15, 67:25, 73:3, 74:25, 75:2, 75:4, 75:11, 75:12, 75:13, 75:14, 75:16, 75:17, 75:18, 76:12, 76:14, 76:15, 77:22, 80:25, 81:12, 85:14, 85:15, 85:21

**therefore** [1] - 74:13

**thereof** [1] - 83:9

**they've** [1] - 67:19

**thinking** [2] - 76:1, 76:19

**Third** [9] - 11:23, 20:25, 21:1, 21:16, 45:1, 57:16, 72:18, 73:23, 79:12

**third** [4] - 4:18, 6:17, 42:4

**thirds** [1] - 22:6

**thousand** [1] - 71:12

**three** [13] - 4:16, 4:24, 6:11, 7:22, 23:19, 40:5, 51:20, 53:18, 53:22, 53:25, 70:9, 82:3, 82:20

**three-part** [2] - 53:22, 53:25

**throughout** [2] - 19:17, 25:9

**tied** [1] - 31:19

**time-consuming** [1] - 74:7

**timely** [1] - 79:22

**timing** [2] - 61:10, 87:9

**tissue** [1] - 21:25

**Title** [1] - 2:24

**today** [15] - 4:16, 4:23, 31:1, 31:2, 31:7, 38:9, 44:4, 49:15, 49:16, 50:20, 74:1, 74:22, 82:3, 85:9

**token** [1] - 53:2

**tomorrow** [3] - 19:11, 19:13

**ton** [2] - 70:3, 70:5

**tons** [2] - 73:19, 73:20

**took** [2] - 54:6, 87:18

**tool** [1] - 33:12

**tooth** [1] - 35:21

**top** [1] - 53:13

**topics** [1] - 34:7

**total** [1] - 43:12

**totally** [3] - 51:6, 58:2

**toughest** [1] - 8:11

**toward** [3] - 26:10, 34:21, 34:23

**towards** [2] - 16:3, 18:21

**track** [1] - 79:21

**trade** [1] - 69:22

**training** [2] - 16:1, 16:8

**transaction** [1] - 13:18

**transactions** [1] - 71:14

**transcript** [2] - 71:15, 82:9

**transcripts** [2] - 12:19, 82:15

**transferred** [1] - 37:22

**treatment** [2] - 4:22, 59:14

**tremendous** [1] - 38:12

**trial** [42] - 4:18, 5:16, 5:23, 6:13, 9:15, 9:16, 12:18, 16:18, 17:16, 18:21, 26:19, 26:25, 27:9, 27:10, 27:15, 28:17, 31:11, 42:5, 43:16, 47:5, 47:24, 47:25, 48:12, 49:12, 50:11, 52:5, 53:14, 54:4, 56:13, 56:21, 56:24, 57:22, 58:17, 60:7, 60:16, 60:20, 61:14, 62:7, 63:7, 63:16, 65:13, 71:5

**tried** [3] - 58:4, 71:13, 79:6

**trip** [1] - 23:24

**trips** [1] - 24:2
**true** [8] - 2:24, 33:18, 40:17, 54:8, 55:20, 66:3, 66:4, 67:12
**TRUJILLO** [1] - 1:15
**Trujillo** [1] - 4:8
**truly** [1] - 40:24
**Trustee** [1] - 79:1
**truth** [1] - 40:24
**truthful** [1] - 83:6
**try** [23] - 7:14, 8:24, 13:10, 14:25, 35:13, 37:11, 46:16, 47:1, 54:7, 59:22, 60:15, 62:3, 62:10, 62:16, 63:1, 63:4, 63:13, 63:14, 70:25, 77:8, 81:18, 86:10, 87:2
**trying** [8] - 4:22, 13:2, 33:16, 34:21, 64:10, 64:21, 64:25, 83:15
**turn** [2] - 26:12, 30:12
**turns** [1] - 16:22
**TWA** [63] - 7:13, 7:18, 7:21, 8:21, 9:6, 9:18, 10:6, 10:18, 10:19, 11:4, 11:8, 12:5, 13:12, 13:15, 13:18, 13:20, 14:2, 14:6, 14:11, 16:19, 17:18, 17:19, 17:20, 17:21, 19:1, 19:12, 22:6, 22:10, 22:15, 22:18, 22:24, 24:12, 24:15, 24:16, 24:20, 24:25, 25:1, 25:8, 25:10, 26:8, 26:11, 26:18, 27:23, 28:21, 29:7, 29:11, 30:6, 34:23, 37:10, 37:23, 52:9, 52:13, 53:19, 53:23, 54:1, 61:23, 65:3, 66:5, 70:10, 75:10, 75:19
**twentieth** [1] - 84:10
**twenty** [2] - 7:22, 70:9
**twenty-three** [2] - 7:22, 70:9
**two** [21] - 5:4, 9:22, 22:6, 23:19, 31:13, 40:1, 40:5, 43:13, 52:6, 53:7, 55:23, 58:10, 62:17, 64:20, 66:12, 73:11, 73:16, 76:19, 77:1, 84:9
**Two** [1] - 17:5
**type** [8] - 55:16,

59:12, 60:11, 61:23, 69:4, 70:23, 82:24, 84:16
**typical** [3] - 61:11, 82:10, 82:17

