<pre>
     1              UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
     2
     3  _____

        PATRICK BRADY, et al,
     4
                    Plaintiff,          CIVIL ACTION NUMBER:
     5
                    -vs-                        02-2917
     6
        AIR LINE PILOTS ASSOCIATION,
     7
                    Defendants.
     8  _____
                Mitchell H. Cohen United States Courthouse
     9           One John F. Gerry Plaza
                 Camden, New Jersey 08101
    10           July 31, 2012

    11  B E F O R E:        THE HONORABLE JOSEPH E. IRENAS
                            SENIOR UNITED STATES DISTRICT JUDGE
    12

    13
        A P P E A R A N C E S:
    14
        ARCHER & GREINER, ESQS.
    15  BY:  STEVEN J. FRAM, ESQUIRE
             JOHN C. CONNELL, ESQUIRE
    16          and
        KATZ & RANZMAN, P.C.
    17  BY:  DANIEL M. KATZ, ESQUIRE
        Attorneys for the Plaintiffs.
    18
        TRUJILLO, RODRIGUEZ & RICHARD, LLC
    19  BY:  LISA J. RODRIGUEZ, ESQUIRE
                and
    20  GREEN JACOBSON, P.C.
        BY: ALLEN P. PRESS, ESQUIRE
    21  Attorneys for the Defendants.

    22
        JOSEPH JACOBSON, ESQUIRE
    23  (Telephoned in )

    24
        Certified as True and Correct as required by Title 28, U.S.C.,
    25  Section 753
             /S/ Cathy J. Ford, CCR, CRR, RPR
</pre>

**1**      THE DEPUTY COURT CLERK:  All rise.

**2**      THE COURT:  Good afternoon.

**3**      MS. RODRIGUEZ:  Good afternoon, your Honor.

**4**      THE COURT:  Tell you what a pleasure it is to see all

**5** of you.  You understand what I just said.  I can't tell you

**6** what a pleasure it is to see all of you.

**7**      Everyone, please be seated.

**8**      Mr. Jacobson, are you here?

**9**      MR. JACOBSON:  Yes, Your Honor.

**10**      THE COURT:  Good afternoon.

**11**      MR. JACOBSON:  Yes, sir.

**12**      THE COURT:  Is it still morning in St. Louis?

**13**      MR. JACOBSON:  No, afternoon.

**14**      THE COURT:  Okay.  Mr. Jacobson, can you hear me

**15** okay?

**16**      MR. JACOBSON:  It's a little tough, your Honor, but

**17** I'm straining to listen.

**18**      THE COURT:  I'm putting a lapel mike on to see if we

**19** can -- Mr. Jacobson, how is that?

**20**      MR. JACOBSON:  That's wonderful, your Honor.

**21**      THE COURT:  Of course, this is the matter of Patrick

**22** Brady, et al versus Airline Pilots Association International.

**23**      Can I please have the appearances of counsel.

**24**      MS. RODRIGUEZ:  Good afternoon, your Honor, Lisa

**25** Rodriguez from Trujillo, Rodriguez and Richard.

```
 1          MR. PRESS:  Allen Press for the plaintiffs.

 2          MR. FRAM:  Your Honor, good afternoon, Steven Fram

 3  Archer Greiner on behalf of ALPA.  With me, my partner, John

 4  Connell, also from Archer Greiner.

 5          THE COURT:  There he is.  I see him back there.

 6  Haven't they put you in a forced retirement, Mr. Connell?

 7          MR. CONNELL:  Not yet, Judge, it's a little

 8  premature.

 9          MR. FRAM:  Also with us, your Honor, is Daniel Katz,

10  our co-counsel.

11          THE COURT:  Okay.  There is two matters today,

12  really.  One is an application by the defendants in support

13  of -- to certify this case for interlocutory appeal under

14  1292(b).  The second, may be called a group of matters, has to

15  do with the procedure that if that motion is not granted --

16  motion is granting, the second, there be nothing else.  So if

17  I granted that will stay, obviously, I believe that will stay

18  things that are followed.  If the motion is not granted, then

19  how we going to proceed hereafter to move the case to trial.

20          The three questions that the defendant wishes to

21  certify for appeal, for interlocutory appeal, are proof of the

22  old saw.  I don't want to control giving the answer.  I want

23  to control phrasing the questions.  Let me control the

24  question, we won't have to worry about the answer.  But, in a

25  generalized sense, I think Mr. Fram might take issue with me,
```

1   but the argument that all three questions actually put forth

2   is that, in bifurcating the case, I should have required a

3   finding that at least some members of the class would -- had

4   sustained damage as a result of the breach of the union's duty

5   of fair representation.  All three of the questions, really,

6   to some degree, raise that same issue in different ways.

7        I took -- and, of course, to some degree, defendant's

8   rights to parse, you know, specific acts of the breach of the

9   duty.  Really, was it this act, was it failure to take an

10  appeal, failure to file a suit, failure to do this, failure to

11  do that.  There was no finding of any particular failure.  I

12  took the position, for right or for wrong, that the heart of

13  the plaintiff's case was that the union breached its duty of

14  fair representation because it was curried, this is lay talk,

15  but curried in favor with APA who represented the American

16  Airline Pilots.  And in doing so it breached its duty of

17  loyalty to the pilots it represented which was the TWA pilots.

18  And I did not require any finding by the jury that a

19  particular different negative result would have occurred had

20  the ALPA been loyal to its TWA union members.  All three

21  questions basically raise the same issue in one way or

22  another.

23       So, I'm going to turn it over to Mr. Fram, whoever is

24  going to argue it.

25            MR. FRAM:  With the Court's permission, Mr. Katz will

 1  argue it.

 2         THE COURT:  Either way, whoever wants to.  Or you

 3  both can take part if you want.  I'll even let Mr. Connell say

 4  something if he wants to.

 5         MR. KATZ:  Thank you, your Honor.

 6         THE COURT:  I have to have humor while you're here,

 7  come on.

 8         MR. KATZ:  With all respect, your Honor --

 9         THE COURT:  Don't say that.  That's the last time

10  today, anybody in this courtroom is going to say "with all due

11  respect."  Because, to me, when somebody tells you "with all

12  due respect," it means, I'll give you what you're due, which

13  is nothing, because you got it wrong so.

14         MR. KATZ:  The insights that you've given us about

15  the issues that ALPA has posed in its brief in support of the

16  1292(b) application, I think --

17         THE COURT:  I'm looking at the three questions.  You

18  laid them out on page one and two.

19         MR. KATZ:  Exactly.  We tried to be helpful.

20         THE COURT:  And you were.

21         MR. KATZ:  I think to some extent we captured one of

22  the concerns that ALPA has with the law as applied in this

23  case.  But I think that also underlying the other questions

24  are separate sub-issues.  One can say that one issue that

25  covers all of them is what is the correct duty of fair

1  representation standard to be applied in this case.  That

2  would be one way of phrasing it.

3          The Supreme Court has said there are three elements

4  to -- that are separate in applying the duty of fair

5  representation --

6              THE COURT:  Assume I know this.

7              MR. KATZ:  -- whether arbitrary, discriminatory and

8  bad faith.  And the discriminatory standard is out of the

9  case.

10         And one of the sub-issues is what is the proper

11 application of the arbitrary standards --

12             THE COURT:  Do you agree with me, though, that if --

13 here, you have a case of one union, in a sense, negotiating

14 with another union for the seniority integration, okay.  It's

15 not as simple as that, I understand.  There was the waiver

16 that the union did early on so it gets a little complicated.

17 But, fundamentally, you had the American pilots who would

18 benefit from, let's say, the worse possible integration,

19 stapling.  And that would be American's pilots best result.

20 And the TWA pilots who would benefit -- if there was total

21 integration.  You just took the two lists and matched them

22 right to the date of hire on one list, right?  That would be

23 the best result for the TWA pilots, right?

24             MR. KATZ:  The best result for the TWA --

25             THE COURT:  Theoretically.

```
 1          MR. KATZ:  Theoretically, the best result --
 2          THE COURT:  One list from the American, which is, in
 3   fact, what in the TWA contract that ALPA provided, I believe.
 4          MR. KATZ:  The contract provided for negotiations and
 5   arbitration by a neutral third-party to settle the integration
 6   issue.
 7          THE COURT:  Yeah, but I think it was more than that.
 8   I think there was some background that suggested what they
 9   wanted was this complete integration as you can have.
10          MR. KATZ:  The TWA pilots were seeking a variant of a
11   date of hire of integration.  They didn't --
12          THE COURT:  The American pilots, their contract, I
13   believe provided for stapling.
14          MR. KATZ:  Yes.
15          THE COURT:  I think that was actually so.
16          MR. KATZ:  In their contract --
17          THE COURT:  So, you have two unions and two groups of
18   pilots who have some very contrary issues created by this
19   merger.  In that case, ALPA had a -- it was very important for
20   ALPA -- remember, these negotiations are very, very subtle.
21   And they are tri-parte because you have to negotiate with
22   American, to some degree; you have those negotiations going
23   on, and you have the negotiation between the unions.  It's
24   very, very important that ALPA's heart beats for the TWA
25   pilots.  It wants that it has unfettered duty of loyalty to
```

1   them and will do, when it makes a decision, whether right or

2   wrong, it's making a decision in the profound belief that it's

3   the best thing for its pilots, the TWA pilots.

