<pre>
 1                 UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
 2    _____

 3    PATRICK BRADY, et al.,
                                       CIVIL ACTION NUMBER:
 4           Plaintiffs,
                                       02-2917 (JEI)
 5              -vs-
                                       TELECONFERENCE
 6    AIR LINE PILOTS ASSOCIATION,
      INTERNATIONAL, et al.,
 7
             Defendants.
 8    _____
              Mitchell H. Cohen United States Courthouse
 9            One John F. Gerry Plaza
              Camden, New Jersey 08101
10            September 18, 2012

11    B E F O R E:          THE HONORABLE JOSEPH E. IRENAS
                            UNITED STATES DISTRICT JUDGE
12
      A P P E A R A N C E S:
13    GREEN JACOBSON
      BY: JOE D. JACOBSON, ESQUIRE
14    BY:  ALLEN P. PRESS, ESQUIRE
      ATTORNEYS FOR PLAINTIFFS
15
      TRUJILLO RODRIGUEZ & RICHARDS
16    BY: NICOLE M. ACCHIONE, ESQUIRE
      ATTORNEYS FOR PLAINTIFFS
17
      ARCHER & GREINER
18    BY: STEVEN J. FRAM, ESQUIRE
      BY: JOHN C. CONNELL, ESQUIRE
19    ATTORNEYS FOR DEFENDANT, AIR LINE PILOTS ASSOCIATION

20    BY:  MARTA WAGNER, ESQUIRE
      BY:  ELIZABETH A. GINSBURG, ESQUIRE
21    ATTORNEY FOR DEFENDANT, AIR LINE PILOTS ASSOCIATION

22    KATZ & RANZMAN
      BY: DANIEL M. KATZ, ESQUIRE
23    ATTORNEYS FOR DEFENDANT

24     Certified as true and correct as required by Title 28,
       U.S.C., Section 753.
25
                      /S/ Carol A. Farrell, CCR, CRR, RMR, CCP
</pre>

─────────────────── Teleconference ───────────────────

1              (Teleconference in chambers with all counsel

2     appearing telephonically, commencing at 4:00 p.m.)

3              THE COURT:  Hello?  Hello?

4              UNIDENTIFIED SPEAKER:  Your Honor, good afternoon.

5              THE COURT:  This is Judge Irenas.  Who else is there?

6              UNIDENTIFIED SPEAKER:  Your Honor, Joe Jacobson,

7     Allen Press, Michael --

8              THE COURT:  All right.  Let's start over again.  I

9     have a court reporter here.  Okay.  Just announce who the

10    lawyers are and who you represent.

11             MR. PRESS:  For the plaintiff, Allen Press and Joe

12    Jacobson here in St. Louis.

13             MS. ACCHIONE:  Nicole Acchione from Trujillo,

14    Rodriguez & Richards for plaintiff.

15             THE COURT:  Okay.  Who else?

16             MR. CONNELL:  John Connell and Steve Fram, Archer

17    Greiner, for the defendant.  And Dan Katz, as well.

18             THE COURT:  From Washington?

19             MR. KATZ:  That's correct, Your Honor.

20             THE COURT:  Right.  Okay.  That's everybody?

21             MR. FRAM:  Your Honor, I believe Betty Ginsberg.

22             THE COURT:  Oh, she's in-house counsel.

23             MR. FRAM:  Yes.  And Marta Wagner is also with Mr.

24    Connell and Mr. Press in St. Louis, I believe.

25             MS. WAGNER:  That's right.  Thank you, Your Honor.

─────────Teleconference─────────

```
 1              THE COURT:  Okay.  And that's ALPA's general counsel,
 2    right?
 3              UNIDENTIFIED SPEAKER:  In-house counsel.
 4              UNIDENTIFIED SPEAKER:  In-house.
 5              THE COURT:  In-house general counsel.  Okay.
 6              This morning, I came in early to get ready to pick a
 7    jury this morning, which I have done, but I'm handed papers
 8    from Archer Greiner, I guess Mr. Fram and/or is that from --
 9    oh, it's John Connell's letterhead.  John, they got you doing
10    something.
11              MR. CONNELL:  Imagine that, Judge.
12              THE COURT:  Are things slow?  What's going on?
13              It's not from Mr. Fram.  It's from John Connell.  And
14    then a short, really, in effect, a one-page response from Lisa
15    Rodriguez.  The dispute appears to be discovery.
16              I did -- to go back, I read the interrogatories, the
17    unanswered interrogatories.  And it's very clear that most of
18    those answers, as a practical matter, couldn't really be
19    given.
20              But Mr. Connell, if you're going to speak, tell me
21    what it is you want.
22              MR. CONNELL:  Well, Judge --
23              THE COURT:  It's, in effect, your application.  So --
24              MR. CONNELL:  Effectively, Judge, you had said some
25    time ago and have said repeatedly since then that, you know,
```

─Teleconference─

1  you're wondering how plaintiffs are going to prove this case

2  with damages, and we are, too.  And one of the most effective

3  ways they're going to do it is through documentation of

4  exactly what their economic loss was.  But --

5          THE COURT:  Yeah, but I don't think --

6          MR. CONNELL:  So on --

7          THE COURT:  I don't know.  Maybe -- well, it's hard

8  for me to envision that I'm going to take thousands of pilots

9  and -- or however many there were, even though there were a

10  lot less than American pilots, there are still a fair number

11  of them.  Weren't there over a thousand pilots?

