## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>AIR LINE PILOTS<br>ASSOCIATION,<br>INTERNATIONAL,<br><br>　　　　　Defendant. | Civil Action No. 02-2917 (JEI)<br><br>**<u>Oral Argument Requested</u>**<br><br>Motion Date: November 19, 2012 |

## DECLARATION OF DANIEL J. TOAL, ESQUIRE, IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS ANSWER

Archer & Greiner
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033-0968
(856) 795-2121

*Pro Hac Vice:*

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 659-4656

*Attorneys for Defendant Air Line Pilots Association, International*

DANIEL J. TOAL, ESQUIRE, hereby declares as follows:

1.     I have been admitted to appear *pro hac vice* in the above-captioned matter, and am a partner at the law firm Paul, Weiss, Rifkind, Wharton & Garrison, LLP, attorneys for Defendant Air Line Pilots Association, International ("ALPA").   I share responsibility for the handling of this matter, and have personal knowledge of the information set forth herein.   As such, I am authorized to make this Declaration.

2.     I am submitting this Declaration in further support of Defendant's Motion for Leave To Amend Its Answer to include mitigation of damages as an affirmative defense.

3.     Attached hereto as Exhibit "A" is a true and correct copy of excerpts of the deposition of Sally Young dated September 19, 2012.

4.     Attached hereto as Exhibit "B" is a true and correct copy of excerpts of the deposition of Michael Finucan dated September 18, 2012.

5.     Attached hereto as Exhibit "C" is a true and correct copy of excerpts of the deposition of Theodore Case dated September 20, 2012.

6.     Attached hereto as Exhibit "D" is a true and correct copy of excerpts of the deposition of Howard Hollander dated September 21, 2012.

1

7.      Attached hereto as Exhibit "E" is a true and correct copy of excerpts of the transcript of the conference before the Court, dated July 31, 2012.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 12, 2012
        New York, NY

_____
Daniel J. Toal

# EXHIBIT A

1        In the District Court of the United States

2                District of New Jersey

3

4    Patrick Brady, et al.,

5           Plaintiffs,

6        vs.                     No. 02-2917 JEI

7    Air Line Pilots Association,

8    International,

9           Defendant.

10

11

12            Deposition of Sally Young

13           On Behalf of the Defendant

14

15              September 19, 2012

16

17

18        Reported by Vanessa L. Hertich

19            Certified Court Reporter

20

21

22

23

24

25

Page 30

1  been marked for identification as Young 5.  This is your
2  furlough notice dated May 15, 2003?
3      A.  Correct.
4      Q.  Were there any other documents that you received
5  in conjunction with this layoff notice?
6      A.  The normal legal documents I think I received and
7  did not keep.
8      Q.  Were the --
9      A.  COBRA opportunities, benefit issues, etc.
10      Q.  You didn't keep those documents?
11      A.  I don't know that I did.
12      Q.  Okay.  Could you check your files one more time?
13      A.  I can.
14      Q.  And if you do have them, please produce them to
15  counsel?
16      A.  Yes.
17      Q.  Any other documents that you received in
18  conjunction with this layoff notice?
19          MR. JACOBSON:  I'm sorry.  Could you rephrase
20  your question?  I don't understand what you just asked.
21      Q.  (By Mr. Connell)  I said, any other documents you
22  received in conjunction with this layoff notice?
23          MR. JACOBSON:  So that's just a repeat of the
24  last question?
25      Q.  (By Mr. Connell)  Yeah.  Just any others I said.

Page 31

1  Any others.
2      A.  Well, the legally required documentation I'm sure
3  American sent.
4      Q.  Okay.  Anything other than that?
5      A.  Not that I remember.
6      Q.  Okay.  Did you generate any documents in response
7  to this May 15, 2003, layoff notice?
8      A.  I don't remember.
9      Q.  In the event that there may be some documents
10  that you did generate and they may still be in your
11  possession, I'd just ask that you to check and see and
12  produce them to counsel, okay?
13      A.  Okay.  Yes.
14      Q.  Let me show you what's been marked for
15  identification as Young 6, and as I understand it, Young
16  6 is your Social Security statement as of 2006?
17      A.  2008.
18      Q.  I'm sorry.  Dated 2008, that's correct, but it
19  only reports your scheduled earnings through 2006,
20  correct?
21      A.  Correct.
22      Q.  And then you have appended to that as well W-2s
23  from 2003, 2006, 2007, 2009, and 2011, and 2001, correct?
24      A.  I don't know which years you said.  Did you
25  include 2007 and 2008?

Page 32

1      Q.  I'll go through them one more time.  2001, 2003,
2  2007 and '08.
3      A.  You skipped '06.
4      Q.  Let's try one more time.  2001, 2003, 2006, 2007
5  and '08, 2009, 2011.
6      A.  And 2010 is in here.
7      Q.  Is 2010 at the top?
8      A.  Yep.
9      Q.  Okay.  It's not marked as such, but if it is,
10  that's fine.  Okay.  Is there any reason why you don't
11  have your W-2s for 2002?
12      A.  There's no reason.  I couldn't find them.  I
13  tried on several occasions to find them.
14      Q.  All right.  And you don't have anything for 2004
15  either, correct?
16      A.  Correct.
17      Q.  But in Young 4C is your W-2 for 2005?  No.  I'm
18  just showing it to you.
19      A.  Yes.
20      Q.  Correct?
21      A.  Yes.  So I didn't copy that for you.
22      Q.  That's all right.  Okay.  Other than Young 5,
23  your May 15, 2003, furlough notice from American, are
24  there any other documents that you have in your
25  possession related to that furlough at all?

Page 33

1      A.  Not that I know of.  Only the documents that
2  we've previously discussed.
3      Q.  How about a recall notice?
4      A.  There may have been a written recall notice.  I
5  couldn't --
6      Q.  It's required, is it not?
7      A.  I couldn't find it.  Well, I got a phone call
8  from -- her name escapes me.  The woman in Manpower
9  Planning that was in charge of recall -- recalling
10  pilots.  So initially what they would do is call you, and
11  there may have been written documentation as well, but
12  they would let you know via phone call that there will be
13  an opportunity for you to come back to a class and what
14  your decision was, whether or not you were in a position
15  to take a recall class and, you know, what your wishes
16  were regarding that.  As I said, I can't remember now if
17  there was a requirement for a written bypass, recall
18  bypass option or not, but I remember having several phone
19  conversations with American, you know, Manpower about
20  when I would come back.
21      Q.  Okay.  Do you recall when you had those telephone
22  conversations?
23      A.  Yeah.  Initially, they offered me a recall class
24  in 2008.  Do you remember what month?
25      Q.  Do you remember what month?

9                                              (Pages 30 to 33)

Page 34

1   A.  I believe I spoke to her in January and the
2   potential class would have been that spring, maybe April
3   was her estimations.
4   Q.  Does that give you a better recollection of when
5   you may have received the written recall notice?
6   A.  It probably would have been in that time frame,
7   yes.
8   Q.  Do you know if you still have that in your
9   possession today?
10  A.  I told you I looked.
11  Q.  And you did not find that?
12  A.  I did not find that.  I can look again.
13  Q.  If you would please, that would be great.  Let me
14  ask you this.  Do you recall generating any documents in
15  response to the recall notice?
16  A.  I'm not sure one is required.
17  Q.  So you don't know --
18  A.  I don't know.
19  Q.  So you don't know if one is required?
20  A.  No, I don't know.
21  Q.  I'm going to ask you again, if you just take a
22  second to look at your documents, for that because it's my
23  understanding that it is --
24  A.  Okay.
25  Q.  -- it is required in a written response.

Page 35

1   A.  Okay.
2   Q.  All right?  Did you ever defer recall?
3   A.  I did.
4   Q.  When did you defer recall?
5   A.  From the time of the first class that I would
6   have been able to been -- be recalled to, which, again,
7   was in the spring of 2008 until March 18th of 2009.
8   Q.  Okay.  And why did you defer recall?
9   A.  I had two sons that were of an age that I felt
10  required more of my presence than a recall class that
11  American Airlines would provide.  There was -- The way
12  American Airlines recalls pilots, there's no guarantee
13  whatsoever what domicile you'll be placed in or what
14  position, first officer position.  You don't know that
15  until the day you show up for recall class and, in fact,
16  when I did come back, I was based in Miami and put on
17  reserve and was gone oftentimes more than 21 days a
18  month.
19  Q.  When you're in recall class, are you compensated?
20  A.  Yes.
21  Q.  At what rates?
22  A.  I believe they would pay you the rate that is the
23  position that you accept from the bucket of positions
24  they offer to the class.
25  Q.  And for you that would have been first officer?

