1              **UNITED STATES DISTRICT COURT**
               **FOR THE DISTRICT OF NEW JERSEY**
2    _____

3    PATRICK BRADY, et al.,

4            Plaintiffs

5                                       CIVIL ACTION
             Vs.                        NO. 02-2917 (JEI)
6
     AIR LINE PILOTS ASSOCIATION,
7    INTERNATIONAL,                     STATUS CONFERENCE

8
             Defendant.
9    _____

10                        UNITED STATES COURTHOUSE
                          ONE JOHN F. GERRY PLAZA
11                        4TH AND COOPER STREETS
                          CAMDEN, NEW JERSEY 08101
12                        November 15, 2012

13   B E F O R E:    THE HONORABLE JOSEPH E. IRENAS
                     UNITED STATES DISTRICT JUDGE
14
     A P P E A R A N C E S:
15
     TRUJILLO, RODRIGUEZ & RICHARDS, LLC
16       LISA J. RODRIGUEZ, ESQUIRE
         NICOLE M. ACCHIONE, ESQUIRE
17          Counsel for Plaintiff

18   GREEN JACOBSON, P.C.
         ALAN P. PRESS, ESQUIRE
19          Counsel for Plaintiff

20   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
         JAY COHEN, ESQUIRE
21       THEODORE V. WELLS, JR., ESQUIRE
         DANIEL J. TOAL, ESQUIRE
22          Counsel for Defendant

23   ARCHER & GREINER, P.C.
         JOHN C. CONNELL, ESQUIRE
24       KERRI E. CHEWNING, ESQUIRE
            Counsel for Defendant
25   (Continued on Page 2)



1   **A P P E A R A N C E S   C O N T I N U E D:**

2   KATZ & RANZMAN, P.C.
          DANIEL M. KATZ, ESQUIRE
3            Counsel for Defendant

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          THE COURT:  I see some familiar faces that should be
 2   somewhere else but here.  Must be a slow day at Paul Weiss.
 3          Okay.  This, of course, is the ALPA case, which has
 4   been parked on my doorstep now for quite a while, and may I
 5   have the appearance of counsel.  Let's start with the
 6   Plaintiffs and then work around.
 7          MS. RODRIGUEZ:  Good morning, Your Honor.  Lisa
 8   Rodriguez and Nicole Acchione from Trujillo, Rodriguez &
 9   Richards for the Plaintiffs.
10          MS. ACCHIONE:  Good morning, Your Honor.
11          MR. PRESS:  Alan Press for the Plaintiffs, Judge.
12          THE COURT:  Good morning, Mr. Press.
13          MR. PRESS:  Good morning.
14          MR. CONNELL:  Archer & Greiner by John C. Connell on
15   behalf of the Defendant, ALPA.  I'm here with my associate,
16   Kerri Chewning.
17          MR. WELLS:  Good morning, Your Honor.  Ted Wells from
18   Paul Weiss.
19          THE COURT:  Representing ALPA?
20          MR. WELLS:  ALPA, yes, Your Honor.
21          MR. COHEN:  Your Honor, Jay Cohen, also from Paul
22   Weiss.
23          THE COURT:  J-a-y?
24          MR. COHEN:  J-a-y, yes, Cohen.
25          THE COURT:  The Cohen I got, but the Jay, J-a-y.
```

```
 1          MR. TOAL:  Good morning, Your Honor.  Dan Toal from
 2   Paul Weiss.
 3          THE COURT:  Dan?
 4          MR. TOAL:  Toal, T-o-a-l.
 5          THE COURT:  T-o-a-l?
 6          MR. TOAL:  That's right, sir.
 7          THE COURT:  And you're from Paul Weiss, okay.
 8          MR. KATZ:  Good morning, Judge Irenas.  Daniel Katz.
 9          THE COURT:  Oh, a familiar face.
10          MR. KATZ:  The law firm of Katz & Ranzman,
11   Washington, D.C., representing the Defendant, ALPA.
12          THE COURT:  Okay.  The reason this was originally set
13   was to sort of check into the progress.  In fact, I think I
14   really anticipated it be done in chambers, not even be done on
15   the record, to just find out when we're getting our expert
16   reports in, what the timing is to respond to the reports, what
17   kind of discovery, and we -- when I say "we," anybody here
18   would undertake in connection to the damages trial, to do
19   those kinds of things.
20          Mr. Wells' appearance was really after -- when I say
21   "Mr. Wells," Paul Weiss and Mr. Wells and the other attorneys
22   from Paul Weiss, came in later, I mean, when this conference
23   was really set up, and he's raised some new issues.  So why
24   don't I let -- let's start with Paul Weiss, tell me, you
25   know -- explain their representations and what it is there.
```

1    Anybody can speak.

2            MR. COHEN:  Your Honor, I'm between the two of them,

3    so I'll give it a try.  Jay Cohen.

4            THE COURT:  I have Jay, J-a-y.

5            MR. COHEN:  I'm actually looking at my judge's

6    portrait on the wall.  I used to work for Judge Hunter.

7            THE COURT:  Yeah, you're not a Marine, are you?

8            MR. COHEN:  I am not, sadly.

9            THE COURT:  Just checking.  November 8th is not a

10   national holiday for you, is it?

11           MR. COHEN:  We had last year, I believe -- I don't

12   know if you know who Judge Snow is, but we had his 40th

13   anniversary party of the all clerks.

14           THE COURT:  Didn't his wife --

15           MR. COHEN:  She just passed away.  She was alive --

16   she was alive, yeah.

17           THE COURT:  I know it was just recently she passed

18   away.

19           MR. COHEN:  Yeah, she was too ill to attend the

20   party.  We realized we had been deprived of all these

21   reunions, so we went to Tavistock, and this morning I went to

22   Shirley's for the first time since 1981 for coffee.

23           THE COURT:  Were you in this building?

24           MR. COHEN:  Yes, the 4th floor.

25           THE COURT:  The 4th floor, yeah.

1          MR. COHEN:  Judge Cohen was across the hall.

2          THE COURT:  Well, I appeared as a practicing lawyer

3    here when he was on the 4th floor.  In fact, I appeared -- in

4    the chambers that I now sit, I appeared before Mitch Cohen,

5    actually.  He was sitting in sort of a butchered version.  The

6    chambers that I now sit in have been redone to look the way

7    they looked in the 1930s.  But when he was there, the room was

8    subdivided and the ceiling was lower, but I appeared before

9    Judge Cohen.

10          MR. COHEN:  It's a much nicer -- Ms. Rodriguez and I

11   talked about this.  It's a much nicer court than it used to

12   be, but I think the new building was the parking lot.

13          THE COURT:  Yeah, well, I was in the new building for

14   a while, but when they redid this courtroom, when they fixed

15   it up and they fixed up the chambers that I'm in, the adjacent

16   chambers, I was then the senior acting judge, so I moved back

17   here.  I remain the only judge in this building.

18          MR. COHEN:  Right.

19          THE COURT:  Bankruptcy, magistrates, district are all

20   in -- are all in the court house.  I'm the only one that's

21   here.

22          MR. COHEN:  Your Honor, if we may, as we -- and,

23   obviously, we've been working closely with Archer & Greiner

24   and Mr. Katz to move this along.  As we understand, what was

25   supposed to have been accomplished in the conference was, one,

1   we can report on discovery.  There was discovery ordered with

2   respect to --

3          THE COURT:  There was five -- we were going to take

4   the deposition of five of the pilots, I believe.

5          MR. COHEN:  Well, five individuals.  Not all pilots.

6   They were American executives --

7          THE COURT:  I just remember five individuals that

8   were supposed to be deposed.

9          MR. COHEN:  Yes, and four of the five have been

10  completed, Your Honor.

11         THE COURT:  Who hasn't been completed?

12         MR. TOAL:  There were four total.

13         MR. COHEN:  Four total.  We have one left on the

14  29th.  John Dare.

15         MR. PRESS:  The five class members have all been

16  deposed, Judge.

17         MR. TOAL:  Mr. Cohen's referring to the third-party

18  witnesses.

19         MR. COHEN:  Oh, from the union.

20         MR. TOAL:  Yeah, American and the union.

21         MR. COHEN:  So that discovery will be completed this

22  month.

23      We are in receipt of preliminary expert reports of the

24  Plaintiffs, and I think we were just discussing this before,

25  and in our view we would like to see final expert reports.  We

1    are going to need some discovery in connection with the

2    experts, fairly targeted discovery.

3          THE COURT: Before we go back, we have expert reports

4    now from the Plaintiff.

5          MR. COHEN: Well, we have preliminary expert reports

6    for the Plaintiffs that set out a methodology for how they

7    would do a list but do not have any of the individualized

8    setoffs and data that should get us to a damage number. So we

9    have a number of expert reports with a range of damages, 160

10    million or so on the low side and --

11          THE COURT: On the low side?

12          MR. COHEN: On the low side. And 1.7 billion on the

13    high side. So we have a wide range of numbers which the

14    Plaintiffs --

15          THE COURT: Get my press agent -- get my press agent

16    to send out a notice that I'm handling a $1.6 billion case to

17    *The Wall Street Journal* or something.

18          MR. COHEN: So we have a range of numbers, but from

19    our view -- and we don't have the final expert reports. We

20    have these preliminary reports with the methodology.

21       You know, but the way we think it makes sense to go

22    forward is, even these preliminary expert reports raise some

23    discovery issues. Let me tell you what those are. One

24    relates to the condition of TWA. So the experts --

25          THE COURT: I'm sorry?

```
 1            MR. COHEN:  Of the TWA Airline's financial condition
 2  prior to the merger.  Let me explain why, if I may.
 3            THE COURT:  And you're talking ten -- how many, ten,
 4  12 years ago?
 5            MR. COHEN:  Yeah, 2000, Your Honor.
 6            THE COURT:  About 12 years ago.
 7            MR. COHEN:  So what their experts do -- and I don't
 8  want to put words in Mr. Press or Ms. Rodriguez's mouth, they
 9  can further explain this -- but what they do is they made a
10  series of assumptions in their "but for" world of what the
11  list would have looked liked, what the WPC would have looked
12  like if ALPA had done a variety of things.  And one of the
13  things that they do, obviously, is talk about bargaining
14  leverage between TWA on one side and American on the other,
15  that's really quite fundamental to their report -- to their
16  reports, and they make some assertions about the TWA's ability
17  to have leverage, which we think are completely consistent --
18  inconsistent rather, with the financial record -- it's an
19  important distinction.  Let me say that again.  Completely
20  inconsistent --
21            THE COURT:  Very good.
22            MR. COHEN:  -- with the financial condition of TWA.
23       What we know in 2000 from the Bankruptcy Court and TWA
24  is the judge viewed the only alternative to American's
25  acquisition of the assets was a liquidation.  Whether or not
```

1   TWA would have been able to fly had the American transaction

2   not gone forward is a critical issue with respect to what were

3   the expectations --

4        THE COURT:  There was also pending -- wasn't there a

5   motion to reject the TWA labor contract, what is it, 1113

6   or --

7        MR. COHEN:  Yes, I think so, Your Honor.

8        THE COURT:  I always forget that special provision of

9   the labor contracts, but there was pending that at the time.

10       MR. COHEN:  Yes.

11       THE COURT:  -- never got decided because of the way

12   the case worked out, but there was a pending motion to reject

13   the -- the TWA labor contract.

14       MR. COHEN:  I believe you're correct, Your Honor.

15       So, fundamentally, we think -- you know, the experts

16   have constructed what the economists call a "but for" world

17   and then say, This is how we view what the leverage would have

18   been of the TWA pilots vis-a-vis American.  And they go back

19   and they look at the history of prior mergers or combinations,

20   they look at lots of arbitration results, which we don't think

21   has any relevance because there was no ability to arbitrate

22   here, and we think that's what the factual witnesses will say,

23   that's what they said at their depositions, and

24   they -- and they distinguished kind of the low end, in their

25   view, of what a list would have looked like, from the high end

1    by distinguishing what the condition was at TWA.  So they

2    distinguish TWA on the one hand from the airlines they say

3    that were essentially out of business.  So that's a

4    fundamental factual predicate:  We think TWA was out of

5    business.

6         I think we need to take three or four, perhaps five,

7    depositions of TWA executives.  We can find them, get the

8    financial records --

9            THE COURT:  To the extent you can find them.

10           MR. COHEN:  Well, we found the American executives.

11   I mean, they're all retired, but we found them.  So that to us

12   is important.

13        The second thing that we don't have, of course, is we

14   don't have any information about the absent class members, the

15   individual members of the class, which, obviously, is relevant

16   to the computation of damages.

17        So all that we have received from the Plaintiffs are

18   these preliminary reports with this gigantic range of numbers

19   and with eight different damage models, I think, in the

20   aggregate, and they say, Here's what it is and we'll tell you

21   later, once we've collected the information, what the setoffs

22   are.  And so, from our perspective, we don't know what their

23   theory is and what their numbers are.  So what we would

24   propose to do to go forward is, one, take the TWA discovery

25   while they're working on their final reports, because they

