# Exhibit 1

```
 1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2   _____

 3   PATRICK BRADY, et al.,

 4            Plaintiffs

 5                                      CIVIL ACTION
             Vs.                        NO. 02-2917 (JEI)
 6
     AIR LINE PILOTS ASSOCIATION,
 7   INTERNATIONAL,                     STATUS CONFERENCE

 8
             Defendant.
 9   _____

10                      UNITED STATES COURTHOUSE
                        ONE JOHN F. GERRY PLAZA
11                      4TH AND COOPER STREETS
                        CAMDEN, NEW JERSEY 08101
12                      November 15, 2012

13   B E F O R E:    THE HONORABLE JOSEPH E. IRENAS
                     UNITED STATES DISTRICT JUDGE
14
     A P P E A R A N C E S:
15
     TRUJILLO, RODRIGUEZ & RICHARDS, LLC
16        LISA J. RODRIGUEZ, ESQUIRE
          NICOLE M. ACCHIONE, ESQUIRE
17           Counsel for Plaintiff

18   GREEN JACOBSON, P.C.
          ALAN P. PRESS, ESQUIRE
19           Counsel for Plaintiff

20   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
          JAY COHEN, ESQUIRE
21        THEODORE V. WELLS, JR., ESQUIRE
          DANIEL J. TOAL, ESQUIRE
22           Counsel for Defendant

23   ARCHER & GREINER, P.C.
          JOHN C. CONNELL, ESQUIRE
24        KERRI E. CHEWNING, ESQUIRE
             Counsel for Defendant
25   (Continued on Page 2)
```

1   A P P E A R A N C E S   C O N T I N U E D:

2   KATZ & RANZMAN, P.C.
          DANIEL M. KATZ, ESQUIRE
3             Counsel for Defendant

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          THE COURT:  I see some familiar faces that should be
 2   somewhere else but here.  Must be a slow day at Paul Weiss.
 3          Okay.  This, of course, is the ALPA case, which has
 4   been parked on my doorstep now for quite a while, and may I
 5   have the appearance of counsel.  Let's start with the
 6   Plaintiffs and then work around.
 7          MS. RODRIGUEZ:  Good morning, Your Honor.  Lisa
 8   Rodriguez and Nicole Acchione from Trujillo, Rodriguez &
 9   Richards for the Plaintiffs.
10          MS. ACCHIONE:  Good morning, Your Honor.
11          MR. PRESS:  Alan Press for the Plaintiffs, Judge.
12          THE COURT:  Good morning, Mr. Press.
13          MR. PRESS:  Good morning.
14          MR. CONNELL:  Archer & Greiner by John C. Connell on
15   behalf of the Defendant, ALPA.  I'm here with my associate,
16   Kerri Chewning.
17          MR. WELLS:  Good morning, Your Honor.  Ted Wells from
18   Paul Weiss.
19          THE COURT:  Representing ALPA?
20          MR. WELLS:  ALPA, yes, Your Honor.
21          MR. COHEN:  Your Honor, Jay Cohen, also from Paul
22   Weiss.
23          THE COURT:  J-a-y?
24          MR. COHEN:  J-a-y, yes, Cohen.
25          THE COURT:  The Cohen I got, but the Jay, J-a-y.
```

```
 1              MR.  TOAL:   Good morning, Your Honor.   Dan Toal from
 2    Paul Weiss.
 3              THE COURT:   Dan?
 4              MR.  TOAL:   Toal, T-o-a-l.
 5              THE COURT:   T-o-a-l?
 6              MR.  TOAL:   That's right, sir.
 7              THE COURT:   And you're from Paul Weiss, okay.
 8              MR.  KATZ:   Good morning, Judge Irenas.   Daniel Katz.
 9              THE COURT:   Oh, a familiar face.
10              MR.  KATZ:   The law firm of Katz & Ranzman,
11    Washington, D.C., representing the Defendant, ALPA.
12              THE COURT:   Okay.   The reason this was originally set
13    was to sort of check into the progress.   In fact, I think I
14    really anticipated it be done in chambers, not even be done on
15    the record, to just find out when we're getting our expert
16    reports in, what the timing is to respond to the reports, what
17    kind of discovery, and we -- when I say "we," anybody here
18    would undertake in connection to the damages trial, to do
19    those kinds of things.
20              Mr. Wells' appearance was really after -- when I say
21    "Mr. Wells," Paul Weiss and Mr. Wells and the other attorneys
22    from Paul Weiss, came in later, I mean, when this conference
23    was really set up, and he's raised some new issues.   So why
24    don't I let -- let's start with Paul Weiss, tell me, you
25    know -- explain their representations and what it is there.
```

```
 1   Anybody can speak.
 2           MR. COHEN:  Your Honor, I'm between the two of them,
 3   so I'll give it a try.  Jay Cohen.
 4           THE COURT:  I have Jay, J-a-y.
 5           MR. COHEN:  I'm actually looking at my judge's
 6   portrait on the wall.  I used to work for Judge Hunter.
 7           THE COURT:  Yeah, you're not a Marine, are you?
 8           MR. COHEN:  I am not, sadly.
 9           THE COURT:  Just checking.  November 8th is not a
10   national holiday for you, is it?
11           MR. COHEN:  We had last year, I believe -- I don't
12   know if you know who Judge Snow is, but we had his 40th
13   anniversary party of the all clerks.
14           THE COURT:  Didn't his wife --
15           MR. COHEN:  She just passed away.  She was alive --
16   she was alive, yeah.
17           THE COURT:  I know it was just recently she passed
18   away.
19           MR. COHEN:  Yeah, she was too ill to attend the
20   party.  We realized we had been deprived of all these
21   reunions, so we went to Tavistock, and this morning I went to
22   Shirley's for the first time since 1981 for coffee.
23           THE COURT:  Were you in this building?
24           MR. COHEN:  Yes, the 4th floor.
25           THE COURT:  The 4th floor, yeah.
```

1      MR. COHEN:  Judge Cohen was across the hall.

2      THE COURT:  Well, I appeared as a practicing lawyer

3 here when he was on the 4th floor.  In fact, I appeared -- in

4 the chambers that I now sit, I appeared before Mitch Cohen,

5 actually.  He was sitting in sort of a butchered version.  The

6 chambers that I now sit in have been redone to look the way

7 they looked in the 1930s.  But when he was there, the room was

8 subdivided and the ceiling was lower, but I appeared before

9 Judge Cohen.

10      MR. COHEN:  It's a much nicer -- Ms. Rodriguez and I

11 talked about this.  It's a much nicer court than it used to

12 be, but I think the new building was the parking lot.

13      THE COURT:  Yeah, well, I was in the new building for

14 a while, but when they redid this courtroom, when they fixed

15 it up and they fixed up the chambers that I'm in, the adjacent

16 chambers, I was then the senior acting judge, so I moved back

17 here.  I remain the only judge in this building.

18      MR. COHEN:  Right.

19      THE COURT:  Bankruptcy, magistrates, district are all

20 in -- are all in the court house.  I'm the only one that's

21 here.

22      MR. COHEN:  Your Honor, if we may, as we -- and,

23 obviously, we've been working closely with Archer & Greiner

24 and Mr. Katz to move this along.  As we understand, what was

25 supposed to have been accomplished in the conference was, one,

 1   we can report on discovery.  There was discovery ordered with

 2   respect to --

 3           THE COURT:  There was five -- we were going to take

 4   the deposition of five of the pilots, I believe.

 5           MR. COHEN:  Well, five individuals.  Not all pilots.

 6   They were American executives --

 7           THE COURT:  I just remember five individuals that

 8   were supposed to be deposed.

 9           MR. COHEN:  Yes, and four of the five have been

10   completed, Your Honor.

11           THE COURT:  Who hasn't been completed?

12           MR. TOAL:  There were four total.

13           MR. COHEN:  Four total.  We have one left on the

14   29th.  John Dare.

15           MR. PRESS:  The five class members have all been

16   deposed, Judge.

17           MR. TOAL:  Mr. Cohen's referring to the third-party

18   witnesses.

19           MR. COHEN:  Oh, from the union.

20           MR. TOAL:  Yeah, American and the union.

21           MR. COHEN:  So that discovery will be completed this

22   month.

23       We are in receipt of preliminary expert reports of the

24   Plaintiffs, and I think we were just discussing this before,

25   and in our view we would like to see final expert reports.  We

 1   are going to need some discovery in connection with the

 2   experts, fairly targeted discovery.

 3           THE COURT:  Before we go back, we have expert reports

 4   now from the Plaintiff.

 5           MR. COHEN:  Well, we have preliminary expert reports

 6   for the Plaintiffs that set out a methodology for how they

 7   would do a list but do not have any of the individualized

 8   setoffs and data that should get us to a damage number.  So we

 9   have a number of expert reports with a range of damages, 160

10   million or so on the low side and --

11           THE COURT:  On the low side?

12           MR. COHEN:  On the low side.  And 1.7 billion on the

13   high side.  So we have a wide range of numbers which the

14   Plaintiffs --

15           THE COURT:  Get my press agent -- get my press agent

16   to send out a notice that I'm handling a $1.6 billion case to

17   *The Wall Street Journal* or something.

18           MR. COHEN:  So we have a range of numbers, but from

19   our view -- and we don't have the final expert reports.  We

20   have these preliminary reports with the methodology.

21       You know, but the way we think it makes sense to go

22   forward is, even these preliminary expert reports raise some

23   discovery issues.  Let me tell you what those are.  One

24   relates to the condition of TWA.  So the experts --

25           THE COURT:  I'm sorry?

```
 1           MR. COHEN:  Of the TWA Airline's financial condition
 2    prior to the merger.  Let me explain why, if I may.
 3           THE COURT:  And you're talking ten -- how many, ten,
 4    12 years ago?
 5           MR. COHEN:  Yeah, 2000, Your Honor.
 6           THE COURT:  About 12 years ago.
 7           MR. COHEN:  So what their experts do -- and I don't
 8    want to put words in Mr. Press or Ms. Rodriguez's mouth, they
 9    can further explain this -- but what they do is they made a
10    series of assumptions in their "but for" world of what the
11    list would have looked liked, what the WPC would have looked
12    like if ALPA had done a variety of things.  And one of the
13    things that they do, obviously, is talk about bargaining
14    leverage between TWA on one side and American on the other,
15    that's really quite fundamental to their report -- to their
16    reports, and they make some assertions about the TWA's ability
17    to have leverage, which we think are completely consistent --
18    inconsistent rather, with the financial record -- it's an
19    important distinction.  Let me say that again.  Completely
20    inconsistent --
21           THE COURT:  Very good.
22           MR. COHEN:  -- with the financial condition of TWA.
23    What we know in 2000 from the Bankruptcy Court and TWA
24    is the judge viewed the only alternative to American's
25    acquisition of the assets was a liquidation.  Whether or not
```

1   TWA would have been able to fly had the American transaction

2   not gone forward is a critical issue with respect to what were

3   the expectations --

4          THE COURT:  There was also pending -- wasn't there a

5   motion to reject the TWA labor contract, what is it, 1113

6   or --

7          MR. COHEN:  Yes, I think so, Your Honor.

8          THE COURT:  I always forget that special provision of

9   the labor contracts, but there was pending that at the time.

10         MR. COHEN:  Yes.

11         THE COURT:  -- never got decided because of the way

12  the case worked out, but there was a pending motion to reject

13  the -- the TWA labor contract.

14         MR. COHEN:  I believe you're correct, Your Honor.

15         So, fundamentally, we think -- you know, the experts

16  have constructed what the economists call a "but for" world

17  and then say, This is how we view what the leverage would have

18  been of the TWA pilots vis-a-vis American.  And they go back

19  and they look at the history of prior mergers or combinations,

20  they look at lots of arbitration results, which we don't think

21  has any relevance because there was no ability to arbitrate

22  here, and we think that's what the factual witnesses will say,

23  that's what they said at their depositions, and

24  they -- and they distinguished kind of the low end, in their

25  view, of what a list would have looked like, from the high end

1    by distinguishing what the condition was at TWA.  So they

2    distinguish TWA on the one hand from the airlines they say

3    that were essentially out of business.  So that's a

4    fundamental factual predicate:  We think TWA was out of

5    business.

6          I think we need to take three or four, perhaps five,

7    depositions of TWA executives.  We can find them, get the

8    financial records --

9            THE COURT:  To the extent you can find them.

10           MR. COHEN:  Well, we found the American executives.

11   I mean, they're all retired, but we found them.  So that to us

12   is important.

13         The second thing that we don't have, of course, is we

14   don't have any information about the absent class members, the

15   individual members of the class, which, obviously, is relevant

16   to the computation of damages.

17         So all that we have received from the Plaintiffs are

18   these preliminary reports with this gigantic range of numbers

19   and with eight different damage models, I think, in the

20   aggregate, and they say, Here's what it is and we'll tell you

21   later, once we've collected the information, what the setoffs

22   are.  And so, from our perspective, we don't know what their

23   theory is and what their numbers are.  So what we would

24   propose to do to go forward is, one, take the TWA discovery

25   while they're working on their final reports, because they

```
 1    don't have final reports; two, we need the information from

 2    the class members so we can determine what the setoffs -- and

 3    we have a dispute, obviously, about mitigation.  Your Honor

 4    knows there is a motion.

 5            THE COURT:  Is it your theory that you're going to go

 6    pilot by pilot as to what the mitigation is?

 7            MR. COHEN:  Yes, consistent with, Your Honor, we have

 8    to all figure out a reasonable way to do that.

 9            THE COURT:  I mean, take Pilot 1, when you worked

10    this job, you flew for this airline and you --

11            MR. COHEN:  Well --

12            THE COURT:  And the same thing with Pilot No. 2,

13    okay, you worked here, you were called -- in other words, take

14    the actual facts of mitigation damages one by one by one.

15            MR. COHEN:  Well, let me start with setoffs, Your

16    Honor, and then, if I may, go to mitigation.  We think --

17            THE COURT:  I put that in one category, setoffs and

18    mitigation.  My point is, it's your position it's going to be

19    done pilot by pilot and not on some aggregated basis.

