```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
    _____

    PATRICK BRADY, et al.,

            Plaintiffs,              CIVIL ACTION NUMBER:

             -vs-                    NO. 02-2917 (JEI)

    AIR LINE PILOTS ASSOCIATION,     Status conference
    INTERNATIONAL,                     (Via telephone)

            Defendant.
    _____
            Mitchell H. Cohen United States Courthouse
            One John F. Gerry Plaza
            Camden, New Jersey 08101
            Thursday, May 30, 2013

    B E F O R E:        THE HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE

    A P P E A R A N C E S:

    TRUJILLO, RODRIGUEZ & RICHARDS, LLC
    BY:  LISA J. RODRIGUEZ, ESQUIRE
         NICOLE M. ACCHIONE, ESQUIRE
            Counsel for Plaintiffs

    GREEN JACOBSON, P.C.
    BY:  ALAN P. PRESS, ESQUIRE
            Counsel for Plaintiffs

    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
    BY:  JAY COHEN, ESQUIRE
         DANIEL J. TOAL, ESQUIRE
            Counsel for Defendant

    ARCHER & GREINER, P.C.
    BY:  JOHN C. CONNELL, ESQUIRE
            Counsel for Defendant
    (Appearances continued on Page 2)

     Certified as true and correct as required by Title 28,
     U.S.C., Section 753.

                        /S/ Karen Friedlander, CCR, RMR
```

*United States District Court*
*Camden, New Jersey*

1   **APPEARANCES CONTINUED:**

2

    KATZ & RANZMAN, P.C.
3   BY:   DANIEL M. KATZ, ESQUIRE
        Counsel for Defendant

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*1*     MS. RODRIGUEZ:  Good morning, Your Honor.  This is
*2* Lisa Rodriguez, and with me is Nicole Acchione, and Alan Press
*3* for the plaintiffs are also on the line.
*4*     THE COURT:  Okay.
*5*     MR. COHEN:  Good morning.
*6*     THE COURT:  For the defense?
*7*     MR. COHEN:  Good morning, Judge, it's Jay Cohen and
*8* Dan Toal from Paul Weiss, and John Connell from Archer Greiner
*9* is on, as well.
*10*     THE COURT:  Good morning, everybody.
*11*     MS. RODRIGUEZ:  Good morning, Your Honor.  Dan Katz
*12* is --
*13*     THE COURT:  Is Dan Katz there, too?
*14*     MR. KATZ:  Yes, Judge Irenas.
*15*     THE COURT:  Good morning, Mr. Katz.
*16*     MR. KATZ:  Good morning.
*17*     THE COURT:  We have a court reporter here.  So since
*18* there is like seven or eight different -- or ten different
*19* people in the room or on the various lines, when you speak,
*20* please just identify yourself, so my court reporter can make
*21* an accurate record.  I'd appreciate that.
*22*    Okay.  What has triggered this conference --
*23*     MS. RODRIGUEZ:  Your Honor, this conference was
*24* triggered by -- plaintiff served a discovery --
*25*     THE COURT:  I was going to tell -- I was going to

1  tell you what it is.  Now you're going to tell me.
2         MS. RODRIGUEZ:  Oh, I'm sorry.  I thought it was a
3  question.  I didn't mean to interrupt.
4         THE COURT:  No, I've read the papers.  I was just
5  going to set the framework.
6      In the process of damages discovery, the plaintiff
7  served both an Interrogatory, and I think a demand for
8  documents, as well, in which they sought the dues -- they
9  sought information with respect to the dues paid to ALPA by
10 the TWA pilots, I think from January 1st, 2001, to April 30th,
11 2002.
12     I have those dates right.  I think I do.
13        MS. RODRIGUEZ:  Yes.
14        THE COURT:  The defendants objected on a couple of
15 grounds.  They -- first objected -- they almost made kind of a
16 pleading argument, an argument that there never was a claim in
17 this case going back ten years, or however old the case is,
18 for that relief.  In other words, a restitution, if that's the
19 right word, of dues paid during that period.  So that there is
20 no such claim in the case, itself.  That's No. 1 objection.
21     Another objection was that the experts' reports
22 produced by the plaintiff never dealt with that issue, at all,
23 and, therefore, its absence from the expert damage reports is
24 fatal.
25     The third objection, and they may overlap, the

