```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
 2
   _____
 3
   PATRICK BRADY, et al.,
 4
          Plaintiffs,              CIVIL ACTION NUMBER:
 5
          -vs-                     NO. 02-2917 (JEI)
 6
   AIR LINE PILOTS ASSOCIATION,    Motion Hearing
 7 INTERNATIONAL,

 8        Defendant.
   _____
 9      Mitchell H. Cohen United States Courthouse
        One John F. Gerry Plaza
10      Camden, New Jersey 08101
        August 1, 2013
11
   B E F O R E:          THE HONORABLE JOSEPH E. IRENAS
12                       UNITED STATES DISTRICT JUDGE

13 A P P E A R A N C E S:

14 SCHNADER HARRISON SEGAL & LEWIS LLP
   BY:  LISA J. RODRIGUEZ, ESQUIRE
15      NICOLE M. ACCHIONE, ESQUIRE
           Counsel for Plaintiffs
16
   GREEN JACOBSON, P.C.
17 BY:  ALAN P. PRESS, ESQUIRE
           Counsel for Plaintiffs
18
   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
19 BY:  JAY COHEN, ESQUIRE
        DANIEL J. TOAL, ESQUIRE
20         Counsel for Defendant

21 ARCHER & GREINER, P.C.
   BY:  JOHN C. CONNELL, ESQUIRE
22         Counsel for Defendant

23
     Certified as true and correct as required by Title 28,
24 U.S.C., Section 753.

25                    /S/ Karen Friedlander, CCR, RMR
```

*United States District Court*
*Camden, New Jersey*

1          THE DEPUTY CLERK:  All rise.

2          (OPEN COURT, August 1, 2013, 1:00 p.m.)

3          THE COURT:  Good afternoon.

4          RESPONSE:  Good afternoon, Your Honor.

5          THE COURT:  Have you settled the case?

6          MR. COHEN:  Not so much.

7          THE COURT:  You haven't?  Why not?  I could dictate

8    terms of settlement that everybody would agree with me and

9    like.

10          MS. RODRIGUEZ:  Go ahead.

11          THE COURT:  And you haven't done that.  You're all so

12    much smarter than I am, you should be able to do that by

13    yourself.

14          All right.  Everyone please be seated.  If I get a pair

15    of glasses out of here, we can go forward.  Costs two bucks.

16          Okay.  This is, of course, now known as Patrick Brady

17    versus Airline Association International.  It's two motions.

18    One by either side.  They are both discovery motions,

19    actually, and can I first have the appearances of counsel.

20          MS. RODRIGUEZ:  Good afternoon, Your Honor.  Lisa

21    Rodriguez and Nicole Acchione from the firm of Schnader,

22    Harrison, Segal & Lewis.

23          THE COURT:  I know that's as of last week or so.

24          MS. RODRIGUEZ:  As of yesterday.

25          THE COURT:  As of yesterday.

*United States District Court*
*Camden, New Jersey*

1          MS. RODRIGUEZ:  Last night at midnight, I think,

2    officially.  On behalf of the plaintiffs in the class.

3          THE COURT:  Is Joe Jacovini there?

4          MS. RODRIGUEZ:  I'm not sure who all is there.  We

5    are in the New Jersey office and I've met lot of people in

6    Philadelphia.

7          THE COURT:  Who is the managing partner in

8    Philadelphia?

9          MS. RODRIGUEZ:  Nick LePore and David Smith.

10          THE COURT:  Okay.

11          MR. PRESS:  Allen Press for the plaintiffs, as well.

12          MS. ACCHIONE:  Nicole Acchione from the law firm of

13    Schnader, Harrison, Segal & Lewis, for plaintiffs.

14          MR. CONNELL:  Archer and Greiner by John C. Connell

15    on behalf of the defense.

16          MR. COHEN:  Jay Cohen from Paul Weiss for the

17    defense.

18          MR. TOAL:  Dan Toal from Paul Weiss on behalf of

19    defendants.

20          THE COURT:  Okay.  Two motions.  One motion is by the

21    defendants to depose what is it, 11 non -- class members, but

22    who are not party class members.  I don't know how you

23    describe that.  People who are in the class, but not -- but

24    not named plaintiffs.  And the issue on which they seem to

25    want to take that deposition has to do with the basic concept

1    that whatever losses were incurred by the pilots has to be

2    offset by -- well, other names or other opportunities that

3    they've had.  And the experts for the plaintiffs have made

4    certain assumptions to which they then extrapolated over, what

5    was it, 2,000 pilots over the --

6        MR. COHEN:  Yes, Your Honor.

7        THE COURT:  -- the full pilot base.  The defendants

8    say, look, we want to test at least with a sampling, based on

9    people in different positions, different positions on the

10   seniority list, you know, and take a sample and see, you know,

11   at least get a feel for whether the assumptions that the

12   expert used to extrapolate those offsets was reasonable.  Do I

13   have -- do I understand that correctly?

14       MR. COHEN:  That's exactly right, Your Honor.

15       THE COURT:  Yeah.  Okay.  So that's the motion, you

16   know, and the burden that the defendants have, I guess, on

17   that would be the generalized expression in some cases that

18   you don't want being a passive member of the class to suddenly

19   be subject to all kinds of inconvenience, if you would want to

20   call it that, just because they were sort of a member of the

21   class.

22       I do note here that this class is a little different

23   than some other classes.  Tend to be much more intimately

24   involved non-class members than would be, you know, in some of

25   your class actions, you know, you know there's basically per

1  person, couple hundred dollars at stake or something, you

2  know.

3      The class of pilots -- indeed, this is a class action

4  where the pilots funded a great deal of litigation themselves

5  and not just the named plaintiffs, I mean, the people within

6  the class.  It was just a much more active class than you

7  might normally find.

8      Now, the other motion by the plaintiffs, which the

9  defendant's resist is they want discovery -- I don't know how

10  they're -- I guess they can gather written or oral

11  depositions, but they want discovery on the union dues paid

12  during -- what is it, about an 18-month period?  The period

13  when it's asserted that the Judge didn't agree with the jury

14  in the first part said that there was a conflict of interest

15  and they were not acting lawyerly, as union representatives

16  for the plaintiff class.

