# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, et al.<br><br>        Plaintiffs,<br><br>        v.<br><br>AIR LINE PILOTS ASSOCIATION,<br>INTERNATIONAL,<br><br>        Defendant. | Civil Action No. 02-2917 (JEI) |

---

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION TO BAR EXPERT OPINION TESTIMONY FROM MICHAEL E. LEVINE AND JAMES S. FELTMAN AND TO LIMIT EXPERT OPINION TESTIMONY FROM KEVIN MURPHY

---

**SCHNADER HARRISON SEGAL & LEWIS LLP**
Lisa J. Rodriguez
Nicole M. Acchione
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1165
(856) 482-5222

**GREEN JACOBSON, P.C.**
Allen P. Press
Joe Jacobson
7733 Forsyth Boulevard, Suite 700
Pierre Laclede Center
St. Louis, Missouri 63105
(314) 862-6800
Attorney for Plaintiffs


August 22, 2013

## **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................ 1

II.   ARGUMENT............................................................................ 3

      A.    Levine and Murphy's Opinions Regarding Causation and Liability
            Violate the Seventh Amendment and Should Be Barred..............3

      B.    Levine and Murphy's Opinions Will Not Aid the Jury................…..9

      C.    Evidence of TWA's Viability is Not Relevant to a Determination
            of the Class's Damages…………………………………………10

      D.    Evidence That TWA Was Not "Viable" Does Not Rebut Plaintiffs'
            Experts………………………………………………………14

            1.    Rikk Salamat…………………………………………...15

            2.    Dr. Henry Farber………………………………….....16

III.  CONCLUSION…………………………………………………...19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bensel v. Allied Pilots Association,*
  387 F.3d 298 (3d Cir. 2004)...............................................................5

*Burlington Industries, Inc. v. Milliken & Company,*
  690 F.2d 380 (4th Cir. 1982) ..............................................................9

*Columbia Pictures Television, Inc.* v. *Krypton Broadcasting of Birmingham,*
  *Inc.,*
  259 F.3d 1186 (9th Cir. 2001) ............................................................8

*Houseman v. United States Aviation Underwriters,*
  171 F.3d 1117 (7th Cir. 1999) ............................................................7

*In re Innotron Diagnostics,*
  800 F.2d 1077 (Fed. Cir. 1986)........................................................6, 7

*In re Paoli, Railroad Yard PCB Litig.,*
  113 F.3d 444 (3d Cir. 1997)...............................................................7

*In re Paoli Railroad Yard PCB Litig.,*
  35 F.3d 717 (3d Cir. 1994)................................................................9

*In re Rhone-Poulenc Rorer, Inc.,*
  51 F.3d 1293 (7th Cir. 1995) .............................................................7

*In re Trans World Airlines,*
  2001 WL 1820326 (Bankr. D. Del. April 32, 2001)...........................12

*McDaniel v. Anheuser-Busch, Inc.,*
  987 F.2d 298 (5th Cir. 1993) .............................................................7

*Yarchak v. Trek Bicycle Corp.,*
  208 F.Supp.2d 470 (D. N.J. 2002) .....................................................9

OTHER AUTHORITIES

*Fed.R.Evid. 702* ...................................................................................2, 9

Fed.R.Evid. 402.......................................................................................2

Fed.R.Evid. 403.........................................................................................................2

## I.   PRELIMINARY STATEMENT

The jury found that the Air Line Pilots Association, International breached its duty to fairly represent the former TWA pilots *and* that ALPA's breach caused injury to some TWA pilots. The jury's verdict left unresolved the amount of damages suffered by the Class. Plaintiffs retained two experts to assist the damage-phase jury in determining damages.

