## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| |
|---|
| PATRICK BRADY, et al., |
| Plaintiffs, |
| v. |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, |
| Defendant. |

Civil Action No. 02-2917 (JEI)

_____

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE
## IN SUPPORT OF ALPA'S MOTION FOR SUMMARY JUDGMENT
_____

Archer & Greiner
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033-0968
(856) 795-2121

*Pro Hac Vice:*

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 659-4656

*Attorneys for Defendant Air Line Pilots Association, International*

Pursuant to Local Civil Rule 56.1, defendant Air Line Pilots Association, International ("ALPA"), respectfully submits that there is no genuine dispute as to the material facts set out below.  ALPA expressly preserves all objections to the admissibility of the evidence cited herein and in the accompanying memorandum of law and does not waive any objections by making this submission.

I.    **Liability Trial and Verdict**

1.    In June 2002, the Allied Pilots Association ("APA") filed a complaint in the District of New Jersey, seeking a declaratory judgment affirming the legality of Supplement CC against a putative class of former TWA pilots, the Aviation Workers Rights Foundation, Inc., and American Airlines ("American"). (Compl., Dkt. No. 1.)

2.    In October 2002, representatives of the putative class filed counterclaims against the APA and American.  The putative class brought counterclaims and cross-claims against American, the Air Line Pilots Association ("ALPA"), and the APA, variously alleging that American, ALPA, and the APA wrongfully deprived them of their seniority rights.  Specifically, the class alleged that ALPA breached its duty of fair representation during seniority integration negotiations between members of the plaintiff class and the APA.  (Pls.' Answer ¶¶ 90-119, Dkt. No. 14.)

3.     Shortly thereafter, the Court ordered realignment of the parties, positioning the newly-certified class of former TWA pilots as plaintiffs on the condition that they file a Second Amended Restated Class Action Complaint by January 27, 2003.  (Order Realigning the Parties ¶ 3, Dkt. No. 49.)

4.     The class representatives filed their Second Amended Restated Complaint on behalf of a class of "all persons formerly employed as pilots by TWA, Inc., who have become or may become employed as pilots by TWA, LLC as a result of the April 2001 asset transaction between American and TWA." Plaintiffs alleged that ALPA's failure to vigorously represent them following American's acquisition of TWA's assets (the "Acquisition") resulted in the "stapling" of 1,242 TWA pilots to the bottom of American's merged seniority list. (Pls.' Compl. ¶¶ 21, 83, Dkt. No. 45; Ex. 1.[1])

5.     On June 7, 2011, the Court commenced a six-week trial on ALPA's liability for a breach of the duty of fair representation.  (6/7/11 Mins., Dkt. No. 384.)

6.     Throughout trial, Plaintiffs alleged that ALPA failed to take various actions—including lobbying, litigating, and boycotting—that purportedly

---

[1] All references to "Ex. __" refer to exhibits to the Declaration of Daniel J. Toal, dated August 22, 2013, submitted in support of ALPA's Motions to Exclude the Testimony of Plaintiffs' Experts and for Summary Judgment.

would have improved the former TWA pilots' negotiating position relative to the APA.  (Ex. 2 at 26:15-27:3, 39:13-23, 51:1-8, 54:24-56:14; Ex. 3 at 79:12-87:4.)

       7.     During closing arguments, class counsel argued to the jury: "What if ALPA had gotten involved [in the seniority integration negotiations] and done any of the things, or all of the things, that were requested of it?  Litigate, boycott . . . Would there have been a better deal?"  Class counsel concluded his argument by stating: "If you lower th[e] staple by one pilot, that is injury."  (Ex. 4 at 75:11-18.)

       8.     The liability jury was given a verdict form with the following questions:  (1) "Did Defendant Air Line Pilots Association violate its duty of fair representation to the TWA Pilots?" and (2) "Did Defendant Air Line Pilots Association's violation of its duty of fair representation directly cause injury to some of the TWA Pilots?"  The jury answered "Yes" to both questions.  (Ex. 5.)

## II.   **TWA's Financial Condition**

       9.     By 2000, TWA had been "unsuccessful for not only that year and a few years before that but for decades."  (Ex. 6 at 12:22-13:3.)

       10.    In the 1970s, TWA's corporate leadership used the airline's positive cash flow to fund non-aviation-related business ventures, such as the acquisitions of Century 21 Real Estate, Hilton International Hotels, and Spartan Foods.  (Ex. 6 at 13:12-17.)

