# Exhibit 1

11-12-2001 14:55 FAX 8173022119         APA EXECUTIVE OFFICE                                    ☒001

# ALLIED PILOTS ASSOCIATION
### 14600 Trinity Blvd., Suite #500
### Fort Worth, Texas 76155-2512
### 800-323-1470

Sue Pyle, Senior Executive Secretary 817-302-2115
spyle@hq.alliedpilots.org
Liz Marko, Executive Secretary 817-302-2117
Kate LeChasseur, Assistant Executive Secretary 817-302-2120



### TELECOPY COVER PAGE

DATE: November 12, 2001

TO:   CA Bob Pastore            FAX: 314 770-8510

FROM: CA John Darrah            FAX: 817-302-2119

THERE WILL BE __17__ PAGE(S) TO FOLLOW

SPECIAL INSTRUCTIONS/COMMENTS:

The information contained in this facsimile message is private and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.

If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service.

ALPA 001507

# SUPPLEMENT CC

## AGREEMENT
Between
**AMERICAN AIRLINES, INC.**
and
THE AIR LINE PILOTS
in the service of
AMERICAN AIRLINES, INC.
as represented by
ALLIED PILOTS ASSOCIATION

THIS AGREEMENT is made and entered into in accordance with the provisions of the Railway Labor Act, as amended, by and between AMERICAN AIRLINES, INC. ("American" or the "Company") and the AIR LINE PILOTS in the service of AMERICAN AIRLINES, INC., as represented by the ALLIED PILOTS ASSOCIATION ("APA" or the "Association").

WHEREAS, the Company has acquired certain assets of Trans World Airlines, Inc. ("TWA"), which have been placed in an entity known as TWA Airlines LLC ("TWA LLC"), and TWA LLC has employed the pilot employees of TWA, with the intention that the TWA Pilots will be consolidated with American's pilots as employees of a single carrier; and

WHEREAS, Section 13.A. of the collective bargaining agreement between the Company and the Association ( the "Green Book") provides that "Seniority as a pilot shall be based upon the length of service as a flight deck operating crew member with the Company except as otherwise provided in Sections 11 and 12 of this Agreement;" Section 13.B. of the Green Book provides that "Seniority shall begin to accrue from the date a pilot is first assigned to air line flying duty and shall continue to accrue during such period of duty except as provided in Sections 11 and 12 of this Agreement;" and Section 17 and related provisions of the Green Book govern the filling of vacancies, displacements, reinstatements, furloughs and recalls based on system seniority; and

WHEREAS, Section 6 of the July 10, 2001 Transition Agreement between the Company and the Association (the "Transition Agreement") provides that, "The American Airlines and TWA LLC pilot seniority lists shall be combined to form a single System Seniority List pursuant to Section 13 of the AA/APA Agreement. In the event that APA and American Airlines decide to modify the application of Section 13, APA shall provide the modified list to American Airlines. American Airlines shall review the list and, if acceptable, provide a copy to all pilots on the combined list. Protests of the System Seniority List shall be handled in accordance with Section 13.G.2. of the current AA/APA Agreement;" and

1

ALPA 001508

11/12.2001 14:36 FAX 8173022119          APA EXECUTIVE OFFICE                      ☑003

WHEREAS, TWA LLC entered into a Transition Agreement with the Air Line Pilots Association, International ("ALPA"), the duly-recognized bargaining representative of the pilot employees of TWA LLC, in connection with which American agreed to use its reasonable best efforts to secure a fair and equitable process for the integration of seniority, by engaging a facilitator to organize meetings with APA and ALPA; and APA agreed to participate in such a process under certain conditions to which all parties agreed, although APA was under no obligation to do so; and

WHEREAS, APA's Mergers and Acquisitions Committee and ALPA's TWA MEC Merger Committee (as ALPA's designee) held 10 days of negotiations regarding the integration of the seniority lists, followed by an additional 15 days of negotiations with the assistance of a facilitator pursuant to an Agreement for Engagement of Facilitator, concluding on September 17, 2001; and

WHEREAS, following September 17, 2001, in furtherance of its reasonable best efforts to assure a fair and equitable process for the integration of seniority, American convened additional meetings with the APA Mergers & Acquisitions Committee and ALPA's TWA MEC Merger Committee on October 20-22, 2001; and

WHEREAS, American has agreed to accept a modification of Section 13 of the Green Book, provided, *inter alia*, that the modified System Seniority List be constructed based on the AA and TWA seniority lists as of a date no earlier than April 10, 2001, and that the treatment of TWA Pilots under Section IV. of Supplement W of the Green Book be resolved in a manner acceptable to the Company; and

WHEREAS, based on the methodologies and information developed during the course of the negotiations between the APA Mergers & Acquisitions Committee and the TWA MEC Merger Committee and the conditions required by American, American and APA have decided, pursuant to Section 6 of the Transition Agreement, to modify the application of Section 13 and related provisions of the Green Book and certain provisions of the Transition Agreement according to the terms set forth below;

NOW, THEREFORE, the parties hereby agree to the following terms, provided that the provisions of the Green Book and Transition Agreement shall apply except as modified herein, and in the event of a conflict, the provisions herein shall apply:

I.      **Definitions**

A.      For purposes of this Supplement CC, the terms "American" and "the Company" mean American Airlines, Inc.

B.      For purposes of this Supplement CC, the term "TWA LLC" means TWA Airlines LLC.

2

ALPA 001509

11/12/2001 14:37 FAX 8173022119          APA EXECUTIVE OFFICE                    ☒004

C.     For purposes of this Supplement CC, the term "AA Pilot" means any pilot hired by American with a date-of-hire on or before April 10, 2001, who had not left the employ of American prior to April 10, 2001.

D.     For purposes of this Supplement CC, the term "TWA Pilot" means any pilot hired by TWA with a date-of-hire on or before April 10, 2001, who had not left the employ of TWA prior to April 10, 2001.

E.     For purposes of this Supplement CC, the term "Green Book" means the Agreement between American and APA, effective May 5, 1997, as amended, including all Supplements, Appendices and Letters of Agreement.

F.     For purposes of this Supplement CC, the term "Transition Agreement" means the Transition Agreement between American and APA dated July 10, 2001.

G.     For purposes of this Supplement CC, the term "Implementation Date" means the date on which the National Mediation Board issues a decision finding that American and TWA LLC are or have become a single carrier.

H.     For purposes of this Supplement CC, the term "Pilot Operational Procedures Integration Date" means the date on which all pilots in the TWA LLC system cease to operate under separate pilot operational procedures, and commence operation under American's pilot operational procedures.

I.     For purposes of this Supplement CC, the term "Operational Fence" means the existence of separate pilot operational procedures at American and TWA LLC following the Implementation Date and until the Pilot Operational Procedures Integration Date. As more fully set forth below, the parties anticipate that the Implementation Date will be prior to the Pilot Operational Procedures Integration Date, subject to the Operational Fence; and that TWA LLC may continue to exist as a separate corporate and business entity after the Pilot Operational Procedures Integration Date, subject to Section 4.A.(i). of the Transition Agreement.

J.     For purposes of this Supplement CC, the term "line pilot" is a pilot who holds a four-part bid status under the Green Book.

K.     For purposes of this Supplement CC, the term "aircraft in service" is defined as an aircraft available for revenue service (not to include any aircraft in storage) or in maintenance for the purpose of return to revenue service in either American or TWA LLC. On or before the first day of each contractual month, the Company will provide, in electronic format, a monthly status report to the Association's Negotiating Committee Chairman identifying the number of aircraft in service for that contractual month, by aircraft type.

3

L.      For purposes of this Supplement CC, the term "small wide-body aircraft" means a B-767-200 or B-767-300, B-757, A-300, or any other aircraft with a maximum gross takeoff weight of more than 200,000 pounds but not more than 409,000 pounds that is not in a higher pay category than the B-767-300 or A-300.

M.      For purposes of this Supplement CC, the term "narrow-body aircraft" means a B-737, B-727, MD-80, B-717, F-100, or any other aircraft with a maximum gross takeoff weight of 200,000 pounds or less.

N.      For purposes of this Supplement CC, a position "reserved" to the TWA Pilots means a position reserved or allotted to the TWA Pilots under Section IV.A. of this Supplement CC, with the exception of positions referred to in Sections IV.A.2.a.(2) and IV.A.2.b.(2) below. A position "reserved" to the AA Pilots means a position reserved or allotted to the AA Pilots under Section IV.B. or Section IV.C. of this Supplement CC.

O.      Except as otherwise may be provided in this Supplement CC, the parties intend that terms be defined in accordance with their meaning under the Green Book.

II.     **Construction of Modified System Seniority List**

The modified System Seniority List will be constructed by integrating the April 10, 2001 AA Pilot Seniority List (i.e., adjusted for hiring and attrition through April 10, 2001) and the TWA Pilot Seniority List as of April 10, 2001 (i.e., adjusted for hiring and attrition through April 10, 2001) in the following manner.

A.      TWA Pilots J.G. Upp, DOH 12/2/63 through Raymond Camus, DOH 3/20/89 will be inserted in the AA Pilot Seniority List on a ratio of approximately one TWA Pilot to 8.1762556 AA Pilots, commencing immediately following AA Pilot W.H. Elder, DOH 10/8/85 and ending immediately following AA Pilot B.D. White, DOH 4/9/01.

B.      The remaining TWA Pilots commencing with TWA Pilot Theron Clark, DOH 3/23/89, will be placed in seniority order immediately following TWA Pilot Raymond Camus, DOH 3/20/89.

C.      All pilots hired by American after April 10, 2001 who had been assigned to air line flying duty as of October 1, 2001 will be placed on the modified System Seniority List following pilots referred to in Section II.B. above in accordance with their length of service as flight deck crew members at American, in accordance with Section 13 of the Green Book.

D.      After furloughed pilots (if any) have been recalled and new pilot positions become available, American will offer employment, in seniority order, to all pilots who

4

ALPA 001511

11/12/2001 14:38 FAX 8173022119          APA EXECUTIVE OFFICE          ☒ 008

were hired by American after April 10, 2001 but who had not been assigned to air line flying duty as of October 1, 2001. Each such pilot will be placed on the modified System Seniority List on the date he is first assigned to air line flying duty with American in accordance with Section 13 of the Green Book, following all pilots then on the modified System Seniority List.

### III.   Implementation of Integrated Seniority List

A.    As soon as possible following the execution of this Supplement CC APA shall, as required by Section 6 of the Transition Agreement, provide the modified System Seniority List, constructed in accordance with Section II. above, to American. American shall review the list and, if acceptable under Section II. above, provide a copy of such list, together with a copy of this Supplement CC, to all pilots on the modified System Seniority List within 60 days. Protests of the modified System Seniority List asserting any omission or incorrect posting affecting a pilot's seniority (other than protests of the application of the methodology (including the ratio agreed to in Section II.A.) agreed to in Section II. above) will be handled at the time of the Implementation Date in accordance with Section 13.G.2. of the current Green Book.

B.    The modified System Seniority List established pursuant to this Supplement CC, including all of the attendant provisions hereof, will apply commencing on the Implementation Date. The Company agrees that, commencing on the Implementation Date, the flight operations of American and TWA LLC will be operated under the modified System Seniority List, including all of the provisions of this Supplement CC. The integrated seniority number and placement on the modified System Seniority List of each TWA Pilot under this Supplement CC will be contingent, to become effective only on the Implementation Date, and is not intended to have any force or effect within TWA LLC prior to the Implementation Date.

### IV.   Fence Provisions

A.    TWA Captain and First Officer Positions

1.    STL Captain and First Officer Positions

a.    (1)    All line pilot positions in Captain bid statuses on B-767-200/B-767-300/B-757 aircraft in the STL domicile will be reserved to the TWA Pilots, until TWA Pilot Morgan Fischer, DOH 9/28/90 (or, in the event that Morgan Fischer ceases to be on the modified System Seniority List, the remaining TWA Pilot immediately senior to Morgan Fischer) has sufficient seniority under this Supplement CC to hold a vacancy in a four-part Captain bid status on B-767-200/B-767-300/B-757 aircraft. At that time, all provisions of this Supplement CC applicable to B-767-200/B-

5

☒ 006          ↞↞↞ APA          EMP REL          11/09/01 FRI 15:31 FAX 8176871843

ALPA 001512

11/12/2001 14:39 FAX 8173022119          APA EXECUTIVE OFFICE                                    ☑007

767-300/B-757 aircraft shall expire (except for Section VI.A), and all Captain line pilot positions on such aircraft shall thereafter be unrestricted.

(2)    American agrees that, so long as subparagraph a.(1) is in effect, the number of B-767-200/B-767-300/B-757 Captain line pilot positions in the STL domicile in any contractual month will be a minimum of 30 per cent of the combined number of small wide-body Captain line pilot positions in the ORD and DFW domiciles in the contractual month; provided, that the number will also be limited to a maximum of the number of reserved small wide-body Captain line pilot positions for the contractual month based on the number of small wide-body aircraft in service, as set forth in the table in Section IV.A.2.a.(1) below.

(3)    TWA Pilots will have a preference to line pilot positions in First Officer bid statuses on B-767-200/B-767-300/B-757 aircraft in the STL domicile, subject to Section V.B.2. below, until TWA Pilot Morgan Fischer, DOH 9/28/90 (or, in the event that Morgan Fischer ceases to be on the modified System Seniority List, the remaining TWA Pilot immediately senior to Morgan Fischer) has sufficient seniority under this Supplement CC to hold a vacancy in a four-part Captain bid status on B-767-200/B-767-300/B-757 aircraft. At that time, all provisions of this Supplement CC applicable to B-767-200/B-767-300/B-757 aircraft shall expire (except for Section VI.A.), and all First Officer positions on such aircraft shall thereafter be unrestricted. In the event that there are insufficient bidders for a position reserved to the TWA Pilots in the STL domicile under this provision, the position shall be filled in accordance with the Green Book; provided, that so long as the position is otherwise reserved to the TWA Pilots, any AA Pilot holding such a position will bid monthly preferences in seniority order, but subordinate to all TWA Pilots in the same bid status.

b.    (1)    All line pilot positions in Captain bid statuses on MD-80, B-717, and DC-9 aircraft in the STL domicile will be reserved to the TWA Pilots until TWA Pilot Magnus Alehult, DOH 7/17/97 (or, in the event that Magnus Alehult ceases to be on the modified System Seniority List, the remaining TWA Pilot immediately senior to Magnus Alehult) has sufficient seniority under this Supplement CC to hold a vacancy in a four-part Captain bid status on any aircraft. At that time, all provisions of this Supplement CC applicable to MD-80, B-717, and DC-9 aircraft shall expire (except for Section VI.A) and all Captain and First Officer positions on such aircraft shall thereafter be unrestricted.

(2)    American agrees that, so long as subparagraph b.(1) is in effect, the number of MD-80/B-717/DC-9 Captain line pilot positions in the STL domicile in any contractual month will be a minimum of 30 per cent of the combined number of narrow-body Captain line pilot positions in the ORD and DFW domiciles in the contractual month; provided, that the number will also be limited to a maximum of the number of reserved narrow-body Captain line pilot positions for the contractual

6

✑007          +++ APA          RMP REL.          11/09/01  FRI 15:31 FAX 8179671043

11/12/2001 14:40 FAX 8173022110          APA EXECUTIVE OFFICE                                      ☒003

month based on the total number of aircraft in service, as set forth in the table in Section IV.A.2.b.(1) below.

(3)     TWA Pilots will have a preference to line pilot positions in First Officer bid statuses on MD-80, B-717, and DC-9 aircraft in the STL domicile, subject to Section V.B.2. below, until TWA Pilot Magnus Alehult, DOH 7/17/97 (or, in the event that Magnus Alehult ceases to be on the modified System Seniority List, the remaining TWA Pilot immediately senior to Magnus Alehult) has sufficient seniority under this Supplement CC to hold a vacancy in a four-part Captain bid status on any aircraft. At that time, all provisions of this Supplement CC applicable to MD-80, B-717, and DC-9 aircraft shall expire (except for Section VI.A.), and all First Officer positions on such aircraft shall thereafter be unrestricted. In the event that there are insufficient bidders for a position reserved to the TWA Pilots in the STL domicile under this provision, the position shall be filled in accordance with the Green Book; provided, that so long as the position is otherwise reserved to the TWA Pilots, any AA Pilot holding such a position will bid monthly preferences in seniority order, but subordinate to all TWA Pilots in the same bid status.

c.      Temporary assignments and temporary duty (TDY) in the STL domicile will be administered in accordance with Section 18.C. and other applicable provisions of the Green Book.

2.      **Additional TWA Captain Positions**

The Company intends that, while the Operational Fence is in effect (i.e., prior to the Pilot Operational Procedures Integration Date), all TWA Pilots will be based in the STL domicile. During that period, no TWA Pilot may be awarded a position outside of the STL domicile; provided, that a TWA Pilot may, with the Company's prior approval, proffer a vacancy outside of the STL domicile, based on system seniority, so long as (i) the TWA Pilots do not hold small wide-body Captain positions in the contractual month in excess of the maximum set forth on the table in Section IV.A.2.a.(1) below based on small wide-body aircraft in service, or narrow-body Captain positions in excess of the maximum set forth on the table in Section IV.A.2.b.(1) below based on the total aircraft in service; and (ii) the award does not require the involuntary assignment of an AA Pilot to a position in the STL domicile. After the Pilot Operational Procedures Integration Date, additional line pilot positions in Captain bid statuses outside of the STL domicile will be reserved to the TWA Pilots based on the number of aircraft in service in the combined American and TWA LLC operation in a given contractual month, in addition to positions reserved under Sections IV.A.1. above, as follows:

a.      (1)     Prior to the expiration of Section IV.A.1.a. above, for any contractual month in which the total of (a) the B-767-200/B-767-300/B-757 Captain line pilot positions reserved to the TWA Pilots in the STL domicile, and (b) the number

☒008          *** APA                    EXP. REL.          11/09/01  FRI 15:52 FAX 8179617843

ALPA 001514

of B-767-200/B-767-300/B-757 Captain line pilot positions then held by TWA Pilots in other domiciles, is less than the number of positions indicated below, based on the number of small-wide body aircraft in service, TWA Pilots will be permitted, in accordance with system seniority, to proffer Captain positions, in addition to those reserved in the STL domicile under Section IV.A.1.a. above, in bid statuses on B-767-200/B-767-300/B-757 aircraft in domiciles other than STL until the total number of small wide-body Captain line pilot positions reserved under Section IV.A.1. above and this Section IV.A.2.a.(1) equals the number indicated below for the contractual month in question:

| Small Wide-Body Aircraft in Service | Number of Reserved Small Wide-Body Captain Line Pilot Positions |
|---|---|
| 276 or more | 260 |
| 271-275 | 238 |
| 266-270 | 200 |
| 261-265 | 167 |
| 255-260 | 132 |

In any contractual month in which fewer than 255 small wide-body aircraft are in service, no Captain proffers on B-767-200/B-767-300/B-757 aircraft will be allotted to the TWA Pilots outside of the STL domicile. In any such month, the number of B-767-200/B-767-300/B-757 Captain line pilot positions in the STL domicile will be no less than 30 per cent of the combined number of small wide-body Captain line pilot positions in the ORD and DFW domiciles in the contractual month; provided, that the number will also be limited to a maximum of 132 Captain line pilot positions or 30 per cent of the number of small wide-body Captain line pilot positions in the ORD and DFW domiciles in the contractual month, whichever is less.

(2)    In a contractual month in which the number of small-wide body Captain line pilot positions reserved to the TWA Pilots declines from the previous contractual month, the most junior TWA Pilots holding such positions outside of the STL domicile in excess of the number of positions reserved to the TWA Pilots will cease to be protected by this provision and shall be subject to displacement. Those pilots will not be displaced solely by reason of losing such protection, but only in accordance with the Green Book.

b.    (1)    Prior to the expiration of Section IV.A.1.b. above, for any contractual month in which the total of (a) the number of narrow-body Captain line pilot positions reserved to the TWA Pilots in the STL domicile, and (b) the number of narrow-body Captain line pilot positions then held by TWA Pilots on all aircraft types in domiciles other than STL, is less than the number of positions indicated below, based on the total number of aircraft in service, one of every six proffers to Captain bid

8

ALPA 001515

statuses on narrow-body aircraft for the contractual month in domiciles other than STL will be reserved to the TWA Pilots, until the total number of narrow-body Captain line pilot positions reserved to the TWA Pilots under Section IV.A.1.b.(1) above and this Section IV.A.2.b.(1) equals the number indicated below for the contractual month in question:

| Total Number of Aircraft in Service | Number of Reserved Narrow-Body Captain Line Pilot Positions |
|---|---|
| 901 or more | 800 |
| 891-900 | 770 |
| 881-890 | 710 |
| 871-880 | 650 |
| 861-870 | 590 |
| 851-860 | 530 |

In any contractual month in which fewer than 851 aircraft are in service, no Captain proffers on narrow-body aircraft will be allotted to the TWA Pilots outside of the STL domicile. In any such month, the number of MD-80/B-717/DC-9 Captain line pilot positions in the STL domicile will be no less than 30 per cent of the combined number of narrow-body Captain line pilot positions in the ORD and DFW domiciles in the contractual month: provided, that the number will also be limited to a maximum of 530 Captain line pilot positions or 30 per cent of the combined number of narrow-body Captain line pilot positions in the ORD and DFW domiciles in the contractual month, whichever is less.

(2)   In a contractual month in which the number of narrow-body Captain positions protected to the TWA Pilots on all aircraft types declines from the previous contractual month, the most junior TWA Pilots holding such positions outside of the STL domicile in excess of the number of positions reserved to the TWA Pilots will cease to be protected by this provision and shall be subject to displacement. Those pilots will not be displaced solely by reason of losing such protection, but only in accordance with the Green Book.

c.   A TWA Pilot based in the STL domicile may not be awarded a position outside of the STL domicile for a contractual month in which there is a vacancy in the pilot's bid status in the STL domicile which cannot be filled by either a pilot on the modified System Seniority List by proffer, by a new hire, or by a pilot being recalled from furlough if the pilot accepts.

9

ALPA 001516

11/12/2001 14:42 FAX 8173022119          APA EXECUTIVE OFFICE                                    Ø011

### B.   AA Captain Positions

1.     All line pilot positions in any four-part Captain bid status on B-777 aircraft will be reserved to AA Pilots until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a vacancy in the same bid status.   Thereafter, TWA Pilots may bid based on system seniority for positions in such bid status; provided, that any TWA Pilot in such bid status will be restricted to reserve until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D.White) has sufficient seniority to hold a regular line selection in such bid status. Thereafter, all positions in such bid status will be unrestricted.

2.     All line pilot positions in any four-part Captain bid status on MD-11 aircraft will be reserved to AA Pilots until AA Pilot B.D. White, DOH 4/9/01(or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a vacancy in the same bid status.   Thereafter, TWA Pilots may bid based on system seniority for positions in such four-part bid status; provided, that any TWA Pilot in such bid status will be restricted to reserve until AA Pilot B.D. White, DOH 4/9/01(or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a regular line selection in such bid status. Thereafter, all positions in such bid status will be unrestricted.

3.     All line pilot positions in any four-part Captain bid status on A-300 aircraft will be reserved to AA Pilots until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a vacancy in the same bid status.   Thereafter, TWA Pilots may bid based on system seniority for positions in such four-part bid status; provided, that any TWA Pilot in such bid status will be restricted to reserve until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to  B.D. White) has sufficient seniority to hold a regular line selection in such bid status.  Thereafter, all positions in such bid status will be unrestricted.

4.     All line pilot positions in any four-part Captain bid status on any other aircraft type with a maximum gross takeoff weight of more than 409,000 pounds or in a pay category higher than the B-767-300 will be reserved to AA Pilots until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a vacancy in the same bid status. Thereafter, TWA Pilots may bid based on system seniority for positions in such four-part bid status; provided, that any TWA Pilot in such bid status will be restricted to reserve until AA Pilot B.D.

ALPA 001517

11/12/2001 14:43 FAX 8173022119          APA EXECUTIVE OFFICE                    ☒012

White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a regular line selection in such bid status. Thereafter, all positions in such bid status will be unrestricted.

### C.   AA First Officer Positions

1.    All line pilot positions in any four-part First Officer bid status on B-777 aircraft will be reserved to AA Pilots until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a vacancy in the same bid status.   Thereafter, TWA Pilots may bid based on system seniority for positions in such four-part bid status; provided, that any TWA Pilot in such bid status will be restricted to reserve until AA Pilot B.D. White, DOH 4/9/01(or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a regular line selection in such bid status. Thereafter, all positions in such bid status will be unrestricted.

2.    All line pilot positions in any four-part First Officer bid status on MD-11 aircraft will be reserved to AA Pilots until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a vacancy in the same bid status.   Thereafter, TWA Pilots may bid based on system seniority for positions in such four-part bid status; provided, that any TWA Pilot in such bid status will be restricted to reserve until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a regular line selection in such bid status.  Thereafter, all positions in such bid status will be unrestricted.

3.    All line pilot positions in any four-part First Officer bid status on A-300 aircraft will be reserved to AA Pilots until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a vacancy in the same bid status.   Thereafter, TWA Pilots may bid based on system seniority for positions in such four-part bid status; provided, that any TWA Pilot in such bid status will be restricted to reserve until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a regular line selection in such bid status.  Thereafter, all positions in such bid status will be unrestricted.

ALPA 001518

11/12 2001 14:43 FAX 8173022119        APA EXECUTIVE OFFICE                                            ☑013

4.    All line pilot positions in any four-part First Officer bid status on any other aircraft type with a maximum gross takeoff weight of more than 409,000 pounds or in a pay category higher than the B-767-300 will be reserved to AA Pilots until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a vacancy in the same bid status.  Thereafter, TWA Pilots may bid based on system seniority for positions in such four-part bid status; provided, that any TWA Pilot in such bid status will be restricted to reserve until AA Pilot B.D. White, DOH 4/9/01 (or, in the event that B.D. White ceases to be on the modified System Seniority List, the remaining AA Pilot immediately senior to B.D. White) has sufficient seniority to hold a regular line selection in such bid status.  Thereafter, all positions in such bid status will be unrestricted.

V.    **Furloughs and Displacements**

A.    **Furloughs**

Furloughs will be administered in inverse system seniority order, and recalls from furlough will be administered in system seniority order, in accordance with the Green Book as modified by the Transition Agreement and Supplement CC.  The parties agree that the TWA Pilots will be covered by Section IV. of Supplement W of the Green Book when pilot J.K. Viele, DOH 8/20/01 is given notice of recall from furlough.

B.    **Displacements**

1.    No AA Pilot may displace a TWA Pilot holding a Captain position reserved to the TWA Pilots under this Supplement CC, or into a position in the STL domicile which is subject to Section IV.A.1. above (except as provided in Section V.B.2. below with respect to First Officer positions).

2.    In the event of a furlough, an AA Pilot without any other displacement right may, to the extent necessary to permit furloughs in inverse seniority order, proffer or be assigned (first from the preference list, and then from the displacement list) to a First Officer bid status in the STL domicile on B-767-200/B-767-300/B-757, MD-80, B-717 or DC-9 aircraft occupied by a more junior TWA Pilot, and will bid monthly bid preferences in such bid status in seniority order, but subordinate to all TWA Pilots in the same bid status.

3.    No TWA Pilot may displace an AA Pilot holding a Captain or First Officer position reserved to the AA Pilots under this Supplement CC.  No TWA Pilot may displace an AA Pilot holding a Captain position if the displacement would result in the TWA Pilots holding small wide-body Captain positions in the contractual month in excess of the maximum set forth in the table in Section IV.A.2.a.(1) above based on

12

☑013                    APA ←←←              EXP REL            11/09/01  FRI 15:34 FAX 8179671543
ALPA 001519

11/12/2001 14:44 FAX 8173022110          APA EXECUTIVE OFFICE                                    ☑014

small wide-body aircraft in service, or narrow-body Captain positions in excess of the maximum set forth in the table in Section IV.A.2.b.(1) above based on the total aircraft in service.

4.    Displacements will otherwise be administered in accordance with the Green Book.

## VI.    Miscellaneous

A.    Except insofar as pilots are on furlough out of seniority order on the modified System Seniority List as of the Implementation Date, and except as expressly provided in this Supplement CC, neither the implementation of the modified System Seniority List together with the other provisions of this Supplement CC, nor the expiration of any provision hereof, shall result in the loss by any pilot of the seat and aircraft (e.g., B-767/757 Captain) then held.

B.    Except as may otherwise be provided in this Supplement CC, in the event that there are insufficient bidders for a position reserved to the AA Pilots or the TWA Pilots under this Supplement CC, the position shall be awarded in accordance with the Green Book.

C.    Each and every provision of this Supplement CC is integral to the modified System Seniority List constructed pursuant to Section II. above, and shall remain in full force and effect and continue to apply in the event of a future seniority list integration arising from a subsequent acquisition, merger or other transaction affecting any pilots on the integrated modified System Seniority list; provided, that, subject to the above, this provision will not limit the integration of seniority lists in the event of said acquisition, merger or other transaction.

D.    By separate letter agreement executed contemporaneously herewith, American and the Association will identify those provisions of the Transition Agreement which are superceded by this Supplement CC.

## VII.    Joint Merger Committee

A.    Promptly following the Implementation Date, the APA President shall appoint two members of the APA, and the Company's Vice President of Employee Relations shall appoint two American Airlines representatives to serve as members on the standing AA/APA TWA Merger Committee.

B.    The AA/APA TWA Merger Committee shall resolve disputes arising from the interpretation, application, and implementation of this Supplement CC.

13

☑014          +++ APA               END REL.     11/09/01  FRI 15:35 FAX 8179671643

ALPA 001520

11/09/01 13:21 FAX 817 3022110    APA EXECUTIVE OFFICE    Ø015
Nov-09-01 13:21                                             P.04

C.    If a dispute described in Section VII.B. above is not resolved by majority vote of the AA/APA TWA Merger Committee, the unresolved dispute may be referred by either party to the Five Member System Board of Adjustment as provided in Section 23 of the Green Book and related letters and practices.

## VIII.    Duration

This Supplement CC shall remain in effect so long as any of the provisions hereof remain applicable. Neither party shall seek, without the express consent of the other party, at any time to modify this Supplement CC through the major dispute provisions of the Railway Labor Act.

IN WITNESS HEREOF, the parties hereto have signed this Agreement this 8th day of November, 2001.

AMERICAN AIRLINES, INC.                    ALLIED PILOTS ASSOCIATION

By: _____             By: _____
Jeffrey Brundage                            John E. Darrah
Vice President, Employee Relations          President

                                        By: _____
                                            Edwin C. White, Jr. Chairman
                                            Mergers & Acquisitions
                                            Committee

14

Ø004                                ERP REL          11/09/01 FRI 11:28 FAX 8179671843
Ø015        *** APA                 ERP REL          11/09/01 FRI 16:35 FAX 8179671843

ALPA 001521

APA EXECUTIVE OFFICE

☑016

➤ **ALLIED PILOTS ASSOCIATION**

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

November 8, 2001

Jeffrey Brundage
Vice President – Employee Relations
American Airlines, Inc.
P.O. Box 619616, MD 5235
Dallas/Fort Worth International Airport, Texas 75261-9616

Dear Jeff:

This will confirm our agreement that Supplement CC of the Basic Agreement between American Airlines, Inc. (the "Company") and APA, executed today, supercedes and/or modifies certain provisions of the July 10, 2001 Transition Agreement, as follows:

1.   The draw down schedule set forth in Section 5 of the Transition Agreement is superceded by Supplement CC.

2.   Sections 7.A., B. C., and D. of the Transition Agreement are superceded by Supplement CC.

3.   With the understanding that, under Supplement CC, STL will be the only TWA Pilot domicile until the Pilot Operational Procedures Integration Date, Sections 4.B.(iii) and 11 of the Transition Agreement relating to co-located bases, and Section 4.B of the Transition Agreement regarding "snap shots" are moot.

4.   This will confirm that, in light of the Company's accelerated plans for the integration of the TWA LLC operation into the American Airlines operation, the Company may execute and deliver to the Association a stipulation that American Airlines and TWA LLC are a single employer for representation purposes on a date earlier than the July 1, 2002 set forth in the Agreement Prohibiting the Leveraging of TWA LLC Against the APA which is an attachment to the Transition Agreement. Furthermore, we understand that the Company represented, in a recent filing with the U.S. Department of Transportation, that TWA "will hold itself out to the traveling public as American" commencing on December 2, 2001.

In addition to the foregoing, APA agrees that the current ALPA grievance procedure may remain in effect at TWA LLC until the National Mediation Board issues a decision determining that American and TWA LLC are or have become a single carrier for

ALPA 001522

11-12-2001 14:48 FAX 8173022119           APA EXECUTIVE OFFICE                    ☑017

Nov-09-01  13:20                                                                 P.03

representation purposes.

If the foregoing correctly sets forth our understandings, please sign in the space provided below and return a signed copy to me.

Very truly yours,

*Jol. E. Darah*

John E. Darrah
President

cc:     Mark Burdette
        Captain Mark Stephens, Chairman, APA Negotiating Committee
        Captain Edwin C. White, Jr., Chairman, APA Mergers & Acquisitions Committee

Agreed to:

Jeffrey Brundage
Vice President – Employee Relations
American Airlines, Inc.

ALPA 001523

11/12.2001 14:46 FAX 8173022119          APA EXECUTIVE OFFICE                    ☒013

Nov-09-01  13:21                                                              P.05

# AmericanAirlines®

November 8, 2001

Captain John E. Darrah, President
Allied Pilots Association
14600 Trinity Boulevard, Suite 500
Fort Worth, Texas 76155

Re: Furloughs and System Seniority

Dear John:

Notwithstanding Section VI. A. of Supplement CC, as soon as practical but in no event later than the second contractual month after the Implementation Date as defined in the Supplement, the Company will assure that any pilots on furlough will be the junior most pilots on the modified System Seniority List established pursuant to Supplement CC. Nothing in this Agreement or in Supplement CC shall affect the Association's right to contest the Company's invocation of force majeure in connection with administration of the Transition Agreement.

Very Truly Yours,

Jeffrey J. Brundage
Vice President
Employee Policy and Relations

Agreed to:

_____
Captain John E. Darrah, President
Allied Pilots Association

11/09/01  FRI 11:26 FAX 8179671843          EMP REL

☑014          APY +++          EMP REL          11/09/01  FRI 15:36 FAX 8179671843

ALPA 001524

# Exhibit 2

```
 1                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3         THEODORE A. CASE, SALLY YOUNG,
           HOWARD HOLLANDER, PATRICK BRADY
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                              Plaintiffs,
 6
                V.                           TRIAL TRANSCRIPT
 7                                           VOL. 1
           AIR LINE PILOTS ASSOCIATION,
 8
                              Defendant.
 9
                                        CAMDEN, NEW JERSEY
10                                      JUNE 7, 2011

11         B E F O R E:  HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                        A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                 AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.  (MO. BAR)
               AND:  JOE D. JACOBSON, ESQ.  (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:  STEVEN FRAM, ESQ.
19                  AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH GINSBERG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

```
 1    research or investigation on your own on matters relating to

 2    the case, or in this type of case.  Do not do any research on

 3    the internet, for instance, or forget Google.  And Bing.  Or

 4    anybody else's search engine.

 5            You are to decide the case upon the evidence

 6    presented at trial.  In other words, you should not consult

 7    dictionaries or reference materials, search the internet,

 8    websites, blogs or use other electronic tools to obtain

 9    information about this case, or to help you decide the case.

10            You should not talk about the trial with anyone

11    else, not your family, not your friend's, not the people you

12    work with.  Please do not try to find out information from

13    any source outside the confines of this courtroom.  Also, as

14    I told you, you should not discuss the case among yourselves.

15    It is important that you wait until all the evidence is

16    received, and you have heard my instructions on the law

17    before you deliberate among yourselves.

18            Let me add that during the course of this trial you

19    will receive all the evidence you properly may consider to

20    decide the case.  Again, do not reach any conclusions on the

21    claim until all of the evidence is in.  Keep an open mind

22    until you start your deliberations at the end of the case.

23    No statement, ruling, remark or comment which I make during

24    the course of the trial is intended to indicate to you my

25    opinion as to how you should decide this case or to influence
```

1    you in any way in your determination of the facts.  At times,

2    I may ask questions of witnesses.  If I do so it is for the

3    purpose of bringing out matters which I feel should be

4    brought out, and not in any way to indicate my opinion about

5    the facts or to indicate the weight I feel you should give to

6    the testimony or the witness.  I don't think it will happen

7    often, but in the heat of battle I may find it necessary to

8    admonish the lawyers, and if I do so, you should not be

9    prejudiced against either side because I found it necessary

10   to admonish one side or the other.

11          Let me tell you, that is called the well of the

12   Court.  That is a tough place to work.  That is a tough place

13   to work.  Take it from me, I worked there for 26 years.

14   Sometimes things can get a little heated.  I don't think it

15   will happen here much, but please be sympathetic to the

16   lawyers and realize that all of them are doing the best that

17   they can.  They really are.  During the trial it may be

18   necessary for me to talk with the lawyers out of your hearing

19   by having a bench conference or what we call a sidebar over

20   there.  If that happens, please be patient.  We are not

21   trying to keep important information from you.  These

22   conferences are are necessary nor me to fulfill my

23   responsibilities which is to be sure that the evidence is

24   presented to you correctly under the law.  We will of course

25   do what we can to keep the number and length of these

1   conferences to a minimum.  While we meet I will invite you to

2   stand up and stretch or take a short break or perhaps even

3   call a recess if it is a lengthy issue and permit you to go

4   for a break.  I may not always grant a attorneys request for

5   a conference.  Do not consider my granting or denying a

6   request for a conference as any indication of my opinion of

7   the case or what your verdict should be.

8         The evidence from which you are to find the facts

9   consists of the following:  The testimony of witnesses,

10  documents, or other things received as exhibits, any facts

11  that are stipulated, that is formally agreed to by the

12  parties, and any facts that are judicially noted, that is

13  facts I say you must accept as true, even without other

14  evidence.

15        The following things are not evidence:  Statements,

16  arguments, and questions of the lawyers for the parties in

17  this case; objections by lawyers; any testimony I tell you to

18  disregard; anything you may hear or see about this case

19  outside the courtroom.  You must make your decision based

20  only on the evidence that you see and hear in court.

21        Are you getting the message?

22        Do not let rumors, suspicions or anything else you

23  may see or hear outside of the Court influence your decision

24  in any way.  Use your common sense in weighing the evidence.

25  Consider it in light of your everyday experience with people

1  and events and give it whatever weight you believe it

2  deserves.  If your experience tells you that certain evidence

3  reasonably leads to a conclusion you are free to reach that

4  conclusion.

5         These are the rules that control when, what can be

6  received into evidence.  Now, a lawyer asks a question or

7  offers an exhibit into evidence, and the lawyer on the other

8  side thinks it is not permitted by the rules of evidence,

9  that lawyer may object.  This simply means as I told you

10  before that the lawyer is requesting that I make a decision

11  on a particular rule of evidence.  You should not be

12  influenced by the fact that an objection is made.  Objections

13  to questions are not evidence.  Lawyers have an obligation to

14  their client to make objections when they believe that

15  evidence being offered is improper under the rules of

16  evidence.  You should not be influenced by the objection or

17  by the court's ruling on it.

18         Do not speculate what the witness might have said,

19  or what an exhibit might have been.

20         There are two types of evidence that you may use in

21  reaching your verdict.  One type of evidence is called direct

22  evidence.  An example of direct evidence is when a witness

23  testifies about something that the witness knows through his

24  own senses, something the witness has seen, felt, touched or

25  heard or did.  If a witness testified that he saw it raining

```
1    outside and you believed him, that would be direct evidence

2    that it was raining.  Another form of evidence -- another

3    form of evidence is circumstantial evidence.  Circumstantial

4    evidence is proof of one or more facts from which you could

5    find another fact.  If someone walked into the courtroom

6    wearing a raincoat covered with drops of water and carrying a

7    wet umbrella, that would be circumstantial evidence from

8    which you could conclude that it was raining.  You should

9    consider both both kinds of evidence that are presented to

10   you.  The law makes no distinction in the weight to be given

11   to either to either direct or circumstantial evidence.  You

12   are to decide how much weight to give any evidence.

13           In deciding what facts are you may have to decide

14   what testimony you believe, and what testimony you do not

15   believe.  You are the sole judges of the credibility of the

16   witnesses.  Credibility means whether a witness is worthy of

17   belief.  You may believe everything a witness says or only

18   part of it, or none of it, in deciding what to believe you

19   may consider a number of factors including the following:

20   The opportunity and ability of the witness to see or hear or

21   know things the witness testified to.  The quality of the

22   witness's understanding and memory.  The witness's manner

23   while testifying.  Whether the witness has an interest in the

24   outcome of the case or any motive, bias or prejudice, whether

25   the witness is contradicted by anything the witness said or
```

1    verdict in this case.

2            You therefore are not to use your notes as

3    authority to persuade fellow jurors of what the evidence was

4    during the trial.  Notes are not to be used in place of

5    evidence.

6            Do not take your notes away from the Court.  I

7    repeat, at the end of the day, please leave your notes in the

8    jury room.  This is a civil case.

9            The plaintiffs are the parties who brought the

10   lawsuit.  ALPA or the Air Line Pilots Association is the

11   party against which the lawsuit was filed.  The plaintiffs

12   have the burden of proving their case by what is called the

13   preponderance of the evidence.  That means the plaintiffs

14   have to prove to you, in light of all the evidence, that what

15   they claim is more likely so than not.  To say it

16   differently, if you were to put the evidence favorable to the

17   plaintiffs and the evidence favorable to ALPA on opposite

18   sides of the scale, the plaintiffs would have to make the

19   scales tip somewhat on their side.  If the plaintiffs fail to

20   meet this burden the verdict must be for ALPA.  If you find

21   after considering all the evidence that a claim or fact is

22   more likely so than not so, then the evidence or fact has

23   been proved by a preponderance of the evidence.  In

24   determining whether any fact has been proved by a

25   preponderance of the evidence in the case you may, unless

1   otherwise instructed, consider the testimony of all

2   witnesses, regardless of who may have called them, and all

3   the exhibits received in evidence, regardless of who may have

4   produced them.

5          You may have heard the term proof beyond a

6   reasonable doubt.  That is a stricter standard of proof that

7   is a lied only to criminal cases.  It does not apply to a

8   civil case such as this so you should put it out of your

9   mind.  Now the trial will proceed in the following manner.

10  First, one of the attorneys for the plaintiff will make an

11  opening statement to you.  Next, one of the attorneys for

12  ALPA will make an opening statement.  What is said in the

13  opening statement is not evidence.  It is simply an outline

14  to help you understand what each party expects the evidence

15  to show.  Plaintiffs go first because they have the burden of

16  proof.  The plaintiffs will then, after the opening

17  statements, the plaintiffs will then present witnesses who

18  counsel for ALPA will cross examine.  The plaintiffs may also

19  present evidence in the form of documents such as emails,

20  letters, or the like.

21         Following the plaintiff's case ALPA will then

22  present witnesses who counsel for plaintiffs may cross

23  examine.  ALPA may also present evidence in the form of

24  documents.  After the parties main case is presented, they

25  may be permitted, if they ask, to present what is called

```
 1    rebuttal evidence.  After all the evidence has been presented

 2    the attorneys will then present the closing arguments to

 3    summarize and interpret the evidence in the way that is

 4    helpful to their client's position.

 5              As with opening statements, closing arguments are

 6    not evidence.

 7              I will then instruct you on the law.  After that

 8    you will retire to the jury room to deliberate on your

 9    verdict.

10              Now, normally we would begin right this minute with

11    the opening statements.  I am going to give the plaintiff

12    about ten minutes to sort of get set up and get organized.

13    Would you like that.

14              MR. PRESS:  That is fine.  Thank you, Judge.

15              THE COURT:  Okay.  So I will send you to the jury

16    room for just ten minutes.  Do not discuss the case among

17    yourselves.  Keep an open mind until you have heard all the

18    evidence.  Pretty soon I will just hold up my finger number 1

19    and you will know what I mean.  Okay.  All rise when the jury

20    leaves.

21              (The jury leaves the courtroom.)

22              (Recess)

23

24

25
```

1          (Jury enters the courtroom.)

2          THE COURT:  I now recognize Mr. Press to give the

3    opening statement on behalf of the plaintiffs.

4          MR. PRESS:  Thank you, your Honor.  Good morning,

5    ladies.  Good morning, gentlemen.

6          My name is Allen Press.  I represent five former

7    TWA pilots.  One of them is sitting go here.  This is Ted

8    Case.  Maybe, you remember TWA.  It was a large airline, had

9    a big base in Newark, big base at JFK and LaGuardia, flew

10   international, flew all over the world, all over the United

11   States.  TWA had a proud 75-year history flying, but it all

12   ended in 2001 when America bought TWA and this lawsuit arises

13   out of that sale.  Okay.

14         Our clients, the five plaintiffs, the five pilots

15   we represent, have brought this case on behalf of a class as

16   you heard Judge Irenas tell you, a class of nearly 2,300 TWA

17   pilots.  And that is who we are here speaking on behalf of

18   for the next couple of weeks.

19         When they brought this case, as you heard, against

20   the labor union, their own labor union.  And that union is

21   called the Air Line Pilots Association.  And you are going to

22   hear a lot of acronyms, and here is the first one.  The Air

23   Line Pilots Association is referred to by our clients and the

24   union as ALPA.  Air Line Pilots Association.  ALPA.  You are

25   going to hear that.  That is the name you will hear.  And

 1    that is the union we are suing here.

 2            Now, what is ALPA?  What was ALPA?  It was a

 3    uniformed in 1931.  And the TWA pilots were one of the

 4    charter members 80 years ago.  They helped form this union.

 5    Okay.  They there was a they were the second pilot group to

 6    join and they helped grow the union.  They grew it to more

 7    than 60,000 members at one time.  It is the largest pilot

 8    union in the world and has been for a long time.  That is

 9    what ALPA is.

10            Now, so that is who the parties are.  And this case

11    as you heard the Judge tell you, it is brought under a

12    federal labor law.  A union as the Judge told you, has a duty

13    to fairly represent its members.  And that is what this case,

14    this duty is called appropriately the duty of fair

15    representation.

16            Here comes another acronym.  DFR.  Duty of fair

17    representation.  You are going to hear probably witnesses

18    refer to this DFR.  So any way, that is what that means.

19    That is what this case is brought under.  We have alleged

20    that ALPA breached its duty of fair representation to the TWA

21    pilots.  And they did it, the evidence is going to show, they

22    did it in one of the most important challenges unionized

23    employee can phase, and what was that challenge?  It was a

24    fight to protect the TWA pilots seniority when American

25    purchased TWA.  We allege and hope to prove that this union

1    treated that way?  And the answer to that question, ladies

2    and gentlemen, is why we are here.  That is why we are here.

3    It was Al pass job, it was the TWA pilots unions job to

4    protected their seniority.  That was their job.  We think the

5    evidence in this courtroom will show that they failed on that

6    job.  Indeed, the evidence is going to show that ALPA did

7    almost nothing to protect the TWA pilots seniority.

8             The largest and most powerful airline in the world

9    with more than 60,000 members was faced off in its seniority

10   fight with a 11,000 member pilot member group and did

11   nothing.  Our clients expected a fight but they didn't get

12   one.  They got no fight.

13            And what resulted was the unfair seniority

14   integration that I put up here and told you about.

15            Now, this didn't happen all in one day.  It was a

16   long process.  I should back up.  These seniority issues and

17   airline mergers, there is a process that almost always

18   involves a negotiation between the two pilot groups.  In this

19   case you are going to hear that the TWA pilots appointed a

20   committee to negotiate, the American pilots had their own and

21   these two groups, the committees get together and talk about

22   how we are going to do this but it is always contentious.  We

23   are talking about job loss, these are things pilots hold dear

24   and they don't want to give it up.  There is a fight.  It is

25   a contentious issue always.  Our pilots, the TWA pilots,

1    expected a fight.  Like I said this didn't happen in one day,

2    it is not like American bought TWA and the next day made this

3    seniority integration.  This was a process that drug out more

4    than 13 months.  And in that 14, 13-month process, ALPA had

5    one opportunity after another to put up a fight, to flex its

6    might and protect its TWA pilots.  But it failed at every

7    opportunity.  You are going to hear about those

8    opportunities.

9         Now, it is not just me, as a lawyer standing up

10   here telling you these things.  You will hear this from

11   witnesses, from TWA pilots who will come here and sit in that

12   chair and tell you what happened.  They will tell you what

13   they did, what they asked their union to do and what the

14   union failed to do to protect them.

15        What happened was the TWA pilots, this committee

16   that was formed to negotiate, they were unable on their own

17   to convince the American pilots to treat them fairly.  All

18   right.  The negotiation was not successful.  So what did the

19   TWA pilots, what did any dues paying union member do?  They

20   went to their union and asked for help.  We need help.  We

21   are getting beat up here.  These American pilots are being

22   completely unreasonable and we need help.  Well, they got

23   none.  What they got was lip service and broken promises.

24   That is what you are going to hear.  There were no strikes.

25   None of the aggressive union action that we come to expect,

1    no strikes, no picketing, no boycotting, no litigating, no

2    anything.  None of the aggressive tactics from the union that

3    you would expect.

4         What you would hear instead is that ALPA simply

5    allowed the American pilots to impose their will on the TWA

6    pilots.  And carry out, what everybody will agree was a

7    grossly unfair integration.  So maybe now you are asking,

8    okay, Mr. Press, why would a union do that?  It doesn't make

9    any sense.

10        And it doesn't.  But there is a reason.  And the

11   reason is a lust for power.  See, ALPA didn't represent the

12   11,000 American pilots.  They did at one time.  The American

13   pilots were founding members of ALPA with TWA and  Northwest,

14   back in 1931.  But in 1963 the American pilots left ALPA and

15   formed their own company union.  In 1963 they left ALPA.

16   Now, in that time ALPA had always wanted those pilots to come

17   back, and in the year 2000 it looked like that might happen.

18        In the year 2000 there was an action at American

19   for those pilots to rejoin ALPA.  In November, 2000, ALPA's

20   president, Duane Woerth was invited to speak to the American

21   boards of directors.  This was the first time since the

22   American pilots broke away from ALPA that this happened.  He

23   was invited to speak, November, 2000.  He took advantage of

24   that, went to Dallas Fort Worth where they are headquartered

25   and spoke to the board of directors about rejoining ALPA.

28

1  His speech motivated the American pilots to form a committee

2  to rejoin ALPA.  They called it the ALPA Exploratory

3  Committee.

4          This committee traveled to Washington, D.C. where

5  ALPA is headquartered.  They had meetings, got their

6  information, were doing due diligence.  They flew to Fort

7  Worth, met with American pilots, and this committee was

8  generating some support at American to rejoin ALPA.  Then

9  what happened?  January, 2001, January 9 to be precise, so

10  this has got the meeting with pilots, meeting at Dallas, on

11  this day, three months, two and a half months later, American

12  announced it was buying TWA.

13          So the transaction is here, on that day everybody

14  knew there was going to be a fight between the TWA pilots and

15  the American pilots over seniority.  So the pilot group that

16  American was, that ALPA was courting to join its union in

17  November and December, all of a sudden now they are the bad

18  guy.  They are the adversary.  Well, ALPA, we believe the

19  evidence will show, they didn't want a fight.  They don't

20  want to fight the American pilots.  They wanted them to join

21  them, and this created a conflict of interest in them.  A

22  conflict of interest.  They were conflicted.  On the one hand

23  they know they got to represent the TWA pilots in this fight

24  that is going to be coming up, and on the other hand, they we

25  have these American pilots that we want to join us and we had

1    a deal done, they didn't encounter this.  So right off the

2    bat you have TWA pilots making huge concessions to the other

3    side.  Unnecessarily.  And you will hear from the negotiate

4    tours who made this, that this was a terrible mistake.  We

5    should have never done this.  It put us behind the eight

6    ball.  We were already back peddling before they even made a

7    move and it was a mistake.

8          The other thing, remember I told you there was,

9    leading up to this 1113 here there was three really big

10   things that happened.  This was the first.  ALPA coming down

11   telling TWA pilots you got to staple 800.  Second one, right

12   on the heels of that, involves a lawyer that, his name is

13   Roland Wilder.  Roland Wilder is a labor lawyer.  And he was

14   hired by the TWA pilots to help them get through this

15   process.  Okay.  He has got over forty years experience in

16   dealing with these issues, and he took his video deposition.

17   He lives in Washington so we couldn't make him come up here

18   and testimony but we took his deposition and you will see it.

19   One of the the things he will tell you is that he came up a

20   with a plan in late March to create some leverage for the TWA

21   pilots.

22          What he wanted to do is slow this process down.  He

23   wanted to slow it down.  How did he want to do that?  He

24   wanted to go to court and get an injunction holding up

25   American's purchase of TWA.  He thought that would create

1  pressure on American to put its foot on the American pilots,

2  on their pilots to soften up.

3          I will tell you in labor negotiation, slowing down

4  the process is almost always a good thing, just creating more

5  time creates leverage.  So he wanted to go to court, and he

6  will describe his strategy for you, but he wanted to get this

7  injunction.  And what good he do what did he do?  On March

8  26, I should back up.  The TWA pilots can't rush into court

9  and litigate their collective bargaining agreement.  It is

10  ALPA's contract.  They are the only ones that can enforce it.

11  ALPA, the union, has to bring the litigation.  So Mr. Wilder

12  knows this.

13          So what does he do?  He writes a letter to the

14  president of the union, Duane Woerth, on March 26, and he

15  says, President Woerth, here is the strategy I have, he cited

16  case law and everything in this letter, you will see it, he

17  said this is the strategy I want to employ.  I want to get

18  this injunction.  Please authorize me to do that.  He asked

19  for authority to file the lawsuit.  What does he get?  He

20  gets no response at all.  The president just completely

21  ignores him.  So his plea for help goes unanswered.  March

22  28, you got to staple 800.  March 26, that letter goes

23  unresponded to, not going to file that lawsuit.

24          Then just a few days later on April 2, is the third

25  event that you are going to hear a lot of evidence about.  On

1       April 2 there was a meeting of the two pilot leaders to talk

2       about the hearing.   Remember April 6 I told you there is go

3       fog be a hearing on the bankruptcy motion to get rid of the

4       contract.   On April 2 there was a meeting to talk about that.

5       I called them pilot leaders.   Let me tell you what they were

6       called.   Another acronym.   MEC.

7              ALPA has a structure.   Here is ALPA.   Then you got,

8       all these different airlines united.   Delta.   Northwest.

9       TWA, U.S. Air.   They were all represented by ALPA.   All these

10      different pilot groups nominate leaders to make decisions for

11      them, some decisions.   They can't make every decision, but

12      some they can.   And these pilot leaders that, that are

13      elected by the pilot group, it is called the master executive

14      counsel master executive council.   MEC.   Another acronym for

15      you.   Every pilot group for you, MEC.   MEC to help them out.

16      The TWA pilots had a MEC.

17             Mr. Case was part of that for a while.   You are

18      going to hear from other members of the MEC who will come in

19      and testify.   The names that the Judge read off to you, Sally

20      Young, Howard Hollander, these are two MEC members.   Anyway,

21      get go back April 2.   There is a meeting of the MEC on that

22      date.   To vote on how we are going to confront this

23      bankruptcy motion.   MEC meeting.

24             At this meeting a parade of ALPA officials and

25      lawyers confronted the MEC members.   There were six voting

1   American pilots across the country can't get to work unless

2   they buy their own tickets.  There is going to be an uproar.

3   And it was Captain Day's opinion that just threatening a jump

4   seat war, just threatening it, would have created some

5   leverage and very quickly.  And he asked for permission to do

6   that.  He said ALPA, please organize it.  Get the word out to

7   all of your members, all 60,000 of them, and tell them to

8   stop letting American pilots jump seat, use your jump seat.

9   Well, what did the executive council do?  No.  We are not

10  going to do that without giving any reason.  We are just, no,

11  we are not going to do that.  Okay.  Well, so then you got,

12  he had another idea.

13          ALPA is part of something bigger.  You have heard

14  of the AFL-CIO.  American Federation of Labor.  ALPA was a

15  member.  This organization represents ten million people or

16  more.  Every major union in the country is a member,

17  affiliated member, and ALPA was.  The American pilots union

18  was not.  ALPA was the piloting union representative of the

19  AFL-CIO.  What Captain Day wanted to do, again, the AFL-CIO

20  maintained a boycott list.  He said these, here is a list of

21  companies that you should not do business with.  They are

22  unfair to labor, and you shouldn't do business with them.

23  And there is literally a list of companies, and it could be

24  anything.  And they published that list to all their members,

25  that don't do business with these people.  And this boycott

1   is designed to create some leverage.  To soften up the

2   company.  What Captain Day wanted to do, he wanted ALPA to go

3   to the AFL-CIO and say hey, put American Airlines on your

4   boycott list.  Okay.  Put American Airlines on that list.

5   Again, doesn't cost a nickel.  ALPA said.  What did they say

6   on July 23, no, not doing that either.  Can't have the jump

7   seat water war, we are not doing that.  We are not going to

8   put American on the boycott list.  Mike Day, he is a pilot.

9   He is not an expert in these matters.  These are two things

10  he thought of.  Okay, do you have any ideas?  No, no, there

11  was no ideas.  The experts, the biggest pilot union in the

12  world, had nothing to offer.

13          Why would a union take such simple actions.  They

14  don't cost anything.  It go back to the conflict of interest.

15  They didn't have the stomach to fight.  They wanted it over

16  as quickly and painlessly as possible.  Sadly there is a

17  whole lot more, there is no way I could cover anything in

18  this short talk up here.

19          And while at the same time Captain Day is in front

20  of the executive counsel the pilots lawyer, Mr. Wilder, he

21  comes up with another strategy, another litigation he wants

22  to file.  He is a lawyer.  That is what he wants to do.  And

23  he comes up with the strategy and he, to sue American and sue

24  the American airline pilots.  I won't get into his theory.

25  I will let him describe it.  He will do a much better job.

1          He wants to suit the American, and the American

2    Airlines pilots.  He drafted a detailed memo and sent it to

3    ALPA for their review like he did in March.  This is July, I

4    think it is July 2 he wrote this memo and sent it up.  He

5    asked for permission to file the lawsuit he wanted to file.

6    Again as we saw in March, he is rebuffed.  He is not given

7    permission.  You got Captain Day asking for help, you got the

8    lawyer for permission to file lawsuits and again the union is

9    simply saying no.

10          So what happened?  Well, without any leverage, the

11   TWA pilots were left to basically, they were at the whim of

12   the American pilots.  And so what happened was the American

13   pilots entered into a side agreement with American Airlines

14   on how the integration is going to work.  They did it on

15   their own.  And they planned to simply foist that agreement

16   on to the TWA pilots.

17          You are going to hear the TWA pilots calmed it the

18   cram down because they, it is just being crammed down their

19   throats.  That was the seniority integration.  Now, here we

20   have Mr. Wilder injecting  himself again with another

21   strategy.  He wanted to stop the cram-down from happening.

22          Now we are into September.  I don't remember the

23   date.  Mr. Wilder comes up with another strategy.  He want to

24   stop the cram down, wants to go to court and get an

25   injunction.  An injunction is an order from the Court saying

1    you can't do that.  Mr. Wilder wanted to go to court and get

2    an injunction saying American, and their union, you can't

3    enter into this cram down agreement.  You can't do it.

4    Again, he draft a very detailed memo and submits it up to the

5    ALPA lawyers for their review and asks for permission to file

6    the suit.  A meeting followed.  In Washington, ALPA's

7    headquarters.  Mr. Wilder met with the president of the

8    union.  This time he gets a different response.  The

9    president says, okay.  When the time comes, and this cram

10   down is imminent, when the time comes you can file that.  You

11   can seek your injunction, Mr. Wilder.  Oh, good.  And that

12   was the plan.  If the TWA pilots couldn't negotiate an

13   agreement, they would seek this injunction if they had to.

14           Well, the day came on October 23, the day came to

15   file the injunction, that is, 10, 23.  There is a series of

16   meetings in Washington, D.C.  between the two pilot

17   negotiating committees in Washington on October -- it began a

18   few days before that.  They broke down on October 23 and a

19   final impasse was reached.  American pilots are saying we

20   need to staple 1200  of your guys, TWA is saying no, we are

21   not doing that, and there was an impasse.  The time has come

22   to seek this injunction.  So the pilots, the whole MEC was

23   there, Mr. Case was there, they called the president and said

24   okay, it is time.  And what did he do?  He reneged.  He had

25   committed to file this lawsuit.  Before, in September.  But

```
 1    when the time same, remember he said when the time comes we

 2    will do it.  The time was at hand and he reneged on his

 3    promise and said we are not doing that.  The pilots said,

 4    well, why?  The answer, "I don't sue other unions."

 5            What kind of reason is that?  "I don't sue other

 6    unions."  The evidence is going to be, first of all, it is

 7    not a truthful statement, they do sue units, but that was the

 8    reason given.  So the injunction can't get filed.  Again,

 9    ALPA has to authorize this.  The pilots can't do it on their

10    own.  And so even that isn't the end.  The TWA pilots have at

11    least one more card in their hand and this gets to an

12    entirely different subject.  The pilots, they know this is

13    not going well and so they came up with an idea of hey, let's

14    go to Congress and get some help there.  Let's get a law

15    passed that might help us.  And they did that.  They drafted

16    their own law, and the sponsor of this bill was a senator

17    from Missouri named Kit Bond who recently retired from the

18    Senate and they approached Senator Bond, Ted Case and another

19    pilot named Matt Comlish will tell you about.  They went so

20    Senator Bond and said we need you your help.  The senator

21    said go draft a bill, bring it back and I will get it and I

22    will sponsor it if it is appropriate, so they did.  With the

23    help of their lawyer, Roland Wilder, they drafted this bill.

24    It got to be called the Bond bill.

25            And this bill, what it would have done was remember
```

1    those scope protections I talked about that got waived, the

2    negotiation, mediation, arbitration, that would have been the

3    law of the land for this transaction.  Congress, this bill

4    would have said American airline pilots, you have to follow

5    this procedure.  You can't do your own cram-down.  There is

6    going to be a fair process for this integration.  That is

7    what the Bond bill is designed to do.  Kit Bond, Senator

8    Bond, did approve it and he did sponsor it, and that was in

9    very early October.  And the thing had legs, lo and behold.

10   There was a massive, I don't know, maybe not massive, there

11   was a significant grass roots lobbying efforts by TWA pilots

12   and TWA flight attendants.  They went on Capitol Hill, talked

13   to senators, talked  to staffers, talked to Congress people,

14   and this bill had some legs.  It got through the Senate.

15   Okay.  And it got attached to a defense appropriation bill.

16          Now, what is important about all of this Bond bill

17   stuff is the fact that ALPA didn't do anything of substance

18   to help get it passed.  And ultimately the bill did fail.  It

19   got through the Senate but it didn't get through the Congress

20   and it failed.  ALPA touts as one of the mighty swords, its

21   connections on Capitol Hill.  It was a whole department

22   devoted to lobbying, a whole group of lobbyists.  One of that

23   was employed by the TWA pilots in support of this bill.  That

24   is what our evidence will show.

25          We can't sit here and tell you the bill would pass

1   if ALPA had got even behind it appropriately but we can tell

2   you that is what the TWA pilots expected, that is what ALPA

3   has done in the past to help pilots in trouble and it didn't

4   happen here.

5         The only tangible evidence of any support for this

6   bill that at least I am aware of today was a letter that

7   President Woerth wrote to Kit Bond, again, Senator Bond was

8   the sponsor of the bill and the president writes a letter

9   saying we support that.  That is not support.  Writing to the

10  Senator or the Congress men that sponsors a bill and saying

11  hey, we like that, that is meaningless.  You need to write

12  and go talk to those politicians that maybe aren't in favor

13  of on it.  That is what lobbying is about.  That didn't

14  happen here.

15        So the bill finally gets defeated in December, and

16  we turn into the dark winter, and in January, and February,

17  there is an effort amongst some TWA pilots, Ted Case again

18  being $1 of them, to say, hey, we got to put up a legal

19  challenge to this cram-down, this seniority integration is

20  going to be imposed on us.  We need to go to court and

21  challenge it and he asked for permission to do that from his

22  union and ALPA said no, we are not doing that.  So then the

23  TWA MEC went to ALPA and said, well, you have got this war

24  chest of money called a major contingency fund, and it is

25  tens and tens of millions of and it is used to help pilots

57

1  groups in trouble, paying for striking and all kinds of

2  activities.  What the TWA pilots asked for said ALPA, you if

3  you are not going to bring this lawsuit, give us some money

4  so we can do that.  Give us that permission.  We want to

5  challenge the seniority integration in court.  We want to do

6  what we can to try to protect out seniority and ALPA said no,

7  we are not going to give you any money.

8          The end, ladies and gentlemen, finally came on

9  April 2, the last date I am going to write, April 2, 2002.

10  That is when TWA was finally integrated into American

11  Airlines for purposes of labor laws, and the American

12  Airlines union then became the bargaining agent for the TWA

13  pilots.  On that day, ALPA no longer represented the TWA

14  pilot, they were not represented represented by the American

15  pilot union.  On that day this cram-down agreement I talked

16  about took effect.  It took effect on that day.  And what

17  happened?  Well, this is after 9-11, and you may recall that

18  9-11 spurned a lot of layoffs and downsizing in the airline

19  industry.  Not a good time for that industry.  And American

20  laid off pilots.  TWA had laid off pilots.  And much of that

21  happened before April 2, 2002.

22          So what happened?  When that cram-down agreement

23  took effect on that day all the American pilots that had are

24  be furloughed, not all, almost all, they got the jobs back

25  and they got replaced on the street by TWA pilots.  Remember

# Exhibit 3

```
 1              IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3         THEODORE A. CASE, SALLY YOUNG,
           HOWARD HOLLANDER, PATRICK BRADY
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                              Plaintiffs,
 6                                                 VOLUME 2
                V.                           TRIAL TRANSCRIPT
 7
           AIR LINE PILOTS ASSOCIATION,
 8
                              Defendant.
 9
                                     CAMDEN, NEW JERSEY
10                                   JUNE 8, 2011

11         B E F O R E:  HONORABLE JOSEPH E. IRENAS
                         UNITED STATES DISTRICT JUDGE
12
                        A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                  AND: LISA J. RODRIGUEZ, ESQ.
15                  AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.  (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.  (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:  STEVEN FRAM, ESQ.
19                  AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH GINSBERG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

 1   Q.   Go ahead, Mr. Case.

 2   A.   We received a fairly warm welcome from a couple of the

 3   ALPA executive council members.  Tom rashberg was one of the

 4   ones.  I am not quite sure if I would called the United

 5   Airlines executive vice president, but those two were

 6   probably the only two that gave us a warm reception.  The

 7   Delta representative was very hostile to us.  He felt that

 8   TWA had been a plague on the association for years and done

 9   nothing but drag down wages from our concessionary contract.

10   We once again did not get a very warm welcome from the

11   executive council.

12              THE COURT:  Was Delta one of the larger

13   members?

14   A.   Yes, sir, Delta was one of the larger members.

15              THE COURT: So through a merger Delta would

16   more likely be an acquirer than an acquiree?

17   A.   Yes, sir.

18              THE COURT:  As an acquirer of American they might

19   oppose it.

20   A.   No, sir.  They are, they were  --  if there was an ALPA

21   ALPA carrier they are subject to merger policies.  If it was

22   non-ALPA to ALPA, and they were the acquirer, they were still

23   subject to --

24              THE COURT:  They may be subject.  But they, Delta

25   didn't support this.

1    A.    No, he was hostile to the fact that we were TWA people

2    asking for this.

3              THE COURT:   What about United?

4    A.    They were the ones -- United was in favor and at the

5    time United was, if I am not mistaken, the largest carrier in

6    the world.

7    Q.    So at the end of the day what support, if any, did you

8    receive from the executive council pursuant to your request?

9    A.    We did not receive support.

10   Q.    So going forward from there, what did you do to try to

11   get your bill passed?

12   A.    We continued a grass root lobbying campaign.  We would

13   organize on -- at a given point, and my task, as I saw it,

14   was to coordinate the small groups of lobbyists, and send

15   them out, give them a list of senators and Congress.

16   Q.    Can I interrupt you?  I am sorry.  When you say grass

17   roots, what do you mean?  Who was involved in the lobbying?

18   A.    In the grass roots lobbying campaign TWA pilots and

19   flight attendants primarily.  We had some ground work

20   machinists that would go with us, but it was mostly pilots

21   and attendants.  We were in uniform, walked the halls of

22   Congress, we would set them up groups and let groups of four

23   or five go to visit different senators and congressmen and

24   and ask for support for the Bond legislation.

25   Q.    How did that work?  Take us through a typical day.

1    A.   It went very well, believe it or not, we got a warm

2    reception.

3    Q.   I am sorry.

4                   MR. FRAM:   Your Honor?

5    Q.   Organizing this grass roots lobbying, what did you do on

6    a daily basis?

7    A.   I was the coordinator.  I would basically collect the

8    people together, assign them a task, assign them which

9    Senator and Congressmen to see and give them a script to read

10   from and let them go out and make a pitch.  We would usually

11   concentrate people within the  group going to their

12   constituent representatives.

13   Q.   Did you also personally visit politicians, senators and

14   Congress people?

15   A.   Yes, sir, I did.

16   Q.   I handed you a stack of business cards.  What is that?

17   A.   A partial stack of Congress men's and senators offices

18   and people that I visited personally.

19   Q.   Those are cards you collected personally?

20   A.   Yes, sir.

21   Q.   Can you flip through and give us some names?

22   A.   Patrick Lahey, Barbara Boxer, Hillary Rodham Clinton,

23   Tom Dashill.  Max Cleland.  Senator, Congressman Oberstar.

24   Q.   Congressman Oberstar, who was he?

25   A.   He was the, I believe at the time, the house chair for

1   the department, the Transportation Department of the House.

2   Transportation committee of house.

3   Q.   Tell us about your meeting with him?

4            MR. FRAM:  Well, I object, your Honor, to any

5   statements made that would be hearsay.  I don't object if he

6   wants to talk about when the meeting was there, who was

7   there, but any substance would be objectionable.

8            THE COURT:  I will allow it.  Go ahead.

9   A.   I made a very detailed presentation to Congress

10  Congressman Oberstar.  He was the chairman of the committee

11  that would be intimately involved with the legislation on the

12  House side.  Spent probably an hour or so with the gentleman

13  explaining to him exactly what this integration was going to

14  do and how terribly harmful it was going to be to Missouri,

15  primarily as well as how unfair it was to the employees.

16           THE COURT:  Is he from Missouri?

17  A.   No, sir, he is not.  He Mr. Oberstar at the conclusion

18  of the meeting simply said, "Mr. Case, you give a great

19  presentation.  Where does ALPA stand on this?"

20  Q.   And what was your response?

21  A.   My response to him was, I asked him had he not already

22  heard from ALPA about this and he said no.

23           MR. FRAM:  Your Honor, I object.

24           THE COURT:  I am going to allow that.  Go ahead.

25  Q.   Can you repeat that, Mr. Case?

1    A.    Yes, sir.  He said where was ALPA on this issue, and I

2    said haven't you heard from ALPA?  And he said no.

3    Q.    And over what period of time did this lobbying go on,

4    really intently?

5    A.    The extensive lobbying went on from mid to late Septe

6    amber all the way up until mid October, primarily.

7    Q.    How much time did you spent personally in Washington,

8    D.C. during that time period?

9    A.    A lot of time.

10   Q.    Can you quantify?

11   A.    Probably four days a week.  Three to four days a week

12   over that period of time I would estimate.

13   Q.    And during that month time did you ever see anybody from

14   ALPA on Capitol Hill?

15   A.    Twice.

16   Q.    Okay.

17   A.    Captain Woerth was there one day for a photo op with a

18   AFL-CIO function, and as I said, all of our pilots were in

19   uniform and flight attendants, and walked over where we were,

20   he grabbed us and put us in the picture with him.  I saw him

21   there that one day.  Like I said it was a photo op.  And just

22   one other time I saw Paul Hallison, who was the ALPA

23   legislative affairs department, one of their lobbyists.

24   Q.    Did anybody at ALPA, this Mr. Hallisay, what is his job

25   title at ALPA?

1    A.   I believe he is in legislative affairs.  He is

2    essentially one of ALPA's lobbyists.

3    Q.   Did ALPA assign Mr. Hallisay or some other lobbyist to

4    help?

5    A.   Not that I am aware.

6    Q.   Did anybody help you from ALPA?

7    A.   Not that I am aware of.  Matt Comlish did most of the,

8    he was mostly the communicator between ALPA  legislative

9    affairs department and our little groups.  I was just on some

10   speaker phone calls with Matt and Mr. Hallisay a couple of

11   times, but it was generally Matt that was the conduit to the

12   ALPA legislative affairs department.

13   Q.   You mentioned this meeting with Mr. Oberstar.  Again, he

14   was a Congressman from where?

15   A.   I am not exactly sure what state I was from at that

16   time.  He was a longstanding house member and chaired the

17   committee we were interested in targeting.

18   Q.   You asked him if he had been in in contact by ALPA?

19        THE COURT:  No, you asked the question, that has

20   been asked and answered.  Move on.

21   Q.   After your meeting with Mr. Oberstar what did you do

22   with respect to soliciting ALPA support for the bill?

23   A.   We continued to request once again via conduit through

24   Matt some support.  What we were after was we wanted some

25   back up from the worlds powerful airline pilot lobbying

```
 1    machine.

 2    Q.   Did you call anybody at ALPA seeking help?

 3    A.   I don't recall.

 4         THE COURT:  Did you write to ALPA seeking help?

 5    A.   I am pretty sure there was correspondence that went back

 6    and forth.  I was extremely busy coordinating the lobbying

 7    effort.

 8         THE COURT:  Did you ever write a letter to ALPA

 9    asking for support?

10    A.   I believe Captain Pastore did.

11         THE COURT:  Okay.  The answer is you didn't.

12         THE WITNESS:  No.

13    Q.   Did you see any evidence of any support from ALPA in any

14    of the offices, Senate offices, you went to?

15    A.   No, sir, not that I could see.

16    Q.   What happened to the bell as to the bill as far as

17    getting through the Congress?

18    A.   Getting through the Congress.

19    A.   It was just passed on the Senate floor by unanimous

20    consent and eventually stripped out of the defense

21    appropriations bill that we had attached it to in the House

22    Senate conference committee.

23    Q.   I handed you exhibit P 418.  What is that?

24    A.   This is a press release from Senator Kit Bond.

25    Q.   What is the date of it?
```

1    A.   It is dated December 8, 2001.

2              MR. PRESS:  Move for the admission of P-418, Judge.

3              MR. FRAM:  I have the same objection as before,

4    your Honor.  Did it is admitted for the truth I object.  If

5    for nonhearsay purposes.  I understand the Court's ruling.

6              THE COURT:  Well, to the extent it has facts, do

7    you have any dispute with what it says in here?

8              MR. FRAM:  Not with respect to the facts.  But

9    there are some opinions and understandings.

10             THE COURT:  To the extent it is Bond's opinion, we

11   are not offering it for the truth.  We are not saying whether

12   his opinions are accurate or inaccurate.  I am going to allow

13   it.  P-418.

14             MR. PRESS:  Yes, your Honor.

15   Q.   This is a press release dated December 8, '01, from the

16   Senator?

17   A.   Yes, sir.

18   Q.   Just read the tag line at the top?

19   A.   Senate adopts Bond airline workers fairness act.

20   Requires third-party arbitration for seniority talk.

21   Q.   It got through the Senate, your bill, that you drafted?

22   A.   Yes, sir.  I didn't draft it completely.

23   Q.   What happened to the bill after that?

24   A.   As I stated before, in the House Senate reconciliation

25   conference it was stripped.

1   Q.   When was that?

2   A.   I don't recall the exact date.

3   Q.   You testified that for about a month, three or four days

4   a week you were in Washington, D.C. lobbying?

5   A.   Yes, sir.

6   Q.   You mentioned the flight pay loss before?

7   A.   Yes, sir.

8   Q.   Where the company would pay for the time off work?

9   A.   Yes, sir.

10  Q.   Were you compensated for your time lobbying at some

11  point?

12  A.   I was reimbursed for the trips that I had to miss to

13  conduct my lobbying experience, yes.

14  Q.   By who?

15  A.   By our ALPA budget, or TWA budget.

16  Q.   What was the process for you to be paid?

17  A.   The process was, as a pilot would drop a trip for

18  conducting union work, a slip of flight pay loss request

19  would go up the chain to National ALPA.  They had to approve

20  all of the flight pay loss and once they approved it and sent

21  it back, then the pilot would be paid for the days that he

22  was available for his trip, while he was doing the union

23  work.

24  Q.   ALPA had been playing flight pay loss claims for your

25  lobbying efforts?

```
 1   A.   It was TWA dollars.  All they are doing is authorizing,

 2   TWA MEC's budget moneys pays for the trips that were lost.

 3   Q.   Was there a time that ALPA stopped doing that?

 4   A.   Yes, there was.

 5            MR. FRAM:  Can we know what exhibit is being handed

 6   out?

 7            MR. PRESS:  357.

 8            MR. FRAM:  I would ask counsel if he could announce

 9   them earlier.

10            MR. PRESS:  I am sorry.

11            THE COURT:  Is it P-357.

12   Q.   I have handed you exhibit P-357.  What is that?

13   A.   It starts with fax cover to Bob Pastore, Ted Case, and

14   Kevin Dillon.  It is from Jalmer Johnson, dated 12/12/01.

15   Q.   Is it is a fax from Jalmer Johnson to you and others?

16   A.   Yes.

17   Q.   Who is Jalmer Johnson?

18   A.   At the time I believe his title was general manager of

19   ALPA.

20            MR. PRESS?  I  move for admission of Exhibit 357,

21   Judge.

22            MR. FRAM:  No objection.

23            THE COURT:  Okay.  P-357 in evidence.

24   Q.   There is the cover page, right?

25   A.   Yes, sir.
```

1   Q.   Go to the next page?

2   A.   Yes, sir.

3   Q.   What is this form, what is this?  It is from you, right?

4   A.   Yes, that's correct.

5   Q.   To Mr. Johnson dated December 12, 2001.

6   A.   Yes, sir.

7   Q.   What is this?

8   A.   This is the flight pay loss form that had to be sent up

9   to National ALPA for approval to pay the pilot for the trip

10  that was missed.

11  Q.   And did you prepare this document?

12  A.   Yes, I did.

13          THE COURT:  By the way, was this one for your loss

14  or somebody else's loss?

15  A.   This particular ONE was for Captain Hollander's  loss.

16          THE COURT:  You were doing it at his behalf.

17  A.   At this time I was the TWA MEC's secretary treasurer.

18  It was my job to apply for the flight loss due for the

19  committee members.

20          THE COURT:  This was for Mr. Hollander.

21  A.   There was for Mr. Hollander's work on Capitol Hill.

22          THE COURT:  This is for work done after the Bond

23  bill had passed?

24          THE WITNESS:  Correct, sir.

25          THE COURT:  Okay.

# Exhibit 4

```
 1                  IN THE UNITED STATES DISTRICT COURT.
                    FOR THE DISTRICT  OF NEW JERSEY
 2                  CIVIL 02-2917  (JEI)

 3          PATRICK BRADY, SALLY YOUNG,
            HOWARD HOLLANDER, THEODORE CASE,
 4          AND MICHAEL FINUCAN, individually
            and on behalf of all others
 5          similarly situated,
                            Plaintiffs,
 6                                               VOLUME  19
                 V.                              TRIAL TRANSCRIPT
 7
            AIR LINE PILOTS ASSOCIATION,
 8
                            Defendant.
 9
                                         CAMDEN, NEW JERSEY
10                                       JULY 12, 2011

11     B E F O R E:   HONORABLE JOSEPH E. IRENAS
                            UNITED STATES DISTRICT JUDGE
12
                      A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                   AND: LISA J. RODRIGUEZ, ESQ.
15                    AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.   (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:  STEVEN FRAM, ESQ.
19                   AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH  GINSBURG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1    still obnoxious from the TWA pilots' side, but that is what

2    they did.

3          Now, what happened after that?  They go into this

4    facilitated negotiation process, all throughout the summer,

5    meeting after meeting after meeting.  I don't know how many

6    meetings.  I know it was more than ten, Mike Day testified

7    to.  And throughout that the APA does nothing.  They don't

8    come off this position one iota to out that whole process in

9    the summer.

10         And then after 9-11, a week after 9-11, they write

11   a letter to Mike Day saying we are done.  We are done talking

12   to you, we are going to go to our board, and we are going to

13   do what we want.  At that point, 14, 15, was still the offer.

14   What happened next?  The TWA pilots got involved.  They went

15   to Senator Bond, got him involved.  And Bond announces this

16   bill that would give arbitration to the TWA pilots, had it

17   passed.  That was on October first that that announcement was

18   made.

19         This is just some Senator saying hey, I got this

20   bill, I put on the floor.

21         What happened next?  American pilots come back to

22   the table on their own and say hey, we got a better deal, you

23   are going to love it.  And that better deal, it was better,

24   was Supplement CC.   The staple lowered to 1,200.  And it

25   included in this notion of fencing all the TWA pilots in St.

1    Louis, which not only kept them all in St. Louis corralled

2    there but it kept American pilots out of St. Louis, which

3    meant they couldn't bid there which was some sort of benefit

4    for the TWA guys.

5            So on the strength of the TWA pilots doing nothing

6    other than get Senator Bond to introduce some legislation,

7    the American pilots lower the staple by 250, and offer this

8    notion of a fence in St. Louis.  That was done with just the

9    leverage of maybe the senator's bill might get passed some

10   day.  That was the only leverage.  That was all that had

11   changed.   What if ALPA had gotten involved and done any of

12   the things, or all of the things, that were requested of it?

13   Litigate, boycott.  All of it.  Would there have been a

14   better deal?  A more favorable deal?  Again, that is up to

15   you to decide.  But again, you must use your common sense and

16   look at what happened.

17           If you lower that staple by one pilot, that is

18   injury.

19           Folks, I am finished.  Okay.  I am sure you have

20   heard enough.  And I am going to sit down now, and the Judge

21   is going to read some instructions to you and we will see you

22   when you get back.

23           THE COURT:  Thank you, Mr. Press.  We will take a

24   short break now.  About 15 minutes.  It is 25 of 11.  About

25   ten of 11.  Then I will read my charge of the law to you.

1    And then the case is yours.  Don't discuss the case among

2    yourselves until you have heard my charge.  All rise.

3                (Jury leaves the courtroom)

4                THE COURT:  Mr. Fram.

5                MR. FRAM:  Two things.  One, I did write out a

6    proposed insert to deal with this with this issue of witness

7    vouching, if I can hand it up.  I indicated, your Honor,

8    where I would request that the Court include it.  It would be

9    on page 10, is where I was suggesting.

10               THE COURT:  Have they seen it?

11               MR. FRAM:  No, they haven't, your Honor.

12               THE COURT:  While they are looking at it, you have

13   a second point.

14               MR. FRAM:  I did, your Honor.  I thought we talked

15   about the advice in the charge that if you find by a

16   preponderance of the evidence that ALPA breached, then you

17   must.  And the converse.  I am looking, your Honor, at the

18   bottom of page 18 of the charge.

19               THE COURT:  Yes.

20               MR. FRAM:  I thought that paragraph was going to

21   move and be part of what you of this --

22               THE COURT:  Page 19, not 18.

23               MR. FRAM:  I am looking at the bottom of 18.

24               THE COURT:  Look at 19.

25               MR. FRAM:  19 is what we discussed.  I guess my

# Exhibit 5

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PATRICK BRADY, et al.,     :    HONORABLE JOSEPH E. IRENAS
                             :
            Plaintiffs,   :
                            : Civil Action No. 02-2917 (JEI)
     v.                :
                             :
                             :         **JURY VERDICT**
AIR LINE PILOTS           :
ASSOCIATION, et al.      :
                             :
            Defendants.   :
                             :

We, the jury, unanimously find the following by a preponderance of the evidence:

(1) Did Defendant Air Line Pilots Association violate its duty of fair representation to the TWA Pilots?

Answer:  Yes   X   No     

**IF YOU ANSWERED "YES" TO QUESTION (1), PROCEED TO QUESTION (2). IF YOU ANSWERED "NO" TO QUESTION (1), PLEASE STOP; YOUR DELIBERATIONS ARE OVER. THE JURY FOREPERSON MUST SIGN THE LAST PAGE OF THIS VERDICT FORM.**

1

(2) Did Defendant Air Line Pilots Association's violation of its duty of fair representation directly cause injury to some of the TWA Pilots?

    Answer:  Yes  ___X___  No  _____


**PLEASE STOP; YOUR DELIBERATIONS ARE OVER.  THE JURY FOREPERSON MUST SIGN THE LAST PAGE OF THIS VERDICT FORM.**

**SO SAY WE ALL, this _13_ day of July, 2011.**


_____
Foreperson

2

# Exhibit 6

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
2                       CAMDEN VICINAGE

3              CIVIL ACTION NO. 02-2917-JEI

4

5    PATRICK BRADY, ET AL.,

6          PLAINTIFFS,

7    VS.

8    AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,,

9          DEFENDANT.
     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/
10

11                      200 S. BISCAYNE BOULEVARD
                        SUITE 3500
12                      MIAMI, FLORIDA
                        FRIDAY, JANUARY 18, 2013
13                      1:53 P.M. - 5:27 P.M.

14

15

16                      VIDEOTAPE

17              DEPOSITION OF WILLIAM COMPTON

18

19       TAKEN VIDEO DEPOSITION OF WILLIAM COMPTON WAS

20   TAKEN ON FRIDAY, JANUARY 18, 2013, AT THE LAW OFFICES

21   OF MORGAN, LEWIS & BOCKLUS, LLP, 200 S. BISCAYNE

22   BOULEVARD, SUITE 5300, MIAMI, FLORIDA, BEFORE CAROL

23   HILL WILLIAMS, FPR, RMR, CRR, CMRS, CPE, CRI, COURT

24   REPORTER AND A NOTARY PUBLIC IN AND FOR THE STATE OF

25   FLORIDA AT LARGE.

Page 11

```
 1    A.    I AM NOT.                                      02:04:55

 2    Q.    DID YOU HOLD ANY LEADERSHIP POSITIONS WITHIN   02:04:56

 3  ALPA WHILE YOU WERE AT TWA?                            02:04:58

 4    A.    I DID.  I WAS -- IN 1986 I WAS ELECTED TO THE  02:05:01

 5  TWA MEC NEGOTIATING COMMITTEE.  IN 1988 I WAS MADE     02:05:07

 6  CHAIRMAN OF THE TWA NEGOTIATING COMMITTEE.  AND IN 1991 02:05:12

 7  I WAS ELECTED MASTER CHAIRMAN OF THE TWA MEC,          02:05:20

 8  MAINTAINED THAT POSITION FOR TWO TERMS THROUGH, I      02:05:27

 9  BELIEVE IT WAS, SEPTEMBER OF 1995.                     02:05:29

10    Q.    ANY OTHER LEADERSHIP POSITIONS WITHIN THE AIR  02:05:35

11  LINE PILOTS ASSOCIATION?                               02:05:37

12    A.    WELL, AS A MASTER -- AS A MEC CHAIRMAN YOU     02:05:38

13  ARE ALSO PART OF THE ALPA EXECUTIVE BOARD, I BELIEVE   02:05:41

14  THAT IS WHAT IT WAS REFERRED TO.  SO I WAS IN THAT     02:05:46

15  CASE -- ALSO I BELIEVE EARLY ON IN THE '80S I WAS ALSO 02:05:48

16  ON THE ALPA NATIONAL BARGAINING COMMITTEE.             02:05:54

17    Q.    YOU MENTIONED THE "TWA MEC," WHAT IS THAT?     02:05:59

18    A.    THE MASTER EXECUTIVE COUNSEL.                  02:06:02

19    Q.    AND WHAT IS THE FUNCTION OF THE MASTER         02:06:06

20  EXECUTIVE COUNSEL?                                     02:06:08

21    A.    IT MAINTAINS THE FUNCTIONALITY OF THE          02:06:11

22  UNIONIZED ALPA PILOTS AT TWA.                          02:06:14

23    Q.    WHEN DID YOU SAY YOU ACTUALLY LEFT TWA?        02:06:29

24         MR. JACOBSON:  OBJECT TO THE FORM OF THE        02:06:35

25    QUESTION.  THERE WERE TWO TWAS.  THE TERM IS         02:06:37
```

Page 12

```
 1     AMBIGUOUS.  TWA, INC. AND TWA, LLC.                  02:06:40
 2          MR. MICHAEL:  YOU CAN ANSWER IF YOU             02:06:43
 3     UNDERSTAND.                                          02:06:46
 4     A.    SO MY LAST DAY WITH TWA WAS THE DAY THEY       02:06:46
 5     CLOSED THE AGREEMENT WITH AMERICAN AIRLINES.  MY LAST 02:06:51
 6     DAY WITH TWA, LLC WAS DECEMBER 31, 2001.            02:06:56
 7     Q.    AND WHAT WAS TWA, LLC?                         02:07:01
 8     A.    IT WAS -- IT WAS THE -- I'M LOOKING FOR THE    02:07:05
 9     RIGHT WORD, BUT IT WAS THE OFFSHOOT OF TWA AFTER THE 02:07:14
10     MERGER WITH AMERICAN AIRLINES.  IN OTHER WORDS,      02:07:19
11     AMERICAN AIRLINES -- IT WAS A SUBSIDIARY OF AMERICAN 02:07:21
12     AIRLINES.  HOW IS THAT?                              02:07:23
13     Q.    WHAT DID YOU DO AFTER YOU LEFT TWA, LLC?       02:07:24
14     A.    I RETIRED.                                     02:07:28
15     Q.    AS OF 1999 WHEN YOU BECAME THE CEO OF TWA,     02:07:35
16     CAN YOU DESCRIBE THE AIRLINE'S COMPETITIVE POSITION  02:07:39
17     WITHIN THE INDUSTRY?                                 02:07:43
18     A.    IN 1999?                                       02:07:44
19     Q.    YES.                                           02:07:45
20     A.    IT WAS NOT GOOD.                               02:07:48
21     Q.    WHY IS THAT?                                   02:07:49
22     A.    TWA, IF YOU GO BACK FROM THE YEAR 2000,        02:07:52
23     HADN'T MADE A PROFIT IN 12 YEARS, AN OPERATING PROFIT, 02:08:01
24     ANY OPERATING PROFIT IN 12 CONSECUTIVE YEARS.  AND IF 02:08:05
25     YOU WOULD GO BACK 30 YEARS, YOU MIGHT JUST FIND A    02:08:08
```

Page 13

```
1   HANDFUL OF YEARS IN WHICH TWA EARNED AN OPERATING        02:08:13

2   PROFIT.  TWA WAS UNSUCCESSFUL FOR NOT ONLY THAT YEAR     02:08:16

3   AND A FEW YEARS BEFORE THAT BUT FOR DECADES.            02:08:25

4       Q.    AND DID YOU FORM AN UNDERSTANDING OF WHY TWA  02:08:28

5   WAS UNSUCCESSFUL?                                       02:08:31

6       A.    IT'S A LONG STORY.                            02:08:33

7       Q.    WHAT WERE SOME OF THE HIGHLIGHTS?             02:08:36

8       A.    I WILL TRY NOT TO TAKE YOU BACK ALL THE WAY   02:08:39

9   TO HOWARD HUGHES.  BUT I WILL TAKE YOU BACK TO THE      02:08:42

10  1970S, AND I WILL TRY TO GET THROUGH THIS RELATIVELY    02:08:47

11  QUICKLY.                                                02:08:51

12          IN THE 1970S TWA FORMED A COMPANY THAT WAS      02:08:51

13  CALLED TRANS WORLD CORPORATION.  INITIALLY IT WAS JUST  02:08:55

14  THE AIRLINE.  BUT THEY USED THE POSITIVE CASH FLOW OF   02:08:58

15  THE AIRLINE BACK IN THE '70S TO ACQUIRE COMPANIES LIKE: 02:09:02

16  CENTURY 21 REAL ESTATE, HILTON INTERNATIONAL HOTELS,    02:09:08

17  SPARTAN FOODS AND A HANDFUL OF OTHER COMPANIES.         02:09:11

18          AND THEY USED TWA'S CASH FLOW TO ACQUIRE        02:09:15

19  THOSE OTHER ENTITIES.  AND THEN THEY SPUN TWA OFF.  SO  02:09:18

20  IN OTHER WORDS, THEY USED TWA'S ASSETS TO FUND THESE    02:09:23

21  OTHER ENTERPRISES RATHER THAN FUNDING TWA ITSELF, AND   02:09:27

22  THEN TWA WAS SPUN OFF WITH FEW ASSETS:  AN OLD FLEET,   02:09:30

23  AN UNPROFITABLE ENTERPRISE.                             02:09:35

24          AND THEN IN THE 1980S CARL ICAHN TOOK A         02:09:40

25  POSITION IN THE COMPANY AND WENT THROUGH THE PROCESS OF 02:09:48
```

Page 14

```
 1   PRIVATIZING -- IT WAS A PUBLICLY TRADED COMPANY.  HE     02:09:55

 2   TOOK A MAJORITY OWNERSHIP IN THE COMPANY.  HE THEN TOOK  02:09:59

 3   THE COMPANY PRIVATE.  BY TAKING IT PRIVATE, HE TOOK A    02:10:00

 4   LOT OF MONEY OUT OF TWA.  TWA DIDN'T HAVE THE RESOURCES  02:10:05

 5   THEN TO FUND MUCH OF ANYTHING.                           02:10:09

 6           AND SHORTLY AFTER THAT TO FUND THE AIRLINE,      02:10:15

 7   HE BEGAN SELLING OFF ASSETS, WHICH PRIMARILY WERE THE    02:10:23

 8   LONDON HEATHROW ROUTES, WHICH WERE VERY VALUABLE TO THE  02:10:28

 9   COMPANY.                                                 02:10:31

10           AND THEN FAST-FORWARDING TO THE EARLY '90S,      02:10:33

11   TWA WENT INTO ITS FIRST BANKRUPTCY.  IN 1991, WENT INTO  02:10:37

12   A SECOND BANKRUPTCY, A PREPACKAGED PLAN, I BELIEVE IT    02:10:44

13   WAS IN 1994, MAY HAVE BEEN 1995, I BELIEVE IT WAS '94.   02:10:47

14   AND THEN WE GOT TO 1999 WHERE YOU ASKED ME HOW WE ARE    02:10:56

15   DOING.  WE ARE NOT DOING TOO GOOD.                       02:10:59

16      Q.   YOU ARE FAMILIAR WITH THE TERM "HUB"?           02:11:02

17      A.   I AM.                                            02:11:04

18      Q.   WHAT IS A "HUB" IN THE AIRLINE INDUSTRY?        02:11:04

19      A.   A HUB IS WHERE A MAJORITY OF YOUR AIRCRAFT OR    02:11:09

20   AIRPLANES FLY INTO AND OUT OF TO OTHER SPOKES.           02:11:12

21      Q.   AND BY 1999 HOW MANY HUBS DID TWA HAVE?         02:11:18

22      A.   TWA HAD PRIMARILY ONE HUB.                       02:11:21

23      Q.   AND WHERE WAS THAT LOCATED?                     02:11:23

24      A.   ST. LOUIS.                                       02:11:25

25      Q.   YOU SAY "PRIMARILY," WERE THERE ANY SECONDARY   02:11:27
```

1    HUBS?                                                    02:11:29

2        A.    YOU COULD HAVE CONSIDERED NEW YORK A HUB AS    02:11:30

3    WELL, THOUGH IT WAS -- I REFER TO IT AS A SMALL HUB.    02:11:33

4        Q.    AND HOW MANY OTHER AIRLINES WERE THERE IN THE  02:11:39

5    INDUSTRY AT THAT TIME THAT HAD ONLY ONE PRIMARY HUB?    02:11:41

6        A.    AT THAT TIME?  I DON'T KNOW OF ANY.  THOUGH    02:11:47

7    MAYBE AIRTRAN WAS -- AIRTRAN MAY HAVE HAD JUST ONE HUB   02:11:58

8    AT THAT POINT.  THEY NOW HAVE BEEN MERGED INTO          02:12:03

9    SOUTHWEST AIRLINES, BUT THEY BRANCHED OUT AFTER THAT.   02:12:06

10   BUT AT ONE POINT THEY HAD ONE HUB.  I CAN'T THINK OF    02:12:09

11   ANY OTHERS OFFHAND THAT JUST HAD ONE HUB.               02:12:12

12       Q.    AND DID HAVING A SINGLE HUB IMPACT TWA'S       02:12:15

13   FINANCIAL POSITION IN ANY WAY?                          02:12:19

14       A.    YES.                                          02:12:21

15       Q.    HOW WAS THAT?                                 02:12:22

16       A.    WELL, IT LIMITS -- IT LIMITED ACCESS TO A     02:12:24

17   VARIETY OF POTENTIAL CUSTOMERS.  FOR EXAMPLE, LET'S SAY 02:12:30

18   YOU LIVED IN -- LET'S SAY YOU LIVED IN CHARLOTTE, NORTH 02:12:35

19   CAROLINA, FOR EXAMPLE, AND YOU WANTED TO GO TO          02:12:39

20   PHILADELPHIA.  WELL, YOU WOULD HAVE TO FLY TO ST. LOUIS 02:12:45

21   AND THEN BACKTRACK TO PHILADELPHIA.                     02:12:48

22             SO YOU'RE NOT GOING TO ATTRACT MANY PEOPLE    02:12:50

23   FROM THE EAST COAST TO FLY ANYTHING EAST OF ST. LOUIS.  02:12:52

24   CONVERSELY, LET'S SAY YOU LIVED IN TULSA, OKLAHOMA, AND 02:12:56

25   YOU WANTED TO GO TO LOS ANGELES.  WELL, WITH ONE HUB,   02:13:02

Page 16

1   YOU WOULD HAVE TO BACKTRACK TO ST. LOUIS TO GET OUT.        02:13:06

2           SO IT'S NOT THE MOST CONVENIENT WAY TO FLY.         02:13:09

3   SO IT DIMINISHES YOUR OPPORTUNITIES.                        02:13:12

4       Q.    DID HAVING ITS HUB LOCATED IN ST. LOUIS           02:13:16

5   AFFECT TWA'S COMPETITIVE POSITION IN ANY WAY?               02:13:18

6       A.    IT DID.  I MEAN, IT HAD SOME ADVANTAGES.  IT      02:13:22

7   HAD SOME ADVANTAGES.  BUT THE FACT THAT YOU HAD ONE HUB     02:13:25

8   AND ALSO AS COMPARED TO YOUR COMPETITORS, IT WAS A          02:13:29

9   RELATIVELY SMALL HUB AS COMPARED TO THE VELOCITY OF         02:13:32

10  TRAFFIC OR THE POPULATION BASE IN THAT PARTICULAR CITY.     02:13:37

11      Q.    AS OF 1999, DID TWA FACE ANY COMPETITION FROM     02:13:41

12  LOW-COST CARRIERS IN ST. LOUIS?                             02:13:45

13      A.    YES.                                              02:13:47

14      Q.    WHICH ONES?                                       02:13:48

15      A.    PRIMARILY SOUTHWEST.                              02:13:49

16      Q.    AND WHAT IS A "LOW-COST CARRIER"?                 02:13:50

17      A.    WELL, I DON'T -- I DON'T KNOW THAT THE NAME       02:13:52

18  FITS NOWADAYS.  BUT "LOW-COST CARRIER" BACK THEN FIT A      02:13:58

19  CARRIER WHOSE COSTS WERE LOWER THAN THOSE IN THE REST       02:14:03

20  OF THE INDUSTRY.                                            02:14:08

21      Q.    AND WAS SOUTHWEST'S COSTS, IN YOUR                02:14:10

22  UNDERSTANDING, LOWER THAN TWA'S AT THAT TIME?               02:14:13

23      A.    YES, THEY WERE.                                   02:14:15

24      Q.    HOW DID COMPETITION FROM SOUTHWEST IMPACT         02:14:16

25  TWA'S FINANCIAL CONDITION?                                  02:14:19

Page 17

```
1     A.    IT WAS QUITE A CHALLENGE ACTUALLY.  THEY CAME      02:14:21

2  IN TO A LOT OF ROUTES THAT TWA HAD FOUND QUITE          02:14:24

3  SUCCESSFUL AND WHICH HAD PERHAPS ONLY COMPETITION FROM  02:14:29

4  FULL-COST CARRIERS.  AND SO NOW YOU HAD A LOW-COST      02:14:34

5  CARRIER THAT COULD CHARGE LESS FOR A PARTICULAR TICKET. 02:14:38

6  AND THEY WERE COMPETING WITH YOU ON THE SAME ROUTES     02:14:41

7  THAT YOU WERE FLYING, WHICH IN MANY CASES FORCED YOU TO 02:14:43

8  REDUCE YOUR FARES TO THAT LEVEL.                        02:14:46

9     Q.    YOU MENTIONED THAT TWA DECLARED BANKRUPTCY     02:14:48

10 THE FIRST TIME IN 1991; IS THAT RIGHT?                  02:14:51

11    A.    I BELIEVE SO.  IT MIGHT HAVE BEEN '92.  NOW    02:14:54

12 THAT I THINK BACK, IT MIGHT HAVE BEEN JANUARY OF '92,   02:14:55

13 BUT RIGHT AROUND THAT TIME FRAME.                       02:15:00

14    Q.    BASED ON YOUR ROLE WITH THE COMPANY AT THE     02:15:00

15 TIME, DID YOU FORM AN UNDERSTANDING AS TO WHAT LED TO   02:15:01

16 THAT FIRST BANKRUPTCY FILING?                           02:15:05

17    A.    TWA -- TWA WAS RUNNING OUT OF MONEY.           02:15:07

18    Q.    AND WHO OWNED TWA AT THE TIME OF ITS FIRST     02:15:16

19 BANKRUPTCY?                                             02:15:19

20    A.    CARL ICAHN.                                    02:15:21

21    Q.    AND WHO IS CARL ICAHN?                         02:15:22

22    A.    CARL ICAHN IS A -- SOME PEOPLE WOULD REFER TO  02:15:24

23 HIM AS A FINANCIER.                                     02:15:27

24    Q.    DID YOU HAVE A VIEW OF WHAT THE IMPACT OF      02:15:29

25 MR. CARL ICAHN'S OWNERSHIP OF TWA WAS ON ITS FINANCIAL  02:15:31
```

Page 18

```
 1   CONDITION?                                          02:15:34

 2       A.    IT WAS TERRIBLE.                           02:15:35

 3       Q.    AND WHAT WAS THE IMPACT OF MR. ICAHN'S     02:15:38

 4   OWNERSHIP OF TWA ON THE EMPLOYEES?                   02:15:40

 5       A.    HE WAS NOT A BIG FAN TO THE TWA EMPLOYEES. 02:15:45

 6       Q.    WHY IS THAT?                               02:15:48

 7       A.    I'M GOING TO TRY TO BE POLITE.  BECAUSE HE 02:15:49

 8   WASN'T RUNNING A SUCCESSFUL AIRLINE.                 02:16:02

 9       Q.    IN WHAT SENSE?                             02:16:05

10       A.    WELL, THE FLIGHT ATTENDANTS WENT ON STRIKE 02:16:08

11   ONCE WITH CARL ICAHN, AND THAT ALIENATED A LOT OF    02:16:12

12   FLIGHT ATTENDANTS PLUS A LOT OF THE OTHER EMPLOYEES, 02:16:17

13   WHETHER THEY WERE MACHINISTS OR PILOTS.              02:16:19

14            BUT THE FACT THAT WHEN HE TOOK THE COMPANY  02:16:24

15   PRIVATE AND SUCKED A LOT OF CASH OUT OF THE COMPANY, 02:16:26

16   AND AS PART OF THAT PRIVATIZATION HE TOOK CASH OUT OF 02:16:28

17   THE COMPANY AND -- TO HIMSELF.  AND THAT PUT TWA IN  02:16:31

18   HIGH RISK.                                           02:16:36

19            AND THEN IN ORDER TO CONTINUE FUNDING THE   02:16:37

20   AIRLINE, AS I MENTIONED PREVIOUSLY, THEN HE GOT INTO 02:16:41

21   SELLING THE LONDON HEATHROW ROUTES.                  02:16:44

22            TWA -- THAT WAS TWA'S STRENGTH.  IT WAS     02:16:47

23   REALLY ITS ONLY STRENGTH.  TWA HAD THE RIGHTS TO FLY 02:16:49

24   BETWEEN LOS ANGELES AND LONDON HEATHROW, SAN FRANCISCO, 02:16:54

25   CHICAGO, PHILADELPHIA, BOSTON, NEW YORK.  ST. LOUIS AND 02:17:01
```

Page 19

```
 1    BALTIMORE WE FLEW TO LONDON, BUT IT WAS IN TO -- NOT        02:17:07
 2    HEATHROW, BUT AN ADJOINING AIRPORT IN LONDON.  BUT THAT     02:17:12
 3    WAS A VERY, VERY, VALUABLE ASSET.                           02:17:16
 4              AND TWA AT THAT TIME HAD A RELATIVELY LARGE       02:17:19
 5    NETWORK THROUGHOUT EUROPE -- THROUGHOUT EUROPE              02:17:22
 6    INCLUDING INTO THE MIDDLE EAST, INTO INDIA.  BUT ONCE       02:17:27
 7    THOSE ROUTES TO LONDON WERE GONE WHERE YOU HAD THE          02:17:31
 8    BUSINESSMAN THAT WANTED TO BUY A TICKET FROM CHICAGO OR     02:17:34
 9    NEW YORK TO LONDON, HE COULD NO LONGER BUY THAT TICKET      02:17:38
10    ON TWA.                                                     02:17:42
11              SO NOW THAT BUSINESSPERSON ALSO DOES BUSINESS     02:17:43
12    IN FRANKFURT, IN ROME, IN PARIS.  IS HE GOING TO NOW        02:17:46
13    TAKE HIS ALLEGIANCE TO ANOTHER AIRLINE THAT CAN TAKE        02:17:53
14    HIM TO LONDON AND THOSE OTHER CITIES OR AM I NOW GOING      02:17:57
15    TO CONTINUE FLYING TWA JUST TO THOSE OTHER CITIES AND       02:18:01
16    BUY MY TICKET ON SOMEBODY ELSE TO LONDON?                   02:18:04
17              SO WHAT HAPPENED WAS, BY THE SALE OF THOSE        02:18:07
18    LONDON HEATHROW ROUTES, IT MADE ALL THE REST OF THE         02:18:09
19    EUROPEAN MARKETS UNPROFITABLE.  SO NOW TWA COULDN'T         02:18:13
20    MAKE ANY MONEY THERE EITHER.  SO THE TWA EMPLOYEES          02:18:17
21    UNDERSTOOD WHAT AFFECT THAT WOULD HAVE ON THE COMPANY,      02:18:20
22    AND IT HAD A HUGE NEGATIVE AFFECT.                          02:18:23
23    Q.    AND WHEN YOU SAY THE "TWA EMPLOYEES                   02:18:26
24    UNDERSTOOD THAT," DO YOU INCLUDE THE PILOTS IN THAT?        02:18:27
25    A.    I DO.                                                 02:18:33
```

Page 20

1    Q.    IN CONNECTION WITH THE FIRST BANKRUPTCY          02:18:33

2  FILING, DID TWA'S EMPLOYEES GIVE ANY CONCESSIONS?        02:18:35

3    A.    YES, THEY DID.                                   02:18:38

4    Q.    WHAT WERE THE CONCESSIONS?                       02:18:39

5    A.    I BELIEVE IT WAS 15 PERCENT IN PAYROLL FOR       02:18:41

6  ALL EMPLOYEES, IS MY RECOLLECTION.                       02:18:50

7    Q.    INCLUDING THE PILOTS?                            02:18:51

8    A.    YES.                                             02:18:52

9    Q.    NOW, AFTER IT CAME OUT OF BANKRUPTCY THE         02:18:59

10  FIRST TIME, DID TWA FILE FOR A SECOND BANKRUPTCY?       02:19:00

11    A.    THEY DID.                                       02:19:04

12    Q.    AND YOU SAID YOU THOUGHT THAT WAS AROUND        02:19:05

13  1994, 1995?                                             02:19:08

14    A.    YES.                                            02:19:10

15    Q.    AND WHAT IS YOUR UNDERSTANDING OF THE           02:19:10

16  CIRCUMSTANCES THAT LED TO THE SECOND BANKRUPTCY FILING? 02:19:12

17    A.    WELL, THAT WAS A PREPACKAGED BANKRUPTCY.  AND   02:19:15

18  WHEN TWA CAME OUT OF THE FIRST BANKRUPTCY, THE AIRLINE  02:19:17

19  REALLY WASN'T TOTALLY FIXED AT THAT POINT.  IN OTHER    02:19:24

20  WORDS, JUST GETTING A 15 PERCENT PAY CUT FROM ALL YOUR  02:19:28

21  EMPLOYEES AND MAINTAINING A NONPRODUCTIVE ENVIRONMENT   02:19:31

22  OR NONPRODUCTIVE WORKFORCE, IT STILL WASN'T GOING TO    02:19:34

23  WORK.  AND THAT WAS LARGELY UNDERSTOOD BY MANY OF THE   02:19:39

24  EMPLOYEES.                                              02:19:44

25         SO AS WE ENTERED THAT '94, '95 PERIOD, WE       02:19:46

Page 21

1    DECIDED TO DO A PREPACKAGED BANKRUPTCY.  I SAY "WE"    02:19:49

2    MEANING TWA.  AND AS PART OF THAT, INSTEAD OF THE    02:19:52

3    EMPLOYEES NOW MAKING -- TAKING WAGE CUTS, IT WAS    02:19:55

4    BASICALLY THE EMPLOYEES CONTRIBUTING TO IMPROVED    02:19:59

5    PRODUCTIVITY ENDEAVORS AND GETTING AIRCRAFT LESSORS TO    02:20:03

6    REDUCE RENTS ON SPECIFIC AIRCRAFT.    02:20:08

7         SO THE PREPACKAGED BANKRUPTCY REALLY -- THE    02:20:14

8    BANKRUPTCY ITSELF ONLY TOOK PLACE, I BELIEVE, IN    02:20:17

9    30 DAYS OR SOMETHING LIKE THAT.  THE PROCESS WENT VERY    02:20:21

10   QUICKLY.    02:20:25

11      Q.    WHEN YOU SAY THAT THE "EMPLOYEES CONTRIBUTED    02:20:26

12   TO IMPROVED PRODUCTIVITY MEASURES," WHAT DO YOU MEAN BY    02:20:28

13   THAT?    02:20:31

14      A.    WELL, THERE WERE A VARIETY OF CHANGES MADE.    02:20:31

15   I DON'T REMEMBER THE SPECIFICS.  BUT PEOPLE MAY HAVE    02:20:39

16   REDUCED VACATION TIME, MAY HAVE REDUCED SICK TIME.  I    02:20:42

17   DON'T REMEMBER EXACTLY WHAT THEY WERE, BUT THEY WERE    02:20:48

18   INITIATIVES TO IMPROVE THE PRODUCTIVITY OF THE    02:20:50

19   WORKFORCE.    02:20:53

20      Q.    WAS THAT ANOTHER FORM OF CONCESSION GIVEN BY    02:20:54

21   THE TWA EMPLOYEES?    02:20:56

22      A.    IT WAS.  BUT THE PRIMARY CONCESSION IN THAT    02:20:57

23   FIRST BANKRUPTCY -- EXCUSE ME, THE SECOND    02:21:00

24   BANKRUPTCY -- COMING OUT OF THE FIRST BANKRUPTCY, I    02:21:04

25   INDICATED TO YOU THE 15 PERCENT PAY CUT FOR VIRTUALLY    02:21:07

Page 22

```
1   ALL THE EMPLOYEES.  AND I'M TRYING TO REMEMBER THIS NOW   02:21:11

2   BECAUSE WE'RE 12, 13 YEARS LATER.  I'M TRYING TO          02:21:15

3   REMEMBER THIS.                                            02:21:19

4            BUT I BELIEVE THE EMPLOYEES HAD WHAT WE CALL     02:21:19

5   THE "SNAP BACK" IN THOSE PAY GIVE-UPS THAT THEY HAD       02:21:23

6   MADE.  IN OTHER WORDS, THE 15 PERCENT AT SOME POINT       02:21:32

7   THERE WAS A SNAP BACK WHERE YOU WOULD GET THE             02:21:35

8   15 PERCENT BACK.  AND THAT -- ONCE AGAIN, I'M SAYING I    02:21:37

9   MIGHT BE OFF A LITTLE BIT OFF ON THE DATES, BUT           02:21:42

10  EVERYBODY UNDERSTOOD THE SNAP BACKS COULDN'T HAPPEN       02:21:46

11  BECAUSE TWA WAS STILL IN TROUBLE.                         02:21:50

12           SO THE UNION LEADERS FROM ALL THE                02:21:53

13  AIRLINES -- I MEAN, ALL THE DIFFERENT UNION GROUPS AT     02:21:56

14  TWA UNDERSTOOD, HEY, WE WOULD LOVE TO HAVE THOSE SNAP     02:21:59

15  BACKS, BUT THE COMPANY CAN'T AFFORD IT.  IT WOULD GO      02:22:03

16  OUT OF BUSINESS.                                          02:22:06

17           SO WHAT HAPPENED WAS, THE BIGGEST CONCESSION     02:22:07

18  ON THE PART OF THE EMPLOYEES IN THAT SECOND BANKRUPTCY    02:22:09

19  WAS GIVING UP THOSE SNAP BACKS.                           02:22:11

20    Q.    AND AGAIN, THAT WOULD INCLUDE THE PILOTS          02:22:13

21  UNION?                                                    02:22:16

22    A.    YES.                                              02:22:17

23    Q.    ARE YOU FAMILIAR WITH SOMETHING CALLED THE        02:22:18

24  "KARABU TICKET PROGRAM"?                                  02:22:19

25    A.    I AM.                                             02:22:22
```

Page 23

```
 1    Q.    WHAT IS IT?                              02:22:22

 2    A.    THAT WAS AN AGREEMENT BETWEEN TWA AND CARL   02:22:23

 3  ICAHN.  KARABU IS A COMPANY AFFILIATED OR OWNED BY CARL  02:22:35

 4  ICAHN.  AND I BELIEVE IT WAS AROUND THAT 1995 TIME   02:22:44

 5  FRAME ICAHN WAS ABLE TO NEGOTIATE AGAINST OR        02:22:50

 6  WITH -- HOWEVER YOU WANT TO TERM THAT -- TWA TO GET A  02:22:58

 7  TICKET PROGRAM THAT ALLOWED HIM TO PURCHASE         02:23:03

 8  TICKETS -- TWA TICKETS AT A 45 PERCENT DISCOUNT FROM  02:23:08

 9  THE LOWEST PUBLISHED FARE.                          02:23:16

10    Q.    AND WHAT DID HE DO WITH THOSE TICKETS THAT HE  02:23:26

11  PURCHASED?                                          02:23:28

12    A.    WHAT HE WOULD DO IS, HE WOULD -- HE DEVELOPED  02:23:31

13  A COMPANY CALLED "LOWESTFARE.COM."  AND HE WOULD PUT  02:23:36

14  THOSE -- PUT TWA TICKETS UP FOR SALE ON LOWESTFARE.COM.  02:23:42

15  SO LET'S SAY THAT FOR AN EXAMPLE, TWA WAS -- EVERYBODY  02:23:47

16  IN THE INDUSTRY JUST FLY A PACIFIC TRIP FROM A TO B,  02:23:51

17  THE TICKET WAS GOING TO BE $100.  LET'S SAY EVERY   02:23:55

18  AIRLINE.  AND USUALLY THE AIRLINES MATCH FARES.  SO  02:23:59

19  EVERYBODY IS CHARGING $100 FOR THAT TICKET FROM A TO B.  02:24:01

20        THE PROBLEM THAT TWA HAD WITH THE KARABU      02:24:06

21  AGREEMENT IS:  CARL ICAHN GETS TO BUY THAT TWA FOR $55.  02:24:09

22  AND THEN HE SELLS IT TO SOMEBODY IN THE PUBLIC FOR  02:24:15

23  SOMEPLACE IN THE DIFFERENCE BETWEEN 55 AND $100.  THE  02:24:18

24  PROBLEM IS:  ALL YOUR COMPETITORS ARE GETTING $100, AND  02:24:22

25  YOU'RE GETTING $55.  SO IT'S MATHEMATICALLY IMPOSSIBLE  02:24:25
```

Page 24

1   FOR TWA TO MAKE ANY MONEY.                                 02:24:32

2            SO EVERYBODY -- YOU HAVE A FARE SALE.             02:24:35

3   EVERYBODY IN THE INDUSTRY DOES A FARE SALE.  WELL,         02:24:38

4   TWA'S FARE SALE IS GOING TO BE -- TO ITS CUSTOMERS, THE    02:24:40

5   FARE SALE IS THE SAME ACROSS ALL CARRIERS.  BUT AS FAR     02:24:45

6   AS TWA IS CONCERNED, WE'RE GAINING 45 PERCENT LESS         02:24:49

7   REVENUE THAN ALL OF OUR COMPETITORS.                       02:24:53

8       Q.    IN YOUR UNDERSTANDING, DID THE KARABU TICKET     02:24:56

9   PROGRAM HAVE AN IMPACT ON TWA'S FINANCIAL CONDITION?       02:24:58

10      A.    IT HELPED KILL TWA.                              02:25:01

11      Q.    CAN YOU EXPLAIN THAT.                            02:25:03

12      A.    WHEN YOU'RE COLLECTING 45 PERCENT LESS           02:25:06

13  REVENUE THAN YOUR COMPETITORS, IT'S HARD TO STAY IN        02:25:08

14  BUSINESS, ESPECIALLY WHEN YOUR COSTS ARE SIMILAR OR        02:25:12

15  YOUR COSTS PERHAPS ARE EVEN MORE EXPENSIVE THAN YOUR       02:25:16

16  COMPETITORS, OR YOUR COSTS ARE MORE EXPENSIVE THAN YOUR    02:25:20

17  COMPETITORS' AND YOUR REVENUE IS 45 PERCENT LESS THAN      02:25:22

18  YOUR COMPETITORS, GUESS WHAT?  IT DOESN'T WORK.            02:25:25

19      Q.    HOW LONG DID THE KARABU TICKET PROGRAM REMAIN    02:25:28

20  IN PLACE?                                                  02:25:32

21      A.    UNTIL THE DAY WE SOLD IT -- SOLD TWA'S ASSETS    02:25:33

22  TO AMERICAN AIRLINES.                                      02:25:36

23      Q.    TO YOUR KNOWLEDGE WAS THERE EVER ANY ANALYSIS    02:25:38

24  DONE TO DETERMINE HOW MUCH THE KARABU TICKET AGREEMENT     02:25:41

25  COST TWA IN REVENUE?                                       02:25:45

Page 25

1    A.    THERE WAS QUITE A BIT OF THAT DONE.          02:25:46

2    Q.    WHO PERFORMED THOSE ANALYSES?              02:25:49

3    A.    PRIMARILY -- PRIMARILY, I BELIEVE, IT WAS   02:25:52

4  JACK STELZER WHO WAS OUR SENIOR VICE-PRESIDENT OF    02:25:57

5  PLANNING AND REVENUE MANAGEMENT.  NOW, MIKE PALUMBO WHO  02:26:02

6  WAS THE CFO MAY HAVE HAD A PLACE IN THAT AS WELL.     02:26:05

7    Q.    DO YOU RECALL WHAT THE IMPACT ON REVENUE WAS?  02:26:11

8    A.    SPECIFICALLY TO GIVE YOU A DOLLAR AMOUNT?  I   02:26:14

9  DON'T KNOW.  I JUST KNOW IT WAS A BIG NUMBER.        02:26:16

10   Q.    ORDER OF MAGNITUDE?                        02:26:18

11   A.    I WOULD HATE TO GUESS AT THIS POINT; IT'S   02:26:22

12  13 YEARS LATER.                                    02:26:24

13   Q.    YOU SAID THAT TWA'S THIRD BANKRUPTCY FILING  02:26:35

14  WAS IN JANUARY OF 2001; IS THAT RIGHT?              02:26:37

15   A.    YES.                                        02:26:43

16   Q.    AND AS CEO DID YOU HAVE AN UNDERSTANDING OF   02:26:45

17  TWA'S FINANCIAL CONDITION AT THE TIME OF THE THIRD   02:26:48

18  BANKRUPTCY FILING?                                 02:26:51

19   A.    I DID.                                      02:26:52

20   Q.    HOW WOULD YOU DESCRIBE IT?                  02:26:53

21   A.    IT WAS WORSE THAN NOT GOOD.  IT WAS BAD.  TWA  02:26:59

22  WAS -- TWA WAS GOING TO LIQUIDATE WITHIN DAYS WITHOUT A  02:27:04

23  DEAL.                                              02:27:12

24   Q.    AND WHAT IS THE BASIS FOR YOUR UNDERSTANDING  02:27:15

25  THAT TWA WAS GOING TO LIQUIDATE WITHIN DAYS WITHOUT A  02:27:19

Page 26

```
1   DEAL?                                                    02:27:23
2       A.    A MAJOR ISSUE WAS THAT WE HAD AN ACCOUNTS      02:27:24
3   RECEIVABLE FUNDING COMING DUE THAT I BELIEVE -- I COULD  02:27:26
4   BE OFF BY A WEEK -- BUT I BELIEVE IT WAS DUE ON          02:27:32
5   JANUARY 10, 2001, AND THAT WAS A $100 MILLION BILL THAT  02:27:35
6   WE OWED.                                                 02:27:41
7            AND IN EARLY JANUARY TWA'S TOTAL CASH, TOTAL    02:27:45
8   AVAILABLE CASH WAS $20 MILLION.  AND TO PUT THAT IN      02:27:49
9   PERSPECTIVE, TWA WAS A COMPANY THAT ON AVERAGE HAD       02:27:56
10  EXPENDITURES OF $10 MILLION A DAY.  AND SOME DAYS IT     02:28:02
11  WAS -- OF COURSE, THAT'S AN AVERAGE -- I MEAN, SO SOME   02:28:09
12  DAYS IT COULD BE 30 MILLION IN A DAY AND THE NEXT DAY    02:28:11
13  IT COULD BE 1 MILLION.  BUT ON AVERAGE IT WAS A COMPANY  02:28:14
14  THAT SPENT $10 MILLION A DAY IN EXPENSES.                02:28:17
15           SO TWA HAD APPROXIMATELY $20 MILLION IN CASH.   02:28:20
16  WE OWED $100 MILLION, AND WE HAD NEGATIVE CASH FLOW.     02:28:24
17  SO IT WAS NOT A GOOD SITUATION.                          02:28:29
18      Q.    I WANT TO TAKE YOU BACK TO THE BEGINNING OF    02:28:37
19  2000, SO A YEAR PRIOR TO THE THIRD BANKRUPTCY FILING.    02:28:42
20  AT THAT POINT WAS TWA OPERATING AT A PROFIT OR A LOSS?   02:28:44
21      A.    NO.  AS I MENTIONED EARLIER, TWA HADN'T        02:28:48
22  EARNED A PROFIT IN THE PREVIOUS 12 YEARS.                02:28:50
23      Q.    ALL RIGHT. AND WHAT WAS YOUR VIEW OF THE       02:28:53
24  COMPANY'S FINANCIAL CONDITION AT THE BEGINNING OF 2000?  02:28:54
25      A.    IT WAS BAD.                                    02:28:58
```

Page 27

```
 1      Q.    DID YOU TAKE ANY STEPS DURING THE COURSE OF     02:29:02

 2   THAT YEAR TO TRY TO ADDRESS THE FINANCIAL CHALLENGES     02:29:04

 3   THAT TWA WAS FACING?                                     02:29:07

 4      A.    WE TRIED TO DO A LOT OF DIFFERENT THINGS.       02:29:08

 5   TWA EMPLOYEES PARTICIPATED IN LARGE DEGREE.  AND I       02:29:12

 6   WOULD SAY -- YOU -- YOU KNOW, YOU SAID IN 2000, BUT      02:29:16

 7   ACTUALLY THE TWA EMPLOYEES MADE HUGE EFFORTS IN A LOT    02:29:18

 8   OF DIFFERENT AREAS IN 1997, 1998, 1999, 2000.  BUT,     02:29:24

 9   UNFORTUNATELY, THAT WASN'T ENOUGH TO MAKE IT WORK.       02:29:35

10         YOU ASKED ABOUT 2000.  ONE OF THE THINGS THAT     02:29:38

11   TWA DID WAS WE TRIED TO DIVERSIFY OUT OF THAT ONE-HUB    02:29:40

12   SYSTEM THAT YOU WERE TALKING ABOUT EARLIER AND TRYING    02:29:44

13   TO DEVELOP WHAT WE CALLED "MINI HUBS."  AND WE DID       02:29:47

14   ACTUALLY OPEN ONE IN SAN JUAN, PUERTO RICO.  WE OPENED   02:29:51

15   ONE IN LOS ANGELES.  AND THE PLAN WAS TO OPEN ONE A      02:29:57

16   YEAR TO TRY TO DIVERSIFY OUT OF THAT ONE-HUB ISSUE.      02:30:00

17         WE ALSO WERE ABLE TO -- TWA HAD ONE OF THE         02:30:06

18   OLDEST FLEETS IN THE INDUSTRY.  WE WERE ABLE TO          02:30:09

19   NEGOTIATE LEASES FOR NEW AIRCRAFT FROM BOEING AND        02:30:14

20   AIRBUS; ALTHOUGH, WE NEVER TOOK DELIVERY OF THE AIRBUS   02:30:20

21   AIRPLANES BUT -- FROM BOEING.  SO WE WERE ABLE TO        02:30:23

22   MODERNIZE THE FLEET, WHICH REDUCED MAINTENANCE           02:30:28

23   EXPENSES, WHICH REDUCED FUEL EXPENSES, WHICH MADE A      02:30:30

24   BETTER PRODUCT FOR THE CUSTOMER, ET CETERA.             02:30:36

25         ONE OF THE PROBLEMS, THOUGH, THAT TWA HAD WAS      02:30:39
```

Page 28

```
1    BECAUSE OF THE WEAK FINANCIAL CONDITION, WE COULDN'T      02:30:41

2    BUY THESE AIRPLANES BECAUSE WE HAD NO MONEY.  SO TWA      02:30:44

3    LEASED THESE AIRCRAFT.  AND BECAUSE OF TWA'S FINANCIAL    02:30:48

4    STANDING, WE HAD TO PAY A LOT MORE FOR OUR AIRCRAFT       02:30:53

5    THAN COMPETITORS DID.                                     02:30:57

6         TWA, FOR EXAMPLE, WITH AN MD80 YOU MIGHT            02:30:58

7    SPEND $250,000 A MONTH LEASING AN MD80 WHERE YOUR         02:31:02

8    COMPETITOR IS LEASING AN MD80 FOR 100,000 OR $125,000 A   02:31:08

9    MONTH.  SO ALTHOUGH YOU'RE GETTING THE BENEFITS FOR THE   02:31:13

10   CUSTOMER AND FOR MAINTENANCE AND FOR FUEL, YOU'RE         02:31:16

11   GETTING HIT ON THE COST SIDE.                             02:31:18

12        SO THOSE WERE A FEW THINGS THAT WERE DONE IN        02:31:20

13   2000.  WE WERE ALSO ABLE -- I DON'T KNOW IF WE DID IT     02:31:23

14   IN 2000 OR '99, BUT WE HAD A NEW CONTRACT WITH ALPA       02:31:27

15   THAT WAS BENEFICIAL TO THE PILOTS AND BENEFICIAL TO THE   02:31:34

16   COMPANY AS WELL.                                          02:31:37

17        WE HAD A CONTRACT EXTENSION WITH THE IAM            02:31:39

18   ALSO, BUT THAT WASN'T AS BENEFICIAL AS THE CONTRACT       02:31:43

19   THAT WE RECEIVED WITH ALPA.                               02:31:48

20   Q.   ONE OF THE THINGS THAT YOU MENTIONED YOU            02:31:53

21   TRIED TO DO WAS TO DEVELOP THESE MINI HUBS.  WAS THAT     02:31:55

22   SUCCESSFUL?                                               02:31:59

23   A.   RELATIVELY SUCCESSFUL.  I MEAN, HE HAD JUST         02:32:00

24   GOTTEN SUCCESSFUL WITH SAN JUAN.  SAN JUAN WAS DOING      02:32:02

25   WELL.  IN LOS ANGELES WE HAD JUST STARTED, SO YOU         02:32:06
```

1    acquisitions committee?

2        A.    Yes.

3        Q.    And who were the members of the APA board at

4    this time?

5        A.    By name?

6        Q.    As best as you can recall.  I realize it's been

7    a long time since these meetings took place.

8        A.    Well, starting in Chicago, I believe it was

9    Captain Bloom, Captain Condes.  Los Angeles, I

10   believe -- let me think about this for a moment.  I want

11   to say Captain LaRuth.  I can't remember the other one.

12   Dallas would have been -- changed the board members so

13   many times, I'm trying to -- I can't say with particular

14   at that point in time because of the different -- I

15   don't -- I'll -- I'd be remiss if I tried to --

16       Q.    That's fine.  Would the APA --

17       A.    Yes.

18       Q.    -- have documents --

19       A.    Yes.

20       Q.    -- that would indicate who the members of the

21   board were at this time?

22       A.    Yes.

23       Q.    What do you call -- what do you recall being

24   discussed concerning the ramifications of the TWA -- TWA

25   acquisition during the meeting as referenced here?

1      A.    The ramifications?

2      Q.    Yeah.

3      A.    Obviously, the biggest impact was seniority and

4   its effects on pilots, career progressions and their

5   expectations was the overriding issue.

6      Q.    Okay.  And there's a reference here to

7   strategic -- strategic direction being given by the

8   board to the mergers and acquisitions committee.  What

9   was the strategic direction that was being given at this

10  time concerning the negotiations with the TWA MEC?

11     A.    I can't recall in particular, but I believe it

12  was to go meet with the TWA counterparts and begin

13  discussions on the integration.  At that point in time,

14  I do not believe there was any defined protocol on what

15  the integration would look like.

16     Q.    On this second page of this hotline, it says,

17  The board has tasked the mergers and acquisitions

18  committee with crafting agreement over the next few

19  weeks that meets the specific set of guidelines

20  concerning integration.

21     A.    Uh-huh.

22     Q.    Do you see that?

23     A.    Uh-huh.

24     Q.    Do you have a recollection at this time what

25  this specific set of guidelines concerning integration

Page 33

1    was?

2         A.    No.

3                   (Exhibit No. 7 was marked.)

4         Q.    (BY MR. TOAL)   Let me show you a document that

5    I'll mark as Darrah Exhibit 7, which is entitled, APA

6    Offer to TWA Pilots For an AA TWA Seniority List

7    Integration.  It's dated March 1st, 2001.  And if you

8    could let me know if this is a document that you saw on

9    or around March 1, 2001.

10        A.    Yes.

11        Q.    Do you recognize this as an integration

12   proposal that the APA made to the TWA pilots around this

13   time?

14        A.    Yeah.  I think it was in response to a proposal

15   that had been exchanged back and forth previous, yes.  I

16   don't think it was the first proposal.

17        Q.    Okay.  And under the heading, Seniority List

18   Integration Method, about a quarter of the way down the

19   first page, it says, Todd Muschany (seniority member

20   825, hired July 7th, 1986) will be placed one number

21   junior to the AA new hire on March 9, 2001.  All TWA

22   pilots will be integrated senior to Muschany at a ratio

23   of five American Airlines pilots to one TWA pilot.

24                   Do you see that?

25        A.    Yes, sir.

1       Q.   So at least -- do you remember approximately

2  how many TWA pilots there were at the time?

3       A.   2300, roughly.

4       Q.   So this -- this proposal envisioned stapling

5  approximately 1,475 TWA pilots after the most junior

6  American Airlines pilot, correct?

7       A.   Correct.

8       Q.   Do you recall when the -- when American

9  Airlines' acquisition of the TWA assets were scheduled

10 to close?

11      A.   I believe that date was April 10th, 2001, or

12 April 9th, 2001, something like that.

13      Q.   Okay.  Was the goal originally to try and get a

14 seniority integration plan in place before the closing

15 date?

16      A.   Right.

17      Q.   And did that happen?

18      A.   No, sir.

19      Q.   Did you have an understanding that American

20 Airlines' proposal to acquire these TWA assets were

21 subject to certain conditions?

22      A.   Yes.

23      Q.   And did you have an understanding that the TWA

24 pilots' agreement to waive the scope and successorship

25 provisions of their Collective Bargaining Agreement was

1   one of those conditions?

2       A.   Yes.

3              MR. JACOBSON:  I'm going to object to the

4   legal nature of the question.

5       Q.   (BY MR. TOAL)  What -- what's your recollection

6   of the conditions that -- the conditions to which this

7   transaction was subject concerning seniority

8   integration?

9       A.   On subject matter in particular to the pilot

10  group, I believe it was the waiving their

11  Allegheny-Mohawk provisions and their other protections

12  in the ALPA document, or the ALPA contract.

13      Q.   And what did those Allegheny-Mohawk provisions

14  provide for in the TWA Collective Bargaining --

15  Bargaining Agreement?

16      A.   I'd have to go back and look at ALPA policy,

17  but it's basically fair and equitable integration and a

18  certain set of standards that ALPA uses in their

19  integrations, which is --

20             THE REPORTER:  Fair and what?  I'm sorry.

21  Can you slow down?  Fair and what integration?

22             THE WITNESS:  Fair and equitable.

23             THE REPORTER:  Equitable.  Thank you.

24             THE WITNESS:  Integration and

25  methodologies to be used.

Page 36

1      A.   Which over time I think has changed to some

2  degree if you go back and look at past integrations.

3      Q.   (BY MR. TOAL)  And was there a methodology that

4  was prescribed in the Collective Bargaining Agreement

5  for seniority integration?

6      A.   With ALPA?

7      Q.   With ALPA.

8      A.   Yes.

9      Q.   What was the methodology?

10      A.   Like I said, I'd have to go back and look at

11  it.  I just remember the overriding piece being fair and

12  equitable.  At one point, seniority integration based on

13  seniority was a part of the ALPA document, as I recall,

14  but it was no longer part of the provisions that were

15  used based on date of hire.

16      Q.   Do you have a recollection of whether the TWA

17  Collective Bargaining Agreement provided for arbitration

18  of seniority integration?

19      A.   I'd have to go back and look at it.  I don't

20  recall.

21      Q.   Let me direct your attention back to Darrah

22  Exhibit 4.  This is the letter from Captain Bensel to

23  Captain White.

24           Do you have that before you?

25      A.   To Captain White -- excuse me.   To

Page 29

```
1    DIDN'T GET THE FULL VALUE OF THAT, BUT WE HAD HIGH        02:32:10

2    HOPES FOR THAT.  AND WE HAD HOPES FOR OTHER POTENTIAL     02:32:12

3    MINI HUBS, IF WE COULD EVER GET THERE.                    02:32:16

4              THE PROBLEM WITH TRYING TO ESTABLISH THESE      02:32:19

5    NEW HUBS, GUESS WHAT, IT COSTS MONEY.  AND WHEN YOU       02:32:21

6    DON'T HAVE ANY MONEY, IT'S HARD TO DO.  YOU KNOW, YOU     02:32:24

7    DO A LOT OF BEGGING.                                      02:32:26

8      Q.    ULTIMATELY, WAS THAT EFFORT ENOUGH TO ADDRESS     02:32:28

9    TWA'S FINANCIAL CONDITION?                                02:32:32

10     A.    NO.                                               02:32:33

11     Q.    WHY NOT?                                          02:32:34

12     A.    WELL, THERE JUST -- THERE JUST WASN'T ENOUGH      02:32:36

13   VOLUME, AND YOU JUST REALLY COULDN'T OVERCOME THE OTHER   02:32:38

14   OBSTACLES.  IN OTHER WORDS, THE FACT THAT YOU HAD         02:32:42

15   LITTLE -- LITTLE CASH.  THE FACT THAT YOU PAID MORE FOR   02:32:45

16   YOUR AIRPLANES.  THE FACT THAT YOU HAD THE KARABU         02:32:48

17   PROGRAM HANGING OVER YOU.                                 02:32:50

18             EVEN THOUGH WE HAVE THESE MINI HUBS, WE DON'T   02:32:54

19   HAVE ENOUGH YET, AND WE DON'T HAVE THE TIME TO BUILD      02:32:57

20   THEM OR THE MONEY TO BUILD A HUB.  YOU JUST DON'T TURN    02:32:59

21   IT ON AND ONE DAY IT'S WONDERFUL.  IT TAKES A PERIOD OF   02:33:03

22   TIME.  SO WE, BASICALLY, JUST RAN OUT OF TIME.           02:33:06

23     Q.    DID TWA'S PENSION OBLIGATIONS HAVE ANY IMPACT     02:33:08

24   ON ITS FINANCIAL CONDITION?                               02:33:11

25     A.    THE PENSION OBLIGATIONS WERE A PROBLEM UNTIL      02:33:18
```

Page 37

```
1    PRESIDENT AND COO.  AND ONE OTHER GENTLEMAN -- NAME    02:43:13
2    STARTED WITH A G.  I CAN'T REMEMBER EXACTLY WHAT IT     02:43:18
3    WAS.  BUT I MET WITH THEM ON A NUMBER OF OCCASIONS.     02:43:20
4        Q.    AND AT ANY POINT DURING THOSE DISCUSSIONS DID  02:43:25
5    CONTINENTAL COME FORWARD WITH A PROPOSAL THAT WOULD     02:43:27
6    HAVE ADDRESSED TWA'S FINANCIAL CHALLENGES?             02:43:30
7        A.    THEY DID NOT.                                 02:43:33
8        Q.    DID THEY COME FORWARD WITH A PROPOSAL TO HIRE  02:43:33
9    ALL OF TWA'S PILOTS?                                   02:43:36
10       A.    NO.                                           02:43:38
11       Q.    WHAT WERE THE OBSTACLES TO REACH AN AGREEMENT  02:43:38
12   WITH CONTINENTAL?                                      02:43:42
13       A.    DO YOU WANT ME TO REPEAT THE PREVIOUS ONES?   02:43:44
14   EVERYBODY KNOWS IT'S THE SAME PROBLEM.                 02:43:47
15       Q.    HOW ABOUT NORTHWEST, WHAT DO YOU RECALL OF    02:43:48
16   THOSE DECISIONS?                                       02:43:50
17       A.    I MET WITH MR. WILSON THERE WHO WAS THE       02:43:50
18   CHAIRMAN OF THE BOARD OF NORTHWEST.                    02:43:53
19       Q.    AND DID NORTHWEST EVER COME FORWARD WITH A    02:43:55
20   PROPOSAL THAT WOULD HAVE ADDRESSED TWA'S FINANCIAL     02:43:58
21   CHALLENGES?                                            02:44:00
22       A.    THEY DID NOT.                                 02:44:01
23       Q.    DID THEY COME FORWARD WITH ANY PROPOSAL TO    02:44:01
24   HIRE ALL OF TWA'S PILOTS?                              02:44:03
25       A.    NO.                                           02:44:05
```

Page 38

```
 1     Q.    AND DID YOU HAVE AN UNDERSTANDING OF WHY NOT?   02:44:05
 2     A.    YES.                                            02:44:07
 3     Q.    WHAT IS THAT UNDERSTANDING?                     02:44:08
 4     A.    THE SAME REASON AS THE OTHER GUYS.              02:44:09
 5     Q.    AND, FINALLY, YOU MENTIONED AIRTRAN.  WHAT DO   02:44:12
 6  YOU RECALL OF THE DISCUSSIONS WITH AIRTRAN?             02:44:16
 7     A.    WE HAD A COUPLE OF DISCUSSIONS WITH JOE         02:44:18
 8  LEONARD WHO WAS THEIR CEO.  WE HAD SOME HOPE OF          02:44:21
 9  SOMETHING HAPPENING THERE BECAUSE WE HAD A COMMON FLEET  02:44:24
10  TYPE COMING IN WITH 717S.  BUT IN THE END THEY WEREN'T   02:44:26
11  WILLING TO MAKE A DEAL.                                 02:44:34
12     Q.    DID AIRTRAN EVER COME FORWARD WITH A PROPOSAL   02:44:36
13  THAT WOULD HAVE ADDRESSED TWA'S FINANCIAL CHALLENGES?    02:44:40
14     A.    NO.                                             02:44:42
15     Q.    AND DID THEY EVER EXPRESS A WILLINGNESS TO      02:44:43
16  HIRE ALL OF TWA'S PILOTS?                                02:44:45
17     A.    NO.                                             02:44:47
18     Q.    AND WHAT WERE THE REASONS THAT TWA WAS NOT      02:44:47
19  ABLE TO REACH A STRATEGIC TRANSACTION WITH AIRTRAN?      02:44:49
20     A.    THE SAME REASONS THAT THE OTHER FOLKS HAD.      02:44:53
21     Q.    AS PART OF YOUR EFFORTS IN 2000 TO ADDRESS      02:45:04
22  TWA'S FINANCIAL PROBLEMS, DID YOU CONSIDER ANY           02:45:06
23  ALTERNATIVES THAT WOULD HAVE ALLOWED THE AIRLINE TO      02:45:09
24  CONTINUE OPERATING ON A STAND-ALONE BASIS?               02:45:12
25     A.    WELL, WHILE WE WERE GOING THROUGH THE EFFORT    02:45:18
```

Page 39

```
1    TO TRY TO FIND A STRATEGIC BUYER, WE WERE ALSO TRYING    02:45:22
2    TO DO EVERYTHING WE COULD TO SAVE THE AIRLINE.  SO       02:45:25
3    THERE WAS AN EFFORT UNDERWAY TO TRY TO KEEP THE          02:45:28
4    AIRLINE -- KEEP THE AIRLINE RUNNING.  AND SO, YES.  THE  02:45:38
5    ANSWER TO YOUR QUESTION IS YES.                          02:45:43
6         Q.    DID THAT EFFORT HAVE A NAME?                  02:45:44
7         A.    DID IT HAVE A NAME?  IT DID HAVE A NAME, AND  02:45:48
8    PERHAPS IT WILL COME TO ME.  IT WILL COME TO ME          02:45:51
9    EVENTUALLY.                                              02:46:02
10        Q.    WHAT WERE THE COMPONENTS OF THAT EFFORT?      02:46:03
11        A.    THE COMPONENTS WERE TO -- IT WAS, BASICALLY,  02:46:07
12   THREE OR FOUR PRONGED.  ONE WAS TO DECREASE THE COST OF  02:46:10
13   THE AIRLINE THROUGH A COUPLE OF MECHANISMS.  ONE         02:46:17
14   MECHANISM WAS TO REDUCE AIRCRAFT LEASE RATES.  ANOTHER   02:46:22
15   MECHANISM WAS TO REDUCE EMPLOYEE COST, NOT BY -- NOT BY  02:46:27
16   CUTTING WAGES, BUT BY IMPROVING PRODUCTIVITY.            02:46:33
17            MY RECOLLECTION ON THE THIRD PRONG              02:46:39
18   WAS -- WHICH WAS THE MOST DIFFICULT OF THE THREE, WAS    02:46:41
19   TO RAISE -- WAS TO RAISE CASH IN ORDER TO MAKE THE       02:46:43
20   EFFORT SUCCESSFUL.                                       02:46:48
21        Q.    AND DID YOU HAVE A TARGET DOLLAR AMOUNT BY    02:46:49
22   WHICH YOU WANTED TO REDUCE THE AIRCRAFT LEASE RATES?     02:46:54
23        A.    YOU KNOW, THERE WAS A NUMBER.  I CAN'T        02:46:58
24   RECOLLECT WHAT IT WAS, BUT THERE WAS A NUMBER.  YEAH.    02:47:00
25        Q.    AND HOW ABOUT THE EFFORT TO REDUCE EMPLOYEE   02:47:03
```

Page 49

```
 1     AT 2:55 P.M.                                      02:59:32

 2                    (OFF THE RECORD.)                   02:59:35

 3            (THEREUPON, TRANSCRIPT OF HEARING BEFORE THE 02:59:35

 4     COMMITTEE ON COMMERCE, SCIENCE AND TRANSPORTATION OF 02:59:35

 5     THE UNITED STATES SENATE, FEBRUARY 1, 2001 WAS MARKED 02:59:35

 6     AS EXHIBIT 1 FOR IDENTIFICATION.)                  02:59:35

 7            THE VIDEOGRAPHER:  WE ARE BACK ON THE VIDEO  03:07:52

 8       RECORD STARTING AT 3:03 P.M.                     03:07:53

 9       Q.    MR. COMPTON, IN CONNECTION WITH THE PROPOSED 03:07:56

10     TRANSACTION BETWEEN TWA AND AMERICAN IN 2001, DID YOU 03:07:58

11     GIVE TESTIMONY BEFORE THE UNITED STATES SENATE?     03:08:03

12       A.    I DID.                                     03:08:05

13       Q.    YOU HAVE IN FRONT OF YOU AN EXHIBIT THAT HAS 03:08:06

14     BEEN MARKED COMPTON 1.  IT'S TITLED "TRANSCRIPT OF A 03:08:08

15     HEARING BEFORE THE COMMITTEE ON COMMERCE, SCIENCE AND 03:08:13

16     TRANSPORTATION OF THE UNITED STATES SENATE," DATED  03:08:16

17     FEBRUARY 1, 2001.  DID YOU TESTIFY AT THAT HEARING? 03:08:19

18       A.    I DID.                                     03:08:23

19       Q.    AND YOU APPEARED LIVE BEFORE THE COMMITTEE? 03:08:23

20       A.    I DID.                                     03:08:25

21       Q.    TO THE BEST YOUR KNOWLEDGE, WAS THE TESTIMONY 03:08:26

22     THAT YOU PROVIDED TO THE SENATE COMMITTEE TRUTHFUL AND 03:08:28

23     ACCURATE?                                          03:08:32

24       A.    IT WAS.                                    03:08:33

25       Q.    CAN I ASK YOU TO TURN TO PAGE 23 OF YOUR   03:08:35
```

Page 50

```
 1   TRANSCRIPT.                                            03:08:37

 2      A.   OKAY.                                          03:08:38

 3      Q.   AND I WOULD LIKE TO DIRECT YOUR ATTENTION TO   03:08:43

 4   THE THIRD PARAGRAPH DOWN.  IT BEGINS "IN 1985 TWA,     03:08:46

 5   DURING THE HEIGHT OF THE WALL STREET DRIVEN MERGERS AND 03:08:50

 6   ACQUISITIONS, WAS ACQUIRED BY CARL ICAHN AND           03:08:55

 7   SUBSEQUENTLY WAS STRIPPED OF ITS MOST VALUABLE ASSETS." 03:08:56

 8           WAS THAT TESTIMONY TRUTHFUL AND ACCURATE WHEN  03:09:01

 9   YOU GAVE IT IN FEBRUARY OF 2001?                       03:09:03

10      A.   IT WAS.                                        03:09:04

11      Q.   AND DO YOU STILL REGARD IT AS SUCH TODAY?      03:09:06

12      A.   I DO.                                          03:09:08

13      Q.   WHAT DID YOU MEAN WHEN YOU SAID THAT "TWA WAS  03:09:09

14   STRIPPED OF ITS MOST VALUABLE ASSETS"?                 03:09:11

15      A.   THAT'S BACK TO THE ISSUE WE SPOKE ABOUT        03:09:16

16   EARLIER ABOUT THE SALE OF THE LONDON HEATHROW ROUTES.  03:09:18

17      Q.   GOING DOWN TO THE BOTTOM OF THAT PAGE IN THE   03:09:28

18   LAST PARAGRAPH, IT SAYS "DUE TO ITS FINANCIAL          03:09:32

19   CONDITION, TWA IS STILL PAYING A PREMIUM FOR AIRCRAFT  03:09:34

20   LEASES, PAYING NEARLY TWICE THE INDUSTRY AVERAGE."     03:09:37

21           IS THAT THE ISSUE YOU TESTIFIED EARLIER        03:09:41

22   ABOUT?                                                 03:09:43

23      A.   IT IS.                                         03:09:43

24      Q.   AND IT GOES ON THAT "THE NEED TO PROVIDE LONG  03:09:44

25   OVERDUE WAGE INCREASES FOR TWA EMPLOYEES AND THE RECENT 03:09:50
```

Page 51

1   STAGGERING INCREASES IN THE PRICE OF JET FUEL FURTHER    03:09:53

2   DRAINS TWA'S RESERVES."  WAS THAT TESTIMONY TRUTHFUL      03:09:57

3   AND ACCURATE WHEN YOU GAVE IT IN 2001?                   03:10:00

4       A.   WHEN I GAVE THAT IN 2001, THAT'S CORRECT.       03:10:02

5       Q.   AND DO YOU STILL REGARD IT AS TRUTHFUL AND      03:10:04

6   ACCURATE TODAY?                                          03:10:09

7       A.   I DO, ABSENT THE POINT THAT I MADE EARLIER      03:10:10

8   THAT $40 BARREL SEEMED EXPENSIVE THEN, BUT WE KNOW NOW   03:10:12

9   IT'S MORE THAN THAT.                                     03:10:17

10      Q.   IF YOU TURN OVER TO PAGE 24, THE FIRST FULL     03:10:19

11  PARAGRAPH AT THE TOP OF THE PAGE SAYS "FINALLY, THIS     03:10:24

12  WINTER WE RAN OUT OF TIME.  IN FACT, BY JANUARY 10,      03:10:27

13  2001, TWA HAD CASH ON HAND OF ONLY $20 MILLION AND       03:10:31

14  NEEDED SIGNIFICANTLY MORE THAN THAT JUST TO OPERATE      03:10:34

15  THROUGH THE NEXT DAY.  WITH OUR CASH RESERVES NEARLY     03:10:36

16  DEPLETED AND A MAJOR FINANCIAL COMMITMENT DUE TO         03:10:40

17  LENDERS COMING DUE, OUR BACKS WERE SQUARELY AGAINST THE  03:10:43

18  WALL."                                                   03:10:46

19          WAS THAT TESTIMONY TRUTHFUL AND ACCURATE WHEN    03:10:46

20  YOU GAVE IT IN 2001?                                     03:10:48

21      A.   IT WAS.                                         03:10:49

22      Q.   AND DO YOU STILL REGARD IT AS TRUTHFUL AND      03:10:49

23  ACCURATE AS YOU SIT HERE TODAY?                          03:10:52

24      A.   I DO.                                           03:10:54

25      Q.   WHAT IS THE "MAJOR FINANCIAL COMMITMENT" THAT   03:10:55

Page 52

```
 1   IS REFERRED TO IN THAT PARAGRAPH?                    03:10:57

 2       A.    IT'S THE RECEIVABLES FINANCING THAT WAS DUE  03:11:00

 3   WITHIN A WEEK OR SO THAT WAS A $100 MILLION BILL THAT 03:11:04

 4   WAS REQUIRED TO BE PAID.                              03:11:09

 5       Q.    THE NEXT PARAGRAPH ON THAT PAGE SAYS "THE   03:11:19

 6   FINANCIAL CRISIS THAT HIT TWA THIS WINTER DID NOT     03:11:21

 7   MATERIALIZE OVERNIGHT.  A YEAR AGO WE COULD SEE       03:11:24

 8   PROBLEMS LOOMING ON THE HORIZON THAT CULMINATED IN OUR 03:11:26

 9   RECENT BANKRUPTCY FILING, AND WE TRIED VERY HARD TO DO 03:11:30

10   SOMETHING DRAMATIC ABOUT IT.                          03:11:33

11           "WE RECOGNIZED THE VIABILITY OF OUR AIRLINE   03:11:34

12   WAS AT STAKE, AND WE WENT KNOCKING ON DOORS TO FIND A 03:11:36

13   SOLUTION.  THERE IS NOT AN AIRLINE OF ANY SIZE IN     03:11:39

14   AMERICA THAT WE DID NOT APPROACH.  THERE IS NOT AN    03:11:41

15   AIRLINE OF ANY SIZE IN AMERICA THAT DID NOT HAVE THE  03:11:44

16   OPPORTUNITY TO STEP IN AND JOIN WITH US.  NO ONE WAS  03:11:47

17   INTERESTED IN TWA AS A GOING CONCERN."                03:11:49

18           DO YOU SEE THAT TESTIMONY?                    03:11:52

19       A.    I DO.                                       03:11:53

20       Q.    AND WAS THAT TRUTHFUL AND ACCURATE WHEN YOU 03:11:53

21   GAVE IT?                                              03:11:55

22       A.    IT WAS.                                     03:11:56

23       Q.    THE "KNOCKING ON DOORS" THAT'S REFERRED TO  03:11:57

24   THERE, IS THAT THE EFFORT TO GO OUT AND MEET WITH     03:11:59

25   AIRLINES TO FIND A POTENTIAL STRATEGIC PARTNER THAT YOU 03:12:02
```

Page 53

1    TESTIFIED ABOUT EARLIER?                              03:12:05

2        A.    YES.                                        03:12:06

3        Q.    AND WHAT DID YOU MEAN WHEN YOU SAID "NO ONE 03:12:06

4    WAS INTERESTED IN TWA AS A GOING CONCERN"?            03:12:08

5        A.    WELL, THERE WERE SOME THAT WERE INTERESTED IN 03:12:12

6    BUYING AN ASSET HERE, AN ASSET THERE.  NOBODY WAS     03:12:17

7    INTERESTED IN TAKING THE ENTIRE AIRLINE.  AND NOBODY  03:12:21

8    WAS INTERESTED IN TAKING ANY OF THE TWA EMPLOYEES.    03:12:26

9        Q.    NOW, TWA DID CONTINUE TO OPERATE AFTER       03:12:37

10   JANUARY 10 OF 2001; IS THAT CORRECT?                  03:12:41

11       A.    YES.                                        03:12:44

12       Q.    AND HOW WAS THAT POSSIBLE?                  03:12:44

13       A.    IT WAS POSSIBLE BECAUSE TWA WAS GOING THROUGH 03:12:47

14   THE BANKRUPTCY PROCESS AND HAD RECEIVED               03:12:52

15   DEBTOR-IN-POSSESSION FINANCING FROM AMERICAN AIRLINES. 03:12:55

16       Q.    DO YOU RECALL IN WHAT AMOUNT THAT            03:12:58

17   DEBTOR-IN-POSSESSION FINANCING WAS?                   03:13:00

18       A.    I BELIEVE THE INITIAL DEBTOR-IN-POSSESSION  03:13:02

19   FINANCING WAS $200 MILLION, I BELIEVE.                03:13:05

20       Q.    AND ABSENT RECEIVING THAT                   03:13:09

21   DEBTOR-IN-POSSESSION FINANCING, DID TWA HAVE ANY      03:13:10

22   ALTERNATIVES TO CONTINUE OPERATIONS?                  03:13:13

23       A.    YOU SAY ABSENT THAT?                        03:13:15

24       Q.    YES.                                        03:13:17

25       A.    ABSENT THAT, TWA WOULD NOT HAVE BEEN ABLE TO 03:13:17

Page 54

```
 1   CONTINUE.                                              03:13:19

 2      Q.    AT PAGE 25 I WOULD LIKE TO DIRECT YOUR        03:13:26

 3   ATTENTION TO THE THIRD FULL PARAGRAPH.  IT SAYS       03:13:30

 4   "SEVERAL OF OUR COMPETITORS ARE NOW SUDDENLY SAYING,  03:13:33

 5   OUT OF AN APPARENT DESIRE TO AVOID THE ENHANCEMENT OF 03:13:37

 6   AMERICAN, THAT TWA COULD BE MAINTAINED AS A STAND-ALONE 03:13:40

 7   ENTERPRISE OR ITS ASSETS PARCELED OUT AMONG VARIOUS   03:13:43

 8   CARRIERS TO PROTECT THE INTERESTS OF CREDITORS.       03:13:46

 9          "THESE CLAIMS, IN ADDITION TO BEING            03:13:49

10   DISINGENUOUS AND SELF-SERVING.  IGNORE THE REALTIES OF 03:13:51

11   THE AIRCRAFT INDUSTRY.  THEY ALSO DISREGARD THE NEEDS 03:13:54

12   OF TWA CONSUMERS, EMPLOYEES AND RETIREES.  IN FACT,   03:13:57

13   THEY ALSO DO NOT REPRESENT THE BEST OPTIONS FOR TWA'S 03:14:01

14   LARGEST CREDITORS."                                   03:14:04

15          WAS THAT TESTIMONY TRUTHFUL AND ACCURATE WHEN  03:14:06

16   YOU GAVE IT IN 2001?                                  03:14:09

17      A.    IT WAS.                                       03:14:10

18      Q.    AND DO YOU STILL REGARD IT AS SUCH TODAY?     03:14:10

19      A.    I DO.                                         03:14:12

20      Q.    WHAT COMPETITORS WERE YOU REFERRING TO?       03:14:13

21      A.    ALL OF THEM.                                  03:14:20

22      Q.    AND WHY DID YOU CALL THEIR CLAIMS             03:14:21

23   "DISINGENUOUS AND SELF-SERVING"?                      03:14:24

24      A.    IT WOULD BENEFIT A LARGE NUMBER OF CARRIERS   03:14:26

25   IF TWA JUST DISAPPEARED.  TWA HAD APPROXIMATELY 200   03:14:29
```

Page 105

```
1       A.    THAT WAS THE ONLY WAY THAT YOU COULD GET A      04:25:05

2   STRATEGIC PARTNER WAS THAT YOU HAD TO GET RID OF THE      04:25:10

3   KARABU AGREEMENT.                                         04:25:13

4       Q.    RIGHT.  AND YOU DID GET RID OF THAT KARABU      04:25:14

5   PROGRAM IN THE JANUARY 2001 BANKRUPTCY.                   04:25:18

6       A.    YES.                                            04:25:21

7       Q.    HAD YOU AND THE BOARD CONSIDERED FILING         04:25:22

8   BANKRUPTCY PRIOR TO THAT TIME, AT ANY POINT PRIOR TO      04:25:25

9   THAT TIME FOR THE PURPOSE OF ELIMINATING THE KARABU       04:25:29

10  PROGRAM?                                                  04:25:32

11          MR. MICHAEL:  OBJECTION TO THE FORM.              04:25:33

12      A.    TWA -- WHEN I WAS ASKED TO COME IN ON AN        04:25:36

13  INTERIM BASIS INTO TWA'S MANAGEMENT IN DECEMBER OF        04:25:39

14  1996, TWA WAS THINKING ABOUT BANKRUPTCY THEN.  SO TWA     04:25:42

15  HAD BEEN THINKING ABOUT BANKRUPTCY FOR AN EXTENDED        04:25:47

16  PERIOD OF TIME, JUST TRYING TO FIND A SOLUTION.  SO       04:25:51

17  THAT'S BEEN -- YOU ASKED ME IF THEY WERE THINKING ABOUT   04:25:54

18  BANKRUPTCY --                                             04:25:57

19      Q.    MY QUESTION WAS -- MAYBE MY QUESTION WASN'T     04:25:58

20  CLEAR.  MY QUESTION WAS MORE SPECIFIC.  WAS TWA LOOKING   04:26:00

21  AT USING BANKRUPTCY AS A WAY OF ELIMINATING THE KARABU    04:26:03

22  PROGRAM PRIOR TO ENTERING INTO THE TRANSACTION WITH       04:26:08

23  AMERICAN AIRLINES IN JANUARY OF 2001?                     04:26:11

24          MR. MICHAEL:  OBJECTION TO THE FORM.              04:26:14

25      A.    IT WAS DISCUSSED AMONGST OUR FINANCIAL          04:26:18
```

Page 106

```
 1  ADVISERS AND BETWEEN -- AND OUR BANKRUPTCY COUNSEL.  IT  04:26:20
 2  WAS CERTAINLY DISCUSSED.                                04:26:26
 3     Q.    WHAT WAS THE EARLIEST THAT YOU CAN RECALL AS   04:26:28
 4  A MEMBER OF THE MANAGEMENT OF TWA IN DISCUSSING THE     04:26:31
 5  POSSIBILITIES IN BANKRUPTCY TO FREE TWA FROM THE BURDEN 04:26:35
 6  OF THE KARABU CONTRACT?                                 04:26:38
 7     A.    I DON'T REMEMBER SPECIFICALLY WHEN THAT        04:26:41
 8  HAPPENED.  BUT ONE OF THE POINTS THAT OUR BANKRUPTCY    04:26:42
 9  COUNSEL AND FINANCIAL ADVISERS PROVIDED US WAS WHETHER  04:26:47
10  WE, TWA, HAD THE RESOURCES TO GO INTO BANKRUPTCY        04:26:54
11  WITHOUT IT TURNING OUT TO BE A LIQUIDATION.  IN OTHER   04:27:00
12  WORDS, YOU HAD -- IT COST MONEY TO GO INTO BANKRUPTCY.  04:27:03
13  I MEAN, YOU HAVE TO HAVE CASH TO GET THROUGH THE        04:27:06
14  BANKRUPTCY.                                             04:27:09
15         AND THERE WAS A REAL QUESTION AS TO WHETHER      04:27:10
16  TWA COULD FINANCE A BANKRUPTCY.  IN OTHER WORDS, WOULD  04:27:14
17  IT TURN FROM AN 11 INTO A 7, LIKE, RIGHT AWAY, WHICH    04:27:17
18  MEANS A LIQUIDATION.  THAT WAS THE CONCERN THAT         04:27:21
19  FINANCIAL ADVISERS HAD AND THE BANKRUPTCY COUNSEL HAD.  04:27:25
20     Q.    I THINK YOU ANSWERED THE NEXT QUESTION I WAS   04:27:28
21  GOING TO ASK -- I WANT TO GO BACK TO THE QUESTION I     04:27:30
22  ASKED, AND THEN I WILL ASK YOU THAT QUESTION THAT I     04:27:33
23  THINK GETS THAT ANSWER.                                 04:27:36
24         THE QUESTION I ASKED WAS:  WHEN WAS THE          04:27:37
25  EARLIEST THAT YOU CAN RECALL AS A MEMBER OF THE         04:27:39
```

```
 1   MANAGEMENT OF TWA DISCUSSING THE POSSIBILITY OF USING    04:27:43

 2   THE BANKRUPTCY PROCESS TO FREE TWA OF THE BURDEN OF THE   04:27:46

 3   KARABU CONTRACT?                                          04:27:50

 4        A.    I AM SURE IT WAS DISCUSSED AS SOON AS PEOPLE   04:27:51

 5   STARTED REALIZING WHAT THE NEGATIVE CONSEQUENCES OF THE   04:28:01

 6   KARABU AGREEMENT WERE.  WHEN THE NEGATIVE                 04:28:04

 7   CONSEQUENCES -- IT TOOK A LITTLE TIME, YOU KNOW, IT       04:28:07

 8   CAME UP IN '95, WHICH IS WHAT WE'RE THINKING IS ABOUT     04:28:10

 9   WHEN KARABU STARTED UP, IT TOOK A LITTLE WHILE FOR THAT   04:28:12

10   TO GET GOING, FOR CARL ICAHN TO GET THE THING IN ORDER.   04:28:15

11           AND AFTER A PERIOD OF TIME, THE BOARD CAME TO     04:28:19

12   UNDERSTAND THAT, HEY, THIS IS HURTING OUR REVENUES.       04:28:22

13   AND SO THEN TWA LOOKED AT OTHER ALTERNATIVES; IN OTHER    04:28:26

14   WORDS, WHAT CAN WE DO ABOUT THIS.                         04:28:29

15           SO TWA HIRED COUNSEL.  TWA FILED A SUIT           04:28:31

16   AGAINST KARABU.  THERE WERE DISCUSSIONS THROUGH           04:28:36

17   FINANCIAL ADVISERS TO CARL ICAHN DIRECTLY TO, HEY, CAN    04:28:39

18   WE MODIFY THIS THING.  IT'S KILLING US.                   04:28:42

19           SO THERE WERE MULTIPLE AVENUES THAT PEOPLE        04:28:45

20   WERE USING TO TRY TO FIND A SOLUTION.  BUT THE            04:28:47

21   LITIGATION DIDN'T WORK IN OUR CASE, BUT IT WAS STILL      04:28:53

22   GOING ON, YOU KNOW, PEOPLE APPEALING AND THAT SORT OF     04:28:57

23   THING.  SO PEOPLE WERE HOPING TO RESOLVE THAT.  PEOPLE    04:29:00

24   WERE -- TALKED TO ICAHN TRYING TO MAKE IMPROVEMENTS,      04:29:02

25   AND NOBODY WAS ABLE TO SOLVE IT.                          04:29:05
```

# Exhibit 7

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

FILED

2001 MAR 16 A 9:16

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

In Re:                              )
                                    )
TRANS WORLD AIRLINES,               ) Case No. 01-0056
INC., et al.,                       )
                                    )
            Debtors.                )

United States Bankruptcy Court
824 Market Street - Sixth Floor
Courtroom No. 2
Wilmington, Delaware

March 9, 2001
9:50 a.m.

-- -- -- --
TRANSCRIPT OF PROCEEDINGS
-- -- -- --

BEFORE:   THE HONORABLE PETER J. WALSH, JUDGE.

-- -- -- --

- - - - - - - - - - - - - - - -
WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware   19801
(302) 655-0477

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

ORIGINAL

P11534

1      Captain Scott A. Schwartz.

2                  MR. WEISFELNER:  Just so the record is

3      clear.  Just an understanding is the witness being

4      presented as a lay witness or is he being presented as

5      an expert witness?

6                  THE COURT:  I assume he's being presented

7      as a fact witness.

8                  MR. MABEY:  That's correct.

9                  CAPTAIN SCOTT A. SCHWARTZ,

10          the witness herein, having first been

11          duly sworn on oath, was examined and

12          testified as follows:

13                       DIRECT EXAMINATION

14     BY MR. MABEY:

15       Q.    Captain Schwartz, please, state your

16     occupation.

17       A.    I'm a pilot for TWA.

18       Q.    How long have you been a pilot at TWA?

19       A.    I'm in my 16th year.

20       Q.    And what was your previous education?

21       A.    I have a B.A. and an M.B.A.

22       Q.    What association represents the TWA airline

23     pilots collective bargaining unit?

24       A.    The Air Line Pilots Association, known as ALPA.



WILCOX & FETZER LTD.
Registered Professional Reporters

1      Q.    Have TWA's pilots elected you to a position in

2   ALPA?

3      A.    They have.   I'm the vice-chairman of the TWA

4   branch of ALPA.

5      Q.    Do you have full access to the financial and

6   operational reports of TWA?

7      A.    Yes, we do.

8      Q.    Why is that?

9      A.    When the airline became employee owned, it was

10   retained that we were allowed to look at the financial

11   statements from the CFO on a routine basis.

12      Q.    Do you have assistance in analyzing these data?

13      A.    Yes, we do.

14      Q.    What is that assistance?

15      A.    We have an investment banking group, Michael

16   Glanzer, who is our investment banker.   We also have

17   an economic financial analysis department in

18   Washington that assists us in evaluating that

19   information.

20      Q.    I call your attention to TWA's two previous

21   bankruptcies which resulted in stand-alone bankruptcy

22   plans.   What actions have TWA's pilots taken to make

23   these plans work?

24      A.    In 1992, during the first bankruptcy, we took



Case 1:02-cv-02917-JEI Document 569-4 Filed 08/22/13 Page 111 of 306 PageID: 18003

1    huge pay concessions.  We took 20 percent pay

2    concessions as well as giving up our A plan or our

3    defined benefits plan.  In 1994, we gave huge work

4    rule concessions.  We became the most efficient

5    productive pilot group in the industry.  We also

6    created a productivity task force where we helped the

7    company find efficiencies and run the airline more

8    efficiently and smarter.

9       Q.   By your observation during this period of time,

10   also in an effort to support stand-alone plans, what

11   actions did you observe the company to take?

12      A.   I believe the company did many things.  They

13   tried several schemes:  taking seats out of airplanes

14   to create more leg room, putting seats back in to

15   create more cash flow, different marketing plans,

16   different utilization of the hub, adding to other

17   banks.  I believe there was a myriad of efforts to

18   improve the airline.

19      Q.   Captain Schwartz, notwithstanding these

20   actions, has TWA had a profitable year in the last

21   decade to the best of your knowledge?

22      A.   They have not.

23      Q.   Does ALPA believe that a stand-alone plan for

24   TWA can succeed?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1     A.    No, we do not.

2                 MR. WEISFELNER:  Objection.

3                 THE COURT:  What's the objection?

4                 MR. WEISFELNER:  I don't know how this

5     witness can necessarily stand here and tell us what

6     ALPA believes.  He hasn't laid that foundation nor do

7     I know how a fact witness is going to give us that

8     sort of an opinion based on -- I haven't even heard

9     his involvement in anything beyond he has access to

10    financial information and he employs an investment

11    banker.  And I don't know why it's relevant either.

12                THE COURT:  Well, I think he indicated

13    he's vice chair of some group and has some access to

14    management information.  It's not clear to me whether

15    he's expressing his own opinion or whether he's

16    expressing the opinion of a constituency that he

17    represents.

18                MR. MABEY:  Thank you, Your Honor.

19    BY MR. MABEY:

20    Q.    Captain Schwartz, are you the vice chair of the

21    TWA ALPA group?

22    A.    Yes, I am.

23    Q.    And are you authorized to speak for them here?

24    A.    I am.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.   Does ALPA believe that a stand-alone plan of

2    reorganization for TWA can succeed?

3    A.   No, we don't.

4    Q.   And in addition to the reasons you've given,

5    citing efforts already undertaken in that behalf, are

6    there other reasons ALPA holds this belief?

7    A.   Our view is that an airline with four percent

8    of the market share, with a weak hub in St. Louis,

9    having the worst O and D statistics in the industry,

10   origination and destination traffic, we believe with

11   an overstrained airport in St. Louis, along with the

12   Karabu plan putting downward pressure on ticket

13   prices, it's not a stand-alone option.

14   Q.   You've testified that, just now, that ALPA

15   believes a stand-alone plan can't succeed.  But isn't

16   it true that ALPA tried to help put together a

17   stand-alone plan at the end of last year?

18   A.   That's correct.

19   Q.   What was that plan called?

20   A.   The self-help plan.

21   Q.   Was that plan ever finalized?

22   A.   It was not.

23   Q.   Why is that?

24   A.   Well, prior to the winter of this last year



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  there was an effort, based on the pro forma cash

2  position -- efforts were needed to be done from the

3  stakeholders to get through the winter.  That would

4  require labor concessions.  It would require lessor

5  concessions, and it would require the refinancings of

6  the cash receivables financings.  All of those

7  components need to be facilitated to create a savings

8  to get through the winter.  None of those things came

9  to fruition.

10  Q.    Were you involved personally in those efforts

11  and negotiations?

12  A.    At some level I was.

13  Q.    If everything had come together, what good

14  would it have done?

15  A.    Our view is, worst case, we could have survived

16  two or three months; best case, we could have survived

17  to the next winter, but not through the next winter.

18  Q.    Would the self-help plan have made TWA

19  profitable?

20  A.    No way.

21  Q.    Why did you join TWA in 1985?

22  A.    In 1985, TWA was a premier carrier.  TWA was

23  the biggest airline going across the North Atlantic.

24  TWA's pay scales for pilots were higher than that of



WILCOX & FETZER LTD.
Registered Professional Reporters

1    American Airlines.  Our pilot group was, roughly, the

2    same size of American Airlines.  It was a good company

3    back in 1985.

4       Q.   By your observations and your organization's

5    observations, when did TWA's problems develop?

6       A.   They began when Icahn took over the airline in

7    1986.  He bled the airline of cash by taking the

8    airline private, paid himself back for the

9    transaction.  The two subsequent bankruptcies left the

10   airline weaker.  The selling of the London routes made

11   the airline weaker.  By the time Icahn left, TWA was

12   nothing like the airline I came to work for in 1985.

13      Q.   If Mr. Icahn is affiliated with a stand-alone

14   TWA plan which seeks labor concessions, what will be

15   the reaction of TWA's pilots?

16          MR. WEISFELNER:  Your Honor, objection.

17          THE COURT:  That calls for speculation.

18   You can ask him what his reaction will be.

19   BY MR. MABEY:

20      Q.   I ask you what your reaction --

21      A.   Your Honor, my reaction would be extremely

22   negative.  I would not fly for an Icahn entity.

23      Q.   What would the reaction of your organization

24   be?



WILCOX & FETZER LTD.
Registered Professional Reporters

P11541

D-203
Page 8 of 28

1     A.    Similar to mine.

2     Q.    Are there other jobs available for pilots --

3     A.    Yes.

4     Q.    -- who are dissatisfied with TWA?

5     A.    There is a pilot shortage going on right now.

6     Q.    Suppose the plan were to reduce the number of

7     pilot jobs from the present approximately 2400 to,

8     say, 1510, what would be the response -- what is the

9     response of you and the Air Line Pilots Association to

10    that proposal?

11    A.    Well, that would certainly exacerbate the

12    situation.  That would create a situation where

13    , captains would get 50 percent pay-cut by going down to

14    co-pilots and then would be furloughed.  It would make

15    things a disaster, more disastrous.

16    Q.    One of the labor concessions currently sought

17    by the TWA Acquisition Group, I represent to you,

18    would require the pilots to work substantially more

19    for the same pay.  What is your reaction and the

20    reaction of the Air Line Pilots Association to this

21    proposal?

22          MR. WEISFELNER:  Your Honor, I object.

23    The representation by the examiner is that it's

24    "substantially" more hours.  I don't know that it's



WILCOX & FETZER LTD.
Registered Professional Reporters

# Exhibit 8

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY
---------------------------------------X
PATRICK BRADY, et al,

                    Plaintiffs,

          - against -

AIR LINE PILOTS ASSOCIATION
INTERNATIONAL,

                    Defendant.

Civil Action No. 02-2917 (JEI)
---------------------------------------X


                         1285 Avenue of the Americas
                         New York, New York

                         January 21, 2013
                         1:55 p.m.


     Videotaped Deposition of Non-Party Witness

MICHAEL PALUMBO, before Rita Persichetty, a Notary

Public of the State of New York.

1   bad if it was versus death.

2           So I think you can argue, you know,

3   to the extent that he had any role in our

4   potential viability at that moment, there might

5   have been an openness to being engaged, if you

6   will.

7       Q    And did TWA ever reengage with

8   Mr. Icahn?

9       A    No, our general objective was

10  actually to try and find not -- we satisfied

11  all our financial obligations to Mr. Icahn,

12  i.e., we paid off all our debt, in fact, much

13  sooner than anyone expected.

14          Our principal in terms of TWA

15  management interaction with Mr. Icahn was

16  trying to terminate the discount ticket

17  program, and we were never able to achieve a

18  mutually satisfactory resolution to that, so

19  our objective really was to separate any

20  business arrangement around that.

21      Q    Now, did that discount ticket program

22  that you mentioned have a name?

23      A    It did, and I can't say that I

24  recall.

25      Q    When did TWA enter into that

1   arrangement with Mr. Icahn?

2        A    It was part of the exit from the

3   prepackaged bankruptcy.

4        Q    And in your understanding, did that

5   discount ticket program have any impact on

6   TWA's financial condition?

7        A    It was felt to have a negative

8   impact.  It wasn't -- it was very hard to

9   precisely measure its impact because you were

10  trying to measure what the revenue would have

11  been without the wholesale ticket program, that

12  is to say, could the company have on its own

13  sold tickets at a higher price than were being

14  the case resulting from the Icahn program.

15            So there are various attempts at

16  valuing that, they were all negative in terms

17  of their impact on revenue, but it was -- be

18  hard to feel comfortable that we were precisely

19  able to measure its impact.

20       Q    Who was it that tried to value the

21  impact of the discount ticket program?

22       A    Both internal and external sources.

23       Q    Do you recall, even on an approximate

24  order of magnitude, what the estimates of that

25  impact was?

1        A     It is 12 years ago.  But its order of

2   magnitude, I think, in terms of what felt like

3   were not reliable analysis that I can recall,

4   you know, was probably on an annual basis

5   negative to the somewhere between 50 and

6   $150 million a year.

7        Q     And would you consider that to be a

8   material impact on TWA's financial condition?

9        A     Well, we were a $3 billion revenue

10  company, so you could say that's relatively

11  small, but, you know, when you got to the net

12  between our revenues and our operating

13  expenses, it was the difference between

14  breakeven and a slight profit and the losses we

15  were experiencing.

16       Q     Are you familiar with something

17  called a Caribou ticket program?

18       A     That is the ticket program.

19       Q     That is the same --

20       A     That's the name I couldn't recall.

21  And actually, I think it had yet another

22  trademark type name, but I'm not recalling.

23            MR. HAVERMANN:  Excuse me, Bill, do

24       you intend to correct him on the date?  He

25       referenced 2005 twice.

1       A    I meant when I said 2005, I think in

2    the case of 2005, it was 1995.

3       Q    Just to be clear, in -- we were

4    talking about TWA's second bankruptcy filing,

5    and that occurred in when?

6       A    In July of 1995, I believe the summer

7    of 1995.

8       Q    Got it.  Thanks.

9       A    Thank you.

10      Q    Now, did there come a time when TWA

11   filed for bankruptcy a third time?

12      A    Ultimately in connection with the 363

13   sale or Section 363 sale to American was the

14   third time, yes.

15      Q    What is a Section 363 sale?

16      A    It's essentially under the provisions

17   of Chapter 11, it's the section that covers an

18   auction sale of assets and assumption of

19   liabilities.

20      Q    And when did that occur?

21      A    That occurred -- I believe it

22   commenced in February of 2001, maybe it was

23   January or February, I'm sorry, I don't recall.

24      Q    Okay.  As chief financial officer of

25   TWA at the time, did you have an understanding

1    of the company's financial condition when it

2    entered bankruptcy for the third time?

3         A    Yes, I did.

4         Q    Can you describe that condition?

5         A    It was extreme from the standpoint of

6    not having enough cash to -- without

7    assistance, not having had enough cash to make

8    it through the month of January of 2001

9    principally because of an amortized --

10   amortization event surrounding our accounts

11   receivable securitizations that was

12   structurally going to extract $100 million of

13   cash without a replacement facility on top of

14   the normal January or winter drain of cash that

15   would approximate another 50 to $60 million,

16   typically, without any statutory trauma.

17        Q    I want to break that down a little

18   bit.  You mentioned an accounts receivable

19   securitizations, and can you describe what that

20   is?

21        A    It's essentially a program where we

22   financed our accounts receivables, but the

23   structure of the financing is actually selling

24   the receivables essentially on a daily basis.

25   So that when you initially borrow, in this

1  case, $100 million against your assets accounts

2  receivable every day, the program would

3  evaluate the cash collected against receivables

4  or receipts from receivables and the new

5  receivables created.

6       As long as that net was positive

7  against what happened that day and what the

8  remaining collateral in terms of receivables

9  were, the revenues were permitted to flow

10  through to the company or the cash sales were

11  permitted to flow through the company.

12       So in effect, every day there was a

13  receipt and a purchase of new receivables.  The

14  effect was -- throughout the life of the

15  receivable financing was the $100 million

16  essentially stayed outstanding the entire

17  period because there was enough collateral to

18  the daily to and fros of daily receipts and new

19  purchases.

20       The amortization event that I spoke

21  of earlier was, essentially, at maturity what

22  would happen is 100 percent of the cash

23  receipts, which were principally credit card

24  receipts and cash sales, would go to repay the

25  debt based on every dollar until $100 million

1   was collected with essentially no cash going to

2   the company.

3           So 100 percent of the receipts until

4   $100 million was received would go to pay off

5   the debt at which point the receivable

6   collateral would be the company's and the cash

7   would flow in the normal course.

8       Q    And just to make sure we're clear, so

9   in very basic terms, the accounts receivable

10  securitization was a form of debt; is that

11  correct?

12      A    Yes.

13      Q    Okay.  And that debt was in the

14  amount of $100 million?

15      A    Yes.

16      Q    And who was it owed to?

17      A    Various institutional investors.  I

18  believe it was a group of eight individual

19  investors.

20      Q    When was the amortization event that

21  you referred -- that you referred to scheduled?

22      A    I think it was mid January, somewhere

23  around the 15th of January 2001.

24      Q    I think you alluded to this in your

25  last answer, but would the full amount of the

1   $100 million obligation come due at once when

2   that amortization event occurred?

3        A    Well, its maturity date was

4   essentially as fast as the cash receipts could

5   pay it off.

6            So if we -- I mean, for instance, if

7   we did receive $100 million on the first day of

8   the amortization, 100 percent of those receipts

9   would go to repay the loan, and it would be

10  paid off in one day.

11           As a practical matter, the loan was

12  anticipated to amortize over -- to go between

13  10 and 20 days, because it was occurring in

14  January, it was a low point of our receipts

15  period, it was during the winter period, so

16  that on top of just our generic size and the

17  amount of receivables we would receive on any

18  particular day, it was a slow period of the

19  year.

20       Q    Now, you said that it was principally

21  due to this accounts receivable securitizations

22  that TWA found itself in an extreme financial

23  position as of January of 2001; is that

24  correct?

25       A    It's correct, because we didn't have

1    any -- there was no natural operating offset to

2    that degree of cash claim, if you will.

3              We weren't generating it, we didn't

4    have another source, and we didn't have that

5    amount of cash incremental to our operating

6    needs.

7        Q    Were there other factors that you can

8    recall that led to TWA finding itself in that

9    financial condition at that point in time?

10       A    Well, we were operating at a cash

11   deficit, an operating cash deficit due to a lot

12   of reasons, among them, jet fuel costs had been

13   increasing.  We had ongoing challenges with

14   another revenue line due to, among other

15   things, the Carl Icahn interests that I spoke

16   of earlier.

17             So, and there was generic concern

18   about the published reports of TWA's financial

19   condition, which also tends to impact

20   passengers, because the passengers tend to buy

21   tickets in advance and are very concerned that

22   if a bankruptcy or worse, a liquidation even

23   occurred prior to their date of transportation,

24   they're left with something of an unsecured

25   plan.

1      Q    You mentioned that jet fuel prices

2  were increasing.  What time period was that

3  occurring in?

4      A    In peaks and valleys over, you know,

5  principally over the last 18 months, but over

6  the six years of my tenure at TWA, nothing like

7  today's levels, but there was a good deal of

8  volatility around crude oil, and therefore, jet

9  fuel prices.

10     Q    When you say the last 18 months, the

11  last 18 months before what?

12     A    Sorry.  The transaction with

13  American, which was the 2001 date that I

14  referred to earlier.

15     Q    Do you recall by how much jet fuel

16  prices increased?

17     A    I'm sorry, I don't recall, but they

18  were significant numbers.

19     Q    And did the price of jet fuel have an

20  impact, in your view, on TWA's financial

21  condition prior to its third bankruptcy filing?

22     A    Yes.

23     Q    And can you describe that impact?

24     A    It was extremely negative because we

25  weren't independently able to raise our prices

1    against the kind of dramatic increase in costs.

2         We didn't have the resources to buy

3    insurance policies or hedge positions to

4    mitigate any of that pricing increase, so it

5    was essentially 100 percent increase in cost

6    with no practical offset.

7    Q    Can you describe what you mean by

8    buying a hedge position with respect to jet

9    fuel costs?

10   A    It's essentially the capacity to buy

11   a form of insurance policy so that you agree in

12   advance to purchase and/or sell either the

13   actual crude oil or some proxy for that

14   resource so that you in effect lock in a price

15   in advance.

16        Those contracts can be right or

17   wrong, and you -- the insurance program is

18   effective if indeed you end up agreeing to

19   purchase jet fuel effectively at a price that

20   is lower than market when it comes time to

21   actually take delivery.

22   Q    You testified that TWA had no ability

23   to hedge against jet fuel costs?

24   A    No, because you have, in most

25   contexts, although the field has advanced in

1    the decade or so since, in most contexts, if

2    you did not carry an investment grade, you had

3    to cash collateralize the potential of prices

4    moving against you.

5              And because you're talking, in many

6    cases, about large dollars in terms of actual

7    fuel purchase content or what the proxy was

8    built around, those were material dollars that

9    we didn't have.

10             It was collateral, it wasn't lost

11   forever, but we couldn't stand up to our end of

12   the bargain of cash collateralizing our

13   noninvestment grade potential obligation.

14   Q     You mentioned carrying an investment

15   grade, what did you mean by that?

16   A     I'm sorry, the major rating agencies

17   define investment grade as the higher quality

18   grades that typically end with what today, I

19   believe, is still referred to as triple B.

20             The TWA -- the highest investment

21   rating that TWA achieved in my tenure was

22   single B and many cases was in the C range.

23   And ultimately, before the bankruptcy filing,

24   was actually in a D range, which is essentially

25   in anticipation of default.

1       Q    Just to be clear, before TWA declared

2   its third bankruptcy in January of 2001, what

3   was its investment rating?

4       A    I believe it was -- where it was

5   rated, it was a D rating or a default rating.

6       Q    As chief financial officer of TWA,

7   did you have an understanding of whether your

8   competitors were able to hedge against jet fuel

9   market risks?

10      A    Generally, but in the main, there

11  were only a handful that could.  Very famously

12  Southwest Airlines had -- was able to hedge for

13  years 100 percent of its requirements and did

14  so at a quite fortuitous time.

15           Beyond Southwest, there were

16  relatively few airlines that were materially

17  hedging at the time, to my knowledge.  Delta, I

18  think, was one of the exceptions as well.

19      Q    And in the time leading up to TWA's

20  third bankruptcy filing in January of 2001, did

21  the inability to hedge against jet fuel costs

22  have an impact on its financial condition, in

23  your view?

24      A    Yes, it did.  We had to pay market

25  price for jet fuel, so to the extent it rose,

1    our only choice was to pay what market was.

2        Q    In connection with the third

3    bankruptcy filing, do you recall testifying in

4    the bankruptcy court?

5        A    I do.

6        Q    And do you recall submitting any

7    written affidavits?

8        A    I do.

9             MR. MICHAEL:  Let's mark this as

10        Palumbo 1.

11             (Palumbo Exhibit 1, Affidavit of

12        Mr. Palumbo, marked for identification.)

13        Q    Mr. Palumbo, you've been handed a

14    document marked as Palumbo Exhibit 1.  It is a

15    filing from the United States Bankruptcy Court

16    for the District of Delaware.  The case is, In

17    Re Trans World Airlines, and it's titled

18    affidavit of Michael J. Palumbo, executive vice

19    president and chief financial officer of the

20    debtors in support of first day motions.

21             Is this an affidavit that you

22    submitted in connection with TWA's third

23    bankruptcy filing?

24        A    Yes, it appears so.

25        Q    And what are first day motions?

Page 45

1    profitability.

2         Q    And at the time of its third

3    bankruptcy filing in January of 2001, how many

4    hubs did TWA have?

5         A    It really had only one main hub.

6    There were efforts at establishing what might

7    be referred to at various points in the

8    industry as focus city -- cities where you had

9    increased activities but not to the level of a

10   hub.

11        A hub characteristically would have

12   what we refer to are banks of activities, very

13   busy collection of passengers and resending out

14   of passengers on a receipt and dispatch basis

15   that would be referred to a bank, that is

16   something -- this activity would occur in

17   approximately an hour's time, so that a hub

18   would have anywhere from five to seven of those

19   concentrated levels of activity or banks and

20   need that in order to support the generic level

21   of activity.

22        So you can have large and small hubs,

23   so therefore, you can have fewer banks, but in

24   general, you need level -- you need a hub to

25   have certain demographic characteristics that

1   limit the potential target for such a defined

2   level of commercial aviation business activity,

3   limit the number of potential cities.

4        Q    Were there other major airlines at

5   that time that had only one hub or one main

6   hub?

7        A    Typically not because it -- among

8   other things, one of the important things about

9   having more than one hub was your ability to

10  coordinate and flow the overall traffic of your

11  entire network and also permit you to

12  efficiently recover from interrupted or regular

13  operations and reposition your equipment and

14  personnel against those unplanned changes in

15  schedule.

16           So there's a good deal of efficiency

17  that comes with having more than one hub as

18  well as an aggregate amount of support from a

19  larger revenue base, you know, that potentially

20  is supporting less in the way of overhead.

21       Q    And was TWA able to realize any of

22  the efficiency that comes from having more than

23  one hub?

24       A    No, because we really only had one

25  hub, so we suffered by comparison to most of

1   our competitors who had multiple hubs.

2        Q    And where was TWA's hub located?

3        A    St. Louis, Missouri.

4        Q    You mentioned you like to have a

5   concentration of population and corporate

6   headquarters at an airline's hub; is that

7   correct?

8        A    That's correct.

9        Q    And why is that beneficial for an

10  airline?

11       A    Well, it's a determinant and a

12  general predictor of the level of volume or air

13  transportation activity.

14       Q    As of the time of TWA's third

15  bankruptcy filing, how would you describe the

16  concentration of population and corporate

17  headquarters in St. Louis?

18       A    The population and corporate

19  headquarters had dramatically changed.  TWA

20  (sic), while a small city on its own, less than

21  a million, as defined, city residents in a true

22  definition of St. Louis city, it started out

23  when I joined TWA in '94 as one of the highest

24  concentration of Fortune 500 companies

25  headquarters in -- especially in consideration

1    of its size.

2            By the time of our third filing in

3    2001, that number was -- had declined by

4    probably something like three-quarters of -- in

5    terms of individual corporate headquarters.

6            What happens in that case, though, is

7    that population, the generic population, could

8    stay essentially the same, but the reason for

9    business activity that a corporate headquarters

10   generally generates, it causes a -- the decline

11   in corporate headquarters causes a dramatic

12   decline in your highest-yielding passenger,

13   which is your business passenger.

14       Q    Did the decline in concentration of

15   corporate headquarters in St. Louis have any

16   impact on TWA's financial condition?

17       A    Yes, it did.

18       Q    What was that impact?

19       A    Negative.

20       Q    Are you familiar with the concept of

21   a low-cost, low-price carrier?

22       A    Yes.

23       Q    What is that?

24       A    It's essentially an airline -- a

25   commercial airline operation whose strategy is

1    built around the generation of and provision of

2    transportation around volume as opposed to --

3    to price, but also an operation at least

4    endeavors to design a cost structure that is

5    proportionately -- disproportionately lower

6    than a full service, higher -- generally

7    higher-yielding airline operation.

8            So it's a low-price, low-cost model

9    that is generally driven by volume as opposed

10   to segmentation of price and a drive towards

11   higher business travel content.

12       Q    At the time of its third bankruptcy

13   filing, was TWA facing competition from any

14   low-price, low-cost carriers in St. Louis?

15       A    Well, particularly in St. Louis,

16   Southwest Airlines, which is probably the

17   leader in that category, was the second largest

18   carrier.  I believe they were approaching

19   30 percent of St. Louis market share, and TWA

20   was, you know, somewhere in the 60 percent

21   range of the TWA volume.

22           So they were a significant competitor

23   in (sic) TWA which had a natural capping of the

24   yields or the price that we could charge for

25   individual seats to a Southwest standard which

Page 50

1    was -- tended to be lower than some of the

2    other competition in the United States.

3         Q     And in your view, did competition

4    with Southwest have any impact on TWA's

5    financial condition leading into the third

6    bankruptcy filing?

7         A     It did.

8         Q     Can you describe that impact?

9         A     It was principally negative due to

10   the natural limitation it imposed on our price

11   that we could charge for our seats going to

12   similar locations.

13        Q     Are you familiar with the concept of

14   a regional jet affiliate?

15        A     Yes.

16        Q     And can you describe that for me?

17        A     That is essentially a feeder system

18   that most carriers were employing to connect

19   smaller markets that couldn't justify larger

20   equipment to some of the -- connect those

21   smaller markets to larger market city pairs,

22   first connecting through your hub and then out

23   ultimately to the desired destination beyond

24   the hub.

25        Q     Did TWA itself ever try to introduce

1    regional jet service?

2         A    They did.

3         Q    Were they able to?

4         A    On a very limited scale, yes.

5         Q    Why only on a very limited scale?

6         A    The -- there was a -- during TWA's --

7    during my tenure at TWA was a period of time

8    that encompassed essentially the introduction

9    of regional flying, but maybe more importantly,

10   the basis on which regional flying was done.

11        When I first started at TWA, most

12   people's regional operations were either

13   separate or owned, but it was principally

14   taking care of the small market dynamic that I

15   described earlier with prop jets which are

16   older, slower flying, less efficient means of

17   connecting those markets, and also, naturally

18   limited the reach of those markets, as to say

19   the prop jets general mission was generally on

20   a smaller point to point basis than the

21   regional jets could be.

22        So on two levels, it permitted you to

23   do more with more markets, to grow to the

24   regional jet alternative.  There was a --

25   during that period of introduction, a -- sort

1   recollection as to the precise amount of cash

2   that TWA had on hand as of the day of its third

3   bankruptcy filing?

4        A    As of the filing day, yes, that's --

5   it does refresh my memory.

6        Q    What was that amount?

7        A    $20 million.

8        Q    Now, you said earlier that the amount

9   of cash that TWA had on hand was in the order

10  of $100 million; is that correct?

11       A    It is correct.  Then I think I was

12  recalling somewhat towards the end of the year,

13  I thought -- I'm sorry, I was answering what I

14  thought was the end of the year question as

15  opposed to on the filing date, but it refreshes

16  my memory nonetheless.

17       Q    And just to be clear, what you

18  recalled as being $100 million cash on hand,

19  that would have been with respect to the end of

20  the year 2000?

21       A    Somewhat previous, if not the end of

22  the year, yes.

23       Q    Okay.  Got it.

24            Now, do you have any recollection of

25  how the amount of cash that TWA had on hand as

1    of the filing date, the $20 million that we've

2    been discussing, compared to the amount of cash

3    you had on hand as of the end of the prior

4    year, December of 1999?

5         A    Sorry, I was -- just had my memory

6    refreshed but since forgotten, but it was about

7    189 million, I think, the prior year.

8         Q    Okay.  So 189 million in December of

9    1999?

10        A    I believe at the prior year -- I'm

11   sorry, sorry, the 19 -- at year-end 1999, I

12   believe the number was 189 million.  I believe

13   it was somewhat less than that to -- at the end

14   of 2000, calendar year 2000.

15        Q    And as of January 10, 2001?

16        A    It seems to be $20 million.

17        Q    Now, at the time of the bankruptcy

18   filing, did you do any analysis regarding how

19   much cash TWA needed to sustain its operations

20   through the following business day?

21        A    Yes.

22        Q    And what was that amount?

23        A    I don't recall with precision.

24        Q    Let me direct your attention to the

25   same page in Palumbo 2 that we've been looking

1   at, starting at Line 16 you were asked,

2   "Mr. Palumbo, how much cash is needed to fund

3   the debtors' operations tomorrow morning?

4           "Answer, We expect approximately a

5   need of $40 million."

6           Do you see that testimony?

7       A    I do.

8       Q    Does that refresh any recollection at

9   the time as to how much cash TWA needed to fund

10  its operations?

11      A    It does.

12      Q    And how much was that?

13      A    $40 million.

14      Q    At the time of the third bankruptcy

15  filing, did TWA have any unused lines of

16  credit?

17      A    No.

18      Q    Did you have any bank facility that

19  it could draw on for additional cash?

20      A    No.

21      Q    Did TWA have any unencumbered assets

22  that it could monetize?

23      A    The only material unencumbered asset

24  at the time that I could recall were our

25  approximate 25 percent interest in Worldspan,

1    which is a global electronic reservation system

2    at the time.

3        Q    So at that time, how was TWA funding

4    its operation?

5        A    Basically through its operation, that

6    is to say that the cash -- the extent to which

7    cash receipts were in excess of cash

8    disbursements.

9        Q    Before it made its third bankruptcy

10   filing, did TWA undertake any effort to raise

11   capital and address the liquidity challenges

12   that you have been describing?

13       A    Yes.

14       Q    When did that effort occur?

15       A    It occurred almost continually for

16   the three years prior to filing for bankruptcy.

17       Q    What was your involvement in the

18   effort?

19       A    In the main, I led the effort.

20       Q    And can you provide an overview of

21   that effort to raise capital?

22       A    It was essentially an effort to both

23   find sources of liquidity, refinance where

24   there might be inefficiencies with the amount

25   of loan to value that we had under various

1    arrangements, pre-existing arrangements.

2              It had to do with trying to find ways

3    to reduce the capital costs and try to

4    negotiate reductions in the rental rates we

5    paid for equipment and other expenses that we

6    had with other vendors.

7              It had to do with trying to find

8    strategic partners along the lines of a -- more

9    of a merger and acquisition circumstance.  It

10   had to do with trying to reduce operating costs

11   by finding various ways to outsource or sell

12   existing operations, such as our maintenance

13   operation, and both trying to lower costs and

14   raise capital at the same time and liquefying

15   what assets we had of the sort -- of the

16   minority interests that we held in entities

17   such as Worldspan and to access any real estate

18   value we had in real estate holdings where

19   there was a potential efficiency in refinance

20   or sale.

21       Q    You mentioned that TWA had about a

22   25 percent interest in Worldspan; is that

23   correct?

24       A    As I recall, that was the approximate

25   interest, it was a minority interest.

1    solution.

2            So over -- I was there six years, I

3    don't remember the time when we weren't looking

4    for a strategic partner.

5        Q    Was the effort to find a strategic

6    partner independent of the self-help plan that

7    you described?

8        A    No.

9        Q    In what way were they related?

10       A    In finding a strategic partner, we

11   would simultaneously be finding a solution to

12   our liquidity challenge.

13       Q    And was that an either-or, in other

14   words?

15       A    It could have been.  It could have

16   been, but the challenge, I mean, the viability

17   challenge or the fiduciary responsibility that

18   we had at TWA was basically with a full -- with

19   an understanding that we were dealing with a

20   structurally flawed entity that was not

21   strategically -- I'm sorry, was not viable on

22   its own, financially viable on its own, both as

23   a network matter in terms of the quality and

24   potential of the city pairs and routes that we

25   possessed and our overall cost structure.

1             We needed -- there was only so much

2    we could do in terms of restructuring,

3    transforming the airline into a standalone

4    viability because the amount of time and

5    liquidity that would have simultaneously been

6    required to find that core viable airline

7    within the TWA standalone, if it could be

8    achieved, we -- there was never a point in the

9    six years of my tenure that we could have

10   financed ourselves to that moment in time.

11            So the -- there was a need to find

12   liquidity in order to extend the search period

13   as opposed to the liquidity providing an end in

14   itself.

15   Q    What specific airlines do you recall

16   talking to about a potential strategic

17   partnership prior to the third bankruptcy

18   filing?

19   A    Sorry for my somewhat facetious

20   earlier answer, but I mean, the specific

21   airlines that -- that is to say, we did indeed

22   talk to essentially every airline that was

23   certified in the United States about

24   potentially becoming a merger partner.

25            We had most extensive conversations

1    with America West, with Northwest Airlines,

2    with Continental Airlines, and then all other

3    to include Delta, et cetera, and American.

4           We had somewhat extensive due

5    diligence, preliminary due diligence

6    conversations with American Airlines in the

7    summer of 2000 that ultimately, albeit not

8    continually or directly, led to the ultimately

9    successful negotiations that occurred later in

10   the year, in the beginning of the next year.

11       Q    What do you recall about the

12   discussions with America West?

13       A    America West structurally had some of

14   the challenges that TWA had, and they were

15   trying to look to our network in combination

16   with their own in part to solve some of their

17   problems.

18          America West was, in profile, a

19   low-cost, low-price operation, whereas TWA was

20   a high-cost, somewhat aspirationally high-yield

21   operation that on its face just philosophically

22   had difficulty combining.

23          The next issue was that our fleets

24   were dramatically different.  We were

25   essentially a Boeing aircraft operator with

1    various models, whereas America West was

2    essentially an Airbus operator.

3            One of the viability -- structural

4    viability requirements is -- is a relatively

5    common fleet or at least a relatively common

6    cockpit, which is part of Southwest formula.

7    So we had a very big structural fleet

8    difference that would be hard to be resolved.

9            We had difficult labor combinations,

10   that is to say our unions didn't match up very

11   well, nor did the work rules between the two

12   match up especially well.

13           Then the location -- the geographic

14   location of their hubs and St. Louis, and their

15   hubs were principally at the time Phoenix and

16   Las Vegas, didn't naturally lend itself to a

17   connecting flow, if you will, just by the

18   nature of the demographics and the kind of

19   corporate activity that existed.

20           On top of all of that, America West

21   at the time was controlled by David Bonderman,

22   and while management saw TWA as a potential

23   strategic solution, that opinion wasn't shared

24   to the same degree, it was my understanding, by

25   Mr. Bonderman.

1              So we spent a lot of time trying to

2    come up with arguments that might persuade

3    Mr. Bonderman to take a different view, but our

4    joint efforts were never successful.

5         Q    So at any point during those

6    discussions, did America West come forward with

7    a proposal that would have addressed the

8    financial and liquidity challenges that TWA was

9    facing?

10        A    Not an advance proposal.  I mean, we

11   discussed frameworks, but there was never a

12   specific proposal that would represent an

13   agreement in principle that was mutually --

14   going to be mutually satisfactory to both

15   entities.

16        Q    At any point during the discussions,

17   was TWA able to reach an agreement with America

18   West that would have included the hiring of all

19   of TWA's pilots?

20        A    No.  In fact, they required a Section

21   363 sale process, and they were less willing to

22   take on beyond -- not just our employment

23   obligations, but such items as our post

24   retirement benefit obligations, so that they --

25   their objectives were to acquire a

1  smaller-flying franchise than by comparison to

2  the American transaction.

3      Q    And other than American, was there

4  any airline that you talked to prior to the

5  2001 bankruptcy filing that came forward with a

6  proposal to -- that would have included the

7  hiring of all of TWA's pilots?

8      A    There was no -- there was no level of

9  advanced agreement that would have included the

10 hiring of materially all of TWA's employees,

11 no.

12     Q    You mentioned discussions with

13 Continental.  What do you recall of those?

14     A    Those specifically came apart because

15 of their demand that TWA employees be granted

16 no more than a right of hire in a transaction

17 that would also include a bankruptcy.

18          But that was just among the issues

19 that we couldn't finally agree upon, but

20 principle among them was a lack of desire to

21 take on the TWA employment obligations.

22     Q    Were there other obstacles that TWA

23 encountered in its efforts to find a strategic

24 partner in this time period?

25     A    Certainly, but they were structural

1    in nature in part, which had to do with things

2    like the differential in fleet and then the

3    attributes of our flight network or our city

4    pairs versus -- and the strategic value that

5    they might offer another partner.

6              And I'm sorry, I left out one very

7    important negative that was universally

8    unacceptable, and that was the absorption of

9    the Icahn discount ticket program.  I think we

10   referred to earlier as a Caribou program.

11             That wholesale ticket program was

12   thought to be an infection, a broadening

13   infection to other people's flight networks

14   that would have deteriorated both their control

15   and the quality of their product mix, so that

16   even if everything else had worked, there was

17   never going to be an agreement as long as the

18   Icahn ticket program needed to be a part.

19   Q    Are -- you mentioned discussions with

20   American Airlines about a potential

21   transaction.  Over what time period did those

22   discussions occur?

23   A    As far as my involvement, my

24   discussions, and they principally were with

25   members of the finance organization at American

1    Airlines, which included Tom Horton, the then

2    CFO, a fella by the name of Beer, who was the

3    treasurer, James Beer, who was a treasurer, and

4    Bev Goulet, who is the current chief

5    restructuring officer at American, as well as

6    some of the related and more junior people in

7    the financing organization.

8            There were two meetings in the summer

9    of 2000 in Chicago, one with Horton and Bev

10   Goulet and one with James Beer and Bev Goulet,

11   I believe, that essentially laid out both the

12   attributes and challenges, if you will, around

13   the TWA system, its assets and its liabilities

14   and were in effect a sort of preliminary due

15   diligence meeting surrounding the potential

16   topic of an acquisition by American.

17           I don't believe those discussions

18   ever got so specific around discussing the

19   framework of and the necessity of a Section 363

20   sale.  They were rather within the context of a

21   general combination without suggesting what the

22   form of the process would have to take.

23           And then there were telephonic

24   follow-ups, intermittent telephonic follow-ups

25   with either additional questions or details

1    around things that we had discussed that maybe

2    weren't so clear in our initial meeting, but

3    there was -- after a point in the summer, call

4    it the beginning of September, until the very

5    end of the year, November, December, I had no

6    further conversations with American until I

7    received a call, I believe, in December from

8    Tom Horton suggesting that American was

9    prepared to consider taking the accounts

10   receivable securitization within an overall

11   context of a debtor in possession financing

12   that would be -- would permit a combination via

13   the 363 -- the Section 363 process which

14   ultimately led to the transaction.

15       Q    So you recall being on that phone

16   call around December of 2000; is that correct?

17       A    Yes.

18       Q    And can you describe how the

19   discussions with American unfolded after that?

20       A    Very shortly after that, a team from

21   TWA went to Dallas, to include our advisers, to

22   meet with a similar team discipline wise at

23   American, along with their advisers, both legal

24   and financial, to start roughing out a basic --

25   to initially go through a further level of due

1    diligence around certain aspects of the

2    liability -- specific liabilities impacting the

3    transaction, et cetera, and then ultimately to

4    begin a process of negotiations of what the

5    terms might be.

6            It was -- I mean, the principal and

7    most urgent issue was, it included a

8    refinancing of that $100 million amortization

9    event that was in something like 30 or 45 days

10   away.

11           So it was -- there was a lot of

12   activity.  There was a lot of to and fro, and

13   it commenced in December and continued into

14   January.

15   Q    Now, you mentioned a 363 asset sale

16   in the context of those discussions.  What were

17   the assets that you understood American was

18   proposing --

19   A    Well, it was essentially the assets

20   necessary to maintain the flying franchise that

21   on the TWA standalone basis was about 3.5,

22   3.6 billion dollars of annual revenues.

23           So it was essentially discerning what

24   of those flying assets were going to be

25   necessary to operate that system, that is

1   far the best alternative for all of the major

2   constituents attached to the TWA franchise.

3        Q    You say it was the best alternative.

4   What were the other alternatives to TWA?

5        A    There were none, you're quite right.

6             I say that -- even if there were,

7   American would have -- the American transaction

8   would likely have been very attractive for a

9   number of reasons, but there -- as a practical

10  matter, there were no alternatives.

11       Q    So to your knowledge, was there any

12  other airline than American at that time that

13  was willing to come forward with a proposal

14  that would hire all of the TWA pilots?

15       A    No, and as further evidence of that,

16  no one came forward in the auction process to

17  make a proposal.

18             I mean, I think we suspected there

19  would be no one, there certainly was no one

20  before the auction process commenced, and as an

21  actual matter, as an actual fact, there was no

22  one in terms of a strategic solution partner

23  that showed themselves as available by virtue

24  of the auction process.

25       Q    Was there any other airline at that

1   time that you were aware of that would have

2   preserved TWA's flying franchise, as you put

3   it?

4        A    Not in the -- not to the level that

5   American was talking about and not to any level

6   that I was aware of.

7             MR. MICHAEL:  I think we need to take

8        a break to change the videotape.

9             THE VIDEOGRAPHER:  This marks the end

10       of Tape 2.  The time is 4:18 p.m. on

11       January 21, 2013.  We are now off the

12       record.

13            (Recess taken.)

14            THE VIDEOGRAPHER:  This is Tape 3 in

15       the deposition of Michael Palumbo.  Time

16       is 4:28 p.m. on January 21, 2013.  We are

17       now back on the record.  You may proceed.

18       Q    Mr. Palumbo, at the time of TWA's

19   third bankruptcy filing, did you have any

20   expectation as to what would happen to TWA if

21   the transaction with American that we've been

22   discussing did not go through?

23       A    I wasn't aware of any solution that

24   would have led to anything other than a likely

25   liquidation of the airline.

1      Q     What was that understanding based on?

2      A     Based on the to date indications of

3  strategic interests by any other party other

4  than American Airlines, based on our liquidity

5  position and potential for enhancement to that

6  liquidity position, and the uncertainties of

7  both the winter and, you know, the resolution

8  of the accounts receivable securitization.

9      Q     Did that understanding change at any

10  time prior to the closing of the American

11  transaction?

12      A     No.

13      Q     You're familiar with the term "debtor

14  in possession financing"?

15      A     I am.

16      Q     I believe you referred to it earlier

17  as debt --

18      A     Yes.

19      Q     Is it okay with you that that's how

20  we refer to it here?

21      A     Of course.

22      Q     Can you explain what DIP financing

23  is?

24      A     It's a very high priority in terms of

25  bankruptcy ranking of liabilities financing.

1    It usually has the premium security behind it

2    or collateral behind it, and it -- so it's

3    relatively secure, relatively fully priced and

4    is a somewhat advantage security in terms of

5    its priority in the bankruptcy process.

6         Q    Did there come a point in time when

7    TWA sought DIP financing from American

8    Airlines?

9         A    Yes.

10        Q    Can you describe that?

11        A    Well, it was actually a combined

12   discussions and negotiations with the purchase

13   agreement, because it was American's desire to

14   ultimately have both, that is to say to achieve

15   the level of being in voice, if you will,

16   throughout the bankruptcy process in respect of

17   its -- the risks and rewards that they were

18   seeking from the transaction.

19             So it became, in essence, a combined

20   proposal, that is to say that the debtor in

21   possession or DIP financing was part of the

22   asset purchase agreement.

23             Over time, because it became a

24   contentious issue in the process, American was

25   and did have conversations about potentially

1       A    Sorry, on Page 12, if I have --

2    Exhibit 1?

3       Q    Exhibit 3.

4       A    Exhibit 3.  My fault again.  And

5    we're going to 18.

6       Q    No, so --

7       A    Twelve.

8       Q    Yes, Page 12 of Exhibit 3 and

9    Line 17.  Do you have that in front of you?

10      A    I do.

11      Q    And you were asked at this January 27

12   hearing, "How much does the interim DIP

13   facility allow to you (sic) draw in total?"

14           And you answered $175 million.

15           Do you see that testimony?

16      A    Right.

17      Q    And does that refresh your

18   recollection as to the initial amount of DIP

19   financing that the bankruptcy court approved?

20      A    Yes.

21      Q    And that was $175 million in total?

22      A    It was.

23      Q    As of the January 10 filing date, why

24   did TWA need that DIP financing?

25      A    It was the combination of the

1    accounts receivable amortization of

2    $100 million and the cash operating

3    requirements that we had forecast to require

4    over time.

5              I think there was -- at no point were

6    there ever permitted, nor was there negotiated

7    a cushion, so it was over some period of time,

8    I think, our forecast need for cash, simply

9    stated.

10   Q    Did you form any understanding at

11   that point in time of what, if any, effect

12   there would be on TWA's operations if it did

13   not receive the DIP financing?

14   A    It would have been severe.  We simply

15   did not have the liquidity to withstand both

16   the operating cash drain and the debt

17   maturities that we were facing.

18   Q    Absent the DIP financing that TWA did

19   receive from American as of the filing date,

20   did it have the ability to pay its employees?

21   A    We didn't have an ability to pay any

22   material obligation that we had.

23   Q    Did you form any projections at this

24   time as to how long the $175 million initial

25   DIP facility would allow you to continue to

1   operate?

2       A    I'm sure we did.  I'm not recalling

3   with specificity, but it wasn't a very long

4   period of time.  We were trying to bridge to a

5   transaction which we had hoped to be in the

6   fairly short term.

7       Q    And do you recall how you used that

8   initial DIP facility?

9       A    To pay the necessary operational

10  payments to critical vendors, employees and

11  other necessary payments in order to maintain

12  operations and preserve the flying franchise.

13      Q    Was any part of the facility used to

14  pay the account receivable securitizations that

15  we discussed?

16      A    Oh, sure, $100 million of the total

17  was paid to the debt -- I'm sorry, that -- of

18  course, that was an obligation.

19      Q    And the rest was used to fund

20  operations essentially?

21      A    Yes, yes.

22      Q    Prior to making its third bankruptcy

23  filing, had TWA made any attempt to seek DIP

24  financing from anyone other than American

25  Airlines?

# Exhibit 9

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF NEW JERSEY
     ---------------------------------------X
3    PATRICK BRADY, et al,

4                      Plaintiffs,

5            - against -

6    AIR LINE PILOTS ASSOCIATION
     INTERNATIONAL,
7
                     Defendant.
8
     Civil Action No. 02-2917 (JEI)
9    ---------------------------------------X

10

11                   1285 Avenue of the Americas
                     New York, New York
12
                     January 16, 2013
13                   3:00 p.m.

14

15       Videotaped Deposition of Non-Party Witness,

16   DAVID RESNICK, before Rita Persichetty, a Notary

17   Public of the State of New York.

18

19

20

21

22

23

24

25

1  work, which was around valuation and looking at

2  financial alternatives, is to look at the

3  competitors in an industry.

4         So we normally do what people refer

5  to as comparable company analysis.  So we look

6  at companies similar to our client, in this

7  case it would be other airlines, and we analyze

8  those based on the public data, look at their

9  financial condition, their performance,

10  projections on the industry, what analysts --

11  research analysts are saying about their

12  prospects.

13         And then we look at other

14  transactions in the industry, whether or not

15  companies have made acquisitions, whether other

16  similar businesses have been sold, to get a

17  sense of valuation, whether companies have

18  raised capital; if so, from whom, how much, on

19  what terms.

20    Q    And did you come to form any

21  conclusions about TWA's financial condition as

22  of the time that Rothschild was engaged?

23    A    I'm sure we did, because we would

24  have prepared a number of presentations for the

25  board as part of our engagement, but again,

1  it's been a long time since I worked on that,

2  but I do remember that the financial situation

3  at TWA was dire in terms of where they were

4  relative to their competitors.

5         TWA had filed for bankruptcy several

6  times before, so the business remained

7  financially challenged in my experience as a

8  restructuring adviser.  It's rare that a

9  company files bankruptcy more than once.

10 Usually you either reorganize successfully or

11 you don't emerge.

12        To file twice, it happens, but if the

13 company and its business is still facing

14 financial challenges a third time, it means

15 they have some significant issues with respect

16 to either their balance sheet or their

17 business, and TWA had both.

18    Q    And what particular issues was TWA

19 facing at the time.

20    A    One of the issues remained from its

21 last restructuring, and that related to an

22 arrangement they had with Carl Icahn and one of

23 his companies, and again, I just don't remember

24 the details given the timing, but it was with

25 respect to Icahn's ability to sell, I think it

1    was through Orbitz was the company he formed,

2    but one of those travel services, discounted

3    tickets.

4            And the airline business, it's a very

5    tough business to run because the fixed costs

6    are so high.  So if you can't fill your seats

7    profitably, or to say it another way, if you

8    have a large number of those seats being filled

9    on a discounted basis, it's very hard to run

10   your routes profitably.  And TWA was continuing

11   to suffer from the arrangement it had made with

12   Icahn from its last restructuring.

13           At the same time, the industry itself

14   was consolidating and was competitive, so they

15   faced a number of other challenges.  And they

16   had a reasonable amount of debt, I don't

17   remember the exact amount, upon emerging from

18   Chapter 11, so that was an added burden on

19   their financial flexibility.

20       Q    Did you form any conclusions about

21   TWA's liquidity at the time that you were

22   advising them?

23       A    All I remember is the liquidity was

24   very limited and they were running -- they were

25   running out of money, and I just, again,

1   remember generally that when we took on that

2   assignment, there was significant pressure from

3   the client, from the board to really move

4   quickly to identify and analyze the various

5   alternatives for the business in terms of being

6   able to generate more liquidity or some other

7   transaction or alternative that would address

8   the company's financial condition.

9        Q    Prior to the time that Rothschild was

10  engaged, did you learn anything about whether

11  TWA had a recent history of profitability?

12       A    I don't recall.

13       Q    Do you recall at the time of your

14  engagement whether TWA had an investment grade

15  bond rating?

16       A    I doubt it.  I don't remember

17  exactly, but most companies we work with in

18  restructuring, and I'm certain TWA would be

19  within this group, are non-investment grade

20  companies.  They don't hire restructuring

21  advice if they're investment grade company.

22       Q    And did you learn -- what did you

23  learn about TWA's strategic position within the

24  airline industry at this time?

25       A    It was challenged.  I mean, they were

1   a smaller player among larger competitors in a

2   consolidating industry.

3       Q    And are you familiar with the term

4   "hub" within the airline industry?

5       A    Yes.

6       Q    And what is an airline hub?

7       A    A hub is where in one particular

8   location, an airline concentrates flights

9   coming in from smaller cities so it could

10  capture the passenger and the revenue related

11  to the passenger for ongoing flights either

12  domestically or internationally.

13      Q    And did TWA have any hubs at the time

14  that you were engaged?

15      A    Its main hub where it was -- had the

16  most profitability was in St. Louis.

17      Q    Did it have any other hubs, to your

18  knowledge, within the United States?

19      A    I don't recall.

20      Q    And did you consider St. Louis to be

21  an attractive airline hub?

22      A    At the time it was probably the most

23  critical asset that TWA had.  They had

24  positions, if I remember correctly, at other

25  major cities in terms of gates and slots, but I

1    know they had a number in New York, but

2    St. Louis was probably the most valuable.

3        Q    And did you consider that relative to

4    other airline hubs to be an attractive place to

5    have your hub?

6        A    If you had to pick any place in the

7    U.S., St. Louis wouldn't have been your choice.

8    You want to concentrate on where you have the

9    bulk of population and business travel.

10       Q    Did TWA have competitors at the

11   St. Louis hub that you recall?

12       A    I believe they had some, but they

13   were by far the largest airline in St. Louis.

14       Q    And do you know whether there were

15   any low-cost carriers operating out of the

16   St. Louis hub?

17       A    I think Southwest had begun to start

18   service.  Again, I'm stretching my

19   recollection, but I believe Southwest had

20   entered St. Louis, but I could be wrong on

21   that.

22       Q    Can you describe for us the process

23   you used to try and consider restructuring

24   alternatives for TWA at this time?

25       A    The primary ones I remember, again, I

1   just emphasize it's been a long time, was

2   looking at what we call strategic alternatives,

3   which meant other airlines that might want to

4   purchase TWA in large part because of the hub

5   they had at St. Louis and other gates and slots

6   at other airports that were in high demand,

7   such as New York where when you have an airport

8   that you can't expand, there are only so many

9   gates and slots to take off and land that are

10  allowed.

11          So if there's a lot of demand,

12  airlines can get them by buying them from other

13  airlines.  So they have value if you can't

14  expand the airport.

15          So we looked at people that would

16  want to buy the airline either in whole or in

17  part, both domestic and international carriers

18  with the international because there were

19  regulations on how much of a domestic airline,

20  international carrier would own.  It would be

21  more of a capital infusion for TWA because they

22  couldn't gain control, but it would provide TWA

23  with the financial resources to restructure and

24  to address some of its challenges with its

25  business.

Page 26

```
 1   started for airlines, was basically once you
 2   were able to finance your planes and you needed
 3   additional financing, you would see what other
 4   assets were available.
 5          So they did not have collateral that
 6   we could use as the basis for DIP financing
 7   where third parties would provide financing
 8   during the pendency of a Chapter 11.  So we had
 9   to get that financing from the buyer, in this
10   case from American.  And generally in my
11   experience, people do that in restructurings
12   where they don't have alternatives.
13       Q    Do you remember the amount of the DIP
14   financing that American agreed to provide?
15       A    No.
16       Q    Mr. Resnick, I'm going to show you a
17   document that I'm going to mark as Resnick
18   Exhibit 1.
19          (Resnick Exhibit 1, Transcript of
20          proceeding on 1/10/01, marked for
21          identification.)
22       Q    It's a transcript of a proceeding on
23   January 10, 2001 concerning first day motions
24   in the bankruptcy court for the District of
25   Delaware.  And if I can direct your attention
```

Page 27

1   to Page 54 of this document, which is the

2   direct testimony of a Mr. Palumbo?

3        A    Yes.

4        Q    Do you know who Mr. Palumbo is?

5        A    Yes.

6        Q    And who is he?  Who was he at the

7   time 2001?

8        A    At the time, he was the chief

9   financial officer of TWA.

10       Q    Okay.  Is Mr. Palumbo someone that

11  you worked with in connection with your

12  advisory responsibilities?

13       A    Yes, closely.

14       Q    If you can please read to yourself

15  Page 54 of Mr. Palumbo's testimony and then

16  I'll ask you if that testimony refreshes your

17  recollection.

18       A    Yes.

19       Q    Okay.  So I am not asking you just to

20  read the words on the page.  I'm asking you if

21  reading this rekindles a recollection that you

22  had concerning TWA's financial position as of

23  January 10, 2001?

24       A    Yes, it indicates that liquidity was

25  extremely tight and that the company had a need

1    in -- of cash in January that it did not have.

2        Q    And with respect to the

3    securitization facility in particular, does

4    this testimony refresh your recollection about

5    whether there was a facility coming due in

6    January?

7        A    Yes, that's what it indicates.

8        Q    Okay.  Do you have an -- independent

9    of this document, having hopefully had your

10   recollection refreshed, do you have an

11   independent recollection of that facility now?

12       A    Yes, that they had an accounts

13   receivable securitization facility that was

14   maturing.

15       Q    To your recollection, did TWA have

16   the means of repaying this facility when it

17   came due in January?

18       A    No.

19       Q    And was part of -- part of your

20   mandate in your advisory capacity to try and

21   find additional sources of liquidity for TWA?

22       A    Yes, I think I mentioned that was

23   part of what we were investigating at the time,

24   it was either transaction or other sources of

25   capital for the company.

1    Q    And what success had you had prior to

2  January 10, 2001 identifying lenders who would

3  be willing to provide additional liquidity to

4  TWA?

5    A    We had no success on that front.

6    Q    And had you had discussions with

7  parties with whom -- parties that you thought

8  might be interested in providing liquidity to

9  TWA?

10    A    Again, my recollection is we went out

11  broadly to a large number of parties, both

12  competitors such as other airlines, other

13  financial investors at the time that might want

14  to invest in a restructured TWA, other parties

15  to provide capital based on the TWA standalone

16  business plan, but we had no takers.

17    Q    And did the parties with whom you had

18  discussions explain why they weren't interested

19  in providing liquidity to TWA?

20    A    Part of the reason was the company's

21  size and position in the industry, part was the

22  agreement with Icahn that constrained how the

23  company would operate.

24    Q    The agreement with Icahn, was that

25  known as the Caribou ticket agreement?

1      A     I don't recall.

2      Q     When, as part of your engagement, did

3    you first discuss with TWA the possibility of

4    taking the company into bankruptcy?

5      A     I don't recall.

6      Q     Did you anticipate that even if TWA

7    went into bankruptcy, that it would need

8    additional financing?

9      A     Yes.

10      Q     And why would that be the case?

11      A     Because of the reasons we discussed

12    earlier.  TWA's liquidity was limited, it had

13    the AR securitization facility maturing, the

14    amount of cash available to operate the

15    business was tight.

16      Q     And if TWA had gone into bankruptcy

17    but could not have located a source of

18    liquidity, what options would have been

19    available to TWA at that time?

20      A     It would have moved to liquidate.

21      Q     Do you recall what was happening to

22    fuel prices for jet fuel in 1999 and 2000?

23      A     No.

24      Q     Okay.  Do you remember any particular

25    issues with respect to TWA with regard to the

1   impact of fuel prices on its financial

2   condition?

3        A    No, fuel prices are critical for any

4   airline's projection, it's probably one of

5   their biggest costs.

6        Q    Do you recall whether TWA had the

7   financial ability to hedge its fuel costs at

8   this time?

9        A    I doubt they could hedge because they

10  weren't investment grade.

11       Q    And do you have a recollection of

12  whether other airlines at this time had the

13  ability to hedge their fuel costs?

14       A    Yes.

15       Q    Let me ask you to take a look at

16  Page 118 of Resnick Exhibit 3.

17            So at the bottom of that page, the

18  last question on the page, you were asked

19  during your cross-examination, "By the way,

20  this management doesn't hedge when fuel price

21  increases, does it?"

22            And your answer is, "It doesn't have

23  the credit worthiness to do so."

24            Do you see that testimony?

25       A    Yes.

1    Q    Is that consistent with the answer

2  that you just gave that you didn't think TWA

3  had the ability to hedge its fuel prices at

4  this time?

5    A    Yes.

6    Q    And why do you need credit worthiness

7  in order to hedge against fuel price changes?

8    A    Because the counterparty of the hedge

9  takes the financial risk, so if they think the

10  company would be unable to pay them, then they

11  won't enter into the hedge.

12    Q    Do you have a recollection with

13  respect to the St. Louis hub, how much of TWA's

14  airline traffic was either originating or

15  terminating in St. Louis?

16    A    No.

17    Q    Now, you mentioned before, your

18  recollection was that Southwest at this time,

19  you thought, was also operating out of the

20  St. Louis hub.

21        Do you remember that testimony?

22    A    Yes.

23    Q    And was Southwest -- did it have a

24  similar cost structure to TWA?

25    A    No, Southwest was what the industry

1    refers to as a low-cost carrier.

2        Q    And did you have an understanding of

3    how the presence of Southwest at the St. Louis

4    hub would affect TWA's pricing for traffic that

5    was originating or terminating at the St. Louis

6    hub?

7        A    Yes.

8        Q    And what was your understanding?

9        A    Southwest would have a significant

10   impact on TWA's pricing because as a low-cost

11   carrier, generally defined as a carrier that

12   doesn't operate a hub and spoke system, it just

13   flies point to point, that does not have a

14   unionized workforce, generally a newer carrier

15   so no longer had -- does not have the burden of

16   any OPEB or pension obligations.

17          They have the ability to price more

18   aggressively because their costs are lower, and

19   the legacy carriers, which -- of which TWA was

20   one, and a carrier that has been in business

21   for extensive period of time, has to meet the

22   price of the LCC in the market unless they're

23   offering a quality of service or frequency of

24   flights that serve travelers, particularly

25   business travelers, would be willing to pay

# Exhibit 10

# ORIGINAL

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRANS WORLD AIRLINES, INC., et al.,[1] | ) | Case No. 01-0056 (___) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## AFFIDAVIT OF MICHAEL J. PALUMBO,
## EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL
## OFFICER OF THE DEBTORS IN SUPPORT OF FIRST DAY MOTIONS

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | SS. |
| COUNTY OF NEW CASTLE | ) | |

MICHAEL J. PALUMBO, being duly sworn, deposes and states:

      1.    I am the Executive Vice President and Chief Financial Officer of Trans World Airlines, Inc. ("TWA"), one of the captioned debtors and the parent of all the debtors (collectively, the "Debtors"). In my capacity as Executive Vice President and Chief Financial Officer of TWA, I am generally familiar with the Debtors' day-to-day business operations, financial condition, and books and records.

      2.    I submit this affidavit in support of the various orders (the "First Day Orders") sought and motions filed with the Court contemporaneously herewith. Except as otherwise

---

[1] The Debtors are the following entities: Trans World Airlines, Inc., Ambassador Fuel Corporation, LAX Holding Company, Inc., Mega Advertising Inc., Northwest 112th Street Corporation, The TWA Ambassador Club, Inc., Trans World Computer Services, Inc., Transcontinental & Western Air, Inc., TWA Aviation, Inc., TWA Group, Inc., TWA Standards & Controls, Inc., TWA Stock Holding Company, TWA-D.C. Gate Company, Inc., TWA-LAX Gate Company, Inc., TWA Logan Gate Co., Inc., TWA-NY/NJ Gate Company, Inc., TWA-Omnibus Gate Company, Inc., TWA-San Francisco Gate Company, Inc., TWA-Hangar 12 Holding Company, Inc., Ozark Group, Inc., TWA Nippon, Inc., TWA Employee Services, Inc., TWA Getaway Vacations, Inc., Trans World Express, Inc., International Aviation Security Inc., Getaway Management Services, Inc., The Getaway Group (U.K.) Inc.

(f)     $100 million (outstanding principal amount) of 9.80% secured notes, series 1997-1 (the "Airline Receivable Asset Backed Notes") issued in December 1997 by Constellation Finance LLC ("Constellation").  In December, 1997, TWA entered into a securitization facility (the "Securitization Facility") whereby TWA sold certain receivables on an ongoing basis to Constellation, a special purpose limited liability company wholly-owned (beneficially) by TWA, with TWA as the servicer of such receivables.  Constellation then issued the Airline Receivable Asset Backed Notes, the terms of which provide for the maintenance of certain minimum levels of receivables or the deposit of funds with the trustee in the event of a receivable deficiency.

22.     As of December 31, 2000, TWA had approximately 201 aircraft in its fleet: 177 aircraft under operating leases, fifteen aircraft under capital leases, and nine owned aircraft. TWA currently operates approximately 188 of aircraft in its fleet.  TWA's annual lease payments for 2000 are approximately $585.36 million for operating leases and $51.18 million for capital leases.

23.     Since 1996, TWA has entered into an aggressive fleet modernization plan, which has included a number of commitments with manufacturers and lessors for the delivery of a significant number of new aircraft.  Unfortunately, due to TWA's need and desire to modernize its fleet in a short period of time, TWA found itself in a "seller's market" and was forced to take many aircraft at above-market rates.  It was anticipated that over the long term such increased costs should be outweighed by the benefits associated with fleet modernization.

24.     As a result in part of TWA's outstanding indebtedness, lease obligations, and lack of any traditional bank facility, TWA currently has no unused credit lines and instead must satisfy all of its working capital and capital expenditure requirements from cash provided by operating activities, from external borrowing, or from sales of assets.  Substantially all of TWA's

10

strategic assets, including its owned aircraft, ground equipment, gates, parts inventory, and slots have been pledged to secure various issues of outstanding indebtedness of TWA. TWA has few strategic assets which it can readily monetize; many of such these being subject to various liens and security interests which would restrict and or limit TWA's ability to realize any significant proceeds from the sale thereof.

## TWA's Current Operations

25.     TWA believes that the modernization of its fleet, modification of its route structure and schedules, wage improvement and other employee incentive plans, and focused marketing efforts have improved operating performance, held costs steady, and increased revenue. However, in the short term, TWA's costs have reduced its available cash and cash equivalents.

26.     The airline industry is a capital-intensive industry in which small fluctuations in revenue per available seat mile ("RASM") and cost per available seat mile ("CASM") can significantly affect a carrier's financial results. This is particularly true for TWA, which has fewer internal financial resources and less access to external capital than many of its major competitors. The reduction in the amounts of TWA's available cash and cash equivalents, coupled with TWA's already extremely limited amount of strategic assets available to support additional indebtedness, have made TWA extremely susceptible to liquidity shortfalls, particularly those caused by external events.

27.     Unfortunately, TWA has suffered from just such an adverse external event – a significant increase in fuel prices in 2000. TWA has been particularly susceptible to variations in fuel prices because, unlike some of its major competitors, it is only able to hedge its exposure to jet fuel market risk on a limited basis. For example, based on current consumption rates, a one cent change in average cost of jet fuel per gallon will increase TWA's fuel expenses by approximately $6.8 million per year. While fuel prices increased slightly from 51 cents per gallon in 1998 to 58 cents per gallon in 1999, average fuel prices skyrocketed to approximately 90 cents per gallon at

11

points in 2000. This resulted in TWA's fuel expenses being $456.3 million for the first nine months of 2000, an approximately 65% increase over fuel expenses ($276.6 million) for the comparable period of 1999. TWA's fuel expenses went from 10.8% of operating expenses in 1999 to 16.1% of operating expenses in the first nine months of 2000.

28.    TWA's increased fuel costs have been coupled with recent increased labor and aircraft modernization costs. Although the number of TWA's employees decreased 2.5% for the first nine months of 2000, any labor cost savings was more than offset by the August 1, 1999 and August 1, 2000 salary increases to IAM-represented employees, ALPA-represented employees, and non-contract employees. Moreover, as TWA has taken delivery of new aircraft in furtherance of its fleet modernization efforts, TWA's aircraft lease costs have increased approximately 37% from $300.7 million in the first nine months of 1999 to $411.5 million for the first nine months of 2000.

29.    As a result of higher costs associated with fuel, labor obligations, and fleet modernization, among other things, TWA's CASM has increased from 8.99 cents in 1997 to 9.31 cents in 1998 to 9.5 cents in 1999 and to 9.75 cents for the first nine months of 2000.

30.    Moreover, TWA's ability to compete with other airlines has been negatively affected by its continuing inability to introduce regional jet service on a broad scale. The rapid growth of regional jet airline affiliates represents a significant competitive challenge for TWA due to its reliance on through-hub passenger traffic. A small, fuel-efficient regional jet can now offer direct service in markets that previously were served only by through-hub services. Although Chautauqua and Trans States, among other commuter airlines, have some regional jets, TWA's current labor agreements limit the number of regional jets that TWA can introduce in its own fleet over time. This had resulted in a competitive disadvantage for TWA.

31.    In sum, although TWA's revenues have increased, its costs still exceeded its revenues and therefore TWA has not yet been able to realize the full benefit of its efforts to modernize its fleet, optimize its route and schedule structure, increase productivity, and target

12

# Exhibit 11

1            IN THE UNITED STATES BANKRUPTCY COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    IN RE:                        :    Chapter 11
                                   :
5    TRANS WORLD AIRLINES INC.,    :    Case No. 01-56 (SLR)
     et al.,                       :       thru 01-82 (SLR)
6                                  :
                  Debtors.
7                          - - -

8                      Wilmington, Delaware
           Saturday, January 27, 2001 at 9:20 a.m.
9
                           - - -
10
     BEFORE:        HONORABLE SUE L. ROBINSON, Chief Judge
11

12   APPEARANCES:

13
             PACHULSKI STANG ZIEHL YOUNG & JONES
14           BY:  LAURA DAVIS JONES, ESQ. and
                  BRUCE GROHSGAL, ESQ.
15
                  and                      ORIGINAL
16
             KIRKLAND & ELLIS
17           BY:  JAMES H.M. SPRAYREGEN, ESQ.,
                  ALEX DIMITRIEF, ESQ.,
18                MICHELLE BROWDY, ESQ. and
                  RENEE HONYBERG, ESQ.
19
                       Counsel for Debtors
20

21           OFFICE OF THE UNITED STATES TRUSTEE
             BY:  MARK KENNEY, ESQ.
22
                       Counsel for Patricia Staiano,
23                     Region 3 United States Trustee

24
                            Brian P. Gaffigan
25                          Official Court Reporter

Palumbo - direct

1    those efforts?

2    A.    I believe I have.

3    Q.    Okay.  Now, you have broken off your efforts to get

4    financing into three parts; is that right?

5    A.    Yes.

6    Q.    Okay.  And the first thing you did was you indicated

7    you looked to the traditional capital markets?

8    A.    Yes.

9    Q.    And could you read off, so we can get a record, what

10   investors and insurance companies in the traditional capital

11   markets you looked to before you came into this court in

12   January of 2001?

13   A.    I can.  The traditional investors were in the main

14   investors who could at least provide us or were known to have

15   a capacity or interest in providing secured financing of the

16   sort the accounts receivable refinancing would represent.

17   The investors we approached were a combination of the

18   initial investors in that security and others we knew to have

19   participated in similar facilities.  Those were ING Capital

20   in New York, Cargill, Foothill Capital, PPM, Moore Capital,

21   Highbridge Capital, Oppenheimer, Mass Mutual, Mass Mutual

22   specifically in Boston, Lutheran Brotherhood, Pacific Life,

23   American Capital, an asset management component of CS First

24   Boston.  Those were the principal traditional investor groups

25   that were noninsurance companies.

26

Palumbo - direct

1            We separately approached Ace Reinsurance, Swiss

2    Reinsurance, Centre Reinsurance, MBIA, Chubb, Safeco, Royal

3    Oak and Greenwich.

4    Q.      And I think you -- actually, I think you testified

5    at your depositions a total of 21 different traditional

6    investors?

7    A.      I believe those add up to 21.

8    Q.      Were you able to get the financing you needed up to

9    January 2001 from any of these traditional investors?

10   A.      No.

11   Q.      Did you also look to nontraditional funding sources

12   before you came here into court in January?

13   A.      We did, yes.

14   Q.      Can you identify those financing sources?

15   A.      These were nontraditional in the sense they aren't

16   in the capital markets routinely but they were financing

17   entities or entities that had financing arms that had a

18   capacity to provide us financing and in all cases had a

19   vested interest in TWA.  Those were Boeing, ILFC, which is

20   owned by AIG, and GECC, General Electric Capital

21   Corporation.

22   Q.      Were you able to get the financing you needed by

23   January of 2001 from the nontraditional financing sources

24   you looked to?

25   A.      No, I was not.

Palumbo - direct

1   Q.      Did you also look to asset-based financing sources

2   before you came?

3   A.      Yes.

4   Q.      And does that include an attempt to get a DIP?

5   A.      It did.

6   Q.      Okay.  And who did you look to to get DIP financing

7   or asset based financing before coming in here to court?

8   A.      That was again General Electric Credit and in this

9   case Foothill.

10  Q.      And were you able to get the financing that you

11  needed?

12  A.      No.

13  Q.      Okay.  And all of these efforts again are through

14  2000, into early 2001?

15  A.      That's correct.

16  Q.      Now, in that time period, Mr. Palumbo, did you look

17  more broadly for DIP loans, basically tell the market TWA is

18  looking for a DIP financing?

19  A.      No.

20  Q.      Was there a reason for that?

21  A.      There was.  We were very concerned that the sheer

22  search for debtor-in-possession or DIP financing had the

23  possibility of, one, becoming known to the marketplace.  And

24  when I talk about marketplace, I'm most concerned in this

25  case about the traveling public marketplace that might,

Palumbo - direct

1   without any explanation as regards the reason for and the

2   strategic plan attendant to a filing, would simply get the

3   message that debtor-in-possession meant bankruptcy and

4   bankruptcy in TWA's case meant at least the third time

5   through.  And there was more than a little speculation that

6   if there were a third filing at TWA that it wouldn't

7   necessarily be a reorganization, it would potentially be a

8   liquidation.  That generic background in my view and TWA

9   management's view have led the traveling public to have

10   concern about buying tickets on TWA, into uncertainty, and

11   that very act would accelerate the process of our cash

12   position deterioration or drive us to the self-fulfilling

13   prophecy of a filing.

14   Q.    And was the speed at which you thought that might

15   happen affected at all by TWA's hub-and-spoke system through

16   St. Louis?

17   A.    Actually it was, yes.

18   Q.    Could you explain that to the Court?  First, let's go

19   back.  What is the hub system we're talking about?

20   A.    Our principal hub location is St. Louis.  Since

21   deregulation, the industry has evolved to individual airlines

22   controlling large centers of both the originating and

23   departing and connecting activity, commonly been referred to

24   as hubs.

25   Q.    And what impact, if at all, would the structure of the

Resnick - cross

1    it was seeking from those two labor forces; isn't that

2    accurate?

3    A.    Yes.

4    Q.    Can you recall off the top of your head how much in

5    dollar amount those concessions were? ·

6    A.    The target was approximately the same amount we were

7    targeting for the lease, so $50 million.

8    Q.    And it's true, is it not, that prepetition, through

9    the course of those negotiations, management believed that

10   it had become reasonably close with labor on reaching those

11   dollar amount on concessions?

12   A.    Yes.

13   Q.    And it's true, isn't it, sir, that the entire

14   self-help plan failed for lack of additional liquidity over

15   and above the concessions it targeted?

16   A.    Yes.

17   Q.    And when we talk about additional liquidity, what

18   we're talking about is $100 million that was necessary to

19   finance out the accounts receivable; correct?

20   A.    In part, an additional $100 million to provide

21   liquidity for the company to operate through January and

22   February.

23   Q.    Were you here for Mr. Palumbo's testimony?

24   A.    For most of it, yes.

25   Q.    Okay.  Would you agree with his testimony that this

Resnick - cross

1    $100 million worth of additional liquidity was at least

2    conceptually targeted to what I guess I will refer to as

3    the lean months of airline operations, that being January

4    and February?

5    A.    Yes.

6    Q.    And would you also agree with me at least initially

7    management believed that the dollar amount that would need to

8    plug that lean couple months started off with $25 million?

9    A.    Yes.

10   Q.    And then it subsequently grew to maybe we need $50

11   million to get over that hurdle?

12   A.    Yes, basically.

13   Q.    And then subsequently the debtor decided that maybe

14   what it really need to get over the hurdle is $100 million.

15   Do you recall that?

16   A.    Yes.

17   Q.    Okay.  And part of the reason why the hole kept on

18   getting bigger and bigger was fuel prices kept going up; is

19   that accurate?

20   A.    That was a reason, yes.

21   Q.    By the way, this management doesn't hedge from fuel

22   price increases, does it?

23   A.    It doesn't have the creditworthiness to do so.

24             MR. DIMITRIEF:  Objection, your Honor.  This is

25   not the sale hearing.  And I think that we've crossed the

Resnick - cross

1  line going from the issues that are before the Court right

2  now which are the auction procedures, the DIP financing and

3  the key employee retention plan into whether the sale ought

4  to go forward.

5          MR. WEISFELNER:  Your Honor --

6          MR. DIMITRIEF:  That's not in front of the Court

7  right now.

8          MR. WEISFELNER:  Your Honor, this is a

9  distinction with absolutely no merit whatsoever.  The

10  concept is that we're going to proffer to this estate bidding

11  procedures which lock this estate in forever and always to a

12  breakup fee-and-expense reimbursement to the tune of up to

13  $10 million such that if the Court were ever subsequently to

14  disapprove the sale motion, which we think is inevitable as a

15  matter of law, we will have spent all of that money for no

16  reason.

17          To suggest that this Court shouldn't consider,

18  as every court does in connection with the propriety of

19  bidding procedures motions, whether the underlying sale would

20  ultimately be appropriate I think is a fallacy.  I think

21  it's critically relevant, as every appellate court that ever

22  looked at propriety of bidding procedures makes crystal

23  clear.  So I don't know how debtor attempts to establish a

24  record if they would like to prevent their opposition from

25  going to the merits of the underlying sale.

# Exhibit 12

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

JUDGE PETER J. WALSH

824 MARKET STREET
WILMINGTON, DE 19801
(302) 252-2925

April 2, 2001

Bonnie Glantz Fatell
Michael D. DeBaecke
Blank Rome Comisky & McCauley LLP
1201 Market Street
Suite 2100
Wilmington, DE 19801

Thomas E. Biron
Richard P. McElroy
Earl M. Forte, III
Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA 19103-6998

Michael Z. Brownstein
Andrew B. Eckstein
Blank Rome Tenzer Greenblatt LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-1408

Counsel for the Statutory
Committee of Unsecured Creditors
of Trans World Airlines, Inc.,
et al.

Steven K. Kortanek
Klehr, Harrison, Harvey,
Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE 19801

Mark E. Felger
Cozen and O'Connor
Chase Manhattan Centre
1201 North Market Street
Suite 1400
Wilmington, DE 19801

Mark I. Bane
David E. Retter
Robert C. Shenfeld
Joseph N. Froehlich
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

Counsel for the Ad Hoc
Committee of Senior Note-
holders and HSBC Bank USA,
as Indenture Trustee

James H.M. Sprayregen
Alexander Dimitrief, P.C.
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601

Laura Davis Jones
Bruce Grohsgal
Pachulski, Stang, Ziehl,
Young & Jones, P.C.
919 North Market Street
P.O. Box 8705
Wilmington, DE 19899-8705

Co-Counsel for the Debtors
and Debtors in Possession

1199

Edward S. Weisfelner
Berlack, Israels & Lieberman LLP
120 West 45th Street
New York, NY 10036

Co-Counsel to High River Limited
Partnership, Karabu Corp. and
Lowestfare.com LLC

Mark D. Collins
Michael J. Merchant
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Alan B. Miller
Richard A. Rothman
Greg A. Danilow
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

Counsel for Appellees American
Airlines, Inc. And AMR Finance,
Inc.

Linda M. Carmichael
White and Williams LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709

Meltzer, Lippe, Goldstein &
Schlissel, LLP
190 Willis Avenue
Mineola, New York 11501

Attorneys for General Federation
Of Jewish Workers in Israel

Re: Trans World Airlines, Inc., et al.
Case No. 01-00056 (PJW)

Dear Counsel:

Before the Court are three emergency motions and one joinder for a stay pending appeal of my March 12, 2001 order ("Sale Order") granting the motion ("Sale Motion") of Trans World Airlines, Inc. ("TWA" or "Debtors") to sell substantially all of its assets to AMR Corporation ("American").  The following parties

by approving the sale. Id. at 148. The court noted that the evidence could support a finding that the debtor contrived the emergency which allegedly justified the immediate sale of the debtor's assets to the buyer because the debtor's CEO may have permitted the buyer to manipulate the timing of the bankruptcy filing in exchange for a lucrative employment agreement with the buyer following the sale. Id. The court concluded that this would constitute collusion between the buyer and debtor, or an attempt to take unfair advantage of other buyers, sufficient to destroy the buyer's good faith status if the objecting parties could substantiate their claims. Id.

15. Accordingly, the Third Circuit directed the bankruptcy court on remand to determine (a) whether there was impermissible collusion that would negate the buyer's good faith status; (b) in the event of collusion, whether the buyer paid "value" for the assets purchased; (c) in the absence of value, whether the bankruptcy court had the power to undo the sale to the buyer; and (d) if the court found it had the power to undo the sale, whether it should, in an exercise of its equitable jurisdiction, pursue an alternate remedy. Abbotts Dairies, 778 F.2d at 151.

16. Consistent with this mandate, I found in ruling on the Sale Motion that American did not manipulate the timing of TWA's bankruptcy. In the absence of the American agreement, TWA

would have filed for chapter 11 relief days earlier then the January 10, 2001 filing.  Sale Hearing Tr. at 380.  That filing would have been a "free fall" chapter 11 case with its attendant outcome risks.

17.  Neither American nor TWA contrived an "emergency." Before negotiating the Asset Purchase Agreement, TWA ended the year 2000 with $ 100 million in cash, which TWA's testimony established was $ 50 to $ 100 million less than TWA needed to survive its winter season.  TWA's approximate cash balance on January 10, 2001 was $20 - 30 million and TWA needed $ 40 million to fund its operations the next day.  First Day Tr. at 54.  As this chapter 11 case progressed, TWA had, and continues to have, a cash burn rate of $ 3 million per day.

18.  Section 1110 further dictated the time constraints of the bid procedures and the need to bring this matter on for a § 363 sale within 60 days of the petition date.  TWA leases approximately 97% of its 180 aircraft.  Sale Hearing Tr. at 21.  It had to complete the auction and sale process no later than March 12, 2001 to avoid the very real prospect of having its fleet grounded  by the § 1110 lessors.  The Code imposes this deadline for all airlines filing for bankruptcy and no bankruptcy court has any authority to delay, for "cause" or any other reason, the exercise by aircraft lessors of  their § 1110 right to either timely rental payments or repossession.  Absent the DIP Financing

in final written form with details, commitments, a $ 50 million good faith deposit, and no "due diligence" outs.    Bidding Procedures Order at 4-5.

    36.   The Bidding Procedures Order established March 5, 2001 as the auction date and March 9, 2001 as the date for the sale hearing.   The Order clearly stated that TWA would only consider qualified competing bids received by February 28, 2001.    Bidding Procedures Order at 4-5.

    37.   The only bid TWA received on February 28, 2001 was the American bid.

    38.   On February 28, 2001, TWA Acquisition Group, Inc. (hereinafter "Icahn/Freeman"), an entity affiliated with Carl Icahn, submitted a two page term sheet which proposed that TWA should emerge from bankruptcy as a stand-alone entity pursuant to a plan of reorganization.   Sale Hearing Tr. at 197-208.

    39.   The Icahn/Freeman proposal did not comply with the Bidding Procedures Order in form or substance.   It made no commitment to TWA; it was not a binding agreement to propose a plan; it had no realistic or detailed plan for preserving TWA as a standalone entity; and it was submitted without the $ 50 million deposit.   At best it was simply an opener for discussion.   Sale Hearing Tr. at 369.   I found the Icahn/Freeman proposal to be completely inadequate as an "alternative transaction" proposal contemplated by the Bidding Procedures Order.   Tr. at 368-69; 813-

14.   I respectfully suggest that that finding is unassailable. Indeed, counsel for Icahn/Freeman stated that "noncompliance of the bidding procedures is something I think the Freeman Group is prepared to stipulate to." Sale Hearing Tr. at 366.

40.   Icahn/Freeman did not provide a deposit nor any further information to TWA at any time between February 28, 2001 to March 4, 2001.  Sale Hearing Tr. at 197-200.

41.   On March 5, 2001, the day of the auction, Icahn/Freeman submitted a "bid" in the form of a draft DIP financing agreement supplemented with miscellaneous financial information which purported to set forth a proposal for TWA to emerge from bankruptcy as a standalone entity.  The proposal did not provide Rothschild with sufficient data to allow a meaningful review of its viability.  Sale Hearing Tr. at 201.

42.   TWA and Rothschild nevertheless suspended the auction until Wednesday, March 7, 2001 at 6 :00 p.m. to consider the Icahn/Freeman proposal.  On the evening of March 5, 2001, TWA and Rothschild met with Icahn/Freeman representatives to discuss the proposal.  In Rothschild's opinion the meeting raised many more questions.  Sale Hearing Tr. at 203-06.  TWA asked for detailed projections and assumptions by Wednesday so as to permit further analysis of the proposal. Sale Hearing Tr. at 204.

43.   Icahn/Freeman did not provide any further information to TWA by the time TWA resumed the auction at 6:00 p.m.

70. There is absolutely no evidence that TWA is attempting to bypass the requirements of § 1113. As I found before, the simple fact is that TWA is a failing enterprise whose likely end, in my opinion, will be either a partial survival as a part of American or a liquidation resulting in no enterprise value and a consequent material loss to all nonpriority general unsecured creditor classes.

71. The end result of what will happen during TWA's § 1113 negotiations is dictated by TWA's inability to survive as a standalone enterprise. There simply is no evidence to suggest that TWA is proceeding in bad faith regarding its § 1113 obligations.

72. Given TWA's precarious financial history, I found that a rejection or denial of the Sale Motion would have resulted in an immediate and precipitous decline in the financial affairs of TWA with a very high probability, if not certainty, of liquidation. A liquidation would result in material adverse harm to TWA's diverse creditor constituencies and loss of enterprise value. I find that issuing a stay pending appeal poses the same risks.

73. Furthermore, the record is devoid of any evidence that the Objecting Parties would be better off if I issue a stay pending appeal. The Committee has failed to make a showing that its constituents would fare better if TWA were liquidated or if TWA were to attempt a standalone reorganization. The mere allegation that an alternative transaction is possible does not establish that

# Exhibit 13

1

1          IN THE UNITED STATES BANKRUPTCY COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    IN RE:                        :   Chapter 11
                                   :
5    TRANS WORLD AIRLINES INC.,    :   Case No. 01-56 (SLR)
     et al.,                       :
6                                  :
                    Debtors.       :
7                                  
                                 - - -

8
                          Wilmington, Delaware
9             Wednesday, January 10, 2001 at 5:44 p.m.
                          First Day Motions
10
                          - - -
11
     BEFORE:         HONORABLE SUE L. ROBINSON, Chief Judge
12
                          - - -
13   APPEARANCES:

14
               PACHULSKI STANG ZIEHL YOUNG & JONES
15             BY:  LAURA DAVIS JONES, ESQ. and
                    BRUCE GROHSGAL, ESQ.
16
                    and
17
               KIRKLAND & ELLIS
18             BY:  JAMES SPRAYREGEN, ESQ.

19                        Counsel for Debtors

20
               OFFICE OF THE UNITED STATES TRUSTEE
21             BY:  MARK KENNEY, ESQ.

22                        Counsel for Patricia Staiano,
                          United States Trustee
23

24   ORIGINAL                   Brian P. Gaffigan
25                              Official Court Reporter

1    the investment banking operation.

2    Q.    Now, Mr. Palumbo, could you describe the scope of your

3    responsibilities at the debtors?

4    A.    I'm responsible for the financial management of TWA's

5    affairs as well as the information systems and properties and

6    facilities men.

7    Q.    And can you describe what the level of knowledge of

8    the current financial situation of the debtors is that you

9    have?

10   A.    It's comprehensive.

11   Q.    Obviously, Mr. Palumbo, you are aware these cases were

12   filed early this morning?

13   A.    Yes.

14   Q.    And the debtors obviously have operated without any

15   DIP financing through the course of today; correct?

16   A.    That's correct.

17   Q.    What has been the affect on the debtors' operations

18   from the filing through tonight when we came to court with

19   operating without the DIP financing?

20   A.    There has been continued deterioration on two fronts

21   principally:  Our trade suppliers; people, for instance, that

22   provide us hotel facilities for our crews.  The revenue side

23   of the equation; the credit card processors have, in various

24   circumstances, exercised rights under material adverse change

25   clauses and withheld certain of our revenues that would

Palumbo - direct

1   otherwise have been distributed to the company.

2   Q.    And Mr. Palumbo, approximately what was the debtors'

3   cash balance on filing?

4   A.    The approximate usual cash on the filing date was

5   about $20 million.

6   Q.    Now, Mr. Palumbo, you've been listening through the

7   course of today's hearing as a number of motions were

8   granted, granting the debtors relief to pay certain

9   creditors?  Did you hear those motions we've gone through

10  over the last hour?

11  A.    Yes.

12  Q.    If the debtor-in-possession financing is not granted

13  tonight, does the debtor have adequate funds to fund the

14  relief granted in those motions?

15  A.    No.

16  Q.    Mr. Palumbo, how much cash is needed to fund the

17  debtors' operations tomorrow morning?

18  A.    We expect approximately a need of $40 million.

19  Q.    And, Mr. Palumbo, approximately how much cash will

20  be needed from drawings on the DIP over the course of

21  approximately the next week to fund the debtors' operations?

22  A.    Over the next week, as has been mentioned earlier,

23  the amortization of the company's $100 million accounts

24  receivable securitization will become due.  We expect once

25  the amortization begins -- and I believe it will actually

1    be the 16th because the 15th in believe will be a holiday --

2    will require, will probably take about $10 million a day,

3    roughly and, therefore, amortize fully to $100 million over

4    approximately 10 business days.

5    Q.    So approximately 14 days into this case, do you

6    have an idea, assuming the DIP financing motion is granted,

7    what the DIP financing balance will be?

8    A.    I believe that including the amortization of the

9    accounts receivable securitization, we will need up to about

10   $170 to $180 million of drawing.

11   Q.    And Mr. Palumbo, what would be the affect of the

12   operations of the debtors of not having the DIP financing

13   available tomorrow morning?

14   A.    It would be extremely difficult to conclude the day.

15   We would likely start to downsize the operation.  We would

16   probably have to ground aircraft.

17   Q.    And do you have any view as to whether that would

18   affect customer bookings?

19   A.    I'm certain it would affect customer bookings.

20   Q.    Mr. Palumbo, obviously the forthcoming of this

21   receivables amortization event January 15 or 16 has been

22   known for quite some time.  Did you at some points in time

23   undertake activities to refinance the securitization?

24   A.    Yes.

25   Q.    Approximately, when did those activities begin?

1   A.     Late summer early fall.

2   Q.     Year 2000?

3   A.     I'm sorry.  Of the year 2000.

4   Q.     And can you briefly describe those activities during

5   late summer and early fall?

6   A.     During that period, in conjunction with Paine

7   Webber who was the initial placement agent on the accounts

8   receivable securitization, we sought to find an adequate

9   group of investors to extend that maturity date or rollover

10   that maturity.  We started with the initial group of

11   approximately eight investors.  I believe it was ten at the

12   time we started the discussions.  We tried to expand that

13   group over the period of time between that, the commencement

14   late summer-early fall to the end of the year.

15         Since we could not find an adequate group within

16   the existing group of investors willing to roll over the

17   financing, we further expanded and we got, by this point,

18   into the month of November with no one point in time ever

19   getting to a circumstance where we could find a group

20   adequate to commit to, on any terms, $100 million.

21   Q.     And Mr. Palumbo, these were on a nonbankruptcy filing

22   basis?

23   A.     That's correct.  This was not within the context of

24   debtor-in-possession financing.  It was an effort to roll

25   over the financing, the accounts receivable securitization in

# Exhibit 14

VOLUME II                                        378

FILED

IN THE UNITED STATES BANKRUPTCY COURT

2001 MAR 16  A

FOR THE DISTRICT OF DELAWARE

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

In the matter of          )
                          )
TRANS WORLD AIRLINES,     )
INC., et al.,             )      Case No. 01-0056 (PJW)
                          )
        Debtors.          )


                          United States Bankruptcy Court
                          824 Market Street - Sixth Floor
                          Wilmington, Delaware


                          Saturday, March 10, 2001
                          9:40 a.m.


BEFORE:  HONORABLE PETER J. WALSH,
         United States Bankruptcy Judge



                TRANSCRIPT OF PROCEEDINGS




                     WILCOX & FETZER
       1330 King Street - Wilmington Delaware   19801
                     (302) 655-0477



W&F

**WILCOX & FETZER LTD.**
Registered Professional Reporters   ORIGINAL

William F. Compton - Direct                    382

1    American Airlines, we actually got the deterioration in

2    bookings down to about a minus six to seven percent as

3    compared to last year.

4            But then as things got noisy again late

5    last week with the various suggestions that there would

6    be other bidders, then the bookings deteriorated again.

7    Early this week they were down 13 to 14 percent.

8    Q.    Mr. Compton, are you saying that people really

9    get out the newspaper and read about what is going on in

10   these bankruptcy proceedings when they are making their

11   travel plans?

12           MR. FORTE:  Objection, hearsay.  Earl Forte

13   for the committee.  And relevance.

14           THE COURT:  He is being asked his

15   impression.

16           MR. FORTE:  Yes, Your Honor, but he is

17   talking about what other people who aren't in the

18   courtroom read in documents that are not in the

19   courtroom.  It is double hearsay.

20           THE COURT:  I think it is a perfectly

21   obvious connection between what people read about this

22   airline and their bookings on that airline.  It is so

23   obvious that I don't think we even need testimony on it.

24           MR. DIMITRIEF:  Well, I will skip it.

William F. Compton - Direct          383

1              MR. FORTE:  I agree, Your Honor.

2              MR. DIMITRIEF:  Sir, I will take that hint

3    and move to the next question.

4    BY MR. DIMITRIEF:

5       Q.   Mr. Compton, what will happen to TWA's business

6    if the sale to American Airlines is delayed or otherwise

7    placed in doubt?

8       A.   It will deteriorate very significantly, very

9    significantly.  I am concerned that if we don't close

10   this deal with American Airlines on a timely basis TWA

11   will be forced into a liquidation.

12      Q.   How soon would that deterioration begin, sir?

13      A.   Virtually immediately.

14             MR. DIMITRIEF:  That's all I have on the

15   sale motion, Your Honor.

16                  CROSS-EXAMINATION

17   BY MR. FORTE:

18      Q.   Good morning, Captain Compton.

19      A.   Good morning.

20      Q.   Earl Forte for the creditors' committee.

21             Now, you are obviously in favor of the

22   American transaction, correct?

23      A.   That's correct.

24      Q.   And so are the pilots; is that correct?



William F. Compton - Cross                      384

1      A.   I believe the vast majority of TWA employees are

2   very supportive of the American transaction.

3      Q.   And that includes the pilots?

4      A.   They are employees of TWA, yes.

5      Q.   Did you play any role in attempting to find a

6   strategic partner or a strategic solution for TWA prior

7   to the January 9th board meeting of this year?

8      A.   Absolutely.

9      Q.   I would like to ask the witness to take a look

10  at Debtors' Exhibit 6 which was admitted into evidence

11  yesterday.

12            May I approach the witness, Your Honor?

13            THE COURT:   Yes.

14      Q.   Captain Compton, if you would, sir, could you

15  please turn to page 8 of D-6.

16      A.   Yes.

17      Q.   Now, it is my understanding that this is the

18  list of potential partners, as it says there, with which

19  TWA had strategic discussions; is that correct?

20      A.   Correct.

21      Q.   Now, it says "recent" at the top; does it not?

22      A.   Does it say what?

23      Q.   Does it say "Recent Strategic Discussions"?

24      A.   It does.



# Exhibit 15

EXECUTION COPY

EXHIBIT

J-272

ASSET PURCHASE AGREEMENT

between

**American Airlines, Inc.,**
as Purchaser,

and

**Trans World Airlines, Inc.,**
as Seller

January 9, 2001

D:\1\247928\07\5BCK07!.DOC\14913 0095

ALPA 013296

J-272

exchange, (ii) information that is or becomes available to the disclosing party on a non-confidential basis from a source other than the other parties and not obtained in violation of this Agreement and (iii) information known to the public or otherwise in the public domain without violation of this Section 9.3; provided, further, that this Section 9.3 shall not in any way limit the disclosure of information by TWA (a) in connection with the commencement and prosecution of the Chapter 11 Cases or (b) regarding TWA (i) to other bidders or potential bidders to the extent specifically permitted by this Agreement or (ii) following the termination of this Agreement.

ARTICLE X

EMPLOYEE MATTERS

10.1   Hiring Obligations.  Upon the occurrence of the Closing, Purchaser shall (i) offer all of Sellers' union employees (all of whom are listed on Schedule 10.1(a)) (other than personnel who (A) have previously been terminated by Purchaser or an entity controlled by Purchaser or (B) would not be qualified for employment under Purchaser's general hiring policies as in effect at Closing) employment by Purchaser or one or more entities controlled by Purchaser at compensation levels substantially equivalent to those currently enjoyed by similarly situated employees of Purchaser or such controlled entity, (ii) offer employment to certain members of TWA's executive management and those non-union employees listed on Schedule 10.1(b) on a case-by-case basis at Purchaser's sole discretion and (iii) provide employment benefits and post-retirement benefits to all employees actually hired by Purchaser pursuant to (i) and (ii) above at levels substantially no less favorable than those benefits provided to Purchaser's similarly situated employees. Any Seller employees to be hired by Purchaser or an entity controlled by Purchaser in accordance with this Section 10.1 will be hired in accordance with terms and conditions established by Purchaser or such entity (and, where applicable, in accordance with and pursuant to collective bargaining agreements relating to employees of Purchaser or such controlled entity).

10.2   Union Matters.  All offers of employment made by Purchaser in accordance with Section 10.1(i) above and all benefits to be provided pursuant to Section 10.1(iii) above will be conditioned on acceptance by all such employees of Purchaser's work rules then in effect and in effect after the Closing Date from time to time that are generally applicable to similarly situated employees of Purchaser. Purchaser and Sellers agree to encourage their respective unions to negotiate in good faith to resolve fair and equitable seniority integration. Prior to Closing, TWA shall amend all existing Collective Bargaining Agreements relating to any present or former employee of TWA to provide that (i) scope, successorship, and benefits provisions of the Collective Bargaining Agreements are not applicable to or being assumed by Purchaser as part of or as the result of the transactions contemplated by this Agreement, and (ii) consummation of the transactions contemplated by this Article X  will not violate or breach in any manner any provision of any Collective Bargaining Agreement (collectively, the "CBA Amendments").

ALPA 013341

# Exhibit 16

Page 1

1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW JERSEY
2                    CAMDEN VICINAGE.
                     CIVIL ACTION NO. 02-2917-JEI
3

4      PATRICK BRADY, et al.,

5                                         Plaintiffs,

6            vs.

7      AIRLINE PILOTS ASSOCIATION,
       INTERNATIONAL,
8                                         Defendant.

9                    ----------------

10                   October 15, 2012

11                   ----------------

12
                             Oral sworn videotaped deposition
13     of DONALD CARTY, 300 Crescent Court, Suite 910, Dallas,
       Texas, was taken at the office of Carty Nickell
14     Investments, 300 Crescent Court, Suite 910, Dallas,
       Texas 75201, before Lindsy R. Conrad, Certified
15     Shorthand Reporter of the State of Texas, on the above
       date, commencing at 10:24 a.m., there being present:

16

17                   GREEN JACOBSON, P.C.
                     BY:  ALLEN P. PRESS
18                   Suite 700, Pierre Laclede Center
                     7733 Forsyth Boulevard
19                   St. Louis(Clayton), Missouri 63105
                     (314)862-1606
20                   Attorney for Plaintiffs

21
                     PAUL, WEISS, RIFKIND, WHARTON & GARRISON
22                   BY:  DANIEL J. TOAL
                          JOSHUA D. KAYE
23                   1285 Avenue of the Americas
                     New York, New York 10019-6064
24                   (212) 373-3869
                     Attorneys for Defendant

25

DEGNAN & BATEMAN
(856) 232-7400

1   the American Airlines collective bargaining agreements

2   were inconsistent with one another.  In what way?

3        A.  Well, in a variety of ways, but in terms of

4   successorship and in terms of any rights they might

5   have, any seniority rights they might have.

6        Q.  And what did -- what did the TWA collective

7   bargaining agreement provide for in terms of scope --

8        A.  You know --

9        Q.  -- and successorship?

10       A.  -- at this point, I can't remember the details

11   of what was in their scope clause.

12       Q.  Okay.

13       A.  I can only remember it being a condition that

14   it be removed.

15       Q.  And was the issue of whether seniority

16   integration would be arbitrated, was that an issue that

17   was addressed by either collective bargaining

18   agreement --

19       A.  I can't recall.

20       Q.  Now, what was -- what was American Airlines

21   planning to do if TWA was unable to secure from its

22   pilots amendment of the collective bargaining agreements

23   concerning scope and successorship?

24            MR. PRESS:  Let me just object to the form

25   of the question.

1          That's just me objecting.  For the record,

2    Mr. Carty, you're free to answer.

3         A.  Well, our intent was to abandon the

4    transaction.

5         Q.  And why -- why would American Airlines have

6    been willing to abandon the transaction had those

7    provisions not been waived?

8         A.  Well, because this transaction met a strategic

9    need, but it wasn't necessarily the only way for us to

10   respond strategically to what was going on in the

11   market, and as I said to you earlier, we were -- we were

12   concerned about the size and the scope and the magnitude

13   of this acquisition and how much risk we added to our

14   company in doing such an acquisition.  We had determined

15   that we were not going to add a labor risk, particularly

16   in light of our most recent history, to the transaction.

17        Q.  So you mentioned the prior history including

18   the previous acquisition that American Airlines went

19   through.  What acquisition was that?

20        A.  That was the Reno acquisition.

21        Q.  And what issues arose out of the Reno

22   acquisition?

23        A.  Well, we ended up in a fairly major dispute

24   with our pilots, and then it ended up with a work action

25   and legal work action as it turns out by our pilots

Page 27

1   where we needed to go into court and have it resolved in

2   the courts.  And while we prevailed legally, a number of

3   things happened that were quite unattractive.  When you

4   have work disruption, obviously, it impacts your

5   customers, it impacts your reputation, but also it,

6   obviously, even though we prevailed, had an impact on

7   our relationship with our pilots.

8        Q.  Did -- did the Reno acquisition -- did some of

9   the issues with the labor -- labor unions relate to

10  integration of seniority lists?

11       A.  They did.

12       Q.  And what sort of labor action did the -- did

13  the union take as a result?

14       A.  The courts determined they were in a

15  work-to-rule campaign and --

16       Q.  Is that also known as a sick-out?

17       A.  Sick-out, that's how it manifested itself, but

18  yes.

19       Q.  Okay.  And what effect did the sick-out have on

20  American Airlines?

21       A.  It resulted during the period that it occurred

22  in a number of cancellations, certainly a number of

23  flight delays, and all of the implications that has for

24  customer service.

25       Q.  And did American Airlines make any effort to

1    quantify the amount of the losses attributable to this

2    labor action?

3         A.  We did.

4         Q.  And what did American Airlines determine the

5    cost of this labor action to be?

6         A.  I don't remember all the details of the

7    financial analysis, but the -- the Court determined that

8    it was a very substantial amount of penalty that the --

9    that the APA would have to pay to American as a

10   consequence of it.

11                (Carty Exhibit No. 2 marked)

12        Q.  I'm going to show you a document I'm going to

13   mark as Carty Exhibit 2, which is the 1998 Annual Report

14   for AMR Corporation.  If I could direct your attention

15   to page 33 of that document.

16        A.  Yes, sir.

17        Q.  So this is the annual report for AMR

18   Corporation.  What's the relationship between AMR and

19   American Airlines?

20        A.  AMR is the parent company of American Airlines.

21        Q.  Okay.  So if I could direct your attention to

22   the bottom right of page 33, and it says, "The company

23   estimates that the illegal pilot job action resulted in

24   pre-tax earnings impact of approximately 200 to 225

25   million during the first quarter of 1999."

1            Do you see that?

2       A.  I do.

3       Q.  Does that refresh your recollection --

4       A.  It does.

5       Q.  -- about the impact of this labor action

6   arising out of the Reno acquisition?

7       A.  Yes, it does.

8       Q.  And to the best of your knowledge, as you sit

9   here today, is this an accurate figure?

10      A.  To the best of my knowledge, it is.

11      Q.  Do you remember that the issue of whether the

12  pilot seniority lists between American Airlines and TWA

13  would be integrated by arbitration was one of the

14  significant issues that was confronted in this

15  acquisition?

16      A.  I remember the discussion of it.  We had made

17  it absolutely clear to our employees that we would not

18  compel arbitration on any of our workforces.

19      Q.  And when did you make that clear to your

20  employees, in what context?

21      A.  I can't remember the timing but very early on.

22      Q.  And did you -- did you communicate that

23  position to the employees in writing?

24      A.  I think we did, yes.

25      Q.  And did you have -- did you have town hall

1   meetings with employees discussing the potential

2   acquisition of these TWA assets?

3        A.  Yes, we did.

4        Q.  And did you repeat this commitment to your

5   employees that you are not going to force arbitration of

6   seniority lists on your employees during those meetings?

7        A.  We did.

8        Q.  And did you make those commitments personally?

9        A.  I did.

10       Q.  And why were you -- why were you willing to

11  make those commitments to your employees?

12       A.  Again, it really relates to the fact that while

13  we felt compelled to take strategic action to change the

14  company, we did not want to take strategic action that

15  would further irritate the labor relations challenges

16  that we already had.

17       Q.  Did you have an understanding of what

18  position -- first of all, did the American pilots have a

19  labor union?

20       A.  They did.

21       Q.  And what was that union called?

22       A.  The APA, the Allied Pilots Association.

23       Q.  Okay.  Did the APA, to your understanding, have

24  a position on whether it was willing to allow

25  arbitration of the seniority integration?

1    A.  It was very clear that it would not allow

2  arbitration of the seniority issue.

3    Q.  And how is that view communicated to you?

4    A.  I don't recall any specific communication.  I

5  just recall that being very clearly their position.

6    Q.  And do you have an understanding of why the APA

7  held that position?

8    A.  I think the APA felt as the acquiring carrier

9  that the pilots of American should not have to subject

10  themselves to arbitration on this kind of issue.

11           (Carty Exhibit No. 3 marked)

12    Q.  Let me show you a document I'm marking as Carty

13  Exhibit 3, which is the Asset Purchase Agreement between

14  American Airlines and TWA.  And let me ask you if you

15  recognize this document, Mr. Carty.

16    A.  I think I recognize it.  It looks familiar.

17    Q.  Were you involved in the negotiation of this

18  agreement?

19    A.  Yes.

20    Q.  And what role did you play in the negotiation?

21    A.  Major terms of this were negotiated personally

22  between Bill Compton and myself, but all of the detail

23  you see in here were negotiated by teams of folks

24  working under my direction but not negotiated

25  specifically by me.

Page 32

1      Q.  Let me direct your attention to Section 10.2 of

2  this agreement, which is on page 41.

3      A.  Yes.

4      Q.  Okay.  So in the middle of this paragraph 10.2

5  on Union Matters, it says, "Prior to closing, TWA shall

6  amend all existing Collective Bargaining Agreements

7  relating to any present or former employees of TWA to

8  provide that (i) scope, successorship, and benefits

9  provisions of the Collective Bargaining Agreements are

10 not applicable to or being assumed by Purchaser as part

11 of or as a result of the transaction contemplated by

12 this Agreement."

13              Do you see that language?

14     A.  I do.

15     Q.  Is that the provision in the agreement that you

16 referred to pursuant to which TWA would have to -- TWA's

17 pilots would have to agree to waive scope and

18 successorship provisions?

19     A.  It is.

20     Q.  And was this the provision that was intended to

21 ensure that American Airlines' pilots would not be

22 subject to arbitration of the integrated seniority list?

23     A.  Yes, that's certainly one element of what was

24 intended here.

25     Q.  How did you envision that TWA itself would be

1    able to amend its collective bargaining agreements

2    regarding scope and successorship?

3        A.   That really wasn't our challenge, but we

4    believed that most of the TWA employees including the

5    pilots understood that TWA was faced with pretty bleak

6    options and, as a consequence, would be willing to make

7    these changes so that the transaction could proceed.

8        Q.   Did -- absent compliance with this Section 10.2

9    concerning amendment to the collective bargaining

10   agreement to remove scope and successorship provisions,

11   would American Airlines have been willing to proceed

12   with the deal that was reflected in this agreement?

13            MR. PRESS:  Let me just show my objection

14   to the form of the question.

15       A.   We would not have proceeded with the

16   transaction.

17       Q.   And how did you know that to be the case?

18       A.   Because I was the ultimate decision maker on

19   this in conjunction with the board, and we were all

20   agreed that we would not proceed unless this happened.

21       Q.   Could you envision any set of circumstances in

22   which the TWA unions would refuse to waive the scope and

23   successor provisions -- the scope and successorship

24   provisions of their collective bargaining agreement and

25   yet American Airlines could be persuaded to proceed with

Page 34

1    the transaction?

2         A.  No, I can't.

3         Q.  Did American Airlines offer any inducements to

4    the TWA pilots to encourage them to amend their

5    collective bargaining agreement to eliminate the scope

6    and successorship provisions?

7         A.  I think we felt that the inducement was

8    inherent in the very existence of jobs at American and

9    that they would want to do that.  Subsequently, in

10   addition to that, we agreed, I think, no matter how long

11   the transition took to bring the TWA pilots' pay up to

12   American levels in a defined period of time, which I

13   can't recall.

14              (Carty Exhibit No. 4 marked)

15        Q.  Let me show you a document which I'll mark as

16   Carty Exhibit 4, which purports to be a letter from you

17   to Bill Compton dated March 6, 2001.  If you could let

18   me know when you've had a chance to review that, please,

19   Mr. Carty.

20        A.  Yes.

21        Q.  Do you recognize this as a letter that you

22   wrote to Mr. Compton?

23        A.  I do.

24        Q.  And in the second paragraph, you say, "This

25   letter is intended to help answer these questions and

1  quickly.

2           And you know, this was ten months after the

3  time of this letter, so our view was that we'd be at AA

4  rates either by then or soon after no matter what, but

5  that was not clear to the TWA pilots.  So we felt the

6  need and Bill Compton felt the need to communicate that

7  explicitly to the TWA pilots.

8      Q.  Okay.  On the second page of this letter in the

9  second to last paragraph, you say, "We are working with

10 our unions to reach the necessary agreements."  Do you

11 see that?

12     A.  Yes.

13     Q.  And what did you mean when you said that you

14 were working with American Airlines' unions to reach the

15 necessary agreements?

16     A.  If you look at the sentence before that, it

17 talks about getting to the point where the TWA-LLC

18 employees could become American employees as quickly as

19 possible.  That, by definition, meant that we would have

20 to work through all the issues of seniority and work

21 roles and so on and so forth.

22     Q.  And what was it that American Airlines was

23 doing with its unions relating to seniority integration?

24     A.  As of the date of this, we were, I think,

25 having early discussions about the fact that we wanted

1   them to work with the TWA unions to come to some

2   understanding as to how seniority would work.

3        Q.  And was the APA receptive to that -- to that

4   objective?

5        A.  Let me just say that I think the APA was

6   understanding of the necessity of that objective but

7   decided to try to use that as negotiating leverage to

8   extract a number of unrelated financial concessions from

9   the company.

10        Q.  And did those efforts succeed?

11        A.  They did not.

12        Q.  And what was the -- how would you describe the

13   history of labor relations between American Airlines and

14   its pilot union in particular prior to January of 2001?

15        A.  Not very good.

16        Q.  And can you expand on that?

17        A.  Well, we'd just come through the Reno sick-out

18   period not long before, so I think that was probably the

19   extreme point of -- of the unhappiness between

20   management and the employees, but there had been a

21   continuous difficult period between the pilots and

22   management.

23        Q.  And do you recall that American Airlines

24   obtained a contempt ruling against -- against its --

25   against the APA as a result of this sick-out action in

1    the Reno acquisition?

2        A.  I do.

3        Q.  And do you recall that the amount of that

4    contempt ruling was about $45 million?

5        A.  I do.

6        Q.  And was that a point of negotiation between

7    American Airlines and the APA and an inducement that

8    American Airlines could offer to try and extract

9    concessions from the APA in the seniority integration

10   process?

11       A.  I don't remember the details of the

12   negotiation, I'm afraid.

13       Q.  Okay.  Do you have any recollection of using

14   the existence of that contempt ruling to try to persuade

15   the APA to take different positions in the seniority

16   integration negotiations?

17       A.  I don't.  I'm not suggesting that didn't happen

18   between the management negotiating team and the APA, but

19   I don't know that.  They owed a substantial amount of

20   money because they obviously did not have the cash to

21   pay the total 45 million.

22       Q.  Did American Airlines end up collecting on that

23   contempt ruling?

24       A.  I don't recall.  We collected a big chunk up

25   front, and I don't recall what eventually happened to

1    the rest of it.

2         Q.  Are you familiar with something called a

3    Section 1113 petition?

4         A.  I am familiar with that.

5         Q.  And what is that?

6         A.  I'm not sure I can describe it accurately

7    legally, but it is a petition wherein the -- the company

8    approaches the bankruptcy court and asks for relief from

9    their labor contracts as a consequence of economic

10   hardship.

11        Q.  And was a 1113 petition filed in connection

12   with the proposed acquisition of TWA's assets?

13        A.  I don't recall whether it was ever filed.  It

14   was clearly -- it was threatened on a number of

15   occasions, but I don't remember if it was filed.  I

16   believe it was filed in the end.

17        Q.  And in this case, would that have been filed by

18   TWA?

19        A.  That would have been filed by TWA.

20        Q.  Do you know what that petition was seeking to

21   accomplish?

22        A.  I presume it was seeking to remove -- either

23   remove the contract completely or certainly remove this

24   clause of the contract.

25        Q.  When you say, "this clause," are you

1    referring -- what are you referring to?

2        A.  I'm referring to the clause we've been

3    discussing around successorship and scope and so on.

4                (Carty Exhibit No. 5 marked)

5        Q.  Let me show you a document that I'll mark as

6    Carty Exhibit 5, which is a motion by TWA for an Order

7    Authorizing Rejection of Certain of Its Collective

8    Bargaining Agreements Pursuant to 11 U.S.C. Section

9    1113, and can you let me know if you've seen this

10   document before?

11       A.  I don't recollect seeing it, but that doesn't

12   mean I haven't seen it.  I could well have seen it and

13   indeed probably did, but I do not recollect it.

14       Q.  Let me direct your attention to page 10 of this

15   document.

16               MR. PRESS:  Page 10 of the brief, Dan?

17               MR. TOAL:  Yes.

18       A.  Page 10 of the brief or 10 of the document?

19       Q.  10 of the brief.

20               MR. PRESS:  It's paginated at the bottom.

21               THE WITNESS:  Yep, got it.

22       A.  Yes.

23       Q.  Okay.  So in the middle of the bottom

24   paragraph, TWA writes, "Failure to obtain the waivers,"

25   referring to the scope and successorship provisions,

1     Q.  So on this page where you begin to testify,

2  you're quoted as saying, "Well, if you're speaking,

3  Senator, to the TWA transaction, TWA is going away one

4  way or another."  Do you see that language?

5     A.  Yes, I do.

6     Q.  And what did you mean by that?

7     A.  I meant that one way or another, TWA would not

8  continue to exist as an operating airline, meaning that

9  either this transaction would get approved or TWA would

10  liquidate as previous witnesses had already testified.

11          (Carty Exhibit No. 9 marked)

12     Q.  I'm going to mark as Carty Exhibit 9 the March

13  30, 2001, letter from -- from American Airlines, Inc.,

14  to Robert Pastore.  It has the Bates number ALPA 13034.

15  And could you let me know if you've seen this document

16  before, Mr. Carty?

17     A.  This looks very familiar.  I can't remember

18  specifically, but it looks very familiar.

19     Q.  And do you remember the signature under

20  American Airlines?  Do you recognize the signature under

21  American Airlines?

22     A.  I believe I do.  I believe that is Anne

23  McNamara's signature.

24     Q.  And who is Anne McNamara?

25     A.  She was the company's general counsel.

1      Q.   Okay.  So it says in the middle of this

2  paragraph, "For its part, American Airlines, Inc.,

3  agrees to use its reasonable best efforts with its labor

4  organization representing the airline pilots craft or

5  class to secure a fair and equitable process for the

6  integration of seniority."  Do you see that?

7      A.   Uh-huh --

8      Q.   And --

9      A.   -- yes, I do.

10      Q.   -- what did American Airlines do to secure a

11  fair and equitable process for integration of seniority?

12      A.   Two things.  We were willing to organize

13  meetings and engage a facilitator to help with those

14  discussions, and we informally urged the APA to be

15  reasonably fair as they sought with the TWA pilots in

16  their discussions.

17      Q.   Okay.  Would American Airlines have done more

18  to secure a fair and equitable integration process if

19  ALPA had initiated litigation to enjoin or delay the

20  merger?

21           MR. PRESS:  Show my objection to the form

22  of question.

23      A.   No.

24      Q.   Would American Airlines have done more to

25  secure a fair and equitable process regarding security

Page 58

1   integration -- seniority integration if ALPA had lobbied

2   more aggressively than it did in favor of the Bond

3   legislation?

4              MR. PRESS:  Again, show my objection to the

5   form of the question.

6      A.  No.

7      Q.  Would American Airlines have done more to

8   secure a fair and equitable process regarding seniority

9   integration if ALPA had asked the Department of

10  Transportation to make seniority arbitration a condition

11  for approval of the acquisition?

12             MR. PRESS:  Again, showing my objection to

13  the form of these, in my judgment, improper

14  hypotheticals.

15     A.  No.

16     Q.  Would American Airlines have done more to

17  secure a fair and equitable process concerning seniority

18  integration if ALPA had asked the AFL-CIO to boycott

19  American Airlines?

20             MR. PRESS:  Again, showing my objection to

21  the form of the question.

22     A.  No.

23     Q.  Would American Airlines have done more to

24  secure a fair and equitable process regarding seniority

25  integration if ALPA had initiated a jump-seat war

Page 59

1    against American Airlines?

2              MR. PRESS:  Same objection.

3         A.   No.

4         Q.   And do you know what a jump-seat war is?

5         A.   I do.

6         Q.   What's that?

7         A.   A jump-seat war is when other airlines don't

8    allow pilots of another airline to ride in their jump

9    seats.  It's their way of commuting.

10        Q.   Would American Airlines have done more to

11   secure a fair and equitable process for seniority

12   integration if ALPA had threatened to strike by the TWA

13   pilots?

14             MR. PRESS:  Same objection.

15        A.   No.

16             (Carty Exhibit No. 10 marked)

17        Q.   I'm going to mark as Carty Exhibit 10 a

18   document that's entitled, "Status Update," dated October

19   10th, 2001.  Mr. Carty, I'll ask you if you have seen

20   this document before.

21             MR. HAVERMANN:  And I'd like to interject

22   I'd like to suggest that if you can answer that question

23   without referring to any communications you and I have

24   had about documents related to this case, please go

25   ahead, but I'd instruct you not to answer that question

Page 60

1     to the extent you'd reveal any documents you and I have

2     gone over in our preparation.

3          Q.  So just please exclude from your answer any

4     documents that you reviewed with counsel, but prior to

5     any preparation that you did for this deposition, is

6     this a document you've seen before?

7          A.  I don't recall.  It certainly looks like I did,

8     but I don't recall.

9               MR. TOAL:  Thank you very much, Mr. Carty.

10              Your witness.

11              MR. PRESS:  I do have some questions,

12    Mr. Carty.

13    BY MR. PRESS:

14         Q.  I'll just start backwards.  You were asked a

15    question to speculate whether or not a boycott of

16    American Airlines by the AFL-CIO would have had any

17    impact on your company.  Has your company -- while you

18    were CEO of American Airlines, did it ever face an

19    AFL-CIO boycott?

20              MR. TOAL:  I object to the form of the

21    question, the characterization as speculation.

22         A.  Not that I recall.

23         Q.  Right.  You never were in that situation to say

24    what you would do if 10 million people and their

25    families stopped flying American Airlines; you don't

# Exhibit 17





# AGREEMENT

between

## TRANS WORLD AIRLINES, INC.

and

## THE AIR LINE PILOTS
in the service of
## TRANS WORLD AIRLINES, INC.

represented by

## THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

(effective September 1, 1998)

ALPA 017856

Section 1(D)(3)(a)(ii)

(ii)    during the time period in which any of the
        restrictions described in this Section 1(D)(3)
        are in effect, the Company will be permitted, at
        its discretion, notwithstanding any other
        provision of the Agreement, to require a pilot
        who would have been furloughed but for the
        restrictions described in this Section 1(D)(3)
        to utilize his or her accrued unused vacation.

(b)    The special protections described in this Section
       1(D)(3) are in addition to the pilot transfer and
       seniority integration rights established in Section
       1(D)(2) above in connection with Substantial Asset
       Sales. However, the Substantial Asset Sales governed
       by Section 1(D)(2) above shall not be counted in
       determining whether the Company has reached a
       Triggering Event (and thereby triggered the special
       protections) under this Section 1(D)(3) in any twelve
       (12) month period.

(c)    In addition, the special protections described in this
       Section 1(D)(3) shall not apply if the Company can
       demonstrate, by clear and convincing evidence, based
       on all the information available at the time of the
       Triggering Event, that the asset sales, transfers or
       dispositions that result in a Triggering Event will
       not result, directly or indirectly in the furlough of
       Company pilots during the twelve (12) month period
       following a sale, transfer or disposition.

(4)    General

(a)    The Company shall not conclude or enter into any
       agreement for any transaction or series of
       transactions that constitute a Substantial Asset Sale
       or a Merger unless the particular Purchaser or the
       Merger Partner, as applicable, agrees in writing to
       offer employment and integrate TWA pilots in
       accordance with the terms of this Section 1(D) or as
       otherwise agreed to by ALPA. The Company will not
       engage in a multiple party sale transaction or any
       other corporate transaction with the purpose or
       knowing effect of avoiding the applicability of this
       Section 1(D).

(b)    This Section 1(D) shall not apply to (i) any sale
       lease-back or any financing transaction in which the
       Company continues to use the financed assets in its
       operations or (ii) the sale of Trans World Express,
       Inc. or any or all of its assets.

(c)    The rights and protections provided the Association
       and the TWA pilots under this Section 1(D) are in
       addition to any other rights and protections contained
       in any other agreement involving the Association and
       the TWA pilots including other provisions of this
       Agreement. In the event of a conflict between Section
       1 and any other provision of this Agreement, this
       Section 1 shall control.

5

ALPA 017861

Section 1(D)(5)

(5)    Acquisition of Airline Assets

In the event (i) the Company acquires international routes or 20 or more aircraft from another carrier (the "Seller") and (ii) the Company's acquisition of such routes or aircraft materially increases the Company's pilot staffing needs and (iii) the terms of the Company's purchase agreement with the Seller require the Company to employ certain of the Seller's pilots with lateral seniority or seniority integration rights, then a reasonable number of transferring pilots from the Seller shall be integrated into the TWA Pilots System Seniority List pursuant to Association Merger Policy if the Seller's pilots are represented by the Association and otherwise pursuant to Sections 3 and 13 of the Allegheny-Mohawk LPPS; provided, however, that no company pilot shall be furloughed or suffer a reduction in pay status as a direct or indirect result of such seniority integration or such acquisition of routes or aircraft.

(E)    Bankruptcy

(1)    In the event a petition under Chapters 7 or 11 of the Bankruptcy Code concerning the Company is filed, then:

(a)    Neither that Company nor any Affiliate shall file any application seeking rejection or modification of any agreement between the Company and the Association pursuant to 11 U.S.C. §1113, including a request to implement interim changes in the Agreement pursuant to 11 U.S.C. §1113(e).

(b)    The Company and its Affiliates stipulate and agree that this Agreement permits the reorganization of the Company and assures that all creditors, the debtor and all affected parties are treated fairly and equitably in any reorganization within the meaning of 11 U.S.C. §1113. The Company and its Affiliates shall actively oppose a rejection or modification of the Agreement or implementation of interim changes to the Agreement if proposed or supported by any other party.

(2)    In the event the Agreement is rejected or modified pursuant to 11 U.S.C. §1113 notwithstanding Section 1(E)(1) above, then the difference between the rates of pay, rules and working conditions established in this Agreement and the post-rejection rates of pay, rules and working conditions for the Company's pilots shall accrue and be treated as an expense of administration pursuant to 11 U.S.C. §§503(B)(1)(A) and 507 and shall be paid as an administrative priority pursuant to 11 U.S.C. §§503(b)(1)(A) and 507(a)(1).

(F)    Remedies

(1)    The Company agrees, and shall require the particular Purchaser (or Successor or Merger Partner if applicable) to agree, to resolve all disputes concerning the interpretation or application of this Section 1 through final and binding arbitration on an expedited basis directly before the ALPA-TWA System Board of Adjustment sitting with a neutral

6

ALPA 017862

REDACTED

Section 1(F)(1), cont.

arbitrator. The dispute shall be filed with the Company within ten (10) days of the interpretation or application of Section 1 and shall be heard no later than fifteen (15) days following the submission to the System Board and decided no later than thirty (30) days after submission (the provisions of Section 22 herein notwithstanding), unless the parties agree otherwise in writing; but in no event shall such arbitration delay the closing of the sale of the transferred assets. ALPA shall cooperate with the Company and the Purchaser in order that any dispute which is not decided at the time of closing will be arbitrated post-closing, with any determination to be binding on the Purchaser unless the Company and the Purchaser agree, with the consent of ALPA (which consent shall not be unreasonably withheld or delayed by ALPA), that such determination shall be and remain the sole obligation of the Company; provided that the Purchaser shall have the right to become a party to and participate in any such arbitration which could become binding upon such Purchaser.

(2)   The Company and the Association agree that the rights and obligations contained in Section 1 of this Agreement are equitable in nature, that there are no adequate remedies at law for the enforcement of such rights and obligations, and that the Association and the Company's pilots will be irreparably injured by any violation of this Section 1. The parties therefore agree that, in addition to any other rights and remedies available under law or the Agreement, this Section 1 shall be enforced by equitable remedies, including injunctions and specific performance, against the Company, its Affiliates and others in privity with the Company.

(3)   In addition, the parties agree that the equitable rights and obligations established in this Section 1 shall remain enforceable, through equitable relief and otherwise, until the Agreement is amended pursuant to Section 6 of the Railway Labor Act notwithstanding (a) any filing concerning the Company under any chapter of the United States Bankruptcy Code, (b) any attempted alteration, modification or rejection of the Agreement pursuant to any provision of the Bankruptcy Code or otherwise, (c) any attempted sale of the property of the Company pursuant to any provision of the Bankruptcy Code or otherwise, or (d) any imposition of an automatic stay with respect to the Company's property.

(G)   Commuter Carriers, Code Sharing and Block Seating

(1)   The Company, its subsidiaries and its corporate affiliates may acquire an ownership interest in commuter carriers and may operate such commuter carriers under the terms of separate collective bargaining agreements with the Association provided that any such commuter carriers comply with the restrictions contained in Sections 1(G)(2) through 1(G)(5) below.

(2)   Except as agreed in the September 5, 1995 Letter of Agreement pertaining to the use of ATR aircraft by Trans States Inc., the Company and its Affiliates will not operate, maintain any ownership interest in, or enter into any code sharing arrangement with, any

7

Section 1(G)(2), cont.

United States air carrier as defined in 49 U.S.C. 40102 (a)(2) that operates any aircraft under the Company's designator code, name, logo or marks with: (a) a maximum seating capacity in excess of sixty (60) seats; (b) a maximum certified gross takeoff weight in excess of 60,000 pounds; (c) a maximum certified cruising speed in excess of 400 miles per hour; or (d) any Jet Aircraft as defined herein. Any carrier that satisfies all of the restrictions contained in this Section 1(G)(2) and that utilizes the Company's or an Affiliate's designator code is hereinafter referred to as a "TWA Commuter Carrier." For purposes of this subsection (G), "Jet Aircraft" is defined as any aircraft that uses a turbine-driven engine without an external propeller.

(3)   Notwithstanding the limitations in Section 1(G)(2) above, TWA Commuter Carriers may operate up to an aggregate of fifteen (15) Jet Aircraft with a maximum seating capacity of fifty (50) seats.

(4)   In addition to the fifteen (15) Jet Aircraft referred to in Section 1(G)(3) above, TWA Commuter Carriers may operate: (i) one additional Jet Aircraft for each additional three aircraft operated by TWA above its current fleet size of 184 aircraft until the TWA fleet size reaches 200 aircraft; and (ii) one additional Jet Aircraft for each additional two aircraft operated by TWA exceeding 200 TWA fleet aircraft. The maximum average seating capacity of the Jet Aircraft operated by TWA Commuter Carriers shall be: fifty (50) seats while the Company's fleet size is less than 190; fifty four (54) seats while the Company's fleet size is between 191 and 195; fifty six (56) seats while the Company's fleet size is between 196 and 200; and sixty (60) seats while the Company's fleet size exceeds 200. The relationship of the Company's fleet size to the number of Jet Aircraft that may be operated by TWA Commuter Carriers and the average seating capacity of the Jet Aircraft that may be operated by TWA Commuter Carriers is shown in Section 1(G)(9) below.

(5)   In no event will TWA Commuter Carriers operate more than a maximum aggregate of thirty (30) Jet Aircraft, and in no event will the certificated seating capacity of any Jet Aircraft operated by any TWA Commuter Carrier exceed seventy (70) seats.

(6)   As a limited exception to the restrictions contained in Sections 1(G)(2), (3), (4) and (5) above, the Company may enter into or maintain code sharing agreements with:

(a)   carriers other than United States air carriers (as defined in 49 U.S.C. 40102 (a)(2)) so long as the Company can demonstrate by clear and convincing evidence, that such code sharing arrangements do not result, directly or indirectly, in the furlough of any Company pilot or a reduction in pay status for any Company pilot;

(b)   United States air carriers (as defined in 49 U.S.C 40102 (a)(2)) other than TWA Commuter Carriers that permit such carriers to apply the Company's designator

8

ALPA 017864

# Exhibit 18

AGREEMENT

between

AMERICAN AIRLINES, INC.

and

THE AIR LINE PILOTS

in the service of

AMERICAN AIRLINES, INC.

as represented by the

ALLIED PILOTS ASSOCIATION

Effective:  May 5, 1997

title.doc

ALPA 013208

L.    REMEDIES

(1)  The Company and the Association agree to arbitrate any grievance filed by the other party alleging a violation of this Section 1 on an expedited basis directly before the System Board of Adjustment sitting with a neutral arbitrator.  The arbitrator shall be a member of the National Academy of Arbitrators and experienced in airline industry disputes.  The burden of proof will be determined by the arbitrator.  The provisions of the Railway Labor Act shall apply to the resolution of any dispute regarding this Section 1.

(2)  The parties agree that, in addition to any other rights and remedies available under law and this Agreement, an arbitration award under this Section 1 shall be enforceable by equitable remedies, including injunctions and specific performance against the Company, AMR Corp., and/or an Affiliate of the Company.   The Company and Association agree that in a court proceeding to enforce an arbitration award under this Section 1, the rights and obligations are equitable in nature, that there are no adequate remedies at law for the enforcement of such rights and obligations, and that the Association and the Company's pilots are irreparably injured by the violation of this Section 1.

sec1.doc

1 - 15

ALPA 013224

SECTION 13

SENIORITY

A.   Service with Company

Seniority as a pilot shall be based upon the length of service as a flight deck operating crew member with the Company except as otherwise provided in Sections 11 and 12 of this Agreement.

B.   Seniority Date

Seniority shall begin to accrue from the date a pilot is first assigned to air line flying duty and shall continue to accrue during such period of duty except as provided in Sections 11 and 12 of this Agreement.

C.   Retention of Seniority

A pilot once having established seniority shall not lose such seniority except as provided in this Section, nor shall his relative position on the Pilots' System Seniority List be changed, except as provided in paragraph B. of this Section.

D.   Basic Seniority Rule

Seniority shall govern all pilots in case of promotion, demotion, their retention in case of reduction in force, their recall from furlough, their assignment or reassignment due to expansion or reduction in force or schedules, and their choice of vacancies, provided that the pilot is sufficiently qualified for the conduct of the operation to which he is to be assigned, and provided further that the awarding of all third crew member flying assignments and base vacancies shall be subject to the terms of the Tripartite Agreement between American Airlines, Inc., the Allied Pilots Association and the AAL Chapter, Flight Engineers' International Association, effective December 11, 1964.   In the event a pilot is considered not to be sufficiently qualified, the Company shall promptly furnish such pilot written reasons therefor. This paragraph shall apply, provided that certain other rules in this Agreement stipulating specific methods and procedures of applying system seniority shall govern such application of system seniority only to the extent of the specific provisions of such rules.

E.   Failure to Qualify in Turn

When a junior pilot is promoted over a senior pilot, by reason of the failure of the latter to qualify in his turn, the senior pilot shall continue to retain his position on the Pilots' System Seniority List.

F.   Loss of Seniority

1.   Resignations, Discharges

A pilot who resigns from the service of the Company, or is discharged for just cause, shall forfeit all seniority as a pilot.

2.   Failure to Return from Furlough

When a pilot who has been furloughed is offered, by written notice from the Company, the opportunity to return to duty as a pilot and such pilot elects, by written statement to the Company, not to return to such duty, or if a recalled pilot fails to comply with the requirements of Section 17.W. of this Agreement, his seniority right of preference in re-employment shall at that time terminate, and all his seniority as a pilot shall be forfeited.

3.   Duration of Re-employment Preference

At the end of ten (10) years from the date of furlough, a pilot who has not been re-employed by the Company shall forfeit all his seniority and shall not be entitled to preference in re-employment.

4.   Retention of Company Benefits

Upon return from furlough, a pilot shall receive all Company benefits accruing by reason of his previous active service.

G.   System Seniority List

1.   Seniority List Supplied by Company

13 - 1

ALPA 013225

The Company shall provide each pilot, within thirty (30) days after July 1st of each year, a Pilots' System Seniority List, effective July 1, which contains the names of all pilots arranged in the order of system seniority, whether active or inactive, and the seniority date of each pilot. Such list shall also reflect each pilot's normal retirement date.

2.   Protests

a.   A pilot shall be permitted a period of thirty (30) days after any posting of the Pilots' System Seniority List, each year, in which to protest to the Company any omission or incorrect posting affecting his seniority.

b.   A pilot on leave or away from his base station at the time of posting of the list shall have a period of thirty (30) days from the date of his return to his base station during which to file such protest.

c.   Any incorrect posting or any other discrepancy which went unprotested on the annual list in which it first appeared shall not be protested on any subsequent annual posting except that typographical and clerical errors may be corrected at any time.

sec13.doc

13 - 2

ALPA 013226

# Exhibit 19

1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2         FOR THE DISTRICT OF NEW JERSEY

 3              CAMDEN VICINAGE

 4         CIVIL ACTION NO. 02-2917-JEI

 5    ----------------------------------------x

 6    PATRICK BRADY, et al.,

 7              Plaintiffs,

 8    -vs-

 9    AIRLINE PILOTS ASSOCIATION, INTERNATIONAL,

10              Defendant.

11    ----------------------------------------x

12                        Tuesday, October 23, 2012

13                        Washington, DC

14

15        VIDEO DEPOSITION OF JEFFREY BRUNDAGE

16

17        The video deposition of JEFFREY

18    BRUNDAGE was taken on Tuesday, October 23, 2012,

19    at 11:26 a.m., at the law offices of Morgan,

20    Lewis LLP, 1111 Pennsylvania, Ave., N.W., before

21    CHERYL NICHOLSON, Court Reporter and Notary

22    Public in and for the District of Columbia.

23

24

25
```

24

 1   and were successful.  And the judge determined

 2   that the APA did not follow his order

 3   expeditiously enough.  And as a result, found

 4   the APA in contempt of court and issued a very

 5   large fine -- very large judgment against the

 6   APA, $45 million.

 7          And that was still unresolved.  That

 8   judgment still remained at the point in time we

 9   began with the TWA acquisition.

10     Q.   What implications did this job

11   acquisition have for American Airlines?

12     A.   It significantly hurt our economic

13   performance, our quarterly results.  It had very

14   significant customer satisfaction implications.

15          We canceled many flights and delayed

16   many passengers during the tenure of that work

17   stoppage.

18     Q.   What was the magnitude of the

19   financial impact of this job action for American

20   Airlines results in that quarter?

21     A.   Well, I'm going to give my best

22   recollection, but it's been a long time.  I

23   think it was in the $100- to $200 million range.

24     Q.   Whose idea was it to require TWA to

25   removal of the scope and successorship

25

1  provisions from the collective bargaining

2  agreements as a precondition for this asset

3  acquisition?

4      A.   Well, based on the information that my

5  team provided to the executive committee, in

6  consultation with the executive committee there

7  was a decision made by the executive committee

8  based on our advise, that that was the way to

9  avoid any Reno like issues.

10     Q.   Where did that idea of having the

11 scope and successorship provisions originate?

12     A.   I was certainly directly involved in

13 that and led the team.  But it was a work

14 product of the team, but it was my

15 recommendation.

16     Q.   Do you have an understanding of what

17 APA's position was on the prospect of

18 arbitrating seniority integration?

19     A.   They had made it very clear to us in

20 all of our discussions that there was no

21 circumstance under which they would entertain

22 the idea of an arbitration.

23     Q.   Who from the APA made that clear to

24 you?

25     A.   Captain Darrah and Captain White would

26

1   have been the primary two contacts that we would

2   have dealt with during that period of time.  But

3   their board of directors, the entire Association

4   was solidly behind that position.

5       Q.   And was this position communicated

6   directly to you?

7       A.   Yes, it was.

8       Q.   During what time period?

9       A.   As soon as American briefed the Allied

10  Pilots Association that we were considering the

11  acquisition of TWA assets.

12      Q.   Had American Airlines proposed

13  arbitration of seniority integration to the APA?

14      A.   Initially we did not.  We made it

15  clear that we believed that the issue of

16  resolving the seniority list was one that should

17  occur between the two pilot groups.

18          And we made -- let me rephrase it.  I

19  think we were willing -- we told them we were

20  willing to accept any reasonable seniority

21  integration methodology that the pilot groups

22  could agree to, so long as we had the

23  opportunity to ensure -- that that list that

24  they might create through that process didn't

25  have unknown economic consequences or

38

1   equitable seniority integration."

2          You see that?

3   A.   Yes, I do.

4   Q.   Is that something that American

5   Airlines did?

6   A.   Yes.

7   Q.   And how did American Airlines do that?

8   A.   Well, we worked with the APA and the

9   TWU and the APFA and used hired facilitation for

10  the unions, encouraged those unions to use those

11  facilitators and encouraged the TWA unions to

12  meet with the American unions so the dialogue

13  could take place about seniority.

14         And with our independent employees,

15  American worked through our normal channels to

16  come up with an integration methodology for

17  independent employees.

18  Q.   In the next sentence it says:  "Prior

19  to closing, TWA shall amend all existing

20  collective bargaining agreements relating to any

21  present or former employee of TWA to provide

22  that, one, scope, successorship and benefits,

23  provisions of the collective bargaining

24  agreements are not applicable to or being

25  assumed by purchaser as part of or as the result

39

1   of the transactions contemplated by this

2   agreement."

3           Do you see that language?

4   A.   Yes.

5   Q.   How did you envision that TWA would be

6   able to amend the collective bargaining

7   agreements to provide for the implacability of

8   the scope or successorship provisions?

9   A.   Well, we hoped that the TWA unions

10  were sufficiently apprised of the dire financial

11  straits that the company was in.  And would

12  recognize that liquidation was a likely outcome,

13  unless this agreement closed.

14          And as a result of that, would agree

15  to voluntarily make those changes to their

16  agreement.

17  Q.   Why did you think those changes to the

18  agreements would be preferable to the

19  alternatives for the TWA pilots?

20  A.   Because it was likely the only way

21  they would have a paycheck.

22  Q.   What did you think would happen if

23  they refused to waive the scope and

24  successorship provisions?

25  A.   The American transaction would not

40

1    have gone forward.

2         Q.   During the discussions with TWA

3    concerning the asset acquisition, did you

4    receive any complaints from the APA about

5    American Airlines' favorable treatment of the

6    TWA pilots?

7         A.   Very early on in the process Don Cardy

8    made representations, I believe through a

9    letter, that we would be moving the TWA pilots

10   to rates of pay in our green book on a date

11   specific in -- if I remember correctly, it was

12   January 1st of the next year.

13             And we had not sufficiently vetted

14   that with our own pilots union, so they were

15   taken by surprise and were unhappy about that

16   representation.

17        Q.   And how did they communicate their

18   displeasure about that commitment?

19        A.   Directly to us through all of our

20   normal communications channels.

21        Q.   And "directly to us," were those

22   sentiments communicated to you personally?

23        A.   To me personally and also Don Cardy

24   personally.

25        Q.   Who communicated those sentiments to

41

1  you?

2       A.   I would have heard from John Darrah

3  first.

4       Q.   Is there anything else that the APA

5  was upset about with respect to American's

6  treatment of the TWA pilots?

7       A.   Nothing comes to mind.

8       Q.   What role did American Airlines play

9  in the seniority integration -- withdrawn.

10           Did the TWA pilots eventually make a

11 decision about whether to waive the scope and

12 successorship provisions in their collective

13 bargaining agreement.

14      A.   They did.  They waived those

15 provisions prior to closing.

16      Q.   Okay.  Are you familiar with something

17 called a 1113 proceeding?

18      A.   Yes, sir.

19      Q.   And what's your understanding of that

20 proceeding?

21      A.   It's a process -- part of the

22 bankruptcy process which allows a judge to

23 abrogate a collective bargaining agreement if in

24 fact the judge believes it's necessary for the

25 successful restructuring of the company.

51

1    that we could cause that to happen, but we

2    clearly were willing to do that."

3            You see that testimony?

4    A.   Yes, sir.

5    Q.   Is that testimony true and accurate?

6    A.   Yes, sir.

7    Q.   Why did you have concerns about

8    whether you would be able to get American

9    Airlines unions to participate even in an

10   discussion with the TWA pilots?

11   A.   Because the American unions were

12   ardent that there would be no seniority

13   arbitration and that there respected agreements

14   could -- allowed them to control how those

15   employees would be added to the seniority list

16   for those -- for their individual unions.

17   Q.   Did there come a time when American

18   Airlines offered inducements to the unions in an

19   effort to bring them to the negotiating table?

20   A.   Yes.

21   Q.   What sort of inducements did American

22   Airlines offer?

23   A.   Well, we had made the representation

24   on compensation, on rates of pay, as you asked

25   me the question earlier.

52

1          We also knew that as the process

2     progressed, we went past September 11th, and

3     September 11th just materially changed the

4     entire landscape for American Airlines.

5          We had real concerns about our ability

6     just to continue to operate.  No idea what

7     passenger demand was going to look like.  No

8     idea what was going to happen to the industry.

9     And as a result, the TWA pilots were extremely

10    focused on a risk of a massive furlough.

11          And in a meeting that I attended, we

12    made representations to the TWA pilots that we

13    were willing to put some restrictions on our

14    ability to furlough so that we would have an

15    opportunity to see what was going to happen in

16    the industry.  To understand that passenger

17    demand was to return.  To understand what might

18    be next for the airline industry.

19          And so what essentially just gave them

20    some comfort that for some period of time we

21    wouldn't simply use 9/11, the horrific events of

22    9/11 to somehow eliminate the TWA pilot

23    employees.  We were focused on trying to make

24    the company successful.

25          Q.   So let me go back to a few things in

53

1    your answer.  You talked about representations

2    that were made about pay.  And were those the

3    representations that you discussed earlier about

4    TWA pilots getting the pay that was provided for

5    in the green book?

6         A.   It was the Don Cardy letter we

7    discussed earlier that came out right after the

8    transaction was announced.

9         Q.   And how did the pay of the TWA pilots

10   compare with the pay that was prescribed in the

11   American Airlines green book?

12        A.   I would describe it as significantly

13   lower.

14        Q.   Which was significantly lower?

15        A.   The TWA pilot pay rates were

16   significantly lower than the Allied Pilots

17   Association pay rate.

18        Q.   Are you able to quantify by how much

19   they were lower?

20        A.   I think on an aggregate basis it was

21   in the $10 million a month range.

22        Q.   Was the decision to bump the TWA

23   pilots up to the pay rates for American Airlines

24   pilots, was that intended in part, at least, as

25   an inducement to persuade the TWA pilots to

54

1   negotiate a seniority integration list with

2   American Airlines -- with the American Airlines

3   pilots?

4       A.   It was clearly an inducement to the

5   pilots so that they would understand what their

6   futures would look like if in fact they waived

7   scope and successorship and the transaction

8   closed.  They could see that in some reasonable

9   period of time they would receive pretty

10  significant pay increases.

11      Q.   You mentioned that September 11th

12  completely changed the landscape for American

13  Airlines.  In what way did it change the

14  landscape?

15      A.   Well, we had been hiring pilots like

16  crazy well prior to the TWA transaction.  As I

17  mentioned earlier, one of the reasons to require

18  TWA's assets was because of the company's

19  concern to have adequate scale to be able to

20  compete in the industry.

21           It was expected that mergers were

22  going to occur and, of course, the united U.S.

23  Air merger was announced.  And one of the ways

24  to grow the company is to do it internally, to

25  buy more airplanes and add more people, and add

55

1   more ASNs.

2           So the company was very focused on

3   growth, very focused on being scaled

4   competitive.

5           After 9/11 there was a real question

6   as to whether we would even be able to operate

7   the entire airline that we had at that time.  So

8   we knew that there was a very significant risk

9   of substantial downsizing.

10          It was happening so quickly there was

11  no way to really know what that was going to

12  look like.  But clearly the company was going to

13  have to get smaller, we were going to have to

14  cut costs, we were going to have to do the

15  180 degrees out of sync of what we were planning

16  to -- in 2001 when we were thinking about the

17  TWA acquisition and growing scale.

18      Q.   So you said American Airlines was

19  hiring pilots like crazy.  During what period of

20  time was that hiring going on?

21      A.   Well, from the time -- I can't speak

22  to prior to me coming to the company, but right

23  through into the 2001 period American was hiring

24  pilots.  We were running classes every month.

25      Q.   When did that change?  When did

56

1    American Airlines go from hiring pilots like

2    crazy to something else?

3        A.   Well, the TWA acquisition changed the

4    perspective, because we now were going to get

5    this scale, get these airplanes and get these

6    pilots.  So when that closed we then would have

7    had TWA folks to be able to build scale.

8            But then after September 11th, you

9    know, the entire TWA acquisition was taken into

10   question in the industry.  At the time that it

11   was done it was hailed as a brilliant move.

12           It had become a real concern after

13   September 11th.  And there was no thought of

14   doing any more hiring, it was about having to

15   shed -- to downsize.

16       Q.   At the time that the asset acquisition

17   with TWA closed, did American have any plans to

18   furlough pilots at that time?

19       A.   No.

20       Q.   And is that something you would have

21   been aware of --

22       A.   Yes.

23       Q.   -- had those plans existed?

24       A.   Yes.

25       Q.   Why is that?

69

1          So this gave them assurances that we,

2     in fact, were going to do our very best to try

3     to make the company as successful as possible.

4          Q.   Beyond the provisions that are

5     reflected here, was American Airlines willing to

6     offer anything else to the TWA pilots in order

7     to encourage them to agree to a integrated

8     seniority list?

9          A.   No.  We made all of the offers we were

10    willing to make during that round of meetings at

11    the Mayflower.

12         Q.   And if -- can you envision any

13    circumstance in which American Airlines would

14    have been prepared to offer more than is

15    reflected on this list to the TWA pilots?

16         A.   I cannot.

17         Q.   Did you have discussions internally

18    about what American Airlines would be prepared

19    to offer to the TWA pilots?

20         A.   We -- internally we believed we

21    stretched to get to the offers that we made

22    during this meeting we represented on this piece

23    of paper.

24         Q.   Were you a party to discussions within

25    American Airlines about whether American

70

```
 1   Airlines should offer more than the items
 2   reflected on this list to the TWA pilots?
 3        A.   The majority of the discussion was
 4   that we had offered too much.
 5        Q.   If ALPA had pursued an AFL/CIO boycott
 6   of American Airlines, would American Airlines
 7   have been willing to offer more than is
 8   reflected on this list?
 9             MR. PRESS:  Just show my objection to
10   the form of question.
11             THE WITNESS:  I don't believe for a
12   moment we would have.
13   BY MR. TOAL:
14        Q.   And what's the basis for your belief?
15        A.   We were in a position where we could
16   not put the entire enterprise at risk based on
17   the circumstances following 9/11 and the
18   situation with the TWA acquisition.
19             So we were focused on making sure we
20   had a company in 2003 and 2004.
21        Q.   If ALPA had commenced a jump seat war
22   against American and it's pilots, would that
23   have persuaded American Airlines to offer more
24   to the TWA pilots than is reflected on this
25   list?
```

71

```
 1       A.   No.

 2            MR. PRESS:  Again, show my objection

 3   to the form of the question.  And I don't even

 4   know what a jump seat war against American

 5   means.

 6            But subject to that, you can answer.

 7            THE WITNESS:  No.

 8   BY MR. TOAL:

 9       Q.   Do you know what a jump seat war is?

10       A.   Yes, I do.

11       Q.   What's a jump seat war?

12       A.   Typically, pilots use the jump seat in

13   the cockpit to be able to commute to work and

14   travel.  And it's reciprocal among airlines.

15   And if a pilot group chose to, they could decide

16   not to allow pilots from a specific carrier

17   access to their jump seat.

18       Q.   Why is it that you say that if ALPA

19   had commenced a jump seat war that it wouldn't

20   have persuaded American Airlines to offer more

21   than is reflected on this list to TWA pilots?

22       A.   Well, I can't imagine it would have

23   had any practical impact, other than to have

24   convinced us that the TWA pilots were very

25   confused about their futures and what was about
```

72

1    to happen to them.

2         Q.   If ALPA had pursued litigation to try

3    to and enjoin implementation of an integrated

4    seniority list between the APA and American

5    Airlines, would that have persuaded American

6    Airlines to offer the TWA pilots more than is

7    reflected on this list?

8              MR. PRESS:  Again, show my objection

9    to the form of the question.

10             THE WITNESS:  No.

11   BY MR. TOAL:

12        Q.   Why do you say that?

13        A.   Well, first, I don't have a law

14   degree.  So I want to be clear from a layman's

15   perspective, based on my experience in the

16   industry, based on having been involved in

17   numerous seniority integrations over the course

18   of my career, both as a participant in the

19   integration and as a person advising the

20   integrations, I could see absolutely no

21   circumstance where there was any realistic

22   litigation after these pilots had, of their own

23   volition, fully aware of the circumstances of

24   waiving those provisions of the scope clause to

25   assume that they were going to somehow magically

73

1    recover what they had bargained away.  Which at

2    the time they believed was the right thing to do

3    to preserve their employment.

4        Q.   Do you recall any discussion within

5    American where anyone at American proposed

6    offering the TWA pilots more than is reflected

7    on this list?

8        A.   I do not.

9        Q.   Did you become aware at a certain

10   point of lobbying efforts on behalf of TWA

11   pilots to try and get legislation to affect

12   seniority integration?

13       A.   Yes.

14       Q.   What did you come to learn?

15       A.   Senator Bond had proposed an amendment

16   which would have applied exclusively to the TWA

17   acquisition by American that would result in

18   binding seniority arbitration.

19            And American was absolutely opposed to

20   that amendment.  Our CEO Don Cardy spoke

21   directly with Senator Kit Bond about that

22   amendment.  We made it clear that it violated

23   the commitments we had made to our own employees

24   regarding seniority integration.

25            And worked -- our team worked on the

76

```
 1    meant looking at the transaction itself, the
 2    viability of the transaction itself.
 3         Q.   Did you have a discussion within
 4    American Airlines about what ways out would be
 5    available in the event that the Bond legislation
 6    passed?
 7         A.   I don't think we got into that level
 8    of detail because we never -- it never appeared
 9    that the legislation was, in fact, going to
10    become law.
11         Q.   Why was it that it didn't appear this
12    legislation would be passed into law?
13         A.   We have numerous -- you know, three,
14    four, five folks who work in our Government
15    Affairs Office in Washington who spend their
16    time communicating and talking with folks up on
17    the hill, staffers on the hill and you tend to
18    get a sense as to what legislation might go and
19    what legislation may not.
20         Q.   Were those people advising American
21    Airlines on the likelihood of this legislation
22    passing into law?
23         A.   Yes.
24         Q.   What were they telling you?
25         A.   They didn't see it as being enacted.
```

77

1      Q.   Who were the individuals on

2      Senator Bond's staff with whom you were

3      communicating?

4           A.   I think I can only remember a first

5      name, and I believe it was Trevor, but that may

6      be completely incorrect.

7           Q.   Okay.  Do you know the names of the

8      individuals in the Government Affairs group for

9      American Airlines from whom you were receiving

10     feedback about the Bond legislation?

11          A.   Two primarily.  Will Ris, who is the

12     senior vice president of Government Affairs and

13     Norma Kayler, who is the managing director of

14     Government Affairs for American.

15          Q.   Did the Bond legislation make American

16     Airlines willing to offer more to the TWA pilots

17     than is reflected on the list that we looked at

18     previously?

19          A.   No, it did not.

20          Q.   If ALPA had lobbied more aggressively

21     upon behalf of the Bond legislation, would that

22     have persuaded American Airlines to offer the

23     TWA pilots more than is reflected on that list?

24          MR. PRESS:  Just show my objection to

25     the form of the question.

78

1          THE WITNESS:  No, it would not have.

2     BY MR. TOAL:

3          Q.   Why do you say that?

4          A.   Based on my discussions with our

5     senior leadership team and my understanding of

6     American's view of how we were going to proceed,

7     we were not in a position to go any further.

8               And I think we clearly demonstrated

9     that by withdrawing from the discussions in

10    Washington and making an agreement with the APA

11    directly without the participation of the TWA

12    pilots.

13         Q.   And when did American Airlines reach

14    an agreement with the APA concerning its

15    seniority integration list?

16         A.   Shortly after that October meeting.

17         Q.   What was the structure of that

18    integrated seniority list?

19         A.   It had certain pilots who were

20    dovetailed into the list.  And then it had the

21    pilots appended to the list.

22         Q.   Was there a -- something known as a

23    protective fence that was an aspect of that

24    list?

25         A.   Yes.  Obviously, when you put two

79

1   carriers together until you've combined the

2   certificates you have to operate the carriers

3   independently on their respective certificate.

4          And it's common to put up a hard fence

5   between the two carriers.  And it simply means

6   that all of the TWA work and flying will be done

7   on that certificate by those pilots, and all of

8   the flying on the American certificate will be

9   done by the APA represented by what's on that

10  certificate.

11     Q.   What was the nature of the fence that

12  was implemented as part of the seniority

13  integration list that American and the APA

14  agreed to?

15     A.   We agreed to a hard fence initially

16  until the carriers were integrated onto a single

17  certificate.  And then we provided the

18  protections we talked about in St. Louis known

19  as Supplement CC.

20     Q.   Do you remember a proposed meeting

21  between American, the APA and the TWA pilots

22  that was scheduled for Columbus Day weekend?

23     A.   Yes.

24     Q.   And is that a meeting that you

25  proposed?

# Exhibit 20

```
              UNITED STATES DISTRICT COURT
                      FOR THE
              NORTHERN DISTRICT OF TEXAS

PATRICK BRADY, et al,          )
      Plaintiff                )
                               ) Civil Action No.
      V.                       )    02-2917 (JEI) (DNJ)
                               )
AIR LINE PILOTS ASSOCIATION,   )
INTERNATIONAL,                 )
      Defendant                )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEO DEPOSITION OF JOHN DARRAH

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ANSWERS AND DEPOSITION OF JOHN DARRAH, produced as

a witness at the instance of the Defendants, taken in

the above-styled and -numbered cause on the 29th day of

November, 2012, A.D., beginning at 10:01 a.m., before

Brandy Cooper, a Certified Shorthand Reporter in and for

the State of Texas, in the offices of McKool Smith,

located at 300 Crescent Court, Suite 1500, Dallas,

Texas, in accordance with the Federal Rules of Civil

Procedure and the agreement hereinafter set forth.

Page 21

1    the time, in management.

2        Q.    And is this a -- this is a document you

3    received as a pilot at the time?

4        A.    Yes.  It came out to the entire membership.

5        Q.    In the first bullet point on the first page, it

6    says, American will buy substantially all the assets of

7    TWA, which has filed for Chapter 11 bankruptcy

8    protection.

9             Do you see that?

10       A.    Yes, sir.

11       Q.    Is that consistent with the information that

12   you received at the time?

13       A.    I'd have to look at the timing of this.  It was

14   our understanding -- I guess the word "substantially"

15   would be correct.  Not all the assets.  So yes.

16       Q.    Okay.  On the second page of this document, the

17   fourth paragraph down says, Of course, there are a lot

18   of integration issues that we will need to iron out with

19   the APA and some seniority issues with respect to the

20   unions we'll need to resolve, but in doing so, I hope we

21   keep in mind that these deals are a big win for our

22   pilots, as I'm sure you will conclude for yourself as

23   you get more familiar with the details.

24             Do you see that language?

25       A.    Yes, sir.

1    Q.   So did the APA conclude that the TWA deal was a

2  big win for the American pilots?

3    A.   Say that again, please.

4    Q.   Did the APA conclude that the TWA transaction

5  was a big win for the American pilots?

6              MR. JACOBSON:  I'm going to object to the

7  form of the question.  I think when you refer to the

8  APA, it's too amorphous.  Are you asking for, was there

9  some sort of policy decision or a -- was there a person

10  or particular body beneath there?  It's just too

11  general.

12              MR. TOAL:  Okay.  You can just object to

13  the form of the question.

14    Q.   (BY MR. TOAL)  You can answer if you understand

15  the question.

16    A.   I would say that the particular pilots,

17  individual pilots, I would say no to that question.

18    Q.   And did the APA have a view about whether this

19  proposed transaction was going to be a big win for

20  American pilots overall?

21    A.   I don't -- stated that way, APA did not have a

22  policy of whether it would be a win or a lose, no.

23    Q.   Okay.

24    A.   It was not a policy.

25    Q.   Okay.  It also references, further down in this

1   letter, to the Reno experience.  Do you have an

2   understanding of what the Reno experience was?

3        A.   Yes, sir.  I was on the negotiating committee

4   at the time of the Reno merger.

5        Q.   And what was the -- what was the Reno

6   experience?

7        A.   American Airlines purchased Reno Air.  It was,

8   timewise, I want to say '97 in December.  And we

9   actually found this out through one of our scope

10  committee members finding documents around the Christmas

11  timeframe, if I recall.  And we weren't even notified

12  that it was going on.  So that's how the relationship

13  started with that, so it wasn't very good with the

14  management.

15            And when we approached management about

16  it, there was a lot of pushback, there was a lot of

17  concern on the APA side that they were going to try to

18  do a stand-alone company, and eventually we had to

19  stick out and evolve from all that and other types of

20  things.

21       Q.   So in the paragraph that's discussing the Reno

22  experience, Mr. --

23       A.   Second-to-the-last paragraph, is it?

24       Q.   Yeah, that's right.

25       A.   Yes.

1      Q.    Toward the end of that, Mr. Kudwa says, It has

2    been a home run -- talking about the Reno experience --

3    a home run for our customers.  Our shareholders have

4    seen big benefits, and it has been a big win for our

5    pilots.

6              Was the APA of the view that the Reno

7    acquisition was a big win for the American pilots?

8      A.    January 10th, 2001.  I'd have to go back and

9    look at the timing of all this, but I would say that

10   would be a mischaracterization of it as a big win.  At

11   one point, we had brought on Reno, I think they had four

12   bases; Las Vegas, San Jose, Seattle, and I'm missing one

13   other.  And we had begun to close those down.  And we

14   eventually closed down the San Jose hub.

15             So I would say the answer to that would be

16   no, it wasn't considered a big win.

17             The context of this integration was much

18   different than we had done previous integrations.  This

19   gets into the historical perspective of integrations in

20   American Airlines, which I think it ultimately relates

21   to this integration is, if you go back now and look at

22   the history of integrations in American Airlines

23   starting with TCA back in the '70s, which was the

24   Caribbean, we've recently given all that up, Reno,

25   AirCal was next.  We gave up all the AirCal flying, and

1    then Reno Air, we ultimately gave up all the Reno Air

2    flying.

3                So I think in the context of that, the

4    pilots looked at this integration and said, look, every

5    time we do an integration with somebody, we end up with

6    nothing.

7                And on this integration, I think we

8    ultimately ended up having those pilots at the bottom of

9    the seniority list, for a multitude of reasons I could

10   get into, but I don't know if it's particular to this.

11               But as far as a severe win for the pilots

12   at American Airlines, once again, I -- I don't think the

13   pilots would have seen it like that.

14   Q.   And when you say you, in these acquisitions,

15   you -- American Airlines eventually gave up the flying,

16   do you mean they -- they gave up the aircraft, but they

17   had the pilots?

18   A.   Ultimately, I can't account for each particular

19   aircraft.  Whether you had aircraft, it's more of the

20   routes.  And when we purchased AirCal, they're a west

21   coast airline, and we eventually abandoned all of that.

22   That was actually in 1987.

23               And then when we purchased Reno Air in

24   '97, they had a San Jose hub where we did up and down

25   the coast flying, which I did for a number of years, but

1    that's all been abandoned again.

2              And then you look at TCA, which was the

3    Caribbean flying, and that was a great focus of ours for

4    many, many years, and recently JetBlue's taken over much

5    of that in their San Juan hub.

6              So part of the problem was the timing with

7    the TWA merger with this and the mindset of the APA or

8    American Airlines pilots was, every time we do a merger,

9    to date, we ultimately end up with nothing but pilots on

10   the seniority list.

11   Q.   At -- at some point, did the APA begin to have

12   discussions with representatives of TWA MEC?

13   A.   Yes.

14   Q.   Approximately when did that happen?

15   A.   The first face-to-face meetings I want to say

16   were in the February timeframe.  I'd have to go back and

17   look at that.  We flew up to St. Louis and met with

18   them, I believe, at the Holiday Inn there, and went out

19   to dinner and had a nice steak dinner at the local steak

20   house and had the introductory meeting with the pilot

21   groups.

22              (Exhibit No. 4 was marked.)

23   Q.   (BY MR. TOAL)  Let me show you a document that

24   I'll mark as Darrah Exhibit 4, which is a letter dated

25   February 15th, 2001, from Captain Leroy Bensel to

1    Captain Ed White.  And if you could let me know if this

2    is a letter that you saw at or around February 2001,

3    please.

4         A.   Yes.

5         Q.   Okay.  So the paragraph at the bottom of the

6    first page, second sentence, he says -- well, let me

7    start with the first sentence.  It says, The involvement

8    of counsel does not mean that we are contemplating legal

9    action of the sort initiated by the former Reno pilots.

10   You and Captain Darrah were kind enough to describe the

11   differences between this transaction and the Reno

12   acquisition that dictate a different approach to the

13   integrations of TWA pilots into the AA pilot system

14   seniority list.

15                  Do you see that language?

16        A.   Yes, sir.

17        Q.   Do you remember the discussion that you had

18   with Captain Bensel concerning the differences between

19   this transaction and the Reno transaction?

20        A.   Vague memories of it.  I would say the

21   characterization of each merger's going to be different.

22   I mean, if you go back and look at the history of every

23   airline merger it's that way.  Take, for example, the

24   United and Continental going on right now with ALPA, and

25   you've got the USAPA merger agreement.  You got

1   Southwest and Muse Air.  You've got Reno and American

2   Airlines.

3                  And I think what we did at this meeting

4   with Captain Bensel and the others on the merger

5   committee was lay out that every merger we do, we're

6   going to look at differently.  And though the Reno

7   merger ended up with their pilots at the bottom of the

8   seniority list, it's a much different merger than a TWA

9   merger because of the carriers.

10                  For example, Reno Airlines was

11  established, I believe, in about 1993 timeframe.  They

12  were only around about four years or so.  Their work

13  rules and conditions were significantly below ours.  The

14  largest aircraft they had was the MD-80.  You

15  characterize that with the TWA operation, which had 767s

16  at the time as their largest aircraft.  They had some

17  international routes.  And they had pilots on the

18  seniority list for 35 years.

19                  I think what we acknowledged at that

20  meeting is not every merger is the same.  Every one's

21  got to be looked at in its separate type of

22  classification on how that would be handled, and that's

23  what we were trying to imply.

24                  (Exhibit No. 5 was marked.)

25      Q.   (BY MR. TOAL)  Let me show you a document that

1  A plan is not market risk, which is a much richer plan.

2  That was the pension piece.

3           Quality of life, our quality of life was

4  one of the best contracts out there at the time.  We had

5  a 78-hour hard limit, which we had just until we were

6  abrogated a couple of months ago, where I believe TWA

7  could fly their pilots to FARs, which means more days on

8  the road.  So a typical pilot, a bid sheet at American

9  Airlines, you can only work 15 days a month.  For TWA it

10  was a lot more than that.  Quality of life was a lot

11  better.

12           Then you looked at our scope protections

13  and our protection in our scope agreement, we were much

14  tighter, which basically had job protections in them.

15  And on the benefits, I think our benefits overall were

16  probably a little bit better, but I couldn't speak to

17  those.

18     Q.   And did APA's views about job security at the

19  two airlines factor into its views on what an

20  appropriate seniority integration was here?

21     A.    Security in a broader context of expectations

22  or, you know, what we saw.  If you looked at -- you took

23  TWA in isolation and said, all right, a pilot over

24  there, what was their future?  It was much different

25  than a pilot would look at his future at American

Page 44

1   Airlines, in stand-alone units, in many respects.

2                   The financial condition of the airline,

3   the future growth opportunities, the aircraft on order,

4   you just look at the time.  We were exploding in the

5   airline industry.  We were hiring 100 pilots a month at

6   American Airlines.  We had never seen that before.

7   Contracting out our training, etc.  And at that point in

8   time, you know, the expectations of upgrades were just

9   like we've never seen before.

10                  So when you contrasted that, what was

11  going on on the American Airlines property to what was

12  going on on the TWA property, I believe they were

13  hiring, but it was essentially more for attrition than

14  growth, if you will, then you just look at the

15  condition.  We looked at all of that and took it into

16  account.

17                  (Exhibit No. 9 was marked.)

18      Q.   (BY MR. TOAL)  I'm going to show you a document

19  that I will mark as Darrah Exhibit 9, which is a

20  March 6th, 2001 letter from Roland Wilder to Wesley

21  Kennedy.  If you'll let me know if this is a document

22  that you saw at or around the time it was sent.

23      A.   Wilder to Kennedy.  Yes.

24      Q.   Okay.  So this is a -- it's a draft memorandum

25  of agreement.  Do you see that?

1     A.   Yes, sir.

2     Q.   And do you know who Roland Wilder is?

3     A.   I believe he was the legal representation for

4  the ALPA group at the time for seniority issues.

5     Q.   Okay.  And who is Wesley Kennedy?

6     A.   He was our representative for APA for seniority

7  integration issues.

8     Q.   Okay.  Do you see in the third paragraph of

9  this proposed memorandum of agreement, Mr. Wilder is

10  proposing binding arbitration if there's no agreement

11  reached after 30 days of mediation concerning seniority

12  integration?

13     A.   Yes, sir.

14     Q.   Was the APA amenable to binding arbitration in

15  the event that -- that the APA and the TWA MEC were

16  unable to reach an agreement on seniority integration?

17     A.   No, sir, absolutely not.

18     Q.   Why not?

19     A.   They would never agree to arbitration on the

20  seniority list.

21     Q.   The APA would never?

22     A.   Nope.

23     Q.   Why?

24     A.   Because we own the seniority list --

25               THE REPORTER:  I can't hear.

1          THE WITNESS:  Because we own the seniority

2    list according to our contract.

3        Q.   (BY MR. TOAL)  What do you mean by that, that

4    you own the seniority list?

5        A.   The contract is ours by definition, the

6    seniority list by definition of our Green Book, and that

7    was even acknowledged by Mr. Carty.  In a meeting with

8    Mr. Carty, we had discussions on that, and his statement

9    was the seniority list integration is your

10   responsibility, you own it.  And American Airlines

11   acknowledged that.

12       Q.   Can you conceive of anything that ALPA could

13   have done to persuade the APA to agree to binding

14   arbitration of the seniority integration?

15          MR. JACOBSON:  I'm going to object to the

16   form of the question.  It calls for speculation.  It

17   leaves out facts that may be material --

18          MR. TOAL:  You can just object to the form

19   of the question instead of a speaking objection.

20          MR. JACOBSON:  I can -- I can make my full

21   objection because my objection good.  It seeks an

22   opinion without providing all the material facts that

23   are required for opinion from a witness who is not an

24   expert.  And it calls for speculation.

25       Q.   (BY MR. TOAL)  You can answer the question.

Page 47

1       A.    Okay.

2       Q.    Do you want it read back?

3       A.    Please.

4             MR. TOAL:  Can you read back the question?

5             (Requested Portion was Read.)

6       Q.    (BY MR. TOAL)  To agree to binding arbitration

7    of the seniority integration process?

8       A.    No, I cannot.

9             (Exhibit No. 10 was marked.)

10      Q.    (BY MR. TOAL)  Let me show you a document that

11   I will mark as Darrah Exhibit 10.  It's a March 13th,

12   2001 letter from Wesley Kennedy to Roland Wilder, and

13   it's copied to you, among others.

14      A.    What was the date on the previous -- so this

15   isn't in chronological order, correct?

16      Q.    That's right.  So the previous memorandum of

17   agreement we looked at was dated March 6th, 2001.

18      A.    6th.  Okay.

19      Q.    So this is a week later.

20            Is this a document you received at or

21   around the time it was sent?

22      A.    Yes, sir.

23      Q.    Is this a document that you reviewed before it

24   was sent out?

25      A.    Yes, sir.

1    Q.    And do you -- did you approve its contents?

2    A.    Yes, sir.

3    Q.    And what was the purpose of this letter?

4    A.    The purpose of the letter was to respond to

5    Mr. Wilder's letter of the date of March 6th, I believe,

6    you just quoted.

7    Q.    And did this letter accurately state the APA's

8    view regarding whether they agreed to binding

9    arbitration of seniority arbi- -- seniority integration?

10    A.    Yes, sir.

11    Q.    If ALPA had threatened a lawsuit to seek an

12    injunction of the TWA acquisition, would that -- would

13    that have made the APA more receptive to binding

14    arbitration of seniority integration?

15                MR. JACOBSON:  I have an objection to the

16    form of the question.  It calls for speculation.  It

17    seeks an opinion from a person who's not a designated

18    witness without providing him with all of the facts and

19    material for such an opinion.

20    Q.    (BY MR. TOAL)  You can answer the question.

21    A.    Yeah.  There was nothing that would have been

22    done by anybody that would have had APA agree to binding

23    arbitration.  There is no way the politics at APA would

24    have gone for that.

25    Q.    What if ALPA had threatened a jump seat war

Page 49

1    against the American Airlines pilots?

2              MR. JACOBSON:  I'd like to make the same

3    objection to the speculative nature of the question.

4        Q.   (BY MR. TOAL)  You can answer.

5        A.   No.  If -- if anything like that would have

6    occurred, I think it would have had just the opposite

7    effect.

8        Q.   And why -- why do you say that?

9        A.   You have to understand, as you obviously do,

10   working with ALPA, the politics of the unions,

11   especially pilots.  In any integration, either side,

12   there's huge debate within the boardroom and there's,

13   obviously, always a group that wants to take a hard line

14   position.  And there's still a group in our APA board of

15   directors that wanted to, you know, quote, staple the

16   entire TWA list to the bottom of the seniority list.

17   And it takes a lot of persuasion for people to

18   understand that we can't something like that, that we've

19   got to go do the fair and equitable route.

20              Doing something like that would have just

21   pushed more and more people into that camp, and I think

22   it would have had a disastrous effect on this.  I didn't

23   hear about this until way after the fact.  I didn't hear

24   about it during the timeframe.  It would not have helped

25   at all.  It would have made the situation much worse.

1    Q.    So on the second page of this letter from

2    Mr. Kennedy, at the bottom, he says, We hope that the

3    TWA committee will turn its attention to responding

4    to APA's March 1st proposal and understand the

5    conditions under which APA is willing to modify the

6    requirements of its contract to integrate the seniority

7    lists under American's superior wages and working

8    conditions, including the protection of the TWA pilots'

9    career path and career expectations.

10              Do you see that?

11   A.    Yes, sir.

12   Q.    And at this point, March 13th, 2001, what were

13   the conditions under which APA would have been willing

14   to modify the requirements of its contract?

15   A.    I believe at that point there had been

16   discussions back and forth that there were seniority

17   list integration proposals on the table.  And I have to

18   go look at particular time, because between the time of

19   the announcement and the first meetings, and obviously,

20   October/November timeframe when we finally concluded the

21   agreement, there had been a lot of changes in documents.

22   So I'd have to go look at that particular date and time.

23   Q.    Okay.  But whatever -- whatever conditions the

24   APA would have been willing to modify at this time would

25   have been reflected in the proposals that were being

1    called APA with questions regarding the recent mailing

2    of ALPA representational cards by a former candidate for

3    national office.  Your APA leadership reminds you that

4    this effort is not sanctioned by the APA, ALPA or the

5    NMB.

6              Do you see that?

7    A.   Yes, sir.

8    Q.   How did the APA know that this effort to send

9    out represen- -- representational cards was not

10   sanctioned by ALPA?

11             MR. JACOBSON:  I'm going to object, calls

12   for speculation.

13   Q.   (BY MR. TOAL)  You can answer.

14   A.   Yeah, we were told so.  You know, there was a

15   group of pilots at that time that wanted to push to go

16   to ALPA National.  And when we got this, we, obviously,

17   made phone calls to ALPA National to see if they were

18   behind this, and they said they were not.  Obviously, I

19   think they would like to have seen APA go to ALPA

20   ultimately, but I was assured by Duane Woerth and others

21   that this was not being sanctioned or run by ALPA

22   National.

23   Q.   And who -- who's the former candidate running

24   for national office within the APA who's sending

25   out these cards?

1      A.    I believe that was Captain Mark Hunnibell.

2                THE REPORTER:  What was the name, please?

3                THE WITNESS:  Yeah, sorry.  Captain Mark

4      Hunnibell, H-U-N-N-I-B-E-L-L.

5      Q.    (BY MR. TOAL)  Did the APA view this

6      representational program as likely to succeed?

7      A.    We didn't know.

8      Q.    Are you saying you did not or you didn't know

9      one way or the other?

10     A.    Didn't know one way or the other.  You never

11     know in politics.

12     Q.    Did you ever learn how many cards this

13     candidate got signed?

14     A.    I did at the time.  I can't recall.

15     Q.    What's your recollection of the number of

16     cards?

17     A.    There was a significant amount, but I couldn't

18     even tell you what it was.

19                (Exhibit No. 21 was marked.)

20     Q.    (BY MR. TOAL)  I'm going to show you a document

21     that I'm marking as Darrah Exhibit 21, which is

22     entitled, ALPA Rightful Place Proposal to APA, June 14,

23     2001.  If you'll let me know if that's a document that

24     you've seen before -- well, if you could let me know if

25     that's a document you saw on or around June 14, 2001,

1   please.

2       A.   Yes, sir.

3       Q.   And what did you understand this document to

4   be?

5       A.   A document from TWA mergers and acquisition

6   committee on the integration proposal.

7       Q.   Did you review this proposal at the time?

8       A.   Yes.

9       Q.   What was your reaction to it?

10      A.   I think the same as every other pilot in

11  American, it was unrealistic.

12      Q.   Why did you think it was unrealistic?

13      A.   Because it went way and above and beyond fair

14  and equitable and what we would classify as what their

15  legitimate career expectations were.

16      Q.   And in what way did it do that?

17      A.   I'd have to review the document, but from my

18  recollection, it put their pilots in a position to gain

19  windfalls beyond what we talked about earlier, not just

20  in our contract, but in our seat positions in the

21  future.

22      Q.   The -- in the first paragraph of this proposal,

23  under General Approach --

24      A.   First --

25      Q.   If you flip one page back, so this is an ALPA

```
 1   23664.

 2        A.    Okay.

 3        Q.    It says, The Rightful Place Proposal is based

 4   on an economic approach that qualifies the career

 5   expectations --

 6                    MR. JACOBSON:  Quantifies.

 7                    MR. TOAL:  I'm sorry?

 8                    MR. JACOBSON:  Quantifies.

 9                    MR. TOAL:  Sorry.

10        Q.    (BY MR. TOAL)  The Rightful Place Proposal is

11   based on an economic approach that quantifies the career

12   expectations and bidding rights of individual airline

13   pilots of separate airlines and integrates them

14   according to those career expectations and rights.

15                    Do you see that?

16        A.    Yes, sir.

17        Q.    Did APA have an issue with this general

18   approach that's described here?

19        A.    As they defined it, yes.

20        Q.    As defined in the rest of the proposal, you had

21   an issue with it?

22        A.    Yes.  My point being is approach that

23   quantifies the career expectations, I don't think that

24   we were beyond that.  But once you defined what their

25   career expectations were, it was not a legitimate, as --
```

1      Q.    And that was commentary concerning -- was --

2    was that commentary concerning ALPA's Rightful Place

3    Proposal?

4      A.    That, and the fact that following that, we

5    agreed to use a facilitator for the mediation of our

6    seniority list.

7      Q.    And how would you characterize the flood of

8    commentary that you received?

9      A.    Very negative.

10     Q.    The bottom of the second paragraph, it says,

11   Our detailed review of your proposal -- meaning the

12   TWA MEC's proposal -- convinces us that is neither fair

13   nor rightful and does injury to the American Airlines

14   pilots.

15                Do you see that?

16     A.    Yes, sir.

17     Q.    Was that an accurate reflection of the APA's

18   view at the time?

19     A.    Yes, sir.

20     Q.    The first bullet point says, The proposal fails

21   to take into account any of the radical differences

22   between our group's pretransaction career expectations,

23   differences based on the nature of the carrier's

24   pretransaction operations, pretransaction pay, benefits

25   and working conditions, and pretransaction long-term job

1    security based on the carrier's financial condition.

2              Do you see that?

3    A.   Yes, sir.

4    Q.   Is that an accurate reflection of the APA's

5    view at the time?

6    A.   Yes, sir.

7    Q.   Flipping over to the next page, the first

8    bullet point there says, The proposal -- referring to

9    the Rightful Place Proposal -- creates enormous

10   windfalls for the TWA pilots at the expense of the

11   American Airlines pilots career expectations in many

12   respects.

13             Do you see that language?

14   A.   Yes, sir.

15   Q.   Is that an accurate reflection of the APA's

16   view at the time?

17   A.   Yes, sir.

18   Q.   And was the APA prepared to agree to a

19   seniority integration that created windfalls for the TWA

20   pilot at the expense of the American Airlines pilots?

21   A.   No.  In the respect of we would not agree to a

22   seniority integration that provided windfall for the TWA

23   pilots over the AA pilots that wasn't fair and equitable

24   to both groups.

25   Q.   So at the bottom of this second page of the

1    document, the second sentence there, it says, This is

2    not a merger with a complete air carrier, nor is it a

3    transaction between equals.  It is a purchase by one of

4    the largest and most financially stable global airlines

5    of most, but not all the assets of a much smaller,

6    largely regional carrier, which was within hours of

7    going out of business.

8              Do you see that language?

9         A.   Where are you?

10        Q.   So that is the bottom of the second page,

11   carrying over to the top of the third page.

12        A.   Yes, I see it.

13        Q.   Was that -- was that language an accurate

14   reflection of APA's view at the time?

15        A.   Yes, sir.

16        Q.   And in particular, when it states that TWA was

17   a much smaller, largely regional carrier which was

18   within hours of going out of business, does that reflect

19   the APA's view at the time?

20        A.   Yes, sir.

21        Q.   Did the APA, with respect to the comment we

22   read previously that referred to the flood of commentary

23   from members of the APA, did the APA keep a log of the

24   commentary it was receiving from its members?

25        A.   I don't know if I'd describe it as a log, but I

1      A.    It was created to give an explanation to our

2  pilots, and TWA pilots as well, on how the integration

3  was done and what its effects were.

4      Q.    And was your objective in creating this

5  document to be accurate?

6      A.    Yes.

7      Q.    And are you aware of anything in this document

8  that's -- that was inaccurate as of the time it was

9  stated?

10     A.    No.  We would not put it out if it was

11 inaccurate at the time it was stated.

12     Q.    So in the beginning of this document, there

13 appears to be a letter signed by you to AA pilots.

14             Do you see that?

15     A.    Yes, sir.

16     Q.    In the first paragraph of that letter, toward

17 the bottom of the paragraph, it says, The APA's effort

18 to forge an integration method that is fair to both

19 sides and will stand the test of time has been made even

20 more difficult and even more emotionally charged by the

21 furloughs that both pilot groups are currently

22 experiencing.

23             Do you see that?

24     A.    Yes, sir.

25     Q.    And did the APA believe that Supplement CC

1    represented the -- an integration method that was fair

2    to both sides?

3         A.   Yes.

4         Q.   And did the APA believe that Supplement CC

5    was -- represented an integration methodology that would

6    withstand judicial scrutiny?

7         A.   Yes, very much so.

8         Q.   On the second page of your letter, first full

9    paragraph, it says, Throughout this entire process, the

10   M and A committee under the direction of the APA board

11   of directors has operated under one central principle,

12   to protect the premerger career paths of all pilots

13   concerned with the integration.

14              Is that an accurate reflection of what the

15   APA's central principle was in the seniority integration

16   discussions?

17        A.   Yes.

18        Q.   And you -- would the APA have agreed to a list

19   that failed to protect the premerger expectations of

20   its -- of the American Airlines pilots?

21        A.   Restate that.

22        Q.   Yeah.  Would the APA have agreed to an

23   integrated seniority list if it had failed to protect

24   the premerger career expectations of the American

25   Airlines pilots?

1      A.   I think I'd go back to what I stated earlier.

2   No, we would not agree to a list that affected the

3   premerger expectations.  But I think any seniority

4   integration does affect the premerger expectations.  To

5   do one by its entirety would, obviously, negatively

6   impact the other group to it, what I would call an

7   unfair, inequitable.

8      Q.   Later on in that paragraph, the second-to-last

9   sentence, it says, The M and A committee, board of

10  directors and national officers were also advised by

11  special legal counsel retained by the association with

12  extensive experience in pilot seniority integrations.

13              Do you see that language?

14     A.   Yes, sir.

15     Q.   And who is the special legal advisor that's

16  referenced there?

17     A.   Probably be Wes Kennedy was who we hired for

18  our seniority issues.

19     Q.   In the next paragraph, the middle --

20  approximately the middle of the paragraph, right after

21  that large dash, it says, The fact that TWA was within

22  hours of ceasing operations when American agreed to

23  purchase most of its assets and hire its employees.

24              And is -- is that statement an accurate

25  reflection of APA's belief at this time, that TWA was

1    within hours of ceasing operations when -- when American

2    agreed to the purchase?

3        A.   Yes, sir.

4        Q.   Further down in the paragraph, the sixth line

5    from the bottom, it says -- starting off in the middle

6    of the sentence, it says, TWA pilots have gained in pay,

7    working conditions, retirement and job security, and the

8    fact that the AA pilots have not experienced comparable

9    gains as a result of the transaction, but will, as in

10   prior acquisitions, assume much of the risk of whether

11   the transaction will ultimately result in additional

12   growth to offset the addition of the TWA pilots to the

13   combined operation.

14            Do you see that language?

15       A.   Yes, sir.

16       Q.   Is that an accurate reflection of APA's views

17   of how the TWA and the American Airlines pilots would

18   fare in this integration?

19       A.   Yes, sir.  And I think history's shown that to

20   be true.

21       Q.   If I could -- using the numbers at the top

22   right of the page, if I could direct you to Page 9 of

23   this document.  So under the heading, The Objectives of

24   The Seniority Integration, the APA writes, Although the

25   APA mergers and acquisitions committee and the TWA MEC

1    was a fair and equitable list.  And there was not any

2    other type of list that we would have gone probably

3    beyond that because it would have been injurious to the

4    the APA pilots.

5       Q.   (BY MR. TOAL)  If the TWA MEC had come to the

6    APA and said, instead of Supplement CC, we'd -- we'd

7    agree to have 2,494 American Airlines pilots at the top

8    of the list, but we're only willing to staple 464 TWA

9    pilots, is -- is that a list that the APA would have

10   agreed to?

11              MR. JACOBSON:  I'm going to make the same

12   objections as to calls for speculation, calls for

13   improper expert opinion testimony without all the facts

14   necessary to render such an opinion.

15              THE REPORTER:  "Without"?

16              MR. JACOBSON:  All the facts necessary to

17   render such an opinion.

18      A.   No, it would not.

19              (Exhibit No. 40 was marked.)

20      Q.   (BY MR. TOAL)  Let me mark as Darrah Exhibit 40

21   a Information Hotline from December 14th, 2001 from you.

22   And I'll ask if this is a document that you sent on or

23   around that time?

24      A.   Yes, sir.

25      Q.   Okay.  Could you read the -- just to yourself,

1    could you read the paragraph at the bottom of this page

2    that carries over to the middle of the second page,

3    please.

4         A.   Yes.

5         Q.   So this paragraph discusses a proposal that the

6    TWA pilots leadership, the TWA MEC leadership offered to

7    the APA during the October discussion in Washington.

8         A.   Uh-huh.

9         Q.   Is that correct?

10        A.   Yes.

11        Q.   And were those the meetings at the Mayflower

12   Hotel?

13        A.   Yes, sir.

14        Q.   And this paragraph indicates that the TWA MEC

15   had made a proposal to the APA under which 600 of its

16   pilots would have been attached to the bottom of the

17   list; is that correct?

18             MR. JACOBSON:  Enter an objection here

19   that that's second level hearsay.

20             THE WITNESS:  Yes.

21        Q.   (BY MR. TOAL)  Okay.  Do you remember the

22   TWA MEC extending such a proposal during those meetings?

23        A.   I don't recall the specifics of that, no.

24        Q.   Okay.  Did -- did the APA accept a proposal

25   from the TWA MEC to staple only 600 TWA --

1      A.    No.

2      Q.    -- pilots?

3      A.    No, they did not.

4      Q.    Now, if ALPA had threatened to seek a AFL-CIO

5 boycott of American Airlines, is that something that

6 would have affected the APA's bargaining position on

7 seniority integration?

8      A.    No.

9            MR. JACOBSON:  I'm going to object to

10 that.  It calls for speculation.

11      Q.   (BY MR. TOAL)  How do you know that?

12      A.   I -- I know as the president of the association

13 I would not -- I would not accept that as anything that

14 would change direction.  I know the board of directors

15 well enough, I know the pilots well enough, it doesn't

16 matter with them.  They would have fought to the death

17 on this issue.  Nothing externally was going to change

18 them, period, end of subject.

19      Q.   If -- if ALPA had done more to lobby on behalf

20 of the Bond bill, would that have changed APA's

21 negotiating position?

22      A.   No.

23            MR. JACOBSON:  Same objections, calls for

24 speculation.

25      A.   There's nothing externally it would have done

1   that would change my board's direction.  It was

2   everything we could do to get them off of stapling them.

3       Q.   (BY MR. TOAL)  If ALPA had threatened

4   litigation to enjoin the transaction to acquire the TWA

5   assets, is that something that would have changed the

6   position of the -- the APA with regard to seniority

7   integration?

8               MR. JACOBSON:  Objection, calls for

9   speculation.

10      A.   By your question, I -- I assume you mean to

11  prevent the -- the acquisition of the TWA --

12      Q.   (BY MR. TOAL)  Yeah, to prevent the acquisition

13  from taking place.

14      A.   I think at the point in time, APA would have

15  hoped you would have done that.

16      Q.   Why is that?

17      A.   Because I think there was a point in time when

18  APA wished we would have walked away from the

19  acquisition.

20              MR. TOAL:  Your witness.

21              MR. JACOBSON:  All right.  Thank you.

22              MR. MYERS:  Do you need a break?

23              THE WITNESS:  I'm good.

24              He asked if I was okay.  I'm good.

25              MR. JACOBSON:  Oh, yeah.  If you want a

Page 158

1    break, it's always --

2                     THE WITNESS:  I'm good.  I'm good.

3                     MR. JACOBSON:  All right.

4                           EXAMINATION

5    BY MR. JACOBSON:

6       Q.   I'll ask a few additional background questions

7    before I go in separate questions.

8                     You have an excellent memory, it seems.

9    What have you done to prepare yourself for the

10   deposition?

11      A.   I don't know if I have an excellent memory.

12   The documents that I've had, I flipped through and

13   looked at.  I'd say maybe a half a dozen documents,

14   eight documents.  He's got 40 documents here.  I --

15   probably 30 of them plus I've never seen before.  I --

16   excuse me.  I haven't seen in a decade.

17      Q.   All right.  And other than your lawyer, did you

18   meet with anybody to talk about this or anything else to

19   prepare yourself for the deposition?

20      A.   No.  I had a ten-minute conversation with Steve

21   Hoffman of James & Hoffman --

22                     MR. MYERS:  Other -- other than your

23   lawyers, have you talked to anybody?

24                     THE WITNESS:  No.  That was it.

25                     MR. JACOBSON:  All right.

1  committee, the TWA, all the meetings we had on what

2  constructs it would take, we tried to include as much as

3  we could from the input from the TWA mergers and

4  acquisition committee to formulate the agreement, and I

5  think Supp. CC contained a lot of those.

6      Q.   Okay.  And although you took all these things

7  in as you talked about, at the end of the day, what the

8  APA and American Airlines agreed to between themselves

9  was above the bottom line that APA would have been

10  willing to go to if they could have reached an agreement

11  with TWA?

12     A.   Let me make sure we're talking about the

13  bottom line --

14          MR. TOAL:  Object to the form of the

15  question.  It's vague.

16     A.   Yeah, bottom line meaning not on the top on the

17  bottom.  Meaning that the proposal of the integration

18  was going to be far worse than what Supp. CC ultimately

19  ended up as, through the discussions.  It was never

20  better than Supp. CC at any point in our discussions.

21  Supp. CC ultimately ended up the best deal that was ever

22  discussed at APA, and far exceeded what the initial

23  discussion in February were.

24     Q.   (BY MR. JACOBSON)  Okay.  Now, we talked about

25  the work -- the merger committee went to get out