# Exhibit 21

AMR CORPORATION 1998 ANNUAL REPORT

EXHIBIT

2

PENGAD 800-631-6989

AMR CORPORATION

domestic traffic, and the impact of international yield decreases on domestic yields, may continue. In 1999, American's total system capacity is expected to increase by approximately four percent, which includes domestic growth of 2.5 percent and international growth of approximately 7.5 percent. The recently announced formation of oneworld™, the global alliance linking American's network and frequent flyer program with British Airways, Canadian Airlines, Cathay Pacific and Qantas - and later this year Finnair and Iberia - coupled with the expansion of other code-share alliances, the acquisitions of Reno Air and Business Express, which was completed by American Eagle in March of 1999, the broad marketing alliances created between American and US Airways and Alaska Airlines, and the delivery of new jet aircraft at both American and American Eagle will enable the Airline Group to further strengthen its network both domestically and internationally during 1999. However, the Company continues to evaluate the implications of further accelerating the retirement of certain aircraft in order to keep the Company's capacity growth in line with general economic conditions.

Pressure to reduce costs will continue, although the volatility of fuel prices makes any prediction of overall costs very difficult. Excluding fuel, the Company anticipates an increase in unit costs of about one percent, driven primarily by higher labor costs associated with the normal seniority and scale increases in the union contracts and an increase in training costs, landing fees, airport facility rent expense and various other inflationary pressures. The increase in costs is partially offset by expected savings in maintenance, materials and repairs expense on the Company's existing fleet, partially due to the Company's announcement in late 1998 that it will retire an additional eight McDonnell Douglas DC-10-10 and two additional Boeing 727-200 aircraft earlier than anticipated, which will save the Company approximately $40 million during the next three years in aircraft maintenance and modification costs. The Company expects to also benefit from maintenance savings associated with new aircraft deliveries and commission expense savings

as a result of changes made in late 1998 to the international commission structure and a decrease in the percentage of commissionable transactions. Effective January 1, 1999, in order to more accurately reflect the expected useful life of its aircraft, the Company changed its estimate of the depreciable lives of certain aircraft types from 20 to 25 years and increased the residual value from five to 10 percent. The impact of the aircraft depreciation changes is expected to result in an approximate $165 million decrease in 1999 depreciation expense. In addition, the Company will depreciate its new Boeing 737-800s and Boeing 777-200IGWs over a period of 25 and 30 years, respectively, with a 10 percent residual value.

In early February 1999, some members of the APA engaged in certain activities (increased sick time and declining to fly additional trips) that resulted in numerous cancellations across American's system. These actions were taken in response to the acquisition of Reno Air in December 1998. On February 10, 1999, American obtained a temporary restraining order prohibiting the union from unilaterally taking actions outside the terms allowed under the collective bargaining agreement. Because of certain actions by the APA and its leaders, American filed a motion to have the APA and its leaders held in contempt of the court's temporary restraining order. The court granted that motion on February 13, 1999, and the airline's operations thereafter returned to normal. In an attempt to resolve the dispute, the Company and the APA have agreed to non-binding mediation. The Company estimates that the illegal pilot job action resulted in a pre-tax earnings impact of approximately $200 to $225 million during the first quarter of 1999.

THE SABRE GROUP    The Company expects continued profitability and revenue growth for The Sabre Group in 1999. Revenues from The Sabre Group's existing outsourcing customers, including American, US Airways and Canadian, are expected to be the same as or less than 1998 revenues as The Sabre Group will have completed Year 2000 efforts for American and Canadian and most of the

33

# Exhibit 22

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

PATRICK BRADY, et al.,
    Plaintiffs,
vs.
AIRLINE PILOTS ASSOCIATION, INTERNATIONAL,
    Defendant.
_____/

DEPOSITION OF:   MICHAEL J. DAY

DATE:     May 2, 2013

TIME:     10:00 a.m. - 3:00 p.m.

PLACE:     618 Second Street
     Cedar Key, Florida
REPORTED BY:    Jennifer R. Witwer, RPR, CRR
     Notary Public

APPEARANCES:
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
BY:  DANIEL J. TOAL, ESQUIRE
BY:  JOSHUA D. KAYE, ESQUIRE
1285 Avenue of the Americas
New York, New York 10019
Attorneys for the Defendants

Green Jacobson, P.C.
BY:  ALLEN P. PRESS, ESQUIRE
Suite 700, Pierre Laclede Center
7733 Forsyth Boulevard
St. Louis, Missouri  63105
Attorney for the Plaintiffs

## Page 2

1  APPEARANCES CONTINUED:
2    Air Line Pilots Association, International
    BY:  MARTA WAGNER, SENIOR ATTORNEY
3    535 Herndon Parkway
    Herndon, Virginia  20170
4    Attorney for the Defendant

## Page 3

1                I-N-D-E-X
2  Witness     Direct  Cross  Redirect  Recross
3  MICHAEL J. DAY
4   By Mr. Toal:    4

10         E-X-H-I-B-I-T-S
11  Defendant's for Identification:    Page
12   Exhibit Number 1 - Compton deposition transcript...10
     Exhibit Number 2 - trial transcript 6/23/11........20
13   Exhibit Number 3 - APA 3/28/01 document............55
     Exhibit Number 4 - APA 3/29/01 document............61
14   Exhibit Number 5 - Carty deposition transcript.....77
     Exhibit Number 6 - 4/18/01 letter.................82
15   Exhibit Number 7 - 4/24/01 letter.................84
     Exhibit Number 8 - 6/14/01 letter.................86
16   Exhibit Number 9 - 7/18/01 letter.................89
     Exhibit Number 10 - 8/17/01 letter................93
17   Exhibit Number 11 - APA proposal..................96
     Exhibit Number 12 - TWA MEC minutes 10/31/01.......99
18   Exhibit Number 13 - Darrah deposition transcript..111
     Exhibit Number 14 - 3/26/01 letter...............118
19   Exhibit Number 15 - White deposition transcript...122
     Exhibit Number 16 - 7/2/01 memo..................125

## Page 4

1         P-R-O-C-E-E-D-I-N-G-S
2     THE COURT REPORTER:  Do you swear or affirm the
3  testimony you're about to give will be the truth, the
4  whole truth, and nothing but the truth?
5     THE WITNESS:  I do.
6  THEREUPON:
7         MICHAEL DAY,
8  was called as a witness and, having been first duly sworn,
9  was examined and testified as follows:
10        DIRECT EXAMINATION
11  BY MR. TOAL:
12   Q.  Good morning, Mr. Day.
13   A.  Good morning.
14   Q.  Mr. Day, did there come a time when you served as
15  ALPA's representative on the unsecured creditors committee in
16  the TWA bankruptcy?
17   A.  Yes.
18   Q.  And when was that?
19   A.  That was in February of 2001.
20   Q.  And for how long did you serve as a representative
21  on that committee?
22   A.  Approximately a month.
23   Q.  And did you form an understanding of TWA's
24  financial condition at the time that you served on the
25  unsecured creditors committee?

Page 13

1   TWA was -- TWA was going to liquidate within days without a
2   deal.
3          Do you see that testimony?
4      A.  Yes.
5      Q.  Are you aware of any facts that would cause you to
6   question that testimony?
7      A.  Only that I'd heard statements to that effect
8   several times before.
9      Q.  And other than that do you have any factual basis
10  for challenging that testimony?
11     A.  No.
12     Q.  And as between yourself and Mr. Compton, as of the
13  time of TWA's third bankruptcy filing who was in a better
14  condition to assess TWA's financial condition?
15     A.  Bill would be.
16     Q.  Do you know who Michael Palumbo is?
17     A.  That's a name out of the past.  I think that
18  was -- I think it was the CFO with Bill Compton.
19     Q.  And did you know Mr. Palumbo?
20     A.  No.
21     Q.  I think you testified previously that you were
22  asked to join the TWA merger committee in March of 2001; is
23  that correct?
24     A.  Yes.
25     Q.  And what was the function of the TWA merger

Page 14

1   committee?
2      A.  Our function was to negotiate with our counterparts
3   with the American Pilots Association which represented the
4   American Airlines pilots in an attempt to merge the two
5   seniority lists.
6      Q.  And was this a committee appointed by the TWA MEC?
7      A.  Yes.
8      Q.  And I think you testified that you'd served
9   previously on the TWA MEC, correct?
10     A.  Yes.
11     Q.  And that was during the time that Bill Compton was
12  the chair of the MEC?
13     A.  Yes.
14     Q.  And what's the function of the MEC?
15     A.  The MEC is the link for the TWA pilots with ALPA
16  National, and their function is to represent the TWA pilots.
17     Q.  And how does the MEC go about doing that?
18     A.  Well, the MEC, they had monthly, quarterly meetings
19  and they would get together and form policy and discuss
20  issues and pass resolutions and go from there.
21     Q.  And was the MEC the highest ranking committee of
22  TWA pilots?
23     A.  Yes.
24     Q.  And what was the relationship between the merger
25  committee and the TWA MEC?

Page 15

1      A.  We were supposed to be a semiautonomous group, but
2   anything we ultimately did was going to have to have the
3   approval from the MEC.
4      Q.  So is it true that the merger committee wouldn't
5   have the ability to approve a seniority integration
6   independently?
7      A.  Yes.
8      Q.  And who needed to sign off on any proposed
9   seniority integration?
10     A.  Ultimately, as I understood it, it would have
11  probably had to have been Duane Woerth.
12     Q.  And what position did Mr. Woerth hold?
13     A.  He was the president of ALPA.
14     Q.  And was it your understanding that the TWA MEC
15  would also have to approve any proposed seniority
16  integration?
17     A.  Yes.
18     Q.  What were the circumstances under which you were
19  asked to become a part of the merger committee?
20     A.  The former chairman developed a medical issue and
21  couldn't continue serving.
22     Q.  And who was the former chair?
23     A.  Bud Bensel.
24     Q.  And did Mr. Bensel continue to play a role with the
25  merger committee?

Page 16

1      A.  Not directly.
2      Q.  Did he play an indirect role?
3      A.  I think so.
4      Q.  And what was the nature of that role?
5      A.  Well, he would communicate with the MEC and I
6   believe he probably communicated with some of my members.
7   Once in a while I would talk to Bud but not too often.
8      Q.  And who are the other members of the merger
9   committee at this time?
10     A.  Well, John Swanson, John Hefley, Shawn Clark, and I
11  think we had one fellow that was on there originally but then
12  he was only on for a few months and he changed and we
13  got -- I'm trying to remember his name but it's escaping me.
14  Then DJ Glasby took his place.  I think five including
15  myself.
16     Q.  Okay.  And I think this is clear from your previous
17  testimony, but you were asked to become the chair of this
18  committee, correct?
19     A.  Yes, unfortunately.
20     Q.  Why do you say that?
21     A.  It was probably the worst year of my life.
22     Q.  In what respect?
23     A.  Just it was extremely unpleasant.
24     Q.  And what made it unpleasant?
25     A.  Our committee had five people.  Theirs had at least

1   seven.  And we felt we had very little leverage and their
2   committee would kind of beat up on us every time we were in
3   there.  They kept reminding us we were getting acquired and
4   this was this, and it caused many sleepless nights.
5          As I said before, that was one of the reasons I
6   wound up moving to Cedar Key was to get away from people for
7   a while.  Ed White was an extremely bright person but he's a
8   pretty tough negotiator, too.
9       Q.  And as general manager did you find the APA's
10  merger committee to take tough positions?
11      A.  Yes.
12      Q.  And did you find them to be aggressive?
13      A.  Yes.
14      Q.  You mentioned some of the things that the APA's
15  merger committee would say to the TWA merger committee,
16  including the fact that TWA was being acquired, correct?
17      A.  Yes.
18      Q.  And do you remember other points that the APA's
19  merger committee would make in an effort to justify the
20  positions that it was taking on seniority integration?
21      A.  Well, they essentially told us we were working for
22  a bankrupt airlines and that we didn't have any career
23  expectations.
24      Q.  And do you remember any other justifications that
25  they offered for the positions they were taking?

1       A.  Well, they would try to say that their collective
2   bargaining agreement required them to staple any acquired
3   pilot group to the bottom of their list, so that's what we
4   were starting with.
5       Q.  Was it your understanding that the APA had the
6   right to insist on the pilots of any acquired airline being
7   stapled to the bottom of the list?
8       A.  It's my understanding that they felt they did.
9       Q.  Did you think they were wrong about that?
10      A.  I felt that -- I wasn't an expert on what their
11  collective bargaining agreement provided them and what kind
12  of deals they made with the company because we weren't
13  usually privy to those, but I had no reason to doubt that
14  that's what they thought they were entitled to.
15      Q.  So with respect to my question whether you thought
16  they were wrong about that, did you have a view as to whether
17  the APA was right or wrong in its position that it was
18  entitled to staple the pilots of acquired airlines to the
19  bottom of the list?
20      A.  Whether they had the right to do it is what you're
21  asking?
22      Q.  Yes.
23      A.  I felt there was some question about it.
24      Q.  And why did you think there was a question about
25  it?

1       A.  Well, dealing with Roland Wilder gave me the
2   feeling that there really wasn't a prior merger where it
3   had been quite that draconian under the same circumstances
4   and he wasn't sure that if it ever had to go to Court that
5   it would hold up, stapling the TWA pilots to the bottom of
6   their list.
7       Q.  Was that something that Roland Wilder told you,
8   that if the APA insisted on stapling the TWA pilots to the
9   bottom of the list that there was some cause of action that
10  the TWA pilots could bring?
11      A.  I don't recall him stating it in those words but I
12  recall him constantly having a plan of attack to back it up
13  with some type of legal action each step of the way.
14      Q.  And, Mr. Day, haven't you testified previously that
15  your understanding was that the APA had the right but not the
16  obligation to staple the TWA pilots to the bottom of the
17  seniority list?
18      A.  I would have to say that, yes, I think I did state
19  that.
20      Q.  And was that accurate testimony when you gave it?
21      A.  It was accurate testimony but I was --
22          MR. PRESS:  Show my objection to the form of the
23  question.  I don't know if that was an accurate
24  recitation of his testimony.  But subject to that you
25  can go ahead and answer.

1       A.  You know, I think we got into a discussion then on
2   some section of their contract acquiring carriers and so on
3   and the judge explained to me that he didn't feel that was
4   applicable in this case.  And as I said, if I said I guess
5   I felt that they thought they had the right to.  Whether they
6   did or not I don't think we'd ever know.
7          MR. TOAL:  So let me show you a transcript of your
8   testimony.  We'll have this document marked as Day
9   Exhibit 2.  This is a copy of the trial transcript in
10  this case from June 23, 2011.
11          (Defendant's Exhibit Number 2 was marked for
12  identification.)
13      Q.  Mr. Day, do you remember testifying during the
14  liability trial in this case?
15      A.  Yes.
16      Q.  And did you offer that testimony on or around
17  June 23rd, 2011?
18      A.  Yes.
19      Q.  So let me direct your attention to Page 108 of
20  this transcript.  And if I could ask you to look starting at
21  Line 19, do you see the Court says:  So you're -- you
22  think -- let me turn that question around.  Do you agree that
23  under this agreement American could have stapled the TWA
24  pilots if this agreement was carried out?  And then it says,
25  The Witness:  I agree they had the right to do that.

Page 29

1    A.  In the aggregate?  I don't understand what it is
2  you're asking.  Are you talking about the pilots as a whole
3  or some specific group of them?
4    Q.  So when I talk about the aggregate I'm talking
5  about the pilots as a whole.
6        If the APA believed that a particular seniority
7  integration proposal would have made the American Airlines
8  pilots worse off overall, did you have any expectation that
9  the APA would agree to such a proposal?
10       MR. PRESS:  I object to the form of the question.
11  I think it's impossible to answer.  Subject to that you
12  can try.
13   A.  Well, I think that it was a negotiating ploy and I
14  think that they were willing to accept something.  They
15  obviously did accept something less than stapling.
16   Q.  Do you think what they accepted made their pilots
17  worse off?
18       MR. PRESS:  Object to the form of the question.
19   A.  Again, the question is -- it's too speculative.  I
20  don't understand what you mean, worse off.  I didn't feel
21  that the Tannen proposal made them worse off.
22   Q.  But the APA felt that the Tannen proposal made
23  their pilots worse off, correct?
24   A.  They said they did.
25   Q.  Do you have any reason to question when they said

Page 30

1  that they believed the Tannen proposal made their pilots
2  worse off that they actually believed that to be the case?
3    A.  Just normal negotiations ploys.
4    Q.  Other than that do you have any other basis for
5  believing that when they said they believed the Tannen
6  proposal made their pilots worse off that they didn't believe
7  that?
8    A.  I don't have any other way of knowing, no.
9    Q.  And you understood that the APA had an obligation
10  to represent its pilots as well, correct?
11   A.  At that point in time the APA had an obligation to
12  represent their pilots, period, right.  Yes.
13   Q.  And you testified previously that the APA at least
14  understood itself to have the right to staple the TWA pilots
15  to the bottom of the list, correct?
16   A.  That's what they seemed to believe, yes.
17   Q.  So any departure from stapling the TWA pilots to
18  the bottom of the list the APA viewed as a concession that
19  they were giving to the TWA pilots, correct?
20       MR. PRESS:  I object to the form of the question.
21   A.  They presented it as a concession, yes.
22   Q.  And do you have any reason to believe that when
23  they presented it as a concession that they didn't actually
24  see it that way?
25   A.  I have no idea what -- how they viewed it

Page 31

1  internally.  I have no reason to -- I have nothing specific,
2  no, but I have no way of knowing what they were thinking.
3    Q.  Well, you never saw a document in which they
4  revealed that they didn't actually view a departure from
5  stapling as a concession, correct?
6    A.  No.  We were never that fortunate, unfortunately.
7    Q.  You did have people who were providing you with
8  information about what the APA was saying, correct?
9    A.  You mean behind the scenes?
10   Q.  Yes.
11   A.  We had information coming in that, I don't know,
12  sometimes it was believable and sometimes it didn't seem
13  believable.  So, yeah, there was so-called information coming
14  in.
15   Q.  But you had sources, people who had access to APA
16  communications who would provide them to you, correct?
17   A.  I do remember, yes, they would check what the APA
18  was publicizing and so on.
19   Q.  And in any of the APA communications that you had
20  access to did you ever see anything that suggested to you
21  that the APA didn't genuinely believe that departures from
22  stapling the TWA pilots represented a concession to the TWA
23  pilots?
24   A.  No, of course they weren't going to say anything
25  like that.  We never saw anything like that.

Page 32

1    Q.  Did you ever hear about anything like that?
2    A.  No.
3    Q.  Did the TWA merger committee have as one of its
4  guiding principles that any seniority integration should
5  preserve the pretransaction career expectations of each pilot
6  group?
7    A.  That's what the Tannen proposal was saying.
8    Q.  That it was --
9    A.  That it did.
10   Q.  And is that an objective that the TWA pilots were
11  trying to achieve, to preserve the pretransaction career
12  expectations of each pilot group?
13   A.  Well, you're talking about a moving target here.
14  As I understood it, when they first went in they were looking
15  for date of hire, which would have been, you know, would have
16  been a nice, simple way of doing it, but Ed White made it
17  pretty clear that that wasn't going to happen.
18   Q.  And did he explain why date of hire was not going
19  to happen?
20   A.  Well, he explained it because we had -- he didn't
21  have to explain it.  We knew we had a pretty senior pilot
22  group.  That's what they were concerned with.  A portion of
23  our pilot group was very senior, and they were looking
24  for -- concerned about a Boeing 777 power grab.
25   Q.  And the Boeing 777 was a plane that TWA wasn't

1   flying at the time, correct?

2      A.   Correct.

3      Q.   So any integration that allowed TWA pilots to fly

4   a 777 would have effectively transferred career expectations

5   that previously had belonged to American Airlines pilots to

6   TWA pilots, correct?

7      A.   At that time based on the airplanes they had, yes.

8      Q.   And did you think that when the TWA merger

9   committee, and I understand it was before your tenure, when

10   they proposed the date-of-hire seniority integration that

11   that was consistent with the objective of preserving

12   pretransaction career expectations of each pilot group?

