# Exhibit 28

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CAMDEN VICINAGE

```
- - - - - - - - - - - - - - )
                             )
PATRICK BRADY, et al.,       )
                             )
          Plaintiffs,        ) No. 02-2917 (JEI)
                             )
      v.                     )
                             )
AIR LINE PILOTS ASSOCIATION, )
                             )
INTERNATIONAL,               )
                             )
          Defendant.         )
- - - - - - - - - - - - - - )
```

Washington, D.C.

Friday, October 12, 2012

Videotaped Deposition of:

EDWIN CHESTER WHITE JR.,

a witness called in the above-entitled action, before
CHERYL A. LORD, RPR, CRR, a notary public in and for
the District of Columbia, taken at JAMES & HOFFMAN
P.C., 1130 Connecticut Avenue N.W., Suite 950,
Washington, D.C., beginning at 11:04 a.m.


APPEARANCES:

1    this committee, this merger committee?

2            What were you supposed to do?

3        A.   Well, initially, we were supposed to

4    analyze anything that had to do with seniority list

5    merger or integration, because at the time, it wasn't

6    known for sure that American Airlines would buy the

7    assets of TWA.  There were also some discussions

8    about purchasing the Trump Shuttle assets.  And there

9    was also some discussions about buying some -- I

10   believe 757s from U.S. Air with the pilots associated

11   with those airplanes.

12           So our initial charge was to do an analysis

13   of seniority list integrations and some quick

14   analysis of the impact of each of those transactions,

15   whether it would be the Trump Shuttle or U.S. Air

16   asset purchase or the TWA asset purchase.

17       Q.   The analysis you did, was it limited to

18   seniority list integrations with airline pilots?

19       A.   We did that, but in addition, we took a

20   look at airplanes and route structures and stuff like

21   that to see what effect it would have like on the

22   domiciles and flying, et cetera.

23       Q.   And what was the next step?

24           What was the next thing that your committee

25   did after doing the research you've just described?

1       A.   Well, as it looked like it was going to be

2   increasingly possible that we would complete the

3   asset purchase of TWA, we had preliminary talks with

4   the TWA pilots, and that occurred with the merger

5   committee, our national officers, and the TWA merger

6   committee and their national officers.

7            I also think at some point, John Darrah had

8   some discussions with the U.S. Air MEC about the 757s

9   and their associated policies, but our committee

10  never got involved in those discussion.

11      Q.   Now, at the point in time when you were

12  doing this research and starting this process of

13  discussing the integration, were you aware of the

14  so-called Allegheny-Mohawk principles?

15      A.   Yes.

16      Q.   That the CBA had previously dealt with?

17      A.   Yes.

18      Q.   Okay.  What are those principles as you

19  understand it?

20      A.   As I understand the Allegheny-Mohawk, what

21  happens is, the -- 2 parties come together and try to

22  negotiate a successful seniority list merge with --

23  and generally associated with the merge is some kind

24  of conditions that go along with the merge.

25            If they're unable to reach an agreement,

1    then you go to binding arbitration where each case

2    makes their argument on what they think the seniority

3    list integration should be, and the arbitrator then

4    comes up with a combined list with appropriate

5    conditions and restrictions.

6         Q.   And do you recall that the -- one of the

7    core aspects of Allegheny-Mohawk is that the

8    integration is supposed to be, quote, fair and

9    equitable?

10        A.   I don't know that to be Allegheny-Mohawk.

11   I know that that was the ALPA merge policy, which we

12   looked at.  But I don't know that that is a

13   requirement of Allegheny-Mohawk.

14        Q.   Okay.  Well, focusing just on

15   Allegheny-Mohawk, to what degree did the

16   Allegheny-Mohawk principles about merger -- to what

17   degree did that impact what your committee was doing?

18        A.   It didn't.

19        Q.   Okay.  And why did it not?

20        A.   Because the way we wrote our seniority

21   list -- our seniority section in the contract, we

22   were never going to be in Allegheny-Mohawk, so we had

23   no reason to know what it was.

24        Q.   This issue of arbitrating the issue if the

25   pilot groups couldn't agree on it, were the American

1    pilots willing to agree to arbitrate or not?

2         A.   No.

3         Q.   Why not?

4              MR. PRESS:  I object to the form of the

5    question asking for the opinion of 11,000 people.

6              But subject to that, you can answer.

7         A.   I will tell you from my perspective on the

8    negotiating committee as a representative of the

9    pilots and for the 1997 agreement, when we rewrote

10   the section, it was the -- I don't know if you want

11   call it the attitude, but it was the policy of the

12   association that we would not do it.  So it really

13   was a policy of the association.

14              BY MR. FRAM:

15         Q.   Did you become aware at some point after

16   getting involved in the merger committee that the TWA

17   pilots had a different policy on seniority

18   integration?

19         A.   Yes.  Again, part of our job as the mergers

20   and acquisition committee was to take a look at, you

21   know, what we were facing as far as -- and "opponent"

22   is an ugly word, but, you know, as your --

23   dance-partner across the table with your opponent,

24   see what they had.  So we looked at their contract.

25              We also looked at our ALPA merge policy

1   again to -- because we knew we were dealing with an

2   ALPA carrier.  We wanted to educate ourselves on

3   those things.

4        Q.   And what do you recall the TWA pilots

5   contract saying about this issue of arbitrating

6   seniority?

7        A.   Well, they -- each pilot group has what's

8   called a scope clause, and it's generally the first

9   section because it's the most important section, and

10  the scope clause basically says that pilot -- flying

11  done on behalf of the company or the corporation or

12  whatever is done by the pilots, and that in that

13  scope clause, there's usually a directive if you

14  would that if the airline is sold in whole or part

15  that the pilots -- that the -- that the -- that the

16  company is -- is going to guarantee certain rights to

17  the company -- to the pilots.

18            So the pilots of TWA had a guarantee in

19  their contract that if their assets were sold in

20  whole or part that they would be afforded the right

21  under Allegheny-Mohawk section 1113 for an

22  arbitration of seniority list integration.

23       Q.   So that conflicted with the terms of the

24  contract between American Airlines and the American

25  pilots?

Page 38

1        A.   Yes.

2        Q.   Now, under the contract between American

3   and its pilots, the APA had the right to take the

4   position that TWA pilots coming in would have

5   seniority in terms of their date of hire at American?

6        A.   Yes.  And the date of hire is a term of

7   art.  It really says based on their service with

8   American Airlines.

9        Q.   So their date of service would actually in

10   some cases be a date after their date of hire?

11        A.   Yes.

12        Q.   Is that fair?

13        A.   Yes.

14        Q.   But it would never be a date that would be

15   before the date of hire?

16        A.   That's correct.

17        Q.   Did that mean that if the seniority

18   integration went according to the American APA

19   contract that pilots who might be very senior at TWA

20   potentially could be put behind all of the American

21   pilots?

22        A.   Yes.

23        Q.   Okay.  Given that the APA had that contract

24   right, why didn't your committee simply take the

25   position, the merger committee take the position that

1  all of the TWA pilots should be put at the end based

2  upon their date of hire or really their date of

3  service at American?

4      A.   Well, I think there's 2 reasons.  One is

5  that when you combine 2 airlines, you have to have a

6  cohesive group coming out of it.  And if you took

7  everyone and put them at the bottom of the list,

8  there would be so much rancor and acrimony for the

9  acquired carrier that it just wouldn't work

10  especially since we were in section 6 negotiations at

11  the time.  That's the first thing.

12          And then the second thing is, if there's --

13  you know, you could call it a moral issue, is, are

14  you being fair.  In our analysis of the TWA pilots,

15  we felt that there really was 3 subsets within the

16  TWA pilot group.

17          There were pilots who were hired

18  prederegulation.  There were pilots who were hired

19  postderegulation but prebankruptcy.  And there were

20  pilots hired postbankruptcy.  And we just felt as a

21  committee that if you took the prederegulation pilots

22  and put them at the end who had a legitimate career

23  expectation, it would have been wrong.

24      Q.   We'll get into some of the details of that

25  approach in just a little bit.

1           You mentioned that there were section 6

2    negotiations happening around the same time.

3         A.   Yes.

4         Q.   Can you just explain for us what section 6

5    negotiations are.

6         A.   Yes.  Again it was the collective

7    bargaining agreement became amendable, and once -- I

8    believe it was in 2000 became amendable, and once the

9    collect bargaining becomes amendable, you enter into

10   negotiations to amend the contract, and that's done

11   under section 6 of the Railway Labor Act.

12        Q.   So those negotiations between the APA and

13   American Airlines?

14        A.   Yes.

15        Q.   Whereas the negotiations between -- about

16   seniority integration were taking place between your

17   committee, the merger committee, and a corresponding

18   committee of TWA pilots?

19        A.   Yes.

20        Q.   All right.  Let's work through a couple

21   documents if we could.  I want to hand you what is --

22   was previously marked as J 10.

23        A.   Okay.

24        Q.   It's actually got -- the marks are on the

25   lower right-hand corner of these ones that have been

Page 41

1    used before in the case.

2              MR. PRESS:  Did you mark this one 1?

3              MR. FRAM:  No.  That was marked as D 440.

4              MR. PRESS:  D 440.

5              MR. FRAM:  Yeah.  What we're doing, just so

6    we're clear, is, we are putting numbers that begin

7    with D 440 on exhibits that were not previously

8    marked.  With respect to other exhibits, we're using

9    the designations that were on them before.

10             MR. PRESS:  I just wanted to make sure I

11   had the number right.

12             MR. FRAM:  Sure.

13             BY MR. FRAM:

14   Q.   All right.  So can you take a minute to

15   look at D 10 and tell me when you're ready, because

16   I'll ask some questions about it.

17   A.   Yes.

18   Q.   All right.  Do you recall receiving that

19   letter from Bud Bensel on or shortly after February

20   15 of 2001?

21   A.   Yes.

22   Q.   And it's signed by Bud Bensel, Captain

23   Leroy W. Bensel, chairman, TWA MEC merger committee.

24             Was he your counterpart on the TWA pilots

25   committee?

1    document, which is D 309.  Yeah, that's it, in the

2    lower -- in the very bottom in the middle, do you

3    recognize that as a document that your committee

4    prepared and provided to the TWA pilots looks like on

5    or about March 1 of 2001?

6        A.   Yes.

7        Q.   Walk us through that.

8             The first subheading says:  APA accepts the

9    following TWA concepts given to APA on 1 March 2001.

10   And then you have 2 points there.

11            Can you just explain hopefully in

12   layperson's terms what those 2 concepts were.

13       A.   Well, in seniority list integration

14   mergers, if we've got 10,000 and they've got 2,000,

15   you obviously don't stick 2,000 people in the middle

16   of a list, so you have some ratio, and if it's 10,000

17   and 2,000, that's 5 to one, which was approximately

18   what we were looking at on the size of the groups.

19   So a ratio of integration is 5 to 1, which you make

20   the argument mathematically, it makes sense.

21            And then on the fence, when you do a

22   seniority list integration, generally mergers have

23   what's referred to as fences, and fences are

24   restrictions on what a pilot can or cannot do with

25   the seniority numbers that they have.

1          So if for example on this one, it says

2     here:  F/O fence for no TWA pilot to fly first

3     officer on the triple 7 or MD 11.

4          The TWA pilots did not have any what we

5     called at the time large wide-body airplanes, the MD

6     11 and triple 7.  So they said, well, we won't allow

7     our pilots to exercise seniority to fly those

8     equipment because we don't have them and we didn't

9     have a career expectation to fly them, so that's what

10     that sentence refers to.

11     Q.   What other types -- just generally what

12     other types of aircraft were being flown by these 2

13     airlines back in 2001?

14          You mentioned large wide-body aircraft.

15     A.   Yes.  At the time we were flying the MD 11

16     and triple 7, which the TWA route structure did not

17     have.  We flew a 767 and a 757, a Boeing 767 and

18     Boeing 757, which was the same kind of equipment that

19     the TWA pilots had.  We flew the Fokker 100, which

20     the TWA pilots did not.  We flew a super 80, which

21     the TWA pilots did.  The TWA pilots flew a Boeing

22     717, which we did not, and they also flew a smaller

23     version of the super 80, which was called the DC 9,

24     which we did not.

25     Q.   And can those different types of aircraft

1    be categorized into large wide-body, small wide-body,

2    and narrow-body?

3         A.   It was a term of art that we decided to use

4    in describing groupings of airplanes that we flew.

5    So in the industry generally the 767 is considered a

6    wide-body airplane, but for the purposes of our

7    discussion if you said wide-body airplane, that also

8    included the triple 7 and MD 11.

9              So as a term of art for in discussions, we

10   called large wide-body those wide-body aircraft that

11   TWA pilots did not have access to in their route

12   structure, small wide-body as the same wide-body

13   equipment that we both flew.

14        Q.   If we go just a little bit farther down the

15   document, seniority list integration method, it says:

16   Todd Muschaney, seniority number 825 hired 7-7-86,

17   will be placed one number junior to the new AA new

18   hire on 3-9-2001.  All TWA pilots will be integrated

19   senior to Muschaney at a ratio of 5 AA pilots to one

20   TWA pilot.

21        A.   Yes.

22        Q.   Can you just sort of walk us through what

23   the seniority list based upon that would have looked

24   like in terms of where the pilot groups are on the

25   combined list?

1        A.   Yes.   When the committee was first formed,

2   we looked at a bunch of different mergers and a bunch

3   of different methodologies.   And I would like to

4   characterize our discussions with the TWA pilots over

5   time as looking for a methodology, because I think --

6   it was my opinion that having a methodology that you

7   could explain to people would make them or give them

8   an understanding of why you did what you did.

9           In some of the seniority list integrations,

10  what they did is, you had an equipment range, a

11  seniority range for the equipment being flown, and in

12  this case -- and pilots based on their seniority bid

13  a seat position, captain and first officer, and they

14  bid equipment type, and as I said earlier, the bigger

15  the equipment, the more money.

16          So a person that's senior usually works up

17  the first officer ranks into bigger equipment until

18  that person can hold captain.   Now he's back on the

19  smaller piece of equipment.   And then as he

20  becomes -- he or she becomes more senior, that pilot

21  moves up the equipment.

22          So super 80 captain makes less money than a

23  7 6 captain, which makes less money than an 11

24  captain, so the seniority range of the pilots that

25  are able to hold those equipment.   So what we did is,

1          Can we agree to use the term insertion

2   point for the point on the combined list where the

3   most senior TWA pilot gets put in?

4        A.   Yes.

5        Q.   And then can we agree that the next group

6   below that where pilots are feathered will be called

7   the feathered group?

8        A.   Yes.

9        Q.   Okay.  And then I think we're going to see

10  some proposals later on where after this group where

11  they're feathered, you have a block of TWA pilots

12  below the feathered group.

13          Can we talk about that group as the end

14  tail group?

15       A.   Yes.

16       Q.   Just for definitional purposes.

17       A.   Yes.

18       Q.   Okay.  All right.  So what was the response

19  of the TWA pilots -- well, just to finish up a couple

20  aspects of this.  I'm not going to go through

21  everything.

22          I see that about 50 percent down, there's a

23  reference to a fence, and there are 6 points there.

24       A.   Yes.

25       Q.   Can you just walk us through quickly what

Page 55

1    the fence being proposed there was.

2         A.   If you don't mind I'll just talk about the

3    substantial ones.

4              Number 2, the restriction on TWA pilots

5    from flying first officer on a triple 7, A 300, or

6    any new bid status greater than 407,000, at the time

7    the max gross weight of the 767 was 407,000 pounds.

8    There was some discussions that American Airlines

9    would buy a bigger version of the 767, which

10   ostensibly would pay more money.

11             So we wanted to carve out that if we did

12   get a 767 that even though it would be lumped as a

13   767 and on paper would show as a 767, it really

14   wasn't a 767.  It was greater.  So that was a

15   restriction.

16             The restrictions on number 3, restriction

17   on TWA pilots flying captain on a triple 7, A 300,

18   727, and 737, the thinking there was, one of the

19   principles of a seniority list integration and what

20   you would consider fair and equitable is, you don't

21   want to rob flying from another party for a period of

22   time.  Call it predatory or anything.

23             In the TWA seniority list integration with

24   Ozark, the TWA pilots were predatory in our opinion

25   because they bumped and flushed the Ozark pilots out

1    of the captains' seats.

2         Q.   All right.  Let's get some background,

3    because I don't think we've talked about the

4    TWA-Ozark transaction before.

5              Can you give us a little background in

6    terms of when that happened and --

7         A.   I don't remember the dates, but again we

8    were tasked at looking at other mergers, and one the

9    mergers that we did look at was the TWA-Ozark.  And

10   if I'm not mistaken, and it's been awhile since I

11   looked at it, what the TWA pilots did to the Ozark

12   pilots is, they had a -- I believe you said we're

13   going to use merge point, so they had a merge

14   point --

15        Q.   Insertion point?

16        A.   Insertion point, okay.

17             They had an insertion point for the Ozark

18   pilots where they ratioed feather, and -- but what

19   they did is, they inserted the Ozark pilots I believe

20   after their captains, and then they took all the

21   captain seats away from the Ozark pilots.

22             We did not want to do that.  We did not

23   feel that that was fair and equitable.  So what we

24   wanted to do is say for a period of time, the TWA

25   pilots brought the 717, the super 80, and the 757 and

Page 76

1    green book rates and everything.

2            So we said, you have to put them on those

3    green book rates because they're part of American

4    Airlines.  Well, now, we wanted that as a bargaining

5    chip.  In other words, why give a pilot a 40 percent

6    pay increase if we can't get him to talk about

7    seniority over here.

8            So we wanted to kind of tie the 2 together.

9    Well, Mr. Carty just went and said, boom, we've got

10   everything.

11           BY MR. FRAM:

12   Q.   So Mr. Carty said to the TWA pilots, you're

13   getting American rates and benefits and all that?

14   A.   Yes, as of January 1st, 2002.

15   Q.   And did he do that without consulting with

16   the APA and the American pilots?

17   A.   That's correct.

18   Q.   And you felt that had what impact on your

19   ability to negotiate seniority with the TWA pilots?

20   A.   Well, the feeling was and we saw an

21   immediate change of attitude with the TWA merger

22   committee is, well, we got it all now, let's talk

23   about seniority.  So bargaining basically stopped or

24   any -- what I felt as a negotiator that any chance of

25   reaching an agreement was greatly lessened, because

1    the vast majority was taken off the table.

2         Q.   Now, do you recall there coming a point in

3    early April of 2001 where the TWA pilots through

4    their MEC, master executive council, voted to waive

5    the right they had under their labor agreement to

6    arbitrate the issue of seniority?

7         A.   Yes.

8         Q.   If the TWA pilots had refused to do that,

9    if they had refused to waive that right, what would

10   the position of the American pilots would have been

11   in terms of seniority negotiations?

12         MR. PRESS:  Let me just object to the form

13   of the hypothetical, calling for speculation.

14         BY MR. FRAM:

15         Q.   You may respond.

16         A.   Okay.  The association -- it was the

17   position of the association that American Airlines

18   could not purchase another carrier and force the

19   pilots on our seniority list other than by following

20   the contract.

21         Q.   Or if the American pilots agreed to do

22   something other than follow the contract.

23         Correct?

24         A.   That is correct, the board of directors of

25   the association, yeah.

Page 78

1       Q.   And your contract as you indicated before

2   gave you the legal right to have new pilots put at

3   the end --

4       A.   Yes.

5       Q.   -- detailed.

6       A.   Yes.

7       Q.   But your committee didn't insist on that as

8   part of the negotiations.  You were willing to agree

9   to something different as -- for the reasons you've

10  testified.

11           Correct?

12      A.   Yes.

13      Q.   Now, let me ask you this:  If the TWA

14  pilots had refused to waive their right to arbitrate

15  seniority and had filed a lawsuit, if ALPA had filed

16  a lawsuit in March or April of 2001 to enjoin, to

17  stop American's purchase of the TWA assets, what

18  would the position of your committee have been?

19           MR. PRESS:  Again, let me object to the

20  form of the hypothetical as calling for speculation.

21      A.   Well, I can tell you, you know, there'd

22  have been dancing in the streets.  I mean, people

23  would've been ecstatic that we weren't going to

24  purchase the assets of TWA.

25           MR. FRAM:  All right.  Why don't we take

1   our lunch break now.  Let's go off the record.

2          THE VIDEOGRAPHER:  The time is now 12:50.

3   We're going off the video record.

4

5                  AFTERNOON SESSION

6          Washington, D.C.; October 12, 2012

7                    1:26 p.m.

8                    *   *   *

9

10         THE VIDEOGRAPHER:  The time is now 1:26,

11  and we're back on the video record.

12

13                FURTHER EXAMINATION

14         BY MR. FRAM:

15     Q.   Mr. White, you mentioned just before the

16  break that if a lawsuit had been filed to enjoin or

17  to stop the American purchases of TWA assets that

18  there would have been dancing in the streets by the

19  American pilots.

20         Can you explain that for us, please?

21     A.   Yeah.  All pilots want to grow from within.

22  You know, we went through the growth plan under

23  Crandall, and then in the '90s, we put in a large

24  aircraft order, and we grew again, and our belief was

25  that if we were -- needed to get bigger, it would be

Page 80

1    better to buy airplanes and have the associated

2    growth of captains come from within our ranks versus

3    to have captains come with the airplanes.

4           So I think it's like anything else, when

5    you dodge a bullet, you're happy, and if the TWA

6    asset purchase had died off, the pilots facing

7    another situation where airplanes come in and

8    pilots -- and the airplanes go away, we aren't taking

9    the pilots, you dodge a bullet, and growth can come

10   from within, and that's why in my opinion there would

11   be a lot of happiness.

12       Q.   Among the American pilots?

13       A.   Yes.

14       Q.   As I understand it, there was a meeting of

15   the APA board on April 5 of 2001 where Duane Woerth

16   came and spoke to the APA board.

17           Were you at that meeting?

18       A.   No.

19       Q.   Did you ever hear after that meeting that

20   Duane Woerth had made a comment to the APA board to

21   the effect that the TWA pilots had to, quote, get

22   real?

23       A.   Never heard that.

24       Q.   The next document I'd like to talk to you

25   about is D 313.  The first page of that document is a

1    his, quote, rightful place, and he defined that as

2    the seniority position in relation to his peers that

3    will assure realization of his career progression

4    without harming the expectations of others.

5           Did there come a point where you received

6    the proposal that he had referred to in that letter?

7    A.    Yes.

8    Q.    And I think you may have talked before

9    about the rightful place proposal.

10          The next document in front of you should be

11   a letter from Mr. White dated June 14 of 2001, and

12   the next document after that I believe is the

13   rightful place proposal.

14          Can you confirm that those are in fact the

15   transmittal letter and the rightful place proposal?

16   A.    Yes.

17   Q.    He had written in this letter of April 24

18   that they had some consultants that were helping

19   them.

20          Do you recall who their consultants were?

21   A.    Yes.  And I think the first time that he

22   suggested it was an economist, and I thought, how can

23   an economist do that, but it was Dr. Tannen who did

24   that and who we subsequently met and was involved in

25   a lot of the discussions.

1       Q.   So Dr. Tannen was actually at some of the

2   meetings among the committees later on?

3       A.   Yes.

4       Q.   Okay.  All right.  So his covering letter

5   encloses the rightful place proposal, and he wrote:

6   This proposal is our attempt to introduce a, quote,

7   new approach into the negotiation process.

8            What was your and your committee's reaction

9   to the rightful place proposal?

10      A.   I would think -- and it's probably a harsh

11  term, but outrage probably was a good term at the

12  time.

13      Q.   Why were you or others outraged by the

14  rightful place proposal?

15      A.   If you look -- if you look at -- if you

16  just take a look at the document, a cursory reading

17  through it without fully understanding it, it

18  appeared to us that it was grabby.  It was inserting

19  their pilots way up on our seniority list.

20           If you understand how a seniority list

21  integration works, there's 2 philosophies.  One is,

22  you give somebody a high seniority number, and then

23  you put a fence around that person to not let him use

24  that seniority number, him or her.  Or you can give

25  them a lower seniority number and help them get

Page 92

1   things with that seniority number that they normally

2   wouldn't get.

3            Since we were the larger carrier and the

4   acquiring carrier, it was our belief that we

5   shouldn't be giving the TWA pilots high seniority

6   numbers and then restricting them on what they could

7   do with it.  That was kind of backwards.

8            And this proposal did that.  And so we were

9   incensed -- probably is a better word than

10  outraged -- incensed that this approach didn't

11  happen.

12      Q.   Did you and your committee prepare a

13  written response to the TWA MEC's rightful place

14  proposal?

15      A.   Yes.

16      Q.   Is that the next document that you have

17  there, which is J 323?

18      A.   Yes.

19      Q.   All right.  Can you just take a minute to

20  skim through that, and then I want to highlight a

21  couple of aspects of it for you, or ask you some

22  questions about a couple aspects of it.

23      A.   Okay.  Go ahead.

24      Q.   This is a document that you helped prepare

25  and that you signed and sent to Mr. Day?

1          A.   Yes.

2          Q.   And I see on the signature page, if you

3     could turn to that, that you copied it not only --

4     you sent copies not only to the other members of your

5     merger committee but also to national officers and

6     board of directors?

7          A.   Yes.

8          Q.   Those were the national officers and board

9     of directors of the APA?

10         A.   Yes.

11         Q.   Why did you do that?

12              Why did you circulate this response so

13    widely?

14         A.   Okay.  First of all, as a chairman and

15    worked at the direction of the board and at the

16    pleasure of the board, I felt it was my

17    responsibility to keep the national officers and

18    board of directors informed of my actions.  That's

19    the way I've always run my chairmanship.

20              I would always ask for an operating box to

21    operate in so I didn't have to go back to the board

22    of directors every time something came up.  And then

23    I would always keep them informed of the actions that

24    I was taking, so that's just part of my management

25    style.

1   they came in the rooms, they really had no authority to

2   go anywhere that was expected to get an agreement.

3      Q.   Did you become aware of any members of the

4   TW -- TWA MEC who were supportive of agreeing to the

5   proposal that the APA was making on seniority

6   integration?

7      A.   That was, obviously, hearsay, but we were told

8   there were representatives on the MEC that thought they

9   should move forward and try to get an agreement with us

10  basically surrounding to terms of where we were at.

11     Q.   And were you told which particular individuals

12  on the TWA MEC were supportive of --

13     A.   I think we were told at the time, but I could

14  not tell you who those individuals today were by name,

15  to be fair.

16     Q.   Did the APA make a new proposal for seniority

17  integration during these meetings at the Mayflower

18  Hotel?

19     A.   I'd have to go back and look at notes or

20  documents.  I -- I believe there were some pieces

21  back -- passed back and forth, but I don't recall.

22              (Exhibit No. 34 was marked.)

23     Q.   (BY MR. TOAL)  Let me show you a document and

24  see if this refreshes your recollection.  I'll mark this

25  as Darrah Exhibit 34.  It's dated October 21, 2001.

1          My question is whether you recognize this

2     as a proposal that the APA made to the TWA MEC on or

3     around October 21, 2001?

4          A.   Yes.

5          Q.   And was this a proposal that you were involved

6     in creating?

7          A.   I was involved in it.  You know, the mergers

8     and acquisitions committee with guidance from the APA

9     board developed it.  I was, obviously, a participant of,

10    but the -- the legwork and actual construction of it was

11    done by the mergers and acquisition committee.

12         Q.   And did you approve of making this proposal to

13    the TWA MEC?

14         A.   Yeah, my -- my job as the APA president was

15    making sure the merger and acquisition committee was

16    following the policy of the board, which it did, and

17    yes, I did approve from that basis.

18         Q.   And when you reference the policy of the board,

19    what was the policy of the board at this point in time

20    with regard to seniority integration?

21         A.   The guidance from the board was as described to

22    the committee on how it was going to be constructed.  I

23    think by this point along the lines we basically had the

24    framework of where this integration was going.  And it

25    was based on what you'll see outlined in this and

1   Brundage, vice president of employee relations, came

2   back and agreed that that kind of concept would be

3   acceptable to American Airlines management.  And I think

4   this is about the point where this was brought into the

5   process, even though it had been discussed previously

6   based on Captain Day's recommendations.

7        Q.   And did American Airlines communicate that

8   there were certain things that the TWA MEC was looking

9   for that it was not prepared to do?

10       A.   Yes.

11       Q.   What were those things?

12       A.   I do recall that in the days -- when is this?

13  So it's in the -- this period.  This was towards the end

14  of that, as in any case, there always a period of

15  deadlines.  And there was a period of a deadline to

16  which we informed the TWA MEC that we would have to move

17  forward with or without an agreement, that we were

18  running out of time on all this.

19            And the TWA MEC sent over a proposal that

20  had a series of protections that -- a company called me,

21  and before we even had a -- a chance to look at it told

22  us they would not accept them.  So the deal was dead

23  before even the APA board of directors essentially

24  reviewed the document.

25            THE VIDEOGRAPHER:  I need to change DVDs,

# Exhibit 29

*Medina for Notebook*      *10*

**Written Testimony of Captain Edwin C. White, Jr.**
**Before the Committee on Health, Education, Labor and Pensions**
**United States Senate**
**Hearing on the TWA/American Airlines Workforce Integration**
**June 12, 2003**


## I.   INTRODUCTION/EXECUTIVE SUMMARY


Mr. Chairman, Members of the Committee, my name is Edwin C. White, Jr. I am an airline pilot employed by American Airlines, Inc. ("American"). I have been employed by American since December 1977 and have been a Captain since 1987. I am currently a Boeing-777 Captain based in Dallas-Fort Worth, Texas. Prior to my employment with American, I served in the United States Air Force, the D.C. Air National Guard and the Air Force Reserves. While flying for the Air National Guard, I worked as a systems analyst at the BDM Corporation in McLean, Virginia. My work as a systems analyst focused on complex problem solving, particularly computer modeling.

I am also a member of the Allied Pilots Association ("APA"), the collective bargaining representative under the Railway Labor Act ("RLA") of the craft and class of pilots employed by American. Over the course of my career at American, I have held numerous offices within the APA. I am currently the Chairman of APA's Negotiating Committee.

In 2001 and 2002, I was Chairman of APA's Mergers & Acquisitions ("M&A") Committee, and on behalf of the Committee, participated in the extended negotiations over the integration of pilot seniority lists following American's acquisition of most of the assets of Trans World Airlines, Inc. ("TWA"). I and my Committee conducted most of those negotiations with my counterparts at the Air Line Pilots Association's ("ALPA") TWA unit, the TWA ALPA Master Executive Council ("TWA ALPA MEC"). Those negotiations were spirited, as are all labor negotiations. They also included a free exchange of ideas as to how the two pilot seniority lists should be integrated. In many of our sessions, we were aided by an independent facilitator retained by American for that purpose.

Although the two groups started the negotiations from two drastically different positions, during the course of the negotiations, we made considerable progress toward a middle ground, and my Committee actually adopted and applied the analytical approach to the matter proposed by the TWA pilot representatives. In the end, the TWA pilot representatives indicated a willingness to accept our final proposal for seniority integration if American were to agree to certain conditions. Unfortunately, American declined to do so.

At that point, as was our obligation to the pilots we represented - - the incumbent American pilots - - and also our obligation under the collective bargaining agreement with American, known by its green cover as the "Green Book," my Committee and I turned our

1

possible to measure not just when a pilot would reach the next seniority range, but his entire career progression looking forward at the time of the transaction - - for example, the progression of a First Officer to narrow-body Captain, to small wide-body Captain, and finally to large wide-body Captain.  We applied the projected retirement dates of all pilots on both seniority lists to build a career path analysis for the full life of the integrated seniority list, based on the pre-transaction aircraft and jobs credited to each group and the projected seniority ranges.

### 2.    The Objectives Of The Integrated List

Applying this career path analysis, we constructed the integrated seniority list to accomplish at least four objectives:

**First, due to the circumstances of the transaction, the list itself was designed to protect the American Pilots' career expectations.**   APA strongly took the position that, as a general matter, the American Pilots' career expectations should be protected by the construction of the integrated list itself, and the necessary protections for the TWA Pilots' expectations were to be achieved through conditions and restrictions.  This position was based on the relative conditions of the two carriers at the time of the asset purchase:

- American was the acquiring carrier.  It was a large, global airline in sound financial condition, was growing and had extensive orders for additional wide-body aircraft.

- TWA was a smaller airline which, although it had once had a global operation, had largely evolved into a domestic carrier.  TWA had no wide-body aircraft on hand or on order and was on the verge of going out of business when it filed for bankruptcy for the third time and American agreed to acquire certain of its assets.  Its pilot compensation rates and work rules reflected its more limited scope and tenuous financial condition.

- Simply by virtue of the asset purchase, the TWA Pilots gained increased pay, enhanced working conditions, improved retirement, and greater long-term job security.  The American Pilots shared none of those gains.

- For the American Pilots, the TWA transaction primarily added risk to their career expectations rather than benefits.  Integrating TWA Pilots into the American seniority list would ultimately benefit the American Pilots only if the combined airline were to grow beyond what American could have expected to grow absent the transaction.  Our experience with American's prior acquisitions of Air Cal and Reno, in which American gained pilots to compete for the same level of jobs as existed prior to the transactions, had taught us that accelerated growth through acquisition was a dubious prospect.

Accordingly, as the pilots of the carrier acquiring assets from a bankrupt airline, the American Pilots were entitled to expect that, to the extent that a pilot's placement on the list imposed risks based on unpredictable future events, the list would be constructed to minimize

19

those risks for the American Pilots. The TWA Pilots - - whose carrier was bankrupt and nearly defunct at the time of the transaction and who had already reaped tangible benefits from the transaction - - should fairly bear much of the future risk that went with those benefits.[10]

Specifically, we built the integrated list to protect the American Pilots' expectations of reaching small wide-body Captain. We set out to assure that the expectation of the most junior American Pilot to reach small wide-body Captain would not be adversely affected by the integration of the TWA Pilots into the American seniority list. Our analysis projected that, absent the TWA transaction, that juniormost pilot could reasonably expect to have enough seniority to hold small wide-body Captain on August 22, 2016, based on aircraft on hand and on order as of April 10, 2001, retirements, and our seniority range analysis. We then determined, based on retirements, the most junior TWA Pilot who could be placed in front of that pilot on the integrated seniority list and leave 260 TWA Pilots (the number of small wide-body Captains jobs credited to the TWA Pilots above) in front of him as of August 22, 2016. That TWA pilot was in TWA's March 17, 1989 new hire class. We placed the first TWA Pilot from the following TWA new hire class (with a hire date of March 20, 1989) immediately behind the junior American pilot as of April 10, 2001. As a result, there were 1,095 TWA Pilots inserted on the combined list senior to the juniormost American pilot, at a ratio of approximately one TWA Pilot to 8.17 American Pilots.

We built the integrated list to preserve the large wide-body Captain expectations of the American Pilots. Beyond an upgrade to small wide-body Captain, an American Pilot's ultimate career expectation as of April 10, 2001 was to be Captain of a large wide-body aircraft at the end of his or her career. By contrast, as of April 10, 2001, the TWA Pilots had no expectation of ever flying large wide-body aircraft because TWA operated no such aircraft and had none on order. Accordingly, only American Pilots were placed in the large wide-body Captain seniority range. The TWA Merger Committee agreed that no TWA Pilots should be placed in the large wide-body Captain seniority range, although the Committees did disagree about the location of the bottom of the range. As discussed above, the projected bottom of the large wide-body Captain seniority range was number 2596. We therefore placed the most senior TWA Pilot as of April 10, 2001 immediately following the bottom of that range, at number 2597 as of April 10, 2001.[11]

We also built the integrated list to protect the TWA Pilots' pre-transaction career expectation of reaching small wide-body Captain. As of April 10, 2001, the end of a TWA Pilot's career path was the opportunity to fly as a small wide-body Captain. If American Pilots were permitted to access the small wide-body Captain positions brought by TWA to the combined operation before the TWA Pilots, it would be a windfall to the American Pilots at the TWA Pilots' expense. In fairness, therefore, we set out to assure that at all times, there would be at least as many TWA Pilots in the projected small wide-body Captain range as the number of jobs attributable to TWA's small wide-body aircraft purchased by American. Inserting 1,095 TWA Pilots as described above spaced those pilots evenly on that portion of the integrated list. Subject to some variation based on attrition, this resulted in a relatively stable distribution of

# Exhibit 30

**UNITED STATES DISTRICT COURT**
DISTRICT OF NEW JERSEY

PATRICK BRADY, *et al.*,

                              Plaintiff,

v.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,

                              Defendant.

Civil Action

No.  02-2917 (JEI)

# REPORT OF PROFESSOR KEVIN M. MURPHY

## I.    CREDENTIALS

1.      My name is Kevin M. Murphy.  I am the George J. Stigler Distinguished Service Professor of Economics in the Booth School of Business and the Department of Economics at the University of Chicago, where I have taught since 1983.

2.      I earned a doctorate degree in economics from the University of Chicago in 1986.  I received my bachelor's degree, also in economics, from the University of California, Los Angeles, in 1981.

3.      At the University of Chicago, I teach economics in both the Booth School of Business and the Department of Economics.  I teach graduate level courses in microeconomics, price theory, empirical labor economics, and the economics of public policy issues.  In these courses, I cover a wide range of topics, including the incentives that motivate firms and individuals, the operation of markets, the determinants of market prices, and the impacts of regulation and the legal system.  Most of my teaching focuses on two things: how to use the tools of economics to understand the behavior of individuals, firms and markets; and how to apply economic analysis to data.  My focus in both research and teaching has been on integrating economic principles and empirical analysis.

4.      I have authored or co-authored more than sixty-five articles in a variety of areas in economics.  Those articles have been published in leading scholarly and professional journals, including the *American Economic Review*, the *Journal of Law and Economics*, and the *Journal of Political Economy*.

5.      I am a Fellow of the Econometric Society and a member of the American Academy of Arts and Sciences.  In 1997, I was awarded the John Bates Clark Medal, which the American Economic Association awarded once every two years to an outstanding American economist under the age of forty.[1]  In 2005, I was named a MacArthur Fellow, an award that provides a

---

[1] The John Bates Clark Medal was awarded biennially until 2009, but it now is awarded annually.  See, http://www.aeaweb.org/honors_awards/clark_medal.php.

93.     It is notable that these results are seen even though Evaluation with Hindsight provides a greater share of gains from the transaction to the American pilots than would have been expected at the time the parties were negotiating.  It reflects the realized, rather than expected, benefits the American pilots received from having TWA pilots below them on the seniority list.  Because of furloughs, the TWA pilots did not receive as much benefit in higher pay as they would have expected, and the American pilots received more value from the furlough protection than they would have expected.  The negotiations would not have reflected the certainty associated with this outcome, however, but only the probability that it could occur (which generally is taken into account as a possible future outcome in my Prospective Evaluation).

94.     Thus, my evaluation of Mr. Salamat's hypothesized DMODEL and the other seniority lists for which he estimates damages shows that:

a)   Prospective Evaluation demonstrates that Mr. Salamat's DMODEL proposal is not a reasonable outcome of bargaining between the parties, because the American pilots would have expected to be made worse off than they expected without the transaction. Even using Evaluation under Hindsight,  DMODEL provided almost all the gains to the TWA pilots, an unlikely outcome given the contract rights of the American pilots;

b)   Mr. Salamat's other proposed lists and the lists proposed by Professor Farber generally are even less reasonable and thus could not have been reached through negotiation.

### C.  Mr. Salamat Provides no Empirical Evidence that ALPA's Actions Would Have Affected the Seniority List

95.     Mr. Salamat provides no empirical evidence that any of the actions that Plaintiffs claim ALPA should have taken would achieve their goal of a more favorable seniority list.  For example, while Mr. Salamat asserts that ALPA should have supported the TWA pilots in seeking an injunction in October 2001, he provides no evidence to suggest that there was any likelihood that a Court would have granted an injunction.  Nowhere in his report does he evaluate empirically whether anything ALPA might have done differently would have influenced the APA to offer seniority integration terms that, on the whole, were more favorable to the TWA pilots than the terms of Supplement CC.  Instead, Mr. Salamat simply *assumes* that each change

in ALPA's conduct would have increased the likelihood of the APA agreeing to a more favorable outcome for the TWA pilots.  This is not a substitute for empirical analysis.

### D. Mr. Salamat Does Not Apply any of the "Theoretical" Foundations that He Claims Underlie His Analysis

96.    Mr. Salamat claims that "[b]ehavioral theory, expected utility, game theory and the analysis of persuasion…attempt to give insight into how parties will behave in negotiations [and] together they form a body of work from which a reasoned and methodical estimate of damages to the TWA pilots can be drawn given the assumption that ALPA had not violated its duty."[125] However, he never develops, presents, applies or properly explains these theories and what they predict about how the specific actions that he claims comprise ALPA's breach would have affected the outcome.  I am aware of no principles in economic theory, behavioral theory, game theory or any other body of academic research and literature that support the methodology that Mr. Salamat applies to construct his hypothetical seniority lists and to calculate damages.

### E. Mr. Salamat's Assumed Probabilities Have No Empirical Basis

97.    As described above, the first step Mr. Salamat took to calculate his estimated DMODEL damages (before set-off) was to "develop[ ] a static table of probabilities that allow a methodical way to estimate the likelihood that [an individual course of action that ALPA could have pursued] could have had in isolation"[126] on reaching DMODEL.  He combined those probabilities into a joint probability of achieving the better outcome.

98.    Mr. Salamat's methodology for evaluating the impact of actions on the outcome is invalid as a matter of logic and statistics.  His probability assignments are summarized in Exhibit 10.  He offers no basis for the individual probabilities he arbitrarily assigns to each proposed ALPA action,  and he admitted at his deposition that he had no rationale for these probabilities.[127]

### F. Mr. Salamat's Assumed Probabilities Are Combined Inappropriately

99.    Exhibit 10 shows that Mr. Salamat compounds the error resulting from his arbitrarily assumed probabilities by adding them together and purporting to calculate the overall probability that the APA would have agreed to the DMODEL List if ALPA had not breached its duty.  As a

---

[125] Salamat Original Report at 4.
[126] Salamat Original Report at 9.
[127] Salamat Dep. 1/29/2013 at 205:23-206:22; 207:15-20.

matter of basic statistics, summing probabilities as Mr. Salamat does is not appropriate. Consider each action that Mr. Salamat claims ALPA could have taken as equivalent to rolling a dice. Mr. Salamat appears to be asking the following: if ALPA rolled the dice six times, what is the likelihood that it would have succeeded in rolling a six at least once? Mr. Salamat's calculation yields 100% (6*(1/6) = 1), but the proper calculation is 66.5% $(1-(1-1/6)^6)$.[128] The second column of Exhibit 10 shows the cumulative probability of Mr. Salamat's individual probability assumptions if calculated properly and if each probability were independent – a combined probability of 53.3% rather than 73%. Accordingly, even assuming that Mr. Salamat's probabilities are otherwise appropriate (and he admitted that they are arbitrary and without empirical basis), the proper amount by which to discount his total damages under the DMODEL is 53.3%, not 73%. Correcting this error alone reduces the damages before set-off, using Mr. Salamat's methodology, from $647.8 million to $473 million.

100.    This calculation still overestimates the likelihood that the parties would have agreed to the DMODEL List because the likelihood of success of each of the hypothetical actions identified by Mr. Salamat is not independent, unlike each roll of the dice. If these actions were taken in the sequence listed, the probability that a particular action would succeed likely would decline after previous actions failed to achieve the TWA pilots' goal. For example, if ALPA had not agreed that the TWA pilots should waive scope (i.e., according to Mr. Salamat, had not failed in its initial duty to the TWA pilots, but instead had taken actions to fight the waiver) and this effort were unsuccessful, the likelihood that future ALPA actions would affect the negotiations to the benefit of TWA likely would have declined given what that failure would have revealed about the strength of the TWA pilots' position. Pursuing futile strategies to achieve the same goal would only confirm the TWA pilots' weak bargaining position and strengthen the APA in its negotiations. Thus, the second column of Exhibit 10 corrects Mr. Salamat's fundamental statistical error, but still overestimates the probability of reaching agreement on the DMODEL (assuming that each individual probability were accurate) because the likelihood of success of the remaining options decreases as previous attempts fail.

---

[128] Each roll has a 5/6th probability of failing. The probability of rolling a six at least once is one minus the probability that all six rolls do not result in a six).

101.    My corrected calculations also may overestimate Mr. Salamat's purported probability of reaching agreement on the DMODEL seniority list because Mr. Salamat failed to take into account that not all of the listed actions could have been pursued in combination.  Pursuing certain actions could have made it impossible to pursue others.  For example, Mr. Salamat testified that he did not consider whether the various legal strategies – which comprise four individual actions on his list – all could have been pursued in sequence.[129]  Instead, having "no [ ] way of assessing whether it would have been possible or not," Mr. Salamat simply "presum[es that the subsequent legal strategy] is not made redundant by the first one."[130]  Since pursuit of some actions could have made it impossible to pursue others, even the 53.3% likelihood of reaching the DMODEL seniority list, based on Mr. Salamat's made-up probabilities, is too high.

### G.  Mr. Salamat Ignores the Impact of and Reason for the St. Louis Fence

102.    Mr. Salamat ignores the benefits that the TWA pilots could have expected from the St. Louis fence.  He focuses exclusively on the outcome for the TWA pilots, viewed with hindsight, under Supplement CC compared with outcomes that he claims could have been achieved through negotiations absent a breach by ALPA (including DMODEL and others).  However, from a prospective view, if American had performed as expected at the time that it agreed to acquire TWA,[131] then the St. Louis fence created by Supplement CC would have resulted in TWA pilots generally flying the same aircraft and having the same or better opportunities at higher pay rates than in the past, irrespective of their position on the seniority list.  In effect, the St. Louis fence created a separate airline within the larger airline, in which bidding opportunities were reserved for the TWA pilots at the higher American pay scale.  The reduction in the value to American of operating and expanding its St. Louis hub after the transaction likely was a consequence of the unanticipated extreme and protracted downturn in air travel, especially at the legacy network carriers like American (see Exhibit 11).

---

[129] Salamat Dep. 1/30/2013 at 5:22-15:6.
[130] Salamat Dep. 1/30/2013 at 6:10-13.
[131] American's CEO in 2004 explained, "business travel was booming—so much so that we were in danger at American of maxing out our two mid-continent hubs at Dallas/Fort Worth and Chicago. Adding the St. Louis hub in that environment seemed to make sense."  "Climbing Back to Altitude: A Commerce Magazine Conversation with American Airlines CEO Gerard Arpey," August 2004 (http://www.stlcommercemagazine.com/archives/august2004/altitude.html).

This indicates (according to Professor Farber's methodology) that Supplement CC was consistent with the result one would expect if ALPA had fulfilled its duty of fair representation.

146.    Exhibit 18 shows the results from Professor Farber's methodology combined with Mr. Salamat's calculation of purported damages after correcting these errors.  I use the average of these three comparables, correct Professor Farber's mistake in ignoring the top staple, assume that the merged seniority list would have the same top staple as Supplement CC, and then determine the combination of bottom staple and merge ratio that yields a proportional difference in mean ranks equal to the average of these three mergers (-0.634).  If Supplement CC were modified according to this approach, I find that eight additional TWA pilots would have been merged with the American pilots, rather than stapled.  Using Mr. Salamat's methodology for calculating damages, these changes in the overall seniority list result in $2.8 million in purported damages.[178]

147.    For the reasons set forth above, it is my opinion that Supplement CC was consistent with the economics of bargaining which is consistent with the TWA pilots suffering no damages as a result of its implementation.  Further, I have pointed out many flaws that render Professor Farber's and Mr. Salamat's methods unreliable for calculating damages in this case.  Nevertheless, if one were to accept the approach that Mr. Salamat takes to calculating damages based on Professor Farber's hypothetical seniority list – correcting only the two glaring errors described above – then Professor Farber's analysis implies that Supplement CC negatively affected the TWA pilots by a total of $2.8 million.

## VIII.    IMPACT OF DATE LIMITATION ON MR. SALAMAT'S DAMAGE CALCULATIONS

148.    My analysis shows that Supplement CC gave the TWA pilots a reasonable share of the benefits from integrating the American and TWA pilots.  Thus, there is no support in the economics of bargaining and negotiation to suggest that the TWA pilots have been damaged.

Counsel for ALPA nonetheless has asked me to calculate damages implied by Mr. Salamat's methodology through April 2003, the date on which a new Collective Bargaining Agreement

---

[178] For purposes of this exercise I have not corrected the errors in Mr. Salamat's calculations that I discussed in Section VI.

negotiated by the APA with American Airlines became effective.  As shown in Exhibit 19, damages under the Mr. Salamat's DMODEL through April 2003 (correcting Mr. Salamat's pension and interest rate calculations) are $30.3 million, or $16.2 million if adjusted by a probability factor (corrected for his arithmetical error) that is based on Mr. Salamat's unfounded assumptions about the impact that certain ALPA actions would have had on the negotiated outcome.

Kevin M. Murphy

June 7, 2013

**Exhibit 1 - Combined American and TWA Fleet as of December 31, 2001**

|                  | American | TWA | TWA Share |
|------------------|----------|-----|-----------|
| Large Wide-body  | 47       | 0   | 0.00%     |
| Small Wide-body  | 239      | 36  | 13.09%    |
| Narrow-body      | 452      | 133 | 22.74%    |
| **Total**        | **738**  | **169** |       |

Sources: 2001-08-14 KPMG Report_001.pdf; Hefley Notes - 4-18-01.pdf; Hefley Notes - 8-20--30-01.pdf.

Exhibit 10

**Salamat Figure 3 - Corrected Cumulative Probability Calculation**

| Action | Δ Importance | Δ Perception | Abandonment | Total | Cumulative Probability | |
|---|---|---|---|---|---|---|
| | | | | | Original | Revised |
| Insist on Waiving Scope | | 5% | | 5.0% | 5.0% | 5.0% |
| Denied April 2001 Legal Strategy: Delay Purchase | 3% | 5% | | 8.0% | 13.0% | 12.6% |
| Denied July 2001 Legal Strategy: Sue American and APA | 3% | 5% | 2% | 10.0% | 23.0% | 21.3% |
| Denied October 2001 Legal Strategy: Injunction | | 5% | | 5.0% | 28.0% | 25.3% |
| Denied October 2001 Legal Strategy: Case, APA Injunction | 3% | | 2% | 5.0% | 33.0% | 29.0% |
| Refuse to request DOT make fair process condition of purchase | 3% | 5% | 2% | 10.0% | 43.0% | 36.1% |
| Refuse to request AFL-CIO support | | 5% | | 5.0% | 48.0% | 39.3% |
| Refuse to block APA pilots from ALPA jumpseats | 3% | 5% | 2% | 10.0% | 58.0% | 45.4% |
| Deny TWA pilots have right to strike | | 5% | | 5.0% | 63.0% | 48.1% |
| Failure to Support TWA Pilots | 3% | 5% | 2% | 10.0% | **73.0%** | **53.3%** |

Source: Salamat Report - 2012-10-12.pdf

**Exhibit 19**

**DMODEL Damages and Mitigation through April 2003**

|  | | Original | Through April 2003 |
|---|---|---|---|
| **Original Damages** | | | |
| Employment Damages | | -109.8 | -18.1 |
| Interest | | -17.8 | -3.5 |
| Furlough Damages | | -352.8 | -6.0 |
| Interest | | -59.7 | -1.1 |
| Future - Employment Damages | | -148.3 | 0.0 |
| PV | | 17.3 | 0.0 |
| Pension Plan A | | -72.8 | -1.3 |
| Pension Plan B | | -143.4 | -3.2 |
| **Total Damages** | | **-887.4** | **-33.1** |
| *Damage Probability* | *53%* | *-473.0* | *-17.7* |
| **Set-Off** | | | |
| Furlough | | 207.6 | 2.1 |
| Interest | | 31.1 | 0.4 |
| Pension Plan A | | 0.0 | 0.0 |
| Pension Plan B | | 55.6 | 0.3 |
| **Total Set-Off** | | **294.3** | **2.8** |
| **Total Set-Off Damages** | | **-593.1** | **-30.3** |
| *Damage Probability* | *53%* | *-316.1* | *-16.2* |

# Exhibit 31

# TWA MEC Minutes

Written, edited and published by your TWA Master Executive Council, these minutes provide a record of the business conducted during the representative body's last meeting. This document is not a verbatim transcript of the meeting's reports, discussions and actions. Rather, it is a comprehensive summary of those events. For more information on the issues influencing TWA pilots' careers, consult the TWA MEC's other various communications.

**SPECIAL MEETING DATE: October 20-22, 2001 Washington, D.C.**

### MASTER EXECUTIVE OFFICERS
**Robert A. Pastore, Master Chairman**
**Keith J. O'Leary, Vice Chairman**

**COUNCIL 2 - NY**
Howard B. Hollander, Captain Rep.
Theodore A. Case, First Officer Rep

**COUNCIL 4 - LAX/SFO**
Pablo Lewin, Captain Rep.
Alan Altman, First Officer Rep.
Glenn Stieneke, Secretary/Treasurer

**COUNCIL 3 - STL**
Steven P. Rautenberg, Captain Rep.
Sally D. Young, First Officer Rep.
Jim Arthur, Secretary/Treasurer

---

**Saturday, October 20, 2001**

1000 Captain Bob Pastore called the meeting to order.

Vice Chairman Keith O'Leary called the roll.

In attendance: Hollander, Case, Young, Arthur, Stieneke

Not In attendance: Rautenberg, Lewin, Altman

Proxies: None

Committee members: Ron Kiel, Keith Holcomb, Bud Bensel, Matt Comlish

Announcements

1001 Recess

Case for the read Article 1 Section 14 from ALPA's Constitution and By-Laws:

*Representation of all members of the Association at any duly called meeting of the Board of Directors, Executive Board and Master Executive Council is mandatory. Elected representatives may be considered as acting against the best interest of the Association if they fail to represent, or arrange for representation of their constituents.*

Case also requested that Pastore notify Woerth regarding members attempt to deny quorum.

Pastore stated he thought this was a postponed regular meeting. Holtzman stated that it would be a stretched to say this was a regular meeting. Additionally a 24-hour notice was given that this was a special meeting.


Pastore Ex
88

1014 Pastore adjourned meeting for lack of quorum.

Pastore called for Special MEC meeting for 10:30, Sunday, October 20.

### Sunday, October 20, 2001

1030 Master Chairman Bob Pastore called the meeting to order.

Vice Chairman Keith O'Leary called the roll.

In attendance: Hollander, Case, Rautenberg, Young, Arthur, Altman, Lewin and Stieneke

Committee Members: Bud Bensel, Matt Comlish, Ron Kiel, Keith Holcomb

Announcements

Pastore reviewed the agenda for the meeting. Also discussed Jeff Brundage's letter to Duane Woerth. Pastore said he spoke directly with Brundage to clear up some of the discrepancies in the letter.

Holtzman briefed the MEC regarding Dispute Resolution Committee grievances. These are handled by the DRC committee, the MEC is not involved.

Case for the record: "I have been made aware of at least two letters written by Duane Woerth, President of ALPA. One, intimating that this TWA MEC intends to depart from the TWA MEC Policy Manual with regard to the seniority integration discussions with the APA which began on October 20, 2001. For the record, this MEC member has no intention of taking any such action.
The other, concerns Special MEC meetings and a reiteration of intimations about the TWA MEC's conduct with respect to the seniority integration discussions with the APA. I am very concerned about the intimidating language of both letters. Because of the failure of this MEC to meet prior to the seniority integration engagement, this MEC has allowed non-Merger Committee members into the room for direct negotiations, which may be in violation of the TWA ALPA MEC Policy Manual. For the record, I object to this action. I am not quite sure how I am to continue representing my constituents with these letters in effect."

### 1045 Briefing from Captain Howard Attarian. ALPA Executive Administrator (*via phone*)
Captain Howard Attarian addressed the MEC regarding the recent seniority integration meetings between ALPA and APA. Also discussed several communication strategies.

Questions and Answers

1058 Briefing concluded.

### 1059 Protocol Discussion for the Merger Committee

Case/Altman moved to enter into Committee of the Whole
VOTE: **PASSED** unanimous voice vote.

1108 Recess
1125 Reconvened

**ALPA 006387**

D-088
Page 2 of 16

Hollander requested that the record reflect that Rautenberg, Lewin and O'Leary were not present.

1130 O'Leary and Lewin returned to the meeting.
.1131 Rautenberg returned to the meeting.

**Legislative Committee Report:  Matt Comlish**
Comlish briefed the MEC regarding the legislative efforts during the past few weeks.  Grass roots campaign has been very successful, receiving a lot support on Capital Hill.  Suggested that the MEC plan for the upcoming weeks.  Comlish said that tomorrow would be the most critical juncture.  Recommended developing public relations campaign and get something released with press today.  He said he would like to see more of the rank and file getting involved.  Comlish suggested that keeping the pressure on and asked the MEC to stay in DC to help with the campaign.  Also need to educate the pilots so they participate and work together as a team.  Expressed concerns that ALPA has not been supportive in either the political or public campaigns.   If this fails, it is because of lack of support from ALPA National.

Questions and Answers

1206 Recess
1214 Reconvened.

Questions and Answers continued.

1222 Report concluded.

1223 Case/Hollander moved to come out of Committee of Whole.
VOTE:  **PASSED** unanimous voice vote.

AI# 0110-118 Case/Hollander
**SUBJECT:**   TWA ALPA legislative initiative.

WHEREAS the TWA ALPA Governmental Affairs Committee has experienced an extraordinary level of success, and been instrumental in placing a Bill on the floor of both the U.S. House of Representatives and U.S. Senate, and

WHEREAS those Bills, Senate (S.1479) and companion House (H.R.2989), are specifically designed to allow for 3rd party neutral arbitration, for a resolution to the TWA / ALPA, American / APATWA LLC's seniority integration, and

WHEREAS those Bills are a direct result of the work of the Governmental Affairs Committee as augmented by certain members of the MEC, now

THEREFORE BE IT RESOLVED that the TWA MEC augments the TWA ALPA Governmental Affairs Committee by placing the following members on the Governmental Affairs Committee to include the entire MEC:  Howard Hollander, Ted Case, Sally Young and Jim Arthur.

Discussion

1228 Lewin/Case moved to POSTPONE until after the Merger Committee report and the conclusion of the legislative report.
VOTE:  **PASSED** voice vote.

---

**ALPA 006388**

D-088
Page 3 of 16

**Merger Committee Update:  Mike Day**
Briefed the MEC regarding ongoing meetings with APA.

1246 Report concluded.

MEC discussed whether to called a Special Meeting or move a late agenda item to deal with any merger proposals.

Arthur suggested that the MEC stay the course that we assured Senator Bond, the MEC would follow.

1255 Recess
1316 Reconvened

**Representational Structure Report:  Bill Kientz**
Kientz updated the MEC regarding representational structure.  Most likely TWA would fall under the American West concept.  The MEC would need to make a request to the Executive Council. Kientz suggested that the MEC make two requests, first dealing with the next four months, then to deal with the next election cycle.  The MEC could request to keep the current officers until the next election cycle. Recommend whatever the MEC decides, it be unanimous.   Some MEC members have suggested seniority-based representation.  Under this structure there would seven status reps, with 300 pilots per rep. Kientz said the he talked to the American West Master Chairman and they were not happy with their setup.  It works, but doesn't work well.

Questions and Answers

1345 Report concluded.

1346 Recess
1408 Reconvened

Rautenberg/Young moved to consider any seniority integration proposal or tentative agreement submitted to the MEC by the TWA MEC Merger Committee.

Discussion

VOTE to consider any seniority integration proposal:  **PASSED** voice vote.

**Representational Structure Discussion**

Young/Hollander moved to into Committee of the Whole.
VOTE:  **PASSED** unanimous voice vote.

Per Pastore, no minutes were recorded during the Committee of the Whole.

1456 Recess
1516 Reconvened

Hollander moved to come out of Committee of Whole.
VOTE:  **PASSED** unanimous voice vote.

**ALPA 006389**

D-088
Page 4 of 16

Representation Structure discussion continued.

MEC agreed that representation would be status quo but agreed to wait until the body heard from Salverson to see if the Executive Council would pass status quo.

**Communications Update:  Keith Holcomb**
Briefed the MEC regarding press conference and his discussions with Don Skiados, ALPA, Director Communications.

1647 Recess
1700 Reconvened

1701 Recess until 20:00pm

20:00 Reconvened
20:01 Recess

2020 **Communications Committee Report:  Keith Holcomb**
 Briefed the MEC regarding press conference and rally.  Rally has been delayed but press conference will go on as scheduled.  Skiados was ready to assist us.

**Negotiating Report:  Ron Kiel**
Kiel updated the MEC regarding meeting with Brundage.  Briefed the MEC on preliminary negotiations.

2039 Recess
2044 Reconvened

**Representation Structure:  Bill Kientz**
Updated the MEC with regarding conversation with Captain Jerry Mugerditchian, ALPA, Vice President Administration.  Mugerditchian said that anything was possible.  Kientz said that there was a possibility that TWA could keep the current reps with seniority block.  Recommend that the decision stay within the confines of the Constitution and By-Laws.

2055 Recess
2109 Reconvened

**Merger Committee Update:  Sean Clarke**
Updated the MEC on the latest proposal from APA.

Questions and Answers

2127 Updated concluded.

2128 AI# 0110-119 Case/Altman
**SUBJECT**: TWA ALPA Representational Structure

WHEREAS the tragic events in early September have caused unprecedented issues to be dealt with by the Air Line Pilots Association, and

WHEREAS the TWA ALPA representational structure has the proven ability to remain adaptable and innovative concerning union representational duties, and

**ALPA 006390**
D-088
Page 5 of 16

WHEREAS TWA LLC is caught in middle of the largest airline merger in history, and

WHEREAS the TWA MEC and ALPA is faced with the largest air carrier seniority integration in history, and

WHEREAS it is vitally important to maintain basic governing principles and stability for the purpose of adequately representing the interests of the TWA ALPA pilots, including representation for pay and working conditions, and

WHEREAS TWA LLC will collapse into a single Council airline with more than two thousand (2000) active members, which will tax the MEC beyond it's representational capacity, now

THEREFORE BE IT RESOLVED that to provide a organization structure for the continued governance and representation of TWA pilots the TWA MEC requests the Vice President – Administration/Secretary to coordinate with the ALPA Executive Council to adopt and administer the following requests:

1.  Provide a temporary vehicle to maintain the current duly elected TWA MEC status representatives as the "status quo" for the purpose of adequately representing the TWA pilots. This vehicle shall expire upon the normal election cycle beginning March 01, 2002.

2.  The MEC requests that the ALPA Vice President-Administration/Secretary coordinate with the ALPA Executive Council to provide a vehicle to maintain the TWA ALPA MEC Officers who are in place on October 31, 2001 until the normal election cycle.

Discussion

2237 Case/Altman moved to POSTPONE until after Kientz's briefing tomorrow.
VOTE:  **PASSED** voice vote.

**Captain Duane Woerth and Captain Howard Attarian (via phone)**
Discussion regarding APA's latest proposal.

2253 Recess.

---

**Monday, October 22, 2001**

0900 Master Chairman Bob Pastore called the meeting to order.

Vice Chairman Keith O'Leary called the roll.

In attendance: Hollander, Case, Rautenberg, Arthur, Lewin, and Altman

Not In attendance: Young and Stieneke

Proxies:  None

Committee members:  Ron Kiel, Keith Holcomb, Bud Bensel, Matt Comlish

**ALPA 006391**

D-088
Page 6 of 16

Announcements

0909 Recess

0918 Stieneke arrived at the meeting.

0920 Young arrived at the meeting

1015 Recess
1030 Reconvened

Lewin/Hollander moved to accept AI#0110-120 as a late agenda item.
VOTE:  **PASSED** voice vote.

<u>AI#0110-120 Young/Rautenberg</u>
SUBJECT:  Parker Dues Deferral

Discussion

**<u>Resolution #01-97 by S. Young/S. Rautenberg</u>**

**BE IT RESOLVED that the TWA MEC approves a two-month period for repayment of 1999 dues/service charge reconciliation for Charles Parker.**

**PASSED** voice vote

Case for the record: Abstained from voting because he did not have enough information to make a decision.

1040 Recess
1100 Reconvened

1103 Altman/Case moved to go into Committee of the Whole.
VOTE:  **PASSED** unanimous voice vote.

Pastore requested no minutes be recorded.

1132 Recess
1148 Reconvened

MEC discussed the agenda and representation structure.

1153 Working lunch that included briefing from the Merger Committee. No minutes recorded per Pastore's direction.

1315 MEC discussed the briefing from the Merger Committee and asked numerous questions of Roland Wilder.

1347 Recess
1349 Reconvened

**ALPA 006392**

D-088
Page 7 of 16

MEC discussion continued.

Tanner shared his opinion regarding the recent proposal; felt it was a step south.   The restrictions were not as favorable as the APA had offered earlier.

Lewin requested that the full details of the deal be given to the body for review before he could make a decision.

Rautenberg also requested the deal be reviewed in its entirety before he could reach a decision.  Felt he did not have enough information to even consider voting.  Rautenberg said he felt that the MEC was in no position to even contemplate this issue, need all the experts to advise us.

1420 **Government Affairs Update:  Matt Comlish**

Comlish updated the MEC regarding efforts on Capitol Hill.  Trevor Blackaan from Senator Kit Bond's office informed Comlish the reason no one from their office would be present during the negotiations was to avoid the appearance of interfering.  Comlish said he found it odd that Norma Kaehler, AMR Vice President, Government Affairs, was on site today.  He said that she had met with him and Bud Bensel and asked a few questions regarding how negotiations were going and how ALPA was being treated. Comlish emphasized the tremendous importance of keeping the legislation effort going.

Questions and Answers

1435 Caucus

1438 Update concluded.

1439 **Merger Committee Update**
Day briefed the MEC regarding the meetings with APA.  Discussion focused on furloughs.

Day's briefing was set aside in order that the MEC receive a briefing from Paul Hallisay, ALPA Director, Government Affairs.

1443 **Briefing from Paul Hallisay, ALPA Director, Government Affairs** (via phone)
Hallisay discussed the MEC's recent legislative efforts.  Stated that he felt that even if the Bill passed in the Senate, it would not pass in the House.   Although efforts to this point have been somewhat successful the Bill would never come to the floor, this issue was very controversial.

Questions and Answers

1449 Briefing concluded.

1500 **Merger Committee Update: Mike Day** (continued)
Day suggested that the MEC hear from Jeff Brundage, AMR, Vice President Employee Relation regarding the recent proposal.

MEC agreed to hear from Brundage.

Kientz briefed the MEC on Brundage's background while he was at ALPA.

---

**1504 <u>Discussion with Jeff Brundage, Vice President Employee Relations, American Airlines (via phone)</u>**

Brundage stated that there were some options.  If there wasn't an agreement, things would remain status quo.  AMR has tentative language with APA and will file for single carrier status.  AMR has said from day one they want to be a single carrier.  The other option was arbitration.  Brundage stated Don Carty told Senator Bond if the Bill passed, he would shut down TWA LLC.  AMR made a commitment to its employees, right or wrong.  AMR employees cannot fathom an arbitrated seniority list.  AMR committed to its employees that AMR would not support arbitration for seniority. If the Bill passed, AMR would shut down the TWA LCC, cannot afford to upset the apple cart.  Brundage said that Delta was going to be very aggressive, that was why we want to be in position to compete.  The other piece was litigation; certainly an option.  AMR doesn't share the same opinion with ALPA of what we signed up with back in Delaware.  We have done what was reasonable to facilitate the process and feel it will stand up in court.  Final option was to make a deal.  Brundage said he would not answer whether or not this was a fair deal. There has been little success of fair integration among major carriers.  He has not seen and integration where all parties were happy in the end, understood that this was an emotional issue.  AMR will do everything it takes to become the number one airline. This was a lousy place to be, but that is where we are.

Questions and Answers

1620 Discussion concluded.

1621 Recess.
1639 Reconvened

Pastore announced that Day made a commitment to Ed White that nothing would be released to the press until close of business tomorrow.  Day said that he had no problem calling White and telling him the deal was off.

Day reviewed in detail the proposal.

Questions and Answers

1725 Recess.
1729 Reconvened.

Questions and Answers

1740 Hollander left the meeting, Hollander proxy to Case.

1744 Lewin left the meeting, Lewin proxy to Altman.

1757 Lewin arrived at the meeting.

1830 Recess
1842 Reconvened

**<u>TWA ALPA Representational Structure Discussion</u>**

Pastore announced that he gave his proxy to Kientz to attend the Executive Board.  He recommended that he would like to see the most Reps possible.

Kientz briefed the MEC regarding prospect of status quo.  ALPA has stated that they are going to be flexible on this because of the current circumstances.  He read from the ALPA Constitution and By-Laws regarding organizational structure.  There were several options, but recommended block seniority representation for the interim.  The MEC needs to be unanimous on this decision.

Questions and Answers

Rautenberg for the record requested the following be read to the Executive Council:  *I understand that the Executive Council will be considering the request of the TWA MEC on representational structure at its meeting this week.  I have abstained from voting on that recommendation in order to facilitate cooperation among the members of the MEC at this critical juncture.  However, I do believe that the Executive Council should be aware of the most serious reservation that prevents me from outright support of our request.*

*I am writing to communicate my concern and ask that you share it with the Executive Council members as they consider our representational situation.  A vacancy was created in the Council 2 First Officer Representative position on August 10, 2001.  That vacancy was created by recall.  The vacancy was filled on an interim basis soon after.  However, to my knowledge, the election process for the secret ballot of the membership to elect the representative to serve the remainder of the term has not begun.  I cannot endorse the failure of Council 2 to begin that process by scheduling and holding the nominating meeting.  Subsequent to about September 28, when TWA announced its intentions to close the JFK domicile, the failure to hold nominations is understandable.  However, the expiration of seven weeks between the recall on August 10 and the announcement of domicile closing at the end of September with no nominations being scheduled or conducted is in my opinion highly inappropriate.  That is aggravated by the fact that Council 2 did in fact find it possible to conduct a meeting for the purpose of electing an interim representative.  Nominations could have been held at that time.*

*The potential addition of four months to an interim representative's term that should already have ended is a circumstance that I cannot support.*

*Thank you in advance for communicating this to the Executive Council.*

Rautenberg for the record said that if the Council #2 election been conducted, he would have supported the status quo motion.

1924 Caucus

MEC reviewed press release.

Kientz recommended that MEC do a straw poll regard representation.  He would take their decision to Bob Salverson and Jerry Mugerditchian to write the resolution.

1942 Recess.

**Tuesday, October 23, 2001**

0900 Master Chairman Bob Pastore called the meeting to order.

0901 Recess

**ALPA 006395**

0945 Reconvened

Vice Chairman Keith O'Leary called the roll.

In attendance: Case, Rautenberg, Young, Arthur, Lewin, Altman and Stieneke

Not In attendance: Hollander

Proxies:  Hollander proxy to Case

Committee members:  Sean Clarke, John Swanson, Matt Comlish, DJ Glasby, Bud Bensel, Mike Day

Guests:  On file MEC office

Announcements

### Merger Committee Report:  Mike Day
Day stated that if there were better furlough protections, the Merger Committee would agree to the deal unanimously.  Pilots that were now furloughed were definitely at risk.  Day didn't believe there was a chance for litigation or the Bill passing, only leverage was to continue to delay.  He said he was not trying to sell this, the Committee tried to get unanimous consensus.  The Committee can only recommend this with certain conditions.

Swanson stated if that the captain upgrades were based on retirements rather than the economy.  With the deal, recall rights would maintain April 10 seniority number, but if the pilot stayed in STL would maintain current seniority and would be able to move up to captain sooner than anywhere in the system.  Recall could be anywhere there was an opening, but as soon as there was an opening in STL, the TWA pilot would get it before any AMR pilot.

Day reminded the body that quality of life is not an issue for APA pilots; they only care about the money.

Swanson stated that the MEC agrees not to take the deal; the TWA pilots would loose about 400 numbers in their seniority number.  Doesn't' seem a lot right now, but later in their career it will.  Also, TWA pilots would be recalled to the bottom of APA seniority list.

Questions and Answers

1022 Recess
1040 Reconvened

Glasby stated that the MEC must do what was the best for all the TWA pilots.  He was opposed to the deal; this was not integration but isolation.  This was the best deal the Committee could get; APA was not going to give anymore.  The upside of voting this down was very small.  The litigation was not going get us better seniority; the legislative option was dead.  Glasby also felt that the airline was going to be shrunk considerably.  If the MEC agreed to the deal, it would protect some 1000 pilots.  If don't accept, all pilots would be at risk.

Clarke said if there was furlough protection, he would not be for the proposal but he would be neutral.  He thought there was a miss conception that if we don't accept the deal that we will loose 400 numbers on seniority, there was a shot that this won't happen.  Briefed the MEC on the mitigation package.  The APA already believes that anyone hired by the April 10 date has furlough protection.  Clarke said that the

**ALPA 006396**
D-088
Page 11 of 16

TWA pilots were the mitigation package whether we take the deal or not.   Clarke hoped that this group would not sell out 1200 pilots to save their own butt.   We don't have to come to a deal, there would be some risks.   He couldn't believe anyone on the Merger Committee could sign a deal that was going to furlough 1200 pilots.   We are here to prevent furloughs, not to voluntarily sign up for furloughs, and that would be what you will be doing if you accept this deal.

Wilder stated he was here to advise the MEC on the law and to help them get were they decided to go. Injunctions were being prepared against the single carrier filing.   In order to get to arbitration all the pieces have to fall in line.   First, the MEC must stop AMR from reaching an agreement with APA and then file injunction on the single carrier filing.   This would only be a short delay, but cannot stop them from doing this eventually.   ALPA needs to win the grievance with Richard Block, on fair and equitable process for integration.   If ALPA wins the grievance, need to get a specific remedy.   The next step if ALPA prevails would be to file suit to make sure the award was enforced.   Next ALPA would need to work on improving the deal.   During this period, ALPA would need to continue the legislative front with Senator Bond.   During this period, there was nothing to prevent furloughs.   Depending on the economy, if the traffic doesn't return, AMR would take it out of our hides.   Wilder didn't see any legal protection to prevent AMR from furloughing heavier on the TWA side.   He saw the fight going on through the first of the year.   If ALPA obtained arbitration, it would be about 120 days for the arbitration.   This would be a period of vulnerability.   As in any war, there would be causalities.   If ALPA doesn't take the deal, APA and AMR positions are that furloughed TWA Pilots would be recalled after all APA pilots.

1122 Recess
1142 Reconvened

MEC reviewed letter to APA to accept the proposal.

Rautenberg/Lewin moved that the letter to APA be issued as written.
Discussion

Case/Young moved to POSTPONE motion by Rautenberg/Lewin until 1230.
Discussion
VOTE: **PASSED** voice vote.
Lewin requested recorded vote.
FOR: Case, Hollander (*Proxy to Case*), Altman, Young
AGAINST: Rautenberg, Lewin

MEC continued discussion on the APA proposal.

Tannen briefed the MEC with numbers of captain projections and potentials for TWA first officers to become captain.

1209 Case/Lewin moved to enter into Committee of Whole.
VOTE: **PASSED** voice vote.
Rautenberg requested recorded vote.
FOR: Case, Hollander (*Proxy to Case*), Lewin, Altman, Young
AGAINST: Rautenberg

MEC continued discussion on APA's proposal.

Altman/Young moved to extend motion to POSTPONE until 1245.
VOTE: **FAILED** recorded vote.

**ALPA 006397**

D-088
Page 12 of 16

Lewin requested recorded vote.
FOR: Young, Altman
AGAINST: Rautenberg, Lewin
ABSTAIN: Hollander (*Proxy to Case*), Case
Pastore voted against the motion to break to the tie vote.

Discussion continued.

Case for the record: "After much sole searching and deliberation, I speak against the motion for conditional acceptance of the seniority integration proposed by the APA representatives yesterday October 22, 2001.

Having been a principle in the effort to encourage the APA to return to the table, I find this offer an affront to those efforts. This offer cannot be considered fair and equitable by any reasonable standard. I represent a range of New York, First Officer constituents. This offer does not meet their needs or desires or the nearly 60% of pilots most directly affected by this offer. This offer places the whole of my constituents at risk of imminent furlough, and would devastate their careers. No reasonable standard would allow for 1241 TWA pilots, with years of service ranging from one year to twelve and a half years of service, to be placed below an American pilot who was hired on April 10, 2001. To rob those 1241 TWA pilots of their dedicated years of service and experience, and consider them newly hired at American Airlines as of April 10, 2001, is totally unacceptable.

Placing nearly 60% of the TWA pilots in immediate risk is deplorable. The only reasonable standard for furlough protection is a reasonable seniority number.

No reasonable standard of fair and equitable has been met with this offer.

After listening to American Airlines labor relations representative, Jeff Brundage, and quoting him: "American and the APA have a Tentative Agreement for an imposed seniority integration, which is essentially identical to the current offer on the floor," with two exceptions. I don't see the advantage of agreeing to this offer and thus denying the Association and TWA pilots due process.

I don't believe that American Airlines has exhausted their "reasonable best efforts" in this effort, and until that effort, and our grievance compelling that effort, has seen the light of day, we do not have the best deal available."

Young called the question that the letter to APA be issued as written.
VOTE: **FAILED** roll call vote.
Lewin requested roll call vote.

**FOR:** 803     **AGAINST:** 1128

| | | |
|---|---|---|
| FOR: | Hollander (*Proxy to Case*) Council#2- | 3 |
| | Case, Council #2- | 3 |
| | Rautenberg, Council #3- | 710 |
| | Young, Council #3- | 7 |
| | Lewin, Council #4- | 80 |
| AGAINST: | Hollander (*Proxy to Case*) Council#2- | 208 |
| | Case, Council #2- | 200 |
| | Rautenberg, Council #3- | 2 |
| | Young, Council #3- | 631 |
| | Lewin, Council #4- | 4 |
| | Altman, Council #4- | 83 |

**ALPA 006398**

D-088
Page 13 of 16

Holtzman updated the MEC regarding conversation with Brundage regarding mitigation. Brundage suggested that ALPA condition its acceptance on APA's mitigation efforts. If APA does this there would be seniority integration as we now it, if don't do mitigation, there would be no deal. For first quarter, the next furloughs would be between 0-250. Brundage suggested that there be in three-way conference call this afternoon to get this done.

Pastore briefed the MEC regarding his conversation with Don Carty. Pastore asked for full furlough protection. Carty said he could not guarantee furlough protection. Covered the furloughs for this year. There would be up to 200 furloughs the fourth quarter. However AMR was only anticipating 133. For the first quarter of next year, furloughs could be 0-250. Although AMR could not guarantee that there would be no furloughs, Pastore recommended asking for AMR to at least guarantee the numbers.

MEC Discussion

Lewin/Young moved to go into Committee of the Whole.
VOTE:  **PASSED** voice vote.

MEC in the Committee of the Whole

1355 MEC Caucus

**1400 Update from Trevor Blackaan of Senator Kit Bond's Office**
Updated the MEC about the legislation.  Senator Bond was committed, but had some concerns that the Bill could be filibustered.

Questions and Answers

1430 Update concluded.

**1431 Discussion with Captain Duane Woerth** (via phone)
Woerth and the MEC discussed the recent proposal and other options available to the MEC if they decide not to accept the deal.

1435 Discussion concluded.

1453 Case/Altman moved to recess until Merger Counsel arrived.
VOTE:  **PASSED** recorded vote.
Lewin requested recorded vote.
**FOR:**  Case, Young, Altman, Hollander proxy to Case
**AGAINST:**  Rautenberg, Lewin

1454 Recess
1514 Reconvened

Pastore updated Hollander via phone with the recent comments from Woerth.

1617 Staff was excused from the room.

MEC discussion with Roland Wilder and the Merger Committee.

---

1635 Staff returned.

Lewin/Rautenberg moved to accept APA proposal with conditions as recommended by the Merger Committee (Counter proposal to APA).

Discussion

1624 Caucus

1630 MEC back in regular session.

1631 VOTE to send Counter proposal: **PASSED** roll call vote.
Lewin requested roll call vote.
**FOR:** 797     **AGAINST:** 412     **ABSTAIN:** 722

| | | |
|---|---|---|
| FOR: | Hollander (*Proxy to Case*) Council#2- | 3 |
| | Case, Council #2- | 3 |
| | Rautenberg, Council #3- | 710 |
| | Lewin, Council #4- | 81 |
| AGAINST: | Hollander (*Proxy to Case*) Council#2- | 208 |
| | Case, Council #2- | 200 |
| | Rautenberg, Council #3- | 2 |
| | Lewin, Council #4- | 2 |
| ABSTAIN: | Young, Council, Council #3 | 638 |
| | Lewin, Council #4 | 1 |
| | Altman, Council #4- | 83 |

1635 Recess
1740 Reconvened

Pastore briefed the MEC regarding his phone conversation with Brundage.  Brundage stated TWA, LLC pilots would not get Greenbook pay prior to January 1, and no guarantees on furloughs.  Pastore said the Brundage did agree to provide in writing that furloughs would be no more than 200 in the 4th quarter of 2001 and and no more than 250 pilots in the first quarter of 2002.

**MEC Discussion with Captain Howard Attarian (*via phone*)**

1758 Discussion concluded.

1759 Young called for the orders of the day.

Pastore asked for indulgence until Brundage responded to the Counter proposal.   MEC agreed.

**MEC Discussion with Captain Howard Attarian and Bob Christy.**

Attarian stated that the counter proposal were not acceptable.  MEC questioned how they were getting this information.   Attarian stated that they just got off the phone with Brundage and he said the conditions were not acceptable.  Pastore said that was not his understanding with his phone conversation with Brundage.

1804 Discussion concluded.
1805 MEC Caucus

---

**1812 <u>MEC Discussion with Jeff Brundage.</u>**
Brundage said that the counter proposal was not acceptable.

1818 Back in regular session

Holtzman outline terms of third proposal to send to APA.

1822 Rautenberg/Lewin moved to accept terms as described by David Holtzman.
VOTE: **FAILED** roll call vote.
Lewin requested roll call vote.

**FOR:** 807       **AGAINST:** 1123       **ABSTAIN:** 1

| | | |
|---|---|---|
| FOR: | Hollander (Proxy to Case), Council #2 - | 3 |
| | Case, Council #2 - | 3 |
| | Rautenberg, Council #3 - | 710 |
| | Young, Council #3 - | 7 |
| | Lewin, Council #4 | 81 |
| | Altman, Council #4 | 3 |
| AGAINST: | Hollander (Proxy to Case), Council #2 - | 208 |
| | Case, Council #2 - | 200 |
| | Rautenberg, Council #3 - | 2 |
| | Young, Council #3 - | 631 |
| | Lewin, Council #4 | 2 |
| | Altman, Council #4 | 80 |
| ABSTAIN: | Lewin, Council #4 | 1 |

Case stated that the MEC had sent a conditional acceptance to the APA proposal.  The MEC is requesting a formal response.

Young asked if the MEC was requesting that Brundage state that he rejected the package?  Holtzman said Brundage made it clear that it was not acceptable.

1829 Young/Altman moved to adjourned meeting.
VOTE: **PASSED** voice vote.

1830 Meeting adjourned.

# Exhibit 32

**FILE COPY**

## ALLIED PILOTS ASSOCIATION

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2115 • Fax 817.302.2119

Captain John E. Darrah
President

**VIA FAX 314-770-8510; 8571
and 202-223-0723**

October 23, 2001

Air Line Pilots Association (TWA-MEC)
Captain Robert A. Pastore, Chairman
500 N.W. Plaza, #1200
St. Ann, MO 63074

Dear Bob:

As you know, when our meetings in Washington, D.C. ended on the afternoon of October 22, we clearly reiterated that the APA Board of Directors was meeting beginning October 23 for the purpose of approving a seniority integration agreement between APA and American Airlines. We understand that AMR management subsequently advised you that, if the TWA MEC did not accept the seniority integration proposal pending at the conclusion of those meetings by 1300 CST on October 23, the Company would proceed to conclude an agreement with APA. We have now received your letter of October 23, which we received at approximately 1630 CST on this date. In your letter, you state that the TWA MEC has voted to accept the seniority integration proposal, but with additional conditions as stated in your letter.

Your letter arrived well after the deadline established by the Company and purports to place conditions on the MEC's acceptance of the proposal beyond those set forth in the proposal. We are gratified that the MEC has concluded that the pending seniority integration proposal is fundamentally acceptable. We made clear in our meetings, however, that we would proceed forward with American unless the proposal was accepted. In addition, as you know, the most significant conditions proposed in your letter would require the agreement of American Airlines management. However attractive some of those conditions might be to us, we understand that American has already advised you that they are unacceptable and that it will therefore not execute your letter.

O:\exepres\misc\102301 Pastore

ALPA 001857

Air Line Pilots Association (TWA-MEC)
Captain Robert A. Pastore, Chairman
October 23, 2001
Page 2


    Accordingly, it does not appear that your letter provides the basis for an agreement among the two pilot groups and American. Therefore, we intend to continue on the course which we identified at the conclusion of our meetings in Washington, D.C.

        Sincerely,

*John E. Darrah*

        Captain John E. Darrah
        President

JED/sp

cc:  Jeffrey J. Brundage

O:\exepres\misc\102301 Pastore

ALPA 001858

# Exhibit 33



# COPY
## NATIONAL MEDIATION BOARD
### WASHINGTON, D.C. 20572

(202) 692-5000

0000014 APR 5 '02

---

| | |
|---|---|
| In the Matter of the Application of the | 29 NMB No. 45 |
| ALLIED PILOTS ASSOCIATION | CASE NO. R-6867 |
| alleging a representation dispute pursuant to Section 2, Ninth, of the Railway Labor Act as amended | FINDINGS UPON INVESTIGATION-DETERMINATION OF CERTIFICATION |
| involving employees of | April 3, 2002 |
| AMERICAN AIRLINES, INC. TRANS WORLD AIRLINES, LLC. | |

This determination addresses the representation consequences of the application filed by the Allied Pilot's Associations (APA) for the craft or class of Flight Deck Crew Members, employees of American Airlines, Inc. (American), and Trans World Airlines, LLC. (TWA- LLC).[1]

The Board finds that the appropriate craft or class in this case is Flight Deck Crew Members and extends the APA's certification in R-3619 (Pilots) to include Flight Deck Crew Members in the single transportation system.

## PROCEDURAL BACKGROUND

On November 9, 2001, APA filed an application alleging a representation dispute involving American Flight Deck Crew Members. APA asserted that American and TWA-LLC constitute a single transportation system. APA filed its application with a

---

[1]   TWA-LLC and American, when used collectively, will be referred to as "Carriers."

-260-

ALPA 010140

J-379

29 NMB No. 45

seniority list of the pilots represented by APA dated July 1, 2001. The application was assigned NMB File No. CR-6736.

On March 5, 2002, the Board determined that American and TWA-LLC operate as a single transportation system for representation purposes. *American Airlines, Inc./Trans World Airlines, LLC.*, 29 NMB 201 (2002). Pursuant to the Board's Representation Manual (Manual) Section 19.6, this investigation addresses the representation of the proper craft or class.

The Board's March 5, 2002, determination stated that the Air Line Pilots Association (ALPA) "has 30 days from the date of this determination to file an application supported by a showing of interest of at least 35 percent of the single transportation system or to supplement the showing of interest in accordance with Manual Section 19.601."

On March 18, 2002, ALPA notified the Board that it would not file an application.

On March 20, 2002, the TWA Master Executive Council of the Air Line Pilot's Association International (ALPA-TWA MEC) submitted an unsolicited request for an investigation "into possible interference by American Airlines, Inc., management with a representational certification."

On March 21, 2002, APA responded to the ALPA-TWA MEC submission and requested that the Board dismiss the ALPA-TWA MEC's allegations.

On March 27, 2002, American filed a response with the Board concurring with APA's submission.

On March 28, 2002, the ALPA-TWA MEC supplemented its March 20, 2002, submission, reiterating its request for an investigation and requesting a 180-day extension of the "representational certification of the pilot craft and class."

-261-

ALPA 010141

29 NMB No. 45

## STATEMENTS OF FACT

APA represents Pilots on American pursuant to Board certification in Case No. R-3619 (1963). AAL Flight Engineers' International Association (FEIA) was certified as the representative of Flight Engineers on American in Case No. R-2933 (1955).[2] ALPA is the voluntarily recognized representative of Pilots on TWA Inc. ALPA was certified as the representative of Flight Engineers at TWA Inc. in Case No. R-3982 (1968).

Effective December 31, 2000, FEIA terminated operations and filed the required termination report with the Department of Labor.

American employs 11,329 employees and TWA-LLC employs 2,243 Flight Deck Crew Members covered by this application.

## DISCUSSION

The Board has consistently extended an organization's certification to cover employees in the craft or class on the entire system when the numbers of employees on each part of the system are not comparable. For example, in *Continental Airlines/Continental Express*, 20 NMB 582 (1993), the Board extended the certification of an incumbent which represented 6,994 Flight Attendants to include 423 unrepresented Flight Attendants. *See also Continental Airlines/Continental Express*, 20 NMB 580 (1993); *SAHSA/TAN*, 19 NMB 17 (1991); *Air Wisconsin, Inc./Aspen Airways, Inc.*, 18 NMB 336 (1991); *Alaska Airlines, Inc./Jet America, Inc.*, 15 NMB 42 (1987).

The Board's examination of the record establishes that the appropriate craft or class in this case is Flight Deck Crew

---

[2]     All Flight Engineers hired at American after 1963 are required to be pilot-qualified and are represented by APA.   *See American Airlines, Inc.*, 19 NMB 113 (1991).

-262-

ALPA 010142

Members. The numbers of APA-represented Flight Deck Crew Members on American and ALPA-represented Flight Deck Crew Members on TWA-LLC are not comparable. Therefore, APA's certification in Case No. R-3619 is extended to cover the entire craft or class of Flight Deck Crew Members on the single transportation system. FEIA's certification issued in R-2933 (Flight Engineers/American) and ALPA's certification in R-3982 (Flight Engineers/TWA Inc.) are terminated.[3]

CONCLUSION

The Board finds that the appropriate craft or class is Flight Deck Crew Members and extends APA's certification in R-3619 (Pilots) to include Flight Deck Crew Members in the single transportation system. The Board extinguishes FEIA's certification issued in R-2933 (Flight Engineers/American) and ALPA's certification in R-3982 (Flight Engineers/TWA Inc.). Accordingly, Case No. R-6867 is closed.

By direction of the NATIONAL MEDIATION BOARD.

*Benetta M. Mansfield*

Benetta M. Mansfield
Chief of Staff

Copies to:
(see attached list)

---

[3]     "Under normal circumstances, participation in . . . representation matters is limited to the applicant, the incumbent, if any, and the carrier." ALPA-TWA MEC is neither the applicant nor the incumbent. While in special circumstances the Board "may deem some form of limited participation by other entities to be appropriate," ALPA-TWA MEC has failed to demonstrate those circumstances here. *Missouri Pacific Railroad (Union Pacific)*, 15 NMB 21, 23 (1987). Therefore, the Board will not consider ALPA-TWA-MEC's submissions.

ALPA 010143

29 NMB No. 45

Harry A. Rissetto, Esq.
Sheldon M. Kline, Esq.
Richard A. Malahowski
Jonathan A. Cohen, Esq.
Clay Warner, Esq.
Roland P. Wilder, Esq.
Edgar N. James, Esq.
Marie Chopra, Esq.
John Ward
Robert Roach
David Rosen, Esq.

-264-

ALPA 010144

# Exhibit 34

# ALLIED PILOTS ASSOCIATION

O'Connell Building  •  14600 Trinity Boulevard, Suite 500  •  Fort Worth, TX 76155-2512  •  817.302.2272  •  www.alliedpilots.org

March 2, 2001

**_TRANSMITTED VIA FACSIMILE (314) 770-8510_**
**_and FEDERAL EXPRESS - NO. 808962169078_**

Captain Leroy W. Bensel, Chairman
TWA MEC Merger Committee
Air Line Pilots Association
500 N. W. Plaza, Suite 1200
St. Ann, MO 63074

Dear Bud:

We are sorry that you and your committee abruptly terminated our meeting on March 1, 2001 without giving us an opportunity to review and explain our written response to the "ALPA Proposed Seniority List Integration" which you presented to us earlier in the day.

As we outlined to you at our February 9 meeting in St. Louis, APA is on a very tight schedule due to the various transactions undertaken by AMR management.  Management is moving aggressively forward with its plan to purchase the assets of TWA and move them into a Limited Liability Company (LLC). The timetable we face requires that the seniority list integration be completed as part of any changes to the APA contract that are required in connection with the transition to a merged operation.   Your February 15, 2001 letter to me acknowledged that your Committee similarly desired to resolve this issue in a timely manner.  Unfortunately, our ability to meet that goal has been inhibited because, of the eight days of face-to-face meetings between the Merger Committees which we originally scheduled, and to which you initially agreed, your Committee has cancelled all but two; and because of your departure from the March 1 meeting, at which your Committee for the first time provided any substantive indication of your position, to which we promptly responded in writing.

As we stated at the March 1 meeting, everyone's concept of "fair" differs according to his or her point of view. Since we did not have the opportunity, I will try to explain what we believe is a fair solution to our seniority list integration problem and how events will dictate our actions over the next several days in the absence of an agreement.  The solution that we offer is not made in a vacuum, but in realistic expectation of what American Airlines management intends to do with both the LLC and the contributions that TWA will make to the merged operation.

ALPA 006032

J-283

Captain Leroy Bensel
March 2, 2001
Page 2

We understand that TWA's assets and the TWA Pilots bring value to the transaction, specifically in the form of legitimate Captain jobs. Our proposal is designed to reflect those legitimate Captain jobs, and to protect them -- including the legitimate pre-merger expectation of TWA First Officers to upgrade -- without adversely affecting the pre-merger career expectations of AA Pilots. We emphasize Captain jobs, not First Officer jobs, because our new hire First Officers at AA have reached a pay structure that is basically equivalent to your narrow body captain's pay, which takes you years to attain at TWA, and because AA is now assigning new hires to First Officer jobs on wide-body equipment comparable to, and even larger than, the largest equipment TWA is bringing to the transaction. We emphasize legitimate Captain jobs, because AMR management has stated publicly that certain TWA routes and aircraft will be eliminated from the combined AA/TWA operation. Our offer is intended to protect those legitimate Captain jobs, protect legitimate expectations of the more senior TWA First Officers to upgrade to Captain, and protect the movement of TWA jobs should AMR management choose to reallocate TWA flying. Our proposal is thus designed to protect TWA pilots' legitimate career expectations and advancement, while at the same time increasing their pay, benefits and retirement and improving their work rules and job security due to the 30-plus years of effort AA pilots have put into our contract. Our proposal is intended to accomplish all of this while protecting AA Pilots' career expectations from the deleterious effects of the merger.

With that background, the offer we made provides several important provisions that protect what you bring to the table:

1.   Our selection of TWA Pilot Muschany (SSN 825) as the break point of the ratioed portion of our proposed merged seniority list reflects our assessment of the number of legitimate Captain jobs which the TWA Pilots will, in fact, contribute to the merged operation. The 5 to 1 ratio applied above that point is designed to protect the seniority of TWA Pilots who currently have sufficient seniority to fly in those positions, and to ensure that, when the fence comes down, your pilots' positions on the merged seniority list should place your 767 Captains with our 767 Captains and your narrow body Captains with our narrow body Captains. To do anything else would cause irreparable damage to the career expectations of AA Pilots.

2.   We have attempted to construct the proposed merged list and the fence to reflect the point in TWA's history that each TWA Pilot was hired. As we have stated, those pilots hired  before TWA's various bankruptcy filings

ALPA 006033

Captain Leroy Bensel
March 2, 2001
Page 3

had at least some expectation to be Captain at some point at TWA, and we have acknowledged that by offering to agree to a mechanism to upgrade them in a timely manner. However, as we have also stated, those pilots that were hired post-bankruptcy had little or no long-term career expectation beyond accumulating experience which would then lead them to employment at other carriers. You clearly acknowledged this distinction in your own presentation on March 1, when you emphasized that 138 TWA First Officers should upgrade to Captain, while you apparently agree that it is appropriate that the future entitlements of the more junior TWA Pilots be determined in accordance with the merged seniority list.

3.  As we explained in an earlier meeting, the fence that we offer balances the interests of the two pilot groups: protection of AA pilots' realistic and legitimate career expectations while offering TWA pilots dramatically increased pay, benefits and working conditions. Your suggestion that TWA pilots exercise their same relative seniority status on the merged seniority list would give TWA pilots windfall gains in pay, benefits and working conditions at the cost of significant injury to AA pilots' career expectations. Your proposal would also give TWA pilots immediate access to equipment types they had no expectation of ever achieving at TWA while AA pilots, who had every expectation of achieving those positions pre-merger, would be blocked from those positions. Finally, your proposal to base placement on the merged list and protection of flying on equipment that will not survive in the merged operation effectively transfers AA pilot career expectations to TWA pilots.

4.  Similarly, in 1993, the TWA pilot group gave up the Final Average Earnings (FAE) calculation for all future hires as well as future accruals for pilots hired on or before 1993. AA pilots still have a retirement fund based on their FAE calculated during their last ten years with the company. Our proposal is designed to protect the retirement expectations of AA pilots without impacting TWA pilots. Doing otherwise would prove injurious to AA pilots.

5.  At the same time, as we explained in an earlier meeting — and as we would have emphasized again on March 1 if your committee had not terminated the meeting — our proposed fence provides protections in both directions. The fence that we propose is designed to protect the TWA Pilots' legitimate career expectations based on what TWA contributes to the merged operation, and affording TWA pilots wage benefits and working conditions they had no expectation of receiving pre-merger.

ALPA 006034

# Exhibit 35

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

JOHN KRAKOWSKI,                    )
KEVIN HORNER, and                  )
M. ALICIA SIKES, individually, and )
on behalf of those similarly situated, )
                                   )
Plaintiffs,                        )
v.                                 )        Case No. _____
                                   )
AMERICAN AIRLINES, INC. and        )        Jury Trial Demanded
                                   )
ALLIED PILOTS ASSOCIATION,         )
                                   )
Defendants.                        )

## CLASS ACTION COMPLAINT FOR DAMAGES
## AND DECLARATORY RELIEF

Plaintiffs John Krakowski, Kevin Horner and M. Alicia Sikes (collectively "Plaintiffs"), on behalf of themselves and all persons similarly situated, for their complaint against Defendants American Airlines, Inc. ("American") and Allied Pilots Association ("APA") state:

### The Parties

1.     Plaintiff Krakowski is a natural person residing in St. Louis County, Missouri.

2.     Plaintiff Horner is a natural person residing in Pike County, Missouri.

3.     Plaintiff Sikes is a natural person residing in Pennsylvania.

4.     American is a Delaware corporation which operates an international airline, and does business and has an operations base in St. Louis County, Missouri.

-1-

seniority list in a manner by which they retained only a fraction of the seniority earned at TWA. Most of these pilots suffered demotions, and many were furloughed as well.

10.     Supplement CC's harshness to the former TWA pilots was slightly ameliorated by provisions for a protective "fence" in St. Louis (TWA's former hub), which fence created minimum Captain and First Officer positions in St. Louis. This fence allowed former TWA pilots to preferentially bid on the flying at American's St. Louis base. This fence in St. Louis continues today, and is defined in Supplement CC as integral to the seniority list created by Supplement CC.

11.     Without Supplement CC's protective fence, the 650 former TWA pilots based in St. Louis would have to bid for routes against the other 8,000 American pilots. Such bidding, however, would be based on the former TWA pilots' heavily reduced seniority in favor of the American pilots, which would cause hundreds of Captains from the former TWA group to be demoted to First Officer, and hundreds of former First Officers in the former TWA group to stand "on call" for days in a row at a new base if they want to fly.

12.     In November 2011, American filed a bankruptcy petition in the Southern District of New York. That case is pending.

13.     Subsequent to its bankruptcy filing, American and APA negotiated for a new pilot collective bargaining agreement. As part of those negotiations, American represented that it intends to close its St. Louis base and eliminate the protective fence by the end of 2012.

**GREEN JACOBSON, P.C.**

By:

Allen P. Press       Mo. Bar No. 39293
Joe D. Jacobson      Mo. Bar No. 33715
7733 Forsyth Blvd., Ste. 700
Clayton, MO 63105-2015
tel: 314.862.6800
fax: 314.862.1606
press@stlouislaw.com

Attorneys for Plaintiffs

# Exhibit 36

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 11-15463(SHL)

 4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5   In the Matter of:

 6

 7   AMR CORPORATION,

 8

 9            Debtor.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                  U.S. Bankruptcy Court

14                  One Bowling Green

15                  New York, New York

16

17                  April 23, 2012

18                  10:00 AM

19

20   B E F O R E :

21   HON SEAN H. LANE

22   U.S. BANKRUPTCY JUDGE

23

24

25
```

1    TRIAL RE:  Doc. #2035 Motion to Reject - Motion of Debtors

2    for Entry of Order Pursuant to U.S.C. 1113 Authorizing

3    Debtors to Reject Collective Bargaining Agreements

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Dawn South, Sherri L. Breach, and William

25    J. Garling

1  competitive industry no company can survive if its costs are

2  materially higher than those of its competitors, and that's

3  where American Airlines is today.

4        How did we get here, what has changed over the

5  last ten years?  Six things, Your Honor.

6        First the rise of the low cost carriers that I've

7  mentioned.  Those low cost carriers now serve 49 of the 50

8  largest domestic routes served by American.  That's up from

9  25 in 1998.  The low cost carriers are now expanding beyond

10  domestic routes.  Spirit Airlines is operating into the

11  Caribbean and Latin America, places where American had

12  traditionally enjoyed a revenue premium in the past.

13        Apart from the rise of the low cost carriers

14  prices are now 100 percent transparent with the spread of

15  the internet.  Anyone in the world with access to the

16  internet can now find the lowest airfare available between

17  any two points very easily, and fare wars have become

18  common.

19        Excuse me.  Third, Your Honor, the events of the

20  past decade have rocked the airline industry.  Excuse me.

21        The first of course and most notorious the events

22  of September 11th, 2001.  We at American will never forget,

23  Your Honor, that the tragic loss of life that day included

24  our passengers and colleagues aboard two American Airlines

25  airplanes.  Those events of course led to dramatically

1    increase in security, added costs and reduced demands, and

2    our industry suffered billions in losses as a result.

3          As if that weren't enough trauma to inflict on the

4    industry, Your Honor, those events were followed by wars in

5    Iraq and Afghanistan, and we also had epidemics, tsunamis,

6    other natural disasters, capped off by a recession.

7          These are the external events that routinely

8    strike this industry and which every business in this

9    industry must be prepared and financially able to endure and

10    rebound from.  Our revenues go down when these events

11    happen, Your Honor, our costs generally do not.

12          The fourth major event in the past decade is the

13    dramatic increase in volatility in the price of fuel.  Began

14    to rise rapidly with the onset of the Iraq war in 2003.

15    These remain volatile ever since, is today well over $100 a

16    barrel.

17          The fuel price spike has had a disproportionate

18    impact on American, Your Honor, because our weekend

19    financial condition over the past ten years prevented

20    American from reinvesting and renewing its fleet for many

21    years so that we ended up with an aging and fuel inefficient

22    fleet.

23          Now we've taken steps in the past year to address

24    that with a very large and significant new aircraft order.

25    I believe it's entirely financed by the manufacturers, Your

1      Honor, which would market factors that enabled us to proceed

2      with it, but it's a burden we've had to live with and will

3      live with until the new aircraft come on line.

4           The second reason why fuel has had a

5      disproportionate impact is that American is required to use

6      small regional jets, less than 50 seats in its regional

7      airline operations which are conducted under contract by

8      regional air carriers.  Those smaller regional jets are not

9      fuel efficient, they have higher unit cost than the larger

10     regional jets used by our competitors.

11          The fifth factor, Your Honor, is that American's

12     major competitors have restructured in bankruptcy.  U.S.

13     Airways went into bankruptcy in 2002, came out in early 2004

14     I believe, but went back in again in late 2004.

15          United Airlines did it differently, Your Honor,

16     they also went in in 2002, but rather than come out and go

17     back in they stayed in bankruptcy for more than three years,

18     and they filed not one, but two 1113 motions.  They did an

19     initial round of 1113 cost reductions in 2003, it proved

20     insufficient, Your Honor, and they went back again for a

21     second round of cost reductions.

22          Delta and Northwest held out a little bit longer,

23     Your Honor, they both filed for bankruptcy in this Court in

24     September of 2005 and emerged in the spring of 2007.

25          The one common factor, Your Honor, is that in

```
 1    unionized employees generally because of the way seniority

 2    works and the disparities, particularly in flight attendants

 3    and the pilots, you begin at very, very low rates as a

 4    pilot.  You pay your own medical, it's -- you know, it's a

 5    very low wage.  And there is quite a difference between the

 6    lowest paid and the highest paid.

 7              So these employees and pilots in particular, and

 8    I'm sure Rob Clayman will say the same for the flight

 9    attendants, you can't leave the airline.  And American

10    pilots, we've got probably more ex-military than any airline

11    in the industry, but even after being in the military the

12    average expectancy of a pilot with American is 32 years,

13    that's based on a projected return of about age 63.  So

14    we're going to go through five management changes.

15              And I just want to say, Your Honor, that if

16    there's one group that has a deep vested interest in a

17    successful business plan and a turn around of this company

18    it's those groups, but particularly the pilots.  They're

19    tied to this airline, they can't leave.

20              I want to ask your indulgence for one moment on

21    how we got where we are today.  It's more in the company's

22    declarations than it is in Mr. Gallagher's presentation, but

23    in 2003 everybody post 911, and to suggest that we need to

24    build a business plan that could sustain that kind of attack

25    we know no company can sustain that kind of attack.  What
```

1    happened in 911 drove the industry, it just cratered.

2            In 2003 we agreed to engage in concessionary talks

3    with the company.  I can speak for the pilots, we took a 23

4    percent pay decrease, that puts us back right now, we're

5    back in 1992 pay rates.  The -- there was a $660 million

6    give over five years.  At the end of that -- and there's a

7    couple people in the room that lives through it.  I can look

8    around the room and see who was there.  Right as we voted on

9    the 606 million the company on April 15th, the very day we

10   ratified the agreement, filed with the SEC statements

11   indicating that they had funded executive comp plans that

12   had never been disclosed.

13           Now they didn't have to disclose to us, but it was

14   a toxic issue in the airline.  Employees were upset, certain

15   unions said they were going to pull back their

16   ratifications, they wouldn't go ahead with the bankruptcy

17   cuts, Congress -- several congressmen from Texas convened a

18   meeting with the company and we worked around the clock for

19   several days talking about how to resolve this.  The CEO

20   resigned, a new exec came in.  We negotiated an agreement

21   with the company on executive compensation and it was

22   drafted by one of the American executives in the room here

23   today, and it said -- it was -- the head of the union -- the

24   pilots union said, look, we can't control your share

25   compensation, that's going to be up to the institutional

1    shareholder services or the rating agencies and the board of

2    directors, but cash, we want an agreement that you won't rob

3    the bank and take more than 200 percent of what you can get

4    under a certain cash compensation executive comp program.

5    The company agreed to that limitation.

6             The following two years were years of great hope,

7    2004, 2005.  The company brought in Baine (ph) Consulting

8    two of the people who are reading Sports Illustrated in the

9    other room, Mickey Malursky (ph) and Larry Rosolow (ph) that

10   were here, they spend a year working with Baine and the

11   company on the -- coming up with a common methodology and

12   how we cost out the pilot contracts.  We had intractable

13   disputes in 2003 about how to value that contract, and the

14   idea was let's get that behind us and know how we value an

15   agreement.

16            The second purpose of the exercise was to look at

17   best in industry for every metric in the pilot contract.

18   And the area where we had problems was productivity, we knew

19   it.  So the pilots union, God bless them, went out in

20   December of 2005 and had road shows and said, look, we need

21   to be more productive, here's best in class, here's where we

22   are, and the presentation they took on the road is very

23   similar to the one Mr. Kasper is going to give.  The growth

24   of low cost carriers, the effective internet pricing.

25            I just looked at it the other day and it's largely

# Exhibit 37

**HEARING DATE AND TIME: April 10, 2012 at 2:00 p.m. (Eastern Time)**
**OBJECTION DEADLINE: April 3, 2012 at 4:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Alfredo R. Perez
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

John J. Gallagher*
Scott M. Flicker**
Jon A. Geier**
Neal D. Mollen**
Todd C. Duffield
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
Telephone: (202) 551-1700
Facsimile: (202) 551-1705

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------x
                                    :
In re                               :        Chapter 11 Case No.
                                    :
AMR CORPORATION, et al.,            :        11-15463 (SHL)
                                    :
                    Debtors.        :        (Jointly Administered)
                                    :
---------------------------------------------------------x
```

**MEMORANDUM IN SUPPORT OF DEBTORS' MOTION TO REJECT**
**COLLECTIVE BARGAINING AGREEMENTS**
**PURSUANT TO 11 U.S.C. § 1113**

**PART ONE: PRINCIPAL MEMORANDUM OF LAW**

* admitted *pro hac vice*
** *pro hac vice* admission pending

airlines generally enjoyed predictable, healthy profit margins and significant pricing power. Declaration of Daniel M. Kasper ("Kasper Decl."), attached as AA Ex. 1, ¶¶ 11-14.

That all changed with deregulation. Almost overnight, prices became a function of market dynamics, competitors freely entered previously protected markets, and when they did, they competed directly on price. This new competition included not just the known, pre-deregulation entities but a number of voracious new market entrants, all with dramatically lower operating costs and no union contracts to encumber them. Because these new entrants (and Southwest, which went from a small regional operation to a significant player on the national stage after deregulation) had dramatically lower labor costs, more productive work rules, and less-senior employees, they were able to set market prices at dramatically lower levels. In this entirely new market, the pre-deregulation ability of the pre-deregulation "legacy" airlines' to recover increased labor costs by raising ticket prices evaporated. Kasper Decl. ¶¶ 15-17.

Although the competitive landscape changed virtually overnight, the legacy pre-deregulation carriers all continued to operate under collective bargaining agreements that had become encrusted over the decades with cumbersome, expensive and inefficient work rules and pay schedules—contract terms that may have been acceptable or even rational in the pre-deregulation era in which they were born but that had become—almost overnight—anachronistic. The dead weight of these contracts and the crushing pressure of unparalleled competition profoundly changed the face of the industry. Since deregulation, 10 U.S. air carriers have filed for bankruptcy (four more than once), and several have disappeared altogether through merger or liquidation. Once hallowed names in U.S. aviation—including Pan Am, TWA, Eastern, and Braniff—have simply disappeared. Kasper Decl. ¶ 27.

-9-

## B.    Pricing Transparency Via the Internet

Before the internet became a fact of American life, airline tickets typically were purchased from travel agencies or directly from the airlines themselves, either at airline ticket offices or over the phone. Even after de-regulation in 1978, finding the absolute lowest fare for any particular trip was a cumbersome process.

With the advent of the internet and the birth of websites such as Expedia, Travelocity, and Orbitz, however, it became possible for the flying public to find, instantly and effortlessly, the very cheapest price for any given route. And bitter experience quickly showed that when one ticket is even a dollar or two cheaper than another, the cheaper airline is instantly rewarded by the shopping public. Kasper Decl. ¶¶ 72-73. The airlines thus found that they had to match their competitors' lowest prices in any market, or lose the business. *Id.* ¶ 16. Put another way, large network carriers have effectively lost the ability to control the pricing of their product.

## C.    September 11 And Its Aftermath

No aspect of U.S. commerce was more directly or profoundly affected by the attacks of September 11, 2001, than commercial aviation. Increased security at the airport made air travel more difficult and less enjoyable (Kasper Decl. ¶¶23-24), and the government imposed massive new costs on the airlines for security measures on airplanes, in the terminal, and at the ticket counter. The combination of huge cost increases, reduced demand, and an inability to pass those costs on in the form of higher ticket prices led to cataclysmic losses for the industry. Between 2001 and 2005, the industry lost approximately $30 billion—more than the industry had made in all the preceding years since the Wright Brothers.[8]

---

[8] U.S. DOT Form 41; Mary Gahan, Aviation's Continuing Crisis, BBC News (Aug. 13, 2002) available at http://tinyurl.com/7t379tm.

### D.    Steep Increases In The Price Of Fuel

American has two fixed operating costs that dwarf all others: labor and fuel.  The real

price of jet fuel was relatively flat throughout the 1990s, but began to rise sharply in 2003 and,

with few exceptions, has remained elevated and volatile since that time:

**EXHIBIT 78:  ANNUAL REAL JET FUEL PRICES,
1990-2012**



*See also* Goulet Decl. ¶ 17.

Accordingly, American has worked aggressively—as aggressively as it can within the

context of its existing contractual commitments—to drive its operations to ever more fuel-

efficient practices (collectively, American's "**Fuel Smart**" initiatives).  Goulet Decl. ¶ 32 and

n.13.  Notwithstanding these efforts, however, the Company's fuel costs between 2000 and

FYE3Q2011 *increased* by 211%.  Kasper Decl. ¶ 134.

Although high fuel prices have affected all carriers, it has had a disproportionate impact

on American for several reasons.  As discussed in greater detail in the Declaration of Dennis

Newgren accompanying Part Two, which deals with changes proposed to the pilot agreement,

restrictions in the pilot CBA prevent the Company's regional partners from utilizing 70-seat and

larger regional jets ("**RJs**") in anything like the numbers its competitors use; those jets are

-11-

flexibility that have now left American with the highest unit labor costs among the major network carriers. AA Ex. 103. Goulet Decl. ¶ 6.

In the years following 9/11, average fares for domestic flights fell (in large measure due to a dramatic rise in price competition driven by lower cost carriers) while fuel costs rose dramatically, and American's losses mounted. Meanwhile, its network competitors took advantage of their post-bankruptcy restructured balance sheets and reduced labor costs to merge, creating two mega-carriers (United and Delta) with networks larger than American's. These newly-merged network carriers have been able to reverse their losses and earn profits. Although American redoubled efforts from 2003 to 2011 to reduce costs even further and, in fact, has maintained non-labor costs in line with its network competitors, it could not—without agreement from the Unions—address its largest barrier to profitability: the terms and scope of its collective bargaining agreements. Between 2001 and 2011, American's parent company, AMR, incurred losses of more than *$10 billion*, on a cumulative basis. AMR was modestly profitable in only two of those 11 years and borrowed heavily to fund its losses, debt obligations and pension liabilities. Goulet Decl. ¶ 7.



AA Ex.104; Goulet Decl. ¶ 7.

     With those insurmountable burdens on its business, AMR has been unable to re-invest and grow the airline to be competitive. The results on American's industry standing have been dramatic. Today, American, including all regional capacity, ranks fourth in overall capacity (ASMs) among passenger carriers worldwide—and third (behind Delta and United) among U.S. carriers.[19] Goulet ¶ 8; Kasper Decl. ¶ 16.

---

[19] *See* OAG May 2012 schedule.



AA Ex. 105.

In 2011, AMR was the **only major carrier to lose money**, and its losses were more than **$1 billion**. Goulet Decl. ¶ 9.



AA Ex. 106.

The impact on AMR of its relative cost and operational disadvantages has been dramatic. As illustrated above, AMR has experienced cumulative losses of over $10 billion since the beginning of 2001, with losses of more than $1 billion in three out of the last four years. During

# Exhibit 38

HEARING DATE AND TIME: April 10, 2012 at 2:00 p.m. (Eastern Time)
OBJECTION DEADLINE: April 3, 2012 at 4:00 p.m. (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                          :
In re                                     :          Chapter 11 Case No.
                                          :
AMR CORPORATION, *et al.*,                :          11-15463 (SHL)
                                          :
                        Debtors.          :          (Jointly Administered)
                                          :
----------------------------------------------------------------x

# DECLARATION OF DENNIS NEWGREN
# IN SUPPORT OF DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING
# AGREEMENTS PURSUANT TO 11 U.S.C. § 1113

3.       I make this declaration in support of American's application pursuant to 11

U.S.C. § 1113 to reject its CBA with APA.  The declaration is based on my personal knowledge

and experience and upon information and materials provided to me at my request by others

working under my supervision.  I would be competent to testify to these matters if called to do

so.

## II.       AMERICAN'S PILOTS AND THEIR COLLECTIVE BARGAINING AGREEMENT

4.       As of February 1, 2012, there were a total of 10,738 pilots on American's

seniority list.  Only 7,664 of those listed, however, were active pilots providing flying services to

the Company.  The remaining pilots were on some form of inactive status, such as on leave or on

furlough.

5.       American's current agreement with APA became effective in May 2003.  The

agreement was reached as the airline industry was still reeling from the impact of the

September 11, 2001, terrorist attacks and the consequences of those attacks:  a precipitous

decline in both passenger traffic and revenues, and an increase in security costs.  American and

all of the other pre-deregulation network carriers[2] against which American was competing

(Delta, Northwest, United, US Airways, and Continental) were facing crushing losses—more

than $7 billion industry wide in 2001 alone.[3]  American alone lost an additional $2.018 billion in

2002.  *See* Declaration of Beverly Goulet ¶ 7.  As the Company teetered on the brink of a

Chapter 11 filing, it engaged APA (and all of the other unions representing American

---

[2] I use the term "network carriers" to refer to American, Delta, Northwest, United, Continental, and US Airways.  Northwest and Delta have merged, as have United and Continental.  These carriers were established prior to the deregulation of the industry in 1978.  These carriers operate a traditional "hub and spoke" model.  *See also* Kasper Decl. ¶ 6 n.7.

[3] *See* Richard Aboulafia, *Transports: Tough Market, Intense Competition*, Aviation Week (Feb. 24, 2003) available at http://tinyurl.com/6ryrzj8.

-2-

AA Ex. 0900

employees) in bargaining to achieve cost reductions that the Company and unions hoped would ensure the Company's viability.

6.     All of American's employees, including those represented by the Unions (including the APA, the Transport Workers Union of America, AFL-CIO ("**TWU**"), and the Association of Professional Flight Attendants ("**APFA**"), responded.  APA and American concluded an agreement that contemplated an average cost reduction then estimated to be $660 million per year.  The sacrifices made by American's pilots were substantial and painful, but were essential to the Company's effort to restructure outside of the Chapter 11 process.

7.     American's competitors, however, pursued a different course, as explained in much greater detail in the Declarations of Jerrold Glass and Daniel Kasper.[4]  US Airways sought bankruptcy protection twice, first in August 2002 and then again in September 2004.  United filed in December 2002 and did not exit until late 2005.  Both Northwest and Delta filed in September 2005.  In bankruptcy, each of these competitors achieved vastly greater reductions in costs—both from labor and from other sources—than American had been able to achieve consensually in 2003.  Delta, Northwest, United, and US Airways were all able to terminate or freeze their pilots' defined benefit pension plans.[5]  They made deep cuts in pilot wage rates, loosened restrictions on the use of a full range of more fuel-efficient regional jets ("**RJs**") by regional partners, and removed constraints on their ability to enter into codesharing and other strategic alliances with carriers around the world and domestically.  In short, they revised their entire cost structures and revenue-generating capabilities to become more efficient and achieved greater value for every dollar spent on unionized and non-union employees, and they bolstered

---

[4] Kasper Decl. ¶ 27; Glass Decl. ¶¶ 42-55.

[5] The expense of these plans is enormous; in 2011 alone, American contributed $180.8 million to the pilot's defined benefit plan.  Wright Decl. ¶ 42 n.28.

AA Ex. 0900

their revenue-generating capabilities by loosening restrictions on the use of regional jet aircraft. As a result, American ended up at a persistent, profound competitive disadvantage because it had reached agreement with the Unions and restructured outside of Chapter 11— before Delta, United, and Northwest thoroughly restructured in bankruptcy, and before US Airways did so a second time.

8.      Thus, under the 2003 CBA with APA, American pilots receive more in total compensation for their work than any of their network carrier competitors, and remain shackled to unique restrictions on their ability to pursue new markets and revenue opportunities when they arise around the world.  *See* the more detailed discussions found in the Kasper Decl. ¶¶ 91-95; and Declaration of Jerrold Glass ("Glass Decl.") ¶¶ 85-91.

9.      The parties have been unsuccessful through more than five years of negotiations[6] to reach a new agreement that would place American on a competitive footing.  If American is to reorganize into a viable competitor on the domestic and world stage, it cannot continue to operate at such a profound disadvantage under rules and limitations long eliminated from the labor contracts of its rivals.  American's Section 1113 proposals seek to rebalance this competitive equation and allow American to regain its footing.  In the following section of this Declaration, I summarize briefly the cost and revenue challenges posed by the pilot agreement.

## III.    AMERICAN'S PILOT AGREEMENT IS THE MOST EXPENSIVE AND MOST RESTRICTIVE IN THE INDUSTRY

### A.      The Pilot Agreement Imposes Unique Costs And Inefficiencies On American

10.      In connection with its pilot negotiations, American employees working under my direction have performed an extensive review of the rates of pay, work rules, and benefits of its

---

[6] The parties exchanged "openers," *i.e.*, initial proposals, in July 2006 and the negotiation teams convened for the first time in September 2006.  AA Exs. 903-904.

AA Ex. 0900

competitors, both as compared to the existing agreement and to American's Section 1113 proposals. Viewed as a whole, the parties' current agreement is the most expensive and the most restrictive in the industry.

11.     **Pilot labor costs per block hour**. The most basic industry-standard measure of pilot labor costs is "pilot labor costs per block hour." A "block hour" is an hour of actual flight time—the interval that starts when an aircraft first moves from the gate "for the purpose of flight" and ends when the aircraft comes to a stop at the gate for the purposes of loading or unloading.[7] Combining all of the elements of pilot labor costs (pay, benefits, work rules, and all other expenses) for 2010 (the most recent year for which there is complete data regarding American's competitors), every pilot block hour costs American more—and in most instances much more—than it costs any of its network competitors.[8]

---

[7] *See* CBA § 2.R.1.

[8] AA Ex. 905.

AA Ex. 0900

### AA Ex. 905:  2010 Pilot Cost / BH Detail



**2010 Pilot Cost / BH Detail**

| | American | Delta | Southwest | United | Continental | Jet Blue | US Airways | Air Tran |
|---|---|---|---|---|---|---|---|---|
| Taxes | $15 | $16 | $13 | $15 | $3 | $13 | $13 | $12 |
| Per Exp | $18 | $23 | $15 | $24 | $15 | $17 | $17 | $16 |
| Benefits | $95 | $61 | $50 | $73 | $32 | $51 | $62 | $18 |
| Salary | $235 | $253 | $265 | $205 | $227 | $197 | $175 | $168 |
| Total | 363 | 353 | 343 | 316 | 276 | 277 | 267 | 214 |

12.    **Profoundly inefficient agreement**.  American's pilots are among the finest in the industry.  They are professional, committed, and highly skilled, but as a result of provisions in their current CBA that have accumulated over the course of many years, they are also paid more to fly fewer hours than pilots at any other network airline:

AA Ex. 0900

- American's average pilot works ***between 12 and 13 days a month***.[9]

- The average pilot is ***paid for 81 hours of time each month, but actually flies approximately 50 hours on average***.  The other 30+ hours of pay is derived from training, vacation, sick time, and a variety of artificial measures of pay (often called "soft" time).

The graph[10] below shows the amount of time the average pilot spent working, on vacation, taking sick leave, in training, and off of work in 2011:

### AA Ex. 906:  American Pilots Worked 42% of Days in 2011



---

[9] Because pilots are paid for both the hours they actually work and for non-work hours spent away from their home base (rather than the number of calendar days they work), calculating a "days worked" figure requires some extrapolation.  Consider, for example, an American pilot who flies three sequences in a given month: (1) Chicago to Honolulu and back to Chicago; (2) Chicago to London to Raleigh-Durham and back to Chicago; and (3) Chicago to Paris and back to Chicago.  These trip sequences amount to ten compensated "days away from base," but only eight "duty period" days (days during which flying occurred).  There are 12 "work" days—days for which compensation is owed.  This average varies widely for American's pilots depending on whether the pilot flies domestically or internationally.

[10] AA Ex. 906.  The chart includes all pilots who were active for 12 months in 2011.  "Days worked" includes flown days, reserve available days, and layover days.  "Sick" time includes days that a pilot is on the sick list and any trips missed due to sick.  Sick if needed days are not included.  "Training" days are the number of days in the training absence (includes travel days). "Vacation" includes days used, PVDs, and days of dropped trips that conflict with a vacation period.  "Leave/Other" includes Family Leave, Personal Leave, Military Leave, Jury Duty, Special Assignment, Transfer Days, and other leave and MC categories.  "Days Off" includes days with no scheduled work or other absence and days dropped from a pilot's schedule.  *Id.*

AA Ex. 0900

13.     As a result of the complicated pay and credit provisions of the agreement, since the last of American's network competitors emerged from bankruptcy in 2007, the Company's B-737 pilots, for example, have been paid rates 22% higher than pilots at United and 32% higher than their peers at US Airways.[11]  Yet, despite earning wages near the top of the industry, American pilots flew fewer hours in 2010 than they did in 2007, and fewer than pilots at every airline save one.

14.     This "productivity gap" stems from a variety of different sources, but a principal cause is the so-called "schedule max"—the maximum number of hours for which the Company can schedule its pilots.  That measure is capped by the agreement at 78 hours per month— significantly lower than the similar figure for pilots at every one of the other U.S. carriers.[12]  *See infra* ¶¶ 121-23.

15.     **Uniquely expensive benefits**.  American's pay rates are among the highest in the industry.  American's total compensation disadvantage, however, is not exclusively, or even primarily, a rate-of-pay problem.  The Company's defined benefit plan provides the most generous pilot retirement in the industry.  Delta and Northwest (now merged), United and Continental (now merged), and US Airways all either terminated or froze their pilot defined benefit pension plans in bankruptcy, but American's defined benefit plan for pilots is still active and accruing new benefits, and it operates in concert with a generous employer-sponsored defined contribution plan.  Indeed, last year, the average pilot's lump sum payment from the defined benefit plan alone was nearly $750,000, and when combined with the lump sum

---

[11] This calculation is based on a summation of the 2007-2011 maximum captain wage rate for a Boeing 737 at Delta, United, and US Airways.

[12] Although the 78 hour limitation is fixed, various contractual constraints prevent American from achieving even this industry worst level—schedules can only be built to an average of 75 hours per month.

AA Ex. 0900

payments from the defined contribution plan, the total averaged more than $1.7 million.  The largest combined lump sum payment last year was more than $3.8 million.  American cannot expect to compete—much less prosper and grow against its network carriers—when it is saddled with enormous costs that its rivals are not forced to bear.[13]

16.    In addition, most of American's pilots contribute no more than 14% to the cost of their medical benefit premiums.  When they retire, they receive no-cost retiree medical coverage for life.  This combination of benefits is unparalleled in the airline industry and is becoming increasingly rare in the economy as a whole.  These costs must be addressed if American is to survive and thrive.

### B.    The Agreement Restricts American's Ability To Generate Revenue

17.    In addition to imposing costs on American that are unequaled among its most significant competitors, the pilot CBA also imposes unique constraints on American's ability to generate revenue, thus adversely affecting both sides of the balance sheet.  The Agreement dramatically limits American's ability to enter into a variety of codesharing and alliance relationships with other regional, domestic, and international airlines—relationships the Company needs to expand the reach of its network.  Using these relationships, American would expand into markets where it cannot currently compete effectively using its own aircraft, and this expansion, in turn, would feed passenger traffic from those markets into ones where American is strong.  Doing so would strengthen American's operation, enhance its financial performance, and help secure job opportunities for American's employees.  Shackled by the pilot CBA "scope" provisions, American has been forced to the sidelines while its competitors have strengthened their own networks, first by entering into codesharing relationships with each other and then by

---

[13] American has lost more than $10 billion over the past ten years and since 2001, APA pilots have retired with total lump sum payments of more than $4.9 billion from the A and B Plans.

AA Ex. 0900

merging with other dominant industry players—Northwest with Delta, United with Continental, and US Airways with America West.  While the American pilot CBA "scope" provisions are ostensibly intended to protect pilot flying, the reality is that, due to the provisions' anti-competitive impact, opportunities for American pilots have been taken by peers at other airlines.

18.    Before Delta completed its 2008 merger with Northwest, it had a codesharing agreement with Continental that extended its network by more than 950 daily flights to 100 destinations.  Similarly, Delta's pre-merger codesharing agreement with Northwest extended the former's network by 930 daily flights to 145 destinations.  Kasper Decl. ¶ 116 n.137.  Before it merged with Delta, Northwest maintained a system-wide arrangement with Continental that extended the network of each carrier by 2,000 flights per day.  *Id.*  US Airways' passengers were allowed to book seats on more than 2,400 daily United flights serving over 130 destinations.  *Id.*  In return, United saw its network expand by approximately 1,500 flights per day to more than 90 destinations.[14]

19.    The most recent spate of mergers between American's competitors has largely (although not entirely) mooted these competitor codesharing relationships.  As a result of the mergers, American's newly configured competitors operate vast networks that independently satisfy the travel needs of most passengers and businesses.  As a result, they no longer have the same pressing need for domestic codesharing as American, although they still find some benefit from them (such as the United-US Airways codeshare).  Meanwhile, because of restrictions in its

---

[14] Kasper Decl. ¶ 116 n.137.  In contrast to the broad freedom American's network competitors have to enter into alliances of various types, American is allowed only modest arrangements with other carriers without APA's prior permission.  For example, the Company currently has an "interline" agreement with JetBlue, which is more limited and far less useful than a code-share.

AA Ex. 0900

pilot agreement, American alone has been prohibited from entering into similar partnerships that could have extended its reach into markets it cannot currently serve profitably.

20.     The pilot agreement also constrains American's ability to enter into agreements with regional partners to deploy new and more fuel-efficient regional jets with more than 50-seats. This sort of service is essential in markets where neither the existing fleet of fuel-inefficient 50 seat jets flown by American's partners nor its own larger "full-sized" jets (*e.g.*, MD-80 or Boeing 737 aircraft) can be operated at a profit.[15] American is allowed to operate (through partners) only 47 specific regional jets with more than 50 seats, and when those specific aircraft are retired, the Company cannot replace them. This restriction is unique in the industry. APA obtained these restrictions in 1997, when RJs were just entering the industry, in the name of saving jobs. But in reality, by restricting regional passenger feed to American's mainline operation, they imperil the jobs of every American pilot, as well as every other American employee. American's most important competitors contract with a variety of regional operators to fly aircraft in the 50-, 70-, and 88-seat ranges; the inability to do the same adversely affects American's ability to obtain feed from locations that it cannot economically serve itself. These and other similar restrictions are described in greater detail below at ¶¶ 53-87 in the context of specific corrective measures American has now proposed.

---

[15] Although Section 1 of the Agreement, the "scope" clause, flatly prohibits American from using any regional jets larger than 50 seats, APA allowed the Company's use of 47 specific 70-seat CRJ-700s, identified by their "tail" numbers," for so long as those aircraft could be flown at American Eagle. Although the Company originally had APA's permission to fly 50 CRJ-700s, an arbitrator later ruled that it could fly only 47 when an American order for the other three was canceled and then reinstated. American is prohibited by the "scope" clause from replacing the 70-seat CRJ-700s as they retire and cannot replace them with new, larger regional jets in the 51-88-seat range.

AA Ex. 0900

D.    **Eliminate Other Inefficiencies**

149.    **Interest Arbitration Relating to Minimum Staffing Requirements in**

**St. Louis**.  When American purchased some of the assets of Trans World Airways in bankruptcy

in April 2001, it agreed to an arrangement that guaranteed a certain number of former TWA

pilots captain spots in a St. Louis pilot base ("**STL**"); it built a "fence" around TWA's former St.

Louis operation and operated it almost as a separate airline.  American reserved all narrowbody

(S80) and small widebody (B757/767) Captain positions then in STL for former TWA pilots

until such time as a specifically identified former TWA pilot had the seniority to hold either

Captain position (S80 or B757/767), at which time the provision would expire and the

"reserved" Captain positions in St. Louis would become available for bidding to all pilots

according to their seniority.  At the time, APA and American both saw the provision as a

temporary accommodation to the TWA pilots that would soon cease to exist because of

anticipated growth in American's operations.

150.    Just months thereafter, however, September 11 intervened.  Since that time, the

supposedly temporary guarantees embodied in Supplement CC have anchored American to

operations and guarantees that cannot be economically justified.  To become profitable, the

Company must cast off such economically inflexible contractual anchors and adapt as its

competitors have in the last ten years.  In its February 1 Section 1113(c) proposal, American

proposed to eliminate the pilot base in St. Louis by the end of 2012 (something it already has the

contractual authority to do) and terminate the Agreement's staffing guarantees, saving an

average of $13 million per year.  As a result of negotiations with APA since that time, American

has accepted in principle APA's proposal to solve the issue of any new protections for former

TWA pilots through interest arbitration narrowly focused by the parties on this one issue.

AA Ex. 0900

# Exhibit 39

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

In re:                                                  Chapter 11

AMR CORPORATION, *et al.*,                              Case No. 11-15463 (SHL)

                                    Debtors.            (Jointly Administered)

------------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**STEPTOE & JOHNSON LLP**
*Counsel for the Allied Pilots Association*
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
By:    Filiberto Agusti, Esq.
       Joshua Robert Taylor, Esq.

**JAMES & HOFFMAN, P.C.**
*Counsel for the Allied Pilots Association*
1130 Connecticut Avenue, N.W., Suite 950
Washington, D.C. 20036
By:    Edgar N. James, Esq.
       Kathy L. Krieger, Esq.
       David P. Dean, Esq.
       Darin M. Dalmat, Esq.
       Daniel M. Rosenthal, Esq.

**GUERRIERI, CLAYMAN, BARTOS & PARCELLI, P.C.**
*Counsel for the Association of Professional Flight Attendants*
1625 Massachusetts Avenue, N.W., Suite 700
Washington, D.C. 20036
By:    Robert S. Clayman, Esq.
       Jeffrey A. Bartos, Esq.
       Carmen R. Parcelli, Esq.
       Paul E. Knupp III, Esq.
       N. Skelly Harper, Esq.

operating costs, freeze or terminate pension obligations, restructure their balance sheets, and obtain relief from work rule and scope restrictions in their collective bargaining agreements. (Kasper Decl. ¶ 38; Goulet Decl. ¶ 20; Glass Decl. ¶¶ 39–55). Additionally, by 2007, US Airways emerged from Chapter 11 strengthened by its merger with America West. (Goulet Decl. ¶ 34). Subsequent to emerging from bankruptcy, Northwest and Delta merged in 2008, and in 2011 United acquired Continental. (Goulet Decl. ¶ 36).

It has been suggested that American's financial difficulties stem not from its high labor costs, but rather from the consolidation of American's competitors. (Akins Decl. ¶ 5). But that view ignores that American's financial difficulties existed before it fell to being the fourth U.S. carrier in terms of domestic revenues. (Kasper Decl. ¶ 29). American has incurred approximately $6.6 billion in net losses since 2003, a pattern that began well before 2007. (Trial Tr. 171:13–18 May 17, 2012 (Akins) (stating that he did not dispute that over the last 10 years, American has lost billions of dollars, including one billion last year alone); AA Ex. 33). It also ignores the vast evidence that American's labor cost structure is, as a general matter, at or near the top of the network carriers. (Trial Tr. 172:7–172:14, May 17, 2012 (Akins) (conceding that "American's labor CASM comprises a higher percentage of overall CASM than the other airlines currently operating today.")).

## IV. RECENT DEVELOPMENTS REGARDING AMERICAN

Given all these competitive pressures, American itself flirted with bankruptcy in 2003. It avoided bankruptcy at that time only because it was able to negotiate new collective bargaining agreements in which the Unions provided significant economic concessions over their prior agreements. More specifically, American achieved labor cost reductions of $1.8 billion in 2003, including $1.6 billion in annual Union labor cost reductions and $200 million in labor cost

reductions from its non-union employees. (Goulet Decl. ¶ 21). But these consensual labor cost reductions were much smaller than those subsequently achieved by American's competitors in their Chapter 11 restructurings. (Goulet Decl. ¶ 6; Trial Tr. 45:15–19, April 24, 2012 (Glass); Glass Decl. ¶¶ 43–55). Thus, while American's cost-saving collective bargaining agreements from 2003 are still in place for the Unions by virtue of the Railway Labor Act,[5] they have been insufficient to allow American to regain profitability.

In the years following 2003 and prior to its bankruptcy filing in November 2011, American again sought labor concessions. American's executives described their strategy during this time as "kick[ing] the can" down the road to permit the Company to "limp along" until sometime in the future when there might be increased demand, a benign fuel environment, and a convergence in American's labor costs vis-à-vis other carriers. (Trial Tr. 171:4–10, April 26, 2012 (Brundage); Trial Tr. 240:14–17, April 24, 2012 (Goulet)). But these events did not occur. (Trial Tr. 242:21–243:3, April 24, 2012 (Goulet); Trial Tr. 171:15–173:8, April 26, 2012 (Brundage)). With the exception of a few TWU employee groups that reached new agreements with the Company, American was unable to reach new collective bargaining agreements with the APA, the APFA and TWU prior to filing bankruptcy.

On November 29, 2011, American filed for bankruptcy, together with its parent AMR Corporation, and other affiliates. In their first day filings, the Debtors foreshadowed this Section 1113 proceeding. Specifically, the Debtors' first day affidavit explained that they have "been unable to match its competitors' abilities to adequately deal" with the variables associated with

---

[5]    *See Allied Pilots Ass'n v. AMR Corp. (In re AMR Corp.)*, 471 B.R. 51 (Bankr. S.D.N.Y. 2012) (a collective bargaining agreement that has become amendable under the Railway Labor Act remains in place and subject to Section 1113 of the Bankruptcy Code).

the airline industry because the "airline industry is labor intensive" and the Debtors have "higher labor-related costs." (Goren First Day Aff. ¶ 28).[6]

Some two months later, on February 1, 2012, American began the process leading up to its Section 1113 application. It unveiled its new business plan, labeled the "Plan for Success," for the six year period from 2012 through 2017 (the "Business Plan"). The Business Plan contains a detailed business model, a network plan and a fleet plan, including details about the markets in which American plans to operate and the equipment it intends to use to serve those markets.[7] (Trial Tr. 102:9–16, April 24, 2012 (Goulet)). The fundamental principles behind the Business Plan include:

- Concentration on the five key hub markets for American: Dallas-Fort Worth, Miami, Chicago, Los Angles, and New York;

- Expanding American international presence, particularly through the use of joint business agreements and codesharing;

- Increasing passenger feed to American's hub and across its network through codesharing with domestic air carriers and increased use of regional jets;

- Implementing a long-term fleet plan sufficient for both replacement and growth;

- Creating a capital structure that allows American to grow and compete, attract capital at favorable rates and withstand external shock to the business; and

- Setting up a sustainable cost structure.

---

[6]  As one industry analyst stated: "Although we believe AMR at its core has all the elements of a strong franchise, it will never be able to achieve its potential until it has a competitive cost structure." (Goren First Day Aff. ¶ 22 (quoting Michael Linenberg, *AMR Corporation: Sept Q Loss Underscores AMR Challenges,* DEUTSCHE BANK EQUITY RESEARCH REPORT (Oct. 20, 2011))).

[7]  The network plan identifies the markets in which American plans to operate, while the fleet plan identifies the equipment that it intends to use to serve those markets. (Trial Tr. 102:9-16, April 24, 2012 (Goulet)).

# Exhibit 40

AGREEMENT

between

AMERICAN AIRLINES, INC

and

THE AIRLINE PILOTS

in the service of

AMERICAN AIRLINES, INC.

as represented by the

ALLIED PILOTS ASSOCIATION

EFFECTIVE: MAY 1, 2003

# AGREEMENT
between
## AMERICAN AIRLINES, INC.
and
## THE AIR LINE PILOTS
in the service of
## AMERICAN AIRLINES, INC.
as represented by the
## ALLIED PILOTS ASSOCIATION
Effective:  May 1, 2003

THIS AGREEMENT is made and entered into in accordance with the provisions of the Railway Labor Act, as amended, by and between AMERICAN AIRLINES, INC., hereinafter known as the "Company", and the air line pilots in the service of AMERICAN AIRLINES INC. as represented by the ALLIED PILOTS ASSOCIATION, hereinafter known as the "Association".

In making this Agreement the parties hereto recognize that compliance with the terms of the Agreement and the development of a spirit of cooperation is essential for mutual benefit and for the intent and purpose of this Agreement.

It is hereby mutually agreed:

# SECTION 1

## RECOGNITION AND SCOPE

### A. Recognition

The Allied Pilots Association has shown satisfactory proof to the Company that it represents more than a majority of the airline pilots of the Company, and further, has been certified by the National Mediation Board.

### B. Definitions

1. Affiliate

   The term "Affiliate" refers to (a) any entity that Controls the Company or any entity that the Company Controls, and/or (b) any other corporate subsidiary, parent, or entity Controlled by or that Controls any entity referred to in (a) above.

2. Agreement

   The term "Agreement" means this collective bargaining agreement between the Association and the Company and all supplements and letters of agreement between the Association and the Company.

3. Air Carrier

   The term "Air Carrier" means any common carrier by air.

4. Commuter Air Carrier

   The term "Commuter Air Carrier" refers to any Air Carrier utilizing only (a) aircraft that are certificated in the United States and Europe with a maximum passenger capacity of 50 passenger seats or fewer and (b) aircraft that are not certificated in any country with a maximum gross takeoff weight of more than 64,500 pounds. If an aircraft type operated by an Air Carrier otherwise meeting the conditions in the preceding sentence is recertified with a maximum passenger capacity of greater than 50 passenger seats, the Air Carrier operating said aircraft shall remain a Commuter Air Carrier so long as it operates said aircraft with no more than 50 passenger seats.

5. Company

   The term "Company" shall refer to American Airlines, Inc.

6. Comprehensive Marketing Agreement

   The term "Comprehensive Marketing Agreement" means an arrangement between the Company or an Affiliate and a Domestic New Entrant Air Carrier that is not a Commuter Air Carrier that contains at least the following elements:

   a. AAdvantage or any other Company frequent flyer program;

   b. joint marketing arrangements (other than AAdvantage type arrangements); and,

   c. the lease or transfer of gates from the Company or a U.S. Affiliate to the Domestic New Entrant Carrier.

7. Control

   The term "Control" shall have the same meaning as the term had in Arbitrator Stephen Goldberg's decision in the Canadian Arbitration Case No. 12-93 (April 25, 1994).

8. Domestic Air Carrier

   The term "Domestic Air Carrier" refers to any Air Carrier that is a citizen of the United States within the meaning of 49 U.S.C. § 40102(a)(15), as that statute defines citizenship on the effective date of this Agreement.

9. Domestic Commuter Air Carrier

   The term "Domestic Commuter Air Carrier" refers to any Commuter Air Carrier that is a citizen of the United States within the meaning of 49 U.S.C. § 40102(a)(15), as that statute defines citizenship on the effective date of this Agreement.

10. Domestic New Entrant Air Carrier

The term "Domestic New Entrant Air Carrier" means a Domestic Air Carrier that has entered the passenger air transportation market since deregulation, either initially or through ceasing operations and then re-entering the market.

11. Fixed Base Operator Flying

The term "Fixed Base Operator Flying" means flying activities in aircraft having a maximum passenger capacity of 30 seats and a maximum payload capacity of 7,500 pounds.

12. Foreign Carrier

The term "Foreign Carrier" means an Air Carrier other than a Domestic Air Carrier.

13. International Flying

The term "International Flying" means scheduled flying by the Company that includes a scheduled landing or departure outside the 48 contiguous states. This definition is solely for the purposes of the exception for International Codesharing and the conditions on that exception in Section 1.J.

14. Major Foreign Carrier

The term "Major Foreign Carrier" means a Foreign Carrier that has had more than $1 billion US, or its equivalent, in annual revenues during its most recent fiscal year.

15. Successor

The term "Successor" shall include, without limitation, any assignee, purchaser, transferee, administrator, receiver, executor, and/or trustee of the Company or of all or substantially all of the equity securities and/or assets of the Company.

16. Successorship Transaction

The term "Successorship Transaction" means any transaction, whether single step or multi-step, that provides for, results in, or creates a Successor.

17. Transborder Flying

The term "Transborder Flying" means flying scheduled by the Company on US-Canada transborder routes.

18. WACC

The term "WACC" refers to AMR Corporation's weighted average cost of capital as described in the letter agreement between the Association and the Company dated May 1, 2003.

## C. SCOPE

1. General.

All flying performed by or on behalf of the Company or an Affiliate shall be performed by pilots on the American Airlines Pilots Seniority List in accordance with the terms and conditions of this Agreement, except as expressly permitted in provisions D.- K. below.

a. Company Flying. Such flying shall include without limitation all passenger flying, cargo or freight flying, and ferry flying, whether scheduled or unscheduled, revenue or non-revenue:

(1)  performed on aircraft owned and operated by or on behalf of the Company or an Affiliate, leased to and operated by or on behalf of the Company or an Affiliate, or operated by the Company or an Affiliate, or

(2)  conducted by any other Air Carrier which the Company has permitted to utilize the Company's present or future designator code, trade name or aircraft paint scheme for the other Air Carrier's flight operations except as expressly permitted in Section 1 D - K below, and provided that the portion of this provision referring to trade names will apply only to Company trade names used to describe the Company's flight operations and not trade names such as "AAdvantage."

b. Prohibited Transactions.

Neither the Company nor an Affiliate shall, without the Association's prior written consent, enter into any transaction, agreement, or arrangement, except as expressly permitted in Section 1.D.- K. below, that permits or provides for:

(1) any form of contracting out or subcontracting out of any Company flying covered by subsection C.1., or any wetleasing from an entity or any chartering of such flying from an entity; or

(2) a Comprehensive Marketing Agreement with a Domestic New Entrant Carrier.

(3) Nothing in this provision C.1.b. shall be construed to permit any other transaction that would violate this provision C.1.

2. Training.

All flight training of American Airlines pilots in Company aircraft shall be performed by American Airlines pilots.

3. Interline Agreements

Nothing in this Section 1 shall be construed to limit the Company or an Affiliate's ability to enter into interline agreements with other Air Carriers.

4. Frequent Flyer Programs.

Nothing in this Section 1 shall be construed to limit the Company or an Affiliate's ability to enter into agreements or arrangements with other Air Carriers involving frequent flyer miles, promotions, awards or other frequent flyer arrangements that are not part of a Comprehensive Marketing Agreement.

5. Captions.

The captions to provisions in this Section 1 are not substantive and should not be considered in construing the meaning of any provision, provided that the Company and the Association do not intend thereby to create an implication as to other captions in this Agreement.

## D. Scope Exception: Commuter Air Carriers

1. Commuter Air Carriers and Section 1 Limitations.

The Company or an Affiliate may create, acquire, maintain an equity position in, enter into franchise type agreements with, and/or codeshare with a Commuter Air Carrier, and flying by any such Commuter Air Carrier shall not be subject to the limitations of Section C.1 above, so long as any such Commuter Air Carrier operates in accordance with the limitations set forth in this Section 1.D.

2. American Eagle, Inc. and Executive Airlines, Inc.

American Eagle, Inc. and Executive Airlines, Inc. may operate, in the aggregate, no more than 43 ATR 72 aircraft or other turbo prop aircraft certificated in the United States and Europe for a maximum passenger capacity of between 51 and 70 seats, without losing their status as Commuter Air Carriers.

3. Purpose; Intent of the Parties.

a. Primary Purpose.

The primary purpose of a Commuter Air Carrier is either to provide passenger and/or cargo revenue feed to Company flights and/or to enhance the Company's overall market presence.

b. Role of Commuter Air Carriers in Company's Development.

The parties recognize that Commuter Air Carriers have played a role in the development of the Company as the world's premier airline. Additionally, the Company and the Association acknowledge that the passenger feed provided to the Company's domestic and international system strengthens the Company, thereby providing enhanced career opportunities to American Airlines pilots.

c. Markets in Which the Company Cannot Earn an Adequate Return on Invested Capital

The Company will operate American Airlines service in markets where such service can earn an adequate return on invested capital. This provision will not require the Company to operate a particular service, but instead, if the Company could operate a service and earn an adequate return on invested capital, the Company may not place or maintain the Company code on such service by a Commuter Air Carrier. Notwithstanding this prohibition, if the Company orders additional aircraft to fly such a route, the Company may place or maintain its code on the route or frequency during the time between order and delivery of the additional aircraft. Similarly, if the Company is procuring an airport slot, gate and/or other route authority to fly such a route, the Company may place or maintain its code on the route or frequency during the time required to procure such a slot and/or authority.

d. Parties to Meet in the Event of Problems.

It is not the intent of either the Company or the Association to limit the expansion of Commuter Air Carriers in developing new markets. If at any time it is determined that these provisions are impeding the ability of Commuter Air Carriers to fulfill their primary role in support of the Company's system, the parties agree to promptly meet and discuss appropriate modifications to this Agreement.

4. Cockpit Crewmember Floor.

In the event that the number of cockpit crewmembers employed by the Company on the American Airlines Pilots Seniority List goes below 7300, the parties agree that the commuter exception contained in this Section D. shall be terminable at the option of APA following a 90-day period to provide an opportunity for discussion. If APA elects to require termination of the commuter exception, the Company shall thereafter have a reasonable time to complete the disposition of the operations covered by this Section D. during which period the parties shall meet in good faith and discuss the issues related to such termination. Pilots added to the American Airlines Pilots Seniority List by way of seniority merger shall not count in calculating the number of cockpit crewmembers for purposes of this section 4.

5. Limitations on Commuter Carriers.

a. Aircraft Limit.

Beginning with the six month period starting 7/1/03, for each six month period, the total number of aircraft operated under this Section D. may not exceed a limit, based on Narrowbody aircraft operated during that period as provided in c. below. Aircraft shall be counted toward that limit as provided in d. below.

b. Counting Narrowbody Aircraft.

Effective each January 1 and July 1, the total number of aircraft that are being operated by the Company in a single aisle seating configuration ("Narrowbody Aircraft") that are "in service," as that term is defined in SUPPLEMENT CC Section 1.K., shall be tallied for purposes of determining the applicable limit on the number of aircraft operated pursuant to this Section D. For the purpose of this tally of Narrowbody Aircraft, the "total number of aircraft" being operated by the Company for the six month period shall be the straight average of the number of aircraft in service at the Company on the fifteenth calendar day of each of the previous six months. If any six-month tally involves a fractional aircraft unit, the fractional unit will be rounded down if less than .5, and otherwise rounded up.

(1) Force Majeure.

In the event that the Company's planned aircraft deliveries do not take place as scheduled due to conditions beyond the Company's control, then for 12 months from the scheduled delivery date, so long as the scheduled deliveries remain firm orders to be delivered as soon as circumstances permit, the aircraft shall be counted as though they had been timely delivered.

If the Company is unable to operate Company aircraft due to conditions beyond the Company's control, then the Company may count such aircraft as in operation for purposes of b.(1) above for three months from the date such aircraft go out of operation, or such longer period as necessary, not to exceed fifteen months, if the Company is taking all practicable steps to restore operations, including by repairing or replacing the affected aircraft.

"Conditions beyond the Company's control" shall include, but not be limited to, the following: (1) an act of God, (2) a strike by any other Company employee group or by the employees of a Commuter Air Carrier operating pursuant to Section 1.D., (3) a national emergency, (4) involuntary revocation of the Company's operating certificate(s), (5) grounding of a substantial number of the Company's aircraft, (6) a reduction in the Company's operation resulting from a decrease in available fuel supply caused by either governmental action or by commercial suppliers being unable to meet the Company's demands, (7) the unavailability of aircraft scheduled for delivery.

c.   Determining the Maximum Number of Aircraft that Commuter Carriers May Operate.

The maximum average number of aircraft that may be operated under this Section D. during a six-month period is the number of Narrowbody Aircraft multiplied by 110%.

d.   Counting Commuter Carrier Aircraft

(1)   Two Counts.

Effective each January 1 and July 1, aircraft operated pursuant to this Section D. for the previous six month period shall be counted toward the aircraft limit in c above as a straight average of the number of aircraft in operation on the fifteenth calendar day of each of the previous six months.

Commuter Air Carriers that are Affiliates or that have more than 50% of their RPMs attributable to passengers flying on the Company code shall be counted on a 1 for 1 basis, with fractional units rounded as at the mainline.

Aircraft at Commuter Air Carriers that are not Affiliates and that have 50% or fewer of their RPMs attributable to flying on the Company's code shall be counted toward the aircraft limit as provided in d. (2) below.

(2)   Counting Aircraft at Commuter Carriers With 50% or Fewer RPMs on the Company's Code.

At Commuter Air Carriers that are not Affiliates and that have 50% or fewer of their RPMs attributable to passengers flying on the Company's code, aircraft shall be counted in one of two ways, depending on whether or not the Commuter Air Carrier operates a portion of its flights as American Connection (or similarly dedicated operation).

If such Commuter Air Carrier does not operate a portion of its flights as American Connection (or similarly dedicated operation), monthly RPMs  flown on the Company's code as a proportion of total monthly RPMs at each such carrier shall be multiplied by the average number of aircraft in operation at that carrier during that month. Fractional units shall be rounded to the nearest hundredth.

Thus, for example, if one third of the monthly RPMs at such a Commuter Air Carrier are attributable to passengers flying on the Company code, then one third of that Commuter Air Carrier's fleet shall be counted toward the overall limit for Commuter Air Carrier aircraft for that month.

If, on the other hand, the Commuter Air Carrier operates a portion of its flights as American Connection or similarly dedicated operation, the aircraft in the dedicated portion of the operation shall be counted on a 1 for 1 basis. If aircraft operated by such a Commuter Air Carrier outside the dedicated portion of the operation carry passengers on the Company code, then:

(a)   The aircraft in the dedicated portion shall be counted on a 1 for 1 basis; and

(b)   The aircraft in the non-dedicated portion shall be counted in the same manner as aircraft at Commuter Carriers without a dedicated operation, excluding the dedicated portion of the operation from the calculation; and

(c)   The number of aircraft in (a) and (b) shall be added together.

Thus, for example, if a Commuter Air Carrier operates 10 aircraft in a dedicated portion of its operations, operates another 10 aircraft in a nondedicated portion of its operations, and if 1/10 of the monthly RPMs in the non-dedicated portion of its operations are attributable to passengers flying on the Company code, then 11

aircraft count toward the overall limit for Commuter Air Carrier aircraft for that month.

e. Penalty for Excess Commuter Carrier Operations.

If, for any six month period, the total number of aircraft operated under this Section D., counted as provided in d. above, exceeds the number permitted under provision c. above, then the number of aircraft that Commuter Air Carriers would otherwise have been permitted to operate during the subsequent six month period shall be reduced by twice the number of such excess aircraft. Moreover, during that subsequent six month period, the Company shall be required to stay within the aircraft limit as calculated on the first day of each month in the period for the previous months in the period. If the Company does not comply during any month of this subsequent six-month period, the Association shall have all available remedies. Nothing herein limits the right of either party to bring a grievance on an expedited basis before the System Board about any dispute regarding compliance with Section 1.D. at any time.

f. Limitations on Aircraft Types in Commuter Air Carriers' Fleets.

No aircraft type in the Company's fleet, or inactive aircraft type previously in the Company's fleet and still under the Company's control, and no orders or options for a Company aircraft type shall be transferred to or operated by a Commuter Air Carrier operated under this Section D.

g. Limits on Certain Non-Stop Flying

Beginning with the calendar quarter starting July 1, 2003, and for each calendar quarter thereafter, Commuter Air Carriers majority owned by AMR Corp. or by an Affiliate shall operate no more than 1% of the total combined scheduled block hours for such Commuter Carriers and the Company in nonstop scheduled service between any of the following airports, without the consent of the Association: DFW, ORD, MIA, JFK, SFO, LAX, LGA, STL and SJU. If the number of departures scheduled by the Company at any other airport exceeds an average of 70 per day over a 12 month period, the Company shall meet with the Association to discuss adding such airport to this list.

No other Commuter Air Carrier operated under this Section 1.D. shall operate nonstop scheduled service between any of the following airports without the consent of the Association: DFW, ORD, MIA, JFK, SFO, LAX, LGA, STL and SJU, except that if Executive Airlines ceases to be a Commuter Carrier that is majority owned by AMR Corp. or an Affiliate, then while Executive Airlines is such a Commuter Carrier, three daily nonstop scheduled roundtrips between SJU and MIA shall not be subject to the restriction in this paragraph. BNA shall be added to the list of restricted airports whenever the Company schedules 40 or more daily departures from BNA. If the number of departures scheduled by the Company at any other airport exceeds an average of 70 per day over a 12 month period, the Company shall meet with the Association to discuss adding such airport to this list.

Section 1.D.5.g amended see Letter VV

h. Hub or Major Airport Departures.

Beginning with the calendar quarter starting July 1, 2003, and for each calendar quarter thereafter, 85% of departures by turbo-jet aircraft at Commuter Air Carriers majority owned by AMR Corp. or by an Affiliate shall be into or out of the following major airports: DFW, ORD, MIA, SJU, SFO, LAX, LGA, STL, and JFK. Other Commuter Air Carriers shall carry passengers on behalf of the Company only into or out of the following airports: DFW, ORD, MIA, SJU, SFO, LAX, LGA, STL and JFK. Departures utilizing commuter slots at slot controlled airports other than those listed above (e.g., DCA) and departures from airports limited to commuter departures by other governmental or aircraft operational restrictions (e.g., SAF), shall not be covered by this provision h.

Section 1.D.5.h amended see Letter VV

6. Preference in Hiring.

If pilots of the Company are on furlough, such pilots shall be given preference in the filling of vacancies on Commuter Air Carriers that are Affiliates. The Company shall also attempt to secure preference for such pilots for vacancies occurring at Commuter Air Carriers in which the Company or an Affiliate owns a minority equity interest and at independently owned

Commuter Air Carriers that have franchise-type agreements or other codesharing relationships with the Company or an Affiliate.

7. Information Sharing.

a. Review of Changes to Commuter Air Carrier Flying.

The Association shall identify individuals to work with the Company's schedule planning department to review contemplated changes in flying by Commuter Air Carriers on routes where passengers will be carried on behalf of the Company. The Association agrees to treat the information provided by the Company pursuant to this provision as confidential.

b. Quarterly Data Review.

On a quarterly basis beginning September 1, 1997, the Company shall review with the Association data that reflects the results of any decisions to substitute flying by Commuter Air Carriers operated under this Section 1.D. for the Company's flying and shall review routes, if any, operated by Commuter Air Carriers on behalf of the Company that could be flown by the Company and earn an adequate return on invested capital. The Company shall also procure and share with the Association the data necessary to verify the limits set forth in this Section D.

c. New Codesharing/Ownership Arrangements.

The Company shall discuss with the Association any plans to enter into new codesharing or ownership arrangements with any Commuter Air Carrier prior to the implementation of such arrangements.

8. Foreign Commuter Air Carrier.

A Commuter Air Carrier that engages in flying only between points outside the United States, its territories or possessions shall not be subject to the limitations set forth in Section D.4.-7.

9. Prohibition on Training.

Neither the Company nor an Affiliate shall provide flight training to any pilot on the seniority list of any Commuter Air Carrier that operates under Section 1.D. on any aircraft type owned or operated by the Company.

## E.  Scope Exception: Fixed Based Operators

The Association recognizes the Company's desire to engage in fixed base operations. Where such operations include Fixed Base Operator Flying, the Association agrees that the provisions of Section 1.C. above shall not apply to such flying as long as it does not supplant the Company's flying and is not utilized in airline service which is offered for sale to the general public through such devices as the Official Airline Guide and airline industry computerized reservations systems.

## F.  Scope Exception: Hawaiian Inter-Island

The Company may place its current or future designator code on flights operating wholly within the Hawaiian Islands provided that the Air Carrier (or its parent) upon which the code is placed is not an Affiliate (other than a Commuter Air Carrier) of the Company, or categorized as a "Group III" Air Carrier by the U.S. Department of Transportation. Further, if the Air Carrier upon which the code is placed also operates between Hawaii and the U.S. mainland, and if the Company drops frequencies existing as of December 1996 between the contiguous 48 states and Hawaii, the Association shall have the right to withdraw its consent to this provision.

## G.  Scope Exception: Air Freight Feed Operations

Notwithstanding Section 1.C. above, it is agreed that the Company shall have the right to contract for Air Freight Feed Operations as defined in SECTION 2, below, or to operate such feeders by means of a subsidiary, affiliate, or a division of the Company, or both. If the Company contracts for such operation, and if any American Airlines pilots are on furlough during the performance of such operation, the Company will recall that number of pilots which equals the minimum number of pilots who would be required to perform the operation if the Company, utilizing the same type of aircraft as are actually utilized on the date of commencement of each such operation, performed the operation itself under the terms of this Agreement. The recall of

furloughed pilots shall proceed in the manner stated in this Agreement. In the event the Company operates any such Air Freight Feed Operation itself, the rules of this Agreement shall apply.

## H. Scope Exception: Domestic Air Carriers Other Than Commuter Carriers

The Company may place its current or future designator code, and/or any designator code that the Company directly or indirectly controls, on a Domestic Air Carrier that is not a Commuter Air Carrier as specified below:

1. The Company shall notify the Association at least 30 days in advance of beginning to codeshare with a Domestic Air Carrier that is not a Commuter Air Carrier.

2. The Company and the Association will discuss the proposed domestic codesharing agreement for a period of 30 days after the notice in order to reach an agreement that will allow the implementation of the codeshare agreement. The parties do not intend these discussions to encompass subjects unrelated to the implementation of the codesharing agreement.

3. The parties will engage a mediator/interest-arbitrator to facilitate their discussions. The mediator/arbitrator will be selected by agreement from a list of interest arbitrators knowledgeable about Scope provisions in pilot collective bargaining agreements. If the parties have not reached agreement within the 30 day period, the mediator/arbitrator will resolve the outstanding issues by issuing an award within 10 days after the conclusion of the 30 days period. Any domestic codesharing agreement that the Company enters into before the issuance of the award, or the reaching of an agreement, shall not require the Company to place its code, or any code that it directly or indirectly controls, on flying by the Domestic Air Carrier.

4. In forming the award, the arbitrator will utilize the terms of the then-existing domestic codeshare agreements among domestic air carriers and the provisions of then-existing collective bargaining agreements for pilots at United, Delta, Northwest, Continental and USAirways airlines that are relevant to domestic codesharing. The Arbitrator will apply those agreements to establish an industry standard domestic codeshare agreement for the period of that agreement that is fair to the pilots.

5. The subjects to be considered by the parties and submitted to the arbitrator, if agreement cannot be reached, shall include, but not be limited to:

   a. Procedures for reciprocal codesharing;

   b. Terms of codesharing on flights between and from the Company's and the Domestic Air Carrier's hubs and focus cities;

   c. Conditions for codesharing on flying in overlapping markets;

   d. Conditions for blocked space arrangements;

   e. Code sharing on International Flying;

   f. Codesharing on regional jet flying by the Domestic Air Carrier's associated regional airlines and commuter carriers, if any;

   g. Block hour limitations;

   h. Joint marketing limitations;

   i. Adequate protections for existing AA flying;

   j. The mutual benefits to the Company and the American Airlines pilots.

6. The interest arbitration will be pursuant to the Railway Labor Act.

7. The interest arbitrator will retain jurisdiction to resolve questions and disputes about the implementation of his award.

8. Section 1.C.1.b. (2), concerning Comprehensive Marketing Agreements, shall no longer be effective upon the implementation of a domestic codesharing agreement under this Section pursuant to either an arbitrator's award or agreement with the Association.

## I. Scope Exception: Transborder

The Company may place its current or future designator code on flights by Canadian Air Carriers as set forth below:

1. Codesharing to Third Countries.

   Codesharing agreements allowing Canadian Air Carriers to carry the Company's code between Canada and a third country must meet the following conditions:

   a. Opportunities to Earn WACC.

      The Company shall always deploy its own aircraft on any international route for which it can obtain authority, so long as that route will earn a return on invested capital at least equal to WACC. The Company shall not use Canadian Air Carriers' flights to third countries as a substitute for opportunities to operate its own international flights from U.S. gateways, provided such Company flights will earn a return on invested capital at least equal to WACC.

   b. Review of Third Country Traffic Flows.

      On September 1, 1997 and every six months thereafter, the Company shall review with the Association the flows of international passengers traveling to third countries on the Company's code on Canadian Air Carriers' flights and on Canadian Air Carriers' codes on the Company's flights. This review shall identify any incremental international operations that meet the criteria in provision 1.a. above. It shall include an evaluation of the size of aircraft and frequency of operations potentially available for the Company. This review shall also assure that the Company is accruing benefits from the traffic carried on its code on Canadian Air Carriers' flights.

   c. Review of Traffic Flows Exceeding Certain Numbers of Passengers on Company Code.

      If, for any period of six consecutive months, Canadian Air Carriers carry more than an average of 50 passengers per flight per day on the Company's code or more than an average of 500 passengers per flight per week on the Company's code, the Company and the Association shall promptly conduct a review as described in 1.b. above to determine whether any opportunity exists to carry that traffic from a U.S. gateway on a Company flight that will earn a return on invested capital at least equal to WACC, assuming that the Company can obtain authority for the operation. Nothing in these provisions 1.a.- c. shall be construed to require the Company to operate a particular route or routes.

   d. Maximizing Use of Canadian Air Carriers' Codes.

      The Company shall attempt to maximize Canadian Air Carrier codesharing on the Company's flights to third country destinations.

2. Ability to Reopen.

   In the event of a change in regulation, law, or industry practice with respect to codesharing, either party retains the right to reopen on this issue of codesharing with a Canadian Air Carrier.

## J. Scope Exception: Other International Codesharing

The Company may place or maintain its current or future designator code on flights by Foreign Carriers under the following conditions:

1. General Principles

   a. Importance of International Codesharing.

      The Company and the Association agree that codesharing with Foreign Carriers has become an important element of international competition and that it is in the Company's interest to enter into codesharing agreements with such carriers when those agreements strengthen the Company's international and domestic route networks.

   b. Purpose of Codesharing.

      The purpose of codesharing is to provide feed to the Company's route system and/or establish, maintain, or acquire market presence.

2. Other Airline Codes on Company Flights.

The Association endorses the maximum use of other airline codes on Company flights. In negotiating codesharing agreements with Foreign Carriers, the Company shall attempt to maximize opportunities to use its own aircraft and personnel.

3. Baseline for International Flying.

A Baseline for International Flying shall be calculated for each year as described below:

a. Effective January 1, 2003, the Baseline for International Flying shall be ____ [the January 1, 2003 International Baseline under the May 1997 Agreement minus the number of block hours that were "double counted" since 1997, (to be determined but not to exceed 18,000 block hours) plus total scheduled block hours in 2002 of Transborder Flying as defined in the May 1997 Agreement].

b. International Baseline for January 1, 2004 and Beyond.

Effective January 1, 2004, and each January 1 thereafter, the International Baseline for that year shall be calculated as follows:

(1) The International Baseline for the previous year shall be adjusted upward by the total block hours of International Flying scheduled by the Company during that year in excess of the previous year's International Baseline. Thus, for example, if the January 1, 2003 International Baseline is _x_ and the total block hours for International Flying scheduled during 2003 is _x+ 1000_, then the January 1, 2004 International Baseline shall be _x_+ 1000._

(2) The International Baseline for the previous year shall carry forward and remain the same if the amount of block hours scheduled by the Company during the previous 12 month period for International Flying is less than or equal to the International Baseline for that year.

4. International Flying Below 90% and/or 80% of the Baseline in 2003 and Beyond.

On January 1, 2004 and on January 1 of each year thereafter, the International Baseline as calculated on the preceding January 1 shall be compared to the total block hours of International Flying scheduled by the Company during the preceding 12 months.

a. If the Company's scheduled International Flying is below 90% of the previous year's International Baseline, the Company shall have until the succeeding January 1 to cure that deficiency by increasing total scheduled block hours of International Flying to the level that would have met that 90% threshold. If the Company's scheduled International Flying during that additional 12 months does not increase to this required level, then the Association's concurrence shall be required for the Company to enter into new international codesharing agreements whether to place the Company's code on a Foreign Carrier's flights or to carry a Foreign Carrier's code on a Company flight.

b. If the Company's scheduled International Flying is below 80% of the previous year's International Baseline, the Company shall have until the succeeding January 1 to cure that deficiency by increasing total block hours back to the level that would have been required to meet that 80% threshold. If the Company's scheduled International Flying during that additional 12 months does not increase to this required level, then the Association's concurrence shall be required for renewal or continuation of all codesharing agreements whether to place the Company's code on a Foreign Carrier's flights or to carry a Foreign Carrier's code on a Company flight, with the exception of those specifically listed below:

Qantas (on AA 10/23/89; by AA 11/15/94)

British Midland (11/1/93)

Gulf Air (transatlantic 7/1/94; UK-Middle East 1/1/94)

5. Opportunities to Earn Adequate Return on Invested Capital.

a. General.

The Association and the Company agree that the Company shall continue to seek international route authority and pursue all opportunities for deploying its aircraft assets on international routes where it will earn an adequate return on invested capital.

b. Review of International Codeshare Traffic.

On May 1, 2003 and every six months thereafter, the Company shall review with the Association the flows of international codeshare passengers traveling on the Company's code on Foreign Carrier flights and on Foreign Carrier codes on the Company's flights. This review shall identify any incremental international operations that meet the criteria in provision 5.a. above. It shall include an evaluation of the size of aircraft and frequency of operations potentially available for the Company. This review shall also assure that the Company is accruing benefits from the traffic carried on its code on Foreign Carrier flights.

c. No Codesharing on Routes That Could Earn Adequate Return on Invested Capital.

The Company shall not, without the Association's consent, place or maintain its code on any international route or frequency operated by a Foreign Carrier, on which the Company could earn an adequate return on invested capital. This analysis shall be performed using the same method to analyze route profitability that AMR then uses internally for route planning. Notwithstanding this prohibition, if the Company orders additional aircraft to fly such an international route, the Company may place or maintain its code on the route or frequency during the time between order and delivery of the additional aircraft. Similarly, if the Company is procuring an airport slot, gate and/or other route authority to fly such a route, the Company may place or maintain its code on the route or frequency during the time required to procure such a slot and/or authority. Nothing in this provision 5 shall be construed to require the Company to operate a particular route or routes.

6. Cabotage.

If any Foreign Carrier obtains the right to transport local passenger or cargo traffic between airports within the United States or its territories, the Company shall not allow its code to be used on flights carrying such traffic and shall not carry that Foreign Carrier's code on flights between airports within the United States or its territories.

7. Leaving Company Code in a Market.

The Company shall not reduce flying in a market and subsequently maintain or place its code on Foreign Carrier service in that market without the Association's concurrence unless:

a. the reduction is temporary, based on seasonality, and such flying will be reinstated; or

b. all of the following three conditions are met:

(1) the Foreign Carrier is a Major Foreign Carrier; and

(2) the route/flight failed to earn an adequate return on invested capital over the preceding three months or, if the flying has not continued for three months, then over such shorter period as the flying has actually continued; and

(3) either there will be no decrease in the Company's total international block hours, as measured on the next January 1 for the preceding calendar year, or there will be a proportionate decrease in international block hours flown by the Company and the codeshare partner on routes codeshared with that partner. (In calculating the proportionate decrease in block hours, such block hours shall be rounded to the nearest number that will enable each carrier to reduce its flying in increments of at least one daily round trip). Examples of such decreases are contained in Letter B.

8. Prior Documentation.

Prior to any reduction under provision 7 above, the Company shall provide to the Association the information and, if necessary, the documents necessary to demonstrate compliance with that provision.

9. Initiating Codesharing with a Major Foreign Carrier.

Notwithstanding provisions J.5.c and J.7. above, the Company may rationalize flying as part of entering into an initial codesharing agreement with a Major Foreign Carrier even though such rationalization involves withdrawing from a market and maintaining or placing the Company's code on the service of the Major Foreign Carrier in that market, or placing the Company code on a flight of a Major Foreign Carrier that could earn an adequate return on invested capital, provided that the following conditions are fulfilled:

a. As a result of the new codesharing agreement, block hours operated by the Company on routes involved in the codesharing agreement decrease by no more than 10% or by the block hours attributable to one round trip on a route (nonstop flying between any two airports) involved in the codesharing agreement, whichever is greater; and

b. either there will be no decrease in the Company's total international block hours, as measured on the next January 1 for the preceding calendar year, or there will be a proportionate decrease in international block hours flown by the Company and the new codeshare partner on routes codeshared with that partner as specified in 7.b.(3) above.

c. Provisions J.5.c. and J.7. shall apply to any subsequent change in service on the codeshared routes. In addition, if the Company withdraws from a route involved in the initial codesharing agreement, and such withdrawal causes block hours operated by the Company on routes involved in the codesharing agreement to drop below the level that would earlier have violated a. above, the Association and the Company shall review the remaining routes on which the Major Foreign Carrier is codesharing. If such review reveals that any route could earn an adequate return on invested capital, the Association shall have the right to require the Company to withdraw its code from one such route for each route from which the Company has withdrawn.

10. Withdrawal from a Codesharing Agreement.

Where the Company is required by this Agreement to withdraw from an agreement with a codesharing partner, such withdrawal shall take place at the earliest possible date that does not cause the Company to incur a financial penalty that is material in the context of the codesharing agreement with the Foreign Carrier.

## K. Equity Ownership Of Foreign Carriers

A Foreign Carrier in which the Company or an Affiliate has an equity investment of more than 15% and with whom the Company codeshares shall be a "Foreign Partner." The Company may have a Foreign Partner only under the following conditions:

1. When a Foreign Carrier becomes a Foreign Partner, the parties shall establish a "Company Baseline" for that Foreign Partner as follows:

a. International flights by the Foreign Partner to or from any point in the U.S. that carry the Company code (or that a new codesharing agreement contemplates will carry the Company code) shall be "Covered Flights."

b. The Company's total scheduled block hours for the previous 12 month period in all markets (city pairs) in which there is a Covered Flight shall be the "Company Baseline."

2. Twelve months after a Foreign Carrier becomes a Foreign Partner and annually thereafter, the Foreign Carrier's total scheduled block hours attributable to Covered Flights for that twelve months shall be compared to the Foreign Carrier's previous year's total scheduled block hours attributable to Covered Flights. The Company's total scheduled block hours in markets in which the Foreign Partner operates a Covered Flight shall also be compared to the Company's previous year's total scheduled block hours in those markets.

a. If the above comparison in any year shows that the Foreign Partner's block hours on Covered Flights have increased, the Company's international block hours shall have increased that year at least the same number of block hours.

b. If the above comparison in any year shows that the Company's block hours in markets in which the Foreign Partner performs Covered Flights have decreased, then the Foreign Partner's block hours on Covered Flights shall have decreased that year or the Company's international block hours shall have increased at least the same number of block hours.

c. If the above comparison in any year shows that the Company's block hours in markets in which the Foreign Partner performs Covered Flights have decreased and the Foreign Partner's block hours on Covered Flights have increased, then the Company's international block hours shall have increased in the same year by the amount of the Company's decrease combined with the amount of the Foreign Partner's increase. For example, if the Company's block hours decrease by 100 hours and the Foreign Partner's block hours increase by 100 hours, the Company's international block hours in that year shall have increased by 200 hours.

d. If the above provisions 2.a., b. or c are violated, the Company shall have the ensuing year to bring itself into compliance. If, at the conclusion of the ensuing year, the Company is still not in compliance, then the Company shall withdraw the Company code from sufficient Covered Flights to bring the Company into compliance.

e. If the comparison in any year shows a decrease in the Company's block hours such that the total is less than the Company Baseline, then the Foreign Partner's block hours on Covered Flights shall not increase until a subsequent year's comparison shows that the Company's block hours are again equal to or greater than the Company's baseline.

## L. Successorship

1. Agreement Binding on Successor.

   The Agreement shall be binding upon any Successor. The Company shall not bring a single step or multi-step Successorship Transaction to final conclusion unless the Successor agrees, in writing, to recognize the Association as the representative of pilots on the American Airlines Pilots Seniority List consistent with the Railway Labor Act, to employ the pilots on the American Airlines Pilots Seniority List in accordance with the provisions of this Agreement, and to assume and be bound by this Agreement.

2. Seniority List Merger.

   If the Successor is an Air Carrier or an affiliate of an Air Carrier, the Company shall, at the option of the Association, require the Successor to agree to integrate the pre-transaction pilot seniority lists of the Company and the Successor in a fair and equitable manner within 12 months of the Successorship transaction pursuant to Sections 3. and 13. of the Allegheny-Mohawk Labor Protective Provisions ("LPPs"). The requirement of this provision does not apply to the Company's acquisition of all or part of another Air Carrier in a transaction which includes the acquisition of aircraft and pilots.

## M. Opportunity To Make Competing Proposal

In the event that any person or entity proposes a transaction which would result in a change of control or potential change of control of the Company or its parent, as those terms are used in AMR's 1988 Long-Term Incentive Plan, whether through a single or multi-step transaction, and the Company determines to pursue or facilitate the proposal, the Company, if consistent with the fiduciary duties of its Board of Directors, shall provide the Association with

1. advance written notice before acting favorably on such proposal; and

2. an opportunity to make a competing proposal.

## N. Other Labor Protective Provisions In Substantial Asset Sale

In the event that, within any 12 month period, the Company transfers (by sale, lease, or other transaction) or otherwise disposes of aircraft, slots, or route authorities ("Aircraft-Related Assets") which, net of Aircraft-Related Asset purchases or acquisitions during the same 12 month period, constitute 20% or more of the value of the Aircraft-Related Assets of the Company to an entity or to a group of entities acting in concert that is an Air Carrier or that will operate as an Air Carrier following its acquisition of the transferred Aircraft-Related Assets (any such entity or group, the "Transferee"; any such transaction, a "Substantial Aircraft-Related Asset Sale"):

1. the Company shall require the Transferee to proffer employment to pilots from the American Airlines Pilots Seniority List in strict seniority order (the "Transferring Pilots"). The number of Transferring Pilots shall be no fewer than the average monthly pilot staffing over the prior 12

months for the Aircraft-Related Assets transferred to the Transferee in connection with the Substantial Aircraft-Related Asset Sale; and

2. the Company shall not finally conclude a transaction under this subsection unless the Transferee agrees to integrate the Transferring Pilots into the Transferee's pilot seniority list pursuant to Sections 3. and 13. of the Allegheny-Mohawk LPPs.

## O. Remedies

1. The Company and the Association agree to arbitrate any grievance filed by the other party alleging a violation of this Section 1 on an expedited basis directly before the System Board of Adjustment sitting with a neutral arbitrator. The arbitrator shall be a member of the National Academy of Arbitrators and experienced in airline industry disputes. The burden of proof will be determined by the arbitrator. The provisions of the Railway Labor Act shall apply to the resolution of any dispute regarding this Section 1.

2. The parties agree that, in addition to any other rights and remedies available under law and this Agreement, an arbitration award under this Section 1 shall be enforceable by equitable remedies, including injunctions and specific performance against the Company, AMR Corp., and/or an Affiliate of the Company. The Company and Association agree that in a court proceeding to enforce an arbitration award under this Section 1, the rights and obligations are equitable in nature, that there are no adequate remedies at law for the enforcement of such rights and obligations, and that the Association and the Company's pilots are irreparably injured by the violation of this Section 1.

# SECTION 2

# DEFINITIONS

## A.  Air Freight Feed Operation

A freight operation conducted with non-turbojet aircraft whose primary purpose is to "feed" the Company's aircraft and which is flown with active or furloughed pilots of the Company or under contract.

## B.  Calendar Month

"Calendar month", as used herein, shall mean the period from the first day of, to and including the last day of each calendar month of the year, except that for pilot scheduling and pay purposes January, February and March will each be considered a thirty (30) day month through the addition of January 31 and March 1 to the month of February. Leap year will make February a thirty-one (31) day month.

The Company may, at its option and prior to the annual vacation bidding for a given year, declare that up to any other four (4) months containing thirty-one (31) calendar days be deemed thirty (30) day contractual months by taking the first or last day of each such month and adding it to each or all of the other thirty (30) calendar day months.

## C.  Captain

"Captain" means a pilot who is in command of the aircraft and is responsible for the manipulation of, or who manipulates the flight controls of an aircraft while under way, including takeoff and landing of such aircraft, and who is properly qualified to serve as, and holds a current airman's certificate authorizing service as a Captain and who holds a Captain bid status.

## D.  Changeover pairings / prior removal sequence

Pairings on the next month allocation for trip sequences originating in the current contractual month.  They may be longer or shorter which show a commitment for that particular month.  Pay protection for any changes are limited to the current month's flying.

## E.  Classification date

A pilot's Classification Date is assigned concurrent with such pilots' occupational date and shall continue to accrue during such period of duty except as provided in Sections 11, 12, and 17 of this Agreement. Classification seniority is used to determine pay level and the timing of advancement to succeeding pay levels.

## F.  Company date

In most cases it is the same as your date of hire since it is based on continuous service with AMR. A current AMR employee hired as an AA pilot will retain his/her original Company date. It is adjusted due to furloughs and leaves of absence as provided for in Sections 11 and 17.

## G.  Co-terminals as used in this Agreement shall mean:

1.  Kennedy/Newark/LaGuardia

2.  Midway/O'Hare

3.  Dallas/Fort Worth International Airport/Love Field

4.  Washington/Dulles International

5.  Tampa/St. Petersburg

6.  Miami/Fort Lauderdale

The above shall become and remain in effect when crew bases are maintained in the respective cities.

## H. Contractual Month

"Contractual month" as used herein, shall mean the period of time, for pilot scheduling and pay purposes, during which allocated flying and the associated trip selections shall be effective, when the thirty (30) day provision of Section 2.B. (Calendar Month) is utilized.

## I. Credited Projection (PROJ)

A pilot's total time for the month, including fly through time credited at the beginning of the month, the greater of scheduled or actual for flying already performed, scheduled time for flying yet to be performed, credits as provided in Section 15 Hours of Service (E.- minimum pay and credit for an on duty period, F. - minimum pay and credit for time away from base, and G.- minimum and average pay and credit for an on duty period), and credit for scheduled flight time when relieved of flying duties as provided in Section 5, [trips missed due to paid sick leave, a training program of more than five (5) days, vacation, jury duty, and Association leave] and credited time for any credit/no pay removals (for example, unpaid sick). Credited Projection (PROJ) is used in conjunction with Scheduled Projection (SPROJ) to determine a regularly scheduled pilot's legality in accordance with SECTION 15 Hours of Service.

## J. Crew Tracking Trip Sequence(s)

Any pairing or repairing of a trip or trip sequence by Crew Tracking, or any flying that is not planned in advance to permit inclusion in a pilot's monthly trip selection, shall be called a "Crew Tracking Sequence".

## K. Date of hire

The first day as an AA pilot. This date does not change for furloughs or leaves of absence.

## L. Day Flying

"Day flying" shall include all flying between the hours of 0600 and 2259 pilot's Home Base Time (HBT).

## M. Diversion

When a crew makes an unscheduled or scheduled landing at a destination other than planned, generally due to operational reasons such as (weather, mechanical, pick-up passengers, passenger emergency).

## N. Domicile

A common location where a group of pilots are based.

## O. Duty day

A calendar day (0000-2400) in which any duty is performed for the company including sign-in and debrief.

## P. Duty period

The elapsed time between sign-in time and release time;

1.  Sign-in time – shall not be less than one hour prior to scheduled or rescheduled departure time for a pilot flying the first flight of a duty period or thirty (30) minutes prior for a pilot deadheading.

2.  Release time – shall apply to all scheduled flying and deadheading and shall be fifteen (15) minutes after the scheduled or actual block in time, whichever is later.  (30 minutes for International trip sequence).

3.  Deadheading to and from training does not require a thirty (30) minute sign-in or a fifteen (15) minute debrief.

### Q. First Officer

"First Officer" means a pilot who is second in command of the aircraft and any part of whose duty is to assist or relieve the Captain in the manipulation of the flight controls of the aircraft while under way, including takeoff and landing of such aircraft, and who is properly qualified to serve as, and holds a current airman's certificate authorizing service as a First Officer and who holds a First Officer bid status. On any international flight requiring more than a two (2) pilot cockpit crew, the First Officer(s) shall also be required to possess an ATPC and a type rating on the equipment flown.

### R. Flight Time

1. Actual – that period of time beginning when an aircraft first moves from the ramp blocks for the purpose of flight and ending when the aircraft comes to a stop at the ramp for the purpose of loading or unloading at either intermediate stops or final destination.

2. Scheduled - the time published publicly by the Company from flight departure to flight arrival of the flight.

### S. Fly-through

Time resulting from a trip or trip sequence which spans two contractual months and refers to the flight time including P&C for which a pilot is credited in the succeeding contractual month.

### T. Furlough

"Furlough" means the removal of a pilot from active duty as a pilot with the Company without prejudice, due to a reduction in force, or the period of time during which such pilot is not in the active employ of the Company as a pilot due to such reduction in force.

### U. Greater Time to Date (GTD)

A running accumulation of a pilot's credited hours to date, including time credited for a crew schedule error affecting a reserve pilot (as provided in Section 18.D.2.), but not including credit for future flying, relief from future flying, or reserve proficiency displacement flying (as provided in18.G.2.). Greater Time to Date (GTD) includes all time credited to date. Greater Time to Date (GTD) is used to determine reserve variances and assignments (as provided in Section 18.

### V. International Officer

"International Officer" means a pilot who is assigned to international flights and who holds, in addition to a First Officer qualification, an ATPC and a type rating on the equipment flown, and whose duties as specified by the Company and as directed by the pilot in command, include the assistance or relief of the Captain or First Officer.

### W. Last trip of the month

The last active scheduled trip sequence in a pilot's contractual month, other than make up, regardless of when it was added to the pilot's schedule.

### X. Management pilot

A pilot who occupies a management position in the Flight Department.

### Y. Midnight cutoff

When a change in a contractual month occurs en route, pay and credit for the time flown before midnight shall be paid and credited to the month in which the pilot involved originated the flight. Midnight shall be determined on the basis of local time at the point of last takeoff.

## Z.  Misconnect

Misconnect means that a particular segment, including deadhead, of a pilot's sequence operates sufficiently late into a station so as to cause such pilot to miss the next segment of such pilot's sequence. [See Q&A #105, #106]

## AA.  Night Flying

"Night flying" shall include all flying between the hours of 2300 and 0559 pilot's HBT.

## BB.  Occupational date

Generally occupational seniority shall begin to accrue from the date a pilot is first scheduled to complete initial new hire training with the Company and shall continue to accrue during such period of duty except as provided in Sections 11 and 12 of this Agreement. Occupational seniority is used for determining placement on the Pilot System Seniority list and for bidding purposes. Any references to seniority in this Agreement are to Occupational Seniority, unless otherwise specified.

## CC.  Pay or Compensation

"Pay" or "compensation", for purposes of this Agreement, means longevity, hourly, gross weight, mileage and, if applicable, international override pay.

## DD.  Pay Projection (PPROJ)

A pilot's total paid time for the month based on fly through time applied to the Credited Projection (PROJ) at the beginning of the month, the greater of scheduled or actual for flying already performed, scheduled time for flying yet to be performed, credits as provided in SECTION 15 Hours of Service (E. - minimum pay and credit for an on duty period, F. - minimum pay and credit for time away from base, and G. - minimum and average pay and credit for an on duty period), for scheduled time when relieved of flying duties as provided in Section 5, [trips missed due to paid sick leave, a training program of more than five (5) days, vacation, jury duty, and Association leave], and for any pay/no credit applications [for example, trips missed due to a training program of five (5) days or less as provided in Section 6.D.1.a.]. Pay adjustments will be made at the end of the month for training pay (Section 6.D.), minimum guarantee (SECTION 4), apportionment pay (Section 6.C.2.), CPA fill up (Section 15.A.6.a.), CPA spill back (Section 15.A.6.b.) and CPA pay out.

## EE.  Pilot

"Pilot" shall include and mean Captain, First Officer, and International Officer.

## FF.  Proficiency Displacement

A qualified pilot about to lose a qualification may request to displace another pilot for proficiency flying.  The displaced pilot, once removed from the trip, is no longer obligated for such trip.  The displacing pilot assumes the obligation to cover the displaced pilot's trip.  (See Q&A #28)

## GG.  Reassignment

A pilot who is legal in all respects for such pilot's next regularly scheduled flight/sequence, but is assigned by the Company to perform other flying instead of such regular flight/sequence.  The pilot shall be paid for whichever of the two (2) flights/sequences produces the higher pay.

## HH.  Recurrent training

Training and any associated proficiency check(s) for a category in which the pilot is qualified and is for the purpose of retaining qualification before becoming non-current.

## II.  Reschedule

A pilot shall be deemed rescheduled if, (1) following a cancellation, the pilot flies or is deadheaded on the first available flight to base or flies or is deadheaded to pick up the next leg

of the pilot's original flight sequence; or (2) following a misconnect or illegality, the pilot flies or is deadheaded on the first available flight to base.  The "first available flight to base" is the flight that arrives at the base the earliest.  This flight may be direct or indirect.

## JJ.  Requalification training

Training (ground and/or flight) and any associated proficiency check(s) for a category for which the pilot was qualified but is no longer currently qualified.

## KK.  Satellite Base

A satellite base is a station where pilots domiciled at a certain crew base as specified herein, may be scheduled to originate and terminate trip sequences. All satellite trip selections must contain only sequences which are scheduled to originate and terminate at the same satellite for the entire contractual month, unless accepted below. The following satellites shall become and remain in effect when crew bases are maintained in the respective cities:

| Crew Bases | Satellites |
|---|---|
|  | Ontario (ONT) / Santa Ana (SNA) / |
| Los Angeles | Long Beach (LGB) |
| San Francisco | Oakland (OAK)/San Jose (SJC) |
| Washington | Baltimore (BWI) |
| Tampa/St. Petersburg | Sarasota (SRQ) |
| Miami/Fort Lauderdale | West Palm Beach (PBI) |

Any Los Angeles based reserve pilot who originates and terminates a trip sequence at a Los Angeles satellite will have the off duty periods immediately preceding and immediately following such trip sequence extended by one hour (1:00) each.

In any contractual month up to thirty-five percent (35%) of the total trip selections for the satellites of Long Beach (LGB), Santa Ana (SNA), Ontario (ONT), Baltimore (BWI), and West Palm Beach (PBI), only, may, at the Company's option, be constructed subject to the following exceptions:

1.  or Long Beach (LGB), one (1) trip sequence for each trip selection may originate and terminate at Santa Ana (SNA), or one (1) trip sequence for each trip selection may originate and terminate at Ontario (ONT), or one (1) trip sequence for each trip selection may originate and terminate at Los Angeles (LAX).

2.  or Ontario (ONT), one (1) trip sequence for each trip selection may originate and terminate at Santa Ana (SNA), or one (1) trip sequence for each trip selection may originate and terminate at Long Beach (LGB), or one (1) trip sequence for each trip selection may originate and terminate at Los Angeles (LAX).

3.  or Santa Ana (SNA), one (1) trip sequence for each trip selection may originate and terminate at Long Beach (LGB), or one (1) trip sequence for each trip selection may originate and terminate at Ontario (ONT), or one (1) trip sequence for each trip selection may originate and terminate at Los Angeles (LAX).

4.  for Baltimore (BWI), one (1) trip sequence for each trip selection may originate and terminate at Washington (DCA).

5.  for West Palm Beach, (PBI), one (1) trip sequence for each trip selection may originate and terminate at Fort Lauderdale (FLL), or one (1) trip sequence for each trip selection may originate and terminate at Miami (MIA).

## LL.  Schedule

"Schedule" means the operating schedule used by the Company in its operations.

## MM. Scheduled Projection (SPROJ)

A pilot's total scheduled time for the month, based on the pilot's trip selection award after adjustment for fly through time. Scheduled Projection (SPROJ) includes credits as provided in

SECTION 15 Hours of Service (E. - minimum pay and credit for an on duty period, F. - minimum pay and credit for time away from base, and G. - minimum and average pay and credit for an on duty period), and credit for scheduled time when relieved of flying duties as provided in Section 5 [trips missed due to paid sick leave, a training program of more than five (5) days, vacation, jury duty, and Association leave]. Scheduled Projection (SPROJ) is adjusted only for underfly on a leg by leg (block to block) basis, an assignment or reassignment (domestic: at base or away from base; international: at base only), an award or assignment of open flying at base (through make-up, reserve, VJA or trip trading with open time), trip trading (with another pilot or with open time), an uncredited removal from all or part of a scheduled trip sequence which results in less time than was originally scheduled (for example, a cancellation). Scheduled Projection (SPROJ) is used in conjunction with Credited Projection (PROJ) to determine a regularly scheduled pilot's legality in accordance with SECTION 15 Hours of Service.

## NN.  Scheduled Trip or Trip Sequence

A "scheduled trip or trip sequence" is a published pairing of flying and/or deadheading, consisting of two or more flight segments, which originates and terminates at a crew base.

## OO.  Service

"Service" means the period of time assigned to active duty as a flight deck operating crewmember or supervisor with the Company.

## PP.  Sick if needed

A reserve pilot who is sick may call and so notify the Company.  The pilot will not be charged sick leave until such pilot is assigned to fly.  At the time the pilot is needed to fly (by assignment – not by proffer) such pilot will be so notified and will be placed on sick leave effective that date.  At the beginning of each subsequent month of reserve, the pilot will convert back to a sick-if-needed status.

## QQ.  Stand in stead displacement

A senior pilot can proffer to stand instead of a junior pilot being displaced from their respective bid status.  In doing so, the senior pilot will be awarded a job from his/her bid preference list using the seniority number of the pilot who is most junior in such bid status at that point in the process.  Once in the new bid status, pilots will use their own seniority number.  The pilot is subject to a lock-in per Section 17L.

## RR.  Supervisory displacement

When a crewmember is replaced on a whole or partial sequence by a Supervisory Pilot. Crewmember is paid schedule for displacement plus greater of schedule/actual time flown.  If crewmember is scheduled to deadhead on displaced leg, the greater of scheduled or actual is paid.

## SS.  Supervisory Pilot

Any pilot listed on the American Airlines Pilot Seniority List who is serving in a managerial or instructional capacity and has not been awarded a monthly trip selection, except that a pilot may be utilized as a temporary supervisory pilot under the provisions of SUPPLEMENT O, or may be appointed to a supervisory position during the course of the month.

## TT.  Trip Selection

"Trip selection" means any monthly regular, relief, secondary or reserve flying assignment.

## UU.  Trip selection denial

When a Captain or First Officer cannot be awarded a trip selection of choice due to minimum experience requirements.  Such pilot will be awarded another selection, in accordance with that

pilot's seniority and choice, and will be pay protected for the trip selection that such pilot could have held.

## VV.  32 hour legality

FAR legality where an international crewmember of a two man unaugmented crew cannot be scheduled to fly over 32 hours in a seven day period.

FAR legality where a crewmember must be given a period of 24 hours free from all duty within a 7 calendar day period.  This relief of duty may be given in the form of a calendar day off, a 24 hour period commencing at any time during the day and terminating 24 hours later (including a period free from all duty of 24 hours or more contained within a sequence), or by moving a reserve's movable duty free period in accordance with Section 15.D.2.c

**Allied Pilots Association**

# SECTION 9

## VACATIONS

### A. Definitions

1. "Applicable rate" as used in this section, means the rate based on day rates as set forth in this Agreement for the highest paying type of equipment involved in that pilot's last trip selection award or reserve flying assignment except that for retirees compensated under paragraph G.1.e.(1), this applicable rate will be based on the pilot's next to the last month of flying prior to retirement.

2. "Vacation Year" as used in this section is used to mean a fiscal vacation year which runs from May 1st thru April 30th of the following year.

3. "Year" as used in this section is used to mean a calendar year.

4. Vacation Bank as used in this section refers to a pilot's available vacation time measured in hours and minutes.

### B. Vacation Period

1. Pilots shall become entitled to and receive vacation allowances with pay in accordance with the following:

   a. All pilots will, except as noted in b. and/or c. below, be eligible for vacation based on accredited service with the Company according to the following schedule:

   | Accredited Service As of December 31 | Vacation Entitlement In Succeeding Vacation Year |
   |---|---|
   | 1 through 7 years | 14 days |
   | 8 through 14 years | 21 days |
   | 15 through 22 years | 28 days |
   | 23 through 29 years | 35 days |
   | 30 or more years | 42 days |

   b. In the year in which a pilot attains eight (8), fifteen (15), twenty-three (23), or thirty (30) years of service, such pilot will be eligible for a prorated vacation, for that year only, according to the following schedule:

   | Years of Accredited Service Completed Between | 8 yrs | 15 yrs | 23 yrs | 30 yrs |
   |---|---|---|---|---|
   | Jan. 1 – Feb. 15 | 21 | 28 | 35 | 42 |
   | Feb. 16 – Mar. 31 | 20 | 27 | 34 | 41 |
   | Apr. 1 – May 15 | 19 | 26 | 33 | 40 |
   | May 16 – June 30 | 18 | 25 | 32 | 39 |
   | July 1 – Aug. 15 | 17 | 24 | 31 | 38 |
   | Aug. 16 – Sep. 30 | 16 | 23 | 30 | 37 |
   | Oct. 1 – Nov. 15 | 15 | 22 | 29 | 36 |
   | Nov. 16 – Dec. 31 | 14 | 21 | 28 | 35 |

   c. A pilot who, as of December 31 of any year, has had less than one (1) year of accredited service with the Company will be entitled to a vacation on the basis of one and one-sixth (1-1/6th) days for each month of service.

2. For purposes of computing the number of days of vacation due, fifteen (15) days or more of service in a calendar month shall be considered a full month and less than fifteen (15) days shall not be considered. Fractions of a day's vacation which equal or exceed one-half (1/2) shall be considered a full day, and other fractions shall not be considered. Vacation days due

shall be converted to vacation hours at the rate of 3 hours and 15 minutes (3:15) per vacation day and will be credited to a pilot's vacation bank.

3. Pilots will bid for and be awarded/assigned vacation periods based on the number of vacation days due. Vacation hours shall be deducted from a pilot's vacation bank on the basis of trip sequences or reserve days of availability dropped for vacation, as appropriate.

## C. Fiscal Vacation Year

The Company shall solicit vacation period preferences for vacations accrued during a calendar year to be taken during the succeeding vacation year. The vacation year will run from May 1 of that year through April 30 of the succeeding year.

## D. Vacation Selection  [See Q&A #126]

1. Vacation periods will be proffered and awarded within each bid status. Pilots shall be permitted to select and shall be awarded in order of system seniority a vacation period proffered for selection within the bid status which they hold during the contractual month of February preceding the vacation year.

2. a. The Company shall make all weeks of the vacation year available in each bid status (minimum one (1) man-month of vacation per bid month). Pilots shall be permitted to bid for vacation weeks in any adjoining combination within a calendar month.

   b. The Company shall make no less than five percent (5%) of the total vacation to be awarded available in each bid status during any month of the vacation year, but not less than a. above.

   c. (1) In each bid status, five percent (5%) need not be applied in any month that planned ramp hours exceed the vacation year average by more than ten percent (10%) for that bid status.

      (2) Exceptions under c.(1) will not exceed ten percent (10%) of total bid status-months in the system.

   d. Temporary assignments solely due to vacation coverage will not create permanent vacancies under Section 18.C.1.f., 18.C.2.e. or 18.C.3.

   e. When a pilot changes bid status, the Company will honor such pilot's assigned vacation period, except when such vacation period increases the manning requirement in the new bid status in that month above the manning requirement level in the month immediately preceding or the month immediately following the vacation month.  In such case, if the pilot's assigned vacation is not honored, the pilot's vacation shall be selected as provided in f. below.

   f. When a pilot's vacation period is assigned, it will not be changed with less than thirty (30) days' notice.  When a pilot's vacation period is changed, the pilot shall be permitted to make a selection of another vacation period from those available in the pilot's bid status within the same vacation year.  Alternatively the affected pilot may elect to take the changed vacation as a floater not subject to the maximum number of floaters specified in paragraph F below.

3. Vacation Bidding

   a. Up to six (6) vacation periods will be bid and awarded in five rounds.  The schedule for the bidding will be updated on or before January 1 for the upcoming vacation bid and will incorporate the minimum notice periods and deadlines below:

      (1) Pilots will be provided with a minimum of 21 calendar days to bid for the first vacation period.

      (2) Following the posting of the first vacation awards, pilots will be provided with a minimum of 4 calendar days to bid for the second vacation period.

      (3) Following the posting of the second vacation awards, pilots will be provided with a minimum of 4 calendar days to bid for the third vacation period.

(4) Following the posting of the third vacation awards, pilots will be provided with a minimum of 4 calendar days to bid for the fourth and fifth vacation periods in a single round.

(5) Following the posting of the fourth and fifth vacation awards, pilots will be provided with a minimum of 3 calendar days to provide the Company with preferences for the award of the final (sixth) vacation period.

b. The vacation award process will be scheduled to complete no later than five calendar days prior to the scheduled closing of the monthly bids for May.

4. Vacation Splits

a. Pilots eligible for eight (8) or more days of vacation may split their vacations a maximum of five times, provided that no split can result in more than one vacation of less than seven days. Any vacation period that is less than seven days will not be available for bidding purposes, but will be converted to hours and placed in the pilot's vacation bank.

b. Primary vacations are awarded based on seniority. Additional vacations will be selected from the remaining vacation periods available after all pilots have been awarded/ assigned their primary vacation period in accordance with D.1., 2., and 3. of this Section. Awarding/assigning of the additional splits of a pilot's vacation period will be in order of seniority within the bid status among those pilots desiring to split their vacation.

5. A pilot may request paid personal vacation days (PVDs) which the Company will grant if manning permits. Days used for personal vacation will be deducted from the vacation day accrual to be awarded in the subsequent vacation year and will be limited to the total number of vacation days in such accrual. Once granted, pilots shall have the following options: [See Q&A #126, #127]

a. Hours Option

(1) The number of PVD days taken, when multiplied by the conversion rate in B.2 above, shall be no less nor greater than the number of days required to completely offset the scheduled pay and credit for the trip sequence or days of availability from which such pilot is removed.

(2) Such time shall be credited to such pilot's vacation bank.

(3) Such pilot shall then be paid and credited for the trip sequence or days of availability from which such pilot is removed from such pilot's vacation bank.

b. Days option

(1) The number of PVD days taken shall be equal to the number of days of the trip sequence or days of availability from which such pilot is removed.

(2) The number of days in (1) above shall be multiplied by the conversion rate in B.2 above, and such time shall be credited to such pilot's vacation bank.

(3) Such pilot shall then be paid and credited for the trip sequence or days of availability from which such pilot is removed from such pilot's vacation bank.

6. Pilot requests for PVDs will normally be granted through the trip trade with open time system.

7. If a pilot who has requested and been granted time off by his supervisor is unable to make up the lost time, he will be given the option to convert the lost time to a personal vacation day(s) subject to D.5 above. Unless the pilot decides otherwise, the lost time will automatically be converted to a personal vacation day(s).

8. A pilot, other than a pilot taking 28 or more days of vacation in a month, may slide the first day of vacation period by up to three (3) days in either direction provided the slide does not increase the number of hours dropped for a regular scheduled pilot by more than one (1) hour or increases unavailable days for a reserve pilot. This provision shall not apply if the new vacation period goes outside of the bid month or the resulting dropped trip sequence touches a fly-through sequence from the previous month or any of the following days: New

Year's Day, Easter Sunday, Independence Day, Thanksgiving Day, and Christmas Day. [See Q&A #38, #128]

9.  Pilots may trade vacation periods within a four-part bid status. The traded periods must be an equivalent number of weeks although the exact number of days need not be equal.

## E.  Deferred Vacations

Vacations shall not be cumulative and a vacation to which a pilot becomes entitled on December 31st of any year shall be treated in accordance with G.1.f of this section, unless taken during the following vacation year; provided that a pilot may be requested by the Company to forego his vacation if such request is in writing, and, in such event, if the pilot has not received his vacation by the end of the vacation year in which it is to be taken, he shall be entitled to said deferred vacation during the succeeding  vacation year.

## F.  Floating Vacation

A pilot with fourteen (14) days or more vacation is allowed to take up to one half of their vacation weeks, to a maximum of two weeks, as a floating vacation(s).  A pilot will notify Crew Resources prior to the bid closing date for the first round of vacation bids how many floating weeks of vacation will be taken. PVD's will not be deducted from a pilot's accrual prior to determining such pilot's eligibility to float a vacation period(s).

A floating vacation grants a pilot the ability to bid on future, Company designated, available floater vacation slots.  Floating vacations are awarded in seven-day increments, i.e. each floating vacation slot posted by Planning will consist of seven consecutive days. The choice of whether or not to use a floater vacation rests solely with the pilot.
Monthly bidding and use of floating weeks:

1.  Planning will electronically post available weekly vacation slots no later than twenty (20) days prior to the beginning of the month in which the floating vacation will be taken.

2.  Pilots, with floating vacation available, may bid for an available vacation slot in their respective four part bid status.

3.  Floating vacation slots will be closed and awarded in seniority order within their respective four part bid status no later than five (5) days prior to monthly bid closing. If a pilot is unsuccessful in bidding a floating vacation week, he may bid again in later bid months during that vacation year.

4.  The pilot has the option to convert the value of  floating vacation(s) to CPA at any point during the vacation year prior to being awarded a specific vacation slot.  If the pilot has less than the full value of such pilot's floating vacation(s) remaining (due to vacation bank having been previously debited), the remaining value may be converted to CPA at any point in the vacation year.

5.  The value of floating vacation(s) not taken in the vacation year will be paid in accordance with G. 1.f.

## G.  Vacation Pay and Credit  [See Q&A #88]

1.  A pilot will:

   a.  be removed from all trip sequences (including brief and debrief) that touch any part of a vacation period.

   b.  not be scheduled for flight assignment, company business, or training during a vacation period.

   c.  be paid and credited for such dropped trip sequences and reserve available days, with a corresponding debit to the vacation bank as follows:

      (1) A regularly scheduled pilot will receive pay and credit for the scheduled value of the trip sequences dropped.

      (2) A reserve pilot will receive pay and credit for one nineteenth (1/19th) of reserve guarantee for each day of availability dropped as a result of the vacation.

    d. receive neither pay nor credit for any hours dropped in excess of the vacation bank provided that a pilot may utilize sufficient PVDs to be paid and credited for any such excess vacation hours used.

    e. receive pay for the value of the hours remaining in his vacation bank and any accrued vacation, at the applicable rate if the pilot:

        (1) Retires  [See Q&A #40],

        (2) is deceased,

        (3) is furloughed or

        (4) resigns with two (2) weeks' written notice.

        (5) is granted a military leave of absence, provided the pilot may alternatively elect to reschedule his vacation in accordance with Section 11.E.7.

    f. have any hours remaining in the vacation bank at the end of the vacation year, at the pilot's option, be:  [See Q&A #127]

        (1) credited to the pilot's CPA bank, or

        (2) applied to the following vacation year's vacation bank to fully or partially replace a previously exercised PVD

2. A pilot who has completed six (6) months' accredited service with the Company and resigns (with two (2) weeks' written notice), or is furloughed by the Company due to reduction in force shall receive pay at the applicable rate as of such date for all vacation accrued and unused to the date of resignation, or furlough.  All vacations accrued since December 31 shall be paid on the basis of one and one-sixth(1-1/6th) days for each month of service for those entitled to a fourteen (14) day vacation under this Section, one and three-fourths (1-3/4ths) days for each month of service for those entitled to twenty-one (21) days of vacation, two and one-third (2-1/3rd) days for each month of service for those entitled to a twenty-eight (28) day vacation, two and eleven-twelfths (2-11/12th) days for each month of service for those entitled to a thirty-five (35) day vacation, and three and one-half (3-1/2) days for each month of service for those entitled to a forty-two (42) day vacation.

## H.  Effect of Leaves on Vacations

A pilot who takes a leave or leaves of absence which exceeds, or the total of which exceeds, sixty (60) calendar days during any calendar year shall have his vacation allowance to which he becomes entitled on December 31 of that year, reduced by one-tenth (1/10th) for each thirty (30) days of said leave, or total of such leaves, in excess of sixty (60) days.  No deductions from vacation allowances shall be made for leaves of absence granted due to injury sustained while on duty, paid sick leave, or for leaves to represent the American Airlines pilots for grievance and collective bargaining purposes.  Such grievance representatives for the purpose of this paragraph shall be System Board of Adjustment members or the representatives selected by a pilot under Section 21.

## I.  Recall from Furlough

A pilot who is furloughed and recalled to work shall accrue vacation allowance from the date of reemployment, to be taken during the succeeding vacation year on the basis of one and one-sixth (1-1/6th)) days for each month of service if he has less than eight (8) years of accredited service with the Company, one and three-fourths (1-3/4ths) days for each month of service if he has more than eight (8) but less than fifteen (15) years of accredited service with the Company, two and one-third (2-1/3rd) days for each month of service if he has more than fifteen (15) but less than twenty three (23) years of accredited service with the Company, two and eleven-twelfth (2-11/12ths) days for each month of service if he has more than twenty-three (23) years but less than thirty (30) years of accredited service with the Company, and three and one-half (3-1/2) days for each month of service if he has more than thirty (30) years of accredited service with the Company.

**J. Return from Military Leave**

A pilot who returns from military leave shall accrue vacation allowance from the date of return, to be taken during the succeeding vacation year on the basis of one and one-sixth (1-1/6th) days for each month of service if he has less than eight (8) years of accredited service with the Company, one and three fourths (1-3/4ths) days for each month of service if he has more than eight (8) but less than fifteen (15) years of accredited service with the Company, two and one-third (2-1/3rd) days for each month of service if he has more than fifteen (15) but less than twenty-three (23) years of accredited service with the Company, two and eleven-twelfths (2-11/12th) days for each month of service if he has more than twenty-three (23) years but less than thirty (30) years of accredited service with the Company, and three and one-half (3-1/2) days for each month of service if he has more than thirty (30) years of accredited service with the Company.

# SECTION 10

## SICK LEAVE

### A. Rate of Accrual

A pilot shall be credited with five (5) hours of sick leave for each month of service with the Company.  The accumulation for each calendar year shall be available for use the following calendar year.  A pilot who has completed the first six (6) months of service may use up to 30 hours of accumulated sick leave in the calendar year in which the first six (6) months' service is completed.

### B. Maximum Accrual

Unused sick leave shall be cumulative up to a maximum of one thousand (1000) hours.

### C. Rapid Reaccrual of Sick Time [See Q&A #132]

A pilot whose level of accrued sick hours is fifty percent (50%) or more of such pilot's total accrual based on length of service, as provided in paragraphs A. and B. above, who is unable to report for duty on account of illness or injury for thirty (30) or more consecutive calendar days will, upon return to duty, begin to accrue sick leave hours at the rate of seven and one-half (7 ½) hours per month until such pilot's accrual reaches the number of hours accrued before the sick leave charge began.  Thereafter, such pilot shall accrue at the rate provided in A. above.

### D. Fractions

For purposes of computing sick leave accrual under this Section, fifteen (15) days or more of service in a calendar month shall be considered a full month and less than fifteen (15) days shall not be considered.

### E. Beginning and Termination  [See Q&A #36, #47, #48]

1. Regularly Scheduled Pilots

    a. A regular scheduled pilot will be charged sick leave for any scheduled trip sequence which such pilot fails to perform as a result of illness or injury, and for which pay is received in accordance with Section 5 of this Agreement.  Any time a regular scheduled pilot flies any portion of a scheduled trip assignment and is unable to complete such assignment due to illness or injury, such pilot will be paid and credited for the entire trip sequence. Such pilot will be charged sick leave equal to the scheduled hours remaining in the trip sequence dropped due to illness or injury.

2. Reserve Pilots

    a. A reserve pilot will be charged sick leave at a rate of 1/19th of reserve guarantee for each reserve day unavailable for duty/training on account of illness or injury, continuing to but not including the date medically cleared for duty if such clearance is completed prior to 1200 local time, subject to the provisions of Supplement AA E.7.c. Such pilot will not be charged with sick leave for duty free periods scheduled in accordance with Section 15.D. of this Agreement. Any time a reserve pilot flies any portion of a scheduled trip assignment and is unable to complete such assignment due to illness or injury, such pilot will be paid and credited for the value of the portion of the trip sequence flown. A reserve pilot who continues on the sick list in subsequent days will be charged sick leave for each reserve day unavailable for duty.  [See Q&A #41, #42]

    b. Reserve pilots will not be charged sick in each new month until such pilot's GTD would require a flying assignment.

3. Long Term Sick – a pilot who has been charged sick and has a continuous absence for three (3) full contractual months shall have sick accrual retroactively credited for any sick charge in excess of forty-six (46) hours in a contractual month upon reaching the end of the third full (3rd) contractual month, for each reserve month served during such absence. If the initial sick

charge starts prior to the sixteenth (16th) day of the calendar month, that month shall be considered a full month.

a.  In the month a pilot's sick leave goes unpaid, the remainder of the available reserve days in that month shall be unpaid and the pilot's guarantee shall be reduced accordingly.

b.  Pilots who go unpaid during the third (3rd) month of a continuous illness shall contact their flight office for early application of the provisions of this paragraph 3.

## F.  Injury on Duty

There shall be deducted from the sick leave payment provided under Section 5 of this Agreement any Weekly Indemnity Pay under Worker's Compensation Insurance applicable to the same period of absence.  A medical certificate may be required for approval of pay for any such sick leave.  [See Q&A #43]

During a pilot's absence due to an injury compensable under the applicable Worker's Compensation Laws, the pilot's sick leave accrual shall be charged, in accordance with E.1., E.2., or E.3 above, as applicable.  In the event such absence exceeds seven (7) consecutive days, such sick leave credit used shall be restored to the pilot's accrual.  This provision may be exercised only once for any one (1) injury.

## G.  Credit After Furlough

A pilot laid off due to reduction in force shall have sick leave accrued prior to layoff credited in the event of recall.

## H.  Medical Self Clearance  [See Q&A #44]

A pilot who has reported sick may declare medically fit to fly in person or by telephone without visiting the Company's medical facilities provided:

1.  That the illness was not for an injury on duty; nor was the pilot hospitalized during such illness.

2.  That such self-clearance shall not apply to pilots with a previous medical history that demands a personal medical clearance, as determined by the base physician or Corporate Medical Director.

# SECTION 15

# HOURS OF SERVICE

## A. Flight Time Limitations

1. At the start of the month the monthly maximum for regularly scheduled pilots shall be seventy-eight (78) scheduled hours (SPROJ) or the scheduled hours derived from the application of Supplement M (including credits under E., F. and G. of this Section). The monthly maximum for reserve pilots shall be eighty-five (85) credited hours (PROJ).  [See Q&A #50,. #79]

2. For determining compliance with the monthly maximum during the course of a month, a regularly scheduled pilot's scheduled projection (SPROJ) will be increased or decreased only as a result of the following:

   a. underfly, on a leg by leg (block to block) basis,  [See Q&A #112]

   b. an assignment or reassignment,

   c. an award or assignment of open flying at the pilot's base (through make-up, reserve, VJA or trip trading with open time),

   d. trip trading (with another pilot or with open time),  [See Q&A #95]

   e. fly through time into the month from a trip sequence which originated in the previous month.

   f. an uncredited removal from all or part of a scheduled trip sequence which results in less time than was originally scheduled.

3. a. A regularly scheduled pilot, for purposes of make-up and trip trading may elect to be scheduled to fly up to five (5) hours above the monthly maximum based on the pilot's scheduled projection (SPROJ), provided the pilot's credited projection (PROJ) does not exceed eighty-five (85) hours at the time such flying is awarded.  When a pilot performs such flying, scheduled time up to the monthly maximum, measured against the pilot's scheduled projection (SPROJ), will be paid, and the greater of scheduled or actual time above the monthly maximum will be placed in the pilot's CPA at the rate of one (1) for one (1).  [See Q&A #46, #49, #86]

   b. A regularly scheduled pilot, for purposes of VJA, may be scheduled to fly, in accordance with Section 18.D.2.k., up to five (5) hours above the monthly maximum based on the pilot's scheduled projection (SPROJ), provided the pilot's credited projection (PROJ) does not exceed eighty five (85) hours at the time such flying is awarded or assigned. Scheduled time up to the monthly maximum, measured against the pilot's scheduled projection (SPROJ), will be paid, and the greater of scheduled or actual time above the monthly maximum will be placed in the pilot's CPA at the rate of one and one-half (1 1/2) for one (1).

   c. A regularly scheduled pilot, scheduled as provided in A.1. above, shall, except as provided in (2) below, fly and complete such scheduled or rescheduled trips.

      (1) For a reassignment, scheduled time up to the monthly maximum measured against the pilot's scheduled projection (SPROJ), will be paid at the rate of one (1) for one (1), and the greater of scheduled or actual time above the monthly maximum will be paid at the rate of two (2) for one (1).

      (2) A pilot who, as a result of an assignment or reassignment, is scheduled to fly more than five (5) hours above the monthly maximum based on the pilot's scheduled projection (SPROJ), or whose credited projection (PROJ) exceeds eighty-five (85) hours, will have such over projection adjusted in accordance with Section 18.E. (Reassignment).

4. For purposes of compliance with A.3. above, regularly scheduled pilots will be considered legal to fly their last scheduled trip or trip sequence of the month, if their credited projection (PROJ) accumulation, when added to the scheduled flight time of such last trip or trip

sequence within the contractual month, including applicable credits under Section 15.E., 15.F., and 15.G. exceeds eighty-five (85) hours.

5. A pilot having once embarked on the last trip sequence of the month may, for operational reasons, be rescheduled away from base to exceed eighty-five (85) credited projection (PROJ) on any trip sequence which returns the pilot to base.

6. Credit Plan Account (CPA) time shall be used as follows:  [See Q&A #55, #56, #80, #113]

   a. Fill up.  At the end of the contractual month CPA time will be used to automatically fill up a pilot's pay projection (PPROJ) for that month to the monthly maximum for that month. All such fill up shall be applied after the provisions of Sections 4.A. and B. (Minimum Guarantees) and 6.C.2. (Apportionment) and any applicable pay-no credit provisions, if applicable, have been satisfied.

   Section 15.A.6.a amended see Letter WW

   b. Spill back.  CPA time remaining will then be used to automatically fill up the pilot's prior month's pay projection (PPROJ) to the monthly maximum for that month.

   Section 15.A.6.b amended see Letter WW

   c. CPA In Excess of Fifty (50) Hours

   If more than fifty (50) hours exist in a pilot's CPA at 0400 Central Time of the first business day following the tenth (10th) calendar day of the month, such time in excess of fifty (50) hours shall be paid out in the following pay period.

   d. Pilot trip drop.

   A pilot may make an election during the month to debit CPA for the scheduled value of a trip sequence dropped or exchanged for a lesser time trip through the trip trade with open time system.  The scheduled value of such trip will be applied to the pilot's credited projection (PROJ), scheduled projection (SPROJ), pay projection (PPROJ) and the pilot's guarantee.

   e. CPA time not used in a., b., c., or d. above will remain in the pilot's CPA for use in subsequent months.

   f. The provisions of a. b. and c. above shall apply to reserve pilots.

   g. Fill up and CPA pay out time shall be paid at day rates for the category and highest equipment contained in the pilot's trip selection award for that month.

   h. For a. (fill up) and d. (pilot trip drop) above, a pilot may elect to use CPA time which will create a negative CPA balance, provided such balance does not exceed a negative twenty-five (25) hours.  [See Q&A #113]

   i. The CPA of a pilot who will be removed from payroll will be adjusted to zero (0) in accordance with the following:

      (1) Paying the pilot if the pilot's CPA balance is positive.

      (2) Debiting the pilot's final pay, including pay for current and accrued vacation, if the pilot's CPA is negative.

      (3) Such adjustment will be at day rates for the category and equipment in which the pilot last served.

         (a) However, a pilot who will be removed from payroll may elect to retain a CPA balance, provided that if such balance is negative the pilot must have sufficient accrued vacation to cover the negative balance.

7. A pilot who flies a trip sequence that originates in one (1) month and terminates in the subsequent month shall have such fly-through time applied to the pilot's credited projection (PROJ), pay projection (PPROJ), and scheduled projection (SPROJ) for the month in which the sequence terminates, in accordance with the following:  [See Q&A #57]

   a. At the start of the month, such time shall be applied to any regularly scheduled pilot who is scheduled to miss a trip sequence or sequences due to training for which pay but not flight time credit is applicable; but only to the extent such flight time replaces any uncredited time as provided for in Section 6.D.1.a.

    b.  At the start of the month, such time shall be applied to any regularly scheduled pilot who is scheduled to miss a trip sequence or sequences due to approved absences for which neither pay nor flight time credit is applicable, but only to the extent such flight time replaces any uncredited time due to such unpaid and uncredited absence.

    c.  At the start of the month, such time shall be applied, after all appropriate applications of paragraphs a. and b. above have been made, in order to increase such pilot's credited projection (PROJ), pay projection (PPROJ), and scheduled projection (SPROJ) up to but not beyond the monthly maximum.

    d.  All fly-through time not used in the application of a., b., and/or c. above will be placed in the pilot's fly-through CPA (FTCPA) and at month's end will be added to the pilot's CPA balance.

8. A pilot cannot be scheduled for more than eight (8) hours duty aloft in a single duty period. [See Q&A #58]

9. No pilot shall be assigned any duty with the Company during any rest period.

10. Duty aloft includes the entire period during which a pilot is assigned as a member of an airplane crew during flight time.

11. Scheduled for duty aloft means the assignment of a pilot on the basis of the flight time established in the operations schedules rather than actual flight time.

12. Flight time is the time from the moment the airplane first moves for the purpose of flight until it comes to rest at the next point of landing (block-to-block time).  However, when the Captain elects to delay starting engines due to quoted takeoff delays, flight time will, at the option of the Captain, be considered to begin at the time the aircraft would normally have departed, and such delay time shall apply for pay and credit purposes and monthly credited time, but will not be included in duty aloft time.

13. The Company will maintain a computer tracking and alert system in order to provide prospective notification to crewmembers who require a twenty-four (24) hour break to avoid seven (7) consecutive days on duty.

## B. Notification

1. The Company shall maintain a standard method of notifying pilots of the scheduled departure time of their trips.  When the scheduled departure time is appreciably delayed, pilots shall be notified as far in advance as is practicable, consistent with the circumstances.  At originating stations, every effort shall be made to promptly notify pilots of any cancellation, delay or deferment of their trips.

2.  a.  Monthly trip selections and allocations shall be available via electronic means prior to the opening of primary bidding.  Monthly bidding for primary trip selections shall open at 0001 on the twelfth (12th) calendar day of the contractual month and close no earlier than 0600 Central Time on the seventeenth (17th) calendar day of the contractual month.  Trip selection awards shall be made available on the nineteenth (19th) calendar day of the contractual month prior to the month for which trip selections are effective.

    b.  Changes to the bid sheet shall be made available to all pilots via electronic means.  The Company may make changes to the bid sheet up to twenty-four (24) hours prior to the actual time of bid closing.  Changes made during the twenty-four (24) hours prior to the actual time of bid closing, other than the complete elimination of a trip selection, shall be treated as a reassignment and are subject to the provisions of Section 18.E. or Supplement I Section 7, as applicable.

    c.  The Company shall make available projected crew assignments on all regularly scheduled trips not less than five (5) days in advance of the departure of such trips, except when prevented by circumstances beyond the control of the Company.  In any event all pilots shall be furnished with adequate notification of the departure time of their trips.  A pilot on a regularly scheduled sequence of trips shall not be removed from such sequence except in cases of irregularity of scheduled operations or unforeseen contingencies which necessitate such removal.

3.  Pilots shall not be required to keep the Company advised of their whereabouts on days off, while on vacation or while on layover.

4.  It shall be the responsibility of pilots who are unable to report for duty to notify, as far in advance as possible, the controlling Chief Pilot or a designated representative of this fact, giving the reason for their inability to report for duty.

5.  This Agreement contemplates that pilots shall devote their entire professional flying service to the Company, except that nothing in this Agreement shall be construed to prevent any pilot from affiliating with the military service of the United States.

## C.  On duty Time

1.  The following on duty limitations shall apply:  [See Q&A #109]

    | Departure Time | Schedule | Re-Schedule | Maximum |
    | --- | --- | --- | --- |
    | 0600-1759 | 12-1/2 Hrs. | 13 Hrs. | 14 Hrs. |
    | *1800-2059 | 11 Hrs. | 12 Hrs. | 13 Hrs. |
    | *2100-0559 | 10 Hrs. | 11 Hrs. | 12 Hrs. |

    *On a block-to-block basis, if the duty period has a break of at least five (5) hours or twice the number of hours of duty aloft preceding the break, whichever is greater, then the twelve and one-half (12-1/2) hour schedule applies.

2.  The determination of on duty periods shall be based on home base time.

3.  a.  A pilot's scheduled or rescheduled on duty period shall commence:

    (1)  One (1) hour prior to the scheduled or rescheduled departure time for a pilot flying the first flight of a duty period, or thirty (30) minutes prior to the scheduled or rescheduled departure time for a pilot deadheading on the first flight of a duty period, and shall continue until fifteen (15) minutes after the scheduled arrival time of the duty period's last flight assignment.  [See Q&A #59, #60, #61]

    (2)  Such scheduled or rescheduled on duty period shall run continuously unless broken by a scheduled or rescheduled rest period in accordance with the following:

    | SCHEDULED ALOFT WITHIN 24 HOURS | HOURS OF SCHEDULED REST |
    | --- | --- |
    | (a) less than 8 hours aloft | 10:00* |
    | (b) 8 hours or more but less than 9 hours aloft | 10:00 |
    | (c) 9 hours or more aloft | 11:00 |
    | (d) Home base | 12:00 |

    *The Company may schedule and must identify as such, in the monthly trip allocation, up to eighteen (18) monthly rest periods of not less than nine hours thirty minutes (9:30) at non-crew base stations.  All eighteen (18) rest periods may be scheduled at the same station, eighteen (18) different stations or any combination thereof. Any or all eighteen (18) stations may be changed from month to month or within the month.  [See Q&A #33, #62]

    If other requirements of this Agreement necessitate a longer or shorter rest period, such provisions shall govern.

    b.  In actual operations, an on duty period shall commence at the required reporting time, but in any event not less than one (1) hour before departure or as provided in C.3.a. above and shall run continuously unless broken by a reduced rest period as provided below where sleeping accommodations are provided at or near the airport; or nine hours and thirty minutes (9:30) as provided in C.3.a.(2) above.  In any case, the pilot will be provided, in addition to reduced rest, normal round-trip travel time to the rest facility.

Where the Company provides reduced rest as stipulated below, the pilot shall also be scheduled for compensatory rest after the on duty period following the reduced rest period.  Such compensatory rest period shall commence no later than twenty-four (24) hours from the beginning of the reduced rest period:

| SCHEDULED ALOFT WITHIN 24 HOURS | HOURS OF REDUCED REST* | HOURS OF COMPENSATORY REST |
|---|---|---|
| Less than 8 hours | 8:00 | 10:00 |
| 8 hours or more but less than 9 hours | 8:00 | 11:00 |
| 9 hours or more | 9:00 | 12:00 |

*Plus normal round-trip travel time to the rest facility.

    (1) In no case will the off duty period be less than twelve hours (12:00) at the pilot's base, except those  off duty periods immediately following a training duty period outlined in Section 6, in which case such off duty period shall not be less than ten hours (10:00) at the pilot's base.

    (2) The required reporting times of one (1) hour, or thirty (30) minutes, and the fifteen (15) minutes debriefing time, are to be considered a part of all on duty periods.

c.  If termination at the pilot's base is at a co-terminal other than the original point of departure, there shall be added one (1) hour to the on duty period for the purpose of allowing for the use of Company furnished transportation as set forth in Section 24.I. of this Agreement.  However, this hour shall not be construed to be a part of the on duty period as specified in C.1. above.

d.  A pilot deadheading shall be considered on duty, provided that the Company may approve such pilot's request to exceed fourteen (14) consecutive hours on duty for the purpose of deadheading to the pilot's base.  [See Q&A #63]

## D.  Off duty Time

1.  Regularly scheduled pilots shall receive not less than five (5) separate periods of forty-eight (48) consecutive hours free from all duty with the Company at their base during each contractual month.  However, at the option of the Company, one (1) of the said forty-eight's (48's) may be:

a.  combined with another forty-eight (48) to produce a duty free period of ninety-six (96) consecutive hours, or

b.  split into two (2) separate duty free periods of twenty-four (24) consecutive hours each, or

c.  split into two (2) twenty-four's (24's), each of which is combined with a forty-eight (48) to produce two (2) duty free periods of seventy-two (72) consecutive hours, or

d.  split into two (2) twenty-four's (24's), one of which is combined with a forty-eight (48) to produce a duty free period of seventy-two (72) consecutive hours, and the other scheduled separately or

e.  The Company may combine the five (5) forty-eight's (48's) to produce two (2) separate duty free periods of ninety-six (96) consecutive hours each, and an additional forty-eight (48) scheduled separately.

f.  Such scheduled duty free periods shall be pre-planned and indicated on the monthly selection sheet and shall be separated by not less than twenty-four (24) hours.

g.  Any regularly scheduled pilot may request a change in any scheduled duty free period by giving the Company notice prior to the beginning of the duty free period to be changed.  Such duty free period, once begun may not be interrupted by either the pilot or the Company.  The Company may change a regularly scheduled pilot's scheduled duty free period only if it is necessary for the purpose of keeping the airline in operation, provided

that with such pilot's consent the Company may change one (1) duty free period prospectively for purposes of assigning such pilot to simulator training.  [See Q&A #29, #64]

h.  A regularly scheduled pilot may voluntarily drop a single forty-eight (48) hour duty free period (DFP) during the course of a contractual month.  However, the Company cannot require such pilot to forfeit a DFP.  [See Q&A #64]

2. a.  Reserve duty free periods shall be scheduled to run from midnight to midnight.

b.  A reserve pilot's duty free periods (DFP's) shall be scheduled on the bid sheet in accordance with the following:  [See Q&A #37]

(1) Ten (10) immovable DFP's [twenty -four (24) hours each] in a thirty (30) day contractual month and eleven (11) immovable DFP's [twenty -four (24) hours each] in a thirty-one day contractual month.

(2) One (1) additional moveable DFP [twenty-four (24) hours] in a contractual month.

(3) A moveable DFP (as defined in 2. above) shall be designated and scheduled contiguous to immovable DFP's.

(4) A moveable DFP shall not be scheduled in the middle of immovable DFP's.

(5) A maximum of five (5) separate groups.

(6) One golden seventy-two (72) or, if manning permits, one golden ninety-six (96).

(7) No free standing twenty-four (24).

c.  A reserve pilot's moveable DFP shall only be adjusted during the contractual month by the Company in accordance with the following:

(1) A pilot must always be given notice at least twelve (12) hours prior to the start of a DFP, if such DFP is to be moved, or if a moveable DFP is to be added to or removed from such DFP.

(2) Once a DFP has begun, no moveable DFP may be added to or removed from such DFP.

(3) Notice must be given by noon (1200) if the movement of a reserve pilot's DFP will change the pilot's days of availability.  However, if a trip sequence becomes available after noon (1200) and there is no pilot available for such trip sequence, the Company may move a reserve pilot's moveable DFP in order for such pilot to fly the trip, provided the movement of such DFP is in compliance with (1) and (2) above.

(4) The moveable DFP may only be moved one (1) time.

(5) The moveable DFP may only be placed contiguous to another DFP.  However, the Company may, if necessary by moving the DFP, schedule one (1) free standing twenty-four (24) hour DFP.

Note: The bidsheet cannot include a free standing twenty-four (24) hour DFP for a reserve pilot. Once the month begins, the Company may either move a movable DFP and place it contiguous to an existing DFP, leaving twenty-four (24) hours of the original DFP as a stand alone twenty-four (24), or move a movable twenty-four (24) and place it as a free standing twenty-four (24), leaving a minimum of forty-eight (48) hours in the original DFP. In no case may the Company create more than one free standing twenty-four (24) hour DFP in any one (1) contractual month by the movement of a movable DFP.

(6) No moveable DFP shall be placed in the middle of a trip sequence or during any planned absence.

d.  Golden DFPs cannot be moved without the reserve pilot's consent. Reserve pilots will not be involuntarily scheduled for flight assignment, company business or training during any golden DFP(s).  [See Q&A #54]

e.  With the Company's consent, a reserve pilot may move any scheduled DFP prospectively if the flying to be proffered/assigned is to fly beyond 1200 local time on the first day of such DFP.

f. Except for a golden DFP, the Company may require a pilot to change any scheduled DFP prospectively, but only in the event that such pilot is scheduled to fly a trip that is scheduled to terminate at the pilot's base no later than 1200 local time on the first day of the DFP involved in accordance with Section 18.D.2.h. This provision may only be exercised by the Company twice for each reserve pilot during a contractual month. However, a reserve pilot may exercise this option at any time during the contractual month. [See Q&A #66, #114, #120]

g. By mutual agreement between a pilot and the Company, a reserve pilot may be scheduled to fly beyond noon of the first day of a DFP.

h. A reserve pilot who flies into a DFP in accordance with f. or g. above shall have the required off duty break and then commence a DFP equal to that which was originally scheduled. [See Q&A #65]

i. By mutual agreement between the reserve pilot and the Company, DFP's may be moved in any combination. [See Q&A #119]

j. Reserve pilots shall be allowed to trade with other reserve pilots equal numbers of Duty Free Periods (DFPs) under the following conditions: [See Q&A #87]

  (1) The trade is submitted to the Company as soon as possible but no later than three (3) days prior to the first day involved in the trade.

  (2) Trades submitted by the deadline shall be processed by the Company as soon as practicable but no later than the earlier of five (5) calendar days after submission of the trade or twenty-four (24) hours prior to the first day involved in the trade.

  (3) The trade does not create, for either pilot, a period of seven (7) or more consecutive reserve available days, or less than four (4) consecutive reserve available days, exclusive of planned absences.

  (4) Multiple pilot trades, that include more than two (2) pilots, may not be submitted. Any trade which inhibits the Company's ability to maintain a pilot's qualifications shall not be accepted.

  (5) DFPs may not be traded into or out of any planned absences, or in front of or behind a movable DFP.

  (6) A movable DFP may not be traded.

3. In no case shall any pilot's scheduled duty free period be changed retroactively.

4. A pilot who is temporarily assigned to a base other than the pilot's home base for purposes other than training will be entitled to scheduled duty free periods in accordance with paragraphs 1. and 2. above, except that such scheduled duty free periods as are normal to the trip selection or reserve flying assignment to which such pilot is assigned will be taken at the base of temporary assignment. When such temporary assignment is for more than one (1) trip or trip sequence but less than a full month, the duty free periods will be those in the reserve flying assignment which was awarded the pilot at such pilot's base. Such pilot shall be given priority pass privileges to the pilot's base, or the American Airlines station closest to the pilot's residence, to be used at the pilot's option during any scheduled duty free period of forty-eight (48) hours or more taken at the base of temporary assignment.

## E. Minimum Pay and Credit

1. A pilot who reports for any flight duty period (including deadheading) shall receive the greatest of the following:

  a. Flight time pay and flight time credit actually earned.

  b. One (1) minute flight time pay and flight time credit for each two (2) minutes of a scheduled or rescheduled on duty period as set forth in paragraph C.3.a. of this Section.

  c. One (1) minute flight time pay and flight time credit for each two (2) minutes of an actual on duty period as set forth in paragraph C.3.b. of this Section.

  The difference between flight time pay and flight time credit earned during such on duty period and the minimum flight time pay and flight time credit provided above shall be

computed as an extension of the trip which brings the pilot to a station for an off duty break as set forth in paragraph C.3.a. and C.3.b. of this Section.

A flight which lands at a co-terminal for the airport of departure as the result of a mechanical interruption shall be paid and credited under this paragraph.

2. Notwithstanding the provisions of paragraph H.1. of this Section, the provisions of E.1. above shall apply, except that the minimum set forth in paragraph G. of this Section shall be two (2) hours' flight time pay and flight time credit if:

   a. a return to the airport of departure is required after takeoff by a mechanical air interruption, provided that the pilot does no other flying or deadheading during the same on duty period, or [See Q&A #67]

   b. a pilot performs or reports to perform any flying between co-terminals which is not contained in a regular publication prepared by the Company in conjunction with each reselection of pilot flying assignments, or [See Q&A #15]

   c. a pilot performs or reports to perform flying as set forth below, when such flying is confined to a single airport or co-terminals:

      (1) engine, instrument, plane, and radio test flights,

      (2) experimental and airway aid test flights,

   d. a pilot performs or reports to perform flying as set forth below, when such flying is confined to a single airport:

      (1) charter, contract, or scenic,

      (2) courtesy or publicity.

   When no flying is performed under E.2.b., E.2.c. or E.2.d. above, flight time pay and flight time credit shall be based on the equipment type involved in the assignment for which the pilot was required to report, at day rates.

3. Miscellaneous Taxi

   a. An aircraft movement which is not part of, and not in conjunction with, a pilot's specific flying assignment shall be termed miscellaneous taxi.  Such miscellaneous taxi shall be performed by the required crew complement for the respective aircraft.

   b. A pilot assigned to a miscellaneous taxi shall be notified of such taxi assignment(s) in the same manner as are pilots who are notified for flying assignments.  (Section 18.D.1.)

   c. A pilot assigned to miscellaneous taxi will be provided with a written release to operate each taxi so assigned.

   d. A pilot performing a miscellaneous taxi assignment(s) will be covered, if applicable, for the duration of such taxi assignment(s), under the following provisions of the Basic Agreement:

      (1) the on duty provisions provided under Section 15.C.3.b.

      (2) The pay and credit provisions provided under Section(s) 15.E., 15.F., and/or 15.G.

      (3) The reassignment provisions of Section 18.E.

   e. The provisions of Section 15.H. shall be applicable to any pilot who reports for, but does not perform, a miscellaneous taxi assignment.

   f. Actual taxi time involved in miscellaneous taxi assignment shall be considered as if it were flight time as defined in Section 15.A.13. (block-to-block time), but shall not be considered flight time for the application of Section 15.A.11.

## F. Time Away From Base

1. A pilot who reports for any flight duty (including deadheading) which involves two (2) or more on duty periods broken by at least one (1) off duty period away from such pilot's base, shall receive the greater of the following:

   a. one (1) minute pay and flight time credit for each three and one- half (3-1/2) minutes of scheduled or rescheduled time away from such pilot's base;

   b. one (1) minute pay and flight time credit for each three and one- half (3-1/2) minutes of actual time away from such pilot's base.

   The difference between flight time pay and flight time credit earned during such period of time away from base and the minimum flight time pay and flight time credit provided above shall be computed as an extension of the trip which brings the pilot back to the pilot's base for legal rest.

2. For purposes of paragraphs F.1. and G. of this Section, on duty periods and off duty periods shall be as set forth in paragraphs C.3.a. and C.3.b. of this Section.

## G. Duty Period - Average and Minimum

A pilot who reports for any flight duty (including deadheading) shall receive a minimum of five (5) hours flight time pay and flight time credit multiplied by the number of duty periods contained in such pilot's trip sequence, provided however, that a pilot who performs two (2) or more on duty periods broken by at least one (1) off duty period away from such pilot's base shall receive, for each duty period provided in E.1. above, a minimum of three (3) hours flight time pay and flight time credit.

## H. Application of Minimum Flight Time Pay and Flight Time Credit

1. The minimum flight time pay and flight time credit provided under E.1.,  F.1., and G. of this Section shall not be applicable when a pilot reports for a duty period which begins at such pilot's base but completes no takeoff or does no deadheading.  [See Q&A #69]

   In lieu thereof, such pilot shall be guaranteed:

   a. Two (2) hours' flight time pay.  Pay under this provision shall be on the basis of day rates of pay as provided in Section 4.A. or B., as applicable.

   b. One (1) minute flight time pay for each two (2) minutes of an actual on duty period as set forth in paragraph C.3.b. of this Section.  [See Q&A #70]

   c. A pilot shall not remain on duty beyond the limitations of Section 15.C.

   The above pay provision shall not be applicable if the pilot is notified prior to reporting for duty.  If the Company attempts to notify the pilot three (3) or more hours prior to the original departure time of the trip, but is unsuccessful, the pilot shall be considered notified.

2. Deadheading covered under the provisions of E.1., F.1. and G. of this Section shall include:

   a. all deadheading by Company assignment, except in connection with route checks and training under Section 6.D.;

   b. deadheading at the pilot's request to pick up the next trip in a sequence when such action does not trigger a double deadhead;

   c. deadheading at the pilot's request as set forth in paragraph C.3.d. of this Section. Duty time spent in the accomplishment of such deadheading shall be considered an extension of the pilot's on duty period.  [See Q&A #63]

   Except as noted above, deadheading at the pilot's request shall not be covered under the provisions of E.1., F.1. and G. of this Section.

3. For purposes of E.1.b. and F.1.a. of this Section, the rescheduled on duty period shall apply whenever a pilot has been rescheduled as set forth in H.4. below.

4. A pilot is considered to be rescheduled any time there is a change or cancellation in such pilot's flying assignment, including deadheading.

5. The provisions of E.1. and F.1. of this Section shall not be applicable to excess duty hours or excess time away from base resulting from the pilot's request to be rescheduled to deadhead on a flight other than that for which such pilot is legally scheduled or rescheduled by the Company.

6. The provisions of E.1.b., F.1.a., and G. of this Section shall apply, under Sections 5, 6.B., 6.C., 6.D.3. and 18.D. of this Agreement, to pilots who hold trip selection awards.

7. Computation of flight time pay and flight time credit applicable under Section 18.E. of this Agreement shall include all flight time pay and flight time credit due under the provisions of Section 15.E., 15.F. and 15.G.

8. When a pilot's arrival at such pilot's base or scheduled layover station is by way of surface transportation, the arrival time, for purposes of C.2, C.3, E.1, F.1 and G. of this Section, shall be considered to be the scheduled departure time of the surface transportation to be used, plus the normal air time and debriefing time.

   In this case, an off duty period under C.3.b. of this Section shall start at the scheduled arrival time of the surface transportation used.

9. When a pilot performs or reports to perform flying set forth in E.2.b., E.2.c. and E.2.d. of this Section, before, during or after an on duty period involving flying not covered under E.2.b., E.2.c. or E.2.d., or while on layover involving an off duty break between such on duty periods, such pilot shall receive:

   a. flight time pay and flight time credit in accordance with E.1., F.1. or G. of this Section, as applicable, for the on duty periods not involving flying covered under E.2.b., E.2.c. or E.2.d., plus,

   b. one (1) minute flight time pay and flight time credit for each two (2) minutes of actual on duty time for the period involving flying covered under E.2.b., E.2.c., or E.2.d., but not less than the flight time pay and flight time credit actually earned and, in any event, not less than two (2) hours minimum flight time pay and flight time credit.

10. If a pilot flies from A to B, and due to the hourly limitation set forth in this Section, must be scheduled to layover and then deadhead from B to A, such pilot may request under Section 15.C.3.d. to be permitted to deadhead home in the first duty period, and the Company may, if it chooses, permit such deadheading.  However, the pilot shall be paid and credited for the scheduled second duty period in lieu of the extension of the first duty period.  [See Q&A #63]

## I. Maximum Flight Time Pay and Flight Time Credit

1. Except as set forth in H.9. of this Section, flight time pay and flight time credits provided in paragraphs E., F. and G. of this Section are not cumulative, but only the greater will apply.

2. A pilot shall be entitled to only the flight time pay and flight time credit for scheduled or rescheduled time away from base, as provided in F.1. of this Section, when the pilot's return to base is delayed by a strike or work stoppage which substantially affects the operation of the Company; provided, if the pilot is returned to base by the Company, in this specific case, the return deadhead transportation to the pilot's base is called "pilot's convenience", and no reschedule is involved.

3. The provisions of F.1 of this Section shall not apply beyond the first twenty-four (24) hours of excess time away from base resulting from the delay in a pilot's return to base due to an official NOTAM which closes, for a period of twenty-four (24) hours or more, the airport at which such pilot is laying over or at which such pilot is forced to layover as the result of such airport closing, provided that such pilot is assigned by the Company to deadhead to base via the first available deadhead transportation, or assigned by the Company to deadhead to base via air transportation within six (6) hours after the first American Airlines flight operates into or out of the airport at which such pilot is laying over.  In this instance, excess time away from base shall be the difference between the time such pilot actually arrives at base and the time such pilot would have arrived had there been no airport closing.

In the circumstances set forth above, when such pilot is assigned by the Company to remain at the layover station, the normal provisions of E.1., F.1. and G. of this Section shall be applicable.

# SECTION 26

## AMENDMENTS TO AGREEMENT, EFFECT ON PRIOR AGREEMENTS, AND DURATION

### A. Amendments to Agreement

Either party hereto may at any time propose, in writing, to the other party any amendment which it may desire to make to this Agreement, and if such amendment is agreed to by both parties hereto, such amendment shall be stated, in writing, signed by both parties and the amendment shall then be deemed to be incorporated in and shall become a part of this Agreement.

### B. Effect on Prior Agreements

This Agreement, including the Supplemental Agreements and Letters attached hereto, shall supersede and take precedence over all Agreements, Supplemental Agreements, Amendments, Letters of Understanding and other documents concerning the same subjects executed between the Company and the collective bargaining representative of the pilots in the service of American Airlines, Inc. prior to the signing of this Agreement.  All rights and obligations, monetary or otherwise, which may have accrued because of services rendered prior to the effective date of this Agreement shall be satisfied or discharged.

### C. Duration

This Agreement shall become effective May 1, 2003, except as otherwise dated herein, and shall continue in full force and effect until May 1, 2008, and shall renew itself without change until each succeeding May 1 thereafter, unless written notice of intended change is served in accordance with Section 6, Title I, of the Railway Labor Act, as amended, by either party hereto at least sixty (60) days prior to May 1, 2008, or May 1 of any subsequent year.

### D. Early Opener

At any time following May 1, 2006, but prior to May 1, 2008, with sixty (60) days prior written notice by either party, the parties will commence negotiations in accordance with Section 6, Title I, of the Railway Labor Act, as amended.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement this the ___1___ day of ___May___, 2003

WITNESS:


FOR THE AIR LINE PILOTS
IN SERVICE OF
AMERICAN AIRLINES, INC.
AS REPRESENTED BY
THEALLIED PILOTS ASSOCIATIONFOR AMERICAN AIRLINES, INC.



*/signed/*_____ */signed/* _____
John Darrah                          Mark Budette
President                            Director, Employee Relations, Flight


*/signed/*_____ */signed/* _____
Ed White                             Jim Anderson


*/signed/*_____ */signed/*_____
Sam Bertling                         Tammy Hardge


*/signed/*_____ */signed/*_____
Ralph Hunter                         John LaMorte


*/signed/*_____ */signed/*_____
Mickey Mellerski                     Eric Lewis


*/signed/*_____ */signed/*_____
Harry Sophos                         Chris Ryan


*/signed/*_____
Bob Stow

**SUPPLEMENT K(1)**

May 1, 2003

Captain John E. Darrah
President
Allied Pilots Association
14600 Trinity Boulevard, Ste 500
Fort Worth, TX  76155

Re: Medical Plan for Pilots

Dear Captain Darrah:

This letter confirms an agreement between the Allied Pilots Association ("APA") and American Airlines, Inc. ("Company") to achieve annual savings in medical and dental costs of $10,000,000 through a combination of increased contributions set forth in paragraph 1 and the plan design changes to the Group Life and Health Plan for Employees of Participating Subsidiaries of AMR Corporation ("Plan") set forth in paragraph 2.

1. Effective May 1, 2003, pilot contributions for medical and dental coverage under the Plan shall increase by a multiple of two.

   *[ Updated May 9, 2003 -* See Supplement K(2)]

2. The parties shall negotiate a new plan design to be implemented January 1, 2004 to achieve the balance in the annual savings.  In the event the parties are unable to agree on a plan design within thirty (30) days from the effective date of this Agreement, the unresolved issues surrounding the plan design and agreed upon savings shall be submitted to an independent neutral who is an expert in employee medical plan design and actuarial calculations.  The parties agree that their respective actuaries shall jointly agree upon the designation of this neutral, who shall be charged with collecting evidence from the parties and issuing a decision within sixty (60) days of his or her appointment.  The parties agree to jointly pay the cost incurred in connection with this dispute resolution.

3. In the event that these two factors are not sufficient to achieve the $10,000,000 in annual savings in medical and dental costs, then the independent neutral shall decide upon a contribution inflation factor to apply to the amount set forth in paragraph 1. Should an inflation mechanism be implemented, the Company agrees to continue to comply with the "Verification Procedure for Increase in Contribution Rates" and to comply with the "Dispute Resolution Mechanism" which was in effect prior to this agreement.

4. 4.  The Company and the APA shall make every effort during the above process to share any information, data, or assumptions used in deriving its respective analysis arriving at the $10,000,000 figure.

5. It is further agreed that no changes shall be made to the retiree medical plan for retired or disabled pilots.

Sincerely,


*/signed/*
Mark L. Burdette
Managing Director, Employee Policy and Relations


Seen and Agreed:


*/signed/*
Captain John E. Darrah
President

SUPPLEMENT K - 1

# Exhibit 41

(Official Form 1) (4/10)

| United States Bankruptcy Court<br>Southern District of New York | Voluntary Petition |
| --- | --- |

| Name of Debtor (if individual, enter Last, First, Middle):<br>**AMR CORPORATION** | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>**N/A** |
| --- | --- |
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>**AMR** | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>**N/A** |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN (if more than one, state all):<br>**75-1825172** | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN (if more than one, state all):<br>**N/A** |
| Street Address of Debtor (No. and Street, City, and State):<br>**4333 Amon Carter Boulevard, MD5675**<br>**Fort Worth, Texas**　　　　　　　　　**76155** | Street Address of Joint Debtor (No. and Street, City, and State):<br>**N/A**　　　　　　　　　　　　ZIP CODE |
| County of Residence or of the Principal Place of Business:<br>**Tarrant** | County of Residence or of the Principal Place of Business:<br>**N/A** |
| Mailing Address of Debtor (if different from street address):<br>**N/A**　　　　　　　　　　　ZIP CODE | Mailing Address of Joint Debtor (if different from street address):<br>**N/A**　　　　　　　　　　　ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>**N/A** | |

| **Type of Debtor**<br>(Form of Organization)<br>(Check one box.) | **Nature of Business**<br>(Check one box.) | **Chapter of Bankruptcy Code Under Which the Petition is Filed** (Check one box) |
| --- | --- | --- |

**Type of Debtor** (Form of Organization) (Check one box.)

- ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*
- ☒ Corporation (includes LLC and LLP)
- ☐ Partnership
- ☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.)

_____

**Nature of Business** (Check one box.)

- ☐ Health Care Business
- ☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)
- ☐ Railroad
- ☐ Stockbroker
- ☐ Commodity Broker
- ☐ Clearing Bank
- ☒ Other

**Airline Parent Company**

**Tax-Exempt Entity**
(Check box, if applicable.)

- ☐ Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code).

**Chapter of Bankruptcy Code Under Which the Petition is Filed** (Check one box)

- ☐ Chapter 7
- ☐ Chapter 9
- ☒ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13
- ☐ Chapter 15 Petition for Recognition of a Foreign Main Proceeding
- ☐ Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding

**Nature of Debts** (Check one box)

- ☐ Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."
- ☒ Debts are primarily business debts.

**Chapter 11 Debtors**

Check one box:
- ☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).
- ☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).

Check if:
- ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,343,300 (amount subject to adjustment on 4/01/13 and every three years thereafter).

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Check all applicable boxes:
- ☐ A plan is being filed with this petition.
- ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(B).

**Filing Fee** (Check one box)

- ☒ Full Filing Fee attached
- ☐ Filing Fee to be paid in installments (applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.
- ☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B.

**Statistical/Administrative Information**

- ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

Estimated Number of Creditors (**on a consolidated basis**)

| ☐ 1-49 | ☐ 50-99 | ☐ 100-199 | ☐ 200-999 | ☐ 1,000-5,000 | ☐ 5,001-10,000 | ☐ 10,001-25,000 | ☐ 25,001-50,000 | ☐ 50,001-100,000 | ☒ Over 100,000 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

Estimated Assets (**on a consolidated basis**)

| ☐ $0 to $50,000 | ☐ $50,001 to $100,000 | ☐ $100,001 to $500,000 | ☐ $500,001 to $1 million | ☐ $1,000,001 to $10 million | ☐ $10,000,001 to $50 million | ☐ $50,000,001 to $100 million | ☐ $100,000,001 to $500 million | ☐ $500,000,001 to $1 billion | ☒ More than $1 billion |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

Estimated Liabilities (**on a consolidated basis**)

| ☐ $0 to $50,000 | ☐ $50,001 to $100,000 | ☐ $100,001 to $500,000 | ☐ $500,001 to $1 million | ☐ $1,000,001 to $10 million | ☐ $10,000,001 to $50 million | ☐ $50,000,001 to $100 million | ☐ $100,000,001 to $500 million | ☐ $500,000,001 to $1 billion | ☒ More than $1 billion |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

(Official Form 1) (4/10)

FORM B1, Page 2

| Voluntary Petition | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case)* | **AMR CORPORATION** |

| All Prior Bankruptcy Case Filed Within Last 8 Years (If more than two, attach additional sheet.) |||
|---|---|---|
| Location Where Filed: **N/A** | Case Number: **N/A** | Date Filed: **N/A** |
| Location Where Filed: **N/A** | Case Number: **N/A** | Date Filed: **N/A** |

| Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet.) |||
|---|---|---|
| Name of Debtor: **American Airlines Realty (NYC) Holdings, Inc.** | Case Number: **As filed** | Date Filed: **November 29, 2011** |
| District: **Southern District of New York** | Relationship: **Wholly-Owned Indirect Subsidiary of AMR Corporation** | Judge: **Undetermined** |

| Exhibit A | Exhibit B |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.) | *(To be completed if debtor is an individual whose debts are primarily consumer debts.)* |
| ☒ Exhibit A is attached and made a part of this petition. | I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by § 342(b). |
| | X _____ Signature of Attorney for Debtor(s)         Date |

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.
☒ No.

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐ Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

☐ Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
(Check any applicable box.)

☐ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☒ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐ Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Certification by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes)

☐ Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐ Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐ Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐ Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(1)).

**(Official Form 1) (4/10)**

FORM B1, Page 3

| Voluntary Petition | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case)* | **AMR CORPORATION** |

## Signatures

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct.<br><br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br><br>[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).<br><br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X_____<br>　Signature of Debtor<br><br>X_____<br>　Signature of Joint Debtor<br><br>_____<br>　Telephone Number (if not represented by attorney)<br><br>_____<br>　Date | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br><br>(Check only **one** box.)<br><br>☐　I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.<br><br>☐　Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.<br><br>X_____<br>　(Signature of Foreign Representative)<br><br>_____<br>　(Printed Name of Foreign Representative)<br><br>_____<br>　Date |

| Signature of Attorney* | Signature of Non-Attorney Bankruptcy Petition Preparer |
|---|---|
| X /s/ Stephen Karotkin<br>　Signature of Attorney for Debtor(s)<br><br>Stephen Karotkin<br>　Printed Name of Attorney for Debtor(s)<br><br>Weil, Gotshal & Manges LLP<br>　Firm Name<br><br>767 Fifth Avenue<br>　Address<br><br>New York, New York 10153<br><br>(212) 310-8000<br>　Telephone Number<br><br>November 29, 2011<br>　Date<br><br>* In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect. | I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.<br><br>_____<br>Printed Name and title, if any, of Bankruptcy Petition Preparer<br><br>_____<br>Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)<br><br>Address<br>_____<br><br>x_____<br><br>_____<br>Date<br><br>Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above.<br><br>Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.* |
| **Signature of Debtor (Corporation/Partnership)**<br><br>I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X /s/ Kenneth W. Wimberly<br>　Signature of Authorized Individual<br><br>Kenneth W. Wimberly<br>　Printed Name of Authorized Individual<br><br>Corporate Secretary<br>　Title of Authorized Individual<br><br>November 29, 2011<br>　Date | |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re                                                      :
                                                          :          **Chapter 11 Case No.**
                                                          :
**AMR CORPORATION,**                                      :          **11- _____ (     )**
                                                          :
                                                          :
                          **Debtor.**                     :
------------------------------------------------------------x

## EXHIBIT "A" TO VOLUNTARY PETITION

     1.     The debtor's securities are registered under Section 12 of the Securities and Exchange Act of 1934 and, the SEC file number is 1-8400.

     2.     The following financial data is the latest available information and refers to the debtor's condition on September 30, 2011 on a consolidated basis with its affiliated debtors and debtors in possession.

    a.    Total assets                          $24,719,000,000

    b.    Total debts (including debts listed in 2.c., below)     $29,552,000,000

    c.    Debt securities held by more than 500 holders.

|  | As of September 30, 2011 | Approximate number of holder |
|---|---|---|
| Secured variable and fixed rate interest due through 2023 (effective rates from 1.00% - 13.00% at September 30, 2011 | $4,577,000,000 | unknown |
| Enhanced equipment trust certificates due through 2021 (rates from 5.10% - 12.00% at September 30, 2011) | $1,985,000,000 | unknown |
| 6.00% - 8.50% special facility revenue bonds due through 2036 | $1,627,000,000 | unknown |
| 7.5% senior secured notes due 2016 | $1,000,000,000 | unknown |
| 6.25% senior convertible notes due 2014 | $ 460,000,000 | unknown |
| 9.0% - 10.20% debentures due through 2021 | $ 214,000,000 | unknown |
| 7.88% - 10.55% notes due through 2039 | $ 173,000,000 | unknown |

Comments: The Debtors have many public debt issues as referenced in their public filings with the Securities and Exchange Commission, including their most recent Form 10-K for the fiscal year ending December 31, 2010; however it is not known if any of those debt issues are held by 500 or more holders as many, if not all, of those securities are held in the name of various nominees.

    d.    Number of shares of preferred stock         0

    e.    Number of shares of common stock     335,227,024 shares outstanding as of October 13, 2011

3.      Brief description of debtor's business:  AMR Corporation is the parent company of various direct and indirect subsidiaries specializing in air transportation services.  AMR's principal subsidiary, American Airlines, Inc., is a major U.S. certificated passenger airline and freight carrier, providing scheduled passenger and freight service to approximately 160 destinations in North America, the Caribbean, Latin America, Europe, and Asia.  In addition, AMR Eagle Holding Corporation, a wholly-owned subsidiary of AMR, owns two regional airlines, American Eagle Airlines, Inc. and Executive Airlines, Inc., which do business as "American Eagle."

4.      List the names of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:  To the best of the Debtors' knowledge and belief, based on publicly filed disclosures, as of October 31, 2011, the  following entities directly or indirectly own, control, or hold 5% or more of the voting securities of the Debtor: PRIMECAP Management Company (12.4%), Capital Global Research Investors (9.3%), Capital World Investors (8.4%), and Asia Mountain Investment Co., Ltd. and certain affiliates (7.3%).

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re : 
: Chapter 11 Case No.
:
AMR CORPORATION, : 11- _____ (     )
:
:
Debtor. :

------------------------------------------------------------x

## CONSOLIDATED LIST OF CREDITORS
## HOLDING 50 LARGEST UNSECURED CLAIMS[1]

       The following is the consolidated list of the creditors of AMR Corporation and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), holding the 50 largest noncontingent unsecured claims as of November 21, 2011.

       Except as set forth above, this list has been prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure and Rule 1007-1 of the Local Rules of Bankruptcy Procedure. This list does not include persons who come within the definition of "insider" set forth in section 101(31) of chapter 11 of the United States Code.

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| WILMINGTON TRUST | WILMINGTON TRUST MICHAEL OLLER MIKEOLLER@WILMINGTONTRUST.COM RODNEY SQUARE NORTH, 1100 NORTH MARKET STREET WILMINGTON, DE 19890 Tel: 302-651-1000 Fax: 302-636-4145 | AMR CORPORATION 6.25% CONVERTIBLE SENIOR NOTES DUE 2014 | | $460,000,000 |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| MANUFACTURERS AND TRADERS TRUST COMPANY | MANUFACTURERS AND TRADERS TRUST COMPANY<br>FARRAH T. WELSH<br>FWELSH@MTB.COM<br>25 SOUTH CHARLES STREET, 11TH FL<br>BALTIMORE, MD 21201<br>Tel: 410-244-3712<br>Fax: 410-244-4236 | ALLIANCEAIRPORT AUTHORITY, INC. SPECIAL FACILITIES REVENUE REFUNDING BONDS 5.25% DUE 2029 | | $357,130,000 |
| MANUFACTURERS AND TRADERS TRUST COMPANY | MANUFACTURERS AND TRADERS TRUST COMPANY<br>FARRAH T. WELSH<br>FWELSH@MTB.COM<br>25 SOUTH CHARLES STREET, 11TH FL<br>BALTIMORE, MD 21201<br>Tel: 410-244-3712<br>Fax: 410-244-4236 | DALLAS FORT WORTH FACILITIES IMPROVEMENT CORP. BONDS 6.375% DUE 2035 | | $199,160,000 |
| WILMINGTON TRUST | WILMINGTON TRUST<br>MICHAEL OLLER<br>MIKEOLLER@WILMINGTONTRUST.COM<br>RODNEY SQUARE NORTH, 1100 NORTH MARKET STREET<br>WILMINGTON, DE 19890<br>Tel: 302-651-1000<br>Fax: 302-636-4145 | AMR PUBLIC INCOME NOTES 7.875% DUE 2039 | | $150,000,000 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| MANUFACTURERS AND TRADERS TRUST COMPANY | MANUFACTURERS AND TRADERS TRUST COMPANY FARRAH T. WELSH FWELSH@MTB.COM 25 SOUTH CHARLES STREET, 11TH FL BALTIMORE, MD  21201 Tel: 410-244-3712 Fax: 410-244-4236 | DALLAS FORT WORTH FACILITIES IMPROVEMENT CORP. REFUNDING BONDS SERIES 5.50% DUE 2030 | | $131,735,000 |
| MANUFACTURERS AND TRADERS TRUST COMPANY | MANUFACTURERS AND TRADERS TRUST COMPANY FARRAH T. WELSH FWELSH@MTB.COM 25 SOUTH CHARLES STREET, 11TH FL BALTIMORE, MD  21201 Tel: 410-244-3712 Fax: 410-244-4236 | DALLAS FORT WORTH FACILITIES IMPROVEMENT CORP. SERIES 1995 6.00% DUE 2014 | | $126,240,000 |
| LAW DEBENTURE TRUST COMPANY OF NEW YORK | LAW DEBENTURE TRUST COMPANY OF NEW YORK GREGG WEISSMAN 400 MADISON AVENUE, 4TH FLOOR NEW YORK, NY  10017 Tel: 212-750-6474 Fax: 212-750-1361 | PUERTO RICO PORTS AUTHORITY SPECIAL FACILITIES REVENUE BONDS, SERIES A 6.25% DUE 2026 | | $115,600,000 |
| THE BANK OF NEW YORK MELLON | THE BANK OF NEW YORK MELLON DARRYL POMYKALA DARRYL.L.POMYKALA@BNYMELLON.COM 1 WALL ST. NEW YORK, NY  10286 Tel: 212-495-1784 Fax: 212-635-1799 | CHICAGO O'HARE INTERNATIONAL AIRPORT SPECIAL FACILITY REVENUE REFUNDING BONDS, SERIES 2007 5.50% DUE 2024 | | $108,675,000 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| MANUFACTURERS AND TRADERS TRUST COMPANY | MANUFACTURERS AND TRADERS TRUST COMPANY FARRAH T. WELSH FWELSH@MTB.COM 25 SOUTH CHARLES STREET, 11TH FL BALTIMORE, MD 21201 Tel: 410-244-3712 Fax: 410-244-4236 | DALLAS FORT WORTH FACILITIES IMPROVEMENT CORP. REFUNDING BONDS SERIES 2000 A3 9.125% DUE 2029 | | $103,000,000 |
| WILMINGTON TRUST | WILMINGTON TRUST MICHAEL OLLER MIKEOLLER@WILMINGTONTRUST.COM RODNEY SQUARE NORTH, 1100 NORTH MARKET STREET WILMINGTON, DE 19890 Tel: 302-651-1000 Fax: 302-636-4145 | AMR DEBENTURES 9.00% DUE 2012 | | $75,759,000 |
| MANUFACTURERS AND TRADERS TRUST COMPANY | MANUFACTURERS AND TRADERS TRUST COMPANY FARRAH T. WELSH FWELSH@MTB.COM 25 SOUTH CHARLES STREET, 11TH FL BALTIMORE, MD 21201 Tel: 410-244-3712 Fax: 410-244-4236 | DALLAS FORT WORTH FACILITIES IMPROVEMENT CORP. REFUNDING BONDS SERIES 2000 A2 9.00% DUE 2015 | | $65,000,000 |
| THE BANK OF NEW YORK MELLON | THE BANK OF NEW YORK MELLON MARY MISELIS MARY.MISELIS@BNYMELLON.COM 101 BARCLAY STREET NEW YORK, NY 10286 Tel: 212-815-4812 Fax: 212-635-1799 | AMR DEBENTURES 9.00% DUE 2016 | | $60,943,156 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| MANUFACTURERS AND TRADERS TRUST COMPANY | MANUFACTURERS AND TRADERS TRUST COMPANY FARRAH T. WELSH FWELSH@MTB.COM 25 SOUTH CHARLES STREET, 11TH FL BALTIMORE, MD  21201 Tel: 410-244-3712 Fax: 410-244-4236 | ALLIANCEAIRPORT AUTHORITY, INC. SPECIAL FACILITIES REVENUE REFUNDING BONDS, SERIES 1991 7.00% DUE 2011 | | $49,525,000 |
| LAW DEBENTURE TRUST COMPANY OF NEW YORK | LAW DEBENTURE TRUST COMPANY OF NEW YORK GREGG WEISSMAN 400 MADISON AVENUE, 4TH FLOOR NEW YORK, NY  10017 Tel: 212-750-6474 Fax: 212-750-1361 | PUERTO RICO PORTS AUTHORITY SPECIAL FACILITIES REVENUE BONDS, 1993 SERIES A 6.30% DUE 2023 | | $39,705,000 |
| U.S. BANK, N.A. | U.S. BANK, N.A. SUSAN MERKER SUSAN.MERKER@USBANK.COM 225 ASYLUM STREET, 23RD FL HARTFORD, CT Tel: 860-241-6815 Fax: 860-241-6897 | PUERTO RICO INDUSTRIAL, MEDICAL, HIGHER EDUCATION AND ENVIRONMENTAL POLLUTION CONTROL FACILITIES FINANCING AUTHORITY, SERIES 1985 6.45% DUE 2025 | | $36,160,000 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| WILMINGTON TRUST | WILMINGTON TRUST MICHAEL OLLER MIKEOLLER@WILMINGTONTRUST.COM RODNEY SQUARE NORTH, 1100 NORTH MARKET STREET WILMINGTON, DE 19890 Tel: 302-651-1000 Fax: 302-636-4145 | AMR DEBENTURES 10.00% DUE 2021 | | $32,162,000 |
| HEWLETT PACKARD | HEWLETT PACKARD MARGARET WHITMAN 3000 HANOVER ST. PALO ALTO, CA 94304 Tel: 650-857-1501 Fax: 650-857-5518 | TRADE DEBT | | $30,862,960 |
| MIAMI DADE COUNTY | MIAMI DADE COUNTY COUNTY CHAIR 111 NW 1ST STREET, SUITE 220 MIAMI, FL 33136 Tel: 305-375-5511 Fax: 305-375-5883 | CLAIMS ADMINISTRATION AGREEMENT | | $25,000,000 |
| ROLLS-ROYCE INC | ROLLS-ROYCE INC JAMES M. GUYETTE 1875 EXPLORER STREET, SUITE 200 RESTON, VA 20190 Tel: 703-834-1700 Fax: 703-709-6086 | TRADE DEBT | | $27,000,000 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| THE BANK OF NEW YORK MELLON | THE BANK OF NEW YORK MELLON TAMMY BAUMGARTEN TAMMY.BAUMGARTEN@BNYMELLON.COM 525 WILLIAM PENN PLACE, 38TH FLOOR PITTSBURGH, PA 15259 Tel: 412-234-4100 | NEW JERSEY ECONOMIC DEVELOPMENT AUTHORITY ECONOMIC DEVELOPMENT BONDS 7.10% DUE 2031 | | $17,855,000 |
| THE BANK OF NEW YORK MELLON | THE BANK OF NEW YORK MELLON MARY MISELIS MARY.MISELIS@BNYMELLON.COM 101 BARCLAY STREET NEW YORK, NY 10286 Tel: 212-815-4812 Fax: 212-635-1799 | AMR DEBENTURES 10.20% DUE 2020 | | $17,525,500 |
| WILMINGTON TRUST | WILMINGTON TRUST MICHAEL OLLER MIKEOLLER@WILMINGTONTRUST.COM RODNEY SQUARE NORTH, 1100 NORTH MARKET STREET WILMINGTON, DE 19890 Tel: 302-651-1000 Fax: 302-636-4145 | AMR DEBENTURES 9.75% DUE 2021 | | $15,700,000 |
| BOEING COMMERCIAL AIRLINES | BOEING COMMERCIAL AIRLINES JIM ALBAUGH 100 NORTH RIVERSIDE CHICAGO, IL 98124 Tel: 312-544-2000 Fax: 312-544-2082 | TRADE DEBT | | $15,305,751 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| THE BANK OF NEW YORK MELLON | THE BANK OF NEW YORK MELLON MARY MISELIS MARY.MISELIS@BNYMELLON.COM 101 BARCLAY STREET NEW YORK, NY 10286 Tel: 212-815-4812 Fax: 212-635-1799 | AMR DEBENTURES 9.88% DUE 2020 | | $7,889,000 |
| WILMINGTON TRUST | WILMINGTON TRUST MICHAEL OLLER MIKEOLLER@WILMINGTONTRUST.COM RODNEY SQUARE NORTH, 1100 NORTH MARKET STREET WILMINGTON, DE 19890 Tel: 302-651-1000 Fax: 302-636-4145 | AMR MEDIUM TERM NOTES, SERIES C 9.20% DUE 2012 | | $7,701,000 |
| HONEYWELL | HONEYWELL DAVID M. COTE 101 COLUMBIA ROAD, MAILSTOP M6/LM MORRISTOWN , NJ 07962 Tel: 973-455-2114 Fax: 973-455-4807 | TRADE DEBT | | $7,678,974 |
| DFW INTERNATIONAL AIRPORT | DFW INTERNATIONAL AIRPORT JEFFREY P. FEGAN P O DRAWER 619428 DFW AIRPORT, TX 75261-9428 Tel: 972-973-5200 Fax: 972-973-5751 | TRADE DEBT | | $7,296,370 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| MANUFACTURERS AND TRADERS TRUST COMPANY | MANUFACTURERS AND TRADERS TRUST COMPANY FARRAH T. WELSH FWELSH@MTB.COM 25 SOUTH CHARLES STREET, 11TH FL BALTIMORE, MD 21201 Tel: 410-244-3712 Fax: 410-244-4236 | DALLAS FORT WORTH FACILITIES IMPROVEMENT CORP. SERIES 2002 8.25% DUE 2036 | | $7,110,000 |
| SKY CHEFS | SKY CHEFS SONDRA LEHMAN 6200 LONGHORN RD IRVING, TEXAS 75063 Tel: 972-793-9000 Fax: 972-793-9738 | TRADE DEBT | | $7,032,964 |
| ALLEGIS GROUP SERVICE INCORPORATED | ALLEGIS GROUP SERVICE INCORPORATED JIM DAVIS 7301 PARKWAY DRIVE HANOVER, MD 21076 Tel: 410-579-3000 Fax: 410-540-7556 | TRADE DEBT | | $6,930,422 |
| CHROMALLOY | CHROMALLOY ARMAND LAUZON 200 PARK AVE NEW YORK, NY 10166 Tel: 212-692-2087 Fax: 212-692-2645 | TRADE DEBT | | $5,648,368 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| CITGO PETROLEUM CORPORATION | CITGO PETROLEUM CORPORATION ALEJANDRO GRANADO AGRANAD@CITGO.COM 1293 ELDRIDGE PARKWAY HOUSTON, TEXAS 77077-1670 Tel: 832-486-4000 Fax: 713-570-5309 | TRADE DEBT | | $5,561,378 |
| WILMINGTON TRUST | WILMINGTON TRUST MICHAEL OLLER MIKEOLLER@WILMINGTONTRUST.COM RODNEY SQUARE NORTH, 1100 NORTH MARKET STREET WILMINGTON, DE 19890 Tel: 302-651-1000 Fax: 302-636-4145 | AMR DEBENTURES 9.80% DUE 2021 | | $5,065,000 |
| FLINT HILLS RESOURCES, LP | FLINT HILLS RESOURCES, LP BRADLEY RAZOOK BRAD.RAZOOK@FHR.COM 1401 ELM STREET, 5TH FLOOR DALLAS, TX 75284-0569 Tel: 316-828-3477 Fax: 316-828-8566 | TRADE DEBT | | $4,318,839 |
| AVIALL DISTRIBUTION SERVICES | AVIALL DISTRIBUTION SERVICES DAN KOMNENOVICH 2750 REGENT BLVD DFW AIRPORT, TX 75261 Tel: 972-586-1000 Fax: 972-586-1361 | TRADE DEBT | | $4,028,277 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| WORLD FUEL SERVICES | WORLD FUEL SERVICES PAUL H. STEBBINS PSTEBBINS@WFSCORP.COM 9800 NW. 41ST, SUITE 400 MIAMI, FL 33178 Tel: 305-428-8000 Fax: 305-392-5600 | TRADE DEBT | | $3,886,383 |
| MIAMI DADE COUNTY AVIATION DEPT | MIAMI DADE COUNTY AVIATION DEPT JOE A. MARTINEZ 4200 NW 36TH ST MIAMI, FL 33142 Tel: 305-876-0939 Fax: 305-876-0948 | TRADE DEBT | | $3,735,216 |
| THE BANK OF NEW YORK MELLON | THE BANK OF NEW YORK MELLON MARY MISELIS MARY.MISELIS@BNYMELLON.COM 101 BARCLAY STREET NEW YORK, NY 10286 Tel: 212-815-4812 Fax: 212-635-1799 | AMR MEDIUM TERM NOTES, SERIES B 10.55% DUE 2021 | | $3,725,000 |
| CITY OF CHICAGO | CITY OF CHICAGO RUFUS WILLIAMS 333 SOUTH STATE STREET CHICAGO, IL 60604-3976 Tel: 773-686-2200 Fax: 312-674-1915 | TRADE DEBT | | $3,481,770 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| ALLIED AVIATION | ALLIED AVIATION<br>ROBERT L ROSE - PRESIDENT<br>462 7TH AVENUE, 17TH FL<br>NEW YORK, NY 10018<br>Tel: 941-312-0303<br>Fax: 941-312-2484 | TRADE DEBT | | $3,422,995 |
| MORGAN STANLEY CAPITAL GROUP | MORGAN STANLEY CAPITAL GROUP<br>STEVE KNOX<br>STEVEN.KNOX@MORGANSTANLEY.COM<br>2000 WESTCHESTER AVENUE<br>PURCHASE, NY 10577<br>Tel: 212-761-4000<br>Fax: 914-225-9301 | TRADE DEBT | | $3,322,781 |
| PETROBRAS DISTRIBUIDORA SA | PETROBRAS DISTRIBUIDORA SA<br>CLAUDIO DISSENHA PORTES<br>RUA GENERAL CANABARRO, 500 - 11 ANDAR MARACANA<br>RIO DE JANEIRO - CEP 22271-900<br>Tel: 55 21 2354 4479<br>Fax: 55 21-3876-4990 | TRADE DEBT | | $3,013,278 |
| BCD TRAVEL USA LLC | BCD TRAVEL USA LLC<br>JOOP DRECHSEL<br>CEO@BCDTRAVEL.COM<br>SIX CONCOURSE PARKWAY NORTHEAST<br>ATLANTA, GA 30328<br>Tel: 678-441-5200<br>Fax: 404-846-3833 | TRADE DEBT | | $2,744,263 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| AIR TOTAL INTERNATIONAL | AIR TOTAL INTERNATIONAL THIERRY DE FEYDEAU THIERRY.DE-FEYDEAU@TOTAL.COM LA DEFENSE CEDEX PARIS, FRANCE 92907 Tel: 33 1 41 35 94 91 Fax: 33 1 41 35 72 21 | TRADE DEBT | | $2,712,890 |
| ROCKWELL INTERNATIONAL | ROCKWELL INTERNATIONAL CLAYTON M. JONES 400 COLLINS ROAD NE CEDAR RAPIDS, IA 52498 Tel: 319-295-1000 Fax: 319-295-1523 | TRADE DEBT | | $2,693,404 |
| ZODIAC, INC. | ZODIAC, INC. OLIVIER ZARROUATI OZARROUARI@ZODIAC.COM ZODIAC - 2, RUE MAURICE MALLET 92130 ISSY-LES-MOULINCAUX - FRANCE Tel: 33 (0) 1041023022060 Fax: 33 (0) 1 41 23 23 10 | TRADE DEBT | | $2,688,513 |
| THE BANK OF NEW YORK MELLON | THE BANK OF NEW YORK MELLON MARY MISELIS MARY.MISELIS@BNYMELLON.COM 101 BARCLAY STREET NEW YORK, NY 10286 Tel: 212-815-4812 Fax: 212-635-1799 | AMR MEDIUM TERM NOTES, SERIES B 10.29% DUE 2021 | | $2,365,000 |

| NAME OF CREDITOR AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE | NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS, INCLUDING ZIP CODE, OF EMPLOYEE, AGENT OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (Trade Debt, Bank Loan, Government Contract, etc.) | C U D S | AMOUNT OF CLAIM (IF SECURED ALSO STATE VALUE OF SECURITY) |
|---|---|---|---|---|
| CARLSON WAGONLIT TRAVEL | CARLSON WAGONLIT TRAVEL DOUGLAS ANDERSON 701 CARLSON WAY, MAIL STOP 82 MINNEAPOLIS, MN 55305 Tel: 800-213-7295 Fax: 763-212-2409 | TRADE DEBT | | $2,510,485 |
| WEBER AIRCRAFT INCORPORATED | WEBER AIRCRAFT INCORPORATED JEFF JOHNSTON JEFF.JOHNSTON@ZODIACAEROSPACE.COM 2000 WEBER DR. GAINESVILLE, TX  76240 Tel: 940-668-4187 Fax: 940-668-4195 | TRADE DEBT | | $2,226,056 |
| EQUILON ENTERPRISES LLC | EQUILON ENTERPRISES LLC PETRA DREYER-DECHER PETRA.DREYER-DECHER@SHELL.COM DEUTSCHLAND OIL GMBH DIA/2 SUHRENKAMP 71-77 D-22284 HAMBURG Tel: 49-40-694-64-367 Fax: 49-40-671-03-897 | PREPAID FUEL SUPPLIERS | | $2,167,973 |

**DECLARATION UNDER PENALTY OF PERJURY:**

       I, the undersigned authorized officer of the corporation named as Debtor in this case, declare under penalty of perjury that I have read the foregoing Consolidated List of Creditors Holding the 50 Largest Unsecured Claims and that the list is true and correct to the best of my information and belief.

Dated: November 29, 2011

/s/ Kenneth W. Wimberly

By:     Kenneth W. Wimberly

Title:  Corporate Secretary

# AMR CORPORATION

## CERTIFICATE OF RESOLUTIONS

I, Kenneth W. Wimberly, solely in my capacity as Corporate Secretary of AMR Corporation (the "**Corporation**"), and not in an individual capacity, hereby certify that the following resolutions were duly adopted at a special meeting of the Board of Directors of the Corporation held on November 28, 2011 in accordance with the requirements of the Delaware General Corporation Law and the Corporation's charter and bylaws, that the attached resolutions are true, complete and correct as they appear, and that these resolutions have not been modified, amended, or rescinded and are still in full force and effect on this date:

<u>Commencement of Chapter 11 Case</u>

RESOLVED, that in the judgment of the Board of Directors of the Corporation, it is desirable and in the best interests of the Corporation, certain of its direct and indirect subsidiaries (the "**Filing Subsidiaries**"), and their respective creditors, employees, and other interested parties that petitions be filed by the Corporation and the Filing Subsidiaries seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

RESOLVED, that the Chairman, the Chief Executive Officer, the President, the General Counsel, the Chief Financial Officer, any other Executive or Senior Vice President, any Vice President (however designated), the Treasurer, the Corporate Secretary, any Assistant Corporate Secretary, and any other person designated and so authorized to act (each, an "**Authorized Officer**") of the Corporation is hereby authorized, empowered, and directed, in the name and on behalf of the Corporation, to execute and verify petitions under chapter 11 of the Bankruptcy Code and to cause the same to be filed in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") at such time as any of the Chief Executive Officer, the General Counsel or the Chief Financial Officer shall determine;

RESOLVED, that the Board of Directors sees no objection to each of the Filing Subsidiaries taking any and all action, including authorizing a filing in the Bankruptcy Court, and to executing and delivering all documents, agreements, motions and pleadings as are necessary, proper, or desirable to enable such Filing Subsidiary to carry out the filing in Bankruptcy Court contemplated hereby;

<u>Retention of Advisors</u>

RESOLVED, that the law firm of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 is hereby employed as attorneys for the Corporation in the Corporation's chapter 11 case, subject to Bankruptcy Court approval;

RESOLVED, that the law firm of Paul Hastings LLP, 875 15th Street, N.W., Washington, DC 20005 is hereby employed as special counsel for the Corporation in the Corporation's chapter 11 case, subject to Bankruptcy Court approval;

RESOLVED, that the law firm of Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022 is hereby employed as special counsel for the Corporation in the Corporation's chapter 11 case, subject to Bankruptcy Court approval;

RESOLVED, that the law firm of Groom Law Group, Chartered, 1701 Pennsylvania Avenue, N.W., Washington, DC 20006 is hereby employed as special counsel for the Corporation in the Corporation's chapter 11 case, subject to Bankruptcy Court approval;

RESOLVED, that the firm of Rothschild Inc., 1251 Avenue of the Americas, 51st Floor, New York, New York 10020 is hereby employed as financial advisor for the Corporation in the Corporation's chapter 11 case, subject to Bankruptcy Court approval;

RESOLVED, that any Authorized Officer is hereby authorized, empowered, and directed to execute and file in the Corporation's chapter 11 case, all petitions, schedules, motions, lists, applications, pleadings, and other papers, and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, financial advisors, and other professionals, and to take and perform any and all further acts and deeds which such Authorized Officer deems necessary, proper, or desirable in connection with the Corporation's chapter 11 case;

General Authorization and Ratification

RESOLVED, that any Authorized Officer is hereby authorized, empowered, and directed, in the name and on behalf of the Corporation, to cause the Corporation to enter into, execute, deliver, certify, file and/or record, and perform, such agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, certificates, or other documents, and to take such other actions that in the judgment of the Authorized Officer shall be or become necessary, proper, or desirable in connection with the Corporation's chapter 11 case; and

RESOLVED, that any and all past actions heretofore taken by any Authorized Officer or the directors of the Corporation in the name and on behalf of the Corporation in furtherance of any or all of the preceding resolutions be, and the same hereby are, ratified, confirmed, and approved in all respects.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of November, 2011.

/s/ Kenneth W. Wimberly
Signature

Kenneth W. Wimberly
Name

Corporate Secretary
Title

# Exhibit 42

**HEARING DATE AND TIME: April 10, 2012 at 2:00 p.m. (Eastern Time)**
**OBJECTION DEADLINE: April 3, 2012 at 4:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

John J. Gallagher*
Scott M. Flicker**
Jon A. Geier**
Neal D. Mollen*
Todd C. Duffield
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
Telephone:  (202) 551-1700
Facsimile:  (202) 551-1705

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                                            :
**In re**                                                   :   **Chapter 11**
                                                            :
**AMR CORPORATION, *et al.*,**                              :   **Case No. 11-15463 (SHL)**
                                                            :
          **Debtors.**                                      :   **(Jointly Administered)**
                                                            :
------------------------------------------------------------X


# NOTICE OF HEARING ON MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. § 1113 AUTHORIZING DEBTORS TO REJECT COLLECTIVE BARGAINING AGREEMENTS

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated March 27, 2012 (the "**Motion**"), will be held before the Honorable Sean H. Lane, United States Bankruptcy Judge, in Room 701 of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), One Bowling Green, New York, New York 10004, on April 10, 2012, at 2:00 p.m. (Eastern Time), or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion (the "**Objections**") must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M-399 (which can be found at http://nysb.uscourts.gov) and (b) by all other parties in interest, on a 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399 and on: (i) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Stephen Karotkin, Esq.), and Paul Hastings LLP, 875 15th Street, N.W., Washington, DC  20005 (Attn: John J. Gallagher, Esq.); (ii) the Debtors, c/o AMR Corporation, 4333 Amon Carter Boulevard, MD 5675, Fort Worth, Texas 76155 (Attn: Kathryn Koorenny, Esq.); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Brian Masumoto, Esq.); (iv) the attorneys for the statutory committee of unsecured creditors, Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Chicago, Illinois 60606 (Attn: John Wm. Butler, Jr., Esq.) and Four Times Square, New York, New York 10036 (Attn: Jay M. Goffman, Esq.); and (v) all

2

entities that requested notice in these chapter 11 cases under Fed. R. Bankr. P. 2002 so as to be received no later than April 3, 2012, at 4:00 p.m. (Eastern Time) (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order filed with the Motion, which order may be entered with no further notice or opportunity to be heard.

Dated: New York, New York
      March 27, 2012

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

John J. Gallagher*
Scott M. Flicker**
Jon A. Geier**
Neal D. Mollen*
Todd C. Duffield

PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
Telephone:  (202) 551-1700
Facsimile:  (202) 551-1705

Attorneys for Debtors
and Debtors in Possession

* admitted *pro hac vice*
* *pro hac vice* admission pending

Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

John J. Gallagher*
Scott M. Flicker**
Jon A. Geier**
Neal D. Mollen*
Todd C. Duffield
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
Telephone:  (202) 551-1700
Facsimile:  (202) 551-1705

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
          :

**In re**          :    **Chapter 11**
          :

**AMR CORPORATION,** *et al.,*    :    **Case No. 11-15463 (SHL)**
          :

    **Debtors.**        :    **(Jointly Administered)**
          :
------------------------------------------------------------X

# MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. § 1113 AUTHORIZING DEBTORS TO REJECT COLLECTIVE BARGAINING AGREEMENTS

* admitted pro hac vice
** pro hac vice admission pending

US_ACTIVE:\43961170\01\14013.0139

TO THE HONORABLE JUDGE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE:

AMR Corporation and its related debtors, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully submit this motion (the "**Motion**") for entry of an order pursuant to section 1113 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") authorizing them to reject nine separate collective bargaining agreements (the "**CBAs**"). In support hereof, the Debtors respectfully represent as follows:

## BACKGROUND
### General

1.     On November 29, 2011 (the "**Commencement Date**"), each of the Debtors commenced a voluntary case under the Bankruptcy Code. The Debtors have continued to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

2.     On December 5, 2011, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors.

### Overview of American Airlines

3.     American Airlines, Inc. ("**American**") is the principal subsidiary of AMR Corporation and was founded in 1934. American is a premier U.S. airline and as of November 1, 2011, American maintained a fleet of over 600 jet aircraft and operated approximately 1,800 scheduled daily departures to approximately 160 destinations throughout North America, the Caribbean, Latin America, Europe, and Asia. American has approximately 65,000 active employees, 70% of whom are represented by one of three labor unions under nine separate CBAs.

4. Further information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Affidavit of Isabella D. Goren Pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the Southern District of New York, sworn to on November 29, 2011 (ECF No. 4).

## JURISDICTION

5. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## RELIEF REQUESTED

6. Pursuant to section 1113(c) of the Bankruptcy Code, the Debtors are seeking entry of an order authorizing them to reject the CBAs between the Debtors and the Allied Pilots Association, the Association of Professional Flight Attendants, and the Transport Workers Union of America, AFL-CIO (collectively, the "**Unions**").

## ACCOMPANYING MEMORANDUM OF LAW

7. The Debtors have contemporaneously filed the Memorandum of Law in support of the Motion, which sets forth the ample authority that exists for the relief requested in this Motion. The Memorandum of Law is divided into five parts: Part One sets forth the principal support of the Motion, Part Two addresses the CBA between the Debtors and the Allied Pilots Association, Part Three addresses the CBA between the Debtors and the Association of Professional Flight Attendants, Part Four addresses the CBAs between the Debtors and the Transport Workers Union in connection with Fleet Service Employees, Dispatch, Ground School and Simulator Instructors, and Simulator Technicians, and Part Five addresses the CBAs between the Debtors and the Transport Workers Union in connection with Mechanics and Related Employees, Stock Clerks and Maintenance Control Technicians. The Motion and the

Memorandum of Law are also supported by various Exhibits and Declarations filed in connection therewith.

## NOTICE

8.      Notice of this Motion has been provided to the Unions and parties in interest in accordance with the Order Pursuant to 11 U.S.C. §§ 105(a) and (d) and Bankruptcy Rules 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures, dated December 23, 2011 (ECF No. 453).  In view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

[*The Remainder of This Page Has Been Intentionally Left Blank*]

9.      No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an Order authorizing the Debtors to reject the CBAs with the Unions and granting such other and further relief as is just.

Dated: New York, New York
       March 27, 2012

                                        _/s/ Stephen Karotkin_____
                                        Harvey R. Miller
                                        Stephen Karotkin
                                        Alfredo R. Pérez

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York  10153-0119
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007


                                        John J. Gallagher*
                                        Scott M. Flicker**
                                        Jon A. Geier**
                                        Neal D. Mollen*
                                        Todd C. Duffield

                                        PAUL HASTINGS LLP
                                        875 15th Street, N.W.
                                        Washington, DC  20005
                                        Telephone:  (202) 551-1700
                                        Facsimile:  (202) 551-1705

                                        Attorneys for Debtors
                                        and Debtors in Possession

                                        * admitted *pro hac vice*
                                        ** *pro hac vice* admission pending

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                                 :
In re                                :           Chapter 11 Case No.
                                                   :
AMR CORPORATION, *et al.*,       :           11-15463 (SHL)
                                                   :
                         Debtors.       :           (Jointly Administered)
                                                   :
------------------------------------------------------------x

### ORDER PURSUANT TO 11 U.S.C. § 1113 AUTHORIZING DEBTORS TO
### REJECT COLLECTIVE BARGAINING AGREEMENTS

Upon the motion, dated March 27, 2012 (the "**Motion**"),[1] of AMR Corporation

and its related debtors, as debtors and debtors in possession (collectively, the "**Debtors**"),

pursuant to section 1113 of title 11 of the United States Code (the "**Bankruptcy Code**"), for an

order authorizing the Debtors to reject the collective bargaining agreements (the "**CBAs**")

between the Debtors and the Allied Pilots Association, the Association of Professional Flight

Attendants, and the Transport Workers Union of America, AFL-CIO, all as more fully described

in the Motion and the accompanying Memorandum of Law; and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334; and consideration of the Motion and the requested relief being a core proceeding the Court

can determine pursuant to 28 U.S.C. § 157(b); and due and proper notice of the Motion having

been provided, and it appearing that no other or further notice need be provided; and the Court

having reviewed the Motion and all other filings and submissions related to the Motion; and the

Court having held an evidentiary hearing related to the Motion, at which testimony was taken;

---

[1]        Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such
terms in the Motion.

and upon all of the filings, submissions, exhibits, and proceedings made to and had before the

Court; and the Court having found and determined that the relief sought in the Motion is in the

best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that pursuant to section 1113(c) of the Bankruptcy Code, the Debtors

are authorized to reject the CBAs; and it is further

ORDERED that the Debtors are authorized to implement and perform under the

terms of the proposals under section 1113 of the Bankruptcy Code, as more fully described in the

Motion, and to take any and all actions that may be reasonably necessary or appropriate to

effectuate the same and perform all obligations contemplated under such proposals; and it is

further

ORDERED that nothing in this Order shall constitute, or be deemed to constitute,

an assumption under section 365 or any other section of the Bankruptcy Code, or a postpetition

re-affirmation, of the CBAs or any other agreement; and it is further

ORDERED that nothing in this Order shall alter the order or priority of any claim

under the Bankruptcy Code or shall convert any prepetition or unsecured claim into a priority

claim, secured claim, postpetition claim, or administrative expense; and it is further

ORDERED that the effect of this Order shall survive the conversion, dismissal,

and/or closing of these chapter 11 cases, the appointment of a trustee herein, the confirmation of

a plan of reorganization, and/or the substantive consolidation of these chapter 11 cases with any

other case or cases; and it is further

2

ORDERED that this Order shall be binding on any subsequent chapter 11 or chapter 7 trustee that may be appointed or elected in these chapter 11 cases or any succeeding chapter 7 case; and is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
[_____], 2012

_____
United States Bankruptcy Judge

# Exhibit 43

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                     :

In re                      :               Chapter 11 Case No.
                      :

AMR CORPORATION, *et al.*,   :              11-15463 (SHL)
                      :

            Debtors.      :               (Jointly Administered)
                      :
-------------------------------------------------------------x

## ORDER PURSUANT TO 11 U.S.C. § 1113
## AUTHORIZING DEBTORS TO REJECT
## THE COLLECTIVE BARGAINING AGREEMENT
## <u>WITH THE ALLIED PILOTS ASSOCIATION</u>

Upon the (a) Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. § 1113

Authorizing Debtors to Reject Collective Bargaining Agreements, dated March 27, 2012 (ECF

No. 2035) (the "**Motion**") and (b) Renewed Motion of Debtors for Entry of Order Pursuant to 11

U.S.C. § 1113 Authorizing Rejection of Collective Bargaining Agreement with Allied Pilots

Association, dated August 17, 2012 (ECF No. 4084) (the "**Renewed Motion**," and the Motion

and the Renewed Motion being referred to herein collectively as the "**1113 Motion**"),[1] all as

more fully described in the 1113 Motion and the pleadings filed by the Debtors in connection

therewith; and the Court having jurisdiction to consider the 1113 Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334 and Amended Standing Order of

Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the 1113 Motion

and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and due

and proper notice of the Motion and the Renewed Motion having been provided, and it appearing

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Renewed Motion.

that no other or further notice need be provided; and hearings (the "**Hearings**") having been held

to consider the relief requested in the Motion and the Renewed Motion and to consider all the

pleadings filed in response thereto; and upon the record of the Hearings; and upon the Court's

Memorandum of Decision, dated August 15, 2012 (ECF No. 4044) with respect to the Motion

(the "**Decision**"); and it appearing that the Debtors have remedied the two defects identified by

the Court in the Decision as demonstrated by the Renewed Motion and at the hearing held with

respect to the Renewed Motion; and upon all of the proceedings had before the Court; and the

Court having found and determined that the relief sought in the Renewed Motion as it relates to

the collective bargaining agreement between the Debtors and the Allied Pilots Association is in

the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the

legal and factual bases set forth in the Renewed Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Renewed Motion is granted as provided herein for the

reasons stated at the hearing held on September 4, 2012; and it is further

ORDERED that pursuant to section 1113 of the Bankruptcy Code, the Debtors are

authorized to reject the collective bargaining agreement with the Allied Pilots Association,

effective as of the date of this Order; and it is further

ORDERED that the Debtors are authorized to take any and all actions that may be

reasonably necessary or appropriate to implement and effectuate the terms of this Order; and it is

further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
September 5, 2012

/s/ Sean H. Lane
United States Bankruptcy Judge

# Exhibit 44

LOA 12-05

# AmericanAirlines®

January 1, 2013

Keith Wilson
President
Allied Pilots Association
14600 Trinity Blvd., Suite 500
Ft. Worth, TX 76155-2512

Subject:     Letter Agreement Re: STL and Other Base Closings

Dear President Wilson:

Pursuant to the order of the United States Bankruptcy Court for the Southern District of New York, dated September 5, 2012, the Company has terminated Supplement CC, but continues to apply certain terms of Supplement CC as non-contractual employment conditions for former TWA Pilots. This letter confirms our agreement concerning the termination of Supplement CC, the planned closure of the STL base, interest arbitration related to that action, and the schedule of any other base closures.

Supplement CC established seniority placement on the Pilots' System Seniority List for TWA pilots, as defined under Section I.D of Supplement CC, and certain preferential flying rights to specific aircraft based at STL associated with those seniority placements. The Company and APA agree that the TWA Pilots' existing seniority placements on the Pilots' System Seniority List are final and shall continue pursuant to Section 13 of the CBA notwithstanding the termination of Supplement CC and any preferential flying rights associated with those seniority placements. The Company and APA agree that a dispute resolution procedure is necessary to determine what alternative contractual rights should be provided to TWA Pilots as a result of the loss of flying opportunities due to termination of Supplement CC and the closing of the STL base.

The Company will have the right, in its sole discretion, to decide whether to close the existing STL pilot base, and such closure and consequences thereof shall not constitute a breach of the CBA. In preparation for closure of the STL pilot base, the Company and APA will engage in final and binding interest arbitration pursuant to Section 7 of the RLA to establish certain terms of the CBA as a substitute for the loss of Supplement CC preferential flying opportunities in order to resolve all issues related to the impact on TWA Pilots of termination of Supplement CC. The interest arbitration will commence within 30 days of the effective date of this agreement and the hearing shall be completed and a final award issued within 90 days of commencement. Within 30 days of issuance of the final award, the Company and APA shall submit to the Board contract language implementing the award and the Board shall within 15 days thereafter issue final approval of such contract language. The Company shall defer closure of the STL base until issuance of a final award and the Company shall have the contractual and legal right to close the STL base upon issuance of and compliance with the award, from which there shall be no reconsideration motions considered and notwithstanding any legal challenges to the award.

LOA 12-05

The interest arbitration panel shall consist of three neutral arbitrators who are members of the National Academy of Arbitrators with Richard Bloch as the principal neutral if he is available and willing to serve. The arbitrators shall decide what non-economic conditions should be provided to TWA Pilots as a result of the loss of flying opportunities due to the termination of Supplement CC and the closing of the STL base, provided that training costs associated with the closure of the base shall be considered non-economic. In no event shall the arbitrators have authority to modify the Pilots' System Seniority List, require the establishment or continuation of any flight operation at any location, or impose material costs beyond training costs on the Company, and any preferential flying rights under the award shall not modify or be deemed a modification of the TWA Pilots' seniority placements on the Pilots' System Seniority List.  The Company and APA shall agree to the procedures and standards governing this arbitration. Assuming he serves as the principal neutral, Richard Bloch shall have continuing jurisdiction to resolve disputes over the implementation and interpretation of the decision by the panel.

The Company also agrees that no pilot base other than STL shall be closed prior to October 1, 2013.

Sincerely,

Laura Einspanier
Vice President – Employee Relations

Seen and agreed:

Keith Wilson
President
Allied Pilots Association

_1 JAN 2013_
Date

# Exhibit 45

**BEFORE THE RAILWAY LABOR ACT**
**BOARD OF ARBITRATION**
**ESTABLISHED PURSUANT TO LOA 12-05**

|  |  |
|---|---|
| **AMERICAN AIRLINES, INC.** | ) |
| | ) |
| | ) **RICHARD I. BLOCH, CHAIR** |
| *and* | ) **STEPHEN GOLDBERG** |
| | ) **IRA JAFFE** |
| **ALLIED PILOTS ASSOCIATION** | ) |
| | ) |
| | ) |
| | ) |

**PRE-HEARING STATEMENT OF THE**
**TWA PILOTS COMMITTEE**

John O'B. Clarke, Jr.
4142 Evergreen Drive
Fairfax, Virginia 22032-1018
(202) 296-8500
jclarke@highsaw.com

Date: April 1, 2013                  Attorney for the TWA Pilots Committee

# BEFORE THE RAILWAY LABOR ACT
## BOARD OF ARBITRATION
## ESTABLISHED PURSUANT TO LOA 12-05

|  |  |  |
|---|---|---|
| **AMERICAN AIRLINES, INC.** | ) | |
| | ) | |
| *and* | ) | **RICHARD I. BLOCH, CHAIR** |
| | ) | **STEPHEN GOLDBERG** |
| **ALLIED PILOTS ASSOCIATION** | ) | **IRA JAFFE** |
| | ) | |
| | ) | |

## PRE-HEARING STATEMENT OF THE
## TWA PILOTS COMMITTEE

This Pre-Hearing Statement is respectfully submitted by the TWA Pilots Committee in support of its position that this Board of Arbitration should establish the parameters of the contract terms that the parties–American Airlines, Inc. ("American" or "AA") and the Allied Pilots Association (APA), with APA acting through its AA Pilots and TWA Pilots Committees–should be instructed to devise "as a substitute for the loss of Supplement CC preferential flying opportunities in order to resolve all issues related to the impact on TWA Pilots of [the] termination of Supplement CC." Joint Exhibit (JEx.) 4 at 1.[1/] Supplement CC was terminated when American exercised the authority given to it by the United States Bankruptcy Court for the Southern District of New York on September 5, 2012, under Bankruptcy Code § 1113 to reject its collective-bargaining agreements (CBAs) with APA, including Supplement CC. American, however, did not exercise that authority completely, for it did not reject the seniority placements Supplement CC had devised. Rather, it

---

[1/]     JEx. 4 is LOA 12-05, the Letter of Agreement which called for the creation of this Board.

rejected the fence provisions Supplement CC had imposed to protect the interests of TWA Pilots that the list itself did not protect–and in fact harmed. In particular, American abrogated Supplement CC's requirement that it maintain a certain level of flying out of its base in St. Louis, Missouri (STL), which was reserved for TWA Pilots.

This Board has been given the authority to devise substitute provisions to protect the TWA Pilots. It should exercise that authority by instructing the parties to devise within the thirty-day period LOA 12-05 contemplates for the drafting of contract language, contractual provisions that replicate insofar as practicable the preferential flying opportunities Supplement CC's STL base provisions provided for TWA Pilots: provisions that mitigated some of the inequities inherent in the seniority placements Supplement CC devised to protect AA Pilots at the expense of TWA Pilots. When it abrogated other aspects of Supplement CC, American retained that list with its inequities, and LOA 12-05 has instructed this Board it may not reorder those placements. The preferential flying rights, which the TWA Pilots are asking this Board mandate, should include, as Supplement CC provided, the designation of Captain and First Officer line positions in a number and on the type of equipment comparable to those the drafters of Supplement CC acknowledged the TWA Pilots brought to American, which reserved positions are to be awarded to TWA Pilots based on their relative order amongst themselves–*i.e.*, "Prior Rights." Those contractual terms should also include, as preferential bidding rights, the ability of TWA Pilots to bid amongst themselves for vacancies reserved for TWA Pilots, monthly schedules for those positions, vacations, and similar quality of life options now that their flying will no longer be located out of a base reserved for them. Both forms of contractual protections were provided by Supplement CC; they are feasible today even

# Exhibit 46

In the Matter of the Arbitration Between
_____

American Airlines Inc.

      And

Allied Pilots Association
and its AA and TWA Pilot Committees
_____

Hearings held on April 11 and 12, May 9, 10, 14 and 15, and June 24, 2013

<u>Before the Arbitration Panel:</u>

      Richard I. Bloch, Esq., Chair
      Stephen B. Goldberg, Esq., Member
      Ira F. Jaffe, Esq., Member

APPEARANCES:

      For American Airlines:

            Thomas E. Reinert, Jr., Esq.
            P. David Larson, Esq.
            (Morgan, Lewis & Bockius, LLP)
            Michelle A. Peak, Esq.
            (Senior Attorney, American Airlines, Inc.)

      For the Allied Pilots Association:

            Edgar N. James, Esq.
            (James & Hoffman, P.C.)

      For the APA AA Pilots Committee:

            Wesley G. Kennedy, Esq.
            (Allison, Slutsky & Kennedy, P.C.)

      For the APA TWA Pilots Committee:

            John O'B. Clarke, Jr., Esq.
            (Highsaw, Mahoney & Clarke, P.C.)

Seen and Agreed:
  /s/
Keith Wilson       Date   <u>1 Jan, 2013</u>
President
Allied Pilots Association[5]

As reflected in the initial paragraph of the LOA, it concerns the termination of

Supplement CC, the Company's planned closure of the St. Louis base, and the dispute settlement

procedure—an "interest arbitration"[6] that will "determine what alternative contractual rights

should be provided to TWA Pilots as a result of the loss of flying opportunities due to

termination of Supplement CC and the closing of the STL base."[7]

The intended product of this arbitration is described briefly in the second and third

paragraphs of LOA 12-05.  The second paragraph reflects the contracting parties' agreement that

the dispute resolution procedure should determine "what alternative contractual rights" should

be provided TWA pilots due to the loss of flying opportunities associated with terminating

Supplement CC and closing the St. Louis base.  This concept is repeated in the third paragraph,

which refers to the arbitration process establishing certain contractual terms "as a substitute for

the loss" of the preferential flying.  Informed by these negotiated terms, the Panel does not seek

to re-establish, reproduce or replicate Supplement CC or its customized preferences.  Given the

termination of that document and the impending St. Louis base closing, that effort would be

both fruitless and contrary to the manifested intent of LOA 12-05, which is to determine

"alternative" rights and to "substitute" for the lost preferential flying opportunities.

The Panel has been given substantial (albeit not unfettered) leeway in creating

substitutes and protections for the former TWA pilots' loss of preferential flying rights at STL.

Where appropriate, the terms of Supplement CC are relevant and provide a useful guide to

inform the structure of our determination of substitute rights and protections.  We decline,

---

[5] Jt. Exhibit 7.
[6] As distinguished from a "rights arbitration," which  seeks to interpret and apply existing contract terms,
the product of an "interest arbitration" is new terms and conditions of employment.
[7] *Id.*

Case 1:02-cv-02917-JEI   Document 569-7   Filed 08/22/13   Page 212 of 236 PageID: 18505
American Airlines and APA and the APA TWA Pilots Committee and                              Page 6 of 20
the APA AA Pilots Committee (LOA 12-05)

however, to incorporate wholesale those terms in our Award in situations in which changed

circumstances suggest that a different approach is more appropriate.

LOA 12-05 incorporates substantial restrictions.  Among these, none is more clear than

that "the TWA Pilots' existing seniority placements on the Pilots' System Seniority List are final

and shall continue…" and the related mandate that "In no event shall the arbitrators have

authority to modify the Pilots' System Seniority List…."  Thus, while the TWA pilots have

vigorously urged the Panel to respond to what they characterize as inequitable and oppressive

results visited upon them by the 2001 seniority integration, the LOA unequivocally precludes

any result that would alter seniority placements on the Pilots' System Seniority List.  Other

restrictions include the mandate that our newly prescribed conditions be "non-economic," such

that there be no "material costs beyond training" to the Company.  Finally, LOA 12-05

incorporates the agreement that nothing in this Award shall "require the establishment or

continuation of any flight operation at any location…."[8]

In recognition of what we regard as a unique process[9], the Arbitration Panel adopted an

interactive approach. In addition to our conducting four day-long hearings for the taking of

evidence and presentation of argument, affected pilots were invited to appear in Washington,

DC and St. Louis to describe the personal impact on them of the loss of Supplement CC and the

St. Louis base.   Written submissions from a large number of pilots were also received by the

Panel.  During the course of the proceedings, the Panel issued "Panel Suggestions Regarding

Post-Hearing Submissions" that contained the Panel's preliminary reactions to the evidence and

arguments submitted at the first two days of hearing. We did this in an effort to foreclose

additional presentations on positions the Panel had concluded, on the basis of the evidence and

---

[8] *Id.*

[9] For purposes of the presentations, and in recognition of starkly differing interests within the bargaining unit, APA delegated its advocacy position in this case to two committees composed of the former TWA pilots and the AA pilots, respectively.  APA takes no position on the substantive positions submitted by the respective committees.

arguments, would not be compelling.[10]  The parties also participated in extensive mid-hearing

mediation sessions in an effort to narrow the scope of the disputed issues.  While those efforts

did not resolve all outstanding differences, the parties were able to modify their positions to

some extent and to present revised positions to the Panel for its ultimate review and response.

At the Panel's invitation, closing statements were submitted both orally and by written briefs,

and our final award was presented to the advocates for their review and response prior to its

release.

The result of all of this, we believe, has been a process that has allowed us to balance, to

the best of our abilities, the competing equitable and contractual concerns of the respective pilot

groups and of the Company.  Predictably, this is a decision that will not please all affected

parties.  However, it is one that, in our judgment, best responds to the charged task of

substituting for the loss of the St. Louis preferential flying opportunities in light of the respective

needs of the parties to this dispute.

## Our Award

Supplement CC guaranteed flying opportunities for many former TWA pilots whose

AA system seniority was insufficient to hold a Captain (CA) position by reserving to those

---

[10] See May 24, 2013 Memo from the Panel to the advocates, which stated, in part:

> Dear Counsel:
>
> At the close of the May 10, 2013 hearing, we requested input from the parties by
> way of post-hearing submissions.  At that time, we also suggested that, in view of the
> compressed time frame and the expressed desire on the part of all parties for an
> expedited resolution, it would be helpful for us to indicate to you some issues on which
> we would welcome your thoughts and input.
>
> Consistent with our wish to receive guidance from you, we also think it
> appropriate to give you preliminary reactions to the evidence and arguments
> submitted thus far, with full recognition that final summaries are yet to come and that
> our ultimate decision will not be made until the full record has been completed and
> closed.
>
> In requesting that the parties focus on these issues, we do not seek to foreclose
> any and all thoughts you may have on any issues that have been presented.  Our hope,
> however, is that input by us at this stage will serve both to focus the dialogue between
> the parties and the Panel and, indeed, to inspire additional discussions among the
> parties.

the Parties agreed to this interest arbitration process to devise appropriate substitute

protections as alternatives to the lost Supplement CC flying rights.

   As noted previously, it is neither feasible nor expected that the rights provided in this

arbitration would precisely track the provisions of Supplement CC.  The movement of the

protected flying from STL to other domiciles, changes in the makeup of the fleet, the ability,

given the passage of time, of former TWA pilots to hold CA and Category IV FO positions,

and other matters require that we craft substitute arrangements that will appropriately

substitute for the lost Supplement CC rights while, at the same time complying with both the

express limitations in LOA 12-05 and the need to minimize adverse effects upon the flying

rights of AA pilots and to avoid interfering with the Company's operation of the airline.

Complicating this daunting task is the fact that Supplement CC is, in certain areas,

imprecise.  While it is not necessary for this Panel to resolve all such ambiguities, they have

been factored into our analysis as to what constitutes a reasoned and equitable substitute for

the loss of Supplement CC protections.

   In the process of fashioning substitute protections, we have addressed a variety of

questions, including the following: 1) What is the amount of protected CA and FO fenced

flying to be provided former TWA pilots?; 2) Shall the restrictions on the rights of the former

TWA pilots to bid on Large Wide Body ("LWB") flying be continued?; 3) What types of

aircraft are to be fenced?; 4) Are there new preferences for STL based flying that may exist

after the date of this Award?; 5) What is the nature of the new fences?; and 6) What should

be the duration of the protections provided by this Award?  We also address additional, less

significant, but nonetheless important, conditions.

   While these items will be addressed seriatim, it is important to note that, in

fashioning the Award in this case, all elements have been considered in their totality in the

context of the lost Supplement CC protections.  While we believe each component is fair and

equitable, some would have been provided under Supplement CC had it not been abrogated,

others are narrower than would have been the case had Supplement CC survived.  Still

others mirror those that would have been provided under Supplement CC.  This is

intentional since, again, it is the totality, in light of both the current and the predicted

operating environment, that is critical to our endeavors.

It also should be noted that, while only certain portions of the Parties' arguments and

proposals are referenced in this Opinion and Award, the Panel has carefully reviewed all the

record evidence provided during this proceeding prior to issuing its ruling.

1) <u>The Amount of Protected CA and FO Flying</u>

The presentations of the Parties have identified the following issues regarding the

amount of protected CA and FO flying: a) the initial number of protected NB and SWB CA

positions to be protected; b) whether the initial number of protected NB and SWB CA

positions are to remain fixed or are to increase or decrease in number based upon overall

flying or some other metric; c) whether FO flying is also to be protected, and if so, in what

fashion; and d) the adjustments to these numbers, if any, that are appropriate based upon

such factors as STL preferential flying, changes in the number of SWB aircraft, and LWB FO

positions or Category I CA positions that former TWA pilots bid with the use of their system

seniority.

On September 7, 2012, when Supplement CC was abrogated and the Company

advised APA it was going to close STL as a pilot base, the total number of  Supplement CC

protected CA positions in STL consisted of 260 NB Captains and 86 SWB Captains.  The

Company and APA agreed, as an interim measure, that the provisions of Supplement CC

would continue until issuance of this  Panel's Award.

The Panel concludes that the initial number of protected NB CA positions should be

260 and the initial number of protected SWB CA positions should be 86.  Continuation of

these existing numbers will best preserve the protections provided the former TWA pilots

without diminishing flying rights of AA pilots.  The Panel is not persuaded these numbers

Case 1:02-cv-02917-JEI   Document 569-7   Filed 08/22/13   Page 216 of 236 PageID: 18509
American Airlines and APA and the APA TWA Pilots Committee and                    Page 11 of 20
the APA AA Pilots Committee (LOA 12-05)

should increase if the overall amount of NB and SWB flying performed by the Company

increases.

Like Supplement CC, the Panel provides preference to the former TWA pilots to hold

FO positions in the same numbers and equipment and at the same locations as there are

fenced TWA CAs flying.  Given the nature of the fences, however, we do not link the flying to

be done by the former TWA FOs to the flying selected by the former TWA pilots who obtain

fenced CA positions.  Rather, like the former TWA pilots who hold fenced CA positions, the

former TWA pilots exercising preference to hold fenced FO positions will use their system

seniority to select flying as FOs.

### 2) Restrictions on the Ability of Former TWA Pilots to Use System Seniority to Bid Large Wide Body Positions

Supplement CC limits the ability of former TWA pilots to use their system seniority

to bid into LWB aircraft in either CA or FO positions.  The Parties disagree with respect to

allowing bids into LWB FO positions.  The TWA Pilots Committee urges that bids into LWB

FO positions be allowed unconditionally.  The AA Pilots Committee proposes that if former

TWA pilots are permitted to bid into LWB FO positions using their system seniority, then

any LWB FO positions bid by former TWA pilots be counted as a CA position since the

positions are comparable in terms of pay to a CA position.

The Panel concludes that the former TWA pilots should be permitted to use their

seniority to bid for and hold LWB FO positions, but that any such positions successfully bid

by any former TWA pilots should be counted towards the fenced NB CA guarantees.  To be

sure, the opportunity to use system seniority to bid an LWB FO position did not exist under

Supplement CC.  While the Panel's role pursuant to LOA 12-05 is to address the loss of flying

opportunities to the former TWA pilots resulting from the abrogation of Supplement CC, the

harm resulting from the abrogation of Supplement CC must be viewed *in toto* and must

include appropriate consideration by this Panel of not only benefits bestowed upon the

Case 1:02-cv-02917-JEI   Document 569-7   Filed 08/22/13   Page 217 of 236 PageID: 18510
American Airlines and APA and the APA TWA Pilots Committee and                      Page 15 of 20
the APA AA Pilots Committee (LOA 12-05)

5) The Location and Nature of Fenced Flying

All parties accept that the former STL fences are to be replaced by fenced flying at other bases of the Company's choosing. The TWA Pilots Committee prefers that the fences be located at a "virtual" base, which would have no physical reality. The Panel, however, rejects that approach as a leap into the unknown, presenting a host of unanswered logistical and operational questions. Accordingly, we direct the parties to establish fenced flying at bases to be determined by the Company, and to provide former TWA pilots at those bases with the flying to which they are entitled under this Award.

The manner in which fenced flying at the various bases is to be administered was a matter of considerable dispute. The final position of the TWA Pilots Committee and the Company was to assign flying to each of the fenced operations at the same domicile or base in a "random" fashion, thus ensuring an unbiased allocation of flying to each side of the fence – former TWA and AA. Thereafter, separate selections from that flying would take place on each side of the fence, with selections based on system seniority. This approach would protect the "quality of life" of the former TWA pilots.

The Panel recognizes these concerns, but is ultimately not convinced the fences should extend beyond guarantees to the seat and equipment. The Panel understands that the most senior former TWA pilots were previously able to use their seniority to select more desirable trip pairings and days off when all of the fenced flying was located in STL. The movement of the fenced flying to multiple domiciles changes that equation significantly and the rights of the AA pilots militate against extending the Supplement CC guarantees beyond fenced guarantees at new locations and the ability to fly in particular equipment and seats.

The use of system seniority with respect to the selection of flying (whether under a preferential bidding system or under the more traditional scheduling system now in effect) will be simpler to implement than the various alternatives crafted by the TWA Pilots Committee or the Company and will require fewer exceptions to the provisions of the

collective bargaining agreement.  Further, the ability of the former TWA pilots to obtain

preferred flying opportunities, preferred days off, priority in obtaining additional flying that

becomes available after the monthly schedules have been bid, and the like, at the domiciles

where the Company places the fenced flying, will increase over time as the system seniority

of those pilots increases.

The proposal to randomly assign flying to one side of the fence or the other would

result, in our view, in a number of inequities.  First, as proposed, all the FO reserve flying

would be placed on the "AA" side of the fence.  This would have the effect of both forcing

such generally less desirable flying wholly onto the more senior AA pilots and also deprive

the former TWA pilots from selecting reserve FO positions if they were desired by any

individual former TWA pilot.  Second, random allocation does not necessarily mean

equitable allocation.  Over the long run one may expect a random distribution to yield

proportionate allocations of flying, but during any particular bid period the results may be

inequitable.  Third, an approach that requires fewer modifications to the AA-APA Agreement

is preferable to one requiring greater modification.  Fourth, the Award in this case will foster

greater integration of the pilot groups.  Not only will these pilots be flying out of the same

domicile, but the selection of FO flying will be done independent of CA selection and by

seniority as well, resulting in increases in the number of flights in which the CA and the FO

are from different groups.  Once the fences have converted to equipment and seat fences,

rather than solely geographic fences, this too, is desirable.  Once the fences are no longer in

effect, flying will be truly merged between the two pilot groups.

6) Duration of the Fenced Flying

The alternative protections provided by this Award shall continue in effect for the

same period as the current AA-APA Agreement.  These protections may not be amended

prior to January 1, 2019, and may be changed thereafter only in accord with the procedures

for changing the terms of the AA-APA Agreement as set forth in that Agreement and the

Railway Labor Act.

The existing Duration provisions of Supplement CC, however, are also to be

continued.  All guarantees and preferences related to SWB (B-757 or B-767) positions will

end as of the date Morgan Fischer has sufficient seniority to hold a four-part bid status as CA

on one of those aircraft types.  All such guarantees and preferences related to the NB CA

positions (MD-80 or Airbus Category II domestic aircraft) will end as of the date that

Magnus Alehult has sufficient seniority to hold a four-part bid status as CA on "any aircraft",

including a Category I aircraft.

Summarizing, the guarantees and preferences provided for pursuant to this Award

will end upon the earlier of pilots Fischer/Alehult having sufficient seniority to hold four-

part bid status as CA in the SWB/NB (including, for the latter, Category I) aircraft

respectively or the date under which AA and APA have reached agreement to change or

eliminate those guarantees and preferences following January 1, 2019.

7) Other Items

- There will be no system flush following the date on which the guarantees and
  preferences provided for in this Award end.  Rather, all openings will
  thereafter be filled in accord with the procedures contained in the applicable
  AA-APA Agreement.

- The Company shall retain the right to locate "fenced" flying based on
  operational considerations.  The provisions of LOA 12-05 recognize the
  Company's rights in that regard and the Company's proposals regarding
  allocation of fenced flying to its five cornerstone bases (DFW, MIA, LAX,
  ORD, and NY (JFK/LGA)) is understood by the Panel to reflect its current
  judgment as to the most appropriate locations to place fenced flying based
  upon current operational needs.

# Exhibit 47

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN KRAKOWSKI, | ) | |
| KEVIN HORNER, and | ) | |
| M. ALICIA SIKES, individually, and | ) | |
| on behalf of those similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No:    4:13-cv-00838 JAR |
| | ) | |
| AMERICAN AIRLINES, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALLIED PILOTS ASSOCIATION, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION TO TRANSFER [DOC. NO. 12]

Plaintiffs submit this memorandum in opposition to the motion to transfer filed by Defendants American Airlines, Inc. ("American") and Allied Pilots Association ("APA").

### I.     Overview.

This is a convenient forum for the parties, and there is no good reason to transfer the case to the Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). American is expected to **exit** bankruptcy later this summer,[1] and Plaintiffs do not even seek monetary relief that could impact the bankruptcy

---

[1]     One of American's bankruptcy lawyers told the Bankruptcy Court at a hearing on June 13, 2013 that the debtors "anticipated exit from bankruptcy later this summer." *See* the transcript excerpts attached as Exhibit 1, p. 10, lines 8-9.

positions in the same or related litigation."). And even if not estopped, Defendants'
arguments for transfer have no merit.

## II.   Argument.

### A.   This case is distinct from *Krakowski I*.

Defendants' principal argument is that this case is "virtually identical" to
*Krakowski I*, and should thus be transferred to the Bankruptcy Court for the same
reasons that case was transferred in March. *Doc. No. 12*, p. 2. Later in their brief,
they even go so far as to claim that Plaintiffs "are now making the identical breach of
the duty of fair representation and collusion allegations that the New York Bankruptcy
Court is poised to address in connection with a fully-briefed and argued motion to
dismiss in the pending *Krakowski I* proceeding." *Id.*, p. 8. This claim borders on
frivolous. Other than the identity of the parties, and some shared factual background,
the cases are wholly distinct.

In *Krakowski I*, Plaintiffs challenge the remedy limitation Defendants included
in an arbitration agreement they entered into in February 2012 relative to the closure
of American's base in St. Louis, which closure will negatively impact the 650 former
TWA pilots based here. A copy of the Complaint in *Krakowski I* is attached as Exhibit
3. This case, however, has nothing to do with that arbitration agreement, or the
closure of the St. Louis base.

In this case, Plaintiffs challenge the legality of the discriminatory seniority list
Defendants implemented in January 2013 as part of the new collective bargaining

agreement they entered into in December (events which took place 7 months *after Krakowski I* was filed in May 2012).

The new list mirrors the grossly unfair list created by Defendants when American acquired TWA in 2001. Defendants only escaped liability then because APA had no duty to represent the former TWA pilots at that time (they were represented by a different union).[2] This, however, was not the case in December 2012 when the new collective bargaining agreement was entered into. The former TWA pilots, now American pilots, are all represented by APA, and APA is obligated to fairly represent all of its members without hostile discrimination to any of them.

Plaintiffs claim that APA breached its duty of fair representation by implementing a new seniority list which mirrors the list created in 2001, a list APA has admitted was unfair. As for American, Plaintiffs claim that American breached the new collective bargaining agreement in failing to order the list according to the specific terms of the agreement.

These claims are completely different than the claim pursued in *Krakowski I*, and the mere fact that *Krakowski I* was transferred to the Bankruptcy Court is no reason to now transfer this case. The contract at issue in this case, which was breached by American and the product of unfair representation by APA, ***did not even exist*** when *Krakowski I* was filed.

---

[2]     As APA's Merger Committee Chairman gloated at the time: "We f—ed you [TWA pilots], because we could."

-4-

Contrary to Defendants' glib assertions, Plaintiffs do not bring this case to "hedge their bets" against an unsuccessful outcome in *Krakowski I*, or to "end-run" this Court's prior transfer Order. *Id*. This is a new case based on new misconduct completely distinct from the conduct at issue in *Krakowski I*. And Plaintiffs have every right to seek to vindicate their rights in this case in an appropriate forum of their choosing – St. Louis.

**B.** **There are no "efficiencies" to be gained by transferring the case to the Bankruptcy Court.**

In an effort to fit this case within the relevant case law, Defendants argue that transfer to the Bankruptcy Court will promote "efficiency." In support, they point out that the Court transferred *Krakowski I* because the Bankruptcy Court was "completely familiar with the facts and evidence pertaining to the issues raised by plaintiffs." Defendants claim this case should be transferred "for the same reasons." *Doc. No. 12*, p. 7. However, those reasons do not exist here.

No claim or argument of any kind has been made in the Bankruptcy Court relative to the subject of this case – the new seniority list implemented in January 2013. In fact, the Bankruptcy Judge had no knowledge of Plaintiffs' claims until he inquired of Plaintiffs' counsel at the June 13 hearing on Defendants' motions to dismiss *Krakowski I*. *See* Exhibit 1, pp. 58-59. Thus, it cannot be argued or concluded that the Bankruptcy Court is "completely familiar" with Plaintiffs' claims in this case. That court is not familiar with Plaintiffs' claims, and this factor provides no basis for finding any supposed "efficiency" in transferring the case to the Bankruptcy Court.

Transferring this case to the Bankruptcy Court is not "in the interest of justice"—rather, it would be a perversion of fairness, an attempt by Defendants to put a thumb on the scale against a group of pilots it has already wronged.

## III.   <u>Conclusion.</u>

For the foregoing reasons, and in accordance with the above-cited authorities, the Court should deny Defendants' motion to transfer.

Respectfully submitted,

GREEN JACOBSON, P.C.

By:  /s/ Allen P. Press
Allen P. Press   MO #39293
Bradley P. Schneider MO #58484
7733 Forsyth Boulevard, Suite 700
St. Louis, Missouri 63105
Telephone: (314) 862-6800
Facsimile: (314) 862-1606
press@stlouislaw.com
schneider@stlouislaw.com
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a true and correct copy of the foregoing was served this 20th day of June, 2013 by ECF filing on the following counsel of record:

George O. Suggs
Schuchat, Cook & Werner
1221 Locust Street, Second Floor
St. Louis, Missouri 63103

David H. Luce
Carmody MacDononald, P.C.
120 South Century Ave., Suite 1800
St. Louis, Missouri 63105

/s/ Allen P. Press

-11-

# Exhibit 48

Allen P. Press - *pro hac vice*
GREEN JACOBSON, P.C.
7733 Forsyth Blvd., Suite 700
Clayton, Missouri 63105
Telephone: (314) 862-6800
Fax: (314) 862-1606
press@stlouislaw.com
Attorneys for Plaintiffs

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re: AMR CORPORATION, et al.,        Case No. 11-15463
                    Debtor.        Chapter 11

-----------------------------------------------------------x

JOHN KRAKOWSKI, KEVIN HORNER and
M. ALICIA SIKES, individually and on
behalf of those similarly situated,

               Plaintiffs,

v.                              Adv. Proceeding No.

AMERICAN AIRLINES, INC., et al.,      13-01283-shl

               Defendants.

-----------------------------------------------------------x

# PLAINTIFFS' COMBINED RESPONSE TO THE
# MOTIONS TO DISMISS FILED BY DEFENDANTS

Instead, it illustrates that the Class' statutory rights were not in issue because there was ***no modification of the status quo***" after Supplement CC took effect in April 2002. *Bensel,* 387 F.3d at 316 (emphasis added).

The current Plaintiffs' claims against APA are vastly different than the *Bensel* plaintiffs' claim in 2002. This is not a case were there was "nothing to negotiate," and the "status quo" was in place, as in the *Bensel* case. In this case, APA negotiated and agreed with American to change the status quo, and unfairly treat the former TWA pilots in the process. That actual negotiation and agreement forms the basis of Plaintiffs' claim against Defendants. Plaintiffs specifically allege that APA acted in bad faith, and in an arbitrary and discriminatory manner towards the former TWA pilots in reaching its new agreement with American. Those claims and allegations are vastly different than those alleged in the *Bensel* case, and the judgment entered for APA in that case thus has no preclusive effect in this case. Judge Ross ruled accordingly in rejecting this same argument:

> Plaintiffs specifically allege that APA acted in bad faith, and in an arbitrary and discriminatory manner towards the former TWA pilots in reaching its new agreement with American. Because the instant case involves a new and different collective bargaining agreement than the one at issue in <u>Bensel</u>, the Court finds the judgment entered for APA in <u>Bensel</u> has no preclusive effect in this case. APA's res judicata and collateral estoppel arguments will, therefore, be denied.

March 4, 2013 Memorandum and Order, p. 6. This is still the case, and Defendants' res judicata and collateral estoppel arguments should again be denied.

## VI.   CONCLUSION.

For the foregoing reasons, and in accordance with the above-cited authorities, the Court should deny Defendants' motions to dismiss.

  Dated:        May 31, 2013.

                                GREEN JACOBSON, P.C.

                          By:  /s/ Allen P. Press
                                Allen P. Press (pro hac vice)
                                7733 Forsyth Blvd., Suite 700
                                Clayton, Missouri 63105
                                Phone: 314-862-6800
                                Fax: 314-862-1606

                                Attorneys for Plaintiffs

-17-

# Exhibit 49



**Portfolio Media. Inc.** | 860 Broadway, 6th Floor | New York, NY 10003 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# AMR Judge Wants DOJ Suit Info Before OK'ing Ch. 11 Plan

By **Natalie Rodriguez**

Law360, New York (August 16, 2013, 4:29 PM ET) -- At a Thursday confirmation hearing for restructuring American Airlines Inc.'s parent, a New York bankruptcy judge requested extra briefs be filed within eights days on how a recent U.S. Department of Justice suit opposing the company's merger with US Airways Group Inc. could impact those plans

Judge Sean Lane asked for supplemental briefs from counsel for AMR Corp., as well as the creditors committee, on how the DOJ's suit can impact the confirmation of the bankrupt company's reorganization plan, a representative for American told Law360 on Friday. The judge's approval is a linchpin to American's proposed $11 billion merger with US Airways.

**At Thursday's hearing**, all objections to the restructuring plan were withdrawn, settled or overruled, except for a portion of the U.S. Trustee's Office that will be taken under advisement by the court, John Wm. Butler Jr., a Skadden Arps Slate Meagher & Flom LLP attorney representing the creditors, told Law360. The Trustee's Office is partly objecting to plans for a **$20 million payment** to outgoing American CEO Tom Horton and to certain proposed reimbursements for creditor committee members.

The post-hearing briefs and a proposed confirmation order will be filed by Aug. 23, and the judge will consider entering the order at an omnibus hearing on Aug. 29, Butler said.

"While we await the court's decision on our plan of reorganization, we will continue to proceed with the legal process to challenge the DOJ complaint in federal court. As we continue to build an airline that is profitable and successful, we will continue planning for our proposed merger with US Airways with teams of talented people committed to the long -term success of the new American," Mike Trevino, an American Airlines spokesman, said in a statement emailed to Law360.

On Tuesday — **just two days before the confirmation hearing** — the DOJ and attorneys general from six states and the District of Columbia **filed the suit in Washington federal court**. They contend the merger, which would create the world's largest airline by passenger volume, would curb competition in key U.S. hubs and lead to higher fares, according to court documents.

"If this merger goes forward, even a small increase in the price of airline tickets, checked bags or flight change fees would result in hundreds of millions of dollars of harm to American consumers," Bill Baer, assistant attorney general in charge of the DOJ's antitrust division, said in a statement.

Stephen Karotkin of Weil Gotshal & Manges LLP said at the Thursday hearing that American was disappointed with the DOJ suit and that the airline intends to mount a

vigorous defense to complete the merger as proposed. Both AMR and the DOJ have said that they **are not seeking a settlement** in the antitrust suit.

AMR filed for bankruptcy in 2011 and announced its merger with US Airways earlier this year.

The creditors are represented by Jay M. Goffman, John Wm. Butler Jr., Albert L. Hogan III, John K. Lyons and Felicia Gerber Perlman of Skadden Arps Slate Meagher & Flom LLP.

AMR is represented by Harvey R. Miller, Stephen Karotkin and Alfredo R. Perez of Weil Gotshal & Manges LLP.

The case is In re: AMR Corp., case number 1:11-bk-15463, in the U.S. Bankruptcy Court for the Southern District of New York.

--Additional reporting by Drew Singer, Liz Hoffman and David McAfee. Editing by Rebecca Flanagan.

All Content © 2003-2013, Portfolio Media, Inc.

# Exhibit 50



dallasnews    SportsDay    GuideLIVE    FD Luxe    neighborsgo

Sign In    Subscribe    Subscriber Services

OBITS    CLASSIFIEDS    AUTOS    JOBS    REAL ESTATE    SHOPPING

 BUSINESS

Powered by *The Dallas Morning News*

 **91°**



FORECAST    TRAFFIC

WALL STREET    AIRLINES    TECHNOLOGY    PERSONAL FINANCE    TOP 100    REAL ESTATE    AUTOS

# American Airlines has no Plan B, will take antitrust fight to court

🔵    37    25    0    Share    0    6    A A ▲ ▼

By MARK CURRIDEN
Texas Lawbook
mark.curriden@texaslawbook.net
Published: 20 August 2013 09:20 PM
Updated: 20 August 2013 09:30 PM

American Airlines general counsel Gary Kennedy was walking up six flights of stairs at the airline's Fort Worth headquarters last week when he received an email from Joe Sims, a key outside lawyer helping the company merge with US Airways.

The state and federal governments were suing to stop the merger.

"I uttered some words that I shouldn't have uttered," said Kennedy, who has led American Airlines' corporate legal department for a decade.

Minutes later, he gave the bad news to CEO Tom Horton and other senior leaders. The U.S. Department of Justice, Texas Attorney General Greg Abbott and five other states had filed a federal antitrust lawsuit to stop the two airlines from combining.

Kennedy, speaking Tuesday for the first time since the government's suit, said American Airlines has no Plan B and will vigorously fight the antitrust lawsuit. Kennedy does not think a settlement is likely.

"We knew Justice had some issues or views on the transaction, but we were still surprised and disappointed," he said.

Even more shocking and unsettling, said Kennedy, is Abbott's role in the litigation.

"I was totally surprised and disappointed with the Texas AG," he said. "We are a Texas-based company and the new, merged company will be stronger and more influential and still based right here in Texas. I do not understand his position on this at all."

Kennedy said Abbott and his legal team gave no indication of their opposition to the merger.

"No concerns were voiced in advance," he said.

Abbott is a Republican candidate for governor.

## 'No contingency plan'

Ironically, lawyers representing American were preparing to use Abbott in their case against Justice, if necessary. Legal experts close to the litigation said American's lawyers believed that Texas would support the merger. They would use that as part of the company's strategic argument.

Kennedy said American has "no contingency plan" if the merger fails.

"We are focusing all of our efforts and energies on winning this lawsuit," he said. "There's no Plan B.

"Our bankruptcy exit plan has as its centerpiece this merger," he said. "If the merger, hypothetically, doesn't go forward, then we have to go back to the bankruptcy court with a new plan."

Kennedy said his legal team has asked the federal judge handling the case, U.S. District Judge Colleen Kollar-Kotelly of Washington, for a scheduling hearing as soon as possible.

"We hope to have this case go to trial before the end of the year," he said. "The discovery in the case is mostly done, and we don't see any need for delays."

## Settlement unlikely

Despite speculation on Wall Street and in the media that American and the Justice Department could negotiate a resolution, Kennedy and Sims say that a settlement is highly unlikely.

"DOJ has shown no interest in settlement discussions," said Sims.

Even so, Kennedy quickly adds, "We remain open to negotiating a settlement."

William Baer, the assistant U.S. attorney general over the antitrust division, echoed views by Sims and Kennedy at his news conference last week.

"If anybody wants to come to us to propose a settlement, we're always prepared to listen," Baer said. "But our view, looking at the evidence before us, is that the right outcome here is a full-stop injunction."

The government's lawsuit not only puts the merger on hold, but it also extends American's extraordinarily legal tab for the outside lawyers it is employing for the bankruptcy, merger and now the antitrust battle.

Court records show that American Airlines, since it filed for bankruptcy in November 2011, is spending about $500,000 a day in legal expenses and that the airline's total legal expenses have been about $150 million.

Kennedy announced in June that he plans to leave American after the company's merger with US Airways is completed.

He now says he has made no career plans beyond his time at American.

"I am fully in the saddle at American and I am looking forward to overseeing this litigation, which we fully expect to win," he said.

Did you see something wrong in this story, or something missing? Let us know.

## Comments

To post a comment, log into your chosen social network and then add your comment below. Your comments are subject to our Terms of Service and the privacy policy and terms of service of your social network. If you do not want to comment with a social network, please consider writing a letter to the editor.

Login to post a comment

| Login |

[ comment box ]

| Post |

### 6 Comments

RSS | Subscribe

**Magnificent Egos** 23 minutes ago
UA is based in Chicago. Any questions?
| Reply |                                          0 |   | 0

**chase van arsdale** 1 hour ago
I have always thought Obama's & Holder's DOJ Was Crooked & One Sided & now I can say Abbott is ONE OF THEM!!
| Reply |   1 reply                                 2 |   | 0

  **P** 33 minutes ago
  he's a two face liar. look at his lawsuit against the homeowner that put him in his wheelchair. Total about face on what he was running on at the time.
  | Reply |                                        1 |   | 0

**Wylie H Dallas** 7 hours ago
[Kennedy, speaking Tuesday for the first time since the government's suit, said American Airlines has no Plan B and will vigorously fight the antitrust lawsuit.]

What happened to Horton's vigorous assertions that American was better off remaining independent? As I recall, he presented a very detailed plan as to how to operate independently that was supported by area political leaders--- what happened to all that?
| Reply |   1 reply                                 1 |   | 3

  **P** 6 hours ago
  it was a sham plan used to try and win over the unions and creditors. It never had any merit.
  | Reply |                                        1 |   | 2

www.dallasnews.com/business/airline-industry/20130820-american-airlines-has-no-plan-b-will-take-antitrust-fight-to-court.ece

2/3



**Sal Duarte** 12 hours ago

Hell Yeahhhhhhhh, let do merger together for American and US Airways to create world largest airlines, the mergers will help emerge from bankruptcy after the merger is completed. If not then we will be dead off for good.. I am not afraid to merge with American and US Airways.. I am happy to see them do it NOW...

Reply     1 reply                                                  3 ☐ ☐  2

> **chase van arsdale** 1 hour ago
>
> The Liberals in DC & Abbott will not listen to reason!
>
> Reply                                                  2 ☐ ☐  0

Sponsored Results

**Mortgage Rates Hit 2.50%**
White House Program Cuts Up to $1k off
www.SeeRefinanceRates.com

**The End Of Obama?**
This looming scandal could ruin the 44th
StansberryResearch.com

**Gentleman Tattooers**
Clean, Professional, Custom, Classic,
http://tattoosonlamar.com

**Heavenly Movers 10%OFF**
We are here to help make your move go
http://hmmoving.com

 AdChoices ▷