# Exhibit 51

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

<table>
<tr><td>PATRICK BRADY, <em>et al.</em>,</td><td>)<br>)</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>v.</td><td>)<br>)</td><td>Civil Action No.  02-2917 (JEI)</td></tr>
<tr><td>AIR LINE PILOTS ASSOCIATION,</td><td>)<br>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)<br>)</td><td></td></tr>
</table>

## PLAINTIFFS' RESPONSE TO DEFENDANT AIR LINE PILOTS ASSOCIATION, INTERNATIONAL'S FIRST SET OF DAMAGE INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Civil Rule 33.1, Plaintiffs respond as follows to Defendant's First Set of Damage Interrogatories to Plaintiffs ("Damage Interrogatories").

### GENERAL OBJECTIONS

Plaintiffs object to each of Defendant's Damage Interrogatories on the following grounds, which are incorporated by reference in each response below.

1.      Defendant's Damage Interrogatories are overly broad, unduly burdensome, vague and/or ambiguous, or seek information that is unrelated to the issues in the case and not reasonably calculated to lead to the discovery of admissible evidence.

2.      Plaintiffs object to each Damage Interrogatory to the extent it seeks information protected from discovery by any evidentiary privilege or attorney work product.

3.      Plaintiffs object to each Damage Interrogatory to the extent it seeks information already in Defendant's possession or available from publicly available means.

4.     Plaintiffs' object to each Damage Interrogatory to the extent it seeks information related to the defense of mitigation because Defendant failed to plead mitigation as an affirmative defense in its Answer to Plaintiffs' Second Amended and Restated Complaint.

5.     Plaintiffs object to, and will not be bound by, any instructions or definitions included in Defendant's Damage Interrogatories to Plaintiffs to the extent those instructions or definitions could be construed to be broader than, or inconsistent with, the requirements of the Federal Rules of Civil Procedure.

**PLAINTIFFS' RESPONSES TO DEFENDANT'S DAMAGE INTERROGATORIES**

1.     Do you contend that the merged seniority list of American Airlines that was created based upon Supplement CC would have been different if ALPA had taken any of the actions that Plaintiffs claimed it should have taken during the liability trial?  If so, for each of the issues noted in (a) through (h) below, state in detail how you contend the merged seniority list would have been different; describe with particularity all facts, and identify all documents, upon which you rely in contending that the list would have been different; and identify every individual you believe has knowledge of such facts and is competent to testify concerning how the list would have been different:

> a.  ALPA's allegedly improper statements to the TWA Merger Committee concerning the committee's seniority list integration proposal to be made during negotiations with the APA Mergers and Acquisitions Committee on March 29, 2001;
>
> b.  ALPA's allegedly improper statements to the TWA MEC with regard to that body's meeting on April 2, 2001;

    c.   ALPA's failure to approve Roland Wilder's proposed federal district court injunction case outlined in his letter to Duane Woerth dated March 26, 2001;

    d.   ALPA's failure to approve Roland Wilder's proposed federal district court case against the APA and American outlined in his memo dated July 2, 2001;

    e.   ALPA's failure to approve the filing of Roland Wilder's federal district court injunction case aimed at enjoining the implementation of Supplement CC, outlined in his memo dated August 8, 2001;

    f.   Duane Woerth's alleged statement to the APA Board of Directors on April 5, 2001, that he had previously told representatives of the TWA pilots that they had to "get real" with respect to their negotiations with representatives of the American pilots regarding the seniority list integration;

    g.   ALPA's decision not to engage in a jumpseat boycott against the American pilots, as suggested by then TWA Merger Committee Chairman Mike Day; and

    h.   ALPA's alleged failure to lobby for the Bond Bill in the fall of 2001.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections.

Notwithstanding these objections, Plaintiffs contend the merged seniority list would have been different if ALPA had not breached its duty of fair representation to the former TWA Pilots, as found by the jury in this case following more than five (5) weeks of trial on the issue of liability. The jury heard overwhelming trial evidence of ALPA's conflict of interest in that ALPA was courting the American Pilots to join ALPA at the same time it purported to represent the former TWA Pilots. Instead of protecting the interests of the TWA Pilots during their seniority negotiations with the American pilots, ALPA sacrificed their interests to curry favor

with the American pilots.  This conflict of interest tainted the entire seniority negotiation process and resulted in an unfair seniority list (known as Supplement CC) being forced upon the former TWA pilots.   The jury has already found that ALPA's breach caused injury to some TWA pilots.

During this damage phase of the litigation, Plaintiffs' damage phase experts will opine on what a fair and reasonable integration of the TWA and American pilot seniority list would have looked like and Plaintiffs incorporate those expert reports herein.

2.      State in detail precisely what you claim the merged seniority list of American Airlines would have been as of April 10, 2002, but for ALPA's alleged breach of the duty of fair representation.  In your answer, please identify, by seniority number, where you claim each former TWA pilot would have been on the combined list, and the number of places higher that he or she would have been on the actual list.  Describe with particularity all facts, and identify all documents, which support your contention.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections. Notwithstanding Plaintiffs' objections, Plaintiffs rely and incorporate by reference the reports of their damage phase experts, which will be produced on September 28, 2012.

3.      State the financial impact resulting from any change in the merged seniority list, as a result of the issues referred to in the preceding Interrogatory.  Describe with particularity all facts, and identify all documents, which support your contention.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections. Notwithstanding Plaintiffs' objections, Plaintiffs rely and incorporate by reference the reports of

4

their damage phase experts which will be produced on September 28, 2012.   Plaintiffs' also

incorporate Plaintiffs' supplemental expert report(s) which will include damage set-offs for each

individual pilot's actual earnings.  *See* PACER Docket No. 495 (Scheduling Order dated

September 7, 2012, Paragraph 1).

    4.    For each former TWA pilot for whom damages of any kind are claimed, provide

the following information:

    a.  Full name and current residence and business addresses;

    b.  Seniority number on the TWA seniority list as of April 10, 2001;

    c.  Seniority number, if any, on the current American seniority list;

    d.  Current employer, status (captain, first officer or second officer), equipment, domicile and division (international or domestic);

    e.  Date(s) of any furlough from American;

    f.  Date(s) that recall was offered at American;

    g.  Date(s) that the pilot deferred or declined recall, if applicable, and the reason for the deferral or decline;

    h.  Date of death if deceased;

    i.  Date of retirement or early retirement, if applicable;

    j.  Date(s) resigned, terminated, or lost FAA medical certificate due to disability; and

    k.  Wages earned from 2001 through the present, the source of the wages and the name and address of each employer.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections and, in particular, ALPA's failure to plead mitigation as an affirmative defense. Notwithstanding Plaintiffs' objections, Plaintiffs rely and incorporate by reference the reports of their damage phase experts which will be produced on September 28, 2012. Plaintiffs also incorporate Plaintiffs' supplemental expert report(s) which will include damage set-off for each individual pilot's actual earnings. Actual earnings from absent class members will be requested following the Court's approval of a form of Class Notice and Request for Documents.

5.    For each former TWA pilot for whom damages are sought:

    a.  Identify every category of damages claimed (i.e., back pay, front pay, lost pension benefits, etc.);

    b.  State the dollar amount sought for each category of damages; and

    c.  Describe in detail how each category of damages was calculated, including all formulas, computer programs, tables and raw data that went into that calculation.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections and, in particular, ALPA's failure to plead mitigation as an affirmative defense. Notwithstanding Plaintiffs' objections, Plaintiffs rely and incorporate by reference the reports of their damage phase experts which will be produced on September 28, 2012. Plaintiffs also incorporate Plaintiffs' supplemental expert report(s) which will include damage set-off for each individual pilot's actual earnings. Actual earnings from absent class members will be requested following the Court's approval of a form of Class Notice and Request for Documents.

6.     For each former TWA pilot for whom damages are sought stemming from an inability to bid a higher paying job under Supplement CC, state by year the total dollar amount of lost income, benefits or earning capacity that he or she claims to have lost from 2001 to the present, or will lose in the future, and how that amount was calculated, including all formulas, computer programs, tables and raw data that went into that calculation.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections and, in particular, ALPA's failure to plead mitigation as an affirmative defense.  Notwithstanding Plaintiffs' objections, Plaintiffs rely and incorporate by reference the reports of their damage phase experts which will be produced on September 28, 2012.   Plaintiffs also hereby incorporate Plaintiffs' supplemental expert report(s) which will include damage set-off for each individual pilot's actual earnings.

7.     For each former TWA pilot for whom any form of damages is sought, state if he or she has obtained other work (whether as an employee, independent contractor or otherwise) other than at American Airlines, from 2001 to the present, and if so state:

    a.   The name and address of the employer or business and the nature of its business;

    b.   If the business is an airline carrier, the status (captain, first officer or second officer), equipment and domicile held each year during employment;

    c.   When the new employment commenced and ended;

    d.   Yearly salary, hourly pay rate, and hours worked per month or the other basis of compensation; and

e.   All available benefits, applicable work rules and employment agreements that governed the employment or other relationship.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections and, in particular, ALPA's failure to plead mitigation as an affirmative defense. Notwithstanding Plaintiffs' objections, Plaintiffs rely and incorporate by reference the reports of their damage phase experts which will be produced on September 28, 2012. Plaintiffs also incorporate Plaintiffs' supplemental expert report(s) which will include damage set-off for each individual pilot's actual earnings. Actual earnings, and related relevant damages information, from absent class members will be requested following the Court's approval of a form of Class Notice and Request for Documents.

8.   For each former TWA pilot for whom any form of damages is sought, describe in detail how he or she attempted to mitigate his or her lost income or other financial injury including, but not limited to, the receipt of unemployment benefits, welfare, retirement income and benefits, or insurance monies received while unemployed or on furlough. If he or she has not attempted to mitigate damages, explain why not.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections and, in particular, ALPA's failure to plead mitigation as an affirmative defense. Plaintiffs also object to the extent this interrogatory seeks information that is irrelevant to the calculation of damages. Notwithstanding Plaintiffs' objections, Plaintiffs rely and incorporate by reference the reports of their damage phase experts which will be produced on September 28, 2012.

Plaintiffs also incorporate Plaintiffs' supplemental expert report(s) which will include damage set-off for each individual pilot's earnings.

9.     For each former TWA pilot for whom any form of damages is sought, list by date all correspondence in any form, job applications, offers of employment, or resumes submitted to a person or company, from 2001 to the present, and list by date any conversations with headhunters or placement agencies, providing the name and address for each.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections and, in particular, ALPA's failure to plead mitigation as an affirmative defense.  Plaintiffs also object on the grounds that this interrogatory seeks irrelevant information that is also not likely to lead to the discovery of admissible evidence.

10.     For each expert witness whom Plaintiffs may call to testify at the damages trial, state the following:

    a.   His or her field of specialty or expertise and any sub-specialties within his or her field of expertise;

    b.   The subject matter on which he or she is expected to testify;

    c.   All opinions that he or she is expected to express and the basis and reasons for those opinions;

    d.   All documents, data or other information that he or she has considered in forming his or her opinion;

    e.   Identify all assumptions that Plaintiffs' counsel provided and assumptions that the expert relied on in forming his or her opinion;

    f.   All exhibits that may be used as a summary of or in support of his or her opinion;

    g.   His or her qualifications, including a list of all publications that he or she authored within ten years preceding the date of this request;

    h.   The compensation paid, to be paid, and the hourly rate of the experts for his or her study, preparation and testimony in this matter;

    i.   All other cases in which he or she has testified as an expert at trial or by deposition within the last four years as of the date of this request, and the compensation paid and hourly rate for his or her work performed in that case; and

    j.   His or her usual hourly rate for preparation and testifying as an expert.

**ANSWER:**

Plaintiffs' expert reports are due on September 28, 2012. Plaintiffs rely and incorporate herein those, and any supplemental, reports. Plaintiffs have already produced curriculums vitae for their two damage phase experts, Henry Farber, Ph.D. and Rikk Salamat.

11. Explain in detail Plaintiffs' damages methodology, the basis for using that methodology, all assumptions used in developing the methodology, and the basis for those assumptions. Describe with particularity all facts, and identify all documents, which support your contention.

**ANSWER:**

Plaintiffs' expert reports are due on September 28, 2012 and Plaintiffs rely and incorporate herein those, and any supplemental, reports. Plaintiffs also rely upon the experts' deposition testimony.

12.    Explain in detail the method used to calculate each category of damages claimed by Plaintiffs in their damages methodology and identify, describe and produce for inspection each document upon which the computation is based including, but not limited to, all documents bearing on the nature and extent of the injuries suffered.

**ANSWER:**

Plaintiffs' expert reports are due on September 28, 2012 and Plaintiffs rely and incorporate herein those, and any supplemental, reports.  Plaintiffs also rely upon the experts' deposition testimony.

13.    Identify, describe and produce for inspection each document in the possession, custody or control of any class member, or of which any former TWA pilot has knowledge, which supports or relates to Plaintiffs' damages claim.  State the full name, address and telephone number of all persons who possess, have custody or control such documents.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections. Notwithstanding this objection, Plaintiffs have produced responsive documents and will continue to update their document production as responsive documents are discovered.

14.    State the name, last-known residential address and personal phone numbers and last-known business address and business phone numbers of every person you may call to testify as a fact witness during the damages trial in this case.

**ANSWER:**

Plaintiffs will supplement this Interrogatory response, as discovery is ongoing.

15.     With respect to each person identified in response to the preceding interrogatory, describe in detail the facts about which they will testify and identify all documents about which they will testify or upon which he or she will rely.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections. Plaintiffs also object on the ground it calls for trial strategy, mental impressions of counsel and/or otherwise infringes upon the attorney work product doctrine.   Subject to and without waiving these objections, Plaintiffs will supplement this Interrogatory response, as discovery is ongoing.

16.     State the name, last-known residential address and personal phone numbers and last-known business address and business phone numbers of every individual who provided information contained in these interrogatory answers and, with respect to each, identify the information provided.

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections. Plaintiffs also object on the ground it calls for trial strategy, mental impressions of counsel and/or otherwise infringes upon the attorney work product doctrine.

17.     If, in responding to these Interrogatories, you or your counsel have withheld the production of any document or have refused to disclose the substance of any oral communication on the grounds of a claim of privilege, confidentiality or the work product doctrine, please comply with Fed. R. Civ. P. 26(b)(5) and L. Civ. R. 33.1(c) by stating the following with respect to each such document or oral communication:

a.   The title, and general subject matter, of each such document or oral communication;

b.   The date of each document or oral communication;

c.   All persons who participated in the preparation of each document or who were present during the oral communication;

d.   The person who signed each document, or over whose name it was issued;

e.   The addressees and all recipients of each document;

f.   The nature and substance of each document or oral communication, with sufficient particularity to enable the same to be identified;

g.   As to any oral communication, whether it was in person or on the telephone; and

h.   The nature of the privilege claimed and the full basis for your objection.

**ANSWER:**

No documents were withheld on any basis set forth in this interrogatory but Plaintiffs will amend this interrogatory answer if documents are intentionally withheld from production.

18.    Has any document that is requested to be identified in these Interrogatories or that is requested in Defendant's Document Request been misplaced, destroyed, erased or cannot be located?  If so, state the following separately for each such document:

a.   The Interrogatory or Document Request to which the document is responsive;

b.   The date of the document;

c.   The type of document (e.g., letter, memorandum, etc.)

d.   The subject matter of the document and its title;

e.   All recipients of the document and the business, legal title or position of each;

     f.   Each person who authored the document and his or her business, legal title or position;

     g.  The last known location of the document; and the reason the document cannot be produced (e.g., misplaced, destroyed, cannot be located, etc.).

**ANSWER:**

Plaintiffs object to this interrogatory on grounds encompassed by the general objections. Class Plaintiffs will seek to have a Class Notice and Request for Information sent to all members of the Class.  This action was bifurcated at the Defendant's request and damages discovery stayed.  This interrogatory is burdensome and it is unrealistic to respond to a request seeking irrelevant information from every absent class member, over an eleven year time period.

The five Class Representatives have endeavored to collect, in good faith, income earnings since 2002, most of which have already been produced.  Plaintiffs will continue to supplement this production, if appropriate.   Any class representative who was furloughed after April 5, 2001, will be asked to collect, in good faith, any documents reflecting employment while on furlough.

# Exhibit 52



# Damages in Brady et al vs.
# The Air Line Pilots Association

Rikk M.T. Salamat, BA, MBA
Principal Consultant, Case Lab Inc.

October 12, 2012



| Section 1 – Rikk. M.T. Salamat |
| --- |

My name is Rikk M.T. Salamat and I reside in Toronto, Ontario, Canada. I did undergraduate course work at the Ontario College of Art and the University of Toronto. I received an HBA from York University in 1994 and an MBA from the University of Toronto in 2003.

I have been the Principal Consultant for Case Lab since 2001. Case Lab is a professional consulting firm that provides economic and financial analysis services for parties involved in disputes. I personally specialize in the analysis of economic and financial data, primarily for professional associations and labour unions, and my CV is set out in Appendix 1. A standard retainer agreement outlining my rates is in Appendix 2.

The majority of my work at Case Lab has been for airline pilots and to date I have worked in either an expert or consultative capacity for the pilots of Canadian Airlines, Air Canada, US Airways, Northwest Airlines, Delta Air Lines, Continental and Trans World Airlines. I have also testified in Canada and the United States as an expert for several pilot seniority integration arbitrations, at the Canadian Human Rights Tribunal, US System Board of Adjustment hearings and in front of the National Mediation Board.

Since 2008, I have been the costing consultant for the US Airline Pilots Association, analyzing the financial impact of proposed contract changes, comparing compensation, and undertaking operational and economic analysis of US Airway and its competitors. In this capacity I have advised union representatives, negotiated with the employer, and have testified as an expert. I was consultant on compensation and wage comparators to the IAMAW during their wage reopener with Air Canada in 2006. I was the expert for the Association of Justices of the Peace of Ontario (AJPO) on the impacts of proposed changes to the Ontario regulations regarding compensation for Justices of the Peace and testified before the 5th Triennial Compensation Commission. I was also the Association's expert before the Ontario Superior Court in litigation stemming from Justice's compensation under the amended regulations. I have testified several times between 2010 and 2012 before the National Mediation Board in the United States on matters pertaining to pilot compensation, the costs of provisions in pilot contracts and have presented comparisons in pilot compensation and airline costs between different US carriers. Most recently, in 2012 I was an expert for the Air Canada Pilots Association in the collective bargaining agreement Final Offer Selection Arbitration before Douglas C. Stanley.

A significant part of my practice since 2001 has been in analyzing the impacts of pilot seniority mergers. I developed and programmed an application called the "ALPA Merger Tool," which I have used to analyze impacts during seniority arbitrations, to assist arbitrators in executive session and deliberation, and to produce the final seniority lists in the pilot seniority mergers of Air Canada/Canadian, US Airways/America West, Northwest/Delta and the merged mechanic seniority list in AirTran/Southwest. I have also developed a number of other applications used in both the aforementioned mergers as well as in the mandatory pilot retirement age hearings at the Canadian Human Rights Tribunal and two class actions related to pilot seniority (Addington et al vs. US Airline Pilots Association stemming from the merger of US Airways/America West and Berry v. Pulley stemming from Air Canada/Connectors).

| Section 2 – Literature Review and Theoretical Framework |
| --- |

In Patrick Brady et al v. Air Line Pilots Association (ALPA), the jury found that ALPA violated its duty of fair representation to the former pilots of Trans World Air (TWA) and that this violation caused injury to the TWA pilots. Had ALPA not violated its duty the result would have been a more favourable seniority integration than the one that was imposed on them by the Allied Pilots Association (APA), the union which represented the pilots of American Airlines.

The TWA pilots were integrated with the American Airlines pilots under an agreement between the APA and American known as Supplement CC, which included both a merged seniority list and a number of conditions and restrictions. There are two major parts involved in calculating the damages to TWA pilots as a result of the Air Line Pilot Association's (ALPA) violation of its duty of fair representation: The first part of the damage calculation is to estimate the integration that would have occurred absent the violation, and the second is to calculate the financial impact that an alternate integration would have had on the TWA pilots.

A number of actions that ALPA failed to take in representing the TWA pilots were brought out at trial. Had these actions been employed they would have brought pressure on the Allied Pilots Association APA while they negotiated seniority with the TWA pilots. As the APA had some ability to act unilaterally and the TWA had no automatic right to have the matter decided by a neutral party, the effect additional pressure would have had can be considered a problem of increased uncertainty and estimating how the parties, as agents, would have responded and ultimately decided given that uncertainty. A summary of the available actions plaintiffs brought out at trial are seen below in Figure 1.

| Figure 1 – ALPA Actions Cited by Plaintiff |
| --- |
| **Action** |
| Insist on Waiving Scope |
| Denied April 2001 Legal Strategy: Delay Purchase |
| Denied July 2001 Legal Strategy: Sue American and APA |
| Denied October 2001 Legal Strategy: Injunction |
| Denied October 2001 Legal Strategy: Case, APA Injunction |
| Refuse to request DOT make fair process condition of purchase |
| Refuse to request AFL-CIO support |
| Refuse to block APA pilots from ALPA jumpseats |
| Deny TWA pilots have right to strike |
| Failure to Support TWA Pilots |
|     - No coordination with merger committee |
|     - Lack of negotiating support |
|     - Lack of funding |
|     - President's lack of support |

From the point of view of the TWA pilots, there were a range of possible outcomes ranging from the least desirable, a list just slightly better than Supplement CC, to an upper limit which is defined as the list an arbitrator would most likely have imposed. The justifications for these being the limits will be discussed

further on. My objective in this matter is to estimate as accurately as possible where in that range an agreement between the TWA pilots and the APA would have fallen given effective representation by ALPA.

There are several theoretical frameworks I have considered and used in order to analyze the effect ALPA's actions would have had on the seniority negotiations between the APA and the TWA pilots and I will begin with a brief survey of the most relevant ones.

The first theoretical approach is that of behavioural theory most closely associated with the work of Walton and McKersie.[1] In their analysis of collective bargaining, they defined four subprocesses of labour negotiations labelled: distributive bargaining, integrative bargaining, attitudinal structuring and intraorganizational bargaining. Distributive and integrative bargaining refer to the processes by which a pie is split (distributive) or grown (integrative) when parties negotiate. Attitudinal structuring refers to balance tactics and reinforcement.

> Balance tactics include emphasizing common interests and characteristics; deemphasizing differences; increasing interaction; being responsive to Opponent's problems; conferring status on Opponent; showing appreciation toward Opponent; and dissociating oneself or Opponent from unpleasantness. Reinforcement tactics include rewarding Opponent for desired behavior and punishing undesirable behavior. Attitudinal structuring may also require "working through" old attitudes in order to clear the air for new ones.[2]

A second framework, also used by Walton and McKersie, has its genesis in the Von Neumann-Morgenstern expected utility theorem[3], which "provides the foundation of standard economic models of how people make choices. Implicit in this theory is the assumption that individuals have stable and coherent preferences; they know what they want and their preference for a particular option does not depend on the context. Individuals who face a choice will go through all available alternatives before selecting the one that they judge to be best."[4] According to Walton and McKersie, a settlement range is determined by expected utility calculations that weight the benefits of a settlement against the cost of failing to obtain an agreement, particularly a strike in their work.

As Von Neumann-Morgenstern's work launched the field of game theory[5], some consideration was also given to the Nash equilibrium. As summarized by Roger Myserson:

---

[1] Walton, R.E. and McKersie, R.B. A Behavioral Theory of Labor Negotiations. New York: McGraw-Hill, 1965.
[2] Tracy, L. and Peterson, R. A Behavioral Theory of Labor Negotiations: How well has it Aged?, Negotiation Journal, January 1996, 93-108:96.
[3] Von Neumann, J., and O. Morgenstern (1944): Theory of Games and Economic Behavior, Third edition, 1953. Princeton, New Jersey: Princeton University Press.
[4] Hedesström, TM (2006): The psychology of diversification: Novice investors' ability to spread risks, Doctoral Dissertation, Goetenberg University, Sweden, 2006:2.
[5] Sebenius, J., Negotiation Analysis, From Games to Inferences to Decisions to Deals, Negotiation Journal, October 2009, 449-465.

---

> Nash… formally defined an equilibrium of a noncooperative game to be a profile of strategies, one for each player in the game, such that each player's strategy maximizes his expected utility payoff against the given strategies of the other players. If we can predict the behavior of all the players in such a game, then our prediction must be a Nash equilibrium, or else it would violate this assumption of intelligent rational individual behavior. That is, if our predicted behavior does not satisfy the conditions for Nash equilibrium, then there must be at least one individual whose expected welfare could be improved simply by reeducating him to more effectively pursue his own best interests, without any other social change.[6]

A third framework comes from the field of negotiation and decision analysis and has as its focus actions taken "away from the table." As Lax and Sebenius state:

> If one characterizes negotiation as an interactive process by which two or more people seek jointly or cooperatively to do better than they could otherwise, then the "otherwise" becomes crucial. The parties' best alternatives without agreement imply the limits to any agreement. For each side, the basic test of any proposed joint agreement is whether it offers higher subjective worth than that side's best course of action absent agreement. Thus, moves "away from the table" to shape the parties' alternatives to agreement may be as or more important than tactics employed "at the table." Actions of the first type delimit the range of possible agreements; those of the second type influence which point in the range may be chosen. The strategic arsenal from which moves of the second type are drawn includes actions that improve alternatives to the negotiation at hand.[7]

The fourth framework is focused on persuasion and borrows from research on negotiation, decision theory and law. As Scycara states, "[p]ersuasive arguments are used by an agent, the persuader, as a means to dynamically change the utilities associated with various plans and outcomes of another agent, the persuadee, so as to increase the willingness of the persuadee to cooperate."[8]

Behavioural theory, expected utility, game theory and the analysis of persuasion all overlap in some regards. Given the highly specific nature of the damages to the TWA pilots, none of these fields can prescribe an equally specific approach. However, as all these fields attempt to give insight into how parties will behave in negotiations, together they form a body of work from which a reasoned and methodical estimate of the damages to the TWA pilots can be drawn given the assumption that ALPA had not violated its duty.

It is perhaps easiest to begin with strict quantitative approaches to estimating negotiation outcomes of the sort we are concerned with here. Such an approach has two necessary preconditions: probabilities of achieving the minimum and maximum outcomes, and a utility function that would define how agents

---

[6] Myserson, R., Nash Equilibrium and the History of Economic Theory, Journal of Economic Literature, September 1999, 1067-1082:1069.
[7] Lax, D.A., Sebenius, J.K., The Power of Alternative or the Limits to Negotiation, Negotiation Journal, April 1985, 163-179:163.
[8] Sycara, K.P., Persuasive Argumentation in Negotiation, Theory and Decision, May 1990, 203-242:204

would choose at various points on the continuum between the minimum and maximum. What we can apply from game theory and expected utility is that there are a range of outcomes between a minimum and a maximum, and that given all the probabilities of all the outcomes of the various actions parties could make, there are theoretical optimal outcomes, or Nash equilibria, and that if the parties were aware of these probabilities, and acting perfectly rationally, there would be the basis for an agreement. To mathematically or statistically estimate what that agreement would, however, require subjective judgements about probabilities at each step, and therefore my analysis is primarily dedicated to the examination and development of those judgements, but applying them using other frameworks.

As a result, the theoretical framework for this analysis is concerned with analyzing and estimating the possible results of the actions ALPA did not employ in representing the TWA pilots. Consistent with negotiation analysis as developed by Sebenius and others, my approach "deemphasize[s] the application of game-theoretic solutions concepts or efforts to find unique equilibrium outcomes…. Focus[ing instead] on changes in perceptions of the 'zone of possible agreement' and the (subjective) distribution of possible negotiated outcomes conditional on various actions."[9]

The first actions I consider are the legal strategies ALPA failed to employ and that the TWA pilots and their counsel, Roland Wilder, believed had some chance of success. Whether ultimately they would have worked, had they been pursued, is for others to estimate, but relevant to my analysis is the effect these actions would have had on the negotiation.

These actions would constitute attempts to gain an advantage in distributive bargaining, or gaining a larger piece of the pie. Had ALPA undertaken these actions, the APA would have faced an increased risk that their role in determining the final seniority list would be diminished. This would also transform the negotiation into one with integrative bargaining potential. As the costs of litigation, friction, and disharmony could be avoided through agreement, litigation would have the ironic effect of increasing the potential gains.  In combination these two shifts in bargaining would theoretically have increased the incentives for the parties to find an agreement.

Litigation would also have addressed the power asymmetry in the relationship between the APA and the TWA pilots. Again, this is not assuming success in litigation, but is a recognition of the fact that litigation would have changed the APA's perception of the TWA pilots. Power in negotiations, as noted by Rubin and Zartman, is "the perceived capacity of one side to produce an intended effect on another through a move involving the use of resources."[10] As they note, the perception of equal power among negotiators tends to result in more effective negotiations. The salient point for the TWA pilots, however, is that power is not an objective quantity, but as Rubin and Zartman observed in the cases they examined, it is "derived from [parties'] ability to draw on a broad array of resources. Perhaps the major source of power – seen as a means of controlling outcomes – was the ability to bring in support from external actors."[11]

---

[9] Sebenius, 2009, 456-7.
[10] Rubin, J.Z., Zartman, I.W., Assymetrical Negotiations: Some Survey Results that may Surprise, Negotiation Journal, October 1995, 349-364:350.
[11] ibid pg. 361.

---

Naturally, litigation is an example of one ability to draw on resources. However, the perception of the TWA pilots' ability to bring in support from others was compromised considerably by some of ALPA's other actions, or failures to act. For instance, ALPA president Duane Woerth, stating to the APA that the TWA pilots needed to "get real"[12] would have gone some distance to creating the opposite of the perception that the pilots had ALPA's support. Likewise, ALPA's lack of funding for lobbying and negotiations, not making disbursements from the "major contingency fund" as they did for other groups, their lack of negotiating support, and their failure to coordinate with the merger committee all would have contributed to the perception that the TWA pilots did not have external support.

ALPA's refusal to request support from the AFL-CIO takes on particular significance in light of Rubin and Zartman's formulation. A boycott by ten million AFL-CIO members would not only represent significant external support, it would also have involved American Airlines itself in the negotiation. In the same vein, had ALPA requested the Department of Transportation make a fair integration a condition of approving the sale of TWA to American Airlines, this would also have created the perception that TWA pilots could draw external actors into the negotiation context. In keeping with the theme, by denying that the TWA pilots had the right to strike, TWA deprived them of an opportunity to exert pressure on the negotiations via the company.

The "jumpseat war" that ALPA refused to employ would have involved not only the pilots of TWA, but would have seen all ALPA pilots, numbering in the tens of thousands, standing together. This clearly would have brought in other external actors. As a form of coercion, it would also have been a form of "hard distributive" bargaining, one of the classic and most common ways in which parties attempt to gain an advantage in negotiation. It is also a form of reinforcement, punishing undesirable behaviour, from the theory of attitudinal structuring.

Some of these non-litigation actions would certainly have exerted some pressure on the negotiations. More significantly, from the point of view of persuasion, they are all forms of persuasive argumentation that work toward the achievement of an agreement. As Sycara states, "the negotiation process itself is a search of a dynamic problem space where an agents' beliefs about other agents' beliefs and hence feasible solutions continuously change the space being searched. What was not an acceptable solution at one point becomes a solution at a later point."[13] In the absence of these forms of persuasive argumentation, less favourable agreements, or failed negotiations are the more likely outcomes.

To return to the discussion of litigation, it is also an "away from the table" move, in the language of decision analysis. Since it's an action that attempts to bring other parties into the negotiation, and could potentially supplant the negotiation, it can be treated as a move that is external to the negotiation. "Because improvement in perceptions of one's alternative implies a favorable change in the bargaining range, the ability to affect alternative – and perceptions of them – lies at the root of many conceptions of 'bargaining power.'"[14] For this reason, litigation, in that it creates alternatives, could have competed in

---

[12] Transcript, V1 pg.46.
[13] Sycara, 1990:206.
[14] Lax and Sebenius, 1985:171.

importance with moves made in direct negotiations, and would have influenced where in the bargaining range the parties could have agreed.

Another compelling reason to believe that litigation would have had an effect on the outcome of negotiations is that the process would have put an alternate view of "fairness" into the negotiating context. As Lowenstein et al note, "a rich literature in psychology and, more recently, a plethora of experiments conducted by economists testing various game-theory propositions indicate that people are influenced powerfully by considerations of fairness."[15] Litigation would have raised questions about, and forced a broader dialogue about, what would constitute fair treatment of the TWA pilots, whether stapling was fair, and whether the seniority integration process itself was fair.  Litigation would force a coherent, explicitly articulated alternative view of fairness to that held by the APA and should, therefore, have influenced the settlement zone. As Lowenstein et al state, "Litigants may not be seeking to maximize their own payoff… but rather may be seeking simply to obtain what they deem fair."[16]

To bring together all these theoretical concepts and discuss their application to the calculation of damages to the TWA pilots, it is helpful to first consider the nature of the problem that is before us:

> Negotiation is an ill-structured and complex process, that to-date has defied all attempts at analysis. The process incorporates intangibles such as the negotiators' skill and experience, the parties' values, beliefs, perceptions and behaviors. What makes the problem even more complex is the dynamic nature of negotiations. The interaction of the participants during negotiations engenders change in their goals, the ways they perceive the issues, their utilities associated with various outcomes and their reservation prices.[17]

Given this above statement and the foregoing discussion of the effects various actions could have influenced the negotiation process, in order to compute the impact of ALPA's violation one must make qualitative and quantitative judgments about how much influence these actions in isolation and in combination would have had on where in the range of possible settlements an agreement could have been formed between the APA and the TWA pilots.

The first step in this process is to define the range of possible outcomes. At the minimum end of the range would be a list that is only marginally, but materially, better than the Supplement CC list that was imposed on the TWA pilots by the APA. As the jury Brady v. ALPA found that ALPA's violation caused harm to the TWA pilots, it must be taken as a foundational part of the analysis that effective representation would have resulted in at least a marginally improved list. At the maximum end of the range would be a list that would be consistent with the decision of arbitrators in pilot seniority mergers. Because some of the litigation and other strategies ALPA failed to employ had at least the potential of compelling arbitration, an arbitrated list is a possible outcome. Additionally, there were strategies and tactics that could have led to an agreement to refer the matter to an arbitrator.

---

[15] Lowenstein, G., Issacharoff, S., Camerer C., Babcock, L., Self-Serving Assessments of Fairness and Pre-trial Bargaining, Journal of Legal Studies, January 1993, 135-159:339.
[16] ibid, 159.
[17] Sycara, 1990:203.

---

The theoretical frameworks outlined above are consistent with the Jury's decision in that they would all expect that increased pressure from ALPA (in the absence of its violation) would have shifted negotiations in the TWA pilots' favour, producing a more favourable integration. The difficulty is in estimating how much of a shift would have occurred.

To assist in that estimate, a helpful tool used by Sycara is to analyze the goals of the various argumentation strategies that were available. The three goals she outlines are:

1. Change the importance of a persuadee's goal/issue
2. Change the persuadee's perception of an issue's value
3. Pursue goal abandonment on the part of the persuadee via threats/promises

Shown in Figure 2 below, I have characterized each of the strategies ALPA failed to employ according to Sycara's three goals. As should be apparent, the strategies in combination would all be expected to have some impact on the APA's negotiating stance. Some, by their nature, might only have affected one or two negotiating goals, but the compound effect of employing several would lead one to expect a significant shift.

| Figure 2 – Impact of ALPA Actions on Negotiations | | | |
|---|---|---|---|
| **Action** | **Δ Importance** | **Δ Perception** | **Abandonment** |
| Insist on Waiving Scope | | ✓ | |
| Denied April 2001 Legal Strategy: Delay Purchase | ✓ | ✓ | |
| Denied July 2001 Legal Strategy: Sue American and APA | ✓ | ✓ | ✓ |
| Denied October 2001 Legal Strategy: Injunction | | ✓ | |
| Denied October 2001 Legal Strategy: Case, APA Injunction | ✓ | | ✓ |
| Refuse to request DOT make fair process condition of purchase | ✓ | ✓ | ✓ |
| Refuse to request AFL-CIO support | | ✓ | |
| Refuse to block APA pilots from ALPA jumpseats | ✓ | ✓ | ✓ |
| Deny TWA pilots have right to strike | | ✓ | |
| Failure to Support TWA Pilots | ✓ | ✓ | ✓ |
|     - No coordination with merger committee | | | |
|     - Lack of negotiating support | | | |
|     - Lack of funding | | | |
|     - President's lack of support | | | |

This analysis, combined with my years of experience working with unions, leads me to conclude that effective representation by ALPA could have compelled the APA to move to a position that was consistent with Supplement CC, so that their position and interests were embedded in the agreement, but a position that allowed the goals and objectives of the TWA pilots to be satisfied as well.

To satisfy these competing interests, it is useful to use Lowenstein et al's observation that parties are more motivated by notions of fairness than commonly thought. As such, Albin's analysis of fairness in negotiations can be particularly helpful in attempting to estimate the outcome of APA/TWA pilot negotiations in an alternate version of history. Her study "identifies and analyzes four types of fairness which have an impact on negotiation: structural fairness, process fairness, procedural fairness, and

outcome fairness. In any one case, all four types of fairness will not necessarily be significant nor even present. While concerns about outcome fairness are commonly thought to dominate negotiations, in some contexts no outcome can be quite fair…"[18]

As such, one would expect that for any list to be considered fair, it would require precedents in the outcomes of negotiations that are perceived to have structural, process and procedural fairness. This most closely describes seniority lists that have resulted either from arbitrations or bi-lateral agreements.

Therefore, in the interest of calculating damages as accurately as theoretically possible, but also as conservatively as possible, I am proceeding with the assumption that the merged seniority list that was most favourable to the American Airlines pilots, but that could be considered reasonable or fair when viewed through the lens of other mergers, would have been the most likely outcome in the absence of ALPA's violation of its duty.

On the one hand, any individual course of action not pursued by ALPA could ultimately have succeeded all on its own. On the other, had all these actions been pursued, there is still the possibility they would all have failed to reach an agreement. It is impossible to say with absolute certainty what the outcome would have been had history been otherwise. In order to establish a probability that ALPA's actions would have produced this outcome, a model was developed based on the assumption that the more of these actions ALPA undertook, the more likely a mutual agreement would have been. As Watkins notes, "To develop dynamic models of negotiation… we must accept that negotiations are strongly nonlinear phenomena… A nonlinear view helps us to understand what causal observation of negotiation processes reveals: movement toward agreement tends to proceed in surges rather than an even flow."[19]

A static model of negotiation would consider each attempt at persuasion a discrete event. A dynamic model, such as the one Watkins describes, would take it as given that the combined influence of several actions would be greater than the potential influence of each action in isolation. This suggests that one method for establishing a lower-bound probability would be to use a static model. A dynamic model, such as one with a multiplier, would be a method to establish an upper-bound.

Using Sycara's methodology as a guide as to the relative importance of each type of influence, I developed a static table of probabilities that allow a methodical way to estimate the likelihood that the actions could have had in isolation. For instance, ALPA providing support to the TWA pilots (the last item in the list of actions), would have had the potential to affect some change in the importance the APA placed on one or more issues (such as fences, the value of TWA jobs, etc.). This support, in isolation, may only have had a 3% chance of moving the APA toward an agreement. In combination with the potential to lead the APA to abandon goals (such as stapling), and change their perception of the TWA, support for the TWA pilots might only have had a 10% chance of obtaining an agreement. As shown in Figure 3, by assigning probabilities to each form of influence (ΔImportance was assigned at 3%, ΔPerception at 5% and Abandonment at 2%), a linear model of the impact of ALPA's actions would predict a 73% chance of creating an agreement.

---

[18] Albin, C., The Role of Fairness in Negotiations, Negotiation Journal, July 1993, 223-244:225
[19] Watkins, M., Building Momentum in Negotiations, Negotiation Journal, July 1998, 241-256:246

**Figure 3 – Linear Model of Probabilities**

| Action | Δ Importance | Δ Perception | Abandonment | Total |
|---|---|---|---|---|
| Insist on Waiving Scope | | 5% | | 5% |
| Denied April 2001 Legal Strategy: Delay Purchase | 3% | 5% | | 8% |
| Denied July 2001 Legal Strategy: Sue American and APA | 3% | 5% | 2% | 10% |
| Denied October 2001 Legal Strategy: Injunction | | 5% | | 5% |
| Denied October 2001 Legal Strategy: Case, APA Injunction | 3% | | 2% | 5% |
| Refuse to request DOT make fair process condition of purchase | 3% | 5% | 2% | 10% |
| Refuse to request AFL-CIO support | | 5% | | 5% |
| Refuse to block APA pilots from ALPA jumpseats | 3% | 5% | 2% | 10% |
| Deny TWA pilots have right to strike | | 5% | | 5% |
| Failure to Support TWA Pilots | 3% | 5% | 2% | 10% |
| **Total** | | | | **73%** |

However, a more dynamic model would use a multiplier such that the compounding effects of multiple actions would be quantified and the effect of momentum on the negotiation would be given a value. As Watkins states, "Regardless of whether negotiations do it by slowly ratcheting up pressure or by establishing specific action-forcing events, the ultimate goal is to build momentum in favorable directions."[20]

To build a simple dynamic model that would be consistent with the value of sequencing actions and momentum, it is interesting to note that a small multiplier of 1.03 applied to multiple actions would have brought the probability that all actions in combination would have a 100% of success, such that:

$$S \times M^n = 100\%$$

Where:
S=The sum of the probabilities individual actions will influence outcome
M=Multiplier effect
n=The number of actions undertaken

In other words, two actions taken together would be 3% more influential than the sum of their individual impacts and three would be 9% more influential. Even if smaller estimates were used to estimate the impact of individual actions such that there was only a 20% chance, a mere 1.17 multiplier (17% more influential) would still have brought the probability up to 100%. Alternatively, if one used no multiplier at all (M=1), then the total probability would merely be the sum of the individual probabilities.

The choice of 3%, 5% and 2% as probabilities for the various types of impacts are tied to the assumption that the outcome is a fair, negotiated list acceptable to both parties. If one were to assume a significantly worse outcome, such as a list only marginally better than Supplement CC, then those probabilities would require upward revision (since a marginal list would be easier to obtain and require less pressure). Likewise, if the assumption was that the outcome would be more favourable to the TWA pilots, then these probabilities would need to be lowered.

---

[20] Watkins, 2009:243

With that theoretical foundation, the basic preconditions for a merged seniority list and the probability that action would have led to an agreement established, I now turn to an examination of the range of options and the estimate of the seniority list that would satisfy those preconditions.

---
**Section 3 – Determination of Outcome in the Absence of ALPA's Violation**
---

It is difficult to overstate the importance of seniority for pilots as it determines the most important aspects of their working lives including the equipment they operate, whether they are a Captain or First Officer, whether they have a schedule or sit reserve, what days they work, how much time they are away from home, where they live, how many hours they work in a month, when they take their vacation and even what meals they are served on board. In dire circumstances, seniority also determines which pilots are laid off (furloughed) and who retains their jobs.

My objective in this matter is twofold: First, I must estimate what a merged seniority list would have been had ALPA not breached its duty of fair representation. Secondly, I must estimate the damages suffered by the TWA pilots as a result of that list not being implemented.

*What seniority integration would have been negotiated had ALPA not breached its duty to the TWA pilots?*

Parties in negotiations typically have starting positions that are subsequently modified over the course of discussions. This movement is the result of a desire not to have negotiations break down, revised understandings of the reasonableness of positions, an appreciation of the other party's interests and the necessity for compromise. This movement can also be the result of pressure from within each negotiating team, from those whom the teams represent and from influence brought to bear from parties not directly involved in the process. In seniority negotiations, these parties can include the company itself, other unions, the Department of Transportation, elected officials, the courts and labour boards.

In most seniority integrations, when negotiations fail to produce an agreement (and most fail), the matter is referred to a neutral party to decide, almost always an arbitrator. In this case, the TWA pilots did not have an automatic right for the matter to be arbitrated and the APA believed it had a contractual right to put every TWA pilot on the bottom of their seniority list, known as stapling. However, there were some limits on the ability to act unilaterally. As they stated:

> APA is ultimately the one that will decide the merger. Ideally, you want both sides to agree, and APA has and continues to work to this end. Unfortunately, that has yet to occur. History has shown that we can expect a lawsuit regarding the TWA seniority integration. There was a question from the floor about the word "Fair". Chairman Turcotte replied that there are many flavors of "Fair". There is "Fair" to APA members and a different "Fair" to the TWA members, BUT the only "Fair" that matters is what the Judge decides. Therefore, APA must continue to show good faith during the negotiations…. A question from the floor - "why doesn't APA just

---

place all the TWA pilots at the bottom of our seniority list from the start?" Chairman Turcotte replied that APA has a legal duty of "Fair Representation" to the TWA pilots.[21]

In addition to the issues the APA mentioned in this report, it can be surmised that American Airlines would have been reluctant to staple the TWA pilots as this would involve significant training costs and operational issues. As a result, the APA was limited in its ability to act unilaterally.

Given that the jury found that ALPA's violation caused harm to the TWA pilots, it must be taken as a basic truth that had ALPA been effective in representing the TWA pilots a better list would have been obtained. This better list could have been the result of negotiation or, alternatively, negotiations could have produced an agreement to refer the matter to an arbitrator. Therefore, there is a range in which the better list would have to have fallen. At one end of the spectrum is a list only slightly better than the one APA imposed, known as Supplement CC. At the other end of the spectrum is a list that might reasonably have been awarded by an arbitrator.

In order to estimate where in this range the TWA pilots would have ended up given effective ALPA representation, I have used what is known as the replication principle. When labour contract negotiations between a union and an employer break down and the matter is referred to an arbitrator for resolution, the prevailing principle arbitrators use is to replicate what the parties, acting reasonably would have agreed to.

> In applying the replication principle, an arbitrator's objective is to replicate or construct a collective agreement which reflects as nearly as possible the agreement that conventional bargaining between the parties would have produced had they themselves been successful in concluding a collective agreement. This approach seeks to put both parties in the same position they would have been had there been no breakdown in negotiations.

> However, arbitrators try to overcome one serious flaw in this approach; that is, they do not simply want to mirror any great imbalances of power between parties in drafting the terms and conditions of employment. They will attempt to look at other objective criteria - for example, the terms and conditions of employment of other employees performing similar work.

> They therefore, in addition to employing the replication principle, impose what they consider to be fair and reasonable terms and conditions. We endorse both these approaches in the determination of first collective agreements.

> The replication principle describes the estimation of a collective agreement within the parameters of reasonable expectation emanating from a context where the employer would not have locked out, and the union and employees would not have struck; i.e. where there would have been no

---

[21] Boston Domicile Meeting, Friday June 15, 2001, pg. 2.

breakdown in negotiations. The fairness and equity principle is concerned with moderating power imbalances and applying objective criteria. The two principles should apply hand-in-hand.[22]

The replication principle, then, offers a valuable practical and philosophical guide to determining what an agreement between the APA and the TWA pilots would have been.

In this case I would argue that the result of ALPA's violation of its duty is that negotiations terminated prematurely. Over several months in 2001, the parties had been moving closer together in their proposals. ALPA's failure to effectively represent the TWA pilots meant that the distance between the parties as of their last proposals could not be further narrowed.

The APA's first proposal in March 2001 was to staple 1,542 TWA pilots and in their final list there were 1,226. The TWA's first proposal saw no TWA pilots stapled and their last proposal saw approximately 209 stapled[23]. To begin estimate how far along that divide the APA could have been compelled to move by effective representation on ALPA's part it is required that several different outcomes be considered.

The first outcome that I have analyzed is what would have been fair. Fairness is a subjective concept, and in seniority integration disputes the question of what assumptions form the basis of a model of fairness are hotly contested. Whether one group had superior expectations for the future, whether one group was about to lose all their jobs, how firm aircraft orders were, how much each group is paid, and the relative strength of contracts are all factors that are brought into the discussion of fairness, ultimately leading to theories on how a merged seniority list should be constructed.

For the purposes of this analysis, however, fairness can be more narrowly defined. The damages suffered by the TWA pilots are the result of the difference between their careers under the Supplement CC list and a list that would have been achievable had ALPA not violated its duty, not a list that was "fair." Nevertheless, a fair list is a necessary reference point for two significant reasons. First, it has to be assumed that the TWA pilots could not have achieved more than what they would have received under a fair list. Second, damages suffered under a fair list is a superior method of allocating damages to individuals, even if it's not the correct method of determining what the damages stemming from ALPA's breach are.

The second outcome is a best guess as to what an arbitrator would have awarded given the facts of the case. If the APA was motivated in part by a fear of an arbitrated list, it must also be the fact that an arbitrated list would be thought safer than a bad negotiated one. Therefore, a likely arbitral award is a necessary reference point because the APA would have been better off agreeing to anything more favourable than it.

Although pilot seniority awards have taken many forms, there are recurring themes in terms of what parties have argued and arbitrators have discussed their relative importance in formulating their lists. The

---

[22] Star of Fortune Gaming Management (BC) Corp v. Teamsters, Local 31 (2001), 2001 Carswell BC 3270, [2001] B.C.C.A.A.A. No. 293 (B.C. Arb. Bd) 22.
[23] These pilot counts represent the number of pilots who would have been stapled, who would remain as of July 1, 2002.

American/TWA merger was not the first where one airline was in bankruptcy. Nor was it the first where one group claimed that the jobs of the other were redundant, in peril or unneeded. One cannot know for certain what any given arbitrator would have done. However, it can be deduced what a list would look like if an arbitrator was to construct a list as favourable to the APA as any that had ever been awarded or mutually negotiated between parties independently without a neutral arbitrator. Put another way, the best list the APA could have hoped to obtain from an arbitrator must be considered the limit of what the APA would have agreed to. I refer to this outcome as the "Arbitrated List."

The third outcome would be one that is as close to the Supplement CC list as possible, but which is materially, if only marginally, more favourable to the TWA pilots. I refer to this as the "Marginal List."

The list upon which damages are based is the one I estimate would have been the best achievable negotiated list and which I refer to as the "Salamat Damage Model." This list is constructed by reference to the other three and uses the Supplement CC list as its basis. Not undertaking any of the 14 actions listed in <u>Figure 1</u> had the effect of denying TWA pilots leverage in their negotiations with the APA. Given the discussion on negotiating theory in Section 2, it is reasonable to conclude that had only a few of these options been exploited, the outcome would have been better than the Marginal List. On the other hand, one cannot say for certain that even if all of these had been exploited, the Arbitrated List would have been achievable, even though it would be biased towards the APA.

Therefore, the Salamat Damage Model is a compromise between the Marginal List and the Arbitrated List. This model requires the most thoughtful analysis as there are no hard and fast rules that one can use to determine at what point either party might have walked away from negotiations and, in essence, rolled the dice that the other party's attempts would fail. The APA could, for instance, have hoped that any litigation strategy ALPA could have brought to bear would have failed and therefore, beyond a certain point, the risk would be warranted. The TWA pilots, likewise, could not be assured of any success in court, in compelling compromise from the APA, or in securing a more fair resolution process. Therefore, at a certain point not agreeing to a proposed list would have become riskier than settling.

To return, then, to the replication principle, in order to calculate damages in this case one must answer the following question: Had ALPA provided fair representation and if both parties were acting reasonably, what is the most the APA pilots could have offered and what is the least the TWA pilots could have accepted? "Reasonable", in this context, means that the parties have taken all the risks into account and that their decisions are consistent with the awards and agreements that have resulted from other disputes.

Many more lists were considered in the course of analyzing the damages in this matter, but they were all in some measure variants of the Fair outcome, the Arbitrated List, the Salamat Damage Model and the Marginal list. I will now discuss each of these four lists in more detail.

*The Measurement of Fairness*

Several tests of fairness are used in assessing the impacts of a merged seniority lists. These can include differences in dates of hire, percentile position, status (i.e. Captain vs. First Officer), equipment (i.e. wide body vs. narrow body) and lifestyle. Most of these tests, however, translate directly into pilots' earning ability and therefore, earnings provide the most comprehensive measure of the relative value of his or her seniority on a list. Due to a myriad of reasons, pay rates are different at different airlines and so one cannot simply use income to measure the value of one pilot's seniority relative to a pilot at a different carrier. As George Nicolau stated in the 2007 award in the seniority merger of the pilots of US Airways and America West, "in prior cases where such differences in pay were greater than they are here, those differences had no real effect on the composition of the list." Thus, income is in no way determinative of the value arbitrators put on pilots seniority relative to pilots of a different airline.

Seniority being the currency with which pilots bid for higher paying positions and lifestyle (base, vacation, schedule, etc.), it is a fact that pilots higher on a seniority list have higher incomes, on average, than pilots lower down. Since good times and bad affect pilots in the same seniority range more or less equally, their incomes will rise and fall, again on average, together.

In April 2002 Supplement CC became effective and the TWA pilots became subject to the collective bargaining agreement between the APA and American Airlines. Figure 4 shows the changes in status between April 2001, when the merger was announced, and July 2002. Statuses are wide-body captain, narrow-body captain, wide-body first officer and narrow-body first officer. Over that time 198 TWA pilots had gone down in position and 310 had been furloughed. Additionally, American closed all pre-merger TWA bases and by April 2002 all TWA pilots were based in St. Louis.

| Figure 4 – TWA Pilot Change in Status, 2001-2002 | | |
|---|---|---|
| **TWA Pilots Change in Status Between** | | |
| **April 4, 2001 and July 1, 2002** | | |
| Total Pilots | 2,338 | |
| No Change | 1,418 | 61% |
| Increased Position | 96 | 4% |
| Decreased Position | 198 | 8% |
| Furloughed | 310 | 13% |
| Retired | 171 | 7% |
| To Inactive | 145 | 6% |

Under the transition agreement between the TWA pilots and American, signed March 31, 2001, American was able to reduce the TWA fleet and adjust staffing in order to rationalize TWA with AMR, to respond to the events of September 11, 2001 and integrate the TWA pilots into the AMR operations. By going a few months into the integrated workforce, it can be assumed that any jobs the TWA pilots still had could

reasonably be considered ones they brought with them. For this reason, July 2002 was chosen as the point in time at which to measure the amount of work available to the TWA pilots.

If, the TWA shakeout and downsizing having occurred, a TWA pilot was earning an average of $8,000 per month, a fair seniority integration, from an economic point of view, would see him or her rising and falling on the same economic tides as an American pilot earning approximately the same amount. If, after some time, it was discovered that the TWA pilot was earning consistently more than his American economic peers, it would be the result of too much seniority. Alternatively, if it was discovered that the pilot was earning consistently less, then it would be because the pilot had too little seniority.

To analyze what would have occurred to the TWA pilots under a seniority list which placed likes with likes, I constructed a seniority list which places American and TWA pilots on a merged list using an optimizing methodology that creates the closest match in income possible given the constraints of building a merged list.

A given pilot's income is the result of both seniority and what the pilot has chosen to do with it. Therefore, within a small section of a seniority list, there can be a wide range in the incomes of pilots. For instance, Figure 5 shows the monthly income of each American Airlines pilot in April 2002 according to his/her seniority. In the neighbourhood of American pilot at seniority #6000 it can be seen that the average income (as seen on the trend line) is approximately $10,000 but that some pilots are earning as little as $7,000 while some are earning as much as $15,000.

**Figure 5 – Scatter Plot, Income vs. Seniority, Linear Trend**



Therefore, when creating a list which places likes with likes, it's necessary to use the average income of a pilot's seniority "neighbourhood" rather than a pilot's individual income. Because the order of pilots on their original list cannot be altered, a pilot earning $15,000, who one would expect to be placed higher on the list, could get stuck behind one who is earning $7,000 and end up lower on the list. Using an average relieves this problem and adjusts for pilots' individual choices.

An additional issue can be seen around the 11,000[th] pilot where income drops sharply. This is because those pilots lower down the seniority list have fewer years of service. Pilot pay rates frequently go up annually, as a pilot accrues years of service with the airline, eventually hitting a maximum at 12 or 15 years. Since differences in income due to varying lengths of service would occur regardless of seniority, when calculating an average income, it is necessary to use pilots' incomes as they would be if they were all paid at the maximum years of service. Otherwise, the average income of a pilot's neighbourhood could be unrepresentatively low.

There are several methods for constructing averages. One is seen in Figure 5 above. The black line running through the dots is called a linear trend and is the line which comes as close as possible to all the individual data points in a population. Using a linear trend, one would look at the point on the trend line closest to a pilot and use that value as the average for his/her neighbourhood. Another common method is

called a rolling average as shown as the dark line in Figure 6 below. A rolling average takes the average of a certain number of pilots, 100 in this example, and uses it to derive an average for a neighbourhood.

**Figure 6 – Scatter Plot, Income vs. Seniority, Rolling Average**



The difference between the two methods is that the linear method does a poorer job of matching the data points than the rolling average does, while the rolling average is volatile, going up and down. This volatility is unavoidable with a rolling average. However, given that there is an inverse relationship between a seniority number and income (as one goes down the other goes up), a rolling average can produce unexpected results.

The objective, then, is to use an average which minimizes volatility while maximizing accuracy. If one uses a greater number of pilots in the average, the accuracy will go down but so will the volatility. By using a progressively larger number of pilots in the average, it was found that a neighbourhood of 240 pilots provided the greatest accuracy and beyond that point, the reduction in volatility was minimal. Therefore, I determined that 240 was the appropriate number of pilots for these calculations.

What this means, in practise, is that for every pilot an average of the 240 closest working pilots is calculated. For example, for the 1,000[th] American pilot, I take the 120 working APA pilots senior to him on the list and the 120 pilots junior to him and average all of their incomes. This exercise is carried out for each pilot of American and TWA.

With the average income for each pilot thus constructed, a list is then created which merges pilots according to income. The result is shown in Figure 7. The grey dots are American pilots and the black dots are TWA pilots. This list is the mathematically optimal one for matching pilots with those of like incomes given the constraint of not being able to reorder pilots on their own list. Not apparent from this

exhibit is that there are pilots who were on furlough in July 2002 that were placed at the bottom of the list starting with the American pilots followed by the TWA pilots. A graphic representation of the list is at Appendix 3 and it is referred to in data files as the "IOPTIMAL" model.

**Figure 7 – Fairness Model Scatter Plot**



*The Arbitrated List*

--------------------------------------------------------------------------------

Since airline deregulation in 1978, there have been 30 major airline mergers in North America that have produced merged seniority lists. There are, no doubt, mergers between smaller carriers that I am unaware of but to the best of my knowledge the 30 listed in <u>Figure 8</u> is a comprehensive list of the ones between major carriers with unionized pilots. Copies of the awards or agreements are in Appendix 4.

| Figure 8 – List of Post-Deregulation Mergers | | |
| --- | --- | --- |
| **Merger** | **Date** | **Arbitrator** |
| Southwest/AirTran | 8/11/2011 | Agreement |
| Pinnacle/Colgan/Mesaba | 6/16/2011 | Bloch |
| Republic/Frontier/Midwest/Lnyx | 2/19/2011 | Eischen |
| Northwest/Delta | 12/8/2008 | Bloch et al |
| US Airways/America West | 5/1/2007 | Nicolau |
| Canadian/Air Canada | 6/16/2003 | Keller |
| **American/Trans World Airlines** | 11/6/2001 | Unilateral |
| **American/Reno** | 10/28/1999 | Unilateral |
| AirTran/Valujet | 9/22/1999 | Scearce |
| American Eagle/Executive Airlines/Busin | 8/20/1999 | Agreement |
| First Air/NWT Air | 1/22/1999 | Keller |
| **Southwest/Morris Air** | 1/1/1994 | Unilateral |
| Continental/People Express | 8/13/1991 | Ross |
| FedEx/Flying Tiger | 5/25/1990 | Nicolau |
| Canadian Airlines/Wardair | 2/8/1990 | Munroe |
| Northwest/Republic | 11/6/1989 | Roberts |
| Alaska/Jet America | 4/15/1989 | Bloch |
| US Air/Piedmont | 10/31/1988 | Kagel |
| Braniff/Florida Express | 1/5/1988 | Agreement |
| EPA/CP/Nordair/PWA | 11/16/1987 | Teplitsky |
| **American/Air California** | 7/1/1987 | Unilateral |
| Continental/Frontier | 6/16/1987 | Nicolau |
| US Air/PSA | 4/9/1987 | Agreement |
| Continental/New York Air | 12/18/1986 | Bloch |
| TWA/Ozark | 11/14/1986 | Agreement |
| Canadian Pacific/Eastern Provincial | 11/6/1986 | Feller |
| **Piedmont/Empire** | 2/12/1986 | Unilateral |
| Alaska/Great Northern | 7/2/1982 | Feller |
| Flying Tiger/Seaboard World | 3/16/1981 | Siebel |
| PanAm/National | 3/12/1981 | Gill |

Of the 30 mergers, in 5 cases the pilots merged their lists by agreement. In 5 cases, including the American/TWA merger, the list was decided without the agreement of both parties. In the remaining 20

--------------------------------------------------------------------------------

cases the lists were merged by an arbitrator. Given this, there are 25 seniority mergers that can be referred to in order to estimate what an arbitrator would decide given the facts of the American/TWA merger and the arguments and proposals put forward by the respective pilot groups.

It should be noted that there is a temporal issue insofar as some of the awards/agreements came after the American/TWA merger. This means that negotiators would not have them available as precedents. However, mergers that came after American/TWA have not produced awards using approaches markedly different from those that came before and certainly none of these later awards have mentioned a specific reason why their decision might have been different at an earlier point in time. Therefore, given that the objective is to estimate an outcome of an arbitration, relying on more source material improves the quality of that estimate.

The Supplement CC list had three parts: The top of the list, made up exclusively of American pilots, a middle part where the remaining American pilots and some TWA pilots were merged arithmetically, and the bottom of the list made up exclusively of the remaining TWA pilots. Using Supplement CC as the integration model to work off of, I then reviewed the awards to find examples of where one group or the other was given exclusive positions at the top or bottom of the list.

### The Top of the Seniority List
-----------------------------------------------------------------------

In at least 5 of the 25 relevant mergers, the pilots were merged by either date of hire or length of service. This means that one group or the other, as a result of hiring patterns, may have ended up in significant numbers at the very top or bottom of the list. However, this is a by-product of how date-based lists work and it must be assumed that the objective was to build lists according to dates, rather than explicitly attempting to give one group or the other a structural advantage or disadvantage in seniority. With that clarification made, I turn now to the 6 mergers where one group was given the top of the list.

#### 1. Southwest/AirTran – 2011

The most recent merger, which culminated in the August 2011 agreement between the pilots of Southwest and AirTran saw 1,338 Southwest pilots being placed at the top of the list ahead of the first AirTran pilot. Given that there were 6,097 Southwest pilots on the combined list, the top block represented approximately 22% of the Southwest pilots. As the list was the result of negotiations between the groups and no rationale for the construction of the list was part of Side Letter 10, the agreement between SWAPA and Southwest Airlines to merge the two lists, little more can be said definitively about the placement of Southwest pilots at the top.

#### 2. US Airways/America West – 2007

In the 2007 US Airways/America West merger award, George Nicolau placed 517 US Airways pilots (approximately 11% of their list) ahead of the first America West pilot, despite the fact that US Airways was in bankruptcy as the time of the merger and had 1,799 pilots on furlough while America West was

financially stable and hiring pilots. The rationale for this was that US Airways operated A330 aircraft and did international flying on the B767 and there were 423 Captains and First Officers awarded this equipment at the time of the merger. Interspersed with the top 423 pilots on the US Airways list were 92 inactive or management/supervisory pilots.

### 3.  Continental/People Express – 1991

In the 1991 Continental/People Express merger award, Jerome Ross placed 651 Continental pilots ahead of the first group into which People Express pilots were merged. This group was initially constructed by Richard Bloch in the 1986 merger of the Continental/New York Air merger. Echoing Bloch's reasoning, Ross stated that "…the 651 senior CAL [Continental] captains … brought equities to the merged carrier that far outweighed those of the senior PEX [People Express] pilots. The date of hire of the CAL group ranged from 1951 to 1972… whereas the PEX group was hired in the 1980 to 1982 period. Continental contributed equipment as assets providing job opportunities well beyond those brought by People Express."[24] An additional number of Captains from both New York Air and Continental who were merged prior to the Ross arbitration were also placed above the first People Express pilot, although the award does not specify how many.

### 4. Continental/Frontier – 1987

In the 1987 Continental/Frontier merger, George Nicolau summed up the prospect for Frontier airlines as follows: "… Frontier was an operating airline [at the merger date]. But any expectations regarding its future must rest on its past… [T]he fact is that Frontier had precious little prospect of surviving as of the day before its shut-down. It was shrinking, not expanding. It was continuously losing money, badly draining its corporate parent, People Express. Most of its assets had already been sold and leased back at less than favourable rates. No one, on that date, could have realistically believed that its prospects were bright or that the promotional expectations were high. The issue, starkly but realistically put, was one of survival."[25]

However, Nicolau went on to state that, "It is significant that the Frontier pilots brought no jobs as such to the merger… On the other hand, the Frontier pilots brought to Continental their experience, their familiarity with the aircraft, and their knowledge of routes and cities served, all of which enabled the company to mount a successful 'turnkey' operation of substantial benefit to it. This circumstance argues against 'stapling' all the Frontier pilots to the bottom of Continental's long list."[26]

Instead of stapling, as the terms of reference under which the arbitration was conducted could be interpreted to endorse, in the final award Nicolau created a list where all Frontier captains were placed below the junior Continental captain as of the first equipment assignment subsequent to merger date.

---

[24] Ross, 1991, 128.
[25] Nicolau, 1987, 42.
[26] Nicolau, 1987, 46-47.

---

### 5. Continental/New York Air – 1986

In the 1986 Continental/New York Air merger, Richard Bloch placed a group of 651 Continental pilots (approximately 28% of the CAL pilots) at the top of the list. Bloch stated that "[t]he first 651 positions on the CAL list have been constructed essentially, though not entirely, by reference to date of hire… These pilots were hired from 1951 through 1972. At that point there is a considerable break in hiring."[27] However, given that the list also consisted of pilots merged by ratio, the placement of Continental pilots at the top of the list must be seen as more deliberate than the same placement would seem under a pure date-of-hire integration.

### 6. Canadian Pacific/Eastern Provincial – 1986

Although the award was effectively overturned in a subsequent merger, David Feller placed 214 Canadian Pacific pilots at the top of the list. Feller stated that these pilots were "…hired in 1967 or earlier, at a time when EPA was essentially a bush airline whose pilots had no expectation of flying jet aircraft."[28]

### Discussion

Based on a review of these awards, there is support for a theory that an arbitrator would have awarded a list with a significant number of American pilots at the top of the list. In estimating the number of pilots an arbitrator would have put in that block, several facts were considered including the following:

- American operated the B777 and A300 while TWA did not. The total number of positions American had on these aircraft was 1,159.
- The junior B777 Captain was #2393 on the American seniority list.
- The junior A300 Captain was considerably more junior and was #5411.

Given these facts, using the junior B777 and A300 captain would have made sense had TWA been comparable to Frontier when it merged with Continental. TWA was in bankruptcy when it merged with American whereas Frontier had ceased operation. It would be more reasonable, however, to argue that TWA was closer to US Airways, which was also bankrupt when it merged with America West. In that case, however, it was US Airways pilots who were given the top of the list.

In light of these comparable cases, I conclude that an arbitrator would have constructed a list with 1,159 American pilots, the total number of B777 and A300 positions, at the top.

---

[27] Bloch, 1986, 7.
[28] Feller, 1986, 14.

---

### *The Bottom of the Seniority List*

As mentioned above, there were 5 mergers where one group saw some of its pilots placed at the bottom of the lists. To extend the clarification above, it is not uncommon that pilots hired after a merger date are placed at the bottom of a merged list according to their dates of hire. It is also not uncommon that only one of the two merging airlines did any hiring after a merger was announced and therefore, new hires are, in essence, stapled to the merged list. Because these pilots are not actually parties to the merger negotiations or arbitrations, their placement at the bottom of the list is of no particular relevance here.

### 1. Southwest/AirTran – 2011

In the agreement between Southwest and AirTran, 368 AirTran pilots, approximately 21% of their list, were placed behind the last Southwest pilot hired prior to the merger announcement. As mentioned above, below this group were place pilots hired after the merger announcement. Again, as the merged list was the product of an agreement, the logic and rationale behind the construction of the list isn't known in the manner it is in an arbitral award.

AirTran operated two aircraft type, the B737 and B717, only the larger of which was operated by Southwest. Given that 53% of AirTran's 2010 ASMs were on the B717,[29] a rough estimate is that 27% of its pilots were B717 First Officers. This was likely at least a contributing factor in the agreement to end-tail some AirTran pilots. However, to contrast the end-tailing of AirTran pilots to those of TWA, in the latter case approximately 57% of TWA's pilots were stapled vs 21% of AirTran's. AirTran's smallest aircraft was also the B717 but American operated the Fokker 100, which was an aircraft comparable to the B717 in size and in the type of missions.

### 2. Republic/Frontier/Midwest/Lynx – 2011

In the complex merger of four airlines, arbitrator Dana Eischen end-tailed 204 Midwest pilots (63% of their list) who were on furlough at the time of the merger. As he stated, "…it cannot be denied that Midwest was an air carrier on the cusp of failure well down the road to extinction at the time of the transaction… One can take no satisfaction in validating the hard cold fact that no reasonable interpretation of fairness and equity justifies placing the remaining pre-acquisition furloughed MEA pilots anywhere but at the bottom tier of the IMSL. There is no evidentiary basis for any expectation that they might have been recalled to active service prior to the acquisition transactions."[30]

Of particular interest in this award is that Eischen only end-tailed the Midwest furloughees while there was a rationale for similar treatment for at least some of the Lynx pilots. As he stated, "their reasonable expectations for career advancement and job security were the least of the active pilot groups, ranking above only the [Midwest] pre-transaction furloghees [sic]… [T]hey operated only turboprop aircraft, had accumulated only limited seniority while flying for a startup operation that promptly went bankrupt and flew under less favorable wages and working conditions. On the other hand, the Q400 was comparable in

---

[29] US Department of Transportation, Form 41, T2 2010 Q1-4.
[30] Eischen, 2011, 34.

seating capacity and productivity to the E-170, to which most of the Lynx Aviation market flying was transferred after acquisition. Treatment of all Lynx pilots as active, with appropriate placement to give them access to that flying is fair and equitable."

As a result, the 101 Lynx pilots were merged with 559 Republic pilots in the third of four groups, the fourth being the Midwest furloughees.

### 3. US Airways/America West – 2007

At the time of the merger, US Airways was in bankruptcy and had a number of pilots on furlough. At the time of the award, there were 1,751 pilots (37% of the US Airways list) on furlough. Even though 959 of these pilots had returned to active service at the time of the award, George Nicolau end-tailed the entire group of furloughees. This decision proved to be highly controversial. In a dissenting opinion, pilot neutral, Jim Brucia, stated:

> I do not agree with the Board's decision, in the particular circumstances of this case, to integrate only working pilots as of the date announcement, leaving all those on furlough at that date on the bottom of the combined seniority list. As a consequence of the Boards decision, [the junior] America West pilot, who was hired less than 2 months before the merger was announced, has been placed immediately senior to US Airways pilot Colello [the senior US Airways furloughee] who was hired more than 16 years earlier and who had over 16 years of credited length of service. I disagree with this placement, which disregards Colello's substantial service time.[31]

The award was the major cause of the US Airways pilots leaving the Air Line Pilots Association and forming their own union, the US Airline Pilots Association, which refuses to be bound by the Nicolau award. As a result of this action and the downstream fact that a joint contract with US Airways had yet to be obtained, the two pilot groups are not yet integrated as of the writing of this report.

### 4. Continental/Frontier – 1987

As mentioned above, Frontier was in exceptionally dire circumstances at the time of the Continental merger. Indeed, the snapshot date in the "Joint Protection Agreement" that served as arbitrator Nicolau's terms of reference, used August 23, 1986 as this was the day prior to Frontier's shutdown. Nicolau placed 67 Frontier pilots, 15% of their list, at the bottom of the combined list. As he stated, "I have, however, placed the remaining 67 Frontier pilots, the bulk of whom were hired from late 1985 through July 1986 below Martes, the last Continental pilot hired before the JPA was signed. Given the late hiring and the unknown economic situation at Frontier, these pilots, in my view, do not bring the same equitable interests as those who proceeded them. The last hired Frontier pilot is then followed on the list by Second Officer T.J. Kratt, who was hired by Continental in February 1987, some four months after the JPA. He, in turn, is followed by approximately 400 others, soon to be 1000."[32]

---

[31] Brucia dissent, 2011, 2-3
[32] Nicolau, 1987, 50-51

5. Canadian Pacific/Eastern Provincial – 1986

Arbitrator David Feller, after he ratioed the CP and EP lists together in date-based groups, was left with 1 Eastern pilot hired in 1982 and a group of pilots who were not employed by Eastern at the time of the merger. As he explained, "The definition of 'EP pilot' includes those pilots not now employed who were hired as strike replacements during the 1983 strike at Eastern Provincial and who were displaced at the termination of that strike but have recall rights."[33] These pilots (approximately 2 dozen) and the single 1982 hire were end-tailed.

Discussion

In three of the five mergers where a group of pilots were end-tailed, the reason was that the pilots were not working due to furlough or because of recall rights.  In Continental/Frontier, Nicolau end-tailed a group of Frontier pilots due to their diminished expectations arising from Frontier's non-operating status and due to terms of reference of the arbitration, which he stated had a "considerable and obvious tilt in favor of the [Continental] pilots."[34] Lastly, in the Southwest/AirTran agreement, one can only speculate as to the rationale for end-tailing 21% of the AirTran pilots.

Leaving aside the last integration, which was the product of an agreement not arbitration, it can be seen that end-tailing pilots is the result of circumstances that are not mirrored in the American/TWA merger. No TWA pilots were on furlough at the time of the merger and it was an operating airline. Therefore, it is reasonable to assume that an arbitrated list would not have seen any TWA pilots end-tailed.

Nevertheless, the fact remains that the TWA pilots' own proposal saw 209 of their pilots being stapled, and presumably this position would have been put in front of an arbitrator. Even though I don't believe there is any justification for end-tailing any TWA pilots, I must assume the TWA pilots' proposal would have led to that outcome.

Thus far I've discussed the top and bottom of the list. There are manifold ways the pilots in the middle of the list could have been merged. The most common method in recent awards is to group pilots by status and equipment and to merge them arithmetically. As seen in Figure 9, below, as of April 2001, 39% of American pilots were in wide-body positions (B767, B777 and A300) while only 31% of TWA positions were. This might have resulted in relatively more American pilots being placed in a top grouping in the absence of a top block of 1,159 American pilots I estimated above. However, as the assumption is that there would have been a top block, it is more likely that the remaining pilots would have been ratioed together as one large group.

---

[33] Feller, 1986, 12
[34] Nicolau, 1987, 46

---

**Figure 9 – Percentage of TWA Pilots by Status and Equipment**

Percentage of Pilots by Status/Equipment

|  | TWA | AMR |
|---|---|---|
| Wide-Body Captain | 15% | 17% |
| Narrow-Body Captain | 35% | 28% |
| Wide-Body First Officer | 16% | 22% |
| Narrow-Body First Officer/Flight Engineer | 33% | 32% |

Therefore, my estimate is that an arbitrated award would have produced a merged list of all pilots as of April 2001. The list would have two categories, a top block of 1,159 American pilots followed by an arithmetically merged category containing the remaining 10,398 American pilots with 1,957 TWA pilots and a stapled group of 209. A graphic representation of this list is included as Appendix 3 and is referred to in data files as the "ARBMODEL".

## *The Marginal List*

When estimating the impact of a breach or an injury it is a common practice to use a highly conservative set of assumptions in order to gauge the severity of the breach. As this sort of "lowball" estimate is required for assessing the magnitude of more reasonable estimates, notional amounts are not particularly helpful. For instance, one could assume that the APA would have stapled one less TWA pilot or, put another way, merged one additional TWA pilot with American pilots. Measuring the difference between this "+1" list and Supplment CC list would indeed produce some damages, but they would be symbolic and unhelpful for assessing the size and reasonableness of the actual damage estimate.

In analyzing this matter, I have concluded that a marginal, material change would have been to merge an additional 200 TWA pilots in with the American pilots. I base this on the fact that the APA's March 2, 2001 proposal to the TWA pilots was to staple 1,542. Supplement CC, finalized in November 2001 stapled 1,226. This represents a change of 316 pilots removed from the stapled group.

It seems reasonable to me that in the absence of ALPA's violation at least 200 additional pilots would have been merged. Had the pressure been more intensive, negotiations might have been farther along by September 11, 2001 and the final list would have been less influenced by the difficulties the airline industry and pilots were facing. Furthermore, pressure could have extended negotiations further to produce a better list for the TWA pilots. In either case, if the APA had lowered the staple by 316 on their own, with ALPA's violation, a material, marginal change would be an additional 200, or what I refer to as the +200 Model.

The +200 would be constructed with 2,484 American pilots at the top, the same as with the Supplement CC list. This would be followed by a merged group of the remaining 8,870 American pilots with 1,140 TWA pilots, whereas Supplement CC had only 940 TWA pilots merged. Lastly there would be a staple of

1,026 TWA pilots as opposed to the 1,226 pilots stapled on the Supplement CC list. A graphic representation of this list is included as Appendix 3 and is referred to in data files as the "SUPCC+200" model.


## The Salamat Damage Model

With the Fairness, Arbitrated and Marginal models as a context, I now return to the replication principle in order to estimate what the TWA pilots and the APA would have agreed to had ALPA not violated its duty of fair representation. This principle, again, attempts to reproduce what parties would have agreed to had they been acting reasonably, and that one yardstick is the outcome from other, similar matters.

With that as a conceptual framework, I turn to the position of the APA, as stated in its response to the TWA pilots' "Rightful Place Proposal." A summary of their objections can be found at pages 1-2 of their July 18, 2001 letter to the Chair of the TWA MEC Merger Committee:

- The proposal fails to take into account any of the radical differences between our groups' pre-transaction career expectations, differences based on the nature of the carriers' pre-transaction operations; pre-transaction pay, benefits and working conditions; and pre-transaction long-term job security based on the carriers' financial condition.
- The proposal creates enormous windfalls for the TWA Pilots at the expense of the AA Pilots' career expectations in many respects, including crediting the TWA Pilots for assets which were not acquired by American, and for other assets which will not be deployed in the consolidated operation. The proposal thereby gives the TWA Pilots placement on the list beyond the value the TWA assets will add to the consolidated operation, and will permit the TWA Pilots - who have already reaped a windfall from the transaction - to hold positions which were rightfully the expectation of the AA Pilots, and to gravitate to the top of the positions which they hold.
- In addition to these conceptual problems, the proposal is based on a whole series of faulty factual premises, which increase the transfer of AA Pilots' career expectancies to the TWA Pilots.

The fundamental question, then, is to what extent ALPA, having employed the options and strategies listed in Figure 1, could have overcome the position of the APA. To begin that assessment, it is first necessary to establish how reasonable the APA's position in fact was.

The APA's first bullet point pertains to career expectations as a result of pre-merger opportunities, pay and job security. Difference in pay, as Nicolau noted in the US Airways/America West merger (see above), rarely plays any significant role in the outcome of a seniority merger and therefore cannot be seen as a reasonable position. Job security has factored into the construction of seniority lists, but only in exceptional circumstances, such as in the case of furloughees or the Frontier pilots. As TWA had no

furloughees at the time of the merger and was still an operating airline, albeit in bankruptcy, only marginal weight could reasonably be put on the TWA pilots' job security. No one can say conclusively what would have occurred had AMR not merged with TWA.

Differing career opportunities, however, have certainly played a role in the construction of lists. The amount of "premium" work, such as wide-body captaincies, aircraft on order, airline growth and quality of work all play some role in virtually every merger and it is not uncommon for one party to argue that its pilots should be granted a seniority premium to reflect the "better opportunities" they bring and that the other party will have a chance to share in.

The second bullet point is related in that it makes the claim that the jobs TWA pilots occupied at the time of the merger might not continue into the future. This type of claim is also very common in seniority mergers.  For instance, in the Northwest/Delta merger, arbitrators Bloch, Eischen and Horowitz noted:

> [T]he Northwest fleet… is composed of numerous aircraft of questionable long-term utility. NWA's DC-9 fleet is old, inefficient, and likely scheduled for replacement. The exact timing and extent of that model's departure is uncertain, but the record is clear that this portion of the fleet has already been substantially reduced… Under even the most optimistic case scenario, therefore, this is an aircraft whose time is limited.[35]

Although the award did not precisely state the impact of the DC-9 on the manner in which they constructed the list, based on the number of DC-9 positions Northwest had, it appears that the arbitrators gave the Northwest pilots credit for approximately half the DC-9 Captain positions they held at the announcement of the merger.[36]

The third bullet point included objections to only crediting American pilots with jobs for aircraft on order up to 2002 and understating the number of jobs that each aircraft would bring them. The third bullet also involved an objection to treating the A300, B767 and B757 as one aircraft grouping. Further objections included:

- "The AA Pilots are entitled to some consideration for the risk they are bearing to their career progressions in having pilots from a failing carrier placed ahead of them on the integrated seniority list."[37]
- The TWA proposal did not factor in the promotional opportunities created by the attrition of American pilots.
- The TWA proposal was based only on upgrade from First Officer to Captain and failed to recognize intervening steps in career progression.
- The TWA proposal would have guaranteed more Captain jobs to TWA pilots than the APA was prepared to protect.

---

[35] Bloch, Horowitz, Eischen, 2008, 22.
[36] Northwest had a 2415 Captains, 446 of them on the DC-9. The top two of four categories in the award gave Northwest 2204 positions, making for a difference of -211, or near half of 446.
[37] APA, July 18, 2001 letter, 14.

As these latter objections were, in large measure, specific to the "Rightful Place Proposal" it is difficult to generalize from them or to find examples of other mergers that would illuminate the reasonableness of the APA's position in its third bullet point. However, having reviewed the TWA proposal and the APA's response, I am unconvinced that the Rightful Place Proposal could have formed the basis for an agreement between the TWA pilots and the APA. Therefore, in estimating what was achievable, I believe it is only reasonable to start with the basic outline of Supplement CC.

As regards the top block of American pilots, it was mentioned above that on the Supplement CC list this block was 2,592 pilots. The TWA's Rightful Place Proposal would have created a block of 1,512, or 1,000 smaller. Using the Nicolau methodology from Continental/Frontier, the junior B777 Captain who would have been #2393 would have yielded a block approximately 200 pilots smaller. Another approach would have been to reserve spaces at the top of the list in the manner Nicolau did in US Airways/America West. Using B777, A300 and B767 Captains and B777, A300 First Officers would have created a block of 2,450. Using all Captains with the exception of those on the F100 would have created a block of 2,494. These approaches and their differences from Supplement CC is shown below in <u>Figure 10</u>.

---

**Figure 10 – Comparison of Approaches to Top of List**

|                                | AMR Top Block | Diff From Sup. CC |
|--------------------------------|:-------------:|:-----------------:|
| Supplment CC                   | 2592          |                   |
| All Captains Except F100       | 2494          | -98               |
| Widebody CA, B777, A300 F/Os   | 2450          | -142              |
| Junior B777 Captain            | 2393          | -199              |
| Rightful Place Proposal        | 1512          | -938              |

---

Using all captains except the F100 would have created a top block only 98 pilots smaller than Supplement CC and is more consistent with the APA's concern about protecting Captain jobs than the others would. Given that it is close in effect to what Nicolau did in Continental/Frontier, it would have been reasonable for the TWA pilots and the APA to agree that the top of the list would be made up of 2,494 American pilots.

The number of TWA pilots that were stapled is a more difficult matter to estimate. Supplement CC saw 1,226 TWA pilots stapled while the Rightful Place Proposal would have stapled 209. This difference of 1,017 pilots is of much greater practical importance than the difference of 938 the parties had about the top of the list. Pilots toward the bottom of the list are subject to furlough and in the days after September 11, 2001 there was great concern about this. Even prior to September 11, there was a question about how many pilots would be needed in a merged American/TWA.

The APA merged 940 TWA pilots with American pilots and stapled the remainder. Given that there were 939 MD90 and B767 Captains on the TWA list, it would appear that this was the basis for that number. As noted above, there have been cases when pilots who did not even bring jobs were merged (not

---

stapled). As of the merger date, all the TWA pilots were working. Thus, my estimate would be that an arbitrator would not have stapled any TWA pilots but for the fact that the TWA's last two proposals would have stapled some number of their own pilots.

I am left, therefore, trying to employ the logic both groups used to assess what they would have ultimately agreed to had ALPA deployed its resources and support effectively. After considering several models in addition to the ones discussed in detail above, it is my estimate that, given APA's recognition that TWA brought Captain positions with its fleet, further pressure and incentives on ALPA's part could have at least convinced them to recognize that the TWA fleet also required First Officers. Large commercial aircraft generally do. If APA was willing to accept that the TWA pilots were entitled to credit for captain positions, if they were acting reasonably it seems likely that given meaningful pressure they would ultimately have been convinced the TWA pilots were also entitled to the co-pilot positions. If these positions were included in the merged group, it would have resulted in a list with the composition seen in Figure 11.

| | AMR | TWA |
|---|---|---|
| **Figure 11 – Damage Model List Construction Counts** | | |
| Top | 2,494 | - |
| Merged | 8,870 | 1,873 |
| Staple | - | 464 |
| Total | 11,364 | 2,337 |

As a result of this simple but significant change, approximately 762 TWA pilots would have been moved up into the merged group and many of them would have been spared furlough. A graphic representation of the list is included as Appendix 3 and it is referred to in the data files as the "DMODEL".

### Conditions and Restrictions

An element of the agreement that is related to but separate from the seniority list itself has to do with bidding restrictions. The TWA Pilots' Rightful Place Proposal included five-year protections that would have guaranteed them 17% of the narrow-body and small wide-body captaincies. Supplement CC also gave the TWA pilots a guaranteed number of positions, although it did so by giving them exclusive access to positions in the St. Louis base and then, via an agreement with American, guaranteeing the number of captain position available there. Additionally, both groups proposed restricting the TWA pilots from holding A300 or B777 positions, although for different periods of time.

The APA had proposed protecting some number of captain positions for the TWA pilots as early as their first proposal. As they stated, "[O]ur proposed fence provides protections in both directions. The fence that we propose is designed to protect the TWA Pilots' legitimate career expectations…"[38] Later, in their

---

[38] March 2, 2001 Letter from Ed White to Leroy Bensel, 3.

response to the Rightful Place Proposal this was echoed: "As we have repeatedly stated, we are prepared to guarantee the number of sustainable Captain jobs contributed by the TWA assets to the consolidated system to TWA Captains, and to a specified number of TWA First Officers who had a plausible anticipation when hired of upgrading to Captain at TWA."[39]

Bidding restrictions can be horrendously complex and in modelling their impacts over several years in several pilot seniority mergers, I can attest to the fact that they usually have unexpected consequences. The fact that the bidding restriction in the Roberts award merging the pilots of Northwest and Republic spawned 24 interpretive arbitrations[40] is but one illustration of their complexities.

The bidding restrictions in Supplement CC:

1.  Guaranteed the TWA pilots 30% of the Small Wide-Body Captaincies available at DFW and ORD (as opposed to the percentage of all positions available system-wide in the TWA proposal)
2.  Guaranteed the TWA pilots 30% of the Narrow-Body Captaincies available at DFW and ORD
3.  Blocked TWA from holding any B777,MD11 or A300 position until the Junior American Airlines pilot had sufficient seniority to hold the position.
4.  Protected the STL domicile for TWA pilots and prevented them from holding positions outside that base.

A key difference between the TWA proposal and Supplement CC was that in the latter the guarantees were also maxima, capping the number of positions TWA pilots could occupy. As shown in <u>Figure 12</u> below, agreeing to the capping part of the provision would have immediately and permanently cost TWA pilots 55% of the wide-body captaincies and 33% of the narrow-body captaincies they had at the time of the merger.

In order for the guarantee of 30% to be redundant, TWA pilots would have to be given sufficient seniority that they could hold their positions without the guarantee. The Fairness Model list gives a reasonable approximation of this, as it gives pilots enough seniority to place them among pilots earning roughly the same amount as of July 2002, after some downsizing had occurred. Under that model, TWA pilots would have gained an average of 2,988 seniority numbers relative to Supplement CC. Under the Salamat Damage Model, however, the average increase in seniority would only be 1,571 numbers and no single TWA pilot would have a seniority number equal to or better than their Fairness Model number. Therefore, it can be concluded that the guarantee of a number of positions would still be required in order for TWA pilots to continue to have access to a minimum percentage of the jobs they held at the time of the merger.

---

[39] July 18, 2001, Letter from Ed White to Michael Day, 16.
[40] Bloch, Eischen, Horowitz, Northwest/Delta Pilot Seniority Award, fn 17.

---

**Figure 12 – TWA and AMR Pilot Positions**

**Positions as of April 2001**
(Unassigned Pilots Assigned Proportionally)

|  | Small Wide-Body Captains | Narrow Body Captains |
|---|---|---|
| **AMR (DFW/ORD)** | 890 | 3477 |
| **TWA** | 598 | 1548 |
| **Percentage of AMR** | 67% | 45% |
| **Entitlement Under Supplment CC** | 267 | 1043 |
| **Loss of Positions** | -331 | -505 |
| **% of Positions Lost** | -55% | -33% |

For this reason, an agreement on protections would have had to be somewhere in the space between those in the Rightful Place Proposal and Supplement CC. As the protections for TWA was lower in Supplement CC it requires little in the way of assumptions to conclude that Supplement CC would have provided the floor for small wide-body and narrow-body captaincies. However, as mentioned above, if this were also to cap the number of positions, then the TWA pilots would have had to agree to a permanent loss of opportunities and this does not seem credible given that there are no precedents for such a permanent cap in any of the reviewed awards. Therefore, I conclude that the restrictions the parties would have agreed to would have mirrored Supplement CC minimums without functioning as caps.

As regards to the fence on B777, MD11 and A300 positions, to the point in time when negotiations were occurring, there were many awards with no significant restrictions, several with a restrictions ranging from 2 to 5 years and the infamous Roberts award with 17 years. As mentioned above, American Airlines pilot, BD White, was used as the trigger for dropping this restriction. However, by 2025 he still would not have sufficient seniority (#2393 or better) to hold the position of B777 Captain. Therefore, more than 24 years of restrictions would have been necessary, displacing Roberts as the most far-reaching.

As shown in Figure 13, under the Salamat Damage Model list only a handful of TWA pilots would be within striking range of a 777 Captaincy for the dozen years after the mergers. However, the junior American A300 Captain was very junior indeed, with less seniority that the Junior B727 Captain, and approximately 348 TWA pilots per year would have had the seniority to hold the A300 position under the Salamat Damage Model list.

**Figure 13 – TWA Pilots Above Seniority Thresholds**

| Number of TWA Pilots with Sen # Better than 2393 On Damage Model List | | | | Number of TWA Pilots with Sen # Better than 5411 On Damage Model List | | | |
|---|---|---|---|---|---|---|---|
| Year | Count | Year | Count | Year | Count | Year | Count |
| 2003 | 3 | 2015 | 18 | 2003 | 351 | 2015 | 18 |
| 2004 | 2 | 2016 | 17 | 2004 | 322 | 2016 | 17 |
| 2005 | 1 | 2017 | 14 | 2005 | 325 | 2017 | 14 |
| 2006 | 0 | 2018 | 55 | 2006 | 330 | 2018 | 55 |
| 2007 | 0 | 2019 | 114 | 2007 | 340 | 2019 | 114 |
| 2008 | 0 | 2020 | 166 | 2008 | 341 | 2020 | 166 |
| 2009 | 0 | 2021 | 196 | 2009 | 341 | 2021 | 196 |
| 2010 | 0 | 2022 | 224 | 2010 | 341 | 2022 | 224 |
| 2011 | 0 | 2023 | 244 | 2011 | 356 | 2023 | 244 |
| 2012 | 0 | 2024 | 296 | 2012 | 381 | 2024 | 296 |
| 2013 | 0 | 2025 | 345 | 2013 | 409 | 2025 | 345 |
| 2014 | 9 | | | 2014 | 423 | | |

However, the junior A300 First Officer was near the bottom of the American list and the junior B777 only a quarter of the way up from the bottom. While the guaranteed minimums on TWA captaincies would have served as justification for the B777 and A300 Captain fences, there are no corresponding protections for junior TWA pilots in the first officer range. Therefore, agreeing to a 10 year fences on B777 and A300 Captain positions would have represented a balanced, meaningful compromise for the TWA pilots.

The St. Louis base was protected for TWA pilots as an integral part of the guarantee of positions and therefore has to be seen as something intended for their benefit. However, prior to the merger, 30% of the TWA pilots did not have STL as a base. In the absence of guarantees that were structurally tied to that base, this limit on their ability to change domiciles, which is an important way pilots exercise their seniority, would not have provided the TWA pilots with protection at all. Given that guarantees in other mergers have been accomplished without requiring pilots be restricted to one domicile, there are other ways the parties could have structured conditions and restrictions to accomplish the goals without placing this severe limit on the TWA pilots' mobility.

In summary, then, my conclusion is that the conditions and restrictions agreed to would have been:

1. Guarantee the TWA pilots 30% of the Small Wide-Body Captaincies available at DFW and ORD.
2. Guarantee the TWA pilots 30% of the Narrow-Body Captaincies available at DFW and ORD.
3. TWA pilots fenced from holding any B777, MD11 or A300 Captain position until December 31, 2011.
4. The TWA pilots would not have been prevented from bidding outside the STL base.

*Damage Summary*

------------------------------------------------------------------------

Before turning to the precise method for calculating damages, a summary of the damages serves as a useful conclusion to the description of the various outcomes. As shown below in <u>Figure 14</u>, the damages suffered by the TWA pilots, from a fairness point of view, are $1.4B. Even under the marginal model, the damages are $164M. However, under what I believe is the likely outcome of a successfully negotiated list, the Salamat Damage Model, the TWA pilots have suffered approximately $887M in damages as a result of ALPA's violation of its duty of fair representation.

| **Figure 14 – Summary of Damages** | |
|---|---|
| | **Calculated Damages $M (Unmitigated)** |
| Fairness Model | $    (1,442) |
| Arbitrated List | $    (1,160) |
| Damage Model | $    (887) |
| Marginal (+200) Model | $    (164) |

| Section 4 – Damage Calculations |
| --- |

The damage calculations were computed using the Perl programming language[41] in combination with a MySQL database. The code containing all major functions used for this report is included as Appendix 5. Some additional functions used in importing data, validating results and stress testing sources are included as Appendix 6. The code use in building the Fairness Model is included as Appendix 7.

Data that was relied on is as follows:

1. Seniority lists for July of each year from 2002 to 2011 provided by the APA – Appendix 8
2. Pilot activity reports detailing each pilots' position, credit hours and line status for each month from April 2002 to June 2012 from American Airlines – Appendix 9
3. An April 9, 2001 American Airlines pilot seniority list with pilots, positions and line status  – Appendix 10
4. An April 10, 2001 TWA pilot seniority list with pilots, positions, and line status – Appendix 11
5. The American Airlines/APA Supplement A pay rates from the 1998 Agreement – Appendix 12
6. The American Airlines/APA Supplement A pay rates from the 2003 Agreement – Appendix 13
7. Annual rates of return for the American Airlines pilots' retirement fund 1997-2011 – Appendix 14
8. Life expectancy tables for 2011 from the Office of the State Actuary – Appendix 15

MySQL tables that were relied on or produced in the calculation process are as follows with their file names. All data tables used or created in the calculation process are included as Appendix 16, a compressed archive containing field definitions and comma-separated text files with the actual data.

1. Pilot Database (pilotdb)
2. Pilot Employment History (emphist)
3. Pay Rates (payrates)
4. Calculated Pilot Monthly Income (income)
5. Pension Impacts (pension)
6. Rolling Average Income Data (proxy)
7. Seniority Lists as Imported (senlist table with listid: "SUPCC.ACT")
8. Aged Seniority Lists (senlist table with listid ending: ".FCST")

As discussed above, a pilot's seniority is a form of currency that he or she uses to bid for a job position, schedule, vacation allotment, training schedules, home base and a variety of monetary and lifestyle options. A pilot who is not at one extreme of a seniority list (i.e. not among the most junior or senior) will have to make a choice about whether they would prefer to be relatively senior in a lower position or junior in a higher one. The most junior pilots in a position will generally sit as a reserve, typically earning less and being on call for several days of the month. They will also have the last choice for things such as vacation days, training schedules, and in some cases meals. Pilots are paid according to the rate for their equipment and the number of hours they spend actually flying aircraft. As reserves only fly when needed

---

[41] Scripts were executed using Perl 5, version 14, subversion 2 (v5.14.2) and MySQL version 5.1.60-community on a PC running Windows 7.

and not according to a schedule, they are paid a guaranteed minimum number of hours which generally works out to less than the hours flown by pilots with a schedule, known as line-holders or block-holders. For that reason, many pilots do not bid for the highest paying position they could hold, but make trade-offs between money and lifestyle.

In Figure 15 below, the grey dots plot each American Airlines pilot according to their seniority and their monthly earnings as if they had 12 years of services in the month of July 2003.

**Figure 15 – Scatter Plot, AMR Top of Scale Income, Linear Trend**



Two observations are readily apparent: First, the lower a pilot's seniority number (i.e. is more senior), the higher his or her income tends to be. Second, pilots who are close to each other on the seniority list can have considerably different incomes. This difference in income for pilots is the result of the particular tradeoffs pilots have made and also as a result of the number of hours each pilot worked in a month. The number of hours worked is not always related to seniority as a pilot can, for instance, be on medical or personal leave for part of the month, which would mean that the number of hours they are credited for may only represent a few days work. Leaving aside these issues for the moment, the dispersion of incomes is primarily the result of individual choices.

A more detailed way to analyze the effect of pilot choice is to compare pilots' actual income to the maximum income each pilot could have earned if every pilot was in the highest paying position their seniority would allow. In Figure 16 below, this maximum income, frequently referred to as stovepipe income, is shown as the dashed line. Pilots whose income is above the line have sacrificed lifestyle for income while pilots who are below the line have done the opposite and have taken lower a lower paying position in exchange for non-monetary benefits.

Pilot preference is the main reason for a pilot being above or below the stovepipe line, but are three other reasons that can cause it as well. The first most common reason as referred to above is that the pilot is not available for the entire month, causing them to have lower income. The second most common reasons are bidding restrictions that allow a pilot to have preferential access to higher positions than their seniority would allow or alternatively block a pilot from holding such a position. Related to this are position freezes that prevent a pilot from changing positions frequently, thereby limiting their exercise of seniority. The third most common reason are reinstatement rights and "no displacement" provisions. These mean than pilots, once they have attained a position, may have preferential access to return to that position in the event they are displaced or alternatively that they can only be displaced by a pilot with more seniority under limited conditions. As a result, reinstatement and "no displacements" result in pilots holding positions out of seniority order.

For example, as discussed previously, Supplement CC included a guaranteed number of captain positions for TWA pilots. However, the merged seniority list did not give them sufficient seniority to hold those positions. As a result, some TWA pilots held these guaranteed positions "out of seniority order."

**Figure 16 – Scatter Plot, AMR Top of Scale Income, Stovepipe**



A third method for analyzing the relationship between income and seniority is to use a rolling average, as was referred to above. To reiterate, the rolling average is the average of the 240 pilots closest to each pilot on the seniority list. In Figure 17, the heavier black line plots the rolling average for each pilot. It can be seen that the rolling is close to the linear average but that it is higher at the most senior and junior ends of the seniority list.

**Figure 17 – Scatter Plot, AMR Top of Scale Income, Rolling Average**



To summarize, there are three methods for describing the relationship between seniority and income, a linear trend, stovepipe income and a rolling average. This relationship between seniority and income is at the heart of estimating the damages to the TWA pilots as one needs to be able to quantify the value of, for instance, being at seniority #6000 vs. #4000 under an alternate list.

For the month of July 2003, the slope of the linear trend is -0.5611, which means that the estimated change in income for moving from #6000 to #4000 is approximately $1,122. Using the stovepipe method, where income goes up in steps rather than gradually, the estimated change in income would be $1,714. Using the rolling average, the estimated change would be $1,366.

In choosing an estimation methodology the stovepipe method was ruled out primarily because of its stair-step nature, which means that changes in seniority over two short distances close to each other can be zero or large depending on the stovepipe income line for the month. This means that several pilots who move 100 seniority numbers could have no change in income while several others who move the same

distance could have a change of several hundred dollars. While this would ultimately produce aggregate damages (i.e. for all pilots taken in combination) comparable to those calculated with a rolling average, it does not accurately calculate the impact to individuals. The linear average was ruled out because average income tends not to increase significantly at the junior end of the seniority list, while it rises quite dramatically at the senior end. Thus, the linear average would overstate the impact on pilots at the junior end of the list and understate them at the senior.

However, one advantage of the linear and stovepipe methods is that there is always a positive relationship between seniority and income; income never goes down as seniority goes up. This aspect of a rolling average, discussed above as volatility, has been minimized by using a relatively large number of pilots in the average (240). Additionally, the line is calculated each month and therefore volatility is minimized to insignificant levels. The entire table with the average income at each system seniority number for each period between April 2002 and June 2012 is the proxy table data in Appendix 16.[42]

Therefore, given the rolling average as the most appropriate estimator of income, the impact (D) for any given pilot in a given month is:

$$D = (i_{sx} - i_{sa}) \times p_l$$

**Where:**
$i_{sa}$ = **Average Top of Scale income at actual seniority**
$i_{sx}$ = **Average Top of Scale income at changed seniority**
$p_l$ = **Percentage of top of scale for pilot's length of service (l)**

The reason the impact must be calculated this way is because of disparities in lengths of service in parts of the seniority list. A TWA pilot and an American Airlines pilot could be next to each other on the seniority list, could have the same position and fly the same number of hours yet their incomes could differ as a result of one having more years of service than the other (Pay scales at American see pilots getting annual increases in their first 12 years. Once the 12th year is reached there are no more automatic increases). Therefore, the difference in income for a 5th year pilot changing position would be less than for a 12th year pilot making the identical change in position. For this reason, the rolling average is calculated as if all pilots were at the 12th year, but when calculating the impact to an individual pilot, the amount is lowered commensurate with the pilot's length of service.

Due to the fence preventing TWA pilots from bidding into B777 and A300 Captaincies until the end of 2011, a different average income line was used to estimate impacts during the April 2002 to June 2012 period. For these moths, an "unfenced average" was calculated that excluded B777 and A300 captains,[43] as shown in <u>Figure 18</u>. It will be noted that below seniority #1500, there is no significant difference between the unfenced and fenced averages. However, at the senior end of the seniority list, the two averages diverge significantly. Using the lower, unfenced average for the period when bidding restrictions are in place, with a six month buffer to be conservative, ensures that damages are not overstated.

---

[42] See proxy data files with model: SUPCC.ACT
[43] See proxy data files with model: SUPCC.ACT.F

---

Figure 18



There are three exceptions to this calculation. The first exception is when a pilot would not be on furlough under an alternate list, but was under Supplement CC. In this case the impact to the pilot is the entire average income at the changed seniority number. In the opposite case, where a pilot was working but would have been furloughed under an alternate list, then the impact is the pilot's actual salary. A second exception is that when a pilot is on voluntary furlough, there are no damages attributed. Pilots may choose to take early furlough when the company announces layoffs and alternately may choose not to come back immediately when the company begins recalling. In either case, if a pilot who was actually on furlough has pilots junior to him/her who are working, I consider them on voluntary furlough and calculate no impact. The last exception is for pilots who are inactive. This is generally because they are on some sort of leave (medical, personal, maternity) or are in transition from one status to another. No impact is calculated for these pilots during periods they are inactive.

These calculations were performed for each pilot for each month from April 2002 to June 2012. As there is no actual data past June 2012, the rolling average for the last month was used to estimate future impacts from July 2012 to June 2026. The shape of the rolling average line will change substantially in the future due to wage rate bargaining, changes in the composition of the American Airlines fleet, changes in pilot

productivity (working hours) as well as increases/decreases in the number of positions. There are also many unknowns such as whether there will be a merger with US Airways and what that merged seniority list might look like. It is impossible to know what these changes will mean to the rolling average line in the future and one is therefore left with two choices: use the latest data available or make no calculations at all.

There is no doubt that better seniority for the TWA pilots would mean that they, on average, would have higher income in the future than they will under Supplement CC and therefore some estimate of those future damages has to be made. Using the assumption that American Airlines will continue to look as it did in June 2012 until 2026 is almost certainly incorrect. However, it is the one assumption that requires no accompanying assumptions. If wages rise in the future or if the workforce expands, this estimate will be conservative. If wages fall below current levels or the workforce contracts, then the estimate will be high. Due to these unknowns there are limitations on the accuracy of the calculation of future damages and therefore they have been itemized separately.

If before trial actual data for periods after June 2012 becomes available and I am requested to, I will update historical and estimated future damages. Such an update would not require any change in my methodology or assumptions.

## *Bidding Restrictions*

An additional technical matter is related to bidding restrictions. As mentioned above, damages have been calculated under the assumption that the Supplement CC protections would provide a number of guaranteed captain positions. If a pilot is in a protected position, then increasing his seniority may not increase his income, as he is already holding a higher paying position than he would otherwise be able to hold. It was mentioned above that one method employed for ensuring that impacts are not overstated was to use a rolling average income line calculated without B777 and A300 Captains.

An additional method used was to identify pilots in protected positions and assume zero impact in the months in which they were holding positions out of seniority order. To determine which pilots to treat as holding a protected position, the threshold seniority number for being able to hold a position by dint of seniority alone was calculated as follows.

$$TH = AMR_{max} + ( ( AMR_{max} - AMR_{avg} ) / ( N_{amr}/2 ) * N_{twa} )$$

**Where**
**TH = Threshhold seniority number for a given position**
**$AMR_{avg}$ = Average AMR seniority number for position**
**$AMR_{max}$ = Maximum AMR seniority number for position**
**$N_{amr}$ = Number of AMR pilots in position**
**$N_{twa}$ = Number of AMR pilots in position**

This formula proportionally expands the American Airlines pilots' seniority range holding a given position to accommodate the positions held by TWA pilots and then uses the bottom of the expanded range as the cut-off point for considering a pilot to hold the position by seniority alone. It uses the bottom half of the seniority distribution in order to limit the effect of senior pilots opting for junior positions. Otherwise, the cut-off point would move farther down the seniority list than would likely be accurate.

In a given month, any pilot below the cut-off point on an alternative seniority list is considered to be holding their position as a result of guarantees and therefore I use the conservative assumption that there is no impact to those pilots for that month.

It's worth noting that pilots who are in the maximum position allowable under restrictions have less ability to exercise seniority for increased income. As noted above, seniority is a form of currency that pilots exchange for income and lifestyle, and that these benefits are somewhat interchangeable. A pilot who is restricted in exchanging seniority for income must therefore use it for lifestyle. For instance there is approximately $755k in employment damages under the Salamat Damage Model attributable to pilots who were B767I Captains who were line-holders. More seniority for them would have to be used for better schedules, vacations, domicile, job classification (such as check pilot or other non-line position) or other items that would not necessarily lead to an increase in income. Therefore, the $755k represents the monetary value of damages to lifestyle. More generically, under the Salamat Model there is approximately $5.1M in damages attributable to pilots whose actual income was greater than two standard deviations above the estimated average income at their alternative seniority number[44]. This amount represents the estimated monetary value of the loss of lifestyle under the Salamat Model. The monetary values for all models are in Appendix 20.

*Inactive Pilots*

There are several reasons why pilots may be listed as inactive for a particular month in the data provided by American Airlines (see abs_char tab, AA0012.xls in Appendix 17). In some cases a pilot may be getting paid by the company during these periods. In other cases the pilot may be paid by another party (i.e. Union, Insurer, FAA) based on the position the pilot holds. In yet other cases the pilot's position may have no bearing on whether, or if, the pilot receives any compensation at all. For this reason, a conservative approach has been adopted and there is no impact calculated for pilots who are inactive, with the exception of furloughed pilots.

If a pilot was on furlough during a given period but would not have been under an alternative list, then the impact to the pilot is the total lost income for the period. However, there are situations where pilots are either on voluntary furlough or have bypassed recall. During the historic period, pilots on voluntary furlough have no impact calculated for them. At the end of the historic period, there were pilot who had

---

[44] The assumption is that, being at the top end of the income distribution, a pilot with income greater than 2 standard deviations above the average at an alternative seniority number would be unable to exercise that enhanced seniority for additional income.

bypassed recall and were, therefore, on furlough by choice. It is uncertain whether these pilots will accept recall in the future or will resign. However, as these pilots still have the right to be recalled, and in that sense are the same as pilots who have not yet been offered recall, I have calculated damages for them as if they will return as soon as attrition will permit. These pilots have no damages attributed to them during the period they would remain on furlough.

There may be legitimate reasons why pilots were furloughed out of seniority order or bypassed recall that might conceivably entitle them to damages. In some situations a pilot may have obligations to a current employer, and therefore cannot accept recall. In others, such as when a pilot is infirm, accepting recall would involve the pilot returning to an inactive status. However, the data provided has no explanations and therefore the conservative assumption is that these pilots have mitigated their damages and it is not appropriate to calculate any damages for these pilots while they are on furlough out of seniority order.

### *Attrition*
------------------------------------------------------------------------

As was mentioned above, calculating damages for the future (from July 2012 to June 2026) was done with a different methodology to historical damages. I have already discussed how the rolling average line for June 2012 was used as the basis for estimating the impacts in the future. This assumption also means that the model assumes the number of available positions at American Airlines will remain the same as June 2012. The model runs to the end of June 2026, a point when 63% of the TWA pilots are estimated to have retired. Often these models run until all pilots have retired (2040 in this matter), but the decision in this case was to use a more conservative forecast horizon of 14 years.

Another assumption that had to be made is when pilots would retire, as this affects pensions, movement up the seniority list, total income and the number of years pilots would suffer damages. Prior to December 13, 2007, when the FAA changed the mandatory retirement age for pilots from 60 to 65, most pilots at mainline carriers worked to 60 unless they left early due to illness or misfortune. Since the change, however, there is increased attrition prior to the mandatory retirement age due to increased illness and early retirement. As a full five years has not even passed since the change, there is no historical data one could rely on for an average. To date I have used estimate average retirement ages ranging from 62 to 64, however the most common that is used in negotiations with management and when forecasting for crew planning purposes is 63. Therefore, for pilots who had not reached 60 by the date of the change, I use the assumption of retirement at 63 and pilots are assumed to cease employment on the first day of the month after turning 63.

*Interest*

---------------------------------------------------------------------------

Compound interest, as shown in <u>Figure 19</u>, was applied to damages from the beginning of the year they were incurred up to January 1, 2013 using the US National inflation rate as calculated from the US Department of Labor Bureau of Labor Statistics Consumer Price Index (CPI-U), found in Appendix 18. A rate of 2.5% was used for years 2012 onwards.

**Figure 19 – Annual and Compound Inflation Rates**

| Year | Annual Rate | Compound Rate to 2013 |
|------|-------------|-----------------------|
| 2000 | 3.38% | 38.41% |
| 2001 | 2.83% | 33.89% |
| 2002 | 1.59% | 30.21% |
| 2003 | 2.27% | 28.18% |
| 2004 | 2.68% | 25.33% |
| 2005 | 3.39% | 22.07% |
| 2006 | 3.23% | 18.06% |
| 2007 | 2.85% | 14.37% |
| 2008 | 3.84% | 11.20% |
| 2009 | -0.36% | 7.09% |
| 2010 | 1.64% | 7.47% |
| 2011 | 3.16% | 5.74% |
| 2012 | 2.50% | 2.50% |

Future damages are discounted from the beginning of the year in which they are incurred back to January 1, 2013 using a discount rate of 2.5%.

*Mitigation*

---------------------------------------------------------------------------

Damages are reduced by income earned through substitute employment, known as mitigation of damages. Mitigation of damages for each member of the class will be calculated once the data has been collected.

*Pension Plan A*

----------------------------------------------------------------

The impact to pilots' pensions under the American Airlines Plan A was calculated as follows:

**PEVA = (Greater of FF x N x 0.0125 and 1,500) x N x P x D**

**Where:**
**PEVA=Present Value of Pension Plan A**
**N=Number of complete years worked for American between**
        **December 1, 2001 and November 30, 2011**
**L=Male life expectancy given year of pilot's year of birth[45]**
**P=Years on pension based on retirement assumption**
**FF=Estimated Average of last 5 Years employment in Dec 2001-Nov 2011 period**
**D=2.5% discount rate factor given year of retirement, and pensionable years**

This calculation is performed using expected income under the Supplement CC list and an alternate, such as the Salamat Damage Model, and the difference between the two present value calculations is the estimated impact to the pilot's Plan A pension under the alternate model. As damages are based on the difference in the rolling average at two points on the seniority list, FF under the Supplement CC list is the average income at a pilot's seniority number on that list and not his/her actual income.

*Pension Plan B*

----------------------------------------------------------------

The impact to pilots' pensions under the American Airlines Plan B was calculated as follows:

**PEVB=DI x CR x ((1 + G)^{(YR - Y)}) x D**

**Where:**
**PEVB=Present Value of Pension Plan B**
**DI=Difference in income between Supplement CC and alternate list**
**CR=Contribution rate – 11%**
**G=Assumed growth rate of fund – 7%**
**Y=Year in which income is earned**
**YR=Year of retirement**
**D=2.5% discount rate factor to January 2013, given year of retirement**

---

[45] As each pilot's gender is not stated in the data, we are using the assumption that all pilots are male. Life expectancy data is based on the US Social Security Administration, Actuarial Life Table, Period Life Table 2007, available at:  http://www.ssa.gov/oact/STATS/table4c6.html Also used was Office of the State Actuary 2011 projected tables available at:
http://osa.leg.wa.gov/Actuarial_Services/Actuarial_Information/Life_Expect_tables.htm

This calculation is performed for each year the pilot is estimated to work before retiring and summed. The difference in sums for Supplement CC and an alternate scenario is the estimated impact to the pilot's Pension Plan B under the alternate model.

### *Summary of Damages under different Lists*

Figure 20 below has the complete breakdown of what the damages to the TWA pilots would be under the different lists that have been discussed. The analyses in Sections 2 and 3 demonstrated that the Salamat Damage Model was the most likely list to be agreed to, had ALPA pursued all the available strategies. Using a conservative assumption that there was no multiplier effect when employing several strategies, I estimated that there is a 73% probability that ALPA's violation has caused $887,409,179 in damages to the TWA pilots and is therefore liable for $647,808,701 in unmitigated damages.

The total damages are broken down in to three sections: Historic damages that occurred during the period for which actual data is available, forecast damages for the period between July 2012 and June 2026, and pension damages. Within the historic section, damages are broken down by type. Employment damages result from pilots being paid less under the Supplement CC integration due to lower seniority than their expected income would be under an alternative integration. Furlough damages are the result of pilots having been furloughed who would not have been under an alternative scenario. Interest was calculated for historic damages and future damages were discounted to January 1, 2013. Pension damages have present-value discounting applied in their calculation and do not, therefore, have the discount broken out separately. Damages broken down by each individual TWA pilot is included in Appendix 19.

| Figure 20 – Summary of Impacts | | | | |
|---|---|---|---|---|

| | | | Figures in $M | |
| | **Fairness Model** | **Arbitrated List** | **Salamat Damage Model** | **Marginal (+200) Model** |
|---|---|---|---|---|
| **April 2002 - June 2012** | | | | |
| Employment Damages | (243.7) | (168.1) | (109.8) | (25.4) |
| Interest | (41.6) | (28.2) | (17.8) | (3.9) |
| Subtotal | (285.4) | (196.3) | (127.6) | (29.3) |
| | | | | |
| Furlough Damages | (501.7) | (432.4) | (352.8) | (57.2) |
| Interest | (80.8) | (72.8) | (59.7) | (11.9) |
| Subtotal | (582.5) | (505.2) | (412.5) | (69.1) |
| | | | | |
| Subtotal | (867.9) | (701.5) | (540.1) | (98.4) |
| | | | | |
| **July 2012 - June 2026** | | | | |
| Employment Damages | (255.1) | (200.2) | (148.3) | (32.0) |
| PV Discount | 29.4 | 23.4 | 17.3 | 3.4 |
| Subtotal | (225.7) | (176.8) | (131.0) | (28.6) |
| | | | | |
| **Pension** | | | | |
| Plan A Damages | (114.0) | (92.8) | (72.8) | (13.0) |
| Plan B Damages | (234.6) | (189.3) | (143.4) | (24.1) |
| Total | (348.6) | (282.1) | (216.3) | (37.1) |
| | | | | |
| **Total Damages** | (1,442.1) | (1,160.3) | (887.4) | (164.1) |

**Figure 21**



Figure 21, above, plots the damage to each TWA pilot under the Salamat Damage Model according to his/her TWA seniority number in April 2001.

---

Figure 22

---



Figure 22, above, shows the average impact for each grouping of 50 TWA pilots according to their April 2001 seniority number under the four different merger models that I have discussed.

| Section 5 – Conclusion |
| --- |

To reiterate Sycara's characterization of the negotiation process, "The interaction of the participants during negotiations engenders change in their goals, the ways they perceive the issues, their utilities associated with various outcomes and their reservation prices."[46] The foregoing analysis represents the most thorough and methodical approach to estimating how a dynamic, interactive and indeterminate process would have resulted in the absence of ALPA's violation of its duty of fair representation to the pilots of TWA. Given that estimating an alternate outcome to a negotiation is an imprecise science, I have assigned probabilities that ALPA's actions could have produced an outcome I have called the Salamat Damage Model. These probabilities total 73% and it is therefore my conclusion that this is the likelihood that ALPA's violation has caused the TWA pilots to lose income equivalent to $887,409,179 as of January 1, 2013 and is therefore liable for $647,808,701 in unmitigated damages. This opinion is to a reasonable degree of certainty using the methods and techniques of the theoretical frameworks discussed above.

---

[46] Sycara, 2009:203

# Exhibit 53



# Damages in Brady et al vs. The Air Line Pilots Association

## Supplementary Report on Damages Under the Farber Lists

Rikk M.T. Salamat, BA, MBA
Principal Consultant, Case Lab Inc.

October 12, 2012



Think Information

| Farber Lists |
|---|

In Patrick Brady et al v. Air Line Pilots Association (ALPA), the jury found that ALPA violated its duty of fair representation to the former pilots of Trans World Air (TWA) and that this violation caused injury to the TWA pilots. This report concerns the calculation of those damages under a list which I will refer to as the "Farber List."

The Farber Lists are three seniority lists that merge the pilots of American Airlines and TWA who were active at the time those two companies merged. These lists were provided to me in electronic format and are included as Farber Appendix 1. In order to harmonize the lists with other seniority lists from later periods, 5 pilots had to be dropped and 28 were inserted above the pilot junior to them on later lists and their employee IDs changed to ones used by the modelling software. These deletions and insertions are detailed in Farber Appendix 2. The assigned employee IDs, matching those in the main report Appendix 16 data tables is detailed in Farber Appendix 3. No other modifications to the lists provided were made.

In my report *Damages in Brady et al v. The Air Line Pilots Association* dated October 12, 2012, I outlined the methodology which was used for analyzing the damages in this matter. Those calculations were performed on a number of different lists using the same assumptions. I have also run the Farber Lists in the same manner as those lists. Figure 1 below summarizes the results of those calculations and any descriptive comments in that other report apply to these results. The damages to individual pilots under each list are in Farber Appendix 4 and all intermediate calculations and inputs are included in the data files in Appendix 16 of my main report.

Figures 2, 3 and 4 plot the damage to each TWA pilot under the Farber Lists 1, 2 and 3 respectively according to each pilot's TWA seniority number in April 2001.

**Figure 1**

Figures in $M

| | Farber Seniority List #1 | Farber Seniority List #2 | Farber Seniority List #3 |
|---|---|---|---|
| **April 2002 - June 2012** | | | |
| Employment Damages | (209.4) | (227.3) | (184.1) |
| Interest | (35.6) | (38.7) | (31.2) |
| Subtotal | (245.0) | (265.9) | (215.3) |
| | | | |
| Furlough Damages | (472.8) | (576.7) | (351.8) |
| Interest | (79.7) | (96.0) | (60.9) |
| Subtotal | (552.5) | (672.6) | (412.7) |
| | | | |
| Subtotal | (797.5) | (938.6) | (628.0) |
| | | | |
| **July 2012 - June 2026** | | | |
| Employment Damages | (235.5) | (276.3) | (186.4) |
| PV Discount | 27.5 | 33.1 | 20.9 |
| Subtotal | (208.0) | (243.2) | (165.5) |
| | | | |
| **Pension** | | | |
| Plan A Damages | (104.2) | (121.3) | (83.0) |
| Plan B Damages | (216.4) | (261.0) | (163.8) |
| Total | (320.6) | (382.3) | (246.7) |
| | | | |
| **Total Damages** | (1,326.2) | (1,564.1) | (1,040.2) |

Figure 2



**Figure 3**



**Figure 4**



# Exhibit 54



# Damages in Brady et al vs.
# The Air Line Pilots Association

# Supplementary Report on Damages Under the
# Tannen List

Rikk M.T. Salamat, BA, MBA
Principal Consultant, Case Lab Inc.

October 12, 2012



Think Information

| Tannen List |
| --- |

In Patrick Brady et al v. Air Line Pilots Association (ALPA), the jury found that ALPA violated its duty of fair representation to the former pilots of Trans World Air (TWA) and that this violation caused injury to the TWA pilots. This report concerns the calculation of those damages under a list which I will refer to as the "Farber List."

The Tannen List, also known as the Rightful Place Proposal, is a seniority lists that merges the pilots of American Airlines and TWA who were active at the time those two companies merged. This list was provided to me in electronic format and is included as Tannen Appendix 1. In order to harmonize the lists with other seniority lists from later periods, several pilots had to be dropped, others were inserted above the pilot junior to them on later lists, and pilots' employee IDs were changed to ones used by the modelling software. The resulting list is included as Tannen Appendix 2. No other modifications to the lists provided were made.

In my report *Damages in Brady et al v. The Air Line Pilots Association* dated October 12, 2012, I outlined the methodology which was used for analyzing the damages in this matter. Those calculations were performed on a number of different lists using the same assumptions. I have also run the Tannen List in the same manner as those lists. Figure 1 below summarizes the results of those calculations and any descriptive comments in that other report apply to these results. The damages to individual pilots under each list are in Tannen Appendix 3 and all intermediate calculations and inputs are included in the data files in Appendix 16 of my main report.

Figure 2 plots the damage to each TWA pilot under the Tannen List according to each pilot's TWA seniority number in April 2001.

| Figure 1 | |
|---|---|
| | Figures in $M |
| | **Tannen** |
| | **Seniority** |
| | **List** |
| April 2002 - June 2012 | |
| Employment Damages | (213.4) |
| Interest | (35.9) |
| Subtotal | (249.3) |
| | |
| Furlough Damages | (664.3) |
| Interest | (111.7) |
| Subtotal | (776.0) |
| | |
| Subtotal | (1,025.3) |
| | |
| July 2012 - June 2026 | |
| Employment Damages | (300.1) |
| PV Discount | 37.1 |
| Subtotal | (263.0) |
| | |
| Pension | |
| Plan A Damages | (130.9) |
| Plan B Damages | (293.5) |
| Total | (424.4) |
| | |
| Total Damages | (1,712.7) |

**Figure 2**



# Exhibit 55



# Furlough Damages in
# Brady et al vs. The Air Line Pilots Association
# After Application of Set-Off

Rikk M.T. Salamat, BA, MBA
Principal Consultant, Case Lab Inc.

April 30, 2013



Think Information

## Calculation of Furlough Damages after Application of Set-Off – April 30, 2013

This report describes the method by which the set-off of furlough damages in the period 2002 to 2011 was calculated for the pilots of the former TWA. Furlough damages include lost income while pilots were on furlough, interest on that income and the impact on pilots' pensions under the American Airlines A and B plans. Such damages do not include future damages (from 2012 onwards) or employment damages from non-furloughed pilots earning less than they otherwise might have under a particular model.

These calculations use pilot responses to the "TWA Pilot Questionnaire" each pilot was mailed in December 2012. As of April 30, 2013 we had received 1,790 responses. Appendix 1 includes a 4th volume of scans that have been received or modified since Volume 3 was provided to ALPA's counsel.

Figure 1 below summarizes, by year, the number of TWA pilots who were on furlough and the number and type of responses received from those pilots. In summary, approximately 82% of the documentation required to calculate or estimate set-off has been received.

| Figure 1 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Furloughed | Rcvd | Missing | Complete | Partial | Incomplete | % Response |
| 2002 | 630 | 487 | 143 | 220 | 266 | 1 | 77% |
| 2003 | 1,287 | 1,060 | 227 | 558 | 500 | 2 | 82% |
| 2004 | 1,350 | 1,111 | 239 | 601 | 508 | 2 | 82% |
| 2005 | 1,359 | 1,120 | 239 | 606 | 512 | 2 | 82% |
| 2006 | 1,317 | 1,090 | 227 | 590 | 498 | 2 | 83% |
| 2007 | 1,290 | 1,068 | 222 | 580 | 486 | 2 | 83% |
| 2008 | 1,162 | 953 | 209 | 493 | 458 | 2 | 82% |
| 2009 | 1,006 | 809 | 197 | 404 | 404 | 1 | 80% |
| 2010 | 1,079 | 878 | 201 | 448 | 429 | 1 | 81% |
| 2011 | 993 | 795 | 198 | 396 | 398 | 1 | 80% |
| | 11,473 | | | 4,896 | 4,459 | | 82% |

For instance, in 2002 630 TWA pilots were furloughed for at least part of the year. Of those, we received responses from 487. 220 of those responses were "complete" files that included the documents listed in Figure 2. 266 of the responses we received were from pilots whose responses were missing some documents ("partial"), but sufficient information was provided to estimate each pilot's income while on furlough. 1 of the responses received was from a pilot who did not provide sufficient information to estimate their income ("incomplete"). No response was received from 143 pilots ("missing"). In total, then, 77%[1] of the required data to calculate or estimate set-off for 2002 was obtained.

---

[1] (220 + 266) / 630

Each pilot response and associated documentation was classified according to the degree of completeness for years the pilot was on furlough. These classifications are found in the "datacheck" field of the table "pq_header" in Appendix 3. The codes used and their definitions are as follows:

| Code | Category | Description |
|------|----------|-------------|
| DONE | A | Reviewed and Complete ("Complete" in Figure 1) – Social Security Earnings Report (SSER) is complete, Pilot Response (PR) is complete, and Supporting Docs (W2s, 1099s, 1040s, etc) are complete. Analysis based on SSER, PR and Supporting Docs. |
| ND_EST | B | Missing Docs Estimate ("Partial" in Figure 1) – SSER is complete, PR is complete, and Supporting Docs are incomplete/absent. Analysis based on both SSER and PR.  Supporting Docs are also used when available. If no SSER and/or PR data was provided, but W2s/1040s clearly show wages then income from the latter was used. |
| SS_EST | B | SS Only Estimate ("Partial" in Figure 1) - SSER is complete, PR is incomplete/absent, and supporting docs are complete/incomplete/absent. Analysis based on both SSER and PR when available, and just SSER for years for which PR is missing. Supporting Docs are also used when available. |
| PR_EST | B | PR Only Estimate ("Partial" in Figure 1) – SSER is incomplete/absent, PR is complete, and supporting docs are complete/incomplete/absent. Analysis based on both SSER and PR when available, and just PR for years for which SSER is missing. Supporting Docs also used when available. |
| NR_EST | B | No Response Estimate ("Partial" in Figure 1) - SSER is incomplete/absent, PR is incomplete/absent, and supporting docs are complete/incomplete (but not absent). Analysis based on both SSER and PR when available.  Analysis based exclusively on Supporting Docs for years for which SSER and PR are missing. |
| NR_NOC ND_NOC | C | ("Incomplete" in Figure 1) Missing Docs Can't Calculate (ND_NOC) or No Response Can't Calculate (NR_NOC) – Questionnaire was returned but no SSER, PR or Supporting Data provided. |
| SS_NOC | C | ("Incomplete" in Figure 1) SS Only Can't Calculate – SSER is submitted but not complete. No PR. SSER is used when available and nothing is checked for years SSER is missing. |
| PR_NOC | C | ("Incomplete" in Figure 1) PR Only Can't Calculate – PR is submitted but not complete. No SSER response. PR is used when available and nothing is checked for years PR is missing. |

Given the different levels of completeness of each pilot response, they were classified as A, B or C. Classes A and B are equivalent insofar as sufficient information was obtained to be able to calculate pilots' earnings in the years when they were on furlough. In class B responses, while not all information may have been provided, it was concluded that income could be calculated from what was submitted. Class C responses are equivalent to non-responses because a pilots' set-off income could not be calculated.

---

**Figure 2**

1. A social security earnings report
2. IRS W2s
3. The first two pages of IRS 1040s
4. A signed pilot response with earnings for each year
5. Other relevant documents

---

For each year that pilots were on furlough, pilots' total annual income for purposes of setting off damages was determined by reviewing the information outlined in Figure 2. The overarching objective was to determine, for each calendar year, how much employment income pilots earned that would set-off their furlough damages. As such, income the pilot would have received regardless of having been furloughed, such as back-pay, was not included as set-off income. Likewise, moneys received that eroded future benefits (such as unemployment benefits), investments or savings were not treated as set-off income. Furthermore, expenses for job search or medical insurance premiums were used to offset employment income, provided such expenses did not provide long-term benefits (such as with fees or tuition for job training/education).

In approximately 60% of the cases[2], the figure listed on the pilot's SSER was used (cvaluesrc = sser in table pq_datacheck). In 10% of the cases, the figure provided by the pilot on his/her statement was used (cvaluesrc = resp). Where there was a discrepancy between PR figures and SSER figures, the higher number was always used, unless supporting documentation proved that lower number was the accurate one. In 1% of the cases the pilot provided insufficient information for the year in question to determine income (cvaluesrc = nodam).

In the remaining 29% of cases (cvaluesrc = other), a base figure, generally that on the SSER, was adjusted to account for income that either increased or decreased the pilot's total set-off income for the year. Those adjustments and their corresponding codes used in the "adjustments" field of the pq_datcheck table are as follows:

**AA**: American Airlines Income: Where an SSER was absent and pilot response did not include American Airline wages, but W2s or data provided by AMR clearly showed income earned, this difference was added to pilot response.

**AE**: American Airlines stock/options investment income. If W2s provided showed code 'V" in box 12, that amount was deducted from the pilot's annual income. If no W2s were provided, but data provided by AMR indicated income for a year the pilot was on furlough for the entire year, the amount was assumed to be stocks and was deducted. This is only applied in the case of pilots not working for American Eagle in that year.  If pilot was employed by American Eagle but no W2 was provided, (i.e., no code "V' to separate stocks from earned wages) then no deductions

---

[2] SQL: SELECT count(*),cvaluesrc FROM pq_datacheck where cvalusrc is not null group by cvaluesrc

were applied. In the first year after furlough, income from AMR/Eagle was assumed to be wages, unless a W2 was provided that clearly indicated in Box 12 that some or all of income was actually code 'V', a stock option.

**AL**: APA payment: In 2006 the Allied Pilots' Association disbursed moneys from the settlement of a grievance. Where a W2 for this amount was provided, this amount was deducted. Where a pilot did not include a W2 for this amount, but where SSER and W2s were provided for all other source of income, the difference between SSER and the sum of W2s was assumed to be the APA payment. This assumed figure was deducted.

**EI**: Employment Insurance: Where documentation provided indicated that the pilot response included employment insurance payments, this amount was deducted from the pilot response.

**F:** Foreign Employment: If pilot claimed wages earned from foreign sources (Form 2555 or on pilot questionnaire) which were not included in SSER, foreign wages were added to SSER amount.

**M:** Medicare Corrections: Where the SSER is not available, and where W2s indicate that the Pilot Response used social security rather than medicare wage, the difference between social security and medicare wages was added to the pilot response.

**MX:** Medical Expenses:  Only used when pilot had some proof of medical insurance expenditures. Where pilot provided estimates of medical insurance premiums and/or costs but incomplete supporting documentation, pilot's estimation was used.  If pilot reported medical expenses on questionnaire but no documentation was provided, no deductions were applied from pilot's given estimates. If one lump figure for medical expenses was provided with some form of supporting documentation, figure was divided by number of years on furlough and a deduction was applied to each year. Where documents provided no dollar amounts (such as Enrollment Forms) and pilot did not provide estimated costs, no deductions were applied.

**P:**  Pension, retirement, insurance contracts. Used when PR included an amount from pension, retirement, insurance income. This amount was always used as a deduction from pilot's response.

**S:** Secondary employment prior to furlough. For pilots who had secondary employment prior to furlough, the 3 year average was calculated. If 3 years of W2s, etc. were not available, then anywhere from 1 to 2 years were used. The average income from secondary employment was deducted for each year of furlough. If pilot retired or had a medical leave of absence, secondary employment was not deducted for that particular year or months. In event of missing W2s but where a pilot provided an estimate for secondary income, the pilot's answer was included in calculation. This approach was only used when the average pre-furlough secondary earnings would be lowered by pilot's response.

**ZZ:** Other. Most often used for 1099M (Miscellaneous Income) and other taxable income not documented anywhere else. This adjustment was used both to add set-off earnings and subtract non-set-off income from totals.

*Estimation of Set-Off of Furlough Damages*
*Attributable to Non-Responders / Pilots Providing*
*Insufficient Data*

As described above, there were a number of pilots from whom no or incomplete information was received. These damages are detailed as Category C in Figure 3, which summarizes the damages and interest under each of the scenarios that were presented in earlier reports. Without this information, set-off of furlough damages cannot be calculated for the Category C pilots. On average, 13% of the furlough damages under each model lacked sufficient documentation to establish the actual set-off of damages.

To estimate the damages attributable to Category C, for each model the lower of the Category A and Category B percentages of set-off to total damages was applied to the total Category C damages. For instance, under the SUPCC+200 (Marginal) model, the *set-off* damages (i.e. after set-off income has been applied to reduce damages) in Category A were 42% of the *unmitigated* damages, while those in Category B were 47% (i.e. pilots in Category B had less set-off income).

Given that one reason pilots may not have responded to the questionnaire is the possibility that the pilots believed their damages to have been set-off, it is reasonable to use a more conservative estimate of the damages attributable to that group. Therefore, to estimate the set-off of damages in Category C, the $14.73M in unmitigated damages was multiplied by the lower of the two (42%) to obtain an estimate of damages of $2.66M after applying set-off.

**Figure 3**

**Unmitigated Damages Categorized by Response Quality ($M)**

| Model | Category A Damages | % of Total | | Category B Damages | % of Total | | Category C Damages | % of Total | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| ARBMODEL | $ 220.21 | 51% | $ | 155.39 | 36% | $ | 56.26 | 13% | $ | 432.37 |
| DMODEL | $ 180.83 | 51% | $ | 124.78 | 35% | $ | 46.67 | 13% | $ | 352.78 |
| FARBER_1 | $ 237.15 | 50% | $ | 172.02 | 36% | $ | 63.14 | 13% | $ | 472.83 |
| FARBER_2 | $ 278.64 | 48% | $ | 210.91 | 37% | $ | 83.77 | 15% | $ | 576.67 |
| FARBER_3 | $ 181.09 | 51% | $ | 123.81 | 35% | $ | 46.43 | 13% | $ | 351.84 |
| IOPTIMAL | $ 249.23 | 50% | $ | 182.36 | 36% | $ | 69.56 | 14% | $ | 501.67 |
| SUPCC+200 | $ 34.69 | 61% | $ | 16.17 | 28% | $ | 6.27 | 11% | $ | 57.20 |
| TANNEN | $ 317.47 | 48% | $ | 244.77 | 37% | $ | 98.51 | 15% | $ | 664.29 |

**Set-Off Damages Categorized by Response Quality ($M)**

| Model | Category A Damages | % of Unmitig. | | Category B Damages | % of Unmitig. | | Category C Damages | Min of A/B | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| ARBMODEL | $ 91.08 | 41% | $ | 65.51 | 42% | $ | 23.27 | 41% | $ | 179.85 |
| DMODEL | $ 74.29 | 41% | $ | 51.74 | 41% | $ | 19.17 | 41% | $ | 145.20 |
| FARBER_1 | $ 99.97 | 42% | $ | 72.85 | 42% | $ | 26.62 | 42% | $ | 199.44 |
| FARBER_2 | $ 117.59 | 42% | $ | 88.56 | 42% | $ | 35.18 | 42% | $ | 241.33 |
| FARBER_3 | $ 77.79 | 43% | $ | 53.63 | 43% | $ | 19.94 | 43% | $ | 151.36 |
| IOPTIMAL | $ 102.64 | 41% | $ | 74.83 | 41% | $ | 28.54 | 41% | $ | 206.02 |
| SUPCC+200 | $ 14.73 | 42% | $ | 7.66 | 47% | $ | 2.66 | 42% | $ | 25.06 |
| TANNEN | $ 137.16 | 43% | $ | 105.60 | 43% | $ | 42.50 | 43% | $ | 285.27 |

**Interest on Set-Off Damages Categorized by Response Quality ($M)**

| Model | Category A Interest | % of Set-Off Dam. | | Category B Interest | % of Set-Off Dam. | | Category C Interest | Min of A/B | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| ARBMODEL | $ 18.15 | 20% | $ | 12.64 | 19% | $ | 4.49 | 19% | $ | 35.28 |
| DMODEL | $ 14.96 | 20% | $ | 9.99 | 19% | $ | 3.70 | 19% | $ | 28.64 |
| FARBER_1 | $ 19.89 | 20% | $ | 14.07 | 19% | $ | 5.14 | 19% | $ | 39.10 |
| FARBER_2 | $ 23.36 | 20% | $ | 17.14 | 19% | $ | 6.81 | 19% | $ | 47.31 |
| FARBER_3 | $ 15.71 | 20% | $ | 10.47 | 20% | $ | 3.89 | 20% | $ | 30.07 |
| IOPTIMAL | $ 20.15 | 20% | $ | 14.09 | 19% | $ | 5.37 | 19% | $ | 39.61 |
| SUPCC+200 | $ 3.27 | 22% | $ | 1.71 | 22% | $ | 0.59 | 22% | $ | 5.57 |
| TANNEN | $ 27.24 | 20% | $ | 20.51 | 19% | $ | 8.25 | 19% | $ | 56.01 |

*Interest*

--------------------------------------------------------------------------------

Interest on set-off damages was calculated using the US CPI rates used for earlier calculations. Interest on Category C damages was estimated by using the lower of the effective interest rates on Category A and B damages. For instance, under the DMODEL (Salamat) model, Category A interest is 20% of the set-off damages, while Category B interest is 19%. Using the approach as above, the lower rate of 19% yields an estimate of $3.7M in interest on Category C damages.

## *Pension*



Pension calculations for the American Airlines A and B plans were revised and recalculated using lower (or no) earnings under each of the models for pilots who a) would not have been on furlough in a particular year under the model and b) had set-off income in that year. Plan A pension impact was recalculated using a lower average final-five years of earnings (FF in the ), adjusted to account for set-off income. Plan B damages similarly used a lower difference in income (DI) between Supplement CC and each of the models. Figure 4 outlines the revised pension damages under each model.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Figure 4** | | | | | | | | | |
| | Unmitigated | | | After Set-Off | | | Δ | | |
| **Model** | **Plan A** | **Plan B** | **Total** | **Plan A** | **Plan B** | **Total** | **Plan A** | **Plan B** | **Total** |
| ARBMODEL | (92.8) | (189.3) | (282.1) | (92.2) | (117.8) | (210.0) | 0.57 | 71.48 | 72.05 |
| DMODEL | (72.8) | (143.4) | (216.3) | (72.8) | (87.7) | (160.6) | 0.01 | 55.67 | 55.68 |
| FARBER_1 | (104.2) | (216.4) | (320.6) | (102.9) | (137.0) | (239.9) | 1.28 | 79.45 | 80.73 |
| FARBER_2 | (121.3) | (261.0) | (382.3) | (119.5) | (160.6) | (280.0) | 1.88 | 100.43 | 102.30 |
| FARBER_3 | (83.0) | (163.8) | (246.7) | (82.3) | (108.7) | (191.1) | 0.63 | 55.04 | 55.67 |
| IOPTIMAL | (114.0) | (234.6) | (348.6) | (111.5) | (149.7) | (261.2) | 2.43 | 84.94 | 87.37 |
| SUPCC+200 | (13.0) | (24.1) | (37.1) | (13.0) | (17.2) | (30.2) | - | 6.95 | 6.95 |
| TANNEN | (130.9) | (293.5) | (424.4) | (128.5) | (173.9) | (302.4) | 2.41 | 119.62 | 122.03 |

*Technical Notes*

----------------------------------------------------------------

Appendix 2 contains revised code used to calculate and generate reports and data.

Running the following command will recalculate set-off, export data files with summary results and populate data tables with the results:

> MODEL.pl cmd mitigrpt_data SUPCC.ACT.F

Running the following command will recalculate pensions using set-off:

> MODEL.pl pdiffm

Running the following command will export summary pension results:

> MODEL.pl cmd mitigrpt_pdata

Appendix 3 contains several data tables. Below are notes relevant to each.

**pq_datacheck :** Data for each pilot who was furloughed at some point in time who provided a pilot response.

- cvalue: set-off income for year
- cvaluesrc: source of income
- adjustments: comma separated list of codes and values as discussed above
- notes: comments

**pq_furhist:** Furlough history, by year for each pilot.

- fstart: furlough start
- fend: furlough end
- need_*: indicates whether W2s, pilot questionnaire response, SSER or IRS 1040s were missing from pilot's response for year

**pq_header:** General information about pilots' responses

- contact_note_1: Message sent to pilot requesting additional information in addition to missing information indicated in need_* fields in pq_furhist
- datacheck: see discussion above
- datacheck_note: general comments about pilot's response

**pq_mitigation:** set-off and unmitigated damages for each year, for each model

**pq_response:** data from pilots' responses to questionnaire

----

- resptype: fbutr indicates pilot answered "furloughed but recalled" page, fnotr indicates pilot answered "furloughed not recalled" page.
- i2000-2012a/b/c: fields with values provided by pilot for income for each year
- q_notes: notes from pilot

**pq_scanlog:** Log of all scans.

**pq_sser:** Medicare earnings from pilots' social security earnings reports

**amrs2data:** Data provided by American Airlines

- source: "w2data" includes income from American Airlines employment, stock grant/option exercise and income from American Eagle. "w2data_noeagle" includes only employment income from American Airlines.

**pension:** results of pension calculations including set-off pension calculation

*Summary*
-----------------------------------------------------------------------

Figure 5 summarizes the damages from furlough[3], broken down by category, in the years 2002 to 2011 under each of the models discussed in my earlier reports after set-off income has been applied.

| Figure 5 |
|---|

**Damages Due to Furlough After Application of Set-Off, 2002-2011**

| | Category A | | | Category B | | | Category C | | |
|---|---|---|---|---|---|---|---|---|---|
| | Lost Earnings | Pension | Total | Lost Earnings | Pension | Total | Lost Earnings | Pension | Total |
| ARBMODEL | $ 109.22 | $ 82.44 | $ 191.66 | $ 78.15 | $ 57.10 | $ 135.25 | $ 27.76 | $ 70.51 | $ 98.27 |
| DMODEL | $ 89.24 | $ 66.57 | $ 155.81 | $ 61.72 | $ 45.26 | $ 106.98 | $ 22.87 | $ 48.75 | $ 71.63 |
| FARBER_1 | $ 119.86 | $ 91.09 | $ 210.95 | $ 86.92 | $ 63.93 | $ 150.85 | $ 31.76 | $ 84.84 | $ 116.59 |
| FARBER_2 | $ 140.96 | $ 107.81 | $ 248.77 | $ 105.70 | $ 78.55 | $ 184.26 | $ 41.98 | $ 93.68 | $ 135.66 |
| FARBER_3 | $ 93.50 | $ 69.62 | $ 163.12 | $ 64.10 | $ 46.44 | $ 110.54 | $ 23.84 | $ 74.99 | $ 98.83 |
| IOPTIMAL | $ 122.79 | $ 96.93 | $ 219.72 | $ 88.92 | $ 67.37 | $ 156.29 | $ 33.92 | $ 96.95 | $ 130.87 |
| SUPCC+200 | $ 18.00 | $ 12.85 | $ 30.85 | $ 9.38 | $ 6.29 | $ 15.66 | $ 3.25 | $ 11.04 | $ 14.30 |
| TANNEN | $ 164.40 | $ 122.62 | $ 287.03 | $ 126.11 | $ 90.83 | $ 216.95 | $ 50.76 | $ 88.95 | $ 139.71 |

Figures 6 to 8 are revised summaries of damages under all models discussed in earlier reports, amended with summary figures on set-off and its impact on:

1. Furlough damages
2. Interest on furlough damages
3. Plan A pension damages
4. Plan B pension damages

---

[3] These are damages from lost earnings (lost salary plus interest) and the related pension impacts. They exclude damages from 2012 onwards and damages due to pilots holding lower paying positions, but who were not furloughed.

**Figure 6**

Figures in $M

| | Fairness Model | Arbitrated List | Salamat Damage Model | Marginal (+200) Model |
|---|---|---|---|---|
| **April 2002 - June 2012** | | | | |
| Employment Damages | (243.7) | (168.1) | (109.8) | (25.4) |
| Interest | (41.6) | (28.2) | (17.8) | (3.9) |
| Subtotal | (285.4) | (196.3) | (127.6) | (29.3) |
| | | | | |
| Furlough Damages | (501.7) | (432.4) | (352.8) | (57.2) |
| Interest | (80.8) | (72.8) | (59.7) | (11.9) |
| Subtotal | (582.5) | (505.2) | (412.5) | (69.1) |
| | | | | |
| Subtotal | (867.9) | (701.5) | (540.1) | (98.4) |
| | | | | |
| **July 2012 - June 2026** | | | | |
| Employment Damages | (255.1) | (200.2) | (148.3) | (32.0) |
| PV Discount | 29.4 | 23.4 | 17.3 | 3.4 |
| Subtotal | (225.7) | (176.8) | (131.0) | (28.6) |
| | | | | |
| **Pension** | | | | |
| Plan A Damages | (114.0) | (92.8) | (72.8) | (13.0) |
| Plan B Damages | (234.6) | (189.3) | (143.4) | (24.1) |
| Total | (348.6) | (282.1) | (216.3) | (37.1) |
| | | | | |
| **Total Damages** | (1,442.1) | (1,160.3) | (887.4) | (164.1) |
| | | | | |
| **Set-Off** | | | | |
| Furlough Damages | 295.6 | 252.5 | 207.6 | 32.1 |
| Interest | 41.2 | 37.5 | 31.1 | 6.3 |
| Plan A Damages | 2.4 | 0.6 | 0.0 | - |
| Plan B Damages | 84.9 | 71.5 | 55.7 | 6.9 |
| Total | 424.2 | 362.1 | 294.3 | 45.4 |
| | | | | |
| **Total Set-Off Damages** | (1,017.9) | (798.3) | (593.1) | (118.7) |

**Figure 7**

Figures in $M

|  | Farber Seniority List #1 | Farber Seniority List #2 | Farber Seniority List #3 |
|---|---|---|---|
| **April 2002 - June 2012** | | | |
| Employment Damages | (209.4) | (227.3) | (184.1) |
| Interest | (35.6) | (38.7) | (31.2) |
| Subtotal | (245.0) | (265.9) | (215.3) |
| | | | |
| Furlough Damages | (472.8) | (576.7) | (351.8) |
| Interest | (79.7) | (96.0) | (60.9) |
| Subtotal | (552.5) | (672.6) | (412.7) |
| | | | |
| Subtotal | (797.5) | (938.6) | (628.0) |
| | | | |
| **July 2012 - June 2026** | | | |
| Employment Damages | (235.5) | (276.3) | (186.4) |
| PV Discount | 27.5 | 33.1 | 20.9 |
| Subtotal | (208.0) | (243.2) | (165.5) |
| | | | |
| **Pension** | | | |
| Plan A Damages | (104.2) | (121.3) | (83.0) |
| Plan B Damages | (216.4) | (261.0) | (163.8) |
| Total | (320.6) | (382.3) | (246.7) |
| | | | |
| **Total Damages** | (1,326.2) | (1,564.1) | (1,040.2) |
| | | | |
| **Set-Off** | | | |
| Furlough Damages | 273.4 | 335.3 | 200.5 |
| Interest | 40.6 | 48.6 | 30.8 |
| Plan A Damages | 1.3 | 1.9 | 0.6 |
| Plan B Damages | 79.5 | 100.4 | 55.0 |
| Total | 394.7 | 486.3 | 286.9 |
| | | | |
| **Total Set-Off Damages** | (931.5) | (1,077.8) | (753.2) |

| Figure 8 | |
|---|---|
| | Figures in $M **Tannen Seniority List** |
| **April 2002 - June 2012** | |
| Employment Damages | (213.4) |
| Interest | (35.9) |
| Subtotal | (249.3) |
| | |
| Furlough Damages | (664.3) |
| Interest | (111.7) |
| Subtotal | (776.0) |
| | |
| Subtotal | (1,025.3) |
| | |
| **July 2012 - June 2026** | |
| Employment Damages | (300.1) |
| PV Discount | 37.1 |
| Subtotal | (263.0) |
| | |
| **Pension** | |
| Plan A Damages | (130.9) |
| Plan B Damages | (293.5) |
| Total | (424.4) |
| | |
| **Total Damages** | (1,712.7) |
| | |
| **Set-Off** | |
| Furlough Damages | 379.0 |
| Interest | 55.7 |
| Plan A Damages | 2.4 |
| Plan B Damages | 119.6 |
| Total | 556.8 |
| | |
| **Total Set-Off Damages** | (1,155.9) |

This report reflects my opinions to a reasonable degree of certainty within my area of expertise.

Rikk M.T. Salamat
Principal Consultant
Case Lab Inc.

# Exhibit 56

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,
        Plaintiffs,
    vs.
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
        Defendant.

------------------
January 29, 2013
------------------
    Oral sworn videotaped deposition
of RIKK SALAMAT, Case Lab, Inc., 288 Clinton Street,
Toronto, Ontario, was taken at the law office of
Archer & Greiner, 1650 Market Street, Philadelphia,
Pennsylvania, before Jean B. Delaney, Certified
Shorthand Reporter and Notary Public of the State of
New Jersey, on the above date, commencing at 9:30
a.m., there being present:

    GREEN JACOBSON, P.C.
    BY: JOSEPH JACOBSON, ESQUIRE
    7333 Forsyth Boulevard
    St. Louis, Missouri  63105
    (314) 862-6800
    Attorneys for Plaintiff

    TRUJILLO, RODRIGUEZ & RICHARDS, LLC
    BY: LISA RODRIGUEZ, ESQUIRE
    258 Kings Highway East
    Haddonfield, New Jersey  08033
    (856) 795-9002
    Attorneys for Plaintiff

Page 2

1    PAUL, WEISS, RIFKIND, WHARTON & GARRISON,
    LLP
2    BY: DANIEL J. TOAL, ESQUIRE
    JULIE ROMM, ESQUIRE
3    1285 Avenue of the Americas
    New York, New York  10019
4    (212) 373-3869
    Attorneys for Defendant, ALPA
5
    KATZ & RANZMAN, PC
6    BY: DANIEL M. KATZ, ESQUIRE
    4530 Wisconsin Avenue N.W., Suite 250
7    Washington, D.C.  20016
    (202) 659-4656
8    Attorneys for Defendant, ALPA
9  Also present:  James Bateman, CLVS
10  Ricardo Cossa, Navigant Economics

Page 3

I N D E X

Witness                     Page
RIKK SALAMAT
  By Mr. Toal               6

E X H I B I T S

Marked for I.D.         Page
Salamat-1  Damages in Brady, et al     13
        versus the Air Line Pilots
        Association, dated October
        12, 2012
Salamat-2  Copy of Rule 26 of the Rules  14
        of Civil Procedure
Salamat-3  Supplementary Report on     23
        Damages Under the Farber
        Lists
Salamat-4  Document entitled        25
        Supplementary Report on
        Damages Under the Tannen
        List
Salamat-5  Preliminary Calculation of    26
        Mitigation of Damages in
        Brady et al versus the Air
        Line Pilot's Association
Salamat-6  Article entitled Persuasive  66

Page 4

    Argumentation in Negotiation
    by Katia Sycara
Salamat-7  Deposition transcript from   218
    Don Carty
Salamat-8  Copy of testimony of Jeff   221
    Brundage
Salamat-9  Memo from Baptiste & Wilder,  248
    P.C. dated March 13, 2001
Salamat-10  August 6, 2001 memo from  256
    Clay Warner to Seth Rosen

Page 5

1    VIDEO SPECIALIST:  Today is
2   January 29th, 2013, and we are here in Philadelphia,
3   Pennsylvania, and this is the videotaped deposition
4   of Rikk Salamat, taken by the defendant in the
5   matter of Brady, et al, filed -- versus the Air Line
6   Pilot's Association, filed in United States District
7   Court of New Jersey, Camden Vicinage, number
8   02-2917.
9          My name is Jim Bateman from Degnan &
10  Bateman, and I am the certified legal video
11  specialist.  The certified court reporter is Jean
12  Delaney, also from the same firm.
13         We are now going on the record and the
14  time is 9:30.
15         Would counsel please announce their
16  appearances for the record.
17         MR. TOAL:  Dan Toal with Paul, Weiss,
18  on behalf of ALPA.  I'm here with my colleague,
19  Julie Romm and co-counsel, Dan Katz.
20         MS. RODRIGUEZ:  Lisa Rodriguez with
21  Trujillo, Rodriguez & Richards for the plaintiffs in
22  the class.
23         VIDEO SPECIALIST:  Would the court
24  reporter please swear in the witness?
25         RIKK SALAMAT, having been duly sworn,

Page 6

1          was examined and testified as follows:
2          VIDEO SPECIALIST:  You may proceed.
3   BY MR. TOAL:
4      Q    Good morning.
5      A    Good morning.
6      Q    Could you state your full name for the
7   record?
8      A    Rikk Salamat.
9      Q    And what were you asked to do in this
10  matter?
11     A    Well, I was asked to analyze the impact
12  of ALPA's breach of their duty of fair
13  representation to the TWA pilots.
14         MS. RODRIGUEZ:  Just, before you get
15  started, there is one other person in the room.
16  Could you just introduce yourself, sir, on the
17  record?
18         MR. COSSA:  Ricardo Cossa from Navigant
19  Economics.
20         MS. RODRIGUEZ:  Thank you.
21  BY MR. TOAL:
22     Q    So you said you were -- you were asked
23  to analyze the impact of a breach by ALPA?
24     A    Yes.
25     Q    And you are analyzing the impact on

Page 7

1   what?
2      A    The impact on the TWA pilots.
3      Q    What's -- what's your area of
4   expertise?
5      A    I am an analyst of economic and
6   financial data, particularly in regards to labor
7   unions and professional associations.  Specifically,
8   airline pilots being the vast majority of my
9   practice.
10     Q    Do you have any other area of expertise
11  that's relevant to this case?
12     A    Well, I have an MBA, so I have general
13  business expertise.  I have experience in
14  programming for a number of different types of
15  applications.
16     Q    And beyond that, do you have any other
17  area of expertise that you consider relevant to this
18  case?
19     A    Well, my experience in negotiations,
20  working with unions who are either in mediation,
21  negotiations, arbitrations.  So as negotiation
22  support.  As an advisor in economic and, you know,
23  financial issues.
24     Q    Anything else?
25     A    There must be others, but off the top

Page 8

1   of my head, those are the ones that are most
2   commonly employed in my practice.
3      Q    When you reference others, what -- what
4   others do you think are relevant to this case?
5      A    Sorry, could you --
6      Q    When you reference other areas of
7   expertise that must exist, which of those do you
8   consider relevant to this case?
9      A    Well, in the negotiation and working
10  with unions requires expertise in, you know, in
11  business, and in, you know, just human
12  relationships, you know, strategy, and tactics, and
13  all of those to some degree are used in this case
14  because we are trying to estimate what might have
15  happened under a different set of circumstances, and
16  you have to draw on a broad range of, you know,
17  skills and experience in order to do that.  So --
18     Q    Are -- are you seeking to be qualified
19  in this case as an expert in negotiations?
20         MS. RODRIGUEZ:  Objection.
21  BY MR. TOAL:
22     Q    You can answer the question.
23         MS. RODRIGUEZ:  Calls for a legal
24  conclusion.  I don't know that he knows what he is
25  being proffered for.  To the extent you know, you

1  can answer it.
2       THE WITNESS:  Sorry.  Can you repeat
3  the question?
4  BY MR. TOAL:
5       Q     The question is, are you seeking to be
6  qualified in this case as an expert in negotiations?
7       MS. RODRIGUEZ:  And again, he is not
8  seeking.  His counsel will seek.
9       THE WITNESS:  Yeah.  Really, I don't
10 know.  I mean, if you ask me if I am an expert in
11 negotiations, I might say yes depending on the
12 context.  If you ask if I was --
13 BY MR. TOAL:
14      Q     Well, in the context of this case, do
15 you consider yourself an expert on negotiations?
16      A     Other people have considered me an
17 expert in negotiations.  I consider myself very well
18 experienced.  You know, it is really for other
19 people to say whether I am an expert or not.
20      Q     Who has -- who has considered you an
21 expert in negotiations?
22      A     Well, there is -- there is one
23 arbitrator who I speak with on some matters who
24 considers me an expert in negotiations.  My clients
25 consider me an expert in negotiations, at least in

1  the context of their needs.  So --
2       Q     Who is the arbitrator that considers
3  you an expert in negotiations?
4       A     Jim Hayes.  Others may.  He is the one
5  I happen to know does.
6       Q     Have you ever been qualified by a court
7  as an expert in negotiations?
8       A     I don't believe I have, no.
9       Q     Have you ever been qualified in an
10 arbitration proceeding as an expert on negotiations?
11      A     Not in negotiations, no.
12      Q     Have you ever written peer-reviewed
13 articles on negotiations?
14      A     No, I have not.
15      Q     Do you have any specialized academic
16 study in negotiations?
17      A     It is a large part of taking an MBA at
18 the University of Toronto.  About -- you know,
19 difficult to sort of quantify, but there are
20 certainly about three courses exclusively on
21 negotiations, and then it touches on several others.
22 So negotiations is a large part of that program.  So
23 that would -- that would be academic training.
24      Q     So as part of your MBA program, you
25 took three courses on negotiation; is that correct?

1       MS. RODRIGUEZ:  Objection.  It
2  mischaracterizes what he said.  You can answer.
3  BY MR. TOAL:
4       Q     You can answer the question.
5       A     As part of the MBA, yes, there was
6  three courses on negotiation.
7       Q     And you said other courses touched on
8  the issues of negotiation?
9       A     Yeah, negotiations gets, you know,
10 involved in, you know, the study of strategy, the
11 study of marketing, the study of organizational
12 behavior, so -- labor relations, law.
13      Q     Other than those courses that you
14 referenced previously, do you have any other
15 specialized academic training in negotiations?
16      A     Yeah.  I -- I mean, I did a course
17 in -- in intensive mediation and negotiation at -- I
18 can't remember the name of the center, but it was
19 with a fellow named Gary Friedman who runs training
20 in negotiation and mediation in San Francisco.  That
21 was one.  And then through -- through the University
22 of Toronto, there have been several lectures and
23 things like that over the years.
24      Q     And the course you mentioned, how long
25 did that course last?

1       A     Four days, I believe.  It was a long
2  time ago.
3       Q     Do you have any certifications that
4  recognize you as an expert in negotiations?
5       A     No, I do not.
6       Q     And what qualifies you as an expert in
7  human relations?
8       A     I -- well, since I've been involved in
9  negotiations and -- and conflict for the vast
10 majority of my career, I would say I developed a
11 significant amount of experience in -- in analyzing
12 situations and --
13      Q     And other than that, anything that
14 qualifies you as an expert in human relations?
15      A     Other than training in -- in my
16 undergraduate and graduate degrees.
17      Q     Other than that, anything else?
18      A     No.
19      Q     Have you ever been certified as an
20 expert by any court in human relations?
21      A     No.
22      Q     Have you ever been recognized as an
23 expert by any arbitrator in human relations?
24      A     No, I have not.
25      Q     Do you have any specialized academic

Page 13

1    training in human relations?
2        A    By specialized, you mean -- I mean, my
3    undergraduate was in anthropology.  The entire thing
4    was about human relations, so is that specialized
5    enough?  I mean, you have to really sort of be a
6    little more specific about what you mean by
7    specialized.
8        Q    Did you take any courses specifically
9    on human relations?
10       A    Every course in anthropology is on
11   human relations.
12       Q    So do you -- is it your view that
13   training in anthropology provides expertise in human
14   relations?
15       A    Some.
16       (Salamat-1  Damages in Brady, et al
17       versus the Air Line Pilots Association, dated
18       October 12, 2012 marked for identification.)
19   BY MR. TOAL:
20       Q    I show you a document that I will mark
21   as Salamat Exhibit-1, entitled Damages in Brady, et
22   al versus the Air Line Pilots Association, dated
23   October 12, 2012.
24       Do you recognize this as your report in this
25   matter?

Page 14

1        A    Looks like it, yeah.
2        Q    Can you confirm that it is your report?
3        A    I mean, I'm assuming it is a faithful,
4    you know, reproduction of the one I produced, yes.
5        Q    And you didn't sign this report, did
6    you?
7        A    I don't know whether I did or not.  No.
8        Q    And is there a reason you didn't sign
9    this report?
10       A    No.  No particular reason.
11       (Salamat-2  Copy of Rule 26 of the
12       Rules of Civil Procedure marked for
13       identification.)
14   BY MR. TOAL:
15       Q    I marked as Salamat Exhibit-2, a copy
16   of Rule 26 of the Federal Rules of Civil Procedure.
17       Let me know if you've seen this document
18   before.
19       A    No, I haven't.
20       Q    Take a look -- I'm using page number at
21   the top of the page, page 35 of this document.  Do
22   you see that?
23       A    Yes.
24       Q    Do you see the heading (2) Disclosure
25   of Expert Testimony?

Page 15

1        A    Yes.
2        Q    And below that there is a heading (B),
3    witnesses who must provide a written report.  Do you
4    see that?
5        A    Yes.
6        Q    Do you see it says, unless otherwise
7    stipulated or ordered by the court, this disclosure
8    must be accompanied by a written report prepared and
9    signed by the witness if the witness is one retained
10   or specially employed to provide expert testimony in
11   the case or one whose duties as the party's employee
12   regularly involved giving expert testimony.  Do you
13   see that?
14       A    Yes.
15       Q    Okay.  Were you aware of the
16   requirement that experts sign their reports that's
17   embedded in Rule 26 of the Rules of Federal
18   Procedure?
19       A    I assumed it had my electronic
20   signature and that I transmitted it to the attorneys
21   along with a cover letter.
22       Q    You assumed that your report had an
23   electronic signature?
24       A    I assumed that that would serve as a
25   signature.  But, no, I was not aware of this rule,

Page 16

1    no.
2        Q    Okay.  And is there some electronic
3    signature that's reflected in your report?
4        A    The fact that it had been emailed by me
5    to Joe, and that I could confirm that the PDF that
6    had been created and sent to him was my report.
7        Q    And have you submitted expert reports
8    in US Federal Court before?
9        A    No, I don't think so.
10       Q    Let me direct your attention to your
11   expert report after the conclusion page, on page 52.
12       A    Page 52.  Yes.
13       Q    Okay.  So --
14       A    Oh, wait, sorry.  No.  Okay.
15       Q    So the next page is a copy of your CV;
16   correct?
17       A    That's correct.
18       Q    Okay.  And the page after that is
19   entitled Rikk M.T. Salamat, Professional
20   Associations; correct?
21       A    Uh-huh.
22       Q    And do you see under here, there is a
23   listing of cases with expert testimony and/or expert
24   reports?
25       A    Yes.

1     Q     If you go down toward the bottom of the
2   page, the third from the bottom, there is an entry
3   for US District Court for the District of Arizona,
4   and it indicates there is an expert report filed for
5   the USAirways Pilot's Association.  Do you see that?
6     A     Yes.
7     Q     Did you submit an expert report in that
8   case?
9     A     Yes, I did.
10    Q     Okay.  And that's US Federal Court?
11    A     Well, I didn't know that that was a
12  federal court.  Sorry.  I was mistaken, if that is a
13  federal court.  I thought that was a state court.
14    Q     So other than that report, have you
15  submitted any other expert reports in any court in
16  the United States?
17    A     No, I have not.  I'm not -- I don't
18  know -- I don't know if System Board of Adjustments
19  count as a -- a court.
20    Q     The report you submitted to the
21  District Court in Arizona, did you sign that report?
22    A     I cannot recall.
23    Q     So do you see below the language we
24  read in Rule 26, it says, the report must contain --
25    A     Sorry.  What page are we on again?

1   Page 26?
2     Q     Page 35 of Rule 26.
3     A     Okay.
4     Q     So do you see where it says, the report
5   must contain, and then there are a listing of items?
6     A     The report must contain, yes.
7     Q     Okay.  So (i) says, a complete
8   statement of all opinions the witness will express
9   and the basis and reasons for them.  Do you see
10  that?
11    A     Uh-huh.
12    Q     Does your report contain a complete
13  statement of all opinions that you will express and
14  the basis and reasons for them?
15    A     I believe it does.
16    Q     Does your report contain the facts or
17  data considered by you in forming these opinions?
18    A     Yes.
19    Q     And does it contain all the facts and
20  data that you considered in forming your opinions?
21    A     Yes.
22    Q     Do you see number four says, the
23  witness's qualifications, including a list of all
24  publications authored in the previous ten years?
25    A     Yes.

1     Q     In reviewing your report, I -- I didn't
2   find any list of publications that you had reviewed
3   prior -- that you had published the prior ten years.
4     A     I haven't published anything in the
5   last ten years.
6     Q     Have you published written work at any
7   time in your professional career?
8     A     No.
9     Q     Have you done any academic research at
10  any time in your professional career?
11    A     As a student, certainly.
12    Q     And -- and from the time that you
13  graduated from school, did you conduct academic
14  research at any time thereafter?
15    A     I'm sorry.  You would have to be a
16  little more specific about what -- about what
17  constitutes academic research.  I'm continually
18  doing academic research.
19    Q     And -- and what academic research have
20  you done?
21    A     My office subscribes to, you know, a
22  handful of journals that I review.  I get -- I go to
23  lectures at the University of Toronto routinely.
24  However, I mean, it is not under the guidance of any
25  supervisor, so it is self-directed academic

1   research.
2     Q     My question is not whether you've read
3   research done by others, but whether you've actually
4   conducted academic research on your own.
5          MS. RODRIGUEZ:  I object to the form.
6          THE WITNESS:  I'm sorry.  You would
7   have -- you would have to be much more specific.  I
8   am -- I am routinely conducting research which I
9   would consider academic, but it's not within the
10  auspices of the university or under the direction of
11  -- of a professor, so --
12  BY MR. TOAL:
13    Q     And you've never done anything to
14  publish the results of any research you've done?
15    A     No.
16    Q     Have you done any original academic
17  research?
18          MS. RODRIGUEZ:  Objection.
19          THE WITNESS:  Again, what do you mean
20  by original academic research?
21  BY MR. TOAL:
22    Q     Something other than reading the work
23  of other people.
24    A     Yes.
25    Q     And what sort of academic research have

Page 21

1    you done?
2        A    I've done primary research on the
3    trends in the regional air carrier market, its
4    ownership structure, its position in North American
5    air traffic and air marketplace.  I've done research
6    on pilot contracts, particularly as -- you know, in
7    terms of scope and compensation.  I would consider
8    all that academic because it is of no particular
9    consulting interest.
10       Q    Were -- were those things done in
11   connection with particular engagements for clients?
12       A    No.
13       Q    And any other academic research that
14   you've done in your professional career?
15           MS. RODRIGUEZ:  Objection to the form.
16   You can answer.
17           THE WITNESS:  I think those -- those
18   two would be the most involved that I've done.
19   BY MR. TOAL:
20       Q    Can you recall any others as you sit
21   here today?
22       A    No, I can't.
23       Q    Have you ever taught on any of the
24   subjects in which you consider yourself an expert?
25       A    No.

Page 22

1        Q    Do you have any plans to do any further
2    work in connection with your expert report in this
3    case?
4        A    I - I -- I can't imagine how I -- how I
5    would but -- so I would have to say no.
6        Q    You don't have any present plans, as
7    you sit here today, to do further work on your
8    expert report; is that correct?
9            MS. RODRIGUEZ:  Objection.  Other than
10   the work that you know he's already done?
11           THE WITNESS:  I'm sorry, when -- when
12   you say do further work on this report, do you mean
13   continue to analyze the matter, because there is
14   still a few outstanding issues related to the
15   report, particularly as -- as, you know, regards
16   mitigation, so yeah.  There is still some work to be
17   done on this report.
18   BY MR. TOAL:
19       Q    And what additional work do you plan to
20   do?
21       A    Estimate the mitigation.
22       Q    And other than estimating mitigation,
23   is there any other work that you plan to do on your
24   report?
25       A    Not -- not as I sit here today.

Page 23

1        Q    Are there any other opinions that you
2    plan to offer beyond those that are reflected in
3    your report and any supplemental work you are doing
4    in connection with mitigation?
5        A    I don't -- I don't believe so, no.
6        Q    You are not aware of any as you sit
7    here today?
8        A    No.
9            (Salamat-3   Supplementary Report on
10          Damages Under the Farber Lists marked for
11          identification.)
12   BY MR. TOAL:
13       Q    I'll hand you a document that I marked
14   as Salamat Exhibit-3, which is entitled
15   Supplementary Report on Damages under the Farber
16   lists.
17       A    Uh-huh.
18       Q    Is this a document that you recognize?
19       A    Yes.
20       Q    And is this a document that you
21   prepared?
22       A    Yes.
23       Q    And what is this document?
24       A    This is a report on the results of
25   running this Farber -- these Farber lists through

Page 24

1    the software we developed for this case.
2        Q    Had you reviewed Professor Farber's
3    report at the time you prepared this supplementary
4    report?
5        A    I still haven't seen his report.
6        Q    So at the time you prepared this, you
7    hadn't reviewed Professor Farber's report; correct?
8        A    The only thing I -- I had, you know,
9    were three lists which I think I provided as part of
10   this report, and -- and that's -- that's the only
11   thing I knew about the Farber report.  I knew there
12   was such a report, and that it produced three lists,
13   and we ran them through the software.
14       Q    Did you know anything about the
15   methodology this Professor Farber was using?
16       A    I didn't know anything about Farber.
17       Q    And you still have not reviewed his
18   report; correct?
19       A    No.
20       Q    Did you calculate, using Professor
21   Farber's lists, a lower bound of damages than he
22   calculated?
23       A    I -- I just ran his three lists through
24   the software, and that's all I've done with Farber's
25   lists.

Page 25

1    Q    Did you -- did you have an
2  understanding that one of those lists was what
3  Professor Farber identified as a lower bound on
4  damages?
5    A    I just -- I didn't have a name for the
6  list.  I just had three lists, and I think I named
7  them A, B, C, or one, two, three, or something like
8  that.  I just gave them cardinal names.  So I don't
9  know what they represent.
10   Q    So -- so is the answer to my question,
11 no, that you didn't have an understanding that one
12 of his lists was designated as a lower bound on
13 damages?
14   A    No.
15   Q    You did not have such an understanding;
16 correct?
17   A    I did not have such an understanding.
18       (Salamat-4   Document entitled
19     Supplementary Report on Damages Under the
20     Tannen List marked for identification.)
21 BY MR. TOAL:
22   Q    Let me mark as Salamat Exhibit-4, a
23 document entitled supplementary report on damages
24 under the Tannen list.
25       And if you can let me know if you recognize

Page 26

1  that document?
2    A    I do.
3    Q    And what is this document?
4    A    This is the result of having run the
5  Tannen list, the rightful place proposal list,
6  through the software.
7    Q    And this is a document you prepared;
8  correct?
9    A    It is.
10   Q    And why -- why did you decide to run
11 the Tannen list through your software?
12   A    I was requested.
13   Q    By whom?
14   A    By, I believe, Joe Jacobson.
15       (Salamat-5   Preliminary Calculation of
16     Mitigation of Damages in Brady et al versus
17     the Air Line Pilot's Association marked for
18     identification.)
19 BY MR. TOAL:
20   Q    Let me mark as Salamat Exhibit-5 a
21 document entitled Preliminary Calculation of
22 Mitigation of Damages in Brady et al versus the Air
23 Line Pilot's Association.
24       Let me know if you recognize that document.
25   A    I do.

Page 27

1    Q    Is it a document that you prepared?
2    A    It is.
3    Q    And what were you attempting to analyze
4  in this document?
5    A    I was attempting to analyze -- well,
6  I'm not sure analyze is the right word, but I was
7  just attempting to -- what I was doing here was just
8  stating the amounts of income that pilots had
9  claimed they had earned during periods when they
10 were on furlough, and which would, therefore, most
11 likely offset any damages that were incurred.
12   Q    And you entitled this, preliminary
13 calculation; correct?
14   A    That's right.
15   Q    And why did you give it that title?
16   A    Well, because a more thorough
17 calculation would involve actually going through
18 each pilot's, the documentation they provided, their
19 -- their W2s, their 1040s, their Social Security
20 statements, and actually doing an analysis of what
21 their income had been prior to, during, and after
22 furlough, and then determining whether we had
23 sufficient documentation to say that their income,
24 you know, was what they had claimed on the
25 questionnaire.  So this is preliminary to the extent

Page 28

1  that what we are doing is we're just taking the
2  pilot's statements about what their income was and
3  using it as it is rather than attempting to
4  substantiate those claims.
5    Q    And do you plan to submit a final
6  calculation of mitigation of damages?
7    A    Potentially.
8    Q    Do you have plans to do that, as you
9  sit here today?
10   A    I imagine we will, but it is an
11 enormous undertaking, and so it may be done by
12 somebody else, or it may be done, you know, in some
13 other fashion.
14   Q    Are you working currently to prepare a
15 final calculation of mitigation of damages?
16   A    No, I'm not.
17   Q    And after doing the work that's
18 reflected in your preliminary calculation of
19 mitigation of damages, have you done any further
20 work regarding mitigation of damages?
21   A    Yes, there is a secondary -- there is a
22 revised version of this report which will be dated
23 the 30th of January.
24   Q    And what additional work did you do in
25 connection with that revised version of the report?

1    coercion.  And anything I found that looked like it
2    could have some relevance to what we were studying,
3    I believe they all ended up in the report.
4        Q    What is JSTOR that you mentioned?
5        A    It is a journal search through the
6    University of Toronto.  I believe it is available to
7    the public, as well as through the University of
8    Toronto.
9        Q    Did you search any other databases
10   other than JSTOR.
11       A    Elsevier.  Those are the two that I
12   recall.
13       Q    What's Elsevier?
14       A    I think that's the University of
15   Chicago's journal search database.
16       Q    Did you keep a record of the keyword
17   searches that you performed?
18       A    No.
19       Q    And how much time did you spend
20   reviewing those databases?
21       A    It would be impossible to say.
22       Q    Well, of your 300 hours, what's your
23   best estimate of the amount of time you spent
24   looking for research relevant to this assignment?
25       A    Well, the difficulty is, that type of

1    work doesn't generally end up in the 300 hours.  I
2    would imagine several days were involved in, you
3    know, looking for journals -- journal articles.
4        Q    And how many hours on those days?
5        A    Six.
6        Q    Six hours each?
7        A    Six hours each.  So maybe 18 to 24
8    hours of reading abstracts.
9        Q    Did you consider, in connection with
10   your work on this matter, any of the bankruptcy
11   filings from the TWA bankruptcy proceeding?
12       A    No, I did not.
13       Q    Were those made available to you?
14       A    No, they were not.
15       Q    Did you -- were you interested in
16   reviewing those materials?
17       A    No.
18       Q    Did you think they would be relevant to
19   your work?
20       A    No, I didn't.
21       Q    Did you review any public filings
22   concerning TWA prior to the time of the transaction
23   with American Airlines?
24       A    No.  I don't believe I did.
25       Q    And why not?

1        A    I didn't consider them relevant.
2        Q    Did you consider any testimony that was
3    provided in the liability phase of the trial in this
4    case?
5        A    Some -- some testimony, yes.
6        Q    And what testimony did you consider?
7        A    The closing of -- I'm sorry.  I don't
8    know Fram's first name.
9        Q    Steve.
10       A    Steve Fram.  The closing of Allen
11   Press.  The charge to the jury.  And some parts of
12   Mike Day's testimony.
13       Q    So the -- the opening and closing
14   statements and charging the jury is not considered
15   testimony.  I was focused on witnesses who were
16   testifying under oath.
17            Did you consider any -- any such testimony
18   from the liability phase of this case, other than I
19   think you mentioned Mike Day's testimony?
20       A    Mike Day.
21       Q    And why -- why did you decide to
22   consider Mike Day's testimony and nobody else's?
23       A    I looked at Mike Day's testimony
24   specifically because he went through the history of
25   the negotiation with the APA in some detail.  He had

1    some relevant facts and figures about how the
2    various proposals had changed -- that had been
3    passed back and forth.  That was of interest in
4    terms of how the negotiation proceeded, so --
5        Q    So how -- how did you know what would
6    be in Mr. Day's testimony before you reviewed it?
7        A    Well, I knew he was the merger chair,
8    so --
9        Q    Did you receive any guidance from
10   anyone about what trial testimony it made sense for
11   you to review?
12       A    No.
13       Q    Did you have access to the testimony of
14   all the witnesses who testified in the liability
15   phase of the case?
16       A    I believe I did have a complete
17   transcript.
18       Q    Did you review testimony from any of
19   the congressional hearings regarding the proposed
20   TWA transaction?
21       A    No, I did not.
22       Q    Did you review any deposition testimony
23   from any of the former American Airlines executives
24   that was taken in the damages phase of this case?
25       A    No, I did not.

1    Q    Were you aware that those depositions
2  had taken place?
3    A    You mean the damages phase of the
4  trial?
5    Q    Yes.
6    A    The one we are in right now?
7    Q    That's right.
8    A    No.  I didn't -- I was not aware.
9    Q    Is that something you think would have
10  been relevant to your work?
11          MS. RODRIGUEZ:  Objection.
12          THE WITNESS:  The statement of
13  executives?
14  BY MR. TOAL:
15    Q    The testimony of American Airlines
16  executives.
17    A    No.
18    Q    Did -- did you review any of the
19  deposition testimony of former TWA executives that
20  was taken in the damages phase of this case?
21    A    No, I did not.
22    Q    Were you aware that those depositions
23  had taken place?
24    A    No.
25    Q    Is that something that may have been

1  relevant to your analysis?
2    A    No.
3    Q    Did you review any of the deposition
4  testimony of the former APA representatives that was
5  taken in the damages phase of this case?
6    A    No, I did not.
7    Q    Were you aware that those depositions
8  had taken place?
9    A    No.
10    Q    Is that something that might have been
11  relevant to your analysis?
12    A    No.
13    Q    Why not?
14    A    Why would it not be relevant?
15    Q    Yeah.
16    A    Well, first of all, I would have to
17  know who they were, what they were speaking about
18  and -- and a great deal more.  And that said, it's
19  still just one person's opinion.
20    Q    Well, you -- you gave a very
21  categorical answer that that testimony wouldn't be
22  relevant to your work without knowing who those
23  witnesses were and what position they held; correct?
24    A    That's correct.
25    Q    Is it your view that there is any

1  information regarding the APA that -- that would
2  have been relevant to your work?
3          MS. RODRIGUEZ:  Objection.
4          THE WITNESS:  You know, no, I don't --
5  I don't believe there is.
6  BY MR. TOAL:
7    Q    And why is that?
8          MS. RODRIGUEZ:  Objection.
9          THE WITNESS:  Why do I not believe
10  anything they could -- well, if -- they can't go
11  back and say what they would have done under a
12  completely alternate set of circumstances.
13  BY MR. TOAL:
14    Q    But you can?
15          MS. RODRIGUEZ:  Objection.
16          THE WITNESS:  I can only say what's
17  most probable.
18  BY MR. TOAL:
19    Q    And how is it you are able to say
20  what -- what was most probably going to happen --
21          MS. RODRIGUEZ:  Objection --
22  BY MR. TOAL:
23    Q    -- in -- in the negotiation had the
24  circumstances been different?
25    A    It -- this goes to the heart of the

1  report where it's analyzing what effective
2  representation by ALPA would have done to the
3  dynamics of the negotiation.  We have to assume that
4  the parties to this negotiation would behave
5  under -- under pressure the same as other parties.
6  And so, given the actions available to ALPA and the
7  pressures that that would have brought, I'm left to
8  conclude that it's more probable than not that the
9  APA would have behaved the same as theory says they
10  would have.
11    Q    Have you spoken with any of the named
12  plaintiffs in this case?
13    A    I -- I don't believe I have, no.  I
14  don't know who the named plaintiffs are.  I don't
15  think I've spoken to Brady.  In -- in connection
16  with this mitigation exercise that we are going
17  through, I fielded a bunch of calls from -- from
18  pilots about what they are supposed to be sending
19  in, so it is -- it's not impossible that I've spoken
20  to one of them in connection with that, but I don't
21  recall.
22    Q    Have you talked to those pilots about
23  the substance of this case?
24    A    No.
25          MS. RODRIGUEZ:  Objection.

1  BY MR. TOAL:
2     Q     Do you know who Ted Case is?
3     A     I do know who Ted Case is.
4     Q     And have you spoken with Mr. Case?
5     A     I believe he was on a conference call
6  at -- at one point, but I didn't speak directly with
7  him.
8     Q     Do you know who Michael Finucan is?
9     A     I recognize the name.
10    Q     Have you spoken with Mr. Finucan?
11    A     No, I have not.
12    Q     Do you know who Howard Hollander is?
13    A     Yes, I know his name.
14    Q     And have you spoken with Mr. Hollander?
15    A     Yes.
16    Q     Do you know who Sally Young is?
17    A     Yes.
18    Q     And have you spoken with Ms. Young?
19    A     No.
20    Q     Is there any information that you think
21  could be relevant to your analysis that you sought
22  but weren't able to acquire?
23    A     Well, crystal ball aside, I don't
24  believe so, no.
25    Q     And why do you say, crystal ball aside?

1     A     I say crystal ball aside being if we
2  could go back and re-live history under a different
3  set of circumstances, that would have been
4  educational.
5     Q     So other than that, anything that you
6  thought might be relevant to your opinions that you
7  sought but weren't able to obtain?
8     A     I don't -- I don't believe there was
9  anything that I asked for that wasn't -- that I
10  wasn't able to find.
11    Q     And you can't think of anything, as you
12  sit here today?
13    A     I can't think of anything.
14    Q     And when were you first retained in
15  this matter?
16    A     Well, I was retained once in order to
17  assist in negotiations, which was, of course,
18  related to this matter, but then retained a second
19  time to actually produce this report.
20    Q     So with respect to the first retention
21  that you mentioned, what was it you were retained to
22  do in that case?
23    A     Do a damage calculation.
24    Q     That's the first retention that you
25  referred to?

1     A     Yes.
2     Q     And which negotiations was that
3  retention related to?
4     A     I believe they were related to
5  settlement negotiations.
6     Q     Okay.  When -- when was that retention?
7     A     November of 2011.
8     Q     And what did you do in connection with
9  that work?
10    A     I estimated what the damages would be
11  under several different lists.
12    Q     Is any of the work you did in
13  connection with that retention reflected in your
14  expert report?
15    A     The software that we used to do that
16  original estimate was included with the production
17  of this report.
18    Q     And were any of the lists that you
19  generated in connection with that retention, do any
20  of those appear in your expert report?
21    A     The Supplement CC Plus 200 list may
22  have been one of the ones that we -- we used for
23  that exercise.
24    Q     Was the -- the list you identified as
25  the Salamat list in your expert report, one of the

1  lists that you prepared in connection with that
2  retention?
3     A     No.
4     Q     Then you mentioned there was a second
5  retention; correct?
6     A     That's correct.
7     Q     And when was your second retention?
8     A     It was in the spring of 2012.  I -- I
9  don't really remember the month.
10    Q     Now, have you done anything to prepare
11  for this deposition?
12    A     I met with Joe Jacobson to go over my
13  report.
14    Q     When did that happen?
15    A     Last week.
16    Q     Which day?
17    A     Thursday and Friday.
18    Q     How long were those meetings?
19    A     Well, we met for about five hours on
20  Thursday and maybe an hour on Friday.
21    Q     Other than that, have you done anything
22  to prepare for this deposition?
23    A     Re-read my report.  That's about it.
24    Q     Is there anything else?
25    A     Just re-read my report.

1     A     Well, you mean, the data -- like
2  seniority lists being very closely related to the
3  employment history and the agreement.  There --
4  there may have been some early versions of a
5  proposed fence in some of the -- some of the
6  proposals that had been passed back and forth
7  between the parties.  But in terms of the fence that
8  was finally implemented, it was the agreement and
9  the employment history.
10     Q     So you referenced proposals that had
11  been passed between the parties; correct?
12     A     Yes.
13     Q     Did you review proposals that were
14  passed between the parties?
15     A     I did.
16     Q     And the proposal that you reviewed, are
17  all of those reflected in your report?
18     A     Yes.
19     Q     And to the extent there is a proposal
20  out there somewhere that's not cited in your report,
21  can I assume that's something you didn't review?
22     A     Well, I -- I -- I only had the
23  proposals that I mentioned in the report.  So there
24  may have been others out there, but I only have the
25  ones that I had.

1     Q     And did you have any source of
2  information on proposals that were communicated
3  orally?
4     A     No.  Unless -- unless it was mentioned
5  in Mike Day's testimony.  But, you know, the
6  proposals that I based most -- the proposals that I
7  based my opinion on are the ones I had the text of
8  or some recording of.
9     Q     Did you make any assumptions in your
10  report about the pre-transaction career expectations
11  of the TWA pilots?
12     A     No.
13     Q     Did you make any assumptions in your
14  report about the pre-transaction career expectations
15  of the American Airlines pilots?
16     A     No.
17     Q     Did you make any assumptions in your
18  report about the leverage that the TWA pilots had in
19  negotiating with the APA?
20     A     Well, I -- I think the whole report is
21  about leverage that the TWA pilots could have had,
22  so you would have to be a little more specific in
23  your question.
24     Q     My -- my question is whether you made
25  any assumptions about the leverage that the TWA

1  pilots had.
2     A     That they actually had given the
3  circumstances?
4     Q     Yes.
5     A     I assume they had a small amount, but
6  I -- I really -- I'm not sure.  You would have to be
7  much more specific about what type of leverage
8  you -- you would be referring to, and maybe you
9  could ask me the question in a different way.  Maybe
10  I'm just --
11     Q     So I'm trying to understand -- I'm
12  trying to differentiate circumstances in which you
13  are offering an opinion or basing your -- your
14  opinions on some piece of evidence.
15     A     Uh-huh.
16     Q     And so I'm -- I'm asking about
17  assumptions that you made where you are just
18  assuming facts to be a certain way.
19     A     Uh-huh.
20     Q     And so my question was, with respect to
21  the leverage that the TWA pilots had in negotiating
22  with the APA, did you make any assumptions about the
23  amount of leverage they had in those negotiations?
24     A     I made some assumptions about the
25  amount of leverage that, for instance, the Bond bill

1  had on the negotiation.
2     Q     And what assumptions did you make?
3     A     My assumption was that by employing
4  that leverage, they were able to compel or convince
5  the APA to change their position.  That, I believe,
6  is the only assumption I made in regards to the TWA
7  pilots and leverage that they had.
8     Q     Did you make any assumptions about the
9  leverage that the TWA pilots would have had, had
10  ALPA conducted itself differently?
11     A     I did.
12     Q     And what assumptions did you make in
13  that regard?
14     A     I assumed they would have had more
15  leverage.
16     Q     Did you -- did you quantify the
17  increased leverage that you thought they would have?
18     A     Yes.
19     Q     And how did you do that?
20     A     I went through -- I employed a
21  methodology for basically decomposing the effect
22  that each additional point of leverage would have
23  had on the probabilities of achieving certain
24  outcomes.  So, for instance, the list that I call
25  the damage model, I estimated the extent at which

Page 57

1    each one of the points of leverage that ALPA could
2    have brought to bear would have had on increasing
3    the probability of that, meaning an outcome in
4    negotiations.
5        Q    So that the probabilities that you
6    associate with each ALPA action, were those the
7    product of an assumption?
8        A    Yes, they were.  They were the product
9    of an assumption and the product of, you know,
10   coming up with a -- a conservative value for the
11   effect of each one of those actions.
12       Q    And the probabilities that you
13   associate with each of those actions by ALPA, was
14   that something that was measured in any way?
15       A    Yes.
16       Q    And what did you do to measure the
17   probability that those actions would have a certain
18   affect?
19       A    Well, what I did to measure the
20   probability was to analyze each of the actions and
21   -- as best as I could understand what the impact of
22   those actions would have been on the negotiation
23   process, in terms of, would it have been able to
24   shift the APA's perception of an issue, their
25   commitment to an issue, and so on.  And then, for

Page 58

1    each one of those types of impacts that the action
2    could have had on the negotiation, assigning a
3    value, a percentage, you know, one, two, three
4    percent probability that that particular action on
5    its own would have produced.
6        Q    And so my -- my question is, for each
7    of those elements of your analysis, how did you know
8    that the probability was 3 percent, versus
9    .3 percent, versus 30 percent?
10       A    Well, it was based largely on the
11   experience of the Bond bill and the impact that it
12   had on the negotiation.
13       Q    And what did the Bond bill tell you
14   about what the specific measurement of each -- each
15   action was?
16       A    Well, if I took the Bond bill at being
17   one action and, you know, how it would have affected
18   the negotiation a number of ways and it moved the
19   APA's position a certain amount, I then went
20   backward and said if that Bond bill could have done
21   that, then if we assume a significantly smaller
22   impact of these other actions, what would the
23   outcome likely have been?
24       Q    Did you have any other basis for -- for
25   assigning those probabilities other than what you

Page 59

1    just described?
2        A    Well, there was the basis -- there is
3    the -- I -- I think the Bond bill was probably the
4    most significant actual historical event that I had.
5        Q    So -- and was there anything else?
6        A    No.
7        Q    Did you do anything to test whether
8    your probabilities were accurate?
9        A    Other than mathematically?
10       Q    Yeah.  When you said that this event
11   has a 3 percent chance of influencing --
12       A    Uh-huh.
13       Q    -- perception, for example, did you do
14   anything to test whether that was right?
15       A    No.  There -- there would be no way to
16   test that.
17       Q    Are you aware of any methodology that's
18   generally accepted within your field of expertise
19   that allows you to determine what those particular
20   probabilities are in -- in any given situation?
21       A    I'm -- I'm not aware of any.
22       Q    Are you aware of the methodology that
23   you used to try and quantify the likelihood of an
24   agreement being reached being used at any time in
25   the past?

Page 60

1        A    Well, the article that I cited written
2    by -- by I believe it was Katia Sycara, who has a
3    computer model developed on -- developed to assess
4    the impact of negotiation, has a framework that is
5    used, that I actually adopted her framework for
6    analyzing the impact of particular arguments on a
7    negotiation, so that's --
8        Q    Does Professor Sycara's framework
9    involve attempting to quantify the likelihood of an
10   agreement being reached under a particular set of
11   circumstances?
12       A    It does attempt to test whether
13   particular arguments will be successful in reaching
14   an agreement.
15       Q    Could you answer my question?
16       A    Okay.  Well, can I ask you to ask your
17   question again?
18       Q    Sure.  Does Professor Sycara's
19   framework involve an effort to quantify the
20   likelihood of an agreement being reached?
21       A    Well, I believe her work could be read
22   that way.  I don't think it's what the model was
23   designed to do, but, I mean, to the extent that it
24   is attempting to assess the likelihood that a
25   particular argument is likely to be persuasive --

1      Q     So is it -- is it fair to say that you
2  assumed that she had a background in computer
3  science, but that you were uncertain of what her
4  background is?
5      A     Yes.
6      Q     So you mention that Professor Sycara
7  used something called a persuader model; correct?
8      A     I believe she developed a thing called
9  a persuader model; yes.
10     Q     And that's what she describes in her
11 article; correct?
12     A     That's correct.
13     Q     And how did she describe the persuader
14 model being used in her article?
15     A     To assess the -- the strength of -- the
16 persuader model was attempted to reproduce
17 negotiations and test the strength of various forms
18 of argumentation.
19     Q     Wasn't the persuader model used in
20 order to generate arguments that a mediator could
21 use with a labor union or a company?
22     A     As well, yes. But it had a -- it had
23 a -- it had a -- obviously, it had a library of
24 arguments that it had to draw those arguments from.
25 And so, in particular context, it had to --

1          (Salamat-6  Article entitled
2      Persuasive Argumentation in Negotiation by
3      Katia Sycara marked for identification.)
4  BY MR. TOAL:
5      Q     All right.  Let me mark as Salamat
6  Exhibit-6, a copy of an article entitled, Persuasive
7  Argumentation in Negotiation by Katia Sycara.
8          All right.  And can you let me know if you've
9  seen this document previously?
10     A     Yes.
11     Q     And is this the article that you cite
12 in your report?
13     A     Yes.
14     Q     And you rely heavily on this -- this
15 framework; correct?  Is that correct?
16         MS. RODRIGUEZ:  Objection.
17         THE WITNESS:  I think heavily would be
18 a mischaracterization, but I do rely on the
19 framework.
20 BY MR. TOAL:
21     Q     So this framework is the sole basis for
22 your attempted quantification of the likelihood of
23 an agreement being reached; correct?
24     A     Yeah.  It -- it is the only framework
25 for quantification that I used in the report, that's

1  correct.
2      Q     And can you show me where in this
3  article Professor -- Professor Sycara says that her
4  persuader model has anything to do with evaluating
5  the strength of arguments?
6          MS. RODRIGUEZ:  Object to form.  It
7  mischaracterizes his testimony.
8  BY MR. TOAL:
9      Q     Is that what you testified to
10 previously?
11     A     Sorry, what was the --
12     Q     Maybe I misunderstood, but did you
13 testify previously that your understanding of the
14 persuader model was that it had some connection to
15 evaluating the strength of arguments?
16     A     Yes.
17     Q     That's your understanding?
18     A     I believe I said that, and my
19 understanding was that's how the model works.
20     Q     And so can you show me where in the
21 article Professor Sycara says that the persuader
22 model can be used to asses the strength of
23 arguments?
24     A     The policy that the persuader uses to
25 generate the weakest, least convincing argument

1  first, reserving strong arrangements for situations
2  where weak ones have been rejected, the hierarchy of
3  convincing power of arguments ranks the strength of
4  an argument for the labor domain.
5          So in that statement, she is saying what she
6  is doing is assessing the strength of a particular
7  argument given the context in which the argument is
8  being presented.
9      Q     Does she say -- does she say the model
10 makes the determination about the strength of the
11 argument?
12     A     Well, what she says is the input to the
13 argumentation process is the persuadee's position on
14 the issue.  I mean, the specifics of how the -- the
15 software actually works, I don't believe is -- is --
16 is laid out in here.  But --
17     Q     Let me ask you --
18     A     -- given that what it is doing is
19 assigning an importance or a strength to a
20 particular argument, I assume it has to be able to
21 because otherwise it wouldn't be able to generate a
22 weak argument first receiving a strong argument for
23 situations where weak ones have been rejected.  It
24 has to be able to assess the arguments' strengths.
25     Q     Did you do anything to attempt to

Page 69

1 confirm your understanding about the use of the
2 persuader model to evaluate the strength of
3 arguments?
4     A    No, I did not.
5     Q    Do you know whether the hierarchy of
6 arguments, according to their persuasive power, is
7 an input to the model or an output of the model?
8     A    Well, let's go through and look -- see
9 what she says.
10    Q    Can you state for the record which page
11 you are reviewing?
12    A    Right now I'm on 226.
13    And my understanding is that these arguments
14 are all inputs into the model.
15    Q    So if your -- your understanding is
16 that these arguments are inputs to the model --
17    A    Yeah.
18    Q    -- do you have any basis for saying
19 that one of the outputs or uses of the model is to
20 evaluate the strength of arguments?
21    A    I'm sorry.  Could you -- could you
22 repeat the question?
23    Q    Yeah.  So if your understanding is that
24 the arguments are inputs to the model, do you have
25 any basis for saying that one of the uses of the

Page 70

1 model is to evaluate the strengths -- the strength
2 of arguments?
3     A    I -- I believe that's what her software
4 does.
5     Q    As an output of the model?
6     A    I believe that that would be an output
7 of the model.
8     Q    Did you do anything to confirm that
9 understanding?
10    A    No, I did not.
11    Q    Did you use the persuader software
12 model in connection with your work?
13    A    No.  I just used the framework that she
14 outlined.
15    THE WITNESS:  Would it be okay to take
16 a break?
17    MS. RODRIGUEZ:  Sure.
18    VIDEO SPECIALIST:  The time is now
19 10:54 and this ends this number one.
20    (Brief recess.)
21    VIDEO SPECIALIST:  The time is now
22 11:07 and we are back on the video record.
23 BY MR. TOAL:
24    Q    Mr. Salamat, in your report do you make
25 assumptions about the APA's willingness to make

Page 71

1 further compromises?
2     A    Not their willingness, but their --
3 their -- I make assumptions about what would happen
4 given more pressure.  You can never speak about
5 anybody's willingness until they're in a situation
6 where that will has expressed itself, so --
7     Q    But you do make assumptions, if
8 circumstances had been different, what the APA's
9 willingness to make further concessions would have
10 been; correct?
11    A    That's correct.
12    MS. RODRIGUEZ:  I'm sorry, can you read
13 back that last question?
14    (The court reporter read back the
15    pending question as follows:
16    "Question:  But you do make
17    assumptions, if circumstances had been
18    different, what the APA's willingness to make
19    further concessions would have been;
20    correct?")
21 BY MR. TOAL:
22    Q    And do you make assumptions in your
23 report about how the APA would have responded to any
24 of the proposed actions by ALPA that you list in
25 your report?

Page 72

1     A    I -- I assume they would have
2 responded.
3     Q    And in what manner do you assume they
4 would respond?
5     A    I assume that given more pressure, that
6 they would have responded in a way that was more
7 fair.
8     Q    To whom?
9     A    To the TWA pilots.
10    Q    And so when you say more fair, you mean
11 more favorable to the TWA pilots; correct?
12    A    I mean more fair and more favorable to
13 the TWA pilots, yes.
14    Q    And do you consider yourself an expert
15 on fairness?
16    A    I do not consider myself an expert on
17 fairness.  I do consider myself an expert on, you
18 know, assessing whether particular seniority
19 integrations are more or less fair to a particular
20 group.
21    Q    And by virtue of what experience do you
22 have expertise on evaluating whether a particular
23 seniority integration is fair to a particular group?
24    A    I spent the last twelve years analyzing
25 seniority integrations and their impact on various

Page 73

1   groups.
2       Q      And what criteria do you use to assess
3   whether a seniority integration is fair?
4       A      A variety. Whether one group is able
5   to access the work that it brought to the merger is
6   a common one. Whether people are able to keep their
7   jobs is generally the measure. Everything else
8   being some form of variation of that.
9       Q      Have you seen in your work that, in
10  evaluating the fairness of seniority integration
11  lists that people look to, whether the integrated
12  list preserves the pre-transaction career
13  expectations of each pilot group?
14      A      That -- that would be common in -- in
15  mergers that people do that, yes.
16      Q      And is that one of the criteria you
17  look to in assessing whether a seniority integration
18  list is fair?
19      A      Not in this particular case, no.
20      Q      Why not in this particular case?
21      A      Because in this case, we weren't
22  looking at what people's premerger expectations
23  were.
24      Q      Why not?
25      A      Because we were looking at what the

Page 74

1   impact would have been under different lists at
2   American Airlines, a merged carrier, and not what
3   expectations they necessarily had going into the
4   merger. The only thing we looked at in terms of
5   that was what number of jobs they had going into the
6   merger. We didn't do any forecasts on -- on what
7   would have happened had there not been a merger.
8   That's what you would typically do in a -- in a
9   seniority arbitration.
10      Q      And did you not think that criteria was
11  relevant in this particular case?
12      A      What the TWA pilots' un-merged career
13  expectations would have been?
14      Q      Pre-transaction career expectations of
15  each pilot group?
16      A      I didn't see how that would be
17  particularly relevant here.
18      Q      Why -- why didn't you think that would
19  be relevant here but relevant in other situations?
20      A      Well, because here the merger is a
21  given. In other situations, not necessarily.
22      Q      What do you mean by that?
23      A      Well, in this case the two carriers did
24  merge. They were merged under a particular
25  seniority integration, and so the exercise was to go

Page 75

1   back and look and see what the history would have
2   been under a different seniority integration.
3       Q      Isn't it the case in any airline
4   combination that the airline pilots will be combined
5   and the question is what their pre-transaction
6   career expectations were?
7           MS. RODRIGUEZ: Objection.
8           THE WITNESS: If you are arguing, you
9   know, what a seniority integration should be, you
10  might. But I wasn't arguing what a seniority
11  integration should have been. I wasn't arguing what
12  seniority integration would have been fair. I have
13  only argued, you know, I have only estimated what a
14  seniority integration that would have been income
15  optimal would have been, what I believe would have
16  been likely under other -- other sets of
17  circumstances.
18  BY MR. TOAL:
19      Q      I'm sorry. You say you estimated what
20  a seniority integration would have been if it was
21  income optimal? Is that what your testimony --
22      A      If it was income optimal.
23      Q      That's what you were estimating here?
24      A      I'm sorry?
25      Q      Is that what you were estimating here?

Page 76

1       A      One of the things that I estimated
2   here.
3       Q      And which list reflects a list that
4   would have been income optimal?
5       A      I believe it is called the I optimal
6   list. It might have also been referred to as the
7   fairness list.
8       Q      And what does the Salamat list
9   represent?
10      A      The Salamat list represents my best
11  estimate at what list would have been achieved in
12  negotiation had ALPA deployed all of the strategies
13  that it had available to it would have been.
14      Q      And you made that determination without
15  assessing the negotiating position of the APA; is
16  that correct?
17      A      Well, I -- I don't believe I said that,
18  but --
19      Q      Well, that's my question. Did you make
20  that assessment -- did you take into consideration
21  the negotiating position of the APA when developing
22  the Salamat list?
23      A      I did.
24      Q      In what ways did you take into
25  consideration the negotiating position of the APA?

Page 77

1    A    The proposals that they had passed, the
2  response to the TWA's pilots proposal.
3    Q    And other than that, did you take into
4  consideration any other information concerning the
5  APA's position?
6    A    I think those would be the main things
7  I relied on.  There -- there was also, you know,
8  characterizations of the APA in their negotiating
9  position that was made in -- in closing arguments in
10  the -- the trial.
11   Q    Anything other than that?
12   A    No.  Just generally the record.
13   Q    And what characterizations of the APA
14  were you -- were you referring to that were made in
15  closing arguments?
16   A    Peter Fram talked about how difficult
17  it was to negotiate with the APA from the point of
18  view of the CEO of American Airlines, Compton, I
19  believe.
20       In Mike Day's testimony, he talked about how
21  they wouldn't respond to proposals that they had
22  made and were disinclined to negotiate in any
23  meaningful way during their facilitated
24  negotiations.
25   Q    And are you aware of any -- withdrawn.

Page 78

1       Did you rely on any information about what the
2  APA would have done had ALPA taken any of the
3  actions that you describe in your report?
4    A    I don't know what information I could
5  have relied on because ALPA didn't take those
6  actions.
7    Q    And did you have any information on
8  what ALPA would have done or what they said they
9  would have done had any of these actions been taken?
10       MS. RODRIGUEZ:  Objection to form.
11  ALPA?
12  BY MR. TOAL:
13   Q    I'm sorry.  Did you have any
14  information on what the APA would have done or what
15  they said they would have done had any of the ALPA
16  actions that you describe in your report been taken?
17       MS. RODRIGUEZ:  Objection.
18       THE WITNESS:  I -- I don't recall
19  coming across any information saying what the APA
20  would have or would not have done given any specific
21  action by ALPA.
22  BY MR. TOAL:
23   Q    So -- so is the answer to my question
24  that you didn't have any such information?
25   A    I don't believe I had any such

Page 79

1  information.
2    Q    Did you make any assumptions in your
3  report about the likelihood that American Airlines
4  would decide to walk away from the proposed
5  transaction with TWA?
6    A    The likelihood that American Airlines
7  would have walked away from the -- no.  I don't
8  believe I made any assumptions about that.
9    Q    Did you have any information about the
10  APA's view about TWA's financial condition at the
11  time of the transaction?
12   A    Yes.
13   Q    And what information did you have?
14   A    In their response to the TWA's rightful
15  place proposal, they characterized TWA's financial
16  position as -- as dismal at best.
17   Q    And did you have any information about
18  the APA's view of the pre-transaction career
19  expectations of the TWA's pilots?
20   A    I believe they didn't believe them to
21  be particularly desirable.
22   Q    Do you have an understanding that the
23  APA believed the TWA pilots to have poor career
24  expectations prior to the transaction?
25   A    Yes.

Page 80

1    Q    Did you have any information suggesting
2  to you that one of the factors the APA was relying
3  upon in proposing seniority integration was what the
4  pre--- pre-transaction expectations of each pilot
5  group were?
6    A    Yes.
7    Q    Did you have an understanding that the
8  TWA MEC was also, in its proposals, relying on its
9  views of what the pre-transaction career
10  expectations of both pilot groups were?
11       MS. RODRIGUEZ:  Objection.
12       THE WITNESS:  I don't believe I've seen
13  any comprehensive document where -- where the TWA
14  MEC characterized the financial condition of -- of
15  TWA.
16  BY MR. TOAL:
17   Q    Are you aware of any information
18  suggesting that the TWA MEC agreed that any
19  integrated list should preserve the pre-transaction
20  career expectations of each pilot group?
21   A    Well, to the -- to the extent that the
22  MEC's point of view is reflected in the Tannen
23  proposal, I assume they believed they had premerger
24  career expectations.  But other than in that form, I
25  don't -- I don't know that I've seen any documents

Page 81

1    that say what the MEC thought the future without an
2    American Airlines merger would have been.
3        Q    But I'm not asking you what the TWA MEC
4    thought TWA's financial condition was.  I'm asking
5    whether you have any information indicating to you
6    that the TWA MEC believed it was appropriate to take
7    into account the pre-transaction career expectations
8    of each pilot group in constructing a merged
9    seniority list.
10       A    To the extent that that is reflected in
11   the Tannen rightful place proposal, I believe it is.
12       Q    Did you do anything to test whether the
13   lists that you set forth in your report succeed in
14   preserving the pre-transaction career expectations
15   of each pilot group?
16       A    No, I did no work on the premerger
17   trans -- the un-merged expectations of either of
18   the pilot groups.
19       Q    And you considered that factor
20   irrelevant for your analysis; correct?
21       A    Yes.  I considered it irrelevant.
22       Q    And the reason you considered it
23   irrelevant was because it was a given at -- at that
24   stage that there was going to be a transaction; is
25   that right?

Page 82

1        A    What I took as a given was how many
2    positions each pilot had at the point when the two
3    airlines were merged.  Whether they would have
4    had -- the way in which we analyze premerger
5    expectations is to assume that the future is going
6    to remain more or less the same as it is at the
7    point the two airlines are merged, and so I could
8    theoretically have compared TWA's premerger
9    expectations to their career under American Airlines
10   Supplement CC list, but I didn't really see that
11   that would tell us anything because I wasn't
12   comparing their careers at American to their careers
13   at a stand-alone-TWA, or a TWA merged with another
14   airline, or a TWA under a different management.
15       Q    So what I was trying to understand
16   is --
17            MS. RODRIGUEZ:  Again, I'm going to ask
18   you -- he was not finished.  You -- you step on his
19   last words.
20            MR. TOAL:  He paused.  He threw me off.
21   So were you done with your answer?
22            THE WITNESS:  Let's just go on, yeah.
23   BY MR. TOAL:
24       Q    I was trying to understand why you
25   seemed to acknowledge that consideration of

Page 83

1    pre-transaction career expectations is relevant in
2    other cases and why you regarded it as irrelevant in
3    this case, and I thought you testified previously
4    that in this case the merger was a foregone
5    conclusion.  Was that your testimony?
6        A    Well, in this case we were looking at
7    the pilots' seniority under a given merger versus
8    what their -- what -- what their careers would have
9    been under a different seniority list in the same
10   merger, not in an un-merged or a premerger airline
11   would have been, so --
12       Q    How does that differentiate this case
13   from any other case in which arbitrators or others
14   take into account the pre-transaction career
15   expectations of each pilot group?
16       A    How does -- how does this case differ?
17       Q    How does that aspect of this case that
18   you regarded a transaction as being a foregone
19   conclusion at the time they were discussing
20   seniority integration, how does that differentiate
21   it from any other case in which pre-transaction
22   expectations of the pilot groups are taken into
23   consideration?
24       A    Well, perhaps I misspoke when I said
25   that earlier because, I mean, I don't think that it

Page 84

1    does actually differentiate this case from the
2    others.  What it differentiates is more of a
3    comparing.  In those other cases, you know, where --
4    where, for instance, I'm working with a -- with a
5    group that's going into a seniority arbitration, we
6    are comparing what their career under the merged
7    carrier will be to what their standalone career
8    expectations were.  So to the extent that they
9    brought X number of jobs with them, are they able to
10   continue to have access to those jobs under this
11   list in this merged airline?  That's not the
12   analysis that I'm doing in this case.  I'm not
13   comparing what -- whether their careers at American
14   are superior to or inferior to the careers that they
15   would have had at TWA as a standalone entity.
16   That's -- that's -- because I'm -- I'm -- we
17   wouldn't be arguing at an arbitration about what we
18   think the seniority integration should be.
19       Q    One of the things you are doing is
20   trying to assess whether the APA would have been
21   willing, under different circumstances, to make
22   additional concessions; correct?
23       A    That's correct.
24       Q    And you knew that the APA regarded the
25   pre-transaction career expectations as -- as a

1  factor in determining what seniority integration
2  would be appropriate; correct?
3      A      In every merger there is one group that
4  thinks the other groups has dismal career
5  expectations.
6      Q      So why would you regard the
7  pre-transaction career expectations of the pilot
8  groups as irrelevant when it was one of the factors
9  that the APA was taking into consideration?
10     A      Because at the end of the day the
11  premerger career expectations of pilots matters to
12  the extent that they brought X number of jobs with
13  them and not typically where -- what may or may not
14  happen with, you know, the company absent the
15  merger.  That stuff is argued.  In my experience, it
16  doesn't play any significant role in the outcome of
17  seniority integrations.
18     Q      And that's based on what experience?
19     A      Well, that's based on a review of the
20  seniority awards going back some years.
21     Q      And you haven't seen seniority awards
22  in which the arbitrators analyze the pre-transaction
23  career expectations of the pilot groups on -- on a
24  standalone basis?
25     A      They do discuss it, certainly.

1      Q      Have you seen situations in which
2  arbitrators say that's the predominant factor in
3  evaluating a seniority arbitration?
4      A      In arbitrations where you are dealing
5  with a liquidated carrier, not a liquidated carrier,
6  but a carrier that ceased to function, I've seen
7  that.
8      Q      Have you seen it in other situations?
9      A      Where a particular amount of weight was
10  placed on what?  You would have to be more specific.
11     Q      On the pre-transaction career
12  expectations of each pilot group.
13     A      Well, they are always based on the
14  premerger -- premerger career expectations in some
15  manner.
16     Q      How -- how do you define
17  pre-transaction career expectations?  What's
18  included in that assessment?
19     A      The amount of work that the pilot group
20  brought to the merger, how old that pilot group is,
21  whether the airline had been growing or shrinking,
22  whether it had aircraft orders.
23     Q      Anything else?
24     A      The financial health of the company.
25  Whether the -- whether the company was in or out of

1  bankruptcy.  Whether it was or was not operating.
2      Q      Anything else?
3      A      I think those would be the most common
4  ones.
5      Q      What about the -- the equipment that
6  each airline operated?
7      A      Well, when I said the job that they
8  brought to the merger, that's what I mean.
9      Q      And what do you know about TWA's
10  financial condition at the time of the American
11  Airline transaction?
12     A      They were in bankruptcy.  It was not
13  healthy.  But as I said, I didn't -- I did not
14  investigate or analyze their financial situation.
15     Q      Is that something you have the
16  expertise to do?
17     A      To assess their financial situation?
18     Q      Yes.
19     A      No.
20     Q      Did you undertake any analysis of the
21  equipment that TWA was operating prior to the time
22  of the transaction?
23     A      Other than to see how many positions
24  they had on different pieces of equipment, no.  I
25  don't know anything about, you know, the age or make

1  of -- of, you know, the particular aircraft they
2  were flying.
3      Q      Did you do anything to undertake an
4  analysis of the number of pilot jobs that TWA would
5  be bringing to a merged entity?
6      A      Some.
7      Q      What did you do in that regard?
8      A      I looked at how many pilot positions on
9  those -- those pieces of equipment were left as of,
10  I guess, 18 months after the merger.
11     Q      Did you do anything else?
12     A      No.
13     Q      Did you undertake any analysis of TWA's
14  viability as a going concern on a standalone basis?
15     A      No, I did not.
16     Q      Is that something that would be
17  relevant to the pre-transaction career expectations
18  of the TWA pilots?
19     A      No.  To the extent that they were still
20  operating as of the merger, no.
21     Q      What about if they were expected to
22  stop operating within a matter of months?  Would
23  that affect their pre-transaction career
24  expectations?
25     A      Not in my opinion, no.

Page 97

1   the number of pilots that were merged from each
2   carrier, what their working status was, and whether
3   it differs from a merger where one group is in
4   bankruptcy to one where, like for a business.  Yes,
5   I've certainly done that analysis.  There is a few
6   others, as well, but they are not really as -- as
7   fun to talk about, but --
8       Q      Few other what?
9       A      Types of analysis between what mergers
10  looked like where the one carrier is in financial
11  distress and not the other.
12      Q      And what -- what other analysis do you
13  have in mind?
14          MS. RODRIGUEZ:  I object to the form.
15          THE WITNESS:  The number of pilots that
16  end up in the top half of the list is one type of
17  analysis that's been done.
18  BY MR. TOAL:
19      Q      And what are the others?
20      A      The number of pilots that have ended up
21  in the bottom half of the list.  You know, the
22  problem with those is it is almost impossible to
23  adjust for the equipment that people are bringing,
24  and whether or not it should be included in the list
25  construction in the first place.  So, in general,

Page 98

1   you are left with just saying how many pilots were
2   merged and what was their status?  And was one group
3   of working pilots left behind or predominantly left
4   off of the construction of the major pilot list in a
5   bankrupt situation versus a non-bankrupt situation.
6       Q      And have you done any written analysis
7   that you can point me to concerning the extent to
8   which the -- the financial condition of the acquired
9   airline affects the placement of pilots of the
10  acquired airline on a merged seniority list?
11      A      I have not written anything on the
12  subject that would be easy to point to.
13      Q      Whether it is easy to point to or not,
14  is there anything you've written on the subject?
15      A      I -- I don't believe I've -- I've
16  written anything on the subject.
17          THE WITNESS:  Can we take a quick
18  break?  I swear, it will only be, like, five
19  minutes.
20          VIDEO SPECIALIST:  The time is now
21  11:45 and we are going off the video record.
22          (Brief recess.)
23          VIDEO SPECIALIST:  The time is now
24  11:48 and we are back on the video record.
25  BY MR. TOAL:

Page 99

1       Q      Mr. Salamat, you did undergraduate
2   coursework at the Ontario College of Art; correct?
3       A      That's correct.
4       Q      And what years did you study there?
5       A      '87 -- '86 and '87, I believe.
6       Q      And what did you study there?
7       A      Fine arts.
8       Q      And why did you leave the Ontario
9   College of Art?
10      A      Because I couldn't draw.
11      Q      Any other reasons?
12      A      Mostly because I couldn't draw, and in
13  order to progress in the program, you had to finish
14  your what was called foundation year where you had
15  to paint, and draw and do a whole bunch of other
16  things, and you had to be able to pass those
17  courses, so --
18      Q      So you said mostly because you couldn't
19  draw.  Were there any other reasons that you decided
20  to leave there?
21      A      There was another reason, but I don't
22  know how relevant it would be.
23      Q      What was the other reason?
24      A      Well, I was seeing this girl.  She
25  thought I would make a fine lawyer, so I decided I

Page 100

1   would leave art school and go off and study
2   economics at the University of Toronto.
3       Q      Okay.  So you -- you did undergraduate
4   coursework at the University of Toronto, also?
5       A      I did -- did one year of undergraduate
6   work there.
7       Q      And what did you study there?
8       A      Economics.
9       Q      Is that '87 to '88?
10      A      Yes, I believe so.
11      Q      And why did you leave the University of
12  Toronto?
13      A      Because economics wasn't for me.  Or
14  more particularly, the University of Toronto wasn't
15  for me.  First year in economics, the University of
16  Toronto was a sort of dismal experience, so I
17  decided to switch universities.
18      Q      And did you leave Toronto to attend
19  York University?
20      A      I did.
21      Q      And you obtained a degree from York
22  University in 1994; is that correct?
23      A      I believe that's correct, yes.
24      Q      Did you go directly from the University
25  of Toronto to York University?

Page 101

1     A     There was -- I don't -- there was
2  nothing in between.
3     Q     Were you a full-time student at York
4  University, from --
5     A     Yes.  Yeah.  I was a full-time student
6  at UFT one year and then York University the next.
7     Q     So starting in -- was it 1989 that you
8  started at York University?
9     A     Yeah.
10    Q     And so, from 1989 through 1994, you
11 were working to get your degree at York University;
12 correct?
13    A     That's correct.
14    Q     What were you studying at York
15 University?
16    A     Anthropology and women's studies.
17    Q     And what degree did you attain from
18 York University?
19    A     An honor's bachelor.
20    Q     And how is an honor's bachelor
21 different from a bachelor of arts degree?
22    A     To get an honor's bachelor, you have to
23 have two majors.
24    Q     And what did you do after you left York
25 University?

Page 102

1     A     I worked at a number of jobs.
2     Q     So what did you do first?
3     A     Well, when I left -- when I graduated
4  from York University, I was still working for an NGO
5  called Earth Roots.  I worked for them for some
6  time, and I left and went to work for a publication
7  called Now Magazine.
8     Q     So what did you do for Earth Roots?
9     A     I was a campaign coordinator.
10    Q     What sorts of campaigns?
11    A     There was a campaign on zero emission,
12 there was the Boreal Forest Logging, Old Growth
13 Forest Protection, and those -- those were the three
14 major campaigns that I worked on.
15    Q     And what did you do in connection with
16 these campaigns?
17    A     I was working with fundraising.  I
18 wrote newsletters.  I was in charge of summer
19 students and scientists who were doing specific bits
20 of research on one of those three projects,
21 maintained databases.  You know, it was an NGO.  You
22 kind of do everything.
23    Q     And when did you leave Earth Roots?
24    A     19 -- I think it was in '94.  I stayed
25 on in some fashion for years after, but my full-time

Page 103

1  ended in '94.
2     Q     Same year you graduated from York
3  University?
4     A     That's correct.
5     Q     And what did you do after leaving Earth
6  Roots?
7     A     I went to work for Now Magazine.  Or I
8  may have worked a couple of contracts with other
9  NGOs in between the two, but --
10    Q     And what is -- what is Now Magazine?
11    A     Now Magazine is an alternative news
12 weekly.
13    Q     What did you do for Now Magazine?
14    A     I was the system's analyst.
15    Q     What systems were you analyzing?
16    A     Well, financial systems.  Financial
17 systems, ad booking systems, publication systems.
18    Q     Were you analyzing the financial
19 systems of Now Magazine?
20    A     Yes.
21    Q     Were you analyzing any other financial
22 systems?
23    A     Just their internal finances.
24    Q     And how long did you stay at Now
25 Magazine?

Page 104

1     A     I think I was there for about four
2  years.
3     Q     So approximately 1998, you left?
4     A     I think around '98, yeah.
5     Q     And what did you do after that?
6     A     I started a company called Web Impact.
7     Q     And what kind of company was that?
8     A     It was a -- an internet development
9  company.
10    Q     So what were you doing at Web Impact?
11    A     I had a staff who was doing internet
12 development.  So I was negotiating contracts with
13 clients, and overseeing staff, and doing some
14 development myself, particularly the -- the more
15 analytical systems that we developed for some
16 clients.
17    Q     What is internet development?
18    A     Web site.  We built -- we built web
19 sites for the most part, but we also did a lot of
20 development for intranets and things that were
21 internet enabled but never actually put on the
22 internet.
23    Q     How long did you stay at Web Impact?
24    A     I sold the company in 2000 -- 2000, I
25 think.  It was right -- right after the crash, so I

Page 105

1    guess it was 2000.  I stayed on for a few months and
2    then left.
3        Q     And what did you do after selling Web
4    Impact?
5        A     I went to work for -- well, I
6    started -- I started my own consulting company where
7    we were doing demonstrable exhibits and evidence for
8    a few law firms.  We -- yeah, that was -- that was
9    the majority of the work that I did, and then I went
10   and took a job at a -- a company called Oven
11   Digital.
12       Q     What is the name of the consulting
13   company that you started?
14       A     I can't remember what -- when -- at
15   some point in time it became Case Lab, but I can't
16   remember when exactly that name started, so --
17       Q     So has that company been operating
18   continuously since you -- you started it after --
19   after leaving Web Impact?
20       A     Yeah.  Even while I was at Oven, I was
21   winding down my work there, but Oven promptly went
22   bankrupt, and so I continued on.
23       Q     And what year did you start this
24   consulting company?
25       A     That would have been after I sold Web

Page 106

1    Impact, so it would have been in 2000.
2        Q     Do you work for law firms in Canada?
3        A     Yes.
4        Q     Did you work for law firms elsewhere?
5        A     Not until -- not -- not originally, no.
6        Q     And then you said you went to Oven
7    Digital?
8        A     Uh-huh.
9        Q     And how were you splitting your time
10   between the consulting company and Oven Digital when
11   you started at Oven Digital?
12       A     Well, when I took the job at Oven
13   Digital, I started transferring all my work over to
14   someone that I had -- I had done work with in the
15   past.  And then Oven went under, and it all got
16   transferred back to me again, so --
17       Q     When did you start at Oven Digital?
18       A     It was in -- it was in 2000, but I -- I
19   can't remember.  It was -- it was in the fall, I
20   believe.
21       Q     And when did you stop working at Oven
22   Digital?
23       A     Well, the company went bankrupt in
24   January or February of 2001.  So I don't know --
25   some of the work that was in progress got taken over

Page 107

1    by a kind of rag-tag bunch of people who had been
2    set adrift, and so kind of continued Oven Digital
3    work up until the middle of the summer of 2001.  So
4    -- but when exactly I stopped being an employee of
5    Oven, I can't recall.
6        Q     What were you doing for Oven Digital?
7        A     Well, my -- my title was technical
8    strategist but, you know, my job was, you know, to
9    be the technical person involved in -- in sales and
10   also overseeing technical staff.  They had design
11   staff and technical staff, and -- and I was
12   overseeing the technical staff.
13       Q     What sort of business is Oven Digital
14   in -- were they in?
15       A     They were a design company, internet
16   design.
17       Q     And what did you do after Oven Digital?
18       A     After Oven Digital, I went back to the
19   consulting work that I was doing before.
20       Q     And have you continued doing that
21   consulting work ever since?
22       A     Yes.
23       Q     Have you been employed by any other
24   businesses since the time that you went back to the
25   consulting group?

Page 108

1        A     Well, I'm a partner in a company called
2    Cruise Wear, and so, you know, I'm technically an
3    employee of that company.
4        Q     What does that company do?
5        A     It -- it has a software -- it creates
6    software for airline scheduling.
7        Q     And you -- you obtained an MBA degree
8    from the University of Toronto in 2003; correct?
9        A     That's right.
10       Q     Were you working while you were
11   studying for your degree?
12       A     Yes.
13       Q     Were you a full-time student in the MBA
14   program?
15       A     Yes.
16       Q     When did you start -- when did you
17   start studying for your MBA?
18       A     The fall of 2001.
19       Q     Did you have any field of concentration
20   in connection with your MBA?
21       A     No.
22       Q     Now, in the first page of your report,
23   you say that you personally specialize in the
24   analysis of economic and financial data, primarily
25   for professional associations and labor unions;

Page 109

1    correct?
2        A    That's correct.
3        Q    Is that an accurate description of your
4    field of specialization?
5        A    I believe it is.
6        Q    Have you ever received any awards or
7    certifications from professional organizations?
8        A    Awards or certifications?
9        I get these plaques given to me now and again
10   that say thank you for your hard work.
11       Q    Who gives you those plaques?
12       A    Pilot groups.  I mean, I've got a bunch
13   of them hanging around.  I've got one from the
14   Northwest pilots.  I've got one from the Canadian
15   Airline pilots.  I've got one from the USAirways
16   pilots.  I've got one from the Ontario Justices of
17   the Peace, I believe.
18       So as -- I was more interested in any
19   sort of professional certifications, professional
20   licenses that you may have.
21       A    No.
22       Q    Have you received any awards from
23   economic groups, business groups?
24       A    No.  No, I haven't.
25       Q    Have you ever served as an arbitrator

Page 110

1    of a seniority integration dispute?
2        A    No, I have not.
3        Q    Have you served as an arbitrator for
4    any kind of dispute?
5        A    No, I have not.
6        Q    Have you served as a mediator?
7        A    No.
8        Q    I'm going to direct your attention back
9    to the list of prior expert testimony.
10       A    Uh-huh.
11       Q    Would you take a look at that page in
12   your report?
13       A    Yes.
14       Q    So the first five entries here all
15   appear to relate to an Air Canada dispute; is that
16   correct?
17       A    That's the merger of Air Canada and
18   Canadian.
19       Q    So are these all different stages of
20   the same -- same underlying dispute?
21       A    Well, they all -- they all stem from
22   the seniority integration of Canadian Airlines
23   pilots and Air Canada pilots.
24       Q    Did you submit written expert reports
25   in connection with this case?

Page 111

1        A    Yes.
2        Q    How many?
3        A    Hmm?
4        Q    How many written expert reports did you
5    submit in that case?
6        A    For the first one, I don't think there
7    was any written.  For the second one, there were
8    several reports I did for Brian Keller and -- and
9    the arbitration panel.  One or two for the
10   proceeding.
11       Q    Which proceeding are you -- are you
12   referring to?
13       A    The seniority integration -- this would
14   be the second arbitration in the -- in the pilot
15   seniority dispute.  The third case would have been a
16   limited reconsideration that was done.  And so,
17   quite possibly all of the work that I had done in
18   the previous two was redone plus some additional
19   work.
20       Q    And just so we are clear that we are
21   talking about the same thing, that is the --
22       A    240103-C.
23       Q    So it says under that entry, expert
24   report for the Air Line Pilot's Association,
25   Canadian Airlines.

Page 112

1        A    Uh-huh.
2        Q    Is it your recollection that you did
3    submit a report --
4        A    Yes.
5        Q    -- in connection with --
6        A    No, no.  I mean, there was a report.  I
7    just can't -- you know, part of that report would
8    have been everything that was done prior, so -- I
9    can't recall how much original work went into that
10   report.
11       Q    Did you submit written reports for
12   either of the two other entries related to the Air
13   Canada matter?
14       A    For the fourth one, yes.  And probably
15   not for the fifth one.  For the fifth one, I would
16   have just served as an expert.
17       Q    Did you testify in any of those five
18   matters?
19       A    Well, I testified in the second one.  I
20   testified multiple times in front of the arbitration
21   panel.
22       Q    How about in any of the others?
23       A    No.
24       Q    In these five matters, to the extent
25   you submitted an expert report, do you have a copy

Page 113

1    of the report that you submitted?
2        A    I doubt it very much.  It's -- it's --
3    it's very unlikely.  I mean, they weren't expert
4    reports in the sense that these ones are.  I mean,
5    they were reports that were specific responses to
6    specific questions posed by the arbitrator.  Could
7    you tell us the impact of X?  And I would do it and
8    hand it over to them.  I mean, they were never --
9    they were not formal reports.  The report for the
10   third one on the list, there may be a copy of that
11   one around someplace.
12       Q    Have you done anything to try and
13   locate any expert report that you submitted in any
14   of these five matters?
15       A    No.
16       Q    Do you have copies of transcripts of
17   any testimony you gave in any of these five matters?
18       A    No.  They didn't have any transcripts
19   in those proceedings.
20       Q    The next matter on the list, the 2007
21   pilot seniority integration of the pilots of
22   USAirways and the pilots of America West Airlines,
23   did you submit a written expert report in that case?
24       A    Well, I submitted a report.  I gave,
25   you know, testimony.  Submitted volumes, and

Page 114

1    volumes, and volumes of data.  But, you know, there
2    wasn't a written report in the sense of this one
3    where a conclusion was arrived at or -- so, it is
4    not what I would have called a report.  It is what I
5    would have called a submission, but -- but you would
6    probably call it a report.
7        Q    I would?
8        A    Yeah.
9        Q    Do you have a copy of the submission
10   that you made in connection with that case?
11       A    I may.  I may.  I don't -- I don't
12   know.
13       Q    Did you offer testimony in that case?
14       A    I did.
15       Q    Was there a transcript of those
16   proceedings?
17       A    I believe there is.
18       Q    Do you have a copy of the transcript of
19   your testimony from that proceeding?
20       A    I do not.
21       Q    Would you be able to acquire a copy of
22   the transcript of your testimony in that case?
23       A    I could request it from the -- the firm
24   that I worked with on that one.  They may or may not
25   have it.  They may or may not provide it.  I don't

Page 115

1    know.
2        Q    So the next -- but you haven't made
3    such a request to date; correct?
4        A    No.
5        Q    The next item on the list, 2008 inquiry
6    by the Fifth Triennial Justices of the Peace
7    Remuneration Commission, did you submit a written
8    expert report in that matter?
9        A    I did.
10       Q    Do you have a copy of that report?
11       A    Not with me, but there is one probably
12   in my office.
13       Q    Did you testify in that case?
14       A    I did.
15       Q    Was there a transcript created of your
16   testimony?
17       A    No.
18       Q    And what were you doing in that matter?
19       A    The Fifth Triennial Justices of the
20   Peace Remuneration Commission is the -- is the quasi
21   judicial body whose responsibility it is to decide
22   how much Justices of the Peace get paid, and my
23   report had to do with the costs of an agreement that
24   was reached between the government and the
25   association of the Justices of the Peace that we

Page 116

1    negotiated.
2        Q    The next matter on this list, the 2008
3    seniority integration arbitration between the pilots
4    of Northwest and the pilots of Delta Airlines, did
5    you submit a written report in that case?
6        A    I wrote a written report for that case.
7    It was submitted by a pilot witness and not by me.
8        Q    Submitted by a pilot witness as if the
9    pilot witness had prepared the report?
10       A    No.  It was presented and discussed by
11   a pilot witness rather than by me.
12       Q    Was there a report submitted under your
13   name?
14       A    I -- I cannot recall.  It certainly
15   would have been well known that it was -- it
16   certainly would have been known by the arbitrators
17   and everyone in the room that it was my work.
18   Whether it had my name on it, I honestly cannot
19   recall.
20       Q    Do you have a copy of the report that
21   was submitted?
22       A    Someplace.
23       Q    Did you testify in that case?
24       A    I did not.
25       Q    The next item, the 2009 System Board of

Page 121

1      A    I did.
2      Q    Do you have a copy?
3      A    Someplace.
4      Q    Did you testify in that case?
5      A    I did.
6      Q    And was a transcript of your testimony
7  created?
8      A    I do not know.
9      Q    And you list a 2008 to 2011 National
10  Mediation Board.  Do you see that?
11     A    Yes.
12     Q    Did you submit a written expert report
13  in connection with that matter?
14     A    Several, over -- over that period.
15     Q    Do you have copies of those reports?
16     A    Most likely.
17     Q    Did you testify in that matter?
18     A    I did.
19     Q    Was there a transcript created of your
20  testimony?
21     A    No.
22     Q    And then you list a 2012 Collective
23  Bargaining Agreement Arbitration by Final Order
24  Selection.  Do you see that?
25     A    Yes.

Page 122

1      Q    Did you submit a written expert report
2  in that matter?
3      A    I did.
4      Q    Do you have a copy?
5      A    Yes.
6      Q    Did you testify in that case?
7      A    I did not testify.
8      Q    So you said in a number of the matters
9  that you listed as prior expert experience, you made
10  submissions but not -- not reports that you thought
11  were similar to the report that you submitted in
12  this case.
13     A    Uh-huh.
14          MS. RODRIGUEZ:  Objection.
15  BY MR. TOAL:
16     Q    Do that you recall that testimony?
17     A    Yes.  I said that many of the reports
18  that I filed were not similar to this one.
19     Q    Have -- have you ever submitted a
20  report that is similar to the report that you
21  submitted in this case?
22     A    Well, this case is pretty unique, so,
23  no.
24     Q    Have you ever submitted a report with
25  an extensive narrative?

Page 123

1      A    Yeah.  You know, the -- the Berry
2  versus Pulley had an extensive narrative.  The final
3  offer selection was largely a quantitative analysis,
4  not much on words.  Human Rights Tribunal might have
5  been a bit wordier.  I don't -- I mean, the
6  difference between a quantitative report and a
7  narrative report, maybe there is some gray area
8  there, but I believe this one would certainly be the
9  most narrative of all.
10     Q    And the Berry versus Pulley matter that
11  you mentioned --
12     A    Yes.
13     Q    -- which -- which one of the items on
14  your list is that?
15     A    That would be the first item on the
16  second page.
17     Q    Have you ever previously offered an
18  expert opinion on the likely result of a negotiation
19  between two parties, had circumstances been
20  different?
21     A    No, I've not.
22     Q    So you say on the first page of your
23  expert report that your practice has involved
24  analyzing the impacts of pilot seniority mergers.
25  Is that accurate?

Page 124

1      A    Yes.
2      Q    What do you specifically do in order to
3  analyze the impacts of pilot seniority mergers?
4      A    Well, when you say what do I typically
5  do, I think you are going to have to be a little
6  more specific than that.
7      Q    How do you go about analyzing the
8  impact of seniority mergers?
9      A    Well, in its most general form, we
10  compare what would happen to the income of pilots
11  under one scenario versus another.
12     Q    And is -- is that -- does that reflect
13  the majority of the expert work you've done in the
14  matters that you've listed on your list of expert
15  testimony?
16     A    Does -- does what?  I'm sorry.  Maybe
17  you can ask that question a different way.
18     Q    In prior cases in which you've served
19  as an expert witness, are you typically making
20  assessments of the impact of two different seniority
21  integration scenarios?
22     A    If it's a seniority integration issue,
23  yeah.
24     Q    So in the seniority integration matters
25  in which you've worked on previously, is the work

1 that you've done to assess the financial impact of
2 two different seniority integration proposals?
3     A    That would generally be the case.
4     Q    You refer in your report to something
5 called the ALPA merger tool?
6     A    Yes.
7     Q    When did you develop the ALPA merger
8 tool?
9     A    The ALPA merger tool was developed in
10 2002.
11     Q    What were the circumstances in which
12 you developed it?
13     A    It was developed for the Air Line
14 Pilot's Association, Canadian Airlines, for the
15 purposes of an appeal of their seniority integration
16 with Canadian Airlines -- with -- with Air Canada.
17 And having won that appeal, to prepare for and to go
18 through the arbitration, second arbitration.
19     Q    Did you use the ALPA merger tool in
20 this case?
21     A    Parts of it were -- were used, but not
22 in any great measure.
23     Q    To the extent you used the ALPA merger
24 tool in this case, how did you use it?
25     A    It had one component that made merged

1 seniority lists, and I used that.
2     Q    And as part of your backup, did you
3 provide the part of the ALPA merger tool that you
4 used in this case?
5     A    I don't know whether I did or not.  I
6 may not have.
7     Q    Okay.  We would request production of
8 whatever part of the ALPA merger tool was used in
9 this case.
10     A    All right.
11     Q    Was your objective in this case to try
12 and figure out what the merged seniority list --
13 what any merged seniority list between the TWA MEC
14 and the APA would have looked like in the absence of
15 a breach of a duty of fair representation by ALPA?
16         MS. RODRIGUEZ:  I object to the form.
17         THE WITNESS:  I'm sorry.  Can I ask you
18 to ask that question again?  I'm really not sure I
19 understood it.
20 BY MR. TOAL:
21     Q    Sure.
22     The question is whether your objective in this
23 case was to try to figure out what any merged
24 seniority list agreed upon between the TWA MEC and
25 the APA would have looked like absent any breach of

1 a duty of fair representation by ALPA?
2     A    No.  That was one objective of the
3 report, yes.
4     Q    And what information did you think you
5 needed in order to make that assessment?
6     A    The proposals that had been passed
7 between the parties, information on -- on what the
8 courses of action that ALPA had available to it that
9 were not undertaken, the closing arguments in the
10 trial and the instructions to the jury in the trial
11 are probably the most important things that I
12 referenced.
13     Q    Anything else that you thought was
14 necessary in order for you to conduct your analysis?
15     A    Well, lots and lots of data.  I mean,
16 first of all, which analysis are we talking about?
17 The -- the estimating of what the APA and ALPA would
18 have agreed to, or --
19     Q    Yes.
20     A    Well, I mean, in terms of data, to the
21 contributing lists that went into the merger, which
22 included people's positions, the fleet information
23 of both of the airlines.  I think I already
24 mentioned the proposals that had been passed,
25 information on the actions that ALPA did or didn't

1 undertake that led to the breach.  Sitting here
2 right now, I can't think of any others, but I'm --
3 I'm not saying there aren't any.
4     Q    Where did you acquire information on
5 the actions that ALPA had available to it that it
6 didn't pursue?
7     A    From the testimony of Mike Day and from
8 the closing arguments.
9     Q    Did you have any other source of
10 information on the actions that ALPA had available
11 to it that it didn't undertake?
12     A    No.  I think -- I think the most
13 comprehensive list I had of things that hadn't been
14 undertaken were the closing arguments in the trial.
15     Q    Did you have any information available
16 to you on the likelihood that any of those actions
17 that ALPA had available to it would be successful?
18     A    Peter Fram's closing.
19     Q    You mean Steve Fram?
20     A    Steve Fram.
21     I'm thinking Peter Frampton.  Okay.  Sorry.
22     Q    Did you have any other source of
23 information other than Steve Fram's closing on the
24 likelihood that any of those actions would have been
25 successful?

Page 129

1    A    No, I did not.
2    Q    And what did Steve Fram's closing tell
3  you about the likelihood that any of those actions
4  would have been successful?
5    A    Well, he -- he thought that the -- the
6  actions wouldn't have been successful.
7    Q    And that was the only source of
8  information you had about whether those actions
9  would have worked or not?
10   A    Yes.
11   Q    Now, in the second page of your report,
12 the first sentence you say, in Patrick Brady, et al,
13 versus Air Line Pilot's Association (ALPA), the jury
14 found that ALPA violated its duty of fair
15 representation to the former pilots of TransWorld
16 Air (TWA), and that this violation caused injury to
17 the TWA pilots.  Do you see that?
18   A    That's right.
19   Q    And did the jury verdict say anything
20 about how many TWA pilots were injured by the
21 alleged breach of fair duty?
22   A    It did not.
23   Q    Did the jury verdict say anything about
24 which of the actions ALPA had available to it but
25 did not undertake constituted the breach of the duty

Page 130

1  of fair representation?
2    A    It did not.
3    Q    Did you make any assumptions in your
4  analysis about which of the options that ALPA had
5  available to it but did not pursue constituted the
6  breach of duty of fair representation?
7    A    I did not.
8    Q    You didn't make any assumptions one way
9  or the other about that?
10   A    Did I make any assumptions about -- I
11 don't believe I did, no.  I mean, I -- I started
12 from the point of view that these were actions that
13 were available, and that had they done all of them,
14 there wouldn't have been a breach.  That's the only
15 assumption I made.
16   Q    Well, you took all of the -- all of the
17 actions that you were aware of that ALPA had
18 available to it but did not pursue into account in
19 your damage analysis; correct?
20   A    Sorry?
21   Q    You -- you took all of the actions that
22 you understood ALPA had available to it but did not
23 pursue into -- into consideration in conducting your
24 damage analysis; correct?
25   A    I did.

Page 131

1    Q    If you knew, for example, that the jury
2  thought that initiating a jump seat war was not a
3  breach of the duty of fair representation, would you
4  have taken that particular action into account in
5  your damage analysis?
6    A    If you are asking me if the jury had
7  said, if they had only done this one thing, there
8  wouldn't have been a breach?  I'm not really sure --
9  because, I mean, this is -- this is kind of
10 exceedingly hypothetical; right, so --
11   Q    If you -- if you -- if you knew that
12 the jury had concluded that pursuing a jump seat war
13 was a silly idea, it only would have antagonized the
14 APA, and that's not part of any breach, would you
15 have taken that ALPA action into consideration in
16 conducting your damage analysis?
17        MS. RODRIGUEZ:  Objection.
18        THE WITNESS:  It -- it is difficult to
19 say one way or the other because, first of all -- I
20 mean, I'm going to try and answer your question but
21 it is kind of hypothetical.  If -- it is hard to
22 imagine how exactly I would know that the jump seat
23 war, not having been pursued had no impact on the
24 jury's decision.  So if there was some way in which
25 the jury, you know, had come back and said, here are

Page 132

1  the five things they should have done, and if they
2  had done them, we would not have found them in
3  violation.  I -- I might be able to -- you would
4  obviously have to take that into consideration.  I
5  mean, there's -- there's -- I -- I don't remember
6  the number, maybe ten things, ten or 11 things that
7  are listed that were available as potential actions.
8  If that list was only two long, you would probably
9  spend a great deal more time trying to understand
10 those two and all of their implications and why two
11 out of the 11 were selected as having -- but, you
12 know, I really -- I don't know how I can answer your
13 question in any meaningful way because it is really
14 kind of hypothetical.
15   Q    You are allowed to pose hypothetical
16 questions to expert witnesses.
17   A    Yeah, but, I mean, this one is kind of
18 hypothetical to the point where you can't really put
19 any -- any meaningful answer to it.  Right?  You
20 know, if the jury had all shown up wearing red one
21 day, would that have changed your opinion?  Well,
22 probably not, right?  You know.  If they said in
23 some way that one of these actions didn't constitute
24 the breach or one of these inactions didn't
25 constitute the breach, of course you would have to

Page 133

1    take that into consideration.  I mean, what I took
2    into consideration were the 11 that were left in
3    Allen Press' closing that were not objected to.
4         Q     Well, in -- in doing that, were you
5    assuming that each of these was a predicate for the
6    jury's verdict that there was a breach of the duty
7    of fair representation?
8         A     My only assumption was that each of
9    these actions was available to ALPA and they didn't
10   pursue them.
11        Q     If -- if you knew because the jury
12   provided a checklist and they were asked for each --
13   each action, check whether it is a breach of the
14   duty of fair representation or not, and the jury had
15   checked three of the boxes as -- as being breaches
16   of the duty of fair representation, would you have
17   taken the other matters into account in your damage
18   analysis?
19        MS. RODRIGUEZ:  I object to this whole
20   line of questioning because that wasn't the trial
21   below.  Go ahead, to the extent you can answer.
22        THE WITNESS:  Look, my assumption is
23   that -- that -- okay.  Well, look.  If the jury had
24   said, like, these three things, we don't think were
25   factors in the violation -- well, let me think about

Page 134

1    this.  I'm sorry, I'm going to have to --
2    BY MR. TOAL:
3         Q     That's fine.
4         A     We are going to have to take some time
5    to think about this, because what are we saying?
6         If we have -- we have a violation on one hand,
7    and on the other we are saying I -- I -- had ALPA
8    done all of these things, the result would have been
9    X.  Now, maybe they would have done those three
10   things anyways.  I mean, of these three things --
11   the question, you know, is, one, what is the impact
12   of these courses of action on the negotiation?  And
13   the other is, what role did these things have in
14   ALPA's breach?  And those are two completely
15   different questions, you know, like the jump seat
16   war.  I mean, maybe the jury would have found that
17   the jump seat war is not something that ALPA needed
18   to do in order to represent its pilots fairly, but
19   that jump seat war was a course of action available
20   to ALPA and didn't pursue it, and had they done it,
21   it would have had an impact on the negotiation.  So
22   it is difficult to sort of take those two things and
23   say, you know, am I analyzing the breach or am I
24   analyzing, you know, the impact of -- of ALPA's
25   inaction, or am I analyzing what each one of these

Page 135

1    courses of action, what kind of impact could it
2    theoretically have had on the negotiations?  So,
3    does that answer your question?  I mean, if --
4         Q     Not really.
5         A     Sorry.  I'm trying my best here.  I
6    really am.
7         Q     What was it that you were trying to
8    analyze here?  The -- the agreement that would have
9    resulted in the absence of a breach of the duty of
10   fair representation by ALPA?
11        A     Correct.
12        Q     So if you knew as a matter of fact that
13   with respect to seven of these ALPA actions that the
14   jury didn't view those as constituting breaches of
15   the duty of fair representation, would that have
16   changed your analysis?
17        MS. RODRIGUEZ:  Let him finish his
18   question.
19        THE WITNESS:  Yeah.  Sorry.  Now it's
20   my fault.
21        If -- if I knew that absolutely, then, of
22   course, it would have to be taken into
23   consideration.
24   BY MR. TOAL:
25        Q     And how would you have taken that into

Page 136

1    consideration?
2         A     I would have -- how would I have taken
3    it into consideration?  Well, as a practical matter,
4    we would have had to say the agreement, rather than
5    being reached here, depending on what those three
6    actions were, there would have been less persuasive
7    force available in the negotiations.  Conceivably
8    the point of agreement would move more towards the
9    American Airlines pilots' side of the -- side of the
10   equation, a list less favorable to the TWA pilots.
11        Q     Would you have confined your analysis
12   to the three ALPA actions that the jury in this
13   hypothetical concluded constituted the breach of a
14   duty of fair representation?
15        A     I would have.
16        Q     Now when you talk in the first sentence
17   about the jury verdict, that the violation caused
18   injury to the TWA pilots, did you mean to suggest
19   the jury had concluded that all TWA pilots had been
20   injured?
21        A     That some TWA pilots had been injured,
22   at least some.
23        Q     At least some?
24        A     Yes.
25        Q     And do -- do you know what the jury

Page 137

1    thought about how many TWA pilots had been injured?
2        A    I do not.
3        Q    And your analysis, your Salamat
4    analysis, for instance, concludes that a substantial
5    number of the TWA pilots suffered no damages;
6    correct?
7        A    That's correct.
8        Q    And have you quantified how your
9    Salamat list determines what percentage of the TWA
10   pilots suffered no damages?
11       A    It does, but I -- I don't know what the
12   number is off the top of my head.
13       Q    Have you quantified that?
14       A    Yes.
15       Q    And what percentage of the TWA pilots
16   did you find sustained no damage?
17       A    I don't know off of the top of my head.
18   I would have to refer to the data files to -- to
19   actually give you an answer to that.
20       Q    My question is, did you go back and do
21   that at some point?  Even if you can't remember now,
22   did you go and say --
23       A    Absolutely, yes.
24       Q    So at one time you knew what percentage
25   your list indicated sustained no damages?

Page 138

1        A    At one time, I did.  A few minutes
2    later, I would have forgotten.  But there is some
3    number of pilots who were not damaged.
4        Q    Now, you say in the second paragraph on
5    page two, there are two major parts involved in
6    calculating the damages to TWA pilots as a result of
7    the Air Line Pilot Association's (ALPA) violation of
8    its dues of fair representation.  The first part of
9    the damage calculation is to estimate the
10   integration that would have occurred absent the
11   violation; correct?
12       A    That's correct.
13       Q    Now, what expertise do you have in
14   estimating the integration that would have occurred
15   absent a breach of the duty of fair representation?
16       A    Well, my experience in working with
17   pilot negotiating committees, pilot merger
18   committees.  Review of all of the awards that have
19   gone back some years to, I guess, post-deregulation.
20   But primarily as my role as an advisor pilot, merger
21   committees.
22       Q    And is it your view that anyone who
23   served as -- as an advisor to pilot merger
24   committees would have the requisite expertise to
25   determine -- at least to estimate the integration

Page 139

1    that would have occurred absent a violation of the
2    duty of fair representation?
3        A    No.  I don't think everybody?
4        Q    Is there some particular experience
5    that you have that other advisors wouldn't have?
6        A    Well, I've done extensive analysis on
7    how lists have been merged and their impacts.  That
8    ability alone would differentiate me from a vast
9    number of people because, you know, I'm the one
10   whose been there showing people what the impacts are
11   and seeing what their reactions are, so --
12       Q    What whose reactions are?
13       A    Pilot merger committees.
14       Q    And in how many of those cases were you
15   analyzing what integration would have occurred
16   absent a breach of the duty of fair representation?
17       A    None.
18       Q    Are you aware of any generally accepted
19   methodology for estimating the seniority integration
20   list that would have been agreed to in the absence
21   of a duty -- breach of the duty of fair
22   representation?
23       A    No, I'm not.
24       Q    Have you done anything to test the
25   accuracy of the methodology that you used to attempt

Page 140

1    to estimate the integration that would have been
2    reached in the absence of a breach?
3        A    I'm sorry.  Could I ask you to say that
4    question again?
5        Q    Yeah.  The question is whether you've
6    done anything to test the accuracy of the
7    methodology that you used to try and estimate the
8    seniority integration list that would have been
9    agreed to in the absence of a breach.
10       MS. RODRIGUEZ:  Objection.
11       THE WITNESS:  I'm going to say yes
12   because the way in which the estimation was done was
13   to compare the list -- a bunch of lists
14   systematically to lists that have been obtained from
15   other agreements and other mergers.  So the -- the
16   analysis that was done was effectively to say, is
17   this list in any manner superior to any other list,
18   given any other circumstance.  And if it was, then
19   we would assume that it might be far reaching as an
20   assumption for a negotiated agreement.  So, yeah, it
21   was -- that was the basis of the entire exercise.
22   BY MR. TOAL:
23       Q    And how did you undertake that
24   analysis?
25       A    To compare a series of different lists

Page 141

1  to other awards.
2      Q    Did you use any sort of quantitative
3  metric in doing that analysis?
4      A    Well, compare -- as I believe the
5  report went through some -- some pains to talk about
6  the size at the top of the list, the size of the
7  staple group, the size of the merged group.  And
8  that's the primary analysis that was done, to look
9  at those three aspects of the Supplement CC list,
10  versus other lists, versus proposed lists such as
11  the plus 200 list, the damage model list, the -- the
12  optimal list and so on.  So that was, in effect, the
13  -- the objective of the exercise, in estimating, was
14  to say to what extent is any given list likely to
15  have found a precedent in other situations.
16      Q    And what are some of the variables that
17  you are aware of that can affect what a seniority
18  integration looks like?
19      A    The variables that would affect what a
20  seniority integration would look like?  The most
21  significant one would be the number of jobs and the
22  type of equipment that each premerger group was
23  operating.
24      Q    Any others that you are aware of?
25      A    Relative ages of the pilot groups,

Page 142

1  relative length of service of the pilot groups.  The
2  type of carriers, whether it's a major carrier or a
3  regional carrier, for instance.  Those could be
4  factors.  Whether it's an agreement or an
5  arbitration.  I think those would be the major
6  variables.
7      Q    And are you excluding from your
8  analysis, the pre-transaction career expectations?
9      A    If by expectations you mean the
10  economics of each contributing carrier, yes.  If you
11  mean by expectations, how much work did they have at
12  the time of the merger, then I wouldn't -- I
13  wouldn't exclude that.  I think I said it is the
14  most important factor.  I mean, to the extent that
15  your expectations are to continue flying the
16  equipment you have or to continue having access to
17  the jobs you brought, then, yes.
18      Q    But in terms of variables that you
19  would point to that explain prior seniority
20  integration lists, you would exclude as a factor the
21  pre-transaction career expectations of each pilot
22  group; is that correct?
23          MS. RODRIGUEZ:  Objection to the
24  question.
25          THE WITNESS:  I think I just said the

Page 143

1  opposite, which was, to the extent that people's
2  premerger expectations are tied to the equipment and
3  jobs that they brought to the merger, I would not
4  exclude that.
5  BY MR. TOAL:
6      Q    Understood.  But to the extent we are
7  talking in pre-transaction career expectations about
8  the prospects of the acquired airline on a
9  standalone basis, you would not identify that as a
10  factor that influenced the composition of prior
11  seniority integration lists; is that correct?
12      A    Only in situations where one carrier
13  had ceased to operate.
14      Q    So did you do anything when you were
15  analyzing prior seniority integration lists to
16  analyze these factors to try and develop a
17  comparable group of seniority integrations?
18      A    I used all of the seniority
19  integrations as benchmarks to say what a minimally
20  acceptable negotiated list would have had to look
21  like.  And so I didn't prioritize any one type of
22  merger according to these factors to any others.
23          THE WITNESS:  Anyone else getting
24  hungry, because I'm feeling a little like it's lunch
25  time, but, you know, I will leave it up to you guys.

Page 144

1          MS. RODRIGUEZ:  It is ten of 1:00 and
2  we have been going for over three hours, so.
3          MR. TOAL:  We can go off the record.
4          VIDEO SPECIALIST:  The time is now
5  12:50 and we are going off the video record.
6          (Luncheon recess.)
7          VIDEO SPECIALIST:  The time is now 2:04
8  and we are back on the video record.
9  BY MR. TOAL:
10      Q    So, Mr. Salamat, before the break we
11  were talking about the methodology that you used to
12  try and estimate the integration that would have
13  occurred absent any breach of the duty of fair
14  representation.  Do you remember that testimony?
15      A    I do.
16      Q    And is there a name for the methodology
17  that you used to try and make that estimate?
18      A    No, there isn't.
19      Q    Are you aware of any known error rate
20  for the methodology that you used to try and
21  estimate the integration that would have occurred?
22      A    I don't believe I know of any known
23  error rate.
24      Q    So you -- directing your attention to
25  page two of your report, in the third paragraph you

Page 145

1    say, a number of actions that ALPA failed to take in
2    representing the TWA pilots were brought out at
3    trial. Had these actions been employed, they would
4    have brought pressure on the Allied Pilots
5    Association, APA, while they negotiated seniority
6    with the TWA pilots. Do you see that language?
7        A    Sorry. Where -- where? Oh, okay.
8    Yes. The third paragraph. Go ahead.
9        Q    Okay.
10       A    Yes.
11       Q    Do you consider yourself an expert on
12   negotiation theory?
13       A    I consider myself familiar with
14   negotiation theory. I don't think I can call myself
15   an expert.
16       Q    And what's your basis for saying that
17   had -- had these actions been employed, they would
18   have brought pressure on the Allied Pilot's
19   Association and their negotiations with the TWA
20   pilots?
21       A    What's my basis for saying they would
22   have brought pressure?
23       First, and probably the most important,
24   experience of having been in negotiations when other
25   groups brought pressure to bear in the form of, you

Page 146

1    know, litigation, or sanctions, or some other form
2    of pressure.
3        Secondary, everything I've been taught in
4    negotiation in terms of what it is that moves
5    parties from one position to another.
6        Those two areas would be the vast majority
7    of -- of my reasoning behind that statement.
8        Q    Anything else you can think of as you
9    sit here today?
10       A    Well, training, teaching, experience,
11   common sense.
12       Q    Anything else?
13       A    I -- I can't think of anything at the
14   moment. I mean, I think those three would encompass
15   most of the -- the reasoning behind that statement.
16       Q    And when you refer to teaching, you are
17   not referring to teaching that you've done; correct?
18       A    No. I'm -- I'm talking about training
19   in negotiation.
20       Q    Training that you've received from
21   others?
22       A    Training that I've received, yes.
23       Q    And you reference your experience in
24   which litigation has been pursued; is that correct?
25       A    Yes.

Page 147

1        Q    And in which cases that you've been
2    involved with has one of the parties to a
3    negotiation pursued litigation?
4        A    When I was working with the Canadian
5    Air Line Pilot's Association -- Air Line Pilot's
6    Association, Canadian Airlines, that would be
7    Canadian Airlines pilots. After having received an
8    unfavorable seniority integration under an
9    arbitrator named Mitchnick, they went through a
10   series of negotiations where they were threatening
11   to take the case to the Industrial Relations Board,
12   and negotiations were going on during that period.
13   So that was one that, you know, is memorable.
14       Q    And with respect to that situation, did
15   the threats of litigation precede an agreement in
16   negotiations between the parties?
17       A    No. No, they did not. They -- they
18   ultimately ended up in litigation.
19       Q    Do you have any other experiences
20   dealing with seniority integration where one of the
21   parties to a negotiation threatened litigation?
22       A    Threatened litigation? I mean, I've
23   been involved in a few where they actually launched
24   litigation, and so presumably threats preceded the
25   launching.

Page 148

1        Q    Okay. So let's -- let's focus first on
2    the ones where litigation was actually pursued.
3        Other than the Canadian Airlines situation,
4    are there other situations in which litigation was
5    pursued?
6        A    Litigation was pursued in the America
7    West/USAirways merger.
8        Q    And did the pendency of litigation in
9    that case result in a negotiated agreement?
10       A    Not so far. I mean, it's an ongoing
11   case.
12       Q    Other than the Canadian Airlines and
13   American West/USAir situations, any others that
14   you've been involved in in which litigation's been
15   pursued?
16       A    Yeah. The connector agreement between
17   Air Canada and the feeder airlines. There was a
18   class action that was pursued following that
19   seniority non-integration.
20       There was litigation -- well, I guess that's
21   not really necessarily stemming directly from a
22   seniority integration, but the whole age 60 case I
23   testified in -- to at the -- in a Canadian Human
24   Rights Tribunal was actually related directly to the
25   merger of Canadian Air Canada because there was two

Page 153

1   group believed they had the right to -- to impose a
2   list on the other.  Air Canada pilots believed they
3   had the right to determine what the seniority
4   integration of the Canadian Airline pilots would be.
5        Q    So the factor that you indicated made
6   the TWA/American Airlines situation unique is that
7   the APA believed it had a right to act unilaterally;
8   right?
9        A    In a negotiation.  Not in litigation.
10       Q    In a negotiation?
11       A    Yeah.  I mean, I'm unaware of a
12  negotiation where one party believed they had the
13  right to act unilaterally.
14       Q    Now, with respect to the specific ALPA
15  actions or inactions that you identify in your
16  report, do you have any information specific to the
17  APA about how it was likely to respond to those
18  actions?
19       A    Specific?  No.  I don't believe I have
20  any information about how they would have responded
21  specifically to any one of these things.
22       Q    Now, you say in the third paragraph on
23  page two, as the APA has some ability to act
24  unilaterally and the TWA had no automatic right to
25  have the matter decided by a neutral party, the

Page 154

1   effect additional pressure would have had can be
2   considered a problem of increased uncertainty in
3   estimating how the parties as agents would have
4   responded and ultimately decided given that
5   uncertainty.  Do you see that language?
6        A    I do.
7        Q    Why do you say the APA had some ability
8   to act unilaterally?
9        A    Well, they had, in their contract, a
10  clause, and I don't know that I know the specific
11  language of the clause off the top of my head, but
12  that they had the right to staple any pilots who
13  came from an airline in an acquisition to the bottom
14  of their list.  However, they had also stated at the
15  same time that this right wasn't absolute.  So where
16  that -- whether or not they had the right, I -- I
17  don't know has ever been truly tested.
18       Q    And who from the APA said that that
19  right wasn't absolute?
20       A    There was a -- I believe it was a
21  communication between the MEC and their pilots in
22  the lead-up to the merger stating that the APA had a
23  duty of fair representation to the pilots, and that
24  ultimately the matter could be decided by a judge,
25  and so they'd stated a number of reasons why they

Page 155

1   couldn't just staple all of the TWA pilots.
2        Q    And do you have any information that
3   the APA -- you are referring to notes from a meeting
4   of the APA's Boston domicile; correct?
5        A    That sounds -- I believe that's
6   correct, yes.
7        Q    And that's cited in your report?
8        A    Yes.  I think I might have cited that
9   in the report.
10       Q    Okay.  Do you have any information
11  about whether the view that the APA owed a duty of
12  fair -- withdrawn.
13       Is your understanding that the statements from
14  that meeting reflected that the APA had a duty of
15  fair representation to the pilots of TWA?
16       A    The only -- my only understanding was
17  that the right to staple the TWA pilots appeared not
18  to be absolute in their own court, so --
19       Q    And do you know whether any views
20  expressed in that meeting represented the views of
21  the APA overall?
22       A    I assumed that whoever was speaking was
23  speaking for the APA overall, but it was the MEC
24  chair, I believe, who was answering the questions,
25  so I assume he spoke for the association.

Page 156

1        Q    And do you know whether that person had
2   any legal background?
3        A    I do not.
4        Q    Okay.  Are you aware of any other
5   limits on the APA's ability to act unilaterally?
6        A    Legal limits or practical limits?  I
7   mean --
8        Q    Any limits at all.
9        A    I considered the fact that they wanted
10  to do a fair integration would be a limit on their
11  ability to act unilaterally, and you can't really
12  act unilaterally if you want to be fair.  So they
13  said all throughout that they wanted a fair
14  integration of the TWA pilots.  So that would
15  presume -- in itself, would forestall acting
16  unilaterally.
17       Q    Anything else that you regard as a
18  limit on the APA's ability to act unilaterally?
19       A    No.  Primary the latter.
20       Q    And when you say primarily, it sounds
21  like you have other things in mind.  Is there
22  anything else?
23       A    The former.  They didn't believe they
24  had an absolute ability, in their own words, and
25  that they wanted to be fair.

Page 157

1      Q      So beyond what you've testified to
2  previously, is there anything else you would point
3  to as a limit on the APA's ability to act
4  unilaterally?
5      A      Not that I'm aware of.
6      Q      And when you say the -- when you say
7  that TWA had no automatic right to have the matter
8  of seniority integration decided by a mutual party,
9  isn't it -- isn't it a fact that TWA didn't have any
10  right, automatic or otherwise, to have the matter
11  decided by a neutral party?
12      A      Well, what I mean is by they had no
13  automatic right, there is nothing that would have
14  prevented the APA from agreeing to -- to have the
15  matter decided by a neutral, and then they would
16  have had the right.  So they had no automatic right
17  to end up there, but that -- that -- there is no
18  reason why that couldn't have been a negotiated
19  agreement.
20      Q      And is your -- do you have any
21  understanding that the APA agreed to arbitrate the
22  issue of seniority integration?
23      A      I'm sorry?
24      Q      Do you have any understanding that the
25  APA agreed to integrate the -- to arbitrate the

Page 158

1  issue of seniority integration?
2      A      No, they didn't, as far as I know.
3      Q      And if the APA was unwilling to agree
4  to arbitration of seniority integration, is it your
5  understanding that TWA and its pilots would have no
6  ability to compel such an arbitration?
7      A      In the absence of -- you mean, you are
8  talking about what actually occurred, or would the
9  TWA pilots have had an ability to compel arbitration
10  given this list of -- of actions?
11      Q      My question is -- is, in the absence of
12  agreement by APA to arbitrate, are you aware of any
13  ability that the TWA pilots had to --
14      A      -- to compel?
15      Q      -- legally compel the APA to
16  participation in an arbitration?
17      A      My understanding is the history, having
18  played out as it did, they didn't.
19      Q      I understand that, as a matter of
20  history, what happened.  But are you aware of any
21  legal mechanism through which the TWA pilots could
22  have forced the APA to arbitration?
23      A      I'm -- I'm -- I'm not -- I'm not a
24  lawyer, so I, you know, I couldn't really speculate
25  on whether they had any kind of ability to compel it

Page 159

1  by other means.  So, no.  The only way I can say
2  that they could have -- that I know they could have
3  achieved an arbitration with the APA would have been
4  to achieve that in a negotiation.
5      Q      Now, in your report at the bottom of
6  page two, you say, from the point of view of the TWA
7  pilots, there were a range of possible outcomes
8  ranging from the least desirable, a list just
9  slightly better than Supplement CC, to an upper
10  limit, which is defined as the list an arbitrator
11  would most likely have imposed.
12      Do you see that language?
13      A      I do.
14      Q      Now, why would the least desirable
15  result have been no change from supplement CC at
16  all?
17      MR. JACOBSON:  I object to the form of
18  the question.  That misstates what the report
19  language as read says.
20      THE WITNESS:  Yeah.  Can I get you to
21  ask that question differently, because I don't think
22  that's what I -- what I actually said here.
23      What I said is, there is a range of possible
24  outcomes ranging from the least desirable, a list
25  just slightly better than Supplement CC, so not

Page 160

1  Supplement CC.
2  BY MR. TOAL:
3      Q      I understand that you are saying that
4  the bottom end of the range would be something
5  better than Supplement CC; correct?
6      A      Right.
7      Q      Is that accurate?
8      A      That's -- that's accurate, yes.
9      Q      Okay.  Now, why I -- why don't you
10  contemplate the possibility that even if ALPA had
11  taken all of these actions, that the APA would not
12  have been willing to offer a list better than
13  Supplement CC?
14      A      I -- I didn't decide that.  The jury
15  decided that.
16      Q      So is your -- is your decision to adopt
17  a lower bound of a list better than CC based on your
18  understanding of the jury verdict?
19      A      That's correct.  And the instructions
20  to the jury, and the closing arguments.
21      Q      And you define here an upper limit,
22  essentially, the best list the TWA pilots could have
23  expected of something that was equivalent to the
24  result that would have been expected in an
25  arbitration decision; correct?

Page 161

1    A    That's correct.
2    Q    But you also have something in your
3  report that you call a fairness model; correct?
4    A    Yes.
5    Q    And the damages you attribute based on
6  the fairness model are higher than those that you
7  calculate based on the arbitrated model; correct?
8    A    That's correct.
9    Q    Now, if you have established an upper
10  bound in your report on damages of what the expected
11  result would have been in an arbitration decision,
12  why do you present an even higher model based on
13  what you call the fairness list?
14    A    Well, the fairness list is a test for
15  the arbitrated list.  And one of the tests of an
16  arbitrated list is would it -- would it have been
17  considerably more fair or would it have flipped the
18  balance and been unfair to the American Airlines
19  pilots in any way?  And so the answer would be that
20  any -- any list that was better than the fairness
21  list would not reasonably be achievable in
22  arbitration, and you wouldn't want to necessarily
23  use it as a goal post.  And so the fairness list has
24  that one advantage to it.  It has that one -- that
25  one main purpose which is to test the likelihood of

Page 162

1  an arbitrated list.  So if the damages under the
2  arbitrated list are less than they are under the
3  optimal list or the fairness list, then it is within
4  a range that I would consider possible.  Anything
5  better than that, probably not.  So that's one
6  reason for the -- for the fairness list.
7    The second is, like I mentioned, that no
8  matter what the damages end up being or what damages
9  would end up being awarded, that the fairness list
10  is the fairest way to distribute damages to
11  individuals rather than -- but not necessarily to
12  calculate what those damages are on an aggregate
13  basis.  But if pilot X was harmed by $10,000 under
14  the fairness list, out of a total pool of damages of
15  100 million, then that would be the way in which you
16  would pro rate them would be my contention.  So it
17  serves as a litmus test and a method of
18  distribution.
19    Q    So to make sure I understand what you
20  are contending in your report, is it accurate to say
21  that you are not contending that without regard to
22  what ALPA did, that the TWA pilots could have
23  achieved through negotiation a list that was as
24  favorable as the fairness list?
25    A    I don't believe they could have, no.

Page 163

1    Q    So that's not something you are
2  presenting as a basis for measurement of damages in
3  this case; correct?
4    A    No.
5    Q    You are not doing that; correct?
6    A    I'm not doing that.
7    Q    Turning over to page three of your
8  report, at the top of that page, the first full
9  sentence, you say, my objective in this matter is to
10  estimate as accurately as possible where in that
11  range an agreement between the TWA pilots and the
12  APA would have fallen given effective representation
13  by ALPA.
14    Do you see that language?
15    A    I do.
16    Q    And do you have any statistical data
17  regarding how accurately that estimate can be made?
18    A    I do not.
19    Q    And did you try and quantify the
20  probability that the APA and the TWA MEC would have
21  agreed on the Salamat model as opposed to any other
22  point in the range?
23    A    Well, I believe I did by assigning
24  possibilities that each individual action could have
25  contributed to some change in the perception of --

Page 164

1  of the TWA pilots by the APA or some -- affected
2  some change in the negotiating stance of the APA.
3  So I did attempt to quantify the effect that those
4  actions would have.
5    Q    My question is whether you attempted to
6  quantify the probability that had ALPA not breached
7  a duty of fair representation, that the agreement
8  that the TWA MEC and the APA would have reached
9  would have resembled the Salamat model.
10    A    I did.
11    Q    And what was the probability that you
12  determined that they would have ended up with the
13  Salamat model?
14    A    73 percent, I believe.
15    Q    Did you assign any probability to the
16  likelihood that the TWA MEC and the APA would have
17  agreed upon a seniority integration list that
18  resembled Supplement CC plus 200?
19    A    I would assume that that one would be
20  closer to a hundred but, I -- I -- I mean, I don't
21  recall what the actual probability was, but I did
22  attempt to estimate it.
23    Q    Well, I'm confused because you said
24  that you assigned the probability in the range of
25  distribution for the Salamat model at 73 percent.

1    being --
2        A      No, no, no.  I said hypothetically --
3    sorry.  I said hypothetically, if the jury had said
4    that one or two of these things didn't constitute
5    the breach, would that have changed my analysis?  I
6    agreed to that, but I don't know that.  So I don't
7    think I ever agreed that I don't know that all of
8    these things were some part of the jury's decision.
9    If I said that, then I misstated it.
10       Q      Well, can you tell me which of these
11   the jury concluded constituted part of the breach?
12       A      All of them.
13       Q      And that's based on what?
14       A      The fact that all of them were argued
15   and the jury found that ALPA was in breach.
16       Q      And how do you know that the jury
17   accepted the arguments as to each one of these?
18       A      I have nothing that indicates that they
19   didn't.
20       Q      And you have nothing that indicates
21   that they did, either.
22       A      I have the fact that they decided --
23   that they found ALPA guilty, and these were the
24   things that they did or didn't do.
25       Q      So are you assuming then that the jury

1    concluded that each of these was a breach of the
2    duty of fair representation for purposes of your
3    analysis?
4        A      I believe that each of these in some
5    way contributed to the breach.
6        Q      And you are certainly trying to assess
7    damages with respect to each of these alleged
8    actions or inactions; correct?
9        MR. JACOBSON:  I object to the form of
10   the question.  Misstates his testimony.
11       THE WITNESS:  Can I ask you to ask the
12   question a different way?
13       MR. TOAL:  Can you read it back?
14       (The court reporter read back the
15   pending question as follows:
16       "Question:  And you are certainly
17   trying to assess damages with respect to each
18   of these alleged actions or inactions;
19   correct?")
20       MR. JACOBSON:  Same objection.
21       THE WITNESS:  Yeah.  I think that's the
22   same question.  So maybe if I could ask you to ask
23   the question in a slightly different way because I'm
24   not really sure I even understand what you mean,
25   so --

1    BY MR. TOAL:
2        Q      Well, you are attempting to estimate
3    damages in this case; correct?
4        A      That's correct.
5        Q      And your analysis of damages requires
6    you to make an assessment about what additional
7    actions ALPA should have taken; correct?
8        A      I don't know that it required me to
9    make an assessment of what ALPA should have done.
10   All I know is what ALPA didn't do or did do, okay,
11   depending on, you know, the action that we are
12   talking about.  All of them contributed to the
13   jury's decision that ALPA was in violation.  I don't
14   know which one of these ones may not have ended
15   up -- which one of these things may have been less
16   compelling to the jury in terms of demonstrating
17   that breach.  I have no information about that at
18   all.
19       Q      Now, are you assuming for purposes of
20   your analysis that TWA -- that ALPA should have
21   advised the TWA MEC not to waive its scope
22   provision?
23       A      Not for me to say what ALPA should or
24   shouldn't have done.  That's an action -- there --
25   there was a course of action there that was

1    available to it.  Not having pursued it is one of
2    the things that contributed to the jury's decision.
3    That's all I can say about it.
4        Q      And you say it contributed to the
5    jury's decision because it was raised and the jury
6    found a breach of the duty of fair representation;
7    correct?
8        A      It was a fact that was before them, and
9    the jury decided as the jury decides, so it is one
10   of the things that contributed to that decision.
11       Q      And that's your only basis for saying
12   that this specific action contributed to the jury's
13   decision; correct?
14       A      The fact that it was argued and that
15   they decided, yes.
16       Q      Now, did you analyze for purposes of
17   your analysis what would have happened if ALPA had
18   advised the TWA -- the TWA MEC not to waive its
19   scope provision?
20       A      Well, I examined that issue in terms of
21   if they hadn't waived scope, what the impact would
22   have been on their negotiating stance.  Would it
23   have -- so, yes.  The answer is yes.
24       Q      Okay.  And what -- what did you
25   consider among the options of what would have

1    happened had ALPA advised the TWA MEC not to waive
2    its scope provision?
3         A    What would the outcome of not having
4    waived scope be?
5         Q    Yeah.  What were the alternatives of
6    how things would have played out?
7         A    Only to the extent that it would have
8    increased pressure on the APA to agree to -- to
9    negotiate more intensively.  Whether that ultimately
10   would have resulted in the sky falling, I don't
11   know.  All I know is that would have increased the
12   TWA pilots' pressure on the APA pilots in
13   negotiations.
14        Q    Can you explain your view of how, had
15   the TWA MEC refused to waive its scope provision, it
16   would have applied pressure to the -- to the -- to
17   ALPA?  I'm sorry.  Withdrawn.
18        Can you explain your view of how, if the -- if
19   the -- if ALPA had advised the TWA MEC not to waive
20   its scope provision, how that would have exerted
21   pressure on the APA?
22        A    Well, now the APA would be in a
23   position where they couldn't guarantee they had a
24   right to unilaterally decide the placement of the
25   TWA pilots.  It was going to go to some other

1    fashion of determining whose rights trumped whose
2    rights.  So not being a lawyer, I don't know what
3    the, you know, the legal implications of that would
4    have been, had, you know, Compton -- Compton wanted
5    his airline.  If he was going to go ahead and
6    acquire TWA and have to deal with his pilots -- I
7    mean, he obviously had no fear of dealing with his
8    pilots, so, you know.  I can only speculate that --
9         Q    Why do you say that -- why do you say
10   that Compton had no fear of dealing with his pilots?
11        A    Well, Steve Fram said that he didn't
12   have any fear of dealing with his pilots, that, you
13   know, he went after them for $45 million and, you
14   know, he was a hard negotiator with his own pilots,
15   and I trusted he knows, so --
16        Q    Do you have any basis for concluding
17   that Compton had no fear of his pilots other than
18   the statement by Steve Fram?
19        A    Other than the statement by Steve Fram,
20   I think, being the most, you know, memorable example
21   I have of -- of the relationship between management
22   and the APA.
23        Q    Anything else you can point to other
24   than the statement by Steve Fram?
25        A    Well, like -- like I say, I think

1    that's the most memorable one.
2         Q    Right.  So you say that's the most
3    memorable.  I'm trying to understand whether you
4    have any other basis, and it sounds like you do
5    because you are talking about --
6         A    Well, my -- my understanding is that
7    they had very difficult labor relations, and a lot
8    of that I just know from -- from being around so
9    many pilots, and how people have characterized
10   various other groups, and the most concrete thing I
11   can point to in terms of why I have that impression
12   is Steve Fram's closing.
13        Q    Do you have an understanding that
14   American Airlines made waiver of the scope and
15   successor -- successorship provisions by the TWA
16   pilots a condition of any transaction with TWA?
17        A    I'm -- I'm aware that that was a
18   condition that they made, yeah.
19        Q    And do you have any reason to believe
20   that had the TWA MEC refused to waive its scope and
21   successorship provision, that the transaction would
22   have gone forward?
23        A    I don't know what would have happened
24   if they hadn't waived their scope.
25        Q    Are you aware that TWA filed a 1113

1    motion with the bankruptcy court?
2         A    I -- I am.
3         Q    And do you know what an 1113 motion is?
4         A    Something to do with bankruptcy.
5         Q    Do you know anything more than that?
6         A    Very little.
7         Q    Did you have an understanding that TWA
8    filed a motion to invalidate its collective
9    bargaining agreement with the TWA pilots, including
10   the scope and successorship provisions?
11        A    I know that there was a motion being
12   brought to the bankruptcy court to do that, yes.  I
13   mean, that was in the closing.
14        Q    And did you have an understanding of,
15   in the absence of a decision by the TWA pilots to
16   waive their scope and successorship provisions,
17   whether the bankruptcy court was likely to grant
18   that motion?
19        A    I have no understanding whatsoever of
20   the likelihood that the -- what the bankruptcy court
21   would have done if they argued that their scope
22   provisions shouldn't be abrogated, so --
23        Q    Do you have any understanding of the
24   APA's views about whether, in the absence of TWA's
25   pilots waiving their scope and successorship

Page 185

1  provisions, that American Airlines would walk away
2  from the transaction?
3      A    That's -- I understand their
4  contention.  Again, that's what Fram said in his
5  closing they would have done.  I don't know that
6  anyone can say for certain that's what would have
7  happened.
8      Q    Do you have any understanding of the
9  APA's perception of the likelihood that American
10 Airlines would walk away from the transaction in the
11 event that the TWA pilots refused to waive their
12 scope and successorship provisions?
13     A    I'm -- I'm -- I am led to believe that
14 that was their disbelief.
15     Q    So if that was their belief, how would
16 it apply pressure to the APA for the TWA pilots to
17 have refused to waive their scope and successorship
18 provision?
19     A    Well, it's one thing to have waived it
20 and -- and say, yeah, see, we were right.  The
21 transaction went ahead.  If they hadn't waived scope
22 and they were in a position where who knows what's
23 going to happen, they have more of an incentive to
24 negotiate.
25     Q    Why -- why would the APA have more of

Page 186

1  an incentive to negotiate?
2      A    Because there is no way that the APA
3  could have known what American was absolutely going
4  to do if they hadn't waived scope.  They could
5  speculate, they could believe, but had they not
6  waived scope, no one can say conclusively what would
7  have happened.  So all that -- my only concern in
8  that whole scenario is what that would have done to
9  the dynamics of the negotiation.
10     Q    If TWA had refused to waive its scope
11 and successorship provisions, would that have
12 affected ALPA's ability to pursue any of the other
13 actions on your list?
14     A    I'm sorry.  Could I ask you to just
15 repeat that question?
16     Q    Yeah.  If the TWA MEC had refused to
17 waive their scope in successorship provisions, would
18 that have affected ALPA's ability to undertake any
19 of the other actions on your list?
20     A    Well, I mean, that would have set off
21 an alternative course in history, and so some of
22 these might never have come to pass.  Would they
23 have been in a position to say, let's try and delay
24 the purchase with the DOT?  That may have made
25 absolutely no sense if they'd waived scope.

Page 187

1      Q    And did you assess -- on figure three,
2  you purport to present a --
3      A    I'm sorry.  Which page are you on?
4      Q    Page ten.  Figure three, you purport to
5  present a linear model of probabilities concerning
6  these actions or inactions by ALPA; correct?
7      A    That's correct.
8      Q    And -- and you -- you add probabilities
9  that you've assigned to each of these actions;
10 correct?
11     A    Right.
12     Q    And so were you assuming for purposes
13 of your analysis that ALPA would have had the
14 ability to pursue each and every action on this
15 list?
16     A    The assumption is yes because, you
17 know, again, none of these things were predicated on
18 success of any one of them on its own having
19 achieved what it set out to do.  So the model is
20 based on -- if they hadn't waived scope, it would
21 have increased pressure.  Now, if they had been
22 successful in -- in not waiving scope and, you know,
23 this 1113 business that you are talking about, not
24 having removed their scope provisions, if that had
25 been successful, who knows what would have happened?

Page 188

1  All of this would probably not have come to pass,
2  and we wouldn't even be having this conversation,
3  right?
4      So all I'm doing is saying, if we look at each
5  one of these actions, what would its impact on the
6  negotiations have been at a marginal level, and then
7  use a linear model, add them up, and see what the
8  probabilities of all of these having been pursued,
9  and assuming all of them could have been pursued.
10 Because unless you assume that one of them
11 succeeded, you would assume that they would go onto
12 the next.  So what you are talking about is more of
13 a feedback model.  And with a feedback model, you do
14 have to assume that some of these have some degree
15 of success and they forced all -- you pursuing other
16 courses of action.  That's not the type of model
17 that I've used here, because we cannot know how
18 successful any one of these things would have been
19 in achieving whatever it set out to do.  I assume
20 they were all set out in one way or the other to
21 achieve something like an arbitration or a mutually
22 agreed upon list.
23     Q    Well, let me -- let me try and
24 understand what you are doing here.  So referring to
25 figure three, the first item you list is insist on

Page 189

1   waiving scope; correct?
2       A     That's correct.
3       Q     And you have a five percent under Delta
4   perception; do you see that?
5       A     Under the change in perception of the
6   importance of -- yes.
7       Q     Okay.  So does the five percent
8   represent what you regard as an increased likelihood
9   of an agreement being reached?
10      A     The five percent is the increased
11  likelihood of an agreement being reached, that's
12  correct.
13      Q     And is it the increased likelihood,
14  specifically of this -- an agreement being reached
15  on the Salamat model?
16      A     That's correct.
17      Q     And if you are using any other model,
18  you would change these percentages?
19      A     Yes, you would have to.
20      Q     And does the five percent represent
21  that, whether the particular action was successful
22  or not, that there would be a five percent --
23      A     There is a five percent probability
24  that that action would have led to an agreement.
25  Not that it would have succeeded, that it would have

Page 190

1   led to an agreement.
2       Q     There is a five percent likelihood that
3   whether the action was successful or not, that it
4   would have led to the Salamat model being agreed
5   upon?
6       A     Yes.
7       Q     So if -- for instance, take the first
8   one.  If ALPA had advised the TWA MEC not to waive
9   their scope, but the TWA MEC decided to do it
10  anyway, would you say in that instance there is a
11  five percent increased likelihood of an agreement
12  being reached?
13      A     Well, my understanding is -- is the TWA
14  pilots did not want to waive scope, so it is kind of
15  difficult to answer the question.  I mean, if I
16  thought -- if there was some evidence that the TWA
17  pilots were all prepared to -- to waive scope, I --
18  I -- I might have to view that one differently
19  because presumably then the TWA pilots wouldn't
20  carry that -- that scope waiver issue into the
21  negotiation with any meaningful force, so it's kind
22  of hard to answer that question.
23      Q     Do you have an understanding that there
24  were some TWA pilots who favored waiving scope?
25      A     I -- I understand that not all were

Page 191

1   opposed to it.  At what point in time some were --
2   were in favor of it, I -- I -- I don't know that I
3   can recall.
4       Q     Do you have any information about the
5   percentages of TWA pilots who favored and opposed
6   waiving scope?
7       A     I -- I do not.
8       Q     Do you have an understanding of what
9   role, if any, ALPA's advice to the TWA MEC had on
10  the TWA MEC's decision to waive scope?
11      A     My understanding is that it tipped the
12  balance towards that being the decision.
13      Q     What's the basis for that
14  understanding?
15      A     I would have to go back and re-read
16  parts of the transcript.  But there was -- bear with
17  me for a moment.  I'm just trying to refresh my
18  memory as to which issue it was when ALPA was
19  bringing pressure to bear on the MEC.  I believe it
20  was a -- a limited number of people who ALPA -- ALPA
21  having said you should waive scope, still thought it
22  shouldn't be done and eventually were outvoted.  So
23  no, I don't know that I can give you a percentage.
24      Q     So my question was specifically what
25  gave you the understanding that any recommendation

Page 192

1   by ALPA about waiving scope tipped the balance?
2       A     Because as I understood it, several
3   people at TWA MEC did not want to waive scope, and
4   it was only by pressure by ALPA that anyone agreed
5   to it.
6       Q     Well, I understand you are saying
7   that's your -- that's your recollection of what
8   happened.  I'm asking about the basis for that
9   belief that you have.  What source of information
10  are you relying upon?
11      A     Again, this would be the -- this would
12  be the testimony of Mike Day, and Allen Press's
13  closing, and parts of Fram's closing, as well, where
14  they all characterized what was going on on some day
15  in April of 2001, 2000.
16      Q     Okay.  So closing arguments are not
17  considered evidence.
18      A     Uh-huh.
19      Q     With respect to evidence that you are
20  relying upon, testimony, documents, the only thing
21  that you would point to as supporting your belief
22  that the -- that any recommendation by ALPA tipped
23  the scale as to whether the TWA MEC should waive
24  scope is the testimony of Mike Day; is that correct?
25          MR. JACOBSON:  I object -- I object to

48  (Pages 189 to 192)

Page 193

1    the form of the question.  The inclusion of the
2    statement closing arguments are not evidence may be
3    true as far as the deliberation of the jury in that
4    case.  As to what is reasonable for an expert to use
5    and rely on in reaching his opinion, that's not a
6    true statement.
7    BY MR. TOAL:
8        Q    Excluding closing arguments.
9        A    Mike Day's testimony.
10       Q    Is the only thing you relied upon for
11   that belief?
12       A    Excluding closing statements.
13       Q    Excluded closing arguments; is that
14   correct?
15       A    Mike Day's' -- Mike Day's testimony.
16       Q    Now, did you take into consideration
17   any of the negative outcomes that might have taken
18   place if the TWA MEC had refused to waive scope?
19       A    In real life, if they had failed to
20   waive scope, did I -- did I contemplate what might
21   have happened?
22       Q    In your analysis of trying to assess
23   damages, do you take into account any of the
24   negative outcomes for the TWA pilots that could have
25   occurred had the TWA MEC refused to waive scope?

Page 194

1        A    I would have to say negative -- I mean,
2    my analysis is limited to the impact, those actions
3    on the negotiation, not on what they might have done
4    outside of the negotiations.  So strictly speaking,
5    no, I guess, because if they had waived scope and
6    American Airlines had decided not to go ahead with
7    the merger, that's -- that's not an eventuality that
8    goes into the consideration of the effect on the
9    negotiations.
10       Q    So if the TWA MEC had refused to waive
11   scope and American had walked away from the
12   transaction, there would be no seniority integration
13   left to negotiate about; correct?
14       A    That's -- that's quite possible, no.
15   If that had happened, then that would have happened.
16   But as I said, that's not what I'm analyzing here.
17   That would be an analysis of the likely success of
18   these things, you know, in achieving their goals,
19   not their effect on the negotiation.
20       Q    So with respect to insisting on waiving
21   scope, if the TWA MEC had refused to waive scope,
22   are you assuming for purposes of your analysis that
23   American Airlines does not walk away from the
24   transaction and that the bankruptcy court does not
25   invalidate the scope and successorship provisions as

Page 195

1    a result of the 1113 motion?
2        A    Well, you know, in a practical fashion,
3    it does assume that the transaction goes on because
4    obviously there is -- there's future actions that
5    happen in the future that are still to be pursued.
6    I don't think it makes any assumptions about what
7    the bankruptcy court might have done, only what
8    impact it would have had on the negotiations.
9        Q    So if --
10       A    And more -- actually, I'm not quite
11   done.
12       Q    Uh-huh.
13       A    The perception of the TWA pilots
14   themselves in the negotiation, you know, in the
15   most -- in the most practical sense, you know, if
16   ALPA stands up and says we are not going to waive
17   our scope, we are going to fight this thing, we are
18   going to fight it in bankruptcy court, they might
19   have been miserable failures at it, but it would
20   certainly have changed the perception of the TWA
21   pilots in the eyes of the APA, so that's -- that's
22   my consideration, not how successful they would have
23   been.
24       Q    But change -- change in perception as
25   used in Sycara's work doesn't focus on changing

Page 196

1    perception of the other party in the negotiation.
2        A    The perception of the importance of
3    stapling two thirds of them, or stapling all of them
4    I guess would be the position that they would have
5    had at that time.
6        Q    But my question, when you talk about
7    change in perception, based on Sycara's work, that's
8    not a change in your perception of the other party
9    to the negotiation?
10       A    No.  That's true.  That's very true,
11   yes.
12       Q    Now, if TWA had refused to waive scope
13   and the bankruptcy court had invalidated the scope
14   and successorship provisions in the 1113 motion,
15   does your analysis assume that there would still be
16   a five percent increased likelihood of -- of the TWA
17   MEC and the APA agreeing on the Salamat model?
18       A    It does, because the importance -- the
19   perception of the importance of the APA's position
20   will have been shifted by the fact that they have --
21   they put up a fight at that stage in the
22   negotiations.  So, yeah, I would say there is still
23   a five percent chance that they would have agreed to
24   the Salamat model.  I mean, five percent being
25   pretty low, being -- but, you know, still a five

1   invalidate the scope and successorship provisions,
2   how would any of these other actions have been
3   pursued?
4       A    They may not have been necessary. But,
5   I mean, again, you are talking -- you are asking me
6   to speculate on the outcome of the action having
7   succeeded, and that's not really what my report is
8   about. I mean -- I think --
9       Q    Well, you add these probabilities of
10  different events occurring which is suggestive of
11  the fact that you think all of them could have been
12  pursued --
13      A    But if I said, okay, this is a five
14  percent chance of this having succeeded, and if it
15  actually succeeds, well, then I guess then there is
16  a zero percent chance of the other succeeding
17  because the goal has already been achieved. So if
18  they hadn't waived scope, and they said, all right,
19  fine, we are going to have an arbitration, well
20  there is a zero chance probability that any of these
21  other things would even have ended up on the list.
22  So you are asking a question that can't be answered
23  logically. So maybe there is -- there is some other
24  way we can -- we can answer your question that
25  doesn't kind of --

1       Q    Well -- well, even if everything goes
2   perfectly for the TWA pilots after they refuse to
3   waive scope, American Airlines doesn't walk away
4   from the transaction, the bankruptcy court doesn't
5   invalidate the scope provision, all you have in that
6   situation is a TWA collective bargaining agreement
7   that says they are entitled to arbitrate seniority
8   integration disputes, and you have an APA agreement
9   that has no obligation to arbitrate seniority
10  integration disputes; correct?
11      A    That's correct.
12      Q    And in that situation, are you taking
13  the position that any of these other actions could
14  have been pursued by ALPA?
15      A    You are asking me to speculate on, you
16  know, a -- a legal context. I don't know -- I don't
17  have any skills to speculate on to say what -- what
18  would the negotiation between the two parties and
19  American, and presumably the creditors, look like if
20  they hadn't waived scope, and American hadn't walked
21  away from the deal, and their -- their contract
22  hadn't been abrogated, at least the scope hadn't
23  been abrogated, what would the negotiation have
24  looked like? And again, that leads me to speculate
25  on what the outcome of that strategy being

1   successful would have been, and I can't speculate on
2   that because I don't know. It didn't happen, and I
3   don't really even have the expertise to guess what
4   the legal ramifications of that eventuality would
5   be.
6       Q    Oh, but you are presenting an analysis
7   that presuppose that all of these actions could have
8   been pursued, and I'm asking, did you undertake any
9   analysis to see if that was, in fact, true?
10      A    The model, as you said and as I said,
11  is a linear model. It assumes all of these actions
12  were available, and that if one of them succeeds in
13  achieving its objective, all the others are either
14  unavailable or redundant. So, you know, the chance,
15  as I said, there is a five percent chance that
16  waiving scope could have produced the damage model.
17  Again, if -- if that five percent translates into
18  the desired outcome, in this case the damage model,
19  then the others are redundant. Each one has a five
20  -- I mean, you do another analysis, you know, if your goal
21  is to roll a six, you got a one in six chance of
22  rolling it, you know, and there is a one in six
23  chance of rolling a five, and a one in six chance of
24  rolling a four. If you roll a six, you are not
25  going to roll five more times. That's, you know,

1   that's a linear probability problem, right? Why
2   would you roll the dice six times if you already
3   achieved your goal? Your probability is one in six.
4   You got it on the first roll. Everyone can go home.
5   That's not what the exercise here is. The exercise
6   says, if you roll that dice once, you got a one in
7   six chance of hitting a six. And if I give you two
8   rolls, you got a one in three. I give you three
9   rolls, one in two, and on and on, so that's how the
10  model works. It doesn't say that, you know, your
11  one in six chance is any different because you hit
12  it on the first roll.
13      Q    So your analysis on insisting on
14  waiving scope is that, if ALPA had advised against
15  waiving scope, that based on that action alone, the
16  TWA MEC had a one in 20 chance of negotiating the
17  Salamat agreement; is that correct?
18      A    One in 20.
19      Q    How did you -- how did you decide upon
20  this five percent or one in 20?
21      A    A lot of it was based on just
22  experience in negotiation and reading what --
23  comparing Sycara's model from what I know in the
24  real world and what other people have said.
25  Particularly, you know, a lot of the stuff that is

1    Walton and McKersie, and their behavioral model
2    of -- their behavior model of negotiation, and how
3    people act.  Plus, you know, to a certain degree,
4    some of these numbers were -- well, actually, all of
5    these numbers were -- were intended to be
6    specifically small from, you know, my knowledge of
7    -- of negotiation.  So they were a way of saying
8    what's a very, very small probability?  If I said
9    one in 20 chance that they would have been able to
10   negotiate something, you know, not that far from
11   Supplement CC, is that a reasonable conclusion to
12   draw?  Is it more probable than not that one in 20
13   is the right probability to use for this?  So some
14   of it was subjective.  There is no way that you can
15   absolutely quantify the likelihood that any -- you
16   know, action that was taken, you know, void -- we
17   could have -- could have conceivably, you know, done
18   experiments.  But even -- even if we had done that,
19   you are left with a subjective proposition.  So at
20   the end of the day, we just went with the subjective
21   proposition that five percent seems more probable
22   not given this action in that context.
23        Q     And is there any science underlying
24   this five percent?
25        A     No.

1        Q     Any economics underlying this five
2    percent?
3        A     Well, you know, in terms of basic
4    economic theory where you assume people are acting
5    rationally and want to minimize any potential for
6    loss, I mean, that being a fundamental economic
7    proposition, yes.  But, you know, in terms of, is
8    there an economic theory that would lead you
9    directly to five percent?  No.
10       Q     Is there any quantitative empirical
11   evidence underlying this five percent?
12       A     No.
13       Q     And is that true with respect to each
14   of the other probabilities listed in table three?
15       A     That's correct.
16       Q     There's no science underlying any of
17   those numbers; correct?
18       A     Well, I wouldn't say no science but, I
19   mean, there is no hard empirical basis for those
20   numbers.  They are all derived from an understanding
21   of the -- the negotiation at hand and actions
22   themselves.
23       Q     So you -- you previously testified as
24   to the five percent that you listed for insist on
25   waiving scope, that there was no science underlying

1    that number.  Are you changing that testimony with
2    respect to any of the other numbers?
3        A     There is no science leading directly to
4    that specific number, I think is what I said, right?
5    Could you read back what exactly it was I said, the
6    question and the answer?  So let me just make sure
7    we are -- we are answering your question as
8    correctly as possible.
9        Q     Okay.  So I asked you, is there any
10   science underlying this five percent, and your
11   answer was no.
12       A     Is that what I said?  The answer was
13   no?
14       Okay.  Well, then maybe I -- maybe I misspoke.
15   What I meant to say was that there is no formula or
16   economic equation that I'm aware of that would say
17   that this specific action would have a five percent
18   probability of producing the Salamat model in this
19   case, so the five percent, no.  There is -- there is
20   no empirical basis for it, is how I would say it.
21   To say there is no science behind it I think would
22   be stretching it a little bit further, right,
23   because, I mean, now you have to say we are
24   assuming, you know, both as an economic fact and
25   just as, you know, an analyst of, you know, data

1    and, you know, negotiations, that some things are
2    more likely than not.  So, you know, there is
3    obviously some science backing up the estimation
4    that five percent is correct.
5        Q     Had you used some scientific method to
6    come up with any of the probabilities reflected in
7    figure three?
8        A     Well, how best to answer this?  The
9    manner in which the numbers were arrived at was
10   based on how much parties have moved on the
11   negotiations, based on this one, in particular.  And
12   a lot of it was based on what happened with the Bond
13   bill, and how it changed the APA's position.
14   Then -- so the analysis was really in terms of how
15   much they had moved between where they were, I guess
16   it was in the summer, and where they moved after the
17   Bond bill, and trying to estimate the amount of
18   pressure that that brought to bear on the
19   negotiation relative to these other matters.  So
20   there was -- you know, this is why I say -- I don't
21   want to say there was no science.  The analysis was
22   based on the movements that the APA had actually
23   made over the course of a year.
24       Q     So --
25       A     Then we have to sort of estimate

Page 209

1    what -- why that movement occurred, and Sycara's
2    model was helpful for at least breaking down each
3    action into individual components, and then
4    estimating what each one of these actions would have
5    had on each one of those components.
6        Q    Well, these numbers reflect your
7    subjective judgments about probabilities; correct?
8        A    They do.
9        Q    And when I asked you if there is any
10   scientific methodology that you used to arrive at
11   these numbers, there was no scientific methodology
12   that you used to arrive at any of these numbers;
13   correct?
14       A    No empirical scientific methodology.  I
15   mean, the assumption of rationality and the reason
16   why you would assign a probability to these outcomes
17   all, of course, is a -- is simple probabilities,
18   basic math.  So you can't say no.  But is there -- I
19   mean, unfortunately there isn't any specific branch
20   of science that I'm aware of that would illuminate
21   this area meaningfully, so --
22       Q    Nor is there a branch of economics that
23   would illuminate this area; correct?
24       A    I don't believe there is, as being a
25   very specific situation.

Page 210

1        Q    And you are not an -- you are not an
2    economist, are you?
3        A    I'm not -- I would not call myself an
4    economist, no.
5        Q    I was a bit confused by one of your
6    prior answers where you -- I thought you first said
7    you were looking at, in coming up with your
8    probabilities, other arbitrations.  And then, later
9    in your answer I thought you changed your answer to
10   say you were actually looking at what happened with
11   respect to this particular transaction.  Which of
12   those were you looking at?
13       A    I'm -- I'm not sure which question you
14   are talking about.  Let's take the first one.  What
15   was the question?
16       Q    With respect to these probabilities,
17   were you trying to derive them based on what
18   happened in this particular negotiation or in other
19   arbitrations?
20       A    Both.
21       Q    Now, you talked about the APA movements
22   with regard to the Bond legislation.  Do you recall
23   that testimony?
24       A    Uh-huh.
25       Q    What analysis did you undertake to try

Page 211

1    and assess what, if any, movements the APA made with
2    respect to its proposals as a result of the Bond
3    legislation?
4        A    Based on the difference of the
5    composition of the two lists as it existed before
6    and after.
7        Q    And what did you do to try and assess
8    whether any movement was caused by the Bond
9    legislation?
10       A    Well, there was movement over that
11   period of time.  The assumption I made was that it
12   was the result of the Bond legislation.  My
13   understanding of the -- of the record was that it
14   was actually surely -- it was surely after a meeting
15   with Senator Bond that a new proposal from the APA
16   was presented and that a communication from Bond's
17   office to the TWA pilots was that the APA pilots had
18   a new proposal and that they were going to be
19   pleased, I believe, was how it was put.  And so,
20   given that it was based on all of the meetings
21   around the Bond legislation, my assumption is that
22   the two were connected and could, in theory, I
23   suppose, be a complete coincidence, but that doesn't
24   seem very reasonable.
25       Q    So that's an assumption that you made

Page 212

1    that movements during that period were caused by the
2    Bond legislation?
3        A    I think any reasonable person would
4    conclude that.
5        Q    Well, whether that's the case or not,
6    that's the assumption you made; correct?
7        A    That's correct.
8        Q    Other than that assumption, do you have
9    any other basis for concluding that any movements
10   during this period were caused by the Bond
11   legislation?
12       A    No.
13       Q    Do you have any information concerning
14   the APA's views about the likelihood that the Bond
15   legislation would become law?
16       A    I'm sorry.  Can I -- can I just get you
17   to -- do I have any --
18       Q    Do you have any information about what
19   the APA's views were about the likelihood that the
20   Bond legislation would -- would become law?
21       A    I -- I don't believe I have any
22   information about their views on that.
23            THE WITNESS:  Can we take a short break
24   here?
25            MR. TOAL:  Sure.

1        VIDEO SPECIALIST:  The time is now 3:39
2  and this ends number three.
3        (Brief recess.)
4        VIDEO SPECIALIST:  The time is now 3:56
5  and we are back on the video record.
6  BY MR. TOAL:
7        Q     Mr. Salamat, with respect to the
8  probabilities that you list in figure three, if I
9  asked any other person with a background similar to
10  yours, I might get different numbers here; correct?
11       A     I believe that's conceivable.
12       Q     And do you have any -- have you
13  analyzed the likelihood that any other person with
14  similar experience would provide exactly the same
15  numbers that you provided?
16       A     I have not.
17       Q     Have you analyzed whether the Salamat
18  model would have made the American Airline pilots
19  worse off than they would have been absent a
20  transaction with TWA?
21       A     I have not done that analysis.  One
22  thing I just want to state, Joe, at the break,
23  reminded me that Compton was the CEO of TWA and I
24  meant Carty -- Carty was the CEO of AMR.  So when I
25  spoke earlier about Compton, I meant Carty.

1        Q     Do you have the expertise to have
2  analyzed the impact of the Salamat model on the
3  American Airlines pilots relative to their position
4  without any TWA transaction?
5        A     I do have the expertise, yes.
6        Q     Do you agree that the American Airlines
7  pilots were unlikely to agree to any seniority
8  integration that would have made them worse off than
9  they would have been without a TWA transaction?
10       A     I'm sorry.  Could I just get you to say
11  the question again?
12       Q     Would you agree that the American
13  Airlines pilots would have been unlikely to have
14  agreed to any seniority integration that would have
15  left them worse off relative to how they would have
16  done in the absence of a transaction with TWA?
17       A     I'm sure that is likely to be the case,
18  but I don't know that it is.  You know, and I don't
19  know how they would have measured the two.  So --
20  but that seems reasonable.
21       Q     Well, that's what you do.  You analyze
22  the financial impact of seniority integrations on
23  pilot groups; right?
24       A     I do.
25       Q     Would the likelihood that American

1  Airlines would have walked away from the transaction
2  in the event that TWA refused to waive scope have
3  had any impact on your analysis?
4        A     Would the likelihood?
5        Q     Yes.
6        A     It depends on what the likelihood is
7  and how -- how it was -- you know, how it was
8  defined.  You are talking about the likelihood of
9  something occurring in response to something that
10  didn't happen.  So it is speculative at best.  So,
11  you know, any evidence I could be given would be as
12  equally speculative.  So the fact that it could have
13  a bearing on -- on my analysis is difficult to say.
14  It could.  You know, but it might not.
15       Q     Well, if I could -- I could demonstrate
16  to your satisfaction that there was a hundred
17  percent chance that in the absence of a waive of
18  scope by the TWA pilots, that the -- that American
19  Airlines would have walked away from the transaction
20  with TWA, would that have affected your analysis in
21  any way?
22       A     Well, if you could demonstrate that,
23  and I'm going to say great big underline, this is an
24  if that could be demonstrated, then presumably this
25  wouldn't have been one of the things that was argued

1  in front of the jury as having constituted a breach.
2  But, again, I'm -- I'm kind of guessing here.  I'm
3  trying -- I'm trying to answer your question in the
4  most useful way possible, but you are asking me
5  about something that they might have not done in the
6  face of something that wasn't done.  So, if it is
7  a -- if you could prove to me that they would have
8  abandoned the transaction entirely, and you can't,
9  but if you could, again, let's underline the if, I
10  would still need to be convinced that that would
11  have happened in such a way that it would've had no
12  effect on the negotiations, that just ALPA having
13  stepped up to the plate would've had no impact on
14  the negotiations, so possibly not.
15       Q     Well, what -- what would be left to
16  negotiate if American walked away from the
17  transaction regarding seniority integration?
18       A     If -- okay.  Well, maybe I don't
19  understand the question that well, so let's try it
20  again.
21       If the TWA had waived scope.  Let's go from
22  there.
23       Q     My question is --
24       A     Sorry.  If the T -- let's start with,
25  if the TWA pilots had not waived their scope, and so

Page 217

1  that's a predicate that we are starting with.
2      Q    That's a predicate, and if I could
3  establish with a hundred percent certainty that in
4  that event that American Airlines would have walked
5  away from the TWA transaction and abandoned it,
6  would that have affected your analysis in any way?
7      A    It may have.  It may have.
8      Q    And how would it have affected your
9  analysis?
10     A    If these things were true, what was
11 argued before the jury would have been completely
12 different and so that thing, that waiving scope may
13 not have made this list.  I mean, and there is a lot
14 of ifs that take me to that conclusion.  So, you
15 know, I say this, you know, on a barrel of, you
16 know, being misquoted.  But, you know, if you accept
17 all the predicates.  If you accept that what was
18 argued before the jury would have been different,
19 then I accept that the analysis would have been
20 different and this item would not have been on the
21 list.
22         (Salamat-7  Deposition transcript from
23     Don Carty marked for identification.)
24 BY MR. TOAL:
25     Q    I'm going to mark as Salamat Exhibit-7,

Page 218

1  a copy of the deposition transcript from Don Carty,
2  and I will ask you if you've seen this document
3  before.
4      A    No, I haven't.
5      Q    Okay.  And you know who Mr. Carty is?
6      A    I do.
7      Q    And who is he?
8      A    He was the CEO of American Airlines.
9      Q    So let me direct your attention to page
10 25 of this transcript.
11     A    Yes.
12     Q    If you take a look at line 20 on page
13 25, do you see that I ask the question of Mr. Carty,
14 now, what was -- what was American Airlines planning
15 to do if TWA was unable to secure from its pilots,
16 amendment of the collective bargaining agreements
17 concerning scope and successorship?  And there is an
18 objection, and the answer is, well, our intent was
19 to abandon the transaction.  Do you see that?
20     A    I do.
21     Q    Were you aware of this testimony at the
22 time you prepared your report?
23         MR. JACOBSON:  I object to the form of
24 the question.  I think the date of the testimony is
25 clearly after the date of the report.

Page 219

1          THE WITNESS:  I was aware that this was
2  what the American Airlines management was saying,
3  that if the TWA pilots didn't waive scope, they
4  would abandon the transcription.  And so I was -- I
5  was aware of the substance of this.  I was not aware
6  of this particular quote.
7  BY MR. TOAL:
8      Q    And were you aware that Mr. Carty --
9  did you ever become aware that Mr. Carty testified
10 to that under oath?
11     A    I -- I didn't -- well, if you are
12 telling me he testified to this under oath now, then
13 I am now aware of it.
14     Q    And prior to today, had you been aware
15 of that?
16     A    No.
17     Q    Is that something that might have
18 affected your analysis had you been aware of it at
19 the time you prepared your report?
20     A    I don't believe it would have because,
21 again, this is a statement that was made, the
22 transaction having occurred.  And lots of people say
23 what they would have done given the circumstances
24 that occurred.
25         Does he have any reason to say, well,

Page 220

1  actually, you know, if they had, I would have done
2  something else?  I mean, you know, he -- I'm sure he
3  believes this.  But no one, including him, can say
4  what he would have done had the -- had the pilots
5  not waived their scope.  Who knows what his board of
6  directors would have done?  Who knows?  Nobody.  He
7  can't say for certain.  No one can, which is why I
8  have to say, you know, you can't prove to me a
9  hundred percent what would have happened one way or
10 another.  I absolutely believe that this is what he
11 means when he says what he might have done.  But
12 fact is, they did waive scope, and everything that
13 we read and look back on is in that context.
14     Q    Okay.  Have you seen any testimony from
15 Jeff Brundage in this case?
16     A    I have not.
17     Q    Do you know who Mr. Brundage is?
18     A    I don't know that I do.  I know his
19 name but I -- I can't remember what his role is.
20     Q    Okay.  So I will represent to you that
21 Mr. Brundage was the head of labor relations for
22 American Airlines.  Does that refresh your
23 recollection about what Mr. Brundage did?
24     A    If you tell me he is the head of labor
25 relations, I assume he does what the head of labor

Page 221

1  relations normally do.
2      Q    But that's not something you knew
3  previously; correct?
4      A    I -- I -- I may have in some way, but,
5  you know, it's not something I'm intimately familiar
6  with.
7          (Salamat-8  Copy of testimony of Jeff
8           Brundage marked for identification.)
9  BY MR. TOAL:
10     Q    Let me mark as Salamat Exhibit-8, a
11 copy of Mr. Brundage's testimony in this case.  And
12 if you could let me know if you've ever seen this
13 transcript before.
14     A    I have not.
15     Q    So let me direct your attention to page
16 19 of this transcript.
17     A    Yes.
18     Q    Do you see at line 22 of this
19 transcript the question is asked, did American
20 Airlines impose any conditions on its potential
21 offer of employment to TWA employees?  And the
22 answer is, well, we made it clear that the
23 transaction would not be concluded if specifically
24 the scope, and successorship, and benefit provisions
25 in the various agreements were not eliminated from

Page 222

1  those agreements prior to closing.
2      Do you see that language?
3      A    I do.
4      Q    Had you been aware of this evidence at
5  the time you prepared your report, is that something
6  that might have affected your analysis?
7      A    No.  For the same reason that Carty
8  statement wouldn't have.
9      Q    Which is, that he couldn't know what
10 they actually intended to do?
11     A    He couldn't have known what they would
12 have ended up doing had they not waived scope, and
13 that's the first thing.  The second thing is that,
14 first of all, I don't know what they would have done
15 had they not waived scope.  I don't know.  You might
16 surmise.  But the fact is, we don't know.  When you
17 decide you are going to hire an airline, my
18 understanding is that there is a lot of momentum
19 behind that, and a lot involved in just walking away
20 from a transaction.  So I don't think anyone can
21 casually say, oh, yeah, we would just abandoned that
22 had they not done it, right?  I -- I think it
23 would be contrary to everything that I've discovered
24 in -- in airline mergers so far to believe that it's
25 as simple as that, number one.

Page 223

1      Number two, my analysis is about the impact
2  that not having waived scope would have had on the
3  TWA pilots' negotiating position.  So, much of what
4  you are asking me here goes back to the -- the issue
5  of them not waiving scope, having provided -- having
6  proved successful by some measure, and I'm not in a
7  position to estimate how successful that action
8  would have been in achieving any particular outcome.
9  So to a certain degree, this is irrelevant to my
10 analysis.  And more particularly, it's not -- it's
11 not got any bearing on what we can actually prove or
12 know, so --
13     Q    But why do you say that the -- the CEO
14 of American Airlines would be incapable of saying
15 what American Airlines would have done in the
16 absence of a scope waiver?
17         MR. JACOBSON:  Objection.  Asked and
18 answered.
19         THE WITNESS:  I think I answered that
20 question already when I said he doesn't know
21 absolutely what he would have done had they not had
22 that waiver.  As I just said, there is a lot of
23 momentum and a lot of factors that go into deciding
24 to even pursue an airline merger.  And so, to walk
25 away from one is not something that would be

Page 224

1  casually done.  So would they have made another run
2  at it?  Would they have done something else?  Would
3  they have tried to seek some -- I mean, I -- who
4  knows?
5  BY MR. TOAL:
6      Q    Do you know whether Mr. Carty had
7  discussions with the American Airlines board of
8  directors about what American Airlines would do in
9  the absence of a scope waiver?
10     A    I have -- I have -- I have no knowledge
11 of what he -- he discussed with the board of
12 directors.
13     Q    You are aware that the waiver of the
14 scope provision was an expressed condition of the
15 American Airlines asset agreement; correct?
16     A    I'm aware of that, I am.
17     Q    Have you reviewed the American Airlines
18 asset agreement?
19     A    I have not.
20     Q    Is it your view that there is nobody on
21 the face of the earth who could say what American
22 Airlines would have done had TWA refused to waive
23 scope?
24     A    I would say it is.  I think it is
25 possible that anybody could speculate about what

Page 257

1    Q    Okay.  Wilder initially advocated
2  litigation against American to enjoin the
3  transaction unless American agreed to follow the
4  procedures for seniority integration set forth in
5  section one of the original ALPA/TWA collective
6  bargaining agreement.  All other parties providing
7  advice to the TWA MEC, including attorneys from the
8  legal and representation department, bankruptcy
9  counsel from LeBouef, Lamb, Green & MacRae and
10  Cohen, Weiss and Simon, and investment counsel,
11  Michael Glanzer viewed Wilder's advice as misguided.
12  Among other reasons, one, the strategy had no legal
13  support.  Two, halting the transaction would have
14  had horrible consequences for TWA pilots since TWA
15  would have ceased operations immediately.  Three,
16  American could easily have used section 1113 of the
17  bankruptcy code to eliminate the entire TWA/ALPA
18  collective bargaining agreement including the
19  provisions in section one that Wilder planned to use
20  as the basis for an injunction.
21    Do you see that language?
22    A    I do.
23    Q    Have you reviewed the LeBouef, Lamb
24  legal analysis that's referenced here?
25    A    No, I've not.

Page 258

1    Q    Have you reviewed the Cohen, Weiss
2  analysis that's referenced here?
3    A    No, I've not.
4    Q    Have you reviewed the Glanzer analysis
5  of Wilder's proposed legal strategy?
6    A    No, I've not.
7    Q    And with respect to this April 2001
8  strategy, how would you define a successful
9  resolution of that -- that proposal?
10    A    How would I define a successful
11  resolution of --
12    Q    -- of that proposed ALPA strategy.
13    A    I'm not sure.  If -- if you are asking
14  me whether this litigation would have succeeded, I
15  don't know that, so --
16    Q    Well, what's the best outcome that the
17  TWA pilots could have hoped for with respect to this
18  proposed strategy?
19    A    That it would have provided them some
20  leverage in the negotiations.
21    Q    And how would that have happened?
22    A    By threatening to hold up the merger,
23  that would have given them more of a presence in the
24  negotiations with presumably, at this point in time,
25  the APA, and their company, TWA, and, you know, the

Page 259

1  American Airlines.
2    Q    So for this strategy to have been
3  successful, would it have been necessary for some
4  court to delay closing of the transaction?
5    A    Again, you know, I can't speculate on
6  how successful the strategy would have been.
7    Q    I'm just trying to understand what
8  you're viewing as a successful outcome of the
9  strategy that would have enabled the TWA pilots to
10  have additional leverage in their negotiations.
11    MR. JACOBSON:  I object to the form of
12  the question.  Misstates his prior testimony.
13    THE WITNESS:  Question again.  Sorry.
14  BY MR. TOAL:
15    Q    Yeah.  The question is, what would have
16  had to have happened for this proposed strategy to
17  have given additional leverage to the TWA pilots in
18  their negotiation with the APA?
19    A    What would have had to have happened?
20  Well, just to take it back to its, you know, basics,
21  which is, this is one of the strategies that it
22  was -- that -- that ALPA didn't pursue.  That was
23  one of the elements that constituted their breach.
24  So had they pursued this one strategy, would they
25  have been found in violation by the jury?  We don't

Page 260

1  know that.  So had they pursued it, would it have
2  provided less bargaining power to the TWA?  And I
3  don't think there is any evidence that that's the
4  case, so it would have had to have provided more.
5  You've now got a union standing behind you in a
6  negotiation who is willing to hold up the sale of
7  the company in order to, you know, have an agreement
8  to a fair integration process.  So that is what
9  would have provided the leverage.  Whether it would
10  have succeeded ultimately in -- in holding up the
11  sale, that presumes knowledge of the outcome of the
12  strategy that I don't have.  So --
13    Q    What basis do you have, if any, for
14  saying, in the particular facts of this case, that
15  this particular legal strategy would have provided
16  the TWA MEC with additional leverage with regard to
17  the APA?
18    A    The fact that they would have had a
19  union standing behind them, trying to assure that
20  their rights were preserved.
21    Q    And what information do you have about
22  what effect that would have had on the APA,
23  specifically?
24    A    Well, again, I assume the APA wanted to
25  be fair, and that in the absence of ALPA undertaking

Page 261

```
 1   actions like this, they were assuming they could
 2   behave as they wanted to.  They could steamroll the
 3   TWA pilots.  If ALPA had stepped up and pursued any
 4   of these strategies, the outcome would have been
 5   better.  That's what the jury found.  So all I'm
 6   doing is saying, this is one of the strategies that
 7   was available to them that they didn't pursue.  The
 8   likelihood that it would have improved the APA's
 9   negotiating position is based on the fact that, you
10   know, this was a significant legal strategy.
11       Q    Well, how do you know it was a
12   significant legal strategy?
13       A    Because they were willing to hold up
14   the sale of the company.
15       Q    Did -- did that mean it was going to
16   work?
17       A    Didn't mean it was going to work.
18       Q    Do you know -- do you have any
19   information about how the APA would have responded
20   to this specific legal strategy?
21       A    I do not.
22       Q    Now, you have -- you have two
23   percentages that are associated with this legal
24   strategy; correct?
25       A    I believe so.
```

Page 262

```
 1       Q    Okay.  So I'm looking at page ten of
 2   your report.
 3       A    I have it.
 4       Q    Okay.  So you have, under change in
 5   importance, you have three percent; right?
 6       A    Yes.  Change in importance is three
 7   percent for any action that has the potential to
 8   shift the importance of a particular issue.
 9       Q    Okay.  So what -- what importance is
10   being changed under your construct?
11       A    The importance of the number of pilots
12   that need to be stapled would be the most
13   significant change in importance.  I mean, the
14   change in importance of the issue or the goal being
15   sought, as I said earlier, is -- it's difficult to
16   separate from the other forms of persuasion that
17   occur in this type of negotiation because it is
18   largely one single issue.  So the importance in this
19   case would be, you know, the important of stapling
20   two thirds of the pilots.
21       Q    And how many -- how many pilots were
22   stapled under Supplement CC?
23       A    Approximately half.
24       Q    And is it your understanding that
25   the -- as of April 2001, the APA had a goal of
```

Page 263

```
 1   stapling two thirds of the TWA pilots?
 2       A    I would have to go back and take a look
 3   at the specific proposals, but at that point in
 4   time, yeah, I -- I wouldn't be able to guess.  I
 5   would have to go back and take a look at the record
 6   and see what proposals were in effect on what dates.
 7       Q    And how would this legal strategy have
 8   caused the APA to change the importance it attached
 9   to how many TWA pilots were stapled?
10       A    Largely because now there is a
11   potential that the TWA pilots might be successful.
12   And so you say, well, the potential that this again
13   is going to be taken out of their hands and possibly
14   decided by some other means that their -- their --
15   their incentive to negotiate more intensively is
16   increased.
17       Q    But how -- how does that change the
18   importance that the APA attaches to that goal?  You
19   seem to be discussing that perhaps it would be more
20   difficult to achieve that goal.  But why do you take
21   the position that this changes the importance that
22   the APA -- APA attaches to that goal?
23       A    The importance of stapling?
24            Well, the stapling is central to their
25   position, so if we take a look at stapling and if we
```

Page 264

```
 1   looked at each individual pilot as an issue, which
 2   might be one way you can sort of deal with the --
 3   the reality is, this is mostly a single-issue
 4   negotiation.  So now suddenly you are dealing with a
 5   stronger negotiating partner, and so maybe 50, or
 6   100, or 200 of those pilots, it's not as important
 7   to staple them, because if you can achieve a
 8   negotiated agreement without it being taken out of
 9   your hands and not have to roll the dice on whether
10   a particular litigation strategy is going to be
11   successful, you're in a better position.  So, you
12   know, their best alternative at that point is better
13   for the TWA pilots than the one before.  If nothing
14   happens, their position doesn't need to change.
15       Q    Are you saying that there is some
16   competing goal that becomes relatively important to
17   the APA if ALPA pursues this litigation strategy?
18       A    Well, if ALPA pursues this litigation
19   strategy, and even if you say it is not going to
20   succeed, there is still a possibility it will
21   succeed.  And so, you know, now you have a new risk
22   that's been entered into the -- into the context.
23            If I could just finish.
24       Q    Sure.
25       A    So you have a new risk that's been
```

# Exhibit 57

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,
                    Plaintiffs,
        vs.
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
                    Defendant.

------------------
January 30, 2013
------------------
        Oral sworn continued videotaped
deposition of RIKK SALAMAT, Case Lab, Inc., 288
Clinton Street, Toronto, Ontario, was taken at the
law office of Archer & Greiner, 1650 Market Street,
Philadelphia, Pennsylvania, before Jean B. Delaney,
Certified Shorthand Reporter and Notary Public of
the State of New Jersey, on the above date,
commencing at 9:30 a.m., there being present:

        GREEN JACOBSON, P.C.
        BY: JOSEPH JACOBSON, ESQUIRE
        7333 Forsyth Boulevard
        St. Louis, Missouri  63105
        (314) 862-6800
        Attorneys for Plaintiff
        TRUJILLO, RODRIGUEZ & RICHARDS, LLC
        BY: LISA RODRIGUEZ, ESQUIRE
        258 Kings Highway East
        Haddonfield, New Jersey  08033
        (856) 795-9002
        Attorneys for Plaintiff

Page 2

 1        PAUL, WEISS, RIFKIND, WHARTON & GARRISON,
 2        LLP
          BY: DANIEL J. TOAL, ESQUIRE
 3        JULIE ROMM, ESQUIRE
          1285 Avenue of the Americas
 4        New York, New York  10019
          (212) 373-3869
 5        Attorneys for Defendant, ALPA
 6        KATZ & RANZMAN, PC
          BY: DANIEL M. KATZ, ESQUIRE
 7        4530 Wisconsin Avenue N.W., Suite 250
          Washington, D.C.  20016
 8        (202) 659-4656
          Attorneys for Defendant, ALPA
 9
          Also present: James Bateman, CLVS
10        Ricardo Cossa, Navigant Economics
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

 1              I N D E X
 2    Witness                        Page
 3    RIKK SALAMAT
 4      By Mr. Toal                    4
 5            E X H I B I T S
 6
 7    Marked for I.D.              Page
 8    Salamat-11  Portion of deposition      20
 9                transcript of Clay Warner
10    Salamat-12  Excerpt from the ALPA      38
11                administrative policies
12    Salamat-13  Supplement CC            178
13    Salamat-14  Deposition transcript of  188
14                John Darrah
15    Salamat-15  Arbitration decision of   231
16                George Nicolau
17
18
19
20
21
22
23
24
25

Page 4

 1        VIDEO SPECIALIST:  The time is now 9:30
 2    and we are back on the record.  Would the court
 3    reporter please swear in the witness.
 4        RIKK SALAMAT, having been duly sworn,
 5    was examined and testified as follows:
 6    BY MR. TOAL:
 7        Q    Good morning, Mr. Salamat.
 8        A    Good morning.
 9        Q    Do you have your report in front of
10    you?
11        A    No, I don't.  Okay.
12        Q    So if you go back to figure one on page
13    two of your report --
14        A    Yes.
15        Q    -- the -- the third action that you
16    list that you say ALPA had available to it is
17    something you describe as denied July 2001 legal
18    strategy.  Sue American and APA.
19        Do you see that?
20        A    I do.
21        Q    What's your understanding of what that
22    legal strategy was?
23        A    My understanding was that that was a
24    strategy to bring a suit to compel American and APA
25    to have a fair integration process.

Page 9

```
 1      A    No, I'm not.
 2      Q    Do you know anything about whether the
 3 APA perceived such a suit to threaten any of its
 4 interests?
 5      A    I have no direct knowledge.
 6      Q    Do you have any indirect knowledge?
 7      A    No, I do not.  I mean, I can -- I can
 8 assume from, you know, their reactions to every
 9 threat that the TWA pilots made that, you know, they
10 wouldn't have thought it in their interest for them
11 to pursue that.  I mean, that would be just common
12 sense.  That's not any direct knowledge of what they
13 thought about this particular action.
14      Q    Do you have an understanding of how the
15 October 2001 legal strategy for an injunction
16 related to the July 2001 legal strategy?
17      A    I do not.
18      Q    Do you know whether the October 2001
19 legal strategy could have been pursued had the
20 April 2001 legal strategy been implemented?
21      A    Had the April 2001 -- again, presuming
22 that it is not made redundant by that having been
23 implemented and been successful, I believe -- in
24 that case, I believe it would have been possible.  I
25 believe it was -- you know, again, presuming it's
```

Page 10

```
 1 not been made redundant.
 2      Q    Well, my question is, do you know
 3 whether the strategy would have been made redundant
 4 by implementation of the April 2001 legal strategy?
 5      A    I don't know, but I don't believe it
 6 would have been.
 7      Q    And is -- is your belief based on any
 8 personal knowledge that you have?
 9      A    I believe they were -- I believe they
10 were different types of actions and, again, not
11 being a lawyer, I don't know what -- what avenues of
12 -- of, you know, legal appeal or -- or what suit
13 could or could not have been brought if another one
14 had first been launched.  So, you know, it is
15 outside my realm of expertise, but my understanding
16 is that the -- the attempt to delay the purchase
17 was -- was an action, you know, targeted at American
18 Airlines, whereas the -- the second October strategy
19 was -- was one directed towards the APA.
20      Q    Well, I'm only asking you now about the
21 prior legal strategies that we discussed, the
22 April 2001 legal strategy.
23           Do you know as a matter of your personal
24 knowledge whether implementation of that strategy
25 would have rendered the October 2001 legal strategy
```

Page 11

```
 1 for an injunction redundant?
 2      A    I have no knowledge.
 3      Q    And do you know whether the
 4 implementation of the July 2001 legal strategy to
 5 sue American and the APA would have rendered the
 6 October 2001 legal strategy redundant?
 7      A    I do not know.
 8      Q    And as with the other strategies on
 9 this list, is your knowledge concerning those legal
10 strategies derived exclusively from closing
11 arguments and the testimony of Mike Day?
12      A    I believe that's the case, yes.
13      Q    You then list a denied October 2001
14 legal strategy:  Case, APA injunction.
15           Do you see that?
16      A    Yes.
17      Q    What does Case refer to there?
18      A    I believe it is Ted Case.
19      Q    And what relevance does Ted Case have
20 to this legal strategy?
21      A    His name was -- came up in connection
22 with devising a strategy.
23      Q    And how did his name come up?
24      A    It was mentioned by Allen Press in his
25 closing as being one of the people who -- who had
```

Page 12

```
 1 come up with the strategy.
 2      Q    Do you know if Mr. Case is a lawyer?
 3      A    I do not.
 4      Q    Do you have an understanding that
 5 Mr. Case is a pilot?
 6      A    I do understand he is a pilot.
 7      Q    Do you have any awareness that he has a
 8 legal degree?
 9      A    I have -- I have no -- I have no
10 knowledge of whether he has a legal degree or not.
11      Q    What's your understanding of this
12 second October 2001 legal strategy?
13      A    My understanding is that -- was a
14 strategy that would have prevented the APA from
15 implementing Supplement CC.
16      Q    Do you have any understanding about the
17 likelihood of success of this legal strategy?
18      A    I do not.
19      Q    Do you know what legal theory it was
20 proposed to be brought under?
21      A    Sorry.  Could -- could I get you to ask
22 that question again?
23           Do I have --
24      Q    Do you have any understanding under
25 what legal theory they would have sought to enjoin
```

Page 45

1    here, the first one talking about no coordination
2    with merger committee.  In the closing of Allen
3    Press, he discussed how the concessionary bargaining
4    was supposed to be done through the president's
5    office, and that didn't happen.  That there was a
6    general failure to coordinate with the merger
7    committee.  This came across in -- in Mike Day's
8    testimony in a number of ways in which calls weren't
9    returned and, you know, requests weren't answered;
10   so lack of coordination was one thing.
11        Lack of negotiating support.  Again, this goes
12   back to, you know, the -- the -- I guess it was a
13   direction that concessionary negotiations were
14   supposed to happen through the president's office
15   and that they weren't given -- the president was not
16   directly involved in every step of the negotiation,
17   or from what it appeared, he wasn't involved in very
18   much at all.
19        Lack of funding refers to two things -- three
20   things.  First of all, they've made requests for
21   funding from ALPA's major contingency fund, and that
22   wasn't made available to them when they were
23   requesting flight pay, flight pay loss from their
24   lobbying activities on Capital Hill.  That was
25   denied.  And there is a third one, but I can't

Page 46

1    remember what it is off the top of my head, so we
2    will just stick with those two.
3        And the president's lack of support would
4    refer to, you know, particularly, you know, the
5    allegation that, you know, not just the allegation,
6    but as I understand, the fact that he went down to
7    meet with the APA and said the TWA pilots needed to,
8    quote, unquote, get real, undermining their
9    negotiating position.
10        So all of these sorts of actions, you know, I
11   just subsumed under one heading of failure to
12   support TWA pilots.
13        Q    And do you have any information about
14   whether the APA would have changed its negotiating
15   position regarding seniority integration if ALPA had
16   done any of those things?
17        A    I'm sorry.  Can you ask the question
18   again?
19        Q    Do you have any information about
20   whether the APA would have changed its negotiating
21   position regarding seniority integration if ALPA had
22   done any of those things?
23        A    I do not.
24        Q    Okay.  In your analysis, you relied
25   substantially on information you derived from the

Page 47

1    closing argument of Allen Press; correct?
2        A    That's correct.
3        Q    And you understand that Mr. Press is a
4    lawyer; correct?
5        A    I do.
6        Q    And you understand that Mr. Press was a
7    paid advocate for the TWA pilots; correct?
8        A    I do.
9        Q    And you understood that there was an
10   entire evidentiary record creating -- created in the
11   trial; correct?
12        A    I am.
13        Q    Did you consider, as part of your
14   analysis, reviewing the evidentiary record in the
15   trial?
16        A    In -- in some instances, I did.
17        Q    The -- the only testimony you reviewed,
18   I believe you testified yesterday, was from Mr. Day;
19   correct?
20        A    The testimony -- yes.  The only -- the
21   only testimony I -- I reviewed in depth was
22   Mr. Day's.  You know, I may have skimmed other
23   parts, but --
24        Q    Are those reflected in your report?
25        A    Which?

Page 48

1        Q    Any other parts of the trial record
2    that you reviewed?
3        A    Not in any substantial way, no.
4        Q    Well, did you review parts of the
5    evidentiary record that are not cited in your
6    report?
7        A    Did I review parts of the evidentiary
8    record that are not cited in the report?
9        Q    That's the question.
10        A    As I say, there is a lot of transcript
11   and, you know, if there was something that was
12   unclear from -- from Mike Day's testimony, or from
13   Allen Press's closing, or from Steve Fram's closing,
14   I may have done a word search to see if I could find
15   anything else in the record that would explain what
16   it was.  But what I was looking for primarily was
17   just factual issues.  So -- in -- in Allen's
18   closing, in Allen Press's closing the issues that he
19   listed I assumed were facts because they hadn't been
20   objected to.
21        Q    Whatever your assumptions were, did you
22   consider reviewing the evidentiary record in its
23   entirety?
24        A    Did I consider reviewing -- by which I
25   assume you mean read the entire transcript?

Page 49

1    Q    Among other things, did you consider
2  reading the entire transcript of the trial?
3    A    I did consider it.
4    Q    And why did you decide against that?
5    A    My understanding was the -- the most
6  clear synopsis of both party's positions would be
7  found in the closing arguments and in the charge to
8  the jury.  So if there was any --
9    Q    Any other reason that you decided not
10 to review the entirety of the evidentiary record?
11   A    My main reason was that all the
12 relevant facts that were in evidence would be
13 brought out in the closing.
14   Q    That was your assumption?
15   A    That's correct.
16   Q    You said that was your main reason.
17 Did you have any other reason for not reviewing the
18 entire evidentiary record from the trial?
19   A    Other than just the sheer volume, no.
20   Q    You -- you talk in your report,
21 starting at page three, about the various
22 theoretical frameworks that you considered in your
23 analysis.  Do you recall that?
24   A    Yes.
25   Q    And one of those is what you described

Page 50

1  as the behavioral theory of Walton and McKersie;
2  correct?
3    A    That's correct.
4    Q    Do you consider yourself an expert on
5  behavioral theory?
6    A    I do not.
7    Q    And prior to your work on this matter,
8  had you read the article by Walton and McKersie that
9  you cite in your report?
10   A    I believe I did in university.  Walton
11 and McKersie is -- is the basis for two of the most
12 commonly used textbooks on negotiation that I'm
13 aware of.  One's called, Getting to Yes, and the
14 other one called Fundamentals of Negotiation, which
15 is used fairly widely in Canada.  I don't know if it
16 is here, but --
17   Q    So your -- do you have a recollection
18 of having read this article before --
19   A    Well, it's a book.  It is a book, and I
20 will have certainly read some chapters from it in
21 the past.  I cited it mainly to say that this is
22 their theory primarily because, you know, Tracy and
23 Peterson refer to it extensively in their article,
24 that being primarily about Walton and McKersie.
25   Q    In connection with your work on this

Page 51

1  matter, did you read Walton and McKersie's book
2  on behavior theory of labor negotiations?
3    A    I did not re-read it.
4    Q    And had you ever read the book in its
5  entirety?
6    A    I -- I don't believe I have.
7    Q    Did you read, in connection with your
8  work on this matter, particular sections of Walton
9  and McKersie?
10   A    Only those sections that would have
11 been repeated in Tracy and Peterson.
12   Q    Did you go back and get Walton and
13 McKersie and look at it, or did you rely on the
14 discussion of Walton and McKersie in Tracy and
15 Peterson?
16   A    I relied on the discussion of Walton
17 and McKersie in Tracy and Peterson.
18   Q    Other than the article by Tracy and
19 Peterson, did you read anything else on behavioral
20 theory in connection with your work on this matter?
21   A    In connection with this matter?  Well,
22 I mean, I refer frequently to Essentials of
23 Negotiation and Getting the Yes.  So whether I
24 looked at those, looking for specifics that would
25 help in this matter, I can't -- I can't recall.  I

Page 52

1  read them all the time, so --
2    Q    You read what all the time?
3    A    Essentials of Negotiation.  I
4  frequently pick that one up.  I get a journal at the
5  office called Negotiation Journal which, you know,
6  gets -- gets reviewed frequently.  Whether I was
7  reading a particular article while this -- this work
8  was ongoing, it is most likely.  So, but, you know,
9  did I read it specifically with an intention of
10 using it in this?  Possibly not.
11   Q    When I reviewed your report, I didn't
12 see any -- any other materials that you cited that
13 had to do with behavioral theory.  Is there
14 something you can point me to in your report other
15 than the Tracy and Peterson article that you
16 actually read in connection with this matter that
17 concerns behavioral theory?
18   A    No.  Just Tracy and Peterson.
19   Q    And how, specifically, did you use
20 behavioral theory to analyze the effect ALPA's
21 actions would have had on the seniority
22 integration -- on the seniority negotiations in this
23 case?
24   A    Well, the behavioral theory, you know,
25 which has its four main parts, descriptions of what

Page 61

1    considers that risk to have zero impact or zero
2    importance in their negotiation, then you have to
3    consider that they are not -- they are not acting
4    rationally.  And so all the models that I know of
5    assume that people are acting rationally.  So -- so,
6    you know, again, this is a somewhat difficult
7    question to answer.
8        Q    Just so the transcript is clear, the
9    prior questions I've been asking whether the witness
10   would agree that if the APA didn't perceive a risk,
11   it could not be influenced by the risk, and I think
12   the question didn't -- didn't get the not.  Did you
13   understand my question to be, if the APA didn't
14   perceive a risk, it could not be influenced by that
15   risk?
16       A    If the APA could not perceive the risk?
17       Q    If it did not perceive the risk.
18       A    If it was not aware of the risk.
19       Q    If it was unaware of the risk, would
20   you agree that it could not have been influenced by
21   that risk with respect to its position on seniority
22   integration?
23       A    Now, when you say unaware of the risk,
24   you mean completely unaware that it even existed,
25   that a strategy was -- was being put into place?

Page 62

1        I mean, I would agree that if they didn't know
2    something wasn't going on, they wouldn't be
3    influenced by it.  And if they systematically, as we
4    know, underestimate the importance of the risk or
5    the risk itself, I would disagree because I think,
6    as soon as someone can perceive a risk, they -- they
7    have to be behaving in accordance with the fact that
8    that risk exists.
9        Q    So I mean to encompass in my question
10   both situations where the risk wasn't perceived
11   because there was no awareness of a risk, or a
12   situation in which there is an awareness of a
13   strategy but no perception of risk attached to it.
14       A    I would agree with the former and
15   disagree with the latter.
16       Q    Okay.  And did you take, what you
17   talked about as -- well, withdrawn.
18   Lowenstein, in his article, talks about the
19   concept of egocentric bias; correct?
20       A    That's correct.
21       Q    And is that what you've been referring
22   to in your prior answers?
23       A    His -- his would be one, yes.  A
24   systematic bias against the likelihood of -- of
25   success in -- in litigation and conflict, yes.

Page 63

1        Q    And -- and that's on both sides of the
2    equation; correct?
3        A    That's correct.
4        Q    So plaintiffs may systematically
5    overestimate their likelihood of success; correct?
6        A    Correct.
7        Q    And defendants may systematically
8    underestimate their likelihood of failure; correct?
9        A    Underestimate, but not ignore.
10       Q    Did you take into account in your
11   analysis the impact of egocentric bias on risk
12   perception by both sides?
13       A    I did.
14       Q    How did you do that?
15       A    In deriving the probabilities that
16   particular actions would have had on the
17   negotiation, I used values that were lower than I
18   might otherwise use -- I had not -- had I not
19   believed that that risk existed or that bias
20   existed.  So, for instance, if I thought that there
21   was no systematic bias, the probability that a
22   particular action would have had on achieving the
23   damage model would have been higher.  Given that
24   that systematic risk does exist, I used lower
25   values.

Page 64

1        Q    And you did that without any actual
2    information on the APA's perception of the risks to
3    which it was subject; correct?
4        A    My -- my assumption is that the risks
5    would be considerably less than the estimation of
6    the TWA pilots of the success of particular
7    strategies, so it would be less.  It would be less
8    impactful in the negotiation.
9        Q    Can you answer my question?  You
10   assigned probabilities in your chart --
11       A    Lower probabilities.
12       Q    -- without the benefit of any actual
13   information about how the APA perceived the risk
14   associated with any of those strategies; correct?
15       A    That's correct.
16       Q    Now, you also reference in your
17   analysis something called negotiation decision
18   analysis.  Do you recall that?
19       A    Yes.
20       Q    And what was the relevance of
21   negotiation and decision analysis for your report?
22       A    Well, many of the strategies that were
23   brought out at trial that ALPA had failed to
24   undertake would have functioned in the negotiation
25   in a way that would have involved other parties,

Page 65

1 would have brought others into the negotiation, and
2 I needed some way in which I could evaluate the
3 importance of that.
4      Now, I know the work of Lax and Sebenius, and
5 Lax alone, have written about decision analysis and
6 the importance, or sort of the -- not the --
7 importance, I think, is the wrong word -- but the --
8 the impact of strategies that occur away from the
9 table. So in a direct negotiation where you are
10 face-to-face, the ability to create alternative
11 strategies and to bring other players into the
12 dispute have some importance. And so Lax and
13 Sebenius, in their decision analysis concept, was
14 useful for analyzing the actions that ALPA failed to
15 take.
16      Q    And does negotiation and decision
17 analysis prescribe any methodology that would allow
18 you to predict the outcome of negotiations?
19      A    Other than better or worse, no. I
20 mean, it does say that certain types of actions
21 should lead, when you are dealing with rational
22 negotiating partners, to better or worse outcomes.
23 But it doesn't prescribe, you know, particular ways
24 of quantifying that.
25      Q    Now, do you consider yourself an expert

Page 66

1 on the expected utility theorem?
2      A    I do not.
3      Q    Do you consider yourself an expert on
4 negotiation and decision analysis?
5      A    Familiar, but I wouldn't call myself an
6 expert.
7      Q    And prior to your work on this matter,
8 had you read this article by Lax and Sebenius?
9      A    I -- I don't know about this particular
10 article. Lax and Sebenius write frequently, so
11 their -- their decision analysis framework pops up
12 in Negotiation Journal not infrequently, so it's--
13 it's conceivable, but I don't remember the first
14 time I read it. I -- I don't think it was for this
15 particular one, this article. There are two
16 articles; one by Lax and one by Sebenius and -- I'm
17 sorry, one by just Sebenius -- so it may be the Lax
18 and Sebenius one I read for the first time here, and
19 the Sebenius one I've read prior.
20      Q    In the block quote you have on page
21 four of your report, do you see it says under --
22 when you're describing the negotiation as an interactive process
23 by which two or more people seek jointly or
24 cooperatively than they could otherwise, then the

Page 67

1 otherwise becomes crucial. The party's best
2 alternatives without agreement imply the limits to
3 any agreement. For each side the basic task of any
4 proposed joint agreement is whether it offers higher
5 subjective worth than that side's best course of
6 action absent agreement.
7      Do you see that?
8      A    Yes.
9      Q    Okay. Is there some way that you can
10 conceive of here that a joint agreement between the
11 TWA MEC and the APA would have produced greater
12 value to the APA than an agreement it imposed
13 unilaterally?
14      A    Yes.
15      Q    And how would that happen?
16      A    The TWA -- the APA wanted to have a
17 fair integration. So at the end of the day, the
18 failure to negotiate an agreement resulted in one
19 that wasn't fair, that was perceived as unfair. And
20 so, in my view, a fair agreement would have been a
21 superior outcome for the APA pilots.
22      Q    And do you have an understanding of
23 what metric the APA was using to determine whether
24 its proposals were fair?
25      A    I do not.

Page 68

1      Q    And do you know whether they were using
2 the same metrics for fairness that you used in your
3 analysis?
4      A    Well, they -- they likely wouldn't have
5 because negotiations were truncated. I mean, in the
6 process of negotiating fairness in pilot seniority,
7 there is a whole education process that goes on when
8 negotiations are intensified. And so notions of
9 fairness are very dynamic and change quite
10 frequently, so --
11      Q    I'm not asking you to speculate on what
12 you think the APA might have used. I'm asking if
13 you know as a matter of empirical fact whether the
14 APA was using the same metrics for fairness that you
15 used in your analysis.
16      MR. JACOBSON: Objection. Asked and
17 answered.
18      THE WITNESS: They used some metrics
19 for constructing the list and had objectives for
20 why. I don't know that that actually represents the
21 metrics they used for evaluating fairness. In fact,
22 I expect they are not. So I'm going to have to say
23 I'm not aware of what metrics they did use.
24 BY MR. TOAL:
25      Q    And so I -- I take it you can't say

Page 69

1  whether, when you tried to come up with a list that
2  you considered fair, you used the same metrics that
3  the APA used in coming up with a list that it
4  presented as fair; correct?
5      A    That's correct.
6      Q    And in your analysis, were you taking
7  into account this language from Lax and Sebenius
8  which says, the party's best alternatives without
9  agreement imply the limits to any agreement?
10     A    Yes.
11     Q    So does your analysis place, as an
12 upper bound on any seniority list that could have
13 been obtained, what the APA's best alternatives were
14 without agreement?
15     A    Sorry.  What?  Does the --
16     Q    Does your analysis place as an upper
17 bound on any seniority list that could have been
18 achieved here what the APA's best alternatives were
19 without an agreement with the TWA MEC?
20     A    Well, their best alternative has to be
21 considered in two different ways.  One is that
22 anyone's best alternative to -- to a negotiated
23 agreement has to be taken -- the timing of the
24 agreement has to be considered.  So, in hindsight --
25 I will have to give an example.

Page 70

1      If there is ongoing litigation and two parties
2  are trying to come to an agreement, they may agree,
3  you know, that one party that gets 60 percent of the
4  pie and one party gets 40 percent of the pie because
5  they don't really want to roll the dice on the
6  outcome of that litigation going against them.  So
7  their best alternative is often to settle at a point
8  at which they think will be superior to the outcome
9  if this other litigation strategy succeeds.
10     So, you know, now if -- if you take it
11 further, you can say, well, if they agree but then
12 they find out the decision would have been
13 otherwise, in hindsight, you can say, well, we would
14 have been better off just rolling the dice because
15 now we know that we would have won the suit.  But
16 when you are talking about a best alternative in
17 this context, you are saying a best alternative that
18 eliminates the risk of a particular other strategy
19 succeeding.
20     So, yeah, it is taken into account that people
21 will act rationally and say, look, if I can -- if I
22 can agree to something better than I think any
23 arbitrator would reasonably give, then I'm better
24 off agreeing to that than taking a chance that this
25 ends up in an arbitration and I end up getting worse

Page 71

1  than that.  So that's what a rational person would
2  do.
3      Q    Would you expect in this situation that
4  the APA would discount the risk associated with
5  seniority integration ending up in arbitration by
6  its perception of the likelihood that that would
7  happen?
8      A    It is a little abstract because of the
9  -- you know, these courses of action weren't
10 followed, and so we don't really have any direct
11 information about how they would have assessed the
12 risk.
13     Q    Is that what a rational party would
14 have done, tried to assess the risk of seniority
15 integration ending up in arbitration and trying to
16 assess the outcome if that happened?
17     A    I -- I would imagine that's what
18 rational -- a rational party would do, yes.
19     Q    And did you make any sort of
20 probabilistic assessment of the likelihood of ending
21 up in arbitration and what the expected result was
22 of arbitration?
23     A    Again, that's presumed, and I made no
24 presumptions about whether a particular strategy
25 would have failed or succeeded.

Page 72

1      Q    So did you not undertake any sort of
2  probabilistic analysis of the sort I just described?
3      A    I -- I think I said earlier that I had
4  no way of knowing what the likely outcome of
5  pursuing a strategy would have been.
6      Q    So is the answer, that's right, I
7  didn't undertake a probabilistic analysis?
8      A    That's right.  No, I did not.
9          THE WITNESS:  Could we take a break?
10 It's 11:00 something here.
11         MR. TOAL:  Yeah.  Sure.  We'll go off
12 the record.
13         VIDEO SPECIALIST:  It is now 11:06 and
14 we are going off the video record.
15         (Brief recess.)
16         VIDEO SPECIALIST:  The time is now
17 11:33 and we are back on the video record.
18 BY MR. TOAL:
19     Q    Mr. Salamat, would the American
20 Airlines pilots have been better off under
21 Supplement CC than any of the lists that you propose
22 in your report?
23     A    By what measure?
24     Q    In terms of their seniority ranking?
25     A    Their seniority ranking under

Page 73

1    Supplement CC would have been better than --
2        Q    In terms of their promotional
3    expectations, would they have been better off under
4    Supplement CC than any of the lists you propose?
5        A    Yes.
6        Q    In terms of the exposure to furlough,
7    would the American pilots have been better off under
8    Supplement CC than any of the lists that you
9    proposed?
10       A    Yes.
11       Q    Now, the fourth framework that you talk
12   about is focused on persuasion, and you say, borrows
13   from research and negotiation, decision theory and
14   law; correct?
15       A    Yes.
16       Q    And the academic support that you rely
17   upon for that framework is the work of Sycara;
18   correct?
19       A    Yes.
20       Q    Anything else?
21       A    No.  Just Sycara.
22       Q    Now, at the bottom, toward the bottom
23   of page four, second to the last paragraph, you say,
24   behavioral theory, expected utility game theory.
25       A    I'm sorry.  Okay, yes.  I have it, yes.

Page 74

1        Q    And the analysis of persuasion all
2    overlap in some regards.  In what -- what regards do
3    these frameworks overlap?
4        A    Well, behavioral -- expected utility,
5    you know, predicated game theory, and so it is --
6    quantitative analysis of outcomes is, I think,
7    fundamental to game theory.  Behavioral theory, to
8    the extent that it is decomposing the actions taken
9    in negotiations and analyzing them with a framework
10   overlaps with game theory in that, you know, it is
11   -- it's trying to analyze the importance or the
12   impact of various strategies within a negotiation.
13   So they are all concerned with analyzing the
14   situations where there is indeterminate outcomes of
15   particular courses of action, so I would say that's
16   the -- the fundamental way in which they overlap.
17       Q    Now, are you aware of any academic work
18   that identifies an intersection between behavioral
19   theory, expected utility game theory, and the
20   analysis or persuasion?
21       A    I can't, off the top of my head, think
22   of one that, you know, goes on to -- that analyzes
23   those overlaps, no.
24       Q    And did you identify one in connection
25   with your work on this matter?

Page 75

1        A    I -- I said I can't identify one that
2    --
3        Q    I took your answer to be that you
4    couldn't identify off the top of your head as you
5    sat here today?
6        A    Yes.
7        Q    But in the course of your work, did you
8    identify any academic writings that identify an
9    intersection between these various frameworks?
10       A    Well, certainly between expected
11   utility and game theory.  Between behavioral theory
12   and game theory, or behavioral theory and expected
13   utility, I can't think of one, no.
14       Q    Now do these fields, either
15   individually or collectively, prescribe a
16   methodology pursuant to which you could predict the
17   likelihood that two parties to a negotiation would
18   reach an agreement?
19       A    No.
20       Q    And do these frameworks, either
21   individually or collectively, prescribe a
22   methodology pursuant to which you could predict the
23   content of any agreement that would be reached
24   between two parties to a negotiation?
25       A    It can predict where parties would

Page 76

1    reach an agreement if they were behaving rationally
2    and you could know everything about all the
3    potential risks.  That would be -- you know, utility
4    theory and game theory would do that.  But, again,
5    that's predicated on knowing the probabilities of
6    outcomes, which in this situation, can't be known.
7    So they could, but not in this situation.
8        Q    Now, if you had concluded in your
9    analysis the likelihood of an agreement being
10   reached was below 50 percent, would that have
11   affected your damage analysis in any way?
12       A    Yes.
13       Q    How would it have affected your
14   analysis?
15       A    If it had come below 50 percent, then
16   it would have been less probable that that would
17   have been an outcome of a negotiated agreement.
18       Q    Did you run any analyses of the
19   probability of an agreement being reached that used
20   numbers different than those that appear in figure
21   three?
22       A    For the -- for what I call the minimal
23   model, I did use different numbers to do an
24   assessment, but not -- I didn't use any different
25   numbers to do an assessment of the damage model,

1  other than for testing purposes.
2      Q     Including for testing purposes, did you
3  ever run an analysis of the probabilities that are
4  set forth in figure three using numbers different
5  than those that appear in figure three?
6      A     Only for testing.
7      Q     And did you run that analysis using
8  numbers that were lower than those that appear in
9  figure three?
10     A     Again, only for testing.
11     Q     But you did do it for testing?
12     A     I did do it for testing, just basically
13  to make sure that -- that the numbers were being
14  added correctly -- and that the multipliers were
15  working correctly.
16     Q     Why did you have to test whether the
17  numbers were being added correctly?
18     A     Well, frequently what happens is you
19  have a total, 73 percent, that is missing one of the
20  component numbers.  So you change all the numbers
21  one at a time and make sure the numbers change,
22  check the formula.  It is testing.  It is not
23  anything more than that.
24     Q     Do you have Katia Sycara's article in
25  front of you?

1      A     It's always the last place you look.
2  Yes, I do.
3      Q     So let me direct your attention to page
4  217.
5      A     217, yes.
6      Q     Did you read this article in its
7  entirety?
8      A     I did.
9      Q     Okay.  And starting on 217, do you see
10  that Professor Sycara sets forth a number of
11  different categories of persuasive arguments that
12  can be made?
13     A     Yes.
14     Q     And did you analyze whether the
15  strategies that you set forth in your report that
16  you indicate ALPA had available to it fell within
17  any of these categories?
18     A     I mean, I considered these -- these
19  categories when -- when -- when reviewing the
20  actions that ALPA had taken, but I didn't use this
21  framework in any systematic way.  I did consider
22  using it in a systematic way, but they -- the
23  framework that she has further on in the article
24  seemed more appropriate.
25     Q     Now, one of the persuasive arguments

1  that list -- that's listed is number nine, threats
2  and promises.  Do you see that?
3      A     I do.
4      Q     Now, are the strategies that you list
5  that ALPA had available to it appropriately --
6  appropriately classified as threats and promises?
7      A     I don't think I would categorize them
8  that way.  They could be threats, if you threatened
9  to do it.  If you actually undertake the action, it
10  is no longer a threat.  You've taken it.
11     Q     Well, is the idea with the strategies
12  that you say ALPA had available to it, that
13  implementation of the strategy would threaten some
14  interest of the APA and thereby make it more willing
15  to compromise?
16     A     I think we are talking about two
17  different types of understandings of threat.  One is
18  a, I will do the following if you don't do X.  And
19  the other is, well, now I've done this and so there
20  is a threat, which I would more probably refer to as
21  a risk.  What it sounds like you are talking about
22  is a risk, not a threat.
23     Q     The strategies that you list that you
24  say ALPA had available to it, was the goal of those
25  strategies to affect the APA's behavior?

1      A     It was.
2      Q     Was the goal of those strategies to
3  affect the APA's belief structure?
4      A     I don't believe that's the goal of the
5  strategies.  The -- let's -- let's go back to the
6  first question again.  Maybe -- maybe I -- maybe I
7  spoke too quickly.  What was the first question?
8      Q     I'm not sure what you are referring to
9  as the first question.
10     A     The question just prior to the one that
11  you are asking now.
12     Q     Was the goal of those strategies to
13  affect the APA's behavior?
14     A     Indirectly, I'm going to have to say.
15  I mean, the goal of those strategies, some, for
16  instance, we know was to potentially affect the
17  APA's action in an indirect way but, you know, the
18  -- the legal strategy was to gain power in the
19  negotiation, not to immediately force the APA to do
20  something.  However, having gained more power in the
21  negotiation, it would have changed the perception of
22  the TWA pilots and so, by extension, it would have
23  changed the behavior of the APA.  So I think I spoke
24  a little too quickly when I said that wasn't the
25  goal of the strategy, or not all of them in any

1      Q     If the APA had been persuaded that any
2    of the lists that you proposed would have failed to
3    protect the promotional opportunities of the
4    American Airlines pilots, do you have any reason to
5    believe that the APA would have agreed to such a
6    list?
7      A     Well, I mean, I know in hindsight that
8    none of them would have.  So I can assume that they
9    would have been able to, using some reasonable
10   forecasting model, to come to the same conclusion,
11   that they would have been better off under any of
12   these lists than they would have otherwise.  We know
13   this because we can look at the -- the so-called
14   fairness model, the income optimal model, which
15   gives pilots enough seniority to access the work
16   they brought into the merger.  And if anyone has
17   seniority superior to that, then they have
18   exceeded -- they have -- they have effectively taken
19   work away from one group and transferred it to
20   themselves.
21         And so, since every single American Airlines
22   pilot has superior seniority under any of the lists
23   that I propose to the fairness list, I know
24   absolutely that they did better than they would
25   have.  So presuming they could do that same

1    analysis, they wouldn't have the same information.
2    But I assume they would have -- they would have come
3    to the conclusion that their -- their premerger
4    career opportunities had been preserved.
5      Q     I'm not asking for a comparison
6    relative to the fairness list that you came up with.
7    I'm asking --
8      A     But -- but it is the same thing.  I
9    mean, this is one way you can measure whether
10   someone's premerger career opportunities were
11   preserved.
12     Q     I'm not asking about your fairness list
13   and the comparison with your fairness list.  I'm
14   asking, if the APA had been of the view that any of
15   the lists you proposed failed to preserve their
16   promotional opportunities relative to what they
17   would have been without the TWA transaction, do you
18   have any reason to believe that the APA would have
19   agreed to such a list?
20         MR. JACOBSON:  I'm going to object.  It
21   is a compound question, and puts an unreasonable
22   expectation on the expert's answer by fencing off a
23   portion of the opinion.
24         THE WITNESS:  I'm going to have to try
25   to answer this in -- in pieces.  If the APA

1    believed -- and by believed I mean there was an
2    actual, reasonable forecast model of what their
3    career opportunities were.  I don't mean, you know,
4    a particularly egocentric or -- or biased model
5    towards what they thought their career expectations
6    were.  So if they had a model that was done with a
7    reasonable assumption, and by that I mean they
8    didn't assume that American Airlines was going to
9    expand dramatically in its international flying, and
10   that there was going to be lots and lots of
11   promotional opportunities they would have had absent
12   the merger, but now that they have -- had a merger,
13   there is only going to be shrinkage in the future.
14         That's what I would call an opportunistic
15   model.  If they didn't have an opportunistic model,
16   if they had a genuine model that looked at what
17   their promotional opportunities would be with and
18   without the merger, I believe that would be a
19   baseline for them deciding whether any seniority
20   list would be acceptable or not.  And anything
21   better than what they would have had under that --
22   that -- in the un-merged scenario in that type of
23   model, I think they would find acceptable.  What I
24   said about the fairness list was it does the best
25   retrospective estimation you can have of what that

1    model would have told them.  I don't know --
2    BY MR. TOAL:
3      Q     And if the APA had been of the view
4    that any of the lists you propose made them worse
5    off in terms of their promotional expectations
6    relative to what they were prior to the transaction,
7    do you have any reason to expect the APA would have
8    agreed to such a list?
9      A     Reasonable promotional expectations is
10   the only way, you know, I could agree to that
11   statement.  And by reasonable, I mean based on a
12   model that did not have particularly opportunistic
13   or, you know, as we say, there is expectations and
14   then there is wishes.  They may wish they would all
15   be wide-body captains next year, but if they have a
16   reasonable expectation of being a wide-body captain
17   next year.  If they had such a model and one of
18   these lists proved short of that standard, then I
19   don't believe it would be acceptable.  But I know
20   from the fairness model, looking backwards, that any
21   reasonable model would have said that each one of
22   the lists was superior to that standard.
23     Q     Well, I -- I believe you testified that
24   you didn't do any analysis to determine whether the
25   promotional opportunities of the American Airlines

Page 93

1  pilots were preserved by any of your lists; is that
2  correct?
3      A    That's correct.
4      Q    Now --
5      A    But you can estimate it using the
6  fairness model.
7      Q    Now, directing your attention back to
8  page 223 of Sycara's article --
9      A    Yes.
10     Q    -- you see the second type of argument,
11 strategy that she identifies as potentially
12 accomplishing the first goal of changing the
13 importance of an issue is indicating a change in the
14 feasibility of the proposed goal?
15     A    Yes.
16     Q    Which of the strategies that you lay
17 out in your report that you say ALPA had available
18 to it were intended to indicate a change in the
19 feasibility of a proposed goal of the APA?
20     A    Well, if the proposed goal was to
21 staple X number of pilots, bringing additional
22 pressure and increasing the risk that the
23 negotiation could be taken out of their hands or
24 that others could be brought into the negotiation
25 would have to change the feasibility of that goal of

Page 94

1  stapling that number of pilots.
2      Q    So for purposes of (B), are you
3  identifying the proposed goal as stapling TWA
4  pilots?
5      A    If that was a proposal -- yes.
6      Q    Do you know if that was a goal of the
7  APA, to staple TWA pilots?
8      A    I believe it was -- it was derivative
9  to their goal, which was to make a merged seniority
10 list, and that some number of TWA pilots were going
11 to be at the bottom of the list as a -- as a result
12 of their -- their thinking about how to build the
13 list. I don't know if that was actually their goal.
14     Q    And which -- which of the ALPA actions
15 do you believe changed the feasibility of whatever
16 proposed goal you are identifying here?
17     A    I believe they would have all changed
18 the feasibility of that -- the proposed goal.
19     Q    So if you look at page 224 of Sycara's
20 article, first full paragraph, you see it says, the
21 second argumentation goal that a persuader might
22 select is to change the persuadee's assessment of
23 the proposed value of an issue.
24     A    Yes.
25     Q    The second goal can be affected by

Page 95

1  using the following strategies. (C), recall a
2  counterexample from persuadee's past behavior.
3      Are any of the strategies that you identified
4  that ALPA had available to it intended to identify a
5  counterexample from APA's past behavior?
6      A    I -- I -- I don't think they would have
7  led to that direct result, no.
8      Q    And (D) says, recall examples of
9  similar peers that have accepted the same value for
10 the issue.
11     Are any of the ALPA strategies that you
12 identify intended to recall examples from APA peers
13 that have accepted the same value for the issue?
14     A    Well, to the extent that all of those
15 strategies would have intensified the negotiation
16 and would have brought into the negotiation what
17 happens in other mergers, all of those precedents
18 are now there. And so, how other units have behaved
19 toward other pilots would certainly have done that.
20     Q    Well, how does -- how does the denied
21 April 2001 legal strategy of delaying purchase
22 relate to bringing in examples of similar peers that
23 have accepted the same value for the issue?
24     A    I don't know that it necessarily would
25 have directly, but we are assuming that that action

Page 96

1  would be one of the ones that would have contributed
2  to a better seniority outcome. One of the ways that
3  a better seniority outcome is going to be achieved
4  is by the APA having to consider what's been looked
5  at as fair and -- in other -- in other mergers. And
6  so, this is why I talk about, you know, a more
7  intensive negotiation being an education process.
8  If what you are proposing isn't being considered
9  fair, then, you know, you were forced to consider
10 what is thought of fair in other mergers. So I -- I
11 would say that pretty much any action would -- that
12 would intensify the negotiation would result to (D)
13 in some way or another.
14     Q    Are you aware of any instance in the
15 negotiating history between the TWA MEC and the APA
16 where either of the parties referenced the results
17 of prior seniority integrations?
18     A    I'm sure they must have, but I'm not
19 aware.
20     Q    Do you have any knowledge as you sit
21 here today that that happened?
22     A    That they looked at the circumstances
23 of any particular merger?
24     Q    Yes.
25     A    No, I'm not aware that they did that.

24  (Pages 93 to 96)

Page 125

1    we have to make some reasonable guesses as to what's
2    more probable than not, so --
3        Q    And that's what you did here?
4        A    I believe that's what I did here, yes.
5        Q    Do you consider the possibility that
6    multiple actions could have diminishing marginal
7    returns?
8        A    At -- at -- at the margin, yes.
9        Q    And --
10       A    But we are not talking -- you mean, you
11   are talking about a -- a fence that might be
12   happening contemporaneously.  You are talking about
13   events that you predicate that one is either
14   succeeding, because if one event is succeeding, then
15   the marginal return from another event is less -- is
16   likely to be less.  If one event is failing, then
17   pursuing a second is likely to have a greater effect
18   than it would otherwise.
19       So, I mean, that's -- that's -- that's not a
20   question that I think you can answer in the
21   abstract, right?  You have to really look at a
22   particular situation and say what the return would
23   be.  You could assume a multiplier, which I think
24   would be fair in this type of situation, a positive
25   multiplier.

Page 126

1        But, as I say, in the event that something is
2    succeeding, if the TWA pilots had insisted on
3    waiving scope, and that was -- that was, you know, a
4    strategy that had been pursued, then perhaps another
5    strategy might be less.  But I don't think I would
6    want to -- I don't -- I don't think I would want to
7    make a sweeping statement about the additive or
8    subtractive nature, or whether there would be
9    diminishing returns on a particular action depending
10   on what came before it.  It is not inconceivable
11   but, again, I think it would be diminishing if that
12   other action was succeeding.  And so an overall
13   probability would be higher because now we are
14   talking about an action which is succeeding, so its
15   chances of achieving a particular outcome is higher
16   than it would have been.  So, you know, it's--
17   it's --
18       Q    And are you proposing to offer an
19   expert opinion in this case as to whether multiple
20   actions would or would not have had a multiplier
21   effect?
22       A    I don't believe I am and I don't
23   believe I have.  I think I've said that, you know,
24   it is quite likely that you would use a multiplier
25   effect and that would increase the likely outcome

Page 127

1    from 73 to a higher number.  And I simply said that
2    a three percent multiplier effect would increase it
3    to a hundred.  I'm not saying that there was a
4    multiplier effect.  But if you accept that multiple
5    actions would have a larger combined effect than the
6    individual constituent actions on their own --
7        Q    In this table -- are you done?
8        A    Yes.
9        Q    In this table, you really are making
10   predictions about how the APA would have responded
11   to each particular action; correct?
12       A    I am predicting that each of these
13   actions would have led them to be more likely to
14   move towards a better seniority integration.
15       Q    And so that's a prediction about how
16   the APA would have responded to these actions;
17   correct?
18       A    Well, we can conclude, you know, from
19   the jury's verdict, that all of these actions would
20   have led to a better seniority integration.  So each
21   one of these in some way have contributed to
22   that.  So we have to predict, yes, that we don't
23   know which ones would have resulted in what
24   particular outcomes, but I would agree that we are
25   assuming that bringing additional pressure in a

Page 128

1    negotiation would have caused the APA to negotiate
2    more intensively, which would have resulted in a
3    better seniority integration.
4        Does that answer your question?
5        Q    I don't think it did.
6        With respect to the probabilities that you
7    list in figure three, do those probabilities attempt
8    to predict the increased likelihood that the APA
9    would have agreed to a seniority list different than
10   Supplement CC?
11       A    I believe that's what I said they do,
12   yes.
13       Q    Okay.  And specifically with respect to
14   these particular probabilities, these are reflective
15   of your view of the likelihood that the APA would
16   agree to the Salamat list that you proposed in your
17   report; correct?
18       A    That's correct.
19       Q    Now why, in your linear model of
20   probabilities, for every situation and every
21   strategy in which you think there is a prospect of
22   changing the APA's importance of a goal, do you
23   assign a three percent probability?
24       A    That seemed the reasonable amount to
25   use.  It seemed more probable that a three percent

Page 129

1  increase in the probability would result from the
2  strategies which I said there would be a change in
3  the importance of the goals that the APA was
4  pursuing, which, you know, we -- we could read
5  primarily in terms of, you know, the staple size.
6      Q     Why would it be the case that each of
7  these different actions has exactly the same
8  probability of changing the APA's -- the importance
9  that the APA attaches to a goal?
10      A     Well, they differ in terms of what --
11  the quality of the actions and whether it seems to
12  me that the importance of the perception of the
13  abandonment -- goal abandonment were possible
14  outcomes -- sorry, possible influences on the
15  negotiation as a result of the specific action.  The
16  change in importance I overall estimated as having a
17  three percent chance of contributing to the
18  particular negotiated outcome in this case, the
19  damage model, and five percent for a change in
20  perception, and two percent for abandonment.  So it
21  is the same value for each type of a change in --
22  perception of the issue.  Not perception, but
23  characterization of the effect of the element on the
24  negotiation.
25      Q     Well, is it just coincidence that every

Page 130

1  action that you decided had the potential to change
2  the importance that the APA attached to a goal has
3  the same percentage likelihood of resulting in -- in
4  an agreement?
5      A     Well, because three percent was the
6  value I used for any action that had the ability to
7  change the percep -- to change importance.  So
8  importance and three percent go together, so do five
9  percent and perception, and two percent and
10  abandonment.
11      Q     And with respect to any action that you
12  thought ALPA had available to it that had the
13  potential to change the importance that the APA
14  attached to a goal, would you have assigned a three
15  percent probability?
16      A     That's correct.
17      Q     Did you try and make an individualized
18  assessment about the potential of each particular
19  action to change the importance that the APA
20  attached to a goal?
21      A     I don't recall doing so.
22      Q     Did -- did you consider whether some
23  actions would be more effective than others at
24  changing the importance that the APA attached to a
25  goal?

Page 131

1      A     No, I didn't, because I -- I
2  considered -- I considered three percent a
3  reasonable value to use for a change in
4  perception -- sorry -- change in importance.
5      Q     Regardless -- regardless of the type of
6  action, as long as it had the potential to change?
7      A     If -- if it didn't -- if a particular
8  action didn't seem like it met a three percent test
9  for a likelihood for a change in action, I didn't
10  consider that it would be something that had a
11  possibility of changing the APA's importance that it
12  attached to an issue.  So the way in which that was
13  taken into consideration was to just not assign a
14  three percent value to any particular action, so --
15      Q     So in your analysis with regard to
16  change and the importance that the APA attached to a
17  goal, you essentially conducted a binary analysis;
18  where, if it had the potential to change the
19  importance, you assigned three percent, and if it
20  didn't, you assigned zero percent?
21      A     That's correct.
22      Q     And why is it that for each action
23  where you decide that it had the potential to change
24  the APA's perception of the importance of a goal,
25  you assigned a five percent probability?

Page 132

1      A     For the same reason.
2      Q     And is it the same reason with respect
3  to goal abandonment?
4      A     That's correct.
5      Q     And how did you decide that an action
6  that had the potential to change the APA's
7  perception of the importance of a goal had a greater
8  potential to result in agreement than an action that
9  had the potential to change the importance that the
10  APA attached to a goal?
11      A     Because a change in their perception
12  appeared in this case to be more influential on the
13  APA's action.  Change in their perception of the
14  issue of stapling TWA pilots, if we look at their
15  conduct around the -- the time when they changed
16  their final proposal around the Bond bill seemed to
17  be most closely related to a change in their
18  perception of the issue rather than the importance
19  of the issue.  And it certainly hadn't caused them
20  to abandon the issue.  So it seemed a very powerful,
21  motivational driver.  So five percent seemed a more
22  reasonable value to use there than a lower three or
23  two percent, which I used for the others.
24      Q     Do you have any empirical support for
25  your conclusion that -- do you have any empirical

Page 141

1    negotiate up to a point, and they can't agree on the
2    remaining issues, and so it is referred to an
3    arbitrator.  So that arbitration is, in part, the
4    result of some of these negotiations.  I don't know
5    which ones.  It would be primarily the -- the ALPA
6    to non-ALPA carrier mergers.  The parties agree
7    to -- agree to arbitration as the resolution, as the
8    end of their negotiation.  It doesn't mean they --
9    they negotiated the final seniority list, so --
10       Q    So, in any ALPA to ALPA transaction,
11   you are aware that ALPA has a policy and a
12   requirement that the respective TWA -- or the
13   respective MEC's engage in arbitration; correct?
14       A    I am.
15       Q    And setting aside arbitration, would
16   you agree that in 25 of these 30 situations, the
17   pilot groups themselves were unable to reach an
18   agreement on any seniority list that they considered
19   mutually acceptable?
20       A    Yes.
21       Q    And yet, in the Salamat model, you
22   calculate a 73 percent likelihood that the TWA MEC
23   and the APA would have been able to agree on a
24   negotiated seniority list that was acceptable to
25   both parties; correct?

Page 142

1        A    That's correct.
2        Q    And with respect to Supplement CC plus
3    200, you suggested that the likelihood of the APA
4    and the TWA MEC reaching an agreement would have
5    approached a hundred percent; correct?
6        A    In the absence of ALPA's breach; yes.
7        Q    In the absence of ALPA's breach?
8        A    Yes.
9        Q    And in the -- the items -- the
10   transactions that you list in figure eight of your
11   report --
12       A    Yes.
13       Q    -- to your knowledge, did any of those
14   involve situations in which one of the unions had
15   breached its obligation of fair representation?
16       A    I'm -- I'm not aware that any of them
17   involved a breach.
18       Q    And even in the absence of any breach,
19   the results of your chart indicate that in 25 out of
20   30 of those situations, the pilot groups were unable
21   to reach agreement between themselves; correct?
22       A    And in 25 of those 30 mergers, the
23   pilots had an automatic right to go to arbitration.
24   So they were -- they were not held to negotiate the
25   agreement.  There was another mechanism available to

Page 143

1    them in order to resolve the dispute.  So they are
2    somewhat -- well, they are substantially different
3    from the TWA/American situation.  If two parties, as
4    I was saying, can't -- can't agree to a list, they
5    can agree to go to negotiation.  Or in a ALPA -- the
6    ALPA merger, they can just go straight to -- go
7    straight to an arbitration.  So that is part of the
8    process.
9        And I think you find many who have been
10   involved who would say that negotiations continue on
11   during arbitrations, and so the fact that it is an
12   arbitrator who determines the final list and puts,
13   you know, his or her name on it, mostly -- mostly
14   his, I think, that doesn't mean that it's not -- you
15   know, that you can't look at it in some way as a
16   negotiated outcome, as well.  So mediation continues
17   throughout -- all the arbitration, seniority merger
18   arbitrations I've been involved in, the parties in
19   some way manage to continue to move closer together
20   throughout the process.  So I -- I wouldn't want to
21   make a strong distinction between an arbitrated
22   outcome and a negotiated outcome for that reason.
23       Q    In each of these cases in figure eight
24   where you list an arbitrator, did you intend to
25   signify that the decision about seniority

Page 144

1    integration was rendered by the arbitrator?
2        A    That's correct.
3        Q    And you didn't intend to signify that
4    arbitration had been initiated when you indicated a
5    particular name for an arbitrator, did you?
6        A    Sorry.  I don't -- I don't understand
7    the question.
8        Q    The question is, the fact that you list
9    an arbitrator's name doesn't signify merely that
10   arbitration proceedings were initiated; does it?
11       A    It means that the arbitrator determined
12   the final seniority integration.
13       Q    And --
14       A    They issued an award.
15       Q    And the reason it would be necessary
16   for the arbitrator to do that is because the parties
17   hadn't been able to reach an agreement between
18   themselves; correct?
19       A    Not on all issues, no.  But as I said,
20   they will have agreed on some issues.
21       Q    Now, if there were more actions that
22   you could come up with in figure three that ALPA had
23   available to it, would it be possible to get to a
24   percentage likelihood of the Salamat model being
25   agreed to greater than a hundred percent?

Page 145

```
1      A    I don't know.  It would depend on how
2   many -- how many more and what the actions were.
3      Q    As a matter of logic, are you familiar
4   with any way in which you can have a greater than a
5   hundred percent probability of something happening?
6      A    No.  It could -- it could never exceed
7   a hundred percent.  It could never reach a hundred
8   percent.
9      Q    Do you consider yourself an expert in
10  probability?
11     A    No, I do not.
12     Q    And what experience do you have in --
13  in determining probabilities?
14     A    Basic training in math and statistics,
15  you know, up to the second or third year of
16  undergraduate level, I guess.  But I wouldn't say
17  that -- that constitutes me being an expert in
18  probability.  I'm certainly very experienced in
19  calculating probabilities for various, you know,
20  financial and operational economic reasons, but --
21     Q    Are you familiar with the proper
22  methodology for aggregating probabilities of
23  separate events?
24     A    There's -- there's several.  So you
25  would have to be more specific.
```

Page 146

```
1      Q    Well, if you were trying to evaluate
2   the probability that multiple events, each of which
3   has a -- a possibility of leading to a certain
4   outcome, what the overall probability of that
5   outcome occurring is, do you know how to do that?
6      A    If you are talking about -- I believe
7   we were talking about this yesterday with the roll
8   of the dice, that it would -- you never would have a
9   hundred percent chance.  So your second roll of the
10  dice would increase your likelihood of eventually
11  hitting a six.  You would approach a hundred
12  percent, but you would never hit a hundred percent.
13  So --
14     Q    So --
15     A    -- I believe I'm familiar with the
16  basics of probabilities, certainly.
17     Q    Okay.  So I would like you to imagine I
18  have a -- a die that has ten sides to it, and I'm
19  trying to determine the probability of rolling a
20  ten.
21     A    I believe that's fundamentally the same
22  as we just did the six-sided dice, but sure.
23     Q    It's easier for me to calculate.
24     A    Okay.
25     Q    So what would my probability of rolling
```

Page 147

```
1   a ten on the first roll be?
2      A    One in ten.
3      Q    Ten percent?
4      A    Ten percent.
5      Q    And what would my probability of
6   rolling a ten on the second roll be?
7      A    One in ten.
8      Q    And -- and if I wanted to determine the
9   probability that I would roll a ten on either of the
10  first two rolls, would I add those probabilities
11  together?
12     A    Two in ten.
13     Q    And so if I rolled the dice 11 times,
14  would I have a 110 percent chance of rolling a ten?
15     A    No, you would not.
16     Q    Does that suggest to you that it is not
17  the proper methodology to aggregate probabilities,
18  to add the independent probabilities?
19     A    Yeah.  I do agree.  That for the one in
20  ten chance, that you wouldn't do it that way.  If
21  you want to know your probability of rolling a ten,
22  a -- a ten on two subsequent rolls, then you've got
23  a one in ten chance times a one in ten chance.  So
24  it is actually multiplied rather than added.  You
25  are quite correct.
```

Page 148

```
1      Q    So if I multiplied those, I would have
2   a one in a hundred chance of rolling a ten on either
3   of the first two rolls?
4      A    No.  1.1.  So you have an additional
5   ten percent chance.
6      Q    I would have a 1.1 percent chance?
7      A    You have to -- you have to -- you'd
8   actually have to calculate it the opposite way.
9   Like, there is a -- if you want to do the
10  multiplication, you have a nine in ten chance of --
11  of not rolling a ten on your first roll.
12     Q    Did you try aggregating the
13  probabilities in your chart in figure three using
14  that methodology?
15     A    By just straight -- by using a
16  multiplicative and using that form of probabilities?
17  No, I did not, because it's not a dice rolling game
18  that I'm trying to assign a probability to.  I'm not
19  trying to establish the likelihood of a random
20  event, which is what you are talking about.  This is
21  a what's-more-probable-than-not scenario, so --
22     Q    Can you point me to any source
23  indicating that the proper method of aggregating
24  probabilities in a situation like you present in
25  figure three is to add the independent
```

1  probabilities?
2      A    I would have to go back and -- and take
3  a look at some works on probabilities.  It is
4  certainly not how you would deal with a random
5  outcome event, but this is not a random outcome.  We
6  are not saying that there is a random probability
7  that something would or would not occur.  So with
8  dice, each roll has a discrete chance of producing a
9  -- a particular outcome or a discrete -- or has the
10 same probability of not producing the outcome.  And
11 so -- and that's different than saying what's the
12 likelihood that any one of these individual actions
13 on its own would have produced a particular outcome.
14 You can't multiply these in the same way because
15 they are not discrete random events.  These are just
16 simply ways of saying what's the probability -- if
17 we assume that all of these actions were available
18 to ALPA, and we put a -- a low value on each of them
19 in order to discount and take into account the
20 likelihood that none of these could have produced an
21 agreement on their own, or that any one of them
22 could have produced the exact same agreement, how
23 can we assess what the fact -- the fact that we have
24 a less than one hundred percent chance of knowing
25 what would have been produced.  So this was my

1  method for doing that.
2      Q    And can you point me to any
3  authoritative text that says this is the appropriate
4  way to aggregate probabilities in this sort of
5  setting?
6      A    Not in this situation, no.  No, I
7  cannot.
8      Q    Just for the sake of the court reporter
9  and the record, you have to let me finish asking my
10 question before you start to answer.
11     A    My apology.
12     Q    And did you consult any authority on
13 probability before you decided on the methodology to
14 use in aggregating the probabilities on figure
15 three?
16     A    I did not.
17     Q    You indicate in figure three that what
18 you are presenting is a linear model of
19 probabilities.  What makes it linear?
20     A    The fact that the -- each -- each
21 individual item is -- is being treated as a single,
22 discrete event rather than them having combined
23 effects on each other, which would be a dynamic
24 model.
25     Q    Now, page twelve of your report on the

1  top, you say, it is difficult to overstate the
2  importance of seniority for pilots as it determines
3  the most important aspects of their working lives,
4  including the equipment they operate, whether they
5  are a captain or first officer, whether they have a
6  schedule or sit reserve, what days they work, how
7  much time they are away from home, where they live,
8  how many hours they work in a month, when they take
9  their vacation, and even what meals they are served
10 on board.
11     Do you see that?
12     A    I do.
13     Q    And when you say it is difficult to
14 overstate the importance of seniority for pilots, it
15 would be equally true for American Airlines pilots,
16 wouldn't it?
17     A    It would.
18     Q    And you discuss in your report the
19 concept that seniority is a currency that's
20 available to pilots; correct?
21     A    That's correct.
22     Q    And pilots can make individual
23 decisions about what they do with that currency;
24 correct?
25     A    That's correct.

1      Q    And that's among the reasons that you
2  have sort of a variability in earnings that's
3  reflected in your figure five; correct?
4      A    That's correct.
5      Q    And figure five shows that the pilots
6  with similar seniority levels can have substantially
7  different monthly earnings; correct?
8      A    Yeah.  They can and do, yes.
9      Q    And it is also the case that pilots
10 with similar earnings can be many thousands of
11 places apart on the seniority list; right?
12     A    That's correct.
13     Q    And one of the decisions that pilots
14 can make is how many hours they work; correct?
15     A    In some cases.
16     Q    And --
17     A    Not -- not in all cases.
18     Q    And do you know -- do you have an
19 understanding of what the range is for how much a
20 pilot can choose to work?
21     A    Sorry.  At -- at American Airlines,
22 or -- because it is different at every single
23 airline.
24     Q    Let's take American Airlines.
25     A    Okay.

Page 153

1    Q    Do you know what the minimum or the
2  maximum number of hours they can work would be?
3    A    I believe the maximum is -- is
4  somewhere around 78 hours a month, and the minimum,
5  I believe, is somewhere closer to 70.  I don't -- I
6  don't recall the precise numbers that are in effect
7  today, but I believe that's currently what it is.
8    Q    And some pilots with high enough
9  seniority to qualify for better equipment,
10  nonetheless, decide to fly equipment that has a
11  lower pay scale attached; correct?
12    A    That's correct.
13    Q    And it is also true that some pilots
14  who have the seniority to qualify for captain choose
15  to fly as first officers; correct?
16    A    That's correct.
17    Q    Do you do anything in your analysis to
18  account for the individual choices pilots are
19  capable of making with their seniority?
20    A    Yes.
21    Q    What do you do?
22    A    We use a rolling average in order to
23  assign a monetary value for each seniority number on
24  the list.
25    Q    How does that account for the

Page 154

1  individual choices that pilots can make about how to
2  use their seniority?
3    A    Well, pilots trade off lifestyle for
4  income, so there is two ways you can determine what
5  the actual maximum value or -- or the representative
6  value of any particular seniority number.  Two
7  methods that are used is to -- well, three methods
8  that are used, one is to take a linear average and
9  say, on average, income goes down $50 for each
10  seniority number, for instance.
11     The other is to use what's referred to
12  sometimes as stovepipe or sometimes linear
13  seniority, which is to say, well, what each pilot
14  earned at each seniority number if every pilot bid
15  in order to maximize their earnings.
16     And the third is to use some type of average,
17  and the most common one is a rolling average.  And
18  so, by doing that, you figure out the most
19  representative and true value of a particular
20  seniority number if pilots do, on average, what
21  their seniority will allow them to.  So it is very
22  close to a stovepipe average.
23     And so pilots who are above that level of
24  income, we know that they've traded lifestyle for
25  income because they will be people who will have

Page 155

1  less desirable schedules according to their own
2  immediate seniority group peers.  Pilots who
3  earn less than that will certainly -- pilots who
4  earn less than that will have maximized lifestyle at
5  the cost of income.  So by using an average, we get
6  rid of people's individual preferences and are able
7  to actually put a monetary value on a change from
8  any given number to any other given seniority
9  number.
10    Q    So you try to account for what any
11  individual pilot would do with additional seniority
12  by looking at the increased earnings on average that
13  someone with that level of increased seniority would
14  have; is that correct?
15    A    Yeah.  I -- I believe that's a -- a
16  reasonable way to put it.  You know --
17    Q    Is it accurate?
18    A    Well, it is not exactly how I would put
19  it.
20    Q    Is there some way in which it is
21  inaccurate?
22    A    Well, let's -- let's hear it again, and
23  I will -- I'll give you a -- just a plain old yes or
24  no.
25    Q    Okay.  So the question was, so you

Page 156

1  tried to account what for any individual pilot would
2  do with individual seniority by looking at the
3  increased earnings on average that someone with that
4  level of increased seniority would have; is that
5  correct?
6    A    Well, I don't try to account.  I do
7  account.  It does account for it.
8    Q    That's the manner in which you would
9  account; correct?
10    A    Yes, that's correct.
11    Q    And in your analysis, you try to make
12  any individualized inquiry of what a -- given
13  pilot actually would have done if they had gotten,
14  for example, 200 additional ranking points on the
15  seniority list.
16    A    What do I -- do I -- if I understand
17  your question correctly, do I try to predict what an
18  individual pilot would actually do with an
19  additional seniority number?  With a better
20  seniority number?
21    Q    Did you try to make any individualized
22  inquiry into what the pilots on the list would have
23  done had they been given a specific amount of
24  additional seniority?
25    A    So if -- if I understand your question

Page 157

1    correctly, you are asking if I gave Bob a thousand
2    more numbers, put him a thousand numbers up the
3    seniority list, what would he do with that thousand
4    numbers?  No.
5         Q    Do you -- did you try -- does your
6    analysis attempt to make any inquiry into what Bob,
7    in your example, would have done if he was one
8    thousand places higher on the seniority list?
9         A    No.  All -- all we can know is what the
10   value of moving up a thousand numbers is.  You can
11   never know what Bob's going to do.  Bob doesn't know
12   what Bob's going to do.  I've actually shown that
13   pretty clearly in another analysis that I did at one
14   point.  So, you know, pilots don't know what they
15   will do when their seniority number is increased.
16   They think they know, but circumstances change, so I
17   couldn't know if they can't.
18        Q    Do you have an understanding of how the
19   St. Louis fence worked?
20        A    I do.
21        Q    And what's the basis for your
22   understanding?
23        A    Supplement CC?
24        Q    So what's your understanding of how the
25   St. Louis fence worked?

Page 158

1         A    The St. Louis fence provided a number
2    of captain jobs that would be placed in St. Louis
3    based on the number of captain positions they had on
4    certain equipment at other American Airlines bases,
5    and that those positions would only be available to
6    TWA -- former TWA pilots.
7         Q    And to your understanding, did the
8    St. Louis fence have any application to TW -- legacy
9    TWA pilots who were not captains?
10        A    I'm sorry.  I don't understand your
11   question.  Did it -- did it --
12        Q    Did it have any application to legacy
13   TWA pilots who weren't captains?
14        A    I -- I believe the FO positions in
15   St. Louis could be also held by TWA pilots, but
16   I don't -- there was no guaranteed number of first
17   officer positions.
18        Q    And did you attempt in your analysis to
19   take into account the operation of the St. Louis
20   fence?
21        A    I did.
22        Q    How did you do that?
23        A    If I could turn to the report?  If --
24   well, that wouldn't be the St. Louis fence, so let's
25   skip that part.

Page 159

1         On page 43, it says, just below bidding
2    restrictions, the second sentence says, if a pilot
3    is in a protected position -- that would be one of
4    these St. Louis fence positions -- if a pilot is in
5    a protected position, then increasing his seniority
6    may not increase his income as he is already holding
7    a higher paying position than he would otherwise be
8    able to hold.
9         What this means is that the pilot has
10   basically been given an artificial seniority number
11   that gives him access to a position that he wouldn't
12   be able to hold had that St. Louis fence not been
13   there.
14        It was mentioned above that one method for --
15   employed for -- it was mentioned above that one
16   method for -- one method employed for ensuring that
17   impacts are not overstated was to use a rolling
18   income line calculated without wide-body captains.
19        An additional method used was to identify
20   pilots in protected positions and assume zero impact
21   in the month in which they were holding a position
22   out of seniority order.  To determine which pilots
23   to treat as holding a protected position, the
24   seniority threshold number for being able to hold a
25   position by dint of that seniority alone was

Page 160

1    calculated as follows.  And then we get to an
2    equation, which I will just tell you what it says.
3    We can go through it in -- in detail if you want,
4    but what it says is that if I increase that pilot's
5    seniority number a thousand, say, to use an
6    arbitration number, and he is outside of the bidding
7    range for that position, then increasing his
8    seniority number wouldn't have improved his
9    situation.  He wouldn't be able to hold that so he's
10   in a protected position, so, therefore, the impact
11   on him is zero.
12        So there is a formula that we use in order to
13   say what the bidding range is, and whether
14   increasing that range in order to basically
15   accommodate additional positions that would now be
16   available system-wide that were previously there in
17   St. Louis would be known.  So that's -- that's
18   one -- that's the most important way we did it.
19        The other -- actually, I believe it is forward
20   in the report, is what was referred to as the
21   rolling income that's calculated as is described --
22   the last paragraph on page 41.  Due to a fence
23   preventing the TWA pilots from bidding into the 777
24   and A300 captaincies until the end of 2011, a
25   different average income line was used to estimate

9914249b-ddc9-43a3-9047-7f58754f5217

Page 189

1    A    I'm -- I'm not aware of any such
2  policy.
3    Q    Would it -- would it have affected your
4  analysis if the APA had a policy against arbitration
5  of seniority integration?
6    A    Policies change, so probably not.  You
7  know, parties can always say, well, this is what we
8  need to do and so we need to change the policy in
9  order to accommodate the situation at hand, so no.
10   Q    And you are not aware of any instance
11 in which the APA has arbitrated a seniority
12 integration dispute; correct?
13   A    I'm not aware of any, no.
14       (Salamat-14  Deposition transcript of
15    John Darrah marked for identification.)
16 BY MR. TOAL:
17   Q    Mr. Salamat, I'm going to show you a
18 document I've marked as Salamat Exhibit-14, which is
19 a copy of the deposition of John Darrah.
20   Do you know who Mr. Darrah is?
21   A    I do not.
22   Q    Mr. Darrah was the president of the APA
23 at the time of the TWA acquisition.
24   A    Okay.
25   Q    Let me direct your attention to page 48

Page 190

1  of his testimony.
2    A    I only have 44 pages.  Oh, wait.
3    Q    Using the numbers on the -- on the
4  panes.
5    A    Okay.  Page 48.
6    Q    Okay.  Do you see at line 11,
7  Mr. Darrah is asked, if ALPA had threatened a
8  lawsuit to seek an injunction of the TWA
9  acquisition, would that -- would that have made the
10 APA more receptive to binding arbitration of
11 seniority integration?  And there is an objection,
12 and the answer is, yeah.  There is nothing that
13 would have been done by anybody that would have had
14 APA agree to binding arbitration.  There is no way
15 the politics at APA would have gone for that.
16   Do you see that?
17   A    Yes.
18   Q    And do you have any information to
19 dispute that?
20   A    Well, this is just one man's opinion of
21 what he would -- what he would have done in a
22 hypothetical circumstance.  It doesn't tell me
23 anything about what -- what actually would have
24 occurred had ALPA undertaken any actions that we are
25 talking about.  I mean, this is someone speculating

Page 191

1  about what they would have done in a circumstance
2  that didn't arise.
3    So I don't think it would change my opinion at
4  all.  I mean, I'm going to assume, as I said before,
5  that additional pressure being brought to bear on
6  the negotiation would have caused the APA to move
7  their position in a way that moved towards the TWA.
8  So whether that means they would have agreed to an
9  arbitration, I can't say.  Is it impossible that
10 some set of circumstances would have made that a
11 preferable outcome to continuing a seniority
12 dispute?  I can't say.  And I don't think this man
13 can say either.  He can speculate about what would
14 have happened in an alternative universe.
15   Q    And that's exactly what you are doing;
16 correct?
17   A    And that's exactly what I'm doing.
18   Q    Now, if it could be established that
19 the APA would not have agreed to arbitration of
20 seniority integration under any circumstances, would
21 that have changed your analysis of the top of the
22 range for a merged seniority integration list?
23   A    I'm not sure it would have.  I mean, I
24 believe that the top end of the range would have to
25 be established by some reference to the best

Page 192

1  possible outcome that came from previous mergers,
2  merger agreements, and not -- by that I mean not
3  unilateral.  And so the best -- the -- the -- an
4  arbitrated list most favorable to the APA as any
5  that had ever occurred would be a reasonable top end
6  of the range.  There would be no point agreeing to
7  anything better than that because at that point you
8  may as well have gone to arbitration.  So I believe
9  that's a reasonable top end of the range.
10   Q    Are you aware of any situation in which
11 a union in a seniority integration dispute that
12 believed itself to have a unilateral right to impose
13 a seniority integration list, agreed to arbitration
14 of the seniority integration dispute?
15   A    I'm not -- I'm not aware of a
16 comparable situation, no.
17   Q    Now, you also say in your report at
18 page 15, that in addition to the models that you
19 present in your report, many more lists were
20 considered; correct?
21   A    That's correct.
22   Q    And what did those lists look like?
23   A    They were different variations of -- of
24 category groupings.  They were different numbers of
25 adding and subtracting pilots from the top end, from

# Exhibit 58

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,
                    Plaintiffs,
        vs.
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
                    Defendant.

------------------
      January 31, 2013
------------------
        Continued oral sworn videotaped
deposition of RIKK SALAMAT, Case Lab, Inc., 288
Clinton Street, Toronto, Ontario, was taken at the
law office of Archer & Greiner, 1650 Market Street,
Philadelphia, Pennsylvania, before Jean B. Delaney,
Certified Shorthand Reporter and Notary Public of
the State of New Jersey, on the above date,
commencing at 9:36 a.m., there being present:

        GREEN JACOBSON, P.C.
        BY: JOSEPH JACOBSON, ESQUIRE
        7333 Forsyth Boulevard
        St. Louis, Missouri  63105
        (314) 862-6800
        Attorneys for Plaintiff
        TRUJILLO, RODRIGUEZ & RICHARDS, LLC
        BY: LISA RODRIGUEZ, ESQUIRE
        258 Kings Highway East
        Haddonfield, New Jersey  08033
        (856) 795-9002
        Attorneys for Plaintiff

Page 2

 1          PAUL, WEISS, RIFKIND, WHARTON & GARRISON,
 2      LLP
        BY: DANIEL J. TOAL, ESQUIRE
 3      JULIE ROMM, ESQUIRE
        1285 Avenue of the Americas
 4      New York, New York  10019
        (212) 373-3869
 5      Attorneys for Defendant, ALPA
 6      KATZ & RANZMAN, PC
        BY: DANIEL M. KATZ, ESQUIRE
 7      4530 Wisconsin Avenue N.W., Suite 250
        Washington, D.C.  20016
 8      (202) 659-4656
        Attorneys for Defendant, ALPA
 9
    Also present:  Phil Roller, CLVS
10      Ricardo Cossa, Navigant Economics
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

 1                I N D E X
 2   Witness                          Page
 3   RIKK SALAMAT
 4      By Mr.  Toal                     4
 5              E X H I B I T S
 6
 7   Marked for I.D.                   Page
 8   Salamat-16   Copy of a document entitled    24
 9              Preliminary Calculation of
10              Mitigation of Damages
11              Revised, dated January 30,
12              2013
13   Salamat-17   TWA pilot seniority          56
14              integration summary of
15              Supplement CC from APA's
16              mergers and acquisitions
17              committee dated December
18              14, 2001
19
20
21
22
23
24
25

Page 4

 1          VIDEO SPECIALIST:  We are back on the
 2   video record.  The time is 9:36.  Would the court
 3   reporter, Jean Delaney, please swear in the witness?
 4          RIKK SALAMAT, having been duly sworn,
 5          was examined and testified as follows:
 6   BY MR. TOAL:
 7      Q      Good morning, Mr. Salamat.
 8      A      Good morning.
 9      Q      Mr. Salamat, one of the models you
10   present in your report is what you call an
11   arbitration model; correct?
12      A      That's correct.
13      Q      Take a look at page 14 of your report.
14      A      I have it.
15      Q      Okay.  You see the second to last
16   paragraph on the page.  You say, the second outcome,
17   referring to the arbitration, model is a best guess
18   as to what an arbitrator would have awarded given
19   the facts of the case; correct?
20      A      That's what I said.
21      Q      And was that accurate?
22      A      I think best guess is probably not the
23   best choice of words to be used there.  I mean, it's
24   not really a guess.  It is an estimation based on,
25   you know, the awards that have -- that were also

1   mentioned in -- in the report, and my experience in
2   the arbitrations that I was involved in.  So best
3   guess is -- probably mischaracterizes my attempt to
4   estimate what the arbitrated list would be.
5       Q    How did you decide the arbitrations
6   that you would include in your analysis?
7       A    I included every arbitration I had
8   access to or every decision that I had access to
9   post-deregulation.
10      Q    Did -- did you review every arbitration
11  decision?
12      A    Every one that I knew of and that I had
13  an award for.  There were -- I -- I believe I
14  mention in here there may have been arbitration
15  awards between less than major carriers that I was
16  unaware of.  But from the library awards I have,
17  which I -- I believe to be comprehensive, I reviewed
18  all of them.
19      Q    So with respect to the list set forth
20  in figure eight of your report, in each of those
21  cases where you -- you indicate there is an
22  arbitrator, did you review each and every one of
23  those awards as part of your analysis?
24      A    I did review them.
25      Q    And did you read those --

1       A    I'm sorry, you are on page --
2       Q    It is on page 21.
3       A    Oh, 21.  Yes.
4       Q    And did you read the arbitration
5   reports for each of those matters in their entirety?
6           MR. JACOBSON:  Object to the form of
7   the question.  Refers to arbitration reports.
8           THE WITNESS:  I did -- to say I read
9   them in their entirety would probably overstate the
10  -- the case.  I reviewed them looking for specifics
11  about the condition of the -- the un-merged
12  carriers, how the list was constructed, and anything
13  that in -- in the arbitrator's decision was stated
14  as -- as relevant to how they had put the list
15  together.  But some of the awards are quite
16  extensive and go through, you know, the history of
17  the carriers, and I didn't review those in any great
18  detail.
19  BY MR. TOAL:
20      Q    So when I asked if you reviewed each of
21  those awards in their entirety, the answer is no;
22  correct?
23      A    The answer would be no.
24      Q    And if you didn't review those awards
25  in their entirety, how did you -- how did you

1   determine which transactions would be comparable to
2   the transaction between American Airlines and TWA?
3       A    Well, I -- I don't know that there is a
4   succinct answer to that.  I mean, could you ask me
5   the question again?
6           I'm sorry, the building that I was in last
7   night was just swaying at 1:00 in the morning and
8   woke me up, so I haven't had the greatest night's
9   sleep, so I'm not as sharp today as I would like to
10  be.
11      Q    The question is, if you didn't review
12  the arbitration awards in their entirety, how did
13  you determine which of the transactions discussed in
14  the awards were comparable to the transaction
15  between American Airlines and TWA?
16      A    Well, I reviewed the awards to the
17  extent that I could understand what the -- what the
18  state of the carriers prior to the transaction was.
19  The things that I was looking for was what was the
20  financial state of both of the carriers that went
21  into the merger, what type of equipment the carriers
22  were operating, what the difference in the types of
23  equipment the carriers were operating were, the
24  length of service, if any mention was made of it --
25  of the two carriers.  You know, anything that would

1   characterize the -- the two contributing pilot
2   groups that went into the merger I reviewed.
3           Some of that stuff, you know, things such as
4   the operating history of the airlines, and, you
5   know, it is not infrequent that an award will say
6   Airline X was started in 1912 as a -- as a -- as a
7   bush pilot operation.  Over the following years --
8   and so -- much of that stuff I did not spend any
9   time reviewing.  I was concerned with the state of
10  the carriers at the point of the merger, and I
11  believe I reviewed all of the awards sufficiently to
12  understand that.
13      Q    And why did you -- why were you
14  concerned with the financial state of the carriers
15  at the time of the transaction?
16      A    Because that's what most -- that is
17  what's most relevant in how the awards are -- are
18  fashioned.  So whether one started as a bush airline
19  has -- has yet to be mentioned as a significant
20  factor in any award.
21      Q    Did you have any objective criteria for
22  determining whether a transaction was the subject of
23  an arbitration decision was comparable to the
24  American Airline/TWA transaction?
25      A    Did I have a criteria for analyzing the

1   comparability of -- of other mergers to this one?
2        Q      The question is if you had an objective
3   criteria.
4        A      Yeah.  The objective criteria was, were
5   the airlines operating at the time of the merger and
6   was one in financial distress, were the two key
7   criteria that I looked for.
8        Q      And what metric did you use to
9   determine if a carrier were in some financial
10  distress at the time of the transaction?
11       A      Whether the arbitrator mentioned that
12  one carrier was in financial distress of some sort.
13  Either -- most particularly, were they in
14  bankruptcy.  I mean, other -- some awards mentioned
15  that, for instance, Canadian Airlines was heading
16  towards bankruptcy but was not in bankruptcy and the
17  arbitrator made mention of that in the award, so --
18       Q      Did you do any independent analysis to
19  try to determine the financial condition of the
20  carriers at the time of the transaction?
21       A      I did not.
22       Q      And did you do any independent analysis
23  to try to determine if either of the carriers was in
24  financial distress at the time of the transaction?
25       A      No.  I relied entirely on the

1   arbitrator's report -- award.
2        Q      And do you have any expertise in
3   predicting the results of arbitration decisions?
4        A      Do I have any expertise?  I would say I
5   am more experienced in -- in estimating that than --
6   than many.  I don't know how you would actually
7   qualify someone as an expert in estimating the
8   outcome.  I've been involved in several.  I've
9   worked with several arbitrators to construct their
10  awards.  So I would say I have significantly more
11  expertise than your average person.  But, again, I
12  don't know what the objective criteria for -- for
13  qualifying someone as an expert in estimating
14  seniority awards would be.
15       Q      And you said yesterday that you had
16  been involved in I believe three arbitrations
17  involving pilot seniority integration disputes;
18  correct?
19       A      Directly involved in the -- in the
20  seniority arbitration, that's correct.
21       Q      Have you been indirectly involved in
22  others?
23       A      Yes.
24       Q      In which others?
25       A      Air Canada/the connectors.  I was

1   involved in the class action suit arising from the
2   non-seniority integration of the connector pilots to
3   Air Canada.  I was indirectly involved in -- well,
4   there was this case which, of course, I'm indirectly
5   involved in the seniority integration.  I think
6   those with the -- I believe there is another but I
7   can't recall it off the top of my head.  But, again,
8   it wouldn't have been -- well, I mean, there has
9   been other seniority integrations not involving
10  pilots, I guess is --
11       Q      Those are the ones you can think of as
12  you sit here right now that involved pilots?
13       A      Yes.
14       Q      Are you offering any sort of opinion in
15  your report about TWA's financial condition at the
16  time of the transaction with American Airlines?
17       A      I am not, other than stating what I
18  believe are -- are facts that came right out of the
19  closing of -- of Allen Press, and Mike Day, and
20  what's generally known that TWA was in bankruptcy at
21  the time of the transaction.
22       Q      Did you do any independent analysis to
23  try to determine what TWA's financial condition was
24  at the time of the American Airlines transaction?
25       A      I did not.  I believe I said that a few

1   times, but --
2        Q      Another of the lists that you presented
3   in your analysis is what you called Supplement CC
4   plus 200; correct?
5        A      That's correct.
6        Q      And how did you select 200 as the
7   number to use in that list?
8        A      It was largely based on the last move
9   that the APA made having involved changing the
10  staple point by 300-and-some odd numbers.  So I
11  assumed that if that would have been their movement
12  on their own without any of the additional pressure
13  from ALPA brought to bear, that somewhat less than
14  350 would be the minimal possible move that would
15  have occurred had ALPA brought all those other forms
16  of pressure to bear on the negotiation.  So less
17  than the APA was -- had done on their own.
18       Q      Did you use any sort of methodology to
19  arrive at the 200?
20       A      No.  That just seemed the most
21  probable.
22       Q      And it seemed probable to you because
23  previously the APA had decreased the number of TWA
24  pilots it was proposing to staple by 316?
25       A      Well, I thought the most probable would

Page 13

1    have been 351, I believe, which is how much the APA
2    did on their own, and so I picked the number roughly
3    two thirds of that in order to be as conservative as
4    possible.
5        Q    You said the -- you believed the most
6    probable would have been 351.  What's the
7    significance of 351?
8        A    That was, I believe, the number of --
9    of pilots that the APA removed from the staple on
10   their own.
11       Q    Take a look at page 28 of your report.
12       A    I have it.
13       Q    Okay.  Do you see the second paragraph
14   under the heading the marginal list?
15       And take a look at the last sentence of that
16   paragraph which says, this represents a change of
17   316 pilots removed from the stapled group.
18       A    Correct.
19       Q    Is that the number you were thinking of
20   by which the APA reduced the number of TWA pilots it
21   proposed to staple?
22       A    Yes.  But if you will just bear with me
23   for one second.  Yes.  316 was the number that I was
24   searching for.  So I picked a number roughly two
25   thirds of that, so 200.

Page 14

1        Q    And did you have some methodology for
2    deciding that additional actions by ALPA would have
3    resulted in an additional movement that was two
4    thirds of what the prior movements had been?
5        A    No.  As a -- as I said, I assumed that
6    in the absence of ALPA's breach, had they undertaken
7    any of the actions available to them, that they
8    would have been able to improve Supplement CC at
9    least as much as the APA was willing to do on their
10   own without any pressure.  So that would have been
11   an additional 316 pilots removed from the staple.
12   In order to be conservative, I just took two thirds
13   of that.  I assumed 316 was the most probable, but
14   in order to estimate damages and give some margin of
15   error, I took 2/3 of that.
16       Q    Is there some methodology that would
17   allow you to say that however much the APA had
18   lowered the staple amount previously was equal to
19   the amount it would -- the additional amount it
20   would lower the staple point if the -- if ALPA had
21   undertaken additional actions?
22       A    Well, the methodology would be mostly,
23   again, referring to each individual action that was
24   available to ALPA and saying, if they had brought
25   this form of pressure to the negotiation, would

Page 15

1    there have been -- well, I -- I mean, obviously, the
2    jury had already concluded that if they had done
3    these things, there wouldn't have been a breach and
4    there would have been a better list.  That minimal
5    better list, given that they didn't specify exactly
6    what that was, it seemed more probable than not that
7    ALPA, doing everything in its power, would have
8    produced a result at least equal to what the APA was
9    willing to do on its own.
10       Q    Was this a subjective judgment that you
11   made?
12       A    This was a -- a subjective judgment.
13       Q    And there is no economic methodology
14   that you are aware of that allows you to determine
15   what additional movement on the staple point the APA
16   would have made based on movements it had made in
17   the past; correct?
18            MR. JACOBSON:  I object to the form of
19   the questions.  It refers to the wrong discipline in
20   science.
21            THE WITNESS:  Sorry.  The question
22   again?
23   BY MR. TOAL:
24       Q    The question is, there is no
25   methodology in economics that allows you to

Page 16

1    determine the amount of additional movement that APA
2    would have made based on the movements it had made
3    previously; correct?
4        A    No.  There is -- there is no way you
5    can know absolutely, and I don't think there is any
6    science that will tell you absolutely what
7    additional movement the APA would absolutely have
8    made in response to any particular action.
9        Q    And are you aware of any necessary
10   relation that exists in negotiation between
11   movements made previously and movements that could
12   be expected in the future?
13       A    Am I aware of any -- sorry.  Can I --
14   can I hear the question again?
15       Q    Yeah.  Are you aware of any necessary
16   relation that exists in negotiation between
17   concessions that a party to the negotiations has
18   made previously and concessions that it can be
19   expected to make in the future?
20       A    Not necessary, no.
21       Q    Are you aware of any probabilistic
22   relationship between the number of concessions made
23   previously and the number of concessions that could
24   be expected in the future?
25       A    I am aware -- well, it -- it is

Page 41

1  referenced in your figure eight?
2      A     Well, reasonable conduct would have
3  been consistent with negotiated agreements, not
4  unilateral agreements.  So they will be -- have to
5  be excluded.  I mean, they are not the result of a
6  negotiation.  They are the result of one party
7  acting unilaterally.  So they would not be
8  appropriate to measure whether the -- the result of
9  a particular negotiation or arbitration was
10  reasonable.
11      Q     So is it true to say that you excluded
12  those four other unilateral seniority integration
13  determinations from your analysis of what would be
14  reasonable?
15      A     That's correct.
16      Q     And did you also exclude from your
17  analysis the instances on your list in which a
18  negotiated resolution was reached?
19      A     I did not.
20      Q     Did you take -- did you take into
21  account the results of the TWA/Ozark seniority
22  integration?
23      A     I had very little information about the
24  TWA/Ozark integration.  I believe it was unilateral,
25  so I don't believe it was -- there was not a

Page 42

1  seniority award associated with TWA/Ozark.
2      Q     So did you exclude it from your
3  analysis because you had insufficient information
4  concerning that seniority integration?
5      A     To the extent that I considered
6  TWA/Ozark, and if I can just go to the list here --
7      Q     It's on page 21.
8      A     What year was TWA/Ozark?
9      Q     1986.
10      A     Yes, that was an agreement between the
11  parties, and I do not have -- I did not have any
12  information other than knowing that it was a -- an
13  agreement that the parties had reached.
14      Q     So did you exclude that seniority
15  integration from your analysis because you lacked
16  sufficient information about how the seniority
17  integration was done?
18      A     I believe that would be a fair
19  statement.
20      Q     Are -- are there other seniority
21  integrations on this list about which you lacked
22  sufficient information to include them in your
23  analysis?
24      A     No.  I believe just that one and the
25  other unilateral agreements.

Page 43

1      Q     Do you have any information about how
2  the seniority integration was done in the TWA/Ozark
3  transaction?
4      A     I do not.
5      Q     Is that something you would be able to
6  determine from the information you have about the
7  TWA pilots?
8      A     It's -- it's conceivable, but I would
9  have to go back and review the documents that I
10  have, I've already cited, and look at the records
11  that I already have.
12      Q     So referring you--
13      A     Sorry.  If I could just clarify what I
14  was saying about TWA/Ozark.
15      As I sit here today, I do not recall the
16  particulars of that merger, so I -- I don't believe
17  I would have actually excluded it from my analysis
18  entirely.  I'm sure I considered it, but as I sit
19  here today, I can't really remember how that merger
20  was done and what the -- what type of agreement it
21  was.
22      Q     Well, are you saying you do believe you
23  have information on the TWA/Ozark transaction?
24      A     Yeah.  I am now recalling that I do
25  have some -- some information on the Ozark pilots,

Page 44

1  on who they were and where they were on the list.
2  Some of the documents I was provided, source
3  contributing lists to the merger, indicated which
4  pilots they were.  But how that agreement came to
5  be, I don't know if I have any process documents, or
6  -- I would have to go back and review it, but --
7      Q     Do you have information --
8      A     -- it's not that -- I -- I do have some
9  information on the merger.  Sitting here today, I
10  can't remember which pieces of information I
11  referred to.
12      Q     Do you have information on how many
13  Ozark pilots got stapled to the bottom of the TWA --
14      A     Sitting here today, I don't recall.  I
15  will have that somewhere, but I don't have it.
16      Q     Is that information that you would have
17  produced as part of your backup materials?
18      A     Any material I had on TWA/Ozark, I
19  believe I would have produced.  I -- if there is an
20  agreement, it would have been produced with the
21  seniority awards.  If I had a seniority list that
22  indicated where those pilots were, that would have
23  certainly been produced.
24      Q     Okay.  So you say at page 15 of your
25  report, the second to the last paragraph, last

1    sentence, you say, reasonable in this context means
2    that the parties have taken all the risks into
3    account and that their decisions are consistent with
4    the awards and agreements that have resulted from
5    other disputes.
6         Do you see that?
7    A    I do.
8    Q    Is that some accepted definition of
9    reasonableness in your field?
10   A    I don't know that my field is wide
11   enough to have an acceptable definition.  I believe
12   that's a reasonable definition.
13   Q    Did you -- did you take this definition
14   of reasonableness from some sort of authoritative
15   source?
16   A    No, I did not.
17   Q    Have you ever seen a definition of
18   reasonableness that substantially is similar to this
19   that appeared in any sort of peer-reviewed article?
20   A    Well, let me think about that.
21        I would need to go back and review, but I
22   believe the article that I cited on systematic bias
23   in -- in estimating may have -- may have described
24   reasonable in a similar fashion, but I don't -- this
25   -- this being a fairly generic concept of reasonable

1    that your decisions are consistent with precedent, I
2    don't think it is all that outside, but I would have
3    to go and find a specific source.  Sitting here,
4    today, I can't -- I -- this didn't come from a
5    specific source.  This, I thought, fell more in the
6    realm of common sense.
7    Q    And what article on systematic bias are
8    you -- are you referring to?
9    A    It would be talking about Lowenstein,
10   Issacharoff, and et al.
11   Q    Are you aware of any definition of
12   reasonable along these lines in any case law from
13   the United States?
14   A    I am not.
15   Q    Any case law from Canada?
16   A    I'm not aware.
17   Q    Any arbitration decision that defines
18   reasonable in this way?
19   A    Not that I can recall, no.
20   Q    And why is it necessary for you to make
21   this qualification in your estimate that both
22   parties were acting reasonably in the way that you
23   define it?
24   A    Sorry.  Why is it necessary for me to
25   qualify what I mean by being reasonable?

1    Q    For purposes of your analysis, why is
2    it necessary for you to make the qualification that
3    your estimate is dependent on the parties acting
4    reasonably?
5    A    Well, it is not -- it's -- the
6    assumption is that the parties are acting
7    reasonably.
8    Q    As you define it; correct?
9    A    As I -- as I define it.  And by
10   reasonable, I think is not a stretch to say a
11   party is acting reasonably if their decisions and
12   their agreements are consistent with the outcomes
13   from other disputes of a similar nature, so --
14   Q    And why do you need to make that
15   assumption that the parties are acting in accordance
16   with the way you've defined reasonable?
17   A    Well, again, we -- we have to assume
18   that the parties are acting reasonably.  It's
19   only -- it's -- it's necessary to define what you
20   mean by reasonable.
21   Q    Could you do your analysis without
22   making the assumption that you made that the parties
23   behaved reasonably in the way that you defined it?
24   A    Could I do the analysis if I assumed
25   the parties, for instance, were acting irrationally?

1    Well, I would have to go back and take a look at
2    articles to see if anyone had ever attempted to
3    estimate the outcome of parties acting irrationally.
4    If there is a systematic way to do it, I'm unaware
5    of it.  All of the sources that I reviewed assume
6    parties are acting reasonably.  The replication
7    principle assumes that parties are acting
8    reasonably.
9    Q    Well, you have a very particular
10   definition of reasonably -- reasonably; correct?
11   A    Yes.  That's -- that's fair.
12   Q    And other than the possibility of
13   Lowenstein, you couldn't point me to any other
14   source that used that definition of reasonably;
15   correct?
16   A    And possibly not even Lowenstein.  As I
17   say, reasonable in this context, to me, means that
18   the parties are making decisions consistent with
19   other disputes.
20   Q    So I'm not asking, if you could have
21   done your analysis if you had to assume that people
22   were acting irrationally.  I'm asking if you could
23   have done your analysis without assuming that people
24   were acting reasonably in the way that you defined
25   reasonably?

Page 53

```
 1      A     That is one possible outcome.
 2      Q     And you are not offering --
 3      A     You also --
 4      Q     You are not offering an expert opinion
 5  that that would have happened; correct?
 6      A     I am not offering an expert opinion
 7  that that would necessarily have happened.
 8      Q     And you -- and you are not assessing
 9  any probability that negotiations would have been
10  concluded prior to September 11th, are you?
11      A     I'm not.  I'm also not offering any
12  evidence on how far the negotiation would have
13  proceeded and how many issues would have been agreed
14  to by the time 9/11 occurred.  We are talking about,
15  you know, a negotiation process that would have
16  occurred more intensively had ALPA not been in
17  breach.  Where it would have been by September 11th,
18  I cannot say.  I can't offer an opinion on that.
19      Q     Does your analysis take into account
20  any impact that the events of 9/11 and their effect
21  on the airline industry had on the negotiations
22  between the APA and the TWA MEC?
23      A     Sorry.  Can you say the question again?
24      Q     Yeah.  The question is, does your
25  analysis take into account any impact that the
```

Page 54

```
 1  events of 9/11 and their effect on the airline
 2  industry had on the negotiations between the APA and
 3  the TWA MEC?
 4      A     Well, as I said, I -- I -- I believe it
 5  does.  You know, whether 9/11 would have been
 6  relevant to the negotiation depends on whether the
 7  negotiation was completed before 9/11 or whether
 8  negotiations were in their final stage before 9/11.
 9  The largest move that the APA made was after 9/11
10  so, you know, it was -- it was -- it's a reality I
11  took into consideration.
12      Q     Did you take into consideration that
13  the events of 9/11 and their aftermath made the
14  prospect of furloughs significantly more likely?
15      A     I did.
16      Q     And in your list, when you suggest that
17  fewer TWA pilots should have been stapled, you are
18  at the same time saying that more American Airlines
19  pilots should have been exposed to furlough;
20  correct?
21      A     That's correct.
22      Q     And you think that's something the APA
23  could have been persuaded to do had ALPA pursued the
24  actions you list in your report; correct?
25      A     Yes.
```

Page 55

```
 1      Q     And you don't have any specific
 2  information that the APA was prepared to expose more
 3  American Airline pilots to furlough than it did;
 4  correct?
 5      A     I have only the understanding that the
 6  APA wanted to be fair and reasonable.  So whether --
 7      Q     So could you answer --
 8      A     -- whether they would have been willing
 9  to furlough more American Airlines pilots in the
10  absence of ALPA's breach, I believe they have have.
11      Q     My question is, do you have any
12  information, any evidence that you are aware of in
13  this case that the APA was willing to expose more
14  American Airlines pilots to furlough in the wake of
15  9/11?
16      A     Well, the largest move on the staple at
17  the bottom of the list was after 9/11, so I have
18  some evidence.
19      Q     My question is, do you have any
20  evidence that the APA was willing to expose more
21  American Airline pilots to furlough relative to the
22  ones that were exposed in Supplement CC?
23            MR. JACOBSON:  Objection.  Asked and
24  answered, I believe.
25            THE WITNESS:  Their largest move on the
```

Page 56

```
 1  bottom staple was after 9/11, so, yes.
 2  BY MR. TOAL:
 3      Q     And do you have any evidence beyond
 4  that?
 5      A     No.
 6            THE WITNESS:  Could we take five
 7  minutes?
 8            MR. TOAL:  Yeah.  Go off the record.
 9            VIDEO SPECIALIST:  The time is 10:53.
10  Off the record.
11            (Brief recess.)
12            VIDEO SPECIALIST:  This begins tape
13  number two.  The time is 11:12 a.m.  We are back on
14  the record.
15            (Salamat-17   TWA pilot seniority
16            integration summary of Supplement CC from
17            APA's mergers and acquisitions committee
18            dated December 14, 2001 marked for
19            identification.)
20  BY MR. TOAL:
21      Q     Mr. Salamat, I show you a document
22  entitled a TWA pilot seniority integration summary
23  of Supplement CC from APA's mergers and acquisitions
24  committee dated December 14, 2001.  I mark this as
25  Salamat Exhibit-17.
```

Page 57

1    Let me know if this is a document you've seen
2  before.
3    A    I don't believe I have.  Give me a
4  moment.  No.  I don't believe I've ever seen this
5  document.
6    Q    Okay.  Let me direct your attention to
7  page 8754 using the pages at the bottom right.
8    A    I have it.
9    Q    Okay.  You see in the paragraph at the
10  bottom of the page it says, last sentence, at the
11  same time, the two merger committees did agree on
12  the basic guidelines for a fair integration, and
13  carrying over onto the next page, first bullet point
14  says, fair integration should preserve the career
15  expectations of the members of each pilot group, the
16  pre-transaction expectations at the time the
17  transaction was entered into.
18    Do you see that?
19    A    I do.
20    Q    If you in your analysis had used the
21  definition of reasonableness that required
22  preservation of the pre-transaction career
23  expectations of each pilot group, would that have
24  affected your analysis?
25    A    Well, I did, first of all, the

Page 58

1  pre-transaction expectations at the time the
2  transaction was entered into.  So, you know, this
3  is -- this is the issue that comes up in every
4  seniority arbitration and what people's expectations
5  were pre-transaction.  And so it's been considered
6  in all of those that I've been involved in and it
7  was considered in this one.
8    Q    Did you consider how your Salamat list
9  affected the career progression of American Airlines
10  pilots?
11    A    To the extent that I compared each
12  model I looked to to the income optimal model, yes.
13    Q    Did you compare whether the Salamat
14  damage model would have slowed the career
15  progression of American Airlines pilots relative to
16  what it would have been prior to the transaction
17  between American Airlines and TWA?
18    A    I did.
19    Q    And what assessment did you reach about
20  whether the Salamat damage model would have slowed
21  the career progression of American Airlines relative
22  to the progression they would have had at American
23  Airlines absent the transaction?
24    A    Well, the income optimal model which
25  gives pilots sufficient seniority to hold the

Page 59

1  position they have will be a -- a generally good
2  proxy for a list which optimally assigns pilot
3  seniority numbers according to their career
4  progression.
5    Now, there is a dynamic issue to this which
6  says, will pilots be able to progress as fast as
7  they would otherwise?  Given that the TWA pilots
8  were largely older than the American Airlines pilots
9  in the seniority list where they were -- were
10  grouped under the Salamat model and, in fact, all of
11  these models, except specifically for the income
12  optimal model, I know as an absolute fact that the
13  only way the TWA pilots could have slowed the
14  progression of any American Airlines pilots would,
15  for them, younger TWA pilots would have been grouped
16  ahead of older American Airlines pilots, and that
17  wasn't the case under any of the lists.
18    So I know that as a fact, that -- that none of
19  these lists would have slowed the American Airlines
20  pilots.  So we have two things we looked at, a
21  comparison to the income optimal list and just a
22  comparison of the demographics of the two lists.
23    Q    And what's the income optimal list?
24    A    That would be called the -- the
25  fairness list.

Page 60

1    Q    Do you have an understanding that the
2  most junior American Airlines pilot hired prior to
3  April of 2001 was a gentleman named B.D. White?
4    A    That name sounds familiar.
5    Q    And do you have an understanding that
6  the APA's proposals regarding seniority integration
7  were based on an assessment of the career
8  progression of B.D. White?
9    A    I -- I -- I know that their conditions
10  and restrictions were tied to that individual.
11    Q    Do you have an understanding that their
12  seniority numbers were tied to that individual?
13    A    Sorry.  I'm -- I'm -- I'm not sure what
14  you are -- you're asking me.
15    Q    Do you have an understanding that the
16  manner in which the APA constructed the list that it
17  proposed Supplement CC was based on the anticipated
18  career progression of B.D. White?
19    A    I was unaware of that fact.  It doesn't
20  surprise me, but I was -- I was not aware of that
21  fact.
22    Q    Why does it not surprise you?
23    A    Because B.D. White was tied to the
24  sunset clause for bidding restrictions.
25    Q    Did you assess whether your Salamat

1  April 2001.  However, there is kind of a gap between
2  the report and the list that I have.  And so, in
3  what way that was factored in is kind of opaque to
4  me.  But on the face of the report, I believe
5  Professor Tannen gave them credit for all of the
6  positions and all of the equipment that they had in
7  April.
8      Q    In your Salamat damage model, did you
9  assess the extent to which American Airlines would
10 not be accepting or would not be deploying TWA
11 planes?
12     A    I did by using the reduced fleet that
13 was there in April 2002, which didn't include, for
14 instance, the Boeing 717 and had fewer MD80s and
15 Boeing 757s.
16     Q    And did you try and take the
17 possibility that American Airlines would not be
18 accepting or deploying TWA planes into account in
19 any other way?
20     A    Just that way.
21     Q    Take a look at page 30 of your report.
22     A    I have it.
23     Q    Take a look at the first bullet point
24 toward the bottom of the page.  Do you know where
25 these bullet points come from?

1      A    They come from the same letter as the
2  summary above.
3      Q    So the letter that the APA sent in July
4  of 2001?
5      A    That's what's cited here, so I expect
6  that's where it came from.
7      Q    Okay.  So the first bullet point says,
8  the AA pilots are entitled to some consideration for
9  the risk they are bearing to their career
10 progressions in having pilots from a failing carrier
11 placed ahead of them on the integrated seniority
12 list.
13     Do you see that?
14     A    I do.
15     Q    And in your analysis, did you consider
16 TWA to be a failing carrier?
17     A    I -- I made no -- no assumption about
18 whether or not TWA was a failing carrier.  I
19 understand it has a specific meaning in railway
20 labor law, so -- but as I said before, the way in
21 which I factored into my estimate the state of TWA
22 was to use the number of jobs that existed after
23 American had gotten rid of equipment and
24 rationalized staffing and fleet.
25     Q    And was the issue of whether TWA was a

1  failing carrier irrelevant to the analysis you
2  conducted that resulted in the Salamat damage model?
3      A    Whether it was a failing carrier?
4      Q    Yes.
5      A    Well, it was a distressed carrier in
6  the way in which -- to the extent that failing
7  means -- has the potential of -- of ceasing
8  operations, I looked at the number of positions that
9  remained as of July 2002.  American Airlines having
10 gotten rid of presumably unprofitable routes and
11 assets, and the number of jobs remaining being what
12 the TWA pilots brought into the merger.  So, yes.
13     Q    So, yes, whether TWA was a failing
14 carrier was not relevant to your analysis?
15     A    I -- I said it was.
16     Q    It was relevant to my analysis?
17     A    It was relevant to the extent I used a
18 later date for the number of positions that TWA
19 pilots still had.  So a failing carrier and, again,
20 not being a -- a railway labor lawyer -- to the
21 extent that a failing carrier means a carrier in
22 financial distress, yes, I did.  If failing carrier
23 has a more specific definition that I'm not aware
24 of, then maybe I'm not answering as accurately as
25 possible.  But to the extent that failing carrier

1  means in financial distress by using a later date
2  and measuring only the jobs that existed as of that
3  later date, then I did take this into account.
4      Q    And other than what you just testified
5  to, did you take into account whether TWA was a
6  failing carrier in any other way?
7      A    No, I did not.
8      Q    And a failing carrier means that TWA
9  was on the verge of liquidating.  Did you take that
10 into account in constructing your Salamat damage
11 model?
12     A    Only by using the later date.  So, no,
13 I did not.  But let me just qualify that.  I'm not
14 accepting your -- I'm not -- I'm not saying that I
15 accept that TWA was on the verge of liquidation.
16 All I know for a fact is that it was in bankruptcy.
17     Q    And you haven't done the analysis to
18 say whether TWA was on the verge of liquidation;
19 correct?
20     A    No, I've not.  But I'm -- I'm also not
21 saying that I accept your characterization of their
22 financial state as being about to liquidate.  They
23 were still an operating airline.
24     Q    So on page 31 of your report, the
25 middle of the top paragraph, you say, I am

1  unconvinced that the rightful place proposal could
2  have formed the basis for an agreement between the
3  TWA pilots and the APA; correct?
4      A     That's correct.
5      Q     And so, are you not advancing the
6  rightful place proposal as a basis for damages in
7  this case?
8      A     I -- I did do a calculation of what the
9  damages would be under that model and under that
10 list.  I don't believe that the APA pilots would
11 have agreed to a list that was constructed using its
12 methodology.  You know, Professor Tannen, as I say,
13 used a mathematical approach by quantifying people's
14 career expectations, and I don't believe that that
15 methodology would have formed the basis.  Whether
16 Tannen's list might have produced damages similar to
17 something within the bargaining range, I can't say,
18 you know --
19     Q     So as -- as you use it, is the rightful
20 place proposal synonymous with the Tannen proposal?
21     A     It is.
22     Q     And you don't believe that would be a
23 basis for an agreement between the TWA MEC and the
24 APA; correct?
25     A     I don't think that list construction

1  method would have formed the basis for an agreement.
2      Q     And so, is it true that you don't
3  believe that damages calculated on the basis of that
4  list would represent an appropriate measure of
5  damages in this case?
6      A     Well, in order to -- to think that that
7  would be an appropriate method for calculating the
8  damages, I would -- I would need to be convinced
9  that in the absence of ALPA's breach, that's the
10 list that would have been obtained.  And as I say
11 here, I'm unconvinced.  That doesn't mean I couldn't
12 be convinced, but, you know, as I view the
13 situation, I don't think it -- it would be an
14 appropriate way to calculate the damages.
15         MR. TOAL:  We can go off the record.
16         VIDEO SPECIALIST:  12:21 and we are
17 going off the record.
18         (Luncheon recess.)
19         VIDEO SPECIALIST:  This begins tape
20 number three.  The time is 1:28.  We are back on the
21 record.
22 BY MR. TOAL:
23     Q     Mr. Salamat, in your Salamat damage
24 model, you have a section at the top of the list
25 that consists of American Airlines pilots; correct?

1      A     That's correct.
2      Q     And your estimate of the number of
3  American Airlines pilots who would be at the top of
4  the list is substantially similar to the number of
5  American Airlines pilots at the top of Supplement
6  CC; correct?
7      A     That's correct.
8      Q     And I think you calculated that the
9  difference between your damage model and Supplement
10 CC was 98 pilots; correct?
11     A     That sounds correct.
12     Q     Take a look at page 31 of your report,
13 figure 10.
14     A     That's correct.
15     Q     And you regarded both Supplement CC and
16 your damage model as broadly consistent with
17 arbitrated results by Nicolau with respect to the
18 number of the pilots at top -- at the top of the
19 list; correct?
20     A     That's -- that's correct.
21     Q     And that's because American Airlines
22 flew certain large wide-body planes that the TWA
23 pilots never had access to; correct?
24     A     That's correct.
25     Q     Because TWA didn't have any large

1  wide-bodies at that point in its life cycle;
2  correct?
3      A     That's correct.
4      Q     Now, the difference between your list
5  and Supplement CC with respect to the number of
6  American Airlines pilots on the top of the list
7  reflects the fact that you didn't include F100s in
8  your -- in your model as being reserved to the
9  American Airlines pilots; correct?
10     A     As being reserved to the American
11 Airlines pilots?
12     Q     Well, tell me in your own words what
13 the difference is between the number of pilots you
14 put at the top of your list and the number of pilots
15 at the top of Supplement CC.  What accounts for the
16 difference?
17     A     Well, as -- as I show in figure 10, I
18 looked at a number of types of job groupings that
19 would have resulted in American Airlines being given
20 the top of the list in some measure, and so there
21 was the rightful place proposal which had 938 fewer
22 at the top.  If I looked at just the -- where the
23 junior 777 captain was, that would have been 199.
24 If I looked at what Nicolau effectively did in US
25 Airways/America West, it would have been 142 less.

Page 113

1   analysis of -- of future career projections, but
2   that this was the specific methodology that they
3   used for deciding the merged group, I wasn't aware.
4        Q      And you didn't do any analysis of the
5   number of TWA pilots who could be placed in front of
6   B.D. White without affecting his career progression
7   to small wide-body captain; did you?
8        A      Well, as I've said before, to the
9   extent that the amount of seniority that B.D. White
10  would need to have in order to preserve his career
11  expectations being represented on the -- the
12  fairness list, no.  I didn't do any un-merged
13  analysis of American Airlines pilots or TWA pilots,
14  but I know empirically, given that the ages of the
15  pilots that were merged ahead of B.D. White, that
16  his career expectations wouldn't be diminished,
17  presuming a static fleet from where the airlines
18  were as of 2001.  So, even though I didn't
19  specifically do an un-merged analysis, that is an
20  area that I did consider.
21       Q      Well, your fairness list is an
22  integrated list; correct?
23       A      That's right.
24       Q      And you didn't do any analysis of B.D.
25  White's career progression under a merged seniority

Page 114

1   integration list relative to his career progression
2   on an American Airlines only list; correct?
3        A      No, I did not.
4        Q      Did you assess whether first officer
5   jobs at TWA prior to any transaction were
6   substantially equivalent to new hire first officer
7   jobs at American Airlines?
8        A      Did I -- were new hires at American
9   Airlines, flying equipment -- were there first
10  officers flying the similar equipment to what first
11  officers at TWA were flying?
12       Q      Yeah.  Did you assess whether that was
13  the case?
14       A      Well, the junior pilots at both
15  airlines were -- were flying similar equipment, so,
16  yes.
17       Q      Well, did you assess whether first
18  officers at American Airlines who were newly hired
19  were able to fly on better equipment than first
20  officers at TWA?
21       A      Well, the first officers were placed on
22  equipment that has needs, so, no, I didn't -- I
23  didn't look at that specifically.  But as the junior
24  pilot on a piece of equipment doesn't necessarily
25  mean that you are equivalent to a senior pilot on

Page 115

1   the same piece of equipment at another airline, I
2   mean, junior pilots go wherever they are told to go.
3   So, I mean, how you could -- how you could draw an
4   equivalence other than they fly the same piece of
5   equipment in the same seat, I -- I -- I don't know
6   how you would do that.
7        Q      Did you analyze how much newly hired
8   first officers at TWA were paid relative to first
9   officers -- withdrawn.
10       Did you analyze how much newly hired first
11  officers at American Airlines were paid relative to
12  first officers at TWA?
13       A      Well, I believe newly hired first
14  officers at American are on -- on a flat salary, and
15  I don't know how that salary necessarily compares to
16  the -- to the pay scale of the first officers at TWA
17  because most of them would have been beyond their
18  probationary period and would be on hourly pay.
19       Q      So you didn't conduct any such
20  analysis; correct?
21       A      No, I didn't.
22       Q      Did you assess whether first officers
23  at TWA who were hired after TWA's second bankruptcy
24  had any plausible career expectation of upgrading to
25  captain?

Page 116

1        A      I did not.
2        Q      Look at figure 12 in your report on
3   page 34.
4        A      Yes.  I have it.
5        Q      So is the date -- the date of this
6   analysis is April 2001; correct?
7        A      Yes.
8        Q      And when you are looking at any
9   positions at TWA, are you -- are you looking at
10  those positions prior to the closing of the
11  transaction with American Airlines?
12       A      This would be as of that date, April of
13  2001.  This would have been from the contributing
14  list that went into Supplement CC, or rather the
15  contributing list that both parties exchanged.
16       Q      In your Salamat damage model, you
17  propose that any restriction on the ability of TWA
18  pilots to bid for 777 and A300 aircraft would go
19  away after ten years; correct?
20       A      Yes.
21       Q      And you acknowledge that TWA pilots had
22  no career expectation of ever flying 777 or A300
23  aircraft at TWA prior to the transaction; correct?
24       A      Prior to the transaction, no.
25       Q      So your model would take a career

Page 117

1    expectation that the TWA pilots never had at TWA and
2    give them such a career expectation at the
3    consolidated airline; correct?
4        A    I can't -- I can't say it would
5    necessarily give any particular pilot that -- that
6    expectation.  Provided they had enough seniority and
7    were young enough to get to a part of the list where
8    they could fly that equipment, then, yes.  But --
9        Q    Page 34 of your report, you say, as
10   shown in figure 13 under the Salamat damage model,
11   only a handful of TWA pilots would be within
12   striking range of a 777 captain seat for the dozen
13   years after their mergers.
14       Do you see that?
15       A    That's correct.
16       Q    So after a dozen years, you are
17   calculating that at least some TWA pilots would be
18   able to bid on 777 captain positions; correct?
19       A    Yeah.  As I said, a handful.
20       Q    And some additional number would be
21   able to bid on first officer positions on 777s;
22   right?
23       A    That's correct.
24       Q    And you also say that approximately 348
25   TWA pilots per year would have had the seniority to

Page 118

1    hold the 8300 position under the Salamat damage
2    model; correct?
3        A    That's correct.
4        Q    And that's a career opportunity that
5    those pilots never would have had at TWA absent this
6    transaction; correct?
7        A    That's correct.
8        Q    And so isn't that transferring career
9    expectations that American Airlines pilots had to
10   TWA pilots?
11       A    Well, one -- one could view it that
12   way.  I mean, those same TWA pilots are also, at the
13   same time, bringing the career expectation that they
14   had to operate their Boeing 767 aircraft, and that
15   work is also being transferred in some measure to
16   American Airlines pilots.  One wouldn't necessarily
17   assume that they will -- they wouldn't have
18   continued access to all of the equipment that they
19   brought to the merger.  And so, after some period of
20   time, who brought what equipment becomes less
21   relevant.  And so ten years seemed a reasonable time
22   that they would have agreed to.
23       Q    And didn't American Airlines also have
24   767 aircraft?
25       A    I believe they did, yes.

Page 119

1        Q    As of the time that TWA's assets were
2    merged into American Airlines, how many domiciles
3    did TWA have?
4        A    As of the time they were merged into --
5        Q    Yeah.
6        A    At -- at what date?
7        Q    As of April 2002, how many domiciles
8    did TWA have?
9        A    There was only one remaining TWA
10   domicile.
11       Q    And as of the time that Supplement CC
12   was implemented, how many domiciles did TWA have?
13       A    I believe still just one.
14       Q    And what was that domicile?
15       A    St. Louis.
16       Q    And prior to the transaction with
17   American Airlines, how many hubs did TWA have?
18       A    Hubs or domiciles?
19       Q    Hubs.
20       A    I don't know what constitutes a TWA
21   hub.  I mean, I would think St. Louis and Los
22   Angeles, and one other station might constitute
23   hubs, but I -- I don't know what -- what actually
24   would have been TWA's hubs.
25       Q    And was TWA considered a regional

Page 120

1    carrier at the time of the transaction with American
2    Airlines?
3        A    I -- I don't believe they would have
4    been considered a -- a regional carrier.  They
5    had -- they had some operations that weren't short
6    haul.  So I wouldn't -- I wouldn't have
7    characterized them that way.
8        Q    Have you done any analysis to assess
9    whether TWA was largely a regional carrier at the
10   time of the transaction with American Airlines?
11       A    No, I have not.
12       Q    We talked yesterday about the manner in
13   which you calculated income for TWA pilots.  Do you
14   recall that?
15       A    Yes.
16       Q    And I believe you told me you looked at
17   the number of hours worked times the pay rate; is
18   that right?
19       A    That's correct.
20       Q    And from what source did you take
21   information on the number of hours worked?
22       A    From the employment history provided by
23   American Airlines.
24       Q    And was the source that you were using
25   listing projected hours?

Page 121

1  A    The -- the source I was using had three
2  hours.  They had projected hours, meet guarantee
3  hours, and another form of hours.  Typically,
4  projected hours, at least as I requested it, would
5  be pay hours, except for reserves who would have
6  meet guarantee hours.  And so the greatest of the
7  three is generally what the pilot gets paid for a
8  particular month.
9  Q    And what was the third category beyond
10 projected and meet guarantee?
11 A    I believe it was block hours.
12 Q    What are block hours?
13 A    It is the actual operating time.  So a
14 pilot might be projected to fly 70 hours in a
15 particular month, but their block time might be
16 higher or lower than that because of canceled
17 flights, because of coming in on time, because of
18 delays.
19 Q    So if -- the block hours reflected the
20 time actually worked; is that correct?
21 A    That would -- that would -- that would
22 be operating time, yes.
23 Q    So why would you take the -- the
24 greater of these three in a situation where the
25 block hours were lower than the projected hours?

Page 122

1  A    Because usually projected hours are pay
2  hours.  Usually you -- you fly to your schedule and
3  are given credit for your schedule and not for the
4  hours that you necessarily actually operate.  If you
5  come in under schedule, you are still paid your
6  projected or better.
7  Q    Do you know -- do you know on what
8  basis the American Airlines pilots were paid?
9  A    I -- I am led to believe it was
10 schedule or better from their contract, but --
11 Q    With that understanding --
12 A    And I'm assuming that that's the data
13 that American Airlines gave us because that's what I
14 requested, was what their pay hours were.  Now, as
15 we mentioned yesterday, we have W2 data now, so we
16 know what each pilot was actually paid.  And so it
17 would be possible to compare what we calculate they
18 would have been paid to what they were actually paid
19 and see if there is an important difference.  And if
20 there is, we may do an amended set of numbers.
21 Q    Did you use any computer programs to
22 assist you in generating the Salamat damage model?
23 A    Did I use any computer programs?
24 Q    Yeah.
25 A    Well, we -- we wrote computer programs

Page 123

1  to analyze that list.  We wrote a program to create
2  the list.  Part of the ALPA merger tool is the
3  software that takes specifications from a merged
4  list and actually creates it.
5  Q    And there was source code that you used
6  to generate the fairness model in your report;
7  correct?
8  A    Uh-huh.
9  Q    And that source code was produced;
10 correct --
11 A    I believe it was.
12 Q    -- as part of your backup materials?
13 A    I believe it was, yes.
14 Q    Was there also source code that was
15 used to generate the Salamat damage model?
16 A    I'm not sure whether it was or not.
17 That's part of the ALPA merger tool, so it may not
18 have been.
19 Q    Why did you use source code to generate
20 the fairness model but not the Salamat damage model?
21 A    Well, the fairness model was specific
22 to this case.  It is not a type of optimized list
23 that I've run before.  So for this one, it had to be
24 written.
25 Q    Was there source code used to generate

Page 124

1  the arbitration model?
2  A    The ALPA merger tool.
3  Q    And was there source code used to
4  generate the Supplement CC 200?
5  A    The ALPA merger tool.
6  Q    Let's take a look at page 43 of your
7  report.
8  A    I have it.
9  Q    Do you have any -- you have an equation
10 under bidding restrictions; do you see that?
11 A    Yes.
12 Q    And that's to calculate the threshold?
13 A    Yes.
14 Q    And can you explain the logic
15 underlying this equation?
16 A    The seniority range in which a pilot
17 can likely hold a position is going to be different
18 from the stove -- from the stovepipe seniority
19 level.  So pilots who are holding, you know, let's
20 take a -- an A320 captain position.  The most senior
21 pilot may be at the very top of the list.  The most
22 junior pilot might be at the middle of the list.
23 There may only -- there may be, you know, only ten
24 percent of the actual pilots in the -- in the
25 company on that piece of equipment in that position,

# Exhibit 59

**EXPERT REPORT**
of
**HENRY S. FARBER**
**In Connection With**


**Brady et al. v. Airline Pilots Association et al.**
**October 12, 2012**

**I.  Qualifications**

1.      I am the Hughes-Rogers Professor of Economics at Princeton University, where I have served on the faculty since 1991.  I served on the faculty of the Department of Economics of the Massachusetts Institute of Technology from 1977 through 1991.  I received a Ph.D. in economics from Princeton University in 1977, a Master of Science in Industrial and Labor Relations from Cornell University in 1974, and a B.S. in economics from Rensselaer Polytechnic Institute in 1972.  Among other topics, I teach courses in labor economics (the analysis of wages, hours, employment, unemployment, labor unions, and other topics related to the workforce) and econometrics (the application of mathematical statistics to problems in economics).  I have written numerous scholarly articles in both of these subject areas, and my research has been widely published in academic and professional journals.  I am a Research Associate of the National Bureau of Economic Research (NBER) and a Research Fellow of the Institute for the Study of Labor (IZA).  I am a Fellow of the Econometric Society, a Fellow of the Society of Labor Economists, and a Fellow of the Labor and Employment Relations Association.  I am a member of the Labour and Income Statistics Advisory Committee of Statistics Canada.  A complete description of my qualifications is contained in my curriculum vitae and a list of my recent testimony is attached as Appendix A to this report.  I have also consulted and testified as an expert witness in numerous cases involving labor economics.

2.      My time is being billed at the rate of $750 per hour for my work in this matter. This is my normal hourly rate for this type of work.

## II.  Background and Assignment

3.      In January 2001 American Airlines ("American") agreed to purchase Trans World Airlines, Inc. ("TWA").[1]  This agreement was consummated in April 2001.[2]  At the time of the purchase, TWA was weak financially but was still flying planes and entered bankruptcy as a condition of its deal with American.[3]  TWA pilots were represented by a union known as the Air Line Pilots Association ("ALPA"), which remained their bargaining agent through April 2002.[4]  American pilots were represented by a union known as the Allied Pilots Association ("APA").

4.      The TWA pilots waived a provision in their contract with TWA that prescribed the procedure to be used in merging seniority lists in the case of TWA combining with another airline.[5]  In November 2001, American and the APA agreed on a method to merge the American and TWA pilot seniority lists.  This method was recorded in a document known as "Supplement CC."[6]

5.      Seniority is an important factor in a pilot's career.  It influences his or her home base, his or her role in the cabin (captain/first officer etc.), the routes and schedules he or she flies, the type of aircraft the pilot flies and also the order in which layoffs or "furloughs" occur.  Thus, a pilot's relative position on the seniority list is a central determinant of the pilot's earnings.

---

[1]  *Brady et al v. Air Line Pilots Association* Second Amended Restated, January 27, 2003  ("complaint"), ¶ 32.

[2]  Complaint, ¶ 54.

[3]  Asset Purchase Agreement Between American Airlines, Inc. as Purchaser and Trans World Airlines, Inc. as Seller, January 9, 2001, (ALPA 013296-013374) at ALPA 013301

[4]  Complaint, ¶ 35.

[5]  In this report I will discuss both mergers and acquisitions of airlines and merged seniority lists.  For clarity, I will refer to combinations of airlines as either "combinations" or "transactions."  I will use "merge" and "merged" to refer to integrating seniority lists.

[6]  Complaint, ¶ 61 and ALPA 1507-1524.

6.      As of April 2001, there were 11,548 American pilots and 2,337 TWA pilots.

1,241 TWA pilots were placed at the bottom of the merged list. (This arrangement is sometimes

called a "bottom staple.")  The remaining 1,096 TWA pilots were interspersed with American

pilots in an approximate 8:1 ratio beginning immediately above those former TWA pilots who

were stapled to the bottom of the list, leaving the 2,588 most senior slots on the list populated by

American pilots only.[7]  While the ability of American pilots to bid on Saint Louis routes was

restricted, this "fence" did not protect former TWA pilots from being bumped by American

pilots with more favorable positions on the seniority list in the event of a furlough.[8]

7.      The plaintiffs in this matter are a class of airline pilots who worked for TWA

prior to the acquisition.  The complaint defines the class as follows:

> … all persons formerly employed by TWA, Inc., who have become or may
> become employed as pilots by TWA, LLC as a result of the April 2001 asset
> transaction between American and TWA.[9]

They alleged that their former union, ALPA, failed in its "duty of fair representation" in

connection with the merger of the TWA and American Airlines pilot seniority lists.[10]  They also

alleged that, had ALPA met its duty of fair representation, their placement on the merged

seniority list would have been more favorable than on the actual merged seniority list.  In

addition, they alleged that if they had enjoyed more favorable positions on the merged seniority

list, they would have earned more than they actually did.[11]  Based on these allegations, the

---

[7]  The source for these figures is the computer file "Copy of Seniority List" provided by counsel for the plaintiffs.  The final seniority list also included pilots hired after the acquisition but before the list was finalized.  These pilots were placed below all of the former TWA pilots.

[8]  Supplement CC, at ALPA 001519.

[9]  Complaint, ¶ 21

[10]  Complaint, ¶ 2.

[11]  Complaint, ¶ 83.

plaintiffs have asked the court to order ALPA to compensate the plaintiffs for the monetary

losses they suffered as a result of ALPA's failure to meet its duty of fair representation.[12]

8.      I understand that a jury has already decided that ALPA did fail in its duty of fair

representation.[13]  I also understand that the extent of the monetary losses the plaintiffs suffered as

a result of ALPA's failure remains to be determined.  As part of evaluating these losses, counsel

for the plaintiffs have asked me to analyze American's acquisition of TWA and to generate an

estimate of a merged seniority list that would have resulted from the combination of the two

airlines had ALPA met its duty of fair representation.  (I will refer to this hypothetical seniority

list as the '"but-for" seniority list.')  In this report, I describe my analysis of this topic and

present my estimate of the "but-for" seniority list.  I have attached a list of the materials I

reviewed in forming my opinions in Appendix B.

### III. Summary of Opinions

9.      I present data on the relative seniority ranks of the former TWA pilots and

American pilots on their post-transaction seniority list and compare those data to similar data

from other transactions.  My analysis of these data indicate that the gap in average seniority

ranks between TWA pilots and American pilots was larger than one would expect given the

circumstances at the time of TWA's acquisition.  I conclude from my analysis that, had ALPA

met its duty of fair representation, the former TWA pilots would have had more favorable

positions on the merged seniority list, on average.

10.     My best estimate of the "but-for" seniority list includes a bottom staple of 350

former TWA pilots with the remaining 1,887 former TWA pilots merged with the American

---

[12]  Complaint, page 31.

[13]  Brady et al v. Air Line Pilots Association, Jury Verdict, July 13, 2011.

pilots using a ratio of 5.81:1.  I base this estimate on a composite of seven other airline

transactions in which the acquired airline, like TWA, was in financial difficulties but still flying

at the time the deal was struck and which, also like TWA, brought valuable assets to the

combined company.  These seven transactions are:  Flying Tiger/Seaboard, FedEx/Flying Tiger,

Delta/Pan Am, Delta/Western, Air Canada/Canadian, Texas International/Continental and

Alaska/Jet America.[14]

11.     My estimate of the "but-for" seniority list, calculated using these parameters, is

included in the back up materials for my report.[15]  In the absence of restrictions based on

equipment or routes, this list can be used as it stands to calculate monetary losses.  Alternatively,

if eligibility restrictions based on routes or equipment are desired, then a subset of the estimated

"but-for" seniority list can be created that maintains the ordering but consists only of pilots who

are eligible for the particular route or equipment.  Assignments of pilots to the restricted slots can

then be made using this subset seniority list.

12.     I also present two further alternative merged seniority lists.  These two additional

lists represent an upper and a lower bound on how favorable the "but-for" seniority list might

have been to the former TWA pilots.  That is, these bounds provide a sense of the possible

margin of error for my estimate.  To calculate these bounds, I first discarded from the seven

comparable seniority list mergers those mergers with the most favorable outcome for the pilots

---

[14]  There is one other seniority list merger in my data where the acquired airline was in financial difficulty
at the time of the merger.  This is the merger that resulted from Republic's acquisition of Frontier.
Because of a pre-transaction mismatch in the types of equipment in service at the airlines being
combined, the former Frontier pilots were placed in unusually high positions on the merged seniority list.
I have not included the Republic/Frontier seniority list merger in my group of comparable mergers
because of these special circumstances.  This decision is conservative in that including this merger would
have resulted in an estimated "but-for" seniority list that would have been more favorable to the TWA
pilots.

[15]  See sen_list1.pdf.

from the acquired airline (Flying Tiger/Seaboard) and the least favorable outcome for the pilots from the acquired airline (Alaska/Jet America).  I then chose the most favorable outcome and the least favorable outcome from the remaining five comparable seniority list mergers as upper and lower bounds.

13.     My upper bound "but-for" list is based on the combination of the FedEx and Flying Tiger seniority lists.  This list features a bottom staple of 210 former TWA pilots and a ratio of 5.43:1 for the remaining former TWA pilots.    This upper bound list is included in the back up materials for my report.[16]

14.     My lower bound "but-for" list is based on the combination of the Texas International and Continental seniority lists.  It features a bottom staple of 521 former TWA pilots and a ratio of 6.36:1 for the remaining former TWA pilots. This lower bound list is included in the back up materials for my report.[17]

15.     As with my estimated "but-for" list, these upper and lower bound lists can be used either with or without restrictions based on routes or equipment.

16.     The remainder of my report explains the reasoning underlying my analysis and opinions.  The report reflects the results of my analysis to date.  If I receive additional relevant information, I may supplement my opinions in response.

## IV. Considerations in Merging Seniority Lists

17.     Transactions in which two or more airlines combine are common in the airline industry.  Since 1980 there have been at least 40 combinations of airlines in the U.S.[18]  Airlines generally use seniority lists to manage the careers of their pilots.  As a result, when two or more

---

[16]  See sen_list2.pdf.

[17]  See sen_list3.pdf.

airlines combine, their seniority lists must be merged.  Because each combination of airlines requires a merger of seniority lists and because information on these mergers is often available, it is possible to gather data on what factors influence the nature of the merged seniority list.

18.     In this section of my report I describe how I collected data on other mergers.  I begin with a short discussion of the institutional background of how seniority lists are merged.  I then describe the factors that are taken into account when seniority lists are merged.   Finally, I present data on the relative ranks of the former TWA pilots and American pilots on their post-merger seniority list and compare these data to similar data from other mergers.

A.     Institutional Background

19.     Normally, the bargaining representatives of the pilots from the airlines involved in the transaction engage in negotiations to determine the merged seniority list.  These bargaining agents are sometimes the unions and sometimes Master Executive Councils ("MECs") of the unions associated with the individual parent airlines.  If the negotiations lead to an agreement, the merged seniority list is normally recorded as an amendment to the collective bargaining agreement ("CBA") between the successor MEC or union and the combined airline.

20.     The ALPA merger policy in place at the time of the American acquisition of TWA describes in detail ". . .  the process by which the affected pilot groups of ALPA airlines arrive at the merged seniority list for presentation to management, through their respective merger representatives, using arbitration if necessary."[19]  The document further states that "[t]he Fundamental purpose of this policy is to provide protection for the employment rights and

---

[18]   See the document US Mergers.pdf in my back up materials for a list of these mergers.

[19]   P-20-ALPA-policy.pdf, September 1998, Preamble, page 2.

interests of ALPA flight deck crew members in an orderly, expeditious, and equitable manner."[20] While pilots at American were not represented by ALPA, it is reasonable that ALPA, in its fair representation of the TWA pilots, would have been guided by these principles in its negotiation with the American pilots represented by the APA.

21.     Because the interests of pilots from two airlines that are combining are often directly opposed (each would like to be higher on the list), it can be difficult for the parties to agree on a merged seniority list through negotiation.  An additional complication is that pilots at both merging airlines may be represented by the same union (e.g., ALPA).   In these cases, there is a clear conflict of interest for the union representing both sets of pilots.  As a result of these factors, an arbitrator is often called upon to determine the merged seniority list.

22.     A procedure that includes negotiation, followed by arbitration if the parties cannot reach an agreement, is now required by law when the pilots are represented by different unions. The McCaskill-Bond statute was passed in December 2007.  It requires that such mergers follow the procedures described in Sections 3 and 13 of the Civil Aeronautics Board's Allegheny Mohawk Labor Protective Provisions of 1972.[21]   Section 3 requires that the merger of seniority lists be "fair and equitable" and provides for arbitration.  Section 13 describes the required arbitration procedures.

23.     Arbitration awards in particular cases result from careful investigation of information provided to the arbitrator, including specific proposals by each group of pilots of methods of merging the lists, as part of the arbitration process. The arbitrator considers the

---

[20]  P-20-ALPA-policy.pdf, September 1998, Part 1B Purpose and Scope of Merger Policy reaffirmed, page 2.

[21] Neumann, A., *Airline Mergers and Labor Integration Provisions Under Federal Law*, Information Brief,  Minnesota House Of Representatives Research Department ,  St. Paul, MN, June 2008 and *Standard Allegheny Mohawk Labor Protective Provisions*, Published at 59 C.A.B. 45.

proposal and the arguments for and against each approach and decides on a merged seniority list that is normally different from each of the parties' proposals.  Written arbitration awards vary in the detail in which the arbitrator's reasoning is presented, but it is clear that arbitrators consider a range of factors.  These arbitration awards are an important source of information on how disputes over merging seniority lists are resolved, including the factors that led the arbitrator to the particular outcome.

24.     Arbitration awards regarding mergers of seniority lists in other airline combinations are relevant sources of information for at least two reasons.   First, it is possible that, had ALPA met its duty of fair representation of the TWA pilots, the merger of the TWA and American seniority lists would have been decided through arbitration.  Second, arbitrators are motivated to provide a merged seniority list that meets the needs of both groups of pilots in a fair and equitable way.   Not only are the arbitrators tasked to render decisions in this manner, but, given that the unions will select arbitrators in future cases, the likelihood of an arbitrator being selected for future cases is affected by the perceived fairness and equity of that arbitrator's earlier decisions.[22]

B.     Factors Considered in Merging Seniority Lists

25.     With the assistance of my staff, I have reviewed information on 41 seniority list mergers.  These include 29 arbitration decisions, 11 amendments to CBAs, and 1 reported federal decision.  A complete list of these mergers is contained in the list of documents considered, (Appendix B).

---

[22] See, for example, Ashenfelter, Orley C., *Arbitration and the Negotiation* Process, The American Economic Review, Vol. 77, No. 2, May 1987 and Bloom, David E. and Cavanagh, Christopher L. *An Analysis of the Selection of Arbitrators*, The American Economic Review, Vol. 76, No. 3, June 1986.

26.     The arbitration decisions are a particularly rich source of data for estimating the "but-for" seniority list because, unlike amendments to CBAs, arbitrators provide a written report describing the results of their deliberations, including an account of the reasons for their decision.  As I have indicated, arbitrators attempt to produce merged lists that are perceived as fair and equitable by both sets of pilots.   As such, the arbitrators' reasoning provides a guide to factors that determine an appropriate outcome.

27.     Arbitrators commonly consider a number of factors.  One constant is that they attempt to preserve the pre-transaction relative ranks of the pilots on the pre-transaction seniority lists.  So that, for example, if pilots A and B both worked for the same airline prior to the transaction and if pilot A was senior to pilot B on the pre-transaction seniority list, he or she should be senior to pilot B on the post-transaction seniority list.

28.     Pre-transaction relative ranks can be preserved by ranking pilots on the merged list in the order of their dates of hire with their pre-transaction employers, placing the pilot having the longest service with either prior employer at the highest rank.  This is called a "date-of-hire" merge.

29.     Pre-transaction relative ranks can also be preserved by means of a "ratio" merge, with or without a staple.   In a ratio merge, the merged list is formed by moving down each pre-merger seniority list selecting a given number of pilots from one airline (the ratio) before selecting a pilot from the other.   If any pilots from either airline remain after all pilots from one of the airlines have been assigned a position on the merged list, the remaining pilots are "stapled" to an end of the list.  This staple is at the bottom of the list if the ratio merge began at the top or at the top of the list if the ratio merge began at the bottom.

30.     A "straight-ratio" merge is a merge where the ratio used is the number of pilots in the larger group divided by the number of pilots in the smaller group.  For example, if airline A had 200 pilots prior to the transaction and airline B had 100 pilots prior to the transaction, the straight ratio would be 2:1.  A merging of lists using the straight ratio in this case would imply selecting the two most senior pilots from airline A and placing them at the top of the new list, then selecting the most senior pilot from airline B and placing him or her third on the new list.  Next, the third and fourth most senior pilots from airline A would be placed fourth and fifth on the new list and the second most senior pilot from airline B would be placed sixth on the new list. And so on.   There is no stapling in a straight ratio merge.

31.     A ratio merge using other than the straight ratio will result in either or both a top staple or a bottom staple, depending on the ratio used relative to the straight ratio as well as any stapling that is done prior to the ratio merge.

32.     In addition to preserving pre-transaction relative ranks, arbitrators generally attempt to preserve the career expectations of both groups of pilots.   Such expectations include likelihood of promotion on one hand and likelihood of furlough on the other.   This leads arbitrators to consider a number of factors related to the career prospects of the pilots absent the transaction.

33.     As a first example, consider the combination of airline A and airline B.   Suppose that airline A was in reasonably good financial condition but the financial condition of airline B was sufficiently poor that it had ceased flying or was expected to cease flying imminently absent the combination with airline A.  In this case, it may be likely that airline B's pilots would have had to seek work elsewhere.   Since, in any future jobs, the (former) airline B pilots would start at the bottom of their new employers' seniority lists, the airline B pilots have minimal career

expectations at airline B absent the transaction, and they could expect to be placed lower on the merged seniority list than if airline B were in better financial health.[23]

34.     As a second example, consider the combination of airline C and airline D. Suppose that airline C was in reasonably good financial condition and that airline D was in worse financial condition than airline C but was still flying and was expected to continue to fly absent the transaction, perhaps through an alternative combination or other type of restructuring.   In this case, it is more likely that airline D's pilots would continue to work for airline D (or for some other combination including airline D) absent the transaction.  In this case, at least some of the airline D pilots have reasonable career expectations at airline D absent the transaction, and, while they may be placed somewhat lower than the airline C pilots on the merged seniority list, they would do better than the airline B pilots in the preceding example.[24]

35.     Finally, as a third example, consider the combination of airline E and airline F with similar equipment types where both airlines are in reasonably good financial condition.  In this case, both groups of pilots have reasonable (and equivalent) career expectations absent the transaction, and we would expect something close to a "fair" merge, perhaps using a straight ratio.[25]

36.     In summary, pilots from airlines in weak financial health that are not expected to stop flying can expect to fare better in the merged seniority list, other things being equal, than pilots from airlines that had ceased flying and worse than pilots from financially healthy airlines. It is worth noting that bankruptcy, per se, is not a clear indicator that an airline will cease flying.

---

[23]  Arbitration Report of George Nicolau in Continental Airlines, Inc./Frontier Airline, 1987.  ALPA 055291-055292.

[24]  Arbitration Report of Jerome H. Ross in Continental Airlines, Inc./People Express, 1991, pp. 119-120

There have been (and continue to be) airlines that declare bankruptcy, reorganize, and continue flying.

37.     Another factor that is often considered in balancing career prospects is whether one airline brings to the combined company something of substantial value.  Examples of this include hubs,[26] routes or route authority,[27] gates at busy airports, and desirable equipment, whether in service or on order.[28]  Pilots from airlines that do bring something of value are often placed more favorably on the merged seniority list than pilots from airlines that do not bring such things, other factors being equal.

38.     Arbitrators can consider the pre-transaction job status of the pilots.  That is, merged seniority lists can be created taking rank into consideration.   For example, if pilots for each airline were captains or first officers, the seniority lists of captains may be merged separately from the seniority lists of first officers.  Additionally, the arbitrator may specify how these lists can be used to specify the order in which first officers can bid for captain positions.  Similarly, arbitrators can also consider the equipment that the pilots flew prior to the transaction.  For example, captains from one airline flying wide-bodied aircraft can be merged with captains from the other airline who fly wide-bodied aircraft and so on.  This type of merger is known as a "status and equipment" merger.[29]

---

[25]  See, for example, Arbitration Report of Richard I. Bloch, In the Matter of the Seniority integration Arbitration between the Pilots of Northwest Airlines, Inc. and the Pilots of Delta Air Lines, Inc., December 8, 2008, pp. 5-9.

[26]  Arbitration Report of Jerome H. Ross in Continental Airlines, Inc./People Express, 1991, pp. 124-125.

[27]  For example, Arbitration Report of Laurence E. Seibel, Flying Tiger Lines, Inc. - Seaboard World Airlines Inc., 1981, page 145.

[28]  For example, Arbitration Report of Laurence E. Seibel, Flying Tiger Lines, Inc. - Seaboard World Airlines Inc., 1981, page 145.

[29]  For example, Arbitration Report of Laurence E. Seibel, Flying Tiger Lines, Inc. - Seaboard World Airlines Inc., 1981, page 158.

-14-

39.     Status and equipment mergers can result in merged lists that are imbalanced in terms of the relative positions of the pilots from the combining airlines.  This can happen if the airlines being combined flew different categories of equipment prior to the transaction.  For example, if pilots from an airline that flew only short haul commuter planes are merged with pilots from an airline that flew only larger, longer-haul aircraft, the pilots from the commuter airline might be placed in a group at the bottom of the merged list.  The rationale for this placement is that, in the absence of the transaction, they had no prospect of advancing to flying the larger equipment or longer routes.[30]

40.     In addition to reviewing the factors considered in merging the seniority lists, I also noted examples where the mean rank of pilots from each group could be computed from the available materials.  I present these data in the next section of my report.

C.     Empirical Analysis

41.     In this section of my report, I define a metric for measuring how well pilots fare when seniority lists are merged.   I then calculate this metric for those seniority list merges for which I was able to get the relevant information from arbitration awards or agreements.  I also calculate my metric for the actual American-TWA merged seniority list and compare its value with the metrics for the other merged seniority lists.

1.     *Defining The Metric*

42.     The metric I use is the proportional difference between the mean seniority rank of pilots from the acquiring airline on the merged seniority list and the mean seniority rank of pilots from the acquired airline on the merged seniority list.  This is a straightforward summary measure of how merging the seniority lists affected the two groups of pilots.  The proportional

---

[30]  I do not have data on the duties of its pilots at the time the seniority lists were integrated.  As a result, it is not possible for me to allow for this factor in my estimate.  Should this information become available,

difference in means is a standard measure of disparities between groups and of changes over time in key variables.  It is widely used in the academic literature.[31]

43.     A negative proportional difference in my metric indicates that pilots from the acquired airline were lower ranked, on average, than pilots from the acquiring airline.  (Higher seniority pilots have lower numbered ranks than lower seniority pilots.  The most senior pilot is ranked number one, for example.)  A positive proportional difference indicates that pilots from the acquired airline were higher ranked, on average, than pilots from the acquiring airline.  The absolute value of the proportional difference provides a measure of the size of the difference in mean ranks with larger absolute values indicating larger proportional difference in mean rank.

44.      A hypothetical example will help clarify the calculation of this metric.  In this hypothetical, two airlines (A and B) of equal size (100 pilots each) combine, with airline A acquiring airline B.  There are many ways to merge their seniority lists.  Consider three approaches,

45.     Approach 1 is least favorable to the airline B pilots.  In this approach, the first 100 places on the seniority list (1-100) go to airline A pilots and the next 100 places (101-200) go to airline B pilots (a complete bottom staple).   The average rank of the airline A pilots is 50.5.  The average rank of the airline B pilots is 150.5.   The difference in mean ranks is -100=50.5-150.5.

---

I may adjust my approach to take advantage of these data.

[31]  See for example, Oaxaca, R., "Male-Female Wage Differentials In Urban Labor Markets**",** International Economic Review, Vol. 14, No. 3, (1973), page 694, Healy, P.M, Kang, S-H, Palepu, K.G. "The Effect of Accounting Procedure Changes on CEO's Cash Salary and Bonus Compensation", Journal of Accounting and Economics 9 (1987), Table 3, Ashenfelter, O. and Bloom, D., "Lawyers as Agents of the Devil in a Prisoner's Dilemma Game," NBER Working Paper No. 4447, (1993), Table 5, Farber, H. ''Nonunion Wage Rates and the Threat of Unionization,'' Industrial and Labor Relations Review 58 (April 2005), page 337 and Staiger, D, Spetz, J, Phibbs, C. "Is There Monopsony in the Labor Market? Evidence from a Natural Experiment", Journal of Labor Economics, (2010), Table 1.

The overall average rank is 100.5, and the proportional difference in mean ranks is -0.995 = -100/100.5 (approximately -1).

46.     Approach 2 is a straight merge.  In this approach, the pilots from each airline are alternately selected and placed on the merged seniority list, arbitrarily beginning with an airline A pilot.   The average rank of airline A pilots is 100 and the average rank of airline B pilots is 101.  The difference in mean ranks is -1=100-101.  The overall average rank is 100.5, and the proportional difference in mean ranks is -0.00995= -1/100.5 (approximately 0).  Note that the difference in mean ranks differs from zero only because of the arbitrary (but necessary) choice to start the merge with a pilot from one airline or the other.

47.     Approach 3 is intermediate with respect to how airline B pilots fare.  In this approach, two pilots from airline A are selected followed by one pilot from airline B, and the process is repeated until all airline A pilots have been selected.  At this point the remaining airline B pilots are bottom stapled.  The average rank of airline A pilots is 75.5 and the average rank of airline B pilots is 125.5, including the 50 airline B pilots who are bottom stapled.  The difference in mean ranks is -50.  The overall average rank is 100.5, and the proportional difference in mean ranks is –0.49751=-50/100.5 (approximately ½).

2.     *Comparison Of Outcomes Across Mergers*

48.     In Table 1 (attached) I present my calculations of the proportional difference in mean ranks for each of the 19 seniority list mergers for which I could locate the data needed to calculate separately the mean rank on the merged seniority list of the pilots from each of the combining airlines.[32]  Each row of the table contains information on a different seniority list

---

[32]  Republic Airways Holdings ("Republic") acquired Midwest Air Group ("Midwest") in July 2009 and acquired Lynx Aviation ("Lynx") and Frontier Airlines ("Frontier") in a second transaction in October 2009. The four seniority lists were combined in a single arbitration.  (See ALPA055696-055790).  While I have displayed this merger as three separate lines in the table, the statistics I show in the table are

merger.[33]  Columns (4) and (5) of the table show the mean rank for pilots from the acquiring airline and the mean rank of pilots from the acquired airline.  Column (6) displays the simple difference in mean ranks calculated as the mean rank of the pilots from the acquiring airline minus the mean rank of the pilots from acquired airline.   Column (7) gives the mean rank of all pilots on the merged list.  The final column (column (8)) shows the proportional difference in mean ranks (my metric).   Column (8) is calculated as column (6) divided by column (7).  The rows in Table 1 are arranged in descending order of the proportional difference in mean ranks.

49.      The proportional difference in mean ranks does not, however, convey all of the information relevant to evaluating the impact of the merger on the status of the pilot groups.  For example, prior to its acquisition by Republic, Lynx was bankrupt and only flying because of injections of money by Republic and, as far as the arbitrator could determine, had no prospect of ever being profitable.[34]  Its pilots flew only regional turboprop planes.  As a result, their career prospects, absent the acquisition, were poor.  On the other hand, any placement on the merged seniority list might have been regarded by the former Lynx pilots as an improvement in their career prospects because the combined list afforded them the potential to advance to more lucrative flights and equipment than would have been available to them had they remained employed by Lynx.  As a result, their placement on the combined seniority list was the least favorable of any pilot group I could analyze.

---

computed from ranks in the seniority list that resulted from combining pilots from all four airlines.   Note that an earlier airline using the name "Frontier" was acquired by Continental Airlines ("Continental") in September 1986 as part of its acquisition of People Express.

[33]  There is one exception to this.  When Air Canada acquired Canadian Airlines International ("Canadian Airlines") the merged seniority list was initially determined in 2001 by M.G. Mitchnick.  Mitchnick's decision was overturned on appeal and the final merged seniority list was determined in 2003 by an arbitration panel composed of M.B. Keller, M. Vorster and R. Pink.  I analyzed both the initial and the final merged lists, and I show the results of both analyses in the table to provide an additional reference point.

50.     In another example, Republic's acquisition of the second Frontier resulted in the largest positive proportional difference in mean rank in the table.  This resulted from the fact that prior to its acquisition by Republic, Frontier flew only larger, longer-haul narrow body planes, while Republic flew a mix of regional planes.[35]  As a result, the arbitrator merged the Frontier pilots favorably relative to the Republic pilots.

51.     The former TWA pilots had a proportional difference in mean ranks on their post-merger seniority list of -0.624.  This is lower than the proportional difference in mean ranks in 15 of the other 18 mergers on the list.  There are four mergers aside from American/TWA in Table 1 with proportional differences in mean rank of -0.60 or smaller (larger than 0.60 in absolute value):  Republic/Lynx, Southwest/Airtran, Republic/Midwest and Continental/Frontier.  Lynx and Midwest were so weak financially at the time of their acquisitions that each was only flying because of financial assistance from Republic.[36]

52.     The experience of the former pilots of the first Frontier Airlines reflects the fact that, at the time it was acquired by Continental, Frontier was grounded and all of its pilots were on furlough.[37]

53.     TWA was not comparable to Lynx, Midwest, or the first Frontier because, while it was weak financially, it was able to continue flying routes.  Additionally, TWA brought a number of valuable assets to the combined airline.  These assets are summarized in an analyst's

---

[34]  ALPA 055729 and ALPA 055715-055716.

[35]  ALPA 055717

[36]  I have not been able to determine why former Airtran pilots were placed so low on their post-transaction seniority list following the Southwest/Airtran transaction and will continue to research this question.

[37]  ALPA 055252.

presentation prepared by American for presentation in January 2001.[38]  They included "… 173 slots at key airports including JFK, LaGuardia, Washington Reagan, Orange County and O'Hare."  The presentation notes that the additional gates at JFK and St. Louis would give the combined airline a share of the gates at those two airports that would be more than 50 percent.  The presentation also highlights the fact that TWA would contribute 188 existing aircraft and 227 aircraft on order to the combined carrier.  Indeed, TWA was sufficiently valuable that both Karl Icahn and Continental Airlines expressed interest in purchasing all or part of TWA as part of a reorganization.[39]  Other things being equal, this factor would tend to raise the former TWA pilots on the merged seniority list.

54.     In short, given TWA's circumstances at the time of its acquisition, the placement of its former pilots on the merged seniority list was unusually unfavorable, on average.  In the next section of my report I turn to estimates of how a more appropriate merged seniority list might have been constructed.

## V.  Construction of the "But-For" Merged Seniority List

55.     I base my best estimate of the "but-for" seniority list on a composite of comparable mergers.  In order to select comparable mergers I focus on two characteristics of TWA at the time of the deal.  As I have indicated, TWA was in a weakened financial state.  Other things being equal, this factor would normally depress the position of the former TWA pilots on a merged seniority list, but the adverse effect of TWA's financial position would be mitigated by the fact that TWA was still flying.  Additionally as I described earlier, TWA provided the combined airline with a number of valuable assets.

---

[38] ALPA 011621.

[39] http://mba.tuck.dartmouth.edu/ccg/commentaries/Anatomy_TWA.html, accessed on October 10 2012.

56.     Accordingly, I chose my group of comparable mergers by looking for transactions in which the acquired airline was in weakened financial condition, but still flying, and contributed substantial assets to the combined airline.  To determine which transactions met these criteria I relied primarily on statements in arbitrators' reports.  These provide an independent, objective source for these data.  I located seven transactions that met the criteria and for which I can calculate the proportional difference in mean ranks on the merged seniority lists:  Flying Tiger/Seaboard, FedEx/Flying Tiger, Delta/Pan Am, Delta/Western, Air Canada/Canadian, Texas International/Continental and Alaska/Jet America.[40, 41, 42]  I then averaged the proportional difference in mean ranks that resulted from merging these seven pairs of seniority lists.  I found that this average is -0.15.

57.     Therefore, I estimate that the proportional difference in mean ranks on the "but-for" seniority list would have been -0.15.  A seniority list with a proportional difference in mean ranks of -0.15 can be prepared with either a bottom staple of former TWA pilots or a top staple

---

[40]  I drew information on the financial conditions and contributions of the acquired airlines from the relevant arbitrator's reports with the exception of Delta/Pan Am.  My sources for the financial condition and contributions of Pan Am were Warwick, Graham, "Delta studies mini Pan Am service," *Flight International,* August 7-13, 1991, page 6 and Warwick, Graham, "Delta makes a difference," *Flight International,* August 21-27, 1991, page 20.

[41]  There is one other seniority list merger in my data where the acquired airline was in financial difficulty at the time of the merger.  This is the merger that resulted from Republic's acquisition of Frontier.  Because of a pre-transaction mismatch in the types of equipment in service at the airlines being combined the former Frontier pilots were placed in unusually high positions on the merged seniority list.  I have not included the Republic/Frontier seniority list merger in my group of comparable mergers because of these special circumstances.  This decision is conservative in that including this merger would have resulted in an estimated "but-for" seniority list that would have been more favorable to the TWA pilots.

[42]  There were two arbitration decisions in the Air Canada/Canadian transaction.  In performing my analysis, I use the proportional mean rank difference from the merged seniority list that resulted from the Mitchnick arbitration.  This was less favorable to the Canadian pilots than the seniority list that resulted from the later arbitration.  As a result, my choice of which merged list to analyze is conservative.

of American pilots and a ratio of the remaining pilots.[43]  I understand from counsel for the plaintiffs that they expect to show that losses resulting from furloughs comprise the largest component of the plaintiffs' lost earnings.  If this is correct, then a bottom staple of former TWA pilots is more conservative than a top staple of American pilots because a bottom staple implies larger losses from furloughs for former TWA pilots in the "but-for" world.

58.     To be conservative I assume that the "but-for" list would have featured a bottom staple of 350 former TWA pilots.  I also assume that the remaining 1,887 former TWA pilots would have been merged with the American pilots using a ratio of 5.81:1.[44]  I have calculated a merged seniority list using these parameters, and this is my estimate of the "but-for" merged seniority list.  It is included in my back up materials.[45]

59.     In the absence of restrictions based on equipment or routes, this list can be used as it stands to calculate monetary losses.  Alternatively, if eligibility restrictions based on routes or equipment are desired, then a subset of the estimated "but-for" seniority list can be created that maintains the ordering but consists only of pilots who are eligible for the particular route or equipment.  Assignments of pilots to the restricted slots can then be made using this subset seniority list.

---

[43]  There is only one combination of bottom staple (assuming no top staple) and ratio that is consistent with a given proportional difference in mean ranks.  This combination can be calculated mathematically.  Similarly, there is only one combination of top staple (assuming no bottom staple) and ratio that is consistent with a given proportional difference in mean ranks.  This combination can also be calculated mathematically.

[44] While 5.81 is close to six, merging the seniority lists by taking exactly six American pilots for each former TWA pilot does not result in the required proportional difference in mean ranks.  As a result, my procedure sometimes takes six American pilots for each former TWA pilot and sometimes takes five American pilots for each former TWA pilot in a fixed pattern and in such a way as to generate a merged seniority list with the required proportional difference in mean ranks.

[45]  See the file sen_list1.pdf.

60.      In order to provide a sense of the possible margin of error for my estimate, I have also calculated a second merged seniority list that represents an upper bound on how favorable the merged seniority list might have been to the former TWA pilots and a third merged seniority list that represents a lower bound on how favorable the merged list might have been to the former TWA pilots.  To calculate these bounds, I first discarded from the seven comparable seniority list mergers the merger with the most favorable outcome for the pilots from the acquired airline (Flying Tiger/Seaboard) and the merger with the least favorable outcome for the pilots from the acquired airline (Alaska/Jet America).  I then chose the most favorable outcome and the least favorable outcome from the remaining five comparable seniority list mergers as upper and lower bounds.  That is, my upper bound is based on a proportional mean rank difference of -0.09 (FedEx/Flying Tiger) and my lower bound is based on a proportional mean rank difference of -0.22 (Texas International/Continental).

61.      I have calculated merged seniority lists using these parameters and these recalculated seniority lists are included in my back up materials.  The upper bound seniority list features a bottom staple of 210 former TWA pilots and a ratio of 5.43:1 for the remaining former TWA pilots.  The lower bound seniority list features a bottom staple of 521 former TWA pilots and a ratio of 6.36:1 for the remaining former TWA pilots.[46]  As with my estimated "but-for" list, these upper and lower bound lists can be used either with or without restrictions based on routes or equipment.

Henry S. Farber
October 12, 2012

---

[46]  See the file sen_list2.pdf for the upper bound and the file sen_list3.pdf for the lower bound.

TABLE 1: COMPARISON OF THE MEAN RANKS OF PILOTS ON POST-MERGER SENIORITY LISTS

PILOTS FROM ACQUIRED COMPANIES COMPARED TO PILOTS FROM ACQUIRING COMPANIES

| Name | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|------|------|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | Number of pilots | | Mean Rank | | | | |
| Acquiring Airline | Acquired Airline | Year of merger | Acquiring Airline | Acquired Airline | Acquiring Airline | Acquired Airline | Difference in Mean Ranks (a) | Mean Rank of All Pilots | Proportional Difference in Mean Ranks (b) |
| Republic (c) | Frontier (d) | 2011 | 1,909 | 646 | 1,445 | 1,029 | 416 | 1,491 | 0.279 |
| Flying Tiger | Seaboard | 1980 | 430 | 131 | 285 | 267 | 18 | 281 | 0.065 |
| Valujet | AirTran (f,g) | 1998 | 200 | 87 | 144 | 145 | 1 | 144 | -0.007 |
| Delta | NorthWest | 2008 | 7,168 | 4,513 | 5,810 | 5,890 | -80 | 5,841 | -0.014 |
| Air Canada (KR) | Canadian (e) | 2001 | 1,407 | 819 | 1,102 | 1,134 | -31 | 1,114 | -0.028 |
| FedEx | Flying Tiger | 1989 | 1,001 | 873 | 898 | 982 | -84 | 938 | -0.090 |
| Delta | PanAm | 1991 | 9,005 | 782 | 4,855 | 5,338 | -483 | 4,894 | -0.099 |
| Delta | Western | 1986 | 4,194 | 1,310 | 2,673 | 3,008 | -335 | 2,753 | -0.122 |
| Air Canada (MR) | Canadian (e) | 2001 | 2,180 | 1,258 | 1,623 | 1,887 | -264 | 1,720 | -0.153 |
| American Eagle | Business Express | 1999 | 1,924 | 337 | 1,096 | 1,331 | -235 | 1,131 | -0.208 |
| Texas International | Continental | 1982 | 396 | 1,629 | 810 | 1,062 | -252 | 998 | -0.249 |
| American | AirCal | 1987 | 6,233 | 461 | 3,275 | 4,281 | -1,006 | 3,345 | -0.301 |
| Alaska | Jet America | 1986 | 489 | 96 | 273 | 394 | -121 | 293 | -0.410 |
| Alaska International | Great Northern | 1980 | 81 | 33 | 50 | 77 | -27 | 58 | -0.475 |
| Continental | Frontier (d) | 1986 | 2,600 | 449 | 1,390 | 2,310 | -920 | 3,049 | -0.603 |
| American | TWA | 2001 | 11,000 | 2,341 | 5,941 | 10,104 | -4,163 | 6,671 | -0.636 |
| Republic (c) | Midwest | 2011 | 1,909 | 325 | 1,445 | 2,381 | -936 | 1,491 | -0.627 |
| Southwest | AirTran (f) | 2011 | 5,882 | 1,696 | 3,234 | 5,718 | -2,484 | 3,790 | -0.660 |
| Republic (c) | Lynx | 2011 | 1,909 | 101 | 1,445 | 2,448 | -1,003 | 1,491 | -0.672 |

Notes Over

**Table 1 Continued**

The table displays data for merged seniority lists for which the required data could be located.

(a)  [(1) - (2)] or the mean rank of the acquiring airline's pilots minus the mean rank of the acquired airline's pilots.  Thus a negative value indicates that the pilots of the acquired airline were lower ranked, on average, after the seniority list merger than the pilots from the acquiring airline.

(b)  (3)÷(4) or the difference in mean ranks as a proportion of the mean rank of all pilots.

(c)  The seniority lists of Republic, Frontier, Midwest and Lynx were merged in a single arbitration.   For these companies' pilots the table presents mean ranks  from the seniority list resulting from the merger of all four groups of pilots.

(d) Frontier Airlines ceased operations in 1986 after being bought by Continental Airlines. A second airline with the same name was started in 1994 by a group that included executives of the 'original' Frontier Airlines. This was then acquired by Republic in 2011.

(e) The same merger between Air Canada and Candian Airlines had 2 different arbitration decisions. The original decision by Arbitrator Mitchnick (MR in table above) was overturned on appeal and the final merged seniority list was determined in 2003 by an arbitration panel composed of M.B. Keller, M. Vorster and R. Pink (KR in table above).

(f) Valujet Airlines purchased AirTran in 1997 and named the combined airline "AirTran Airways". This combined airline was purchased by Southwest Airways in 2011.

(g) For the merger between Valujet and AirTran, the number of "former AT pilots who have executed recognition cards" stated in the arbitration report at ALPA-056227, 87, is assumed to be the total number of former AirTran pilots merged. The number of Valujet pilots is then inferred to be 200 from the "total of 287 captains and first officers" mentioned at ALPA-056242.

**APPENDIX A**

**CURICULLUM VITAE**

Henry Stuart Farber                                              Page 2 of 10
June 2011
_____

**Major Fields of Interest**

Labor Economics          Econometrics          Law and Economics
Industrial Organization   Political Economy

**Past Positions**

Professor (1986-1991), Associate Professor (1981-1986), Assistant Professor (1977-1981), Department of Economics, Massachusetts Institute of Technology.

Institute for Advanced Study, Member, School of Social Science, September 2006 - August 2007.

Russell Sage Foundation, Visiting Scholar, September 2002 - July 2003.

Fellow, Center for Advanced Study in the Behavioral Sciences, 1983-1984 and 1989-1990.

Director, Industrial Relations Section, Princeton University, July 1993-December 1993, July 1995-June 1998, July 2003 – June 2004.

Associate Editor, Industrial and Labor Relations Review, 1999–2004.

Associate Editor, Quarterly Journal of Economics, 1984-1989.

Editorial Board, American Economic Review, 1988–1991.

Social Science Research Council Advisory Group on a 1986 Quality of Employment Survey, 1985-86.

Visiting Fellow, University of Warwick, Summer 1982.

Member, Visiting Committee, Department of Economics, Princeton University, 1979-1990.

Member, Nominating Committee, Industrial Relations Research Association, 1990.

Co-Director, Summer Institute on Negotiation and Dispute Resolution, Center for Advanced Study in the Behavioral Sciences, Summer 1992.

John M. Olin Fellow, Cornell Law School, February 1994 and October 1994.

Member, Peer Review Panel, National Science Foundation Economics Program, Spring 1992, Spring 1994-Spring 1995.

Editorial Board, Industrial and Labor Relations Review, 1994-1999.

Member, Peer Review Panel, National Science Foundation Behavioral Sciences Infrastructure Competition, Spring 1999.

Member, Committee on the Status of Women in the Economics Profession, 1996-2000

Technical Review Committee, National Longitudinal Surveys, 1996-2004.

Social Science External Advisory Council, Cornell University, 2006-2008.

Executive and Supervisorty Committee, CERGE, Charles University Prague, 2005-2010.


**Membership in Professional Societies**

American Economic Association

American Law and Economics Association

American Statistical Association

Econometric Society (Fellow)

Society of Labor Economists (Fellow)

## Fellowships, Grants, Contracts, and Awards

National Science Foundation, Grant No. SES-7924880 to Massachusetts Institute of Technology, "Economics of Labor Unions," 1/80-6/82.

U.S. Department of Labor, Minimum Wage Study Commission, Contract No. J9E-00113 to Massachusetts Institute of Technology, "Union Wages and the Minimum Wage," 9/80-2/81.

Alfred P. Sloan Research Fellowship, Alfred P. Sloan Foundation, 9/81-8/85.

National Science Foundation, Grant No. SES-8207703 to Massachusetts Institute of Technology, "An Analysis of the Unionization Process in the United States," 7/82-6/83.

Edwin E. Ghiselli Award for Research Design, American Psychological Association, Division 14, 1984. (with Max H. Bazerman)

National Science Foundation, Grant No. SES-8408623 to National Bureau of Economic Research, "Threat Effects and the Extent of Unionization in the United States," 7/84-12/86.

National Science Foundation, Grant No. SES-8605530 to National Bureau of Economic Research, "The Political Economy of Labor Unions," 8/86-12/88.

National Science Foundation, Grant No. SES-8912664 to National Bureau of Economic Research, "Empirical Analysis of Inter-Firm Worker Mobility," 7/89-6/92.

U.S. Department of Labor, Grant No. E-9-J-9-0050 to National Bureau of Economic Research, "Evaluating Competing Theories of Interfirm Worker Mobility," 9/89-1/92.

U. S. Department of Labor, Office of the Assistant Secretary for Policy, Contract No. B9461588, "Incidence and Consequences of Job Loss," 12/95-4/46.

U. S. Department of Labor, Office of the Assistant Secretary for Policy, Contract No. B9462164, "Alternative Employment Arrangements as a Response to Job Loss," 7/96-12/96.

U. S. Department of Labor, Office of the Assistant Secretary for Policy, Contract No. B9492501, "Job Loss and Long-Term Employment in the U.S." 6/99-11/99.

Richard E. Quandt Teaching Prize, Department of Economics, Princeton University, June 2000 and June 2011.

## Published Papers

"The Composition of Strike Activity in the Construction Industry," *Industrial and Labor Relations Review*, April 1976: pp. 388-404. (with D.B. Lipsky)

"The Determinants of Union Wage Demands: Some Preliminary Empirical Evidence," *Proceedings of the Thirtieth Annual Winter Meeting of the Industrial Relations Research Association*, 1977.

"Bargaining Theory, Wage Outcomes, and the Occurrence of Strikes: An Econometric Analysis," *American Economic Review*, June 1978: pp. 262-271.

## Published Papers (cont'd)

"Individual Preferences and Union Wage Determination: The Case of the United Mine Workers," *Journal of Political Economy*, October 1978: pp. 923-942.

"The United Mine Workers and the Demand for Coal: An Econometric Analysis of Union Behavior," *Research in Labor Economics*, Vol. 2, 1978.

"Interest Arbitration, Outcomes, and the Incentive to Bargain," *Industrial and Labor Relations Review*, October 1979: pp. 55-63. (with Harry C.Katz)

"Unionism, Labor Turnover, and Wages of Young men," *Research in Labor Economics*, Vol. 3, 1980: pp. 33-35.

"Why Workers Want Unions: The Role of Relative Wages and Job Characteristics," *Journal of Political Economy*, April 1980: pp. 349-369. (with Daniel H. Saks)

"An Analysis of Final-Offer Arbitration," *Journal of Conflict Resolution*, December 1980: Vol. 24, No. 4, pp. 683-705.

"Does Final-Offer Arbitration Encourage Bargaining?" *Proceedings of the Thirty-third Annual Meeting of the Industrial Relations Research Association*, 1980: pp. 219-226.

"The Role of Arbitration in Dispute Settlement," *Monthly Labor Review*, May 1981.

"Union Wages and the Minimum Wage," *Report of the Minimum Wage Study Commission*, Vol. VI, 1981.

"Splitting-the-Difference in Interest Arbitration," *Industrial and Labor Relations Review*, October 1981, pp. 70-77.

"Job Queues and the Union Status of Workers," *Industrial and Labor Relations Review*, April 1982: pp. 354-367. (with John M. Abowd)

"Worker Preferences for Union Representation," *Research in Labor Economics*, Supplement 2, 1983: pp. 171-205.

"The Determination of the Union Status of Workers," *Econometrica*, September 1983: pp. 1417-1437.

"Right to Work Laws and the Extent of Unionization," *Journal of Labor Economics*, July 1984: pp. 319-352.

"Analyzing the Decision Processes of Third Parties," *Sloan Management Review*, Fall 1985: pp. 39-48. (with Max H. Bazerman)

"Arbitrator Decision Making: When are Final Offers Important?" *Industrial and Labor Relations Review*, October 1985: pp. 76-89. (with Max H. Bazerman)

"The Extent of Unionization in the United States: Historical Trends and Prospects for the Future," Presented to M.I.T./Union Conference, June 1983. in *Challenges and Choices Facing American Labor*, Thomas Kochan, ed. M.I.T. Press, 1985.

"The Analysis of Union Behavior." In Ashenfelter and Layard, eds. *The Handbook of Labor Economics*, North Holland Publishing Company, 1986.

## Published Papers (cont'd)

"The General Basis of Arbitrator Behavior: An Empirical Analysis of Conventional and Final-Offer Arbitration," *Econometrica*, November 1986: pp. 1503-1528. (with Max H. Bazerman)

"Why is there Disagreement in Bargaining?" *American Economic Review*, May 1987: pp. 347-352. (with Max H. Bazerman)

"Job Duration, Seniority, and Earnings," *American Economic Review* June 1987: pp. 278-297. (with Katharine G. Abraham)

"The Recent Decline of Unionization in the United States," *Science* 13 November 1987, pp. 915-920.

"The Evolution of Public Sector Bargaining Laws." in *When Public Sector Employees Unionize*, Richard B. Freeman and Casey Ichniowski, eds., University of Chicago Press, 1988, pp. 129-166.

"Returns to Seniority in Union and Nonunion Jobs: a New Look at the Evidence," *Industrial and Labor Relations Review* 42 October 1988: pp. 3-19. (with Katharine G. Abraham)

"Divergent Expectations as a Cause of Disagreement in Bargaining: Evidence from a Comparison of Arbitration Schemes," *Quarterly Journal of Economics* 104 February 1989: pp. 99-120. (with Max H. Bazerman)

"Trends in Worker Demand for Union Representation," *American Economic Review*, 79(2), May 1989: pp.166-171.

"The Decline of Unionization in the United States: What Can be Learned from Recent Experience?," *Journal of Labor Economics* 8(1) January 1990: pp. S75-S105.

"The Role of Arbitration Costs and Risk Aversion In Dispute Outcomes," *Industrial Relations* 29(3), Fall 1990: pp. 361-384. (with Margaret A. Neale and Max H. Bazerman)

"Medical Malpractice: An Empirical Examination of the Litigation Process," *Rand Journal of Economics* 22(2), Summer 1991: pp. 199-217. (with Michelle J. White)

"Is Arbitration Addictive? Evidence from the Laboratory and the Field," *Proceedings of the Forty-fourth Annual Meeting of the Industrial Relations Research Association*, 1992, pp. 402-410. (with Janet Currie)

"An Experimental Comparison of Dispute Rates in Alternative Arbitration Systems," *Econometrica* 60(6), November 1992: pp. 1407-1433. (With Orley Ashenfelter, Janet Currie, and Matthew Spiegel)

"Union Membership in the United States: The Decline Continues," in *Employee Representation: Alternatives and Future Directions*, Bruce Kaufman and Morris Kleiner, editors. Industrial Relations Research Association, 1993. (with Alan B. Krueger)

"The Incidence and Costs of Job Loss: 1982-1991," *Brookings Papers on Economic Activity: Microeconomics*, 1993: pp. 73-132.

"A Comparison of Formal and Informal Dispute Resolution in Medical Malpractice," *Journal of Legal Studies*, June 1994: pp. 777-806. (with Michelle J. White)

## Published Papers (cont'd)

"The Analysis of Inter-Firm Worker Mobility," *Journal of Labor Economics*, October 1994: pp. 554-593.

"Forming Beliefs about Adjudicated Outcomes: Risk Attitudes, Uncertainty, and Reservation Values," *International Review of Law and Economics*, 1995 : pp. 289-303. (with Linda Babcock, Cynthia Fobian, and Eldar Shafir)

"Polities and Peace," *International Security*, Fall 1995: pp. 123-146. (with Joanne Gowa). Reprinted in Debating the Democratic Peace, Michael E. Brown, Sean M. Lynn-Jones, and Steven E. Miller, eds. MIT Press, 1996.

"Learning and Wage Dynamics," *Quarterly Journal of Economics* 111 November 1996: 1007-1047. (With Robert Gibbons)

"Common Interests or Common Polities? Reinterpreting the Democratic Peace," *Journal of Politics* 59 May 1997: 393-417. (with Joanne Gowa)

"The Litigious Plaintiff Hypothesis: Case Selection and Resolution," *Rand Journal of Economics* 28 1997 : S92-S112. (with Theodore Eisenberg)

"The Changing Face of Job Loss in the United States, 1981-1995," *Brookings Papers on Economic Activity: Microeconomics*, 1997: 55-128.

"Trends in Long-Term Employment in the United States: 1979-1996," in *Third Public GAAC Symposium: Labor Markets in the USA and Germany*, German-American Academic Council Foundation, Bonn and Washington, 1998.

"Has the Rate of Job Loss Increased in the Nineties?" *Proceedings of the Fiftieth Annual Winter Meeting of the Industrial Relations Research Association*, Volume 1, 1998: 88-97.

"Are Lifetime Jobs Disappearing? Job Duration in the United States: 1973-1993," in *Labor Statistics Measurement Issues*, John Haltiwanger, Marilyn Manser, and Robert Topel, eds., University of Chicago Press, 1998. pp. 157-203.

"Mobility and Stability: The Dynamics of Job Change in Labor Markets." In Ashenfelter and Card, eds. *The Handbook of Labor Economics*, vol 3B, pp. 2439-2484, North Holland Publishing Company, 1999.

"Changing Stock Market Response to Announcements of Job Loss: Evidence from 1970-1997," *Proceedings of the Fifty-First Annual Winter Meeting of the Industrial Relations Research Association*, Volume 1, 1999. pp. 26-34. (with Kevin Hallock).

"Alternative Employment Arrangements as a Response to Job Loss," *Journal of Labor Economics*, October 1999. pp. S142-S169.

"Capital Markets and Job Loss: Evidence from North America," *Wirtschafts Politische Blatter*, 1999. pp. 573-577. (with Kevin Hallock).

"Recent Trends in Employer-Sponsored Health Insurance Coverage: Are Bad Jobs Getting Worse?" *Journal of Health Economics*, January 2000. pp. 93-119. (with Helen Levy).

## Published Papers (cont'd)

"Trends in Long-Term Employment in the United States: 1979-1996," in Estreicher, ed. *Global Competition and the American Employment Landscape As We Enter the 21st Century: Proceedings of New York University 52d Annual Conference on Labor*, pp. 63-98, Kluwer Law International, 2000.

"Union Success in Representation Elections: Why Does Unit Size Matter?" ' *Industrial and Labor Relations Review*, January 2001. pp. 329.348.

"Accounting for the Decline of Unions in the Private Sector, 1973-1998," *Journal of Labor Research*, Summer 2001. pp. 459-485. Reprinted in *The Future of Private Sector Uniionism in the United States* James T. Bennett and Bruce E. Kaufman, eds. Armonk, NY. M. E. Sharpe. (with Bruce Western)

"Ronald Reagan and the Politics of Declining Union Organization," *British Journal of Industrial Relations*, September 2002. pp. 385-401. (with Bruce Western)

"The Government As Litigant: Further Tests of the Case Selection Model," *American Law and Economics Review*, 2003. (with Theodore Eisenberg)

"Can Increased Organizing Reverse the Decline of Unions in the U.S.? Lessons from the Last Quarter Century," in *Changing Role of Unions: New Forms of Representation*. P. Wunnava, ed. M.E. Sharpe, 2004. pp. 323-361. (with Bruce Western)

"Job Loss in the United States, 1981-2001," *Research in Labor Economics* 23 (2004), pp. 69-117.

"Is Tomorrow Another Day? The Labor Supply of New York City Cab Drivers," *Journal of Political Economy* 113 (February 2005), pp. 46-82.

"Nonunion Wage Rates and the Threat of Unionization," *Industrial and Labor Relations Review* 58 (April 2005), pp. 335-352.

"What do we know about Job Loss in the United States? Evidence from the Displaced Workers Survey, 1981-2004," *Economic Perspectives*, Federal Reserve Bank of Chicago (Second Quarter, 2005), pp. 13-28.

"Union Membership in the United States: The Divergence between the Public and Private Sectors," in *Collective Bargaining in Education: Negotiating Change in Today's Schools*, Jane Hannaway and Andrew J. Rotherham, eds. Harvard Education Press, 2006, pp. 27-51.

"Is the 'Company Man' an Anachronism? Trends in Long Term Employment in the U.S." in *The Price of Independence*, Sheldon Danziger and Cecilia Rouse, eds. Russell Sage, 2007, pp. 56-83.

"Reference Dependent Preferences and Labor Supply: The Case of New York City Taxi Drivers," *American Economic Review*, June 2008: pp. 1069-1082.

"Short(er) Shrift — The Decline in Worker-Firm Attachment in the United States," in *Laid Off, Laid Low: Political and Economic Consequences of Employment Insecurity*, Katharine S. Newman, ed. New York, Columbia University Press, 2008. pp. 10-37.

**Published Papers (cont'd)**

"The Changing Relationship Between Job Loss Announcements and Stock Prices, 1970-99,"
    *Labour Economics*, January 2009: 1-11. (with Kevin Hallock).

"Job Loss and the Decline in Job Security in the United States," in Katharine G. Abraham,
    James R. Spletzer, and Michael Harper, eds. *Labor in the New Economy*. U. of Chicago
    Press, 2010.

"Labor Market Monopsony," *Journal of Labor Economics*, April 2010: 203-210. (with Orley
    Ashenfelter and Michael R. Ransom)

**Published Reviews, Comments, and Short Surveys**

Review of *The Future Impact of Automation on Workers* by Wassily Leontief and Faye
    Duchin. in *Science*, May 23, 1986: pp. 1022-1023.

Review of *What Do Unions Do?* by Richard B. Freeman and James L. Medoff in *Journal of
    Economic Literature*, December 1986: pp. 1842-1844.

Comments on Dissertation Roundtable Session, *Proceedings of the Thirty-ninth Annual Meet-
    ing of the Industrial Relations Research Association*, 1986: pp. 229-231.

Comment on "Semi-parametric Estimation on Employment Duration Models" by Joel L.
    Horowitz and George R. Neumann in *Econometric Reviews*, 1987: pp. 41-54. (with
    David E. Card).

Comment on "The Impact of Firm Acquisitions on Labor" by Charles Brown and James
    L. Medoff in *Corporate Takeovers: Causes and Consequences*, Alan J. Auerbach, ed.,
    University of Chicago Press, 1988.

Comment on "FAT: The Displacement of Nonproduction Workers and the Efficiency of U.S.
    Manufacturing Industries," by Richard E. Caves and Matthew B. Kreps. *Brookings
    Papers on Economic Activity: Microeconomics*, 1993: pp. 278-282.

Comment on "Participation and Productivity: A Comparison of Worker Cooperatives and
    Conventional Firms in the Plywood Industry," by Ben Craig and John Pencavel. *Brook-
    ings Papers on Economic Activity: Microeconomics*, 1995: pp. 161-166.

Comment on "Lost Jobs," by Robert E. Hall, *Brookings Papers on Economic Activity*, 1995:
    pp. 257-262.

Response to "Democracy and Peace," by Charles S. Gochman, *International Security*, Winter
    1996/97: pp. 186-187. (with Joanne Gowa).

Response to "A Tale of Two Democratic Peace Critiques," by William R. Thompson and
    Richard Tucker, *Journal of Conflict Resolution*, June 1997: pp. 455-456. (with Joanne
    Gowa).

Comment on "International Trade and Job Displacement in U.S. Manufacturing, 1979-1991,"
    by Lori G. Kletzer, in Susan M. Collins ed.   *Imports, Exports, and the American
    Worker*, Washington, DC. The Brookings Institution Press, 1998. pp. 457-459.

Case 1:02-cv-02917-JEI   Document 569-8   Filed 08/22/13   Page 213 of 279 PageID: 18742

**Published Reviews, Comments, and Short Surveys (cont'd)**

Review of *What Workers Want* by Richard B. Freeman and Joel Rogers in *Journal of Economic Literature*, 2000. (in press).

"Trade Unions, Empirical Analysis of." *International Encyclopedia of Social and Behavioral Sciences,* Elsevier Science, 2001.

"Dispute Resolution." *International Encyclopedia of Social and Behavioral Sciences,* Elsevier Science, 2001.

Comment on "The U.S. Health Care System and Labor Markets," by Brigitte C. Madrian, in Jane Sneddon Little, ed. *The Challenge of Reforming the U.S. Health Care System*, Boston. The Federal Reserve Bank of Boston, 2007. pp. 165-172.


**Unpublished Papers**

"Product Demand and Union Wage Behavior: The Case of Bituminous Coal." Presented at the Atlantic City Meeting of the Econometric Society, September 1976.

"Relative Wages, Union Membership, and Job Queues: Econometric Evidence Based on Panel Data," July 1978, (with John M. Abowd). (Revision of paper presented to the Econometric Society, New York, December 1977).

"An Analysis and Evaluation of Final Offer Arbitration," Working Paper No. 242, Department of Economics, M.I.T., May 1979.

"Mechanisms for Settling Public Sector Labor Disputes: A Comparative Evaluation of Conventional Arbitration and Final-Offer Arbitration," August 1979.

"Are Quits and Firings Actually Different Events: A Competing Risk Model of Job Duration," July 1980. Presented at the Denver Meeting of the Econometric Society, September 1980.

"An Analysis of Hicks' Theory of Industrial Disputes," July 1980. Presented at the Denver Meeting of the American Economic Association, September 1980.

"Divergent Expectations, Threats Strategies, and Bargaining under Arbitration," June 1981. Presented at the San Diego Meeting of the Econometric Society, June 1981.

"The Determination of Negotiated Wage Changes: A Reference Wage Approach," September 1981.

"The Demand for Union Representation," Working Paper No. 295, Department of Economics, M.I.T., February 1982.

"The Union Status of Jobs: Some Preliminary Results," December 1982. Presented at Conference on Labor Economics, Hoover Institution, January 1983.

"The Political Economy of Labor Unions," October 1983.

"Product Market Competition, Union Organizing Activity, and Employer Resistance," Working Paper No. 551, Department of Economics, MIT, April 1990. (With John M. Abowd)

## Unpublished Papers (cont'd)

"Evaluating Competing Theories of Worker Mobility," Final Report submitted to U.S. Department of Labor, Bureau of Labor Statistics, March 1992.

"The Relationship Between Quality of Care and Liability in Medical Malpractice," mimeo, June 1992. (with Michelle J. White)

"The Role of the Panel Study of Income Dynamics in the Analysis of Labor Force Dynamics," mimeo, October 1994. (prepared at the request of the Board of Overseers of the Panel Study of Income Dynamics)

"The Changing Face of Job Loss in the United States, 1981-1993," Working Paper No. 360, Industrial Relations Section, Princeton University, March 1996.

"Job Creation in the United States: Good Jobs or Bad?," Working Paper No. 385, Industrial Relations Section, Princeton University, July 1997.

"Job Loss and Long-Term Employment in the U.S., 1981-1997. Report submitted to U.S. Department of Labor, November 1999.

"Round Up the Usual Suspects: The Decline of Unions in the Private Sector, 1973–1998." Working Paper No. 437, Industrial Relations Section, Princeton University, April 2000.

"Notes on the Economics of Labor Unions," Working Paper No. 452, Industrial Relations Section, Princeton University, May 2001.

"Job Loss in the United States, 1981-1999," Working Paper No. 453, Industrial Relations Section, Princeton University, June 2001.

"What's a Dropout to Do? Coping with the Deterioration of the Low-Skilled Labor Market," Working Paper No. 467, Industrial Relations Section, Princeton University, July 2002. (with Leah Platt)

"Labor Market Adjustment to Globalization: Long-Term Employment in the U.S. and Japan," Working Paper No. 519, Industrial Relations Section, Princeton University, September 2007.

"Increasing Voter Turnout: Is Democracy Day the Answer?" Working Paper No. 546, Industrial Relations Section, Princeton University, February 2009.

"Rational Choice and Voter Turnout: Evidence from Union Representation Elections," Working Paper No. 552, Industrial Relations Section, Princeton University, October 2009.

" Job Loss in the Great Recession: Historial Perspective from the Displaced Workers Survey." Working Paper No. 564, Industrial Relations Section, Princeton University, May 2011.

**Sworn Testimony**
**In the Past Five Years**
**10/12/2012**
**Henry S. Farber**

1. Hearing testimony, before the National Labor Relations Board in the matter of New York University, employer, and GSOC/UAW, petitioner.  Case 2-RC-23481, January 2011.

2. Deposition testimony, Clarke et al., v. Baptist Memorial Healthcare et al., USDC Western District of Tennessee, 2:06-cv-02377-MaV, September 2008

3. Deposition testimony, Milwaukee County v. Mercer Human Resources Consulting, Inc., Eastern District of Wisconsin, 06-CV-00372-CNC, March 2008.

4. Deposition testimony, Fleishman et al., v. Albany Medical Center et al., USDC Northern District of New York, 06-CV-0765, January 2008

5. Deposition testimony, Maderazo et al., v. VHS San Antonio Partners et al., USDC Western District of Texas, 06-CA-0535, January 2008

6. Testimony as a witness at a Daubert Hearing, Birda Trollinger, et al, v. Tyson Foods, Inc., et al., USDC Eastern District of Tennessee, 4:02-CV-23, November, 2007.

7. Deposition testimony, Birda Trollinger, et al, v. Tyson Foods, Inc., et al., USDC Eastern District of Tennessee, 4:02-CV-23, October, 2007.

**APPENDIX B**

**DOCUMENTS CONSIDERED**

-B2-

# SENIORITY LIST MERGERS

**Negotiated Merges**

1. Supplemental Agreement Between Delta Airlines, Inc. and The Air Line Pilots in the service of Delta Air Lines Inc. as Represented by The Air Line Pilots Association, International, Delta Acquisition of Pan American Assets, 1991.  ALPA 055476-055497.

2. Agreement between Alaska Airlines, Inc. and the Air Line Pilots Association International, August 14, 1990 (ALPA055392 – ALPA055402) (In Arbitration Report of Richard I. Bloch, Jet America Airlines and Alaska Airlines.).

3. Letter of Agreement between Piedmont Aviation, Inc. and the Air Line Pilots in the Service of Piedmont Aviation, Inc. as Represented by the Air Line Pilots Association International, Empire Merger, February 12, 1986 (ALPA055237 – ALPA055244).

4. Seniority Integration Agreement between Southwest Airlines Co. and AirTran Airways, Inc., April 14, 2011 (ALPA055791 – ALPA055805, duplicate under ALPA055862 - ALPA055876).

5. Side Letter 9: Complete Integration of AirTran Pilots into Southwest Airlines Operation, July 29, 2011 (ALPA055806 – ALPA055838).

6. Questions and Answers Regarding Side Letter 9 to the SWAPA-Southwest CBA, (ALPA055839 – ALPA055846).

7. Letter of Agreement between AirTran Airways, Inc. and the Air Line Pilots in the Service of AirTran Airways, Inc. as Represented by the Air Line Pilots Association, Intl., Merger-Related Modifications to Collective Bargaining Agreement  (ALPA055847 – ALPA055852, duplicate under ALPA055895 – ALPA055900).

8. Letter of Agreement between Southwest Airlines Co., AirTran Airways, Inc., Seniority List Integration Dispute Resolution, July 22, 2011 (ALPA055853 – ALPA055861, duplicate under ALPA055901 - ALPA055908).

9. Side Letter 10: Complete integration of AirTran Pilots into Southwest Airlines Operation, September 22, 2011 (ALPA055877 – ALPA055886).

10. Questions and Answers Regarding Side Letter 10  to the SWAPA-Southwest CBA, (ALPA055887 – ALPA055894).

11. Agreement between United Air Lines, Inc. and the Air Line Pilots in the Service of United Air Lines, Inc. as Represented by the Air Line Pilots Association International, United Air Lines and Pan Am (Pacific Division), January 8, 1986 (ALPA055221 -  ALPA055223).

12. Agreement Respecting Integration of Certain Pilots of Pan American World Airways into United Airlines Pilots Seniority List, November 7, 1985 (ALPA055224 – ALPA055232).

13. Letters from David Pringle, Senior Vice President of Human Resources, United, to UAL/ALPA MEC Merger Committee and Pan Am/United ALPA Merger Committee, December 13, 1985 (ALPA055233 – ALPA055236).

14. Merger Agreement between American Eagle Airlines, Inc., Executive Airlines, Inc., Business Express Airlines, Inc. and the Airline Pilots in the service of American Eagle Airlines, Inc., Executive Airlines, Inc., Business Express Airlines, Inc. as represented by The Airline Pilots Association International, Business Express Airlines Transition Agreement, 1999. (ALPA 056149 – ALPA 056224)

15. Merger Agreement between Braniff, Inc. and The Air Line Pilots in the service of Braniff, Inc. as represented by The Air Line Pilots Association, International, Florida Express Merger, 1988. (ALPA 056101 – ALPA 056116)

16. Merger Agreement between Braniff, Inc. and The Air Line Pilots in the service of Braniff, Inc. as represented by The Air Line Pilots Association, International, Florida Express Merger, 1989. (ALPA 056117 – ALPA 056123)

**Arbitration Reports**

17. Arbitration Report of Jerome H. Ross in Continental Airlines, Inc./People Express, 1991.

18. Arbitration Report of M.G. Picher in Air Canada/Air Nova/Air Alliance/Air Ontario/Air B.C./NWT Air, 1995.

19. Arbitration Report of Herbert Fishgold in United Airlines/Pan American World Airways (European Routes), 1991.

20. Arbitration Report of Thomas T. Roberts in Northwest Airlines/Republic Airlines, 1989.

21. Arbitration Report of Donald R. Munroe, Q.C. in Canadian Airlines/Wardair, 1990.

22. Arbitration Report of George Nicolau in Federal Express/Flying Tigers, 1990 - Opinion.

23. Arbitration Report of George Nicolau in Federal Express/Flying Tigers, 1990 – Award.

24. Arbitration Report of J.R.P. Horn, Promotion and Seniority Rights of Pilots Employed by Air New Zealand Limited, 1980.

25. Expert Witness Report of David E. Feller, Promotion and Seniority Rights of Pilots Employed by Air New Zealand, David E. Feller, 1980.

26. Arbitration Report of David E. Feller, Alaska International Air Inc. - Great Northern Airlines Inc., 1982.

27. Arbitration Report of David E. Feller, Canadian Pacific Airlines- Eastern Provincial Airways, 1986.

28. Arbitration Report of Martin Teplitsky, Canadian Pacific Airlines Master Executive Council – Nordair Master Executive Council - Pacific Western Master Executive Council - Eastern Provincial Master Executive Council,1987.

29. Arbitration Report of George Nicolau, Continental Airlines- Frontier Airlines, 1987.

30. Arbitration Report of Richard I. Bloch, Continental Airlines- New York Air, 1986.

31. Arbitration Report of Marcia L. Greenbaum et al, Texas International Airlines, Inc. Pilot Group- Continental Air Lines, Inc. Pilot Group, 1983.

32. Arbitration Report of David E. Feller, Delta Air Lines Pilots Merger Representative- Western Air Lines Merger Representative, 1989.

33. Arbitration Report of Laurence E. Seibel, Flying Tiger Lines, Inc. - Seaboard World Airlines Inc., 1981.

34. Arbitration Report of Sam Kagel, USAir Pilots-Piedmont Pilots, 1988.

35. Arbitration Report of Richard I. Bloch et al, Pilots of Republic Airlines Inc. - Pilots formerly employed by Hughes Air-West, Inc., 1981.

36. Arbitration report of Lewis M. Gill, Merger of Flight Deck Crew Member Seniority Lists, Pan American World Airlines and National Airlines, 1981.

37. Arbitration Report of Theodore J. Vass, Southern Airways, Inc. - North Central Airlines Inc., 1980.

-B4-

38. Arbitration Report of M.G. Mitchnick, Air Canada Pilots' Association- Air Line Pilots Association (representing Canadian Airlines Merging Committee), 2001.

39. Arbitration Report of M.B.Keller et al, Air Canada Pilots' Association- Air Line Pilots Association (representing Canadian Airlines Merging Committee), 2003.

40. Canada Industrial Relations Board Reasons for Decision, Air Canada Pilots' Association- Air Line Pilots Association, July 10 2002.

41. Arbitration Report of Richard I. Bloch, Jet America Airlines and Alaska Airlines, April 15, 1989 (ALPA055355 – ALPA055387).

42. Supplementary Opinion of Richard I. Bloch, Jet America Airlines and Alaska Airlines, April 23, 1989 (ALPA055388 – ALPA055391).

43. Award by Lewis M. Gill, Merger of Flight Deck Crew Member of Seniority Lists, Pan Am and National Airlines,  March 12, 1981 (ALPA055220A – ALPA055220O).

44. Arbitration Report of Dana E. Eischen, In the Matter of Seniority List Integration Arbitration, Republic Airline/Chautauqua Airlines/Shuttle America, Frontier Airlines,  Lynx Aviation, and Republic Airways Holdings, Inc., February 19, 2011 (ALPA055696 – ALPA055790).

45. Arbitration Report of Marcia L. Greenbaum, Air Line Pilots Association International Arbitration Opinion and Award in the Matter of Former Pan American World Airways Pilot Group of 42 (the London Transferees) and United Airlines, Inc. Preacquisition Pilot Group, September 23 and January 23, 1993 (ALPA055498 - ALPA055667).

46. Arbitration Report of Richard I. Bloch , In the Matter of the Seniority integration Arbitration between the  Pilots of Northwest Airlines, Inc. and the Pilots of Delta Air Lines, Inc., December 8, 2008.

47. Arbitration Report of George Nicolau, In the Matter of the Seniority Integration of the Pilots of US Airways, Inc. and the Pilots of America West Airlines, Inc.,  May 1, 2007.

48. Concurring and Dissenting Opinion by Captain James P. Brucia, Pilot Neutral , In the Matter of the Seniority Integration of the Pilots of US Airways, Inc. and the Pilots of America West Airlines, May 1, 2007.

49. Arbitration Report of James F. Scearce, Airtran Holdings, Inc. d/b/a AirTran Airways – National Pilot's Association – Donald Warzocha, et al., 1999 (Valujet – AirTran). (ALPA 056225 – ALPA 056252 and ALPA 056253 – ALPA 056254)

**Reported Federal Decision**

50. Air Wisconsin Pilots Protection Committee v. Sanderson, 909 F.2d 213 (7th Cir. 1990)

**Other**

51. Merged Seniority List, American/Air Cal merger.  ALPA 055354-A - 055354-HHHH.

## LEGAL DOCUMENTS

52. *Brady, et al.  v. Air Line Pilots Assoc.*, Second Amended Restated Complaint, January 27, 2003.

53. *Brady, et al.  v. Air Line Pilots Assoc.*, Jury Verdict, July 13, 2011.

54. *Brady, et al.  v. Air Line Pilots Assoc.*, Plaintiffs' First Request for Production of Documents Directed to Defendant ALPA on the Issue of Damages

55. *Brady, et al.  v. Air Line Pilots Assoc.*, Memorandum of Defendant Air Line Pilots Association, Int'l in Support of its Motion for Summary Judgment (March 12, 2009)

56. *Brady, et al.  v. Air Line Pilots Assoc.,* Plaintiffs' Memorandum of Law in Opposition to Defendants Motion for Summary Judgment.

57. *Brady, et al.  v. Air Line Pilots Assoc.,* Trial Tr. Volume 1, pp. 1-175 (June 7 2011).

58. *Brady, et al.  v. Air Line Pilots Assoc.,* Trial Tr. Volume 10, pp. 1-21 (June 23 2011).

59. *Brady et al v. Air Line Pilots Association et al.,* Trial Tr. Volume 18, pp. 1-155 (July 11 2011).

60. *Brady et al v. Air Line Pilots Association et al.,* Trial Tr. Volume 19, pp. 1-115 (July 12 2011).

**ELECTRONIC DOCUMENTS**

**Seniority List Calculations:**

61. Copy of Seniority List.xls  - received from Counsel

62. build_sen.do

63. sen_bot_staple.do

64. sen_bot_staple_lb.do

65. sen_bot_staple_ub.do

66. outsheet_bot_staple.do

67. outsheet_bot_staple_lb.do

68. outsheet_bot_staple_ub.do

69. AA.csv

70. TWA.csv

71. sen_list1.csv

72. sen_list2.csv

73. sen_list3.csv


**Mean Ranks Calculations:**


74. mean ranks over seven mergers.xlsx

75. Mean Ranks 1.xlsx

76. Mean Ranks 2.xlsx

77. Mean Ranks 3.xlsx

78. AA AirCal.xlsx

79. AE1-BEX2 ranking.csv

80. Alaska1-GN2 ranking.csv

81. meanranks  4.xlsx

82. meanranks.do

83. VJ1-AT2 sim.csv

## ACADEMIC ARTICLES

84. Ashenfelter, Orley C., *Arbitration and the Negotiation* Process, The American Economic Review, Vol. 77, No. 2, May 1987.

85. Bloom, David E and Cavanagh, Christopher L., *An Analysis of the Selection of Arbitrators*, The American Economic Review, Vol. 76, No. 3, June 1986.

86. Oaxaca, R., "Male-Female Wage Differentials In Urban Labor Markets**",** International Economic Review, Vol. 14, No. 3, (1973).

87. Healy, P.M, Kang,S-H, Palepu, K.G. "The Effect of Accounting Procedure Changes on CEO's Cash Salary and Bonus Compensation". Journal of Accounting and Economics 9 (1987).

88. Ashenfelter, O. and Bloom, D., "Lawyers as Agents of the Devil in a Prisoner's Dilemma Game," NBER Working Paper No. 4447, (1993).

89. Farber, H. ``Nonunion Wage Rates and the Threat of Unionization," Industrial and Labor Relations Review 58 (April 2005).

90. Staiger, D, Spetz, J, Phibbs, C. "Is There Monopsony in the Labor Market?  Evidence from a Natural Experiment.". Journal of Labor Economics, (2010).

## OTHER DOCUMENTS

91. Asset Purchase Agreement Between American Airlines, Inc. as Purchaser and Trans World Airlines, Inc. as Seller, January 9, 2001.  ALPA 013296-013374.

92. AMR Corporation Annual Report on Form 10-K, for Fiscal Year Ended December 31, 2002, page 16.

93. P-20-ALPA-policy.pdf, September 1998.

94. Warwick, Graham, "Delta studies mini Pan Am service," *Flight International,* August 7-13, 1991.

95. Warwick, Graham, "Delta makes a difference," *Flight International,* August 21-27, 1991.

96. Neumann, A., *Airline Mergers and Labor Integration Provisions Under Federal Law*, Information Brief, Minnesota House Of Representatives Research Department ,  St. Paul, MN, June 2008

97. *Standard Allegheny Mohawk Labor Protective Provisions*, Published at 59 C.A.B. 45.

98. http://mba.tuck.dartmouth.edu/ccg/commentaries/Anatomy_TWA.html, accessed on October 10 2012.

99. US mergers.pdf

100.     ALPA008497 – ALPA08498

101.     ALPA008500

102.     ALPA006032 – ALPA006036

103.     ALPA006052

104.     ALPA023652

105.     ALPA004671 – ALPA004678

106.     ALPA023658 – ALPA023659

107.     ALPA006061 – ALPA006062

108.     P00438 – P00450

109.     ALPA021078 – ALPA021079

110.     ALPA001808 – ALPA001827

-B7-

111.   ALPA004748 – ALPA004756
112.   ALPA004757 – ALPA004758
113.   ALPA001507 – ALPA001524
114.   ALPA011621 – ALPA011638
115.   P04631 – P04643

# Exhibit 60

                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
                    CAMDEN VICINAGE
                    CIVIL ACTION NO. 02-2917 (JEI)


PATRICK BRADY, et al.,

                                    Plaintiffs,

          vs.

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
                                    Defendant.



                    ------------------

                     January 22, 2013

                    ------------------


                         Oral sworn deposition of HENRY
FARBER, ASHFELTER & ASHMORE, 32 Nassau Street,
Princeton, New Jersey  08540, was taken at the law
office of Archer & Greiner, 700 Alexander Park,
Princeton, New Jersey, before Jean B. Delaney,
Certified Shorthand Reporter and Notary Public of
the State of New Jersey, on the above date,
commencing at 9:43 a.m., there being present:


          GREEN JACOBSON, P.C.
          BY: ALLEN P. PRESS, ESQUIRE
          7333 Forsyth Boulevard
          St. Louis, Missouri  63105
          (314) 862-6800
          Attorneys for Plaintiff

          TRUJILLO, RODRIGUEZ & RICHARDS, LLC
          BY: LISA RODRIGUEZ, ESQUIRE
          258 Kings Highway East
          Haddonfield, New Jersey  08033
          (856) 795-9002
          Attorneys for Plaintiff


     D E G N A N  &  B A T E M A N ,  I N C .

Page 3

1               I N D E X
2    Witness                        Page
3    HENRY FARBER
4       By Mr. Toal                   6
5           E X H I B I T S
6
7    Marked for I.D.                 Page
8    Farber-1   Expert report          6
9    Farber-2   Report of Rikk Salamat    13
10   Faber-3   Salamat's calculation of    52
11         damages based on Farber model
12   Farber-4   Copy of the jury verdict     87
13   Farber-5   TWA pilot seniority        104
14         integration summary
15   Farber-6   Document from Tuck Business   164
16         School regarding TWA merger
17   Farber-7   Deposition transcript of John   177
18         Darrah
19   Farber-8   Testimony of Jeff Brundage    182
20   Farber-9   Deposition transcript of Don   187
21         Carty
22   Farber-10   Document regarding Flying    234
23         Tigers Airlines and Seaboard
24         World Airlines
25   Farber-11   Letter dated July 18, 2001   244

Page 4

1          between Ed White and Michael
2    Day
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          VIDEO SPECIALIST:  Today is
2    January 22nd, 2013, and we are here in Princeton,
3    New Jersey, and this is the videotaped deposition of
4    Henry Farber, taken by the plaintiff -- I'm sorry --
5    the defendant, in the matter of Brady, et al. versus
6    Air Line Pilots Association, filed in United States
7    District Court, Court of New Jersey, Camden
8    Vicinage, number 02-2917.  My name is Jim Bateman
9    from Degnan & Bateman, and I'm the certified legal
10   video specialist.  The certified court reporter is
11   Jean Delaney, also from the same firm.
12         We are now going on the record and the
13   time is 9:43.  Would counsel please announce their
14   appearances for the record.
15         MR. TOAL:  Dan Toal from Paul, Weiss,
16   Rifkin, Wharton & Garrison on behalf of defendant,
17   ALPA.  With me is my colleague, Julie Romm.
18         MR. KATZ:  I'm Daniel Katz of the
19   Washington D.C. law firm, Katz & Ranzman,
20   representing defendant, ALPA.
21         MR. PRESS:  Allen Press is here for the
22   plaintiffs.
23         MS. RODRIGUEZ:  Lisa Rodriguez, also
24   for the plaintiffs.
25         VIDEO SPECIALIST:  Would the court

Page 6

1    reporter please swear in the witness.
2          HENRY FARBER, having been duly sworn,
3        was examined and testified as follows:
4          VIDEO SPECIALIST:  You may proceed.
5    BY MR. TOAL:
6       Q    Good morning, Professor Farber.
7       A    Good morning.
8          (Farber-1  Expert report marked for
9        identification.)
10   BY MR. TOAL:
11      Q    I'm going to mark for you a copy of
12   your expert report you submitted in this case.
13      I'm going to mark this document as Farber
14   Exhibit-1.  If you could, tell me if this is, in
15   fact, your expert report.
16      A    It appears to be my report.
17      Q    Okay.  And is that your signature on
18   the bottom of page 22 of this report?
19      A    Yes.
20      Q    This -- this report contain all the
21   opinions that you intend to offer in this case?
22      A    Yes.
23      Q    Do you have any current plans to do
24   more work in connection with this case?
25      A    No current plans unless more

Page 7

1   information is made available that is relevant.
2       Q    And what sort of information do you
3   contemplate might be made available that would be
4   relevant?
5       A    Well, there could be information on --
6   I imagine if someone showed me a relevant
7   arbitration award that we had not seen.  But I have
8   -- I have no current plan to do any further work.
9       Q    And do you have any current plans to
10  offer any opinions that are not reflected in this
11  report?
12      A    No.
13      Q    Since the time you submitted this
14  report on October 12th, 2012, have you done any
15  additional work?
16      A    No.
17      Q    Now, are you expressing in your report
18  any opinion on the quantity of damages that you
19  claim the members of the class sustained?
20      A    Quantity in dollars?
21      Q    Yes.
22      A    No.
23      Q    Do you have any opinion on the -- the
24  quantity of damages that you say members of the
25  class sustained in terms of dollars?

Page 8

1       A    No.
2       Q    Do you have any opinion on what the
3   proper methodology would be for trying to quantify
4   in dollar terms the -- the damages that you say
5   members of the class sustained?
6           MR. PRESS:  I object to the form of the
7   question.  He has no opinion on that.  If you're
8   asking him to sit here and think about the issue and
9   articulate the opinion, he can't do that, and I
10  object to the form of the question.
11          THE WITNESS:  I have not formulated any
12  opinion on that, no.
13  BY MR. TOAL:
14      Q    Have you thought about what the proper
15  methodology for quantifying damages would be?
16      A    I have not done any analysis, no.
17      Q    Is there any reason that in your report
18  you don't attempt to quantify damages to the members
19  of the class?
20      A    Yes.
21      Q    And what's that reason?
22      A    I was not asked to do that.
23      Q    Were you asked not to do that?
24      A    I was -- I was -- I -- I did what I was
25  asked, and I was not asked to calculate dollar

Page 9

1   damages.
2       Q    And my question to you is whether you
3   were asked not to try and quantify the damages that
4   you say were sustained by the class.
5       A    No.  No.
6       Q    Is that something you believe you would
7   be able to do given your qualifications?
8       A    Yes.
9       Q    And how would you go about doing that?
10          MR. PRESS:  I object to the form of the
11  question.
12          THE WITNESS:  I've not thought about
13  that.
14  BY MR. TOAL:
15      Q    Can you think about it now?
16      A    It might take a while.
17      Q    How long do you think it would take?
18      A    I mean, that -- frankly, it could take
19  days.  I just -- it's -- it's not a straightforward,
20  at least for me it wouldn't be a straightforward
21  issue.  I -- I think what I did in my report is an
22  important piece of that.  Ultimately I could talk to
23  you about the theory of how one calculates damages
24  in a case like this.  But without further work, it
25  would be speculation.

Page 10

1       Q    Well, based on -- as -- as you sit here
2   today, what thoughts, if any, do you have on how you
3   would take your report and proceed from that report
4   to attempt to quantify damages?
5           MR. PRESS:  Let me object to the form
6   of the question.  You asked this now two or three
7   times, and he told you that it is a complex issue
8   and you're asking him to speculate.
9           THE WITNESS:  I -- I don't have any
10  specific thoughts as I sit here today.
11  BY MR. TOAL:
12      Q    Do you have any general thoughts as you
13  sit here today?
14          MR. PRESS:  Object to the form of these
15  questions.  It's outside of what he was asked to do.
16          MR. TOAL:  Counsel, you're doing
17  speaking objections.
18          MS. RODRIGUEZ:  No, no, no.
19          MR. TOAL:  You can just object to the
20  form of the question.
21          MR. PRESS:  Well, I'm going to tell you
22  what's wrong with the form so you can ask a proper
23  question.  I'm sorry, Dan, but that's the way that I
24  object, and I object to these.  You are asking him
25  to speculate, and he's already told you that.

Page 11

```
 1        THE WITNESS:  What I would tell you in
 2   general terms would not be -- would not be specific
 3   to this case at all.  It would be just in general.
 4   I can talk to you about how I think about damages in
 5   a case.  Do you want me to do that?
 6   BY MR. TOAL:
 7        Q    Do you have thoughts about how you
 8   would quantify damages in a case like this, whether
 9   general or specific?
10        A    The only general thought I would offer
11   is that in -- in a case like this, the first order
12   of business would be to ask what would have happened
13   but for the alleged bad act, in this case, the
14   failure of duty fair representative to say what
15   would have the earnings of the pilots have been.
16   And I would start by that because seniority is such
17   an important component of their earnings in figuring
18   out what the seniority, the merged seniority list
19   would have looked like.  From that, I would have
20   used that as an important component of calculating
21   damages.
22        Q    And do you have any thoughts about how
23   you would determine if any given pilot had increased
24   seniority, what they would have done with that
25   seniority?  Is there any methodology you are aware
```

Page 12

```
 1   of that would allow you -- allow you to determine
 2   that?
 3        MR. PRESS:  I object to the form of
 4   these questions.  Again, you are asking this witness
 5   to speculate about things he hasn't considered.
 6        THE WITNESS:  I have not thought about
 7   that question.
 8   BY MR. TOAL:
 9        Q    Do you have any experience quantifying
10   damages in a case like this?
11        A    I can't answer that.  I -- I would
12   like -- you need to define the question better.  I
13   -- do I have any -- I have experience calculating
14   damages in cases, yes.
15        Q    And do you believe if you had
16   additional time to think about the question that you
17   would be able to develop a methodology for
18   quantifying damages in a case like this?
19        A    Yes.
20        Q    You reviewed the report submitted in
21   this case by Rikk Salamat?
22        Rikk Salamat.
23        MS. RODRIGUEZ:  S-A-L-A-M-A-T.
24        (Farber-2  Report of Rikk Salamat
25        marked for identification.)
```

Page 13

```
 1        MR. TOAL:  I would mark as Farber
 2   Exhibit-2, a copy of the report submitted by Rikk
 3   Salamat.
 4   BY MR. TOAL:
 5        Q    Can you tell me if you've ever seen
 6   that report before?
 7        A    No.
 8        Q    Were you aware that there was another
 9   expert that had been retained by plaintiffs in this
10   case?
11        A    I -- I learned that last week.
12        Q    Had you known that at the time you were
13   working on your report, would you have wanted to see
14   that expert's report before submitting your own?
15        A    No.
16        Q    Are you aware of any methodology in
17   economics that would allow you to quantify the
18   likelihood that if circumstances had been different,
19   that an agreement between two parties would have
20   been reached?
21        MR. PRESS:  I object to that question.
22   I'm sorry.
23        THE WITNESS:  Can you repeat the
24   question, please?
25   BY MR. TOAL:
```

Page 14

```
 1        Q    Did you understand the question?
 2        A    No.
 3        Q    Okay.  Are you aware of any methodology
 4   in the field of economics that would allow you to
 5   determine and quantify the likelihood that if
 6   circumstances had been different, that two parties
 7   who did not reach an agreement, would have reached
 8   an agreement?
 9        A    I can't answer that question.
10        Q    Why not?
11        A    It is too vague.  I -- I don't even
12   know if circumstances had been different.  That can
13   be different in so many ways.  I can't answer that
14   question.
15        Q    Are you aware of any methodology in the
16   field of economics that would allow you to quantify
17   the probability that any two parties would reach an
18   agreement?
19        A    It is still too vague.  Agreement about
20   what?  Where to go to dinner?  What?
21        Q    Are -- are you aware of any methodology
22   that would allow you to predict the likelihood or
23   determine the probability that an agreement would be
24   reached in any -- any field?
25        A    Yes.
```

1    Q   And -- and what -- what methodologies
2  are you aware of that would allow you to do that?
3    A   Well, I've done some work myself on
4  strike activity.  For example, in the labor -- I'm a
5  labor economist, and strike activity in the labor
6  area, you can look at -- I've done -- there is work
7  done on -- in law and economics on the likelihood of
8  a case settling or going to trial.  I've done some
9  of that.  There is models -- there are bargaining
10  models in economics that speak to the question of --
11  of why there are -- why there are disputes that
12  depend on things like asymmetric information.  It
13  depends on the cost to both sides of disputing
14  relative to what they would get if there was -- if a
15  dispute was settled.
16    Q   And do those methodologies allow you to
17  quantify the probability that agreement between two
18  two parties would be reached in those fields?
19    A   With the right data available,
20  sometimes.
21    Q   Do you believe that you would be able
22  to quantify the probability that had there been no
23  alleged breach of the duty of fair representative by
24  ALPA in this case, that the TWA MEC and the Allied
25  Pilots Association would have been able to reach an

1  agreement on a seniority integration list?
2       MR. PRESS:  I object to the form of the
3  question.
4       THE WITNESS:  No.
5  BY MR. TOAL:
6    Q   Are you aware of any methodology in the
7  field of labor economics that would allow you to do
8  so?
9    A   Would I have unlimited time and access
10  to resources to perform such an analysis?
11    Q   You -- you would have whatever time the
12  judge allowed you to --
13    A   That's a different question.
14    Q   -- before you needed to submit your
15  expert report.
16    A   That's a different question.  If you
17  ask -- I'm not going to tell you what question to
18  ask, but -- let's just say that's a very hard
19  problem.
20    Q   Do you believe that within the context
21  of this case that you would be able to quantify the
22  probability that an agreement between the TWA MEC
23  and the Allied Pilots Association with regard to
24  seniority integration would have been reached had
25  there been no alleged breach of the duty of fair

1  representative?
2    A   No.
3       MR. PRESS:  I object to the form of the
4  question.
5  BY MR. TOAL:
6    Q   And your answer was?
7    A   No.
8    Q   Is there any published research that
9  you are aware of that would allow you to determine
10  the likelihood that two unions would have agreed on
11  seniority integration absent alleged breach of the
12  duty of fair representation?
13    A   No.
14    Q   Were you made aware how the results of
15  your expert report were to be used in the context of
16  this case?
17    A   Yes.
18    Q   And what were you told about that?
19    A   I was told they would be used in
20  calculating the damages.
21    Q   And did you know who would be
22  calculating those damages?
23    A   No.
24    Q   Did you know how those damages would be
25  calculated based on the work that you had done --

1  the work that you had done?
2    A   No.
3    Q   Were you interested to know how your
4  work was going to be used in an effort to calculate
5  damages?
6    A   Yes.
7    Q   Did you make any inquiries about how
8  that would be done?
9    A   No.
10    Q   Why not?
11    A   It wasn't what I was asked to do.
12    Q   You agree that the manner in which
13  pilots use their seniority ranking -- withdrawn.
14      Do you agree that pilots make individual
15  choices as to how to use seniority ranking?
16    A   Yes.
17    Q   Have you done any work in the airline
18  industry?
19    A   No.
20    Q   Prior to this case, you hadn't?
21    A   That's correct.
22    Q   And had you done any work concerning
23  seniority integration prior to this case?
24    A   No.
25    Q   Did you do any -- any analysis to

1    determine how much variation there is in income of
2    pilots within similar seniority rankings?
3        A    No.
4        Q    Would it be important for you to know,
5    if you are attempting to quantify damages based on
6    an alternative seniority list, how much variation
7    there was in income among pilots with similar --
8    similar seniority levels?
9        A    I haven't thought about it.  I was not
10   asked to do that.
11       Q    And as you think about it now, is that
12   something that would be important for you to know?
13       A    I don't know.
14       Q    In your report you attempt to quantify
15   a best estimate of what an alternative seniority
16   list would have looked like in this case; correct?
17       A    Yes.
18       Q    And you also calculate something that
19   you refer to as upper and lower bounds for what
20   seniority lists in this case would have looked like;
21   correct?
22       A    Yes.
23       Q    Are you able -- are you able to say
24   what the likelihood was that in the absence of any
25   breach of the duty of fair representation, that the

1    list you propose as your best estimate would have
2    come about?
3        A    Can you repeat the question, please?
4            (The court reporter read back the
5        pending question as follows:
6            "Question:  Are you able -- are you
7        able to say what the likelihood was that in
8        the absence of any breach of the duty of fair
9        representation, that the list you propose as
10       your best estimate would have come about?")
11       THE WITNESS:  Yes.
12   BY MR. TOAL:
13       Q    And what is -- what is the likelihood
14   that the list you propose would have come about?
15       A    Well, I have to -- when you say the
16   list I propose, something -- there is thousands of
17   names on the list.  And when you say the list I
18   propose, there could be some slight differences.
19   There's also factored -- how -- I would say it is
20   quite likely that the list I proposed or something
21   quite similar would have -- would have come out.
22       Q    Okay.  Can you quantify the likelihood
23   that a list as -- such as the one you propose or one
24   that is substantially similar would have come about?
25       A    Let me -- let me reframe my answer.  I

1    know -- in term -- if -- if you want a precise --
2    when you say likelihood, if you want a probability
3    like .6 or .7 or .8, the answer then to my earlier
4    question should have been no, I can't do that.
5        Q    Can you quantify the probability that
6    any alternative list that was produced in this case
7    would have been somewhere between your upper and
8    lower bounds?
9        A    Without knowing what the particular
10   list was, I can't -- I couldn't know the answer to
11   that.  I -- I do not -- I don't know.  I haven't
12   seen any alternative lists.
13       Q    But you -- you developed an upper and
14   lower bound; correct?
15       A    Yes.
16       Q    And you -- you come up with, in between
17   those bounds, what you view as your best estimate of
18   what an alternative list would have looked like;
19   correct?
20       A    Yes.
21       Q    So what I'm asking is whether you can
22   quantify the likelihood that whatever alternative
23   list would have come about in the absence of a
24   breach of the duty of fair representation by ALPA
25   would have been somewhere between the upper and

1    lower bounds that you set out.
2        A    I can't quantify that probability.
3        Q    Can you say that it is greater than
4    50 percent, that -- that any list would have been
5    between the upper and lower bounds that you propose?
6        A    No.
7        Q    Do you know how much Mr. Salamat
8    calculated your model would yield in damages?
9        A    No.
10       Q    Let me direct your attention to Farber
11   Exhibit-2, which is Mr. Salamat's report.
12       Do you have that in front of you?
13       A    Yes.
14       Q    I will come back to that.
15       Let me direct your attention to page 10 of
16   Mr. Salamat's report.  And if I -- I could ask you
17   to take a look at figure 3, which is a -- entitled
18   linear model of probabilities.  Do you see that?
19       A    Yes.
20       Q    Do you see in this chart that
21   Mr. Salamat is aggregating probabilities which he
22   defines as increased probabilities that an agreement
23   would have been reached?
24       A    I don't understand his figure at all.
25   I don't know what it is.  I would have -- I don't

Page 35

1    A    My report assumes that -- that there
2  would have been a merged seniority list. I agree
3  that the two ways I can think of sitting here to
4  reach such a merged list are a negotiated agreement
5  or an arbitration, but I am not making any
6  assumption one way or the other on that. I'm simply
7  assuming there would have been a merger of the
8  seniority lists.
9    Q    Well, didn't you agree that a merged
10  seniority list could also come about through a
11  unilateral decision by the APA?
12    A    I don't -- I don't -- I have no view of
13  that. I don't -- I don't -- my view -- my view is
14  to -- this would start out as a negotiation between
15  the APA and ALPA.
16    Q    And as between a list that is
17  unilaterally decided by the APA, a list that is
18  negotiated, or a list that is determined by
19  arbitration, are you expressing any view as to the
20  likelihood of any of those three possibilities?
21    A    My understanding of the negotiation
22  process is -- is that had ALPA performed its duty of
23  fair representation, there would have been -- the
24  process would have started with a negotiation
25  between APA and ALPA.

Page 36

1    Q    Whether that's true or not, are you
2  expressing any view as to the likelihood of a
3  negotiated result, an arbitrated result, or a
4  unilaterally determined seniority list by the APA?
5    A    By definition, once they start
6  negotiating, if they reach an agreement, it is a
7  negotiated agreement.
8    Q    And if they negotiate and it is
9  unsuccessful, then they've got to come up with some
10  other way to determine what the seniority list is
11  going to be. So my question to you is, whether
12  you are expressing an opinion on the likelihood of
13  any of those three possibilities for how a merged
14  seniority list could come about.
15    A    I'm suggesting that unilateral
16  imposition is not an option I'm considering.
17    Q    And why is that?
18    A    Because there is a negotiation that
19  would take place. Even -- even an arbitrated
20  solution takes place after negotiation.
21    Q    Are you aware of any reason why in this
22  case there could not have been a unilateral decision
23  by the APA with regard to the seniority integration
24  list?
25    A    I have not seen any evidence in the

Page 37

1  industry in the -- quite a number of cases we looked
2  at where there had been a unilateral imposition.
3    Q    Do you know what Supplement CC is?
4    A    Yes.
5    Q    And what is that?
6    A    Supplement CC, as I understand it, is
7  an addendum to the -- to some agreement which
8  specifies how the seniority lists will be merged in
9  the American/TWA case.
10    Q    And how is that determined?
11    A    I don't know precisely. I -- I don't
12  know.
13    Q    Do you have an understanding that
14  Supplement CC was determined unilaterally by the
15  APA?
16        MR. PRESS: I object to the form of the
17  question.
18        THE WITNESS: I -- I don't know.
19  BY MR. TOAL:
20    Q    Let me direct your attention to Farber
21  Exhibit-2, which is Mr. Salamat's report.
22    A    Okay.
23    Q    And if you could take a look at page 21
24  of this report.
25        Do you see here, Mr. Salamat, figure eight,

Page 38

1  has a list of post deregulation mergers?
2    A    Okay.
3    Q    And do you see in the last column under
4  arbitrator, he either lists an arbitrator, lists an
5  agreement or lists unilateral?
6    A    Yes.
7    Q    So as to the mergers that he designates
8  as unilateral, do you have any reason to dispute
9  that the seniority integration list in those cases
10  were determined unilaterally?
11    A    I have no idea how this was come up
12  with. I just don't know. I have no opinion.
13    Q    Okay. If you -- if you knew as a
14  matter of fact that the APA had the ability
15  unilaterally to determine what the merged seniority
16  integration list would look like, would that affect
17  your analysis in any way?
18    A    No.
19    Q    Why not?
20    A    Because in a -- I don't think you start
21  a negotiation with the assumption that the person
22  you are negotiating with has unilateral authority.
23  In no sense is that a negotiation. So I start from
24  the view that they will -- had ALPA performed its
25  duty of fair representation, there would have been a

Page 39

1  negotiation.  APA may come into that negotiation
2  with the view that their contract gives them a
3  unilateral right.  That doesn't necessarily give
4  them the unilateral right.  I would have done
5  exactly the same.  In fact, my analysis is
6  predicated -- my analysis is not predicated on, but
7  my analysis understands that APA does have this
8  clause in their contract just like TWA had a clause
9  in their contract; TWA pilots had a clause in their
10  contract.  And how that would play out in
11  negotiation where both parties are ably -- ably
12  represented is something that, you know, it is hard
13  to speculate on.  And the best you could do is the
14  analysis I did.
15       Q     But you have an understanding that the
16  provision in the TWA collective bargaining agreement
17  with regard to arbitration of seniority integration
18  disputes was waived; correct?
19       A     Yes.
20       Q     And I'm asking you to assume just as a
21  matter of fact that the APA had the unilateral
22  ability to determine what a seniority integration
23  list would look like.  With that assumption, would
24  that affect your analysis in any way?
25            MR. PRESS:  I object to the form.  He's

Page 40

1  already answered the question, and I object to your
2  incomplete hypothetical.
3            THE WITNESS:  You -- you prefaced your
4  hypothetical with the statement that TWA had waived
5  the right to arbitration.  And my -- I'm going to
6  proceed from the view that that was due to ALPA's
7  failure to represent -- that waiver by ALPA was a
8  big part of their failure to represent adequately
9  the TWA pilots.  Therefore, I -- I can't -- I don't
10  know what to do with -- with the view that the APA
11  thought it had unilateral authority.  If you want to
12  tell me as -- is your -- let me ask you a question.
13  Is your hypothetical that, forget the bargaining,
14  forget everything.  God came down and gave the APA
15  the unilateral right to choose what the seniority
16  list would be?  Is that --
17  BY MR. TOAL:
18       Q     Yes.  Would that affect your analysis
19  in any way?
20       A     Yes.  Because if I were asked to say
21  what would have happened had the APA -- had the --
22  had ALPA performed its duty of fair representation,
23  I would have said even ALPA's not more powerful than
24  God, and God came down and gave the APA the
25  unilateral right, and it would have been different,

Page 41

1  sure.
2       Q     And in what way would it have been
3  different?
4       A     I -- I don't know.
5       Q     Well, in that event, would you have had
6  to have taken into account the possibility that no
7  negotiated agreement between the TWA MEC and the APA
8  would have been reached?
9            MR. PRESS:  No, wait.  Let's be clear
10  on what event you are describing because he just
11  described an event where God came down and powered
12  the union.  If that's part of your hypothetical,
13  that's an okay question.  If not, I object to the
14  form of it.
15            THE WITNESS:  Once God gives APA the
16  power, there is no negotiation.
17  BY MR. TOAL:
18       Q     So let's say, instead of God coming
19  down, American Airlines had said, we will do this
20  transaction if, and only if, the arbitration
21  provision as seniority integration is waived by
22  or on behalf of TWA pilots.  In that event, would it
23  be necessary for you to take into account the
24  possibility that no negotiated result would have
25  been reached?

Page 42

1       A     My analysis does take into account the
2  fact that no negotiated result would have been
3  reached.
4       Q     But the only alternative you consider
5  is that an arbitrated result would be reached;
6  correct?
7       A     That's the only one I -- I can
8  enumerate here, but I take no stand on exactly how
9  the merged seniority list would have been
10  considered -- what the process that led to the
11  merged seniority list being constructed would have
12  been.  I simply say there would have been a merged
13  seniority list.
14       Q     Right, but you don't take into account
15  in your analysis the possibility that the APA could
16  unilaterally determine what the merged seniority
17  list would look like; correct?
18       A     I don't accept that as a premise,
19  that's correct.
20       Q     And if you did accept that as a
21  premise, how would your analysis change, if at all?
22            MR. PRESS:  Well, how -- how would he
23  know that?  I object to the form.
24            THE WITNESS:  Your -- your hypothetical
25  now is the APA can impose whatever list they want.

BY MR. TOAL:

1   Q  My hypothetical is there are at least
2 three options available for -- for determining what
3 a merged seniority integration list would look like.
4 One is the parties could agree to arbitrate the
5 dispute. Two is that the parties could negotiate
6 and try and reach an agreement consensually. And
7 three is that the APA had the ability to determine
8 what the merged list would look like. So if all
9 three options were available, would that affect your
10 analysis?

11   MR. PRESS: I'm just going to object.
12 You are asking incomplete hypotheticals over and
13 over again. This one is seriously flawed. But
14 subject to that, you can answer.

15   THE WITNESS: I -- I honestly don't
16 know how to answer that question. The -- I can't
17 just assume that the APA -- here is the problem.
18 Negotiation and arbitrations are part of a process.
19 It is not as if, well, you do this or you do this,
20 or there is a unilateral. A unilateral imposition
21 is simply -- is that, again, you are back to the God
22 scenario. So either we have the God scenario or we
23 don't. I've told you that if we have the APA power to
24 scenario where God can -- gives the APA power to

1 impose what they want, yes, that would affect my
2 analysis.

3   If they -- if I was approached to say you have
4 to accept that the APA can impose what they want,
5 and it has nothing to do with ALPA's failure to
6 fairly represent the TWA pilots, I would say, how --
7 what's there to do? We understand that.

8   What I'm saying is, we live in a world where
9 had ALPA not failed in its duty of fair
10 representation, you have a bargaining process. At
11 the end of the day, the bargaining process might
12 have arbitration. Okay? And, you know, I -- I
13 proceed from there.

14 BY MR. TOAL:

15   Q  So when you say if the APA had the
16 ability to determine what the merged seniority list
17 would look like unilaterally, what's there to do, do
18 you mean that there would be no damage in that case?

19   MR. PRESS: Well, I object to the form
20 of the question. He told you that they did not have
21 that power.

22   MR. TOAL: Allen, would you stop with
23 the speaking objections and trying to coach your
24 witness?

25   MR. PRESS: No, I'm not. I'm trying

1 to -- object to the form of the question. It is
2 only so good.

3   MR. TOAL: All right. We are going to
4 speak to the judge later today, so --

5   THE WITNESS: Can you repeat the
6 question, please?

7   (The court reporter read back the
8 pending question as follows:

9   "Question: So when you say if the APA
10 had the ability to determine what the merged
11 seniority list would look like unilaterally,
12 what's there to do, do you mean that there
13 would be no damage in that case?")

14   MR. PRESS: I object to the form of the
15 question in that it mischaracterizes the witness's
16 prior testimony.

17   THE WITNESS: Here is -- what I mean to
18 say is, if you assume a hypothetical where no matter
19 what ALPA did, the APA would have the right to
20 unilaterally impose what they wanted, then, indeed,
21 in that case, there would not be damages. If --

22 BY MR. TOAL:

23   Q  And if instead of God coming down and
24 giving this power to the APA, it was a power derived
25 from the American Airline asset purchase agreement

1 and the law, would your answer be the same?

2   MR. PRESS: I object to the form of the
3 question. It mischaracterizes the evidence in the
4 prior trial.

5   THE WITNESS: No.

6 BY MR. TOAL:

7   Q  Why not?

8   A  Because no one, in fact, we've not
9 lived in the world where TWA's pilots -- the ALPA --
10 ALPA did not waive the right to arbitration. We
11 don't know what American, in fact, would have done.
12 We don't know whether TWA would have continued and
13 -- and continued to fly, and had other suitors,
14 other ways to get resources and so on. So it's --
15 the hypothetical that simply says that what if we --
16 now you are closer to describing the world we live
17 in, which is American made statements that said if
18 you want to continue with this, you got to get your
19 pilots to waive their right to arbitration. But had
20 they not waived the right to arbitration, I'm -- I'm
21 assuming that TWA would continue to fly.

22   Q  You -- you are making that assumption?

23   A  Yes. I'm -- I'm -- I'm assuming that
24 that's not like God giving the APA power.

25   Q  So in your mind there is a difference

1    Q    That's -- when I calculated it, it was.
2    A    I have not done that calculation.
3    Q    Okay.  Do you -- do you think it would
4  be appropriate to discount any quantification of
5  your model by the -- the probability that an
6  agreement would have been reached between the TWA
7  MEC and the APA?
8    A    I really have no opinion about
9  Mr. Salamat's methodology.  I have not read what he
10  has done.  I've not studied it.  I really can't tell
11  you whether it's appropriate or not.
12    Q    I'm really asking about your
13  methodology and whether you think it would be
14  appropriate to -- to discount any quantification
15  that's derived from your model by the likelihood
16  that an agreement would have been reached.
17    A    You mean a negotiated agreement?
18    Q    A negotiated agreement.
19    A    No.
20    Q    What about by a combination of the
21  likelihood of a negotiated or an arbitrated
22  agreement?
23    A    You need to understand, again, that I
24  believe that a merged seniority list would have
25  emerged with probability one.  However it was done,

1  there would have been a merged seniority list, so
2  there is no discounting to be done.
3    Q    Do you deny that one of the
4  possibilities for creation of a merged seniority
5  list was that the APA would determine what list to
6  implement?
7    A    What I'm saying is that my whole -- my
8  analysis is based on the idea that what would have
9  happened in this case is basically what happened on
10  average in a set of comparable cases.  And,
11  therefore, I'm -- I'm -- I'm not making any
12  assumption at all about the mechanism.  And as a
13  result, I'm simply calculating a list and
14  saying this is -- if we did -- not we, but if the
15  TWA/American seniority lists were merged in a way
16  that looked a lot like what happened in the
17  comparable cases on average, here is what we would
18  have gotten.  I'm not opining at all about how to
19  calculate -- how to convert my list into a dollar
20  figure.  I can't discount a list.
21    Q    My question is whether your -- in your
22  analysis, you are excluding the possibility that the
23  APA could determine unilaterally what the merged
24  seniority integration list would look like.
25    A    I'm not making an assumption about that

1  one way or the other.
2    Q    So if the APA could have implemented a
3  list unilaterally, doesn't that require you to
4  adjust your figure based on the possibility that no
5  arbitrated or negotiated list would have been
6  reached?
7    A    No.
8    Q    Why not?
9    A    Because what I'm saying is that in
10  the -- what I'm saying is, in a world, in the
11  hypothetical world where ALPA did not violate its
12  duty of fair representation, what would have
13  happened is what happened on average in the seven
14  cases.  This is the expectation.  In those
15  comparable cases, too, there was some chance that
16  there could be a unilateral imposition, and there
17  wasn't or there was, I don't know.  And it's
18  simply -- I'm simply saying my estimate is an
19  estimate of the mean.  I don't need to discount the
20  mean.  This is what happened in comparable cases.
21    Q    But the comparable cases you look at
22  are only arbitrations; correct?
23    A    Oh, no.  I think there is one case
24  that's not.
25    Q    Okay.  Did you look at -- did you try

1  and calculate the proportional difference in means
2  from negotiated lists?
3    A    What you'll see in -- in -- in table
4  one, in my report, is a list of the cases that we
5  were able to calculate our statistic for.  And I
6  know at least one of our seven comparables was
7  negotiated.  I don't know -- I honestly don't know
8  about the rest --
9    Q    So --
10    A    -- as I sit here.  I could find out.
11    Q    So if you had information concerning
12  negotiated lists, do you think they would be
13  appropriate for inconclusion in your analysis?
14    A    Yes.
15    Q    And if you had information for lists
16  that were determined unilaterally, would those be
17  appropriate for inclusion in your analysis?
18    A    Yes.  Again, inclusion in my analysis
19  in terms of table one, would it be listed in table
20  one, yes.  And the question of would it be made into
21  the comparables, that depends on the -- on the other
22  factors.  But certainly whether it is arbitrated or
23  negotiated, or even imposed, that would -- that
24  ought not to be a relevant factor.
25    Q    Do you have any expertise in assessing

Page 63

```
 1   what would have happened in the absence of a breach
 2   of a duty of fair representation?
 3        A    No.
 4        Q    You are not offering any expert
 5   opinions on what would have happened in the absence
 6   of a breach by ALPA of their duty of fair
 7   representation; correct?
 8        A    No.  That's not correct.
 9        Q    Are you offering opinions about what
10   would have happened?
11        A    That's exactly what my list is.  It is
12   an estimate of what would have happened absent
13   ALPA's breach of their duty of fair representation.
14        Q    And what -- what permits you to offer
15   an expert opinion about what would have happened in
16   the absence of a breach of duty of fair
17   representation?
18        A    You are asking what -- on what basis do
19   I do that?
20        Q    Yeah.
21        A    Okay.  I'm using -- I'm using a common
22   method in -- in economics, and labor economics in
23   particular, when there is -- while that comes not
24   from breach of duty of fair representation, but --
25   but there is allegations of some difference --
```

Page 64

```
 1   difference in treatment, difference in behavior, and
 2   you are saying what would have happened absent this
 3   difference of treatment.
 4        The simplest possible example is imagine sex
 5   discrimination in pay.  Women earn less than men.
 6   We want to know what women would earn had they had
 7   not been discriminated against in pay.  The best
 8   thing you do is to say, well, let's find either a
 9   place where women are not discriminated against and
10   look at their pay there, or let's find men in
11   similar jobs and ask what they are paid there, and
12   say that's what women would have earned but for the
13   bad act, the discrimination.
14        So all -- all I'm really doing is taking that
15   approach of comparing outcomes here where there is
16   some allegation of some illegal behavior, to another
17   situation where there isn't, and -- and looking at
18   the difference -- the differences between those two.
19   And, you know, I've done this before.  Labor
20   economists do this in their work all the time.  It
21   is commonly accepted as a technique for
22   understanding the -- the effects of certain
23   behaviors.
24        Q    So your sample includes arbitrated
25   results in one negotiated result; correct?  Your
```

Page 65

```
 1   sample of seven?
 2        A    I believe so.  I would have to
 3   double-check.
 4        Q    Those are the ones that you -- those
 5   are the ones that you determined to be comparable;
 6   correct?
 7        A    That's correct.
 8        Q    Did you assess in which of those cases
 9   the union representing the pilots of the acquiring
10   airline had the ability unilaterally to determine
11   what the seniority list would look like?
12        A    No.
13        Q    And do you know whether, in any of
14   those cases, the pilots of the acquiring airline had
15   a unilateral ability to determine what the seniority
16   list would look like?
17        A    No, I don't.
18        Q    And to the extent that in this case the
19   APA did have the unilateral ability to determine
20   what the list would look like, the seven
21   transactions in your sample would not be comparable,
22   at least in that respect; correct?
23        A    No.
24        MR. PRESS:  I object to the form of the
25   question.  It's an incomplete hypothetical.
```

Page 66

```
 1        THE WITNESS:  I don't accept the view
 2   that the APA had the right unilaterally to impose
 3   the terms.  They had a contract that said they had
 4   the right, but they -- they needed to engage in a
 5   negotiation, which they could have well waived that
 6   right.  And it's -- so I -- I honestly don't
 7   understand the hypothetical.
 8   BY MR. TOAL:
 9        Q    Well, I -- I understand that you
10   disagree that the APA -- APA had the right to impose
11   a list unilaterally.  If you assumed that they did,
12   however, then at least in that respect, the
13   American/TWA transaction would not be comparable to
14   the seven transactions that you determined to be
15   comparable on your list; correct?
16        A    I'm -- I'm going to come back to the
17   God example.  If, in fact, God gave the APA the
18   right to do whatever the heck they wanted, and they
19   didn't -- and that's the way the world was, then --
20   and there was nothing anyone could do about it, no
21   ALPA, no anyone could do anything about it, then
22   that would make it sui generis.
23        Q    You -- you said you are assuming that
24   the APA had to participate in negotiations; is that
25   correct?
```

Page 67

1     A     I said all I'm assuming -- all I'm
2  assuming is that had ALPA not shirked its duty of
3  fair representation, that the outcome would have
4  been similar on average -- to what happened on
5  average in these other cases.  I'm not making any
6  particular assumption about process at all.
7     Q     And why do you assume that the result
8  would have been equal to the average as opposed to
9  any other point, any other particular transaction on
10 your list?
11    A     Because the average -- again, I'm --
12 I'm going to go back to the -- to the established
13 scientific basis for how we do these things, which
14 is simply we say, look, what we have to do is say,
15 what do we expect -- what do we expect to have
16 happened in this case.  And the way what we expect
17 to have happened is you take the average of what
18 happened in the set of comparable situations, or
19 what do we expect this person to earn, this woman to
20 earn.  It is what ten similarly situated men earned
21 for doing the same work, in the same industry, et
22 cetera.  And while it is true there can be some
23 variation and this person might earn a little bit
24 more or a little bit less, I'm giving you my best
25 estimate.  It is an estimate.  It is not an edict

Page 68

1  that says this is exactly what it will be, but this
2  is an estimate.
3     Q     And, indeed, even between your
4  settlement's calculations of your lower and upper
5  bounds, there is a $500 million difference between
6  the two; correct?
7     A     I would have to -- I would have to look
8  at the numbers again.  Where is that?
9     Q     It's in Farber Exhibit-3, page two.
10    A     Yes.  $500 million between the upper
11 bound and the lower bound.
12    Q     Now, if you turn to your report, which
13 is Farber Exhibit-1, you have an appendix B.
14    A     Yes.
15    Q     And does Exhibit-B contain all the
16 documents that you reviewed in connection with the
17 preparation of your report?
18    A     Yes.  I have to -- I have to -- I
19 really have to -- let me be clear on this.  I did
20 not personally review every document in this report.
21 I have people working for me who are under my
22 direction.  I reviewed a lot of them, but they
23 reviewed some of these, too, and reported to me when
24 they found something that was important.
25    Q     And what -- what advice -- what

Page 69

1  instruction did you give to them about which
2  findings should be reported to you and which need
3  not be?
4     A     Well, what we did was, you know, we
5  first thought about -- we read some background -- we
6  all read some background stuff.  Basically, let's
7  see if I can find -- some of the legal documents,
8  you know, the complaint, the motions, memorandums,
9  et cetera, et cetera.  And we got a feel for the
10 case, what it was about.  We thought about how are
11 we going to come up with an estimate of what would
12 have happened but for the breach of duty of fair
13 representation, and we hit -- we realized that the
14 best way to do this was to look at comparable cases.
15    So we thought, where do we get information on
16 what happened when the seniority lists were merged
17 elsewhere?  And arbitration awards turned out to be
18 right on point and also quite useful because
19 arbitrators tend to be fairly verbose and give a lot
20 of discussion of what's going on.  So we -- I read a
21 number of them.  And I said, okay, here is what we
22 want to know.  What factors are arbitrators saying
23 they are considering?
24    By the way, another important document for us
25 was the ALPA merger policy which talked about the

Page 70

1  factors that ought to be considered in -- in merging
2  seniority lists, which is a document that's not
3  directly applicable because it is about -- I believe
4  it is mostly meant to be about mergers between two
5  airlines that are both -- whose pilots are both
6  represented by ALPA, but it nonetheless lists a set
7  of factors that arbitrators seem to have adopted in
8  many cases even when both airlines are not ALPA
9  airlines.
10    And we realized our -- and as I went through
11 this -- I'm giving you a long answer, I know.
12 What -- what the arbitrators were talking about is a
13 whole set of factors that led them to shade their
14 decision in favor of one airline or the other,
15 having to -- and so I asked my people, when you are
16 reading this, we need to be able to figure out
17 merger by merger, what the -- you know, where things
18 stood with regard to the two airlines on these
19 factors.  You have to look for direct statements
20 about these factors.
21    Then I said, we also need to have a metric, a
22 number, so I need to get mergers where -- where I
23 have enough information on the merger process to be
24 able to calculate a summary statistic of the merged
25 lists.  In other words, that's that proportional

Page 71

```
 1    mean difference statistic.  And so -- so I tasked my
 2    people with reading those reports, looking for other
 3    documents that could help give us the information on
 4    merger by merger of both the background and the
 5    outcome.
 6        Q    How much time did you personally spend
 7    reviewing these documents?
 8        A    Without consulting my time sheets, I
 9    couldn't tell you exactly how many hours I did.
10        Q    And what's your best estimate, as you
11    sit here today?
12        A    Two or three days.
13        Q    And how long were those days?
14        A    My days are normal days, you know eight
15    hours, nine hours, ten hours sometimes.
16        Q    And how much time --
17        A    When I was younger, my days were
18    longer.
19        Q    How much time did you spend on this
20    engagement overall, personally?
21        A    This past year?
22        Q    From the time you were retained until
23    --
24        A    -- this morning.
25        Q    Until today.
```

Page 72

```
 1        A    I can tell you that it's less than ten
 2    days, more than three days -- more than three days.
 3        Q    And with whom did you work when you
 4    referred to members of your staff?
 5        A    Okay.  I work with a small firm in
 6    Princeton called Ashenfelter and Ashmore, and David
 7    Ashmore is a principal of that firm, and he is -- is
 8    -- the way -- let me tell you how we operate.
 9    Basically, I'm the expert.  He runs the day-to-day
10    under my direction, and we -- and then we have a
11    staff of three Ph.D. economists.  Actually over the
12    time period this has gone on for a while, probably
13    there were four staff economists involved who did
14    the work under my oversight, David's day-to-day
15    supervision, collecting information, you know,
16    putting it in the spreadsheet, doing the calculated
17    we wanted.  You know, I would meet with the staff
18    regularly to talk about where we were, ask
19    questions.  I'd look at documents that they thought
20    were ambiguous to help them out and so on.
21        Q    Okay.  Other than the documents listed
22    on appendix B to your report, did you consider any
23    other documents?
24        A    Not that I recall sitting here now.  I
25    mean --
```

Page 73

```
 1        Q    And --
 2        A    It's hard.  You know, it wouldn't
 3    surprise me that there is something that somehow I
 4    looked at didn't make it on the list, but we tried
 5    to be quite careful about that.
 6        Q    Did you have access to other documents?
 7        A    Well, we all have access to the web.
 8    I'm not sure what you mean.
 9        Q    Did you have other -- access to other
10    documents related to this case?
11        A    I don't -- I don't quite know how to
12    answer that.  You are asking me, do I have access to
13    things I didn't look at so they didn't make it into
14    this report?
15        Q    Yeah.
16        A    I don't know.  I assume so because I
17    presume I could have asked for some things that I
18    didn't think of, and, you know, TWA pilots'
19    attorneys might have been able to give it to me, for
20    example.  I don't know.  Maybe there is some legal
21    documents.  I just don't know.
22        Q    Well, who -- who determined the
23    documents to which you would have access?
24        A    Well, as these things generally go, TWA
25    pilots and lawyers, when they retained us, started
```

Page 74

```
 1    us off with some documents that they thought we
 2    ought to look at, the complaint and so on, and the
 3    jury award.  You know, as we know, TWA has already
 4    been found guilty of their duty of fair
 5    representation, of violating their duty of fair
 6    representation.  And we then said we need these
 7    arbitration awards.  As I understand it, counsel for
 8    APA, or APA through counsel -- through counsel
 9    provided us with arbitration awards.  I think that's
10    right.  I'm sure we got them indirectly through the
11    TWA pilot attorneys.  We say we need arbitration
12    awards, and they say, okay, we know where to get
13    those for you, and they got them.  And then we did
14    some web searching to find outcomes of some other
15    cases that -- and so on.  So --
16        Q    Did you ask for any documents that you
17    weren't able to get access to?
18        A    No.  Not that I recall, I should say.
19    Not that I recall.  This is not a case where I felt
20    very frustrated by lack of availability of things.
21        Q    And you don't have a recollection of
22    asking for any other documents?
23        A    No.  That's correct.  That's correct.
24        Q    Did you review any of the filings in
25    TWA's bankruptcy proceeding?
```

1    A    No.
2    Q    Did you think that would be relevant to
3  your analysis?
4    A    I've -- I've never seen a bankruptcy
5  filing.  I'm not sure what's in them.  So it's --
6  no.  I don't think so, no.
7    Q    Was TWA's financial condition at the
8  time of the transaction with American relevant to
9  your analysis?
10    A    Yes.
11    Q    In what way?
12    A    A part -- one of the factors we
13  considered in choosing comparable merger lists was
14  the financial condition of the acquired carrier.
15  And as a result, in order to make them comparable,
16  we tried to find cases where -- with some, at a
17  crude level, similarity with TWA's financial
18  condition.  So, of course, TWA's financial condition
19  was relevant.
20    Q    And if you had determined that TWA was
21  either not flying at the time of the transaction or
22  that it imminently would not be flying, would that
23  have affected your analysis?
24    A    Potentially.
25    Q    In what way?

1    A    I don't know.  I didn't do that
2  analysis.
3    Q    But would it have -- have affected the
4  other transactions that you viewed as comparables?
5    A    Potentially, yes.
6    Q    Potentially or actually?
7    A    I would have to look at the list, but I
8  assume it would change at least some of the
9  comparables, yes.
10    Q    And did you make determinations in your
11  report based on which airlines either were not
12  flying or were at imminently at risk of not flying
13  on the one hand, and airlines that were in a
14  weakened financial condition but still flying and
15  expected to continue flying for the foreseeable
16  future?
17    A    I -- I -- I don't know what you mean by
18  foreseeable future, but were not imminently going to
19  shut down.  But were -- I mean -- I don't know what
20  it means to fly for the foreseeable future, but I
21  did make distinctions like that, yes.
22    Q    And if you had determined that TWA was
23  at risk of imminent grounding of its planes, would
24  that have caused you to shift the group of
25  comparables from those where the -- the airlines

1  either were not flying or imminently were expected
2  not to fly?
3        MR. PRESS:  Objection.  That's been
4  asked and answered.
5        MR. TOAL:  I didn't finish my question.
6  BY MR. TOAL:
7    Q    Would that have led you to change your
8  comparables to the group that was either not flying
9  or imminently expected not to fly?
10        MR. PRESS:  I object to form.  That's
11  been asked and answered.
12        THE WITNESS:  I -- I never created such
13  a group, but it would have certainly shifted --
14  would have likely shifted the set of comparables,
15  yes.
16  BY MR. TOAL:
17    Q    Did you ever calculate what the
18  proportional difference in mean ranks was for those
19  airlines where the acquired airline was either not
20  flying or was expected imminently not to be flying?
21    A    Well, table one contains the
22  proportional mean difference -- the proportional --
23  the proportional mean difference for all of the
24  airlines we were able -- for which we were able to
25  calculate it, but I never grouped them in the way

1  you are suggesting.
2    Q    Take a look at table one of your
3  report.  This is right after your signature page.
4    A    Yes, yes.
5    Q    Now, of this group, which of the
6  acquired airlines on this list fall within the
7  category of not flying at the time of the
8  acquisition or expected to stop flying imminently?
9    A    I -- I -- I honestly -- I want to say
10  Lynx, but beyond Lynx, I'm not sure.  I don't -- I
11  haven't memorized their status.
12    Q    Did you ever do an analysis of how the
13  proportional difference in mean rank for the
14  American Airline/TWA transaction compared to those
15  in which the acquired airline either was not flying
16  or was expected to stop flying imminently?
17    A    No.
18    Q    As you look at this chart, are you able
19  to make a determination about how the proportional
20  mean difference in ranks for TWA/American Airlines
21  would compare to those other airlines -- those other
22  transactions?
23    A    No, no.
24    Q    Do you agree that the proportional mean
25  rank for the American/TWA transaction is roughly

Page 79

```
1   comparable to those for the Continental/Frontier,
2   Republic/Midwest, Southwest/AirTran and
3   Republic/Lynx transactions?
4       A    Yes.
5       Q    Okay.  So you said you never -- never
6   looked at the bankruptcy filings for TWA; correct?
7       A    Correct.
8       Q    Did you ever look at TWA's public
9   filings leading up to the time of its bankruptcy?
10      A    No.
11      Q    Did you ever look at any analyst
12  reports concerning TWA at or around the time of its
13  bankruptcy?
14      A    No.
15      Q    Did you ever look at any bond ratings
16  for TWA leading up to the time of its bankruptcy?
17      A    No.
18      Can I -- can I amend an answer?
19      Q    Sure.
20      A    Only because I'm not sure what a
21  bankruptcy filing is.  You mean the papers that TWA
22  filed going into bankruptcy?
23      Q    Yeah.  Did you look at any of those?
24      A    No.
25      Q    Did you look at any of the testimony
```

Page 80

```
1   from the bankruptcy proceeding?
2       A    I looked at some.  I don't know whether
3   it was testimony or reports.  I don't think I looked
4   at testimony.
5       Q    Did you read any of the judge's rulings
6   from the bankruptcy proceeding?
7       A    No.  Now that I think about it, I
8   didn't read any documents from the proceeding.
9       I'm sorry.  I don't have anything to amend.  I
10  was thinking of something different.
11      Q    Did you read any contemporaneous press
12  coverage concerning TWA's financial condition
13  leading up to the time of its bankruptcy?
14      A    No.
15      Q    Did you read any testimony from this
16  case concerning TWA's financial condition leading up
17  to the time of its bankruptcy?
18      A    No.
19      Q    Did -- did anyone make you aware that
20  TWA's chief executive officer was deposed in this
21  case?
22      A    I -- I think I learned that at
23  breakfast this morning.
24      Q    Okay.  And what did you learn?
25      A    That he testified yesterday.
```

Page 81

```
1       Q    Did you learn anything about the
2   substance of his testimony?
3       A    Not a thing.
4       Q    Were you made aware that TWA's chief
5   financial officer was deposed in this case?
6       A    No.
7       Q    Did you read any congressional
8   testimony concerning the proposed transaction
9   between American and TWA?
10      A    I had no idea there was congressional
11  testimony.
12      Q    So the answer is no?
13      A    Yes.
14      Q    Would any of those things have been
15  helpful to your analysis?
16          MR. PRESS:  I object to the form of the
17  question.  How could he -- I object to the form of
18  the question.  Calling for speculation.
19          THE WITNESS:  Without -- without
20  knowing what's in them, I don't know.
21  BY MR. TOAL:
22      Q    Is there the possibility that any of
23  those things would have been helpful to your
24  analysis?
25          MR. PRESS:  Same objection.
```

Page 82

```
1           THE WITNESS:  There is always a
2   possibility.
3   BY MR. TOAL:
4       Q    You were trying to determine what TWA's
5   financial condition was at or around the time of the
6   bankruptcy.  Do you have views about the best way to
7   do that?
8       A    For the purpose -- for my purposes
9   here, I think I did what I needed to do.
10      Q    So not for your purposes here.  If --
11  if you were trying to understand, given your
12  background as an economist, what TWA's financial
13  condition was leading up to the time it declared
14  bankruptcy, do you have knowledge of the types of
15  sources that you would consult?
16      A    I've never studied bankruptcy.  I would
17  have to know for what purpose.  I honestly -- I
18  honestly don't know how to answer that question.
19      Q    I'm -- I'm not asking you a bankruptcy
20  question.  I'm asking you if you are trying to
21  determine TWA's financial condition --
22      A    For what purpose?
23      Q    For purposes of --
24      A    Let me get that.  I apologize --
25      Q    For purposes of understanding what its
```

Page 83

1  financial condition was prior to the American
2  Airlines transaction.
3        MR. PRESS:  I object to the form of the
4  question.  You haven't answered his problem with the
5  question.
6        THE WITNESS:  For -- for purposes of --
7  of my analysis, I really only need an answer to a
8  very narrow question, which is, would I expect that
9  they keep flying, and I satisfied myself that they
10  were flying.  And, frankly, filing for bankruptcy
11  has very little to do, if anything to do, with
12  whether you stop flying.  So, no, I don't -- I
13  haven't thought about that.
14  BY MR. TOAL:
15      Q    So my question is a little bit
16  different.  My question is, if you are trying to
17  understand what TWA's financial condition was, what
18  sources would you consult to do that?
19        MR. PRESS:  I object to the form of the
20  question for the same reasons.
21        THE WITNESS:  I would have to ask
22  somebody.  I mean, in the sense that -- in terms of
23  their detail.  I'm a labor economist, not a capital
24  economist.  So I would -- I'm not sure what I would
25  consult to get a -- a detailed picture of TWA's

Page 84

1  financial situation.
2  BY MR. TOAL:
3      Q    No idea as you sit here today?
4      A    Well, I probably would start, like
5  everyone does, I'd go on Google and I'd start
6  searching on TWA, on finances.  I imagine if I did
7  that now, even though they haven't existed for ten
8  years, I could find something.
9      Q    Okay.  But that's not something that
10  you did; correct?
11     A    That's correct.
12     Q    Do you have the expertise to assess
13  what the financial condition of a company like TWA
14  was prior to the time of the American transaction?
15     A    No.
16        VIDEO SPECIALIST:  I have ten minutes
17  before I need to stop you and flip the tape over.
18  Whenever you want to take a break.
19        MR. TOAL:  Okay.  Why don't we go off
20  the record?
21        VIDEO SPECIALIST:  The time is now
22  11:28 and this concludes tape number one.
23        (Brief recess.)
24        VIDEO SPECIALIST:  The time is now
25  11:43 and we are back on the video record.

Page 85

1  BY MR. TOAL:
2      Q    Professor Farber, when you testified
3  before the break that you were -- were excluding or
4  not accepting the possibility of a unilateral
5  determination of the seniority integration list by
6  the APA, were you also excluding the possibility
7  that the APA could determine the merge seniority
8  integration list in discussions and negotiations
9  with American Airlines?
10     A    Only American Airlines?
11     Q    Yes.  Without the participation of the
12  TWA MEC.
13     A    Yes.  Yes.
14     Q    You were excluding that possibility?
15     A    I was simply saying -- I was not -- let
16  me -- let me back -- let me say again.  I -- I don't
17  actually -- I don't actually specify the process by
18  which a merged seniority list would be reached.  I'm
19  simply saying that had ALPA not shirked its duty of
20  fair representation, the merge -- the merged
21  seniority list on average would have looked like the
22  average of those groups, of the comparable group,
23  however it was done.  Whether it was done, you know,
24  unilaterally with American Airlines, with TWA, with
25  an arbitration.  I don't specify the mechanism.  I

Page 86

1  don't need to make an assumption about that.
2      Q    Do you recognize that in order for any
3  such list to come into existence, that the APA
4  either would have had to have agreed to the list or
5  would have had to agree to arbitrate the list --
6      A    I -- as I said, I don't make an
7  assumption one way or the other about how that would
8  work.  American Airlines could -- could have put
9  pressure on the APA.  I just don't -- I just don't
10  know.
11     Q    But do -- do you have any understanding
12  of any way a merged seniority integration list could
13  come into existence without the APA either agreeing
14  to the list or agreeing to arbitrate the list?
15     A    As I sit here, I would think that
16  that's quite likely, that that would be the -- the
17  way it would happen, one of those two ways.
18     Q    And do you have any basis for saying
19  that the list that you have identified as your best
20  estimate is a list that the APA would have agreed
21  to?
22     A    Yes.
23     Q    And what is that basis?
24     A    That basis is it's the average of what
25  happened in comparable cases where presumably both

Page 87

1    sides were ably represented by their unions.
2        Q    And other than that, do you have any
3    other basis for saying that the list that you
4    identify as your best estimate is a list that the
5    APA would have agreed to?
6        A    No.
7        Q    Now, have you reviewed the jury verdict
8    in this case?
9        A    I've seen only a two-page sheet with
10   checks on it, if I recall -- if I recall correctly.
11            (Farber-4  Copy of the jury verdict
12            marked for identification.)
13   BY MR. TOAL:
14       Q    I'm going to show you a document that I
15   will mark as Farber Exhibit-4, which is a copy of
16   the jury verdict.
17       If you could, let me know if you've seen a
18   copy of that document before, please.
19       A    Yes, I have.
20       Q    And did this verdict give you insight
21   into what the jury determined the particular breach
22   of the duty of fair representation was?
23       A    No.
24       Q    Did you have any other source of
25   information as to what the jury found as the

Page 88

1    particular breach of the duty of fair
2    representation?
3        A    Well, I -- I -- I don't have any --
4    other than this, I don't have any idea about what
5    the jury found.  I do know what was alleged.
6        Q    But you don't know if the jury accepted
7    some subset of that -- those allegations or all of
8    them; correct?
9        A    As far as I can tell, this is all you
10   get from the jury, right?  You tell me.  Is there
11   more than this from the jury?
12       Q    This -- this is all I've seen.  So, is
13   it -- in response to my question, do you know
14   whether the jury agreed that everything that was
15   alleged was a breach of the duty of fair
16   representation?
17       A    No.
18       Q    Does that bear upon your analysis?
19       A    No.
20       Q    Would it affect your determination of
21   what the alternative merged seniority list would
22   have looked like through negotiation if the APA had
23   failed to do one thing that was alleged versus eight
24   things that were alleged?
25       A    No.

Page 89

1        Q    Why not?
2        A    Because as I said, my method was simply
3    to look at a set of comparable cases, and use the
4    average of those comparable cases where presumably
5    both sides were adequately represented by their
6    unions, and say this is what would have happened but
7    for whatever it was that ALPA did or didn't do.
8        Q    But you know, as a matter of fact,
9    correct, that the APA did not agree to arbitrate the
10   dispute it had with the TWA MEC over the merged
11   seniority integration list; correct?
12       A    I know that -- yes.
13       Q    And you also know that, in fact, the
14   APA did not agree to any of the merged seniority
15   lists that the TWA MEC proposed; correct?
16       A    I do not know of any list that the APA
17   accepted.  That's correct.
18       Q    So isn't it necessary to your analysis
19   that for the alternative lists that you proposed to
20   have come into being, that something ALPA did or did
21   not do would have led the APA to either agree to
22   arbitration or agree to some list that the TWA MEC
23   was proposing?
24       A    No.
25       Q    Why not?

Page 90

1        A    I'm understanding your question to mean
2    one of the lists that we saw -- one of the proposals
3    that I saw from the TWA MEC.  So that it might have
4    been a different list that they negotiated jointly
5    that they would have agreed to, not necessarily one
6    proposed by the TWA MEC.
7        Q    In any -- in any event, there would
8    have had to have been something that ALPA could have
9    done to persuade the APA to agree to a list that was
10   different from and better than Supplement CC;
11   correct?
12       A    Yes.
13       Q    And what is it that you think that the
14   -- that ALPA could have done to persuade the APA to
15   agree to a list that was better than Supplement CC?
16       A    I don't have an opinion on that.
17       Q    Can you point to anything that you
18   believe ALPA could have done to persuade the APA to
19   agree to a list that was more favorable to the TWA
20   pilots than Supplement CC?
21       A    I would suggest that they start by not
22   waiving their right to arbitration and perhaps --
23   and/or if they were going to waive their right to
24   arbitration, get something concrete in return rather
25   than simply a promise to use -- by American to use

Page 91

1   their best efforts to create a fair and equitable
2   merger of the lists.  That's --
3        Q     And if American Airlines presented its
4   deal with a condition that the -- that the TWA
5   pilots agree to waive the arbitration provision in
6   their collective bargaining agreement and present it
7   as a take-it-or-leave-it proposal, can you think of
8   anything that ALPA could have done to make it
9   unnecessary for the TWA pilots to waive their
10  arbitration protection?
11       A     I don't know.
12       Q     Can you think of anything, as you sit
13  here today?
14       A     That's not -- I'm not -- I've not
15  studied that question.
16       Q     Are you aware that TWA filed a motion
17  with the bankruptcy court to invalidate the TWA
18  pilots' collective bargaining agreement?
19       A     No.
20       Q     Would that affect your analysis?
21       A     No.
22       Q     Do you have an understanding of whether
23  that motion sought to invalidate the TWA pilots'
24  arbitration provision with respect to seniority
25  integration?

Page 92

1        A     I -- I don't -- I didn't hear -- I
2   don't understand the question.
3        Q     You have an understanding that one of
4   the objectives of the motion that TWA filed was, in
5   the event that the TWA pilots refused to waive the
6   arbitration provision regarding seniority
7   integration, that the bankruptcy court would agree
8   to invalidate it.
9        A     Do I understand that?
10       Q     Do you have that understanding?
11       A     No.  I -- I don't know.  I didn't hear
12  about that.
13       Q     And if such a motion had been filed,
14  would that affect your analysis?
15       A     No.
16       Q     Other than a waiver of the arbitration
17  provision, are you aware of any other actions that
18  ALPA could have taken that would have made the APA
19  more willing to agree to a seniority integration
20  list that was better than Supplement CC?
21       A     No.
22       Q     Have you ever spoken with any of the
23  named plaintiffs in this case?
24       A     No.
25       Q     Have you ever spoken with any member of

Page 93

1   the class in this case?
2        A     No.
3        Q     Have you spoken with any pilots at all
4   concerning this case?
5        A     No.
6        Q     Have you conducted any interviews as
7   part of your work on this case?
8        A     No.
9        Q     I would like to direct your attention
10  to page four of your report, which is Farber
11  Exhibit-1.
12       Take a look at paragraph eight of this report.
13  A sentence in the middle of that paragraph says, as
14  part of evaluating these losses, counsel for the
15  plaintiffs have asked me to analyze American's
16  acquisition of TWA and to generate an estimate of a
17  merged seniority list that would have resulted from
18  the combination of the two airlines had ALPA met its
19  duty of fair representation.  Do you see that
20  language?
21       A     Yes.
22       Q     Were you asked by counsel to estimate a
23  merged seniority list that would have resulted from
24  the combination of the airlines if ALPA had met its
25  duty of fair representation, or to estimate the list

Page 94

1   that would have resulted?
2        A     I'm not sure how to answer that.  I
3   suppose to make the sentence grammatically correct,
4   the "A" needs to be a "the" or the "would" needs to
5   be a "could", just as a matter of grammar.  So given
6   that the merged seniority list is qualified by
7   estimate of, I would say the merged seniority list.
8        Q     And to your knowledge, was anything
9   resembling the list that you propose ever discussed
10  in negotiations between the TWA MEC and the APA?
11       A     Not to my knowledge.
12       Q     Do -- do you have any reason to
13  believe, based on the bargaining history between the
14  TWA MEC and the APA, that the list you proposed
15  would have been the end result of negotiations
16  between the parties in the absence of a breach of
17  the duty of fair representation?
18       A     Yes.
19       Q     And what's the basis for that belief?
20       A     My analysis is that, on average, in
21  cases similar to this, this is the list that would
22  have resulted.
23       Q     So is it your belief that the parties
24  would have departed from the structure of the list
25  they were discussing, and instead would have adopted

Page 95

1    the list that you proposed as your best estimate?
2        A    Let's be clear. There is factored --
3    my list is essentially a starting structure of an
4    ultimate seniority list because it is quite likely,
5    as I mentioned in my report, that other factors such
6    as the fence around St. Louis, and equipment, and
7    status would result in the names on the list in the
8    order I put them being put into sub-lists that
9    reflect all that stuff.
10       Q    Okay. So --
11       A    And -- and the list -- let me say --
12   let me continue. Let me finish. And the proposals
13   that were bandied about had a lot of discussion of
14   those -- those issues, you know, differences of
15   equipment and so on, that I chose not to consider in
16   constructing my list with the understanding that the
17   list could be used as a starting framework to create
18   a -- a list that made -- took account of differences
19   and the status, and equipment, and domicile and so
20   on.
21       Q    Okay. So you are not saying that the
22   list that you proposed as your best estimate is the
23   list that a negotiation in the absence of a breach
24   by ALPA would have produced; correct?
25       A    Let me say it would -- it would

Page 96

1    probably not be the list that was written down, but
2    it -- it would be implicit in the list, in whatever,
3    you know, multipiece list they came up with would
4    essentially be derived from my list. So it is
5    not -- you know, it is not -- it is not appropriate
6    to dismiss my list and say, well, this isn't what
7    they would have come up with. In fact, it -- it is
8    important, even if they -- even if they don't think
9    about it that way, it is an important building block
10   that they use then to say, okay, let's take the, you
11   know, B767 pilots and -- and -- and what numbers are
12   they? They would take them in order off of my list.
13       Q    So, for instance, your list has no top
14   staple; correct?
15       A    That's correct.
16       Q    And based on the negotiating history,
17   was even the TWA MEC taking the position that there
18   should be no top staple on the list?
19       A    I don't know. I don't remember.
20       Q    Is that significant to your analysis,
21   what the negotiating history was?
22       A    Yes. The fact that there is no top
23   staple was a -- I mean, and I think we say this in
24   the report, at the end of the day, the model that I
25   used gives me this one number which is the

Page 97

1    proportional mean difference in ranks. In order to
2    construct a list from that, you can do it in an
3    infinite number of ways. The two that make sense
4    are a bottom staple and a ratio of the rest or a top
5    staple and the ratio of the rest. I could have just
6    as easily come up with a staple and a ratio of the
7    rest. But the bottom staple and a ratio of the rest
8    was conservative to the sense it would yield smaller
9    damages to the TWA pilots. And whenever I have an
10   arbitrary choice to make, I like to try to make it
11   in a conservative way. So the fact that there is no
12   top staple was simply a choice I made to be
13   conservative. There could have been a top staple.
14       Q    Could you have had a top staple and a
15   bottom staple?
16       A    Absolutely.
17       Q    Why didn't you construct your list that
18   way given that -- given the negotiating history
19   between the parties?
20       A    Again, because that way would have
21   yielded larger damages to TWA, and any choice I make
22   of -- in other words, once you have a top staple and
23   a bottom staple, you have a choice of how big each
24   one is, and then how big the ratio in between them
25   is. So that ultimately you have to make choices to

Page 98

1    construct the list. This is exactly why I say, you
2    know, would my list be exactly what would come out
3    person for person? It is -- it's a little bit hard
4    to say, but what we chose to do was to say we want
5    to make this comparable in overall effect to other
6    mergers in a way that's most conservative, that
7    yields the smallest damages to TWA pilots in order
8    to protect ourselves from the criticism that we are
9    simply making assumptions that make our damages as
10   large as possible. In fact, the assumptions I make
11   when I have an assumption to make are designed to
12   make damages as small as possible, and the fact that
13   they come out as large as they do when I make the
14   assumptions to make them as small as possible, is
15   testament to something. I mean, so -- that's a
16   little discursive, I understand.
17       Q    Do you recognize that, based on the
18   negotiating history between TWA, the TWA MEC and the
19   APA, there is nobody in the negotiation talking
20   about a list that wouldn't have a -- a section at
21   the top reserved to American Airlines pilots?
22       A    Let me put -- if you would like me to,
23   I will go back and construct a list with a top
24   staple, if -- if my lawyers would like me to, and
25   I'll get a big -- and then we can give it to the

Page 103

1   narrowbody pilots, and often a distinction between
2   pilots and first officers, and I would then do a
3   more nuanced list that took account of that, which
4   is -- but nonetheless I felt that the list we came
5   up with could be used once that information was
6   available.
7       Q     And what other information other than
8   status and equipment information would you need to
9   modify your list to be reflective of an agreement
10  that you think would have been reached between the
11  TWA MEC and the APA?
12      A     I would have to think hard but I'd want
13  to think, at least, about the domicile issue in
14  particular.  Even Supplement CC built some kind of
15  fence around St. Louis, which is meant to protect,
16  at least a little bit, the TWA pilots, though it is
17  fairly porous.
18      Q     What do you mean by fairly porous?
19      A     Well, there are situations in which
20  American pilots from outside can, I think the term
21  is, bump and flush TWA pilots out of St. Louis.
22      Q     What -- what do you understand those
23  situations to be?
24      A     A more -- I don't remember precisely.
25      Q     And what's your understanding of how

Page 104

1   the St. Louis fence worked under Supplement CC?
2       A     I don't really have a firm
3   understanding.  Just enough -- I read enough of it
4   to know that there are cases where, if an American
5   pilot from outside had more seniority and was -- he
6   could bid on a job in -- in St. Louis.  But I
7   don't -- I don't have a nuanced understanding of
8   Supplement CC.
9           (Farber-5  TWA pilot seniority
10           integration summary marked for
11           identification.)
12  BY MR. TOAL:
13      Q     Let me mark for you as Farber Exhibit-5
14  a -- a TWA pilot seniority integration summary of
15  Supplement CC, dated December 14, 2001, and ask you
16  if you have seen this document before.
17      A     You gave me two pieces of paper here?
18      Q     The jury verdict, I think, was the
19  exhibit we marked previously.
20      A     Oh, okay.  That's your copy.  Okay.
21  Okay.
22      I don't think I -- okay.  I've not seen this
23  before.
24      Q     Okay.  Let me ask you to direct your
25  attention to page 26 of this document.  You see at

Page 105

1   the -- the bottom of this page there is a heading
2   that says St. Louis?
3       A     Uh-huh.
4       Q     And it says, Supplement CC reserves all
5   B767-200, B767-300, B757 Captain positions in the
6   St. Louis domicile to the TWA pilots, until Morgan
7   Fisher, the last TWA pre-bankruptcy hire, and the
8   last TWA pilot hired before the American furloughs
9   in 1993 has sufficient seniority to hold a small
10  widebody Captain position somewhere in the system.
11  Do you see that?
12      A     Uh-huh.  Yes.
13      Q     Is this consistent with your
14  understanding of how the St. Louis fence was to
15  work?
16      A     Yes.
17      Q     And do you have any knowledge as to
18  whether any legacy American Airline pilot has ever
19  successfully bid into a Captain position in the
20  St. Louis domicile?
21      A     No.
22      Q     How would you -- how would you go about
23  conceptually trying to take the St. Louis fence into
24  account in modifying the best estimate seniority
25  integration list that you proposed?

Page 106

1       A     As I sit here, I don't know right now.
2       Q     Okay.  But you haven't done that in
3   your best estimate; correct?
4       A     No.  I have not.
5       Q     Do you have the expertise to do that?
6       A     I would have to think -- I would have
7   to first study the problem and see what it involves
8   before I could answer that even.
9       Q     So as you sit here today, you can't
10  tell me whether you -- whether or not you have the
11  expertise --
12      A     That's right.
13      Q     -- to take the St. Louis fence into
14  account, in -- in -- in determining a --
15      A     I mean, let me say this.  I think I --
16  I think I have the expertise.  The question is, do I
17  have the information.
18      Q     And what information would you need?
19      A     I'm not sure.  I would have to study
20  the problem to figure out the information I needed
21  to do that.
22      Q     Okay.  So as you sit here today, you --
23  you can't tell me what information you would need in
24  order to factor the St. Louis fence?
25      A     That's correct.  I could give you a

Page 107

1    start on the information, but I couldn't tell you
2    all the information.
3        Q    So as you sit here today, what
4    information are you aware of that you would --
5        A    Well, I certainly would want to know
6    the number of planes involved.  The -- the -- there
7    is also a question of are we asking the question
8    prospectively, so that sitting there in
9    January 2001, do I want to make a projection of what
10   the fence would mean?  Or do I want to look
11   retrospectively from 2012 and say what did the fence
12   mean?  Those are two different questions.
13       So I would want to know, for example, what do
14   I expect flights -- the numbers of planes domiciled
15   in St. Louis to be?  How many will be small wide
16   bodies?  How many will be other kinds of planes?
17   Interestingly, the language you had me read
18   had to do with Captains.  In fact, it was that
19   portion that I was talking about was talking about
20   junior officers.  So I would want to know all that
21   stuff.
22       And, you know, it would also require
23   information and opportunities elsewhere in the
24   American system to know what it meant for the -- the
25   American pilots to be able to not bid or bid into

Page 108

1    the St. Louis domicile.  Things like that.
2        Q    If -- if it turns out under the
3    St. Louis fence that the TWA pilots are competing
4    with one another with respect to their -- their
5    bids, would that affect your damage analysis in any
6    way?
7        A    If the -- if the -- can you repeat the
8    question?
9        Q    Yeah.  If it turns out under the
10   St. Louis fence that the legacy TWA pilots who are
11   within the St. Louis domicile are effectively
12   competing against one another with respect to their
13   bids, would that affect your analysis in any way?
14       A    That's what the seniority list is
15   about.  That -- that determines the outcome of that
16   competition.
17       Q    Just to be clear, I'm -- I'm saying
18   that they are competing only with other legacy TWA
19   pilots and not with any legacy American Airlines
20   pilots.
21       A    I understand.  That's right.  That's
22   right.  But that's what the seniority list is about.
23   There would be a seniority list, and the names on
24   the list that would be relevant for those flights
25   are the TWA names, and they would be competing with

Page 109

1    each other; and depending on the order on that list,
2    there might be American pilots in the middle there,
3    but they are irrelevant, I mean, because they can't
4    bid on those planes.
5        So I wouldn't have -- I -- I don't -- in doing
6    my analysis of the fence, I certainly would have to
7    think about how many TWA pilots there were in
8    St. Louis, yes.
9        Q    Well, let -- let me ask you to assume
10   that all the legacy TWA pilots are in the St. Louis
11   domicile.
12       A    There is no others.
13       Q    There are no others.
14       A    Okay.
15       Q    And so when they bid, they are only
16   bidding against other legacy TWA pilots.  Would that
17   affect your damage analysis in any way?
18       MR. PRESS:  I object to the form of the
19   question.
20       THE WITNESS:  No.  No.  It -- it
21   might -- I -- I come up with a list.  That's my
22   damage analysis.  It's a list, and the list can be
23   used if someone wants to take my list and figure out
24   where people are domiciled, and have a fence, and
25   specify exactly how the fence works, and play the

Page 110

1    thing out, that could be reflected in someone's use
2    of my list.
3    BY MR. TOAL:
4        Q    Would you agree that it would affect
5    the question of whether TWA pilots actually
6    sustained damage during the period that they worked
7    at American Airlines?
8        MR. PRESS:  I object to the form of the
9    question.
10       THE WITNESS:  I don't know.
11   BY MR. TOAL:
12       Q    Do you agree that Supplement CC
13   maintained the same relative order of TWA pilots as
14   had been in place at TWA?
15       MR. PRESS:  I object to the form of the
16   question.  You are completely mischaracterizing the
17   record.
18       THE WITNESS:  I don't know.
19   BY MR. TOAL:
20       Q    You don't know whether Supplement CC
21   maintained the same relative order of pilots?
22       A    I -- I -- I haven't -- I haven't read
23   it carefully and I haven't read it recently.  And
24   this is a -- a summary of it I have not seen before.
25       Q    If you could take a look at page 27 of

Page 111

1  this document.  You see the second paragraph on this
2  page says, Supplement CC also reserves the related
3  first officer positions in St. Louis to the TWA
4  pilots, while these small widebody captain and
5  narrowbody captain fences are in effect.  This is to
6  assure that the TWA pilots will continue to enjoy
7  some of the quality of life benefits they have in
8  their separate TWA operation despite their placement
9  on the integrated seniority list.
10      A   Uh-huh.  Yes.
11      Q   Is that consistent with your
12  understanding of how the St. Louis fence worked?
13      A   I don't really have a clear
14  understanding about the St. Louis -- how the
15  St. Louis fence works.  In fact, I would have to
16  read this carefully to get such an understanding.
17      Q   Do you know whether, when Mr. Salamat
18  took your model, he did anything to account for the
19  impact of the St. Louis fence on the damage figures
20  he calculated?
21      A   I have no idea.
22      Q   You agree that before anyone took your
23  model and attempted to quantify damages, that it
24  would be important to take into account the impact
25  of the St. Louis fence and any equipment and status

Page 112

1  restrictions?
2      A   I -- until I do the analysis, I don't
3  know if it would be important or not.
4      Q   And you haven't done that analysis;
5  correct?
6      A   That's correct.
7      Q   Take a look at page 14 of your report,
8  which is Farber-1.
9      See the footnote 30 at the bottom.  You say, I
10  do not have data on the duties of its pilots.  At
11  the time the seniority lists were integrated, as a
12  result, it is not possible for me to allow for this
13  factor in this estimate.  Should this information
14  become available, I may adjust my approach to take
15  advantage of these data.  Do you see that language?
16      A   Yes.
17      Q   And what did you mean when you said you
18  didn't have data on the duties of pilots?
19      A   I would have to go look at the raw data
20  again, but I believe -- let me see what -- let me
21  see where that footnote is.  Hold on.
22      Q   It's at the bottom of paragraph 39.
23      A   Uh-huh.  I didn't -- I don't have, I
24  don't think, the assignments of the pilots to
25  particular equipment, I believe.  I could be wrong

Page 113

1  about this.  I know we didn't have enough data to do
2  the full analysis.  I'm not even sure I had the --
3  had the ranks.  That I can't be sure of.
4      Q   So as you sit here today, can you tell
5  me what you had in mind when you talked about the
6  data on the duties of pilots?
7      A   Yeah.  I wanted to know what the rank
8  was and what kind of aircraft they were assigned to.
9      Q   And did you ask for that information?
10      A   I can't be sure.  I -- I -- I'm not
11  sure.
12      Q   And had you had that information, how
13  -- how would that have affected your analysis?
14      A   Well, it -- it was -- it's a decision.
15  I would of discussed it with the attorneys to decide
16  whether what they wanted from me was a list like
17  they have now, which is essentially just a rank
18  order of seniority, not taking into account status
19  or equipment, or they wanted a more fully nuanced
20  list that broke things out by category, because my
21  professional opinion was that the list I got -- had
22  I had that equipment, I would have started with the
23  same list I've got here, and then I would have then
24  simply extracted like, okay, now we are going to
25  look at wide bodies, so let's just take the subset

Page 114

1  of our list, which is widebody Captains, let's say,
2  pull them out in the same order they appear on my
3  master list, and then assign them that way, and then
4  do that with narrowbody Captains, then with widebody
5  first officers and narrowbody first officers.
6      So I -- I don't think it would have changed
7  the first part of my analysis, which is to come up
8  with the list, but it would have enabled me to take
9  the analysis further and come up with sub-lists by
10  status and equipment and maybe by domicile, and then
11  that -- that would have been just a further output
12  of my analysis.  But I basically took this analysis
13  as far as I was asked to do -- go.
14      Q   Okay.  So we were looking before at
15  paragraph eight of your report where you described
16  what your assignment was.  Do you recall that
17  paragraph?
18      A   I can read it.
19      MR. PRESS:  Which paragraph?
20      THE WITNESS:  Eight.
21      MR. TOAL:  Paragraph eight.
22      THE WITNESS:  Yes.
23  BY MR. TOAL:
24      Q   Okay.  So this is where you said you
25  were -- you were looking to generate an estimate of

Page 115

1  a merged seniority list that would have resulted
2  from a combination of the two airlines had ALPA met
3  its duty of fair representation; correct?
4      A    Yes.
5      Q    Are you aware of any generally accepted
6  economic methodology for doing that?
7      A    Yes.
8      Q    And what methodology is that?
9      A    That's the method I used.
10     Q    And have you seen proportional
11 differences in mean ranks used in any other
12 seniority integration dispute?
13     A    What I meant was that the method is the
14 method of finding a comparison group, and -- and
15 then comparing what you see with the comparison
16 group as a -- as a measure of damages, not -- I've
17 -- I've never seen anyone do anything with regard to
18 merging of seniority lists.
19     Q    Just to be clear, so your testimony is
20 you've never seen any other expert use proportional
21 difference in mean ranks in the context of a
22 seniority integration dispute; correct?
23     A    That's correct.
24     Q    Have you ever seen any arbitrator in a
25 seniority integration dispute rely on proportional

Page 116

1  differences in mean ranks?
2      A    No.
3      Q    Have you ever seen an arbitrator in a
4  seniority integration dispute even take that factor
5  into consideration in any way?
6      A    Yes.
7      Q    And in which arbitration?
8      A    I don't -- my -- my yes answer doesn't
9  mean they are looking at literally the proportional
10 difference in mean ranks, but many arbitrators --
11 several -- more than a few times you see
12 arbitrators, when they are evaluating the proposal
13 of one side or the other, say that it -- the
14 proposal of one side or the other would result in a
15 serious disparity in placement on the list between
16 the two airlines.
17     And, indeed, in most arbitrations, the
18 positions of the two parties result in a big
19 difference in average placement on the list.  And
20 all I did was simply figure out a summary way to
21 quantify that difference.
22     Q    So my question is more specific about
23 whether you've ever seen any arbitrator actually
24 calculate and use proportional difference in mean
25 ranks in the context of the seniority integration

Page 117

1  dispute.
2      A    No.
3      Q    Have you ever seen any peer-reviewed
4  research advocating the use of proportional
5  difference in mean ranks in the context of
6  seniority -- seniority integration disputes?
7      A    No.
8      Q    Do you agree that in most seniority
9  integration disputes, that the unions in question
10 are not able to reach agreement on seniority
11 integration?
12     A    I can't say -- I've not done a count so
13 I don't want to say that most but I know that in
14 many cases they do not reach agreement.
15     Q    You haven't done any analysis of how
16 frequently the parties reach agreement and how
17 frequently they don't?
18     A    That's correct.
19     Q    And what's your understanding of the
20 role the APA was to play in the process of
21 determining the integrated seniority list in this
22 case?
23     A    I consider them just like any other
24 union in a -- in a merger acquisition.  They're the
25 party representing one group of employees on one

Page 118

1  side.
2      Q    Did you undertake any analysis to
3  determine whether the best estimate list that you
4  propose would have preserved the pre-transaction
5  career expectations of the American Airlines pilots?
6      A    No.
7      Q    And you may have answered this --
8      A    Can I -- can I -- can I amend that
9  answer?
10     Q    Yeah.
11     A    Okay.  I took no direct consideration
12 of career expectations, but by choosing a list of
13 comparables in a particular way, what that does is
14 that that results in a list that's, again,
15 comparable to what would have happened with fair
16 representation, and presumably those other
17 arbitrations took account of career expectations, so
18 I would expect to get something quite reasonable in
19 the way of career expectations out of my list.
20     Q    Okay.  But my question was specific to
21 this particular case and whether you undertook any
22 analysis to determine whether the best estimate list
23 that you propose would have preserved the
24 pre-transaction career expectations of the American
25 Airlines pilots.

Page 123

1    A    APA's negotiating position?
2    Q    Yes.
3    A    Maybe.
4    Q    So why wouldn't it be important to take
5  into account the APA's views concerning TWA's
6  financial condition?
7    A    Because if -- if -- if ALPA were
8  adequately representing the pilots of TWA, this
9  would come out in negotiation. Either ALPA, with
10 the proper information, would convince the APA and
11 they would reach an agreement, or there wouldn't be
12 a merger, or there would be some other way that --
13 another way for it -- another way forward. Again,
14 all -- I'm doing something very straightforward. I
15 -- I simply say, here is what happened in similar
16 cases that should have happened here. That's all.
17   Q    Well, isn't -- isn't one of the
18 questions whether the cases that you relied upon are
19 actually similar or not?
20   A    Well, on average, they are similar.
21   Q    Well, you determined that they were
22 similar because of --
23   A    Yes.
24   Q    -- because of a judgment you made about
25 the financial condition of the airlines, the

Page 124

1  acquired airlines that you included in your sample;
2  correct?
3    A    Correct.
4    Q    And if you made a different judgment,
5  and were more pessimistic about the financial
6  prospects of TWA, you might have put together a
7  different set of comparables; correct?
8    A    That's correct.
9    Q    Did you do any -- any independent
10 analysis of TWA's financial condition at the time of
11 this transaction?
12      MR. PRESS: Didn't we just go through
13 this? It's been asked and answered.
14      THE WITNESS: I read statements -- I
15 read some material. They were flying. They were
16 flying in full -- and -- you know, I -- did I do any
17 independent analysis? No, I did not go and look at
18 bankruptcy filings or any of that.
19 BY MR. TOAL:
20   Q    But your criteria is not just whether
21 the acquired airline happened to be flying at the
22 time. You also talked about whether it was going to
23 stop flying imminently; correct?
24   A    Yes.
25   Q    So what steps did you take to determine

Page 125

1  whether TWA was expected to stop flying imminently?
2    A    I read -- as I was reading the record,
3  which was sort of the history, more of the history
4  of the case and the history of the bankruptcy, and I
5  read -- in particular, I read one paper. It's cited
6  here. I can find -- would you like me to find you
7  the reference?
8    Q    Is it the paper by a professor at the
9  Tuck Business School?
10   A    Exactly. Who -- who -- who argued, for
11 example -- you know, a key future for me was there
12 were other suitors besides American Airlines who
13 would have provided debtor-in-possession financing
14 and kept the airline operating. As a result, I
15 didn't think their shutdown was imminent.
16   Q    And which other suitors are you
17 referring to?
18   A    Carl Ichan.
19   Q    Any others?
20   A    Carl Ichan, I-C-H-A-N.
21 I would have to look at the paper again.
22 That's one -- his is a name that sticks with me.
23   Q    Is that the only one you can recall as
24 you sit here?
25   A    Yes. And they were also -- I believe

Page 126

1  they had equipment that was worth something, and
2  there were other sources of financing that they
3  perhaps could have pursued internally, if I recall
4  correctly. But, again, I don't have it memorized.
5    Q    When were you first retained in this
6  matter?
7    A    I don't actually know, remember.
8    Q    What's your best recollection?
9    A    Must be sometime in the last two years.
10 Certainly not within the last eight months or nine
11 months, but sometime between ten months ago and two
12 years ago. I just don't -- honest to God, I just
13 don't remember. I think it must have been early
14 last year.
15   Q    Early 2012?
16   A    Could be. It might be in 2011.
17 Perhaps my attorneys -- the attorneys for TWA can
18 help you out with that.
19   Q    And how much have you been paid so far
20 in connection with this assignment?
21   A    I don't know.
22   Q    Do you have a reasonable estimate you
23 can make?
24   A    Well, as I said, I think you asked me
25 earlier if I've -- if I've worked -- if I take away

1    what I worked now, maybe I got paid for three days.
2    So probably -- I probably -- I might have gotten
3    paid $20,000.
4        Q    How much?
5        A    $20,000 maybe.  I don't know.
6        Q    And how much have Ashenfelter & Ashmore
7    been paid?
8        A    I have no idea.  20,000, by the way, is
9    only -- is only the grossest estimate.  I -- I
10   honestly --
11       Q    Did you do anything to prepare for this
12   deposition?
13       A    Yes.
14       Q    What did you do?
15       A    I reread my report, both at the
16   beginning of preparation and at the end of
17   preparation.  And in between, I took a look at core
18   materials including the things like the -- many --
19   not many, but a number of the arbitration awards,
20   particularly the ones -- at -- the ones related to
21   the comparison group.  I read some other documents
22   that I thought were important -- I thought were
23   interesting and important including the article by
24   the guy at the Tuck School, Dartmouth.  The -- I
25   tried to read Supplement CC, but I didn't have a

1    nice summary like you have here.  Things like that.
2    Plus I spent a half a day with -- with the attorneys
3    talking about what the deposition might be about.
4        Q    And when was that meeting?
5        A    Last Thursday.
6        Q    Did you meet in person?
7        A    Yes.
8        Q    And who was present at that meeting?
9        A    The two attorneys here, me, and David
10   Ashmore.  Oh, and -- I'm blanking on her name.
11       Q    Another attorney?
12       A    Another attorney.  Don't tell her I
13   forgot her name.  I'm terrible at that.
14       Q    It is going to be in the transcript
15   now.
16       A    What's that?
17       Q    It's going to be in the transcript.
18       A    I know, I know, I know.  I'm so bad at
19   that.
20       Q    Were -- were you provided with any
21   assumptions on which to base your analysis?
22       A    No.  Meaning the preparation?
23       Q    No.  In the -- in the course of your
24   analysis at all, did plaintiff's counsel --
25       A    Yes, yes.

1        Q    -- instruct you to make any
2    assumptions?
3        A    Yes.
4        Q    And which assumptions did they direct
5    you to make?
6        A    They directed me to make the assumption
7    that ALPA had breached its duty of fair
8    representation, as that had been found by a court of
9    law.
10       Q    Anything else?
11       A    No.  Not that I can recall here.
12       Q    Were you asked to make any assumptions
13   about TWA's financial condition?
14       A    No.
15       Q    Were you asked to make any assumptions
16   about the likelihood that TWA would cease flying in
17   the absence of a transaction with American Airlines?
18       A    No.
19       Q    Were you asked to make any assumptions
20   about the premerger career expectations of TWA
21   pilots?
22       A    No.
23       Q    And in putting together your list, did
24   you pay attention to the pre-transaction career
25   expectations of the TWA pilots?

1        A    Say that -- please repeat that.
2        Q    In your work on this assignment, did
3    you pay attention to the pre-transaction career
4    expectations of the TWA pilots?
5        A    No.
6        Q    And did you pay attention to the
7    premerger career expectations of the American
8    Airlines pilots in constructing your list?
9        A    No.
10       Q    Did you make any assumptions in your
11   work about the value of TWA's assets to American
12   Airlines?
13       A    No assumptions.  I drew conclusions.
14       Q    And what conclusions did you draw?
15       A    That TWA brought assets that had real
16   value to the transaction.  That was one of the
17   criterion I used -- one of the criterion I used to
18   find comparables.
19       Q    And what do you mean by real value?
20       A    I mean something that American was
21   willing to pay for.
22       Q    And isn't that the case in any of these
23   transactions that there is always something that the
24   acquiring airline is willing to pay for?
25       A    Well, the question is, is it

Page 131

1  substantial, and there was -- I relied here on a
2  presentation by American which outlined the -- the
3  assets that TWA was going to bring to the -- to the
4  merger.
5      Q      And did you identify any transactions
6  in which you felt the acquiring -- the acquired
7  airline was not bringing assets of substantial value
8  to the transaction?
9      A      I believe there were some.
10     Q      And which ones can you recall?
11     A      I don't recall which ones they were,
12  but that a reason -- that would be a reason for it
13  not to be included as a comparable transaction.
14     Q      Did you do any analysis of what the
15  value, in fact, was to American Airlines of TWA's
16  assets?
17     A      No.
18     Q      Did you develop any metric to assess
19  the value of the assets that the acquired airline
20  was bringing to a merger?
21     A      No.
22     Q      Do you have the expertise to do that?
23     A      That depends on the nature of the
24  asset.
25     Q      With respect to which assets would you

Page 132

1  be able to assess the value of what the acquired
2  airline is bringing to the table?
3      A      Well, for example, if they own
4  equipment of particular types, there is a market for
5  equipment and I can value the equipment at market
6  value.  To the extent there is markets in slots at
7  particular airports, that's a little harder, then I
8  begin to need someone with more expertise in the
9  airline industry to tell me what TWA's gates at JFK
10  were worth, for example, or what, if there are in a
11  dominant position in St. Louis, was worth.  That
12  sort of thing.
13     Q      And you didn't undertake any efforts to
14  actually do that in this case; correct?
15     A      No.  I -- my -- my -- it was -- I did
16  not quantify those.  That's correct.
17     Q      Were you asked to make any assumptions
18  about what leverage TWA had in the negotiations
19  concerning seniority integration?
20     A      No.
21     Q      Did you make any assessment of the
22  leverage that TWA -- the TWA MEC had on the one hand
23  and the APA had on the other hand in the
24  negotiations concerning seniority integration?
25     A      Did I -- did I make any assumptions,

Page 133

1  you are asking me?
2      Q      Did you make any assessment?
3      A      An assessment, no.
4      Q      Would that have been relevant to your
5  analysis, what the bargaining leverage of each side
6  was?
7      A      Well, the -- the -- the -- the
8  situation was tainted by the fact that ALPA shirked
9  its duty of fair representation, so that what I
10  observed as the bargaining leverage would not be an
11  indication of something that would exist absent that
12  bad behavior.
13     Q      Did you try to make any assessment of
14  what bargaining leverage TWA, the TWA MEC would have
15  had relative to the APA in the absence of any breach
16  by ALPA?
17     A      Yes.
18     Q      And what -- how did you go about
19  conducting that assessment?
20     A      That was simply my -- my analysis.  My
21  analysis showed that the TWA pilots would have done
22  much better on a merged list.  That's an assessment
23  of relative bargaining power.
24     Q      So -- and my -- my question is really
25  focused on, not the outcome of the negotiations, but

Page 134

1  whether you did any assessment of the bargaining
2  leverage that each side had in the negotiations
3  absent any breach by ALPA.
4      A      No.
5      Q      In paragraph three of your report, page
6  two, you say, at the time of the purchase, referring
7  to the American Airline asset purchase, TWA was weak
8  financially, but was still flying planes and entered
9  bankruptcy as a condition of its deal with American.
10  Do you see that?
11     A      Yes.
12     Q      Do you know whether American -- whether
13  -- withdrawn.
14      Do you know whether TWA would have entered
15  bankruptcy in the absence of any deal by American
16  Airlines?
17     A      No.
18     Q      Would that be relevant to your
19  analysis?
20     A      No.
21     Q      Why not?
22     A      Because what I was interested in was
23  whether TWA would continue to fly and not whether
24  they were -- whether they were bankrupt or not, had
25  filed for bankruptcy or not.

Page 135

1    Q    And other than -- any information you
2  had concerning proposals by Carl Ichan, did you do
3  anything else to determine whether TWA would have
4  been in a position to keep flying absent the
5  American transaction?
6    A    All I -- I read that article by the
7  economist at Tuck who argued that there were other
8  sources of cash for TWA, as well, and --
9    Q    Anything other than that?
10   A    No.
11   Q    And do you have the expertise to
12 determine whether an airline is likely to cease
13 flying within any given period of time?
14   A    If I put my mind to it, I'm sure I
15 could do that.
16   Q    And how would you do it?
17   A    I don't know.  I would have to put my
18 mind to it.
19       I would have to, you know, look at their
20 financial situation, you know, what their cash flow
21 looked like, what their revenues, fixed expenses,
22 and so on, projections for -- for passengers.  It is
23 not something I have ever done.  It would take me a
24 very long time to do, but you just asked me if I had
25 the expertise to do it, and, essentially, what I

Page 136

1  saying is I could develop the expertise to do that.
2    Q    As you sit here today --
3    A    I don't not have the expertise, sitting
4  here.
5    Q    What would be sufficient to persuade
6  you that, absent an American Airlines transaction,
7  that TWA was likely to cease operations?
8    A    Soon.
9    A    Soon.
10   A    I don't know.
11   Q    Are you offering any opinion here about
12 what would have happened to TWA in the absence of a
13 transaction with American Airlines?
14   A    No.
15   Q    And are you offering any opinion about
16 what would have happened to the TWA pilots in the
17 absence of a transaction with American Airlines?
18   A    No.
19   Q    Are you able to offer any opinion about
20 whether, in the absence of a transaction with
21 American Airlines, the TWA pilots would have been
22 able to maintain their jobs as pilots?
23   A    I'm assuming in my analysis that TWA
24 would continue to fly.  I'm -- as I read -- as I
25 read the material, what I saw was that there was a

Page 137

1  bankruptcy auction.  Had American not been there,
2  there was another purchaser who presumably would
3  have bought the assets.  The airline would have
4  flown and pilots kept their jobs.
5    Q    So my question is whether you are able
6  to offer an expert opinion as to what would've
7  happened to the TWA pilots in the absence of a
8  transaction with American Airlines.
9    A    No.  I'm relying on others' -- others'
10 views of that.  That's correct.
11   Q    Whose views?
12   A    Well, the views of that -- you know,
13 I'm basically -- as I read it, I don't know if I
14 want to call it -- quite call it an expert opinion,
15 but I concluded, reading what I read, that TWA
16 looked to me like they would -- likely going to fly,
17 and I based that on the fact that there were other
18 sources of cash for them that the fellow from Tuck
19 talked about, and that there were other suitors in
20 the bankruptcy.
21   Q    And so what I'm asking is whether you
22 are in a position to offer an expert opinion as to
23 what would have happened to the TWA pilots in the
24 absence of the American transaction.
25       MR. PRESS:  I object to the form.

Page 138

1  that's been asked twice and he's answered it twice,
2  the same way.
3        THE WITNESS:  The same answer that I
4  said --
5  BY MR. TOAL:
6    Q    Well, I -- your answer was that you
7  read an article by a professor at the Tuck School.
8    A    Right.
9    Q    Does that give you a sufficient basis
10 to express an opinion as to what would have happened
11 to the TWA pilots in the absence of the American
12 transaction?
13   A    I'm not -- I wasn't considering -- I
14 was asked to opine on something very simple, which
15 is had ALPA performed its duty of fair
16 representation, what would the merged seniority list
17 have looked like?  Now, implicit in that, I don't
18 take a stand one way or the other on the -- what
19 would have happened to the TWA pilots had the
20 American transaction not gone through.
21   Q    So you are not offering an expert
22 opinion on that subject?
23   A    I'm not offering an opinion on that.
24 That's correct.
25   Q    If -- if it were determined that the

Page 139

1    likelihood was that TWA would have liquidated
2    shortly after January 2001 in the absence of an
3    American transaction, would that have affected your
4    analysis?
5        A    Yes.
6        Q    In what way?
7        A    I would have had to select my
8    comparables differently.
9        Q    And you are aware that the transactions
10   you categorized as having an acquired airline that
11   was either not flying or was about to stop flying
12   had proportional differences in mean rank of about
13   minus .6; correct?
14       A    I don't know.  I haven't done that
15   grouping.  You asked me that before.  I don't know.
16       Q    Look at page -- page two of your
17   report.  Paragraph five.
18       You say, seniority is an important factor in a
19   pilot's career.  It influences his or her home base,
20   his or her role in the cabin (captain/first
21   officer), et cetera.  The routes and schedules he or
22   she flies, the type of aircraft the pilot flies, and
23   also the order in which layoffs or furloughs occur.
24   Thus, a pilot's relative position on the seniority
25   list is a central determinate of the pilot's

Page 140

1    earnings.  Do you see that?
2        A    Yes.
3        Q    What are the other determinates of a
4    pilot's earnings?
5        MR. PRESS:  Really?  Object to the form
6    of the question as being over broad.
7        THE WITNESS:  Well, their preferences
8    will affect their earnings.  What airline they work
9    for will affect their earnings, just for an example.
10   BY MR. TOAL:
11       Q    Are you aware of any determinates of
12   pilot earnings?
13       MR. PRESS:  Same objection.
14       THE WITNESS:  Conditional on their
15   being a pilot already, working for a particular
16   airline, basically their preferences are going to
17   determine what routes they choose to bid for, what
18   equipment they choose to bid for will be -- taken
19   together; that pretty much determines it.
20   BY MR. TOAL:
21       Q    What about the number of hours they
22   choose to work?
23       A    That's part of choosing, what they
24   choose to bid for.  That's what I meant, yes.
25       Q    Have you assessed the relationship

Page 141

1    between seniority and income levels for the pilot
2    population in this case?
3        A    No.
4        Q    Do you have an understanding about
5    whether there is a difference between the pay rates
6    for TWA pilots and the pay rates for American
7    Airlines pilots?
8        A    I have no idea.
9        Q    Did you see in your review of
10   arbitration decisions that that was a factor that
11   arbitrators took into consideration in assessing
12   seniority integration?
13       A    Took what into consideration?
14       Q    Differences in pay rates between the
15   acquired and acquiring airline.
16       A    Sometimes.  I saw that sometimes.
17       Q    And how -- how is that factor taken
18   into consideration when it was?
19       A    It might be a factor for -- for shading
20   the -- the integration one way or the other.  It was
21   usually just mentioned.  It was seldom one of the --
22   I can't remember if it was ever a determining
23   factor, how the integration was done.
24       Q    And your analysis does not take into
25   account whether there are differences in pay rates

Page 142

1    between the TWA and the American pilots; correct?
2        A    That's correct.
3        Q    Isn't that a component of
4    pre-transaction career expectations?
5        A    Pre --
6        Q    Pre-transaction career expectations?
7        A    I would imagine.
8        Q    Did -- did you see in your review of
9    arbitration decisions that arbitrators universally
10   focus on preserving the pre-transaction career
11   expectations of both pilot groups?
12       A    Yes.
13       Q    And your -- your list was constructed
14   without regard to that factor; correct?
15       A    As I said, it is without direct regard
16   for it, but it is implicit in the method I use.
17       Q    Paragraph 25 of your report, page nine.
18       You say at the bottom, with the assistance of
19   my staff, I've reviewed information on 41 seniority
20   list mergers.  These include 29 arbitration
21   decisions, 11 amendments to CBAs, and one reported
22   federal decision.  Do you see that?
23       A    Yes.
24       Q    And you list all those mergers in
25   appendix B to your report; correct?

Page 143

1    A    Yes.
2    Q    Are these all the transactions between
3  airlines to which you had information on seniority
4  integration?
5    A    This is -- this -- yes.  I believe
6  that's correct.
7    Q    Did you have a temporal cutoff for
8  your -- for your analysis?
9    A    Not that I recall.
10    Q    If you take a look at Mr. Salamat's
11  report, which is Farber Exhibit-2 --
12    A    Yeah.
13    Q    You go to page 21 of that report.
14  You see he also has a list of
15  post-deregulation mergers?
16    A    Okay.
17    Q    Do you know why there are differences
18  between your list of transactions and his?
19    A    No.
20    Q    Now, in your analysis that you describe
21  in paragraph 25, how much consideration did you give
22  to the 11 instances in which there were amendments
23  to collective bargaining agreements related to
24  seniority integration?
25    A    How much consideration did I give?

Page 144

1    Q    Yeah.
2    A    I -- fundamentally, I considered each
3  -- each case on its own merits.
4    Q    On your table one --
5    A    Yes.
6    Q    -- you include, I think it is 19
7  transactions.
8    A    Yes.  Uh-huh.
9    Q    So why out of the 41 transactions you
10  considered does your chart contain only 19?
11    A    It's because in -- in order to make it
12  into table one, I had to be able to calculate the
13  mean rank difference, which referred that there be
14  sufficient -- two considerations.
15    Number one, I had to be able to calculate mean
16  rank difference, and many of the documents we saw
17  for cases didn't include enough information on the
18  merged seniority list to be able to calculate that.
19    Number two, I had to be able to figure out
20  whether -- what the airline's financial condition
21  was at some -- I -- I agree rather than perfunctory
22  level.  But, nonetheless, I had to be --
23  characterize the financial condition of the airline.
24  And number two, I had to be able to have some
25  indication of whether the acquiring airline brought

Page 145

1  value to the merger.
2    So if I had that -- those pieces -- those two
3  pieces of information plus enough information to
4  calculate the mean rank difference, they would be
5  included in table one.  Otherwise, they would not.
6    Q    And in that answer about whether the
7  airline brought value, did you mean to say the
8  acquired airline brought value to the transaction?
9    A    Yes.  The acquired.  Did I say
10  acquiring?
11    Q    I think so.
12    A    Okay.  I'm sorry.  The acquired
13  airline, yeah.
14    Q    So for any of the 41 transactions that
15  you considered, if it doesn't appear on table one,
16  that's because you lacked information about one of
17  these three categories that you just mentioned?
18    A    That's correct.
19    Q    Is there any other reason why a
20  transaction would be missing from list one?
21    A    As I sit here, not that I'm aware of.
22    Q    Okay.  Now, information about the
23  financial condition of the airline would be
24  something that would be publicly available; correct?
25    A    Could be.

Page 146

1    Q    And in any of the cases where you were
2  missing financial information concerning the
3  condition of the acquired airline pre-transaction,
4  did you make any effort to acquire that information
5  from publicly available sources?
6    A    I want -- I want -- I want to say I
7  believe we did.  It wasn't just -- I mean, the fact
8  that they are losing money is not what I'm
9  interested in.  I'm interested in the prospects for
10  -- for continuing to fly.  So it was a little more
11  complicated than saying, yes, I can look at their
12  profit and loss statement.  I want to say we did
13  some work on that.  We tended to rely a lot on,
14  particularly in the arbitration reports, on the
15  arbitrator's reasoning, which is -- and there is
16  clearly a lot less information in the amendments to
17  collective bargaining agreements which don't give
18  reasoning.  Right?  They just tell you what they
19  decided.  But do I believe we did some work.  Like,
20  for example, in Delta/Pan Am, which is not an
21  arbitration but is a -- I think it is an amendment
22  to a collective bargaining agreement.  In that
23  particular case, we had to go outside to find some
24  of the other information.
25    Q    And the way you went outside was

1  referring to two newspaper articles concerning that
2  transaction?
3     A    Yeah.  Public sources.
4     Q    Did you do anything else?
5     A    No.
6     Q    And other than that particular example,
7  is there anything else you did to try and get
8  financial information?
9     A    Well, there might have -- there might
10  have been other cases where we did that.  I just --
11  I didn't do that work myself.  So as I sit here now,
12  I can't tell you which cases we had to go outside
13  the basic document to get information.
14     Q    And with respect to any value that the
15  acquired airline was bringing to the transaction,
16  did you explore whether that was information that
17  could have been obtained from publicly available
18  sources?
19     A    No.  That was -- that's a good
20  question.  I think -- I have -- I have a memory in
21  one case of one of my guys coming to me and saying,
22  look, look what they are doing.  And that was fine.
23  So there was obviously some searching going on for
24  that.  But my -- my best recollection is that in
25  almost every case where we saw whether there was

1  value or not, it was internal to the report.  It was
2  a statement, for example, by an arbitrator that
3  said, you know, airline B is bringing, you know,
4  good equipment and gates at important airports.
5     Q    So for the transactions that don't
6  appear on table one, did you exhaust efforts to
7  obtain information about the financial condition of
8  the acquired airline and the value of assets they
9  brought to the transaction from publicly available
10  sources?
11     A    Exhaust efforts is pretty extreme.  We
12  made some efforts.  Whether we made exhaustive
13  efforts, I'm not -- I'm not going to claim that.
14     Q    Did you make efforts with respect to
15  each of the transactions for which you had
16  information that would allow you to calculate the
17  difference in means, did you make efforts for each
18  of those to assess the financial condition of the
19  airline and the value of the assets it brought to
20  the transaction from publicly available sources?
21     A    I believe so, yes.
22     Q    And who would know more about that?
23     A    David Ashmore.
24     Q    And your analysis of the fact that a
25  seniority integration resolution was agreed rather

1  than arbitrated sounds like it wouldn't have made a
2  difference to your analysis as long as you could get
3  information concerning the financial condition of
4  the acquired carrier and the value of the assets
5  they brought to the transaction; is that correct?
6     A    Yes.
7     Q    So even when you didn't have
8  information concerning the financial condition of
9  the acquired carrier or the value of the assets they
10  brought to the transaction, but you had information
11  that allowed you to calculate the proportional
12  difference in mean ranks, did you make that
13  calculation?
14     A    I don't think we made calculations of
15  proportional difference in mean ranks for anybody
16  who is not on this list.
17     Q    Are you aware of transactions in which
18  the acquired -- pilots of the acquired airline got
19  stapled to the bottom of the seniority list?
20     A    I think there was one transaction we
21  saw like that.
22     Q    Which transaction was that?
23     A    It might have been one of the ones
24  involving Licks or Lynx.  Lynx.  It was an airline
25  that was grounded, wasn't flying, had only regional

1  planes, et cetera.  I don't remember which one it
2  was.
3     Q    So on the list put together by
4  Mr. Salamat on page 21 of his report, you see
5  reference to the American/Reno transaction?
6     A    Yes.
7     Q    Did you do any investigation into the
8  circumstances of seniority integration in the
9  American/Reno transaction?
10     A    I would have to look and see.  I don't
11  even know if it is on our list of 41 transactions.
12  In other words -- in other words, it is quite likely
13  we never heard -- we never found that one.  It is
14  simply because it doesn't look like it was an
15  arbitration, and we -- I don't see any document.
16     Q    You testified that you weren't
17  confining your analysis to arbitrations; correct?
18     A    That's true, and we tried to find as
19  many of these as we could, which I never -- I hope I
20  never represented that we found them all, and we
21  certainly never selected them on any systematic
22  basis in the sense of, oh, we'll look for the ones
23  that are favorable or something.  I don't -- I just
24  don't think we found that one.
25     Q    Do you have a list somewhere of what

Page 151

1    the 41 transactions you considered are?
2        A    Unless it is somewhere in the backup --
3    I -- I -- there may not be -- is it in the appendix
4    here?  Probably not, right?
5        Q    There is a list of --
6        A    -- of arbitration reports.
7        Q    -- agreements.
8        A    Arbitration awards and agreements,
9    right?  You know, to be honest, I would have to
10   check to see whether we have a document like that.
11       Q    Okay.  But for purposes of determining
12   the 41 transactions that you considered as part of
13   your universe, we should try and extract that
14   information from Exhibit B; correct?
15       A    There is also backup materials that you
16   were provided, right, and it could be in there in a
17   file.  But I'm sure, if you would like such a list,
18   we can get that to you if you don't have it, if you
19   can't find it here.  It is an oversight on our part.
20   It should be in there.
21       Q    You say in page -- paragraph 26 of your
22   report -- you say, arbitration decisions are a
23   particularly rich source of data for estimating the
24   but-for seniority list because, unlike amendments to
25   CBAs, arbitrators provide a written report

Page 152

1    describing the results of their deliberations,
2    including an account of the reasons for their
3    decision.  Do you see that?
4        A    Yes.
5        Q    But the only factors that you consider
6    in your analysis are whether the acquired airline
7    was not flying, or would shortly stop flying, and
8    whether it brought substantial assets -- assets of
9    substantial value to the transaction; correct?
10       A    Yes, correct.
11       Q    Now, the arbitrators themselves
12   actually consider a host of other factors; correct?
13       A    Yes.
14       Q    And did you attempt to take any of
15   those other factors into consideration in
16   constructing your list?
17       A    In general, no.
18       Q    And specifically?
19       A    And specifically, there was at least
20   one case where -- in fact, it is on -- I think it is
21   in table one.  If we go to table one.
22   Republic/Frontier, which is -- it's -- I think it's
23   -- it is an unusual one because it gives a huge
24   advantage to the acquired airline's pilots.  Do you
25   see that?  In other words, it is the only one with a

Page 153

1    reasonably sized positive proportional mean
2    difference.
3        So the question is, why would that be?  And it
4    turns out, when you look at it, that Frontier was
5    flying big airplanes and Republic was basically
6    flying little regional jets, and it was unusual that
7    a -- a regional airline like that was acquiring,
8    essentially, a trunk carrier, or a regional trunk
9    carrier anyway, flying bigger planes.
10       And as a result, because of the status in the
11   equipment business, the Frontier guys got put near
12   the top of the list and wound up better.  So we
13   tried to consider -- you know, but most -- most of
14   the -- almost all of the mergers, all of the
15   acquisitions, I should call it, the acquired airline
16   was subsidiary in some way.  Subsidiary is the wrong
17   word.  Small -- I will call it smaller in some way.
18       There is another example here which is Texas
19   Air/Continental.  Texas International/Continental is
20   another example, which is quite interesting because
21   Continental is much bigger.  This is -- I -- I guess
22   it must be -- Frank Lorenzo, right?  You know, he is
23   an ambitious guy with this little airline in Texas,
24   and God dammit, he is going to buy Continental,
25   right?  So he looks at that, and -- so that -- but

Page 154

1    that, nonetheless, wound up not so good for
2    Continental.  They had a lot of people stapled at
3    the bottom.
4        So we tried to consider a lot -- a lot -- this
5    is a long answer to the question, did we ever
6    consider anything else?  The answer is, we read
7    these carefully.  We tried to understand what was
8    going on.  Ultimately, in the -- because the
9    analysis is a small numbers problem and we wanted to
10   try to find a reasonable sized set of matched
11   transactions, you can't do that on too many -- in
12   too many dimensions or else you won't get any
13   matches.
14       And what you have to do is pick the most
15   salient pieces -- portions which we felt was
16   financial viability, essentially flight viability
17   and value, and say, let's focus on those.  And, on
18   average, take the average of those, and the other
19   things will average out.  Some of them will be a
20   little better on some things and worse on other
21   things.
22       So I don't know if that's responsive to your
23   question, but that's what I have to say.
24       Q    So my question is, within the construct
25   of your -- your model and your alternative seniority

Page 155

1    list, did you make any efforts to take into account
2    any other --
3        A    Oh, in a formal modeling sense?
4        Q    Yeah.
5        A    No.  I guess I could have shortened
6    that answer somewhat.
7        Q    And when you go through -- you go
8    through your list, which is generally sorted by the
9    proportional difference in mean ranks; correct?
10       A    Yes.
11       Q    With one exception it looks like, at
12   the bottom -- toward the bottom of the list, the
13   American/TWA transaction actually looks like it's --
14   it's out of order based on this table.  Do you see
15   that?
16       A    Yes.  Why is that?
17       Q    Do you know why that is?
18       A    It is either a typo in -- in the .627
19   or just a misordering in the list.  One or the
20   other.  I honestly -- if someone has a calculator, I
21   can redo the calculation, but it's -- I don't have
22   an explanation for that.  I am happy to find out.
23       Q    In any event, when you go through this
24   list in rank order, the situations in which you felt
25   that the mean rank was different than you would have

Page 156

1    expected, and you tried to learn more about the
2    underlying transaction; correct?
3        A    Well, you know, frankly, we only really
4    did that at the end of the day for the one at the
5    very top of the list and the one at the very bottom
6    of the list partly because that Republic merger is
7    an odd one because it involved four airlines.  It
8    was really one merger.  And they merged four
9    seniority lists.
10       And -- so there were three airlines acquired
11   by Republic.  This was -- and it had a single
12   seniority merger, which is Lynx, Midwest, and
13   Frontier.  This is, I guess, what they called the
14   second Frontier.  There were two Frontier Airlines.
15   So we always -- we always considered that
16   transaction quite gingerly because it is so, so
17   different from the rest of them.  And as a result,
18   at the end of the day, it is interesting that that
19   yielded both the top number on the list and the
20   bottom number on the list, and we are not going to
21   use those for anything.
22       So, really, it was -- it wasn't so much that
23   we were looking if a number looked wrong.  That
24   wasn't what we did.  What we did is, as we were
25   reading the cases, if something struck us and said,

Page 157

1    this is not typical of mergers in general, it set up
2    a flag for it.  So, you know, the Republic/
3    Frontier -- you know, Republic/Frontier/Midwest/
4    Lynx deal was just different from any of the others.
5        Q    Well, do you acknowledge that there are
6    factors other than the financial condition of the
7    acquired airline and the value of the assets it
8    brings to the transaction that can influence the
9    seniority integration process?
10       A    Yes.
11       Q    And what other factors would you
12   acknowledge could influence that process other than
13   those two?
14       A    It could be many things.  The skill of
15   the negotiators.  Those are -- you know, there --
16   there are things, you know, again as we talked about
17   that's implicit.  And the way I put things together
18   is career expectations of -- of the people.  Those
19   are -- you know, the things that are most, you know,
20   there is -- there is the criterion -- well, it's
21   actually not characteristic of a merger, trying to
22   preserve seniority rank within a company and so on.
23       The issue of -- of -- of equipment status and
24   domicile, how those stack up.  Particularly
25   equipment differences are often very important in

Page 158

1    mergers of lists, which is how, for example, the
2    Frontier, the Republic/Frontier wound up the way it
3    did.  That's an equipment issue really, equipment
4    and route issue.  So there are other things, sure.
5        Q    Did you ever try running a proportional
6    difference in mean rank for the American Airline/TWA
7    transaction excluding the American Airline pilots at
8    the top of the list who were flying a category of
9    equipment that TWA didn't have?
10       A    No.  Interesting idea, though.
11       Q    Is that something that you think would
12   make sense to do?
13       A    Not in isolation, no.  I would have
14   to -- I would have to look at all these.  You can't
15   just cherrypick one observation and do that.
16       Q    Do you think it would make sense to do
17   that globally?
18       A    Given the purposes of my analysis, no.
19   Because again, my analysis comes up with an overall
20   list.  And then imagine that you wanted to use it,
21   and then you took my list and used it to create
22   status and equipment specific lists.  That would
23   automatically take account of this because as soon
24   as you look at the equipment, you'd have a list that
25   only had American pilots in it, and then you would

Page 219

```
1    decisions concerning seniority integration, did you
2    notice that arbitrators took into account the
3    financial condition, not only of the acquired
4    airline, but the acquiring airline?
5        A    Yes.
6        Q    And what was the reason that you
7    decided not to take into consideration in your
8    analysis the financial condition of the acquiring
9    airline?
10       A    Largely because we were interested in
11   what disadvantage there might be to the acquired
12   airline's pilots.  So I was more concerned that I
13   not include airlines that were not flying anymore or
14   acquired airlines that were really strong, because
15   it wouldn't -- it wouldn't be fair to say that TWA
16   pilots should have done as well as an acquired --
17   pilots from an acquired airline where that airline
18   was strong and not in any fiscal trouble at all.  I
19   didn't see the matter to be as pressing on the
20   acquiring airline side because most airlines who
21   acquiring are in reasonable shape.  That's why they
22   are out there acquiring other airlines.
23       Q    But there is a continuum in terms of
24   financial condition; correct?
25       A    Yes.  Correct.  But I created a very
```

Page 220

```
1    crude breakdown.  I didn't use the continuum.
2        Q    But you could have used the continuum;
3    correct?
4        A    I'm not sure how.  Remember, again, I
5    have this problem of what we call informally where I
6    work, micronumerosity, meaning not very many -- not
7    very many observations.  And to use a continuous
8    variable, I need to then have -- I need to have
9    those 3,000 mergers to look at so I can get 3,000
10   different data points.  I can break that down into
11   three categories; healthy, not healthy but flying,
12   and dead.  And I can do that with fewer
13   observations.  So I don't know how quite -- I would
14   quite use a continuous measure.  And I -- I don't
15   know -- I don't know what advantage it would bring
16   to the analysis here, frankly.
17       Q    Well, if you are trying to understand
18   the -- understand and predict the likely outcome of
19   an arbitration involving seniority integration
20   between TWA and American Airlines, isn't it
21   important to understand how arbitrators actually
22   come to their decisions?
23       A    Well, reading the arbitration reports,
24   I read many of them, they talk in categories.  They
25   say, airport A -- airline A was healthy.  Airline B
```

Page 221

```
1    was in some trouble.  Airline C is no longer flying.
2    Those are the terms they talk in.  They don't say,
3    the rate of return on profits for airline A was
4    8.6 percent last year, or their stock was up
5    12 percent and the other stock was only up
6    8 percent.  They don't use continuous measures.
7    They use categorical measures in their -- in their
8    discussions.  So, frankly, I'm adopting the kinds of
9    wording that the arbitrators are -- are -- are
10   telling me in their -- in their reports.
11       Q    Do the categories that arbitrators use
12   break down into flying and not flying?
13       A    Roughly, yeah.  They roughly say, you
14   know, those guys, they are not flying anymore.
15   Their planes are all grounded, so I can't give their
16   pilots -- their career expectations are de minimis.
17   And, therefore, I'm not going to give them -- I'm
18   not going to give them very favorable position on
19   the merged seniority list.  Or they will say,
20   airline B was in trouble, but they brought a lot of
21   equipment to the merger and they had -- and they
22   were flying, and so -- while they don't deserve the
23   date of the hire merger they were asking for, they
24   deserve more consideration than airline A, which is
25   acquiring them, is offering.
```

Page 222

```
1        Q    And are those the only two categories
2    that you saw arbitrators using to describe the
3    financial condition of acquiring airlines?
4        A    Of acquiring airlines.  Most of the
5    time the acquiring airline is in good financial
6    condition.  So I can't say it is the only two.  I
7    don't remember the wording of every one.  But, boy,
8    for the most part, the acquiring airlines are doing
9    okay.  That's why they are buying.
10       Q    Did you make any effort to assess in
11   your list of comparables, the value of the assets
12   that the acquiring airline was bringing to the
13   transaction?
14       A    No.
15       Q    And did you make any effort to assess
16   the value of the assets that American Airlines
17   Airlines was bringing to its transaction with TWA?
18       A    No.
19       Q    Did you consider that irrelevant to
20   your analysis?
21       A    It is the same answer as I gave to the
22   last line of questions.
23       Q    Which is?
24       A    Essentially, the acquiring airlines are
25   in generally good shape.  They are bringing
```

Page 231

1   with American, they never represented the pilots, I
2   don't -- I just don't know the answer to that.
3       Q    If you were to learn that TWA, the TWA
4   pilots made proposals about bottom staples prior to
5   any breach of a duty of fair representation, would
6   that affect your analysis?
7       A    To be honest, until you started this
8   line of questioning, I never understood the breach
9   of duty of fair representation as linked to a single
10  date or event.  I viewed it as, in this process, the
11  TWA pilots were not adequately represented, and
12  that's how -- and that's the assumption I'm making.
13  In this process, the TWA pilots are not adequately
14  represented.  And -- and -- and so I don't know what
15  to make sense of a hypothetical that says as of a
16  particular date, because I don't understand the
17  timing.  I don't know what events we are talking
18  about.  I have no way of answering that.
19      Q    Have you analyzed whether the TWA
20  pilots were better off under Supplement CC than they
21  had been prior to the transaction when they were at
22  TWA?
23      A    No.
24      Q    Is that relevant to your analysis?
25      A    No.

Page 232

1       Q    Do you have a view about at what period
2   in time it is appropriate to start calculating
3   damages in -- in this case relative to when
4   Supplement CC was implemented?
5       A    I have no view of that.
6       Q    And what is the earliest point at which
7   you think it would be appropriate to start
8   calculating damages?
9       A    I've never thought of that -- thought
10  about that.
11      Q    Can you think about it now?
12      A    I don't think I understand the timing
13  well enough relative to the timing of the -- of the
14  acquisition of TWA.  I don't -- Supplement CC was
15  several -- what happened, the acquisition was
16  completed in April?  You have to tell me more about
17  the timing for me to know that.  I just don't.
18      Q    So if you -- if you assume that
19  Supplement CC went into effect in April of 2002, and
20  the deal was -- the deal closed in April of 2001 --
21      A    Okay.
22      Q    -- what's the earliest point at which
23  you think it is appropriate to start calculating
24  damages?
25      A    I would have to know what happened

Page 233

1   between April 2001 and April 2002.  In other words,
2   how were flight assignments made?  What seniority
3   list was in place in that year?
4       Q    So assume that the TWA pilots were in a
5   separate subsidiary of American Airlines and were on
6   a separate seniority list prior to April of 2002.
7       A    That was effectively their old TWA
8   seniority list?
9       Q    Right.
10      A    And they were flying only their old TWA
11  flights, and no American pilots -- it was as if they
12  had never been acquired?
13      Q    Correct.  They were a subsidiary of --
14  a separate subsidiary of American Airlines.
15      A    Yeah.  I actually -- I know I led
16  you -- I led you down this path of telling me about
17  the timing, but I'm not -- I'm really not sure of
18  how to answer when it would be appropriate.  In
19  fact, when I do this kind of work, I would probably
20  ask the attorneys with whom I'm working when -- when
21  I ought to be starting calculation of damages.  I
22  don't have a professional economist's view of that.
23      Q    You would just take direction from
24  counsel on that issue?
25      A    On a question of when, I would discuss

Page 234

1   with counsel.  And if they told me it was an issue
2   of economics, I would then try to come up with an
3   answer.  But that's not the way I would get at that.
4       Q    Did you analyze whether any of your
5   seven comparator arbitrations successfully preserved
6   the pre-transaction career expectations of each
7   pilot group?
8       A    No.
9       Q    Have you done any independent research
10  into the facts underlying the seven comparator
11  transactions that you looked at?
12      A    Do you mean independent of the
13  documents that I -- cite here?
14      Q    Independent of reviewing the
15  arbitration decision itself, for instance?
16      A    No.  Well, if the arbitration decision
17  had complete information -- no -- sufficient
18  information, I should say, for me to figure out
19  whether it met my criteria.  I -- I don't think I
20  went further, though.
21      Q    And in most of the situations did the
22  arbitration decision contain sufficient information
23  for you to make those determinations?
24      A    Yes.
25      Q    And in which instances did the

Page 235

1   arbitration decision not contain sufficient
2   information?
3        A     As I -- again, there is Delta/Pan Am,
4   which is not an arbitration decision, where we
5   certainly had to go outside.  I believe in the paper
6   I footnote the cases which I can't -- I don't have
7   in my head where we have -- if there is any, where I
8   have to use outside information.  There may or may
9   not have been.
10       Q     So one of the transactions that you
11  looked at that you identified as a comparable
12  transaction involved Flying Tiger and Seaboard;
13  correct?
14       A     Yes.
15       Q     And why did you consider that a
16  comparable transaction?
17       A     I think that's a -- I -- without
18  remembering the precise details, these are two
19  freight carriers.  The arbitrator felt that Seaboard
20  brought things of real value to the transaction.  It
21  was still flying.  It was not about to stop flying.
22  So the same thing that made me, you know, choose the
23  others.  It met -- it met the criterion.  And,
24  again, we can calculate the mean rank difference
25            (Farber-10  Document regarding Flying

Page 236

1         Tiger Lines and Seaboard World Airlines
2         marked for identification.)
3   BY MR. TOAL:
4        Q     I show you document entitled Flying
5   Tiger Lines and Seaboard World Airlines, which I
6   marked as Farber Exhibit-10.  Let me know if you
7   personally reviewed this decision.
8        A     I did.
9        Q     Let me direct your attention to page
10  146 of this decision.  Do you see there is a
11  heading, the financial strength of the two carriers?
12       A     Yes.
13       Q     So at least in this decision, the
14  arbitrator evaluated the financial condition of both
15  the acquiring and the acquired airline; correct?
16       A     Yes, yes.
17       Q     And toward the end of the first
18  paragraph the decision says, for pilots in a weak or
19  tentative carrier, receipt of jobs and job
20  protection with a healthy and expanding carrier
21  represents a significant reward which is an
22  important factor in balancing the advantages that
23  each group obtain from the merger.  Do you see that?
24       A     Yes.
25       Q     Do you agree with that statement?

Page 237

1        A     Yes.
2        Q     And do you agree that the TWA pilots
3   received a significant reward going from TWA to
4   American Airlines as part of that transaction?
5            MR. PRESS:  I object to the form of the
6   question.
7            THE WITNESS:  I -- I have no idea.
8   BY MR. TOAL:
9        Q     You have no idea, why?
10       A     I haven't examined that question.
11       Q     Would that have been important to take
12  into consideration in trying to come up with an --
13  an estimate of what a alternative seniority
14  integration list in this case would have looked
15  like?
16            MR. PRESS:  I object to the form of the
17  question.  What is it?
18            THE WITNESS:  Well, as I said, you
19  know, I -- I -- I know I keep giving the same
20  answer.  Implicitly, I take account of that in
21  choosing the set of comparables, so that the
22  seniority integration that arbitrators tend to
23  impose reflects -- reflects those factors.  You
24  know, they say -- they try to balance career
25  expectations.  You are asking about career

Page 238

1   expectations again, which I implicitly take into
2   account.
3   BY MR. TOAL:
4        Q     Do you see the -- the date of this
5   decision is 1981?
6        A     Yes.
7        Q     Okay.  If you turn to page 147 of this
8   decision, do you understand SWA was the abbreviation
9   for Seaboard?
10       A     Yes.
11       Q     Okay.  So do you see in the bottom
12  paragraph on this page it says, overall, SWA has
13  achieved net profits on a regular basis throughout
14  the 1970s?
15       A     Yes.
16       Q     Was that true of TWA?  Had it achieved
17  profits on a regular basis in the decade prior to
18  its acquisition?
19       A     I don't know.
20       Q     Do you know, prior to the acquisition
21  by American Airlines, when the last time that TWA
22  had earned a profit was?
23       A     No.
24       Q     Is that relevant to your analysis?
25       A     No.

Page 239

1    Q    Why not?
2    A    Because, as I said, I -- you are asking
3 me -- essentially trying to ask me a similar set
4 of -- to get me to say there is a more continuous
5 measure of financial viability that you would like
6 me to look at, and I said I can't do that because of
7 lack of -- of number of cases.  So what I simply do
8 is look at the overall situation, and figure out
9 whether I think the airline -- this airline's still
10 operating is key, and is it likely to shut down
11 immediately, yes or no.
12    Q    So wouldn't the record of profitability
13 be relevant to whether the airline was likely to
14 continue flying?
15         MR. PRESS:  I object to the form of the
16 question.  Improper speculative hypothetical.
17         THE WITNESS:  What matters is -- is
18 more the current situation.  The long history is
19 less -- is less relevant.  I -- I don't --
20 BY MR. TOAL:
21    Q    But you didn't look at the current
22 situation for TWA either; right?
23    A    Well, I looked at the situation.  They
24 were still flying.  They had assets.  They had
25 liabilities -- I agree they had big liabilities but

Page 240

1 they had assets, and they seemed like a weak, viable
2 airline.  So --
3    Q    Were -- how did TWA's liabilities at
4 the time of the acquisition compare to the size of
5 its assets?
6    A    I don't know.
7    Q    So that's not something you looked at
8 either?
9    A    That's correct.
10    Q    Paragraph 37 of your report.
11         MR. PRESS:  Which paragraph?
12         MR. TOAL:  37.
13 BY MR. TOAL:
14    Q    You say, another factor that is often
15 considered in balancing career prospects, is whether
16 one airline brings to the combined company something
17 of substantial value.  Do you see that?
18    A    Yes.
19    Q    Well, wouldn't it be more relevant to
20 the analysis of seniority integration to ask what
21 each airline brought to the transaction that had the
22 prospect of creating sustainable pilot jobs?
23    A    I'm really not sure of what you are
24 asking.  How is that different?
25    Q    Well, some assets may -- may not carry

Page 241

1 with them the prospect of pilot jobs; correct?
2    A    I believe that everything I list here
3 would suggest to me that it brings jobs, the assets
4 for airlines -- create business and create jobs.
5 Hubs, routes or route authority, gates at busy
6 airports, desirable equipment, those are all things
7 that create jobs.
8    Q    And what -- what assets of substantial
9 value did you determine TWA was bringing to this
10 transaction?
11    A    Right.  My understanding is they -- in
12 no particular order, the -- the -- the hub in
13 St. Louis.  Valuable gates at -- I believe at JFK.
14 Valuable gates, I think, was it -- I -- I can't be
15 sure.  I'll say Washington National.  They
16 brought -- they brought equipment that apparently
17 was -- was of real value, equipment both that they
18 had and equipment that was on order.  They -- and
19 they had -- you know, they had the -- basically, the
20 gates in St. Louis, the gates -- the gates in JFK, I
21 believe gates in Washington.  That particularly gave
22 them a lot of market share in St. Louis and a lot of
23 market share at JFK, and TWA was a big player at
24 JFK, and those were of real value.  And this --
25 anyway, that's --

Page 242

1    Q    Did you make any effort to quantify the
2 value of those assets?
3    A    No.
4    Q    Why -- why do you consider the
5 St. Louis hub to be something that was valuable?
6    A    This was -- this was considered
7 valuable by American Airlines.  I saw a presentation
8 -- there was sort of a slide presentation in one of
9 the exhibits from American Airlines explaining why
10 the TWA acquisition was going to be really valuable
11 for American Airlines.  And it listed the St. Louis
12 hub as a valuable thing.  So, I'm just --
13    Q    So you're relying on that presentation?
14    A    I'm relying on that presentation.
15    Q    Did you do any work beyond looking at
16 that presentation and trying to assess the value of
17 assets that TWA was bringing to the transaction?
18    A    No.
19    Q    Did you evaluate what TWA's route
20 structure was at the time of the transaction?
21    A    No.
22    Q    Do you know if it was primarily a
23 domestic airline at the time of the transaction?
24    A    No.
25    Q    Do you know how many flights per day it

Page 243

1   had?
2       A    No.
3       Q    Do you know how highly leveraged it
4   was?
5       A    No.
6       Q    And was none of that relevant to your
7   analysis?
8       A    What was relevant to my analysis was,
9   was the airline flying and, number two, did they
10  bring things of value to the transaction.  Those are
11  what was relevant to my analysis.
12      Q    And would any of the considerations
13  that I mentioned impact any of those factors that
14  you took into consideration, at least potentially?
15      A    No.
16      Q    Did you analyze how many jobs TWA was
17  expected to contribute to the combined entity?
18      A    No.
19      Q    And, specifically, did you look at how
20  many pilot jobs TWA was expected to bring to the
21  combined entity?
22      A    No.
23      Q    Did you consider how many pilot jobs
24  TWA was expected to bring to the combined entity
25  relative to the number of pilots that it would bring

Page 244

1   to the combined entity?
2       A    Well, if I couldn't -- didn't consider
3   the number of TWA pilot jobs, I don't see how I can
4   do it relative to the number of pilots.
5       Q    So the answer would be no?
6       A    Right.
7       Q    Would that be relevant to your analysis
8   of the value of the assets that TWA was bringing to
9   the transaction?
10      A    I don't know how -- how I understand
11  bringing -- what bringing jobs exactly means.
12      Q    Well, if -- if you had a population of
13  2300 pilots, but the plan by the acquiring airline
14  was to reduce the number of TWA routes and planes so
15  that there were fewer pilot jobs available, might
16  that be relevant to the value of the assets that TWA
17  was expected to bring to the transaction?
18      A    Well, as I said, American said that the
19  assets were worth a lot.  Number two, on the day the
20  acquisition happened, TWA brought, by your numbers,
21  2300 jobs.  If American chooses at that point to
22  change their jobs, it is not clear that it all
23  comes out of the hide of the TWA folks.  It might
24  come out of the hide of the American folks.  So it
25  is not clear what it means to say.  You know, maybe

Page 245

1   the 2300 jobs that TWA brings enables American to
2   eliminate a thousand American jobs.
3       Q    So my only question is whether that's
4   at least potentially relevant to your analysis.
5       A    No.  What's relevant is the question of
6   whether TWA brings value to the transaction.
7       Q    And would the issue of how many jobs
8   are coming over relative to the number of pilots
9   coming over have the potential to affect the value
10  of the assets that are coming over?
11      A    The number of jobs coming over is equal
12  to the number of pilots coming over, and it's what
13  happens after that that changes the number of jobs.
14  So I don't understand the framing of the question as
15  how many jobs do you bring over.
16          (Farber-11  Letter dated July 18, 2001
17      between Ed White and Michael Day marked for
18      identification.)
19  BY MR. TOAL:
20      Q    Let me show you a letter that I will
21  mark as Farber Exhibit-11, dated July 18, 2001,
22  which is between Captain Ed White and Captain
23  Michael Day.
24          Can you let me know if you've seen this
25  document before?

Page 246

1       A    I may have, but I don't recall anything
2   specific about it.
3       Q    Okay.  And do you know who Captain Day
4   is?
5       A    It says here he is the chairman of the
6   TWA MEC.
7       Q    And independent of this document, did
8   you have any knowledge who Captain Day was?
9       A    No.
10      Q    Do you know who Captain White is, who
11  sent the letter?
12      A    Only -- only from earlier in this
13  deposition.
14      Q    Okay.  Let me direct your attention to
15  page 11 of this letter.  See the first bullet point
16  on the top of this page?  It says, similarly, in
17  American's other two post-deregulation acquisitions,
18  AirCal and Reno, we've seen American acquire another
19  carrier and then dispose of the acquired carrier's
20  entire fleet.  We are, thus, acutely sensitive to
21  careful consideration of the value which assets
22  truly add to the consolidated operation measuring
23  one side derives a unfair windfall from the
24  integration of the seniority list.  Do you see that?
25      A    Yes.

Page 247

1    Q    Would the position of the APA regarding
2  how many pilot jobs it expected the TWA acquisition
3  to result in have any bearing on your analysis of
4  the likely seniority integration list?
5    A    Is that related to this bullet point?
6  I mean, you read me a bullet point.  Are you asking
7  me to respond to the bullet point?
8    Q    I think it is related to the bullet
9  point, but you can tell me if you disagree.
10         MR. PRESS:  Why don't you start the
11  question over again?  Can you read the question
12  back?
13         (The court reporter read back the
14         pending question as follows:
15         "Question:  Would the position of the
16         APA regarding how many pilot jobs it expected
17         the TWA acquisition to result in have any
18         bearing on your analysis of the likely
19         seniority integration list?")
20         MR. PRESS:  Note my objection to the
21  form of the question.
22         THE WITNESS:  Now, in the analysis I
23  do, that does not have a direct effect.  It--
24  I've -- I concluded that TWA brought value that showed
25  analysis.  Based on American documents that showed

Page 248

1  they brought equipment and routes and hubs --
2  actually equipment, a hub and gates that American
3  wanted.  If American wanted them, they wanted to
4  fill them with planes.  Those planes have jobs.  And
5  as a result, that -- that's the kind of stuff that
6  an arbitrator would look at and say, oh, TWA is
7  bringing value.  Therefore, I'm going to give TWA
8  some value for that when I come up with my merged
9  list.  So it is accounted for in my choice of my
10  comparators, indirectly in my choice of comparators.
11  Each of them, there is some statement that there is
12  something of value that the acquired airline is
13  bringing to the -- to the merger.
14  BY MR. TOAL:
15    Q    Well, with respect to the possibility
16  that no agreement would be reached between the APA
17  and the TWA MEC, do you consider American's prior
18  experience with the number of jobs brought over from
19  acquired airlines to be relevant to the likelihood
20  of any agreement being reached?
21    A    No.
22    Q    And that's because of what?
23    A    It's simply about -- I don't know
24  enough about those particular previous cases.  I
25  don't know what Aircraft Reno brought.  I don't know

Page 249

1  what aircraft AirCal brought.  I -- unless I -- it
2  doesn't appear to me based on what I saw from
3  American that they were simply going to buy these
4  planes to sell them, or sell the gates, or -- I
5  just -- it didn't appear that way to me.  But even
6  if they were selling them, they were selling them
7  for real value.  So, I had no -- I had no reason to
8  change my --
9    Q    Do you know how many of TWA's planes it
10  owned?
11    A    Who?  I don't understand the question.
12    Q    Do you know how many of the planes that
13  TWA flew it had an ownership interest in?
14    A    No.
15    Q    Do you know whether it leased the vast
16  majority of its planes?
17    A    No.
18    Q    Do you know, with respect to the planes
19  it owned, what its equity interest was in those
20  planes?
21    A    No.
22    Q    Do you know of the number of TWA planes
23  how many American Airlines accepted as part of this
24  transaction?
25    A    No.

Page 250

1    Q    Do you know if it accepted the entirety
2  of TWA's fleet?
3    A    No.
4    Q    Would that make a difference to your
5  analysis?
6    A    As I said, I'm relying on the statement
7  by American that the planes were of value, along
8  with the gates and the hubs.
9    Q    That may be true as to the planes that
10  they acquired, but presumably not with respect to
11  the planes they didn't acquire; correct?
12    A    I don't know.
13    Q    And would it be potentially relevant to
14  your analysis how many planes American accepted from
15  TWA's fleet?
16    A    No.  My analysis is not designed in
17  that way.
18    Q    And your analysis really doesn't depend
19  on anything that happened with respect to the
20  TWA/American Airlines transaction other than your
21  determination that TWA was not in danger of ceasing
22  operations in the near future and your determination
23  that TWA was bringing assets of value to the
24  transaction; correct?
25    A    Correct.

Page 251

1    Q    And your analysis disregards the
2  history of negotiations between American Airlines
3  and the TWA MEC; right?
4    A    Between American Airlines or the APA?
5    Q    I'm sorry. Your analysis disregards
6  the history of negotiations between the APA and the
7  TWA MEC; correct?
8    A    Correct.
9    Q    And other than the determination that
10 you made that TWA was not in danger of ceasing
11 operations in the near future, your analysis
12 disregards all other information about the TWA
13 financial condition; correct?
14   A    Correct.
15   Q    And your analysis disregards all
16 information concerning American Airlines' financial
17 condition; correct?
18   A    Yes.
19   Q    And your analysis disregards the value
20 of the assets that American Airlines was bringing to
21 the transaction; correct?
22   A    No.
23   Q    How does your analysis take into
24 account the value of the assets that American
25 Airlines was bringing to the transaction?

Page 252

1    A    It takes account of them by choosing
2  comparables where other -- where airlines are
3  bringing things of value to the merger.
4    Q    Are you thinking about TWA? My
5  question involved American Airlines.
6    A    Oh, I'm sorry. I apologize. That's
7  correct.
8    Q    It's correct that your analysis
9  disregards the value of the assets --
10   A    Yes. In answering your original
11 question, yes.
12   Q    Let me ask it just so the record is
13 clear.
14   Your analysis disregards the value of assets
15 that American Airlines was bringing to this
16 transaction; correct?
17   A    Correct.
18   Q    Your analysis disregards the
19 negotiating position of the APA; correct?
20   A    Yes.
21   Q    Your analysis disregards the APA's
22 views concerning whether it was willing to engage in
23 arbitration of seniority integration disputes;
24 correct?
25   A    Yes.

Page 253

1    Q    Your analysis disregards
2  pre-transaction -- the direct pre-transaction
3  expectations of the TWA pilots; correct?
4    MR. PRESS: I object to the form of the
5  question. Asked and answered.
6    THE WITNESS: I don't understand that
7  question.
8  BY MR. TOAL:
9    Q    Well, I thought before previously you
10 testified that you didn't directly take into
11 consideration the pre-transaction expectations of
12 the TWA pilots. Is that true?
13   MR. PRESS: It's been asked and
14 answered five times, I think.
15   THE WITNESS: Are you asking me their
16 expectations -- okay. Let me answer the question.
17 The answer is that's the kind -- that's the
18 kind of thing I take into account indirectly by
19 choosing my set of comparators.
20 BY MR. TOAL:
21   Q    That's why my question asked if you
22 took it into account directly.
23   A    Well, that's what I meant by directly.
24 Okay. Yes, I did not.
25   Q    And you did not directly take into

Page 254

1  consideration the pre-transaction career
2  expectations of the American Airlines pilots;
3  correct?
4    A    Correct.
5    VIDEO SPECIALIST: Two minutes, Dan.
6  BY MR. TOAL:
7    Q    Your analysis didn't take into
8  consideration the status and equipment of pilots in
9  either the American Airlines or the TWA groups;
10 correct?
11   A    What I did was I created a tool that
12 they could use to do that, but I did not take that
13 into account.
14   Q    And your analysis didn't take into
15 account any restrictions based on domicile,
16 including the St. Louis fence; correct?
17   A    That's correct.
18   Q    Did your analysis take into
19 consideration the size of the acquiring airline in
20 terms of the number of pilots relative to the size
21 of the acquired airline?
22   A    Yes.
23   Q    In what way?
24   A    When calculating the -- the
25 proportional mean difference, a critical element of

Page 255

1    that is how big the pilot forces are in the
2    calculation.
3        Q    Did you try to assess whether
4    transactions in which the acquiring airline has
5    multiples of the number of pilots of the acquired
6    airline, whether the proportional difference in mean
7    rank is correlated with that difference in size?
8        A    No, I did not.
9        Q    Is that something you would have the
10   ability to do?
11       A    Crudely.
12       Q    Why crudely?
13       A    Because of the micronumerosity problem,
14   the fact that there are not many -- all that many
15   mergers.  I don't know that I can estimate that
16   relationship very precisely.
17           MR. TOAL:  Off the record.
18           VIDEO SPECIALIST:  The time is now 5:20
19   and this ends disk number three.
20           MR. TOAL:  Why don't we -- why don't we
21   break for the day and get back at it tomorrow?
22       The deposition concluded at 5:20 p.m.
23           **********
24
25

Page 256

1           C E R T I F I C A T I O N
2    STATE OF NEW JERSEY
3               SS.
4    COUNTY OF GLOUCESTER
5        I, Jean B. Delaney, a Certified Shorthand
6    Reporter and Notary Public of the State of New
7    Jersey, do hereby certify that I reported the
8    deposition in the above-captioned matter; that the
9    said witness was duly sworn by me; that the reading
10   and signing of the deposition were waived by said
11   witness and by counsel for the respective parties;
12   that the foregoing is a true and correct transcript
13   of the stenographic notes of testimony taken by me
14   in the above-captioned matter.
15       I further certify that I am not an
16   attorney or counsel for any of the parties, nor a
17   relative or employee of any attorney or counsel
18   connected with the action, nor financially
19   interested in the action.
20
21
22   _____
         Jean B. Delaney, CSR #XIO1556
23       Notary Public #2044912 Exp. 6/19/13
24   Dated: January 23, 2013
25       D E G N A N & B A T E M A N, I N C.

# Exhibit 61

## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,
           Plaintiffs,
    vs.
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
           Defendant.

------------------
January 23, 2013
------------------

Continued oral sworn videotaped
deposition of HENRY FARBER, Ashenfelter & Ashmore,
32 Nassau Street, Princeton, New Jersey  08540 was
taken at the law office of Archer & Greiner, 700
Alexander Park, Princeton, New Jersey, before Jean
B. Delaney, Certified Shorthand Reporter and Notary
Public of the State of New Jersey, on the above
date, commencing at 9:30 a.m., there being present:

GREEN JACOBSON, P.C.
BY: ALLEN P. PRESS, ESQUIRE
7333 Forsyth Boulevard
St. Louis, Missouri  63105
(314) 862-6800
Attorneys for Plaintiff
TRUJILLO, RODRIGUEZ & RICHARDS, LLC
BY: NICOLE ACCHIONE, ESQUIRE
258 Kings Highway East
Haddonfield, New Jersey  08033
(856) 795-9002
Attorneys for Plaintiff

PAUL, WEISS, RIFKIND, WHARTON & GARRISON,
LLP

## Page 2

```
 1        JULIE ROMM, ESQUIRE
          1285 Avenue of the Americas
 2        New York, New York  10019
          (212) 373-3869
 3        Attorneys for Defendant, ALPA
 4        KATZ & RANZMAN, PC
          BY: DANIEL M. KATZ, ESQUIRE
 5        4530 Wisconsin Avenue N.W., Suite 250
          Washington, D.C.  20016
 6        (202) 659-4656
          Attorneys for Defendant, ALPA
 7
          Also present:  James Bateman, CLVS
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                    I N D E X
 2   Witness                           Page
 3   HENRY FARBER
 4      By Mr. Toal                        4
 5            E X H I B I T S
 6
 7   Marked for I.D.                    Page
 8   Farber-12  Congressional hearing     65
 9   transcript
10   Farber-13   April 2nd, 2001 decision   75
11   from the United States Bankruptcy Court,
12   District of Delaware
13   Farber-14   Rough copy of the transcript   81
14   of Bill Compton
15   Farber-15   Copy of the arbitration     97
16   decision concerning Continental Airlines
17   and Texas International
18   Farber-16   Copy of the arbitration     99
19   decision regarding the
20   FederalExpress/Flying Tigers
21   Farber-17   July 12, 1991 article from   116
22   the New York Times entitled Pan Am
23   Agrees To Sell
24
25
```

## Page 4

```
 1        VIDEO SPECIALIST:  Today is
 2   January 23rd, 2013, and this is the continued
 3   videotaped deposition of Henry Farber.  We are now
 4   going on the record and the time is 9:30.
 5        Would the court reporter please swear in
 6   the witness?
 7        HENRY FARBER, having been duly sworn,
 8        was examined and testified as follows:
 9   BY MR. TOAL:
10   Q     Good morning, Professor Farber.
11   A     Good morning.
12   Q     Professor, in this case are you
13   offering an expert opinion as to whether, in the
14   absence of a transaction with American Airlines, TWA
15   would have been able to continue to fly?
16   A     No.
17   Q     Did you do anything to analyze that
18   question?
19   A     Yes.
20   Q     So you -- you made a judgment in this
21   case that TWA should be categorized as an airline
22   that was not in danger of ceasing operations
23   imminently; correct?
24   A     Yes.
25   Q     And can you describe what your
```

1  Boeing; correct?
2      A    I believe I read somewhere that they
3  were talking with Boeing about -- about how to deal
4  with TWA's -- lease obligations to Boeing.
5      Q    And do you know anything about the
6  terms of those negotiations?
7      A    No.
8      Q    Do you know whether they were
9  successful?
10     A    No.
11     Q    Do you know whether, even if they were
12  successful, it would have addressed any of TWA's
13  liquidity concerns?
14     A    Well, I assume they would have
15  addressed some of them at least.  Success -- that's
16  what success would mean.  It would mean that they
17  would have addressed TWA's liquidity concerns.
18     Q    Do you know whether they would have
19  sufficiently addressed TWA's liquidity concerns that
20  it would have been able to pay its debts in the
21  ordinary course?
22     A    No.
23     Q    And you said your sense was that TWA
24  was in better shape than some of the other airlines
25  you listed on table one?

1      A    Yes.
2      Q    What did you do to analyze the
3  likelihood that any of those carriers that were
4  still flying were at risk of ceasing operations
5  imminently?
6      A    What I said -- what I meant by that
7  statement was there were airlines on the list that
8  had actually ceased flying.
9      Q    So aside from the ones that had
10  actually ceased flying, how did you evaluate for any
11  airline on the list whether it was likely to cease
12  flying imminently?
13     A    I relied on the arbitrator's
14  statements.
15     Q    Did you do anything beyond looking at
16  the arbitrator's statements?
17     A    No.
18     Q    Did you evaluate the background of the
19  arbitrators in those particular cases to see if they
20  had the expertise necessary to evaluate whether an
21  airline was likely to cease operations imminently?
22     A    No.
23     Q    So this -- this methodology that you've
24  described, trying to evaluate whether an airline was
25  likely to cease flying imminently, is that something

1  that labor economists do in the ordinary course of
2  their work?
3      A    No.
4      Q    Is it something that you feel that you
5  have expertise in doing?
6      A    Yes.
7      Q    And what -- how do you acquire the
8  expertise that allows you to evaluate whether an
9  airline was likely to cease flying imminently?
10     A    Well, I -- I relied on my general
11  training as an economist.  It wasn't something in
12  particular that a labor economist has a particular
13  advantage at.  But as part of this case, I had to
14  figure -- I had to try to figure out where in the
15  range of -- of part of my work in this case where in
16  the range of airlines undergoing mergers TWA fit.
17  Frankly -- anyway, let me leave it at that.
18     Q    And what aspect of your training as an
19  economist gives you expertise in evaluating whether
20  an airline is likely to cease operations imminently?
21     A    Well, as I said, having read
22  descriptions of mainly in these arbitration reports
23  of -- of quite a range of airlines in various states
24  of array or disarray, I got a feeling for what the
25  history, what the history was in airlines that were

1  what I would call in real trouble in the sense that
2  they were not flying, mostly not flying but, like,
3  about to cease flying.  They were in a kind of what
4  I'll call output free fall that I just didn't see in
5  the record for TWA.
6      Q    So my question to you is, what about
7  your economic training gives you expertise in
8  evaluating whether an airline is likely to cease
9  flying imminently, and what you described for me was
10  reading arbitration reports in the context of this
11  case; correct?
12     A    Yes, and evaluating them in the light
13  of my training as a economist, understanding how
14  markets work and so on.  I don't know how to answer
15  the question beyond that.
16     Q    Okay.  Is there anything else you can
17  point to in your training as an economist that gives
18  you expertise in evaluating the likelihood that an
19  airline will cease operations imminently?
20     A    No.
21     Q    And is the -- the methodology that you
22  describe for evaluating whether an airline is likely
23  to cease operations which consisted largely of
24  reading arbitration reports, is that a generally
25  accepted methodology in the field of economics for

Page 13

1 evaluating whether an airline is likely to cease
2 operations imminently?
3    A    I don't know.
4    Q    To your knowledge, is it?
5    A    No.
6    Q    Have you ever seen any peer reviewed
7 research setting forth such a methodology for
8 evaluating whether an airline is likely to cease
9 operations imminently?
10    A    No.
11    Q    Have you ever been engaged as an
12 expert, prior to this case, to evaluate whether an
13 airline was likely to cease operations imminently?
14    A    No.
15    Q    What relevance does it have in your
16 analysis whether an airline was likely to cease
17 operations imminently?
18    A    It -- it simply helped me determine the
19 set of comparable situations and, as it -- you know,
20 fundamentally cease operation imminently is a -- is
21 a -- is, from where I sit, an unfortunately
22 imprecise categorization.  The key -- the key is
23 that if you were to look at -- it was -- the role it
24 played in the analysis was really -- let me just
25 give you the shortest answer.  The role it played in

Page 14

1 the analysis was to help me determine what the
2 appropriate set of comparable cases were.
3    Q    Okay.  So you talked about, in your
4 answer, that the -- the notion of whether an airline
5 was likely to cease operations imminently was -- was
6 imprecise; correct?
7    A    Yes.
8    Q    And -- and you testified that it was an
9 imprecise term; correct?
10    A    It -- it doesn't have a quantitative.
11 What I mean by that is, there is no accepted
12 definition quantitatively of what imminently means.
13    Q    And -- and did you adopt a quantitative
14 definition in your own mind when you used that term?
15    A    No.
16    Q    What did you have in mind when you were
17 talking about whether a -- an airline that you were
18 analyzing was likely to cease operations imminently?
19    A    What I had in mind was -- what I wanted
20 to do was eliminate from a comparable list airlines
21 that were either not flying anymore or airlines that
22 were essentially in what I would call an output free
23 fall that it was absolutely clear that the routes
24 and equipment they used would no longer be used so
25 that they would stop -- they would -- would

Page 15

1 essentially cease operation, you know, almost
2 momentarily.
3    It was really very much a -- a -- a concept
4 about, look, are these guys, you know, really, you
5 know, can they make payroll Friday?  Here it is
6 Wednesday.  Can they make payroll Friday?  And -- so
7 that was what I meant by imminent.  And that was --
8 in -- in -- in retrospect, sitting here, it is an
9 unfortunate choice of word, but the concept I had in
10 mind was -- was quite clear.  They are not flying
11 and they won't be flying in a few days.  You know,
12 again, days is precise.  But, you know, very soon.
13    And as -- in reading the record, I -- I
14 said -- I found quite a range of financial
15 conditions in other airlines, and I needed -- what I
16 wanted to do was, you know, using my best judgment
17 as an economist, figure out the ones that appeared
18 to be most comparable to TWA's situation, and a lot
19 of these airlines are in financial difficulty.  So
20 it was a question of which ones are, you know, just
21 essentially already gone, even if they are still in
22 the last motions of flying, and which of them are
23 struggling along, which is really what TWA was
24 doing.  And then, of course, which ones were
25 actually healthy, which weren't in TWA's category

Page 16

1 either.
2    Q    So you only divide -- you only divide
3 the world in terms of comparables into those
4 acquired airlines that are not flying or are
5 expected to cease flying imminently, and those that
6 don't fall into that category; correct?
7    A    No.  I -- I divide the world into three
8 groups.
9    Q    Which other groups do you use?
10    A    The -- the -- the third group is the
11 group of airlines that is financially healthy, the
12 acquired airlines that were quite financially
13 healthy.
14    Q    So when you talked about imminently
15 being an expectation that the airline would cease
16 flying in a few days, do you mean to say that if you
17 expected an airline to cease operations a month
18 after a transaction, that you would not have
19 included them in the category of airlines that were
20 expected to cease flying imminently?
21    A    I don't know the answer to that.  I
22 would have to look at the details of the particular
23 case.  All of this is based on reading the
24 arbitration reports.  And in isolation, a single
25 statement is not going to tell me what I need to

1  know to answer your question.
2      Q     Well, if I'm trying to understand your
3  analysis and whether you appropriately categorized
4  airlines into your various buckets, what -- what
5  protocol can I use to determine whether you
6  appropriately made the analysis of whether an
7  airline is expected to cease flying imminently?
8      A     I don't know that I can specify a
9  protocol for you.  I have to read the decision, see
10  what the arbitrator said.  The arbitrators, what
11  they tend to do is summarize the overall situation,
12  summarize the case made by each side, and then try
13  to -- to draw it together.  And by reading that, I
14  felt I got an accurate picture of what was going on
15  in these other situations.
16     Q     So it is based on your subjective
17  judgment based on what you read in an arbitration
18  decision; correct?
19     A     It is based on my expert judgment.
20     Q     But it is based on a subjective, not an
21  objective judgment, relying on what you read in an
22  arbitration decision; correct?
23     A     Yes.
24     Q     And based on an arbitration decision
25  where you made no effort to understand what the

1  qualifications of the arbitrator was to assess, the
2  likelihood that the airline would stop operating
3  imminently; correct?
4      A     That's correct.
5      Q     Now, if -- if an airline was in danger
6  of liquidation within the near future, would you
7  view that as equivalent to an airline that was going
8  to cease flying imminently?
9          MR. PRESS:  I object to the form of the
10  question.  Particularly, your use of the phrase in
11  danger.  Subject to that, you can answer.
12         THE WITNESS:  I don't -- I don't --
13  again, I can't answer that without reading the
14  details of the case.  And when -- when an -- when an
15  organization is in financial difficulty, there are
16  many paths that can happen.  Liquidation's one.
17  Continuing operation under the bankruptcy rules is
18  another.  Finding an angel is a third.  You know,
19  it's --
20  BY MR. TOAL:
21     Q     Well, if an airline is expected to
22  liquidate its assets in bankruptcy, are you familiar
23  with the process by which that can happen?
24     A     I'm familiar, yes.
25     Q     And what does that mean for an airline

1  or any business to liquidate in bankruptcy?
2      A     Well, as I understand -- I mean, in
3  bankruptcy you can reorganize or liquidate, as I
4  understand.  And to liquidate would mean they would
5  sell their assets.
6      Q     And do you know what happens to the
7  employees of a company that liquidates?
8      A     They are not -- they are not working.
9      Q     Is it an accepted methodology within
10  the field of economics to rely on arbitration
11  decisions to understand whether an airline is about
12  to cease flying?
13     A     I don't know.
14     Q     To your knowledge, is it?
15     A     No.  It is not a subject of academic
16  discourse to discuss whether airlines are going to
17  liquidate or not.  So it is not really an
18  appropriate question to ask whether it is accepted
19  to use a technique in this narrow question when the
20  question doesn't come up in academic discourse.
21     Q     Well, are you -- are you familiar with
22  any testing of the methodology you used to analyze
23  whether an airline was about to cease flying?
24     A     No.
25     Q     And do you know whether the technique

1  that you used in relying on arbitration decisions
2  has a known error rate?
3      A     No.
4      Q     Let me ask you to take a look at
5  paragraph 33 of your report.
6          Before I get there, let me ask you, do you
7  regard -- do you regard liquidation in bankruptcy as
8  the equivalent of ceasing operation?
9      A     I don't really know the bankruptcy
10  rules well enough.  I'm not an expert on bankruptcy.
11  I'm -- I'm -- I'm interpreting the term liquidation
12  as selling off the assets rather than continuing to
13  operate.
14     Q     So would you regard those, at least as
15  you are using those terms, as being equivalent?
16     A     Yes, yes.
17     Q     Okay.  So in paragraph 33, you set
18  forth an example involving hypothetical airlines A
19  and B that are combining, and you say suppose that
20  airline A was in reasonably good financial condition
21  but the financial condition of airline B was
22  sufficiently poor that it had ceased flying or is
23  expected to cease flying imminently absent the
24  combination with airline A.  Do you see that?
25     A     Yes.

Page 81

```
 1      identification.)
 2      MR. TOAL:  Let me mark as Farber
 3   Exhibit-14, a rough copy of the transcript of the
 4   deposition of Bill Compton.
 5   BY MR. TOAL:
 6      Q    Is this something you've seen before
 7   today?
 8      A    No.
 9      Q    And you know who Bill Compton is?
10      A    No.
11      Q    Bill Compton was the CEO of TWA at the
12   time of the transaction with American Airlines.
13      Does that refresh your recollection?
14      A    No.  I -- I never knew who the CEO of
15   TWA was.
16      Q    Okay.  So look at page eight of this
17   transcript.  Take a look at page 14 -- line 14.
18      You see the questions asked, as of 1999 when
19   you became the CEO of TWA, can you describe the
20   airline's competitive position within the industry?
21   And the answer is, in 1999?  The question is, yes.
22   And the answer is, it was not good.  And the
23   question is, why is that?  And the answer is, TWA,
24   if you go back from the year 2000, hadn't made a
25   profit in 12 years, an operating profit, any
```

Page 82

```
 1   operating profit in twelve consecutive years.  And
 2   if you would go back 30 years, you might just find a
 3   handful of years in which TWA earned an operating
 4   profit.  TWA was unsuccessful for not only that year
 5   and a few years before that, but for decades.  Do
 6   you see that?
 7      A    Yes.
 8      Q    Is that information that you were aware
 9   of when you prepared your report?
10      A    No.
11      Q    Is that information that, had you been
12   aware of, might have affected your analysis?
13      A    No.
14      Q    Why not?
15      A    This isn't the kind of analysis I did.
16   I -- you've asked me this morning several times,
17   more than several times, whether I've considered the
18   financial details of TWA, and I haven't.  That's not
19   how I -- I -- I -- I did my analysis.
20      Q    Is it your testimony that the history
21   of profitability of TWA wouldn't have any bearing on
22   whether it was expected to cease flying in January
23   of 2001?
24      A    I'm saying based on my analysis, it
25   didn't -- I concluded that it didn't appear to me
```

Page 83

```
 1   that TWA was going to cease flying imminently.
 2      Q    And my question is whether the history
 3   of profitability of TWA would be expected to have
 4   any bearing on whether TWA was expected to cease
 5   flying imminently as of January 2001?
 6      A    Not in the analysis I did, no.
 7      Q    What about in the real world?
 8      A    This is a real world.  I did a real
 9   world analysis of a particular kind.  In a different
10   kind of analysis, someone else might consider that.
11   I didn't.
12      Q    Take a look at page 21 of this
13   transcript.
14      And with respect to the analysis that you did,
15   the factor that you focused on was whether there was
16   a output free fall, correct, in determining whether
17   TWA was expected to cease flying imminently?
18      A    I didn't see the size of their
19   operations.  I didn't look at their financials.  I
20   didn't see signs in their operations.  That's all.
21      Q    And the factor that you focused on was
22   whether there was an output free fall; correct?
23      A    Uh-huh.
24      Q    I'm sorry.  Did you answer that last
25   question?
```

Page 84

```
 1      A    You asked me did the factor that I
 2   didn't consider --
 3      Q    I asked you if the factor that you
 4   focused on in your analysis was whether there was an
 5   output free fall.
 6      A    Yeah, uh-huh, yes.
 7      Q    Okay.  So on page 21 of this
 8   transcript, if you take a look at line nine, you see
 9   it says, you said that TWA's third bankruptcy filing
10   was in January of 2001; is that right?  The answer
11   is, yes.  The question is, as -- and as CEO, do you
12   have an understanding of TWA's financial condition
13   at the time of the third bankruptcy filing?  And the
14   answer is, I did.  The question is, how would you
15   describe it?  And the answer is, it was worse than
16   not good.  It was bad.  TWA was -- TWA was going to
17   liquidate within days without a deal.  Do you see
18   that testimony?
19      A    Yes.
20      Q    Now, would that have affected your
21   analysis if you had been aware of this testimony
22   prior to preparing your report?
23      MR. PRESS:  I object to the form of the
24   question.  Assumes facts.
25      THE WITNESS:  Perhaps, it would.
```

Page 85

```
1   BY MR. TOAL:
2        Q    In what way?
3        A    Well, it would lead me to believe that
4   perhaps -- perhaps TWA, I don't know if they were
5   going to be able to find another suitor, but it
6   would make it somewhat more likely that they would
7   cease operations soon.
8        Q    Then the testimony goes on to say, what
9   is the basis for your understanding that TWA was
10  going to liquidate within days without a deal?  And
11  the answer is, a major issue was that we had an
12  accounts receivable fund coming due that I
13  believe -- I could be off by a week, but I believe
14  it was due on January 10, 2001, and it was a hundred
15  million bill that we owed.  And in early January,
16  TWA's total cash, total available cash was
17  20 million.  Put that in perspective, TWA was a
18  company that on average had expenditures of
19  10 million a day some days it was, of course, as an
20  average.  Some days it could be 30 million in a day,
21  and the next day it would be one million.  On
22  average, it was a company that spent 10 million a
23  day in expenses.  So TWA had approximately
24  20 million in cash, we owed a hundred million, we
25  had negative cash flow, so it was not a good
```

Page 86

```
1   situation.
2        Do you see that?
3        A    Yes.
4        Q    And if you had been aware of that
5   testimony prior to preparing your report, might that
6   have affected your analysis about whether TWA is
7   expected to cease flying imminently?
8        A    It was something I would have
9   considered.  There is more information that's
10  needed.  I don't know what TWA's revenue per day is,
11  for example.  This is all about expenditures and
12  available cash.  It is not about the revenues.
13       MR. PRESS:  And it impeaches the
14  judge's supposed finding.
15       MR. TOAL:  That's an objection, Allen?
16       MR. PRESS:  Yes.  I object to the use
17  of these documents.  I mean, you are asking him to
18  assume facts that aren't true, and I do object to
19  this, Dan, but go ahead and ask your question.
20       MR. TOAL:  That sounds more like a
21  speech than an objection.
22       MR. PRESS:  Yeah.  Call it what you
23  want.
24  BY MR. TOAL:
25       Q    Professor Farber, if -- if it was true
```

Page 87

```
1   that TWA was going to liquidate within days without
2   a deal, would that have led you to categorize TWA as
3   being comparable to the airlines that were
4   equivalent to airline B in your example from your
5   report?
6        A    I don't know.  I -- TWA, again, was
7   still flying.  They were still flying a full
8   schedule which differentiates them quite
9   dramatically from the other airlines in category B,
10  most -- most of which were not flying at all.  TWA
11  was still flying.
12       Q    Your category B, Professor, is airlines
13  that either had ceased flying or were expected to
14  cease flying imminently; correct?
15       A    Yes.
16       Q    And if it's true that as of the time of
17  the transaction that, absent the transaction, TWA
18  was going to liquidate within days, would that
19  qualify as being expected to cease flying
20  imminently?
21       A    I'm telling you that my reading of the
22  record was that there were other options for TWA,
23  and it wasn't clear to me that they were going to
24  cease flying imminently.
25       Q    I understand, but I'm asking you to
```

Page 88

```
1   assume that this testimony is true.  You don't have
2   to agree with that.  I'm just asking you to make an
3   assumption.
4        A    Well, the assumption is not about the
5   testimony.  You are asking me to agree that TWA
6   would have stopped flying the next day, and the
7   answer is, if TWA would have been expected to stop
8   flying the next day, I would have had to classify
9   that as imminently ceasing flying.
10       Q    Which would be equivalent to the
11  airline B in your example; correct?
12       A    Yes.
13       Q    And on your chart, and on table one,
14  the acquired airlines that you've indicated are
15  comparable to airline B in your hypothetical are
16  Frontier, Midwest and Links; correct?
17       A    But there is more.  There is some --
18  for example, I believe Delta/Northwest.  Again, I --
19  remember, I don't have in front of me the
20  classification of all of them.  I remember the three
21  at the bottom that weren't flying at all, but there
22  is also some near to the top that are higher up that
23  are in that category.
24       Q    Okay.  So -- but the ones that you
25  identified, that you were able to identify earlier
```

Page 89

```
 1   today, were Frontier --
 2        A    Well, but that's -- I should not have
 3   done that without the full list in front of me
 4   because it is not fair to just pick the ones at the
 5   bottom and say, yeah, they are in that category
 6   because there are others throughout the list that
 7   are in that category, as well.
 8        Q    You believe that Northwest was an
 9   airline that had ceased flying --
10        A    No, no.  I -- I say -- I'm not
11   saying -- I have to get -- let me stop talking about
12   specifics and tell you, I will get you, either today
13   or soon, a list that tells you which of these are in
14   which category.  And from there, what you can do is
15   ask what would be the effect on the list of
16   moving -- you can have your people do that.
17        Q    Have you done that analysis --
18        A    No.
19        Q    -- of what would the effect be on the
20   list if you had categorized TWA as an airline that
21   was expected to cease flying?
22        A    No.  No.  I've never done that.
23        Q    So with regard to your knowledge about
24   TWA's financial condition prior to the American
25   Airlines transaction, do you know anything about
```

Page 90

```
 1   what -- what TWA's level of profitability was at the
 2   time?
 3        A    No.
 4        Q    Do you know anything about its
 5   profitability trends?
 6        A    No.
 7        Q    Do you know anything about its yields
 8   at the time?
 9        A    No.  Yields?  I'm sorry.  I don't
10   understand the question.  What yields?
11        Q    Do you know anything about any of its
12   yields, its yields on operations?
13        A    What's a yield?
14        Q    Are there certain yields with regard to
15   TWA that you knew about?
16        A    Define yield for me, please.
17        Q    Do you know if there are any pilots who
18   had been furloughed from TWA at the time of the
19   transaction?
20        A    No.
21        Q    Do you know when TWA had most recently
22   hired pilots before the transaction?
23        A    I don't know the precise date, but I
24   believe there were some that were hired reasonably
25   close to the date of acquisition.
```

Page 91

```
 1        Q    And just on order of magnitude, how
 2   recently do you understand pilots --
 3        A    Months.  Months, I think, but I could
 4   be misremembering the scenario.
 5        Q    Did you assess whether any pilots that
 6   were hired were hired to replace retiring pilots?
 7        A    No.
 8        Q    Did you assess whether the number of
 9   pilots who were hired were more or less than the
10   number of pilots who were retiring or leaving the
11   company?
12        A    No.
13        Q    Do you know anything about whether TWA
14   had unencumbered assets?
15        A    No.
16        Q    Do you know anything about whether TWA
17   had untapped lines of credit?
18        A    No.
19        Q    So beyond the transactions that are
20   listed on -- in your table one in your report, your
21   backup materials by -- by my count had arbitration
22   decisions for an additional ten transactions.
23        A    Okay.
24        Q    Is that consistent with your
25   recollection?
```

Page 92

```
 1        A    I don't have a specific numerical
 2   recollection.
 3        Q    Do you know why those transactions are
 4   not included on table one?
 5        A    Lack of information.
 6        Q    Do you know which information was
 7   lacking in those situations?
 8        A    No.
 9        Q    Did you have enough information in
10   those situations to calculate a proportional
11   difference in mean rank?
12        A    I don't know.
13        Q    One of the transactions on your table
14   one is Texas International and Continental; correct?
15        A    Yes.
16        Q    And in that transaction, Texas
17   International, although it is a smaller airline, was
18   the acquiring airline; correct?
19        A    Correct.
20        Q    And you -- you actually used that
21   transaction as establishing your lower bound for
22   what an alternative seniority integration list would
23   have looked like in this case; correct?
24        A    Uh-huh.
25        Q    So here you calculated a proportional
```

23 (Pages 89 to 92)

Page 105

1    or the other.  You know, like a fat person and a
2    skinny person, you average them and you get an
3    average person.  You know, a really healthy airline,
4    a somewhat weaker airline, you get an average
5    airline. And you take that average, and -- and there
6    is more than one factor so there is not just a
7    financial health.
8         There is also the value they bring to the
9    merger.  Those are all related to things like career
10   expectations.  There was no benefit with the data
11   available to have a larger number of categories.  In
12   fact, it would have resulted probably in a less
13   precise estimate.
14        Q     But you could have concluded that in
15   order to create categories with comparable airlines,
16   I need to have a certain number.  And if that number
17   prevented you from doing an average; you could have
18   stated that as your conclusion; correct?
19        A     It could have, but I felt I could make
20   it come up with a credible estimate in three
21   categories.
22        Q     And if you -- would you agree with me
23   that if you have a category with dissimilar
24   airlines, that the average is not going to be
25   predictive of the results of any future transaction

Page 106

1    within that category?
2         A     No.
3         Q     And when you talked about a generally
4    accepted methodology, what methodology were you
5    referring to?
6         A     It was something we talked about
7    yesterday, with the idea that when there is some --
8    some -- I will call it some -- I will call it a bad
9    act, discrimination or something.  What you want to
10   ask is, what would have happened absent some
11   particular act?  You have to observe what the
12   outcome would have been in the situation where there
13   wasn't the allegation that there was a particular
14   action.
15        In this case, it was the duty -- it was the
16   shirking by ALPA of their duty of fair
17   representation with a breach.  In more legal terms,
18   the breach of the duty of fair representation.  So I
19   found arbitrations that looked similar, just like I
20   would find people doing similar work in an
21   environment that is non-discriminatory, and I would
22   look at the pay of -- of people from that situation,
23   and compare it to the pay in the situation where
24   there has been the -- the discrimination.
25        And in this case I looked at arbitration

Page 107

1    outcomes and cases where there hadn't been an
2    allegation of breach of -- there hadn't been any
3    breach of the duty of fair representation, and said
4    we understand each case is a little bit different.
5    That's why we look at an average.  And what we get
6    from the average, it says, you know, other things
7    equal, it's just basically saying that sometimes
8    it's higher and sometimes it's lower, and on average
9    we get it right.  This is, you know, this is a
10   commonly accepted way of doing what's called --
11   doing what's called evaluation in -- in empirical
12   economics.  Not just in labor economics, but in
13   other areas of economics.
14        Q     So is the methodology that you were
15   referring to, the calculation of proportional
16   difference in mean ranks?
17        A     No.  No.  The -- I'm taking it -- I'm
18   taking the big picture and saying how is Professor
19   Farber approaching this problem?  What he is doing
20   is he is saying, look.  We have a situation where
21   ALPA breached their duty of fair representation.  We
22   need a scientifically accepted method.  We need a
23   reliable method to come up with an estimate of what
24   would have happened in that case absent the breach
25   of duty of fair representation.  The -- the way --

Page 108

1    the way an economist would look at this would be to
2    say, we need to find situations where there was not
3    a breach of the duty of fair representation,
4    situations that on average are similar.  The key is
5    on average.  No two situations are exactly
6    identical.
7         So, on average, I -- I -- I've taken
8    essentially a sample of cases like that, the ones I
9    can find.  They weren't chosen to be one way or the
10   other.  They were simply chosen because they met the
11   criteria I laid out to make them in the broadest
12   terms similar to the TWA case.  And you can go
13   through the record and say this one is a little bit
14   different that way.  That one is a little bit
15   different the other way.  But, on average, that's
16   what you get.  And that's -- that's the
17   scientifically accepted way of doing this.
18        Q     Just to be clear, what you have done
19   here is not a scientifically accepted method for
20   predicting the result of a -- of a seniority
21   integration in the absence of a breach of a duty of
22   fair representation; correct?
23        A     When you phrase it that narrowly, no,
24   because no one has ever done that.  No one's ever
25   had call to do that before.  So that what you have

Page 109

1   to do is go to the accepted science on looking at
2   how does one calculate what happened absent a
3   certain behavior, and there is a scientifically
4   accepted way of doing it, and that's what I've done.
5       Q     And what's the name for the
6   scientifically accepted approach that you used?
7       A     What's the name for it?  I don't know
8   that I have a formal name for it.  I -- I want to
9   say it's -- I don't have a particular name for it.
10      Q     So as far as I can tell, the thing that
11  you've done here, that there is a scientific or
12  economic name for is that you calculated a
13  proportional difference in mean ranks; correct?
14      A     Well, you can calculate proportional
15  between anything you want.  What I'm saying is it's
16  -- it's -- the -- the scientific method of it is --
17  is -- has more to it than just a calculation.  It is
18  not -- you know, the calculation is the least of it.
19  The calculation took us two seconds.  You know,
20  the -- the -- the hard part is to say, how do I set
21  up what you might think of as, the phrase we use is
22  natural experiment.
23      We have a situation here where we observe an
24  outcome in the presence of a breach of the duty of
25  fair representation.  And the legitimate question to

Page 110

1   ask is, what is the effect of this breach of duty?
2   In order to do that, I have to -- unfortunately, I
3   can't go to the alternate universe and run the
4   TWA/American transaction without the doing of the
5   job.  I can't do that.
6       So what I have to do, and this is the science
7   of it, what I have to do is come up with another set
8   of cases that in important respects are similar, but
9   obviously are always going to vary, and look at the
10  average outcome in those cases where the both units
11  did their job, and compare the outcomes.  The
12  calculation of the proportional mean difference is
13  simply the metric I use to compare the difference in
14  this world that's not tainted with the world that's
15  tainted.
16      Q     So when you are talking about what you
17  did that you think was scientifically accepted, do
18  you think the creation of the categories that you
19  developed was the product of some scientific method?
20      A     I'm saying the framework I used is the
21  product of the scientific method, and I use my
22  expertise as an economist to come up with the
23  categories that made sense given my experience doing
24  this kind of analysis, not in the litigation
25  framework particularly, but in -- in -- in my

Page 111

1   economic work generally.
2       Q     But you've never worked in the -- on a
3   matter dealing with seniority integration before;
4   correct?
5       A     That's correct.
6       Q     And you had no experience in that area
7   before this case?
8       A     That's correct.
9       Q     And there was no science to how you
10  developed your categories; correct?
11      A     I -- I resist the term no science.  No.
12  I used my best professional judgment.
13      Q     And there -- there are no objective
14  metrics for how you developed your categories;
15  correct?
16      A     That is correct.  And one could
17  calculate alternative comparison groups based on
18  different characterizations of the data.  For
19  example, one, for example, I haven't thought about
20  this before, but one, you might say let's just
21  re-categorize groups.  Take airlines that are shut
22  down and look at them.  Take airlines that are
23  flying but in financial distress.  Take them.  Take
24  airlines that are healthy.  Take them.  That would
25  be an alternate three category view of the world.

Page 112

1       You could take -- create -- if you really
2   wanted to go to four categories:  Airlines that are
3   shut down; airlines that are flying but could well
4   shut down soon; airlines that are flying but weak,
5   but could continue to flying; airlines that would
6   fly forever.  I don't know what effect of doing any
7   of those alternatives were, but you could do that or
8   I could do that.
9       Q     And in using a scientific method, you
10  would try and take into account other variables that
11  might account for the proportional difference in
12  mean rank that you are seeing in these transactions;
13  correct?
14      A     As I said, the -- the paucity, the
15  micronumerosity, the phrase that I used -- he always
16  likes that -- the micronumerosity that I talked
17  about yesterday means that I can't consider
18  explicitly very many different things.  The fact is
19  that things like career expectations are often
20  highly correlated with the financial condition of
21  the carrier.
22      Airlines that are weaker financially offer
23  less good career expectations to their pilots.
24  Airlines that are stronger financially tend to offer
25  stronger career expectations to pilots.  They tend

Page 113

1  to, not a hundred percent of the time.  So by
2  categorizing them and using the financial condition
3  of the airline, they're in trouble, they are not in
4  trouble, like that, I'm also capturing part of the
5  career expectations.  So even though I don't name
6  career expectations as something I explicitly
7  consider, it is accounted for indirectly in my
8  analysis.  It is not ignored.
9      Q    Well, my question is, with respect to,
10  if your job is to isolate the impact of an alleged
11  breach of the duty of fair representation, in a
12  scientific methodology, you would want to take into
13  account all of the other explanatory variables that
14  impact the metric that you are using; correct?
15      A    Doing real science in the real world,
16  limited by the data available, we do the best
17  scientific thing we can, and you can't take account
18  of every single detail --
19      Q    So --
20      A    -- directly.  Indirectly, I do account
21  for an awful lot of this.
22      Q    Well, you don't account for, for
23  instance, length of service of -- of the pilots in
24  either the acquired or the acquiring airline;
25  correct?

Page 114

1      A    We do.  That's how the seniority list
2  is constructed, based on length of service.  That's
3  what the seniority list is, is length of service.
4      Q    Do you evaluate for each of the
5  transactions on your list, the extent to which the
6  proportional difference in mean rank that you see is
7  attributable to differences in seniority from the
8  acquired and the acquiring airline?
9      A    The lists I come up with preserve the
10  seniority ranking within the airlines.  The
11  proportional mean difference in ranks that we
12  compute then is also based on the seniority rankings
13  of the pilots in the two airlines.  So I'm really
14  not sure what else I could be doing with the
15  seniority.
16      Q    Well, your metric of proportional
17  difference in mean rank could be affected by when
18  each of the airlines in the transaction actually
19  hired pilots; correct?
20      A    No.  It is not a date of hire merge.
21  It's -- it's -- it's affected entirely by the
22  ordering within airline, within origin airline of
23  the pilots is based on their date of hire.  But you
24  can imagine -- let -- let -- let me give you the
25  following example that might make this clearer.  I'm

Page 115

1  trying to help you here.  The following example.
2      Imagine you have two airlines merging, one of
3  which started 50 years ago and hasn't hired a pilot
4  in 30 years, so all their pilots have at least 30
5  years seniority.  It's crazy numbers.  The other
6  airline started ten years ago, so all their pilots
7  were hired in the last ten years.  Right?  Maybe I'm
8  making your case for you.  I don't know.
9      Our method of merging -- and they have equal
10  numbers of pilots, and we merge them in what I'll
11  call a fair ratio.  So, take one, take the next.
12  Take one, take the next.  Take one, take one from
13  the next.  You are going to do that in order, and
14  what's going to look -- certainly pilots from the
15  newer airlines are going to be higher -- higher on
16  the list than some -- some pilots from the new
17  airline will be higher on the list than some pilots
18  from the older airline, all of whom have more
19  seniority.  Right?
20      But that's the nature of the merger of
21  seniority lists always.  That's why often, when a
22  legacy airline with pilots with lots of seniority
23  are being acquired, the first thing they say is, we
24  want a date of hire merge, because that's going to
25  put them all at the top of the list.  And the

Page 116

1  arbitrators always reject that, virtually always
2  reject that.
3      Q    Have you seen cases in which
4  arbitrators take into account date of the hire in
5  constructing a merge list?
6      A    Have I seen -- frankly, there is a lot
7  of lip service paid to date of hire, but it turns
8  out, aside from ordering within the carriers, they
9  are more concerned about career expectations, and
10  financial health, and things like that.
11      Q    Well, would you agree that if an
12  arbitrator did take date of hire into consideration,
13  and the acquiring and the acquired pilots had
14  differences in their date of hire, that's -- that's
15  a factor that could influence the proportional
16  difference in mean rank between the two airlines?
17      A    If the arbitrator took into account
18  date of the hire, sure.
19      Q    What do you know about the transaction
20  between Delta and Pan Am?
21      A    I know this is one -- this is the one
22  that was not decided by an arbitration, and I
23  believe we went outside the arbitration award to try
24  to get some information on the financial health and
25  so on.

Page 117

1    Q    And do you know whether that
2  transaction involved Delta acquiring all Pan Am
3  pilots or only certain Pan Am pilots?
4    A    I don't know.  I don't recall.
5         (Farber-17  July 12, 1991 article from
6         the New York Times entitled Pan Am Agrees To
7         Sell Major Routes To Delta marked for
8         identification.)
9  BY MR. TOAL:
10   Q    Let me show you a document that I will
11 mark as Farber Exhibit-17, an article from the New
12 York Times dated July 12, 1991, entitled Pan Am
13 agrees to sell major routes to Delta.
14        Is this an article you've seen before,
15 Professor?
16   A    No.  I have not seen this -- reviewed
17 this personally, no.  Is it --
18   Q    Okay.  Let me direct your attention to
19 the beginning of this article.
20        It says, bankrupt and crippled by its failure
21 to develop a solid, domestic route, Pan Am World
22 Airways wrote an end to a saga as America's once
23 proud flight carrier by agreeing Thursday to sell
24 off its remaining premier international routes.  Do
25 you see that?

Page 118

1    A    Yes.
2    Q    Does this refresh any recollection that
3  you have about whether the Pan Am transaction
4  involved an acquisition of substantially all of Pan
5  Am's assets or only select assets?
6    A    I -- I -- I can read this here.  I see
7  that.
8    Q    Do you have any independent knowledge
9  about whether the Pan Am transaction involved only
10 part of the airline's assets?
11   A    No.
12   Q    And with respect to the pilots that
13 were hired, do you know anything about where they
14 fell on Pan Am's seniority list?
15   A    No.
16   Q    And did you undertake any analysis to
17 try and understand whether the placement of the Pan
18 Am pilots on the integrated seniority list was
19 explained by their seniority?
20   A    Well, certainly it was explained by
21 their seniority.  I mean, because to the ordering of
22 the Pan Am pilots on the combined list is in order
23 of their seniority.
24   Q    Well, if Delta was acquiring Pan Am's
25 premier international routes and the pilots on those

Page 119

1  routes had sufficient seniority to bid into those
2  flights, might that suggest that the Pan Am pilots
3  on any integrated list would -- would do better?
4    A    Not necessarily.  It -- it depends on
5  the nature of -- of how the lists were merged.  If
6  they were merged on a strict date-of-hire basis,
7  that would be true.  It may be true that -- and --
8  and this was the result of some negotiations.  I
9  look at this -- it is true, while it -- it is
10 somewhat mild, it is also true, on average, the Pan
11 Am pilots did worse than the Delta pilots.  That's
12 why the difference is negative on table one.  So the
13 Pan Am pilots, on average, did worse on the combined
14 seniority list.
15   Q    But you don't know the composition of
16 that group of Pan Am pilots; correct?
17   A    No.
18   Q    And you don't know whether they were --
19 if the legacy Pan Am pilots were the most senior
20 pilots or not; correct?
21   A    I don't.  That's correct.
22   Q    And you don't know whether any
23 relatively recent hires at Pan Am were part of this
24 transaction; correct?
25   A    That's correct.

Page 120

1    Q    Paragraph 53 of your report, you say
2  that TWA was not comparable to Links, Midwest, or
3  the first Frontier because, while it was weak
4  financially, it was able to continue flying routes.
5    A    Correct.  Paragraph --
6    Q    -- 53.
7    A    53.
8    Q    And are you offering an expert opinion
9  with regard to that statement that TWA was not
10 comparable to Links, Midwest, or first Frontier?
11   A    I'm -- I'm -- I'm saying what I said
12 here.  I said TW -- it was weak financially.  It was
13 able to continue flying routes.  Yes, it was flying
14 routes.
15   Q    Is that --
16   A    That's an observation.
17   Q    That's an observation.  Is that an
18 expert opinion you are offering?
19   A    It is an observation.
20   Q    So is the answer to my question, no?
21   A    They were flying routes.  Yeah, I mean,
22 yes.  I suppose.  Maybe it is not -- I don't know --
23 I don't know if an observation is an expert opinion
24 or not.  I'm observing a fact.
25   Q    But --

1      A    TW -- Frontier -- TWA was flying routes
2  and Links, Midwest, and Frontier were not.  Ergo,
3  they are not compatible.  Is that an expert
4  conclusion?
5      Q    Do you have any expertise in evaluating
6  whether airlines are comparable to one another in
7  terms of their financial condition?
8      A    I'm saying that I didn't say that.
9  What I was saying was --
10     Q    This is a new question.  I'm not --
11     A    Okay.
12     Q    My question is, do you have expertise
13 in evaluating whether two airlines are comparable to
14 one another in terms of their financial condition?
15          MR. PRESS:  Didn't we go through this
16 ad nauseam yesterday?  Well, the answer to that is,
17 yes, we did.  It's been asked and answered.
18          THE WITNESS:  I have expertise to know
19 whether two airlines, in general terms, are
20 comparable in financial condition.
21 BY MR. TOAL:
22     Q    And what -- what expertise do you have
23 in that area?
24     A    Well, I can -- again, I can -- I'm
25 trained as an economist.  I can -- you know, I can

1  read -- read -- I can read materials that are --
2  that are put in front of me, and I -- I have -- I've
3  told you the purpose to which I've put, you know,
4  that analysis, the -- the -- the rough
5  categorization of the airlines into different
6  categories.
7      Q    You mentioned the Ichan proposal as a
8  potential alternative for TWA in the event there was
9  no transaction with American Airlines; correct?
10     A    Yes.
11     Q    Do you know anything about the position
12 of the TWA pilots regarding a -- any transaction
13 involving Carl Ichan?
14     A    No.
15     Q    Are you aware that the TWA MEC passed a
16 resolution indicating that they would not
17 participate or support any transaction involving
18 Carl Ichan?
19     A    No.
20     Q    Is that relevant to your analysis?
21     A    No.
22     Q    On table one, you list a transaction
23 between Southwest and AirTran; correct?
24     A    Yes.
25     Q    And how did you categorize that

1  transaction?
2      A    As I said, as I sit here in front of
3  me, I don't have the categorization.
4      Q    I believe you said in your report that
5  you tended to do further research, at footnote 36 on
6  page 18.
7      A    Let me -- let me --
8      Q    Take a look at page 18.
9      A    It might say in -- the answer to your
10 previous question might be in my report.
11          What group did I put them in?
12     Q    I don't think the -- the categorization
13 is in your report, but at footnote 36 you say, I
14 have not been able to determine why former AirTran
15 pilots were placed so low on their post transaction
16 seniority list following the Southwest/AirTran
17 transaction --
18     A    Right.
19     Q    -- and will continue to research this
20 question.
21     A    Right.
22     Q    So what have you done to continue to
23 research that question?
24     A    We simply -- we -- we -- we spent some
25 time trying to search sources, various sources,

1  again, online and so on, to try to get more
2  information on what went on there.  We've been
3  unable to find anything to shed -- to shed light
4  on -- on -- on why that transaction looks the way it
5  does.
6      Q    Is that work you did after submitting
7  your report?
8      A    Well, as I -- as we say in the report,
9  we are continuing to look at that question, but we
10 haven't come up with anything.  So, yes, it is work
11 we've done since submitting the report, but there is
12 nothing to show for it.
13     Q    Just to be clear, you did work after
14 submitting your report to try and understand --
15     A    Yes, yes.
16     Q    Do you know how much work you did?
17     A    No, I don't.  You know, we probably
18 asked one of our guys to do it.  They put a few
19 hours in, but it is not a big -- it's not a high --
20 frankly, it -- it wasn't a high priority -- it was
21 not a high priority once the report was in.
22     Q    And is that something you are
23 continuing to pursue?
24     A    Well, I -- I don't know.
25     Q    Do you have any plans to continue to

Page 125

1   pursue that research?
2       A    No.
3       Q    Now, with respect to -- now, which of
4   the acquired airlines on table one do you understand
5   were not flying at the time of the transaction?
6           MR. PRESS:  You already asked that.  He
7   said he was going to get back to you.
8           MR. TOAL:  I -- I think I asked him
9   about categorizations which is broader than the
10  airlines that were not flying.
11          THE WITNESS:  What I volunteered to you
12  was that I knew that Republic, Links -- Republic did
13  -- Links, Midwest, and the first Frontier were not
14  flying at the time of their acquisition.  But I --
15  beyond that, I don't know about the rest of the
16  list, and -- and I can -- I will -- will send you
17  something if you -- if you -- if you want, we can
18  send you something like that.
19  BY MR. TOAL:
20      Q    Do you know anything about the
21  circumstances that led to Frontier ceasing
22  operation?
23      A    Which Frontier?  The first Frontier?
24      Q    The first Frontier that you list with
25  the Continental -- the Continental transaction.

Page 126

1       A    Not -- not as I sit here right now.
2       Q    Do you know whether Frontier had the
3   ability to obtain financing that would have allowed
4   it to continue flying?
5       A    I'm sorry.  Say that again.
6       Q    Do you know whether Frontier had the
7   ability to obtain financing that would have allowed
8   it to continue to fly?
9       A    No, I don't.
10      Q    So take a look at paragraph 49 of your
11  report.  You say in the second sentence here, you
12  say, for example, prior to its acquisition by
13  Republic, Links was bankrupt and only flying because
14  of injections of money by Republic, and as far as
15  the arbitrator could determine, had no prospect of
16  ever being profitable.  Do you see that?
17      A    Yes.
18      Q    So does that refresh your recollection
19  that at the time of the acquisition, Links was, in
20  fact, flying?
21      A    I would have to -- I would have to
22  double check that.  I -- I was quite sure they
23  weren't flying.  So either the sentence is wrong or
24  my recollection earlier is wrong.  So I want to
25  double check that.

Page 127

1       Q    Okay.  And isn't it true that TWA was
2   flying at the time of the transaction only because
3   of injections of money by American Airlines?
4       A    I don't know that.
5       Q    Did you make any efforts to determine
6   whether that was true?
7       A    No.
8       Q    Why not?
9       A    Just didn't.
10      Q    Now, take a look at paragraph 51 of
11  your report.  Do you see the last sentence here?
12  Last sentence here says, Links and Midwest
13  were so weak financially at the time of their
14  acquisitions that each was only flying because of
15  financial assistance from Republic.  Do you see
16  that?
17      A    Yes.  It just shows -- shows you the
18  danger of -- of trying from memory to tell you
19  something about table one.
20      Q    Does that refresh your recollection
21  that Midwest was flying at the time of the
22  transaction?
23      A    To -- yes.
24      Q    And to the extent that TWA was -- was
25  flying at the time of the transaction only because

Page 128

1   of financial assistance from American Airlines, and
2   in that respect, TWA would be comparable to Links
3   and Midwest; correct?
4       A    In that particular respect, yes.
5           MR. PRESS:  It is 12:30.
6           MR. TOAL:  You want to take a break?
7           MR. PRESS:  Yes, unless you are close.
8           MR. TOAL:  It -- it is probably a good
9   time to take a break.
10          VIDEO SPECIALIST:  The time is now
11  12:29 and we are going off the video record.
12          (Luncheon recess.)
13          VIDEO SPECIALIST:  The time is now 1:37
14  and we are back on the video record.
15  BY MR. TOAL:
16      Q    Professor Farber, during the break you
17  indicated you had a clarification you wanted to make
18  concerning table one; is that correct?
19      A    Yes, I did.  At one point, I -- when
20  you asked me do I know which -- which of the
21  acquired airlines in table one were not flying, I
22  indicated that Midwest and Links were not flying.
23  And I did some checking over lunch, and what I
24  discovered was I had misspoken.  The text is
25  accurate on this.  They were both flying, but they

Page 129

```
 1   were both flying very diminished fleets and
 2   schedules, just a fraction of what they used to fly.
 3       Q    And how did you do that checking?
 4       A    I -- I -- I checked with two of the
 5   people back at the office, and they looked it up for
 6   me.
 7       And this is -- and this is evident on a
 8   careful reading of the arbitration reports.
 9       Q    And Professor Farber, you indicated
10   that you are going to attempt to find out how the
11   other acquired airlines were categorized that appear
12   on table one.
13       A    Yes.
14       Q    Were you able to do that over the lunch
15   break?
16       A    I -- I don't -- I don't have a list
17   ready for that yet, no.  But I can get it to you if
18   you would like.
19       Q    Okay.  Professor Farber, what testing
20   did you do, if any, to determine whether the
21   methodology used here enables you to predict the
22   results of seniority integrations?
23       A    I didn't do any testing.
24       Q    In your list of comparable
25   transactions, transactions you considered comparable
```

Page 130

```
 1   to American Airlines and TWA, you include two
 2   transactions involving cargo airlines; correct?
 3       A    Yes.
 4       Q    And did you do any research to try and
 5   evaluate whether there are any relevant differences
 6   between cargo airlines and passenger airlines?
 7       A    When I looked at those initially, I
 8   said -- I wondered, and then I looked at the
 9   descriptions in the arbitrator's reports, and the
10   arbitrators appeared to do -- use similar sets of
11   criteria when -- when rendering a decision.  So
12   ultimately I just went ahead with that.
13       Q    And other than reviewing the
14   arbitration decisions, did you do any other analysis
15   to try and assess whether cargo airlines had
16   relevant differences from passenger airlines?
17       A    No.
18       Q    And you also include in your list of
19   transactions that you considered comparable,
20   transactions between two Canadian airlines; correct?
21       A    A transaction between two Canadian
22   airlines.  There were two Canadian?
23       Q    There was one transaction between --
24       A    One transaction between two Canadians
25   airlines, yes.
```

Page 131

```
 1       Q    And do you have an understanding as to
 2   whether the rules and laws that govern seniority
 3   integration in Canada are comparable to the rules
 4   and laws that govern seniority integration in the
 5   United States?
 6       A    Well, the legal framework governing
 7   labor unions in Canada is different from the United
 8   States.  It is more -- much less nationally based
 9   and more provincially based than the US.  But,
10   again, when I read the report, both of them, there
11   are two -- there are two for that case.  It is sort
12   of strange.  Again, they -- the -- the -- the -- the
13   text reads just like an American arbitration report.
14   They are considering the same factors.  They are
15   considering the health of the airlines, value broad,
16   career expectations, et cetera.  So, again, I
17   decided to go ahead with them.
18       Q    And did you do anything other than
19   reading the arbitration decision in that --
20   concerning that transaction to understand whether
21   the rules governing seniority integration in Canada
22   differ from the rules governing seniority
23   integration in the United States?
24       A    I'm not sure what you mean by rules.
25   Whose rules?
```

Page 132

```
 1       Q    Any relevant laws, regulations,
 2   standards that are used by arbitrators.
 3       A    Again, I'm reading -- I determined that
 4   there appeared that the standards used were the same
 5   as in the US, de facto.
 6       Q    I understand, but what you read was the
 7   arbitration decision itself.
 8       A    Correct.
 9       Q    And my question is whether, other than
10   reading that arbitration decision, you made any
11   other efforts to assess whether there were
12   differences between Canadian standards and US
13   standards regarding seniority integration?
14       MR. PRESS:  He answered what standards.
15       THE WITNESS:  It is not clear to me
16   what standards you are talking about.  These are
17   private transactions, so that in the US, for
18   example, there is -- there is no external standard
19   governing seniority interactions.  These are
20   essentially private -- private negotiations or -- or
21   private arbitrations.  At least -- yes.  Well, at
22   least until -- I mean, let me -- let me amend that.
23       I understand in the US there is a regulatory
24   framework, and at least currently the McCaskill bond
25   amendment codifies into law that there ought to be
```

Page 149

1 proportionate difference in means as your -- as your
2 metric?
3 A Yes.
4 Q Which cases?
5 A In many cases -- in -- in -- in -- in
6 the paid discrimination cases, particularly, well,
7 what I've done is I looked at pay differences as a
8 function of characteristics in the workers
9 accounting for differences in job performed, in age,
10 in experience, time with the company, things like
11 that.
12 Q And why did you take those
13 characteristics into account such as job
14 performance, age, experience?
15 A I didn't say job performance.
16 Q You did say job performance.
17 A I meant job assignment.
18 Q Job performed?
19 A The -- the job performed, yes. I said
20 job performed.
21 Q Okay.
22 A That's job assignment, not job
23 performance.
24 Q Okay. So job performed, age, time with
25 the company. Why -- why did you attempt to take

Page 150

1 those characteristics into account?
2 A Well, there is a large body of
3 literature in labor economics which, in particular,
4 I mentioned -- did I mention education? Education
5 is variable number one in these analyses. We -- we
6 have a model called the human capital model which
7 links pay to worker's characteristics, and then --
8 and links then when people will be paid to the skill
9 they bring to the job measured by education, how
10 long they've been in the labor market, how long
11 they've worked for the company. There is some
12 controversy about how finely one should control for
13 the job performed, but it is something we often look
14 at in these analyses.
15 Q And did you analyze those factors
16 because those are nondiscriminatory characteristics
17 that can account for pay differences?
18 A Yes.
19 Q Were you aware there was a transaction
20 between TWA and Ozark Airlines?
21 A I think I heard about it but I
22 hadn't -- I don't know anything about it.
23 Q Do you have information concerning the
24 seniority integration in the TWA/Ozark case?
25 A No. Not that I can recall.

Page 151

1 Q Did you ever seek information
2 concerning the TWA/Ozark case?
3 A No. Not specifically. If it was one
4 of the mergers we were to have looked at, presumably
5 we looked. But I don't -- no, I don't -- I didn't
6 look for that.
7 MR. TOAL: And let's go off the record.
8 VIDEO SPECIALIST: The time is now 2:07
9 and we are going off the video record.
10 (Brief recess.)
11 VIDEO SPECIALIST: The time is now 2:14
12 and we are back on the video record.
13 MR. TOAL: Thank you, Professor Farber.
14 I pass the witness.
15 MR. PRESS: No questions.
16 VIDEO SPECIALIST: The time is now 2:14
17 and this concludes the videotaped deposition.
18 The deposition concluded at 2:14 p.m.
19 **********
20
21
22
23
24
25

Page 152

C E R T I F I C A T I O N
STATE OF NEW JERSEY
                              SS.
COUNTY OF GLOUCESTER
    I, Jean B. Delaney, a Certified Shorthand
Reporter and Notary Public of the State of New
Jersey, do hereby certify that I reported the
deposition in the above-captioned matter; that the
said witness was duly sworn by me; that the
foregoing is a true and correct transcript of the
stenographic notes of testimony taken by me in the
above-captioned matter.
    I further certify that I am not an
attorney or counsel for any of the parties, nor a
relative or employee of any attorney or counsel
connected with the action, nor financially
interested in the action.


_____
    Jean B. Delaney, CSR #XIO1556
    Notary Public #2044912 Exp. 6/19/13
Dated: January 24, 2013

D E G N A N & B A T E M A N, I N C.