# Exhibit 62

**UNITED STATES DISTRICT COURT**
DISTRICT OF NEW JERSEY

PATRICK BRADY, *et al.*,

                              Plaintiff,

v.

AIR LINE PILOTS ASSOCIATION INTERNATIONAL,

                              Defendant.

Civil Action
No.  02-2917 (JEI)


EXPERT REPORT OF
KATIA P. SYCARA, PH.D.


March 15, 2013


**Newell-Simon Hall, 1602D**
**Carnegie Mellon University**
**5000 Forbes Avenue**
**Pittsburgh, PA 15213-3890**

### III.    Documents Considered

In performing my analysis, I have reviewed Mr. Salamat's October 12, 2012 expert report and his deposition in this case.  I have also reviewed other relevant materials, including the trial transcript.  A complete list of documents considered is attached as Appendix B.

### IV.    Summary of Opinions

Based upon my education, experience, and expertise, as well as my review of Mr. Salamat's report and other materials from this case, my opinion is that Mr. Salamat has misapplied my theory of persuasive argumentation.  Mr. Salamat's application of my argumentation theory to estimate how much better (for the TWA pilots) a hypothetical agreement between the TWA pilots and APA would have been, had ALPA taken actions which plaintiffs alleged it failed to pursue, does not support Mr. Salamat's qualitative analysis, quantitative analysis, or conclusions.

My opinion is based on the following:

- Although Mr. Salamat admits that the actions that ALPA allegedly did not take *are not arguments*, he nevertheless uses my persuasive argumentation model, which presupposes that arguments are used, as a framework to estimate the probability of a hypothetical agreement between TWA pilots and the APA had certain actions been taken.

- Mr. Salamat applies my argumentation model to what he characterizes as a single issue negotiation over pilot seniority, but a key assumption of my theory, which he ignores, is that the negotiation involves multiple issues.

- Mr. Salamat fails to construct a structure of the beliefs and goals of the persuadee (APA), even though construction of such a model is a crucial element in my theory.

- Although Mr. Salamat admits that in this case, the importance of an issue and perception of an issue's value cannot be distinguished, he nevertheless treats them as separate in his estimation framework.

- My argumentation model does not prescribe any means of estimating probabilities of success in reaching an agreement.  However, Mr. Salamat uses my theory to estimate such probabilities, which is inconsistent with the design of my model.

### V.    My Academic Work on Persuasive Argumentation

My argumentation theory presents a computational model of how a software agent can generate plausible persuasive arguments in negotiation to guide parties toward convergence to an agreement.  A software agent is a computer program that has an explicit objective, e.g. producing arguments, that it wants to achieve and also has a set of computational methods that it can use in order to achieve that objective.  In my 1990

7.  On p. 9 of his report, Mr. Salamat says: "Using Sycara's methodology as a guide as to the relative importance of each type of influence, I developed a static table of probabilities that allow a methodical way to estimate the likelihood that the actions could have had in isolation. …..As shown in Figure 3, by assigning probabilities to each form of influence (ΔImportance was assigned at 3%, ΔPerception at 5% and Abandonment at 2%), a linear model… ".  My argumentation model does not provide any guidance about the relative importance of changing an issue's perception versus importance or abandonment, and my model provides no basis for Mr. Salamat's assignment of probabilities to these forms of influence.  Indeed, at his deposition Mr. Salamat admitted that his assignment of probabilities was subjective and essentially arbitrary.

## VII.    Mr. Salamat's Report Incorrectly Attempts to Estimate Probabilities

Even if Mr. Salamat's attempts to apply my model of persuasive argumentation to an analysis of damages in this case were not fundamentally flawed, for all of the reasons set forth above, his analysis would  still be wrong because his estimate of the probability that a different seniority integration would be reached is both inconsistent with my theory and incorrect as a matter of mathematics.

To estimate the probability that an agreement more favorable to the TWA pilots (the Salamat agreement as he says in his deposition) would have been reached, Mr. Salamat assigns subjective, arbitrary probabilities to each cell in the table of Figure 3.  He then adds all the probabilities in the rows and columns to get 73%, which he interprets as the probability of APA and the TWA pilots agreeing to the Salamat agreement.

The estimation model is simply wrong.

First, as discussed above, Mr. Salamat fails to meaningfully distinguish between the importance of an issue and the persuadee's perception of an issue's value.  As a result, the three-column format he presents is incorrect.

Second, as Mr. Salamat acknowledged during his deposition (January 29, p. 206), he did not use any scientific methodology to determine the value of the probabilities that he assigned to the cells of the Table in Figure 3.  Mr. Salamat also could not explain why he assigned the same numerical probability value to each column.

Third, adding the probabilities in each cell of the table is wrong as a matter of basic math. (Douglas C. Montgomery and George C. Runger, *Applied Statistics and Probability for Engineers*, Wiley 2010, Ch. 2, 3, and 5.)  According to probability theory, probabilities can only be summed if the outcomes associated with an action are mutually exclusive.  In other words, for Mr. Salamat's approach to be valid, an action that changes the Importance of an issue cannot change the Perception of an issue's value or lead to goal Abandonment.

However, in Figure 3, ΔImportance, ΔPerception and Abandonment are not mutually exclusive, as Mr. Salamat states on p. 9 of his report: "For instance, ALPA providing

support to the TWA pilots (the last item in the list of actions), would have had the potential to effect some change in the importance the APA placed on one or more issues (such as fences, the value of TWA jobs, etc). This support, in isolation, may only have had a 3% chance of moving the APA toward an agreement. In combination with the potential to lead the APA to abandon goals (such as stapling), and change their perception of the TWA, support for the TWA pilots might only have had a 10% chance of obtaining an agreement". In other words, he considers that ΔImportance, ΔPerception and Abandonment can co-occur, i.e. they are not mutually exclusive.

A simple check of the validity of Mr. Salamat's method of combining probabilities shows that his method is wrong. The simple check is to slightly change the probabilities in the table and verify whether their sum is still less than or at most equal to 100% since the value of a probability cannot exceed 100%. As an example, consider increasing the probability in each cell of Figure 3 by 2%. A 2% increase in each cells results in 5% for ΔImportance, 7% for ΔPerception, and 4% for Abandonment. If one then adds the rows of the Table in Figure 3 with the new numbers and adds the column of the total of the rows, as Mr. Salamat did in Figure 3, the total is 113% which is wrong since the value of a probability cannot exceed 100%.

## VIII. Conclusion

Based on my review of his work, Mr. Salamat has seriously misapplied my theory of persuasive argumentation. His report and deposition show multiple points of confusion in his understanding of the underlying concepts and assumptions of my theory. Mr. Salamat uses the wrong estimation framework; ignores fundamental assumptions about and preconditions for the applicability of my model; and attempts to use my model to generate probabilities in contravention of both my own theories and of basic math.

Katia P. Sycara
March 15, 2013

# Exhibit 63

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3         PATRICK BRADY, SALLY YOUNG,
           HOWARD HOLLANDER, THEODORE CASE,
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                           Plaintiffs,
 6                                           VOLUME 10
                V.                           TRIAL TRANSCRIPT
 7
           AIR LINE PILOTS ASSOCIATION,
 8
                           Defendant.
 9
                                      CAMDEN, NEW JERSEY
10                                    JUNE  23, 2011

11         B E F O R E:   HONORABLE JOSEPH E. IRENAS
                          UNITED STATES DISTRICT JUDGE
12
                          A P P E A R A N C E S:
13
                TRUJILLO, RODRIGUEZ & RICHARD
14              BY:  NICOLE M. ACCHIONE, ESQ.
                     AND: LISA J. RODRIGUEZ, ESQ.
15                   AND
                GREEN JACOBSON, P.C.
16              BY:  ALLEN PRESS, ESQ.   (MO. BAR)
                AND: JOE D. JACOBSON, ESQ.   (MO. BAR)
17              For the Plaintiffs.

18              ARCHER GREINER
                BY:  STEVEN FRAM, ESQ.
19                   AND
                KATZ & RANZMAN
20              BY:  DANIEL M. KATZ, ESQ.
                FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
                ELIZABETH  GINSBURG, ESQ.
22              IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1          Pursuant to Section 753 Title 28 United States
Code,  the following transcript is certified to be an
2  accurate record as taken stenographically in the
above-entitled proceedings.

3
                         S/   LYNNE JOHNSON
4
                         Lynne Johnson, CSR, CM, CRR
5                        Official Court Reporter

6

7

8

9

10              LYNNE JOHNSON, CSR, CM, CRR
             OFFICIAL COURT REPORTER
11           UNITED STATES DISTRICT COURT
             P.O. BOX 6822
12           LAWRENCEVILLE, NJ  08648

13

14

15

16

17

18

19

20

21

22

23

24

25

Day-direct/Press                                                    14

```
1    Q.    That was their initial proposal?

2    A.    Yes.

3    Q.    To integrate how many TWA pilots?

4    A.    Well, we had approximately 2,300 pilots.

5    Q.    Staple how many?

6    A.    About 1,500.

7    Q.    Then the other 800 or so would be integrated on what

8    basis, again?

9    A.    They would be integrated on the basis of one TWA for

10   five American, starting at the bottom of the list and working

11   up which would have put our senior captain, Captain Upp, who

12   had been hired in 1963, about, somewhere in the 7000's,

13   paired up with pilots ahead, even, that hadn't even been born

14   yet.

15   Q.    You would have been in that group personally?

16   A.    I would, I was actually about 150 behind him, behind

17   Captain Upp on our group.  So I would have been at least

18   another 750 behind that.

19   Q.    Do you recall what response the TWA merger committee

20   made to this initially proposal by the American pilots,

21   Captain Day?

22   A.    Well, all the proposals, as I understood it coming in,

23   had been rejected.

24   Q.    Okay.  Did you understand the basis for the American

25   negotiators proposal?
```

1   A.   Yes.

2   Q.   Okay.  What was that?

3   A.   Well, first of all they were very concerned about the

4   top third of our seniority list.  It was very senior, date of

5   hire wise, compared to their list.  And they felt that the

6   only protected jobs would be sustainable captain jobs.  They

7   felt that a 767 first officer position at American was new

8   hire position, so that all of these pilots should go on the

9   bottom of their list.  But that wasn't just on the bottom of

10  the list, that was on the bottom of pilots that were

11  continuing to be hired as we were negotiating.

12  Q.   All right.  Now, their opener was to staple two thirds

13  approximately to the pilot seniority list, right?

14  A.   Yes.

15  Q.   But the Judge, Judge Irenas, yesterday, asked you if the

16  APA, or the American pilots had the right to staple all of

17  you, and you I think, what was your response to the Judge?

18  A.   Well, I didn't argue with the Judge.  And I agreed that,

19  with him.

20  Q.   And what was the basis for your belief in that?

21  A.   Well, what we had been continually told by the APA that

22  their green book required all pilots to be put on the bottom

23  of of their list.

24          THE COURT:  The green book, is the collective

25  bargaining agreement.

1              THE WITNESS:  Their collective bargaining

2    agreement.

3    A.    And that because that basically was what they kept

4    pushing.

5    Q.    So this notion that there could be 100 percent staple,

6    that was something the American negotiators said?

7    A.    Continuously.

8    Q.    Since court yesterday, have you looked at this green

9    book, the scope section of it?

10   A.    I did go back and review it.

11   Q.    Okay.  And it has been marked as an exhibit, that was

12   P-255.  If we can have that, please.

13              THE COURT:  P-255 is already in evidence?

14              MR. PRESS:  It is, yes.

15   Q.    Is this what you looked at, Captain Day?

16   A.    Yes.

17   Q.    If you go to beige 14 of this exhibit, you see the

18   section that has been highlighted called successorship?

19   A.    I do.

20   Q.    Now, can you describe for the jury what, how you

21   interpret the contract language on how the seniority list

22   would be merged in the context that you found yourself in.

23              MR. FRAM:  I object, your Honor.  I don't see that

24   there is any foundation that the witness knew about these

25   provisions at the time.  He has testified about what

1    Americans position was.  And there is no indication he

2    disagreed with Americans position.  I really think this is

3    leading in terms of trying to get him to change testimony he

4    has already given.

5            THE COURT:  I am going to allow it.  Go ahead.  Go

6    ahead.

7    Q.   Captain Day, what does this contract say about how the

8    list would be merged?

9    A.   Well --

10   Q.   First of all, tell the jury what provision you are, you

11   want them to focus on?

12   A.   I am looking at section I there, successorship.  We are

13   talking about seniority list merger which is Section 2 behind

14   it.  It talks first, if the successorship is an affiliate of

15   the air carrier, which it is not.  If it were it would have

16   been essentially go under, as the Judge pointed out

17   yesterday, arbitration.

18           But then we get to the end where it says the

19   requirement of this provision does not apply to the company's

20   acquisition of all or part of another air carrier in a

21   transaction which includes the acquisition of aircraft and

22   pilots, and that would be this specific transaction.

23   Q.   Is there anywhere in there that says there has to be 100

24   percent staple, that you read?

25   A.   No.

Day-cross/Fram                                                    107

1    A.    That's correct.

2    Q.    Did you review the asset purchase agreement between

3    American Airlines and TWA that was the basis for the

4    bankruptcy and the transaction that was proposed in the

5    bankruptcy?

6    A.    I believe I did.

7    Q.    And were you aware that one of the conditions of the

8    American TWA deal was that the TWA pilots had to waive their

9    scope and successorship provisions?

10   A.    Yes.

11   Q.    When did you first review the, and by the way, did you

12   know that was required, that condition was required, by

13   American because American had a collective bargaining

14   agreement with the own pilots represented by the APA, and

15   that collective bargaining agreement had different

16   provisions.

17   Q.    Different provisions from the agreement between TWA and

18   the pilots.  Do you recall that?

19   A.    I do.

20   Q.    Okay.  And did you testify this morning that the

21   position taken by the American pilot was that they were

22   entitled under their collective bargaining agreements, to

23   have the TWA pilots stapled?

24   A.    Yes.

25   Q.    And then you said this morning when Mr. Press put P-255

1    up that you had reviewed the agreement last night and had a

2    different view today of what that agreement required, right?

3              MR. PRESS:  Judge, I think that mischaracterizes

4    the testimony.

5              THE COURT:  Well, I don't know.  I heard something

6    like that.

7    Q.   Let's put it up, let's bring up P-255, and let's look at

8    the successorship provision that the witness referred to.  On

9    page  1-14.

10             Let's blow up those couple paragraphs, the one

11   agreement binding on successor.  Seniority list merger.

12   These are the ones that we talked about a little bit this

13   morning, right?

14             Now, are you telling us that your reading today of

15   these provisions is that the American pilots did not have the

16   right to have the TWA's pilots stapled.

17   A.   No.

18   Q.   Okay.  What relevance, if any, do you think this --

19             THE COURT:  So your you think, let me turn that

20   question around.

