After more than two years of discovery on damages and more than a decade of litigation, the record is still bereft of admissible evidence demonstrating that Plaintiffs have suffered any monetary harm at all, let alone the massive damages claimed in their speculative and methodologically deficient expert reports. *See Dunkin' Donuts*, 2006 WL 20521, at *8. On the undisputed factual record, Plaintiffs are entitled, at most, to nominal damages. *See Centrix HR, LLC v. On-Site Staff Mgmt., Inc.*, 349 F. App'x 769, 775 (3d Cir. 2009) (affirming award of nominal damages in the absence of evidence to support a "reasonable estimate" of monetary damages); *Alexander v. Int'l Union of Operating Eng'rs*, 624 F.2d 1235, 1240-41 (5th Cir. 1980) (finding that a union breached its duty of fair representation and awarding nominal damages); *Abrams v. Commc'ns Workers of Am.*, 23 F. Supp. 2d 47, 54 (D.D.C. 1998) (same).

As Plaintiffs have not offered a viable theory of damages supported by any admissible evidence, summary judgment should be granted.

### 1. Plaintiffs Have Not Put Forward Admissible Expert Opinions to Support Their Claim for Damages

Following the conclusion of the liability trial, Plaintiffs stated repeatedly that they would rely on expert testimony to prove their damages. (*See, e.g.,* ¶ 99 96 (interrogatory responses relying on the forthcoming reports of their "damage phase experts" in response to questions about Plaintiffs' damage claims and theories).) But the only expert testimony Plaintiffs have offered to support

61

their damages claims—from Farber and Salamat—is *inadmissible* as a matter of law, for the reasons set forth above.  Because Plaintiffs have proffered no other evidence to support a damages claim, summary judgment is appropriate.  *See, e.g., Furlan* v. *Schindler Elevator Corp.,* No. 12–2232, 2013 WL 1122649, at *4-6 (3d Cir. Mar. 19, 2013) (affirming grant of summary judgment where expert testimony necessary to plaintiffs' claim "d[id] not satisfy the *Daubert* threshold, even under the most liberal standard"); *Anders* v. *Puerto Rican Cars, Inc.*, 409 F. App'x 539, 543 (3d Cir. 2011) (affirming grant of summary judgment where "the lack of admissible expert testimony precluded" plaintiffs from establishing an element of their claim).

### 2. The Undisputed Record Makes Clear that ALPA's Actions Did Not Cause Plaintiffs To Suffer any Monetary Harm

Even if—contrary to fact and law—some aspect of the expert testimony Plaintiffs have proffered were deemed admissible, Plaintiffs still would be unable to meet their burden of proving that they suffered monetary harm as a result of ALPA's alleged breach of duty.  Plaintiffs' damage theory focuses on two types of losses that they claim would not have been incurred had ALPA fulfilled its duty and obtained higher placement for the TWA pilots on the merged seniority list.  First, Plaintiffs contend that a number of TWA pilots would not have been furloughed from American in the wake of September 11 or would been furloughed at a later date.  Thus, they purport to have suffered damages in the form of lost

income during those furlough periods. Second, Plaintiffs assert that they lost income (and will lose income in the future) while actively employed by American because they were deprived access to more lucrative flying opportunities by virtue of their lower placement on the merged seniority list. (Salamat Rpt. 12.) Both damage theories fail because there is no evidence in the record that would allow a reasonable jury to conclude that the APA would have agreed to a more favorable seniority integration for the TWA pilots.

The APA believed that they "own[ed]" the seniority list, as their CBA allowed them to staple all pilots of an acquired airline (such as TWA) to the bottom of the list. (¶¶ 34, 5148.) And the APA understood the respective pre-transaction career expectations of the American and TWA pilots—which the APA considered of paramount importance—to be vastly different due to the disparate financial condition and long-term prospects of the two carriers. (*See* ¶¶ 4849-50, 5352-5556.)

The TWA pilots were flying for an airline on the verge of liquidation that lacked any viable alternative to acquisition by American. TWA had already been through two bankruptcies in the 1990s, both of which necessitated significant concessions from ALPA that resulted in diminished pay rates and work conditions. (¶¶ 13-14.) Throughout this period, the airline remained unprofitable, as it had been for the prior twelve or more consecutive years. (¶¶ 9, 17.) And due to

63

systemic problems relating to TWA's business model, limited liquidity, and a dismal credit rating, there was no reasonable basis to conclude that TWA's financial condition would turn around in the foreseeable future. (¶ 18; *see also* ¶¶ 9-17.)