## U

**U.S.C** [1] - 2:25
**ultimately** [4] - 29:16, 57:12, 64:16, 68:9
**unanimous** [1] - 20:14
**unavailable** [1] - 9:16
**undeniably** [1] - 43:20
**under** [13] - 13:25, 16:3, 17:1, 17:14, 19:4, 19:6, 19:19, 20:1, 20:16, 26:19, 44:19, 44:20, 50:12
**understood** [6] - 7:16, 30:2, 30:4, 30:10, 79:25, 83:8
**undisputed** [2] - 39:9, 48:19
**unfairly** [1] - 32:22
**unimportant** [1] - 42:18
**union** [12] - 6:24, 8:2, 15:9, 21:9, 22:3, 22:14, 22:17, 23:16, 24:1, 26:9, 65:4, 75:5
**Union** [4] - 7:7, 26:16, 36:25, 77:20
**union's** [1] - 24:1
**Union's** [1] - 79:14
**unions** [7] - 10:21, 14:16, 14:18, 16:22, 17:6, 19:21, 32:18
**UNITED** [2] - 1:1, 1:12
**United** [1] - 1:9
**unquote** [1] - 21:6
**untriable** [1] - 58:2
**untrue** [1] - 49:2
**up** [33] - 5:1, 6:25, 7:2, 7:3, 9:20, 19:3, 19:10, 20:2, 21:20, 22:8, 22:14, 22:15, 26:7, 31:5, 37:13, 39:2, 44:3, 45:14, 46:12, 51:2, 51:19, 52:18, 62:3, 65:1, 70:4, 70:19, 72:5, 79:2, 79:20, 84:4, 84:11, 86:14, 87:11

**Uzbekistan** [1] - 83:17

## V

**vague** [2] - 14:15, 15:3
**valid** [3] - 57:10, 61:4, 77:17
**variety** [1] - 9:2
**various** [2] - 26:15, 75:23
**vastly** [2] - 69:24, 69:25
**Vegas** [3] - 36:8, 36:9, 44:19
**verbs** [1] - 33:9
**verdict** [20] - 6:14, 6:16, 19:25, 20:14, 20:18, 20:23, 20:24, 21:19, 21:23, 23:1, 25:19, 54:15, 54:25, 60:10, 62:23, 63:1, 64:8, 76:18, 77:6, 78:1
**versus** [13] - 4:5, 54:21, 56:11, 56:12, 60:12, 60:18, 62:5, 71:4, 72:18, 72:25, 73:17, 73:22, 77:15
**vice** [1] - 39:6
**Vice** [1] - 10:10
**video** [1] - 43:25
**viewed** [1] - 20:19
**vigorously** [1] - 49:14
**violated** [1] - 11:24
**violation** [5] - 15:20, 16:10, 61:22, 62:24, 62:25
**virtually** [2] - 15:3, 49:23
**vivid** [1] - 14:4
**void** [1] - 17:3
**volunteers** [1] - 38:17
**vote** [12] - 9:8, 12:22, 13:7, 15:11, 15:21, 18:15, 19:15, 19:16, 29:18, 29:19, 29:20, 29:21
**voted** [6] - 13:3, 14:6, 15:24, 18:16
**votes** [5] - 12:24, 13:1, 13:4, 13:5, 13:6
**vs** [1] - 1:5

## W

**W-o-e-r-t-h** [1] - 36:17
**wait** [2] - 83:16, 83:22
**waive** [4] - 29:21, 29:22
**waived** [1] - 27:23
**waiver** [1] - 76:3
**Wal** [12] - 56:11, 60:18, 62:4, 67:21, 68:20, 69:10, 71:4, 72:25, 73:8, 73:17, 77:15
**Wal-Mart** [12] - 56:11, 60:18, 62:4, 67:21, 68:20, 69:10, 71:4, 72:25, 73:8, 73:17, 77:15
**walk** [1] - 13:18
**war** [4] - 14:9, 33:3, 34:25, 63:8
**warning** [1] - 18:17
**warrant** [1] - 74:2
**warrants** [2] - 52:6, 79:15
**wars** [4] - 25:10, 33:18, 33:19, 75:22
**waste** [1] - 8:14
**ways** [4] - 52:10, 59:21, 62:16, 66:15
**week** [1] - 65:21
**weekend** [1] - 87:21
**weeks** [1] - 20:10
**weigh** [1] - 45:2
**Wendell** [1] - 72:9
**whatsoever** [1] - 7:6
**whichever** [1] - 61:23
**whole** [8] - 21:20, 40:18, 40:22, 55:14, 62:5, 70:10, 70:12, 70:14
**wide** [5] - 55:16, 55:22, 67:20, 67:23, 68:24
**Wide** [1] - 10:1
**Wilder** [2] - 14:15, 24:21
**Wilder's** [1] - 22:1
**wind** [1] - 52:18
**wiped** [1] - 13:14
**wishes** [1] - 13:2
**withdrawal** [1] - 49:19
**witness** [6] - 21:8, 40:20, 45:12, 45:21, 63:22

**witnesses** [1] - 42:1
**Woerth** [15] - 8:16, 24:13, 32:3, 32:6, 33:2, 33:20, 33:24, 34:8, 34:25, 36:8, 36:13, 36:14, 36:15, 36:17, 43:4
**woman** [2] - 68:22, 86:25
**women** [1] - 20:9
**word** [4] - 32:19, 38:24, 72:7, 73:7
**wording** [1] - 39:1
**words** [1] - 57:21
**worry** [1] - 15:13
**worse** [7] - 8:23, 9:11, 24:20, 24:25, 25:7, 53:20, 53:21
**Worth** [1] - 33:1
**wound** [1] - 70:4
**writing** [1] - 70:20
**wrote** [3] - 5:12, 39:2, 72:17

## Y

**year** [6] - 38:13, 38:19, 60:23, 79:6, 84:5, 84:10
**years** [2] - 84:7, 84:8
**Young** [1] - 13:3
**Young's** [1] - 13:5
**yourself** [1] - 42:9

## Z

**zero** [1] - 38:14