4        Much like a lawyer.  You know, we have conflict of

5   interest rules 1.7.  You want your lawyer to be loyal to you.

6   The client wants to feel that you're -- not only that you're

7   right, but whether you're right or wrong in a particular

8   decision, your motivation is for the client.

9        And I put out to the jury, and the theory of the case

10  tried by the plaintiffs, was that ALPA was about to lose the

11  shrinking pilot base of TWA, shrinking airline at that point.

12  They were about to lose those pilots no matter what happened.

13  And they wanted APA to -- well, they wanted American to come

14  into ALPA, to leave APA and come into ALPA.  If that's

15  American's motivation in carrying out its negotiations -- and

16  that comes to the notion of fair representation.  You can use

17  all the fancy words you want, all the tests you want, if ALPA

18  is motivated by a desire not to help ALPA but to bring the

19  newly merged airline pilots of whom a number was huge, 10,000

20  pilots something, total, if you add TWA to American --

21        MR. KATZ:  11,500 American pilots --

22        THE COURT:  One thing about Mr. Katz, he'll know the

23  numbers.

24        MR. KATZ:  2,300 TWA pilots.

25        THE COURT:  He'll know the numbers, he'll know what

1   sock sizes they wear.  If that's the case -- and I think the

2   jury found that case, that was the case presented to the jury,

3   it's really a very bad thing.

4        For instance, you phrase your first question, Where

5   union members charged that a union acted arbitrarily toward a

6   union of representative employees -- forget acted arbitrarily.

7   Acted without your best interest at heart -- can that union be

8   held to have acted arbitrarily when its advice and decisions

9   were all supported by a substantial segment of the represented

10  group and were objectively reasonable.

11       Well, the answer to that:  Based on the facts and the

12  law known at the time.

13       You want me to say the answer is obviously no.  I say

14  the answer is obviously yes.

15        MR. KATZ:  Your Honor, I'm not asking you to say the

16  answer is no.  I'm suggesting that there is a debatable

17  proposition.  The arbitrary led a duty of fair representation

18  standard --

19        THE COURT:  But that's analyzing fact.  In fact, you

20  use the word, Based on the facts and the law.

21        MR. KATZ:  Your Honor, it is a legal issue --

22        THE COURT:  It's not a legal issue.  It's a factual

23  issue.

24        MR. KATZ:  The legal issue is what is the proper

25  standard for an arbitrary DFR violation.  And it's an

 1   objective standard.  It doesn't not --

 2          THE COURT:  You throw the word "arbitrary" in.  You

 3   throw that word in.

 4          MR. KATZ:  That's one of the three bases of the DFR

 5   violation.

 6          THE COURT:  You don't want to say -- I am absolutely

 7   convinced if this case goes to the Supreme Court, they're

 8   going to say, I don't know whether it falls into the arbitrary

 9   or what word it falls within, if a union is motivated, not to

10   support its members, but to, not to offend and to, in fact,

11   recruit the other party in the negotiation, the other pilot's

12   union, that that's a breach of duty of fair representation.

13   In fact, I think the Third Circuit actually said that in its

14   opinion when it sent the case back to me.  I believe that was

15   said right in that opinion.

16          MR. KATZ:  Your Honor, I've been practicing labor law

17   for 43 years --

18          THE COURT:  I've practiced it for no years.

19          MR. KATZ:  And I would submit to you that there is a

20   proposition here that the Third Circuit may well diverge the

21   law as this Court has applied it to this case in terms of the

22   arbitrary standard for the duty of fair representation

23   violation or for the bad faith that led to the duty of fair

24   representation or for the causation led.  Those are separate

25   elements of establishing and proving a duty of fair

1  representation violation.  It is not any different from what

2  the Third Circuit has said.  The plaintiffs quoted -- they

3  actually misquoted on page seven of the plaintiff's opposition

4  brief.  They talked about this conflict of interest that you

5  asserted and --

6          THE COURT:  Let me get that, page seven?

7          MR. KATZ:  Yes.  ALPA disagrees that there is any

8  conflict of interest here.

9          THE COURT:  Well, of course.

10          MR. KATZ:  It would have been the best thing that

11  could have happened to the TWA pilots if the American pilots

12  had decided to join ALPA and come under ALPA's merger policy

13  which would have required them to arbitrate the integrating of

14  seniority pilots with the TWA pilots, but they weren't going

15  to come in and -- accepting for the sake of argument, this

16  conflict of interest --

17          THE COURT:  But that even there, you are kind of

18  turning the facts a little on their head, but what APA wanted,

19  and maybe even ALPA, was to resolve that dispute between -- in

20  other words, fix the integration, reach an agreement on the

21  integration and then bring in the APA.  So whatever the --

22  when I say that, you know, bring the pilots into ALPA from the

23  APA.  Well, at that point the integration would have been done

24  and whatever ALPA's policy on integration is would have made

25  no difference.

1        MR. KATZ:  Judge Irenas on the bottom of page seven

2   is a portion of the Third Circuit decision you referred to.

3   It talks about is ALPA facing the conflict of interest arising

4   from an active organizing campaign to bring American pilots

5   into ALPA with the knowledge and approval of ALPA.  It says

6   ALPA, but what the Third Circuit said was with the knowledge

7   and approval of the Allied Pilots Association, of APA.  And

8   there was no evidence at trial because it wasn't true that

9   there was any active organizing campaign to bring American

10  pilots into ALPA.  It was also untrue --

11       THE COURT:  You just can't say there is no evidence.

12       MR. KATZ:  There is no evidence.

13       THE COURT:  I already ruled on it.  There is

14  evidence.  All right.

15       MR. KATZ:  You referred in denying our Rule 50(b)

16  motion to events that occurred in December 2001.  The events

17  that plaintiffs are challenging occurred March and April and

18  throughout 2001 up until November 7th, 2001 when Supplement CC

19  was signed.

20       But look at the reminder of this quote that they got at

21  the bottom of page seven.

22       THE COURT:  Are you saying it was misquoted?

23       MR. KATZ:  Well, it says ALPA in the fourth line.  It

24  should say APA.  And then it says, it is premature to dismiss

25  the DFR claims if plaintiff proves their allegations that ALPA

1   failed to take specific actions on behalf of its members or

2   improper purpose or in bad faith.  And there is no trial

3   evidence that ALPA failed to take any specific action for

4   improper purpose.

5          THE COURT:  There wasn't any testimony that there are

6   certain things that they should have done?  Then maybe we

7   weren't watching the same trial.

8          MR. KATZ:  Well, the trial I saw Mike Day testified

9   that he asked Duane Woerth to start a jump seat war in

10  April 2001.

11         THE COURT:  Even before that.

12         MR. KATZ:  Well, let's talk about the April 2nd MEC.

13  The word "advising."  Were advising MEC on April 2nd, 2001.

14  Randy Babbitt, who was the administrator of the FAA after

15  having been appointed by the President, confirmed by the

16  Senate, he advised the MEC.  There is absolutely no evidence

17  in the trial record that Randy Babbitt was basing his advice

18  on an improper purpose or in bad faith.

19         Richard Seltzer, you heard him testify, a lawyer from

20  Cohen, Weiss and Simon, a bankruptcy expert, who testified

21  about what he said at the April 2nd meeting.  There is no

22  evidence whatsoever that either Babbitt or Seltzer or Michael

23  Glazer, the investment banker, were even aware of this

24  supposed effort, active organized campaign by ALPA.  There was

25  no organized campaign by anyone on April 2nd, 2001, your

1    Honor.  The Honey Bell and Clark campaign began in May, so how

2    could Babbitt or Seltzer or Glazer be aware of it.

3          There are a lot of facts in this case, I readily admit

4    that.  But the fact --

5                THE COURT:  That's a profound statement.

6                MR. KATZ:  That doesn't mean the issues we raise are

7    not legal issues.  It means that there is a record of a

8    five-week trial that supports the legal questions that we

9    respectfully submit are debatable.  We are not saying that you

10   should admit that they're wrong.  There is no question, there

11   are admitting District Judges who have certified cases after

12   being convinced that they were right about the ruling they

13   made, but they recognize that they were difficult issues and

14   this conflict of interest issue that the plaintiffs have

15   argued and this Court has accepted presents and raises a

16   debatable issue.  Can that supposed conflict of interest

17   substitute the kind of evidence the Third Circuit was talking

18   about right here.

19         The Third Circuit said we want specific actions, we

20   want proof of an improper purpose or bad faith.  They knew

21   about the conflict of interest that's referred to in the same

22   quotation, but the Court of Appeals, which was reviewing the

23   statute of limitations issue at that time says --

24               THE COURT:  The ray of hope doctrine.

25               MR. KATZ:  The ray of hope doctrine.  I think the

1    Court once referred to it as the glimmer of hope doctrine.

2    However, that may be, we think you were correct in dismissing

3    the case before, and we think that you should provide an

4    opportunity now for the Third Circuit to give us its --

5              THE COURT:  To say I was right.

6              MR. KATZ:  The Third Circuit's view of its divergent

7    it's better for all of us to find out now.  That divergent

8    from law as applied last year to the trial that we conducted

9    in June and July of last year.  It will save the Court time.