12          MR. CONNELL:  2,300.

13          THE COURT:  2,300.  And, you know, hold a trial as to

14  what -- you know, if you look at the interrogatories and think

15  you can answer those interrogatories for all 2300, and then

16  try to figure out who had a loss of who didn't.  We know that

17  a certain number didn't, the ones that were above the staple

18  didn't.  But they're a minority.  I mean, most of them

19  probably were claim losses.

20          And so what do you want me to do?  Tell me what it is

21  you would like me to do, Mr. Connell.  What do you want me to

22  do?

23          MR. CONNELL:  The order that Your Honor entered on

24  September 7th required not production of all documents

25  responsive to the 14 document requests of May 31 for 2,300

Teleconference

```
 1   pilots but, rather, only for five class representatives.
 2           THE COURT:  Right.
 3           MR. CONNELL:  And we've only gotten a smattering of
 4   those documents, and that was, by the way, in preparation for
 5   the depositions of the class reps, which has been accelerated
 6   to a date before the production of plaintiffs' expert report.
 7           THE COURT:  What's the date now -- I just didn't get
 8   a chance because I was on trial all day.  What is the date for
 9   the expert reports?  Plaintiffs' expert reports?
10           MR. PRESS:  The 28th.
11           THE COURT:  The 28th of September?
12           MR. PRESS:  Correct.
13           THE COURT:  So we're almost there.
14           MR. PRESS:  We're almost there.
15           THE COURT:  Today is the 18th.  So we're -- we're
16   just ten days away.
17           What do we have from the five class reps?
18           MR. PRESS:  Judge, this is Allen Press.  The
19   depositions you ordered are beginning.  We're in the middle of
20   one right now.  And they will all be concluded this week.  We
21   have produced in advance of the depositions all of the -- all
22   the class reps' wage -- W-2 data --
23           THE COURT:  Well, there would be -- you'd have W-2s,
24   you'd have 1099s, you could have K-1s.
25           MR. PRESS:  Right.
```

────Teleconference────

```
 1              THE COURT:  I mean, there may be other things, but
 2    those are the three that occur to me.
 3              MR. PRESS:  And then ALPA's lawyers last week said
 4    they'd also like to see the tax returns so we're collecting
 5    all that now and producing those in advance of each
 6    deposition, Judge.  So we've complied and --
 7              THE COURT:  Well, let me ask you this.  The one --
 8    the depositions you're in the middle of is who?
 9              MR. PRESS:  It's Mike Finucan.  And, Judge, just so
10    you know, he's in the room right now, listening in.
11              THE COURT:  Well, that's okay.  Nothing secret here.
12              Have his tax returns been produced?
13              MR. CONNELL:  They were just produced at the very
14    beginning of this deposition today, Judge.
15              I understand the Hollander's tax returns were
16    e-mailed to our Haddonfield office, but we don't have any of
17    the tax returns of the other people, but we're even missing
18    some tax returns from Mr. Finucan.  The fact of the matter is
19    all of this information was supposed to be produced on
20    September 11 in preparation for the depositions.  I'm
21    receiving this stuff for the first time today.
22              THE COURT:  What's missing with Finucan?
23              MR. JACOBSON:  Your Honor, this is Joe Jacobson.  I'm
24    defending Mr. Finucan's deposition.
25              THE COURT:  Yes.
```

———Teleconference———

1          MR. JACOBSON:  The tax returns that he had, he could

2     not locate a tax return for the year 2000, the year 2002,

3     2004, so he did not produce those.  He can't produce documents

4     that he can't find.  Each tax return is a two-page document

5     for the first of two pages.  They have the same data as far as

6     income that the W-2s, 1099s had.  There is not more than five

7     minutes of scanning to see if there is anything that's

8     different, and that was done at the beginning of the

9     deposition.  We haven't had any questions on these tax returns

10    yet.  I anticipate they'll be coming up soon.

11         MR. CONNELL:  But the fact of the matter is, Your

12    Honor, as you had pointed out before, this information has

13    been available to plaintiffs for years, not to mention since

14    May 31st, and I just don't understand why we're getting it,

15    you know, when I walk into a deposition today.

16         THE COURT:  Well, that's water over the dam.  I mean,

17    what Mr. Finucan has produced, he's produced.  Whether the

18    absence of those three years will have some significance --

19    does he have W-2s for those years?

20         MR. JACOBSON:  Yes.

21         MR. CONNELL:  For some of them, yes.

22         THE COURT:  Because those years, he was -- was he

23    flying for the airline those years?

24         UNIDENTIFIED SPEAKER:  Yes.

25         THE COURT:  Well then, he would have -- then

—Teleconference—

 1   presumably, he would have W-2s for those, or he would have

 2   copies of them.

 3          All right.  Mr. Connell, what is -- again, I'm trying

 4   to figure out, have -- the W-2s, I gather, have been produced

 5   already, right?

 6          MR. CONNELL:  Some of them have been.  Not all of

 7   them have been.  There is one of the class reps that we only

 8   have Social Security information on.  We do not have W-2s.

 9   Okay?  We don't have a complete set of furlough notices,

10   recall notices, furlough communication.

11          THE COURT:  Yeah, but -- do they exist?  I mean --

12          MR. CONNELL:  We don't have that stuff.  The fact of

13   the matter is what we do have is a smattering of documents,

14   and a responsive -- an answer from the plaintiffs that

15   basically objects to each of the categories of document

16   production.  If they don't have them, then they should be put

17   to the task of saying "We don't have this information for the

18   following of the five class reps."  But they haven't done

19   that.  They've just said, "We object."