Page 36

1   A.  First officer 737.
2   Q.  Okay.  Did you generate any documents with regard
3   to the deferral of recall?
4   A.  The deferral of recall?
5   Q.  Yeah.  When you deferred recall, did you write
6   them a letter?
7   A.  I think that -- I think that that's required.
8   Q.  Okay.  Do you have that in your possession?
9   A.  I've looked for all those documents.  I will look
10  again.
11  Q.  Okay.  I'd appreciate that.
12  A.  Uh-huh.
13  Q.  And produce it to counsel if you would, please.
14  Do you recall if when you responded to defer the recall,
15  that you did so, was it in a -- by a typed letter or by
16  an e-mail, do you recall?
17  A.  I believe it was by e-mail and there might have
18  been a requirement for -- Again, I don't recall exactly
19  the requirements.  There might have been a requirement
20  for a written follow-up and I don't know the answer to
21  that.  Now that we talk about it, I don't think there is
22  a requirement for written follow-up.  There's a
23  requirement for her.  I don't remember her name.  Sue
24  Kalosa, to respond to your e-mail and I think that is
25  considered notice, but I don't remember exactly.

Page 37

1   Q.  Okay.  Did you search your e-mail files for
2   documents responsive to --
3   A.  I did.
4   Q.  Let me get -- This is where I have to get the
5   question out -- to documents responsive to the May 31
6   document request 14 categories?  You know what I'm
7   referring to?
8   A.  I do and I did not.
9   Q.  Okay.  I would ask you, therefore, please review
10  your e-mail files to check and see if you possess any
11  e-mails, electronically stored information that would be
12  responsive to any of the 14 document request categories
13  on the May 31 document request, okay?
14  A.  I understand.  What I hear you saying is --
15  Q.  Is what?  All right.  Did you ever have any
16  discussions with other pilots about furlough and furlough
17  recall?
18  A.  Yes.
19  Q.  Can you tell me who you spoke with?
20  A.  No.
21  Q.  Because you don't want to tell me or you can't
22  remember?
23  A.  It was -- It was a large number of people.
24  Q.  So you just don't remember, specifically, who
25  they were?

DEGNAN & BATEMAN
(856)  232-7400

Page 38

1    A.  No.

2    Q.  Any one of them?

3    A.  I'm quite sure I spoke to some of the other named

4  Plaintiffs, at a minimum.

5    Q.  Okay.  And what were your sentiments about the

6  furlough at the time?

7    A.  It was pretty horrifying.

8    Q.  But what, specifically, did you discuss?  What

9  were your communications with your colleague pilots?

10    A.  It was a tragedy.  It put a lot of people in very

11  uncomfortable financial positions.

12    Q.  Did you understand this to be a business decision

13  on the part of American Airlines?

14    A.  No.

15    Q.  What did you understand it to be then, if not

16  that?  And what else was it?

17    A.  My sentiments about it were that the position

18  that I was placed on in the seniority list had much to do

19  with whether or not I was furloughed.

20    Q.  I'm talking about the furlough itself.  Did you

21  understand that to be a business decision on the part of

22  American Airlines?

23    MR. JACOBSON:  I'm going to object to the form of

24  the question.  It's not clear whether you're asking the

25  notion of furlough in the abstract or the notion of

Page 39

1  furlough of Ms. Young here herself, so it's ambiguous.

2    Q.  (By Mr. Connell)  The decision to furlough

3  pilots, was that a business decision on the part of

4  American Airlines?

5    A.  You're asking me to guess what American Airlines

6  was doing.  I don't know that it was anything -- I don't

7  know that it was other than a business decision.

8    Q.  Okay.  That's what I'm asking.

9    A.  But I don't know what American was doing.  It

10  wasn't my --

11    Q.  I mean, do you have any -- Go on.  Finish your --

12    A.  It wasn't my position to be on the inside of

13  American Airlines' business decisions.

14    Q.  I understand that.  I'm just saying to you, do

15  you have any reason to believe that it was anything but a

16  business decision on the part of American Airlines?

17    A.  I suppose not.

18    Q.  Did this -- The furlough decision itself had

19  nothing to do with the allegations that you brought

20  against ALPA in this lawsuit, correct?

21    MR. JACOBSON:  I'm going to object to the form of

22  the question again because it's ambiguous and I don't

23  know whether you're referring to furloughs in general or

24  the decision to furlough Ms. Young in particular.

25    Q.  (By Mr. Connell)  I'm talking about the furlough

Page 40

1  in general.

2    A.  I guess I don't know what you're trying to find

3  out.

4    Q.  American Airlines' decision to furlough pilots

5  had nothing to do with the allegations you brought

6  against ALPA in this case, correct?

7    A.  I don't know what you're asking.

8    Q.  What don't you understand?  Tell me.

9    A.  I don't know what your point is.  I can't answer

10  it if I don't understand what you're --

11    Q.  Did it have anything to do with your allegations

12  against ALPA?

13    A.  No, probably not.

14    Q.  Okay.  Now, up until the date of your furlough,

15  did you have any employment other than TWA and American

16  Airlines?

17    A.  While I was working for TWA?

18    Q.  Correct.

19    A.  There were some income that I got because I did

20  ALPA work, but that is not an employment.

21    Q.  Understood.  Any other?

22    A.  No.

23    Q.  Okay.  And how about with American up until the

24  time you're furloughed?

25    A.  No.

Page 41

1    Q.  After your furlough -- May 2003, correct?

2    A.  July.

3    Q.  July.  Okay.  The notice was in May.  Who did you

4  work for before you were recalled?

5    A.  I worked for American Eagle -- Excuse me.

6  Initially in 2004 I did a short stint of what's called

7  Pilot Contract Services, which is just contract pilot

8  work ferrying and test flying 767s for Park Aviation,

9  Dublin, Ireland.

10    Q.  How long did you do that?

11    A.  Five months.

12    Q.  Were you over in Dublin the whole time?

13    A.  No.  It was -- They had an office in Colorado

14  Springs that kind of handled the pilots that were

15  American, U.S. citizens.  I was finally offered a

16  position --

17    Q.  Excuse me a second.  Do you know what five months

18  those were?

19    A.  I'd say July, August, September, October, and

20  November.  I was finally offered a flow back to American

21  Eagle.  I took that in December of 2004.

22    Q.  What rank?

23    A.  Captain.

24    Q.  And plane?

25    A.  CRJ 700.

11                                      (Pages 38 to 41)

Page 42

```
1      Q.  Okay.  Flying out of where?
2      A.  Chicago.
3      Q.  Okay.  And go on.
4      A.  That schedule was pretty rough there and I was
5   commuting.
6      Q.  From where?  From St. Louis?
7      A.  From -- Yeah.  I had some friends that I knew
8   were working for Flight Safety, so I decided in the fall
9   of 2006 to try to obtain employment with Flight Safety
10  and they were kind enough to offer me a job late 2006.
11     Q.  Do you have a month?
12     A.  Might have been November.
13     Q.  And your position was?
14     A.  Simulator and ground instructor.
15     Q.  Okay.  How long did you have that position?
16     A.  I stayed there until I came back in March of 2009
17  to American Airlines.
18     MR. JACOBSON:  Can we take a brief break?
19     MR. CONNELL:  Sure.
20     THE VIDEOGRAPHER:  We're off the record at 10:25
21  a.m.
22     (A short recess was held.)
23     THE VIDEOGRAPHER:  We're back on the record at
24  10:38 a.m.  Please continue.
25     Q.  (By Mr. Connell)  Sally, we were talking about
```

Page 43

```
1   your employment during furlough.  You were furloughed in
2   July '03, correct?
3      A.  Correct.
4      Q.  And you were not employed until sometime in July
5   '04?
6      A.  Correct.
7      Q.  What did you do in the meantime?
8      A.  Well, it was a stressful time.  I don't -- The
9   begin for job search -- The start of the job search was
10  in early 2004.
11     Q.  Okay.  Why did you wait six months?
12     A.  Well, partly because I thought I needed a couple
13  months off and then -- and then I got geared up and
14  started looking for a job.
15     Q.  Okay.  So you started looking in January?
16     A.  Uh-huh.
17     Q.  of '04?
18     A.  Correct.
19     Q.  Six months after your furlough?
20     A.  Yes.
21     Q.  Okay.  Did you do anything between July and
22  January --
23     A.  I did.
24     Q.  -- other than take time off?
25     A.  I did.  I took care of my sons.
```