```
 1   don't have final reports; two, we need the information from

 2   the class members so we can determine what the setoffs -- and

 3   we have a dispute, obviously, about mitigation.  Your Honor

 4   knows there is a motion.

 5            THE COURT:  Is it your theory that you're going to go

 6   pilot by pilot as to what the mitigation is?

 7            MR. COHEN:  Yes, consistent with, Your Honor, we have

 8   to all figure out a reasonable way to do that.

 9            THE COURT:  I mean, take Pilot 1, when you worked

10   this job, you flew for this airline and you --

11            MR. COHEN:  Well --

12            THE COURT:  And the same thing with Pilot No. 2,

13   okay, you worked here, you were called -- in other words, take

14   the actual facts of mitigation damages one by one by one.

15            MR. COHEN:  Well, let me start with setoffs, Your

16   Honor, and then, if I may, go to mitigation.  We think --

17            THE COURT:  I put that in one category, setoffs and

18   mitigation.  My point is, it's your position it's going to be

19   done pilot by pilot and not on some aggregated basis.

20            MR. COHEN:  We don't think --

21            THE COURT:  Partially aggregated basis.

22            MR. COHEN:  We don't think under the Wal-Mart

23   decision the Plaintiffs can go forward that way.  We think we

24   are entitled to, first off, actual earnings, which is not part

25   of their expert reports, they make all sorts of assumptions;
```

```
 1   actual earnings at American, which their experts don't
 2   consider; actual setoffs; actual mitigation.  Yes, we think
 3   we're entitled to that data, and we would like to do it in a
 4   reasonable way.
 5          We are, obviously, not going to take 2,700 depositions,
 6   or even a substantial fraction of that, but we need the data.
 7   We think we can get it --
 8          THE COURT:  For how many pilots do you think you can
 9   get?
10          MR. COHEN:  Is there 2,700 in the class?  Oh, it's
11   2,300.
12          THE COURT:  You think you can get detailed
13   information from 2,300 pilots in this case and send it to a
14   jury?
15          MR. COHEN:  I think what we are saying, Your Honor,
16   is in the first instance the Plaintiffs need to give us that
17   information for their class members.  Obviously, it's been
18   done on other cases by interrogatory.
19          THE COURT:  I'm sorry?
20          MR. COHEN:  It's been done in other cases by
21   interrogatory.  We have served interrogatories on --
22          THE COURT:  In a jury case?
23          MR. COHEN:  I don't think there is any distinction of
24   a jury trial, Your Honor --
25          THE COURT:  I don't want to represent -- I'm not
```

1   representing there is any legal distinction between jury and

2   nonjury, but do you have a case, a case where there was a jury

3   and we're submitting 2,300 --

4         MR. COHEN:  So maybe I'm not being clear, Your Honor.

5   I understand your point.  We're not saying we are going to

6   submit item by item by item.  What we are saying is the

7   experts' calculations to aggregate all this information have

8   to be based on the actual information with respect to class

9   members.

10        THE COURT:  I remember in 1968 I was bored and I

11  enrolled in a graduate program at NYU and it was in trade

12  regulation, and one of the courses we took happened to be

13  Robinson-Patman, now basically a dead letter, but at the time

14  it was a much hotter issue than it is today.  You don't hear

15  much about Robinson-Patman today.  I still think it's on the

16  books, but you don't hear much about it.  I heard of cases

17  that had to do with what was called the wrongdoing rule.  The

18  wrongdoing rule is when the wrongful conduct of the Defendant

19  created the difficulty for the Plaintiff in measuring damages.

20  You wound up with -- you could use a method of calculating

21  damages that might not in pure theory be the best or most

22  accurate.  And I gather they have not come up with such a

23  theory.

24        I mean, let me give you an example.  Take mitigation.

25  I could pick 20 people at random from a computer program of

```
 1    the 2,300 pilots.  You know, figure mitigation, you know,
 2    detail, come up with some kind of average, and then use it
 3    across the board, just to give you one very primitive way of,
 4    you know, looking at it.  You following me?
 5            MR. COHEN:  Oh, I understand.
 6            THE COURT:  In other words, so I wouldn't be
 7    presenting to a fact-finder, whether it was a jury or a judge,
 8    trying to deal with 2,300, you know, different -- okay.  Go
 9    ahead.
10            MR. COHEN:  So, Your Honor, I mean, obviously, we're
11    not going to call all of these people, but here's what we
12    think, and I don't even think the Plaintiffs disagree.  What
13    the Plaintiffs have not done in their expert reports is --
14    they are, as I understand it, collecting exactly the
15    information that I'm talking about that we need from their
16    class members.  I think we probably have a disagreement about
17    the scope of what they're collecting, but I think even the
18    Plaintiffs recognize that actually --
19            THE COURT:  Do you know what they're collecting?
20            MR. COHEN:  I think we'd have to look to Mr. Press to
21    address it.  I think I know what they're collecting, but we
22    had a motion that was withdrawn, so I think there --
23            MS. RODRIGUEZ:  Well, we had asked for your input and
24    you refused us, so --
25            THE COURT:  I mean, one of the things you could do, I
```

1    guess, is come up with an agreed-upon form, you know, in which

2    both sides agree that this is the information you're going to

3    collect from the pilots and develop some method for going out

4    and getting it.

5              MS. RODRIGUEZ:  And, Your Honor, we had actually

6    proposed that in September, and that was the genesis behind

7    our motion for Court-approved notice, but Defendants at that

8    time chose not to participate in the information -- in adding

9    to the information that we were seeking from the class, but --

10             THE COURT:  You don't -- I don't have a motion

11   pending on that.

12             MS. RODRIGUEZ:  We filed a motion.  Defendants

13   opposed -- we filed a motion seeking Court approval because we

14   wanted a notice that incorporated everyone's request for

15   information from the class.  We didn't want to be in a

16   position --

17             THE COURT:  Is that pending?

18             MS. RODRIGUEZ:  The Defendants opposed it and you had

19   suggested before it wasn't appropriate for the Court to give a

20   stamp of approval over the Defendants' objection, if they

21   weren't willing to --

22             THE COURT:  That's how I feel now.

23             MS. RODRIGUEZ:  If they weren't willing to

24   participate, it really didn't make sense.

25             THE COURT:  It's not pending?

1          MS. RODRIGUEZ:  It's not pending.  It was something

2     that we had contemplated.

3          MR. COHEN:  Your Honor, what we're saying is to

4     actually -- huge amounts of money swing on these mitigation

5     and setoff issues.  I think we know that.

6          THE COURT:  Apparently, it's a huge amount.

7          MR. COHEN:  And one of the things we know from the

8     Plaintiffs' preliminary reports is there are hundreds of class

9     members who are no worse off if they would have been under

10    Schedule CC, so even under the Plaintiffs' preliminary theory

11    there are class members who are not damaged.  They're a very

12    small number --

13         THE COURT:  We knew that.  I don't think there is any

14    surprise that there is a small -- some number of class members

15    who, as it turns out, were not damaged.

16         MR. COHEN:  So I think, Your Honor, our view is that

17    since the decision of Wal-Mart by the Supreme Court, which

18    rejected this trial by formula, we are entitled to the

19    information, actual information.  We are not suggesting huge

20    numbers of people testify.  There will have to be some

21    testimony from individuals.  And the experts will compute it.

22         So what we would like to see is go forward with that

23    discovery; give us the information when they give it to their

24    experts.  We want them to give us their final expert reports,

25    preferably telling us what their damage number is instead of a