20            MR. COHEN:  We don't think --

21            THE COURT:  Partially aggregated basis.

22            MR. COHEN:  We don't think under the Wal-Mart

23    decision the Plaintiffs can go forward that way.  We think we

24    are entitled to, first off, actual earnings, which is not part

25    of their expert reports, they make all sorts of assumptions;
```

1   actual earnings at American, which their experts don't

2   consider; actual setoffs; actual mitigation.  Yes, we think

3   we're entitled to that data, and we would like to do it in a

4   reasonable way.

5           We are, obviously, not going to take 2,700 depositions,

6   or even a substantial fraction of that, but we need the data.

7   We think we can get it --

8           THE COURT:  For how many pilots do you think you can

9   get?

10          MR. COHEN:  Is there 2,700 in the class?  Oh, it's

11  2,300.

12          THE COURT:  You think you can get detailed

13  information from 2,300 pilots in this case and send it to a

14  jury?

15          MR. COHEN:  I think what we are saying, Your Honor,

16  is in the first instance the Plaintiffs need to give us that

17  information for their class members.  Obviously, it's been

18  done on other cases by interrogatory.

19          THE COURT:  I'm sorry?

20          MR. COHEN:  It's been done in other cases by

21  interrogatory.  We have served interrogatories on --

22          THE COURT:  In a jury case?

23          MR. COHEN:  I don't think there is any distinction of

24  a jury trial, Your Honor --

25          THE COURT:  I don't want to represent -- I'm not

1    representing there is any legal distinction between jury and

2    nonjury, but do you have a case, a case where there was a jury

3    and we're submitting 2,300 --

4            MR. COHEN:  So maybe I'm not being clear, Your Honor.

5    I understand your point.  We're not saying we are going to

6    submit item by item by item.  What we are saying is the

7    experts' calculations to aggregate all this information have

8    to be based on the actual information with respect to class

9    members.

10           THE COURT:  I remember in 1968 I was bored and I

11   enrolled in a graduate program at NYU and it was in trade

12   regulation, and one of the courses we took happened to be

13   Robinson-Patman, now basically a dead letter, but at the time

14   it was a much hotter issue than it is today.  You don't hear

15   much about Robinson-Patman today.  I still think it's on the

16   books, but you don't hear much about it.  I heard of cases

17   that had to do with what was called the wrongdoing rule.  The

18   wrongdoing rule is when the wrongful conduct of the Defendant

19   created the difficulty for the Plaintiff in measuring damages.

20   You wound up with -- you could use a method of calculating

21   damages that might not in pure theory be the best or most

22   accurate.  And I gather they have not come up with such a

23   theory.

24           I mean, let me give you an example.  Take mitigation.

25   I could pick 20 people at random from a computer program of

1    the 2,300 pilots.  You know, figure mitigation, you know,

2    detail, come up with some kind of average, and then use it

3    across the board, just to give you one very primitive way of,

4    you know, looking at it.  You following me?

5              MR. COHEN:  Oh, I understand.

6              THE COURT:  In other words, so I wouldn't be

7    presenting to a fact-finder, whether it was a jury or a judge,

8    trying to deal with 2,300, you know, different -- okay.  Go

9    ahead.

10             MR. COHEN:  So, Your Honor, I mean, obviously, we're

11   not going to call all of these people, but here's what we

12   think, and I don't even think the Plaintiffs disagree.  What

13   the Plaintiffs have not done in their expert reports is --

14   they are, as I understand it, collecting exactly the

15   information that I'm talking about that we need from their

16   class members.  I think we probably have a disagreement about

17   the scope of what they're collecting, but I think even the

18   Plaintiffs recognize that actually --

19             THE COURT:  Do you know what they're collecting?

20             MR. COHEN:  I think we'd have to look to Mr. Press to

21   address it.  I think I know what they're collecting, but we

22   had a motion that was withdrawn, so I think there --

23             MS. RODRIGUEZ:  Well, we had asked for your input and

24   you refused us, so --

25             THE COURT:  I mean, one of the things you could do, I

1  guess, is come up with an agreed-upon form, you know, in which

2  both sides agree that this is the information you're going to

3  collect from the pilots and develop some method for going out

4  and getting it.

5            MS. RODRIGUEZ:  And, Your Honor, we had actually

6  proposed that in September, and that was the genesis behind

7  our motion for Court-approved notice, but Defendants at that

8  time chose not to participate in the information -- in adding

9  to the information that we were seeking from the class, but --

10           THE COURT:  You don't -- I don't have a motion

11  pending on that.

12           MS. RODRIGUEZ:  We filed a motion.  Defendants

13  opposed -- we filed a motion seeking Court approval because we

14  wanted a notice that incorporated everyone's request for

15  information from the class.  We didn't want to be in a

16  position --

17           THE COURT:  Is that pending?

18           MS. RODRIGUEZ:  The Defendants opposed it and you had

19  suggested before it wasn't appropriate for the Court to give a

20  stamp of approval over the Defendants' objection, if they

21  weren't willing to --

22           THE COURT:  That's how I feel now.

23           MS. RODRIGUEZ:  If they weren't willing to

24  participate, it really didn't make sense.

25           THE COURT:  It's not pending?

```
 1          MS. RODRIGUEZ:  It's not pending.  It was something

 2     that we had contemplated.

 3          MR. COHEN:  Your Honor, what we're saying is to

 4     actually -- huge amounts of money swing on these mitigation

 5     and setoff issues.  I think we know that.

 6          THE COURT:  Apparently, it's a huge amount.

 7          MR. COHEN:  And one of the things we know from the

 8     Plaintiffs' preliminary reports is there are hundreds of class

 9     members who are no worse off if they would have been under

10     Schedule CC, so even under the Plaintiffs' preliminary theory

11     there are class members who are not damaged.  They're a very

12     small number --

13          THE COURT:  We knew that.  I don't think there is any

14     surprise that there is a small -- some number of class members

15     who, as it turns out, were not damaged.

16          MR. COHEN:  So I think, Your Honor, our view is that

17     since the decision of Wal-Mart by the Supreme Court, which

18     rejected this trial by formula, we are entitled to the

19     information, actual information.  We are not suggesting huge

20     numbers of people testify.  There will have to be some

21     testimony from individuals.  And the experts will compute it.

22          So what we would like to see is go forward with that

23     discovery; give us the information when they give it to their

24     experts.  We want them to give us their final expert reports,

25     preferably telling us what their damage number is instead of a
```

1   range that's over a billion and a half dollars, which I don't

2   think is a particularly easy thing to respond to.  I

3   understand they may have fallback theories, but there should

4   be a theory of damages, I think, that's their primary theory.

5   And then we'll respond promptly.  If they can tell us when

6   they will submit their final reports, and we'll do the

7   discovery in the interim, and give us the information --

8            THE COURT:  When you say, "we'll do the discovery,"

9   be more specific.

10           MR. COHEN:  The TWA discovery.

11           THE COURT:  Tell me what you mean by that.

12           MR. COHEN:  Your Honor, what we would like is a

13  number of depositions of former TWA executives.  Would you

14  like the names, Your Honor?

15           THE COURT:  Well, not right now.  I'm trying to get a

16  notion of the scope.

17       You are not talking about discovery of pilots.

18           MR. COHEN:  No, no.

19           THE COURT:  You're talking about the discovery of

20  executives.  Well, the executives may be pilots, but --

21           MR. COHEN:  So what we have in mind, Your Honor, is

22  the CEO who gave testimony at the bankruptcy hearing; the CFO;

23  the investment banker at Rothschild, a firm in New York that

24  was retained to evaluate.

25           THE COURT:  What's that person's name?

```
 1              MR. COHEN:  David Resnick, R-e-s-n-i-c-k.  The former
 2    CEO, if Your Honor would like the name, is William --
 3              THE COURT:  No.
 4              MR. COHEN:  Sorry.
 5              THE COURT:  Okay.  Go ahead.
 6              MR. COHEN:  So Terry Hayes, who is the VP of labor
 7    relations.  And we've identified one or two pilots who we
 8    think would have relevant information:  a Captain Schwartz,
 9    who is the vice chair of the MEC, and a gentleman named John
10    Hefley, H-e-f-l-e-y, who is now working at Cathay Pacific.  He
11    used to be a plaintiff in this case.
12         So we would propose to take those --
13              THE COURT:  Excuse me.  You said "used to be a
14    plaintiff," meaning what?
15              MR. COHEN:  He was supposed to be a plaintiff.  He
16    was a class rep and no longer is, as I understand it, Your
17    Honor.
18              THE COURT:  Okay.
19              MR. COHEN:  The discovery that Your Honor had
20    already --
21              THE COURT:  He's still a plaintiff, though.  He's
22    just not a --
23              MR. COHEN:  He's a member of the class, of course,
24    Your Honor, yes.
25         So the discovery that we had previously talked about
```

```
 1   completing that Your Honor referenced at the beginning will be
 2   done at the end of November.
 3           THE COURT:  Okay.  Tell me what you're trying --
 4   what's the thrust -- what kind of proof are you trying to
 5   develop with this group of --
 6           MR. COHEN:  The proof that we're trying to develop,
 7   Your Honor, is that to the extent the Plaintiffs' damage
 8   theory is predicated on the assumption that TWA had
 9   alternatives to the American sale, that's what their experts
10   say, that they are different than an airline that was going to
11   simply cease flying, and, therefore, under the Plaintiffs'
12   theory had some leverage, right.  The Plaintiffs' theory is,
13   if you had done your job and exercised your leverage, you
14   would have gotten a much better list.
15           THE COURT:  Well, the staple point would have been
16   different, if you get right down to it.  The staple point
17   would have been different.
18           MR. COHEN:  Yes.  Staple and --
19           THE COURT:  And how many people stapled to the end of
20   the list.  The smaller that group is, well, obviously, the
21   smaller the damages.  The bigger that group is, the bigger the
22   damages.
23           MR. COHEN:  So what we would like to show, Your
24   Honor, is what we think we can prove, because it's what the
25   Bankruptcy Court found -- but we can't use that as evidence --
```

1    the Bankruptcy Court found that, in fact, TWA was out of

2    alternatives and that had it not taken the American deal it

3    would have liquidated.  We would like to develop --

4         THE COURT:  Where do you get that?

5         MR. COHEN:  From the finding of the Bankruptcy Court

6    approving the American assets.  I think was a 363

7    confirmation.

8         THE COURT:  Is there a specific finding that they

9    would have had to liquidate?

10        MR. COHEN:  Yes, Your Honor, there was.

11        THE COURT:  To approve the American merger, you

12   didn't have to find that.  You could have found that the

13   American deal was a fair and adequate deal.  You don't have to

14   find -- it's not a matter of bankruptcy law.  It's not a

15   requisite that you find there would have been a liquidation

16   but for that merger.

17        MR. COHEN:  Your Honor is absolutely right, but, in

18   fact, there was a specific finding by the Bankruptcy Court in

19   connection with the challenge to the acquisition saying that

20   it was -- in connection with the fairness, it was fair

21   because, in fact, there is no other alternative for TWA.

22        So I actually have the transcript here, but I can't lay

23   my hands on it at the moment.

24        MR. KATZ:  Do you want me to comment?

25        MR. COHEN:  Just give me the case.

1          MR. KATZ:  There was a hearing March 12th, 2001

2    before the Bankruptcy Court, Your Honor, and at that hearing

3    the bankruptcy judge approved the American acquisition, there

4    was an auction, and the only qualified bidder was American.

5          THE COURT:  Right.

6          MR. KATZ:  And he approved it.  And the reasons he

7    gave from the bench on March 12th at the conclusion of the

8    hearing were that, absent the American transaction, it was a

9    virtual certainty that TWA would liquidate were it not for the

10   American acquisition.  The bankruptcy judge then codified and

11   issued a formal opinion on April 2, 2001 in which he gave a

12   detailed analysis of all the financial parameters and came to

13   the same conclusion.

14         THE COURT:  Okay.

15         MR. COHEN:  Your Honor, the precise language which my

16   colleague was good enough to hand to me is:  If TWA does not

17   proceed with the transaction with American, there isn't going

18   to be a strategic transaction with anyone else, and the

19   inevitable result would be a liquidation of the debtor.  Which

20   is fundamentally at odds with the Plaintiffs' experts, because

21   the Plaintiffs' experts, how they get in this range and how

22   they --

23         THE COURT:  You mean the new round of experts.

24         MR. COHEN:  Yes, Your Honor.

25         THE COURT:  You're not talking about the experts that

1  they hired at the time this was all going on.

2         MR. COHEN:  No, Plaintiffs' damage experts for the

3  damages trial in this case.

4         So what we would propose, Your Honor, is not to take

5  2,300 depositions and not to do massive class-wide discovery,

6  you know, while they are collecting the data from their

7  clients and, you know, we will proceed with this TWA

8  discovery.

9         THE COURT:  Are you leading to a motion of some

10 kind -- I mean, is the idea here you do the discovery and make

11 a motion to either dismiss the damage or reduce it?  Is that

12 the end game here?

13        MR. COHEN:  Well, Your Honor, I think there are

14 three -- two or three possible end games.  And one certainly

15 principal end game is to make sure that we have an opportunity

16 to effectively cross-examine their experts at trial, if they

17 get to trial -- I'll come back to motions -- and show that

18 their factual predicates for their reports are false.

19        THE COURT:  It may be that it's even correct that the

20 American deal had not been done that there was no other really

21 viable alternative for TWA.  That may be true.  But it doesn't

22 follow from that that had the union taken a stronger

23 bargaining position they could not have gotten a better deal,

24 which those two --

25        MR. COHEN:  Yes, I understand, Your Honor.

```
 1          THE COURT:  The fact is at the end of the day there
 2  was really no viable alternative.  In other words, TWA
 3  couldn't continue on as a standalone airline.  It doesn't
 4  follow -- it's not an automatic result from that if the union
 5  had taken an aggressive position that they still might not
 6  have gotten a better deal from American.  And I don't
 7  think the experts -- when I use "the experts," I'm talking
 8  about the people the union hired back -- you know, back when
 9  all this was going on -- I don't think they were arguing that
10  they could be a standalone airline.  A couple did, but most of
11  them did not.  The argument was that, you know, that
12  they -- had they taken a stronger position they could have
13  gotten a better deal and that TWA was a nice acquisition for
14  American and that American really wanted to see it blow up.
15          MR. COHEN:  I understand, Your Honor, and I'm not
16  making a point --
17          THE COURT:  You understand what I'm saying?
18          MR. COHEN:  Absolutely.  I'm not making that point.
19  What I'm saying is -- so now we're at the damages phase and
20  the Plaintiffs' experts say, Well, I have to quantify what
21  would have happened, right, if they had more leverage.  And
22  the way that they attempt to quantify that is -- actually, I
23  don't know how this testimony will actually ultimately survive
24  a Daubert motion, but what their principal expert says is, I
25  can quantify the bargaining leverage, and one of the essential
```

 1   factual predicates --

 2          THE COURT:  Quantify it in what sense?

 3          MR. COHEN:  What he says, Your Honor, he looks at the

 4   various things that -- and, you know, the Plaintiff will have

 5   to explain this -- he looks at the various things that he says

 6   that TWA -- that the TWA pilots could have done and that ALPA

 7   could have done, all the things that were dealt with in the

 8   liability trial.

 9          THE COURT:  Threat of litigation.

10          MR. COHEN:  Threat of litigation, the jump seat war.

11   And he says there's a 2 percent probability that could have

12   occurred; there is a 6 percent probability that could have

13   helped -- exactly what he says, Your Honor -- there is

14   8 percent probability.  He adds all of those things up under a

15   theory that we think will not survive a Daubert motion,

16   ultimately, but we'll see what he has to say, you know, down

17   the road.  He adds all those things up and he adjusts his

18   damages figures by probabilities.

19          The other thing that he does, Your Honor, is he's

20   looking at a range of arbitration awards.  After all, the

21   fundamental question is what was the reasonable expectation of

22   the pilots, right, had there not been the alleged breach of

23   the duty of fair representation.  So he looks at all these

24   arbitration results, some of them, not surprisingly, are not

25   that good for the pilots who are in the acquired airline, some

```
 1    are better.  The way that he attempts to distinguish the ones
 2    at the low end of the range is to say, Oh, well, those
 3    airlines, they were on the verge -- they either were
 4    furloughing pilots or they were not really going to fly
 5    anymore.
 6          And we think, Your Honor, the reason we want to take
 7    this discovery and why we think it is relevant, we think we
 8    can say, Look, Plaintiffs' expert, you will concede that if
 9    you believed, right, and if you assumed that -- that TWA had
10    no options and it was on the verge of bankruptcy and
11    it --
12          THE COURT:  Was in bankruptcy.
13          MR. COHEN:  -- was on the verge of liquidating, you
14    would have to concede that you would move down this scale of
15    bargaining leverage and where the likely list would be down to
16    the very low end.  Where they are is at the very high end.
17          THE COURT:  But the issue comes down to where is the
18    staple point.
19          MR. COHEN:  Well, it's one of the issues, as I
20    understand their expert, because they also moved people around
21    all through the middle of the list, and that has a lot of
22    dollar implications, actually, Your Honor.  It's not just the
23    staple point.  It's really essentially every point in the list
24    they're making assumptions based on probabilities.  So they're
25    not just saying, well, the staple point, instead of No. 10,
```

```
 1   it's at No. 50 or No. 2.  It's throughout the list.

 2         So that discovery, Your Honor, we really need.  I mean,

 3   I don't think, ultimately, Plaintiffs' experts can testify

 4   based on factual predicates that are completely inconsistent

 5   with the record, so we want to take that discovery.  It will

 6   be targeted.  It will be these small number of depositions.

 7   We're prepared to proceed with them.  You know, with Christmas

 8   coming up, we'll finish them, say, by mid-January.  You know,

 9   we don't need a lot of time to take them.  We'll get some

10   documents from them.

11         And in the meantime, they can be proceeding with

12   collecting that information.  And what they really should give

13   us is the final expert reports that actually don't have just a

14   menu, the damages are 165 million -- or if they want to -- 165

15   to 1.7 billion, but I think we're at least entitled to know

16   what is their damage theory that they intend to present at

17   trial so we can present experts in opposition to their damage

18   theory.

19         So that's what we're seeking, Your Honor.  I mean, we

20   can do that discovery.  We do need the information from the

21   Plaintiffs.  We do have a disagreement as to mitigation, as

22   Your Honor is aware of, but they, I believe, are collecting

23   the setoff data.  They don't have to tell us what they're

24   doing.