1    arguments, but the third is that as a matter of law, they -- I
2    don't know, a dozen cases that deal with possible restitution
3    of union dues would not allow that remedy in this case, even
4    if it were properly pleaded, in the first instance, that it
5    would not allow it because restitution is allowed only if you
6    can show that the act of collecting the fees itself was
7    illegal; in other words, it was somehow not provided for in
8    some fashion.  Or the expenditure of specific amounts from
9    those union dues was illegal in some fashion.
10            That's why you get some first amendment-type cases, you
11   know, where there's either nonunion members are having their
12   dues used or things of that sort, where it's to the right of
13   an objector to object to the expenditure, that kind of issue.
14   But put it all together, the defense position is that the
15   plaintiff has no legitimate need for this info.
16            So I'm going to start with Ms. Rodriguez, or whoever is
17   going to make the argument, Mr. Press, Ms. Rodriguez, and then
18   I'm going to turn to Mr. Cohen for a response, or whoever he
19   wants -- whoever he wants to respond.  Okay?
20            MS. RODRIGUEZ:  Okay.  Thank you, Your Honor.  I'll
21   start with the argument as laid out by Your Honor.
22            THE COURT:  Well, it's not my argument.  I was just
23   trying to summarize the papers that I got.
24            MS. RODRIGUEZ:  The recap.
25            THE COURT:  Yeah, I was just trying to recap the

1  papers I have, that's all.

2          MS. RODRIGUEZ:  Plaintiff's second amended restated
3  Complaint specifically has allegations that the union has the
4  certified representative for the TWA pilots collected union
5  dues from the pilots, and the prayer for relief in that
6  Complaint seeks compensatory damages, as well as such other
7  relief as the Court deems equitable and just.  In a quick look
8  at *Black's Law Dictionary* includes in the definition --

9          THE COURT:  Well, that's going to sway me.  I mean,
10 what, if you could produce *Black's Law Dictionary*, that ends
11 that -- thus endeth the argument.

12         MS. RODRIGUEZ:  But it includes as compensatory
13 damages, indemnity or restitution for harm sustained.  With
14 regard to whether or not union dues are an available remedy,
15 the cases make clear that that is something that is determined
16 on a case-by-case basis, and Eddington -- the Eddington case
17 that is cited by both plaintiffs and defendants -- talks about
18 the -- it's appropriate if it's the proportional means of
19 redress.

20         And, in this instance, we have had a whole trial on the
21 issue of ALPA's breach of the fiduciary duty to the TWA
22 pilots, and during the trial, testimony was adduced that the
23 pilots -- I'm sorry, the union actually spent pilot money in
24 its attempt to woo the APA, the pilots -- the American pilots.
25 So the facts are in the records.  They've been proven at

1  trial.
2       The damage report -- the expert report was -- that's
3  something different.  I mean, the main theory of our damage --
4  our main damage theory is a "but for" seniority list, and
5  that's what our experts put together.  But when you look at
6  the "but for" seniority list, and we knew that this was going
7  to be a case, you know, before the experts even opined.  But
8  the pilots at the very bottom of that list wouldn't have
9  been -- wouldn't have been on a list, anyway.  They wouldn't
10 have faired any better.
11      And so it's those pilots, those pilots that we're
12 really seeking to get some level of compensation for ALPA's
13 breach of their fiduciary duty, and a way that they can also
14 receive some remedy is to have them receive the union dues for
15 which they paid, for which ALPA then used those dues to court
16 the APA pilots.
17      THE COURT:  Let me ask you this.  Even the way the
18 list was generated back at the time of the merger, there were
19 certain TWA pilots who didn't get hurt.  Not a very large
20 number, but a few.
21      MS. RODRIGUEZ:  There were pilots at the bottom of
22 the -- yes.
23      THE COURT:  Not at the bottom of the list, the top of
24 the list.
25      MS. RODRIGUEZ:  Yes, there were pilots at the top of