17      They analogize to a great degree in the brief to legal

18  cases.  Cases of legal or maybe sometimes not practiced, but

19  cases where a lawyer -- or burdened by a conflict of interest,

20  and there is case law out there in one form or another where

21  it suggests that lawyers are not entitled to any fee, has to

22  disgorge a fee that he earned while burdened by a conflict of

23  interest.  And they do cite a case or two also in the union

24  context where it was suggested -- I don't know if it ever was

25  actually awarded, but it was suggested that that might be a

1    remedy.  I think there's a couple of cases that suggest it.

2         So those are the two motions, and I'll start with

3    Mr. Cohen or whoever is going to lead the --

4         MR. COHEN:  I will, Your Honor.

5         THE COURT:  And then I'll hear the opposition and --

6    I'll treat each motion separately.  In other words, I'll hear

7    you, I'll hear the plaintiffs and then I'll give you rebuttal

8    and I'll go to the other motion and just reverse the process.

9         MR. COHEN:  Okay.  Your Honor, I think you've

10   actually outlined the issues.  They're not complicated on our

11   motion.  So let me sort of deal a little bit with the response

12   so we can have the benefit of a reply and why we think that

13   the response doesn't give you any reason to not allow us to

14   have the discovery.  The principal response -- well, let me

15   deal with the highest level.  The highest level is --

16        THE COURT:  I don't take issue with the cases they

17   cited.

18        MR. COHEN:  Right.

19        THE COURT:  I think those cases that deal with what

20   discovery is going to be permitted as to non-named plaintiff

21   class members, those cases on their facts, individually on

22   their facts, are properly decided.  I mean, I don't take issue

23   with those.

24        MR. COHEN:  Nor do we, Your Honor.

25        THE COURT:  I don't know how you could take -- first

*United States District Court*
*Camden, New Jersey*

1  of all, it is the law.  How could you take -- but I don't even

2  take issue with it as an intellectual matter.

3          MR. COHEN:  Yeah.

4          THE COURT:  I understand why, if you bring a class

5  action, in many contexts, you don't want to, for a lot of

6  different reasons, you don't want to suddenly have hundreds

7  of, you know, dep notices go out to get some poor person who

8  doesn't know the litigation is going, let alone that he's a

9  plaintiff.

10          And I understand that.  I understand that.  I

11  understand the law.

12          MR. COHEN:  And we don't disagree with the general

13  law.  It doesn't, in our judgment, have any applicability

14  here.  One, as Your Honor mentioned this afternoon, this is a

15  different kind of class and that case law is really to protect

16  absent class members who may not have a large stake in the

17  class from being harassed and being coerced on dropping out of

18  the class.  I don't think we're going to have that here.  It's

19  a hardy bunch on the plaintiffs' side.

20          THE COURT:  Pilots are used to being in charge, most

21  definitely.

22          MR. COHEN:  And, you know, really, really, what this

23  is, Your Honor, it's a way for us to prepare for the

24  cross-examination of plaintiffs' expert.  You're going to get

25  *Daubert* motions in a couple of weeks.  I actually talked to

*United States District Court*
*Camden, New Jersey*

1   Mr. Press to see if we could put it off for a week and we'll

2   work it out.  But we're filing motions this month, *Daubert*

3   motions.

4          THE COURT:  You're filing.

5          MR. COHEN:  Both sides are filing simultaneous

6   motions this month.  But, you know, there are a series of

7   assumptions, you know, that we just think are wrong.  I mean,

8   just sort of taking the second of the three assumptions that

9   we are dealing with, which is, there are hundreds of pilots

10  who have not put in data with respect to setoffs.  They didn't

11  send back their questionnaires --

12         THE COURT:  About three quarters did answer the

13  questionnaires and about a quarter didn't.  Is it something

14  like that?

15         MR. COHEN:  Yeah.  It may even be higher than three

16  quarters.  We're not criticizing the return rates.  You know,

17  we were accused in the answering papers of criticizing them

18  for being less than perfect.  That's not our point at all.

19  Our point is that their expert has made an assumption with

20  respect to whether the folks who did not respond are entitled

21  to setoff damages.  And he said, well, on average, I think

22  they're just like everybody else.  And, you know, although he

23  did concede at his deposition it's entirely possible, because

24  he doesn't know, that one reason why pilots did not respond is

25  they don't think they have any damages.

1          THE COURT:  Let me ask you this, is there -- maybe I

2     should know this, but is there any specific characteristics

3     that is common to the ones that didn't respond?  Meaning that

4     they're all above the staple point or that three-quarters of

5     them are above the staple point?  Some kind of

6     characteristic --

7          MR. COHEN:  I don't think so.  Mr. Toal, do you know?

8     Mr. Toal deposed Mr. Sullivan.  So if you know --

9          MR. TOAL:  I don't think we have any information

10    indicating that this group is --

11         THE COURT:  That there's some commonality to a large

12    group.

13         MR. COHEN:  I don't think so.

14         THE COURT:  Some common characteristics, if you

15    understand what I mean.

16         MR. COHEN:  No, I understand what you mean.  People

17    who were above a certain age, below a certain age, lived

18    outside of St. Louis, we don't know.

19         THE COURT:  I didn't see anything in the papers.

20         MR. COHEN:  But what we do know is that the

21    plaintiffs' expert doesn't know.  And they say, well, you, you

22    know, you have arguments and you can cross-examine them.  You

23    don't need to burden anybody with any depositions.  And I --

24    you know, with all due respect to the plaintiffs, I don't

25    think that's their decision to make.  I mean, we have an

1  expert who is sponsoring a report with a series of damage

2  models that go as high as a billion dollars or more, right?

3         THE COURT:  A billion?

4         MR. COHEN:  Yeah.  You might remember from the

5  earlier conference, Your Honor, he had eight or so different

6  models and presumably by trial, we will get it down to one.

7  In any case, he's made a series of assumptions, and we are

8  going to cross-examine him without -- you know, on the fact

9  that there is no factual basis for his assumption.

10         So we were looking for an unobtrusive way to bolster

11  our cross-examination, I mean, with respect to this.  You

12  know, we're criticized for not taking a representative sample.

13  We try to limit the number of people.  We don't want to depose

14  50 people.  It would be devastating, I think, to his model if

15  we deposed 50.  But we are willing to take a few depositions.