In response, ALPA disclosed five experts, none of whom offer an opinion as to the amount of damages suffered by the Class. Rather than litigate damages, ALPA has chosen to relitigate liability and causation. Three of ALPA's expert witnesses, Michael E. Levine, Kevin M. Murphy, and James S. Feltman, offer opinions to rebut the jury's verdict. Plaintiffs' motion is limited to these three expert witnesses.[1]

Levine's entire report attempts to impeach the jury's liability verdict in violation of the Seventh Amendment. Levine opines that ALPA is not liable and did not cause damages to the Class:

> TWA's pilots had very poor prospects at the time of the acquisition and the American pilots knew it, so there was no prospect of improving them through different negotiating tactics and the TWA pilots therefore had little if any choice but to accept the American pilots' offer.

---

[1]     The Report of Michael E. Levine dated March 15, 2012 is attached as Exhibit 1 and the errata for his Report is attached as Exhibit 2.  The Report of Kevin M. Murphy dated June 7, 2013 is attached as Exhibit 3 and the errata for his Report is attached as Exhibit 4. The Report of James S. Feltman dated March 15, 2012 is attached as Exhibit 5.

Ex. 1, Levine Rpt., p. 7, ¶ 3.

Levine also opines about TWA's pre-merger viability and concludes his 37-page report by stating that TWA's bankruptcy was necessary to avoid liquidation and that TWA had no viable alternatives to filing for bankruptcy and merging with American. Ex. 1, Levine Rpt., p. 37.  Levine's opinions concerning TWA's pre-merger viability are not relevant and are unduly prejudicial under Federal Rules of Evidence 402, 403 and 702.

Feltman's report is cumulative of Levine's opinion concerning TWA's pre-merger viability. He concludes his 44-page report that, given TWA's financial condition, it was unreasonable to assume TWA would have continued as an ongoing concern. Ex. 5, Feltman Rpt., p. 44. Again, TWA's ongoing viability as a stand-alone airline is not at issue in the damage phase of the case.

Finally, Murphy's report, although broader in scope than Feltman's or Levine's, offers some of the same opinions.  For instance, Murphy states:

> [I]t is my opinion that Supplement CC was consistent with the economics of bargaining which is consistent with the TWA pilots suffering no damages as a result of its implementation.

Ex. 3, Murphy Rpt., ¶ 147. Because this opinion impermissibly impeaches the jury verdict in violation of the Seventh Amendment, Murphy should be precluded from rendering any opinion that Supplement CC was consistent with the economics of

bargaining and that the TWA pilots suffered no damages.

The Court should bar ALPA from presenting the expert opinion testimony of Levine and Feltman in their entirety, and its presentation of Murphy's testimony should be limited. All three opinions stray outside the bounds of permissible expert testimony.

## II.   ARGUMENT

### A.   Levine and Murphy's Opinions Regarding Causation and Liability Violate the Seventh Amendment and Should Be Barred.

According to Levine, TWA's financial condition was so dire that Supplement CC was the inevitable outcome and the TWA pilots have therefore not been damaged. Levine devotes 10 pages in his report to explain why the TWA pilots had "no prospect of improving" the seniority integration, and had "little if any choice but to accept the American pilots' offer." Ex. 1, Levine Rpt., p. 7, ¶ 3; pp. 26-36. He concludes his analysis by stating: "With negligible bargaining leverage and a non-viable airline, TWA pilots *were fortunate* to have secured any deviations from an arrangement that stapled all of them to the bottom of the American seniority list." *Id.* at p. 36 (emphasis added). At his deposition, Levine specifically testified, contrary to the verdict, that there was *nothing* ALPA could have done to improve the TWA pilots' seniority and, therefore, there were no

resulting damages.

> Q:    Do you agree that the overall outcome of the integration of the TWA pilots into American would have been more favorable had ALPA fairly represented the TWA Pilots?

> A:    …I believe that the aggregate position of the TWA Pilots *would not have been different* more or less *no matter what ALPA had done* because it was a function of TWA's condition and the APA's legal rights and its own internal politics and American's concerns.

Ex. 6, Levine Dep. Tr., 21:2-18; 24:2-8 (emphasis added).