11.    TWA entered the 1980s with "an old fleet, [and] an unprofitable enterprise."  (Ex. 6 at 13:18-23.)

12.    In 1985, Carl Icahn acquired a controlling stake in TWA.  Icahn took TWA private and sold off many of the airline's most valuable assets, including TWA's "only strength"—highly profitable trans-Atlantic routes that enabled TWA to connect domestic flights to destinations throughout Europe.  (Ex. 6 at 13:24-14:9, 18:22-19:20, 50:3-12; Ex. 7 at 153:6-12.)

13.    TWA declared bankruptcy for the first time in 1992.  To sustain the company through bankruptcy, ALPA and other employees' unions made significant concessions.  Still, the airline remained unprofitable.  (Ex. 6 at 17:9-20:8, Ex. 7 at 148:20-149:8.)

14.    TWA entered its second bankruptcy in 1995.  Although the TWA unions, including ALPA, had already agreed to severe pay cuts as part of the 1992 bankruptcy, they again agreed to a variety of productivity measures aimed at improving TWA's financial position, including reduced vacation and sick time. (Ex. 6 at 20:9-22:22; Ex. 8 at 25:3-7.)

15.    To increase its short-term cash flow and emerge from its second bankruptcy as a stand-alone airline, TWA sold to another Icahn-controlled entity "Karabu," the right to purchase any TWA ticket at a discount of 40 to 55 percent. (Ex. 6 at 22:23-23:9; Ex. 7 at 151:1-13; Ex. 9 at 16:18-17:12.)

16.     In the long-term, the Karabu arrangement undermined TWA's ability to sell retail tickets at full price because Karabu was offering customers the same tickets at a significant discount.  The Karabu deal—which cost TWA between $50 and $150 million annually and made it "mathematically impossible for TWA to make any money"—ultimately "helped kill TWA."  (Ex. 6 at 23:20-24:10; Ex. 8 at 23:4-24:6.)

17.     As of 2000, TWA had not posted an operating profit in 12 consecutive years.  (Ex. 6 at 12:15-13:3.)

18.     The causes of TWA's financial vulnerability were numerous:

(a)     TWA had become a single-hub airline, with its only hub located in St. Louis.  St. Louis was an inconvenient hub for domestic passengers traveling to or from the coasts, and its popularity as a destination and origin hub had declined over the years, in particular because many of the corporate headquarters that had once made St. Louis an attractive operational base had relocated.  (Ex. 6 at 15:12-16:10; Ex. 7 at 151:7-13; Ex. 8 at 46:21-48:19; Ex. 9 at 19:13-20:9.)

(b)     TWA faced increased competition from Southwest Airlines, a low-cost carrier ("LCC") with its own hub in St. Louis and overlapping routes with TWA.  (Ex. 6 at 16:11-17:8; Ex. 8 at 49:12-50:12; Ex. 9 at 20:14-21.)

(c)     Because TWA had limited liquidity and a poor credit rating, it was forced to enter equipment leases at significantly worse terms than its competitors, sometimes paying in excess of twice as much per month, making its fleet unusually costly to improve and maintain.  (Ex. 6 at 27:17-28:11.)

5

(d)     Similarly, TWA's poor credit rating precluded it from entering into favorable hedging agreements to offset a sudden and significant increase in jet fuel costs.  (Ex. 6 at 31:9-20; Ex. 8 at 31:1-33:13; Ex. 9 at 48:15-49:11; Ex. 10 ¶ 27; Ex. 11 at 118:17-23.)

19.     At the close of 2000, TWA had approximately $50 to $100 million less cash on hand than necessary to sustain operations through the winter season.  (Ex. 12 at ¶ 17.)

20.     TWA had a $100 million debt obligation scheduled to come due on January 15, 2001 that was secured by TWA's receivables—that is, all of TWA's incoming cash and credit card payments—until the full $100 million was repaid.  TWA did not have the resources to repay the $100 million obligation.  (Ex. 8 at 25:24-30:6; Ex. 9 at 27:14-28:18; Ex. 13 at 54:4-55:16.)

21.     In January 2001, TWA had no available sources of credit and could only finance its operations from cash provided by operating activities, external borrowing, or asset sales.  (Ex. 8 at 66:14-67:8; Ex. 10 ¶ 24.)

22.     TWA pursued potential corporate combinations with other airlines—including America West, Northwest, Continental, AirTran, and Delta— but none of the discussions turned up a willing partner or acquirer.  (Ex. 6 at 32:22-38:20; Ex. 8 at 99:15-106:14.)