13      A.   I don't know.  I don't know what he was thinking.

14   As I understood it, when Bud Bensel, right before they went

15   into the first meeting with them, looked at his committee and

16   gave them a rah-rah talk and told them this is going to be

17   the best day of your life, guys.  And those poor guys came

18   out of that meeting so beat up, they said if that's the best

19   day I'd hate to see the worst one.  So I don't know what Bud

20   was thinking.

21      Q.   I'm not asking what he was thinking.  I'm asking

22   what your -- what you were thinking when you took over as

23   chair of the merger committee.

24          Did you think that a seniority integration proposal

25   based on date of hire was consistent with the objective of

1   preservation of each pilot groups' pretransaction career

2   expectations?

3      MR. PRESS:  Without fences and -- I object to the

4   form of the question.

5      MR. TOAL:  You can just object to the form.

6      A.   You know, I don't know that I ever viewed it that

7   way.  I felt that my job was to get the best deal for our

8   guys.  And in the course of negotiations they were the ones

9   that brought up the career expectations, that not one

10   American pilot's career expectations has to be -- can be

11   altered.

12      Q.   That was a position that the APA merger --

13      A.   That was the position the APA committee came out

14   with.  And that's why essentially the negotiations really

15   were very difficult at that point until we got the Tannen

16   proposal, because that's what Tannen was tasked to do, try to

17   give them a proposal that would show that their career

18   expectations were being met.

19      Q.   And did the APA view the Tannen proposal as

20   preserving their career expectations?

21      MR. PRESS:  Object to the form of the question.

22      A.   Apparently not.  They didn't accept it.

23      Q.   And how did the APA react to the Tannen proposal?

24      A.   Well, they rejected it.

25      Q.   And beyond rejecting it, how was it received when

1   it was presented to the American pilots?

2      A.   Oh, they were laughing and snorting and acting like

3   a bunch of children in the meeting there.

4      Q.   And did you get information on the reaction of the

5   American pilots more broadly to the Tannen proposal?

6      A.   No, not their pilot group.

7      Q.   Would it be fair to say that the APA merger

8   committee objected strenuously to the Tannen proposal?

9      A.   Yes.  Of course, they objected strenuously to just

10   about every proposal we gave them.

11      Q.   Did you form a view about whether the American

12   pilots viewed the transaction with TWA as something that they

13   wanted to happen?

14      A.   Well, the only interaction I had was with their

15   APA group.  I didn't know any other American Airlines

16   pilots.  And I don't think they were particularly enthralled

17   with it.

18      Q.   Did you sense any enthusiasm among the members of

19   the APA for the TWA transaction?

20      MR. PRESS:  Objection.  He just answered that

21   question.

22      A.   No.  No, you know, unless they felt that by

23   stapling us they were going to move up faster, you know.

24   They didn't come out and say that, though, but it was pretty

25   obvious, you know, an obvious conclusion to stapling a group

1   of people and taking their airplanes what was going happen to

2   the nonstapled group's career expectations.  They were going

3   to be improved dramatically.

4      Q.   How were the American pilots going to take the TWA

5   airplanes?

6      A.   It was part of the acquisition.

7      Q.   Were there opportunities for the American pilots to

8   fly on TWA airplanes?

9      A.   Not initially.  The airplanes had to be recertified

10   by the FAA to come under the American Airlines certificate,

11   which is a typical government bureaucratic process that takes

12   some time, as well as the pilots.  For instance, I was a 767

13   check airman captain instructor with TWA, yet once the

14   certificate went over to American I had to go through

15   American's complete training program like a new hire.

16      Q.   And beyond government and regulatory hurdles to

17   American Airlines pilots flying on TWA planes was there

18   something that was part of Supplement CC known as the

19   St. Louis fence?

20      A.   What's the specific question again?

21      Q.   Are you familiar with something called the

22   St. Louis fence?

23      A.   Yes.

24      Q.   And are you aware that was a component of

25   Supplement CC?

1      A.  Yes.  Okay.  I thought we were talking about while
2  we were going through negotiations.  Supplement CC didn't
3  come out until after everything was complete.
4      Q.  I understand.  I'm bouncing around a little.
5      A.  Yeah.
6      Q.  How did the St. Louis fence work?
7      A.  The St. Louis fence basically provided that there
8  would be a specific number of captain positions reserved for
9  TWA pilots on the 767 and the MD-80 in St. Louis, and they
10  were based on the number of similar slots in Dallas and
11  Chicago, and said the company would preserve those for former
12  TWA pilots.
13      Q.  And was part of the St. Louis fence a prohibition
14  on American Airlines pilots bidding for flying at the
15  St. Louis domicile?
16      A.  Yes.
17      Q.  And was the St. Louis fence effectively
18  discouraging American Airlines pilots from bidding on flying
19  out of the St. Louis domicile?
20      A.  Yes.
21      Q.  And was that something that helped protect the
22  career expectations of the legacy TWA pilots?
23      MR. PRESS:  Object to the form of the question.
24      A.  As opposed to being stapled, yes.
25      Q.  Did you have a view of what the American pilots

1  were getting out of this proposed TWA asset acquisition?
2  What was the benefit to them?
3      A.  They were getting an additional hub.  They were
4  getting their fleet expanded.  They were getting a trained
5  workforce.  They were getting certain international routes
6  which were different than domestic and that these have to be
7  negotiated.
8      Q.  My question is not what American Airlines was
9  getting out of the transaction but what American pilots in
10  particular, how they were benefitting from the transaction,
11  if at all.
12      A.  In that it was going to ultimately be a bigger,
13  stronger airlines.
14      Q.  That was the hope at least, correct?
15      A.  Yes.
16      Q.  And at the time of the transaction there was no
17  certainty that that would happen, correct?
18      A.  No.
19      Q.  Other than that, can you point to anything else
20  that the American pilots were getting out of the transaction?
21      A.  Well, there was approximately 200 airplanes and
22  two-thirds of our seniority list got stapled onto the bottom,
23  so I would say a fair number of their pilots got enhanced
24  seniority which equates to enhanced money, enhanced working
25  conditions and so on.

1      Q.  How would the TWA planes have allowed the American
2  Airlines pilots to get enhanced seniority given the operation
3  of the St. Louis fence?
4      A.  Well, the St. Louis fence only protected
5  approximately 800 of our pilots.  First officers weren't
6  included in it and it was only that limited number of
7  captains.  There were captains that actually got furloughed
8  off the MD-80 because they weren't included in that group.
9      Q.  Are you certain that the St. Louis fence had no
10  application to first officers?
11      A.  It was always made clear to us that it was captain
12  positions that were being protected.
13      Q.  Are you certain about that?
14      A.  Well, let me think a minute.  Is this a trick
15  question?
16      Q.  I don't ask those.
17      A.  I'd have to look at the Tannen proposal when you
18  ask it like that.  I mean, I'd have to look at Supplement CC
19  to see how it came out, but that was basically my
20  understanding, that the captain positions were the ones that
21  they were talking about, that they did not specifically
22  list -- reserve a specific number of first officer positions.
23      Q.  Okay.  And we can look at Supplement CC later.
24      Aside from what you just testified to, anything
25  else that you would point to that was a benefit of this

1  transaction for American Airlines pilots?
2      MR. PRESS:  I object to the form of the question.
3      A.  Well, those are the examples that come off the top
4  of my head.
5      Q.  And as you sit here today you can't think of
6  anything other than what you testified to previously,
7  correct?
8      A.  No.
9      Q.  What were the benefits of this transaction for the
10  TWA pilots?
11      MR. PRESS:  I'd just object to the form of the
12  question.  Without a time period I think it's vague.
13      A.  I guess it depends on if you feel that TWA was not
14  going to be a standalone carrier or was not going to be
15  purchased by somebody else the benefits would be most of the
16  airlines seemed to be growing together and becoming mega
17  carriers.  That would have been the advantage.  At the time
18  it looked like American was a big, stable airlines.  Again, I
19  feel -- I'd just seen it so many other times that all of a
20  sudden Bill Compton would pull this rabbit out of the hat.
21      Q.  But that doesn't mean a rabbit is always coming out
22  of the hat, does it?
23      A.  No, it doesn't.  It doesn't mean it, but I
24  don't -- you know, you asked me what I thought and that's
25  what I felt.  I felt that TWA probably would have kept going

Page 41

1   along.
2       Q.  If you believe that TWA, absent a transaction with
3   American, would have liquidated and that the TWA pilots would
4   have lost their jobs, is it your understanding that TWA
5   pilots would have had to start out at the bottom of a
6   seniority list at some other airline?
7       A.  With those premises that you've given, yes.
8       Q.  And relative to a situation like that would you
9   agree that the American transaction made the TWA pilots
10  better off?
11      MR. PRESS:  He has to assume all the facts that
12      you --
13      MR. TOAL:  Yes.
14      MR. PRESS:  Okay.
15      A.  Again, if you believe TWA was simply going to go
16  out of business, then certainly they were better off.
17      Q.  And that would be true even if every single TWA
18  pilot was stapled to the bottom of the American Airlines
19  seniority list, correct?
20      A.  Anything would have been better than being
21  unemployed.
22      Q.  Relative to TWA, American Airlines was certainly
23  at the time of this transaction a more stable airline
24  financially, correct?
25      A.  Yes.

Page 42

1       Q.  And it was a larger airline, correct?
2       A.  Yes.
3       Q.  It flew more types of equipment, correct?
4       A.  Yes.
5       Q.  It flew larger equipment, correct?
6       A.  Yes.
7       Q.  It had higher pay rates on an hourly basis,
8   correct?
9       A.  On an hourly basis, yes.
10      Q.  Do you have an understanding of whether, for legacy
11  TWA pilots who continued to work at American Airlines,
12  whether overall they made more money at American or TWA?
13      A.  I don't know.  I don't know whether they made more.
14  Generally each year you tend to make more money than the
15  prior year until you go into a concessionary mode and go
16  backwards, but I don't -- it would be conjecture for me to
17  answer that.
18      Q.  So you just don't have an understanding one way or
19  the other, correct?
20      A.  Whether the legacy pilots were making more money?
21      Q.  Yes.
22      MR. PRESS:  I'm going to object to the form of the
23      question.
24      A.  I don't know.  There was too many things happening.
25  You're talking about after I left or the few years that I was

Page 43

1   still there?
2       Q.  Let's take the year, the first full year after the
3   transaction.  Do you have an understanding of whether TWA
4   pilots who continued to work at American during that period
5   made more than in the last full year during which they worked
6   for TWA?
7       MR. PRESS:  I object to the form of the question as
8       being overbroad.
9       A.  My feeling is it was about the same, at least in
10  my case.  I didn't -- and I don't know about the other
11  fellows.
12      Q.  Well, your hourly rate went up significantly,
13  correct?
14      A.  My hourly pay rate went up but I was limited in the
15  number of hours that I could fly and my working conditions
16  changed, too.
17      Q.  So your hourly rate at TWA had been $130 per hour,
18  correct, prior to the transaction?
19      A.  That sounds about right.
20      Q.  And at TWA your hourly rate went up to
21  approximately $200 per hour, right?
22      A.  No, I was thinking it was closer to 160, but, you
23  know, again, I don't remember the specific number.
24      Q.  If you testified previously that your hourly rate
25  at American Airlines was approximately $200 an hour would

Page 44

1   that be accurate?
2       A.  Was that in 2001 or '2 or 2005?
3       MR. PRESS:  Hey, Dan, we've been going for more
4       than an hour.  Is this a good time to break?
5       MR. TOAL:  Yeah, let me just finish this line.
6   BY MR. TOAL:
7       Q.  So take a look at the transcript of your trial
8   testimony at Page 118.  Actually, I'll ask you to take a
9   look first at the bottom of Page 117, Line 22.  Are you with
10  me?
11      A.  Um-hum.
12      Q.  So you see the Court says:  But the hourly rate
13  went up actually?  And your answer is:  The hourly rate went
14  up.  Certain working conditions changed.
15      Do you see that?
16      A.  Yes, uh-huh.
17      Q.  Then you were asked:  The hourly rate for people at
18  your level went up by over $60 per hour, yes?  And your
19  answer is:  That sounds about right.
20      Correct?
21      A.  Um-hum.
22      Q.  And then you were asked:  It went up from 130
23  something to about 200 per hour, yes?  And your answer is:
24  Well, the hourly rate went up, but before I had the ability
25  to fly up to 100 hours at our other rate.  So, yes, the

Page 49

1  pilot group?
2      A.  Yes.
3      Q.  And was that something that was guiding you in your
4  negotiations?
5      A.  Yes, it was.
6      Q.  And in that context what is meant by a windfall?
7      A.  Well, a windfall would have been if American takes
8  all of our airplanes, staples two-thirds of our pilots to
9  the bottom, and suddenly that many of their pilots are able
10  to fly equipment and positions that they were not able to
11  fly before, especially if they furloughed those two-thirds
12  of the pilots immediately after that.  That would be a
13  windfall.
14      Q.  And would it be a windfall to the TWA pilots if
15  they were able to fly equipment that they weren't able to fly
16  previously at TWA?
17      A.  Initially, yes.
18      Q.  What do you mean by initially?
19      A.  Well, in any merger at some point in time generally
20  these types of restrictions are ended.  Even American, which
21  was the subject of three or four mergers, had pilots now
22  flying that had no expectations of flying other airplanes.
23      Q.  And did the TWA pilots want the ability eventually
24  to fly equipment including equipment that TWA didn't have at
25  the time of the transaction?

Page 50

1      A.  Eventually, yes.
2      Q.  Is that something the APA objected to?
3      A.  Yes, they did.
4      Q.  And did they explain why they were objecting to
5  that?
6      A.  Their standard mantra was not one American pilot's
7  career expectations can be harmed.  So they said until the
8  last pilot hired on this seniority list is able to hold that,
9  then no TWA pilot can do it.
10      Q.  Now, if there was a seniority integration proposal
11  in which the TWA pilots only competed against themselves, the
12  American pilots only competed against themselves with respect
13  to bidding, do you agree that's a structure that would have
14  preserved each pilot group's career expectations?
15          MR. PRESS:  Object to the form of the question.
16      A.  Not just with that by itself.
17      Q.  What else would you need?
18      A.  Well, you'd need lots of things.  You'd
19  need -- you'd need to determine how many airplanes each group
20  was going to have and how they were utilized.
21      Q.  So what if we said all the legacy TWA airplanes
22  would be available to the TWA pilots, all the legacy American
23  planes would be available to the American pilots.  Would you
24  agree that was a structure that would preserve the
25  pretransaction career expectations of each pilot group?

Page 51

1          MR. PRESS:  Again I object to the form of the
2  question.
3      A.  And the same -- flying the same routes?  I'm trying
4  to think if that would be -- if it could be structured in
5  that manner and at that specific point in time, yes, but
6  going into the future there's no way of telling.
7      Q.  Do you recall that the TWA merger committee and the
8  APA merger committee exchanged proposals for the first time
9  on or around March 1st of 2001?
10      A.  That sounds about right, but I wasn't present I
11  don't think for the first round of exchanges.
12      Q.  Do you recall that the APA objected to the initial
13  proposal it got from the TWA MEC as being essentially a
14  date-of-hire proposal?
15      A.  I had heard that, yes.
16      Q.  And from the time you took over the merger
17  committee did you have any expectation that the APA would
18  agree to a date-of-hire type proposal?
19      A.  We were continuously told that they would not.
20      Q.  And did you ever have reason to believe at any time
21  that the APA would accept a date-of-hire proposal?
22      A.  They didn't give us any reason to believe it.
23      Q.  And did you have any reason to believe it from any
24  other source?
25      A.  No.

Page 52

1      Q.  Isn't it true that the TWA MEC was trying to get a
2  proposal as close to date of hire as possible?
3      A.  Well, that was the original goal, I understood.
4      Q.  And was that something that you were trying to
5  achieve throughout the course of your negotiations, to get as
6  close as possible to a date-of-hire seniority integration?
7      A.  You know, we were always waiting for the Tannen
8  proposal to come forth.  We didn't know what it was going to
9  say.  That's why, you know, there was such a difficult time
10  trying to negotiate originally because we didn't want to do
11  anything to shoot ourselves in the foot later on.  And the
12  Tannen proposal was not a date-of-hire proposal, and that's
13  what our official final proposal to them was.
14      Q.  And what's your understanding of the methodology of
15  the Tannen proposal?
16      A.  It uses what they call the running mate.
17      Q.  And how under the Tannen proposal were running
18  mates established?
19      A.  Well, you took -- you divided the pilot group up.
20  First of all you started with captains and you divided them
21  up into three groups.  You took the 777 captains as Boeing
22  777 and then they also had MD-11s.  And they took that number
23  of captains, 350, for instance, and they saw how far down the
24  seniority list it went.  And they took to the 95th percentile
25  of that.  And at that point those pilots forward were called

Page 69

1   Q.  Do you recall them saying that as you sit here
2   today?
3   A.  No, I don't recall what was specifically said.
4   Q.  Do you recall anything they said other than what
5   you've described previously?
6   A.  The only two things, like I said, I recall was the
7   800 staple job and the fact that we've got to get a deal
8   done.
9   Q.  Did you have an understanding at this time of the
10  prospects for the 1113 motion in the bankruptcy court being
11  granted?
12  A.  That was -- at that point in time as of this
13  meeting here it was still being discussed.  The big threats
14  weren't coming out I don't think until slightly after that.
15  But it was hovering over our heads that the 1113 was going to
16  be done if we didn't get this thing done and then we were
17  going to be left without anything.
18  Q.  And in terms of your own view, did you think that
19  at a minimum that there was a significant likelihood that
20  this 1113 motion would be granted?
21  A.  My personal feeling?  No, I didn't necessarily
22  think it would be granted.
23  Q.  Did you think there was any chance it would be
24  granted?
25  A.  Of course.

Page 70

1   Q.  What did you think the likelihood was that the 1113
2   motion would be granted?
3   A.  I did not think it was likely that it was going to
4   be granted initially.
5   Q.  And why did you not think it was likely to be
6   granted initially?
7   A.  Because of the draconian effect that it wasn't
8   widely -- it wasn't widely used in the industry, and I think
9   that the judge wanted to see them try to work this thing out
10  a little bit more.
11  Q.  And other than that did you have any other reason
12  for not thinking it was likely that this motion would be
13  granted?
14  A.  No, except that I know that Roland always had
15  something up his sleeve and that if he had to he was going to
16  be filing paperwork to try to slow it down if he had to.
17  Q.  To slow what down?
18  A.  To slow the process down.
19  Q.  The bankruptcy process?
20  A.  Well, the 1113 part of it anyway.
21  Q.  Anything other than that?
22  A.  No.
23  Q.  Did you conduct any legal analysis of the merits of
24  the 1113 motion?
25  A.  No.

Page 71

1   Q.  Were there advisors who believed that the 1113
2   motion was likely to be granted?
3   A.  Yes.  That's what some of them were saying.  I
4   don't recall which one specifically but I think it was -- as
5   it got closer to the date more and more of them were saying
6   it was going to be granted.  Roland was the only one that
7   wanted to hold out.
8   Q.  And to your knowledge did Mr. Roland believe that
9   the 1113 motion would not be granted?  I'm sorry, let me
10  restate that.
11      To your knowledge did Mr. Wilder believe that the
12  1113 motion would not be granted?
13  A.  I think he felt that there was a likelihood that it
14  wouldn't.  He felt that if we -- if it was granted then we
15  would -- our negotiating position was going to be even worse
16  than it was at this point in time.
17  Q.  Well, the consequences of having the 1113 motion
18  granted for the TWA pilots would have been disastrous,
19  correct?
20  A.  Yeah, very possibly, depending whether the 1113
21  totally abrogated everything or whether it was piecemeal or
22  how it was structured.
23  Q.  And was your understanding at the time that if the
24  1113 motion were to be granted that it would abrogate the
25  collective bargaining agreement in its entirety?