21             Do you agree that under this agreement American

22   could have stapled the TWA pilots, if this agreement was

23   carried out?

24             THE WITNESS:   I agree they had the right to do

25   that.

Day-cross/Fram                                                    109

```
 1              THE COURT:  Okay.
 2   Q.   Didn't you testify this morning that agreement binding
 3   on successor provision, that that provision applied to the
 4   transaction between American and TWA?
 5   A.   Yes.
 6   Q.   What do you understand the successor referred to in that
 7   paragraph to be, are you saying that successor there was TWA?
 8   A.   Well, yes.
 9   Q.   All right.  So you read the sentence, the agreement
10   shall be binding upon any successor.  You felt in that
11   paragraph that successor would encompass TWA.  Yes?
12   A.   Yes.
13   Q.   Are you aware, sir, that successor is a defined term in
14   this agreement?
15   A.   Not right now, no.
16              THE COURT:  Before that, as a lawyer, you know what
17   we mean when we talk about a defined term.
18              THE WITNESS:  Yes, sir, I do.
19              THE COURT:  Okay.
20   Q.   Did you look at the definitions to this agreement last
21   night when you looked at this one particular provision?
22   A.   No, I did not.
23   Q.   I mean you know as a lawyer from your legal training
24   that a contract has to be read in its entirety to understand
25   the document and what it means, right?  Are you familiar with
```

# Exhibit 64



**ALLIED PILOTS ASSOCIATION**

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org

April 18, 2001

Captain Mike Day
Chairman TWA Merger Committee
Airline Pilots Association International
500 N. W. Plaza, Suite 1200
Saint Ann, Missouri 63074

Dear Mike:

Attached is the APA Merger & Acquisitions Committee's revised seniority integration proposal.

As we have stated in our previous meetings and correspondence with the TWA Merger Committee, the basic objective of our approach to the AA/TWA pilot seniority list merger is to protect the career expectations of AA pilots while preserving the career expectations of TWA pilots. For TWA pilots, this includes protecting the Captain jobs the TWA assets contribute to the combined airline, the opportunity to upgrade into those Captain jobs for a certain number of TWA pilots, and assuring that TWA Pilots will not be bumped or flushed from their positions solely by reason of the implementation of the combined seniority list.

In working through this problem, we must acknowledge the possibility that management may have purchased assets that simply will not work at AA, and therefore ultimately may not be utilized in a combined operation. At the same time, while no AA pilot should see his or her career stagnate or decline as a result of the acquisition, no AA pilot should expect to see his or her career accelerate at the expense of the TWA pilots. It is to prevent the latter that we have proposed protecting for TWA pilots the actual,

ALPA 004671

— J-309

sustainable Captains jobs brought by TWA, protecting upgrade possibilities, and ruling out a bump or flush.

In all frankness, your last proposal fails to honor these principles, since it places the TWA Pilots on the merged seniority list in a manner that would permit them positions far beyond what legitimately could have been expected absent this transaction. Just as one example, the operation of your proposed merged seniority list would expand the approximately 300 767 Captains jobs TWA brings to the table into nearly four times that many positions -- all at the expense of AA pilots who could otherwise have expected a natural progression to such seats.

---

Letter to Captain Day
April 18, 2001
Page 2 of 2

In order to put our principles into practice, we propose to take a snapshot of the numbers of sustainable Captains jobs at AA and TWA as of a date to be agreed upon. That "snapshot" will then be used to establish a baseline for the number of Captains positions protected to the TWA pilots. The baseline will initially reflect jobs in original TWA bid statuses. Should AMR move TWA equipment around the AA system, we propose to guarantee for TWA pilots a number of Captains proffers within the AA system to assure that the total number of jobs protected under our proposal to the TWA Pilots remains available. Our proposal also assures that those protected Captain positions will be available to a certain number of TWA First Officers, who we agree had legitimate expectations to upgrade to Captain at TWA, without regard to their placement on the merged seniority list.

In addition, under the proposed Transition Agreement between AA and APA, a hard fence may be in place for bidding into or out of the LLC as late as the end of 2004. The LLC will presumably have bid sheets separate from AA during the period of the hard fence. This should allow TWA pilots to exercise operational seniority within the LLC regardless of their placement on the combined seniority list. TWA pilots will also be

ALPA 004672

afforded the additional opportunity of bidding into the AA system and exercising their seniority on the combined list should they choose to do so.

In summary, we have constructed a proposal that is designed to protect the jobs of current TWA Captains, that guarantees a certain number of First Officers will upgrade to Captain, and we have guaranteed that these jobs will continue to exist for you should AMR move those jobs around our system. Furthermore, the hard fence erected by the LLC will protect the TWA pilots, with separate bid sheets that allow you to exercise your operational seniority within the LLC. TWA pilots, should they choose, will also have access to the variety of opportunities available within the combined system. All this will take place against a backdrop of dramatically increased pay, job security, career path, and an improved and secure retirement.

For these reasons, we believe that our proposal is the basis for a fair resolution of the seniority integration issues. We are ready to discuss this proposal and any questions you may have about it.

Sincerely,

/signed
Captain Edwin White, Jr.
Chairman of Allied Pilots
Association
Mergers & Acquisitions
Committee

---

18 April 2001

APA' s Comprehensive Offer for an AA/TWA Seniority List Integration

*I. Merged Seniority List*

ALPA 004673

System seniority within the merged AA system will be determined as set forth below. Merged seniority numbers may have no application within TWALLC during the period of the hard fence, and will apply to TWA Pilots only within the AA operation.

## A. Seniority List Merge Date

Seniority List merge date shall be on the date on which American Airlines was declared the successful winner of the auction for the assets of TWA (12 March 2001).

## B. Seniority for Pilots Hired after the Seniority List Merge Date

All pilots hired after the seniority merge date shall be given a seniority number in accordance with Section 13 of the APA collective bargaining agreement.

## C. Seniority List Integration Method

Since the most senior equipment at TWA is the 767, APA proposes to place the senior most TWA pilot behind the most junior pilot projected to be a 757/767 Captain based on the current fleet and additional firm order aircraft for B777 and B757. Based on calculations, this seniority should be 7051. APA further proposes to evenly ratio 883 TWA captains from 7052 to the end of the AA seniority list.

## II. Captain Upgrade Opportunities

In order to meet the career expectations of TWA pilots to upgrade to Captain, APA is willing to provide a mechanism to upgrade an agreed to number of TWA F/Os to Captain at an agreed rate.

## A. Captain Job Protection

In order to protect the number of TWA Captain jobs that are brought to the American Airlines system, APA is willing to guarantee Captain positions based on the following.

```
1. AA Management will identify the number of TWA Captains
   in their respective bid status on an agreed date.
```

ALPA 004674

These jobs will be tracked as a 5-part bid status - TWA/BASE/EQUIP/CAPT/DIVISION.

2. The positions identified in 1. will be tracked by AA management and adjusted based on the following formula, which will be used to determine the number of TWA Captain jobs that are available for TWA pilots to bid and hold:
# jobs by aircraft type = previous month's jobs, minus any aircraft grounded or not retained in the AA/TWALLC fleet, times a Manning Ratio for that aircraft, minus a percentage of TWA retirements from that aircraft, minus any TWA captains who proffer to F/O positions outside of fence, minus any proportional decrease in flying (see below), minus any TWA pilots eligible for upgrade that bypass Captain.

3. The Captain jobs identified in 2. will be available for bid by TWA pilots. No AA pilot can bid jobs posted as TWA jobs until all TWA pilot proffers and displacements have been satisfied for the bid period.

4. If the total number of Captain jobs in a TWA bid status do not meet the requirement in 2., lateral Captain bids at AA bases that have excess jobs will be available for bid by TWA pilots.

B. No AA pilot may displace a TWA pilot who holds a guaranteed TWA 5-part Captain bid (under the jobs formula).

## C. *Formula for Proportional Decrease in Flying*

In order to calculate the number of Captain job that will be decreased in the TWA captain's job protection formula, the following will be used:

Snapshot of aircraft on agreed date:

| | | |
|---|---|---|
| TWA | – | 178 |
| AA | – | 718 |
| Total | – | 896 |

If the number of total aircraft operated by AA and the TWALLC drops below 896, or the number of aircraft operated by AA drops below 718, then:

1. If the number of aircraft operated by the TWALLC is 178, the number of captain jobs will be decreased by 1 TWA captain Job for each 5 AA captain jobs; or

ALPA 004675

2. If the number of aircraft operated at the TWALLC is less than 178, or the draw down schedule as outlined in the AA/APA TWALLC transition agreement; and if the number of aircraft decrease at the TWALLC is less than the number of aircraft loss at AA, then the number of TWA protected captain jobs will be reduced by 1 captain job for each 5 captain jobs lost at AA as measured by the difference between the AA/TWALLC aircraft loss differential.

## IV. *Fence*

A. The fence will be from the senior most TWA pilot to the junior most AA pilot on March 12, 2001. The fence will be in force from the date of seniority merge until the junior most pilot on the AA seniority list March 12, 2001 has had the opportunity to bid a four part captain bid at American Airlines as defined by the Basic Working Agreement between American Airlines and APA. In addition, the following will apply to TWA pilots:

1. No TWA pilot may bid a First Officer position on the 777, A300 or any new bid status on equipment with a Maximum Gross Takeoff Weight (MGTOW) greater than 407,000 pounds until the junior most AA pilot on the AA seniority list as of March 12, 2001 has had the opportunity to bid a four part F/O bid on the 777 at American Airlines as defined by the Basic Working Agreement between American Airlines and APA. Once the junior most AA pilot on the AA seniority list as of March 12, 2001 has bid or bypassed a 777 F/O bid, any TWA pilot may bid F/O on such equipment. If a TWA pilot inside the fence elects to bid a F/O position on the 777, A300 or any new equipment greater than 407,000 pounds, such pilot will be restricted from bidding Captain on any equipment until the junior most AA pilot on the AA seniority list as of March 12, 2001 has had the opportunity to bid a four part Captain bid at AA.

2. No TWA pilot may bid a Captain position on the 737 until the junior most AA pilot on the AA seniority list as of March 12, 2001 has had the opportunity to bid a four part Captain bid on the 737 at American Airlines as defined by the Basic Working Agreement between American Airlines and APA. Any TWA pilot that bids a four part Captain bid on the 737 is restricted to reserve until the junior most AA pilot on the AA

ALPA 004676

seniority list as of March 12, 2001 can hold a regular line selection.

3. No TWA pilot may bid a Captain position on the 727 until the junior most AA pilot on the AA seniority list on March 12, 2001 has had the opportunity to bid a four part Captain bid on the 727 at American Airlines as defined by the Basic Working Agreement between American Airlines and APA. Any TWA pilot that bids a four part Captain bid on the 727 is restricted to reserve until the junior most AA pilot on the AA seniority list as of March 12, 2001 can hold a regular line selection.

4. No TWA pilot may bid a Captain position on the 777, A300 or any new bid status on equipment greater than 407,000 pounds until the junior most AA pilot on the AA seniority list as of March 12, 2001 has had the opportunity to bid a four part Captain bid on the 777 at American Airlines as defined by the Basic Working Agreement between American Airlines and APA. Any TWA pilot that bids a four part Captain bid on the 777, A300 or any new bid status on equipment greater than 407,000 pounds is restricted to reserve until the junior most AA pilot on the AA seniority list as of March 12, 2001 could hold a regular line selection on the 777.

B. During the operation of the TWALLC, the following restrictions apply to movement inside the LLC and transfer between the LLC and American Airlines:

1. No TWA pilot in the LLC may displace an AA pilot outside the LLC.

2. Once a TWA pilot has bid out of the TWALLC into American Airlines, such pilot can exercise all provisions of the contract, except:

   a. As noted in Section IV.A.

   b. A displaced TWA pilot may not displace to a bid status where proffers are concurrently being run. In such case, the TWA pilot may only proffer.

C. Inside the fence, TWA pilots may displace other TWA pilots in accordance with the contract provided:

1. TWA pilots displaced from their TWA positions will not have reinstatement rights.

ALPA 004677

2. TWA pilots may not utilize the stand in stead provision of the contract.

D. After the fence defined in paragraph 1 is removed, the total percentage of TWA pilot jobs in each 4-part bid status (except STL domicile) is limited to 17 %. If the total number of TWA jobs in a 4-part bid status exceeds 17 %, no TWA pilot may bid into the status (except STL domicile).

ALPA 004678

# Exhibit 65

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

PATRICK BRADY, et al,

      Plaintiffs,           CIVIL ACTION NUMBER:

      -vs-              02-2917 (JEI)

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,

      Defendants.
_____

      Mitchell H. Cohen United States Courthouse
      One John F. Gerry Plaza
      Camden, New Jersey 08101
      July 12, 2012

B E F O R E:      THE HONORABLE JOSEPH E. IRENAS
                SENIOR UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

TRUJILLO, RODRIGUEZ & RICHARDS, ESQS.
BY:  LISA RODRIGUEZ, ESQUIRE
      and
    ALLEN PRESS, ESQUIRE
    JOSEPH JACOBSON, ESQUIRE
Attorneys for the Plaintiffs.


ARCHER & GREINER, ESQS.
BY:  STEVEN J. FRAM, ESQUIRE
      and
    JOHN C. CONNELL, ESQUIRE
    DANIEL KATZ, ESQUIRE
    ELIZABETH GINSBERG, ESQUIRE
Attorneys for the Defendants.

Certified as True and Correct as required by Title 28, U.S.C.,
Section 753
    /S/ Cathy J. Ford, CCR, CRR, RPR

─────────── TELEPHONE CONFERENCE ───────────

1   supposed to sign?

2          MR. PRESS:  I believe it is, Judge.  I thought I saw

3   it on e-mail to that effect.

4          MS. RODRIGUEZ:  I think Mr. Connell filed it on the

5   docket yesterday, your Honor.

6          THE COURT:  Oh, yesterday.  All right.

7          MR. PRESS:  So the date of that we need primarily is

8   in the hands of the third-parties that are in this bankruptcy

9   and completely distracted and --

10         THE COURT:  Well, APA is not in bankruptcy, I assume.

11         MR. PRESS:  No, but they're in the 1113 process with

12  American.  They just put out a potential contract for

13  membership restitution last week.  But I've shown some

14  patience with these lawyers, but I told them that my patience

15  has to be at an end now.  And if I can't get a commitment from

16  them or what they're going to do, I need to go down to Texas

17  and hire a lawyer and file a motion to compel.  That's where

18  we are, Judge.

19         THE COURT:  And you're saying to me that until you

20  get that information from American slash APA, your experts

21  can't finish their reports?

22         MR. PRESS:  It won't be the best report possibly.

23         THE COURT:  Well, no report is ever the best report

24  possible.  I need a little more than that.