TWA pursued potential corporate combinations with other airlines—including America West, Northwest, Continental, American, AirTran, and Delta—but none of the discussions turned up a willing partner or acquirer. (¶ 22.) Efforts to find traditional financing in an attempt to prolong TWA's viability also failed. (¶ 23.) And the airline's CEO, William Compton, its board of directors, and the market concluded that TWA lacked the liquidity to finance ongoing operations through a reorganization or even to emerge from bankruptcy as a stand-alone entity. (¶ 24; *see also* ¶¶ 19-20, 26.) By January 2001, TWA had no available sources of credit and could only finance its operations from cash provided by operating activities, external borrowing, or asset sales. (¶ 21.) Thus, the airline's financial condition was dire: "TWA was . . . going to liquidate within days without a deal." (¶ 25.) The offer by American in January 2001 to acquire certain TWA assets out of bankruptcy thus rescued TWA from liquidation. (¶ 27.)

By contrast, at the time of the transaction, American's financial condition was not only much stronger than TWA's, but American had established itself as one of the strongest U.S. carriers. (¶ 5653.) As the APA president

64

testified, APA's view was that "[t]his is not a merger with a complete air carrier, nor is it a transaction between equals. It is a purchase by one of the largest and most financially stable global airlines of most, but not all the assets of a much smaller, largely regional carrier, which was within hours of going out of business." (¶ ~~52~~49.)

These circumstances put the TWA pilots at a distinct disadvantage in terms of bargaining power, and enabled the APA to take a firm position in the negotiations: It would not "agree to a seniority integration that provided windfall[s] for the TWA pilots over the AA pilots." (¶ ~~54~~51; *see also* ¶ ~~55~~52.) And under no circumstances would it agree to a seniority integration in which American pilots would be worse off as a result of the merger. (¶¶ ~~48~~47, 50; *see also* ¶¶ ~~58~~55-~~60~~57.) As a result, the TWA pilots could not have convinced the APA that they were entitled to something more favorable than Supplement CC. (¶ ~~72~~69.)

These uncontroverted facts put the lie to Plaintiffs' claim that, if ALPA had acted differently during the seniority list negotiations, the APA would have agreed to a list that delivered hundreds of millions of dollars more in benefits to the TWA pilots. Regardless that Plaintiffs' entire damage theory rests on this claim, by way of support Plaintiffs offer nothing more than conjecture and speculation, which is contradicted squarely by the undisputed factual record. John

65

Darrah, the president of the APA, testified that "there was not *any* other type of list that we would have gone probably beyond [Supplement CC] because it would have been injurious to the . . . APA pilots." (¶ ~~72~~69.) Top executives at American likewise testified that the company was not willing to do anything additional to secure a more favorable seniority integration for TWA pilots, regardless of what actions ALPA might have taken. (¶ ~~73~~70.) The TWA transaction came fresh on the heels of a contentious dispute with the APA in connection with American's acquisition of Reno Air, including a pilot "sick-out" that cost American over $200 million during the first quarter of 1999. (¶ 38.) In light of that dispute, American management "did not want to take strategic action that would further irritate the labor relations challenges that we already had." (~~¶ 39~~*Id.*) Thus, American was unwilling to act to obtain a better result for the TWA pilots than the one they received in Supplement CC. (¶ ~~40~~61.)

And with respect to the specific strategies that Plaintiffs claim ALPA should have pursued, the undisputed factual record establishes that pursuit of these strategies would not have changed the outcome—at least not in a way that would have benefited the TWA pilots. For example, Darrah testified that the hypothetical actions on which Salamat bases his damages opinion—such as threats of an AFL-CIO boycott, additional ALPA lobbying for the Bond legislation, or litigation to enjoin the merger—would have had no effect on the APA's bargaining position or

66

would have made it more aggressive. (¶¶ 6258-59; *see also* ¶ 6360.) He testified that actions such as waging a "jump seat war" would have *harmed* the TWA pilots' bargaining position—by pushing more and more APA pilots into the camp of those who wanted to staple all TWA pilots to the bottom of the seniority list." (¶ 6158.)