10   It will save the party's time and money.  It will be much more

11   efficient to get the answer to the question of, What is the

12   proper DFR standard to be applied to this case from the Third

13   Circuit at this point in time?

14       And while the Court mentioned the stay, we have

15   suggested in our 1292(b) brief, there is no automatic stay

16   just because you approve the application by one party to

17   request interlocutory Appellate review.  And these proceedings

18   in the District Court could go on with plaintiffs initially

19   preparing their expert report --

20             THE COURT:  But you would ask for a stay?

21             MR. KATZ:  I'm not suggesting that we would.  I don't

22   think ALPA has made that determination.  And if the Court --

23   it's within the Court's discretion as to whether to grant the

24   stay or not.  We can have parallel proceedings where the

25   damages of proceedings continue in this court and there is no

1    loss of time if we can apply to the Third Circuit and grant

2    review, each side files a brief, maybe there is argument, and

3    they render a decision, it would be prior to the time that we

4    would be completed, completing discovery and going into the

5    final pretrial preparations and the trial on damages.  So it

6    would advance the ultimate resolution of the case, calls for

7    an immediate appeal.  The issue we raised, our legal issues,

8    are not factual ones.  The question of whether this conflict

9    of interest is a substitute for evidence of bad faith

10   motivation for Mr. Babbitt or Mr. Seltzer or Mr. Glazer to

11   change his advice, whether it's a substitute for evidence that

12   made a difference to the MEC and whether that caused any harm

13   to the jobs of the TWA pilots, the advice that was rendered,

14   those are all legal questions.  It's not necessary for the

15   Court of Appeals to delve into a factual question, is this

16   witness right, or is this witness right?  The evidence is

17   there in the trial record.  The Court suggested two years ago

18   when we were here on prior application under Section 1292(b)

19   that it would be appropriate to await the completion of the

20   trial so that there would be a complete record of these events

21   for the Appellate Court to review.  We have accomplished that.

22   The trial was conducted over five weeks and that record is

23   completed.

24        So, it is an appropriate moment for the Appellate Court

25   review that we are seeking.  I guess I would just refer the

1   Court in terms of the arbitrary standard we are talking for

2   are pages 15 to 20 of our 1292(b) brief.

3          THE COURT:  I'm sorry, what page are you referring

4   to?

5          MR. KATZ:  15 to 20.

6          THE COURT:  Page 15?

7          MR. KATZ:  15 to 20 of our 1292(b) brief.

8          THE COURT:  Reply brief or the original belief.

9          MR. KATZ:  The original brief.  We discussed the

10  Supreme Court case and cases from six circuit Courts of

11  Appeals that talk about the causation requirement as framed in

12  our third issue.  And those cases differ substantially because

13  they require direct evidence that the alleged misconduct by

14  the union, that it be seriousness, that it cause a worse

15  seniority integration than would otherwise have happened --

16         THE COURT:  Or in unified trial, I wouldn't disagree

17  with you.  I would agree with that.  Obviously, even

18  comparable law thinks, you know, it's better -- a lawyer, you

19  know, commits a breach of his duty of fair representation, in

20  one way or another, at the end of the day, you have to also

21  prove that the client was damaged by it.  And I don't think

22  it's any different here.  It's just that we bifurcated it.

23         I don't disagree with that at all, showing a breach of

24  duty of fair representation without damage.  There is no cause

25  of action.  I don't disagree with that.  I don't think the

1   plaintiffs would disagree with that.  I don't know how they

2   could.  They're not in this for a $1 verdict.

3        MR. KATZ:  The plaintiffs did argue to the jury that

4   if one TWA pilot would have been moved one place higher on the

5   merged list as a result of ALPA's alleged misconduct, that

6   that satisfies the causation requirement.  It was a separate

7   requirement in the verdict form.  So, I think the plaintiffs

8   do contend that they fulfilled that element of the duty of

9   fair representation because the jury checked off the box

10  saying that some of the TWA pilots were injured by ALPA's

11  alleged misdeeds, but that's not the kind of injury that is of

12  the legal matter.

13       The Circuit Courts of Appeals and The United States

14  Supreme Court as required in these cases that we cited and

15  referenced as part of our brief, in terms of the bad faith

16  claim, the plaintiffs are saying that there are reasonable

17  inferences that can be drawn to support the jury's verdict.

18  In our view, those inferences do not amount to substantial

19  evidence of fraud, deceitful action, or dishonest conduct.

20  That's a very high standard.

21       I can refer the Court to one decision that explicates

22  the high standards that are required here.  It's the O'Neill

23  versus ALPA case in the Fifth Circuit after it was remanded by

24  the United States Supreme Court, that Fifth Circuit decision

25  addresses the bad faith requirement and explains the very high

1  standard that is required to establish bad faith.  Inferences

2  from supposed conflict of interest do not satisfy that

3  substantial evidence of fraud, deceitful action, or dishonest

4  conduct.  What was the fraud, deceitful action, or dishonest

5  conduct?  As this Court had previously recognized, everybody

6  knew from October of 2000 -- and even before then -- that it

7  was ALPA's goal to organize all of the unorganized pilots and

8  all the pilots in independent pilots unions.  There was

9  nothing wrong with that goal.  The TWA, MEC members concurred

10 in that goal when there was a resolution adopted at the

11 October 2004 director's meeting.  That's not made in defraud,

12 because American and TWA corporations agree on a corporate

13 transaction for the assets of TWA to be acquired by American

14 Airlines.  That doesn't turn something that was totally

15 proper, organized, into unorganized, into something that is

16 fraudulent, or deceitful or dishonest.  There is nothing that

17 amounted to anything like that.  And the O'Neill case in the

18 Fifth Circuit is one we would point the Third Circuit to, to

19 contrast with the law that was applied here where the

20 plaintiffs rely on inferences and circumstantial evidence such

21 as a meeting between John Clark and Duane Woerth that occurred

22 on December 6th, 2001.

23         THE COURT:  In Las Vegas.

24         MR. KATZ:  In Las Vegas, exactly.  This is a month

25 after Supplement CC has already been entered into.

```
 1        And let me just pose a hypothetical to Judge Irenas.
 2   Suppose Duane Woerth had refused the meeting or had gone to
 3   the meeting and when Clark offered some organization cards,
 4   said, We don't want your organization cards.  The plaintiffs
 5   will be claiming that was a duty of fair representation
 6   violation.  In fact, Jerry Cure, the lawyer for plaintiffs,
 7   and the allegations in the second amended restated complaint
 8   that ALPA didn't do enough to bring the American pilots into
 9   ALPA.  And it was a violation of the duty of fair
10   representation for ALPA not to have sought to have an election
11   conducted by the National Mediation Board.  And that's one of
12   the things that those cards might have been useful for, under
13   some circumstance.  So, the bottom line on that is that there
14   is a very different legal standard that the plaintiffs are
15   applying and that the Court is accepting to talk about
16   inferences which we view as not reasonable inferences because
17   they don't satisfy the long-well established Humphrey versus
18   Moore substantial evidence of fraud, deceitful action, or
19   dishonest conduct rule that has been applied by many Courts of
20   Appeals including the Fifth Circuit in the case I mentioned.
21        The arbitrary claim falls on its own weight if there is
22   no bad faith.  The arbitrary standard has been repeatedly
23   referred to by the Supreme Court as an objective standard.  It
24   doesn't have to do with the intent of the union or the union
25   officials.  It's got to do with whether there was a wholly
```

1  irrational decision made by the union.  And we submit, while

2  there are many facts at issue in this case, that the

3  undisputed facts that were adduced at trial show that every

4  decision ALPA made was reasonable, was, at least, it was to

5  use a double negative, it was not wholly irrational which is

6  the standard imposed by the Supreme Court.

7         Take the decision about a jump-seat war, and I come

8  back to that because the Court had previously recognized in

9  some earlier hearing that there was a possibility of

10 retaliation by the American pilots and that it would lead to a

11 worse seniority integration and it would only lead to

12 disruption of the industry if ALPA were to undertake a

13 jump-seat boycott.  How can one say that was wholly irrational

14 for Duane Woerth to have told Mike Day, We have a policy

15 against that.  We don't use jump-seats for political purposes.

16 And this is not anything that's going to help you.  So, he

17 said, No.  When it's based on the policy as understood by the

18 president of the union, we submit, with all respect, that

19 cannot be wholly irrational.  And the arbitrary standard as

20 interpreted by other Courts of Appeals and by the Third

21 Circuit would take a different read on that regardless of the

22 allegation of a conflict of interest in the case.

23        So, unless there are further questions, or comments, I

24 thank you for your attention.

25            THE COURT:  Thank you very much.

1          Who is going to -- Mr. Press, you're going to do it?

2            MR. PRESS:  Thank you, your Honor.

3          All three of the issues that they seek for you to

4    certify basically argue at their core that plaintiffs for one

5    of three reasons, or all three reasons, that plaintiffs did

6    not make a submissible case, that's what they're all about on

7    their efforts.  And for the Third Circuit to answer either one

8    of those questions, or all three of them, will require the

9    Third Circuit to review the entire record.

10          Now, if this is a case that is completely inappropriate

11   for a certification at this juncture, this is it.  All three

12   questions are phrased in an argumentative way and

13   mischaracterizes the evidence and argue.  All three questions

14   are factually offensive.  And, Judge, for that reason the

15   motion should be denied.