20          THE COURT:  Mr. Jacobson?

21          MR. JACOBSON:  The requests were made to the class as

22   a whole, not simply the five class reps.

23          THE COURT:  No, I know, but it's effectively, for the

24   moment, been limited to the class five -- the five class reps.

25          MR. JACOBSON:  That's correct.  The class reps have

Teleconference

 1  produced what they have.  We can't produce what they don't

 2  have.  And the objections were asserted, just for the record,

 3  because it was a class-wide request.  But we're not --

 4          THE COURT:  Well, I want to make it clear right now,

 5  that I consider the class-wide requests premature.  But I do

 6  think that the five class reps should produce that material,

 7  to the extent they have it.  I mean, it could well be that

 8  for -- I don't know whether you would keep furlough -- you

 9  know, I mean, some of the -- when I read the requests this

10  morning, my reaction to some of it was that they just might

11  not keep that stuff.  I mean, just, you know, they just might

12  not have it.

13          MR. FRAM:  Your Honor, it's Steve Fram.

14          There is one other category of documents that we

15  think we know exists that haven't been produced for at least

16  one plaintiff.  Sally Young we have reason to believe was

17  disciplined in some way and was not permitted to fly for about

18  six months in 2011.  So we had asked, for all the pilots, and

19  obviously --

20          THE COURT:  Yeah, I saw that question.

21          MR. FRAM:  Yeah.  So we want to see any materials

22  relating to any discipline that would have prevented the pilot

23  from flying, medical disability and the like.  That, as I

24  understand it, has not been produced.

25          The other thing I would note, Your Honor, is that the

—Teleconference—

```
1   plaintiffs just filed within the last hour a notice for
2   motion, a notice for -- a motion for notice to the class,
3   asking the members of the class, or at least some of them, to
4   produce a broad range of information, many of the same types
5   of documents that we're talking about.  We happen to think
6   that's premature.  We thought that was an issue that Your
7   Honor was going to discuss with counsel --
8           THE COURT:  Well, I just -- I mean, maybe I'm -- I
9   just thought that we would get a -- I never believed that it
10  would be September -- close to September 28th and we still
11  didn't have a theory of plaintiffs' damages.  But it just
12  struck me that real extensive and nitty-gritty discovery would
13  be better done if we knew the theory, if we knew -- if we knew
14  the framework for the claims.
15          MR. CONNELL:  Judge, I think that's exactly right
16  and, in fact, I think even plaintiffs' counsel agrees with
17  that proposition.
18          THE COURT:  I think so.  I mean, I'm not soliciting
19  approval of my view, but my view is that once we have a
20  framework, we can begin to fine-tune maybe a little bit the
21  discovery requests or demands for documents or even from the
22  plaintiffs to their own class.
23          MR. FRAM:  Well, Your Honor, that's my point, is that
24  the notice that they're proposing to send asks for information
25  from the class members that has not been produced in --
```

─Teleconference─

1            THE COURT:  Why is that being filed with the Court?

2            MR. FRAM:  Beg your pardon, Your Honor?

3            THE COURT:  Why -- maybe I should address this to

4    Mr. Jacobson.  Why is the -- is that request to your class

5    being filed with the Court?

6            MS. ACCHIONE:  Your Honor, this is Nicole Acchione.

7    I can address that.

8            When we were in front of Your Honor in July of this

9    year, I believe Mr. Rodriguez raised the issue with the Court,

10   because it was a notice to the class, because a class member's

11   failure to produce documents could result perhaps in the

12   inability of a class member to obtain a monetary judgment, if

13   we were successful.  We wanted the Court to approve the notice

14   that was going to the class, since the Court is the fiduciary

15   as well to the class, and so we wanted to have it -- the form

16   of the notice approved by the Court and, also, the manner that

17   we intended to disseminate the notice to the class reviewed

18   and approved by the Court.

19           THE COURT:  And you want me to do this before we have

20   the expert's report?

21           MR. FRAM:  That's our concern, Your Honor.  We think

22   it's premature.  We don't know --

23           THE COURT:  Well, let me say, notwithstanding the

24   theory that I'm a fiduciary for the class -- I mean, I don't

25   know that I'm -- I guess maybe in one sense I am, but I owe

-Teleconference-

1   duties to both parties here, to the defense and to the

2   plaintiff, and I don't think of myself necessarily as a

3   fiduciary for the -- you may be technically correct, don't get

4   me wrong, but I don't think of myself in that regard.  I think

5   of you in that regard -- plaintiffs' counsel I certainly

6   consider fiduciaries for the class.  And I consider the five

7   named plaintiffs to -- the steering committee to be

8   fiduciaries for the class.  I just don't think of myself as a

9   fiduciary for the class.

10          I mean, I'm trying to figure out why I should

11   approve -- if you're trying to solicit information from the

12   class, I mean documents and, you know, W-2s, tax returns,

13   K-1s, 1099s, furlough notices, you know, there is a whole --

14   if you read the interrogatories or the demand for documents,

15   there is even a lot of other things in there, as well.

16          What kind of decision does plaintiff think I'm going

17   to make?  I mean, how do I judge whether it's fair or not

18   fair?  I mean, I don't give legal advice.  I mean, do I think

19   that maybe it's too much or not enough?