Page 44

```
1      Q.  Okay.
2      A.  My mom, who'd had heart surgery, she'd had bypass
3   surgery the first time in 1989, began -- Her husband had
4   died 2003, I believe, maybe 2002, and she was not in
5   great health.  Spent some time trying to help her
6   reorganize after her husband's death.  We moved her to --
7   I have two sisters and none of us live in the same place.
8   We all sort of lobbied for her to move to where one of us
9   lived.  We spent some time trying to help her make that
10  decision.  I spent some time researching local areas
11  where -- that might be appropriate for her to live in --
12  close to me out in Lake St. Louis.
13     Q.  Where did she live at the time?
14     A.  She lived in El Dorado, Kansas, where we grew up,
15  and she ended up moving to just outside of Bloomington,
16  Illinois, where my oldest sister lives.  So we helped her
17  relocate and the process took some time and was a
18  worthwhile assistance that I was able to lend her, but
19  bills were calling my name and I needed to find
20  employment, so I finally got started on that in 2004.
21     Q.  So between July '03 and January of '04, what was
22  your source of income -- or what were -- Excuse me.
23     A.  I had --
24     Q.  Let me rephrase that.  What were your sources of
25  income, plural?
```

Page 45

```
1      A.  I had -- I had saved some money.  The contract at
2   American provided furlough pay.  I believe it was for
3   four months.
4      Q.  It was four of those six months?
5      A.  Yes.
6      Q.  Okay.
7      A.  And that's what I -- That's what I lived on.
8      Q.  Did you have unemployment?
9      A.  I never did apply for unemployment.
10     Q.  Okay.  Why not?  Were you eligible?
11     A.  I think I was.
12     Q.  But you didn't apply?  why not?
13     A.  Well, I don't think I was eligible while I was
14  getting furlough pay and so I didn't.
15     Q.  So that ran out, roughly, October --
16     A.  Yes.
17     Q.  -- the furlough pay?
18     A.  Uh-huh.
19     Q.  And then you didn't apply for unemployment after
20  that?
21     A.  Uh-uh.
22     Q.  Why not?
23     A.  I don't think so.  You know, I could be wrong,
24  but I don't think I did.  No, I didn't.
25     Q.  Any reason why not?
```

Page 46

1    A.  Well, I don't know.  I think -- I think that I
2  thought that there was going to be a short period of time
3  between, you know, the furlough pay and trying to find
4  and obtaining employment, so . . .
5    Q.  And, in fact, there was about two months; is that
6  right?  I'm sorry.  You said --
7    A.  I started looking --
8    Q.  -- there was another six months?
9    A.  Yeah.
10   Q.  Or eight months?
11   A.  Another six months.  Yeah, that's right.
12   Q.  Okay.  So what was your rate of compensation for
13  furlough pay?
14   A.  The same rate that I was getting paid before
15  being furloughed.
16   Q.  So you got a hundred percent of compensation --
17   A.  For four --
18   Q.  -- for four months?
19   A.  -- months, uh-huh.
20   Q.  And then starting, roughly, November 1 you didn't
21  have any furlough pay and you didn't apply for
22  unemployment or unemployment insurance?
23   A.  I don't remember applying for unemployment.  I
24  don't think I did.
25   Q.  Did you have -- So after November 1 until you

Page 47

1  obtained employment in July '04 as a contract pilot, what
2  were your sources of income?
3    A.  Well, I think I just told you.  I had some money
4  saved and --
5    Q.  Okay.  We didn't go over that period, so go on.
6    A.  I had some money saved and, you know, I tried to
7  make the furlough pay last.  I usually get a tax refund.
8  I'm sure I used that for covering bills.  The tax refund
9  in whenever, March or April of 2004 for the year 2003,
10  so . . .
11   Q.  Any other sources of income?
12   A.  I don't believe so.
13   Q.  Okay.  Between July '01 and July '04, what did
14  you do to search for employment, if anything?  I'm sorry.
15  July '03.  July '03 to July '04, what did you do to
16  search for employment?
17   A.  I went -- You know, I have to say I don't
18  remember the exact times for all of this, so maybe we
19  should just say that the testimony for time frames on
20  these job searches and how that all played out in that
21  say year between being furloughed and obtaining the Pilot
22  Services, strictly estimations.  So at some point --
23   Q.  I'm just going to ask you though if you could to
24  do your best to give me truthful and accurate
25  information --

Page 48

1    A.  Absolutely.
2    Q.  -- because we don't want it jumbled.
3    A.  I did apply for work at Trans Meridian.
4  Interviewed at Trans Meridian.  Was not hired.
5    Q.  When did you apply there?
6    A.  I -- It was -- It might have even been in 2000 --
7  late 2003.  That's why I'm saying.  I'm just giving you
8  estimations.  I know for a fact that I applied and was
9  interviewed at Trans Meridian, was not hired.  I applied
10  and was interviewed --
11   Q.  For what position?
12   A.  First officer or captain.  They were hiring both
13  on an MD-80.
14   Q.  Do you know why you did not get the position?
15   A.  I don't.
16   Q.  Okay.  And that was late '03?
17   A.  I believe that was late '03 because that's when
18  some of my fellow pilots were getting hired.
19   Q.  How did you learn of that position?
20   A.  Word of mouth.  Sometime in 2000 -- Sometime in
21  either late 2003 or early 2004 I began the application
22  process with Air Tran.  Again, let's say sometime between
23  the time I got furloughed and when I got hired with the
24  Contract Services, I was in the process of applying with
25  Air Tran.  I did get hired at Air Tran.

Page 49

1    Q.  When?
2    A.  I believe in the fall.
3    Q.  Of?
4    A.  Of 2004.  I did not accept that position because,
5  approximately, concurrently, we were hearing that we were
6  going to be offered -- I seriously considered taking that
7  position.  It would have, in my estimation, required me
8  to move to Atlanta and very seriously considered moving
9  to Atlanta and decided instead to accept the American
10  Eagle flow back.  Also in that time frame, somewhat --
11  sometime between getting furloughed and the fall of
12  2000 -- late fall of 2004 I interviewed with a company
13  called -- well, WAS, Inc. Incorporated is a pilot
14  services company that contracts pilots to -- provides
15  pilot hiring for international companies.  I interviewed
16  there.
17   Q.  When was this?
18   A.  When was it?
19   Q.  Yeah.
20   A.  Sometime between when I got furloughed and late
21  fall of 2004.
22   Q.  W-A-S, Inc.?
23   A.  Yeah.  Or a position with JALways, Incorporated.
24   Q.  This is separate from WAS, Inc. or the same?
25   A.  It was -- They do -- They provide pilot resources

# EXHIBIT B

1        In the District Court of the United States

2             District of New Jersey

3

4   Patrick Brady, et al.,

5       Plaintiffs,

6     vs.             No. 02-2917 JEI

7   Air Line Pilots Association,

8   International,

9       Defendant.

10

11

12        Deposition of Michael Finucan

13       On Behalf of the Defendant

14

15         September 18, 2012

16

17

18     Reported by Vanessa L. Hertich

19       Certified Court Reporter

20

21

22

23

24

25

Page 30

1    Q.  And then when did you switch -- What period of
2  time were you at the Danvers office?
3    A.  The Danvers office from late May of 2003 until I
4  want to say -- I was there a year, so late May, early
5  June of 2004.
6    Q.  And then you went to Hilton Head?
7    A.  Correct.
8    Q.  May '04 till when?
9    A.  Till my recall.
10   Q.  Which would have been September 2007?
11   A.  Correct.
12   Q.  Did you live at Hilton Head that whole time?
13   A.  I did.
14   Q.  Where did you live at Hilton Head?
15   A.  Well, I actually maintained two residence -- two
16  residences at the time because my family actually was
17  still living in Maine.  We owned a home in Maine and I
18  had a condominium that was loaned out to me by my boss
19  and --
20   Q.  Where?
21   A.  In Hilton Head for a time and so there was a
22  little straddle period there, but we eventually moved the
23  whole family down in 2000 -- 2005.
24   Q.  And how long did you stay there?
25   A.  Until -- until 2009.