```
 1   range that's over a billion and a half dollars, which I don't
 2   think is a particularly easy thing to respond to.  I
 3   understand they may have fallback theories, but there should
 4   be a theory of damages, I think, that's their primary theory.
 5   And then we'll respond promptly.  If they can tell us when
 6   they will submit their final reports, and we'll do the
 7   discovery in the interim, and give us the information --
 8           THE COURT:  When you say, "we'll do the discovery,"
 9   be more specific.
10           MR. COHEN:  The TWA discovery.
11           THE COURT:  Tell me what you mean by that.
12           MR. COHEN:  Your Honor, what we would like is a
13   number of depositions of former TWA executives.  Would you
14   like the names, Your Honor?
15           THE COURT:  Well, not right now.  I'm trying to get a
16   notion of the scope.
17       You are not talking about discovery of pilots.
18           MR. COHEN:  No, no.
19           THE COURT:  You're talking about the discovery of
20   executives.  Well, the executives may be pilots, but --
21           MR. COHEN:  So what we have in mind, Your Honor, is
22   the CEO who gave testimony at the bankruptcy hearing; the CFO;
23   the investment banker at Rothschild, a firm in New York that
24   was retained to evaluate.
25           THE COURT:  What's that person's name?
```

1          MR. COHEN:  David Resnick, R-e-s-n-i-c-k.  The former

2   CEO, if Your Honor would like the name, is William --

3          THE COURT:  No.

4          MR. COHEN:  Sorry.

5          THE COURT:  Okay.  Go ahead.

6          MR. COHEN:  So Terry Hayes, who is the VP of labor

7   relations.  And we've identified one or two pilots who we

8   think would have relevant information:  a Captain Schwartz,

9   who is the vice chair of the MEC, and a gentleman named John

10  Hefley, H-e-f-l-e-y, who is now working at Cathay Pacific.  He

11  used to be a plaintiff in this case.

12         So we would propose to take those --

13         THE COURT:  Excuse me.  You said "used to be a

14  plaintiff," meaning what?

15         MR. COHEN:  He was supposed to be a plaintiff.  He

16  was a class rep and no longer is, as I understand it, Your

17  Honor.

18         THE COURT:  Okay.

19         MR. COHEN:  The discovery that Your Honor had

20  already --

21         THE COURT:  He's still a plaintiff, though.  He's

22  just not a --

23         MR. COHEN:  He's a member of the class, of course,

24  Your Honor, yes.

25         So the discovery that we had previously talked about

1   completing that Your Honor referenced at the beginning will be

2   done at the end of November.

3          THE COURT:  Okay.  Tell me what you're trying --

4   what's the thrust -- what kind of proof are you trying to

5   develop with this group of --

6          MR. COHEN:  The proof that we're trying to develop,

7   Your Honor, is that to the extent the Plaintiffs' damage

8   theory is predicated on the assumption that TWA had

9   alternatives to the American sale, that's what their experts

10  say, that they are different than an airline that was going to

11  simply cease flying, and, therefore, under the Plaintiffs'

12  theory had some leverage, right.  The Plaintiffs' theory is,

13  if you had done your job and exercised your leverage, you

14  would have gotten a much better list.

15         THE COURT:  Well, the staple point would have been

16  different, if you get right down to it.  The staple point

17  would have been different.

18         MR. COHEN:  Yes.  Staple and --

19         THE COURT:  And how many people stapled to the end of

20  the list.  The smaller that group is, well, obviously, the

21  smaller the damages.  The bigger that group is, the bigger the

22  damages.

23         MR. COHEN:  So what we would like to show, Your

24  Honor, is what we think we can prove, because it's what the

25  Bankruptcy Court found -- but we can't use that as evidence --

1      the Bankruptcy Court found that, in fact, TWA was out of

2      alternatives and that had it not taken the American deal it

3      would have liquidated.  We would like to develop --

4              THE COURT:  Where do you get that?

5              MR. COHEN:  From the finding of the Bankruptcy Court

6      approving the American assets.  I think was a 363

7      confirmation.

8              THE COURT:  Is there a specific finding that they

9      would have had to liquidate?

10             MR. COHEN:  Yes, Your Honor, there was.

11             THE COURT:  To approve the American merger, you

12     didn't have to find that.  You could have found that the

13     American deal was a fair and adequate deal.  You don't have to

14     find -- it's not a matter of bankruptcy law.  It's not a

15     requisite that you find there would have been a liquidation

16     but for that merger.

17             MR. COHEN:  Your Honor is absolutely right, but, in

18     fact, there was a specific finding by the Bankruptcy Court in

19     connection with the challenge to the acquisition saying that

20     it was -- in connection with the fairness, it was fair

21     because, in fact, there is no other alternative for TWA.

22         So I actually have the transcript here, but I can't lay

23     my hands on it at the moment.

24             MR. KATZ:  Do you want me to comment?

25             MR. COHEN:  Just give me the case.

1        MR. KATZ:  There was a hearing March 12th, 2001

2    before the Bankruptcy Court, Your Honor, and at that hearing

3    the bankruptcy judge approved the American acquisition, there

4    was an auction, and the only qualified bidder was American.

5        THE COURT:  Right.

6        MR. KATZ:  And he approved it.  And the reasons he

7    gave from the bench on March 12th at the conclusion of the

8    hearing were that, absent the American transaction, it was a

9    virtual certainty that TWA would liquidate were it not for the

10   American acquisition.  The bankruptcy judge then codified and

11   issued a formal opinion on April 2, 2001 in which he gave a

12   detailed analysis of all the financial parameters and came to

13   the same conclusion.

14       THE COURT:  Okay.

15       MR. COHEN:  Your Honor, the precise language which my

16   colleague was good enough to hand to me is:  If TWA does not

17   proceed with the transaction with American, there isn't going

18   to be a strategic transaction with anyone else, and the

19   inevitable result would be a liquidation of the debtor.  Which

20   is fundamentally at odds with the Plaintiffs' experts, because

21   the Plaintiffs' experts, how they get in this range and how

22   they --

23       THE COURT:  You mean the new round of experts.

24       MR. COHEN:  Yes, Your Honor.

25       THE COURT:  You're not talking about the experts that

 1    they hired at the time this was all going on.

 2              MR. COHEN:  No, Plaintiffs' damage experts for the

 3    damages trial in this case.

 4         So what we would propose, Your Honor, is not to take

 5    2,300 depositions and not to do massive class-wide discovery,

 6    you know, while they are collecting the data from their

 7    clients and, you know, we will proceed with this TWA

 8    discovery.

 9              THE COURT:  Are you leading to a motion of some

10    kind -- I mean, is the idea here you do the discovery and make

11    a motion to either dismiss the damage or reduce it?  Is that

12    the end game here?

13              MR. COHEN:  Well, Your Honor, I think there are

14    three -- two or three possible end games.  And one certainly

15    principal end game is to make sure that we have an opportunity

16    to effectively cross-examine their experts at trial, if they

17    get to trial -- I'll come back to motions -- and show that

18    their factual predicates for their reports are false.

19              THE COURT:  It may be that it's even correct that the

20    American deal had not been done that there was no other really

21    viable alternative for TWA.  That may be true.  But it doesn't

22    follow from that that had the union taken a stronger

23    bargaining position they could not have gotten a better deal,

24    which those two --

25              MR. COHEN:  Yes, I understand, Your Honor.

1          THE COURT:  The fact is at the end of the day there

2    was really no viable alternative.  In other words, TWA

3    couldn't continue on as a standalone airline.  It doesn't

4    follow -- it's not an automatic result from that if the union

5    had taken an aggressive position that they still might not

6    have gotten a better deal from American.  And I don't

7    think the experts -- when I use "the experts," I'm talking

8    about the people the union hired back -- you know, back when

9    all this was going on -- I don't think they were arguing that

10   they could be a standalone airline.  A couple did, but most of

11   them did not.  The argument was that, you know, that

12   they -- had they taken a stronger position they could have

13   gotten a better deal and that TWA was a nice acquisition for

14   American and that American really wanted to see it blow up.

15          MR. COHEN:  I understand, Your Honor, and I'm not

16   making a point --

17          THE COURT:  You understand what I'm saying?

18          MR. COHEN:  Absolutely.  I'm not making that point.

19   What I'm saying is -- so now we're at the damages phase and

20   the Plaintiffs' experts say, Well, I have to quantify what

21   would have happened, right, if they had more leverage.  And

22   the way that they attempt to quantify that is -- actually, I

23   don't know how this testimony will actually ultimately survive

24   a Daubert motion, but what their principal expert says is, I

25   can quantify the bargaining leverage, and one of the essential

```
 1   factual predicates --
 2           THE COURT:  Quantify it in what sense?
 3           MR. COHEN:  What he says, Your Honor, he looks at the
 4   various things that -- and, you know, the Plaintiff will have
 5   to explain this -- he looks at the various things that he says
 6   that TWA -- that the TWA pilots could have done and that ALPA
 7   could have done, all the things that were dealt with in the
 8   liability trial.
 9           THE COURT:  Threat of litigation.
10           MR. COHEN:  Threat of litigation, the jump seat war.
11   And he says there's a 2 percent probability that could have
12   occurred; there is a 6 percent probability that could have
13   helped -- exactly what he says, Your Honor -- there is
14   8 percent probability.  He adds all of those things up under a
15   theory that we think will not survive a Daubert motion,
16   ultimately, but we'll see what he has to say, you know, down
17   the road.  He adds all those things up and he adjusts his
18   damages figures by probabilities.
19           The other thing that he does, Your Honor, is he's
20   looking at a range of arbitration awards.  After all, the
21   fundamental question is what was the reasonable expectation of
22   the pilots, right, had there not been the alleged breach of
23   the duty of fair representation.  So he looks at all these
24   arbitration results, some of them, not surprisingly, are not
25   that good for the pilots who are in the acquired airline, some
```

1  are better.  The way that he attempts to distinguish the ones

2  at the low end of the range is to say, Oh, well, those

3  airlines, they were on the verge -- they either were

4  furloughing pilots or they were not really going to fly

5  anymore.

6       And we think, Your Honor, the reason we want to take

7  this discovery and why we think it is relevant, we think we

8  can say, Look, Plaintiffs' expert, you will concede that if

9  you believed, right, and if you assumed that -- that TWA had

10  no options and it was on the verge of bankruptcy and

11  it --

12       THE COURT:  Was in bankruptcy.

13       MR. COHEN:  -- was on the verge of liquidating, you

14  would have to concede that you would move down this scale of

15  bargaining leverage and where the likely list would be down to

16  the very low end.  Where they are is at the very high end.

17       THE COURT:  But the issue comes down to where is the

18  staple point.

19       MR. COHEN:  Well, it's one of the issues, as I

20  understand their expert, because they also moved people around

21  all through the middle of the list, and that has a lot of

22  dollar implications, actually, Your Honor.  It's not just the

23  staple point.  It's really essentially every point in the list

24  they're making assumptions based on probabilities.  So they're

25  not just saying, well, the staple point, instead of No. 10,

1    it's at No. 50 or No. 2.  It's throughout the list.

2          So that discovery, Your Honor, we really need.  I mean,

3    I don't think, ultimately, Plaintiffs' experts can testify

4    based on factual predicates that are completely inconsistent

5    with the record, so we want to take that discovery.  It will

6    be targeted.  It will be these small number of depositions.

7    We're prepared to proceed with them.  You know, with Christmas

8    coming up, we'll finish them, say, by mid-January.  You know,

9    we don't need a lot of time to take them.  We'll get some

10   documents from them.

11         And in the meantime, they can be proceeding with

12   collecting that information.  And what they really should give

13   us is the final expert reports that actually don't have just a

14   menu, the damages are 165 million -- or if they want to -- 165

15   to 1.7 billion, but I think we're at least entitled to know

16   what is their damage theory that they intend to present at

17   trial so we can present experts in opposition to their damage

18   theory.

19         So that's what we're seeking, Your Honor.  I mean, we

20   can do that discovery.  We do need the information from the

21   Plaintiffs.  We do have a disagreement as to mitigation, as

22   Your Honor is aware of, but they, I believe, are collecting

23   the setoff data.  They don't have to tell us what they're

24   doing.

25         And I'd be happy to address whether we wanted to

```
 1    participate, if I could clear that up.  We didn't think it was
 2    for the Court to be involved in soliciting data.
 3              THE COURT:  Well, I didn't either.
 4              MR. COHEN:  Yes, I'm aware of that, Your Honor.  And
 5    if they want us to agree on a joint set of interrogatories to
 6    the class members, we'll do that.  We'd be happy to do that.
 7    It's not that we didn't want to participate at all.  It's
 8    that, as Your Honor thought, we didn't think it was the
 9    Court's job at this point to go to the class members.
10         So we're prepared to sit down with them, work out a set
11    of interrogatories.  We obviously think it should include not
12    just setoffs but mitigation.  We can go collect that
13    information.  Whenever they tell us that their final expert
14    reports are ready, we'll -- you know, we'll take depositions
15    within a few weeks of when their final expert reports are
16    ready.
17              THE COURT:  The deposition of their expert?
18              MR. COHEN:  Yeah, once they actually give us their
19    actual report with actual numbers.  And we can certainly -- if
20    they gave us expert reports --
21              THE COURT:  One expert?  Two experts?
22              MR. COHEN:  Well, it's two or three, Your Honor.
23              MS. RODRIGUEZ:  Two.
24              MR. COHEN:  Two, okay.
25              THE COURT:  Two different reports.
```

```
 1              MS. RODRIGUEZ:  Yes.