25         And I'd be happy to address whether we wanted to
```

 1   participate, if I could clear that up.  We didn't think it was

 2   for the Court to be involved in soliciting data.

 3            THE COURT:  Well, I didn't either.

 4            MR. COHEN:  Yes, I'm aware of that, Your Honor.  And

 5   if they want us to agree on a joint set of interrogatories to

 6   the class members, we'll do that.  We'd be happy to do that.

 7   It's not that we didn't want to participate at all.  It's

 8   that, as Your Honor thought, we didn't think it was the

 9   Court's job at this point to go to the class members.

10        So we're prepared to sit down with them, work out a set

11   of interrogatories.  We obviously think it should include not

12   just setoffs but mitigation.  We can go collect that

13   information.  Whenever they tell us that their final expert

14   reports are ready, we'll -- you know, we'll take depositions

15   within a few weeks of when their final expert reports are

16   ready.

17            THE COURT:  The deposition of their expert?

18            MR. COHEN:  Yeah, once they actually give us their

19   actual report with actual numbers.  And we can certainly -- if

20   they gave us expert reports --

21            THE COURT:  One expert?  Two experts?

22            MR. COHEN:  Well, it's two or three, Your Honor.

23            MS. RODRIGUEZ:  Two.

24            MR. COHEN:  Two, okay.

25            THE COURT:  Two different reports.

```
 1            MS. RODRIGUEZ:  Yes.

 2            MR. COHEN:  Two different reports.  They actually

 3  have three sets of numbers, but it's two experts.  And they're

 4  not consistent with each other.  They don't use the same

 5  methodology and they don't get to the same numbers, so we

 6  don't feel we're in a place to be responding.

 7            THE COURT:  So we don't have a foolish consistency,

 8  the hobbit and the small mind?

 9            MR. COHEN:  Yeah, I have a small mind, Your Honor.  I

10  apologize.

11       So we will move this discovery forward.  You know,

12  we'll have completed that other discovery on the 29th.  We

13  just told the Plaintiff about the date today.  If they can

14  make that last deposition on the 29th, we'll be done with all

15  the pre-existing depositions.  We will go subpoena these TWA

16  people.  I am sure we can finish it by the end of January.  We

17  probably would do better if it wasn't Thanksgiving and

18  Christmas, but by the end of January.  I don't know how much

19  time it will take for the data collection from the class

20  members and then for their experts to actually give us their

21  numbers.  And, you know, once we get that, we'll be happy to

22  talk about --

23            THE COURT:  My guess is that's a formidable task.

24            MR. COHEN:  Your Honor, I understand that, and I

25  don't mean --
```

```
 1          THE COURT:  A large number, you know, of events that
 2   took place many, many years ago where, you know, people may or
 3   may not have records, you know, to back up, you know, whatever
 4   numbers they suggest.  But all right.
 5          MR. COHEN:  And, Your Honor, I don't mean to minimize
 6   that, but I do think under the Wal-Mart case, which I think is
 7   the law now, you know, trial by formula doesn't work.  And as
 8   I said, I don't think there is a disagreement.  The Plaintiffs
 9   are intending to collect that data.  You know, if they fall
10   short, what the implications will be for people who don't
11   submit data, I don't think we have to reach that today.
12          But that's our basic proposal:  Discovery of the TWA
13   financial condition between now and the middle of January;
14   collect the data.  As I said, if they want to sit down and do
15   joint interrogatories, we'll sit down with them this week,
16   beginning of next week, and try to agree upon them so it's
17   coming from both parties so we don't disagree what we are
18   asking for.  And once they tell us when they will give us
19   final expert reports, we'll depose those folks within a month,
20   and we'll find out when we can put in our responsive reports.
21          THE COURT:  Mr. Press?
22          MR. PRESS:  Thank you, Judge.  The only thing I heard
23   Mr. Cohen ask for was permission to take some depositions,
24   which we really don't have an objection to.
25          THE COURT:  You mean the one of the CEO, CFO, so
```

1    forth?

2           MR. PRESS:  Right.  I'm not saying it'S going to be

3    relevant and admissible, but it's certainly likely or could

4    lead to admissible evidence.  So if they want to go take

5    depositions, they can go take them.  We don't have a problem

6    with that, Judge.

7           But I do have a problem with characterizing our

8    experts' reports as preliminary.  The only thing we lack from

9    a final damage number were the actual earnings from the class

10   members, which we are collecting, Judge.  We have prepared a

11   Request for Information to all of the class members, and we

12   tailored it from the themes that came out in the depositions

13   they took of our clients and we've asked for that information.

14   It's actually at a printer right now being printed and --

15          THE COURT:  What's at the printer?

16          MR. PRESS:  Our Request for Information to the class

17   members.

18          THE COURT:  Oh, the class.

19          MR. PRESS:  I'm sorry, Judge.  And we expect that to

20   hit the street and go out to 2,000 people very shortly.  But

21   what the -- what the union does have is our experts' view of

22   what the "but for" seniority list should have looked like and

23   every individual pilot's "but for" earning from that "but for"

24   seniority list.  So, really, ALPA has everything it needs to

25   take a meaningful deposition of our experts right now.

```
 1            THE COURT:  Except the offsets.

 2            MR. PRESS:  That's all they're missing, but that's

 3  really -- that's really not opinion evidence, that's just

 4  math, Judge.  They've had these reports for more than four

 5  weeks.  They've never even asked for dates to take our

 6  experts' depositions.  They're available now, and we think

 7  that these depositions should be taken.  When the offsetting

 8  data is collected, it's a simple matter of math.  Harold

 9  Hollander, or take whatever pilot, we already have a number

10  for that pilot, what his "but for" earnings would have been.

11  We have that and they have it.

12            THE COURT:  Without regard to any kind of offsets.

13            MR. PRESS:  Right.  And then once we collect that

14  person's information, it's just a matter of subtraction,

15  Judge.

16       They can take a meaningful deposition right now and

17  they don't want to.  They want to delay things.  We want, of

18  course, to go to trial.  It was June 5, 2010 when we started

19  the liability case, Judge, and I suggest we start the damage

20  case two years after that in June, in 2012.  Our --

21            MS. RODRIGUEZ:  2013.

22            MR. PRESS:  Oh, you're right.  2013, Judge.  I'm

23  missing a year.

24       But we have no objection --

25            THE COURT:  What's a year among friends?
```

```
 1          MR. PRESS:  Exactly.  After six years of this thing.

 2          We have no objection to the TWA discovery they seek,

 3  but we do have an interest in seeing them pushing forward on

 4  the expert discovery, Judge.

 5          THE COURT:  Anything else?

 6          MR. PRESS:  No, not really.

 7          MR. COHEN:  Your Honor, let me just correct it.

 8  We're not seeking to delay.  I mean, the Plaintiffs --

 9          THE COURT:  If I understand what Mr. Press just said,

10  he said, look, you want to take these five or six people or

11  seven people; he says he doesn't object to that.  If you can

12  find them and subpoena them, he has no objection.

13          MR. COHEN:  Your Honor, and I appreciate that.

14          THE COURT:  He's saying a different thing.  He's

15  saying he's given you a report that shows a "but for," you

16  know -- where would have been had the union done what, in his

17  view, they should have done or the expert's view they should

18  have done.

19          MR. PRESS:  True.

20          THE COURT:  And what the earnings would have been had

21  that been done.

22          MR. PRESS:  True.  They have that.

23          THE COURT:  He's saying all that's missing is the

24  offsets to that.  In other words, if a pilot would have made

25  $200,000, you know, to get the actual damage number we have to
```

1   know what he or she earned in that interim period.  So if it

2   was $50,000, then the damage would be $150,000 for that pilot.

3          Is that what you're saying?

4          MR. PRESS:  That's exactly what we're saying.

5          MR. COHEN:  It's not just math, Your Honor.  The

6   mitigation piece of this, as opposed to what they actually

7   earned, but what they should have done.  So we know from their

8   expert reports, because they conceded it, that where you are

9   on a list is not necessarily predictive of how much money you

10  make.  Because you could be No. 1 on the list, and if you

11  decide to take a leave of absence, if you decide that you

12  don't like flying jumbo jets anymore, if you decide you don't

13  want to fly on weekends, you're going to earn a considerably

14  different amount of money, and their expert reports

15  acknowledge that.  So the mitigation piece of this, Your

16  Honor, is directly relevant to what the opinion is with

17  respect to damages.

18         Now, you know, if they want us to take depositions

19  twice -- we can schedule depositions of their experts, you

20  know, say in December or early next year.  Our thinking, Your

21  Honor, was that it would be more efficient to depose them once

22  when we have a final report.  We didn't think that we should

23  put their experts to the trouble of two sets of depositions.

24  I don't think it's just them.  It's just that their experts

25  wouldn't be getting the data.  They wouldn't be subject of

1    expert testimony.

2           THE COURT:  The position of Mr. Press is that all I'm

3    getting is mathematical numbers, and I guess you're

4    challenging that assumption.  You're saying that mitigation is

5    more than just what they, in fact, earned other than by

6    flying, but would involve personal decision-making, you know,

7    as to what they're going to do with their lives at this point

8    forward.

9           MR. COHEN:  Right.  I'm not just saying that.  Their

10   experts are saying that.  Their experts concede that your

11   place on the seniority list is not the only necessary input to

12   understanding what you would have earned.  And it's not just

13   offsets, it's offsets and the choices you make that affect you

14   where you are.  So if we had put everybody at the top of the

15   list, we, you know -- we still would have differing earnings

16   from their models.  So it goes to the fundamental assumptions

17   in their model about how they're going to deal with mitigating

18   circumstances.

19          THE COURT:  What information are you gathering from

20   your 2,000 models?

21          MR. PRESS:  Primarily, it's coming from the

22   furloughees, Judge.  When were you furloughed?  How much money

23   did you earn when you were on furlough?  When were you

24   recalled back to American Airlines, if ever?  Did you accept

25   the recall or not?  And if you were furloughed, did you make

1  any applications to commercial airlines while you were not

2  flying for American?  Those are the primary categories of data

3  that we are collecting, Judge, and documents to support the

4  earnings information they provide us, including W-2s and tax

5  returns, not the full returns, but the first two pages of tax

6  returns.

7          THE COURT:  When do you think that information is

8  going to be forthcoming?

9          MR. PRESS:  It's going to start coming in in

10  December.  We gave them a date to respond.  January 31st was

11  the drop-dead date for that.

12          MS. ACCHIONE:  January 31st.

13          MR. PRESS:  Yes, Ms. Rodriguez makes a wonderful

14  point.  One of our experts doesn't do any math.  We have two

15  experts that have created "but for" seniority lists, but one

16  of them takes Professor Farber's seniority list and computes

17  individual damages from it.  So Professor Farber isn't

18  involved in any of this mathematical issue at all, it's only

19  the other expert, whose name is Rikk Salamat.  He's taken each

20  "but for" list and created the -- done the damages

21  calculation, Judge.  So there is no impediment at all for them

22  deposing Dr. Farber.  And, really, they could take a very

23  meaningful deposition of Mr. Salamat right now today.  And,

24  obviously, Mr. Cohen has expressed a great understanding of

25  our experts' -- the basis for their opinions.  So it sounds to

 1   me like they're ready to take a deposition today.

 2          So we would, again, encourage you, Judge, let's get

 3   these depositions set of the experts.  They can take the TWA

 4   depositions.  Let's get a date for them to disclose experts

 5   and a trial date.

 6          THE COURT:  I can't decide now, but let's assume I

 7   would determine after the information came in from your pilots

 8   by January that a further deposition is required of one or

 9   both of the experts.

10          MR. PRESS:  Judge, if they showed a compelling need

11   for a deposition, I'm sure you would order it.

12          THE COURT:  Well, that's my point, I would.

13          MR. PRESS:  I know.

14          THE COURT:  And I can't say now.  I don't have -- a

15   lot of this is still kind of theoretical to me.  It's hard for

16   me to say.  But, certainly, if I thought the information

17   generated by the pilots was used in a way by the experts that

18   required further exploration, I would order it.  The fact that

19   they were once previously deposed would not block me from

20   making them be deposed again.  You understand that?

21          MR. PRESS:  Of course, Judge.

22          THE COURT:  Okay.

23          MR. PRESS:  Ninety-five percent of the fight on this

24   damages phase is the "but for" seniority list, which they

25   have.  And so let's begin --

```
 1              THE COURT:  I wouldn't put a percentage on it.  It's
 2     an issue and the mitigation is another issue.  The mitigation
 3     issue, I gather, could have a very significant dollar -- I'll
 4     call it mitigation/offset issue.
 5              MR. PRESS:  The setoff will be substantial, material.
 6     Failure to mitigate, I mean, that's going to be a very
 7     deminimus issue.
 8              THE COURT:  Put those two together.
 9              MR. PRESS:  There weren't any pilot jobs available
10     back in the time period we're talking about.
11          Judge, again, the heart of what the next jury's going
12     to decide is the "but for" list, and they can address these
13     issues right now, and we're asking that you order them to.
14              THE COURT:  Why not take those depositions?
15              MR. COHEN:  Your Honor, as long as we're going to get
16     a second opportunity to depose them --
17              THE COURT:  I can't say now whether the new
18     information would justify a second, but if I think it does,
19     the fact that there was a prior deposition is not going to
20     block my ordering another deposition.
21              MR. COHEN:  I understand that, Your Honor.  But one
22     other thing I want to make sure, we don't have their final
23     reports.
24              THE COURT:  Well, that -- that's terminology.  I
25     mean, his position is it is final, it's a final report.
```

1          MR. COHEN:  Your Honor, then not only will have we to

2    take them twice, but I don't want to find that we've taken

3    their depositions and in the guise of doing math they're going

4    to have a new methodology.  If what they're representing is

5    that this is their methodology, they're not going to change

6    it, the rest is math, you know, I -- frankly, these are

7    incredibly complicated reports.  So while I appreciate

8    Mr. Press's compliment, we are not fully conversant.

9          But we can take them in January.  We don't need to take

10   an enormous amount of time.  But, one, we don't want to see

11   that we take it, it's a preview of cross-examination at trial,

12   and then we get a second and final report with completely

13   different methodology.  That's part of our reluctance.

14         But if Your Honor wants us to go forward, you know,

15   with an understanding that we may have to come back to you,

16   then we'll send some deposition notices for January and we'll

17   take them.

18          MR. PRESS:  Judge, you pushed us, and we accepted the

19   push.  You ordered us to produce these reports, we've produced

20   them, they have had them for four weeks.  They've not even

21   asked me when we can make them available.  They're available.

22   This could all be done before the calendar year is up.

23          THE COURT:  Why wait for January?

24          MR. COHEN:  Your Honor, I think if you saw the

25   complexity -- I'd be happy to have you see these reports --

1    see the complexity of these reports and the complexity of the

2    models.  I mean, our experts are unpacking their data.  It's

3    not just asking what's on the printed page, but voluminous

4    data.  These are, obviously, very complicated data.  They've

5    analyzed 40 different arbitrations to come up with these

6    probabilities.  The amount of supporting data is massive.

7    And, Your Honor, we think, you know, we're reasonable in what

8    we do, but, not surprisingly, we're going to have experts who

9    are going to assist us, and they're digesting the underlying

10   data.  If it was just a matter of reading a report, we would

11   have noticed the deposition and taken it, but there are

12   massive and massive quantities of supporting data that you

13   need to unpack these eight different damage models.  So that's

14   the reason for waiting until January.

15            THE COURT:  I understand now, Counsel.

16        You gave me a list of the people you want to depose,

17   other than the experts, as the CEO of TWA, the then CEO.

18            MR. COHEN:  Yes, sir.

19            THE COURT:  The CFO; a particular investment banker;

20   Terry Hayes.  Who is Terry again?

21            MR. COHEN:  The vice president of labor relations,

22   Your Honor.

23            THE COURT:  The VP of labor relations.  And who

24   else -- oh, Schwartz.

25            MR. COHEN:  Schwartz and Hefley, Your Honor.