1  the list that didn't get hurt, right.
2              THE COURT:  Who were not hurt.
3              MS. RODRIGUEZ:  Yes.
4              THE COURT:  Because there was a staple point, but,
5  you know, it depends whether -- there's always somebody above
6  the staple point.  So do those people get their dues back?
7          I mean, let's assume you had a senior TWA pilot who was
8  not in any way hurt.  Let's assume there was a hundred of
9  those or two hundred.  I mean, I don't know the number.  But
10 there's -- of the 2,000 TWA pilots, there was a couple
11 hundred, let's say, who just were not hurt, for a variety of
12 reasons, were not hurt; in other words, they continued to fly.
13 In fact, some of them got an increase because the American pay
14 rate was a little higher, I believe, than TWA's, if I'm not
15 mistaken.  And -- I think we had testimony on that.  And not
16 only did they make less, they probably made a little bit more.
17 Are they going to get their dues back?
18             MS. RODRIGUEZ:  Well, let me -- I misspoke, Your
19 Honor.  Even the pilots at the top were -- had some damages
20 because they -- because if it had been -- if the list had been
21 a correct list, they would have been hired.  So their damages
22 are certainly less.  They're not as -- didn't have as severe
23 an impact as those pilots closer to the bottom of the list.
24             And right now, we're just -- we're just seeking the
25 number.  I mean, whether or not -- yes, everybody should be

1  entitled to those dues back that were wrongfully set by the
2  TWA pilots.  It just becomes more important for those pilots
3  that would not otherwise get anything back.
4          THE COURT:  Okay.  You finished?  I'm not cutting you
5  off.  I mean...
6          MS. RODRIGUEZ:  No, I understand.  The discovery we
7  sought is not burdensome.
8          THE COURT:  No.  Burdensome doesn't -- that
9  argument is not -- doesn't strike me to be burdensome.  I
10 understood that the way dues were computed in those days was
11 as a percentage of a pilot's income.
12         MS. RODRIGUEZ:  That's our understanding, as well,
13 Your Honor.
14         THE COURT:  Like 1.2 percent or something, you know.
15 We had actually a discussion of that in a different context in
16 this case.  I mean, I remember people talking about that.  But
17 I'm not -- it's just rattling around in my memory that that's
18 the way the dues were computed.
19         MS. RODRIGUEZ:  There was testimony at trial as to
20 the way dues were computed, I believe.
21         THE COURT:  Yeah, I mean, I know I remember that.  It
22 was as a percentage, I believe.
23         MS. RODRIGUEZ:  I believe that's right.  I believe
24 it's 1.9 percent of salary.
25         THE COURT:  Is that what it was?  Yeah.  I know it

*1* was one-point-something.

*2*     MS. RODRIGUEZ:  But to conclude, we believe that ALPA
*3* was on sufficient notice that a dues refund could be part of
*4* the case.  At this point, whether or not a refund theory is
*5* actually admissible at trial isn't the issue, it's just
*6* whether or not the damages sought by the plaintiffs are
*7* appropriate.

*8*     THE COURT:  Okay.  Mr. Cohen?

*9*     MR. COHEN:  Yes, Your Honor, I think you have tee'd
*10* up our positions fairly accurately.  Look, you know, we have
*11* -- I would say there is, to go back to our last conference,
*12* there is a little goose to be gandered here.

*13*     I have to listen to Ms. Rodriguez -- when I listen to
*14* Ms. Rodriguez, I can't help but think about the argument we
*15* had about mitigation, where the argument was made because we
*16* had not amended our Complaint in ten years, we could not
*17* advance a defense that they were clearly on notice of.

*18*     Restitution is a separate theory.  It's not other
*19* relief that is just improper.  They could have pled
*20* restitution.  We think it's wrong as a matter of law, and the
*21* Eddington case is directly on point.  It's obviously not a
*22* Third Circuit or New Jersey case, but it is directly on point.
*23* They have never advanced a claim for restitution.