16         THE COURT:  11.  Is that only what you want?

17         MR. COHEN:  Yes.

18         THE COURT:  Why did I think it was 11.

19         MR. COHEN:  It is 11.

20         THE COURT:  Segmented by --

21         MR. COHEN:  Yeah, and I was only dealing with --

22         THE COURT:  Limited characteristics.

23         MR. COHEN:  Yes, and I was dealing with this segment

24  at the moment, I think, is three or four.  And what I'm saying

25  is, we are willing to live with a small number that will allow

1   us to put evidence before the jury and also during the

2   cross-examination to say that the expert Salamad who made an

3   assumption that's counterfactual.

4          And the plaintiffs say, well, you can just argue that

5   now, you don't need to burden people.  But I don't really

6   understand that point, Your Honor.  You know, we are trying to

7   develop factual evidence.  Same thing with respect to the

8   people who were voluntarily on furlough.  So the plaintiffs

9   have a theory that they're entitled to future damages through

10  2026.

11          THE COURT:  By "voluntary," you mean those who could

12  have come back but chose not to.

13          MR. COHEN:  Exactly, have chosen not to come back.

14  Those folks are in the damage calculations through 2026

15  because their expert says, my assumption is that anybody who

16  is, you know, as of 2012, that everybody, when they are

17  offered, there will be no furloughs going forward and when

18  they are -- and American will operate as it does, which, of

19  course, is again counterfactual, because they're in

20  bankruptcy, and from 2012 through 2026, they're damaged and --

21          THE COURT:  That's in a category of how the mighty

22  have fallen.

23          MR. COHEN:  Yeah, that's true, Your Honor.

24          And so I think that again what we're saying is, we were

25  trying to be -- and these are not long depositions.  You know,

1    two hours apiece I'm sure will be fine for these depositions.

2    We are trying to take some --

3              THE COURT:  Well, I will -- if I order them, I'm

4    going to time them.

5              MR. COHEN:  We assume, Your Honor.

6              THE COURT:  You know, I tend to do that now almost in

7    all depositions, no matter what the case, but --

8              MR. COHEN:  I would think two hours per person would

9    be fine for these depositions.  And you know, and we want to

10   develop evidence so when we cross-examine Mr. Salamad, if he's

11   permitted to testify at trial, if he gets past the *Daubert*

12   motion, to show that with respect to these series of

13   assumptions not only does he have no factual basis, but there

14   are facts available that are contrary to his assumption.

15         So it's really very, very straightforward.  Same thing

16   with respect to the pilots that weren't harmed.  We think

17   there are series of pilots --

18             THE COURT:  You are talking about the ones above the

19   staple point.

20             MR. COHEN:  Above the staple point.  Under his

21   methodology, they have -- he calls them, quote/unquote,

22   lifestyle damages.  So they are damaged in somewhere.  So, you

23   know, we --

24             THE COURT:  That really surrounds what kind of planes

25   they were flying, doesn't it?  That issue?

1          MR. COHEN:  But whether they were --

2          THE COURT:  They were not flying 757's or --

3          MR. COHEN:  Not flying the biggest wide bodies.

4          THE COURT:  They were flying with the MD80s or

5    smaller.

6          MR. COHEN:  Yes, mostly narrow bodies and some small

7    wide bodies.

8          So then we're criticized saying, well, you just

9    cherry-picked people, they are not representative.  To do a

10   representative sample of these hundreds of people, we would

11   have to take far more than 11.  So, I mean, we are kind of

12   being whipsawed.  On the one hand, you shouldn't take any

13   discovery.  On the other hand, the discovery you're seeking is

14   meaningless because it's not representative.  I mean, that's

15   our burden to deal with, but we are trying to develop some

16   factual evidence.

17         It will not slow down this case moving forward, and it

18   seems very different to me than the cases in which plaintiffs

19   were being -- you know, we're not taking depositions to find

20   out if they actually bought the TV sets and, you know, they're

21   entitled to the five-dollar voucher.  I mean, these are

22   fundamental assumptions in which hundreds of millions of

23   dollars rest in his damage assumptions.  So, I mean that, I

24   think, is reasonably straightforward.

25         We -- you know, we have been saying this since last

1  fall, you know, at least since we got involved in the case,

2  we've been on record saying at some point we're going to want

3  to take discovery of some of the absent class members, you

4  know, the non plaintiff -- non lead plaintiff class members to

5  test the factual assumptions.  We try to balance our need for

6  that discovery against being as unburdensome as possible.

7        And -- so, you know, that's where we are.  I don't

8  think it's a complicated motion and I don't think simply going

9  back and saying that absent a class member discovery is

10 disfavored is an answer to our response, or that you can

11 cross-examine him without it.

12       I mean, I'm sure we can cross-examine Mr. Salamad

13 without his deposition.  It's a lot better after we depose

14 him.  We can cross-examine him without the benefit of our own

15 expert.  It's a lot better with him.  The cross-examination at

16 trial will be sharper and more focused and easier to drive

17 home.  Because those are not simple analyses, Your Honor.  I

18 mean, these are incredibly complicated models that I think the

19 jury is going to grapple with, again, if he survives the

20 *Daubert* motion which we're going to urge you not to let him

21 survive the *Daubert* motion.

22       THE COURT:  That's what a *Daubert* motion is.

23       MR. COHEN:  Yes.  If he survives, these are

24 complicated models and these are reasonably simple points that

25 I think drive home cross-examination points in which tens and

1   tens of billions of dollars ride with respect to each one of

2   these.  I mean, there are hundreds, 600 of the 2300-so folks

3   in the class are on furlough and have refused to come back.

4   600.  And then there's 400 or so who didn't respond to the

5   questionnaire.  There's probably some overlap between the two,

6   I haven't separated, but there are upwards of a quarter, maybe

7   a third of the class that is in one of these two categories.

8   And so we're not saying let's take 700 people.  We are not --

9   you know, we are not saying go back and send questionnaires to

10  each of these people.  You know, we asked for input into the

11  questionnaire.  The plaintiff sent the questionnaire they felt

12  was appropriate and now we need some additional information.

13      So I think reasonably straightforward, we can bang

14  these out, you know, we can go where the witnesses are and not

15  inconvenience anyone.

16      THE COURT:  Okay.  Thank you.

17      MR. PRESS:  Thank you, Judge.  Whatever facts are

18  going to be gleaned from these depositions, Judge, will not be

19  meaningful either statistically for purposes of computing

20  class by damages or meaningful in a legal way.