Murphy devotes four pages in his report to explain why "Supplement CC is a reasonable outcome for the TWA pilots given the economics of bargaining." Ex. 3, Murphy Rpt., pp. 28-31. He concludes this analysis by stating: "Supplement CC was consistent with the economics of bargaining which is consistent with the TWA pilots suffering no damages as a result of its implementation." *Id.* at p. 57, ¶ 147.

Neither the jury's verdict, nor the Third Circuit's 2004 decision which expressly held that Supplement CC was not the "inevitable outcome" of the seniority integration, leaves room for ALPA to present evidence to the jury that the TWA Pilots could not have achieved a more favorable seniority integration than Supplement CC. The Third Circuit specifically held that "with appropriate continued representation by ALPA, a more propitious seniority agreement than Supplement CC could have been obtained for the Class." *Bensel v. Allied Pilots*

*Association*, 387 F.3d 298, 305 (3d Cir. 2004).

At trial, the jury rejected ALPA's argument that the TWA Pilots could not have reasonably expected a better seniority integration than Supplement CC in light of TWA's financial problems. After explaining to the jury the court's instruction on causation, Trial Tr. Vol. 18, p. 12:17-23 ("what they have to prove is that the overall outcome of the integration of the TWA pilots into American would have been more favorable, no different"), ALPA argued that the American pilots were justified in rejecting the TWA Pilot's seniority proposal, a proposal endorsed by ALPA and known the "Rightful Place Proposal" because:

> This is not a merger with a complete air carrier. Nor is it a transaction between equals.  It is a purchase by one of the largest and most financially stable global airlines of most, but not all, of the assets of a much smaller, largely regional carrier *that was within hours going out of business.*

Trial Tr. Vol. 18, 97:7-12 (July 11, 2011) (emphasis added). ALPA argued that the transaction with American "was the equivalent of catching the Hail Mary pass" *Id.*, 97:22-24, and urged the jury to read the APA's July 18 letter rejecting the "Rightful Place Proposal" as "it will help you understand why the TWA pilots had no leverage. They had no contractual leverage. They had no leverage in terms of appealing to the economics of the situation. It was a very difficult situation." Trial Tr. Vol. 18, 99:3-8. A major aspect of ALPA's defense was that, given TWA's

lack of financial viability, there was nothing ALPA could have done to improve the TWA pilots' seniority.

The jury rejected ALPA's evidence and arguments and determined through its verdict that, but for ALPA's breach, the TWA pilots would have received a more favorable integration. The Court's jury instructions explicitly required such a finding to return a verdict for the Plaintiffs:

> If Plaintiffs prove that ALPA's conduct was arbitrary or motivated by bad faith, they must then prove a tangible injury resulting from that conduct in order to prevail. A labor union can only be held liable for breach of its duty of fair representation if its breach directly causes injury to an individual or group to whom the duty is owed. *In this case, proving injury means that Plaintiffs are required to demonstrate that, but for ALPA's breach of its duty of fair representation, the overall outcome of the integration of the TWA Pilots into American would have been more favorable.*

Docket Entry No. 411 (Jury Charge, p. 14) (emphasis added). The resulting verdict read: "Did Defendant [ALPA's] violation of its duty of fair representation directly cause injury to some of the TWA Pilots?  Answer:  Yes."

Levine and Murphy's opinions contradict the jury's verdict. The Seventh Amendment to the United States Constitution prohibits a second jury from considering an issue already tried and resolved by the first jury. *In re Innotron Diagnostics*, 800 F.2d 1077, 1086 (Fed. Cir. 1986); *In re Rhone-Poulenc Rorer,*

-6-

*Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) (the Seventh Amendment dictates that a jury's findings of fact cannot be reexamined by a second jury). Thus, "when a court bifurcates a case, it must divide issues between separate trials in such a way that the same issue is not reexamined by different juries." *In re Paoli*, 113 F.3d 444, 452 n.5 (3d Cir. 1997). This is true of issues of causation in particular. *McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298, 305 (5th Cir. 1993) ("If the first jury decides the causation issue, the second jury cannot consider that same issue").