23.     Efforts to find traditional financing in an attempt to prolong TWA's viability also failed.  (Ex. 11 at 25:6-26:10.)

24.     TWA's CEO, William Compton, its board of directors, and the market generally doubted whether TWA had the liquidity to finance ongoing operations through reorganization or whether it could emerge from bankruptcy as a stand-alone entity.  (Ex. 6 at 106:3-19; Ex. 8 at 111:18-112:12; Ex. 11 at 27:21-28:13.)

25.     Compton testified that the airline's financial condition at the time was "worse than not good":  "TWA was . . . going to liquidate within days without a deal."  (*See* Ex. 6 at 25:21-23.)

26.     TWA's Chief Financial Officer, Michael Palumbo, testified that, even if TWA were to enter bankruptcy, it would need approximately $40 million to continue operating.  (Ex. 13 at 54:16-55:16.)

27.     The offer by American in January 2001 to acquire certain TWA assets rescued TWA from liquidation.  Specifically, TWA was only able to continue flying because American provided financing in connection with its agreement to acquire certain TWA assets.  As part of the Acquisition, TWA was required to file for bankruptcy for a third time.  (Ex. 8 at 25:10-16, 117:10-22; Ex. 14 at 383:5-11; Ex. 15.)

III.   **Scope Waiver Was a Condition of American's Acquisition of TWA**

28.     On January 9, 2001, American and TWA entered into an Asset Purchase Agreement under which American agreed to purchase certain TWA

assets out of bankruptcy, and provide debtor-in-possession ("DIP") financing—approximately $200 million, initially—to allow TWA to continue operations.  (Ex. 6 at 53:9-54:1; Ex. 15.)

29.    As of January 10, 2001, TWA's cash balance was at least $20 million short of what TWA needed to fund its operations the following day.  (Ex. 8 at 65:15-66:13.)

30.    American agreed as part of the Asset Purchase Agreement to provide employment for TWA's unionized employees—including its pilots—at wages and benefits comparable to those of American's unionized employees.  (Ex. 15 at ALPA 013341.)

31.    American's agreement to acquire TWA was subject to certain conditions.  The Asset Purchase Agreement stated:  "Prior to Closing, TWA shall amend all existing Collective Bargaining Agreements . . . to provide that . . . scope, successorship, and benefits provisions of the Collective Bargaining Agreements are not applicable to or being assumed by [American]."  (Ex. 15 at ALPA 013341.)

32.    Donald Carty, the CEO of American during the relevant time, testified that this provision was included by American, in part, "to ensure that [American's] pilots would not [have to arbitrate] the integrated seniority list."  (Ex. 16 at 32:20-24.)

33.    The TWA pilots' collective bargaining agreement ("CBA") required binding arbitration of disputes over seniority integration upon acquisition of TWA by another airline.  (Ex. 17 at ALPA 017862-63.)

34.    By comparison, the CBA between American and its pilot union, the Allied Pilots Association (the "APA"), provided that the APA could staple pilots of an acquired airline to the bottom of the American seniority list.  (Ex. 18 at ALPA 013225.)

35.    American CEO Donald Carty testified that "[the APA] was very clear that it would not allow arbitration of the seniority issue."  (Ex. 16 at 30:23-31:2.)

36.    Jeffrey Brundage, American's Vice President of Employee Relations during the relevant time, testified that:  "[The APA] had made it very clear to us in all of our discussions that there was no circumstance under which they would entertain the idea of an arbitration." (Ex. 19 at 25:16-22.)

37.    John Darrah, president of the APA during the relevant time, testified that the APA was "absolutely not" amenable to arbitration of the seniority list and that "[t]here was nothing that would have been done by anybody that would have had APA agree to binding arbitration."  (Ex. 20 at 45:14-22, 48:21-23.)

38.    American had had a prolonged dispute with the APA in 1999 in connection with American's acquisition of Reno Air and its pilots.  Displeased

with American's handling of that process, the APA engaged in a "sick-out" that cost American between $200 and 225 million in pre-tax earnings during the first quarter of 1999. (Ex. 16 at 26:17-28:10, 38:12-40:1; Ex. 21 at 33.)   American CEO Donald Carty testified that American "did not want to take strategic action that would further irritate the labor relations challenges that we already had." (Ex. 16 at 30:14-16.)