Page 72

1   A.  That's what we were being told by the ALPA
2   advisors, and that it would -- we would even be left without
3   union representation.
4   Q.  And did anyone have a contrary view?
5   A.  Well, Roland, Roland didn't necessarily have a
6   contrary view to the consequences if it was granted, but he
7   just felt that we shouldn't acquiesce to it.
8   Q.  And I'm just asking here about the consequences if
9   the 1113 motion were to be granted.
10      Did anyone including Mr. Wilder have a contrary
11  view of the consequences of the 1113 motion being granted?
12  A.  No, not that I can recall.
13  Q.  And the TWA MEC had not agreed to waive its scope
14  and successorship provisions at the time of these proposals
15  in March of 2001, correct?
16  A.  Correct.
17  Q.  And did you have an understanding that the asset
18  acquisition by American Airlines was conditioned on the TWA
19  pilots waiving their scope and successorship provision?
20  A.  Yes.
21  Q.  Did you have an understanding that in the absence
22  of such a waiver of the scope and successorship provisions
23  that American Airlines had no obligation to proceed with this
24  asset acquisition?
25  A.  Yes.

Page 73

1    Q.   And what was your understanding of what the
2    consequence would be for TWA and its pilots if American
3    Airlines didn't proceed with this asset acquisition at this
4    time?
5        A.   Well, as I said before, I thought that going into
6    it TWA could have still been a standalone carrier at the
7    time.  Unfortunately, the further they got into it with the
8    attorneys' fees involved eating up the cash, then it became
9    less and less likely that they could just continue on in that
10   fashion.
11       Q.   So as of the end of March 2001 what was your
12   understanding of the consequence to TWA and its pilots if
13   American Airlines didn't proceed with the asset acquisition?
14       A.   Well, at that point in time it could
15   have -- there's certainly a possibility that TWA could have
16   gone under.  There was more likelihood at that point in time
17   than there was before going in.  How much I don't know.
18       Q.   There was at least an appreciable risk at this
19   point that if American Airlines decided not to proceed with
20   the asset acquisition that the TWA pilots would lose their
21   jobs at TWA, correct?
22       A.   That was always a possibility, yep.
23       Q.   And when you said you felt pressured by the ALPA
24   National advisors what was it they did that pressured you?
25       A.   It was just their presentation, especially Christy.

Page 74

1    Q.   What was it about their presentation?
2        A.   Well, it was pretty forceful.
3        Q.   Anything other than that that caused you to feel
4    pressure?
5        A.   No.
6        Q.   Do you have any evidence that any of the views that
7    any of the ALPA advisors expressed didn't reflect their
8    good-faith views about the issues they were discussing?
9        A.   I don't know how far you want to go out on this,
10   you know.  At the time I didn't.
11       Q.   Since then have you acquired any information that
12   you view as evidence that the views they were expressing at
13   the time were not reflective of their good-faith views?
14       A.   Well, yeah.  You know, I had a lot of respect for
15   all these folks and then subsequently I learned, thank God I
16   didn't know it at the time, that they're sitting there trying
17   to court the American pilots the same time they're supposed
18   to be representing us.  That's a conflict of interest.  And
19   that makes me question motive.
20       Q.   Anything else that makes you believe that the views
21   they expressed concerning the issues they were discussing
22   were not reflective of their actual views?
23       A.   Only that there was obviously monetary concerns to
24   try to get it wrapped up because it was costing more money
25   the longer we continued along this route.

Page 75

1    Q.   Anything other than that?
2        A.   No.
3        Q.   And do you know -- when you refer to efforts to
4    court American Airlines pilots what are you referring to?
5        A.   Meetings with American pilots, providing them with
6    funds, cards, so on.  I don't know what was said at that
7    point in time.
8        Q.   Do you know if ALPA provided any cards to any
9    American Airlines pilots?
10       A.   I don't know where they got the cards but I know
11   there was cards distributed.
12       Q.   Do you know if they came from ALPA?
13       A.   No.
14       Q.   Do you know of any funds that ALPA provided to
15   American Airlines pilots?
16       A.   Only from what I've learned in the proceedings
17   before this.
18       Q.   And who did you learn that from?
19       A.   Watching some of the testimony, some of the video.
20       Q.   Now, you're a lawyer, correct?
21       A.   Yes.
22       Q.   And you're licensed to practice?
23       A.   Yes.
24       Q.   Do you agree that many legal judgments are such
25   that reasonable minds could differ about what the best course

Page 76

1    of action would be?
2        A.   That's why we have lawyers.  Absolutely.
3        Q.   And with respect to the likelihood that the 1113
4    motion would be granted, would you agree that was an issue
5    about which reasonable minds could differ?
6        A.   Yes.
7        Q.   Would you agree that the issue of whether the best
8    course of action for the TWA pilots was to waive their scope
9    and successorship provision was an issue about which
10   reasonable minds could differ?
11       A.   Not from the TWA pilots' standpoint.  It was
12   suicidal.
13       Q.   Well, if you believed that American Airlines would
14   walk away from the transaction absent a waiver --
15       A.   If you believed that then possibly, but I didn't
16   believe they were going to walk away from it.
17       Q.   Did other people believe that American Airlines
18   would walk away from the transaction in the absence of a
19   waiver?
20       A.   People said they did.
21       Q.   Did American Airlines say that it was going to walk
22   away from the transaction in the absence of a waiver of the
23   scope and successorship provisions?
24       A.   I don't recall them specifically saying it.  It
25   said in their agreement that they could.

Page 81

1   provisions?
2       A.   No.
3       Q.   And is that because you were not a member of the
4   MEC at that time?
5       A.   Yeah, I tried to avoid the MEC meetings as much as
6   possible.  We had enough going on on our plate.
7       Q.   Did you learn about the nature of the discussions
8   concerning whether the MEC should waive the scope and
9   successorship provisions?
10      A.   No, not really.
11      Q.   When you say not really, did you learn anything
12  about them?
13      A.   Well, you know, there's always chatter here and
14  there but -- obviously there was big debates going on.
15  That's what I understand.  It wasn't an easy decision for
16  them, I know that.
17      Q.   Do you know if Mr. Wilder had a view about whether
18  the scope and successorship provision should be waived?
19      A.   He felt it should not.
20      Q.   Did he express that view to you?
21      A.   Yes.
22      Q.   Did he tell you why?
23      A.   If it was waived we'd be dancing naked in the
24  streets.  We'd -- he felt our negotiating position would be
25  severely hampered.

Page 82

1       Q.   And did Mr. Wilder believe that American Airlines
2   would not walk away from the transaction in the absence of a
3   waiver?
4       A.   I don't recall us getting into that discussion.
5       Q.   And did you ever discuss with Mr. Wilder how likely
6   he thought it was that in the absence of a waiver the
7   bankruptcy judge would abrogate at least the scope and
8   successorship provisions?
9       A.   I don't recall us getting into that either.
10          (Defendant's Exhibit Number 6 was marked for
11      identification.)
12      Q.   I'll show you a document that we'll mark as Day
13  Exhibit 6, which is a letter to you from Captain White dated
14  April 18, 2001.
15          Is this a documentation that you recognize,
16  Mr. Day?
17      A.   (Witness reviewing document.)
18          I think so, but I'd have to really look at it again
19  if you want to discuss it in detail.
20      Q.   Well, do you recognize this as a counterproposal on
21  seniority integration that the APA was presenting to you?
22      A.   Yes.
23      Q.   Do you see on the first page of this document,
24  second paragraph, the last sentence says:  For TWA pilots
25  this -- talking about the objectives of seniority

Page 83

1   integration -- includes protecting the captain jobs the TWA
2   assets contribute to the combined airline, the opportunity to
3   upgrade into those captain jobs for a certain number of TWA
4   pilots, and assuring that TWA pilots will not be bumped or
5   flushed from their positions solely by reason of the
6   implementation of the combined seniority list.
7           Do you see that?
8       A.   Yes.
9       Q.   Do you have an understanding of what Captain White
10  means when he talks about assuring that TWA pilots will not
11  be bumped or flushed from their positions?
12      A.   Well, yeah, yeah, I think so.
13      Q.   And what's your understanding of what that means?
14      A.   Well, he's saying that by virtue of having a
15  seniority list that -- as an example, I'm not going to
16  be -- all of a sudden that my seniority number -- regardless
17  of what my seniority number is, if I wasn't senior enough to
18  hold that position on the new seniority list I will not be
19  bumped out of my captaincy.
20      Q.   You could hold your current position even if there
21  were people with higher seniority; is that correct?
22      A.   Yes, um-hum.
23      Q.   And was that a feature of Supplement CC that pilots
24  couldn't be bumped and flushed from their positions?
25      A.   Yes.

Page 84

1       Q.   And do you recall that you rejected the proposal
2   that Captain White set forth in connection with this letter?
3       A.   Yes.
4           MR. TOAL:  Let me show you a letter that you sent
5   to Captain White on April 24th.
6           MR. PRESS:  You know, this letter doesn't look
7   complete.  It's not signed.  There's something weird
8   about this exhibit.
9           THE WITNESS:  There's something weird, yeah.  I
10  don't know what to say about it either.  It's kind of
11  odd.
12          MR. PRESS:  Maybe somebody could have printed it
13  wrong is all I'm suggesting.
14          MR. TOAL:  So let me ask you to mark this as Day
15  Exhibit 7.  Actually, I think we're missing a page on
16  this document.  This appears to be missing a second page
17  but is dated April 24, 2001, a letter from you to
18  Captain White.
19          (Defendant's Exhibit Number 7 was marked for
20      identification.)
21  BY MR. TOAL:
22      Q.   Do you remember responding to Captain White
23  shortly after he presented the APA's seniority integration
24  proposal?
25      A.   Yes.

Page 85

1    Q.   And do you recall sending this letter?
2    A.   Sure looks like my signature, yes.
3    Q.   Okay.  Let me direct your attention to the third
4  paragraph of this letter.  Do you see it says:  We agree with
5  your statement of the basic objective to protect the career
6  expectations of American Airlines pilots while preserving
7  those of TWA pilots, and assure you that our committee shares
8  that objective.
9       Do you see that?
10   A.   Yes.
11   Q.   And was that a true statement?
12   A.   Yeah, it's a true statement, but remember, this is
13 in the process of negotiations.  Now, what we believe
14 internally among our committee versus what we're proposing
15 can be two different things.
16   Q.   And was there a difference between what you stated
17 here about this basic objective being shared and what the
18 committee thought internally?
19   A.   No.  The objective, the objective is there.
20   Q.   In what areas did what the merger committee was
21 telling the APA differ from what the committee was discussing
22 internally?
23   A.   Well, again, you've got to understand that we're
24 attempting to keep this rolling along until we've got the
25 Tannen proposal in our hand, which didn't come out until

Page 86

1  June.
2    Q.   Any other areas you can think of where what you
3  were telling --
4    A.   No, not off the top of my head.
5    Q.   You continue and you say:  But we do not believe
6  that the doctrinal approach you have taken in these
7  negotiations is capable of achieving that mutual goal.
8       Do you see that?
9    A.   Yes.
10   Q.   And what did you mean by doctrinal approach?
11   A.   I mean we didn't agree with this -- I'm simply
12 telling him we don't agree with his approach.
13   Q.   What about it was doctrinal?
14   A.   That's just window dressing.  Maybe I had a
15 thesaurus out that day.
16       MR. PRESS:  I thought it was doctrinal.
17       MR. TOAL:  Let me show you a document that we'll
18 mark as Day Exhibit 8, which is a letter from you to
19 Captain White dated June 14, 2001.
20       (Defendant's Exhibit Number 8 was marked for
21 identification.)
22   Q.   Do you recognize this as a letter that you sent
23 transmitting the Rightful Place proposal to the APA?
24   A.   Yes.  This is essentially the cover letter to the
25 huge proposed seniority list.

Page 87

1    Q.   Who came up with this name, Rightful Place
2  proposal?
3    A.   Not me.  I don't recall.
4    Q.   And do you have an understanding of why it was
5  called the Rightful Place proposal?
6    A.   No.  I think it was just catchy.  I think it
7  actually, if anything, backfired.  I don't think the APA
8  liked the name.
9    Q.   Were you told that the APA didn't agree that this
10 proposal reflected the rightful place of the TWA pilots?
11   A.   Something along that line.
12   Q.   What do you remember them saying?
13   A.   Well, I remember them snickering right off the bat,
14 rightful place.
15   Q.   It was poorly received by the APA?
16   A.   Yes.
17   Q.   Now, the Rightful Place proposal had certain
18 equipment fences, correct?
19   A.   Yes.
20   Q.   And there was a five-year fence proposed for the
21 777 and the MD-11, correct?
22   A.   Yes.
23   Q.   Although previously you had proposed a ten-year
24 fence for the 777, correct?
25   A.   Yes.

Page 88

1    Q.   And why were you proposing to reduce the length of
2  the 777 fence?
3    A.   Because it was a comprehensive proposal.  As far as
4  I was concerned we were starting from scratch.
5    Q.   And so after five years TWA pilots would be able to
6  bid for 777 positions that they had no expectation of at TWA,
7  correct?
8    A.   Yes, up to a maximum of 17 percent of those bid
9  positions.
10   Q.   And do you know where the number 17 percent came
11 from?
12   A.   That was the ratio of the TWA captain positions to
13 the American captain positions I believe.
14   Q.   At the time of this transaction TWA's fleet largely
15 consisted of narrow-body planes, correct?
16   A.   The majority was narrow-body airplanes, yes.
17   Q.   And do you remember what the composition of the
18 fleet was at this time, the split between small wide bodies
19 and narrow bodies?
20   A.   No, I don't remember off the top of my head.
21   Q.   And the idea that TWA pilots would be able to fly
22 777s and MD-11s within five years, is that the transfer of a
23 career expectation that once belonged to the American pilots
24 to TWA pilots?
25   A.   At some point in time, but it would still have to

1    be done on a seniority basis.
2        Q.  To the best of your knowledge at the time of this
3    acquisition did TWA have any orders for large wide-body
4    planes?
5        A.  No.
6        Q.  Were you aware of any plans by TWA to acquire large
7    wide-body planes?
8        A.  I don't recall them having any at that time.  Now,
9    we did have plenty of wide-body airplanes at one time.
10       Q.  But not at the time of this transaction, correct?
11       A.  No.
12       Q.  Do you recall that Captain White responded to the
13   Rightful Place proposal?
14       A.  At the meeting?
15       Q.  At any time.
16       A.  I recall him providing me a written response to it.
17       Q.  Do you recall any reaction he provided at the
18   meeting?
19       A.  No.
20           MR. TOAL:  Let me show you a document that we'll
21       mark as Day Exhibit 9, which is a July 18, 2001, letter
22       from Captain White to you.
23           (Defendant's Exhibit Number 9 was marked for
24       identification.)
25       Q.  Do you recognize this as Captain White's response

1    to the Rightful Place proposal?
2        A.  Looks like it.
3        Q.  Do you recall in this letter that Captain White
4    expressed the view that the TWA merger committee was
5    backtracking from positions it had taken previously?
6        A.  Yes.
7        Q.  And do you recall that Captain White made that
8    charge with respect to the number of TWA pilots that would be
9    stapled, for instance?
10       A.  Yes.
11       Q.  Do you recall that Captain White made that charge
12   with respect to the length of the equipment fences for the
13   777, for example?
14       A.  Yes, I believe so.
15       Q.  And if I could ask you to take a look at the third
16   page of this letter, the first bullet point.  Do you see that
17   Captain White says:  Putting aside cosmetic changes at the
18   top of the proposed integration list, your current proposal
19   has radically improved the placement of TWA pilots on the
20   list from your earlier proposals?
21       A.  Yep.
22       Q.  So even with regard to placement of pilots
23   Captain White was charging that you had backtracked from
24   positions that the TWA merger committee had taken previously,
25   correct?

1        A.  That was his position.
2        Q.  Do you disagree with that position?
3        A.  Yes.  I felt it was two different concepts.  The
4    Rightful Place proposal was a computerized method of
5    integration based on the principles I explained before
6    whereas these other numbers, both his and ours, were simply
7    numbers, really pretty arbitrary.
8        Q.  Do you recall Captain White expressing the view in
9    this letter that the Rightful Place proposal was essentially
10   a date-of-hire proposal?
11       A.  Off the top of my head I don't recall that, but it
12   says what it says.
13       Q.  Right.
14           Let me direct your attention to the 17th page of
15   this document.  Do you see after the bullet points the first
16   sentence there says:  In the end ALPA's June 14 proposal in
17   many respects approaches a date-of-hire proposal for the TWA
18   pilots.  Indeed, just as in your previous proposals, the
19   middle and lower portions of your pretransaction seniority
20   list virtually get their dates of hire.
21           Do you see that?
22       A.  Yes.
23       Q.  And did you conduct any analysis of the Rightful
24   Place proposal to see if that was true with respect to the
25   middle and lower portions of the TWA pretransaction seniority

1    list?
2        A.  Well, as I said, the date -- the Rightful Place
3    proposal was based on a certain premise.  The only way date
4    of hire entered into it was TWA pilots were arbitrarily moved
5    down the list if the Rightful Place proposal would have put
6    them ahead of an American Airlines pilots on date of hire.
7        Q.  So my question is whether you did any analysis with
8    respect to the middle and the lower portion of the TWA
9    seniority list to see how closely their positions on your
10   proposal corresponded to their dates of hire.
11       A.  No.  We felt that the Tannen proposal stood as it
12   was.  They weren't coming up with another proposal, they were
13   simply rejecting ours.
14       Q.  Did you expect when you presented the Rightful
15   Place proposal that the APA would agree to it?
16       A.  I was hopeful that they would at least come up with
17   a counterproposal somewhere close to it.
18       Q.  My question is whether you had an expectation that
19   the APA would accept the Rightful Place proposal.
20       A.  Well, I sent Ed White a paper with a place for his
21   signature to accept it.  Did I expect them to simply accept
22   the proposal as presented?  No.  That wasn't in their nature.
23       Q.  Why do you say that?
24       A.  It would have been too easy.
25       Q.  And what -- when you refer to their nature, what

1   should be accepted?

2       A.  Yes.

3       Q.  And were you among those people?

4       A.  Yes.

5       Q.  And why did you think the proposal should be

6   accepted?

7       A.  Because it was at the end of the road.  There

8   wasn't going to be anything else left, and there was a couple

9   of little tidbits that they were going to give us if we

10  accepted it.  And I felt that if it was accepted, that down

11  the road it would be part of their collective bargaining

12  agreement that couldn't be arbitrarily changed by them.  That

13  was my reasoning.

14      Q.  And so was it your view that this was the best deal

15  that the TWA merger committee was going to be able to

16  negotiate?

17      A.  Yes, if you call that our negotiations.  This was

18  basically a cram down.

19      Q.  What do you mean by that?

20      A.  I mean that they basically said that there's no

21  more negotiations, that this is it.

22      Q.  So when you say cram down do you mean take it or

23  leave it?

24      A.  This is going to occur.  The company and the APA

25  had agreed that this was going to occur.  Jeff Brundage was

1   there and they said this is it, this is what's going

2   to -- this is what's going to happen.  That's what I call a

3   cram down, not, okay, well, what do you propose?  There was

4   no more proposals.  There was no more negotiations at that

5   point.

6       Q.  I'm just trying to understand the terminology.

7       A.  Okay.

8       Q.  Are you using cram down as being equivalent to a

9   take it or leave it offer?

10      A.  Yeah.

11      Q.  Do you recall when discussing whether this proposal

12  should be accepted saying to the members of the MEC that

13  equity was in the eye of the beholder?

14      A.  Yes.

15      Q.  And what did you mean by that?

16      A.  Today I don't know what I meant by it.  I guess I

17  meant that there's a lot of different ways of looking at

18  things depending where you're sitting and so on.  I'm sure

19  Ed White thought that this was a fair deal.

20          Now, you know, I also want to tell you that this

21  document that you gave me here, when this was presented to us

22  we got no paperwork.  They were simply sitting across the

23  table there rattling all this stuff down as we're furiously

24  writing.  And we were expected to go into the MEC and tell

25  them what it was.  That's why I kind of stopped and had to

1   look at it, see what it was.  It would have been nice if they

2   would have provided this to us while they were telling us,

3   but I guess that's part of their negotiating policy.

4       Q.  Do you also recall telling the MEC that the

5   St. Louis cell was not better than date of hire but it was

6   the best we could get?

7       A.  Was not better than date of hire?  That sounds like

8   something I could have said.  I can't recall specifically

9   saying it but I could have said it.