25         MS. RODRIGUEZ:  Your Honor, I think there is --

─── TELEPHONE CONFERENCE ───

1 again, I think that there are two issues:  One is there is

2 substantially along the way in doing a report that's they're

3 doing, and with the August 6th deadline in mind.  But they --

4 just given the timing of when we were first able to obtain

5 experts, we ended up crunched in the middle of the summer

6 because of their schedules even with the most basic report

7 they're going to be pushing up against that deadline.  And so

8 we need a little bit of relief from that deadline.  But then

9 in order to have the most complete report, we'd like to be

10 able to pursue the information from American in Texas to

11 complete it.

12    THE COURT:  Let me hear from the defendants.

13    MR. FRAM:  Your Honor, thank you.  Steve Fram.

14   Your Honor, if the plaintiffs need some additional time

15 to finish their reports whether it be vacation or whatever, we

16 don't oppose that.  And I understand how difficult and complex

17 the whole process is.

18    THE COURT:  Well, I mean, a lot of this is a

19 reflection of the fact that, intuitively, at least to me, the

20 calculation of damages is an extraordinarily difficult

21 exercise.  Just it feels that way intuitively to me.

22    MR. FRAM:  Your Honor, we appreciate that.  As I

23 think you know that we went through a mediation where both

24 counsel worked together to try to focus on some of the issues,

25 and I think we all learned, among other things, that it is

─── TELEPHONE CONFERENCE ───

1  very complex.

2      THE COURT:  That's just to me, that's intuitive only

3  to me, since I didn't participate in that but --

4      MR. FRAM:  Your Honor, if they need more time, that's

5  fine, we understand.  We're a little bit confused, I guess,

6  about the type of motion they're talking about and whether or

7  not that's necessary for them to complete their expert

8  reports.

9      THE COURT:  I'm going to get to that next.  Let them

10  address that first, and I'll get back to you, Mr. Fram, on

11  that.

12      MR. FRAM:  Your Honor, I guess what we would like to

13  see happen is a date for the expert reports.  If their

14  position is they do need information from the APA and from

15  American, then we'd like to see some mention of dates by which

16  they'll file motions to compel and bring that to a head so

17  that we're just not out in limbo in terms of scheduling.

18      THE COURT:  Okay, Mr. Press, or whoever is going to

19  speak, tell me a little bit about the *in limine* rulings.  I

20  mean, I know what the word "*in limine*" means, but it doesn't

21  give me much of a clue as to what you are talking about.

22      MS. RODRIGUEZ:  I think right now we anticipate, and

23  it doesn't necessarily need to be in this first phase, I think

24  what may be helpful is if we could, after meeting with,

25  spending more time with our expert, present a trial plan,

# Exhibit 66

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

PATRICK BRADY, et al,

       Plaintiff,           CIVIL ACTION NUMBER:

       -vs-                02-2917

AIR LINE PILOTS ASSOCIATION,

       Defendants.
_____

      Mitchell H. Cohen United States Courthouse
      One John F. Gerry Plaza
      Camden, New Jersey 08101
      July 31, 2012

**B E F O R E:**      THE HONORABLE JOSEPH E. IRENAS
                    SENIOR UNITED STATES DISTRICT JUDGE


**A P P E A R A N C E S:**

ARCHER & GREINER, ESQS.
BY:  STEVEN J. FRAM, ESQUIRE
     JOHN C. CONNELL, ESQUIRE
      and
KATZ & RANZMAN, P.C.
BY:  DANIEL M. KATZ, ESQUIRE
Attorneys for the Plaintiffs.

TRUJILLO, RODRIGUEZ & RICHARD, LLC
BY:  LISA J. RODRIGUEZ, ESQUIRE
      and
GREEN JACOBSON, P.C.
BY: ALLEN P. PRESS, ESQUIRE
Attorneys for the Defendants.


JOSEPH JACOBSON, ESQUIRE
(Telephoned in )


Certified as True and Correct as required by Title 28, U.S.C.,
Section 753
     /S/ Cathy J. Ford, CCR, CRR, RPR

```
 1          MR. PRESS:  Allen Press for the plaintiffs.
 2          MR. FRAM:  Your Honor, good afternoon, Steven Fram
 3   Archer Greiner on behalf of ALPA.  With me, my partner, John
 4   Connell, also from Archer Greiner.
 5          THE COURT:  There he is.  I see him back there.
 6   Haven't they put you in a forced retirement, Mr. Connell?
 7          MR. CONNELL:  Not yet, Judge, it's a little
 8   premature.
 9          MR. FRAM:  Also with us, your Honor, is Daniel Katz,
10   our co-counsel.
11          THE COURT:  Okay.  There is two matters today,
12   really.  One is an application by the defendants in support
13   of -- to certify this case for interlocutory appeal under
14   1292(b).  The second, may be called a group of matters, has to
15   do with the procedure that if that motion is not granted --
16   motion is granting, the second, there be nothing else.  So if
17   I granted that will stay, obviously, I believe that will stay
18   things that are followed.  If the motion is not granted, then
19   how we going to proceed hereafter to move the case to trial.
20          The three questions that the defendant wishes to
21   certify for appeal, for interlocutory appeal, are proof of the
22   old saw.  I don't want to control giving the answer.  I want
23   to control phrasing the questions.  Let me control the
24   question, we won't have to worry about the answer.  But, in a
25   generalized sense, I think Mr. Fram might take issue with me,
```

1    but the argument that all three questions actually put forth

2    is that, in bifurcating the case, I should have required a

3    finding that at least some members of the class would -- had

4    sustained damage as a result of the breach of the union's duty

5    of fair representation.  All three of the questions, really,

6    to some degree, raise that same issue in different ways.

7         I took -- and, of course, to some degree, defendant's

8    rights to parse, you know, specific acts of the breach of the

9    duty.  Really, was it this act, was it failure to take an

10   appeal, failure to file a suit, failure to do this, failure to

11   do that.  There was no finding of any particular failure.  I

12   took the position, for right or for wrong, that the heart of

13   the plaintiff's case was that the union breached its duty of

14   fair representation because it was curried, this is lay talk,

15   but curried in favor with APA who represented the American

16   Airline Pilots.  And in doing so it breached its duty of

17   loyalty to the pilots it represented which was the TWA pilots.

18   And I did not require any finding by the jury that a

19   particular different negative result would have occurred had

20   the ALPA been loyal to its TWA union members.  All three

21   questions basically raise the same issue in one way or

22   another.

23        So, I'm going to turn it over to Mr. Fram, whoever is

24   going to argue it.

25            MR. FRAM:  With the Court's permission, Mr. Katz will

1  argue it.

2          THE COURT:  Either way, whoever wants to.  Or you

3  both can take part if you want.  I'll even let Mr. Connell say

4  something if he wants to.

5          MR. KATZ:  Thank you, your Honor.

6          THE COURT:  I have to have humor while you're here,

7  come on.

8          MR. KATZ:  With all respect, your Honor --

9          THE COURT:  Don't say that.  That's the last time

10  today, anybody in this courtroom is going to say "with all due

11  respect."  Because, to me, when somebody tells you "with all

12  due respect," it means, I'll give you what you're due, which

13  is nothing, because you got it wrong so.

14          MR. KATZ:  The insights that you've given us about

15  the issues that ALPA has posed in its brief in support of the

16  1292(b) application, I think --

17          THE COURT:  I'm looking at the three questions.  You

18  laid them out on page one and two.

19          MR. KATZ:  Exactly.  We tried to be helpful.

20          THE COURT:  And you were.

21          MR. KATZ:  I think to some extent we captured one of

22  the concerns that ALPA has with the law as applied in this

23  case.  But I think that also underlying the other questions

24  are separate sub-issues.  One can say that one issue that

25  covers all of them is what is the correct duty of fair

1   would have done better in their negotiations for integration

2   with American pilots.

3        I really don't have to do the second three, but the

4   second is that the order offers a substantial ground for

5   difference of opinion as to its correctness.  I don't accept

6   that.  I don't accept that there is a reasonable ground for

7   difference.

8        And, finally, if the appeal immediately will materially

9   advance the ultimate determination of the litigation.  I don't

10  believe that.  I don't believe that for a minute.  It's a

11  ten-year old litigation, another two years at the circuit

12  isn't going to help this litigation.  And we're better off

13  pushing it to a conclusion and letting the circuit have a

14  whole record and dealing with it.

15       I'm going to deny the motion for a Section 1292(b)

16  certification and proceed to bring this case to a conclusion.

17       Now, having ruled against the defendants on that issue,

18  the plaintiffs, you got a difficult road to hoe.  I think

19  we're all ready, are we not, past the date for the expert

20  reports?

21            MS. RODRIGUEZ:  No, Your Honor.  The original date

22  was August 6th.

23            THE COURT:  For the file -- but you're not going to

24  meet that date?

25            MS. RODRIGUEZ:  We're not going to meet that date.

1          THE COURT:  Well, you know, this case is very old.

2     The theory of the case, meaning the theory that you argued,

3     and that the jury adopted, meaning the breach of the duty of

4     exclusive loyalty to the TWA pilots.  You've known that theory

5     now for years and years and years.  It's not like it was like

6     the theory changed at the last minute and then you suddenly

7     were faced with a new theory of liability.  You got to come

8     forth with your expert.  You have to show me, and the other

9     side, as to how you're going to prove your case.

10          MS. RODRIGUEZ:  And we're working on it.

11          THE COURT:  Because I'm sitting here now, and I can't

12     figure it out.

13          MS. RODRIGUEZ:  Your Honor, we're working on that.

14          THE COURT:  Well, I know "we're working on it."

15          MS. RODRIGUEZ:  As your Honor knows discovery on the

16     damage phase was stayed until May 4th.  So, actually --

17          THE COURT:  But that -- maybe you need some

18     discovery, I'm not saying there isn't some discovery, but the

19     simple matter is you know what the theory is.

20          MS. RODRIGUEZ:  We know what the theory is.

21          THE COURT:  And you know a lot of the facts.

22          MS. RODRIGUEZ:  We do.

23          THE COURT:  I'm not saying there isn't maybe a nook

24     or cranny in discovery that's needed, but, I mean, this case

25     has been well explored by both sides.

1          MS. RODRIGUEZ:  Your Honor, our experts are in the

2  process of putting together a "but for" seniority list.  "But

3  for" the breach of ALPA, this is what a reasonable --

4          THE COURT:  And, by the way, Vulcan doesn't -- Vulcan

5  One or Two, I'm not totally persuaded by Vulcan.  Vulcan is a

6  nonjury case, I believe.

7          MS. RODRIGUEZ:  It was a nonjury case.

8          THE COURT:  It was a nonjury case.  Because a jury

9  case which alone, as Mr. Fram pointed out in one of his

10  papers, makes a big difference.

11          MR. FRAM:  It was a Title Seven case, your Honor.

12          THE COURT:  And the Supreme Court, I think, has since

13  said that the theory they used is not only limited to Title

14  Seven cases but limited to even a subspecies of Title Seven

15  cases, I believe.

16          MS. RODRIGUEZ:  I think what the takeaway from Vulcan

17  and Duke is that -- at least as to the mitigation part of the

18  case -- that has to be presented.  That the defendants have to

19  have a chance to test mitigation separately, that's why we

20  proposed a --

21          THE COURT:  Yeah, but where do -- you seem to suggest

22  that I take away from the jury, for instance, the mitigation

23  issue.  How can I do that?  How can I take it away from the

24  jury?

25          MS. RODRIGUEZ:  Perhaps, you don't take it away from

# Exhibit 67

August 17, 2001

Captain Edwin C. White, Jr.
Chairman
Mergers & Acquisitions Committee
Allied Pilots Association
14600 Trinity Boulevard, Suite 500
Fort Worth, TX 76155-2512

Dear Ed:

This is in response to your letter of July 18, 2001, in which you comment on our Committee's proposal dated June 14, 2001. The June 14th proposal was characterized as the "Rightful Place Proposal" because it employs an empirical method based on actual jobs to arrive at an equitable integration of the AA and TWA System Seniority Lists. That method is far superior to what pilot groups have done in the past, that is, attempt to correlate conflicting, often irrelevant financial and operating data about their respective carriers in an effort to determine seniority list placement. Such imprecise tools have worked poorly in earlier integrations.

The difficulty with earlier approaches is that their criteria for ordering seniority lists cannot be reliably translated into seniority placements. Realistically, "differences based on the nature of the carriers' pre-transaction operations [or] pre-transaction pay, benefits and working conditions" of the pilot groups are useless in assigning seniority numbers to individual pilots. Similarly, the nature of the corporate transaction giving rise to operational integration tells us very little about seniority list placement. Under American Airlines' approach to integration in this transaction, it is undeniable that an **operational merger** meeting all legal, contractual and internal union policy definitions of "merger" will occur. It is the fact of **operational merger**, not a characterization of the underlying corporate transaction, that is important for pilots. The imprecision of these and other factors mentioned in your letter is why they should not weigh heavily in seniority integration proceedings.

Our proposal quantifies the actual pre-transaction career expectations of AA and TWA pilots in order to effect an integration that preserves those expectations and avoids injuring either pilot group. Your assertion that our proposal does not take into account pre-transaction career expectations is plainly incorrect; those expectations provide the quantifiable, reliable criteria upon which our proposal is built. You are correct, however, in observing that our proposal does not attempt the impossible, that is, to translate financial and operational irrelevancies into seniority placements. We take that as a compliment, not a criticism.

ALPA 004748

# Exhibit 68

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| PATRICK BRADY, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 02-CV-2917 (JEI) |
| | ) | |
| AIR LINE PILOTS ASSOCIATION, | ) | |
| INTERNATIONAL | ) | |
| | ) | |
| Defendant. | ) | |

## STIPULATION AND ORDER
## AS TO MICHAEL TANNEN

**WHEREAS** Plaintiffs designated Michael Tannen ("Tannen") as a potential witness in Plaintiffs' Supplemental Rule 26 Disclosures (Damage Phase), dated November 5, 2012;

**WHEREAS** Defendant Air Line Pilots Association, International ("ALPA") expressly sought and received permission from the Court on February 15, 2013 to depose Tannen by April 30, 2013;

**WHEREAS** Plaintiffs' counsel subsequently represented that Plaintiffs likely would not call Tannen as a witness at the damages trial;

**WHEREAS** ALPA, in reliance on Plaintiffs' representation that they will not call Tannen to testify at the damages trial, decided that it is not necessary to depose Tannen at this time;

**WHEREAS** Plaintiffs' counsel indicated that Plaintiffs may seek to play at the damages trial the video presentation in which Tannen explains the "Rightful Place Proposal,"

which was marked as Exhibit P-428 at the liability trial;

**IT IS HEREBY STIPULATED AND AGREED, THAT:**

1. Plaintiffs will not call Tannen to testify at the damages trial.

2. ALPA will not depose Tannen.

3. ALPA reserves all rights to object to the admissibility of any evidence that Plaintiffs seek to introduce at trial, including any explanations of the "Rightful Place Proposal," whether documented on video or in some other form, which objections Plaintiffs maintain are waived.