Nor could a list more favorable to the TWA pilots have been achieved through arbitration if the TWA pilots had refused to waive the scope and successorship provisions of their collective bargaining agreement, which otherwise would have entitled them to arbitration of seniority integrations. All witnesses on the APA/American side testified—without exception or contradiction—that had ALPA not waived the scope and successorship provisions of its CBA, arbitration of the seniority integration would never have been an option. If ALPA had not waived, TWA would have pressed on with the pending § 1113 motion to reject the CBA, pursuant to the terms of the Asset Purchase Agreement. (¶¶ 31, 39-4443.) Ultimately, American would have walked away from the transaction rather than to have tried to pressure the APA into agreeing to arbitration. (*See, e.g.,* ¶ 37 (APA president testified: "There was nothing that would have been done by anybody that would have had APA agree to binding arbitration."); ¶ 40 39 (American CEO confirming that American "would not have proceeded with the transaction" absent scope waiver); ¶ 41 40 (American VP of Employee Relations stating: "The American transaction would not have gone forward."); *see also* ¶ 6663.)

67

Even Plaintiffs' own witnesses do not—and cannot—claim to have any facts to support the notion that the TWA pilots could have achieved a more favorable seniority list integration than Supplement CC, nor any evidence to establish what the APA would have done if ALPA had behaved differently. (¶¶ 6766, 7471.)  Michael Day, the TWA MEC Merger Committee Chairman, admitted that, as to each of the actions Plaintiffs assert ALPA should have taken, he was not aware of any facts indicating that the actions would have had any impact on the APA's negotiating position.  (¶¶ 6864-6966.)  Yet these proposed actions are the *entire basis* of Plaintiffs' claim for damages.

As the uncontroverted evidence establishes that none of the actions that Plaintiffs claim ALPA should have taken would have impacted the seniority list in a way that favored the TWA pilots, there is no evidentiary basis for Plaintiffs to seek compensatory damages.  As a result, the Court should grant ALPA's motion for summary judgment.

### B. THE TIME PERIOD DURING WHICH ANY DAMAGES ACCRUED SHOULD BE LIMITED AS A MATTER OF LAW

Plaintiffs seek damages for lost income that allegedly accrued, or will accrue, over a twenty-five year period, based on the purported effects of union representation that terminated in April 2002.  Determination of the termination date for Plaintiffs' claimed damages is a question of law, and thus can be decided on a motion for summary judgment.  *See, e.g., Prusky* v. *Allstate Life Ins. Co.*, No.

68

American-APA Agreement"). This is the agreement under which the APA operated during seniority integration negotiations with the TWA MEC in 2001, and to which Supplement CC was added. On May 1, 2003, more than a year after ALPA's role as the bargaining agent for the former TWA pilots terminated, the APA and American renegotiated the terms of the 1997 American-APA Agreement and entered into a new agreement to which ALPA was not a party.

By that time, American was facing industry-wide turmoil caused by the convergence of September 11th, the Afghanistan and Iraq Wars, and the outbreak of SARS in Asia. (¶¶ 8683-8784.) To avoid bankruptcy, American negotiated for, and won, $1.6 billion in annual concessions from its unions, including the APA, which shouldered approximately $660 million of the annual concessions.

(¶ 8885.) The terms of the concessions negotiated by the APA and the new package of rights that was to govern all American pilots' employment—including pilots of the former TWA—were memorialized in a Restructuring Agreement. (*Id.*) The Restructuring Agreement replaced in full the CBA that governed during the acquisition and the subsequent seniority integration negotiations period in 2001 and 2002. (¶ 89*Id.*) The Restructuring Agreement was a substantial departure from the 1997 American-APA Agreement. For example, the APA agreed to pay cuts amounting to a 23 percent decrease in net pay and a regression to 1992 pay

71

rates; a significant increase in employee contributions to all medical benefit plans; reduced vacation pay and sick leave; and a reduction of the amount of available flight time, which further decreased pilots' net pay. (~~Id.~~ ¶ 86.)