16          And the second prong of the statutory analysis wasn't

17   discussed by Mr. Katz and that's the issue of whether or not

18   this is going to materially advance litigation, the outcome of

19   litigation, that is.  It clearly argued to certify these

20   issues now for appeal would only further protract this

21   litigation, Judge.  It will not materially advance it.  The

22   Third Circuit took almost two years to decide the original

23   appeal which was a pure legal question.  And so the notion

24   that we could receive what the damage phase in the Third

25   Circuit won't rule yet before we get to the damages jury, that

 1   verdict, that's preposterous, Judge.

 2        We urge you to deny this motion.  And unless you have a

 3   question of me, I'm going to sit down, Judge.

 4        THE COURT:  Okay.  Mr. Katz, anything you want to

 5   add?

 6        MR. KATZ:  Nothing further, your Honor.

 7        THE COURT:  All right.  When was this case filed

 8   originally?

 9        MR. PRESS:  September 2002.

10        THE COURT:  2000 --

11        MR. PRESS:  Two.

12        THE COURT:  So, we're sitting here with a ten-year

13   old case.

14        MR. PRESS:  True.

15        THE COURT:  The first prong of the 1292(b) analysis,

16   of course, is the Court must find that the order presents a

17   controlling question of law which if wrongfully decided would

18   result in reversible error.  The caselaw makes clear that when

19   we talk about a controlling rule of law, they're not talking

20   about, in effect, mixed questions of fact of law, they're

21   talking about a rule where it does not require detailed

22   factual analysis.  But just where there may be a reasonable

23   difference of opinion as to what rule of law should apply.

24   Now, look at the questions:  Where union members charge that a

25   union acted arbitrarily towards a union of represented

1  employees, can that union be held to have acted arbitrarily

2  when its advice or decision were all supported by a

3  substantial segment of the represented group and were

4  objectively reasonably based on the facts -- based on the

5  facts -- and the law.  In my view, that is an intentionally

6  factual question.  You have to decide does a substantial

7  segment support any particular decision?  Was it objectively

8  reasonable?  I mean, was it objectively reasonable in a

9  particular situation not to seek an adjournment of a court

10  proceeding?  What kind of analysis is that?  That's hardly a

11  legal analysis.  To me, if a union is operating under a very

12  square conflict of interest where their loyalty is not to the

13  people they represent, but to employees of a different union,

14  even the fact that a particular decision might be -- might

15  find support as being objectively reasonable, might find that

16  it was supported by a substantial segment of a represented

17  group, still doesn't mean that it was the right decision and

18  doesn't mean that it couldn't be effected, if you will, by the

19  breach of the duty of loyalty.  And the second and third

20  also -- the second question is, Where a union has an alleged

21  conflict of interest based on its essential purpose to

22  organize employee groups, can that union be held to have acted

23  in bad faith in the absence of direct evidence that the union

24  altered its advice or decisions in a way that involved

25  intentional misrepresentations or dishonest conduct.  That, to

1    me, and once again, a detailed factual analysis.  And I'm not

2    going to read the third one because it's longer.  But I think

3    all three of these are not the kind of each square issue of

4    law.  Like the issue that sent the case back to us in the

5    first place.  Although, it wasn't interlocutory.  I think all

6    answers to all of these three questions, by the very nature,

7    involve a very detailed factual analysis of the record.

8         And to another degree, in effect, the questions were

9    framed -- that's why I say if you control the question, not

10   the answer, you're probably better off.  The questions here

11   are framed in a way to try to make them look like legal

12   issues, but they're not.  They might come down to a mixed

13   issue of fact of law to some degree, but I believe that when

14   the issue of a breach of the duty of loyalty is concerned,

15   there is no issue that, in my view, they're trying to use --

16   the defendants are trying to frame the question in a way to

17   make a breach of the duty of loyalty, not a breach of the duty

18   of fair representation, unless there are things like dishonest

19   conduct, intentional misrepresentation.  I don't think that's

20   the case.  I think, in and of itself, a union which is

21   motivated by a loyalty to a group with whom its own members

22   are negotiating, has breached the duty of fair representation.

23   Again, I think at the end of the day there has to be damages.

24   But even in this case, our jury decided that if that duty of

25   loyalty hadn't been breached, at least some of the pilots

1   would have done better in their negotiations for integration

2   with American pilots.

3        I really don't have to do the second three, but the

4   second is that the order offers a substantial ground for

5   difference of opinion as to its correctness.  I don't accept

6   that.  I don't accept that there is a reasonable ground for

7   difference.

8        And, finally, if the appeal immediately will materially

9   advance the ultimate determination of the litigation.  I don't

10  believe that.  I don't believe that for a minute.  It's a

11  ten-year old litigation, another two years at the circuit

12  isn't going to help this litigation.  And we're better off

13  pushing it to a conclusion and letting the circuit have a

14  whole record and dealing with it.

15       I'm going to deny the motion for a Section 1292(b)

16  certification and proceed to bring this case to a conclusion.

17       Now, having ruled against the defendants on that issue,

18  the plaintiffs, you got a difficult road to hoe.  I think

19  we're all ready, are we not, past the date for the expert

20  reports?

21            MS. RODRIGUEZ:  No, Your Honor.  The original date

22  was August 6th.

23            THE COURT:  For the file -- but you're not going to

24  meet that date?

25            MS. RODRIGUEZ:  We're not going to meet that date.

```
 1          THE COURT:  Well, you know, this case is very old.
 2   The theory of the case, meaning the theory that you argued,
 3   and that the jury adopted, meaning the breach of the duty of
 4   exclusive loyalty to the TWA pilots.  You've known that theory
 5   now for years and years and years.  It's not like it was like
 6   the theory changed at the last minute and then you suddenly
 7   were faced with a new theory of liability.  You got to come
 8   forth with your expert.  You have to show me, and the other
 9   side, as to how you're going to prove your case.
10          MS. RODRIGUEZ:  And we're working on it.
11          THE COURT:  Because I'm sitting here now, and I can't
12   figure it out.
13          MS. RODRIGUEZ:  Your Honor, we're working on that.
14          THE COURT:  Well, I know "we're working on it."
15          MS. RODRIGUEZ:  As your Honor knows discovery on the
16   damage phase was stayed until May 4th.  So, actually --
17          THE COURT:  But that -- maybe you need some
18   discovery, I'm not saying there isn't some discovery, but the
19   simple matter is you know what the theory is.
20          MS. RODRIGUEZ:  We know what the theory is.
21          THE COURT:  And you know a lot of the facts.
22          MS. RODRIGUEZ:  We do.
23          THE COURT:  I'm not saying there isn't maybe a nook
24   or cranny in discovery that's needed, but, I mean, this case
25   has been well explored by both sides.
```

1          MS. RODRIGUEZ:  Your Honor, our experts are in the

2    process of putting together a "but for" seniority list.  "But

3    for" the breach of ALPA, this is what a reasonable --

4          THE COURT:  And, by the way, Vulcan doesn't -- Vulcan

5    One or Two, I'm not totally persuaded by Vulcan.  Vulcan is a

6    nonjury case, I believe.

7          MS. RODRIGUEZ:  It was a nonjury case.

8          THE COURT:  It was a nonjury case.  Because a jury

9    case which alone, as Mr. Fram pointed out in one of his

10   papers, makes a big difference.

11         MR. FRAM:  It was a Title Seven case, your Honor.

12         THE COURT:  And the Supreme Court, I think, has since

13   said that the theory they used is not only limited to Title

14   Seven cases but limited to even a subspecies of Title Seven

15   cases, I believe.

16         MS. RODRIGUEZ:  I think what the takeaway from Vulcan

17   and Duke is that -- at least as to the mitigation part of the

18   case -- that has to be presented.  That the defendants have to

19   have a chance to test mitigation separately, that's why we

20   proposed a --

21         THE COURT:  Yeah, but where do -- you seem to suggest

22   that I take away from the jury, for instance, the mitigation

23   issue.  How can I do that?  How can I take it away from the

24   jury?

25         MS. RODRIGUEZ:  Perhaps, you don't take it away from

1    the jury, but in the first instance, you have to have the "but

2    for" list.  And the defendants have been talking all along

3    that they don't know who damaged, who is high, who is low, and

4    once you have that list, you will know who has been damaged

5    and who hasn't been damaged, because there will be people at

6    the top of the list that were reasonably integrated and there

7    will be people at the bottom of the list that would have been

8    furloughed regardless.  So, you'll have those people on either

9    end of the list --

10           THE COURT:  You mean, you'll concede that point, is

11   what you're saying?

12           MS. RODRIGUEZ:  And we've always conceded that point.

13           THE COURT:  There are some people in the, quote,

14   class who there won't be a damage claim.

15           MS. RODRIGUEZ:  Because they're either too low or

16   they were high enough that they were integrated in a

17   reasonable fashion.  So, you'll have that list and then

18   they'll know who the damaged members of the class are.

19        So, that's step one.

20           THE COURT:  Well, when is step one -- since we can't

21   go to step two without step one, when is step one going to be

22   completed?