20          MS. ACCHIONE:  Well, Your Honor, to be honest, we

21   were not a hundred percent certain whether the Court's

22   approval of the notice was required.  We decided to proceed

23   with an abundance of caution and seek the Court's approval of

24   the form of notice.

25          We also suspected that there would be information

Teleconference

1    that -- in addition to what we requested, there may be

2    additional information that ALPA would request of the class

3    members, as well, and to the extent it made sense to reach out

4    to the class members one and only one time, through a notice

5    that was approved by the Court and ALPA had a chance to weigh

6    in on, we thought it made sense to go that route.  We filed it

7    in advance of the October 2nd hearing.  It's not returnable

8    until after our expert reports are due, but we wanted the

9    opportunity to discuss it, have it on record and on the

10   docket, and have the opportunity to discuss the form of the

11   notice at the October 2nd hearing with Your Honor.

12            THE COURT:  Well, again, I find it a little difficult

13   to see myself approving what you strategically think you need

14   from your clients to help prove your case.  I mean, that's a

15   decision you have to make.  You know, maybe you'll decide that

16   everyone who's eaten at a Greek restaurant in the last 20

17   years has to give the menu, you know, because you think that

18   will help your case.  But, I mean, I -- those are the kind of

19   decisions that I don't normally get into.  You --

20            MS. ACCHIONE:  Okay.

21            THE COURT:  You decide what it is you think you need

22   to prove your case.  You're working with your experts,

23   presumably -- presumably, they would give you guidance, and

24   they'd say, look, this is our theory and this is what we think

25   we need to "prove" in our theory.  But I don't normally get

────── Teleconference ──────

1   involved in -- in that decision.  I mean, I -- you decide what

2   it is you think you need to prove your case, which is

3   dependent on how you're going to go about doing it.  And, you

4   know, I don't see myself, say, approving this is what you

5   should be asking for.

6         MS. ACCHIONE:  Okay.

7         THE COURT:  Because maybe next week you'll decide

8   there are some more things you should ask for, and the week

9   after that, there are some more things.  I -- or, conversely,

10  if there are things asked for you don't really need.  That

11  could be looked at another way, you know.  But -- I don't

12  know.

13        Right now, I was concerned only with the five

14  steering committee members, the plaintiffs, the now -- the

15  now-named plaintiffs.  Bud Bensel, where are you when we need

16  you?  And that they produce --

17        MR. CONNELL:  You're getting a rise out of this end

18  of the phone call.

19        THE COURT:  What did you say?

20        MR. CONNELL:  You're getting a rise on this end of

21  the phone call.

22        THE COURT:  Who is?  Oh, Bud?  Well, maybe.  He's

23  probably listening in and we don't even know it.

24        THE COURT REPORTER:  Your Honor, they're not

25  identifying themselves when they speak.

Teleconference

```
 1            THE COURT:  Oh yeah.  When you speak, please identify
 2   yourselves so my court reporter can get the right person.
 3            MR. CONNELL:  That was John Connell.
 4            THE COURT:  Okay.  I want the information -- I don't
 5   think it should be doled out.  I mean, I think it should be
 6   produced right away.  Because I think at this point we're
 7   going to have the tax returns, the W-2s, the 1099s, the K-1s.
 8   If there is furlough notices of one kind -- or I assume you
 9   have a recall notice, you have a notice of putting you on
10   furlough, and they must have some kind of notice where they
11   recall you.  Don't they?
12            MR. CONNELL:  Yes, they do.
13            THE COURT:  Yeah.  If they recall you, you know, you
14   have some kind of notice.  You know, whatever could be
15   produced of what's asked for, if it exists.  I mean, I have no
16   problem, if it's truthful, for somebody to say we looked and
17   Pilot X just doesn't have this information.  Sally Young
18   doesn't have it.  There is no such -- we don't have this.
19   Maybe it existed once but we don't have it now.  Okay.  As the
20   plaintiffs have pointed out, nothing I can do about that,
21   unless there is some kind of proof that somebody, you know,
22   was deliberately deep-sixing documents.  But, you know, this
23   is stuff from ten years ago, more than ten years ago.
24            So could we do that?  Can we get the stuff for those
25   five people, completely?  Why is there such silence?
```

1        MR. FRAM:  Your Honor, Steve Fram.  You already

2   directed --

3        THE COURT:  Well, can I direct it again?

4        MR. FRAM:  Absolutely.  You're the judge.  You can do

5   that.  Do you want to give a deadline or --

6        THE COURT:  Well, I can't figure it out.  These

7   depositions were scheduled some time ago.  I don't like the

8   idea, just conceptually, of producing documents on the morn of

9   deposition.  I mean, you ought to give at least a couple of

10  days, you know.  So, you know, at least a little time.

11       What's left, Mr. Jacobson or Mr. Press, what's left

12  to produce that is produceable, that we do have, that just

13  hasn't yet been produced?  Is there anything that's going to

14  be produced as to these five people that has not yet been

15  produced and is not lost?

16       MR. CONNELL:  Judge, this is John Connell.  We're

17  back.  We got cut off, for mechanical reasons here, for about

18  probably two-and-a-half minutes.

19       MR. PRESS:  Two-and-a-half minutes.

20       MR. CONNELL:  The last thing that I think we heard

21  from Your Honor was about -- shortly after Bud Bensel.

22       THE COURT:  Well, let me -- I'll go back.

23       I don't quite understand -- I've already limited, for

24  the moment, the discovery in those document requests to the

25  five named plaintiffs -- now named plaintiffs.  Okay.  So

-Teleconference-

1   let's start with that.  We're not talking about 1500 or

2   whatever number of pilots would be involved.  We're just

3   talking about five.