Page 31

1    Q.  And then you moved back to New Hampshire or
2  Maine?
3    A.  New Hampshire.
4    Q.  Was that your only employment at Hilton Head
5  between 2005 and 2009?
6    A.  Yes, it was.
7    Q.  You didn't work for anybody except Mortgage
8  Networking?
9    A.  I did not.  I received commission income through
10 a -- My boss had a mortgage entity within that framework
11 because we -- There are certain licensing requirements
12 for certain states that we were doing business in and
13 Mortgage Network, with whom I worked, did not have a
14 license -- or did not have a license in -- I think it was
15 Illinois.  I think I did a loan in Illinois for a client
16 and was able to do that through his mortgage entity and
17 he paid me as a 1099, but I was, basically, working -- I
18 was still working for Mortgage Network, so I wasn't,
19 essentially, in his employ.  It was he, essentially,
20 wrote the loan and paid me a commission.
21   Q.  So in any given year while you were with Mortgage
22 Network, Inc., how much -- Well, what was your -- What
23 was the basis of your compensation as a loan officer for
24 Mortgage Network?
25   A.  Straight commission.

Page 32

1    Q.  Straight commission?  And was it the same every
2  year --
3    A.  No.
4    Q.  -- or did it vary by year?
5    A.  Varied by year.
6    Q.  Okay.  And you would be paid with that -- How was
7  that documented?
8    A.  I was -- I was a W-2 employee.
9    Q.  Okay.  And you would also receive though 1099
10 compensation?
11   A.  As I said, there were -- you know, there was
12 maybe one or two 1099s, to my recollection, that were for
13 loans outside the licensing purview of Mortgage Network.
14   Q.  And that was for the period of '03 through your
15 recall?
16   A.  Correct.
17   Q.  Just two loans?
18   A.  I -- It may have been three.  I have no idea the
19 actual number of loans, but it was a very small number
20 and those were, you know, in the grand scheme of the --
21 of my compensation, they were -- they did not amount to
22 be the majority of my income.
23   Q.  Okay.  What kind of training did you have to get
24 to be a loan officer for Mortgage Network?
25   A.  It was, basically, on-the-job training.  There

Page 33

1  was lots of just introduction to what the business is
2  about, you know, all the requirements for licensing, the
3  -- you know, you had to be familiar with all of the laws
4  relating to the business.  So there was a lot of ground
5  work there, but there was also direct one-on-one
6  assistance with other loan officers to -- on how to write
7  a loan, how to, you know, work with clients, how to price
8  products and so forth and services.
9    Q.  And did you have to get certified or licensed to
10 perform that job?
11   A.  Eventually we ended up having to have some
12 licensing requirements in certain states.
13   Q.  Did you obtain them?
14   A.  But the licensing, the actual licensing -- Like I
15 had a -- when I went to South Carolina, they required you
16 to have an individual license and you had to do education
17 requirements to obtain your license.  Some -- Some states
18 -- The company I worked for was a mortgage lender, it
19 wasn't a broker.  So if you worked for the mortgage
20 lender, you were licensed by virtue of their licensing,
21 but there were some states that required individual loan
22 officer licensing.
23   Q.  And one of them you said was South Carolina?
24   A.  Correct.
25   Q.  And did you obtain a South Carolina license?

9

Page 34

1    A.  Yes.

2    Q.  Okay.  When did you obtain that?

3    A.  I'm not exactly sure of that.  It was sometime

4  after -- I want to say sometime around 2005 when the

5  requirements or maybe 2006 when those requirements

6  occurred.

7    Q.  And how long was that effective?

8    A.  I think you had -- I think there were annual

9  requirements, you know, an online continuing education

10  course that would just, basically, refresh you on all the

11  lending laws and so forth.

12    Q.  And have you allowed that to since lapse?

13    A.  Correct.  Yes, I have.

14    Q.  When did that last lapse?

15    A.  As I said, I pretty much stopped active work in

16  the business upon my recall.

17    Q.  Okay.  How did you find the job with Mortgage

18  Network?

19    A.  I have a family friend who was quite successful

20  in the business.

21    Q.  And you started with them you said in May '03

22  just in terms of training and such?

23    A.  That's correct.

24    Q.  So you were getting trained before your actual

25  furlough?

Page 35

1    A.  I was.

2    Q.  Okay.  You were anticipating the furlough?

3    A.  It was -- Nobody knew.  There was a possibility

4  of that, but . . .

5    Q.  So you were just taking prophylactic measures?

6    A.  Well, you could say that, but, you know, I had

7  always planned to branch out at some point and, you know,

8  have something else to do and another way of augmenting

9  my income, so it was more an outgrowth.  I had an

10  opportunity and that presented itself.

11    Q.  So even if the furlough had not occurred, you

12  probably would have pursued this anyway?

13    A.  I probably would have.

14    Q.  Why did you give it up upon recall?

15    A.  I just -- There were a number of personal reasons

16  and it became difficult to manage things in my personal

17  life and managing the business and, you know, I had to

18  take care of my family, so . . .  The time that it takes

19  to be active, involved, and successful in that business

20  and make it worth your time was -- was too much of a time

21  demand for me to be able to do it properly, so . . .

22    Q.  Are there other opportunities that you're looking

23  at as an alternative to Mortgage Network, Inc. now that

24  you're back working with American Airlines?

25    A.  Not at the present time.

Page 36

1    Q.  Do you have anything that you're anticipating in

2  the future?

3    A.  Not at the present time.

4    Q.  In terms of your getting hired with Mortgage

5  Network, Inc., was there any correspondence between you

6  and your friend?

7    A.  It was all phone, you know, word of mouth.  Got

8  on an airplane and went down to Hilton Head and visited

9  him and it started from there.

10    Q.  Were you ever actually unemployed?

11    A.  No.

12    Q.  So you never received any unemployment insurance?

13    A.  I did not.

14    Q.  Was there any other work, line of work, anything

15  at all that you were considering or pursuing during your

16  time of employment with Mortgage Network, Inc.?

17    A.  No.

18    Q.  Why?

19    A.  It required my full attention to do that, so to

20  divert my attention would have made it difficult to do

21  the job.

22    Q.  Was the compensation sufficient for you?

23    A.  No, not at the time.

24    Q.  But you didn't do anything to try to bypass the

25  compensation?

Page 37

1    A.  I was in a squeeze play.  I was caught in a

2  declining market with rising rates and increased

3  business.  You know, home values were starting to

4  deteriorate significantly and we all know what happened

5  ensuing '07 and, certainly, '08.  So it was a -- It was a

6  snowballing -- It had a snowball effect and it was

7  difficult to know when -- because I would have bright

8  spots where I would have some good months and business

9  would sort of have spurts and show some, you know, return

10  to robust activity and then we would have some down time,

11  so it was hard to gauge that.

12    Q.  Is there any reason though that you didn't look

13  for either supplemental employment opportunities or

14  substitute employment opportunities during that time

15  period?

16    MR. JACOBSON:  I'm going to object.  I'm not sure

17  what time period you're referring to now.

18    Q.  (By Mr. Connell)  When you were working with

19  Mortgage Network, Inc.

20    A.  Well, first off, when I -- When I started working

21  for them full time, I moved from -- from Massachusetts,

22  from Danvers, Massachusetts to -- After a year of working

23  there, the economy had showed some signs of decline in

24  the northeast, however, the market down in Hilton Head

25  was very robust and I made the decision to move and to go

10                                    (Pages 34 to 37)

Page 38

1  down to work side-by-side with the family friend that had
2  brought me into the company and that is -- you know, I
3  threw myself into that full time.
4       As things progressed, it became -- it started to
5  become a little bit more difficult to earn commissions
6  and to keep clients.  There was quite a lot of
7  competition and so, as I said, there were times when
8  you'd be -- you'd get on a roll and other times when
9  you'd have low spots and it was -- I didn't -- because of
10  the time demands of, you know, just keeping ahold of your
11  business and keeping your clients happy and your realtors
12  happy and so forth, I just didn't have the time to pursue
13  that and, honestly, the only other thing that I was
14  qualified for was flying and at that point there still --
15  you know, the prospects for a flying job were not good
16  for me and so I had -- I had to make -- You know, the
17  choices that I made were, you know, I made them because
18  of my personal set of circumstances at the time.
19       Q.  So, essentially, you didn't have the time to look
20  for other opportunities?
21       A.  Well, I didn't have the time, nor did I have the
22  qualifications for other opportunities.
23       Q.  Okay.  With regard to your qualifications for
24  other opportunities, did you ever attempt to obtain
25  retraining, other forms of education, certification in