 2              MR. COHEN:  Two different reports.  They actually

 3    have three sets of numbers, but it's two experts.  And they're

 4    not consistent with each other.  They don't use the same

 5    methodology and they don't get to the same numbers, so we

 6    don't feel we're in a place to be responding.

 7              THE COURT:  So we don't have a foolish consistency,

 8    the hobbit and the small mind?

 9              MR. COHEN:  Yeah, I have a small mind, Your Honor.  I

10    apologize.

11         So we will move this discovery forward.  You know,

12    we'll have completed that other discovery on the 29th.  We

13    just told the Plaintiff about the date today.  If they can

14    make that last deposition on the 29th, we'll be done with all

15    the pre-existing depositions.  We will go subpoena these TWA

16    people.  I am sure we can finish it by the end of January.  We

17    probably would do better if it wasn't Thanksgiving and

18    Christmas, but by the end of January.  I don't know how much

19    time it will take for the data collection from the class

20    members and then for their experts to actually give us their

21    numbers.  And, you know, once we get that, we'll be happy to

22    talk about --

23              THE COURT:  My guess is that's a formidable task.

24              MR. COHEN:  Your Honor, I understand that, and I

25    don't mean --
```

1          THE COURT:  A large number, you know, of events that

2     took place many, many years ago where, you know, people may or

3     may not have records, you know, to back up, you know, whatever

4     numbers they suggest.  But all right.

5          MR. COHEN:  And, Your Honor, I don't mean to minimize

6     that, but I do think under the Wal-Mart case, which I think is

7     the law now, you know, trial by formula doesn't work.  And as

8     I said, I don't think there is a disagreement.  The Plaintiffs

9     are intending to collect that data.  You know, if they fall

10    short, what the implications will be for people who don't

11    submit data, I don't think we have to reach that today.

12         But that's our basic proposal:  Discovery of the TWA

13    financial condition between now and the middle of January;

14    collect the data.  As I said, if they want to sit down and do

15    joint interrogatories, we'll sit down with them this week,

16    beginning of next week, and try to agree upon them so it's

17    coming from both parties so we don't disagree what we are

18    asking for.  And once they tell us when they will give us

19    final expert reports, we'll depose those folks within a month,

20    and we'll find out when we can put in our responsive reports.

21         THE COURT:  Mr. Press?

22         MR. PRESS:  Thank you, Judge.  The only thing I heard

23    Mr. Cohen ask for was permission to take some depositions,

24    which we really don't have an objection to.

25         THE COURT:  You mean the one of the CEO, CFO, so

1  forth?

2         MR. PRESS:  Right.  I'm not saying it'S going to be

3  relevant and admissible, but it's certainly likely or could

4  lead to admissible evidence.  So if they want to go take

5  depositions, they can go take them.  We don't have a problem

6  with that, Judge.

7         But I do have a problem with characterizing our

8  experts' reports as preliminary.  The only thing we lack from

9  a final damage number were the actual earnings from the class

10 members, which we are collecting, Judge.  We have prepared a

11 Request for Information to all of the class members, and we

12 tailored it from the themes that came out in the depositions

13 they took of our clients and we've asked for that information.

14 It's actually at a printer right now being printed and --

15         THE COURT:  What's at the printer?

16         MR. PRESS:  Our Request for Information to the class

17 members.

18         THE COURT:  Oh, the class.

19         MR. PRESS:  I'm sorry, Judge.  And we expect that to

20 hit the street and go out to 2,000 people very shortly.  But

21 what the -- what the union does have is our experts' view of

22 what the "but for" seniority list should have looked like and

23 every individual pilot's "but for" earning from that "but for"

24 seniority list.  So, really, ALPA has everything it needs to

25 take a meaningful deposition of our experts right now.

```
 1            THE COURT:  Except the offsets.

 2            MR. PRESS:  That's all they're missing, but that's

 3    really -- that's really not opinion evidence, that's just

 4    math, Judge.  They've had these reports for more than four

 5    weeks.  They've never even asked for dates to take our

 6    experts' depositions.  They're available now, and we think

 7    that these depositions should be taken.  When the offsetting

 8    data is collected, it's a simple matter of math.  Harold

 9    Hollander, or take whatever pilot, we already have a number

10    for that pilot, what his "but for" earnings would have been.

11    We have that and they have it.

12            THE COURT:  Without regard to any kind of offsets.

13            MR. PRESS:  Right.  And then once we collect that

14    person's information, it's just a matter of subtraction,

15    Judge.

16        They can take a meaningful deposition right now and

17    they don't want to.  They want to delay things.  We want, of

18    course, to go to trial.  It was June 5, 2010 when we started

19    the liability case, Judge, and I suggest we start the damage

20    case two years after that in June, in 2012.  Our --

21            MS. RODRIGUEZ:  2013.

22            MR. PRESS:  Oh, you're right.  2013, Judge.  I'm

23    missing a year.

24        But we have no objection --

25            THE COURT:  What's a year among friends?
```

```
 1          MR. PRESS:  Exactly.  After six years of this thing.
 2          We have no objection to the TWA discovery they seek,
 3   but we do have an interest in seeing them pushing forward on
 4   the expert discovery, Judge.
 5          THE COURT:  Anything else?
 6          MR. PRESS:  No, not really.
 7          MR. COHEN:  Your Honor, let me just correct it.
 8   We're not seeking to delay.  I mean, the Plaintiffs --
 9          THE COURT:  If I understand what Mr. Press just said,
10   he said, look, you want to take these five or six people or
11   seven people; he says he doesn't object to that.  If you can
12   find them and subpoena them, he has no objection.
13          MR. COHEN:  Your Honor, and I appreciate that.
14          THE COURT:  He's saying a different thing.  He's
15   saying he's given you a report that shows a "but for," you
16   know -- where would have been had the union done what, in his
17   view, they should have done or the expert's view they should
18   have done.
19          MR. PRESS:  True.
20          THE COURT:  And what the earnings would have been had
21   that been done.
22          MR. PRESS:  True.  They have that.
23          THE COURT:  He's saying all that's missing is the
24   offsets to that.  In other words, if a pilot would have made
25   $200,000, you know, to get the actual damage number we have to
```

1  know what he or she earned in that interim period.  So if it

2  was $50,000, then the damage would be $150,000 for that pilot.

3       Is that what you're saying?

4       MR. PRESS:  That's exactly what we're saying.

5       MR. COHEN:  It's not just math, Your Honor.  The

6  mitigation piece of this, as opposed to what they actually

7  earned, but what they should have done.  So we know from their

8  expert reports, because they conceded it, that where you are

9  on a list is not necessarily predictive of how much money you

10  make.  Because you could be No. 1 on the list, and if you

11  decide to take a leave of absence, if you decide that you

12  don't like flying jumbo jets anymore, if you decide you don't

13  want to fly on weekends, you're going to earn a considerably

14  different amount of money, and their expert reports

15  acknowledge that.  So the mitigation piece of this, Your

16  Honor, is directly relevant to what the opinion is with

17  respect to damages.

18       Now, you know, if they want us to take depositions

19  twice -- we can schedule depositions of their experts, you

20  know, say in December or early next year.  Our thinking, Your

21  Honor, was that it would be more efficient to depose them once

22  when we have a final report.  We didn't think that we should

23  put their experts to the trouble of two sets of depositions.

24  I don't think it's just them.  It's just that their experts

25  wouldn't be getting the data.  They wouldn't be subject of

1   expert testimony.

2          THE COURT:  The position of Mr. Press is that all I'm

3   getting is mathematical numbers, and I guess you're

4   challenging that assumption.  You're saying that mitigation is

5   more than just what they, in fact, earned other than by

6   flying, but would involve personal decision-making, you know,

7   as to what they're going to do with their lives at this point

8   forward.

9          MR. COHEN:  Right.  I'm not just saying that.  Their

10  experts are saying that.  Their experts concede that your

11  place on the seniority list is not the only necessary input to

12  understanding what you would have earned.  And it's not just

13  offsets, it's offsets and the choices you make that affect you

14  where you are.  So if we had put everybody at the top of the

15  list, we, you know -- we still would have differing earnings

16  from their models.  So it goes to the fundamental assumptions

17  in their model about how they're going to deal with mitigating

18  circumstances.

19         THE COURT:  What information are you gathering from

20  your 2,000 models?

21         MR. PRESS:  Primarily, it's coming from the

22  furloughees, Judge.  When were you furloughed?  How much money

23  did you earn when you were on furlough?  When were you

24  recalled back to American Airlines, if ever?  Did you accept

25  the recall or not?  And if you were furloughed, did you make

1    any applications to commercial airlines while you were not

2    flying for American?  Those are the primary categories of data

3    that we are collecting, Judge, and documents to support the

4    earnings information they provide us, including W-2s and tax

5    returns, not the full returns, but the first two pages of tax

6    returns.

7          THE COURT:  When do you think that information is

8    going to be forthcoming?

9          MR. PRESS:  It's going to start coming in in

10   December.  We gave them a date to respond.  January 31st was

11   the drop-dead date for that.

12         MS. ACCHIONE:  January 31st.

13         MR. PRESS:  Yes, Ms. Rodriguez makes a wonderful

14   point.  One of our experts doesn't do any math.  We have two

15   experts that have created "but for" seniority lists, but one

16   of them takes Professor Farber's seniority list and computes

17   individual damages from it.  So Professor Farber isn't

18   involved in any of this mathematical issue at all, it's only

19   the other expert, whose name is Rikk Salamat.  He's taken each

20   "but for" list and created the -- done the damages

21   calculation, Judge.  So there is no impediment at all for them

22   deposing Dr. Farber.  And, really, they could take a very

23   meaningful deposition of Mr. Salamat right now today.  And,

24   obviously, Mr. Cohen has expressed a great understanding of

25   our experts' -- the basis for their opinions.  So it sounds to

```
 1   me like they're ready to take a deposition today.

 2         So we would, again, encourage you, Judge, let's get

 3   these depositions set of the experts.  They can take the TWA

 4   depositions.  Let's get a date for them to disclose experts

 5   and a trial date.

 6         THE COURT:  I can't decide now, but let's assume I

 7   would determine after the information came in from your pilots

 8   by January that a further deposition is required of one or

 9   both of the experts.

10         MR. PRESS:  Judge, if they showed a compelling need

11   for a deposition, I'm sure you would order it.

12         THE COURT:  Well, that's my point, I would.

13         MR. PRESS:  I know.

14         THE COURT:  And I can't say now.  I don't have -- a

15   lot of this is still kind of theoretical to me.  It's hard for

16   me to say.  But, certainly, if I thought the information

17   generated by the pilots was used in a way by the experts that

18   required further exploration, I would order it.  The fact that

19   they were once previously deposed would not block me from

20   making them be deposed again.  You understand that?