```
 1          THE COURT:  Schwartz and Hefley.  That's one, two,
 2  three, four, five, six.  Any others?
 3          MR. COHEN:  Yeah, Your Honor, that's what I'm aware
 4  of today.  I mean, you know, if any of these things led back
 5  to somebody else, we'd come back to you, Your Honor, but
 6  that's what we're talking about.
 7          THE COURT:  Well, you know, I don't want this to be a
 8  moving target.
 9          MR. COHEN:  I understand, Your Honor.  What I'm
10  saying is --
11          THE COURT:  I'm not trying to limit you.  I'm just
12  trying --
13          MR. COHEN:  No, I understand that, Your Honor.
14          THE COURT:  -- at this point to get what the universe
15  is.
16          MR. COHEN:  Right.  So what I don't know is, when we
17  take Mr. Compton's deposition, if we can't find him or we find
18  him and he says, really the guy who really worked this for us
19  is not the CFO but the treasurer or is the head of
20  strategic -- we want to do the right number of things.  It's
21  not a constant moving target.  And we'll complete that by
22  January, too, so that will put the onus on us to get it at the
23  end of January -- the end of January to get it done.
24          THE COURT:  Well, let me ask you, how much time do
25  you think you need to do these six?
```

```
 1           MR. COHEN:  In terms of time elapsed or per
 2   deposition, Your Honor?
 3           THE COURT:  Well, per deposition I'm going to allow
 4   four hours --
 5           MR. COHEN:  Yes, I'm aware of that.
 6           THE COURT:  -- absent -- absent some applications
 7   where I would suggest you needed more than four.  But now I'm
 8   talking about a time line.
 9           MR. COHEN:  So what I'm saying, Your Honor, is I
10   think that we could do those initial depositions of their
11   experts and this discovery by the end of January.
12           THE COURT:  And that's the same date you're
13   projecting for getting most of the information?
14           MR. PRESS:  It is, Judge.  We expect to have most of
15   it well before that.
16       Oh, Mr. Cohen mentioned that he has experts.  They
17   haven't been disclosed, Judge.  And they've obviously been
18   working with experts.  They have a very prominent trial team.
19   They're backed by an international union.  For them to say
20   that they need an additional three months to take two
21   depositions, Judge, I just find that incredible.
22           THE COURT:  No, no.
23           MR. PRESS:  Okay.
24           THE COURT:  What about disclosing your experts to
25   them?
```

1          MR. COHEN:  Your Honor, we're working with consulting

2    experts.  We haven't settled on our testifying expert.  As

3    soon as we do, we'll disclose them.

4          THE COURT:  All right.  January 31st seems to be a --

5    my current inclination right now is to give you until the 30th

6    of January or the 31st of January to complete these six

7    depositions.  Again, the CEO; CFO; an investment banker; Terry

8    Hayes, the labor relations guy; and two pilots, Schwartz and

9    Hefley.

10         Number two, I want you to complete at least the

11   depositions of their two experts by the same date, by the

12   31st.  Again, I'm not saying that there couldn't be a

13   follow-up deposition by then.  I want you to reveal the

14   identity of your trial experts, not your consulting experts --

15   obviously, you can consult with whoever you want -- by the

16   same date, by the 31st.  But I'd like your reports to be by

17   March 15th.  In other words, when I say "your reports," their

18   reports, the experts' reports.

19         MR. COHEN:  Can I indulge Your Honor for two more

20   weeks to give us the full two months --

21         THE COURT:  Okay.  March 1st.

22         MR. COHEN:  -- March 31st.

23         THE COURT:  March 1st I said.  You wanted two weeks,

24   so I'm accommodating.

25         MR. COHEN:  Two additional weeks, Your Honor.

1          THE COURT:  Oh, you want additional weeks.  I thought

2    you were criticizing me for being too slow and you wanted to

3    get it in faster than that.

4          MR. COHEN:  I would never criticize Your Honor.

5          THE COURT:  I have an entire bar that relishes

6    criticizing me, so don't feel bad.  Go right ahead.

7          I'm going to stick to March 15th.  That's all of

8    January, all of February, all of December.  I mean, you have

9    their -- you know, I don't want to get into an argument about

10   the word "final" or not, but you have their reports just

11   absent the -- the data -- the individual data from the

12   individual pilots.

13         MR. COHEN:  And, Your Honor, just to be clear, on

14   March 15th I understand we're responding without the setoff

15   and mitigation data to --

16         THE COURT:  No, you should have the setoff and

17   mitigation.

18         MR. COHEN:  Well, Your Honor, if we don't get it

19   until the end of January -- if they're getting it at the end

20   of January, I think March 15th will be very hard.

21         I thought that Your Honor was talking about their

22   experts responding to the equivalent of the reports they've

23   given us and in which we are taking their depositions, because

24   we're not going to be deposing the Plaintiffs' experts with

25   the benefit of any of that data.

```
 1          MR. PRESS:  The offsetting data will be collected by
 2   the end of January and it will be assimilated into --
 3          THE COURT:  Can I ask you this, is there any way that
 4   we can stage it?  Because even if they got half of the data,
 5   let's assume, for a thousand pilots, that would be very
 6   helpful to them.  I mean, it's true that there would be pilots
 7   they don't have, but nevertheless, that's a pretty big sample.
 8   It's like a 50 percent sample.
 9          MR. PRESS:  I'm not dealing with the firm that's in
10   charge of the collection.  Maybe Ms. Acchione could address
11   that better.
12          THE COURT:  It's your moment in the sun.
13      All I'm suggesting is that clearly -- you know, what is
14   it, the Pareto Principle, 80 percent will come in fast and the
15   remaining 20 percent is going to take up most of the time.  Is
16   there any way we can turn over to the Defendant, say, whatever
17   you collect by December 31st so they could have that, make use
18   of that?
19          MS. ACCHIONE:  Absolutely, Your Honor.  We can do
20   that.
21          MR. COHEN:  Your Honor, obviously the earlier we can
22   get the data, that would obviously be helpful, so we're happy
23   to receive it on a rolling basis.
24          MS. ACCHIONE:  We can do it on a rolling basis.
25          MR. COHEN:  What's not clear to me, when are their
```

 1  experts --

 2          THE COURT:  Well, I'm going to get to that right now.

 3          MR. COHEN:  I don't think our experts should have to

 4  go first on the entire question of damages net of mitigation

 5  and the like.

 6          THE COURT:  I understand your point, but let me just

 7  take it one step at a time.

 8          There would be, in effect, a rolling.  I certainly

 9  think that by December 31st you should turn over everything

10  you've gotten by then, because I suspect that, you know, and

11  it's typical, ultimately, it's going to be 20 percent of the

12  pilots that are going to be a problem in getting information

13  and probably 70, 80 percent will come forth -- I hope will

14  come forth pretty readily.  And it would be as if dealing with

15  any group, there will be some small percentage, in terms of

16  80/20, 20 percent for whatever the reason, you know, lack of

17  records, illness, some reason they can't get you what you

18  want.  But if you could get it by the 31st of December.

19          Now, second, is it your anticipation that either or

20  both of your experts are going to render a new report in which

21  they integrate the data derived from individual plaintiffs?

22          MR. PRESS:  They'll be no change in the methodology.

23          THE COURT:  No, no, that's not what I asked.

24          MR. PRESS:  There will be a new exhibit with the

25  math, but that would be it.

```
 1              THE COURT:  Well, will there be a new report?
 2              MR. PRESS:  No.
 3              THE COURT:  Will it just be an exhibit to the
 4    existing report?
 5              MR. PRESS:  Yes.
 6              THE COURT:  What is it you anticipate?  You're going
 7    to get all this information.
 8              MS. RODRIGUEZ:  Judge, if I can, and just if you're
 9    looking for a way to stage it, perhaps, Professor Farber --
10              THE COURT:  No, I want to know what you plan to do.
11              MS. RODRIGUEZ:  Professor Farber is done.  He is not
12    the math person.  He's not going to crunch the numbers.  So
13    his report --
14              THE COURT:  So you do not anticipate that Doctor --
15    what's his first name?
16              MS. RODRIGUEZ:  Hank.
17              MR. PRESS:  Henry.
18              MS. RODRIGUEZ:  Henry, Henry Farber.
19              THE COURT:  Okay.  With Paul Weiss here we've got to
20    be very formal.
21              MS. RODRIGUEZ:  Very formal, okay.
22              THE COURT:  So you don't anticipate any change in his
23    report as a result of the new data coming in from the
24    individual pilots?
25              MS. RODRIGUEZ:  No.  His report is totally done and
```

```
 1   it's -- the data goes to --
 2           THE COURT:  Now, with respect -- who is the other
 3   fellow?
 4           MS. RODRIGUEZ:  Rikk, and it is Rikk, R-i-k-k,
 5   Salamat.
 6           THE COURT:  R-i-k-k.
 7           MS. RODRIGUEZ:  Yes.
 8           THE COURT:  You know, a friend of mine is a judge in
 9   rural Arkansas, the western half of Arkansas, named Jimm with
10   two M's, Jimm Larry Hendren, who sits in three different court
11   houses all through western Arkansas.
12       And so this is Rikk, R-i-k-k.
13           MS. RODRIGUEZ:  Salamat, S-a-l-a-m-a-t.
14           THE COURT:  One T?
15           MS. RODRIGUEZ:  One T.
16           THE COURT:  Doctor?
17           MS. RODRIGUEZ:  Yes.
18           MR. PRESS:  No.
19           THE COURT:  No?  All right.
20       Now, do you anticipate a new report from him?
21           MS. RODRIGUEZ:  His report will have numbers in it,
22   but it won't be a new report.  He's got a methodology and he's
23   got the "but for" list.
24           THE COURT:  If the answer is he's going to just
25   attach an exhibit with a number next to each pilot, that's not
```

```
 1   a new report.

 2           MR. PRESS:  That's all that will change, Judge.

 3           THE COURT:  I mean, if you have a list, Pilot Jones,

 4   you know, $47,322, you know, Pilot Smith, you know, $63,127,

 5   and that's going to be some kind of exhibit attached to the

 6   report, that's not really a new report.

 7           MR. PRESS:  I agree, and you've stated it correctly.

 8           THE COURT:  That's all it's going to be.

 9           MR. PRESS:  Yes.

10           THE COURT:  He's just going to come up with a list.

11   And what will that number represent?  What is it in your mind

12   that number will be?  We have Pilot Jones, $47,233.  What is

13   that number going to be?  What will that number supposably

14   represent?

15           MR. PRESS:  Actual damages for that class member.  I

16   don't know how to say it any more succinctly.  That's what

17   that will represent.

18           MS. RODRIGUEZ:  It will be his earnings on the "but

19   for" list minus --

20           THE COURT:  Which we already have.

21           MS. RODRIGUEZ:  Which we have.  And we have that

22   number.  So Pilot --

23           THE COURT:  And they have.

24           MS. RODRIGUEZ:  They have it.  Pilot Jones is on the

25   "but for" list at $50,000.  We get his setoff income.  We find
```

1    out that he flew for JetBlue and made $25,000.  So that list

2    will be the $50,000 minus the $25,000.

3            THE COURT:  So, fundamentally, you're just going to

4    add two columns to the existing.

5            MS. RODRIGUEZ:  It's math.

6            THE COURT:  One column shows, in effect, what without

7    offset would be, then what the offset would be, and then the

8    last column is the net damages.

9            MS. RODRIGUEZ:  Correct.

10           THE COURT:  And that's the only change.  I mean, in

11   his complicated text, we're not getting any changes.

12           MS. RODRIGUEZ:  No.

13           THE COURT:  Just two different -- two new columns on

14   a schedule that ready exists.

15           MS. RODRIGUEZ:  He runs the setoff that he gets

16   through a computer program that he calculated and, yes, it's

17   just arithmetic.

18           MR. COHEN:  Your Honor, I just want to just correct

19   one thing.

20           THE COURT:  Essentially you got what you asked for.

21   You wanted representation if they're going to change the

22   report.  In effect, that's what you got.

23           MR. COHEN:  I think you've solved all of our problems

24   but one, Your Honor, if I may.

25           THE COURT:  Okay.  What's that one?  ALPA can afford

```
 1   to pay the bill, so don't worry about that.  If that was the
 2   problem, put that one aside.
 3            MR. COHEN:  No, Your Honor.
 4            THE COURT:  Right, Mr. Katz?
 5            MR. KATZ:  I'd have to ask the clients about that,
 6   Your Honor.
 7            MR. COHEN:  Your Honor, when they're collecting that
 8   data that's at the printer -- maybe it needs to be held up --
 9            THE COURT:  What they're printing is the request, not
10   the data.
11            MR. COHEN:  Right.  But what they're not requesting
12   is anything that goes to mitigation, which is the subject of
13   Your Honor's motion.
14            THE COURT:  Such as?
15            MR. COHEN:  Such as, you know, what kind of request
16   did they put in?  Did they take leaves of absence?  I mean,
17   we're going to have to collect some information from these
18   plaintiffs about what they did.  We don't know, you know, how
19   they bid on their various -- we're going to need information.
20            THE COURT:  Well, let me tell you what they plan to
21   give you.  Let's get this on the table.  I think what they
22   plan is only what we would call offsets, you know.
23            MR. PRESS:  Judge --
24            THE COURT:  Did you fly for JetBlue, you know, or did
25   you fly for some freight airline?  You know, you make X
```

1    dollars, you know, during what periods?  Or did you work

2    outside the airline industry?

3            MR. PRESS:  What you say is true, Judge.

4            THE COURT:  There is one guy who had a gardening

5    operation.  It sticks in my mind there was one guy that became

6    a landscaper.  He was a pilot but he had a landscaping

7    business.  I don't know why I remember that, but he had a

8    landscaping business in which he earned some money as a

9    landscaper.

10           MR. PRESS:  Your Honor, the issues that Mr. Cohen's

11   addressed, we have addressed them in our request.  I wasn't

12   inclusive in giving the list.

13           THE COURT:  Tell me how you addressed it.

14           MR. PRESS:  We've asked for people on maternity

15   leave, for instance, medical leave; people that lost their FAA

16   certificate for some reason.  So again --

17           THE COURT:  You mean their certificate which allows

18   them to fly?

19           MR. PRESS:  Correct.  So we have addressed those

20   issues.

21           MR. COHEN:  I think they've addressed some of the

22   issues.  I'm glad to hear they're getting that data, but there

23   are other issues that are individual.  If they're not going to

24   ask for that data, we're going to have to figure out some way

25   to get that information.  Again, it makes a difference.  You

1    know, it truly makes a difference.  So if you were on the

2    list -- and this is the problem with the model, because, you

3    know, the model I understand is a proxy, but, you know, when

4    they say, for example, they're using actual, they're not even

5    using in their models actual earnings data for the pilots.

6    That's not true.  Their model --

7              THE COURT:  I'm sorry.

8              MR. COHEN:  Their model is not taking into account

9    actual earnings for the actual people on the list.  It is an

10   aggregate of.  For each place on the list they look at a

11   certain number of places above and a certain number of places

12   below and they come up with a proxy for earnings.  That's the

13   problem with these models and, you know, we're -- they're

14   going to have to confront these individual issues at some

15   point before trial.

16             THE COURT:  Well, we just have to give the Circuit

17   something to do.  Van Antwerpen screwed this thing up fairly

18   well and -- so let's -- because he went to North Academy

19   instead of Kramer.  Maybe that's going to be for the Circuit

20   to sort out.

21        I mean, no matter what they say they're going to

22   gather, you'll find something they should gather that they're

23   not gathering.

24             MR. COHEN:  Well --

25             THE COURT:  And I'm not going to let you take 2,000

1    depositions.

2            MR. COHEN:  Of course not, Your Honor.  And nor would

3    our client.  And nor would we ask to do that.

4        But, look, I think that it might be helpful, you know,

5    if we could have a day or two to confer with Plaintiffs and

6    we'll see if there is anything else that is reasonably

7    included in that list.

8            THE COURT:  Why don't you do it today.  I'm here all

9    day today.  I do have another matter, but I'm here --

10           MR. COHEN:  We can do that, Your Honor.

11           THE COURT:  -- as late as you want.  I'm sure we have

12    a conference room or conference rooms we can provide you.

13           MR. COHEN:  We're happy to do that, Your Honor.

14           THE COURT:  Because at the end of the day, subject to

15    whatever attack might be on a Daubert motion, they're going to

16    present their report the way they want to present their

17    report.  They're going to include that information.  They have

18    got to provide the information to you and there has to be full

19    disclosure whatever they're relying on, but they're going to

20    decide what they need; their experts are going to say you need

21    this information -- and in a sense they've already said

22    that -- and they're going to present their reports.

23        You'll depose them.  And you may say as part of your

24    argument, you know, that these are -- these are inadequate

25    because there are certain other information you didn't get,

1      you know.  Well, fine.  It's like any other expert's report.

2      We'll argue it out.  Your own experts may say that they didn't

3      get this, this, and this, so, therefore, they're unreliable.

4      That could play out either in a Daubert motion or it can play

5      out at trial.  It can play out different experts -- you know,

6      one expert says the other expert didn't -- didn't do a good

7      job.  I have that all the time, you know.

8           But, obviously, if you can reach some sort of

9      agreement, or even if it's not total agreement, you know, 80

10     or 90 percent agreement, it will make things easier.

11          MR. COHEN:  Your Honor, again, in terms of

12     sequencing, it still doesn't -- I don't think it's appropriate

13     for our experts on March 15th to give net damage figures, net

14     of offsets and mitigation, without seeing theirs.  So

15     somewhere between --

16          THE COURT:  But you are going to see theirs.

17          MR. COHEN:  Before March 15th?  I don't think Your

18     Honor set a date.

19          THE COURT:  Yes, I did.  My understanding is that

20     December 31st they're going to send you all the information

21     they have that they have already collected and January 31st is

22     the drop-dead date for everybody.

23          MR. COHEN:  Right.  When is the date, Your Honor,

24     which we're going to get that schedule from Mr. Salamat that

25     says -- with the net numbers?

1          THE COURT:  Well, that schedule should be prepared on

2    an ongoing basis so we can turn things over on the 31st of

3    December.  I mean, the schedule should already be prepared as

4    to those -- let's assume it's 60 percent of the pilots, or

5    whatever it is, done by the 31st.  For those 60 percent it

6    should already be done.

7          MR. PRESS:  And it will be.

8          THE COURT:  You understand what I mean?  For those

9    extra two columns.

10         MR. PRESS:  Knowing pilots and their interest in this

11   case, I suspect we'll have most of the data by the end of this

12   year.

13         THE COURT:  I don't know what the percent will be.

14   Whatever the percentage will be, when I say turning over the

15   data, I mean more than just giving raw numbers.  I mean the

16   schedule that you anticipate that's going to be annexed to the

17   report should be completed, at least as for those pilots,

18   whether it's 1,000, 1,200, 1,500, where you have that data.

19         MR. PRESS:  And then it will be updated to be

20   final --

21         THE COURT:  And then on the 31st you are updated for

22   the remaining pilots.

23         MR. COHEN:  I appreciate that.  I didn't realize,

24   Your Honor.  Obviously, that's fine.

25         THE COURT:  I'm taking him at his word that basically

```
 1    what we have is sort of a math -- you know, some simple

 2    algorithm which creates the two columns --

 3              MR. PRESS:  Yes, Your Honor.

 4              THE COURT:  -- on the existing -- in effect, existing

 5    schedule we already have.