*24*     The allegation in the Complaint that Ms. Rodriguez
*25* refers to is simply an allegation that dues were collected,

1   not that a portion or all of the dues were collected as part
2   of an illegal scheme.  And there is no evidence in the record
3   that would allow us, without some discovery, and likely
4   without expert work that hasn't been done by either side, to
5   determine what portion, under their theory, of the dues were
6   lawful and what portion were not lawful.
7         Let's say the pilots hypothetically paid a million
8   dollars, or $2 million in dues over the course of the year,
9   and ALPA engaged in a range of activities for the benefit of
10  all pilots generally, and TWA pilots specifically.  There's no
11  theory of restitution, I don't believe, under which they would
12  be entitled to a return of all of those moneys.
13        So the part of -- the part of the story that's being
14  left out is that we're going to have to go down some long and
15  winding path and determine for -- by the way, not a huge
16  amount of money.  And you're right, Your Honor, we're not
17  arguing burden here.  It is, of course, not something that
18  we've raised.  But, you know, we are arguing that this could
19  have been introduced into the case years ago.  It wasn't
20  introduced.
21        There is no claim for restitution.  Plaintiffs know how
22  to plead in the alternative an equitable claim for
23  restitution, as opposed to compensatory damages, and, in fact,
24  the case law that says that this type of claim is not
25  available in cases like this, of course, makes that very point

1  and says that compensatory damages are the only damages that
2  are permissible in a case such as this.  So, by definition,
3  they're seeking -- they didn't plead it.  They're seeking
4  damages that are not available as a matter of law.
5      And there really should be, Your Honor, I would say,
6  some sense of balance here.  I mean, if they would like to
7  rethink their position on mitigation and allow us the room to
8  reconsider, then, you know, we could have a discussion.  But
9  if we're going to be held to pleadings that are a decade old,
10 we think the plaintiffs, as well as the defendants, have to be
11 held to the same pleadings.
12     THE COURT:  Okay.  Anybody else?  There's nobody
13 suffering from undelivered argument?
14     MR. COHEN:  No, Your Honor.  Thank you.
15     THE COURT:  Just make sure.  Mr. Katz, you're not
16 suffering from undelivered argument?
17     MR. KATZ:  No, Your Honor.  I think Mr. Cohen
18 adequately and eloquently stated out the position.
19     THE COURT:  Okay.  All right. Do you -- do both
20 sides agree that the issue of whether this is a remedy should
21 be decided by me now?  Or in the near future?  I mean, long --
22 you know, on motion practice?
23     MR. COHEN:  That's certainly the defendant's
24 position, Your Honor.
25     MS. RODRIGUEZ:  Your Honor --

```
 1              THE COURT:  Go ahead.
 2              MS. RODRIGUEZ:  I'm actually --
 3              THE COURT:  You're thinking.
 4              MS. RODRIGUEZ:  I'm thinking.
 5              THE COURT:  Okay.  Good, it's good -- good.
 6              MS. RODRIGUEZ:  I think that you don't need to decide
 7  the issue now.  I think the issue of the discovery, because
 8  it's discreet and because it's usually produced, you can make
 9  that decision now, and then once we get the discovery, we can
10  tee it up for whether or not --
11              THE COURT:  Well, I don't know about discovery.  I
12  mean, the underlying trial I don't think identified any
13  specific sum of money that was spent by ALPA to court the
14  American pilots.  I don't recall any testimony, you know, that
15  we spent 10,000 or a hundred thousand or a million dollars, or
16  whatever it was, to court the pilots.
17           I know what the evidence was.  There was evidence that
18  they were doing things, but not in terms of how much it cost.
19  There was no such evidence.
20              MS. RODRIGUEZ:  There was no evidence on a macro
21  level of how much they spent courting the pilots, but there
22  was testimony and evidence introduced, for instance, dinners
23  where they were.
24              THE COURT:  Yeah, but we're talking -- you're not
25  suing for three dinners.  I mean --
```

*1*       MS. RODRIGUEZ:  You are correct.