21      They are cherry-picking pilots from three different

22  categories for some -- to attack an assumption that was made

23  to determine class-wide damages.  And they fall into three

24  different categories.  The first are the nonresponders, Judge.

25  There's approximately 400 people who did not respond.  Our

1   expert has assumed --

2           THE COURT:  What, about 1600 did respond?

3           MR. PRESS:  Over 1800.

4           THE COURT:  1800.  So there's 2200.

5           MR. PRESS:  Our expert, based on the data we have,

6   assumed that the nonresponders mitigated to the same extent as

7   the class overall.  Their own expert last week testified that

8   that was a reasonable number, 60 percent.  They want to

9   depose --

10          THE COURT:  I'm sorry, 60?

11          MR. PRESS:  60 -- people who mitigated on average, 60

12  percent of their total loss.  And Mr. Murphy, one of their

13  experts testified last week he had knowledge that that is a

14  number that he would have expected to see.  And so to make

15  that assumption for the nonresponders is a reasonable thing to

16  do.  They want to attack this assumption by deposing two

17  people.  Of the 11, two fall into that one category, Judge.

18          THE COURT:  I'm sorry, what's the one category?

19          MR. PRESS:  The category of nonresponders.

20          THE COURT:  No, no, I understand that.  But two fall

21  into what category?

22          MR. PRESS:  Two of the 11 depos.

23          THE COURT:  The other nine are responders who did

24  respond.

25          MR. PRESS:  Right.

1          THE COURT:  Two were nonresponders.

2          MR. PRESS:  Correct.  And there's no way you can form

3   any sort of meaningful conclusion by taking two depositions of

4   the 400 people who did not respond.  It's simply -- it's not

5   relevant.  It won't be admissible.  And so it shouldn't be

6   allowed now.

7          The other category that Mr. Cohen mentioned was the

8   expert's assumption that people will accept recall if offered.

9   The other assumption is to assume nobody will or some

10  percentage will.  And they want to attack that assumption

11  which is inherently speculative, what people will do in the

12  future.  They want to attack that by deposing six people of

13  11.  Six of the 11 fall under that category.  Again, that will

14  never provide you anything meaningful, statistically, to say

15  what people in the future are going to do.  And so we would

16  urge you to not allow this discovery, Judge, and --

17         THE COURT:  But your expert made an assumption it was

18  going to be a hundred percent were going to come back, right?

19         MR. PRESS:  That's true.

20         THE COURT:  Is that -- even for someone who knows

21  nothing about the airline industry, just some stranger coming

22  on to the -- is that a reasonable assumption?

23         MR. PRESS:  I think so.  The alternative is to do

24  something completely arbitrary.

25         THE COURT:  Well, isn't that just as arbitrary as any

1   other assumption?

2          MR. PRESS:  Well, that's --

3          THE COURT:  You say doing something completely

4   arbitrary.  It seems counterintuitive, to some degree.  But

5   given, you know, the opportunities that people have and, you

6   know, what they -- you know, they start to need something

7   because they're not, you know, because they're on furlough and

8   they like what they're doing and they don't want to come back.

9          MR. PRESS:  Judge, there's another point to be made

10  on this particular issue that goes -- it doesn't even -- you

11  don't have to even-- we don't have to argue that point and

12  that's this:  When American Airlines offers recall to a former

13  TWA pilot, which has happened and it has for years now, when

14  that happens, let's say the first person that's offered that

15  position says, nah, I don't want to go back to American

16  Airlines with my horrible seniority number.  I'm just going to

17  stay with what I'm doing.  Then that position gets offered to

18  the next person down and so on and so forth until somebody

19  actually accepts the job.

20         So again, when you're looking at class-wide damages,

21  this is irrelevant, who actually takes the job, for the most

22  part.  The job is getting filled and somebody's mitigating

23  with that income.  And that's the point, Judge.

24         And so Mr. Salamad's assumption is perfectly

25  appropriate in this case.  If they want -- I'm sure they'll

1   have something at trial to say about it, but that goes to the

2   weight of it.  And to let six people come into court and

3   testify, well, I wouldn't accept a recall; that's not going to

4   be helpful to the jury.

5          The third category of deponents or witnesses they would

6   like to depose are people who they want to try to solicit

7   opinions from that I was not damaged.  They've done this

8   repeatedly in the nine depositions of pilots that they've

9   already taken, and so now they want to -- they want to try to

10   get some pilot to testify that, you know, the experts got this

11   money in here, saying you were damaged by this amount; do you

12   believe that?  And the witness would say, no, or whatever the

13   witness says.

14          This is irrelevant, Judge.  I cannot see that you would

15   allow a parade of pilots to come in and tell the jury whether

16   or not they were damaged and to what extent.  You will get

17   wide, diverging opinions on that issue.  And you open up this

18   box, that fairness will dictate that we get to call pilots

19   that would tell the jury I was damaged a million dollars or

20   whatever.  I don't think we should go down this road, Judge.

21   It's not relevant and it won't be helpful to the jury to have

22   nonexperts testify whether they were damaged and to what

23   extent.  And so for all three categories, all 3-11 witnesses,

24   Judge, we would ask you to deny this.

25          THE COURT:  All three categories.

 1          MR. PRESS:  All three categories, totalling 11.

 2          Do you have any questions of me, Judge?

 3          MR. COHEN:  Your Honor, can I just response?

 4          THE COURT:  I would like to hear -- although I would

 5    like to hear --

 6          MR. COHEN:  Very, very briefly, Your Honor.

 7          On the first category, Mr. Press said, you know, that

 8    testimony is not admissible.  Why not?

 9          THE COURT:  Well, I'm not going to rule on

10    admissibility right now, unless it was so obvious, you know.

11    The standard is mainly to the discovery of a witness.  It's

12    not admissibility.  The evidence is not the same rules.

13          MR. COHEN:  Right.  It's also, Your Honor, being

14    developed for cross examination.  I think their expert at some

15    point are going to ask for a *Daubert* hearing that's before the

16    jury, you know, is hearing him, and he's going to have to

17    explain how he made these assumptions and he's not going to

18    concede they were arbitrary.  He's going to say they were

19    reasonable and we're going to say did you base it on anything.

20    And there is no evidence at the moment.

21          And, you know, the problem with, you know, Mr. Press's

22    argument is this is not just aggregate damages.  Again, Your

23    Honor is going to see a lot more of this when you see the

24    *Daubert* motion.