Here, causation and injury in fact were decided in the first trial. The Court need only look at its instructions and the verdict to conclude as much. *In re Paoli*, 113 F.3d 444, 452 (3d Cir. 1997) (court held issue of foreseeability was properly before the second jury because, in the first trial, there was no jury instruction on the issue of foreseeability, neither party requested such an instruction, and the jury interrogatories did not refer to foreseeability).

ALPA is precluded from relitigating these issues. In a bifurcated trial, the jury's verdict in the first phase becomes the law of the case and is given collateral estoppel effect. *In re Innotron Diag.*, 800 F.2d at 1085 (issues determined in first phase of bifurcated trial are settled and removed from consideration in second phase of case); *Houseman v. United States Aviation Underwriters*, 171 F.3d 1117, 1127 (7th Cir. 1999) (defendants cannot reargue issues settled in first phase of

-7-

trial).

Levine and Murphy's opinions on causation directly contradict the jury's verdict, and the admission of those opinions would violate the Seventh Amendment. [2] These opinions should therefore be excluded from trial.

## B.      Levine and Murphy's Opinions Will Not Aid the Jury.

Levine and Murphy's opinions are also irrelevant, and will not assist the jury in determining the damages suffered by the Class. The next jury will be required to answer one question: What are the Class's damages? Testimony that the Class has no damages and the TWA pilots were "fortunate" to get Supplement CC, the product of ALPA's breach, will not help the jury do its job. Such evidence would only confuse the jury.

Testimony that "is generally relevant to the question of liability rather than to the question of damages [is] properly excluded from the damages phase of the trial." *Columbia Pictures Television, Inc.* v. *Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001).  *See also Burlington Industries, Inc. v.*

---

[2]      ALPA requested the bifurcation. ALPA also insisted, over Plaintiffs' objection, that Plaintiffs prove causation and injury in fact as part of the liability trial. ALPA asserted in support of its motion to bifurcate that the first phase of litigation was "one that solely concerns the actions of ALPA in the 2001 negotiations that resulted in the seniority arrangements that ultimately emerged," while the second phase would "focus[] instead on the questions of how the individual pilots would have fared in 2002 and thereafter had seniority arrangements proved more favorable."  *See* Docket No. 112 (Def. Motion to Bifurcate, p. 14).  ALPA represented to the Court that "the underlying facts, the evidence necessary to establish those facts, and the witnesses who would testify to that evidence, *are entirely distinct* on the two issues." *Id.* at 15 (emphasis added).

-8-

*Milliken & Company*, 690 F.2d 380, 387 (4th Cir. 1982) (evidence of an *in pari delicto* defense "was not timely and was properly excluded" from bifurcated trial because it "goes to the issue of liability -- an issue finally settled in this case -- rather than to the extent of the damages").

For all these reasons, the Court should bar ALPA from presenting Levine's expert opinions in their entirety and should preclude testimony from Murphy that Supplement CC was a "reasonable outcome" and the TWA pilots suffered no damages.

## C. Evidence of TWA's Viability is Not Relevant to a Determination of the Class's Damages.

"Helpfulness to the trier of fact" is the ultimate touchstone in evaluating the admissibility of expert testimony. *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994). Expert testimony is only allowed if, among other things, the opinion "will help the trier of fact to understand the evidence or to determine a fact in issue." *Fed.R.Evid. 702(a)*. This has been referred to as the "fit" requirement – whether there is a relevant "connection between [the expert's opinion] and particular disputed factual issues in the case." *Yarchak v. Trek Bicycle Corp.*, 208 F.Supp.2d 470, 494 (D. N.J. 2002), citing *In re Paoli*, 35 F.3d at 741-43.

Levine, Murphy, and Feltman offer opinions that, absent the transaction with

American, TWA would have liquidated and its pilots would have lost their jobs. *See* Ex. 1, Levine Rpt., pp. 6-7; Ex. 3, Murphy Rpt., p. 6; Ex. 5, Feltman Rpt. Levine and Feltman in particular go to great lengths to support their opinions of TWA's lack of viability. Murphy based his opinion on Levine and Feltman's "assessment of TWA's financial condition." Ex. 3, Murphy Rpt., p. 60, ¶ 145. Regardless of their basis, these opinions are not relevant to the determination of the Class's damages. The opinions are also unduly speculative and should be excluded for that reason as well.