39.   Mr. Carty also testified that "[w]e would not have proceeded with the transaction" absent a waiver of the TWA pilots' scope provisions and that:

> [T]his transaction met a strategic need, but it wasn't necessarily the only way for us to respond strategically to what was going on in the market, and . . . we were concerned about the size and the scope and the magnitude of this acquisition and how much risk we added to our company in doing such an acquisition.  We had determined that we were not going to add a labor risk, particularly in light of our most recent history, to the transaction.

(Ex. 16 at 26:8-16, 33:8-16.)

40.   American Vice President of Employee Relations Jeffrey Brundage likewise testified that "[t]he American transaction would not have gone forward" if TWA pilots refused to waive scope.  (Ex. 19 at 39:22-40:1.)

41.   TWA MEC Merger Committee Chairman Michael Day also testified that "in the absence of . . . a waiver of the scope and successorship provisions . . . American Airlines had no obligation to proceed with the merger" and that nothing happened "at any time" that gave him "any reason to believe that

the APA would have agreed to arbitrate seniority integration" (Ex. 22 at 72:21-25, 102:5-8.)

42.     When the TWA Master Executive Council (the "TWA MEC"), the ALPA governing body for the TWA pilots, delayed waiving the provisions required by the American Asset Purchase Agreement, TWA petitioned the Bankruptcy Court to force rejection of the CBA pursuant to 11 U.S.C. § 1113. (Ex. 23 at 3-4.)

43.     Terry Hayes, TWA's Vice President of Labor Relations during the relevant time, testified that the purpose of the § 1113 motion was to "protect [TWA's] chance of being able to close [the Asset Purchase Agreement] with American." (Ex. 24 at 81:2-9.)  The TWA MEC voted to waive scope on April 2, 2001.  (Ex. 25.)  The Acquisition closed on April 10, 2001.  (Compl. ¶ 54, Dkt. No. 1.)

## IV.   **The APA's Superior Bargaining Position**

44.     Over a several month period, the TWA MEC and the APA attempted to reach agreement on a merged seniority list.  (Ex. 26 at ALPA 8752-54.)

45.     Michael Day, the TWA MEC Merger Committee Chairman beginning March 10, 2001, testified that:  "[The APA's] standard mantra was not one American pilot's career expectations can be harmed."  (Ex. 22 at 50:6-7.)

46.    Ed White, the Chair of the APA Mergers & Acquisition ("M&A) Committee during the relevant period, wrote in a letter to Michael Day dated July 18, 2001:  "At our first meeting in February 2001, [the TWA MEC Merger Committee] emphasized that unity, fairness and equity, and efficiency will be served by a seniority integration which . . . preserves career expectations."  (Ex. 27 at ALPA 001809.)

47.    APA President John Darrah likewise testified that the APA "would not agree to a list that affected the [American pilots'] premerger expectations."  (Ex. 20 at 138:22-139:3.)

48.    Mr. Darrah testified that "we own the seniority list according to our contract."  (Ex. 20 at 46:1-2.)

49.    Mr. White explained that in the APA's view, "[t]his is not a merger with a complete air carrier.  Nor is it a transaction between equals.  It is a purchase, by one of the largest and most financially stable global airlines, of most—but not all—of the assets of a much smaller, largely regional carrier which was within hours of going out of business."  (Ex. 27 at ALPA 001809-10.)

50.    TWA MEC Merger Committee Chairman Michael Day agreed that "the basic objective [was] to protect the career expectations of American Airlines pilots while preserving those of TWA pilots."  (Ex. 22 at 85:3-19.)

51.     APA President John Darrah testified that the APA would not "agree to a seniority integration that provided windfall[s] for the TWA pilots over the American pilots."  (Ex. 20 at 97:18-24.)

52.     APA Mergers & Acquisition Committee Chair Ed White similarly testified that a "fair and equitable" integration could not be "predatory" in the sense that it would "rob flying from another party" that had the pre-existing expectation of such flying.  (Ex. 28 at 55:18-22.)

53.     At the time of the Acquisition, American's financial condition was much stronger than TWA's; indeed American was one of the strongest major U.S. carriers.  (Ex. 20 at 43:18-44:16, 97:25-98:20; Ex. 22 at 41:22-42:9; Ex. 29 at 19.)

54.     There was also a pay rate disparity between the pilot groups: TWA pilots were paid at a pay scale well below American's (and the industry average).  (Ex. 6 at 20:1-8; Ex. 27 at ALPA 001813-14.)