10          MR. TOAL:  Let me show you a document, see if it

11      refreshes your recollection.  We'll mark this as Day

12      Exhibit 12, which is a copy of the TWA MEC minutes of a

13      special meeting October 31, 2001.

14          (Defendant's Exhibit Number 12 was marked for

15      identification.)

16      Q.  Do you recognize these minutes?

17      A.  Well, they look like MEC minutes to me.  It says

18  it was never approved, whatever that means, so I probably

19  didn't get a copy of it, or anybody else, until they were

20  printed.

21      Q.  Okay.  So let me direct your attention to the

22  second page right under the first listing of questions and

23  answers.  Do you see where it says Mike Day, Counsel Number

24  2?

25      A.  Um-hum, yes.

1       Q.  And what does that counsel number two mean?

2       A.  That was essentially the St. Louis pilots versus

3   New York pilots.

4       Q.  And was that part of the domicile that you were

5   part of?

6       A.  Yes.

7       Q.  So you can read this entire paragraph if you like,

8   but the last sentence here says:  St. Louis cell was not

9   better than date of hire but it was the best we could get.

10          Does seeing this sentence in the context of the

11  rest of the discussion refresh your recollection that that's

12  a statement that you made concerning the St. Louis cell?

13      A.  Yeah, I'd say I probably said that.  I can't tell

14  you I said it with 100 percent certitude but I'm not going to

15  sit up here and deny it.

16      Q.  And as of this time, October of 2001, do you

17  recall that you were trying to get a seniority integration

18  proposal that was as close to a date-of-hire methodology as

19  possible?

20      A.  No.  I was giving him a comparison, you know.  Date

21  of hire as far as we were concerned, you know, if we could

22  have gotten date of hire that would have been wonderful, but

23  that wasn't going to occur.  We could see that from these

24  constant negotiations here.  And the Tannen proposal we felt

25  completely went away from it, too.

Page 101

1    Q.   From the perspective of the TWA pilots, based on
2   your understanding would date of hire have been an idea
3   seniority integration?
4    A.   From -- probably for -- well, at least for the top
5   third for sure.
6    Q.   And so I recognize that what you're discussing as
7   of October 2001 was not strictly date of hire, but were you
8   trying to get a proposal that was as close to a date-of-hire
9   methodology as you could achieve?
10   A.   In October?
11   Q.   Yes.
12   A.   No.
13   Q.   And so why did you feel the need to compare the
14  St. Louis cell to date of hire in these discussions?
15   A.   Because that's what everybody understood, you know.
16  That was this mythical standard there that many of the MEC
17  members could only understand.  That's what we had done with
18  Ozark.
19   Q.   And you say mythical because you understood that
20  the APA was never going to agree to date of hire?
21   A.   Ed White basically said we're not going to have
22  that, we're not going to have arbitration, so --
23   Q.   What did the APA say about the prospect of
24  arbitration?
25   A.   Well, Ed told me up front that we're not going to

Page 102

1   have arbitration.
2    Q.   And were you ever told anything by the APA that was
3   contrary to that statement?
4    A.   No.
5    Q.   Did anything happen at any time that gave you any
6   reason to believe that the APA would have agreed to arbitrate
7   seniority integration?
8    A.   No.
9    Q.   Did the APA explain why it was unwilling to
10  participate in arbitration of seniority integration?
11   A.   Sure.  Well, they didn't say why but it was pretty
12  obvious.  They'd lose control of the process.
13   Q.   Do you have any reason to believe that under any
14  circumstances the APA would have agreed to a seniority
15  integration proposal that was more favorable to the TWA
16  pilots than Supplement CC?
17   A.   Yep.
18   Q.   And what reason do you have for believing that?
19   A.   I believe if my union would have backed me up and
20  provided me some leverage we would have got a better deal.
21   Q.   Do you have any factual information regarding what
22  the APA would have done if ALPA had behaved differently?
23   A.   No.
24   Q.   So other than your belief you expressed, do you
25  have any other reason for believing that the TWA pilots could

Page 103

1   have gotten a seniority integration list that was better for
2   them than Supplement CC?
3    A.   Other than what I've told you, my beliefs that we
4   weren't provided the leverage that we needed?
5    Q.   Yes.
6    A.   No.
7    Q.   Do you have any basis for believing that the APA
8   would have accepted a seniority integration list that had a
9   bottom staple of 210 TWA pilots?
10   A.   Do I have any basis for believing that they would
11  have accepted?
12   Q.   Yes.
13   A.   Well, they didn't accept the Tannen proposal which
14  had at least that, so why would they -- they've already not
15  accepted it, so I'm not sure what you're asking me.
16   Q.   And they didn't accept your proposal that had a
17  staple of 400-some-odd TWA pilots either, correct?
18   A.   Correct.
19   Q.   And so do you have any reason for believing the
20  APA would have accepted any seniority integration proposal
21  that had a bottom staple of fewer than 400-something pilots?
22   A.   I don't have any factual reason to believe it.
23   Q.   Do you have any other reason for believing it even
24  if it's not factual?
25   A.   No.

Page 104

1    Q.   Just based on their negotiating position do you
2   have any reason to believe they would have accepted a bottom
3   staple of fewer than 400-something pilots?
4    A.   Not with the situation as it was with our lack of
5   leverage, no, they weren't going to accept anything less.
6    Q.   With any different set of circumstances do you have
7   any reason to believe that the APA under any circumstances
8   would have accepted a bottom staple of fewer than
9   400-something pilots?
10   A.   Only my belief that if we had been provided the
11  proper leverage we could have done better.  I don't know the
12  numbers.
13   Q.   And what do you view as the proper leverage?
14       MR. PRESS:  Let me just object to the form of the
15   question.  Subject to that you can go ahead and answer.
16   A.   Well, we suggested certain things, you know, the
17  jumpseat war, I'm sure you're familiar with that, AFL-CIO
18  pressure, boycotting and so on, that's the type.  I used
19  those as examples and said, you know, ALPA National's got
20  think tanks there that could certainly come up with more
21  things than Mike Day can come up with sitting around at home
22  dreaming.  But those are the two or three that came to my
23  mind.
24   Q.   Well, beyond the things that just came to your
25  mind, out of all the thing that you were aware of that you

Page 109

1    A.  I considered it and didn't think that it would
2  happen.
3    Q.  Do you think the question of whether to institute a
4  jumpseat war in these circumstances was a question about
5  which reasonable minds could differ?
6    A.  Not for basic unionism.  I think our backs were
7  against the wall and I think they had to do something and
8  this was one of the few things they could have done.
9    Q.  So you think that any reasonable union in these
10  circumstances would have instituted a jumpseat war; is that
11  correct?
12    A.  Yes.  Yes.
13    Q.  And you think that even though you're not aware of
14  any union that's actually done it at any time in history,
15  correct?
16    A.  No.
17    Q.  No what?
18    A.  I'm not aware.
19    Q.  Do you know how many American pilots take advantage
20  of ALPA jumpseats?
21    A.  No.
22    Q.  Did you do any assessment when proposing a
23  jumpseat war of the costs that would be imposed on American
24  pilots?
25    A.  No.

Page 110

1    Q.  Did you do any assessment of the costs that would
2  be imposed on TWA pilots if APA responded with a jumpseat war
3  of its own?
4    A.  No.
5    Q.  Did you compare the cost to American pilots
6  relative to what they were being asked to give up in the
7  seniority integration?
8    A.  No.
9    Q.  Do you have any reason to believe, any factual
10  information to believe that if ALPA had instituted a jumpseat
11  war against the American pilots that the APA would have
12  offered a more favorable integration from the perspective of
13  the TWA pilots?
14    A.  No.
15    Q.  Do you know who John Darrah is?
16    A.  Yes.
17    Q.  And who is he?
18    A.  He was the president or chairman, whatever they
19  call it, of the APA at the time of the announcement.
20    Q.  And did you have any interaction with Mr. Darrah?
21    A.  I don't believe so.  I may have met him but I can't
22  remember.
23    MR. TOAL:  I'm going to show you and mark as
24  Exhibit Number 13 a copy of Mr. Darrah's deposition in
25  this case.

Page 111

1    (Defendant's Exhibit Number 13 was marked for
2  identification.)
3    Q.  Let me direct your attention to Page 48 of this
4  transcript.
5    A.  Okay.
6    Q.  So take a look at Line 11.  Do you see Mr. Darrah's
7  asked a question:  If ALPA had threatened a lawsuit to seek
8  an injunction of the TWA acquisition, would that -- would
9  that have made the APA more receptive to binding arbitration
10  of seniority integration?
11    Do you see that?
12    A.  Yes.
13    Q.  Then below that -- well, withdrawn.
14    Okay.  So directing your attention to Line 25 on
15  Page 48, do you see Mr. Darrah is asked the question:  What
16  if ALPA had threatened a jumpseat war against the American
17  Airlines pilots?  There's an objection, and the answer is:
18  No, if anything like that would have occurred I think it
19  would have had just the opposite effect.
20    The question is asked:  And why -- why do you say
21  that?  And the answer is:  You have to understand, as you
22  obviously do working with ALPA, the politics of the unions,
23  especially of pilots.  In any integration, either side,
24  there's a huge debate within the boardroom and there's
25  obviously always a group who wants to take a hardline

Page 112

1  position.
2    And there's still a group in our APA board of
3  directors that wanted to, you know, quote, staple the entire
4  TWA list to the bottom of the seniority list.  It takes a lot
5  of persuasion for people to understand that we can't (sic)
6  something like that, that we've got to go do the fair and
7  equitable route.
8    Doing something like that would have just pushed
9  more and more people into that camp and I think it would have
10  had a disastrous effect on this.  I didn't hear about this
11  until way after the fact.  I didn't hear about it during the
12  time frame.  It would not have helped at all.  It would have
13  made the situation much worse.
14    Do you see that testimony?
15    A.  Yes.
16    Q.  Do you have any factual basis to contest
17  Mr. Darrah's testimony that if ALPA had declared a jumpseat
18  war against the American Airlines pilots that it would have
19  had a disastrous effect?
20    A.  No.  That's his opinion.  I don't have any factual
21  information.
22    Q.  And as between you and Mr. Darrah, who is in a
23  better position to assess the impact on the American pilots
24  of a jumpseat war that was declared by ALPA?
25    MR. PRESS:  Object to the form of the question.

Page 113

1    A.  Well, Mr. Darrah, of course, is an APA pilot,
2  however, he's also a politician, so I don't -- I don't know.
3  I think it's speculation, but he feels he's in a better
4  position.  I feel we don't know what would have happened.
5    Q.  Did you ever undertake any steps to try and
6  understand what effect declaration of a jumpseat war would
7  have on the view of American pilots toward seniority
8  integration with TWA?
9    A.  No.  What I did was I took the numbers involved.
10  There was 12,000 American pilots and 2,500 TWA pilots.  That
11  created their leverage, yet there was 70,000 ALPA pilots.
12  That reversed the leverage.  So all I was trying to do was
13  get them to negotiate in good faith.
14    Q.  But you didn't know how many American pilots used
15  ALPA jumpseats, correct?
16    A.  No.
17    Q.  And out of the ALPA pilots how many of those flew
18  on cargo airlines?
19    A.  I have no idea.
20    Q.  Are there jumpseats on cargo airplanes?
21    A.  I believe so until that nutcase tried to club the
22  captain on that Fed X flight, but as far as I know they have
23  jumpseats.
24    Q.  You also mentioned another idea you had of ALPA
25  seeking an AFL-CIO boycott.  Do you recall that testimony?

Page 114

1    A.  Yes.
2    Q.  And what was the idea that you had?
3    A.  The idea was to try to put pressure on American so
4  that they would try to sweeten the deal with their pilots to
5  encourage them to negotiate with us.
6    Q.  And what is it that you wanted ALPA to do?
7    A.  To have the AFL-CIO put American on the boycott
8  list.
9    Q.  And do you have an understanding of whether the
10  AFL-CIO would have done that just based on a request from
11  ALPA?
12    A.  No.  I presume that -- no, I don't.
13    Q.  Do you know anything about the procedures for the
14  AFL-CIO to put a company on its boycott list?
15    A.  No, I don't.  I'm not privy to that.
16    Q.  Do you know if the AFL-CIO would have agreed to put
17  American Airlines on its boycott list based on the conduct of
18  a union representing its pilots?
19    A.  No, I don't know that.
20    Q.  Are you aware of any situation in the past in which
21  the AFL-CIO has put a company on its boycott list based on
22  the conduct of the union representing its employees?
23    A.  No.
24    Q.  Do you know what the financial impact of being on
25  the AFL-CIO boycott list would have been for American

Page 115

1  Airlines?
2    A.  No.
3    Q.  Did you try and undertake any financial assessment
4  of what that impact would be?
5    A.  No.
6    Q.  What is it you think American Airlines could have
7  done to influence the negotiating posture of its -- of the
8  APA?
9    A.  I can only offer examples.  I would think that
10  furlough protection that suddenly disappeared.
11    Q.  Anything else that you thought American could have
12  done to influence the APA's bargaining position?
13    A.  Well, I know they were I think at that time
14  attempting to negotiate their new working agreement.  They
15  could have offered them some of the things that they were
16  asking for, whatever they were, as an --
17    Q.  Do you know what they were?
18    A.  No, have no idea.
19    Q.  Do you know what the cost to American would have
20  been of offering any of those things?
21    A.  No.
22    Q.  Do you know -- do you have any reason to believe
23  that American was prepared to offer additional inducements to
24  the APA?
25    A.  No.

Page 116

1    Q.  Do you have any knowledge of the cost of being on
2  the AFL-CIO boycott list relative to the cost of offering any
3  of these inducements to the APA?
4    A.  No.
5    Q.  Now, American Airlines actually offered furlough
6  protection to the American Airlines pilots, correct?
7    A.  I don't recall.  As I said, we weren't invited into
8  their negotiations with their -- between the APA and
9  American.
10    Q.  Do you recall becoming aware that American Airlines
11  agreed to provide furlough protection to the American
12  Airlines pilots?
13    A.  The only thing I can recall is when Ed White told
14  me we got furlough protection for your guys.
15    Q.  Did you consider the possibility that requesting an
16  AFL-CIO boycott could have had adverse effects for the TWA
17  pilots in the seniority integration negotiations?
18    A.  I didn't think it would.
19    Q.  Did you consider that possibility?
20    A.  Yep.
21    Q.  Now, you testified previously about certain
22  litigation tactics that Roland Wilder had suggested.  Do you
23  recall that testimony?
24    A.  Yep.
25    Q.  And what litigation tactics were you aware of that

Page 129

1   those legal strategies had been successful in the past?
2       A.   I recall him saying that he -- I thought he had
3   used some of them before but I don't recall the specifics,
4   which ones were being -- there were new ones he was coming up
5   with being creative or whether this was something that he had
6   tried before.  I don't recall.
7       Q.   And did he tell you that any of these litigation
8   strategies, to the extent they had been used in the past, had
9   succeeded?
10      A.   I don't recall a conversation like that.
11      Q.   You don't recall him telling you that, correct?
12      A.   That's correct.
13      Q.   Now, if ALPA had pursued litigation to enjoin
14  single carrier status for American in October of 2001, how
15  would that have affected the APA's position regarding
16  seniority integration?
17      A.   I don't know.  It would have -- as I understood, it
18  would have brought things to a halt at that point in time.
19  And we knew that American was anxious to get this pilot group
20  together and get the airplanes all under one certificate, and
21  if we could put pressure on American then maybe American
22  could provide inducements to the APA.  After all, it was
23  American and the APA that came up with this Supplement CC, it
24  wasn't the TWA pilots.
25      Q.   So the thought for this strategy was that you could

Page 130

1   threaten some interest of American Airlines and hope that
2   American Airlines would put pressure on the APA to offer more
3   favorable seniority integration to the TWA pilots; is that
4   correct?
5       A.   That's the best that I can recollect at this time.
6       Q.   And did you do any analysis of what the costs would
7   be to American Airlines for having single carrier status
8   enjoined?
9       A.   No.
10      Q.   Did you form a view about the likelihood that this
11  legal strategy would be successful if it was pursued?
12      A.   I did not.
13      Q.   Did Mr. Wilder give you any assessment of the
14  likelihood that this strategy would be successful if pursued?
15      A.   I don't recall.
16      Q.   Did he have any information suggesting to you that
17  American Airlines would be prepared to offer inducements to
18  the APA were this strategy pursued and were it successful?
19      A.   No.  This was a strategy.
20      Q.   So you didn't know if this strategy would have any
21  effect on the APA's position with regard to seniority
22  integration, correct?
23      A.   That's correct.
24      Q.   And you didn't know if any of the other legal
25  strategies would have had any effect on the APA's views on

Page 131

1   seniority integration, correct?
2       A.   Didn't know for sure, no.
3       Q.   You didn't know at all, correct?
4       A.   Didn't know.
5       Q.   Did Mr. Wilder ever propose in October 2001 that
6   ALPA sue the APA?
7            MR. PRESS:  Say it again.
8       Q.   Did Mr. Wilder ever propose in October 2001 that
9   ALPA sue the APA?
10      A.   I don't ever remember a proposal to sue the APA.
11      Q.   Do you remember discussion of whether ALPA should
12  approach the Department of Transportation to try and make a
13  fair seniority integration process a condition of the asset
14  purchase of TWA?
15      A.   I recall it being mentioned along the way but I
16  don't recall any of the specifics of it.
17      Q.   Is that something you thought ALPA should have
18  done?
19      A.   If it would have helped provide leverage, yes.
20      Q.   Are you aware of anything that -- well, did you
21  think that would provide leverage?
22      A.   I felt that anything you could do to slow down the
23  train would provide some leverage.
24      Q.   With respect to the Department of Transportation,
25  are you aware of anything specifically that ALPA didn't do

Page 132

1   that you thought it should have done?
2       A.   With respect to the Department of Transportation?
3   No, I don't know what ALPA did or didn't do with the
4   Department of Transportation.
5       Q.   Okay.  Were you aware that representatives of the
6   TWA MEC actually met with the secretary of the Department of
7   Transportation?
8       A.   I don't recall that.
9       Q.   Do you remember there was discussion prior to the
10  waiver of scope about whether TWA pilots would have the right
11  to strike in the event that the Section 1113 motion was
12  granted?
13      A.   I recall there was some discussion on that.
14      Q.   What do you recall about that discussion?
15      A.   I recall I couldn't get a real good answer because
16  somewhere someone had said we could and then others said no,
17  you don't have any union, you don't have any rights at that
18  point in time, which seemed rather farfetched to me, but
19  that's -- you know, that's about it.
20      Q.   Is there anything that you thought ALPA should
21  have done that it didn't do with regard to the question of
22  whether TWA pilots had the right to strike in those
23  circumstances?
24      A.   The only thing I think they would be required to do
25  would be to give us an honest assessment of whether there was

1   going to be a union and whether there was going to be any
2   rights to strike.
3        Q.   And do you have any factual information to suggest
4   they did not provide an honest assessment of their view of
5   whether the TWA pilots would have a right to strike in those
6   circumstances?
7        A.   I don't recall that issue today, no.
8        Q.   The discussion that was had concerning the right
9   to strike, who would the TWA pilots have been striking
10  against?
11       A.   Well, at that point in time they would have been
12  striking against TWA because I'm not sure that TWALLC had
13  been created yet.
14       Q.   And do you have any basis for thinking that a TWA
15  pilots strike against TWA would have affected the APA's
16  bargaining position on seniority integration?
17       A.   Well, off the top of my head the only thing I could
18  think is how it would effect American.  And if American
19  wanted to see this successfully concluded they would have
20  liked to seen TWA be as strong as possible, so --
21       Q.   Well, at this point this is before the TWA pilots
22  had waived scope, correct?
23       A.   Right.
24       Q.   So at that point American was not obligated to
25  proceed with the transaction, correct?