4. Plaintiffs reserve the right to seek to call Tannen in the event the video is excluded, in which case Plaintiffs must advise ALPA at least sixty (60) days in advance of trial of their intent to do so.

5. In that event, ALPA shall be entitled to depose Tannen prior to trial.

2

Dated: April 29, 2013

**ARCHER & GREINER P.C.**

By: _____
    John C. Connell, Esquire
    Kerri E. Chewning, Esquire

One Centennial Square
Haddonfield, NJ 08033
(856) 795-2121

-and-

Theodore V. Wells, Jr., Esquire
Jay Cohen, Esquire
Daniel J. Toal Esquire
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

-and-

Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 659-4656

*Attorneys for Defendant Air Line Pilots
Association, International*

**SO ORDERED:**

_____
HONORABLE JOSEPH E. IRENAS
UNITED STATES DISTRICT JUDGE

9/30/13

**TRUJILLO RODRIGUEZ
& RICHARDS LLC**

By: _____
    Lisa J. Rodriguez, Esquire
    Nicole M. Acchione, Esquire

258 Kings Highway East
Haddonfield, NJ 08033
(856) 795-9002

-and-

Allen P. Press, Esquire
Joe Jacobson, Esquire
GREEN JACOBSON, P.C.
7733 Forsyth Blvd., Suite 700
St. Louis, MO 63105
(314) 862-6800

*Attorneys for Plaintiffs*

3

# Exhibit 69

**In the Matter of the Seniority List Integration Arbitration**

**Under ALLEGHENY-MOHAWK Labor Protective Provisions, Section 13(b)**
**Pursuant to the Dispute Resolution Agreement Among and Between**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **---THE PILOTS OF ---** | : |
| | : |
| **REPUBLIC AIRLINE/CHAUTAUQUA AIRLINES/SHUTTLE AMERICA,** | : |
| **represented by International Brotherhood of Teamsters ("IBT"),** | : |
| | : |
| **FRONTIER AIRLINES, represented by Frontier Airline Pilots** | : |
| **Association ("FAPA"),** | : |
| | : |
| **MIDWEST AIRLINES,  represented by Air Line Pilots Association,** | : |
| **International ("ALPA"),** | : |
| | : |
| **LYNX AVIATION, represented by United Transportation Union ("UTU")** | : |
| | : |
| **-and-** | : |
| | : |
| **REPUBLIC AIRWAYS HOLDINGS, INC., ("RAH")** | : |
| **[on behalf of Itself and Its Affiliates Chautauqua Airlines, Inc.,** | |
| **Republic Airline, Inc., Shuttle America Corp., Frontier Airlines, Inc.,** | : |
| **Midwest  Airlines, Inc., and Lynx Aviation, Inc.]** | : |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## APPEARANCES

| | |
|---|---|
| For UTU/Lynx Aviation Pilots: | **Clinton J. Miller, III, General Counsel** |
| For ALPA/Midwest Pilots: | **Highsaw, Mahoney & Clark, P.C.** |
| | **By John O'Brien Clark, Jr.** |
| For FAPA/Frontier Pilots: | **Allison, Slutsky and Kennedy, P.C.** |
| | **By Wesley G. Kennedy** |
| For IBT/Republic, Chautauqua, | |
| Shuttle America Pilots: | **Baptiste & Wilder, P.C.** |
| | **By William R. Wilder** |
| For RAH, Inc.: | **Ford & Harrison, LLP** |
| | **By Thomas J. Kassin** |
| | **Lilia R. Bell** |

| **MERGER COMMITTEE CHAIRS** | **TECHNICAL ADVISORY TEAM** |
|---|---|
| Capt. Anthony Freitas, Midwest | Capt. Anthony Freitas, Midwest |
| Capt. Mark Manausa, Lynx | Capt. Eve Grauer, Republic |
| Capt. Jeffrey Thomas, Frontier | F.O. Trevor Jenkins, Frontier |
| Capt. Daniel Sneddon, Republic | Capt. Cory Sewell, Lynx |
| | Mr. Ken Pack, RAH, Inc. |

**Midwest**

By any objective measure, it cannot be denied that Midwest Airlines was an air carrier on the cusp of failure well down the road to extinction at the time of the transaction. But the record plainly establishes that the pilots of Midwest do not come to this proceeding as mendicants. In all fairness, the Midwest pilots are entitled to vindication in this proceeding of both real and constructive equities they brought to the merger.

In the vernacular, the very word "seniority" is equated with length of service. Appropriate recognition of many long years of additional career development by the Midwest pilots is intuitively fair and equitable in this seniority list integration. *See e.g.,* Chautauqua-Shuttle America, at 11 (Richard R. Kasher 2005). Also, Midwest as a branded airline did not cease to exist when it was acquired by RAH. More specifically, before and after the acquisition, Midwest provided the platform for Republic pilot crews to fly 12 otherwise grounded E-170s. In addition, along with Frontier, Midwest has been a post-acquisition platform for "branded" flying of E-190 aircraft, which RAH pilots had not and could not otherwise have operated in FFD service. Even though the Midwest pilot group brought no metal, *per se*, to the table, fairness requires that the contingent of MEA pilots deemed "active" by the Bloch II SBA decision be accorded constructive equity credit in these proceedings for their share of that enhanced E-jet flying.

One can take no satisfaction in validating the hard cold fact that no reasonable interpretation of fairness and equity justifies placing the remaining pre-acquisition furloughed MEA pilots anywhere but at the bottom tier of the IMSL. There is no evidentiary basis for any expectation that they might have been recalled to active service prior to the acquisition transactions. Nor can they shelter under the protective penumbra of the Bloch II decision, because they were furloughed prior to the transactions. ALPA's theory that RAH, Inc. effectively orchestrated those pre-acquisition furloughs and the eventual demise of Midwest Airlines, by manipulating events beginning in September 2008, is not established by a preponderance of persuasive record evidence and simply cannot be sustained by innuendo and conjecture.

**Lynx**

As to the Lynx pilots, their reasonable expectations for career advancement and job security were the least of the active pilot groups, ranking above only the MEA pre-transaction furloghees. However, the reduced circumstances of the Lynx pilot group proximately caused by the situation on their own ground at transaction time was exacerbated by post-transaction decisions of RAH Inc. In particular, this included liquidating turboprop aircraft Lynx pilots were flying and reallocating RAH-crewed small regional jets to service the Lynx Aviation market.

These facts establish a mixed bag of equities for the Lynx Pilots. On the one hand, they operated only turboprop aircraft, had accumulated only limited seniority while flying for a startup operation that promptly went bankrupt and flew under less favorable wages and working conditions. On the other hand, the Q400 was comparable in seating capacity and productivity to the E-170, to which most of the Lynx Aviation market flying was transferred after acquisition. Treatment of all Lynx pilots as active, with appropriate placement to give them access to that flying is fair and equitable.

# Exhibit 70

The ALPA Arbitration Board

```
--------------------------------------------------------x
                                                        :
    In the Matter of the Seniority Integration of       :
                                                        :
                                                        :
        The Pilots of US Airways, Inc.                  :
                                                        :
                and                                     :      OPINION
                                                        :        AND
                                                        :       AWARD
    The Pilots of America West Airlines, Inc.           :
                                                        :
--------------------------------------------------------x
```

**The ALPA Arbitration Board**
George Nicolau, Chairman
Captain Stephen Gillen, Pilot Neutral
Captain James P. Brucia, Pilot Neutral

**APPEARANCES**

**For the US Airways Pilots:**
Katz & Ranzman, P.C.
  By: Daniel M. Katz, Esq.
      Jason M. Whiteman. Esq.


**For the America West Pilots:**
Bredhoff & Kaiser, P.L.L.C.
    By: Jeffrey R. Freund, Esq.
        Roger Pollack, Esq.
        Lisa Powell, Esq.

On May 19, 2005, US Airways and America West Airlines announced that they would merge, taking the name US Airways. Both pilot groups were represented by the Air Line Pilots Association, which has a Merger Policy governing the integration of pilot seniority lists. Pursuant to that Policy, each group chooses a Merger Committee, whose representatives are charged with exchanging employment data and seeking to determine a fair and equitable integration of their respective lists.

FARBER-004624

While the Board has repeatedly expressed misgivings as to the fairness of each group's full proposal, in our judgment certain aspects of both meet the fair and equitable standard. That standard, it must be recalled, does not rank its stated criteria in any particular order. Rather they are goals to be kept in mind as equities are matched to various integration methods until a fair and equitable result is reached.

Of considerable importance is the question of career expectations. As previously stated, America West argues that the career expectations of the US Airways pilots were nil; that if the airline was not a failing carrier saved from certain liquidation by its purchase by America West, it was so close as to make little difference. On the other hand, America West, in the view of its pilots, was robust and on its way to sustained achievement. The US Airways pilots argue that neither description fits the facts. In their view, US Airways, though in bankruptcy for the second time, had lowered its costs and secured additional investment capital ensuring its survival and prospects of emerging from bankruptcy. Beyond this, as shown by repeated post-merger statements by America West's CEO and by expert analysis, that airline was also in poor financial condition. Thus, both airlines needed each other and both have benefited from the merger. The US Airways pilots assert that this, as well as cases it cites as precedent, argue for the proposition that the financial picture

FARBER-004647

of the two airlines was relatively the same and, as such, should not even be considered.

Our view is that neither picture is persuasive. The US Airways reliance on post-merger statements by America West's CEO, clearly made to assuage growing concerns of America West pilots who had seen a post-merger end to hiring, an increasing return of long-furloughed US Airways pilots and a flattening in their own advancement, is misplaced. Equally so is America West's insistence that US Airways was about to disappear. Yet, it cannot be disputed that there were differences in the financial condition of both carriers and that US Airways was the weaker. This necessarily means that career expectations differed and that US Airways pilots had more to gain from the merger than their new colleagues.

Gains also came in other ways. Though the US Airway pilots argue that the collective bargaining agreements are comparable, that is not the case. In pay, the America West Contract is better for comparable aircraft except for the B757. Though A330 and B767 pay did not exist at America West, those 19 aircraft are only 5% of the combined fleet and the B757s only add another 13%. The bulk of the fleet (81%) is comprised of the 292 A320s and B737s, where America West's higher rates, even without increases that a combined contract may bring, will result in a collective benefit to US Airways pilots of

FARBER-004648

US Airways pilots the opportunity to bid into such vacant positions if they so chose for an additional period of four years, making a total of six years since the merger unless, as we said before, Age 65 legislation or rule-making were to change the retirement age.

On balance, it is our judgment that this allocation is equitable and, since such protection has already existed for more than two years, that it is for a sufficient length so as to then allow the list to operate independently for such aircraft. Except for this restriction, all other present flying, as defined in the Conditions and Restrictions that follow, is to operate by the list. As set forth in those Conditions and Restrictions, new flying, as defined therein is to be equitably shared in the formula set forth.

A majority of the Board has also decided that the totality of pre-merger career expectations weighs in favor of active pilots as of the date of the announcement. When one considers the number and length of furloughs on the US Airways side and the dim prospects the airline faced and compares it to the lack of furloughs on the America West side, which furloughs ceased to exist long before the merger took place, merging active pilots with furloughees, despite the length of service of some of the latter, is not at all fair or equitable under any of the stated criteria.

FARBER-004651

# Exhibit 71

```
------------------------------------------x
                                          :
In the Matter of                          :
                                          :        OPINION
THE SENIORITY INTEGRATION OF              :          and
CONTINENTAL AIRLINES AND FORMER           :         AWARD
FRONTIER AIRLINE PILOTS                   :
                                          :
------------------------------------------x
```

## APPEARANCES:

### For the Continental Airline Pilots Merger Committee:

Gordon and Barnett
  by Denis F. Gordon, Esq.

### For the Former Frontier Pilots Merger Committee:

Porter, Wright, Morris and Arthur
  by John A. McGuinn, Esq.
     Gary L. Lieber, Esq.

### For Continental Airlines, Inc.:

Akin, Gump, Strauss, Hauer and Feld
  by Michael J. Madigan, Esq.
     Jonathan S. Spaeth
Rachel Suarez, Esq., Assistant General
  Counsel, Continental Airlines

This proceeding is the result of the October 2, 1986 Frontier-Continental Job Preservation and Litigation Settlement Agreement, known as the "JPA" (Joint Exhibit 1), and the Procedures For Seniority Integration, as subsequently agreed to by the Company and the Frontier and Continental Pilot Merger Committees (Joint Exhibit 3). The two documents, taken together,

- 50 -

First Officers and 15 former New York Air pilots who are already
Captains.  As previously described, that 285 represent Contin-
ental's Section 3(c)(2) Captain expectancies based on the "order
or option" aircraft.  However, also as previously described,
they will be eligible for the first 285 Captain vacancies no
matter how those vacancies arise.

Following this group, I have ratioed the 177 Frontier
pilots hired prior to 1984 who are not now flying as Captain with
the remaining 579 Continental pilots hired prior to the execution
of the JPA.  A goodly number of these Frontier pilots had flo__
as Captains at Frontier, but are not now flying as Captain
because of the differing utilization rates.  That circumstance
together with the economic factors applicable to all Frontier
First Officers who came to Continental, as the Frontier pilots
emphasized at the hearing, led me to conclude that stapling
these pilots at the bottom of the October 2, 1986 list would
not be fair and equitable as the JPA uses that term and that a
ratio would be appropriate.

I have, however, placed the remaining 67 Frontier pilots,
the bulk of whom were hired from late 1985 through July 1986,

- 51 -

below Martes, the last Continental pilot hired before the JPA
was signed.  Given the late hirings and the known economic
situation at Frontier, these pilots, in my view, do not bring
the same equitable interests as those who proceeded them.

The last hired Frontier pilot is then followed on the
list by Second Officer T. J. Kratt, who was hired by Continental
in February 1987, some four months after the JPA.  He, in turn,
is followed by approximately 400 others, soon to be 1000.

The Frontier pilots stated that if an EDOH list was not
adopted, they would propose conditions and restrictions
different from those initially suggested.  One such condition,
suggested either on a permanent basis or for a 30-day period
after the Award, is a "leapfrog" provision which would permit
Frontier pilots to fill vacancies and positions on the list
created by Frontier retirements or resignations and further
permit all other junior Frontier pilots to move a Frontier
notch up the list, leapfrogging CO pilots in the process.
Needless to say, the other Parties opposed this "floating
block" as a radical reformation of the list, a continuation of
the "double track" system that was to end on the date the
integrated list was implemented and a substantial and

# Exhibit 72

FLYING TIGER LINES, INC

AND

SEABOARD WORLD AIRLINES, INC.