Because ALPA did not have an ongoing relationship with either the APA—which represented the legacy American pilots as well as the former TWA pilots—or with American, and had *no* authority or power to negotiate for the former TWA pilots, ALPA could not have been liable for any harms relating to the former TWA pilots' employment with American at least as of the time of the new CBA. To the contrary, any such liability on the part of ALPA terminated—at the latest—upon replacement of the agreement that was in effect at the time that ALPA was responsible for negotiations with the TWA pilots' employer. Plaintiffs should thus be precluded from seeking the approximately $562.8 million in damages that their primary damage model attributes to the period beginning in May 2003, after the new CBA went into effect, and extending through June 2026.[32]

### 2. Plaintiffs' Claim for Future Damages Should Be Dismissed

Even if ALPA could be held liable for some measure of damages incurred after May 2003, the damages Plaintiffs seek extend well beyond the time frame permitted by law. At the very least, ALPA is entitled to summary judgment

---

[32] As explained in Dr. Murphy's report, if Salamat's methodology was followed, but a cutoff date of May 1, 2003 were used, the total damages calculated by the DMODEL would decrease to $30.3 million (after set-offs). (Ex. 30 ¶ 148.)

as to Plaintiffs' claims for future damages extending through June 2026.  Through their primary damages expert, Plaintiffs seek future employment damages, or "front pay," of more than $131 million (under the Salamat Model).  We are aware of no support under existing law for the award of future employment damages as a remedy against one's former union for a breach of the duty of fair representation.  Moreover, Plaintiffs have failed to adduce *any evidence* to support such an award.

Plaintiffs' front pay claim is based on income allegedly lost due to holding a lower position on the seniority list while employed by American over the next fourteen years.  The lost income estimate, as performed by Salamat, assumes that American "will continue to look as it did in June 2012 until 2026." (Salamat Rpt. 43.)  But even Salamat concedes that assumption is "almost certainly incorrect." (*Id.*)  Even now, barely a year after Salamat attempted to predict the future, circumstances have demonstrated the folly of his assumptions.  (¶ 87 95.)

Underscoring the cloudy picture in Salamat's crystal ball is his willful blindness to the fact that American entered bankruptcy on November 29, 2011. (¶ 90 87.)  As part of American's ongoing bankruptcy, Supplement CC—the list on which Plaintiffs premise damages—was stripped of all legal force on September 5, 2012.  (¶¶ 91 88-93 90.)  Indeed, American specifically sought release from provisions of Supplement CC that erected the St. Louis Fence, which cost American approximately $14 million annually.  (¶ 91 88.)  American and the APA

73

agreed to arbitrate a new agreement designed to protect the former TWA pilots' pre-transaction career expectations. (¶ 9491.)[33]

On July 22, 2013, an arbitration panel rejected the former TWA pilots' request to reorganize the American seniority list. Instead, the panel devised work rules and protective provisions that replaced those imposed by Supplement CC, but left American with significant discretion with respect to implementation. (¶ 9693.) The future impact on the former TWA pilots of the seniority list and the modified rules and provisions remains highly uncertain. Thus, because Plaintiffs cannot satisfy their burden of advancing a "basis upon which to base an award of future earnings," they are not permitted to submit their claims for front pay to the jury. *See Olabode* v. *William Hecht, Inc.*, No. CIV. A. 95-6221, 1997 WL 805187, at *12 (E.D. Pa. Dec. 30, 1997); *see also Hansel* v. *Pub. Serv. Co. of Colo.*, 778 F. Supp. 1126, 1135-36 (D. Colo. 1991) (holding that quantification of front pay damages requires "some basis upon which to base an award of future earnings").

---

[33] That Supplement CC is no longer in effect cannot be disputed, as is clear from *Krakowski* v. *American Airlines, Inc.*, No. 13-00838 (E.D. Mo.), a pending lawsuit by a putative class of former TWA pilots challenging American and the APA's refusal to reintegrate the Seniority List in light of Supplement CC's rejection. In that suit, class counsel, Allen Press, challenges "the legality of the discriminatory seniority list [American] implemented in January 2013 as part of *the new collective bargaining agreement*." (¶ 97 94 (emphasis added.) The TWA Pilots Committee, which represents the interests of plaintiff class members in the arbitration, conceded that "Supplement CC was terminated" when American rejected its collective bargaining agreements, as permitted by the Bankruptcy Court. (¶ 9592.) Plaintiffs cannot have their cake and eat it too.