23           MR. PRESS:  Judge, we deferred this so that I could

24   report back to you on the status of American Airlines document

25   production to us which is crucial for our damage model in that

1   when we reassigned TWA pilot with a new seniority number, we

2   are going to use the actual earning of the person in that

3   seniority slot for our assumed earnings for that pilot.  It's

4   the best data there is for that.

5          We are trying to eliminate as many assumptions from our

6   model as possible so that we have less quarreling with the

7   other side.

8          I spoke with the lawyer yesterday.  He said --

9          THE COURT:  The lawyer?

10         MR. PRESS:  The American Airlines lawyer yesterday.

11  He told me we should have the data this week in an electronic

12  format that our expert is going to be able to use.

13         Our experts have told us that if that happens, we --

14         THE COURT:  This is the bankruptcy lawyer?

15         MR. PRESS:  It's their general counsel in Washington

16  D.C.

17         MR. KATZ:  Your Honor, if I may, I got an e-mail from

18  the lawyer.  The name is Jonathan Fritts, F-R-I-T-T-S.  He's a

19  partner with Morgan, Lewis and Bockius in Washington, D.C. or

20  labor counsel for American Airlines, and have been back in

21  2001.  And what he said in the e-mail was that he talked to

22  Allen and that American was prepared to produce this week some

23  of the data that had been requested by the plaintiffs and by

24  ALPA, because we've subpoenaed American to produce information

25  as well.  But as other information, including the wage

 1    information, the W2 earnings for the individual pilots, he did

 2    not give any anticipated time of arrival to that data.

 3              THE COURT:  You sound like a baby.

 4              MR. PRESS:  But the data that they are going to

 5    provide this week is sufficient for us.  Our purpose is to get

 6    a good start and get our experts going.  And, Judge, they have

 7    assured us that they can have reports by the end of September.

 8    So that's what we're here to report to you today.

 9              MR. FRAM:  Your Honor, if I can ask for a

10    clarification --

11              THE COURT:  Ask it from me?

12              MR. FRAM:  From plaintiff's counsel.

13        The outstanding directive requires all the plaintiffs

14    expert reports with respect to damages, and I think what

15    counsel commented is that they're going to have a "but for"

16    list, I just want to be clear that the reports we get at

17    whatever date are all of their reports.  But for damages, the

18    whole kit and caboodle so that we know what we're looking at.

19              THE COURT:  Well, the one thing that won't happen, of

20    course, is mitigation.  They're not going to prove mitigation

21    for you.

22              MR. PRESS:  That was not our intent.

23              MR. FRAM:  That I appreciate, but in terms of --

24              MR. PRESS:  By the way, can I interrupt.  Failure to

25    mitigate has not been pleaded, it's not an issue that's framed

 1  in the pleadings in this case.  So I just wanted to alert the

 2  Court to that.

 3          MR. FRAM:  Your Honor, we'll move to amend if there

 4  is any question about it.  We raised that repeatedly.  Of

 5  course, the case was bifurcated.  We were focusing on

 6  liability issues.  I don't think anybody even thought about

 7  the issue of mitigation.  In fact, the facts that pertain to

 8  mitigation, or the lack thereof, didn't even exist at the time

 9  the case was commenced.

10          So, if we need a formal motion, we'll certainly make it

11  on appeal.

12          THE COURT:  I'm not going to advise that.  You have

13  to make your own decision on that.

14          MR. FRAM:  But we're not asking for the plaintiff to

15  prove mitigation for us, your Honor.  What we're asking to

16  do is to produce --

17          THE COURT:  Clearly, that would be your burden.  If

18  you wanted to challenge on the mitigation basis, that's your

19  burden.

20          MR. FRAM:  We'll, of course, need information from

21  the class to get into that issue.  So we will need some

22  discovery.  But my point is that I just want to be clear from

23  the plaintiff's perspective, your Honor, that whatever expert

24  reports they intend to rely upon will be provided by whatever

25  date the Court sets.  And that we're not going to have a

 1   multi-step process, which I think is what counsel may have

 2   been suggesting.  We're going to get a "but for" list by a

 3   certain date and then on some other date in the future, we're

 4   going to get actual calculation and numbers.

 5          So, I would appreciation the clarification on what

 6   we're going to get by whatever date the Court sets.

 7          MR. PRESS:  It was our intent to provide by

 8   September 30th the re-created seniority list with the "what

 9   if" earnings if each TWA pilots had been in that spot.

10   Those --

11          THE COURT:  You have the data for that?

12          MR. PRESS:  Yes.  Assuming --

13          THE COURT:  He's suggesting you won't.

14          MR. PRESS:  Assuming the American Airlines lawyer is

15   not misleading us or is mistaken himself, we will have that

16   data.

17          THE COURT:  Including W2s.

18          MR. PRESS:  No -- yes.

19          THE COURT:  From the American?

20          MR. PRESS:  From the American pilots.  What we won't

21   have is the information to apply a setoff for the class

22   members interim earnings.  We will not have that data by

23   September 30th, but we will have the first two components of

24   the damage model which are the two most critical for the

25   defendant to be able to analyze and see what our case is

1    about.

2          MR. FRAM:  Your Honor, the interim earnings is not a

3    question of litigation that's something plaintiffs have to

4    account for in their damages calculations.  And we were

5    anticipating they would have that information.

6          So, it does sound to me like --

7          THE COURT:  That information is in your control?

8    That's your client's base, isn't it?

9          MR. PRESS:  Judge, we would have to send notice to

10   the class members.  First, we have to identify the damaged

11   class members, who are they?  Who should be giving us their

12   W2s and tax returns.  We won't have that until the end of

13   September.  So, we would suggest, we will disclose the "what

14   if" seniority list, the "what if" earnings, that gives them --

15   that's where the battle is, that's where the attack is.  When

16   we re-create the seniority list, that's where they're going to

17   jump up and down say, it's ridiculous.

18         THE COURT:  Maybe they'll agree with you.

19         MR. PRESS:  It could happen.  I would welcome that.

20   But for us to then supplemental the report, to just simply

21   report what the damaged class members earned in the interim

22   period, that's not going to be something I hope that there is

23   a lot of debate about.  It's a matter of just summarizing tax

24   returns and subtracting from the "what if" earnings to the

25   actual interim earnings and coming to a net number.  That's

1    simple.  That's math.  So, we would suggest that we have that

2    data by January.

3              MR. FRAM:  Your Honor, may I.

4              THE COURT:  Yes.

5              MR. FRAM:  The information that counsel refers to,

6    interim earnings, that's information that we've already asked

7    for in written discovery.  Just to keep this process moving,

8    you may recall from the last hearing we sent them basic set of

9    interrogatories and a basic document request.  We would have

10   that type of area information for the class members for whom

11   we seek damages so we are hopeful -- we anticipate they are in

12   the process of gathering that now.  And we anticipate that --

13             THE COURT:  I don't get that.  I don't think that's

14   the case.

15             MR. FRAM:  Well, then we're going to --

16             MR. PRESS:  Judge, we just got the class list last

17   week from the defendant.  We could not have done it,

18   physically could not.

19             THE COURT:  Am I correct.  They haven't done it.

20             MR. FRAM:  I don't understand what counsel just said

21   about just getting the class list.  They had the list of

22   pilots as of April of 2001 for years and years.  I don't

23   understand that comment at all, but there is basic information

24   that we need.  And I'm very, I guess, troubled is my word

25   about the prospect that we're not going to see that until

1   January.  That really slows this process down.  Perhaps,

2   counsel could tell us what they are doing in the interim to

3   try to gather that information.  I can't imagine why it would

4   be taking another seven months.  I'm sorry, another

5   five months.

6         THE COURT:  And the slowness really bothers me.  I

7   don't disagree with you.

8         MS. RODRIGUEZ:  Judge, with regard to the class list,

9   to any answer any questions you may have.  When we had the

10   class certify and send out notice when the case got remanded

11   to your Honor, one of defendant's motion they were adament

12   about was the class not be given access to the class list,

13   that it stay with the claims administrator.  That any

14   identifying with the class members or giving the list, only go

15   to that.  And it was issue that your Honor ruled on it, and we

16   didn't push on it.  That's why when discovery started again,

17   it was important for us.  And we asked for the class list in

18   December.  We got it a couple weeks ago.  But notwithstanding

19   that, if this going to be done correctly, it should be done

20   more systematically than just randomly -- two things.  Mr.

21   Press is correct.  That it's only going to -- the W2

22   information or the tax --

23         THE COURT:  It will be the middle group.  It won't be

24   the top group or won't be the bottom group.

25         MS. RODRIGUEZ:  It will be a subset of the group.

 1   And until we get the list, we don't know who that list is,

 2   number one.  And, number two, it should be a court approved

 3   class notice that goes out to those class members so that

 4   there is a process that can be challenged if need be going

 5   forward if there is a problem with it instead of randomly

 6   saying, you know, here's my letter, give me your tax returns.

 7   And then having an issue down the line when there hasn't been

 8   a process, because your Honor is the fiduciary for these class

 9   members.  We are as well, but it should be in a class notice.

10   That's why the schedule that we anticipated would have our

11   expert reports in January 30th.  Right after the expert

12   reports, or in, I guess, doesn't need to even wait for the

13   expert reports, but a motion for protective order because much

14   of what defendants sought in their discovery included things

15   like job applications.  And I think that's more far afield

16   than they're entitled to even in a mitigation phase.