4           Is there any reason -- well, let me ask you.  Is

5   there any material relating to those five that you have, in

6   other words, that will not be claimed to be lost, but exists

7   and is yet to be produced?

8           MR. PRESS:  Yes.  Just --

9           THE COURT:  Then why can't we get it all out right

10  now?  We're only talking about five people.

11          MR. PRESS:  Yes, and some of those documents are on

12  planes on the way here for a deposition tomorrow.  It's all

13  going to be provided before the depositions begin, Judge.

14          MR. CONNELL:  But, Judge, that's the point.  I mean,

15  this was supposed to be in preparation for the depositions of

16  September 11th and Mr. Finucan, who is being deposed today, is

17  a very accommodating and very forthcoming witness, has said

18  that some of this documentation he provided to his prior

19  counsel, and for some reason it hasn't made its way to current

20  counsel.

21          THE COURT:  Prior counsel meaning Cureton?

22          MR. CONNELL:  I'm not -- he didn't identify which

23  one.  But --

24          UNIDENTIFIED SPEAKER:  Judge --

25          MR. FINUCAN:  I had told you that I had forwarded

─Teleconference─

```
 1   everything that I had to previous counsel.

 2           THE COURT:  That's --

 3           MR. PRESS:  Judge -- this is Mr. Press.

 4           MR. FINUCAN:  I did not say that.

 5           MR. PRESS:  All we're talking about is the tax

 6   returns, Judge, and --

 7           THE COURT:  Then let me start.  I mean, getting

 8   information out of you guys is like doing root canal.

 9           Other than tax returns, other than tax returns, has

10   all available information relating to just the five class

11   members, the five class representatives, been produced?  To

12   the extent you can find that it exists.

13           MR. PRESS:  Yes, it's an affirmative.

14           THE COURT:  Okay.

15           MR. CONNELL:  Well, the question is -- it's simply

16   out there.  The fact of the matter is -- this is John Connell,

17   Judge.

18           The fact of the matter is there are documents that

19   the witnesses are going to have to go back and check on

20   because they haven't -- they haven't been able to

21   affirmatively tell me that they do not have these documents.

22           THE COURT:  Well, he just told it to you.

23           MR. JACOBSON:  Your Honor, this is Joe Jacobson.

24           I would say that is a mischaracterization of the

25   testimony today.  This witness was asked about --
```

─Teleconference─

1          THE COURT:  Well, I'm not asking about this witness.

2          MR. JACOBSON:  Your Honor, we have produced -- my

3    understanding is we produced everything that our five

4    witnesses have that are responsive to the document requests.

5          THE COURT:  And you're also affirming that you cannot

6    find the other -- other things they asked for that you haven't

7    produced?

8          MR. JACOBSON:  Right.  They have searched their

9    records and they've looked through their documents and

10   everything that they had in response, they provided to us.

11   There was a misunderstanding on our part regarding the tax

12   returns only.  That's why those were not produced initially.

13   There was communication between Mr. Fram and Mr. Press on the

14   tax returns.  We've gathered the tax returns.  We've produced

15   some of them.  The others will be produced before those

16   respective witnesses' depositions.  They are one documents --

17   they are one small group of documents each, not going to

18   interfere with their preparation for the depositions.

19   Everything else that our clients have, to the best of my

20   knowledge, that's responsive, has been located and produced.

21         THE COURT:  Okay.  The witness you have there, what's

22   his name?

23         MR. JACOBSON:  Mike Finucan.

24         THE COURT:  Mike Finucan.  Mr. Finucan, can you hear

25   me?

‑Teleconference‑

```
 1            MR. FINUCAN:  I can, Your Honor.

 2            THE COURT:  Mr. Finucan, did you receive a copy of

 3    the demand for documents?  Do you know what was demanded?

 4            MR. FINUCAN:  I do know what was demanded of me, what

 5    was requested of me.

 6            THE COURT:  That's what I mean, requested.  I mean,

 7    did you actually look at the demand for documents?  The

 8    document in which --

 9            MR. FINUCAN:  No, I actually spoke to Mr. Connell

10    about that.  He presented me with one specific document, and

11    it wasn't -- I don't recall reading that document, Your Honor,

12    but I do recall counsel asking me for every -- every facet of

13    documentation that was --

14            THE COURT:  Well, okay.  Thank you, sir.

15            Defendants, one of the things you can do, if you have

16    any doubt, is question the witness, say you have -- what is

17    it -- 14 categories of documents asked for?

18            MR. CONNELL:  Correct.

19            THE COURT:  You just go through and say, "Did you

20    search for all these?  Have you produced all that you could

21    find?"  It's just five minutes of questioning.  And you can

22    verify whether, in fact, he has produced every document that

23    he has in those categories or not, leaving aside the tax

24    returns for the moment.  What's the problem with that?

25            MR. CONNELL:  Judge, I understand that.  And we have
```

---Teleconference---

 1  done that to a certain degree so far.  The fact of the matter

 2  is this information was ordered to be produced a long time

 3  ago.  Why are we getting tax returns at the beginning of each

 4  deponent's respective deposition?  Why can't we have that in

 5  preparation --

 6          THE COURT:  Let me get the tax returns -- but you

 7  understand, you can -- it's proper questioning for you to ask,

 8  you know, look at Number 7.  Whatever -- I don't even know

 9  what number 7 is.  But whatever -- well, it's attached to the

10  papers.  It's Tab -- it's Tab 1.  And just show the witness,

11  say, "Okay, did you produce all of that category of document?"