Page 39

1  any other field whatsoever?
2       A.  Not in -- Not in another field, but that -- No, I
3  did not.
4       Q.  Okay.  Any reason why?
5       A.  As I said, I was working full time in the
6  mortgage business.  I was trying to make a living doing
7  that and that, in my estimation at the time, was the best
8  possible opportunity for me given, you know, my set of
9  personal circumstances.
10       Q.  Since 2000 and especially during your period of
11  work with Mortgage Network, you didn't have any medical
12  or disciplinary issues that limited your ability to work
13  or seek other employment, did you?
14       A.  No.
15       Q.  Okay.  And did you ever suffer a loss of any FAA
16  medical certificate or other license needed to operate as
17  a pilot or flight crew member?
18       A.  What time period are we talking about?
19       Q.  Any time after 2000.
20       A.  After 2000?
21       Q.  Yes.
22       A.  Up to the present?
23       Q.  Yes.
24       A.  Okay.  In January of 2009 I had an illness.  I
25  contracted a virus that caused me to lose my medical for

Page 40

1  a short period of time, but it was reinstated a few
2  months later.
3       Q.  When was it restored?
4       A.  On or about April of 2009.
5       Q.  Okay.  And as a result of that loss, were you
6  able to operate as a pilot or flight crew member during
7  that period January to April?
8       A.  Was I able to --
9       Q.  What were you doing during that period January --
10       A.  I was --
11       Q.  -- to April?
12       A.  I was on sick leave.
13       Q.  Right.  Got you.  Paid?
14       A.  Yes.
15       Q.  During the period of your -- Strike that.
16       So during the period of May '03 until your
17  furlough, that was the only period of time, as I
18  understand your testimony, that you worked for another
19  employer during your periods of employment with TWA and
20  American Airlines, correct?
21       A.  Correct.
22       Q.  Question for you.  Is there a -- Do you know if
23  you have in your possession, I don't mean today, personal
24  possession, home, your 2000 federal income tax return?
25       A.  It was asked of me and I looked for it and I

Page 41

1  can't find it.
2       Q.  You can't find it.
3       A.  But I would think that your client would have my
4  pay records because my 2000 ALPA dues was predicated on
5  that pay, so they should be able to extrapolate what my
6  pay was in 2000.
7       Q.  I'm not talking about the pay so much as the tax
8  returns and you don't have them?
9       A.  I don't.  I'm sorry.
10       Q.  The 1099s that I understand was two or three
11  loans you said during your time with Mortgage Network,
12  Inc., do you have those 1099s still?
13       A.  I produced them, yeah.  Whatever -- whatever I
14  have, I produced.
15       Q.  Okay.  You have any statements that reflect
16  things like flight pay loss?
17       A.  For?
18       Q.  Flight pay loss or furlough pay, anything like
19  that.
20       A.  You mean -- You mean for like we were entitled to
21  furlough pay for four months after --
22       Q.  Yes.
23       A.  Yeah, I think we were entitled, by contract, I
24  think it was four and a half months pay.
25       Q.  So other than the contract, do you have any

11                                                    (Pages 38 to 41)

Page 42

1 documentation that would reflect that?
2   A.  I don't have it in my possession.
3   Q.  Including at home?
4   A.  I produced what I have.
5   Q.  And you already said you didn't receive any
6 unemployment benefits?
7   A.  I did not.
8   Q.  Any -- No retirement benefits at this point?
9   A.  No.  I'm not retired.
10   Q.  Any insurance monies received since 2000 of any
11 sort?
12   A.  Insurance for related to --
13   Q.  Unemployment, disability, sick leave, anything
14 like that.
15   A.  I'm receiving disability pay currently.
16   Q.  Currently?
17   A.  Yes.
18   Q.  Any cash income since 2000?
19   A.  No.
20   Q.  None at all?
21   A.  No.
22   Q.  Did you ever have available to you any employment
23 services agencies, search agencies, things like that that
24 could help with job placements, job retraining?
25   A.  I don't really know.

Page 43

1   Q.  So it's fair to say that you didn't avail
2 yourself of any services of that nature?
3       MR. JACOBSON:  Object to the form of the
4 question.  It assumes facts not in evidence.  He's not
5 aware of any, so asking if he didn't avail himself
6 suggests that they exist.
7   Q.  (By Mr. Connell)  Do you recall availing yourself
8 of any such services?
9   A.  I don't.
10   Q.  And other than Mortgage Network, Inc., there were
11 no other employment opportunities that you searched for
12 or pursued during your time of employment with TWA and
13 American Airlines, as well as your time of furlough,
14 correct?
15   A.  Correct.  I never made formal application with
16 any prospective employer.
17   Q.  Okay.  Even -- Did you just even search out any
18 other employment?
19   A.  In what way?
20   Q.  Any way.  Read the want ads?
21   A.  Sure.  Absolutely.  And I've networked
22 extensively with my fellow pilots who were similarly
23 situated, so, yeah.  It's not like I was sitting there
24 like a lump on a log and saying, oh, I guess I'll go do
25 this.  The reality of my situation was that I was one of

Page 44

1 the last in a line of people furloughed and,
2 unfortunately, there were so many furloughed in the wake
3 of 9/11 from all the different airlines, that the flying
4 jobs were few and far between and anything that would pay
5 anything close to approaching my former income with
6 American would have required an overseas move that was
7 not possible in my situation.
8   Q.  Why was it not possible?
9   A.  I had young children and I had family obligations
10 at home and to consign myself to chase a flying job that
11 would not be -- offer much security beyond a promise of,
12 hey, you know, we'll hire you for this year and see how
13 it works out, it's a big step to make that type of move.
14 And any domestic flying opportunities that I knew of were
15 -- the pay was just simply insufficient and so that's --
16 And most of my fellow TWA pilots -- former TWA pilots who
17 found themselves in that situation, most of them that I
18 know of suffered greatly during that period trying to
19 chase flying jobs, away from home for, you know, weeks
20 and weeks on end, flying in substandard conditions with
21 substandard carriers.  And I know of two friends who were
22 fortunate enough to hire on in the corporate world and
23 those are the only two success stories that I know of
24 personally.  So the job prospects for professional pilot
25 at the time of my furlough in December of 2003 were slim

Page 45

1 to none.  The only major airline, and if you would want
2 to call it a major airline that was hiring at the time at
3 that year was Jet Blue Airlines, at Jet Blue Airways, and
4 they stopped hiring in I believe the summer of that year,
5 so the door had been --
6   Q.  Which year?
7   A.  2003.  So the door had been closed, essentially,
8 so the problem with getting furloughed is if you're one
9 of the last guys out the door, you are left to pick the
10 carcass of whatever jobs are left over.  So that's the
11 situation that I found myself in and that's why -- that
12 was one of the main motivating factors on why I took the
13 course of action that I did.  There simply were not
14 flying jobs available that would have assured me of
15 restoring anything close to the income that I had enjoyed
16 previously.
17   Q.  Did the reasons that caused the furlough have
18 anything to do with the allegations that you raised in
19 this complaint against ALPA?
20       MR. JACOBSON:  I'm going to object to the form of
21 the question.  I think that's wholly speculative on --
22 For him to say that his furlough is somehow related to
23 the misconduct that the jury found ALPA engaged in, I
24 think that's just too far field.  It's too speculative.
25   Q.  (By Mr. Connell)  Do you have any reason to

# EXHIBIT C

1        In the District Court of the United States

2                 District of New Jersey

3

4    Patrick Brady, et al.,

5           Plaintiffs,

6       vs.                        No. 02-2917 JEI

7    Air Line Pilots Association,

8    International,

9           Defendant.

10

11

12              Deposition of Theodore Case

13              On Behalf of the Defendant

14

15              September 20, 2012

16

17

18          Reported by Vanessa L. Hertich

19              Certified Court Reporter

20

21

22

23

24

25

Page 58

1  you have a list in your possession at home?
2      A.  Yes.  Well, it's online at the airline.
3      Q.  Okay.  Could you produce that though your
4  counsel?
5      A.  Yes.  I believe you guys already have that list
6  from the mediation, but I can -- I can certainly provide
7  the list.
8      Q.  That sort of begs a whole different question.
9      A.  Yes, it does.
10     MR. CONNELL:  Well, let me just ask you.  I just
11  want to know this is a fact.
12     MR. JACOBSON:  Sure.
13     MR. CONNELL:  I'm not trying to compromise your
14  position.  There was information exchanged at the
15  mediation.  Are we going to do not disclose in discovery
16  at this point or are we not?
17     MR. JACOBSON:  I think mediation's stuff all kept
18  confidential.
19     MR. CONNELL:  It is.  It is.  I agree.
20     MR. JACOBSON:  But, certainly, you know, there's
21  factual material that we could supply you that's the same
22  material.
23     MR. CONNELL:  Right.  That's -- you know, because
24  I mean, that's part of what I think Ted's talking about
25  here.