21         MR. PRESS:  Of course, Judge.

22         THE COURT:  Okay.

23         MR. PRESS:  Ninety-five percent of the fight on this

24   damages phase is the "but for" seniority list, which they

25   have.  And so let's begin --
```

```
 1          THE COURT:  I wouldn't put a percentage on it.  It's
 2   an issue and the mitigation is another issue.  The mitigation
 3   issue, I gather, could have a very significant dollar -- I'll
 4   call it mitigation/offset issue.
 5          MR. PRESS:  The setoff will be substantial, material.
 6   Failure to mitigate, I mean, that's going to be a very
 7   deminimus issue.
 8          THE COURT:  Put those two together.
 9          MR. PRESS:  There weren't any pilot jobs available
10   back in the time period we're talking about.
11          Judge, again, the heart of what the next jury's going
12   to decide is the "but for" list, and they can address these
13   issues right now, and we're asking that you order them to.
14          THE COURT:  Why not take those depositions?
15          MR. COHEN:  Your Honor, as long as we're going to get
16   a second opportunity to depose them --
17          THE COURT:  I can't say now whether the new
18   information would justify a second, but if I think it does,
19   the fact that there was a prior deposition is not going to
20   block my ordering another deposition.
21          MR. COHEN:  I understand that, Your Honor.  But one
22   other thing I want to make sure, we don't have their final
23   reports.
24          THE COURT:  Well, that -- that's terminology.  I
25   mean, his position is it is final, it's a final report.
```

1          MR. COHEN:  Your Honor, then not only will have we to

2    take them twice, but I don't want to find that we've taken

3    their depositions and in the guise of doing math they're going

4    to have a new methodology.  If what they're representing is

5    that this is their methodology, they're not going to change

6    it, the rest is math, you know, I -- frankly, these are

7    incredibly complicated reports.  So while I appreciate

8    Mr. Press's compliment, we are not fully conversant.

9          But we can take them in January.  We don't need to take

10   an enormous amount of time.  But, one, we don't want to see

11   that we take it, it's a preview of cross-examination at trial,

12   and then we get a second and final report with completely

13   different methodology.  That's part of our reluctance.

14         But if Your Honor wants us to go forward, you know,

15   with an understanding that we may have to come back to you,

16   then we'll send some deposition notices for January and we'll

17   take them.

18          MR. PRESS:  Judge, you pushed us, and we accepted the

19   push.  You ordered us to produce these reports, we've produced

20   them, they have had them for four weeks.  They've not even

21   asked me when we can make them available.  They're available.

22   This could all be done before the calendar year is up.

23          THE COURT:  Why wait for January?

24          MR. COHEN:  Your Honor, I think if you saw the

25   complexity -- I'd be happy to have you see these reports --

1   see the complexity of these reports and the complexity of the

2   models.  I mean, our experts are unpacking their data.  It's

3   not just asking what's on the printed page, but voluminous

4   data.  These are, obviously, very complicated data.  They've

5   analyzed 40 different arbitrations to come up with these

6   probabilities.  The amount of supporting data is massive.

7   And, Your Honor, we think, you know, we're reasonable in what

8   we do, but, not surprisingly, we're going to have experts who

9   are going to assist us, and they're digesting the underlying

10   data.  If it was just a matter of reading a report, we would

11   have noticed the deposition and taken it, but there are

12   massive and massive quantities of supporting data that you

13   need to unpack these eight different damage models.  So that's

14   the reason for waiting until January.

15          THE COURT:  I understand now, Counsel.

16      You gave me a list of the people you want to depose,

17   other than the experts, as the CEO of TWA, the then CEO.

18          MR. COHEN:  Yes, sir.

19          THE COURT:  The CFO; a particular investment banker;

20   Terry Hayes.  Who is Terry again?

21          MR. COHEN:  The vice president of labor relations,

22   Your Honor.

23          THE COURT:  The VP of labor relations.  And who

24   else -- oh, Schwartz.

25          MR. COHEN:  Schwartz and Hefley, Your Honor.

```
 1              THE COURT:  Schwartz and Hefley.  That's one, two,
 2    three, four, five, six.  Any others?
 3              MR. COHEN:  Yeah, Your Honor, that's what I'm aware
 4    of today.  I mean, you know, if any of these things led back
 5    to somebody else, we'd come back to you, Your Honor, but
 6    that's what we're talking about.
 7              THE COURT:  Well, you know, I don't want this to be a
 8    moving target.
 9              MR. COHEN:  I understand, Your Honor.  What I'm
10    saying is --
11              THE COURT:  I'm not trying to limit you.  I'm just
12    trying --
13              MR. COHEN:  No, I understand that, Your Honor.
14              THE COURT:  -- at this point to get what the universe
15    is.
16              MR. COHEN:  Right.  So what I don't know is, when we
17    take Mr. Compton's deposition, if we can't find him or we find
18    him and he says, really the guy who really worked this for us
19    is not the CFO but the treasurer or is the head of
20    strategic -- we want to do the right number of things.  It's
21    not a constant moving target.  And we'll complete that by
22    January, too, so that will put the onus on us to get it at the
23    end of January -- the end of January to get it done.
24              THE COURT:  Well, let me ask you, how much time do
25    you think you need to do these six?
```

```
 1          MR. COHEN:  In terms of time elapsed or per
 2   deposition, Your Honor?
 3          THE COURT:  Well, per deposition I'm going to allow
 4   four hours --
 5          MR. COHEN:  Yes, I'm aware of that.
 6          THE COURT:  -- absent -- absent some applications
 7   where I would suggest you needed more than four.  But now I'm
 8   talking about a time line.
 9          MR. COHEN:  So what I'm saying, Your Honor, is I
10   think that we could do those initial depositions of their
11   experts and this discovery by the end of January.
12          THE COURT:  And that's the same date you're
13   projecting for getting most of the information?
14          MR. PRESS:  It is, Judge.  We expect to have most of
15   it well before that.
16       Oh, Mr. Cohen mentioned that he has experts.  They
17   haven't been disclosed, Judge.  And they've obviously been
18   working with experts.  They have a very prominent trial team.
19   They're backed by an international union.  For them to say
20   that they need an additional three months to take two
21   depositions, Judge, I just find that incredible.
22          THE COURT:  No, no.
23          MR. PRESS:  Okay.
24          THE COURT:  What about disclosing your experts to
25   them?
```

1      MR. COHEN:  Your Honor, we're working with consulting

2  experts.  We haven't settled on our testifying expert.  As

3  soon as we do, we'll disclose them.

4      THE COURT:  All right.  January 31st seems to be a --

5  my current inclination right now is to give you until the 30th

6  of January or the 31st of January to complete these six

7  depositions.  Again, the CEO; CFO; an investment banker; Terry

8  Hayes, the labor relations guy; and two pilots, Schwartz and

9  Hefley.

10      Number two, I want you to complete at least the

11  depositions of their two experts by the same date, by the

12  31st.  Again, I'm not saying that there couldn't be a

13  follow-up deposition by then.  I want you to reveal the

14  identity of your trial experts, not your consulting experts --

15  obviously, you can consult with whoever you want -- by the

16  same date, by the 31st.  But I'd like your reports to be by

17  March 15th.  In other words, when I say "your reports," their

18  reports, the experts' reports.

19      MR. COHEN:  Can I indulge Your Honor for two more

20  weeks to give us the full two months --

21      THE COURT:  Okay.  March 1st.

22      MR. COHEN:  -- March 31st.

23      THE COURT:  March 1st I said.  You wanted two weeks,

24  so I'm accommodating.

25      MR. COHEN:  Two additional weeks, Your Honor.

```
 1            THE COURT:  Oh, you want additional weeks.  I thought
 2    you were criticizing me for being too slow and you wanted to
 3    get it in faster than that.
 4            MR. COHEN:  I would never criticize Your Honor.
 5            THE COURT:  I have an entire bar that relishes
 6    criticizing me, so don't feel bad.  Go right ahead.
 7            I'm going to stick to March 15th.  That's all of
 8    January, all of February, all of December.  I mean, you have
 9    their -- you know, I don't want to get into an argument about
10    the word "final" or not, but you have their reports just
11    absent the -- the data -- the individual data from the
12    individual pilots.
13            MR. COHEN:  And, Your Honor, just to be clear, on
14    March 15th I understand we're responding without the setoff
15    and mitigation data to --
16            THE COURT:  No, you should have the setoff and
17    mitigation.
18            MR. COHEN:  Well, Your Honor, if we don't get it
19    until the end of January -- if they're getting it at the end
20    of January, I think March 15th will be very hard.
21            I thought that Your Honor was talking about their
22    experts responding to the equivalent of the reports they've
23    given us and in which we are taking their depositions, because
24    we're not going to be deposing the Plaintiffs' experts with
25    the benefit of any of that data.
```

1    MR. PRESS:  The offsetting data will be collected by

2   the end of January and it will be assimilated into --

3    THE COURT:  Can I ask you this, is there any way that

4   we can stage it?  Because even if they got half of the data,

5   let's assume, for a thousand pilots, that would be very

6   helpful to them.  I mean, it's true that there would be pilots

7   they don't have, but nevertheless, that's a pretty big sample.

8   It's like a 50 percent sample.

9    MR. PRESS:  I'm not dealing with the firm that's in

10   charge of the collection.  Maybe Ms. Acchione could address

11   that better.

12    THE COURT:  It's your moment in the sun.

13    All I'm suggesting is that clearly -- you know, what is

14   it, the Pareto Principle, 80 percent will come in fast and the

15   remaining 20 percent is going to take up most of the time.  Is

16   there any way we can turn over to the Defendant, say, whatever

17   you collect by December 31st so they could have that, make use

18   of that?

19    MS. ACCHIONE:  Absolutely, Your Honor.  We can do

20   that.

21    MR. COHEN:  Your Honor, obviously the earlier we can

22   get the data, that would obviously be helpful, so we're happy

23   to receive it on a rolling basis.

24    MS. ACCHIONE:  We can do it on a rolling basis.

25    MR. COHEN:  What's not clear to me, when are their

  1    experts --

  2            THE COURT:  Well, I'm going to get to that right now.

  3            MR. COHEN:  I don't think our experts should have to

  4    go first on the entire question of damages net of mitigation

  5    and the like.

  6            THE COURT:  I understand your point, but let me just

  7    take it one step at a time.

  8            There would be, in effect, a rolling.  I certainly

  9    think that by December 31st you should turn over everything

 10    you've gotten by then, because I suspect that, you know, and

 11    it's typical, ultimately, it's going to be 20 percent of the

 12    pilots that are going to be a problem in getting information

 13    and probably 70, 80 percent will come forth -- I hope will

 14    come forth pretty readily.  And it would be as if dealing with

 15    any group, there will be some small percentage, in terms of

 16    80/20, 20 percent for whatever the reason, you know, lack of

 17    records, illness, some reason they can't get you what you

 18    want.  But if you could get it by the 31st of December.

 19            Now, second, is it your anticipation that either or

 20    both of your experts are going to render a new report in which

 21    they integrate the data derived from individual plaintiffs?

 22            MR. PRESS:  They'll be no change in the methodology.

 23            THE COURT:  No, no, that's not what I asked.

 24            MR. PRESS:  There will be a new exhibit with the

 25    math, but that would be it.

```
 1            THE COURT:  Well, will there be a new report?

 2            MR. PRESS:  No.

 3            THE COURT:  Will it just be an exhibit to the

 4  existing report?

 5            MR. PRESS:  Yes.

 6            THE COURT:  What is it you anticipate?  You're going

 7  to get all this information.

 8            MS. RODRIGUEZ:  Judge, if I can, and just if you're

 9  looking for a way to stage it, perhaps, Professor Farber --

10            THE COURT:  No, I want to know what you plan to do.

11            MS. RODRIGUEZ:  Professor Farber is done.  He is not

12  the math person.  He's not going to crunch the numbers.  So

13  his report --

14            THE COURT:  So you do not anticipate that Doctor --

15  what's his first name?