 6              MR. PRESS:  Correct.

 7              THE COURT:  And that you have.  And when he turns

 8    over the data, it should be with -- with this -- with the

 9    schedule expanded for those pilots that we have the data for.

10              MR. PRESS:  Yes.

11              THE COURT:  And that would be December 31st, which we

12    certainly hope will be way more than half, we hope.  And

13    again, I'm taking him at his word that most will be.  And

14    whatever the stragglers are, we'll get them in the next month.

15              MR. COHEN:  That's very helpful, Your Honor.

16         And our -- and again, if we want to move forward with

17    expedition, it would be helpful if we did not have eight

18    different damage theories.  I mean, could the Plaintiffs --

19              THE COURT:  I'm sorry.  Run that one by me again.

20              MR. COHEN:  There are a range of numbers -- I

21    don't -- when our expert is going to submit a report, I don't

22    know whether they're claiming damages of a hundred -- I know

23    they're not 150 million -- 800 million --

24              THE COURT:  You're right now attacking the report.

25              MR. COHEN:  No, no, no, I'm attacking, Your Honor,
```

1    that there isn't a damage number.  They have refused to

2    actually say, This is our principal damage claim.  We are

3    claiming --

4         THE COURT:  Maybe I'm losing you.  I understand there

5    is out there a schedule.  I don't know if it's in the report

6    or not, but it exists and you have it.  It lists all the

7    pilots and what they would have earned, in effect, if the

8    union had done, in their view, what the union was supposed to

9    do without regard to any offsets, without regard to whether

10   they flew for JetBlue or flew for a cargo -- some of these

11   guys went to fly for cargo companies.  Not passengers, but

12   they were flying, in effect, cargo planes, I believe.  I

13   thought we had that.

14        MR. COHEN:  Your Honor, here's what we have.  We have

15   eight different schedules.  We have numbers under something

16   called the fairness model, the arbitration list, the Salamat

17   damage model, the marginal plus two model, Farber seniority 1,

18   Farber seniority 2, Farber seniority 3, Tannen (phonetic)

19   seniority.  What I'm asking for is not to respond to eight

20   different damage theories.

21        MR. PRESS:  There are different versions of a "but

22   for" world that have been created.

23        THE COURT:  Yeah, but basically you can't -- there

24   has got to be a "but for" world that you're going to go with.

25        MR. PRESS:  Well --

```
 1              THE COURT:  Are you going to tell the jury, I have
 2    eight different theories and you pick one of them?
 3              MR. PRESS:  No.
 4              THE COURT:  That's what it sounds like to me.
 5              MR. PRESS:  No, we will not do that.  But a point of
 6    fact, there may be alternative models presented to the jury.
 7              THE COURT:  Oh, I'm sure.  Well --
 8              MR. PRESS:  I can tell you it's not going to be
 9    eight.  But I can't commit that it's going to be one.  I don't
10    think that's reasonable, Judge, to hold us to that.
11              THE COURT:  No, no.  But there has got to be a point
12    that the jury can make a rational -- I mean, the idea of an
13    expert is to express an opinion.  And you say that because of
14    the special training and knowledge and background of
15    particularly -- it's in my standard charge to the jury on
16    expert opinion.  You know, you explain why you're letting this
17    opinion go and then you tell the jury that they can accept it,
18    but they don't have to accept it.  They can accept it or
19    reject it, and you give them some guidance they can consider
20    for accepting and rejecting.
21              MR. PRESS:  I understand.
22              THE COURT:  You're really raising a different issue.
23              MR. COHEN:  What I'm saying, Your Honor --
24              THE COURT:  And this is not the same issue, because
25    in extending the columns, you can take any of the eight --
```

1   once you have the data and the number, you can extend out any

2   one of them.

3           MR. COHEN:  What I'm raising, Your Honor, is if

4   you're going to submit reports on March 15th -- I understand

5   they're two different experts.  I understand the concept of

6   Expert A has a theory and Expert B has a theory and --

7           THE COURT:  Well, Expert A --

8           MR. COHEN:  Expert A has four theories and Expert B

9   has three theories.

10          THE COURT:  But the first expert, Henry Farber, Dr.

11  Farber, is not -- Dr. Farber is not using numbers.  He's not

12  relying on a list of any kind, so he's --

13          MR. COHEN:  No, Your Honor, that's not correct.  He's

14  creating three different lists.  The numbers are being run

15  through by Mr. Salamat, but he actually -- they have seven or

16  eight -- they have eight different lists.  You know, and then

17  they're complaining that we're not going forward with our

18  experts.  I don't know how we can proceed in any kind of

19  rational basis with eight different lists.

20          THE COURT:  Maybe that would be a subject of your

21  expert report.  I mean, that may be one of the very things

22  they'll comment on is if they have seven theories, many of

23  which are inconsistent with each other.

24          MR. COHEN:  I understand that, Your Honor.  But what

25  I'm asking --

```
 1            THE COURT:  I'm not saying they are.  I'm just saying
 2   that that could be what your expert -- I don't know.
 3            MR. COHEN:  What I'm asking for is that they
 4   should -- each expert should tell us what his opinion is with
 5   respect to damages.  I truly don't know what their damage
 6   number is.
 7            MR. PRESS:  Judge, our opinions have been -- our
 8   opinions -- our experts have expressed opinions.  There are
 9   two very detailed reports.  If their experts have an opinion
10   on what the damages were, why don't they tell us?
11        It has no impact on their ability to take a deposition
12   and have an expert articulate an alternative view of what the
13   "but for" world would have been.  It really doesn't.
14            THE COURT:  Yeah, but an alternative view of what the
15   "but for" world would have been is a different damage theory.
16            MR. PRESS:  Of course.
17            THE COURT:  The damage theory flows -- whatever it
18   is, it flows from your view of what the "but for" world would
19   have been.  I mean, you know, the actual numbers will depend
20   on the numbers from the individual pilots, but at least in
21   gross, a different view of the "but for" world is a different
22   damage figure.  I mean, cumulatively it's a different damage
23   figure.
24            MR. PRESS:  There is no question about that.
25            THE COURT:  I suppose you could have a "but for"
```

```
 1   world anywhere from total integration, I guess would be one

 2   "but for" world.  You took the two lists and actually

 3   integrated them 100 percent, no stapling.

 4          MR. PRESS:  Why not put the TWA pilots on the top?

 5          THE COURT:  And then you have -- well, I suppose you

 6   could have backwards.  You could have senior to the American

 7   pilots.  I suppose that's even -- we'll call that reverse

 8   stapling, where the American pilots would get stapled to the

 9   TWA list.  That would be anti-stapling or reverse stapling.

10   But no matter which one of those you choose, the more

11   realistic would be total integration would be the best, if you

12   just took the two lists.

13        And, indeed, the two contracts had different provisions

14   dealing with that very issue.

15          MR. PRESS:  True.

16          THE COURT:  You might call it the APA -- the APA

17   contract, I believe, called for total integration, did it not?

18          MR. PRESS:  Well, there was some debate about what it

19   really provided for, but that was one interpretation, yes.

20          THE COURT:  There were different language in the APA,

21   which American had, as opposed to the ALPA contract, which

22   arguably did not have that.  Or maybe it was the other way

23   around.  I don't know.

24          MR. PRESS:  You stated it right, Judge.

25          MR. KATZ:  Your Honor, to be precise, the TWA
```

```
 1   contract --

 2          THE COURT:  Are you trying to make me be precise, Mr.

 3   Katz?

 4          MR. KATZ:  No, I'm going to be precise.

 5          THE COURT:  Oh, you're going to be precise.

 6          MR. KATZ:  The TWA contract did not require any

 7   particular result.  It required a process that ended in

 8   arbitration --

 9          THE COURT:  Right.

10          MR. KATZ:  -- to resolve the integration of the TWA

11   pilots --

12          THE COURT:  The American contract did not have

13   arbitration.

14          MR. KATZ:  The American contract required all of the

15   incoming pilots be put on the bottom of the American list.

16          THE COURT:  But all I'm saying, just to go back, I

17   could -- your experts, not me, could postulate, well, if the

18   union did what it was supposed to do, it would have had one

19   list with no staple point.  That, to me, is kind of the top.

20   And then you'd say, well, you know, staple points would be,

21   you know, here, here, here, here.  And plus other

22   modifications as well.  I don't want to say the staple point

23   was the only one.  But each one comes up with a different

24   damage number.

25          MR. PRESS:  That's true.
```

```
 1          THE COURT:  And I'd say from no damages -- if you had

 2   total integration, probably, in effect, no damages, to -- no,

 3   I'm sorry, not no damage, that's the highest damages.  And

 4   then as you go down in your "but for" world, less and less and

 5   less and less and less.

 6       All I'm saying, that's grist for your mill.

 7          MR. COHEN:  No, I understand that, Your Honor.  It's

 8   just --

 9          THE COURT:  If you think that they've given you, you

10   know, a mishmash which, you know, maybe you can't

11   come -- take that up.

12          MR. COHEN:  All I was trying to say, Your Honor, is

13   given these time frames -- which we will obviously do whatever

14   Your Honor asks us -- to have to respond to eight different

15   models seems like an imposition.

16          THE COURT:  Let me put it this way.  You can't -- if

17   you've given eight different -- and I'm really leaping way

18   ahead to a trial.  If you've given eight different models of

19   possible "but for" worlds, okay, and now it's come time for

20   trial, and he gets on the stand and says, I'm picking Model 3,

21   that's the model that I think is the one that matters, but

22   nowhere in his report has he ever picked Model 3 before or he

23   just said his Model 1, 2, 3, 4, 5, 6, 7, and 8, but now he

24   gets on the stand and says, Model 3 is my model, I'm not going

25   to allow that.
```

```
 1           MR. PRESS:  Of course, Judge.  I wouldn't expect you
 2    to.
 3           THE COURT:  You know.  So --
 4           MS. RODRIGUEZ:  And again, Your Honor, with
 5    regard -- and I'll just talk --
 6           THE COURT:  Maybe that's the reason for deposing
 7    these folks.  One of the reasons you depose them is to pin
 8    them down.
 9           MR. COHEN:  I'm just trying to deal with --
10           THE COURT:  It seems to me -- I'm salivating here
11    over the opportunity to depose these guys.  This would sound
12    like fun for me.
13           MR. COHEN:  Judge, we'll check your schedule.
14           THE COURT:  Which of the eight theories is going to
15    be your theory?  It sounds like fun for me.
16           MR. COHEN:  The thought had occurred to us, however,
17    if what's going to happen in trial, right, is that the witness
18    is going to say, Well, I was deposed and I had thought about
19    it some more and pick one instead of two, three, four --
20           THE COURT:  I'm not going to allow that.  Well, if it
21    turns out at the deposition he's very, very clear that I'm
22    picking one and you've pinned him down adequately, I'll allow
23    him to testify consistent with his deposition.  But what I'm
24    not going to do is let someone give you eight different
25    theories of damages, "but for" models and models of the "but
```

```
 1  for" world, and then have -- and then have at deposition not

 2  pick any one as being the right one and then come up at the

 3  trial and say, I'm picking No. 3.  That's my model.  I'm going

 4  with three.  That's my model, ladies and gentlemen of the

 5  jury.  That's what I want you to find the "but for" world

 6  would have been.

 7          MR. COHEN:  No, Your Honor, I --

 8          THE COURT:  I'm not going to allow that.

 9          MR. PRESS:  Your Honor, can I --

10          THE COURT:  Mr. Press isn't taking issue with me on

11  that.

12          MR. PRESS:  Just as a point of fact, Judge, and I

13  didn't want to get into this, but our experts have picked what

14  they think was the most reasonable outcome.  They've said

15  that.  They've each articulated their opinion.

16          THE COURT:  I'm not arguing with you on that.  I

17  mean, you may be right.  I just don't know.

18          MS. RODRIGUEZ:  For instance, Your Honor, again with

19  regard to Dr. Farber, he talks about the "but for" list that

20  he opines on would be the "but for" list, but he talks about

21  having an upper parameter list and a lower parameter list, but

22  they're not three different methodologies.

23          THE COURT:  Let me give you an example.  I used to do

24  a lot of litigation in real estate, tax appeal and things like

25  that.  And you get an MAI report from a person and he'd say,
```

1    Well, on one theory I would value it this way, another theory

2    I would value it this way.  If there is reproduction costs, I

3    would do this.  If there was an income, I would do this.  When

4    the cap rate was this, I would do this, but if my cap rate was

5    this -- but at the end of the day he says, I put it all

6    together and I find the one that is most reasonable is this.

7    And so he doesn't say, I have seven different valuations which

8    might be.  He says, In my opinion, this one is what I think is

9    the value.

10          So, I mean, extrapolating this to this kind of thing, I

11   can see, Well, there is three or four different ways we can

12   come to a number here for a "but for" universe.  But when I

13   consider all the pros and cons of each of the methodologies,

14   it's two that I pick.  That one I think is the right one.

15          MR. PRESS:  That's what happened, Judge.

16          MR. COHEN:  Your Honor, we'll proceed with the

17   deposition --

18          THE COURT:  I mean, he says that's the one.  I don't

19   know.  I mean, I don't want to make it -- nothing I say should

20   be construed as my opinion.

21          MR. COHEN:  I understand, Your Honor.  We'll explore

22   it at the deposition, Your Honor.

23          Your Honor, so we don't have to go back, obviously

24   we're not going to be able to do these depositions in four

25   hours, so I don't know if that is an appropriate time.

```
 1              THE COURT:  Isn't it obvious?  Oh, you're talking --
 2              MR. COHEN:  No, the expert.
 3              THE COURT:  I didn't put four hours on the expert
 4   depositions.
 5              MR. COHEN:  Okay, thank you.
 6              THE COURT:  I only put the four hours on the CEO,
 7   CFO, the labor relations guy, the two class representatives.
 8   Just those folks.
 9              MR. COHEN:  All right.  Thank you for the
10   clarification.
11              THE COURT:  And the investment banker.
12         Oh, no, I'm going to revisit the issue.  I'm uninclined
13   to -- as long as things don't get out of hand, I'm not
14   inclined to put any limit on any of the experts.  Either way,
15   them deposing your experts or you deposing their experts.
16              MR. COHEN:  I'm sure we'll work out the time of the
17   experts' --
18              THE COURT:  I want to be reasonable, but I don't
19   think I can say now that four hours would be adequate or
20   inadequate.  I just can't say, so I don't want to put a limit
21   now, you know.  I doubt I would put a limit at all, quite
22   candidly, on the experts, the expert testimony.  Unless it
23   gets out of hand on the third day or something, you know.  I
24   doubt that.
25         Okay.  Anything else?
```

```
 1              MR. PRESS:  Nothing from the Plaintiffs, Judge.