*2*       THE COURT:  You know, fundamentally, your theory, if

*3* I can extrapolate it a bit, is that a union's primary duty to

*4* its workers, to its members, is one of loyalty, and that in

*5* this situation in that year, in the three-, four-month period,

*6* when there was the merger between American and TWA, the union

*7* did not carry out its fundamental duty.  And, therefore,

*8* because it didn't carry out its fundamental duty to its

*9* members, it should make restitution to the members.

*10*       I mean, that's kind of your theory here.  It's not

*11* really tied to specific expenditures.  It's not one of those

*12* cases where you have dissenting union members -- we still have

*13* several of those cases.  You don't articulate it that way yet,

*14* but that's really what you're arguing.  You're really arguing,

*15* hey, look, why do I have a union in the first place?

*16*       We have a union because they're going to be loyal to my

*17* interests.  At the time when that loyalty was most needed --

*18* it's not my -- I'm just articulating what your position really

*19* is.  At the time we needed the union's loyalty the most, they

*20* had a blatant conflict of interest and, in effect, sold us

*21* down the river.  I mean, that's your theory and, therefore,

*22* you go from there to say, well, if they didn't carry out their

*23* most fundamental obligation to us, they should pay us back

*24* what we paid them to perform that service.  And that's really

*25* your argument.

1    Whether that -- whether that articulates a valid cause
2 of action, even assuming it was properly pleaded, I really --
3 I'd like a little more briefing on the subject, quite
4 candidly, and probably oral argument on the subject, as well.
5    I mean, that's -- I mean, most of the cases are a
6 little different in some way, and in some degree you've put
7 the issue kind of very squarely.  Not on any particular
8 expenditure, you know, not on any argument that the collection
9 of dues was somehow illegal in some fashion.  Your argument
10 simply is, their fundamental duty of loyalty to us was
11 breached, and it was breached at a time when it was very
12 crucial and important to us and, therefore, we should -- what
13 we paid you to perform that service, you know, we should get
14 back.
15    You know, I can almost -- I haven't -- for instance,
16 take a lawyer.  A lawyer -- let's say a lawyer has a blatant
17 conflict of interest and he collects a fee, but then later
18 comes out in some kind of decision that the conflict existed,
19 would the lawyer have to regurgitate his fee in that
20 situation?  Would he have to give back whatever fees he
21 collected, if it turns out he was laboring at the time under a
22 very strong conflict of interest?
23    And I can't claim I've studied the cases enough to do
24 it, but at least surficially, they all appear to be a little
25 more specific on their facts, and it doesn't really raise the

1   issue that Ms. Rodriguez is raising, which is really just

2   basically you weren't loyal to us and you sold us down the

3   river because you wanted to get the APA pilots into your fold

4   and, therefore, why should I have to pay you for that period

5   of time that you were not laboring in our behalf?  You sold me

6   a zircon instead of a diamond.  I paid for a diamond, I want

7   my money back because all I got was a zircon.  So that's what

8   restitution is, and that's equitable.

9         So what I'd like to do is tee that up for a decision

10  right away.

11        MS. RODRIGUEZ:  Okay.

12        THE COURT:  I'd like to have a motion by Ms.

13  Rodriguez, saying what she -- articulating her position as to

14  why she should get her -- and then a response -- you know,

15  under standard motion practice.

16        MS. RODRIGUEZ:  Okay.

17        THE COURT:  Because I think it's an important issue,

18  and I want to give it more thought than I've given it now

19  based on the -- and I'm not criticizing the papers I got.  I

20  mean, they are high-quality papers all the way, but it's

21  skimpy for what is a -- why are you laughing?

22        MR. COHEN:  Usually people complain that our papers

23  are too long, Your Honor.  I'm happy to be accused of being

24  skimpy for a change.