25          This model was constructed basically around bands of

*United States District Court*
*Camden, New Jersey*

 1   folks of where they are.  So he builds up from individual

 2   damages based on a series of assumptions.  He doesn't say,

 3   well, I've thought about this and damages for the whole class

 4   is $500 million.  It's not like a securities case where they

 5   say know, you know, the price was inflated by $3, so the

 6   damages for this entire period are 500, and how you whack up

 7   the damages, I don't really care.  He has a model.  He moves

 8   people around in the model, computes damages based on where

 9   they fall within the list as banded by a large group on either

10   side of where the individual plaintiff is.

11        So these individual assumptions matter.  They matter to

12   the aggregate amount of damages, and we want the ability to

13   show that there simply --

14        THE COURT:  What do you make of this argument that no

15   matter what the deposition shows -- assume the deposition

16   shows something that's at odds with the assumption the expert

17   made.  But when you're dealing with one of 2200 pilots, that

18   there's just no statistical relevance or accuracy.

19        MR. COHEN:  Well, I think what I'm trying --

20        THE COURT:  That's what, to some degree, you're

21   saying.  What can you get?  You get 2200 pilots.  It's one

22   thing if you sample 400 pilots or you sample 300 pilots and

23   get -- that's one thing.  But if you sample two or four or

24   six, what are you going to get?  You are getting random

25   numbers.

1          MR. COHEN:  We are happy to take the information from

2     400.  I didn't think Your Honor would be excited about that.

3          THE COURT:  No, I wouldn't.  No.  Excited, I would

4     not be, that's correct.

5          MR. COHEN:  What we're trying to do, Your Honor, is

6     to demonstrate the flaw in the plaintiffs' expert's model.

7     We're not trying to recalculate damages for him.  We have a

8     whole series of attacks on him.  We are not trying to

9     recalculate damages by adjusting for each individual pilot.

10    We are trying to demonstrate exactly what Your Honor said,

11    that his assumptions are arbitrary.  It's their burden on the

12    setoff.  If he makes an assumption that everyone is going to

13    continue to work, all right?  You know, or that, that, you

14    know, that the setoff damages for the 400 people who didn't

15    respond is the same as the people who did.

16         If the only evidence before Your Honor is that the

17    folks who were actually questioned about -- who didn't put

18    those declarations in and actually don't agree with his

19    assumptions, we're going to ask Your Honor to throw out his

20    model at least with respect to that assumption.  That's what

21    we're going to try to do.  It is their burden.

22         We're not trying to recalculate damages through these

23    experts.  We're trying to demonstrate that there are a series

24    of assumptions that are counterfactual.  And then the question

25    is, should he be allowed to testify.  And there are -- you

1    know, we have attacks with respect to many pieces of his

2    model, most of which we're not seeking discovery for, because

3    we understand the arguments we're going to make.  But these

4    are going to be concrete examples.

5         Your Honor will ultimately rule whether or not that

6    affects the reliability of his opinion.  But we want to take

7    some evidence to show it's not reliable.  It's not our fault

8    that the plaintiffs didn't seek this information.  They could

9    have asked a question in their questionnaire:  Dear Mr. -- if

10   you're a voluntary -- you know, if you haven't come back to

11   American and you are offered employment, do you intend to go

12   back.  It is a question.  They could have gotten some yeses

13   and more than likely -- you know, likely we would have gotten

14   a lot of no's, probably overwhelming no.

15        They chose not to ask that question.  Having chosen not

16   to ask that question and converting it into yes, my expert is

17   go to assume it's a reasonable assumption that everybody is

18   going to go back.

19        You know, the problem doesn't lie with us, it lies with

20   the plaintiffs.  So let us take some limited amount of

21   discovery to demonstrate that point to Your Honor.  That's all

22   we're trying to do.  We're not trying to come up with

23   representative sample.  This is not discovery that's going to

24   underline our expert's damages model.

25        THE COURT:  Okay.  Thank you, Mr. Cohen.

*United States District Court*
*Camden, New Jersey*

1          All right.  Let's go to the other motion now and,

2    again, this is the motion for discovery of the union dues over

3    the -- I can't remember whether it was 18 months or something

4    like that.  Over the period of time.

5          MS. RODRIGUEZ:  January 1st, 2001, Your Honor, to

6    April 3rd, 2002.

7          THE COURT:  How long is that?

8          MS. RODRIGUEZ:  12, 13, 14 -- 15 months.

9          THE COURT:  15.  Okay.  I was wrong, it was 15

10   months.  To discover what the union dues were during that

11   period that the union was infected with an illegal conflict.

12         So -- now, you argued -- I think you pleaded in the

13   Complaint that it was three million a year.

14         MS. RODRIGUEZ:  On information and belief, Your

15   Honor, yes, that they collected approximately $3 million a

16   year.  Your Honor, we need to start with the premise that

17   there is no prohibition under the Railroad Labor Act with

18   awarding disgorgement or restitution of union dues as a matter

19   of law.  The statute provides and contemplates resort to usual

20   judicial remedies, and the import is that through the use of

21   usual judicial remedies, the plaintiff is made whole.  And

22   that's the whole goal of the Railroad Labor Act.

23         So then you need to look at in this case will the class

24   be made whole by allowing the restitution of union dues.  And

25   the question is really, under the facts of this case, is it

1    punitive or is it compensatory.  And we have a finding that

2    the union breached its duty of fair representation, that

3    during the period of time that it was purporting to negotiate

4    on behalf of the TWA pilots and, in fact, had a conflict of

5    interest and its interest lie otherwise, and that that whole

6    process was tainted.  That whole process was affected.

7         You hear defendants come forward now and take shots at

8    plaintiffs' expert who -- both their experts who put together

9    a reconstituted but-for seniority list.  But even other than

10   that but-for seniority list, there are people at the bottom of

11   the list that, given a number of assumptions, still wouldn't

12   receive backpay damages under that.

13        And so for those people, restitution of dues is

14   something that would make them whole.  And you look at the

15   cases in the union context even, that provide for disgorgement

16   of fees and it is in that context where the fees were

17   improperly spent, political contributions or otherwise,

18   improperly spent.  And that's a situation you have here.

19        You have union members who paid their dues, they paid

20   the dues for a union to negotiate on their behalf, and the

21   union didn't.  It's akin to those cases where the court awards

22   disgorgement of attorneys fees as we cited in our brief.