The liability jury heard substantial evidence concerning TWA's financial condition from several sources: ALPA's bankruptcy counsel, bankruptcy filings, and a TWA MEC member. ALPA, for instance, presented live testimony from attorney Richard Seltzer. *See* Trial Tr. Vol. 16 (July 6, 2011). Seltzer, who was involved in the January 2001 bankruptcy, testified extensively as to TWA's weak financial condition, Trial Tr. Vol. 16 95:17-25, and told the jury that TWA had only $20 to 30 million in cash which, from his past experience, he "knew was an extremely small amount of cash." *Id.* at 96:6-9. Seltzer testified that if the debtor-in-possession financing by American had not been provided, TWA "would not have had the money …. to make payments that were due." *Id.* at 96:10-19. Seltzer also described the bankruptcy court's opinion approving the transaction, in which

the judge said there was "a very very strong likelihood, if not certainty, that TWA would liquidate if this transaction did not go through." *Id.* at 110:6-12. He further testified that there were no alternatives to the American asset purchase. *Id.* at 97:23 – 98:23.

ALPA also presented the testimony of Steve Rautenberg, a former TWA Pilot and member of the TWA MEC. Like Seltzer, Rautenberg testified as to his perception of TWA's financial health both immediately prior to, and during, the bankruptcy.

> Q:   What conclusions, if any, did you reach from reviewing these documents about TWA's financial condition?
>
> A:   This was in the latter part of September, very early part of October, 2000, and the documents that I saw initially were for, I believe July, perhaps August, but I believe the initial documents were for July which is the heart of TWA's historic peak travel season and they…

[OBJECTION ADDRESSED BY COURT]

> A:   Yeah, July was the heart, the peak financial season for TWA and the documents showed that the company was missing its expense targets substantially by blocks of approximately $20 million on the wrong side of expenses and they were missing revenue targets on the wrong side of expenses by approximately $20 million. ….
>
> Q:   Did you continue to review similar financial documents through the end of 2000?
>
> A:   I did, as they became available, yes.
>
> Q:   What did they tell you about the company's financial circumstances?

A:     Similar results.  The situation was not improving.

Trial Tr. Vol. 13, 4:9 – 5:14 (Rautenberg, June 29, 2011).   Rautenberg also

testified as to TWA's viability post-bankruptcy.

Q:     And what conclusions or assessments did you reach during that
timeframe after the bankruptcy about the company's prospects for
survival as a stand alone entity?

A:     I didn't believe that the company had any prospects, post bankruptcy
filing, had any prospects of surviving as a stand alone entity, and I
had concerns that the company's failing performance in the
bankruptcy process were going to – was going to dissuade some of
the participates, i.e., American Airlines, from their continued interest.

*Id.* at 6:8-16.

ALPA introduced bankruptcy documents to show TWA's poor financial

health. *See, e.g.*, Exhibits D395, D396, D381, D380, D378, D12 (TWA's Section

1113 Motion), D211 (Declaration of Terry Hayes in Support of TWA's Section

1113 Motion), D397, D285 (TWA's Emergency Motion for Interim and Final

Orders), D288 (*In re Trans World Airlines*, 2001 WL 1820326 (Bankr. D. Del.

April 32, 2001).

The expert reports of Levine and Feltman rely, in large measure, on this

evidence, but TWA's viability is not at issue in determining damages, nor is its

ability to survive as a stand-alone carrier absent the acquisition. The transaction

closed, and ALPA *thereafter* failed to protect the TWA pilots' seniority in breach

of its duty to fairly represent them.

The only remaining disputed factual issue is the amount of the Class's damages. There is no "fit" between that issue and evidence about TWA's viability at the time of its sale to American. The first jury already heard the evidence that TWA was not viable, and gave it whatever weight it deserved in finding liability, causation, and injury in fact. Additional evidence that TWA was not viable will not assist the next jury in quantifying the Class's damages. ALPA should thus be barred from presenting such evidence.