55.     At the time of the Acquisition, TWA's fleet consisted primarily of narrow-body planes, with a much smaller number of small wide-body ("SWB") planes and no large wide-body ("LWB") aircraft.  (Ex. 22 at 32:25-33:2, 89:2-11; Ex. 26 at ALPA 8765-66, 8771-72; Ex. 30 at Ex. 1.)

56.     At the time of the Acquisition, LWB and SWB planes comprised a substantial segment of American's fleet.  (Ex. 28 at 50:11-51:14; Ex. 30 at Ex. 1.)

57.     TWA MEC Merger Committee Chairman Michael Day testified that the APA would not have agreed to any integration that allowed TWA pilots to fly LWB planes, as that would have "effectively transferred career expectations" from American pilots to TWA pilots.  (Ex. 22 at 32:25-33:7, 88:21-89:1.)

## V.   Actions Plaintiffs Allege ALPA Failed to Pursue on Behalf of the TWA Pilots

58.     Mr. Darrah opined that waging a jump seat war would "have had just the opposite [of the desired] effect," "push[ing] more and more people into th[e] camp [of wanting to staple all TWA pilots to the bottom of the list]."  (Ex. 20 at 49:5-21.)

59.     Mr. Darrah also testified that an AFL-CIO boycott of American or additional ALPA lobbying for the Bond legislation would not have had an impact on the APA's bargaining position.  (Ex. 20 at 156:4-157:2.)

60.     APA Mergers & Acquisition Committee Chair Ed White similarly testified that threats of litigation or of a jump seat war would not have impacted the APA's bargaining position.  (Ex. 28 at 123:19-124:17, 127:13-18.)

61.     American CEO Donald Carty likewise testified that American would not have done anything more to secure a fair and equitable integration

process if ALPA had initiated litigation to enjoin or delay the merger; had lobbied more aggressively for the Bond legislation; had asked the Department of Transportation to make seniority arbitration a condition for approval of the acquisition; had asked the AFL-CIO to boycott American; had initiated a jump seat war; or had threatened a TWA pilot strike.  (Ex. 16 at 57:17-59:15.)

62.     American Vice President of Employee Relations Jeffrey Brundage agreed that an AFL-CIO boycott, a jump seat war, litigation, or the Bond legislation would not have had an effect on American's involvement.  (Ex. 19 at 70:5-72:10, 77:15-78:1.)

63.     The minutes of an October 22, 2001 TWA MEC meeting also recount that Mr. Brundage stated:

> Don Carty told Senator Bond if the [Bond] Bill passed, he would shut down TWA LLC.  [American] made a commitment to its employees, right or wrong.  [American] employees cannot fathom an arbitrated seniority list.  [American] committed to its employees that [American] would not support arbitration for seniority.  If the Bill passed, [American] would shut down the TWA LCC [sic], cannot afford to upset the apple cart.

(Ex. 31 at ALPA 6394.)

64.     TWA MEC Merger Committee Chairman Michael Day testified that he has no "factual information regarding what the APA would have done if ALPA had behaved differently."  (Ex. 22 at 102:21-23.)

15

65.     Mr. Day also testified that the TWA MEC Merger Committee "felt we had very little leverage" because the APA continually reminded the MEC that they "were getting acquired" and were "working for a bankrupt airline[] . . . [where the TWA pilots] didn't have any career expectations."  (Ex. 22 at 17:1-23.)

66.     Mr. Day also testified that:

(a)     He did not have "any factual information to believe that if ALPA had instituted a jumpseat war against the American pilots that the APA would have offered a more favorable integration from the perspective of the TWA pilots."  (Ex. 22 at 110:9-14.)

(b)     He did not have "any reason to believe that American was prepared to offer additional inducements to the APA" as a result of an AFL-CIO boycott.  (Ex. 22 at 115:22-25.)

(c)     He "[d]idn't know" if any of the legal strategies Roland Wilder proposed "would have had any effect on the APA's views on seniority integration."  (Ex. 22 at 130:20-131:4.)

(d)     He did not know "what ALPA did or didn't do with the Department of Transportation."  (Ex. 22 at 132:3-4.)

(e)     He did not know whether "a TWA [pilot] strike against TWA would make American more or less interested in pursuing" the merger.  (Ex. 22 at 134:6-9.)

(f)     He "did not feel [the TWA MEC Merger Committee] was necessarily personally hampered" by the amount of financial support ALPA provided and he "never asked for more money from ALPA." (Ex. 22 at 134:25-135:2.)