1        A.   Correct, but it was always our feeling that they
2   really honestly wanted this to go through.
3        Q.   And did you --
4        A.   And maybe they were willing to do a little bit more
5   to help it go through.
6        Q.   Did you think a TWA strike against TWA would make
7   American more or less interested in pursuing this
8   transaction?
9        A.   I don't know.
10       Q.   Can you think of any reason why it would make
11  American Airlines more interested in doing the transaction?
12       A.   They had already put money into it.  If they walked
13  away from it they were going to throw the money away, so it
14  was in their interest to continue forward with it.  So if
15  they could do something to alleviate a strike or whatever,
16  that would be a reason.
17       Q.   My question is whether a TWA strike against TWA,
18  whether you can conceive of any circumstance in which that
19  would make American more eager to pursue this transaction.
20       A.   Well, just what I said, just to try to make the
21  transaction move forward smoother.
22       Q.   Do you have any -- do you have a view that ALPA
23  should have done anything differently than it did with
24  respect to providing financial support to the TWA MEC?
25       A.   I never asked for more money from ALPA.  I said to

1   create leverage.  So I really -- I did not feel my committee
2   was necessarily personally hampered.  The only thing was I
3   wasn't sure that we really should have had to assess our own
4   pilots for a non-ALPA-to-ALPA merger.
5        Q.   And other than that, any issue that you had with
6   the financial support that ALPA provided to the TWA MEC?
7        A.   I can't recall any at this time.
8        Q.   Are you aware of any prior situation in an
9   ALPA-to-non-ALPA merger in which the MEC did not have to make
10  an assessment on its pilots?
11       A.   Not specifically, no.
12       Q.   Generally?
13       A.   Well, generally, generally I felt that with ALPA's
14  merger policy that they treated it different, that the reason
15  they couldn't provide funds if it was an ALPA-to-ALPA merger
16  was because they were representing both groups.  But in a
17  case were they weren't representing both groups there's no
18  reason in the world they couldn't have provided funds.
19       Q.   My question, though, is whether you're aware of
20  any situation involving an ALPA-to-non-ALPA merger where the
21  MEC of the ALPA airline was not required to assess its
22  pilots.
23       A.   No, I'm not.
24       Q.   And you're aware that ALPA provided financial
25  support to the MEC, correct?

1        A.   Yes.
2        Q.   And in what form did ALPA provide financial
3   support?
4        A.   Well, ALPA collected dues from us and then doled
5   portions of them back.  And this was in the form of in our
6   case MEC office, staff, flight pay loss in this case and so
7   on.  So that's the type of support.
8        Q.   Are you familiar with something known as the bond
9   bill?
10       A.   Yes.
11       Q.   Is there anything with respect to the bond bill
12  that you believe ALPA should have done but did not do?
13       A.   Again, that wasn't my committee that really
14  instituted that.  You know, the MEC had a government affairs
15  committee, and Matt Thomas (phonetic) was kind of in charge
16  of that one and he went his direction on that.  So I'm really
17  not that familiar with it.  I didn't get that involved.  As a
18  matter of fact, I don't know that I got involved at all in
19  that.
20       Q.   So I understand what you said, but having said
21  that, is there anything you are aware of that you think ALPA
22  should have done with respect to the bond bill that it did
23  not do?
24       A.   Well, there's nothing that I'm aware of.
25       Q.   Do you believe that you personally were financially

Page 137

1   damaged by the seniority integration between the American and
2   the TWA pilots?
3      A.  Well, again, depends how the merger would have went
4   before.  If it would have went and I would have been flying
5   the 777 I would have certainly made a lot more money.  If I
6   had been flying international the entire time like I had been
7   doing before I would have made more money.  So I was
8   affected, not to the same extent that many others were
9   affected.
10      Q.  Were you financially damaged by implementation of
11   Supplement CC?
12         MR. PRESS:  Object to the form of the question.
13   Standing alone that question doesn't make any sense so I
14   object.
15      A.  Really, again, it depends on what you're comparing
16   it against.
17      Q.  Comparing it to your financial position at TWA.
18         MR. PRESS:  Same objection.
19      A.  You know, that year versus the year before?  I
20   don't know that I was financially impacted.  I can't tell you
21   that.  And as far as what it may have been, again, I don't
22   know.  I don't know what would have happened.  But as far
23   as -- you're asking was I financially impacted when CC was
24   implemented, and I'm saying that I'm sure I was but not to
25   the same extent as anybody else, especially the bottom

Page 138

1   two-thirds.
2      Q.  That's not what you said previously, correct?
3      A.  I believe what I said previously, that this was not
4   about me and I was -- well, I don't know.  I'd have to see
5   what the question, the exact question was.  How was I hurt?
6   What was the question?
7      Q.  Well, take a look at Page 117 from your trial
8   testimony in this case.
9      A.  Okay.  I'm there.
10      Q.  So starting at the beginning of the prior page,
11   bottom of 116, the question is asked:  In terms of the
12   implementation of Supplement CC, what planes were you flying
13   after, what planes did you continue to fly from 2002?  Start
14   with that.  You say:  Same, 767, 757.
15         Do you see that?
16      A.  Yes, uh-huh.
17      Q.  So in terms of the planes that you were flying
18   you were not adversely affected by implementation of
19   Supplement CC, correct?
20      A.  That's correct.
21      Q.  And at Line 7 on Page 117 you were asked:  So was
22   your seniority in terms of the kinds of planes you were
23   flying, was that adversely affected?  And your answer is:
24   Not relative to the airplanes I was flying, no.
25         Do you see that?

Page 139

1      A.  Yes.
2      Q.  And that was accurate testimony, correct?
3      A.  Yes.
4      Q.  And it continues to be accurate today?
5      A.  Yes.
6      Q.  Okay.  And you were asked at Line 10:  Did you make
7   less money in 2002 than you had in 2000 and 2001?  And your
8   answer is:  I can't say for sure but I don't think I did.
9         Correct?
10      A.  That's what I said, yeah.
11      Q.  And that was accurate then, correct?
12      A.  That was accurate then, yeah.  I couldn't say for
13   sure but I don't think I did, so --
14      Q.  Okay.  And that's accurate now, correct?
15      A.  Yes.
16      Q.  Line 13 you were asked:  All right.  So you were
17   senior enough at TWA so that when Supplement CC was imposed
18   it didn't really hurt you; is that fair?  And your answer
19   is:  I was not adversely affected, no.
20         Do you see that?
21      A.  I see that.
22      Q.  And that was accurate testimony, correct?
23      A.  That was accurate as far as what -- well, what they
24   were asking at that point in time.  You know, again, I don't
25   feel like I was badly damaged but I think that everybody was

Page 140

1   damaged to some extent.  So adversely affected, yeah, I
2   wouldn't necessarily agree with what I said at that point but
3   I've had two years to think about it, too.
4      Q.  So in those two years what's occurred to you
5   regarding ways in which you've been damaged?
6      A.  Well, I started recalling that prior to that point
7   in time I was flying out of New York and I was flying
8   international.  And immediately after this we all got
9   corralled, they closed New York to us, put us in St. Louis,
10   and we had to start flying domestic trips.
11      Q.  When did that happen?
12      A.  2001 or '2, somewhere in that area there.
13      Q.  Was that before the implementation of
14   Supplement CC?
15      A.  Yes.
16      Q.  So that didn't have anything to do with seniority
17   integration, correct?
18      A.  That would be -- that would be correct.
19      Q.  So with respect to the seniority integration, in
20   what ways have you been harmed by the seniority integration?
21      A.  As far as the seniority integration itself I can't
22   give you any examples.
23      Q.  Do you believe you lost seniority as a result of
24   the seniority integration here?
25      A.  Well, yes.

# Exhibit 23

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRANS WORLD AIRLINES, INC., et al.,[1] | ) | Case No. 01-0056 (PJW) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

**Hearing Date: To be determined**
**Objection Date: March 26, 2001 at 4:00 p.m.**

**MOTION BY TRANS WORLD AIRLINES, INC.**
**FOR AN ORDER AUTHORIZING REJECTION OF CERTAIN OF ITS**
**COLLECTIVE BARGAINING AGREEMENTS PURSUANT TO 11 U.S.C. § 1113**

Trans World Airlines, Inc. ("TWA"), one of the above-captioned debtors and

debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel,

submit this Motion for entry of an Order Authorizing the Rejection of Certain of Its Collective

Bargaining Agreements Pursuant to 11 U.S.C. § 1113 (the "Motion"). In support of the Motion,

TWA respectfully states as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C.§ 157(b).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein is 11 U.S.C. § 1113.

---

[1] Debtors are the following entities:  Trans World Airlines, Inc., Ambassador Fuel Corporation, LAX Holding Company, Inc., Mega Advertising, Inc., Northwest 112th Street Corporation, The TWA Ambassador Club, Inc., Trans World Computer Services, Inc., Transcontinental & Western Air, Inc., TWA Aviation, Inc., TWA Group, Inc., TWA Standards & Controls, Inc., TWA Stock Holding Company, TWA-D.C. Gate Company, Inc., TWA-LAX Gate Company, Inc., TWA Logan Gate Co., Inc., TWA-NY/NJ Gate Company, Inc., TWA-Omnibus Gate Company, Inc., TWA-San Francisco Gate Company, Inc., TWA-Hangar 12 Holding Company, Inc., Ozark Group, Inc., TWA Nippon, Inc., TWA Employee Services, Inc., TWA Getaway Vacations, Inc., Trans World Express, Inc., International Aviation Security, Inc., Getaway Management Services, Inc., and The Getaway Group (U.K.), Inc.

85400-001\DOCS_DE:19025.1
03/15/01 6:55 PM

**ALPA 019274**

## BACKGROUND

3.      On January 10, 2001 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under the United States Bankruptcy Code, thereby becoming debtors-in-

possession pursuant to 11 U.S.C. §§ 1107 and 1108.  The Debtors' Chapter 11 cases are being

jointly administered pursuant to an order of the Court.

4.      The Debtors, currently the eighth largest airline in the United States, have

been operating for seventy-five years and provide air transportation, cargo, and other

transportation related services to millions of customers each year.  During 2000, the Debtors

carried approximately 26.4 million passengers and flew approximately 27.2 billion revenue

passenger miles.  As of December 31, 2000, the Debtors operated a fleet of approximately 188

jet aircraft and provided regularly scheduled jet service to approximately 103 cities in the United

States, Canada, Mexico, the Caribbean, Europe, and the Middle East.  The Debtors currently

employ approximately 20,00 full time and part time employees.

5.      The Debtors consist of Trans World Airlines, Inc. ("TWA"), a Delaware

corporation, and its twenty-six wholly-owned, direct or indirect subsidiaries.  These Debtor-

subsidiaries hold assets or perform activities with the intent to enhance or otherwise complement

the operations of TWA.

6.      Shortly before the commencement of these Chapter 11 cases, the Debtors

and AMR Corp. or its designee ("American") entered into an Asset Purchase Agreement dated

January 9, 2001 (the "Asset Purchase Agreement") that provides, inter alia, for American's

purchase of all or substantially all of the Debtors' assets (subject to higher and better offers

pursuant to court approved bidding procedures), the assumption of a significant portion of the

85400-001\DOCS_DE:19025.1                              2
03/15/01 6:55 PM

**ALPA 019275**

Debtors' obligations (including, without limitation, certain retiree medical benefit obligations), and the hiring of the vast majority of the Debtors' 20,000 employees.

7.      On March 12, 2001, this Court approved the Debtors' sale of substantially all of their assets to American, pursuant to the Asset Purchase Agreement.  TWA and American anticipate that a closing of this sale will occur in the very near future, pending applicable governmental approval.  TWA and American contemplate that at the time of closing, TWA's assets will be sold to the Purchaser, and substantially all of TWA's contract employees will be hired by Purchaser.  Thereafter, the assets and employees of the Purchaser will be integrated into American's operations and workforce, respectively, over the course of time.

## RELIEF REQUESTED

8.      As described more fully in the accompanying Memorandum in Support of Motion By Trans World Airlines, Inc. for an Order Authorizing Rejection of Certain of Its Collective Bargaining Agreements Pursuant to 11 U.S.C. § 1113 (the "Memorandum") and Affidavit of Terry L. Hayes ("Affidavit"), the Asset Purchase Agreement requires, as a condition to closing, that certain portions of TWA's collective bargaining agreements with its unionized workforce (the "CBA's") be waived or modified by the respective unions so as to conform with the TWA-American transaction and enable that transaction to close.  Despite TWA's good faith efforts, it has been unable to obtain the required CBA waivers from its unions, thereby jeopardizing a closing and the successful sale of TWA as a going concern.  As a result, TWA must request authority to reject its CBA's pursuant to 11 U.S.C. § 1113.

9.      As described more fully in the Memorandum and Affidavit, TWA has complied with all of the requirements of Section 1113 in good faith and is still willing to

85400-001\DOCS_DE:19025.1
03/15/01 6:55 PM

3

ALPA 019276

continue negotiating with its unions.  Despite these efforts, however, TWA's unions have refused without good cause to agree to the necessary modifications to allow the TWA–American transaction to close.

WHEREFORE TWA respectfully requests entry of an order, substantially in the form attached hereto, (a) authorizing TWA to reject its collective bargaining agreements in accordance with Section 1113 of the Bankruptcy Code and (b) granting such further relief as this Court deems equitable and just.

85400-001\DOCS_DE:19025.1
03/15/01 6:55 PM

4

**ALPA 019277**

# Exhibit 24

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY
-----------------------------------------X
PATRICK BRADY, et al,

     Plaintiffs,

 - against -

AIR LINE PILOTS ASSOCIATION
INTERNATIONAL,

     Defendant.

Civil Action No. 02-2917 (JEI)
-----------------------------------------X


      1285 Ave. of the Americas
      New York, New York

      January 28, 2013
      1:50 p.m.


   Videotaped Deposition of Non-Party

Witness TERRY HAYES, before Rita Persichetty,

a Notary Public of the State of New York.

1    previously presented to the MEC negotiating

2    committee on March 9th?

3         A    I think the provisions are the same,

4    the letters have been signed by the appropriate

5    LLC and American Airlines personnel so that

6    there's signature on a piece of paper.

7         Q    Did you present the proposal that's

8    reflected in Exhibit 4 to the MEC negotiating

9    committee on or around March 14 of 2001?

10        A    I believe I did, yes.

11        Q    And do you recall what response you

12   got?

13        A    It still did not address their

14   concerns regarding process of seniority.

15        Q    And did the MEC accept this proposal?

16        A    No, not at that time.

17        Q    In the course of putting this

18   proposal together, did you form any plan as to

19   what you would do if the MEC refused to accept

20   it?

21        A    We had had conversations internally

22   about what our next step should be in the

23   bankruptcy process.

24        Q    And what were those next steps?

25        A    We had talked about preparing an

1    1113.

2         Q     And did you, in fact, prepare an 1113

3    motion?

4         A     Yes, we did.

5         Q     Why was that?

6         A     As I said before, to protect the

7    purchase -- the asset purchase agreement and

8    protect our chances of being able to close that

9    agreement with American.

10        Q     Now, your declaration in support of

11   the 1113 motion that we looked at in Exhibit 3

12   and the 1113 motion itself were filed on

13   March 15 of 2001; is that correct?

14        A     Yes.

15        Q     What happened after those filings

16   were made?

17        A     We continued to negotiate.

18        Q     Did TWA subsequently submit any

19   further written proposal to the MEC negotiating

20   committee?

21        A     Yes, I'm sure we did.

22              MR. MICHAEL:  Let's mark this as

23        Hayes 5.

24              (Hayes Exhibit 5, Document dated

25        3/17/01, marked for identification.)

1        Q      You've been handed an exhibit marked

2    as Exhibit 5 to your declaration.  It has a

3    handwritten cover sheet dated March 17, 2001

4    addressed to the ALPA MEC office and various

5    others from Terry Hayes.

6        A      Yes.

7        Q      Let me ask you to take a look through

8    Exhibit 5.  I'll ask you to take a look through

9    Exhibit 5 and tell me if that's a document that

10   you recall receiving on or around March 17th of

11   2001.

12       A      Yes, it is.

13       Q      And what was this document?

14       A      This was a prepared transition

15   agreement between TWA LLC and the pilots.

16       Q      And is this draft agreement that you

17   did indeed fax to the TWA MEC office on

18   March 17 of 2001?

19       A      Yes, I did.

20       Q      What was the purpose of the

21   transition agreement that was being proposed

22   here?

23       A      It was to begin to put into writing

24   what the final agreement would look like, and

25   so it has some of those characteristics of what

# Exhibit 25

## TWA MEC SPECIAL MEETING
## APRIL 2, 2001
## ST. LOUIS, MO

## COMPILATION OF ACTIONS

### Resolution #01-64 by S. Rautenberg/P. Lewin

WHEREAS the Negotiating Committee reports that it has negotiated to the best offer available from TWA and American for a collective bargaining agreement applicable to TWA LLC on all issues except Scope, subject to minor clarifications on a handful of matters; and

WHEREAS TWA has filed a motion under § 1113 of the Bankruptcy Code to reject the current ALPA collective bargaining agreement, which will be considered April 6, 2001; and

WHEREAS the MEC has considered extensive advice from its bankruptcy counsel (Steve Tumblin and Richard Seltzer), merger counsel (Roland Wilder), investment advisor (Michael Glanzer) and former ALPA President Randy Babbitt, as well from ALPA staff in the Representation Department (Bill Roberts and David Holtzman),  Legal Department (Clay Warner), and Economic and Financial Analysis Department (Bob Christy), now

**THEREFORE BE IT RESOLVED that the Negotiating Committee is directed to seek clarification immediately on all outstanding issues arising from the proposed agreement covering the operations of TWA LLC (the "LLC CBA") and to finalize the LLC CBA, and**

**BE IT FURTHER RESOLVED that bankruptcy counsel is directed to take steps that would insure that the LLC CBA is incorporated in court documents resolving the § 1113 motion, and**

**BE IT FURTHER RESOLVED that no later than April 5, 2001, the Master Chairman, or his designee, is directed to execute the LLC CBA and forward the LLC CBA immediately to ALPA President Duane Woerth for his signature, and to waive those provisions of the current ALPA-TWA collective bargaining agreement that must be waived as a condition to the closing of the Asset Purchase Agreement, and**

**BE IT FURTHER RESOLVED that the Merger Committee, with the assistance of the MEC Officers and advisors, is directed to take all appropriate actions, including efforts to negotiate with the Allied Pilots Association concerning seniority integration, and**

**BE IT FURTHER RESOLVED that the Master Chairman does not release this motion until advised by the Communications Committee Chairman.**

> PASSED roll call vote
> (Hollander requested roll call vote)
> **FOR: 1501  AGAINST: 450  ABSTAIN: 0**
> **FOR:**
> Hollander, Council #2:        55
> Singer, Council #2:          142
> Rautenberg, Council #3:      724
> Young, Council #3:           400

**ALPA 006209**

# TWA MEC SPECIAL MEETING
## APRIL 2, 2001
## ST. LOUIS, MO

## COMPILATION OF ACTIONS

|                          |     |
|--------------------------|-----|
| Lewin, Council #4:       | 90  |
| Altman, Council #4:      | 90  |
| **AGAINST:**             |     |
| Hollander, Council #2:   | 180 |
| Singer, Council #2:      | 65  |
| Young, Council #3:       | 205 |

**ALPA 006210**

COMPILATION OF ACTIONS
APRIL 2, 2001

# Exhibit 26

# AA/TWA PILOT

## SENIORITY INTEGRATION:

## SUMMARY OF SUPPLEMENT CC

### [TO AA/APA BASIC AGREEMENT]

*From*

*APA's Mergers & Acquisitions Committee*

**December 14, 2001**

ALPA 008746

## ➤ ALLIED PILOTS ASSOCIATION
O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org



December 14, 2001


Dear AA Pilot:

As you all know, both well before and since the tragic events of September 11, the APA has been grappling with the issues arising from American Airlines' acquisition of most of TWA's assets. Certainly the most difficult and sensitive aspect of that transaction is the integration of the TWA pilots into the AA seniority list and workforce. The integration of two pilot groups is always an emotionally charged issue for the pilots involved. This particular integration is especially difficult and complex because it is the largest such integration in the history of U.S. aviation, affecting more than 14,000 pilots. The APA's effort to forge an integration method that is fair to both sides and will stand the test of time has been made even more difficult — and even more emotionally charged — by the furloughs that both pilot groups are currently experiencing.