MERGER OF SENIORITY LISTS

1981

TABLE OF CONTENTS

VOLUME II

| | |
|---|---|
| Discussion and Opinion | 142 |
| Award | 185 |
| Working Pilots Integrated Entitlement Chart | Appendix A |
| Integrated Seniority List | Appendix B |

March 16, 1981

FARBER-002832

144

placement of an overly large number of SWA pilots near the top of a merged
seniority list necessarily has the effect of disadvantaging the FTL pilots
who are forced in disproportionately large numbers to the bottom of the
seniority list. Such adverse placement will damage FTL pilots with respect
to their ability to hold their present status, their rights to fly preferred
lines of flying, their rights to hold domicile and to bid vacation prefer-
ence, their rights to present and future earnings opportunities, and their
right to upgrade. I conclude, therefore, that use of a date of hire or
adjusted service method of integration will not produce an acceptable accommo-
dation throughout the list and is neither fair nor equitable in light of
the surrounding circumstances of this case. This conclusion is consistent
with both the joint procedural Agreement and the provisions of ALPA merger
policy set forth above. The question presented then is, in constructing an
integrated seniority list, what factors are relevant under the mandated
standard.

I have carefully reviewed all of the prior arbitration decisions
provided by the Parties which involved the integration of seniority lists in
cases of air carrier mergers. In those cases the following factors (not
listed in any particular order of importance) were considered:

    1. The financial strength of one carrier to the other;

    2. The length of service of each employee;

    3. The date of hire of each employee;

    4. The degree that the integrated list preserves the pre-merger

FARBER-002835

positions and status of the pilots;

     5.   The new benefits that each group has derived from being part of a new carrier;

     6.   The types of service that each group brought to the merger;

     7.   The types of and amount of equipment that each group brought to the merger;

     8.   The equipment on order at the time of the merger;

     9.   The routes and route authority that each carrier brought to the merger;

     10.   The number and treatment of employees on furlough or leave of absence;

     11.   The pay and benefits that each pilot enjoyed prior to the merger;

     12.   The domiciles which are part of each carrier's operations;

     13.   The size of the two pilot groups;

     14.   The positions that each group anticipated absent the merger;

     15.   The prospects of the merged carrier;

     16.   The anticipated attrition as a result of retirement and the like;

     17.   The historic development and performance of the carriers; and

     18.   The types of restrictions, both temporary and permanent, that are necessary to make the integrated list fair and equitable throughout.

FARBER-002836

146

On the basis of the extensive record, I consider the factors here-
inafter set forth to be relevant and pertinent to this case.

### The Financial Strength of the Two Carriers

The financial condition of the carriers is considered relevant
because the value of the jobs brought to the merger by the pilots of each
carrier is affected by the future security of those positions.  A carrier's
financial condition will impact on its ability to borrow sufficient funds
to modify, replace or expand the existing fleet, and the cost of that
borrowing.  For pilots of a weak or tentative carrier, the receipt of jobs,
and job protection, with a healthy and expanding carrier represents a
significant reward which is an important factor in balancing the advantages
that each group obtained from the merger.  In this case FTL was a healthy
and expanding carrier; SWA was a carrier whose future was tentative prior
to the merger.

The FTL pilots emphasized the recent history of large operating losses
by SWA on its scheduled air transport operations as evidence of SWA's
"failing" condition.  It should be noted that the air cargo industry is
a barometer of the world economic climate.  The entire industry, including
both SWA and FTL have experienced operating losses recently.  The poor
performance of SWA may be due in part to general industry wide conditions.

However, I conclude that SWA's entire corporate operation rather
than a part of it is the appropriate focus in connection with any claims of
a lack of continued viability.  SWA's non-airline activities are all related

FARBER-002837

149

In the merger case the CAB necessarily found that SWA was a carrier with financial woes that was no longer a viable competitor to FTL.  Given the different purposes of that proceeding and the limited nature of such factual findings, I hold that the CAB's subsidiary factual findings, while not conclusive for purposes of this proceeding, are relevant evidence in support of FTL's claims, and I have accorded them due weight in my decision.

The Level of Pay

Considerable information was submitted and testimony proferred in connection with the level of earnings for FTL and SWA pilots. The FTL pilots pointed to their higher W-2 earnings, their higher maxima per their working agreement, their more favorable synthetic time formula in their working agreement, and the fact that the SWA pilots have been furloughed extensively, thereby depressing the SWA pilots' true earnings even further as can be seen from the earnings data for 1977-79.  The FTL pilots also argued that the SWA collective bargaining agreement entered into in September of 1979 was made on the heels of the FTL-SWA agreement to merge and, therefore, the large gains achieved by the SWA pilots under that agreement would not have occurred absent the merger.

The SWA pilots note that the FTL earnings were based upon an 80 hour rather than the SWA 75 hour cap, that the FTL pilots were permitted to work in excess of their cap thereby inflating their earnings even further, that the SWA pilots reach top scale in their 10th year whereas FTL pilots

150

do not reach top scale until their 12th year, and that the hourly earnings of SWA pilots' top scale is the same or higher than is the hourly earnings of FTL pilots in most categories.

An examination of the wage information indicates that the FTL pilots are correct in their assertion that the September 1979 working agreement provided SWA pilots substantial increases in compensation and I concur that at least part of that increase was the result of the merger. It is also clear that regardless of the reasons, the gross earnings of the FTL pilots in recent years have been higher and more stable by category than the gross earnings of the SWA pilots. It should also be recognized, however, that a greater percentage of SWA pilots are at the top level pay by virtue of their greater length of service, their new working agreement which grants them credit for pay purposes for furlough time, and their pay scale which permits SWA pilots to reach top scale sooner than do FTL pilots.

Type of Flying

Both FTL pilots and SWA pilots fly exclusively B-747s and DC-8s in all-cargo operations. The percentage of FTL flying that is domestic flying is much greater than is that of SWA. International flying is generally compensated higher than is domestic flying. SWA has a greater percentage of B-747 flying than does FTL. B-747 flying is generally compensated higher than DC-8 flying. (These two facts are interconnected since B-747s are preferred as long-term trans-Atlantic aircraft over DC-8s.) The similarities in the types of flying mean that the pilots at FTL and

FARBER-002841

151

SWA have comparable and interchangeable skills.  Both pilot groups stated
that they did not intend to imply in their testimony that the flying of
one carrier was inferior to the other.  Each of the various lines of flying
and domiciles has its appeal and different pilots will choose one versus
another on the basis of personal predelictions.

Equipment

FTL pilots argued that FTL brought more equipment to the merged carrier,
that FTL enjoyed an expanding route structure and that FTL would expect
to expand its fleet even further in the years ahead.  SWA's equipment and
route structure was, on the other hand, asserted to be on the decline.
While FTL's fleet size was growing during the 1970s, SWA's fleet size
(in terms of number of aircraft) was decreasing.  While FTL's pilot employ-
ment increased from 1973 to 1980, SWA's decreased.  In addition to its
conversion to B-747s which reduced the need for pilot employment, SWA's
trans-Atlantic market share was shrinking.  Its reliability also dipped
(even after eliminating the phantom Italian flights).

Perhaps most important, however, with regard to equipment was the
cash flow and financial situation of SWA as contrasted with that of FTL.
As discussed above, SWA was at best a troubled carrier.  The handling of the
2 B-747Fs for which delivery was taken in late 1980 is illustrative of the
problem.  SWA previously had ordered two B-747Fs for late 1980 delivery.
As the delivery date approached, however, it became apparent that SWA
needed to borrow the funds to purchase these planes and had not yet

FARBER-002842

# Exhibit 73

Cited as:

# Canadian Air Line Pilots Assn. and Air Canada

IN THE MATTER OF an Arbitration
Between
Canadian Air Line Pilots Association, and
Master Executive Councils for Air Canada, Air Nova, Air
Alliance, Air Ontario, Air B.C., NWT Air
Re merger of Canadian Air Line Pilots Association (CALPA)
Seniority lists

[1995] C.L.A.D. No. 247

**Canada**
**Labour Arbitration**
**M.G. Picher, Arbitrator**

Heard: Montréal, Québec, December 17-21, 1994
Decision: March 28, 1995
(86 pp.)

**Appearances:**

For Air Canada:

    Daniel M. Katz, Counsel.
    Captain Howard Malone, Merger Representative.
    F/O Christopher Pulley, Merger Representative.

For Air Nova:

    R.A. Pink, Counsel.
    Captain Paul Peace, MEC Vice-Chairperson.
    Captain Ian Rothwell, Merger Representative.
    Captain Paul Steeves, MEC Chairperson and Merger Representative.

For Air Alliance:

    Claude G. Melançon, Procureur.
    Suzanne Gascon, Procureur.
    Commandant Vincent Charron, Conseil Exécutif.
    Commandant Nick Di Cintio, Conseil Exécutif.
    Commandant Claude Provençal, Conseil Exécutif.

For Air Ontario:

FARBER-003354

calculated from the date the pilots entered the Pilot's Ground School. The distinction is important for some 204 pilots on the Air B.C. list because, prior to April of 1991, unlike the other Connectors, Air B.C. did not place its trainee pilots onto its payroll until they commenced operational flying for the Company. The Connectors submit that equity requires that the 204 Air B.C. pilots in question be granted seniority dates effective the date in which they commenced Ground School, rather than their "line date", or the date on which they began operational flying. The Connectors submit that for all practical purposes, and within the meaning of section 26 of the CALPA Administrative Policy, those pilots should be seen as first employed by Air B.C. when they entered its Ground School and that their seniority date should be calculated accordingly, to put them in a position equivalent to the other companies' pilots.

FINAL POSITION OF THE AIR CANADA MEC
POSITION FINALE DU CONSEIL EXÉCUTIF D'AIR CANADA

¶ 85    In response to the arbitrator's invitation to table its ultimate position, the Air Canada MEC did not vary from its original position, which is that all of the Connector pilots should be endtailed. It did table one qualification, however, in the form of Paragraph G of its offer, reproduced above, whereby LOU-17 shall be construed to allow any pilot on the integrated seniority list to fly CL-65 aircraft in the service of the Connector Airlines or their corporate successors.

IV
REASONS FOR AWARD
MOTIFS DE LA SENTENCE

¶ 86    In the arbitrator's view, it is important to bear in mind the factors which, in accordance with the Merger Policy, were established by CALPA to guide the fashioning of a merged seniority list That document provides, in part:

> The seniority lists shall be integrated by balancing the equities brought to the merger by the respective pilot groups using the following objectives:
>
> - preserve jobs
> - maintain pre-merger pay and standard of living
> - maintain pre-merger pilot status
> - minimize changes to career potential
> - avoid windfall gains to either group at the expense of the other
> - or any other factors

¶ 87    The first issue to be addressed is whether Air Canada and the Connector Airlines can be said, as the Air Canada MEC contends, to be entirely different kinds of airline operations, so that the merger of their seniority lists should be resolved on the basis of the U.S. precedents cited by counsel for the Air Canada MEC which involve the merger of trunk or national airlines with smaller commuter airlines. To a certain point, that argument has merit. There is clearly a substantial difference between Air Canada wide-body service, and even some of its narrow-body flying, and the flying generally done by the Connectors. I am satisfied that insofar as equipment such as the Airbus A-320 and the wide-bodied B767, L-1011 and B-747 aircraft are concerned, Air Canada can fairly be characterized as a carrier that is different in kind from the Connector Airlines.

¶ 88    At the lower end, however, that is not true. In this regard, Air Canada's case is distinguishable from the American precedents cited, where only the Piedmont/Empire case appears to have involved any significant overlap in equipment. From the standpoint of equipment, routes serviced and remuneration of

FARBER-003385

pilots, there is a meaningful overlap between the DC-9 and Canadair CL-65 aircraft utilized by Air Canada, and the BAe-146 and DASH-8 service of the Connector Airlines. Whatever the merits of this case might have been before the advent of the CL-65s, the addition of that aircraft to the service of Air Canada leaves little doubt as to a substantial similarity in the service performed by both the parent company and the Connectors. I am satisfied that there is, at the junior end of the Air Canada operation, a meaningful segment of work which, on an equipment and status basis, is directly comparable to the work performed by the Connector Airlines. On that basis alone, this case must be distinguished from cases where a trunk or national airline, with no regional or commuter capacity, merges with a commuter airline, as in the precedents cited by the Air Canada MEC. While the arbitrator realizes that the use of CL-65s by Air Canada may well be prompted by the constraints of LOU-17, that reality only gives merit to the submission of the Connector Airline MECs to the effect that LOU-17 is itself compelling evidence of an important overlap in operations as between Air Canada and its Connectors.

¶ 89     An overlap in the relative circumstances brought to the merger by the Air Canada pilots and the Connector pilots is further borne out when regard is had to the earnings of pilots within the two systems. If one accepts that wages are the best reflection of the value of work, a significant segment of the work performed at the junior end of the spectrum by Air Canada pilots corresponds dramatically to work performed by the Connector pilots. As the following table illustrates, the wages paid in 1994 for a number of Captain and First Officer positions show a real overlap.

| CARRIER | EQUIPMENT | POSITION | SALARY (MONTHLY) |
|---------|-----------|----------|------------------|
| Air B.C. | BAe-146( | (Capt-5 yr) | $7,128.00 |
| Air Ont | DASH-8-300 | (Capt-5 yr) | $6,158.00 |
| Air Ont | DASH-8-300 | (F.O.-5 yr) | $3,803.00 |
| Air Canada | CL-65(RJ) | (Capt) | $6,236.00 |
| Air Canada | CL-65(RJ) | (F.O.) | $3,755.00 |
| NWT Air | Boeing 737 | (Capt-12 yr) | $7,018.00 |
| Air Canada | DC-9 | (Capt-5 yr) | $5,901.00 |
| Air Canada | DC-9 | (F.O.-5 yr) | $4,880.00 |
| Air Canada | A-320 | (F.O.-5 yr) | $6,409.00 |

¶ 90     As the above table reflects, insofar as wage rates are concerned, there is a substantial comparability as regards Captains in service on BAe-146 jets and DASH-8-300s as compared with Air Canada Captains operating DC-9s and Canadair CL-65 regional jets. Similarly, there is a close overlap as between the First Officer on a DASH-8-300 and the First Officer on an Air Canada regional jet In light of this evidence, I am satisfied that it is neither fair nor accurate to suggest that, at least insofar as the junior end of Air Canada operations is concerned, the Connector Airline pilots live and work in an entirely different world. As interesting as it may be to compare the earnings of an Air Canada 747-400 Captain at the top end of Air Canada operations with those of an Air B.C. Captain flying a Twin Otter, it is the above table relating to the lower end of Air Canada's operations which tells the more significant story for the purposes of fashioning an equitable and fair merged seniority list based on meaningful status and equipment comparisons.