17        So there has got to be a culling so that the class

18   isn't -- we're not picking up the phone and saying, okay, now

19   we need this, now we need that.  So the motion for protective

20   order has to be somewhere in this process.

21        As I said, that doesn't necessarily need to wait until

22   the expert reports are produced at the end of September, but a

23   motion for protective order, and we'll get some rulings on

24   exactly what they're entitled to.  And then a real class

25   notice that goes out to those people once the expert report is

```
 1   produced.  And I guess the class notice could be -- we can
 2   file a motion for a class notice at the same time that we file
 3   a motion for protective order -- for approval of a class
 4   notice at the same time we file a motion for a protective
 5   order.
 6           THE COURT:  Your view is that the "but for" list, if
 7   that's what you want to call it, is going to be ready
 8   September 30?
 9           MS. RODRIGUEZ:  Yes.
10           THE COURT:  And the report that shows what
11   methodology was used.
12           MS. RODRIGUEZ:  Yes.
13           THE COURT:  To create that list.
14           MS. RODRIGUEZ:  Yes.
15           THE COURT:  What do you see happening after that?
16           MS. RODRIGUEZ:  After that --
17           THE COURT:  Take depositions, going to be
18   depositions.
19           MS. RODRIGUEZ:  I would imagine.
20           THE COURT:  You don't really need the calculations of
21   the offsets for the experts.
22           MS. RODRIGUEZ:  For the depositions, I don't believe
23   so.  So then the defendants can have our experts' depositions
24   and identify their experts.
25           THE COURT:  Then what happens?
```

```
 1          MS. RODRIGUEZ:  Then, well, we had proposed that the
 2   defendants would disclose their expert reports by
 3   November 30th; supplemental reports for -- based on the
 4   interim earnings, be produced by January 15th; Daubert motions
 5   by February 15th; and then joint final pretrial order at your
 6   Honor's discretion.
 7          MR. FRAM:  If I may --
 8          MS. RODRIGUEZ:  The Daubert motions could be moved
 9   up, but in the interim, supplemental reports of January 15th.
10   The Daubert motions could be on the heels of that.  Doesn't
11   have to be a whole month later.
12          MR. FRAM:  The names of the TWA pilots were class
13   members, that was an exhibit at trial.  I think what counsel
14   is indicating that they may have not have had the addresses
15   for those people.  My understanding is that that information
16   is available through American.  As your Honor recalls, these
17   former TWA pilots became American pilots.  So American is
18   going to have --
19          THE COURT:  Some of them became American.
20          MR. FRAM:  Some of them.  But American is going to
21   have more up-to-date information in many cases, perhaps not
22   all than ALPA.  But as far as the identity of the people that
23   have known that, I understand there is an issue about
24   contacting them.  What I'm still hearing, your Honor, is that
25   we're going to get a "but for" list by the end of September
```

1    but there won't be numbers.  We're not going to get the

2    numbers in the damage claim with respect to the pilots they

3    claim were injured.  I think --

4            THE COURT:  Well, you'll get the gross number without

5    offsets.

6            MS. RODRIGUEZ:  Yes.  There'll be an aggregate

7    number.

8            MR. FRAM:  But are we going to get that aggregate

9    number in --

10           THE COURT:  How can you get an aggregate number

11   unless you know what the offset was.

12           MR. PRESS:  We'll have "what if" earnings tied to

13   that "what if" seniority list.  We will not have the --

14           THE COURT:  You'll have the offset for what they

15   actually earned during that period doing whatever they were

16   doing even if they were artists or whatever they choose to do.

17           MR. FRAM:  Or investment bankers --

18           THE COURT:  That's what I mean, investment bankers,

19   pilots.

20           MR. FRAM:  So, your Honor, those are not damage

21   figures.  That's not a damage number that's admissible or that

22   they can rely upon.  So we are talking about a two-stage

23   process.  Where we're not going to get their true expert

24   reports and numbers until some point later.

25           THE COURT:  Yeah, but if they're true expert reports

1  in a sense that once you determine their view of where the

2  integration should have taken place or how it should have

3  taken place had there been no breach of the duty of fair

4  representation and their methodology for getting there, the

5  question of what the offsets are for actual earnings during

6  this period -- not saying mitigation, just actual earnings

7  during that period, it's just mathematical calculation.  I

8  mean, it's not --

9           MR. FRAM:  It's not, your Honor.  I'll tell you why.

10          THE COURT:  Please tell me why.

11          MR. FRAM:  Suppose the argument is that a pilot who

12  was furloughed, say, the pilot was Number 1500.  That pilot

13  really should have been Number 1300.  Number 1300 was also

14  furloughed.  It's not going to be meaningful to say that 1500

15  would have moved up to 1300 done better.  He might have done

16  better being furloughed at an earlier point than the pilot

17  1,300 who was furloughed later.

18       There is a lot of complexity here, your Honor.  And the

19  idea that by creating "but for" list that you can even get

20  close to what the potential damages are, what the claims

21  damages are, in our view, is wrong.  And I'll tell you we

22  spent a lot of time --

23          THE COURT:  But that may be an attack on their expert

24  report but --

25          MR. FRAM:  Your Honor, if they need the time that's

1    fine, I just want to be clear we're not going to be in a

2    position to submit our own expert reports to literally critic

3    theirs until we have the final analysis.  The "but for"

4    analysis that will give us the ability to depose those experts

5    and probably will need to take some fact discovery at that

6    point.  But we're not going to get the actual numbers until

7    later, so I hope counsel is not suggesting that we're going to

8    have to prepare and submit our expert reports on a number of

9    issues within 30 days after getting their actual number which

10   I think they proposed was January 15th.  We're going to see

11   those numbers, that is going to include all the interim

12   earnings and alike, for the first time on the 15th of January

13   under that schedule.  We do have an issue with mitigation.  I

14   think based upon the discussion that were filed, and counsel

15   will consent a formal motion to raise failure to mitigate.

16   They put it out that we filed our answer six or seven years

17   ago, and we didn't raise mitigation as an affirmative defense.

18          THE COURT:  You did.

19          MR. FRAM:  We did not.  At that point in time, we

20   were focusing on liability issues, your Honor.  And we weren't

21   permitted to take discovery with respect to damage issues.

22   And we haven't been to date.  So --

23          THE COURT:  Well, you certainly weren't blocked

24   raising mitigation in your original answer?

25          MR. FRAM:  Your Honor, we weren't, but it would have

1  been meaningless, because many of the facts that we believe

2  exist that would have supported mitigation, didn't even exist.

3  We'll make the motion --

4       THE COURT:  Yeah, but mitigation is a fairly obvious

5  thing that becomes an issue.  You couldn't modify it in any

6  way but --

7       MR. FRAM:  Your Honor, given how obvious it was,

8  we're surprised to hear a suggestion from the other side that

9  they may object to our raising it.

10      THE COURT:  That's a clever way of turning it around.

11  I like it.

12      MR. FRAM:  Thank you, your Honor.  I have to order

13  the transcript now.  In any event, we're fine with part of

14  their schedule, but we're going to need the ability to take

15  back discovery.  We'd like to start with their experts'

16  depositions after we get the "but for" report and take some

17  fact discovery; and then I think the way to do this, your

18  Honor, is after we get their report that has numbers,

19  including the interim numbers, is to have a management

20  conference.  At that point we should be in a position to

21  advise the Court and plaintiff's counsel what we agree or

22  disagree with and talk to the Court about how much time we

23  think we need.

24      We are prepared to go ahead, as I say, in the interim

25  with certain fact discovery that we think is helpful.  We do

1   want counsel to respond to the extent they can to some of the

2   written discovery.  We do have the named class

3   representatives, your Honor.  I think we'd like the

4   opportunity to take their depositions as we typically do in a

5   class case.

6         With respect to damages, I think we can wait until

7   after September 30th to do that.  There are depositions that

8   we think we need to be taken.

9         THE COURT:  What discovery do you want from the class

10  reps?

11        MR. FRAM:  We think there probably is case studies in

12  terms of what they were able to do or not do in terms of

13  interim earnings or mitigation and alike.  So we think they're

14  parties --

15        THE COURT:  You think you have to wait until you get

16  their expert's report?

17        MR. FRAM:  We can probably do it before, if there is

18  no objection to that or if the Court thinks it's helpful.  I

19  don't have a problem with that.

20        So, we can certainly schedule that later this month or

21  in September.  But there are depositions, your Honor of the

22  American pilots, the APA witnesses that we think are going to

23  be necessary.  There is discovery from American Airlines some

24  of which you're getting.  So, there is a lot that can be done,

25  your Honor, between now and January.  We're willing to go

1    ahead and do it, but we just want to be clear that until we

2    see the bottom line --

3           THE COURT:  What do you think that can be done

4    between now and September 30th?

5           MR. FRAM:  We could probably take the depositions of

6    the day class rep.  We can probably start to take some of the

7    depositions of the American and APA witnesses.  We may be able

8    to do that.

9           Paper issues are important.  We'd like to get answers

10   to the extent there is -- they can be provided to our written

11   discovery.  But we're happy to work with -- sit with counsel

12   and try to work out a schedule.