12  The witness will say "yes" or "no" or "I've looked for them

13  but I can't find them" or "I can find only some of them."

14  Whatever he's going to say, he'll say.

15          And as to the tax returns, Mr. Jacobson, why has --

16  why -- those, in a way, would be the documents most likely to

17  be available.  People, I think, would tend to save tax returns

18  more than other kinds of documents.  You know, some of the

19  things you ask for, I can understand why somebody would not

20  necessarily retain them.  But tax returns, people, I think,

21  are more likely to retain than not.

22          MR. JACOBSON:  With Mr. Finucan, he had most of the

23  tax returns.

24          THE COURT:  I have my tax returns back to law school,

25  when it was a card.  The whole tax return was one card, not

Teleconference

1   even a whole sheet of paper.  It was a card you could fill out

2   and send in.  And I believe I have them all the way back to

3   law school.  But those are the kind of things that you are

4   likely to keep.

5        So why -- just give me an explanation of why we're

6   getting them so belatedly.

7        MR. JACOBSON:  Your Honor, as I said earlier, there

8   was -- my understanding, from talking to Allen Press, more

9   directly because he was involved in that, a misunderstanding

10  between Allen and the other side about --

11       THE COURT:  This is Joe Jacobson.

12       MR. JACOBSON:  -- about the tax returns are part --

13       THE COURT:  Joe Jacobson.

14       MR. JACOBSON:  -- or if they had been listed, he

15  would have -- if he had realized it, that during that argument

16  you had, he would have argued that that wasn't relevant

17  because it contained additional information that should be

18  privileged on the wife, includes income that's not in any

19  way -- wasn't related, and that all of the information --

20       THE COURT:  But with five people, if you thought

21  there was some kind of privileged information or information

22  that could be subject to confidentiality, that could be

23  redacted.

24       MR. JACOBSON:  Yes, and we have done that.  Your

25  Honor, what -- during that time, he didn't realize the tax

———Teleconference———

1    returns were called for.  When we produced the documents, it

2    did not include tax returns.  The other side contacted us,

3    there was an exchange of letters, and then we said okay, and

4    we went and started getting tax returns to produce it.  So it

5    was a misapprehension or oversight on our part.  It's been

6    corrected.  And the process of correction is in the process of

7    being completed.  And, frankly, they don't contain information

8    that's going to be relevant, for example, the W-2s and the

9    1099s, but they want it, we've redacted out Social Security

10   numbers of the spouses and the children, and we're producing

11   the documents.

12           THE COURT:  Well, nobody is objecting -- I don't

13   think anybody is objecting to you redacting out the wives' and

14   children's Social Security numbers.

15           MR. CONNELL:  No, Judge.  John Connell.  We're not

16   objecting to that.  But the fact is, with all due respect --

17           THE COURT:  All due respect to whom?

18           MR. CONNELL:  To the plaintiffs' counsel.

19           THE COURT:  Not to me?

20           MR. CONNELL:  Oh, no, not to you.

21           THE COURT:  Because I don't like that phrase --

22           MR. CONNELL:  No, Judge --

23           THE COURT:  Because the phrase "with all due respect"

24   really means we have none and that's what you're going to get.

25           MR. CONNELL:  The fact of the matter is plaintiffs'

―Teleconference―

```
 1    counsel said, and we quoted this in our letter to the Court,

 2    that they would be identifying the W-2s and the tax returns.

 3    Tax returns.  Tax returns for damaged class members.  This was

 4    on July 31.  What's the misunderstanding?  We should have this

 5    stuff long before now.

 6            THE COURT:  Mr. Press or Mr. Jacobson, when are the

 7    tax returns for the five class members going to be completely

 8    produced?

 9            MR. PRESS:  Sally Young's depo is tomorrow morning at

10    9.  She is bringing them with her.

11            THE COURT:  Okay.  So --

12            MR. PRESS:  -- deposition tomorrow at 1.  He is on a

13    plane bringing them with him.  Ted Case's deposition is the

14    following afternoon and he will have them produced before

15    then.  So it's all going to happen this week, Judge.

16            They're going -- they're going to take the

17    depositions.  They'll have the tax returns.  They've had the

18    wage data since September 7th.  There is absolutely no impact

19    on their ability to take these depositions.  They're going to

20    go forward and get completed, just as you ordered.

21            THE COURT:  Okay.  As a practical matter, Mr. Connell

22    or Mr. Fram --

23            MR. CONNELL:  Judge --

24            THE COURT:  -- what would you ask me to do?

25            MR. CONNELL:  Well, I also need the furlough
```

─Teleconference─

1    information, all the written documentation related --

2              THE COURT:  But they've said they don't have it.

3              MR. CONNELL:  They have not said that they don't have

4    it.

5              THE COURT:  Well then, question them.  You have a guy

6    there.  Ask him a question.  He's under oath.

7              MR. CONNELL:  Judge, I will do that, but the fact is

8    this Court ordered them to produce that information --

9              THE COURT:  But we don't know -- it doesn't stretch

10   the imagination that a lot of this stuff may not just exist in

11   their files.  I mean, maybe they're lurking in the company

12   files somewhere, but, you know, I don't know that -- if they

13   got a furlough notice or a recall notice --

14             MR. CONNELL:  Judge --

15             THE COURT:  -- you know, eight years go, that they

16   still have it.