Page 59

1      MR. JACOBSON:  He just mentioned a list, but that
2  was a list that was just received from American Airlines,
3  correct?
4      MR. CONNELL:  No.
5      THE WITNESS:  It's from me.
6      MR. CONNELL:  From him.  Right.
7      THE WITNESS:  The only difficulty with the list,
8  and if I understand what you're looking for, is parties
9  who deferred and parties who have declined recall.
10     Q.  (By Mr. Connell)  Right.
11     A.  It identifies who they are primarily, but there
12  are some people in it who have been furloughed twice --
13     Q.  I understand.
14     A.  -- and been recalled twice and so it is a little
15  convoluted to follow, but it is -- it is fairly easy to
16  see the people who have deferred who have -- are still on
17  deferral and intentionally not returned.
18     MR. CONNELL:  Okay.  But this is really your
19  decision, not Ted's.
20     MR. JACOBSON:  He's talked about it now in the
21  deposition.  This is not the mediation, so it's --
22     MR. CONNELL:  No.  No.  No.  I know, but, I mean,
23  you know, honestly, I'm trying to be fair here.
24     MR. JACOBSON:  Yeah.
25     MR. CONNELL:  What do you -- What do you want to

Page 60

1  do?
2      MR. JACOBSON:  I don't --
3      MR. CONNELL:  You want --
4      MR. JACOBSON:  Sitting here I don't see a problem
5  producing that.  I would defer to Allen since he's the
6  lead guy on the case, but --
7      MR. CONNELL:  Well, let me -- The reason I ask is
8  because we have that.  I have it here.  We could, time
9  allowing, go into that.
10     MR. JACOBSON:  Why don't we, when we take our
11  next break, I'll go talk to Allen, make sure there's not
12  an issue with that.
13     MR. CONNELL:  Okay.  I think that might be a good
14  idea.
15     Q.  (By Mr. Connell)  All right.  So you would need
16  to rely upon that list to identify the pilots who
17  declined recall?
18     A.  It would be very helpful because there's quite a
19  few of them.
20     Q.  Okay.  And were there pilots also -- Do you know
21  why they declined recall?
22     A.  Some I knew personally and some I knew just
23  speculatively.
24     Q.  I don't want you to -- I don't want to know about
25  speculation.  Only the personal stuff.

Page 61

1      A.  Some of them have better jobs and some of them
2  have decent jobs, but they're waiting to see what happens
3  here before they change their mind and come back.
4      Q.  when you say decent, you know, paying as well as
5  they were making here?
6      A.  That and not quite, but the work rules here are
7  not necessarily the best in the world.
8      Q.  At American?
9      A.  Correct.  And now with this most recent turn of
10  events with the 1113 and the contract, most of the people
11  who have deferred will not be coming back.
12     Q.  Okay.
13     A.  They won't be offered the opportunity, more than
14  likely.
15     Q.  Okay.  Do you have an idea -- Like you said, some
16  of these people got better jobs or some at least equal
17  compensation, but better rules.  Do you know when those
18  people obtained that employment?
19     A.  Just only through personal relationships with
20  some of them.  The parties -- Most of the parties that
21  I'm familiar with went to Cathay Pacific and it's a very
22  financially stable company.  It's Chinese and British
23  and, essentially, they've got a job for life as long as
24  they show up and most of those pilots who went to Cathay,
25  not all of them, but most of those pilots who went to

16                                    (Pages 58 to 61)

Page 62

1  Cathay will more than likely stay there.
2       Q.  Let me ask you the question this way.  If you
3  were put to the task of finding out when these pilots who
4  deferred or declined recall had obtained alternative
5  employment that they were satisfied with, for whatever
6  reason, how would you go about doing that?
7       A.  Personal contacts.  We still have a fairly tight
8  network of communication amongst the former TWA people.
9       Q.  So you'd just, basically, have to reach out to
10 each individual pilot?
11      A.  Reach out and phone tree.  Build a phone tree.
12      Q.  That information at this point has not yet been
13 compiled, has it or has it?
14      A.  To the best of my knowledge, no, it has not.
15      MR. CONNELL:  Okay.  We'll take a break now.
16      THE VIDEOGRAPHER:  Very good.  This will end disk
17 number one in the deposition of Theodore Case.  We are
18 off the record at 2:35 p.m.
19      (A short recess was held.)
20      (Defendant's Exhibit Number 5 was marked for
21 purposes of identification.)
22      THE VIDEOGRAPHER:  We're back on the record at
23 2:50 p.m.  This begins disk number two in the deposition
24 of Theodore Case.  Please continue.
25      MR. CONNELL:  Now that we're back, we just had a

Page 63

1  colloquy about the documents.
2       MR. JACOBSON:  Yes.  During the break I went and
3  looked at the list that Mr. Case discussed and looked at
4  it with Allen and it is a list that Mr. Case prepared at
5  our request and with our cooperation in order to gather
6  data from disparate areas to collect, among other things,
7  information about when pilots received recall notices,
8  who deferred, when they responded and all that and it is,
9  in our view, work product and it is work product that
10 until recently probably was the only source of the
11 information, but since we have now received discovery
12 from APA in this case, it's my understanding from Allen
13 that the information that we've talked about briefly here
14 that's contained in this exhibit that was created by Mr.
15 Case is available from the documents that APA produced.
16 That it's not nearly as pretty, it's not color coded, but
17 that information is reasonably available from this other
18 source and so out of concern, and maybe it's an excess of
19 concern, about not waiving our work product privilege in
20 this matter, we're not going to want to use that at this
21 deposition.
22      MR. CONNELL:  And does that also mean that
23 there's no intention on part of the Plaintiffs to
24 designate that document as discoverable?
25      MR. JACOBSON:  I don't understand your question.

Page 64

1  Can you say that again?
2       MR. CONNELL:  Does that mean there's no intention
3  on the part of Plaintiffs to designate that document as
4  something that you're going to produce in discovery, not
5  just in the deposition, but in discovery generally for
6  the damages basis trial?
7       MR. JACOBSON:  That's an excellent question.  I
8  don't think I can answer it because I haven't thought
9  about it enough.  It is possible I suppose, as we get
10 deeper into the APA produced documents and the American
11 Airline produced documents, that if there are gaps in
12 there and there may be portions of this document that we
13 pull out in some way and use, I think it's pretty
14 unlikely that we would make any use of the document as a
15 whole.  If we were to, you know, decide it actually has
16 information that's not available elsewhere because,
17 obviously, you know, as far as a source, we rather would
18 have documents that we sourced from APA or American as
19 opposed to Mr. Case's conversations with hundreds of
20 former TWA pilots because of all the evidentiary problems
21 in trying to offer such a document.  If we were to
22 achieve that, we'd, certainly, let you know right away,
23 but sitting here right now, I don't see why we would do
24 that since my understanding from talking to Allen is that
25 the information is now available from sources that make

Page 65

1  it easier to offer the document into evidence --
2  information into evidence.
3       MR. CONNELL:  Yeah, I understand.  I mean, I'm
4  not going to -- This is not to argue with you.
5       MR. JACOBSON:  Yeah.  Yeah.
6       MR. CONNELL:  But just to conclude the colloquy,
7  I'm not so sure that's the case.  I mean, deferral --
8  deferral information and I don't know that we necessarily
9  have a composite source for that information.
10      MR. JACOBSON:  Well, certainly, something that we
11 can look into together and if, in fact, there isn't a
12 ready source, alternative source information, that,
13 certainly, would be a factor to militate into making the
14 document available not withstanding work product.
15      MR. CONNELL:  Actually, could I ask this?  Would
16 it be possible for -- because I know this is a last
17 minute request in the middle of a deposition and you
18 haven't had a whole lot of time to think about this, but
19 would it be possible for you and Allen to confer say over
20 the weekend and --
21      MR. JACOBSON:  We will talk.
22      MR. CONNELL:  -- you would let us know maybe by
23 next Tuesday, Wednesday, something like that?
24      MR. JACOBSON:  We'll talk about this.
25      MR. CONNELL:  If you want to, I can, you know,

17                                        (Pages 62 to 65)

# EXHIBIT D

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2              CAMDEN VICINAGE.
                CIVIL ACTION NO. 02-2917-JEI
 3

 4    PATRICK BRADY, et al.,

 5                                  Plaintiffs,

 6          vs.