16            MS. RODRIGUEZ:  Hank.

17            MR. PRESS:  Henry.

18            MS. RODRIGUEZ:  Henry, Henry Farber.

19            THE COURT:  Okay.  With Paul Weiss here we've got to

20  be very formal.

21            MS. RODRIGUEZ:  Very formal, okay.

22            THE COURT:  So you don't anticipate any change in his

23  report as a result of the new data coming in from the

24  individual pilots?

25            MS. RODRIGUEZ:  No.  His report is totally done and
```

```
 1   it's -- the data goes to --

 2           THE COURT:  Now, with respect -- who is the other

 3   fellow?

 4           MS. RODRIGUEZ:  Rikk, and it is Rikk, R-i-k-k,

 5   Salamat.

 6           THE COURT:  R-i-k-k.

 7           MS. RODRIGUEZ:  Yes.

 8           THE COURT:  You know, a friend of mine is a judge in

 9   rural Arkansas, the western half of Arkansas, named Jimm with

10   two M's, Jimm Larry Hendren, who sits in three different court

11   houses all through western Arkansas.

12       And so this is Rikk, R-i-k-k.

13           MS. RODRIGUEZ:  Salamat, S-a-l-a-m-a-t.

14           THE COURT:  One T?

15           MS. RODRIGUEZ:  One T.

16           THE COURT:  Doctor?

17           MS. RODRIGUEZ:  Yes.

18           MR. PRESS:  No.

19           THE COURT:  No?  All right.

20       Now, do you anticipate a new report from him?

21           MS. RODRIGUEZ:  His report will have numbers in it,

22   but it won't be a new report.  He's got a methodology and he's

23   got the "but for" list.

24           THE COURT:  If the answer is he's going to just

25   attach an exhibit with a number next to each pilot, that's not
```

1    a new report.

2            MR. PRESS:  That's all that will change, Judge.

3            THE COURT:  I mean, if you have a list, Pilot Jones,

4    you know, $47,322, you know, Pilot Smith, you know, $63,127,

5    and that's going to be some kind of exhibit attached to the

6    report, that's not really a new report.

7            MR. PRESS:  I agree, and you've stated it correctly.

8            THE COURT:  That's all it's going to be.

9            MR. PRESS:  Yes.

10           THE COURT:  He's just going to come up with a list.

11   And what will that number represent?  What is it in your mind

12   that number will be?  We have Pilot Jones, $47,233.  What is

13   that number going to be?  What will that number supposably

14   represent?

15           MR. PRESS:  Actual damages for that class member.  I

16   don't know how to say it any more succinctly.  That's what

17   that will represent.

18           MS. RODRIGUEZ:  It will be his earnings on the "but

19   for" list minus --

20           THE COURT:  Which we already have.

21           MS. RODRIGUEZ:  Which we have.  And we have that

22   number.  So Pilot --

23           THE COURT:  And they have.

24           MS. RODRIGUEZ:  They have it.  Pilot Jones is on the

25   "but for" list at $50,000.  We get his setoff income.  We find

1    out that he flew for JetBlue and made $25,000.  So that list

2    will be the $50,000 minus the $25,000.

3            THE COURT:  So, fundamentally, you're just going to

4    add two columns to the existing.

5            MS. RODRIGUEZ:  It's math.

6            THE COURT:  One column shows, in effect, what without

7    offset would be, then what the offset would be, and then the

8    last column is the net damages.

9            MS. RODRIGUEZ:  Correct.

10           THE COURT:  And that's the only change.  I mean, in

11   his complicated text, we're not getting any changes.

12           MS. RODRIGUEZ:  No.

13           THE COURT:  Just two different -- two new columns on

14   a schedule that ready exists.

15           MS. RODRIGUEZ:  He runs the setoff that he gets

16   through a computer program that he calculated and, yes, it's

17   just arithmetic.

18           MR. COHEN:  Your Honor, I just want to just correct

19   one thing.

20           THE COURT:  Essentially you got what you asked for.

21   You wanted representation if they're going to change the

22   report.  In effect, that's what you got.

23           MR. COHEN:  I think you've solved all of our problems

24   but one, Your Honor, if I may.

25           THE COURT:  Okay.  What's that one?  ALPA can afford

```
 1    to pay the bill, so don't worry about that.  If that was the

 2    problem, put that one aside.

 3            MR. COHEN:  No, Your Honor.

 4            THE COURT:  Right, Mr. Katz?

 5            MR. KATZ:  I'd have to ask the clients about that,

 6    Your Honor.

 7            MR. COHEN:  Your Honor, when they're collecting that

 8    data that's at the printer -- maybe it needs to be held up --

 9            THE COURT:  What they're printing is the request, not

10    the data.

11            MR. COHEN:  Right.  But what they're not requesting

12    is anything that goes to mitigation, which is the subject of

13    Your Honor's motion.

14            THE COURT:  Such as?

15            MR. COHEN:  Such as, you know, what kind of request

16    did they put in?  Did they take leaves of absence?  I mean,

17    we're going to have to collect some information from these

18    plaintiffs about what they did.  We don't know, you know, how

19    they bid on their various -- we're going to need information.

20            THE COURT:  Well, let me tell you what they plan to

21    give you.  Let's get this on the table.  I think what they

22    plan is only what we would call offsets, you know.

23            MR. PRESS:  Judge --

24            THE COURT:  Did you fly for JetBlue, you know, or did

25    you fly for some freight airline?  You know, you make X
```

1    dollars, you know, during what periods?  Or did you work

2    outside the airline industry?

3              MR. PRESS:  What you say is true, Judge.

4              THE COURT:  There is one guy who had a gardening

5    operation.  It sticks in my mind there was one guy that became

6    a landscaper.  He was a pilot but he had a landscaping

7    business.  I don't know why I remember that, but he had a

8    landscaping business in which he earned some money as a

9    landscaper.

10             MR. PRESS:  Your Honor, the issues that Mr. Cohen's

11   addressed, we have addressed them in our request.  I wasn't

12   inclusive in giving the list.

13             THE COURT:  Tell me how you addressed it.

14             MR. PRESS:  We've asked for people on maternity

15   leave, for instance, medical leave; people that lost their FAA

16   certificate for some reason.  So again --

17             THE COURT:  You mean their certificate which allows

18   them to fly?

19             MR. PRESS:  Correct.  So we have addressed those

20   issues.

21             MR. COHEN:  I think they've addressed some of the

22   issues.  I'm glad to hear they're getting that data, but there

23   are other issues that are individual.  If they're not going to

24   ask for that data, we're going to have to figure out some way

25   to get that information.  Again, it makes a difference.  You

1  know, it truly makes a difference.  So if you were on the

2  list -- and this is the problem with the model, because, you

3  know, the model I understand is a proxy, but, you know, when

4  they say, for example, they're using actual, they're not even

5  using in their models actual earnings data for the pilots.

6  That's not true.  Their model --

7          THE COURT:  I'm sorry.

8          MR. COHEN:  Their model is not taking into account

9  actual earnings for the actual people on the list.  It is an

10 aggregate of.  For each place on the list they look at a

11 certain number of places above and a certain number of places

12 below and they come up with a proxy for earnings.  That's the

13 problem with these models and, you know, we're -- they're

14 going to have to confront these individual issues at some

15 point before trial.

16         THE COURT:  Well, we just have to give the Circuit

17 something to do.  Van Antwerpen screwed this thing up fairly

18 well and -- so let's -- because he went to North Academy

19 instead of Kramer.  Maybe that's going to be for the Circuit

20 to sort out.

21     I mean, no matter what they say they're going to

22 gather, you'll find something they should gather that they're

23 not gathering.

24         MR. COHEN:  Well --

25         THE COURT:  And I'm not going to let you take 2,000

 1   depositions.

 2          MR. COHEN:  Of course not, Your Honor.  And nor would

 3   our client.  And nor would we ask to do that.

 4          But, look, I think that it might be helpful, you know,

 5   if we could have a day or two to confer with Plaintiffs and

 6   we'll see if there is anything else that is reasonably

 7   included in that list.

 8          THE COURT:  Why don't you do it today.  I'm here all

 9   day today.  I do have another matter, but I'm here --

10          MR. COHEN:  We can do that, Your Honor.

11          THE COURT:  -- as late as you want.  I'm sure we have

12   a conference room or conference rooms we can provide you.

13          MR. COHEN:  We're happy to do that, Your Honor.

14          THE COURT:  Because at the end of the day, subject to

15   whatever attack might be on a Daubert motion, they're going to

16   present their report the way they want to present their

17   report.  They're going to include that information.  They have

18   got to provide the information to you and there has to be full

19   disclosure whatever they're relying on, but they're going to

20   decide what they need; their experts are going to say you need

21   this information -- and in a sense they've already said

22   that -- and they're going to present their reports.

23          You'll depose them.  And you may say as part of your

24   argument, you know, that these are -- these are inadequate

25   because there are certain other information you didn't get,

1    you know.  Well, fine.  It's like any other expert's report.

2    We'll argue it out.  Your own experts may say that they didn't

3    get this, this, and this, so, therefore, they're unreliable.

4    That could play out either in a Daubert motion or it can play

5    out at trial.  It can play out different experts -- you know,

6    one expert says the other expert didn't -- didn't do a good

7    job.  I have that all the time, you know.

8          But, obviously, if you can reach some sort of

9    agreement, or even if it's not total agreement, you know, 80

10   or 90 percent agreement, it will make things easier.

11          MR. COHEN:  Your Honor, again, in terms of

12   sequencing, it still doesn't -- I don't think it's appropriate

13   for our experts on March 15th to give net damage figures, net

14   of offsets and mitigation, without seeing theirs.  So

15   somewhere between --

16          THE COURT:  But you are going to see theirs.

17          MR. COHEN:  Before March 15th?  I don't think Your

18   Honor set a date.

19          THE COURT:  Yes, I did.  My understanding is that

20   December 31st they're going to send you all the information

21   they have that they have already collected and January 31st is

22   the drop-dead date for everybody.

23          MR. COHEN:  Right.  When is the date, Your Honor,

24   which we're going to get that schedule from Mr. Salamat that

25   says -- with the net numbers?

```
 1              THE COURT:  Well, that schedule should be prepared on
 2   an ongoing basis so we can turn things over on the 31st of
 3   December.  I mean, the schedule should already be prepared as
 4   to those -- let's assume it's 60 percent of the pilots, or
 5   whatever it is, done by the 31st.  For those 60 percent it
 6   should already be done.
 7              MR. PRESS:  And it will be.
 8              THE COURT:  You understand what I mean?  For those
 9   extra two columns.
10              MR. PRESS:  Knowing pilots and their interest in this
11   case, I suspect we'll have most of the data by the end of this
12   year.
13              THE COURT:  I don't know what the percent will be.
14   Whatever the percentage will be, when I say turning over the
15   data, I mean more than just giving raw numbers.  I mean the
16   schedule that you anticipate that's going to be annexed to the
17   report should be completed, at least as for those pilots,
18   whether it's 1,000, 1,200, 1,500, where you have that data.
19              MR. PRESS:  And then it will be updated to be
20   final --
21              THE COURT:  And then on the 31st you are updated for
22   the remaining pilots.
23              MR. COHEN:  I appreciate that.  I didn't realize,
24   Your Honor.  Obviously, that's fine.
25              THE COURT:  I'm taking him at his word that basically
```

```
 1   what we have is sort of a math -- you know, some simple

 2   algorithm which creates the two columns --

 3            MR. PRESS:  Yes, Your Honor.

 4            THE COURT:  -- on the existing -- in effect, existing

 5   schedule we already have.