 2              THE COURT:  Well, let me recapitulate what I think.

 3              MR. PRESS:  Well, wait.  While we're here, can we

 4     talk about when the Plaintiffs should depose the Defendant

 5     expert and any rebuttal experts and the trial date?

 6              THE COURT:  They're supposed to have it by

 7     March 15th.

 8              MR. PRESS:  Correct.

 9              THE COURT:  I don't know what a rebuttal expert is.

10              MR. PRESS:  I don't know either.

11              THE COURT:  I'm very unsympathetic to one expert

12     files a report and the other one files a response to that one

13     and then the other one files a response to that one.  He's an

14     expert.  He's supposed to give an opinion, you know.

15              MR. PRESS:  Judge, I agree with that approach.

16              THE COURT:  But right now they're due March 15th.  I

17     would like your depositions to be within 30 days, standard --

18     standard final pretrial type of dates.

19              MR. PRESS:  Tax day 2013.

20              THE COURT:  I normally give 30 days to depose the

21     other side, 30 days after receiving the report to depose the

22     other side's experts.

23              MR. PRESS:  That's agreeable to us.

24              THE COURT:  All right.  Let me just go back over

25     everything so we -- we're on -- and I'll probably try to put
```

1    this in order.

2         Number one, I'm giving leave to the defense to take the

3    six depositions, the CEO, the CFO, the labor relations guy

4    from TWA, an investment banker, and then two -- were Schwartz

5    and Hefley on the -- originally on the steering committee?

6              MR. PRESS:  Mr. Hefley was, Judge.

7              THE COURT:  And what about Schwartz?

8              MR. PRESS:  No, he was not.

9              THE COURT:  Was he a MEC member?

10             MR. PRESS:  He was assistant vice chairman.

11             THE COURT:  So he was a member of the MEC?

12             MR. PRESS:  He was.

13             THE COURT:  For what service, for what --

14             MR. PRESS:  He was the MEC assistant vice chairman.

15   Vice chairman, I'm sorry.

16             THE COURT:  But didn't they have three MECs, one for

17   each of the --

18             MR. PRESS:  He was not an elected MEC member.  He was

19   a --

20             THE COURT:  On which of the three locations?  There's

21   St. Louis, New York, and --

22             MR. PRESS:  He was an officer, so he's not really an

23   MEC member.  MEC officer is the right way to phrase it.

24             THE COURT:  All right.  Schwartz -- and Hefley was a

25   pilot, but he was a member of the original plaintiffs group.

1          MR. PRESS:  That's true.  He was also on the merger

2     committee that negotiated with the American pilots.

3          THE COURT:  Right.  That was kind of an informal --

4     yeah, informal committee.

5          Okay.  Those six depositions at four hours a dep are

6     going to be done by the Defendant by January 31st.  Okay.

7          No. 2, the documents, the individual offset and

8     mitigation data, will be turned over to the Defendant,

9     whatever exists, on December 31st, and whatever doesn't exist

10    on December 31st will be turned over by January 31st.  And

11    it's understood by turning it over we don't mean just turning

12    over just the raw data, but making the mathematical

13    calculations that you say are going to be made and relied upon

14    with the data you're gathering.

15         MS. RODRIGUEZ:  Your Honor, can we just move that a

16    day since the deadline is the 31st for the pilots to get it

17    to --

18         THE COURT:  Well, it's the same day I intended.  I

19    don't know why I said the 30th.  I mean the last day of the

20    month.

21         MS. RODRIGUEZ:  All right.

22         THE COURT:  I'm sorry.  I'm missing your point, Ms.

23    Rodriguez.

24         MS. RODRIGUEZ:  Our drop-dead date to the pilots was

25    the end of January, so to the extent a pilot gets his

```
 1    information in at 11:59, he's compliant, and so we would need

 2    just --

 3             THE COURT:  When is the drop-dead date?

 4             MS. RODRIGUEZ:  January 31st.  So if we could have

 5    February --

 6             THE COURT:  Why don't you just move it back?

 7             MS. RODRIGUEZ:  Because it's already at the printer.

 8             THE COURT:  So change it.  You can change anything

 9    unless it's actually gone out.  Unless it's already been

10    created.  I mean, the document hasn't been printed yet.  It's

11    just in the computer.

12             MR. PRESS:  I got sideways here.  I thought at the

13    end of December this year we're going to disclose whatever

14    data we have collected and then we're going to supplement the

15    end of January.

16             THE COURT:  No, no, what you're disclosing -- the

17    point I'm making is you're disclosing not just the raw data

18    but the calculations which you're going to make that yields

19    the actual damage figure.

20             MR. PRESS:  That's right, and an updated schedule

21    from the expert.