25        THE COURT: Well, that's good.  That's right.  Well,

*United States District Court*
*Camden, New Jersey*

```
 1  I'm not suggesting we need 600-page papers, but I really
 2  think, you know, maybe briefing within the briefing page
 3  limits of the rules would, you know, let me grasp it.
 4          You know, again, producing the information or
 5  requesting it I can't believe is that burdensome a task, if it
 6  were due, but I really think I have to just consider a little
 7  more deeply, A, is the claim properly pled?  If it is properly
 8  -- or even if it isn't properly pled, should I allow it to be
 9  amended; in effect, you know, the generous Federal Rules on
10  amending pleadings?
11          Pleadings can be amended in the middle of a trial under
12  certain circumstances.  You know, if it's not properly pled,
13  and I allow it to be amended to be pled.  And assuming it's,
14  quote, properly pled, is there, in fact, a cause of action
15  there?  Is there -- does the law recognize such a cause of
16  action?  And to the extent the Third Circuit hasn't ruled on
17  it, or the Supreme Court hasn't ruled on it, you know, how
18  should I view it in that light?
19          Are we all on board for this?
20          MS. RODRIGUEZ:  Yes, Your Honor.
21          MR. COHEN:  Yes, Your Honor.  We understand what you
22  want.
23          THE COURT:  And on -- I don't want this to lurk
24  around.  How much time -- let's start with Ms. Rodriguez since
25  your motion would trigger all the time limits.  How much time
```

```
 1  do you need to put it together?  I mean, you've done some of
 2  the work.  Obviously, it's in your letter to me, the two-page
 3  letter.
 4            MS. RODRIGUEZ:  Two weeks, Your Honor.
 5            THE COURT:  That's okay.  What's today's date?  Today
 6  is the 29th.  What is two weeks?  May has 31 days, I think.
 7  Oh, today is the 30th?
 8            MS. DiMAIO:  Next Thursday is the 6th, so then --
 9            THE COURT:  Let's make it Friday, the 7th, then.
10            MS. DiMAIO:  That's just one week.
11            THE COURT:  So the 14th, then.  Am I right?  Is the
12  14th a Friday?
13            MS. DiMAIO:  Yes.
14            THE COURT:  So you'll file your papers by the 14th.
15  Under our rules, what do they get to respond, ten days?
16            MS. DiMAIO:  I think it's two weeks, but I can go
17  check.
18            THE COURT:  Well, no.
19        Well, anyway, Mr. Cohen, just follow the rule.  If you
20  think you need a little more time, just give me a call.
21            MR. COHEN:  Yeah, I don't think we will, Your Honor.
22  We'll follow the rule.
23            THE COURT:  Yeah, just follow the -- well, the local
24  rule for doing it.  But again, if you need a week or
25  something, let me know.  It won't be a problem.
```

*United States District Court*
*Camden, New Jersey*

```
 1              MR. COHEN:  Yes, Your Honor.
 2              THE COURT:  So --
 3              MS. DiMAIO:  Do you want me to schedule oral argument
 4   now or --
 5              THE COURT:  Well, I'll wait.  Because I have some
 6   trials coming up.  Let me -- I'll schedule -- as soon as the
 7   papers are in, we'll work out a date with you for oral
 8   argument.
 9              MS. RODRIGUEZ:  Very good, Your Honor.  Thank you.
10              THE COURT:  Okay?  And let's attack the issue
11   squarely.  Let's find out, really, is there such a cause of
12   action.  Because if there is a valid cause of action, I'm not
13   too inclined to get hung up on technicalities of, you know,
14   whether it was properly pled or not properly pled, which we
15   can cure, or timing issues, in a case that's ten years old or
16   something like that.
17           On the other hand, if there's no cause of action for
18   that, as Mr. Cohen has argued, I think that we ought to
19   determine that right now and just put a stop to it, you know,
20   not complicate the case with a new theory of damages.
21           So -- and I just want to explore it a little more
22   thoroughly than I've done up to now.  Okay?
23              MS. RODRIGUEZ:  Thank you, Your Honor.
24              THE COURT:  All right?
25              MR. COHEN:  Your Honor, have a good day.
```

*United States District Court*
*Camden, New Jersey*

1  THE COURT: Okay. Both of you have a good time
2  and --
3  MS. RODRIGUEZ: Thank you.
4  THE COURT: Okay. And I'm going back to my 51st
5  reunion this weekend.
6  MS. RODRIGUEZ: Oh, enjoy. Take care.
7  MR. COHEN: Thank you, Judge.
8  THE COURT: Bye.
9  (8:57 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25