23        The defendants cite Addington as support for the

24   proposition that disgorgement is inappropriate.  But

25   Addington, while recognizing that there are situations where

1   disgorgement may be appropriate, Addington is not this case,

2   because in Addington you have the union on both sides of the

3   transaction.  And you were talking about the union that

4   favored one group of pilots over the other group of pilots.

5   You don't have that in this case.

6        THE COURT:  This doesn't really match the expenditure

7   case, though, does it?  There's not an argument here where

8   somebody has spent some money they shouldn't have spent, like

9   political expenditure cases.  You can actually identify and

10  say, this money was spent, you know, on something which you

11  shouldn't have spent it on.  I don't know that there's any

12  evidence in the record anywhere that there was any particular

13  expenditure that they made that was wrong.

14       MS. RODRIGUEZ:  Well, there is evidence in the

15  record -- I agree that this isn't clear on all fours with

16  those expenditure cases, but there's certainly evidence that

17  was adduced at trial that they spent money inappropriately,

18  for instance, the dinner in Las Vegas.  I mean, that only

19  amounts to a thousand dollars, but it's -- but to say there's

20  no evidence, there's evidence, Your Honor, that the union took

21  the union dues and they used it for an illegal purpose.  They

22  used it to court the American pilots.  No, we don't know --

23       THE COURT:  There's no real evidence -- maybe some

24  small things, but nothing amounts to more than you say, a

25  couple thousand dollars that says they were, according to

1  your -- the real heart of your argument is, I mean, the

2  evidence you put in was that there was a bunch of things they

3  could have done.  You add all that stuff about the jump seat

4  war.  We had stuff about the -- you know, basically it was a

5  litigation strategy.  Fundamentally, various kinds of legal

6  suits, you know, to dump things up and just taking a very

7  aggressive posture.  But I don't see where expenditures were

8  involved.  There was a failure to expend, maybe, more than the

9  actual expenditure.  It was like, you should have hired me.

10  Who was that lawyer who had recommended a litigation strategy?

11         MS. RODRIGUEZ:  Roland Wilder.

12         THE COURT:  What?

13         MS. RODRIGUEZ:  Roland Wilder?

14         THE COURT:  I think so, right.

15         You know, it was like, you should have hired me to do

16  this, you know.  And -- so it was like a failure to expend,

17  more than a theory that you expended it.  It was like you

18  should have done all these things and you didn't do it.

19         MS. RODRIGUEZ:  But those cases are instructive,

20  nonetheless, because you've got the union member paying

21  money -- they are paying their union dues for the union to act

22  on their behalf and the union didn't act on their behalf.

23         And so, no you can't, and I don't think it's

24  appropriate to parse out and say, well, they spent this money

25  and this money and this money courting the American pilots.

1  But what they did do is they took money and they didn't do

2  anything.  And it's not an instance like in Addington where

3  you've got two pilot groups, so you take from one pilot group,

4  you disgorge -- you cause the union to disgorge this pilot

5  group, and this pilot group is also represented as being hurt.

6  That's not the situation.

7       THE COURT:  There is no merger with American.  Those

8  would have been the same.  So whatever they were spent on,

9  they would have -- I'm having a little trouble with that.

10      MS. RODRIGUEZ:  We're only -- we're asking for the

11 disgorgement of union dues for that period of time when the

12 union was not acting on behalf of the TWA pilots.  They had

13 their own agenda, they had a conflict of interest.  They

14 had -- the union was not --

15      THE COURT:  What kind of discovery -- how do you want

16 to take that discovery?  Tell me what you want to do.

17      MS. RODRIGUEZ:  We asked for document request.  They

18 are simple document requests, Your Honor.  They're attached to

19 our brief and there's an Interrogatory.  We didn't ask for

20 deposition, we asked for Interrogatory.

21      THE COURT:  So you want written discovery.

22      MS. RODRIGUEZ:  We want written discovery.  And just

23 briefly, Your Honor, the Complaint, the defendants attack the

24 Complaint for failure to plead restitution.  There's no

25 requirement that restitution be pled specifically.  Our

*United States District Court*
*Camden, New Jersey*

1   Complaint asks for compensatory damages and other relief

2   that's equitable and just.

3        MR. COHEN:  Your Honor, let me start, if I may, with

4   the last point because it's of some importance to us.  I don't

5   know, when people want to have a theory of restitution, they

6   plead it, in my experience.  You know, this harks back for us

7   to standing at this lectern, losing a motion on mitigation in

8   which the plaintiffs made the argument that we had never

9   asserted an affirmative defense of mitigation and, therefore,

10  we should not be able to take any discovery and pursue it.

11       There has never been a pleading in this case in which

12  they sought as a remedy restitution union dues.  The first

13  time we heard about it is in the context of this discussion.

14  The problem is not responding to their Interrogatory or the

15  doc request.  The number is what the number is for whatever

16  that period is.  We will have to do some backing and filling

17  to figure out exactly what the dues are in the 15-month

18  period.  The problem is, if this is going to be a claim that's

19  advanced at trial, we have to defend ourselves.  And this is

20  not a case, as Your Honor said, in which the dues were somehow

21  improperly extracted.

22       THE COURT:  Yeah, I found a big difference between

23  the expenditure cases, particularly with our political

24  expenditures, you know, for political campaign contributions.

25       MR. COHEN:  Right.

 1          THE COURT:  From this case.  Because this is -- has a

 2     nonexpenditure case.

 3          MR. COHEN:  Right.  And what we have here, Your

 4     Honor, if they're going to advance this case, we're going to

 5     have to mount a defense that with respect to probably the

 6     overwhelming amount of the dues that were collected, that the

 7     dues were properly spent, the union was functioning, it was

 8     providing services to the TWA pilots.  It wasn't all somehow

 9     spent improperly and it's not like -- you know, the league of

10     the lawyers case doesn't really -- the lawyer analogy doesn't

11     really apply.  It hasn't been applied in this case.

12          Well, there is one case that deals exactly with this

13     issue.  It's the Addington case.  And the fact that the union

14     was on both sides really doesn't make a difference.  It's

15     exactly the same allegation was made in that case.

16          So the question is, at this point in the case, having

17     never articulated a claim for restitution, are we now going to

18     have to defend it?  Are we going to have to adduce evidence?