### D.   Evidence That TWA Was Not "Viable" Does Not Rebut Plaintiffs' Experts.

In an effort to avoid the obvious relevance problem inherent in any evidence of TWA's viability, Levine and Feltman claim that their opinions about viability are intended to rebut Plaintiffs' experts' opinions. Plaintiffs' experts, however, do not offer opinions about TWA's viability. The defense experts' opinions should not be admitted under the guise of purported rebuttal.

Levine asserts that Plaintiffs' experts' "assumed that TWA was sufficiently viable to survive a period during which its pilots could have bargained for better seniority treatment as part of the acquisition of its assets by American Airlines." Ex. 1, Levine Rpt., p. 5, ¶ C. Feltman asserts that Plaintiffs' experts "assumed that TWA was a financially viable airline that had the wherewithal to survive as a

going concern at the time of its acquisition by American." Ex. 5, Feltman Rpt, p. 4.

These characterizations of Plaintiffs' experts' opinions are inaccurate. Neither of Plaintiffs' experts makes the assumptions of TWA's viability that Levine and Feltman attribute to them.

### 1.     Rikk Salamat.

Plaintiffs engaged Rikk Salamat to develop a Class-wide damage model. Salamat is an economist who is consulted extensively by the airline industry with respect to airline pilots in particular. ALPA itself has engaged Salamat to assist it in analyzing and resolving pilot seniority integration issues in other airline mergers.

Salamat analyzed the trial record and created a "but for" seniority list that fairly and reasonably estimates what the integrated American/TWA pilot seniority list would have most likely looked like but for ALPA's breach of its duty to fairly represent the TWA pilots. (This is an over-simplification of Salamat's work, but is sufficient for purposes of this motion.) Salamat's actual opinions and the bases thereof are reflected in the report attached as Exhibit 7.

There are no opinions expressed in Salamat's report about TWA's viability. At his deposition, ALPA's lawyers pressed Salamat to offer such opinions.  He

testified that he made "no assumptions" concerning TWA's financial condition. *See* Ex. 8, January 29, 2013 Salamat Dep. Tr. 50:18-51:7. When pressed further to agree that TWA was not viable, Salamat testified that speculation that TWA would have liquidated within months absent the American transaction "would not impact his analysis." *Id.* at 88:13-25.

Contrary to the assertions of ALPA's experts, Salamat did not assume anything about TWA's viability or lack thereof. He did not analyze the issue. Salamat's determination not to focus on viability was appropriate given that TWA's viability is not relevant to determining the Class's damages.

### 2.    Dr. Henry Farber.

Dr. Farber is a Hughes-Rogers Professor of Economics at Princeton University. Working entirely independently from Salamat, Dr. Farber constructed an alternative "but for" seniority list by comparing the American/TWA pilot seniority integration to pilot integrations from similar airline mergers. (This, too, is an over-simplification of Dr. Farber's work, but again is sufficient for purposes of this motion.) His actual opinions and the bases thereof are reflected in his report attached as Exhibit 9.

As with Salamat's report, there are no opinions expressed in Dr. Farber's report about TWA's viability. The only part of Dr. Farber's work that even

-15-

considered TWA's financial condition was his selection of "comparable" mergers for his analysis. He selected mergers between financially strong carriers, like American, and financially weak, but still operating carriers, like TWA.

ALPA criticizes Dr. Farber's analysis because he did not include mergers between strong carriers and failed carriers. Dr. Farber excluded mergers with failed carriers because TWA was still flying when it went into its pre-arranged bankruptcy and its liquidation was not "imminent" at that time. Ex. 9, ¶33. Dr. Farber's use of the word "imminent" provides the convenient opening for Levine and Feltman to assert that he supposedly assumed TWA was "viable." At his deposition, Dr. Farber clarified what he meant by "imminent." He testified that absent the American transaction, TWA was expected to keep flying for "days, a week, a couple of weeks." Ex. 10, January 23, 2013 Farber Dep. Tr. 41:2-17.