(g)     "[T]here's nothing that [he is] aware of" that he "think[s] ALPA should have done with respect to the [B]ond bill that it did not do."  (Ex. 22 at 136:21-24.)

67.     The TWA MEC and the APA were ultimately unable to agree on a seniority list.  (Ex. 32.)

68.     On November 8, 2001, the APA and American bilaterally executed an agreement on the pilot seniority integration list as an amendment to the APA CBA, "Supplement CC."  (Ex. 1.)

69.     APA President John Darrah testified that "there was not any other type of list that we would have gone probably beyond that because it would have been injurious to the . . . APA pilots."  He also testified that the integration proposal was "never better than Supp. CC at any point in our discussions.  Supp. CC ultimately ended up the best deal that was ever discussed at APA, and far exceeded what the initial discussion in February were."  (Ex. 20 at 154:1–4, 163:17-23.)

70.     American Vice President of Employee Relations Jeffrey Brundage, when questioned about additional inducements American might have offered TWA, testified:

> Based on my discussions with our senior leadership team and my understanding of American's view of how we were going to proceed, *we were not in a position to go any further.*  And I think we clearly demonstrated that by withdrawing from the discussions in Washington and making an agreement with the APA directly without the participation of the TWA pilots.

(Ex. 19 at 78:4-12 (emphasis added).)

71.     TWA MEC Merger Committee Chairman Michael Day also admitted that he has no "reason for believing that the TWA pilots could have gotten a seniority integration list that was better for them than Supplement CC" other than his "beliefs."  (Ex. 22 at 102:24-103:6.)

## VI.  **Structure of Supplement CC**

72.     Supplement CC took effect on April 3, 2002.  (Ex. 1 at ALPA 1510; Ex. 33 at ALPA 010140, 010143.)

73.     The Summary of Supplement CC that was distributed by the APA's Mergers & Acquisitions Committee stated that Supplement CC was constructed with the goal of "preserv[ing] the career expectations of the members of each pilot group—the *pre-transaction* expectations at the time the transaction was entered into."  (Ex. 26 at ALPA 8755).

74.     Under Supplement CC, the top 2,596 positions on the merged seniority list were given to American pilots who were eligible to fly LWB aircraft because "TWA pilots had no expectation of ever flying" such equipment.  (Ex. 26 at ALPA 8757, 8763-64; *see also* Ex. 22 at 89:2-11.)

75.     In the next segment of the seniority list, the 1,095 most senior TWA pilots were merged with the remaining American pilots (hired before the Acquisition closed) at a ratio of approximately one TWA pilot to eight American pilots.  This formulation was based on preserving the expectation of the most

junior American pilot to reach SWB captain by a certain point in time, while still

ensuring that "[a]t all times, there will be at least 260 TWA pilots [the number of

sustainable SWB Captain jobs brought to the merger by TWA] in the projected

small wide-body Captain seniority range."  (Ex. 26 at ALPA 8757, 8762-65.)

76.    The remaining 1,242 TWA pilots were then placed in seniority

order after the merged section.  (Pls.' Compl. ¶¶ 21, 83, Dkt. No. 45; Ex. 1.)

77.    At the bottom of the list were pilots hired by American after the

Acquisition closed.  (Ex. 26 at ALPA 8758.)

78.    APA Mergers & Acquisition Committee Chair Ed White

observed in a letter to then-TWA MEC Merger Committee Chair Bud Bensel,

dated March 2, 2001:

> [N]ew hire First Officers at [American] have reached a pay structure
> that is basically equivalent to [TWA's] narrow body captain's pay,
> which takes you years to attain at TWA, and . . . [American] is now
> assigning new hires to First Officer jobs on wide-body equipment
> comparable to, and even larger than, the largest equipment TWA is
> bringing to the transaction.

(Ex. 34 at ALPA 6033.)

79.    Supplement CC also included targeted conditions and

restrictions, including two sets of "fences."  (Ex. 26 at ALPA 8765.)

80.    One fence "reserved all Captain positions on B-777, MD-11,

and A-300 aircraft to the [American] pilots until the expectation of the most junior

[American] pilot on April 10, 2001—B.D. White, DOH 4/9/01—is fulfilled" and

also "applied parallel fences to reserve the First Officer jobs on these aircraft to the [American] pilots."  In so doing, this fence operated to "protect the [American] pilots' expectations on the large wide-body aircraft operated only by American prior to the transaction, which were not part of the TWA pilots' career path."  (Ex. 26 at ALPA 8765-66.)