All concerned, of course, would have preferred that the integration method be decided and announced as quickly as possible, and I can certainly understand the impatience many of you must have experienced in awaiting the results of the process. Given the complexity and sensitivity of the task, however, and given the fact that our meetings with TWA pilot representatives and then the company extended over many months, a quick solution was not possible. We have also had to approach this complex task with care because we are not looking for a quick fix, but for a solution that will deal with the many aspects of this integration in the long term. We appreciate the patience and professionalism you have shown while your union leadership has worked through this difficult problem.

Supplement CC to the AA/APA collective bargaining agreement (the "Green Book") relating to integration issues was approved unanimously by the APA Board of Directors on November 7, 2001, and has now been executed by both the Company and the APA. Details of the integration plan have been available on the APA Web Site since late October. The final text of Supplement CC and the related letters of agreement are available on the APA Web Site under "TWA Seniority" on the Member Services page. No doubt, many of you have questions about what Supplement CC means and how it will work. To help

**ALPA 008747**

answer some of those questions, I am enclosing a detailed written briefing by
the APA Mergers & Acquisitions Committee. That briefing explains the
mechanics of the integration, summarizes the process that led to the agreement,
explains the bases for the integration method achieved, and discusses the
reasons the APA and American devised this particular integration structure.

Throughout this entire process, the M&A Committee, under the direction of the
APA Board of Directors, has operated under one central principle: to protect the
pre-merger career paths of all pilots concerned with the integration. As you can
imagine, that has been an exceedingly difficult task given the sheer numbers of
pilots involved, the very different financial situations of American and TWA at
the time of the acquisition and the recognition that, once the smoke clears, all of
us will be part of one, unified pilot group. In doing its work, the APA M&A
Committee made use of the considerable technical resources at the
Association's disposal, including statistical modeling techniques to analyze and
evaluate the mass of information bearing on the integration to achieve that
central, governing principle. The M&A Committee, Board of Directors and
National Officers were also advised by special legal counsel retained by the
Association, with extensive experience in pilot seniority integrations. In the
end, what was required was a solution balancing many factors, and the M&A
Committee along with the APA Board should be congratulated for achieving a
result that truly meets our goal.

From the outset, many of you have pointed out that strictly applied, Section 13
of the Green Book would result in the TWA Pilots accumulating seniority from
the time they first are assigned to revenue flying duty with American, whenever
that time might come. You have asked why we could not simply take this
approach, based on some of the obvious circumstances — the fact that TWA
was within hours of ceasing operations when American agreed to purchase
most of its assets and hire its employees; the fact that American did not buy all
of TWA's assets, and some that it did buy will be disposed of before full
integration of the two operations is complete; the fact that, entirely independent
of the ultimate pilot integration, TWA pilots have gained in pay, working
conditions, retirement, and job security; and the fact that the AA pilots have not
experienced comparable gains as a result of the transaction, but will (as in prior
acquisitions) assume much of the risk of whether the transaction will ultimately
result in additional growth to offset the addition of the TWA pilots to the
combined operation.

You can be assured that the M&A Committee and the APA Board have taken
all of these factors and other similar factors into account in devising an
integration methodology. In light of their governing principle, however, neither
the M&A Committee nor the Board could ignore other factors relevant to a
reasonable calculation of legitimate career expectations.

First and foremost, it is clear that TWA brings to the table a large pilot base (St.
Louis) and a number of aircraft and Captains positions that were not previously
contemplated at a pre-transaction American. Given our experience in
American's prior acquisitions, the M&A Committee took a very hard and

**ALPA 008748**

realistic look at the _sustainable_ assets TWA brought to the table and factored those into its integration methodology. At the same time, however, to be fair we have striven to avoid giving the AA pilots an injurious windfall by giving them the benefit of opportunities that legitimately belonged to the TWA pilots prior to the transaction.

Less tangible, but still significant in crafting a seniority integration that is fair to all concerned, is TWA's long history as a major domestic and international carrier, with many

thoroughly professional pilots who have sacrificed much over many years of service to keep their carrier afloat. Once the integration is complete, these pilots will not be "them" but part of "us" — American Airlines pilots. These former TWA pilots will become our friends and neighbors. We will all be wearing the same uniforms, flying in the same cockpits and working toward the same goal — making American the most successful airline in the world and making the job of an American pilot the best pilot job in the world. These are obviously difficult times, and the future will present us with many difficult challenges. We must work together to face the new challenges in front of us in a changing world and a changing industry. Once the dust of the integration settles and the inevitable resentments on both sides of the house dissipate, all of us as AA pilots will need to act as a unified force.

Finally, both the M&A Committee and the APA Board have been keenly aware throughout this long process that virtually no pilot integration goes without challenge in the legal system. And, as APA knows from experience, no matter how righteous you might think your cause is, anytime you put your fate in the hands of a third party there is a risk. It would be a disservice to all of you if we devised an integration that would give the AA pilots all of the benefits and would make you feel good now, but could be vulnerable to such a challenge. Thus, while your representatives have worked literally thousands of hours to devise an integration method that will stand the test of time, they have also worked to devise a method that will stand the test of litigation, if necessary.

In order to inform yourselves fully about the integration method, I urge you to study the enclosed materials carefully, and to raise questions with the Committee members on matters of concern to you. On an issue as complex and as emotionally charged as this, we should all try to avoid snap judgments and short-term perspectives. If you do so, I am confident that you will ultimately conclude that your representatives have in fact protected your legitimate career expectations. Moreover, because your representatives have done so in a manner that also protects the legitimate career paths of the TWA pilots, they have devised a structure that is fair to all, and will stand the test of time. Most importantly, that structure should allow all of the involved pilots to go forward proudly, and in unity, as we all forge an even better future as American Airlines pilots.

**ALPA 008749**

Fraternally,

*/signed/*
Captain John E. Darrah
President

Enclosure

# **TABLE OF CONTENTS**

I.     THE PROCESS

II.    THE OBJECTIVES OF THE SENIORITY INTEGRATION

III.   THE TIMELINE FOR IMPLEMENTING AN INTEGRATED LIST

IV.    CONSTRUCTION OF THE INTEGRATED SENIORITY LIST

     A.     The Integrated List

     B.     Building Blocks for Construction of the List

     C.     Objectives Achieved by the Integrated List

V.     FENCES

     A.     AA Large Wide-Body Fences

     B.     TWA Small Wide-Body and Narrow-Body Fences

          1.     Rationales for the Fences

          2.     St. Louis

          3.     Captain Positions Outside of St. Louis

     C.     The Combined Impact of the Integrated List and Fences

VI.    FURLOUGHS AND DISPLACEMENT

ALPA 008750

VII.    OTHER PROVISIONS OF SUPPLEMENT CC

VIII.   CONCLUSION .......

Supplement CC to the Green Book between American Airlines, Inc. ("the company") and the Allied Pilots Association ("APA") governs the integration of the AA and TWA pilot seniority lists. This is the largest pilot seniority integration in history, affecting more than 14,000 pilots. The APA Mergers & Acquisitions ("M&A") Committee, under the direction of the APA Board of Directors, has expended literally thousands of hours in devising a seniority integration methodology which is fair to both pilot groups. That methodology involves both the con-struction of the integrated seniority list itself, and conditions and restrictions on the list to assure fairness in the operation of the list.

This briefing paper:

> 1) Outlines the lengthy process which resulted in Supplement CC;
>
> 2) Summarizes the overall objectives of Supplement CC;
>
> 3) Summarizes the time frame in which the integrated seniority list
>
> will be implemented;
>
> 4) Explains the construction of the integrated seniority list and the reasons
>
> for that construction;
>
> 5) Explains the fence provisions which protect each pre-transaction group,
>
> as well as the rationales behind those provisions; and
>
> 6) Summarizes some of the other technical provisions necessary to the
>
> implementation and operation of Supplement CC.

## I. THE PROCESS

ALPA 008751

Supplement CC was approved unanimously by the APA Board of Directors on November 7, 2001, and has been signed by American Airlines and APA. Supplement CC is the result of a 10-month process involving analysis by the APA Board of Directors, National Officers and M&A Committee; extensive negotiations between the M&A Committee and the ALPA TWA Merger Committee, including negotiations with the assistance of a professional facilitator; briefings given to American management by APA based on the information and methodologies developed in those negotiations, and the accommodation of concerns expressed by the company; additional meetings convened by management among management, the M&A Committee and TWA MEC Merger Committee; and the crafting of contractual language by legal counsel for the company and APA:

> • The APA Board of Directors established the Mergers & Acquisitions Committee in January 2001 after the initial announcement of American's intention to purchase certain TWA assets and to hire TWA's employees. APA also retained special legal counsel, with extensive experience in previous pilot seniority integrations spanning 17 years, to advise the M&A Committee, the National Officers, and the Board of Directors. The M&A Committee immediately began an intensive analysis of the proposed transaction, the pre-transaction carriers, and the possible methodologies for integrating the seniority lists.

> • Commencing in February 2001 — before the transaction was even approved by the Bankruptcy Court — the M&A Committee began meetings with the TWA MEC Merger Committee in an effort to arrive at a mutually acceptable seniority integration. The Merger Committees had 10 days of face-to-face meetings between February and June 2001.

> • From the outset of the bankruptcy proceeding and consistently throughout that pro-ceeding, American Airlines made clear to ALPA and other TWA unions that American's offer to purchase certain TWA assets and to hire TWA's pilots and other employees was conditioned on waivers by the unions of collective bargaining agreement provisions calling for third-party arbitration of seniority integration issues. As a further inducement for that waiver, American promised ALPA that it would use its reasonable best efforts to bring about a fair and equitable seniority integration process, by engaging a facilitator to work with the two pilot groups on integration issues. In exchange for the offers of continued employment and the other considerable benefits that came with agreement to American's terms, ALPA waived the arbitration provisions. That waiver did not mean that ALPA waived the TWA pilots' seniority rights. It meant

**ALPA 008752**

only that ALPA had waived its claim to <u>a particular process</u> for integrating the lists — third-party arbitration. In exchange, ALPA agreed to <u>another process</u> — facilitation.

• Although APA was under no obligation to agree to the use of a facilitator — or any other process — we promptly agreed to do so in an effort to reach a mutually acceptable solution, so long as certain conditions were agreed to regarding the confidentiality of the process and the time frame in which the facilitator would be permitted to act. Those conditions were accepted by the TWA pilots and by the managements of American and TWA LLC. APA and ALPA mutually selected facilitator Rolf Valtin, a well-known labor mediator and arbitrator, and a past President of the National Academy of Arbitrators. The APA M&A Committee and the TWA MEC Merger Committee held 15 more days of negotiations with Mr. Valtin's assistance, commencing on July 23, 2001 and concluding on September 17, 2001. At that time, negotiations between the pilot groups were concluded.

• After the facilitation process ended on September 17, 2001, the M&A Committee briefed the APA Board of Directors on the information and methodologies developed during the facilitation process. With the Board's authorization, the M&A Committee began briefing American management on APA's proposed seniority integration methodology. In the course of those briefings, management raised some issues with the methodology, including management's unwillingness to agree to a seniority integration based on a date earlier than April 10, 2001 (the closing date of the transaction); and management's insistence that the treatment of TWA pilots for purposes of "flow back" to American Eagle in the event of a furlough be resolved to the company's satisfaction. In order to implement the proposed methodology, APA resolved those concerns with the company.

• On October 20-22, 2001, the company convened a final set of meetings with the APA M&A Committee and the TWA MEC Merger Committee in Washington, DC, in a last-ditch effort to secure the TWA MEC's agreement to the proposed methodology. In the end, although the TWA MEC voted to accept the proposal, it did so on conditions that management immediately rejected as unacceptable.

• In the absence of an agreement with the TWA MEC, American management and APA proceeded to conclude the agreement set forth in Supplement CC. Legal counsel for the company and the Association put into contractual

ALPA 008753

language the methodology agreed on by the parties. The APA Board of Directors reviewed that proposed language, and made some additional suggestions based on input from the APA mem-bership. With that input, Supplement CC was approved unanimously by the Board Directors on November 7, 2001.

This process gave APA, the TWA pilots, and the company ample opportunity to contribute their analyses and concerns to the ultimate outcome. The seniority integration established by Supplement CC reflects a careful effort by APA's Board and the M&A Committee to give appropriate weight to all of that input.

## II. THE OBJECTIVES OF THE SENIORITY INTEGRATION

Although the APA M&A Committee and the TWA MEC Merger Committee were ultimately unable to agree on all of the terms of a mutually acceptable solution, the two Committees repeatedly stated similar goals for the AA/TWA seniority integration:

> • **Both Committees stated that the seniority integration should be mutually beneficial to members of the two pilot groups.**

> • **Both Committees stated that the seniority integration should be one that promoted unity in the combined pilot group.**

> • **Both Committees stated that the seniority integration should be workable**.

This was especially essential, since the company's agreement to the result was necessary to the outcome, and the company could not be expected to agree to an out-come that it could not feasibly implement or which imposed unreasonable extra costs.

> • **Both Committees stated that the seniority integration should be fair.**

It is almost a cliche in pilot seniority integrations that fairness is in the eye of the beholder, and that is certainly true. We did not agree that the TWA Merger Committee's proposal was fair. And, even though the TWA MEC ultimately voted to conditionally accept our final proposal, many TWA pilots would probably tell you that they don't think our methodology is "fair." At the same time, the two Merger Committees did agree on the basic guidelines for a "fair" integration:

**ALPA 008754**

- *A fair integration should preserve the career expectations of the members of each pilot group — the pre-transaction expectations at the time the transaction was entered into.*

- *A fair integration should avoid "injurious windfalls" — windfalls to one pilot group at the other's expense.*

It is important to understand that the pilots' expectations are measured pre-transaction. What were the pilots' expectations immediately prior to the transaction, and what would their career paths have been if the transaction had not happened and the separate carriers had continued to exist into the future? That means that events after the transaction are of secondary importance in measuring fairness, because the important question is what each group "brought to the party" at the time of the transaction. This is a two-way street. It means that the TWA pilots cannot claim to have expected the improved pay, work rules, retirement and job security that they have gained from the transaction. It also means that, to some extent, we have to treat the TWA pilots as if TWA would have continued in operation, since the AA pilots cannot claim that they expected to have the benefit of added aircraft, jobs, and advancement opportunities that, in fact, belonged to TWA prior to the transaction. Similarly, a focus on pre-transaction expectations means that the fairness of the seniority integration is measured without the impact of the unexpected events of the past few months. Such events have impacted both groups, and are presumed to be temporary in any case. The integrated seniority list will be in place permanently, and therefore should reflect long-term trends and prospects.

- **Both Committees stated that seniority integration should be based on a methodology to analyze the fairness of the result**.

  Again, although we disagreed on some of the details, the two Committees followed a common approach to analyzing each other's proposals, based on a "career path" analysis — identifying important milestones in a pilot's career path such as initial Captain upgrade, upgrade to small wide-body Captain and (for the AA pilots) upgrade to large wide-body Captain. By comparing a pilot's career path absent the transaction and under an integrated list, it is possible to quantify and analyze how a pilot's pre-transaction career progression is affected by the integration.

## III. THE TIMELINE FOR IMPLEMENTING AN INTEGRATED LIST

Throughout this process, many pilots have asked why the M&A Committee has not arrived at a solution and implemented it immediately. Aside from the complexity of the process described above,

**ALPA 008755**

the conditions for implementing an integrated list simply have not been met. The integrated seniority list is intended to operate once there is one carrier — American Airlines. However, as part of its purchase of certain TWA assets, management has taken the unprecedented step of deploying those assets in the separate TWA LLC operation, to facilitate the rationalization of the TWA operation and the orderly transition of the assets into the AA operation. While two separate carriers are being operated, the two pilot groups are under separate contracts, with separate bargaining representatives — APA representing the American pilots under the Green Book, and ALPA representing the TWA pilots under a separate contract. This will still be true even after the TWA pilots begin to work under the same terms and conditions as the AA pilots — the TWA pilots will be under a contract identical to the Green Book, but it will still be a separate contract administered by ALPA until there is a single carrier.

The events of September 11, 2001 and their aftermath have obviously accelerated management's timetable for combining the TWA assets into American as a single carrier. The company has sped up the consolidation of the TWA LLC operation into St. Louis, as well as the schedule on which the TWA pilots are being moved onto American Airlines systems and procedures. Now, as of December 2, 2001, TWA LLC will be held out to the public as part of American Airlines. The rush of events since September 11, 2001 — including the furlough of pilots from both American and TWA LLC — has made implementation of the integrated seniority an especially emotional issue for the pilots of both airlines.

Since September 11, many AA pilots have asked why APA and American could not implement an immediate solution to assure that the impact of these events would be shared by the AA and TWA pilots in accordance with their pre-transaction expectations as reflected in the integrated list. However, the parties must still wait for the necessary condition for implementing the integrated list — there must be a single carrier. On November 9, 2001, APA filed a petition with the National Mediation Board (NMB), stating that there will be a single carrier as of December 2, 2001. Until the NMB makes a decision on that petition, the AA and TWA pilots will still be separately represented by APA and ALPA, and will still be under separate (but identical) contracts. Once the NMB finds that there is a single carrier, there will be a single bargaining representative for the combined group. Until that time, an integrated list cannot be implemented without ALPA's agreement.

Accordingly, under Supplement CC, the integrated seniority list and the attendant conditions and restrictions will be implemented as of the date the NMB issues a decision finding that American and TWA LLC are or have become a single carrier. Until that time, American and TWA LLC will continue to be operated separately, with separate bargaining representatives, separate contracts, and separate seniority lists. At the same time, American has agreed that if there are pilots on furlough

ALPA 008756

when the integrated seniority list is implemented, by the second contractual month thereafter any pilots on furlough will be the most junior on the integrated list.

Even after the integrated seniority list is implemented, the AA and TWA pilots will probably continue to operate on separate operational procedures, until American and TWA have a common operating certificate from the FAA and all TWA pilots are flying under American's operating procedures. During that period, although there will be a single seniority list, there will also be an "Operational Fence" which will generally keep the pilot groups flying separately. St. Louis will be the only TWA pilots domicile, although American can give its prior approval to a TWA pilot training in American's procedures and bidding based on system seniority into the AA system; American cannot give such approval if it would result in an AA pilot being assigned to St. Louis, or in the TWA pilots holding more than the specified number of Captain positions based on the number of aircraft in service.

After the Operational Fence comes down, the operation of the integrated seniority list will still be subject to conditions and restrictions, including restrictions on large wide-body Captain and First Officer positions to protect the AA pilots, and restrictions on B-767-200/B-767-300/B-757 and MD-80/B-717/DC-9 Captain and First Officer positions to protect the TWA pilots. Those fence provisions are described in more detail below.

## IV. CONSTRUCTION OF THE INTEGRATED SENIORITY LIST

A. The Integrated List

The integrated seniority list is constructed as follows:

• The 1,095 most senior TWA pilots as of April 10, 2001 (J.G. Upp, DOH 12/2/63 through Raymond Camus, DOH 3/20/89) will be inserted in the AA Pilot Seniority List on a ratio of approximately one TWA pilot to 8.1763 AA pilots, commencing immediately following AA pilot number 2596 as of April 10, 2001(W.H. Elder, DOH 10/8/85) and ending immediately following the last AA pilot hired prior to April 10, 2001 (B.D. White, DOH 4/9/01).

• The remaining TWA pilots (commencing with TWA pilot Theron Clark, DOH 3/23/89), will be placed in seniority order immediately following TWA pilot Raymond Camus, DOH 3/20/89.

**ALPA 008757**

• All pilots hired by American after April 10, 2001 who had been assigned to airline flying duty as of October 1, 2001 (when management began furloughing pilots) will then be placed on the integrated list in seniority order after the TWA pilots.

• Once the current furloughs are over and additional pilot positions become available, management has agreed that approximately 105 pilots who were in training as of October 1, 2001, but who had yet not been assigned to air line flying duty, will be offered employment and placed on the seniority list, in seniority order.

While this bare explanation tells you how the list was constructed, it does not tell you why it was constructed in this manner. This integrated seniority list results from careful analysis of each pilot group's career path immediately prior to the transaction, including the pilot groups' demographics, the aircraft and jobs for which each group was entitled to credit based on the carriers' pre-transaction operations, and American's projections for the future as of April 10, 2001. That analysis is summarized below.