¶ 91     The arbitrator appreciates that the table may simplify the picture somewhat, and that the positioning of many Air Canada Captains at the 12-year wage level would suggest a greater actual earnings differential. However, I do not consider that these figures can be disregarded for what they reflect of the dollar value comparability of the service performed by the Connector pilots and that performed by pilots in the junior end of the Air Canada service. Moreover, when regard is had to the equipment itself, as reflected

FARBER-003386

in the chart comparing the DC-9, BAe-146, DHC-300 and the Canadair CL-65 regional jet, reproduced above, there is also significant comparability in the equipment utilized. I am therefore persuaded that a fair application of an equipment and status approach, if such an approach were to be followed, requires that it be done in the area of overlap and that so applied it does not justify fashioning a seniority list which would endtail the Connector pilots behind all Air Canada pilots. To put it differently, fences can be devised to treat, in a similar fashion, the pilots in the area of overlap, while protecting the great majority of Air Canada pilots whose seniority places them in the different world of wide-body flying.

¶ 92    Given the significant segment of meaningful overlap between the last 249 Air Canada pilots and the Connector pilots, the prospect of a seniority list which would endtail all of the Connector pilots beneath the most junior Air Canada pilot must give any arbitrator serious pause. Firstly, it would depart from the fundamental principle reflected in the Munroe award and, to some extent in the Teplitsky award, to the effect that date of hire should be the preferred basis for merging seniority lists in the Canadian airline industry.

¶ 93    Secondly, the career expectation approach advocated by the Air Canada MEC is a doubtful instrument The arbitrator is inclined to accept the view expressed by the expert witnesses called on behalf of the Connectors, to the effect that predicting the future in the airline industry after deregulation is next to impossible. The hard lessons of the CPAL/EPA arbitration award, and the subsequent plight of the EPA pilots in the face of additional mergers, speaks forcefully to the danger inherent in an endtail formula based on career expectations. If, for example, the arbitrator were to accept the Air Canada MEC's proposal for endtailing the Connector pilots, and a few years down the road Air Canada should merge with another airline, say Canadian Airlines, with a fully dovetailed or rationed merged seniority list, the endtailed Connector pilots could find themselves severely prejudiced, standing well behind pilots from another airline who are substantially junior to themselves. These are not fanciful concerns, as the problems visited upon CALPA and its members in the aftermath of the CPAL/EPA merger remain unresolved to this day. For that reason alone, the arbitrator favours the approach articulated by arbitrator Munroe. While it may be that in some circumstances an unqualified equipment and status approach can be justified over a date of hire approach to the merger of seniority lists, the party arguing for a departure from the date of hire standard should demonstrate compelling reasons to justify that approach. In this case that has not been done and in my view cannot be done, largely because of the overriding significant area of overlap between the Connector pilots and the most junior Air Canada pilots.

¶ 94    With respect to the CALPA Merger Policy objectives of preserving jobs, maintaining pre-merger pay and standards of living and maintaining pre-merger pilot status, the final compromise proposal advanced by the Connector Airline MECs poses little, if any, problem. Firstly, for the purposes of access to work, all Air Canada pilots senior to P.J. O'Hara (Jab. 1, 1994 Seniority Number 1433) are entirely-untouched by the merger. Secondly, the no-flush/no-bump provision which is part of the Connectors' proposal guarantees to all Air Canada pilots below O'Hara on the list the ability to retain the positions which they presently hold or will obtain upon recall, notwithstanding the merger of the seniority lists. Moreover, from the standpoint of equity and maintaining pre-merger pilot status, which the arbitrator deems significant, the proposal of the Connectors is framed in such a way as to effectively protect the status of the 243 Air Canada pilots who are on furlough at the present time. They will all be recalled to service in the near future, and upon their return to work they will be unaffected by the bidding provisions of the Connectors' proposal. That protection is subject only to the terminal date of December 31, 1995 which, in the circumstances, should not become an operative factor and, which in any event, is fair. In the result, all Air Canada pilots affected by the merger as proposed by the Connectors retain their pre-merger pilot status and, implicitly, their pay, standard of living and jobs.

¶ 95    Insofar as the further objective of the CALPA Merger Policy regarding minimizing the impact on

FARBER-003387

# Exhibit 74

IN THE MATTER OF AN ARBITRATION PURSUANT TO CANADIAN AIR LINE PILOTS ASSOCIATION ADMINISTRATIVE POLICY MANUAL INVOLVING PILOTS REPRESENTED BY CANADIAN PACIFIC AIRLINES MASTER EXECUTIVE COUNCIL, THE NORDAIR MASTER EXECUTIVE COUNCIL, THE PACIFIC WESTERN MASTER EXECUTIVE COUNCIL AND THE EASTERN PROVINCIAL AIRWAYS MASTER EXECUTIVE COUNCIL

**BOARD:**

Martin Teplitsky, Q.C.,
Arbitrator

**APPEARANCES:**

On behalf of Eastern Provincial:    Robin Cumine

On behalf of Canadian Pacific:        Peter Gall, Susan
                                       Arnold

On behalf of CALPA:                 John Keenan

On behalf of Nordair Pilots:        James K. A. Hayes
                                       Susan Ballantyne

On behalf of Pacific Western:          Thomas A. Roper
                                       Patrick Saul

FARBER-003304

15

light of its substantial losses between 1981 and 1986.  At page
35:  "CPAL's survival would not be certain, as it is financially
weak".  Their efforts to explain the inconsistencies were not
convincing.

In any event, a review of all the evidence clearly
discloses that a merger was necessary for each airline.  This was
acknowledged  in the following colourful passage from the report
of CP's experts filed with the Board:

> "If they refused to join together (perhaps for reasons
> of ego or an unwillingness to share the future gains
> with the firm that sells out to the other), they would
> both be worse off.  In effect, they would "hang
> separately"."

In the result, there is only one conclusion that I can
reach.  The CP pilots' legitimate career expectations without a
merger were poor.  On the other hand, the merger may result in
their fulfilling their expectations.  In other words, rather than
losing by the merger, they have gained by it.

The calculations of the CP pilot group which were
designed to demonstrate losses to their group, on a time-based
solution, were fundamentally flawed because these depend on pre-
merger expectations which, as I have already noted would not have
been achieved.  I am satisfied that the CP pilot group brought
much to the merger, but not more than anyone else.  The future
success and growth of CAIL will be a product of everyone's

FARBER-003319

# Exhibit 75



BEFORE THE ARBITRATION PANEL
RICHARD I. BLOCH, CHAIRMAN
CAPTAIN RANDY L. MARIN
CAPTAIN MERLE C. EGLET

JET AMERICA AIRLINES

and

ALASKA AIRLINES

Hearings held Octover 11-14,17-21
October 31-November 4,21-23,25,1988

Appearances:

For Jet America Airlines
Dan Katz, Esq.
Ellen Ranzman, Esq.

For Alaska Airlines
Jeffrey Freund, Esq.
Peter Shinevar, Esq.

OPINION

Facts

   This seniority integration arbitration is between two airlines that are dramatically different by any objective measurement.  Alaska Airlines began operations in 1932 as an intra-Alaska carrier, beginning jet service in the early 1960's. In 1968, it merged with Alaska Coastal and Ellis Airlines, subsequently merging again with Cordova Airlines.  Between 1972 and 1987, Alaska expanded substantially, operating Boeing B-727's from Seattle to nine cities in Alaska.  In the six years between

ALPA 055355

FARBER-003934

they fully comport with the guidance of both the 1985 and '87 policies, which beseech one to carefully weigh equities, to match them to various methods of integration until a fair and equitable agreement is reached and to consider, among other things, the avoidance of windfalls.

Additionally, as in the case of every known bona fide seniority integration arbitration that has occurred in the last 30 years, this Panel has carefully considered, among other things, the career expectations of the respective groups and their contribution to the mix.

Constructive Notice

While the two pilot groups agree that all pilots hired after the October 1, 1987 merger date should be placed on the combined list in date of hire order below the last pilot of either carrier integrated by award, they differ as to the events, and therefore the dates, that should constitute "constructive notice" to pilots of the ultimate merger.

"Constructive notice" becomes meaningful, it is agreed, as the date when newly-hired pilots know, or should know, that their flying careers, and specifically their seniority status, will be determined in reference to an additional group of pilots. A t issue here are 55 Alaska and 10 Jet America pilots who joined the Company between the October 1, 1986 and July 23, 1987.

The Jet America pilots contend that September 30, 1986, the date of AAG's acquisition of Jet America, constitutes the "constructive notice" date and that pilots hired thereafter

ALPA 055361

FARBER-003940

should be placed in date of hire order, together with the post-October 1, 1987 new hires, all of whom are inserted after the last of the pilots of either carrier integrated by an Award. The Alaska pilots, for their part, observe that nothing in AAG's acquisition of Jet America in the Fall of 1986 would have placed pilots on notice of an impending merger; all that was known at that point was that Jet America was to be acquired. All indications then were that the airlines would be maintained as separate entities. It suggests July 23, 1987 -- the date the merger was actually announced -- as the constructive notice date.

We find that the July date is more realistically reflective of the time pilots were advised that their futures would be related. Prior to July of 1987, there was no reason to conclude that Alaska and Jet America would be a single carrier. To the contrary, AAG was announcing precisely the contrary. The first public notification of July 23 provided the notice of the impending merger and served, therefore, as the constructive notice to potential new hires.

Career Expectations

The evidence persuades the panel that prior to the acquisition by AAG, there was serious question as to the continued viability of Jet America Airlines. While the Jet America pilots portray the evidence as reflecting merely that

ALPA 055362

FARBER-003941

Alaska's balance sheet was "better than Jet America's," [6] the evidence shows considerably more than that. At the least, it is patently clear that the present course of the Jet America affairs in 1986 was headed the wrong way. Massive policy and financial restructuring was required to keep the airline alive, and there is real doubt that these changes could have been accomplished.

The conscious decision on the part of Jet America management to eschew the traditional hub-and-spoke system had not borne fruit. Assumptions that it could fly in the teeth of its competition and depend on its competitors' customers to interline were mistaken. And, the slot restrictions at both Long Beach and Orange County Airports precluded Jet America from attaining a size that would have allowed it to establish its own hub and to build a substantial base of its own. As was the case with most post de-regulation entrants, Jet America found itself competing with established airlines whose underlying size and financial strength permitted significant, and generally disastrous, fare competition. The slot protection at the Long Beach Airport permitted Jet America, for a time, at least, to offer the only long-haul service to its chosen eastern cities. However, restrictions at Long Beach were lifted by a Federal Court order, and between 1983 and 1986, additional slots were awarded to United, American and Delta, among others, who welcomed the chance to carry passengers to Chicago and Dallas/Fort Worth, their own

---

[6]    Post-hearing Brief, p.10.

ALPA 055363

FARBER-003942

major hubs.  At the same time, these carriers were able to reduce their fares[7] on those legs, and thus attack the Jet America strategy at its heart.  Having begun with a 45% departure share in 1982 at Long Beach, the result of the loosened slot restrictions in 1983 resulted in a drop of the market share to 34% in 1984, and to 25% for the quarter preceding the merger, following the entry of American Airlines[8].  Without seeking to detail all the operational indicators, we note that load factors fell precariously between 1983 and 1986 in the five city pairs[9] that accounted for almost 70% of Jet America's total passengers in 1986.  In only eight of its 20 quarters of life-before-acquisition did the company operate at or above its break even load factors on a system-wide basis.  During the last quarter prior to acquisition, the load factors were some 15 points below break-even.[10]

Moreover, in the period immediately preceding acquisition, Jet America was encountering real and substantial financial problems.  While extensive evidence was presented as to possible restructuring plans, we find that few were probable and that, in the overall, they amounted to little more than wishful thinking.

---

[7]    See Alaska Exhibit IV-2, p.2

[8]    See Alaska Exhibit III-12, p.14.

[9]    Long Beach-Chicago, Long Beach-Dallas, Chicago-Detroit, Orange County-Las Vegas and Dallas-St. Louis.

[10]    See Alaska Exhibit IV-3, pp.1-3.

ALPA 055364

FARBER-003943

For the most part, the evidence demonstrates a rather clear lack of viable and visible financing options for a company that had run desperately short of money in 1986. The shortage stemmed from a combination of initial under-capitalization, which required expensive aircraft leasing and unattractive financing options. Between 1981 and 1986, Jet America was profitable in only one year, 1983, where it earned an 8 million dollar net profit.[11] Jet America's net margin, the net income as a percent of revenues, declined rapidly since 1983 from a positive 3.3% to a negative 13.1% in 1986. And, the airline's capital structure had turned primarily to debt by 1986. Overall losses increased from 3.7 million dollars in 1984 to 8.5 million in 1985, to 8.7 million in the first six months of 1986, as a result of the combined impact of increasing competition, taken together with the increasing debt servicing required of the company.

In comparison with Alaska Airlines which, at the time, and for some sixteen years, was operating on a relatively solid basis, this was more than merely a mismatch in balance sheets as Jet America pilots suggest. Instead, it was a picture of an airline that urgently needed dramatic financial and operational restructuring.

The Jet America pilots vigorously contend that there were a variety of competitive strategies that would have saved the day.

---

[11]   Even this profit, however, was enhanced by a one-time sale of tax benefits of 6.4 million dollars.

ALPA 055365

FARBER-003944

However, the financial realities of the moment lead inevitably to substantial skepticism on that score. Vigorous and optimistic testimony notwithstanding, it is almost impossible to conclude that in 1986, with some five days of operating cash remaining, the airline could have continued much longer. Since 1985, the Company had been utilizing an expensive form of accounts receivable financing with a little known lender[12]. It had borrowed 4.8 million dollars on a 5.0 million dollar credit line, it was unable to take delivery of its 7th and 8th McDonnell-Douglas MD-80s, as it had planned[13] and, significantly, was facing the prospect of over 8 million dollars in 14% convertible debentures coming due in 1987.

One cannot lightly dismiss the impact of the seemingly indefatigable optimism of various experts and planners who, one way or another, keep various airlines flying, against apparently impossible odds. But even in this context, it is difficult to understand how the company could have solved both its financial and strategic problems simultaneously. Given these realities, there is every reason to conclude that Jet America, and its pilots, profited by the new association with Alaska. Jet America pilots' career expectations were considerably brighter after the acquisition than before.

---

[12] Jet America was paying an interest rate of prime plus 3.5%, having pledged virtually all its unsecured assets, including receivables and inventories.