13          Your Honor, one of the odd things about this case, and

14   this is an artifact of bifurcation, of course, is that we

15   haven't really gotten into any damages of discovery at all.

16   We don't have Rule 26 disclosures from the plaintiffs.  We're

17   not preparing that to a typical joint discovery plan in this

18   district.  We're doing this a little bit on the fly.  So we

19   would like to think about what we can do between now and

20   September 30th.  But certainly the depositions, your Honor, of

21   the class reps and their documents that relate to these

22   issues, because even though what happened to them, or didn't

23   happen to them, may not be representative of whether or not --

24          THE COURT:  Slow down.  You think you can do the

25   class rep deps before September 30th.

```
 1          MR. FRAM:  Yes, Your Honor.

 2          THE COURT:  What else do you think, specifically?

 3          MR. FRAM:  Some depositions, your Honor, of American

 4  witnesses and Allied Pilots witnesses.

 5          THE COURT:  How many are you talking about?

 6          MR. FRAM:  I'm thinking somewhere in the range of

 7  five to 10 would be feasible.

 8          THE COURT:  What else?  Anything else you think be

 9  done in that period?  Paper discovery of any kind?

10          MR. FRAM:  I think we can do some paper discovery.

11          THE COURT:  Which is?

12          MR. FRAM:  Production of documents to the extent it's

13  available.

14          THE COURT:  What kind of documents?

15          MR. FRAM:  Tax returns, W2s.

16          THE COURT:  On who?

17          MR. FRAM:  With respect to certainly the named class

18  reps.  And then any other pilots whom the plaintiffs can

19  provide.

20      As your Honor may recall, we have at this point, I

21  think it's five named class reps, but we have many other

22  pilots some of who testified at trial who have been active in

23  the case.  And we are assuming certainly there is a summary of

24  pilots for whom the plaintiffs had been in regular

25  communication and for whom they can get that type of
```

1  documentation.  So, to the extent -- unless they're willing to

2  set aside some of those pilots and stipulate that they have no

3  damaged claims, then we think it would be helpful to get that

4  discovery as well.  And having that information, again, your

5  Honor, would be helpful to us in projecting forward in terms

6  of what else we need and how we can start to prepare our case.

7       I think Mr. Katz has a question.

8       MR. KATZ:  Yes, your Honor, in terms of clarifying

9  Mr. Fram's comments, I have a question I'd like to ask

10 opposing counsel through the Court, one or two questions.

11      THE COURT:  Go ahead.

12      MR. KATZ:  First, they have provided us a designation

13 of two experts.  I just want to establish a true or false, are

14 we going to get the reports from both of these people by

15 September 30th or just one?

16      MR. PRESS:  You'll get whatever reports either one of

17 those gentleman prepare by September 30th.

18      THE COURT:  Well, that's no answer at all.

19      MR. PRESS:  I don't know if he's trying to get me to

20 commit on who the expert is.

21      THE COURT:  That's not an answer.

22      MR. PRESS:  No.  No.  If we intend to call --

23      THE COURT:  Whatever you have, you'll give him which

24 might include nothing.

25      MR. PRESS:  If we intend to call either one of them,

1    we will have a report provided to the defendant by that date.

2         MR. KATZ:  And if they don't provide a report by that

3    date, then they won't call that person.

4         THE COURT:  Is that what you're saying?

5         MS. RODRIGUEZ:  Yes.

6         MR. PRESS:  Yes.

7         MR. KATZ:  As a follow-up to that, we heard a

8    description from counsel for the plaintiffs of what this "but

9    for" list is going to be.  And my question is, when we get

10   this list, is it going to show the projected earnings for each

11   pilot by name, or is it just going to be a gross number for

12   the entire group for whom they are claiming damages?

13        MR. PRESS:  Our intent is to do that by name.

14        MR. KATZ:  So we would get individual amounts that

15   the pilot should have earned.

16        THE COURT:  You can put, you can say -- Mr. Press,

17   you can say, all right, this pilot had they not been the

18   breach, this is the order, you know, this TWA, Joe Smith, TWA

19   pilot, would have been 1112.  Joe Jones would have been, you

20   know, 1100 something.  But that doesn't necessarily -- that

21   doesn't say what the earnings would have been.

22        MR. KATZ:  No, Your Honor.  That's my question to Mr.

23   Press.

24        THE COURT:  You follow me?  The fact that somebody

25   who wound up, let's assume, it's 1400 on the list would now

1  been 1100 on the list --

2       MR. PRESS:  We would assign each class member damages

3  based upon the American pilot in his or her position actually

4  earned.  That's what we would intend to do.

5       THE COURT:  So, you would account, for instance,

6  let's assume somebody should have been 1100, who turns out was

7  1500, then you now determine they would have been 1100, you

8  just look at what the American pilot 1100 actually earned.

9       MR. PRESS:  True.  Precisely.

10      THE COURT:  Assuming he was furloughed.  Whatever he

11  wound up earning that would be assigned to the panel Joe Jones

12  from TWA who is moved from 1400 to 1100.

13      MR. KATZ:  And we're going to learn that on

14  September 30th.

15      MS. RODRIGUEZ:  Your Honor, that's basically --

16      MR. PRESS:  There may be a deduct.

17      THE COURT:  I understand there is inherently a deduct

18  for what that pilot actually earned during that period, even

19  for non flying.  I mean, earned as a bartender or whatever he

20  or she earned.  I understand that.  And I think I understand

21  that you don't plan to have that by September 30th.

22      MS. RODRIGUEZ:  And it may not be quite as -- there

23  may be some regression analysis done within that -- within

24  that category, like Pilot Number 17 may now be Pilot Number 2

25  and it may not -- our expert is still working on it.

1          I don't want to come in here two months from now and

2    say, They sat here and told us A, B, and C.  It's in the

3    process of being done, and there are some components of --

4          THE COURT:  Well, boy, you better figure out what it

5    is you're conceptually going to show.

6          MS. RODRIGUEZ:  Our expert can tell you what they're

7    going to show, your Honor, but --

8          THE COURT:  You had this case and you had this theory

9    of liability for a long time now.

10         MS. RODRIGUEZ:  We're going to have the numbers in

11   January.  I mean, in September.

12         THE COURT:  I'm not saying now if the numbers aren't

13   there, I'm going to strike the whole thing.  But I want to --

14   I got to move the case.  You have to come up with a theory of

15   liability.  And you, at the very least, have to show, very

16   least, where you say the integration, how it would have taken

17   place, the "but for," if you will, list.  You have to show the

18   pilot who is 1412 should now have been 1127.  Instead of 800

19   should have been 600.  You got to, at the very least, do that.

20         MR. PRESS:  We will.  We can and we will.  And Judge

21   we will take every effort to expedite this, believe me.

22         MR. FRAM:  Your Honor, in terms of the schedule, can

23   we proceed with the discovery on the --

24         THE COURT:  What I'd like to do -- I think the more I

25   bite off, the more I'm going to wind up in revising it three

```
 1    days later or whatever.

 2         I want to set the date for their report.  Your singular

 3    or plural, report or reports, on the 30th.  But, again, from

 4    Mr. Katz's point, if you don't intend to use the person, I

 5    don't care if you get the report, but anybody you intend to

 6    use as an expert, that their report should be September 30th.

 7    And it should, at the very least, be a "but for" report

 8    meaning this is where they would have been had the two things

 9    been stapled, absent, but for, a breach of the duty of fair

10    representation.  And without regard to offset by actual

11    earnings shows what they would have earned in gross from

12    American had they been in that better number.  That at the

13    very least, I think we should have by September 30th.

14         I think that defendant should have the right to depose,

15    let's assume, for no more than four hours, it's five, right.

16         MR. FRAM:  I think it's five.  It's changed a couple

17    of times.

18         THE COURT:  We reduced the number.

19         MR. FRAM:  We did, your Honor.

20         THE COURT:  Whatever the number is.

21         MR. PRESS:  It's five.  What can they conceivably

22    talk about for four hours at this point in the case?

23         THE COURT:  Well, I didn't say it had to be four

24    hours long.  I just -- I don't want to cut off arbitrarily,

25    look, anybody feels being oppressive, call me up right then
```

 1   and there from wherever you are, where you're taking them.

 2   And then I think you should have the right -- if you're going

 3   to want to take five of their people -- or they want to take,

 4   I don't know, do you want to take any of their people?

 5            MR. PRESS:  Sitting here today, we don't have anybody

 6   in mind to depose about.

 7            THE COURT:  Would you like to take five of American

 8   or APA people?

 9            MR. FRAM:  Both.

10            THE COURT:  Either American or APA?  That's

11   different.  APA is not in bankruptcy, American is.

12            MR. FRAM:  We would subpoena the individuals.  I

13   don't think the --

14            THE COURT:  They will all be subpoenas, none of them

15   are your clients?

16            MR. FRAM:  Yes, exactly.

17            MR. PRESS:  Judge, can you -- or maybe they will

18   agree to disclose who these third-party witnesses are, because

19   I don't know who they are.

20            MR. FRAM:  We will.  We will obviously serve

21   deposition notices and give counsel notice.

22            THE COURT:  It may wind up being more than five some

23   day, I just wanted to get something started that's reasonable

24   to do.