17             MR. PRESS:  It's Allen, Judge.  We produced the data

18   they requested for the five classes.

19             THE COURT:  I know.  I mean, you guys are just

20   talking over each other's heads.  I mean, you say you produced

21   everything you could find, and they say you haven't, implying

22   that there is stuff you could find but just haven't produced.

23   The only way I know, you have the guy under oath in front of

24   you.  Ask him if, you know -- furlough notices, have you

25   produced all your furlough notices?  You know?

Teleconference

1          MR. FRAM:  Your Honor, Steve Fram.

2          With respect to Sally Young, are we going to receive

3    the materials that I referred to before about this period

4    where she had to take off because of some type of disciplinary

5    issue?  I don't think Mr. Press or Mr. Jacobson have addressed

6    that.

7          THE COURT:  Why don't you -- you'll have her under

8    oath.  Ask her.

9          MR. FRAM:  Okay.  The other thing, Your Honor --

10         THE COURT:  That's why we're taking the depositions.

11   And, you know, look, depositions cover all the time, not just

12   in this case, the whereabouts of documents.  I mean, there are

13   depositions of commercial cases where days are spent

14   questioning a witness, not about the facts of a case, but just

15   about where documents are and where they might be found and

16   who has them and where they are being stored.  I mean, days of

17   depositions are -- can sometimes include that.  I mean, that's

18   nothing -- you know, and I wouldn't -- and I don't -- I don't

19   think that's improper in this case.  You know, and if she was

20   incapable of flying because of some -- some health reason or

21   disciplinary reason or combination of both, the -- well then,

22   she can be questioned about that.

23         MR. FRAM:  Your Honor, these depositions were limited

24   to four hours each.  If we need --

25         THE COURT:  You know, give me a call.  I'm here all

```
─────────────────────Teleconference─────────────────────
```

 1   the time.  I mean, you know, the -- I mean, ask the question.

 2   See how long it takes.  I mean, you have 14 categories of

 3   documents.  It just can't be that long.

 4           MR. JACOBSON:  Your Honor, this is Joe Jacobson.

 5           THE COURT:  Yeah.

 6           MR. JACOBSON:  I point out that at this deposition,

 7   Mr. Finucan was asked questions about that, and he was able to

 8   describe the two periods of time when he was not flying

 9   because of medical reasons, and I think the questions answered

10   together took less than five minutes.

11           THE COURT:  You know, again, I wasn't there.

12   Mr. Finucan sounds like he's being responsive, which is a good

13   thing.  But ask him.  If it turns out it takes more than four

14   hours, fine, we'll add an hour.  I mean I -- I don't consider

15   it to be rigid.  I was just trying to set some reasonable

16   framework.  But there is nothing in this case, nothing unusual

17   about inquiring into a witness, not about the facts of a case,

18   but to where documents are, if that witness knows where one

19   might find documents of a particular description.  And I

20   believe that if one of the five class -- class reps was

21   disciplined or for health reasons barred from flying for a

22   particular period of time, that's -- A, that's proper

23   discovery; and, B, if there are documents that back that up,

24   you're entitled to know where they are.  I agree with all

25   that.

```
                        Teleconference
```

1           But these generalized, you know, whines that you

2    don't have the documents aren't getting us anywhere.  What can

3    I do?  I'm not -- am I going to dismiss the case?  No, I'm not

4    going to do that.  So why don't we take what we have, we have

5    the witnesses coming in in the next four -- the next few days,

6    apparently, they're all going to be in.  I heard four -- at

7    least four of them are.  Is the fifth going to be in, too?

8           MR. FRAM:  Yes, Your Honor.  All this week.

9           THE COURT:  They are all going to be in.  Question

10   them.  You know, ask questions.

11          By the way, I will even give you my cell phone number

12   and so if I'm -- because I will be out of the office for

13   tomorrow, but you can reach me on my cell phone.  And I'll

14   tell -- if you have some question, you want an extra half hour

15   or an extra hour, we'll work on it.  My number is 856 -- no.

16   It's 908.  908.  908-227-6076.  All right?  If you can't reach

17   me here at the office.  And --

18          MR. FRAM:  Could I just go back quickly to the motion

19   for notice to the class?

20          THE DEPUTY CLERK:  It's Mr. Fram.

21          MR. FRAM:  It was just filed today.  It's been made

22   returnable October 15 --

23          THE COURT:  When you say made returnable, is it a

24   motion for me to approve it?  Is that what it is?

25          MR. FRAM:  It is, Your Honor.  And our problem is

Teleconference

1   that we're not going to see the expert reports, as you know,

2   until the 28th and we're not even having a conference that

3   Your Honor set until October the 2nd --

4           THE COURT:  Okay.

5           MR. FRAM:  -- and we thought this whole issue of

6   notice would be a topic for discussion at that conference.

7   So --

8           THE COURT:  Okay.  The only thing you can do to help

9   me -- if you want.  I won't even order you to do it.  But it

10  would be helpful if you could, in that mighty machine that is

11  Archer Greiner, do just a bit of research as to whether a

12  class representative giving notice to a class, seeking proofs,

13  documents to prove an aspect of the case, requires Court

14  approval.  I'm just not familiar with that concept.  I mean,

15  class-action lawyers are gathering information to support

16  their claim usually starting before the complaint is ever

17  filed and continuing on probably until the afternoon of trial.