 7    AIRLINE PILOTS ASSOCIATION,
      INTERNATIONAL,
 8                                  Defendant.

 9              ------------------

10              September 21, 2012

11              ------------------

12              Oral sworn videotaped deposition
      of HOWARD HOLLANDER, 14 Adelphi Avenue, Harrison,
13    New York, was taken at the law office of Archer &
      Greiner, One Centennial Square, Haddonfield, New
14    Jersey 08033, before Jean B. Delaney, Certified
      Shorthand Reporter and Notary Public of the State of
15    New Jersey, on the above date, commencing at 11:16
      a.m., there being present:
16
                TRUJILLO RODRIGUEZ & RICHARDS LLC
17              BY: LISA J. RODRIGUEZ, ESQUIRE
                    NICOLE M. ACCHIONE, ESQUIRE
18              Eight Kings Highway West
                Haddonfield, New Jersey  08033
19              (856)795-9002
                Attorneys for Plaintiffs
20
                ARCHER & GREINER, ESQUIRES
21              BY: STEVEN J. FRAM, ESQUIRE
                    JOHN C. CONNELL, ESQUIRE
22              One Centennial Square
                Haddonfield, New Jersey  08033
23              (856)795-2121
                Attorneys for Defendant
24
      Also present:  Marta Wagner
25              James Bateman, CLVS
```

Page 81

1     Q    Do you agree that Hollander-1, which is
2  the doc request that we are working off, in
3  paragraph 1(c) specifically asks you to produce
4  federal and state tax returns?
5          MS. RODRIGUEZ: Objection.
6          THE WITNESS: I -- I didn't see this
7  document so I -- my apologies, Mr. Fram. I provided
8  what my attorneys asked me to provide, so --
9  BY MR. FRAM:
10    Q    1(e) on that page is kind of a catchall
11 that asks for all other documents that reflect
12 income for the period from 2000 to the present.
13         Other than the 1099s, you produced 10 -- W2s.
14 Other than those and the 1099s, can you think of any
15 other documents that would reflect income that you
16 received during this time frame, 2000 to the
17 present?
18    A    That I received, no.
19    Q    All right. Let's skip down to
20 paragraph three where for each former TWA
21 pilot for whom back pay damages were sought.
22 Produce all documents that concern, refer, or relate
23 to any firing, resignation, medical disability, loss
24 of AA medical certificate or disciplinary actions.
25         Take them one at a time.

Page 82

1          Were you ever fired by American Airlines?
2     A    I was not.
3     Q    Did you ever resign from the company?
4     A    I did not.
5     Q    Other than the issue you've had since
6  June because of your rotator cuff injury, have you
7  ever been on medical disability from American
8  Airlines?
9     A    I have not.
10    Q    Have you ever lost or had suspended
11 your FAA medical certificate?
12    A    I have not.
13    Q    And then, have you been subject to any
14 disciplinary actions or proceedings while at
15 American Airlines?
16    A    I have not.
17    Q    Next page, paragraph four.
18         For each former TWA pilot for whom back pay
19 damages are sought, please produce all documents
20 that refer or relate to bids, awards, approvals, or
21 denials of a furlough stand-in stead, voluntary
22 furlough.
23         You were never furloughed; right?
24    A    I was never furloughed.
25    Q    And as a consequence, you don't have

Page 83

1  any of those types of documents; is that correct?
2     A    That is correct.
3     Q    By the way, do you know what back pay
4  damages are?
5     A    Would that -- I'm not certain. I'm not
6  certain.
7          MS. RODRIGUEZ: Don't guess.
8  BY MR. FRAM:
9     Q    Yeah. Yeah, I'm not asking you to
10 guess. I'm just trying to get a sense if you -- of
11 whether you understand what the term means.
12    A    I -- I do not have a full compensation
13 of what it means.
14    Q    Some of these other requests refer to
15 front-pay damages. Do you have an understanding of
16 what front pay damages are?
17    A    I do not.
18    Q    Skipping down to number eight, we asked
19 that for each pilot for whom lost pension or
20 retirement benefits -- retirement benefits are
21 sought, to produce any documents.
22         Do you believe that you have suffered a loss
23 of any pension or retirement benefits as a
24 consequence of anything that ALPA did or didn't do?
25    A    I take the position that I do.

Page 84

1     Q    Okay. Explain your position for me,
2  please.
3     A    Pension and/or retirement benefits in
4  our current environment are based on your annual
5  salary. You make so much. They contribute so much.
6  I feel that for many years being removed from my
7  Captain status, more so than my Check Airman status,
8  at a lower annual salary, means a lower contribution
9  to those pension and retirement benefits. And had I
10 not lost that position, I believe they would be a
11 higher number as of today's date.
12    Q    Just going back to your declaration in
13 the American bankruptcy, you note in -- yeah, I'm
14 looking at page four of that document, paragraph 14.
15         It says, when AA purchased the assets of TWA,
16 there were approximately 2,200 TWA pilots, many of
17 whom work from their domicile in St. Louis,
18 Missouri. Today there are approximately 700 former
19 TWA pilots actively employed by AA and another 700
20 on furlough.
21         Do you see that?
22    A    I do.
23    Q    If we do the math and add 700 with 700,
24 that comes to about 1,400, meaning that there is
25 about 800 pilots that are other than those who are

Page 85

1 actively employed or on furlough. Do you agree with
2 that math?
3     A    Those numbers were not provided by me,
4 but by virtue of what you just said, I agree. But,
5 I mean, I didn't provide the 700 and 700.
6     Q    All right. Look. You -- you adopted
7 those numbers. You would not have signed or
8 authorized somebody to put your name on this
9 declaration if you didn't believe they were true;
10 correct?
11         MS. RODRIGUEZ: Objection. Objection.
12         MR. FRAM: Objection noted.
13         THE WITNESS: I -- I didn't dispute the
14 numbers. I -- I just don't have any firsthand
15 knowledge as to the accuracy of them.
16 BY MR. FRAM:
17     Q    So you took the word of the lawyers who
18 drafted the document that those numbers were
19 accurate, is that fair?
20     A    That -- that's fair.
21     Q    Okay. All right. So look, there is,
22 you know, there is 800 pilots other than the ones
23 that were -- that -- that are actively employed in
24 January who -- or who were on furlough; yes? That's
25 the math.

Page 86

1         MS. RODRIGUEZ: Objection. Are you
2 asking him to do the math?
3         MR. FRAM: Yeah, I am.
4         MS. RODRIGUEZ: Just --
5         MR. FRAM: It is just a foundational
6 question.
7         THE WITNESS: By virtue of your math,
8 it -- it sounds valid.
9 BY MR. FRAM:
10     Q    Okay. What -- what happened to the
11 other 800?
12     A    To the best of my knowledge, they've
13 either succumbed to retirement, or disability, or
14 unfortunately death. I -- I don't know the exact
15 answer for all 800, but I would say many have
16 retired or -- or passed on.
17     Q    Is it -- as you understand it, do some
18 of them work for other airlines?
19     A    I do know of some pilots that work for
20 other airlines.
21     Q    Okay. Would they be included in the
22 800 that we've derived, or would they be part of the
23 700 on furlough?
24         MS. RODRIGUEZ: Objection.
25 BY MR. FRAM:

Page 87

1     Q    If you know.
2     A    I -- I don't know. I really don't
3 know.
4     Q    Of the 700 on furlough that you refer
5 to in that paragraph, how many are out of work as
6 opposed to -- how many are out of work as pilots as
7 opposed to ones who are working for other airlines?
8         MS. RODRIGUEZ: Objection.
9         THE WITNESS: I -- I don't have a
10 number for that, Mr. Fram.
11 BY MR. FRAM:
12     Q    Okay. Do you agree that former TWA
13 pilots who were furloughed by American in some cases
14 have gotten jobs at other carriers?
15     A    I would agree.
16     Q    Okay. Do you personally know some of
17 the former TWA pilots who are currently flying for
18 other carriers?
19     A    I -- I personally know of at least six
20 off -- offhand.
21     Q    Great. Can you tell me the names of
22 the six that come to mind?
23     A    Sure. Paul Bruder.
24     Q    Spell that, please.
25     A    B-R-U-D-E-R.

Page 88

1     Q    Uh-huh.
2     A    I'm trying to think. Lombardi, like
3 the football player. But his first name is not
4 Vince. I'm trying to think of his first name. Mr.
5 -- Captain -- former Captain Lombardi. There is a
6 gentleman named Simms. S-I -- I believe it is two
7 Ms and an S. Ah, ah, what's his name? You know,
8 over the years I bump into these people and I'm
9 trying to remember names. I'm -- forgive me. Those
10 are the three I can think of off the top of my head,
11 but I've -- I've conversed with at least six people
12 who are flying elsewhere.
13     Q    Of those six, were any offered their
14 jobs back at American?
15     A    I -- I -- I can't recall. I'm -- I'm
16 not in close contact with them.
17     Q    Are you aware of any former TWA pilots
18 who were furloughed by American and who were
19 recalled from furlough?
20     A    Am I aware of pilots that were
21 furloughed and have now returned?
22     Q    Yes.
23     A    Yeah, I'm aware that exists, yeah.
24     Q    There are -- in fact, hundreds of
25 former TWA pilots who were furloughed by American

# EXHIBIT E