 6            MR. PRESS:  Correct.

 7            THE COURT:  And that you have.  And when he turns

 8   over the data, it should be with -- with this -- with the

 9   schedule expanded for those pilots that we have the data for.

10            MR. PRESS:  Yes.

11            THE COURT:  And that would be December 31st, which we

12   certainly hope will be way more than half, we hope.  And

13   again, I'm taking him at his word that most will be.  And

14   whatever the stragglers are, we'll get them in the next month.

15            MR. COHEN:  That's very helpful, Your Honor.

16        And our -- and again, if we want to move forward with

17   expedition, it would be helpful if we did not have eight

18   different damage theories.  I mean, could the Plaintiffs --

19            THE COURT:  I'm sorry.  Run that one by me again.

20            MR. COHEN:  There are a range of numbers -- I

21   don't -- when our expert is going to submit a report, I don't

22   know whether they're claiming damages of a hundred -- I know

23   they're not 150 million -- 800 million --

24            THE COURT:  You're right now attacking the report.

25            MR. COHEN:  No, no, no, I'm attacking, Your Honor,
```

 1   that there isn't a damage number.  They have refused to

 2   actually say, This is our principal damage claim.  We are

 3   claiming --

 4        THE COURT:  Maybe I'm losing you.  I understand there

 5   is out there a schedule.  I don't know if it's in the report

 6   or not, but it exists and you have it.  It lists all the

 7   pilots and what they would have earned, in effect, if the

 8   union had done, in their view, what the union was supposed to

 9   do without regard to any offsets, without regard to whether

10   they flew for JetBlue or flew for a cargo -- some of these

11   guys went to fly for cargo companies.  Not passengers, but

12   they were flying, in effect, cargo planes, I believe.  I

13   thought we had that.

14        MR. COHEN:  Your Honor, here's what we have.  We have

15   eight different schedules.  We have numbers under something

16   called the fairness model, the arbitration list, the Salamat

17   damage model, the marginal plus two model, Farber seniority 1,

18   Farber seniority 2, Farber seniority 3, Tannen (phonetic)

19   seniority.  What I'm asking for is not to respond to eight

20   different damage theories.

21        MR. PRESS:  There are different versions of a "but

22   for" world that have been created.

23        THE COURT:  Yeah, but basically you can't -- there

24   has got to be a "but for" world that you're going to go with.

25        MR. PRESS:  Well --

```
 1          THE COURT:  Are you going to tell the jury, I have
 2   eight different theories and you pick one of them?
 3          MR. PRESS:  No.
 4          THE COURT:  That's what it sounds like to me.
 5          MR. PRESS:  No, we will not do that.  But a point of
 6   fact, there may be alternative models presented to the jury.
 7          THE COURT:  Oh, I'm sure.  Well --
 8          MR. PRESS:  I can tell you it's not going to be
 9   eight.  But I can't commit that it's going to be one.  I don't
10   think that's reasonable, Judge, to hold us to that.
11          THE COURT:  No, no.  But there has got to be a point
12   that the jury can make a rational -- I mean, the idea of an
13   expert is to express an opinion.  And you say that because of
14   the special training and knowledge and background of
15   particularly -- it's in my standard charge to the jury on
16   expert opinion.  You know, you explain why you're letting this
17   opinion go and then you tell the jury that they can accept it,
18   but they don't have to accept it.  They can accept it or
19   reject it, and you give them some guidance they can consider
20   for accepting and rejecting.
21          MR. PRESS:  I understand.
22          THE COURT:  You're really raising a different issue.
23          MR. COHEN:  What I'm saying, Your Honor --
24          THE COURT:  And this is not the same issue, because
25   in extending the columns, you can take any of the eight --
```

1   once you have the data and the number, you can extend out any

2   one of them.

3            MR. COHEN:  What I'm raising, Your Honor, is if

4   you're going to submit reports on March 15th -- I understand

5   they're two different experts.  I understand the concept of

6   Expert A has a theory and Expert B has a theory and --

7            THE COURT:  Well, Expert A --

8            MR. COHEN:  Expert A has four theories and Expert B

9   has three theories.

10           THE COURT:  But the first expert, Henry Farber, Dr.

11  Farber, is not -- Dr. Farber is not using numbers.  He's not

12  relying on a list of any kind, so he's --

13           MR. COHEN:  No, Your Honor, that's not correct.  He's

14  creating three different lists.  The numbers are being run

15  through by Mr. Salamat, but he actually -- they have seven or

16  eight -- they have eight different lists.  You know, and then

17  they're complaining that we're not going forward with our

18  experts.  I don't know how we can proceed in any kind of

19  rational basis with eight different lists.

20           THE COURT:  Maybe that would be a subject of your

21  expert report.  I mean, that may be one of the very things

22  they'll comment on is if they have seven theories, many of

23  which are inconsistent with each other.

24           MR. COHEN:  I understand that, Your Honor.  But what

25  I'm asking --

1          THE COURT:  I'm not saying they are.  I'm just saying

2     that that could be what your expert -- I don't know.

3          MR. COHEN:  What I'm asking for is that they

4     should -- each expert should tell us what his opinion is with

5     respect to damages.  I truly don't know what their damage

6     number is.

7          MR. PRESS:  Judge, our opinions have been -- our

8     opinions -- our experts have expressed opinions.  There are

9     two very detailed reports.  If their experts have an opinion

10    on what the damages were, why don't they tell us?

11        It has no impact on their ability to take a deposition

12    and have an expert articulate an alternative view of what the

13    "but for" world would have been.  It really doesn't.

14         THE COURT:  Yeah, but an alternative view of what the

15    "but for" world would have been is a different damage theory.

16         MR. PRESS:  Of course.

17         THE COURT:  The damage theory flows -- whatever it

18    is, it flows from your view of what the "but for" world would

19    have been.  I mean, you know, the actual numbers will depend

20    on the numbers from the individual pilots, but at least in

21    gross, a different view of the "but for" world is a different

22    damage figure.  I mean, cumulatively it's a different damage

23    figure.

24         MR. PRESS:  There is no question about that.

25         THE COURT:  I suppose you could have a "but for"

1    world anywhere from total integration, I guess would be one

2    "but for" world.  You took the two lists and actually

3    integrated them 100 percent, no stapling.

4            MR. PRESS:  Why not put the TWA pilots on the top?

5            THE COURT:  And then you have -- well, I suppose you

6    could have backwards.  You could have senior to the American

7    pilots.  I suppose that's even -- we'll call that reverse

8    stapling, where the American pilots would get stapled to the

9    TWA list.  That would be anti-stapling or reverse stapling.

10   But no matter which one of those you choose, the more

11   realistic would be total integration would be the best, if you

12   just took the two lists.

13        And, indeed, the two contracts had different provisions

14   dealing with that very issue.

15           MR. PRESS:  True.

16           THE COURT:  You might call it the APA -- the APA

17   contract, I believe, called for total integration, did it not?

18           MR. PRESS:  Well, there was some debate about what it

19   really provided for, but that was one interpretation, yes.

20           THE COURT:  There were different language in the APA,

21   which American had, as opposed to the ALPA contract, which

22   arguably did not have that.  Or maybe it was the other way

23   around.  I don't know.

24           MR. PRESS:  You stated it right, Judge.

25           MR. KATZ:  Your Honor, to be precise, the TWA

```
 1   contract --

 2           THE COURT:  Are you trying to make me be precise, Mr.

 3   Katz?

 4           MR. KATZ:  No, I'm going to be precise.

 5           THE COURT:  Oh, you're going to be precise.

 6           MR. KATZ:  The TWA contract did not require any

 7   particular result.  It required a process that ended in

 8   arbitration --

 9           THE COURT:  Right.

10           MR. KATZ:  -- to resolve the integration of the TWA

11   pilots --

12           THE COURT:  The American contract did not have

13   arbitration.

14           MR. KATZ:  The American contract required all of the

15   incoming pilots be put on the bottom of the American list.

16           THE COURT:  But all I'm saying, just to go back, I

17   could -- your experts, not me, could postulate, well, if the

18   union did what it was supposed to do, it would have had one

19   list with no staple point.  That, to me, is kind of the top.

20   And then you'd say, well, you know, staple points would be,

21   you know, here, here, here, here.  And plus other

22   modifications as well.  I don't want to say the staple point

23   was the only one.  But each one comes up with a different

24   damage number.

25           MR. PRESS:  That's true.
```

1              THE COURT:  And I'd say from no damages -- if you had

2    total integration, probably, in effect, no damages, to -- no,

3    I'm sorry, not no damage, that's the highest damages.  And

4    then as you go down in your "but for" world, less and less and

5    less and less and less.

6         All I'm saying, that's grist for your mill.

7              MR. COHEN:  No, I understand that, Your Honor.  It's

8    just --

9              THE COURT:  If you think that they've given you, you

10   know, a mishmash which, you know, maybe you can't

11   come -- take that up.

12             MR. COHEN:  All I was trying to say, Your Honor, is

13   given these time frames -- which we will obviously do whatever

14   Your Honor asks us -- to have to respond to eight different

15   models seems like an imposition.

16             THE COURT:  Let me put it this way.  You can't -- if

17   you've given eight different -- and I'm really leaping way

18   ahead to a trial.  If you've given eight different models of

19   possible "but for" worlds, okay, and now it's come time for

20   trial, and he gets on the stand and says, I'm picking Model 3,

21   that's the model that I think is the one that matters, but

22   nowhere in his report has he ever picked Model 3 before or he

23   just said his Model 1, 2, 3, 4, 5, 6, 7, and 8, but now he

24   gets on the stand and says, Model 3 is my model, I'm not going

25   to allow that.