22             THE COURT:  What?

23             MR. PRESS:  An updated schedule from the expert.

24             THE COURT:  Right.

25             Now, by the 31st you're going to get the rest -- I
```

1    would just move that date back a couple of days so you can do

2    the calculation you have to do.

3         MS. RODRIGUEZ:  That's fine, Your Honor.

4         THE COURT:  Look, I'm not going to tell you how to

5    collect the data.  All I'm going to do is on December 31st, by

6    that day, you've got to give them whatever you've collected,

7    and not just the raw data, but showing how the calculation is

8    made that yields the actual damage number.  It's what I call

9    the extra two columns on the schedule.  The rest of that

10   information that you get, anything you get up to the 31st,

11   turned over to them in the same way, in the same format.

12   Okay.

13        I want the depositions of Dr. Henry Farber and

14   Mr. Rikk, with two K's, Salamat to be taken by the Defendants

15   by January 31st.  And it's, again, understood, if there is

16   something that I haven't kind of conceived of that would mean

17   that the deposition was not effective because there was some

18   information there that was not available, it's a risk we have

19   to take.  I may have to order another deposition.  So I want

20   to -- I think there is enough, particularly if by

21   December 31st we get most, 80 percent or 70 percent, or even

22   50 percent, you know -- well, that would go a long way to

23   being able to make the deposition meaningful.  So I want those

24   two depositions done.

25        By March 15th I want the experts' reports -- first of

1    all, by January 31st I want them identified, the trial experts

2    identified as to who they are.  I want their reports in by

3    March 15th, and then I want their depositions done by

4    April 15th.  Tax day, April 15th.

5           Okay.  Anything else?

6               MR. COHEN:  No, Your Honor.

7               MR. PRESS:  No, Judge.

8               THE COURT:  Okay.  All right.  Thank you.  Thank you

9    all for being here.

10          And I'm just wondering whether I should set another

11   date.  You know, I'm going to set a date in early February --

12   I'm going to try to do it now -- for another meeting just

13   to -- because a lot of things should have happened by then and

14   I just don't want to lose total track of things.

15          Do we have a date like very early February?

16              THE DEPUTY CLERK:  February 8th.

17              THE COURT:  February 8th, 10:00.  What day of the

18   week is that?

19              THE DEPUTY CLERK:  Friday.

20              THE COURT:  All right.  It's a Friday.  February 8th,

21   okay, here.  And given the number of people involved, we'll do

22   it in the courtroom, in this courtroom.  Okay?

23              MR. COHEN:  Yes, Your Honor.

24              THE COURT:  Okay.  We'll see.

25

1                    C E R T I F I C A T E

2              I, Cherilyn M. McCollum, a Certified Court

3    Reporter and Notary Public of the State of New Jersey, do

4    hereby certify that the foregoing is a true and accurate

5    computer-aided transcript of the testimony as taken

6    stenographically by and before me at the time, place and on

7    the date hereinbefore set forth.

8              I do further certify that I am neither of

9    counsel nor attorney for any party in this action and that I

10   am not interested in the event nor outcome of this litigation.

11

12

13

14

15

16

17

18

19

20

21

22              _____
                Certified Court Reporter
23              XI02094
                Notary Public of New Jersey
24              My commission expires 3-22-16

25   Dated: _____

*United States District Court*
*Camden, New Jersey*

# Exhibit 2

FILED

2001 MAR 16   A 9: 0.

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In Re:                          )
                                )
TRANS WORLD AIRLINES,           ) Case No. 01-0056
INC., et al.,                   )
                                )
        Debtors.                )

United States Bankruptcy Court
824 Market Street - Sixth Floor
Courtroom No. 2
Wilmington, Delaware

March 9, 2001
9:50 a.m.

-- -- -- --

TRANSCRIPT OF PROCEEDINGS

-- -- -- --

BEFORE:   THE HONORABLE PETER J. WALSH, JUDGE.

-- -- -- --

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware   19801
(302) 655-0477

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

ORIGINAL

Warner 23

17

1    Captain Scott A. Schwartz.

2                MR. WEISFELNER:  Just so the record is

3    clear.  Just an understanding is the witness being

4    presented as a lay witness or is he being presented as

5    an expert witness?

6                THE COURT:  I assume he's being presented

7    as a fact witness.

8                MR. MABEY:  That's correct.

9                CAPTAIN SCOTT A. SCHWARTZ,

10           the witness herein, having first been

11           duly sworn on oath, was examined and

12           testified as follows:

13                    DIRECT EXAMINATION

14   BY MR. MABEY:

15       Q.   Captain Schwartz, please, state your

16   occupation.

17       A.   I'm a pilot for TWA.

18       Q.   How long have you been a pilot at TWA?

19       A.   I'm in my 16th year.

20       Q.   And what was your previous education?

21       A.   I have a B.A. and an M.B.A.

22       Q.   What association represents the TWA airline

23   pilots collective bargaining unit?

24       A.   The Air Line Pilots Association, known as ALPA.



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Schwartz - Direct                                            148

1      Q.    Have TWA's pilots elected you to a position in

2    ALPA?

3      A.    They have.   I'm the vice-chairman of the TWA

4    branch of ALPA.

5      Q.    Do you have full access to the financial and

6    operational reports of TWA?

7      A.    Yes, we do.

8      Q.    Why is that?

9      A.    When the airline became employee owned, it was

10   retained that we were allowed to look at the financial

11   statements from the CFO on a routine basis.

12     Q.    Do you have assistance in analyzing these data?

13     A.    Yes, we do.

14     Q.    What is that assistance?

15     A.    We have an investment banking group, Michael

16   Glanzer, who is our investment banker.   We also have

17   an economic financial analysis department in

18   Washington that assists us in evaluating that

19   information.

20     Q.    I call your attention to TWA's two previous

21   bankruptcies which resulted in stand-alone bankruptcy

22   plans.   What actions have TWA's pilots taken to make

23   these plans work?

24     A.    In 1992, during the first bankruptcy, we took

1    huge pay concessions.  We took 20 percent pay

2    concessions as well as giving up our A plan or our

3    defined benefits plan.  In 1994, we gave huge work

4    rule concessions.  We became the most efficient

5    productive pilot group in the industry.  We also

6    created a productivity task force where we helped the

7    company find efficiencies and run the airline more

8    efficiently and smarter.

9       Q.   By your observation during this period of time,

10   also in an effort to support stand-alone plans, what

11   actions did you observe the company to take?

12      A.   I believe the company did many things.  They

13   tried several schemes:  taking seats out of airplanes

14   to create more leg room, putting seats back in to

15   create more cash flow, different marketing plans,

16   different utilization of the hub, adding to other

17   banks.  I believe there was a myriad of efforts to

18   improve the airline.

19      Q.   Captain Schwartz, notwithstanding these

20   actions, has TWA had a profitable year in the last

21   decade to the best of your knowledge?

22      A.   They have not.

23      Q.   Does ALPA believe that a stand-alone plan for

24   TWA can succeed?

1    A.    No, we do not.

2              MR. WEISFELNER:  Objection.

3              THE COURT:  What's the objection?

4              MR. WEISFELNER:  I don't know how this

5    witness can necessarily stand here and tell us what

6    ALPA believes.  He hasn't laid that foundation nor do

7    I know how a fact witness is going to give us that

8    sort of an opinion based on -- I haven't even heard

9    his involvement in anything beyond he has access to

10   financial information and he employs an investment

11   banker.  And I don't know why it's relevant either.

12             THE COURT:  Well, I think he indicated

13   he's vice chair of some group and has some access to

14   management information.  It's not clear to me whether

15   he's expressing his own opinion or whether he's

16   expressing the opinion of a constituency that he

17   represents.

18             MR. MABEY:  Thank you, Your Honor.

19   BY MR. MABEY:

20     Q.    Captain Schwartz, are you the vice chair of the

21   TWA ALPA group?

22     A.    Yes, I am.

23     Q.    And are you authorized to speak for them here?

24     A.    I am.



1    Q.   Does ALPA believe that a stand-alone plan of
2    reorganization for TWA can succeed?
3    A.   No, we don't.
4    Q.   And in addition to the reasons you've given,
5    citing efforts already undertaken in that behalf, are
6    there other reasons ALPA holds this belief?
7    A.   Our view is that an airline with four percent
8    of the market share, with a weak hub in St. Louis,
9    having the worst O and D statistics in the industry,
10   origination and destination traffic, we believe with
11   an overstrained airport in St. Louis, along with the
12   Karabu plan putting downward pressure on ticket
13   prices, it's not a stand-alone option.
14   Q.   You've testified that, just now, that ALPA
15   believes a stand-alone plan can't succeed.  But isn't
16   it true that ALPA tried to help put together a
17   stand-alone plan at the end of last year?
18   A.   That's correct.
19   Q.   What was that plan called?
20   A.   The self-help plan.
21   Q.   Was that plan ever finalized?
22   A.   It was not.
23   Q.   Why is that?
24   A.   Well, prior to the winter of this last year

1    there was an effort, based on the pro forma cash

2    position -- efforts were needed to be done from the

3    stakeholders to get through the winter.  That would

4    require labor concessions.  It would require lessor

5    concessions, and it would require the refinancings of

6    the cash receivables financings.  All of those

7    components need to be facilitated to create a savings

8    to get through the winter.  None of those things came

9    to fruition.

10   Q.   Were you involved personally in those efforts

11   and negotiations?

12   A.   At some level I was.

13   Q.   If everything had come together, what good

14   would it have done?

15   A.   Our view is, worst case, we could have survived

16   two or three months; best case, we could have survived

17   to the next winter, but not through the next winter.

18   Q.   Would the self-help plan have made TWA

19   profitable?

20   A.   No way.

21   Q.   Why did you join TWA in 1985?

22   A.   In 1985, TWA was a premier carrier.  TWA was

23   the biggest airline going across the North Atlantic.

24   TWA's pay scales for pilots were higher than that of

1    American Airlines.  Our pilot group was, roughly, the

2    same size of American Airlines.  It was a good company

3    back in 1985.

4       Q.   By your observations and your organization's

5    observations, when did TWA's problems develop?

6       A.   They began when Icahn took over the airline in

7    1986.  He bled the airline of cash by taking the

8    airline private, paid himself back for the

9    transaction.  The two subsequent bankruptcies left the

10   airline weaker.  The selling of the London routes made

11   the airline weaker.  By the time Icahn left, TWA was

12   nothing like the airline I came to work for in 1985.

13      Q.   If Mr. Icahn is affiliated with a stand-alone

14   TWA plan which seeks labor concessions, what will be

15   the reaction of TWA's pilots?

16              MR. WEISFELNER:  Your Honor, objection.

17              THE COURT:  That calls for speculation.

18   You can ask him what his reaction will be.

19   BY MR. MABEY:

20      Q.   I ask you what your reaction --

21      A.   Your Honor, my reaction would be extremely

22   negative.  I would not fly for an Icahn entity.

23      Q.   What would the reaction of your organization

24   be?

1     A.    Similar to mine.

2     Q.    Are there other jobs available for pilots --

3     A.    Yes.

4     Q.    -- who are dissatisfied with TWA?

5     A.    There is a pilot shortage going on right now.

6     Q.    Suppose the plan were to reduce the number of

7     pilot jobs from the present approximately 2400 to,

8     say, 1510, what would be the response -- what is the

9     response of you and the Air Line Pilots Association to

10    that proposal?

11    A.    Well, that would certainly exacerbate the

12    situation.  That would create a situation where

13    , captains would get 50 percent pay-cut by going down to

14    co-pilots and then would be furloughed.  It would make

15    things a disaster, more disastrous.

16    Q.    One of the labor concessions currently sought

17    by the TWA Acquisition Group, I represent to you,

18    would require the pilots to work substantially more

19    for the same pay.  What is your reaction and the

20    reaction of the Air Line Pilots Association to this

21    proposal?

22              MR. WEISFELNER:  Your Honor, I object.

23    The representation by the examiner is that it's

24    "substantially" more hours.  I don't know that it's

Schwartz - Direct

1    appropriate to solicit a reaction to a proposal that

2    says you'll work substantially more hours for less

3    pay.  I tell you right now, I don't like it.  We have

4    stipulated that no one is going to like it.  But I

5    don't know how it's relevant to the proceedings before

6    you because he doesn't have any facts or figures.

7              THE COURT:  I don't understand the basis

8    of the question.

9              MR. MABEY:  I represent to the witness,

10   Your Honor, that there is as of yesterday a TWA

11   Acquisition Group terms sheet which proposes to

12   increase the amount of hours worked by pilots without

13   increasing the pay.  I ask now the witness what the

14   reaction of the Air Line Pilots Association is to this

15   proposal and his personal reaction.

16             MR. WEISFELNER:  And, Your Honor, I think

17   again we need a bunch of foundation.  He said there

18   was a terms sheet that was presented yesterday.  We

19   don't know that this witness has had an opportunity to

20   review the terms sheet, yet alone his organization,

21   yet alone to determine what, if any, reaction his

22   organization has.

23             Your Honor, this is exactly why the sort

24   of testimony without the benefit of a deposition in

1    advance is so terribly prejudicial.  Your Honor, I

2    repeat my objection to this entire course of testimony

3    and, in particular, to these sort of questions where

4    we're supposed to extrapolate from one witness'

5    testimony an entire organization's reaction based on

6    hypotheticals that have no detail.

7                    MR. MABEY:  May I respond, Your Honor?

8                    THE COURT:  You can proceed if you lay a

9    foundation with the type of questions that counsel

10   just suggested.

11                   MR. MABEY:  Your Honor, I state the fact

12   subject to it being established later in testimony.

13   BY MR. MABEY:

14      Q.   And I ask you, captain Schwartz, are you aware

15   of proposals which have been made with respect to

16   pilot concessions under a TWA Acquisition Group

17   proposal?

18      A.   Yes, I am.

19      Q.   And how are you aware of them?

20      A.   I have seen them.

21      Q.   And have you seen a document when you say you

22   have seen them?

23      A.   I have seen some paper with writing on it.

24      Q.   When did you see that?



1    A.    Today.

2    Q.    Did those papers speak of requiring 70 hard

3   hours of pilot work?

4    A.    I did not see that section.

5    Q.    And have you had an opportunity to discuss

6   these proposals with the governing body of the Air

7   Line Pilots Association?

8    A.    Yes, I have.

9    Q.    And what is the position of the Air Line Pilots

10  Association with respect to this proposal?

11          MR. WEISFELNER:  With respect to what

12  portion of the proposal?  Your Honor, I object again.

13  He hasn't demonstrated that he discerns what any

14  elements of the proposal is.

15          THE COURT:  I assume he's talking about

16  the pilot concessions on time.

17          MR. WEISFELNER:  This witness just

18  testified that he doesn't know what the concessions

19  are.  He saw documents, but he hasn't read the

20  documents to tell him what the concessions are.  He's

21  had a representation from counsel --

22          THE COURT:  All right.  Ask him what

23  concessions he's aware of.

24  BY MR. MABEY:

1    Q.    What concessions with respect to pilot work

2    hours for no additional pay are you aware of, Captain

3    Schwartz?

4    A.    I'm simply aware there would be an increase in

5    flying for the same pay.

6    Q.    Does the Air Line Pilots Association have a

7    position with respect to such a condition, if

8    required, requested, or imposed by the TWA Acquisition

9    Group?

10   A.    Besides being opposed to it, it's impractical.

11   We're already flying up against the FAA limitations.

12   We're already the most productive pilot group in the

13   industry.  We couldn't fly any more if we wanted to.

14   Q.    Why is that true?

15   A.    Because of our demand staffing because of the

16   contract that we did in 1994 pursuant to the last

17   bankruptcy.

18   Q.    Well, are the pilots, in effect, working

19   overtime?

20   A.    Yes.  We're working overtime to mitigate our

21   already low pay.

22            MR. MABEY:  May I approach the witness and

23   the bench, Your Honor?

24            THE COURT:  Yes.

1          (Pilots' Exhibit No. 1 was marked for

2     identification.)

3

4     BY MR. MABEY:

5       Q.    Captain Schwartz, I show you what has been

6     marked for identification as Pilot'S Exhibit No. 1 and

7     ask you if you can identify this document.

8       A.    Yes, sir.

9       Q.    What is it?

10      A.    It's a resolution that was passed yesterday in

11    Wilmington by our governing body.

12      Q.    Were you present at that time?

13      A.    I was.

14      Q.    Would you read the portions in bold at the

15    bottom, please?

16      A.    "Therefore, be it resolved that the TWA master

17    Executive Council of the Air Line Pilots Association

18    representing all of TWA's pilots are opposed to TWA

19    Acquisitions Group getting control of TWA; and be it

20    further resolved, that TWNEC is vehemently and

21    unequivocally opposed to any contractual concessions

22    to Carl Icahn or any Carl Icahn entity.  Passed,

23    unanimous voice vote."

24          MR. MABEY:  I move the admission of



1    Pilots' Exhibit No. 1.

2              THE COURT:  Any objection?

3              MR. WEISFELNER:  No objection.

4              THE COURT:  Admitted.

5              (Pilots Exhibit No. 1 was received in

6    evidence.)

7    BY MR. MABEY:

8        Q.   Captain Schwartz, does ALPA support the

9    American bid?

10       A.   Yes, we do.

11             MR. MABEY:  No further questions.

12             THE COURT:  Cross-examination.

13             MR. WEISFELNER:  Thank you, Judge.

14                  CROSS-EXAMINATION

15   BY MR. WEISFELNER:

16       Q.   I believe you testified that --

17             THE COURT:  Mr. Weisfelner, would you take

18   the podium, please?

19   BY MR. WEISFELNER:

20       Q.   Captain Schwartz, you testified that things are

21   very rosy at TWA.  Is that correct?

22       A.   That's correct.

23       Q.   Why do you stay employed there?  Let me restate

24   the question.  There is a glut of opportunity for you



1    guys.   That was your testimony.   If you are not happy

2    at TWA because of all the things that happened to you

3    dating back to the early '90s, why don't you leave?

4        A.   I didn't say I wasn't happy.

5        Q.   You said it was -- you didn't say you were

6    happy.  You didn't say you were unhappy.

7                  Let's talk about the self-help plan.   How

8    many dollars worth of concessions, if you can recall,

9    was TWA's management looking for from its labor force?

10       A.   I don't recall the aggregate number.

11       Q.   Can you recall how much they were looking for

12   from the pilots?

13       A.   As much as they can get.

14       Q.   Do you remember the dollar amount?

15       A.   Not exactly.

16       Q.   Do you remember it within a range?

17       A.   Between 15 and 25 million, somewhere in that

18   range.

19       Q.   Say again.

20       A.   Between 15 and 25 million.

21       Q.   Were those in W-2 reductions?

22       A.   No.

23       Q.   So they were in productivity enhancements?

24       A.   That's correct.

Schwartz - Cross

1    Q.    They were looking for more hours of work for

2    less pay, for the same pay?

3    A.    They were looking at a myriad of things.

4    Q.    Were they, among the myriad of things, looking

5    for more hours for the same pay?

6    A.    I don't recall that.

7    Q.    Oh.  Do you recall whether or not whatever they

8    were looking for by way of concessions would have

9    bumped you up against FAA regulations?

10   A.    We're already bumped up against FAA

11   regulations.

12   Q.    How many hours a month does the FAA regulations

13   provide that you can't work beyond?  What's the limit?

14   A.    100 hours.

15   Q.    100 hours a month?

16   A.    That's correct.

17   Q.    And how many hours a month, not including

18   overtime, did you fly last month?

19   A.    I'm a full-time union person.  I didn't fly at

20   all last month.

21   Q.    You didn't fly at all.  How much would a

22   typical pilot fly in a month?

23   A.    I would say between 75 and a hundred hours a

24   month.



WILCOX & FETZER LTD.
Registered Professional Reporters

Schwartz - Cross                                    163

1    Q.   At TWA?

2    A.   Yes.

3    Q.   That includes overtime or excludes overtime?

4    A.   Includes over time.

5    Q.   Excluding overtime, how much does a standard

6    pilot at TWA fly?

7    A.   Well, you can't exclude overtime.  It's not

8    officially overtime.  We don't call it that.  We can

9    fly up to a hundred hours a month.  We can get paid

10   beyond that.  Our average line value is around 75

11   hours, but we can certainly fly more than that to

12   mitigate our low pay.  And we do that whenever we get

13   the chance.

14   Q.   How much do you get paid?

15   A.   On what basis?

16   Q.   On a monthly basis.  What do you make a month?

17   A.   I make about --

18        MR. MABEY:  Objection.  Irrelevant.

19        THE COURT:  Overruled.

20   A.   I make about $11,000 a month.

21   Q.   Where are you, relatively speaking, on the

22   seniority list?

23   A.   The top third.

24   Q.   The top third.  Are you going to accept

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    employment offered by American under the American

2    asset acquisition proposal?

3        A.    Yes.

4        Q.    Will you fly for American?

5        A.    Yes.

6        Q.    Okay.  And tell us what agreements you've reach

7    with American and their union as to where your

8    relative seniority will be slotted into their unions?

9        A.    We haven't negotiated that yet.

10       Q.    Pardon me?

11       A.    We don't know that.

12       Q.    How much of your union membership, therefore,

13   is going to be going over to American Airlines and

14   happily without knowing they're going to get slotted

15   in seniority-wise?

16       A.    All of them.

17       Q.    You can speak for all of them?

18       A.    It's my view.

19       Q.    It's your view that they ought to.  Even people

20   who are dramatically below you on the seniority list?

21       A.    Sure.

22       Q.    If American tells you have to get slotted in at

23   the bottom of their seniority list, you are okay with

24   that?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    That's a negotiation.

2    Q.    I'm saying if they were to tell you that you

3    had to get slotted in at the bottom of their seniority

4    list, would that be okay?

5    A.    I don't know.  I would have to make that

6    decision at that time.

7    Q.    What factors would go into the equation as to

8    whether you would be happy with that?

9    A.    There are conditions and restrictions that

10   would go along with that.  There would be pay issues,

11   how I-

12   Q.    Suppose you had an alternative form of

13   employment where you could maintain your seniority and

14   maintain your W-2 pay scale, would that be among the

15   factors you'd consider in making this future

16   determination as to whether you were happy with an

17   American transaction where you lost your seniority?

18   A.    Not if it was a guaranteed loser.  American

19   offers us security.  It's a complete solution.  This

20   other solution is just going put us out of work.

21   Q.    That's based on the review of the documentation

22   that you did this morning?

23   A.    No.  That's based on years of observing TWA in

24   the shrinking market share knowing TWA does not work

Schwartz - Cross                                                    166

1    as a stand-alone carrier.

2       Q.    Nevertheless, you stand there month in month

3    out drawing your salary?

4       A.    That's correct.

5       Q.    Now, you said TWA was the most productive

6    airline in the industry?

7       A.    I said our work rules, the TWA work rules are

8    the most productive in the industry for the kind of

9    airline that we are as a major carrier.

10      Q.    Are your work rules more or less productive

11   than those in effect Southwest Airlines?

12      A.    Very similar.  We modeled our contract with

13   Southwest Airlines.

14      Q.    In terms of hard hours per pilot, who is more

15   productive, TWA pilots or Southwest Pilots?

16      A.    I don't know.

17      Q.    Would you be prepared to become as productive

18   as a Southwest pilot?

19      A.    In my view we already are as productive as a

20   Southwest pilot.

21      Q.    If I were to represent to you that under the

22   TWA asset acquisition proposal, you are not being

23   asked to be any more or less productive than the

24   pilots are at Southwest Airline?

```
 1        A.    It's not an issue of productivity.  It's an
 2   issue of job security.
 3        Q.    I thought you told us on direct that what you
 4   were concerned was having to work more hours for less
 5   money.  It really comes down to job security.  Is that
 6   what you are saying?
 7        A.    In my view.
 8        Q.    That's the whole bottom line --
 9        A.    No, it's not.
10        Q.    You are here to tell us the reason -- the
11   reason why you are opposed to the asset acquisition
12   proposal advanced by TWA Acquisition Group is because
13   of job security?
14        A.    No, it's not.
15        Q.    What job security did you have last year?  Let
16   me rephrase the question.  When did you first become
17   concerned that TWA could not survive as a stand-alone
18   operation?  When did that realization occur to you?
19        A.    That has realization become more and more
20   obvious as time has gone by.
21        Q.    When did it first occur to you, sir?
22        A.    It first occurred to me during the Icahn
23   privatization that the airline was in jeopardy, that
24   our survival was in jeopardy.
```

Schwartz - Cross                                          168

```
1    Q.    That was how many years ago?

2    A.    It's '90 -- I can't recall what year it was.

3    Q.    But since it first occurred to you that you

4    should be concerned about your job security you have

5    seen TWA go in and out of two separate Chapter 11

6    cases.  Right?  You weren't enough about your job

7    security at that time to leave your $11,000 a month

8    55-hour work a month job to secure your job someplace

9    else?

10              MR. MABEY:  Objection, Your Honor.  The

11   question misstates facts.

12              THE COURT:  You say $11,000 a month back

13   to '92.  I'm not sure that's his testimony.

14              MR. WEISFELNER:  Let me restate the

15   question.

16              THE COURT:  50 hours a week.  I don't know

17   where that came from.

18              MR. WEISFELNER:  A month.

19              THE COURT:  A month.

20              MR. WEISFELNER:  Let me restate it.

21              THE COURT:  I'm thinking of lawyers, I

22   guess.