19     Are we going to have to burden the jury at a trial with

20     saying, well, of the X million dollars -- I don't know the

21     number.  Let's take the three million dollars that they play

22     on information and belief, that 2.7 million was properly spent

23     because we had a health and welfare fund and we made mailings

24     and we lobbied in Washington on behalf of all pilots,

25     including the TWA pilots, and we advanced the legislative

1   agenda.  That was obviously in the interest of the TWA pilots.

2          They can't possibly mean that they get restitution

3   because we violated our duty that, therefore, you know, they

4   get restitution of all of those dues.  So it opens up an

5   entire different line of discovery and evidence that hasn't

6   been in this case.  And with all due respect to the plaintiffs

7   simply by saying --

8          THE COURT:  But it's not evidence that you're not in

9   control over.  I mean, whatever evidence you would need to

10  defend, if that's the issue, you control that evidence.  You

11  have access to it, you know what it is.  It's not like it's

12  some evidence that you would need discovery --

13         MR. COHEN:  I understand that, Your Honor.

14         THE COURT:  -- to get from them.  You follow what I

15  mean?  Sometimes you raise a new issue in a case and it

16  requires discovery to defend it.  This doesn't require

17  discovery.  But let's assume you had not planned to resist

18  restitution.  Now you want to resist it.

19         MR. COHEN:  Then I'd have to go back and figure

20  out --

21         THE COURT:  It's all within your control.

22         MR. COHEN:  Yes, but it's not --

23         THE COURT:  You know what you spent on pushing the

24  legislation in Washington.  You know what you spent -- well,

25  just for things like payroll.  Remember, most of the money --

1   at least a lot of the money goes to payroll.  You have staff

2   in the union, it goes to that.  It goes to the building or

3   rental, I don't know if they own the building or rent the

4   building.  You know, it goes for administrative expenses.  It

5   goes for a lot of different things.  That's all within your

6   control.

7           MR. COHEN:  Absolutely correct, Your Honor.  But

8   there is still a question of fundamental fairness, which is,

9   do you get to change your damage -- their experts -- these are

10  not make-whole damages.  Their expert's opinion is the damages

11  under their models make everyone whole.  That's the opinion of

12  their experts.  This isn't in excess of compensatory damages.

13  This is saying, well, apart from everything I need.

14          What's their damage theory?  Their damage theory is, if

15  you had acted properly, the list would have been X rather than

16  Y.  Their expert says if the list had been X rather than Y,

17  here are the damages.

18          THE COURT:  You mean the staple point.

19          MR. COHEN:  Correct, right.  Here are the damages

20  that flow to a class.  That makes everybody whole.  So by

21  definition, these are not compensatory damages, which is

22  exactly what the Addington case from Arizona was about, in

23  exactly this context, was:  Are these punitive noncompensatory

24  damages that are not recoverable in a case such as this.  And

25  there's nothing that Addington case that suggests because the

1  same union was on both sides it made any difference.  I mean,

2  that's -- there is a factual distinction, but it's one that's

3  not recognized or commented upon by the Court.

4      And again, Your Honor, you know, we -- it's very hard

5  for us, having lost that mitigation defense, because we didn't

6  plead it in ten years, to say that the plaintiffs can come in

7  with a new theory and say, well, we said and other unjust

8  relief, so we covered ourselves somehow.  You know, there's

9  nothing in this Complaint.  All they do is mention the amount

10 of dues.  They don't say the dues were taken inappropriately,

11 that the union isn't -- isn't entitled to keep the dues

12 because they acted in a breach of fiduciary duty.  They've

13 never raised any of that before.

14     So again, we're not arguing that the discovery is

15 burdensome.  What we're saying is, the time to take the issue

16 out of this case is now, because they missed the time to

17 inject into in the case.

18     MS. RODRIGUEZ:  Just briefly, Your Honor.  I just

19 want to note one huge difference.  Mr. Cohen talks about being

20 here --

21     THE COURT:  Quite candidly, if you want to talk about

22 anything, both of you, I'm less interested in the argument

23 that wasn't pled than I am in what would be the theory of the

24 admissibility over the relevance of that.  I mean, if you --

25 if you're developing a model, or your experts are developing a

1   model, models or a model, singular, which say this is what you

2   would have to do to put the pilots in the same position they

3   were had the union been a vigorous advocate for them.  What

4   would be the theory of also getting your dues back?  Because

5   if you get everything you're entitled to, even if you have to

6   resort to litigation to get it, why should you also get your

7   dues back?

8         MS. RODRIGUEZ:  Well, I think there's two parts to

9   that.  And the first is, we've -- our experts put forth the

10   but-for list and --

11         THE COURT:  I'm sorry?

12         MS. RODRIGUEZ:  A but-for seniority list.  The

13   experts that we have created a but-for seniority list.  But

14   for ALPA's breach, this is what a reasonable list would have

15   looked like.  And that's what their reports talk about.

16         THE COURT:  They weren't pushed to that.  They sort

17   of got to do that, in a way, but all right.

18         MS. RODRIGUEZ:  Defendants are -- and we think that

19   those are valid and we think that when Your Honor has the

20   opportunity to see them in the context of a *Daubert* motion,

21   that you'll agree and those are appropriate damage remedies,

22   but perhaps you won't.

23         And the difference, again with Addington is, Addington

24   was after the court already found -- those pilots got the

25   seniority list that was negotiated for.  They got the nickel

1    analyst.

2            THE COURT:  Well, are you saying this is like an

3    alternate remedy?

4            MS. RODRIGUEZ:  It is an alternate remedy.  It's an

5    alternate remedy.  We don't know what the damage -- we know

6    what we think is an appropriate theory.

7            THE COURT:  In other words, you're saying if, for

8    some reason, your expert's model gets rejected at the *Daubert*

9    stage --

10           MS. RODRIGUEZ:  It is --

11           THE COURT:  I'm not saying -- by the way, I'm not

12   saying it is.  But what you're saying to me is if a *Daubert*

13   would rule that the -- I rule that the expert is not

14   admissible, he's not going to be allowed to testify as to his

15   model of what the make-whole damages are, that you would be

16   entitled to an alternate remedy of the restitution.