Levine and Feltman offer various opinions about TWA's financial condition, but none of those opinions rebut Dr. Farber's statement that TWA would have kept flying for "days, a week, a couple of weeks" without the American transaction. Indeed, fact witnesses upon whom ALPA's experts rely testified that TWA's liquidation could have been avoided for months or even longer without the American transaction.

David Resnick, for instance, is an investment banker formerly employed by

Rothschild who worked closely with TWA before and after its acquisition by American. He testified to a "self-help plan" developed by TWA's unions and creditors that was ultimately abandoned in favor of the sale to American. Resnick testified that the self-help plan, while not optimal, would have prevented the immediate liquidation of TWA:

* The self-help plan was "essentially a band-aid, an interim solution that would give us more time to achieve the primary goal to find a strategic solution. ... [TWA] would only buy itself time with a self-help plan to allow it to improve its operations." Ex. 11, Resnick Dep. Tr. 34:3-20.

* "[T]he self-help plan was just a way to buy us some additional time to try to fix those fundamental issues that had bedeviled TWA for the past ten years." Resnick Dep. Tr. 38:14-18.

* "[T]he self-help plan was better than the other alternatives. ... The other alternative would be, in our view, a liquidation." Resnick Dep. Tr. 41:17-21.

ALPA elicited similar testimony from Scott Schwartz, the TWA MEC Vice-Chairman who testified in support of the transaction before the TWA Bankruptcy Court. Schwartz identified other options available to TWA that would have avoided "imminent" liquidation:

* "Our view is, *worst* case, we would have survived two or three months; *best* case, we could have survived to the next winter." Ex. 12, Schwartz Dep. Tr. 34:1-5.

* "Well, I believed that all the stand-alone plans that we looked at, all the nontransactional plans that we looked at would have kept TWA in business for some period of time, whether it be months or years."

-17-

Schwartz Dep. Tr. 69:12-16.

Schwartz testified that absent the sale to American, "TWA's assets would have likely been sold to Carl Ichan's group." While not desirable, "the TWA MEC and myself and our advisors felt the Icahn deal was real," and would have kept TWA operating. Ex. 12, Schwartz Dep. Tr. 123:11-24.

Dr. Farber's testimony is completely consistent with the testimony of the fact witnesses. As they all agree, TWA was not in "imminent" – *i.e.*, "days, a week, a couple of weeks" -- threat of liquidation when American agreed to buy it. Implementation of TWA's self-help plan, or a sale to Carl Ichan, would have prevented or delayed liquidation. Levine and Feltman's analyses of TWA's financial condition do not contradict these facts, and their opinions should not be admitted as purported rebuttal of Dr. Farber's "opinion," an opinion he does not hold – *i.e.*, that TWA was "viable." Levine, Murphy, and Feltman's opinions regarding TWA's viability are not relevant to any issue remaining in the case, and ALPA should be barred from presenting that evidence.

## III.   CONCLUSION

For these reasons, and in accordance with the above-cited authorities, the Court should bar ALPA from presenting any evidence from Michael Levine and James Feltman. The Court should also preclude ALPA from presenting evidence

-18-

from Kevin Murphy that Supplement CC was a "reasonable outcome," that the Class suffered no damages, and about TWA's viability.

**SCHNADER HARRISON SEGAL & LEWIS LLP**

BY: _____*s/ Lisa J. Rodriguez*_____
        Lisa J. Rodriguez
        Nicole M. Acchione
        Woodland Falls Corporate Park
        220 Lake Drive East, Suite 200
        Cherry Hill, NJ 08002-1165
        (856) 482-5222

        **GREEN JACOBSON, P.C.**
        Allen P. Press
        Joe Jacobson
        7733 Forsyth Boulevard, Suite 700
        Pierre Laclede Center
        St. Louis, Missouri 63105
        (314) 862-6800
        Counsel for Plaintiffs