81.    The other fence, the "St. Louis" fence, "reserves all B-767-200/B-767-300/B-757 Captain positions in the St. Louis domicile to the TWA pilots until Morgan Fischer (the last TWA pre-bankruptcy hire, and the last TWA pilot hired before the American furloughs in 1993) has sufficient seniority to hold a small wide-body Captain position somewhere in the system"; "reserves all MD-80/B-717/DC-9 Captain positions in St. Louis to the TWA pilots until Magnus Alehult (the last TWA hire in 1997, and the last TWA pilot hired before American resumed hiring in 1998) can hold a Captain position somewhere in the system"; and "reserves the related First Officer positions in St. Louis to the TWA pilots while these small wide-body Captain and narrow-body Captain fences are in effect."  In so doing, it "protect[ed] the TWA pilots' pre-transaction career path, including narrow-body and [SWB] Captain jobs attributable to aircraft that TWA operated prior to the transaction, principally in the St. Louis domicile."  The St. Louis fence was designed to prevent American pilots, who would not have had access to the opportunities in St. Louis prior to the merger, "from reaping an

injurious windfall by gaining advancement opportunities that belonged to the TWA pilots prior to the transaction."  (Ex. 26 at ALPA 8765, 8767, 8771-72.)

82.     Class counsel, Allen Press, has stated in connection with his representation of former TWA pilots in another action, that the St. Louis fence is "integral to the seniority list created by Supplement CC . . . . Without [the fence], the 650 former TWA pilots based in St. Louis would have to bid for routes against the other 8,000 American pilots."  (Ex. 35 ¶¶ 10-11.)

## VII.    **Changes to the American-APA CBA Pursuant to Subsequent Financial Shortfalls at American**

83.     The convergence of September 11th, the Afghanistan and Iraq wars, and "epidemics, tsunamis, and other natural disasters, capped off by a recession" caused serious financial harm throughout the airline industry, including to American.  (Ex. 19 at 52:1-8, 54:11-55:17; Ex. 36 at 24:21-25:6; *see also* Ex. 37 at 10.)

84.      In 2002, American lost $2.018 billion, and "teetered on the brink of a Chapter 11 filing."  (Ex. 37 at 26; Ex. 38 ¶ 5.)

85.     To avoid bankruptcy, American negotiated for, and won, severe concessions from its unions, totaling $1.6 billion on an annual basis, of which the APA alone shouldered $660 million.  The agreement on the APA's concessions was memorialized in a Restructuring Agreement, effective as of May 1, 2003.  The Restructuring Agreement replaced, in full, the CBA that governed during the

Acquisition and the subsequent seniority integration negotiations period.  (Ex. 38 ¶ 6; Ex. 39 at 14-15; Ex. 40 at §§ 1-2, 26-1.)

86.     The Restructuring Agreement incorporated pay cuts amounting to a 23 percent decrease in net pay and a regression to 1992 pay rates; a significant increase in employee contributions to all medical plans; reduced vacation pay and sick leave; and a reduction of the amount of available flight time, which further decreased pilots' net pay.  (Ex. 36 at 61:2-6;  Ex. 40 at §§ 9, 10, 15(A), Supplement K-1.)

87.     American's financial woes continued over the next 8 years, and American entered bankruptcy on November 29, 2011.  (Ex. 41.)

88.     On March 27, 2012, American petitioned the Bankruptcy Court for authorization to reject its collective bargaining agreements under Section 1113 of the Bankruptcy Code.  American argued that its collective bargaining agreements imposed financial burdens that impeded American's ability to make a profit.  Among those burdens was continued operation of the St. Louis base pursuant to Supplement CC, which cost American approximately $13 million annually.  (Ex. 42; Ex. 38 ¶¶ 10-20, 150.)

89.     American's Section 1113 petition was granted on September 5, 2012.  (*See* Ex. 43.)

90.     With the authority conferred by the Bankruptcy Court, American rejected Supplement CC in full, including those provisions that granted the TWA pilots preferential flying rights out of the St. Louis base.  (Ex. 44 at 1-2.)

91.     American and the APA agreed via Letter of Agreement to arbitrate the former TWA pilots' entitlement to alternate contractual rights that would achieve Supplement CC's stated goal:  preserving the TWA pilots' pre-transaction career expectations.  (Ex. 44 at 1-2.)