## B. Building Blocks for Construction of the List

In most pilot seniority integrations, fairness to the respective groups is achieved through a combination of placement on the list, and conditions and restrictions on the operation of the list as necessary to assure that its operation reflects the groups' expectations and avoids injurious windfalls. In this case, APA has strongly taken the position that, in general, the AA pilots' career expectations should be protected by the construction of the integrated list, with any necessary additional protection for the TWA pilots' expectations to be achieved through conditions and restrictions. This is based on the relative conditions of the two carriers at the time the transaction was entered into:

• American was the acquiring carrier. It was a large, global airline in sound financial condition, which was growing and had extensive orders for additional wide-body aircraft.

• TWA was a smaller airline which, although it had once had a global operation, had evolved into a largely domestic carrier. TWA had no wide-body aircraft on order, and was on the verge of

**ALPA 008758**

going out of business when it filed for bankruptcy for the third time and American agreed to acquire certain of its assets.

• The TWA pilots have already gained increased pay, enhanced working conditions, improved retirement, and greater long-term job security as a result of the acquisition — gains in which the AA pilots have not shared. Strictly speaking, this is not an "injurious" windfall, since it does not come at the direct expense of the AA pilots. However, it can certainly be taken into account in weighing the equities of the integration, and in deciding who should bear the risk of the future operation of the list, to go along with those benefits.

• By contrast, for the AA pilot, a seniority integration with the TWA pilots largely involves risks rather than benefits. Integrating TWA pilots into the AA seniority list will ultimately benefit the AA pilots only to the extent that the combined airline grows beyond what American could have expected absent the transaction. The AA pilots' experience with the prior acquisitions of Air Cal and Reno have taught that this is, at best, unpredictable.

Accordingly, as the pilots of the carrier acquiring assets from a bankrupt airline, the AA pilots are entitled to expect that, to the extent that a pilot's placement on the list will impose risks based on unpredictable future events, the list will be constructed to minimize those risks for the AA pilots. The TWA pilots — whose carrier was bankrupt and nearly-defunct, and who have already reaped most of the benefits of the transaction — should fairly bear much of the future risk that goes with those benefits.

In this context, the integrated list established in Supplement CC has been constructed based on the career path model referred to above. The building blocks of that construction are:

**The lists to be integrated**. The first building blocks are obviously the AA and TWA seniority lists to be integrated. The critical question is the effective date of the lists to use in constructing the integrated list, which determines what hiring and attrition at each carrier is taken into account before the lists are integrated. Our

ALPA 008759

original proposal was to use the AA and TWA lists as of the date on which the Bankruptcy Court approved American's purchase of TWA's assets; that date proved to be <u>March 12, 2001</u>. In fact, the APA M&A Committee and the TWA MEC Merger Committee had tentatively agreed to use the AA and TWA seniority lists as of March 12, 2001 but, when we then briefed the company on the methodology that had been developed, the company was unwilling to agree to use any date earlier than <u>April 10, 2001</u> — the date on which its purchase of certain of TWA's assets was closed. Agreement to this company condition was necessary in order to reach an agreement on Supplement CC. Accordingly, the integrated seniority list is constructed using the AA and TWA seniority lists as of April 10, 2001, including all pilots hired by either airline prior to that date, and removing all attrition through that date.

**Fleets and manning**. The pilots' career paths are based on jobs; those jobs are, in turn, created by the manning of aircraft. We did a careful analysis of the aircraft each carrier had on hand and on order, and aircraft from both carriers that it was well known would not remain in the fleet for the long term. Then, because American rather than TWA manning will ultimately be applied in the combined operation, we applied average AA manning to those aircraft to determine the line pilot jobs for which each group could legitimately be credited. In particular, we found that 260 small wide-body line pilot Captain jobs, and 800 narrow-body line pilot Captain jobs, could be attributed to the aircraft being brought to the transaction by the TWA pilots.

**Projected seniority ranges**. Pilots do not bid for positions in lock-step based on pay, seat or any other single factor. Accordingly, Captain positions on a given aircraft are spread over ranges of seniority numbers larger than the simple number of positions available. For instance, according to data posted by TASC on the APA Web Site, in April 2001 American had 4,766 active line Captains, but the junior Captain on the system was number 7203. Thus, as many as 2,500 AA pilots who could hold Captain positions chose to bid for First Officer positions, and an AA pilot could hold a Captain position when he reached approximately the 63rd percentile on the AA seniority list. In contrast, at TWA the junior Captain was only at the 52nd percentile of the pre-transaction seniority list. The reason is that, on a large global airline such as

**ALPA 008760**

American, a pilot has a wider range of positions and pay rates from which to choose — in AA's case eight aircraft types, two divisions (domestic and international), and nine domiciles. Such "quality of life" choices represent a significant part of a pilot's career path.

The critical milestones between the various seniority ranges are represented by the junior narrow-body Captain, the junior small wide-body Captain, and the junior large wide-body Captain. Thus, a narrow-body First Officer knows the seniority number of the junior wide-body First Officer; a wide-body First Officer knows the seniority of the junior narrow-body Captain; a narrow-body Captain knows the seniority number of the junior small wide-body Captain; and so on. The pilot knows that, when he or she crosses that next threshold, he or she has the opportunity to move up to the next range of the career path. By knowing the bottom seniority number of the bottom narrow-body Captain, small wide-body Captain, and large wide-body Captain, we can project the pilots' career paths into the future.

We know where those milestones were on the AA seniority list as of April 2001. To properly evaluate the career path in the future, however, it is necessary to project for two other factors:

> • The additional aircraft that American had on order as of April 2001 will make additional jobs available in the future. Those additional jobs can be projected to move the seniority ranges farther down the seniority list.

> • The integration of the TWA aircraft, and the TWA aircraft orders assumed by American, can also be projected to make additional jobs available, further extending the seniority ranges.

How do you project how far the existing seniority ranges will be extended on the integrated seniority list by these additional aircraft? Both APA and ALPA retained experts to analyze this issue, who arrived at projections of the number of seniority numbers added to the large wide-body, small wide-body, and narrow-body Captain ranges for each additional aircraft. In the end, we used reasonable projections incorporating elements of each expert's analysis. Based on that analysis, we projected that, with the added aircraft and

**ALPA 008761**

the addition of the TWA pilots, the junior narrow-body Captain would ultimately be approximately number 9838 on the integrated list; the bottom small wide-body Captain would ultimately be approximately number 8126 on the integrated list; and the bottom large wide-body Captain would ultimately be approximately number 2596 on the integrated list. With these projected seniority ranges, it is possible to project pilots' career paths into the future, based on the aircraft and jobs which each group contributed to the transaction.

**Age 60 retirements**. Measuring pilots' future career paths against these seniority ranges also requires taking into account projected attrition from each pilot group. There has been much discussion over the past several months that many senior TWA pilots retire in the near future. That is true, but much of that attrition is going to occur while the Operational Fence is still in place, when AA pilots cannot access TWA positions. And, commencing a few years in the future, the AA pilots' retirements accelerate while the TWA pilots' retirements slow down. Accordingly, it is not enough only to measure when a pilot's <u>next</u> advancement will be reached. Instead, you must measure how attrition will impact the pilot's entire career path <u>throughout his career</u>. Based on the retirement data and the projected seniority ranges, it is possible to measure, not just when the pilot would have advanced to the next seniority range, but his entire career progression at the time of the transaction — for example, the progression of a First Officer to narrow-body Captain, to small wide-body Captain, and to large wide-body Captain. We have applied the projected retirement dates of all pilots on both seniority lists to build a career path analysis for the full life of the integrated seniority list, based on the pre-transaction aircraft and jobs credited to each group and the projected seniority ranges.

## C. Objectives Achieved by the Integrated List

Applying this career path analysis, we constructed the integrated seniority list to accomplish three specific objectives:

**First, we built the integrated list to protect the AA pilots' expectations to reach small wide-body Captain.** Since American Airlines is primarily a wide-body carrier, one important milestone in an AA pilot's career is holding a wide-body Captain position. We set

ALPA 008762

out to assure that the expectation of the most junior AA pilot (B.D. White, DOH 4/9/01) to reach small wide-body Captain would not be adversely affected by the integration of the TWA pilots into the AA seniority list.

Our analysis indicated that, absent the TWA transaction, B.D. White could reasonably expect to have enough seniority to hold small wide-body Captain on August 22, 2016, based on aircraft on hand and on order on April 10, 2001, age 60 retirements, and our seniority range analysis. We then determined, based on age 60 retirements, the most junior TWA pilot who could be placed in front of B.D. White on the integrated seniority list and leave 260 TWA pilots (the number of small wide-body jobs credited to the TWA pilots above) in front of B.D. White as of August 22, 2016. That pilot was in TWA's March 17, 1989 new hire class.

We placed the senior TWA pilot in the next TWA new hire class (Raymond Camus, DOH 3/20/89), immediately behind B.D. White. As of April 10, 2001, there were 1,095 TWA pilots senior to Camus. Those 1,095 TWA pilots are inserted on the list senior to B.D. White, at a ratio of approximately one TWA pilot to 8.17 AA pilots.

Thus, B.D. White's pre-transaction expectation to upgrade to small wide-body Captain is not adversely affected by the transaction. On the date on which he would otherwise have expected to reach that seniority range, he is projected to have a number of TWA pilots in front of him equivalent to the number of small wide-body Captain jobs attributable to the TWA aircraft acquired by American.

**Second, we built the integrated list to preserve the large wide-body Captain expectations of the AA pilots.** In addition to the upgrade to small wide-body Captain, an AA pilot's ultimate career expectation as of April 10, 2001 was to have the opportunity to fly large wide-body Captain at the end of his or her career. This is especially important to the AA pilot because his or her retirement is based substantially on earnings in the final years of that career. By contrast, as of April 10, 2001, the TWA pilots had no expectation of ever flying large wide-body aircraft, since TWA operated no such aircraft and had none on order. Accordingly, only AA pilots were placed in the large wide-body Captain seniority range. The TWA Merger Committee agreed that no TWA pilots should be placed in the large wide-

ALPA 008763

body Captain seniority range, although the Committees disagreed about the location of the bottom of the range.

As discussed above, the projected bottom of the large wide-body Captain seniority range is number 2596. We therefore placed the most senior TWA pilot as of April 10, 2001 (J.G. Upp, DOH 12/2/63) immediately following the bottom of that range, at number 2597 as of April 10, 2001. Thus, the large wide-body Captain seniority range includes only AA pilots.

In addition, as we analyzed the impact of age 60 retirements into the future, we set out to construct the list so that, to the extent possible, this would remain the case into the future, to protect the career path and final earnings of every AA pilot on the property as of April 10, 2001. We did so by inserting the 1,095 TWA pilots between W.H. Elder and B.D. White on a straight ratio, resulting in an even distribution of TWA pilots in that range of the integrated seniority list. Consequently, throughout the careers of all AA pilots hired prior to April 10, 2001 — all the way down to B.D. White — the top of the large wide-body seniority range will be occupied by AA pilots, who had the pre-transaction expectation to finish their careers with the opportunity to fly as senior large wide-body Captains. Thus, the end of the AA pilots' career path, and the importance of that ultimate end to the pilots' retirement, has been preserved by the integrated list.

**Third, we also built the integrated list to recognize that the TWA pilots' pre-transaction career path included small wide-body Captain**. As of April 10, 2001, the end of a TWA pilot's career path was the opportunity to fly as a small wide-body Captain. If AA pilots were permitted to access those TWA small wide-body Captain positions before the TWA pilots, it would be a windfall to the AA pilots at the TWA pilots' expense. In fairness, therefore, we set out to assure that, at all times, there will be at least as many TWA pilots in the projected small wide-body Captain range as the number of jobs attributable to TWA's small wide-body aircraft. Inserting 1,095 TWA pilots between W.H. Elder and B.D. White on a straight ratio, as described above, spaces those pilots evenly on that portion of the AA list. Subject to some variation based on attrition, this results in a relatively stable distribution of TWA pilots on the list over time. At all times, there will be at least 260 TWA pilots in the projected small

**ALPA 008764**

wide-body Captain seniority range, assuring that the TWA pilots' pre-transaction career path is preserved.

This does not mean that there will always be 260 TWA small wide-body Captains, since some TWA pilots may exercise their seniority to make other choices, or the fleet may change from what was projected as of April 10, 2001. As indicated above, given that American was the acquiring carrier and given the benefits already derived by the TWA pilots from the transaction, we concluded that it was appropriate to place most of that risk on the TWA pilots in the construction of the list. The point is that we preserved the <u>projected opportunities</u> of the TWA pilots as of April 10, 2001.

## V. FENCES

In almost any large pilot seniority integration, it is inevitable that the integrated list by itself will not assure a fair result, and that conditions and restrictions on the operation of the integrated list will be necessary to assure the protection of the pilot groups' pre-transaction expectations. The AA/TWA integration under Supplement CC is no exception. Two sets of "fence" provisions are necessary to assure that the seniority list fairly operates to reflect the AA and TWA pilots' career paths as of April 10, 2001, as quantified in the seniority range methodology described above: (1) to protect the AA pilots' expectations on the large wide-body aircraft operated only by American prior to the transaction, which were not part of the TWA pilots' career path; and (2) to protect the TWA pilots' pre-transaction career path, including narrow-body and small wide-body Captain jobs attributable to aircraft that TWA operated prior to the transaction, principally in the St. Louis domicile. The basic concepts of these fences are:

- Until appropriate triggers are met, all Captain and First Officer positions in any line pilot bid status on large wide-body aircraft are reserved to the AA pilots.

- Until appropriate triggers are met, all line pilot positions in St. Louis on aircraft types operated by TWA — B-767-200/B-767-300/B-757, MD-80, B-717, and DC-9 — are reserved to the TWA pilots, with additional Captain positions made available to the TWA pilots outside St. Louis as necessary to meet the positions brought to the transaction by the TWA assets (adjusted to share the impact of any shrinkage in the fleet).

- All other positions in the AA system are bid by system seniority under the Green Book.

### A. AA Large Wide-Body Captain and First Officer Fences

ALPA 008765

Since the outset of this process, the APA Board of Directors, National Officers and M&A Committee have taken a strong position that, since only American operated B-777, MD-11, and A-300 aircraft at the time of the transaction, the TWA pilots had no expectation of flying those aircraft types. Accordingly, every AA pilot has a superior expectation to fly those aircraft types. We have therefore reserved all Captain positions on B-777, MD-11, and A-300 aircraft to the AA pilots until the expectation of the most junior AA pilot on April 10, 2001 — B.D. White, DOH 4/9/01 — is fulfilled. Those fences will apply separately to each four-part bid status. In any four-part Captain bid status on these aircraft, no TWA pilot may bid for a position until B.D. White has sufficient seniority to hold a position in the bid status; and no TWA pilot may hold a regular line selection in the bid status until B.D. White has sufficient seniority to hold a regular line selection.

In addition, many First Officer positions on B-777, MD-11, and A-300 aircraft are highly desirable — to many pilots, more desirable than some Captain positions. These desirable large wide-body First Officer positions were among the "quality of life" choices available to AA pilots before the transaction, but not to TWA pilots. We have therefore applied parallel fences to reserve the First Officer jobs on these aircraft to the AA pilots. In any four-part First Officer bid status on B-777, MD-11, or A-300 aircraft, no TWA pilot may bid for a position until B.D. White has sufficient seniority to hold a position in the bid status; and no TWA pilot may hold a regular line selection in the bid status until B.D. White has sufficient seniority to hold a regular line selection.

We also recognize that technology in the industry is ever-changing, and that the fleet may evolve in the future, particularly in this most desirable stratum of the fleet. We have therefore extended the same fences to any other aircraft type with a maximum gross takeoff weight of more than 409,000 pounds — anything larger than the B-767-300 (the largest aircraft in the TWA fleet at the time of the transaction) — or which is in a higher pay category than the B-767-300 or A-300.

These fences assure that the expectation of every AA pilot to fly the largest aircraft in the fleet — through the last pilot hired before April 10,2001 — is not adversely affected by the integration of the seniority list.

ALPA 008766

## B. TWA Small Wide-Body and Narrow-Body Fences

Just as we insist on the AA pilots' prior right to fly large wide-body aircraft, we have recognized that the TWA pilots' pre-transaction career path included upgrades to narrow-body Captain positions, and culminated in the opportunity to fly as small wide-body Captains. In recognizing that TWA career path, we must also acknowledge that, because we have insisted on constructing the integrated list to protect the AA pilots from the risks of future events, the integrated list by itself might not sufficiently protect the TWA pilots' career paths or prevent the AA pilots from reaping an injurious windfall by gaining advancement opportunities that belonged to the TWA pilots prior to the transaction. For these reasons, we have included in Supplement CC fences to protect upgrades to narrow-body Captain and small wide-body Captain for the TWA pilots. At the same time, we have been careful to tailor those protections to assure that, just as the AA pilots do not reap a windfall at the TWA pilots' expense, the TWA pilots do not reap additional windfalls in the future at the expense of the AA pilots.

### 1. Rationales for the Fences

Before describing the specific fences included in Supplement CC to protect TWA small wide-body Captain and narrow-body Captain positions, it is important to understand the various objectives that those fences are constructed to achieve.

**St. Louis is the primary focus of the TWA pilots' flying**. American Airlines repeatedly stressed at the time of the transaction — and the TWA Merger Committee repeatedly stressed to us in our negotiations — that American Airlines was gaining a third hub in the mid-section of the country, potentially relieving congestion in its other midcontinent hubs in Chicago and Dallas-Fort Worth. St. Louis was TWA's primary hub and largest domicile prior to the transaction, and the AA pilots had no significant pre-transaction expectation of flying out of a domicile in that location. This structure has, of course, been confirmed since the transaction. As American has prepared for the transition of the TWA LLC operation into American, all of the TWA flying and the TWA pilots have been transferred to the

ALPA 008767

STL domicile.

The fences in Supplement CC therefore recognize (1) that the flying representing the TWA pilots' pre-transaction career path is now reflected first and foremost in St. Louis, and (2) that any expectation that an American pilot had to fly aircraft of the types flown by TWA in the St. Louis domicile must acknowledge that the St. Louis domicile was part of the TWA pilots' career path. The fences are designed to preserve the TWA pilots' opportunities to upgrade within the St. Louis domicile, and to continue to have some of the quality of life (schedules, days off, vacations, etc.) that they had within the separate TWA operation, notwithstanding their relative placement on the integrated seniority list.

**Different portions of the TWA seniority list had different pre-transaction expectations, and feel the impact of the integrated seniority list in different ways**. While TWA was obviously in dire financial straits when many of its assets were acquired by American, TWA also had a long and varied history, and its pilots similarly have had differing experiences at the carrier. This is graphically illustrated by the impact of the integrated seniority list on TWA pilots' anticipated time to Captain. We projected the number of years of service required for each TWA pilot to reach narrow-body Captain and wide-body Captain based on TWA's April 10, 2001 seniority list, a static fleet and age 60 retirements. We then compared that to their anticipated time to narrow-body Captain and small wide-body Captain based on the integrated list operating without any restriction:

• Those senior TWA pilots with enough system seniority on the integrated seniority list to hold small wide-body Captain were unaffected by the integrated list.

• In the middle of the TWA list, some pilots were slowed down by the integrated list, operating by itself, in their progression to small wide-body Captain. That deceleration was particularly dramatic for the TWA pilots as junior as the last TWA pilot hired before TWA's first bankruptcy petition in 1992 (Morgan Fischer, DOH 9/28/90). On the integrated list, Fischer

**ALPA 008768**

was also the last TWA pilot hired for nearly four years, and was the last TWA pilot hired prior to the AA pilots who were furloughed beginning in 1993.

• Similarly, TWA First Officers in the middle portion of the TWA list were slowed in their anticipated progression to narrow-body Captain positions by the operation of the integrated seniority list without any restrictions. That deceleration was particularly dramatic for pilots as junior as TWA's last 1997 hire, Magnus Alehult, DOH 7/23/97. Alehult was also the last TWA pilot hired before American resumed hiring in 1998.