[13] These aircraft were critical elements in any future plans. Merrill-Lynch Capital Markets, retained by Jet America, was unable to project a load factor and yield figure "due to uncertain viability of Jet America Airlines, Inc. in 1987 under a 6-aircraft scenario" (Alaska VI-8 p.11)

ALPA 055366

# Exhibit 76





This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers, please click here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now. »

July 12, 1991

# Pan Am Agrees to Sell Major Routes to Delta. $260 Million Transaction IncludesHub in Frankfurt and N.Y. Shuttle

By Lawrence Malkin

**NEW YORK—** Bankrupt and crippled by its failure to develop a solid domestic route base, Pan American World Airways wrote an end to its saga as America's once-proud flag carrier by agreeing Thursday to sell off its remaining premier international routes.

Delta Air Lines, which started off in the crop-dusting business in the Mississippi River delta, agreed to pay $260 million for Pan Am's routes between New York and Europe; its remaining European hub operations in Frankfurt; the successful Pan Am shuttle linking Washington, Boston, and New York; and its links with London via Miami and Detroit.

The sale must be approved by U.S. and foreign government regulators and both airlines' boards, as well as Pan Am's bankruptcy judge.

Under the terms of the agreement, Delta would take over 45 Pan Am planes and offer jobs to 6,000 of Pan Am's 22,000 employees. The deal includes 21 A-310 Airbus jets, and it marks the first time that the European consortium has succeed in placing any of its planes in the Delta fleet.

Delta will also agreed to honor Pan Am tickets until Feb. 1 on the routes Pan Am is selling to Delta.

Last winter, Pan Am sold most of its London routes to United Air Lines, and the combination of the collapse in air traffic during the Gulf war and the rise in fuel prices after the invasion of Kuwait proved to be its coup de grace.

For two years, the Pan Am chairman, Thomas G. Plaskett, has been trying to sell off the airline piecemeal and find jobs for as many of its employees as possible. To facilitate the sale, he took the airline into Chapter 11 bankruptcy protection on Jan. 8.

With the prospect of the recovery of the U.S. economy and some consequent revival in air traffic, successful airlines - which unlike Pan Am survived the last decade of deregulation - have been shopping for parts of Pan Am that would fit into their empires.

Case 1:02-cv-02917-JEI   Document 569-9   Filed 08/22/13   Page 82 of 107 PageID: 18890

Even as Mr. Plaskett was negotiating with Delta executives in New York, he received an offer from United Air Lines for numerous assets, including Pan Am's still profitable Caribbean and Latin American routes, through which Pan Am pioneered U.S. influence in the air.

United also bid for some of the European routes that were sold to Delta.

Senior executives of all three airlines spent all of Wednesday meeting at Pan Am's Park Avenue headquarters building, and it seemed possible that what United did not win in the first round of bargaining, it might well carry away in the second, since no other airline is known to have bid for the Latin American routes.

Pan Am's Latin American division was the airline's only profitable division last year and in 1989. It posted a profit of $54.2 million in 1990, year, down from $71.1 million the year before.

United's offer also included a promise of jobs for a number of Pan Am employees, but the officers of the Chicago-based airline did not say now many.

In addition to United, Pan Am also has been negotiating for several weeks with Jay A. Pritzker, the wealthy chairman of the Hyatt Corp. hotel organization, who took over Braniff when it went bankrupt.

Pan Am spokesmen would not say what parts of the airline Mr. Pritzker was interested in.

What remains of Pan Am are three regional feeder services operating out of Miami, Berlin, and Kennedy International Airport in New York; its domestic coast-to-coast routes and services between New York and Miami, and its celebrated International Flight Academy in Miami, whose graduates include the crews of the White House jet, Air Force One. All of it is up for sale.

Copyright 2013 The New York Times Company  |  Home  |  Privacy Policy  |  Search  |  Corrections  |  XML  |  Help  |  Contact Us  |  Back to Top

# Exhibit 77

*Page 1 of 250*

*Exhibit Index - Page 5*

91 21 2093

SECURITIES AND EXCHANGE COMMISSION
Washington, D. C. 20549

RECD S.E.C.
SEP 10 1991
10

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):  September 1, 1991

DELTA AIR LINES, INC.
(Exact name of registrant as specified in its charter)

| Delaware | 1-5424 | 58-0218548 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

Hartsfield Atlanta International Airport, Atlanta, Georgia 30320
(Address of principal executive offices)

Registrant's telephone number, including area code:  (404) 765-2600

PROCESSED BY
250 - 7
SEP 11 1991
DISCLOSURE
INCORPORATED

available Sellers shall provide Buyer with updated informa-
tion in respect of the Foreign Benefit Plans.

(vi)   Buyer shall notify Airways of its election to
assume any obligation under any Foreign Benefit Plan. Buyer
and Sellers shall use their best efforts to affect the trans-
actions described in this subsection 5.9(g).

(h)(i)   Buyer will offer employment to at least
seven hundred (700) of Sellers' pilots, who must be fully
trained and currently qualified in the Boeing 727 or Airbus
A-310 categories (i.e., Airbus A-310 Captain, Boeing 727
Captain, Airbus A-310 First Officer, Boeing 727 First
Officer, Boeing 727 Second Officer) as of November 1, 1991
(subject to subsections 5.9(h)(ii) and (v) hereof), or such
other date as may be agreed upon in writing by Buyer and
Sellers, and who must meet all of Buyer's standards and
requirements for pilots, including without limitation medical
requirements, in order to be eligible for consideration by
Buyer hereunder.   Subject to subsections 5.9(h)(iii) and
(vii), Sellers' pilots who meet such requirements will be
offered employment with Buyer in seniority order by category.
Except as provided in subsection 5.9(h)(ii), such offers
shall be for employment effective upon the Closing.   Buyer
shall determine in its sole discretion the number of Sellers'
pilots in each such category to whom Buyer will offer employ-
ment.

(ii)   If there is an Interim Closing with respect to
the Shuttle Assets, Buyer and Sellers shall use their best
efforts to complete all training and to do all else
reasonably necessary to allow the number of Sellers' pilots
set out in this subsection 5.9(h)(ii) to become Transferred
Employees and to operate the Shuttle Service effective as of
the Interim Closing.   Subject only to the contingency
described in the last sentence of this subsection 5.9(h)(ii),
Buyer will offer employment in seniority order by category to
sixty (60) Boeing 727 Captains, sixty-seven (67) Boeing 727
First Officers, and fifty-seven (57) Boeing 727 Second
Officers, who are fully trained and qualified in those
categories as of September 1, 1991, subject to subsection
5.9(h)(v) hereof, or such other date as may be agreed upon in
writing by Buyer and Sellers, and who meet all of the other
standards and requirements described in subsection 5.9(h)(i)
hereof.   Such offers shall be for employment effective as of
the Interim Closing.   The pilots who are offered employment
with Buyer pursuant to this subsection shall be part of, and
not in addition to, the seven hundred (700) pilots to whom
Buyer will offer employment pursuant to subsection 5.9(h)(i)

-58-

72

# Exhibit 78

## TRANS WORLD AIRLINES PILOTS MASTER EXECUTVE COUNCIL

*MEC OFFICERS*
**Robert A. Pastore**
 *Chairman*
**Scott A. Schwartz**
 *Vice Chairman*
**Robert C. Stow, Sr.**
 *Secretary/Treasurer*



Air Line Pilots Association

| | |
|---|---|
| **DATE:** | March 22, 2001 |
| **TO** | MEC |
| | Negotiating Committee |
| **FROM:** | Mike Day |
| **SUBJECT:** | For Your Information |

Pursuant to Mike Day's request, Bill Kientz did some research and came up with the attached information.

SUSAN Smith

JUly 78 interne

Aug 19

Sep 30

SeP 30
OCr 30

P-405

P04631

FARBER-002690

## Delta Purchase of Pan Am Assets During Pan Am's Bankruptcy

- In 1991, while Pan Am was in Chapter 11 reorganization and still operating, ALPA was instrumental in gaining Delta's agreement to buy Pan Am's North Atlantic routes and Shuttle operation and to buy Pan Am's A-310s and some B-727s. Delta also made a conditional commitment to provide funding for a newly reorganized Pan Am.

- As a part of the deal, ALPA obtained Delta's commitment to hire at least 700 current and qualified Pan Am pilots and flight engineers to operate the aircraft.

- At the time, Pan Am did not have sufficient current and qualified pilots to fill Delta's requirements for the A-310, and had to develop a training program that would satisfy Delta's needs. The Pan Am MEC proposed that all training opportunities be provided in seniority order.

- Pan Am notified the MEC that it could not offer training opportunities in strict seniority order because too many of the most senior pilots were not trained on the A-310, and management could not obtain sufficient simulator time to accomplish the lengthy initial training that would be required by Delta's deadline. In addition, the Company believed that seniority-based bidding would result in the loss of too many senior Pan Am captains, impairing its ability to reorganize into a new carrier.

- The MEC developed a revised plan to address Delta's and Pan Am's requirements that would allow pilots to train by seniority, but Delta rejected this plan because it failed to provide a "turn-key operation" as of the target date.

- The MEC and Pan Am eventually agreed that only pilots previously qualified on the A-310 would be allowed to train for A-310 positions at Delta.

- On the B-727, there were enough current and qualified pilots at Pan Am to meet Delta's requirements. However, ALPA was successful in negotiating additional B-727 training opportunities, and Pan Am provided 30 additional training slots in system seniority order.

- The MEC submitted to an arbitrator the question of whether transfer should be by strict seniority, allowing Captains to bid for Delta First Officer positions as well as Captain positions, or by status as well, limiting the bidding for Delta First Officer positions to Pan Am First Officers. After a hearing, the arbitrator recommended and the carrier adopted a strict seniority approach.

- Pan Am's financial situation deteriorated rapidly, and it ceased operating shortly after the transfer of pilots, aircraft, and routes to Delta occurred.

- Two groups of Pan Am pilots who did not transfer to Delta filed lawsuits against ALPA, alleging that they had not been fairly treated. One case was dismissed by the judge and the other case was settled.