25            MR. FRAM:  So we can take the depositions of five

1   and/or American and APA witnesses?

2            THE COURT:  Right.

3            MR. FRAM:  We'll coordinate with counsel.

4            THE COURT:  Coordinate the dates.

5            MR. FRAM:  Of course, your Honor.

6            THE COURT:  Ten witnesses, at four hours, I don't

7   think it will take four hours, but even if it did took to the

8   second, it's four weeks.

9            MR. FRAM:  The APA and American witnesses may be

10  longer than four hours.  I was assuming we --

11           THE COURT:  Why is that?

12           MR. FRAM:  Remember, Jeff Brundage, your Honor, we

13  need some time I think to get him to address a number of

14  topics --

15           THE COURT:  You mean because he's evasive.

16           MR. FRAM:  No, because he knows a lot of the

17  importance of the case.  So our assumption is --

18           THE COURT:  Still going to limit it to four hours.

19  If somebody wants to make an application after four hours to

20  extend it, call me on the telephone.

21           MR. FRAM:  For planning purposes that may be a little

22  difficult, your Honor.  Are you comfortable with letting us go

23  with just the one day for seven hours.

24           THE COURT:  Just for Brundage?

25           MR. FRAM:  Just for American and the APA witnesses.

```
 1            THE COURT:  No, I'm sticking to four hours.

 2            MR. FRAM:  All right.

 3            THE COURT:  I think you can get a lot of information

 4   from somebody in four hours with proper questioning.  But if

 5   you come up towards the end and it looks like you need more,

 6   just let me know what day you're going to be so I can make

 7   myself available and tell me how to reach me for extending it.

 8            MR. FRAM:  Thank you, your Honor.

 9            THE COURT:  So, that's all I'm going to try to

10   accomplish by September 30th.

11            MR. FRAM:  How about documents with respect to the

12   class reps we're going to depose.  We are focused on damages.

13   We did ask for interim earning, other information about them.

14            THE COURT:  Unless you let me know, what is that you

15   want?

16            MR. FRAM:  We want to know what they were doing

17   during any period they were furloughed.  And if they were not

18   working, what they were doing to try to find work.  I have a

19   document request.  I don't know that you want me to give it

20   up.

21            THE COURT:  Not for every pilot in the American

22   group?

23            MR. FRAM:  No, starting at this point, just for the

24   five depositions we are going to take for four hours or less,

25   four hours or less.  Just focusing on the names and class
```

1    reps, your Honor.

2            MR. PRESS:  That deposition should take 30 minutes,

3    Judge.

4            THE COURT:  First of all, I don't think -- that

5    information, that can be provided without a doubt.

6            MR. PRESS:  Interrogatories.

7            MR. FRAM:  Once we get the written information, it

8    may even take a shorter deposition.

9            THE COURT:  You're basically saying you want the

10   actual work history of the five class reps?

11           MR. FRAM:  Exactly.

12           THE COURT:  I don't know what exact dates are, but

13   from predetermined dates.  And I have no objection to that.

14           MR. FRAM:  Precisely.  It may be, your Honor, if we

15   get that, we don't even need depositions.  But if we do,

16   there'll be limited as your Honor has directed to four hours.

17           THE COURT:  Yeah.

18           MR. FRAM:  Okay.  I think that gives us what we can

19   accomplish to move this ahead by September 30th.

20           THE COURT:  I'm trying to see what we can get done by

21   September 30th and then I'll setup a conference the first week

22   of October and go from there.

23       I got to have the -- the fundamental methodology of

24   computing damages, is still a mystery to me.

25           MR. FRAM:  Yes.

```
 1            THE COURT:  I really mean that.  I'm trying to think
 2   if I were a lawyer, what would I be thinking.  How would I go
 3   about doing that.  And I can't say that my lights are popping
 4   up all over my head, how I would do it.  But econometrics I
 5   guess is not my field.
 6            MR. PRESS:  Two points, Judge.  As to these
 7   third-party witnesses, can you ask, or order, the defendants
 8   to supplement their Rule 26 disclosures.  I just don't want to
 9   be surprised with a new witness that wasn't deposed in the
10   next 60 days down the road.  They should amend Rule 26.
11            THE COURT:  Rule 26 disclosures generally involve a
12   case, not a person.  You're talking about making a Rule 26
13   voluntary disclosures which should have been made ten years
14   ago or something like that.
15            MR. PRESS:  There is a provision in Rule 26(a) for
16   disclosure of witnesses, Judge.  And that's what we would ask
17   to be amended.
18            MR. FRAM:  Your Honor, we'll supplement it.  We'll
19   give them notice of who we have in mind and what we think
20   those people will say, your Honor, no problem.
21            MR. PRESS:  The other issue, September 30th is a
22   Sunday.  Can we make it October 1st or September 28th?
23            THE COURT:  September 28th.
24            MR. PRESS:  There we go.
25            THE COURT:  Friday.  Make it that Friday.  Okay.
```

 1   Let's just review the date here, because we're going to ask

 2   somebody to prepare -- we are going to get one or two,

 3   whatever experts going to be used, get their reports which,

 4   again, I expect to set forth the basic methodology, even if we

 5   don't have all the numbers and certain rule on mitigation, we

 6   won't even have proper offset at that point, but that

 7   shouldn't stop having a basic philosophy, I don't know if

 8   that's the right word, of how we're going to decide, how the

 9   list would have been integrated, the lists would have

10   integrated, if there had not been a breach of duty of fair

11   representation.  So we'll get that.  We'll get a complete five

12   depositions of each of the class reps.  We'll also have

13   produced, at least, the work history of those five reps during

14   the period when the integration took place, actually, took

15   place and today, right?  Then we'll have the reverse of that.

16   He will be allowed -- not the reverse.  He'll be allowed to

17   take five American slash APA witnesses.  And he will provide

18   you with, in effect, Rule 26 type disclosures, 26(a) type

19   disclosure, respecting those five witnesses, four-hour limit.

20   Okay.  I think that covers everything.

21           MR. FRAM:  Then a conference date in early October.

22           THE COURT:  We'll give it to you -- what I'm going to

23   ask, I'll ask Mr. Fram to draw the order, draw a draft order.

24   Before I ever get it.  I don't want to see it until you

25   reviewed it with Mr. Press or Ms. Rodriguez and then give it

1    to me.  But we'll call you, Mr. Fram, and give you the date,

2    the first week in October.

3           MR. FRAM:  Thank you, your Honor.

4           THE COURT:  We'll have a conference.  Sitting here

5    now I just don't know.  We'll know in a day or two.  Probably

6    know today.  Mr. MacStravic will call you and let you know.

7    You're willing to take the burden of doing this order.

8           MR. FRAM:  Yes, of course, your Honor.  We'll work it

9    out.

10          THE COURT:  But I want to make sure -- I don't want

11   to see even a draft of it until you passed it by and worked

12   with -- however, you go, between Ms. Rodriguez, Mr. Press, Mr.

13   Jacobson, however you work it out.

14       See, I mentioned your name Mr. Jacobson.

15          MR. JACOBSON:  I appreciate it, your Honor.

16          THE COURT:  And, Mr. Jacobson, you can't see the

17   courtroom, but do you know that my head is rotating back and

18   forth, I spent 30 seconds looking at the defendant, and I

19   spent 30 seconds looking at the plaintiff, then turned back

20   and spent 30 seconds looking at the defendant.  I go back and

21   forth regardless of who is winning and regardless of what I'm

22   saying.

23       You heard that?

24          MR. JACOBSON:  I heard it.

25          THE COURT:  Okay.  And then we'll go to the next step

1   after that.  I think when we get that, somehow or other, we

2   will be in a little better position to be able to layout (a)

3   complete discovery, may not be that more, but if more is

4   necessary, and also a trial.  It's a little different

5   necessarily than discovery plan.  (A), how the case will be

6   discovered, how do we try it?  Because that still intrigues

7   me, the fact that it's a jury case.  Nonjury I can do all

8   kinds of things.  We had a case here involving a prison riot

9   where the police came in and allegedly beat up seven of the

10  prisoners.  Wound up they agreed to be nonjury.  And we had

11  Judge Bissell, former Judge Bissell, coming every week for a

12  year and a half, trying mini cases.  There had been a quote,

13  settlement, if you will, but basically wound up trying

14  probably 50 or 60 or 80 cases, maybe even more, little tiny

15  cases, right down the hall in Judge Rodriguez's old courtroom,

16  back there.

17          So how the case is going to be tried.  Anything else by

18  either party?

19              MR. FRAM:  Nothing further.  Thank you, your Honor.

20              MR. PRESS:  No, Your Honor.

21              MS. RODRIGUEZ:  No, Your Honor.

22              THE COURT:  And the disembodied voice in the sky,

23  have anything to say to me?

24              MR. JACOBSON:  No, Your Honor.  I heard you perfectly

25  throughout.  Sometimes had to strain to hear the lawyers, but

1    I got all I need to know.

2            THE COURT:  All right.  Have a good afternoon,

3    everybody.  We'll see you, I don't know, October 2nd or 3rd,

4    something like that.

5            MR. FRAM:  Thank you, your Honor.

6            THE DEPUTY COURT CLERK:  All rise.

7            (Proceeding is concluded for the day.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25