18          MR. FRAM:  Your Honor, we're fairly confident that

19  they're not required to --

20          THE COURT:  I mean, I just -- I am not familiar

21  with -- with the notion that when class counsel or class

22  representatives seek information from members of the class to

23  support their claim, particularly in this kind of case, where

24  it's a finite class and we're not dealing with 50,000 people,

25  you know, who bought unleaded gasoline and they claimed you

─────────Teleconference─────────

```
 1   would get rich if you bought it, and there is a lawsuit over

 2   it, you know.  I mean, this is a very finite class, very

 3   specific theory.  I just don't know where that would come

 4   from.  Why the class lawyers -- I'm not even sure they need to

 5   deal with the class -- you know, I mean, they want to

 6   coordinate with the class reps, just to make sure, you know,

 7   get the information from them.  But I don't even know if they

 8   need -- why they can't go out to the class and say, "Look,

 9   we'd like this information, this information, this

10   information.  It's going to help us prove our case."  Why not?

11   Unless I'm missing something, I don't understand why not.

12          MR. FRAM:  Your Honor, we'll submit something.  I

13   think we may want to wait until we've seen their expert --

14          THE COURT:  Yeah, I'm not -- you may do that.  I

15   mean, I'm not ordering you to do this.

16          MR. FRAM:  It would be helpful, Your Honor, if we

17   could agree now, though, that the return date of the motion is

18   put off for one motion cycle.

19          THE COURT:  When is it now returnable?

20          MR. FRAM:  It's returnable on the 15th.

21          THE COURT:  Of October.

22          MR. FRAM:  Of October.  That means our opposition

23   would be due on October 1 which is before we have the

24   conference on October 2.

25          THE COURT:  Do you want to push everything off two
```

Teleconference

```
 1    weeks?

 2            MR. FRAM:  Yeah, if we could do that, I think it

 3    would be helpful.

 4            THE COURT:  Any objection, Mr. Jacobson, Mr. Press?

 5            MR. PRESS:  No.

 6            MR. JACOBSON:  No objection.

 7            THE COURT:  Okay.  I'll make the return date -- make

 8    sure you notice that.  We'll make the return date the 29th,

 9    and your response will be due the 15th.

10            MR. FRAM:  Yes, Your Honor.

11            THE COURT:  Right?

12            MR. FRAM:  Thank you.

13            THE COURT:  Your response is due the 15th.  But don't

14    give me a thousand pages.  I would be happy with three or four

15    case cites, each with a little blurb.

16            MR. FRAM:  Yes, Your Honor.

17            THE COURT:  I mean, I don't need a magnum opus to get

18    anywhere.  Keep Egan away from the file.

19            (Laughter.)

20            MR. FRAM:  I'll pass that comment along.

21            THE COURT:  Pass that along.  I don't want him

22    anywhere near this ALPA file.

23            They came in with seven motions.  I brought them into

24    the library and showed them six trans files filled with

25    documents which constituted the motions.  And I said, who do
```

—Teleconference—

```
 1   you expect -- thousands of pages in each one, and highly
 2   technical.  I said, "Who do you expect to read this stuff?"
 3           MR. FRAM:  Your Honor, we'll set up a firewall
 4   between this file and Mr. Egan.
 5           THE COURT:  Yes.  And, you know, like "The Tell-Tale
 6   Heart."  Can't we put Mr. Egan and block him into someplace
 7   and then put plaster and brick over it so he doesn't have
 8   access to a computer?
 9           MR. CONNELL:  That didn't restrain the heart, Judge.
10           THE COURT:  Oh, I know.  The heart kept beating.
11   That was -- that's right.  That was the whole purpose of the
12   Poe story, "The Tell-Tale Heart."  So -- that's right.  The
13   heart kept beating.
14           All right.  Anything else?
15           UNIDENTIFIED SPEAKER:  I think that covers it.
16           UNIDENTIFIED SPEAKER:  Nothing here, Judge.
17           UNIDENTIFIED SPEAKER:  Thank you.
18           THE COURT:  Anything from the plaintiffs?
19           UNIDENTIFIED SPEAKER:  No, Your Honor.  Thank you.
20           THE COURT:  Okay.  You have a deposition, you have
21   witnesses coming in, use it.  And, again, remember, there is
22   nothing improper about questioning a witness about the
23   whereabouts of documents.  That's routine in heavy-duty
24   commercial litigation.  Routine.  And with E-discovery, it's
25   even become more routine, because now it's not where they are
```

────Teleconference────

1    physically located, but where they are -- in the cloud, where

2    they are located.  And, you know, so it's perfectly proper

3    questioning.

4            And so -- all right.  We will -- I will see you soon

5    enough.  Have a good weekend.  And, oh, it's only Monday --

6    only Tuesday.  Well, have a good weekend, anyhow.

7            (Laughter.)

8            UNIDENTIFIED SPEAKER:  Thank you, Judge.

9            THE COURT:  Okay.  Bye-bye.

10           UNIDENTIFIED SPEAKER:  Bye.

11           UNIDENTIFIED SPEAKER:  Bye.

12           UNIDENTIFIED SPEAKER:  Bye.

13           (The proceedings concluded at 4:45 p.m.)

14

15

16                        *   *   *

17

18

19

20

21

22

23

24

25

1

2                        CERTIFICATE OF REPORTER

3

4    I certify that the foregoing is a correct transcript of the

5    record of proceedings in the above-entitled matter.

6

9    _____
     Carol Farrell, CCR, CRR, RMR, CCP
10   Realtime Systems Administrator
     United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25