```
1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW JERSEY
2

3    _____

     PATRICK BRADY, et al,
4
              Plaintiff,              CIVIL ACTION NUMBER:
5
              -vs-                          02-2917
6
     AIR LINE PILOTS ASSOCIATION,
7
              Defendants.
8    _____
              Mitchell H. Cohen United States Courthouse
9             One John F. Gerry Plaza
              Camden, New Jersey 08101
10            July 31, 2012

11   B E F O R E:        THE HONORABLE JOSEPH E. IRENAS
                         SENIOR UNITED STATES DISTRICT JUDGE
12


13
     A P P E A R A N C E S:
14
     ARCHER & GREINER, ESQS.
15   BY:  STEVEN J. FRAM, ESQUIRE
          JOHN C. CONNELL, ESQUIRE
16         and
     KATZ & RANZMAN, P.C.
17   BY:  DANIEL M. KATZ, ESQUIRE
     Attorneys for the Plaintiffs.
18
     TRUJILLO, RODRIGUEZ & RICHARD, LLC
19   BY:  LISA J. RODRIGUEZ, ESQUIRE
            and
20   GREEN JACOBSON, P.C.
     BY: ALLEN P. PRESS, ESQUIRE
21   Attorneys for the Defendants.

22
     JOSEPH JACOBSON, ESQUIRE
23   (Telephoned in )

24
     Certified as True and Correct as required by Title 28, U.S.C.,
25   Section 753
          /S/ Cathy J. Ford, CCR, CRR, RPR
```

1    would have done better in their negotiations for integration

2    with American pilots.

3         I really don't have to do the second three, but the

4    second is that the order offers a substantial ground for

5    difference of opinion as to its correctness.  I don't accept

6    that.  I don't accept that there is a reasonable ground for

7    difference.

8         And, finally, if the appeal immediately will materially

9    advance the ultimate determination of the litigation.  I don't

10   believe that.  I don't believe that for a minute.  It's a

11   ten-year old litigation, another two years at the circuit

12   isn't going to help this litigation.  And we're better off

13   pushing it to a conclusion and letting the circuit have a

14   whole record and dealing with it.

15        I'm going to deny the motion for a Section 1292(b)

16   certification and proceed to bring this case to a conclusion.

17        Now, having ruled against the defendants on that issue,

18   the plaintiffs, you got a difficult road to hoe.  I think

19   we're all ready, are we not, past the date for the expert

20   reports?

21        MS. RODRIGUEZ:  No, Your Honor.  The original date

22   was August 6th.

23        THE COURT:  For the file -- but you're not going to

24   meet that date?

25        MS. RODRIGUEZ:  We're not going to meet that date.

```
 1            THE COURT:  Well, you know, this case is very old.
 2   The theory of the case, meaning the theory that you argued,
 3   and that the jury adopted, meaning the breach of the duty of
 4   exclusive loyalty to the TWA pilots.  You've known that theory
 5   now for years and years and years.  It's not like it was like
 6   the theory changed at the last minute and then you suddenly
 7   were faced with a new theory of liability.  You got to come
 8   forth with your expert.  You have to show me, and the other
 9   side, as to how you're going to prove your case.
10            MS. RODRIGUEZ:  And we're working on it.
11            THE COURT:  Because I'm sitting here now, and I can't
12   figure it out.
13            MS. RODRIGUEZ:  Your Honor, we're working on that.
14            THE COURT:  Well, I know "we're working on it."
15            MS. RODRIGUEZ:  As your Honor knows discovery on the
16   damage phase was stayed until May 4th.  So, actually --
17            THE COURT:  But that -- maybe you need some
18   discovery, I'm not saying there isn't some discovery, but the
19   simple matter is you know what the theory is.
20            MS. RODRIGUEZ:  We know what the theory is.
21            THE COURT:  And you know a lot of the facts.
22            MS. RODRIGUEZ:  We do.
23            THE COURT:  I'm not saying there isn't maybe a nook
24   or cranny in discovery that's needed, but, I mean, this case
25   has been well explored by both sides.
```

1          MS. RODRIGUEZ:  Your Honor, our experts are in the

2     process of putting together a "but for" seniority list.  "But

3     for" the breach of ALPA, this is what a reasonable --

4          THE COURT:  And, by the way, Vulcan doesn't -- Vulcan

5     One or Two, I'm not totally persuaded by Vulcan.  Vulcan is a

6     nonjury case, I believe.

7          MS. RODRIGUEZ:  It was a nonjury case.

8          THE COURT:  It was a nonjury case.  Because a jury

9     case which alone, as Mr. Fram pointed out in one of his

10    papers, makes a big difference.

11         MR. FRAM:  It was a Title Seven case, your Honor.

12         THE COURT:  And the Supreme Court, I think, has since

13    said that the theory they used is not only limited to Title

14    Seven cases but limited to even a subspecies of Title Seven

15    cases, I believe.

16         MS. RODRIGUEZ:  I think what the takeaway from Vulcan

17    and Duke is that -- at least as to the mitigation part of the

18    case -- that has to be presented.  That the defendants have to

19    have a chance to test mitigation separately, that's why we

20    proposed a --

21         THE COURT:  Yeah, but where do -- you seem to suggest

22    that I take away from the jury, for instance, the mitigation

23    issue.  How can I do that?  How can I take it away from the

24    jury?

25         MS. RODRIGUEZ:  Perhaps, you don't take it away from

1    the jury, but in the first instance, you have to have the "but

2    for" list.  And the defendants have been talking all along

3    that they don't know who damaged, who is high, who is low, and

4    once you have that list, you will know who has been damaged

5    and who hasn't been damaged, because there will be people at

6    the top of the list that were reasonably integrated and there

7    will be people at the bottom of the list that would have been

8    furloughed regardless.  So, you'll have those people on either

9    end of the list --

10         THE COURT:  You mean, you'll concede that point, is

11   what you're saying?

12         MS. RODRIGUEZ:  And we've always conceded that point.

13         THE COURT:  There are some people in the, quote,

14   class who there won't be a damage claim.

15         MS. RODRIGUEZ:  Because they're either too low or

16   they were high enough that they were integrated in a

17   reasonable fashion.  So, you'll have that list and then

18   they'll know who the damaged members of the class are.

19       So, that's step one.

20         THE COURT:  Well, when is step one -- since we can't

21   go to step two without step one, when is step one going to be

22   completed?

23         MR. PRESS:  Judge, we deferred this so that I could

24   report back to you on the status of American Airlines document

25   production to us which is crucial for our damage model in that

```
 1   when we reassigned TWA pilot with a new seniority number, we
 2   are going to use the actual earning of the person in that
 3   seniority slot for our assumed earnings for that pilot.  It's
 4   the best data there is for that.
 5        We are trying to eliminate as many assumptions from our
 6   model as possible so that we have less quarreling with the
 7   other side.
 8        I spoke with the lawyer yesterday.  He said --
 9        THE COURT:  The lawyer?
10        MR. PRESS:  The American Airlines lawyer yesterday.
11   He told me we should have the data this week in an electronic
12   format that our expert is going to be able to use.
13        Our experts have told us that if that happens, we --
14        THE COURT:  This is the bankruptcy lawyer?
15        MR. PRESS:  It's their general counsel in Washington
16   D.C.
17        MR. KATZ:  Your Honor, if I may, I got an e-mail from
18   the lawyer.  The name is Jonathan Fritts, F-R-I-T-T-S.  He's a
19   partner with Morgan, Lewis and Bockius in Washington, D.C. or
20   labor counsel for American Airlines, and have been back in
21   2001.  And what he said in the e-mail was that he talked to
22   Allen and that American was prepared to produce this week some
23   of the data that had been requested by the plaintiffs and by
24   ALPA, because we've subpoenaed American to produce information
25   as well.  But as other information, including the wage
```