```
 1            MR. PRESS:  Of course, Judge.  I wouldn't expect you
 2  to.
 3            THE COURT:  You know.  So --
 4            MS. RODRIGUEZ:  And again, Your Honor, with
 5  regard -- and I'll just talk --
 6            THE COURT:  Maybe that's the reason for deposing
 7  these folks.  One of the reasons you depose them is to pin
 8  them down.
 9            MR. COHEN:  I'm just trying to deal with --
10            THE COURT:  It seems to me -- I'm salivating here
11  over the opportunity to depose these guys.  This would sound
12  like fun for me.
13            MR. COHEN:  Judge, we'll check your schedule.
14            THE COURT:  Which of the eight theories is going to
15  be your theory?  It sounds like fun for me.
16            MR. COHEN:  The thought had occurred to us, however,
17  if what's going to happen in trial, right, is that the witness
18  is going to say, Well, I was deposed and I had thought about
19  it some more and pick one instead of two, three, four --
20            THE COURT:  I'm not going to allow that.  Well, if it
21  turns out at the deposition he's very, very clear that I'm
22  picking one and you've pinned him down adequately, I'll allow
23  him to testify consistent with his deposition.  But what I'm
24  not going to do is let someone give you eight different
25  theories of damages, "but for" models and models of the "but
```

1    for" world, and then have -- and then have at deposition not

2    pick any one as being the right one and then come up at the

3    trial and say, I'm picking No. 3.  That's my model.  I'm going

4    with three.  That's my model, ladies and gentlemen of the

5    jury.  That's what I want you to find the "but for" world

6    would have been.

7              MR. COHEN:  No, Your Honor, I --

8              THE COURT:  I'm not going to allow that.

9              MR. PRESS:  Your Honor, can I --

10             THE COURT:  Mr. Press isn't taking issue with me on

11   that.

12             MR. PRESS:  Just as a point of fact, Judge, and I

13   didn't want to get into this, but our experts have picked what

14   they think was the most reasonable outcome.  They've said

15   that.  They've each articulated their opinion.

16             THE COURT:  I'm not arguing with you on that.  I

17   mean, you may be right.  I just don't know.

18             MS. RODRIGUEZ:  For instance, Your Honor, again with

19   regard to Dr. Farber, he talks about the "but for" list that

20   he opines on would be the "but for" list, but he talks about

21   having an upper parameter list and a lower parameter list, but

22   they're not three different methodologies.

23             THE COURT:  Let me give you an example.  I used to do

24   a lot of litigation in real estate, tax appeal and things like

25   that.  And you get an MAI report from a person and he'd say,

1   Well, on one theory I would value it this way, another theory

2   I would value it this way.  If there is reproduction costs, I

3   would do this.  If there was an income, I would do this.  When

4   the cap rate was this, I would do this, but if my cap rate was

5   this -- but at the end of the day he says, I put it all

6   together and I find the one that is most reasonable is this.

7   And so he doesn't say, I have seven different valuations which

8   might be.  He says, In my opinion, this one is what I think is

9   the value.

10        So, I mean, extrapolating this to this kind of thing, I

11  can see, Well, there is three or four different ways we can

12  come to a number here for a "but for" universe.  But when I

13  consider all the pros and cons of each of the methodologies,

14  it's two that I pick.  That one I think is the right one.

15          MR. PRESS:  That's what happened, Judge.

16          MR. COHEN:  Your Honor, we'll proceed with the

17  deposition --

18          THE COURT:  I mean, he says that's the one.  I don't

19  know.  I mean, I don't want to make it -- nothing I say should

20  be construed as my opinion.

21          MR. COHEN:  I understand, Your Honor.  We'll explore

22  it at the deposition, Your Honor.

23        Your Honor, so we don't have to go back, obviously

24  we're not going to be able to do these depositions in four

25  hours, so I don't know if that is an appropriate time.

1              THE COURT:  Isn't it obvious?  Oh, you're talking --

2              MR. COHEN:  No, the expert.

3              THE COURT:  I didn't put four hours on the expert

4    depositions.

5              MR. COHEN:  Okay, thank you.

6              THE COURT:  I only put the four hours on the CEO,

7    CFO, the labor relations guy, the two class representatives.

8    Just those folks.

9              MR. COHEN:  All right.  Thank you for the

10   clarification.

11             THE COURT:  And the investment banker.

12        Oh, no, I'm going to revisit the issue.  I'm uninclined

13   to -- as long as things don't get out of hand, I'm not

14   inclined to put any limit on any of the experts.  Either way,

15   them deposing your experts or you deposing their experts.

16             MR. COHEN:  I'm sure we'll work out the time of the

17   experts' --

18             THE COURT:  I want to be reasonable, but I don't

19   think I can say now that four hours would be adequate or

20   inadequate.  I just can't say, so I don't want to put a limit

21   now, you know.  I doubt I would put a limit at all, quite

22   candidly, on the experts, the expert testimony.  Unless it

23   gets out of hand on the third day or something, you know.  I

24   doubt that.

25        Okay.  Anything else?

```
 1              MR. PRESS:  Nothing from the Plaintiffs, Judge.

 2              THE COURT:  Well, let me recapitulate what I think.

 3              MR. PRESS:  Well, wait.  While we're here, can we

 4     talk about when the Plaintiffs should depose the Defendant

 5     expert and any rebuttal experts and the trial date?

 6              THE COURT:  They're supposed to have it by

 7     March 15th.

 8              MR. PRESS:  Correct.

 9              THE COURT:  I don't know what a rebuttal expert is.

10              MR. PRESS:  I don't know either.

11              THE COURT:  I'm very unsympathetic to one expert

12     files a report and the other one files a response to that one

13     and then the other one files a response to that one.  He's an

14     expert.  He's supposed to give an opinion, you know.

15              MR. PRESS:  Judge, I agree with that approach.

16              THE COURT:  But right now they're due March 15th.  I

17     would like your depositions to be within 30 days, standard --

18     standard final pretrial type of dates.

19              MR. PRESS:  Tax day 2013.

20              THE COURT:  I normally give 30 days to depose the

21     other side, 30 days after receiving the report to depose the

22     other side's experts.

23              MR. PRESS:  That's agreeable to us.

24              THE COURT:  All right.  Let me just go back over

25     everything so we -- we're on -- and I'll probably try to put
```

```
 1    this in order.

 2         Number one, I'm giving leave to the defense to take the

 3    six depositions, the CEO, the CFO, the labor relations guy

 4    from TWA, an investment banker, and then two -- were Schwartz

 5    and Hefley on the -- originally on the steering committee?

 6         MR. PRESS:  Mr. Hefley was, Judge.

 7         THE COURT:  And what about Schwartz?

 8         MR. PRESS:  No, he was not.

 9         THE COURT:  Was he a MEC member?

10         MR. PRESS:  He was assistant vice chairman.

11         THE COURT:  So he was a member of the MEC?

12         MR. PRESS:  He was.

13         THE COURT:  For what service, for what --

14         MR. PRESS:  He was the MEC assistant vice chairman.

15    Vice chairman, I'm sorry.

16         THE COURT:  But didn't they have three MECs, one for

17    each of the --

18         MR. PRESS:  He was not an elected MEC member.  He was

19    a --

20         THE COURT:  On which of the three locations?  There's

21    St. Louis, New York, and --

22         MR. PRESS:  He was an officer, so he's not really an

23    MEC member.  MEC officer is the right way to phrase it.

24         THE COURT:  All right.  Schwartz -- and Hefley was a

25    pilot, but he was a member of the original plaintiffs group.
```

 1          MR. PRESS:  That's true.  He was also on the merger

 2    committee that negotiated with the American pilots.

 3          THE COURT:  Right.  That was kind of an informal --

 4    yeah, informal committee.

 5          Okay.  Those six depositions at four hours a dep are

 6    going to be done by the Defendant by January 31st.  Okay.

 7          No. 2, the documents, the individual offset and

 8    mitigation data, will be turned over to the Defendant,

 9    whatever exists, on December 31st, and whatever doesn't exist

10    on December 31st will be turned over by January 31st.  And

11    it's understood by turning it over we don't mean just turning

12    over just the raw data, but making the mathematical

13    calculations that you say are going to be made and relied upon

14    with the data you're gathering.

15          MS. RODRIGUEZ:  Your Honor, can we just move that a

16    day since the deadline is the 31st for the pilots to get it

17    to --

18          THE COURT:  Well, it's the same day I intended.  I

19    don't know why I said the 30th.  I mean the last day of the

20    month.

21          MS. RODRIGUEZ:  All right.

22          THE COURT:  I'm sorry.  I'm missing your point, Ms.

23    Rodriguez.

24          MS. RODRIGUEZ:  Our drop-dead date to the pilots was

25    the end of January, so to the extent a pilot gets his

1    information in at 11:59, he's compliant, and so we would need

2    just --

3            THE COURT:  When is the drop-dead date?

4            MS. RODRIGUEZ:  January 31st.  So if we could have

5    February --

6            THE COURT:  Why don't you just move it back?

7            MS. RODRIGUEZ:  Because it's already at the printer.

8            THE COURT:  So change it.  You can change anything

9    unless it's actually gone out.  Unless it's already been

10   created.  I mean, the document hasn't been printed yet.  It's

11   just in the computer.

12           MR. PRESS:  I got sideways here.  I thought at the

13   end of December this year we're going to disclose whatever

14   data we have collected and then we're going to supplement the

15   end of January.

16           THE COURT:  No, no, what you're disclosing -- the

17   point I'm making is you're disclosing not just the raw data

18   but the calculations which you're going to make that yields

19   the actual damage figure.

20           MR. PRESS:  That's right, and an updated schedule

21   from the expert.

22           THE COURT:  What?

23           MR. PRESS:  An updated schedule from the expert.

24           THE COURT:  Right.

25           Now, by the 31st you're going to get the rest -- I

1    would just move that date back a couple of days so you can do

2    the calculation you have to do.

3        MS. RODRIGUEZ:  That's fine, Your Honor.

4        THE COURT:  Look, I'm not going to tell you how to

5    collect the data.  All I'm going to do is on December 31st, by

6    that day, you've got to give them whatever you've collected,

7    and not just the raw data, but showing how the calculation is

8    made that yields the actual damage number.  It's what I call

9    the extra two columns on the schedule.  The rest of that

10   information that you get, anything you get up to the 31st,

11   turned over to them in the same way, in the same format.

12   Okay.

13       I want the depositions of Dr. Henry Farber and

14   Mr. Rikk, with two K's, Salamat to be taken by the Defendants

15   by January 31st.  And it's, again, understood, if there is

16   something that I haven't kind of conceived of that would mean

17   that the deposition was not effective because there was some

18   information there that was not available, it's a risk we have

19   to take.  I may have to order another deposition.  So I want

20   to -- I think there is enough, particularly if by

21   December 31st we get most, 80 percent or 70 percent, or even

22   50 percent, you know -- well, that would go a long way to

23   being able to make the deposition meaningful.  So I want those

24   two depositions done.

25       By March 15th I want the experts' reports -- first of

1   all, by January 31st I want them identified, the trial experts

2   identified as to who they are.  I want their reports in by

3   March 15th, and then I want their depositions done by

4   April 15th.  Tax day, April 15th.

5          Okay.  Anything else?

6            MR. COHEN:  No, Your Honor.

7            MR. PRESS:  No, Judge.

8            THE COURT:  Okay.  All right.  Thank you.  Thank you

9   all for being here.

10         And I'm just wondering whether I should set another

11  date.  You know, I'm going to set a date in early February --

12  I'm going to try to do it now -- for another meeting just

13  to -- because a lot of things should have happened by then and

14  I just don't want to lose total track of things.

15         Do we have a date like very early February?

16           THE DEPUTY CLERK:  February 8th.

17           THE COURT:  February 8th, 10:00.  What day of the

18  week is that?

19           THE DEPUTY CLERK:  Friday.

20           THE COURT:  All right.  It's a Friday.  February 8th,

21  okay, here.  And given the number of people involved, we'll do

22  it in the courtroom, in this courtroom.  Okay?

23           MR. COHEN:  Yes, Your Honor.

24           THE COURT:  Okay.  We'll see.

25

1                     C E R T I F I C A T E

2              I, Cherilyn M. McCollum, a Certified Court

3    Reporter and Notary Public of the State of New Jersey, do

4    hereby certify that the foregoing is a true and accurate

5    computer-aided transcript of the testimony as taken

6    stenographically by and before me at the time, place and on

7    the date hereinbefore set forth.

8              I do further certify that I am neither of

9    counsel nor attorney for any party in this action and that I

10   am not interested in the event nor outcome of this litigation.

11

12

13

14

15

16

17

18

19

20

21

22              _____

                Certified Court Reporter
23              XI02094
                Notary Public of New Jersey
24              My commission expires 3-22-16

25   Dated: _____

*United States District Court*
*Camden, New Jersey*