23              MR. WEISFELNER:  Hours a week is right.

24   BY MR. WEISFELNER:
```

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    Captain Schwartz, you tell us that your primary

2    concern about the alternative transaction is job

3    security because you have a concern about whether or

4    not TWA can remain viable as a stand-alone enterprise.

5    Am I correctly characterizing and, in effect,

6    summarizing your testimony?

7    A.    That is a concern, major concern.

8    Q.    And I'm asking you how is the prospect any

9    different in connection with this alternative being

10   presented as you've, in effect, lived through over the

11   last ten years in two bankruptcies?

12   A.    There's an option of a complete solution with

13   the American bid.   There is an option of continued

14   misery with this other bid.

15   Q.    By the way, didn't the TWA pilots support the

16   Icahn privitization?

17   A.    No.

18   Q.    It didn't support the Icahn privitization?

19   A.    Not that I know of.

20   Q.    It's your testimony, sir, that the TWA pilots

21   did not support the Icahn privitization?

22   A.    That's my recollection.

23   Q.    What are the FAA maximums again in terms of

24   number of hours flown a month?

1     A.    100 hours a month.

2     Q.    Okay.  On average, how many hours a month do

3  TWA pilots fly?

4     A.    I don't know that number.

5     Q.    That wouldn't be applicable to you, sir,

6  because you don't fly.  Correct?

7     A.    I am qualified, but I haven't flown in several

8  months.

9     Q.    Tell us, in terms of the TWA Acquisition Group

10  proposal, what does it assume with regard to expansion

11  with regard to additional hubs for the airline?

12     A.    I'm sorry.  I don't understand the question.

13     Q.    What assumptions are contained in the TWA --

14  I'll call it the Icahn group proposal so it's easier

15  for you to recall -- in the Icahn group proposal that

16  you have seen or heard about, what are the underlying

17  assumptions with regard to development of additional

18  hub cities?

19     A.    I heard something about some expansion of hub

20  cities.

21     Q.    Beyond that do you know any of the details of

22  the assumption?

23     A.    No, no, no.

24     Q.    What are the assumptions about number of hard

Schwartz - Cross

171

1   hours of additional flying that pilots would be asked

2   to do for the same pay?

3       A.    I don't know the specifics.

4       Q.    And what are the assumptions about injection of

5   additional equity capital into the corporate

6   structure?

7       A.    My view, it doesn't change the structural

8   problems.

9       Q.    I'm asking what you can tell us about the

10  underlying amount of equity new TWA would have

11  following a reorganization.

12      A.    I don't know.

13      Q.    You don't know.  How much cash would the new

14  enterprise have?

15      A.    I don't know.

16      Q.    Who would manage the airline operationally?

17      A.    I don't know.

18      Q.    What new route structures would the airline

19  fly?

20      A.    I don't know.

21      Q.    What would its fleet components be?  What

22  planes would it fly?

23      A.    I don't know.

24      Q.    What do you know about the proposal other than



Schwartz - Cross                                         172

1    Mr. Icahn is going to finance it?

2       A.    It's a stand-alone plan.  It calls for labor

3    concessions.  And it can't work.

4       Q.    And you base your prediction that it can't work

5    based on what analysis?

6       A.    Based on 15 years of experience.

7       Q.    As a flying pilot?

8       A.    As a flying pilot observing the industry.

9       Q.    And all the efforts that the pilots have made,

10   historically and as recently as December, to, in

11   effect, self-help the airline, those were all for

12   naught, in your opinion, and in fact they were

13   wrong-headed to begin with?

14      A.    Would you rephrase that?

15      Q.    Your organization has committed time and

16   effort, has it not, to assist TWA's management, after

17   Icahn was long gone, in assisting the airline in a

18   self-help program.  Correct?

19      A.    Right.  Our view is to help the airline survive

20   to get to a complete solution, which American Airlines

21   brings.

22      Q.    To what extent are you aware of whether or not

23   the Icahn group proposal like-wise attempts to allow

24   the airline to survive long enough to a final

1    solution?  Like a merger or another consolidation with

2    another airline but on better economic terms.

3      A.    A bad experience of two other bankruptcies and

4    privitization.

5      Q.    A bad experience.  But you really don't know

6    the details of what our proposal is, do you, sir?

7      A.    That's correct.

8                   MR. WEISFELNER:  No further questions.

9                   THE COURT:  Anyone else for

10   cross-examination?

11                  Any redirect?

12                      REDIRECT EXAMINATION

13   BY MR. MABEY:

14     Q.    Captain Schwartz, is there anything in the

15   cross-examination of you this afternoon which changes

16   your view or ALPA's official view with respect to

17   Pilots' Exhibit 1, which has been introduced in

18   evidence?

19     A.    Absolutely not.

20                  MR. MABEY:  No further questions.

21                  THE COURT:  Anything else for this

22   witness?

23                  MR. WEISFELNER:  No.

24                  THE COURT:  You may step down.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

# Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PATRICK BRADY, et al.,

      Plaintiffs,

    v.

AIR LINE PILOTS ASSOCIATION,

      Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 02-2917
(JEI)

**CASE MANAGEMENT ORDER**

**APPEARANCES:**

TRUJILLO, RODRIGUEZ & RICHARDS, LLP
By: Lisa J. Rodriguez
Nicole M. Acchione
258 Kings Highway East
Haddonfield, NJ 08033
    Counsel for Plaintiffs

GREEN JACOBSON, PC
By: Allen P. Press
7733 Forsyth Boulevard
Suite 700 Pierre Laclede Center
St. Louis, MO 63105
    Counsel for Plaintiffs

ARCHER & GREINER, PC
By: John C. Connell
Steven J. Fram
One Centennial Square
Haddonfield, NJ 08033
    Counsel for Defendants

*Pro Hac Vice*:
KATZ & RANZMAN, PC
By: Daniel M. Katz
4530 Wisconsin Ave., N.W., Suite 250
Washington, DC 20016
    Counsel for Defendants

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
BY: Jay Cohen
Daniel J. Toal

Theodore V. Wells
1285 Avenue of the Americas
New York, NY 10019
    Counsel for Defendants

**IRENAS,** Senior District Judge:

    This matter having come before the Court upon a status conference held on November 15, 2012; the Court having considered the parties' positions; and for good cause appearing;

    **IT IS** on this 15th day of November, 2012,

    **ORDERED THAT:**

1.  ALPA may take the depositions of six former TWA executives and employees connected with the American Airlines merger before January 31, 2013.  These depositions shall be limited to four hours each.

2.  ALPA shall take the depositions of Plaintiffs' two experts, Dr. Henry Farber and Mr. Rikk Salamat, before January 31, 2013.

3.  ALPA shall identify its trial experts no later than January 31, 2013.

4.  ALPA's shall serve its expert reports on Plaintiffs by March 15, 2013.  Plaintiffs shall take the depositions of

these experts before April 15, 2013.

5. On or before December 31, 2012, Plaintiffs shall turn over all set-off data in their possession at that time to ALPA. This data should take the form of updated damages schedules. Plaintiffs will turn over all remaining data no later than January 31, 2013.

                     /s/ Joseph E. Irenas

                     **JOSEPH E. IRENAS, S.U.S.D.J.**

# Exhibit 4

# PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K GARRISON    (1946-1991)
RANDOLPH E PAUL     (1946-1956)
SIMON H RIFKIND      (1950-1995)
LOUIS S WEISS        (1927 1950)
JOHN F WHARTON      (1927-1977)

WRITER'S DIRECT DIAL NUMBER
(212) 373-3163

WRITER'S DIRECT FACSIMILE
(212) 373-2399

WRITER'S DIRECT E-MAIL ADDRESS
jaycohen@paulweiss.com

UNIT 3601, FORTUNE PLAZA OFFICE TOWER A
NO 7 DONG SANHUAN ZHONGLU
CHAO YANG DISTRICT
BEIJING 100020
PEOPLE S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828 6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U K
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2 CHOME
CHIYODA-KU TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
PO BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W ABBOTT
ALLAN J ARFFA
ROBERT A ATKINS
DAVID J BALL
JOHN F BAUGHMAN
LYNN B BAYARD
DANIEL J BELLER
CRAIG A BENSON
MITCHELL L BERG
MARK S BERGMAN
BRUCE BIRENBOIM
H CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L BROCHIN
RICHARD J BRONSTEIN
DAVID W BROWN
SUSANNA M BUERGEL
PATRICK S CAMPBELL*
JESSICA S CAREY
JEANETTE K CHAN
YVONNE Y F CHAN
LEWIS R CLAYTON
JAY COHEN
KELLEY A CORNISH
CHRISTOPHER J CUMMINGS
CHARLES E DAVIDOW
DOUGLAS R DAVIS
THOMAS V DE LA BASTIDE III
ARIEL J DECKELBAUM
ALICE BELISLE EATON
ANDREW J EHRLICH
GREGORY A EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ANDREW C FINCH
BRAD J FINKELSTEIN
ROBERTO FINZI
PETER E FISCH
ROBERT C FLEDER
MARTIN FLUMENBAUM
ANDREW J FOLEY
HARRIS B FREIDUS
MANUEL S FREY
ANDREW L GAINES
KENNETH A GALLO
MICHAEL E GERTZMAN
PAUL D GINSBERG
ADAM M GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D GOLDBAUM
NEIL GOLDMAN
ERIC S GOLDSTEIN
ERIC GOODISON
CHARLES H GOOGE, JR
ANDREW G GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A GUTENPLAN
GAINES GWATHMEY, III
ALAN S HALPERIN
JUSTIN G HAMILL
CLAUDIA HAMMERMAN
GERARD E HARPER
BRIAN S HERMANN
ROBERT M HIRSH
MICHELE HIRSHMAN
MICHAEL S HONG
JOYCE S HUANG
DAVID S HUNTINGTON

JEH C JOHNSON
MEREDITH J KANE
ROBERTA A KAPLAN
BRAD S KARP
JOHN C KENNEDY
ALAN W KORNBERG
DANIEL J KRAMER
DAVID K LAKHDHIR
STEPHEN P LAMB*
JOHN E LANGE
DANIEL J LEFFELL
XIAOYU GREG LIU
JEFFREY D MARELL
MARCO V MASOTTI
EDWIN S MAYNARD
DAVID W MAYO
ELIZABETH R McCOLM
MARK F MENDELSOHN
WILLIAM B MICHAEL
TOBY S MYERSON
CATHERINE NYARADY
JOHN J O'NEIL
ALEX YOUNG K OH
BRAD R OKUN
KELLEY D PARKER
MARC E PERLMUTTER
VALERIE E RADWANER
CARL L REISNER
WALTER G RICCIARDI
WALTER RIEMAN
RICHARD A ROSEN
ANDREW N ROSENBERG
JACQUELINE P RUBIN
RAPHAEL M RUSSO
JEFFREY D SAFERSTEIN
JEFFREY B SAMUELS
DALE M SARRO
TERRY E SCHIMEK
KENNETH M SCHNEIDER
ROBERT B SCHUMER
JAMES H SCHWAB
JOHN M SCOTT
STEPHEN J SHIMSHAK
DAVID R SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J SIMONS
MARILYN SOBEL
AIDAN J SOLOWAY
TARUN M STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F TARNOFSKY
MONICA K THURMOND
DANIEL J TOAL
LIZA M VELAZQUEZ
MARIA T VULLO
LAWRENCE G WEE
THEODORE V WELLS JR
BETH A WILKINSON
STEVEN J WILLIAMS
LAWRENCE I WITDORCHIC
MARK B WLAZLO
JULIA MASON WOOD
JORDAN E YARETT
KAYE N YOSHINO
TONG YU
TRACEY A ZACCONE
T ROBERT ZOCHOWSKI, JR

*NOT ADMITTED TO THE NEW YORK BAR

January 17, 2013

**Via ECF**
The Honorable Joseph E. Irenas, S.U.S.D.J.
United States District Court for the District of New Jersey
Mitchell H. Cohen Federal Building & U.S. Courthouse
1 John F. Gerry Plaza, Room 310
Camden, NJ 08101

Re:   *Brady, et al.* v. *Air Line Pilots Association, Int'l*
      Civil Action No. 02-2917 (D.N.J. Camden) (JEI)

Dear Judge Irenas:

We write in response to plaintiffs' letter of yesterday afternoon requesting a conference with the Court to address plaintiffs' motion for a protective order. In that motion, plaintiffs seek to prevent the depositions of two fact witnesses, John Hefley and Scott Schwartz, that the Court has already expressly authorized.

Pursuant to the Court's November 15, 2012 Order, ALPA is subject to a January 31, 2013 deadline for completing the depositions of Hefley and Schwartz, as well as the depositions of four additional TWA-related witnesses and plaintiffs' two experts. (Nov. 15, 2012 Order ¶¶ 1, 2.) As the Court recalls, this Order was issued following the November 15, 2012 Status Conference, during which ALPA sought and obtained the Court's permission to depose Hefley, Schwartz, and the other witnesses. (Nov. 15, 2012 Status Conference Tr. at 71; Nov. 15, 2012 Order ¶ 1.) During the Status Conference, Plaintiffs' counsel expressly stated that he had "no objection to the TWA discovery [ALPA] seek[s]." (Nov. 15, 2012 Tr. at 33.) And plaintiffs raised no objections at any

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Joseph E. Irenas, S.U.S.D.J.                                      2

time in the nearly two months that followed, even though the parties appeared again
before the Court on January 4 in connection with defendant's motion to amend.

      At the November 15 Conference, I detailed for the Court the reasons
ALPA proposed to take these depositions, which are independent of their membership in
the plaintiff class. (Nov. 15, 2012 Status Conference Tr. at 19-27.)  Specifically, I
explained that these witnesses would provide testimony demonstrating that "TWA had no
options" and "was on the verge of bankruptcy," issues that go to the heart of plaintiffs'
damages theory. (Nov. 15 Tr. at 26.)  To support their theory of damages, plaintiffs'
experts assert that the TWA pilots could have negotiated a better seniority integration list
with the Allied Pilots' Association ("APA") because, they assume, the TWA pilots'
"reasonable [pre-transaction career] expectations" were relatively high.

      By virtue of their positions on the TWA Master Executive Council
("MEC"), Hefley and Schwartz have factual information relevant to this foundational
assumption for the plaintiffs' expert reports.  Schwartz was the Vice Chairman of the
TWA MEC and even offered testimony during TWA's bankruptcy proceeding in support
of American Airlines' acquisition of substantially all of TWA's assets.  Hefley served on
(and authored the minutes of) the TWA MEC's Merger Committee, which was charged
with negotiating with the APA regarding seniority integration.  We thus made clear at the
conference that we were seeking to depose these witnesses not in their capacities as class
members, but as percipient fact witnesses.  In particular, in view of their positions, both
witnesses are expected to have knowledge concerning, among other things, (i) TWA's
perilous financial condition at the time of the transaction, (ii) the absence of any viable
alternatives to American Airline's proposed asset acquisition, and (iii) the history of the
negotiations between representatives of the TWA MEC and the APA regarding seniority
integration.  All of these issues bear directly on the viability of plaintiffs' speculative and
counter-factual damage models.  Notwithstanding their awareness of our rationale for
these depositions and the status of Hefley and Schwartz as non-representative members
of the class, Plaintiffs' counsel expressly stated at the Status Conference that he had no
objections to this discovery. (Nov. 15, 2012 Tr. at 33.)

      Moreover, when ALPA thereafter served plaintiffs' counsel, in their
capacity as counsel for the class, with subpoenas for the depositions of Hefley and
Schwartz on December 28, 2012, plaintiffs did not object on grounds of relevance or
otherwise suggest they planned to seek a protective order.  Instead, Plaintiffs' counsel
told us that they (i) had no authority to accept service on behalf of class members; (ii)
were not willing to contact Hefley or Schwartz to seek their authorization to accept
service; and (iii) did not even know how to get in touch with Hefley or Schwartz,
notwithstanding that they had recently finished mailing questionnaires to all class
members.  Plaintiffs' counsel therefore insisted that we serve Hefley and Schwartz
personally.  Accordingly, on January 8, 2013, we served Plaintiffs' counsel with notices
of subpoenas for both witnesses and undertook to make personal service.  Plaintiffs'
counsel then waited an additional 2 days, until January 10, 2013, to file this motion.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Joseph E. Irenas, S.U.S.D.J.                                    3

Based on the date when Plaintiffs' counsel filed their motion, this Court's local rules provided that the motion date would be February 4. Plaintiffs' counsel doubtless appreciated that—due to their needless and inexplicable decision to wait nearly two months after learning of our intent to depose Hefley and Schwartz before filing this motion—the motion date was 4 days *after* the deadline this Court had established for ALPA to complete their depositions.

As plaintiffs' letter acknowledges, ALPA has now managed to serve both Hefley and Schwartz with the subpoenas for their depositions. Hefley and Schwartz have each responded, indicating their willingness and availability to be deposed before the January 31 deadline. Hefley indicated that he is available on January 28, 29, or 30, and Schwartz indicated his availability on the date noticed in the subpoena, January 25. As we indicated in an email to plaintiffs' counsel, ALPA would like to proceed with these depositions in accordance with the schedule imposed by the Court. We also advised plaintiffs' counsel by email that ALPA planned to address the scheduling issues in its opposition to plaintiffs' pending motion for a protective order, but plaintiffs' counsel evidently decided to preempt that filing with the letter it sent yesterday.

Contrary to the suggestion of plaintiffs' counsel that ALPA somehow was trying to moot their motion by proceeding with the Hefley and Schwartz depositions before the Court had an opportunity to resolve the pending motion, ALPA had planned to propose an expedited briefing schedule. In particular, ALPA plans to file its opposition to plaintiffs' motion later today, significantly in advance of the January 22 due date prescribed by the Court's local rules. We would respectfully propose that plaintiffs file any reply by January 22, in the hope that doing so would permit the motion to be resolved prior to the scheduled depositions.

In the alternative, should the Court require additional time to consider and resolve this motion, we would respectfully request that the Court extend our time to complete these depositions.

Respectfully,

*Jay Cohen / RPT*

Jay Cohen

cc:     All counsel of record (via ECF)

# Exhibit 5

**Chewning, Kerri**

| | |
|---|---|
| **From:** | John Hefley ███████████████ |
| **Sent:** | Monday, January 14, 2013 11:07 AM |
| **To:** | Chewning, Kerri; 'Allen Press'; Connell, John |
| **Subject:** | Note from John Hefley re: deposition |

To:

Kerri E. Chewning
John C. Connell
Allen Press

Dear All:

This weekend I was served with a subpoena for deposition in Burlington, Vermont pursuant to Patrick Brady, et al vs. Air Line Pilots Association, International.

I am writing to advise that I am unavailable on the date specified, as I will be making my way back to the east coast from a 7-day round trip to Hong Kong at the time specified in the subpoena.

Having said that, I WILL be available the following week on 28, 29, or 30 January 2013. If you are not available on any of those dates, I will be happy to reschedule once I have my February schedule, which should occur Wednesday 16 January 2013.

I'll be happy to reschedule either via email or telephone at your convenience.

███████████████████
████████████████████████████████

All the Best,
John Hefley