17           MS. RODRIGUEZ:  Or if you think a portion of the

18   damage analysis is inappropriate, then it's an alternative

19   remedy for those people.  But it's certainly --

20           THE COURT:  Well, that really complicates it.

21           MS. RODRIGUEZ:  But the issue for Your Honor has to

22   be, is it -- in the context of this case, is it punitive.  And

23   really, sitting here today, you can't make that determination

24   until you know what the damages are that are awarded.  It's --

25   this is a discovery motion.  I understand the bigger

1  ramifications of it.  But sitting here today, you know that

2  unlike mitigation, which the rules require to be pled, there's

3  no requirement that restitution be pled, so there's no

4  inherent unfairness.  You know that we've got damage models

5  that put forth a but-for list that the defendants -- Mr. Cohen

6  said, we've got thousands of attacks on their expert.  So we

7  know all that and you know that we're asking for a small

8  segment of discovery that may be relevant when push comes to

9  shove and we're on trial and what our damages are.

10         THE COURT:  But if it's relevant -- in your view,

11  it's relevant as an alternate remedy, not as a cumulative one.

12         MS. RODRIGUEZ:  It's certainly not cumulative.

13         THE COURT:  It's not like I want to get everything

14  that my expert says would make -- I call it the make-whole

15  remedy that the models of the expert are going to create.  But

16  what you're really saying is if you don't get that, this could

17  be an alternate to that.  You're not saying you could get this

18  on top of --

19         MS. RODRIGUEZ:  If you're talking about compensatory

20  plus, then that's punitive.  We're talking about -- yes, Your

21  Honor.

22         THE COURT:  Okay.

23         MR. COHEN:  Your Honor, can I --

24         Only when Ms. Rodriguez is finished.  Let her finish

25  and then when she's finished, I'll let you speak.

*United States District Court*
*Camden, New Jersey*

 1          MS. RODRIGUEZ:  But again, I end where I start.  You

 2   need to look at it under the facts of this case, is it

 3   punitive.  And Addington recognized that there are situations

 4   and not limited to the political contribution cases, but

 5   neither the Railroad Labor Act, nor the cases themselves have

 6   any prohibition on disgorgement.  We have damage theories that

 7   we think are appropriate and that we think will prevail.  But

 8   this is a alternative damage theory.  The discovery we seek is

 9   minimal and we ask the Court grant our motion.  Thank you.

10          THE COURT:  Yes, Mr. Cohen.

11          MR. COHEN:  I think, that with all due respect, while

12   Ms. Rodriguez said she was agreeing with you, I think that

13   from my seat you may be speaking past each other.  I want to

14   make sure that we're clear.

15          THE COURT:  Well, you understand what I was saying?

16          MR. COHEN:  Yes.  I think really what Ms. Rodriguez

17   acknowledged is that if their expert's theory, if he were

18   allowed to testify and the jury awards exactly what

19   Mr. Salamad says the damages are, they have been compensated

20   wholly and they can't get anything else.

21          What she then went on to say was not what Your Honor

22   asked, I think, an alternative damage theory.  I think what I

23   heard her say, which I have a disagreement with is, well,

24   let's say, you know, he asks for 500 but the jury only gives

25   300, right, in response to that, then we can also get this,

1    because we were entitled to 500.

2         No, you weren't entitled to 500.  That's what the jury

3    found.  So there's a difference between saying, if I get

4    something less than what I want, there's an alternative damage

5    theory, and, if I don't get anything, under the Salamad

6    testimony, then I get this, which would be an alternative

7    damage theory.  And I don't think I heard it as an alternative

8    damage theory.

9         So it can't be that the rationale for this is, well,

10   you may chip away at Mr. Salamad, because we think his number

11   is make-whole damages.  If we get anything less --

12        THE COURT:  Yeah, yeah, I suppose the jury can say,

13   I, in part, accept the model but I also, in part, accept some

14   of the things your expert is going to say and, therefore,

15   instead of giving 500 million -- I'm making that number up.

16   But if he got 75 hundred million, I'm going to give him 150

17   million.

18        MR. COHEN:  Right.  Go a little lower, Judge.  I

19   would feel better.

20        THE COURT:  All right.  15 million instead of 50

21   million.

22        MR. COHEN:  But what I'm saying, that's make-whole

23   damages found by the jury.  You don't then get to say that I

24   also want these damages now, because if I get less than 500,

25   it's make-whole.

1      So if there's any -- you know, you know, unless and

2 until --

3      THE COURT:  Generally, in contract law -- now I'm not

4 talking about contract law.  If I remember back 50 years to

5 my -- I had a famous teacher in contract.  Restitution would

6 generally be an alternate to regular contract damage with the

7 standard, if there's such a thing as standard contract

8 damages, is you get what you would have gotten had the breach

9 not be made.  The idea is to make you whole, you know, as to

10 where you were.  But if, for whatever the reason, that could

11 not be done because of the nature of the contract, something

12 that had made that one possible alternative, in particular

13 situations was restitution, where you get back -- where you

14 get back -- you don't necessarily get the profits you would

15 have made from the contract, but you get back what you spent.

16 But they're not -- they're not normally cumulative.  You only

17 get restitution on top of what I call regular contract

18 damages.  All right.

19      MR. COHEN:  That's consistent with my understanding,

20 Your Honor.

21      THE COURT:  Anything you want to add?

22      MS. RODRIGUEZ:  No, Your Honor.

23      THE COURT:  Okay.  The -- I will give you something,

24 not long, but I'll give you something in writing on this

25 and -- could I see you inside for a few minutes?  If you're

*United States District Court*
*Camden, New Jersey*

1   not rushing to go look at your new offices or something like

2   that.

3         Are you going to stay -- physically, are you going to

4   stay where you are?

5         MS. RODRIGUEZ:  Physically, for the next month, we

6   are where we are, but they have offices on Route 38 in Cherry

7   Hill in the Woodland Falls complex.  So eventually, we will be

8   moving over there.  But for the time being, we are physically

9   in our own spaces.

10        THE COURT:  How many people do you have that you have

11  to move into Schnader?

12        MS. RODRIGUEZ:  All together, there are three people

13  that have moved into Philadelphia, and then Nicole and I in

14  New Jersey and a paralegal.

15        THE COURT:  Okay.  By the way, good luck,

16  congratulations.  Good luck.

17        MS. RODRIGUEZ:  Thank you.

18        THE COURT:  Schnader is a great firm.

19        (12:53 p.m.)

20

21

22

23

24

25

*United States District Court*
*Camden, New Jersey*