92.     The TWA Pilots Committee, which represented the interests of plaintiff class members in the arbitration, stated in its Pre-Hearing Statement that "Supplement CC was terminated when American exercised the authority given to it by the United States Bankruptcy Court for the Southern District of New York . . . to reject its collective bargaining agreements."  (Ex. 45 at 1.)

93.     In the arbitration, the former TWA pilots requested a reordering of the American seniority list.  The arbitration panel rejected that request in a decision issued on July 22, 2013.  Instead, the panel required American to provide the former TWA pilots preferential bidding rights for 346 narrow body and SWB captain positions; to permit otherwise qualified former TWA pilots to bid for positions on LWB planes; and to establish new fences at other American bases in the event that the St. Louis base closes.  (Ex. 46 at 6, 10-16.)

94.     Also in 2013, a putative class of former TWA pilots brought a lawsuit challenging American and the APA's refusal to reintegrate the seniority list in light of Supplement CC's rejection.  Specifically, the same class counsel as in this action, Allen Press, challenged "the legality of the discriminatory seniority list [American] implemented in January 2013 as part of the new collective bargaining agreement."  Class counsel also defended against a motion to dismiss in that case by arguing that the Third Circuit's decision in *Bensel* v. *Air Line Pilots Association*, 271 F. Supp. 2d 616 (3d Cir. 2004), did not bar Plaintiffs' claims because its claims against American involved the agreement reached during bankruptcy—a "new and different" collective bargaining agreement capable of giving rise to new claims.  (Ex. 47 at 3 (emphasis added)); Ex. 48 at 16.)

95.     The significant uncertainty surrounding American's future continues to this day.  In early 2013, American announced a merger with U.S. Airways, which is still pending all necessary approvals.  The United States Department of Justice, as well as certain state Attorneys General, have filed suit opposing the proposed merger.  If the U.S. Airways merger does not go through, it is unclear if or how American will emerge from bankruptcy.  As American executives have publicly stated, the merger is the "centerpiece" of the company's bankruptcy exit plan, and they have no "Plan B."  (*See, e.g.*, Ex. 49; Ex. 50.)

VIII.  **Plaintiffs' Expert Reports**

96.     Plaintiffs have stated that they will rely on expert testimony to support their claims for monetary damages.  (Ex. 51 at 4-11.)

97.     Plaintiffs offered two purported experts for this purpose: Mr. Rikk Salamat and Dr. Henry Farber.  (Exs. 52- 55; Ex. 59.)

98.     In their reports, Plaintiffs' proposed experts make foundational assumptions about, among other things:  (1) TWA's financial condition in January 2001, when the Acquisition was announced; (2) the pre-transaction career expectations of the TWA pilots; (3) the negotiating leverage of the TWA MEC and the APA; (4) the impact of certain actions ALPA allegedly failed to pursue on behalf of the TWA pilots on the negotiations between the TWA MEC and the APA, and on the resulting seniority list integration; and (5) the findings of the jury in the liability trial.  (Ex. 52 at 2-3, 5-22, 24, 27-52; Ex. 59 ¶¶ 3, 9-12, 53-61.)

99.     In his report, Mr. Salamat discusses ten actions Plaintiffs contend ALPA failed to pursue on behalf of the TWA pilots.  He assumes that the jury determined ALPA was required to pursue each of these actions to fulfill its duty of fair representation and that each action would have improved the TWA pilots' bargaining position in their negotiations with the APA.  Mr. Salamat identified these actions by reviewing the trial testimony of one witness, Michael

Day, and the closing arguments of Plaintiffs' counsel.  (Ex. 52 at 2, 5-11; Ex. 56 at

39:6-20, 128:4-8, 192:6-193:15.)

    100. Aside from the testimony of Mr. Salamat and Dr. Farber,

Plaintiffs have offered no other evidence in support of their claims for monetary

damages.

Dated:  Haddonfield, NJ
        August 22, 2013

Respectfully submitted,

Theodore V. Wells, Jr., Esquire
Paul, Weiss, Rifkind, Wharton
   & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064


- and -


Archer & Greiner
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033


By:  */s/ John C. Connell*
     John C. Connell, Esquire
     Kerri E. Chewning, Esquire

*Pro Hac Vice:*

Jay Cohen, Esquire
Daniel J. Toal, Esquire
Paul, Weiss, Rifkind, Wharton
   & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 659-4656

*Attorneys for Defendant Air Line Pilots Association, International*