• However, pilots at the bottom of the TWA list are <u>significantly accelerated</u> in their progression to both narrow-body Captain and small wide-body Captain, even though they are placed on the integrated list after American's last pre-April 10, 2001 hire. The reasons are the relative size and diversity of American's fleet, and the impact of accelerated retirements of AA pilots in future years. Although the integrated seniority list places those pilots behind the other TWA pilots and behind all pilots hired by American prior to April 10, 2001, <u>the most junior TWA pilots' career progressions are dramatically accelerated by the integration.</u>

The fences protecting TWA Captain positions are directed primarily to protecting the middle groups identified above — pilots who without those protections could argue that their career progressions were being inhibited by the integrated seniority list. Without those protections, the integrated list by itself would result in the transfer of many of those TWA narrow-body and small wide-body Captain upgrades to AA pilots, which would arguably be a windfall to the AA pilots at the TWA pilots' expense.

**At some point, the integrated seniority list will operate to preserve both groups' career paths without the necessity of these protections for the TWA pilots.** Once the protected TWA pilots have upgraded — the pre-bankruptcy hires in the case of small wide-body Captain positions, the pre-1998 hires in the case of narrow-body Captain upgrades — the TWA pilots' system seniority on the integrated seniority list will give sufficient protection to their pre-transaction career paths. At that point, the integrated

ALPA 008769

seniority list will preserve those career paths without the necessity of fences to protect the TWA pilots.

**We have to recognize the possibility that some of the TWA jobs might move outside of St. Louis.** There can be no assurance that the company will not move flying fairly attributable to TWA from St. Louis to the company's other midcontinent hubs in Chicago and Dallas-Fort Worth — the hubs that, as a practical matter, compete with St. Louis within the AA system — or that St. Louis might otherwise shrink in ways that deprive the TWA pilots in St. Louis of positions they brought to the transaction. Accordingly, to the extent that the protected small wide-body Captain or narrow-body positions in St. Louis at a given time is less than the number of positions determined under Supplement CC to be attributable to the TWA aircraft, it is necessary to provide a mechanism to permit TWA pilots to access positions outside of St. Louis in numbers sufficient to satisfy their expectation under the agreement.

**At the same time, the fences protecting the TWA pilots should not injure the AA pilots.** While we have constructed fences to reserve the St. Louis domicile to the TWA pilots until the appropriate triggers are reached, it obviously would not be fair to the AA pilots to permit the company to grow that protected domicile at the expense of the rest of the operation and the AA pilots' career paths. We therefore made sure that St. Louis can only grow in proportion to American's other midcontinent hubs in DFW and Chicago.

Similarly, while we have constructed the fences to protect the TWA pilots' projected career paths as of April 10, 2001, we obviously could not guarantee that there will never be a downturn in the company's operations throughout the life of those fences. We therefore took pains to make sure that the fences did not insulate the TWA pilots from a shrinkage in the combined fleet, and that the impact of any such shrinkage is fairly shared between the two pilot groups. Specifically, while we have recognized the number of small wide-body Captain positions and the number of

ALPA 008770

narrow-body Captain positions that can be attributed to the TWA aircraft, we have built in appropriate reductions in the numbers of protected TWA small wide-body Captain positions in the event the small wide-body fleet shrinks, and in the number of protected TWA narrow-body Captain positions in the event that the total fleet shrinks.

By basing the duration of these fences on the upgrades of the appropriate pilots, rather than a specific time frame, we give Supplement CC the flexibility necessary to accommodate unpredictable future events. What is being protected by the fences is the career path which the TWA pilots had in place at the time of the transaction as they looked forward into the future — not necessarily what will actually happen in the future. The fences protect that expectation by providing for the TWA pilots' exercise of their pre-transaction "operational seniority" amongst themselves, until the pilots needing protection achieve the appropriate upgrades. This is true regardless of what happens to the airline in the future — if the airline grows faster, the TWA pilots will move up faster within their career path, but still in the appropriate relation to each other and the AA pilots. If the airline grows more slowly or shrinks, the TWA pilots will advance more slowly, but still in the appropriate relation to each other and the AA pilots. Through this construction, neither group is permitted to gain an inappropriate windfall based on unpredictable future events.

## 2. St. Louis

Supplement CC reserves all B-767-200/B-767-300/B-757 Captain positions in the St. Louis domicile to the TWA pilots until Morgan Fischer (the last TWA pre-bankruptcy hire, and the last TWA pilot hired before the American furloughs in 1993) has sufficient seniority to hold a small wide-body Captain position somewhere in the system. At that time, all protections for the TWA pilots on small wide-body aircraft will expire, since the integrated list is constructed to operate fairly without restriction once Fischer has had the opportunity to upgrade to small wide-body Captain.

ALPA 008771

Similarly, Supplement CC reserves all MD-80/B-717/DC-9 Captain positions in St. Louis to the TWA pilots until Magnus Alehult (the last TWA hire in 1997, and the last TWA pilot hired before American resumed hiring in 1998) can hold a Captain position somewhere in the system. At that time, all protections for TWA pilots on narrow-body aircraft will expire, since the integrated seniority list is constructed to operate fairly without restriction once Alehult has had the opportunity to upgrade to Captain.

Supplement CC also reserves the related First Officer positions in St. Louis to the TWA pilots while these small wide-body Captain and narrow-body Captain fences are in effect. This is to assure that the TWA pilots will continue to enjoy some of the quality of life benefits they have in the separate TWA operation, despite their placement on the integrated seniority list.

Obviously, there will eventually be situations in which there are not enough TWA pilots to fill all of those First Officer positions. When there are insufficient TWA bidders for a protected First Officer position, AA pilots may proffer that position. However, in order that the TWA pilots continue to have the quality of life associated with those positions, an AA pilot proffering such an "insufficient bidder" position will bid his monthly preferences behind all of the TWA pilots in the bid status.

There may also be situations in which an AA pilot will be assigned "TDY" into St. Louis by the company. Under Supplement CC, that will be governed entirely by the existing rules under the Green Book. In particular, since that pilot would be going to St. Louis involuntarily, he or she would be permitted to bid monthly preferences based on his or her system seniority.

To prevent the company from eliminating or unreasonably shrinking the St. Louis domicile while expanding the competing ORD and DFW hubs (which would harm the TWA pilots, and would force the displacement of TWA pilots from St. Louis into the AA system), Supplement CC requires that, until Morgan Fischer can hold a

**ALPA 008772**

small wide-body Captain position, the number of B-767-200/B-767-300/B-757 Captain positions in St. Louis must be at least 30 per cent of the combined number of small wide-body Captain positions in ORD and DFW. And, until Magnus Alehult can hold a Captain position, the number of MD-80/B-717/DC-9 Captain positions in St. Louis must be at least 30% of the combined number of narrow-body Captain positions in ORD and DFW.

During the same time periods, to prevent the company from growing the St. Louis domicile at the expense of the AA operation (which would harm the AA pilots), the company has agreed that the number of B-767-200/B-767-300/B-757 Captain jobs in St. Louis will not exceed the number of jobs brought to the transaction by the TWA pilots, based on the number of small-wide body aircraft in service in the combined operation, up to a maximum of 260 jobs. And, the company has agreed that the number of MD-80/B-717/DC-9 Captain jobs in St. Louis will not exceed the number of narrow-body Captain positions brought to the transaction by the TWA pilots, based on the total number of aircraft in service in the combined operation, up to a maximum of 800 jobs. The maximum numbers of jobs in the St. Louis domicile in a given month will be based on the size of the fleet, as detailed on the tables in the following section.

Finally, the protections for the TWA pilots in St. Louis apply only on aircraft types operated by TWA at the time of the transaction — B-767-200/B-767-300/B-757, MD-80, B-717, and DC-9. If American deploys any other narrow-body or small wide-body aircraft type in St. Louis, positions will be bid based on system seniority. Any future positions in St. Louis on large wide-body aircraft would be subject to the fences protecting AA pilots discussed above.

### 3. Captain Positions Outside of St. Louis

As discussed above, when we applied American's average manning rates to the TWA aircraft acquired by American and projected at the time of the transaction to be added to the American fleet, we determined that 260 small

**ALPA 008773**

wide-body Captain jobs and 800 narrow-body Captain jobs could be attributed to those aircraft. Obviously, the small wide-body or narrow-body jobs reserved in St. Louis may not be sufficient to meet the requisite number. To the extent that proves to be the case, Supplement CC provides mechanisms for TWA pilots to access additional positions outside of St. Louis to the extent necessary to make up the difference:

• If the TWA pilots have fewer protected B-767-200/B-767-300/B-757 Captain positions in St. Louis than the total number of positions to which they are entitled based on the small wide-body fleet, TWA pilots are permitted to proffer additional small wide-body Captain positions outside of the St. Louis domicile, until the TWA pilots hold the requisite number of jobs. On small wide-body aircraft, the necessary protection for the TWA pilots can be accomplished based on system seniority, because the TWA pilots have been placed on the integrated list so that they have sufficient pilots in the small wide-body Captain seniority range.

• If the TWA pilots have fewer protected MD-80/B-717/DC-9 Captain positions in St. Louis than the total number of positions they are entitled to based on the total fleet, one out of every six narrow-body Captain proffers outside of St. Louis will be allotted to the TWA pilots, regardless of their seniority relative to the AA pilots, until the requisite number of narrow-body Captain jobs are held by the TWA pilots. On narrow-body aircraft, these positions must be protected regardless of system seniority, because the placement of TWA pilots on the integrated seniority list in that range (which, as discussed above, was done to protect the AA pilots from the risk of future events) is not always adequate to permit them to hold those Captain positions based on system seniority alone. As a result, this mechanism is necessary to assure that the TWA pilots have access to the proper number of positions, and that AA pilots do not reap a windfall at the TWA pilots' expense. (This does not mean that the company has to create that number of jobs if proffers are not otherwise available.)

However, the TWA pilots are not guaranteed 260 small wide-body Captain positions or 800 narrow-body Captain positions if the fleet does not meet the projections made based on aircraft on hand and on order and aircraft retirements anticipated

ALPA 008774

as of April 10, 2001. If the fleet fails to meet those levels, Supplement CC provides for a proportionate reduction in the number of positions for the TWA pilots. The TWA small wide-body positions are reduced based on the size of the small wide-body fleet:

| Small Wide-Body Aircraft In Service | Number of Reserved Small Wide-Body Captain Line Pilot Positions |
|---|---|
| 276 or more | 260 |
| 271-275 | 238 |
| 266-270 | 200 |
| 261-265 | 167 |
| 255-260 | 132 |

If the small wide-body fleet shrinks below 255 aircraft, the TWA pilots will not be entitled to any positions outside of St. Louis, but will be limited to whatever B-767-200/B-767-300/B-757 positions there are in the St. Louis domicile. In such a month, the number of B-767-200/B-767-300/B-757 Captain jobs in St. Louis must be at least 30% of the combined number of small wide-body Captain jobs in ORD and DFW, but cannot be more than 132 or 30% of the small wide-body Captain jobs in ORD and DFW, whichever is smaller.

The TWA narrow-body positions are reduced based on the size of the total number of aircraft in service:

| Total Number of Aircraft In Service | Number of Reserved Narrow-Body Captain Line Pilot Positions |
|---|---|
| 901 or more | 800 |
| 891-900 | 770 |
| 881-890 | 710 |
| 871-880 | 650 |
| 861-870 | 590 |
| 851-860 | 530 |

ALPA 008775

If the total fleet shrinks below 851 aircraft, the TWA pilots will not be entitled to any positions outside of St. Louis, but will be limited to whatever MD-80/B-717/DC-9 positions there are in St. Louis. In such a month, the number of MD-80/B-717/DC-9 Captain jobs in St. Louis must be at least 30% of the combined number of narrow-body Captain jobs in ORD and DFW, but cannot be more than 530 or 30% of the narrow-body Captain jobs in ORD and DFW, whichever is smaller.

These narrow-body figures are tied to the total fleet, rather than the narrow-body fleet alone, because of the evolving nature of American's fleet. As American grows into a more global carrier, the average gauge of the fleet is growing; indeed, absent the transaction American's narrow-body fleet was projected, as of April 10, 2001, to shrink even as the airline experienced significant growth. Therefore, simply measuring the TWA pilots' narrow-body positions based on the narrow-body fleet alone might not have been a fair reflection of their career path going into the future. If the total fleet grows, the AA pilots enjoy the growth of the company's large wide-body fleet and small wide-body fleet, due to the fences protecting AA large wide-body positions and the limits on the number of TWA small wide-body positions. By the same token, as long as the total fleet is stable or growing, protecting the TWA pilots' narrow-body jobs does no harm to the AA pilots.

TWA pilots holding these protected Captain positions outside of St. Louis cannot be displaced by AA pilots, so long as the number of positions protected to the TWA pilots remains the same or increases. However, if the small wide-body fleet or the total fleet shrinks while TWA pilots are holding protected positions outside of St. Louis, the numbers of positions protected against displacement shrink in accordance with the tables above. If that happens, the most junior TWA pilots holding positions outside of St. Louis will no longer be protected against displacement, until the requisite number of protected positions is reached. This does not mean that those pilots will necessarily be displaced from their positions.

**ALPA 008776**

It simply means that they become subject to displacement as provided in the Green Book.

Going forward, these job protections are based on the measurement of the combined small wide-body fleet and the combined total fleet, not on an effort to track specific "AA" or "TWA" airframes into the future. The reason for this is that there is no easy way to measure "replacement" aircraft, or to decide whether an aircraft order that is placed after the transaction closed is an "AA" order, a "TWA" order, or an order shared by the two groups. Prior seniority integrations which have attempted to include a specific "replacement aircraft" concept have resulted in difficult disputes and lengthy litigation over whether a particular aircraft or aircraft type is "new" or "replacement." The most practical solution is what we have done. As discussed above, we have given each group credit for aircraft brought to the transaction, including aircraft on hand and on order at the time of the transaction, taking into account anticipated aircraft retirements. Under Supplement CC, we treat the future growth of the small wide-body fleet and the total fleet beyond those levels in a way that primarily benefits the AA pilots, in light of the carriers' relative financial conditions at the time of the transaction, and the benefits the TWA pilots have gained from the transaction. Under Supplement CC, we treat any shrinkage in the fleet below those same projections in a way that shares the pain proportionately between the two groups.

### C. The Combined Impact of the Integrated List and Fences

Taking into account the combined effect of the integrated list and the fences, it is possible to measure the impact of Supplement CC on each pilot's pre-transaction expectations under the career path model discussed above. To the extent that the fences operate — for the AA pilots' progression to large wide-body Captain; for the TWA pilots' progression to narrow-body Captain through Magnus Alehult; for the TWA pilots' progression to small wide-body Captain through Morgan Fischer — the career paths are unaffected, since each pilot group is fenced off in its pre-transaction operation. For both narrow-body Captain

**ALPA 008777**

upgrades and small wide-body Captain upgrades, there are small groups of TWA pilots junior to the trigger points (Alehult on narrow-body Captain upgrades, and Fischer on small wide-body Captain upgrades) who may experience some deceleration in their projected achievement of those milestones, and there may be some AA pilots who experience <u>very small</u> acceleration in reaching those milestones as a consequence. That impact is justified by TWA's dire financial condition at the time of the transaction. It is also justified by the fact that, given the ages of those TWA pilots, they are projected to remain on the integrated list long enough to have long tenures as small wide-body Captains and even large wide-body Captains — in short, a career path exceeding anything they could have anticipated at TWA. Moreover, the temporary negative impact on some TWA pilots is also more than offset by the fact <u>even more</u> TWA pilots are <u>accelerated</u> in reaching those same milestones, and to a greater degree than the deceleration experienced by those other TWA pilots. The net result for the TWA pilots as a whole is the enhancement of their pre-transaction careers as a result of the transaction. Thus, on the whole, Supplement CC balances the career paths of the two groups without injurious windfalls to either group.

## VI. FURLOUGHS AND DISPLACEMENT

Supplement CC provides for furloughs and displacements in accordance with the Green Book, except to the extent necessary to permit the operation of the fences protecting each pilot group as described above.

Once the integrated seniority list is implemented at the time of an NMB single carrier ruling, furloughs and recalls from furlough will be administered based on system seniority under the Green Book. In addition, as noted above, if there are pilots on furlough from the separate AA and TWA operations at the time the list is implemented, the company has agreed that, by the second month after implementation, any pilots on furlough will be the junior pilots on the integrated seniority list.

No TWA pilot may displace an AA pilot from a Captain or First Officer position protected by the large wide-body fences discussed above. This remains true so long as the position is protected by the fence (i.e., until B.D. White can hold a position in the four-part bid status).

Similarly, no AA pilot may displace a TWA pilot who holds a protected TWA Captain position. Nor may an AA pilot displace a TWA pilot from a

**ALPA 008778**

First Officer position in St. Louis on B-767-200/B-767-300/B-757 aircraft or MD-80, B-717, or DC-9 aircraft, with one exception. In the event of a furlough, to the extent necessary to permit furloughs in system seniority order, a junior AA pilot can displace a more junior TWA pilot from a First Officer position in St. Louis. In that event, to preserve the TWA pilots' quality of life within the separate St. Louis operation, the AA pilot will bid monthly preferences after TWA pilots in the position. These protections are effective as long as the applicable fence remains in place for the TWA pilots (until Morgan Fischer can hold a small wide-body Captain in the case of small wide-body Captain positions; until Magnus Alehult can hold a Captain position in the case of narrow-body Captain positions).

## VII. OTHER PROVISIONS OF SUPPLEMENT CC

Supplement CC includes a few additional technical provisions relating to the administration of the integrated seniority list:

- The agreement includes a "no bump/no flush" clause, which provides that a pilot may not be displaced from the aircraft and seat he holds (e.g., B-767 Captain) because the integrated seniority list is implemented, or because a provision of Supplement CC has expired. This does not mean that a pilot (a TWA pilot or an AA pilot) can never be displaced from the position he or she holds today. He or she remains subject to displacement under the Green Book as modified by the provisions of Supplement CC discussed above. The no bump/no flush clause simply means that the implementation of the list or the expiration of a fence provision cannot, by itself, "flush" a pilot from his or her position.

- The agreement contains a general "insufficient bidder" provision stating that, subject to the other provisions of Supplement CC, where there are insufficient bidders for a protected position the position will be filled based on the Green Book. That provision gives the company guidance on what to do when it cannot fill a protected position from the protected group.

- The agreement makes clear that all of the provisions of Supplement CC are integral to the integrated list, and must be applied in any seniority list integration in a future transaction.

- In a separate letter of agreement, the company and APA have agreed that Supplement CC supercedes or makes unnecessary certain provisions of the July 10, 2001 Transition Agreement between the parties.

- The agreement creates a Joint Merger Committee, made up of company and APA representatives, to resolve disputes arising from the interpretation, application and implementation of Supplement CC. Disputes which cannot be resolved may be

ALPA 008779

referred by either party to the System Board of Adjustment.

## VIII. CONCLUSION

We have given you this detailed briefing on the background, construction, and operation of Supplement CC so that you can have a thorough understanding of the seniority list integration being implemented by American Airlines and APA. As you can see, Supplement CC has resulted from a detailed, careful analysis of the hiring patterns and demographics of the two groups; the fleet each carrier had on hand and on order; the pilot groups' pre-transaction compensation, working conditions, and work rules; and each group's long-term job security at the time of the transaction, based on the carriers' relative financial conditions. We have carefully developed the seniority integration methodology:

- To be mutually beneficial to the pilot groups;

- To be workable for the company;

- To be fair to each pilot group, by protecting the pre-transaction career paths of each group and avoiding injurious windfalls to either group; and

- To promote the long-term unity of the pilot group.

We firmly believe that we have protected your pre-transaction career path, including your future upgrade opportunities and your retirement; constructed a system which will stand the test of time because it also is fair to the TWA pilots; and promoted the long-term unity of the combined pilot group because neither group can claim that the other has gained at its expense.

Fraternally,

**APA Mergers & Acquisitions Committee**

Captain Edwin C. White, Chairman

Captain Steve Catalano

Captain Charles Hepp

Captain Michael Mellerski

FO James Eaton

FO James Pavlica

**ALPA 008780**

## Go to the TWA Page

APA Communications comm.coord@hq.alliedpilots.org
HTML Updated: 06 December 2001

ALPA 008781