Jonathan A. Cohen
Director, Legal Department
Air Line Pilots Association

P04634

FARBER-002693

# Exhibit 79

```
 1                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3          PATRICK BRADY, SALLY YOUNG,
            HOWARD HOLLANDER, THEODORE CASE,
 4          AND MICHAEL FINUCAN, individually
            and on behalf of all others
 5          similarly situated,
                         Plaintiffs,
 6                                               VOLUME 9
                 V.                              TRIAL TRANSCRIPT
 7
            AIR LINE PILOTS ASSOCIATION,
 8
                         Defendant.
 9
                                       CAMDEN, NEW JERSEY
10                                     JUNE  22, 2011

11          B E F O R E:   HONORABLE JOSEPH E. IRENAS
                           UNITED STATES DISTRICT JUDGE
12
                         A P P E A R A N C E S:
13
                TRUJILLO, RODRIGUEZ & RICHARD
14              BY:  NICOLE M. ACCHIONE, ESQ.
                    AND: LISA J. RODRIGUEZ, ESQ.
15                     AND
                GREEN JACOBSON, P.C.
16              BY:  ALLEN PRESS, ESQ.   (MO. BAR)
                AND:  JOE D.  JACOBSON, ESQ.   (MO. BAR)
17              For the Plaintiffs.

18              ARCHER GREINER
                BY:  STEVEN FRAM, ESQ.
19                    AND
                KATZ & RANZMAN
20              BY:  DANIEL M. KATZ, ESQ.
                FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
                ELIZABETH  GINSBURG, ESQ.
22              IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1    committee?

2    A.    Yes.

3    Q.    Is there anything else that you can recall that he said

4    that was important to you at the time?

5    A.    Well, at the time we had in our collective bargaining

6    agreement, section 1 we had what was called scope, which

7    offered us protection and said in case of an acquisition or a

8    merger, whatever, we were going to be covered under certain

9    processes to assure a fair and equitable integration.

10              THE COURT:  But the heart of that was at the end of

11   the day there would be an independent arbitrator deciding the

12   dispute if the parties couldn't resolve it themselves.  That

13   was it in effect.

14              THE WITNESS:  That summarizes it.

15              THE COURT:  The Mohawk Allegheny rights.

16              THE WITNESS:  That is in effect what that really

17   meant.  You could negotiate, but if you couldn't agree you

18   would have a third party, independent arbitrator, to come in

19   and say this is what is fair.  This is what we are going to

20   do.

21              THE WITNESS:  Yes, sir.  That is what I was going

22   to say, you took the words out of my mouth.  But that

23   simplifies it just the way I would have described it.  Thank

24   you.

25              THE COURT:  Now go to the APA contract.

Day-direct/Press                                                    62

1    A.    Well, that is where the problem came in.

2    Q.    Right.

3    A.    We had this provision in our collective bargaining

4    agreement, but apparently the APA, in their collective

5    bargaining agreement, had a provision that said in case of a

6    merger, pilots would go to the bottom of their list.

7              THE COURT:  Is that the so-called staple job?

8              THE WITNESS:  That is the staple job.  That is

9    their green book.  Yes, sir.

10             THE COURT:  Would that be in part because American,

11   being so strong, relatively at the time, was likely to be the

12   acquirer of TWA and a lot of smaller airlines were likely to

13   be the acquired ones?

14             THE WITNESS:  Also because they were an independent

15   union and they could set up their own rules, whereas under

16   ALPA, if he, if it had been ALPA to ALPA.

17             THE COURT:  You had 60 airlines or something?

18   A.    Right.  70,000 pilots.

19   Q.    As ALPA members you all agreed to be bound by the same

20   merger policy, no matter what airline you flew for?

21   A.    Yes.

22   Q.    But the American pilots were represented by their own

23   company union, and didn't have that?

24   A.    So we had an ALPA to non-ALPA merger in this case.

25   Q.    Right.  And Roland was explaining what to you about

1   that?   I said Roland.  Mr. Wilder?

2   A.   Well, Roland, Mr. Wilder, he felt as long as we had a

3   process, we had a good chance at having a fair and equitable

4   integration.

5   Q.   What do you mean, process?

6   A.   Well, either, as the Judge has said, arbitration, or

7   something along that line.  But not stapled.

8   Q.   Were you led to believe that that was something that Mr.

9   Wilder was seeking to achieve, that when he took over as

10  chairman?

11  A.   Absolutely.

12  Q.   Okay.

13          THE COURT:  I am sorry.  When he took over as

14  counsel.

15  Q.   No, took over as merger committee chairman?

16          THE COURT:  Mr. Wilder.

17  Q.   No?

18          THE COURT:  I thought you said Wilder became

19  chairman.  I got you.

20  Q.   What did Mr. Wilder say about this process agreement.

21  Let's do it that way.

22  A.   I felt it was essential.  Otherwise, I think his phrase

23  was we would be dancing naked in the streets.

24  Q.   When you took over as merger committee chairman, Captain

25  Day, did you learn whether or not there had been any

# Exhibit 80

AIR LINE PILOTS ASSOCIATION

BOARD OF ARBITRATION

In the Matter of:

| | |
|---|---|
| CONTINENTAL AIR LINES, INC. | : RE: PILOT SENIORITY INTEGRATION |
| PILOT GROUP | : |
| | : |
| | : |
| AND | : DATE OF AWARD: JULY 25, 1983 |
| | : |
| TEXAS INTERNATIONAL AIRLINES,INC. | : EFFECTIVE DATE OF INTEGRATED LIST: |
| PILOT GROUP | :     JULY 31, 1983 |
| | : |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

BOARD OF ARBITRATION:

Marcia L. Greenbaum, Chairperson

Jack G. Blaz, Member

William P. Hale, Member

| MERGER REPRESENTATIVES | APPEARANCES |
|---|---|
| **For the Continental Pilot Group:** | |
| Captain Carl M. Miller, Chairman | Richard F. Watt Esq. |
| Captain Guy F. Casey | Robert H. Nichols Esq. |
| First Officer Duane H. Barton | Cotton, Watt, Jones, |
| | King & Bowlus |
| | Chicago, Illinois |
| | |
| **For the Texas International Pilot Group:** | |
| Captain James McCartney, Chairman | Daniel M. Katz Esq. |
| Captain J.V. Sclifo | Connerton & Bernstein |
| Captain Reagan Jackson | Washington, D.C. |

FARBER-003048

C. **Why Pilots Are Merged As They Are**

1. For the most part the Board of Arbitration has taken a picture of the two carriers in the latter part of 1981, and in particular on November 25, 1981, when the "normalization" agreement was signed, TXI placed its people on the CAL Board of Directors and effectively gained control of CAL. However, we have also taken other snapshots to reflect changes in the picture occasioned by subsequent developments, such as the sale of aircraft, for example. Where we used LOS as a guide, we used the dates of 7/31/81 and 11/25/81.

2. We reserved some 66 DC-10 Captain positions for CAL Pilots until 1986 because these positions, which carry higher pay on long range heavy wide-body equipment, are more desirable. Reserving them for CAL Pilots as opposed to TXI Pilots reflects the facts that these are job equities brought to the merger by CAL Pilots and that TXI Pilots had no reasonable expectation of such flying in the near future.

3. The Board has grouped pilots by focusing one eye on the DOH/LOS concept and the other on the job equities brought to the merger by each group. In some groups one concept has prevailed, and in some the other has taken the lead. Groups are merged in a series of ratios, and few restrictions are added because the Fence Agreement and the bid system limit crossover and displacement for a period of time.

4. In Group 2 we have merged senior to mid-range DC-9 Captains with B-727 Captains because the parties themselves have negotiated the same pay scale for these positions and equated them.

FARBER-003093

# Exhibit 81

AGREEMENT

between

SOUTHWEST AIRLINES CO.,

AIRTRAN AIRWAYS, INC.,

THE AIRLINE PILOTS IN THE SERVICE OF SOUTHWEST AIRLINES CO.

as represented by

THE SOUTHWEST AIRLINES PILOTS' ASSOCIATION,

and

THE AIRLINE PILOTS IN THE SERVICE OF AIRTRAN AIRWAYS, INC.,

as represented by

THE AIR LINE PILOTS ASSOCIATION

---

## SENIORITY INTEGRATION AGREEMENT

---

THIS SENIORITY INTEGRATION AGREEMENT ("Agreement") is made and entered into in accordance with the provisions of the McCaskill-Bond Act, 49 USCA § 42112, Pub.L. 110-161, Div. K, Title I, § 117, Dec. 26, 2007, 121 Stat. 2383, in accordance with the provisions of the Southwest Airlines and AirTran Airways pilots' respective collective bargaining agreements, and in accordance with the Parties' Seniority Integration Process Agreement dated April 14, 2011, by and between **SOUTHWEST AIRLINES CO., AIRTRAN AIRWAYS, INC.**, the **AIRLINE PILOTS** in the service of **SOUTHWEST AIRLINES CO.**, as represented by the **SOUTHWEST AIRLINES PILOTS' ASSOCIATION**, and the **AIRLINE PILOTS** in the service of **AIRTRAN AIRWAYS, INC.** as represented by the **AIR LINE PILOTS ASSOCIATION**.

---

*WHEREAS*, on September 26, 2010, Southwest Airlines Co. ("Southwest") and AirTran Holdings, Inc., parent company of AirTran Airways, Inc. (together "AirTran") entered into an Agreement and Plan of Merger ("Merger Agreement"); and

*WHEREAS*, under the Merger Agreement, effective on May 2, 2011, Southwest – through a series of simultaneous transactions - acquired all of the stock of AirTran and AirTran became a wholly-owned direct subsidiary of Southwest; and

ALPA 055862

FARBER-004864

3. AirTran Check Airmen will be transitioned to ensure sufficient coverage at Southwest and AirTran during the integration. AirTran Check Airmen transitioned to Southwest out of the projected transition order will be assigned to the Southwest domicile that their seniority would have held.

E. Equipment Lock:

1. Except as provided below, B717 vacancy awards will be limited to AirTran Pilots and new hire pilots until the January, 2015 bid period.

   a. Notwithstanding the transition of aircraft from AirTran to Southwest, in the event of B737 downgrades, displaced Southwest Captains may displace to B717 Captain starting with the January 2015 bid period.

   b. In the event of furloughs, Southwest pilots may displace and bid to the B717 prior to the January 2015 bid period.

   c. Involuntary equipment displacements will not result in an equipment lock.

   d. Displacements resulting solely from changes in domicile staffing with no reduction in equipment seats shall be B717 and B737 aircraft specific.

   e. Hiring will be fleet specific (i.e. A B737 Pilot cannot bid to fill a B717 New Hire slot) until the January 2015 bid period.

2. AirTran Pilots whose seat positions are eliminated by reduction of the B717 fleet will bid system seniority for their new assignment.

3. The only Captain seat an AirTran B717 Captain may displace to is a B717 Captain seat in a different domicile.

4. An equipment lock applies until the later of two (2) years from transfer to the aircraft or through the December 2014 bid period.

5. During a furlough, equipment locks will be removed.

6. To prevent a furlough, Southwest and SWAPA may agree to remove equipment locks to balance staffing between fleets.

F. Upgrade Provisions:

4

ALPA 055880

FARBER-004882

1. AirTran Pilots will be prohibited from holding a Captain or Lance Captain position on the Southwest B737 until the January 2015 bid period.

2. No Lance Captain program will be established for the B717.

G. Domicile Integrity:

1. Unless otherwise mutually agreed by Southwest and SWAPA, the provisions of Side Letter 8 Section 3.E. will apply through December 31, 2012, or until opening a new traditional B737 domicile, except as provided in G.2 below. The Company commits to opening a traditional B737 Southwest domicile by January 1, 2013.

2. The provisions of Side Letter 8 Section 3.E. will apply to any current Southwest B737 domicile should the Company elect to establish a B717 domicile within the same domicile. Additionally, the provisions of Side Letter 8 Section 3.E. will apply until the January 2015 bid period to the MCO domicile should the Company elect to establish a TPA B717 domicile, unless otherwise mutually agreed by both parties.

3. Southwest Airlines commits to establishing an Atlanta domicile with a minimum of fifteen (15) overnighting B717 aircraft by January 1, 2015, unless otherwise mutually agreed by both parties. If necessary, a second B717 domicile will be announced prior to the Transition Bid process at AirTran.

H. Specific CBA Sections will be temporarily amended for the duration of the integration period for the sole purpose of clarifying the language's effect on AirTran Pilots becoming Southwest Pilots. Upon Complete Operational Integration, or as otherwise delineated below or mutually agreed by Southwest and SWAPA, the temporary amendments below will be null and void.

1. Reference to Section 1.C. MERGERS AND FRAGMENTATION:

Until December 31, 2014, or as otherwise mutually agreed by the Company and Association, Southwest /AirTran routes, flown by AirTran pilots operating aircraft listed in Appendix B of Side Letter 8, will be exempt from the restrictions of Section 1.C.1.

2. Reference to Section 1.F. CODESHARING:

Until December 31, 2014, or as otherwise mutually agreed by the Company and Association, Southwest /AirTran marketing and connectivity ventures will be exempt from the restrictions in Section

5

ALPA 055881

# Exhibit 82

Case 1:02-cv-02917-JEI   Document 569-9   Filed 08/22/13   Page 102 of 107 PageID: 18910

# A · COURSE · IN
# ECONOMETRICS

## ARTHUR S. GOLDBERGER



# A Course in Econometrics

## Arthur S. Goldberger

Harvard University Press
Cambridge, Massachusetts
London, England

Copyright © 1991 by the President and Fellows of Harvard College
All rights reserved
Printed in the United States of America
Second printing, 1994

This book is printed on acid-free paper, and its binding materials
have been chosen for strength and durability.

*Library of Congress Cataloging-in-Publication Data*

Goldberger, Arthur Stanley, 1930–
    A course in econometrics / Arthur S. Goldberger.
      p.   cm.
    Includes bibliographical references and index.
    ISBN 0–674–17544–1 (alk. paper)
    1. Econometrics. I. Title.
HB139.G634 1991
330′.01′5195—dc20                    90–42284
                                                CIP

Case 1:02-cv-02917-JEI   Document 569-9   Filed 08/22/13   Page 105 of 107 PageID: 18913

Turning to another text, we find that Judge et al. (1988, chap. 21) devote over twenty-five pages to multicollinearity. They point out that coefficients may appear to be nonsignificantly different from zero, and hence variables may be dropped from the regression, not because the variables have no effect, but rather because the sample is inadequate to estimate the effects precisely. This can happen even though the multiple $R^2$ is high enough to indicate that the full regression has significant explanatory power.

They argue that methods are required to detect the presence, severity, and form or nature of multicollinearity. They review some methods used to decide that the multicollinearity is severe: the simple correlation between a pair of explanatory variables exceeds 0.8 or 0.9, or the simple correlation exceeds the $R^2$ of the main regression. Such cutoff points are, they warn, arbitrary, and "pairwise correlations can give no insight into more complex interrelationships" when more than two explanatory variables are involved (p. 869).

Other methods are discussed: the determinant of $\mathbf{X'X}$, variance inflation factors, auxiliary regressions, Theil's multicollinearity effect, and matrix decompositions. In the decomposition approach, relatively small characteristic roots of $\mathbf{X'X}$ indicate near-linear dependencies among the explanatory variables, and the associated characteristic vectors identify the dependencies themselves. They remark (p. 870) that "analysis of the characteristic roots and vectors of the $\mathbf{X'X}$ matrix can reveal much about the presence and nature of multicollinearity." They view the decomposition approach as the best of the available devices, but caution that it does not provide a complete solution: fixing a cutoff point for relative smallness is just a rule of thumb, and the method may fail to isolate multiple linear dependencies from one another.

Judge et al. go on to discuss several strategies for mitigating the effects of severe multicollinearity, while emphasizing that none of those strategies is completely safe.

## 23.3.   Micronumerosity

Econometrics texts devote many pages to the problem of multicollinearity in multiple regression, but they say little about the closely analogous problem of small sample size in estimating a univariate mean. Perhaps that imbalance is attributable to the lack of an exotic polysyllabic

name for "small sample size." If so, we can remove that impediment by introducing the term *micronumerosity*.

Suppose an econometrician set out to write a chapter about small sample size in sampling from a univariate population. Judging from what is now written about multicollinearity, the chapter might look like this:

### Micronumerosity

The extreme case, "exact micronumerosity," arises when $n = 0$, in which case the sample estimate of $\mu$ is not unique. (Technically, there is a violation of the rank condition $n > 0$: the matrix 0 is singular.) The extreme case is easy enough to recognize. "Near micronumerosity" is more subtle, and yet very serious. It arises when the rank condition $n > 0$ is barely satisfied. Near micronumerosity is very prevalent in empirical economics.

### Consequences of micronumerosity

The consequences of micronumerosity are serious. Precision of estimation is reduced. There are two aspects of this reduction: estimates of $\mu$ may have large errors, and not only that, but $V(\bar{y})$ will be large.

Investigators will sometimes be led to accept the hypothesis $\mu = 0$ because $u^\circ = \bar{y}/\hat{\sigma}_{\bar{y}}$ is small, even though the true situation may be not that $\mu = 0$ but simply that the sample data have not enabled us to pick $\mu$ up.

The estimate of $\mu$ will be very sensitive to sample data, and the addition of a few more observations can sometimes produce drastic shifts in the sample mean.

The true $\mu$ may be sufficiently large for the null hypothesis $\mu = 0$ to be rejected, even though $V(\bar{y}) = \sigma^2/n$ is large because of micronumerosity. But if the true $\mu$ is small (although nonzero) the hypothesis $\mu = 0$ may mistakenly be accepted.

### Testing for micronumerosity

Tests for the presence of micronumerosity require the judicious use of various fingers. Some researchers prefer a single finger, others use their toes, still others let their thumbs rule.

A generally reliable guide may be obtained by counting the number of observations. Most of the time in econometric analysis, when $n$ is close to zero, it is also far from infinity.

Case 1:02-cv-02917-JEI   Document 569-9   Filed 08/22/13   Page 107 of 107 PageID: 18915

Several test procedures develop critical values $n*$, such that micronumerosity is a problem only if $n$ is smaller than $n*$. But those procedures are questionable.

*Remedies for micronumerosity*
If micronumerosity proves serious in the sense that the estimate of $\mu$ has an unsatisfactorily low degree of precision, we are in the statistical position of not being able to make bricks without straw. The remedy lies essentially in the acquisition, if possible, of larger samples from the same population.

But more data are no remedy for micronumerosity if the additional data are simply "more of the same." So obtaining lots of small samples from the same population will not help.

If we return from this fantasy to reality, several lessons may be drawn.
• Multicollinearity is no more (or less) serious than micronumerosity. Exact multicollinearity ($R_j^2 = 1$) is a close analogue of exact micronumerosity ($n = 0$). When a research article complains about multicollinearity, readers ought to see whether the complaints would be convincing if "micronumerosity" were substituted for "multicollinearity."
• For example, if a test for exact multicollinearity is reported, the null hypothesis being $R_j^2 = 1$, readers ought to consider whether they would test the null hypothesis $n = 0$. Or if a test for orthogonality is reported, the null hypothesis being $R_j^2 = 0$, readers ought to consider whether they would test the null hypothesis that $n$ is large. It is quite sensible to measure $n$, but would one want to undertake a statistical test on the true value of $n$?
• For another example, if a rule is proposed to decide whether the collinearity is severe (how large $R_j^2$ has to be before one says that there is a multicollinearity problem), readers ought to consider whether it is plausible to develop a rule that decides how small $n$ has to be before one says that there is a small-sample-size problem.

## 23.4.   When Multicollinearity Is Desirable

Multicollinearity may make the estimates of individual $\beta_j$'s imprecise, while facilitating the precise estimation of particular combinations of the elements of $\boldsymbol{\beta}$. Suppose that we have estimated